## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (___) |
| Debtors. | (Joint Administration Requested) |

### DEBTORS' INFORMATIONAL BRIEF

## I.     Preliminary Statement

The Boy Scouts of America ("BSA") is a non-profit corporation founded in 1910 and chartered by an act of Congress signed into law by President Woodrow Wilson on June 15, 1916. The BSA holds a federal charter alongside other organizations distinguished for their service to the national community, including the American Red Cross, the Boys & Girls Clubs of America, and Little League Baseball. The BSA's mission is to prepare young people for life by instilling in them the values of the Scout Oath and Law and encouraging them to be trustworthy, kind, friendly and helpful. The BSA also trains young men and women in responsible citizenship, character development, and self-reliance through participation in a wide range of outdoor activities, educational programs, and, at older ages, career-oriented programs in partnership with community organizations. At the time of the BSA's chartering, Congress recognized the "importance and magnitude" of the BSA's work and observed that the BSA "tends to conserve the moral, intellectual, and physical life of the coming generation."[2]

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] *See* H.R. Rep No. 64-130, at 245 (1916).

Since its inception 110 years ago, more than 130 million young men and women have participated in the BSA's youth programs. More than 35 million adult volunteers have helped carry out the BSA's mission.[3] The BSA's alumni are legion among our nation's business, political, and cultural leaders. Their legacy is the creation and support of Scouting units in virtually every corner of America and at U.S. military bases worldwide. Today, the BSA remains one of the largest youth organizations in the country and one of the largest Scouting organizations in the world, with approximately 2.2 million registered youth participants and approximately 800,000 adult volunteers.[4]

The BSA welcomes all young men and women, regardless of gender, race, ethnic background, sexual orientation, disability, or gender identification, who are willing to accept Scouting's values and meet the other requirements of membership. A Scout subscribes to the following oath: "On my honor I will do my best to do my duty to God and my country and to obey the Scout Law; to help other people at all times; to keep myself physically strong, mentally awake, and morally straight."[5] Scouts are expected to conduct themselves in accordance with the Scout Law: to be "trustworthy, loyal, helpful, friendly, courteous, kind, obedient, cheerful, thrifty, brave, clean, and reverent."[6]

To carry out its mission of developing youth leaders of character and integrity, the BSA grants charters to thousands of local organizations across the country, including faith-based institutions, clubs, civic associations, educational institutions, businesses, and groups of citizens. These chartered organizations, in turn, form units—referred to as "packs" for Cub Scouts,

---

[3] *See* BSA, *About the BSA*, available at https://www.scouting.org/about/.

[4] *Id.*

[5] *See* BSA, *What are the Scout Oath and Law?*, available at https://www.scouting.org/discover/faq/question10/.

[6] *See* BSA, *About the BSA*, available at https://www.scouting.org/about/.

"troops" for Scouts BSA (formerly known as Boy Scouts), "crews" for Venturing, "ships" for Sea Scouts, "labs" for STEM Scouts, and "posts" for Exploring. Scouting units are led by adult volunteers appointed by the chartered organization.

Each of the BSA's more than 81,000 Scouting units in the United States is organized, registered, and supported by a local council assigned to the geographic area in which the unit is located (a "Local Council"). Each Local Council is a separate non-profit corporation incorporated under the applicable state laws in which it operates and is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code. Each Local Council is also legally independent from the BSA, each with its own officers, board of trustees or directors, and management. The BSA has chartered approximately 261 Local Councils across the country, which are led by paid professional adult leaders with assistance from volunteers (together, "Scouters").

As widely reported, the BSA is currently a defendant in numerous lawsuits related to historical acts of sexual abuse in its programs. In addition to the approximately 275 lawsuits pending in state and federal courts across the United States, attorneys for abuse victims have provided information regarding approximately 1,400 additional claims not yet filed, for a total of approximately 1,700 known asserted abuse claims. Approximately 90% of pending and asserted claims relate to abuse that occurred over thirty years ago.

The following chart illustrates the years in which abuse is stated to have occurred in the pending or asserted claims against the BSA:[7]

---

[7] This chart reflects the pending or asserted claims of which the BSA was aware as of November 2019. Where abuse is alleged to have occurred over multiple years, the "claim year" is the first year of alleged abuse.



Today, a robust set of expert-informed policies and procedures comprise the BSA's youth protection program. In the late-1980s, the BSA strengthened its programs with a series of enhanced policies and procedures, including a more comprehensive volunteer screening database, additional supervision requirements and reporting obligations designed to keep would-be abusers away from Scouts, and improved training and other literature addressing ways to prevent, recognize, respond to, and report even the suspicion of sexual abuse. Scouts are now safer than they have ever been, and the BSA is currently regarded as "one of the safest youth-serving organizations in the world."[8]

The BSA recognizes that, in the past, its efforts to protect youth participants have at times failed some of the very children such efforts were meant to protect. Sometimes predators used the BSA organization to gain access to children, and volunteers or employees of the BSA or Local Councils did not effectively act on allegations and transgressions as the BSA would have wanted them to and as the organization's policies mandate today.

---

[8] Janet I. Warren, *Boy Scouts of America Volunteer Screening Database: An Empirical Review 1946-2016* ("Warren Report"), at 91 (2019).

The BSA cares deeply about all victims of child abuse and sincerely apologizes to anyone who was harmed during their time in Scouting. The BSA understands that no apology can repair damage caused by abuse or take away pain that victims have endured. The BSA is steadfast in its commitment to provide equitable compensation to victims of abuse in its Scouting programs and to continually improve all of its policies to prevent abuse. The BSA believes victims of abuse, and it will continue to actively encourage anyone who has suffered abuse while in Scouting to come forward.

Many abuse victims have taken legal action against the BSA and Local Councils in the civil tort system. Recent changes in state statutes of limitations have led to a sharp increase in the number of claims asserted against the BSA and placed tremendous financial pressure on the organization. Since 2002, approximately 17 states have enacted legislation allowing victims of sexual abuse to assert claims that previously would have been barred by applicable statutes of limitation. The trend accelerated in 2019, when more than a dozen states enacted such legislation. The BSA expects that, but for the commencement of these chapter 11 cases and the imposition of the automatic stay, additional abuse lawsuits would continue to be filed in light of this recent legislation. In January 2020, for example, a group of plaintiffs filed suit in the U.S. District Court for the District of Columbia alleging that the District's recent revival-window legislation permits plaintiffs to bring previously time-barred claims, regardless of where the abuse occurred or where the plaintiff resides.[9]

The BSA cannot continue to address abuse litigation in the tort system on a case-by-case basis. The BSA spent more than $150 million on settlements and legal and related professional costs from 2017 through 2019 alone. In addition to the unsustainable financial cost of continuing

---

[9] *See Does 1-8 v. Boy Scouts of America*, No. 20-00017 (RJL) (D.D.C. 2020).

to engage in piecemeal litigation across the country, continuing this process will result in the risk of inconsistent judicial outcomes and inequitable treatment of victims. For these reasons, beginning in late 2018, the BSA, with assistance of legal and financial advisors, began to explore strategic options for achieving an equitable global resolution of abuse claims.[10]

The strategic options that the BSA explored throughout 2019 included efforts to reach a settlement with a substantial number of abuse victims that could be implemented through a prearranged chapter 11 proceeding. Those efforts involved several meetings with attorneys representing many abuse victims, including a two-day mediation in early November 2019. The mediation was attended by a prepetition future claims representative and some of the BSA's insurers. Unfortunately, the mediation was unsuccessful. It became apparent that attorneys for abuse victims believed that certain Local Councils with significant abuse liabilities have significant assets that could be used to compensate victims. Further, it became clear that attorneys for abuse victims would only accept information about the nature and extent of the BSA's available assets if provided through a court-supervised process. Accordingly, the BSA recognized in late 2019 that there were no meaningful prospects for a prearranged global resolution.

Under these circumstances, the Debtors have commenced these chapter 11 cases to achieve dual objectives:[11] (a) timely and equitably compensating victims of abuse in Scouting

---

[10] The BSA's declining Scouting membership and associated revenue in recent years is another factor that prompted the BSA to review its strategic options. As of December 2019, the BSA had approximately 2.1 million registered Scouts, down from approximately 2.6 million Scouts as of 2012. Compounding this decline, as of December 31, 2019, the Church of Jesus Christ of Latter-day Saints concluded its 105-year relationship as a chartered organization with all Scouting programs around the world, including the BSA. The effect of this change is expected to remove approximately 400,000 Scouts from the BSA's Scouting programs. The inability to resolve abuse claims continues to put pressure on the BSA's membership and donations, which is further driving the BSA to seek a global resolution through a chapter 11 proceeding.

[11] The Local Councils, chartered organizations, and the BSA's affiliated organizations and affinity groups (*see* p. 12, *infra*) are not Debtors in these chapter 11 cases.

and (b) ensuring that the BSA emerges from bankruptcy with the ability to continue its vital charitable mission. Prolonged bankruptcy proceedings would imperil both of these objectives. It is therefore imperative that the Debtors' reorganization proceedings not become mired in endless discovery, unyielding litigation, or other hallmarks of inefficiency. As a non-profit corporation that relies largely on registration fees and donations, considerations of economy and speed are of the utmost importance to the BSA.

Unlike a for-profit corporation, the BSA cannot rely on revenues from the ordinary sales of products or services to sustain its operations during bankruptcy. Instead, there is a close correlation between the financial condition of the BSA and the public's confidence in the organization's ability to carry out its mission to serve youth, families, and local communities through its Scouting programs. A prolonged bankruptcy case would erode public confidence in the BSA, jeopardize its ability to operate, and potentially deprive America's youth of the ability to participate in Scouting. A prolonged chapter 11 case would also deplete the assets available to compensate abuse victims.

The Debtors have taken several immediate steps to promote the expeditious and efficient execution of their reorganization proceedings:

- **Data Room**. To avoid the delays and expense of protracted discovery, the BSA has established and is populating an electronic data room, which it will use to proactively make financial and non-financial information available to a committee representing abuse victims. This data room includes, among other things, balance sheets and asset-level information for the BSA and numerous Local Councils, including details regarding donor restrictions on such assets, as well as information on the BSA's liabilities and organizational structure.[12]

---

[12] The data rooms will be made available to any official committee and other court-appointed representative pursuant to the terms of a protective order. The BSA has prepared a proposed protective order, which it intends to discuss with the Local Council Committee, advisors for any official committee, and other court-appointed representatives. A copy of the proposed protective order is attached as **Exhibit 3**.

- **Ad Hoc Committee of Local Councils**. Prior to the commencement of these cases, the BSA assisted in the formation of an ad hoc committee of Local Councils comprised of eight Local Councils of various sizes from every region of the country (the "Local Council Committee"). The primary purpose of the Local Council Committee is to allow Local Councils to participate in negotiations regarding a global resolution of abuse claims and other issues important to them, including the treatment of their shared insurance with the BSA. The Local Council Committee has also been instrumental in coordinating the BSA's prepetition (and continuing) efforts to collect and organize Local Council asset information. The individual members of the Local Council Committee are all volunteers. The volunteer chair is Richard G. Mason of the Wachtell, Lipton, Rosen & Katz law firm. Mr. Mason is the volunteer president of one of the Local Councils. A list of the Local Council members of the Local Council Committee, as well as each member's representative on the Committee, is attached as **Exhibit 1**.

- **Future Claims Representative**. In early 2019, when the BSA made the decision to pursue a prearranged global resolution of abuse claims through a potential chapter 11 proceeding, the BSA determined that it was necessary and appropriate to engage an independent third-party representative for future abuse claimants. After considering possible candidates for the role, the BSA selected James L. Patton, Jr. to serve as prepetition future claims representative. As noted above, Mr. Patton and his advisors attended the November 2019 mediation.

- **Scheduling Motion for Disputes Regarding Certain Identified Property**. The Debtors will file a motion seeking to establish a schedule for this Court to hear and adjudicate any disputes regarding whether certain identified property is subject to enforceable restrictions under applicable law and/or is otherwise unavailable to satisfy creditor claims. In particular, this motion requests that the Court approve deadlines for (a) filing initial information requests that are non-duplicative of information available in the data room referenced above; (b) commencing an adversary proceeding seeking a declaratory judgment as to whether the identified property is available to satisfy creditor claims; (c) filing an answer to the adversary complaint; (d) holding a meet-and-confer; and (e) a status conference. The relief requested in this motion strikes an appropriate balance between affording parties in interest a sufficient opportunity to review, examine, and potentially challenge the BSA's characterizations of its assets, and the need to avoid sprawling, disorganized litigation in these cases.

- **Bar Date Motion**. The Debtors will file a motion to establish comprehensive procedures for providing notice of the applicable bar dates to the Debtors' creditors and for creditors, including abuse victims, to file proofs of claim. This relief includes Court approval of (a) bar dates by which creditors shall be required to file proofs of claim, including a separate bar date for proofs of claim on account of abuse claims; (b) the forms of the Debtors' proposed proofs of claim, including a customized proof of claim for abuse victims; and (c) the forms of the Debtors' proposed bar date notices, including a separate bar date notice for abuse

victims. The Debtors also intend to formulate a supplemental noticing program tailored to reach as many presently unknown abuse claimants as practicable in coordination with any official committee of abuse victims that may be appointed in these cases.

- **Mediation**. The Debtors will file a motion seeking the immediate appointment of a sitting bankruptcy judge as a mediator and the referral to mandatory mediation of all issues related to a global settlement of abuse claims through a consensual plan of reorganization. The BSA believes that it is critical for a mediator to be appointed at the outset of these cases given the need to avoid a prolonged chapter 11 process for these non-profit organizations and the complexity of the issues at hand, including the nature of the abuse claims, the enforceability of restrictions on the BSA's and Local Councils' assets, and the BSA's historical insurance coverage.

- **Plan of Reorganization.** The Debtors will file a plan of reorganization that provides a framework for, among other things, the global resolution of abuse claims asserted against the BSA and a comprehensive restructuring of the organization.

- **Consolidation and Stay of Pending Abuse Lawsuits**. Concurrently with the commencement of these cases, the BSA is taking measures to consolidate and stay all pending abuse litigation. In particular, the BSA is in the process of removing to federal district court all abuse claims pending in state courts throughout the country against the BSA and/or Local Councils, and chartered organizations. The BSA will also be filing a motion with the U.S. District Court for the District of Delaware to transfer all of the removed abuse actions to that court under 28 U.S.C. § 157(b)(5). Finally, the Debtors have commenced an adversary proceeding in these chapter 11 cases seeking a preliminary injunction against the continued prosecution of abuse claims against the BSA, Local Councils, and chartered organizations and affiliated organizations that have been named in such lawsuits. As set forth in detail below, the BSA believes that the consolidation and transfer of all such abuse claims will promote the efficient and effective administration of the Debtors' bankruptcy estates and assist all parties in their negotiations.

As these actions make clear, the Debtors are committed to supporting victims by designing and executing a value-maximizing global resolution of abuse claims in these chapter 11 cases. The Debtors recognize that these cases will present unique challenges and require the Court and parties to address complicated legal and financial issues. But the Debtors also believe that a court-supervised process that ensures equal treatment of similarly situated claimants will foster productive settlement discussions among the relevant stakeholders. The BSA hopes these

negotiations will result in a global agreement on a consensual plan of reorganization that provides for the equitable treatment of all abuse claimants and ensures that the BSA can continue to provide its important programs to the young men and women of this country.

The BSA is woven into the fabric of American life. In 1946, then-General Eisenhower, who later served as a member of the BSA's National Executive Board, stated that "[t]he Boy Scout movement merits the unstinted support of every American who wants to make his country and his world a better place in which to live."[13] For more than a century, the BSA has benefitted from the support of millions of American families and from generous donors who believe in the BSA's program of character development and values-based leadership training. The BSA does not take this support for granted; it has ensured that thousands of young people from underserved communities benefit from the lessons and opportunities found in Scouting. The Debtors are continuing to work tirelessly to provide the means to equitably compensate abuse victims while ensuring that the BSA retains the capability to serve America's youth into the future. The BSA is confident that the commencement of these cases begins a new and promising chapter in the storied history of Scouting in the United States.

## II.    Background

### A.    Overview of the BSA

The BSA was incorporated in the District of Columbia on February 8, 1910, and subsequently chartered by Congress as a non-profit corporation under Title 36 of the U.S. Code on June 15, 1916.[14] The Congressional Report in support of the BSA's incorporation provides that the Scouting program:

---

[13] *See* Boys' Life, Feb. 1946 Issue, p. 3.

[14] *See* 36 U.S.C. §§ 30901-08.

> is intended to supplement and enlarge established modern educational facilities in activities in the great and healthful out of doors where may be the better developed physical strength and endurance, self-reliance, and the powers of initiative and resourcefulness, all for the purpose of establishing through the boys of today the very highest type of American citizenship.[15]

Consistent with this intention, the BSA's congressional charter states that the purpose of the organization is to "promote, through organization, and cooperation with other agencies, the ability of boys to do things for themselves and others, to train them in Scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred virtues, using the methods which are now in common use by Boy Scouts."[16] These mandates have been the guiding principle for the BSA's work for over a century.

As a non-profit corporation, the BSA is required to adopt and carry out a charitable, religious, educational, or other philanthropic mission. Since its inception, it has been the BSA's mission "to prepare young people to make ethical and moral choices over their lifetimes by instilling in them the values of the Scout Oath and Law."[17] The successful delivery of this mission to youth in America is the BSA's fiduciary obligation.[18] Thus, to be eligible for Scouting, individuals must subscribe to, and conduct themselves in accordance with, the Scout Oath and the Scout Law:

---

[15] H.R. Rep No. 64-130, at 245 (1916).

[16] BSA Charter, § 3; *see also* BSA Bylaws, § 2 ("In achieving this purpose, emphasis shall be placed upon its educational program and the oaths, promises, and codes of the Scouting program for character development, citizenship training, leadership, and mental and physical fitness.").

[17] *See* BSA, *Mission & Vision*, available at https://www.scouting.org/legal/mission/.

[18] Unlike a profit-seeking corporation, the BSA and its senior leadership have a fiduciary obligation to the Scouting mission, not to the generation of profits. This means that all of the BSA's decisions and actions must be in furtherance of its mission. To that end, all Scouting policies, practices, and programming are specifically designed to train Scouts in responsible citizenship, character development, and self-reliance, in a manner consistent with the BSA's mission.

- **Scout Oath.** "On my honor I will do my best to do my duty to God and my country and to obey the Scout Law; to help other people at all times; to keep myself physically strong, mentally awake, and morally straight."[19]

- **Scout Law.** "A Scout is trustworthy, loyal, helpful, friendly, courteous, kind, obedient, cheerful, thrifty, brave, clean, and reverent."[20]

At all levels of Scouting, these fundamental tenets of the BSA's mission are taught to Scouts so they can successfully develop into our nation's next generation of great leaders.

In support of its mission, the BSA has long facilitated the spread of Scouting in the United States through units chartered by local partners and has also designed and implemented an array of its own outdoor activities, educational and skill-building programs, and career training. As noted above, since its inception, more than 130 million Scouts have participated in the BSA's programming, and more than 35 million adult leaders have helped carry out the BSA's mission. The BSA has grown to be one of the largest youth organizations in the country, as well as one of the largest Scouting organizations in the world. In 2019, nearly three million Scouts and adult leaders were involved in Scouting and helped deliver more than 13 million Scouting service hours to communities across the country.

Throughout its 110-year history, the BSA has continually looked for ways to offer Scouting to more young men and women. In 1912, the BSA formed the Camp Fire Girls as a sister organization. In the 1930s, the BSA introduced Cub Scouts as a program for younger participants. Other past and current BSA programs include Air Scouts, Sea Scouts, Exploring, Venturing, and STEM Scouts. In 2018, the BSA welcomed girls into Cub Scouts, and in 2019, the BSA began chartering girl units to join Scouts BSA, the program previously known as Boy

---

[19] *See* BSA, *What are the Scout Oath and Scout Law?*, available at https://www.scouting.org/discover/faq/question10/.

[20] *See* BSA, *About the BSA*, available at https://www.scouting.org/about/.

Scouts. Since 2017, over 200,000 girls have participated in Scouting, including approximately 130,000 in Cub Scouts, 30,000 in Scouts BSA, and 65,000 in Venturing, Sea Scouts, and Exploring. The BSA has also organized affiliated organizations and affinity groups—such as Learning for Life, Order of the Arrow, and National Eagle Scout Association—to provide additional educational, civic and developmental programs for Scouts, as well as engagement opportunities for Scouting alumni and supporters.

The BSA also provides other services critical to continued Scouting opportunities for America's young men and women, including core program content, such as events and other activities at high adventure facilities; the procurement and sale of uniforms and equipment; information technology and digital resources; training of professional Scouters to serve in Local Councils; communications and publications including magazines and online content for Scouts and adult leaders; training development and delivery; national events; registration systems; and other quality control services. In addition, every four years, the BSA hosts a National Jamboree, where tens of thousands of Scouts from around the country gather to celebrate Scouting, learn about teamwork and leadership, and develop lifelong friendships.

The national headquarters of the BSA is in Irving, Texas. The BSA has approximately 1,650 employees, all of whom are located in the United States and its territories. The BSA's employees are located at its headquarters; at the BSA's national warehouse and distribution center in Charlotte, North Carolina; at approximately 175 official BSA Scout Shops located throughout the country; and at the BSA's four high adventure facilities located in Florida and the U.S. Virgin Islands, New Mexico, West Virginia, and Minnesota and parts of Canada. The BSA's sources of funding include membership fees, high adventure facility fees, donor contributions, legacies and bequests, corporate sponsorships, grants from foundations, and

supply sales at Scout shops, on its website, and directly to Local Councils. In 2019, the BSA's total gross revenues were approximately $394 million. Of this total, approximately 30% were attributable to supply sales, approximately 16% to membership fees, approximately 15% to high adventure facility operations, approximately 13% to investments, approximately 8% to contributions, and approximately 8% to event fees.

### B.    The Scouting Experience

As discussed above, delivery of the Scouting mission is the fiduciary obligation of the BSA. Local Councils and chartered organizations, and the Scouting units that they sponsor, operationalize this mission. Through these organizations, Scouts learn the values embodied in the Scout Oath and Scout Law. From the beginner-level Cub Scouts to the most advanced offerings at high adventure facilities, all Scouting programming is intended to instill in the next generation of leaders the fundamental tenets of the BSA's mission.

**<u>Cub Scouts</u>**. The gateway to the Scouting program is Cub Scouts, where younger participants (K-5) first build character, learn citizenship, and develop personal skills and physical fitness. The den—a small group of six to eight children who are the same grade and gender—is the cornerstone of Cub Scouting. In the den, Cub Scouts make friends, develop new skills and interests, and learn respectfulness, sportsmanship, and citizenship. Several dens in the same community form a pack. At pack meetings, Cub Scouts engage in a wide range of fun and interactive activities, including games, arts and crafts, skits, and songs. Packs also hold special events and activities, such as advancement banquets, field trips, community service projects, and, most famously, the Pinewood Derby. Cub Scouts attend camp outings and participate in other local outdoor activities, such as hiking, biking, swimming, sledding, and a variety of team sports, all of which help instill in them a life-long respect for the environment, a core principle of the Scouting mission. Many of these outdoor adventures are held at Local Council-owned properties

specifically developed and maintained for the purpose of delivering the Scouting program. Cub Scout programming is family-oriented and adult volunteers, many of whom are parents of participating Cub Scouts, play an active role in den and pack leadership.

**Scouts BSA**. After Cub Scouts, youth participants progress to Scouts BSA. The Scouts BSA program focuses on service to others, community engagement, leadership development, respect for the environment, and personal and professional growth. In Scouts BSA, adult volunteers take a back seat, and Scouts themselves assume important leadership roles at their own meetings and activities. Scouts BSA units, known as "troops," are single-gender and composed of several smaller groups called "patrols." At patrol and troop meetings, Scouts engage in knowledge- and skill-based challenges, team building exercises, and community service projects, such as cleaning parks and other public spaces, enhancing nature preserves, building trails in wildlands, constructing playgrounds, creating libraries, collecting meals for food banks, visiting with the sick or elderly, or responding to national emergencies.

In Scouts BSA, every Scout is able to take on a leadership role in his or her patrol, which provides one of the unique experiences in Scouting that inspires young people from all backgrounds, experiences, and capabilities to see themselves as a leader and hone skills that will last a lifetime. In addition, Scouts are encouraged to participate in a wider suite of outdoor activities, including weekend camping trips, summer camps, and themed-camporees where they are exposed to more advanced Scouting programming and skill-building in diverse areas, such as first aid, rock climbing, forestry, conservation, and environmental awareness. At these events, Scouts from different troops work together and form life-long bonds. Local Council camps and other facilities are the hub for many of these outdoor adventures.

Central tenets of Scouts BSA programming are rank advancement and merit badges. Young men and women begin their journey in Scouts BSA at the rank of Scout. As they master skills and learn important life lessons, they progress to the ranks of Tenderfoot, Second Class, First Class, Star, and then Life. Along the way, Scouts earn merit badges that recognize hard work and achievement in sports, arts, sciences, trades, personal finance, and future careers. Just last year, young men and women earned more than 1.7 million merit badges that represent skills that will help them succeed throughout their lives.

Scouts who successfully complete this rigorous program, serve as a leader in their troop for a designated period of time, and design and lead a significant service project, are awarded Scouts BSA's highest rank of Eagle. Less than 8% of Scouts achieve the Eagle Scout rank, and past Scouts achieving this honor permeate our nation's government, economy, and culture, including President Gerald Ford, astronaut Neil Armstrong, civil rights leader Percy Sutton, and entrepreneurs Sam Walton and Ross Perot, to name a few.

**Advanced Scouting**. In addition to Scouting's core Cub Scouts and Scouts BSA offerings, older Scouts participate in other advanced programs. In Venturing, co-ed groups form their own Scout-led "crews" that design and carry out specialized programming and activities. The opportunities available through Venturing are endless: a Scout interested in the outdoors can join a Venturing crew that backpacks in state or national parks and kayaks in local or remote rivers; a Scout interested in the sciences can join one that builds robots or volunteers at planetariums and museums; and a Scout interested in community service can join one that volunteers at soup kitchens or rebuilds homes in the wake of natural disasters. Venturing crews instill in their members the importance of adventure, leadership, personal growth, and service, all of which are fundamental to the Scouting mission.

Other advanced programs for older Scouts include Sea Scouts, where Scouts learn boating skills and water safety, and also study maritime heritage. Sea Scouts participate in boating and other water-based excursions, such as scuba diving off the Florida Keys and kayaking in the Everglades. Another program, Exploring, is the BSA's preeminent workforce development program. Through Exploring, Scouts join career-specific clubs sponsored by local businesses, government agencies, and community organizations. Scouts develop important personal and professional skills through immersive, on-the-job training. And STEM Scouts offers the Scouting experience with less emphasis on the outdoors. Participating young men and women learn about and nurture a lifelong interest in science, technology, engineering, and math through creative, hands-on activities, educational field trips, and interaction with STEM professionals.

**High Adventure Facilities**.[21] The apex of the Scouting program is found at the four iconic high adventure facilities operated by the BSA. At these facilities, Scouts experience the truest embodiment of what Congress envisioned when it chartered the organization more than a century ago—unparalleled facilities hosting outdoor activities, educational programs, and leadership training.

- **Northern Tier**.[22] The BSA opened Northern Tier—located on the boundary waters between Minnesota and Canada—as its first high adventure facility in 1923. For nearly a century, the BSA has maintained several wilderness bases at Northern Tier from which generations of Scouts have explored millions of acres of lakes, rivers, forests, and wetlands in northern Minnesota, northwestern Ontario, and southeastern Manitoba. Scouts at Northern Tier embark on canoe treks covering up to 150 miles and lasting as long as two weeks. Along the way, Scouts camp at remote, unstaffed campgrounds, where they must learn and implement Scouting's philosophy of self-sufficiency. In the winter, Northern Tier

---

[21] *See* Scouting Newsroom, *About the BSA*, *High Adventure*, available at https://www.scoutingnewsroom.org/about-the-bsa/fact-sheets/outdoor-adventures/.

[22] *See generally* Northern Tier, *About Northern Tier*, available at https://www.ntier.org/about/.

transforms into a cold-weather camping outpost, where Scouts can engage in winter activities such as cross-country skiing, dog sledding, snow shoeing, and ice fishing. Over the years, the BSA has hosted almost 250,000 Scouts and Scouters at Northern Tier.

- **Philmont Scout Ranch.**[23] The BSA's largest high adventure facility, Philmont, was opened in 1938 on nearly 150,000 acres of rugged mountain wilderness in the Sangre de Cristo range of the Rocky Mountains in northeastern New Mexico. At Philmont, Scouts have access to a labyrinth of backpacking trails, as well as 35 staffed camps and 55 trail camps, spread across mountainous terrain ranging in elevation from 6,500 to 12,500 feet. In addition, the BSA's programing at Philmont features the best of the Old West—horseback riding, burro packing, gold panning, chuckwagon dinners, and interpretive history—along with physical challenges such as rock climbing, mountain biking, and sport shooting. These experiences teach Scouts about our nation's frontier history and instill in them a lifelong sense of adventure and confidence in challenging situations. In addition, Philmont hosts a series of leadership training programs for adult leaders. Well over a million Scouts and Scouters have experienced the unique and diverse offerings of Philmont.

- **Florida Sea Base.**[24] Sea Base was commissioned by the BSA as its third high adventure facility in 1980. At several facilities in south Florida and the U.S. Virgin Islands, Scouts swim, snorkel, scuba dive, and fish. Scouts also participate in boating and sailing adventures throughout the Caribbean, as well as primitive camping on several island-based settlements. Through Sea Base's programming, Scouts learn to trust one another and work as a team, and also learn the importance of conservation and the preservation of our environment. Since opening its doors, the BSA has provided aquatic adventures to nearly 300,000 Scouts and Scouters at Sea Base.

- **Summit Bechtel Reserve.**[25] Most recently, in 2013, the BSA opened the Summit in the wilds of West Virginia. It is the preeminent summer camp, high adventure facility, and leadership training center for the millions of Scouts and adults leaders involved in Scouting now and for generations to come. At the Summit, Scouts explore the New River Gorge region through white-water rafting, kayaking, canyoneering, and advanced orienteering. Scouts also participate in more modern adventures, such as skateboarding, ATV riding, freestyle BMXing, and zip-lining. This programming pushes Scouts past their comfort zones, where they can better develop and master the leadership, character, citizenship, and

---

[23] *See generally* Philmont Scout Ranch, *About Philmont*, available at https://www.philmontscoutranch.org/about/.

[24] *See generally* Sea Base, *About Sea Base*, available at https://www.bsaseabase.org/about/.

[25] *See generally* Summit Bechtel Reserve, *About Us*, available at https://www.summitbsa.org/about-us/summit-story/. Arrow WV, Inc., a West Virginia non-profit entity, owns the Summit. The BSA leases the Summit from Arrow WV and provides the services required for its operation.

fitness that are core the BSA's mission. In addition to its regular programming, the BSA hosts a National Jamboree at the Summit every four years. And, in 2019, it hosted the largest World Jamboree ever, with over 45,000 Scouts in attendance from 167 countries. It was the first such event held in the United States in over 50 years. All told, approximately 200,000 Scouts and Scouters have experienced the wonders of the Summit since it opened less than a decade ago.[26]

As Scouts progress through Scouting, these high adventure facilities provide them with opportunities to implement the knowledge and training that they gained through Cub Scouts and Scouts BSA at locations and in programs that are not available anywhere else in the country. Not surprisingly, there is strong demand for these high adventure facilities—more than 70,000 Scouts and Scouters participate in the programs and events held there every year, and more than two million have done so since their openings.[27] As their storied histories portend, these facilities and the programming they allow play a critical role in the BSA's delivery of the Scouting program to young Americans.

### C.    Delivery of Scouting Programs

As described above, the BSA, Local Councils, and chartered organizations work closely together to carry out the mission of Scouting. Each of these entities plays a vital role in training Scouts in responsible citizenship, character development, and self-reliance. Despite their common purpose, the BSA, Local Councils, and chartered organizations are legally independent entities. Each Local Council is a non-profit corporation under the laws of its respective state and exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code. Each Local Council also maintains its own senior management and independent volunteer board of directors. The BSA does not hold any equity interest in any Local Council, chartered

---

[26] The Summit also offers unique programs to introduce non-Scouts to Scouting through partnerships with other local youth-serving and educational organizations.

[27] *See* Scouting Newsroom, *About the BSA*, *High Adventure*, available at https://www.scoutingnewsroom.org/about-the-bsa/fact-sheets/outdoor-adventures/. Several of the high adventure facilities have lotteries because demand exceeds the capacity of these facilities.

organization, or Scouting unit, and only the BSA and its wholly owned subsidiary, Delaware BSA, LLC, are debtors in these chapter 11 cases.[28]

### 1.    Local Councils

In furtherance of its mission, the BSA charters independently incorporated Local Councils to facilitate the delivery of the Scouting program.[29] There are currently 261 Local Councils, covering geographic areas of varying size, population, and demographics. Although they are legally independent of the BSA, Local Councils are required to organize, operate, and promote Scouting in a manner consistent with the BSA's mission and with the BSA's charter, bylaws, rules and regulations, policies, and guidelines.[30] Local Councils generally do not receive financial support from the BSA; instead, they rely upon their own fundraising through donations, product sales, special events, and corporate gifts.[31] The BSA does, however, provide certain corporate and administrative support to the Local Councils in exchange for shared-services and other fees and reimbursements, as well as for the assistance of Local Councils in delivering the Scouting mission. This support includes human resources, access to training facilities, marketing services, and general liability insurance coverage.

Although not a precise analogue, the relationship between the BSA and the Local Councils is similar to that of a franchisor and franchisee. The BSA is responsible for developing

---

[28] In addition to Local Councils and chartered organizations, the BSA is also affiliated with several non-stock entities, each of which is related to, but legally independent of, the BSA. Several of these affiliated, non-stock entities are directly involved in delivering the Scouting program, while others, such as the National Boy Scouts of America Foundation, serve the BSA's mission in other ways. The BSA also holds an interest in several subsidiaries, including Boy Scouts of America Asset Management, which manages the BSA's and certain Local Councils' investments through a limited partnership.

[29] Local Councils are not agents of the BSA and they have no authority to bind the organization. *See* BSA Rules & Regulations, Art. III.

[30] *See id*. Those requirements are consistent with Local Councils' status as 501(c)(3) supporting organizations to the BSA.

[31] *See* Scouting Newsroom, *About the BSA*, *How Scouting is Funded*, available at https://www.scoutingnewsroom.org/about-the-bsa/fact-sheets/how-scouting-is-funded/.

and disseminating the structure and content of the Scouting program, owns and licenses intellectual property, and provides training and support services, including corporate services such as human resources, marketing and legal functions, and information technology. The BSA, in addition to holding the power to grant charters to Local Councils, may also revoke a Local Council's charter for failing to meet national standards. Local Councils, for their part, play a key role in delivering the Scouting program. Local Councils also serve the vital function of collecting member fees and remitting such funds to the BSA. Each of these Local Councils is crucial to the BSA's ability to carry out its mission.

The most important functions served by Local Councils are their recruiting of chartered organizations and their oversight of the operation of the Scouting units that those chartered organizations create. Local Councils also provide other services essential to Scouting, including: funding of local Scouting programs and initiatives; recruiting of Scouts and volunteer leaders; providing Scout and volunteer training; offering opportunities for rank advancement; locally enforcing the BSA's policies, rules, and regulations; and registering members and leaders. In addition, many Local Councils own and operate service centers, camps, and other facilities that provide the local resources necessary for a successful Scouting program.

A corps of qualified and trained professional and volunteer Scouters is essential for Local Councils to provide these services. To that end, Local Councils hire a professional Scout executive and other key staff from a pool of professionals—pre-commissioned by the BSA— who have demonstrated the moral, educational, and emotional qualities necessary for leadership.[32] These commissioned professionals and other staff members support Local Councils in connection with day-to-day operations, recruitment of new chartered organizations,

---

[32] *See* BSA Rules & Regulations, Art. VIII.

management of fundraising, maintenance of program facilities, and numerous other services. Thousands of volunteers also donate their time and resources to support Local Councils, including through assistance with programming, such as unit leadership, unit activities, merit badge colleges, youth and adult leader training and advancement opportunities, and fundraising events.

### 2.  Chartered Organizations

There are currently more than 41,000 chartered organizations in the country. They are typically local organizations—such as faith-based institutions, clubs, civic associations, educational institutional, businesses, and groups of citizens—that sponsor the more than 81,000 local Scouting units throughout the country. Some chartered organizations are actively involved with the units they sponsor and use Scouting as a means to further their own mission or serve their broader communities. In addition, chartered organizations assist with recruiting and vetting adult leaders and other volunteers, and provide meeting space and other monetary and in-kind support to the packs and troops they sponsor.

### III.  Child Sexual Abuse, Scout Protection Efforts, and Abuse Claims Against the BSA

The safety of children in its programs is the most important priority of the BSA. The BSA today enforces a robust set of multilayered policies and procedures to protect the young men and women involved in Scouting. These measures are informed by respected experts in the fields of child safety, law enforcement, and child psychology. The BSA is committed to the protection of its Scouts, and that commitment is integral to the BSA's identity and mission as it seeks to continue instilling values of leadership, service, and patriotism in millions of children who participate in Scouting programs across the country.

Despite its current record, in the past, predominately at a time when there was little expertise across any organization about the topic of abuse prevention, predators were able to use

Scouting and other youth programs to access children. Given these past events and recent changes in the legal landscape governing sexual abuse claims, the BSA and Local Councils are defendants in hundreds of lawsuits related to acts of sexual abuse in its Scouting programs.[33] The vast majority of these claims date back to more than 30 years ago, before the BSA implemented a series of strengthened policies and practices designed to keep Scouts safe. These enhanced youth-protection measures have proven effective—Scouts are now safer than they have ever been.

The BSA recognizes that current youth protection efforts cannot change the past. Nor can they repair the damage caused by abuse suffered by Scouts because of those who used the program to harm children. The BSA is committed to providing equitable compensation to victims and to continually improving its policies and practices to prevent future abuse in Scouting. However, the cost of addressing historical abuse claims has become unsustainable. The BSA cannot continue to address these claims through piecemeal litigation and remain viable as a non-profit corporation. Accordingly, the BSA has determined this filing is necessary to both compensate victims and ensure that the BSA retains the capability to carry out its mission.

### A.    Historical and Current Environment Concerning Sexual Abuse and Youth Protection

American society has only recently begun to come to terms with the breadth, frequency, and psychological impact of childhood sexual abuse.[34] Through the first half of the 20th century

---

[33] Chartered organizations are also named as defendants in approximately 135 of the 275 Pending Abuse Actions.

[34] The World Health Organization defines childhood sexual abuse as: "[t]he involvement of a child in sexual activity that he or she does not fully comprehend, is unable to give informed consent to, or for which the child is not developmentally prepared and cannot give consent, or that violates the laws or social taboos of society." World Health Organization Guidelines for medico-legal care for victims of sexual violence (2003), p. 75, available at http://www.who.int/violence_injury_prevention/publications/violence/med_leg_guidelines/en; *see also* U.S. Dept. of Health and Human Services, Centers for Disease Control and Prevention, Preventing Child Sexual Abuse within Youth-serving Organizations: Getting Started on Policies and Procedures, p. 1.

in all corners of society, childhood sexual abuse, "although present, was not acknowledged and was seemingly tolerated."[35] When acknowledged, social mores toward sexual abuse often led to more focus on the reputational harm a child might suffer if the abuse became known rather than the psychological trauma the abuser had inflicted. As a result, child sexual abuse often went undiscussed, underreported, and unprosecuted. Victims often repressed their experiences and suffered for years with the harmful consequences of abuse. Indeed, in many instances victims either did not realize that their experiences constituted sexual abuse or did not appreciate that this abuse continued to cause harm to them as adults.

The United States progressed in recognizing the pain and pervasiveness of child sexual abuse in the late 20th century, though slowly and unevenly. While society began to view sex offenses against children as a widespread social problem by the 1960s, it often failed to believe the victims.[36] Before the 1970s, "a sizable portion of the writing about sexual abuse of children held that children's and also women's accusations of incest and sexual victimization were not credible."[37] Nevertheless, the increase in awareness around child sexual abuse allowed the child abuse protection movement to take hold. The first legislative action on child abuse occurred in 1963, and within four years, all fifty states passed some form of law requiring the reporting of child abuse.[38]

---

[35] Herbert C. Covey, *The Smallest Victims: A History of Child Maltreatment and Child Protection*, at 2, 103 (2018) ("In the 1930s, there was resistance and denial that sexual abuse of children occurred. When it did, adults minimized its damage to children.").

[36] *Id.* at 104.

[37] *Id.*

[38] Barry L. Steelman, *Notes and Comments: Maryland Laws on Child Abuse and Neglect: History, Analysis and Reform*, 6 Univ. of Balt. L. Rev., 113 (1976); *see also* Monrad Paulsen, Graham Parker & Lynn Adelman*, Child Abuse Reporting Laws - Some Legislative History,* 34 Geo. Wash. L. Rev. 482, 482 (1966) ("Seldom in the nation's history has a specific kind of legislation been enacted so quickly in so many states.").

The 1970s and 1980s brought the beginning of a social revolution focused on the protection and rights of youth victims. In 1973, the Subcommittee on Children and Youth of the Senate Committee on Labor and Public Welfare conducted hearings to consider the enactment of legislation to prevent child abuse.[39] These hearings led Congress to pass the Child Abuse Prevention and Treatment Act, which provides financial assistance to states for programs directed toward the prevention, identification, and treatment of child abuse and neglect, and establishes a National Center on Child Abuse and Neglect.[40] In 1986, Congress passed the Child Abuse Victims Rights Act, providing exploited children the right to sue their offenders for civil damages.[41]

In the 1990s, legislative efforts in the area of child protection focused on the identification of, and availability of information regarding, sex offenders. In 1994, Congress passed the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act,[42] requiring states to form registries of offenders convicted of sexually violent offenses against children and to form more rigorous registration requirements for sex offenders. This legislation paved the way for the passage of Megan's Law in 1996, which mandated law enforcement agencies to release information about registered sex offenders. By the early 21st century, child sexual abuse had "become a legitimate focus of professional attention."[43]

---

[39] Child Abuse Prevention and Treatment Act, 1973: Hearings on S. 1191 Before the Subcomm. on Children and Youth of the Senate Committee on Labor and Public Welfare, 93rd Cong., 172 (1973).

[40] Child Abuse Prevention and Treatment Act, Pub. L. No. 93-247; 88 Stat. 4 (1974).

[41] 18 U.S.C § 2255.

[42] 42 U.S.C. § 14071.

[43] B.J. Cling, *Sexualized Violence against Women and Children: A Psychology and Law Perspective*, at 177 (2004).

### B.      The BSA's History of Youth Protection Efforts

The BSA's progress in recognizing child sexual abuse as a widespread problem generally aligned with the change in societal awareness and legislative actions described above. Particularly since the late 1980s, the BSA has been at the forefront of the nation's fight against sexual abuse through the design and implementation of a robust set of policies and procedures to ensure the safety of its participants. These policies, many of which have been recognized as best practices, are reflected in virtually every facet of the organization's efforts to carry out its mission. They include an enhanced volunteer screening database; supervision requirements to prevent would-be abusers from gaining access to Scouts; reporting obligations for individuals with knowledge of abuse; and expert-approved training to prevent and, where necessary, recognize and respond to sexual abuse. Through these initiatives and the commitment of its volunteers, the BSA is now regarded as one of the safest youth-serving organizations in the world.[44]

The BSA first operationalized its commitment to protecting its Scouts from abuse in the 1920s. Long before background checks and literature regarding childhood sexual abuse, the BSA created a tracking system to help prevent those found to have engaged in misconduct, including sexual abuse, from re-registering as leaders in the organization.[45] This focus on youth protection intensified in the early 1980s, as the BSA began implementing policies and procedures aimed toward preventing would-be abusers from gaining access to Scouts. Various BSA-sponsored

---

[44] *See* Warren Report at 91 (describing the BSA as "undoubtedly one of the safest youth-serving organizations in the world."); *see also* BSA, *Youth Safety*, available at https://www.scouting.org/about/youth-safety/ (endorsement of the BSA's youth-protection efforts by Dr. Michael Bourke, PhD, Chief Psychologist, Behavioral Analysis Unit, U.S. Marshall Service and Dr. Barbara Knox, MD, Medical Director, University of Wisconsin, Child Protection Program).

[45] *See generally* Scouting Newsroom, *Youth Protection*, *100 Years of Youth Protection*, available at https://www.scoutingnewsroom.org/youth-protection/100-years-of-enhancing-efforts-to-protect-youth/.

publications, including *Scouting* and *Boys' Life* magazines, began addressing the issue of child abuse prevention through the inclusion of advertisements and articles discussing child abuse, including child sexual abuse, and ways to prevent it. During this time period, the BSA also introduced policies directed at protecting Scouts, including policies prohibiting one-on-one interaction with a Scout, requiring at least two youth-protection trained adults be present with youth at all times, requiring Scout executives to report abuse allegations, and offering reimbursement for counseling to victims and their families. Most recently, the BSA has partnered with 1in6, a trusted national resource for male survivors of abuse, to expand its counseling services so that victims of abuse in Scouting are able to access vital support from trained professionals whenever they need it.[46] The implementation of these policies coincided with the creation of multiple board-level committees, including a Youth Protection Task Force in 1985, and an Expert Advisory Board in 1986, which the BSA staffed with experts in the field of child abuse prevention and child safety. These changes have proven tremendously effective—as noted above, approximately 90% of the known abuse claims against the BSA relate to abuse that occurred before the majority of these measures were implemented.

The BSA continued to improve on its youth protection initiatives in the 1990s and into the new millennium. These efforts included enhancing its training materials and requiring criminal background checks for all professionals and staff who work with Scouts.[47] Recognizing that child abuse prevention is a nationwide problem, the BSA began taking an active role in broader initiatives to protect Scouts, including providing representatives to the U.S. Advisory

---

[46] *See generally* 1in6, *Boy Scouts of America*, available at https://1in6.org/BSA/.

[47] By 2003, the BSA had begun conducting third-party, computerized criminal background checks on all new adult volunteers, and by 2008 all adult volunteers were required to undergo a full criminal background check. Currently, backgrounds are "re-checked" every five years.

Board on Child Abuse and Neglect and hosting symposiums focused on youth protection and child abuse prevention.[48]

### 1.    The Voluntary Screening Database and Ineligible Volunteer Files

In the 1920s, the BSA created a system of files to bar individuals from Scouting who lacked the moral, emotional, and character values necessary to work with Scouts.[49] These files have a well-documented history, entering the public consciousness by at least 1935, when then-Colonel Theodore Roosevelt Jr., who served as Vice President of the BSA, discussed the use of a list of ineligible volunteers.[50] In 1937, William D. Murray brought more attention to the topic when he released *The History of the Boy Scouts of America*, which detailed the BSA's practice of identifying ineligible volunteers.[51] As part of its early efforts to establish the Volunteer Screening Database, the BSA began cross-referencing all adult volunteers against a list of "ineligible volunteers" maintained at its national headquarters. The BSA named the files related to these ineligible volunteers "card files," but they later came to be known as "IV Files." The IV Files identified individuals affiliated with Scouting who were considered to be unfit for involvement for any number of reasons, including financial mismanagement, failing to uphold the leadership standards of the BSA, and suspected abuse.[52]

What began as a collection of paper records has since evolved into a comprehensive Volunteer Screening Database to protect Scouts by encouraging candid, proactive reporting of all

---

[48] *See* Scouting Newsroom, *Youth Protection*, *100 Years of Youth Protection*, available at https://www.scoutingnewsroom.org/youth-protection/100-years-of-enhancing-efforts-to-protect-youth/.

[49] *See generally id.*

[50] *See* New York Times, *Boy Scouts Head Explains 'Red' List* (June 9, 1935), available at https://www.nytimes.com/1935/06/09/archives/boy-scouts-head-explains-red-list-name-applies-solely-to-color-of.html.

[51] *Cf.* William D. Murray, *The History of the Boy Scouts of America* (1937).

[52] *See* Warren Report at xiv, 3.

incidents of suspected abuse. There are no evidentiary thresholds—the BSA requires that any suspicion of abuse, regardless of whether it would be sufficient to launch a law enforcement investigation or support a conviction, must be reported to law enforcement.[53] This Volunteer Screening Database has been invaluable to preventing known or suspected abusers from joining or reentering the BSA. The Center for Disease Control and Prevention has recommended systems of this type—systems that "track allegations and suspicions of child sexual abuse cases"—as a best practice that all youth-serving organization should implement.[54] Consistent with its commitment to being a leader in child protection, the BSA has advocated for the adoption of a nationwide system to be used across youth-serving organizations.[55]

### 2.    The Warren Report

The BSA recognizes that the Volunteer Screening Database contains information that could be useful to other stakeholders in the fight against childhood sexual abuse. Accordingly, approximately a decade ago, the BSA began extensive internal and external reviews of its IV Files by commissioning a review of files in its Volunteer Screening Database. Dr. Janet Warren, a Professor of Psychiatry and Neurobehavioral Sciences at the University of Virginia, led an effort to analyze 920 files in the BSA's Volunteer Screening Database created between 1965 and 1984.[56] The results of Dr. Warren's analysis have been instrumental in evaluating the policies and procedures used by the BSA to keep its Scouts safe. Specifically, Dr. Warren's team found that, while most of the files involved allegations of child sexual abuse, many contained no clear

---

[53] *See* BSA, *Youth Protection*, available at https://www.scouting.org/training/youth-protection/.

[54] *See* U.S. Dept. of Health and Human Services, Centers for Disease Control and Prevention, Preventing Child Sexual Abuse within Youth-serving Organizations: Getting Started on Policies and Procedures, pp. 8, 19. (2007).

[55] *See* Scouting Wire, *BSA's Call to Establish a Nationwide Volunteer Screening Database*, available at https://scoutingwire.org/bsas-call-to-establish-a-nationwide-volunteer-screening-database/.

[56] *See* Warren Report at 19.

indication that law enforcement was aware of the allegations.[57] In 2011, the BSA undertook a retrospective review and reported to law enforcement all past allegations of potential sexual abuse analyzed by Dr. Warren.[58]

Recognizing the informational and instructional value of Dr. Warren's work, the BSA subsequently commissioned an additional review of files that were outside the scope of Dr. Warren's analysis. This review covered files in the Volunteer Screening Database involving child sexual abuse from 1985 through 2011, in addition to certain files dating back to the 1940s. The BSA specifically tasked reviewers with identifying files that did not clearly indicate law enforcement's awareness of the abuse. Based on the findings of this review, the BSA then distributed a second round of communications to law enforcement agencies, notifying them of the allegations contained in the files, offering to provide copies of the files upon request, and committing to cooperate fully with any investigation. Separately, the BSA also retained Dr. Warren again to undertake a broader review of its Volunteer Screening Database. In this phase of her assessment, Dr. Warren's team reviewed and analyzed an additional 7,819 files in the BSA's Volunteer Screening Database generated from 1946 through 2016. This analysis included a review of files of volunteer leaders and Scouts suspected of having acted in an inappropriate sexual manner with other Scouts, without regard to whether there was any involvement with Scouting at the time of the abuse.[59] A copy of Dr. Warren's 2019 report is attached as **Exhibit 2**.

The resulting report from Dr. Warren's analysis was significant in a number of ways. First, the report confirmed the efficacy of the IV Files, finding that they "served a worthwhile

---

[57] Dr. Warren's team determined that approximately half of the files were opened following an abuser's contact with the criminal justice system. *Id.*

[58] *Id.* at 17.

[59] *Id.* at xiv, 1.

purpose within BSA by helping to identify individuals who were unfit to work directly with children and removing them from Scouting."[60] Second, Dr. Warren concluded that there was "no incident of a cover-up initiated or condoned by BSA National Council."[61] Third, the report described the BSA as "undoubtedly one of the safest youth-serving organizations in the world."[62]

However, notwithstanding the more encouraging findings in the report, Dr. Warren's research and the BSA's experience underscored the need for an integrative, collaborative effort to address child sexual abuse.[63] Dr. Warren found it "startling" that there were "thousands of IVs and almost double the number of known victims in what is undoubtedly one of the safest youth-serving organizations in the world."[64] In order to advance a broader perspective on youth protection, Dr. Warren recommended that:

> all youth-serving organizations in America to submit comparable data [to that contained in the IV files] to a single, secure information-sharing platform, with credible researchers applying for and being given access to these data so as to describe patterns of child abuse on a broader scale and generate analyses that can inform child protection efforts as they evolve over the coming years.[65]

The BSA supports Dr. Warren's proposal, and in April 2019, publicly proposed a Nationwide Volunteer Screening Database to ensure that "the efforts made by youth-serving organizations to protect them would not remain siloed within the individual organizations, but

---

[60] *Id.* at xxi. Dr. Warren cautioned that variability across the files limited the ability to use the data for conducting statistical comparisons. *Id.* at 96-97.

[61] *Id.* at 41.

[62] *Id.* at 91.

[63] *Id.* at 91-92.

[64] *Id.* at 91.

[65] *Id.* at 90.

instead be translated into broadly accessible scientific knowledge concerning how to best protect children."[66]

### C.     Child Sexual Abuse Claims against the BSA

As discussed above, there are approximately 275 pending civil actions asserting personal injury claims against the BSA and certain Local Councils and chartered organizations related to abuse suffered by a Scout at the hands of a Scouting leader, volunteer, or another member of the BSA (collectively, "Pending Abuse Actions"). The Pending Abuse Actions are being litigated in dozens of state and federal jurisdictions around the country. Although the Pending Abuse Actions vary in their procedural posture, very few are close to trial and most are in either the discovery or motion-practice phase.

The BSA believes the ongoing publicity surrounding such claims has encouraged many victims to come forward in advance of this filing, and has been made aware of approximately 1,400 additional claims of abuse. In sum, the BSA is aware of approximately 1,700 pending or asserted claims of abuse against itself or a Local Council organization. To the extent claims of abuse have not been asserted, the BSA encourages individuals to submit proofs of such claims prior to the BSA's requested bar date.

#### 1.     The Impact of Statute-of-Limitations Changes on Claims against the BSA and Non-Debtor Stakeholders

The number of claims against the BSA has increased dramatically over the past twenty years due to changes to state statutes of limitations governing causes of action alleging child sexual abuse. Since 2002, 17 states have enacted legislation allowing individuals to bring claims that would otherwise have been barred by the applicable limitations period. Most of these

---

[66] *Id.*

jurisdictions have implemented revival windows that temporarily eliminate the civil statutes of limitations for victims whose claims have already expired.[67] These revival windows have allowed older victims of child abuse to bring lawsuits decades after the abuse occurred, including against private organizations, such as the BSA and Local Councils. Other jurisdictions have fully eliminated limitations periods going forward and revived expired claims.[68]

The trend of retroactive revisions to limitations periods for sexual abuse claims accelerated in 2019, when more than a dozen states revised their limitations periods to allow victims of abuse to bring claims that would otherwise have been time-barred.[69] As noted above, most recently, a group of plaintiffs has filed suit in the U.S. District Court in the District of Columbia alleging that the District's recent revival-window legislation permits plaintiffs to bring previously time-barred claims, regardless of where the abuse occurred or where the plaintiff resides.[70] The BSA expects the number of these claims would, but for the commencement of these chapter 11 cases, have increased in 2020 and beyond.[71]

These changes in statute of limitations have dramatically altered the legal landscape for sexual abuse claims. Specifically, the number of suits alleging claims from earlier years that

---

[67] *See, e.g.*, CAL. CIV. PROC. CODE § 340.1 (West 2020); HAW. REV. STAT. ANN. § 657-1.8 (West 2018); DEL. CODE ANN. tit. 10, § 8145 (West 2009) and tit. 18, § 6856 (West 2010); GA. CODE ANN. § 9-3-33.1 (West 2019); MINN. STAT. ANN. § 541.073 (West 2013).

[68] *See, e.g.*, VT. STAT. ANN. tit. 12, § 522 (West 2019).

[69] *See, e.g.*, S 199, 2019 Leg., Reg. Sess. (N.C. 2019) (1-year revival window to open on January 1, 2020); H.B. 2466, 54th Leg., 1st Reg. Sess. (Ariz. 2019) (19-month window opened in May 2019 for expired claims); S. 477 2019 Gen. Assemb., Reg. Sess. (N.J. 2019) (two-year window opened on December 1, 2019 for expired clams); MONT. CODE ANN. § 27-2-216 (West 2019) (one-year window opened in May 2019); D.C. CODE ANN. § 23-113 (West 2019) (two-year window opened in May 2019); N.Y. C.P.L.R. 214-g (McKinney 2019) (one-year window opened in August 2019); CAL. CIV. PROC. CODE § 340.1 (West 2020) (additional three-year window set to open on January 1, 2020).

[70] *See Does 1-8 v. Boy Scouts of America*, 20–00017 (D.D.C.)

[71] *See* Cara Kelly, *Boy Scouts face a 'flood of litigation' over child sexual abuse* (Jan. 6, 2020), available at https://www.usatoday.com/story/news/investigations/2020/01/06/boy-scouts-hit-more-lawsuits-claiming-child-sex-abuse/2806124001/ (quoting plaintiffs' counsel's statement that he expects a "flood of litigation" in California and "a tidal wave of cases against [the Boys Scouts]" more generally).

would otherwise have been barred by the applicable limitations period has surged. These suits have forced the BSA to look backward—past the decades of progress and leadership in youth protection—to the mid- to late-twentieth century, when the vast majority of the abuse in Scouting occurred. Claims alleging abuse within the last thirty years make up a small fraction of total known abuse claims.[72] The vast majority of the claims the BSA is now facing allege child sexual abuse from the 1940s to the 1980s. Fairly compensating victims that were abused during this time frame has placed tremendous financial pressure on the BSA and its local partners.

### 2.  Other Defendants

As discussed above, several organizations work together to deliver the Scouting program, including Local Councils and chartered organizations that are independently incorporated and chartered by the BSA. Historically, claims against the BSA, Local Councils, and chartered organizations, including the Pending Abuse Actions, have generally been litigated and administered solely by the BSA. The unique relationship between the BSA and these entities, as discussed above, has led the BSA to take a leading role in administering such litigation. In practice, the BSA coordinates with Local Councils and chartered organizations to efficiently respond to and manage such cases, while minimizing the risk of inconsistent treatment of actions and victims.

This approach also stems from the fact that the allegations made by plaintiffs in the Pending Abuse Actions and unfiled claims are substantially directed at the BSA. The resolution of the Pending Abuse Actions thus requires the BSA to pay careful attention to a wide variety of litigation matters, including, for example, responses to broad discovery requests, the overwhelming majority of which are directed at the BSA as opposed to Local Council or

---

[72] Of the approximately 1,700 pending or asserted abuse claims against the BSA, approximately 1,500 involve claims alleging abuse that occurred before 1988.

chartered organization defendants. Through this approach, the BSA has, among other things, facilitated the retention of joint defense counsel, responded to the vast majority of discovery requests, coordinated with insurance carriers, and authorized and funded the payment of any settlement amounts related to the Pending Abuse Actions or similar, previously resolved, claims. Given the complexity of the issues involved the Pending Abuse Actions, and the BSA's central role in litigating them, the organization has retained national coordinating counsel to oversee the handling of claims against it and the Local Councils and chartered organizations.

### 3.    Insurance

The BSA has historically procured commercial, general-liability insurance ("CGL") policies from multiple insurers to protect itself from a myriad of risks, including claims of sexual abuse or sexual misconduct. These policies date back to 1962 and over time came to include both primary and excess insurance coverage that provide substantial limits of liability in many years. As set forth below, the BSA's insurance coverage has varied over time with traditional insurance in some years and fronting policies in other years. Also, while the amount of coverage remains substantial in many years, the insolvency of certain insurers and the resolution of sexual-abuse and other claims have either eroded, eliminated, or exhausted the liability limits for certain policies. In some instances, the availability of certain insurance policies remains contingent upon the resolution of active pending litigation between the BSA and some of its insurers. Nonetheless, with respect to most (if not all) policy years, at least some level of coverage under the CGL policies is available for bodily injury claims, including claims arising out of sexual abuse and sexual misconduct.

### a)    Overview of the BSA's Insurance Program

The type of coverage provided for by the BSA's insurance program has varied over the last six decades. Between 1962 and 1982, the BSA acquired insurance policies where each claim

of bodily injury allowed the BSA to access the limits of liability under the applicable insurance policies.[73] These are more commonly referred to as "per-occurrence" policies. Beginning in 1983, the BSA shifted its insurance program to policies that contained overall aggregate limits of liability. The BSA purchased these types of policies from 1983 to the end of 1985. As a counterbalance to the imposition of aggregate limits, the BSA's towers of insurance in 1983 through 1985 included significant limits of liability and excess layers of coverage.

The BSA substantially altered its insurance program beginning in 1986 and through 2018, procuring primary insurance and excess policies where the deductible matches the policy's limit of liability. These policies are more commonly referred to as "fronting" policies. In addition, beginning in late 1990, the BSA procured significant insurance with limits of liability exceeding $100 million. In 2019, the BSA reverted to traditional insurance and expects to continue with such insurance in 2020.

b)    The BSA's Insurance Coverage for the Local Councils and Chartered Organizations

For decades, the BSA has undertaken and committed to procuring general liability insurance coverage for Local Councils and volunteers. Starting around 1971, the BSA began adding certain Local Councils as additional insureds under its CGL policies. Then, in 1978, the BSA formalized this practice through the implementation of a General Liability Insurance Program ("GLIP"), whereby the BSA agreed to procure general liability insurance for all Local Councils by including them in the definition of "Named Insured" in all of the BSA CGL policies. Similarly, starting in 1978, the BSA began to provide insurance coverage under its CGL policies to certain Chartered Organizations.

---

[73] For purposes of simplicity, this analysis is limited to the BSA's primary insurance policies.

IV.    **These Chapter 11 Cases Represent the Only Viable Option for Designing and Executing a Consensual Global Resolution of Abuse Claims.**

The principal aims of the Bankruptcy Code include providing for equal distributions among similarly situated creditors and providing a debtor with a reasonable opportunity to make a fresh start.[74] Companies facing mass tort liabilities, in particular, have recognized that there are limited alternatives available to resolve such claims without incurring the prohibitive costs of case-by-case litigation and risking disparate outcomes in similar cases. Since the asbestos cases of the 1980s, debtors have used the tools and procedures available in a chapter 11 proceeding to facilitate the global resolution of their mass tort liabilities. These tools and procedures include the ability to halt lawsuits automatically upon the commencement of a case; to transfer mass tort claims to (and resolve claims and common issues in) a centralized forum; to protect the interests of future claimants through a court-appointed representative; to provide equitable compensation to tort creditors through a post-effective date trust under a confirmed plan of reorganization; and to obtain channeling injunctions and releases from all liability relating to the tort claims.[75] As a

---

[74] *See Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 655–56 (2006) ("[W]e are mindful that the Bankruptcy Code aims, in the main, to secure equal distribution among creditors."); *In re Dow Corning Corp.*, 237 B.R. 380, 393 (Bankr. E.D. Mich. 1999) ("A central policy of the Bankruptcy Code is the equitable distribution of a debtor's assets among its creditors."); *In re Federal-Mogul Glob. Inc.*, 330 B.R. 133, 154 n.10 (Bankr. D. Del. 2005) ("The [Bankruptcy Code] . . . permit[s] a complete settlement of the affairs of a bankrupt debtor, and a complete discharge and fresh start.") (quoting H.R. Rep. No. 95-595, at 180 (1977)); *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (Bankr. Del. 2012) ("[T]he purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start.") (quoting *In re T–H New Orleans L.P.*, 116 F.3d 790, 802 (5th Cir.1997)) .

[75] *See generally* Douglas G. Smith, Resolution of Mass Tort Claims in the Bankruptcy System, 41 UC Davis L. Rev. 1613 (2008). Companies that have employed these strategies over the last three years include Purdue Pharma (opioids), Insys Therapeutics (opioids), Pacific Gas & Electric Company (wildfires), and Takata Corporation (airbag inflators), among others. *See In re Purdue Pharma L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Sept. 16, 2019), ECF No. 17 (describing bankruptcy as the "only way" to resolve opioid litigation rationally, to halt the "destruction of value and runaway costs" associated with the litigation, and to centralize all of the claims against the debtors); *In re Insys Therapeutics, Inc.*, No. 19-11292 (KG) (Bankr. D. Del. Jan. 16, 2020), ECF No. 1115 (approving plan of liquidation that provided for a recovery trust benefitting victims of opioid epidemic); *In re PG&E Corp. & Pac. Gas and Elec. Co.*, No. 19-30088 (DM) (Bankr. N.D. Cal. Jan. 29, 2019), ECF No. 28 (stating that bankruptcy represented the "only viable alternative" to address liabilities arising from wildfires that occurred in Northern California in 2017 and 2018; *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Jan. 5, 18), ECF No. 1630 (describing the mechanism under the plan of reorganization to channel all personal injury and wrongful death claims to a post-effective date trust).

non-profit corporation with a mission of delivering Scouting programs to millions of young men and women across the country, the availability of chapter 11 as a means to conclusively resolve mass tort liabilities is even more important in the context of the BSA's reckoning with historical abuse claims.

For the BSA, a consensual, expeditious, global resolution of all claims related to abuse in the BSA's Scouting programs is the only realistic path forward. The BSA cannot continue to litigate abuse claims in the civil tort system, especially in light of the recent changes in state statutes of limitations and corresponding increase in the number of pending claims.

As noted above, the BSA spent more than $150 million on settlements and legal and other professional costs from 2017 through 2019. In addition to depleting its assets, continued case-by-case litigation or individual settlements with abuse victims would do little to dispel the cloud of uncertainty that lingers over the BSA's organization. If the BSA were to proceed with piecemeal litigation rather than concerted efforts to forge a comprehensive solution, the only beneficiaries would be the victims standing at the "front of the line," to the detriment of all other victims. This approach would also erode the public's confidence in the BSA's ability to carry out its mission to serve young men and women, families, and local communities through its Scouting programs. Indeed, if a consensual global resolution of all abuse claims is not reached in these chapter 11 cases, the BSA's ability to deliver its mission to future generations of Scouts may be in peril, as revenues derived from current registrations are insufficient to cover the cost of continued piecemeal litigation. The BSA's financial reorganization under chapter 11 is the only means by which the BSA can achieve its dual objectives of (a) equitably compensating victims of abuse in its Scouting programs and (b) ensuring that the BSA emerges from bankruptcy with the capability to continue carrying out its charitable mission.

As detailed herein, the BSA has taken decisive actions designed to promote a constructive dialogue with key stakeholders to reach a consensual global resolution of abuse claims. During these chapter 11 cases, the BSA will bring together all relevant stakeholders—including abuse victims, the future claimants' representative, insurers, and Local Councils—to address the complex issues relating to the resolution of abuse claims.

### A.   The BSA Engaged in Extensive Efforts to Reach a Global Resolution of Abuse Claims Before the Commencement of these Proceedings.

In late 2018, the BSA retained legal and financial advisors to explore its restructuring options in light of, among other factors, the increasing number of abuse claims asserted against the BSA as a result of changes in state statutes of limitation. The BSA determined at the outset of this strategic review to pursue a potential agreement with a critical mass of abuse victims and other relevant stakeholders that could be implemented through a prearranged chapter 11 plan. A prearranged bankruptcy filing was the most desirable option as it represented the quickest, most efficient, and least costly bankruptcy process. As a non-profit corporation, considerations of economy and speed are of the utmost importance to the BSA. A prearranged case would have avoided an open-ended bankruptcy process that could, without an appropriate sense of urgency, result in irreparable damage to the BSA's mission.

In connection with these strategic efforts, the BSA recognized that it would ultimately need to structure a settlement around a plan of reorganization that provides for channeling injunctions with respect to both current and potential future abuse claims.[76] Accordingly, the

---

[76] Unlike a future claim in other mass tort contexts, there is no latency period for abuse. In the abuse context, a future claim is properly understood as a claim related to abuse that has already occurred but which is held by an individual who (a) has not attained 18 years of age, (b) suffers from "repressed memory" such that he or she is not aware that he or she holds an abuse claim, or (c) has not discovered the injury or the connection between the injury and the abuse and who could not in the exercise of reasonable care have discovered the injury or connection between the injury and the abuse. Given (i) the significant advertising and publicity surrounding abuse in scouting over the past year; (ii) the highly publicized nature of this restructuring; and (iii) the robust and comprehensive claims and

BSA determined, in consultation with its advisors, that it was necessary and appropriate to engage an independent third-party representative for future abuse claimants. After considering possible candidates for the role, the BSA selected James L. Patton, Jr. in early 2019 to serve as prepetition future claimants' representative. The BSA selected Mr. Patton due to his significant experience in complex mass tort cases in the chapter 11 context and his reputation for integrity in serving as a fiduciary in bankruptcy proceedings. Mr. Patton, in turn, retained legal and financial advisors to assist him in conducting an analysis of the BSA's liabilities and assets and in negotiations with the BSA and other stakeholders.

The BSA also engaged in discussions with an ad hoc group of attorneys representing significant numbers of abuse claimants. The ad hoc group was advised on restructuring matters by James Stang of Pachulski Stang Ziehl & Jones LLP. The BSA provided information to these attorneys, including Mr. Stang, regarding its liabilities and assets, and some attorneys for abuse victims provided information to the BSA regarding additional abuse claims that they asserted would be filed against the BSA in the future. In particular, the attorneys asserted that they represented hundreds of abuse victims who had not yet filed suit.

In addition, the BSA engaged in discussions with certain of its insurers about the nature and extent of available coverage for pending and additional abuse claims that have not yet been filed. As noted above, the BSA has procured CGL policies from multiple insurers since 1962 to protect itself from risks, including claims of sexual abuse or sexual misconduct. Local Councils were subsequently included as "additional insureds" under these policies. As a general matter, the amount of remaining coverage under these policies is substantial, and the BSA expects that

---

noticing procedures that the BSA will implement through these cases, the BSA expects that the vast majority of potential claimants will be identified as part of the bar date process in these chapter 11 cases and does not expect that there will be significant future claims relating to prior abuse in the BSA's Scouting programs.

the proceeds of these policies will comprise a significant portion of the assets contributed to any victims compensation trust.

These prepetition restructuring efforts involved several meetings with attorneys representing abuse victims, including a two-day mediation in early November 2019 with many of these attorneys, as well as the prepetition future claimants' representative and certain of the BSA's insurers. The mediation, unfortunately, was unsuccessful. It became apparent that attorneys for abuse victims believed that certain Local Councils with significant abuse liabilities have significant assets that could be used to compensate victims.

It became apparent that attorneys for abuse victims believed that certain Local Councils with significant abuse liabilities have significant assets that could be used to compensate victims. Further, it was clear to the BSA that attorneys for abuse victims would only accept information about the nature and extent of the BSA's available assets if provided through a court-supervised process. The abuse claimants' attorneys have indicated a strong preference for the BSA to file for relief under chapter 11 so they can compel the production of information regarding the BSA's and Local Councils' liabilities and assets, as well as other data relating to abuse claims. Accordingly, the BSA recognized in late 2019 that there were no meaningful prospects for a global resolution of abuse claims without the commencement of chapter 11 proceedings.

**B.      Given the BSA's Inability to Reach Agreement on a Prearranged Reorganization, the BSA is Taking Several Immediate Steps to Promote Efficiency at the Outset of these Chapter 11 Cases.**

Beginning after the conclusion of the November 2019 mediation, the BSA and its advisors turned their attention to preparing for a chapter 11 filing. The BSA recognized that prolonged bankruptcy proceedings would be costly and deplete funds available to compensate abuse victims. As a non-profit that relies on member fees and donations to sustain its operations, delays caused by protracted litigation and discovery, for example, would also negatively impact

these revenue sources and ultimately jeopardize the BSA's ability to carry out its mission to serve young men and women, families, and communities. Accordingly, both prior to and immediately upon the commencement of these cases, the BSA took several decisive steps designed to ensure that its chapter 11 cases would proceed expeditiously, in the interest of safeguarding the future of the BSA's mission and maximizing the value of the Debtors' estates for the benefit of abuse victims and other stakeholders.

**First**, the BSA engaged Mr. Patton as the prepetition future claimants' representative. As noted above, the BSA shared information with Mr. Patton and his advisors regarding its liabilities and assets during the prepetition period, and Mr. Patton participated in the November 2019 mediation.

**Second**, the BSA assisted in the formation of the "Local Council Committee," which is comprised of eight Local Council members who represent every region of the country. As noted above, there are 261 Local Councils chartered by the BSA. Despite the uniformity of their purpose in carrying out the BSA's mission, there are significant differences among Local Councils in terms of the number of Scouts registered in the units they oversee, the value and nature of their assets, and the number of abuse claims asserted against them (in some cases, none). While each Local Council is a separate non-profit that needs to decide on its own participation in these cases and whether to coordinate its efforts with the Local Council Committee, the committee will allow Local Councils to have a collective voice in this restructuring, particularly with respect to key issues impacting Local Councils, such as the treatment and protection of their shared insurance rights with the BSA and any potential contributions to a victims compensation trust. The individual members of the Local Council

Committee are all volunteers. A list of the Local Council members of the Local Council Committee, as well as each member's representative on the Committee, is attached as **Exhibit 1**.

**Third**, the BSA has established a data room that it is continuing to populate with voluminous data including, among other things, the following:

- the BSA's organizational documents;

- the BSA's balance sheets and financial statements;

- detailed information regarding the BSA's assets, including enforceable donor restrictions on the use or transfer of such assets under applicable state law;

- detailed information regarding the BSA's liabilities, including abuse claims and non-abuse litigation, secured indebtedness, and pension liabilities;

- all information provided to the prepetition future claimants' representative;

- detailed information submitted by certain Local Councils regarding their assets and applicable donor and other restrictions; and

- the BSA's current and historical insurance policies, including coverage charts and documents pertaining to coverage disputes between the BSA and its insurers.

The purpose of establishing this data room is to proactively collect and provide the information that the BSA understands would be demanded by attorneys for abuse claimants. By providing this information proactively, the BSA hopes to avoid or minimize costly and time-consuming discovery. The BSA intends to make the data room available to any official committees appointed in these cases and other key constituents, subject to the entry of a protective order that provides for acceptable confidentiality procedures.

**Fourth**, the BSA is filing a motion to establish procedures to address and, if necessary, litigate potential disputes regarding whether certain identified property of the BSA is subject to enforceable restrictions under applicable law and/or is otherwise unavailable to satisfy creditor claims. The BSA recognizes that certain constituents, including any official committees, will want to analyze and may potentially challenge the validity and impact of, among other things,

donor restrictions and the designations of property as essential to the BSA's capability to carry out its missions. Consistent with the BSA's coordinated efforts to avoid unnecessary delays and litigation, the BSA hopes that the proposed procedures will help streamline the adjudication of any disputes regarding these issues.

**Fifth**, the Debtors are filing a plan of reorganization that provides a framework for, among other things, the global resolution of abuse claims asserted against the BSA and other entities that carry out the Scouting program. The principal components of the plan include the establishment of a victims compensation trust, which will be funded with contributions from the BSA and potentially from other parties; the imposition of a channeling injunction precluding the filing or prosecution of abuse claims against the BSA and other protected parties and directing abuse claims, including future abuse claims, solely to the trust for administration and payment; the restructuring of the BSA's funded indebtedness; the treatment of the BSA's prepetition trade debt and other unsecured claims; and the BSA's entry into exit financing facilities to supplement its capability to continue carrying out its charitable mission after emergence from bankruptcy.

**Sixth**, the Debtors are filing a motion to establish deadlines for creditors to file both general and abuse-related proofs of claim and for approval of the proof of claim forms and the manner of notice thereof. Through this motion, the Debtors are seeking the Court's approval of a special abuse-related proof of claim form and to establish specialized confidentiality procedures for the submission and handling of sensitive information that may be contained in the abuse-related proofs of claim. This relief will provide a clear timeline for filing claims in these chapter 11 cases, thereby providing certainty to all parties in interest. The Debtors also intend to formulate a supplemental noticing program that is tailored to reach as many presently unknown abuse claimants as practicable in coordination with any official committee of abuse victims that

may be appointed in these cases. This supplemental noticing program will be proposed to the Court at a later date.

**Seventh**, the Debtors will be seeking the stay of the approximately 275 civil actions asserting abuse claims against Scouting entities. Specifically, the BSA will soon file an adversary complaint requesting that this Court issue a preliminary injunction against the continued prosecution of these abuse claims against the BSA, Local Councils, and chartered organizations for a period of 180 days from the issuance of the injunction. Without this vital relief, the pending abuse litigation would potentially proceed against the BSA's codefendants, thereby depleting the BSA's shared insurance with Local Councils, diverting critical resources, and distracting key personnel from the BSA's reorganization efforts. Moreover, the resources it would require for the BSA to continue to carry out these tasks during these cases are better directed to the pursuit of a consensual resolution of all abuse claims.

**Eighth**, the BSA will soon remove from state court and seek to transfer to the U.S. District Court for the District of Delaware the hundreds of abuse claims pending in various courts across the country. These procedures, which are specifically designed to be employed in mass tort personal injury bankruptcy cases under 28 U.S.C. §§ 157(b)(5), 1334(b), and 1452(a), will facilitate the efficient resolution of the abuse claims, which are integrally related to—and, indeed, the primary reason for—the Debtors' bankruptcy cases. Specifically, consolidating these actions in a single forum will substantially streamline the pending litigation, permit the parties, if necessary or desirable, to resolve common issues of fact and law, and promote the consistent, equitable, and timely resolution of abuse claims.

**Ninth**, the Debtors are filing a motion for the appointment of a sitting bankruptcy judge as a mediator. The mediator would be tasked with mediating any and all issues relating to the

comprehensive resolution of claims relating to historical acts of abuse in the BSA's Scouting programs through a chapter 11 plan of reorganization. The Debtors have requested that the following parties be directed to participate in the mediation: the Debtors; the Local Council Committee; the prepetition future claimants' representative; any official committee of creditors appointed by the Office of the United States Trustee; and the BSA's relevant insurers. As should be clear from this and the other pleadings filed by the Debtors concurrently herewith, the complexity and sheer number of issues that must be resolved in connection with a global resolution of abuse claims under a plan of reorganization cannot be understated. These issues include the funding of a victims compensation trust; the treatment of abuse claims asserted against Scouting entities that are not debtors in these cases; the enforceability of donor and other restrictions on the BSA's and Local Councils' assets; the relative treatment of abuse claimants under the plan and trust distribution procedures; issues pertaining to shared insurance between the BSA and Local Councils; and coverage disputes between the BSA and its insurers. The appointment of a mediator at the outset of these cases will assist the parties in addressing these and other disputed issues and, the Debtors hope, foster early and productive settlement discussions among the relevant stakeholders. Moreover, because mediation could be required at several different junctures during these cases and due to the complexity of the issues at hand, the appointment of a mediator now will allow the mediator to become familiar with the parties, the key issues, and the central aspects of the disputes.

## V.   Conclusion

These chapter 11 cases present unique, historic, and complex challenges. Never before has a congressionally chartered non-profit corporation with a nationwide mission affecting millions of Americans sought the protection of a bankruptcy court. The Debtors are steadfastly committed to reaching a global resolution of abuse claims through these proceedings, and they

are confident that, with the measures they have implemented at the outset of these cases, all stakeholders will be well positioned to efficiently work toward that resolution on a consensual basis.

*[Remainder of Page Intentionally Left Blank]*

Dated:  February 18, 2020        MORRIS, NICHOLS, ARSHT & TUNNELL LLP
      Wilmington, Delaware

*/s/ Derek C. Abbott*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Joseph C. Barsalona II (No. 6102)
Eric W. Moats (No. 6441)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email:  dabbott@mnat.com
      aremming@mnat.com
      jbarsalona@mnat.com
      ptopper@mnat.com
      emoats@mnat.com

– and –

SIDLEY AUSTIN LLP
James F. Conlan (*pro hac vice* pending)
Thomas A. Labuda (*pro hac vice* pending)
Michael C. Andolina (*pro hac vice* pending)
Matthew E. Linder (*pro hac vice* pending)
Karim Basaria (*pro hac vice pending*)
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Email:  jconlan@sidley.com
      tlabuda@sidley.com
      mandolina@sidley.com
      mlinder@sidley.com
      kbasaria@sidley.com

– and –

SIDLEY AUSTIN LLP
Jessica C. K. Boelter (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 839-5300
Email: jboelter@sidley.com

PROPOSED COUNSEL TO THE DEBTORS
 AND DEBTORS IN POSSESSION

## **Exhibit 1**

## **LOCAL COUNCIL COMMITTEE**

## **Exhibit 1**

**Ad Hoc Committee of Local Councils of the Boy Scouts of America**

| **Member** | **State(s)** | **Representative** |
|---|---|---|
| Greater New York Councils | New York | Richard G. Mason (Chair) |
| Andrew Jackson Council | Mississippi | James A. McCullough II |
| Atlanta Area Council | Georgia | William S. Sugden |
| Crossroads of America Council | Indiana | Michael J. Hebenstreit |
| Denver Area Council | Colorado | Mark Williams |
| Grand Canyon Area Council | Arizona | Christopher R. Kaup |
| Mid-America Council | Iowa, Nebraska, South Dakota | Robert L. Freeman |
| Minsi Trails Council | Pennsylvania | Mark S. Chehi |

## **Exhibit 2**

**WARREN REPORT**

# BOY SCOUTS OF AMERICA

## VOLUNTEER SCREENING DATABASE: AN EMPIRICAL REVIEW

## 1946–2016



University of Virginia, School of Medicine

Janet I. Warren, DSW

Professor of Psychiatry and Neurobehavioral Sciences Institute of Law, Psychiatry, and Public Policy University of Virginia

## 2019

# EXECUTIVE SUMMARY

This report summarizes the findings of an empirical study of the contents of 7,819 Ineligible Volunteer (IV) files generated by the Boy Scouts of America (BSA) from 1946 through 2016 in connection with their Volunteer Screening Database (VSD). While there are multiple categories of files generated as part of the BSA's VSD, the specific files included in this study included only the "P-files," for volunteer leaders and youth members who were associated with Scouting and who were suspected of having acted in an inappropriate sexual manner with youth victims, some of whom were involved in Scouting and others who were not. In this report, the adults removed are referred to as Adult IVs, and the youth members removed are referred to as Youth IVs. The report is organized into 12 sections: (1) a historical review of the inception and use of the VSD by the BSA; (2) the methodology used in conducting the study; (3) an overview of the contents of these 7,819 files; (4) processes used in opening the Adult and Youth VSD files; (5) attributes of the Adult IVs; (6) attributes of the Youth IVs; (7) the characteristics of the alleged victims; (8) observed patterns of victim selection; (9) identifiable techniques used to access victims and avoid detection; (10) issues surrounding pedophilia and mixed offending; (11) relevant BSA policy issues; and (12) conclusions.

**Methodology**

The IV files which are now part of the VSD were received by researchers at UVA as scanned PDFs, which contained 190,748 pages of case-specific material. File size and content varied greatly from 1-917 pages. Each file was coded using a revised version of the *Ineligible Volunteer Record Sheet (IVRS),* now referred to as the *Ineligible Volunteer Designation Request (IVDR),* utilized by the BSA to capture basic identifying information about each IV. Included in this instrument was a qualitative narrative to encapsulate the allegations contained in each file in a standardized manner. Additional data were collected using a second template, the *UVA Research Coding Form (UVA-RCF),* which was designed specifically for the study to capture more contextual information about the IV and their interactions with each alleged victim. When combined, the two instruments included 410 data entry fields, many of which allowed for repetition of relevant fields, resulting in over 7,200 distinct analytic variables. File distribution and coding occurred through a web-based interface designed by Custom Application Consultation Services (CACS), a specialty application development center within Information Technology Services (ITS) at UVA. The file coding was conducted by over 30 individuals hired for the project from the University of Virginia and other university graduate programs over a period of nearly three years. Throughout this report, we frequently compared data based upon whether the IV file was created before 1988 or from 1988 to 2016, as 1987 was the year the BSA formally launched their first national child protection program.

**Nature and Content of Files**

Beginning in the early 1900s, BSA National Council ("National Council") requested that local councils send information to the central office on "ineligible volunteers," meaning individuals affiliated with Scouting who were considered to be unfit for involvement for any number of reasons, from financial mismanagement to failing to uphold the leadership standards of the BSA. The dataset considered here consisted *only* of the IV files involving alleged sexual misconduct; such files were originally designated as "P" files (for "perversion") before the BSA changed their file classification system in recent years. This dataset contained files involving 6,878 (88.0%) Adult IVs, and 941 (12.0%) Youth IVs. IV files were most commonly classified in the Child Sexual Abuse (CSA) category, with this representing 75.9 percent of the total number of Adult and Youth files stemming from the 70-year period.

The number of files involving Adult IVs accused of CSA (A-CSA) experienced a peak near the end of the 1980s, and then declined irregularly for the remaining years of files reviewed. This decline is consistent with the reduced rates of child sexual abuse and other forms of violent crime observed over this same time period in American society. In contrast to the decline in the number of CSA files found among the Adult IV files, there was no comparable decline observed in the Youth CSA IV files (Y-CSA). There was an average of 32 Youth CSA IV files opened each year from 1990, when this designation was first utilized by BSA.

The IV files were submitted to BSA National Council from local councils throughout the USA and from some international locations. These numbers ranged from a low of 0.1 percent submitted from Puerto Rico and Wyoming to a high of 6.4 percent submitted from Texas and 7.4 percent from California. Given that some child molesters may relocate repeatedly to avoid detection, we further examined the A-CSA IVs (5.6 percent) who were known to have been registered in different geographical locations while involved in Scouting. These analyses indicated that the IVs registered in multiple states had significantly more years of involvement in the BSA as adults, more alleged victims, more re-registration attempts, and a greater proportion of Scouting-involved-only or mixed (Scouting-involved and non-Scouting-involved) victims.

We found that law enforcement or Child Protective Services (CPS) were involved with the IV, the victim(s), the reporting of the alleged abuse, or the investigation of the alleged abuse in 95.3 percent of the A-CSA IV files before 1988 and 97.6 percent of the files after 1987. Law enforcement or CPS were involved in 95.2 percent of the Youth IV files. In 2013, after the IV files were sent to UVA, the BSA also began a separate review of all "P-coded" files dating from 1965 to ensure that law enforcement had been contacted and notified of all incidents of alleged sexual abuse contained in the IV files if confirmation of such was not clearly noted in the files.

**Opening of A-CSA and Y-CSA Ineligible Volunteer Files**

Notification by law enforcement or the issuing of an arrest warrant constituted the primary path (55.5%) by which the BSA became aware of allegations of sexual abuse by one of its adult volunteer leaders. This pathway was common, although less frequent, in instances that involved youth (37.1%).

Disclosures by the victims were central to the investigation of IVs within BSA whether they occurred directly in the context of Scouting, through a family member, or through either of these avenues to law enforcement. These disclosures revealed the presence of sexual abuse far more often than did the observation of suspicious behavior by a third party, the presence of physical evidence or injury, the presence of pornography, other social media postings, or the uncovering of a criminal history for a specific IV. Family members prompted notification to BSA of the abuse of a child in an additional 24.5 percent of the allegations involving Adult IVs and 41.3 percent of the Youth IVs.

In 14.1 percent of the files after 1987, Adult IVs tried to dispute the initial allegations of inappropriate sexual behavior that were being levied against them. These numbers reflect only instances in which an IV's disputation was not successful, as cases where a regional or national review reversed a revocation were removed from the VSD.

After the opening of an A-CSA file, the BSA placed 75 (5.0%) of the A-CSA IVs on probation prior to 1988, and 30 (0.8%) after 1987. The use of probation with IVs alleged to have acted in a sexually inappropriate manner with youth was no longer used by the BSA after 1991. We found no mention of probation with this group in the IV files after 1994. The use of probation for other VSD classifications was terminated by the BSA in 2008.

It was not uncommon for individuals to obtain psychiatric treatment during the probationary period, with treatment at that time being seen as a viable and effective response to psychological disturbances associated with sexually offending against children. Of the 105 individuals placed on probation, 13 (17.3%) reoffended after they were reinstated from 1946 through 1987, and 4 (13.3%) reoffended from 1988 through 2016.

As part of the coding, our reviews identified 106 files (.02%) in which we identified credible information suggesting actions had been taken to limit dissemination of information concerning child sexual abuse associated with Scouting. We classified these files according to seven descriptive sub-categories, namely: (1) parental request/action; (2) Scouting efforts to avoid media coverage; (3) action taken by individual with no current affiliation to Scouting; (4) incompetency; (5) different points of view; (6) cover- up conducted by local personnel; (7) cover-up by the BSA National Council. We found no incident of a cover-up initiated or condoned by the National Council.

**Attributes of Adult Ineligible Volunteers**

The most consistent information found in the CSA IV files referenced the physical attributes of the IVs, along with their occupations and special interests. Historically, this information was used to identify IVs who attempted to re-register after having their registration revoked by BSA.

The vast majority of Adult IVs entered into the files for CSA were males (98.5%), although 1.5 percent of the A-CSA IV files did involve women who allegedly abused children. These women included those who allegedly offended against children alone, and those who did so with a male accomplice. A-CSA IVs most commonly fell in the 30-39 age range (29.5%) at the time the IV files was opened, although files were somethings opened years after the alleged offenses. Rates of CSA declined gradually for men over the age of 40 years. One IV was 95 years of age when the CSA file was opened, although it was opened based on allegations of sexual abuse that had been perpetrated decades earlier.

The A-CSA IVs were involved in Scouting for an average of 5.9 years before their file was first opened, with a range of 0 to 60 years prior to their alleged sexual abuse being identified. There were limited data in the files concerning whether or not the A-CSA IVs had been involved in Scouting as a youth. The data that were available indicated that at least 21.4 percent of the A-CSA IVs were known to have been involved in Scouting when they were youth, with this involvement lasting an average of 6.8 years.

In general, the A-CSA IVs tended to be Caucasian, which is consistent with the racial makeup of the larger BSA organization. The employment of the A-CSA IVs varied across the full range of occupations identified in the U.S. census. At least one third of the IVs were employed in positions that provided them either authority over or easy access to children. One fifth of the IVs were employed in schools and libraries, community programs and social services, and healthcare. Another 13 percent were involved in some military capacity or in law enforcement. Almost one-third of the A-CSA IVs were also known to have participated in some type of volunteer youth activity. These activities included other youth mentoring programs, community sports teams, recreational programs, and involvement in various faith-based programs for children and adolescents.

The most common Scouting positions held by the A-CSA IVs at the time that they were entered into the VSD included Scoutmasters (24.1%), Assistant Scoutmasters (22.5%), and Committee Members (10.9%).

We found that at least 65.4 percent of the A-CSA IVs had been arrested for a sex crime, as documented in their IV files. Those that were convicted received prison sentences ranging from 0 to 400 years, with a mean of 10.6 years and a median of 5.0 years in the cases opened before 1987, and a mean of 12.5 years and a median of 6.0 years in the cases opened after 1987.

Although our coding was restricted to the information included in the IV files, which was sometimes quite limited, we examined all available information for evidence of various personal characteristics that might be

relevant to child sexual abuse. The data revealed that the A-CSA IVs alleged to have sexually abused a child were not frequently portrayed as being antisocial in their attitudes or behavior (2.8%), were not commonly known to be suffering from a substance abuse disorder (1.3%), and did not generally identify or acknowledge themselves as being homosexual (2.4%), bisexual (0.4%), or pedophilic (2.5%). The special affinity for children often attributed to pedophiles was observed in only 4.3 percent of the A-CSA IV files (for example, being the favorite coach on a community sports team). Among the A-CSA IVs, 2.8 percent were identified as suffering from some type of mental disorder, and 0.4 percent were known to be taking psychotropic medication.

The Y-CSA IVs were almost exclusively male and generally 14 years of age or older. However, there were 31 Youth IVs aged ten years or younger, and 131 between the ages of 11 and 13 years. The abusive sexual contact that allegedly occurred in the Y-CSA files tended to involve an IV who was at least three years older (49.8%) and physically larger (31.9%) than their victim(s). Cognitive differences (15.3%) and leadership differences (12.8%) were also observed.

**Alleged Victims of CSA by Adult and Youth IVs**

We were able to locate information concerning 7,762 (81.2%) alleged male victims and 1,792 (18.8%) alleged female victims in the A-CSA IV files dated 1946 through 2016. The Y-CSA IV files contained information on 913 (75.3%) male and 299 (24.7%) female alleged victims of Y-CSA. In the A-CSA files, we were able to identify 5,116 (49.5%) Scouting-involved victims and 5,221 (50.5%) non-Scouting involved victims. Within the Y-CSA files, we located 682 (51.2%) Scouting-involved victims and 651 (48.8%) non-Scouting involved victims

The alleged victims ranged from <1 to 17 years of age for the A-CSA IVs, and 1 to 17 for the Y-CSA IVs. Depending on the method of age calculation used, the average age of the victims identified in the A-CSA IV files was approximately 12 years when the sexual abuse began, and approximately 13 years when the abuse was reported to the BSA. In some instances, the abusive relationship continued until the alleged victim had passed the age of majority. The average age for alleged victims identified in the Y-CSA IV files was slightly younger with the average age of the victims being approximately 11 years when the abuse began and still being 11 years of age when the IV file was opened.

The CSA IV files contained some files that indicated an extraordinarily large number of child victims, up to 250 for one A-CSA IV and 51 for one Y-CSA IV. However, these large victim counts were the exception rather than the rule, with the estimated median victim count for A-CSA IVs being three, and for Y-CSA IVs, two different victims. When the coders counted victims that could be individually identified as required for coding on the IVRS, the median number of victims fell to one for both the A-CSA IVs and Y-CSA IVs.

The number of alleged victims associated with the A-CSA IV files opened each year decreased from a high of 615 in 1989 to a low of 86 in 2009, mirroring the decline in the number of new IV files opened across this same

time period. The number of alleged victims of Y-CSA IVs varied less across the shorter period that information on Youth IVs was collected (1990-2016), ranging from a high of 79 in 2012 to a low of 23 in 2005.

Significant to programming was the finding that 702 or 13.9% of the A-CSA IV had some type of familial relationship with their victim(s). Of this group, 72.0% had been arrested at some point for a sex crime. This finding underscores the importance of moving beyond categorical assumptions concerning the sexual abuse of children in youth-serving organizations and understanding of the vulnerability of children across the various relationships that define their lives.

**Observed Victim Selection Patterns of Adult and Youth CSA IVs**

We found remarkably consistent patterns among the alleged victims of both the A-CSA and Y-CSA IVs, suggesting that perpetrators tended to choose victims of a particular age, gender, and affiliation with Scouting. In other words, victim selection clearly did not reflect a random or purely opportunistic decision-making process. Instead, IVs appeared to select their victims according to a combination of convenient acquisition patterns and personal sexual motivations for the abusive behavior (e.g., specific sexual interest in victims of a particular age and gender).

The majority of both A-CSA and Y-CSA IVs had only one alleged child victim and few had more than five victims. Specifically, 104 A-CSA IVs had 10 or more alleged victims of child sexual abuse, and 18 had 20 or more alleged victims of child sexual abuse. Within the Y-CSA files, we found 28 Y-CSA IVs with five or more alleged victims and, four Y-CSA IVs with 10 or more alleged victims.

In reviewing the victim age preferences of the IVs, we chose to follow the age cut-offs used in the Diagnostic and Statistical Manual of Mental Disorders (Edition 5) (2013) for diagnosing Pedophilia. We found that 1,464 (53.8%) A-CSA IVs allegedly sexually abused *only* children aged 13 years and younger, 963 (35.4%) *only* children aged 14 years and older, and 296 (10.8%) allegedly sexually abused children across both of these age groups. The data also indicated that 442 (86.7%) Y-CSA IVs allegedly sexually abused *only* children 13 years of age and younger, 53 (10.4%) allegedly sexually abused *only* children 14 years of age and older, and 15 (2.9%) allegedly sexually abused children across both age groups. The younger age skew of victims among Youth IVs is likely due to the fact that Youth IVs tended to abuse victims younger than themselves.

Along these lines, we found that IVs tended to sexually abuse only male or only female victims, with a much smaller percentage offending indiscriminately against both male and female victims. We found that 3,016 (70.7%) A-CSA IVs had male victims *only*, 1,085 (25.4%) had female victims *only*, and 167 (3.9%) had victims that included both male and female children. A similar pattern was observed with the Y-CSA IVs.

Victim selection based upon the Scouting affiliation of the victim was also relatively comparable across the A–CSA IVs and Y-CSA IVs. Fifty percent of the A-CSA IVs and 48.2 percent of the Y-CSA IVs offended *only*

against non-Scouting involved youth; 41.5% of A-CSA IVs and 47.0% of the Y-CSA IVs *only* against Scouting-involved IVs, and 8.5% of A-CSA IVs and 5.0% of the Y-CSA IVs against both groups of victims.

**Techniques Used to Access Victims and Avoid Detection**

The A-CSA IVs tended to use child attracting activities and interests, travel and exciting adventure, and the creation of an intimate relationship with a sense of caring to access their victims. It was also common for A-CSA IVs to abuse a youth whom they perceived to be sleeping and/or to misattribute the sexual acts during or after the fact. Further, with older victims, the A-CSA IVs often singled out a youth to make them feel special, enable them to engage in pseudo-adult activities, provide them access to alcohol or drugs, expose them to pornography, or engage them in other activities designed to arouse them sexually. The minority of A-CSA IVs who offended against youth of varying ages appeared more likely to provide their alleged victims with money and gifts. The Y-CSA IVs used a variety of victim-accessing behaviors which again varied by the age of the victim.

We discovered little information in the A-CSA files that was indicative of specific "techniques" used to keep the child victims from reporting the sexual abuse to others. These data were missing in up to 62 percent of the files. However, the data that were available suggested that some reasons the child victims of A-CSA-IVs failed to disclose the abuse was fear of losing an important relationship, losing opportunities they valued, or being embarrassed by what they would have to tell others. There were also indications that some of the younger youth were subjected to threats of physical harm if they disclosed the abuse.

A considerable number of the alleged victims of both the A-CSA and Y-CSA IVs reported their abuse after the first incident. This rate varied based upon the victim selection patterns of the perpetrators. With the Adult IVs who allegedly abused *only* victims under the age of 14 years, 15.5% of the known victims reported their alleged abuse after the first incident. This can be compared to 17.8% of victims abused by perpetrators with victims *only* over the age of 14 years and 10.2% of youth who were victimized by perpetrators with victims in both age categories. More victims of Y-CSA IVs reported their abuse after the first incident. These rates varied from a low of 29.4% to 34.1% over the three victim selection types.

In terms of the sexual behaviors allegedly experienced by the male and female victims, we found that the female victims were two to three times more likely to have experienced penetration by both the A-CSA and Y-CSA IVs. We found that 14.3 percent of the girl victims and 14.8 percent of the boy victims of A-CSA IVs reported their abuse immediately, and 21.5 percent of the girl victims and 32.0 percent of the boy victims of Y-CSA IVs. These findings contradict clinical lore that asserts that boy victims of CSA are more reticent to report sexual abuse than girl victims of CSA.

**Issue of Pedophilia and Mixed Offending**

Based upon the observed consistency of the age preferences demonstrated by the majority of A-CSA and Y-CSA IVs, we decided to explore tentatively the "likely presence" or "likely absence" of a pedophilic, paraphilic sexual interest in children among the IVs in sample. In seeking to identify this group, we aligned with the criteria set forth by the *Diagnostic and Statistical Manual of Mental Disorders, Edition 5,* which identifies 13 years of age or younger as the most common age for making a formal diagnosis of pedophilia. In identifying this group of IVs, which we termed "likely pedophiles" or LPs, we used six variables or composites that were available in our database: (1) if the IV self-identified as a pedophile; (2) if the IV indicated some type of use or distribution of child pornography; (3) if the IV had at least three victims 13 years or younger and no known victims 14 years or older; (4) if the IV had been coded according to the non-specific victim code of child pornography; (5) if the IV was removed from Scouting for allegations of child pornography without any allegations of direct child victimization; and (6) the IV had been arrested for possessing child pornography or distributing child pornography. These analyses indicated that 14.5 percent of the Adult and Youth IVs met our classification criteria for "likely" being pedophilic.

We also found 801 (10%) A-CSA and Y-CSA IVs who deviated from a consistent pattern of victim selection with respect to age, gender, and/or Scouting affiliation in their choice of child victims. These IVs had longer IV files, more child victims, more victims under and over the age of 13 years, more Scouting and non-Scouting affiliated child victims, more male victims, and more female victims. The effect sizes of these differences were medium to large for the majority of these comparisons. The Mixed Offender group was also more often considered unstable members of the local community and had more frequently come to the attention of law enforcement and arrested for a sex crime.

**Relevant BSA Policy Issues Pertinent to Child Sexual Abuse**

After 1987, 56.2 percent of all allegations of child sexual abuse by Scouting-involved youth occurred in the context of activities that were formally associated with Scouting. When the alleged abuse did occur during a BSA-sponsored activity, the most frequent setting for both A-CSA IVs and Y-CSA IVs involved camping.

When the abuse was alleged to have occurred outside of Scouting-sponsored events, the locations included the IV's home, an activity such as a movie or ball game that involved the IV and other Troop members but which was not organized or convened under the auspices of Scouting, and/or outdoor and camping events that were informally arranged and which occurred without the approval of the Troop Committee.

**Limitations of the Data**

When considering our data analyses and the conclusions derived from them, it is important to remain aware of the limitations of these data. The VSD files are administrative files that for almost 100 years have been managed by the registration department of the BSA. They were created as part of the system used to serve as a filter for the yearly registration that was required of each volunteer leader, a process used to track all adults who had regular contact with children through the BSA. These names were historically checked by hand each year until the 1980s when this process became computerized, allowing for a more rapid comparison of names across the different BSA information systems. This information was intended only to fulfill the function of comparing names of potential registrants to the individuals listed in the IV files, and was never collected for research purposes As such, the information requested from the local councils focused on identifying the alleged perpetrator, determining how this person might be identified if they sought to re-register after having their registration revoked by the BSA, and establishing that there was sufficient information to make reasonable the conclusion that the identified individual had, in fact, been involved in inappropriate behavior that did not meet the leadership standards of the organization.

**Conclusions**

Based upon the totality of the data analyzed, we concluded that the IV files created as part of the VSD served a worthwhile purpose within BSA by helping to identify individuals who were unfit to work directly with children and removing them from Scouting. Over the past 70 years, the VSD has identified and removed from Scouting 1,133 men who appear to suffer from a pedophilic sexual interest in children; 801 men who seemed indiscriminately and possibly impulsively sexually exploitive of children; and 3,118 men who appear to been sexually involved with children but with less intrusive behaviors and a fewer numbers of victims.

The data summarized in our report indicate that Scouting -involved adults commonly offended against only non-Scouting involved youth, that these abusive relationships often overlapped with family relationships, that IVs were commonly involved in other youth-serving organizations, and that the employment of the IVs placed them in schools, in human services, and even in organizations designed specifically to protect children from harm. This interplay of positions often in a single community underscores the need for an integrated approach to child protection that considers the totality of the daily lives of both perpetrators and victims of CSA in order to avoid falling prey to "tunnel vision" that attempts a too-narrow solution to a far-reaching problem. The public health perspective on child sexual abuse, which views child sexual abuse as one form of child injury that can occur across multiple contexts, possibly holds the linking potential needed to serve this important integrative function. The rush to categorize child sexual abuse primarily based on where it happens keeps us from delving into the importance questions such as the etiology of pedophilia, how it might be managed by those who suffer from it, and how can victims be quickly identified, assisted and offered restitution outside the traumatizing and costly gyrations of the court system.

Our analyses have identified 12,284 sexually abused children, approximately one-half that were involved in Scouting and one-half that were not. This finding underscores the pervasive nature of child sexual abuse throughout society and the importance of an integrative and collaborative effort to address it. However, these same data also demonstrated the relative safety of youth involved in Scouting. As illustrated, an average of 81 A-CSA IVs was identified each year out of an average of 1,762,602 adult volunteer leaders registered each year in Scouting. On average, 14 Y-CSA IVs were identified each year, out of an average of 5,105,099 youth who register with Scouting each year. Similarly, the number of youth who were allegedly sexually abused in Scouting each year is very low, with an estimated average of 78 youth out of an average of 5,105,099 youth registered in Scouting on a yearly basis. These findings are congruent with a large study conducted by Shattuck, Finkelhor, Turner, and Hamby (2016) which led the authors to conclude, "[a]buse in youth-serving organizations was a relatively rare form of abuse, dwarfed by abuse by family members and other adults" (p. 1).

Finally, our data demonstrate that sexual abuse of children in Scouting is not perpetrated by a consistent nor a single type of offender. Our victim analyses did demonstrate that IVs showed a marked tendency to select only victims that fit a specific profile according to age, gender, and Scouting affiliation. However, the sample also contained a variety of types of offenders, including youth who sexually offended against other youth, adolescent boys involved in mutual sexual exploration, linked cases of exploitation based on prior patterns of abuse, antisocial men who repeatedly exploited many different types of victims, and some men who appear to have offended against a single youth after being involved in Scouting for many years. These findings underscore the importance of moving beyond a simplistic explanations of child sexual abuse to better capture the many different motivations that can prompt individuals to be sexually exploitive of children.

# TABLE OF CONTENTS

Introduction ........................................................................................................................... 1

    Historical Context of the BSA and the Ineligible Volunteer Files ..................................... 2

Methodology ......................................................................................................................... 20

Nature and Content of the IV Files ...................................................................................... 24

    Incident Codes for Adult and Youth IVs ......................................................................... 24

    Making Sense of these Numbers: A Proportional Assessment ......................................... 28

    Geographical Distribution of Adult and Youth IVs ........................................................ 30

    Public Documentation and Law Enforcement Involvement in IV Files .......................... 31

Activities Surrounding Creation of CSA-Coded IV Files ...................................................... 34

    File Opening and Initial Allegations ................................................................................ 34

    Procedural Elements of the File Contents ....................................................................... 39

    IV Responses to Allegations ............................................................................................ 42

Attributes of Adult Ineligible Volunteers ............................................................................. 43

Attributes of Youth CSA Ineligible Volunteers .................................................................... 53

Alleged Victims of CSA by Adult and Youth IVs ................................................................. 54

    Defining Victim Categories for Reviewing Victim Selection Patterns ............................. 54

    Identifying Victim Selection Criteria among A-CSA and Y-CSA IVs .............................. 58

Observed Victim Selection Patterns of Adult and Youth CSA IVs ....................................... 61

    Frequency of Victim Selection Patterns among A-CSA and Y-CSA IVs .......................... 66

Techniques used to Access Victims and Avoid Detection ...................................................... 70

Nature of Alleged Abuse by Duration and Sexual Activity ................................................... 74

Issue of Pedophilia and Mixed Offending ............................................................................ 78

Location of Child Sexual Abuse for Scouting-Affiliated Victims ........................................... 84

Conclusions .......................................................................................................................... 85

    The Significance of the IV Files for the BSA ................................................................... 86

    The Nature of the Abuse Identified in the IV Files ......................................................... 90

    Informing BSA Youth Protection Programs .................................................................... 95

    Limitations of the Data .................................................................................................. 96

    Final Comments ............................................................................................................. 98

References ............................................................................................................................. 100

Appendix A: BSA Volunteer Screening Database Coding Manual

Appendix B: Coder Reliability, 1946–2016 Files

Appendix C: Screenshot of Filtrum Registration Screening Module

Appendix D: Yearly Presentation of Tabled Data

# LIST OF TABLES

Table 1: Descriptions of all Adult and Youth IV Files.................................................................. 23
Table 2: Adult and Youth Incident Codes for 7,819 IV Files: Jan. 1, 1946 to Dec. 31, 2016........... 25
Table 3: Adult Incident Codes for 6,878 Adult IV Files: Jan. 1, 1946 to Dec. 31, 2016.................. 25
Table 4: Youth Incident Codes for 941 Youth IV Files: Jan. 1, 1946 to Dec. 31, 2016 ................... 26
Table 5: Adult and Youth IV Files by State or International Council of Origin............................... 30
Table 6: Public Source Content of Adult and Youth CSA IV Files ............................................... 32
Table 7: Involvement of Law Enforcement in Reporting or Investigating Allegations..................... 34
Table 8: Dynamics Surrounding the Opening of Adult and Youth CSA IV Files............................ 35
Table 9: Initial Reports of Allegations Identified in the Adult and Youth CSA IV Files .................. 36
Table 10: Response of Local Council to Allegations of CSA by Adult and Youth IV Files .............. 38
Table 11: Use of Probation with A-CSA and Y-CSA IVs ........................................................... 39
Table 12: Attempts to Avoid Disclosure of Abuse by Adult and Youth CSA IV Files.................... 40
Table 13: Responses of Adult IVs to Allegations of CSA ........................................................... 42
Table 14: Responses of Youth IVs to Allegations of CSA .......................................................... 43
Table 15: Demographic Characteristics of Adult IVs with Allegations of CSA.............................. 44
Table 16: Physical Characteristics of Adult IVs with Allegations of CSA..................................... 46
Table 17: Scouting Registration of Adult IVs with Allegations of CSA ....................................... 47
Table 18: Identified Characteristics Associated with Offending among A-CSA IVs........................ 49
Table 19: Attempts to Reregister by A-CSA IVs....................................................................... 51
Table 20: Involvement in Pornography and Digital Media by A-CSA IVs by Decade..................... 52
Table 21: Involvement in Other YSOs by A-CSA IVs (IVRS)..................................................... 52
Table 22: Demographic Characteristics of Y-CSA IVs (IVRS) .................................................... 53
Table 23: Dynamics of Alleged Sexual Activity by Y-CSA IVs ................................................... 54
Table 24: Estimated and Coded Number of Alleged Victims of A-CSA and Y-CSA IVs ................. 55
Table 25: Measures of the Ages of Alleged Victims of Adult and Youth IVs................................. 58
Table 26: Select Characteristics of Identified Victims of Alleged A-CSA and Y-CSA..................... 61
Table 27: Select Characteristics of A-CSA IVs by Number of Victims by Decades........................ 65
Table 28: Select Characteristics of Y-CSA IVs by Number of Victims......................................... 65
Table 29: Identified Behaviors to Gain Access and Compliance by Victim Age............................. 71
Table 30: Identified Techniques to Avoid Detection by Victim Age ............................................. 72
Table 31: Identified Behaviors to Gain Access and Compliance by Victim Gender ........................ 73
Table 32: Identified Techniques to Avoid Detection by Victim Gender........................................ 74
Table 33: Duration of Alleged CSA by A-CSA and Y-CSA IVs................................................... 75
Table 34: Chi Square Analyses of Victim Selection Characteristics with Duration of Abuse............ 75
Table 35: Alleged Sexual Behavior by Victim Age.................................................................... 77
Table 36: Alleged Sexual Behavior by Victim Gender................................................................ 78
Table 37: Frequency of Component Variables for Pedophilia Composite ...................................... 79
Table 38: Indications of Pedophilia Compared on Select Variables .............................................. 80
Table 39: Indications of Pedophilia Compared on Select Variables, Continued ............................. 81
Table 40: Indications of Mixed Victim Selection Compared on Select Variables............................ 82
Table 41: Indications of Mixed Victim Selection Compared on Select Variables, Continued............ 83
Table 42: Location of Alleged Abuse for Youth Registered in Scouting ....................................... 84

# LIST OF FIGURES

Figure 1. Incident Codes for 7,819 Adult and Youth IV Files: Jan. 1, 1946, to Dec 31, 2016 ......................... 27

Figure 2. Incident Codes for 1,884 Adult and Youth IV Files, Excluding CSA and Y-CSA ............................ 28

Figure 3. Visual Representation of Identified Adult IVs Relative to Adults Registered ..................................... 28

Figure 4. Visual Representation of Identified Youth IVs Relative to Youth Registered .................................... 29

Figure 5. Descriptive Contents of CSA IV Files: Adult and Youth IVs...................................................... 33

Figure 6. Initial Allegations of A-CSA and Y-CSA ................................................................................. 37

Figure 7. Responses of Local Council to Allegations of CSA by Adult IVs over Time ..................................... 39

Figure 8. Attempts to Re-register by A-CSA IVs by Year of Removal ......................................................... 50

Figure 9. Numbers of Alleged Victims of A-CSA and Y-CSA IVs by Year..................................................... 56

Figure 10. Visual Representation of Identified Alleged Youth Victims1 Relative to Youth Registered ........... 57

Figure 11. Gender of Alleged Victims of A-CSA and Y-CSA ..................................................................... 59

Figure 12. Scouting Affiliation of Alleged Victims of A-CSA and Y-CSA .................................................... 60

Figure 13. Adult and Youth CSA IVs by Number of Victims..................................................................... 62

Figure 14. A-CSA and Y-CSA IVs' Observed Victim Selection: Age of Victims............................................ 63

Figure 15. A-CSA and Y-CSA IVs' Observed Victim Selection: Gender of Victims ....................................... 63

Figure 16. A-CSA and Y-CSA IVs' Observed Victim Selection: Scouting Affiliation of Victims ..................... 64

Figure 17. Bar Charts of A-CSA IVs' Total Victim Count: Age of Victims.................................................. 66

Figure 18. Bar Charts of Y-CSA IVs' Total Victim Count: Age of Victims.................................................. 67

Figure 19. Bar Charts of A-CSA IVs' Total Victim Count: Victim Gender .................................................. 68

Figure 20. Bar Charts of Y-CSA IVs' Total Victim Count: Victim Gender .................................................. 68

Figure 21. Bar Charts of A-CSA IVs' Total Victim Count: Scouting Affiliation ........................................... 69

Figure 22. Bar Charts of Y-CSA IVs' Total Victim Count: Scouting Affiliation ........................................... 70

Figure 23 A and *B*: Duration of Abuse for Male and Female Victims......................................................... 76

Figure 24 A and *B*: Duration of Abuse for Scouts and Non-Scouts............................................................ 76

Figure 25 A and *B*: Duration of Abuse by A-CSA and Y-CSA ................................................................. 77

# INTRODUCTION

In the following report, we present data summarizing the content of 7,819 Ineligible Volunteer (IV) files generated by the Boy Scouts of America (BSA) from 1946 through 2016, this information having been obtained as part of a sustained effort by the organization to screen volunteer leaders and protect youth in Scouting. The specific files included in this study address volunteer leaders and youth members who were suspected of having acted in an inappropriate sexual manner with youth who either were or were not involved in Scouting at the time of the alleged abuse.

The IV files were analyzed over a four-year period at the Institute of Law, Psychiatry and Public Policy in the University of Virginia (UVA) School of Medicine through a research contract ratified between the BSA and UVA in 2013. The intent of the contract was to have a university-based research team review the IV files concerning sexual misconduct in order to better inform the BSA of the aggregate content of the files, to identify observable patterns and trends in the data over time, and to provide the BSA with a foundation for assessing the optimal structure and applications of the membership screening database in the future. The templates used in coding the data were developed by the UVA research team in collaboration with the BSA and were reviewed by the Institutional Review Board for the Social and Behavioral Sciences at UVA (Protocol 2013009300).

The BSA provided the IV files to UVA as scanned PDFs, which contained 190,748 pages of case-specific material. Each file was coded using a revised version of the *Ineligible Volunteer Record Sheet* (IVRS), now referred to as the Ineligible Volunteer Designation Request (IVDR), utilized by the BSA to capture basic identifying information about each IV and the alleged behavior that lead to the revocation of their registration. Additional data were collected using a second template, the *UVA Research Coding Form (*UVA-RCF), which was designed for the study to capture more information about the IV and their interactions with each alleged victim. The two instruments when combined include 410 data entry fields, many of which allow for multiple reiteration of data entry based upon the circumstances of each allegation (e.g., repeating victim-specific data fields for each victim within a file). File distribution and coding occurred through a web-based interface designed by Custom Application Consultation Services (CACS), a specialty application development center within Information Technology Services (ITS) at UVA. This application allowed for the secure electronic transfer of data directly to and from a server protected by a three-factor security system maintained by UVA-ITS.

Our report is organized into 12 sections: (1) a historical review of the inception and use of the IV files by the BSA, (2) the methodology used to conduct the study, (3) an overview of file contents, (4) processes used in opening the Adult and Youth IV files, (5) attributes of the Adult IVs, (6) attributes of the Youth IVs, (7) attributes of the alleged victims, (8) observed patterns of victim selection, (9) identifiable techniques used to access victims and avoid detection, (10) issues surrounding pedophilia and mixed offending, (11) relevant BSA policy issues, and (12) conclusions.

## Historical Context of the BSA and the Ineligible Volunteer Files

We begin our review of the BSA IV files with a historical summary of their inception, development, and application over the past 100 years. The evolution of the IV files over time reflects important cultural changes in our understanding of child sexual abuse and the optimal responses to it, not only by youth-serving organizations, but also by the broader society. Integral to the history of the IV files is a complex web of societal factors including public debate and discourse concerning child abuse in general and child sexual abuse in particular; greater law enforcement involvement in issues traditionally handled in the privacy of the family; the emergence of the women's movement and its focus on sexual violence against women; an increased scholarly interest in child sexual abuse; constantly evolving laws concerning the treatment and containment of sexual offenders; the emergence of litigation against youth-serving organizations and other community-serving entities for perceived failure to protect children from victimization; and an increasingly sophisticated understanding of how to best implement and monitor various types of youth protection policies and programs. This history has spanned over a century and has shaped the ways that sexual abuse has been understood by all organizations involved with youth, including the Boy Scouts of America.

In the late 1890s, Robert Baden-Powell, who would later become a Lieutenant-General in the British Army, began the development of a novel form of military training while serving in India. He expressed that the men with whom he was serving were poorly trained for the type of effort that was required of them. To address these deficits, he developed a series of special training courses referred to as "Scout Training." In 1900, he applied this same training to a group of youths who had been drafted to provide support services during the Boer War, with the goal of enabling these young people to assume combat roles as adult men. Their ensuing performance was thought to be exceptional, prompting Baden-Powell to begin the development of an analogous type of Scouting program for use with boys during peacetime. He sought to devise a system that would instill the ideals of manliness, endurance, resourcefulness, self-control, honor, and trustworthiness. He aligned the use of uniforms, merit badges, and progressive ranks with this lengthy list of values to offer youth identifiable emblems of advancement in their skills and capabilities as they grew into manhood. He also emphasized the importance of the youths assuming leadership roles and learning how to teach and mentor younger boys as they progressed through the ranks (Scheidleiger, 1948).

In 1910, William Dickson Boyce, a Chicago newspaper publisher who was familiar with the English Boy Scouts, applied for a congressional charter to establish a national American Boy Scouts organization, which was incorporated in Illinois and Washington, D.C. (Scheidleiger, 1948). Over the next year, various fledgling Boy Scout groups became absorbed into the Boy Scouts of America, with the first BSA office opening in New York City in January of 1911. Mirroring the structure created by Baden-Powell, the organization implemented a requirement for annually renewable registration of all Scout leaders. In 1913, this requirement was expanded to include all Scouting-affiliated youth. This yearly registration requirement was viewed as a mechanism the organization could use to monitor its membership and ensure that only adults with the requisite moral and

2

leadership qualities were allowed to have sustained contact with youth. This type of review also provided a mechanism whereby adults who were found to be mentally and morally "unfit" and "unworthy" of involvement in Scouting could be identified and removed from any further involvement with youth (Murray, 1937).

Integral to the BSA registration process was the creation of a list comparable in function to the "Grey List," which had previously been implemented by Baden-Powell to keep track of individuals who had been removed from Scouting in Britain. Generated within the Registration Department of BSA, the Ineligible Volunteer (IV) files were used to track individuals who were believed to have failed to meet the necessary standards of leadership, necessitating the revocation of their BSA registration. The initial classification of these files included seven categories of behavior or infractions, namely criminal, financial, perversion, theft, moral, leadership, and religion. In 1935, Colonel Teddy Roosevelt, President of the Greater New York BSA Foundation, referenced the list during an address at the 25th anniversary of the Scout's National Council in Chicago.[1] As part of his address, Roosevelt stressed the importance of carefully monitoring the integrity of the leaders who were entering Scouting:

> We have, as have been reported to the personnel committee, a confidential list of 2,904 men from every state and large city in the nation who are undesirables. Eight hundred and forty-seven of these men are wholly undesirable for any work with boys no matter how limited–they are morally unfit. Every applicant is checked with care against the confidential file. Every man seeking certification must meet these conditions and any other safeguards that we can devise for surer protection (Murray, 1937, p. 359).

Some months later, *The New York Times* published an article that sought to address speculations that had arisen in response to the remarks made by Colonel Roosevelt at the Scouting event (Boy Scouts Head, June 9, 1935). In the article, "Boy Scouts Head Explains 'Red' List," Dr. James E. West, Chief Scout Executive, clarified that the term "red flag list" was not being used by BSA to identify and exclude communists from Scouting. Rather, he explained that it constituted an administrative shorthand for the red stickers placed on the registration cards of men who had been reviewed and denied further participation in Scouting.

In the article, Dr. West clarified that the revocation of a leader's registration could be prompted by various causes, including "moral perversion." He reflected that the subset of individuals excluded for reasons of moral perversion appeared to be made up of two distinct groups. One group seemed to be comprised of men who were "morally imbalanced" and whose sexual interest in boys was the sole motivation for their involvement in Scouting. The other group appeared to be made up of men who were "soundly balanced" but who became "morbid on the subject" following their immersion in youth activities with boys, and "sometimes [gave] way to temptation… [making] them degenerate." Dr. West estimated that 30 percent of the 2,919 men on the list in 1935 fell within these two categories of degeneration, while the remaining men were believed to be guilty of

---

[1] Boy Scouts of America (BSA) refers only to the national organization chartered by Congress. However, BSA issues annual charters to local organizations and groups of individuals to operate Scouting units. BSA also issues annual charters to local, not-for-profit corporations called councils that are organized to support the Scouting units in their community. The Greater New York BSA Foundation, of which Colonel Roosevelt was President at the time of his remarks, was one such local organization chartered by the BSA national organization.

3

mishandling Scout funds, being mentally incompetent, and/or being "organization misfits." In the article, Dr. West sought to contextualize the problem, reflecting that during the previous 25 years, the organization had registered 1,325,000 individual adult male volunteers. Of these, 2,919 were ultimately placed on the "red flag list," inducing Dr. West to conclude that the problem with individual volunteers was "not very alarming" (Boy Scouts Head, June 9, 1935).

In a legal affidavit compiled in 2010, the Senior Membership Administrator of BSA, Nathaniel Marshall, described the process used to maintain the IV files prior to the advent of computers. During these earlier years, the name of each IV was entered onto a card, which was organized alphabetically into a Rolodex. Each year, during the registration period, the administrative staff would check each volunteer registration against the names contained in the Rolodex. To improve efficiency, cards in the Rolodex were removed when the BSA became aware that the IV had reached the age of 75 years or had died. According to Mr. Marshall, this deletion practice ended when the lists were transferred to a computer-based registration system. A table appended to the affidavit identified six classification codes used to identify IVs from 1926 through 1985, namely problems associated with finances, leadership, morals, perversion, theft, and religion. The table further indicated that 1,587 files were opened from 1946 through 1985 with 1,123, or 71 percent, referencing concerns related to the perversion or "P" classification category (Marshall Affidavit, 2010).

This effort by the BSA to identify men who were "morally imbalanced" as expressed through a sexual interest in children was occurring at a time when American society in general had become increasingly fearful of sexual violence, some of which involved children. The image of the sex offender as a "sexual psychopath" began to emerge by the 1930s, based in part on the testimony of mental health experts at the trials of a number of infamous serial rapists and murderers, some of whom targeted children (e.g., Leopold and Loeb, Albert Fish). In 1937, angry citizens began holding meetings across the country, inviting representatives of police departments, state legislatures, and civil groups to attend, demanding action against the wave of sex crimes they believed to be threatening the safety of children. In 1947, FBI Director J. Edgar Hoover published an article in *American Magazine* asserting the following:

> The most rapidly increasing type of crime is that perpetrated by degenerate sex offenders… Should wild beasts break out of circus cages, a whole city would be mobilized instantly. But depraved human beings, more savage than beasts, are permitted to rove America at will. (Hoover, 1947, p. 32)

In 1955, *American Magazine* printed another article by Hoover, where he went on to describe the scope and rate of sex offenses observed by law enforcement:

> During 1953, sex offenses reached an all-time high, with arrests occurring at the rate of one every 28.6 minutes in the 1,174 cities which reported statistics. If this ratio holds true for the whole country, it means that a sex criminal was arrested somewhere every 6.7 minutes, day and night. Of all crimes against the person, one out of seven is now of this nature. Rape cases have increased 110 per cent since 1937. And for every arrest made in a sex case we know that several similar crimes occurred in which the offender was not apprehended or no report made to the police. (Hoover, 1955, p. 19)

Hoover criticized parents for adopting an "ostrich-like" attitude to the problem and for not adequately training and safeguarding their own children. He also argued that sex offenders were different from other types of

4

criminals as they were motivated to offend because they were emotionally and mentally ill. He asserted that they could be changed into decent citizens only through "far reaching" medical and psychiatric treatment:

> We raise millions of dollars every year, and properly so, to combat cancer, heart disease, polio and other diseases of the body, but as a nation, we take almost no steps to cure the sick minds of those who prey upon innocent children. This is because most of us have no sympathy for such individuals. But by neglecting their sickness we only hurt ourselves and are just as unwise as we would be if we permitted victims of contagious diseases to roam unsupervised in our midst." (Hoover, 1955, p. 101)

These concerns triggered the passage of new laws in many states designed to contain sexually violent offenders, often in state psychiatric facilities. The statutes took a variety of forms, including civil commitment, criminal sentencing enhancements, or a hybrid of both approaches. Initially, these new sexual psychopath laws were enormously popular and embraced by most of the public. However, in 1950, Paul Tappan, Ph.D., J.S.D., wrote an influential report, *The Habitual Sex Offender: Report and Recommendations,* while he was serving as the Technical Consultant to the National Council on Crime and Delinquency. Originally considered highly controversial, the report underwent 15 editions over the span of 10 years and ultimately began to reform much of the collective thinking about the sexual abuse of children. The monograph outlined assumptions about sexual offenders that had justified the sexual psychopathy laws, but which emerging research had proven to be inaccurate (Tappan, 1950). For example, Tappan explained how research suggested that most sex offenders were not strangers, but rather acquaintances of those whom they harmed; most sex offenders had a low rate of recidivism and generally did not escalate in their sexually deviant behavior; it was not possible to predict the future dangerousness of most sexual offenders; sexual psychopathy did not constitute a unique clinical entity and effective treatment of this condition was not available; most sex crimes were of a minor type and generally did not come to official attention; and the due process rights of many offenders were being abrogated through the process of commitment. Based on these and other similar observations, the Group for the Advancement of Psychiatry concluded in their publication, *Psychiatry and Sex Psychopath Legislation: The 30s to the 80s,* that sexual psychopath laws were a failed experiment, signaling a change of philosophy that encouraged containment rather than treatment of repeat sexual offenders (Group for the Advancement of Psychiatry, 1977).

The first published paper describing empirical findings of child abuse by the general medical profession appeared in 1945 when John Caffey and William Silverman published a paper entitled "Infantile Cortical Hyperostosis: Preliminary Report on a New Syndrome" in The American Journal of Roentgenology and Radium Therapy. In the article, they reported that infants who suffered from excessive blood collection beneath the skull were also found to have healed fractures in their arms and legs when examined by X-rays. This constituted the first empirical finding that identified some of the physical parameters of child abuse. Building on these reports, in 1962, "The Battered-Child Syndrome" was published in the Journal of the American Medical Association. In this paper, C. Henry Kempe and his co-authors explicitly asserted that children were being physically beaten and sexually assaulted, often by their parents and others responsible for their care, and that physicians were failing in their responsibility to identify and address this abuse.

5

Research on the Battered-Child Syndrome led almost immediately to the passing of mandatory reporting laws, which were passed in 47 states between 1962 and 1966. In 1963, the Children's Bureau, in collaboration with the American Medical Association, the Council of State Governments, and the American Humane Association, urged states to enact mandating reporting laws in a report called *The Abused Child* (Brown & Gallagher, 2014). These statutes were initially written to mandate physicians and other healthcare professionals to report suspected child abuse, as at the time, they were considered to be the only professional group qualified to make such determinations (Brown & Gallagher, 2014). Some physicians opposed being made responsible for this type of professional duty:

> It was feared that a good many physicians felt that reporting was either mere "meddling" or a violation of a "professional confidence." The legislative reporting requirement was designed to overcome inaction based on either opinion, as well as on the reluctance of physicians to "become involved" in proceedings which end in court and require their appearance as a witness. It is likely that some physicians were also deterred by a fear of civil liability should they report, a fear which can be diminished by enacting a statutory immunity from liability. (Paulsen, 1967, p. 4)

The controversy concerning which professional groups should be mandated to report child sexual abuse was further compounded by debates regarding which agency would be the recipient of these reports when they were made (Paulsen et al., 1965). Some groups advocated that allegations of child abuse ought to be reported to child welfare agencies, the argument being that welfare agencies prioritized keeping families together and had the experience and resources with which to achieve this goal. Other groups asserted that law enforcement should be responsible for this type of report as it involved a crime against a child (Paulsen et al., 1965). Those who opposed the law enforcement option argued that involving the police in child abuse investigations would discourage parents from taking their sick or injured children to receive medical treatment for fear of legal punishment. California was the first state to enact a mandated reporting statute and did so in 1963; at that time, it was the only state that had enacted laws making child abuse a crime (Brown & Gallagher, 2014; Pence, & Wilson, 1994). A year later, in 1964, the American Medical Association publicly declared that mandated reporting responsibilities should be extended to other professions such as teachers, welfare or social workers, clergymen, attorneys, and police officers (Brown & Gallagher, 2014; Paulsen, 1967).

As these legal changes were unfolding, three major news magazines picked up on this newly defined physical condition or criminal act, with Newsweek, Time, and The Saturday Evening Post publishing articles on what came to be referred to as the "Battered-Child Syndrome." This attention placed child abuse in the media spotlight and led to a burgeoning of research and writing by government agencies and academics. In 1965, "child abuse" was included in the Index Medicus as a new medical category, and by 1970, scientific papers on the topic averaged about 40 per year. By 1965, no book had been published on the topic of child abuse, but by 1975 there were nine, and by 1980, 105 books had been published.

Amidst these societal changes, on December 4, 1972, Paul Ernst, the newly appointed Director of Registration, Subscription, and Statistics Services within the BSA, distributed an intra-organization memorandum, sending it to all regional directors and management staff in the BSA. The document, entitled Maintaining Standards of

6

Leadership, sought to bring some consistency to the processes used in responding to allegations of child sexual abuse, revoking the registration of volunteer leaders, and informing BSA National of these actions. In the memorandum, Ernst emphasized that the standards were developed solely to protect the youth of America and that their enforcement was not meant to infringe on the rights of any individual, nor was the refusal of registration in the BSA to be construed as persecution or the defamation of character of any specific individual. Six steps were outlined in the memorandum, these being required of the Scout Executive if a registered leader committed an act or conducted themselves in a manner that made them unfit to be a leader or associate of boys. The steps included informing the Registration and Subscription Executive of the allegations; securing evidence about the situation from sources such as signed statements of the principals, police reports, court records, and newspaper clippings; hand-delivering a written notification of the revocation to the IV; reading the letter to the person being revoked while providing a verbal explanation for the revocation; reviewing the various avenues open for a local, regional, and national review of the revocation; and sending a written summary of the contact to the Registration and Subscription Department of BSA National. Emphasis was placed upon the Scout Executive not making any specific accusations against the individual other than referencing broad concerns such as financial affairs, moral life, or lack of leadership ability. The Scout Executive was directed to convey to the IV that BSA would not be sharing the information with anyone and simply wanted the individual to stop all Scouting activity.

The memorandum also outlined the process for Scout Executives to use when responding to inquiries from the BSA about possible IVs who were seeking to re-register with the organization. The memorandum explained that some volunteers were allowed to re-register after their circumstances had changed sufficiently to alleviate prior concerns about their behavior. Ernst asked the recipients of the memorandum to keep it filed with other policy statements and to share it only with the top management of each council to avoid misunderstandings that might arise if this information was widely distributed. At the time when Ernst compiled his Maintaining Standards of Leadership memorandum, the IV files were considered confidential, although many of the alleged incidents resulted in police action, which tended to prompt local news coverage. In line with the intent of the files, the BSA wanted to encourage the reporting of all suspicious activity and therefore attempted to define a low threshold for reporting suspicions and concerns.

In 1973, U.S. Senator Walter Mondale wrote that nowhere in the federal government could he find one official assigned full-time to the prevention, identification, and treatment of child abuse and neglect. Based upon this advocacy, a year later the Child Abuse Prevention and Treatment Act (P.L. 103-247) (CAPTA) was signed into law. The new law provided funds to states for the development of Child Protective Services (CPS) and the creation of hotlines designed to prevent serious injury to children. CAPTA also authorized federal funds to improve the responses within the various states to child physical abuse, neglect, and sexual abuse. A new federal agency was created to administer CAPTA, the National Center on Child Abuse and Neglect; over the next

years, it funded training, regional multi-disciplinary evaluation centers, demonstration projects, and new research on child maltreatment.

The Child Abuse Prevention and Treatment Act also required the Secretary of the Department of Health, Education, and Welfare to conduct a comprehensive study of the incidence of child abuse and neglect nationally. The first National Incidence Study (NIS-1) was conducted in 1979 and 1980, with the report being published in 1981. Using a stratified random sample of 26 counties clustered within 10 states, the study found an incidence rate of 70 youths per 100,000 who were subject to various forms of sexual abuse including oral, vaginal, or anal penetration; genital fondling; and/or other or unspecified forms of molestation. Almost half of the sexual abuse incidents involved some type of penile penetration, with more serious injuries being associated with sexual exploitation than with physical assault. In terms of gender, 83 percent of the incidents of sexual exploitation involved girls and 17 percent involved boys, with the highest period of risk occurring between the ages of 12 and 17 years (NIS-1, 1981). This federally mandated research has continued over the past 40 years with the NIS-2 being published in 1987, the NIS-3 in 1996, and the NIS-4 in 2010.

Alongside these developments in government, the women's movement began to shed light on the various forms of violence that were being perpetrated against women. In 1975, Susan Brownmiller published her groundbreaking book, Against Our Wills: Men, Women, and Rape, injecting the power of the women's movement into a broader discussion of how physical and sexual violence were being used to intimidate and control women. Along these lines, in 1978, Diana Russell studied 830 women in San Francisco and used the term "acquaintance rape" for the first time to refer to all rapes that occurred between individuals who knew each other. This discussion opened the door to the exploration of various types of domestic violence in the home and incest within the family. With this new focus on abuse and violence within the family, many professionals came to equate child sexual abuse primarily with intra-familial child abuse (Lanning, 2010). This framework prompted a new wave of educational programming, which focused on the child's ability to distinguish "good touch" from "bad touch" and the right of the child to refuse these kinds of overtures by adults. This type of sexual abuse was widely interpreted as a family dynamic that was distinct from a pedophilic interest in children. As such, it was thought to be treatable with the appropriate professional interventions, allowing for the eventual reconstitution of some family units.

In 1978, Groth and Birnbaum (1978) sought to move beyond this family focus and began to study the sexual orientation of men who had been committed for treatment after being convicted of a sexual assault against a child. Within this group, they identified two groups of offenders: those who were sexually fixated exclusively on children and those who had regressed from peer relationships. They found no examples of regression to child victims among peer-oriented homosexual males, leading them to posit that adult heterosexual males might constitute a greater risk to underage children than adult homosexual males. With the publication of the Diagnostic and Statistical Manual of Mental Disorders III in 1980, homosexuality was removed from the DSM as a diagnosable form of mental disorder. Simultaneously, the diagnosis of pedophilia was expanded to include

8

specific reference to homosexual and heterosexual pedophilia, with the assertion being made without cited research that homosexual pedophiles were more chronic in their behavior and tended more often to sexually abuse boys that they knew at least casually.

Reflecting back on this time in American society, Lanning (2018) noted that when he first began to study sex crimes as an FBI agent in 1973, the sexual vulnerability of children was attributed primarily to strangers ("stranger danger"), with programming focusing on ways to prevent these individuals from luring children into isolated areas where they could be molested. Starting in the late 1970s, there was a growing emphasis placed on cases of sexual abuse perpetrated by family members, who used various methods to coerce sexual interactions with children within the family. Only in the 1980s did the focus shift from strangers and family members to extra-familial acquaintance offenders, as multiple highly publicized incidents of sexual abuse of children within respected community organizations began to emerge. In 1977, the Los Angeles Police Department (LAPD) established the first specialized unit known as the Sexually Exploited Child Unit, and based upon their success, several other law enforcement agencies across the country began to copy the specialized work of this unit. According to Lanning, it was within this context that investigators began to identify the tendency of some offenders to gravitate toward the victim-rich environment of youth-serving organizations, where they were able to use various seduction techniques to acquire victims and ensure that these victims did not disclose the sexual abuse that was occurring. These techniques, which came to be known as grooming, combined attention, affection, kindness, gifts, alcohol, drugs, money, and access to desired privileges to establish a relationship with sought-after victims–a relationship that could then be exploited for the purposes of sexual abuse.

In 1982, Big Brothers Big Sisters of America (BBBS) published the report *Child Sexual Abuse*, written by Donald L. Wolff, Esq., an experienced district attorney and then-National Vice President of the BBBS. In the report, he observed the following:

> As you know, the reported number of child abuse/molestation instances has been increasing. Unfortunately, we who are in the business of providing services, particularly volunteer services to young children in our community, are faced with the knowledge that… said services attract those who may abuse our children as well as those whose motives are pure. (Heldt, 2002)

A few years later, the Teacher Identification Clearinghouse was initiated through the National Association of State Directors of Teacher Education and Certification (NASDTEC), which allowed for voluntary submission of information regarding educators who had been removed from their teaching positions. The clearinghouse was created primarily to prevent child abuse in the schools, with the Executive Director at the time having estimated that 70 percent of the names in the database were entered because of child sexual abuse. Access to the database was restricted to jurisdictional agencies responsible for educator certification and to additional educational organizations approved by NASDTEC. In the same vein, in 1989, the National Practitioner Data Bank was also implemented into law (45 CRF Part 60) by the U.S. Department of Health and Human Services (HHS) to collect information on medical practitioners who had their licenses revoked for a wide array of

9

inappropriate behaviors. This information was considered confidential and could be released only under specified regulations identified in the federal law.

As the threat of these types of individuals was identified and their propensity for moving between different youth-serving organizations became apparent, the federal government sought to develop ways to track at-risk individuals moving throughout the community. This effort, however, took 15 years to come to fruition. In December of 1982, the Presidents' Task Force on Victims of Crime recommended making sexual assault, child molestation, and child pornography arrest records available to employers if their employees came in regular contact with children. However, in early 1983, Senator Arlen Specter failed to gain the necessary backing for legislation that would have prohibited employment of any individual in juvenile detention care, correctional, or treatment facilities who had not undergone a national FBI record check. Later in 1983, Senator Chuck Grassley introduced legislation designed to create a centralized registry of all state and federal arrests and convictions for child sexual assault, child molestation, and child pornography. It was to be named the Child Care Protection and Employee Responsibility File. The legislation ultimately failed due to concerns about administrative burdens and the possible abuse of this type of registry by employers and the general public. As a result, it was not until 1993 that the National Child Protection Act was enacted to improve the quality of the criminal history and child abuse records that were available to youth-serving organizations and to establish procedures requiring organizations serving youth to request these background checks on prospective employees and volunteers.

In 1985, the first child advocacy center (CAC) was opened to promote increased interagency coordination in response to allegations of child sexual abuse. The movement began in response to the criticism that child abuse investigations often became a form of system-induced trauma that further victimized the abused child (Jackson, 2004). This trauma was seen as emanating from interviews by different professionals in a variety of locations unfamiliar to the child, repeated medical examinations by different healthcare professionals, poorly developed interviewing skills that often contaminated and distorted the information that was provided by the child, and a failure of law enforcement to collaborate with social welfare services, often causing gaps or duplication of investigative efforts. The CAC model sought to improve and integrate the way in which these different disciplines worked together to better respond to suspected incidents of child sexual abuse while protecting the child victim and supporting the family. As identified by the parent organization, the National Children's Alliance (NCA), the model was made up of nine core components and standards, including a child friendly facility, a multidisciplinary team, an investigative child interview conducted by well-trained professionals, a medical examination of the child conducted according to forensic practice standards, provision of mental health services, victim advocacy, case review, case tracking, organizational structure, and cultural competency and diversity.  In 1990, a federal law (P. L. 101–647) established that the NCA would receive federal funds to provide resources, training, and technical assistance to CACs throughout the country (Jackson, 2004).

As these changes in perception and practices regarding child sexual abuse began to define the policy landscape, the New York Times published an article entitled "Scout Molester Hid Criminal Past" (July 9, 1986). The author

focused on the past of Carmine "Thomas" DiBaise, who was ultimately murdered by one of the five 13-to-14-year-old youths he had befriended at an arcade and taken to an isolated Hudson Valley cabin. Once at the cabin, Mr. DiBaise repeatedly molested the boys over the course of a weekend. The abduction and sexual molestation of the boys were not related to any Boy Scout group or activity, but Mr. DiBaise had previously worked as a printer at the Greater New York Council of the BSA and served as a Troop leader and Cub Pack leader in the Chelsea area of Manhattan. In an interview, a spokesperson for the BSA National Council explained that the organization kept a confidential list of known or suspected sex offenders who had once been involved with the Boy Scout movement. He explained that because individuals were entered into the file primarily based on information supplied by members and not law enforcement, it was possible for some men to lie on their registration application and to enter Scouting despite having a criminal background. The article ended by indicating that Mr. DiBaise was murdered by one of the five youths with his own gun and that the District Attorney concluded that the shooting was "justified," resulting in no further action against any of the youths.

In 1989, a significant meta-analytic study concerning the treatment of sex offenders was published and widely disseminated throughout academia and government. This represented the first meta-analytic study of the efficacy of sex offender treatment based upon extant quantitative research. Published by Furby and Weinrott in Psychological Bulletin, it was introduced into the professional community through presentation of the data at many of the main conferences for providers of treatment to sex offenders in the community, in hospitals, and in correctional settings. The influential study had such pervasive impact because it concluded that "[t]here is as yet no evidence that clinical treatment reduces rates of sex offenses in general and no appropriate data for assessing whether it may be differentially effective for different types of offenders." This study had far-reaching effects on policy-making and programming, undercutting the long-standing belief that pedophilia was a treatable psychiatric condition, and reorienting much of the federal and state policy that followed over the next 35 years away from treatment. Increasingly, treatment of sex offenders was viewed as unviable and ineffective, and states across the country began to legislate policies aimed at containment of repeat offenders through commitment laws and community recognition of sex offenders through the creation of sex offender registries.

As these policy changes occurred, the confidentiality of the BSA "P"-coded IV files (previously referred to as the Perversion Files) was legally challenged when the court released 231 of the files during litigation against the BSA in Reston, Virginia in 1991.[2] The court in Reston ordered all of the "P" files of Scouting-involved adults created by the BSA from 1975 through 1984 to be released to the attorneys for review and examination. In August 1990, Patrick Boyle and Elizabeth Marchak of The Washington Times began to enter these files into their newspaper's database along with other BSA cases they were able to identify through media channels. In May of 1991, they published a weeklong series of articles that summarized their perceptions of the IV files and of the sexual abuse that was allegedly occurring in the BSA. These five articles, published between May 20th

---

[2] At this time, we are not aware of any challenges to the confidentiality of the other six coded categories of IV files having been made in court. These included at the time Criminal, Financial, Theft, Moral, Leadership and Religion.

and 24th, 1991, described the origins of the IV files, their content based on testimony provided by Paul Ernst in previous litigation, and a short description of 416 allegations compiled and organized by state. The articles also provided a series of questions and answers about the sexual abuse of boys and the nature of pedophilia.

In developing their description of the IV files, Boyle and Marchak summarized the process by which an adult volunteer was vetted for work with youth in Scouting, identified various means by which Scouting leaders "seduced" their victims, and sought to ascertain the aspects of Scouting that made it more vulnerable than other organizations to the sexual abuse of children. Central to Boyle's writing was the assertion that the BSA had been trying to hide the prevalence of child abuse in Scouting, keeping the existence of the IV files out of public awareness and allegedly providing the press with inaccurate information about the extent of sexual abuse in Scouting. Boyle observed that the adults who had been placed on the IV files came from all walks of life and held a variety of occupations, such as attorneys, priests, teachers, police officers, and truck drivers. Moreover, he concluded that rather than being sinister strangers, these men were often viewed as upstanding members of the local community who were well liked by both the children and the parents involved in Scouting. Further, Boyle observed that rather than deliberately setting out to hurt boys, many of the men in the IV files professed love for particular boys and explained their sexual contact as an outgrowth of affection for them.

In September of 1991, Michael Rothschild, a Sacramento litigator, obtained a court order forcing the release of an additional 25,000 pages of material pertaining to 1,871 IV files falling under the "P" category dating from 1971 through 1991. Using these files, he argued in Galt, California that the BSA was a "magnet for pedophiles," and therefore responsible for the abuse of his client. In response, Richard

Walker, a spokesperson from BSA National in Irving, Texas, stated that the number of child molesters identified in the BSA was small. Citing the 1.15 million adult volunteers who were involved in Scouting each year, he concluded that approximately 1 in 13,000 adult volunteers was removed from Scouting annually for allegedly sexually abusing youth (New York Times, October 15, 1993). The following year, Michael Rothschild published a copyrighted document entitled Litigation Against the Boy Scouts of America. In the document, he outlined strategies for litigating these cases and directed attorneys to the most egregious cases and those most useful in making arguments related to the secrecy of the files, the use of probation, and the ability of some IVs to re-register with BSA after having their registration revoked. The court that ordered the release of the "P" coded IV files did not order them to be sealed at the end of the trial, and Attorney Rothschild was consequently able to sell the 1,871 files on the internet prior to their public release in 2012.

In 1993, President Bill Clinton was finally able to enact into law the National Child Protection Act, a bill designed to establish a national database of convicted child molesters that could be used by youth-serving organizations to check the criminal backgrounds of their employees and volunteers. Administrative Group Director of the BSA, Lawrence F. Potts, provided testimony regarding the youth protection policies of the Boy Scouts of America as part of the Hearing before the Subcommittee on Civil and Constitutional Rights of the

Committee on the Judiciary, House of Representatives, 103rd Congress, First Session, on HR1237. In his testimony, he commented on the educational initiative the organization had undertaken beginning in 1987 and referenced various internal safeguards used by the organization, including a standard two-part application required of each volunteer leader. During his testimony, and later in his remarks published in Child Abuse and Neglect, Potts described the process by which each registration was annually checked against BSA National's master file of all individuals who had been found ineligible to participate in Scouting. Potts acknowledged that some applicants could conceivably lie when answering the questions on the application form but claimed that this two-step process made clear that the organization was aggressively hostile toward child molesters and intent upon removing them permanently from Scouting (Potts, 1992).

As part of the same Congressional hearing, Col. Thomas A. Handley, legal counsel for the Civil Air Patrol, described their screening process and their efforts beginning in 1991 to participate in the National Assembly's Collaboration for Youth Task Force on Child Sexual Abuse. He described these efforts as being a shared initiative that included the BSA, the Salvation Army, and BBBS. A main goal of the Collaboration was to seek effective ways to screen volunteer members and to establish a mechanism by which the various national youth-serving organizations could share information about unfit or undesirable leaders (Hearing transcript, p. 68). As part of his testimony, Col. Handley requested that the committee consider establishing legal means that would allow the various youth-serving organizations to exchange lists of current members and members who had been disqualified for sexual misconduct. He observed that pedophiles tended to move from organization to organization and confirmed that his organization kept a record of volunteers who had not been criminally prosecuted, but who had demonstrated an inclination to molest children. He emphasized the importance of being able to share this information across organizations and the role of this type of collaboration in screening out pedophiles and preventing child sexual abuse in all youth-serving organizations (Hearing transcript, p. 67).

Lynn C. Swann, President of the Board of BBBS, joined the BSA and the Civil Air Patrol in offering his full support for the implementation of a national criminal background computer system, asserting that it would create a uniform and consistent method of tracking individuals who had perpetrated child abuse crimes. Appended to his testimony was a copy of the American Bar Association (ABA) Study of Child Abuse Allegation Reports in the Big Brothers Big Sisters of America, 1982–1991. In the report, Feller and Peterson (February 1992) described the process by which the data were collected retrospectively by field staff through telephone interviews conducted with agency directors in each state. The case information was understood to be confidential and was maintained by a national board appointed by the legal counsel. Based on these data collection efforts, the BBBS identified 304 reports of alleged sexual abuse reported to have occurred between 1982 and 1991. In the report, these instances were analyzed by state, type of sexual abuse, total number of matches with a child per perpetrator, age of perpetrator at the time of the alleged incident, perpetrator's occupation, age of the victim at the time of the alleged incident, and the outcome of these cases concerning either criminal prosecution or civil litigation (Hearing transcript, pp. 97-106).

The Congressional hearing transcript also discussed a publication by the Center on Children and the Law of the ABA, which examined effective screening mechanisms for youth-serving organizations. In the report, Wells, Davis, Dennis, and Hinton (1993) summarized the research available on the incidence of intra-familial sexual abuse and commented on the recidivistic nature of child sexual abuse, along with the difficulties intrinsic to identifying offenders prior to the perpetration of a sexual crime against a child. They provided a description of various national initiatives that had been implemented to identify individuals with a proclivity for sexually abusing children. These included pre-employment screening, licensing of programs, criminal background checks, the establishment of state child abuse registries, legislative mandates requiring state sex offender registries, the creation of the National Practitioner Database for medical practitioners, and the establishment of the Teachers Identification Clearinghouse for educators who were dismissed because of improper behavior with youth. Wells, Davis, and Dennis (1993) further summarized the factors slowing the implementation of a national criminal background check system, which included the extensive time it took to receive the requested information, the presence of incomplete disposition data in many criminal records, and the significant costs associated with automating and updating criminal history information.

A year after the passage of the National Child Protection Act, Patrick Boyle published his book Scouts Honor: Sexual Abuse in America's Most Trusted Institution (1994). Based primarily on in-depth interviews with eight men identified in the IV files, he described their sexual abuse of Scouting-involved and non-Scouting-involved youth and their often close relationships with the families of these youth. These descriptions also chronicled the long-term involvement of these individuals in Scouting and the behavior that ultimately resulted in their identification as child molesters. Describing the IV files as "confidential files–a blacklist of sorts of people who were banned from the Boys Scouts of America" (1994, p. 55), Boyle detailed Paul Ernst's role in overseeing the files for many years and described the process by which the information in the files was solicited from local councils. He also presented a chart of 1,871 IV files opened from 1971 through 1991.[3] In analyzing these data, Boyle focused on the significant increase in the number of files opened after 1987, a response he attributed to the unveiling of the BSA's new youth protection guidelines that year. As part of writing the book, Boyle conducted interviews with three top-ranking BSA employees, including Paul Ernst, who spoke with him about the IV files and their history and significance to the national organization (Boyle Affidavit, 2008).

In 1998, the Office of Juvenile Justice and Delinquency Prevention (OJJDP), the US Department of Justice, proposed guidelines for the screening of persons working with children, the elderly, and individuals with disabilities in need of support. These guidelines emerged in response to the Violent Crime and Law Enforcement Act of 1994, which directed the Attorney General to develop guidelines for the adoption of appropriate safeguards by care providers and by states for protecting vulnerable populations. In the foreword

---

[3] The 1,871 IV files opened from 1971 to 1991 represent the same group of IV files that were given to Attorney Michael Rothschild of Sacramento in September 1991, in compliance with a court order. These 1,871 IV files are the "P" coded files created from 1971 to 1991 and do not include IV files in any of the other six code categories created during the same time interval.

to the report, Attorney General Reno highlighted that the guidelines did not mandate criminal record checks for all care providers but rather presented advice on establishing policies that provided an appropriate level of screening based upon the specific circumstances surrounding the interactions of each caregiver with a vulnerable person. In some instances, this might include the Federal Bureau of Investigation's fingerprint-based criminal record checks.

In assessing these various screening possibilities, the OJJDP report suggested a three-step decision-making model. The first step included an assessment of factors that pertained to the setting in which the care was provided, the employer's or volunteer's level of contact with the individual receiving care, and the vulnerability of the care receiver. The second step centered on weighing the availability of pertinent information, the cost of any type of specific screening process, and the necessary human resources needed to carry out such a process. The third step required the selection of appropriate screening practices which would be used in addition to the basic screening protocol, which included reference checks, interviews and a written application. Attorney General Reno concluded her remarks by highlighting that the recommended guidelines, while useful in reducing the incident of abuse by care providers, were not sufficient to eliminate the problem of abuse. She emphasized the importance of parents speaking to their children and family about what was and was not acceptable behavior from care givers and service providers, and the importance of service organization and employers providing on-going monitoring of those in contact with vulnerable populations.

In 2002, Gene Abel, MD, Director of the Behavioral Medicine Institute in Georgia and a respected academic researcher on the nature of paraphilic disorders, was hired as part of litigation against the BSA in Oakland, California, to review the same 1,871 IV files released to Rothschild 11 years earlier. The analyses were funded by the attorneys for the plaintiff to bolster their argument that their client would have successfully avoided the abuse perpetrated against him while involved in Scouting if youth protection materials had been provided to him in Spanish. This argument was consistent with the interpretation offered by Boyle, which focused on the increase in the number of IV files opened between 1987 and 1991 after the BSA's child protection guidelines went into effect. In other words, central to the plaintiff's legal strategy was asserting the efficacy of the BSA's youth protection guidelines released in 1987 (Abel Deposition, June 7 and June 10, 2002).

The files provided to Dr. Abel were reviewed by a team of four coders using a one-page data entry sheet. The protocol included questions concerning the date of the file, the position of the IV in Scouting, the number of victims who were involved in Scouting, the grooming behaviors used by the IV to gain access to his victims, and the final outcome or disposition of the case, if indicated. When being deposed about his analyses of the files, Dr. Abel reflected on the limited information that was contained in many of the files and the need to delete questions from their draft protocol because the information could not be found consistently in the majority of the files. When queried further about his findings, Dr. Abel testified that only 1,458 of the files showed evidence of child molestation; within these, 840 of the identified IVs were reported to have molested

only youth involved in Scouting, 618 molested only youth who were not involved in Scouting, and 79 involved the abuse of youth who were both Scouting-involved and non-Scouting-involved.

This finding was explored further to assess its relevance to the argument being raised by the plaintiff's attorney. Dr. Abel confirmed an increase in the files opened between 1987 and 1991, but testified that this increase occurred primarily among IVs known to have sexually abused only youth who were not involved in Scouting. When cross-examined about the relevance of this finding, Dr. Abel agreed that it supported the hypothesis that the change in the number of IV files opened each year after 1987 was *not* due to the introduction of BSA's new child protection guidelines but rather a result of society's increasing response to and containment of these types of crimes against children. Dr. Abel was also questioned about the considerable difference in the number of victims identified in his analyses as compared to those reported by Patrick Boyle. He commented that his group identified only 50 to 60 percent of the victims identified by Boyle in his book based on a review of the same 1,871 IV files (Abel Deposition, June 7 and June 10, 2002).

By 2008, the BSA's *Standards for Membership and Leadership* manual had been revised three times and was summarized in a 55-page document with 12 appendices. The document included sections on the screening of volunteers, the reporting procedures for allegations of child sexual abuse and non-child abuse cases, criminal background checks, policies concerning social security numbers, procedures for revoking the registration of Scouting youth because of inappropriate behavior, and how to deal with non-registered volunteers who were involved with Troops at the local level. A section specifically referencing allegations of child sexual abuse described the various ways that the council might receive reports of child abuse and delineated the various steps that should be followed in responding to them. The section's introduction underscored that it was prepared for Scout Executives and other professional members of the BSA, as well as certain key volunteers, who might find themselves involved in implementing these procedures. Conscientious adherence to the procedures was mandatory, and it was emphasized that Scouting professionals would be held directly accountable for timely and proper implementation of all procedures outlined in the manual.

The section titled *How to Deal with Allegations of Child Abuse* emphasized that it was the responsibility of the Scout Executive to ensure that proper procedures and all state reporting laws were followed in instances of child abuse. The Scout Executive was cautioned to limit the public dissemination of the information prior to it being investigated and to explicitly follow the reporting channels required by the BSA and state statutory reporting laws. It was noted that discussing allegations with others might result in unjust damage to an individual's reputation or a lawsuit for defamation of character if the report was discovered to be unfounded. The procedural guidelines stated the following:

> In the event that your jurisdiction does not require reporting, make sure that the individual making the allegation understands that although the local council has no such requirement, it is the policy of the Boy Scouts of America to report all such allegations to the authorities who will conduct the investigation. Explain to the individual that he or she may also have a duty to report this incident to the authorities… (BSA, 2008)

16

The chapter continued with a description of the nature of mandatory reporting laws, a definition of the "reasonable suspicions" standard embedded in most of these laws, a review of relevant reporting procedures, and the inherent immunity from civil and criminal liability that accrues if a suspicion of child abuse is made to the proper authorities in good faith:

> The authorities may take a long time to conduct their investigation or to take action. Consideration needs to be given to the possibility that the results of an investigation will not justify a finding that a child has been abused but may still indicate that the policies of the BSA were violated in which case the Scout Executive will need to determine actions to be taken in accordance with the provisions of the previous chapter. Any allegation of child abuse that appears to have substance, even if anonymous, necessitates immediate removal of the alleged abuser from Scouting. This may be only temporary in the event that the report is proven to be false but the risk of continuing to permit the alleged abuser to participate is too great to take. Individuals should be told that this action is being taken in the best interest of Scouting. (BSA, 2008)

The document further conveyed that Scout Executives might want to meet with the parents of the other youth in an affected unit, both to help parents address their concerns regarding the allegations and to support them in discussing with their own children whether or not they too might have been abused by the same perpetrator.

According to the manual, Scout Executives were urged to maintain contact with the family of the victim until it was clear that the crisis was over and the family no longer needed or desired further assistance from the BSA. The procedures for arranging for the initiation of counseling sessions for victims and/or their families were also summarized. These indicated that counseling was offered for up to three months with extensions being available based upon an extension request by the treating psychologist, psychiatrist, or licensed counselor. The document explained that counseling resources were widely available for victims and their families and advised Scout Executives to consult with physicians, social service agencies, pediatric departments in local hospitals, and the National Child Abuse Hotline to identify resources across the country.

In 2008, an addendum to be inserted into the *Standards for Membership and Leadership* was sent to all Scout Executives, stating that there was no longer an option for probation of an IV and that it had to be determined unequivocally if an individual met the membership and leadership requirements of the BSA or not. This addendum articulated explicitly a policy that had been in practice for many years, with probation not having been used in instances of child sexual abuse since 1994. In line with emerging policy, in 2011 the BSA also adopted the practice of reporting all suspicions of child sexual abuse to the police in conjunction with the revocation of the registration of a volunteer leader and their entry into the Ineligible Volunteer file. This practice was initiated nationwide, making all BSA volunteers and employers mandated reporters. As part of this initiative, the BSA also undertook a retrospective review and contacted law enforcement for all cases in which a file review failed to indicate a law enforcement contact at the time of the initial opening of the IV file.

As these changes were occurring in the BSA, the U.S. Centers for Disease Control and Prevention published its report *Preventing Child Sexual Abuse Within Youth-Serving Organizations* (Saul & Audage, 2007). The report focused on child abuse prevention efforts, which were described as optimally including the proper screening

and selection of employees; guidelines for interactions between adults and children; practices for monitoring behaviors; ways of ensuring a safe physical environment; avenues for responding to suspicions, inappropriate behavior, and breaches in policy; and training for employees/volunteers, caregivers, and youth. The report addressed several challenges and reactions that commonly emerged and tended to undermine efforts when organizations attempted to implement comprehensive child protection programs. These included minimization of the need for child abuse prevention, limited/inadequate resources, poor employee/volunteer retention, the tendency to accept and rely on a single strategy, problems with internal communication within agencies, and a lack of knowledge about the varied resources that had been developed to encourage child abuse prevention programs. When summarizing a few primary principles for use by all youth-serving organizations, the report identified the importance of creating an open environment in which employees and volunteers feel comfortable discussing the issue of child sexual abuse, identifying clear goals that are expressed through the various policies and procedures being adopted, integrating programming into the current risk management planning process, creating mechanisms for assessing compliance with the protection program, and staying informed about practices and policies as they develop and are implemented by other youth-serving organizations.

Concerning responses to specific allegations, the Centers for Disease Control and Prevention report emphasized that youth-serving organizations should not attempt to conduct their own investigation of child-abuse allegations beyond asking a few clarifying questions of a child. It also underscored the importance of keeping internal records, which allowed each organization to track allegations and suspicions of child sexual abuse and to record the resolution of child abuse cases that had been referred to either CPS or law enforcement for investigation. When addressing the confidentiality of these reports, CDC recommended that the names of potential victims, the accused perpetrator, and the person making the report remain private, and that procedures be developed to guide decisions as to when allegations of sexual abuse would be reported to the community and when they would not. The report recommended that a single spokesperson be identified who would communicate with the press and general community while also referencing general training for all employees and volunteers on how to deal with the press and the community.

A few years later, the BSA "P"-coded IV files received perhaps their most widespread media coverage during a lawsuit brought in Portland, Oregon, against the BSA in 2010. This litigation involved abuse allegations made against Timur Dykes for sexual abusing a Scout in the early 1980s when the victim was 12 years old. As part of the lawsuit, approximately 1,000 files from the years 1965 to 1984 were offered into evidence, with the caveat that only the jury and the attorneys involved in the case could review them. The attorneys for the plaintiff argued that the BSA had sought to hide the problem of child sexual abuse in Scouting. They also argued that if the BSA had made the files public 25 years earlier, community awareness combined with more sophisticated youth protection practices would have protected the Scout from the sexual abuse he allegedly experienced as an adolescent. The BSA asserted that the files were kept confidential to protect the privacy of victims and their families as well as the privacy of accused persons who had not been convicted of a crime. The BSA also sought

18

to demonstrate that BSA's handling of this information as confidential was consistent with standard practices of all youth-serving organizations 30 years earlier. During the trial, various witnesses explained that because the BSA worked on and wanted to continue to work on suspicion rather than proof, it had to protect itself from liability that might accrue from wrongfully accused individuals. After the trial and following a review by the Oregon Supreme Court, the "P"-coded IV files discussed as part of that trial were released to the public. On October 18, 2012, they were posted to the website of one of the plaintiff's attorneys from that trial.

Concurrent with the public release of these "P"-coded IV files, the BSA released a report by Janet I. Warren, DSW, compiled while she was serving as a defense expert in litigation against the BSA in Seattle, Washington (2011). In the report, Warren described the analysis of 920 "P"-coded IV files opened between 1965 and 1984, 829 of which involved allegations of sexual abuse of a child. Based on her analyses, Warren concluded that the IV files were useful and had served their purpose in identifying 175 men (21% of the Scouting-involved adults identified in that set of files) who attempted to re-register with the BSA after having their registration revoked by the national organization. She, however, observed that the IV files did not contain the type of information that might be combined to screen out leaders before they offended against a youth either inside or outside of Scouting. Warren further disputed the characterization of the IV files as "secret files," observing that 58.1 percent of the files contained some type of public documentation, often including newspaper articles and police reports, and that in 63 percent of the files law enforcement was involved in the investigation of the allegations of child sexual abuse.[4]

This evolution in our thinking about child sexual abuse in general, and the BSA IV files in particular, is perhaps best contextualized by the epidemiology of child sexual abuse in American society today. Based upon data obtained from three comparable national U.S. telephone surveys of youths aged 15 through 17 years, Finkelhor, Vanderminden, Turner, Shattuck, and Hamby (2014) found that 26.6 percent of 17-year-old girls reported having experienced sexual abuse or sexual assault some time in their childhood or adolescence. They also found that 5.1 percent of the boys surveyed reported sexual abuse or assault during this same period. This abuse was found to involve both adult and youth perpetrators and to involve a period of increased risk between the ages of 15 and 17 years. Shattuck, Finkelhor, Turner, and Hamby (2016) also analyzed these same data as they pertained to the location of reported child sexual abuse. They found that within their sample of 13,052 children and adolescents aged 0 through 17 years, the rate of abuse in youth-serving organization was 0.4 percent (95% CI, 0.2-0.7) for the past year, and 0.8 percent (95% CI, 0.5-1.1%) over the lifetime. Based upon these findings, they concluded, "[a]buse in youth-serving organizations was a relatively rare form of abuse, dwarfed by abuse by family members and other adults" (p. 1).

Contemporary research further indicates that rates of child sexual abuse in America are declining. The most recent National Incidence Study (NIS-4), conducted in 2010, indicated that there has been a 26 percent

---

[4] As a comparison, the *ABA Study of Child Abuse Allegation Reports in Big Brothers Big Sisters of America, 1982-1991* reports a lower percentage of files reflecting law enforcement involvement during that approximate time period (p. 104).

reduction in acts resulting in demonstrable harm to a child victim (termed the Harm Standard) per 1,000 children in the general population since the completion of the NIS-3 in 1993 (Sedlak, Mettenburg, Basena, Petta, McPherson, Greene, and Li, 2010). The greatest area of decline involved child sexual abuse, which under the Harm Standard decreased from 217,700 acts of child sexual abuse in 1993 to 135,300 in 2005-2006, reflecting a 38 percent decrease in the number of sexually abused children and a 44 percent decrease in the rate of sexual abuse. In seeking to explain this trend, Finkelhor (2008) reviewed a wide range of possible explanations for this decrease and concluded that the effects of economic prosperity, the increase in avenues of social control and of victim advocacy, and the effects of advancements in psychiatric pharmacology were trends in society that were worthy of further study in understanding these trends in criminal activity. Finkelhor also underscored the importance of evolving social norms, which have rendered discussions of child sexual abuse a topic of public discourse and academic interest, and which have altered the practices of parents and children when encountering a situation that might be potentially hazardous to the safety of a child (Finkelhor, 2009; Gibson & Leitenberg, 2000).

With this 100-year history in mind, we will now turn our attention to a review of the BSA IV files that were created during this time period. Initially housed on a Rolodex, the Volunteers Screening Database began as a simple paper file system that has evolved into a complex computer system that is monitored on a 24-hour basis and subjected to regular administrative review. The structure and function of the IV files evolved in tandem with society's evolving understanding of child sexual abuse, which influenced the practices of the BSA. In turn, the youth protection efforts of the BSA clearly informed standards and practices for youth-serving organizations across America.

## METHODOLOGY

The following section of our report summarizes the analyses of data obtained through a review of 7,819 IV files involving alleged sexual misconduct of adult volunteers or youths, traditionally termed "P" files (indicating perversion). These files were created by the Registration Department of BSA National between January 1, 1946, and December 31, 2016. Each of these IV files contains at minimum descriptive information about the IV designed to enable their identification at some later time should they seek to re-register in Scouting, as well as some type of objective evidence convincing enough to warrant their exclusion from Scouting. Annually, registration for each volunteer leader is checked against this list of IVs, the goal being to ensure that an IV does not gain access to youths after being denied registration by the organization.

Extracting and coding relevant data from the IV files proceeded in four stages. First, the Ineligible Volunteer Record Sheet (IVRS), used by the BSA to summarize information about each IV, was revised for electronic/online coding. This revision was undertaken to more effectively capture the most relevant information contained in each file in a manner that would be optimally accessible and useful in reviewing the files. It was also designed to better capture information that had become available since the inception of the

IVRS, such as any past crimes identified through formal criminal background checks, any possible violations of the BSA youth protection guidelines, the IV's known involvement in other youth-serving organizations, and the reporting of allegations to a state authority. A structured narrative of the allegations and their surrounding circumstances was also included in the form to enable a quick review of each file and to provide some qualitative insight into the empirical analyses that constituted the primary focus of the study.

As part of this process, each IV file was categorized according to a new and more nuanced coding scheme. This coding scheme was being developed by the BSA to more precisely classify adult and youth IVs who previously would have fallen collectively under the broader "P" classification code. The expanded file classification included the following eight codes for the Adult IVs:

- *Child Pornography* (CP): These files reference Adult IVs who were alleged to be in possession of child pornography or involved in the distribution of child pornography, but did not include instances in which the IV was alleged to be making child pornography, these instances being coded as CSA.
- *Child Sexual Abuse* (CSA): These files reference Adult IVs alleged to have committed child sexual abuse while they were involved with Scouting, whether or not the alleged victim was involved in Scouting at the time of the alleged abuse, and whether or not the file also involved references to child pornography, other criminal activity, pornography, or youth protection violations.
- *Criminal* (C): These files reference Adult IVs alleged to have committed a significant crime, usually  involving a sexual, but at times a non-sexual, crime against an adult or a non-sexual crime against a child.
- *Criminal Background Checks* (CBC): These files reference Adult IVs for whom a formal criminal background check revealed a sexual crime before their registration with the BSA or a registered volunteer for whom a criminal background check revealed to the BSA a previously unknown criminal history involving a sexual crime.
- *Pornography* (P): These files reference Adult IVs alleged to have possessed pornographic materials, which were handled in a reckless manner, and while not directly presented to children, may have allowed children to gain access to the materials.
- *Youth Protection Violations* (YPV): These files reference Adult IVs alleged to have violated youth protection standards, but who did not cross the threshold of behavior that would be considered child sexual abuse (e.g., spending time alone with a youth in the absence of sexual activity).
- *Unwelcome* (U): These files reference adults with no known involvement with Scouting but who were identified through public sources, such as sex offender registry notices or the media, and considered to be of such high risk that they were entered into the IV files as a precaution against any future attempts at registration.
- *Other* (O): These files reference Adult IVs who were involved in Scouting but who do not fit within any of above categories, often because it was determined that the IV had sexually offended against youths either prior to or after the IV's involvement in Scouting.

The youth-on-youth allegations included the following six codes:

- *Youth Child Pornography* (Y-CP): These files reference youths under the age of 18 years who were alleged to be in possession of or involved in the distribution of child pornography, but did not include instances in which the IV was alleged to be making child pornography, these instances being coded as CSA.
- *Youth Child Sexual Abuse* (Y-CSA): These files reference youths under the age of 18 years alleged to have committed child sexual abuse while they were involved with Scouting, whether or not the alleged victim was involved in Scouting at the time of the alleged abuse, and whether or not the file also involved references to child pornography, other criminal activity, pornography, or youth protection violations.

- *Youth Criminal* (Y-C): These files reference youths under the age of 18 years alleged to have committed a crime other than one involving sexual behavior against other youths.
- *Youth Pornography* (Y-P): These files reference youths under the age of 18 years alleged to have possessed pornographic materials, which were handled in a reckless manner with other youths.
- *Youth Protection Violations* (Y-YPV): These files referenced youths under the age of 18 years alleged to have violated youth protection policies, but who did not cross the threshold of behavior that would be considered child sexual abuse.
- *Other* (Y-O): These files reference youths under the age of 18 years who were involved in Scouting but who do not fit within any of the above categories, often because it was determined that the IV had sexually offended against another youth either prior to or after their involvement in Scouting.

Each individual was assigned one incident code only, and if the reason for removal did not clearly align with one of the distinct categories (e.g., Child Sexual Abuse, Criminal) then "Other" was selected for the incident code. These "Other" incidents included sexual offenses that occurred prior to the individual's involvement with the BSA or after they left Scouting, as well as sexual activity between adults that was not considered inappropriate for a volunteer leader but not criminal. A hard copy of the programmed IVRS is included in the BSA Volunteer Screening Database Coding Manual contained in Appendix A.

The second stage of the project involved revising the coding protocol used in the earlier Warren (2011) study. The revised research form, the UVA-Research Coding Form (UVA-RCF), included more questions about the behavior of Youth IVs, an expanded set of questions concerning the means used by the IV to gain access and avoid detection while allegedly sexually abusing one or more children, and the completion of a victim module for all identified victims, including both Scouting-involved and non-Scouting-involved youths. A copy of the revised UVA-RCF is also included in the BSA Volunteer Screening Database Coding Manual contained in Appendix A.

The third stage of the study design involved working with Custom Application Consulting Services (CACS) in Information Technology Services (ITS) at the University of Virginia to program both forms into a web-based application and database. The application allowed for secure electronic data entry, review, and storage of the IV files. The website was accessed by coders using UVA security tokens and was aligned with a database designed to facilitate the transfer of the coded data into statistical software. This application avoided the need to provide hard copies of the IV files to coders and allowed UVA to hire qualified coders who lived outside its geographical area. Further, because file coding and database creation were conducted simultaneously via the web-based platform, this process bypassed the need for any additional data entry after qualified research assistants had coded each IV file.

The coding of the 7,819 files was completed by over 30 coders and the project research manager. The coders were recruited through the University of Virginia and listservs of other graduate programs in clinical psychology on the east coast of the U.S. The final coding team was made up graduate students in clinical psychology, law school students and recent graduates, and individuals who had completed or were nearing the completion of their undergraduate degrees in psychology and were preparing to apply for graduate programs in clinical

psychology and/or clinical social work. The training on the two protocols was conducted using a web group meeting format, followed by a detailed review of the first ten cases completed by each coder. The coding manual was created and updated over the first months of the project. A narrative summary guide was also created to standardize the contents and lengths of the case descriptions created for each file. Prior to beginning the coding, each coder signed a confidentiality agreement that was included in the BSA Volunteer Screening Database Coding Manual contained in Appendix A.

Coders were also assigned reliability cases (i.e., identical cases completed by more than one coder) in order to assess inter-rater agreement of coding categories. The reliability cases were distributed by the research manager periodically to each coder who was active on the project at that time, this number varying from 12 to 30+ over the course of the project. The reliability cases were examined using percent agreement across nine variables obtained from the IVRS and fifteen variables obtained from the UVA-RCF. These variables were selected for the reliability analyses as they were central to the BSA's use of the IV files, and each was present more often than not in the majority of files. We chose to use percent agreement to measure reliability among coders as our data were primarily dichotomous, and the number of reliability cases coded by each research assistant varied. The average percent agreement found on the identified variables calculated for 18 coders, each of whom had completed a minimum of 100 cases, was 92.83. These data are summarized in Appendix B.

Finally, as the data collection began to near completion, we began further software development to enhance the BSA's ability to organize, analyze, and provide structure to the creation and review of their IV files going forward. This software was designed to facilitate information sharing between youth-serving organizations concerning at-risk individuals and to enhance ongoing research into child sexual abuse. See Appendix C for screenshot of this software under development, Filtrum: Registration Screening Module.

**Table 1: Descriptions of all Adult and Youth IV Files**

|  | Adult IVs | | | Youth IVs | | | All IVs |
|---|---|---|---|---|---|---|---|
|  | <1988 | >1987 | All | <1988 | >1987 | All | All |
| Total files | 1,718 | 5,160 | 6,878 | 11 | 930 | 941 | 7,819 |
| Page length | 15.20 | 26.29 | 23.52 | 18.27 | 30.92 | 30.77 | 24.40 |
| Page range | 2 - 412 | 1 - 917 | 1 - 917 | 3 - 39 | 2 - 263 | 2 - 263 | 1 - 917 |
| Sum of pages | 26,114 | 135,678 | 161,792 | 201 | 28,755 | 28,956 | 190,748 |

The coding took 32 months to complete and required the review of 190,748 pages of case material according to 410 unique variables and 7,175 repeated and composite variables derived from the information contained in the two coding forms. The mean page length was 23.52 pages for the Adult IV files and 30.77 pages for the Youth IV files, with a range of 1 to 917 pages across the 7,819 files included in the study.

Given the 70 years of data included in the study, we sought to define some demarcations in our data analyses that would capture historical differences in cultural beliefs and practices concerning child sexual abuse in American society. We chose to do this by conducting data analyses that compared IV files generated before

and after 1987. In 1987, the BSA implemented their first comprehensive youth protection program which, over the ensuing years, increasingly publicized the issue of child sexual abuse and broadened to include a diversified set of programs for adults and youth. Around this time, national and state laws also began to emerge expanding the mandatory reporting of child sexual abuse, requiring the registration of a large segment of convicted sex offenders, and allowing for the commitment of sexually violent predators following incarceration.

The quality of the data varied over the different variables and across the 70 years of the data review. Information was consistent for the demographic and physical characteristics of the IVs, this being congruent with the purpose of the files in identifying and tracking IVs over time and location. Information was more limited concerning individual characteristics of the victims and the interactions they had with the IV prior to and during the alleged abuse. The information contained in the files increased in quantity over the two primary chronological periods of the study (i.e., before and after 1987), although there was not necessarily a consistent correlation between the length of the file and the quality of the information contained in it. Analytically, we conducted tests of statistical significance on the data that appeared to be of theoretical relevance and for which we believed that there was robust enough data to warrant statistical inference. We did not conduct tests of statistical significance on data that were primarily descriptive.

It is important to emphasize that all of the data described in tables, figures, and text throughout this report is representative only of the information that was submitted to BSA National Council by the local councils. These data, therefore, cannot be assumed to be full, accurate representations of all dynamics associated with a specific allegation or IV. Specifically, each variable could be coded only if the requisite information was contained in the file. We could not always ascertain whether the absence of information regarding a behavior or characteristic of an IV or alleged victim indicated that the file did not present enough information to code for that behavior or characteristic, or if the file indicated that the behavior or characteristic was explicitly not present. This limitation is inherent to research conducted with archival data, particularly those that were generated for administrative reasons only.

## NATURE AND CONTENT OF THE IV FILES

### Incident Codes for Adult and Youth IVs

The IV dataset contained files involving 6,878 (88.0%) Adult IVs and 941 (12.0%) Youth IVs. These are summarized in Table 2 according to their specific classification codes. The date assigned to each IV file represents the date each file was opened based upon a credible allegation of inappropriate sexual behavior and *not* the date of the alleged abuse, this information being unavailable in the majority of IV files. These data indicate that the most common classification of IV files was Child Sexual Abuse (CSA), with this representing 75.9 percent of the total number of Adult and Youth "P"-coded IV files over the 70-year span of the files. These CSA-coded files included allegations involving Scouting-involved volunteers and members, whether

24

these activities occurred during or outside of Scouting activities or programming. The second most common category was Other ("O"), which involved 10.9 percent of the Adult and Youth IV files. The third largest category was made up of IVs who were discovered to have been in possession of child pornography or were known to have distributed child pornography (4.2%), but who were not known to have made child pornography, with those IVs coded as CSA. These data are presented by year in Appendix D of this report.

**Table 2: Adult and Youth Incident Codes for 7,819 IV Files: Jan. 1, 1946 to Dec. 31, 2016**

| Decade[1] | CSA | | YPV | | CP | | C | | P | | O | | CBC[2] | | U[2] | | Total[3] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1940s | 3 | (75.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 1 | (25.0%) | 0 | (0.0%) | 0 | (0.0%) | 4 (0.1%) |
| 1950s | 62 | (83.8%) | 0 | (0.0%) | 0 | (0.0%) | 2 | (2.7%) | 0 | (0.0%) | 9 | (12.2%) | 0 | (0.0%) | 1 | (1.4%) | 74 (0.9%) |
| 1960s | 498 | (82.2%) | 0 | (0.0%) | 0 | (0.0%) | 49 | (8.1%) | 0 | (0.0%) | 59 | (9.7%) | 0 | (0.0%) | 0 | (0.0%) | 606 (7.8%) |
| 1970s | 338 | (88.0%) | 0 | (0.0%) | 0 | (0.0%) | 20 | (5.2%) | 0 | (0.0%) | 25 | (6.5%) | 0 | (0.0%) | 1 | (0.3%) | 384 (4.9%) |
| 1980s | 1,137 | (90.9%) | 2 | (0.2%) | 8 | (0.6%) | 44 | (3.5%) | 0 | (0.0%) | 51 | (4.1%) | 4 | (0.3%) | 5 | (0.4%) | 1,251 (16.0%) |
| 1990s | 1,853 | (74.0%) | 19 | (0.8%) | 46 | (1.8%) | 94 | (3.8%) | 2 | (0.1%) | 402 | (16.0%) | 29 | (1.2%) | 60 | (2.4%) | 2,505 (32.0%) |
| 2000s | 1,143 | (68.5%) | 12 | (0.7%) | 116 | (7.0%) | 45 | (2.7%) | 4 | (0.2%) | 187 | (11.2%) | 143 | (8.6%) | 19 | (1.1%) | 1,669 (21.3%) |
| 2010s | 901 | (68.0%) | 5 | (0.4%) | 162 | (12.2%) | 42 | (3.2%) | 4 | (0.3%) | 122 | (9.2%) | 67 | (5.1%) | 23 | (1.7%) | 1,326 (17.0%) |
| Total[4] | 5,935 | (75.9%) | 38 | (0.5%) | 332 | (4.2%) | 296 | (3.8%) | 10 | (0.1%) | 856 | (10.9%) | 243 | (3.1%) | 109 | (1.4%) | **7,819** |

[1] The year is determined by the date on the IVRS.
[2] Only reflect Adult IVs, as these codes were not possible for youth members.
[3] Row totals denote the number of files per year across all adult and youth incident codes.
[4] Column totals denote the number of files per adult and youth incident code across all years.
[5] Classification Codes: CSA (Child Sexual Abuse), YPV (Youth Protection Violation), CP (Child Pornography), C (Criminal), P (Pornography), O (Other), CBC (Criminal Background Check), U (Unwelcome).

Similar patterns were found when the IV files were analyzed separately according to the Adult and Youth codes. As reflected in Table 3, 3.5 percent of the Adult IVs were precluded from registering with the BSA or had their BSA registration revoked based on the results of a criminal background check (CBC). Instances of individuals being removed due to a CBC began in 1986 and notably increased starting in 2003, reaching a peak of 16.7 percent of the yearly Adult IVs in 2006. Child Pornography (CP) also became an increasingly common classification after reaching a high of 24.3 percent of the Adult yearly totals in 2013. The Other classification category of IV files continued to be common, as seen with the combined analyses presented in Table 2.

**Table 3: Adult Incident Codes for 6,878 Adult IV Files: Jan. 1, 1946 to Dec. 31, 2016**

| Decade[1] | CSA | | YPV | | CP | | C | | P | | O | | CBC | | U | | Total[2] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1940s | 2 | (66.7%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 1 | (33.3%) | 0 | (0.0%) | 0 | (0.0%) | 3 (<0.05%) |
| 1950s | 62 | (83.8%) | 0 | (0.0%) | 0 | (0.0%) | 2 | (2.7%) | 0 | (0.0%) | 9 | (12.2%) | 0 | (0.0%) | 1 | (1.4%) | 74 (1.1%) |
| 1960s | 497 | (82.3%) | 0 | (0.0%) | 0 | (0.0%) | 49 | (8.1%) | 0 | (0.0%) | 58 | (9.6%) | 0 | (0.0%) | 0 | (0.0%) | 604 (8.8%) |
| 1970s | 337 | (88.0%) | 0 | (0.0%) | 0 | (0.0%) | 20 | (5.2%) | 0 | (0.0%) | 25 | (6.5%) | 0 | (0.0%) | 1 | (0.3%) | 383 (5.6%) |
| 1980s | 1,109 | (90.9%) | 2 | (0.2%) | 8 | (0.7%) | 43 | (3.5%) | 0 | (0.0%) | 49 | (4.0%) | 4 | (0.3%) | 5 | (0.4%) | 1,220 (17.7%) |
| 1990s | 1,558 | (71.1%) | 19 | (0.9%) | 46 | (2.1%) | 90 | (4.1%) | 2 | (0.1%) | 386 | (17.6%) | 29 | (1.3%) | 60 | (2.7%) | 2,190 (31.8%) |
| 2000s | 871 | (63.1%) | 12 | (0.9%) | 114 | (8.3%) | 39 | (2.8%) | 4 | (0.3%) | 179 | (13.0%) | 143 | (10.3%) | 19 | (1.4%) | 1,381 (20.1%) |
| 2010s | 616 | (60.2%) | 5 | (0.5%) | 157 | (15.3%) | 39 | (3.8%) | 3 | (0.3%) | 113 | (11.0%) | 67 | (6.5%) | 23 | (2.2%) | 1,023 (14.9%) |
| Total[3] | 5,052 | (73.5%) | 38 | (0.6%) | 325 | (4.7%) | 282 | (4.1%) | 9 | (0.1%) | 820 | (11.9%) | 243 | (3.5%) | 109 | (1.6%) | **6,878** |

[1] The year is determined by the date on the IVRS.
[2] Row totals denote the number of files per year across all adult incident codes.
[3] Column totals denote the number of files per adult incident code across all years.
[4] Classification Codes: CSA (Child Sexual Abuse), YPV (Youth Protection Violation), CP (Child Pornography), C (Criminal), P (Pornography), O (Other), CBC (Criminal Background Check), U (Unwelcome).

**Table 4: Youth Incident Codes for 941 Youth IV Files: Jan. 1, 1946 to Dec. 31, 2016**

| Decade[1] | CSA | | CP | | C | | P | | O | | Total[2] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1940s | 1 | (100.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 1 | (0.1%) |
| 1950s | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) |
| 1960s | 1 | (50.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 1 | (50.0%) | 2 | (0.2%) |
| 1970s | 1 | (100.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 1 | (0.1%) |
| 1980s | 28 | (90.3%) | 0 | (0.0%) | 1 | (3.2%) | 0 | (0.0%) | 2 | (6.5%) | 31 | (3.3%) |
| 1990s | 295 | (93.7%) | 0 | (0.0%) | 4 | (1.3%) | 0 | (0.0%) | 16 | (5.1%) | 315 | (33.5%) |
| 2000s | 272 | (94.4%) | 2 | (0.7%) | 6 | (2.1%) | 0 | (0.0%) | 8 | (2.8%) | 288 | (30.6%) |
| 2010s | 285 | (94.1%) | 5 | (1.7%) | 3 | (1.0%) | 1 | (0.3%) | 9 | (3.0%) | 303 | (32.2%) |
| Total[3] | 883 | (93.8%) | 7 | (0.7%) | 14 | (1.5%) | 1 | (0.1%) | 36 | (3.8%) | **941** | |

[1] The year is determined by the date on the IVRS.
[2] Row totals denote the number of files per year across all youth incident codes.
[3] Column totals denote the number of files per youth incident code across all years.
[4] Classification Codes: CSA (Child Sexual Abuse), CP (Child Pornography), C (Criminal),
   P (Pornography), O (Other).

As illustrated in Table 4, the Youth IV files contained almost exclusively allegations of CSA (93.8%). In our coding of these Youth IV files, we sought to differentiate between abusive sexual contact and sexual contact that appeared to involve mutual sexual exploration between similarly aged peers. In instances of files that had been coded as Y-CSA but which appeared to be consensual youth-on-youth sexual conduct, the files were coded under the CSA classification code, but no victims were included for analyses from either the IVRS or UVA-RCF victim module "D". When there was any uncertainty about the nature of the sexual interactions occurring between youth, the files were included in the CSA classification category and victims were identified and coded accordingly.

As indicated in Figure 1, the number of files involving Adult IVs accused of CSA increased ten-fold from 25 files in 1980 to a high of 257 IVs in 1989, and then decreased to a low of 69 in 2013, a decline of almost 75 percent over a 24-year period. This decline is consistent with the reduced rates of child sexual abuse and other forms of violent crime observed over this same time period in American society. In contrast to the decline in the number of CSA files found among the Adult IV files, there was no comparable decline observed in the Youth CSA IV files, with there being between 17 and 63 files opened each year between 1990 and 2016, with an average of 32 files each year. The classification of Youth IV files as separate from the Adult IV files reflects the BSA's acknowledgement of the developmental differences in the dynamics, causes, and trajectories of sexually abusive behavior perpetrated by youth as contrasted with adults.

Trends in the frequency of classification codes over time are displayed in Figures 1 and 2. Figure 2 contains the same data as Figure 1, but with the Adult and Youth CSA IV files removed to allow for an expanded review of the other IV classification codes. This figure illustrates the increasing role of criminal background checks (CBC) in identifying adults with histories of criminal offending as this type of state and federal search became technologically and financially feasible in America. The BSA made CBCs mandatory for all adult volunteers starting in 2003. However, the number of individuals removed from the BSA based upon a CBC reached a maximum of 25 Adult IVs in 2008. This number indicates that despite the widespread appeal of CBCs, they

play a minor role in identifying unfit leaders within the BSA. This finding is not surprising given available research indicating that only 10 percent of arrested child molesters have a previous conviction for a sexual crime against a child (Finkelhor, 2009; Smallbone, Marshall, and Wortley, 2008).



*Figure 1.* Incident Codes for 7,819 Adult and Youth IV Files: Jan. 1, 1946, to Dec 31, 2016

Figure 2 further illustrates the growing role of child pornography in the identification of Adult IVs with a sexual interest in children. In 2010, 38 IV files were opened solely due to the presence of child pornography. These individuals generally came to the attention of the BSA when an arrest was made by law enforcement. There has been considerable debate in the research literature concerning the relationship between viewing child pornography and sexually offending against a child (Bourke and Hernandez, 2009; Kingston, Fedoroff, Firestone, Curry & Bradford, 2008; Seto, Hanson & Babchishin, 2011). Our data do not address this question directly but do indicate a substantial increase in the discovery of Scouting-involved adults who view child pornography over time.

Use of the Other IV classification code for Adult IVs has decreased over time from a high of 58 IV files in 1991 to a low of 5 IV files in 2016. It has been seldom used with Youth IVs, specifically only 36 times among all Youth IV files examined. It is not clear why this classification has decreased over time, although it may reflect, in part, the change in coding that occurred when homosexual behavior between consenting adults was removed from the coding of the "P"-files.



*Figure 2.* Incident Codes for 1,884 Adult and Youth IV Files, Excluding CSA and Y-CSA

## Making Sense of these Numbers: A Proportional Assessment

The BSA began formally tabulating yearly registration data in 1955. The numbers concerning Adult and Youth IVs identified from 1955 through 2016 indicate that on average 81 new Adult IV files and 14 new Youth IVs files were opened each year for issues that now are considered to fall under the CSA category. To understand these numbers as they pertain to the larger organization, we created a visual display that would represent these IVs in the broader context of all volunteer leaders registered with the BSA each year from 1955 through 2016.



Each of the 10,000 dots represents 176.3 adults registered with BSA.

The orange area represents Adult IVs added to the "P" files.

*Figure 3.* Visual Representation of Identified Adult IVs Relative to Adults Registered

On average, 1,762,602 adults registered in Scouting each year from 1955 through 2016. To integrate these numbers with the average number of IVs identified each year, a proportional grid was created composed of 10,000 dots, each of which represents 176.3 adult BSA volunteer leaders (see Figure 3). The box containing the orange dots at the lower right bottom of the grid, which is magnified in the enlarged call-out to the right, represents the number of Adult IVs identified each year. Similarly, an average of 5,105,099 youth registered annually in a Scouting program. This number is represented in Figure 4 to reflect proportionally the 14 Youth IVs, who, on average, were identified and placed in the IV files each year from 1955 through 2016.



Each of the 10,000 dots represents 510.5 youth members registered with BSA.

The orange area represents Youth IVs added to the "P" files.

*Figure 4*. Visual Representation of Identified Youth IVs Relative to Youth Registered

These proportional diagrams provide a visual aid that reflects two perspectives simultaneously. Overall, this sample included nearly 6,000 individuals removed from Scouting for allegations of sexual misconduct over a period of 70 years, and as such represents a unique sample of community-living child molesters in America outside of law enforcement and child protective services. However, simultaneously, this same group of unfit leaders and abusive youth in Scouting is tiny when viewed in the context of the overall number of adults and youth involved in Scouting each year. This comparison is critical as it flips the perspective on the total number of CSA IV files from one signifying a problem with child sexual abuse in the BSA to one indicating a predominantly safe environment for the vast majority of youths involved in Scouting. These visual aids also convey the immense task facing the BSA and all other youth-serving organizations when seeking to identify and preemptively exclude abusive individuals from having contact with children.

**Geographical Distribution of Adult and Youth IVs**

The registration records included in the IV files were examined to determine the location of the IV when they were alleged to have acted in a sexually inappropriate manner towards a child.

**Table 5: Adult and Youth IV Files by State or International Council of Origin**

| State | All Codes[1] | | CSA[2] | | State | All Codes | | CSA | |
|---|---|---|---|---|---|---|---|---|---|
| Alaska | 49 | (0.6%) | 38 | (0.6%) | New Hampshire | 43 | (0.5%) | 38 | (0.6%) |
| Alabama | 74 | (0.9%) | 53 | (0.9%) | New Jersey | 180 | (2.2%) | 133 | (2.1%) |
| Arizona | 74 | (0.9%) | 59 | (1.0%) | New Mexico | 32 | (0.4%) | 27 | (0.4%) |
| Arkansas | 53 | (0.7%) | 41 | (0.7%) | New York | 481 | (5.9%) | 375 | (6.0%) |
| California | 591 | (7.3%) | 459 | (7.4%) | North Carolina | 187 | (2.3%) | 157 | (2.5%) |
| Colorado | 160 | (2.0%) | 119 | (1.9%) | North Dakota | 34 | (0.4%) | 29 | (0.5%) |
| Connecticut | 94 | (1.2%) | 77 | (1.2%) | Ohio | 340 | (4.2%) | 283 | (4.6%) |
| Delaware | 55 | (0.7%) | 43 | (0.7%) | Oklahoma | 90 | (1.1%) | 69 | (1.1%) |
| Florida | 429 | (5.3%) | 317 | (5.1%) | Oregon | 206 | (2.5%) | 151 | (2.4%) |
| Georgia | 185 | (2.3%) | 145 | (2.3%) | Pennsylvania | 408 | (5.0%) | 310 | (5.0%) |
| Hawaii | 22 | (0.3%) | 18 | (0.3%) | Puerto Rico | 7 | (0.1%) | 7 | (0.1%) |
| Idaho | 99 | (1.2%) | 70 | (1.1%) | Rhode Island | 101 | (1.2%) | 70 | (1.1%) |
| Illinois | 409 | (5.0%) | 303 | (4.9%) | South Carolina | 71 | (0.9%) | 60 | (1.0%) |
| Indiana | 191 | (2.4%) | 151 | (2.4%) | South Dakota | 29 | (0.4%) | 23 | (0.4%) |
| Iowa | 113 | (1.4%) | 87 | (1.4%) | Tennessee | 103 | (1.3%) | 84 | (1.4%) |
| Kansas | 73 | (0.9%) | 51 | (0.8%) | Texas | 538 | (6.6%) | 400 | (6.4%) |
| Kentucky | 73 | (0.9%) | 56 | (0.9%) | Utah | 317 | (3.9%) | 209 | (3.4%) |
| Louisiana | 112 | (1.4%) | 92 | (1.5%) | Vermont | 28 | (0.3%) | 24 | (0.4%) |
| Maine | 81 | (1.0%) | 59 | (1.0%) | Virginia | 130 | (1.6%) | 98 | (1.6%) |
| Maryland | 168 | (2.1%) | 132 | (2.1%) | Washington | 235 | (2.9%) | 177 | (2.9%) |
| Massachusetts | 215 | (2.7%) | 177 | (2.9%) | West Virginia | 46 | (0.6%) | 36 | (0.6%) |
| Michigan | 245 | (3.0%) | 192 | (3.1%) | Wisconsin | 194 | (2.4%) | 148 | (2.4%) |
| Minnesota | 138 | (1.7%) | 114 | (1.8%) | Wyoming | 11 | (0.1%) | 9 | (0.1%) |
| Mississippi | 19 | (0.2%) | 13 | (0.2%) | Far East | 31 | (0.4%) | 21 | (0.3%) |
| Missouri | 309 | (3.8%) | 227 | (3.7%) | Transatlantic | 61 | (0.8%) | 53 | (0.9%) |
| Montana | 25 | (0.3%) | 17 | (0.3%) | Direct Service | 7 | (0.1%) | 7 | (0.1%) |
| Nebraska | 97 | (1.2%) | 65 | (1.0%) | Missing[3] | 221 | (2.8%) | 131 | (2.2%) |
| Nevada | 48 | (0.6%) | 34 | (0.5%) | Multiple States[4] | 426 | (5.6%) | 335 | (5.8%) |

[1] Percentages are based on 8,111 cases.
[2] Percentages are based on 6,207 cases.
[3] Missing data includes files in which the registration data was missing or in which the IV was not formally registered in Scouting.
[4] Percentages are taken from 7,598 for all incident codes and 5,804 for CSA incident codes to depict the number of registered people removed from multiple states.

As illustrated, the IV files were submitted to BSA National from councils located throughout the USA and from some international locations. These numbers ranged from a low of 0.1 percent submitted from Puerto Rico and Wyoming to a high of 6.4 percent submitted from Texas and 7.4 percent from California. These state differences reflect variability in population and likely differences in the popularity of Scouting in different regions of the U.S. State- and international council-level registration numbers were not available for the whole time period of files which were reviewed in this report, so no attempt was made to create any type of proportional assessment of these IV file numbers.

The finding that 94.4 percent of the IVs were registered in a single state prior to the revocation of their registration suggests that it is relatively rare for child molesters within the BSA to be unrooted or itinerant. Instead, IVs most commonly seemed to be embedded in a single, stable community, where they perhaps were able to use their position of trust or authority within that community to select and abuse children. This stability further underscores the importance of youth protection programs that prepare children to recognize this behavior as it commences and for organizations to provide easy channels through which this information can be reported to adults.

Given the movement of some child molesters across state lines, presumably to avoid detection and to facilitate efforts to re-register in a new location, we examined further the 335 A-CSA IVs (5.8 percent) who were known to have been registered in more than one state while involved in Scouting. We compared this group to the IVs who were registered in only one state during their time in Scouting, comparing their number of known victims, the Scouting affiliation of their victims (Scouting-involved only, non-Scouting-involved only, mixed), and their attempts to re-register in Scouting after having their registration revoked. These analyses indicated that the IVs registered in multiple states had significantly more years of involvement in the BSA as adults, more alleged victims, more re-registration attempts, and a higher proportion of Scouting-involved-only victims.

## Public Documentation and Law Enforcement Involvement in IV Files

In providing an overview of the IV files, we sought to determine the extent to which the alleged child sexual abuse identified within them was known to the broader community through the media, law enforcement, sex offender registries, and/or other means of public notification. These analyses were conducted to respond to the assertion made by some commentators that the IV files are "secret files," which contain unique information as yet unknown to the research community and/or the public at large. In conducting these analyses, we separated the analyses according to years up to and including 1987 vs. years 1988 and after.

The data analyses that follow (through Table 35) address only IV files that contain allegations of CSA perpetrated by Adult and Youth IVs. As indicated previously, this set of files–A-CSA and Y-CSA–represent 5,935 files or 75.9 percent of the total number of IV files contained in our sample. The remaining files involved crimes with no identified victims, no identified victims under the age of 18 years, or illegal activities that occurred when the IV was not involved in Scouting. Further, the historical comparisons that are included in many of the tables that follow were conducted only for A-CSA IVs, as there were only 11 Y-CSA-IVs identified in the sample prior to 1988.

**Table 6: Public Source Content of Adult and Youth CSA IV Files**

| | Adult IVs | | Youth IVs |
|---|---|---|---|
| | <1988 | >1987 | 1946-2016 |
| Indication that allegations were public record[1] | 726  (48.7%) | 2,299  (65.7%) | 235  (27.0%) |
| Types of information in the file:[2] | | | |
| Newspaper or other media:[3] | 496  (68.3%) | 1,676  (72.9%) | 78  (33.2%) |
|    Explicit that the IV was in BSA[4] | 291  (58.7%) | 802  (47.9%) | 21  (26.9%) |
|    Explicit that the victim was in BSA[4] | 192  (38.7%) | 482  (28.8%) | 15  (19.2%) |
| Police reported victim statement[3] | 60  (8.3%) | 365  (15.9%) | 22  (9.4%) |
| Police reported family member statement[3] | 32  (4.4%) | 218  (9.5%) | 28  (11.9%) |
| Police reported IV statement[3] | 32  (4.4%) | 241  (10.5%) | 19  (8.1%) |
| Legal documents about alleged behavior[3] | 152  (20.9%) | 548  (23.8%) | 67  (28.5%) |
| Documentation of civil or criminal action[3] | 187  (25.8%) | 769  (33.4%) | 97  (41.3%) |
| Sex offender registry record/printout[3] | 5  (0.7%) | 92  (4.0%) | 17  (7.2%) |
| Other public documents or official records[3] | 0  (0.0%) | 8  (0.3%) | 1  (0.4%) |

[1] 3 missing <1988, 60 missing >1987 for adult IVs, 12 missing for youth IVs.
[2] Multiple responses were possible.
[3] Percentages derived from indication that allegations were public record.
[4] Percentages derived from files containing newspaper or other media.

Table 6 focuses exclusively on the types of documents that were included in each file. These were used to assess the external/public as contrasted to internal/private sources of information that BSA used to confirm that credible allegations of inappropriate sexual behavior had been made against a specific IV. As reflected in Table 6, from 1946 through 2016, there were clear indications that 55.6 percent of the IVs were identified based upon information known to the public as broadly defined. This information was most commonly conveyed through the media and the official channels of the criminal justice system. Public awareness was found to increase from before to after 1987, likely due to the historical trends described previously. There were some indications that the BSA was explicitly mentioned less frequently in the newspaper articles saved to the IV files after 1987, possibly reflecting a selection bias with more comprehensive efforts being made to include all media content in the files post 1987 even when the BSA was not explicitly mentioned in them.

Only 27.0 percent of the Y-CSA files contained some indication of public documentation, most often some media coverage or involvement of the youth in the justice system. To some extent, this difference reflects the laws that continue to protect youth combined with the states' interest in rehabilitating juvenile delinquents. As detailed later in our report, parents of the Youth IVs sometimes sought to protect the privacy of their children, to dispute the allegations being made, and to advocate for mental health treatment and/or the youth's reinstatement in Scouting. In sum, then, the differences in public documentation between A-CSA vs. Y-CSA IV files likely reflect a long history of parents, communities, and law enforcement responding differently to sexual activity occurring between adolescent youths when compared to incidents involving the exploitation of a youth by an adult.



*Figure 5*. Descriptive Contents of CSA IV Files: Adult and Youth IVs

To explore specifically the role of law enforcement and child protection services in the reporting and investigation of the allegations contained in the A-CSA and Y-CSA IV files, we combined all law enforcement and CPS references into one composite measure. Notably, this composite did not require the presence of a formal law enforcement or CPS document in the file (as reflected previously in Table 6 and Figure 5), but did require the presence of a credible reference to law enforcement or CPS involvement in an investigation or response to the allegations. For example, one file could contain an investigative law enforcement or child protective services document, another could contain a newspaper article referencing legal action against the IV, and yet another could contain notes indicating that the police had been notified by the local council or family of the alleged victim. All of these were considered to be indications of law enforcement or CPS awareness of the allegations. These different variables are summarized in Table 7.

We found that law enforcement or CPS was involved with the IV, the victim(s), the reporting of the alleged abuse, or the investigation of the alleged abuse in 95.3 percent of the A-CSA IV files before 1988 and 97.6 percent of the files after 1987. Comparably, law enforcement was involved in 95.2 percent of the Youth IV files.

**Table 7: Involvement of Law Enforcement in Reporting or Investigating Allegations**

| | Adult IVs | | | | Youth IVs | |
|---|---|---|---|---|---|---|
| | <1988 | | >1987 | | 1946-2016 | |
| Law enforcement aware of alleged victim | 1,276 | (85.4%) | 3,081 | (86.6%) | 711 | (80.5%) |
| Law enforcement non-specific victim codes[1] | 4 | (0.3%) | 117 | (3.3%) | 4 | (0.5%) |
| Reference in public media | 200 | (13.4%) | 959 | (27.0%) | 102 | (11.6%) |
| Opening of file involved law enforcement | 820 | (54.8%) | 2,016 | (56.7%) | 328 | (37.1%) |
| Law enforcement investigated Adult or Youth IV | 1,054 | (70.5%) | 2,993 | (84.1%) | 650 | (73.6%) |
| Law enforcement involved in follow up | 456 | (30.5%) | 1,462 | (41.1%) | 364 | (41.2%) |
| Omnibus, any law enforcement involvement | 1,334 | (89.2%) | 3,274 | (92.0%) | 754 | (85.4%) |
| Child Protective Services (CPS) involved | 1,163 | (77.8%) | 2,935 | (82.5%) | 761 | (86.2%) |
| Any law enforcement, including CPS | 1,424 | (95.3%) | 3,470 | (97.6%) | 841 | (95.2%) |

[1] Include child pornography, police cyber-impersonation, criminal background check, and sex offender registry.

In 2013, after the IV files were sent to UVA, the BSA began an independent review of all "P"-coded files dating from 1965 to the present to ensure that law enforcement had been contacted and notified of all alleged crimes contained in the IV files. This process was implemented to ensure that police notification had occurred in all cases retrospectively for the past 50 years.

## ACTIVITIES SURROUNDING CREATION OF CSA-CODED IV FILES

In this section, we examine the processes through which allegations of child sexual abuse became known to the various councils and through them to BSA National Council. As previously noted, the following data address only IV files that contain allegations of CSA allegedly perpetrated by Adult or Youth IVs.

### File Opening and Initial Allegations

When seeking to understand the dynamics that led to the opening of a file, coders were instructed to identify, when possible, the earliest disclosure or report of alleged child sexual abuse. However, the files often did not contain a full chronology of the interactions and processes that occurred from when the abuse was alleged to have commenced to file completion. Given this limitation, the subsequent data reflect the best information available in each IV file, utilizing the earliest known report mentioned in the file contents.

These data indicate that a notification by law enforcement or the issuing of an arrest warrant constituted the primary path (55.5%) through which the BSA became aware of allegations of sexual abuse by one of its adult volunteer leaders. This pathway was common although less frequent in instances that involved youth offenders (37.1%). These findings suggest that in the majority of the files, BSA did not receive initial confidential information concerning CSA and pass it along to law enforcement. Rather, the data suggest that the police more often became aware of allegations of child sexual abuse *first* and then informed the BSA of these allegations, either as a part of their investigation or as a form of community notification.

However, as illustrated in Table 8, reports by the victims were central to the investigation of IVs within BSA, whether these disclosures occurred directly to the BSA or indirectly through victim disclosure to law

34

enforcement (who later notified the BSA). Victim reports to the BSA or others revealed the presence of sexual abuse far more often than did the observation of suspicious behavior by a third party, the presence of physical evidence or injury, the presence of pornography, social media postings, or the uncovering of a criminal history for a specific IV. There was some indication that youths who were sexually abused by another youth tended to report their abuse more often (46.0%) while still a youth, as compared to youth who were sexually abused by an adult (37.7%). This finding may to be indicative of the power differential that is experienced by youths in relation to their adult leaders and underscores the importance of youth protection programming ensuring youths that they will be believed, respected, and provided some autonomy in the ways that their disclosures are handled. To foster a sense of privacy and security, the BSA has developed and publicized various avenues for reporting child sexual abuse by a youth or adult. These include the *Scouts First* hotline handled by Membership Standards at BSA National, online forms to enable reporting incidents or concerns with minimal information required, and the provision of an email address designated explicitly for reporting all incidents of concern.

### Table 8: Dynamics Surrounding the Opening of Adult and Youth CSA IV Files

| What led to the opening of the IV file[1,2]: | Adult IVs | | Youth IVs | |
|---|---|---|---|---|
| Report of youth: | 2,019 | (40.0%) | 409 | (46.3%) |
|     Report by child/youth | 1,905 | (37.7%) | 406 | (46.0%) |
|     The youth contacted BSA once they reached adulthood | 168 | (3.5%) | 3 | (0.4%) |
| Report of third party: | 3,914 | (77.5%) | 657 | (74.5%) |
|     Observation of inappropriate/suspicious behavior by third party | 652 | (12.9%) | 128 | (14.5%) |
|     Family member | 1,240 | (24.6%) | 365 | (41.4%) |
|     Police officer/prosecution/defense/arrest information | 2,805 | (55.6%) | 328 | (37.2%) |
|     Physical or medical personnel | 51 | (1.0%) | 9 | (1.0%) |
|     Physical evidence (STI, physical injury, etc.) | 24 | (0.5%) | 9 | (1.0%) |
|     Virtual or social media evidence (text message, online posting, etc.) | 76 | (1.5%) | 7 | (0.8%) |
|     Inexplicable sexual knowledge or behavior by a child/youth | 13 | (0.3%) | 4 | (0.5%) |
|     IV was arrested for possessing/viewing child pornography | 172 | (3.4%) | 2 | (0.2%) |
|     IV was arrested for distributing child pornography | 60 | (1.2%) | 0 | (0.0%) |
|     BSA receiving notification that the IV had a criminal background | 392 | (7.8%) | 74 | (8.4%) |
| Other | 359 | (7.1%) | 65 | (7.4%) |
| Unknown | 296 | (5.9%) | 53 | (6.0%) |

[1] Multiple answers could be selected, and does not address the order of responses indicated in a file.

Family members notified the BSA of the abuse of a child in an additional 24.5 percent of the files involving Adult IVs and 41.3 percent of the files involving Youth IVs. We were unable to confirm that all of these reports came from disclosures made by a child to their parents, although this appeared to be the most common scenario through which this information was obtained and conveyed to Scouting officials. These findings illustrate the importance of parents being trained and encouraged to promote open communication with their children, this being the platform that will provide their children the opportunity to tell them of their concerns regarding some leaders and possibly some other youth, and to inform parents of any abuse they themselves experienced. Bystander reports by other youth with suspicions of potential misconduct can be particularly important when the victim is unable or unwilling to report their abuse to others immediately.

**Table 9: Initial Reports of Allegations Identified in the Adult and Youth CSA IV Files**

| | Adult IVs | | | | Youth IVs | |
|---|---|---|---|---|---|---|
| | <1988[1] | | >1987[1] | | 1946-2016[1] | |
| Anonymous report | 12 | (0.8%) | 55 | (1.5%) | 11 | (1.2%) |
| Scout volunteer leader | 125 | (8.4%) | 485 | (13.6%) | 247 | (28.0%) |
| Council employee | 59 | (3.9%) | 129 | (3.6%) | 25 | (2.8%) |
| Scouting victim of alleged abuse | 91 | (6.1%) | 229 | (6.4%) | 54 | (6.1%) |
| Other Scouting youth | 5 | (0.3%) | 17 | (0.5%) | 11 | (1.2%) |
| Scouting family member[2] | 227 | (15.2%) | 354 | (10.0%) | 192 | (21.8%) |
| Other non-Scouting youth (non-victim) | 2 | (0.1%) | 4 | (0.1%) | 1 | (0.1%) |
| Other non-Scouting youth (victim) | 3 | (0.2%) | 33 | (0.9%) | 7 | (0.8%) |
| Member of chartered organization | 21 | (1.4%) | 56 | (1.6%) | 13 | (1.5%) |
| Law enforcement | 246 | (16.5%) | 481 | (13.5%) | 50 | (5.7%) |
| BSA national office | 9 | (0.6%) | 54 | (1.5%) | 4 | (0.5%) |
| Other | 7 | (0.5%) | 24 | (0.7%) | 3 | (0.3%) |
| Unknown | 634 | (42.4%) | 1,326 | (37.3%) | 183 | (20.7%) |
| CPS or similar agency[3] | 2 | (0.1%) | 17 | (0.5%) | 4 | (0.5%) |
| Attorney or other legal notification[3] | 4 | (0.3%) | 16 | (0.4%) | 1 | (0.1%) |
| Someone who knows the IV[3] | 8 | (0.5%) | 29 | (0.8%) | 11 | (1.2%) |
| Family member of non-Scouting victim[3] | 8 | (0.5%) | 53 | (1.5%) | 45 | (5.1%) |
| Media notification[3] | 17 | (1.1%) | 72 | (2.0%) | 3 | (0.3%) |
| IV reported themselves[3] | 5 | (0.3%) | 53 | (1.5%) | 4 | (0.5%) |
| Family friend of victim[3] | 1 | (0.1%) | 10 | (0.3%) | 2 | (0.2%) |

[1] 1 missing <1988, 2 missing >1987 for adult IVs, 1 missing for youth IVs.
[2] This variable was coded to reflect the family member of a youth involved in Scouting.
[3] These responses came from the "Other" category, which allowed a free-response area to write in other sources of information.

In Table 9, we present the categories of individuals who were associated with the initial report of A-CSA and Y-CSA to the BSA. Prior to 1988, youth abused by an Adult IV tended to make their initial reports to a family member or to law enforcement. After 1987, there was an increase in the frequency with which the initial report was made to a Scout volunteer leader, this change possibly being associated with and prompted by the youth protection guidelines introduced in 1987. The youths abused by another youth demonstrated a consistent preference for reporting their alleged abuse to a Scout volunteer leader, the vast majority of these youths having entered Scouting after the initial introduction of youth protection programming in 1987. As a second-most frequent response, the youths disclosed their abuse to a family member who contacted the BSA, again underscoring the importance of the family network for hearing about and responding to allegations of child sexual abuse. In 62 instances, the A-CSA IV reported themselves to the BSA, and in 48 instances someone who knew the IV reported them to the authorities. It was uncommon for members of the Chartered Organization or for BSA National Council to be the recipient of the initial report of child sexual abuse.

To further clarify the dynamics of CSA reporting in Scouting, we combined the initial reporting sources listed in Table 9 according to their affiliation either within or outside of Scouting. For example, a Scout leader was coded as an "inside Scouting" recipient of information, while law enforcement and CPS were coded as "outside Scouting" recipients of information. The relative importance of these two avenues of reporting for Adult and Youth IVs is summarized in Figure 6. As illustrated, both avenues contribute to the protection of youth and the identification of at-risk individuals in Scouting. As such, both represent an important component of effective youth protection programming.



*Figure 6.* Initial Allegations of A-CSA and Y-CSA

The development of these two components of youth protection programming reflects a historical evolution of thought concerning the proper way to respond to child sexual abuse. The IV files were initially created at a time when child sexual abuse was not a topic of public discourse, and law enforcement did not generally view it as a crime that warranted investigation. Rather, it was considered primarily a private matter handled by the family and often kept confidential for the benefit of the victim. However, since that time a number of broader social changes have ensued promoting disclosure and law enforcement involvement, including a shift in cultural norms, a more mature understanding of the behavior of pedophilic and non-pedophilic child molesters, the creation of national computerized criminal background databases, and the evolution of public policy that promotes the public tracking of sex offenders. Together, these processes have exerted a synergetic effect that over the past 15 years has contributed to the documented decline in child sexual abuse in America and the increased recognition of it as a public health problem that involves a pervasive form of child exploitation.

Table 10 summarizes the actions taken by the local councils in response to the initial allegations of child sexual abuse. Across both time intervals and A-CSA and Y-CSA incidents, the most immediate actions involved suspending the alleged perpetrator from further involvement in Scouting activities, seeking to obtain more information about the alleged incidents, and increasingly making a formal report to local law enforcement or child protective services. These responses reflect the rudimentary purpose of the IV files as they were created almost 100 years ago, namely to identify potential perpetrators, separate them from Scouting, and gather evidence supporting their expulsion. Additional responses such as seeking written statements, meeting with parents of the alleged victims or parents of other youth in the same Troop, speaking directly with the alleged victim, and/or speaking directly with the alleged perpetrator are referenced less frequently in the files. These activities may well occur at the local level but not be included in the correspondence that is shared with BSA National by the local Scout Executive, their responsibility being solely to inform BSA National of the identity and characteristics of the IV and to provide documentation that warrants the revocation of their registration.

Figure 7 displays the same data as Table 10 in line graphs of the proportion of Adult IV and Youth IV cases in which each category of council response was initiated by year. In this figure for Adult IVs, years pre-1960 are collapsed into the first data point, and for Youth IVs the data pre-1990 is collapsed into the "1989" data point.

**Table 10: Response of Local Council to Allegations of CSA by Adult and Youth IV Files**

| | Adult IVs[1] | | | | Youth IVs[1] | |
| | <1988 | | >1987 | | 1946-2016 | |
|---|---|---|---|---|---|---|
| Administrative responses | 1,420 | (95.0%) | 3,268 | (91.9%) | 821 | (93.1%) |
| Seek more information about alleged incidents or adult | 764 | (51.1%) | 1,547 | (43.5%) | 412 | (46.7%) |
| Immediately suspend alleged perpetrator | 1,284 | (85.9%) | 2,872 | (80.8%) | 712 | (80.7%) |
| Meeting with parents of other Scouts in the same Troop | 42 | (2.8%) | 132 | (3.7%) | 58 | (6.6%) |
| Actions related to adult perpetrator: | 335 | (22.4%) | 485 | (13.6%) | 2 | (0.2%) |
| Meet with alleged adult | 287 | (19.2%) | 469 | (13.2%) | 1 | (0.1%) |
| Request formal, written resignation from adult | 115 | (7.7%) | 38 | (1.1%) | 1 | (0.1%) |
| Actions related to alleged youth victim or family | 320 | (21.4%) | 538 | (15.1%) | 349 | (39.6%) |
| Meet with alleged victim of adult sexual abuse by BSA official | 138 | (9.2%) | 242 | (6.8%) | 31 | (3.5%) |
| Obtain written statement from alleged victims/parents | 167 | (11.2%) | 207 | (5.8%) | 64 | (7.3%) |
| Meet with parent of alleged victim by Scouting official | 175 | (11.7%) | 335 | (9.4%) | 175 | (19.8%) |
| Meeting the youth (youth-on-youth behavior) by BSA officials | 1 | (0.1%) | 0 | (0.0%) | 184 | (20.9%) |
| Notifying the parents of youth (youth-on-youth behavior) | 1 | (0.1%) | 0 | (0.0%) | 213 | (24.1%) |
| Inter/Intra-organizational actions | 385 | (25.8%) | 1,386 | (39.0%) | 446 | (50.6%) |
| Meeting with chartered organization personnel | 95 | (6.4%) | 293 | (8.2%) | 80 | (9.1%) |
| Seeking guidance from BSA National | 82 | (5.5%) | 334 | (9.4%) | 149 | (16.9%) |
| Contact with law enforcement/prosecution/CPS | 284 | (19.0%) | 1,157 | (32.5%) | 355 | (40.2%) |
| Other | 34 | (2.3%) | 155 | (4.4%) | 30 | (3.4%) |
| Unknown | 31 | (2.1%) | 80 | (2.3%) | 11 | (1.2%) |

[1] 1 missing <1988, 2 missing >1987 for adult IVs, 1 missing for youth IVs.

The proper role of local councils in responding to allegations of child sexual abuse has been debated over the years by individuals involved in Scouting and the broader community. Some advocates argue that the BSA should routinely involve itself in investigative and notification functions, their involvement with youth imposing upon them responsibility for consistent follow-up of all complaints made to them. Others argue that this type of involvement in allegations of child sexual abuse is inappropriate and at times harmful, given that only law enforcement and CPS are professionally trained and provided with the legal mandate necessary to skillfully conduct investigations and provide notifications to communities. Before 1988, BSA personnel did appear to be more involved in meeting with victims, perpetrators, and parents while obtaining written statements of the alleged abuse, these actions now being contrary to practice standards concerning the interviewing of victims of child sexual abuse.



Note: for Adult IVs, years pre-1960 are collapsed into the first data point, and Youth IVs the data pre-1990 is collapsed into the "1989" data point.

*Figure 7.* Responses of Local Council to Allegations of CSA by Adult IVs over Time

**Procedural Elements of the File Contents**

Historically, probationary registration was used by the BSA to provide a means for individuals to be involved in Scouting while being subjected to heightened monitoring and stricter supervision for a limited period of time. This form of registration was used when the allegations of concern were unclear, poorly understood, or considered not well-substantiated. The probationary period, which often lasted two years, was technically imposed by BSA National, but was monitored locally by Scout Executives and volunteer leaders. It was not uncommon for individuals to obtain psychiatric treatment during the probationary period, treatment at that time being viewed as a viable and effective response to psychological disturbances related to inappropriate sexual behavior. The use of probation with IVs alleged to have acted in a sexually inappropriate manner with youth was last used in 1994 and was terminated formally in 2008 by BSA National.

**Table 11: Use of Probation with A-CSA and Y-CSA IVs**

| | Adult IVs[1] | | | |
|---|---|---|---|---|
| | <1988 | | >1987 | |
| Probationary status identified | 75 | (5.0%) | 30 | (0.8%) |
|    Received mental health treatment[2] | 18 | (24.0%) | 4 | (13.3%) |
|    Ultimately reinstated[2] | 18 | (24.0%) | 16 | (53.3%) |
|    Offended after probationary period[2] | 13 | (17.3%) | 4 | (13.3%) |

[1] No files for youth IVs indicated a probationary registration status.
[2] Percentages derived from files indicating probation status.

These data indicate that probation was used infrequently, particularly after 1987. When BSA National used it, it often did not result in the full reinstatement of the IV. Of 105 individuals placed on probation, 13 or 17.3 percent reoffended after they were reinstated from 1946 through 1987, and 4 or 13.3 percent reoffended from 1988 through 2016. We found no instances of Youth IVs being placed on probation.

Table 12 summarizes the data that were collected concerning perceived efforts made by the BSA to limit disclosures of child sexual abuse that either occurred within a Scouting context or involved a registered volunteer leader in a non-Scouting context. This query was included in the *UVA-Research Coding Form* (UVA-RCF) to collect quantitative data concerning the assertion at times made against the BSA that it knowingly sought to cover-up the sexual abuse that was occurring in the organization. In the coding template, each coder was required to respond to the following query: "For both adult and youth-on-youth alleged sexual abuse, is there any information or language in the file that expressed an intent or effort to limit or obscure public awareness of Scouting's involvement in the abuse that was alleged to have occurred?" In collecting these data, we had each coder identify the sentence, comment, or set of circumstances that prompted them to affirm the presence of an effort to limit awareness of the information contained in the file. Each of these files was then reviewed by the Principal Investigator and Research Manager to determine the accuracy of the designation and perceived intent of the actions recorded. We chose to define this variable broadly and to include instances where there was no clear intent to suppress or conceal information, but the decision-making of someone associated with Scouting or not associated with Scouting kept relevant information from being reported to BSA National Council in a timely matter.

**Table 12: Attempts to Avoid Disclosure of Abuse by Adult and Youth CSA IV Files**

| | Adult IVs | | Youth IVs |
|---|---|---|---|
| | <1988 | >1987 | 1946-2016 |
| | N   (%) | N   (%) | N   (%) |
| Any coded information regarding non-disclosure attempt[1] | 55   (1.1%) | 81   (1.6%) | 22   (2.5%) |
| Cover-up attempt:[1] | | | |
| Yes | 40   (0.8%) | 50   (1.0%) | 16   (1.8%) |
| No | 15   (0.3%) | 30   (0.6%) | 6   (0.7%) |
| Unknown | 0   (0.0%) | 1   (<0.05%) | 0   (0.0%) |
| If yes, likely explanation:[2] | | | |
| Parental Action/Request | 1   (2.5%) | 3   (6.0%) | 2   (12.5%) |
| Media concerns within Scouting | 13   (32.5%) | 4   (8.0%) | 0   (0.0%) |
| Cover-up by sources outside of Scouting | 2   (5.0%) | 7   (14.0%) | 1   (6.3%) |
| Incompetency | 5   (12.5%) | 18   (36.0%) | 7   (43.8%) |
| Different Points of View | 6   (15.0%) | 3   (6.0%) | 0   (0.0%) |
| Cover-up Locally | 13   (32.5%) | 15   (30.0%) | 6   (37.5%) |
| Cover-up BSA Nationally | 0   (0.0%) | 0   (0.0%) | 0   (0.0%) |

[1] Percentages are shown as the proportion to the total number of A-CSA and Y-CSA files, respectively.
[2] Percentages are shown as the proportion to the number of files where a cover-up attempt was indicated.

Eleven other positive endorsements were found but were coded for either CP or O classification codes. Our follow-up review of these 158 files included a two-step review process. First, we examined the statements identified by the coder in the context of the entire file to determine if they correctly captured the criteria being

used to prompt a positive endorsement of this variable. This review identified 106 files in which we identified credible information suggesting actions that limited disclosure of information concerning child sexual abuse associated with Scouting. The remaining 52 files did not support this conclusion and were removed from further analyses concerning this specific variable. Once this determination had been made, we classified the 106 remaining files according to seven descriptive sub-categories:

- *Parental request/action*: An example of parental action involved a case in which a parent who was the Scoutmaster of a troop did not report to the Scout Executive an incident of another youth sexually abusing his son until two years later, when he became aware that the youth who had perpetrated the abuse was planning to transfer to another Troop.

- *Scouting effort to avoid media coverage*: Efforts to limit media coverage ranged from rather innocuous statements in the file noting that Scouting had not been mentioned in a local newspaper article to concerted efforts of local Scouting-involved individuals to "bury the incident" and ensure that BSA was not mentioned by local news channels when reporting incidents such as the arrest of a sex offender.

- *Action taken by individual with no current affiliation to Scouting*: At times, efforts to limit public awareness of a possible incident of sexual abuse associated with Scouting were initiated by individuals who were not employed by or registered with the BSA. In one case, a judge chastised a BSA volunteer leader for having taken photos of Scouts skinny dipping, but agreed to return the photos to the BSA volunteer leader if he left Scouting quietly. In another, a police supervisor, when told that one of his staff was having sex with a female Explorer, told the reporting officer to put the statement in the safe, later denying that he had been aware of the statement when the incident was investigated by state law enforcement.

- *Incompetency*: This designation was coded for files in which a Scouting-involved adult demonstrated poor judgement and incorrectly failed to inform BSA National Council, not believing that information they received warranted reporting or not believing the veracity of the information that was provided to them. For example, one file coded as incompetency involved a Scouting leader who did not make a report to the local council after a youth disclosed having been sexually abused but shortly thereafter recanted the allegations. In another incident, a youth informed his Scoutmaster of having been sexually abused but was not believed; the report to BSA National Council did not occur until three years later when the alleged perpetrator was found on a tower using binoculars to look into the boys' bathroom at a camping event.

- *Different points of view*: In a file coded "differing points of view," there was some initial delay or inaction in reporting the incident to BSA National Council due to some disagreement on the nature of the incident. An example from a Y-CSA file reflecting different points of view involved a case in which the parents of two youth involved in a sexual incident each claimed that the other parent's child had sexually abused their child, with much of the information suggesting a consensual encounter between two adolescents.

- *Cover-up conducted by local personnel*: An example of a cover-up initiated by the local chapter is reflected in an incident in which a Scout reported to his Scoutmaster that another voluntary leader had abused him, and the Scoutmaster allegedly turned and walked away from the youth, ignoring him for the remainder of the camping event. In another incident, a mother reported that when she asked the Scoutmaster if he had told others about an incident of sexual abuse that had occurred in his Troop, he allegedly replied that he wanted to "keep things quiet" and had told everyone that needed to know.

- *Cover-up by BSA National*: We found no incident of a cover-up initiated or condoned by BSA National Council.

It is important to note that in all of these instances, an IV file was ultimately opened by BSA National Council with actions being taken by them to restrict the registration of the individual involved in Scouting. The examples provided have also been drawn across different periods and therefore in some instances reflect cultural practices that are different from those condoned today. Furthermore, these data were collected from the IV files

themselves, and by definition, would not and could not include information that was not submitted to BSA National Council. Therefore, it is possible that other incidents of cover-ups or other attempts to limit disclosure exist but were simply not recorded in the IV files.

## IV Responses to Allegations

Table 13 summarizes the responses of A-CSA IVs to allegations of child sexual abuse being made against them. In 14.1 percent of the files opened after 1987, we found information indicating that the Adult IV tried to dispute the initial allegations. This reflected an increase from 7.6 percent of the IVs identified in the files dated 1946 through 1987. A number of IVs (12.1% after 1987 and 3.3% before 1988) also requested that their revocation be reviewed at the regional or national level. These numbers reflect only instances in which the regional or national review was unsuccessful, as cases that resulted in the revocation being reversed are removed from the IV filing system. Prior to 1987, it was more common for IVs to be allowed to submit a generic letter of resignation with no specific reason for the revocation, to offer to obtain psychiatric or psychological treatment for their inappropriate behavior, and to move out of their community following allegations of sexual abuse. Each of these behaviors diminished after 1987. Based on the information contained in the files, it was uncommon for the IV to threaten or pursue legal action against the BSA (1.5%). Notably, in almost three-quarters of the files (71.8%), there were no indications of any of these specific responses found in the IV file, and it is unknown how the IV responded to the allegations.

**Table 13: Responses of Adult IVs to Allegations of CSA**

| | Adult IVs | |
|---|---|---|
| | <1988[1] | >1987[1] |
| Dispute the allegation(s) being made against him or her | 113  (7.6%) | 502 (14.1%) |
| Request local or national review of their exclusion from Scouting | 49  (3.3%) | 430 (12.1%) |
| Submit a generic letter of resignation that did not mention sexual abuse | 156  (10.4%) | 114 (3.2%) |
| Submit letter of resignation that mentioned sexual abuse | 17  (1.1%) | 17 (0.5%) |
| Threaten legal action against the BSA for refusal for his or her BSA registration | 16  (1.1%) | 60 (1.7%) |
| Offer to obtain psychiatric/psychological treatment | 104  (7.0%) | 50 (1.4%) |
| Resign from some other youth-serving position (e.g., teacher) | 46  (3.1%) | 66 (1.9%) |
| Move out of the community in which the abuse allegedly occurred | 205  (13.7%) | 96 (2.7%) |
| None of the above | 959  (64.2%) | 2,666 (75.0%) |

[1] 1 missing <1988, 2 missing >1987.

The responses were different when the CSA IV was a youth, as indicated in Table 14. In a substantial number of the files, the parents of the Y-CSA IV sought to dispute the actions taken by the BSA (30.4%) and sought mental health treatment for their child (36.6%).

**Table 14: Responses of Youth IVs to Allegations of CSA**

|  | Youth IVs[1] | |
|---|---|---|
| One Scouting youth was removed from Scouting | 764 | (86.6%) |
| More than one Scouting youth was removed from Scouting | 69 | (7.8%) |
| Parent(s) disputed actions taken by BSA and sought reinstatement of youth | 268 | (30.4%) |
| Mental health interventions were recommended or obtained for youth | 323 | (36.6%) |
| Law enforcement became involved in investigating sexual acts | 637 | (72.2%) |
| At least one Scouting youth was arrested for sexual behavior | 367 | (41.6%) |
| Scouting youth tried to register as adult leader after reaching 18 years of age | 22 | (2.5%) |
| None of the above | 15 | (1.7%) |

[1] 1 missing.

These data highlight the active role that many parents assumed when their child was alleged to have sexually abused another child, as well as their often-sustained efforts to keep their sons involved in Scouting. They also sought treatment more often, possibly believing that the behavior expressed a psychological disorder rather than an ingrained sexual interest in children as often assumed or asserted with Adult IVs accused of sexually abusing children. Despite this attention to treatment, law enforcement became involved in more than two-thirds of these incidents, with 41.6 percent of the youth being arrested for their behavior. In 86.5 percent of the Y-CSA incidents at least one Scout was removed from Scouting because of their inappropriate sexual behavior. The number of youths who tried to re-register upon reaching adulthood was small (2.5%).

## ATTRIBUTES OF ADULT INELIGIBLE VOLUNTEERS

The most consistent information found in the CSA IV files referenced the physical characteristics of the IVs, along with their occupations and special interests. Historically, this information was used to identify IVs who sought to re-register after having their registration revoked by the BSA.

The vast majority of Adult IVs entered into the files for CSA were males (98.5%), although 1.5 percent of the A-CSA IV files did involve women who abused children with or without a male accomplice. The age range of the men entered into the IV for contemporary allegations of CSA was very broad, ranging from 18 to 79 years.[5] Notably, this was the age when the IV file was *opened,* not the age when the IV first began abusing children. The most common ages of the A-CSA IVs fell in the 30-39 year range (29.5%), followed by the 40-49 year range (26.5%) and 18-29 year range (25.4%). The number of files opened for CSA for men began to decline gradually after the age of 50.

There are several possible explanations for the decline in the number of files opened for IVs over the age of 50. The decline may be partially attributable to BSA's previous practice of deleting the names of individuals from the IV list when they reached the age of 75 or died. However, this drop-off in CSA allegations later in life is also consistent with research on sex offenders in general, which shows that the risk of sexual offending declines after the age of 65 (Helmus, Thornton, Hanson, & Babchishin, 2012). However, given that IVs were

---

[5] Although one IV was 95 years of age when the CSA file was opened, it was opened based on allegations of sexual abuse that had been allegedly perpetrated decades earlier.

accused of sexually offending against youth from the age of 18 until the age of 79, it is clear that older adults can still pose some risk of sexually offending against youths.

In general, the A-CSA IVs tended to be white, which is consistent with the racial makeup of the larger BSA organization. The employment of the A-CSA IVs was found to vary across the full range of occupations identified in the U.S. census. To better understand two factors often associated anecdotally with sexual offending against children–holding authority over potential victims, and having easy access to potential victims–we created two composite measures that can be viewed separately or in combination in Table 15. At least one-third of the IVs were employed in positions that provided them either authority over or easy access to children. One-fifth of the IVs were employed in schools and libraries, community programs and social services, or healthcare. Another 13 percent were involved in some military capacity or in law enforcement, positions that exert authority and control over community members via uniforms, insignia, and in some cases weapons.

**Table 15: Demographic Characteristics of Adult IVs with Allegations of CSA**

| Adult IVs | | Adult IVs, Continued | |
|---|---|---|---|
| Gender: | | Occupation:[5, 6] | |
| Female | 76  (1.5%) | Military/protective service or access to children: | 1,661 (40.7%) |
| Male | 4,976  (98.5%) | Likely access to children: | 1,088 (26.7%) |
| Age of IV:[1] | | Community/Social Service | 415 (8.2%) |
| 18-29 | 1,284  (25.7%) | Education, Training, Library | 585 (11.5%) |
| 30-39 | 1,490  (29.8%) | Healthcare Practitioners/Technical | 177 (3.5%) |
| 40-49 | 1,339  (26.8%) | Military and police/protective service: | 655 (16.1%) |
| 50-59 | 562  (11.3%) | Military Specific | 356 (7.0%) |
| 60-69 | 223  (4.5%) | Police/Protective Service | 348 (6.8%) |
| 70+ | 95  (1.9%) | Architecture and Engineering | 135 (2.7%) |
| Race:[2] | | Arts/Entertainment/Sports/ Media | 143 (2.8%) |
| White/Caucasian | 3,921  (93.7%) | Building/Grounds Cleaning | 171 (3.4%) |
| Non-White/Caucasian | 262  (6.3%) | Business/Financial | 113 (2.2%) |
| Marital Status:[3] | | Computer/Mathematical | 143 (2.8%) |
| Single | 1,917  (48.0%) | Construction/Extraction | 191 (2.8%) |
| Ever married | 2,079  (52.0%) | Farming, Fishing, Forestry | 63 (1.2%) |
| Children:[4] | | Food Preparation/Service-Related | 133 (2.6%) |
| Yes | 1,949  (38.8%) | Healthcare Support | 53 (1.0%) |
| No | 1,124  (22.4%) | Installation, Maintenance, Repair | 317 (6.2%) |
| | | Legal Occupations | 46 (0.9%) |
| [1] 59 missing. | | Life, Physical, Social Science | 44 (0.9%) |
| [2] 869 missing. | | Management | 184 (3.6%) |
| [3] 1,056 missing. | | Material Moving | 65 (1.3%) |
| [4] 24 missing; remaining 38.7% unknown. | | Office/Administrative Support | 108 (2.1%) |
| [5] Each IV could have multiple occupations coded. | | Personal Care/Service | 52 (1.0%) |
| | | Production | 148 (2.9%) |
| [6] 972 missing. | | Sales/Related | 337 (6.6%) |
| | | Transportation | 180 (3.5%) |
| | | Unemployed | 577 (11.3%) |

Given the family orientation of the Scouting program, we were interested in exploring whether single, never-married men (37.9%) were over-represented in the IV files after controlling for age, as compared to men who were currently or previously married (41.2%). We were not able to directly explore this question through a comparison of the IVs with the larger group of registered BSA adult leaders, as data concerning marital status is not routinely collected by the BSA. However, we sought to use the information that was available and compared ever married and never married IVs according to their number of known victims, the gender of known victims (male only, female only, and mixed), the age of known victims (13 years of age and under only, over 13 years of age only, and mixed), and the Scouting affiliation of known victims (Scouting-involved only, non-Scouting-involved only, and mixed). These analyses indicated that never-married IVs had a greater proportion of Scouting-involved-only and male-only victims as compared to ever-married IVs, who were more likely to have female-only victims and victims of mixed genders and Scouting affiliation. However, there were no significant interactions between marital status of the IV and age ranges of victims.

We conducted similar analyses to explore whether the parenting status of A-CSA IVs influenced their patterns of offending. Again, comparative data concerning the parenting status of the larger pool of registered BSA adult volunteer leaders were not available as this information is not collected routinely by the BSA. Therefore, we compared A-CSA IVs with and without children in terms of the number of known victims, the gender of known victims (male only, female only, and mixed), the age of known victims (13 years of age and under only, over 13 years of age only, and mixed), and the Scouting affiliation of known victims (Scouting-involved only, non-Scouting-involved only, and mixed). These analyses indicated that there were significant interactions between each victim selection variable and the parenthood status of the A-CSA IVs. Specifically, IVs who were known to have children were likely to have only victims 13 years of age or younger, only non-Scouting affiliated victims, and only female victims.

The fact that approximately 40 percent of IVs were married at some point and 40 percent had children demonstrate the conventional social adjustment of many men who sexually abuse children. This type of apparent "normalcy" argues against earlier stereotypes of all child molesters as isolated and socially inept individuals who lived alone or with their extended family. At the same time, these findings on marital and parenting status suggest that single, never-married volunteer leaders without children seem to be particularly prone to using Scouting as an avenue to gain access to male victims. In contrast, the offending patterns of ever-married IVs and IVs with children demonstrate that an interest in sexually abusing children, especially female children, can be incidental to the IV's involvement in Scouting. These differences in lifestyles and offending patterns bring to mind the Regressed vs. Fixated child molester paradigm developed by Groth (1979), or the Preferential vs. Situational child molester distinctions developed later by Lanning (1987, 2010). These differences also harken back to the observation made by Dr. James E. West in 1937, when he identified two groups of men falling into their "P" category of files: one group who were "morally imbalanced" and who entered Scouting with interest in making sexual contact with boys, and a second group who were "soundly

balanced" but, while working with boys, became "morbid on the subject" and "sometimes [gave] way to temptation" (Boy Scouts Head, June 9, 1935).

In Table 16, we sought to examine the various physical characteristics of the A-CSA IVs, this information being among the most consistent finding in the IV files over the 70 years of the study. Consistent with the historical decline and ultimate rejection of the physiognomy explanations of criminality, we found no physical characteristics that suggested these individuals could be identified based on some unique observable attribute, or that their physical appearance gave any hint of a genetic underpinning for their sexual attraction to children. They were generally of average height and weight, their hair and eye coloring appearing similar to the rest of the white population in America, and they seldom exhibited distinguishing physical or mental abnormalities. As indicated previously, these types of data were integral to the purpose of the IV files when they were first created in 1922–that is, helping identify individuals who tried to re-register after being revoked, even if they used a different name–but have notably diminished in significance given the advent of social security numbers, criminal background checks, and social media.

### Table 16: Physical Characteristics of Adult IVs with Allegations of CSA

|  | Adult IVs | |
|---|---|---|
| Average height[1] | 5' 10" | |
| Height range | 3' 9" - 7'1" | |
| Average weight[2] | 184.1 | |
| Weight range | 90 - 405 | |
| Average BMI[3] | 26.4 | |
| BMI range | 13.9 - 62.5 | |
| Distinguishing physical characteristics:[4] | | |
|   Cognitive limitations/deficits | 37 | (11.6%) |
|   Physical deformity | 63 | (19.7%) |
|   Unusual facial features | 92 | (28.8%) |
|   Unusual size | 54 | (16.9%) |
|   Unusual skin/scarring | 48 | (15.0%) |
|   Unusual speech patterns | 26 | (8.1%) |
| Eye color:[5] | | |
|   Black | 27 | (1.2%) |
|   Blue | 725 | (32.9%) |
|   Brown | 1,116 | (50.6%) |
|   Gray | 41 | (1.9%) |
|   Green | 89 | (4.0%) |
|   Hazel | 206 | (9.3%) |
|   Dichromatic | 1 | (<0.5%) |
| Hair color:[6] | | |
|   Bald | 55 | (1.6%) |
|   Black | 611 | (17.3%) |
|   Blonde | 324 | (9.2%) |
|   Brown | 2,063 | (58.4%) |
|   Gray | 288 | (8.2%) |
|   Red | 96 | (2.7%) |
|   Sandy | 61 | (1.7%) |
|   White | 35 | (1.0%) |

[1] Height in 3,549 A- CSA files; [2] Weight in 3,473 A-CSA files; [3] BMI in 3,462 of the A-CSA files;
[4] Percentages from 320 A-CSA with distinguishing physical characteristics; [5] Percentages from 2,205 A-CSA files with eye color; [6] Percentages derived from 3,533 A-CSA files with hair color.

**Table 17: Scouting Registration of Adult IVs with Allegations of CSA**

| | Adult IVs | |
|---|---|---|
| Executive Officer/Institution Head (IH) | 181 | (3.9%) |
| Position with Youth Involvement | 3,277 | (64.9%) |
|     Assistant Cubmaster (CA) | 76 | (1.6%) |
|     Assistant Den Leader (DA) | 37 | (0.8%) |
|     Assistant Scoutmaster (SA) | 1,136 | (24.2%) |
|     Assistant Varsity Coach (VA) | 5 | (0.1%) |
|     Assistant Webelos Den Leader (WA) | 27 | (0.6%) |
|     Crew Advisor (NL) | 52 | (1.1%) |
|     Crew Associate Advisor (NA) | 29 | (0.6%) |
|     Cubmaster (CM) | 197 | (4.2%) |
|     Den Leader (DL) | 162 | (3.5%) |
|     Mate (MT) | 12 | (0.3%) |
|     Merit Badge Counselor (MBC) | 75 | (1.6%) |
|     Pack Trainer (PT) | 3 | (0.1%) |
|     Scoutmaster (SM) | 1,216 | (25.9%) |
|     Scout Parent (PS) | 15 | (0.3%) |
|     Scout Parent Unit Coordinator (PC) | 6 | (0.1%) |
|     Skipper (SK) | 17 | (0.4%) |
|     Tiger Cub Adult (AP) | 48 | (1.0%) |
|     Tiger Cub Den Leader (TL) | 14 | (0.3%) |
|     Unit College Scouter Reserve (92U) | 0 | (0.0%) |
|     Varsity Scout Coach (VC) | 12 | (0.3%) |
|     Venturing Scouter Reserve (92V) | 0 | (0.0%) |
|     Webelos Den Leader (WL) | 138 | (2.9%) |
| Position with no Youth Involvement | 828 | (16.4%) |
|     Chartered Organization Representative (CR) | 82 | (1.7%) |
|     Committee Chair (CC) | 196 | (4.2%) |
|     Committee Member (MC) | 550 | (11.7%) |
| Other[1] | 402 | (8.6%) |
| Years of involvement as an adult[2] | | |
|     Mean | 5.9 | |
|     Median | 3.0 | |
|     Range | 0 - 60 | |
| Involvement in Scouting as a youth (Adult IVs)[3] | | |
|     Yes | 1,079 | (21.8%) |
|     No | 318 | (6.4%) |
| If yes, years of involvement | | |
|     Mean | 6.8 | |
|     Range | 0 - 18 | |

[1] 364 missing position in Scouting.
[2] 1,450 missing.
[3] 3,562 unknown, 93 missing.

As reflected in Table 17, the A-CSA IVs alleged to have sexually abused a child were found to have been involved in Scouting for an average of 5.9 years with a range of 0 to 60 years before their alleged sexual abuse was reported. There were limited data in the files concerning whether or not the A-CSA IVs had been involved in Scouting themselves as youths, and no consistent registration data concerning childhood involvement available from the BSA. The data that were available indicate that at least 21.4 percent of the A-CSA IVs were known to have been involved in Scouting when they were children, with this involvement lasting on average 6.8 years. While no IVs' true motivations for becoming adult volunteer leaders with the BSA can be known, these data seem to suggest that at least one-fifth of the A-CSA IVs did not join Scouting for the first time as

47

adults based solely on a sexual interest in youths, but rather that their sexually inappropriate behavior with youths emerged in the context of an existing relationship with Scouting dating back to their own childhoods.

The most common Scouting positions held by the A-CSA IVs at the time that they were entered into the IV files included Scoutmasters (24.1%), Assistant Scoutmasters (22.5%), and Committee Members (10.9%). The involvement of Committee Members is somewhat less intuitive as their formal role involves collaboration with other parents to provide the support and resources that are required by their local Troops, although their operational support of Troop activities often provides an opportunity for sustained and direct contact with youth.

In Table 18, we summarized characteristics of adults that research has demonstrated are associated with sexual offending, both in general and specifically with children, and explored how often these characteristics occurred within the population of IVs. We were specifically interested in whether any of these attributes appear to be related to the IVs having been arrested for a sexual crime, this information allowing for a comparison between the community-living BSA sample and the convicted or incarcerated offenders who make up the study samples of most published research on sexual offenders. These sexual crimes could have occurred prior to, during, or after the revocation of their registration with BSA. As illustrated below, over 60 percent of the A-CSA IVs had been arrested for a sex crime, a finding that argues against the characterization of the IV files as "secret files" allowing individuals to slip beneath the radar of the criminal justice system indefinitely. The proportion of A-CSA IVs ever arrested for a sex from increased from 60.7 percent up to and including 1987 to 67.3 percent after 1987, likely indicating the increasing historical norm of police involvement in CSA cases and the greater likelihood of a prior sex crime coming to light via a criminal background check. Out of only the IVs arrested for a sex crime, less than half (39.5%) ever received jail or prison sentences, according to the information contained in the IV files. The minority that were incarcerated received jail or prison sentences ranging from 0 to 400 years, with a mean of 10.6 years and a median of 5.0 years in the cases up to and including 1987, and a mean of 12.5 years and a median of 6.0 years in the cases after 1987. A relatively small minority of the A-CSA IVs (15.5% <1988 and 10.0% >1987) were court ordered into psychiatric treatment, and 9.8 percent were known to have been placed on a sex offender registry after 1987 when these systems were mandated at both the state and federal level.

As illustrated in Table 18, in 56.8 percent of the files none of the characteristics commonly associated with men who sexually offend against children were identified in the A-CSA IV files. Based on the generally poor quality of these data, we are not able to determine if this indicated that the adults identified in the IV files were significantly different in their characteristics and behaviors from child molesters studied in other contexts, or if these data were merely missing, much of it not being relevant to the intent and goal of the files. Of note, 65% of the A-CSA IVs coded on this variable had been arrested at some point in time. Concerning the ever-arrested parameter, arrest or conviction information was often submitted to the BSA sometime after the IV had been

removed from Scouting, whether or not these legal proceedings were related to the allegations that led to the IV's revocation from Scouting.

The two characteristics commonly associated with child molesters that were most frequently endorsed in the IV files were having an interest in military or para-military activities (15.1%) and having a familial/custodial relationship to the alleged victim (13.9%). Because the war-related origins of the BSA still project a military flavor across the organization (e.g., uniforms, ranks, troops, and insignia), this martial character may make the BSA even more appealing to some men with an interest in sexually abusing children as compared to other youth-serving organizations. Again counter to the stereotype that all child abusers in the BSA join with the express intention of accessing young victims, analyses suggest that more than one in ten of the IVs had a family or custodial relationship with at least one of their child victims. This finding suggests that, for at least some IVs, BSA membership may have been incidental to the child sexual abuse perpetrated against a minor family member.

**Table 18: Identified Characteristics Associated with Offending among A-CSA IVs**

| | All[1] | | Never | | Arrested | |
|---|---|---|---|---|---|---|
| Suffered from some form of mental disorder: | 144 | (2.8%) | 48 | (2.9%) | 96 | (2.9%) |
| Was taking some type of psychotropic medication | 19 | (0.4%) | 5 | (0.3%) | 14 | (0.4%) |
| Suffered from a substance abuse disorder | 64 | (1.3%) | 21 | (1.5%) | 43 | (1.3%) |
| Had less than a high school education | 52 | (1.0%) | 17 | (1.0%) | 35 | (1.1%) |
| Suffered from diagnosed or self-described pedophilia | 125 | (2.5%) | 27 | (1.6%) | 98 | (3.0%) |
| Described self as bisexual | 20 | (0.4%) | 11 | (0.7%) | 8 | (0.2%) |
| Described self as homosexual | 120 | (2.4%) | 69 | (4.1%) | 51 | (1.5%) |
| Interest in military or paramilitary activities | 763 | (15.1%) | 239 | (14.4%) | 524 | (15.9%) |
| Had experienced sexual abuse as a child or adolescent | 95 | (1.9%) | 34 | (2.0%) | 61 | (1.8%) |
| Had a familial/custodial relationship to alleged victim | 702 | (13.9%) | 195 | (11.7%) | 505 | (15.3%) |
| Intent or attempted suicide in relation to alleged abuse | 60 | (1.2%) | 15 | (0.9%) | 45 | (1.4%) |
| Had special affinity to children | 220 | (4.3%) | 79 | (4.7%) | 141 | (4.3%) |
| Indicated cognitive distortions | 159 | (3.1%) | 53 | (3.2%) | 106 | (3.2%) |
| Displayed social or intimacy deficits | 82 | (1.6%) | 27 | (1.6%) | 55 | (1.7%) |
| Displayed antisociality in life situations | 140 | (2.8%) | 33 | (2.0%) | 107 | (3.2%) |
| None of the above | 2,872 | (56.8%) | 985 | (59.2%) | 1,871 | (56.6%) |

| | Adult IVs | |
|---|---|---|
| | <1988 | >1987 |
| Ever arrested for a sex crime[2] | 908 (61.3%) | 2,395 (68.7%) |
| Probation only | 156 (17.1%) | 283 (11.4%) |
| Jail/prison | 376 (25.2%) | 930 (26.1%) |
| Range of prison sentence length (years) | 0 − 335 | 0 − 400 |
| Average prison sentence length (years) | 10.6 | 12.5 |
| Median prison sentence length (years) | 5.0 | 6.0 |
| Court ordered psychiatric treatment | 232 (15.5%) | 355 (10.0%) |
| Added to sex offender registry | 28 (1.9%) | 349 (9.8%) |

[1] Includes IVs with missing information about arrest status (3), with percentages based on all IVs.
[2] Refers to an arrest for a sex crime, not any criminal offense.
[3] Percentages are based on IVs with each characteristic for whom arrest status is known.

The data in Table 18 further reveal that the Adult IVs alleged to have sexually abused a child were infrequently described as antisocial in their attitudes or behavior (2.8%), suffering from a substance abuse disorder (1.3%),

or identifying as homosexual (2.4%), bisexual (0.4%), or pedophilic (2.5%) in their sexual orientation. The special affinity for children often attributed to pedophiles was observed in only 4.3 percent of the A-CSA IV files; the cognitive distortions attributed to most child molesters (e.g., blaming the child victim for the abuse) in only 3.1 percent of the files; and the social and intimacy deficits often seen as one of the etiological factors associated with child molesting in only 1.6 percent of the files. Among the A-CSA IVs, 2.8 percent were identified as suffering from some mental disorder, and 0.4 percent were known to be taking psychotropic medication. It is our impressions that all of these statistics are under-estimates of the true rates of these attributes and behaviors. Again, many of these characteristics may have been present but simply not recorded in the IV files, with many requiring a thorough clinical assessment to identify accurately.

Figure 8 and Table 19 describe the efforts made by some A-CSA IVs to re-register with the BSA after having their registration revoked by BSA National Council. As summarized in Figure 8, these efforts varied across the 70 years of the study, with 21.5 percent of the A-CSA IVs seeking to re-register prior to 1988 but only 5.2 percent from 1988 through 2016. While this decline in re-registration attempts in recent years suggests that the BSA's improved member screening measures are effective at keeping sexually abusive volunteers out of Scouting, it also raises a troubling question: Where do these IVs go, now that they are no longer attempting to re-register in the BSA? This concern underscores the importance of collaboration and information sharing between different youth-serving organizations, since the decline in re-registration attempts suggests that individuals who have their registration revoked by BSA National may be moving to other child-rich environments in order to access potential victims. These data further suggest that the original function of the IV files–to identify individuals who seek to re-register with the BSA–is being replaced by the new and highly relevant function of collecting standardized information that can serve to track abusive individuals across different youth-serving organizations.



*Figure 8*. Attempts to Re-register by A-CSA IVs by Year of Removal

As summarized in Table 19, the A-CSA IVs who sought to re-register prior to 1988 tended to attempt to do so in another state (47.1%), while after 1987, they tended to seek to re-register in the same council (63.2%).

**Table 19: Attempts to Reregister by A-CSA IVs**

|  | <1988 | | >1987 | |
| --- | --- | --- | --- | --- |
| Any attempt to reregister | 321 | (21.6%) | 186 | (5.3%) |
| Total attempts to reregister | 457 | | 234 | |
| Mean number of times | 1.5 | | 1.3 | |
| Range of number of times | 1 – 7 | | 1 – 5 | |
| Location of reregistration attempt:[1] | | | | |
|    Same council | 148 | (32.6%) | 141 | (63.2%) |
|    Different council | 92 | (20.3%) | 39 | (17.5%) |
|    Different state | 214 | (47.1%) | 43 | (19.3%) |

[1] Percentages based on 454 attempts <1988 with location coded, and 223 attempts >1987 with location coded

To explore whether re-registration attempts were associated with other aspects of the IV's alleged offending behavior, we compared the two groups (those with and without re-registration attempts) on their number of known victims, the gender of known victims (male only, female only, and mixed), the age of known victims (13 years of age and under only, over 13 years of age only, and mixed), and the Scouting affiliation of known victims (Scouting-involved only, non-Scouting-involved only, and mixed). These analyses indicated that IVs who attempted to re-register after having their membership revoked from the BSA had more alleged victims, a greater proportion of male-only victims, a greater proportion of Scouting-involved only victims, and a slightly greater proportion of mixed Scouting-affiliation victims. These analyses suggest persistent attempts to re-register marked an IV as a higher-risk child molester more likely to have joined BSA to access male victims.

Table 20 summarizes the presence of child pornography and other sexually oriented materials found in A-CSA IVs files. Reference to adult and child pornography was common in the A-CSA IV files, increasing from 11.6 percent of the files dated 1946 to 1987 to 16.4 percent of the files dated 1988 to 2016, possibly due to the increased ease of accessing pornography in the digital age. At times, A-CSA IVs seemed to use pornography as part of the process of manipulation used to entice a youth into sexual activity.

Child pornography involvement was increasingly mentioned in the IV files over time, including the personal viewing of child pornography, making of child pornography, and distribution of child pornography. A composite variable was created to capture each A-CSA IV's possible involvement with child pornography.[6] This composite variable included taking inappropriate photographs of Scouting-involved or non-Scouting-involved youths, viewing child pornography, and/or distributing child pornography. These analyses indicated that 6.2 percent of A-CSA IVs up to and including 1987 and 10.3 percent after 1987 demonstrated at least one type of involvement with child pornography, a behavior that is clinically associated with an exclusive or non-

---

[6] Of note, this child pornography composite variable was only applied to A-CSA IVs, meaning adults with allegations of contact sexual offenses against children or who had created child pornography themselves. Not included were the 325 Adult IVs (4.7%) who were coded in the CP (not CSA) classification, who had their registration revoked due to the possession of child pornography without known child victims.

exclusive pedophilic interest in children (CITATION). Given that all of these IVs involved in child pornography were also alleged to have sexually victimized children, these IVs seem to have used child erotica as an adjunct to, rather than replacement for, sexual contact with a child.

The A-CSA files also reflected an increasing use of digital media for sexual purposes over the past 30 years. This activity tended to include sending digital sexual communications (3.2%), taking digital photographs with a sexual intent (2.2%), and using chat rooms for sexual purposes (2.2%). These changes undoubtedly capture the behaviors that prompted the BSA to develop in 2008 further youth protection guidelines concerning the inappropriate use of cameras, digital devices, and social media.

**Table 20: Involvement in Pornography and Digital Media by A-CSA IVs by Decade**

| | Adult IVs | | | |
|---|---|---|---|---|
| | <1988 | | >1987 | |
| File references pornography:[1] | 173 | (11.6%) | 584 | (16.7%) |
| Taking sexually inappropriate images of Scouting youth[2] | 43 | (2.5%) | 88 | (15.1%) |
| Taking sexually inappropriate images of non-Scouting youth[2] | 47 | (27.2%) | 162 | (27.7%) |
| Viewing child pornography[2] | 29 | (16.8%) | 242 | (41.4%) |
| Distributing child pornography[2] | 14 | (8.1%) | 76 | (13.0%) |
| Showing youth pornography (child or adult)[2] | 91 | (52.6%) | 244 | (41.8%) |
| Images/films contain explicit Scouting-related content[2] | 3 | (1.7%) | 5 | (0.9%) |
| File references inappropriate use of social media: | 3 | (0.2%) | 243 | (7.0%) |
| Digital sexual communication (text, audio, or video)[3] | 0 | (0.0%) | 113 | (46.5%) |
| Taking digital photos[3] | 3 | (100.0%) | 77 | (31.7%) |
| Sexual use of chat rooms[3] | 0 | (0.0%) | 77 | (31.7%) |
| Facebook conversations/comments[3] | 0 | (0.0%) | 20 | (8.2%) |
| Posting of photos[3] | 0 | (0.0%) | 13 | (5.3%) |
| Posting of sexual videos[3] | 0 | (0.0%) | 1 | (<0.05%) |
| Other[3] | 0 | (0.0%) | 46 | (18.9%) |

[1] This data refers only to the question in the C module of the *UVA-RCF*, and does not include data from the *IVRS* or elsewhere.
[2] Percentages derived from 173 and 584 files referencing pornography before and after 1988, respectively.
[3] Percentages derived from 3 and 243 files referencing inappropriate use of social media before and after 1988, respectively.

As summarized in Table 21, almost one-third of the A-CSA IVs were known to have been involved in at least one other youth-serving organization (YSO). These organizations included other youth mentoring programs (such as the BBBS), community sport teams, recreational programs (such as the YMCA), and various faith-based programs for children and adolescents. Moreover, as indicated earlier in Table 15, 11.5 percent of the A-CSA IVs were involved in teaching and 8.2 percent in some type of community/social services, implying regular contact with youth. One IV coded under a non-CSA classification category was described as belonging to 28 other youth-serving organizations.

**Table 21: Involvement in Other YSOs by A-CSA IVs (IVRS)**

| | Adult IVs[1] | | | |
|---|---|---|---|---|
| | <1988 | | >1987 | |
| Indication of involvement in other youth-serving organization | 296 | (19.9%) | 982 | (27.9%) |
| Average number of other youth-serving organizations | 1.3 | | 1.4 | |
| Median number of other youth-serving organizations | 1 | | 1 | |
| Range of number of other youth-serving organizations | 1 – 8 | | 1 – 13 | |

[1] 8 missing <1988, 32 missing >1987

Prior to 2013, the IVRS form used by the BSA did not include a question that specifically addressed the IV's involvement in other youth-serving organizations, an omission that suggests these present data underestimate this type of cross-organizational activity. Given this caveat, the finding that over one-quarter of the A-CSA IVs were routinely involved with children in organizations outside of Scouting again accentuates the importance of youth-serving organizations being able to share information about volunteers or staff who have been found to be sexually inappropriate or abusive toward children.

## ATTRIBUTES OF YOUTH CSA INELIGIBLE VOLUNTEERS

As summarized in Table 22, the Y-CSA IVs were almost exclusively male and generally 14 years of age or older. However, there were 31 Youth IVs aged ten years or younger, and 131 between the ages of 11 and 13 years. The majority of the Y-CSA IVs tended to be involved in Boy Scouts, although 5.0 percent were involved in Cub Scouting, and 2.5 percent each in the Explorer and Venturing programs, both of which involve programming for older youth.

**Table 22: Demographic Characteristics of Y-CSA IVs (IVRS)**

| | Youth IVs | | | Youth IVs | |
|---|---|---|---|---|---|
| Gender: | | | Eye color:[5] | | |
| Female | 1 | (0.1%) | Black | 1 | (0.6%) |
| Male | 882 | (99.9%) | Blue | 64 | (40.0%) |
| Age of IV: | | | Brown | 77 | (48.1%) |
| 7-10 | 31 | (3.5%) | Dichromatic | 0 | (0.0%) |
| 11-13 | 131 | (14.8%) | Gray | 1 | (0.6%) |
| 14-17 | 615 | (69.6%) | Green | 6 | (3.8%) |
| Mean age | 15.8 | | Hazel | 11 | (6.9%) |
| Age range | 7 – 60[1] | | Hair color:[6] | | |
| Race:[2] | | | Bald | 0 | (0.0%) |
| White/Caucasian | 517 | (87.8%) | Black | 32 | (10.7%) |
| Non-Caucasian | 72 | (12.2%) | Blonde | 62 | (20.8%) |
| Position in Scouting:[3] | | | Brown | 180 | (60.4%) |
| Boy Scouting | 751 | (88.8%) | Gray | 0 | (0.0%) |
| Cub Scouting | 44 | (5.2%) | Red | 15 | (5.0%) |
| Exploring | 22 | (2.6%) | Sandy | 7 | (2.3%) |
| Sea Scouting | 2 | (0.2%) | White | 2 | (0.7%) |
| Varsity | 5 | (0.6%) | | | |
| Venturing | 22 | (2.6%) | | | |
| Average height | 5'7" | | | | |
| Height range | 3'0" – 6'5" | | | | |
| Average weight | 156.8 | | | | |
| Weight range | 60 – 280 | | | | |
| Distinguishing physical characteristics:[4] | | | | | |
| Cognitive limitations | 29 | (59.2%) | | | |
| Physical deformity | 0 | (0.0%) | | | |
| Unusual facial features | 7 | (14.3%). | | | |
| Unusual size | 7 | (14.3%) | | | |
| Unusual skin/scarring | 3 | (6.1%) | | | |
| Unusual speech | 3 | (6.1%) | | | |

[1] Y-CSA IV age could be over 18 in cases when the allegations of abuse were reported after the IV had reached adulthood.
[2] 294 missing.
[3] 37 missing.
[4] Percentages based on youth with any distinguishing physical characteristic (N=49). Total Y-CSA N=883.
[5] Percentages based on 160 files indicating eye color.
[6] Percentages based on 298 files indicating hair color.

As summarized in Table 23, abusive Youth IVs tended to be at least three years older and physically larger than their victims, whether those victims were male or female. Documented intellectual disabilities more often characterized the female victims in male-on-female abusive incidents, while leadership seniority was more common in incident involving a male perpetrator and male victim. However, in over one-quarter of the Y-CSA IV files involving both male and female victims, there were no discernable differences noted between the alleged perpetrator and victim, arguing for the presence of more subtle dynamics associated with this type of abusive behavior. These data do not capture the 101 youth who were coded as having participated in a consensual sexual act with another youth, as no victims were coded in these instances and the data in Table 23 derives from victim data only.

**Table 23: Dynamics of Alleged Sexual Activity by Y-CSA IVs**

| | Youth IVs[1] | | | |
|---|---|---|---|---|
| | Male on Male | | Male on Female | |
| Type of sexual contact between youth: | | | | |
| Non-consensual only | 464 | (98.5%) | 176 | (98.9%) |
| Consensual only | - | - | - | - |
| Both non-consensual and consensual | 7 | (1.5%) | 2 | (1.1%) |
| Relationship between youth IV and alleged victim: | | | | |
| Size difference | 146 | (30.6%) | 92 | (51.4%) |
| >3 years age difference | 247 | (51.8%) | 127 | (70.9%) |
| Social status difference | 29 | (6.1%) | 11 | (6.1%) |
| Leadership difference | 81 | (17.0%) | 19 | (10.6%) |
| Cognitive difference | 58 | (12.2%) | 57 | (31.8%) |
| Prior incidents of bullying, fighting, threats, etc. | 30 | (6.3%) | 0 | (0.0%) |
| Sexual activity as part of initiation process | 10 | (2.1%) | 0 | (0.0%) |
| Sexual activity as part of game | 35 | (7.3%) | 7 | (3.9%) |
| None of the above but other indications of victimization | 143 | (32.4%) | 43 | (25.4%) |
| Consensual sexual activity between youth: | | | | |
| Consensual or mutual exploration/gratification | 0 | (0.0%) | 2 | (1.1%) |
| Part of group delinquent behavior | 3 | (100.0%) | 0 | (0.0%) |
| Unknown | 0 | (0.0%) | 0 | (0.0%) |

[1] This table displays only youth IVs who had only male or only female identified victims, and excludes those youth IVs with both male and female identified victims.

As summarized in Table 23, almost all of the sexual incidents identified in this subsample of single gender only cases, the Y-CSA was abusive in nature. However, at times, the sexual behavior, particularly between two or more males, appeared to occur as part of an initiation process (2.1%), as part of a game (7.3%), or as part of consensual or mutual process of sexual exploration (1.3%). These constitute behaviors that have been explicitly addressed by the BSA's as part of their evolving youth protection guidelines.

## ALLEGED VICTIMS OF CSA BY ADULT AND YOUTH IVS

### Defining Victim Categories for Reviewing Victim Selection Patterns

The process of identifying the total number of alleged victims of CSA was complex and required the creation of various filters to accurately capture the number and types of alleged victims identified in the A-CSA and Y-

CSA IV files. The first filter removed alleged victims from files with incident codes other than A-CSA and Y-CSA. A second filter removed any victims coded as "non-specific" on the IVRS, meaning abusive incidents identified through actions such as police cyber-impersonation, or when an IV had a positive criminal background check or had been placed on a sex offender registry. A third filter identified IVs who were linked through their abusive behavior, meaning that considering each of these linked IVs victims separately would have amounted to double-counting of victims. We became aware of these linked cases only partway through the coding, after which we instigated a process of coders identifying linked cases and reporting them to the research manager for review. These cases varied widely in how they were linked, from multiple IVs allegedly victimizing the same victim to more complex patterns of victimization. For example, one linked case involved three youths, with the first allegedly abusing the second youth (possibly a relative), and these two youths together (or separately) allegedly abusing the third youth. A fourth filter was created to remove coded victims of Y-CSA files which appeared to involve allegations of exclusively consensual sexual activity between youth of similar ages (up to three years difference in age).

**Table 24: Estimated and Coded Number of Alleged Victims of A-CSA and Y-CSA IVs**

|  |  | Adult IVs | Youth IVs |
|---|---|---|---|
| Estimated[1] | Range | 1 – 250 | 1 – 51 |
|  | Mean | 4.9 | 2.9 |
|  | Median | 3 | 2 |
|  | Average confidence[2] | 4.9 | 5.6 |
| IVRS | Range | 1 – 50 | 1 – 27 |
|  | Mean | 2.2 | 1.8 |
|  | Median | 1 | 1 |
|  | Sum | 10,916 | 1,368 |
| Victim Module (D)[3] | Range | 1 – 26 | 1 – 11 |
|  | Mean | 1.9 | 1.6 |
|  | Median | 1 | 1 |
|  | Sum | 7,238 | 1,017 |

[1] Estimation not filled out for 3,126 Adult IV files, and 204 Youth IV files.
[2] Confidence of estimated number of victims was on a 0-to-7 scale, with 0 representing "50-50."
[3] At least three distinct pieces of information from the variables in the victim module were required to complete this section for each alleged victim.

Table 24 summarizes the various ways alleged victims were counted in this study, displayed in order of the quantity and quality of information we had associated with each measure. These counting methods involve both victims who were involved in Scouting and those who were not. The first method originated from a question in Section B of the UVA-RCF, which asked the coders to estimate the total number of victims, if more than one victim, and to rate their confidence in this estimate. The mean for the estimated number of victims was approximately twice as large as the mean number of victims when restricted to individually identifiable individuals for which concrete information was available in the files. These estimates were often based on general statements in the files, such as a newspaper article quoting a law enforcement officer as saying there were "over 10 victims of child molestation"; other cases involved statements from an identified alleged victim saying that the IV had also abused "a few other boys in the Troop," without further information about these other alleged victims. The second method of counting alleged victims, described in the second row of

Table 24, drew from the victim section of the IVRS victim. In order for a victim to be coded via this method, a specific alleged victim had to be identified in the file, although the information about that victim could be very sparse, even limited to no more than age, gender, or Scouting affiliation.[7] The third method was the most conservative, described in the third row of Table 24, was with most conservative.  Alleged victims were counted according to the victim section of the UVA-RCF (Section D), which was only completed if at least three distinct pieces of information to be coded for a specific victim. For example, Section D would be coded for a particular victim if the file identified at least their gender, their approximate age, and their association with Scouting. Unsurprisingly, this method resulted in the smallest number of estimated victims.

Obviously, a range of potential alleged victims are possible depending on the method of counting. We chose to use the second method–drawing the victim count from specific victims identified in the IVRS–for the analyses that followed, since it struck a reasonable balance between the more conservative and more liberal counting methods, and appeared the most reliable among the different victim counts identified in each file.

As indicated in Table 24, the CSA IV files contained some files that indicated an extraordinarily large number of child victims, up to 250 for one A-CSA IV and 51 for one Y-CSA IV. However, these large victim counts were the exception rather than the rule; the estimated median victim count for A-CSA IVs was three and for Y-CSA IVs was two. When the coders counted only victims who could be individually identified as required for coding on the IVRS, the median number of victims fell to one for both the A-CSA IVs and Y-CSA IVs. These various counts illustrate the disturbing number of victims that can be identified in the unusual cases, but they also contrast this impression with the available information indicating that most A-CSA and Y-CSA IVs had one or two identifiable child victims at the time that their registrations were revoked by the BSA.



*Figure 9.* Numbers of Alleged Victims of A-CSA and Y-CSA IVs by Year

---

[7] "Scouting affiliation" here refers only to the registration status of the victim at the time the IV file was opened and not whether the abuse occurred inside or outside of Scouting activities.

The data summarized in Figure 9 reflect the year that the IV file was opened and does not necessarily coincide with the year that the abuse occurred, this incident–specific information not being captured in the majority of the files. The notable increase in victims from 1986 to 1991 corresponds to an increase in the overall number of CSA IV files opened during the same period. 1955 As already suggested, the significant increase in IV files opened from 1986 through 1991 might reflect an increase in contemporary reports of sexual abuse due to an overall American crime wave during this period, combined with historical cases that came to light because of the emerging publicity surrounding child sexual abuse at that time.

With the overall decline in the number of A-CSA IV files opened from 1989 to 2013, the number of victims associated with the A-CSA IV files opened each year decreased from a high of 615 in 1989 to a low of 86 in 2009. The number of victims of Y-CSA IVs varied less in the 1990s, ranging from a high of 79 in 2012 to a low of 23 in 2005. These differences in trends of victim numbers for Adult vs. Youth IVs again underscore the differences in the behavior of these two groups and the varying impact of societal trends on the CSA being perpetrated by Adult and Youth IVs.

Figure 10 visually displays the number of Scouting-involved youths who were sexually victimized each year in the context of the average number of youths who register with BSA each year. In this figure, we used both the estimated mean number of victims and the number of alleged victims identified on the IVRS.



Each of the 10,000 dots represents 510.5 youth members registered with BSA.

The orange area represents *IVRS* counted victims; the striped area represents estimated victims.

*Figure 10.* Visual Representation of Identified Alleged Youth Victims[1] Relative to Youth Registered

On average, there are 78 IVRS-identified alleged Scouting-involved victims each year, as compared to 5,105,099 average youths involved with Scouting each year from 1955 through 2016 (these being the years in which

registration data is available for the BSA). We also obtained an estimated total number of victims each year for this same time period, which came to 184 estimated youth victims each year (agnostic to Scouting status). The number of IVRS-identified Scouting-involved victims is represented by the solid orange portion of the dot, while the estimated total number is represented by both the solid orange and striped orange portions of the dot combined. Regardless of which count of alleged victims is used, it is evident that the number of alleged victims is exceedingly small in relation to the total number of youth involved in Scouting, and that for the vast majority of children, their experience in Scouting is safe.

### Identifying Victim Selection Criteria among A-CSA and Y-CSA IVs

Table 25 summarizes the omnibus variable that was created to best capture the age of the IVRS-identified victims when the abuse began and ended. These age measurements are based on different sources of information, including the coded age of each alleged victim, the recorded birthdate of the alleged victim, the date the IV file was opened, and the dates the alleged abuse was believed to have commenced. These various calculations were based on different variables with varying proportions of missing data. Therefore, the data are combined into a composite best-fit variable to optimally facilitate examination of the age-related preferences of each CSA IV.

**Table 25: Measures of the Ages of Alleged Victims of Adult and Youth IVs**

|  |  | Adult IVs | Youth IVs |
|---|---|---|---|
| Calculated age when alleged abuse began[1] | Median | 12.6 | 11.4 |
|  | Range | 1.1 – 33.0 | 2.4 – 17.5 |
| Age entered by coder[2] | Median | 13 | 9 |
|  | Range | <1 – 72 | 1 – 22 |
| Age when IVRS opened[3] | Median | 14.5 | 11.9 |
|  | Range | -6.3 – 70.3 | 2.9 – 55.0 |
| Combined age[4] | Median | 13.0 | 10.0 |
|  | Range | <1 – 59.0 | 1.0 – 17.5 |
| Age when alleged abuse began[5] | Median | 12 | 11 |
|  | Range | <1 – 17 | 2 – 17 |
| Age when alleged abuse ended[5] | Median | 13 | 11 |
|  | Range | 1 – 17 | 2 – 17 |
| Age when alleged abuse ended-over 18 years[6] | Median | 20 | N/A |
|  | Range | 19 – 30 | N/A |

[1] Was determined by the difference of the alleged victims' date of birth and the date when the alleged abuse began per the IVRS.

[2] Was the approximate age entered by the coders of each file, to be indicated when the date of birth and date alleged abuse again was not available.

[3] Was determined by the difference of the alleged victims' date of birth and the date when the IVRS was filled out. Negative age indicates that information regarding an alleged victim was added to the file after the file was created, and that the alleged victim was not yet born at the time of the IV was removed from Scouting.

[4] Combines the above ages with preference given to calculated age abuse began, followed by age entered by coder, and if neither is available then age IVRS opened.

[5] Included age information for victims whose alleged abuse occurred after the IV had been placed in the IV files.

[6] Reflects allegations of abusive sexual contact which continued into adulthood.

These different age calculations indicate that the victims ranged from <1 to 17 years of age for the A-CSA IVs and 1-17 for the Y-CSA IVs. Depending on the method of age calculation used, the average age of the victims

identified in the A-CSA IV files was approximately 12 years when the sexual abuse began, and approximately 13 years when the abuse was reported to the BSA. In some instances, the abusive relationship continued after the victim had passed the age of majority, and in other instances, the abuse stopped before the victim turned 18 but was not reported to the BSA until the victim had reached adulthood. The average age for alleged victims identified in the Y-CSA files was slightly younger than those of the A-CSA IVs, with the average age of the Y-CSA victims being approximately 11 years when the abuse began and still being 11 years when the IV file was opened. This may be because Y-CSA IVs tended to abuse victims younger than themselves, which tends to shift the age distribution of Y-CSA IV victims downward.

Concerning the gender of identified victims, we were able to locate information concerning 7,762 (81.2%) male victims and 1,792 (18.8%) female victims in the A-CSA IV files dated 1946 through 2016. The Y-CSA IV files over this same period contained information on 913 (75.3%) male and 299 (24.7%) female alleged victims of Y-CSA. These numbers are illustrated in Figure 11 and demonstrate that while the victims of the A-CSA IVs tended to be primarily males before 1987, the proportion of female victims increased significantly in the years after 1987.



*Figure 11.* Gender of Alleged Victims of A-CSA and Y-CSA

In Figure 12, we summarized the number of IVRS-identified victims who were Scouting-affiliated and those for whom we could find no indication of Scouting involvement. For the A-CSA IVs, this involved 5,116 (49.5%) Scouting-involved victims and 5,221 (50.5%) non-Scouting-involved victims. Within the Y-CSA files, we located 682 (51.2%) Scouting-involved victims and 651 (48.8%) non-Scouting-involved victims.



*Figure 12*. Scouting Affiliation of Alleged Victims of A-CSA and Y-CSA

In the instances of Y-CSA, the proportion of Scouting-involved and non-Scouting-involved victims was almost equal, while the A-CSA IVs demonstrated markedly different patterns of victim selection across both time intervals. In the earlier years, the A-CSA IVs tended to offend more often against youths who were involved in Scouting, whereas after 1987 they tended to abuse a greater proportion of youths who were not known to have any affiliation with Scouting.

Given that few female victims were affiliated with Scouting, Figures 11 and 12 are likely different ways of describing the same trend: that after 1987, A-CSA IVs became less likely to select Scouting-involved boys as victims. This may reflect an effect of the youth protection policies implemented by the BSA in 1987, prompting volunteers with a sexual interest in children to seek victims outside the safety parameters established by the BSA. The increase proportion of non-Scouting-involved and female victims after 1987 might also be capturing an increased investment in case-finding occurring throughout the general community and in other youth-serving organizations, due to the new policies and programming concerning child sexual abuse that were being implemented nationally at that time.

Table 26 summarizes the information that was available in the IV files concerning victim vulnerabilities that have been associated with CSA in the research literature. These data were collected from Section D of the UVA-RCF, which as previously noted was completed only when there were at least three pieces of information available about an alleged victim. Information about victim vulnerabilities was seldom found in the IV file. When present, it indicated that 11.4 percent of the A-CSA victims and 18.9 percent of the Y-CSA victims were living with only one parent, in most cases this parent being the mother. For a much smaller percentage of

victims, there were indications that the victim's family was facing some type of family instability or hardship. There were fewer indications that the victims were disabled or struggling in school. Prior victimization was not often noted in the files for youth abused by A-CSA and Y-CSA IVs, this type of information not being part of the information gathering process used in opening an IV file.

**Table 26: Select Characteristics of Identified Victims of Alleged A-CSA and Y-CSA**

|  | Adult IVs | | Youth IVs | |
|---|---|---|---|---|
| Victim with disability:[1] | | | | |
| One or more with disability | 80 | (1.1%) | 30 | (3.0%) |
| No indication of disability | 7,096 | (98.9%) | 979 | (97.0%) |
| Other identified vulnerabilities: | | | | |
| Living with both parents:[2] | | | | |
| Yes | 820 | (11.4%) | 191 | (18.9%) |
| No | 478 | (6.6%) | 36 | (3.6%) |
| Unknown | 5,923 | (82.0%) | 784 | (77.5%) |
| Family instability or hardship:[3] | | | | |
| Yes | 334 | (4.6%) | 33 | (3.2%) |
| No | 106 | (1.5%) | 23 | (2.3%) |
| Unknown | 6,779 | (93.9%) | 960 | (94.5%) |
| Struggling at school:[4] | | | | |
| Yes | 112 | (1.6%) | 23 | (2.3%) |
| No | 1,243 | (17.2%) | 212 | (20.9%) |
| Unknown | 5,856 | (81.2%) | 780 | (76.8%) |
| Prior victimization:[5] | | | | |
| Yes | 92 | (1.3%) | 13 | (1.3%) |
| No indication | 7,120 | (98.4%) | 999 | (98.2%) |

[1] 62 missing for identified victims of adult IVs, 8 missing for identified victims of youth IVs.
[2] 17 missing for identified victims of adult IVs, 6 missing for identified victims of youth IVs.
[3] 19 missing for identified victims of adult IVs, 1 missing for identified victims of youth IVs.
[4] 27 missing for identified victims of adult IVs, 2 missing for identified victims of youth IVs.
[5] 26 missing for identified victims of adult IVs, 5 missing for identified victims of youth IVs.

There were fewer indications that the victims were disabled or struggling in school, although the available data suggest that this might be more prevalent among the Y-CSA victims (2.3 versus 1.6%). Prior victimization was not often noted in the files for youth abused by A-CSA and Y-CSA IVs, this type of information not being part of the information gathering process used in opening an IV file.

## OBSERVED VICTIM SELECTION PATTERNS OF ADULT AND YOUTH CSA IVS

In the following section, we used the IVRS-identified victim data matched with information about the IV to explore patterns of victim selection observed in the alleged abusive behavior of A-CSA and Y-CSA IVs. In making these comparisons across variables, we encountered systemic problems with missing data that reduced the number of cases in which these combined relationships could be identified and analyzed, so these results should be interpreted with caution. It is possible that more complete data could change the results and conclusions of these analyses.

As illustrated in Figure 13, the majority of both A-CSA and Y-CSA IVs had only one identified child victim, with few having more than five victims across the 70 years of the study. Specifically, 104 A-CSA IVs had 10 or more identified victims, and 18 had 20 or more identified victims of child sexual abuse. Within the Y-CSA files, we found 28 Y-CSA IVs with five or more identified victims and four Y-CSA IVs with 10 or more identified victims. These numbers do not capture unidentified victims (i.e., when the file refers to other possible victims but does not provide any information about them), and so certainly underestimates the number of victims per IV to some extent. Nevertheless, when taken at face value, these numbers contradict public perceptions of the BSA being infiltrated by predatory pedophiles who offend against a large number of child victims before coming to public attention.



*Figure 13.* Adult and Youth CSA IVs by Number of Victims

Figure 14 illustrates the victim selection patterns observed among the A-CSA and Y-CSA IVs based on the ages of their chosen victims. Age information for this chart used the omnibus age variable described in Table 25, which was created to reduce the amount of missing age data while capturing the most accurate victim ages available. Of note, only A-CSA and Y-CSA IVs with more than one identified victim could possibly fall into the "mixed ages" category in Figure 14.

In reviewing the age preferences of the A-CSA and the Y-CSA IVs, we chose to divide the ages according to the criteria used in the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (DSM-5) for diagnosing pedophilia, which references children generally age 13 years or younger. As illustrated in Figure 14, 1,464 (53.8%) A-CSA IVs sexually abused only children aged 13 years and younger, 963 (35.4%) abused only children aged 14 years and older, and 296 (10.8%) abused both children aged 13 and under and children aged 14 and older.



*Figure 14.* A-CSA and Y-CSA IVs' Observed Victim Selection: Age of Victims

The data also indicated that 442 (86.7%) Y-CSA IVs sexually abused only children 13 years of age and younger, 53 (10.4%) abused children only 14 years of age and older, and 15 (2.9%) abused both children aged 13 and under and children aged 14 and older. These numbers demonstrate notable consistency in the ages of selected victims, with only a small minority of IVs choosing victims both below and above the 13-year-old age cutoff. These data also demonstrate that both A-CSA and Y-CSA IVs preferred victims 13 years of age and younger.



*Figure 15.* A-CSA and Y-CSA IVs' Observed Victim Selection: Gender of Victims

Figure 15 also reflects consistency in victim choice, with 3,016 (70.7%) A-CSA IVs having male victims only, 1,085 (25.4%) female victims only, and 167 (3.9%) victims that included both male and female children. A similar pattern was observed with the Y-CSA IVs. Within this group, 477 (67.4%) Y-CSA IVs had male victims only, 180 (25.4%) had female victims only, and 51 (7.2%) were found to have allegedly offended against both

63

male and female children. These data support the presence of a particular gender preference, which expresses itself in the victim choice of over 90 percent of both A-CSA and Y-CSA IVs. Within both groups, the majority of the IVs choose male victims, although one-quarter of the IVs demonstrated a preference for exclusively female victims.

In Figure 16 we examined victim choice as it was impacted by the Scouting or non-Scouting affiliation of the victims. The following data includes A-CSA and Y-CSA IVs with one, and more than one identified victim; the mixed Scouting affiliation category is necessarily limited to IVs with more than one victim. Scouting affiliation information for this chart was included for all victims for whom such information was contained in the files; however, Scouting affiliation was not available in many files.



*Figure 16.* A-CSA and Y-CSA IVs' Observed Victim Selection: Scouting Affiliation of Victims

As illustrated in Figure 16, the victim choice of both the A-CSA and Y-CSA IVs again tended to reflect a consistent pattern of victim selection based on the Scouting affiliation of each victim. The proportion of non-Scouting victims is over-represented in Figure 16, as the IVRS asked only if the victim was involved in Scouting and provided an alternative response of "no indication." Nonetheless, as reflected in Figure 16, the majority of both the A-CSA and Y-CSA IVs tended to choose one or the other type of victim over the course of their abusive behavior. The Y-CSA IVs had a particularly low number of mixed victims as it pertained to the Scouting affiliation of their victims.

In Table 27, we examined the A-CSA IVs' victim selection patterns as they varied over time. Included in the table are the victim selection variables described in Figures 14-16, as well as indices of the A-CSA IVs' involvement in Scouting and other youth-serving organizations. As reflected in Table 27, these data suggest changes over time regarding the ways by which A-CSA IVs with more than one victim selected their victims,

which merit special attention because of the greater damage inflicted by this high-offending group. After 1987, A-CSA IVs with more than one victim tended toward more younger victims, fewer male-only victims, and fewer Scouting-only affiliated victims. They also demonstrated less involvement in other youth-serving organizations, less involvement in Scouting as a youth, and a shorter time in Scouting before having their registration in Scouting revoked by the BSA.

**Table 27: Select Characteristics of A-CSA IVs by Number of Victims by Decades**

| | | Adult IVs <1988 | | | | Adult IVs >1987 | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1 Victim | | >1 Victim | | 1 Victim | | >1 Victim | |
| Age:[1] | Under 14 | 164 | (39.6%) | 250 | (60.4%) | 585 | (55.7%) | 465 | (44.3%) |
| | 14+ | 91 | (52.6%) | 82 | (47.4%) | 559 | (70.8%) | 231 | (29.2%) |
| | Mixed ages | - | - | 104 | (100.0%) | - | - | 192 | (100.0%) |
| Gender:[2] | Males Only | 409 | (34.4%) | 779 | (65.6%) | 915 | (50.1%) | 913 | (49.9%) |
| | Females Only | 76 | (60.8%) | 49 | (39.2%) | 728 | (75.8%) | 232 | (24.2%) |
| | Both Genders | - | - | 36 | (100.0%) | - | - | 131 | (100.0%) |
| Scouting Affiliation:[3] | Scouts Only | 270 | (36.7%) | 465 | (63.3%) | 713 | (59.3%) | 490 | (40.7%) |
| | Non-Scouts Only | 298 | (52.2%) | 273 | (47.8%) | 1,210 | (68.5%) | 557 | (31.5%) |
| | Mixed Scouting | - | - | 143 | (100.0%) | - | - | 255 | (100.0%) |
| IV YSO Involvement:[4] | No Other YSOs | 482 | (41.2%) | 687 | (58.8%) | 1,548 | (64.9%) | 837 | (35.1%) |
| | Other YSOs | 114 | (36.3%) | 200 | (63.7%) | 493 | (50.2%) | 490 | (49.8%) |
| IV Scouting as Youth:[5] | BSA-Involved | 74 | (32.9%) | 151 | (67.1%) | 476 | (58.5%) | 337 | (41.5%) |
| | Non-BSA-Involved | 23 | (42.6%) | 31 | (57.4%) | 172 | (67.7%) | 82 | (32.3%) |
| IV Time in Scouting:[6] | Below Median | 223 | (40.8%) | 323 | (59.2%) | 854 | (63.5%) | 490 | (36.5%) |
| | Above Median | 128 | (38.3%) | 206 | (61.7%) | 702 | (55.5%) | 562 | (44.5%) |

[1] 804 missing <1988, 1,524 missing >1987
[2] 146 missing <1988, 637 missing >1987
[3] 46 missing <1988, 331 missing >1987
[4] 8 missing <1988, 31 missing >1987
[5] 1,215 missing <1988, 2,439 missing >1987
[6] 613 missing <1988, 837 missing >1987

Table 28 contains similar comparisons for the Y-CSA IVs based on their victims' age, gender, and Scouting affiliation. As indicated previously, time intervals were not utilized for the Y-CSA IVs as there were only 11 Y-CSA IVs identified prior to 1988, since the BSA only began collecting information on youth offenders in the late 1980s.

**Table 28: Select Characteristics of Y-CSA IVs by Number of Victims**

| | | All Youth IVs | | | |
|---|---|---|---|---|---|
| | | 1 Victim | | >1 Victim | |
| Age: | Under 14 | 273 | (61.8%) | 169 | (38.2%) |
| | 14+ | 39 | (73.6%) | 14 | (26.4%) |
| | Mixed ages | - | - | 15 | (100.0%) |
| Gender | Males Only | 291 | (61.0%) | 186 | (39.0%) |
| | Females Only | 141 | (78.3%) | 39 | (21.7%) |
| | Both Genders | - | - | 51 | (100.0%) |
| Scouting Affiliation | Scouts Only | 226 | (63.5%) | 130 | (36.5%) |
| | Non-Scouts Only | 240 | (65.9%) | 124 | (34.1%) |
| | Mixed Scouting | - | - | 38 | (100.0%) |

The majority of Y-CSA IVs had a single victim, under the age of 14 years, who was male; however, 38 percent of the Y-CSA IVs had more than one victim. When the Y-CSA IVs abused females, there was predominately

one victim, with 22 percent of Y-CSA IVs being known to have allegedly abused more than one female. The Y-CSA IVs demonstrated a comparable risk of abusing youth inside or outside of Scouting.

**Frequency of Victim Selection Patterns among A-CSA and Y-CSA IVs**

To better display the victim selection data, we created the following bar charts to illustrate the total number of identified victims of A-CSA and Y-CSA IVs according to the victim selection characteristics of age, gender, and Scouting affiliation. These data are essential both to law enforcement and youth-serving organizations when trying to assess the relative level of risk associated with child molesters who demonstrate particular patterns of victim selection.



*Figure 17.* Bar Charts of A-CSA IVs' Total Victim Count: Age of Victims

As indicated above, victims under 14 years of age were the most common type of alleged victim identified in the A-CSA IV files, and this remained consistent across A-CSA IVs with total victim counts ranging from one through more than ten. However, when the victim count of the A-CSA IV was lower, victims 14 years and older were not uncommon, although mixed-aged victim counts began to replace this segment of victims as the victim count per A-CSA IV increased in number ranging from seven through 10.



*Figure 18*. Bar Charts of Y-CSA IVs' Total Victim Count: Age of Victims

The preference for younger victims was even more pronounced for the Y-CSA IVs, who predominantly had victims 13 years of age or younger and few victims over the age of 13 years. This behavior appears indicative of a predatory ability of older youths to sexually abuse younger youths because of differentials in size or leadership status within the troop. However, as with the A-CSA IVs, as the total number of victims per Y-CSA increased, the frequency of a mixed-age victim selection pattern increased simultaneously. As illustrated in Figure 18, no Y-CSA IVs with more than five victims exclusively abused older victims, instead either exclusively abusing victims 13 and under or abusing a mixture of younger and older victims. Together, these patterns illustrate the relative vulnerability of youths aged 13 and under to sexual abuse by older youths associated with Scouting.

Regarding victim gender, the majority of A-CSA IVs abused primarily male victims–which is unsurprising since almost all youths involving in Scouting from 1946 to 2016 were male. However, among the A-CSA IVs with only one known victim, almost one-third offended exclusively against females. Female-only victim selection behaviors also ocurred across the entire range of total victims per IV, including those with more than 10 victims. In line with in our previous analyses on mixed-age victims, mixed-gender victim selection behavior also increased as the number of total victims per IV increased.



*Figure 19.* Bar Charts of A-CSA IVs' Total Victim Count: Victim Gender

As illustrated in Figure 20, the majority of Y-CSA IVs tended to offend against male-only victims regardless of the total number of victims per Y-CSA IV. When they had only one victim, there was again a third that chose a female victim only, with this female-only proportion diminishing slightly as the total number of female-only victims increased to a total of 4 total victims per Y-CSA IV. Y-CSA IVs with the highest number of total victims per Y-CSA IV consistently chose male-only victims with mixed-victim choice occurring only with Y-CSA IVs who were known to have between two to eight total victims.



*Figure 20.* Bar Charts of Y-CSA IVs' Total Victim Count: Victim Gender

Figure 21 illustrates the surprising frequency with which A-CSA IVs choose victims not affiliated with Scouting. For almost the full range of per-IV victim counts, A-CSA IVs chose exclusively Scouting-involved victims a minority of the time. More often than not, the A-CSA IVs chose victims that were either exclusively non-Scouting-involved or were a mixture of Scouting-involved and non-Scouting-involved. Again, as with the previous comparisons, the mixed category was increasingly common as the total number of victims per A-CSA IV increased. Significantly, these data directly contradict the implicit assumption that all Scouting-involved adults expelled from the BSA for child molestation were sexually abusing primarily children they encountered through Scouting activities.



*Figure 21.* Bar Charts of A-CSA IVs' Total Victim Count: Scouting Affiliation

The Y-CSA IVs were notable for overall choosing victims of mixed Scouting affiliation far less often than their adult counterparts. Instead, most of the Y-CSA IVs with fewer total victims chose showed a consistent victim selection pattern in regards to Scouting affiliation: Y-CSA IVs with eight or fewer victims chose either only victims they encountered within Scouting or only victims they encountered outside of Scouting, with comparable numbers for each. For Y-CSA IVs with large numbers of victims (nine or more), the victim selection pattern became more erratic due to the very small cell sizes. The Y-CSA IV with the largest number of victims (27 victims) abused only youths outside of Scouting; the Y-CSA IVs with nine and 11 total victims abused only youths inside of Scouting; and the Y-CSA IVs with ten total victims all abused youths both inside and outside of Scouting.



*Figure 22.* Bar Charts of Y-CSA IVs' Total Victim Count: Scouting Affiliation

## TECHNIQUES USED TO ACCESS VICTIMS AND AVOID DETECTION

In this section, we examine the techniques used by A-CSA and Y-CSA IVs to gain access to their child victims and to avoid disclosure of their victimization to others. We examined these behaviors according to the age and gender of the alleged victim(s). As indicated in the historical section of our report, these behaviors have been termed "grooming" since approximately the mid-1980s.

Tables 29 and 30 summarize the behaviors used by A-CSA and Y-CSA IVs to access their victims and avoid detection according to the age of the victims. Unfortunately, these data were missing in 25 to 50 percent of the Adult and Youth CSA files, this information being unrelated to the intent and structure of IV files. The creation of an IV file has never required a detailed exploration of the interactions that occurred between the alleged victims and their perpetrators, with professional practice standards now requiring that interviews of child victims of CSA be conducted by law enforcement and CAC professionals with specialized training in the forensic interviewing of children. However, this means that we cannot know whether behaviors not endorsed in an IV file truly did not occur or whether such information was simply not recorded.

The A-CSA IVs tended to use child-attracting activities and interests, travel and exciting adventure, and the creation of intimate relationships with a sense of caring. A-CSA IVs who abused both younger and older victims showed the greatest use of child-attracting activities. A-CSA IVs also sometimes abused youths that they believed to be sleeping and to misattribute the sexual acts that had occurred or were occurring. Further, with older youths, the A-CSA IVs more often singled out a youth to make them feel special, enabled them to engage in pseudo-adult activities (such as driving a car or motor boat), provided them with access to alcohol or drugs, and exposed them to pornography and/or engaged them in other activities designed to arouse them sexually.

A-CSA IVs who offended against youths of varying ages appeared more likely to provide their alleged victims with money and gifts.

The Y-CSA IVs used a variety of victim-accessing behaviors, which again varied by the age of the victim. With the younger victims, they used child-attracting activities and interests, often while providing the family of their victim(s) with assistance with activities of daily living. With the older victims, Y-CSA IVs engaged in sexual contact while the youth appeared to be sleeping, provided the youth with opportunities to engage in pseudo-adult behavior, and bonded with their victims through an intimate relationship with an implied sense of caring. The Y-CSA IVs who offended against youths of varied ages similarly engaged in child-attracting activities, promoted nudity and close sleeping, and engaged their victims with pornography.

**Table 29: Identified Behaviors to Gain Access and Compliance by Victim Age**

| | Adult IVs | | | | | Youth IVs | | | | | |
| | < 14 | | 14 + | | Mixed | | < 14 | | 14 + | | Mixed | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Access to and compliance of the victim: | | | | | | | | | | | | |
| Child attracting activities/interests | 337 | (13.2%) | 141 | (10.7%) | 178 | (17.2%) | 90 | (14.7%) | 1 | (1.5%) | 8 | (18.2%) |
| Misattribution of sexual acts | 163 | (6.4%) | 71 | (5.4%) | 65 | (6.3%) | 30 | (4.9%) | 0 | (0.0%) | 0 | (0.0%) |
| Promoted nudity/close sleeping | 94 | (3.7%) | 45 | (3.4%) | 48 | (4.6%) | 10 | (1.6%) | 1 | (1.5%) | 6 | (13.6%) |
| Singling out youth/feel special | 97 | (3.8%) | 79 | (6.0%) | 52 | (5.0%) | 2 | (0.3%) | 0 | (0.0%) | 0 | (0.0%) |
| Travel/exciting adventures | 215 | (8.4%) | 114 | (8.6%) | 88 | (8.5%) | 13 | (2.1%) | 4 | (5.9%) | 1 | (2.3%) |
| Assistance in progress in Scouting | 96 | (3.8%) | 34 | (2.6%) | 32 | (3.1%) | 1 | (0.2%) | 1 | (1.5%) | 0 | (0.0%) |
| Assistance with family daily activities | 110 | (4.3%) | 37 | (2.8%) | 45 | (4.3%) | 60 | (9.8%) | 0 | (0.0%) | 0 | (0.0%) |
| Demos to diminish inhibitions | 44 | (1.7%) | 4 | (0.3%) | 35 | (3.4%) | 16 | (2.6%) | 0 | (0.0%) | 0 | (0.0%) |
| Chastising youth | 0 | (0.0%) | 6 | (0.5%) | 6 | (0.6%) | 3 | (0.5%) | 0 | (0.0%) | 0 | (0.0%) |
| Victim appeared asleep | 181 | (7.1%) | 113 | (8.5%) | 72 | (6.9%) | 23 | (3.8%) | 12 | (17.6%) | 1 | (2.3%) |
| Acting like nothing unusual happened | 60 | (2.4%) | 42 | (3.2%) | 17 | (1.6%) | 20 | (3.3%) | 2 | (2.9%) | 1 | (2.3%) |
| Implied consent, desensitization | 12 | (0.5%) | 14 | (1.1%) | 6 | (0.6%) | 3 | (0.5%) | 0 | (0.0%) | 0 | (0.0%) |
| Intimate relationship/sense of caring | 194 | (7.6%) | 184 | (13.9%) | 71 | (6.8%) | 12 | (2.0%) | 5 | (7.3) | 2 | (4.5%) |
| Pseudo-adult behaviors | 39 | (1.5%) | 118 | (8.9%) | 56 | (5.4%) | 7 | (1.1%) | 4 | (5.9%) | 0 | (0.0%) |
| Use of alcohol, or other drugs | 52 | (2.0%) | 108 | (8.2%) | 81 | (7.8%) | 0 | (0.0%) | 3 | (4.4%) | 0 | (0.0%) |
| Showing pornography | 101 | (4.0%) | 77 | (5.8%) | 90 | (8.7%) | 4 | (0.7%) | 3 | (4.4%) | 9 | (20.5%) |
| Sexual pleasure or enticement | 38 | (1.5%) | 75 | (5.7%) | 33 | (3.2%) | 12 | (2.0%) | 3 | (4.4%) | 1 | (2.3%) |
| Providing shelter, food, home | 42 | (1.6%) | 29 | (2.2%) | 29 | (2.8%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) |
| Money/gifts | 105 | (4.1%) | 53 | (4.0%) | 70 | (6.8%) | 14 | (2.3%) | 3 | (4.4%) | 1 | (2.3%) |
| Other | 466 | (18.3%) | 235 | (17.8%) | 152 | (14.7%) | 117 | (19.1%) | 17 | (25.0%) | 18 | (40.9%) |
| None of the above | 1,070 | (42.0%) | 466 | (35.2%) | 390 | (37.6%) | 302 | (49.3%) | 26 | (38.2%) | 11 | (25.0%) |

These patterns illustrate two aspects of the behaviors often referred to as "grooming" in investigative and lay discourse. First, rather than grooming being an entirely separate set of behaviors reserved for child molesters alone, many of these behaviors lie at the heart of all healthy, prosocial mentoring of youth. Included in this category are behaviors such as identifying and engaging in activities that interest youth, generating opportunities for adventure and travel, developing a close relationship with an implicit sense of caring, and helping families with their activities of daily living, particularly in instances of single parent households. These actions are intrinsic to healthy, normal relationships between adults and youth, whether in the context of Scouting, other mentoring relationships, or the family. Second, these patterns suggest that involving youths in activities that

can reflect unfavorably on them or get them into trouble–such as using drugs or alcohol and stimulating their own sexual curiosity through pornography–can diminish the likelihood that victim will report the abuse to others by creating a sense of secrecy or embarrassment. Attempts to sexually abuse youth while they are sleeping have undoubtedly diminished due to the strict guidelines established after 1987 forbidding any type of sleeping proximity between youths and adults. The misattributing of sexualized behavior, such as in instances of touching during costume fitting for Indian dance or the enactment of various first aid maneuvers, is also less effective in recent years given the effort made to expose children and adolescents to youth protection programming and the public discourse concerning child sexual abuse which increasingly occurs within families and the wider community.

### Table 30: Identified Techniques to Avoid Detection by Victim Age

| | Adult IVs | | | Youth IVs | | |
|---|---|---|---|---|---|---|
| | < 14 | 14 + | Mixed | < 14 | 14 + | Mixed |
| Techniques to avoid detection: | | | | | | |
| Loss of important relationship | 66 (2.6%) | 96 (7.3%) | 53 (5.1%) | 2 (0.3%) | 1 (1.5%) | 0 (0.0%) |
| Loss of sexual excitement/stimulation | 12 (0.5%) | 46 (3.5%) | 23 (2.2%) | 0 (0.0%) | 2 (2.9%) | 1 (2.3%) |
| Sense of embarrassment/humiliation | 90 (3.5%) | 75 (5.7%) | 27 (2.6%) | 21 (3.4%) | 9 (13.2%) | 1 (2.3%) |
| Fears of being excluded from group | 26 (1.0%) | 20 (1.5%) | 24 (2.3%) | 10 (1.6%) | 4 (5.9%) | 1 (2.3%) |
| Threats of physical harm | 79 (3.1%) | 28 (2.1%) | 20 (1.9%) | 38 (6.2%) | 2 (2.9%) | 0 (0.0%) |
| Use of Scouts' Honor | 10 (0.4%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| Threats of reporting illegal behavior | 6 (0.2%) | 7 (0.5%) | 3 (0.3%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| Concerns about IV being harmed | 33 (1.3%) | 25 (1.9%) | 11 (1.1%) | 4 (0.7%) | 1 (1.5%) | 0 (0.0%) |
| Harm to Scouts, Troop, or BSA | 4 (0.2%) | 2 (0.2%) | 6 (0.6%) | 1 (0.2%) | 1 (1.5%) | 0 (0.0%) |
| Lost opportunities | 37 (1.5%) | 43 (3.3%) | 49 (4.7%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| Other | 304 (11.9%) | 118 (8.9%) | 104 (10.0%) | 68 (11.1%) | 5 (7.4%) | 11 (25.0%) |
| None of the above | 1,578 (62.0%) | 727 (55.0%) | 662 (63.8%) | 291 (47.5%) | 30 (44.1%) | 16 (36.4%) |
| N/A; reported after first incident | 395 (15.5%) | 236 (17.8%) | 106 (10.2%) | 189 (30.9%) | 20 (29.4%) | 15 (34.1%) |
| Aggressive/threatening behaviors: | | | | | | |
| Physical violence | 79 (3.1%) | 59 (4.5%) | 45 (4.3%) | 50 (8.2%) | 12 (17.6%) | 0 (0.0%) |
| Threats of physical violence | 92 (3.6%) | 36 (2.7%) | 22 (2.1%) | 56 (9.2%) | 2 (2.9%) | 0 (0.0%) |
| Threats towards family/friends | 29 (1.1%) | 8 (0.6%) | 2 (0.2%) | 5 (0.8%) | 0 (0.0%) | 0 (0.0%) |
| None of the above | 2,367 (93.0%) | 1,229 (92.9%) | 960 (92.6%) | 507 (82.8%) | 55 (80.9%) | 44 (100.0%) |

As summarized in Table 30, we discovered little information in the A-CSA files that indicated specific "techniques" used to keep the child victims from reporting the sexual abuse to others. These data were again missing in up to 62 percent of the files, limiting our ability to fully understand these patterns. However, the data that were available suggested that the child victims of A-CSA-IVs most often feared losing an important relationship, losing opportunities they valued, or being embarrassed by what they would have to tell others. The IVs sometimes threatened both younger and older youths with physical harm to themselves or their families or actually physically harmed them in order to discourage disclosure. Further, some older youths appeared concerned that reporting might interfere with the sexually stimulating experiences they were having.

The Y-CSA IVs seemed to use somewhat different techniques including threats of physical aggression, intimations of excluding the youth from important social groups, and underscoring the humiliation that would

accompany any disclosure of the sexual activity that had occurred. Of note, a significant number of the younger and older victims of both the A-CSA and Y-CSA IVs appear to have reported their abuse after the first incident. This reporting activity did not differ significantly over the two time periods of our study, with 11.2% of the alleged victims up to and including 1987 and 13.3% of alleged victims after 1987 reporting their abuse after the first incident. Tables 31 and 32 summarize these same "techniques" used to engage child victims and to keep them from reporting the sexual abuse to others according to the gender of the victim. Information concerning the techniques used by A-CSA and Y-CSA IVs to avoid detection was again limited and was not coded in over one-half of the adult and youth files. Similar to the pattern described above for age, A-CSA IVs and Y-CSA IVs who abused both male and female victims showed the greatest use of child-attracting activities. In additions, IVs with exclusively female victims were the most likely to entice their victims (particularly older females) into sexual contact through an intimate relationship with the implication of a deep sense of caring.

### Table 31: Identified Behaviors to Gain Access and Compliance by Victim Gender

| | Adult IVs | | | | | Youth IVs | | | | | |
| | All male | | All female | | Mixed | | All male | | Female | | Mixed | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Access to and compliance of the victim: | | | | | | | | | | | | |
| Child attracting activities/interests | 719 | (13.3%) | 66 | (5.6%) | 81 | (17.2%) | 85 | (12.3%) | 10 | (5.5%) | 26 | (22.4%) |
| Misattribution of sexual acts | 414 | (7.7%) | 18 | (1.5%) | 20 | (4.2%) | 41 | (5.9%) | 6 | (3.3%) | 2 | (1.7%) |
| Promoted nudity/close sleeping | 260 | (4.8%) | 4 | (0.3%) | 6 | (1.3%) | 24 | (2.5%) | 0 | (0.0%) | 1 | (0.9%) |
| Singling out youth/feel special | 276 | (5.1%) | 29 | (2.5%) | 7 | (1.5%) | 2 | (0.3%) | 0 | (0.0%) | 0 | (0.0%) |
| Travel/exciting adventures | 476 | (8.8%) | 48 | (4.1%) | 21 | (4.5%) | 38 | (5.5%) | 2 | (1.1%) | 0 | (0.0%) |
| Assistance in progress in Scouting | 224 | (4.1%) | 4 | (0.3%) | 7 | (1.5%) | 2 | (0.3%) | 0 | (0.0%) | 0 | (0.0%) |
| Assistance with family daily activities | 188 | (3.5%) | 34 | (2.9%) | 29 | (6.2%) | 14 | (2.0%) | 22 | (12.2%) | 25 | (21.6%) |
| Demos to diminish inhibitions | 113 | (2.1%) | 1 | (0.1%) | 9 | (1.9%) | 28 | (4.1%) | 0 | (0.0%) | 0 | (0.0%) |
| Chastising youth | 12 | (0.2%) | 1 | (0.1%) | 0 | (0.0%) | 7 | (1.0%) | 0 | (0.0%) | 0 | (0.0%) |
| Victim appeared asleep | 460 | (8.5%) | 28 | (2.4%) | 15 | (3.2%) | 49 | (7.1%) | 1 | (0.6%) | 1 | (0.9%) |
| Acting like nothing unusual occurred | 154 | (2.9%) | 7 | (0.6%) | 3 | (0.6%) | 26 | (3.8%) | 0 | (0.0%) | 0 | (0.0%) |
| Implied consent, desensitization | 27 | (0.5%) | 10 | (0.9%) | 2 | (0.4%) | 0 | (0.0%) | 0 | (0.0%) | 5 | (4.3%) |
| Intimate relationship/sense of caring | 327 | (6.1%) | 212 | (18.1%) | 51 | (10.8%) | 10 | (1.4%) | 18 | (9.9%) | 8 | (6.9%) |
| Pseudo-adult behaviors | 274 | (5.1%) | 26 | (2.2%) | 15 | (3.2%) | 15 | (2.2%) | 0 | (0.0%) | 0 | (0.0%) |
| Use of alcohol, or other drugs | 291 | (5.4%) | 50 | (4.3%) | 17 | (3.6%) | 3 | (0.4%) | 0 | (0.0%) | 0 | (0.0%) |
| Showing pornography | 358 | (6.6%) | 14 | (1.2%) | 20 | (4.2%) | 22 | (3.2%) | 0 | (0.0%) | 0 | (0.0%) |
| Sexual pleasure or enticement | 134 | (2.5%) | 36 | (3.1%) | 11 | (2.3%) | 25 | (3.6%) | 2 | (1.1%) | 0 | (0.0%) |
| Providing shelter, food, home | 93 | (1.7%) | 39 | (3.3%) | 10 | (2.1%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) |
| Money/gifts | 254 | (4.7%) | 37 | (3.2%) | 25 | (5.3%) | 14 | (2.0%) | 1 | (0.6%) | 3 | (2.6%) |
| Other | 755 | (14.0%) | 291 | (24.8%) | 121 | (25.7%) | 136 | (19.7%) | 38 | (21.0%) | 32 | (27.6%) |
| None of the above | 2,254 | (41.7%) | 468 | (39.9%) | 172 | (36.5%) | 337 | (48.8%) | 97 | (53.6%) | 36 | (31.0%) |

The data summarized in Table 32 suggest that the A-CSA IVs tended to leverage the potential loss of an important relationship to minimize the reporting inclination of their female victims. Y-CSA IVs seemed to use threats and/or acts of physical violence against mixed-gender victims more often than against male-only or female-only victims, although the cell counts for many of these items were very small and thus potentially unreliable. Sometimes victims were provided shelter and food, engaged through sexual stimulation and enticement, and provided with exciting experiences including adventure and travel. The Y-CSA IVs often provided the family of their victims with help and support around the home; developed a close, intimate

relationship with their victims; and provided their victims with appealing activities and opportunities. Physical violence and threats of physical violence were more common among Y-CSA IVs particularly in their abusive interactions involving male victims and when they abused both male and female victims.

**Table 32: Identified Techniques to Avoid Detection by Victim Gender**

| | Adult IVs | | | Youth IVs | | |
|---|---|---|---|---|---|---|
| | **All male** | **All female** | **Mixed** | **All male** | **Female** | **Mixed** |
| Techniques to avoid detection: | | | | | | |
| Loss of important relationship | 162 (3.0%) | 90 (7.7%) | 19 (4.0%) | 2 (0.3%) | 3 (1.7%) | 3 (2.6%) |
| Loss of sexual excitement | 63 (1.2%) | 28 (2.4%) | 5 (1.1%) | 2 (0.3%) | 1 (0.6%) | 1 (0.9%) |
| Sense of embarrassment, humiliation | 224 (4.1%) | 17 (1.5%) | 9 (1.9%) | 34 (4.9%) | 3 (1.7%) | 0 (0.0%) |
| Fears of being excluded from group | 95 (1.8%) | 8 (0.7%) | 1 (0.2%) | 30 (4.3%) | 0 (0.0%) | 0 (0.0%) |
| Threats of physical harm | 155 (2.9%) | 29 (2.5%) | 17 (3.6%) | 64 (9.3%) | 2 (1.1%) | 14 (12.1%) |
| Use of Scouts' Honor | 10 (0.2%) | 0 (0.0%) | 1 (0.2%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| Threats of reporting illegal behavior | 25 (0.5%) | 3 (0.3%) | 0 (0.0%) | 1 (0.1%) | 0 (0.0%) | 0 (0.0%) |
| Concerns about IV being harmed | 82 (1.5%) | 14 (1.2%) | 3 (0.6%) | 5 (0.7%) | 0 (0.0%) | 0 (0.0%) |
| Harm to Scouts, Troop, or BSA | 16 (0.3%) | 0 (0.0%) | 0 (0.0%) | 2 (0.3%) | 0 (0.0%) | 0 (0.0%) |
| Lost opportunities | 140 (2.6%) | 19 (1.6%) | 14 (3.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| Other | 472 (8.7%) | 152 (13.0%) | 70 (14.9%) | 54 (7.8%) | 11 (6.1%) | 30 (25.9%) |
| None of the above | 3,406 (63.1%) | 687 (58.6%) | 278 (59.0%) | 307 (44.5%) | 123 (68.0%) | 52 (44.8%) |
| N/A; reported after first incident | 802 (14.8%) | 168 (14.3%) | 54 (11.5%) | 221 (32.0%) | 39 (21.5%) | 16 (13.8%) |
| Aggressive/threatening behaviors: | | | | | | |
| Physical violence | 161 (3.0%) | 53 (4.5%) | 23 (4.9%) | 73 (10.6%) | 7 (3.9%) | 3 (2.6%) |
| Threats of physical violence | 156 (2.9%) | 31 (2.6%) | 12 (2.5%) | 78 (11.3%) | 6 (3.3%) | 21 (18.1%) |
| Threats towards family/friends | 35 (0.6%) | 12 (1.0%) | 9 (1.9%) | 16 (2.3%) | 2 (1.1%) | 5 (4.3%) |
| None of the above | 5,078 (94.0%) | 1,080 (92.2%) | 425 (90.2%) | 549 (79.6%) | 166 (91.7%) | 94 (81.0%) |

Table 32 also indicates that a comparable number of male and female alleged victims were known to have reported their abuse after the first incident when the perpetrator was an adult. Information suggesting disclosure after the first incident was found for 14.8 percent of the male victims of A-CSA IVs and 14.3 percent of the female victims of A-CSA victims. In contrast, more alleged male victims (32.0%) reported their abuse after the first incident when the perpetrator was a youth, as compared to alleged female victims (21.5%).

## NATURE OF ALLEGED ABUSE BY DURATION AND SEXUAL ACTIVITY

The following tables and figures summarize our attempts to calculate and display the duration of the abuse using both the "approximate duration of the abuse" collected on the IVRS and the age of the victim when the abuse began and ended as coded on the Victim "D" module. Information about the duration of the abuse was frequently not contained in the files; when available, coders estimated that the alleged sexual abuse lasted on average one year and that this duration was similar for both the A-CSA and Y-CSA IVs. Less frequently, we had exact information on the date that the abuse started and ended from the "D" victim module; these calculations indicated that the abuse continued for less than one year with this duration again being similar for the A-CSA and Y-CSA IVs. As illustrated, there were also some cases involving periods of abuse spanning multiple years and sometimes continuing well after the victim reached adulthood.

**Table 33: Duration of Alleged CSA by A-CSA and Y-CSA IVs**

| | | Adult IVs | Youth IVs |
|---|---|---|---|
| Approximate duration of alleged abuse[1] | Median | 1 year | 1 year |
| | Range | 1 month – 20 years | 1 month – 7 years |
| Calculated duration of alleged abuse from age at start and end[2] | Median | <1 year | <1 year |
| | Range | <1 – 17 years | <1 – 7 years |

[1] 9,240 missing for identified victims of adult IVs, 1,228 missing for identified victims of youth IVs.
[2] 4,111 missing for identified victims of adult IVs, 470 missing for identified victims of youth IVs.

Table 34 summarizes the abuse duration as calculated based upon the Victim "D" module which captured data on specific victims as to when the abuse began and when it was known to have ended. Clear differences in abuse duration were found based upon the gender of the victim, their Scouting affiliation, and whether the sexual abuse was alleged to have been perpetrated by an A-CSA or Y-CSA IV. The sexual abuse of girl victims lasted longer with 15.2 % being abused for more than one year. Victims with no known affiliation with Scouting (13.5%) were more likely to be abused for more than one year. Youth sexually abused by A-CSA IVs were almost four times more likely to be abused for more than one year than youth sexually abused by other youth.

**Table 34: Chi Square Analyses of Victim Selection Characteristics with Duration of Abuse**

| | | < 1 Year | | 1+ Years | | Total N | Chi Square |
|---|---|---|---|---|---|---|---|
| Gender:[1] | Male | 2,260 | (83.2%) | 456 | (16.8%) | 2,716 | 7.215** |
| | Female | 719 | (79.3%) | 188 | (20.7%) | 907 | |
| Adult/Youth:[2] | Adult IV | 2,511 | (80.3%) | 616 | (19.7%) | 3,127 | 61.470*** |
| | Youth IV | 515 | (94.1%) | 32 | (5.9%) | 547 | |
| Scouting Affiliation:[3] | Yes | 1,565 | (82.7%) | 328 | (17.3%) | 1,893 | 0.328 |
| | No Indication | 1,453 | (82.0%) | 320 | (18.0%) | 1,773 | |

[1] 4,632 missing cases for gender combined with abuse duration.
[2] 4,581 missing cases for adult/youth status of IV combined with abuse duration.
[3] 4,589 missing cases for Scouting affiliation combined with abuse duration.
*p<.05, **p<.01, ***p<.001

Figure 23 illustrates the duration of the abuse for all male and female known victims. In Figure 23 A, the full expanse of the abuse duration is included in the bar group including all victims who were known to have been abused for less than one year. As reflected in the lines of best fit in Figure 23 A, while the majority of both male and female victims were abused for less than one year, the female victims experienced a greater proportion of victims who were abused for longer periods of time extending up to 12 years. The majority of the male victims were abused for a shorter period of time and the number of male youth being abused for longer periods of time dropped more precipitously as the duration of the abuse increased. Figure 23 B displays the same data with the majority of male and female victims who were abused for less than one year being removed from the analyses. As indicated, proportionally more female victims were abused for longer periods of time than were the male victims.



*Figure 23 A and B*: Duration of Abuse for Male and Female Victims

Figure 24 A and B displays the duration of the sexual abused based upon the Scouting affiliation of the victims. When all the victims were included in the analyses as displayed in Figure 23 A, there were no observable differences in the duration of the abuse regardless of whether the victim was Scouting-involved or not. When the victims abused for less than one year were removed from the analyses, there was a modest indication of the victims who were not involved in Scouting, more often being abused for longer periods of time ranging up to 13 years.



*Figure 24 A and B*: Duration of Abuse for Scouts and Non-Scouts

Figure 25 A and B illustrates the duration of the abuse based upon whether the abuse was perpetrated by an A-CSA IV or a Y-CSA IV. In both bar graphs, the first including all known victims and the second only victims abused for longer than one year, it is clear that A-CSA IVs abuse far more victims but do so proportionally for relatively shorter periods of time. The Y-CSA IVs demonstrated a less noticeable decline, however, it is unclear whether this reflects a difference between A-CSA and Y-CSA IV's sexual offending, or the small sample size of the Y-CSA IV files.



*Figure 25 A and B*: Duration of Abuse by A-CSA and Y-CSA

Tables 35 and 36 describe the sexual behaviors that characterized the abuse by A-CSA and Y-CSA IVs. Table 34 divides these behaviors according to victim age, described separately for Adult and Youth IVs. The sexual abuse allegedly perpetrated by both A-CSA IVs and Y-CSA IVs against victims in all age categories most commonly involved either (1) fondling of the victim with the IV's hands or mouth, or (2) looking at the victim in a sexual way or photographing the victim. A-CSA IVs were known to have penetrated 13.5 percent of their victims, while Y-CSA IVs were known to have penetrated 10.4 percent of their victims.

**Table 35: Alleged Sexual Behavior by Victim Age**

| | Adult IVs | | | | | | Youth IVs | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | < 14 | | 14+ | | Mixed | | < 14 | | 14+ | | Mixed | |
| Talking/looking/photographs | 598 | (23.5%) | 447 | (33.8%) | 372 | (35.9%) | 160 | (26.1%) | 18 | (26.5%) | 26 | (59.1%) |
| Massaging/tickling/wrestling | 156 | (6.1%) | 117 | (8.8%) | 90 | (8.7%) | 24 | (3.9%) | 4 | (5.9%) | 7 | (15.9%) |
| Fondling victim (hands, mouth) | 1,072 | (42.1%) | 524 | (39.6%) | 396 | (38.2%) | 193 | (31.5%) | 25 | (36.8%) | 13 | (29.5%) |
| Fondling IV (hands, mouth) | 233 | (9.2%) | 118 | (8.9%) | 71 | (6.8%) | 79 | (12.9%) | 6 | (8.8%) | 4 | (9.1%) |
| Masturbation of victim to orgasm | 56 | (2.2%) | 48 | (3.6%) | 39 | (3.8%) | 3 | (0.5%) | 1 | (1.5%) | 1 | (2.3%) |
| Masturbation of IV to orgasm | 125 | (4.9%) | 56 | (4.2%) | 37 | (3.6%) | 49 | (8.0%) | 3 | (4.4%) | 7 | (15.9%) |
| Penetration of victim by IV | 304 | (11.9%) | 178 | (13.5%) | 123 | (11.9%) | 89 | (14.5%) | 13 | (19.1%) | 8 | (18.2%) |
| Penetration of IV by victim | 29 | (1.1%) | 32 | (2.4%) | 20 | (1.9%) | 7 | (1.1%) | 1 | (1.5%) | 0 | (0.0%) |
| Other | 706 | (27.7%) | 283 | (21.4%) | 266 | (25.7%) | 164 | (26.8%) | 23 | (33.8%) | 11 | (25.0%) |
| Unknown | 448 | (17.6%) | 197 | (14.9%) | 172 | (16.6%) | 110 | (18.0%) | 8 | (11.8%) | 3 | (6.8%) |

The sexual behaviors that A-CSA and Y-CSA IVs allegedly perpetrated against male and female victims are summarized in Table 36. These sexual behaviors were largely consistent across both male and female victims, with the most common behaviors again being fondling and sexual looking/photographing of the victim. The one behavior with a large gender difference was penetration of the victim by the IV. A-CSA IVs with female-only victims penetrated them 23.0 percent of the time, as compared to 7.9 percent of the male victims of Adult IVs who only abused boys. Similarly, Y-CSA IVs with female-only victims penetrated them 21.0 percent of the time, as compared to 10.4 percent of the male victims of Youth IVs who only abused boys. Further, penetration among IVs with mixed-gender victims was always more common than among IVs with male-only victims.

**Table 36: Alleged Sexual Behavior by Victim Gender**

| | Adult IVs | | | Youth IVs | | |
|---|---|---|---|---|---|---|
| | All male | All female | Mixed | All male | All female | Mixed |
| Talking/looking/photographs | 1,628 (30.1%) | 282 (24.1%) | 102 (21.7%) | 238 (34.5%) | 22 (12.2%) | 25 (21.6%) |
| Massaging/tickling/wrestling | 422 (7.8%) | 48 (4.1%) | 28 (5.9%) | 40 (5.8%) | 1 (0.6%) | 3 (2.6%) |
| Fondling victim (hands, mouth) | 2,121 (39.3%) | 405 (34.6%) | 179 (38.0%) | 217 (31.4%) | 45 (24.9%) | 46 (39.7%) |
| Fondling IV (hands, mouth) | 396 (7.3%) | 91 (7.8%) | 36 (7.6%) | 88 (12.8%) | 12 (6.6%) | 17 (14.7%) |
| Masturbation of victim to orgasm | 188 (3.5%) | 1 (0.1%) | 4 (0.8%) | 18 (2.6%) | 0 (0.0%) | 0 (0.0%) |
| Masturbation of IV to orgasm | 238 (4.4%) | 21 (1.8%) | 23 (4.9%) | 72 (10.4%) | 1 (0.6%) | 8 (6.9%) |
| Penetration of victim by IV | 426 (7.9%) | 270 (23.0%) | 66 (14.0%) | 72 (10.4%) | 38 (21.0%) | 25 (21.6%) |
| Penetration of IV by victim | 87 (1.6%) | 2 (0.2%) | 4 (0.8%) | 5 (0.7%) | 1 (0.6%) | 3 (2.6%) |
| Other | 1,550 (28.7%) | 224 (19.1%) | 133 (28.2%) | 188 (27.2%) | 54 (29.8%) | 27 (23.3%) |
| Unknown | 892 (16.5%) | 255 (21.8%) | 87 (18.5%) | 94 (13.6%) | 48 (26.5%) | 29 (25.0%) |

## ISSUE OF PEDOPHILIA AND MIXED OFFENDING

Based upon the observed consistency of the age preferences demonstrated by the majority of A-CSA and Y-CSA IVs, we decided to explore tentatively the "likely presence" or absence of a pedophilic sexual interest in children. We used conservative criteria in conducting these exploratory analyses given the rudimentary nature of the data, a choice which is likely to underestimate the number of IVs within our population who, in fact, experience a pedophilic sexual interest in children.

In seeking to identify this group, we aligned with the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (DSM-5)*,* which identifies sexual interest or behavior toward children 13 years of age or younger as the most common age cutoff for making a formal diagnosis of pedophilia. In identifying this group of IVs, which we termed "likely pedophiles" or LPs, we used six variables or composites that were available in our database: (1) if the IV self-identified as a pedophile (C11); (2) if they indicated any use or distribution of child pornography (C12); (3) if they had at least three victims 13 years of age or younger and no known victims over the age of 13 years; (4) if any of their alleged sexual activity was coded according to the non-specific victim code of child pornography (NSVC); (5) if they were removed for allegations of child pornography without any allegations of direct child victimization; and (6) if there was endorsement of B6i or B6j, which indicated that the IV had been arrested for possessing child pornography or distributing child pornography. As such, these analyses do not focus exclusively on Adult and Youth IVs accused of child sexual abuse (i.e., the groups of IVs described in the bulk of this report, from Tables 6 through 35), but also include individuals who were removed from Scouting for the use of child pornography without any known direct child victims. In identifying these proxy measures, we recognize that child pornography can contain images of adolescents up to 17 years, but case experience suggests that legal action is seldom initiated based upon images of older adolescents exclusively.

In creating the LP category, we acknowledge that these six queries do not equate to a formal diagnosis of pedophilia, and that we are therefore inevitably misclassifying some of this population, over-classifying some Adult IVs as LPs who are not, while missing others who are pedophilic but who were not identified as such

through our coding of the files. Despite these reservations, we concluded that our inclusion criteria were conservative enough to capture a pattern of behavior that was correlated with pedophilic tendencies and that further analyses of these data might be informative given the size and origins of our population. In exploring this group of likely pedophilic IVs, we also became aware of another, smaller group of individuals who, unlike the majority of the Adult and Youth IVs, were indiscriminate in their selection of victims according to age, gender, or Scouting affiliation. We also chose to further examine this group of Adult IVs. assuming the motivation for their abusive behavior was different from those who showed a very consistent and well-developed victim-selection pattern.

As summarized in Table 37, 14.5 percent of the Adult and Youth IVs met our classification criteria for "likely" being pedophilic. Most of these 1,133 IVs were designated LPs due to viewing or distributing child pornography. Seldom was a specific pedophilia diagnosis identified in the IV files, although 139 adults in our population did self-identify as being pedophilic based either upon their own understanding of this disorder or having been diagnosed with it at some point prior to the revocation of their registration with BSA. In only 2.4 percent of all A-CSA files did the Adult IV have at least 3 victims aged 13 years and under combined with no known victims aged 14 and older, again emphasizing that the stereotype of the Scouting-involved child molester abusing many young victims does not describe the majority of adults in the IV files.

### Table 37: Frequency of Component Variables for Pedophilia Composite

|  | Pedophilia Indicated[1] | | Pedophilia Not Indicated[2] | |
|---|---|---|---|---|
| Total[3] | 1,133 | (14.5%) | 6,686 | (85.5%) |
| IV was diagnosed with pedophilia[4] | 139 | (1.9%) | 7,350 | (98.1%) |
| Any child pornography[4,5] | 874 | (11.2%) | 6,945 | (88.8%) |
| 3+ victims <14[4,6] | 186 | (2.4%) | 7,633 | (97.6%) |

[1] Column reflects the number of positive responses to each variable which went into the pedophilia composite.
[2] Column reflects the number of negative responses to each variable which went into the pedophilia composite.
[3] 338 missing from pedophilia composite variable.
[4] 8 missing from pedophilia diagnosis, child pornography, and 3+ victims <14 variables.
[5] Composite created from all cases in which the IV was arrested for possession or distribution of child pornography or a non-specific victim code for child pornography was entered.
[6] Value includes all IVs with three or more victims under 14 who did not have any victims over 14.

In Table 38, we examined differences between the LP and Non-LP groups on certain dichotomous variables that capture behaviors of interest in understanding sexually abusive behavior toward children, including variables described in the research literature as risk factors for sexual offending. In conducting these statistical comparisons, we excluded variables, such as having been arrested for child pornography, since they were used in generating the pedophilia composite. We present the data using both percentages of cases and odds ratios, a statistic that quantifies the strength of the association between two events.

In Table 38, we examined differences between the LP and Non-LP groups on certain dichotomous variables that capture behaviors of interest in understanding sexually abusive behavior toward children, including variables described in the research literature as risk factors for sexual offending. In conducting these statistical

comparisons, we excluded variables, such as having been arrested for child pornography, since they were used in generating the pedophilia composite.

**Table 38: Indications of Pedophilia Compared on Select Variables**

| | | Pedophilia Indicated | | Pedophilia Not Indicated | | |
|---|---|---|---|---|---|---|
| | | N | % | N | % | Odds Ratio |
| Time Interval | <1988 | 200 | (17.7%) | 1,529 | (22.8%) | 0.723* |
| | >1987 | 933 | (82.3%) | 5,157 | (77.1%) | |
| IV Age | Adult IV | 1,090 | (96.2%) | 5,788 | (86.7%) | 3.933* |
| | Youth IV | 43 | (3.8%) | 898 | (13.4%) | |
| Marital Status | Single | 372 | (48.4%) | 2,696 | (52.9%) | 0.836* |
| | Ever Married | 396 | (51.6%) | 2,399 | (47.1%) | |
| IV had children | No | 207 | (32.8%) | 1,684 | (42.5%) | 0.662* |
| | Yes | 424 | (67.2%) | 2,282 | (57.5%) | |
| Likely to access children: | No | 617 | (70.8%) | 3,901 | (76.8%) | 0.735* |
| | Yes | 254 | (29.2%) | 1,181 | (23.2%) | |
| Military/Protective Service | No | 752 | (86.3%) | 4,366 | (85.9%) | 1.036 |
| | Yes | 119 | (13.7%) | 716 | (14.1%) | |
| Not stable member of community | Stable | 972 | (96.2%) | 4,387 | (97.2%) | 0.729 |
| | Not Stable | 38 | (3.8%) | 125 | (2.8%) | |
| IV arrested for alleged CSA in file | No | 87 | (9.2%) | 716 | (19.7%) | 0.413* |
| | Yes | 859 | (90.8%) | 2,921 | (80.3%) | |
| Overall LE variable | No | 43 | (3.8%) | 976 | (14.6%) | 0.242* |
| | Yes | 1,090 | (96.2%) | 5,710 | (85.4%) | |
| IV ever arrested for a sex crime | No | 166 | (16.4%) | 1,604 | (35.5%) | 0.355* |
| | Yes | 848 | (83.6%) | 2,910 | (64.5%) | |
| Other YSOs | No | 807 | (71.7%) | 5,186 | (78.2%) | 0.709* |
| | Yes | 318 | (28.3%) | 1,448 | (21.8%) | |
| Involved in BSA as a youth | No | 53 | (15.8%) | 313 | (24.7%) | 0.574* |
| | Yes | 282 | (84.2%) | 956 | (75.3%) | |
| Time registered as an adult | At or below median | 364 | (46.4%) | 1,829 | (56.1%) | 0.679* |
| | Above median | 420 | (53.6%) | 1,433 | (43.1%) | |
| Did IV attempt to reregister | No | 955 | (94.2%) | 4,050 | (88.9%) | 2.022* |
| | Yes | 59 | (5.8%) | 506 | (11.1%) | |
| Number of victims | 1 | 207 | (29.7%) | 2,929 | (58.9%) | 0.295* |
| | >1 | 490 | (70.3%) | 2,042 | (41.0%) | |
| Age of victim | < 14 | 347 | (64.7%) | 1,559 | (57.8%) | 1.744* |
| | 14 + | 115 | (21.5%) | 901 | (33.4%) | |
| | Mixed | 74 | (13.8%) | 237 | (8.8%) | |
| Scouting Affiliation | Scouting Only | 226 | (33.8%) | 2,068 | (43.4%) | 0.794* |
| | Non-Scouting | 327 | (48.9%) | 2,375 | (49.9%) | |
| | Mixed | 116 | (17.3%) | 320 | (6.7%) | |
| Gender of victim | Male | 475 | (73.0%) | 3,018 | (69.8%) | 1.435* |
| | Female | 125 | (19.2%) | 1,140 | (26.4%) | |
| | Mixed | 51 | (7.8%) | 167 | (3.9%) | |

* These data are significant.

Most of the comparisons between the LPs and Non-LPs were statistically significant, suggesting the presence of at least two different types of child molesters in the population of Ineligible Volunteers. As compared to non-LPs, individuals in the LP group showed the following differences:

- More often identified prior to 1988;

- More often adults when they were entered into the IV files;

- More often were married with children;

- More often able to access children through employment in community-based services and other youth-serving organization;

- More often arrested for allegations of child sexual abuse;

- More likely to have had contact with law enforcement;

- More likely to have been involved with BSA as a youth;

- Registered in Scouting for more than the median length of time;

- More likely to have more than one victim;

- More likely to have non-Scouting victims;

- More likely to have male victims; and

- Twice as likely to attempt to re-register with the BSA after having their registration revoked.

Despite these various signs of risk, all IVs, whether in the LP or non-LP group, were generally considered to be stable members of the community (greater than 96%).

As described in Table 39 below, we also continued these comparisons using various interval variables with *t*-tests to test for significance between the LP and Non-LP groups and Cohen's *d* to assess effect sizes of these differences. These comparisons indicated that the LP group had significantly longer IV files, more victims 13 years of age or younger, more victims involved in Scouting and not involved in Scouting, and more male victims. The effect sizes were generally small, except for the number of victims 13 years of age or younger, which was of medium size.

**Table 39: Indications of Pedophilia Compared on Select Variables, Continued**

|  | Pedophilia Indicated | | Pedophilia Not Indicated | | | |
|---|---|---|---|---|---|---|
|  | M | SD | M | SD | T | d |
| Number of pages in file | 28.12 | 26.73 | 23.76 | 30.69 | 4.955*** | 0.151 |
| Number of victims | 2.29 | 3.62 | 1.45 | 1.96 | 7.601*** | 0.288 |
| Victims < 14 | 0.99 | 1.91 | 0.35 | 0.71 | 11.21*** | 0.447 |
| Victims > 14 | 0.25 | 0.69 | 0.22 | 0.55 | 1.707 | 0.059 |
| Number Scouting-affiliated victims | 0.93 | 2.08 | 0.71 | 1.44 | 3.505*** | 0.126 |
| Number Victims not Scouting-affiliated/unknown | 1.22 | 2.71 | 0.67 | 1.39 | 6.704*** | 0.256 |
| Male victims | 1.75 | 3.25 | 1.00 | 1.84 | 7.610*** | 0.285 |
| Female victims | 0.28 | 0.87 | 0.27 | 0.70 | 0.608 | 0.0211 |

*p<.05
**p<.01
***p<.001

Given the consistency that we observed in the victim selection behavior of most IVs, we decided to conduct further analyses designed to compare 801 (10%) Adult and Youth IVs who demonstrated mixed victim selection patterns as compared to those who did not. This mixed offending (MO) group was defined as showing

mixed victim selection patterns according to the age, gender, and/or Scouting affiliation of their victims. By definition, the MO group had to have had more than one victim, which likely already makes them riskier than the bulk of IVs who offended against just one victim. Therefore, in Table 40, we compare IVs in the MO group only to IVs with more than one victim who did not show mixed offending. Analytically, we present the differences between these two groups in various dichotomous variables using both percentages of cases and odds ratios.

**Table 40: Indications of Mixed Victim Selection Compared on Select Variables**

| | | Mixed Victims Indicated | | Mixed Victims Not Indicated | | |
|---|---|---|---|---|---|---|
| | | N | % | N | % | Odds Ratio |
| Time Interval | <1988 | 244 | (30.5%) | 655 | (37.8%) | 1.391* |
| | >1987 | 557 | (69.5%) | 1075 | (62.1%) | |
| IV Age | Adult IV | 715 | (89.3%) | 1518 | (87.7%) | 0.861 |
| | Youth IV | 86 | (10.7%) | 212 | (12.2%) | |
| Marital Status | Single | 377 | (54.6%) | 869 | (59.4%) | 1.221* |
| | Ever Married | 314 | (45.4%) | 593 | (40.6%) | |
| IV had children | No | 237 | (46.0%) | 534 | (50.9%) | 1.216 |
| | Yes | 278 | (54.0%) | 515 | (49.1%) | |
| Likely to access children: community service etc. | No | 480 | (70.4%) | 1086 | (74.7%) | 1.245* |
| | Yes | 202 | (29.6%) | 367 | (25.3%) | |
| Military/Protective Service | No | 570 | (83.6%) | 1223 | (84.2%) | 1.045 |
| | Yes | 112 | (16.4%) | 230 | (15.8%) | |
| Composite for likely to access children and MPS | No | 390 | (57.2%) | 886 | (60.9%) | 1.170 |
| | Yes | 292 | (42.8%) | 567 | (39.0%) | |
| Not stable member of community | Stable | 684 | (95.7%) | 1459 | (96.9%) | 1.437 |
| | Not Stable | 31 | (4.3%) | 46 | (3.1%) | |
| IV arrested for possession of CP | No | 765 | (95.5%) | 1677 | (96.9%) | 1.489 |
| | Yes | 36 | (4.5%) | 53 | (3.1%) | |
| IV arrested for distribution of CP | No | 786 | (98.1%) | 1715 | (99.1%) | 2.182* |
| | Yes | 15 | (1.9%) | 15 | (0.9%) | |
| IV arrested for alleged CSA in file | No | 86 | (13.3%) | 252 | (22.0%) | 1.838* |
| | Yes | 559 | (86.7%) | 891 | (78.0%) | |
| Overall LE variable | No | 39 | (4.9%) | 205 | (11.8%) | 2.626* |
| | Yes | 762 | (95.1%) | 1525 | (88.2%) | |
| IV ever arrested for a sex crime | No | 160 | (22.3%) | 606 | (40.3%) | 2.347* |
| | Yes | 557 | (77.7%) | 899 | (56.7%) | |
| Other YSOs | No | 522 | (65.7%) | 1277 | (74.5%) | 1.523* |
| | Yes | 272 | (34.3%) | 437 | (25.5%) | |
| Involved in BSA as a youth | No | 38 | (17.4%) | 75 | (19.4%) | 1.139 |
| | Yes | 180 | (82.6%) | 312 | (80.9%) | |
| Time registered as an adult | At or below median | 271 | (51.1%) | 547 | (51.8%) | 1.029 |
| | Above median | 259 | (48.9%) | 508 | (48.2%) | |
| Did IV attempt to reregister | No | 637 | (88.5%) | 1305 | (86.0%) | 0.802 |
| | Yes | 83 | (11.5%) | 212 | (14.0%) | |

*These data are significant.
Perpetrators with only one victim were excluded from these analyes.

As compared to non-MO IVs with more than one victim, the MO group showed the following differences:

- More frequently registered with Scouting after 1987;

- More likely to have been married;

- More often involved in occupations that provided them access to children, e.g., through community service;

- More likely to be arrested for distribution of child pornography;

- More likely to be arrested for alleged sexual abuse in file;

- More frequently had come to the attention of law enforcement;

- More likely to have been arrested for a sex crime at some point in time; and

More likely to be involved in other youth serving organizations. In Table 41, we also continued these comparisons with select interval variables, all of which were found to be statistically significant. As compared to non-MO IVs with more than one victim, IVs in the MO group had longer IV files, more child victims, more victims under and over the age of 14 years, more Scouting and non-Scouting affiliated child victims, and more male and female victims. The effect sizes of these differences were medium to large for the majority of these comparisons. These analyses suggest that mixed offenders are a qualitatively different group than multi-victim offenders with consistent victim selection patterns, in that the MO group showed greater risk on a variety of variables.

**Table 41: Indications of Mixed Victim Selection Compared on Select Variables, Continued**

|  | Mixed Victims Indicated | | Mixed Victims Not Indicated | | | |
|---|---|---|---|---|---|---|
|  | M | SD | M | SD | T | d |
| Number of pages in file | 31.13 | 34.64 | 25.67 | 32.96 | -5.460*** | 1.432 |
| Number of victims | 4.69 | 4.37 | 3.11 | 2.09 | -1.576*** | 0.129 |
| Victims < 14 | 1.46 | 2.06 | 0.73 | 1.18 | -0.737*** | 0.645 |
| Victims 14+ | 0.71 | 0.98 | 0.28 | 0.75 | -0.429*** | 0.035 |
| Number Scouting-affiliated victims | 1.89 | 2.48 | 1.77 | 2.22 | -0.117 | 0.099 |
| Number Victims not Scouting-affiliated/unknown | 2.62 | 3.64 | 1.17 | 1.83 | -1.443*** | 0.109 |
| Number Male victims | 3.64 | 4.13 | 2.39 | 2.28 | -1.241*** | 0.128 |
| Number Female victims | 0.59 | 1.15 | 0.39 | 1.10 | -0.198*** | 0.048 |

*** p<.001

Once this was done, almost all of the variables analyzed in Table 41 were found to be highly significant. These IVs had:

- Longer IV files;
- More child victims;
- More victims under and over the age of 14 years;
- More non-Scouting affiliated child victims;
- More male victims;
- More female victims.

The effect sizes of these differences were medium to large for the majority of these comparisons.

## LOCATION OF CHILD SEXUAL ABUSE FOR SCOUTING-AFFILIATED VICTIMS

Table 42 summarizes data collected regarding the location of the sexual abuse that was perpetrated by A-CSA and Y-CSA IVs to better inform youth protection activities within Scouting. These analyses included only incidents of alleged sexual abuse involving victims that were known to have been registered in Scouting at the time of the abuse. As indicated, approximately one-half of the incidents for which location was known involved incidents that occurred during a specific Scouting activity. In the remainder of incidents, the alleged abuse occurred either outside of Scouting or the location of the abuse was unknown. The location of these incidents might include the IV's home, an activity such as a movie or ball game that involved the IV and other Troop members but which was not organized or convened under the auspices of Scouting, and/or outdoor and camping events that were informally arranged and which occurred without the approval of the Troop Committee or at a location other than a formal BSA facility. These non-Scouting related circumstances became slightly more frequent after 1987, suggesting that the youth protection programming implemented at that time may have pushed at least some of the abusive behavior outside of the formal domain of Scouting and into unofficial events similar to those offered by BSA, but not endorsed or sanctioned by the organization. These data underscore the importance of parents being educated about and remaining cognizant of the differences that are not always readily apparent with these different categories of activities and that this distinction and potential slippage be reviewed in all aspects of youth protection programming.

When the abuse did occur during a BSA sponsored activity, the most frequent setting for both A-CSA IVs and Y-CSA IVs involved a camping event. After 1987, 56.2 percent of the A-CSA and 78.7 percent of the Y-CSA occurred during a camping trip. Other types of outings and the home of the A-CSA IVs were also relatively common locations in which abusive incidents unfolded.

**Table 42: Location of Alleged Abuse for Youth Registered in Scouting**

| Alleged Victims Registered in Scouting | | | | | |
|---|---|---|---|---|---|
| | Adult IVs | | | | Youth IVs |
| | <1988 | | >1987 | | 1946-2016 |
| Did abuse occur during Scouting activity: | | | | | |
| Yes | 1,276 | (53.9%) | 1,538 | (56.4%) | 537 (79.2%) |
| No | 206 | (8.7%) | 375 | (13.8%) | 50 (7.4%) |
| Unknown | 887 | (37.4%) | 813 | (29.8%) | 91 (13.4%) |
| If yes, location of abuse during Scouting[1]: | | | | | |
| Camping | 690 | (54.1%) | 887 | (57.7%) | 396 (73.7%) |
| Leader's home | 124 | (9.7%) | 143 | (9.2%) | 4 (0.7%) |
| Meeting | 47 | (3.7%) | 86 | (5.6%) | 32 (6.0%) |
| Other | 92 | (7.2%) | 108 | (7.0%) | 43 (8.0%) |
| Outing | 239 | (18.7%) | 210 | (13.7%) | 45 (8.1%) |
| Traveling to or from Scouting function | 38 | (3.0%) | 50 | (3.3%) | 4 (0.7%) |
| Youth's home | 5 | (0.4%) | 6 | (0.4%) | 3 (0.6%) |

## CONCLUSIONS

In reviewing these 7,819 Ineligible Volunteer (IV) files generated by the Boy Scouts of America (BSA) from 1946 through 2016, we have sought to be rigorous and exhaustive without overreaching in our presentation or interpretation of the data. This effort has culminated in the creation of a large and multi- tiered dataset that captures information about different classifications of IVs, characteristics of the IVs and each of their identified victims, and the interactions that occurred within these dyads and groups of individuals over time. We have also collected information on the BSA's organizational responses to these allegations, the involvement of law enforcement, perceptions of the IVs by their local communities, and the nature of the files that were created to target and track the IVs over the 70 years of the study. We have used our data analyses to try to identify patterns in the behavior of the IVs to best inform youth protection efforts by the BSA and other youth-serving organizations, while more generally informing our shared understanding of child sexual abuse and the behaviors of different types of child molesters.

Our research efforts were strengthened by the large number of files generated over 70 years but simultaneously limited by the archival and administrative nature of the IV files, which have been the property of the membership division of the BSA since their inception. Throughout our study, we were continually reminded that these were not files designed to inform us as researchers about child molesting in America, but rather clerical documents designed to monitor the registration of volunteer leaders whom the BSA concluded no longer met their leadership standards. This function initially involved a Rolodex filled with names arranged alphabetically and a process of hand-checked by a large cohort of administrative staff each year. Over the years, the IV filing system has been transformed into a computerized database with searchable capabilities and PDF copies of the files that now contain information not conceived of when the membership-screening database began in 1922. Rather than having to depend on physical descriptions of particular individuals, their occupations and hobbies, and the names of their family members, the files are now replete with social security numbers, criminal background checks, and sex offender registration information, data that can be accessed nationwide with relative ease. This transformation has changed the process of reviewing the files, and as we have seen throughout our study, increased the amount of material contained in them.

Research suggests that child sexual abuse is declining in America. Ideally, this trend will be supported and galvanized by a coordinated effort between organizations and agencies, informed programming based upon evidence-based interventions, and innovative research designed to examine the etiology of pedophilia and other correlates of exploitive sexual behavior toward children. We hope that our report will encourage further research using these data and offer continued support for the sharing of information between different youth-serving organizations.

## The Significance of the IV Files for the BSA

Building on the work initiated by Baden-Powell in England, the BSA quickly recognized the safety issues that were embedded in the frequent and sustained contact of adults with children. This type of mentoring relationship, which often continued for years, was seen as the necessary foundation for helping youth grow into independent and capable young men. However, it also created a bond outside the family, which could be exploited by unscrupulous adults. To address this issue, the BSA created annual registration for both adults and youths, required local organizations to sponsor and supervise individual Troop activities, and created the membership screening database to identify and track individuals who had their registration revoked because of inappropriate behavior, sometimes involving sexual improprieties with youth. Although individuals affiliated with the BSA spoke about the IV files publicly numerous times over the years–sometimes leading to misunderstandings, such as Teddy Roosevelt's 1935 speech prompting the mistaken belief that the files were meant to identify communists–the files received little public interest until the 1990s, when the public outcry over clergy abuse began to expand to include youth-serving organizations.

With this new development, the IV files became of interest to attorneys, courts, and past victims, who attempted to leverage the files to argue that the BSA had prior notice of sexual abuse occurring within the organization and therefore was legally liable for it. This new legal strategy prompted the publication in 1994 of *Scout's Honor: Sexual Abuse in America's Most Trusted Institution,* written by newspaper reporter Patrick Boyle, as well as the creation of a guide for civil litigators entitled *Litigation Against the Boy Scouts of America,* which was sold along with 1,871 IV files by Michael Rothschild, an attorney from California. The IV files again caught nation's attention when a former Scout was awarded an $18 million settlement for the abuse perpetrated against him by Scoutmaster Timur Dykes in the 1980s, when the plaintiff was 12 years of age. In each of these venues, the "P"-coded IV files were presented as a secret cache of rich information describing as yet unknown child molesters, as well as containing critical information about the behavior of high-risk child molesters and pedophiles. Accompanying this presentation was the implicit, and at times explicit, assertion that the BSA had kept this information secret and out of sight because of a self-serving wish to maintain an untarnished image in American society.

These assertions–which to date have been found compelling in multiple cases of civil litigation–were not substantiated by our empirical review of these files generated over 70 years. It is true that the IV files have been considered confidential over the years and their contents not shared openly with the general public. This practice was supported for many years by the cultural belief that sexual abuse was a humiliating experience best handled by the nuclear family, thereby ensuring that child victims not be identified by the public, labeled, and further traumatized by the disclosure of their victimization to others. Not only did we not have a formal term for child sexual abuse until the work of Kempe in the 1960s, the abuse of children did not become a crime in any state of the country until 1961. This view was further endorsed by law enforcement, which was initially reticent to become involved in cases of child abuse during this same time period, adamantly maintaining that

those in the medical professions best handled these types of situations. A formal designation of responsibility for all types of child abuse did not emerge until the passing of the Child Abuse Prevention and Treatment Act (P.L. 103-247) (CAPTA) in 1974, which for the first time legislated Child Protective Services (CPS) across the nation.

In addition to these broader cultural forces, two additional internal considerations of the BSA organization have fostered the confidential handling of the IV files. First, the BSA often expressed the concern that they might be sued for defamation of character if they entered someone into the IV files without adequate information to support their decision-making process. Each file contained at least one letter—and at time multiple letters—from the BSA asking the Scout Executive to send verifying information such as a newspaper article reporting an arrest or conviction, a police report describing an investigation of child sexual abuse, or a written statement by a child victim. For years, this information was reviewed by an attorney who would determine if enough information was available to support the revocation of an individual's registration with the BSA. A three-tiered review process was also established and made available to any individual who wished to dispute their revocation locally, regionally, and ultimately nationally.

Second—and conversely—the BSA also wanted to encourage the reporting of *all* suspicious or concerning behavior from the local Troops and councils, not just behavior that had reached the level of a criminal charge or conviction. Therefore, the BSA sought to identify a low reporting standard that would not hamper local volunteers from alerting the organization when they observed behavior that they thought was concerning, suspicious, or possibly illegal. This goal made the presence of unverified or unverifiable allegations in the IV files even more likely, reinforcing the first organizational concern about liability for defamation of character in the event of unsupported allegations.

These reporting concerns were not specific to the BSA, but shared by all youth-serving organizations, governmental organizations, and state agencies, none of which offered immunity to mandated reporters until the late 1960s, or made allegations of child sexual abuse public until the passing of sex offender registration laws in the 1990s. Notably, even these legal changes did not fully address the BSA's concerns prompting confidentiality of the IV files. Most mandated reporting laws focused only on professionals (not volunteers) involved with children, and registration laws included only individuals who had been convicted of a sex crime, rather than individuals merely suspected of sexual impropriety with children. These concerns have continued to create barriers to open sharing of information between youth-serving organizations, despite the widespread understanding that individuals with a sexual interest in children will access diverse organizations to identify future victims.

This observation brings to mind the efforts of the National Assembly's Collaboration for Youth Task Force on Child Sexual Abuse, as described by Colonel Hadley in 1993 during the Hearing before the Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary (House of Representatives, 103rd

Congress, First Session, HR1237). During his testimony, Col. Hadley urged that a legal mechanism be established to allow youth-serving organizations to share information about volunteer leaders or professional staff who had been dismissed because of alleged inappropriate sexual behavior with youth. This idea has resurfaced over the years, but continues to elude lawmakers, despite national clearinghouses now being operative to track educators and health care professionals who have behaved inappropriately with children or who have been involved in other disqualifying professional behavior.

Further related to the confidentiality of the IV files is the assertion that they are "secret files," rich in unknown content and hidden from the public for nefarious and self-serving reasons. Here again, this claim concerning the IV files was not supported by the information contained in them. We found that law enforcement or Child Protective Service (CPS) were involved with the IV, the victim(s), the reporting of the alleged abuse, or the investigation of the alleged abuse in 89.2 percent of the A-CSA IV files up to and including the year 1987 and 92.0 percent of the files from 1988 and afterward. Law enforcement was involved in 85.4 percent of the Youth IV files. In 2010, the BSA declared all registered leaders to be mandatory reporters requiring a report to law enforcement or child protective services based upon reasonable suspicions of child abuse. Moreover, in 2011, the BSA adopted the policy of reporting all IVs to law enforcement in their local communities, this effort being made retrospectively for the past 60 years.

Related to the secrecy of the IV files are accusations frequently asserted in the context of civil litigation that BSA willfully destroyed or distorted material contained in some files for the protection of the larger organization. To explore this possibility, we had our coders review each file to discern if it included information suggestive of a "cover-up" or attempt to whitewash the abuse that was being alleged against a particular volunteer leader. For each file, we required them not only to code when this type of information appeared to be present, but also to transcribe the specific statements or facts that prompted their positive endorsement of this variable. As summarized in Table 12, 106 (0.02%) of the files were tagged as containing some type of manipulation or deception. These files most often involved behavior at the local level to handle alleged incidents internally and not make this information known either to law enforcement or BSA National Council. Efforts to keep alleged abuse out of the media were also not uncommon. No information was found indicative of an effort by BSA National to destroy or distort information about alleged child sexual abuse. In making these observations, it is important to emphasize that this information was collected from the IV files themselves, and by definition, would not and could not include information that was not included in or removed from the records.

Despite these criticisms of the IV files and the BSA's creation and use of them, after completing the analyses described in this report, we ultimately arrived at the opinion that the files had served a useful function and could continue to support the youth-protection efforts of the BSA. However, after processing thousands of pages of narrative content, the data revealed that out of millions of volunteer leaders who had been active in Scouting over several decades, the IV files had succeeded in identifying and removing 5,052 child molesters

from Scouting: 1,133 men who appear to have suffered from a pedophilic sexual interest in children; 801 men who seemed indiscriminately and possibly impulsively sexually exploitive of children; and 3,118 men who appear to have sexually molested children but with more sporadic behaviors and fewer numbers of victims. We also found our analyses leading us back to the comment made by Dr. West in 1935 when he observed that the men in the IV files were made up of at least two groups, one that appeared to be "morally imbalanced" and who became involved in Scouting specifically to gain sexual access to boys, and another group who was "soundly balanced" but who through their immersion and activities with boys "gave way to temptation."

Although the removal of these 5,052 child molesters from Scouting is undoubtedly positive and likely protected other Scouting-involved youth, at the same time, at least a segment of these IVs likely sought victims elsewhere. Illustrating the broader risk and responsibility of all youth-serving organizations, our data indicate that at least one-third of the IVs were involved in one or more other youth-serving organizations, with the most common occupations placing them in education and training, community/social services, and protective services. As referenced in our report, one IV was known to have been involved in 30 different youth-serving organizations at the time that his registration with the BSA was revoked. The success of the *Teacher Identification Clearinghouse* operated by the State Directors of Teacher Education and Certification and the *National Practitioner Data Bank* created by Congress to protect the public against adverse actions by health professionals could serve as prototypes for this type of cross-organizational exchange. In support of this type of development, the tracking software developed by UVA for the purposes of this research has been designed to generate concise summary reports of individuals and incidents, which could easily be transported into a secure, communal information-sharing website for use by all youth-serving organizations in America.

This type of collaboration between youth-serving organizations would require a more precise definition of the role of the IV files in the BSA at this time and moving forward. Our review of the files revealed that they ranged in length from 1 to 917 pages, with the size and complexity of the files progressing steadily over the course of each decade. While this pattern reflects a seemingly positive intent to document all relevant information, enhanced by the proliferation of available records in the digital age, it also makes the files unruly, time-consuming to review, and unstandardized in terms of the information that can be identified and extracted from them. We attempted to address this problem by having the coders generate a five-to-six sentence narrative of the contents of each file, with each summary being structured according to a variety of content and stylistic requirements. However, this process of combining qualitative with quantitative research served to continually underscore the varying breadth and depth of the information contained in the files, and the need for the BSA to decide the purpose and function of them explicitly. This will require clarity as to whether the IV files will remain registration files designed solely to identify unfit leaders within Scouting and share this information with other youth-serving organizations, or if they will be expanded and restructured to facilitate and inform research.

The registration-only option would entail a well-structured set of inquiries to be addressed in each case, with clearly defined guidelines regarding the appropriate sources of information to be incorporated into each file; all

information extraneous to the identification of credible allegations of inappropriate sexual behavior would be excluded. This option would standardize and shorten the IV files and make the review of them less time-intensive, while providing a standardized platform for sharing this information with other youth-serving organizations. The research-sustaining option would require consultation with researchers having expertise in child sexual abuse, training of all administrative staff on the proper processes for collecting and entering data into the files, periodic checks on their reliability, and the compilation of regular research reports to assess the quality and relevance of the data being collected. This latter option would be time-intensive and costly, and it would require the BSA to collaborate closely with an academic research institution and adhere consistently to the core principles of scientific inquiry. It is our opinion that the most collaborative and generative choice would require all youth-serving organizations in America to submit comparable data to a single, secure information-sharing platform, with credible researchers applying for and being given access to these data so as to describe patterns of child abuse on a broader scale and generate analyses that can inform child protection efforts as they evolve over the coming years. This approach would ensure that the experience of victimized youth and the efforts made by youth-serving organizations to protect them would not remain siloed within the individual organizations, but instead be translated into broadly accessible scientific knowledge concerning how to best protect children.

Regardless of the direction that the BSA chooses to follow, our analyses support the recent division of the "P"-coded IV files into separate adult and youth classification codes. As described earlier, the classification codes now involve eight categories for adults including Child Pornography (CP), Child Sexual Abuse (CSA), Criminal ©, Criminal Background Check (CBC), Pornography (P), Youth Protection Policy Violations (YPV), Unwelcome (U), and Other (O). The youth classifications include Child Pornography (CP), Child Sexual Abuse (CSA), Pornography (P), Youth Protection Policy Violations (YPV), and Other (O) codes; only the Unwelcome and Criminal Background Check categories were excluded among youth due to them being under the age of 18 years and infrequently identified through CBCs and public sources. When these two categories of files were compared across many analyses, we found significant differences in the dynamics of abuse allegedly perpetrated by Adult and Youth IVs, along with different responses by the parents, BSA, and the larger community. The division of the Youth and Adult files is further reinforced by the research literature, which demonstrates significant differences in the etiology, risk for re-offense, and efficacy of treatment among juveniles as contrasted to adult sex offenders (Caldwell, 2010; Letourneau & Miner, 2005; Seto & Lalumière, 2010).

### The Nature of the Abuse Identified in the IV Files

When we move from the structure of the IV files to their behavioral content, we find information illustrating differences in the characteristics of the IVs and the methods they used in selecting and interacting with their victims. However, in seeking to identify the most salient aspects of these data, we encountered two characteristics of the files that required our careful attention throughout the project. The first involved the administrative and archival nature of the data, which left many important questions unanswered, and the second

was the unstructured content of files leaving us with missing data and little quantitative consistency across the 70 years of the study. At times, there were thoughtful and revealing handwritten statements by the child victims, but these were not common and more often the files contained little more than newspaper articles describing in terse terms the number and age range of the known victims of an arrested, confessed, or convicted child molester.

We did find that the information in the more recent files was more extensive than in the older files, with the IV files increasing in mean size three-fold from the period preceding 1987 to the period following it. However, the problem of missing data remained ubiquitous. For example, in Table 16 we attempted to examine the presence among the A-CSA IVs of various characteristics associated in the research literature with sexual offending, and we found that none of these characteristics were identified in 2,872 (56.8%) of the A-CSA IV files. Given that none of these characteristics were pertinent to the intent of the IV files, we could not determine if these men were likely to possess these empirically-supported characteristics and the relevant information was simply not included in the files, or if in fact these men were substantially different from the child molesters who have been studied as part of criminally-convicted offender samples.

On the other hand, the database that emerged from the files was large, containing 7,819 alleged perpetrators and 12,284 identified victims. This size provided considerable power for our analyses, making it possible to find significant differences with most group comparisons. However, it evoked uncertainty concerning the effect of missing data on our data analyses. To address this problem, we prioritized interpretive analyses that represented data that was reasonably consistent in the files, used conservative criteria when defining our composite measures, and calculated effect sizes for our primary comparisons among different types of alleged perpetrators. When looking at victim selection patterns of A-CSA and Y-CSA IVs, we examined the sex, gender and Scouting affiliation of all known victims for each IV, as this information was available for the majority of known victims. In contrast, we did not perform any comparative analyses of victim vulnerability, the behaviors used to entice or coerce them into sexual contact, or the timing and duration of their alleged abuse, as this information was spotty and not specific enough to provide a firm foundation for bivariate or multivariate analyses. When attempting to differentiate between IVs who appeared likely to be pedophilic from those with no confirming information, we sought to be conservative in the criteria we used to identify the likely presence of a paraphilic disorder. These included the IV self-identifying as a pedophile; their involvement in the use, creation or distribution of child pornography or erotica; or the IV having more than three known alleged victims 13 years of age or younger and no known alleged victims over the age of thirteen years.

Given these caveats, several findings contained in our report deserve reiteration and comment. The first, and perhaps the most obvious, involves the large number of IVs and victims identified in the BSA membership screening database. It is startling to consider there being thousands of IVs and almost double the number of known victims in what is undoubtedly one of the safest youth-serving organizations in the world. This finding punctuates the pervasive nature of child sexual abuse in America and the importance of an integrative and

collaborative effort to address it. However, proximate to this finding and embedded in it is the equally compelling finding that Scouting is a predominately safe environment. As mentioned earlier, Shattuck, Finkelhor, Turner, and Hamby (2016) found that within their iterative sample of 13,052 children, the rate of child abuse in youth-serving organizations was 0.4 percent (95% CI, 0.2-0.7) for the past year, and 0.8 percent (95% CI, 0.5-1.1%) over the lifetime of each youth. The majority of this abuse involved verbal abuse with sexual abuse being reported far less frequently. Based upon these findings, they concluded that abuse in youth-serving organizations was a relatively rare form of child abuse, "dwarfed" by abuse by family members and other adults.

As illustrated graphically in Figures 3, 4, and 8, the rate of CSA perpetrated by Scouting-involved adults or youth each year remains miniscule. As illustrated, an average of 81 Adult CSA IVs were identified each year from an average of 1,762,602 adult volunteer leaders registered each year in Scouting. On average, 14 Youth CSA IVs were identified each year, from an average of 5,105,099 youth who register with Scouting on an annual basis. Similarly, the number of youths who were allegedly sexually abused in Scouting each year is very low, equaling an estimated average of 78 youths out of an average of 5,105,099 youths registered in Scouting on a yearly basis. These data do not enable us to calculate a true incidence rate of CSA in Scouting, as the IV files are neither investigative in nature, nor exhaustive in terms of identifying all the sexual abuse that occurs each year in Scouting. However, the data we do have in fact illustrate the profound rarity with which these types of incidents occur within Scouting. This perspective is difficult to reconcile when presented with our total of 12,284 identifiable alleged victims across the 70 years of our study. It does, however, illustrate the importance of holding both perspectives in mind as we seek to improve youth protection, optimally share data across youth-serving organizations, and understand the porous nature of child sexual abuse and the risk that follows children through the various activities of their daily lives. Although cognitively complex and emotionally challenging, any perspective that is less encompassing serves only to mask the true contours of the problem and diminish our ability to identify levels of relative risk and the proper locations and types of interventions that will be most effective in protecting children.

When we turn our attention to the behavior of the Adult and Youth IVs, we found remarkably consistent patterns among the alleged victims of both the A-CSA and Y-CSA IVs, suggesting that perpetrators tended to choose victims of a particular age, gender, and affiliation with Scouting. In other words, victim selection clearly did not reflect a random or purely opportunistic decision-making process. Instead, IVs appeared to select their victims according to a combination of convenient acquisition patterns and personal sexual motivations for the abusive behavior (e.g., specific sexual interest in victims of a particular age and gender).

We sought to understand some of these sexual dynamics by identifying which Adult and Youth IVs appeared likely to experience a paraphilic sexual attraction toward children ("likely pedophilic," or LP) and compared them to individuals for whom supporting information was not available in the files. As such, it is likely that the LP group is under-represented in our analyses. Nonetheless, we found that 14.5 percent of the Adult and Youth

IVs appeared likely to be pedophilic–meaning they experience a sustained, focused, and intense pattern of sexual arousal toward pre-pubescent children–specifically toward male children age 13 years and younger. This group of 1,133 IVs appeared to have more often been married with children, were generally viewed as stable members of the community, were more often able to access children through employment in community-based services, were more likely to be involved with other youth-serving organizations, and were more likely to have been involved with BSA as a youth. Despite these prosocial characteristics, the same individuals were more likely to have had contact with law enforcement and were more likely to have been arrested for a sex crime. The LP group was twice as likely to attempt to re-register with the BSA after having their registration revoked.

Within our victim selection analyses, we also found 801 (10%) A-CSA and Y-CSA IVs who deviated from a consistent pattern of victim selection, and crossed lines of age, gender, and/or Scouting affiliation in their choice of child victims. These IVs had longer IV files, more child victims, more victims under and over the age of 13 years, more Scouting and non-Scouting affiliated child victims, more male victims, and more female victims. The effect sizes of these differences were medium to large for the majority of these comparisons. The Mixed Offender group was also more often considered unstable members of the local community and had more frequently come to the attention of law enforcement and arrested for a sex crime.

Turning to the issue of gender, we found that although IVs in the LP and MO groups were more likely to have male victims, the data revealed a significant number of female victims in both the A-CSA and Y-CSA IV files, underscoring that sexual abuse in Scouting is not limited exclusively to men with a sexual interest in boys. While approximately two-thirds of the CSA files included male victims, approximately one-third of the files included identifiable female victims. With regard to the sexual behaviors allegedly experienced by the male and female victims, we found that the female victims were two to three times more likely to have experienced penetration by both the A-CSA and Y-CSA IVs. When we explored disclosure rates across the two genders, we found that both the male and female alleged victims often did not disclose their sexual abuse after what appeared to be the first incident, this occurring with only 14.3 percent of the girl victims and 14.8 percent of the boy victims of A-CSA IVs, and 21.5 percent of the girl victims and 32.0 percent of the boy victims of Y-CSA IVs. These findings contradict clinical lore that asserts that boy victims of CSA are more reticent to report sexual abuse than girl victims of CSA. These findings also indicate that youth are more willing to report sexually abusive behavior when perpetrated by another youth as opposed to when the perpetrator is an adult. These differences reinforce the power differential assumed in sexually abusive behavior toward children by adults and highlight the importance of youth protection programs that provide low-barrier avenues for reporting sexual abuse, possibly online, avoiding the need for an initial full report and confrontation with an adult. These findings also serve as a reminder that youth protection programs in youth-serving organizations need to explicitly discuss abuse by other youths, not just abuse by adults in the program.

Our analyses–which have focused on victim selection patterns of A-CSA and Y-CSA IVs–must also be properly contextualized alongside the finding that the median number of child victims for the A-CSA and Y-CSA IVs

was one. We cannot know validity or completeness of these data and emphasize that they need to be considered keeping in mind the limited victim information contained in many of the files, combined with empirical research that confirms that most child molesters have more than one victim by the time they come to public attention. Nonetheless, to some extent this finding might reflect the success of the protection programming implemented by the BSA and the decline in child sexual abuse documented in American society in the last 20 years (Finkelhor, 2008).

Even though the median number of child victims per IV was one, there was great variability, with estimated total child victims per A-CSA IVs ranging from 1 to 250, and among Y-CSA IVs ranging from 1 to 51. These wide ranges demonstrate the diversity of behavior and sexual intent of the IVs contained in these files. For example, the married man with children who is involved in Scouting for 25 years and has one boy victim appears meaningfully different from the 32-year-old unmarried man with no children who offends against over 50 victims of mixed gender over the course of a relatively short affiliation with Scouting. Similarly, two 13-year-old boys who are found engaged in consensual sexual conduct appear meaningfully different from the 16-year-old adolescent who is known to have aggressively abused over 20 children. In a few instances, we even found female IVs who sexually abused adolescent boys either with a male partner or independent of any co-conspirator, who also obviously seem to fall in a different category of perpetrator from male offenders abusing young boys and girls. These different scenarios raise complex questions about sexual orientation, sexual attraction, and criminal predispositions, which can obviously not be answered by the data in the IV files. However, the diversity of behavior found in the files confirms that the issue of CSA in Scouting is not simply one of same-sex pedophiles trying to find an easy way to their preferred victim type. While this observation adds little to the dialogue about child molesters in general, it might serve a useful function in undermining simple stereotypes that are not conducive to thoughtful youth protection policies and/or programs within the BSA.

The information we have on the behavior used by A-CSA and Y-CSA IVs to access and gain compliance from their child victims was particularly limited as this information was not requested of the Scout Executive by the BSA. However, when this information was available, it illustrated how IVs used seemingly normal, prosocial behaviors to gain access to child victims in Scouting–behaviors that might not necessarily appear as "red flags" to parents, Scouting leaders, or other adult observers. For example, the use of child-attracting activities, the use of travel and adventure, the development of a close relationship based on a mutual sense of caring, and efforts to give each child individualized attention are all behaviors that are embedded in the fabric of the Scouting experience, instrumental to the positive development of all youth involved in Scouting, and extend naturally to other activities in the family and larger community. Yet such behaviors are also frequently used by child molesters to create opportunities for abuse. This finding suggests that our preoccupation with the idea of "grooming" may have become too entrenched, since there seems to be a large overlap between the "grooming" behaviors of child molesters and the typical relational overtures of well-intentioned, non-abusive adults seeking

to support youth development, particularly in the setting of Scouting. This perspective argues for seeking a deeper understanding of how victims perceive the metamorphosis of seemingly normal behavior into the prelude for sexual abuse, particularly among the minority of children who are able to immediately identify and respond to this transformation of behavior in a self-protective manner by reporting the abuse after the first incident. Finally, these findings suggest that youth protection programs preoccupied with grooming that teach youth to be suspicious of all special attention from any adult involved in the organization are likely to be overbroad and may have the potential for harm by dampening even healthy mentoring relationships.

Our data demonstrated that at least half of A-CSA and Y-CSA IVs offended exclusively against youth who were not involved in Scouting (i.e., the files did not positively indicate a Scouting affiliation). This proportion may have been over-represented because of missing data concerning Scouting affiliation, but the consistency of the data that are available indicates a distinct pattern of victim selection found among these offenders. This finding again illustrates that the problem of sexual abuse in Scouting is not limited to volunteers who join Scouting with the express intention of accessing young male victims. Instead, the permeable nature of the sexual offending that occurs in Scouting suggests that such offending reaches into other aspects of community living. This reality reinforces the public health model of violence prevention, a perspective that is increasingly being applied to CSA, and one designed to address abuse through primary, secondary, and tertiary forms of interventions in multiple settings. The public health model precludes an exclusive focus on one level or location of interventions, and rather focuses on the importance of cooperation, coordination, and integration of services across the broader community. The importance of such coordination is underscored in our analyses indicating at least 19.9 percent of A-CSA IVs were involved in other youth-serving organizations prior to 1988, and 27.6 percent after 1988, with the most commonly identified occupations involving teaching, social services, and protective services. Similarly, 19.2 percent of the IVs had a custodial relationship with at least one of their victims, again expanding the focus beyond the confines of the singular context of Scouting to the family and community in general. When viewed together, these findings argue for investigative practices that go beyond meeting with Troop members and suggest the need for law enforcement to seek additional victims not only in Scouting but also in the family of the victim and in the larger community.

**Informing BSA Youth Protection Programs**

Two findings emerged from the data that are particularly relevant to youth protection in the BSA and other youth-serving organizations. The first was that only approximately one-half of the abusive incidents perpetrated by A-CSA IVs against Scouting-involved youth for which location was known occurred during Scouting-sponsored activities. In many instances the alleged abuse occurred outside of Scouting activities, these encounters often flowing naturally from the activities and goals that had previously emerged in the context of Scouting. Non-Scouting-sponsored interactions are likely particularly prone to abuse because they lack the official youth protection safeguards now mandated for all Scouting-sanctioned events. Such frequency of abuse occurring outside Scouting activities suggests that a clearer demarcation is required between activities that are

Scouting-sponsored and those offered independently by Scouting-involved volunteers. Parents and other caretakers of children need to be educated concerning the importance of keeping abreast of their children's activities; BSA youth protection guidelines prohibit any type of outside interaction, but this requires particular diligence on the part of parents to be enforced effectively. In contrast, 78.7 percent of the incidents for which location was knowing involving Y–CSA IVs occurred during Scouting-sponsored events. This finding undoubtedly speaks to the Youth IVs having a more limited ability to create contexts outside of Scouting for abuse to occur possibly further primed by less experience in manipulating social contexts for more malevolent purposes.

The second finding involves the frequency with which A-CSA and Y-CSA occur during camping events. This was particularly true of the Y-CSA IVs, who allegedly abused other youth 73.7 percent of the time during a camping event. These camping events varied from relatively informal overnights in the local community, to weeklong trips, to Scouting-sponsored summer camps, to District-wide delegations, to the National Jamboree. This risk while camping is not unique to Scouting or to youth-serving organizations in general. Instead, it unquestionably reflects the inherent risks associated with groups of adolescents being away from parental supervision for extended periods, particularly when involving overnight excursions.

## Limitations of the Data

When considering our data analyses and the conclusions derived from them, it is crucial to remain aware of the limitations of these data. The IV files are administrative files that for almost 100 years have been managed by the membership department of the BSA. They were created to serve as a filter for the yearly registration that was required of each volunteer leader, a process used to track all adults who had regular contact with children through the BSA. These names were historically checked by hand each year until the 1980s when this process became computerized, allowing for a more rapid comparison of names across the different BSA information systems. This information was never collected for research purposes and the various queries were designed for their comparison purposes only. As such, the information requested from the local councils focused on identifying the alleged perpetrator, determining how this person might be identified if they sought to re-register after having their registration revoked by the BSA, and establishing that there was sufficient information to make reasonable the conclusion that the identified individual had, in fact, been involved in inappropriate behavior that did not meet the leadership standards of the organization. Only relatively recently have various additional procedural and reporting requirements been introduced into this process.

Despite this singular intent, we found the size of the files grew over time. This appears to have occurred in response to the additional information that became available as part of the digital age, combined with the creation of state and federal information systems for tracking individuals charged with sexual crimes. However, this increase in size varied among cases and was to some extent still dependent on the quality and quantity of information submitted to the BSA by the local councils. Given this variability, we found that the IV files ranged

in length from one to 917 pages, creating a wide expanse of information that was not consistently present or able to be coded across the entire dataset. It was not until 1972 that Paul Ernst compiled the first memo providing a consistent process for compiling each file, this structure being expanded over the ensuing years into a 55-page manual that provides extensive information concerning the development and use of the information in the IV files.

Given their intended purpose, the most consistent data found in the IV files consisted of identifying information concerning the IV, including his physical characteristics, occupations, hobbies, and interests, along with any physical or psychological anomalies that might facilitate his identification at some later point in time. Information about the alleged victims was often sparse and was primarily summarized as an evidentiary basis for the exclusion of the IV from further registration with the BSA. As such, the interactions that occurred between the alleged perpetrator and their victims were captured episodically, and the different sources of this information created considerable variability in the way that this information was described and summarized. This variability is the antithesis of what is sought when conducting statistical comparisons of data, and it significantly limited our ability to interpret the information that was available across the various files. Most notably, it was impossible to determine whether a characteristic or behavior was absent in the files because it was truly not present in the interactions that unfolded between an alleged perpetrator and his alleged victim(s), or because the information was simply not collected as part of the exchange that occurred between the local council and the BSA when the file was created. To address this issue, we chose not to explore the data using various forms of bivariate and multivariate comparisons, believing that this approach would imply greater statistical accuracy than our data warranted. However, we sought to capture as much relevant information as could be found across the various files and to provide it in a descriptive format that could be compared to known trends in child sexual abuse.

Our data collection also derived from documents generated over a 70-year period. During this time, many societal changes occurred regarding our understanding of and response to child sexual abuse, these changes introducing a cultural dimension to the data collected and the ways in which the BSA responded to the allegations being submitted to them. As with all cultural transformations, these changes unfolded gradually without any clear articulation of their specific origins, explicit content, or their anticipated impact on our understanding of child sexual abuse as it was evolving over time. We tried to capture some of these changes in our analyses by comparing data collected prior to and after 1987, this cut-point reflecting a moment when American society was identifying the phenomenon of acquaintance rape and the BSA was releasing its first comprehensive youth-protection program. This rudimentary comparison, while descriptive of one watershed moment in American history, nonetheless lacks the precision that would be necessary to fully capture the cultural influences that were impacting the practices of the BSA and all other youth-serving organizations in America.

## Final Comments

Our research suggests that the rates of child sexual abuse in the Boy Scouts of America, as in the larger society, are decreasing. This is likely due to growing sophistication in the education of youth and parents, the management and tracking of individuals with a higher demonstrated risk for sexually victimizing children, and the advocacy that has provided youth the support necessary to report their abuse to others. This trend represents a broader shift in our society dating back over 50 years to 1962 when C. Henry Kempe first published his seminal paper "The Battered-Child Syndrome," which ushered in a new era of identification and prevention and served as the foundation for his second Nobel Prize nomination. Since that time, we have seen major initiatives launched by the federal government, federal and state law enforcement, academic researchers, child advocacy centers, youth protection non-profits, youth-serving organizations, religious organizations, and clearinghouses for professional groups with regular contact with children. Each of these efforts has contributed significantly to improving conditions in our society to combat child sexual abuse. However, each of these initiatives has tended to occur exclusively in the silo of the sponsoring organizations, and these group-specific efforts have conveyed intentionally or unintentionally that child sexual abuse occurs in specific locations that are relatively isolated one from the other.

The BSA data demonstrate that this is not the case. The data summarized in our report indicate that Scouting-involved adults commonly offended against only non-Scouting involved youth, that often these abusive relationships overlapped with family relationships, that IVs were commonly involved in other youth-serving organizations, and that the employment of the IVs placed them in the schools, in the domain of human services, and in organizations designed specifically to protect children from harm.  These overlapping positions, often in a single community, underscore the need for an integrated approach to child protection that considers the totality of the daily lives of both perpetrators and victims of CSA in order to avoid falling prey to "tunnel vision" that attempts a too-narrow solution to a far-reaching problem. The public health perspective on child sexual abuse, which views child sexual abuse as one form of child injury that can occur across multiple contexts, possibly holds the linking potential needed to serve this important integrative function.

Our data also demonstrate that the sexual abuse of children in Scouting is not limited to a single type of offender. Our victim analyses demonstrated marked specificity in IVs' victim selection patterns according to age and gender. This pattern of victimization, in some instances, appears to be reflective of a paraphilic sexual interest in children of a specific gender and age. However, the sample also contained other types of offenders, including youths who sexually offended against other youths, adolescent boys involved in mutual sexual exploration, linked cases of exploitation based on prior patterns of abuse, antisocial men who were repeatedly exploitive of many different types of victims, and some men who appear to have offended against a single youth after being involved in Scouting for many years. This diversity in the type of child molesters identified in the IV files is congruent with research that has identified different patterns of child molesting in both clinical and criminal populations (Groth, 1979; Knight, Carter, & Prentky, 1989; Lanning, 1986, 2010). These findings argue against simple

stereotypes of the men contained on the IV list and highlight the importance of continuing to explore the different ways in which adults become sexually exploitive of children. This type of approach will ensure that we maintain a multifaceted perspective of the problem, one that will inform child protection across a wide expanse of differing circumstances. Proximate to these considerations is the observation made by J. Edgar Hoover 50 years ago when he commented on the fact that we spend immense amounts of money each year trying to combat various types of acute and chronic diseases but invest no money in trying to "cure the sick minds of those who prey upon innocent children" (1955). Clearly, medical advances since his time would argue for a whole-hearted effort to understand the etiology of pedophilia, and from this, the ways to inoculate vulnerable individuals from developing pedophilic interests in the first place and supervise and treat those who do display sexual interest in children. We also have much to learn from men who experience some form of deviant sexual desire but chose never to abuse or harm a child.

In closing, I would like to publicly thank James Reed, the Research Manager for this project, who has worked closely with me through every phase of this five-year project. He was involved in the development of our web-based data entry application; the hiring, training, and managing of over 40 coders spread across the east coast of America; the creation of over 1,300 composite variables and the individual and combined analyses of data pertaining to 7,819 IVs and 12,284 victims. All of the work summarized in this report has emerged in part due to his intelligence, determination, and perseverance, along with his uncanny ability to supervise large cohorts of individuals according to their unique talents and capabilities. I would also like to thank the University of Virginia for its intellectual, technological, and administrative support, the Boy Scouts of America for their willingness to provide us with unfettered access to their IV files, and the professional and administrative staff who is responsible for maintaining them.

Janet I. Warren, DSW
Professor of Psychiatry and Neurobehavioral Sciences
Institute of Law, Psychiatry and Public Policy
University of Virginia
2019

# REFERENCES

Abel, G. G. (2002, June 7). Juarez v. Paz. *Deposition of Gene G. Abel, M.D., Vols. I-III*, No. 767805-5.

American Psychological Association. (1980). *Diagnostic and Statistical Manual of Mental Disorders* (3rd ed.). Washington, DC: Author.

American Psychological Association. (2013). *Diagnostic and Statistical Manual of Mental Disorders* (5th ed.). Washington, DC: Author.

Bourke, M. L., & Hernandez, A. E. (2009). The 'Butner Study' redux: A report of the incidence of hands-on child victimization by child pornography offenders. *Journal of Family Violence, 24*, 183-191. https://doi.org/10.1007/s10896-008-9219-y.

Boy Scouts of America. (2008, February). *Procedures for Maintaining Standards of Membership and Leadership: Including How to Deal with Allegations of Child Abuse.* Irving, TX: Author.

Boy Scouts of America. (1991). *Procedures for Maintaining Standards of Membership: Including How to Deal with Child Abuse (1991 Revision).* Irving, TX: Author.

Boy Scouts head explains 'red' list. (1935, June 9). *New York Times.*

Boyle, P. (1991, May 20). Scouting's sex abuse trail leads to 50 states. *The Washington Times.* Retrieved from https://newsline.umd.edu.

Boyle, P. (1991, May 21). 25 years of abuse kept molester moving. *The Washington Times.* Retrieved from https://newsline.umd.edu.

Boyle, P. (1991, May 22). Corporate policy kept abuse secret. *The Washington Times.* Retrieved from https://newsline.umd.edu.

Boyle, P. (1991, May 23). Boy fled terror, shame by suicide. *The Washington Times.* Retrieved from https://newsline.umd.edu.

Boyle, P. (1991, May 24). Scouts take heed, hit abuse head-on. *The Washington Times.* Retrieved from https://newsline.umd.edu.

Boyle, P. (1994). *Scout's Honor: Sexual Abuse in America's Most Trusted Institution.* Rocklin, CA: Prima Publisher.

Boyle, P. (2008, April 24). *Affidavit of Patrick Boyle.* United States District Court for the District of Massachusetts.

Brown, L. G., & Gallagher, K. (2014). Mandatory reporting of abuse: A historical perspective on the evolution of states' current mandatory reporting laws in the Commonwealth of Pennsylvania. *Villanova Law Review Tolle Lege, 59*(6), 37-44. Retrieved from http://digitalcommons.law.villanova.edu.

Brownmiller, S. (1975). *Against Our Will: Men, Women, and Rape.* New York, NY: Simon & Schuster, Inc.

Caffey, J. & Silverman, W. (1945). Infantile cortical hyperostosis: Preliminary report on a new syndrome. *US: American Journal of Roentgenology and Radium Therapy, 1* (tDAR id: 113552)

The Child Abuse Prevention and Treatment Act (CAPTA) P.L. 93-247, 42 U.S.C. §§ 2(b)(6) (1974, 2010).

Davis, N. S., Grasso, K. L., Dennis, K., Wells, S. J., and Liss, M. B. (1998). *Guidelines for the Screening of Persons Working with Children, the Elderly, and Individuals with Disabilities in Need of Support.* Washington, D.C.: U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention. Retrieved from https://www.ncjrs.gov.

Ernst, P. (1972). *Maintaining Standards of Leadership.* Irving, TX: Boy Scouts of America.

Finkelhor, D. (2008). *Childhood Victimization: Violence, Crime, and Abuse in the Lives of Young People.* New York, NY: Oxford University Press.

Finkelhor, D. (2009). The prevention of childhood sexual abuse. *The Future of Children, 19,* 169-194. https://doi.org/10.1353/foc.0.0035.

Finkelhor, D., Vanderminden, J., Turner, H., Shamby, S., & Shattuck, A. (2014). Upset among youth in response to questions about exposure to violence, sexual assault and family maltreatment. *Child Abuse & Neglect, 38,* 217-223. https://doi.org/10.1016/j.chiabu.2013.07.021.

Furby, L., Weinrott, M. R., & Blackshaw, L. (1989). Sex offender recidivism: A review. *Psychological Bulletin, 105*(1), 3-30. https://doi.org/10.1037/0033-2909.105.1.3.

Gibson, L. E., & Leitenberg, H. (2000). Child sexual abuse prevention programs: Do they decrease the occurrence of child sexual abuse? *Child Abuse & Neglect, 24,* 1115-1125. https://doi.org/10.1016/S0145-2134(00)00179-4.

Groth, A. N. (1979). *Men Who Rape: The Psychology of the Offender.* Plenum Press, New York & London.

Groth, A. N., & Birnbaum, H. J. (1978). Adult sexual orientation and attraction to underage persons. *Archives of Sexual Behavior, 7*(3), 175-81. https://doi.org/10.1007/BF01542377.

Group for the Advancement of Psychiatry: Committee on Psychiatry & Law. (1977). Psychiatry and Sex Psychopath Legislation, the 30s to the 80s. (No. 9). Advancement of Psychiatry.

Heldt, H. (2002). Comparison of BSA rates of child molestation with rates in other organizations. Litigation document in Juarez v. Paz, SF890260v1.

Helmus, L., Thorton, D., Hanson, R. K., & Babchishin, K. M. (2012). Improving the predictive accuracy of Static-99 and Static-2002 with older sex offenders: Revised age weights. *Sexual Abuse: A Journal of Research & Treatment, 24,* 64-101. https://doi.org/10.1177/1079063211409951.

Hoover, J. E. (1947). How safe is your daughter? *American Magazine, 144,* 32-33.

Hoover, J. E. (1955). How safe is your youngster? *American Magazine, 159,* 99-103.

House of Representatives. (1993, July 16). National Child Protection Act of 1993: Hearing before the Subcommittee on Civil and Constitutional Rights, of the Committee on the Judiciary, House of Representatives. One Hundred Third Congress, on H.R. 1237. Washington: U.S. G.P.O.

Jack Doe 1, et al. v. Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints, et al. Marshall, N. E. (2010). Supplemental Declaration, Circuit Court of the State of Oregon, Jack Doe 1 v. Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints.

Jackson, S. L. (2004). A USA national survey of program services provided by child advocacy centers. *Child Abuse & Neglect, 28*(4), 411-21. https://doi.org/10.1016/j.chiabu.2009.09.020

Kempe, C. H., Silverman, F. N., Steele, B. F., Droegemueller, W., & Silver, H. K. (1985). The battered child syndrome. *Child Abuse & Neglect, 9,* 143-154. https://doi.org/10.1016/0145-2134(85)90005-5.

Kingston, D. A., Fedoroff, P., Firestone, P., Curry, S., & Bradford, J. M. (2008). Pornography use and sexual aggression: The impact of frequency and type of pornography use on recidivism among sexual offenders. *Aggressive Behavior, 34,* 341-351. https://doi.org/10.1002.ab.20250.

Knight, R., Carter, D. L., & Prentky, R. (1989). A system for the classification of child molesters: Reliability and application. *Journal of Interpersonal Violence, 4,* 3-23. https://doi.org/10.1177/088626089004001001.

Lanning, K. (1986**/7?**). Child molesters: A behavioral analyses for professionals investigating the sexual exploitation of children. 1st Edition, National Center for Missing and Exploited Children. Washington, DC.

Lanning, K. (2010). Child molesters: A behavioral analyses for professionals investigating the sexual exploitation of children. 5th Edition, National Center for Missing and Exploited Children. Washington, DC.

Lanning, K. (2017). The evolution of *grooming*: concept and term. *Journal of Interpersonal Violence, 33*(1), 5-16. https://doi.org/10.1177/0886260517742046.

Martinez, G. M., Daniels, K., & Chandra, A. (2012). *Fertility of men and women aged 15-44 years in the United States: National survey of family growth, 2006-2010* (CDC Pub. No. 51). Hyattsville, MD: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics. Retrieved from https://cdc.gov/nchs/data/nhsr/nhsr051.pdf

Murray, W. D. (1973). *The History of the Boy Scouts of America.* Boy Scouts of America.

National Center on Child Abuse and Neglect. (1980). *National study of the incidence and severity of child abuse and neglect.* Washington, DC: U.S. Dept. of Health and Human Services, Office of Human Development Services, Administration for Children, Youth and Families, Children's Bureau, National Center on Child Abuse and Neglect.

National Center on Child Abuse and Neglect. (1988). *Study findings: Study of national incidence and prevalence of child abuse and neglect: 1988.* Washington, DC: U.S. Dept. of Health and Human Services, Office of Human Development Services, Administration for Children, Youth, and Families, Children's Bureau, National Center on Child Abuse and Neglect.

*H.R. 1237: National Child Protection Act: Hearings before the Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary House of Representatives, Senate,* 103rd Cong. (1993). (Testimonies of Handley, Col. T. A., & Potts, L. F; statement of Swann, L. C.)

New Jersey, National Council on Crime and Delinquency (1950). *The habitual sex offender: Report and recommendations of the commission on the habitual sex offender as formulated by Paul W. Tappan, technical consultant.* Trenton, NJ: Commission on the Habitual Sex Offender. Retrieved from http://hdl.handle.net/10929/47580.

Paulsen, M. J. (1967). Child abuse reporting laws: the shape of the legislation. *Columbia Law Review, 67*(1), 1-49. https://doi.org/10.2307/1121129.

Paulsen, M., Parker, G., & Adelman, L. (1965). Child abuse reporting laws – some legislative history. *George Washington Law Review, 34*(3), 482-506. Retrieved from https://heinonline.org.

Pence, D., & Wilson, C. (1994). Team investigation of child sexual abuse: The uneasy alliance. In J. R. Conte (Ed.), *Interpersonal Violence: The Practice Series* (Vol. 6). Thousand Oaks, CA: SAGE Publications, Inc.

Potts, L. F. (1992). The youth protection program of the Boy Scouts of America. *Child Abuse & Neglect: The International Journal, 16*(3), 441-45. https://doi.org/10.1016/0145-2134992090053-T.

Records detail sex-abuse by scoutmasters. (1992, October 15). *New York Times.*

Russell, D. E. H. (1986). *The Secret Trauma: Incest in the Lives of Girls and Women.* New York, NYC: Basic Books, Inc.

Saul, J., & Audage, N. C. (2007). *Preventing child sexual abuse within youth-serving organizations: Getting started on policies and procedures.* Atlanta, GA: U.S. Dept. of Health and Human Services, Centers for Disease Control and Prevention, National Center for Injury Prevention and Control.

Scheidleiger, S. (1948). A comparative study of the Boy Scout movement in different national and social groups. *American Sociological Review, 13,* 739-750. https://doi.org/10.1007/s10508-0140302-6.

Sedlak, A. J., & Broadhurst, D. D. (1996). *Third national incidence study of child abuse and neglect: Final report.* Washington, DC: U.S. Department of Health and Human Services, Office of Human Development Services, Administration for Children, Youth, and Families, Children's Bureau, National Center on Child Abuse and Neglect.

Sedlak, A.J., Mettenburg, J., Basena, M., Petta, I., McPherson, K., Greene, A., and Li, S. (2010). *Fourth national incidence study of child abuse and neglect (NIS–4): Report to Congress.* Washington, DC: U.S. Department of Health and Human Services, Office of Human Development Services, Administration for Children, Youth, and Families, Children's Bureau, National Center on Child Abuse and Neglect.

Seto, M. C., Hanson, R. K., & Babchishin, K. M. (2011). Contact sexual offending by men with online sexual offenses. *Sexual Abuse: A Journal of Research and Treatment, 23*(1), 124-145. https://doi.org/10.1177/1079063210369013.

Shattuck, A., Finkelhor, D., Turner, H., & Hamby, S. (2016). Children exposed to abuse in youth-serving organizations: Results from national sample surveys. *JAMA Pediatrics, 170*(2):e154493.

Smallbone, S. W., Marshall, W. L., & Wortley, R. K. (2008). *Preventing Child Sexual Abuse: Evidence, Policy, and Practice.* Portland, OR: Willan Publishing.

Warren, J. I. (2011). Review of the Ineligible Volunteer (IV) Files of the Boy Scouts of America (BSA).

# BOY SCOUTS OF AMERICA

## MEMBERSHIP SCREENING DATABASE: AN EMPIRICAL REVIEW

## 1946 – 2016

## APPENDIX A:

## THE BSA VOLUNTEER SCREENING DATABASE, CODING MANUAL

## 2019

# THE BSA VOLUNTEER SCREENING DATABASE



# Coding Manual



## Version History:

**v.1.0, distributed 05-29-2013**
**v.1.1, distributed 07-12-2013**
**v.1.2, distributed 09-27-2013**
**v.1.3, distributed 10-08-2013**
**v.2.0, distributed 12-18-2013**
**v.2.1, distributed 03-24-2015**
**v.2.2, distributed 04-24-2015**
**v.2.3, distributed 05-22-2015**
**v.2.4, distributed 05-15-2017**

# Introduction

We have compiled this manual to assist in the coding of the Boy Scouts of America (BSA, Scouting) Ineligible Volunteer (IV) files, specifically, those that contain allegations of child sexual abuse. The IV files emerged in response to the early initiative to register all youth and adults who became involved in Scouting, to create a mechanism to identity "unfit" leaders, and to curtail their continued involvement in the organization. This process of identification involves the submission of information from the local community to BSA National Headquarters; this information is then used in the creation of an organization-wide IV information system against which all applicants for BSA registration are checked to ensure that no individual who had been denied registration is seeking reinstatement in another area and/or by using a different name. The files vary in length and in the quality of the information they contain, but each represents an individual against whom allegations of sufficient seriousness have been received to warrant their exclusion from all Scouting activities.

Our current review of the IV files of the BSA uses two coding forms: the first is a revised version of the *Confidential Record Sheet* that is used by the BSA to collect information on each IV from local sources, and the second is a research data coding form that has been developed specifically for this project to collect more detailed information about the file, the response of the local councils to the allegations, the IV, and the various identified victims.

This research is confidential in nature and is protected by the confidentiality agreements that have been signed by each of our coders. The research has been reviewed by the Institutional Review Board for the Social and Behavioral Sciences (IRB-SBS) at the University of Virginia (UVA) and was provided approval starting Spring 2013.

Case review and data entry on the project require the use of security tokens issued by UVA to access both the IV files and the coding forms which will be housed on servers located behind secure firewalls at UVA. Each coder will have access only to the folder that is designated by their name and to which cases will routinely be loaded for their review and coding. It is important that security tokens never be left in a computer when active work is not being conducted, and they can never be transferred to another person for use in accessing any aspect of the secure website being used for the project.

This document is designed as a functional manual and as such should be referred to frequently while coding. It will also continue to be updated and revised as additional questions are reported to us or discrepancies are noted in our reliability testing. If questions arise that are not addressed in the manual, contact James Wellbeloved-Stone (phone: 434-924-8309; email: jmw6bh@hscmail.mcc.virginia.edu or jmw6bh@virginia.edu), who will be available to provide you with on-going feedback throughout the course of the project. Reliability will be checked on a rolling basis throughout the course of the study so please freely request feedback on any questions that are of concern to you when coding particular cases.

I would like to thank all of our coders; your hard work and time providing the feedback on the pilot tests of the coding forms have been instrumental in making this document possible. Your assistance to us has been invaluable.

If any issues should arise or if I can be of assistance to you, please contact me at any time.

Janet I. Warren, DSW
Professor of Psychiatry and Neurobehavioral Sciences
University of Virginia
jiw@virginia.edu
434-924-8305

# Table of Contents

**General Coding Procedure** .................................................................................3-5

**How to Access Files Electronically** ...................................................................6

**Ineligible Volunteer Record Sheet (IVRS)** ................................................ 7-12

   Background Information ..................................................................................7-8

   Scouting Connections .....................................................................................8-10

   If Sexual Abuse is Alleged ............................................................................ 10-12

   Resolution by BSA National Office ............................................................... 12

**Coding Form** ...................................................................................................... **13-22**

   A-Nature of the Case File................................................................................. 13

   B-Overview of Content Concerning Sexual Behavior with a Minor .............. 13-17

   C-Characteristics of the IV over 18 Years of Age.......................................... 18-19

   D-Characteristics of Alleged Victim .............................................................. 20-22

**Appendices** ......................................................................................................... **23-69**

   Appendix A: Confidentiality Agreement ........................................................ 23-24

   Appendix B: Ineligible Volunteer Record Sheet ............................................ 25

   Appendix C: Coding Form ............................................................................. 26-35

   Appendix D: Drop-down Menu Contents ...................................................... 36-63

      Sheet 1: Demographics & Background ...................................................... 36

      Sheet 2: Occupations ................................................................................. 37

      Sheet 3: Scouting Positions/Program ......................................................... 38

      Sheet 4: Council Info ................................................................................. 39-45

      Sheet 5: Chartered Organizations .............................................................. 46-56

      Sheet 6: CBC Offenses .............................................................................. 57-58

      Sheet 7: Location of Alleged Abuse ........................................................... 59

      Sheet 8: Barriers to Abuse ......................................................................... 60

      Sheet 9: How Abuse was Reported ............................................................. 61

      Sheet 10: Other YSOs ................................................................................ 62

      Sheet 11: Incident Code/Legal Outcome ................................................... 63

   Appendix E: Page with Bates Numbering........................................................ 64

   Appendix F: Instructions for Case Descriptions .............................................. 65-68

   Appendix G: IRB Approval ............................................................................ 69

**Formatting Notes** ..............................................................................**Facing Back Cover**

# General Coding Procedure

Below you will find a list of general rules to follow while coding. They can be used to anchor your decision-making and to provide consistency in the choices you make when the information is complex or confusing.

- First and foremost, be objective in your coding and don't go "too far afield:" Never add personal opinions or commentary, and ensure you are carefully reading the file to ensure accuracy of your information. This is particularly important when composing the case summary -description of what occurred in each case, as well as the explanation of any attempt to obscure public awareness of Scouting's involvement (question B20). Please avoid adjectives and adverbs, stay close to the facts that you can clearly ascertain, and seek to be precise in what you write in this section. We have outlined in detail the process for creating these case summaries and these directions are copied in Appendix F of this manual.  Remember, these fields should be self-sufficient to explain what happened in the file, do not presume the reader will know the names of the individuals involved so always identify whom you are referring to (e.g., "John, the alleged victim…") and use the appropriate staff position for the various leaders, e.g., Scout Executive.

- When not readily apparent, do your best to look across various documents in the file, and extrapolate only when very clear-cut and justifiable (e.g., if a newspaper article mentions a spouse then you can indicate they are married, even if the BSA documentation does not say as such). It is good to question your answer in terms of "what would I say if asked to justify this particular answer to this question?" and to only respond when you could clearly, succinctly explain all aspects of your response.

- Take your time coding and look through the files thoroughly **before** you begin coding so that you don't waste time trying to figure out one question that could be clearly indicated on the next page of the file that you have not yet read. However, do not begin to take notes or summarize information concerning a case in any other document as this information will potentially constitute a breach of confidentiality.

- When in doubt be conservative about what to indicate, and if you have a difficult case to code, please contact us for guidance as you complete the forms. When contacting us about a case, ensure that all communications are appropriately vague, such that you only mention the case number and question number in any emails, and do not mention the IV's name or other confidential (or even personally identifiable) information. Referring to dates or other de-identified information in email is acceptable, but provide as little information as possible to make your question clear; if there is a very complicated question, set up a time to call or Skype with us to better answer your question.

- How to estimate responses: some questions (such as B16, B19) specifically ask you to make an informed estimate, and to rate your confidence in said estimate. For these questions, take the time to absorb the information in the file, think critically about the question being asked, and use your best judgment—be able to construct a rational argument for your estimate and be able to point to the specific information that led you to that resulting estimation. For rating the confidence, *1* is the lowest value, reflecting very little confidence in an estimate while *7* is the highest value, reflecting near-certitude that your estimate is correct. You are also able to code that it is not possible to make any type of estimation based upon the information contained in the file.

- How to treat *Yes, No, Unknown*, and *No indication* responses. These response choices are used for many questions, and understanding each category is necessary to code accurately:

- o *Yes:* This means that there is clear indication that the question was affirmed, and while this standard is high it need not be explicitly written out word for word by the file. For example, D24 (*Did the youth continue in Scouting activities while the sexual activity was occurring?*) could be answered positively if it appears there were multiple instances of abuse at Scouting activities, or if there was any other indication that the youth was still involved when the allegations came to light.

- o *No:* This means that there is clear indication in the file that there is *not* the presence of some behavior referenced by a question, and is held to an equally high standard as responding *Yes*. For example, B14, (*Are there indications that the adult IV was involved in other youth serving organizations?*) could be answered negatively only if there was a clear absence of other activities, and while the file need not explicitly say "the IV was only involved in Scouting" if all indications are that Scouting was the IVs only involvement with children you could still answer *No*.

- o *Unknown:* This response should be used when neither *Yes* nor *No* would be an appropriate choice, and as such should be used cautiously to ensure you are not missing anything in the file. For example, C2, (*Was the IV employed at the time that the file was opened?*) could be answered *Unknown* only if the file contained no references to any career or job the IV may have had, or if any positions mentioned had clearly expired long before the time the allegations which led to the opening of the file surfaced.

- o *No indication:* This response is similar to *Unknown*, but has been used specifically when it is the information might or might not be implied in the file but is not clearly enough indicated to code confidently. For example, C9 (*Was the adult IV ever arrested for a sex crime?*) could be answered as such if there was very little information about any police involvement, so in spite of possibly serious allegations without any indication of follow-through on the part of law enforcement you would have to respond *No indication*.

- Only select the *Other* and *Unknown* responses when absolutely necessary, and if there is a space provided to specify do so as precisely and succinctly as possible (you are permitted 100 characters). Try to accurately fit your response to **the best response** of those that are offered to you unless you believe that this would lead to some sort of inaccuracy or distortion of the information being provided.

- How to enter dates: use the calendar icon to select the appropriate date, and click on the "header" to go up one level; for instance, if it says *July 2013*, when you click on that you will be taken to a list of the months in 2013, and when you click on *2013* you will be taken to a decade of years, etc. This enables easy navigation to any date with only a few clicks. When you do not have complete information, go to the first of the month, and then the first month; for example, if you only know a year enter January first of that year, etc. If you have no information, choose an appropriate *Unknown* or *Not apply* option or leave blank.

- In section B, we are differentiating between adult on youth sexual abuse, youth on youth sexual abuse, and youth and youth consensual sexual behavior. These are clearly identified in each question and determine if a victim module will be completed on any youth or not. Throughout the forms, a youth is described as an individual under the age of 18 years; therefore, a youth who is 17 with a birthday the following week is still considered a youth in this context.

- The big picture: In this research project, as with all others, there are two apparently competing interests— one being to obtain only factual, well-documented and valid data, and the other to obtain useful data for

analysis and research to better inform the relevant field of study. A corollary of this is the idea of losing the forest for the trees, or paying too much attention to picayune details when there is useful information in a more wide-angled analysis. In this project, the questions have been crafted to direct you to a good balance of obtaining details, without losing sight of the goals of being able to assist BSA, other YSOs, and the general research literature on the sexual abuse of children. We ask that you read the file carefully, take time to think about what you have read, and then code each question as though you are having a personal conversation with us and are best trying to convey to us what you have learned about this particular individual and the situation that lead to the opening of the IV file.

- When you finish coding, review the form to make sure you answered each question. Pay special attention to questions that have sub-questions in which you are directed to answer in a certain way; for example, questions that start out "If yes to…" or "if not…"

- Use the file information only: Do not search out further information about any IV or any crime series using Google or any other types of search mechanism. While this information might be interesting, it will not necessarily be available on all IVs, particularly IV files that predate the internet. Our study is also specifically focused on what the BSA could have known about these individuals based upon the information that was provided to them. Note: one exception that can be made is if a BSA council seems to no longer exist; in such cases use online resources to try and ascertain what the new council structure is and put down the council currently in place for the location of a given IV file.

- In cases with consensual and non-consensual activities (youth on youth): Ensure that you code the files only for the alleged instances of (and parties involved in) sexual abuse, do not code information for activities that were consensual or for individuals that were only involved in a consensual way. If there is ambiguity about a specific case contact your coding supervisor for guidance.

## How to Access Files Electronically

Below is a summary of the various steps that you will need to follow to access the files and inform us when they are completed.

- Using your security token, access the following server-space (on PC, go to Windows Explorer, in the bar to the left select your computer, and in the top menu bar select "Map Network Drive;" for Mac, from finder press command + K to map the network, and click the plus sign after typing in the address):

  - PC address:\\es3.eservices.virginia.edu\BSA_IV_Files$

  - Mac address: smb://es3.eservices.virginia.edu/BSA_IV_Files$

  - To log in, use "eservices\[your computing ID]" and enter your eservices/netbadge password.

- Open the following website to access the online coding form (also requires authentication):

  - https://cacs-web-hsz.web.virginia.edu/IneVol/Home

- Once logged in to the server directory, you will find your own folder to which you will have access based upon your email and security token.

- Open the first file there, and make note of the file name.

- In the website, start by clicking *Click Here to create a new File*, this will create a file and automatically send you to the IVRS/"*Record*" portion of the coding; then proceed with the coding form by clicking on *Edit Case*, and in both forms ensure that the *File ID* field contains the file name of the file you are coding.

- As you code each section, we have inserted a save button so you can avoid dealing with re-doing work should you have a momentary power lapse, internet connection failure, etc. While you should be coding with the information fresh in your mind, you will be able to save a file and go back to it later until you click the finalize button.

- As mentioned previously, once you click *Finalize* you will no longer be able to code the file; for longer files, it is suggested you thoroughly read through the file first and only enter data in the web form once you feel familiarized with the contents of the file. Should you prematurely finalize a file let your supervisor know so they can assign you a new *File ID* to use for the online system.

- Once you have completed coding the file, delete that file from your directory (it is a copy that has been provided to you); another copy can be provided to you should you accidentally delete the wrong file.

- Once you have completed all of the files in your folder, contact your supervisor (James Wellbeloved-Stone) by email and he will upload another series of files into your folder.

# Ineligible Volunteer Record Sheet (IVRS)

## Section 1: Background Information

- **Full name:** Whenever possible, include the full legal name as it appears in official BSA documents, court documents, etc. This information may be used to alert law enforcement of the alleged behavior so make every effort to find the complete legal name of the IV at some place in the file.

- **Date:** This field refers to the date that the original confidential record sheet was opened and is usually indicated on the top of the IVRS form which is at the very beginning of the file. See general coding instructions concerning the entry of incomplete date information, page 4.

- **Date of birth/approximate age:** As indicated, try to obtain the exact date of birth, and **only** input approximate age if the date of birth is not available. This information may be used to request criminal background checks on an individual so therefore must be as complete and accurate as possible.

- **SS No./driver's license No.:** Social Security number should be input as ###-##-####, and driver's license number should be input as it is entered on the previous version of the forms (either the old IVRS or other legal/police documentation); there are up to 15 characters (letters and numbers) available for this item—however—**do not** input extra zeros before or after the license to make it reach 15 characters. License numbers vary from state to state but we have provided you with enough space for even the longest; notify your supervisor should you encounter a license number longer than 15 characters.

- **Address, telephone, email address:** These fields ought to pertain specifically to the IV in question, please include these even if they seem old and possibly outdated; if the IV is a youth, include contact information that might get you to their household, such as an email address listed for a parent, etc. In cases with multiple phone numbers, pick the one that seems to be the primary contact number.

- **Weight/height:** Weight will be entered using a menu bar which will reflect increments of 10 lbs., from 50-400 lbs., at which point you will select after which you simply select *More than 400 lb.* If the weight is not in a multiple of 10, round up if the number is five and above and round down if the number is four and below. Height is similarly input by feet and inches, from 3′ 0″ to 7′ 11″, after which you select *More than 7′ 11″*.

- **Race/ethnicity:** Select from the options that will be presented in the drop-down menu and which are listed in Appendix D, Sheet 1-column 1, page 36 of this document.

- **Hair color:** Select from the options presented in the drop-down menu and which are listed in Appendix D, Sheet 1-column 2, page 36 of this document. For this field, do not obtain information from any photograph that may be contained in file, only include if hair color is clearly stated in the file contents. Otherwise, select *Unknown*.

- **Eye color:** Select from the options will be presented in the drop-down menu and which are listed in Appendix D, Sheet 1-column 3, page 36 of this document. For this field, do not obtain information from any photograph that may be contained in file, only include if eye color is clearly stated in the file contents. Otherwise, select *Unknown*.

## Ineligible Volunteer Record Sheet (IVRS), Continued

- **Gender:** Select either male or female. If gender cannot be ascertained from file contents contact your coding supervisor.

- **Distinguishing physical characteristics:** Select from the options presented in the drop-down menu and which are listed in Appendix D, Sheet 1-column 5, page 36 of this document.

- **Name of parent (IV under 18):** Enter as much of the parent's name as possible, and indicate any nickname or preferred name in quotation marks (e.g., John "Buck" Doe, Jane "Fawn" Doe; or, Richard "Dick" Smith, Frederick "Eric" Smith, etc.).

- **Marital status:** Select from the options presented in the drop down menu and which are listed in Appendix D, Sheet 1-column 6, page 36 of this document. For the option "Divorced/separated" include those instances when a spouse leaves the IV due to allegations of abuse becoming known-through the opening of the IV file or otherwise.

- **Name of spouse:** Enter as much of the spouse's name as possible, and indicate any nickname or preferred name in quotation marks (e.g., John "Buck" Doe, Jane "Fawn" Doe; or, Richard "Dick" Smith, Frederick "Eric" Smith, etc.).

- **Children/number of children:** This information, if available, will most likely be present on the IVRS although it might be found elsewhere such as a newspaper article about the IV.

- **Names and ages:** List as much detail as possible, and if all you have is a nickname then enter that in quotes; if they are a victim coded for later in the IVRS, Coding Form then ensure that their name is listed consistently across all fields where they are mentioned.

- **Any children in Scouting:** This question will not apply if the IV does not have children; however, if the IV does have children there may be indications in law enforcement reports or newspaper stories that indicate if they were involved in Scouting.

- **IV employment:** Select from the options presented in the drop-down menu which are listed in Appendix D, Sheet 2, page 37 of this document. Write out the name of the employer; repeat up to five times and notify your supervisor should there be more occupations. When entering the name of the employer please include as much information as is available, especially that which would allow the employer to be identified.

### Section 2: Scouting Connections

- **IV Registration with BSA:** For individuals who are prevented from registering due to a CBC, select *No* but do enter the information for the council to which they applied as this information will be saved even if *No* is selected. For positions-select from the options listed in Appendix D, Sheet 3, page 38. Note-youth IV is defined as an individual **under** the age of 18 years; if the IV crosses from juvenile to adult within the purview of the file contents, use the age at the earliest time of the alleged abuse for filling this section out. This does not include youth involvement prior to the allegations occurring as an adult volunteer, only count as a youth if the allegations pertaining to the IV started before the IV turned 18. For IVs involved

## Ineligible Volunteer Record Sheet (IVRS), Continued

as participants (i.e., as a Scout and not a leader) who are over 18, ensure you code for the correct type of involvement.

- **Special note:** Ensure that you have one row of involvement for every period of time an IV was involved in a particular capacity; in other words, if an IV held the same position with a gap in time you would have two rows, one covering the first period of time in that position and a second covering the second period of time in that position. Additionally, if an IV held two positions for the same period of time there should also be two rows, one for each position held. Ask your coding supervisor should you want clarification on this.

- **Selecting adult position to code:** When an adult leader has held multiple positions in the BSA, we consider paid/council-level positions to take precedence over all others. The next highest precedence goes to positions involving direct contact with youth (e.g., Scoutmaster over Committee Member), and the last level is the most recent position held when two comparable positions are being considered, for instance a Scoutmaster and Cubmaster.

- **Unit/Council Information:** Select from the options presented in the drop down menu and which are listed in Appendix D, Sheet 4, pages 39-45 of this document. Unit number will need to be manually entered, as will the registration dates, which can be found in the PAS portions of a file. There may be multiple different units and councils mentioned and you will have coding options that will allow you to enter all that you find referenced in the file.

- **Chartered Organization(s):** Select from the options presented in the drop-down menu and which are listed in Appendix D, Sheet 5, pages 46-56 of this document. Select the organization that best fits; for instance, some organizations will be clearly be listed by name and easy to identify, while others will need to be categorized—such as city government, utility companies, etc. If there is a chartered organization that does not fit *any* of the ones listed, use your best judgment/approximation and contact your supervisor to have them double check it after you finish the rest of your coding.

- **Criminal Background Check (CBC):** Whether a CBC has been conducted or not is located in the Person administrative documents (labeled PAS), which are usually at the end of a file; leave offense(s) and date(s) blank unless there is a prior offense noted. For CBC offense codes, select from the options presented to you in the drop down menu bar and which are listed in Appendix D, Sheet 6, pages 57-58 of this document. **Only conviction data from a CBC and not charge data** should be entered into the CBC section. You will have to examine the CBC carefully to discern what the charge is and what the conviction is as these can often seem very different from one another. While you may have the sense that the charge offense seems more likely or descriptive of what occurred than does the conviction offense— which is often obtained through a plea bargain—keep to the rule of entering conviction data **only** or we will have a great deal on inconsistency across files and the possibility of counting allegations that were wholly unsubstantiated. Such prior concerns can be indicated elsewhere (see *Prior concerns…*, page 12 of this document).

- **Case description (formerly referred to as two-to-three sentence description):** We want a concise description of what happened and want you to compose this using all available sources of information in the file; for detailed instructions on what information to include, see Appendix F, pages 65-68. When

# Ineligible Volunteer Record Sheet (IVRS), Continued

writing these descriptions **avoid commentary** (for example, avoid adverbs, adjectives, probabilistic statements, and reflective comments such as "it seems," "I think," "sort of," etc.). Also, do not feel obliged to try and "intuit" information about a file when there is a dearth of detail in the file contents. This portion of the IVRS will be closely monitored by your coding supervisor to ensure that objectivity is maintained. You might further monitor yourself by thinking "we want the facts and nothing but the facts" as you set to writing this portion down. Also, ensure that for every victim mentioned in the description there is a corresponding victim module filled out, even when there is not much information; this is the way we assess the number of alleged victims so it is very important that all identifiable victims are coded for as such.

- **Indication of past incidents:** Past incidents are considered events that were inappropriate but did not reach the threshold to open an IV file or remove the individual from Scouting; for instance, there could be a note that an IV was previously instructed not to put his or her hands on a youth while speaking to them, etc.

- **Indications of IV involvement in other YSOs (Youth Serving Organizations):** Select the best fit from the options listed presented to you as a drop-down menu and which are Appendix D, Sheet 10, page 61 of this document. Please be sure to include all the youth serving organizations that can be identified including occupation that would give the IV consistent contact with children (for example, being a school teacher). Keep in mind this is a "best fit" question, and the specific organization you are coding for may not be listed; in such a case, pick the listed organization the closest to the one you are trying to code for.

## Section 3: If Sexual Abuse is Alleged

- **Name(s) of victim(s)/date of birth:** While coding, repeat this section as many times as necessary for each victim that is identifiable. Ideally there should be one of these sections coded for each victim. You will find that your coding form expands to ensure you have space to enter information on as many victims as you can find referenced in the file, simply click the button *Add additional victim* located at the bottom of this section next to the *Save* button. Furthermore, ensure the name matches the name in the victim module for the case, section D; for instance, in cases with two victims whose names are unknown put in the name field *Victim 1* and *Victim 2*, just to ensure they can be easily corresponded to one another.

- **For non-specific victim only:** This drop-down menu is used to identify cases in which there are no identifiable victims present, yet there is information contained in section 3 of the IVRS to be coded; you can select multiple of the options provided.

- **Address:** Input the address of the alleged victim, using as much of the address that can be ascertained (e.g., input city/state/zip if that is all that is available, do not leave completely blank because you lack the street address).

- **Gender, race/ethnicity:** Use the same drop-down menu options as mentioned in Section 1: Background Information (see Appendix D, Sheet 1, page 35 of this document).

- **Parent name:** If two parents are mentioned, use the one which is directly mentioned in the file the most. Enter all details concerning the name of the parent that are available to you.

# Ineligible Volunteer Record Sheet (IVRS), Continued

- **Parent's address, telephone:** Input the address of the parent of the alleged victim, and use the information for the most referenced parent if both are mentioned in the file and live separately.

- **Victim registration:** For Scouting positions, use the drop-down menu to select from the following: Cub Scouting (males first-fifth grade, 7-10 y/o), Boy Scouting (males 11-17 y/o, 10 y/o under special circumstances), Sea Scouting (males and females 14-21 y/o, 13 if completed eighth grade), Venturing (males and females 14-21 y/o, 13 if completed eighth grade), Exploring (males and females 14-20 y/o, sometimes 15-21 y/o) (see the youth list in Appendix D, Sheet 3, page 37 of this document). Use *Unknown* when there is no mention of their specific Scouting affiliation.

- **Allegations of abuse during Scouting activities:** Select from the options listed in Appendix D, Sheet 7, page 58 of this document. Note that "Scouting activities" extends beyond simply the official start and end times of organized activities, for instance before or after a meeting has occurred would still count, as would abuse that occurred on the way to or from an event.

- **Barriers to abuse not upheld:** See Appendix D, Sheet 8, page 59; only answer in those cases where the alleged abuse occurred during Scouting activities (see note above). Below are the items described one at a time:

  - Two-deep leadership refers to there being two or more adults present during any outing;

  - No one-on-one contact extends not only to one-on-one meetings, but also those situations in which an adult and a youth are completely out of sight of other individuals.

  - Separate accommodations apply to keeping leaders and youth separate, with the only exceptions being made for a parent and their children only.

  - Privacy of youth indicates that there should be no unnecessary contact between youth and adults, especially in shower-rooms and changing areas (e.g., a medical emergency could necessitate entering the showering area).

  - Inappropriate use of cameras, etc., refers not only to any use of digital media to capture nude images of youth, but also to the use of online media and/or communication of a sexual nature.

  - Secret organizations are not permitted in BSA, and any sort of sub-group that does secret activities is prohibited.

  - Hazing or bullying includes any activity meant as an initiation, especially those that are demeaning to the individual being initiated, as well as any effort to repeatedly humiliate an individual.

  - Scout Oath and Law: For violations of the following, limit yourself to those violations that present themselves clearly in the file, for instance do not automatically conclude that each IV was not cheerful (and therefore in violation of the Scout Law) when the allegations of abuse came to public awareness.

    - Scout Oath:
      "On my honor I will do my best

## Ineligible Volunteer Record Sheet (IVRS), Continued

> To do my duty to God and my country
> and to obey the Scout Law;
> To help other people at all times;
> To keep myself physically strong,
> mentally awake, and morally straight."

- ▪ Scout Law:
  "A Scout is Trustworthy, Loyal, Helpful, Friendly, Courteous, Kind, Obedient, Cheerful, Thrifty, Brave, Clean, Reverent."

- ○ Failure to follow youth protection policies, any case of alleged sexual abuse must be reported.

- **Date alleged abuse began and duration:** Specific dates are often difficult to ascertain after the fact. If available, they are often found in arrest information (if present), and more generally police reports or court records may also provide some idea of when the alleged abuse began. See general coding guidelines concerning incomplete date data entry, page 4 of this document.

- **How abuse was reported:** Select from the options presented to you as a menu bar and which are listed in Appendix D, Sheet 9, page 60 of this document, and use the *Unknown* option only when absolutely necessary. Should there be a clearly identifiable method of report not listed in the dropdown contact your supervisor prior to finalizing the record/case so they can check whether it should be included (see page 3 regarding inclusion of information in emails).

- **Prior concerns with IV adhering to BSA youth protection policies:** This question applies specifically to cases in which BSA made note of concerns, whether at the time or mentioned retrospectively, but does not apply to incidents that were previously unknown and only were revealed in the process of opening the IV file.

- **Was law enforcement aware:** It should be assumed that law enforcement was aware of the alleged sexual impropriety if there was an arrest, any charges levied against the IV, or any record of law enforcement informing BSA of an investigation into the IV.

- **BSA reported to law enforcement:** This question applies only if BSA filed a report to law enforcement, which might be independent of law enforcement's awareness of the allegations against the IV.

- **BSA reported date:** This will be completed only if the BSA was reporting the abuse to law enforcement and not if law enforcement was making a report to BSA.

- **LE (Law Enforcement) dept. name/location:** If there was any law enforcement involvement, informed by BSA or otherwise, include the name and location of the department in sufficient detail that contact could be made with the department if required. Keep in mind space is limited for this response, if the update button doesn't register then abbreviate your response, for instance use *VA* instead of *Virginia*, *Dept.* instead of *Department*, etc. Additionally, always include the state of the law enforcement agency; many states have the same city and county names (i.e. there's an Orange County in California and North Carolina). If you are unsure of the exact law enforcement agency, you can put the city/county and state

## Ineligible Volunteer Record Sheet (IVRS), Continued

where the IV lives. Names of law enforcement agencies are typically "Sheriff's Office" and Police Department.

- **CPS (Child Protective Services) informed:** Assume there was no CPS involvement, and only indicate *Yes* or *Unknown* if it is clear that the allegations are under the purview of CPS; in other words, ensure there was some custodial relationship between the IV and alleged victim. Prior to selecting anything other than *No*, ensure that a report was therefore made to CPS exclusively or in conjunction with a report to law enforcement.

### Section 4: Resolution by BSA National Office

For section four of the IVRS you will notice the online coding interface has fewer options relative to the hard copy (see Appendix B, page 25 of this document); this discrepancy is due to the nature of the coding files and how the record-keeping inconsistencies common to these files would make coding this section in its entirety overly difficult and likely inaccurate. Please therefore only code the following questions in this section:

- **Incident code:** See Appendix D, Sheet 11, page 63 of this document.
- **Legal outcome:** Select from *Guilty*, *Not guilty*, or *Unknown*; default to *Unknown* unless there is specific information that there was a trial, and there is a clear indication of the outcome of that trial.

# Coding Form

## Section A: Nature of the Case File

**A1.** **Earliest date of alleged abuse**: This date can come from a police report, charges filed, etc., and does not need to be from a direct victim statement. In cases with a CBC incident code, put in the date that the CBC was filed, and not the date of any offenses identified.

**A2.** **Latest date concerning the IV or any victim**: This date should be the latest, or most recent piece of information contained in the file, and could be a newspaper clipping, date the file was opened if the IV tried to re-join Scouting, etc. Do not include dates of a purely "bookkeeping nature;" for example a post-it note with a brief memo about where the file should be stored would not be considered as concerning the IV or any victim.

**A3.** **Pages in file**: Exclude from this count any cover page that only contains the IV's name and other completely blank pages.

**A4.** **Bates range**: Only include these if the case is one that is involved in litigation and has already had Bates numbers assigned to it. See Appendix E on page 64 for an example of a document with Bates numbers. In the absence of Bates numbering, select the *Not apply* option.

**A5.** **Does the file contain info to discern why IV was expelled**: If you select *No* do not code further.

**A6.** **Does the file only contain information about sexual activity between individuals over 18 years old**: If you select *Yes*, do not code further. Ensure you read the text following A6 regarding CBC offense code cases before moving forward.

## Section B: Overview of Content Concerning Sexual Behavior with a Minor

**B1.** **File contains allegations of sexual activity between youth and adult**: We are coding two different types of sexual abuse and this is our first designation that a particular case involves allegations of sexual behavior between an adult and a youth.

**B2.** **File contains allegations of sexual activity between youth only:** This reflects our first designation that this case involves sexual behavior between youth under the age of 18 years. This question is coded *Yes* only if it exclusively involves sexual behavior between youth, unlike B1 above.

**B3.** **Contents are of public record:** Applies to all documents that are published (e.g., newspaper), as well as those documents that are not published but **could** be obtained by the public (such as court records).

**B4.** **Public documentation included:** Include all types clearly included in the file, as well as those that are clearly referenced in a second-hand way (for example, treat a file with a newspaper article quoting a victim's statement as including both a newspaper or other media publication and a victim statement made to or referenced by police).

**B5.** **Who initially reported to the local council:** For this question ensure you are identifying who contacted the local council, not who brought the allegations to light in a broader sense. For example, a parent may have contacted the police who later contacted the BSA as part of the investigation, and you

# Coding Form, Continued (Section B)

code such an instance as the police, not the parents. If possible, identify the position of the person informed in the local council.

**B6.    What led to IV file opening:** For this question, identify the immediate or proximal cause to the file being opened, which is not necessarily the initial allegation—although in many cases these will be the same.

**B7.    How did the local council respond**: For this question, ensure you are identifying correctly the local council's actions, not those actions taken by BSA National Headquarters.

**B8.    Were the parents of alleged Scouting-victims of adult sexual abuse made aware:** Answer positively if there is any indication that the parents were made aware, which would include indications that the youth were interviewed by police or testified in court. Select the *N/A…* option when appropriate, bearing in mind your response here should match your response to B10.

   **B8a.    Did they believe:** Indicate *Yes* if the youth involved testified before court, and/or if the IV was convicted of a sexual offense with said youth. Only select the *No* category if there are clear indications that the parents specifically did not believe the allegations. Keep in mind a case of a youth providing information to someone in BSA, police, etc., in the presence of parents most likely indicates that the parent believed the allegations unless the parents stated explicitly that they did not believe what their child was saying to them or to others.

   **B8b.    Did they allow their children to continue in Scouting:** To code positively, there will have to be some indication that the parents intended to allow their child to continue in Scouting or that the youth was present in Scouting activities sometime after the alleged abuse became known to others. For example, they could have become an Eagle Scout some years after the allegations came to light.

**B9.    Were the parents of alleged Scouting participants of youth on youth sexual activity made aware:** Answer positively if there is any indication that the parents were made aware—possibly through a meeting with Scouting involved adults or through some formal intervention such as making a report to the police.

   **B9a.    Did the parents believe the allegations:** Only select the *No* response if there are clear indications that the parents specifically did not believe the allegations. Code that the parents did believe the allegation even if they sought to normalize or minimize the significance of the behavior (e.g., saying "boys will be boys").

   **B9b.    Did they allow their children to continue in Scouting:** To code positively, there will have to be some indication that the parent intended to allow their child to continue in Scouting or that the youth was present in Scouting activities after the alleged abuse became known to others.

**B10.    Did other parents of other Scouts become aware:** Answer Y*es* if it is clear that the parents of other Scouts were told explicitly by Scouting involved individuals, if the parents were known to have met together after the allegations became known, or if there newspaper clippings from the local press which

## Coding Form, Continued (Section B)

would have been available to the general community. Note-this question should only be answered in cases where there is a Scouting-involved victim.

**B10a.**   **Did any believe the allegations:** Be aware of the "any" qualifier and use the criteria used in B8a, B9a.

**B10b.**   **Did any allow their children to continue in Scouting:** Be aware of the "any" qualifier and use the criteria used in B8b, B9b.

**B10c**.   **Did any remove their children from Scouting:** Be aware of the "any" qualifier and note that this questions asks if any parent decided to or expressed the intent to remove their child from Scouting because of the allegations of sexual abuse.

**B11.**   **Was the adult IV placed on probation:** Probation refers to an action taken by the National Headquarters for the BSA to place someone on a probationary registration status, a decision that is made by BSA registration department. This type of probation is conveyed formally to the IV, and the National Headquarters will check on the status of probationary registrants on at least an annual basis until the probationary period is complete (usually two years). This probation is also different from court ordered probation, and is limited only to internal probation initiated by the BSA. Do not code instances when the local council places someone on suspension, or asks them to refrain from Scouting events while allegations against them are investigated. The use of BSA probation ended through a communication dated January, 2008, and therefore should not be encountered in any files after that date.

**B11a.**   **Did the IV receive mental health treatment:** This information may be found explicitly through a letter submitted to the BSA by a mental health provider, or may be referenced by the IV in communications with Scouting officials. It can be coded positively based simply upon the self-report of the IV as to having obtained such services, or upon finding that the IV was court-ordered to receive some form of treatment.

**B11b.**   **Was the IV ultimately reinstated:** To be coded positively, there will have to be an explicit report that the IV was taken off their probationary status by the BSA and allowed to continue in Scouting. This reflects a formal action by BSA and should **not** be coded positively if the IV managed to get back into Scouting under some guise or ruse.

**B11c.**   **If yes (to reinstatement), was the IV known to have offended against youth after probation ended:** This will be coded in the positive if there is a clear indication that the IV was known to have abused Scouting involved youth after being on probation. It does not include the sexual abuse of other youth not involved in Scouting.

**B11d.**   **If yes (to re-offense after probation), after what amount of time:** Please estimate time based upon the data they were taken off of probation and the date of the next alleged offense, again involving only Scouting involved youth.

**B12.**   **After the report of the alleged sexual abuse, did the adult IV…:** Try to capture any clear actions of the adult IV in the options provided; however, if there is a very clear action that cannot fit in any of the

# Coding Form, Continued (Section B)

provided categories simply select *None of the above* and bring this to the attention of your coding supervisor.

**B13.** **Did the adult IV attempt to register with BSA in another area after being declared ineligible:** This might be reflected in a request made by the BSA to the local council to complete an identification check (i.e., a standardized series of questions concerning the IV's age, appearance, and whereabouts in the past) with the notation of it being the same person—or—some type of written documentation by the BSA, or local council that the IV had tried to reregister with a troop or unit. Also code positively if the IV attempted or was successful in becoming re-involved in Scouting as a non-registered volunteer.

    **B13a.** **No. of times:** Be inclusive and combine all attempts to become re-involved in Scouting either in the same or different locations, either after short or lengthy periods of time, and either through formal registration or efforts to reintegrate as a non-registered volunteer.

    **B13b.** **Did attempts involve an alias:** This information may be found in the individual identity checks which may reflect slightly or significantly altered names, new registration forms that contain an altered identity, or comments by others that the person was the same person who was using a different name.

    **B13c.** **Did attempts involve altered SSN:** Keep in mind this only applies if you responded *Yes* to B13b. A positive coding may accrue from either a report of the IV having altered their SS number or there being documents in the file that contain different SS numbers. Do **not** assume that the transposition of a single number was a simple mistake.

    **B13d.** **Enter date of each attempt:** List all dates of each attempt to re-enter Scouting, this question pertains to B13 at large, not just B13b, c.

**B14.** **Indications the IV was in other YSOs:** For questions B14a-c, keep in mind that the categories are not mutually exclusive and you could select *Yes* or *Unknown* to some, any, or all of them. Be sure to remember that this could also involve an occupation that would ensure access to youth and need not only be a volunteer activity in a youth specific organization. Some church activities also focus specifically on children and youth.

    **B14a.** **During BSA**: This may be reflected in a notation by the local council or BSA, indirectly in newspaper articles, or can be discerned by employment dates; for example dates working as a teacher overlapping with the dates of registration with BSA.

    **B14b.** **Before BSA:** This information could be reflected in prior employment captured on IVRS, on any résumés that might be included in the IV file, or might be referenced in newspaper articles. The IV might themselves reference prior work with children during conversations with local council members.

    **B14c.** **After BSA:** This information may be found in newspaper articles or other correspondence submitted to BSA National Headquarters indicating that the IV was either arrested later for another offense and the article mentioned the IV's involvement in some YSO. However, keep in mind this question is asking about YSO **involvement**, not necessarily sexual abuse in said YSO.

# Coding Form, Continued (Section B)

**B15.  Police involvement with adult IV:** Count any type of law enforcement as police (sheriff's office, military police, federal law enforcement, etc.). If there is explicit intent to prosecute mentioned, you can assume that there has been police involvement. If there is an arrest, there has been police involvement.

    **B15a.  Arrest for behavior in IV file:** Try to discern if any of the behavior that is being charged reflects the behavior that came to the attention of BSA. This may be reflected in newspaper articles that indicate if some of the victims were involved in Scouting.

    **B15b.  Conviction for behavior in IV file:** The conviction is made by the court after a finding of guilty and may reflect convictions that sound quite different from the actual offense behavior. For example, someone charged with lewd and lascivious behavior might plead guilty to disrupting the peace. However, keep in mind such a plea deal still reflects a conviction for the behavior in the IV file, even if the charges pled to do not accurately reflect the allegations in the file.

**B16.  Multiple youth victims of adult IV:** Youth are defined as any person under the age of 18 years. They may be involved in Scouting or not.

    **B16a.  Estimation of total numbers:** For this estimation, ensure you are carefully looking to all available sources in the file that could indicate the number of victims, and use "50-50" as the cut-off for your lowest confidence estimate (would be ranked one). Estimates reported in newspaper articles should be coded as *5* and estimates in police reports as *7*. It is understood that that there are often far more victims that those who are formally identified but we do not know by what factor this occurs and therefore cannot integrate this type of supposition into our estimation process.

**B17.  For youth on youth activity, was there…:** Please code all that apply. Note that the last three response choices are indicative of consensual activity, whereas the prior choices (items one through nine) are indicative of non-consensual or otherwise abusive activity. As such, those non-abusive options have "[No victim module]" entered after them to indicate that section D should not be filled out in the absence of one of the first nine abusive items.

**B18.  For youth on youth activity, indicate if…:** Please code all that apply. If none apply, ensure you select that option and do not leave the question entirely blank.

**B19.  For youth on youth activity, estimation of total numbers:** For this estimation, ensure you are carefully looking to all available sources in the file that could indicate the number of youth involved, and use the same confidence guidelines mentioned under B16a. In this question, it is likely that the information will come from the reports of youth who identify the other youth who were also involved in the sexual behavior. This number should include both the IV, the victim(s), and any other youth involved in the sexual activity.

**B20.  For both adult and youth on youth, was there any indication that there was intent to limit or obscure Scouting's involvement:** A positive coding of this section must derive from explicit statements or actions by an identifiable individual. It might also be reflected in clear inconsistencies in what is said by Scouting involved persons at different times to different audiences. It should not be coded if there seems to simply be confusion or disagreement in what is known by the various

# Coding Form, Continued (Section B)

spokespersons. It should also not be coded if the inconsistencies seem to reflect a growing awareness of relevant, additional information over time. Try to be factual and reasoned in your assessment and avoid conspiratorial thinking.

**B20a.** **Type exact sentences that indicate there was this intent:** This must be filled in if you select the answer *Yes* to B20. Please enter the statement exactly as written. If it involves two contradictory statements by the same person at proximate times—or different people at proximate times—enter one sentence and then enter *versus* and enter the second sentence. Include dates of each statement if possible.

**B20b.** **Did the efforts involve…:** Please check all that might apply. As with other questions, be conservative and extrapolate only from the sentence(s) that you have entered above. Be able to explain any coding that is indicated in this section based upon explicit statements or actions and do not code based upon hunches and/intuitions.

**B20c.** **The individual who proposed these efforts was…:** In all cases you should be able to identify the person who made the relevant statement or took the relevant action. If the person is not indicated in the list provided, he/she can be entered in the *Other-specify* text box.

## Section C: Characteristics of the IV over 18 Years of Age

**C1.** **Is there a photo of the IV:** Keep in mind any photo would count, not necessarily an official photo from BSA.

**C2.** **Was the IV employed:** Count the IV as employed if they held a steady job during the course of the alleged abuse, do not say *No* if they were put on probation/unpaid leave or fired due to the IV file being opened or the alleged abuse coming to public awareness.

**C3.** **Was the IV ever married:** Do not count the IV as not being married if they had recently separated from their spouse due to the file being opened or the alleged abuse coming to public awareness. We want to know if they were *ever* married.

**C4.** **If the IV had children, were they in Scouting:** Keep in mind this answer should match the similar question under the *Background Information* section of the IVRS (page 7).

**C5.** **Any indication the IV was not a stable member of the community:** This question reflects the coding of a negative state/situation only. Only code *Yes* if there is clear reason to believe that the IV did not get along well with others in society, had a hard time holding a steady job, was described as a drifter, or seemed odd to neighbors, coworkers, others in the community, etc.

**C6.** **Was the IV in Scouting as a youth:** This information will likely be mentioned either by news clippings and/or in the Person pages which are usually at the end of the file. It may be listed on older copies of the IVRS where one question references awards and past statuses in Scouting.

## Coding Form, Continued (Section C)

**C6a.**   **Number of years:** This information may be reported by the IV themselves during interviews or in their resignation letter. Some member of a local council might also mention this time period during the investigation of a particular IV.

**C7.**   **Did the IV complete youth protection training:** Youth protection training was initiated by the BSA in the mid-1980s. After this date, it is often reflected in the Person pages at the end of the file.

**C8.**   **How many years had the IV been involved with Scouting:** Count from the first adult involvement, not youth involvement (aka when they first volunteered in an adult capacity, not participated as a youth/young adult in Venturing, Exploring).

**C9.**   **Was the IV ever arrested for a sex crime:** Code *Yes* if they were arrested for the alleged events that led to the opening of the IV file, or some prior event(s). Most basically, if there are **any** indications that the IV was arrested for a sex crime at any time and under any circumstances, code this question as *Yes*. This includes sex crimes that had no relation to BSA involved youth.

**C9a.**   **Did the sentence involve only probation:** In this instance we are referring to criminal probation, not probation by the BSA. We will use these data to explore how sentencing of sex offenders by the courts has changed over the years. Probation occurs **instead of** incarceration and parole happens **after** a period of incarceration. We are asking here only about the former. In cases where a sentence was suspended, in part or in whole, respond to C9b only for the final amount of time to be served (time sentenced minus time suspended).

**C9b.**   **Did the sentence involve jail/prison:** This question seeks to determine if the person was ever incarcerated for their illegal actions. You need not try and discern if they spent time in a jail, prison, or a military stockade. Most basically were they ever locked up and if so for how long. You would not count time if they were committed to a psychiatric facility even if the commitment occurred on court order.

**C9c.**   **Jail/prison, length in years:** Round to the closest year. If sentence is listed in days, round first to months, then to years. So, in cases of a sentence of six months or less you will enter zero years.

**C9d.**   **Was there mandatory psychiatric treatment:** This information is most often found in court sentencing documents or newspaper articles. Mandatory means that it was ordered by the court as part of the sentencing process and does not include seeking treatment voluntarily.

**C9e.**   **Was he/she added to a sex offender registry:** Sex offender registries did not begin until 1994. This information will most likely be contained in court records that reflect the imposition of the sentence.

**C10.**   **Did the behavior with a Scout/youth involve another adult:** This information if often contained in newspaper reports although it might be described in the information being submitted to the BSA. In these instances it is often reported as two leaders being entered into the IV files at the same time for the same alleged behavior.

# Coding Form, Continued (Section C)

**C10a**   **Male or female:** If there is another adult involved, generally their gender will be stated explicitly or by the gender of their name. You may assume that a typically female name reflects a female, and vice versa for typically male names.

**C10b.**   **Spouse:** Only indicate *Yes* if it is readily apparent that the other adult was the spouse of the IV, either by this being stated explicitly or a man and woman sharing the same last name.

**C11.**   **Is there any indication…:** Do not make assumptions on this question. For instance an indication of a mental disorder does not necessarily mean that the IV was taking some type of psychotropic medication or suffered a substance abuse disorder.

**C12.**   **Does the file reference pornography:** Code this item broadly by first identifying any mention of pornography in the file from any source and involving any individuals. This can include professional or homemade pornography and can involve the photographing of youth if there is some explicit or implied sexual content to the image.

**C12a.**   **If pornography is being created, does it involve explicit BSA materials:** If the IV is making their own pornography, can you discern some BSA insignia being included in the images that are being created? For example, is the youth wearing part of a uniform, is there a BSA flag featured in the background, is a BSA facility featured, etc. In cases where there is no indication of CP being created, select *Not applicable*, and only select *No* if CP is being created and does not have any explicitly BSA-related content.

**C13.**   **Does the file involve inappropriate use of digital/social media:** Does the alleged inappropriate sexual behavior by the adult or youth involve some type of exchange using digital or social media including sexual text messages, sexual photographs taken with a digital device, messages, or images posted to Facebook sites, etc.

## Section D: Characteristics of Alleged Victim

Do not complete a victim form if you have no information other than there were a certain number of victims. These victims will be identified in the estimates you make in B16 and B19. With the victim module, we are trying to get information about what happened to specific victims.

**D1.**   **Victim name:** Try your best to obtain as much of the victim's name as possible, and if you can identify multiple victims without specific names then write in "*Victim 1*," "*Victim 2*," etc. In any case, if there is a document where the victim's name was blacked out or otherwise obscured indicate *Marked through*, and only indicate *Unknown* in the absence of a blacked-out name.

**D2.**   **In Scouting:** Default to indicating *No indication* unless there is clear indication, whether from the press, local council, or BSA that the alleged victim was indeed involved with Scouting.

**D3.**   **Multiple youth aware:** With this question, we are trying to capture the not uncommon circumstance in which other youth know that the sexual abuse is occurring but who decide not to report it to other adults. The other youth can be other another victim who knew that multiple youth were being abused, victims who participated in group sexual activities, or non-victims who were aware of the abuse having seen something, heard something, or having been informed directly of the abuse by one of the victims.

## Coding Form, Continued (Section D)

**D4.** **Age of victim when alleged behavior began:** In most cases, it will not be clear when the abuse began and more likely the age will be reported as to when the abuse was discovered. However, in some victim statements, a youth will report how old they are when a particular offender began to abuse them. It is fine to do some rudimentary calculations based upon the information that is available, for example to code *9 years old* if a 12-year-old said that the abuse began about three years earlier.

**D5.** **Age of victim when alleged behavior ended:** In cases where the age isn't clear, code the median age rather than entering an age range. For example, if there were charges that indicated the youth's age was between 12 and 14 you would select 13.

**D6.** **Gender of Victim**: The gender of victims is often reported in newspaper articles and court documents and can be inferred from the use of common male and female names**.**

**D7.** **Gender: Race/ethnicity:** Use the same drop-down menu options as mentioned in Section 1: Background Information of the IVRS (see Appendix D, Sheet 1, page 35 of this document).

**D8.** **Any handicap or disability:** Use the criteria listed in the General Coding Instructions and use *Yes* only if there is clear reason to do so.

**D9.** **When was behavior reported:** There will often be dates on statements made by youth, reports submitted by Scout leaders, or in police documents. These dates should be used rather than the date that the IVRS was created.

**D10.** **Did youth request behavior be confidential:** This question includes instances in which the youth may have asked that their parents not be informed of the sexual activity that occurred and/or instances in which the youth did not want the public or other youth to become aware of their victimization. Do not select *Yes* if it appears the request was made by the parents without some other indication that the youth also desired for it to be kept confidential.

**D11.** **Did the alleged inappropriate behavior involve:** Check all that apply and try to dissect the behavior enough to capture all the behaviors that are subsumed in it. Do not only code the most "extreme" sexual behavior that allegedly occurred.

**D12.** **Did the alleged inappropriate behavior involve:** This information will most often be identified in statements made by the youth or reported in an interview with the police. Do not code it unless it is explicitly stated and/or reported. For example, do not assume that anal intercourse had to involve physical force. Conversely, if the alleged victim suffered injuries due to the alleged behavior then you can conclude there was some use of physical violence, even if it was not explicitly detailed as such in the file.

**D13.** **How long did the victim know the perpetrator:** Do not input an estimate unless there is clear reason to do so.

**D14.** **Does the file suggest only one encounter:** In some instances a child/youth will explicitly tell an adult or police officer that the sexual encounter happened only once. Do not assume that it happened only

## Coding Form, Continued (Section D)

once if there is only one incident described or referenced in the file without some other corroboration of the idea that it was **specifically** a one-time occurrence.

**D14a**.    **Estimate of encounters:** For this estimation, ensure you are carefully looking to all available sources in the file that could indicate the number of encounters, and use the same confidence guidelines mentioned under B16a, page 15 of this document.

**D15**.    **Did the youth tell anyone:** If you select "Yes," you must be able to check at least one of the listed categories.

**D16**.    **After the allegations were made known…:** Please be sure to check all that apply. Keep in mind the options pertain to many different individuals and groups, so ensure you carefully consider each option.

**D17**.    **Was the youth living with both parents:** This will often be stated in police reports or implied when the victim is visited in the home by a Scouting involved person. You can assume the victim is living with both parents if references to the "parents" are present (i.e., the mere presence of the plural form of the word parent is sufficient to indicate that the youth lived with both parents).

**D17a**.    **If not with both parents, single mother:** This should be coded only if there is some explicit reference to the mother being single at the time of the abuse or report. This may be in correspondence she has with BSA or in police reports.

**D17b**.    **If single mother, male role model:** This should be coded affirmatively only when this is expressed by the mother to someone and should not be assumed simply because the youth was living with a single mother

**D18.**    **Was the youth's family experiencing social/financial strains:** This will have to be coded based upon the totality of the information included in the file. It need not be expressed explicitly by a member of the family. For example, the file might indicate that the youth had just begun at a new school and had been invited to attend Scouts by one of their new friends. However, the strain might also not be specific to the youth, such as there could be mention that the youth's parents were having to care for a grandparent, there was a death in the family etc., which could indicate a familial strain that is not necessarily linked to the youth struggling socially.

**D19.**    **Indications the youth was struggling at school intellectually or socially:** This will have to be coded based upon the totality of the information included in the file. The youth or a member of the family need not express it explicitly. For example, it might be reflected in the report of another youth that the victim seemed odd and did not fit in well with others.

**D20.**    **Indications youth was previously victimized, outside Scouting:** This information is not usually present in the file; however, occasionally it will be mentioned in the context of interviews with a parent or through contact with police who had dealt with the prior cases of abuse with that youth.

**D21.**    **Did the IV socialize with the alleged victim's family outside Scouting:** This information will be elicited primarily in interviews with the parent(s) of the victim or parents of other Scouting involved

## Coding Form, Continued (Section D)

youth. It should be coded positively if the family participated in any activities with the IV outside of those **directly** associated with Scouting.

**D22.** **What behaviors did IV use to gain access:** Please be sure to code all that apply. These questions are concerned with how the IV allegedly was able to achieve and maintain sexual contact with the victim, and are not directly concerned with what actually happened. In other words, do not by default select *Sexual pleasure or excitement* in the presence of allegations of sexual contact unless there is clear indication that the IV allegedly used the experience of pleasure/excitement to motivate the victim to continue. There may also be different methods used during different sexual encounters so do not code only those that are common across all the encounters, instead try to capture all behaviors that were mentioned at any point in the file.

**D23.** **What behaviors did IV use to keep youth from reporting:** Remember that there might be multiple reasons that a youth does not report abuse so please try to capture all that are relevant to this particular youth. Also, you are often going to have to use some interpretation of the facts in responding to this question. For example, if the youth says that they were given drugs and alcohol and were allowed to watch pornography, you can code "threats of reporting other untoward behavior" without the youth explicitly stating that this is why they did not report the abuse to others. If the youth stated that the IV had become his best friend, then you can code "loss of important relationship" without the youth explicitly telling this to their parent(s) or to the police. If you have any questions or want a second opinion on a specific case, contact your coding supervisor.

**D24.** **Did youth continue to attend BSA activities during alleged sexual activity:** This will often be implied by the abuse occurring during some type of Scouting activity.

**D25.** **Did youth continue to attend BSA activities after alleged sexual activity:** This will most often be indicated in statements by a parent to the effect that they still believe in the BSA and want their child to continue benefitting from what Scouting has to offer. It might also be reflected in a statement given by a youth in which they say they still want to continue on towards some goal (e.g., a boy/young man wanting to achieve his Eagle Scout status).

**D26.** **Any indication victim provided testimony in court:** This information is often not contained in the IV files but might be indicated in a newspaper article submitted to the BSA at some later date or in a police report in which the youth expresses a willingness to testify against the IV. This can be coded positively even if it is unclear if something might have intervened in the interim.

# Appendix A: Confidentiality Agreement

## CONFIDENTIALITY AGREEMENT

The Rector and Visitors of the University of Virginia ("UVA") has retained _____ ("me" or "I") to assist Dr. Janet Warren in connection with the review and analysis of certain "Ineligible Volunteer" or "Confidential" files maintained by BSA pursuant to the Research Funding Agreement between the Rectors and Visitors of the University of Virginia and the Boy Scouts of America ("the Agreement"). In connection with this project, UVA will receive copies of BSA files that will be reviewed and coded for future evaluation during the term of the Agreement.

In consideration of such retention, and the fees to be paid to me for that analysis, the undersigned understand and agree as follows:

**1.     THAT THE FILES TO BE REVIEWED ARE TREATED AS HIGHLY CONFIDENTIAL BY BSA, AND THAT BSA HAS TAKEN STEPS TO PREVENT PUBLIC DISCLOSURE OF THE CONFIDENTIAL INFORMATION CONTAINED IN THESE FILES.  IT IS UNDERSTOOD THAT THIS INFORMATION IS HIGHLY CONFIDENTIAL AND EVERYONE INVOLVED IN THIS PROJECT AGREES TO KEEP THE FILES AND INFORMATION CONTAINED THEREIN STRICTLY CONFIDENTIAL PURSUANT TO THE TERMS OF THIS AGREEMENT.**

2.     The files may be subject to protective orders and other agreements in litigation against BSA, local Scouting Councils, and other parties.

3.     During and after the retention described above, neither UVA nor anyone involved in the review of these files will discuss, disclose, reveal, publish, comment upon publicly, or otherwise disseminate any documents or the information contained in any documents to be provided to UVA, or the results of any analysis (including preliminary conclusions and impressions) to any person other than Dr. Warren, without the specific written permission of an authorized representative of BSA.

4.     No copies of the materials will be made unless Dr. Warren is advised and approves. UVA will maintain the material provided to me by BSA, any copies, notes, writings made, in strictest confidence, and will allow no person access to those materials.  To the extent possible, these materials will be secured in a locked location that cannot be accessed by persons other than Dr. Warren and others assisting on this project.

5.     During and after the retention described above, the documents, notes and working papers will not be removed from the place UVA designates as the place where the work will be performed. UVA will disclose to those retaining me the physical address where the documents, notes and working papers are maintained.

1052572.01-NYCSR01A                                          MSW - January 8, 2013

## Appendix A: Confidentiality Agreement, Continued

6.    At the completion of this review, or upon the written demand of an authorized representative of the Boy Scouts of America, UVA will return to Dr. Warren or BSA all copies of any material provided to UVA, and all written or computerized documents, charts, summaries, or other data compilations, including my own notes, and the notes of those UVA has retained in the review of the materials.  UVA will certify the return of those documents in writing.

7.    This Confidentiality Agreement will continue after this review is completed and will survive for a period of twenty (20) years from the Effective Date of this Agreement.

8.    In the event UVA is served with a subpoena or other court order demanding that it produce or discuss the materials which are the subject of this agreement, UVA agrees to immediately notify Dr. Warren and BSA, and to take no action to reveal the documents or their contents, or any materials that UVA has prepared in connection with this project, without BSA's knowledge and written permission.  Notice to BSA will be made to:  General Counsel, Boy Scouts of America, 1325 W. Walnut Hill Lane, Irving, Texas  75038; telephone: (972) 580-2016; facsimile: (972) 580-7849.

9.    If asked by any media source or person to comment publicly about this file review project or my review of any specific file, I will refrain from making any public statement and will immediate contact Dr. Warren.  I understand that BSA has not authorized me to make any public statement or disclosure regarding my review of the files.

I understand that this agreement is a contract.

Effective as of this _____ day of January, 2013 ("Effective Date").


The Rector and Visitors of the University of Virginia

By Lynn Koplin, Assistant Director of Contracts

Although not a Party to the underlying Agreement hereto, I have read and understand my obligations under this Confidentiality Agreement

1052572.01-NYCSR01A                                   MSW - January 8, 2013

# Appendix B: Ineligible Volunteer Record Sheet

## INELIGIBLE VOLUNTEER RECORD SHEET

### BACKGROUND INFORMATION

Full name (no initials if you can possibly get full name):                                     Date:  /  /

| Date of birth:  /  / | If no DOB, approximate age: | SS No.:  —  — | Driver license No.: |
| --- | --- | --- | --- |

| Address: | | City: | State: | ZIP: |
| --- | --- | --- | --- | --- |

Telephone  with area code: (     )                             Email address:

| Weight: | Height: | Race/ethnicity: | Hair color: | Eye color: | Gender: |
| --- | --- | --- | --- | --- | --- |

Distinguishing  physical characteristics:                        Name of parent (IV under 18):

| Marital status: | Name of spouse: | Children? ❑ Yes  ❑No  ❑ Unknown |
| --- | --- | --- |

| Number of children: | Names and ages: | Any children in Scouting? ❑ Yes  ❑No  ❑ Unknown |
| --- | --- | --- |

Occupation(s):                                          Employer (s):

### SCOUTING CONNECTIONS

| IV registered with BSA? ❑Yes  ❑ No | If yes, Scouting position for Adult IV: | If yes, Scouting program for Youth IV (<18): |
| --- | --- | --- |

| Unit No.: | Council  name: | Council No.: | Headquarter  city/state: | Region: | Area: | Date registered | Date resigned |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | /  / | /  / |

Chartered organization(s):

| If Adult IV, was Criminal Background Check (CBC) conducted? ❑ Yes  ❑ No | Date:  /  / | Any offense(s) identified? ❑ Yes  ❑ No |
| --- | --- | --- |

| If yes, all offense(s) in CBC: | If yes, all date(s) in CBC: |
| --- | --- |

Please provide a two-to-three sentence description of the alleged incident including: what happened, under what circumstances, and how was the behavior discovered?

| Any indications of similar past incidents involving the IV? ❑ Yes  ❑ No | If yes, please provide description(s) and date(s) below: |
| --- | --- |

| Date(s):  /  / | Description(s): |
| --- | --- |

Any indication IV was involved in other Youth Serving Organizations? ❑ Yes  ❑ No     If yes, specify below:

| Name: | Location: |
| --- | --- |

### IF SEXUAL ABUSE IS ALLEGED (including child pornography)

| Name of victim: | For non-specific victim only: ❑ Child Pornography.   ❑ Police Cyber Impersonation  ❑ CBC (Criminal Background Check)   ❑ SOR (Sex Offender Registry) |
| --- | --- |

| Date of birth:  /  / | If no DOB, approximate age: | Address: | City: |
| --- | --- | --- | --- |

| State: | ZIP: | Race/ethnicity: | Gender: |
| --- | --- | --- | --- |

| Parent Name: | Telephone  with area code: (     ) | Address: | City: |
| --- | --- | --- | --- |

| State: | ZIP: | Victim(s) registered with BSA? ❑Yes  ❑ No | If yes, Scouting program: |
| --- | --- | --- | --- |

| Did any alleged abuse occur during Scouting activities? ❑ Yes  ❑No  ❑ Unknown | If yes, where: | ❑ Other-specify: | When:  /  / |
| --- | --- | --- | --- |

If yes, any of the BSA *Barriers to Abuse* not being upheld? ❑ Yes  ❑ No indication     If yes, please indicate all that apply:

| Date alleged abuse began:  /  /  ❑ Unknown | Approximate duration of abuse ___ Months ___Years ❑ Unknown |
| --- | --- |

| How was abuse reported? | Any prior concerns about IV adhering to BSA youth protection polices? ❑ Yes  ❑ No |
| --- | --- |

| Law enforcement (LE) aware of incident? ❑Yes  ❑ No  ❑ Unknown | Did BSA make report to LE? ❑Yes  ❑ No  ❑ Unknown |
| --- | --- |

| BSA report date:  /  / | LE dept. name/ location: | CPS informed? ❑Yes  ❑ No  ❑ Unknown |
| --- | --- | --- |

### RESOLUTION BY BSA NATIONAL OFFICE

| Additional  information attached/sent to: | Date sent:  /  / |
| --- | --- |

| Indicate all information types obtained for IV file. | Incident code ( add Y if IV is youth): |
| --- | --- |

| If legal outcome:   ❑ Guilty ❑ Not guilty ❑ Unknown | Date all positions expired in PAS:  /  / |
| --- | --- |

| Reviewed by: | Date:  /  / |
| --- | --- |

## Appendix C: Coding Form

**BSA DATA CODING FORM 2013**

| YEAR: _____ | UVA CASE NUMBER: _____ | CODER INITIALS: _____ |

### A. NATURE OF THE CASE FILE

A1. What is the earliest date concerning alleged abuse referenced in the file: _____

A2. What is the latest date concerning the IV or any victim referenced in the file: _____

A3. How many pages does file contain: _____

A4. Bates range:  Start _____        End _____        ☐ Not apply

A5. Does the file contain enough information to discern the reason that the individual was being expelled or prevented from joining the BSA?  ☐ Yes ☐ No

A6. If yes, does the file involve improper sexual activity **only** between individuals over the age of 18 years?
☐ Yes ☐ No

**If there is not enough information to conclude that the IV file involved sexual behavior with a person under the age of 18 years, or if only a CBC prevented an adult from registering with the BSA, do not code any further on this form.**

### B. OVERVIEW OF FILE CONTENT CONCERNING SEXUAL BEHAVIOR WITH A MINOR

B1. Does this file involve allegations of sexual activity with youth (under the age of 18 years) and an adult (aged 18 or older)?          ☐ Yes ☐ No ☐ Unknown

B2. Does this file involve allegations of sexual activity **only** between youth **under** the age of 18 years?
☐ Yes ☐ No ☐ Unknown

B3. Are there materials in the file that indicate that the allegations of sexual behavior with youth under the age of 18 years were of public record?          ☐ Yes ☐ No

B4. If yes, does the file contain any of the following public documentation (check all that apply):

| Newspaper or other media publications | ☐ Yes ☐ No |
| --- | --- |
| If yes, does the material make explicit that the alleged *perpetrator* was affiliated with Scouting? | ☐ Yes ☐ No |
| If yes, does the material make explicit that the alleged *victim(s)* was affiliated with Scouting? | ☐ Yes ☐ No |
| Victim statement(s) made to/referenced by police | ☐ Yes ☐ No |

1

## Appendix C: Coding Form, Continued

| | |
|---|---|
| Family member statement(s) made to/referenced by the police | ☐ Yes ☐ No |
| Offender statement(s) to the police | ☐ Yes ☐ No |
| Other police or prosecution/defense records/reports/letters | ☐ Yes ☐ No |
| Legal documents of criminal or civil action concerning alleged behavior | ☐ Yes ☐ No |
| Sex offender registry record/printout | ☐ Yes ☐ No |
| Other public documents or official records If yes, describe: _____ | ☐ Yes ☐ No |

B5. Who initially reported the alleged sexual abuse to the local council:
- ☐ Anonymous report
- ☐ Scout volunteer leader
- ☐ Council employee
- ☐ Scouting victim of alleged abuse
- ☐ Other Scouting youth
- ☐ Scouting family member
- ☐ Other non-Scouting youth (non-victim)
- ☐ Other non-Scouting youth (victim)
- ☐ Member of the chartered organization
- ☐ Law enforcement
- ☐ Report or notification sent by BSA National Headquarters
- ☐ Other-specify: _____
- ☐ Unknown

B6. What led to the opening of the IV file (check all that apply):
- ☐ Disclosure by child/youth
- ☐ Observation of inappropriate/suspicious behavior by third party
- ☐ Report of third party – family member
- ☐ Report of third party – police officer/prosecution/defense/arrest information
- ☐ Report of third party – physician or medical personnel
- ☐ Physical evidence (STI, physical injury, etc.)
- ☐ Virtual or social media evidence (text message, Facebook posting, YouTube videos, etc.)
- ☐ Inexplicable sexual knowledge or behavior by a child/youth
- ☐ IV was arrested for possessing/viewing child pornography
- ☐ IV was arrested for distributing child pornography
- ☐ The youth contacted BSA once they reached adulthood
- ☐ BSA receiving notification that the IV had a criminal background
- ☐ Other-specify: _____
- ☐ Unknown

B7. How did the **local council** respond/follow-up to the alleged incident(s) (check all that apply):
- ☐ Seeking to obtain more information about the alleged incident or adult perpetrator
- ☐ Immediate revocation of the alleged perpetrator's registration with BSA
- ☐ Meeting with the alleged adult perpetrator
- ☐ Requesting a formal, written resignation from the alleged adult perpetrator
- ☐ Meeting with the alleged victim of adult sexual abuse by Scouting official

2

# Appendix C: Coding Form, Continued

☐ Obtaining a written statement from the alleged victim(s) or their parent(s)
☐ Meeting with the parent of the alleged victim(s) by Scouting officials
☐ Meeting with parents of other Scouts involved in the same troop
☐ Meeting with personnel associated with the Chartered organization (for example, church)
☐ Seeking guidance or clarification from BSA National Headquarters
☐ Contact with law enforcement/prosecution/CPS (Child Protective Services)
☐ Meeting with the youth involved in youth on youth sexual behavior by Scouting officials
☐ Notifying the parents of youth involved in youth on youth sexual behavior
☐ Other- specify: _____
☐ Unknown

B8. Were the parent(s) of the alleged Scouting victim(s) of **adult sexual abuse** made aware of the allegations by BSA, law enforcement, or some other entity/agency?     ☐ Yes ☐ No ☐ Unknown
                                                                                            ☐ N/A- youth not in Scouting

    B8a. If yes, did the parent(s) believe the allegation(s)?     ☐ Yes ☐ No ☐ Unknown
    B8b. If yes, did the parent(s) allow their child(ren) to continue in Scouting?     ☐ Yes ☐ No ☐ Unknown

B9. Were the parent(s) of the youth involved in alleged **youth on youth sexual** made aware of the allegations by BSA, law enforcement, or some other entity/agency?     ☐ Yes ☐ No ☐ Unknown
    B9a. If yes, did the parent(s) believe the allegation(s)?     ☐ Yes ☐ No ☐ Unknown
    B9b. If yes, did the parent(s) allow their child(ren) to continue in Scouting?     ☐ Yes ☐ No ☐ Unknown

B10. Did the parent(s) of other Scouts become aware of the allegation(s)?     ☐ Yes ☐ No ☐ Unknown
                                                                              ☐ N/A- youth not in Scouting

    B10a. If yes, did they (any) believe the allegation(s)?     ☐ Yes ☐ No ☐ Unknown
    B10b. If yes, did they (any) allow their child to continue in Scouting?     ☐ Yes ☐ No ☐ Unknown
    B10c. If yes, did they (any) remove their child from Scouting?     ☐ Yes ☐ No ☐ Unknown

B11. Was the **adult IV** placed on probation based on concerns about their behavior(s)?     ☐ Yes ☐ No ☐ Unknown
    B11a. If yes, was IV reported to have received mental health treatment?     ☐ Yes ☐ No ☐ Unknown
    B11b. If yes, was IV ultimately reinstated?     ☐ Yes ☐ No ☐ Unknown
    B11c. If yes, was IV known to have offended against BSA youth after probation?     ☐ Yes ☐ No ☐ Unknown
    B11d. If yes, after what amount of time did they reoffend?     _____ Months, _____ Years  ☐ Unknown

B12. After the report of alleged sexual abuse, did the **adult IV** in relation to the BSA (check all that apply):
☐ Dispute the allegation(s) being made against them
☐ Request local or national review of their exclusion from Scouting
☐ Submit a generic letter of resignation that did not mention sexual abuse allegations
☐ Submit a letter of resignation that mentioned child sex abuse
☐ Threaten some type of legal action against the BSA for refusal of their BSA registration
☐ Offer to obtain psychiatric/psychological treatment
☐ Resign from some other youth serving position (for example being a school teacher)
☐ Move out of the community in which the abuse had occurred
☐ None of the above

3

# Appendix C: Coding Form, Continued

B13. Did the **adult IV** attempt to register with BSA as a leader/volunteer in another area after being declared
    ineligible for membership in Scouting?         ☐ Yes ☐ No indication
    B13a. If yes, indicate total number of times: _____
    B13b. If yes, did any attempts involve an alias/altering other information?    ☐ Yes ☐ No indication
    B13c. If yes, did any of these involve an altered social security number?    ☐ Yes ☐ No indication
    B13d. If yes, enter date of each attempt below:

| _____ | ☐ Same community <br> ☐ Different community/same state <br> ☐ Different state |
| --- | --- |
| _____ | ☐ Same community <br> ☐ Different community/same state <br> ☐ Different state |
| _____ | ☐ Same community <br> ☐ Different community/same state <br> ☐ Different state |
| _____ | ☐ Same community <br> ☐ Different community/same state <br> ☐ Different state |
| _____ | ☐ Same community <br> ☐ Different community/same state <br> ☐ Different state |

B14. Are there indications that the **adult IV** was involved in other youth serving organizations?
    (If yes, these will have been entered on the ICRS)        ☐ Yes ☐ No
    B14a. If yes, did it occur during involvement with the BSA?    ☐ Yes ☐ Unknown
    B14b. If yes, did it occur before becoming involved with the BSA?    ☐ Yes ☐ Unknown
    B14c. If yes, did it occur after becoming involved with the BSA?    ☐ Yes ☐ Unknown

B15. Were the police involved in the investigation of the alleged sexual behavior(s) of this **adult IV**?
        ☐ Yes ☐ No indication
    B15a. If yes, was IV arrested for alleged sexual behavior(s) referenced in file?    ☐ Yes ☐ No indication
    B15b. If yes, was IV convicted for alleged sexual behavior(s) referenced in file?    ☐ Yes ☐ No indication
    B15c. If yes, did the investigation involve an undercover operation with a law enforcement officer?
        ☐ Yes ☐ No indication

B16. Were there multiple youth victims of **adult IV** sexual abuse mentioned?    ☐ Yes ☐ No ☐ Unknown
    B16a. If yes, is it possible to estimate total numbers?
    ☐ Yes: number _____    ☐ No, not possible to estimate with any accuracy
    Confidence of estimate? 1  2  3  4  5  6  7 (highly confident)

B17. In instances of **youth on youth sexual activity**, indicate if there was (check all that apply):
    ☐ A size difference between youth
    ☐ An age difference between youth (> 3 years)
    ☐ A social status difference between youth
    ☐ A leadership difference between youth
    ☐ A cognitive difference between youth
    ☐ Prior incidents of bullying, threats, fighting, etc.
    ☐ Sexual activity as part of an initiation process, name if known: _____

4

## Appendix C: Coding Form, Continued

☐ Sexual activity as part of a game, name if known: _____
☐ None of the above but other indications of victimization

☐ Sexual activity was part of consensual or mutual exploration/gratification [No victim module]
☐ Sexual activity was part of a group delinquent behavior (e.g., paired with alcohol/drugs) [No victim module]
☐ Unknown [No victim module]

B18. In instances of **youth on youth sexual activity** indicate if (check all that apply):
☐ One Scouting youth was suspended from Scouting
☐ More than one Scouting youth was suspended from Scouting
☐ Parent(s) disputed actions taken by BSA and sought reinstatement of youth
☐ Mental health interventions were recommended or obtained for youth
☐ Law enforcement became involved in investigating sexual acts
☐ At least one Scouting youth was arrested for sexual behavior
☐ Scouting youth tried to register as adult leader after reaching age 18 years
☐ None of the above

B19. In instances of **youth on youth sexual activity** is it possible to estimate the total number of youth involved in the sexual activity?
☐ Yes: number _____    ☐ No, not possible to estimate with any accuracy
Confidence of estimate? 1  2  3  4  5  6  7 (highly confident)

B20. For both **adult** and **youth on youth** alleged sexual abuse, is there any information or language in the file that expresses an intent or effort to limit or obscure public awareness of Scouting's involvement in the abuse that was alleged to have occurred?                                    ☐ Yes ☐ No indication
B 20a. If yes, please type the exact sentence or sentences that created this impression in the file:

_____

B20b. If yes, did the effort(s) involve withholding information from (check all that apply):
☐ The parents of the victim of alleged **adult** sexual abuse
☐ The parents of the victim of alleged **youth on youth** sexual abuse
☐ The parents of the youth involved in apparently consensual sexual activity
☐ The parents of other Scouts
☐ The chartering organization
☐ Scout leaders
☐ The media
☐ Law enforcement
☐ Child Protective Services (CPS)
☐ BSA National Headquarter staff
☐ Non-specific general statement
☐ Other-specify: _____

B20c. If yes, was the person who proposed or who made these efforts at withholding the information:
☐ A staff member at BSA National Headquarters
☐ A member of the local Scouting council that reported the abuse to BSA Headquarters
☐ A community person who had some past experience with or loyalty to BSA (for example, a law

5

## Appendix C: Coding Form, Continued

enforcement officer, judge, or journalist who earned Eagle Scout)
- ☐ The victim
- ☐ The parents of the victim
- ☐ The parents of some other youth involved in Scouting
- ☐ Other-specify: _____

### C. CHARACTERISTICS OF THE ADULT IV (18 YEARS OF AGE AND OLDER)

C1. Is there a photo of the IV in the file? ☐ Yes ☐ No

C2. Was the **adult IV** employed at the time that the file was opened? ☐ Yes ☐ No ☐ Unknown

C3. Are there indications the **adult IV** was ever married? ☐ Yes ☐ No ☐ Unknown

C4. If the **adult IV** had children, were they involved in Scouting or was there evidence that the children (possibly now grown) had previously been involved with Scouting? ☐ Yes ☐ No ☐ Unknown

C5. Was there any information to indicate that the **adult IV** was NOT a stable member of the local community? ☐ Yes ☐ No indication

C6. Had the **adult IV** been a member of Scouting as a youth? ☐ Yes ☐ No ☐ Unknown
    C6a. If yes, number of years: _____ ☐ Unknown

C7. Had the **adult IV** completed BSA Youth Protection Training? ☐ Yes ☐ No indication

C8. How many years had the **adult IV** been involved in Scouting as an adult when the IV file was opened? _____ Years ☐ Unknown

C9. Was the **adult IV** ever arrested for a sex crime? ☐ Yes ☐ No indication
    C9a. If yes, were they given a sentence that involved only probation? ☐ Yes ☐ No ☐ Unknown
    C9b. If yes, were they sentenced to a jail/prison term? ☐ Yes ☐ No ☐ Unknown
    C9c. If yes to C9b, what was the length of the jail/prison term in years: _____ ☐ Unknown
    C9d. If yes, was the IV court ordered to psychiatric treatment by the courts? ☐ Yes ☐ No indication
    C9e. If yes, were they added to a sex offender registry due to the offense? ☐ Yes ☐ No indication

C10. Did the sexual behavior with a Scout/youth involve another adult? ☐ Yes ☐ No indication
    C10a. If yes, was the other adult male or female? ☐ Male ☐ Female
    C10b. If the **adult IV** was married, was the other adult their spouse? ☐ Yes ☐ No

C11. Is there any indication that the **adult IV** (check all that apply?)
- ☐ Suffered from some form of mental disorder-specify: _____
- ☐ Was taking some type of psychotropic medication
- ☐ Suffered from a substance abuse disorder
- ☐ Had less than a high school education
- ☐ Suffered from diagnosed or self-described pedophilia
- ☐ Described self as bisexual
- ☐ Described self as homosexual
- ☐ Displayed interest in military or paramilitary activities that involving wearing uniforms combined with role of authority (for example being in military, being a police officer/security guard, etc.)

6

# Appendix C: Coding Form, Continued

☐ Had experienced sexual abuse as a child or adolescent
☐ Had a familial/custodial relationship to the alleged victim
☐ Referenced intent or attempted suicide in relationship to alleged abuse
☐ Was observed by others as having a special affinity to children/youth or being invested in their companionship
☐ Indicated cognitive distortions concerning sexual activity with youth such as the IV was providing sex education, the youth was seductive and wanted sex, the activity was harmless, the IV lost control due to alcohol/drugs, etc.
☐ Displayed social or intimacy deficits as indicated by being described as a loner, having no friends or family, living with parent(s) without any other relationships, etc.
☐ Displayed antisociality in life situations as indicated by lying, breaking rules/laws, having a criminal background, using an alias, being exploitive of others, being reckless and irresponsible, etc.
☐ None of the above

C12. Does the file make reference to pornography? ☐ Yes ☐ No indication
If yes, check all that apply:
  ☐ IV taking sexually inappropriate photos/videos/films of Scouting involved youth
  ☐ IV taking sexually inappropriate photos/videos/films of non-Scouting involved youth
  ☐ IV viewing child pornography
  ☐ IV distributing child pornography
  ☐ IV showing youth pornography (child or adult)
  C12a. If there are any indications of pornographic images of youth being created do they contain explicit BSA content (for examples, wearing a cap, shirt, some insignia, etc.)? ☐ Yes ☐ No ☐ Not applicable

C13. Does the file involve sexually inappropriate use of digital/social media?    ☐ Yes ☐ No indication
If yes, which types of social media:
  ☐ Sexual texting/messaging/Skyping (including MMS)
  ☐ Taking digital photographs
  ☐ Sexual chatting in chat rooms
  ☐ Facebook conversations or comments
  ☐ Posting of sexual photos-specify location: _____
  ☐ Posting of sexual videos to YouTube or other locations-specify other location: _____
  ☐ Other-specify: _____

---

**D. CHARACTERISTICS OF THE ALLEGED VICTIM** *Use module only for victims that can be identified SPECIFICALLY and include victims that are both Scouts AND non-Scouts.*

*Victims are defined as:*
  1. *Youth under the age of 18 years having sex with a person over the age of 18 years; OR*
  2. *Youth under the age of 18 years having sex with a youth under the age of 18 years when the sex was identified as NOT being consensual (refer to B17: if coded as consensual or group delinquent ONLY do not code for victim module)*

D1. Please indicate name of this victim: _____    ☐ Marked through    ☐ Unknown

D2. Was this youth a member of Scouting?    ☐ Yes ☐ No indication

7

## Appendix C: Coding Form, Continued

| D3. Were there multiple youth aware that it was occurring? | ☐ Yes ☐ No indication |
|---|---|
| D4. Age of victim when alleged inappropriate sexual behavior began: | _____ ☐ Unknown |
| D5. Age of victim when alleged inappropriate sexual behavior ended: | _____ ☐ Unknown |
| D6. Gender of youth: | ☐ Male ☐ Female |
| D7. Race/ethnicity: | _____ |
| D8. Did the youth have any type of discernible handicap or disability? | ☐ Yes ☐ No indication |
| D9. When was the inappropriate sexual behavior reported? | _____ ☐ Unknown |
| D10. Did the youth request the alleged inappropriate behavior be kept confidential? | ☐ Yes ☐ No indication |

D11. Did the alleged inappropriate sexual behavior involve (check all that apply):
☐ Massage that did not involve the genitals
☐ Sexualized tickling or wrestling
☐ Telling sexual or obscene stories
☐ Sexual looking or taking of nude photographs/videos
☐ Showing pornographic images to the youth (either professional or homemade)
☐ Making some type of sexual proposition to the youth
☐ Sexual kissing
☐ Fondling of victim's sexual body parts over or under clothes
☐ Fondling of victim's sexual body parts with mouth
☐ Fondling of IV's sexual body parts over or under clothes
☐ Fondling of IV's sexual body parts with mouth
☐ Masturbation of victim to orgasm
☐ Masturbation of IV in front of victim
☐ Masturbation of IV to orgasm
☐ Penetration of victim with finger, penis, or other object
☐ Penetration of IV with finger, penis or other object
☐ Other-specify: _____ Please try to approximate the activity and use other only as a last resort
☐ Unknown

D12. Did the alleged inappropriate sexual behavior involve (check all that apply):
☐ Physical violence
☐ Threats of physical violence
☐ Threats of violence towards family or friends
☐ None of the above

D13. Is it possible to estimate the time that the youth knew the perpetrator before the abuse began?
☐ Yes ☐ No
If yes, please select estimated length of time (in years): _____

8

## Appendix C: Coding Form, Continued

D14. Does the file suggest there was only one encounter with alleged sexual abuse?  ☐ Yes ☐ No indication
  D14a. If not once, is it possible to estimate how many encounters occurred?
    ☐ Yes: number _____  ☐ No, not possible to estimate with any accuracy
    Confidence of estimate? 1  2  3  4  5  6  7 (highly confident)

D15. Did the youth tell anyone of the abuse while it was occurring?  ☐ Yes ☐ No indication
  If yes, who did they tell (check all that apply):
    ☐ An adult involved in Scouting
    ☐ Another Scout
    ☐ Another non-Scout involved youth
    ☐ A parent or adult family member
    ☐ A teacher
    ☐ A friend
    ☐ A sibling
    ☐ Other-specify: _____
    ☐ Unknown

D16. What occurred after the initial allegation of sexual abuse was made known (check all that apply):
    ☐ The youth was interviewed by anyone in Scouting
    ☐ The youth made a statement to someone in Scouting of what had occurred
    ☐ A member of Scouting made a report to the police or district attorney
    ☐ The parents were notified of the alleged abuse
    ☐ The parents made a report to the police or district attorney
    ☐ The parents asked that the incident(s) be kept confidential
    ☐ The parents expressed concerns about their child testifying in court
    ☐ The youth was interviewed by the police
    ☐ The youth made a formal statement to the police
    ☐ The youth received some type of physical/medical examination or assessment
    ☐ The youth testified against the alleged perpetrator in court
    ☐ The youth was referred for psychotherapeutic help
    ☐ None of the above

D17. Was the youth living with both parents at the time of the alleged sexual abuse?  ☐ Yes ☐ No ☐ Unknown
  D17a. If no, were they living with a single mother?  ☐ Yes ☐ No ☐ Unknown
  D17b. If yes to D17a, was she motivated by providing male role model to child?  ☐ Yes ☐ No ☐ Unknown
    ☐ Not applicable

D18. Was the family of the youth experiencing social or financial strains at the time of the abuse such as divorce,
  unemployment, poverty, relocation, etc.?  ☐ Yes ☐ No ☐ Unknown

D19. Are there indications the victim was struggling at school intellectually or socially?  ☐ Yes ☐ No ☐ Unknown

D20. Had the victim previously been victimized?  ☐ Yes ☐ No indication
  If yes, how (check all that apply):    ☐ Sexual abuse    ☐ Physical abuse
    ☐ Neglect

D21. Did the IV socialize with the family of this alleged victim outside of Scouting?  ☐ Yes ☐ No ☐ Unknown

D22. How did the IV gain access and compliance of the victim (check all that apply):
    ☐ Child attracting activities or interests (for example, baseball cards, pets, pools, games, etc.)

9

## Appendix C: Coding Form, Continued

- ☐ Misattribution of sexual acts (for example, checking for fungus, a physical exam, wrestling, etc.)
- ☐ Explanations of camping activities that prompted nudity and/or close sleeping arrangements
- ☐ Making sexual advances when it appeared that the youth was asleep
- ☐ Being singled out and made to feel special in relation to other Scouts
- ☐ Travel and/or exciting adventures in the community/special trainings or preparations
- ☐ Implied or real assistance in progress in Scouting (for example, help with Merit Badges)
- ☐ Offering to assist with family daily activities (for example, babysit, help with homework, etc.)
- ☐ Having other youth demonstrate nudity/other sexual activities to diminish inhibitions
- ☐ Chastising youth for being immature, uptight, inexperienced, etc.
- ☐ Committing sexual acts while the victim was sleeping or appearing to be asleep
- ☐ Acting like nothing unusual happened after a night-time encounter
- ☐ Implied consent and gradual desensitization by stopping each activity when asked by victim
- ☐ Intimate relationship and sense of caring/love
- ☐ Pseudo-adult behaviors (for example, staying up late/drinking/smoking, etc.)
- ☐ Use of alcohol, marijuana, or other drugs
- ☐ Showing pornography in books, magazines, and/or movies
- ☐ Sexual pleasure or enticement
- ☐ Sense of there being a sexual/romantic relationship that was important/meaningful to the IV
- ☐ Providing shelter, food, and home to child in need
- ☐ Money and/or gifts
- ☐ Other-specify: _____
- ☐ None of the above

D23. How did the IV keep the youth from reporting the alleged abuse to an adult (check all that apply):
- ☐ Loss of important relationship for the youth
- ☐ Loss of sexual excitement and stimulation for the youth
- ☐ Sense of embarrassment or humiliation
- ☐ Fears that it might result in the youth being excluded from a sense of in-group identity and activities
- ☐ Threats of physical harm to self or others
- ☐ Use of the Scouts Honor not to break one's word
- ☐ Threats of reporting other untoward behavior such as alcohol, drugs, driving a car, etc.
- ☐ Concerns about IV being harmed and having life ruined by reporting, for example going to jail
- ☐ Harm to other Scouts, the local troop, or BSA in general
- ☐ Lost opportunities such as money, alcohol, drugs, travel opportunities, etc.
- ☐ Other-specify: _____
- ☐ None of the above
- ☐ Not applicable as abuse was reported to adult immediately after first incident

D24. Did the youth continue to attend BSA activities while the sexual activity was occurring?
- ☐ Yes ☐ No ☐ Unknown ☐ Not applicable as not involved in Scouting

D25. Did the youth continue to attend BSA activities after the sexual activity was disclosed?
- ☐ Yes ☐ No ☐ Unknown ☐ Not applicable as not involved in Scouting

D26. Is there any indication that the victim provided testimony in court concerning the IV?
- ☐ Yes ☐ No ☐ Unknown

10

## Appendix D: Drop-Down Items Sheet 1: Demographics-Background

| Race/Ethnicity | Hair Color | Eye Color | Gender | Distinguishing Physical Characteristics | Marital Status |
|---|---|---|---|---|---|
| American Indian or Alaska Native | Bald | Black | Female | Cognitive limitations/ deficits | Divorced / separated |
| Arab or Middle Eastern | Black | Blue | Male | Physical deformity | Married |
| Asian | Blonde | Brown | | Unusual facial features | Single |
| Black or African American | Brown | Dichromatic | | Unhealthy skin/scarring | Unknown |
| Hispanic or Latino | Gray | Gray | | Unusual speech patterns | |
| Native Hawaiian or Other Pacific Islander | Red | Green | | Unusual size | |
| White or Caucasian | Sandy | Hazel | | | |
| | Unknown | Unknown | | | |
| | White | | | | |

# Appendix D: Drop-Down Items Sheet 2: Occupations

| Occupations: | Examples |
|---|---|
| Architecture and Engineering | e.g., architects-except naval, agricultural engineers (chemical, civil, etc.), mapping technicians |
| Arts, Design, Entertainment, Sports, and Media | e.g., announcers, technical writers, photographers |
| Building and Grounds Cleaning and Maintenance | e.g., maids, pest control workers, grounds maintenance workers |
| Business and Financial Operations | e.g., business managers of artists, HR workers, fiscal analysts |
| Community and Social Service | e.g., counselors, probation officers, clergy |
| Computer and Mathematical | e.g., computer programmers, web developers, mathematicians/statisticians |
| Construction and Extraction | e.g., carpenters, insulation workers, miners |
| Education, Training, and Library | e.g., archivists/museum technicians teachers, librarians |
| Farming, Fishing, and Forestry | e.g., agricultural inspectors, hunters & trappers, logging workers |
| Food Preparation and Service Related | e.g., bartenders, cooks, dishwashers |
| Healthcare Practitioners and Technical | e.g., medical doctors, veterinarians, speech-pathologists |
| Healthcare Support | e.g., nursing (NOT nurse practitioners), massage therapists, pharmacy aides |
| Installation, Maintenance, and Repair | e.g., automotive technician, locksmiths, computer repairers |
| Legal Occupations | e.g., lawyers, judges, paralegals |
| Life, Physical, and Social Science | e.g., scientists, economists, scientific research assistants/technicians |
| Management | e.g., chief executives, sales managers, all other managers |
| Material Moving | e.g., cleaners of vehicles and equipment, truck/tractor drivers, packagers |
| Military Specific | e.g., military officer and tactical operations leader, enlisted supervisor, enlisted specialist, etc. |
| Office and Administrative Support | e.g., clerks, receptionists, word processors & typists |
| Personal Care and Service | e.g., animal trainers, morticians, childcare workers |
| Production | e.g., bakers, machinists, woodworkers, etchers, etc. |
| Protective Service | e.g., firefighters, criminal investigators, lifeguards |
| Sales and Related | e.g., cashiers, telemarketers, models |
| Transportation | e.g., aircraft pilots, railroad signal operators, parking lot attendants |
| Unemployed | |

# Appendix D: Drop-Down Items Sheet 3: Scouting Positions/Programs
## Sheet 3: Scouting Positions-Adult

| Position (Code) -- Adult |
| --- |
| Assistant Cubmaster (CA) |
| Assistant Den Leader (DA) |
| Assistant Scoutmaster (SA) |
| Assistant Varsity Coach (VA) |
| Assistant Webelos Den Leader (WA) |
| Chartered Organization Representative (CR) |
| Committee Chair (CC) |
| Committee Member (MC) |
| Crew Advisor (NL) |
| Crew Associate Advisor (NA) |
| Cubmaster (CM) |
| Den Leader (DL) |
| Executive Officer/Institution Head (IH) |
| Mate (MT) |
| Merit Badge Counselor |
| Other Position |
| Pack Trainer (PT) |
| Scoutmaster (SM) |
| ScoutParent (PS) |
| ScoutParent Unit Coordinator (PC) |
| Skipper (SK) |
| Tiger Cub Adult (AP) |
| Tiger Cub Den Leader (TL) |
| Unit College Scouter Reserve (92U) |
| Varsity Scout Coach (VC) |
| Venturing Unit College Scouter Reserve (92V) |
| Webelos den leader (WL) |

## Sheet 3: Scouting Program-Youth

| Program -- Youth |
| --- |
| Boy Scouting |
| Cub Scouting |
| Exploring |
| Sea Scouting |
| Venturing |
| Varsity |

## Appendix D: Drop-Down Items Sheet 4: Council Info

| Council Name | Headquarters City | Region | Area | Council No. |
|---|---|---|---|---|
| ABRAHAM LINCOLN | SPRINGFIELD, IL | CE | 3 | 144 |
| ALABAMA-FLORIDA | DOTHAN, AL | SO | 1 | 3 |
| ALAMEDA | ALAMEDA, CA | WE | 3 | 22 |
| ALAMO AREA | SAN ANTONIO, TX | SO | 3 | 583 |
| ALLEGHENY HIGHLANDS | FALCONER, NY | NE | 4 | 382 |
| ALLOHAK | PARKERSBURG, WV | CE | 4 | 618 |
| ALOHA | HONOLULU, HI | WE | 6 | 104 |
| ANDREW JACKSON | JACKSON, MS | SO | 1 | 303 |
| ANNAWON | NORTON, MA | NE | 1 | 225 |
| ANTHONY WAYNE AREA | FORT WAYNE, IN | CE | 6 | 157 |
| ARBUCKLE AREA | ARDMORE, OK | SO | 8 | 468 |
| ATLANTA AREA | ATLANTA, GA | SO | 9 | 92 |
| BADEN-POWELL | BINGHAMTON, NY | NE | 3 | 368 |
| BALTIMORE AREA | BALTIMORE, MD | NE | 6 | 220 |
| BAY AREA | GALVESTON, TX | SO | 3 | 574 |
| BAY-LAKES | APPLETON, WI | CE | 1 | 635 |
| BLACK HILLS AREA | RAPID CITY, SD | WE | 5 | 695 |
| BLACK SWAMP AREA | FINDLAY, OH | CE | 6 | 449 |
| BLACK WARRIOR | TUSCALOOSA, AL | SO | 9 | 6 |
| BLACKHAWK AREA | ROCKFORD, IL | CE | 7 | 660 |
| BLUE GRASS | LEXINGTON, KY | SO | 6 | 204 |
| BLUE MOUNTAIN | KENNEWICK, WA | WE | 1 | 604 |
| BLUE RIDGE | GREENVILLE, SC | SO | 5 | 551 |
| BLUE RIDGE MOUNTAINS | ROANOKE, VA | SO | 7 | 599 |
| BOSTON MINUTEMAN | MILTON, MA | NE | 1 | 227 |
| BUCKEYE | CANTON, OH | CE | 4 | 436 |
| BUCKS COUNTY | DOYLESTOWN, PA | NE | 5 | 777 |
| BUCKSKIN | CHARLESTON, WV | CE | 4 | 617 |
| BUCKTAIL | DUBOIS, PA | NE | 4 | 509 |
| BUFFALO TRACE | EVANSVILLE, IN | CE | 6 | 156 |
| BUFFALO TRAIL | MIDLAND, TX | SO | 3 | 567 |
| CADDO AREA | TEXARKANA, TX | SO | 2 | 584 |
| CALCASIEU AREA | LAKE CHARLES, LA | SO | 1 | 209 |
| CALIFORNIA INLAND EMPIRE | REDLANDS, CA | WE | 4 | 45 |
| CALUMET | MUNSTER, IN | CE | 7 | 152 |
| CAPE COD AND ISLANDS | YARMOUTH PORT, MA | NE | 1 | 224 |
| CAPE FEAR | WILMINGTON, NC | SO | 7 | 425 |
| CAPITOL AREA | AUSTIN, TX | SO | 3 | 564 |
| CASCADE PACIFIC | PORTLAND, OR | WE | 1 | 492 |
| CATALINA | TUCSON, AZ | WE | 6 | 11 |
| CENTRAL NEW JERSEY | DAYTON, NJ | NE | 5 | 352 |

## Appendix D: Drop-Down Items Sheet 4: Council Info, Continued

| | | | | |
|---|---|---|---|---|
| CENTRAL FLORIDA | ORLANDO, FL | SO | 4 | 83 |
| CENTRAL GEORGIA | MACON, GA | SO | 9 | 96 |
| CENTRAL MINNESOTA | SARTELL, MN | CE | 1 | 296 |
| CENTRAL NORTH CAROLINA | ALBEMARLE, NC | SO | 5 | 416 |
| CENTRAL WYOMING | CASPER, WY | WE | 5 | 638 |
| CHATTAHOOCHEE | COLUMBUS, GA | SO | 9 | 91 |
| CHEROKEE AREA | BARTLESVILLE, OK | SO | 8 | 469 |
| CHEROKEE AREA | CHATTANOOGA, TN | SO | 6 | 556 |
| CHESTER COUNTY | WEST CHESTER, PA | NE | 6 | 539 |
| CHICAGO AREA | CHICAGO, IL | CE | 7 | 118 |
| CHICKASAW | MEMPHIS, TN | SO | 6 | 558 |
| CHIEF CORNPLANTER | WARREN, PA | NE | 4 | 538 |
| CHIEF SEATTLE | SEATTLE, WA | WE | 1 | 609 |
| CHIPPEWA VALLEY | EAU CLAIRE, WI | CE | 1 | 637 |
| CHOCTAW AREA | MERIDIAN, MS | SO | 1 | 302 |
| CIMARRON | ENID, OK | SO | 8 | 474 |
| CIRCLE TEN | DALLAS, TX | SO | 2 | 571 |
| COASTAL CAROLINA | CHARLESTON, SC | SO | 5 | 550 |
| COASTAL EMPIRE | SAVANNAH, GA | SO | 5 | 99 |
| COLONIAL VIRGINIA | NEWPORT NEWS, VA | SO | 7 | 595 |
| COLUMBIA-MONTOUR | BLOOMSBURG, PA | NE | 4 | 504 |
| CONNECTICUT RIVERS | EAST HARTFORD, CT | NE | 2 | 66 |
| CONNECTICUT YANKEE | MILFORD, CT | NE | 2 | 72 |
| CONQUISTADOR | ROSWELL, NM | WE | 6 | 413 |
| CORNHUSKER | LINCOLN, NE | CE | 5 | 324 |
| CORONADO AREA | SALINA, KS | CE | 5 | 192 |
| CRADLE OF LIBERTY | PHILADELPHIA, PA | NE | 5 | 525 |
| CRATER LAKE | CENTRAL POINT, OR | WE | 1 | 491 |
| CROSSROADS OF AMERICA | INDIANAPOLIS, IN | CE | 6 | 160 |
| DAN BEARD | CINCINNATI, OH | CE | 6 | 438 |
| DANIEL BOONE | ASHEVILLE, NC | SO | 5 | 414 |
| DANIEL WEBSTER | MANCHESTER, NH | NE | 1 | 330 |
| DE SOTO AREA | EL DORADO, AR | SO | 8 | 13 |
| DEL-MAR-VA | WILMINGTON, DE | NE | 6 | 81 |
| DENVER AREA | DENVER, CO | WE | 5 | 61 |
| DES PLAINES VALLEY | LA GRANGE, IL | CE | 7 | 147 |
| EAST CAROLINA | KINSTON, NC | SO | 7 | 426 |
| EAST TEXAS AREA | TYLER, TX | SO | 2 | 585 |
| ERIE SHORES | TOLEDO, OH | CE | 6 | 460 |
| EVANGELINE AREA | LAFAYETTE, LA | SO | 1 | 212 |
| FAR EAST | TOKYO, JA | WE | 6 | 803 |
| FIVE RIVERS | HORSEHEADS, NY | NE | 3 | 375 |
| FLINT RIVER | GRIFFIN, GA | SO | 9 | 95 |

## Appendix D: Drop-Down Items Sheet 4: Council Info, Continued

| | | | | |
|---|---|---|---|---|
| FRENCH CREEK | ERIE, PA | NE | 4 | 532 |
| GAMEHAVEN | ROCHESTER, MN | CE | 1 | 299 |
| GARDEN STATE | RANCOCAS, NJ | NE | 5 | 690 |
| GATEWAY AREA | LA CROSSE, WI | CE | 1 | 624 |
| GEORGIA-CAROLINA | AUGUSTA, GA | SO | 5 | 93 |
| GLACIER'S EDGE | MADISON, WI | CE | 7 | 620 |
| GOLDEN EMPIRE | SACRAMENTO, CA | WE | 3 | 47 |
| GOLDEN SPREAD | AMARILLO, TX | SO | 2 | 562 |
| GRAND CANYON | PHOENIX, AZ | WE | 6 | 10 |
| GRAND COLUMBIA | YAKIMA, WA | WE | 1 | 614 |
| GRAND TETON | IDAHO FALLS, ID | WE | 2 | 107 |
| GREAT ALASKA | ANCHORAGE, AK | WE | 1 | 610 |
| GREAT LAKES | DETROIT, MI | CE | 2 | 272 |
| GREAT RIVERS | COLUMBIA, MO | CE | 5 | 653 |
| GREAT SALT LAKE | SALT LAKE CITY, UT | WE | 2 | 590 |
| GREAT SMOKY MOUNTAIN | KNOXVILLE, TN | SO | 6 | 557 |
| GREAT SOUTHWEST | ALBUQUERQUE, NM | WE | 6 | 412 |
| GREAT TRAIL | AKRON, OH | CE | 4 | 433 |
| GREATER ALABAMA | BIRMINGHAM, AL | SO | 9 | 1 |
| GREATER CLEVELAND | CLEVELAND, OH | CE | 4 | 440 |
| GREATER NEW YORK COUNCILS | NEW YORK, NY | NE | 2 | 640 |
| GREATER NIAGARA FRONTIER | BUFFALO, NY | NE | 3 | 380 |
| GREATER ST. LOUIS AREA | ST LOUIS, MO | CE | 3 | 312 |
| GREATER WESTERN RESERVE | WARREN, OH | CE | 4 | 463 |
| GREATER YOSEMITE | MODESTO, CA | WE | 3 | 59 |
| GREEN MOUNTAIN | WATERBURY, VT | NE | 3 | 592 |
| GREENWICH | GREENWICH, CT | NE | 2 | 67 |
| GULF COAST | PENSACOLA, FL | SO | 1 | 773 |
| GULF RIDGE | TAMPA, FL | SO | 4 | 86 |
| GULF STREAM | PALM BEACH GARDENS, FL | SO | 4 | 85 |
| HAWK MOUNTAIN | READING, PA | NE | 6 | 528 |
| HAWKEYE AREA | CEDAR RAPIDS, IA | CE | 3 | 172 |
| HEART OF AMERICA | KANSAS CITY, MO | CE | 5 | 307 |
| HEART OF OHIO | ASHLAND, OH | CE | 4 | 450 |
| HEART OF VIRGINIA | RICHMOND, VA | SO | 7 | 602 |
| HOOSIER TRAILS | BLOOMINGTON, IN | CE | 6 | 145 |
| HOUSATONIC | DERBY, CT | NE | 2 | 69 |
| HUDSON VALLEY | NEWBURGH, NY | NE | 2 | 374 |
| ILLOWA | DAVENPORT, IA | CE | 3 | 133 |
| INDIAN NATIONS | TULSA, OK | SO | 8 | 488 |
| INDIAN WATERS | COLUMBIA, SC | SO | 5 | 553 |
| INLAND NORTHWEST | SPOKANE, WA | WE | 1 | 611 |
| IROQUOIS TRAIL | BATAVIA, NY | NE | 3 | 376 |

## Appendix D: Drop-Down Items Sheet 4: Council Info, Continued

| | | | | |
|---|---|---|---|---|
| ISTROUMA AREA | BATON ROUGE, LA | SO | 1 | 211 |
| JAYHAWK AREA | TOPEKA, KS | CE | 5 | 197 |
| JERSEY SHORE | TOMS RIVER, NJ | NE | 5 | 341 |
| JUNIATA VALLEY | REEDSVILLE, PA | NE | 4 | 497 |
| KATAHDIN AREA | BANGOR, ME | NE | 1 | 216 |
| KNOX TRAIL | FRAMINGHAM, MA | NE | 1 | 244 |
| LA SALLE | SOUTH BEND, IN | CE | 6 | 165 |
| LAS VEGAS AREA | LAS VEGAS, NV | WE | 6 | 328 |
| LAST FRONTIER | OKLAHOMA CITY, OK | SO | 8 | 480 |
| LAUREL HIGHLANDS | PITTSBURGH, PA | NE | 4 | 527 |
| LEWIS & CLARK | BELLEVILLE, IL | CE | 3 | 114 |
| LINCOLN HERITAGE | LOUISVILLE, KY | SO | 6 | 205 |
| LINCOLN TRAILS | DECATUR, IL | CE | 3 | 121 |
| LONG BEACH AREA | LONG BEACH, CA | WE | 4 | 32 |
| LONGHORN | FORT WORTH, TX | SO | 2 | 662 |
| LONGHOUSE | SYRACUSE, NY | NE | 3 | 373 |
| LONGS PEAK | GREELEY, CO | WE | 5 | 62 |
| LOS ANGELES AREA | LOS ANGELES, CA | WE | 4 | 33 |
| LOS PADRES | SANTA BARBARA, CA | WE | 4 | 53 |
| LOUISIANA PURCHASE | MONROE, LA | SO | 1 | 213 |
| MARIN | SAN RAFAEL, CA | WE | 3 | 35 |
| MASON-DIXON | HAGERSTOWN, MD | NE | 6 | 221 |
| MAUI COUNTY | WAILUKU, MAUI, HI | WE | 6 | 102 |
| MECKLENBURG COUNTY | CHARLOTTE, NC | SO | 5 | 415 |
| MIAMI VALLEY | DAYTON, OH | CE | 6 | 444 |
| MID-AMERICA | OMAHA, NE | CE | 5 | 326 |
| MIDDLE TENNESSEE | NASHVILLE, TN | SO | 6 | 560 |
| MID-IOWA | DES MOINES, IA | CE | 5 | 177 |
| MIDNIGHT SUN | FAIRBANKS, AK | WE | 1 | 696 |
| MINSI TRAILS | LEHIGH VALLEY, PA | NE | 5 | 502 |
| MISSISSIPPI VALLEY | QUINCY, IL | CE | 3 | 141 |
| MOBILE AREA | MOBILE, AL | SO | 1 | 4 |
| MOHEGAN | WORCESTER, MA | NE | 1 | 254 |
| MONMOUTH | MORGANVILLE, NJ | NE | 5 | 347 |
| MONTANA | GREAT FALLS, MT | WE | 5 | 315 |
| MORAINE TRAILS | BUTLER, PA | NE | 4 | 500 |
| MOUNT BAKER | EVERETT, WA | WE | 1 | 606 |
| MOUNT DIABLO SILVERADO | PLEASANT HILL, CA | WE | 3 | 23 |
| MOUNTAINEER AREA | FAIRMONT, WV | CE | 4 | 615 |
| MUSKINGUM VALLEY | ZANESVILLE, OH | CE | 4 | 467 |
| NARRAGANSETT | EAST PROVIDENCE, RI | NE | 1 | 546 |
| NASHUA VALLEY | LANCASTER, MA | NE | 1 | 230 |
| NATIONAL CAPITAL AREA | BETHESDA, MD | NE | 6 | 82 |

## Appendix D: Drop-Down Items Sheet 4: Council Info, Continued

| | | | | |
|---|---|---|---|---|
| NETSEO TRAILS | PARIS, TX | SO | 2 | 580 |
| NEVADA AREA | RENO, NV | WE | 3 | 329 |
| NEW BIRTH OF FREEDOM | MECHANICSBURG, PA | NE | 6 | 544 |
| NORTH FLORIDA | JACKSONVILLE, FL | SO | 4 | 87 |
| NORTHEAST GEORGIA | ATHENS, GA | SO | 9 | 101 |
| NORTHEAST ILLINOIS | HIGHLAND PARK, IL | CE | 7 | 129 |
| NORTHEAST IOWA | DUBUQUE, IA | CE | 3 | 178 |
| NORTHEASTERN PENNSYLVANIA | MOOSIC, PA | NE | 5 | 501 |
| NORTHERN LIGHTS | FARGO, ND | CE | 1 | 429 |
| NORTHERN NEW JERSEY | OAKLAND, NJ | NE | 5 | 333 |
| NORTHERN STAR | ST PAUL, MN | CE | 1 | 250 |
| NORTHWEST GEORGIA | ROME, GA | SO | 9 | 100 |
| NORTHWEST SUBURBAN | MOUNT PROSPECT, IL | CE | 7 | 751 |
| NORTHWEST TEXAS | WICHITA FALLS, TX | SO | 2 | 587 |
| NORWELA | SHREVEPORT, LA | SO | 2 | 215 |
| OCCONEECHEE | RALEIGH, NC | SO | 7 | 421 |
| OHIO RIVER VALLEY | WHEELING, WV | CE | 4 | 619 |
| OKEFENOKEE AREA | WAYCROSS, GA | SO | 9 | 758 |
| OLD COLONY | CANTON, MA | NE | 1 | 249 |
| OLD HICKORY | WINSTON-SALEM, NC | SO | 7 | 427 |
| OLD NORTH STATE | GREENSBORO, NC | SO | 7 | 70 |
| ORANGE COUNTY | SANTA ANA, CA | WE | 4 | 39 |
| OREGON TRAIL | EUGENE, OR | WE | 1 | 697 |
| ORE-IDA | BOISE, ID | WE | 2 | 106 |
| OTSCHODELA | ONEONTA, NY | NE | 3 | 393 |
| OVERLAND TRAILS | GRAND ISLAND, NE | CE | 5 | 322 |
| OZARK TRAILS | SPRINGFIELD, MO | CE | 5 | 306 |
| PACIFIC HARBORS | TACOMA, WA | WE | 1 | 612 |
| PACIFIC SKYLINE | FOSTER CITY, CA | WE | 3 | 31 |
| PALMETTO | SPARTANBURG, SC | SO | 5 | 549 |
| PATRIOTS' PATH | FLORHAM PARK, NJ | NE | 5 | 358 |
| PEE DEE AREA | FLORENCE, SC | SO | 5 | 552 |
| PENNSYLVANIA DUTCH | LANCASTER, PA | NE | 6 | 524 |
| PIEDMONT | GASTONIA, NC | SO | 5 | 420 |
| PIEDMONT | PIEDMONT, CA | WE | 3 | 42 |
| PIKES PEAK | COLORADO SPRINGS, CO | WE | 5 | 60 |
| PINE BURR AREA | HATTIESBURG, MS | SO | 1 | 304 |
| PINE TREE | PORTLAND, ME | NE | 1 | 218 |
| PONY EXPRESS | ST JOSEPH, MO | CE | 5 | 311 |
| POTAWATOMI AREA | WAUKESHA, WI | CE | 7 | 651 |
| POTOMAC | CUMBERLAND, MD | NE | 4 | 757 |
| PRAIRIELANDS | CHAMPAIGN, IL | CE | 3 | 117 |
| PRESIDENT GERALD R. FORD | GRAND RAPIDS, MI | CE | 2 | 781 |

## Appendix D: Drop-Down Items Sheet 4: Council Info, Continued

| | | | | |
|---|---|---|---|---|
| PUERTO RICO | GUAYNABO, PR | NE | 5 | 661 |
| PUSHMATAHA AREA | COLUMBUS, MS | SO | 1 | 691 |
| QUAPAW AREA | LITTLE ROCK, AR | SO | 8 | 18 |
| QUIVIRA | WICHITA, KS | CE | 5 | 198 |
| RAINBOW | MORRIS, IL | CE | 7 | 702 |
| REDWOOD EMPIRE | SANTA ROSA, CA | WE | 3 | 41 |
| REVOLUTIONARY TRAILS | UTICA, NY | NE | 3 | 400 |
| RIO GRANDE | HARLINGEN, TX | SO | 3 | 775 |
| RIP VAN WINKLE | KINGSTON, NY | NE | 2 | 405 |
| ROCKY MOUNTAIN | PUEBLO, CO | WE | 5 | 63 |
| SAGAMORE | KOKOMO, IN | CE | 6 | 162 |
| SAM HOUSTON AREA | HOUSTON, TX | SO | 3 | 576 |
| SAMOSET | WESTON, WI | CE | 1 | 627 |
| SAN DIEGO-IMPERIAL | SAN DIEGO, CA | WE | 6 | 49 |
| SAN FRANCISCO BAY AREA | SAN LEANDRO, CA | WE | 3 | 28 |
| SAN GABRIEL VALLEY | PASADENA, CA | WE | 4 | 40 |
| SANTA FE TRAIL | GARDEN CITY, KS | CE | 5 | 194 |
| SENECA WATERWAYS | ROCHESTER, NY | NE | 3 | 397 |
| SEQUOIA | FRESNO, CA | WE | 3 | 27 |
| SEQUOYAH | JOHNSON CITY, TN | SO | 6 | 713 |
| SHENANDOAH AREA | WINCHESTER, VA | SO | 7 | 598 |
| SILICON VALLEY MONTEREY BAY | SAN JOSE, CA | WE | 3 | 55 |
| SIMON KENTON | COLUMBUS, OH | CE | 4 | 441 |
| SIOUX | SIOUX FALLS, SD | CE | 1 | 733 |
| SNAKE RIVER | TWIN FALLS, ID | WE | 2 | 111 |
| SOUTH FLORIDA | MIAMI LAKES, FL | SO | 4 | 84 |
| SOUTH GEORGIA | VALDOSTA, GA | SO | 9 | 98 |
| SOUTH PLAINS | LUBBOCK, TX | SO | 2 | 694 |
| SOUTH TEXAS | CORPUS CHRISTI, TX | SO | 3 | 577 |
| SOUTHEAST LOUISIANA | NEW ORLEANS, LA | SO | 1 | 214 |
| SOUTHERN SHORES FSC | ANN ARBOR, MI | CE | 2 | 783 |
| SOUTHERN SIERRA | BAKERSFIELD, CA | WE | 4 | 30 |
| SOUTHWEST FLORIDA | FORT MYERS, FL | SO | 4 | 88 |
| STONEWALL JACKSON AREA | WAYNESBORO, VA | SO | 7 | 763 |
| SUFFOLK COUNTY | MEDFORD, NY | NE | 2 | 404 |
| SUSQUEHANNA | WILLIAMSPORT, PA | NE | 4 | 533 |
| SUWANNEE RIVER AREA | TALLAHASSEE, FL | SO | 4 | 664 |
| TECUMSEH | SPRINGFIELD, OH | CE | 6 | 439 |
| TEXAS SOUTHWEST | SAN ANGELO, TX | SO | 3 | 741 |
| TEXAS TRAILS | ABILENE, TX | SO | 2 | 561 |
| THEODORE ROOSEVELT | MASSAPEQUA, NY | NE | 2 | 386 |
| THREE FIRES | ST CHARLES, IL | CE | 7 | 127 |
| THREE HARBORS | MILWAUKEE, WI | CE | 7 | 636 |

# Appendix D: Drop-Down Items Sheet 4: Council Info, Continued

| | | | | |
|---|---|---|---|---|
| THREE RIVERS | BEAUMONT, TX | SO | 3 | 578 |
| TIDEWATER | VIRGINIA BEACH, VA | SO | 7 | 596 |
| TRANSATLANTIC | LIVORNO, IT | NE | 6 | 802 |
| TRAPPER TRAILS | OGDEN, UT | WE | 2 | 589 |
| TRI-STATE AREA | HUNTINGTON, WV | CE | 4 | 672 |
| TUKABATCHEE AREA | MONTGOMERY, AL | SO | 9 | 5 |
| TUSCARORA | GOLDSBORO, NC | SO | 7 | 424 |
| TWIN RIVERS | ALBANY, NY | NE | 3 | 364 |
| TWIN VALLEY | MANKATO, MN | CE | 1 | 283 |
| UTAH NATIONAL PARKS | OREM, UT | WE | 2 | 591 |
| VENTURA COUNTY | CAMARILLO, CA | WE | 4 | 57 |
| VERDUGO HILLS | GLENDALE, CA | WE | 4 | 58 |
| VIRGIN ISLANDS | CHRISTIANSTED, VI | NE | 5 | 410 |
| VOYAGEURS AREA | HERMANTOWN, MN | CE | 1 | 286 |
| W.D. BOYCE | PEORIA, IL | CE | 3 | 138 |
| WATER AND WOODS | FLINT, MI | CE | 2 | 782 |
| WEST CENTRAL FLORIDA | SEMINOLE, FL | SO | 4 | 89 |
| WEST TENNESSEE AREA | JACKSON, TN | SO | 6 | 559 |
| WESTARK AREA | FORT SMITH, AR | SO | 8 | 16 |
| WESTCHESTER-PUTNAM | HAWTHORNE, NY | NE | 2 | 388 |
| WESTERN COLORADO | GRAND JUNCTION, CO | WE | 5 | 64 |
| WESTERN LOS ANGELES COUNTY | VAN NUYS, CA | WE | 4 | 51 |
| WESTERN MASSACHUSETTS | WESTFIELD, MA | NE | 2 | 234 |
| WESTMORELAND-FAYETTE | GREENSBURG, PA | NE | 4 | 512 |
| WINNEBAGO | WATERLOO, IA | CE | 3 | 173 |
| YANKEE CLIPPER | HAVERHILL, MA | NE | 1 | 236 |
| YOCONA AREA | TUPELO, MS | SO | 6 | 748 |
| YUCCA | EL PASO, TX | WE | 6 | 573 |
| Bronx | New, York, NY | NE | 2 | 641 |
| Brooklyn | New York, NY | NE | 2 | 642 |
| Manhattan | New York, NY | NE | 2 | 643 |
| Queens | New York, NY | NE | 2 | 644 |
| Staten Island | New York, NY | NE | 2 | 645 |
| Exploring | New York, NY | NE | 2 | 646 |
| Direct Service | National Office, BSA | SO | 1 | 800 |

## Appendix D: Drop-Down Items Sheet 5: Chartered Organizations

| Chartered Organization | Code |
|---|---|
| Academies | 122 |
| Accounting Firms, Business-Industry | 222 |
| AF and AM—Eastern Star, Shriners, Sojourners, Masons | 91 |
| AFL-CIO (Affiliates) | 49 |
| African Methodist Episcopal Church | 1 |
| African Methodist Episcopal Zion Church | 2 |
| Air Force (Bases, Reserves)* | 50 |
| Air National Guard* | 51 |
| Albanian Orthodox Diocese of America | 5 |
| Alpha Kappa Alpha | 242 |
| Alpha Phi Alpha | 235 |
| Alpha Phi Omega | 237 |
| Athletic Booster Clubs | 401 |
| Ambulance/First Aid/Rescue Squad* | 151 |
| American Baptist Association | 175 |
| American Baptist Churches in the U.S.A. | 175 |
| American Bar Association | 58 |
| American-Carpatho-Russian Orthodox Greek Catholic Church | 5 |
| American Evangelical Christian Church | 25 |
| American Indian Reservation | 216 |
| American Indian Tribal Council | 216 |
| American Legion and Auxiliary | 52 |
| AMVETS | 54 |
| American Red Cross | 53 |
| Anglican Church | 4 |
| Animal Veterinarian Hospitals—Clinics | 174 |
| Antiochian Orthodox Christian Archdiocese of N. America | 5 |
| Armenian Church of America | 231 |
| Army (Bases, Reserves)* | 55 |
| Army National Guard* | 56 |
| Assemblies of God | 6 |
| Associate Reformed Presbyterian Church | 7 |
| Association for Retarded Citizens | 131 |
| Athletic Booster Clubs | 401 |
| Baha'i Faith | 214 |
| Banks, Savings/Loan Associations, Banking Business | 223 |
| Baptist Churches | 175 |
| Baptist Association, American | 175 |
| Baptist Convention, Southern | 175 |
| Baptist General Conference | 175 |
| Baptist Missionary Association of America | 175 |
| Baptist Seventh Day | 175 |

## Appendix D: Drop-Down Items Sheet 5: Chartered Organizations, Continued

| | |
|---|---|
| Bar Associations | 58 |
| Beachy Amish Mennonite Church | 214 |
| Berean Fundamental Church | 214 |
| B'nai B'rith | 32 |
| Board of Education* | 123 |
| Board of Trade, Chambers of Commerce, Community Booster Clubs (Not School Affiliated) | 59 |
| Boys and Girls Clubs | 64 |
| BPOE (Elks) | 142 |
| Brethren Church (Ashland, Ohio) | 22 |
| Brethren, Church of the | 22 |
| Brethren, Christian Brethren of Plymouth | 22 |
| Brethren in Christ Church | 22 |
| Brethren in Christ, United | 22 |
| Brethren of America, Church of the Lutheran | 8 |
| Buddhist Churches of America | 10 |
| Bugle/Fife and Drum Corps | 16 |
| Burlington Northern Company | 226 |
| Businessmen's Clubs (Local) | 63 |
| Business-to-School Support Agencies | 243 |
| Byzantine Rite Catholic Church | 39 |
| Camps, Parks, Recreational Boards | 65 |
| Catholic Church, American-Carpatho-Russian Orthodox Greek | 5 |
| Catholic Church, Byzantine Rite | 39 |
| Catholic Church, Christian | 214 |
| Catholic Church, Eastern | 39 |
| Catholic Church, North American Old Roman | 214 |
| Catholic Church, Roman | 39 |
| Catholic, Holy Name Society, Roman | 39 |
| Catholic, Hospitals, Roman | 39 |
| Catholic, Knights of Columbus, Roman | 84 |
| Catholic Men's Club, Roman | 39 |
| Catholic, Other | 39 |
| Catholic Youth Organization (CYO) | 39 |
| Catholic War Veterans | 39 |
| Catholic Parents Associations, Schools, PTAs | 39 |
| Chambers of Commerce, Community Booster Clubs (not school-affiliated), Business Assn. | 59 |
| Chemist Societies | 105 |
| Child Care Centers/Day Care Centers | 48 |
| Christian and Missionary Alliance | 233 |
| Christian Catholic Church | 214 |
| Christian Church (Disciples of Christ) | 12 |
| Christian Church of North America | 214 |
| Christian Congregation, Inc. | 214 |

# Appendix D: Drop-Down Items Sheet 5: Chartered Organizations, Continued

| | |
|---|---|
| Christian Methodist Episcopal Church | 15 |
| Christian Nation, U.S.A. | 214 |
| Christian Reformed Church in North America | 214 |
| Christian Union | 214 |
| Church of Christ | 17 |
| Church of Christ, United | 45 |
| Church of God | 28 |
| Church of God (Anderson, Ind.) | 28 |
| Church of God by Faith, Inc. | 28 |
| Church of God (Cleveland, Tenn.) | 28 |
| Church of God General Conference (Oregon, Ill.) | 28 |
| Church of God in Christ | 3 |
| Church of God in Christ, International | 3 |
| Church of God in Christ (Mennonite) | 3 |
| Church of God of Prophecy | 28 |
| Church of God of the Mountain Assembly, Inc. | 28 |
| Church of Jesus Christ of Latter-day Saints (Mormon) | 21 |
| Church of the Brethren | 22 |
| Church of the Lutheran Brethren of America | 8 |
| Church of the Nazarene | 23 |
| Church, Religious Groups, Other | 214 |
| Citizens for Scouting, Groups of Citizens | 70 |
| City Council, Zoos, Libraries, Town Board, City Government* | 71 |
| Civil Air Patrol (CAP) | 229 |
| Civil Defense* | 72 |
| Civitan International | 74 |
| Club, Improvement Home Owners, Tenants Assoc. | 73 |
| Club, Sierra International | 39 |
| Clubs, Boys and Girls | 64 |
| Clubs, Industry, Fraternal Groups | 102 |
| Clubs, Ladies | 86 |
| Clubs, (Local) Businessmen's | 63 |
| Clubs, Men's | 94 |
| Clubs, Community Booster (not school-affiliated), Boards of Trade, Chambers of Commerce | 59 |
| Clubs, Gun and Rifle | 78 |
| Clubs, Organizations, Fraternal Groups, Other (unclassified) | 102 |
| Clubs, Other (not listed elsewhere), Service (unclassified) | 102 |
| Clubs, Roman Catholic Men's | 39 |
| Clubs, Women's | 86 |
| Clubs, Yacht | 121 |
| Coast Guard (Stations, Reserves and Auxiliaries)* | 75 |
| Colleges, Universities, Junior Colleges, Seminaries | 124 |
| Communications, Business-Industry | 224 |

# Appendix D: Drop-Down Items Sheet 5: Chartered Organizations, Continued

| | |
|---|---|
| Community Action Program* | 76 |
| Community Booster Clubs, (not school-affiliated), Boards of Trade, Chambers of Commerce | 59 |
| Community Center, Settlement House (except Jewish) | 97 |
| Community of Christ | 41 |
| Community Churches | 11 |
| Community College | 124 |
| Computer Science, Business-Industry | 228 |
| Congregational Church (United Church of Christ) | 45 |
| Congregational Church, Evangelical | 25 |
| Conservation Clubs and Groups—Hunting, Fishing, and Sportsmen | 78 |
| Conservative Baptist Association of America | 175 |
| Consolidated School* | 133 |
| Consular and Diplomatic Service* | 79 |
| Coptic Orthodox Church | 5 |
| Correctional Institution | 129 |
| Cosmopolitan International | 102 |
| Council of Churches, Ministerial Association | 164 |
| Councils/Districts of BSA | 137 |
| County or State Government* | 112 |
| Cumberland Presbyterian Church | 7 |
| Dads' Club, Mothers' Club | 128 |
| DAV (Disabled American Veterans) | 138 |
| Day Care Centers, Nurseries | 48 |
| Dental Associations | 139 |
| Delta Sigma Theta | 244 |
| Detention Home | 129 |
| Disciples of Christ (Christian Church) | 12 |
| Distributing Industry, Utilities | 191 |
| District Committees/Local Councils of BSA | 137 |
| Eagles, Fraternal Order of (FOE) | 140 |
| Eastern Catholic Church | 39 |
| Eastern Star, Masonic Lodges | 91 |
| Economic Opportunity Commission (EOC)* | 99 |
| Elks Lodges (BPOE) | 142 |
| Engineering Societies | 143 |
| Episcopal Church | 24 |
| Episcopal Church, Reformed | 214 |
| Evangelical Christian Church, American | 25 |
| Evangelical/Independent Churches | 25 |
| Evangelical Church of North America | 25 |
| Evangelical Congregational Church | 25 |
| Evangelical Covenant Church | 25 |
| Evangelical Free Church of America | 25 |

## Appendix D: Drop-Down Items Sheet 5: Chartered Organizations, Continued

| | |
|---|---|
| Evangelical Lutheran Church | 8 |
| Evangelical Lutheran Synod | 8 |
| Evangelical Methodist Church | 26 |
| Exchange Club, National | 144 |
| Fabricating, Business-Industry | 190 |
| Fathers' Club | 128 |
| Farm Bureau, Farm Cooperatives | 145 |
| Federal Government* | 148 |
| Federated Churches | 9 |
| FFA | 145 |
| Fire Chiefs Association (IAFC)* | 160 |
| Fire Departments, Professional* | 160 |
| Fire Departments, Volunteer* | 160 |
| Firefighters Union (IAFF)* | 160 |
| Fire Services (specify)* | 160 |
| First Aid/Rescue Squads/Ambulance* | 151 |
| Fishing, Hunting, Sportsmen, Conservation Clubs and Groups | 78 |
| Foreign Schools and Agencies | 257 |
| 4-H | 145 |
| Fraternal Groups, Other Clubs, Organizations | 102 |
| Fraternal Order of Eagles (FOE) | 140 |
| Fraternal Order of Police (IUPA)* | 103 |
| Free Lutheran Congregations | 8 |
| Free Methodist Church of North America | 26 |
| Free Will Baptist | 175 |
| Friends General Conference (Quakers) | 27 |
| Friends of Libraries/Zoos/Museums, etc. | 248 |
| Friends, Religious Society of (Quakers) | 27 |
| Friends United Meeting (Quakers) | 27 |
| Frontiers of America | 102 |
| Full Gospel Assemblies and Fellowship | 214 |
| Fundamental Methodist Church, Inc. | 26 |
| General Association of Regular Baptist Churches | 175 |
| General Motors Corporation | 226 |
| Government (Town Boards, City Councils, Zoos, Libraries), City* | 71 |
| Government, Federal* | 148 |
| Government, State or County* | 112 |
| Grange, National | 141 |
| Greek Orthodox Church | 5 |
| Groups of Citizens, Citizens for Scouting | 70 |
| Gun and Rifle Clubs | 78 |
| Halfway Houses, Group Homes | 171 |
| Hindu/Sikh | 234 |

# Appendix D: Drop-Down Items Sheet 5: Chartered Organizations, Continued

| | |
|---|---|
| Holy Name Society (Roman Catholic) | 39 |
| Home and School Groups | 128 |
| Homeowners Associations | 73 |
| Homeschool Associations | 125 |
| Hospitals, Clinics | 172 |
| Hospitals, Clinics, Animal or Veterinarian | 174 |
| Hospitals for Handicapped | 130 |
| Hospitals, Roman Catholic | 39 |
| Housing Authority (HUD)* | 195 |
| Hungarian Reformed Church in America | 214 |
| Hunting, Fishing, Sportsmen, Conservation Clubs and Groups | 78 |
| Improvement Clubs, Block Clubs | 73 |
| Independent Churches/Congregations, Unaffiliated | 214 |
| Independent Christian Schools | 325 |
| Independent Fundamental Churches of America | 214 |
| Indian Reservation, American | 216 |
| Indian Tribal Councils | 216 |
| Industry Clubs | 102 |
| Insurance and Real Estate, Business Industry | 215 |
| International Church of the Four Square Gospel | 214 |
| International Pentecostal Church of Christ (Pentecostal) | 31 |
| IOOF Lodge (Odd Fellows) | 98 |
| Iota Phi Theta | 239 |
| Islam, Muslim, Masjid | 36 |
| Izaak Walton League | 194 |
| Jaycees—Junior Chamber of Commerce | 81 |
| Jehovah's Witnesses | 214 |
| Jewish Community Centers | 32 |
| Jewish Day Schools | 332 |
| Jewish, Other | 32 |
| Jewish Synagogues, Temples, and Other Organizations | 32 |
| Jewish War Veteran Posts | 32 |
| Jewish War Veterans | 249 |
| Job Corps Centers* | 82 |
| Kappa Alpha Phi | 240 |
| Kiwanis International | 83 |
| Knights of Columbus, Roman Catholic | 84 |
| Knights of Pythias | 85 |
| Labor Organizations (AFL-CIO Affiliates) | 49 |
| Labor Organizations (other than AFL-CIO, i.e., IBT, UMW, NEA) | 90 |
| Ladies' Clubs | 86 |
| Latvian Evangelical Church in America | 214 |
| Law Enforcement Agencies (Specify)* | 103 |

## Appendix D: Drop-Down Items Sheet 5: Chartered Organizations, Continued

| | |
|---|---|
| LDS—The Church of Jesus Christ of Latter-day Saints (Mormon) | 21 |
| Libraries, City Government, Town Boards, City Councils, Zoos* | 71 |
| Lions International | 87 |
| Loyal Order of Moose | 89 |
| Lutheran Brethren of America, Church of the | 8 |
| Lutheran Church in America | 8 |
| Lutheran Church, Other | 8 |
| Lutheran Church—Missouri Synod | 8 |
| Lutheran Churches, Evangelical | 8 |
| Lutheran Congregations, Free | 8 |
| Lutheran Schools | 308 |
| Manufacturing, Business Industries/General Motors Corp. | 190 |
| Marines, Marine Reserves | 92 |
| Masjid, Islam, Muslim | 36 |
| Masons (AF and AM)--Eastern Star, Shriners, Sojourners | 91 |
| Medical Societies | 93 |
| Mennonite Brethren Churches | 214 |
| Mennonite Church | 214 |
| Men's Clubs | 94 |
| Men's Clubs (Roman Catholic) | 39 |
| Methodist Church, Evangelical | 26 |
| Methodist Church, Inc., Fundamental | 26 |
| Methodist Church of North America, Free | 26 |
| Methodist Church Southern | 26 |
| Methodist Church, United | 26 |
| Methodist Church, U.S.A., Primitive | 26 |
| Methodist Episcopal Church, African | 1 |
| Methodist Episcopal Church, Christian | 15 |
| Methodist Episcopal Zion Church, African | 2 |
| Methodist, Except Episcopal and the Wesleyan | 26 |
| Metropolitan Community Church | 214 |
| Military Order of Cooties (VFW) | 95 |
| Military Order of World Wars | 250 |
| Military Schools, ROTC | 247 |
| Ministerial Association, Council of Churches | 164 |
| Missionary Church | 214 |
| Mobile Home Park Association | 102 |
| Model Cities | 99 |
| Moose, Loyal Order of | 89 |
| "Mormon", (LDS) The Church of Jesus Christ of Latter-day Saints | 21 |
| Moravian Church in America | 35 |
| Mothers' Clubs | 128 |
| Muslim, Masjid, Islam | 36 |

# Appendix D: Drop-Down Items Sheet 5: Chartered Organizations, Continued

| | |
|---|---|
| NAACP and Other Advocacy Groups | 259 |
| National Association of Free Will Baptists | 175 |
| National Baptist Convention of America | 176 |
| National Baptist Convention of America, Inc. | 178 |
| National Baptist Convention, USA | 177 |
| National Guard—Air* | 51 |
| National Guard—Army* | 56 |
| National Missionary Baptist Convention of America | 176 |
| National Primitive Baptist Convention, Inc. | 175 |
| Navy, Naval Reserve* | 230 |
| Nazarene, Church of the | 23 |
| Neighborhood Community Center, Settlement House | 97 |
| Neighborhood Opportunity Center | 97 |
| Netherlands Reformed Congregations | 214 |
| New Apostolic Church of North America | 214 |
| Non-Denominational Churches | 214 |
| Nonprofit Agencies | 256 |
| North American Baptist Conference | 175 |
| North American Old Roman Catholic Church | 214 |
| Nurseries, Day Care Centers | 48 |
| Odd Fellows (IOOF) Lodge | 98 |
| Office of Economic Opportunity (OEO)* | 76 |
| Omega Psi Phi | 238 |
| Optimist International | 100 |
| Organizations, Fraternal Groups, Other Clubs | 102 |
| Orphanages (non-church affiliated) | 101 |
| Orthodox Christian Archdiocese of North America, Antiochian | 5 |
| Orthodox Church, Coptic | 5 |
| Orthodox Church, Greek | 5 |
| Orthodox Church, Serbian | 5 |
| Orthodox Church in America | 5 |
| Orthodox Church in America, U.S.A., Ukrainian | 5 |
| Orthodox Church in America, Romanian | 5 |
| Orthodox Church of Antioch Syrian | 5 |
| Orthodox Diocese of America, Albanian | 5 |
| Orthodox Greek Catholic Church, American-Russian | 5 |
| Orthodox Presbyterian Church | 7 |
| Other Baptist | 175 |
| Other Catholic | 39 |
| Other Clubs, Organizations, Fraternal Groups | 102 |
| Other Educational Institutions | 126 |
| Other Jewish | 32 |
| Other Lutheran | 8 |

## Appendix D: Drop-Down Items Sheet 5: Chartered Organizations, Continued

| | |
|---|---|
| Other Service Clubs or Organizations | 258 |
| Parents' Clubs, PTOs, PTSAs | 128 |
| Parents/Faculty Club | 128 |
| Parents Without Partners | 104 |
| Parks, Park Boards, Camps, Playgrounds | 65 |
| Pentecostal Church, International, United | 31 |
| Pentecostal Church of Christ, International | 31 |
| Pentecostal Church of God in America, Inc. | 31 |
| Phi Beta Sigma | 241 |
| Plymouth, Christian Brethren | 22 |
| Police, Sheriff Departments, Fraternal Order of Police (IUPA) | 103 |
| Polish National Catholic Church of America | 214 |
| Presbyterian | 7 |
| Presbyterian Church, Associate Reformed | 7 |
| Presbyterian Church, Orthodox | 7 |
| Presbyterian Church Evangelical | 7 |
| Presbyterian Church, Cumberland | 7 |
| Presbyterian Church (U.S.A.) | 7 |
| Presbyterian Church of North America, Reformed | 7 |
| Primitive Baptists | 175 |
| Primitive Methodist Church, USA | 26 |
| Private School, Academies | 122 |
| Professional, Scientific Societies, See Also 58 (Bar), 93 (Medical), 139 (Dental), 143 (Engineering) | 105 |
| Progressive National Baptist Convention, Inc. | 179 |
| PTA | 127 |
| PTO, PTSA | 128 |
| PTA, Catholic Schools | 39 |
| Public Schools* | 133 |
| Quakers (Friends Church) | 27 |
| Railroads, Business Industry | 226 |
| Real Estate and Insurance, Business Industry | 215 |
| Recreational Boards, Camps, Parks | 65 |
| Red Cross, American | 53 |
| Reform School | 129 |
| Reformed Baptists | 175 |
| Reformed Church in America | 40 |
| Reformed Episcopal Church | 214 |
| Reformed Presbyterian Church, Associate | 7 |
| Reformed Presbyterian Church of North America | 7 |
| Religious Society of Friends (Quakers) | 27 |
| Rescue Squad/Ambulance/First Aid* | 151 |
| Reserves—Air Force Bases* | 50 |
| Reserves—Army Bases* | 55 |

## Appendix D: Drop-Down Items Sheet 5: Chartered Organizations, Continued

| | |
|---|---|
| Reserves—Coast Guard (Stations and Auxiliaries)* | 75 |
| Reserves—Marines, Marine Bases* | 92 |
| Reserves—Navy, Naval* | 230 |
| Retail Stores, Business Industry | 225 |
| Roman Catholic Church | 39 |
| Roman Catholic Holy Name Society | 39 |
| Roman Catholic Hospitals | 39 |
| Roman Catholic Knights of Columbus | 84 |
| Roman Catholic Men's Club | 39 |
| Romanian Orthodox Church in America | 5 |
| Rotary International | 107 |
| Roundtable International | 102 |
| Ruritan Club | 109 |
| Russian Orthodox Greek Catholic Church, American-Carpatho | 5 |
| Savings/Loan Associations, Banks, Business-Industry | 223 |
| School Faculty* | 133 |
| Schools for the Handicapped | 135 |
| Schools, Catholic, and Catholic Parents Association | 339 |
| Scientific Societies, See also 58 (Bar), 93 (Medical), 139 (Dental) | 105 |
| Search and Rescue/First Aid/Ambulance Services | 254 |
| Serbian Eastern Orthodox Church | 5 |
| Sertoma International | 111 |
| Service Clubs—Other (unclassified) | 102 |
| Settlement House | 97 |
| Seventh Day Adventists | 214 |
| Seventh Day Baptist | 175 |
| Sheriff's Departments* | 103 |
| Shriners, Sojourners | 91 |
| Sierra International Club | 39 |
| Sigma Gamma Rho | 245 |
| Soccer Leagues and Clubs | 402 |
| Sons of the American Revolution | 102 |
| Sororities and Fraternities | 124 |
| Southern Baptist Convention | 175 |
| Southern Methodist Church | 26 |
| Sportsmen, Conservation, Hunting, Fishing Clubs and Groups | 78 |
| Sports Organizations, Other | 403 |
| State or County Government* | 112 |
| Swedenborgian Church | 214 |
| Synagogues, Temples, and Congregations, Jewish | 32 |
| Syrian Orthodox Church of Antioch | 5 |
| Telephone Pioneers of America | 224 |
| Temples, Congregations, and Synagogues, Jewish | 32 |

## Appendix D: Drop-Down Items Sheet 5: Chartered Organizations, Continued

| | |
|---|---|
| Tenants, Improvement Clubs, Homeowners | 73 |
| The Salvation Army | 42 |
| Town Boards, City Councils, Zoos, Libraries, City Government* | 71 |
| Trailer Park | 102 |
| Transportation, Business Industry | 226 |
| Training Schools (Reform) | 129 |
| Tribal Council (American Indian) | 216 |
| Ukrainian Orthodox Church in America, U.S.A. | 5 |
| Unaffiliated Church/Congregations, Independent | 214 |
| Unclassified, Business Industry | 227 |
| Unclassified Churches | 214 |
| Unclassified Groups, Organizations, Fraternal Groups | 102 |
| Unitarian Universalist Association | 44 |
| United Brethren in Christ | 22 |
| United Church of Christ (Congregational Church) | 45 |
| United Methodist Church | 26 |
| United Pentecostal Church International | 31 |
| United States Steel Company | 190 |
| United States Power Squadrons | 236 |
| United Way, Foundations, Other Similar Agencies | 255 |
| Urban League | 102 |
| Utilities, Distributing Business-Industry | 191 |
| Veterinarian, Animal Hospitals/Clinics | 174 |
| VFW, Auxiliary, Cooties | 95 |
| Volunteer Emergency Auxiliaries | 252 |
| Volunteer Fire Company* | 160 |
| Volunteer Fire Auxiliaries | 253 |
| Volunteers of American | 102 |
| Volunteers Police Auxiliaries | 251 |
| Wesleyan Church | 47 |
| Women's Clubs | 86 |
| YMCA | 120 |
| YMHA | 32 |
| YWCA | 120 |
| YWHA | 32 |
| Yacht Clubs | 121 |
| Youth Centers | 97 |
| Zeta Phi Beta | 243 |
| Zoos, Libraries, City Government, Town Boards, City Councils* | 71 |

# Appendix D: Drop-Down Menus: Sheet 6: CBC Offense Codes

| Offense Title | Offense Code |
|---|---|
| **VIOLENT** | |
| Capital Murder | 0 |
| Murder, Deliberate Homicide | 1 |
| Manslaughter | 2 |
| Attempted Murder, Attempted Manslaughter | 3 |
| Aggravated Assault | 4 |
| Assault and Battery/Other Assault | 6 |
| Other or Unspecified Violent Crimes* | 9 |
| **POTENTIALLY VIOLENT** | |
| Robbery | 21 |
| Kidnapping | 22 |
| Arson | 23 |
| Other or Unspecified Potentially Violent* | 29 |
| **OTHER CRIMES AGAINST PERSON** | |
| Criminally Negligent Homicide, Vehicular Homicide | 30 |
| Families and Children (contributing to the delinquency of a minor) | 31 |
| Hit and Run | 32 |
| Coercion | 33 |
| Unlawful Imprisonment, Unlawful Restraint | 34 |
| Harassment, Verbal Assault (e.g., Simple Assault, Terroristic Threat, Intimidation) | 35 |
| Criminal Possession of Weapon | 36 |
| Menacing | 37 |
| Reckless Endangerment | 38 |
| Other or Unspecified Crime Against Person* (Conspiracy, Mutiny in a penal institution) (Accessory to violent crime) | 39 |
| **SEX** | |
| Forcible Rape | 40 |
| Forcible Sodomy | 41 |
| Statutory Rape (Consensual), Misdemeanor Rape | 42 |
| Sexual Abuse, Sexual Assault | 44 |
| Sexual Misconduct | 45 |
| Incest | 46 |
| Lewd and Lascivious Conduct | 47 |
| Other or Unspecified Sex Crime | 49 |
| **PROPERTY** | |
| Burglary, Breaking and Entering | 50 |
| Criminal Mischief | 51 |
| Criminal Trespassing, Unlawful Entry | 52 |
| Larceny (Grand and Petit) | 53 |
| Auto Theft | 54 |
| Theft, Shoplifting, Pickpocketing (except auto theft) | 55 |

## Appendix D: Drop-Down Menus: Sheet 6: CBC Offense Codes, Continued

| | |
|---|---|
| Possession of Stolen Property, Criminal Receiving | 56 |
| Forgery and Counterfeiting | 57 |
| Fraud (Deceptive Practices) Falsifying Records, Embezzlement | 58 |
| Forged Check, Bad Check, Theft of Service | 59 |
| Bribery | 60 |
| Conspiracy | 61 |
| Other or Unspecified Property Crime (e.g., Possession of a Forged Instrument) | 69 |
| **DRUG** | |
| Drug, Selling Dangerous | 70 |
| Drug, Possession Dangerous | 71 |
| Other or Unspecified Drug Crime (possession of a forged drug document, illegal RX) | 79 |
| **MINOR** | |
| Parole Violation | 80 |
| Probation Violation | 81 |
| DWI, DUI | 82 |
| Public Intoxication, Drunkenness | 83 |
| Court Related Offenses (warrants, failure to appear, escape, bail jumping) | 84 |
| Gambling | 85 |
| Criminal Nuisance | 86 |
| Disorderly conduct, Breach of Peace, Resisting Arrest | 87 |
| Loitering, Vagrancy | 88 |
| Indecent Exposure, Obscenity, Public Lewdness | 89 |
| Traffic Infractions | 90 |
| Prostitution, Pandering | 97 |
| Other or Unspecified Minor Offense | 97 |
| No Crime | 98 |
| No Information | 99 |

## Appendix D: Drop-Down Menus: Sheet 7: Location of Alleged Abuse

| Location of Alleged Abuse |
|---|
| Camp |
| Meeting |
| Outing |
| Leader's Home |
| Youth's Home |
| Traveling to or from Scouting function |
| Other-specify: |

## Appendix D: Drop-Down Menus: Sheet 8: Barriers to Abuse

| Barriers to Abuse |
| --- |
| Two deep leadership |
| No one-on-one contact |
| Separate accommodations for leaders and youth |
| Privacy of youth to be respected, especially when dressing and showering |
| No inappropriate use of cameras, imaging, digital devices, and social media |
| No secret organizations, initiations, or hazing |
| No bullying |
| Behavior inconsistent with the Scout Oath and Law |
| Failure to follow youth protection policies, including mandatory reporting of child abuse |

## Appendix D: Drop-Down Menus: Sheet 9: How Abuse was Reported

| How abuse was reported |
| --- |
| Report of youth (victim) |
| Report of youth (non-victim) |
| Report of parent |
| Report of Scout Leader |
| Report of law enforcement |
| Unknown |

## Appendix D: Drop-Down Menus: Sheet 10: Youth Serving Organizations

| YSO (Youth Serving Organization) Name |
| --- |
| American Red Cross-Youth Office |
| American Youth Soccer Organization |
| Big Brothers Big Sisters of America |
| Boys and Girls Club of America |
| Boys and Girls State |
| Camp-Related Organization (e.g., Camp Fire, American Camp Assn., etc.) |
| Children of the American Revolution |
| Church-Related Youth Activities (e.g., Sunday School) |
| Civil Air Patrol |
| Community Sports Activity (e.g., Little League Coach, Soccer, Basketball, etc.) |
| Fellowship of Christian Athletes |
| Girl Scouts |
| Hugh O'Brian Youth Leadership |
| Junior Statesmen of America |
| Key Club (Kiwanis Educating Youth) |
| National 4-H Council |
| Public or Private Schools (Teacher or Any Other Position-e.g., Coach, Janitor) |
| ROTC/Military Academies |
| Special Olympics, Inc. |
| YMCA/YWCA, etc. |
| Youth Special Events & Destinations (e.g., Carnivals, Amusement Parks, Children's Museums) |

## Appendix D: Drop-Down Menus: Sheet 11: Incident Code/Legal Outcome

### Sheet 11: Incident Code

| Incident Type | Code | Code-Youth |
|---|---|---|
| Child Pornography | CP | Y-CP |
| Child Sexual Abuse | CSA | Y-CSA |
| Criminal | C | Y-C |
| Criminal Background Check | CBC | (Not apply) |
| Leadership | L | Y-L |
| Other | O | Y-O |
| Pornography | P | Y-P |
| Theft | T | Y-T |
| Unwelcome | U | (Not apply) |
| Youth Protection Programs | YPV | Y-YPV |

### Sheet 11: Legal Outcome

| If Legal Outcome |
|---|
| Guilty |
| Not Guilty |
| Unknown |

## Appendix E: Page with Bates Numbering (highlighted in yellow)



March 13,

Mr. ████████ Scout Executive
Council, No. ████████

PERSONAL AND CONFIDENTIAL
Re: ████████████ and
████████████

Dear ████:

   We have just received the information on the two men mentioned above and we certainly appreciate your very prompt action and complete report covering such matters. We have taken appropriate action to delete both men from the unit records.

                                    Sincerely yours,
                                    PERSONNEL DIVISION


                                    Assistant Director
                                    Registration Service


**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**                    BSA_AJOC1840

## Appendix F: Instructions for Case Descriptions

### INSTRUCTIONS FOR WRITING THE FILE DESCRIPTION

1. **Focus 1:** Introduce IV by name, age, occupation, employer, Scouting position, and council

   *"John Doe, a 27-year-old police officer for the Metro City Police Department and Scoutmaster with the Hometown #555 council, was charged with…"*

2. **Focus 2:** Charges, convictions, and any sentences imposed (no need to mention possible sentences that might be referenced pretrial).

   *Doe was convicted of five counts of lewd and lascivious behavior with youth under 16 years of age, and was sentenced to five years of probation.*

3. **Focus 3:** Alleged sexual behavior that occurred. We want to be as specific as possible; for example, if the file clearly states that the IV touched a Scout's penis, we want to specifically include that in the description instead of saying a vague statement such as, "Doe inappropriately touched a Scout." We would like you to use words to create a visual image for the reader.

   *Doe was alleged to have rubbed the penises of three boys underneath their clothing while sharing a tent with them on a six-day camping trip in the mountains from March 7 to 13, 2003. He was also alleged to have performed oral sex on a different Scout at his home while working alone with the youth on a Merit Badge.*

Pay attention to the use of the word "alleged;" which is to be used unless the IV was clearly convicted or pleaded guilty to the crime in court.

4. **Focus 4:** Information about the victim(s). We want to know their age, gender, how the alleged abuse affected them, and any other relevant information (for example, if the youth reported being humiliated, feeling sorry for the IV, wanting to forget the whole ordeal, etc).

   *The three boys on the camping trip were 11 to 15 years of age, and had discussed among themselves that they did not want to "tell on" their Scoutmaster for fear that he would get in trouble with the law. The youth who was molested at Doe's home was very upset and began crying when he arrived home, thus prompting his mother to obtain information about the abuse.*

Do not include the name of victims. If there are multiple victims, you can say "Victim 1," "Victim 2," etc. to help clarify the incidents involving each victim.

5. **Focus 5:** Information about how the local council found out about the abuse; local council refers to council employees (Scout Executive, Field Director, etc.), not Scoutmaster.

   *When the mother of the youth learned of the allegations, she immediately called a Committee Member of the Troop, who contacted the local council and also reported the allegations to law enforcement.*

## Appendix F: Instructions for Case Descriptions, Continued

6. **Focus 6:** If there was a regional and/or a national review, the result of that review should be included.

> *A regional review of Doe's revocation of membership was held in 2000, and his revocation was upheld.*

IV's first request a regional review of the revocation of their membership. If they are unsatisfied with the results of the regional review, they can ask for a national review.

7. **Focus 7:** Highly unusual aspects of the case such as the child committing suicide, the perpetrator committing suicide, the perpetrator killing the victim, the perpetrator marrying the mother of the victim, any other unusual or interesting characteristics of the IV, etc. Here you should just use your own best judgment.

### WHAT TO MENTION SPECIFICALLY IF IT IS NOT THERE

8. **Focus 8:** In a single sentence, reference any of the central information that was missing in the file so we can tell it was not there and not just left out of the description.

> *It is unclear how the local council found out about the alleged incident, and there is no other information about the alleged incident or the alleged victim.*

Note the second clause is not necessary to include in every file, and should only be mentioned when there is a notable lack of detail presented in the file.

### CERTAIN GRAMMATICAL AND PUNCTUATION PRACTICES

- Please leave only a single space between each period and the beginning of the next sentence
- Please print out the date fully, i.e. instead of putting 7/22/2008 write July 22, 2008
- Please capitalize any proper nouns related to Scouting; for example, Scouting positions (Scoutmaster, Committee Member, Youth Member, etc.), "Scouting," Boy Scouts, and names of councils.
- Please use hyphens for "13-year-old" and "second-degree rape."
- The proper use of law enforcement terms include Sheriff's Office and Police Department
- Please write out any number less than 10 and use digits for any number 10 or greater. The exception would be when you are writing dates (i.e. October 2, 2009), or a sentence with two concurrent series of numbers for clarity.

**(See example descriptions on following page.)**

## Appendix F: Instructions for Case Descriptions, Continued

### SOME EXAMPLES FOR REFERENCE

**A short example:**

*John Smith Doe, a 26-year-old Assistant Scoutmaster and Scoutmaster with the Someplace #123 Council in Alabama, was found guilty of second-degree sexual assault of a child in March 2002. Other charges alleging additional abuse were dropped and he was sentenced to 12 years on probation. There is no other information about the incident or victim, and it is unclear how the incident came to light, as well as how the local council discovered what had occurred.*

**A medium example:**

*Joseph Smith Doe, a 40-year-old school cafeteria manager with the Somewhereville Elementary School and Scoutmaster with the Otherplace #456 council in Connecticut, pleaded guilty to two counts of using a computer for solicitation and two counts of taking of indecent liberties with children. He was sentenced to nine and a half years on probation and six months incarceration. The investigation was a part of an undercover operation from June to August 2005 conducted by the Somewhereville County Sheriff's Office. During the operation, the deputies posed as 14-to-16 year old girls in online chat rooms. It is unclear how the local council found out about the allegations.*

**A long example:**

*Jacob Smith Doe, a 38-year-old former day care worker, Assistant Scoutmaster, and Committee Member with the New Place #789 council in Delaware, was accused of child abuse on two occasions. In 2000, he was investigated for inappropriately touching the genitals of his uncle's four-to-five-year-old son, but attributed the touching to giving the boy a bath and washing his genitals with a washcloth. In 2006, Doe allegedly touched the genitals of seven boys at a swimming pool during an outing with the day care center. Child Protective Services investigated both of the allegations and determined them unfounded. A Scouting parent contacted the Committee Chair of Troop 123 to inform her that the Children and Youth Services had investigated Doe for sexual misconduct, and the local council conducted an investigation before revoking Doe's membership. A regional review was conducted and upheld Doe's revocation; Doe appealed this review to a national level, and there is no information in the file about the outcome of the national review, but, the presence of the file suggests that Doe's revocation was upheld.*

# Appendix G: IRB Approval



**UNIVERSITY** *of* **VIRGINIA**

OFFICE OF THE VICE PRESIDENT FOR RESEARCH
INSTITUTIONAL REVIEW BOARD FOR THE SOCIAL AND BEHAVIORAL SCIENCES

In reply, please refer to: Project # 2013-0093-00

February 27, 2013

Janet Warren
Psychiatry and Neurobehavioral Sciences
PO Box 800660

Dear Janet Warren:

The Institutional Review Board for the Behavioral Sciences has approved your research project entitled "A review of the "P" or Perversion Ineligible Volunteer (IV) files from the Boy Scouts of America - 1990-210." You may proceed with this study.

This project # 2013-0093-00 has been approved for the period February 27, 2013 to February 26, 2014. If the study continues beyond the approval period, you will need to submit a continuation request to the Review Board. If you make changes in the study, you will need to notify the Board of the changes.

Sincerely,

Tonya R. Moon, Ph.D.
Chair, Institutional Review Board for the Social and Behavioral Sciences

One Morton Drive, Suite 500 • Charlottesville, VA 22903
P.O. Box 800392 • Charlottesville, VA 22908-0392
Phone: 434-924-5999 • Fax: 434-924-1992
www.virginia.edu/vpr/irb/sbs.html

## Formatting Notes

This manual was typeset in Garamond, with the IVRS and Coding Form set in Arial and Cambria, respectively. This document was primarily in 11 pt. font, with headers at 14 and 12 pts. Spacing used was 1.15 spaces, and paragraphs were set to 12 pt. after, with some exceptions.

Most text was left justified, with bullet points indented to 0.25 ″, and text starting at 0.5 ″; indented bullet points were set an additional 0.25 ″ to the right for each level of indentation. For the "lettered" lists, the first level was at 0.25 ″ with the text at 0.6125 ″, and the second level of indentation changed to 0.5 ″ and 0.75 ″. Tertiary levels added 0.25 ″ to each measure (all in regards to the left margin).

Page margins were set to 0.5 ″ around all edges, and blank pages were inserted for ease of printing. Bold text indicates emphasis, and italics are used exclusively to quote text from the coding materials (coding form, IVRS, etc.), including not only prompt text but also possible answer phrasing.

The colored text was set to RGB of 0/63/135.

For questions concerning the formatting, please contact:
James M. Wellbeloved-Stone, jmw6bh@hscmail.mcc.virginia.edu

# BOY SCOUTS OF AMERICA

## MEMBERSHIP SCREENING DATABASE: AN EMPIRICAL REVIEW

## 1946 – 2016

## APPENDIX B:

## CODER RELIABILITY, 1944 – 2016 FILES

2019

Reliability Analysis

Reliability was assessed using ten cases distributed to the coders ever four-hundred cases.

| | 1 | 2 | 521 | 921 | 1221 | 1721 | 2021 | 2421 | 2821 | 3221 | 3621 | 4021 | **Total** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| IVRS.1 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | **100** |
| IVRS.2 | 100 | 100 | 100 | 100 | 100 | | 100 | 100 | 100 | 100 | 100 | 100 | **100** |
| IVRS.3 | 100 | 100 | 100 | 100 | | 100 | 100 | 100 | 100 | 100 | 60 | 100 | **96.67** |
| IVRS.4 | | | 100 | | 100 | 85 | 100 | | 100 | 100 | | 100 | **97.86** |
| IVRS.5 | 50 | 75 | 100 | 50 | 55.6 | 50 | 100 | 100 | | 100 | 80 | 80 | **76.42** |
| IVRS.6 | 100 | 75 | 100 | 100 | 100 | | 100 | 100 | 100 | 100 | 100 | 100 | **97.73** |
| IVRS.7 | 100 | 100 | 92.9 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 80 | 80 | **96.08** |
| IVRS.8 | 100 | 100 | 100 | 100 | 66.7 | 90 | 100 | 100 | 100 | 100 | 40 | 100 | **91.39** |
| IVRS.9 | 75 | 100 | 100 | 100 | 100 | 100 | 100 | 85.7 | 100 | 80 | 100 | 100 | **95.06** |
| | | | | | | | | | | | | | |
| UVARCT.1 | 100 | 100 | 100 | 100 | 88.9 | 90 | 100 | 100 | 100 | 100 | 100 | 60 | **94.91** |
| UVARCT.2 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | **100** |
| UVARCT.3 | 75 | 100 | 100 | 100 | 100 | 90 | 100 | 100 | 100 | 100 | 100 | 100 | **97.08** |
| UVARCT.4 | 100 | 100 | 100 | 90 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | **99.17** |
| UVARCT.5 | 91.1 | 94.6 | 88.3 | 79.2 | 96 | 100 | 91.1 | 94.9 | 92.9 | 91.4 | 95.7 | 90 | **92.10** |
| UVARCT.6 | 100 | 75 | 64.3 | 100 | 77.8 | 100 | 62.5 | 57.1 | 85.7 | 80 | 100 | 100 | **83.53** |
| UVARCT.7 | 100 | 100 | 100 | 100 | 100 | 70 | 100 | 100 | 100 | 100 | 100 | 40 | **92.50** |
| UVARCT.8 | 100 | 88.9 | 100 | 97.8 | 91.4 | 91.1 | 100 | 84.1 | 100 | 100 | 80 | 77.8 | **92.59** |
| UVARCT.9 | 100 | 100 | 100 | 100 | 88.9 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | **99.08** |
| UVARCT.10 | 91.7 | 97.9 | 86.9 | 78.3 | 77.8 | 88.3 | 75 | 71.4 | 69 | 80 | 93.3 | 88.3 | **83.16** |
| UVARCT.11 | 87.5 | 100 | 92.9 | 80 | 77.8 | 85 | 75 | 71.4 | 71.4 | 80 | 90 | 95 | **83.83** |
| UVARCT.12 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 85.7 | 100 | 80 | 100 | 100 | **97.14** |
| UVARCT.13 | 100 | 100 | 90.2 | 95.6 | 88.2 | 90 | 100 | 112 | 98.2 | 97.5 | 80 | 80 | **94.31** |
| UVARCT.14 | 100 | 100 | 64.3 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | | **97.03** |
| UVARCT.15 | 75 | 75 | 100 | 100 | 11.1 | 100 | 100 | 71.4 | 71.4 | 60 | 20 | | **71.99** |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | **Average Overall:** | **92.83** |

IVRS Variables:

IVRS.1: Name of IV (1 correct first name and 1 correct last name)

IVRS.2: Date of birth (if present)

IVRS.3: Address-correct street name and city name

IVRS.4: Weight and height (if present)

IVRS.5: Occupation

IVRS.6: Council name(s)

IVRS.7: Chartered organization (any correct)

IVRS.8: Any indication IV in any other YSOs (y/n question)

IVRS.9: 1 Matching victim name

UVA-RCT Variables:

UVA-RCT.1: Earliest date concerning referenced abuse in file (by year)

UVA-RCT.2: Does it contain enough information (A5)

UVA-RCT.3: Does it involve activity individuals under 18 (A6)

UVA-RCT.4: B3: materials indicate public record (Y/N)

UVA-RCT.5: B6: what led to file opening, any matching

UVA-RCT.6: B8: parents of Y in A-CSA aware of allegations?

UVA-RCT.7: B9: parents of Y in Y-CSA aware of allegations?

UVA-RCT.8: B12: IV responses, any overlap

UVA-RCT.9: B14: indications other YSOs (Y/N)

UVA-RCT.10: B17: Y on Y… any overlap

UVA-RCT.11: B18: instances of Y on Y responses, any overlap

UVA-RCT.12: C9: IV ever arrested sex crime

UVA-RCT.13: C11: any overlap, characteristics of IV

UVA-RCT.14: C12: reference to pornography (Y/No indication)

UVA-RCT.15: # of victim modules coded

**Total:** Total Reliability Per Question

# BOY SCOUTS OF AMERICA

## MEMBERSHIP SCREENING DATABASE: AN EMPIRICAL REVIEW

## 1946 – 2016

## APPENDIX C:

## SCREEN SHOT OF FILTRUM: REGISTRATION

## SCREENING MODULE

### 2019

**FILTRUM | RSM**
*A Registration Screening Module*

**Purpose:** A registration screening module that maintains a database of allegations, information surrounding the allegation, including persons involved (perpetrators, victims, etc.), location

**Home Page:** Includes up-to-date case statistics, visual interpretations, and customizable tabs based on security level and need.
- Personalized URL to the organization.
- Search bar to lookup information and its records.



**ALLEGATIONS:** The first step in collecting information of an alleged incident.
- Includes the initial allegation report, associated individuals, record keeping of when a case is closed or re-opened, a complete list of narratives throughout the case process, and current status of case based on information provided and authorized approvals.
- Allegations are organized by "Name of Perpetrator(s)" | "Council #" | "Year of Allegation"
- If an identified individual is not already in the database, their information can be added under PEOPLE.



**PEOPLE:** Providing information on person's potentially in involved in an allegation.

- Includes basic demographic and contact information, records of multiple addresses, organization affiliations, and associations of any allegations



**DOCUMENTS/ATTACHMENTS:** Associating documents with supplemental information to an allegation.

- Includes a document type, received information, and the ability to associate documents with a person or allegation.
- Documents are organized by "Document Type" | "Date of Document" | "Date Received"
- An email will be sent to an authorized reviewer to approve the attachment if "May require reopening of case?" is checked, "Other" is selected as document type, or both are selected.



**EXPORT TO CLEARININGHOUSE:** Pulls specific information to be reviewed by legal and exported to a .csv file.

-------------------------------------------------------**EXTRA TABS**-------------------------------------------------------------------

**REPORTS and DASHBOARDS:** These tabs would typically not be available for the general reporter or viewer. However, these tabs can provide consolidated statistics and reports on information provided in allegations and visual displays to present the data. DASHBOARDS are functional way to interpret the data in a simple and aesthetically pleasing manner.

**COUNCILS:** This tab would be hidden from all viewers most of the time, unless needed. COUNCILS provides contact information on a particular organization council and will be associated with people and therefore, associated with allegations. A particular council, its information, or its associated records can be searched for in the search bar at the top of the webpage.

# BOY SCOUTS OF AMERICA

## MEMBERSHIP SCREENING DATABASE: AN EMPIRICAL REVIEW

## 1946 – 2016

# APPENDIX D: COMPLETE YEARLY PRESENTATION OF TABLED DATA

## 2019

**Adult Incident Codes for 6,878 Adult IV Files: Jan. 1, 1946 to Dec. 31, 2016**

| Year[1] | CSA | YPV | CP | C | P | O | CBC | U | Total[2] |
|---|---|---|---|---|---|---|---|---|---|
| 1946 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1947 | 1 (100.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 1 (0.0%) |
| 1948 | 1 (100.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 1 (0.0%) |
| 1949 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 1 (100.0%) | 0 (0.0%) | 0 (0.0%) | 1 (0.0%) |
| 1950 | 1 (100.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 1 (0.0%) |
| 1951 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1952 | 2 (100.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 2 (0.0%) |
| 1953 | 3 (100.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 3 (0.0%) |
| 1954 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1955 | 3 (75.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 1 (25.0%) | 0 (0.0%) | 0 (0.0%) | 4 (0.1%) |
| 1956 | 6 (100.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 6 (0.1%) |
| 1957 | 9 (81.8%) | 0 (0.0%) | 0 (0.0%) | 1 (9.1%) | 0 (0.0%) | 1 (9.1%) | 0 (0.0%) | 0 (0.0%) | 11 (0.2%) |
| 1958 | 17 (85.0%) | 0 (0.0%) | 0 (0.0%) | 1 (5.0%) | 0 (0.0%) | 1 (5.0%) | 0 (0.0%) | 1 (5.0%) | 20 (0.3%) |
| 1959 | 21 (77.8%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 6 (22.2%) | 0 (0.0%) | 0 (0.0%) | 27 (0.4%) |
| 1960 | 32 (88.9%) | 0 (0.0%) | 0 (0.0%) | 4 (11.1%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 36 (0.5%) |
| 1961 | 46 (82.1%) | 0 (0.0%) | 0 (0.0%) | 6 (10.7%) | 0 (0.0%) | 4 (7.1%) | 0 (0.0%) | 0 (0.0%) | 56 (0.8%) |
| 1962 | 38 (88.4%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 5 (11.6%) | 0 (0.0%) | 0 (0.0%) | 43 (0.6%) |
| 1963 | 44 (80.0%) | 0 (0.0%) | 0 (0.0%) | 5 (9.1%) | 0 (0.0%) | 6 (10.9%) | 0 (0.0%) | 0 (0.0%) | 55 (0.8%) |
| 1964 | 48 (80.0%) | 0 (0.0%) | 0 (0.0%) | 6 (10.0%) | 0 (0.0%) | 6 (10.0%) | 0 (0.0%) | 0 (0.0%) | 60 (0.9%) |
| 1965 | 50 (75.8%) | 0 (0.0%) | 0 (0.0%) | 7 (10.6%) | 0 (0.0%) | 9 (13.6%) | 0 (0.0%) | 0 (0.0%) | 66 (1.0%) |
| 1966 | 66 (81.5%) | 0 (0.0%) | 0 (0.0%) | 5 6.2%) | 0 (0.0%) | 10 (12.3%) | 0 (0.0%) | 0 (0.0%) | 81 (1.2%) |
| 1967 | 58 (76.3%) | 0 (0.0%) | 0 (0.0%) | 6 (7.9%) | 0 (0.0%) | 12 (15.8%) | 0 (0.0%) | 0 (0.0%) | 76 (1.1%) |
| 1968 | 61 (91.0%) | 0 (0.0%) | 0 (0.0%) | 2 (3.0%) | 0 (0.0%) | 4 (6.0%) | 0 (0.0%) | 0 (0.0%) | 67 (1.0%) |
| 1969 | 54 (84.4%) | 0 (0.0%) | 0 (0.0%) | 8 (12.5%) | 0 (0.0%) | 2 (3.1%) | 0 (0.0%) | 0 (0.0%) | 64 (0.9%) |
| 1970 | 47 (87.0%) | 0 (0.0%) | 0 (0.0%) | 4 (7.4%) | 0 (0.0%) | 3 (5.6%) | 0 (0.0%) | 0 (0.0%) | 54 (0.8%) |
| 1971 | 36 (78.3%) | 0 (0.0%) | 0 (0.0%) | 2 (4.3%) | 0 (0.0%) | 8 (17.4%) | 0 (0.0%) | 0 (0.0%) | 46 (0.7%) |
| 1972 | 45 (83.3%) | 0 (0.0%) | 0 (0.0%) | 3 (5.6%) | 0 (0.0%) | 6 (11.1%) | 0 (0.0%) | 0 (0.0%) | 54 (0.8%) |
| 1973 | 32 (80.0%) | 0 (0.0%) | 0 (0.0%) | 5 (12.5%) | 0 (0.0%) | 2 (5.0%) | 0 (0.0%) | 1 (2.5%) | 40 (0.6%) |
| 1974 | 30 (88.2%) | 0 (0.0%) | 0 (0.0%) | 2 (5.9%) | 0 (0.0%) | 2 (5.9%) | 0 (0.0%) | 0 (0.0%) | 34 (0.5%) |
| 1975 | 23 (92.0%) | 0 (0.0%) | 0 (0.0%) | 1 (4.0%) | 0 (0.0%) | 1 (4.0%) | 0 (0.0%) | 0 (0.0%) | 25 (0.4%) |
| 1976 | 31 (93.9%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 2 (6.1%) | 0 (0.0%) | 0 (0.0%) | 33 (0.5%) |
| 1977 | 38 (95.0%) | 0 (0.0%) | 0 (0.0%) | 1 (2.5%) | 0 (0.0%) | 1 (2.5%) | 0 (0.0%) | 0 (0.0%) | 40 (0.6%) |
| 1978 | 27 (96.4%) | 0 (0.0%) | 0 (0.0%) | 1 (3.6%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 28 (0.4%) |
| 1979 | 28 (96.6%) | 0 (0.0%) | 0 (0.0%) | 1 (3.4%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 29 (0.4%) |
| 1980 | 21 (84.0%) | 0 (0.0%) | 0 (0.0%) | 1 (4.0%) | 0 (0.0%) | 3 (12.0%) | 0 (0.0%) | 0 (0.0%) | 25 (0.4%) |
| 1981 | 24 (96.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 1 (4.0%) | 0 (0.0%) | 0 (0.0%) | 25 (0.4%) |
| 1982 | 31 (93.9%) | 0 (0.0%) | 0 (0.0%) | 2 (6.1%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 33 (0.5%) |
| 1983 | 57 (90.5%) | 0 (0.0%) | 0 (0.0%) | 4 (6.3%) | 0 (0.0%) | 2 (3.2%) | 0 (0.0%) | 0 (0.0%) | 63 (0.9%) |
| 1984 | 78 (92.9%) | 0 (0.0%) | 0 (0.0%) | 1 (1.2%) | 0 (0.0%) | 5 (6.0%) | 0 (0.0%) | 0 (0.0%) | 84 (1.2%) |
| 1985 | 91 (95.8%) | 0 (0.0%) | 1 (1.1%) | 2 (2.1%) | 0 (0.0%) | 1 (1.1%) | 0 (0.0%) | 0 (0.0%) | 95 (1.4%) |
| 1986 | 109 (91.6%) | 0 (0.0%) | 0 (0.0%) | 5 (4.2%) | 0 (0.0%) | 4 (3.4%) | 1 (0.8%) | 0 (0.0%) | 119 (1.7%) |
| 1987 | 186 (88.6%) | 0 (0.0%) | 4 (1.9%) | 7 (3.3%) | 0 (0.0%) | 12 (5.7%) | 0 (0.0%) | 1 (0.5%) | 210 (3.1%) |
| 1988 | 255 (90.1%) | 0 (0.0%) | 2 (0.7%) | 11 (3.9%) | 0 (0.0%) | 12 (4.2%) | 1 (0.4%) | 2 (0.7%) | 283 (4.1%) |
| 1989 | 257 (90.8%) | 2 (0.7%) | 1 (0.4%) | 10 (3.5%) | 0 (0.0%) | 9 (3.2%) | 2 (0.7%) | 2 (0.7%) | 283 (4.1%) |
| 1990 | 182 (72.2%) | 3 (1.2%) | 3 (1.2%) | 11 (4.4%) | 1 (0.4%) | 40 (15.9%) | 4 (1.6%) | 8 (3.2%) | 252 (3.7%) |
| 1991 | 171 (66.5%) | 6 (2.3%) | 0 (0.0%) | 19 (7.4%) | 0 (0.0%) | 58 (22.6%) | 0 (0.0%) | 3 (1.2%) | 257 (3.7%) |
| 1992 | 199 (73.7%) | 3 (1.1%) | 1 (0.4%) | 15 (5.6%) | 0 (0.0%) | 45 (16.7%) | 3 (1.1%) | 4 (1.5%) | 270 (3.9%) |
| 1993 | 198 (73.9%) | 3 (1.1%) | 2 (0.7%) | 9 (3.4%) | 0 (0.0%) | 48 (17.9%) | 2 (0.7%) | 6 (2.2%) | 268 (3.9%) |
| 1994 | 169 (73.2%) | 2 (0.9%) | 1 (0.4%) | 7 (3.0%) | 0 (0.0%) | 42 (18.2%) | 2 (0.9%) | 8 (3.5%) | 231 (3.4%) |
| 1995 | 151 (75.5%) | 0 (0.0%) | 4 (2.0%) | 4 (2.0%) | 0 (0.0%) | 39 (19.5%) | 1 (0.5%) | 1 (0.5%) | 200 (2.9%) |
| 1996 | 138 (67.0%) | 2 (1.0%) | 4 (1.9%) | 8 (3.9%) | 0 (0.0%) | 44 (21.4%) | 2 (1.0%) | 8 (3.9%) | 206 (3.0%) |

| Year | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1997 | 125 | (68.7%) | 0 | (0.0%) | 5 | (2.7%) | 4 | (2.2%) | 0 | (0.0%) | 31 | (17.0%) | 8 | (4.4%) | 9 | (4.9%) | 182 (2.6%) |
| 1998 | 124 | (71.7%) | 0 | (0.0%) | 15 | (8.7%) | 9 | (5.2%) | 0 | (0.0%) | 14 | (8.1%) | 3 | (1.7%) | 8 | (4.6%) | 173 (2.5%) |
| 1999 | 101 | (66.9%) | 0 | (0.0%) | 11 | (7.3%) | 4 | (2.6%) | 1 | (0.7%) | 25 | (16.6%) | 4 | (2.6%) | 5 | (3.3%) | 151 (2.2%) |
| 2000 | 89 | (74.2%) | 1 | (0.8%) | 5 | (4.2%) | 1 | (0.8%) | 0 | (0.0%) | 18 | (15.0%) | 5 | (4.2%) | 1 | (0.8%) | 120 (1.7%) |
| 2001 | 87 | (69.6%) | 0 | (0.0%) | 14 | (11.1%) | 3 | (2.4%) | 0 | (0.0%) | 12 | (9.5%) | 8 | (6.3%) | 1 | (0.8%) | 125 (1.8%) |
| 2002 | 113 | (64.6%) | 1 | (0.6%) | 4 | (2.3%) | 14 | (8.0%) | 0 | (0.0%) | 32 | (18.2%) | 8 | (4.5%) | 3 | (1.7%) | 175 (2.6%) |
| 2003 | 92 | (68.1%) | 1 | (0.7%) | 8 | (5.9%) | 1 | (0.7%) | 0 | (0.0%) | 16 | (11.9%) | 13 | (9.6%) | 4 | (3.0%) | 135 (2.0%) |
| 2004 | 89 | (73.6%) | 1 | (0.8%) | 9 | (7.4%) | 0 | (0.0%) | 0 | (0.0%) | 11 | (9.1%) | 11 | (9.1%) | 0 | (0.0%) | 121 (1.8%) |
| 2005 | 87 | (62.1%) | 1 | (0.7%) | 19 | (13.6%) | 2 | (1.4%) | 0 | (0.0%) | 17 | (12.1%) | 13 | (9.3%) | 1 | (0.7%) | 140 (2.0%) |
| 2006 | 81 | (61.4%) | 0 | (0.0%) | 8 | (6.1%) | 4 | (3.0%) | 1 | (0.8%) | 15 | (11.4%) | 22 | (16.7%) | 1 | (0.8%) | 132 (2.0%) |
| 2007 | 74 | (58.3%) | 3 | (2.4%) | 14 | (11.0%) | 6 | (4.7%) | 1 | (0.8%) | 7 | (5.5%) | 18 | (14.2%) | 4 | (3.1%) | 127 (1.8%) |
| 2008 | 89 | (52.7%) | 2 | (1.2%) | 19 | (11.2%) | 4 | (2.4%) | 2 | (1.2%) | 27 | (16.0%) | 25 | (14.7%) | 1 | (0.6%) | 169 (2.5%) |
| 2009 | 70 | (51.1%) | 2 | (1.5%) | 14 | (10.2%) | 4 | (2.9%) | 0 | (0.0%) | 24 | (17.5%) | 20 | (14.6%) | 3 | (2.2%) | 137 (2.0%) |
| 2010 | 93 | (47.7%) | 3 | (1.5%) | 36 | (18.4%) | 14 | (7.1%) | 1 | (0.5%) | 26 | (13.3%) | 21 | (10.7%) | 1 | (0.5%) | 195 (2.8%) |
| 2011 | 103 | (57.2%) | 1 | (0.6%) | 17 | (9.4%) | 11 | (6.1%) | 1 | (0.6%) | 23 | (12.8%) | 23 | (12.8%) | 1 | (0.6%) | 180 (2.6%) |
| 2012 | 116 | (61.7%) | 1 | (0.5%) | 18 | (9.6%) | 10 | (5.3%) | 1 | (0.5%) | 26 | (13.8%) | 13 | (6.9%) | 3 | (1.6%) | 188 (2.7%) |
| 2013 | 69 | (64.5%) | 0 | (0.0%) | 26 | (24.3%) | 2 | (1.9%) | 0 | (0.0%) | 7 | (6.5%) | 1 | (0.9%) | 2 | (1.9%) | 107 (1.6%) |
| 2014 | 70 | (63.1%) | 0 | (0.0%) | 23 | (20.7%) | 1 | (0.9%) | 0 | (0.0%) | 10 | (9.0%) | 2 | (1.8%) | 5 | (4.5%) | 111 (1.6%) |
| 2015 | 84 | (64.1%) | 0 | (0.0%) | 20 | (15.3%) | 1 | (0.8%) | 0 | (0.0%) | 16 | (12.2%) | 4 | (3.1%) | 6 | (4.6%) | 131 (1.9%) |
| 2016 | 81 | (73.0%) | 0 | (0.0%) | 17 | (15.3%) | 0 | (0.0%) | 0 | (0.0%) | 5 | (4.5%) | 3 | (2.7%) | 5 | (4.5%) | 111 (1.6%) |
| Total[3] | 5,052 | (73.5%) | 38 | (0.6%) | 325 | (4.7%) | 282 | 4.1% | 9 | (0.1%) | 820 | (11.9%) | 243 | (3.5%) | 109 | (1.6%) | **6,878** |

**Youth Incident Codes for 941 Youth IV Files: Jan. 1, 1946 to Dec. 31, 2016**

| Year[1] | CSA | YPV | CP | C | P | O | Total[2] |
|---|---|---|---|---|---|---|---|
| 1946 | 1 (100.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 1 (0.1%) |
| 1947 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1948 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1949 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1950 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1951 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1952 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1953 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1954 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1955 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1956 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1957 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1958 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1959 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1960 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 1 (100.0%) | 1 (0.1%) |
| 1961 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1962 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1963 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1964 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1965 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1966 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1967 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1968 | 1 (100.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 1 (0.1%) |
| 1969 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1970 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1971 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1972 | 1 (100.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 1 (0.1%) |
| 1973 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1974 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1975 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1976 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1977 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1978 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1979 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1980 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1981 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1982 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1983 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1984 | 2 (100.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 2 (0.2%) |
| 1985 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1986 | 1 (100.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 1 (0.1%) |
| 1987 | 3 (75.0%) | 0 (0.0%) | 0 (0.0%) | 1 (25.0%) | 0 (0.0%) | 0 (0.0%) | 4 (0.4%) |
| 1988 | 8 (100.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 8 (0.9%) |
| 1989 | 14 (87.5%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 2 (12.5%) | 16 (1.7%) |
| 1990 | 15 (88.2%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 2 (11.8%) | 17 (1.8%) |
| 1991 | 17 (89.5%) | 0 (0.0%) | 0 (0.0%) | 1 (5.3%) | 0 (0.0%) | 1 (5.3%) | 19 (2.0%) |
| 1992 | 29 (90.6%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 3 (9.4%) | 32 (3.4%) |
| 1993 | 32 (94.1%) | 0 (0.0%) | 0 (0.0%) | 1 (2.9%) | 0 (0.0%) | 1 (2.9%) | 34 (3.6%) |
| 1994 | 42 (93.3%) | 0 (0.0%) | 0 (0.0%) | 1 (2.2%) | 0 (0.0%) | 2 (4.4%) | 45 (4.8%) |
| 1995 | 28 (93.3%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 2 (6.7%) | 30 (3.2%) |
| 1996 | 27 (96.4%) | 0 (0.0%) | 0 (0.0%) | 1 (3.6%) | 0 (0.0%) | 0 (0.0%) | 28 (3.0%) |
| 1997 | 33 (94.3%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 2 (5.7%) | 35 (3.7%) |

| Year | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1998 | 45 | (95.7%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 2 | (4.3%) | 47 | (5.0%) |
| 1999 | 27 | (96.4%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 1 | (3.6%) | 28 | (3.0%) |
| 2000 | 42 | (93.3%) | 0 | (0.0%) | 0 | (0.0%) | 1 | (2.2%) | 0 | (0.0%) | 2 | (4.4%) | 45 | (4.8%) |
| 2001 | 19 | (95.0%) | 0 | (0.0%) | 0 | (0.0%) | 1 | (5.3%) | 0 | (0.0%) | 0 | (0.0%) | 20 | (2.1%) |
| 2002 | 33 | (94.3%) | 0 | (0.0%) | 0 | (0.0%) | 1 | (2.9%) | 0 | (0.0%) | 1 | (2.9%) | 34 | (2.6%) |
| 2003 | 18 | (100.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 18 | (1.9%) |
| 2004 | 20 | (90.9%) | 0 | (0.0%) | 0 | (0.0%) | 2 | (9.1%) | 0 | (0.0%) | 0 | (0.0%) | 22 | (2.4%) |
| 2005 | 20 | (100.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 20 | (2.1%) |
| 2006 | 26 | (92.9%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 2 | (7.1%) | 28 | (3.0%) |
| 2007 | 34 | (100.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 34 | (3.6%) |
| 2008 | 29 | (93.5%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 2 | (6.7%) | 31 | (3.2%) |
| 2009 | 31 | (88.6%) | 0 | (0.0%) | 2 | (5.7%) | 1 | (2.9%) | 0 | (0.0%) | 1 | (2.9%) | 35 | (3.7%) |
| 2010 | 50 | (90.7%) | 0 | (0.0%) | 2 | (3.7%) | 1 | (1.9%) | 1 | (1.9%) | 1 | (1.9%) | 55 | (5.8%) |
| 2011 | 45 | (97.8%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 1 | (2.2%) | 46 | (4.9%) |
| 2012 | 63 | (90.0%) | 0 | (0.0%) | 2 | (2.9%) | 0 | (0.0%) | 0 | (0.0%) | 5 | (7.1%) | 70 | (7.5%) |
| 2013 | 35 | (94.6%) | 0 | (0.0%) | 0 | (0.0%) | 1 | (2.7%) | 0 | (0.0%) | 1 | (2.7%) | 37 | (4.0%) |
| 2014 | 31 | (91.2%) | 0 | (0.0%) | 1 | (2.9%) | 1 | (2.9%) | 0 | (0.0%) | 1 | (2.9%) | 34 | (3.6%) |
| 2015 | 31 | (100.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 31 | (3.3%) |
| 2016 | 30 | (100.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 0 | (0.0%) | 30 | (3.2%) |
| Total[3] | 883 | (93.8%) | 0 | (0.0%) | 7 | (0.7%) | 14 | (1.5%) | 1 | (0.1%) | 36 | (3.8%) | **941** | |

[1] The year is determined by IVRS.

[2] Row totals denote number of files per youth incident code across years.

[3] Column totals denote number of files per year across youth incident codes

**Adult and Youth Incident Codes for 4,254 IV Files: Jan. 1, 1946 to Dec. 31, 2016**

| Year[1] | CSA | YPV | CP | C | P | O | CBC[2] | U[2] | Total[3] |
|---|---|---|---|---|---|---|---|---|---|
| 1946 | 1 (100.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 1 (0.0%) |
| 1947 | 1 (100.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 1 (0.0%) |
| 1948 | 1 (100.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 1 (0.0%) |
| 1949 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 1 (100.0%) | 0 (0.0%) | 0 (0.0%) | 1 (0.0%) |
| 1950 | 1 (100.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 1 (0.0%) |
| 1951 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1952 | 2 (100.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 2 (0.0%) |
| 1953 | 3 (100.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 3 (0.0%) |
| 1954 | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) |
| 1955 | 3 (75.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 1 (25.0%) | 0 (0.0%) | 0 (0.0%) | 4 (0.1%) |
| 1956 | 6 (100.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 6 (0.1%) |
| 1957 | 9 (81.8%) | 0 (0.0%) | 0 (0.0%) | 1 (9.1%) | 0 (0.0%) | 1 (9.1%) | 0 (0.0%) | 0 (0.0%) | 11 (0.1%) |
| 1958 | 17 (85.0%) | 0 (0.0%) | 0 (0.0%) | 1 (5.0%) | 0 (0.0%) | 1 (5.0%) | 0 (0.0%) | 1 (5.0%) | 20 (0.3%) |
| 1959 | 21 (77.8%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 6 (22.2%) | 0 (0.0%) | 0 (0.0%) | 27 (0.3%) |
| 1960 | 32 (86.5%) | 0 (0.0%) | 0 (0.0%) | 4 (10.8%) | 0 (0.0%) | 1 (2.7%) | 0 (0.0%) | 0 (0.0%) | 37 (0.5%) |
| 1961 | 46 (82.1%) | 0 (0.0%) | 0 (0.0%) | 6 (10.7%) | 0 (0.0%) | 4 (7.1%) | 0 (0.0%) | 0 (0.0%) | 56 (0.7%) |
| 1962 | 38 (88.4%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 5 (11.6%) | 0 (0.0%) | 0 (0.0%) | 43 (0.6%) |
| 1963 | 44 (80.0%) | 0 (0.0%) | 0 (0.0%) | 5 (9.1%) | 0 (0.0%) | 6 (10.9%) | 0 (0.0%) | 0 (0.0%) | 55 (0.7%) |
| 1964 | 48 (80.0%) | 0 (0.0%) | 0 (0.0%) | 6 (10.0%) | 0 (0.0%) | 6 (10.0%) | 0 (0.0%) | 0 (0.0%) | 60 (0.8%) |
| 1965 | 50 (75.8%) | 0 (0.0%) | 0 (0.0%) | 7 (10.6%) | 0 (0.0%) | 9 (13.6%) | 0 (0.0%) | 0 (0.0%) | 66 (0.8%) |
| 1966 | 66 (81.5%) | 0 (0.0%) | 0 (0.0%) | 5 (6.2%) | 0 (0.0%) | 10 (12.3%) | 0 (0.0%) | 0 (0.0%) | 81 (1.0%) |
| 1967 | 58 (76.3%) | 0 (0.0%) | 0 (0.0%) | 6 (7.9%) | 0 (0.0%) | 12 (15.8%) | 0 (0.0%) | 0 (0.0%) | 76 (1.0%) |
| 1968 | 62 (91.2%) | 0 (0.0%) | 0 (0.0%) | 2 (2.9%) | 0 (0.0%) | 4 (5.9%) | 0 (0.0%) | 0 (0.0%) | 68 (0.9%) |
| 1969 | 54 (84.4%) | 0 (0.0%) | 0 (0.0%) | 8 (12.5%) | 0 (0.0%) | 2 (31.3%) | 0 (0.0%) | 0 (0.0%) | 64 (0.8%) |
| 1970 | 47 (87.0%) | 0 (0.0%) | 0 (0.0%) | 4 (7.4%) | 0 (0.0%) | 3 (5.6%) | 0 (0.0%) | 0 (0.0%) | 54 (0.7%) |
| 1971 | 36 (78.3%) | 0 (0.0%) | 0 (0.0%) | 2 (4.3%) | 0 (0.0%) | 8 (17.4%) | 0 (0.0%) | 0 (0.0%) | 46 (0.6%) |
| 1972 | 46 (83.6%) | 0 (0.0%) | 0 (0.0%) | 3 (5.5%) | 0 (0.0%) | 6 (10.9%) | 0 (0.0%) | 0 (0.0%) | 55 (0.7%) |
| 1973 | 32 (80.0%) | 0 (0.0%) | 0 (0.0%) | 5 (12.5%) | 0 (0.0%) | 2 (5.0%) | 0 (0.0%) | 1 (2.5%) | 40 (0.5%) |
| 1974 | 30 (88.2%) | 0 (0.0%) | 0 (0.0%) | 2 (5.9%) | 0 (0.0%) | 2 (5.9%) | 0 (0.0%) | 0 (0.0%) | 34 (0.4%) |
| 1975 | 23 (92.0%) | 0 (0.0%) | 0 (0.0%) | 1 (4.0%) | 0 (0.0%) | 1 (4.0%) | 0 (0.0%) | 0 (0.0%) | 25 (0.3%) |
| 1976 | 31 (93.9%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 2 (6.1%) | 0 (0.0%) | 0 (0.0%) | 33 (0.4%) |
| 1977 | 38 (95.0%) | 0 (0.0%) | 0 (0.0%) | 1 (2.5%) | 0 (0.0%) | 1 (2.5%) | 0 (0.0%) | 0 (0.0%) | 40 (0.5%) |
| 1978 | 27 (96.4%) | 0 (0.0%) | 0 (0.0%) | 1 (3.6%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 28 (0.4%) |
| 1979 | 28 (96.6%) | 0 (0.0%) | 0 (0.0%) | 1 (3.4%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 29 (0.4%) |
| 1980 | 21 (84.0%) | 0 (0.0%) | 0 (0.0%) | 1 (4.0%) | 0 (0.0%) | 3 (12.0%) | 0 (0.0%) | 0 (0.0%) | 25 (0.3%) |
| 1981 | 24 (96.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 1 (4.0%) | 0 (0.0%) | 0 (0.0%) | 25 (0.3%) |
| 1982 | 31 (93.9%) | 0 (0.0%) | 0 (0.0%) | 2 (6.1%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 0 (0.0%) | 33 (0.4%) |
| 1983 | 57 (90.5%) | 0 (0.0%) | 0 (0.0%) | 4 (6.3%) | 0 (0.0%) | 2 (3.2%) | 0 (0.0%) | 0 (0.0%) | 63 (0.8%) |
| 1984 | 80 (93.0%) | 0 (0.0%) | 0 (0.0%) | 1 (1.2%) | 0 (0.0%) | 5 (5.8%) | 0 (0.0%) | 0 (0.0%) | 86 (1.1%) |
| 1985 | 91 (95.8%) | 0 (0.0%) | 1 (1.1%) | 2 (2.1%) | 0 (0.0%) | 1 (1.1%) | 0 (0.0%) | 0 (0.0%) | 95 (1.2%) |
| 1986 | 110 (91.7%) | 0 (0.0%) | 0 (0.0%) | 5 (4.2%) | 0 (0.0%) | 4 (3.3%) | 1 (0.8%) | 0 (0.0%) | 120 (1.5%) |
| 1987 | 189 (88.3%) | 0 (0.0%) | 4 (1.9%) | 8 (3.7%) | 0 (0.0%) | 12 (5.6%) | 0 (0.0%) | 1 (0.5%) | 214 (2.7%) |
| 1988 | 263 (90.4%) | 0 (0.0%) | 2 (0.7%) | 11 (3.8%) | 0 (0.0%) | 12 (4.1%) | 1 (0.3%) | 2 (0.7%) | 291 (3.7%) |
| 1989 | 271 (90.6%) | 2 (0.7%) | 1 (0.3%) | 10 (3.3%) | 0 (0.0%) | 11 (3.7%) | 2 (0.7%) | 2 (0.7%) | 299 (3.8%) |
| 1990 | 197 (73.2%) | 3 (1.1%) | 3 (1.1%) | 11 (4.1%) | 1 (0.4%) | 42 (15.6%) | 4 (1.5%) | 8 (3.0%) | 269 (3.4%) |
| 1991 | 188 (68.1%) | 6 (2.2%) | 0 (0.0%) | 20 (7.2%) | 0 (0.0%) | 59 (21.4%) | 0 (0.0%) | 3 (1.1%) | 276 (3.5%) |
| 1992 | 228 (75.5%) | 3 (1.0%) | 1 (0.3%) | 15 (5.0%) | 0 (0.0%) | 48 (15.9%) | 3 (1.0%) | 4 (1.3%) | 302 (3.9%) |
| 1993 | 230 (76.2%) | 3 (1.0%) | 2 (0.7%) | 10 (3.3%) | 0 (0.0%) | 49 (16.2%) | 2 (0.7%) | 6 (2.0%) | 302 (3.9%) |
| 1994 | 211 (76.4%) | 2 (0.7%) | 1 (0.4%) | 8 (2.9%) | 0 (0.0%) | 44 (15.9%) | 2 (0.7%) | 8 (2.9%) | 276 (3.5%) |
| 1995 | 179 (77.8%) | 0 (0.0%) | 4 (1.7%) | 4 (1.7%) | 0 (0.0%) | 41 (17.8%) | 1 (0.4%) | 1 (0.4%) | 230 (2.9%) |

| Year | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| 1996 | 165 (70.5%) | 2 (0.9%) | 4 (1.7%) | 9 (2.8%) | 0 (0.0%) | 44 (18.8%) | 2 (0.9%) | 8 (3.4%) | 234 (3.0%) |
| 1997 | 158 (72.8%) | 0 (0.0%) | 5 (2.3%) | 4 (1.8%) | 0 (0.0%) | 33 (15.2%) | 8 (3.7%) | 9 (4.1%) | 217 (2.8%) |
| 1998 | 169 (76.8%) | 0 (0.0%) | 15 (6.8%) | 9 (4.1%) | 0 (0.0%) | 16 (7.3%) | 3 (1.4%) | 8 (3.6%) | 220 (2.8%) |
| 1999 | 128 (71.5%) | 0 (0.0%) | 11 (6.1%) | 4 (2.2%) | 1 (0.6%) | 26 (14.5%) | 4 (2.2%) | 5 (2.8%) | 179 (2.3%) |
| 2000 | 131 (79.4%) | 1 (0.6%) | 5 (3.0%) | 2 (1.2%) | 0 (0.0%) | 20 (12.1%) | 5 (3.0%) | 1 (0.6%) | 165 (2.1%) |
| 2001 | 106 (73.1%) | 0 (0.0%) | 14 (9.7%) | 4 (2.8%) | 0 (0.0%) | 12 (8.3%) | 8 (5.5%) | 1 (0.7%) | 145 (1.9%) |
| 2002 | 146 (69.5%) | 1 (0.5%) | 4 (1.9%) | 15 (7.1%) | 0 (0.0%) | 33 (15.7%) | 8 (3.8%) | 3 (1.4%) | 210 (2.7%) |
| 2003 | 110 (71.9%) | 1 (0.7%) | 8 (5.2%) | 1 (0.7%) | 0 (0.0%) | 16 (10.5%) | 13 (8.5%) | 4 (2.6%) | 153 (2.0%) |
| 2004 | 109 (76.2%) | 1 (0.7%) | 9 (6.3%) | 2 (1.4%) | 0 (0.0%) | 11 (7.7%) | 11 (7.7%) | 0 (0.0%) | 143 (1.8%) |
| 2005 | 107 (66.9%) | 1 (0.6%) | 19 (11.9%) | 2 (1.3%) | 0 (0.0%) | 17 (10.6%) | 13 (8.1%) | 1 (0.6%) | 160 (2.0%) |
| 2006 | 107 (66.9%) | 0 (0.0%) | 8 (5.0%) | 4 (2.5%) | 1 (0.6%) | 17 (10.6%) | 22 (13.8%) | 1 (0.6%) | 160 (2.0%) |
| 2007 | 108 (67.1%) | 3 (1.9%) | 14 (8.7%) | 6 (3.7%) | 1 (0.6%) | 7 (4.3%) | 18 (11.2%) | 4 (2.5%) | 161 (2.1%) |
| 2008 | 118 (59.0%) | 2 (1.0%) | 19 (9.5%) | 4 (2.0%) | 2 (1.0%) | 29 (14.5%) | 25 (12.5%) | 1 (0.5%) | 200 (2.6%) |
| 2009 | 101 (58.7%) | 2 (1.2%) | 16 (9.3%) | 5 (2.9%) | 0 (0.0%) | 25 (14.5%) | 20 (11.6%) | 3 (1.7%) | 172 (2.2%) |
| 2010 | 143 (57.2%) | 3 (1.2%) | 38 (15.2%) | 15 (6.0%) | 2 (0.8%) | 27 (10.8%) | 21 (8.4%) | 1 (0.4%) | 250 (3.2%) |
| 2011 | 148 (65.5%) | 1 (0.4%) | 17 (7.5%) | 11 (4.9%) | 1 (0.4%) | 24 (10.6%) | 23 (10.2%) | 1 (0.4%) | 226 (2.9%) |
| 2012 | 179 (69.4%) | 1 (0.4%) | 20 (7.8%) | 10 (3.9%) | 1 (0.4%) | 31 (12.0%) | 13 (5.0%) | 3 (1.2%) | 258 (3.3%) |
| 2013 | 104 (72.2%) | 0 (0.0%) | 26 (18.1%) | 3 (2.1%) | 0 (0.0%) | 8 (5.6%) | 1 (0.7%) | 2 (1.4%) | 144 (1.8%) |
| 2014 | 101 (69.7%) | 0 (0.0%) | 24 (16.6%) | 2 (1.4%) | 0 (0.0%) | 11 (7.6%) | 2 (1.4%) | 5 (3.4%) | 145 (1.8%) |
| 2015 | 115 (71.0%) | 0 (0.0%) | 20 (12.3%) | 1 (0.6%) | 0 (0.0%) | 16 (9.9%) | 4 (2.5%) | 6 (3.7%) | 162 (2.1%) |
| 2016 | 111 (78.7%) | 0 (0.0%) | 17 (12.1%) | 0 (0.0%) | 0 (0.0%) | 5 (3.5%) | 3 (2.1%) | 5 (3.5%) | 141 (1.8%) |
| Total[4] | 5,935 (75.9%) | 38 (0.5%) | 332 (4.2%) | 296 (3.8%) | 10 (0.1%) | 856 (10.9%) | 243 (3.1%) | 109 (1.4%) | **7,819** |

[1] The year is determined by the date on the IVRS.

[2] Only reflect Adult IVs, as these codes were not possible for youth members.

[3] Row totals denote the number of files per year across all adult and youth incident codes.

[4] Column totals denote the number of files per adult and youth incident code across all years.

## Exhibit 3

**[PROPOSED ] CONFIDENTIALITY AND PROTECTIVE ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (___) |
| Debtors. | (Joint Administration Requested) |

**[PROPOSED] CONFIDENTIALITY AND PROTECTIVE ORDER**

This Confidentiality and Protective Order ("**Order**") shall govern the production, review, disclosure, and handling of any Discovery Material (as defined herein) by any person or entity (each a "**Party**" and, collectively, the "**Parties**") in connection with the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") of the Boy Scouts of America and Delaware BSA, LLC (together, the "**Debtors**").

## I.    PURPOSES AND LIMITATIONS

This Order applies to the disclosure, handling, and use of documents and all discovery in the Chapter 11 Cases and related proceedings, including informal discovery; discovery under rule 2004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); materials produced, provided, or made available on a voluntary basis; and discovery in connection with judicial or other proceedings, such as contested matters, adversary proceedings and other disputes.  The Parties have sought or may seek certain Discovery Material (as defined below) from one another with respect to the Chapter 11 Cases (collectively, "**Discovery Requests**") as provided by the Federal Rules of Civil Procedure (the "**Federal Rules**")**, the Bankruptcy Rules, and the Local Rules of Bankruptcy Practice and Procedure of the United

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtors' federal tax identification number, are as follows:  Boy Scouts of America (6300); and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 W. Walnut Hill Ln., Irving, TX 75038.

States Bankruptcy Court for the District of Delaware (the "**Local Rules**"). In addition, the Parties have and may continue to produce, provide access to, or make available certain Discovery Material on a voluntary basis. The purpose of this Order is to facilitate and expedite the production, exchange and treatment of Discovery Material (as defined below) and to protect Discovery Material that a Party seeks to maintain as  confidential.

## II.    <u>DEFINITIONS</u>

<u>**Challenging Party**</u>:  a Party that challenges the designation of information or items under this Order.

<u>**Counsel (without qualifier)**</u>:  Outside Counsel of or In-House Counsel (as well as their respective support staff).

<u>**Derivative Information**</u>: as defined in Paragraph 5.5.

<u>**Designating Party**</u>: a Party that designates information or items that it produces as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL," or "COMMITTEE COUNSEL ONLY."

<u>**Discovery Material**</u>: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are (1) produced or generated in disclosures or responses to Discovery Requests; (2) produced, provided, or made available on a voluntary basis; or (3) provided to legal advisors, industry advisors, financial advisors, accounting advisors, experts and consultants (and their respective staff) that are retained by the Debtors' creditors in connection with the Chapter 11 Cases.  "Discovery Material" includes deposition testimony, interrogatories, answers to interrogatories, requests for admission, responses to requests for admission, documents, all materials contained in the secure data room maintained by the Debtors,

information and things produced, including information provided to the Receiving Party orally, as well as any and all copies, abstracts, digests, notes, summaries, and excerpts thereof.

**In-House Counsel**: attorneys who are employees or contractors of a Party. In-House Counsel does not include Outside Counsel of Record or any other outside counsel.

**Outside Counsel**: attorneys who are not employees of a Party but are retained to represent or advise a Party regarding the Chapter 11 Cases. With respect to the Debtors, and any Official Committee(s), Outside Counsel refers to counsel that has been retained by one of the above Parties and whose retention has been approved by the Bankruptcy Court. With respect to the Ad Hoc Committee (the "**Local Council Committee**") of the Local Councils of the Boy Scouts of America, the Outside Counsel also shall include attorneys who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), so long as the attorney continues to represent or advise members of the Local Council Committee.

**Producing Party**: a Party that produces, provides, or makes available Discovery Material.

**Professional Vendors**: persons or entities that provide litigation support services (*e.g.*, facilitating conference calls, photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

**Protected Material**: any Discovery Material designated "CONFIDENTIAL," "HIGHLY CONFIDENTIAL," or "COMMITTEE COUNSEL ONLY."

**Receiving Party**: a Party that receives Discovery Material from the Producing Party.

### III.    <u>SCOPE</u>

This Order applies to all Discovery Material that is produced, formally or informally, voluntarily or in response to a formal Discovery Request, in connection with the Chapter 11 Cases, including but not limited to Discovery Material produced in response to any Discovery Requests. Discovery Material produced in connection with the Chapter 11 Cases or pursuant to Rule 2004 (unless otherwise agreed by the Debtors) may only be used in the Chapter 11 Cases, including in connection with any contested motions in the Chapter 11 Cases, but may not be used in connection with any adversary proceeding or other litigation. This Order does not affect, amend or modify any existing confidentiality agreements, joint defense agreements, Committee Bylaws, non-disclosure agreements, intercreditor agreements, protective orders or similar agreements applicable to any Producing Party and/or Receiving Party, and nothing in this Order shall constitute a waiver of any rights under such agreements or orders. Where this Order is in conflict with any existing confidentiality agreements, joint defense agreements, intercreditor agreements, Committee Bylaws, non-disclosure agreements, protective orders or similar agreements applicable to any Producing Party and/or Receiving Party in connection with the Chapter 11 Cases, the provision that provides the most confidentiality protection for Discovery Materials applies.

The protections conferred by this Order cover not only Protected Material, but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material. However, the protections conferred by this Order do not cover the following information, whether or not it is Protected Material: (a) any information that is in the public domain at the time of disclosure to a Receiving Party or

becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; and (b) any information known to the Receiving Party prior to the disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party.

## IV.    DURATION

Even after Debtors' emergence from the Chapter 11 Cases, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or an order entered by the Bankruptcy Court directs otherwise. The Debtors' emergence from the Chapter 11 Cases shall not relieve the Parties from their responsibility to maintain the confidentiality of Discovery Material pursuant to this Order, and the Bankruptcy Court shall retain jurisdiction to enforce the terms of this Order.

## V. DESIGNATING PROTECTED MATERIAL

5.1 Manner and Timing of Designations. Subject to Paragraphs 5.5 and 5.6 and, except as otherwise provided in this Order, or as otherwise stipulated or ordered, Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced. Any Producing Party may designate Discovery Material as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL," or "COMMITTEE COUNSEL ONLY" in accordance with the following provisions:

5.2 "CONFIDENTIAL" Material. A Producing Party may designate Discovery Material as **"CONFIDENTIAL"** if such Producing Party believes in good faith (or with respect to documents received from another person, has been reasonably advised by such other person) that: (1) such Discovery Material (a) constitutes or contains nonpublic proprietary or confidential technical, business, financial, personal or other information of a nature that can be protected

under the Bankruptcy Rules or the Federal Rules, or (b) is subject by law or by contract to a legally protected right of privacy; or (2) the Producing Party (a) is under a preexisting obligation to a third-party to treat such Discovery Material as confidential or (b) has in good faith been requested by another Party to so designate such Discovery Material on the grounds that such other Party considers such Discovery Material to contain information that is confidential or proprietary to such Party.

     5.3 <u>"HIGHLY CONFIDENTIAL" and "COMMITTEE COUNSEL ONLY" Material</u>. A Producing Party may designate Discovery Material as **"HIGHLY CONFIDENTIAL"** or **"COMMITTEE COUNSEL ONLY"** if such Producing Party believes in good faith (or with respect to documents received from another person, has been reasonably advised by such other person) that such Discovery Material constitutes or includes Discovery Material that is of such a nature that a risk of competitive injury or a material risk to the Debtors' development of a plan of reorganization or emergence from the Chapter 11 Cases would be created if such Discovery Material were disclosed to persons other than those identified in Paragraph 7.3 of this Order with regard to Discovery Material designated "HIGHLY CONFIDENTIAL" and Paragraph 7.4 of this Order with regard to Discovery Material designated "COMMITTEE COUNSEL ONLY, such as trade secrets, sensitive financial, personal or business information, including insurance policy information, or material prepared by its legal advisors, industry advisors, financial advisors, accounting advisors, experts or consultants (and their respective staff) that are retained by any Party in connection with the Chapter 11 Cases, and only to the extent that the Producing Party believes in good faith that such material is of such a nature that HIGHLY CONFIDENTIAL or COMMITTEE COUNSEL ONLY treatment is warranted.[2]

---

[2] Information pertaining to abuse victims, minors, BSA employees, and BSA volunteers remain subject to the additional requirements imposed by the Court based on the relief granted in connection with Debtors' motion

5.4 <u>Manner Of Designating Discovery Material</u>. Designation in conformity with this Order requires:

(a) For Discovery Material produced in documentary form (*e.g.*, paper or electronic documents or records, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix the legend "CONFIDENTIAL," "HIGHLY CONFIDENTIAL," or "COMMITTEE COUNSEL ONLY" to each page that contains Protected Material.

(b) For testimony given in deposition or in other pretrial or trial proceedings, such testimony may be designated as appropriate by: (1) stating so orally on the record and requesting that the relevant portion(s) of testimony is so designated; or (2) providing written notice within fourteen (14) days of the Party's receipt of the final transcript from the court reporter that the relevant portion(s) of such transcript or recording of a deposition thereof is so designated, except in the event that a hearing on related issues is scheduled to occur within fourteen (14) days, in which case the foregoing fourteen (14) day period will be reduced to seven (7) business days. Until expiration of the aforesaid designation period, as applicable, following receipt of the transcript by the Parties, all deposition transcripts and recordings shall be considered and treated as Committee Counsel Only unless otherwise designated by counsel to any Party on the record at the deposition or in other pretrial or trial proceedings. Discovery Material previously designated as Protected Material that is marked as an exhibit during a deposition shall be treated as so designated at all times, regardless of whether the Discovery Material has been so marked by the court reporter.

---

seeking special noticing and confidentiality procedures to protect abuse victims, minors, BSA employees, BSA volunteers, and certain other parties in interest.

(c) For Discovery Material produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL," "HIGHLY CONFIDENTIAL," or "COMMITTEE COUNSEL ONLY." If possible, the Producing Party shall identify in an accompanying cover letter the specific data included in such media that is subject to the designation.

(d) For Discovery Material produced, provided, or made available through the BSA secure data room, including but not limited to Discovery Material provided or made available voluntarily, that the Producing Party label the folder or subfolder containing any Highly Confidential information as "HIGHLY CONFIDENTIAL" and any Committee Counsel Only Material as "COMMITTEE COUNSEL ONLY." Any Discovery Material contained in the BSA secured data room that is not identified as "HIGHLY CONFIDENTIAL" or "COMMITTEE COUNSEL ONLY" shall be treated as "CONFIDENTIAL."

5.5 <u>Derivative Information</u>. Extracts, summaries, compilations, and descriptions of Discovery Material and notes, electronic images or databases containing Discovery Material (**"Derivative Information"**) shall be treated as Protected Material in accordance with the provisions of this Order to the same extent as the Discovery Material or information from which such Derivative Information is made or derived.

5.6 <u>Inadvertent Failures to Designate</u>. The failure to designate particular Discovery Material as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL," or "COMMITTEE COUNSEL ONLY" at the time of production shall not operate to waive a Producing Party's right to later designate such Discovery Material as Protected Material or later apply another designation pursuant to this Order (**"Misdesignated Material"**). At such time, arrangements will be made

for the destruction of the Misdesignated Material or for the return to the Producing Party of all copies of the Misdesignated Material and for the substitution, where appropriate, of properly labeled copies of such Discovery Material. Upon receipt of replacement copies of such Misdesignated Material with the proper designation, the Receiving Party or Parties shall promptly take all reasonable steps to return or destroy all previously produced copies of such Misdesignated Material. If requested by the Producing Party, a Receiving Party shall verify in writing that it has taken all reasonable steps to return or destroy such Misdesignated Material. No Party shall be deemed to have violated this Order if, prior to notification of any later designation, such Discovery Material was disclosed or used in any manner consistent with its original designation but inconsistent with its later designation. Once such later designation has been made, however, any Discovery Material shall be treated in accordance with that later designation; provided, however, that if the material that was not designated has been, at the time of the later designation, previously publicly filed with the Bankruptcy Court, no Party shall be bound by such later designation except to the extent determined by the Bankruptcy Court upon motion of the Party that did not make the designation.

## VI. <u>CHALLENGING CONFIDENTIALITY DESIGNATIONS</u>

6.1 <u>Timing of Challenge to Confidentiality Designations</u>. A Receiving Party shall not be obliged to challenge the propriety of a confidentiality designation at the time made, and a failure to do so shall not preclude a subsequent challenge thereto. The failure of any Party to challenge the designation by a Producing Party of Discovery Material as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL," or "COMMITTEE COUNSEL ONLY" during the discovery period shall not be a waiver of that Party's right to object to the designation at trial.

6.2 <u>Meet and Confer</u>. The Challenging Party shall initiate the dispute resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific paragraph of the Order. Within five (5) business days of the date of service of the notice challenging the designation, the Parties shall attempt to resolve each challenge in good faith and must begin the process by conferring directly. In conferring, the Challenging Party must explain the basis for its belief that the confidentiality designation was not proper and must give the Designating Party an opportunity to review the Protected Material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation. A Challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet and confer process first or establishes that the Designating Party is unwilling to participate in the meet and confer process in a timely manner.

6.3 <u>Judicial Intervention</u>. If the Parties cannot resolve a challenge without court intervention and if either the Challenging Party or the Designating Party wishes to then seek Court intervention, both the Challenging Party and Designating Party shall submit a joint letter

or motion to the Bankruptcy Court, reflecting each party's position, describing adherence to the meet-and-confer requirement of Paragraph 6.2, and attaching any relevant information (including documents or declarations), within ten (10) business days after the conclusion of efforts to meet and confer and the indication in writing by either the Challenging Party or the Designating Party of its intent to seek court intervention. If by joint motion, the motion shall be set at the first available date on regular notice. The Bankruptcy Court expects the parties to cooperate in the preparation of the joint letter or motion so that each side has adequate time to prepare its own arguments and address its adversary's arguments before submission. All Parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation until the Bankruptcy Court rules on the challenge.

## VII. <u>ACCESS TO AND USE OF DISCOVERY MATERIAL</u>

7.1 <u>Use of Discovery Material</u>. A Receiving Party may use Discovery Material that is disclosed or produced by another Party solely for the purposes of the Chapter 11 Cases and not for any other purpose, including any other litigation or judicial proceedings, or any business, competitive, governmental, commercial, or administrative purpose or function. In the case of use by Official Committees, Protected Material may be used only in a manner consistent with the Committee's duties and responsibilities. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the Debtors emerge from Bankruptcy, a Receiving Party must comply with the provisions of section 14 below (FINAL DISPOSITION). Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

7.2 <u>Disclosure of "CONFIDENTIAL" Information or Items</u>. Unless otherwise ordered by the Bankruptcy Court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to: (a) the officers, directors, employees, and Counsel of the Receiving Party to whom disclosure is reasonably necessary for purposes of the Chapter 11 Cases; (b) where the Receiving Party is an Official Committee, its members, Outside Counsel and its advisors that are retained by the Official Committee or its Outside Counsel and where necessary approved by the Bankruptcy Court, to whom disclosure is reasonably necessary for purposes of the Chapter 11 Cases; (c) the Debtors and their Counsel; (d) any Official Committee, including its members, and the Official Committee's Outside Counsel to whom the Producing Party has given consent; (e) the Local

Council Committee and its Counsel, (f) the U.S. Trustee; and (g) any other persons specified in Paragraph 7.3 below.

7.3 <u>Disclosure of "HIGHLY CONFIDENTIAL" Information or Items</u>. Unless otherwise ordered by the Bankruptcy Court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL" only to:

(a) Outside Counsel of the Receiving Party to whom disclosure is reasonably necessary for purposes of the Chapter 11 Cases;

(b) financial advisors, accounting advisors, experts and consultants (and their respective staff) that are retained by the Receiving Party (and in the case of the Debtors or any Official Committee, approved by the Bankruptcy Court) in connection with the Chapter 11 Cases who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c) financial advisors, accounting advisors, experts and consultants (and their respective staff) that are retained by any Party (and in the case of the Debtors or any Official Committee, approved by the Bankruptcy Court) in connection with the Chapter 11 Cases, to whom the Producing Party may consent in writing and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A).

(d) Outside Counsel for the U.S. Trustee;

(e) the Bankruptcy Court or any Court to which an appeal is taken, and their personnel;

(f) court reporters and their staff, professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for purposes of the Chapter 11 Cases and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(g) for purposes of witness preparation, any deponent or witness who was noticed for a deposition, or is on a witness list for hearing or trial, in preparation for his or her noticed

deposition, hearing, or trial testimony where such Protected Material is determined by counsel for a Party in good faith to be necessary to the anticipated subject matter of testimony, and that doing so would not cause competitive harm; provided, however, that such persons (1) sign the "Acknowledgment and Agreement to Be Bound" (Exhibit A), (2) are only provided such Protected Material in connection with preparation for the anticipated testimony, and (3) shall not be permitted to retain copies of such Protected Material.

(h) Deponents and witnesses where counsel has a good faith basis for believing that the witness would have had knowledge of the contents of the Protected Material in the course of fulfilling his or her responsibilities or has information that directly bears upon the Protected Material.

(i) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

(j) any adverse witness during the course of a deposition where counsel questioning the witness reasonably and in good faith believes that questioning the witness regarding the document is necessary and that doing so would not cause competitive harm and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A).

(k) any other person or entity with respect to whom the Producing Party may consent in writing and that also has signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A). A request by a Receiving Party under this Paragraph 7.3(k) must be in writing and reasonably specify the Discovery Materials that it seeks to disclose, the "person or entity" to which it seeks to disclose this Discovery Material, and the reason it seeks to disclose these Discovery Materials. The Producing Party shall use reasonable best efforts to provide a response

in three (3) business days from receipt of a written request. If the request is denied, either Party may promptly seek Court intervention.

7.4 <u>Disclosure of "COMMITTEE COUNSEL ONLY" Information or Items</u>. Unless otherwise ordered by the Bankruptcy Court, a Receiving Party shall not disclose any information or item designated "COMMITTEE COUNSEL ONLY" to any other person or party without the prior written consent of the Designating Party; <u>provided</u>, <u>however</u>, that (1) this non-disclosure provision shall not be applicable to any Committee Counsel Only information that specifically has previously been publicly disclosed without restriction by the Designating Party (excluding disclosures by the Designating Party to their respective legal advisors, auditors, or other professional advisors, or disclosures required by law or judicial process), (2) the persons receiving Committee Counsel Only information shall be permitted to discuss such information with only those parties listed in Paragraph 7.3 and representatives of members of an Official Committee approved by the Bankruptcy Court, but only to the extent the Designating Party approves such discussions in advance. Notwithstanding any of the foregoing, materials designated "COMMITTEE COUNSEL ONLY" may be disclosed to Outside Counsel for the Official Committee(s) of tort claimants but may not be disclosed to the members of the Official Committee or any of their other attorneys.

7.5 <u>Filing or Submitting Protected Material To Court</u>. Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record any Protected Material. A Party that seeks to file any Protected Material with the Bankruptcy Court must file such Protected Material under seal in accordance with the Federal Rules, the Bankruptcy Rules, the Local Rules, and the individual practice rules of the Bankruptcy Court. Protected Material may only be filed under seal pursuant

to a court order authorizing the sealing of the specific Protected Material at issue. Nothing in this Paragraph, however, shall preclude a Party from filing Discovery Material that the Party itself has designated as its own Protected Material in unredacted form and without requesting sealing.

7.6 In certain instances, materials submitted to the Bankruptcy Court may be designated Protected Material by a Designating Party and the filing Party may disagree or have no position with respect to whether sealing is appropriate. In such instances, the filing Party shall comply with the procedures in Paragraph 7.5, but shall indicate in its motion for permission to file under seal that the confidentiality designation was made by the Designating Party. If the Designating Party is a Non-Party, such Designating Party shall also be served with copies of the motion and the unredacted materials submitted to the Bankruptcy Court. The Designating Party will have ten (10) days thereafter to submit a motion specifying the portions of the Discovery Material to be sealed and setting forth the reasons why sealing is appropriate under the circumstances, as contemplated by the Local Rules and the individual practice rules of the Bankruptcy Court, or otherwise consenting that the Discovery Material need not be sealed.

7.7 All Discovery Material for which a Party is requesting permission to file under seal (**"Sealed Documents"**) pursuant to this Order, shall be filed in unredacted form in conformity with the sealing procedures set by the Clerk of the Bankruptcy Court. Such Sealed Documents shall be released by the Clerk of the Bankruptcy Court only upon further order of the Bankruptcy Court.

7.8 Use of Protected Material in Open Court. The limitations on disclosure in this Order shall not apply to any Discovery Material offered or otherwise used by any Party at trial or any hearing held in open court except as provided in this paragraph. As part of any pretrial conference or any meet and confer regarding the use of exhibits in any evidentiary hearing, and

at least 72 hours prior to the use of any Protected Material at trial or any hearing to be held in open court, counsel for any Party who desires to offer or use such Protected Material at trial or any hearing to  be held in open court shall meet and confer in good faith with the Producing Party (and/or Designating Party, as applicable) together with any other Parties who have expressed interest in participating in such meet and confer to discuss ways to redact the Protected Material so that the material may be offered or otherwise used by any party, in accordance with the provisions of the Bankruptcy Code and Bankruptcy Rules. If the Parties are unable to resolve a dispute related to such Protected Material, then the Party who desires to offer or use such Protected Material at trial or any hearing to be held in open court bears the burden of requesting relief from the Bankruptcy Court and, in the absence of such relief, such Protected Material shall not be offered or otherwise used at trial or any hearing held in open court.

7.9 <u>Removal of Sealed Records</u>. Sealed records that have been filed may be removed by the Designating Party (i) within 90 days after a final decision disposing of the Litigation is rendered if no appeal is taken, or (ii) if an appeal is taken, within thirty (30) days after final disposition of the appeal.

# VIII. <u>PROTECTED MATERIAL DEMANDED, SUBPOENAED FOR DISCLOSURE, ACTUALLY DISCLOSED, OR ORDERED PRODUCED IN OTHER PROCEEDINGS</u>

8.1. If a Party is served with a subpoena or a court order issued in other proceedings that compels disclosure of any information or items designated in the Chapter 11 Cases as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL," or "COMMITTEE COUNSEL ONLY," that Party must:

(a)    promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

(b)    promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Order. Such notification shall include a copy of this Order; and

(c)    cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.

8.2. If any person or entity who is not a Party to this Order by any discovery request or other formal or informal process, requests or demands any Protected Material from any Party (including any Party's counsel or Representative), the Party or Representative receiving such request or demand shall, if so entitled and permitted given the nature of the legal process, demand or request at issue, promptly notify the other Parties as soon as practicable and provide copies of any writings or documents relating to such request, demand, or actual disclosure, including subpoenas, summonses, and the like. If any Party wishes to protect the confidentiality of any Protected Material in response to the demand or request, then the recipient of the demand or request shall, to the extent reasonably practicable and legally permissible, cooperate with such Party to undertake the necessary steps to assert such applicable privileges, immunities, and rights to protect the confidentiality of the Shared Information. The Party wishing to assert the applicable privileges, immunities, and rights shall bear all costs associated with doing so, including the costs incurred by the recipient in taking any necessary steps.

8.3 If the Designating Party timely seeks a protective order regarding the Protected Material that is requested or demanded as described in paragraphs 8.1 and 8.2 above, the Party served with the subpoena or court order shall not produce any Protected Material before a determination by the Bankruptcy Court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the

burden and expense of seeking protection in that Court of its confidential material.  Nothing in this Order should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another Court.

## IX. UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A. Disclosure of Protected Material other than in accordance with the terms of this Order may subject the disclosing person to such sanctions and remedies as the Bankruptcy Court may deem appropriate.

## X. NON-WAIVER OF PRIVILEGE; INADVERTENT PRODUCTION OF PRIVILEGED DISCOVERY MATERIAL

The Parties agree that the inadvertent or unintentional disclosure of Discovery Material supplied under this Order, regardless of whether the information was designated as Protected Material at the time if disclosure, shall not be deemed a waiver in whole or in part of any privilege or immunity, either as to the specific information disclosed or as to any other information relating thereto or to related subject matter. Upon discovery of the inadvertent error, the Parties shall cooperate to preserve privilege or immunity for that disclosed material, including retrieval of all copies.

No Party or its counsel shall have the right to waive the attorney-client, work product, joint defense, common interest or any other privilege or defense that might be applicable to any

Discovery Material it has received from any other Party or its counsel, even if the interests of the Parties (or some subset thereof) diverge at a later point in time. Each Party and its counsel shall retain the sole right to waive its own privileges as to any Discovery Material originated solely from it or its counsel or other advisors, provided prior notice is given to any other Party that may have a shared or joint privilege in such Discovery Material that arose prior to the date and independent of this Order.

## XI. <u>DEPOSITIONS</u>

11.1 <u>Presence Of Persons During Deposition Testimony</u>. Anyone who attends a deposition is subject to the provisions of this Order with respect to such deposition. When Protected Material is elicited during a deposition, persons not entitled to receive such information under the terms of this Order shall, upon request, be excluded from the portion of the deposition so designated.

11.2 <u>Responsibilities And Obligations Of Court Reporters.</u> In the event that testimony is designated as Protected Material, the court reporter, who shall first have agreed to abide by the terms of this paragraph, shall be instructed to include on the cover page of each such transcript the legend, "This transcript portion contains information subject to a Protective Order and shall be used only in accordance therewith," and each page of the transcript shall include the legend "CONFIDENTIAL," "HIGHLY CONFIDENTIAL," or "COMMITTEE COUNSEL ONLY," as appropriate. If the deposition is recorded, the recording shall also be subject to the same level of confidentiality as the transcript and include the legend "CONFIDENTIAL," "HIGHLY CONFIDENTIAL," or "COMMITTEE COUNSEL ONLY" as appropriate, if any portion of the transcript itself is so designated.

## XII. **MISCELLANEOUS**

12.1 <u>Right to Further Relief</u>. Nothing in this Order abridges the right of any person to seek its modification by the Bankruptcy Court in the future, including as this Order applies to any particular contested matter or adversary proceeding.

12.2 <u>Right to Assert Other Objections</u>. Nothing in this Order waives any right by a Party that it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Order.

12.3 <u>Continuing Applicability Of Order</u>. The provisions of this Order shall survive the Debtors' emergence from Bankruptcy for any retained Discovery Material. The Debtors' emergence from Bankruptcy shall not relieve the Parties from their responsibility to maintain the confidentiality of Discovery Material pursuant to this Order, and the Bankruptcy Court shall retain jurisdiction to enforce the terms of this Order.

12.4 <u>Amendment or Assignment Of Order</u>. This Order may be amended only by an instrument in writing signed by each of the Parties, with approval by the Bankruptcy Court. Nothing herein shall preclude a Party from applying at any time (including, without limitation, after the conclusion of the Chapter 11 Cases) to the Bankruptcy Court for relief from (including, without limitation termination of) any or all of the provisions of this Order. The Debtors and the Party seeking to modify or terminate the Order shall meet and confer in good faith to reach an agreement on any issues in dispute concerning the meaning, application, or interpretation of this Order prior to any application to the Bankruptcy Court for resolution of such dispute. A Producing Party and a Receiving Party may agree to modify this Order as it applies to a

particular production or a particular proceeding in the Chapter 11 Cases with ten (10) business days prior notice to the Debtors.

12.5 <u>Use Of Discovery Material By Producing Party</u>. Nothing in this Order affects the right of any Producing Party to use or disclose its own Discovery Material in any way. Such disclosure will not waive the protections of this Order and will not otherwise entitle other Parties or their attorneys to use or disclose such Discovery Material in violation of this Order.

12.6 <u>Obligations Of Parties</u>. Nothing herein shall relieve a Party of its obligations under the Federal Rules, Bankruptcy Rules, Local Rules, any existing joint defense or common interest agreements, or under any future stipulations and orders, regarding the production of documents or the making of timely responses to Discovery Requests in connection with any dispute or the Chapter 11 Cases.

12.7 <u>Advice Of Counsel</u>. Nothing herein shall prevent or otherwise restrict counsel from rendering advice to their clients in connection with the Chapter 11 Cases and, in the course thereof, relying on examination of Protected Material; <u>provided</u>, <u>however</u>, that in rendering such advice and otherwise communicating with such client, counsel shall not make specific disclosure of any information in any manner that is inconsistent with the restrictions or procedures set forth herein.

12.8 <u>Enforcement</u>. The provisions of this Order constitute an Order of this Court and violations of the provisions of this Order are subject to enforcement and the imposition of legal sanctions in the same manner as any other Order of the Bankruptcy Court.

## XIII. <u>FINAL DISPOSITION</u>

Within 90 days after the conclusion of the Debtors' emergence from Bankruptcy, unless otherwise ordered by the Bankruptcy Court, each Receiving Party must return all Protected

Material to the Producing Party or destroy such material. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, Derivative Information, and any other format reproducing or capturing any of the Protected Material. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 90 day deadline that (1) identifies (by category, where appropriate) all the Protected Material that was returned or destroyed and (2) affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Outside Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material. A Receiving Party's obligations under this paragraph shall not require the destruction or return of Discovery Material by Outside Counsel that is stored on backup storage or in archiving solutions made in accordance with regular data backup procedures for disaster recovery or litigation hold, provided that Outside Counsel maintains the confidentiality thereof in accordance with this Order. If a Receiving Party chooses to take all commercially reasonable steps to destroy, rather than return, documents in accordance with this paragraph, that Receiving Party shall, if requested by the Producing Party, verify such destruction in writing to counsel for the Producing Party. Notwithstanding anything in this paragraph, to the extent that the information in the Discovery Material remains confidential, the terms of this Order shall remain binding.

**END OF ORDER**

## EXHIBIT A

## ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of _____

_____ [print or type full address], declare under penalty of perjury that I have read

in its entirety and understand the Confidentiality and Protective Order that was issued by the

United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on

_____ in the chapter 11 cases of the Boy Scouts of America and

Delaware BSA, LLC [Case No. _____, Docket No. _____] (the "**Order**").  I agree to comply with

and to be bound by all the terms of the Order and I understand and acknowledge that failure to so

comply could expose me to sanctions and punishment in the nature of contempt. I solemnly

promise that I will not disclose in any manner any information or item that is subject to the Order

to any person or entity except in strict compliance with the provisions of the Order. I further

agree to submit to the jurisdiction of the Bankruptcy Court for the purpose of enforcing the terms

of this Confidentiality and Protective Order, even if such enforcement proceedings occur after

termination of the Chapter 11 Cases (as defined in the Order).

I hereby appoint _____ [print or type full name] of

_____ [print or type full address and telephone

number] as my Delaware agent for service of process in connection with this action or any

proceedings related to enforcement of the Order.


Date: _____

City and State where sworn and signed: _____

Printed name: _____

Signature: _____