## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (___) |
| Debtors. | (Joint Administration Requested) |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF ESSENTIAL VENDORS, FOREIGN VENDORS, SHIPPERS, WAREHOUSEMEN, OTHER LIEN CLAIMANTS, AND 503(b)(9) VENDORS, AND (II) GRANTING RELATED RELIEF

The Boy Scouts of America (the "BSA") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), submit this motion (this "Motion"), pursuant to sections 105(a), 363(b), 503(b)(9), 1107(a), and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an interim order (the "Proposed Interim Order") and a final order (the "Proposed Final Order"), substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, (i) authorizing, but not directing, the Debtors to pay, in the ordinary course of their non-profit operations, prepetition claims of: (a) Essential Vendors (as defined below), (b) Foreign Vendors (as defined below), (c) Shippers, Warehousemen, and Other Lien Claimants (each as defined below, and collectively, the "Lien Claimants," and their lien claims, the "Lien

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

Claims"), and (d) 503(b)(9) Vendors (as defined below), (ii) authorizing, but not directing, the Debtors to condition payment of any prepetition amounts owed to any Essential Vendor, Foreign Vendor, Lien Claimant, or 503(b)(9) Vendor upon written verification that such party will abide by certain trade terms, (iii) authorizing banks to receive, process, honor and pay checks or electronic transfers used by the Debtors to pay the foregoing, and (iv) granting related relief. The facts and circumstances supporting this Motion are set forth in the *Declaration of Brian Whittman in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed concurrently herewith.  In further support of this Motion, the Debtors respectfully state as follows:

## STATUS OF THE CASES AND JURISDICTION

1.      On the date hereof (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").  Concurrently with the filing of this Motion, the Debtors have requested joint administration and procedural consolidation of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors continue to operate and maintain their non-profit organization and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in these cases, and no statutory committee has been appointed.

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent, pursuant to pursuant to Local Rule 9013-1(f), to the entry of a final order or judgment by the Court in connection with this Motion if

it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory and other predicates for the relief requested herein are sections 105(a), 363(b), 503(b)(9), 1107(a), and 1108 of the Bankruptcy Code, rules 6003 and 6004 of the Bankruptcy Rules and Local Rule 9013-1.

## BACKGROUND OF THE DEBTORS

5.      The BSA is a federally chartered non-profit corporation under title 36 of the United States Code.  The BSA is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code.  Founded in 1910 and chartered by an act of Congress in 1916, the BSA is one of the largest youth organizations in the United States and one of the largest Scouting organizations in the world, with approximately 2.2 million registered youth participants and approximately 800,000 adult volunteers.  As a non-profit corporation, the BSA is required to adopt and carry out a charitable, religious, educational, or other philanthropic mission.  The BSA's mission is to prepare young people for life by instilling in them the values of the Scout Oath and Law,[2] encouraging them to be trustworthy, kind, friendly and helpful, while also training youth in responsible citizenship, skills development and self-reliance through participation in a wide range of outdoor activities, educational programs, and, at older ages, career-oriented programs in partnership with community organizations.  Delaware BSA, LLC ("Delaware BSA") is a non-profit limited liability company incorporated under the laws of

---

[2] **Scout Oath:** "On my honor I will do my best to do my duty to God and my country and to obey the Scout Law; to help other people at all times; to keep myself physically strong, mentally awake, and morally straight."  **Scout Law:** "A Scout is trustworthy, loyal, helpful, friendly, courteous, kind, obedient, cheerful, thrifty, brave, clean, and reverent."

Delaware and exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code.  BSA is the sole member of Delaware BSA.

6.      To carry out its mission of developing youth leaders of character and integrity, the BSA grants charters to thousands of local organizations across the country, including faith-based institutions, clubs, civic associations, educational institutions, and businesses.  These chartered organizations, in turn, form Scouting units—referred to as "packs" for Cub Scouts, "troops" for Scouts BSA (formerly known as Boy Scouts), "crews" for Venturing, "ships" for Sea Scouts, "labs" for STEM Scouts, and "posts" for Exploring.  Scouting units are led by adult volunteers appointed by the chartered organization.  Each of the BSA's approximately 81,000 Scouting units in the United States is organized, registered, and supported by one of 261 local councils that are chartered by the BSA and oversee the Scouting program in an assigned geographic area. Each local council is separately incorporated under the non-profit laws of its respective state, maintains an independent board of directors and senior management, and is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code.  The BSA does not hold any equity interest in any local council, chartered organization, or Scouting unit, and only the BSA and its wholly owned subsidiary, Delaware BSA, are debtors in these chapter 11 cases. Additional information regarding the BSA, its mission and operations, and the events and circumstances preceding the Petition Date is set forth in the First Day Declaration and the *Debtors' Informational Brief*, filed concurrently herewith.

## RELIEF REQUESTED

7.      By this Motion, the Debtors request entry of the Proposed Interim Order and Proposed Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively:

(i)    authorizing, but not directing, the Debtors to pay, in the ordinary course of their non-profit operations, prepetition claims of:

    (a)    vendors that provide supplies necessary to the BSA's Scouting mission (collectively, the "Essential Vendors," and their claims relating to these supplies, the "Essential Vendor Claims") in an amount not to exceed $1,500,000 on an interim basis (the "Interim Essential Vendor Cap") and $3,000,000, inclusive of the Interim Essential Vendor Cap, on a final basis (the "Final Essential Vendor Cap");

    (b)    vendors located outside of the United States (collectively, the "Foreign Vendors," and their claims, the "Foreign Vendor Claims") in an amount not to exceed $500,000 on an interim basis (the "Interim Foreign Vendor Cap") and $500,000, inclusive of the Interim Foreign Vendor Cap, on a final basis (the "Final Foreign Vendor Cap");

    (c)    Lien Claimants, in an amount not to exceed $4,500,000 on an interim basis (the "Interim Lien Claimants Cap") and $4,750,000, inclusive of the Interim Lien Claimants Cap, on a final basis (the "Final Lien Claimants Cap");

    (d)    ordinary-course vendors entitled to administrative expense status under 503(b)(9) of the Bankruptcy Code on account of goods received by the Debtors within 20 days before the Petition Date (collectively, the "503(b)(9) Vendors," and their claims, the "503(b)(9) Claims") in an amount not to exceed $2,000,000 on an interim basis (the "Interim 503(b)(9) Cap") and $3,750,000, inclusive of the Interim 503(b)(9) Cap, on a final basis (the "Final 503(b)(9) Cap");

(ii)    authorizing, but not directing, the Debtors to condition payment of any prepetition amounts owed to any Essential Vendor, Foreign Vendor, Lien Claimant, or 503(b)(9) Vendor (collectively, the "Vendors," and their claims, the "Vendor Claims") on written verification that such party will abide by certain trade terms;

(iii)    authorizing, but not directing, applicable banks and other financial institutions to receive, process, honor and pay any and all checks drawn on and transfers made from the Debtors' accounts to the extent that those checks or transfers relate to any of the foregoing; and

(iv)    granting related relief, including scheduling a final hearing to consider approval of the Proposed Final Order.

