## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (___)<br><br>(Joint Administration Requested) |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) MAINTAIN AND ADMINISTER PREPETITION CUSTOMER, SCOUT, AND DONOR PROGRAMS AND PRACTICES AND (B) PAY AND HONOR RELATED PREPETITION OBLIGATIONS, AND (II) GRANTING RELATED RELIEF

The Boy Scouts of America (the "BSA") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), submit this motion (this "Motion"), pursuant to sections 105(a) and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), rule 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an interim order (the "Proposed Interim Order") and a final order (the "Proposed Final Order"), substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, (i) authorizing the Debtors to maintain and administer their prepetition customer, Scout, and donor programs and practices, (ii) authorizing the Debtors to pay and otherwise honor prepetition and post-petition obligations to customers and donors under the customer, member, and donor programs and practices in the

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtors' federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, TX 75038.

ordinary course, in the Debtors' discretion, (iii) authorizing the Debtors to pay or otherwise honor credit card chargebacks, returns, and/or processing fees, including authorizing the applicable credit card processors to set off such obligations in the ordinary course, (iv) authorizing the Debtors to pay or otherwise honor the fees of third-party administrators of their prepetition customer, Scout, and donor programs and practices and (v) granting related relief, including scheduling a hearing to consider approval of the Motion on a final basis (the "Final Hearing"). In support of this Motion, the Debtors submit the *Declaration of Brian Whittman in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") filed concurrently herewith.[2] In further support of this Motion, the Debtors respectfully state as follows:

## STATUS OF THE CASES AND JURISDICTION

1.     On the date hereof (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court"). Concurrently with the filing of this Motion, the Debtors have requested joint administration and procedural consolidation of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). The Debtors continue to operate and maintain their non-profit organization and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No party has requested the appointment of a trustee or examiner in these cases, and no statutory committee has been appointed.

2.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding within the meaning of

---

[2]     All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

28 U.S.C. § 157(b)(2), and the Debtors confirm their consent, pursuant to Local Rule 9013-1(f), to the entry of a final order or judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory and other predicates for the relief requested herein are sections 105(a), and 363(b) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 and Local Rule 9013-1(m).

## BACKGROUND OF THE DEBTORS

5.      The BSA is a federally chartered non-profit corporation under title 36 of the United States Code.  The BSA is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code.  Founded in 1910 and chartered by an act of Congress in 1916, the BSA is one of the largest youth organizations in the United States and one of the largest Scouting organizations in the world, with approximately 2.2 million registered youth participants and approximately 800,000 adult volunteers.  As a non-profit corporation, the BSA is required to adopt and carry out a charitable, religious, educational, or other philanthropic mission.  The BSA's mission is to prepare young people for life by instilling in them the values of the Scout Oath and Law,[3] encouraging them to be trustworthy, kind, friendly and helpful, while also training youth in responsible citizenship, skills development and self-reliance through participation in a wide range of outdoor activities, educational programs, and, at older ages, career-oriented programs in partnership with community organizations.  Delaware BSA, LLC

---

[3]     **Scout Oath:** "On my honor I will do my best to do my duty to God and my country and to obey the Scout Law; to help other people at all times; to keep myself physically strong, mentally awake, and morally straight." **Scout Law:** "A Scout is trustworthy, loyal, helpful, friendly, courteous, kind, obedient, cheerful, thrifty, brave, clean, and reverent."

("<u>Delaware BSA</u>") is a non-profit limited liability company incorporated under the laws of Delaware and exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code.  BSA is the sole member of Delaware BSA.

6.      To carry out its mission of developing youth leaders of character and integrity, the BSA grants charters to thousands of local organizations across the country, including faith-based institutions, clubs, civic associations, educational institutions, and businesses.  These chartered organizations, in turn, form Scouting units—referred to as "packs" for Cub Scouts, "troops" for Scouts BSA (formerly known as Boy Scouts), "crews" for Venturing, "ships" for Sea Scouts, "labs" for STEM Scouts, and "posts" for Exploring.  Scouting units are led by adult volunteers appointed by the chartered organization.  Each of the BSA's approximately 81,000 Scouting units in the United States is organized, registered, and supported by one of 261 local councils that are chartered by the BSA and oversee the Scouting program in an assigned geographic area.  Each local council is separately incorporated under the non-profit laws of its respective state, maintains an independent board of directors and senior management, and is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code.  The BSA does not hold any equity interest in any local council, chartered organization, or Scouting unit, and only the BSA and its wholly owned subsidiary, Delaware BSA, are debtors in these chapter 11 cases. Additional information regarding the BSA, its mission and operations, and the events and circumstances preceding the Petition Date is set forth in the First Day Declaration and the *Debtors' Informational Brief*, filed concurrently herewith.

## **<u>RELIEF REQUESTED</u>**

7.      By this Motion, the Debtors request entry of the Proposed Interim Order and the Proposed Final Order, substantially in the forms attached hereto as **<u>Exhibit A</u>** and **<u>Exhibit B</u>**, respectively, granting the following relief: (i) authorizing the Debtors to maintain and administer

their prepetition customer, Scout, and donor programs and practices, (ii) authorizing the Debtors to pay and otherwise honor prepetition and post-petition obligations to customers and donors under the customer, member, and donor programs and practices in the ordinary course, in the Debtors' discretion, (iii) authorizing the Debtors to pay or otherwise honor credit card chargebacks, returns, and/or processing fees, including authorizing the applicable credit card processors to set off such obligations in the ordinary course, (iv) authorizing the Debtors to pay or otherwise honor the fees of third-party administrators of their prepetition customer, Scout, and donor programs and practices and (v) granting related relief, including scheduling the Final Hearing.

<u>**THE PUBLIC PROGRAMS**</u>

8.      As a nonprofit organization, the BSA does not generate income like a typical chapter 11 debtor in possession.  Rather, the BSA primarily relies on revenue generated from charitable donations, memberships, merchandise, and licensing trademarks to third parties to fund its operations.  It is therefore critical that the BSA maintains a positive relationship with customers, Scouts, and donors.  To that end, the BSA has implemented various programs and policies for customers, Scouts, and donors (collectively, the "<u>Public Programs</u>"), including, without limitation, (i) gift cards, refunds and exchanges, and promotions for the Scout Shop and Trading Post, (ii) scholarships, (iii) counseling support, (iv) pass-through donations, and (v) gift annuities.  Without the ability to pay or otherwise honor its obligations under the Public Programs (collectively, the "<u>Public Program Obligations</u>") and maintain the Public Programs in the ordinary course, the BSA would risk losing the hard-earned trust, loyalty, and goodwill of their customers, members, and donors during a difficult time, which would jeopardize the future of the organization.  The Debtors' ability to maintain and administer the Public Programs and

pay and otherwise honor the Public Program Obligations is therefore necessary to protect the future of the BSA and preserve value for creditors.

I.    **Customer Programs and Policies.**

9.    Although the BSA is a non-profit organization, it maintains retail operations for customers.  The Scout Shop serves as the BSA's official retailer with approximately 175 locations nationwide and an e-commerce platform accessible at https://www.scoutshop.org, as well as various program-specific sites, such as the high adventure facilities' websites and an alumni website.  Scouts, as well as the general public, are able to purchase a wide array of items, including uniforms, apparel, tents, backpacks, and other gear, from the retail locations and websites.  In addition, each high adventure base has a Trading Post, where campers may purchase supplies, gifts, and apparel.  To that end, the BSA has implemented several programs and policies relating to its retail operations (collectively, the "Customer Programs").  By this Motion, the Debtors are requesting authority to continue honoring the Customer Programs in the ordinary course, consistent with past practices.

A.    **Return and Exchange Policies.**

10.    The Debtors maintain certain return, refund, and exchange policies for customer purchases consistent with retail industry practice (collectively, the "Return and Exchange Policies").  Retail customers are permitted to return merchandise for any reason at any time.  A customer must present a receipt to receive a full refund for the merchandise purchased.  In absence of a receipt, a return may only be completed for an even exchange or a Scout Shop gift card.

11.    Without the Refund and Exchange Policies, current and potential customers will be less incentivized to shop at the Debtors' Scout Shops, Trading Posts, or on their e-commerce platform as opposed to competitors, which may lead to a potentially significant decline in

revenues to the ultimate detriment of the Debtors' estates.  Based on historical returns, the Debtors estimate that the cash outlay for the Refund and Exchange Policies will be approximately $600,000 within the first 30 days of these chapter 11 cases.  By this Motion, the Debtors are requesting authorization to honor the Return and Exchange Policies with respect to merchandise purchased before, on, or after the Petition Date.

B.    **Sales Promotions.**

12.    The Debtors regularly conduct ordinary course sales promotions at Scout Shops, Trading Posts, and online (the "Sales Promotions").  The Sales Promotions consist of seasonal discounts, clearance discounts, and other promotions.  As an example, the e-commerce site just ran a seven-day Presidents Day sale offering 50% off all clearance items, which sale ended on February 17, 2020, at 11:59 prevailing Eastern Time.  By this Motion, the Debtors are requesting authorization to continue conducting Sales Promotions in the ordinary course.

C.    **Gift Cards.**

13.    The Debtors maintain a program pursuant to which customers can purchase physical or electronic, pre-paid, non-expiring gift cards (collectively, the "Gift Cards").  Gift Cards are available in varying denominations and can be purchased online or at the Scout Shops. Once purchased, a Gift Card may be used like cash for purchases online or at the Scout Shop or Trading Post.  The Debtors estimate that approximately $2.5 million in Gift Cards purchased by customers prepetition remain outstanding as of the Petition Date.

14.    The Debtors utilize Valutec Card Solutions and Opticard (collectively, the "Gift Card Processors") to process the Gift Cards.[4]  In addition, the Gift Card Processors maintain electronic records of transactions and purchases utilizing Gift Cards accessible to the Debtors,

---

[4]    For the avoidance of doubt, the Debtors are not by this Motion seeking to assume or reject any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code.

which records are maintained for 60 days from the date of such transaction.  The Debtors pay various fees to the Gift Card Processors in connection with the Debtors' sale and processing of Gift Cards and the maintenance of related data records (collectively, the "Gift Card Fees," and together with the Gift Cards, the "Gift Card Obligations").  During peak sale months, the Debtors pay approximately between $1,000 and $1,500 in Gift Card Fees per month to the Gift Card Processors.  The Debtors estimate that, as of the Petition Date, approximately $8,000 in Gift Card Fees is accrued and unpaid, $7,000 of which will become due and owing in the first 30 days of these chapter 11 cases.

15.     By this Motion, the Debtors seek authorization (but not direction) to, in a manner consistent with their prepetition practices, honor all Gift Card Obligations and continue the Gift Cards in the ordinary course after the Petition Date.

### D.     Credit Card and Other Payment Processors.

16.     In addition to cash and checks, the Debtors accept the following customer payment methods at the Scout Shops, Trading Posts, and online: (i) credit and debit cards issued by American Express, Discover, MasterCard and Visa (in store and online); (ii) PayPal (online only); and (iii) Apple Pay (in stores) (collectively, the "Non-Cash Payments").  To process the Non-Cash Payments, the Debtors are party to those certain instrument processing agreements (the "Payment Processing Agreement") with Chase Merchant Services (operated by Paymentech, LLC, a wholly owned subsidiary of JPMorgan Chase Bank, N.A.), Total Systems Services, Inc. (f/k/a Cayan), Card Connect, Shift4, Authorize.Net, Moneris, Wells Fargo, Dynamic Payments, and Stripe (collectively, with any successors in interest, the "Payment Processors").

17.     Under the Payment Processing Agreements, the Debtors generally receive gross proceeds of customer purchases, less any chargebacks, returns, and/or processing fees debited from the payment balance by the Payment Processor.  The Payment Processors charge either a

set processing fee per transaction or collect fees based on a percentage of the transaction amount. The Debtors pay processing fees that range from $0.00 to $1.75 or 0.0% to 2.0% per transaction (the "Processing Fees").

18.     When a customer returns merchandise purchased from the Debtors with a Non-Cash Payment or disputes a charge with a Payment Processor, the Debtors may, in certain circumstances, be obligated to refund to the Payment Processor the value of the purchase, subject to certain adjustments (collectively, "Chargebacks" and, together with the Processing Fees, the "Processing Obligations").  The Debtors generally satisfy Chargebacks by netting (*i.e.*, setting off) the applicable amount charged against payments owed to the Debtors by the Payment Processor.   It is possible that certain Processing Obligations that the Debtors incurred before the Petition Date may not have been netted, either in full or in part, against payments owed to the Debtors by the Payment Processors before the Petition Date.

19.     It is essential to the Debtors' continued operations that they be able to continue to accept Non-Cash Payments.   Non-Cash Payments comprise the overwhelming majority of payments made by the Debtors' customers.  Accordingly, any interruption in the Debtors' ability to continue accepting Non-Cash Payments or paying or otherwise honoring the Processing Obligations would irreparably damage the Debtors' retail operations and could ultimately jeopardize their ability to reorganize successfully.  Based on historical activity, the Debtors estimate that approximately $115,000 in Processing Obligations remain outstanding, all of which will become due and owing in the first 30 days of these chapter 11 cases.  By this Motion, the Debtors are requesting authority to (a) pay all prepetition Processing Obligations and (b) allow the Payment Processors to continue to administer the Non-Cash Payments and set off any

Processing Obligations against amounts owed to the Debtors from the Non-Cash Payments, whether the Debtors incurred such Processing Obligations before, on, or after the Petition Date.

## II.   Scout Programs and Policies.

20.     The Debtors also offer a number of programs to Scouts and Scout alumni, and in certain instances, members of the general public who are interested in BSA programs, including, without limitation, Scout and volunteer deposits, scholarships, and counseling support (collectively, the "Scout Programs").  By this Motion, the Debtors request authority to continue honoring the Scout Programs in the ordinary course and consistent with past practices.

### A.     Scout and Volunteer Deposits.

21.     In certain instances, the Debtors receive nonrefundable, partial payments from Scouts and volunteers in advance of providing services (the "Deposits").  For example, the BSA National Jamboree, National Order of the Arrow Conference, and high adventure facilities all require a deposit from participants several months prior to the reservation, each on a varying payment schedule.  In rare situations, the Debtors may refund a Deposit to an individual if the individual leaves Scouting prior to the applicable event.  As of December 31, 2019, the Debtors held $27 million in Deposits, nearly all of which is applicable to reservations at the Debtors' high adventure facilities; only approximately 2% of Deposits are being held for the next BSA National Jamboree and National Order of the Arrow Conference.  By this Motion, the Debtors request authority to apply all Deposits to applicable future events and issue refunds on account of Deposits with respect to Deposits placed before, on, or after the Petition Date consistent with prepetition practices.

### B.     Scholarships and Grants.

22.     The Debtors also offer approximately 140 scholarships, grants, or monetary awards (collectively, the "Scholarships and Grants") annually to BSA members meeting various

criteria.  The Scholarships are awarded to BSA members in recognition of merit achievements (such as earning the Eagle Scout Award), academic achievements (including membership in the BSA's honor society, the Order of the Arrow), community service, the pursuit of science, technology, engineering, or mathematical (or "STEM") fields, and/or financial need.  Generally, these recognitions are provided to individual members—at the local, regional, and national levels of the BSA organization—who best exemplify the Scout Oath and Law in their daily lives.  The Scholarships and Grants encourage positive youth leadership development and service to others.  Generally, scholarship and grant applications are due in October for the following academic year and the BSA makes decisions on scholarship and grant awards in February, with some awards announced publicly in May at the BSA's annual national meeting.  Specific details for each of the approximately 140 Scholarship and Grant opportunities can be found on the BSA's website.

23.    As of the Petition Date, approximately $700,000 in Scholarships and Grants awarded for the 2019-2020 school year have not yet been remitted to the applicable schools, because, among other things, some recipients have deferred their scholarships so they can complete religious missions before attending college and some recipients have not yet submitted their requests for second semester payments.  Scholarships and Grants for the 2020-2021 academic year have not yet been awarded, but the Debtors estimate that at least approximately $600,000 will be owed on account of multiple-year Scholarships awarded in previous years.  In 2018, the Debtors paid approximately $1,500,000 in scholarships and $500,000 in grants, and the Debtors anticipate that their obligations for Scholarships and Grants for 2020 will be substantially similar to the total amounts paid in 2018.[5]  By this Motion, the Debtors request

---

[5]    Scholarships and Grants awarded in 2019 were inflated as a result of the World Jamboree and therefore an anomaly.  As such, the Debtors believe that 2018 is a more accurate indicator of potential costs and obligations for 2020.

authority to honor existing Scholarships and Grants obligations and to continue offering Scholarships and Grants in the ordinary course and consistent with past practices.

### C. Counseling Support Programs.

24. As has been widely reported, there have regrettably been instances of child abuse in the BSA. For decades, the Debtors have endeavored to prioritize youth safety and provide the upmost protection to children at every level of the BSA organization. Consistent with this responsibility, the Debtors are committed to providing ongoing support to abuse victims[6] and their families, including financial assistance for counseling. Specifically, the Debtors have established a program to reimburse abuse victims and their families for the cost of ongoing counseling (the "Counseling Reimbursement Program"). The Debtors also partner with 1in6, a nationally recognized male abuse support group, to provide clinically facilitated online support groups and an online helpline (the "1in6 Partnership," and together with the Counseling Reimbursement Program, the "Counseling Support Programs").

25. Under the Counseling Reimbursement Program, the Debtors reimburse the cost of weekly counseling visits with a therapist of their choice. Benefits under the Counseling Reimbursement Program are available to any victim of child abuse in Scouting and family members in the Debtors' discretion. The Debtors' obligations under the Counseling Reimbursement Program are also embodied in certain settlement agreements with abuse victims. During the twelve-month period preceding the Petition Date, the Debtors made payments under the Counseling Reimbursement Program, either directly to providers or indirectly through reimbursements to participants on account of their payments to providers, in the aggregate

---

[6]   Pursuant to the Notice and Confidentiality Procedures Motion, filed contemporaneously herewith, the Debtors are seeking to seal the identity and personal information of all participants in the Counseling Support Programs. To the extent that any relief requested in this Motion requires disclosure or dissemination of the identity or personal information of the participants in the Counseling Support Programs, the Debtors request that such information remained seals until the Court has entered the Notice and Confidentiality Motion.

amount of approximately $50,000.  As of the Petition Date, the Debtors estimate that they are current on all reimbursement obligations under the Counseling Reimbursement Program, and any outstanding liability associated with such reimbursement obligations would be negligible.

26.     In addition, the 1in6 Partnership supports the needs of any Scouts, former Scouts, and family members of Scouts who suffered abuse during their time in Scouting.  As of the Petition Date, no prepetition amounts related to the 1in6 Partnership and its corresponding services are outstanding.  By this Motion, the Debtors are seeking authority to continue the Counseling Support Programs in the ordinary course of business and honor any pre- or post-petition obligations related thereto.

**III.    Donor Programs.**

27.     The Debtors also offer a number of programs to donors, including offering individuals the ability to donate to international scouting funds and organizations and other programs that may provide tax benefits for charitable donations (collectively, the "Donor Programs").  By this Motion, the Debtors request authority to continue honoring the Donor Programs in the ordinary course and consistent with past practices.

**A.    Pass-Through Donations.**

28.     To further the BSA's mission worldwide, the BSA serves as an intermediary for donations to international scouting funds and organizations that donors are unable to donate to directly due to various legal restrictions.  In particular, the BSA serves as an intermediary for donations (the "Pass-Through Donations") to the World Friendship Fund and International Scouting Foundations (as defined below).

29.     The World Scout Foundation, European Scout Foundation, Asia-Pacific Scout Foundation, Africa Scout Foundation, Gilwell Development Fund, and Kandersteg Foundation (collectively, the "International Scouting Foundations") are international non-profit institutions

that invest in the development and strengthening of Scouting worldwide through the provision of financial and other support, including grants and capital investments. Specifically, the World Scout Foundation aims to empower the more than 50 million Scouts worldwide with strong values and leadership skills, and to create active citizens who in turn make a positive impact in their communities.

30. Americans who wish to invest in the International Scouting Foundations make donations with the BSA via check or credit card, and the BSA in turn transfers the donations to the specified International Scouting Foundation. This process is not precisely contemporaneous, however, and the BSA may be holding such donations for the benefit of the International Scouting Foundations for a period of time until the funds are fully processed and wired to the specific International Scouting Foundation. As of the Petition Date, the Debtors estimate that they hold $30,000 in International Scouting Foundation donations that have not yet been remitted to the applicable International Scouting Foundation.

31. The World Friendship Fund takes voluntary contributions from individual donors and uses that money toward projects that help National Scout Organizations in less-fortunate countries and BSA projects that impact World Scouting. The BSA is one of 170 different Scouting organizations in the World Organization of the Scout Movement, and the sole manager of the World Friendship Fund. The BSA collects donations from individual donors and remits the funds three times a year to the National Scout Organizations or BSA projects selected to receive the grants. The Debtors estimate that, as of the Petition Date, they are holding approximately $100,000 in funds that are to be remitted to the National Scout Organizations or BSA projects from grants approved or pending review in February.

32.     Because the Debtors are merely serving as an intermediary for the Pass-Through Donations, the Debtors do not believe that they need relief from the Bankruptcy Court to continue such practices.   Nevertheless, out of an abundance of caution, by this Motion the Debtors are requesting authority to remit prepetition donations they already hold for the World Friendship Fund and International Scouting Foundations in full and to continue serving as an intermediary for such donations in furtherance of the Debtors' mission.

### B.     Gift Annuity Program.

33.     As a means of raising funds and furthering the BSA's charitable mission, the BSA from time to time enters into charitable gift annuity agreements (the "Gift Annuity Agreements") with donor annuitants (the "Annuitants").   Under these agreements, the Annuitant transfers property to the BSA in exchange for the BSA's promise to pay the Annuitant—or, in certain cases, multiple Annuitants—a fixed stream of income for life.  After the death of the Annuitant (or if the donor has designated more than one beneficiary, each Annuitant), the remaining value of the original gift, net of fees earned by State Street Global Advisors ("State Street"),[7] is then used by the BSA to further its charitable mission.  The BSA has historically made fixed income payments worth approximately 70% of the value of the gifts made by the Annuitants and retained the remaining 30% as a charitable gift.   The BSA has operated the charitable gift annuity program (the "Gift Annuity Program") for approximately twenty-seven (27) years.

34.     Just as the BSA benefits from the Gift Annuity Program, the Annuitants receive tangible benefits from the program, including the following: (a) a portion of the gift is tax deductible to the Annuitant; (b) the BSA's annuity obligation provides a regular stream of

---

[7]     State Street administers the BSA's segregated gift annuity accounts and makes payments from those accounts to the Annuitants.  In the year ended December 31, 2019, State Street earned approximately $26,619 in fees on account of its administration of the BSA's Gift Annuity Program.

income to the Annuitant, a portion of which is considered a return of principal and is not generally taxable to the Annuitant; and (c) if appreciated property (*e.g.*, stocks, mutual funds, or bonds) is used to fund the Annuitant's initial gift to the BSA, the donation will result in a lesser capital gains tax liability than the Annuitant would otherwise incur if he or she were forced to liquidate the donated property.

35.     In the great majority of cases, funds or property donated pursuant to the Gift Annuity Program are directly transferred by the donor Annuitants to, and are subsequently held in, one of two segregated, long-term investment accounts at State Street maintained by the BSA for the benefit of the Annuitants (the "Gift Annuity Accounts").[8]  As of December 31, 2019, the total balance of the Gift Annuity Accounts was approximately $7.1 million.[9]  State Street administers BSA's Gift Annuity Program and invests the funds in the State Street Global Advisors Common/Collective Funds.  The interest rates paid under the Gift Annuity Program are established by the American Council on Gift Annuities and are not affected by market performance.  As of the Petition Date, the BSA was party to approximately 195 Gift Annuity Agreements, including 194 active agreements and one deferred agreement.[10]

---

[8]   In a small minority of cases, funds or securities donated pursuant to the Gift Annuity Program are transferred by the Annuitants to a different account held by the BSA.  In those cases, the BSA liquidates the property (if applicable) and promptly transfers the donated funds or proceeds of the donated property to the appropriate State Street account.

[9]   California state law imposes a minimum reserve requirement for the benefit of California Annuitants, and requires that the reserves be held in trust for the benefit of such California Annuitants in a segregated account which is separate from reserves for the benefit of Annuitants of any other state.  See CAL. INS. CODE § 11521.1 (West 2019).  Various other states also impose minimum reserve and segregation requirements, but do not require that those reserves be held separately from the reserves for Annuitants from other states.  See, e.g., N.Y. INS. LAW § 1110(b) (McKinney 2019); FLA. STAT. § 627.481(2)(a) (2019).  To comply with applicable state law, BSA maintains two Gift Annuity Accounts at State Street: one for California Annuitants, and one for all other Annuitants.

[10]  An active agreement is an annuity agreement under which the BSA is currently paying an Annuitant a stream of income.  A deferred agreement is an annuity agreement under which the BSA will not begin paying an Annuitant a stream of income until the donor has attained a specific age.

36.    During 2018, the BSA made payments to Annuitants in the aggregate amount of approximately $580,000.  In the twelve months following the Petition Date, the Debtors estimate that the BSA will make payments to existing Annuitants in the amount of approximately $560,000 if no Annuitants pass away and no new Gift Annuity Agreements are executed, or under $60,000 per month on average.  During the 27-year history of the Gift Annuity Program, the BSA has never defaulted on its payment obligations.  By this Motion, the Debtors are requesting authority (only upon entry of the Proposed Final Order) to continue the Gift Annuity Program in the ordinary course consistent with prepetition practices and honor all obligations to Annuitants related thereto whether such obligations arose prepetition or post-petition.

## BASIS FOR RELIEF

I.    **The Continuation of the Public Programs and Payment of Prepetition Obligations With Respect Thereto is Appropriate Under Sections 105(a) and 363(b) of the Bankruptcy Code.**

37.    The Court may grant the relief requested herein pursuant to section 363 of the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  A court may authorize a debtor to pay certain prepetition claims under section 363.  See In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (discussing prior order authorizing payment of prepetition wage claims pursuant to section 363(b) of the Bankruptcy Code).  To do so, "the debtor must articulate some business justification, other than mere appeasement of major creditors."  Id.

38.    The Court may also authorize payment of prepetition claims in appropriate circumstances under section 105(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code, which codifies the bankruptcy court's equitable powers, empowers a court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this

title." 11 U.S.C. § 105(a).  Under section 105(a), a court may permit payments of prepetition

obligations to be made outside of a plan if such payments are essential to the continued operation

of a debtor's business.  Specifically, the Court may use its power under section 105(a) of the

Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of

payment" rule (also referred to as the "doctrine of necessity").

39.     The United States Court of Appeals for the Third Circuit recognized the

"necessity of payment" doctrine in In re Lehigh & New England Ry. Co., 657 F.2d 570, 581 (3d

Cir. 1981).  The Third Circuit held that a court could authorize the payment of prepetition claims

if such payment was essential to the continued operation of the debtor.  Id. (stating that a court

may authorize the payment of a prepetition claim if there "is the possibility that the creditor will

employ an immediate economic sanction, failing such payment"); see also In re Penn Cent.

Transp. Co., 467 F.2d 100, 102 n.1 (3d Cir. 1972) (recognizing necessity of payment doctrine

permits "immediate payment of claims of creditors where those creditors will not supply services

or material essential to the conduct of the business until their pre-reorganization claims shall

have been paid"); In re Just for Feet, Inc., 242 B.R. 821, 824–25 (Bankr. D. Del. 1999) (noting

that, in the Third Circuit, debtors may pay prepetition claims that are essential to continued

operation of business); In re Columbia Gas Sys., Inc., 171 B.R. 189, 191–92 (Bankr. D. Del.

1994) (same).

40.     The rationale for the necessity of payment rule—the rehabilitation of a debtor in

reorganization cases—is "the paramount policy and goal of Chapter 11."  In re Ionosphere Clubs,

98 B.R. at 176; see also In re Just for Feet, 242 B.R. at 826 (finding that payment of prepetition

claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11

reorganization"); In re Quality Interiors, Inc., 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991)

("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process"); In re Adams Apple, Inc., 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that allowance of "unequal treatment of pre-petition debts when necessary for rehabilitation . . ." is appropriate); In re Chateaugay Corp., 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payment of prepetition workers' compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately"); 2 COLLIER ON BANKRUPTCY ¶ 105.04[5][a] (16th ed. 2013) (discussing cases in which courts have relied on the "doctrine of necessity" or the "necessity of payment" rule to pay prepetition claims immediately). Accordingly, the Court has authority to authorize the Debtors to continue the Public Programs and pay prepetition claims arising thereunder pursuant to sections 363(b) and 105(a) of the Bankruptcy Code.

### A.    The Continuation and Honoring of the Customer Programs is Appropriate.

41.    The Debtors' continued ability to maintain and administer the Customer Programs without interruption during the pendency of these chapter 11 cases will help to preserve one of the Debtors' three main revenue streams and the hard-earned trust, loyalty, and goodwill of their customers.   While the merchandise at Scout Shops, Trading Posts, and online is primarily merchandise unique to the BSA, the Debtors are also retailers of general camping and outdoors

merchandise that coincide with the Scouting programs.  Accordingly, if the Debtors were unable to continue their Customer Programs during these chapter 11 cases to pay or otherwise honor the prepetition obligations under the Customer Programs, the Debtors would risk alienating their customers and losing their business to competitors.  Such a result would undoubtedly jeopardize the Debtors' restructuring efforts and irreparably harm their estates.

42.     Courts in this District routinely authorize the continuation of customer programs where retaining the loyalty and patronage of customers is critical to successful chapter 11 cases. See, e.g., In re Mattress Firm, Inc., Case No. 18-12241 (CSS) (Bankr. D. Del. Nov. 7, 2018), ECF No. 760 (authorizing debtors to continue customer programs and honor prepetition obligations in connection therewith); In re Claire's Stores, Inc., Case No. 18-10584 (MFW) (Bankr. D. Del. Mar. 20, 2018), ECF No. No. 104 (same); In re Charming Charlie Holdings Inc., Case No. 17-12906 (CSS) (Bankr. D. Del. Jan. 10, 2018), ECF No. 281 (same); In re True Religion Apparel, Inc., Case No. 17-11460 (CSS) (Bankr. D. Del. July 31, 2017), ECF 234 (same); In re Marsh Supermarkets Holding, LLC, Case No. 17-11066 (BLS), ECF No. 50 (Bankr. D. Del. May 12, 2017) (same).

43.     For these reasons, the Court should authorize the Debtors to maintain and administer the Customer Programs and pay and otherwise honor the obligations under the Customer Programs in the ordinary course, in the Debtors' discretion, whether such obligations arise before, on, or after the Petition Date.

**B.      The Continuation and Honoring of Scout Programs is Appropriate.**

44.     It is also essential to the Debtors' ability to continue their organization and restructure successfully that the Debtors be able to continue maintaining and administering the Scout Programs.  Scouts are undoubtedly the heart of the Debtors' organization and charitable mission.  It is therefore critical that the Debtors be authorized to continue the Scout Programs

and honoring prepetition obligations with respect thereto.  For example, if the Debtors are not authorized to honor Deposits for future events and apply the funds as expected by Scouts, Scouts may be discouraged from paying for such events in the future and it may be untenable for the Debtors to continue hosting such events.  These special events are cornerstones of the BSA Scouting programs and without them, children may be less interested in participating in Scouting programs and memberships could decline.

45.     Scholarships and Grants are also important to maintaining the goodwill of Scouts. The Debtors have already committed to providing Scholarships and Grants and recipients of such awards are relying on such funds to assist with the costs of higher education.  If the Debtors are not authorized to continue honoring their Scholarship and Grant obligations, it may ultimately be the recipients of such Scholarships and Grants who are harmed—the awards may be the linchpin in a student's ability to afford higher education.

46.     Lastly, there can be no doubt that denying the Debtors' authority to continue the Counseling Support Programs and honoring all prepetition obligations with respect thereto would be wholly inequitable.  The Debtors cannot undo its past failures to protect children from abuse, and it would only create further harm to such victims if the Debtors can no longer continue the Counseling Reimbursement Program or 1in6 Partnership.

47.     For these reasons, the Court should authorize the Debtors to maintain and administer the Scout Programs and pay and otherwise honor obligations under the Scout Programs in the ordinary course, in the Debtors' discretion, whether such obligations arise before, on, or after the Petition Date.  If the Debtors were unable to continue their Scout Programs during these chapter 11 cases or pay or otherwise honor obligations with respect thereto, the Debtors would risk alienating Scouts and potentially face a sharp decline in

memberships.  Such a result would undoubtedly jeopardize the Debtors' restructuring efforts and irreparably harm their estates.

### C.    The Continuation and Honoring of Pass-Through Donations is Appropriate.

48.    As noted above, the Debtors merely serve as an intermediary for individuals who wish to donate to international funds and organizations that further the Scouting mission worldwide.  The Debtors therefore do not believe that such Pass-Through Donations are assets of the Debtors' estates and are only seeking such relief out of an abundance of caution.  If the Debtors are unable to honor donors' wishes with respect to Pass-Through Donations, the Debtors risk disenfranchising their donors more broadly.  It is unlikely that the Debtors could continue their non-profit operations without donations, or even with a mere decline in donations.  As such, the Court should authorize the Debtors to maintain the Pass-Through Donations and otherwise honor all obligations with respect thereto in the ordinary course.

## II.    The Continuation and Honoring of Gift Annuity Program Obligations is Appropriate.

### A.    The Reserves Backing At Least a Portion of the Gift Annuities Are Held In Trust for the Benefit of the Annuitants, and Are Therefore Not Property of the Debtors' Estates.

49.    Most of the Gift Annuity Agreements are regulated pursuant to state law gift annuity statutes.  California's gift annuity statute requires that all gift annuity funds received by the BSA from California residents be held in trust for the benefit of the Annuitants and that minimum reserves be established to meet future payment obligations.  See CAL. INS. Code § 11521.1 (West 2019).  Certain other state statutes do not explicitly use trust language, but require that the funds be held in segregated accounts, that minimum reserves be established to meet future payment obligations, and that such funds shall not be used for any purpose other than

payments to the holders of gift annuities.  See, e.g., FLA. STAT. § 627.481(2)(a) (2019); N.Y. INS. LAW § 1110(b) (McKinney 2019).

50.     The Debtors have not spent the significant time and financial resources that would be required to individually evaluate whether each of the BSA's 195 Gift Annuity Agreements creates an express or implied trust relationship.  However, the Debtors' review of certain of the Gift Annuity Agreements and state law suggest that a material portion of the reserves held in the BSA's segregated State Street accounts are held in trust for the benefit of the Annuitants.  To the extent those amounts are held in trust, they are not property of the estate and cannot be used to satisfy the claims of creditors other than the Annuitants.  See 11 U.S.C. § 541(d) (excepting from the creation of the estate any "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest").  Because any amounts held in trust by the Debtors are not property of the Debtors' estates, payment of such amounts to Annuitants in the ordinary course will not prejudice any party in interest in these chapter 11 cases.

**B.      The Debtors' Inability to Continue to Perform Their Obligations Under the Gift Annuity Program Would Lead to Costly Litigation.**

51.     Even if certain of the reserves held by the BSA under the Gift Annuity Program are not held in trust for the Annuitants, the BSA is likely to face costly and disruptive litigation if not authorized to perform its prepetition obligations under the Gift Annuity Program.  Certain state statutes place use restrictions on the BSA's reserves under the Gift Annuity Program, meaning that even if the Court does not grant the relief requested in this Motion, the Debtors may nonetheless be prohibited from utilizing their gift annuity reserves to satisfy the claims of any claimant other than the Annuitants.  See, e.g., FLA. STAT. § 627.481(2)(a) (2019) (gift annuity reserves "shall not be applied for the payment of the debts and obligations of the corporation or trust or for any purpose other than the annuity benefits specified in this section");

N.Y. INS. LAW § 1110(b) (McKinney 2019) (gift annuity reserves "shall not be applied to pay [the charitable organization's] debts and obligations or for any purpose except the aforesaid annuity benefits").

52.     The Debtors' failure to continue to perform under their obligations under the Gift Annuity Program could also result in the commencement of delinquency proceedings, proceedings to take possession of the BSA's gift annuity reserves, and the revocation of the BSA's authority to issue charitable gift annuities in the future by state regulators.  See, e.g., CAL. INS. Code §§ 11524, 1011, et seq. (West 2019) (authorizing the insurance commissioner of California to commence a proceeding to take possession of the assets of an organization); FLA. STAT. § 627.481(6) (2019) (allowing the insurance commissioner of Florida to order a charitable organization to cease issuing charitable annuities).  While government enforcement actions based on the failure to comply with the state annuity regulations might be precluded by the automatic stay, state governments could arguably assert that their proposed actions fall within the police and regulatory powers exception to the automatic stay, requiring the Debtors to engage in costly and time-consuming litigation that would distract the Debtors' management and professionals from pressing issues in these chapter 11 cases.  See 11 U.S.C. § 362(b)(4) (excepting from the automatic stay "action[s] or proceedings[s] by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power").

53.     The Debtors submit that they should be permitted to satisfy all obligations arising under the Gift Annuity Program in order to avoid any breach of state law and the corresponding costs associated with defending state enforcement actions, which might not be subject to the automatic stay.  Absent authority to continue honoring their Gift Annuity Agreement obligations, which total on average less than $60,000 per month for the remainder of 2020, the Debtors will

be placed in the untenable position of potentially being required to violate either state law or this Court's orders. Moreover, the suspension or revocation of the Debtors' license to issue charitable gift annuities in a particular state would necessarily preclude them from procuring charitable annuities in that state and would do nothing to further the interests of the Debtors, their estates, or their creditors.

        **C.**    **Payment of Claims under the Gift Annuity Program Is Appropriate Under Section 363(b) of the Bankruptcy Code Even in the Absence of a Trust Relationship.**

54.    Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363 of the Bankruptcy Code, a court may authorize a debtor to pay certain prepetition claims if a sound business purpose exists for doing so. In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999) (requiring that debtor show a "sound business purpose" to justify its actions under section 363 of Bankruptcy Code); see also In re Phoenix Steel Corp., 82 B.R. 334, 335–36 (Bankr. D. Del. 1987). Moreover, if "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." In re Johns-Manville Corp., 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); see also In re Tower Air, Inc., 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

55.    Payment of claims and administration fees under the Gift Annuity Program as they become due in the ordinary course is a sound exercise of the Debtors' business judgment. The Debtors' continued payment of these obligations will avoid a potentially value-destructive interruption to the Debtors' fundraising efforts. Any failure or inability of the Debtors to honor

their obligations under the Gift Annuity Program will dissuade prospective Annuitants from entering into new Gift Annuity Agreements, thereby cutting off a historical source of funding for the Debtors' operations.

56.     However, the damage that would be done to the Debtors' fundraising efforts if they are not permitted to continue and make payments under the Gift Annuity Program are likely to be significantly further-reaching than just an inability to issue new gift annuities.   Any interruption to the Gift Annuity Program could erode the public's confidence in the Debtors' organization and cause potential donors to direct their charitable giving to other nonprofit organizations, thereby hampering the Debtors' ability to carry out their charitable mission.   And because the average age of the Annuitants is approximately 89 years, many of the Annuitants are particularly vulnerable and rely upon income from the Gift Annuity Program to meet their daily living expenses, significantly raising the likelihood of negative news coverage if the Debtors were to stop payments under the Gift Annuity Program.   The intense reputational risk inherent in a default on the Debtors' obligations under the Gift Annuity Program provides a sound business purpose for the relief being requested herein.

> **D.     The Court May Also Authorize the Payment of Gift Annuity Program Obligations Under Section 105(a) of the Bankruptcy Code and the Doctrine of Necessity.**

57.     The Court may also authorize the payment of prepetition claims in appropriate circumstances under section 105(a) of the Bankruptcy Code and the doctrine of necessity when such payment is essential to a debtor's continued operations.   See, e.g., In re Just for Feet, 242 B.R. at 824–25 (holding that section 105(a) of Bankruptcy Code provides a statutory basis for payment of prepetition claims under doctrine of necessity and noting that "[t]he Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during

chapter 11"); In re Columbia Gas Sys., Inc., 171 B.R. at 191–92 (confirming that doctrine of necessity is standard in Third Circuit for enabling a court to authorize payment of prepetition claims prior to confirmation of a reorganization plan). Such prepetition amounts need not be entitled to priority of payment in bankruptcy to be eligible for payment under the doctrine of necessity.  See Transcript of Oral Argument at 20-22, In re Gibson Brands, Inc., Case No. 18-11025 (July 12, 2018), ECF No. 428 (the "Gibson Brands Transcript") (statements of Judge Sontchi that "[t]he doctrine of necessity doesn't rely on the provisions of Section 507 of the [Bankruptcy] Code" and motions to pay prepetition amounts may be approved "based on a showing that there's a risk of irreparable harm to the debtors' business.").

58.     In addition, the Court has the authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein, because such relief is necessary for the Debtors to carry out their fiduciary duties under section 1107(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105.  Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession" to "protect and preserve the estate, including an operating business' going concern value," on behalf of a debtor's creditors and other parties in interest.  See  In re CEI Roofing, Inc., 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)); see also In re Penick Pharm., Inc., 227 B.R. 229, 232–33 (Bankr. S.D.N.Y. 1998) ("[U]pon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of a bankruptcy trustee.").

59.     As discussed above, payment of claims under the Gift Annuity Program as they come due is warranted under the circumstances of these chapter 11 cases because the BSA's continued payment of its obligations under this program is necessary both to preserve and promote a historical source of funding for the Debtors' operations and to avoid potentially large negative consequences associated with a failure to pay.  It is vital to prospective donors' and the public's confidence in the BSA's ability to deliver its charitable mission that the BSA honor its existing obligations under the Gift Annuity Program.  Accordingly, it is essential to the Debtors' reorganization that the Gift Annuity Program not be impacted by these chapter 11 cases.

60.     The language of the Gift Annuity Agreements also varies considerably.  For example, certain transfers of property to the BSA are characterized by the Gift Annuity Agreements as "permanently restricted gifts," while others are characterized as "absolute gift[s]."  Certain Gift Annuity Agreements state that they are "for the benefit of" certain funds or charitable causes, while others are less specific.  The Gift Annuity Agreements also vary in the extent to which they state the gift immediately becomes part of the general assets of the BSA. While the Debtors' payment obligations under the Gift Annuity Agreements are modest—on average less than $60,000 per month for the remainder of 2020—it would require the Debtors to invest significant resources to investigate the extent to which each of their 195 Gift Annuity Agreements creates a trust relationship.  Because the Debtors have good business reasons to honor their obligations under the Gift Annuity Program regardless of whether those amounts are held in trust, they should not be required to incur the cost of individually investigating each of the Gift Annuity Agreements.  See Gibson Brands Transcript at 20-22 (approving payment of prepetition amounts in part because the amounts proposed to be paid were modest as compared to the professional fees that would be incurred to precisely calculate which sums were pre- vs.

post-petition).   Thus, the Debtors request that they be permitted to honor their Gift Annuity

Agreement obligations in the ordinary course.

**THE COURT SHOULD AUTHORIZE THE PROCESSING
OF CHECKS AND ELECTRONIC FUND TRANSFERS**

61.     The Debtors have sufficient cash to pay the amounts related to the Public

Programs in the ordinary course.   Under the Debtors' existing cash management system, the

Debtors have made arrangements to readily identify checks or other electronic funds transfer

requests relating to the Public Programs.   Accordingly, the Debtors believe there is minimal risk

that checks or electronic funds transfer requests that the Court has not authorized will be

inadvertently honored.   Therefore, the Debtors request that the Court authorize, but not direct, all

applicable financial institutions to receive, process, honor, and pay any and all checks or

electronic funds transfer requests in respect of the Public Programs, provided that sufficient

funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover

such payments.

**THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED**

62.     Bankruptcy Rule 6003 empowers the Court to issue an order, within 21 days after

the Petition Date, granting a motion to "use . . . property of the estate, including a motion to pay

all or part of a claim that arose before the filing of the petition," if such relief "is necessary to

avoid immediate and irreparable harm."   Fed. R. Bankr. P. 6003(b).   As described herein, the

continued and uninterrupted service of the Public Programs is critical to the Debtors' operations.

The Debtors submit that the relief requested is necessary to avoid immediate and irreparable

harm to the Debtors and their estates, and relief is therefore appropriate under Bankruptcy Rule

6003, to the extent applicable.

29

## RESERVATION OF RIGHTS

63.     Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.  The Debtors expressly reserve their right to contest any claim related to the relief sought herein.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be, nor should it be construed as, an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h) REQUIREMENTS

64.     In addition, by this Motion, the Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As set forth above, the Debtors require immediate relief to continue ordinary course operations for the benefit of all parties in interest.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

65.     Similarly, for the reasons stated above, the Debtors respectfully request a waiver of the notice requirements of Bankruptcy Rule 6004(a) to the extent they are deemed applicable.

## NOTICE

66.     Notice of this Motion will be provided to (i) the U.S. Trustee; (ii) the twenty-five (25) law firms representing the largest numbers of abuse victims asserting claims against the Debtors; (iii) the holders of the thirty (30) largest unsecured claims against the Debtors on a

consolidated basis, other than abuse-related claims; (iv) counsel to JPMorgan Chase Bank, N.A.; (v) the County Commission of Fayette County (West Virginia), as issuer of those certain Commercial Development Revenue Bonds (Arrow WV Project), Series 2010A, 2010B and 2012; (vi) representatives of the prepetition Ad Hoc Committee of Local Councils; (vii) counsel to the prepetition Future Claimants' Representative; (viii) counsel to the prepetition ad hoc group of attorneys representing significant numbers of abuse victims; (ix) the United States Attorney's Office for the District of Delaware; (x) the Internal Revenue Service; (xi) the United States Department of Justice; and (xii) any party that has requested notice pursuant to Bankruptcy Rule 2002. Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested herein, no other or further notice need be given.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and the Proposed Final Order, substantially in the forms attached hereto, granting the relief requested herein and any further relief the Court may deem just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated:  February 18, 2020
       Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Derek C. Abbott*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Joseph C. Barsalona II (No. 6102)
Eric W. Moats (No. 6441)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email:  dabbott@mnat.com
     aremming@mnat.com
     jbarsalona@mnat.com
     emoats@mnat.com
     ptopper@mnat.com

– and –

SIDLEY AUSTIN LLP
James F. Conlan (*pro hac vice* pending)
Thomas A. Labuda (*pro hac vice* pending)
Michael C. Andolina (*pro hac vice* pending)
Matthew E. Linder (*pro hac vice* pending)
Alyssa Russell
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Email:  jconlan@sidley.com
     tlabuda@sidley.com
     mandolina@sidley.com
     mlinder@sidley.com
     alyssa.russell@sidley.com

– and –

SIDLEY AUSTIN LLP
Jessica C. K. Boelter (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 839-5300
Email: jboelter@sidley.com

PROPOSED COUNSEL TO THE DEBTORS
AND DEBTORS IN POSSESSION

**Exhibit A**

**Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (___) |
| Debtors. | (Joint Administration Requested) |
| | **Ref. Docket No. ___** |

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO (A) MAINTAIN AND
ADMINISTER PREPETITION CUSTOMER, SCOUT, AND DONOR PROGRAMS
AND PRACTICES AND (B) PAY AND HONOR RELATED PREPETITION
OBLIGATIONS, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the Boy Scouts of America and Delaware BSA,

LLC, the non-profit corporations that are debtors and debtors in possession in the above-

captioned chapter 11 cases (the "Debtors"), for entry of an interim order (this "Interim Order"),

pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rules 6003 and

6004, (i) authorizing the Debtors to (a) maintain and administer customer, Scout, and donor

programs and practices, and (b) pay and otherwise honor related prepetition obligations, and

(ii) granting related relief; and upon consideration of the First Day Declaration; and this Court

having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing*

*Order of Reference* from the United States District Court for the District of Delaware, dated

February 29, 2012; and this matter being a core proceeding within the meaning of 28 U.S.C. §

157(b)(2); and this Court being able to issue a final order consistent with Article III of the United

States Constitution; and venue of this proceeding and the Motion being proper pursuant to 28

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtors' federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, TX 75038.

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

U.S.C. §§ 1408 and 1409; and appropriate notice of and the opportunity for a hearing on the Motion having been given and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court; and all objections, if any, to the Motion having been withdrawn, resolved or overruled; and the relief requested in the Motion being in the best interests of the Debtors' estates, their creditors and other parties in interest; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The relief requested in the Motion is GRANTED on an interim basis as set forth herein.

2.      The Final Hearing on the Motion shall be held on _____, 2020 at ___:___ __.m., prevailing Eastern Time.  Any objections or responses to entry of a final order (the "Final Order") on the Motion shall be filed no later than 4:00 p.m., prevailing Eastern Time, on _____, 2020 (the "Objection Deadline"), and served on the following parties: (i) the Debtors, Boy Scouts of America, 1325 West Walnut Hill Lane, Irving, Texas 75038, Attn: Steven P. McGowan; (ii) proposed counsel to the Debtors, Sidley Austin LLP, 787 Seventh Avenue, New York, New York 10019, Attn: Jessica C.K. Boelter, and One South Dearborn, Chicago, Illinois 60603, Attn: Matthew E. Linder; (iii) proposed co-counsel to the Debtors, Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor, P.O. Box 1347, Wilmington, Delaware 19899-1347, Attn: Derek C. Abbott; (iv) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: David L. Buchbinder and Hannah M. McCollum; (v) counsel to the prepetition Future Claimants' Representative, Young

Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Robert S. Brady and Edwin J. Harron; (vi) counsel to JPMorgan Chase Bank, N.A., Norton Rose Fulbright US LLP, 2200 Ross Avenue, Dallas, Texas 75201-7932, Attn: Louis R. Strubeck and Kristian W. Gluck; (vii) representatives of the prepetition Ad Hoc Committee of Local Councils, Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, New York 10019, Attn: Richard G. Mason and Joseph C. Celentino; (viii) counsel to the prepetition ad hoc group of attorneys representing significant numbers of abuse victims, Pachulski, Stang, Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California 90067, Attn: James I. Stang; (ix) counsel to the County Commission of Fayette County (West Virginia), Steptoe & Johnson PLLC, Chase Tower – 8th Floor, 707 Virginia Street East, Charleston, West Virginia 25301, Attn: John Stump; (x) counsel to any statutory committee appointed in these chapter 11 cases; and (xi) any party that has requested notice pursuant to Bankruptcy Rule 2002.

3.      The Debtors are authorized, but not directed, to maintain and administer the Public Programs and pay or otherwise honor any Public Program Obligations and any third-party administrators' fees incurred in connection with the Public Programs, whether arising before, on or after the Petition Date, in the ordinary course and consistent with past practice, as necessary and appropriate in the Debtors' business judgment; provided, however, for the avoidance of doubt, this Interim Order does not authorize the Debtors to pay any obligations under the Gift Annuity Program on an interim basis.

4.      If the Debtors at any time during these chapter 11 cases cease to honor Gift Cards, the Debtors shall file a notice of the same with the Court, and serve such notice on the Office of

the U.S. Trustee, any statutory committee appointed in these chapter 11 cases, and any party that has requested notice pursuant to Bankruptcy Rule 2002.

5.      The Debtors are authorized, but not directed, to continue to operate under the Payment Processing Agreements.  The Debtors are authorized to pay or reimburse the Payment Processors for the Processing Fees, whether such obligations arose prepetition or post-petition, and the Payment Processors are authorized to receive or obtain payment for such Processing Fees, as provided under, and in the manner set forth in, the Payment Processing Agreements, including, without limitation, by way of recoupment or setoff without further order of the Court. Any post-petition claim that a Payment Processor may have under the Payment Processing Agreements shall be entitled to, in addition to any other lien, collateral, or payment priority rights in support thereof, administrative expense priority status pursuant to Section 503(b) of the Bankruptcy Code.

6.      Each of the banks at which the Debtors maintain their accounts relating to payment of the obligations related to the Public Programs are authorized to (i) receive, process, honor, and pay all checks presented for payment and to honor all fund transfer requests made by the Debtors related thereto, to the extent that sufficient funds are on deposit in those accounts and (ii) accept and rely on all representations made by the Debtors with respect to which checks, drafts, wires, or automated clearing house transfers should be honored or dishonored in accordance with this or any other order of the Court, whether such checks, drafts, wires, or transfers are dated before, on, or after the Petition Date, without any duty of further inquiry.

7.      The Debtors are authorized, but not directed, to issue new post-petition checks, or to effect new electronic funds transfers, on account of the Public Program Obligations, and to

replace any prepetition checks or electronic fund transfer requests that have been lost or dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

8.      Nothing contained in the Motion or Interim Order is intended or should be construed to create an administrative priority claim on account of any of the Public Programs.

9.      Nothing in this Interim Order (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors or their estates; (ii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates to contest the validity, priority, or amount of any claim against the Debtors or their estates; (iii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates with respect to any and all claims or causes of action against any third party; or (iv) shall be construed as a promise to pay a claim or continue any applicable program post-petition, which decision shall be in the discretion of the Debtors.  Any payment made pursuant to this Interim Order is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

10.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b) because the relief granted in this Interim Order is necessary to avoid immediate and irreparable harm to the Debtors' estates.

11.     Notice of the Motion shall be deemed good and sufficient notice of such Motion, and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are waived by such notice.

12.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

13.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

14.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation and enforcement of this Order.

Dated: _____, 2020
Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit B

**Proposed Final Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (___) |
| Debtors. | (Joint Administration Requested) |
| | **Ref. Docket No.** ___ |

**FINAL ORDER (I) AUTHORIZING DEBTORS TO
(A) MAINTAIN AND ADMINISTER PREPETITION CUSTOMER, SCOUT, AND
DONOR PROGRAMS AND PRACTICES AND (B) PAY AND HONOR RELATED
PREPETITION OBLIGATIONS, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the Boy Scouts of America and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), for entry of a final order (this "Final Order"), pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (i) authorizing the Debtors to (a) maintain and administer prepetition customer, Scout, and donor programs and practices and (b) pay and honor related prepetition obligations, and (ii) granting related relief; and upon consideration of the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this matter being a core proceeding within the meaning of 28 U.S.C. § 157(b)(2); and this Court being able to issue a final order consistent with Article III of the United States Constitution; and venue of this proceeding and the Motion being proper

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtors' federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, TX 75038.

[2]    All capitalized terms used but not otherwise defined herein shall have the meaning given to them in the Motion.

pursuant to 28 U.S.C. §§ 1408 and 1409; and appropriate notice of and the opportunity for a hearing on the Motion having been given and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court; and all objections, if any, to the Motion having been withdrawn, resolved or overruled; and the relief requested in the Motion being in the best interests of the Debtors' estates, their creditors and other parties in interest; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The relief requested in the Motion is GRANTED on a final basis as set forth herein.

2.      The Debtors are authorized, but not directed, to maintain and administer the Public Programs and pay or otherwise honor any Public Program Obligations and any third-party administrators' fees incurred in connection with the Public Programs, whether arising before, on or after the Petition Date, in the ordinary course and consistent with past practice, as necessary and appropriate in the Debtors' business judgment.

3.      If the Debtors at any time during these chapter 11 cases cease to honor Gift Cards, the Debtors shall file a notice of the same with the Court, and serve such notice on the Office of the U.S. Trustee, any statutory committee appointed in these chapter 11 cases, and any party that has requested notice pursuant to Bankruptcy Rule 2002.

4.      The Debtors are authorized, but not directed, to continue to operate under the Payment Processing Agreements.  The Debtors are authorized to pay or reimburse the Payment Processors for the Processing Obligations, whether such obligations arose prepetition or post-

petition, and the Payment Processors are authorized to receive or obtain payment for such Processing Obligations, as provided under, and in the manner set forth in, the Payment Processing Agreements, including, without limitation, by way of recoupment or setoff without further order of the Court. Any post-petition claim that a Payment Processor may have under the Payment Processing Agreements shall be entitled to, in addition to any other lien, collateral, or payment priority rights in support thereof, administrative expense priority status pursuant to Section 503(b) of the Bankruptcy Code.

5.      Each of the banks at which the Debtors maintain their accounts relating to payment of the obligations related to the Public Programs are authorized to (i) receive, process, honor, and pay all checks presented for payment and to honor all fund transfer requests made by the Debtors related thereto, to the extent that sufficient funds are on deposit in those accounts and (ii) accept and rely on all representations made by the Debtors with respect to which checks, drafts, wires, or automated clearing house transfers should be honored or dishonored in accordance with this or any other order of the Court, whether such checks, drafts, wires, or transfers are dated before, on, or after the Petition Date, without any duty of further inquiry.

6.      The Debtors are authorized, but not directed, to issue new post-petition checks, or to effect new electronic funds transfers, on account of the Public Program Obligations, and to replace any prepetition checks or electronic fund transfer requests that be have been lost or dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

7.      Nothing contained in the Motion or Final Order is intended or should be construed to create an administrative priority claim on account of any of the Public Programs.

8.      Nothing in this Final Order (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as

to the validity of any claim against the Debtors or their estates; (ii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates to contest the validity, priority, or amount of any claim against the Debtors or their estates; (iii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates with respect to any and all claims or causes of action against any third party; or (iv) shall be construed as a promise to pay a claim or continue any applicable program post-petition, which decision shall be in the discretion of the Debtors.  Any payment made pursuant to this Final Order is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

9.      The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b) because the relief granted in this Final Order is necessary to avoid immediate and irreparable harm to the Debtors' estates.

10.     Notice of the Motion shall be deemed good and sufficient notice of such Motion, and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are waived by such notice.

11.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

12.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

13.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation and enforcement of this Final Order.


Dated: _____, 2020
Wilmington, Delaware                              _____
                                                  UNITED STATES BANKRUPTCY JUDGE