**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION
WAGES, SALARIES, EMPLOYEE BENEFITS, AND OTHER COMPENSATION
AND (B) MAINTAIN EMPLOYEE BENEFITS PROGRAMS AND PAY RELATED
ADMINISTRATIVE OBLIGATIONS, (II) AUTHORIZING APPLICABLE
BANKS AND OTHER FINANCIAL INSTITUTIONS TO HONOR AND PROCESS
RELATED CHECKS AND TRANSFERS, AND (III) GRANTING RELATED RELIEF**

The Boy Scouts of America (the "BSA") and Delaware BSA, LLC, the non-profit

corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "Debtors"), submit this motion (this "Motion"), pursuant to sections 105(a),

363(b), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy

Code") rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), and rule 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United

States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an interim

order (the "Proposed Interim Order") and final order (the "Proposed Final Order"), substantially

in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, (i) authorizing the

Debtors to (a) pay their outstanding Prepetition Employee Obligations (as defined below) and (b)

maintain their existing Compensation and Benefits Programs (as defined below), (ii) authorizing

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

applicable banks and other financial institutions to receive, process, honor, and pay any and all checks drawn on and transfers made from the Debtors' accounts to the extent such checks or transfers relate to any of the foregoing, (iii) modifying the automatic stay if necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Program (as defined below), and (iv) granting related relief, including scheduling a hearing to consider entry of the Proposed Final Order authorizing the Debtors to continue the Non-Insider Severance Program (as defined below) on a final basis (the "Final Hearing").  The facts and circumstances supporting this Motion are set forth in the *Declaration of Brian Whittman in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed concurrently herewith.[2]  In further support of this Motion, the Debtors respectfully state as follows:

## STATUS OF THE CASES AND JURISDICTION

1.      On the date hereof (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").  Concurrently with the filing of this Motion, the Debtors have requested joint administration and procedural consolidation of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors continue to operate and maintain their non-profit organization and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in these cases, and no statutory committee has been appointed.

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of

---

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent, pursuant to Local Rule 9013-1(f), to the entry of a final order or judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The statutory and other predicates for the relief requested herein are sections 105(a), 363(b), and 507 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, and Local Rule 9013-1.

## BACKGROUND OF THE DEBTORS

5.     The BSA is a federally chartered non-profit corporation under title 36 of the United States Code.  The BSA is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code.  Founded in 1910 and chartered by an act of Congress in 1916, the BSA is one of the largest youth organizations in the United States and one of the largest Scouting organizations in the world, with approximately 2.2 million registered youth participants and approximately 800,000 adult volunteers.  As a non-profit corporation, the BSA is required to adopt and carry out a charitable, religious, educational, or other philanthropic mission.  The BSA's mission is to prepare young people for life by instilling in them the values of the Scout Oath and Law,[3] encouraging them to be trustworthy, kind, friendly and helpful, while also training youth in responsible citizenship, skills development and self-reliance through participation in a wide range of outdoor activities, educational programs, and, at older ages,

---

[3] **Scout Oath:** "On my honor I will do my best to do my duty to God and my country and to obey the Scout Law; to help other people at all times; to keep myself physically strong, mentally awake, and morally straight."  **Scout Law:** "A Scout is trustworthy, loyal, helpful, friendly, courteous, kind, obedient, cheerful, thrifty, brave, clean, and reverent."

career-oriented programs in partnership with community organizations. Delaware BSA, LLC ("Delaware BSA") is a non-profit limited liability company incorporated under the laws of Delaware and exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code. BSA is the sole member of Delaware BSA.

6.      To carry out its mission of developing youth leaders of character and integrity, the BSA grants charters to thousands of local organizations across the country, including faith-based institutions, clubs, civic associations, educational institutions, and businesses. These chartered organizations, in turn, form Scouting units—referred to as "packs" for Cub Scouts, "troops" for Scouts BSA (formerly known as Boy Scouts), "crews" for Venturing, "ships" for Sea Scouts, "labs" for STEM Scouts, and "posts" for Exploring. Scouting units are led by adult volunteers appointed by the chartered organization. Each of the BSA's approximately 81,000 Scouting units in the United States is organized, registered, and supported by one of 261 local councils (collectively, the "Local Councils") that are chartered by the BSA and oversee the Scouting program in an assigned geographic area. Each local council is separately incorporated under the non-profit laws of its respective state, maintains an independent board of directors and senior management, and is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code. The BSA does not hold any equity interest in any local council, chartered organization, or Scouting unit, and only the BSA and its wholly owned subsidiary, Delaware BSA, are debtors in these chapter 11 cases. Additional information regarding the BSA, its mission and operations, and the events and circumstances preceding the Petition Date is set forth in the First Day Declaration and the *Debtors' Informational Brief*, filed concurrently herewith.

## RELIEF REQUESTED

7.      By this Motion, the Debtors request entry of the Proposed Interim Order and Proposed Final Order:

> (i)      authorizing, but not directing, the Debtors to:
>
>> (a)      pay or cause to be paid all or a portion of the Prepetition Employee Obligations;
>>
>> (b)      continue paying and/or funding the Compensation and Benefits Programs (and amounts related thereto), including administrative obligations to certain third parties in connection therewith, during these chapter 11 cases in the ordinary course as such Compensation and Benefits Programs were in effect as of the Petition Date and as such may be modified, terminated, amended, or supplemented by the Debtors;
>>
>> (c)      to reissue checks, wire transfers, automated clearing house payments, electronic payments, or other similar methods of payment on account of Compensation and Benefits Programs where such method of payment has been dishonored postpetition;
>
> (ii)     modifying the automatic stay if necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Program (as defined below);
>
> (iii)    authorizing, but not directing, applicable banks and other financial institutions to receive, process, honor and pay any and all checks drawn on and transfers made from the Debtors' accounts to the extent that those checks or transfers relate to any of the foregoing; and
>
> (iv)     granting related relief, including scheduling the Final Hearing to consider entry of the Proposed Final Order authorizing the Debtors to continue the Non-Insider Severance Program (as defined below) on a final basis.[4]

## DEBTORS' WORKFORCE

8.      As of the Petition Date, the BSA employs approximately 1,650 individuals to deliver the Scouting program at the national level across the BSA organization and overseas to

---

[4] The Debtors expressly reserve, and do not waive, the right to modify or terminate any Prepetition Employee Obligations or Compensation and Benefits Programs to the extent that such right exists under the terms of the Prepetition Employee Obligations or Compensation and Benefits Programs or as may be permitted or required by applicable law or further order of the Court.

serve U.S. citizens. These individuals include corporate, legal, technology, human resources, marketing, finance, communications, and registration systems managers and personnel, national events personnel, print and magazine publications staff, training and leadership employees for youth, employees, volunteers and professional adult leaders, registration systems employees, business and quality control services employees, warehouse, logistics and distribution staff, customer service personnel, retail sales associates, and a variety of staff providing management and support for the BSA's high adventure facilities, including general managers, cowboys, butchers, boat captains, and back country rangers (the "BSA Employees").[5] All of the BSA Employees are located in the United States and U.S. territories.[6]

9.     The BSA Employees include approximately: (i) 1,000 full-time, salaried BSA Employees (*i.e.*, BSA Employees who work 30 hours or more per week) (the "Full-Time Employees"), (ii) 500 part-time, hourly BSA Employees (the "Part-Time Employees"), and (iii) 150 full-time, seasonal, salaried BSA Employees (*i.e.*, BSA Employees who work for 30 hours or more per week for a limited period of the year at the high adventure facilities) (the "Seasonal Employees"). The BSA Employees are located at the Debtors' national headquarters in Irving, Texas, at the Debtors' national warehouse and distribution center in Charlotte, North Carolina, at approximately 175 Official BSA Scout Shops (the "Scout Shops") across the United States and at four high adventure facilities located in Florida and the U.S. Virgin Islands, New Mexico, West Virginia, and Minnesota and parts of Canada.

---

[5] Approximately 30 BSA Employees are on paid leave as of the Petition Date.

[6] There are typically one to three seasonal employees located in Canada who are employed annually from April to September. These employees are employed by Atikaki Youth Ventures Inc., a Non-Debtor Related Entity (as defined below). For the avoidance of doubt, this Motion does not seek relief with respect to these employees. A description of and relief related to these employees is sought within the Shared Services Motion, filed concurrently herewith.

10.     The Debtors supplement their workforce by retaining independent contractors (the "Independent Contractors") and temporary workers (the "Temporary Workers") to perform various tasks including, but not limited to, providing illustrating, copywriting, and photography services for the BSA's multiple national magazine publications, IT development and support services, software engineering services, marketing support, and supply-chain and customer service support.  As of the Petition Date, approximately 60 Independent Contractors and 135 Temporary Workers were providing services to the Debtors or their affiliates.  The Debtors contract directly with the Independent Contractors, who are paid directly by the Debtors.  The Debtors procure the services of the Temporary Workers through third-party staffing agencies (the "Staffing Agencies").  The Debtors pay the Staffing Agencies, and the Staffing Agencies, in turn, pay the wages and benefits (as applicable) of the Temporary Workers.

11.     As described more fully in the First Day Declaration and the Shared Services Motion, certain of the BSA's non-debtor affiliates that are directly or indirectly wholly owned or controlled by the BSA (the "Related Non-Debtor Entities") do not maintain their own employees or management.  Instead, the Related Non-Debtor Entities are parties to certain shared services arrangements with the BSA, whereby approximately 32 BSA Employees allocate some or all of their time to the Related Non-Debtor Entities.  The BSA is responsible for the compensation and benefits provided to these BSA Employees, and the associated Related Non-Debtor Entity allocates payment to the Debtors for these services via intercompany transactions under a shared services arrangement.[7]  The relief being requested in this Motion includes the BSA Employees who allocate some or all of their time to the Related Non-Debtor Entities.

---

[7] The allocation of these costs from the BSA to the Related Non-Debtor Entities and the shared services arrangement is described more fully in the Shared Services Motion.

12.     The Local Councils are locally funded and operate with limited staffs, focusing their efforts at the community level.  The BSA's national scope and size provide the BSA with the ability to support the Local Councils in various ways, including offering Employee Benefits Programs (as defined herein) to approximately 6,600 eligible full-time employees of the Local Councils (the "Local Council Employees"), many of whom would not otherwise be able to receive these vital benefits.  For the avoidance of doubt, except as specifically set forth herein, the relief being requested in this Motion is limited solely to the Compensation and Benefits Programs (as defined below) that the BSA provides to the BSA Employees for services performed on behalf of the BSA and the Related Non-Debtor Entities, and excludes the benefits offered to the Local Council Employees.  Contemporaneously herewith, the Debtors are seeking authority to pay and continue the benefits offered to the Local Council Employees pursuant to the Shared Services Motion.[8]

### BSA EMPLOYEE COMPENSATION AND BENEFITS PROGRAMS

13.     The BSA Employees, Independent Contractors, and Temporary Workers (through the Staffing Agencies) are an indispensable part of the Debtors' organizational operations, and their skills, knowledge, and understanding of the Debtors' organization and infrastructure are essential to preserving the stability and efficiency of the Debtors' organization.  Such employees' continued services are critical to ensuring the success of the Debtors' reorganization under chapter 11 of the Bankruptcy Code and the continuation of the BSA's charitable mission.  Like many similarly-situated organizations, the Debtors maintain certain compensation and benefits programs and pay various administrative fees and insurance premiums in connection therewith

---

[8] The allocation and reimbursement of the cost of the benefit programs provided by the BSA to the Local Council Employees is described in greater detail in the Shared Services Motion.

(collectively, the "Compensation and Benefits Programs"), including the following (each as defined herein):

    (i)     Employee Compensation Obligations;

    (ii)    Payroll Taxes and Deductions;

    (iii)   Reimbursable Expenses;

    (iv)   Health Insurance Plans;

    (v)    Health Savings Account Program;

    (vi)   COBRA Benefits;

    (vii)   Life and AD&D Insurance;

    (viii)  Scout Executives' Alliance;

    (ix)   Disability Insurance;

    (x)    Workers' Compensation Program

    (xi)   Non-Insider Severance Program;

    (xii)   Retirement Plans and Employer Matching Obligation;

    (xiii)  PTO and Other Leave Programs; and

    (xiv)  Other Benefits Programs.

14.    A significant number of the BSA Employees rely exclusively or primarily on the compensation and benefits they receive from the Debtors under the Compensation and Benefits Programs to pay their daily living expenses.  The BSA Employees and their families would be subject to significant financial hardship if the Debtors could not honor prepetition obligations that may be outstanding as of the Petition Date under the Compensation and Benefits Programs or continue to administer the Compensation and Benefits Programs without interruption during the pendency of the Debtors' chapter 11 cases.  Further, the Debtors' failure to honor their obligations to the BSA Employees in connection with the Compensation and Benefits Programs could likely result in substantial attrition at a time when the Debtors need the BSA Employees to maintain the BSA organization's operations and ultimately reorganize.

15.     Subject to Court approval and the terms and conditions set forth herein, the Debtors intend to continue to administer the Compensation and Benefits Programs in the ordinary course, though the Debtors may elect to exercise their business judgment and modify, change, and/or discontinue any such programs in their discretion in the ordinary course. The Debtors estimate that, as of the Petition Date, they owe approximately $5,090,000 in connection with the Compensation and Benefits Programs (the "Prepetition Employee Obligations").[9] Pursuant to the Proposed Interim Order, the Debtors request authority, on an interim basis prior to the Final Hearing (the "Interim Period"), to pay an aggregate amount not to exceed $4,800,000 in Prepetition Employee Obligations that may come due prior to the Final Hearing. The Prepetition Employee Obligations comprise the following categories of Compensation and Benefits Programs and amounts that accrued prepetition and will become due after the Petition Date, during the Interim Period and cumulatively on a final basis after the Final Hearing:

| Compensation and Benefits Programs[10] | Interim | Final (Cumulative) |
|---|---|---|
| Unpaid Compensation | $2,000,000 | $2,000,000 |
| Payroll Taxes and/or Deductions | $200,000 | $200,000 |
| Reimbursable Expenses | $720,000 | $960,000 |
| Health Insurance Plans | $790,000 | $790,000 |
| Health Savings Account Program | $95,000 | $95,000 |
| COBRA Benefits | $20,000 | $20,000 |
| Life and AD&D Insurance | $130,000 | $130,000 |
| Scout Executives' Alliance | $15,000 | $15,000 |
| Disability Insurance | $170,000 | $200,000 |
| Non-Insider Severance Program and Severance Obligations | $0 | $20,000 |
| Retirement Plans | $350,000 | $350,000 |
| Employer Matching Obligation | $180,000 | $180,000 |
| Other Benefits Programs | $130,000 | $130,000 |
| **Total** | **$4,800,000** | **$5,090,000** |

---

[9] This excludes estimated self-insurance claims, a large portion of which will likely be funded from the Welfare Benefits Trust (as defined below) prior to its exhaustion or otherwise come from funds set aside for this purpose, as described below.

[10] All capitalized terms used in this table have the meanings ascribed to such terms herein.

16.    The Prepetition Employee Obligations that the Debtors are obligated to pay to, or fund on account of, any BSA Employee or Independent Contractor, excluding the PTO obligations and Health Benefit Claims (each as defined and described in greater detail below), do not exceed the $13,650 priority cap of sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

## I.    Employee Compensation and Withholdings

17.    The Debtors incur payroll obligations in the ordinary course of their operations, including wages, salaries, and other compensation provided to the BSA Employees, Temporary Workers (through the Staffing Agencies), and Independent Contractors, as well as all related withholdings, deductions and expense reimbursement obligations (collectively, and together with any related obligations and administrative costs outlined or referenced in this Section I, the "Employee Compensation Obligations").  By this Motion, the Debtors are requesting authority to pay all accrued but unpaid Employee Compensation Obligations (collectively, the "Unpaid Compensation"), substantially all of which will become due and owing during the Interim Period.  The Debtors also request authority to continue to pay, fund, or otherwise honor the Employee Compensation Obligations on a postpetition basis in the ordinary course consistent with their prepetition practices.  The components of the Employee Compensation Obligations are discussed in detail below.

### A.    Unpaid Compensation

18.    The Debtors pay hourly wages or salary to the BSA Employees and Independent Contractors either in arrears or on a current basis, with either bi-weekly or semi-monthly payments.[11]  Specifically, Full-Time Employees are paid semi-monthly on the 15th and last day of each month on a current basis, Part-Time Employees are paid bi-weekly approximately one

---

[11] If a payroll date falls on a weekend or holiday, BSA Employees are paid on the preceding Thursday or Friday, or the business day preceding the holiday, respectively.

week in arrears, and Seasonal Employees are paid semi-monthly approximately five business days in arrears. The Debtors' aggregate average semi-monthly payroll for Full-Time Employees is approximately $3.6 million, the average bi-weekly payroll for Part-Time Employees is approximately $110,000, and the average semi-monthly payroll for Seasonal Employees is approximately $135,000.[12] The Debtors use Paychex, Inc. ("Paychex") as their third-party payroll administrator.[13] Paychex generally debits funds from the Debtors' payroll disbursement account two days before each payroll date and then electronically transfers the funds via direct deposit to the BSA Employees' personal bank accounts.[14] The Debtors pay certain of the Seasonal Employees through pay cards that are administered through ADP. Paychex generally debits funds from the Debtors' payroll disbursement account two days prior to each payroll date and then electronically transfers the funds to the Seasonal Employees' ADP pay cards.

19. The Debtors estimate that, as of the Petition Date, they owe approximately $2.0 million in Unpaid Compensation, all of which was earned within 180 days of the Petition Date. The Debtors estimate that all of these amounts will become due and owing during the Interim Period. The Debtors are requesting authority to pay all of this amount under the Proposed Interim Order and on a final basis.

## B.    Independent Contractor and Temporary Worker Compensation

20. As discussed above, the Debtors rely on Independent Contractors and Temporary Workers in the ordinary course of their organizational operations to perform a wide range of services critical to the Debtors' mission, including, among other things, providing publication

---

[12] The Debtors' aggregate payroll for the Seasonal Employees ranges from approximately $85,000 in the low season to $1.2 million during the high season.

[13] The Debtors pay approximately $6,000 in average monthly processing fees to Paychex. The Debtors estimate that, as of the Petition Date, they owe approximately $600 in unpaid processing fees to Paychex.

[14] All BSA Employees paid through Paychex are paid via ACH/direct deposit or pay cards.

services for the BSA's national magazines, IT and software support, and various other functions. The Debtors rely on the support of Independent Contractors and, through the Staffing Agencies, Temporary Workers to complete discrete projects in furtherance of the Debtors' organization and to fill short-term positions that are not economically feasible to employ on a full- or part-time basis.

21.     The authority to continue paying the Debtors' Independent Contractors and the Staffing Agencies is critical to minimizing disruption of the Debtors' continued organizational operations. As of the Petition Date, as part of the Unpaid Compensation described above, the Debtors owe approximately $1.5 million on account of accrued and unpaid wages of Independent Contractors and Temporary Workers, all of which will become due and owing within the Interim Period. The Debtors are requesting authority to pay or remit all of this amount under the Proposed Interim Order and on a final basis, and to continue honoring such obligations on a postpetition basis in the ordinary course of their operations and consistent with past practice.

### C.    Withholding and Deduction Obligations

22.     The Debtors are required by law to withhold from the BSA Employees' wages, salaries, and other compensation certain amounts related to federal, state, and local income taxes and Social Security, Medicare, and imputed taxes for remittance to the appropriate taxing authorities (collectively the "Withholdings"). Further, the Debtors must match Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment and disability insurance (the "Employer Payroll Taxes" and, together with the Withholdings, the "Payroll Taxes") from their own funds. The Payroll Taxes total approximately $2.0 million per month. Paychex debits the total amount of Payroll Taxes due from the applicable accounts of the Debtors two days before each payroll date and then remits the Payroll Taxes to the appropriate taxing authorities on behalf of the Debtors on the

dates such Payroll Taxes are due.  The BSA remits Payroll Taxes due to taxing authorities in the U.S. Virgin Islands and Puerto Rico directly for BSA Employees in those locations.

23.     In addition to the Withholdings, the BSA routinely deducts certain amounts from the BSA Employees' paychecks for child support and other garnishments, as well as deductions on account of the Compensation and Benefits Programs discussed in detail below (such as the BSA Employees' share of dental plan premiums and retirement plan contributions) (collectively, the "Deductions").  The Debtors forward the Deductions to the appropriate recipients.  On average, the Debtors deduct approximately $1.1 million per month in Deductions from the BSA Employees' paychecks and remit these amounts to the appropriate providers.

24.     The Debtors estimate that there are approximately $200,000 of accrued Payroll Taxes and/or Deductions outstanding as of the Petition Date, all of which is estimated to come due in the Interim Period.  In addition, due to the commencement of these chapter 11 cases, certain prepetition Payroll Taxes may not have been remitted by Paychex or forwarded to the appropriate recipient by the Debtors before the Petition Date.  The Debtors therefore respectfully request authority (i) to process, or to direct Paychex to process, any unpaid or unremitted Payroll Taxes and Deductions as of the Petition Date on an interim and final basis and (ii) to continue to honor and process, or to direct Paychex and to continue to process, Payroll Taxes and Deductions on a postpetition basis, in the ordinary course and consistent with their prepetition practices.[15]

### D.    Reimbursable Expenses

25.     At any given time, the Debtors may have outstanding obligations to certain of the BSA Employees and a related third-party administrator for reimbursement of reasonable and

---

[15] Concurrently herewith, the Debtors have sought authority, but not direction, to pay certain prepetition taxes, assessments, fees, and other charges in the ordinary course pursuant to the Tax Motion.  By this Motion, the Debtors do not seek authority to pay prepetition claims that may be covered by the relief sought in the Tax Motion.

customary out-of-pocket organizational expenses incurred on behalf of the Debtors in connection with their employment (the "Reimbursable Expenses").[16]  The Reimbursable Expenses include expenses for travel such as airfare, rental cars or mileage reimbursement, lodging, meals, and other organizational expenses paid directly by the BSA Employees.  The BSA Employees submit Reimbursable Expenses through the Debtors' standard expense report process, which is administered by third-party expense management platform Deem.  The BSA Employees are reimbursed by the Debtors within one week through their accounts payable system.  On average, the Debtors reimbursed approximately $330,000 per month in 2019.  As of the Petition Date, the Debtors estimate that they owe approximately $960,000 in accrued but unpaid Reimbursable Expenses, $720,000 of which will come due during the Interim Period, and that no administrative fees are owed to Deem.[17]  The Debtors are requesting authority to pay up to $720,000 owed on account of the Reimbursable Expenses during the Interim Period and $960,000 on a final basis, and to continue honoring such obligations postpetition in the ordinary course and consistent with their prepetition practices.

## II.    Employee Benefits Programs and Related Obligations

26.    In addition to the Employee Compensation Obligations discussed above, the Debtors offer comprehensive benefits to eligible BSA Employees, Retirees (as defined below), and the survivors of eligible BSA Employees and Retirees.  These benefits include medical,

---

[16] In connection with the Reimbursable Expenses, the Debtors also maintain a purchase card program with JPMorganChase Bank, N.A., as further described in the Cash Management Motion, filed contemporaneously herewith (the "Purchase Card Program").  Under the Purchase Card Program, the Debtors provide company-sponsored credit cards to certain eligible employees for authorized organizational purchases and expenses for the high adventure facilities.  Additional information regarding the processing of payments under the Purchase Card Program is contained in the Cash Management Motion.  As discussed above, certain of the BSA Employees are also compensated via purchase card, and relief related to such compensation is being sought pursuant to this Motion. Relief with respect to the Purchase Card Program as it relates to Reimbursable Expenses is being sought pursuant to the Cash Management Motion, and the information contained herein is solely presented for illustrative purposes.

[17] Because the Debtors cannot track the Reimbursable Expenses until they are entered into their system, this estimate is based on the monthly average Reimbursable Expenses for 2019.

dental, and vision plans, life insurance, disability coverage, the Workers' Compensation Program (as defined below), various retirement plans and benefits, and other employee benefits described in greater detail in this Section II (collectively, the "Employee Benefits Programs").    In connection with the Employee Benefits Programs, the Debtors utilize the administrative services of Morneau Shepell, which include the administration of the Debtors' health and welfare benefits plans, and the maintenance of a call center and website to support annual enrollment and ongoing administration.    Morneau Shepell also administers the Pension Plan (as defined below) for BSA Employees.    Morneau Shepell charges a monthly administrative fee of $54,000 for Pension Plan administration and $65,000 for health and benefits plans administrative services.    As of the Petition Date, the Debtors owe approximately $290,000 to Morneau Shepell.[18]

27.    On average, the Debtors pay approximately $1.9 million per month in respect of the Employee Benefits Programs, including administrative fees and exclusive of Health Benefit Claims (as defined and described below).[19]    As of the Petition Date, the Debtors estimate that approximately $1,930,000 is accrued and unpaid on account of the Employee Benefits Programs, and are requesting authority to pay or remit up to $1,880,000 of this amount under the Proposed Interim Order.    The Debtors are seeking to continue funding the Employee Benefits Programs on a postpetition basis in the ordinary course and consistent with their prepetition practices.

---

[18] The Debtors utilize Willis Towers Watson, LCG Associates, and other firms as additional advisors for the Employee Benefits Programs.    These advisors provide certain necessary health and welfare consulting services, including, among other things, health plan strategy and management, communications, and actuarial services.    The Debtors estimate that total amounts owed to Morneau Shepell and other advisors as of the Petition Date is approximately $405,000 for both Pension Plan and health and benefits plans administration.

[19] As set forth in the Shared Services Motion, the Debtors use their national scope and size to offer certain Employee Benefits Programs to both BSA and Local Council employees.    Many of the third parties who charge administrative fees in connection with administering the Employee Benefits Programs view the BSA as the obligor with respect to amounts that come due under such programs.    Thus, the BSA would be required to pay an entire invoice in order to continue a given Employee Benefit Program for both the BSA and Local Council Employees.    In recognition of this, for certain of the Employee Benefits Programs discussed below the Debtors are seeking authority in this Motion to pay certain prepetition and postpetition third-party administrative fees with respect to both BSA and Local Council employees.

A.    **Health Insurance Plans**

28.    The Debtors offer medical, dental, prescription, and vision coverage and Medicare benefits (collectively, the "Health Insurance Plans") to all Full-Time and Seasonal BSA Employees and their dependents, to certain eligible retirees of the BSA (the "Retirees"),[20] and to the survivors of eligible BSA Employees or Retirees (the "Survivors").[21]  In connection with the self-funding of certain of the Health Insurance Plans, the BSA established that certain Boy Scouts of America Employee Welfare Benefit Trust, dated as of August 24, 2016 (the "Welfare Benefits Trust").  Historically, the BSA deposited certain employee and employer contributions related to the Health Insurance Plans into the Welfare Benefits Trust, which is classified as a voluntary employees' beneficiary association (VEBA) trust, and paid self-insured claims out of this trust.  More recently, the BSA has instead segregated these contributions in an investment account maintained exclusively for this purpose and elected not to make these deposits and plans to make claims payments directly once the Welfare Benefits Trust is exhausted, which is expected to occur by April 2020.

1.    **Medical and Dental Plans**

29.    The Debtors offer three medical plans—a PPO plan and two high deductible health plans—administered by UnitedHealthcare ("United").  The Debtors also offer self-funded supplemental Medicare benefits to Retirees, survivors, participants in the Long-Term Disability Insurance (as defined and discussed below), and dependents of such parties who are under 65

---

[20] Retirees include BSA Employees who have retired from the BSA and are members of the BSA Retirement Plan; Retirees who retired on or after January 1, 2005 are required to have at least ten years of benefits eligible service in order to be eligible for continuing Health Insurance Plan benefits.

[21] Employees who were hired on or before May 31, 2004 who work twenty-one (21) hours or more per week year-round with the BSA, and Full-Time Employees hired on or after June 1, 2004 (*i.e.*, working thirty or more hours per week year-round with the BSA) are eligible to participate in the Health Insurance Plans.  Survivors eligible for Health Insurance Plans include the spouse and/or dependent children of a deceased BSA Employee who was enrolled in the Pension Plan.  Survivors of BSA Employees who did not retire from the BSA are not eligible for the Health Insurance Plans, other than eligibility continuation under COBRA, as required by law.

years old, enrolled in Medicare Parts A and B, and not enrolled in a Medicare prescription drug plan or other Medicare supplement plan (together with the PPO plan and the high deductible health plans, the "Medical Plans"), also administered by United.  United provides day-to-day administrative assistance in connection with the Health Insurance Plans.  The Debtors pay United approximately $210,000 per month in administrative fees, and an additional $20,000 to $100,000 per month for access to shared savings network discounts, which is highly variable depending on claims paid for each month.  Under United's services, the Debtors provide prescription drug coverage through a program administered by OptumRx.

30.    The Debtors offer one self-insured dental assistance plan (the "Dental Plan") administered through MetLife Insurance Company ("MetLife").  The Debtors pay MetLife approximately $22,000 per month in administrative fees.  The Dental Plan generally covers dental services and basic restorative services, and offers a preferred dentist program, which is a network of in-network dental providers that offer services at reduced rates.  The Dental Plan premiums, deductibles, co-pays, and out-of-pocket costs vary depending on whether a preferred dentist program provider is selected and whether dependents are covered by the Dental Plan. The costs of the Medical and Dental Plans are partially borne by the Debtors, but BSA Employees pay an estimated 35% of the total contributions to the Medical and Dental Plans through Deductions to pay for each month's coverage, with contributions varying by plan.[22]

31.    As self-insured Medical and Dental Plans, the Debtors fund and insure all claims submitted to the relevant health benefits providers on account of services provided to the participants (the "Health Benefit Claims").  Health Benefit Claims are paid as they are processed by the health benefit providers, but there is typically a lag time in receiving claims and the

---

[22] Participating Retirees and survivors are billed a premium for the BSA Employee costs of the Medical Plans, or, if they receive a large enough benefit under the Pension Plan, premiums are deducted from their checks.

Debtors are unable to determine the precise amount of Health Benefit Claims that have accrued and are owing as of the Petition Date. The average monthly amount of Health Benefit Claims has been approximately $3.9 million. By this Motion, the Debtors are requesting authority to pay any Health Benefit Claims owed as of the Petition Date under the Proposed Interim Order and on a final basis, and to continue paying the Health Benefit Claims on a postpetition basis in the ordinary course and consistent with their prepetition practices.

33. Also in connection with self-funding the Medical and Dental Plans, the Debtors maintain a stop-loss insurance policy with Sun Life Assurance Company of Canada to cover catastrophic medical claims (the "Stop-Loss Insurance"). The Debtors pay premiums on account of the Stop-Loss Insurance, which are approximately $554,000 per year, generally paid in the first quarter of the year. As of the Petition Date, the Debtors estimate that they have accrued prepetition obligations of approximately $88,000 on account of the Stop-Loss Insurance. The Debtors seek authority to pay any prepetition amounts that come due on account of the Stop-Loss Insurance. Further, by this Motion, the Debtors respectfully request authority to continue the Stop-Loss Insurance in the ordinary course on a postpetition basis.

33. The Debtors estimate that the total cost of the Medical and Dental Plans, including the Stop-Loss Insurance and administrative fees, is approximately $460,000 per month on average. As of the Petition Date, the Debtors estimate that the amount of accrued and outstanding prepetition obligations under the Medical and Dental Plans, excluding Health Benefit Claims, is approximately $790,000, and the Debtors seek to pay all accrued and outstanding obligations under the Medical and Dental Plans during the Interim Period and on a final basis, and maintain the Medical and Dental Plans in the ordinary course.

### 2.     Vision Plan

34.     The Debtors offer vision benefits through a plan insured and administered by Vision Service Plan ("VSP").  The Vision Plan generally provides benefits covering annual eye examinations, corrective lenses, frames, and contact lenses.  Premiums vary based on whether the Employee, Retiree, or Survivor has dependents covered by the Vision Plan.  The Vision Plan is a fully insured plan, so administrative fees paid to VSP in connection with the Vision Plan are included in the premiums.  Participants in the Vision Plan are responsible for the payment of premiums.

### B.     Health Savings Account Program

35.     The BSA Employees who participate in certain of the Medical Plans with high deductibles may contribute a portion of their pre-tax compensation to health savings accounts through a program (the "Health Savings Account Program") administered by United and OptumHealth Bank ("Optum"), which funds may be used for incidental medical expenses. Annually, the BSA also contributes a lump-sum of $500 to each health savings account opened between January 1 and June 30, and $250 to each account opened on or after July 1. Participating BSA Employees can make pre-tax contributions to the Health Savings Account Program through Deductions to cover reimbursements annually of up to $7,100 for family coverage and up to $3,550 for individual coverage.  As of the Petition Date, approximately 450 BSA Employees and Retirees are enrolled in the Health Savings Account Program.  On average, the Debtors deduct a total of approximately $77,500 per month from participating parties' paychecks (the "Employee HSA Deductions") on account of contributions to their respective Health Savings Account Programs.  The Debtors request authority, on an interim and final basis, to (i) remit Employee HSA Deductions of up to $95,000 withheld from BSA Employees' prepetition paychecks but not yet forwarded to Optum and to (ii) continue honoring their

obligations under the Health Savings Account Program postpetition in the ordinary course and consistent with their prepetition practices.

### C.    COBRA

36.    Pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), certain former BSA Employees covered by the Health Insurance Plans ("COBRA Participants") may continue insurance coverage under the Medical Plans, the Dental Plan, the Vision Plan, and the Health Savings Account Program (the "COBRA Benefits").    COBRA Participants are entitled by law to continue to receive COBRA Benefits for up to 18 months, and in certain instances up to 36 months, after termination of their employment.    As of the Petition Date, there are approximately 10–20 former BSA Employees who are COBRA Participants. COBRA Participants are responsible for paying all premiums associated with the COBRA Benefits.    The Debtors use WageWorks to administer the COBRA Benefits, including to provide all required notifications, bill and collect premiums, coordinate enrollment information with the Medical Plan administrators, and providing customer service and support for COBRA Participants.    The Debtors pay approximately $6,500 per month to WageWorks in administrative fees (the "COBRA Administration Fee").    As of the Petition Date, the Debtors estimate that they owe approximately $20,000 to WageWorks on account of the COBRA Administration Fee, all of which will become due and owing during the Interim Period.    The Debtors are requesting authority to pay up to $20,000 of the prepetition amount under the Proposed Interim Order and on a final basis, and to continue honoring such obligations postpetition in the ordinary course and consistent with their prepetition practices.

D.    **Life and AD&D Insurance**

1.    **Life and AD&D Insurance**

37.    The Debtors provide basic life and accidental death and dismemberment insurance (the "Basic Life and AD&D Insurance") and optional supplemental life insurance for Full-Time and Seasonal Employees of the BSA, Retirees, their spouses, and dependents (the "Supplemental Life Insurance" and, together with the Basic Life and AD&D Insurance, the "Life and AD&D Insurance").    The Life and AD&D Insurance is insured and administered by MetLife.    The Debtors' total monthly costs in connection with premiums and related administrative fees under the Life and AD&D Insurance are approximately $101,000.    The Debtors do not pay any amounts for the Supplemental Life Insurance, which is fully funded through Deductions or billing to participants.    As of the Petition Date, the Debtors owe approximately $130,000 for accrued and unpaid premiums and administrative fees paid to MetLife, all of which will become due and owing within the Interim Period.    The Debtors are requesting authority to pay up to all of this amount under the Proposed Interim Order and on a final basis, and to continue honoring their obligations under the Life and AD&D Insurance postpetition in the ordinary course and consistent with their prepetition practices.

2.    **Scout Executives' Alliance**

38.    Certain commissioned professional, executive, and professional-technical BSA Employees and Retirees with the BSA are eligible to enroll and become members of the Scout Executives' Alliance fellowship fund (the "Alliance"), which provides supplemental life insurance benefits to its members.    The Alliance is insured and administered through Metlife. Members of the Alliance make contributions entirely through Deductions based on salary levels, and Retirees make contributions through their annual pensions or via check transfers.    In turn, the BSA pays for group term life insurance for these individuals with employee contributions in

excess of the premium cost held in a segregated account as a buffer against any future cost increases.  As of the Petition Date, the Debtors owe approximately $15,000 for accrued and unpaid premiums and administrative fees paid to MetLife, all of which will become due and owing during the Interim Period.  The Debtors are requesting authority to pay up to all of this amount under the Proposed Interim Order and on a final basis, and to continue honoring their obligations to Metlife in respect of the Alliance postpetition in the ordinary course and consistent with their prepetition practices.

<strong>E.    Disability Insurance</strong>

39.    The Debtors provide Full-Time and Seasonal BSA Employees with short-term disability insurance coverage (the "<u>Short-Term Disability Insurance</u>"), long-term disability insurance (the "<u>Long-Term Disability Insurance</u>"), and salary continuation for medical leaves of absence (the "<u>Salary Continuation for Medical Leave</u>" and, together with the Short-Term and Long-Term Disability Insurance, the "<u>Disability Insurance</u>").  The Short-Term Disability Insurance and Salary Continuation for Medical Leave is insured and administered by Unum Life Insurance Company ("<u>Unum</u>") and the Long-Term Disability Insurance is insured and administered by MetLife.

40.    Salary Continuation for Medical Leave is available to Full-Time Employees with serious health conditions for up to 120 calendar days in a rolling twelve-month period.  Salary continuation is available once a Full-Time Employee remains out of work for a period of personal illness or injury of at least seven calendar days, and pays such employees 60% of their regular rate of pay.  The BSA funds the Salary Continuation for Medical Leave.

41.    The Short-Term Disability Insurance complements the Salary Continuation for Medical Leave and replaces a portion of an eligible party's compensation for up to seventeen (17) weeks when such party is unable to work due to a non-work related injury or illness.  The

Short-Term Disability Insurance applies after seven days of disability, at which time eligible BSA Employees are paid 25% of their pre-disability earnings, with a minimum weekly benefit of $25.00 and a maximum of $2,500. The Short-Term Disability Insurance is fully funded by premium payments made by the BSA Employee on an after-tax basis, which are made through Deductions.

42.     The Long-Term Disability Insurance replaces a portion of the eligible BSA Employee's compensation when such employee is unable to work due to a non-work related injury or illness. The Long-Term Disability Insurance applies after 120 days and pays BSA Employees 60% of their monthly pre-disability pay, up to a maximum of $22,500 per month, until they recover or reach normal retirement age. The BSA funds the Long-Term Disability Insurance.

43.     The Debtors pay Unum and Metlife approximately $20,100 and $120,300 per month, respectively, in premiums and administrative fees in connection with the Disability Insurance. As of the Petition Date, the Debtors owe approximately $55,000 to Unum and $145,000 to Metlife on account of premiums and related administrative fees in connection with the Disability Insurance, of which up to $170,000 is estimated to come due in the Interim Period and up to $200,000 in the aggregate on a final basis. The Debtors are requesting authority to pay up to $170,000 in the aggregate under the Proposed Interim Order and up to $200,000 on a final basis, and to continue honoring such obligations postpetition in the ordinary course and consistent with their prepetition practices.

F.     **Workers' Compensation Program**

44.     Under applicable state laws, the Debtors are required to (i) provide the BSA Employees with workers' compensation insurance coverage for claims arising from or related to their employment (the "Workers' Compensation Program") and (ii) satisfy the Debtors'

obligations to insurers, third party administrators, state funds, and/or the BSA Employees, including, without limitation, all premiums, charges, claims, deductibles, retentions, administrative fees and all other obligations relating to the Workers' Compensation Program (the "Workers' Compensation Obligations").  The Debtors maintain two insurance policies with Twin City Fire Insurance Company and Property/Casualty Insurance Co. of Hartford on account of the Workers' Compensation Program, which are maintained to cover claims in Wisconsin and all of the remaining states in which the Debtors operate, respectively (including those states in which there is state-mandated workers' compensation insurance fund coverage).  The Debtors are required to pay monthly insurance premium installments in respect of the state programs in order to pay workers' compensation claims as they are adjudicated.

45.    The Debtors estimate that they pay, on average, approximately $32,000 per month in Workers' Compensation Obligations.  As of the Petition Date, there are approximately 26 pending claims under the Workers' Compensation Program, which the Debtors estimate aggregate to a total liability of approximately $422,000.

46.    The Debtors employ ESIS Inc. as a third-party administrator to investigate, administer, and pay claims arising under the Workers' Compensation Program (the "Third-Party Administrator").  For those claims arising under the Debtors' Workers' Compensation Program that total $10,000 or less, the Third-Party Administrator will pay the appropriate party and request repayment from the BSA.  For claims totaling more than $10,000, the Third-Party Administrator will submit a "large loss" invoice to the BSA, and once the BSA funds the invoice, the Third-Party Administrator will release the payment to the claimant.  The Third-Party Administrator also provides loss prevention services and certain other administrative and advisory services.

47.     By this Motion, the Debtors are requesting authority to (i) continue and maintain the Workers' Compensation Program in the ordinary course, (ii) pay any obligations arising under or in connection with the Workers' Compensation Program—including all accrued but unpaid prepetition amounts related to the Workers' Compensation Program during the Interim Period and on a final basis, workers' compensation claims, settlements, assessments, and other obligations, and the posting of any collateral in connection therewith, (iii) modify the automatic stay to allow the BSA Employees to assert claims under the Workers' Compensation Program to the extent applicable, and (iv) continue honoring their obligations to the Third-Party Administrator in the ordinary course, including paying any administrative fees that may be due and owing as of the Petition Date or that come due and owing during these chapter 11 cases.

### G.     Non-Insider Severance Program

48.     In the ordinary course of their operations, the Debtors maintain a severance program for the benefit of BSA Employees who have been terminated without cause (the "Non-Insider Severance Program").  The Non-Insider Severance Program compensates eligible BSA Employees for the financial disruption caused by the Debtors' termination of their employment. Upon termination, eligible BSA Employees are entitled to receive ongoing payments equal to one week of their base salary for each year of service, up to a maximum of 26 weeks' base salary.  Additionally, as of the Petition Date, the Debtors owe approximately $15,000 in severance to one former non-insider BSA Employee.  By this Motion, the Debtors are requesting authority, solely upon entry of the Proposed Final Order, to (i) pay up to $20,000 on account of prepetition Non-Insider Severance Program and other severance obligations in the ordinary course, and (ii) continue the Non-Insider Severance Program in the ordinary course as such program was in effect prepetition, and (iii) to pay any benefits under the Non-Insider Severance

Program to BSA Employees who are not "insiders" as such term is defined by section 101(31) of the Bankruptcy Code.[23]

### H.    Retirement Plans

49.    The Debtors offer two retirement plans (the "Retirement Plans") to Full-Time and Seasonal BSA Employees, which are described in further detail below.

#### 1.    Pension Plan

50.    Certain of the Full-Time BSA Employees with at least one year of service[24] and Retirees participate in a defined benefit pension plan (the "Pension Plan"), originally established by the BSA in 1938.   The Pension Plan is a qualified retirement plan subject to sections 401(a)(17) and 415 of the Internal Revenue Code.   Entry into the Pension Plan was frozen on December 31, 2018, and no BSA Employees have been permitted to become active participants under the Pension Plan after such date.

51.    On and after January 1, 2019, the Pension Plan was amended to become a two-tiered plan.   Pursuant to the amendment, "grandfathered employees" with fifteen (15) years of service and age plus service equal to sixty (60) years were permitted continue to participate in the Pension Plan, while "non-grandfathered employees" were automatically enrolled into the Match Savings Plan described and defined below.   There are currently approximately 289 "grandfathered" BSA Employees participating in the Pension Plan.   These BSA Employees are required to contribute 4.25% of their salary to the Pension Plan, while the BSA makes discretionary contributions.   The BSA spends 7.75% of each eligible BSA Employee's wages on retirement-related costs, which is first used to satisfy obligations under the Match Savings Plan

---

[23] Prior to the Petition Date, the Debtors offered an annual incentive program (the "AIP") designed to maximize and enhance certain BSA Employee performance based on achieving certain annual target metrics.  For the avoidance of doubt, the Debtors are not seeking any relief related to the AIP pursuant to this Motion.

[24] Employees hired on or before May 31, 2004 working 21 or more hours per week are also eligible.

(described and defined below), followed by administrative costs with respect to the Pension Plan, with the remainder contributed to the Pension Plan.    Approximately 1,200 Retirees and beneficiaries participate in the Pension Plan.

52.    For the 2019 plan year, the BSA contributed approximately $3.0 million to the Pension Plan on behalf of the BSA Employees and Retirees and made an additional contribution of $60 million.    Total BSA Employee contributions to the Pension Plan in the 2019 plan year were approximately $1.14 million.    The BSA's total administrative and actuarial fees related to the Pension Plan in 2019 were approximately $775,000.    As of the Petition Date, the Debtors have withheld but not yet remitted approximately $70,000 in BSA Employee contributions to the Pension Plan, and owe approximately $140,000 on account of employer contributions.    The Pension Plan is managed by the BSA and is administered by Morneau Shepell.    As of the Petition Date, the Debtors owe approximately $230,000 to Morneau Shepell and other Pension Plan advisors on account of administrative fees, all of which is estimated to become due and owing during the Interim Period.    By this Motion, the Debtors are requesting authority to (i) remit unpaid prepetition BSA Employee contributions to the Pension Plan of up to $70,000 on an interim and final basis, (ii) remit up to $140,000 on account of employer contributions on an interim and final basis as part of the Employer Matching Obligations described and defined below, and (iii) pay up to $230,000 of administrative fees on an interim and final basis.

### 2.    Match Savings Plan

53.    The BSA sponsors a 403(b) defined contribution retirement plan, which is available to employees of exempt organizations and is similar to a 401(k) retirement plan (the "Match Savings Plan").    All eligible BSA Employees may enroll in the Match Savings Plan, which enables the BSA Employees to make pre-tax Deductions up to limits set by the Internal Revenue Code.

54.    As of the Petition Date, approximately 1,050 current BSA Employees participate in the Match Savings Plan.  Each month the Debtors deduct and withhold approximately $440,000 in Employee Contributions for the Match Savings Plan.  The Match Savings Plan is managed by Fidelity Workplace Services.  As is customary, Fidelity Workplace Services makes deductions from participants' Match Savings Plan funds in respect of administrative fees (the "Fidelity Administrative Fees").    The Debtors disburse the Employee Contributions and Employer Matching Obligations (as defined below) from their operating account within one week after the applicable payroll date.  As of the Petition Date, the Debtors have withheld but not yet remitted approximately $50,000 on account of Employee Contributions for the prepetition period.

### 3.    Employer Matching Obligation

55.    The Debtors have a limited matching program under the Pension Plan and Match Savings Plan (the "Employer Matching Obligation").    For "grandfathered" BSA Employees receiving benefits under the Pension Plan, the BSA matches 50% of Employee Contributions up to 6% of pay.  With respect to non-grandfathered BSA Employees under the Match Savings Plan, the BSA makes an automatic contribution of 1.75% of a BSA Employee's pay regardless of whether a BSA Employee makes an Employee Contribution, and matches 100% of Employee Contributions up to 6% of pay.  The Debtors paid approximately $6.5 million in 2019 on account of the Employer Matching Obligation.  As of the Petition Date, the Debtors estimate that they owe approximately $180,000 on account of the Employer Matching Obligation with respect to the Retirement Plans, all of which will become due and owing in the Interim Period.

56.    Many of the BSA Employees' sole or primary source of retirement savings consist of the amounts they have saved and received pursuant to the Retirement Plans.  Further, many of the BSA Employees choose to participate in the Match Savings Plan because of the

Employer Matching Obligation.  Continuing the Employer Matching Obligation is essential to maintaining BSA Employee morale and protecting the expectations of the BSA Employees.  In addition, the Debtors assert that the Employee Contributions are generally held in trust by the Debtors and are not property of their estates.  Accordingly, the Debtors are requesting authority to pay all of the outstanding Employer Matching Obligations and any unpaid Fidelity Administrative Fees on an interim and final basis, and to continue honoring such obligations postpetition in the ordinary course and consistent with their prepetition practices.[25]

### I.    PTO and Other Leave Programs

57.     Pursuant to the Debtors' paid time-off ("PTO") policy as of the Petition Date, which combines vacation, sick days, and any other personal time off, Full-Time BSA Employees are paid their regularly scheduled wages for each day of PTO up to the maximum number of days accrued based on years of service, which ranges from 24 to 36 days per year.  The PTO policy also provides that for BSA Employees terminating their employment with the Debtors, accrued and unused vacation days are monetized and paid to such BSA Employees in cash.  In general, PTO in excess of ten days at the end of a calendar year is not eligible to be carried over to the next year, unless required by applicable state law.  Part-time Employees of the BSA may be eligible for PTO benefits only as required by applicable state and local laws.

58.     The Debtors estimate that, as of the Petition Date, the aggregate value of accrued but unpaid PTO is approximately $3.85 million were it to be fully monetized.  However, because PTO is typically not monetized until a BSA Employee's termination, the Debtors do not

---

[25] Prior to the Petition Date, the Debtors also offered: (i) a non-qualified defined benefit retirement plan under section 457(f) of the Internal Revenue Code that provided supplemental retirement benefits to certain Retirement Plan participants whose compensation exceeded the annual compensation limit (the "Restoration Plan"); and (ii) a non-qualified deferred compensation plan offered under section 457(b) of the Internal Revenue Code (the "457(b) Plan").  For the avoidance of doubt, the Debtors are not seeking any relief related to the Restoration Plan or the 457(b) Plan at this time.

currently owe any cash amounts on account of accrued but unpaid PTO. Pursuant to this Motion, the Debtors are requesting authority to (i) honor the BSA Employees' ordinary course use of PTO under the PTO policy in existence as of the Petition Date, whether accrued pre- or postpetition, without regard to statutory cap imposed by section 507(a)(4) of the Bankruptcy Code, and (ii) modify the PTO policy to pay the value of accrued PTO to any of the BSA Employees terminated on or after the Petition Date up to the cap imposed by section 507(a)(4) of the Bankruptcy Code.

59.     The Debtors also provide for the BSA Employees to take the following categories of leave under certain circumstances: (i) Family and Medical Leave Act, (ii) personal leave, (iii) military caregiver leave, (iv) uniformed services leave, (v) bereavement leave, and (vi) civic duty leave for jury duty or appearing in court as a witness (collectively, "Other Leave"). By this Motion, the Debtors are requesting authority to maintain their Other Leave programs for BSA Employees in the ordinary course of their operations.

### J.    Other Benefits Programs

60.     The Debtors also provide the following additional Employee Benefits Programs to certain eligible BSA Employees (collectively, the "Other Benefits Programs"):

- **Vehicle Program**. The Debtors provide leased vehicles to certain executives, regional directors, and various other BSA Employees (the "Vehicle Program"). The Debtors pay Automotive Rentals Inc. ("Automotive Rentals") approximately $45,000 per month on account of the Vehicle Program. As of the Petition Date, the Debtors estimate that they owe approximately $90,000 to Automotive Rentals for leased vehicles on account of BSA Employees.

- **125 Plan**. The Debtors offer the 125 Premium Only Plan (the "125 Plan") to active eligible BSA Employees. Through the 125 Plan, eligible BSA Employees can reduce their taxable income by subtracting such employees' cost for coverage under certain Employee Benefits Programs from a BSA Employee's salary before taxes are calculated.

- **Employee Assistance Program**.  BSA Employees can obtain confidential support for issues such as stress, abuse, alcohol and other drug problems, anxiety, depression, financial or legal concerns, gambling, child and elder care, and relationship issues and concerns (the "Employee Assistance Program").  The program is administered by United.  The Debtors make the Employee Assistance Program available to all BSA Employees at no cost for eligible Employees up to a certain number of visits.  The cost to the Debtors is included in the administrative fees paid to United.

- **Wellness Program**.  The Debtors are in the process of offering a comprehensive wellness program to BSA Employees (the "Wellness Program") through Vitality.  The Wellness Program provides incentives for benefit-eligible BSA Employees to improve their health, in the form of points that may be converted to gift cards and other rewards.  No amounts are outstanding as of the Petition Date on account of this program.

- **Naturally Slim Program**.  The Debtors offer Naturally Slim to BSA Employees, which is a web-based education program focused on improving eating habits, losing weight, and decreasing risk factors that lead to metabolic syndrome (the "Naturally Slim Program").  The Debtors make the Naturally Slim Program available to all BSA Employees at no cost as long as the program requirements are completed.  The Debtors pay Naturally Slim approximately $15,000 per month based on the number of BSA Employees in connection with the Naturally Slim Program.  As of the Petition Date, the Debtors estimate that they owe approximately $15,000 to Naturally Slim on account of the Naturally Slim Program.

- **Additional Insurance Program.**  The Debtors offer additional personal insurance options to their employees, allowing them to purchase additional coverages at a discount through Liberty Mutual (auto, home, renter) and AFLAC (catastrophic injury) (together, the "Additional Insurance Program"). The BSA deducts amounts from participating employee's payroll checks and remits the amounts to the appropriate provider on a monthly basis in arrears. The Debtors pay approximately $25,000 per month to Liberty Mutual and AFLAC on account of the Additional Insurance Program.  As of the Petition Date, the Debtors estimate that they owe approximately $25,000 to Liberty Mutual and AFLAC on account of the Additional Insurance Program.

- **Professional Services.**  The Debtors offer financial planning and advisory and tax planning services to certain BSA Employees (the "Professional Services"). The BSA pays for the Professional Services on behalf of the participating BSA Employees, and such employees are then taxed for these services through payroll deductions.  As of the Petition Date, no amounts are outstanding on account of this program.

As of the Petition Date, the Debtors estimate that they owe approximately $130,000 in connection with the Other Benefits Programs, and are requesting authority to pay up to this entire amount during the Interim Period and on a final basis. The Debtors are requesting authority to continue the Other Benefits Programs in the ordinary course on a postpetition basis.

**BASIS FOR RELIEF**

I.    **Sufficient Cause Exists to Authorize the Debtors to Honor the Compensation and Benefits Programs.**

A.    **Certain Compensation and Benefits Programs Are Entitled to Priority Treatment.**

61.    Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Compensation and Benefits Programs owed to the BSA Employees to priority treatment. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. See 11 U.S.C. § 1129(a)(9)(b) (requiring payment of certain allowed unsecured claims for (i) wages, salaries, or commissions, including sick leave pay earned by an individual and (ii) contributions to an employee benefit plan). Thus, granting the relief sought herein should only affect the timing of certain payments to the BSA Employees, and does not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Compensation and Benefits Programs at this time enhances value for the benefit of all interested parties. See In re Equalnet Commc'ns Corp., 258 B.R. 368, 370 (Bankr. S.D. Tex. 2000) ("The need to pay [employee wage] claims in an ordinary course of business time frame is simple common sense. Employees are more likely to stay in place and to refrain from actions which could be detrimental to the case and/or the estate if their pay and benefits remain intact and uninterrupted.").

**B.    Payment of Certain Compensation and Benefits Programs Is Required by Law.**

62.    The Debtors are requesting authority to pay the applicable Withholdings to the appropriate third-party entities.  These amounts principally represent BSA Employee earnings that taxing authorities, BSA Employees, and judicial authorities have designated for deduction from the BSA Employees' paychecks.  Indeed, certain Withholdings are not property of the Debtors' estates because the Debtors withhold such amounts from the BSA Employees' paychecks on another party's behalf.  See 11 U.S.C. §§ 541(b)(1), (d); see also Begier v. I.R.S., 496 U.S. 53, 59 (1990) (holding that "[b]ecause the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate'" (citation omitted)).

63.    Further, federal and state laws require the Debtors to withhold certain tax payments from the BSA Employees' paychecks and pay such amounts to the appropriate taxing authority.  26 U.S.C. §§ 6672, 7501(a); see also City of Farrell v. Sharon Steel Corp., 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); In re DuCharmes & Co., 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes); In re Chabrand, 301 B.R. 468, 475–81 (Bankr. S.D. Tex. 2003) (same).  Because the Withholdings may not be property of the Debtors' estates, the Debtors are requesting that the Court authorize them to transmit, or direct Paychex to transmit, the Withholdings on account of the BSA Employees to the proper parties in the ordinary course.

64.    Similarly, pursuant to applicable state laws, the Debtors are required to maintain a Workers' Compensation Program to ensure prompt and efficient payment of applicable claims.

If the Debtors fail to maintain the Workers' Compensation Program, they may be prohibited by law from operating in those states without making significant adjustments or risk fines and other penalties. Accordingly, the Debtors submit that the continuance of the Workers' Compensation Program on an uninterrupted basis and the payment of any prepetition obligations thereunder in the ordinary course of business is crucial to the Debtors' ongoing restructuring efforts and preservation of the estates' value.

## II.     Debtors May Honor and Pay the Compensation and Benefits Programs in the Ordinary Course of Operations.

65.     The ability to compensate the BSA Employees, Independent Contractors, and Temporary Workers (through Staffing Agencies) in the ordinary course of operations is necessary to facilitate the Debtors' reorganization and is authorized under section 363(c) of the Bankruptcy Code, which provides that a debtor in possession may continue to operate in the ordinary course. See 11 U.S.C. § 363(c)(1) (providing that, so long as "the business of the debtor is authorized to be operated under [section 1108 of the Bankruptcy Code] and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business, without notice or a hearing"); 11 U.S.C. § 1108 (providing that a debtor in possession, as trustee, may operate the debtor's business unless a court orders otherwise). As discussed above, the BSA Employees are vital to the Debtors' organization and the fulfillment of their charitable mission. Over 60 percent of the BSA Employees have worked for the BSA for at least five years, and have indispensable skills and understanding of the unique nature of the BSA organization. The BSA Employees fulfill a diverse range of needs across the BSA, which range from operating a series of high adventure facilities that annually accommodate over 70,000 participants, to managing the Debtors' large

scale retail sales operations and wholesale supply chain across approximately 175 Scout Shops nationwide.   Accordingly, sufficient cause exists to allow the Debtors to maintain and pay Employee Compensation and Benefits on a post-petition basis in the ordinary course.

### III.     Payment of the Prepetition Employee Obligations Is a Sound Exercise of the Debtors' Business Judgment and Is in the Best Interests of the Debtors' Estates.

66.     The payment of the Prepetition Employee Obligations and the maintenance of the Compensation and Benefits Programs on a post-petition basis are in the best interests of the Debtors' estates and these actions are authorized under sections 363(b) and 105(a) of the Bankruptcy Code.   Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors, as debtors in possession, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners."   In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).   Moreover, the "fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs."   NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984).   The payment of the Prepetition Employee Obligations requested in this Motion, as well as the continued payment of the Compensation and Benefits Programs on a postpetition basis, is in the interest of all parties because such payments will facilitate the continued operation of the Debtors' organization, help implement the restructuring contemplated under the Plan and thereby avoid liquidation of the estates, and preserve the organization's going-concern value.   See In re Lehigh & N.E. Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981).

67.     Consistent with a debtor in possession's fiduciary duties and the overriding purpose of reorganization under chapter 11, courts have authorized the payment of prepetition obligations under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so.   See 11 U.S.C. § 363(b)(1) (allowing the debtor to "use, sell, or lease, other than in

the ordinary course of business, property of the estate" upon order of the court); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (requiring debtor to show a "sound business purpose" to justify use of assets under section 363 of the Bankruptcy Code); *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (authorizing debtor's payment of prepetition claims as necessary to protect debtor's business). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions . . . courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

68.     Additionally, section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," 11 U.S.C. § 105(a), and supports the Court's ability to authorize the Debtors to pay the Prepetition Employee Obligations. A bankruptcy court's use of its equitable powers to "authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *In re Ionosphere Clubs*, 98 B.R. at 175. Federal courts have consistently permitted the postpetition payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors. *See, e.g.*, *Miltenberger v. Logansport C. & S.W.R. Co.*, 106 U.S. 286, 311–12 (1882) (permitting payment of a pre-receivership claim prior to reorganization to prevent "stoppage of [crucial] business relations"); *In re Lehigh & N.E. Ry. Co.*, 657 F.2d at 581; *In re Just for Feet, Inc.*, 242 B.R. 821, 824 (D. Del. 1999) ("The Supreme Court, the Third Circuit and the District

of Delaware all recognize the court's power to authorize payment of prepetition claims when such payment is necessary for the debtor's survival during chapter 11.").

69.     This "doctrine of necessity" functions in a chapter 11 reorganization as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not expressly authorized by the Bankruptcy Code.  See, e.g., In re Penn Cent. Transp. Co., 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the doctrine of necessity "permit[s] immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid"); In re Columbia Gas Sys., Inc., 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (noting that debtors may pay prepetition claims that are essential to continued operation of business).  The doctrine is frequently invoked early in a reorganization, particularly in connection with the provisions of chapter 11 relating to the payment of prepetition claims. Where the payment of prepetition claims "is necessary to permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately," courts have authorized such payments pursuant to section 105(a).  In re Structurlite Plastics Corp., 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) (internal quotation marks omitted).  Accordingly, pursuant to section 105(a) of the Bankruptcy Code, this Court is empowered to grant the relief requested herein.

70.     The Debtors submit that the requested relief is a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm, and is justified under sections 105(a) and 363(b) of the Bankruptcy Code.  As addressed above, any interruption or failure by the Debtors to pay the Prepetition Employee Obligations or maintain the Compensation and Benefits Programs and pay related administrative obligations during these

chapter 11 cases would jeopardize the Debtors' relationship with the BSA Employees, Temporary Workers, and Independent Contractors and, in turn, adversely impact morale and prompt valuable members of the Debtors' workforce to seek employment elsewhere.  At this early stage in the Debtors' cases, the Debtors simply cannot risk the substantial and potentially irreparable damage to the BSA organization that would accompany any failure to pay the Prepetition Employee Obligations or pay the Compensation and Benefits Programs in the ordinary course during these chapter 11 cases.  Consequently, all of the Debtors' creditors will benefit if the requested relief is granted.

71.     For the reasons discussed herein, in the overwhelming majority of large organizational chapter 11 filings, including in this District, courts have approved payment of employee prepetition claims for, and continued maintenance of, employee compensation and benefits similar to those described herein.[26]  Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay the Prepetition Employee Obligations and to continue funding the Compensation and Benefits Programs on a post-petition basis in the ordinary course and consistent with prepetition practices.

IV.     **The Non-Insider Severance Program Is a Reasonable and Sound Exercise of the Debtors' Business Judgement.**

A.     **The Non-Insider Severance Program Is Authorized Under Section 363(c)(1) of the Bankruptcy Code.**

72.     The Debtors further request that they be authorized to continue to honor the Non-Insider Severance Program in the ordinary course of their organizational operations.  The Debtors submit that the Non-Insider Severance Program should be reviewed under section 363(c)(1) of the Bankruptcy Code rather than section 503(c) because the Non-Insider Severance

---

[26] See, e.g., In re Hexion Holdings LLC, Case No. 19-10684 (KG) (Bankr. D. Del. Apr. 1, 2019), ECF No. 92; In re Checkout Holding Corp., Case No. 18-12794 (KG) (Bankr. D. Del. Dec. 13, 2018), ECF No. 101; In re Mattress Firm, Inc., Case No. 18-12241 (CSS) (Bankr. D. Del. Oct. 9, 2018), ECF No. 177.

Program is a preexisting program that the Debtors have maintained in the ordinary course and desire to continue on a postpetition basis.  Further, no insiders are part of the Non-Insider Severance Program.  See In re Blitz U.S.A. Inc., 475 B.R. 209, 215 (Bankr. D. Del. 2012) (holding that a prepetition employee incentive plan was an ordinary course transaction made with sound business judgment and in good faith under section 363 of the Bankruptcy Code).

**B.      The Non-Insider Severance Program Is Authorized Under Sections 363(b) and 503(c)(3) of the Bankruptcy Code.**

73.      Alternatively, to the extent that the Non-Insider Severance Program is not authorized under section 363(c)(1) of the Bankruptcy Code, the Debtors submit that payment of the Non-Insider Severance Program is also authorized under sections 363(b) and 503(c) of the Bankruptcy Code.  Importantly, because the Debtors do not propose to pay any insiders on account of the Non-Insider Severance Program, such program is not subject to the heightened standards of sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code.  See 11 U.S.C. § 503(c)(1) and (2) (applying only to insiders).

74.      Instead, pursuant to section 503(c)(3) of the Bankruptcy Code, the Non-Insider Severance Program only requires a showing that it is "justified by the facts and circumstances of the Debtors' chapter 11 cases."  See 11 U.S.C. § 503(c)(3).  This standard, in turn, is essentially the same as the business judgment standard that applies under section 363(b) of the Bankruptcy Code.  See In re Velo Holdings Inc., 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) ("Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b)."); In re Glob. Home Prods. LLC, 369 B.R. 778, 783 (Bankr. D. Del. 2007) ("If [the proposed plans are] intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363.").

75.     The Debtors submit that continuing to maintain the Non-Insider Severance Program is a sound exercise of their business judgment and is in the best interests of the estates. The Non-Insider Severance Program is a longstanding component of the Debtors' overall Employee Compensation and Benefits and serves an important objective: protecting BSA Employees against financial hardship in the event of termination.  Therefore, the Debtors believe that it is necessary to continue this program—which applies only to BSA Employees who are not "insiders" within the meaning of section 101(31) of the Bankruptcy Code—on a postpetition basis.  Courts in this District and others have granted relief similar to that requested herein in other complex chapter 11 cases.  See, e.g., In re Insys Therapeutics, Inc., Case No. 19-11292 (KG) (Bankr. D. Del. Sept. 19, 2019), ECF No. 639; In re Mattress Firm, Inc., Case No. 18-12241 (CSS) (Bankr. D. Del. Nov. 7, 2018), ECF No. 757; In re TK Holdings Inc., Case No. 17-11375 (BLS) (Bankr. D. Del. July 26, 2017), ECF No. 330.  Accordingly, the Debtors request that the Court authorize the Debtors to continue the Non-Insider Severance Program in the ordinary course of operations, including payment of prepetition obligations related thereto, if any.

**V.      The Court Should Authorize Banks and Other Financial Institutions to Honor and Pay Checks and Other Transfers Related to the Compensation and Benefits Programs.**

76.     The Debtors further request that the Court authorize, but not direct, applicable banks and other financial institutions to receive, process, honor and pay any and all checks and wire transfer requests relating to the Compensation and Benefits Programs, provided that sufficient funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover such disbursements.  The Debtors represent that each such check or transfer can be readily identified as relating directly to payment of the Compensation and Benefits Programs.  Accordingly, the Debtors assert that there is minimal risk that checks or transfer

requests that have not been authorized by the Court will be inadvertently made.  Nevertheless, in the interest of ensuring the prompt and efficient payment of the Compensation and Benefits Programs, the Debtors request that the banks be authorized to rely on the representations of the Debtors as to which checks are issued or authorized to be paid on account of the Compensation and Benefits Programs without any duty of further inquiry and without liability for following the Debtors' instructions.

77.     The Debtors also request authorization for, and/or ratification of: (i) their banks' honoring of prepetition checks and transfers on or after the Petition Date in connection with Compensation and Benefits Programs, (ii) banks to process and honor all other checks issued for payments approved by this Motion, and (iii) reissuance of checks, wire transfers, automated clearing house payments, electronic payments, or other similar methods of payment authorized by this Motion where the applicable check is dishonored post-petition.

## **REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED**

78.     Bankruptcy Rule 6003 empowers the Court to issue an order, within 21 days after the Petition Date, granting a motion to "use . . . property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" if such requested relief "is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003(b).  For the reasons discussed above, entry of the Proposed Interim Order is integral to the Debtors' ability to successfully transition into chapter 11 without workforce disruptions that would harm their ability to carry out the BSA's charitable mission.  As described above, the relief requested is necessary to avoid a severe disruption in the Debtors' operations at this critical juncture and, in turn, preserve the ongoing value of the Debtors' operations and to maximize the value of the Debtors' estates for the benefit of all stakeholders.  Accordingly, the Debtors submit that they

have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

### RESERVATION OF RIGHTS

79.     Nothing contained herein is intended or should be construed as (a) an admission as to the validity of any claim or lien against the Debtors, (b) a waiver of the Debtors' rights to subsequently dispute such claim or lien on any grounds, (c) a promise or requirement to pay any prepetition claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion, the Proposed Interim Order, or the Proposed Final Order, (e) a request or authorization to assume any prepetition agreement, contract, or lease, pursuant to section 365 of the Bankruptcy Code, or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

### WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h) REQUIREMENTS

80.     In addition, by this Motion, the Debtors seek a waiver of any notice requirements under Bankruptcy Rule 6004(a) and any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As set forth above, the Debtors require immediate relief to continue ordinary organizational operations for the benefit of all parties in interest.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

81.     Similarly, for the reasons stated above, the Debtors respectfully request a waiver of the notice requirements of Bankruptcy Rule 6004(a) to the extent they are deemed applicable.

## NOTICE

82.     Notice of this Motion will be provided to (i) the U.S. Trustee; (ii) the twenty-five (25) law firms representing the largest numbers of abuse victims asserting claims against the Debtors; (iii) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis, other than abuse-related claims; (iv) counsel to JPMorgan Chase Bank, N.A.; (v) the County Commission of Fayette County (West Virginia), as issuer of those certain Commercial Development Revenue Bonds (Arrow WV Project), Series 2010A, 2010B and 2012; (vi) representatives of the prepetition Ad Hoc Committee of Local Councils; (vii) counsel to the prepetition Future Claimants' Representative; (viii) counsel to the prepetition ad hoc group of attorneys representing significant numbers of abuse victims; (ix) the United States Attorney's Office for the District of Delaware; (x) the Internal Revenue Service; (xi) the United States Department of Justice; and (xii) any party that has requested notice pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested herein, no other or further notice need be given.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Interim Order and Proposed Final Order, substantially in the forms attached hereto, granting the relief requested herein and any further relief the Court may deem just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated:  February 18, 2020
       Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Derek C. Abbott*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Joseph C. Barsalona II (No. 6102)
Eric W. Moats (No. 6441)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email:  dabbott@mnat.com
      aremming@mnat.com
      jbarsalona@mnat.com
      emoats@mnat.com
      ptopper@mnat.com

– and –

SIDLEY AUSTIN LLP
James F. Conlan (*pro hac vice* pending)
Thomas A. Labuda (*pro hac vice* pending)
Michael C. Andolina (*pro hac vice* pending)
Matthew E. Linder (*pro hac vice* pending)
Blair M. Warner (*pro hac vice* pending)
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Email:  jconlan@sidley.com
      tlabuda@sidley.com
      mandolina@sidley.com
      mlinder@sidley.com
      blair.warner@sidley.com

– and –

SIDLEY AUSTIN LLP
Jessica C. K. Boelter (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 839-5300
Email:  jboelter@sidley.com

PROPOSED COUNSEL TO THE DEBTORS
AND DEBTORS IN POSSESSION

**<u>Exhibit A</u>**

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (___) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. __** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION
WAGES, SALARIES, EMPLOYEE BENEFITS, AND OTHER COMPENSATION
AND (B) MAINTAIN EMPLOYEE BENEFITS PROGRAMS AND PAY RELATED
ADMINISTRATIVE OBLIGATIONS, (II) AUTHORIZING APPLICABLE BANKS
AND OTHER FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED
CHECKS AND TRANSFERS, AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the Boy Scouts of America and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), for entry of an order (this "Interim Order"), pursuant to sections 105(a), 363(b), and 507 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 9013-1, (i) authorizing the Debtors to (a) pay their outstanding Prepetition Employee Obligations and (b) maintain their existing Compensation and Benefits Programs, (ii) authorizing applicable banks and other financial institutions to receive, process, honor, and pay any and all checks drawn on and transfers made from the Debtors' accounts to the extent such checks or transfers relate to any of the foregoing, and (iii) granting related relief; and upon consideration of the First Day Declaration; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] All capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Motion.

United States District Court for the District of Delaware, dated February 29, 2012; and this matter being a core proceeding within the meaning of 28 U.S.C. § 157(b)(2); and this Court being able to issue a final order consistent with Article III of the United States Constitution; and venue of this proceeding and the Motion in this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and appropriate notice of and the opportunity for a hearing on the Motion having been given and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court; and all objections, if any, to the Motion having been withdrawn, resolved or overruled; and the relief requested in the Motion being in the best interests of the Debtors' estates, their creditors and other parties in interest; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The relief requested in the Motion is GRANTED on an interim basis as set forth herein.

2.      The Final Hearing on the Motion shall be held on _____, 2020 at ___:___ __.m., prevailing Eastern Time.  Any objections or responses to entry of a final order (the "<u>Final Order</u>") on the Motion shall be filed no later than 4:00 p.m., prevailing Eastern Time, on _____, 2020 (the "<u>Objection Deadline</u>") and served on the following parties: (i) the Debtors, Boy Scouts of America, 1325 West Walnut Hill Lane, Irving, Texas 75038, Attn: Steven P. McGowan; (ii) proposed counsel to the Debtors, Sidley Austin LLP, 787 Seventh Avenue, New York, New York 10019, Attn: Jessica C.K. Boelter, and One South Dearborn, Chicago, Illinois 60603, Attn: Matthew E. Linder; (iii) proposed co-counsel to the Debtors,

Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor, P.O. Box 1347, Wilmington, Delaware 19899-1347, Attn: Derek C. Abbott; (iv) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: David Buchbinder and Hannah M. McCollum; (v) counsel to the prepetition Future Claimants' Representative, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Robert S. Brady and  Edwin J. Harron; (vi) counsel to JPMorgan Chase Bank National Association, Norton Rose Fulbright US LLP, 2200 Ross Avenue, Dallas, Texas 75201-7932, Attn: Louis R. Strubeck and Kristian W. Gluck; (vii) representatives of the prepetition Ad Hoc Committee of Local Councils, Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, New York 10019, Attn: Richard G. Mason and Joseph C. Celentino; (viii) counsel to the prepetition ad hoc group of attorneys representing significant numbers of abuse victims, Pachulski, Stang, Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California 90067, Attn: James I. Stang; (ix) counsel to the County Commission of Fayette County (West Virginia), Steptoe & Johnson PLLC, Chase Tower – 8th Floor, 707 Virginia Street East, Charleston, West Virginia 25301, Attn: John Stump; (x) counsel to any statutory committee appointed in these chapter 11 cases; and (xi) any party that has requested notice pursuant to Bankruptcy Rule 2002.

3.    The Debtors are authorized, but not directed, to (a) pay the Prepetition Employee Obligations (either directly or to third parties for payment or remittance, as applicable), provided that no payment shall be made on account of the Prepetition Employee Obligations in excess of the limits provided for by Bankruptcy Code sections 507(a)(4) or 507(a)(5), other than as provided herein, (b) maintain and continue to honor and pay, in their discretion, amounts with respect to the Debtors' Compensation and Benefits Programs as such were in effect as of the

3

Petition Date and as such may be modified or supplemented from time to time in the ordinary course, and (c) make all Withholdings, Payroll Taxes, and Deductions relating to the Compensation and Benefits Programs as required by applicable law, up to a maximum aggregate cap of $4,800,000 for all amounts authorized to be paid under this Interim Order.  For the avoidance of doubt, the payment of Health Benefit Claims pursuant to the self-insured Medical and Dental Plans and any amounts owed under the Workers' Compensation Program shall be excluded from the cap.

4.       The Debtors are authorized, but not directed, to continue to maintain their Compensation and Benefits Programs with respect to the BSA Employees, Retirees, Temporary Workers, and Independent Contractors, provided, that, pending entry of an order granting relief with respect to the Non-Insider Severance Program and other severance obligations, the Debtors shall not pay any such amounts that may become due and owing.

5.       The automatic stay is modified, solely to the extent necessary, to authorize, but not direct, the Debtors to permit the BSA Employees to proceed with any valid claims they may have under the Workers' Compensation Program, provided that any recovery on account of such claims is limited solely to the proceeds under the Debtors' applicable insurance policies and proceeds from non-debtor sources.

6.       Notwithstanding any other provision of this Interim Order, pending entry of a final order, nothing in this Interim Order shall authorize the Debtors to make any cash payment to or on behalf of any BSA Employee on account of wages and other compensation obligations in excess of the statutory caps set forth in section 507(a)(4) and 507(a)(5) of the Bankruptcy Code, including cash payment of PTO obligations with respect to any terminated BSA Employees.  For the avoidance of doubt, this Interim Order shall have no impact on the Debtors'

4

ability to honor the BSA Employees' ordinary course use of PTO days in accordance with the PTO policy, whether accrued prepetition or postpetition, nor shall it affect the Debtors' reimbursement of Health Benefit Claims to BSA Employees in excess of the statutory caps.

7.    The Debtors are authorized, but not directed, to initiate the Wellness Program and to honor and pay any amounts that may come due, as such may be modified or supplemented from time to time in the ordinary course.

8.    Nothing in the Motion or this Interim Order shall be deemed to authorize the payment of any amount in satisfaction of bonus or severance obligations to insiders subject to section 503(c) of the Bankruptcy Code.

9.    All applicable banks and other financial institutions are hereby authorized to receive, process, honor and pay any and all checks, drafts, wires, check transfer requests or automated clearing house transfers evidencing amounts paid by the Debtors under this Interim Order whether presented prior to or after the Petition Date to the extent the Debtors have good funds standing to their credit with such bank or other financial institution.  Such banks and financial institutions are authorized to rely on the representations of the Debtors as to which checks are issued or authorized to be paid pursuant to this Interim Order without any duty of further inquiry and without liability for following the Debtors' instructions.  The Debtors are authorized to issue postpetition checks, or to effect postpetition wire transfer requests, in replacement of any checks or transfers in respect of the payments authorized to be paid pursuant to this Interim Order that are dishonored or rejected.

10.    Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed as (a) an admission as to the validity or priority of any claim or lien against the Debtors, (b) a waiver of the Debtors'

rights to subsequently dispute such claim or lien on any grounds, (c) a promise or requirement to pay any prepetition claim, (d) an implication or admission that any particular claim is of a type specified or defined in the Motion or this Interim Order, (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

11.     Notwithstanding entry of this Interim Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claims held by, any party.

12.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b) because the relief granted in this Interim Order is necessary to avoid immediate and irreparable harm to the Debtors' estates.

13.     Notice of the Motion shall be deemed good and sufficient notice of such Motion, and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are waived by such notice.

14.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry.

15.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

16.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.


Dated: _____, 2020
      Wilmington, Delaware                    _____
                                            UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit B</u>**

**Proposed Final Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (___)<br><br>(Jointly Administered)<br><br>**Ref. Docket No. __** |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION
WAGES, SALARIES, EMPLOYEE BENEFITS, AND OTHER COMPENSATION
AND (B) MAINTAIN EMPLOYEE BENEFITS PROGRAMS AND PAY RELATED
ADMINISTRATIVE OBLIGATIONS, (II) AUTHORIZING APPLICABLE BANKS
AND OTHER FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED
CHECKS AND TRANSFERS, AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the Boy Scouts of America and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), for entry of an order (this "Final Order"), pursuant to sections 105(a), 363(b), and 507 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 9013-1, (i) authorizing the Debtors to (a) pay their outstanding Prepetition Employee Obligations and (b) maintain their existing Compensation and Benefits Programs, (ii) authorizing applicable banks and other financial institutions to receive, process, honor, and pay any and all checks drawn on and transfers made from the Debtors' accounts to the extent such checks or transfers relate to any of the foregoing, and (iii) granting related relief; and upon consideration of the First Day Declaration; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] All capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Motion.

United States District Court for the District of Delaware, dated February 29, 2012; and this matter being a core proceeding within the meaning of 28 U.S.C. § 157(b)(2); and this Court being able to issue a final order consistent with Article III of the United States Constitution; and venue of this proceeding and the Motion in this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and appropriate notice of and the opportunity for a hearing on the Motion having been given and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at an interim hearing, and, if necessary, at a final hearing before this Court; and all objections, if any, to the Motion having been withdrawn, resolved or overruled; and the relief requested in the Motion being in the best interests of the Debtors' estates, their creditors and other parties in interest; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The relief requested in the Motion is GRANTED on a final basis as set forth herein.

2.      The Debtors are authorized, but not directed, to (a) pay the Prepetition Employee Obligations (either directly or to third parties for payment or remittance, as applicable), provided that no payment shall be made on account of the Prepetition Employee Obligations in excess of the limits provided for by Bankruptcy Code sections 507(a)(4) or 507(a)(5), other than as provided herein, (b) maintain and continue to honor and pay, in their discretion, amounts with respect to the Debtors' Compensation and Benefits Programs as such were in effect as of the Petition Date and as such may be modified or supplemented from time to time in the ordinary course, and (c) make all Withholdings, Payroll Taxes, and Deductions relating to the

Compensation and Benefits Programs as required by applicable law, up to a maximum aggregate cap of $5,090,000 for all amounts authorized to be paid under this Final Order.  For the avoidance of doubt, the payment of Health Benefit Claims pursuant to the self-insured Medical and Dental Plans and any amounts owed under the Workers' Compensation Program shall be excluded from the cap.

3.    The Debtors are authorized, but not directed, to continue to maintain their Compensation and Benefits Programs with respect to the BSA Employees, Temporary Workers, and Independent Contractors.

4.    The automatic stay is modified, solely to the extent necessary, to authorize, but not direct, the Debtors to permit the BSA Employees to proceed with any valid claims they may have under the Workers' Compensation Program, underlined provided that any recovery on account of such claims is limited solely to the proceeds under the Debtors' applicable insurance policies and proceeds from non-debtor sources.

5.    The Debtors are authorized, on a final basis, to continue the Non-Insider Severance Program and to make payments on account of such program and other severance obligations.

6.    Nothing in the Motion or this Final Order shall be deemed to authorize the payment of any amount in satisfaction of bonus or severance obligations to insiders subject to section 503(c) of the Bankruptcy Code.

7.    Notwithstanding any other provision of this Final Order, nothing in this Final Order shall authorize the Debtors to make any payment to or on behalf of any BSA Employee, Temporary Worker, or Independent Contractor on account of wages and other compensation obligations in excess of the statutory caps set forth in section 507(a)(4) and 507(a)(5) of the

Bankruptcy Code, including cash payment of PTO obligations with respect to any terminated BSA Employees.  For the avoidance of doubt, this Final Order shall have no impact on the Debtors' ability to honor the BSA Employees' ordinary course use of PTO days in accordance with the PTO policy, whether accrued prepetition or postpetition, nor shall it affect the Debtors' reimbursement of Health Benefit Claims to BSA Employees in excess of the statutory caps.

8.     All applicable banks and other financial institutions are hereby authorized to receive, process, honor and pay any and all checks, drafts, wires, check transfer requests or automated clearing house transfers evidencing amounts paid by the Debtors under this Final Order whether presented prior to or after the Petition Date to the extent the Debtors have good funds standing to their credit with such bank or other financial institution.  Such banks and financial institutions are authorized to rely on the representations of the Debtors as to which checks are issued or authorized to be paid pursuant to this Final Order without any duty of further inquiry and without liability for following the Debtors' instructions.  The Debtors are authorized to issue postpetition checks, or to effect postpetition wire transfer requests, in replacement of any checks or transfers in respect of the payments authorized to be paid pursuant to this Final Order that are dishonored or rejected.

9.     Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed as (a) an admission as to the validity or priority of any claim or lien against the Debtors, (b) a waiver of the Debtors' rights to subsequently dispute such claim or lien on any grounds, (c) a promise or requirement to pay any prepetition claim, (d) an implication or admission that any particular claim is of a type specified or defined in the Motion or this Final Order, (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, or (f) a

waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

10.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order shall be immediately effective and enforceable upon its entry.

11.     The Debtors are authorized to take all action necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

12.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

Dated: _____, 2020
        Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE