## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

BOY SCOUTS OF AMERICA AND
DELAWARE BSA, LLC,[1]

Debtors.

Chapter 11

Case No. 20-10343 (___)

(Joint Administration Requested)

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION OBLIGATIONS UNDER SHARED SERVICES ARRANGEMENTS, (II) AUTHORIZING CONTINUED PERFORMANCE OF OBLIGATIONS UNDER SHARED SERVICES ARRANGEMENTS, AND (III) GRANTING RELATED RELIEF

The Boy Scouts of America (the "BSA") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), submit this motion (this "Motion"), pursuant to sections 105(a), 363(b), and 363(c) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of an interim order (the "Proposed Interim Order") and final order (the "Proposed Final Order"), substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, (i) authorizing, but not directing, the Debtors to pay certain prepetition obligations under certain shared organizational services arrangements and services agreements (collectively, the "Shared Services Arrangements") related to the Local Councils and Related Non-Debtor Entities (each as

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

defined below) in the ordinary course, (ii) authorizing, but not directing, the Debtors to continue performing under the Shared Services Arrangements in the ordinary course, (iii) authorizing applicable banks and other financial institutions to receive, process, honor, and pay any and all checks drawn on and transfers made from the Debtors' accounts to the extent such checks or transfers relate to any of the foregoing, and (iv) granting related relief.  The facts and circumstances supporting this Motion are set forth in the *Declaration of Brian Whittman in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed concurrently herewith.[2]  In further support of this Motion, the Debtors respectfully state as follows:

## STATUS OF THE CASES AND JURISDICTION

1.      On the date hereof (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").  Concurrently with the filing of this Motion, the Debtors have requested joint administration and procedural consolidation of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors continue to operate and maintain their non-profit organization and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No party has requested the appointment of a trustee or examiner in these cases, and no statutory committee has been appointed.

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent, pursuant to Local Rule 9013-1(f), to

---

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

the entry of a final order or judgment by the Court in connection with this Motion if it is

determined that the Court, absent consent of the parties, cannot enter final orders or judgments in

connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory and other predicates for the relief requested herein are sections

105(a), 363(b), and 507 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local

Rule 9013-1.

## BACKGROUND OF THE DEBTORS

5.      The BSA is a federally chartered non-profit corporation under title 36 of the

United States Code.  The BSA is exempt from federal income tax under section 501(c)(3) of the

Internal Revenue Code.  Founded in 1910 and chartered by an act of Congress in 1916, the BSA

is one of the largest youth organizations in the United States and one of the largest Scouting

organizations in the world, with approximately 2.2 million registered youth participants and

approximately 800,000 adult volunteers.  As a non-profit corporation, the BSA is required to

adopt and carry out a charitable, religious, educational, or other philanthropic mission.  The

BSA's mission is to prepare young people for life by instilling in them the values of the Scout

Oath and Law,[3] encouraging them to be trustworthy, kind, friendly and helpful, while also

training youth in responsible citizenship, skills development and self-reliance through

participation in a wide range of outdoor activities, educational programs, and, at older ages,

career-oriented programs in partnership with community organizations.  Delaware BSA, LLC

("Delaware BSA") is a non-profit limited liability company incorporated under the laws of

---

[3] **Scout Oath:** "On my honor I will do my best to do my duty to God and my country and to obey the Scout Law; to help other people at all times; to keep myself physically strong, mentally awake, and morally straight."  **Scout Law:** "A Scout is trustworthy, loyal, helpful, friendly, courteous, kind, obedient, cheerful, thrifty, brave, clean, and reverent."

Delaware and exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code.  BSA is the sole member of Delaware BSA.

6.      To carry out its mission of developing youth leaders of character and integrity, the BSA grants charters to thousands of local organizations across the country, including faith-based institutions, clubs, civic associations, educational institutions, and businesses (collectively, the "Chartered Organizations").  These Chartered Organizations, in turn, form Scouting units— referred to as "packs" for Cub Scouts, "troops" for Scouts BSA (formerly known as Boy Scouts), "crews" for Venturing, "ships" for Sea Scouts, "labs" for STEM Scouts, and "posts" for Exploring.  Scouting units are led by adult volunteers appointed by the Chartered Organization.  Each of the BSA's approximately 81,000 Scouting units in the United States is organized, registered, and supported by one of 261 local councils (collectively, the "Local Councils") that are chartered by the BSA and oversee the Scouting program in an assigned geographic area.  Each Local Council is separately incorporated under the non-profit laws of its respective state, maintains an independent board of directors and senior management, and is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code.  The BSA does not hold any equity interest in any Local Council, Chartered Organization, or Scouting unit, and only the BSA and its wholly owned subsidiary, Delaware BSA, are debtors in these chapter 11 cases.  Additional information regarding the BSA, its mission and operations, and the events and circumstances preceding the Petition Date is set forth in the First Day Declaration and the *Debtors' Informational Brief*, filed concurrently herewith.

### RELIEF REQUESTED

7.    By this Motion, the Debtors request entry of the Proposed Interim Order and the

Proposed Final Order, substantially in the forms attached hereto as **Exhibits A** and **B**,

respectively:

> (i)    authorizing, but not directing, the Debtors to pay or cause to be paid all or a portion of the prepetition obligations owed on account of the Local Council Benefits Programs, the 457(b) Plan as it relates to the Local Councils, the Local Council Scout Shops, and the Other Local Council Disbursements under the Shared Services Arrangements between the Debtors and the Local Councils in the ordinary course;

> (ii)    authorizing, but not directing, the Debtors to pay or cause to be paid a portion of the prepetition obligations owed on account of the Related Non-Debtor Entities under the Shared Services Arrangements between the Debtors and the Related Non-Debtor Entities in the ordinary course;

> (iii)    authorizing, but not directing, the Debtors to continue performing or paying under the Shared Services Arrangements between the Debtors and the Local Councils and Related Non-Debtor Entities (as defined below), including without limitation the Related Entity Transactions (as defined below), in the ordinary course as such Shared Services Arrangements were in effect as of the Petition Date and as such may be modified, terminated, amended, or supplemented by the Debtors;

> (iv)    authorizing, but not directing, the Debtors to reissue checks, wire transfers, automated clearing house payments, electronic payments, or other similar methods of payment on account of the Shared Services Arrangements where such method of payment has been dishonored prepetition;

> (v)    authorizing applicable banks and other financial institutions to receive, process, honor, and pay any and all checks drawn on and transfers made from the Debtors' accounts to the extent such checks or transfers relate to any of the foregoing; and

> (vi)    granting related relief, including scheduling a final hearing (the "<u>Final Hearing</u>") to consider approval of the Proposed Final Order.[4]

---

[4] The Debtors expressly reserve, and do not waive, the right to modify or terminate any prepetition obligations under the Shared Services Arrangements to the extent that such right exists under the terms of the Shared Services Arrangements or as may be permitted or required by applicable law or further order of the Court.

## OVERVIEW OF THE DEBTORS' SHARED SERVICES ARRANGEMENTS
## WITH LOCAL COUNCILS AND RELATED NON-DEBTOR ENTITIES

I.      **Shared Services Arrangements with Local Councils**

      A.      **Overview of Relationship Between the BSA and Local Councils**

8.      To carry out its mission of developing youth leaders of character and integrity, the BSA has chartered 261 Local Councils across the United States, which are led by paid professional adult leaders with assistance from volunteers (together, "Scouters"). Each Local Council is separately incorporated under the non-profit laws of its respective state and is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code. Local Councils generally do not receive financial support from the BSA; instead, they rely upon their own fundraising through donations, product sales, special events, and corporate gifts. Each Local Council maintains its own independent board of directors and senior management.[5] Although they are legally independent of the BSA, Local Councils are required to organize, operate, and promote Scouting in a manner consistent with the BSA's mission and with the BSA's charter, bylaws, rules and regulations, policies, and guidelines

9.      Although not a precise analogue, the relationship between the BSA and the Local Councils is similar to that of a franchisor and franchisee. The BSA is responsible for developing and disseminating to the Local Councils the structure and content of the Scouting program. The BSA also owns and licenses the organization's intellectual property, provides training and support services, and provides a variety of corporate services. The Local Councils' charters are reviewed and renewed annually in January and February by the BSA. The BSA, in addition to holding the power to grant and renew charters, may also revoke a Local Council's charter for failing to meet national standards.

---

[5] In certain instances, one or more directors of a Local Council may also serve as a director of the BSA's National Executive Board.

10.     The most important functions served by Local Councils are their recruiting of Chartered Organizations and their oversight of the operation of the Scouting units that those Chartered Organizations create.  Local Councils also provide other services essential to Scouting, including: funding of local Scouting programs and initiatives; recruiting of Scouts and volunteer leaders; Scout and volunteer training; opportunities for rank advancement; local enforcement of the BSA's policies, rules, and regulations; and registration of members and leaders.  In addition, many Local Councils own and operate service centers, camps, and other facilities that provide the local resources necessary for delivery of a successful Scouting program to the approximately 2.2 million youth participants of the BSA.

11.     Local Councils also serve the vital function of collecting member fees and remitting such funds to the BSA.  These member fees total approximately $100 million annually, and provide a substantial portion of the BSA's annual revenue.  Each of these Local Councils is crucial to the BSA's ability to carry out its mission.  Simply put, without the Local Councils, it would be impossible for the BSA to carry out its mission.

12.     The BSA uses its national scope and size to provide various types of support to the Local Councils.  For example, the BSA offers benefits programs to eligible, full-time employees of the Local Councils (described and defined below as the "Local Council Benefits Programs").  These benefits are paid for by the BSA, which in turn obtains monthly reimbursement from the Local Councils—many of which would not otherwise be able to independently provide these vital benefits to their employees without expending significant amounts of Local Councils' limited financial resources.

13.     In addition to the Local Council Benefits Programs, the BSA facilitates back-office accounting, human resources, information technology, member recruitment support and

fundraising, marketing communications, leadership training, and other related support to the Local Councils. The BSA also provides liability insurance at the national level for the Local Councils, local units, and their volunteers and leaders. As described in detail below, the management, administrative, and support services that the BSA provides to the Local Councils (the "Local Council Shared Services Arrangements") have historically been of an integrated nature and generally can be performed more efficiently and effectively for all entities in the organizational structure, as opposed to requiring performance by each Local Council alone. The Local Councils would be incapable of operating their organizations in their respective geographic regions absent the services provided under the Local Council Shared Services Arrangements.

14.     Both the BSA and the Local Councils benefit greatly from the Local Council Shared Services Arrangements. The Local Councils are critical to the Debtors' ability to fulfill their mission to approximately 2.2 million members: without the operation of the Local Councils, the Debtors would be incapable of having the Scouting program reach each member of the BSA. Indeed, the Local Councils are independent, non-profit corporations mandated to exist by and for the benefit of the BSA's mission, and the Local Councils offer programs pursuant to the BSA's Charter and Bylaws. The continued performance under the Local Council Shared Services Arrangements will enable the Debtors to stabilize their operations following the commencement of these chapter 11 cases and avoid a need to shift focus at this critical stage of their restructuring.

**B.      Overview of Shared Services Arrangements**

15.      The Local Council Shared Services Arrangements include, without limitation:

a.      <u>Services Provided by the BSA</u>:

- Human resources services, including with respect to employee benefits, online training from Scouting University for positions within the BSA, human resources software and recommended policies and procedures through an employee handbook template used by most Local Councils;

- accounting technical support, including accounting software, systems, and procedures, and IT support, including network connectivity, firewalls, and support services;

- training support services for Local Council staff and professional development training for Scouters, and program tools and training for year-round camp operation;

- program services, including the production of literature such as handbooks, merit badge pamphlets, brochures, and supplemental training materials;

- supply chain services, including the provision of uniforms, equipment, and program supplies and shipping of such merchandise;

- bulk purchasing of custom patches for Scout rank and merit achievements;

- national primary general liability insurance coverage for all registered volunteer leaders and Local Councils on a worldwide basis (the "<u>Insurance Program</u>");

- legal services, including youth protection resources, training, and background checks for all registered volunteers and staff;

- corporate affairs and community involvement and relationship services, including setting and maintaining program standards to ensure national consistency across Local Councils and maintaining and developing new relationships with organizations that use the Scouting program;

- marketing and communications support services, including the coordination of a communications network via publications such as *Boys' Life* and *Scouting* magazine; and

- office support services, including office planning and evaluation, extensive financial counseling, planned giving and fundraising information, and professional personnel support.

   b. <u>Services Provided by the Local Councils</u>:

- collection of member dues and payment of various fees to the BSA;

- oversight of programming at the unit level and delivery of Scouting programs;

- organization, registration, and support of all Chartered Organizations to form units led by adult volunteers;

- recruitment and retention of membership and volunteer leaders;

- use of Local Council office space for significant Scout Shop retail merchandise and product sales;

- local enforcement and maintenance of the BSA's policies, rules, and regulations; and

- ownership and operation of hundreds of camps, facilities, activities, and events for members of the BSA.

16. During 2019, approximately $100 million in total was billed by the BSA to the Local Councils for these services (excluding the remittance of membership registration fees), and a similar amount is expected for 2020. The BSA bills the Local Councils monthly for these services, with payments from the Local Councils typically remitted within thirty (30) days.

**C.** **Fees Charged**

17. The BSA charges a series of fees to the Local Councils in respect of the Local Council Shared Services Arrangements. The fees are not intended to precisely compensate the BSA for services provided to the Local Councils, as the Local Councils do not charge the BSA for services rendered to the BSA.

- **<u>National Service Fee</u>.** The BSA charges a national service fee based on a percentage of budgeted Local Council wages of approximately $8.7 million annually, aggregated across all of the Local Councils and billed in ten installments.

- **<u>Charter Renewal Fees</u>.** In connection with the annual renewal process for Local Council charters, the BSA charges a $100 charter fee per Local Council.

- **Information Services Fee.**  The BSA charges a monthly fee for a portion of the IT services provided to the Local Councils, related primarily to firewalls, connectivity, and related support.  In 2019, the average monthly fee across the Local Councils was approximately $675 per Local Council.

18.    In addition to the shared services described above, the BSA provides certain third-party services to the Local Councils at cost, billed to the Local Councils on an as-requested basis. The BSA charges the Local Councils for actual third-party costs associated with providing Local Council Benefits Programs to Local Council Employees (as defined below), director and officers' insurance, shipping and freight charges for wholesale product purchases, training courses, fees for conferences, camp schools, registration shared services, fund development, and magazine subscriptions.

D.    **Local Council Benefits Programs**[6]

19.    The BSA offers the same comprehensive health and welfare and retirement benefits available to eligible employees of the BSA (the "Local Council Benefits") to approximately 6,600 eligible full-time[7] employees of the Local Councils (the "Local Council Employees") and their dependents, as well as their eligible survivors[8] (the "Survivors") and retirees[9] (the "Retirees").  The Local Council Benefits Programs include the following:[10]

---

[6] Certain of the terms used in this section but not otherwise defined herein shall have the meanings ascribed to such terms in the Wages Motion.

[7] Local Council Employees are considered "full-time" if they work 21 or more hours per week year-round and were hired on or before May 31, 2004, or if they work 30 or more hours per week year-round if hired on or after June 1, 2004.

[8] Survivors include the spouse and/or dependent children of a deceased Local Council Employee who was enrolled in the BSA Retirement Plan.

[9] Retirees include Local Council Employees who have retired from the Local Councils and are members of the BSA Retirement Plan; Retirees who retired on or after January 1, 2005 are required to have at least ten years of service in order to be eligible for continuing Health Insurance Plan (as defined below) benefits.  Retirees must be under age 65 to receive Local Council Benefits.

[10] A more detailed description of each of these benefits programs is provided in the Wages Motion, filed concurrently herewith.  The abbreviated summary of benefits contained herein is not intended to modify or alter the description of such benefits provided in the Wages Motion with respect to the Local Council Employees.

(a) **Health Insurance Plans**:  The Debtors offer three self-insured medical plans and prescription coverage, including supplemental Medicare benefits, through UnitedHealthcare (the "Medical Plan"), a self-insured dental plan through MetLife, and vision coverage through VSP to Local Council Employees, Survivors, and Retirees.  As of the Petition Date, approximately 6,400 Local Council Employees, Survivors, and Retirees are enrolled in one or more of the Health Insurance Plans.  The BSA is responsible for paying claims on the self-insured Health Insurance Plans and premiums on the other Health Insurance Plans (the "Health Benefit Claims").  The BSA bills the Local Councils monthly for the total estimated cost of the Health Insurance Plans in which each Local Council's Employees participate, and the Local Councils are responsible for deducting Local Council Employee contributions from their paychecks and remitting both this amount and their employer share to the BSA.  The BSA believes that with the exception of certain administrative costs that it would likely bear in any event on account of its own employees, the full cost of these benefits as it relates to the Local Council Employees is billed to the Local Councils.

(b) **Health Savings Account Program**:  The Debtors offer a health savings account program to Local Council Employees who participate in certain of the medical plans with high deductibles, pursuant to which such employees may contribute a portion of their pre-tax compensation to their accounts for incidental medical expenses.  Approximately 1,600 Local Council Employees participate in the Health Savings Account Program, which is administered by UnitedHealthcare and Optum.  Annually, the Medical Plan, as administered by the BSA, contributes $500 to each health savings account opened between January 1 and June 30, and $250 to each account opened on or after July 1.  This contribution is covered by the employer portion of the medical premiums charged to the Local Councils.

(c) **COBRA Benefits**:  Certain former Local Council Employees covered by the Health Insurance Plans may elect to continue insurance coverage under the Health Insurance Plans after their termination.  There are currently approximately 20 former Local Council Employees who are COBRA participants, and they are responsible for paying all premiums associated with the COBRA Benefits, which by statute are set at 102% of cost to cover additional administration costs, which are the responsibility of the BSA.

(d) **Life and AD&D Insurance**:  The Debtors provide basic life and accidental death and dismemberment insurance to approximately 6,100 Local Council Employees and Retirees, and provide an option for eligible parties to purchase supplemental life insurance.  These programs are insured and administered by MetLife.  The BSA is directly reimbursed by the Local Councils for premiums and related administrative fees under the Life and AD&D Insurance.  The Local Councils are responsible for

deducting and remitting premiums paid by the Local Council Employees for supplemental Life and AD&D Insurance, which are then remitted to the Debtors.

(e)    **Scout Executives' Alliance**: Certain commissioned professional, executive, and professional-technical Local Council Employees and Retirees are eligible to enroll and become members of the Scout Executives' Alliance fellowship fund (the "Alliance"), which provides supplemental life insurance benefits to its members. Approximately 2,050 Local Council Employees' contributions to the Alliance are deducted from their paychecks by the Local Councils and remitted to the BSA for deposit in the Alliance operating account, the amount of which is equal or greater than the Debtors' cost to procure the insurance.

(f)    **Disability Insurance**:    Local Councils provide long-term disability insurance and may elect to offer short-term disability insurance to their respective Local Council Employees, which replaces a portion of an eligible party's compensation for specified periods of time when such party is unable to work due to a non-work related injury or illness. Approximately 4,300 Local Council Employees participate in the Disability Insurance programs.    The short-term disability insurance is insured and administered by Unum and the long-term disability insurance is insured and administered by MetLife. Short-term disability insurance is funded by premium payments made by Local Council Employees, which are deducted from their paychecks by the Local Councils. Long-term disability insurance is funded by premium payments by the Local Council. Both amounts are remitted to the BSA, which makes the premium payment to the appropriate provider.

(g)    **Unemployment Plan**:  Local Councils may elect to set aside funds for potential future unemployment claims of their respective Local Council Employees (the "Unemployment Plan").   A third-party vendor, 501(c) Services, administers the Unemployment Plan.   The BSA invoices the Local Councils for their set premiums and holds the Local Councils' pooled assets in an unemployment fund. The BSA reimburses 501(c) for claims paid out.

(h)    **Pension Plan**: Approximately 10,900 Full-time Local Council Employees with at least one year of service and Retirees participate in the BSA's defined benefit pension plan (the "Pension Plan"), which is a qualified retirement plan.  Entry into the Pension Plan was frozen on December 31, 2018, and no Local Council Employees have been permitted to become active participants in the Pension Plan after such date. "Grandfathered" Local Council Employees with fifteen (15) years of vesting service and age plus vesting service equal to sixty (60) years or more were permitted continue to participate in the Pension Plan, while "non-grandfathered" employees were automatically enrolled in the Match Savings Plan,

described below.  Local Council Employees enrolled in the Pension Plan contribute 4.25% of their salary to the Pension Plan.  Each Local Council provides 7.75% of total wages to fund retirement programs, which is first used to pay for the employer match to the Match Savings Plan (described below) and any residual is contributed into the Pension Plan.  Total Local Council Employee contributions to the Pension Plan in the 2019 plan year were approximately $3.3 million, which the Local Councils deduct from such employees' paychecks and remit to the BSA after the BSA has paid such amounts to the Pension Plan on behalf of the Local Council Employees.  The Pension Plan is managed by the BSA and is administered by Morneau Shepell.  The Pension Plan trust pays Morneau Shepell's administrative fees on behalf of the Local Councils.

(i)     **Match Savings Plan**: On and after January 1, 2019, the Pension Plan was amended to become a two-tier plan.  Pursuant to the amendment, "non-grandfathered" Local Council Employees were automatically enrolled into the Match Savings Plan.  The Match Savings Plan is a 403(b) defined contribution retirement plan, pursuant to which approximately 4,000 Local Council Employees currently make pre-tax payroll deductions up to Internal Revenue Code limitations.  In addition, the Local Councils make employer matching contributions.  For "grandfathered" Local Council Employees receiving benefits under the Pension Plan, each Local Council matches 50% of Local Council Employee contributions up to 6% of pay.  With respect to non-grandfathered Local Council Employees under the Match Savings Plan, the Local Council makes an automatic contribution of 1.75% of an employee's pay regardless of whether a Local Council Employee makes an Employee Contribution, and matches 100% of employee contributions up to 6% of pay.  Each month, the Local Councils remit funds for their Local Council Employees' withholdings and employer match for the Match Savings Plan, which the Local Councils deduct from such employees' paychecks and provide from their own funds, respectively.  Fidelity administers the Match Savings Plan, subject to payment of an administrative fee out of Match Savings Plan funds on behalf of the Local Councils.

(j)     **Other Benefits Programs**: The Debtors offer certain other welfare benefits to Local Council Employees, including a 125 Plan to reduce taxable income by subtracting Local Council Employees' costs of coverage under certain Local Council Employee Benefits Programs from such employees' taxable income, an Employee Assistance Program for counseling as part of the Medical Plan administered by UnitedHealthcare, a Vitality Program, which offers wellness training and benefits, and a Naturally Slim Program, focused on improving eating habits.

20.     On average, the Debtors pay approximately $1.4 million per month in respect of the Local Council Benefits Programs, which excludes certain administrative fees paid with

respect to overseeing the Local Council Benefits Programs, some of which are not directly reimbursed by the Local Councils, and excludes Health Benefit Claims. As described in the Wages Motion, filed concurrently herewith, many of the third parties who charge administrative fees in connection with administering the Employee Benefits Programs view the BSA as the obligor with respect to amounts that come due under such programs for employees of the BSA and the Local Councils. Thus, the BSA would be required to pay an entire invoice in order to continue a given Employee Benefit Program for both the BSA and Local Council Employees. In recognition of this, for certain of the Employee Benefits Programs, the Debtors are seeking authority in the Wages Motion to pay certain prepetition and postpetition third-party administrative fees with respect to both BSA and Local Council Employees.

21.     Specifically, the BSA pays applicable employer contributions of the Local Councils and the Local Council Employee deductions in respect of the Local Council Benefits Programs on behalf of the Local Councils and Local Council Employees, which deductions are invoiced and billed to the Local Councils on a monthly basis. The Local Councils typically remit payment to the BSA for its payment of the employer contributions and employee deductions to the benefits providers within thirty (30) days. Additionally and as described above, the Debtors pay certain administrative and claims fees on behalf of both BSA employees and Local Council Employees in connection with offering these benefits to all employees, which, in most cases, are included in the premium amounts and reimbursed by the Local Councils. The Debtors estimate that approximately $1,726,000 in the aggregate in respect of the Local Council Benefits Programs will become due and payable within the period between the Petition Date and entry of the Proposed Final Order (the "Interim Period").

22.     Inclusive of any administrative fees described above that are attributable to the Local Councils, the following chart sets forth the various categories and approximate outstanding prepetition amounts of obligations in respect of the Local Council Benefits Programs that the Debtors are seeking authority to pay as part of the Local Council Shared Services Arrangements within the Interim Period and on a final basis.

| Local Council Benefits Programs | Interim | Final (Cumulative) |
|---|---|---|
| Health Insurance Plans (excluding Health Benefit Claims) | $80,000 | $80,000 |
| Life and AD&D Insurance | $340,000 | $340,000 |
| Scout Executives' Alliance | $45,000 | $45,000 |
| Disability Insurance | $154,000 | $154,000 |
| Unemployment Plan | $50,000 | $50,000 |
| Pension Plan | $337,000 | $337,000 |
| Employer Matching Obligation | $720,000 | $720,000 |
| **Total** | **$1,726,000** | **$1,726,000** |

23.     The Local Council Employees rely on the Debtors and the Local Council Shared Services Arrangements in order to receive vital benefits to assist them with their daily living expenses and health and welfare.  The Local Council Employees and their families, along with Retirees and Survivors of the Local Councils, would be subject to significant financial hardship if the Debtors could not honor prepetition obligations that may be outstanding as of the Petition Date under the Local Council Benefits Programs or continue to administer the Local Council Benefits Programs without interruption during the pendency of the Debtors' chapter 11 cases.  If the Debtors were to cease providing the Local Council Benefits Programs, the Local Councils are not structured such that they would be able to offer these critical benefits, and the Local Council Employees would lose access to basic healthcare and welfare benefits.  As a result, the Debtors' failure to honor these obligations pursuant to the Local Council Shared Services

Arrangements would likely result in significant attrition in the Local Councils at a critical time in the BSA organization's operations.

24.    By this Motion, the Debtors are seeking authorization to (a) pay all prepetition amounts due in respect of the Local Council Benefits Programs in an aggregate amount not to exceed $1,726,000 in the Interim Period and on a final basis, and (b) to continue providing all of the Local Council Benefits Programs postpetition in the ordinary course of their organizational operations.[11]

### E.    Non-Qualified Deferred Compensation Plan

25.    At their election and expense, certain Local Councils have participated in the Boy Scouts of America 457(b) Plan (the "457(b) Plan"), which is a non-qualified, deferred compensation plan. The funds withheld from Local Council participants are remitted directly from each Local Council to the 457(b) Plan manager, Fidelity Investments Institutional Operations Company, Inc. ("Fidelity"). Fidelity handles investing the funds in accordance with the participants' direction and disbursement of the funds over a period of time not to exceed ten years as the participant directs upon their retirement. There is currently approximately $960,000 held by Fidelity related to deferrals by seven (7) Local Council participants. Fidelity's administrative fees for management of the 457(b) Plan are paid directly by the plan participants from their 457(b) Plan assets. While this account is in the name of the BSA, the funds of the Local Council participants are segregated, and the Debtors request that Fidelity be authorized to continue to make payments to Local Council participants out of those funds on a postpetition basis.

---

[11] Prior to entry of the Proposed Final Order, nothing contained in the Motion or in any Proposed Interim Order entered by the Court will limit the ability of the Debtors' creditors and other parties in interest to analyze and raise objections to any aspect of the Local Council Shared Services Arrangements, including but not limited to the methodologies employed in calculating such payments owed by the Local Councils to the BSA.

26.     The Debtors estimate that of the approximately $960,000 held by Fidelity on account of deferrals by the Local Council 457(b) Plan participants, approximately $10,000 will become due and owing during the Interim Period.  The Debtors are requesting authority for Fidelity to remit up to $10,000 to the Local Council participants during the Interim Period and to remit up to $960,000 on a final basis, as adjusted for any gains or losses in the underlying investment and as per distribution elections made by Local Council participants.

F.     **National General Liability Insurance Program**

27.     Another central component of the Shared Services Arrangements with the Local Councils is the BSA's provision of the Insurance Program.  Under the Insurance Program, the BSA offers primary general liability insurance coverage for all registered volunteer leaders, Local Councils, Chartered Organizations and units on a worldwide basis engaged in official Scouting activities.  The Insurance Program is comprised of a series of primary and excess general liability policies, which renew on March 1 of each year.  The policies under the Insurance Program apply to liability exposures of the BSA, its Related Non-Debtor Entities, and the Local Councils, in addition to Chartering Organizations, units, and volunteers.  Malpractice, non-owned aviation, maritime liability, and employment practices liability is included in the Insurance Program.[12]

28.     By this Motion, the Debtors are seeking to continue providing the Insurance Program as part of the Local Council Shared Services Arrangements postpetition in the ordinary course of their organizational operations.

---

[12] Local Councils retain responsibility for the first $1 million per occurrence for owned automobile liability insurance and non-owned and leased or hired vehicle coverage for Local Council Employees and volunteers engaged in official Scouting activities or on Scouting or Local Council business.  Local Councils are also responsible for crime/bond/fiduciary liability insurance, workers' compensation insurance for Local Council Employees, and property insurance.

### G.    Local Council Scout Shops and Other Local Council Disbursements

29.    As noted above, a significant portion of the BSA's annual revenue comes from retail merchandise and product sales at approximately 175 Scout Shops across the United States. At any given point in time, the BSA offers 8,000 to 10,000 unique products through the Scout Shops, wholesale distributors, and online sales related to highly customized uniforms, patches, and other merchandise for each of the BSA programs, as well as program emblems, badges, equipment and camping accessories, and jewelry and general apparel.  Annually, these sales generate approximately $120 million in total revenue to the BSA.  Approximately 135 Local Councils support these national sales efforts by designating a portion of their office space as a BSA Scout Shop (the "Local Council Scout Shops") pursuant to lease agreements with the BSA.

30.    The Local Council Scout Shops are locations where the BSA sells uniforms, apparel, camping equipment, and other merchandise directly to BSA members.  In the aggregate, approximately $90.0 million in annual sales to the BSA is generated by sales at the Local Council Scout Shops.  In return for the lease of Local Councils' office space, the BSA remits monthly rent payments to such Local Councils based on a percentage of sales.  This payment is calculated as eight percent (8%) of net sales at the Local Council-provided Scout Shop location, plus an additional five percent (5%) escalator on annual sales above $750,000 at such location. On average, the BSA pays approximately $635,000 per month in the aggregate to the Local Councils in respect of the Local Council Scout Shops.

31.    As part of its support of Local Councils, the BSA makes certain other miscellaneous disbursements to the Local Councils by the BSA ("Other Local Council Disbursements").  These disbursements include grants to Local Councils and Scouts made from donor-restricted funds, Local Council fees collected on the BSA's online platforms on behalf of the Local Councils, sending amounts that the BSA collects on behalf of the Local Councils as a

part of various fundraising efforts and campaigns, and reimbursing Local Council Employee travel expenses when required by the BSA for meetings or conferences.  For the calendar year 2019, these amounts were approximately $7.0 million.  As of the Petition Date, the Debtors estimate that the amount of accrued and outstanding amounts owed to the Local Councils in respect of the Local Council Scout Shops and Other Local Council Disbursements is approximately $370,000.

32.    As of the Petition Date, approximately $11.5 million was due and owing to the BSA on account of the Local Council Shared Services Arrangements exclusive of remittance of membership registration fees.  The BSA estimates that it owes approximately $1,726,000 on account of the Local Council Benefits Programs (excluding amounts that may be owed in respect of Health Benefit Claims),[13] and approximately $370,000 to the Local Councils on account of the BSA's use of the Local Councils' real property for Scout Shop sales and other Local Council disbursements—all of which will become due and owing during the Interim Period.  The Debtors are requesting authority to pay or remit up to $2,106,000 of the prepetition amounts owed on account of the Local Council Shared Services Arrangements during the Interim Period and up to $3,056,000 on a final basis.  The Debtors are also seeking authority to continue performing under the Local Council Shared Services Arrangements on a postpetition basis in the ordinary course and consistent with their prepetition practices.

## II.    Related Non-Debtor Entities Shared Services

33.    Apart from the Local Councils, under the Shared Services Arrangements, the BSA also receives services from certain specialized non-debtor affiliates, which are wholly-

---

[13] The Health Insurance Plans are self-insured by the BSA.

owned by, or subject to the control of, the BSA (the "<u>Related Non-Debtor Entities</u>").[14]  These

services include investment and foundation management, lease transactions, and conference and

training support.  In return, the BSA provides centralized management, cash management, tax

administration, and other centralized functions that are essential to the successful operation of the

Debtors' large-scale nonprofit organization.  The BSA administers these shared services with the

Related Non-Debtor Entities through ordinary course intercompany receivables and payables

between the BSA and such entities (the "<u>Related Entity Transactions</u>").

34.    While the Local Councils facilitate the Debtors' mission and are vital in reaching

participants at a local level, the Related Non-Debtor Entities provide specialized services under

the Shared Services Arrangements that are necessary to facilitate the BSA's national reach,

including, among other things, investment and foundation management, management of national

programs, lease transactions, and conference and training support functions.  These Related Non-

Debtor Entities include: (i) BSAAM; (ii) Arrow; (iii) Learning for Life; (iv) BSA Foundation;

and (v) Atikokan and Atikaki.  With the exception of Atikaki, these Related Non-Debtor Entities

do not maintain their own employees or management.  Instead, these entities are parties to

certain Shared Services Arrangements through which the BSA provides certain centralized

management, cash management, tax administration, and other centralized functions.[15]

35.    The BSA conducts these shared services with the Related Non-Debtor Entities

through ordinary course Related Entity Transactions.  The Shared Services Arrangements

---

[14] The Related Non-Debtor Entities are as follows: (i) BSA Asset Management, LLC ("<u>BSAAM</u>"); (ii) Arrow WV, Inc. ("<u>Arrow</u>"); (iii) Learning for Life; (iv) National Boy Scouts of America Foundation (the "<u>BSA Foundation</u>"); (v) Atikokan Youth Ventures Inc. ("<u>Atikokan</u>"); and (vi) Atikaki Youth Ventures Inc. ("<u>Atikaki</u>").  For the avoidance of doubt, the Related Non-Debtor Entities exclude the independently chartered Local Councils.

[15] The BSA has approximately thirty-two (32) employees who are dedicated to the following Related Non-Debtor Entities: four (4) for BSAAM, three (3) for Learning for Life, and twenty-five (25) for the BSA Foundation.  While the Shared Services Arrangements with respect to these Related Non-Debtor Entities are discussed below, for the avoidance of doubt, all relief with respect to the wages and benefits provided to these employees is sought and described in the Wages Motion, filed concurrently herewith.

between the Debtors and the Related Non-Debtor Entities have historically leveraged economies of scale and promoted a more efficient use of the organization's limited non-profit resources, providing for the efficient administration of necessary services across the entire BSA organizational structure (as opposed to each Related Non-Debtor Entity acting on its own).

36.    Pursuant to this Motion, the Debtors are requesting authority to continue the Related Entity Transactions in the ordinary course, and to pay certain limited prepetition amounts to third parties on account of the Related Non-Debtor Entities as described below. The BSA can trace, ascertain, and account for the Related Entity Transactions and will continue to do so on a postpetition basis. Each of these Related Non-Debtor Entities is discussed below.

A.    **BSAAM Agreement**

37.    Among other things, the BSA receives investment management and advisory services from non-debtor subsidiary BSAAM, which provides the BSA and certain of the BSA's Related Non-Debtor Entities with discretionary oversight and management of their long-term assets (the "BSAAM Services"). The BSA is the sole member of BSAAM.

38.    BSAAM oversees management of the funds making up the various benefits programs and trusts of the BSA, along with providing management and investment services for the BSA's unrestricted endowment and donations to the BSA.[16] Additionally, BSAAM is the General Partner of the BSA Commingled Endowment Fund, LP, a Delaware limited partnership, which is an investment vehicle open only to BSA, the Local Councils, and their affiliates for investing long-term funds. BSAAM charges to and directly collects fees from the BSA Commingled Endowment Fund, LP. BSAAM provides these services for the BSA's various benefits, trusts, and unrestricted endowment pursuant to that certain *Letter of Agreement* between

---

[16] These include the BSA Employee Welfare Benefits Trust, BSA Retirement Benefits Trust, and BSA Master Pension Trust.

the BSA and BSAAM, dated as of May 9, 2011 (the "BSAAM Agreement"), which sets forth a fee schedule for BSAAM's services, charged monthly. Under the terms of the BSAAM Agreement, the BSA performs certain payroll, benefits, insurance, travel and other miscellaneous cost-related services for BSAAM. There is an investment staff of four (4) BSA employees who provide services to BSAAM. Historically, the BSAAM Agreement has facilitated an efficient means of managing the BSA's assets and investments on a consolidated basis.

39.    On average, the BSA pays approximately $50,000 per month on behalf of BSAAM pursuant to the terms of the BSAAM Agreement. In 2019, the total amount charged to the BSA by BSAAM on account of the BSAAM Services was approximately $591,000. The Debtors are seeking authorization, but not direction, to continue performing under the BSAAM Agreement in the ordinary course.

B.    **Arrow Agreement**

40.    The BSA leases the Summit Bechtel Family National Scout Reserve (the "Summit Bechtel Reserve") in West Virginia from Related Non-Debtor Entity Arrow pursuant to that certain *Shared Services Agreement and Lease of Premises*, dated as of February 13, 2017 (the "Arrow Agreement"). Arrow is a non-stock, non-profit corporation under the laws of West Virginia that is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code. Under the Arrow Agreement, the BSA provides the necessary services required to operate the Summit Bechtel Reserve in West Virginia. This includes, among other things, the payment of certain amounts to third parties on Arrow's behalf, such as utility services, certain taxes, construction, and maintenance costs. Arrow leases the Summit Bechtel Reserve to the BSA for nominal consideration.

41.    Pursuant to this Motion, the Debtors are seeking to pay prepetition taxes to third parties on Arrow's behalf of approximately $5,000 on a final basis only, and are seeking the

authority, but not the direction, to continue operating and maintaining the Summit Bechtel Reserve under the Arrow Agreement in the ordinary course.

42.     The BSA's expertise in operating the Summit Bechtel Reserve, which is the BSA's newest adventure facility, is essential to its successful operation.  The Summit Bechtel Reserve also operates as a camp for BSA members and leadership training center for the millions of youth and adult leaders involved in Scouting.  The Summit Bechtel Reserve offers a range of unique program activities, including mountain biking, BMX, skate boarding, archery, shooting, zip lines and ropes courses, climbing and rappelling, and other outdoor adventures.  The Summit Bechtel Reserve also hosts large national events for the BSA, including the World Scout Jamboree in 2019 and the annual National Scout Jamboree.  As such, the Summit Bechtel Reserve, and the BSA's services to Arrow in respect of this location, are essential to the Debtors' mission and operations.

### C.     Learning for Life Shared Services Arrangement

43.     Learning for Life is a non-profit Related Non-Debtor Entity of the BSA that provides nationwide values-based programs in the areas of character education, anti-bullying, life skills, self-esteem, and decision-making.  Learning for Life is a non-stock, non-profit corporation under the laws of the District of Columbia that is exempt from federal income taxes under section 501(c)(3) of the Internal Revenue Code.  The program has operates in conjunction with 261 Local Councils across the United States and is made up of two components.  First, Learning for Life offers an in-school program in which curriculum is sold to schools across the United States.  The second component of the program is an after-school career exploring program in partnership with business and industry.  For example, Learning for Life partners with police forces, fire departments, and hospitals so that students are exposed to a variety of career

paths.  Learning for Life also manages the Learning for Life Foundation, which works through the Local Councils to identify funding sources and projects for the Learning for Life programs.

44.    There are three (3) BSA employees who provide services to Learning for Life.[17] These costs are allocated back to Learning for Life via Related Entity Transactions.  On average, Learning for Life is charged approximately $355,000 per month by the BSA pursuant to the Learning for Life Shared Services Arrangement.  Additionally, the BSA collects program fees of approximately $250,000 per month on behalf of Learning for Life.

45.    The Debtors are seeking authorization, but not direction, to continue performing under the Learning for Life Shared Services Arrangement in the ordinary course.  The Debtors are also seeking authority to pay limited prepetition tax obligations on account of Learning for Life of approximately $500 during the Interim Period and up to $10,000 on a final basis.

46.    Learning for Life is a core component of the BSA's mission, and provides essential integrated academic and character development programs, anti-bulling and cyber intimidation programs, and leadership development programs.  Learning for Life's mission is to empower students to build exceptional character and leadership skills by guiding them through an innovative, research-based curriculum that enhances students' learning and teaches necessary life skills.  Since its founding in 1991, Learning for Life has served more than 25.5 million youth.  As such, Learning for Life is central to the Debtors' mission and operations.

**D.    National Boy Scouts of America Foundation Shared Services Arrangement**

47.    The BSA receives certain fundraising services from Related Non-Debtor Entity BSA Foundation.  The BSA Foundation is a non-stock, non-profit corporation under the laws of

---

[17] Relief requested with respect to the payment of these BSA employees is described and sought in the Wages Motion.

the District of Columbia and exempt from federal income taxes under section 501(c)(3) of the Internal Revenue Code.

48.    The BSA Foundation exists to help secure the future of Scouting, and partners with Local Councils and donors to facilitate philanthropy and engage youth.  The BSA Foundation provides donors with the ability to implement a donor-advised fund with the BSA, and to specify where each donor would like the funds to be used.  Each gift that comes in to the BSA Foundation is charged an administrative or annual fee, which funds the employment of fifteen (15) major gifts directors.  These major gifts directors, who are employees of the BSA, are able to provide needed fundraising and major gifts expertise to the Local Councils for an additional fee to the BSA Foundation.  Twenty-five (25) BSA employees, including the fifteen major gifts directors noted above, provide full-time services to the BSA Foundation.[18]

49.    The BSA pays the taxes, payroll, benefits, insurance, travel costs, and other miscellaneous operating expenses of the BSA employees that provide full-time services on behalf of the BSA Foundation, and disburses and receives funds on behalf of the BSA Foundation.  These costs are allocated back to the BSA Foundation via Related Entity Transactions.  By this Motion, the Debtors are seeking authorization, but not direction, to continue performing under the BSA Foundation Shared Services Arrangement in the ordinary course.  The Debtors are also seeking authority to pay limited prepetition tax obligations on account of the BSA Foundation of approximately $500 during the Interim Period and up to $10,000 on a final basis.

50.    The BSA Foundation's expertise with philanthropy and major gifts is essential to the BSA's mission and to secure the future of Scouting.  The BSA Foundation supports the BSA

---

[18] Relief requested with respect to the payment of these BSA employees is described and sought in the Wages Motion.

and Local Councils in their major gift fundraising efforts across the entire organization.  The balance of major gifts at the end of 2019 totaled over $73 million.  The BSA Foundation also manages the distribution of donor-advised funds such as scholarships, funds for rebuilding camps and high adventure facilities including after the occurrence of natural disasters, and funding for major Scouting events such as the National Jamboree.  If the Debtors were forced to do without the services of the BSA Foundation, the procurement and management of major gifts and donations would suffer.  These fundraising activities are core to the BSA's survival as a nonprofit corporation and ability to continue to impact approximately 2.2 million participants.

> ### E.  Atikokan and Atikaki Shared Services Arrangement

51.    The BSA receives certain services from Related Non-Debtor Entities Atikokan and Atikaki related to operation of the Northern Tier high adventure facility ("Northern Tier") in Manitoba and Ontario, Canada.  Atikokan and Atikaki are nonprofit corporations are non-share capital corporations formed under the laws of Canada, with registered addresses in Winnipeg, Manitoba.

52.    Approximately one to three Canadian employees work seasonally at the Northern Tier locations in Canada from April to October.  Atikaki maintains Bissett, Manitoba base for the Northern Tier high adventure facility, which base offers canoe trips into the Atikaki Provincial Park and Woodland Caribou Provincial Park.  Atikokan maintains the Don Rogert Canoe Base for the Northern Tier high adventure facility, which base offers canoe trips into the Quetico and Crown Lands in Canada.  The Canadian employees who manage the seasonal Canadian operations at the Northern Tier locations are employed and compensated by Atikaki.[19]  Atikaki

---

[19] The U.S.-based seasonal employees are employed by the BSA, as is described more fully in the Wages Motion, which is filed concurrently herewith.  The description and relief contained herein with respect to the Atikaki employees is not intended to modify or alter the relief being requested in the Wages Motion with respect to the BSA Employees.

processes payroll via Ceridian HCM, Inc., funds for which come out of a Northern Tier bank account at Royal Bank of Canada controlled by the BSA.  The operations and employees at the Northern Tier high adventure facility provided by Atikaki and Atikokan are essential to the success and servicing of the many Scouts who annually visit these locations.

53.     By this Motion, the Debtors are seeking authorization, but not direction, to continue performing under the Atikaki and Atikokan Shared Services Arrangements in the ordinary course.

**BASIS FOR RELIEF**

**I.      Section 363(c) of the Bankruptcy Code Authorizes the Debtors to Continue Performing Under the Shared Services Arrangements.**

54.     Section 363(c)(1) of the Bankruptcy Code provides that a debtor in possession "may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors are operating as debtors in possession.

55.     The ordinary course of business standard under section 363(c)(1) was intended to allow a debtor in possession flexibility to run its organization.  See, e.g., In re Ohio Ferro-Alloys Corp., 96 B.R. 795, 797 (Bankr. S.D. Ohio 1989) (stating that the debtor has discretion to make business decisions to operate in the ordinary course).  Therefore, a debtor in possession may use, sell, or lease property of the debtor's estate without the need for prior court approval if the transaction is in the ordinary course of business.  In re Johns-Manville Corp., 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (holding that ordinary course of business use of estate property does not require a prior hearing).

56.    Here, the Debtors seek only to continue performing under the Shared Services Arrangements in the ordinary course of their operations without alteration of their terms and conditions, except as specifically set forth herein or in the Proposed Interim and Final Orders. The Debtors propose to use estate property and to expend funds to perform under the Shared Services Arrangements in the same manner as they used such property and expended such funds to perform prepetition.  As a non-profit corporation, the operations engaged in between the Debtors and the Local Councils and Related Non-Debtor Entities are all aimed at furthering the Debtors' charitable mission, and as such are part of their ordinary course operations.

57.    The Debtors are able to account for all Related Party Transactions and transactions with the Local Councils, including all cash receipts and disbursements. Additionally, these transactions support the Debtors' core mission and therefore are not only integral to the Debtors' continued operations, but also to their charitable reputation.  The Shared Services Arrangements are routine not only for the Debtors' organization, but also common among many complex business enterprises that operate through multiple affiliates. Precisely because of their routine nature, the Related Party Transactions are integral to the Debtors' ability to continue operating without disruption, and in many instances, are critical to the Debtors' mission.   Thus, section 363(c)(1) provides sufficient authority for the Debtors' continued performance under the Shared Services Arrangements.

II.    **The Debtors' Continued Performance Under the Shared Services Arrangements Is a Sound Exercise of the Debtors' Business Judgment.**

58.    Even if performance of the Shared Services Arrangements is not in the ordinary course, the Debtors are still authorized to perform under the Shared Services Arrangements pursuant to section 363(b) of the Bankruptcy Code because continued performance of the Shared Services Arrangements is a sound exercise of the Debtors' business judgment.  Section 363(b) of

the Bankruptcy Code authorizes a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  A debtor may use, sell, or lease property of the estate where a sound business purpose justifies such actions.  In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999) (requiring debtor to show a "sound business purpose" to justify use of assets under section 363 of the Bankruptcy Code); see also In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (authorizing debtor's payment of prepetition claims as necessary to protect debtor's business); In re Phoenix Steel Corp., 82 B.R. 334, 335–36 (Bankr. D. Del. 1987).  Specifically, once a debtor articulates a valid business justification for a particular form of relief, the court reviews the debtor's request under the business judgment rule.  In re Johns-Manville, 60 B.R. at 616 ("Where the debtor articulates a reasonable basis for its business decisions . . . courts will generally not entertain objections to the debtor's conduct."); see also In re Tower Air, Inc., 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task."); In re Commercial Mortg. & Fin. Co., 414 B.R. 389, 394 (Bankr. N.D. Ill. 2009) (noting that a debtor in possession "has the discretionary authority to exercise his business judgment in operating the debtor's business similar to the discretionary authority to exercise business judgment given to an officer or director of a corporation" (internal quotation omitted)).

59.    Additionally, section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," and supports the Court's ability to authorize the Debtors to pay the Shared Services Arrangements.  A bankruptcy court's use of its equitable powers to "authorize the payment of

pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." In re Ionosphere Clubs, 98 B.R. at 175.

60.    The Debtors' continued provision of services to the Local Councils under the Local Council Shared Services Arrangements is within the sound business judgment of the Debtors because it is essential to the Debtors' ability to carry out their mission.  Through the Local Councils, Scouting programs are able to reach young people in every part of the United States.  If the Debtors were not permitted to continue to provide the Local Council Shared Services Arrangements, such services would be nearly impossible and prohibitively expensive for each Local Council to individually replace.  This would harm the BSA organization and severely limit its operations, as the Local Council Shared Services Arrangements provide economies of scale to the entire BSA organization.  The Local Councils are critical to the Debtors' ability to fulfill their mission: it is only through the 261 Local Councils that the Debtors are able to reach the approximately 2.2 million youth participants and approximately 800,000 adult volunteers with Scouting programs.  This outcome would distract the Debtors from their efforts to stabilize their organizational operations and would effectively eliminate the Debtors' ability to achieve their mission, creating an attendant loss of value to the Debtors' estates.  The Local Councils are essential to the structure of the BSA organization: the Local Councils are chartered to reach participants in specific geographic regions, through the national programs created by the Debtors.

61.    Additionally, certain other Related Non-Debtor Entities including BSAAM, Arrow, Learning for Life, BSA Foundation, and Atikaki and Atikokan are specialized entities that provide critical investment, advisory, leasing, philanthropic, and management services to the Debtors.  The Debtors' continued performance under these Shared Services Arrangements is in

the sound organizational judgment of the Debtors because they enable the Debtors to obtain these specialized services in a more cost-efficient manner than if the Debtors were to procure such services themselves.  If the Debtors were not permitted to continue performance under the Shared Services Arrangements, the Debtors would be forced to try to replicate services that would be prohibitively expensive for the Debtors to replace.  Absent the services being provided under the Shared Services Arrangements, the Debtors would be unable to continue operating their organization in a "business as usual" form, which would harm their ability to fulfill their mission.  This outcome would force the Debtors to spend significant amounts of estate funds to attempt to replicate services currently provided to the Debtors by these Related Non-Debtor Entities, would impede the Debtors' restructuring goals, and would lead to an attendant substantial loss of value to the Debtors' estates.  Thus, the Debtors' continued performance under the Shared Services Arrangements enhances the value of the Debtors' estates for all parties in interest, and is a sound exercise of the Debtors' business judgment and should be approved.

### III.    Payment of Certain Prepetition Local Council Benefits Programs Is a Sound Exercise of the Debtors' Business Judgment and Is in the Best Interests of the Debtors' Estates.

62.    The payment of prepetition obligations under the Local Council Benefits Programs, the 457(b) Plan, the Local Council Scout Shops, and the Other Local Council Disbursements in an amount not to exceed $2,106,000 during the Interim Period, and the maintenance of these programs on a postpetition basis is in the best interest of the Debtors' estates, and these actions are authorized under sections 363(b) and 105(a) of the Bankruptcy Code.  The Debtors, operating their organization as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business for the benefit of [their] creditors and (if the value justifies) equity owners."  In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the

duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." Id. Consistent with a debtor's fiduciary duties to preserve the estate, courts have authorized payment of prepetition obligations in order to preserve the value of the estate under sections 105(a) and 363(b) of the Bankruptcy Code. See, e.g., In re Ionosphere Clubs, Inc., 98 B.R. at 175 (stating that section 363(b) provides "broad flexibility" for a debtor to satisfy prepetition claims where supported by a proper business justification); see also In re Just for Feet, Inc., 242 B.R. 821, 824 (D. Del. 1999) ("Section 105(a) of the Code provides a statutory basis for the payment of pre-petition claims.").

63.    In addition, courts may authorize payment of prepetition claims in appropriate circumstances under section 105(a) of the Bankruptcy Code.  Section 105(a) empowers the Court to "issue any order, process, or judgment that is necessary . . . to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  Under section 105(a), the Court "can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor."  In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992); see also In re Just for Feet, Inc., 242 B.R. at 826 ("[T]o invoke the necessity of payment doctrine, a debtor must show that payment of the pre-petition claims is 'critical to the debtor's reorganization.'" (quoting In re Fin. News Network, Inc., 134 B.R. 732, 736 (Bankr. S.D.N.Y. 1991)).

64.    Numerous courts, including the Third Circuit, have recognized the "doctrine of necessity" as a mechanism by which a bankruptcy court can exercise its equitable powers to authorize payment of a debtor's prepetition obligations where, as here, such payment is necessary to effectuate the "paramount purpose" of chapter 11 reorganization, which is to prevent the debtor from going into liquidation and preserve the debtor's potential for rehabilitation.  See In re Lehigh & New England Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981)

(holding that "if payment of a claim which arose prior to reorganization is essential to the continued operation of the [business] during reorganization, payment may be authorized even if it is made out of [the] corpus"); In re Penn Cent. Transp. Co., 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the doctrine of necessity "permit[s] immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid").

65.     By this Motion, the Debtors are only seeking authority to pay prepetition obligations under the Local Council Benefits Programs up to a cap during the Interim Period and on a final basis.  Authorizing the Debtors, in their business judgment, to pay amounts owed under the Local Council Benefits Programs will assist the Debtors in fulfilling their fiduciary obligation to maximize the value of their estates for all creditors, and as such is an exercise of sound business judgment.  The BSA, as a nonprofit National Council, relies on an organizational structure that requires the chartering and creation of the 261 Local Councils in specified geographic regions.  Each Local Council is made up of professional Scouters and volunteers, who in turn distribute the Scouting mission to participants in various units within the Local Council.  Local Councils also own and operate service centers, camps, and other local facilities and resources required for a successful Scouting program.  Local Councils are independent nonprofit corporations that pay wages and compensation for their own staff, but they operate with limited budgets and employees based on locally funded donations, product sales, special events and corporate gifts.  It is essential to both the Scouting mission and the Debtors' successful reorganization that the Debtors be able to continue providing the Local Council Benefits Programs to these approximately 6,600 paid Local Council Employees, using the size of the BSA national organization to provide these parties with necessary benefits that may

otherwise be prohibitively expensive.  It would damage the Debtors' operations and the Local Councils if the Local Councils were forced to furnish their own benefits to the Local Council Employees or have them go without it.  The Debtors are, in many instances, able to obtain favorable rates for their benefits programs because of the inclusion of the Local Council Employees, and the Debtors are reimbursed by the Local Councils for amounts that the Debtors pay on behalf of the Local Council Employees.  The Debtors' ability to honor the Shared Services Arrangement with respect to the Local Council Benefits Programs will ensure that significant attrition does not occur within the Local Councils at a critical time in the Debtors' organizational operations.

## THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

66.    Bankruptcy Rule 6003 empowers the Court to issue an order, within 21 days after the Petition Date, granting a motion to "use . . . property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" if such requested relief "is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003(b).  For the reasons discussed above, entry of the Proposed Interim Order is integral to the Debtors' ability to successfully transition into chapter 11.  As described above, the relief requested is necessary to avoid a severe disruption in the Debtors' operations at this critical juncture and, in turn, preserve the ongoing value of the Debtors' operations and to maximize the value of the Debtors' estates for the benefit of all stakeholders.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## RESERVATION OF RIGHTS

67.    Nothing contained herein is intended or should be construed as (a) an admission as to the validity of any claim or lien against the Debtors, (b) a waiver of the Debtors' rights to

subsequently dispute such claim or lien on any grounds, (c) a promise or requirement to pay any prepetition claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion, the Proposed Interim Order, or the Proposed Final Order, (e) a request or authorization to assume any prepetition agreement, contract, or lease, pursuant to section 365 of the Bankruptcy Code, or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

### WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h) REQUIREMENTS

68.     In addition, by this Motion, the Debtors seek a waiver of any notice requirements under Bankruptcy Rule 6004(a) and any stay of the effectiveness of the order(s) approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As set forth above, the Debtors require immediate relief to continue ordinary organizational operations for the benefit of all parties in interest.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

### NOTICE

69.     Notice of this Motion will be provided to (i) the Debtors' cash management banks; (ii) the U.S. Trustee; (iii) the twenty-five (25) law firms representing the largest numbers of abuse victims asserting claims against the Debtors; (iv) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis, other than abuse-related claims; (v) counsel to JPMorgan Chase Bank, N.A.; (vi) the County Commission of Fayette County (West Virginia), as issuer of those certain Commercial Development Revenue Bonds (Arrow WV Project), Series 2010A, 2010B and 2012; (vii) representatives of the prepetition Ad Hoc

Committee of Local Councils; (viii) counsel to the prepetition Future Claimants' Representative; (ix) counsel to the prepetition ad hoc group of attorneys representing significant numbers of abuse victims; (x) the United States Attorney's Office for the District of Delaware; (xi) the Internal Revenue Service; (xii) the United States Department of Justice; and (xiii) any party that has requested notice pursuant to Bankruptcy Rule 2002.  Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested herein, no other or further notice need be given.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Interim Order and the Proposed Final Order, substantially in the forms attached hereto, granting the relief requested herein and granting any further relief the Court may deem just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated:  February 18, 2020
Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/  Derek C. Abbott*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Joseph C. Barsalona II (No. 6102)
Eric W. Moats (No. 6441)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email:  dabbott@mnat.com
        aremming@mnat.com
        jbarsalona@mnat.com
        emoats@mnat.com
        ptopper@mnat.com

– and –

SIDLEY AUSTIN LLP
James F. Conlan (*pro hac vice* pending)
Thomas A. Labuda (*pro hac vice* pending)
Michael C. Andolina (*pro hac vice* pending)
Matthew E. Linder (*pro hac vice* pending)
Blair M. Warner (*pro hac vice* pending)
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Email:  jconlan@sidley.com
        tlabuda@sidley.com
        mandolina@sidley.com
        mlinder@sidley.com
        blair.warner@sidley.com

– and –

SIDLEY AUSTIN LLP
Jessica C. K. Boelter (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 839-5300
Email:  jboelter@sidley.com

PROPOSED COUNSEL TO THE DEBTORS
AND DEBTORS IN POSSESSION

## Exhibit A

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (___) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. __** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO PAY
CERTAIN PREPETITION OBLIGATIONS UNDER SHARED SERVICES
ARRANGEMENTS, (II) AUTHORIZING CONTINUED PERFORMANCE
OF OBLIGATIONS UNDER INTERCOMPANY AND SHARED SERVICES
ARRANGEMENTS, AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the Boy Scouts of America (the "BSA") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), for entry of an order (this "Interim Order"), pursuant to sections 105(a), 363(b), and 363(c) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (i) authorizing, but not directing, the Debtors to pay or cause to be paid certain prepetition obligations under the Shared Services Arrangements between the Debtors and the Local Councils and Related Non-Debtor Entities in the ordinary course, (ii) authorizing, but not directing, the Debtors to continue performing under the Shared Services Arrangements between the Debtors and the Local Councils and Related Non-Debtor Entities in the ordinary course, (iii) authorizing applicable banks and other financial institutions to receive, process, honor, and pay any and all checks drawn on and transfers made from the Debtors'

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] All capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Motion.

accounts to the extent such checks or transfers relate to any of the foregoing, and (iv) granting related relief; and upon consideration of the First Day Declaration; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this matter being a core proceeding within the meaning of 28 U.S.C. § 157(b)(2); and this Court being able to issue a final order consistent with Article III of the United States Constitution; and venue of this proceeding and the Motion in this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and appropriate notice of and the opportunity for a hearing on the Motion having been given and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court; and all objections, if any, to the Motion having been withdrawn, resolved or overruled; and the relief requested in the Motion being in the best interests of the Debtors' estates, their creditors and other parties in interest; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The relief requested in the Motion is GRANTED on an interim basis as set forth herein.

2.      The Final Hearing on the Motion shall be held on _____, 2020 at ___:___ __.m., prevailing Eastern Time.  Any objections or responses to entry of a final order (the "Final Order") on the Motion shall be filed no later than 4:00 p.m., prevailing Eastern Time, on _____, 2020 (the "Objection Deadline") and served on the following parties: (i) the Debtors, Boy Scouts of America, 1325 West Walnut Hill Lane, Irving, Texas 75038, Attn:

Steven P. McGowan; (ii) proposed counsel to the Debtors, Sidley Austin LLP, 787 Seventh Avenue, New York, New York 10019, Attn: Jessica C.K. Boelter, and One South Dearborn, Chicago, Illinois 60603, Attn: Matthew E. Linder; (iii) proposed co-counsel to the Debtors, Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor, P.O. Box 1347, Wilmington, Delaware 19899-1347, Attn: Derek C. Abbott; (iv) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: David Buchbinder and Hannah M. McCollum; (v) counsel to the prepetition Future Claimants' Representative, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Robert S. Brady and Edwin J. Harron; (vi) counsel to JPMorgan Chase Bank, N.A., Norton Rose Fulbright US LLP, 2200 Ross Avenue, Dallas, Texas 75201-7932, Attn: Louis R. Strubeck and Kristian W. Gluck; (vii) representatives of the prepetition Ad Hoc Committee of Local Councils, Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, New York 10019, Attn: Richard G. Mason and Joseph C. Celentino; (viii) counsel to the prepetition ad hoc group of attorneys representing significant numbers of abuse victims, Pachulski, Stang, Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California 90067, Attn: James I. Stang; (ix) counsel to the County Commission of Fayette County (West Virginia), Steptoe & Johnson PLLC, Chase Tower – 8th Floor, 707 Virginia Street East, Charleston, West Virginia 25301, Attn: John Stump; (x) counsel to any statutory committee appointed in these chapter 11 cases; and (xi) any party that has requested notice pursuant to Bankruptcy Rule 2002.

3.      During the period of time from entry of this Interim Order until the Final Hearing (the "Interim Period"), the Debtors are authorized, but not directed, to continue performing under any and all of the Shared Services Arrangements in the ordinary course of operations and on the

terms set forth in the Motion and this Interim Order; provided, however, that nothing in this Interim Order shall in any way prejudice (i) the ability of the Debtors' creditors and other parties in interest to analyze and raise objections to any aspects of the Shared Services Arrangements prior to the Final Hearing including, but not limited to, all payments made thereunder and the methodologies employed in calculating such payments or (ii) the Debtors' ability to contest such objections.  In the event that the Local Councils and Related Non-Debtor Entities are provided with estate property by the Debtors to pay BSA entities or third parties in accordance with a Shared Services Arrangement, the Local Councils and Related Non-Debtor Entities are authorized to pay such entities as directed by the Debtors.

4.      The Debtors are authorized, but not directed, to honor, pay, or otherwise satisfy any prepetition obligations arising on account of the Local Council Benefits Programs (either directly or to third parties for payment or remittance, as applicable) up to a maximum aggregate cap of $1,726,000 for all amounts authorized to be paid under this Interim Order with respect to the Local Council Benefits Programs.  For the avoidance of doubt, the payment of Health Benefit Claims pursuant to the self-insured Health Insurance Plans shall be excluded from the cap.

5.      Fidelity is authorized, but not directed, to (a) honor, pay, or otherwise satisfy any prepetition obligations arising on account of the 457(b) Plan to Local Council participants up to a maximum aggregate cap of $10,000 for all amounts authorized to be paid under this Interim Order and (b) maintain and continue to honor and pay, in their discretion, amounts with respect to the Local Council participants in the 457(b) Plan as such were in effect as of the Petition Date and as such may be modified or supplemented from time to time in the ordinary course.

6.      The Debtors are authorized, but not directed, to honor, pay, or otherwise satisfy any prepetition obligations arising on account of the Local Council Scout Shops and Other Local

Council Disbursements up to a maximum aggregate cap of $370,000 for all amounts authorized to be paid under this Interim Order.

7.     The Debtors are authorized, but not directed, to honor, pay, or otherwise satisfy any prepetition obligations arising on account of Learning for Life up to a maximum aggregate cap of $500 for all amounts authorized to be paid under this Interim Order.

8.     The Debtors are authorized, but not directed, to honor, pay, or otherwise satisfy any prepetition obligations arising on account of the BSA Foundation up to a maximum aggregate cap of $500 for all amounts authorized to be paid under this Interim Order.

9.     In accordance with this Interim Order and any other order of this Court, each of the financial institutions at which the Debtors or their non-debtor affiliates maintain their accounts relating to the payment of the obligations described in the Motion is directed to receive, process, honor, and pay any and all checks, drafts, wire transfers, and automated clearing house transfers issued, whether before or after the Petition Date, for payment of obligations described in the Motion.

10.    Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed as (a) an admission as to the validity or priority of any claim or lien against the Debtors, (b) a waiver of the Debtors' rights to subsequently dispute such claim or lien on any grounds, (c) a promise or requirement to pay any prepetition claim, (d) an implication or admission that any particular claim is of a type specified or defined in the Motion or this Interim Order, (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

11.     Notwithstanding entry of this Interim Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claims held by, any party.

12.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b) because the relief granted in this Interim Order is necessary to avoid immediate and irreparable harm to the Debtors' estates.

13.     Notice of the Motion shall be deemed good and sufficient notice of such Motion, and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are waived by such notice.

14.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry.

15.     The Debtors are authorized to take all action necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

16.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.


Dated: _____, 2020           _____

                                       UNITED STATES BANKRUPTCY JUDGE

6

**<u>Exhibit B</u>**

**Proposed Final Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (___) |
| Debtors. | (Jointly Administered) |
| | Ref. Docket No. __ |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO PAY CERTAIN
PREPETITION OBLIGATIONS UNDER SHARED SERVICES ARRANGEMENTS,
(II) AUTHORIZING CONTINUED PERFORMANCE OF OBLIGATIONS UNDER
INTERCOMPANY AND SHARED SERVICES ARRANGEMENTS,
AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the Boy Scouts of America (the "BSA") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), for entry of an order (this "Final Order"), pursuant to sections 105(a), 363(b), and 363(c) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, (i) authorizing, but not directing, the Debtors to pay or cause to be paid certain prepetition obligations under the Shared Services Arrangements between the Debtors and the Local Councils and Related Non-Debtor Entities in the ordinary course, (ii) authorizing, but not directing, the Debtors to continue performing under the Shared Services Arrangements between the Debtors and the Related Non-Debtor Entities and Local Councils in the ordinary course, (iii) authorizing applicable banks and other financial institutions to receive, process, honor, and pay any and all checks drawn on and transfers made from the Debtors'

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] All capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Motion.

accounts to the extent such checks or transfers relate to any of the foregoing, and (iv) granting related relief; and upon consideration of the First Day Declaration; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this matter being a core proceeding within the meaning of 28 U.S.C. § 157(b)(2); and this Court being able to issue a final order consistent with Article III of the United States Constitution; and venue of this proceeding and the Motion in this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and appropriate notice of and the opportunity for a hearing on the Motion having been given and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at an interim hearing and, if necessary, a final hearing before this Court; and all objections, if any, to the Motion having been withdrawn, resolved or overruled; and the relief requested in the Motion being in the best interests of the Debtors' estates, their creditors and other parties in interest; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.     The relief requested in the Motion is GRANTED on a final basis as set forth herein.

2.     The Debtors are authorized, but not directed, to continue performing under any and all of the Shared Services Arrangements with the Local Councils and the Related Non-Debtor Entities in the ordinary course of operations and on the terms set forth in the Motion and this Final Order.  The Debtors are further authorized, but not directed, to use estate property and to expend estate funds consistent with prepetition practices and in the ordinary course of

operations to perform under the Shared Services Arrangements. In the event that the Local Councils and Related Non-Debtor Entities are provided with estate property by the Debtors to pay BSA entities or third parties in accordance with a Shared Services Arrangement, the Local Councils and the Related Non-Debtor Entities are authorized to pay such entities as directed by the Debtors.

3.      The Debtors are authorized, but not directed, to honor, pay, or otherwise satisfy any prepetition obligations arising on account of the Local Council Benefits Programs (either directly or to third parties for payment or remittance, as applicable) up to a maximum aggregate cap of $1,726,000 for all amounts authorized to be paid under this Final Order with respect to the Local Council Benefits Programs. For the avoidance of doubt, the payment of Health Benefit Claims pursuant to the self-insured Health Insurance Plans shall be excluded from the cap.

4.      Fidelity is authorized, but not directed, to (a) honor, pay, or otherwise satisfy any prepetition obligations arising on account of the 457(b) Plan to Local Council participants up to a maximum aggregate cap of $960,000 for all amounts authorized to be paid under this Final Order, as adjusted for any gains or losses in the underlying investment and as per distribution elections made by Local Council participants, and (b) maintain and continue to honor and pay, in Fidelity's discretion, amounts with respect to the Local Council participants in the 457(b) Plan as such were in effect as of the Petition Date and as such may be modified or supplemented from time to time in the ordinary course.

5.      The Debtors are authorized, but not directed, to honor, pay, or otherwise satisfy any prepetition obligations arising on account of the Local Council Scout Shops and Other Local Council Disbursements up to a maximum aggregate cap of $370,000 for all amounts authorized to be paid under this Final Order.

6.      The Debtors are authorized, but not directed, to honor, pay, or otherwise satisfy any prepetition obligations arising on account of Arrow up to a maximum aggregate cap of $5,000 for all amounts authorized to be paid under this Final Order.

7.      The Debtors are authorized, but not directed, to honor, pay, or otherwise satisfy any prepetition obligations arising on account of Learning for Life up to a maximum aggregate cap of $10,000 for all amounts authorized to be paid under this Final Order.

8.      The Debtors are authorized, but not directed, to honor, pay, or otherwise satisfy any prepetition obligations arising on account of the BSA Foundation up to a maximum aggregate cap of $10,000 for all amounts authorized to be paid under this Final Order.

9.      In accordance with this Final Order and any other order of this Court, each of the financial institutions at which the Debtors or their non-debtor affiliates maintain their accounts relating to the payment of the obligations described in the Motion is directed to receive, process, honor, and pay any and all checks, drafts, wire transfers, and automated clearing house transfers issued, whether before or after the Petition Date, for payment of obligations described in the Motion.

10.      Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed as (a) an admission as to the validity or priority of any claim or lien against the Debtors, (b) a waiver of the Debtors' rights to subsequently dispute such claim or lien on any grounds, (c) a promise or requirement to pay any prepetition claim, (d) an implication or admission that any particular claim is of a type specified or defined in the Motion or this Final Order, (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, or (f) a

waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

11.     Notwithstanding entry of this Final Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claims held by, any party.

12.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry.

13.     The Debtors are authorized to take all action necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

14.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

Dated: _____, 2020

_____
UNITED STATES BANKRUPTCY JUDGE