## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (___) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF BRIAN WHITTMAN IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

Brian Whittman, being duly sworn, states the following under penalty of perjury:

1.       I am a Managing Director at Alvarez & Marsal North America, LLC ("A&M"), a limited liability corporation, which has served as a restructuring advisor to the Boy Scouts of America (the "BSA") and Delaware BSA, LLC ("Delaware BSA"), the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), since October 2018.  I have twenty-five years of financial restructuring and bankruptcy experience.[2]  I have served as a Managing Director in A&M's Restructuring & Turnaround group since 2008 and the group's co-head of the Midwest region since 2019.  During my tenure at A&M I also served as interim chief financial officer of Horizon Global in 2018–19, chief restructuring officer of UCI International in 2016, and interim chief financial officer of PSAV, Inc. in 2014.  Prior to joining A&M in 2002, I spent seven years working as a director in restructuring at a former "Big Five" accounting firm.

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]    For the past twenty-five years I have advised companies requiring performance improvement or financial restructuring across a wide range of industries, including automotive, communications, distribution, manufacturing, media, mining and retail.  I have also led complex engagements for companies, secured lenders and creditors, serving in both interim management and advisory roles.  I am a Certified Insolvency and Restructuring Advisor and a Certified Public Accountant.

2.      On the date hereof (the "Petition Date"), both of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  As the lead Managing Director at A&M responsible for this engagement since August 2019, I had a lead role in preparing the Debtors' chapter 11 filings, developing the Debtors' business plans, and providing diligence to and negotiating with certain of the Debtors' key constituencies.  In doing so, I have familiarized myself with the Debtors' day-to-day operations, financial affairs, and books and records through review of certain financial documents and discussions with management.

3.      To enable the Debtors to minimize the adverse effects of the commencement of the chapter 11 cases on their non-profit operations, the Debtors are requesting various types of relief in certain "first day" pleadings (each, a "First Day Motion" and collectively, the "First Day Motions").  The First Day Motions seek relief aimed at, among other goals, (a) obtaining authorization to utilize cash collateral on a post-petition basis; (b) preserving certain customer, Scout, and donor programs and other prepetition practices and honoring related obligations; (c) maintaining vendor confidence; (d) ensuring the continued payment of employee wage and benefits obligations; (e) ensuring that the Debtors' ability to continue to use their prepetition cash management systems without interruption; (f) obtaining authorization to continue to perform under certain essential shared services arrangements and services agreements with certain of the Debtors' non-debtor affiliates and related entities; (g) establishing certain administrative procedures to facilitate a seamless transition into chapter 11; and (h) promoting the efficient and expedited global resolution of claims.  The achievement of the aforementioned goals will be critical to the success of these chapter 11 cases and the Debtors' reorganization efforts.

4.      I submit this declaration (the "Declaration") in support of the First Day Motions. I am authorized to submit this Declaration on behalf of each of the Debtors.  I am familiar with the contents of each First Day Motion, and I believe that the relief sought therein (a) is necessary to ensure the Debtors' continued capability to carry out the mission of the BSA and (b) is integral to the successful reorganization of the Debtors.

5.      Except as otherwise stated in this Declaration, all facts set forth herein are based on my personal knowledge, materials provided by, or my discussions with, members of the Debtors' management team, information provided by the Debtors' advisors, or information obtained from my personal review of relevant documents.[3]  Additionally, the views asserted in this Declaration are based upon my experience and knowledge of the Debtors' operations, financial condition, and liquidity.  If called upon to testify, I would competently testify to the facts set forth herein.

## PRELIMINARY STATEMENT

6.      The BSA is a non-profit corporation founded in 1910 and chartered by an act of Congress on June 15, 1916.  The BSA's mission is to train youth in responsible citizenship, character development, and self-reliance through participation in a wide range of outdoor activities, educational programs, and, at older age levels, career-oriented programs in partnership with community organizations.  I understand that, since its inception 110 years ago, more than 130 million Americans have participated in the BSA's youth programs and more than 35 million volunteers have helped carry out the BSA's mission.  Today, the BSA remains one of the largest youth organizations in the United States and one of the largest Scouting organizations in the

---

[3]     Certain information set forth herein relates to matters (a) contained in the Debtors' books and records and (b) within the knowledge of other A&M employees, and is based on information provided by such employees.

world, with approximately 2.2 million registered youth participants and approximately 800,000 adult volunteers as of December 2019.

7.    As has been widely reported, the BSA is currently a defendant in numerous lawsuits relating to historical acts of sexual abuse in its Scouting programs.  I understand that there are currently approximately 275 lawsuits pending in state and federal courts across the United States asserting abuse-related claims against the BSA.  In addition, attorneys for abuse victims have provided information asserting approximately 1,400 additional claims that have not yet been filed, for a total of approximately 1,700 known asserted abuse claims.  Based on my review of the relevant data, approximately 90% of these pending and asserted claims relate to abuse that occurred over thirty years ago.

8.    The number of abuse claims asserted against the BSA has sharply increased in recent years, an increase which I understand to coincide with a trend of states' enacting legislation to allow victims of sexual abuse to assert claims that would previously have been barred by applicable statutes of limitations.  The recent increase in the number of abuse claims filed against the BSA has placed tremendous financial pressure on the organization.  The BSA spent more than $150 million on settlements and legal and related professional costs from 2017 through 2019 alone.  In view of these developments, the BSA determined that it could not continue to address abuse litigation in the tort system on a case-by-case basis without jeopardizing its capability to carry out its mission.  In late 2018, the BSA retained legal and financial advisors, Sidley Austin LLP and A&M, respectively, to explore strategic options for achieving a global resolution of abuse claims.

9.    The Debtors explored certain restructuring options throughout 2019.    As discussed in detail below and in the *Debtors' Informational Brief*, filed concurrently herewith

4

(the "Informational Brief"), these options included efforts by the Debtors to reach a global settlement with a substantial number of abuse victims that could be implemented through a prearranged chapter 11 proceeding.  These efforts were unsuccessful.

10.     Ultimately, the Debtors and their advisors turned their attention to preparing for the commencement of these chapter 11 proceedings.  The Debtors' dual objectives in these chapter 11 cases are (a) timely and equitably compensating victims of abuse in Scouting and (b) ensuring that the Debtors emerge from bankruptcy with the capability to continue carrying out its charitable mission.  As a non-profit corporation that relies on member fees and donations to sustain its operations, the BSA recognizes that prolonged bankruptcy cases would be costly, would deplete funds available to compensate abuse victims, and would endanger the BSA's capability to continue to carry out its mission after emergence.  Accordingly, as discussed below and in the Informational Brief, both prior to and immediately upon the commencement of these cases, the BSA took several decisive steps designed to ensure that these chapter 11 cases would proceed expeditiously.  The Debtors believe that, with the measures they have implemented at the outset of these cases, all stakeholders will be well positioned to efficiently work toward a global resolution.

11.     Part I of this Declaration provides an overview of the Debtors' non-profit operations and a summary of their prepetition indebtedness.  Part II discusses the events and circumstances leading to the commencement of these chapter 11 cases, including an overview of the Debtors' restructuring efforts.  Part III sets forth the relevant facts in support of each of the First Day Motions.

## PART I
## OVERVIEW OF THE BOY SCOUTS OF AMERICA

A.    **The Boy Scouts of America**.

12.    The BSA was incorporated in the District of Columbia in 1910 and chartered by Congress in 1916 as a non-profit corporation under Title 36 of the United States Code.  I am informed that, as a non-profit corporation, the BSA is required to adopt and carry out a charitable, religious, educational, or other philanthropic mission.  The BSA's mission is "to prepare young people to make ethical and moral choices over their lifetimes by instilling in them the values of the Scout Oath and Law":

- **Scout Oath**:  "On my honor I will do my best to do my duty to God and my country and to obey the Scout Law; to help other people at all times; to keep myself physically strong, mentally awake, and morally straight."

- **Scout Law**:  "A Scout is trustworthy, loyal, helpful, friendly, courteous, kind, obedient, cheerful, thrifty, brave, clean, and reverent."

The BSA also trains young men and women in responsible citizenship, character development, and self-reliance through participation in a wide range of outdoor activities, educational programs, and, at older ages, career-oriented programs in partnership with community organizations.  In support of this mission, the BSA supports and supervises Scouting in the United States, including through its local partners that implement the BSA's Scouting programs.  An organizational chart depicting the Debtors and their affiliated and related entities is attached hereto as **Exhibit A**.

13.    As discussed in greater detail in Part I.C below, a core function of the BSA is to grant charters to local organizations that deliver the Scouting programs to the youth of America.  The BSA's Scouting programs include Cub Scouts for children in kindergarten through fifth grade, Scouts BSA for youth ages 11 to 17, Venturing and Sea Scouts for young men and women

ages 14 to 20, and STEM Scouts for children and young adults in elementary school through high school.  These programs and others are discussed in detail in the Informational Brief.

14.    Another core function of the BSA is to provide services that are critical to the delivery of high-quality Scouting opportunities.  These services include, among other things, providing core program content; procuring and selling uniforms and equipment; maintaining information technology and digital resources; training adult professional and volunteer "Scouters" to serve in Local Councils (as defined below); coordinating Scouting communications and publishing magazines and other periodicals for Scouts, their families, adult leaders and alumni; organizing national Scouting events; operating and maintaining registration systems; and implementing quality control measures.  In addition, every four years, the BSA hosts a National Jamboree, where tens of thousands of Scouts gather together to celebrate Scouting, learn about teamwork and leadership, and meet other Scouts from around the country. In 2019, for the first time in more than fifty years, the BSA hosted the World Jamboree, an official educational event of the World Organization of the Scout Movement.  The 2019 World Scout Jamboree was the largest World Scout Jamboree ever, attended by more than 45,000 Scouts from 167 countries.

15.    The national headquarters of the BSA is located in Irving, Texas.  The BSA employs approximately 1,650 individuals, all of whom are located in the United States and its territories.  The BSA's employees are located at its headquarters, at the BSA's national warehouse and distribution center in Charlotte, North Carolina, at approximately 175 official BSA Scout Shops located throughout the United States and Puerto Rico and at the BSA's four high adventure facilities located in Florida, Minnesota and parts of Canada, New Mexico, and West Virginia.

16.     The BSA is funded by membership fees, donor contributions, legacies and bequests, corporate sponsorships, grants from foundations, and supply sales.  In 2019, the BSA's gross revenues were approximately $393 million.  Of this total, approximately 30% of gross revenues were attributable to sales of merchandise at Scout Shops, on its website, and directly to Local Councils (as defined below); approximately 16% to membership fees; approximately 15% to high adventure facility operations; approximately 13% to income on investments; approximately 8% from donor contributions, legacies, and bequests; and approximately 8% to event fees.

**B.      Delaware BSA**.

17.     The BSA is the sole member of Delaware BSA, a non-profit limited liability company that was incorporated under the laws of Delaware on July 11, 2019.  Delaware BSA is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code. Delaware BSA has pledged substantially all of its assets to secure the obligations of the BSA and Arrow (as defined below) under the Prepetition Secured Agreements and Bond Agreements (each as defined below).  Delaware BSA's principal asset is a depository account located in Delaware.

**C.      Local Councils and Chartered Organizations**.

18.     To carry out its Scouting programs, the BSA has granted charters to 261 local councils assigned to specific geographic areas across the United States (collectively, "Local Councils").  I understand that each Local Council (a) is separately incorporated under the non-profit laws of its respective state, (b) is exempt from federal income tax under section 501(c)(3)

of the Internal Revenue Code, and (c) has an independent board of directors[4] and senior management.  None of the Local Councils are debtors in these chapter 11 cases.

19.     The primary function of Local Councils is to recruit and oversee the local organizations that administer the BSA's Scouting programs and to own and operate local camp grounds that are part of delivering the BSA's outdoor programing.  In particular, Local Councils lead the effort to partner with local organizations to sponsor units of Scouts and adult leaders involved in Scouting.   These organizations (collectively, "<u>Chartered Organizations</u>") are typically faith-based institutions, clubs, civic associations, educational institutions, businesses, and groups of citizens.  Chartered Organizations, in turn, form Scouting units — referred to as "packs" for Cub Scouts, "troops" for Scouts BSA (formerly known as Boy Scouts), "crews" for Venturing, "ships" for Sea Scouts, "labs" for STEM Scouts, and "posts" for Exploring. Chartered Organizations assist with the recruitment of adult leaders and other volunteers and provide meeting spaces and other monetary and in-kind support to the packs and troops that they sponsor.  Scouting units are led by adult volunteers appointed by their affiliated Chartered Organization.  There were approximately 81,000 Scouting units in the United States as of December 2019.

20.     A corps of qualified and trained professional Scouters and volunteers is essential to the ability of Local Councils to carry out the BSA's mission.  Accordingly, each Local Council is led by adult volunteers and paid professional Scouters, including a professional Scout executive, a volunteer council president and a volunteer council commissioner.  These positions are referred to within Scouting as the "Key 3."  These personnel manage the day-to-day operations of the Local Councils, including coordinating the recruitment of new chartered

---

[4]     In certain instances, one or more directors of a local council may also serve as a director of the BSA's National Executive Board (the "<u>Board</u>").

organizations, leading fundraising efforts, maintaining program facilities, enforcing the BSA's policies, rules, and regulations on a local level, and numerous other important services

21.    Local Councils generally do not receive financial support from the BSA; instead, they rely upon their own fundraising through donations, product sales, special events, and corporate gifts.  The BSA does, however, use its national reach and resources to provide certain corporate and administrative support to Local Councils in exchange for certain fees and reimbursements, as well as for the assistance of Local Councils in collecting membership fees and delivering the Scouting mission.  This support includes, among other things, general insurance liability coverage, human resources, access to training facilities, and marketing services.  Additional details regarding shared services between the BSA, Local Councils, and other related entities are set forth in Part III below.

22.    Although not a precise analogue, the relationship between the BSA and the Local Councils is similar to that of a franchisor and franchisee.  The BSA is responsible for developing and disseminating the structure and content of the Scouting program, owns and licenses intellectual property, and provides training and support services, including corporate services such as human resources, legal functions, and information technology.  The BSA, in addition to holding the power to grant charters to Local Councils, may also revoke a Local Council's charter for failing to meet national standards.  Local Councils, for their part, play a key role in delivering the Scouting programs.  Local Councils also serve the vital function of collecting member fees and remitting such funds to the BSA.  Each of these Local Councils is crucial to the BSA's ability to carry out its mission.

D.    **Related Non-Debtor Entities**.

23.    In addition to Local Councils and Chartered Organizations, the BSA also has several subsidiaries and maintains affiliate relationships with several non-stock, non-profit

entities.  The subsidiaries of the BSA and affiliated entities with material assets or operations are described below.[5]  None of the entities described below are debtors in these chapter 11 cases.

### 1.    **BSA Asset Management, LLC**.

24.    BSA Asset Management, LLC ("BSAAM") is a Delaware limited liability company of which the BSA is the sole member.  The BSA receives investment management and advisory services from BSAAM, which provides the BSA and certain of the BSA's Related Non-Debtor Entities with discretionary oversight and management of their long-term assets (the "BSAAM Services").  Such services include the management of the BSA's and certain Local Councils' investments through the BSA Commingled Endowment Fund, LP (the "Partnership"),[6] a Delaware limited partnership of which BSAAM is the general partner.  BSAAM charges to and directly collects fees from the Partnership for such investment services.  In addition to its role as general partner of the Partnership, BSAAM is also the settlor of the BSA Endowment Master Trust (the "Endowment Trust").

25.    In addition, I am informed that BSAAM generally oversees the management of the funds making up the various benefits programs and trusts of the BSA, along with providing management and investment services for the BSA's unrestricted endowment and donations to the BSA.[7]  BSAAM provides these services for the BSA's various benefits, trusts, and unrestricted endowment pursuant to that certain *Letter of Agreement* between the BSA and BSAAM, dated as

---

[5]    In addition to the entities listed in Part I.D, additional entities affiliated with the BSA include NewWorld 19, LLC ("NewWorld"), which was formed in connection with the 2019 World Jamboree, and Texas BSA, LLC ("Texas BSA"), a non-profit limited liability company that was incorporated under the laws of Texas on July 12, 2019.  The BSA is the sole member of Texas BSA.  As of the Petition Date, NewWorld and Texas BSA are inactive entities.

[6]    The BSA and certain Local Councils are limited partners of the Partnership.  Each limited partner receives units of partnership interest in proportion to, and in exchange for, its financial contributions to the Partnership.

[7]    These include the BSA Employee Welfare Benefits Trust, BSA Retirement Benefits Trust, and BSA Master Pension Trust (each as defined below).

of May 9, 2011 (the "BSAAM Agreement"), which sets forth a fee schedule for BSAAM's services, charged monthly. Under the terms of the BSAAM Agreement, the BSA performs certain payroll, benefits, insurance, travel and other miscellaneous cost-related services for BSAAM. BSAAM has an investment staff of four (4) BSA employees who provide services to BSAAM. Historically, the BSAAM Agreement has facilitated an efficient means of managing the BSA's assets and investments on a consolidated basis.

26.    On average, the BSA pays approximately $50,000 per month on behalf of BSAAM pursuant to the terms of the BSAAM Agreement. In 2019, the total amount charged to the BSA by BSAAM on account of the BSAAM Services was approximately $591,000.

### 2.    BSA Endowment Master Trust.

27.    The Endowment Trust is a trust established under the laws of Delaware exclusively for the purpose of investing funds contributed to the Partnership by the BSA and participating Local Councils. I understand that the Endowment Trust is a multiple pooled account trust arrangement established to provide economies of scale and efficiency of administration to eligible entities that elect to invest their funds in the Endowment Trust. Global Trust Co. is the trustee of the Endowment Trust as of the Petition Date. In addition, the Endowment Trust is also a limited partner of the Partnership.

### 3.    National Boy Scouts of America Foundation.

28.    The National Boy Scouts of America Foundation (the "Foundation") is a non-stock, non-profit corporation under the laws of the District of Columbia and exempt from federal income taxes under section 501(c)(3) of the Internal Revenue Code and governed by a separate board of directors. The Foundation exists to help secure the future of Scouting at the Local Council level by providing support for major-gift fundraising efforts across the organization. I am informed that the Foundation provides donors with the ability to implement a donor-advised

fund with the BSA, and to specify where each donor would like the funds to be used.  Each gift that comes in to the BSA Foundation is charged an administrative or annual fee, which funds the employment of fifteen (15) major gifts directors.  These major gifts directors, who are employees of the BSA, are able to provide needed fundraising and major gifts expertise to the Local Councils for an additional fee to the BSA Foundation.  I am informed that twenty-five (25) BSA employees, including the fifteen major gifts directors noted above, provide full-time services on behalf of the Foundation.

29.    I am informed that the BSA pays the taxes, payroll, benefits, insurance, travel costs, and other miscellaneous operating expenses of the BSA employees that provide full-time services on behalf of the Foundation, and disburses and receives funds on behalf of the Foundation.  These costs are allocated back to the Foundation.

30.    I have been advised that the Foundation's expertise with philanthropy and major gifts is essential to the BSA's mission and to secure the future of Scouting.  The Foundation supports the BSA and Local Councils in their major gift fundraising efforts across the entire organization.  The balance of major gifts at the end of 2019 totaled over $73 million.  I am informed that the Foundation also manages the distribution of donor-advised funds such as scholarships, funds for rebuilding camps and high adventure facilities including after the occurrence of natural disasters, and funding for major Scouting events such as the National Jamboree.  If the Debtors were forced to do without the services of the Foundation, the procurement and management of major gifts and donations would suffer.  I understand that these fundraising activities are core to the BSA's survival as a nonprofit corporation and ability to continue to impact approximately 2.2 million participants

4.      **Learning for Life.**

31.     Learning for Life is a non-stock, non-profit corporation under the laws of the District of Columbia that is exempt from federal income taxes under section 501(c)(3) of the Internal Revenue Code and governed by a separate board of directors.  The mission of Learning for Life is to empower students to build exceptional character and leadership skills by guiding them through an innovative, research-based curriculum that enhances the learning experience and teaches the skills necessary to succeed both academically and throughout their lives. Learning for Life also administers the Exploring club career education program for young men and women.  The Exploring program teaches important life and career skills to young people from all backgrounds through immersive career experiences and mentorship provided by thousands of local, regional and national businesses and organizations, which offer career-specific posts or clubs that help youth pursue their special interests, grow and develop.  Learning for Life also manages the Learning for Life Foundation, which works through the Local Councils to identify funding sources and projects for the Learning for Life programs.

32.     I understand that there are three BSA employees who are dedicated to providing services to Learning for Life, which costs are allocated back to Learning for Life.  I am informed that, on average, Learning for Life is charged approximately $355,000 per month by the BSA pursuant to the Learning for Life Shared Services Arrangement.  Additionally, the BSA collects program fees of approximately $250,000 per month on behalf of Learning for Life.

33.     I have been advised that Learning for Life is a core component of the BSA's mission, and provides essential integrated academic and character development programs, anti-bulling and cyber intimidation programs, and leadership development programs.  Since its founding in 1991, Learning for Life has served more than 25.5 million youth.  As such, the

14

Debtors believe, and I agree, that Learning for Life is central to the Debtors' mission and operations.

### 5. *Arrow WV, Inc.*

34.     Arrow WV, Inc. ("Arrow") is a non-stock, non-profit corporation under the laws of West Virginia that is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, and is governed by a separate board of directors. Arrow was formed in 2009 to facilitate the acquisition and development of the BSA's newest high adventure facility, the 14,000 acre Summit Bechtel Family National Scout Reserve (the "Summit")[8], located in the New River Gorge area of West Virginia.  Arrow owns the real property and improvements that comprise the Summit and leases the Summit to the BSA for nominal consideration pursuant to that certain *Shared Services Agreement and Lease of Premises*, dated as of February 13, 2017 (the "Arrow Agreement").   Under the Arrow Agreement, the BSA provides the necessary services required to operate the Summit Bechtel Reserve in West Virginia.  This includes, among other things, the payment of certain amounts to third parties on Arrow's behalf, such as utility services, certain taxes, construction, and maintenance costs.

35.     I understand that the BSA's expertise in operating the Summit is essential to its successful operation.  The Summit is one of the BSA's preeminent high adventure facilities, which also operates as a camp for BSA members and leadership training center for the millions of youth and adult leaders involved in Scouting.  The Summit offers a range of unique program activities, including mountain biking, BMX, skate boarding, archery, shooting, zip lines and ropes courses, climbing and rappelling, and other outdoor adventures.  The Summit also hosts large national events for the BSA, including the World Scout Jamboree in 2019 and the annual

---

[8]    Construction of the Summit was accomplished in part with the proceeds of two tax-free bond issuances, as discussed in Part I.E below.

National Scout Jamboree.  As such, the Summit Bechtel Reserve, and the BSA's services to Arrow in respect of this location, are essential to the Debtors' mission and operations.

### 6. *Canadian Entities.*

36.     Atikaki Youth Ventures Inc. ("Atikaki") and Atikokan Youth Ventures Inc. ("Atikokan") are non-share capital corporations formed under the laws of Canada, with registered addresses in Winnipeg, Manitoba.  Atikaki and Atikokan are each governed by a separate board of directors.

37.     I am informed that approximately one to three Canadian employees work seasonally at the Northern Tier high adventure facility (the "Northern Tier") locations in Canada from April to October.  Atikaki maintains Bissett, Manitoba base for the Northern Tier, which base offers canoe trips into the Atikaki Provincial Park and Woodland Caribou Provincial Park. Atikokan maintains the Don Rogert Canoe Base for the Northern Tier in Atikokan, Ontario, Canada, which base offers canoe trips into the Quetico and Crown Lands. I am informed that the Canadian employees who manage the seasonal Canadian operations at the Northern Tier locations are employed and compensated by Atikaki.  Atikaki processes payroll via Ceridian HCM, Inc., funds for which come out of a Northern Tier bank account at Royal Bank of Canada controlled by the BSA.  I have been advised that the operations and employees at the Northern Tier provided by Atikaki and Atikokan are essential to the success and servicing of the many Scouts who annually visit these locations.

### E.    Summary of Prepetition Indebtedness.

38.     As of the Petition Date, the Debtors were liable to the Prepetition Secured Parties (as defined below) pursuant to the Prepetition Loan Documents (as defined below) for the aggregate principal amount not less than (a) $61,542,720 in respect of letters of credit issued on behalf of the BSA under the 2019 RCF Agreement (as defined below), if such letters of credit are

16

ultimately drawn; (b) (i) $11,250,000 in respect of term loans made to the BSA, (ii) $25,212,317 in respect of revolving loans made to the BSA, and (iii) $44,299,743 in respect of letters of credit issued on behalf of the BSA, if such letters of credit are ultimately drawn, each under the 2010 RCF Agreement (as defined below); (c) $40,137,274 under the 2010 Bond Agreement (as defined below); and (d) $145,662,101 under the 2012 Bond Agreement (as defined below), in each case excluding accrued interest, fees, expenses, and other costs and obligations. The total of the Debtors' prepetition funded indebtedness plus outstanding letters of credit is $328,104,155. The obligations referenced in this paragraph are collectively referred to herein as the "Prepetition Obligations."

39.    The Prepetition Obligations are guaranteed by the Debtors and their non-debtor affiliate, Arrow (the Debtors and Arrow, collectively, the "Loan Parties")[9] pursuant to the terms of (a) that certain *Third Amended and Restated Security Agreement* dated as of March 21, 2019, by and among the BSA and Arrow, as debtors, JPMorgan Chase Bank, N.A. ("JPM"), as lender and collateral agent (in both capacities, the "Prepetition Secured Parties"), and the Issuer (as defined below) and (b) that certain *Consent and Security Agreement* dated as of February 3, 2020, by and among the Debtors and JPM (the agreements referenced in clauses (a) and (b), together, the "Prepetition Secured Agreements"). The Prepetition Obligations are secured by the "Prepetition Collateral," which consists of (i) a first-priority lien on the "accounts" and certain property arising out of or otherwise relating to "accounts," "deposit accounts," "securities accounts," and "investment property" (each as defined in Article 9 of the Uniform Commercial Code) and the "proceeds and products of any or all of the foregoing" of the Debtors, but

---

[9]    Although Arrow is a guarantor of the Prepetition Obligations, prior to the Petition Date, on February 17, 2020, the Debtors and Prepetition Secured Parties entered into that certain *Limited Waiver*, waiving certain existing and prospective events of default with respect to Arrow under the Prepetition Loan Documents. As noted above, Arrow is not a debtor in these chapter 11 cases.

excluding certain amounts that are donor-restricted funds and certain funds designated by the Board for specific purposes; and (ii) first-priority mortgages on the Debtors' headquarters in Texas and high adventure facilities in Florida, New Mexico, and Minnesota/Canada.[10]    The Prepetition Obligations are secured on a *pari passu* basis under the Prepetition Secured Agreements.

## 1.    *2010 RCF Agreement*.

40.    On August 11, 2010, the BSA entered into that certain Credit Agreement (as amended from time to time, the "2010 RCF Agreement"), pursuant to which JPM, as lender, provided the BSA with a revolving line of credit in the original aggregate principal amount of up to $100,000,000.  The 2010 RCF Agreement has two components — a $75,000,000 revolving credit facility, which provides for the issuance of secured letters of credit by JPM on behalf of the BSA (the "2010 Revolver"), and a $25,000,000 term loan (the "2010 Term Loan").

41.    Borrowings under the 2010 RCF Agreement bear interest at a fluctuating rate per annum measured by reference to either adjusted LIBOR, plus an applicable margin, or an alternative base rate.  The BSA also pays certain fees, commissions and related charges and expenses under the 2010 RCF Agreement.  Amortization payments under the 2010 Term Loan are due on a quarterly basis and interest payments under both the 2010 Term Loan and the 2010 Revolver are due on a monthly or quarterly basis depending on the interest rate election.  The 2010 Revolver is scheduled to mature on March 2, 2020, and the 2010 Term Loan is scheduled to mature on March 2, 2022.

---

[10]    The Prepetition Secured Parties do not have a mortgage on the Summit, but the Prepetition Secured Parties do have a lien on the proceeds of that certain $350.0 million *Promissory Note* with the BSA as lender and Arrow as borrower, dated June 30, 2019 (as amended, the "Intercompany Promissory Note").  The Intercompany Promissory Note is secured by a mortgage on the Summit property.  As such, the Summit is not considered part of the Prepetition Collateral.

42.    As of the Petition Date, $36,462,317 was outstanding under the 2010 RCF Agreement, which is comprised of $25,212,317 of revolving loans made, and $11,250,000 of term loans made.  In addition there are $44,299,743 of undrawn letters of credit.

2.    *2019 RCF Agreement*.

43.    On March 21, 2019, the BSA entered into that certain Credit Agreement (the "2019 RCF Agreement"), pursuant to which JPM, as lender, provided the BSA with a revolving line of credit of up to $71,500,000.  The 2019 RCF Agreement provides for the issuance of secured letters of credit by JPM on behalf of the BSA.

44.    Borrowings under the 2019 RCF Agreement bear interest at a fluctuating rate per annum measured by reference to either adjusted LIBOR, plus an applicable margin, or an alternative base rate.  The BSA also pays certain fees, commissions and related charges and expenses under the 2019 RCF Agreement.  Interest payments under the 2019 RCF Agreement are due on a quarterly basis.  The 2019 RCF Agreement was originally scheduled to mature on March 21, 2020.  On January 16, 2020, JPM consented to an extension of the maturity date of the 2019 RCF Agreement to March 21, 2021.

45.    As of the Petition Date, the Debtors' outstanding obligations under the 2019 RCF Agreement were comprised entirely of approximately $61,542,720 in undrawn letters of credit, all of which are secured by a segregated cash account that is part of the Debtors' cash collateral. The BSA's line of credit under the 2019 RCF Agreement was frozen as of November 22, 2019, and remained frozen as of the Petition Date.

3.    **Bond Agreements**.

a.    *2010 Bond Agreement*.

46.    On November 5, 2010, the Loan Parties entered into that certain Bond Purchase and Loan Agreement with The County Commission of Fayette County (West Virginia), as issuer

(the "Issuer"), and JPM, as lender and purchaser (as amended, restated, supplemented or otherwise modified from time to time, the "2010 Bond Agreement"), pursuant to which the Issuer issued The County Commission of Fayette County (West Virginia) Commercial Development Revenue Bond (Arrow WV Project), Series 2010A in an aggregate principal amount of $50,000,000 (the "Series 2010A Bonds") and Series 2010B in an aggregate principal amount of $50,000,000 (the "Series 2010B Bonds," and together with the Series 2010A Bonds, the "2010 Bonds"), the proceeds of which were loaned to BSA. The 2010 Bonds are due November 5, 2020. Interest on the 2010 Bonds accrues at 3.22%.

47.    On November 5, 2015, the BSA repaid the Series 2010A Bonds in full. As of the Petition Date, the Debtors' outstanding principal obligations under the 2010 Bond Agreement on account of the Series 2010B Bonds was approximately $40,137,274.

### b.    *2012 Bond Agreement*.

48.    On March 9, 2012, the Loan Parties entered into that certain Bond Purchase and Loan Agreement with the Issuer, as issuer, and JPM, as lender and purchaser (as amended, restated, supplemented or otherwise modified from time to time, the "2012 Bond Agreement," and together with the 2010 Bond Agreement, the "Bond Agreements," and the Bond Agreements, 2010 RCF Agreement, and 2019 RCF Agreement, collectively, the "Prepetition Loan Documents"), pursuant to which the Issuer issued The County Commission of Fayette County (West Virginia) Commercial Development Revenue Bond (Arrow WV Project) Series 2012 in the initial aggregate principal amount of $175,000,000 (the "2012 Bonds"). The 2012 Bonds are due March 9, 2022. Interest on the 2012 Bonds accrues at 2.94%.

49.    The Issuer loaned the aggregate proceeds of the 2012 Bonds to the BSA pursuant to that certain Promissory Note – 2012, executed by the BSA, as borrower, and payable to the order of the Issuer in the aggregate principal amount of $175,000,000 (the "2012 Note"). The

Issuer pledged the 2012 Note to JPM to secure the repayment of the 2012 Bonds.  The BSA then loaned the proceeds of the 2012 Bonds to Arrow to fund the development of the Summit High Adventure Facility under the Arrow Intercompany Note.   Arrow's obligations under the Intercompany Note are due March 31, 2029.

50.     As of the Petition Date, the Debtors' outstanding principal obligations under the 2012 Bond Agreement on account of the Series 2012 Bonds was approximately $145,662,101.

### 4.     Trade and Other Indebtedness.

51.     I have been informed that, in addition to the Prepetition Obligations, as of the Petition Date, the Debtors estimate that they have approximately $20 million of outstanding unsecured trade accounts payable and related accrued liabilities.   The BSA also sponsors a defined benefit pension plan that was approximately 89% funded with an underfunding of approximately $183 million as of February 1, 2019.   Since that time, the underfunding has been reduced by contributions and investment return.   In addition, as of the Petition Date, the BSA owes approximately $16 million on account of benefits outstanding under certain non-qualified retirement benefit plans under sections 457(b) and 457(f) of the Internal Revenue Code.[11] Further, as of the Petition Date, the BSA owes an estimated $30 million for ordinary-course accrued liabilities such as accrued payroll and benefits, self-insured medical claims, and taxes.

### PART II
### EVENTS AND CIRCUMSTANCES
### PRECEDING THESE CHAPTER 11 CASES

52.     As stated above, the BSA is currently a defendant in numerous lawsuits relating to historical acts of sexual abuse in its Scouting programs.   I understand that there are currently approximately 275 lawsuits pending in state and federal courts across the United States asserting

---

[11]    This amount does not include approximately $8 million on account of benefits outstanding for Local Council employees under these non-qualified benefit plans.

abuse-related claims against the BSA.  In addition, attorneys for abuse victims have provided information regarding approximately 1,400 additional claims that have not yet been filed, for a total of approximately 1,700 known asserted abuse claims.  Based on the information provided, approximately 90% of pending and asserted claims relate to abuse that occurred before 1988, when the BSA strengthened its existing youth protection programs,[12] which I understand included a more comprehensive volunteer screening database, additional supervision requirements and reporting obligations designed to keep would-be abusers away from youth, and improved training and other literature addressing ways to prevent, recognize, and respond to sexual abuse.

53.     The number of abuse claims asserted against the BSA has sharply increased in recent years, an increase which I understand coincides with a trend of states' enacting legislation to allow victims of sexual abuse to assert claims that would previously have been barred by applicable statutes of limitations.  The BSA recognized that it could not continue to address abuse litigation on a case-by-case basis.  For example, as noted above, the BSA spent more than $150 million on settlements and related legal and professional costs from 2017 through 2019. For these reasons, among others, beginning in late 2018, the BSA began to explore strategic options for achieving an equitable global resolution of abuse claims with the assistance of legal and financial advisors.[13]

---

[12]   A more detailed overview of the history of sexual abuse and youth protection efforts generally and within the BSA is set forth in the Informational Brief.

[13]   The BSA's declining Scout membership and associated revenue in recent years is another factor that prompted the BSA to review its strategic options.  As of December 2019, the BSA had approximately 2.2 million registered Scouts, down from approximately 2.6 million Scouts as of 2012.  Compounding this decline, as of December 31, 2019, the Church of Jesus Christ of Latter-day Saints concluded its 105-year relationship as a chartered organization with all Scouting programs around the world, including the BSA.  The effect of this change is expected to remove approximately 400,000 Scouts from the BSA's Scouting programs.  The inability to resolve abuse claims continues to put pressure on the BSA's membership and donations, which is further driving the BSA to seek a global resolution through a chapter 11 proceeding.

54.    The BSA determined at the outset of this strategic review to pursue a potential agreement with a critical mass of abuse victims and other relevant stakeholders that could be implemented through a prearranged chapter 11 plan.  A prearranged bankruptcy filing was the most desirable option, as the BSA believed it represented the quickest, most efficient, and least costly bankruptcy process that could be achieved under the circumstances.  As a non-profit corporation, considerations of economy and speed are of the utmost importance to the BSA.

55.    In connection with these strategic efforts, the BSA recognized that it would ultimately need to structure a settlement around a plan of reorganization that provides for channeling injunctions with respect to both current and potential future abuse claims.[14] Accordingly, the BSA determined, in consultation with its advisors, that it was necessary and appropriate to engage an independent third-party representative for future abuse claimants.  After considering possible candidates for the role, the BSA selected James L. Patton, Jr. to serve as prepetition future claimants' representative.  The BSA selected Mr. Patton due to his significant experience in complex mass tort cases in the chapter 11 context and his reputation for integrity in serving as a fiduciary in bankruptcy proceedings.  Mr. Patton, in turn, retained legal and financial advisors to assist him in conducting an analysis of the BSA's liabilities and assets and in negotiations with the BSA and other stakeholders.

---

[14]    Unlike a future claim in other mass tort contexts, there is no latency period for abuse.  In the abuse context, I understand that a future claim is properly understood as a claim related to abuse that has already occurred but which is held by an individual who (a) has not attained eighteen (18) years of age, (b) suffers from "repressed memory" such that he or she is not aware that he or she holds an abuse claim, or (c) has not discovered the injury or the connection between the injury and the abuse and who could not in the exercise of reasonable care have discovered the injury or connection between the injury and the abuse.  Given (i) the significant advertising and publicity surrounding abuse in scouting over the past year; (ii) the highly publicized nature of this restructuring; and (iii) the robust and comprehensive claims and noticing procedures that the BSA will implement through these cases, the BSA expects that the vast majority of potential claimants will be identified as part of this noticing process and does not expect that there will be significant future claims relating to prior abuse in the BSA's Scouting programs.

56.     The BSA also engaged in discussions with an ad hoc group of attorneys representing significant numbers of abuse claimants.  The ad hoc group was advised on restructuring matters by James Stang of the firm Pachulski Stang Ziehl & Jones LLP.  The BSA provided information to these attorneys, including Mr. Stang, regarding its liabilities and assets, and some attorneys for abuse victims provided information to the BSA regarding additional abuse claims that they asserted would be filed against the BSA in the future.  In particular, the attorneys asserted that they represented hundreds of abuse victims who had not yet filed suit.

57.     In addition, the BSA engaged in discussions with certain of its insurers about the nature and extent of available coverage for pending and potential additional abuse claims.  The BSA has procured commercial general liability policies from multiple insurers since 1962 to protect itself from risks including claims of sexual abuse or sexual misconduct.  Local Councils were subsequently included as "additional insureds" under these policies.  I understand, based on my discussions with the BSA's legal advisors, that the amount of remaining coverage under these policies is substantial, and that the BSA expects that the proceeds of these policies will comprise a substantial portion of the assets contributed to any victims compensation trust.

58.     These prepetition restructuring efforts involved several meetings with attorneys representing many abuse victims, including in a two-day mediation in early November 2019 with these attorneys, as well as the prepetition future claimants' representative and some of the BSA's insurers.  Unfortunately, the mediation was unsuccessful.  It became apparent that attorneys for abuse victims believed certain Local Councils with significant abuse liabilities have significant assets that could also be used to compensate victims.  Further, it became clear that attorneys for abuse victims would only accept information about the nature and extent of the BSA's available assets if provided through a court-supervised process.  The abuse victims' attorneys have

24

indicated a strong preference for the BSA to file for relief under chapter 11 so they can compel the production of information regarding the BSA's and local councils' liabilities and assets, as well as other data relating to abuse claims.  Accordingly, the BSA recognized in late 2019 that there were no meaningful prospects for a global resolution of abuse claims without the commencement of chapter 11 proceedings.

59.     Beginning after the conclusion of the November 2019 mediation, the BSA and its advisors turned their attention to preparing for a chapter 11 filing. The BSA recognized that prolonged bankruptcy proceedings would be costly and deplete funds available to compensate abuse victims.  As a non-profit that relies on member fees and donations to sustain its operations, the BSA believes, and I agree, that delays caused by protracted litigation and discovery, for example, would also negatively impact these revenue sources and ultimately jeopardize the BSA's ability to carry out its mission.  Accordingly, both prior to and immediately upon the commencement of these cases, the BSA took several steps designed to ensure that its chapter 11 cases would proceed expeditiously and to ensure that all stakeholders would be well positioned to work efficiently toward a global resolution of abuse claims.  These steps are discussed in detail in the Informational Brief.

## PART III
## FIRST DAY MOTIONS

60.     The Debtors have filed a number of First Day Motions, consisting of administrative motions and motions relating to the Debtors' business operations.  The Debtors believe, and I agree, that approval of each First Day Motion is an important element of their reorganization efforts and is necessary to ensure a seamless transition into chapter 11 with minimal disruption to their operations.  I have reviewed each of the First Day Motions or had their contents explained to me, including the exhibits thereto, and believe that the Debtors would

suffer immediate and irreparable harm absent the ability to continue their business operations as requested in First Day Motions.  Factual information with respect to each First Day Motion is provided below and in each First Day Motion.  Capitalized terms, to the extent not defined herein, have the meanings provided in the respective First Day Motions.

I.    **Administrative Motions.**

A.    ***Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* (the "Joint Administration Motion").**

61.    These chapter 11 cases involve two affiliated Debtors, Boy Scouts of America and Delaware BSA, LLC.  Because the Debtors' financial affairs and operations are closely related, most, if not all, of the motions, hearings, and orders in the bankruptcy proceedings will affect both of the Debtors.  In the Joint Administration Motion, the Debtors are requesting consolidation for procedural purposes only.  Accordingly, my understanding is that no party's substantive rights will be adversely impacted if the cases are jointly administered.  Given the integrated nature of the Debtors' operations, joint administration of the Debtors' cases will promote efficiency and ease the administrative burden on this Court and all parties in interest.

62.    Further, joint administration will significantly reduce the volume of paper that otherwise would be filed with the office of the Clerk of the Bankruptcy Court (the "Clerk"), will render the completion of various administrative tasks less costly, and will minimize the number of unnecessary delays.  Moreover, the joint administration of these chapter 11 cases will simplify supervision of these cases by the Office of the United States Trustee (the "U.S. Trustee").  Accordingly, the Debtors believe, and I agree, that joint administration of these chapter 11 cases is in the best interests of the Debtors' respective estates, creditors and all other parties in interest.

**B.** ***Debtors' Motion for Entry of an Order Extending Time to File (I) Schedules of Assets and Liabilities and Statements of Financial Affairs and (II) Rule 2015.3 Reports*** **(the "**<u>Schedules and Statements Motion</u>**").**

63.    There are potentially hundreds of creditors in these jointly administered cases. The Debtors run a massive national charitable organization with approximately 2.2 million registered youth members and 800,000 registered adult leaders across 261 Local Councils, in addition to operations at numerous properties, including, without limitation, High Adventure facilities located in Florida, Minnesota, New Mexico, and West Virginia, and approximately 175 Scout Shops across the country.   In contrast, the Debtors only have a limited number of employees with requisite expertise to consult with the Debtors' professionals.   To prepare the schedules of assets and liabilities and statements of financial affairs (collectively, the "<u>Schedules and Statements</u>"), the Debtors must first close their books as of the Petition Date, which is occurring in the middle of a month, and then compile information from their books, and records relating to creditor claims, as well as the Debtors' assets, liabilities, executory contracts, and unexpired leases.   This information is voluminous.   Collecting the necessary information requires a significant expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors in the near term, and such parties are simultaneously tasked with addressing the immediate needs of the Debtors' day-to-day operations.

64.    In addition, the Debtors directly and indirectly own three non-debtor subsidiaries for which they are required to file reports under Bankruptcy Rule 2015.3 (the "<u>2015.3 Reports</u>"). I believe that the scope and complexity of the Debtors' organization, coupled with the initiation of litigation and related protocols at the outset of these chapter 11 cases, necessitates an extension of the deadline to file the 2015.3 Reports.   As discussed above, the Debtors have a limited number of employees with competing demands on their time at this critical juncture of these chapter 11 cases.   In addition, submitting the 2015.3 Reports and the Statements &

Schedules at the same time will facilitate uniform information as it relates to intercompany balances.

65.    The Debtors' available resources to marshal the required information are strained, and collecting the necessary information to prepare both the Schedules and Statements and 2015.3 Reports requires a significant coordinated expenditure of time and effort from the Debtors, their employees, and their professionals.    Because focusing the attention of key personnel on critical operational and chapter 11-related issues during the early days of these chapter 11 cases will facilitate a smooth transition into chapter 11, I believe that the Debtors' request for a total of 58 days from the Petition Date to file their Schedules and Statements and 2015.3 Reports will maximize the value of their estates for the benefit of all parties in interest.

66.    The Debtors believe, and I agree, that the extensions requested in the Schedules and Statements Motion will aid the Debtors' efforts to ensure the accuracy and completeness of the Schedules and Statements and 2015.3 Reports which in turn will promote efficient administration of these chapter 11 cases.    Accordingly, it is both essential and in the best interests of the Debtors' respective estates and creditors that an interim order be entered extending the deadline to file the Schedules and Statements and 2015.3 Reports by an additional 30 days, for a total of 58 days from the Petition Date, without prejudice for the Debtors to request additional time if necessary.

C.    ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to File (A) a Consolidated List of Counsel Representing the Largest Numbers of Abuse Victims and (B) a Consolidated List of Other Unsecured Creditors of the Debtors, (II) Authorizing and Approving Special Noticing and Confidentiality Procedures, (III) Authorizing and Approving Procedures for Providing Notice of Commencement, and (IV) Granting Related Relief (the "Notice and Confidentiality Procedures Motion").***

67.    Pursuant to the Notice and Confidentiality Procedures Motion, the Debtors are seeking entry of interim and final orders (i) authorizing the Debtors to file a list of the twenty-

five (25) law firms representing the largest numbers of abuse victims asserting claims against the Debtors (the "Top Plaintiffs' Counsel List"), and a consolidated list of creditors holding the thirty (30) largest unsecured claims against the Debtors other than abuse-related claims (the "Unsecured Creditors List"), (ii) authorizing and approving special noticing and confidentiality procedures to protect the identities and personal contact information of victims of abuse, minors, employees, and volunteers, (iii) authorizing the Debtors to implement certain procedures for the mailing and publication of the notice announcing the commencement of these chapter 11 cases, and (iv) granting related relief.

68.    I understand that, pursuant to Bankruptcy Rule 1007(d), a chapter 11 debtor must file with its voluntary petition a list setting forth the names, addresses and claim amounts of the creditors, excluding insiders, that hold the twenty largest unsecured claims in the debtor's case (the "Top 20 List").

69.    As noted above, there are approximately 275 lawsuits pending in state and federal courts across the United States asserting abuse-related claims against the BSA (the "Abuse Lawsuits"). Many of these individuals have asserted their claims as "John Doe" claimants in the public record (collectively, the "Doe Claimants"). Given the sensitive nature of the Abuse Lawsuits, the Debtors seek to protect the identity of the abuse victims. Additionally, the Debtors cannot determine which of the Abuse Claims are the largest for purposes of a Top 20 List given the unliquidated nature of the claims asserted in the Abuse Lawsuits. Accordingly, the Debtors believe, and I agree, that it would be appropriate to provide the Top Plaintiffs' Counsel List in lieu of listing individuals in the Abuse Lawsuits on the Top 20 List in order to (i) protect those victims involved in the Abuse Lawsuits, including the Doe Claimants, against public disclosure of their identities and personal contact information, and (ii) provide supplemental information in

lieu of liquidated claim information that satisfies the intent of the Top 20 List.  The Top

Plaintiffs' Counsel List was compiled based on information from the pending Abuse Lawsuits

and claims raised during the Debtors' prepetition discussions with attorneys for holders of Abuse

Claims.

70.     In addition to the Top Plaintiffs' Counsel List, the Debtors are also filing the

Unsecured Creditors list, which provides a list of the largest thirty creditors of each Debtor other

than holders of abuse claims, including beneficiaries of nonqualified benefits plans, trade

vendors, and non-abuse litigants.  The Debtors believe, and I agree, that filing the Top Plaintiffs'

Counsel List and the Unsecured Creditors List will facilitate the disclosure of information

required by the Bankruptcy Rules, given the limitations of the known information regarding the

individual holders of Abuse Claims in these chapter 11 cases and the importance of protecting

the privacy of abuse victims.

71.     The Debtors are also seeking to protect the confidentiality of the identities, home

addresses, and/or other personal contact information of the Doe Claimants, certain named

holders of Abuse Claims, minors, and current and former employees and volunteers of the BSA

through the implementation of redaction procedures for the creditor matrix and any documents

filed in these chapter 11 cases containing such information.  In recognition of the sensitivity of

disclosure related to the Doe Claimants and minor litigants, I respectfully submit that the Court

approve the confidentiality procedures described in the Notice and Confidentiality Procedures

Motion to protect the privacy of abuse victims and minors and preserve their identities from

public disclosure.  Additionally, I believe that the circumstances of these chapter 11 cases

warrant the redaction of personal contact information and addresses for current and retired

employees and volunteers of the BSA.  I submit that it is appropriate to authorize the Debtors to

redact from any paper filed with the Court in these chapter 11 cases address and contact information of the Debtors' employees and volunteers because such information could be used to perpetrate identity theft. The threat of identity theft is of particular importance in these proceedings, which the Debtors expect to garner substantial media publicity.

> **D.**    ***Debtors' Application for Appointment of Omni Agent Solutions as Claims and Noticing Agent* Nunc Pro Tunc *to the Petition Date* (the "<u>Claims Agent Application</u>").**

72.    I understand that this Court is authorized to utilize agents and facilities other than the Clerk for the administration of bankruptcy cases. I believe that if Omni Agent Solutions is retained as the claims and noticing agent (the "<u>Claims and Noticing Agent</u>") in these chapter 11 cases, the distribution of notices and the processing of claims will be expedited and the Clerk will be relieved of the administrative burden of processing what may be an overwhelming number of claims. I have also reviewed the Claims and Noticing Agent's engagement letter and the description of services that the Claims and Noticing Agent has agreed to provide and the compensation and other terms of the engagement as provided in the application of the Claims and Noticing Agent. Based on that review, I believe that the Debtors' estates, creditors, parties in interest, and the Court will benefit from the Claims and Noticing Agent's experience and cost-effective methods. The Debtors assert, and I agree, that the appointment of the Claims and Noticing Agent is the most effective and efficient manner by which to provide noticing and claims processing services in the chapter 11 cases and is necessary and in the best interests of the Debtors and their estates.

## II.    <u>Operational Motions</u>.

**A.    *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to the Prepetition Secured Party Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, 364 and 507; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b); and (IV) Granting Related Relief* (the "<u>Cash Collateral Motion</u>").**

73.    As discussed in <u>Part I.E</u> above, the Debtors' Prepetition Obligations to the Prepetition Secured Parties are secured by liens on the Debtors' accounts and investment property and proceeds thereof, excluding certain deposit accounts and securities accounts. During these chapter 11 cases, the Debtors must obtain consent of the Prepetition Secured Parties, or without the consent of the Prepetition Secured Parties, court authorization to continue using "cash collateral" ("<u>Cash Collateral</u>") of the Prepetition Secured Parties.

74.    I believe that the Debtors' continued use of Cash Collateral as requested in the Debtors' Cash Collateral Motion is essential to preserve and maintain the going-concern value of the Debtors' estates.  The Debtors' ability to continue their operations without interruption is essential for the Debtors to maximize the value of their estates for the benefit of all stakeholders and avail themselves of the "breathing room" afforded by a chapter 11 restructuring. Accordingly, the Debtors urgently require Cash Collateral to continue to operate their capital-intensive businesses and to fund the administration of these chapter 11 cases.

75.    Absent the relief requested in the Cash Collateral Motion, the Debtors will not have sufficient liquidity to continue to fund their operations, fund employee payroll and benefits obligations, pay vendors of necessary goods and services, and satisfy other operational requirements during their restructuring.  All of the foregoing expenditures are essential to preserve the value of the Debtors' estates as a going concern.  The Debtors believe, and I agree,

that any delay in the Debtors' ability to access Cash Collateral would irreparably harm the Debtors and their estates.

76.     As a condition to their consent to the Debtors' use of Cash Collateral, the Prepetition Secured Parties seek the following forms of adequate protection against the post-petition diminution in value of their interest in the Cash Collateral resulting from the Debtors' use of such property: (a) replacement liens on all of the Prepetition Collateral of the Debtors' estates to the extent of any actual post-petition diminution in value; (b) allowed superpriority administrative expense claims against the Debtors as, I understand, is provided for in section 507(b) of the Bankruptcy Code, to the extent of any actual diminution in value of the Prepetition Collateral; and (c) periodic payments of (i) accrued and unpaid prepetition and post-petition interest, fees, and costs due and payable under the Prepetition Loan Documents and (ii) the reasonable and documented fees and expenses payable to the Prepetition Agent under the Prepetition Loan Documents.  The Debtors believe, and I agree, that the adequate protection provided in the Cash Collateral Motion is the product of extensive arms-length negotiations between the Debtors and Prepetition Secured Parties, is fair and reasonable under the circumstances, and is in the best interests of the Debtors, their estates, and all parties in interest.

**B.      *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Use Their Cash Management System, Including Existing Bank Accounts, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Exiting Business Forms, (II) Waiving the Requirements of 11 U.S.C. § 345(b) and (III) Granting Related Relief* (the "<u>Cash Management Motion</u>").**

77.     The Debtors maintain an integrated, centralized cash management system in the ordinary course of their operations to collect, transfer, invest and disburse funds generated by the BSA's operations and charitable donations made to the BSA by third parties (the "<u>Cash Management System</u>").  The Cash Management System facilitates the Debtors' cash monitoring,

forecasting, and reporting and enables the Debtors to maintain control over the administration of their bank accounts.  As part of the Cash Management System, the Debtors maintain 66 bank accounts (together with any other bank accounts that the Debtors may open in the ordinary course, collectively, the "Bank Accounts") at 23 banks and financial institutions (collectively, the "Banks").

78.     I understand that the Cash Management System is generally similar to the systems commonly employed by complex organizations comparable to that of the Debtors, but it is also unique in that the BSA is one of the only federally charted non-profit organizations of its magnitude.  The Debtors essentially maintain two segregated Cash Management Systems—one Cash Management System for restricted funds (the "Restricted Cash Management System") and one Cash Management System for unrestricted funds (the "Unrestricted Cash Management System").  I have been advised that the cash management restrictions and requirements set forth in section 345 of the Bankruptcy Code only apply to "money of the estate," which does not include Restricted Cash Management System, but the Debtors nevertheless are requesting relief with respect to their entire Cash Management System out of an abundance of caution.

### 1.     The Restricted Cash Management System.

79.     I have been advised that the Restricted Cash Management System comprises funds that are either subject to valid restrictions on the use of such funds imposed by a donor at the time of their contribution or bequest to the Debtor or otherwise being held in trust for non-debtors.  The Restricted Cash Management System consists of eight Bank Accounts at five Banks.  Specifically, donations made via check or cash[15] are deposited by the BSA directly into a

---

[15]     Donations in the form of equity securities are transferred into one of two Brokerage Accounts (as defined below) and promptly liquidated, at which time the proceeds are transferred to the Primary Concentration Account, if the funds are not subject to use restrictions, or the Donations Account, if the funds are subject to a donor's use restrictions.

donations account with JPM (the "Donations Account").  The vast majority of donations and

bequests received by the BSA contain donor restrictions, and as a result, all funds in the

Donations Account are treated as restricted unless the BSA's treasury department later

determines that particular funds were donated without requisite donor restrictions.  Any such

unrestricted funds are ultimately transferred out of the Donations Account to the Debtors'

primary concentration account, which holds unrestricted funds as described below.  The

remaining Bank Accounts in the Restricted Cash Management System consist of the following

accounts:

- **Restricted Donations Investment Account.**  If the BSA determines that restricted donations will not be spent in the forthcoming twelve-month period, the BSA transfers such funds from the Donations Account to a restricted donations investment account held at Goldman Sachs & Co. ("Goldman Sachs").

- **Summit Investment Account.**  The BSA invests restricted donations received for the benefit of the Summit Bechtel Reserve (the "Summit") in a separate investment account held at Goldman Sachs.

- **SBRSA Account**.  The Summit Bechtel Reserve Staff Association (the "SBRSA") collects association dues for purposes of granting scholarships to Scouts and holds the funds in a general account at JPM (the "SBRSA Account").  Dues paid by cash or check are deposited directly into the SBRSA Account and dues paid by credit card are deposited into the Credit Card Depository Account (as defined below) and then transferred through the Primary Concentration Account to the SBRSA Account.

- **SBRSA Investment Account.**  If the BSA determines that funds in the SBRSA Account will not be spent in the forthcoming twelve-month period, the BSA transfers funds from the SBRSA Account to a restricted investment account at BlackRock, Inc. ("BlackRock").

- **Local Council Unemployment Investment Account.**  The BSA invests funds contributed by Local Councils that have opted out of their respective state unemployment programs in an investment account held at Goldman Sachs, which funds are used to reimburse the respective state for claims paid out to former employees.

- **Deferred Compensation Investment Account (Local Council Sub-Account).**  The BSA invests funds for a non-qualified deferred compensation plan, created pursuant to section 457(b) of the Internal Revenue Code (the "457(b) Plan"), in an investment

account (the "Deferred Compensation Investment Account") held at Fidelity Investments ("Fidelity"). The Deferred Compensation Investment Account contains two subaccounts: one for BSA employees and one containing funds contributed by and held in the name of certain Local Councils with employees who participate in the 457(b) Plan. I am advised that funds in this investment account are invested from a menu of funds at the direction of the individual participants in the 457(b) Plan.

- **California Gift Annuity Investment Account.**[16] The BSA invests funds from California-based charitable gift annuity donations in a segregated investment account with State Street Bank and Trust Co. ("State Street"), which funds are ultimately due and payable to the individual donors over time.

80. As discussed in Part I.D above, the BSA makes direct investments in the Partnership and the Endowment Master Trust, which is also a limited partner of the Partnership. The BSA makes capital contributions to the Partnership from time to time in exchange for partnership units in proportion to, and in exchange for, such contributions. I understand that as of the Petition Date, the value of the BSA's interest in the Partnership was approximately $83 million total (including approximately $5 million held by the Endowment Trust), all of which consists of donor-restricted funds.

## 2. Unrestricted Cash Management System.

81. The primary Bank in the Unrestricted Cash Management System is JPM, with which the BSA maintains 23 of its unrestricted Bank Accounts. The BSA also maintains 36 Bank Accounts with a number of other Banks, which are listed on Exhibit 1 to Exhibit A of the Cash Management Motion. The unrestricted Bank Accounts generally fall into one of five broad categories: (a) Concentration Accounts, which are used to facilitate the collection of cash

---

[16] California state law imposes a minimum reserve requirement for the benefit of California Annuitants, and requires that the reserves be held in trust for the benefit of such California Annuitants in a segregated account which is separate from reserves for the benefit of Annuitants of any other state. See CAL. INS. § 11521.1 (West 2018). Various other states also impose minimum reserve and segregation requirements, but do not require that those reserves be held separately from the reserves for Annuitants from other states. See, e.g., N.Y. INS. LAW § 1110(b) (McKinney 2019); FLA. STAT. § 627.481(2)(a) (2019). To comply with applicable state law, the BSA maintains two Gift Annuity Accounts at State Street: one for California Annuitants, and one for all other Annuitants.

received by the Debtors; (b) Depository Accounts, which are used to collect the organization's revenues and transfers funds into other Bank Accounts in the Cash Management System; (c) Disbursement Accounts, which are used to pay general operating costs (such as rent, insurance premiums, and taxes, among other things); (d) Investment Accounts, which are used to invest the BSA's working capital and other funds awaiting disbursement, as well as certain funds I understand are held in trust for certain related non-debtor entities; and (e) the L/C Cash Collateral Account, which I understand holds cash that collateralizes a standby letter of credit issued by JPM on behalf of the BSA for the benefit of Old Republic International Corporation in connection with the BSA's general liability insurance program. I understand that, as of the Petition Date, the Debtors hold approximately $265 million in unrestricted cash and investments in the Unrestricted Cash Management System.

82.    With respect to the Investment Accounts that are part of the Unrestricted Cash Management System, other than the Deferred Compensation Investment Account, I am informed that such Investment Accounts either invest solely in short-term government treasury obligations through the State Street 1-3 Year U.S. Agency Index (CM2SNON) and the State Street 1-3 Year U.S. Treasury Index (CM2QNON) (the "Government Bond Funds") or the following money market funds (the "Money Market Funds"): the BlackRock FedFund (TFDXX); the Federated Government Obligations Fund (GOFXX); the Goldman Sachs Financial Square Government Fund (FFTXX); and the JPMorgan United States Government Money Market Fund (OGVXX). I have been advised that each of the Money Market Funds have the highest money market fund rating and invest exclusively in United States Treasury bills and United States Treasury Notes owned directly or through repurchase agreements, as shown in the prospectuses attached as Exhibits C-1 – C-4 to the Cash Management Motion. I have been advised that funds in the

Deferred Compensation Investment Account are invested from a menu of funds at the direction of participants in the 457(b) Plan and the BSA has no control over such investments.

83.     I am also informed that in the ordinary course of business, the Banks charge, and the Debtors pay, honor or allow the deduction from the appropriate account, certain service charges and other fees, costs and expenses (collectively, the "Bank Fees").  Historically, the Debtors estimate that they are charged approximately $25,000 in total Bank Fees per month.  I am informed that approximately $17,500 of accrued but unpaid Bank Fees are outstanding as of the Petition Date (collectively, the "Prepetition Bank Fees"), approximately all of which will become due and owing within the first 30 days of these chapter 11 cases and prior to entry of a final order (the "Interim Period").

84.     The Debtors also maintain a purchase card program (the "Purchase Card Program") with JPM.  Under the Purchase Card Program, the Debtors have issued credit cards to eligible employees to be used for preauthorized travel and other expenses related to the BSA's operations, which expenses are typically limited to point-of-purchase expenditures.  The purchase cards are not utilized for paying for items such as invoices for goods or services or large recurring expenses.  As of the Petition Date, only 14 of the Debtors' employees held cards issued and authorized for use under the Purchase Card Program with a total aggregate maximum balance of $225,000 under the Purchase Card Program.  The Purchase Card Program is critical to the Debtors' ability to carry out their ongoing operations without disruption because they enable eligible employees to engage in business travel and pay for small but necessary expenses incurred in the Debtors' daily operations without undue delay.  Payments under the Purchase Card Program are automatically debited from the Primary Concentration Account on the 10th

day of each month (or on the next business day, as applicable).  The Debtors' average aggregate monthly expenditures under the Purchase Card Programs are approximately $180,000.

85.     I understand that the U.S. Trustee Operating Guidelines for this district require debtors in possession to, among other things, (a) close all existing bank accounts and open new debtor-in-possession bank accounts; (b) establish one debtor-in-possession account for all estate monies required for payment of taxes, including payroll taxes; (c) physically set aside all monies required by law to be withheld from employees or collected from others for taxes; (d) open a new set of books and records as of the commencement date of the case; (e) use new business forms indicating the debtor-in-possession status of the chapter 11 debtor; and (f) make all disbursements of estate funds by check with a notation representing the reason for the disbursement.

86.     I believe that the enforcement of these provisions of the U.S. Trustee Operating Guidelines during these chapter 11 cases would be expensive and burdensome, and would severely disrupt the Debtors' operations however, because of the nature and complexity of the BSA's operations and the significant volume of collections, disbursements, and movement of funds through the Cash Management System on a daily basis.  Indeed, I understand the Debtors' treasury department does not have enough staff to run another, separate cash management system.  By contrast, I believe that maintaining the current Cash Management System, including the Purchase Card Program, will facilitate the Debtors' smooth transition into these chapter 11 cases by, among other things, minimizing delays in paying post-petition debts and eliminating administrative inefficiencies.  Finally, I believe that maintaining the current Cash Management System will allow the Debtors' treasury and accounting employees to focus on their daily

responsibilities as opposed to the non-accretive task of reconstructing the Cash Management System.

87.     Moreover, I do not believe that any parties in interest will be harmed by maintaining the Cash Management System.  I understand that the Debtors have implemented appropriate measures to ensure that Debtor entities will not make unauthorized payments on account of prepetition obligations.

88.     Additionally, I believe that according certain flexibility to the Banks, as requested in the Cash Management Motion, is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether the Debtors may pay a particular item in accordance with a Court order or otherwise.  Considering the nature and complexity of their operations, the Debtors need to conduct transactions by debit, electronic fund, ACH payments, and other similar methods.  I therefore believe that if the Debtors are denied the opportunity to conduct transactions by debit, electronic fund, ACH payments, or other methods used in the ordinary course, the Debtors' operations would be disrupted unnecessarily, burdening the Debtors and their creditors with additional costs.

89.     Finally, I believe that it is appropriate for the Court to authorize the Debtors to continue to pay the Bank Fees, including any prepetition Bank Fees.  I believe that material benefit of maintaining the Cash Management System to avoid disruption and costly delay is warranted in comparison to the relatively modest amount of the Bank Fees.

**C.**    ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Obligations Under Shared Services Arrangements, (II) Authorizing Continued Performance of Obligations Under Intercompany and Shared Services Arrangements, and (III) Granting Related Relief*** **(the "**Shared Services Motion**").**

**1.    Local Council Shared Services Arrangements.**

90.    As discussed in Part I above, the BSA carries out its mission through Local Councils.  The most important functions served by Local Councils are their recruiting of Chartered Organizations and their oversight of the operation of the Scouting units that those Chartered Organizations create.  Local Councils also provide other services essential to Scouting, including: funding of local Scouting programs and initiatives; recruiting of Scouts and volunteer leaders; Scout and volunteer training; opportunities for rank advancement; local enforcement of the BSA's policies, rules, and regulations; and registration of members and leaders.  In addition, many Local Councils own and operate service centers, camps, and other facilities that provide the local resources necessary for delivery of a successful Scouting program to the approximately 2.2 million youth participants of the BSA.

91.    The Local Councils generally do not receive financial support from the BSA, but as described above, the BSA uses its national scope and size to provide other types of support to the Local Councils.  For example, the BSA offers health and welfare and retirement benefits programs to eligible, full-time employees of the Local Councils (the "Local Council Benefits Programs").  These benefits are paid for by the BSA, which in turn obtains monthly reimbursement from the Local Councils—many of which would not otherwise be able to provide these vital benefits to their employees without expending significant amounts of Local Councils' limited financial resources.

92.    In addition to the Local Council Benefits Programs, the BSA facilitates back-office accounting, human resources, information technology, member recruitment support and

fundraising, marketing communications, leadership training, and other related support to the Local Councils.  The BSA also provides liability insurance at the national level for the Local Councils, local units, and their volunteers and leaders.  The various management, administrative, and support services that the BSA provides to the Local Councils (the "Local Council Shared Services Arrangements") have historically been of an integrated nature and generally can be performed more efficiently and effectively for all entities in the organizational structure, rather as opposed to requiring performance by each Local Council alone.  The Local Councils would be incapable of operating their organizations in their respective geographic regions absent the services provided under the Local Council Shared Services Arrangements.

a.    *Overview of Local Council Shared Services Arrangements*.

93.    I am informed that the Local Council Shared Services Arrangements include, without limitation, the following services provided by the BSA:

- human resources services, including with respect to employee benefits, online training from Scouting University for positions within the BSA, human resources software and recommended policies and procedures through an employee handbook template used by most Local Councils;

- accounting technical support, including accounting software, systems, and procedures, and IT support, including network connectivity, firewalls, and support services;

- training support services for Local Council staff and professional development training for Scouters, and program tools and training for year-round camp operation;

- program services, including the production of literature such as handbooks, merit badge pamphlets, brochures, and supplemental training materials;

- supply chain services, including the provision of uniforms, equipment, and program supplies and shipping of such merchandise;

- bulk purchasing of custom patches for Scout rank and merit achievements;

- national primary general liability insurance coverage for all registered volunteer leaders and Local Councils on a worldwide basis (the "Insurance Program");

- legal services, including youth protection resources, training, and background checks for all registered volunteers and staff;

- corporate affairs and community involvement and relationship services, including setting and maintaining program standards to ensure national consistency across Local Councils and maintaining and developing new relationships with organizations that use the Scouting program;

- marketing and communications support services, including the coordination of a communications network via publications such as *Boys' Life* and *Scouting* magazine; and

- office support services, including office planning and evaluation, extensive financial counseling, planned giving and fundraising information, and professional personnel support.

94.    In addition, I am informed that the Local Council Shared Services Arrangements include, without limitation, the following services provided by the Local Councils:

- collection of member dues and payment of various fees to the BSA;

- oversight of programming at the unit level and delivery of Scouting programs;

- organization, registration, and support of all Chartered Organizations to form units led by adult volunteers;

- recruitment and retention of membership and volunteer leaders;

- use of Local Council office space for significant Scout Shop retail merchandise and product sales;

- local enforcement and maintenance of the BSA's policies, rules, and regulations; and

- ownership and operation of hundreds of camps, facilities, activities, and events for members of the BSA.

95.    During 2019, approximately $100 million in total was billed by the BSA to the Local Councils for services under the Local Council Shared Services Arrangements (excluding the remittance of membership registration fees), and a similar amount is expected for 2020.  The

BSA bills the Local Councils monthly for these services, with payments from the Local Councils typically remitted within thirty (30) days.

<div align="center">

**b.**    *Fees Charged*.

</div>

96.    I am informed that the BSA charges a series of fees to the Local Councils in respect of the Local Council Shared Services Arrangements.    The fees are not intended to precisely compensate the BSA for services provided to the Local Councils, as the Local Councils do not charge the BSA for services rendered to the BSA.

- **National Service Fee**.   The BSA charges a national service fee based on a percentage of budgeted Local Council wages of approximately $8.7 million annually, aggregated across all of the Local Councils and billed in ten installments.

- **Charter Renewal Fees**.   In connection with the annual renewal process for Local Council charters, the BSA charges a $100 charter fee per Local Council.

- **Information Services Fee**.   The BSA charges a monthly fee for a portion of the IT services provided to the Local Councils, related primarily to firewalls, connectivity, and related support.   In 2019, the average monthly fee across the Local Councils was approximately $675 per Local Council.

97.    In addition to the above, I understand that the BSA provides certain third-party services to the Local Councils at cost, billed to the Local Councils on an as-requested basis.   The BSA charges the Local Councils for actual third-party costs associated with providing Local Council Benefits Programs to Local Council Employees (as defined below), director and officers' insurance, shipping and freight charges for wholesale product purchases, training courses, fees for conferences, camp schools, registration shared services, fund development, and magazine subscriptions.

<div align="center">

**c.**    *Local Council Benefits Programs*.

</div>

98.    The BSA offers the same comprehensive health and welfare and retirement benefits available to eligible employees of the BSA (the "<u>Local Council Benefits</u>") to

<div align="center">

44

</div>

approximately 6,600 eligible full-time[17] employees of the Local Councils (the "<u>Local Council Employees</u>") and their dependents, as well as their eligible survivors[18] (the "<u>Local Council Survivors</u>") and retirees[19] (the "<u>Local Council Retirees</u>").  The Local Council Benefits Programs include the following:

- **Health Insurance Plans**:  The Debtors offer Health Insurance Plans (as defined below) to Local Council Employees, Local Council Survivors, and Local Council Retirees.  The Debtors are responsible for paying claims on the self-insured Health Insurance Plans and premiums on the other Health Insurance Plans (the "<u>Health Benefit Claims</u>").  The Debtors bill the Local Councils monthly for the total estimated cost of the Health Insurance Plans in which each Local Council's Employees participate, and the Local Councils are responsible for deducting Local Council Employee contributions from their paychecks and remitting both this amount and their employer share to the Debtors.  I understand that the Debtors believe that, with the exception of certain administrative costs that they would likely bear in any event on account of its own employees, the full cost of these benefits as it relates to the Local Council Employees is billed to the Local Councils.

- **Health Savings Account Program**: The Debtors offer their Health Savings Account Program (as defined below) to Local Council Employees with Health Insurance Plans qualifying as a high-deductible medical plan.  Approximately 1,600 Local Council Employees participate in the Health Savings Account Program, which is administered by UnitedHealthcare and Optum.  Annually, the Medical Plan (as defined below), as administered by the BSA, contributes $500 to each health savings account opened between January 1 and June 30, and $250 to each account opened on or after July 1.  This contribution is covered by the employer portion of the medical premiums charged to the Local Councils.

- **COBRA Benefits:**  Certain former Local Council Employees covered by the Health Insurance Plans may elect to continue insurance coverage under the Health Insurance Plans after their termination.    There are currently

---

[17]    Local Council Employees are considered "full-time" if they work 21 or more hours per week year-round and were hired on or before May 31, 2004, or if they work 30 or more hours per week year-round if hired on or after June 1, 2004.

[18]    Survivors include the spouse and/or dependent children of a deceased Local Council Employee who was enrolled in the BSA Retirement Plan (as defined below).

[19]    Retirees include Local Council Employees who have retired from the Local Councils and are members of the BSA Retirement Plan; Retirees who retired on or after January 1, 2005 are required to have at least ten years of service in order to be eligible for continuing Health Insurance Plan benefits.  Retirees must be under age 65 to receive Local Council Benefits.

approximately 20 former Local Council Employees who are COBRA participants, and they are responsible for paying all premiums associated with the COBRA Benefits, which by statute are set at 102% of cost to cover additional administration costs, which are the responsibility of the Debtors.

- **Scout Executives' Alliance:**  Certain commissioned professional, executive, and professional-technical Local Council Employees and Retirees are eligible to enroll and become members of the Alliance (as defined below), which provides supplemental life insurance benefits to its members.  Approximately 2,050 Local Council Employees' contributions to the Alliance are deducted from their paychecks by the Local Councils and remitted to the Debtors for deposit in the Alliance operating account, the amount of which is equal or greater than the Debtors' cost to procure the insurance.

- **Disability Insurance:**  Local Councils provide long-term disability insurance and may elect to offer short-term disability insurance to their respective Local Council Employees, which replaces a portion of an eligible party's compensation for specified periods of time when such party is unable to work due to a non-work related injury or illness.  Approximately 4,300 Local Council Employees participate in the Disability Insurance (as defined below) programs.  Short-Term Disability Insurance (as defined below) is funded by premium payments made by Local Council Employees, which are deducted from their paychecks by the Local Councils. Long-Term Disability Insurance (as defined below) is funded by premium payments by the Local Council. Both amounts are remitted to the BSA, which makes the premium payment to the appropriate provider.

- **Unemployment Plan:**  Local Councils may elect to set aside funds for potential future unemployment claims of their respective Local Council Employees (the "<u>Unemployment Plan</u>").  A third-party vendor, 501(c) Services, administers the Unemployment Plan.  The BSA invoices the Local Councils for their set premiums and holds the Local Councils' pooled assets in an unemployment fund.  The BSA reimburses 501(c) Services for claims paid out.

- **Pension Plan:**  Approximately 10,900 Full-time Local Council Employees with at least one year of service and Retirees participate in the Debtors' Pension Plan (as defined below).  Entry into the Pension Plan was frozen on December 31, 2018, and no Local Council Employees have been permitted to become active participants in the Pension Plan after such date. "Grandfathered" Local Council Employees with fifteen (15) years of vesting service and age plus vesting service equal to sixty (60) years or more were permitted continue to participate in the Pension Plan, while "non-grandfathered" employees were automatically enrolled in the Match Savings Plan, described below.  Local Council Employees enrolled in the Pension Plan contribute 4.25% of their salary to the Pension Plan.  Each Local Council

provides 7.75% of total wages to fund retirement programs, which is first used to pay for the employer match to the Match Savings Plan (described below) and any residual is contributed into the Pension Plan. Total Local Council Employee contributions to the Pension Plan in the 2019 plan year were approximately $3.3 million, which the Local Councils deduct from such employees' paychecks and remit to the BSA after the BSA has paid such amounts to the Pension Plan on behalf of the Local Council Employees. The Pension Plan is managed by the BSA and is administered by Morneau Shepell. The Pension Plan trust pays Morneau Shepell's administrative fees on behalf of the Local Councils

- **Match Savings Plan:** On and after January 1, 2019, the Pension Plan was amended to become a two-tier plan. Pursuant to the amendment, "non-grandfathered" Local Council Employees were automatically enrolled into the Match Savings Plan. The Match Savings Plan is a 403(b) defined contribution retirement plan, pursuant to which approximately 4,000 Local Council Employees currently make pre-tax payroll deductions up to Internal Revenue Code limitations. In addition, the Local Councils make employer matching contributions. For "grandfathered" Local Council Employees receiving benefits under the Pension Plan, each Local Council matches 50% of Local Council Employee contributions up to 6% of pay. With respect to non-grandfathered Local Council Employees under the Match Savings Plan, the Local Council makes an automatic contribution of 1.75% of an employee's pay regardless of whether a Local Council Employee makes an Employee Contribution, and matches 100% of employee contributions up to 6% of pay. Each month, the Local Councils remit funds for their Local Council Employees' withholdings and employer match for the Match Savings Plan, which the Local Councils deduct from such employees' paychecks and provide from their own funds, respectively. Fidelity Workplace Services administers the Match Savings Plan, subject to payment of an administrative fee out of Match Savings Plan funds on behalf of the Local Councils.

- **Other Benefits Programs**: The Debtors offer certain other welfare benefits to Local Council Employees, including a 125 Plan to reduce taxable income by subtracting Local Council Employees' costs of coverage under certain Local Council Employee Benefits Programs from such employees' taxable income, an Employee Assistance Program for counseling as part of the Medical Plan administered by UnitedHealthcare, a Vitality Program, which offers wellness training and benefits, and a Naturally Slim Program, focused on improving eating habits.

99.    I am informed that, on average, the Debtors pay approximately $1.4 million per month in respect of the Local Council Benefits Programs, which excludes certain administrative fees paid with respect to overseeing the Local Council Benefits Programs, some of which are not

47

directly reimbursed by the Local Councils, and excludes Health Benefit Claims. As discussed below in connection with the Wages Motion (as defined below), any of the third parties who charge administrative fees in connection with administering the Employee Benefits Programs view the BSA as the obligor with respect to amounts that come due under such programs for employees of the BSA and the Local Councils. Thus, the BSA would be required to pay an entire invoice in order to continue a given Employee Benefit Program for both the BSA and Local Council Employees. I understand that, in recognition of this, for certain of the Employee Benefits Programs, the Debtors are seeking authority in the Wages Motion to pay certain prepetition and post-petition third-party administrative fees with respect to both BSA and Local Council Employees.

100.    Specifically, I am informed that the BSA pays applicable employer contributions of the Local Councils and the Local Council Employee deductions in respect of the Local Council Benefits Programs on behalf of the Local Councils and Local Council Employees, which deductions are invoiced and billed to the Local Councils on a monthly basis. The Local Councils typically remit payment to the BSA for its payment of the employer contributions and employee deductions to the benefits providers within thirty (30) days. Additionally, the Debtors pay certain administrative and claims fees on behalf of both BSA employees and Local Council Employees in connection with offering these benefits to all employees, which, in most cases, are included in the premium amounts and reimbursed by the Local Councils. I am informed that the Debtors estimate that approximately $1,726,000 in the aggregate in respect of the Local Council Benefits Programs will become due and payable within the Interim Period.

101.    I understand that the Local Council Employees rely on the Debtors and the Local Council Shared Services Arrangements in order to receive vital benefits to assist them with their

daily living expenses and health and welfare.  The Local Council Employees and their families, along with Retirees and Survivors of the Local Councils, would be subject to significant financial hardship if the Debtors could not honor prepetition obligations that may be outstanding as of the Petition Date under the Local Council Benefits Programs or continue to administer the Local Council Benefits Programs without interruption during the pendency of the Debtors' chapter 11 cases.  I have been advised that if the Debtors were to cease providing the Local Council Benefits Programs, the Local Councils are not structured such that they would be able to offer these critical benefits, and the Local Council Employees would lose access to basic healthcare and welfare benefits.  As a result, the Debtors' failure to honor these obligations pursuant to the Local Council Shared Services Arrangements would likely result in significant attrition in the Local Councils at a critical time in the BSA organization's operations.

### d.    *Non-Qualified Deferred Compensation Plan*.

102.    I am informed that, at their election and expense, certain Local Councils have participated in the 457(b) Plan.  The funds withheld from Local Council participants are remitted directly from each Local Council to the 457(b) Plan manager, Fidelity.  Fidelity handles investing the funds in accordance with the participants' direction and disbursement of the funds over a period of time not to exceed ten years as the participant directs upon their retirement. There is currently approximately $960,000 held by Fidelity related to deferrals by seven (7) Local Council participants.  I am informed that Fidelity's administrative fees for management of the 457(b) Plan are paid directly by the plan participants from their 457(b) Plan assets.  While this account is in the name of the BSA, I am informed that the funds of the Local Council participants are segregated in a separate sub-account, and the Debtors request that Fidelity be authorized to continue to make payments to Local Council participants out of those funds on a post-petition basis.  I am informed that the Debtors estimate that of the approximately $960,000

held by Fidelity on account of deferrals by the Local Council 457(b) Plan participants, approximately $10,000 will become due and owing during the Interim Period.

e.  *National General Liability Insurance Program*.

103.    I am informed that another central component of the Local Council Shared Services Arrangements is the BSA's provision of the Insurance Program.  Under the Insurance Program, the BSA offers primary general liability insurance coverage for all registered volunteer leaders, Local Councils, Chartered Organizations and units on a worldwide basis engaged in official Scouting activities.  The Insurance Program is comprised of a series of primary and excess general liability policies, which renew on March 1 of each year.  The policies under the Insurance Program apply to liability exposures of the BSA, its Related Non-Debtor Entities, and the Local Councils, in addition to Chartering Organizations, units, and volunteers.  I am informed that malpractice, non-owned aviation, maritime liability, and employment practices liability is included in the Insurance Program.[20]

f.  *Local Council Scout Shops and Other Local Council Disbursements.*

104.    As discussed in Part I, a significant portion of the BSA's annual revenue comes from retail merchandise and product sales at approximately 175 Scout Shops across the United States.  Annually, these sales generate approximately $120 million in total revenue to the BSA.  I am informed that approximately 135 Local Councils support these national sales efforts by designating a portion of their office space as a BSA Scout Shop (the "Local Council Scout Shops") pursuant to lease agreements with the BSA.  The Local Council Scout Shops are

---

[20]    Local Councils retain responsibility for the first $1 million per occurrence for owned automobile liability insurance and non-owned and leased or hired vehicle coverage for Local Council Employees and volunteers engaged in official Scouting activities or on Scouting or Local Council business.  Local Councils are also responsible for crime/bond/fiduciary liability insurance, workers' compensation insurance for Local Council Employees, and property insurance.

locations where the BSA sells uniforms, apparel, camping equipment, and other merchandise directly to BSA members.  I am informed that, in the aggregate, approximately $90.0 million in annual sales to the BSA is generated by the Local Council Scout Shops.  In return for the lease of Local Councils' office space, the BSA remits monthly rent payments to such Local Councils based on a percentage of sales.  I have been advised that this payment is calculated as eight percent (8%) of net sales at the Local Council-provided Scout Shop location, plus an additional five percent (5%) escalator on annual sales above $750,000 at such location.  I understand that, on average, the BSA pays approximately $635,000 per month in the aggregate to the Local Councils in respect of the Local Council Scout Shops.

105.    I am informed that, as a part of its support of Local Councils, the BSA makes certain other miscellaneous disbursements to the Local Councils by the BSA ("Other Local Council Disbursements").  These disbursements include grants to Local Councils and Scouts made from donor-restricted funds, Local Council fees collected on the BSA's online platforms on behalf of the Local Councils, sending amounts that the BSA collects on behalf of the Local Councils as a part of various fundraising efforts and campaigns, and reimbursing Local Council Employee travel expenses when required by the BSA for meetings or conferences.  For the calendar year 2019, these amounts were approximately $7.0 million.  I am informed that, as of the Petition Date, the Debtors estimate that the amount of accrued and outstanding amounts owed to the Local Councils in respect of the Local Council Scout Shops and Other Local Council Disbursements is approximately $370,000.

106.    I am informed that, as of the Petition Date, approximately $11.5 million was due and owing to the BSA on account of the Local Council Shared Services Arrangements exclusive of remittance of membership registration fees.  The BSA estimates that it owes approximately

$1,726,000 on account of the Local Council Benefits Programs (excluding amounts that may be owed in respect of Health Benefit Claims), and approximately $370,000 to the Local Councils on account of the BSA's use of the Local Councils' real property for Scout Shop sales and other Local Council disbursements—all of which will become due and owing during the Interim Period.

### 2.    Related Non-Debtor Entities Shared Services.

107.    As discussed in Part I.D above, under the Shared Services Arrangements, the BSA also receives services from BSAAM, Arrow, Learning from Life, the BSA Foundation, Atikokan, and Atikaki (the "Related Non-Debtor Entities").  These services include investment and foundation management, lease transactions, and conference and training support.  In return, the BSA provides centralized management, cash management, tax administration, and other centralized functions that are essential to the successful operation of the Debtors' large-scale nonprofit organization.  The BSA administers these shared services with the Related Non-Debtor Entities through ordinary course intercompany receivables and payables between the BSA and such entities (the "Related Entity Transactions").

108.    While the Local Councils facilitate the Debtors' mission and are vital in reaching participants at a local level, the Related Non-Debtor Entities provide specialized services under the Shared Services Arrangements that are necessary to facilitate the BSA's national reach, including, among other things, investment and foundation management, management of national programs, lease transactions, and conference and training support functions.  With the exception of Atikaki, these Related Non-Debtor Entities do not maintain their own employees or management.  Instead, these entities are parties to certain Shared Services Arrangements through

which the BSA provides certain centralized management, cash management, tax administration, and other centralized functions.[21]

109.    The BSA conducts these shared services with the Related Non-Debtor Entities through ordinary course Related Entity Transactions.    The Shared Services Arrangements between the Debtors and the Related Non-Debtor Entities have historically leveraged economies of scale and promoted a more efficient use of the organization's limited non-profit resources, providing for the efficient administration of necessary services across the entire BSA organizational structure (as opposed to each Related Non-Debtor Entity acting on its own).

110.    The Debtors believe, and I agree, that the Shared Services Arrangements provide increased efficiency and cost-saving measures to the Debtors' daily administrative and corporate responsibilities.    Indeed, an inability to continue performance under the Shared Services Arrangements would severely disrupt the Debtors' business operations and distract the Debtors' personnel from ongoing restructuring efforts.

D.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay of Related Administrative Obligations, (II) Authorizing Applicable Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers, and (III) Granting Related Relief* (the "Wages Motion").

111.    As of the Petition Date, the BSA employs approximately 1,650 individuals to deliver the Scouting program at the national level across the BSA organization, which include corporate managers, personnel for various corporate functions including legal, technology, marketing and communications, registration systems, national events and human resources personnel, personnel for print and magazine publications of the BSA, training and leadership

---

[21]    The BSA has approximately thirty-two (32) employees who are dedicated to the following Related Non-Debtor Entities: four (4) for BSAAM, three (3) for Learning for Life, and twenty-five (25) for the BSA Foundation.

employees for youth, employees, and professional adult leaders, as well as other business and quality control services, warehouse, shipping, distribution and customer service employees, retail sales associates, and a variety of staff providing management and support for the BSA's high adventure facilities, including general managers, cowboys, butchers, boat captains, National Scouting Museum staff, and back country rangers (the "BSA Employees").[22]   All of the BSA Employees are located in the United States and U.S. territories.

112.    The BSA Employees include approximately: (i) 1,000 full-time, salaried BSA Employees (*i.e.*, BSA Employees who work 30 hours or more per week) (the "Full-Time Employees"), (ii) 500 part-time, hourly BSA Employees, and (iii) 150 full-time, seasonal, salaried BSA Employees (*i.e.*, BSA Employees who work for 30 hours or more per week for a limited period of the year at the High Adventure Facilities) (the "Seasonal Employees").   The BSA Employees are located at the Debtors' national headquarters, at the Debtors' national warehouse and distribution center in Charlotte, North Carolina, at Scout Shops, and at the four High Adventure Facilities.

113.    The Debtors supplement their workforce by retaining independent contractors (the "Independent Contractors") and temporary workers (the "Temporary Workers") to perform various tasks including, but not limited to, providing illustrating, copywriting, and photography services for the BSA's multiple national magazine publications, IT development and support services, software engineering services, marketing support, and supply-chain and customer service support.   As of the Petition Date, approximately 60 Independent Contractors and 135 Temporary Workers were providing services to the Debtors or their affiliates.   The Debtors contract directly with the Independent Contractors, who are paid directly by the Debtors.   The

---

[22]    Approximately 30 BSA Employees are on paid leave as of the Petition Date.

Debtors procure the services of the Temporary Workers through third-party staffing agencies (the "Staffing Agencies").  The Debtors pay the Staffing Agencies, and the Staffing Agencies, in turn, pay the wages and benefits (as applicable) of the Temporary Workers.

114.    As discussed above in Part I.D and in connection with the Shared Services Motion, certain of the non-Debtor related entities do not maintain their own employees or management.  Instead, these are parties to certain shared services arrangements with the BSA, whereby approximately 32 BSA Employees allocate some or all of their time to the non-Debtor related entities.  The BSA is responsible for the compensation and benefits provided to these BSA Employees, and the sharing non-Debtor related entity allocates payment to the Debtors for these services via intercompany transactions to the non-Debtor related entities under a shared services arrangement.

115.    Through the Wages Motion, the Debtors request authority to pay prepetition amounts related to certain compensation and benefits programs (the "Compensation and Benefits Programs") and continue to pay these amounts on a post-petition basis, in the ordinary course of business.  The Debtors estimate that, as of the Petition Date, they owe approximately $5,090,000 in connection with the Compensation and Benefits Programs (the "Prepetition Employee Obligations").[23]

116.    The Debtors assert, and I agree, that the Employees would suffer hardship without the relief requested in the Wages Motion and, in many instances, financial difficulties, since the monies associated with the Compensation and Benefits Programs are needed to enable the Employees to meet their personal obligations.  In addition, without the requested relief, in my

---

[23]    This excludes estimated self-insurance claims, a large portion of which will likely be funded from the Welfare Benefits Trust (as defined below) prior to its exhaustion or otherwise come from funds set aside for this purpose, as described below.

opinion the Debtors' stability would be undermined by the potential threat that otherwise loyal Employees at all levels would seek other employment.

### 1.  Employee Compensation.

117.   In the ordinary course of business, the Debtors incur payroll obligations in the ordinary course of their operations, including  wages, salaries, and other compensation provided to the BSA Employees, Temporary Workers (through the Staffing Agencies), and Independent Contractors, as well as all related withholdings, deductions, and expense reimbursement obligations ("Employee Compensation").

### a.  *Unpaid Compensation*.

118.   The Debtors pay hourly wages or salary to the BSA Employees and Independent Contractors either in arrears or on a current basis, with either bi-weekly or semi-monthly payments.[24]  Specifically, Full-Time Employees are paid semi-monthly on the 15th and last day of each month on a current basis, Part-Time Employees are paid bi-weekly approximately one week in arrears, and Seasonal Employees are paid semi-monthly approximately five business days in arrears.  I am informed that the Debtors' aggregate average semi-monthly payroll for Full-Time Employees is approximately $3.6 million, the average bi-weekly payroll for Part-Time Employees is approximately $111,000, and the average semi-monthly payroll for Seasonal Employees is approximately $135,000.[25]   I understand that the Debtors use Paychex, Inc. ("Paychex") as their third-party payroll administrator.[26]  Paychex generally debits funds from the Debtors' payroll disbursement account two days before each payroll date and then electronically

---

[24]   If a payroll date falls on a weekend or holiday, BSA Employees are paid on the preceding Thursday or Friday, or the business day preceding the holiday, respectively.

[25]   The Debtors' aggregate payroll for the Seasonal Employees ranges from approximately $85,000 in the low season to $1.2 million during the high season.

[26]   The Debtors pay approximately $6,000 in average monthly processing fees to Paychex.  The Debtors estimate that, as of the Petition Date, they owe approximately $600 in unpaid processing fees to Paychex.

transfers the funds via direct deposit to the BSA Employees' personal bank accounts.[27]    The Debtors pay certain of the Seasonal Employees through pay cards that are administered through ADP.  Paychex generally debits funds from the Debtors' payroll disbursement account two days prior to each payroll date and then electronically transfers the funds to the Seasonal Employees' ADP pay cards.

### b.      *Independent Contractor and Temporary Worker Compensation*.

119.    As discussed above, the Debtors rely on Independent Contractors and Temporary Workers in the ordinary course of their organizational operations to perform a wide range of services critical to the Debtors' mission, including, among other things, providing publication services for the BSA's national magazines, IT and software support, and various other functions. The Debtors rely on the support of Independent Contractors and, through the Staffing Agencies, Temporary Workers to complete discrete projects in furtherance of the Debtors' organization and to fill short-term positions that are not economically feasible to employ on a full- or part-time basis.  The Debtors assert, and I agree, that the authority to continue paying the Debtors' Independent Contractors and the Staffing Agencies is critical to minimizing disruption of the Debtors' continued organizational operations.

### c.      *Withholding and Deduction Obligations*.

120.    The Debtors are required by law to withhold from BSA Employees' wages, salaries and other compensation certain amounts related to federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate taxing authority (the "Withholdings").  Further, the Debtors must match from their own funds Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal

---

[27]    All BSA Employees paid through Paychex are paid via ACH/direct deposit or pay cards.

and state unemployment and disability insurance (together with the Withholdings, the "<u>Payroll Taxes</u>").  The Payroll Taxes total approximately $2.0 million per month.  Paychex debits the total amount of Payroll Taxes due from the applicable accounts of the Debtors two days before each payroll date and then remit the Payroll Taxes to the appropriate taxing authorities on behalf of the Debtors on the dates such Payroll Taxes are due.  The BSA remits Payroll Taxes due to taxing authorities in the U.S. Virgin Islands and Puerto Rico directly for BSA Employees in those locations.

121.    In addition to the Payroll Taxes, the BSA routinely deducts certain amounts from the BSA Employees' paychecks for child support and other garnishments, as well as pre- and post-tax deductions payable pursuant to certain of the Compensation and Benefits Programs discussed in detail below (such as the BSA Employees' share of dental plan premiums and retirement plan contributions) (collectively, the "<u>Payroll Deductions</u>").  The Debtors forward the Payroll Deductions to the appropriate recipients.  On average, the Debtors deduct approximately $1.1 million per month in Payroll Deductions from the BSA Employees' paychecks and remit these amounts to the appropriate providers.

122.    The Debtors estimate that there are approximately $200,000 of accrued Payroll Taxes and/or Payroll Deductions outstanding as of the Petition Date, all of which is estimated to come due in the Interim Period.  In addition, due to the commencement of these chapter 11 cases, certain prepetition Payroll Taxes may not have been remitted by Paychex or forwarded to the appropriate recipient by the Debtors before the Petition Date.

### d.    *Reimbursable Expenses*.

123.    At any given time, the Debtors may have obligations to certain BSA Employees for the reimbursement of certain reasonable and customary out-of-pocket organizational expenses incurred on behalf of the Debtors in connection with their employment

(the "<u>Reimbursable Expenses</u>").  These Reimbursable Expenses include expenses for travel such as airfare, rental cars or mileage reimbursement, lodging, meals, and other organizational expenses paid directly by the BSA Employees.  The BSA Employees submit Reimbursable Expenses through the Debtors' standard expense report process, which is administered by third-party expense management platform Deem.  The BSA Employees are reimbursed by the Debtors within one week through their accounts payable system.  On average, the Debtors reimbursed approximately $330,000 per month in 2019.  I am informed that, as of the Petition Date, the Debtors estimate that they owe approximately $960,000 in accrued but unpaid Reimbursable Expenses, $720,000 of which will come due during the Interim Period, and that no administrative fees are owed to Deem.[28]

## 2. Employee Benefit Obligations and Related Obligations.

124.    In addition to the Employee Compensation discussed above, the Debtors offer comprehensive benefits to eligible BSA Employees, Retirees (as defined below), and the survivors of eligible BSA Employees and Retirees.  These benefits include medical, dental, and vision plans, life insurance, disability coverage, the Workers' Compensation Program (as defined below), various retirement plans and benefits, and other employee benefits described in greater detail in this Section II (collectively, the "<u>Employee Benefits Programs</u>").  In connection with the Employee Benefits Programs, the Debtors utilize the administration services of Morneau Shepell, which include the administration of the Debtors' health and welfare benefits plans, and the maintenance of a call center and website to support annual enrollment and ongoing administration.  Morneau Shepell also administers the Pension Plan (as defined below) for BSA Employees.  I am informed that Morneau Shepell charges a monthly administrative fee of

---

[28]    Because the Debtors cannot track the Reimbursable Expenses until they are entered into their system, this estimate is based on the monthly average Reimbursable Expenses for 2019.

$54,000 for Pension Plan administration and $65,000 for health and benefits plans administrative services, and that, as of the Petition Date, the Debtors owe approximately $290,000 to Morneau Shepell.[29]

125.    On average, the Debtors pay approximately $1.9 million per month in respect of the Employee Benefits Programs, including administrative fees and exclusive of Health Benefit Claims (as defined and described below).  As of the Petition Date, the Debtors estimate that approximately $1,930,000 is accrued and unpaid on account of the Employee Benefits Programs, and are requesting authority to pay or remit up to $1,880,000 of this amount under the Proposed Interim Order.

a.    *Health Insurance Plans.*

126.    The Debtors offer medical, dental, prescription, and vision coverage and Medicare benefits (collectively, the "Health Insurance Plans") to all Full-Time and Seasonal BSA Employees and their dependents, to certain eligible retirees of the BSA (the "Retirees"),[30] and to the survivors of eligible BSA Employees or Retirees (the "Survivors").[31]  In connection with the self-funding of certain of the Health Insurance Plans, the BSA has established that certain Boy Scouts of America Employee Welfare Benefit Trust, dated as of August 24, 2016 (the "Welfare Benefits Trust").  Historically, the BSA deposited certain employee and employer

---

[29]    The Debtors utilize Willis Towers Watson, LCG Associates, and other firms as additional advisors for the Employee Benefits Programs.  These advisors provide necessary health and welfare consulting services, including, among other things, health plan strategy and management, communications, and actuarial services. The Debtors estimate that the total amounts owed to Morneau Shepell and other advisors as of the Petition Date is approximately $405,000 for both Pension Plan and health and benefits plans administration.

[30]    Retirees include BSA Employees who have retired from the BSA and are members of the BSA Retirement Plan; Retirees who retired on or after January 1, 2005 are required to have at least ten years of service in order to be eligible for continuing Health Insurance Plan benefits.

[31]    Employees who were hired on or before May 31, 2004 who work twenty-one (21) hours or more per week year-round with the BSA, and Full-Time Employees hired on or after June 1, 2004 (*i.e.*, working thirty or more hours per week year-round with the BSA) are eligible to participate in the Health Insurance Plans.  Survivors include the spouse and/or dependent children of a deceased BSA Employee who was enrolled in the BSA Retirement Plan.

contributions related to the Health Insurance Plans into the Welfare Benefits Trust, which is classified as a voluntary employees' beneficiary association (VEBA) trust, and paid self-insured claims out of this trust.  More recently, the BSA has instead segregated these contributions in an investment account maintained exclusively for this purpose and elected not to make these deposits and plans to make claims payments directly once the Welfare Benefits Trust is exhausted, which is expected to occur by April 2020.

127.    ***Medical and Dental Plans.***  I am informed that the Debtors offer three medical plans to the BSA Employees—a PPO plan and two high deductible health plans (collectively, the "Medical Plans")—administered by UnitedHealthcare ("United").  The Debtors also offer self-funded supplemental Medicare benefits to Retirees, survivors, participants in the Long-Term Disability Insurance (as defined and discussed below), and dependents of such parties who are under 65 years old, enrolled in Medicare Parts A and B, and not enrolled in a Medicare prescription drug plan or other Medicare supplement plan (together with the PPO plan and the high deductible health plans, the "Medical Plans"), also administered by United.  I understand that United provides day-to-day administrative assistance in connection with the Health Insurance Plans.  The Debtors pay United approximately $200,000 per month in administrative fees, and an additional $20,000 to $100,000 per month for access to shared savings network discounts, which is highly variable depending on claims paid for each month.  Under United's services, the Debtors provide prescription drug coverage through a program administered by OptumRx.

128.    The Debtors offer one self-funded dental assistance plan (the "Dental Plan") administered through MetLife Insurance Company ("MetLife").  The Debtors pay MetLife approximately $22,000 per month in administrative fees.  The Dental Plan generally covers

dental services and basic restorative services, and offers a preferred dentist program, which is a network of in-network dental providers that offer services at reduced rates. The Dental Plan premiums, deductibles, co-pays, and out-of-pocket costs vary depending on whether a preferred dentist program provider is selected and whether dependents are covered by the Dental Plan. The costs of the Medical and Dental Plans are partially borne by the Debtors, but BSA Employees pay an estimated 35% of the total contributions to the Medical and Dental Plans through Payroll Deductions to pay for each month's coverage, with contributions varying by plan.[32]

129.    As self-funded Medical and Dental Plans, the Debtors fund and insure all claims submitted to the relevant health benefits providers on account of services provided to the participants (the "Health Benefit Claims"). Health Benefit Claims are paid as they are processed by the health benefit providers, but there is typically a lag time in receiving claims and the Debtors are unable to determine the precise amount of Health Benefit Claims that have accrued and are owing as of the Petition Date. The average monthly amount of Health Benefit Claims has been approximately $3.9 million.

130.    Also in connection with self-funding the Medical and Dental Plans, the Debtors maintain a stop-loss insurance policy with Sun Life Assurance Company of Canada to cover catastrophic medical claims (the "Stop-Loss Insurance"). The Debtors pay premiums on account of the Stop-Loss Insurance, which are approximately $554,000 per year. As of the Petition Date, the Debtors estimate that they have accrued approximately $88,000 on account of the Stop-Loss Insurance.

---

[32]    Participating Retirees and survivors are billed a premium for the BSA Employee costs of the Medical Plans, or, if they receive a large enough benefit under the Pension Plan, premiums are deducted from their checks.

131.    I am informed that the Debtors estimate that the total cost of the Medical and Dental Plans, including the Health Benefit Claims, Stop-Loss Insurance, and administrative fees, is approximately $460,000 per month on average, and as of the Petition Date, the Debtors estimate that the amount of accrued and outstanding prepetition obligations under the Medical and Dental Plans, excluding Health Benefit Claims, is approximately $790,000.

132.    ***Vision Plan.***    The Debtors offer vision benefits through a plan insured and administered by Vision Service Plan ("VSP").    The Vision Plan generally provides benefits covering annual eye examinations, corrective lenses, frames, and contact lenses.    Premiums vary based on whether the Employee, Retiree, or Survivor has dependents covered by the Vision Plan. The Vision Plan is a fully insured plan, so administrative fees paid to VSP in connection with the Vision Plan are included in the premiums.    Participants in the Vision Plan are responsible for the payment of premiums.

b.    ***Health Savings Account Program.***

133.    The BSA Employees who participate in certain of the Medical Plans with high deductibles may contribute a portion of their pre-tax compensation to health savings accounts through a program (the "Health Savings Account Program") administered by United and OptumHealth Bank ("Optum"), which funds may be used for incidental medical expenses. Annually, the BSA also contributes a lump-sum of $500 to each health savings account opened between January 1 and June 30, and $250 to each account opened on or after July 1. Participating BSA Employees can make pre-tax contributions to the Health Savings Account Program through Payroll Deductions to cover reimbursements annually of up to $7,100 for family coverage and up to $3,550 for individual coverage.    I am informed that, as of the Petition Date, approximately 450 BSA Employees are enrolled in the Health Savings Account Program. On average, the Debtors deduct a total of approximately $77,500 per month from participating

parties' paychecks (the "Employee HSA Deductions") on account of contributions to their respective Health Savings Account Programs.  The Employee HSA Deductions are included in the Payroll Deductions discussed above.

<p style="text-align:center"><b>c.      <i>COBRA.</i></b></p>

134.    Pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), certain former BSA Employees covered by the Health Insurance Plans ("COBRA Participants") may continue insurance coverage under the Medical Plans, the Dental Plan, the Vision Plan, and the Health Savings Account Program (the "COBRA Benefits").  COBRA Participants are entitled by law to continue to receive COBRA Benefits for up to 18 months, and in certain instances up to 36 months, after termination of their employment.  As of the Petition Date, there are approximately 10-20 former BSA Employees who are COBRA Participants. COBRA Participants are responsible for paying all premiums associated with the COBRA Benefits.  The Debtors use WageWorks to administer the COBRA Benefits, including to provide all required notifications, bill and collect premiums, coordinate enrollment information with the Medical Plan administrators, and providing customer service and support for COBRA Participants, and pay approximately $6,500 per month to WageWorks in administrative fees (the "COBRA Administration Fee").  As of the Petition Date, the Debtors estimate that they owe approximately $20,000 to WageWorks on account of the COBRA Administration Fee, all of which will become due and owing during the Interim Period.

<p style="text-align:center"><b>3.      Life, Accidental Death and Dismemberment ("AD&D"), and Disability Insurance Programs.</b></p>

<p style="text-align:center"><b>a.      <i>Life and AD&D Insurance.</i></b></p>

135.    The Debtors provide basic life and accidental death and dismemberment insurance (the "Basic Life and AD&D Insurance") and optional supplemental life insurance for

<p style="text-align:center">64</p>

Full-Time and Seasonal Employees of the BSA, Retirees, their spouses, and dependents (the "Supplemental Life Insurance" and, together with the Basic Life and AD&D Insurance, the "Life and AD&D Insurance").  The Life and AD&D Insurance is insured and administered by MetLife.  I am informed that the Debtors' total monthly costs in connection with premiums and related administrative fees under the Basic Life and AD&D Insurance are approximately $101,000.  The Debtors do not pay any amounts for the Supplemental Life Insurance, which is fully funded through Deductions or billing to participants.  I am informed that, as of the Petition Date, the Debtors owe approximately $130,000 for accrued and unpaid premiums and administrative fees paid to MetLife, all of which will become due and owing within the Interim Period.

### b.    *Scout Executives' Alliance*.

136.    Certain commissioned professional, executive, and professional-technical BSA Employees and Retirees with the BSA are eligible to enroll and become members of the Scout Executives' Alliance fellowship fund (the "Alliance"), which provides supplemental life insurance benefits to its members.  The Alliance is insured and administered through Metlife. Members of the Alliance make contributions entirely through Payroll Deductions based on salary levels, and Retirees make contributions through their annual pensions or via check transfers.  In turn, the BSA pays for group term life insurance for these individuals with employee contributions in excess of the premium cost held in a segregated account as a buffer against any future cost increases.  I am informed that, as of the Petition Date, the Debtors owe approximately $15,000 for accrued and unpaid premiums and administrative fees paid to MetLife, all of which will become due and owing during the Interim Period.

### c.    *Disability Insurance*.

137.    The Debtors provide Full-Time and Seasonal BSA Employees with short-term

65

disability insurance coverage (the "<u>Short-Term Disability Insurance</u>"), long-term disability insurance (the "<u>Long-Term Disability Insurance</u>"), and salary continuation for medical leaves of absence (the "<u>Salary Continuation for Medical Leave</u>" and, together with the Short-Term and Long-Term Disability Insurance, the "<u>Disability Insurance</u>").    The Short-Term Disability Insurance and Salary Continuation for Medical Leave is insured and administered by Unum Life Insurance Company ("<u>Unum</u>") and the Long-Term Disability Insurance is insured and administered by MetLife.

138.    Salary Continuation for Medical Leave is available to Full-Time Employees with serious health conditions for up to 120 calendar days in a rolling twelve-month period.  Salary continuation is available once a Full-Time Employee remains out of work for a period of personal illness or injury of at least seven calendar days, and pays such employees 60% of their regular rate of pay.  The BSA funds the Salary Continuation for Medical Leave.

139.    The Short-Term Disability Insurance complements the Salary Continuation for Medical Leave and replaces a portion of an eligible party's compensation for up to seventeen (17) weeks when such party is unable to work due to a non-work related injury or illness.  The Short-Term Disability Insurance applies after seven days of disability, at which time eligible BSA Employees are paid 25% of their pre-disability earnings, with a minimum weekly benefit of $25.00 and a maximum of $2,500.  The Short-Term Disability Insurance is fully funded by premium payments made by the BSA Employee on an after-tax basis, which are made through Deductions.

140.    The Long-Term Disability Insurance replaces a portion of the eligible BSA Employee's compensation when such employee is unable to work due to a non-work related injury or illness.  The Long-Term Disability Insurance applies after 120 days and pays BSA

Employees 60% of their monthly pre-disability pay, up to a maximum of $22,500 per month, until they recover or reach normal retirement age. The BSA funds the Long-Term Disability Insurance.

141. I am informed that the Debtors pay Unum and Metlife approximately $20,100 and $120,300 per month, respectively, in premiums and administrative fees in connection with the Disability Insurance. As of the Petition Date, the Debtors owe approximately $55,000 to Unum and $145,000 to Metlife on account of premiums and related administrative fees in connection with the Disability Insurance, of which up to $170,000 is estimated to come due in the Interim Period and up to $200,000 in the aggregate on a final basis.

**4.      *Workers' Compensation Program*.**

142. I am advised that, under applicable state laws, the Debtors are required to (i) provide the BSA Employees with workers' compensation insurance coverage for claims arising from or related to their employment (the "Workers' Compensation Program") and (ii) satisfy the Debtors' obligations to insurers, third party administrators, state funds, and/or the BSA Employees, including, without limitation, all premiums, charges, claims, deductibles, retentions, administrative fees and all other obligations relating to the Workers' Compensation Program (the "Workers' Compensation Obligations"). The Debtors maintain two insurance policies with Twin City Fire Insurance Company and Property/Casualty Insurance Co. of Hartford on account of the Workers' Compensation Program, which are maintained to cover claims in Wisconsin and all of the remaining states in which the Debtors operate, respectively (including those states in which there is state-mandated workers' compensation insurance fund coverage). The Debtors are required to pay monthly insurance premium installments in respect of the state programs in order to pay workers' compensation claims as they are adjudicated. I am informed that The Debtors estimate that they pay, on average, approximately $32,000 per month

in Workers' Compensation Obligations.  As of the Petition Date, there are approximately 26 pending claims under the Workers' Compensation Program, which the Debtors estimate aggregate to a total liability of approximately $422,000.

143.    I am also informed that the Debtors employ ESIS Inc. as a third-party administrator to investigate, administer, and pay claims arising under their general liability Insurance Policies and Workers' Compensation Program (the "Third-Party Administrator").  For those claims arising under the Debtors' Workers' Compensation Program that total $10,000 or less, the Third-Party Administrator will pay the appropriate party and request repayment from the BSA.  For claims totaling more than $10,000, the Third-Party Administrator will submit a "large loss" invoice to the BSA, and once the BSA funds the invoice, the Third-Party Administrator will release the payment to the claimant.  The Third-Party Administrator also provides loss prevention services and certain other administrative and advisory services with respect to the insurance policies.

### 5.    Non-Insider Severance Program.

144.    In the ordinary course of their operations, the Debtors maintain a severance program for the benefit of certain non-insider BSA Employees who have been terminated without cause (the "Non-Insider Severance Program").  The Non-Insider Severance Program compensates eligible BSA Employees for the financial disruption caused by the Debtors' termination of their employment.  Upon termination, eligible BSA Employees are entitled to receive ongoing payments equal to one week of their base salary for each year of service, up to a maximum of 26 weeks' base salary.  Additionally, as of the Petition Date, the Debtors owe approximately $15,000 in severance to one former non-insider BSA Employee.  I understand that the Debtors are requesting authority to (a) pay up to $20,000 on account of prepetition Non-Insider Severance Program and other severance obligations in the ordinary course and

(b) continue the Non-Insider Severance Program in the ordinary course as such program was in effect prepetition and to pay any benefits under the Non-Insider Severance Program only to BSA Employees who are not "insiders" as such term is defined by section 101(31) of the Bankruptcy Code.

### 6.    Retirement Plans.

145.    The Debtors offer two retirement plans (the "Retirement Plans") to Full-Time and Seasonal BSA Employees, which are described in further detail below.

### a.    *Pension Plan*.

146.    Certain of the Full-Time BSA Employees with at least one year of service[33] and Retirees participate in a defined benefit pension plan (the "Pension Plan"), originally established by the BSA in 1938.  I have been advised that the Pension Plan is a qualified retirement plan subject to sections 401(a)(17) and 415 of the Internal Revenue Code.  Entry into the Pension Plan was frozen on December 31, 2018, and no BSA Employees have been permitted to become active participants under the Pension Plan after such date.

147.    On and after January 1, 2019, the Pension Plan was amended to become a two-tiered plan.  Pursuant to the amendment, "grandfathered employees" with fifteen (15) years of service and age plus service equal to sixty (60) years were permitted continue to participate in the Pension Plan, while "non-grandfathered employees" were automatically enrolled into the Match Savings Plan described and defined below.  I am informed that there are currently 289 "grandfathered" BSA Employees participating in the Pension Plan.  These BSA Employees are required to contribute 4.25% of their salary to the Pension Plan, while the BSA may make discretionary contributions.  The BSA spends 7.75% of each eligible BSA Employee's wages on

---

[33]    Employees hired on or before May 31, 2004 working 21 or more hours per week are also eligible.

retirement-related costs, which is first used to satisfy obligations under the Match Savings Plan (described and defined below), followed by administrative costs with respect to the Pension Plan, with the remainder contributed to the Pension Plan.   Approximately 1,200 Retirees and beneficiaries participate in the Pension Plan.

148.   For the 2019 plan year, the BSA contributed approximately $3.0 million to the Pension Plan on behalf of the BSA Employees and Retirees and made an additional contribution of $60 million.  Total BSA Employee contributions to the Pension Plan in the 2019 plan year were approximately $1.4 million.  The BSA's total administrative and actuarial fees related to the Pension Plan in 2019 were approximately $775,000.  As of the Petition Date, the Debtors have withheld but not yet remitted approximately $70,000 in BSA Employee contributions to the Pension Plan, and owe approximately $140,000 on account of employer contributions.   The Pension Plan is managed by the BSA and is administered by Morneau Shepell.  I am informed that, as of the Petition Date, the Debtors owe approximately $230,000 to Morneau Shepell on account of administrative fees, all of which is estimated to become due and owing during the Interim Period.

### b.   *Match Savings Plan*.

149.   The BSA sponsors a 403(b) defined contribution retirement plan, which is available to employees of exempt organizations and is similar to a 401(k) retirement plan (the "Match Savings Plan").  All eligible BSA Employees may enroll in the Match Savings Plan, which enables the BSA Employees to make pre-tax Payroll Deductions up to limits set by the Internal Revenue Code (the "Employee Contributions").

150.   I am informed that, as of the Petition Date, approximately 1,050 current BSA Employees participate in the Match Savings Plan. Each month the Debtors deduct and withhold approximately $440,000 in Employee Contributions for the Match Savings Plan.  The Match

Savings Plan is managed by Fidelity Workplace Services.  As I understand is customary, Fidelity Workplace Services makes deductions from participants' Match Savings Plan funds in respect of administrative fees (the "Fidelity Workplace Administrative Fees").  The Debtors disburse the Employee Contributions and Employer Matching Obligations (as defined below) from their operating account within one week after the applicable payroll date.  I am informed that, as of the Petition Date, the Debtors have withheld but not yet remitted approximately $50,000 on account of Employee Contributions for the prepetition period.

**c.**      ***Employer Matching Obligation.***

151.      The Debtors have a limited matching program under the Pension Plan and Match Savings Plan (the "Employer Matching Obligation").  For "grandfathered" BSA Employees receiving benefits under the Pension Plan, the BSA matches 50% of Employee Contributions up to 6% of pay.  With respect to non-grandfathered BSA Employees under the Match Savings Plan, the BSA makes an automatic contribution of 1.75% of a BSA Employee's pay regardless of whether a BSA Employee makes an Employee Contribution, and matches 100% of Employee Contributions up to 6% of pay.  I am informed that the Debtors paid approximately $6.5 million in 2019 on account of the Employer Matching Obligation, and as of the Petition Date, the Debtors estimate that they owe approximately $180,000 on account of the Employer Matching Obligation with respect to the Retirement Plans, all of which will become due and owing in the Interim Period.

152.      I understand that many of the BSA Employees' sole or primary source of retirement savings consist of the amounts they have saved and received pursuant to the Retirement Plans.  Further, many of the BSA Employees choose to participate in the Match Savings Plan because of the Employer Matching Obligation. The Debtors believe, and I agree, that continuing the Employer Matching Obligation is essential to maintaining BSA Employee

71

morale and protecting the expectations of the BSA Employees.  In addition, I have been advised that the Debtors assert that the Employee Contributions are generally held in trust by the Debtors and are not property of their estates.  Accordingly, the Debtors are requesting authority to pay all of the outstanding Employer Matching Obligation and any unpaid Fidelity Workplace Administrative Fees on an interim and final basis, and to continue honoring such obligations post-petition in the ordinary course and consistent with their prepetition practices.

### 7.   Paid Time-Off and Other Leave Policies.

153.    Pursuant to the Debtors' paid time-off ("PTO") policy as of the Petition Date, which combines vacation, sick days, and any other personal time off, Full-Time BSA Employees are paid their regularly scheduled wages for each day of PTO up to the maximum number of days accrued based on years of service, which ranges from 24 to 36 days per year.  The PTO policy also provides that for BSA Employees terminating their employment with the Debtors, accrued and unused vacation days were monetized and paid to such BSA Employees in cash.  In general, PTO in excess of ten days at the end of a calendar year is not eligible to be carried over to the next year, unless required by applicable state law.  Part-time Employees of the BSA may be eligible for PTO benefits only as required by applicable state and local laws.

154.    The Debtors estimate that, as of the Petition Date, the aggregate value of accrued but unpaid PTO is approximately $3.85 million were it to be fully monetized.  Because PTO is typically not monetized until a BSA Employee's termination, however, the Debtors do not currently owe any cash amounts on account of accrued but unpaid PTO.

155.    The Debtors also provide for the BSA Employees to take the following categories of leave under certain circumstances: (i) Family and Medical Leave Act, (ii) personal leave, (iii) military caregiver leave, (iv) uniformed services leave, (v) bereavement leave, and (vi) civic duty leave for jury duty or appearing in court as a witness (collectively, "Other Leave").  The

Debtors are also requesting authority to maintain their Other Leave programs for BSA Employees in the ordinary course of their operations.

### 8.    Other Benefit Programs.

156.    The Debtors also provide a number of additional Employee Compensation and Benefits to certain eligible BSA Employees (the "Other Benefits Programs"):

- **Vehicle Program**.  The Debtors provide leased vehicles to certain executives, regional directors, and various other BSA Employees (the "Vehicle Program").    The Debtors pay Automotive Rentals Inc. ("Automotive Rentals") approximately $45,000 per month on account of the Vehicle Program.  As of the Petition Date, the Debtors estimate that they owe approximately $90,000 to Automotive Rentals for leased vehicles on account of BSA Employees.

- **125 Plan**.  The Debtors offer the 125 Premium Only Plan (the "125 Plan") to active eligible BSA Employees.   Through the 125 Plan, eligible BSA Employees can reduce their taxable income by subtracting such employees' cost for coverage under certain Employee Benefits Programs from a BSA Employee's salary before taxes are calculated.

- **Employee Assistance Program**.   BSA Employees can obtain confidential support for issues such as stress, abuse, alcohol and other drug problems, anxiety, depression, financial or legal concerns, gambling, child and elder care, and relationship issues and concerns (the "Employee Assistance Program").  The program is administered by United.  The Debtors make the Employee Assistance Program available to all BSA Employees at no cost for eligible Employees up to a certain number of visits.  The cost to the Debtors for this program is included in the administrative fees paid to United.

- **Wellness Program**.    The Debtors are in the process of offering a comprehensive wellness program to BSA Employees (the "Wellness Program") through Vitality.  The Wellness Program provides incentives for benefit-eligible BSA Employees to improve their health, in the form of points that may be converted to gift cards and other rewards.  No amounts are outstanding as of the Petition Date on account of this program.

- **Naturally Slim Program**.    The Debtors offer Naturally Slim to BSA Employees, which is a web-based education program focused on improving eating habits, losing weight, and decreasing risk factors that lead to metabolic syndrome (the "Naturally Slim Program").  The Debtors make the Naturally Slim Program available to all BSA Employees at no cost as long as the program requirements are completed.  The Debtors pay Naturally Slim

approximately $15,000 per month based on the number of BSA Employees in connection with the Naturally Slim Program. As of the Petition Date, the Debtors estimate that they owe approximately $15,000 to Naturally Slim on account of the Naturally Slim Program.

- **Additional Insurance Program.** The Debtors offer additional personal insurance options to their employees, allowing them to purchase additional coverages at a discount through Liberty Mutual (auto, home, renter) and AFLAC (catastrophic injury) (together, the "<u>Additional Insurance Program</u>"). The BSA deducts amounts from participating employee's payroll checks and remits the amounts to the appropriate provider on a monthly basis in arrears. The Debtors pay approximately $25,000 per month to Liberty Mutual and AFLAC on account of the Additional Insurance Program. As of the Petition Date, the Debtors estimate that they owe approximately $25,000 to Liberty Mutual and AFLAC on account of the Additional Insurance Program.

- **Professional Services.** The Debtors offer financial planning and advisory and tax planning services to certain BSA Employees (the "<u>Professional Services</u>"). The BSA pays for the Professional Services on behalf of the participating BSA Employees, and such employees are then taxed for these services through payroll deductions. As of the Petition Date, no amounts are outstanding on account of this program.

157. I am informed that, as of the Petition Date, the Debtors estimate that they owe approximately $130,000 in connection with the Other Benefits Programs, and are requesting authority to pay up to this amount during the Interim Period and on a final basis. The Debtors are also requesting authority to continue the Other Benefits Programs in the ordinary course on a post-petition basis.

E.    ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and (II) Granting Related Relief*** (the "<u>**Tax Motion**</u>").

158. I have been advised that, as a non-profit entity under 26 U.S.C. § 501(c)(3), the BSA is not obligated to pay federal or state income taxes in the United States related to its charitable or educational purposes. In the ordinary course of their operations, however, the Debtors collect, incur, and pay certain sales and use taxes, property taxes, certain state and other income taxes, excise taxes, and various other governmental taxes, fees, and assessments,

including, but not limited to, licensing fees (collectively, the "Taxes").  I understand that the Debtors remit the Taxes to various federal, state, and local governmental units, including taxing, licensing, and regulatory authorities (collectively, the "Governmental Authorities").

### 1.    Income Taxes.

159.    As noted above, the BSA is a non-profit entity under 26 U.S.C. § 501(c)(3) and therefore is not obligated to pay federal income taxes in the United States related to its charitable or educational purposes.  The Debtors do pay unrelated business income taxes ("Unrelated Business Income Taxes"), income taxes in Canada and a franchise tax to the state of New Mexico in connection with operating in the state (together with the Unrelated Business Income Taxes, the "Income Taxes").  I am further informed that the Debtors accrue Unrelated Business Income Taxes for income generated from investments made through their partnerships,[34] for the sale of cattle, advertising in their magazines, real estate rent, and sponsorship revenue.  When due, the Debtors pay Income Taxes on a monthly, quarterly, and annual basis.  I am informed that the Debtors also have incurred approximately $10 million in net operating loss carryforwards ("NOLs"), which may be utilized in potentially reducing the Debtors' tax liability in future periods.  I am informed that in 2019, the Debtors paid approximately $250,000 in Income Taxes, and as of the Petition Date, the Debtors estimate that they have accrued approximately $50,000 in Income Taxes, approximately $40,000 of which will become due and owing during the interim period.

---

[34]    National Foundation also incurs Unrelated Business Income Taxes from investments made through partnerships.  The BSA pays the Unrelated Business Income Taxes for National Foundation as they come due, and are reimbursed by the National Foundation.

### 2.    Sales and Use Taxes

160.    The Debtors incur, collect, and remit certain state and local sales taxes and similar obligations in connection with the sale of camping supplies, apparel, and accessories at the BSA Scout Shop locations and the Scout Shop online store (collectively, the "Sales Taxes").  I have been advised that Sales Taxes are essentially general consumption taxes charged at the point of purchase for certain goods and are typically established by the applicable Governmental Authority as a percentage of the retail price of the goods purchased.

161.    Additionally, the Debtors purchase a variety of equipment, materials, supplies, and services necessary for their operations from vendors who may not operate or be registered to collect taxes in the state where the goods are to be delivered or the services are to be performed and, therefore, these vendors do not charge the Debtors sales taxes in connection with such purchases of goods or services.  I have been advised that, in these instances, applicable law generally requires the Debtors to subsequently pay use taxes on such purchases to the applicable Governmental Authorities ("Use Taxes," and, together with Sales Taxes, the "Sales and Use Taxes").  The Debtors generally remit Sales and Use Taxes to Governmental Authorities on a monthly basis.  I am informed that in 2019, the Debtors paid approximately $6.32 million in Sales and Use Taxes to Governmental Authorities, and as of the Petition Date, the Debtors estimate that they have accrued approximately $880,000 in Sales and Use Taxes to various Governmental Authorities, the majority of which will become due and owing during the interim period.

### 3.    Property Taxes.

162.    I have been advised that state and local laws in the jurisdictions where the Debtors operate generally grant Governmental Authorities the power to levy property taxes against the Debtors' real and personal property ("Property Taxes").  I am informed that, currently, the

Debtors pay taxes on real property located in California that was donated to their non-debtor affiliate National Foundation and are reimbursed pursuant to a shared service agreement. Additionally, in certain localities the Debtors pay personal property taxes on the equipment and inventory at their Scout Shops.

163.     To avoid the imposition of statutory liens on their real and personal property, the Debtors typically pay Property Taxes in the ordinary course as such taxes are invoiced, and his includes Property Taxes collected from certain third parties and paid to the applicable Governmental Authorities.  I am informed that in 2019, the Debtors paid approximately $30,000 in Property Taxes, and as of the Petition Date, the Debtors estimate that they have accrued approximately $30,000 in Property Taxes, none of which will become due and owing during the interim period.

### 4.     Import Duties.

164.     Due to its many international suppliers, the BSA may be required to pay applicable duties enforced by the United States Customs and Border Protection for all internationally supplied goods (the "Import Duties").  In addition, I understand that for all supplies, merchandise and apparel shipped to the Scout Shop in Puerto Rico, the BSA also specifically pays all charges related to the Puerto Rico Import Tax.  I am informed that in 2019, the Debtors paid approximately $2,900,000 in Import Duties and Puerto Rico Import Tax, and as of the Petition Date, the Debtors estimate that they have accrued approximately $600,000 in Import Duties and Puerto Rico Import Tax, approximately $390,000 of which will become due and owing during the interim period.

### 5.     Other Taxes and Fees.

165.     The Debtors also remit other taxes and fees required in certain jurisdictions, including charitable registration and permit fees, licensing fees for Scouts Shops, environmental

fees, excise taxes, and other miscellaneous taxes such as storm water and bag taxes ("Other Taxes and Fees").  I understand that in 2019, the Debtors paid approximately $90,000 in Other Taxes and Fees, and as of the Petition Date, the Debtors estimate that they have accrued approximately $60,000 in Other Taxes and Fees, approximately $10,000 of which will become due and owing during the interim period.

### 6.    Penalties.

166.    I have been advised that the Debtors also pay tax penalties in certain instances (the "Penalties").  Specifically, I am informed that a number of jurisdictions rejected the BSA's 2018 filings for failing to include an audit report.  I am informed that the estimated Penalties associated with rejected filings total $40,000, the majority of which will become due and owning during the interim period.

167.    The Debtors assert, and I agree, that the Debtors' ability to pay prepetition Taxes is critical to their continued and uninterrupted operations and would ultimately preserve the resources of the Debtors' estates and going-concern values.  It is my understanding from various members of the Debtors' tax department and legal advisors that the failure to pay prepetition Taxes could materially and adversely affect the Debtors' non-profit operations in a number of ways.  Among other things, I understand that the failure to timely pay prepetition taxes would require the Debtors to spend time and money to resolve whether (i) the obligations are entitled to priority status under the Bankruptcy Code; (ii) the obligations are secured by liens on the Debtors' real and personal property, thus entitling the relevant governmental authorities to a secured claim against property of the relevant Debtor's estate; and (iii) the obligations are subject to so-called "trust fund" taxes that the Debtors are required to collect from third parties and hold in trust for the benefit of the relevant taxing authorities.

168.    In addition, I have been advised by the Debtors' legal advisors that some taxing jurisdictions may hold responsible officers personally liable in various circumstances for unpaid prepetition sales and use taxes.  To the extent that any such "trust fund" taxes remain unpaid by any of the Debtors, I understand that their officers could be subject to civil liability or criminal prosecution during the pendency of these chapter 11 cases.  The Debtors assert, and I agree, that the possibility of any such lawsuit or criminal prosecution would distract the Debtors and their officers in their efforts to implement a successful reorganization strategy, to the detriment of all parties in interest.  Accordingly, I believe that the relief requested in the Tax Motion is necessary to prevent immediate and irreparable harm to the Debtors' estates.

**F.    *Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payments for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving Procedures for Resolving Additional Adequate Assurance Requests, and (IV) Granting Related Relief* (the "Utilities Motion").**

169.    I am informed that in the ordinary course of the Debtors' operations and management of their properties, the Debtors obtain electricity, natural gas, water and sewage, telecommunications, internet, cable, waste, and other similar services (collectively, the "Utility Services") from a number of utility companies (collectively, the "Utility Providers").  I am informed that the Debtors pay approximately $626,000 each month for Utility Services, calculated as a historical average payment for the twelve-month period ending December 31, 2019, or based on the highest month's bill during the same period when the full twelve-month period is unavailable.

170.    I understand that, to provide additional assurance of payment to the Utility Providers, the Debtors propose to deposit $301,900 (the "Adequate Assurance Deposit") into a segregated bank account owned by the Debtors (the "Adequate Assurance Account") within

twenty days of the Petition Date.  I am informed that the Adequate Assurance Deposit is equal to approximately one half of the cost of the Debtors' average monthly Utility Services, calculated as a historical average payment for the twelve-month period ending December 31, 2019, or based on the highest month's bill during the same period when the full twelve-month period is unavailable, less the existing deposits.

171.    I understand that no liens will encumber the Adequate Assurance Deposit or the Adequate Assurance Account.  The Debtors believe, and I agree, that the Adequate Assurance Deposit and existing deposits, in conjunction with cash on hand, cash flow from operations, and their proposed use of cash collateral, demonstrates the Debtors' ability to pay for future utility services in the ordinary course and constitutes sufficient adequate assurance to the Utility Providers.  Additionally, I understand that the Debtors' proposed adequate assurance procedures allow Utility Providers to request adequate assurance for unpaid utility services and additional adequate assurance when they believe the proposed amount is not sufficient.

172.    In my opinion, uninterrupted Utility Services are essential for the Debtors to maintain their headquarters and distribution and supply center, located in Texas and North Carolina, respectively, and to provide the necessary support for their approximately 175 Scout Shops throughout the United States.  Any interruption in Utility Services, even for a brief period of time, would severely disrupt the Debtors' non-profit operations, including their Scouting programs, and jeopardize the Debtors' reorganization efforts.  Accordingly, it is my belief that it is critical that the Utility Services continue without interruption during these chapter 11 cases, and the proposed Adequate Assurance Deposit into the Adequate Assurance Account is sufficient to provide the Utility Providers with adequate assurance, as required by the Bankruptcy Code.

G.    ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain and Administer Prepetition Customer, Scout, and Donor Programs and Practices and (B) Pay and Honor Related Prepetition Obligations, and (II) Granting Related Relief*** (the "Public Programs Motion").

173.    As a nonprofit organization, the BSA does not generate income like a typical chapter 11 debtor in possession.  Rather, the BSA primarily relies on revenue generated from charitable donations, memberships, merchandise, and licensing trademarks to third parties to fund its operations.  I understand that it is therefore critical that the BSA maintains a positive relationship with customers, Scouts, and donors.  To that end, the BSA has implemented various programs and policies for customers, Scouts, and donors (collectively, the "Public Programs"), including, without limitation, (i) gift cards, refunds and exchanges, and promotions for the Scout Shop and Trading Post, custom uniform orders, (ii) scholarships, (iii) counseling support, (iv) pass-through donations, and (v) gift annuities.  I understand that without the ability to pay or otherwise honor its obligations under the Public Programs (collectively, the "Public Program Obligations") and maintain the Public Programs in the ordinary course, the BSA would risk losing the hard-earned trust, loyalty, and goodwill of its customers, members, and donors during a difficult time, which could jeopardize the future of the organization.  The Debtors assert, and I agree, that the Debtors' ability to maintain and administer the Public Programs and pay and otherwise honor the Public Program Obligations is therefore necessary to protect the future of the BSA and preserve value for creditors.

1.    **Customer Programs and Policies.**

174.    As noted above, although the BSA is a non-profit organization, it also maintains retail operations for customers.  The Scout Shops serve as the BSA's official retailer with approximately 175 locations nationwide and an e-commerce platform accessible at https://www.scoutshop.org, as well as various program-specific sites, such as the High

Adventure Facilities' websites and an alumni website.  Local Councils and Scouts, as well as the general public, are able to purchase a wide array of items, including uniforms, apparel, tents, backpacks, and other gear, from the retail locations and websites.  In addition, each High Adventure Facility has a Trading Post, where campers may purchase supplies, gifts, and apparel. To that end, the BSA has implemented several programs and policies relating to its retail operations (collectively, the "Customer Programs").

### a.      *Refund and Exchange Policies.*

175.    The Debtors maintain certain return, refund, and exchange policies for customer purchases consistent with retail industry practice (collectively, the "Return and Exchange Policies").  Customers are permitted to return merchandise for any reason at any time.  A customer must present a receipt to receive a full refund for the merchandise purchased.  In absence of a receipt, a return may only be completed for an even exchange or a Scout Shop gift card.

176.    I understand that without the Refund and Exchange Policies, current and potential customers may be unwilling to shop at the Debtors' Scout Shops, Trading Posts, or on their e-commerce platform, which may lead to a potentially significant decline in revenues to the ultimate detriment of the Debtors' estates.  Based on historical returns, I am informed that the Debtors estimate that the cash outlay for the Refund and Exchange Program will be approximately $600,000 within the first 30 days of these chapter 11 cases.

### b.      *Sales Promotions.*

177.    The Debtors regularly conduct sales promotions at the Scout Shop, Trading Post, and online (the "Sales Promotions").  The Sales Promotions consist of seasonal discounts, clearance discounts, and other promotions.  As an example, the e-commerce site just ran a seven-

day Presidents Day sale offering 50% off all clearance items, which sale ended on February 17,

2020, at 11:59 prevailing Eastern Time.

<div align="center">

**c.**     ***Gift Cards.***

</div>

178.   I am informed that the Debtors maintain a program pursuant to which customers

can purchase physical or electronic, pre-paid, non-expiring gift cards (collectively, the "Gift

Cards"). Gift Cards are available in varying denominations and can be purchased online or at the

Scout Shops. Once purchased, a Gift Card may be used like cash for purchases online or at the

Scout Shop or Trading Post. I understand that the Debtors estimate that approximately

$2.5 million in Gift Cards remain outstanding as of the Petition Date.

179.   I am further informed that the Debtors utilize Valutec Card Solutions and

Opticard (collectively, the "Gift Card Processors") to process the Gift Cards. In addition, the

Gift Card Processors maintain electronic records of transactions and purchases utilizing Gift

Cards accessible to the Debtors, which records are maintained for 60 days from the date of such

transaction. The Debtors pay various fees to the Gift Card Processors in connection with the

Debtors' sale and processing of Gift Cards and the maintenance of related data records

(collectively, the "Gift Card Fees," and together with the Gift Cards, the "Gift Card

Obligations"). During peak sale months, the Debtors pay approximately between $1,000 and

$1,500 in Gift Card Fees per month to the Gift Card Processors. I understand that the Debtors

estimate that, as of the Petition Date, approximately $8,000 in Gift Card Fees are accrued and

unpaid, $7,000 of which will become due and owing in the first 30 days of these chapter 11

cases.

<div align="center">

**d.**     ***Credit Card and Other Payment Processors.***

</div>

180.   I am informed that, in addition to cash and checks, the Debtors accept the

following customer payment methods at the Scout Shops, Trading Posts, and online: (i) credit

<div align="center">83</div>

and debit cards issued by American Express, Discover, MasterCard and Visa (in store and online); (ii) PayPal (online only); and Apple Pay (in stores) (collectively, the "Non-Cash Payments"). To process the Non-Cash Payments, the Debtors are party to those certain instrument processing agreements (the "Payment Processing Agreement") with Chase Paymentech, Total Systems Services, Inc. (f/k/a Cayan), Card Connect, Shift4, Authorize.Net, Moneris, Wells Fargo, Dynamic Payments, and Stripe (collectively, the "Payment Processors").

181. I am informed that, under the Payment Processing Agreements, the Debtors generally receive gross proceeds of customer purchases, less any chargebacks, returns, and/or processing fees debited from the payment balance by the Payment Processor. The Payment Processors charge either a set processing fee per transaction or collect fees based on a percentage of the transaction amount. The Debtors pay processing fees that range from $0.00 to $1.75 or 0.0% to 2.0% per transaction (the "Processing Fees").

182. I am also informed that when a customer returns merchandise purchased from the Debtors with a Non-Cash Payment or disputes a charge with a Payment Processor, the Debtors may, in certain circumstances, be obligated to refund to the Payment Processor the value of the purchase, subject to certain adjustments (collectively, "Chargebacks" and, together with the Processing Fees, the "Processing Obligations"). I understand that the Debtors generally satisfy Chargebacks by netting (*i.e.*, setting off) the applicable amount charged against payments owed to the Debtors by the Payment Processor. It is possible that certain Processing Obligations that the Debtors incurred before the Petition Date may not have been netted, either in full or in part, against payments owed to the Debtors by the Payment Processors before the Petition Date. I am informed that, based on historical activity, the Debtors estimate that approximately $115,000 in

Processing Obligations remain outstanding, all of which will become due and owing in the first 30 days of these chapter 11 cases.

183.    The Debtors assert, and I agree, that it is essential to the Debtors' continued operation that they be able to continue to accept Non-Cash Payments.  I understand that Non-Cash Payments comprise the overwhelming majority of payments made by the Debtors' customers.  Accordingly, I am informed that any interruption in the Debtors' ability to continue accepting Non-Cash Payments or paying or otherwise honoring the Processing Obligations would irreparably damage the Debtors' retail operations and could ultimately jeopardize their ability to reorganize successfully.

## 2.    Scout Programs and Policies.

184.    The Debtors also offer a number of Public Programs to Scouts and Scout alumni, and in certain instances, members of the general public who are interested in BSA programs, including, without limitation, maintaining Scout and volunteer deposits, providing scholarships, and offering counseling support (collectively, the "Scout Programs").

### a.    *Scout and Volunteer Deposits*.

185.    I am informed that in certain instances, the Debtors receive partial payments from Scouts in advance of providing services (the "Deposits").  For example, the BSA National Jamboree, National Order of the Arrow Conference, and High Adventure Facilities all require a deposit from participants several months prior to the date of the reservation, each on a varying payment schedule.  I understand that in rare situations, the Debtors may refund a Deposit to an individual if the individual leaves Scouting prior to the applicable event.  I am informed that as of December 31, 2019, the Debtors held $27 million in Deposits and it is important that the Debtors be able to honor all Deposits for future events.  I understand that the majority of the Deposits are held in connection with reservations at the High Adventure Facilities, and only

approximately 2% of the Deposits are being held for the next National Order of the Arrow Conference and National Jamboree.

186.    The Debtors believe, and I agree, that it is essential that the Debtors be able to honor Deposits for future events and apply the funds as expected by Scouts.  Otherwise, I understand that Scouts may be discouraged from paying for such events in the future and it may be untenable for the Debtors to continue hosting such events.  I am informed that these special events are often cornerstones of the BSA Scouting programs and without them, children may be less interested in participating in Scouting programs and memberships could decline.

b.    *Scholarships*.

187.    I am informed that the Debtors also offer approximately 140 scholarships, grants, or monetary awards (collectively, the "Scholarships and Grants")[35] annually to BSA members meeting various criteria.  The Scholarships and Grants are awarded to BSA members in recognition of merit achievements (such as earning the Eagle Scout Award), academic achievements (including membership in the BSA's honor society, the Order of the Arrow), community service, the pursuit of science, technology, engineering, or mathematical (or "STEM") fields, and/or financial need.  Generally, these recognitions are provided to individual members—at both at the local, regional, and national levels of the BSA organization—who best exemplify the Scout Oath and Law in their daily lives.  The Debtors believe, and I agree, that the Scholarships encourage positive youth leadership development and service to others.

188.    I understand that, generally, scholarship and grant applications are due in October for the following academic year, and the BSA makes decisions on scholarship and grant awards in February, with some awards announced publicly in May at the BSA's annual national

---

[35]    Specific details for each of the approximately 140 scholarships, grants, and other monetary award opportunities can be found on the BSA's website.

meeting.  I am informed that as of the Petition Date, approximately $700,000 in Scholarships and Grants awarded for the 2019-2020 school year have not yet been remitted to the applicable schools, because, among other things, some recipients have deferred their scholarships so they can complete religious missions before attending college and some recipients have not yet submitted their requests for second semester payments.  I am further informed that Scholarships and Grants for the 2020-2021 academic year have not yet been awarded, but the Debtors estimate that at least approximately $600,000 will be owed on account of multiple-year Scholarships awarded in previous years.  In 2018, the Debtors paid approximately $1,500,000 in scholarships and $500,000 in grants, and the Debtors anticipate that their obligations for Scholarships and Grants for 2020 will be substantially similar to the total amounts paid in 2018.

189.    The Debtors assert, and I agree, that Scholarships and Grants are important to maintaining the goodwill of Scouts.  The Debtors have already committed to providing Scholarships and Grants and recipients of such awards are relying on such funds to assist with the costs of higher education.  If the Debtors are not authorized to continue honoring their Scholarship and Grant obligations, it may ultimately be the recipients of such Scholarships and Grants who are harmed unnecessarily, as the awards may be the linchpin in a student's ability to afford higher education.

### c.    *Counseling Support Programs.*

190.    As discussed in Part II above, there have been instances of child abuse in the BSA's history.  I am informed that, consistent with the Debtors' responsibility to prioritize youth safety and provide the upmost protection to children at every level of the BSA's organization, the Debtors are committed to providing ongoing support to abuse victims and their families, including financial assistance for counseling.  Specifically, the Debtors have established a program to reimburse abuse victims and their families for the cost of ongoing counseling

(the "Counseling Reimbursement Program").  The Debtors also partner with 1in6, a nationally recognized male abuse support group, to provide clinically facilitated online support groups and an online helpline (the "1in6 Partnership," and together with the Counseling Reimbursement Program, the "Counseling Support Programs").

191.    Under the Counseling Reimbursement Program, the Debtors reimburse the participant's cost of weekly counseling visits to a therapist of their choice.  Benefits under the Counseling Reimbursement Program are available to any victim of child abuse in Scouting, as well as family members in the Debtors' discretion.  I am informed that the Debtors' obligations under the Counseling Reimbursement Program are also embodied in certain settlement agreements with abuse victims.  During the twelve-month period preceding the Petition Date, the Debtors made payments under the Counseling Reimbursement Program, either directly to providers or indirectly through reimbursements to participants on account of their payments to providers, in the aggregate amount of approximately $50,000.  I am informed that, as of the Petition Date, the Debtors estimate that they are current on all reimbursement obligations under the Counseling Reimbursement Program, and any outstanding liability associated with such reimbursement obligations would be negligible.

192.    In addition, the 1in6 Partnership supports the needs of any Scouts, former Scouts, and family members of Scouts who suffered abuse during their time in Scouting.  I am informed that, as of the Petition Date, no prepetition amounts related to the 1in6 Partnership and its corresponding services are outstanding.  The Debtors believe, and I agree, that it would be inequitable to abuse victims if the Debtors were unable to continue the Counseling Support Programs and honoring all prepetition obligations with respect thereto.

### 3.    Donor Programs.

193.    The Debtors also offer a number of programs to donors, including offering individuals the ability to donate to international scouting funds and organizations and other programs that may provide tax benefits for charitable donations (collectively, the "Donor Programs").

#### a.    *Pass-Through Donations*.

194.    I am informed that, to further the BSA's mission worldwide, the BSA serves as an intermediary for donations to international scouting funds and organizations that donors are unable to donate to directly due to various legal restrictions.  In particular, the BSA serves as an intermediary for donations (the "Pass-Through Donations") to the World Friendship Fund and International Scouting Foundations (as defined below).

195.    I am informed that the World Scout Foundation, European Scout Foundation, Asia-Pacific Scout Foundation, Africa Scout Foundation, Gilwell Development Fund, and Kandersteg Foundation (collectively, the "International Scouting Foundations") are international non-profit institutions that invest in the development and strengthening of Scouting worldwide through the provision of financial and other support, including grants and capital investments. Specifically, the World Scout Foundation aims to empower the more than 50 million Scouts worldwide with strong values and leadership skills, and to create active citizens who in turn make a positive impact in their communities.

196.    I understand that Americans who wish to invest in the International Scouting Foundations make donations with the BSA via check or credit card, and the BSA in turn transfers the donations to the specified International Scouting Foundation.  This process is not precisely contemporaneous, however, and the BSA may be holding such donations for the benefit of the International Scouting Foundations for a period of time until the funds are fully

processed and wired to the specific International Scouting Foundation.  As of the Petition Date, I am informed that the Debtors estimate that they hold approximately $30,000 in International Scouting Foundation donations that have not yet been remitted to the applicable International Scouting Foundation.

197.    In addition, I am informed that the World Friendship Fund takes voluntary contributions from individual donors and uses that money toward projects that help National Scout Organizations in less-fortunate countries and BSA projects that impact World Scouting. The BSA is one of 170 different Scouting organizations in the World Organization of the Scout Movement, and the sole manager of the World Friendship Fund.  The BSA collects donations from individual donors and remits the funds three times a year to the National Scout Organizations or BSA projects selected to receive the grants.  I am informed that the Debtors estimate that, as of the Petition Date, they are holding approximately $100,000 in funds that are to be remitted to the National Scout Organizations or BSA projects from grants approved or pending review in February.

198.    I understand that the Debtors merely serve as an intermediary for individuals who wish to donate to international funds and organizations that further the Scouting mission worldwide.  I have been advised that the Debtors therefore do not believe that such Pass-Through Donations are assets of the Debtors' estate and are only seeking such relief out of an abundance of caution.  I understand that if the Debtors are unable to honor donors' wishes with respect to Pass-Through Donations, the Debtors risk disenfranchising their donors more broadly. The Debtors unlikely could continue their non-profit operations without donations, or even a mere decline in donations.

b.    *Gift Annuity Program*.

199.    I am informed that, as a means of raising funds and furthering the BSA's charitable mission, the BSA from time to time enters into charitable gift annuity agreements (the "Gift Annuity Agreements") with donor annuitants (the "Annuitants").  Under these agreements, the Annuitant transfers property to the BSA in exchange for the BSA's promise to pay the Annuitant—or, in certain cases, multiple Annuitants—a fixed stream of income for life.  After the death of the Annuitant (or if the donor has designated two beneficiaries, both Annuitants), the remaining value of the original gift, net of fees earned by State Street Global Advisors ("State Street"),[36] is then used by the BSA to further its charitable mission.  The BSA has historically made fixed income payments with approximately 70% of the value of the gifts made by the Annuitants and retained the remaining 30% as a charitable gift.  The BSA has operated the charitable gift annuity program (the "Gift Annuity Program") for approximately twenty-seven (27) years.

200.    I understand that, just as the BSA benefits from the Gift Annuity Program, the Annuitants receive tangible benefits from the program, including the following: (a) a portion of the gift is tax deductible to the Annuitant; (b) the BSA's annuity obligation provides a regular stream of income to the Annuitant, a portion of which is considered a return of principal and is not generally taxable to the Annuitant; and (c) if appreciated property (*e.g.*, stocks, mutual funds, or bonds) is used to fund the Annuitant's initial gift to the BSA, the donation will result in a lesser capital gains tax liability than the Annuitant would otherwise incur if he or she were forced to liquidate the donated property.

---

[36]    State Street administers the BSA's segregated gift annuity accounts and makes payments from those accounts to the Annuitants.  In the year ended December 31, 2019, State Street earned approximately $26,619 in fees on account of its administration of the BSA's Gift Annuity Program.

201.    I am informed that, in the great majority of cases, funds or property donated pursuant to the Gift Annuity Program are directly transferred by the donor Annuitants to, and are subsequently held in, one of two segregated, long-term investment accounts at State Street maintained by the BSA for the benefit of the Annuitants (the "<u>Gift Annuity Accounts</u>").[37]    As of December 31, 2019, the total balance of the Gift Annuity Accounts was approximately $7.1 million.[38]    State Street administers the BSA's Gift Annuity Program and invests the funds in the State Street Global Advisors Common/Collective Funds.    I understand that the interest rates paid under the Gift Annuity Program are established by the American Council on Gift Annuities and are not affected by market performance.    I am informed that, as of the Petition Date, the BSA was party to approximately 195 Gift Annuity Agreements, including 194 active agreements and one deferred agreement.

202.    During 2018, the BSA made payments to Annuitants in the aggregate amount of approximately $580,000.    I am informed that, in the twelve months following the Petition Date, the Debtors estimate that the BSA will make payments to existing Annuitants in the amount of approximately $560,000 if no Annuitants pass away and no new Gift Annuity Agreements are executed, or under $60,000 per month on average.    During the 27-year history of the Gift Annuity Program, the BSA has never defaulted on its payment obligations.

203.    I have been advised that the Gift Annuity Agreements may create an express or implied trust agreement, in which case, the amounts held in trust would not be included as

---

[37]    I am informed that in a small minority of cases, funds or securities donated pursuant to the Gift Annuity Program are transferred by the Annuitants to a different account held by the BSA.  In those cases, the BSA liquidates the property (if applicable) and promptly transfers the donated funds or proceeds of the donated property to the appropriate State Street account.

[38]    I have been advised that California state law imposes a minimum reserve requirement for the benefit of California Annuitants, and requires that the reserves be held in trust for the benefit of such California Annuitants in a segregated account which is separate from reserves for the benefit of Annuitants of any other state.

property of the Debtors' estate.  I have also been advised that even if certain of the reserves held

by the BSA under the Gift Annuity Program are not held in trust for the Annuitants, the BSA

would likely face costly and disruptive litigation if not authorized to continue to performing its

prepetition obligations under the Gift Annuity Program.  Moreover, the Debtors believe, and I

agree, that it is essential that the Debtors be authorized to continue honoring the Gift Annuity

Program, because any interruption to the Gift Annuity Program could erode the public's

confidence in the Debtors' organization and cause potential donors to direct their charitable

giving to other nonprofit organizations, which would hamper the Debtors' continued ability to

carry out their charitable mission.

**H.**     ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of Essential Vendors, Foreign Vendors, Shippers and Warehousemen, Lien Claimants, and 503(b)(9) Vendors, and (II) Granting Related Relief (the "Vendors Motion").***

**1.**     **Essential Vendors.**

**a.**     ***Scouting Suppliers.***

204.     I am informed that, in the ordinary course of their operations, the BSA purchases

supplies, merchandise and apparel, including components of its iconic uniforms, to sell to Scouts

and their families, local councils, volunteers, and other members of the public at one of

approximately 175 Scout Shops located across the United States and its territories, and through

its online Scout Shop.  At any given point in time, the BSA offers 8,000 to 10,000 unique

products related to highly customized uniforms, patches, and other merchandise for each of the

BSA programs, as well as program emblems, badges, equipment and camping accessories, and

jewelry and general apparel.  Further, approximately 135 local councils support these national

sales efforts by designating a portion of their office space as a BSA Scout Shop.  These local

council Scout Shops are locations where the BSA sells uniform, apparel, camping equipment, and other merchandise directly to BSA members.

205.    As noted above, total retail sales represented approximately 30% of the BSA's total gross revenue for 2019 and are, therefore, critical to sustaining the BSA's operations and the BSA's ability to carry out its core program.  More importantly, I understand that the BSA's retail operations make the BSA's Scouting programs possible by supplying Local Councils and BSA members with essential, unique items ranging from uniforms and camping supplies to merit badges and venturing handbooks.  For example, every Scout has a uniform, which can be customized to each individual, replete with identifying patches, branded belts, shoulder loops, and more.  I understand that many of these items are supplied by essential vendors (the "Essential Vendors"), without whom the BSA and Local Councils would be unable to carry out their mission.

206.    Similarly, the Debtors also utilize certain essential printing suppliers that have the knowhow to produce the BSA's specialized printed materials—including handbooks and merit badge pamphlets—that are at the very core of Scouting.  Each of these items is manufactured by one of the BSA's over 10,000 vendors and is sold exclusively by the BSA to Local Councils and individuals through its Scout Shops, online Scout Shop, and Trading Posts.  Local Councils and individual Scouts expect and need the BSA to provide these unique items, and even a brief interruption in the flow of the Debtors' merchandise and supplies from the Essential Vendors could cause a severe negative impact on the Scouting experience for the BSA's members.  Further, I understand that identifying and switching to alternative suppliers for each of the vendors the Debtors have deemed Essential Vendors—many of whom the organization has relied upon for years—would be time-consuming, cost prohibitive, and, in some cases, impossible.

94

207.    In addition, the Debtors also operate four high adventure facilities that provide Scouts with opportunities to implement their knowledge and training at locations and in programs that are not available anywhere else in the country.   Most of the high adventure facilities operate in remote locations where there are very limited suppliers of the types of goods and services that are essential for these facilities to operate.   Certain of the Essential Vendors identified by the Debtors and their professionals provide these essential supplies to these remote locations.  If these Essential Vendors refuse to continue providing goods or services to these high adventure facilities post-petition, the Debtors may be unable to find replacement vendors in time (or at all) for the critical months when thousands of Scouts arrive at these high adventure facilities.  Such a situation could jeopardize the BSA's ability to safely and successfully operate the high adventure facilities.

### b.    *Identifying the Essential Vendors.*

208.    In order to limit the scope and magnitude of the relief requested, the Debtors and their advisors spent significant time reviewing and analyzing books and records, reviewing prepetition vendor lists and consulting with certain of the Debtors' employees and professionals who are responsible for maintaining, and have intimate knowledge of, the Debtors' vendor and service provider relationships.   With the assistance of their restructuring professionals, the Debtors considered the following criteria: (i) whether the vendor is a sole, limited-source or high-volume supplier of goods and services essential to the Debtors' retail operations; (ii) whether the Debtors would be able to obtain comparable goods or services from alternative sources for a similar cost within a reasonable time frame; (iii) the potential disruption to the Debtors' programs or lost revenues suffered while transitioning to alternative vendors; (iv) whether a vendor is otherwise contractually obligated to continue to provide goods or

services to the Debtors; and (v) whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to ship inventory or services on a post-petition basis.

209.    As a result of this laborious, time-consuming process, the Debtors were able to pare down their approximately 10,000 vendors and identify a small fraction of those vendors and suppliers that are in fact Essential Vendors.  Further, the proposed Final Essential Vendors cap of $3 million represents approximately 3% percent of the BSA's total annual supply expenses.

### 2.    Foreign Vendors.

210.    The Debtors rely upon certain foreign vendors outside of the United States, primarily in Asia, to supply critical, unique goods in connection with their retail operations and certain IT services (collectively, the "Foreign Vendors," and their claims, the "Foreign Vendor Claims").  The Debtors rely on Foreign Vendors to supply an important subset of the goods and merchandise sold in Scout Shops, online Scout Shop, and Trading Posts.  In addition, the Debtors' foreign IT vendors provide critical services, including for business application management, maintenance and development of the BSA's electronic data processing, information, recordkeeping, communications, and other systems.  I have been advised that if the Foreign Vendors stop providing these supplies and services, the Debtors operations would be irreparably harmed and their chances at successfully reorganizing severely undermined.

211.    I understand that the Debtors are concerned that Foreign Vendors may discontinue providing goods and/or services absent timely payment of the Foreign Vendor Claims.  Additionally, if left unpaid, I have been advised that the Foreign Vendors may take action against the Debtors based upon an erroneous belief that Foreign Vendors are not subject to the automatic stay provisions of section 362(a) of the Bankruptcy Code.  Although the automatic stay applies to protect the Debtors assets wherever they are located in the world, I have been advised that attempting to enforce the provisions of section 362(a) in foreign countries is

difficult, disruptive, and costly.  Further, the proposed payment of $500,000 to Foreign Vendors is a small fraction of the organizations overall annual supply expenses—less than 1%.

### 3.    Lien Claimants.

212.    I have been advised that certain vendors the Debtors conduct business with may be able to assert statutory liens—like mechanics' liens, materialmens' liens, shippers' liens and warehousemens' liens—against the Debtors' high adventure facility locations or the Debtors' goods or equipment, notwithstanding the automatic stay imposed by section 362 of the Bankruptcy Code.  As a result, certain Lien Claimants may refuse to perform their ongoing obligations to the Debtors, including performing servicing obligations in connection with the Debtors' facilities, unless their claims are paid in full.  I have been advised that such Lien Claimants may also seek to file and perfect these statutory liens, creating an unnecessary administrative burden on the Debtors and their estates at this critical juncture.

### a.    *Shippers and Warehousemen.*

213.    In operating their organization, the Debtors use and make payments to domestic and foreign commercial common carriers, movers, shippers, delivery services, and other third-party service providers (collectively, the "Shippers") to ship, transport, store, and otherwise facilitate the movement of goods through established national and international distribution networks, as well as a third-party warehouse (the "Warehousemen") to store goods in transit (such payments, the "Shipping and Warehousing Charges").

214.    The BSA owns and operates a distribution center (the "BSA Distribution Center") and leases a warehouse facility that is used solely for storage of its excess inventory.  The BSA Distribution Center is the Debtors' main hub for receiving and shipping all supplies, merchandise and apparel the BSA ships to Scout Shops, online customers of the Scout Shops, wholesale distributors and local councils.  The BSA contracts with various shippers to ship orders from the

BSA Distribution Center to their final destination.   Further, the BSA also drop-ships certain merchandise from manufacturers directly to the Scout Shops, Trading Posts, and individual customers.   The BSA also utilizes international suppliers in meeting its demands for supplies, merchandise, and apparel.

215.    I am informed that the services provided by the Shippers and Warehousemen are critical to the Debtors' operations.   The Debtors rely on the Shippers and Warehouseman for the frequent, often daily, shipments of essential supplies, merchandise and apparel to Scout Shops, online customers of the Scout Shop and Local Councils.   I have been advised that, following the commencement of these chapter 11 cases, certain Shippers and Warehousemen who hold goods for delivery to or from the Debtors may refuse to release the goods pending receipt of payment for their prepetition services.   Indeed, I have been advised that under some state laws, a Shipper or Warehouseman may have a lien on the goods in its possession to secure the charges or expenses incurred for the transportation or storage of goods.   I have also been advised that pursuant to section 363(e) of the Bankruptcy Code, the Shippers and Warehousemen, as bailees, may be entitled to adequate protection as holders of possessory liens.

216.    Any disruption to the Debtors' acquisition of these goods from Shippers or Warehousemen could result in a slow-down or shut-down of the supply chain at the Debtors' various Scout Shops and Local Councils, adversely impacting Debtors' retail operations and Scouting to the detriment of all parties in interest.   As mentioned above, Local Councils maintain little or no merchandise inventory on site, further threatening Scouting programs in the event that the Shippers or Warehousemen stopped providing services to the Debtors.

217.    Accordingly, to meet their delivery deadlines and maintain uninterrupted operations, the Debtors have implemented an efficient system for the receipt of goods and the

delivery of merchandise to their members and non-member customers. This system relies heavily on third parties, including the Shippers and Warehousemen. At any given time, there are thousands of shipments of goods and BSA merchandise en route to and from various locations throughout the country in possession of Shippers and Warehousemen. I understand that it is therefore imperative that the Debtors be authorized to pay any Shipping and Warehousing Charges, whether they arose prior to or after the Petition Date, that the Debtors determine in their business judgment are necessary to ensure the uninterrupted shipment and delivery of the goods.

<p style="text-align:center"><b>b.    <i>Other Lien Claimants</i>.</b></p>

218.    The Debtors also routinely transact business with a number of other third parties including contractors, repairmen, and manufacturers who may assert tooling, mechanics', materialmen's, or other liens (the "Other Lien Claimants," and their claims, the "Other Lien Claims") against the Debtors and their property if the Debtors fail to pay for the goods or services rendered. The Other Lien Claimants perform a number of services for the Debtors, including construction, plumbing, and electric repair and maintenance for the high adventure facilities and the Debtors' various other real property facilities.

219.    Specifically, much of the work that the Other Lien Claimants performed for the Debtors in 2019 and early 2020 was in relation to final phase construction of a dining hall, bunk house and leadership center on the Summit high adventure facility. The BSA will pay Other Lien Claimants for this construction work from its unrestricted cash, but will then be reimbursed in full from charitable donations that have been restricted for use only in connection with development of the high adventure facilities. Further development of the high adventure facilities is ongoing and their on-time completion is critical to the upcoming summer season.

220.    As described above, if the Debtors are not permitted to pay the Other Lien Claims pursuant to the relief requested, certain of the Other Lien Claimants may be able to assert

<p style="text-align:center">99</p>

mechanics liens and materialmen's liens against the Debtors' high adventure facility locations or the Debtors' goods or equipment, notwithstanding the automatic stay imposed by section 362 of the Bankruptcy Code.   Such filings would create significant administrative burden on the Debtors and their estates, and certain Other Lien Claimants may refuse to perform their ongoing obligations to the Debtors while such actions are pending.   The Debtors assert, and I agree, that such a consequence could have dramatic, negative effects on the organization and its ability to advance its mission.   As mentioned above, the construction work that the Other Lien Claimants is performing at high adventure facilities is crucial for the upcoming seasons.   Any interruption of construction services by the Other Lien Claimants could prevent the completion of the facilities in time for the critical summer months.   The Debtors estimate that approximately $4,750,000 in prepetition amounts are owed to Shipping and Warehousemen and Other Lien Claimants as of the Petition Date.

### 4.      503(b)(9) Vendors.

221.    In their review of their books and records while seeking to narrowly tailor the relief requested in this Motion, the Debtors identified certain claims that may be entitled to priority status under section 503(b)(9) of the Bankruptcy Code.   I have been advised that such claims may be entitled to priority status under section 503(b)(9) of the Bankruptcy Code ("503(b)9) Claims") because they are undisputed obligations for goods received by the Debtors in the ordinary course of business in the twenty (20) days prior to the Petition Date.   The Debtors estimate that approximately $3,750,000 in prepetition amounts are owed to vendors on account of 503(b)(9) Claims as of the Petition Date.

222.    The Debtors seek, in their discretion, to pay certain 503(b)(9) Claims as they come due in the ordinary course of business (typically on 30-day terms), instead of satisfying the 503(b)(9) Claims upon confirmation of a chapter 11 plan.   By altering the timing of payments

that certain 503(b)(9) Vendors are entitled to receive as a matter of statute, such payments may induce the individual 503(b)(9) Vendors to adhere to more favorable trade terms and conduct business with the Debtors.

### 5.    Customary Trade Terms.

223.    The Debtors further request authority, but not direction, to condition payment of any prepetition amounts owed to any vendor, upon written verification at the Debtors' discretion, that such vendor will abide by certain trade terms, including that such vendor will (i) continue to provide services to the Debtors during the pendency of these chapter 11 cases on the most favorable terms that existed in the twelve (12) months before the Petition Date, (ii) agree that they shall not be permitted to cancel on less than 90 days' notice any contract or agreement pursuant to which they provide services to the Debtors, and (iii) take whatever action is necessary to remove any liens in respect of such claim, if any, at such Vendor's sole cost and expense; provided that no such payment shall be deemed to be a waiver of rights regarding the extent, validity, perfection or possible avoidance of any such liens.

224.    If any Vendor accepts payment pursuant to this Order for a prepetition obligation of the Debtors premised upon its compliance with conditions (i), (ii), and (iii) above, and thereafter fails to comply with those conditions, I have been advised that any payments made pursuant to this Interim Order shall be deemed an avoidable post-petition transfer under section 549 of the Bankruptcy Code, and, therefore, shall be recoverable by the Debtors in cash upon written request.   Upon recovery by the Debtors, the claim shall be reinstated as a prepetition claim in the amount so recovered.

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 18th day of February, 2020

/s/ Brian Whittman
Brian Whittman
Managing Director
Alvarez & Marsal North America, LLC

## <u>Exhibit A</u>

**Organizational Chart**

# Organizational Chart