## II.    Essential Vendors

### A.    Scouting Suppliers

8.    For generations of Americans, the uniforms of the BSA are synonymous with the Scouts who wear it—trustworthy, loyal, helpful, friendly, courteous, kind, obedient, clean, and reverent.



9.    In the ordinary course of its non-profit operations, the BSA purchases supplies, merchandise and apparel, including components of its iconic uniforms, to sell to Scouts and their families, local councils, volunteers, and other members of the public at one of 174 Scout Shops located across the United States and its territories, and through its online Scout Shop.  At any given point in time, the BSA offers 8,000 to 10,000 unique products related to highly customized uniforms, patches, and other merchandise for each of the BSA programs, as well as program emblems, badges, equipment and camping accessories, and jewelry and general apparel.  Further,

approximately 135 local councils support these national sales efforts by designating a portion of their office space as a BSA Scout Shop.  These local council Scout Shops are locations where the BSA sells uniform, apparel, camping equipment, and other merchandise directly to BSA members.

10.    Total Scout Shop sales represented approximately 30% of the BSA's total annual revenue in 2019 and are both critical to sustaining the BSA's operations and to carrying out its core programs.  But more important than their contribution to the BSA's revenues, the BSA's retail operations make the BSA's Scouting programs possible by supplying local councils and Scouts with essential, unique items ranging from uniforms and camping supplies to merit badges and venturing handbooks.  By way of example, every Scout has a uniform, which can be customized to each individual, replete with identifying patches, branded belts, shoulder loops, and more.  Many of these items are supplied by Essential Vendors, without whom the BSA and the local councils would be unable to carry out their mission.

 



Similarly, the Debtors also utilize certain essential printing suppliers that have the knowhow to produce the BSA's specialized printed materials—including handbooks and merit badge pamphlets—that are at the very core of Scouting.  Each of the BSA's Scouting items is manufactured by one of the BSA's over 10,000 vendors and is sold exclusively by the BSA to local councils and individuals through its Scout Shops, online Scout Shop, and Trading Posts. Local councils and individual Scouts expect and need the BSA to provide these unique items, and even a brief interruption in the flow of the Debtors' merchandise and supplies from the Essential Vendors could cause a severe negative impact on the Scouting experience for the BSA's members.  Further, identifying and switching to alternative suppliers for each of the vendors the Debtors have deemed Essential Vendors—many of whom the organization has relied upon for years—would be time-consuming, cost prohibitive, and, in some cases, impossible.

11.    In addition, the Debtors also operate four high adventure facilities that provide Scouts with opportunities to implement their knowledge and training at locations and in programs that are not available anywhere else in the country.  Most of the high adventure facilities operate in remote locations where there are very limited suppliers of the types of goods and services that are essential for these facilities to operate.  Certain of the Essential Vendors identified by the Debtors and their professionals provide these essential supplies to these remote locations.  If these Essential Vendors refuse to continue providing goods or services to these high

adventure facilities postpetition, the Debtors may be unable to find replacement vendors in time (or at all) for the critical months when thousands of Scouts arrive at these high adventure facilities.  Such a situation could jeopardize the BSA's ability to safely and successfully operate the high adventure facilities.

**B.     Identifying the Essential Vendors**

12.     In order to limit the scope and magnitude of the relief requested, the Debtors and their advisors spent significant time reviewing and analyzing books and records, reviewing prepetition vendor lists and consulting with certain of the Debtors' employees and professionals who are responsible for maintaining, and have intimate knowledge of, the Debtors' vendor and service provider relationships.   With the assistance of their restructuring professionals, the Debtors considered the following criteria: (i) whether the vendor is a sole, limited-source or high-volume supplier of goods and services essential to the Debtors' retail operations; (ii) whether the Debtors would be able to obtain comparable goods or services from alternative sources for a similar cost within a reasonable time frame; (iii) the potential disruption to the Debtors' programs or lost revenues suffered while transitioning to alternative vendors; (iv) whether a vendor is otherwise contractually obligated to continue to provide goods or services to the Debtors; and (v) whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to ship inventory or services on a postpetition basis.

13.     As a result of this laborious, time-consuming process, the Debtors were able to pare down their approximately 10,000 vendors and identify a small fraction of those vendors and suppliers that are in fact Essential Vendors.  Further, the proposed Final Essential Vendors Cap represents approximately 3% percent of the BSA's total annual supply expenses.

14.     The Debtors estimate that approximately $3,000,000 in prepetition amounts are owed to Essential Vendors as of the Petition Date, who are generally paid on 30-day terms.  The

Debtors are seeking the authority, but not the direction, to pay prepetition Essential Vendor

Claims in an amount not to exceed the Interim Essential Vendor Cap ($1,500,000) and Final

Essential Vendor Cap ($3,000,000, inclusive of the Interim Essential Vendor Cap), as applicable

in the normal course of business.

## III.    Foreign Vendors

15.    The Debtors rely upon Foreign Vendors, primarily located in Asia, to supply

critical, unique goods in connection with their retail operations and certain information

technology ("IT") services.  The Debtors rely on Foreign Vendors to supply an important subset

of the goods and merchandise sold in Scout Shops, online Scout Shop, and Trading Posts.  In

addition, the Debtors' foreign IT vendors provide critical services, including for business

application management, maintenance and development of the BSA's electronic data processing,

information, recordkeeping, communications, and other systems.  If the Foreign Vendors stop

providing these supplies and services, the Debtors operations would be irreparably harmed and

their chances at successfully reorganizing severely undermined.

16.    The Debtors are concerned that Foreign Vendors may discontinue providing

goods and/or services absent timely payment of the Foreign Vendor Claims.  Additionally, if left

unpaid, the Foreign Vendors may take action against the Debtors based upon an erroneous belief

that Foreign Vendors are not subject to the automatic stay provisions of section 362(a) of the

Bankruptcy Code.  Although the automatic stay applies to protect the Debtors assets wherever

they are located in the world, attempting to enforce the provisions of section 362(a) in foreign

countries is difficult, disruptive, and costly.  Further, the proposed payment to Foreign Vendors

is a small fraction of the organizations overall annual supply expenses—less than 1%.

17.    For the foregoing reasons, the Debtors submit that payment of the Foreign Vendor

Claims, which are generally made on 30-day terms, is necessary to preserve and enhance the

value of the Debtors' business for the benefit of all parties in interest.  The Debtors estimate that approximately $500,000 in prepetition amounts are owed to Foreign Vendors as of the Petition Date.  The Debtors are seeking the authority, but not the direction, to pay prepetition Foreign Vendor Claims in an amount not to exceed the Interim Foreign Vendor Cap ($500,000) and Final Foreign Vendor Cap ($500,000, inclusive of the Interim Foreign Vendor Cap).

## IV.   Lien Claimants

18.   Certain vendors the Debtors conduct business with may be able to assert statutory liens—like mechanics' liens, materialmens' liens, shippers' liens and warehousemens' liens— against the Debtors' high adventure facility locations or the Debtors' goods or equipment, notwithstanding the automatic stay imposed by section 362 of the Bankruptcy Code.[3]  As a result, certain Lien Claimants may refuse to perform their ongoing obligations to the Debtors, including performing servicing obligations in connection with the Debtors' facilities, unless their claims are paid in full.  Such Lien Claimants may also seek to file and perfect these statutory liens, creating an unnecessary administrative burden on the Debtors and their estates at this critical juncture.  As such, the Debtors seek interim and final relief to pay such Lien Claimants on account of their prepetition claims.

### A.   Shippers and Warehousemen

19.   In operating their organization, the Debtors use and make payments to domestic and foreign commercial common carriers, movers, shippers, delivery services, and other third-party service providers (collectively, the "Shippers") to ship, transport, store, and otherwise facilitate the movement of goods through established national and international distribution

---

[3] Indeed, the act of perfecting such statutory liens, to the extent consistent with section 546(e) of the Bankruptcy Code, is expressly excluded from the automatic stay.  See 11 U.S.C. § 362(b)(3).  Under section 546(b) of the Bankruptcy Code, a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection."  11 U.S.C. § 546(b)(1)(A).

networks, as well as a third-party warehouse (the "<u>Warehousemen</u>") to store goods in transit (such payments, the "<u>Shipping and Warehousing Charges</u>").

20.     The BSA owns and operates a distribution center (the "<u>BSA Distribution Center</u>") and leases a warehouse facility that is used solely for storage of its excess inventory.  The BSA Distribution Center is the Debtors' main hub for receiving and shipping all supplies, merchandise and apparel the BSA ships to Scout Shops, online customers of the Scout Shops, wholesale distributors and local councils.  The BSA contracts with various shippers to ship orders from the BSA Distribution Center to their final destination.  Further, the BSA also drop-ships certain merchandise from manufacturers directly to the Scout Shops, Trading Posts, and individual customers.  The BSA also utilizes international suppliers in meeting its demands for supplies, merchandise, and apparel.

21.     The services provided by the Shippers and Warehousemen are critical to the Debtors.  The Debtors rely on the Shippers and Warehouseman for the frequent, often daily, shipments of essential supplies, merchandise and apparel to Scout Shops, online customers of the Scout Shop, and local councils.[4]  Following the commencement of these chapter 11 cases, certain Shippers and Warehousemen who hold goods for delivery to or from the Debtors may refuse to release the goods pending receipt of payment for their prepetition services.[5]  Indeed, under some state laws, a Shipper or Warehouseman may have a lien on the goods in its possession to secure

---

[4] There are shipping services that the BSA facilitates and pays for the Local councils, which gets billed back to the local councils after the shipment.  The relief related to these transactions is being sought in the Shared Services Motion.

[5] Under certain state laws, Shippers or Warehousemen may have a lien on the goods in its possession, which secures the charges or expenses incurred in connection with the transportation or storage of the goods. For example, section 7-307(a) of the Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal charges, and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law." U.C.C. § 7-307(a).  The Debtors do not concede that any liens described in this Motion, including contractual liens, mechanics' liens, and statutory liens, are valid and expressly reserve the right to contest the extent, validity, perfection or possible avoidance of all such liens.

the charges or expenses incurred for the transportation or storage of goods. Additionally, pursuant to section 363(e) of the Bankruptcy Code, the Shippers and Warehousemen, as bailees, may be entitled to adequate protection as holders of possessory liens.

22.     Any disruption to the Debtors' acquisition of these goods from Shippers or Warehousemen could result in a slow-down or shut-down of the supply chain at the Debtors' various Scout Shops and local councils, adversely impacting Debtors' retail operations and Scouting to the detriment of all parties in interest. As mentioned above, the local councils maintain little or no merchandise inventory on site, further threatening Scouting programs in the event that the Shippers or Warehousemen stopped providing services to the Debtors.

23.     Accordingly, to meet their delivery deadlines and maintain uninterrupted operations, the Debtors have implemented an efficient system for the receipt of goods and the delivery of merchandise to their members and non-member customers. This system relies heavily on third parties, including the Shippers and Warehousemen. At any given time, there are thousands of shipments of goods and BSA merchandise en route to and from various locations throughout the country in possession of Shippers and Warehousemen. It is thus imperative that the Debtors be authorized to pay any Shipping and Warehousing Charges, whether they arose prior to or after the Petition Date, that the Debtors determine in their business judgment are necessary to ensure the uninterrupted shipment and delivery of the goods.

**B.     Other Lien Claimants**

24.     The Debtors also routinely transact business with a number of other third parties including contractors, repairmen, and manufacturers who may assert tooling, mechanics', materialmens', or other liens (the "Other Lien Claimants," and their claims, the "Other Lien Claims") against the Debtors and their property if the Debtors fail to pay for the goods or services rendered. The Other Lien Claimants perform a number of services for the Debtors,

including construction, plumbing, and electric repair and maintenance for the high adventure facilities and the Debtors' various other real property facilities.

25.     Specifically, much of the work that the Other Lien Claimants performed for the Debtors in 2019 and early 2020 was in relation to final phase construction of a dining hall, bunk house and leadership center on the Summit high adventure facility.  The BSA will pay Other Lien Claimants for this construction work from its unrestricted cash, but will then be reimbursed in full from charitable donations that have been restricted for use only in connection with development of the high adventure facilities.  Further development of the high adventure facilities is ongoing and their on time completion is critical to the upcoming summer season.

26.     As described above, if the Debtors are not permitted to pay the Other Lien Claims pursuant to the relief requested, certain of the Other Lien Claimants may be able to assert mechanics liens and materialmen's liens against the Debtors' high adventure facility locations or the Debtors' goods or equipment, notwithstanding the automatic stay imposed by section 362 of the Bankruptcy Code.  Such filings would create significant administrative burden on the Debtors and their estates, and certain Other Lien Claimants may refuse to perform their ongoing obligations to the Debtors while such actions are pending.  Such a consequence could have dramatic, negative effects on the organization and its ability to advance its mission.  As mentioned above, the construction work that the Other Lien Claimants is performing at high adventure facilities is crucial for the upcoming seasons.  Any interruption of construction services by the Other Lien Claimants could prevent the completion of the facilities in time for the critical summer months.

27.     The Debtors estimate that approximately $4,750,000 in prepetition amounts are owed to Shipping and Warehousemen and Other Lien Claimants as of the Petition Date.  The

Debtors are seeking the authority, but not the direction, to pay prepetition Lien Claims in an amount not to exceed the Interim Lien Claimants Cap ($4,500,000) and Final Lien Claimants Cap ($4,750,000, inclusive of the Interim Lien Claimants Cap), as applicable.

**V.      503(b)(9) Vendors**

28.     In their review of their books and records while seeking to narrowly tailor the relief requested in this Motion, the Debtors identified certain claims that may be entitled to priority status under section 503(b)(9) of the Bankruptcy Code, because such claims are undisputed obligations for goods received by the Debtors in the ordinary course of business in the twenty (20) days prior to the Petition Date.

29.     The Debtors estimate that approximately $3,750,000 in prepetition amounts are owed to 503(b)(9) Vendors as of the Petition Date.  The Debtors are seeking the authority, but not the direction, to pay 503(b)(9) Claims in an amount not to exceed the Interim 503(b)(9) Cap ($2,000,000) and Final 503(b)(9) Cap ($3,750,000, inclusive of the Interim 503(b)(9) Cap), as applicable in the normal course of business.

30.     The Debtors seek, in their discretion, to pay certain 503(b)(9) Claims as they come due in the ordinary course of business (typically on 30-day terms), instead of satisfying the 503(b)(9) Claims upon confirmation of a chapter 11 plan.  By altering the timing of payments that certain 503(b)(9) Vendors are entitled to receive as a matter of statute, such payments may induce the individual 503(b)(9) Vendors to adhere to more favorable trade terms and conduct business with the Debtors.

**VI.      Customary Trade Terms**

31.     The Debtors further request authority, but not direction, to condition payment of any prepetition amounts owed to any Vendor, upon written verification at the Debtors' discretion, that such Vendor will abide by certain trade terms, including that such Vendor will (i)

continue to provide services to the Debtors during the pendency of these chapter 11 cases on the most favorable terms that existed in the twelve (12) months before the Petition Date, (ii) agree that they shall not be permitted to cancel on less than 90 days' notice any contract or agreement pursuant to which they provide services to the Debtors, and (iii) take whatever action is necessary to remove any liens in respect of such claim, if any, at such Vendor's sole cost and expense; provided that no such payment shall be deemed to be a waiver of rights regarding the extent, validity, perfection or possible avoidance of any such liens.

32.     If any Vendor accepts payment pursuant to this Order for a prepetition obligation of the Debtors premised upon its compliance with conditions (i), (ii), and (iii) above, and thereafter fails to comply with those conditions, any payments made pursuant to this Interim Order shall be deemed an avoidable postpetition transfer under section 549 of the Bankruptcy Code, and, therefore, shall be recoverable by the Debtors in cash upon written request.  Upon recovery by the Debtors, the claim shall be reinstated as a prepetition claim in the amount so recovered.

**BASIS FOR RELIEF**

**I.     Sections 105(a) and 363(b) of the Bankruptcy Code Permits the Payment of Obligations to Vendors.**

33.     The Debtors, operating their organization as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business for the benefit of [their] creditors and (if the value justifies) equity owners."  In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value."  Id.  Consistent with a debtor's fiduciary duties to preserve the estate, courts have authorized payment of prepetition obligations pursuant

to sections 105(a) and 363(b) of the Bankruptcy Code.  See, e.g., In re Just for Feet, Inc., 242 B.R. 821, 826 (D. Del. 1999) (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a bankruptcy court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept.").  Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim."  In re CoServ, L.L.C., 273 B.R. at 497.

34.    The Court may authorize the Debtors to pay prepetition Vendor Claims under section 363(b) of the Bankruptcy Code.  Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Under section 363 of the Bankruptcy Code, a court may authorize a debtor to pay certain prepetition claims if a sound business purpose exists for doing so.  See In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999) (requiring that debtor show a "sound business purpose" to justify its actions under section 363 of Bankruptcy Code); see also In re Phoenix Steel Corp., 82 B.R. 334, 335–36 (Bankr. D. Del. 1987).  Moreover, if "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  In re Johns-Manville Corp., 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); see also In re Tower Air, Inc., 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").  Under this section, a court may authorize a debtor to pay certain prepetition claims.  See In re Ionosphere Clubs, Inc., 98 B.R. at 175 (authorizing payment

of prepetition claims where the debtors articulate "some business justification, other than mere appeasement of major creditors"); see also In re James A. Phillips, Inc., 29 B.R. 391, 397 (S.D.N.Y. 1983) (authorizing, pursuant to section 363, a contractor to pay prepetition claims of some suppliers who were potential lien claimants, because the payments were necessary for the general contractors to release funds owed to the debtors).  Courts have consistently declined to interfere with a debtor's business decision, provided that the debtor can demonstrate that the decision was made in good faith and on an informed basis.  In re Dura Auto. Sys., Inc., No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *259–60 (Bankr. D. Del. Aug. 15, 2007); In re Nellson Nutraceutical, Inc., 369 B.R. 787, 797 (Bankr. D. Del. 2007) ("[I]f the Court determines that a transaction is in the ordinary course of a debtor's business, the Court will not entertain an objection to the transaction, provided that the conduct involves a business judgment made in good faith upon a reasonable basis and within the scope of authority under the Bankruptcy Code").

35.     The relief requested herein is appropriate and warranted under the circumstances. The authority to satisfy the Vendor Claims in the initial days of these cases will maintain the integrity of the BSA's supply chain, facilitate the sale of supplies and merchandise at Scout Shops, online Scout Shops, and directly to local councils.  Simply put, it will allow the Debtors to efficiently administer these chapter 11 cases without disrupting the Debtors' non-profit operations.  Failure to pay the Vendor Claims could potentially destroy value that would otherwise inure to the benefit of the Debtors' estates and jeopardize the BSA's ability to carry out its mission.  Based on these circumstances, the Debtors submit that the relief requested herein represents a sound exercise of the Debtors' business judgment, is necessary to avoid

immediate an irreparable harm to the Debtors estates, and is therefore justified under section 105(a) and section 363(b) of the Bankruptcy Code.

36.      In addition, courts may authorize payment of prepetition claims in appropriate circumstances under Bankruptcy Code section 105(a).  The Court's general equitable powers are codified in section 105(a) of the Bankruptcy Code.  Section 105(a) empowers the Court to "issue any order, process, or judgment that is necessary . . . to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a); In re CEI Roofing, Inc., 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (finding that "[b]ecause Congress has specifically provided that prepetition wage claims up to a certain amount per claim be elevated to priority status under § 503(1)(3)" the court's job is easier when it considers approval of such prepetition claims); see also In re Penick Pharm., Inc., 227 B.R. 229, 233 (Bankr. S.D.N.Y. 1998) ("[U]pon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of a bankruptcy trustee."). A bankruptcy court's use of its equitable powers to "authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."  In re Ionosphere Clubs, 98 B.R. at 175. Under section 105(a), the Court "can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor." In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992); see, e.g., In re Just for Feet, 242 B.R. at 824–25 (holding that section 105(a) of Bankruptcy Code provides a statutory basis for payment of prepetition claims under doctrine of necessity and noting that "[t]he Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of prepetition claims when such payment is necessary for the debtor's survival during chapter 11"); In re Columbia Gas Sys., Inc., 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (confirming that doctrine of necessity is standard in Third

Circuit for enabling a court to authorize payment of prepetition claims prior to confirmation of a reorganization plan).

37.     In a long line of well-established cases, federal courts consistently have permitted post-petition payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors.  See, e.g., Miltenberger v. Logansport, C. & S. W. R. Co., 106 U.S. 286, 312 (1882) (payment of pre-receivership claim permitted to prevent "stoppage of [crucial] business relations"); In re Lehigh & New Eng. Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981) (holding that "if payment of a claim which arose prior to [the commencement of the bankruptcy case] is essential to the continued operation of the . . . [business] during [the bankruptcy case], payment may be authorized even if it is made out of [the] corpus"); Dudley v. Mealey, 147 F.2d 268, 271 (2d Cir. 1945) (extending doctrine for payment of pre-petition claims beyond railroad reorganization cases).

38.     This legal principle—known as the "doctrine of necessity"—functions in chapter 11 cases as a mechanism by which a bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code.  See In re Just for Feet, 242 B.R. at 826 (finding that "to invoke the necessity of payment doctrine, a debtor must show that payment of the pre-petition claims is critical to the debtor's [continued operation]"); In re Columbia Gas Sys., Inc., 136 B.R. 930, 939 (Bankr. D. Del. 1992) (recognizing that "[i]f payment of a pre-petition claim 'is essential to the continued operation of [the debtor], payment may be authorized'"); In re Boston & Me. Corp., 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a judicial power to authorize trustees to pay claims for goods that are indispensably necessary to the debtors' continued operation).  The doctrine is frequently invoked early in a bankruptcy case, particularly in connection with those sections of

the Bankruptcy Code that relate to payment of prepetition claims.  In one case, the court indicated its accord with "the principle that a bankruptcy court may exercise its equity powers under section 105(a) to authorize payment of pre-petition claims where such payment is necessary 'to permit the greatest likelihood of . . . payment of creditors in full or at least proportionately.'"  In re Structurelite Plastics Corp., 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988).

39.     As explained above, the supplies, merchandise, and apparel provided by the Essential Vendors are vital to the Debtors' Scouting mission and the local councils who rely on a constant supply from the BSA for certain core Scouting products.  The Debtors submit that the total amount to be paid to the Essential Vendors is minimal compared to the importance and necessity of the Debtors' uninterrupted receipt of the necessary supplies.  Moreover, given the unique and highly-specialized nature of the BSA's Scouting supplies, there are no cost-effective or readily accessible alternatives to paying the Essential Vendors.

## II.     Failure to Make Timely Payment of Lien Claims Would Threaten the Debtors' Ability to Operate and May Subject the Debtors' Assets to the Perfection of Liens.

40.     As noted above, certain Lien Claimants may be entitled under applicable non-bankruptcy law to assert certain possessory liens on the Debtors' goods, equipment in their possession, or property (notwithstanding the automatic stay under section 362 of the Bankruptcy Code) in an attempt to secure payment of their prepetition claim.  Under section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.[6]  As a result, the Debtors anticipate that certain of the Lien Claimants may assert or perfect liens, simply refuse to turn over goods in their possession, or stop performing their ongoing obligations.  Even absent a valid

---

[6]  See 11 U.S.C. § 546(b)(1)(A) (providing that a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection").

lien, to the extent certain Lien Claimants have possession of the Debtors' inbound inventory or outbound goods, mere possession or retention would disrupt the Debtors' operations.

41.     Furthermore, in instances where the amount owed to Lien Claimants is less than the value of the properly held to secure a Lien Claim, such parties may be fully secured creditors of the Debtors' estates.  In such instances, payment only provides such parties with what they may be entitled to receive under a plan of reorganization, only without any interest costs that may otherwise accrue during these chapter 11 cases.  Conversely, all creditors will benefit from the seamless transition of the Debtors' non-profit operations into bankruptcy and the ultimate delivery and sale of BSA merchandise and supplies in the BSA Scout Shops, online Scout Shops, and direct local council sales.  Additionally, as discussed above, payments to Other Lien Claimants relating to the final phase construction work on the Summit high adventure facility will be reimbursed in full from charitable donations restricted for such purpose.  The prompt payment of the Lien Claims, and satisfaction of any liens asserted against the Debtors' property, is thus in the Debtors' sound business judgment, crucial for the orderly and efficient operation of the Debtors' organization and, in turn, for carrying out the BSA's Scouting mission.

**III.    The Court Should Authorize the Payment of the Foreign Vendor Claims.**

42.     As described above, the Debtors' business depends on the supply of goods and services from the Foreign Vendors.  In particular, without the Foreign Vendors the Debtors would not be able to sell certain essential merchandise at Scout Shops and the online Scout Shop.  Moreover, the Debtors depend on critical IT services to maintain their non-profit operations.  If the Debtors do not pay certain of the Foreign Vendor Claims, the Foreign Vendors may simply refuse to do business with the Debtors unless and until they receive payment on account of their prepetition claims.  The Foreign Vendors may also take other precipitous action against the Debtors based on the incorrect belief they are not bound by the automatic stay.

43. Courts in this district and in other jurisdictions routinely authorize chapter 11 debtors to pay claims to foreign entities outside the reach of the court's jurisdiction, where it would be unduly time-consuming and expensive to seek to enforce an order of the bankruptcy court in the creditor's home country, and where the payments are essential to the debtor's continued operations.  See, e.g., In re Forever 21, Inc., No. 19-12122 (KG) (Bankr. D. Del. Oct. 28, 2019), ECF No. 332 (authorizing payment of prepetition foreign vendor claims); In re Z Gallerie, LLC, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019), ECF No. 171 (same); In re Things Remembered, Inc., No. 19-10234 (KG) (Bankr. D. Del. Feb. 26, 2019), ECF No. 197 (same); In re ATD Corp., No. 18-12221 (KJC) (Bankr. D. Del. Oct. 24, 2018), ECF No. 236 (same); In re VER Technologies Holdco LLC, No. 18-10834 (KG) (Bankr. D. Del. Apr. 4, 2018), ECF No. 60 (same).

## IV.    The Court Should Authorize the Payment of 503(b)(9) Claims.

44. Section 503(b)(9) of the Bankruptcy Code provides administrative priority for the "value of any goods received by the debtor within 20 days before the commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business."  11 U.S.C. § 503(b)(9).  These claims must be paid in full for the Debtors to confirm a plan.  11 U.S.C. § 1129(a)(9)(A). As a result, the Debtors believe payment of the 503(b)(9) Claims in the ordinary course is a simple timing issue.  Instead of waiting to satisfy the 503(b)(9) Claims after confirmation of a plan of reorganization (at which time such payments may be too late to benefit the Debtors' estates), the Debtors seek to pay some of these claims in the ordinary course, while such payments can still induce the individual 503(b)(9) Vendor to adhere to favorable trade terms and do business with the Debtors going forward.  Although section 503(b)(9) does not specify a time for payment of these expenses, debtors have the discretion to pay administrative claims prior to confirmation if the debtor has the ability and

there is a need to pay.  See, e.g., Dura Auto. Sys., No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) (ECF No. 153) Hr'g Tr. 49:21-23 ("arguably the debtor could pay its 503(b)(9) claimants without court approval."). The timing of such payments also lies squarely within the Court's discretion. See In re Global Home Prods., LLC, No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (agreeing with parties that "the timing of the payment of that administrative expense claim is left to the discretion of the Court").

## V. Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers.

45.    The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course by virtue of expected cash flows from ongoing operations and donations and anticipated access to cash collateral.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the relief requested herein.  Accordingly, the Debtors assert that checks or wire transfer requests, other than those relating to the authorized payments in respect of utility services, will not be inadvertently honored.  Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

### THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

46.    Bankruptcy Rule 6003 empowers the Court to issue an order, within 21 days after the Petition Date, granting a motion to "use . . . property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" if such requested relief "is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003(b).  For the reasons discussed above, entry of the Proposed Interim Order is integral to the Debtors' ability to

successfully transition into chapter 11.  As described above, failure to pay the prepetition claims of Vendors could disrupt the Debtors' organizational operations at their high adventure facilities and other operating locations and disrupt the provision of supplies, merchandise, and apparel that are central to their charitable mission—thereby causing immediate and irreparable harm to the Debtors' estates and, consequently, other interested parties.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## **RESERVATION OF RIGHTS**

47.     Nothing contained herein is intended or should be construed as (a) an admission as to the validity or priority of any claim or lien against the Debtors, (b) a waiver of the Debtors' rights to subsequently dispute such claim or lien on any grounds, (c) a promise or requirement to pay any prepetition claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion, the Proposed Interim Order, or the Proposed Final Order, (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

## **WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h) REQUIREMENTS**

48.     In addition, by this Motion, the Debtors request a waiver of any notice requirements under Bankruptcy Rule 6004(a) and any stay of the effectiveness of the order(s) approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As set forth above, the Debtors require immediate relief to continue ordinary organizational operations for

the benefit of all parties in interest.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

## NOTICE

49.     Notice of this Motion will be provided to (i) the U.S. Trustee; (ii) the twenty-five (25) law firms representing the largest numbers of abuse victims asserting claims against the Debtors; (iii) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis, other than abuse-related claims; (iv) counsel to JPMorgan Chase Bank, N.A.; (v) the County Commission of Fayette County (West Virginia), as issuer of those certain Commercial Development Revenue Bonds (Arrow WV Project), Series 2010A, 2010B and 2012; (vi) representatives of the prepetition Ad Hoc Committee of Local Councils; (vii) counsel to the prepetition Future Claimants' Representative; (viii) counsel to the prepetition ad hoc group of attorneys representing significant numbers of abuse victims; (ix) the United States Attorney's Office for the District of Delaware; (x) the Internal Revenue Service; (xi) the United States Department of Justice; and (xii) any party that has requested notice pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested herein, no other or further notice need be given.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Interim Order and the Proposed Final Order, substantially in the forms attached hereto, granting the relief requested herein and any further relief the Court may deem just and proper.

Dated:  February 18, 2020
     Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Derek C. Abbott*

Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Joseph C. Barsalona II (No. 6102)
Eric W. Moats (No. 6441)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email:  dabbott@mnat.com
       aremming@mnat.com
       jbarsalona@mnat.com
       emoats@mnat.com
       ptopper@mnat.com

– and –

SIDLEY AUSTIN LLP
James F. Conlan (*pro hac vice* pending)
Thomas A. Labuda (*pro hac vice* pending)
Michael C. Andolina (*pro hac vice* pending)
Matthew E. Linder (*pro hac vice* pending)
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Email:  jconlan@sidley.com
       tlabuda@sidley.com
       mandolina@sidley.com
       mlinder@sidley.com

– and –

SIDLEY AUSTIN LLP
Jessica C. K. Boelter (*pro hac vice* pending)
Andres Barajas
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 839-5300
Email:  jboelter@sidley.com
       andres.barajas@sidley.com

PROPOSED COUNSEL TO THE DEBTORS
AND DEBTORS IN POSSESSION

## **Exhibit A**

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (___) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. __** |

**INTERIM ORDER (I) AUTHORIZING DEBTORS**
**TO PAY CERTAIN PREPETITION CLAIMS OF ESSENTIAL**
**VENDORS, FOREIGN VENDORS, SHIPPERS, WAREHOUSEMEN, OTHER LIEN**
**CLAIMANTS, AND 503(b)(9) VENDORS, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the Boy Scouts of America and Delaware BSA,

LLC, the non-profit corporations that are debtors and debtors in possession in the above-

captioned chapter 11 case (collectively, the "Debtors") for entry of an interim order (this

"Interim Order") (i) authorizing, but not directing, the Debtors to pay, in the ordinary course of

operations, certain prepetition claims of Essential Vendors, Foreign Vendors, Lien Claimants,

and 503(b)(9) Vendors, (ii) authorizing, but not directing, the Debtors to condition payment of

any prepetition amounts owed to any Essential Vendor, Foreign Vendor, Lien Claimant, or

503(b)(9) Vendor on written verification that such party will abide by certain conditions, (iii)

authorizing banks to receive, process, honor and pay checks or electronic transfers used by the

Debtors to pay the foregoing, and (iv) granting related relief; and the Court having jurisdiction

over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of*

*Reference* from the United States District Court for the District of Delaware, dated February 29,

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] Capitalized terms used but not defined herein have the meanings assigned to such terms in the Motion.

2012; and this matter being a core proceeding within the meaning of 28 U.S.C. § 157(b)(2); and

the Court being able to issue a final order consistent with Article III of the United States

Constitution; and venue of this proceeding and the Motion in this district being proper pursuant

to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the

Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest;

and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing

on the Motion were appropriate under the circumstances and no other notice need be provided;

and this Court having reviewed the Motion and having heard the statements in support of the

relief requested therein at an interim hearing and, if necessary, a final hearing before this Court;

and all objections, if any, to the Motion having been withdrawn, resolved or overruled; and the

relief requested in the Motion being in the best interests of the Debtors' estates, their creditors

and other parties in interest; and this Court having determined that the legal and factual bases set

forth in the Motion establish just cause for the relief granted herein; and after due deliberation

and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The relief requested in the Motion is GRANTED on an interim basis as set forth

herein.

2.      The Final Hearing on the Motion shall be held on _____, 2020 at ___:___

__.m., prevailing Eastern Time.  Any objections or responses to entry of a final order (the "Final

Order") on the Motion shall be filed no later than 4:00 p.m., prevailing Eastern Time, on

_____, 2020 (the "Objection Deadline") and served on the following parties: (i) the

Debtors, Boy Scouts of America, 1325 West Walnut Hill Lane, Irving, Texas 75038, Attn:

Steven P. McGowan; (ii) proposed counsel to the Debtors, Sidley Austin LLP, 787 Seventh

Avenue, New York, New York 10019, Attn: Jessica C.K. Boelter, and One South Dearborn,

Chicago, Illinois 60603, Attn: Matthew E. Linder; (iii) proposed co-counsel to the Debtors, Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor, P.O. Box 1347, Wilmington, Delaware 19899-1347, Attn: Derek C. Abbott; (iv) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: David Buchbinder and Hannah M. McCollum; (v) counsel to the prepetition Future Claimants' Representative, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Robert S. Brady and  Edwin J. Harron; (vi) counsel to JPMorgan Chase Bank, N.A., Norton Rose Fulbright US LLP, 2200 Ross Avenue, Dallas, Texas 75201-7932, Attn: Louis R. Strubeck and Kristian W. Gluck; (vii) representatives of the prepetition Ad Hoc Committee of Local Councils, Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, New York 10019, Attn: Richard G. Mason and Joseph C. Celentino; (viii) counsel to the prepetition ad hoc group of attorneys representing significant numbers of abuse victims, Pachulski, Stang, Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California 90067, Attn: James I. Stang; (ix) counsel to the County Commission of Fayette County (West Virginia), Steptoe & Johnson PLLC, Chase Tower – 8th Floor, 707 Virginia Street East, Charleston, West Virginia 25301, Attn: John Stump; (x) counsel to any statutory committee appointed in these chapter 11 cases; and (xi) any party that has requested notice pursuant to Bankruptcy Rule 2002.

3.      The Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay the prepetition Essential Vendor Claims in an amount not to exceed $1,500,000 in the aggregate, absent further order of the Court.

4. The Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay the prepetition Foreign Vendor Claims in an amount not to exceed $500,000 in the aggregate, absent further order of the Court.

5. The Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay the prepetition Lien Claims, including, without limitation, Shippers, Warehousemen Charges and Other Lien Claims in an amount not to exceed $4,500,000 in the aggregate, absent further order of the Court.

6. The Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay the 503(b)(9) Claims in an amount not to exceed $2,000,000 in the aggregate, absent further order of the Court.

7. The Debtors are authorized, but not directed, to require that, for any payments that are made to Vendors on account of prepetition charges, the Vendors receiving the payments shall (i) continue to provide services to the Debtors during the pendency of these chapter 11 cases on the most favorable terms that existed in the twelve (12) months before the Petition Date, (ii) agree that they shall not be permitted to cancel on less than 90 days' notice any contract or agreement pursuant to which they provide services to the Debtors, and (iii) take whatever action is necessary to remove any liens in respect of such claim, if any, at such Vendor's sole cost and expense; provided that no such payment shall be deemed to be a waiver of rights regarding the extent, validity, perfection or possible avoidance of any such liens. If any Vendor accepts payment pursuant to this Order for a prepetition obligation of the Debtors premised upon its compliance with conditions (i), (ii) and (iii) above, and thereafter fails to comply with those conditions, any payments made pursuant to this Interim Order shall be deemed an avoidable postpetition transfer under section 549 of the Bankruptcy Code, and, therefore, shall be

recoverable by the Debtors in cash upon written request.  Upon recovery by the Debtors, the claim shall be reinstated as a prepetition claim in the amount so recovered.

8.     The banks and other financial institutions at which the Debtors maintain their disbursement accounts are authorized at the Debtors' direction, to receive, process, honor, and pay, to the extent of funds on deposit, any and all checks drawn or electronic fund transfers requested or to be requested by the Debtors in respect of payment amounts owed in connection with the relief granted herein.

9.     The Debtors are authorized, but not directed, to issue new postpetition checks, or effect new electronic fund transfers, on account of payments made in connection with the relief granted herein and to replace any prepetition checks or electronic fund transfer requests that may be lost or dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

10.     Nothing contained in this Interim Order or in the Motion is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  Likewise any payment made pursuant to this Order is not intended to be and shall not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

11.     Notwithstanding entry of this Interim Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party.

12.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b) because the relief granted in this Interim Order is necessary to avoid immediate and irreparable harm to the Debtors' estates.

13.     Notice of the Motion shall be deemed good and sufficient notice of such Motion, and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are waived by such notice.

14.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

15.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

16.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.


Dated: _____, 2020
Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

6

## Exhibit B

**Final Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (___) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. __** |

**FINAL ORDER (I) AUTHORIZING DEBTORS TO PAY
CERTAIN PREPETITION CLAIMS OF ESSENTIAL VENDORS, FOREIGN
VENDORS, SHIPPERS, WAREHOUSEMEN, OTHER LIEN CLAIMANTS,
AND 503(b)(9) VENDORS, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the Boy Scouts of America and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 case (collectively, the "Debtors") for entry of a final order (this "Final Order") (i) authorizing, but not directing, the Debtors to pay, in the ordinary course of operations, certain prepetition claims of Essential Vendors, Foreign Vendors, Lien Claimants, and 503(b)(9) Vendors, (ii) authorizing, but not directing, the Debtors to condition payment of any prepetition amounts owed to any Essential Vendor, Foreign Vendor, Lien Claimant, or 503(b)(9) Vendor on written verification that such party will abide by certain conditions, (iii) authorizing banks to receive, process, honor and pay checks or electronic transfers used by the Debtors to pay the foregoing, and (iii) granting related relief; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] Capitalized terms used but not defined herein have the meanings assigned to such terms in the Motion.

February 29, 2012; and this matter being a core proceeding within the meaning of 28 U.S.C. § 157(b)(2); and this Court being able to issue a final order consistent with Article III of the United States Constitution; and venue of this proceeding and the Motion in this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at an interim hearing and, if necessary, a final hearing, before this Court; and all objections, if any, to the Motion having been withdrawn, resolved or overruled; and the relief requested in the Motion being in the best interests of the Debtors' estates, their creditors and other parties in interest; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.    The relief requested in the Motion is GRANTED on a final basis as set forth herein.

2.    The Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay the prepetition Essential Vendor Claims in an amount not to exceed $3,000,000 in the aggregate, absent further order of the Court.

3.    The Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay the prepetition Foreign Vendor Claims in an amount not to exceed $500,000 in the aggregate, absent further order of the Court.

4.     The Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay the prepetition Lien Claims, including, without limitation, Shippers and Warehousemen Charges and Other Lien Claims in an amount not to exceed $4,750,000 in the aggregate, absent further order of the Court.

5.     The Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay the 503(b)(9) Claims in an amount not to exceed $3,750,000 in the aggregate, absent further order of the Court.

6.     The Debtors are authorized, but not directed, to require that, for any payments that are made to Vendors on account of prepetition charges, the Vendors receiving the payments shall (i) continue to provide services to the Debtors during the pendency of these chapter 11 cases on the most favorable terms that existed in the twelve (12) months before the Petition Date, (ii) agree that they shall not be permitted to cancel on less than 90 days' notice any contract or agreement pursuant to which they provide services to the Debtors, and (iii) take whatever action is necessary to remove any liens in respect of such claim, if any, at such Vendor's sole cost and expense; provided that no such payment shall be deemed to be a waiver of rights regarding the extent, validity, perfection or possible avoidance of any such liens.  If any Vendor accepts payment pursuant to this Final Order for a prepetition obligation of the Debtors premised upon its compliance with conditions (i), (ii) and (iii) above, and thereafter fails to comply with those conditions, any payments made pursuant to this Final Order shall be deemed an avoidable postpetition transfer under section 549 of the Bankruptcy Code, and, therefore, shall be recoverable by the Debtors in cash upon written request.  Upon recovery by the Debtors, the claim shall be reinstated as a prepetition claim in the amount so recovered.

7.      The banks and other financial institutions at which the Debtors maintain their disbursement accounts are authorized at the Debtors' direction, to receive, process, honor, and pay, to the extent of funds on deposit, any and all checks drawn or electronic fund transfers requested or to be requested by the Debtors in respect of payment amounts owed in connection with the relief granted herein.

8.      The Debtors are authorized, but not directed, to issue new postpetition checks, or effect new electronic fund transfers, on account of payments made in connection with the relief granted herein and to replace any prepetition checks or electronic fund transfer requests that may be lost or dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

9.      Nothing contained in this Final Order or in the Motion is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  Likewise any payment made pursuant to this Final Order is not intended to be and shall not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

10.     Notwithstanding entry of this Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party.

11.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b) because the relief granted in this Final Order is necessary to avoid immediate and irreparable harm to the Debtors' estates.

12.     Notice of the Motion shall be deemed good and sufficient notice of such Motion, and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are waived by such notice.

13.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

14.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

15.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.


Dated: _____, 2020
Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE