## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (___) |
| Debtors. | (Joint Administration Requested) |

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.**

## DISCLOSURE STATEMENT FOR THE CHAPTER 11 PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

SIDLEY AUSTIN LLP
James F. Conlan
Thomas A. Labuda
Michael C. Andolina
Matthew E. Linder
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000

– and –

SIDLEY AUSTIN LLP
Jessica C. K. Boelter
Alex R. Rovira
Andrew P. Propps
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 839-5300

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Joseph C. Barsalona II (No. 6102)
Eric W. Moates (No. 6441)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200

*Proposed Counsel for the Debtors and Debtors in Possession*

Dated: February 18, 2020
         Wilmington, Delaware

[1] The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtors' federal tax identification number, are as follows: Boy Scouts of America (6300); and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 W. Walnut Hill Ln., Irving, TX 75038.

## <u>IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT</u>

**THE DEADLINE TO VOTE ON THE PLAN IS [\_\_\_], 2020 AT [\_\_]:00 [\_].M. PREVAILING EASTERN TIME (THE "<u>VOTING DEADLINE</u>").**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE CLAIMS AND NOTICING AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

**THE DATE BY WHICH OBJECTIONS TO CONFIRMATION MUST BE FILED AND SERVED IS [\_\_\_\_\_], 2020 AT [\_\_\_]:00 [\_].M. PREVAILING EASTERN TIME.**

**THE HEARING ON CONFIRMATION OF THE PLAN IS SCHEDULED AT [\_\_\_], 2020 AT [\_\_]:00 [\_].M. PREVAILING EASTERN TIME.**

This Disclosure Statement contains, among other things, summaries of the *Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* (as such may be amended, altered, modified or supplemented from time to time, the "<u>Plan</u>"), dated February 18, 2020,[2] certain statutory provisions, and certain anticipated events in the Chapter 11 Cases. Although the Debtors believe that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions or every detail of such anticipated events. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern for all purposes. Factual information contained in this Disclosure Statement has been provided by the Debtors' management except where otherwise specifically noted.

The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there can be no assurance that the statements contained herein will be correct at any time after this date. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, except as otherwise provided in the Plan or in accordance with applicable law. The information contained in this Disclosure Statement, including the information regarding the history, charitable non-profit operations of the Debtors and their non-debtor affiliates and certain related entities, and the financial information regarding the Debtors, is included for purposes of disclosing information related to the Plan, but, as to contested matters, adversary proceedings, and any other litigation or disputes, is not to be construed as an admission or stipulation, but rather as a statement made in settlement negotiations as part of the Debtors' attempt to settle and resolve claims and controversies pursuant to the Plan. This Disclosure Statement will not be admissible in any non-bankruptcy proceeding, nor will it be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan as to holders of Claims against, or Interests in, either the Debtors or the Reorganized Debtors. The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission. Except where specifically noted, the financial information contained in this Disclosure

---

[2] Except as otherwise set forth herein, capitalized terms used in this Disclosure Statement but not defined herein have the meanings ascribed to them in the Plan.

Statement and the exhibits hereto have not been audited by a certified public accountant and have not been prepared in accordance with generally accepted accounting principles in the United States.

The Debtors have not authorized any person or Entity in connection with this Disclosure Statement or the Plan to give any information or make any representation or statement regarding this Disclosure Statement or the Plan, in each case, other than that which is contained in this Disclosure Statement and the exhibits hereto or as otherwise incorporated by reference or referred to herein. If any such information, representation or statement is given or made, it may not be relied upon as having been authorized by the Debtors.

The Debtors' management, in consultation with the Debtors' financial advisors, prepared the financial projections provided in this Disclosure Statement. While the Debtors have presented these projections with numerical specificity, they have necessarily based the projections on a variety of estimates and assumptions that, although considered reasonable by management at the time of preparation, may not be realized, and are inherently subject to significant operational, economic, and financial uncertainties and contingencies, many of which will be beyond the Debtors' or the Reorganized Debtors' control. The Debtors caution that they cannot make any representations as to the accuracy of these projections or to the Debtors' or Reorganized Debtors' ability to achieve the projected results. Some assumptions inevitably will not materialize. Further, events and circumstances occurring subsequent to the date on which these projections were prepared may differ from any assumed facts and circumstances. Alternatively, any events and circumstances that come to pass may well have been unanticipated, and thus may affect financial results in a materially adverse or materially beneficial manner. The projections, therefore, may not be relied upon as a guaranty or other assurance of the actual results that will occur.

Certain of the information contained in this Disclosure Statement is by its nature forward looking and contains estimates, assumptions and projections that may be materially different from actual future results. The words "believe," "may," "will," "estimate," "continue," "anticipate," "intend," "expect" and similar expressions identify these forward-looking statements. These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described in Article VIII of this Disclosure Statement, "Risk Factors." In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements. Except as required by law, the Debtors disclaim any obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

*[Remainder of Page Intentionally Left Blank]*

## TABLE OF CONTENTS

ARTICLE I. INTRODUCTION ................................................................................ 1
   A.     GENERAL BACKGROUND.......................................................................... 1
   B.     GENERAL OVERVIEW OF THE PLAN ...................................................... 2
         1.    The Victims Compensation Trust ..................................................... 3
         2.    Channeling of Abuse Claims to the Victims Compensation Trust ........... 4
         3.    Treatment of General Unsecured Claims................................................... 4
         4.    Treatment of the Claims under the Debtors' Secured Facilities .............. 4
         5.    Exit Facility ..................................................................................... 4
         6.    General Settlement of Claims and Interests............................................. 4
         7.    Releases........................................................................................... 4
   C.     OVERVIEW OF CHAPTER 11................................................................... 5
   D.     VOTING ON THE PLAN ............................................................................. 5
   E.     VOTING PROCEDURES, BALLOTS, AND VOTING DEADLINE ............... 6
         1.    Holders of Claims and Interests Entitled to Vote ................................. 6
         2.    Vote Required for Acceptance by a Class of Claims............................... 8
         3.    Solicitation Package ......................................................................... 8
         4.    Voting Procedures, Ballots and Voting Deadlines .................................. 9
         5.    Confirmation Hearing and Deadline for Objections to Confirmation .... 10

ARTICLE II. ORGANIZATION OVERVIEW AND CORPORATE HISTORY ................... 11
   A.     Organization Overview................................................................................ 11
         1.    The Boy Scouts of America ........................................................... 11
         2.    The Scouting Experience ................................................................ 13
         3.    Delivery of the Scouting Programs ................................................ 16
   B.     Corporate and Capital Structure.................................................................. 18
         1.    Affiliated Entities ........................................................................... 18
         2.    Capital Structure ............................................................................ 20
         3.    General Unsecured Claims.............................................................. 23
   C.     Corporate Governance ................................................................................ 23

ARTICLE III. EVENTS LEADING TO THE CHAPTER 11 CASES...................................... 23
   A.     Child Sexual Abuse Claims against the BSA .............................................. 23
         1.    The Impact of Statute-of-Limitations Changes on Claims against the
              BSA and Non-Debtor Stakeholders ........................................................ 24
         2.    Other Defendants ........................................................................... 25
         3.    Insurance ......................................................................................... 26
   B.     The BSA Engaged in Extensive Efforts to Reach a Global Resolution of Abuse
       Claims Before the Commencement of these Proceedings. ............................. 27
   C.     Given the BSA's Inability to Reach Agreement on a Prearranged
       Reorganization, the BSA has Taken Several Immediate Steps to Promote
       Efficiency at the Outset of these Chapter 11 Cases. ................................... 28

ARTICLE IV. THE CHAPTER 11 CASES ....................................................................... 28
   A.     Voluntary Petitions ..................................................................................... 28
   B.     First Day Relief............................................................................................ 29

C.    Other Relief Requested on the Petition Date ........................................ 29
    1.    Scheduling Motion for Asset Characterization Disputes..................... 29
    2.    Bar Date Motion ............................................................................ 29
    3.    Consolidation and Stay of Pending Abuse Lawsuits ............................ 30
    4.    Motion for Appointment of a Judicial Mediator ................................... 30

ARTICLE V. OVERVIEW OF THE PLAN ........................................................................ 30
A.    Distributions....................................................................................... 30
B.    Exit Facilities ...................................................................................... 30
C.    Sources of Consideration for Plan Distributions ................................... 30
D.    Treatment of Unclassified Claims ........................................................ 31
    1.    Unclassified Claims Summary........................................................ 31
    2.    Unclassified Claims Details ........................................................... 31
E.    Classification of Claims and Interests................................................... 32
    1.    Classified Claims and Interests Summary ...................................... 32
    2.    Classified Claims and Interests Details........................................... 34
    3.    Elimination of Vacant Classes ...................................................... 38
F.    The Victims Compensation Trust ........................................................ 38
    1.    Establishment and Purpose of the Victims Compensation Trust............ 38
    2.    Receipt of Trust Assets ................................................................. 38
    3.    The Trust Distribution Procedures ................................................. 39
    4.    Discharge of Liabilities to Holders of Abuse Claims ........................... 39
    5.    Imposition of Channeling Injunction ..................................................... 39
    6.    Insurance Rights Transfer .............................................................. 39
    7.    Indemnification Obligation ................................................................ 41
    8.    Excess Assets in Victims Compensation Trust.................................... 41
    9.    Trust Expenses ............................................................................. 42
    10.    Victims Compensation Trustee....................................................... 42
    11.    Compensation of Victims Compensation Trustee and Retention of
        Professionals ................................................................................ 42
    12.    Future Claimants' Representative ................................................... 42
    13.    Consent Rights of the Debtors and the Reorganized Debtors................. 43
    14.    Cooperation; Transfer of Books and Records...................................... 43
    15.    No Liability ................................................................................... 43
    16.    U.S. Federal Income Tax Treatment of the Victims Compensation Trust
        .................................................................................................. 43
    17.    Institution and Maintenance of Legal and Other Proceedings................ 44
    18.    Insurance Neutrality...................................................................... 44
G.    Due Authorization............................................................................... 44
H.    Continued Legal Existence .................................................................. 44
I.    Vesting of Assets in the Reorganized Debtors ...................................... 45
J.    Cancellation of Indebtedness ............................................................... 45
K.    Preservation of Causes of Action.......................................................... 45
L.    Workers' Compensation Programs ....................................................... 45
M.    Local Council Charters ....................................................................... 46
N.    Treatment of Executory Contracts and Unexpired Leases ..................... 46
    1.    Assumption of Executory Contracts and Unexpired Leases.................. 46

2. Rejection Damages Claims ........................................................ 47
O. Provisions for Resolving Disputed Claims ......................................... 47
    1. Objections to Claims .......................................................... 47
    2. Resolution of Disputed Administrative Expenses and Disputed Non-Abuse Claims ............................................................. 48
    3. Resolution of Abuse Claims .............................................. 48
    4. Payments and Distributions with Respect to Disputed Claims ............... 48
    5. Distributions After Allowance ........................................... 48
    6. Estimation of Claims ...................................................... 48
    7. No Distributions Pending Allowance ..................................... 49
    8. Claims Resolution Procedures Cumulative .............................. 49
    9. Interest ..................................................................... 49
    10. Insured Non-Abuse Claims .............................................. 49
P. Discharges, Channeling Injunction, Releases, Exculpations and Injunctions; Survival of Indemnification and Exculpation Obligations ...................... 49
    1. Discharge .................................................................. 49
    2. Channeling Injunction .................................................... 50
    3. Provisions Relating to Channeling Injunction ......................... 51
    4. Injunction Against Interference with Plan .............................. 52
    5. Releases ................................................................... 52
    6. Exculpation ............................................................... 53
    7. Injunctions ................................................................ 54
Q. Reservation of Rights ............................................................. 55
R. Disallowed Claims ................................................................ 55
S. Retention of Jurisdiction ......................................................... 55
    1. General Retention ........................................................ 55
    2. Specific Purposes. ........................................................ 55

ARTICLE VI. ACCEPTANCE OR REJECTION OF THE PLAN ........................... 57
A. Classes Entitled to Vote on the Plan ............................................ 57
B. Votes Required for Acceptance by a Class ....................................... 58
C. Certain Factors to Be Considered Prior to Voting ............................... 58

ARTICLE VII. CONFIRMATION PROCEDURES ....................................... 59
A. Hearing on Plan Confirmation ................................................... 59
B. Requirements for Confirmation of the Plan ..................................... 59
C. Best Interests of Creditors / Liquidation Analysis .............................. 61
D. Feasibility ........................................................................ 62
E. Acceptance by Impaired Class ................................................... 62
F. Conditions Precedent to Confirmation of the Plan .............................. 62
G. Conditions Precedent to the Effective Date ..................................... 63
H. Waiver of Conditions Precedent to the Effective Date .......................... 63
I. Vacatur of Confirmation Order; Non-Occurrence of Effective Date ............. 63
J. Alternatives to Confirmation and Consummation of the Plan .................... 64

ARTICLE VIII. RISK FACTORS ....................................................... 64
A. Business-Related Risks ........................................................... 64

B.    Bankruptcy-Specific Considerations ................................................... 64
    1.    General .................................................................................. 64
    2.    Nonacceptance of the Plan—Confirmation by Nonconsensual "Cram-down".................................................................................... 65
    3.    Objections to the Plan's Classification or Amounts of Claims and Interests ................................................................................ 65
    4.    The Conditions Precedent to Plan Confirmation and the Effective Date of the Plan May Not Occur .......................................................... 65
    5.    Non-Confirmation or Delay of Confirmation of the Plan...................... 65
    6.    Amendment of Plan Prior to Confirmation by the Debtors .................... 66
    7.    Failure to Obtain Approval of Releases, Injunctions and Exculpation... 66
    8.    Plan Based on Assumptions.................................................... 67

ARTICLE IX.  CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........................................................................................ 67
    A.    The Victims Compensation Trust ........................................................ 68
    B.    Holder of Class 3A, 3B, 4A, and 4B Claims ...................................... 69
    C.    Holders of Class 5 and Class 6 Claims ............................................... 69
    D.    Holders that are Non-United States Persons....................................... 70

ARTICLE X.  CONCLUSION AND RECOMMENDATION................................................. 70

## <u>Table of Exhibits</u>

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Liquidation Analysis (to be attached to a subsequent amendment to this Disclosure Statement)

EXHIBIT C    Financial Projections Analysis (to be attached to a subsequent amendment to this Disclosure Statement)

# ARTICLE I. INTRODUCTION

## A.  GENERAL BACKGROUND

Boy Scouts of America and Delaware BSA, LLC (the "<u>Debtors</u>"), submit this Disclosure Statement pursuant to section 1125 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in connection with the solicitation of acceptances of the Plan. A copy of the Plan is attached hereto as **<u>Exhibit A</u>**. The rules of interpretation set forth in Article I of the Plan shall govern the interpretation of this Disclosure Statement. **Please note that to the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan governs.**

The Plan provides for the reorganization of the Debtors under chapter 11 of the Bankruptcy Code. If the Plan is confirmed and consummated, the Debtors, as Reorganized Debtors, will emerge from bankruptcy able to continue the BSA's mission, and holders of Abuse Claims will have a streamlined and certain process by which they may obtain compensation for Abuse.

Under the Plan, (1) Abuse Claims shall be channeled to the Victims Compensation Trust pursuant to the Channeling Injunction and may be asserted only and exclusively against the Victims Compensation Trust, (2) the holders of all 2010 Credit Facility Claims, 2019 RCF Claims, 2010 Bond Claims, and 2012 Bond Claims will have their claims restructured under restated documentation, and (3) holders of General Unsecured Claims will receive *Pro Rata* shares of the GUC Plan Distribution.

The Plan also provides for the payment in full in Cash of Claims entitled to administrative expense or priority status under the Bankruptcy Code.

**In addition, the Plan includes certain release, injunctive, and exculpatory provisions described in greater detail below.**

The Debtors are proposing the Plan following extensive arm's length, good faith discussions with certain of their key stakeholders, as described in more detail below. The Debtors believe the Plan represents the best available option for all creditors and parties in interest. For all of the reasons described in this Disclosure Statement, the Debtors urge you to return your ballot accepting the Plan by the Voting Deadline (*i.e.*, the date by which your ballot must actually be received), which is [_____], 2020, at [__]:00 [__].m. (prevailing Eastern Time).

This Disclosure Statement sets forth certain information regarding the prepetition operating and financial history of the Debtors, the events leading up to the commencement of the Chapter 11 Cases, material events that have occurred during the Chapter 11 Cases, and the anticipated organization, operations, and capital structure of the Reorganized Debtors if the Plan is confirmed and becomes effective. This Disclosure Statement also describes terms and provisions of the Plan, including certain effects of confirmation of the Plan, certain risk factors, the manner in which distributions will be made under the Plan, and certain alternatives to the Plan.

On [_____], 2020, the Bankruptcy Court entered an order approving this Disclosure Statement as containing "adequate information," *i.e.*, information of a kind and in sufficient detail to enable a hypothetical reasonable investor typical of the holders of Claims or Interests to make an informed judgment about the Plan. **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN NOR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.**

**EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD REVIEW THIS DISCLOSURE STATEMENT AND THE PLAN AND ALL EXHIBITS HERETO AND THERETO BEFORE CASTING A BALLOT. THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF AND PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED; HOWEVER, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THOSE DOCUMENTS AND AS OTHERWISE PROVIDED HEREIN.**

## B.  GENERAL OVERVIEW OF THE PLAN

The Plan provides for the reorganization of the Debtors as a going concern and will enable them to continue the BSA's mission. Specifically, the Plan contemplates (i) the establishment of a Victims Compensation Trust for the benefit of holders of Abuse Claims that shall assume liability for all Abuse Claims and hold, administer, and distribute Trust Assets for the benefit of holders of Abuse Claims, and the channeling of all Abuse Claims to such trust, (ii) making distributions to holders of General Unsecured Claims, (iii) restructuring certain of the Debtors' prepetition Secured Claims, and (iv) entering into the Exit Facility.

The following chart summarizes the projected distributions to holders of Allowed Claims against and Interests in each of the Debtors under the Plan. Although every reasonable effort was made to be accurate, the projections of estimated recoveries are only an estimate. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. As a result of the foregoing and other uncertainties which are inherent in the estimates, the estimated recoveries in this Disclosure Statement may vary from the actual recoveries received. In addition, the ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain confirmation of the Plan and meet the conditions to confirmation and effectiveness of the Plan, as discussed in this Disclosure Statement. The recoveries set forth below are projected recoveries only and may change based upon changes in the amount of Allowed Claims as well as other factors related to the Debtors' business operations and general economic conditions. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Allowed Claims against and Interests in each of the Debtors.

| Class | Claim or Interest | Estimated Allowed Amount[3] | Treatment | Plan Recovery |
|---|---|---|---|---|
| N/A | Administrative Expense Claims | $[__] | Paid in full / Unimpaired | 100% |
| N/A | Professional Fee Claims | $[__] | Paid in full / Unimpaired | 100% |
| N/A | Priority Tax Claims | $[__] | Paid in full / Unimpaired | 100% |
| 1 | Other Priority Claims | $[__] | Paid in full / Reinstated / Unimpaired | 100% |
| 2 | Other Secured Claims | $[__] | Paid in full / Collateral Returned / Reinstated / Unimpaired | 100% |
| 3A | 2010 Credit Facility Claims | $[__] | Reinstated with modifications / Impaired | 100% |
| 3B | 2019 RCF Claims | $[__] | Reinstated with modifications / Impaired | 100% |
| 4A | 2010 Bond Claims | $[__] | Reinstated with modifications / Impaired | 100% |
| 4B | 2012 Bond Claims | $[__] | Reinstated with modifications / Impaired | 100% |
| 5 | General Unsecured Claims | $[__] | *Pro Rata* share of GUC Plan Distribution / Impaired | [___]% |
| 6 | Abuse Claims | $[__] | Channeled to Victims Compensation Trust / Impaired | [___]% |
| 7 | Interests in Delaware BSA, LLC | N/A | Reinstated / Unimpaired | 100% |

The key terms of the Plan are as set forth below.

### 1. *The Victims Compensation Trust*

On the Effective Date of the Plan, the Debtors shall establish a trust for the benefit holders of Abuse Claims. The Victims Compensation Trust shall assume liability for all Abuse Claims and hold, administer and distribute Trust Assets for the benefit of holders of Abuse Claims.

---

[3] Figures with respect to the Allowed amounts of the Claims set forth in this chart are based upon the Debtors' best estimates of such Claims as of the date of this Disclosure Statement.

### 2. *Channeling of Abuse Claims to the Victims Compensation Trust*

From and after the Effective Date, all Abuse Claims shall be subject to the Channeling Injunction, and the Protected Parties shall not have any obligation with respect to any liability of any nature or description arising out of, relating to, or in connection with any Abuse Claims.

### 3. *Treatment of General Unsecured Claims*

Holders of prepetition trade debt and other General Unsecured Claims, which do not include Abuse Claims, will receive *Pro Rata* shares of the GUC Plan Distribution, which will be funded by Cash on hand and the proceeds of the Exit Facility.

### 4. *Treatment of the Claims under the Debtors' Secured Facilities*

The 2010 Credit Facility Claims, 2019 RCF Claims, 2010 Bond Claims, and 2012 Bond Claims will be allowed and deemed fully Secured. On the Effective Date of the Plan, all such Claims will be restructured under restated documentation.

### 5. *Exit Facility*

On the Effective Date of the Plan, the Debtors anticipate securing access to a credit facility or credit facilities, which will provide additional liquidity to supplement the Debtors' capability to continue carrying out the BSA's charitable mission after emergence from bankruptcy.

### 6. *General Settlement of Claims and Interests*

As described more fully in Section V.B of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that holders of Claims or Interests might have with respect to any Claim or Interest under the Plan. Distributions made to holders of Claims in any Class are intended to be final.

### 7. *Releases*

The Plan contains certain releases (as described more fully in Section V.P.5 hereof), including releases by the Debtors, Reorganized Debtors, and the Estates of the Released Parties (each solely in their capacity as such). The Plan also provides that each Holder of an Abuse Claim will be deemed to have expressly, conclusively, absolutely, unconditionally, irrevocably, and forever discharged and released from all Abuse Claims and any and all Claims and Causes of Action against the Debtors and the other Protected Parties. Under the Plan, the Released Parties means the parties listed in Section I.A.113 of the Plan, and the Protected Parties means the parties listed in Section I.A.107 of the Plan.

## C.  OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and its equity security holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote the equality of treatment of similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the commencement date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and equity interests in the debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

## D.  VOTING ON THE PLAN

The Disclosure Statement Order approved certain procedures governing the solicitation of votes on the Plan from holders of Claims against the Debtors, including setting the deadline for voting, specifying which holders of Claims are eligible to receive Ballots to vote on the Plan, and establishing other voting procedures.

**THE DISCLOSURE STATEMENT ORDER IS HEREBY INCORPORATED BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN. YOU SHOULD READ THE DISCLOSURE STATEMENT ORDER, THE CONFIRMATION HEARING NOTICE, AND THE INSTRUCTIONS ATTACHED TO YOUR BALLOT IN CONNECTION WITH THIS SECTION, AS THEY SET FORTH IN DETAIL PROCEDURES GOVERNING VOTING DEADLINES AND OBJECTION DEADLINES.**

The Plan, though proposed jointly and consolidated for purposes of making distributions to holders of Claims under the Plan, constitutes a separate Plan proposed by each Debtor. Therefore, the classifications set forth in the Plan apply separately with respect to each Plan proposed by, and the Claims against and Interests in, each Debtor. Your vote will count as votes for or against, as applicable, each Plan proposed by each Debtor.

This summary does not contain all of the information that is important to you and is qualified in its entirety by the more detailed information concerning solicitation of votes on the Plan included in <u>Section I.E</u> of this Disclosure Statement and in the accompanying Plan.

| The Voting Classes | The Debtors are soliciting votes to accept or reject the Plan from the holders of Claims in Classes 3A, 3B, 4A, 4B, 5, and 6. |
|---|---|
| **Voting Record Date:** | Only holders in the Voting Classes as of [_____], 2020 will be entitled to vote on the Plan. The Debtors reserve the right to set a later Voting Record Date if the Debtors decide to extend the Voting Deadline. |
| **Voting Deadline; Extension:** | The Voting Deadline is [ ]:00 [ ].m., prevailing eastern time, on [_____], 2020, unless the Debtors in their sole discretion extend the date by which Ballots will be accepted. If the Voting Deadline is extended, the term "Voting Deadline" will mean the time and date that is designated. Any extension of the Voting Deadline will be followed as promptly as practicable by notice of the extension. |
| **Voting Procedures:** | If you are a holder of a Claim in the Voting Classes, you should deliver a properly completed Ballot to the Claims and Noticing Agent. Ballots must be received by the Claims and Noticing Agent on or before the Voting Deadline. Ballots may be delivered via [_____]. |
| **Revocation or Withdrawal of Ballots:** | Upon the expiration or termination of this Solicitation, holders may not revoke or withdraw their Ballots; underlined_provided, that prior to the Voting Deadline, as may be extended, voting holders may withdraw any votes cast even if such votes have been delivered to the Voting Agent. |
| **Claims and Noticing Agent:** | The Debtors have retained Omni Agent Solutions as the Claims and Noticing Agent in connection with this Solicitation. Deliveries of Ballots should be directed to Omni Agent Solutions as set forth below or pursuant to the instructions contained in the Ballots. |

### E.  VOTING PROCEDURES, BALLOTS, AND VOTING DEADLINE

The following instructions for voting to accept or reject the Plan, together with the instructions contained in the Ballot constitute the Voting Instructions. To vote on the Plan, you must be a holder of a Claim in the Voting Classes as of the Voting Record Date. To vote, you must fill out and sign the Ballot enclosed in the Solicitation Package (as defined below).

### *1.  Holders of Claims and Interests Entitled to Vote*

Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or equity interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such claim or equity interest, the plan (a) cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy or defaults of a kind that do not require cure), (b) reinstates the maturity of such claim or equity interest as it existed before the default, (c) compensates the holder of such claim or equity interest for any damages from such holder's reasonable reliance on such legal right to an accelerated payment, (d) if such claim or such interest arises from a failure to perform nonmonetary obligations, other than a default arising from a failure to operate a nonresidential real property lease, compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure and

6

(e) does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

The following table sets forth (a) a simplified summary of which Classes are entitled to vote on the Plan and which are not, and (b) the estimated Allowed amount (in USD millions), the estimated recovery percentage and/or the voting status for each of the separate Classes of Claims and Interests provided for in the Plan.

| Class | Claim or Interest | Entitled to Vote | Estimated Allowed Amount[4] | Plan Recovery |
|---|---|---|---|---|
| 1 | Other Priority Claims | No—Presumed to Accept | $[__] | 100% |
| 2 | Other Secured Claims | No—Presumed to Accept | $[__] | 100% |
| 3A | 2010 Credit Facility Claims | Yes | $[__] | 100% |
| 3B | 2019 RCF Claims | Yes | $[__] | 100% |
| 4A | 2010 Bond Claims | Yes | $[__] | 100% |
| 4B | 2012 Bond Claims | Yes | $[__] | 100% |
| 5 | General Unsecured Claims | Yes | $[__] | [___]% |
| 6 | Abuse Claims | Yes | $[__] | [___]% |
| 7 | Interests in Delaware BSA, LLC | No—Presumed to Accept | N/A | 100% |

In accordance with sections 1126 and 1129 of the Bankruptcy Code, the Voting Classes are impaired under the Plan and, to the extent Claims in the Voting Classes are deemed Allowed, the holders of such Claims will receive distributions under the Plan. As a result, the holders of Allowed Claims in each of these Classes are entitled to vote to accept or reject the Plan.

Holders of Claims in Classes 1 and 2 and holders of Interests in Class 7 are Unimpaired under the Plan and are therefore conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, no holders of Claims or Interests in such Classes shall be entitled to vote to accept or reject the Plan.

Accordingly, the Debtors are only soliciting votes on the Plan from holders of Allowed Claims or Interests in Classes 3A, 3B, 4A, 4B, 5, and 6. If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package, including a Ballot setting forth detailed voting instructions. If your Claim is included in the Voting Classes, you should read your Ballot and carefully follow the instructions included in the Ballot. Please use only the Ballot that accompanies this Disclosure Statement or the Ballot that the Debtors otherwise provided to you.

---

[4] Figures with respect to the Allowed amounts of the Claims set forth in this chart are based upon the Debtors' best estimates of such Claims as of the date of this Disclosure Statement.

If an objection has been filed with respect to your Claim, you are not entitled to vote on the Plan (unless your Claim is only disputed in part, in which case you shall be entitled to vote solely on account of the undisputed portion of your Claim) unless you obtain an order of the Bankruptcy Court either resolving the objection or temporarily allowing your claim for voting purposes. In addition, if your Claim is identified in the Schedules as disputed, contingent, or unliquidated, you are not entitled to vote on the Plan unless you obtain any order of the Bankruptcy Court temporarily allowing such Claim for voting purposes (or otherwise allowing such Claim).

**As set forth in the Confirmation Hearing Notice and in the Disclosure Statement Order, holders of Claims who seek to have their claims temporarily allowed by the Bankruptcy Court for voting purposes must file on the docket and serve on parties entitled to receive service thereof a motion seeking such relief no later than [____], 2020.**

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Disclosure Statement Order also sets forth assumptions and procedures for determining the amount of Claims that each creditor is entitled to vote in these Chapter 11 Cases and how votes will be counted under various scenarios.

**Your vote on the Plan is important.** The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired and entitled to vote under a plan votes to accept such plan, unless the plan is being confirmed under the "cram-down" provisions of section 1129(b) of the Bankruptcy Code. Section 1129(b) permits confirmation of a plan of reorganization, notwithstanding the nonacceptance of the plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims or interests votes to accept a proposed plan. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class.

### 2. *Vote Required for Acceptance by a Class of Claims*

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted. Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims in such class that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims in such class that have voted. Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests in such class that have voted.

### 3. *Solicitation Package*

The package of materials (the "Solicitation Package") sent to the Voting Classes contains:

   a.  the Ballot and applicable voting instructions;

b. this Disclosure Statement and all exhibits hereto, including the Plan and all exhibits thereto;

c. the order approving to Disclosure Statement Motion (without exhibits) (the "<u>Disclosure Statement Order</u>");

d. a notice of the Confirmation Hearing (the "<u>Confirmation Hearing Notice</u>"); and

e. a cover letter from the Debtors.

The Debtors will distribute the Solicitation Packages to holders of Claims in the Voting Classes via [_____] before the Voting Deadline. In addition, the Plan, this Disclosure Statement, and, once they are filed, all exhibits to both documents (including the Plan Supplement) will be made available online at no charge at the website maintained by the Noticing and Claims Agent, Omni Agent Solutions (the "<u>Claims and Noticing Agent</u>"), at [_____]. In addition, the Debtors will provide parties in interest (at no charge) with hard copies of the Plan and/or Disclosure Statement, as well as any exhibits thereto, upon request to the Noticing and Claims Agent by email at [_____] or by telephone at [(___) ___-____].

## *4. Voting Procedures, Ballots and Voting Deadlines*

[_____], 2020 (the "<u>Voting Record Date</u>") is the date that will be used for determining which holders of Interests are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures. Except as otherwise set forth in the Plan or in this Disclosure Statement, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

If you are entitled to vote to accept or reject the Plan, one or more Ballot(s) has been enclosed in your Solicitation Package for the purpose of voting on the Plan. Please vote and return your Ballot(s) in accordance with the instructions accompanying your Ballot(s).

You should carefully review (1) the Plan, (2) this Disclosure Statement, (3) the Disclosure Statement Order, (4) the Confirmation Hearing Notice, and (5) the detailed instructions accompanying your Ballot prior to voting on the Plan.

After carefully reviewing these materials, including the detailed instructions accompanying your Ballot(s), please indicate your acceptance or rejection of the Plan by completing the Ballot(s). All votes to accept or reject the Plan with respect to any Class of Claims entitled to vote on the Plan must be cast by properly submitting the duly completed and executed form of Ballot designated for such Class. Holders of Claims voting on the Plan should complete and sign the Ballot(s) in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept the Plan" or "Reject the Plan." In order for your vote to be counted, you must complete and return your Ballot(s) in accordance with the instructions accompanying your Ballot(s) on or before the Voting Deadline. Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you.

In order for the Holder of a Claim in the Voting Class to have such Holder's Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered to [_____] so that such Holder's Ballot is actually received by the Claims and Noticing Agent on or before the Voting Deadline, *i.e.* [_____], 2020 at [__]:00 [__].m. prevailing Eastern Time.

**IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.**

**ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM IN THE VOTING CLASSES BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.**

**EACH HOLDER OF A CLAIM IN THE VOTING CLASSES MUST VOTE ALL OF ITS CLAIMS WITHIN SUCH CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM IN THE VOTING CLASSES WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTOR THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN. IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE VOTING CLASSES AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.**

**IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.**

### 5. *Confirmation Hearing and Deadline for Objections to Confirmation*

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, shall hold a hearing to confirm a plan of reorganization. The Confirmation Hearing pursuant to section 1128 of the Bankruptcy Code will be held on [_____], 2020 at [__].m. prevailing Eastern Time, before the Honorable Judge [_____], United States Bankruptcy Judge for the District of Delaware, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market Street, [____] Floor, Courtroom [____], Wilmington, Delaware. The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the entities who have filed an objection to the Plan, if any, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the

Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation. Any objection to Confirmation of the Plan must: (i) be made in writing; (ii) state the name and address of the objecting party and the nature of the claim or interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Plan; and (iv) be filed with the Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy court so that they are received on or before [_____] at [__]:00 [_].m. prevailing Eastern Time.

## ARTICLE II. ORGANIZATION OVERVIEW AND CORPORATE HISTORY

### A. Organization Overview

#### 1. The Boy Scouts of America

The BSA was incorporated in the District of Columbia on February 8, 1910, and subsequently chartered by Congress as a non-profit corporation under Title 36 of the United States Code on June 15, 1916. 36 U.S.C. §§ 30901-08. The Congressional Report in Support of the Act to Incorporate the Boy Scouts of America provides that the Scouting program "is intended to supplement and enlarge established modern educational facilities in activities in the great and healthful out of doors where may be the better developed physical strength and endurance, self-reliance, and the powers of initiative and resourcefulness, all for the purpose of establishing through the boys of today the very highest type of American citizenship." H.R. Rep. No. 64-130 at 245 (1916). Consistent with this intention, the BSA's congressional charter states that the purpose of the organization is to "promote, through organization, and cooperation with other agencies, the ability of boys to do things for themselves and others, to train them in Scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred virtues, using the methods which are now in common use by Boy Scouts." BSA Charter, § 3; *see also* BSA Bylaws, § 2 ("In achieving this purpose, emphasis shall be placed upon its educational program and the oaths, promises, and codes of the Scouting program for character development, citizenship training, leadership, and mental and physical fitness."). These mandates have been the guiding light for the BSA's work for over a century.

As a non-profit corporation, the BSA is required to adopt and carry out a charitable, religious, educational, or other philanthropic mission. It is the BSA's mission "to prepare young people to make ethical and moral choices over their lifetimes by instilling in them the values of the Scout Oath and Law." *See* https://www.scouting.org/legal/mission/. Unlike a profit-seeking corporation, the BSA's senior leadership owes fiduciary duties to the Scouting mission, not the generation of profits. The successful delivery of this mission to youth in America is the BSA's fiduciary obligation. To that end, all Scouting policies, practices, and programming are specifically designed to train Scouts in responsible citizenship, character development, and self-reliance, in a manner consistent with the BSA's mission. Thus, to be eligible for Scouting, individuals must subscribe to, and conduct themselves in accordance with, the Scout Oath and the Scout Law:

11

- **Scout Oath.** "On my honor I will do my best to do my duty to God and my country and to obey the Scout Law; to help other people at all times; to keep myself physically strong, mentally awake, and morally straight."[5]

- **Scout Law.** "A Scout is trustworthy, loyal, helpful, friendly, courteous, kind, obedient, cheerful, thrifty, brave, clean, and reverent."[6]

At all levels of Scouting, these fundamental tenets of the BSA's mission are taught to Scouts so they can successfully develop into our nation's next generation of great leaders.

In support of its mission, the BSA has long facilitated the spread of Scouting in the United States through units chartered by local partners and has also designed and implemented an array of its own outdoor activities, educational and skill-building programs, and career training. Since its inception, more than 130 million Scouts have participated in the BSA's programming, and more than 35 million adult leaders have helped carry out the BSA's mission. The BSA has grown to be one of the largest youth organizations in the country, as well as one of the largest Scouting organizations in the world. In 2019, nearly three million Scouts and adult leaders were involved in Scouting and helped deliver more than 13 million Scouting service hours to communities across the country.

Throughout its 110-year history, the BSA has continually looked for ways to offer Scouting to more young men and women. In 1912, the BSA formed the Camp Fire Girls as a sister organization. In the 1930s, the BSA introduced Cub Scouts as a program for younger participants. Other past and current BSA programs include Air Scouts, Sea Scouts, Exploring, Venturing, and STEM Scouts. In 2018, the BSA welcomed girls into Cub Scouts, and in 2019, the BSA began chartering girl units to join Scouts BSA, the program previously known as Boy Scouts. Since 2017, over 200,000 girls have participated in Scouting, including approximately 130,000 in Cub Scouts, 30,000 in Scouts BSA, and 65,000 in Venturing, Sea Scouts, and Exploring. The BSA has also organized affiliated organizations and affinity groups—such as Learning for Life, Order of the Arrow, and National Eagle Scout Association—to provide additional educational, civic, and developmental programs for Scouts, as well as engagement opportunities for Scouting alumni and supporters.

The BSA also provides other services critical to continued Scouting opportunities for America's young men and women, including core program content, such as events and other activities at high adventure facilities; the procurement and sale of uniforms and equipment; information technology and digital resources; training of professional Scouters to serve in Local Councils; communications and publications including magazines and online content for Scouts and adult leaders; training development and delivery; national events; registration systems; and other quality control services. In addition, every four years, the BSA hosts a National Jamboree, where tens of thousands of Scouts from around the country gather to celebrate Scouting, learn about teamwork and leadership, and develop lifelong friendships.

The national headquarters of the BSA is in Irving, Texas. The BSA has approximately

---

[5] *See* BSA, *What are the Scout Oath and Law?*, available at https://www.scouting.org/discover/faq/question10/.

[6] *See* BSA, *About the BSA*, available at https://www.scouting.org/about/.

1,650 employees, all of whom are located in the United States and its territories. The BSA's employees are located at its headquarters; at the BSA's national warehouse and distribution center in Charlotte, North Carolina; at approximately 174 official BSA Scout Shops located throughout the country; and at the BSA's four high adventure facilities located in Florida and the U.S. Virgin Islands, New Mexico, West Virginia, and Minnesota and parts of Canada. The BSA's sources of funding include membership fees, high adventure facility fees, donor contributions, legacies, and bequests, corporate sponsorships, grants from foundations, and supply sales at Scout shops, on its website, and directly to Local Councils. In 2019, the BSA's total gross revenues were approximately $394 million. Of this total, approximately 30% were attributable to supply sales, approximately 16% to membership fees, approximately 15% to high adventure facility operations, approximately 13% to investments, approximately 8% to contributions, and approximately 8% to event fees.

### 2. The Scouting Experience

Delivery of the Scouting mission is the fiduciary obligation of the BSA. Local Councils and Chartered Organizations, and the Scouting units that they sponsor, operationalize this mission. Through these organizations, Scouts learn the values embodied in the Scout Oath and Scout Law. From the beginner-level Cub Scouts to the most advanced offerings at high adventure facilities, all Scouting programming is intended to instill in the next generation of leaders the fundamental tenets of the BSA's mission.

### a. Cub Scouts

The gateway to the Scouting program is Cub Scouts, where younger participants (kindergarten through fifth grade) first build character, learn citizenship, and develop personal skills and physical fitness. The den—a small group of six to eight children who are the same grade and gender—is the cornerstone of Cub Scouting. In the den, Cub Scouts make friends, develop new skills and interests, and learn respectfulness, sportsmanship, and citizenship. Several dens in the same community form a pack. At pack meetings, Cub Scouts engage in a wide range of fun and interactive activities, including games, arts and crafts, skits, and songs. Packs also hold special events and activities, such as advancement banquets, field trips, community service projects, and, most famously, the Pinewood Derby. Cub Scouts attend camp outings and participate in other local outdoor activities, such as hiking, biking, swimming, sledding, and a variety of team sports, all of which help instill in them a life-long respect for the environment, a core principle of the Scouting mission. Many of these outdoor adventures are held at Local Council-owned properties specifically developed and maintained for the purpose of delivering the Scouting program. Cub Scout programming is family-oriented and adult volunteers, many of whom are parents of participating Cub Scouts, play an active role in den and pack leadership.

### b. Scouts BSA

After Cub Scouts, youth participants progress to Scouts BSA. The Scouts BSA program focuses on service to others, community engagement, leadership development, respect for the environment, and personal and professional growth. In Scouts BSA, adult volunteers take a back seat, and Scouts themselves assume important leadership roles at their own meetings and

activities. Scouts BSA units, known as "troops," are single-gender and composed of several smaller groups called "patrols." At patrol and troop meetings, Scouts engage in knowledge- and skill-based challenges, team building exercises, and community service projects, such as cleaning parks and other public spaces, enhancing nature preserves, building trails in wildlands, constructing playgrounds, creating libraries, collecting meals for food banks, visiting with the sick or elderly, or responding to national emergencies.

In Scouts BSA, every Scout is able to take on a leadership role in his or her patrol, which provides one of the unique experiences in Scouting that inspires young people from all backgrounds, experiences, and capabilities to see themselves as a leader and hone skills that will last a lifetime. In addition, Scouts are encouraged to participate in a wider suite of outdoor activities, including weekend camping trips, summer camps, and themed-camporees where they are exposed to more advanced Scouting programming and skill-building in diverse areas, such as first aid, rock climbing, forestry, conservation, and environmental awareness. At these events, Scouts from different troops work together and form life-long bonds. Local Council camps and other facilities are the hub for many of these outdoor adventures.

Central tenets of Scouts BSA programming are rank advancement and merit badges. Young men and women begin their journey in Scouts BSA at the rank of Scout. As they master skills and learn important life lessons, they progress to the ranks of Tenderfoot, Second Class, First Class, Star, and then Life. Along the way, Scouts earn merit badges that recognize hard work and achievement in sports, arts, sciences, trades, personal finance, and future careers. Just last year, young men and women earned more than 1.7 million merit badges that represent skills that will help them succeed throughout their lives.

Scouts who successfully complete this rigorous program, serve as a leader in their troop of a designated period of time, and design and lead a significant service project, are awarded Scouts BSA's highest rank of Eagle. Less than 8% of Scouts achieve the Eagle Scout rank, and past Scouts achieving this honor permeate our nation's government, economy, and culture, including President Gerald Ford, astronaut Neil Armstrong, civil rights leader Percy Sutton, and entrepreneurs Sam Walton and Ross Perot, to name a few.

### c. Advanced Scouting

In addition to Scouting's core Cub Scouts and Scouts BSA offerings, older Scouts participate in other advanced programs. In Venturing, co-ed groups form their own Scout-led "crews" that design and carry out specialized programming and activities. The opportunities available through Venturing are endless: A Scout interested in the outdoors can join a Venturing crew that backpacks in state or national parks and kayaks in local or remote rivers; a Scout interested in the sciences can join one that builds robots or volunteers at planetariums and museums; and a Scout interested in community service can join one that volunteers at soup kitchens or rebuilds homes in the wake of natural disasters. Venturing crews instill in their members the importance of adventure, leadership, personal growth, and service, all of which are fundamental to the Scouting mission.

Other advanced programs for older Scouts include Sea Scouts, where Scouts learn boating skills and water safety, and also study maritime heritage. Sea Scouts participate in

boating and other water-based excursions, such as scuba diving off the Florida Keys and kayaking in the Everglades. Another program, Exploring, is the BSA's preeminent workforce development program. Through Exploring, Scouts join career-specific clubs sponsored by local businesses, government agencies, and community organizations. Scouts develop important personal and professional skills through immersive, on-the-job training. And STEM Scouts offers the Scouting experience with less emphasis on the outdoors. Participating young men and women learn about and nurture a lifelong interest in science, technology, engineering, and math through creative, hands-on activities, educational field trips, and interaction with STEM professionals.

### d.  High Adventure Facilities

The apex of the Scouting program is found at the four iconic high adventure facilities operated by the BSA. At these facilities, Scouts experience the truest embodiment of what Congress envisioned when it chartered the organization more than a century ago—unparalleled facilities hosting outdoor activities, educational programs, and leadership training. As Scouts progress through Scouting, these high adventure facilities provide them with opportunities to implement the knowledge and training that they gained through Cub Scouts and Scouts BSA at locations and in programs that are not available anywhere else in the country. Not surprisingly, there is strong demand for these high adventure facilities—more than 70,000 Scouts and Scouters participate in the programs and events held there every year, and more than two million have done so since their openings. As their storied histories portend, these facilities and the programming they allow play a critical role in the BSA's delivery of the Scouting program to young Americans.

#### (i)    Northern Tier

The BSA opened Northern Tier—located on the boundary waters between Minnesota and Canada—as its first high adventure facility in 1923. For nearly a century, the BSA has maintained several wilderness canoe bases at Northern Tier from which generations of Scouts have explored millions of acres of lakes, rivers, forests, and wetlands of northern Minnesota, northwestern Ontario, and southeastern Manitoba. Scouts at Northern Tier embark on canoe treks covering up to 150 miles and lasting as long as two weeks. Along the way, Scouts camp at remote, unstaffed campgrounds, where they must learn and implement Scouting's philosophy of self-sufficiency. In the winter, Northern Tier transforms into a cold-weather camping outpost, where Scouts can engage in winter activities such as cross-country skiing, dog sledding, snow shoeing, and ice fishing. Over the years, the BSA has hosted almost 250,000 Scouts and Scouters at Northern Tier. *See generally* Northern Tier, *About Northern Tier*, available at https://www.ntier.org/about/.

#### (ii)    Philmont Scout Ranch

The BSA's largest high adventure facility, Philmont, was opened in 1938 on nearly 150,000 acres of rugged mountain wilderness in the Sangre de Cristo range of the Rocky Mountains in northeastern New Mexico. At Philmont, Scouts have access to a labyrinth of backpacking trails, as well as 35 staffed camps and 55 trail camps, spread across mountainous terrain ranging in elevation from 6,500 to 12,500 feet. In addition, the BSA's programming at

Philmont features the best of the Old West—horseback riding, burro packing, gold panning, chuckwagon dinners, and interpretive history—along with physical challenges such as rock climbing, mountain biking, and sport shooting. These experiences teach Scouts about our nation's frontier history and instill in them a lifelong sense of adventure and confidence in challenging situations. In addition, Philmont hosts a series of leadership training programs for adult leaders. Well over a million Scouts and Scouters have experienced the unique and diverse offerings of Philmont. *See generally* Philmont Scout Ranch*, About Philmont*, available at https://www.philmontscoutranch.org/about/.

### (iii)    Florida Sea Base

Florida Sea Base ("Sea Base") was commissioned by the BSA as its third high adventure facility in 1980. At several facilities in south Florida and the U.S. Virgin Islands, Scouts swim, snorkel, scuba dive, and fish. Scouts also participate in boating and sailing adventures throughout the Caribbean, as well as primitive camping on several island-based settlements. Through Sea Base's programming, Scouts learn to trust one another and work as a team, and also learn the importance of conservation and the preservation of our environment. Since opening its doors, the BSA has provided aquatic adventures to nearly 300,000 Scouts and Scouters at Sea Base. *See generally* Sea Base*, About Sea Base*, available at https://www.bsaseabase.org/about/.

### (iv)    Summit Bechtel Reserve

Most recently, in 2013, the BSA opened the Summit Bechtel Reserve ("Summit") in the wilds of West Virginia. It is the preeminent summer camp, high adventure facility, and leadership training center for the millions of Scouts and adult leaders involved in Scouting now and for generations to come. At the Summit, Scouts explore the New River Gorge region through white-water rafting, kayaking, canyoneering, and advanced orienteering, Scouts also participate in more modern adventures, such as skateboarding, ATV riding, freestyle BMXing, and zip-lining. This programming pushes Scouts past their comfort zones, where they can better develop and master the leadership, character, citizenship, and fitness that are core to the BSA's mission. In addition to its regular programming, the BSA hosts a National Jamboree at the Summit every four years. In 2019, the BSA hosted the largest World Jamboree ever, with over 45,000 attendees Scouts in attendance from 167 countries. It was the first such event held in the United States in over 50 years. All told, approximately 200,000 Scouts and Scouters have experienced the wonders of the Summit since it opened less than a decade ago. *See generally* Summit Bechtel Reserve, *About Us*, available at https://www.summitbsa.org/about-us/summit-story/.

### 3.    *Delivery of the Scouting Programs*

Local Councils, and Chartered Organizations work closely together to carry out the mission of Scouting. Each of these entities plays a vital role in training Scouts in responsible citizenship, character development, and self-reliance. Despite their common purpose, the BSA, Local Councils, and Chartered Organizations are legally independent entities. Each Local Council is a non-profit corporation under the laws of its respective state and exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code. Each Local Council also maintains its own senior management and independent volunteer board of directors. The BSA does not hold any equity interest in any Local Council, Chartered Organization, or Scouting unit,

and only the BSA and its wholly owned subsidiary, Delaware BSA, LLC, are debtors in these Chapter 11 Cases.[7]

### a.  Local Councils

In furtherance of its mission, the BSA charters independently incorporated Local Councils to facilitate the delivery of the Scouting program. Local Councils are not agents of the BSA, and they have no authority to bind the organization.

There are currently 261 Local Councils, covering geographic areas of varying size, population, and demographics. Although they are legally independent of the BSA, Local Councils are required to organize, operate, and promote Scouting in a manner that is consistent with the BSA's mission and with the BSA's charter, bylaws, rules and regulations, policies, and guidelines. Local Councils generally do not receive financial support from the BSA; instead, they rely upon their own fundraising through donations, product sales, special events, and corporate gifts. The BSA does, however, provide certain corporate and administrative support to the Local Councils in exchange for shared-services and other fees and reimbursements, as well as for the assistance of Local Councils in delivering the Scouting mission. This support includes human resources, access to training facilities, marketing services, and general liability insurance coverage.

Although not a precise analogue, the relationship between the BSA and the Local Councils is similar to that of a franchisor and franchisee. The BSA is responsible for developing and disseminating the structure and content of the Scouting program, owns and licenses intellectual property, and provides training and support services, including corporate services such as human resources, marketing and legal functions, and information technology. The BSA, in addition to holding the power to grant charters to Local Councils, may also revoke a Local Council's charter for failing to meet national standards. Local Councils, for their part, play a key role in delivering the Scouting program. Local Councils also serve the vital function of collecting member fees and remitting such funds to the BSA. Each of these Local Councils is crucial to the BSA's ability to carry out its mission.

The most important functions served by Local Councils are their recruiting of Chartered Organizations and their oversight of the operation of the Scouting units that those Chartered Organizations create. Local Councils also provide other services essential to Scouting, including: funding of local Scouting programs and initiatives; recruiting of Scouts and volunteer leaders; providing Scout and volunteer training; offering opportunities for rank advancement; locally enforcing the BSA's policies, rules, and regulations; and registering members and leaders. In addition, many Local Councils own and operate service centers, camps, and other facilities that provide the local resources necessary for a successful Scouting program.

A corps of qualified and trained professional and volunteer Scouters is essential for Local Councils to provide these services. To that end, each of the Local Councils hires a professional

---

[7] In addition to Local Councils and Chartered Organizations, the BSA is also affiliated with several non-stock entities, each of which is related to, but legally independent of, the BSA. Several of these affiliated, non-stock entities are directly involved in delivering the Scouting program, while others, such as the National Boy Scouts of America Foundation, serve the BSA's mission in other ways.

Scout executive and other key staff from a pool of professionals—pre-commissioned by the BSA—who have demonstrated the moral, educational, and emotional qualities necessary for leadership. Those commissioned professionals and other staff members support the Local Councils in connection with day-to-day operations, recruitment of new Chartered Organizations, management of fundraising, maintenance of program facilities, and numerous other services. Thousands of volunteers also donate their time and resources to support the Local Councils, including through assistance with programming, such as unit leadership, unit activities, merit badge colleges, youth and adult leader training and advancement opportunities, and fundraising events.

### b. Chartered Organizations

There are currently more than 41,000 Chartered Organizations in the country. They are typically local organizations—such as faith-based institutions, clubs, civic associations, educational institutions, businesses, and groups of citizens—that sponsor the more than 81,000 local Scouting units throughout the country. Some Chartered Organizations are actively involved with the units that they sponsor and use Scouting as a means to further in their own mission or serve their broader communities. In addition, Chartered Organizations assist with recruiting and vetting adult leaders and other volunteers, and provide meeting space and other monetary and in-kind support to the packs and troops that they sponsor.

### B. Corporate and Capital Structure

### 1. Affiliated Entities

### a. Delaware BSA, LLC

Debtor Delaware BSA, LLC ("Delaware BSA"), of which the BSA is the sole member, is a non-profit limited liability company that was incorporated under the laws of Delaware on July 11, 2019. Delaware BSA is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code. Delaware BSA has pledged substantially all of its assets to secure the obligations of the BSA and Arrow under the 2019 RCF Agreement, the Prepetition Security Agreement (2020), the 2010 Bond Agreement and the 2012 Bond Agreement. Delaware BSA's principal asset is a depository account located in Delaware.

### b. BSA Asset Management, LLC and BSA Commingled Endowment Fund, LP

Related Non-Debtor Entity BSA Asset Management, LLC ("Asset Management") is a Delaware limited liability company of which the BSA is the sole member. BSAAM manages the BSA's and certain Local Councils' investments through the BSA Commingled Endowment Fund, LP (the "Endowment Fund"), a Delaware limited partnership of which BSAAM is the general partner. The BSA and certain Local Councils are limited partners of the Partnership. Each limited partner receives units of partnership interest in proportion to, and in exchange for, its financial contributions to the Partnership. In addition to its role as general partner of the Partnership, BSAAM is the settlor of the BSA Endowment Master Trust.

### c.  BSA Endowment Master Trust

Related Non-Debtor Entity BSA Endowment Master Trust (the "Master Trust") is a non-profit 501(c)(3) Delaware trust established under the laws of Delaware exclusively for the purpose of investing funds contributed to the Partnership by the BSA and participating Local Councils. The Master Trust is a multiple pooled account trust arrangement established to provide economies of scale and efficiency of administration to eligible entities that elect to invest their funds in the Master Trust. Global Trust Co. is the trustee of the Master Trust as of the Petition Date. In addition, the Master Trust is also a limited partner of the Endowment Fund

### d.  National Boy Scouts of America Foundation

Related Non-Debtor Entity National Boy Scouts of America Foundation (the "National Foundation") is a non-stock, non-profit corporation under the laws of the District of Columbia and exempt from federal income taxes under section 501(c)(3) of the Internal Revenue Code. The Foundation exists to help secure the future of Scouting at the Local Council level by providing support for major-gift fundraising efforts across the organization. The Foundation is governed by a separate board of directors.

### e.  Learning for Life

Related Non-Debtor Entity Learning for Life is a non-stock, non-profit corporation under the laws of the District of Columbia that is exempt from federal income taxes under section 501(c)(3) of the Internal Revenue Code. The mission of Learning for Life is to empower students to build exceptional character and leadership skills by guiding them through an innovative, research-based curriculum that enhances the learning experience and teaches the skills necessary to succeed both academically and throughout their lives. Learning for Life also administers the Exploring club career education program for young men and women. The Exploring program teaches important life and career skills to young people from all backgrounds through immersive career experiences and mentorship provided by thousands of local, regional and national businesses and organizations, which offer career-specific posts or clubs that help youth pursue their special interests, grow and develop. Learning for Life is governed by a separate board of directors.

### f.  Arrow WV, Inc.

Arrow WV, Inc. ("Arrow") is a non-stock, non-profit corporation under the laws of West Virginia that is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code. Arrow was formed in 2009 to facilitate the acquisition and development of the Summit. Arrow owns the real property and improvements that comprise the Summit and leases the Summit to BSA. Construction of the Summit was accomplished with the proceeds from the 2010 Bond and the 2012 Bond to the BSA from Fayette County, West Virginia. The bonds were issued and purchased by JPMorgan Chase Bank, National Association ("JPMorgan" or the "Prepetition Secured Lender"). The BSA provided funding for the construction of the facility utilizing donations and pledges to the BSA and other BSA financial support. Arrow is governed by separate board of directors.

### g. Atikaki Youth Ventures Inc. and Atikokan Youth Ventures Inc.

Related Non-Debtor Entities Atikaki Youth Ventures Inc. ("Atikaki") and Atikokan Youth Ventures Inc. ("Atikokan") are non-share capital corporations formed under the laws of Canada, with registered addresses in Winnipeg, Manitoba. Atikaki maintains the Bissett, Manitoba base for the Northern Tier high adventure facility, which offers canoe trips into the Atikaki Provincial Park and Woodland Caribou Provincial Park. Atikokan maintains the Don Rogert Canoe Base for the Northern Tier high adventure facility in Atikokan, Ontario, Canada, which offers canoe trips into the Quetico and Crown Lands. Each of Atikaki and Antikokan are governed by separate boards of directors.

### h. Texas BSA, LLC

Related Non-Debtor Entity Texas BSA, LLC ("Texas BSA") is a non-profit limited liability company that was incorporated under the laws of Texas on July 12, 2019. The BSA is the sole member of Texas BSA. As of the Petition Date, Texas BSA is an inactive entity.

### i. NewWorld 19, LLC

Related Non-Debtor Entity NewWorld 19, LLC, ("NewWorld") was formed in connection with the 2019 World Jamboree. As of the Petition Date, NewWorld is an inactive entity.

### 2. Capital Structure

The following is an overview of the BSA's capital structure and approximate outstanding obligations (collectively, "Prepetition Obligations") under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement, and the 2019 RCF Agreement (collectively, the "Prepetition Secured Agreements") as of the Petition Date:

| Description | Amount ($mm)[8] | Interest Rate | Maturity |
|---|---|---|---|
| **2019 RCF Agreement** | | | |
| -   2019 RCF Revolver | $[0] | L + 125 | Mar. 2021 |
| -   2019 RCF Letters of Credit | $61,542,720 | | |
| **2010 Credit Agreement** | | | |
| -   2010 Revolver | $25,212,317 | L + 125 | Mar. 2020 |
| -   2010 Term Loan | $11,250,000 | L + 100 | Mar. 2022 |
| -   2010 Letters of Credit | $44,299,743 | | |
| **2012 Bond Agreement** | $145,662,101 | 2.94% | Mar. 2022 |
| **2010 Bond Agreement** | $40,137,274 | 3.22% | Nov. 2020 |

---

[8] Estimated amounts as of February 18, 2020.

| Total Secured Debt | $328,104,155[9] | | |
|---|---|---|---|

Collectively, the Prepetition Obligations total approximately $328,104,155. Each Prepetition Secured Agreement is secured by the same collateral ("Prepetition Collateral")—substantially all property loaned, leased, or operated by the Debtors and Arrow. Under each Prepetition Secured Agreement, the BSA is the borrower and JPMorgan is the sole secured lender thereto. The Debtors assert that the value of the Prepetition Collateral exceeds the value of the Prepetition Obligations.

### a. 2010 Credit Agreement

On August 11, 2010, the BSA entered into the $100.0 million 2010 Credit Agreement with JPMorgan. Arrow is a guarantor under the facility. The 2010 Credit Agreement has been amended seven times, most recently in conjunction with the entry into the 2019 RCF Agreement on March 21, 2019.

The 2010 Credit Agreement has two components, a $75.0 million revolving credit component (the "2010 Revolver") and a $25.0 million term loan component (the "2010 Term Loan"). The 2010 Revolver, which allows the organization to issue letters of credit, is scheduled to mature on March 2, 2020, while the 2010 Term Loan is scheduled to mature on March 2, 2022.

Pursuant to the terms of the 2010 Credit Agreement, the BSA's outstanding obligations under the 2010 Credit Agreement are secured by the "Collateral," which was defined under that certain *Security Agreement* dated August 11, 2010 (as amended on November 5, 2010 and March 9, 2012, the "Original Security Agreement") and the 2010 Credit Agreement as (a) a lien on all "accounts," "payment intangibles," (each as such defined in Article 9 of the Uniform Commercial Code) and the proceeds thereof and (b) all property in which liens were granted to the Prepetition Agent.

In connection with the BSA's entry into the 2019 RCF Agreement on March 21, 2019, the Original Security Agreement was amended and restated pursuant to the Prepetition Security Agreement (2019). Pursuant to the Prepetition Security Agreement (2019) and certain mortgages (collectively, the "Mortgages"), BSA and Arrow granted to JPMorgan contemporaneously with the BSA's entry into the 2019 RCF Agreement a security interest in the organization's (a) headquarters in Texas and (b) high-adventure facilities in Florida, West Virginia, New Mexico, and Minnesota/Canada ((a) and (b), collectively, the "Mortgaged Properties"). The Original Security Agreement is secured by the Prepetition Collateral *pari passu* with the other Prepetition Secured Agreements.

As of the Petition Date, the Debtors are truly, justly, and lawfully indebted and liable to JPMorgan for $25,212,317 in respect of revolving loans made, $11,250,000 in respect of term loans made, and $44,299,743 in respect of undrawn letters of credit issued by JPMorgan under the 2010 Credit Agreement.

---

[9] These amounts include contingent, undrawn letters of credit under the 2019 RCF Agreement and the 2010 Credit Agreement totaling $105,842,463.

### b.  2010 Bond Agreement

On November 5, 2010, BSA and Arrow entered into the 2010 Bond Agreement, pursuant to which the Issuer issued the Series 2010A Bonds in an aggregate principal amount of $50,000,000 and Series 2010B Bonds in an aggregate principal amount of $50,000,000 (collectively, the "2010 Bonds"), the proceeds of which were loaned to BSA. On November 5, 2015, the BSA repaid the Series 2010A Bonds in full. The loans from the Issuer to BSA were evidenced by that certain Promissory Note - 2010A executed by BSA and payable to the order of the Issuer in the original principal amount of $50,000,000 which notes were pledged by the Issuer to secure the repayment of the Series 2010A Bonds, and the 2010 Note,. As of the date of issuance of the 2010 Bonds and all dates thereafter, the 2010 Bonds were secured *pari passu* in the same collateral as the loans under the 2010 Credit Agreement.

As of the Petition Date, the Debtors are truly, justly, and lawfully indebted and liable to JPMorgan for $40,137,274 for the remaining outstanding 2010 Bonds under the 2010 Bond Agreement.

### c.  2012 Bond Agreement

On March 9, 2012, the BSA and Arrow entered into the 2012 Bond Agreement with the Issuer and JPMorgan, pursuant to which the Issuer issued the Series 2012 Bonds("2012 Bonds") in an aggregate principal amount not to exceed $175 million. As of the date of issuance of the 2012 Bonds and all dates thereafter, the 2012 Bonds were secured *pari passu* in the same collateral as the loans under the 2010 Credit Agreement and the 2010 Bonds. The loans from the Issuer to BSA are evidenced by 2012 Note.

As of the Petition Date, the Debtors are truly, justly, and lawfully indebted and liable to JPMorgan for $145,662,101 under the 2012 Bond Agreement.

### d.  2019 RCF Agreement

On March 21, 2019, the BSA entered into the $71.5 million 2019 RCF Agreement with JPMorgan, with Arrow as a guarantor. The 2019 RCF Agreement, which matures on March 21, 2021, is a secured facility with a revolving component and a component under which the BSA can issue letters of credit.

In connection with the execution of the 2019 RCF Agreement, the Debtors granted JPMorgan security interests in the Prepetition Collateral. At the time of the execution, the Debtors contemporaneously entered into the Prepetition Security Agreement (2019) and granted JPMorgan the Mortgages in the Mortgaged Property. The 2019 RCF Agreement is secured *pari passu* with the other Prepetition Secured Agreements.

As of the Petition Date, the Debtors are truly, justly, and lawfully indebted and liable to JPMorgan for $0 in respect of loans made and $61,542,720 in respect of undrawn letters of credit issued by JPMorgan under the 2019 RCF Agreement.

### e. Prepetition Security Agreement (2020)

On February 3, 2020, in connection with a capital contribution by the BSA to Delaware BSA, the BSA, Delaware BSA, and JPMorgan entered into the Prepetition Security Agreement (2020). Pursuant to the Prepetition Security Agreement (2020), Delaware BSA pledged its accounts and other property, except to the extent excluded by the Prepetition Security Agreement (2020), as security for the Prepetition Obligations.

### 3. General Unsecured Claims

General Unsecured Claims consist of any Claim against the Debtors that is not an Administrative Expense Claim, a Priority Tax Claim, an Other Priority Claim, an Other Secured Claim, a 2010 Credit Facility Claim, a 2019 RCF Claim, a 2010 Bond Claim, a 2012 Bond Claim, or an Abuse Claim that are neither secured by collateral nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court.

Any Rejection Damages Claims for damages alleged to arise from the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be classified as Allowed General Unsecured Claims and treated in accordance with Section III.B.7 of the Plan.

The Debtors anticipate that General Unsecured Claims will include trade Claims, workers compensation Claims, non-Abuse litigation Claims (primarily for personal injury), deferred compensation Claims, and Claims relating to the Debtors' retirement programs.

## C. Corporate Governance

Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent that there are anticipated changes in the Reorganized Debtors' directors and officers, the Debtors will identify those changes in the Plan Supplement and thereafter such changes will be attached to the Plan as Exhibit Q. After the Effective Date, the Reorganized Debtors' organizational documents, as each may be amended thereafter from time to time, shall govern the designation and election of directors of the Reorganized Debtors.

## ARTICLE III. EVENTS LEADING TO THE CHAPTER 11 CASES

The safety of children in its programs is the most important priority of the BSA. The BSA today enforces a robust set of multilayered policies and procedures to protect the young men and women involved in Scouting. These measures are informed by respected experts in the fields of child safety, law enforcement, and child psychology. The BSA is committed to the protection of its Scouts, and that commitment is integral to the BSA's identity and mission as it seeks to continue instilling values of leadership, service, and patriotism in millions of children who participate in Scouting programs across the country.

## A. Child Sexual Abuse Claims against the BSA

Despite its current record, in the past, predominantly at a time when there was little

expertise across any organization about the topic of abuse prevention, predators were able to use Scouting and other youth programs to access children. Given these past events and recent changes in the legal landscape governing sexual abuse claims, the BSA and Local Councils are defendants in hundreds of lawsuits related to acts of sexual abuse in its Scouting programs. The vast majority of these claims date back to more than 30 years ago, before the BSA implemented a series of strengthened policies and practices designed to keep Scouts safe. These enhanced youth-protection measures have proven effective—Scouts are now safer than they have ever been.

The BSA recognizes that current youth protection efforts cannot change the past. Nor can they repair the damage caused by abuse suffered by Scouts because of those who used the program to harm children. The BSA is committed to providing equitable compensation to victims and to continually improving its policies and practices to prevent future abuse in Scouting. However, the cost of addressing historical abuse claims has become unsustainable. The BSA cannot continue to address these claims through piecemeal litigation and remain viable as a non-profit corporation. Accordingly, the BSA has determined this filing is necessary to both compensate victims and ensure that the BSA retains the capability to carry out its mission.

As of the filing of this case, there were approximately 275 pending civil actions asserting personal injury claims against the BSA and certain Local Councils and Chartered Organizations related to abuse suffered by a Scout at the hands of a Scouting leader, volunteer, or another member of the BSA (collectively, "Pending Abuse Actions"). The Pending Abuse Actions are being litigated in dozens of state and federal jurisdictions around the country. Although the Pending Abuse Actions vary in their procedural posture, very few are close to trial and most are in either the discovery or motion-practice phase.

The BSA believes the ongoing publicity surrounding such claims has encouraged many victims to come forward in advance of this filing, and has been made aware of approximately 1,400 additional claims of Abuse. In sum, the BSA is aware of approximately 1,700 pending or asserted claims of Abuse against the BSA or a Local Council. To the extent claims of Abuse have not been asserted, the BSA encourages individuals to submit proofs of such claims prior to the BSA's requested bar date.

### 1. The Impact of Statute-of-Limitations Changes on Claims against the BSA and Non-Debtor Stakeholders

The number of claims against the BSA has increased dramatically over the past twenty years due to changes to state statutes of limitations governing causes of action alleging child sexual abuse. Since 2002, 17 states have enacted legislation allowing individuals to bring claims that would otherwise have been barred by the applicable limitations period. Most of these jurisdictions (including California, Delaware, Georgia, Hawaii, Minnesota, New Jersey, and North Carolina) have implemented revival windows that temporarily eliminate the civil statutes of limitations for victims whose claims have already expired. These revival windows have allowed older victims of child abuse to bring lawsuits decades after the abuse occurred, including against private organizations, such as the BSA and Local Councils. Other jurisdictions (including Vermont) have fully eliminated limitations periods going forward and revived expired claims.

The trend of retroactive revisions to limitations periods for sexual abuse claims accelerated in 2019, when more than a dozen states (including Arizona, California, District of Columbia, Montana, New Jersey, New York, and North Carolina) revised their limitations periods to allow victims of abuse to bring claims that would otherwise have been time-barred. As noted above, most recently, a group of plaintiffs has filed suit in the U.S. District Court in the District of Columbia alleging that the District's recent revival-window legislation permits plaintiffs to bring previously time-barred claims, regardless of where the abuse occurred or where the plaintiff resides.[10] The BSA expects the number of these claims would, but for the commencement of these Chapter 11 Cases, only have increased in 2020 and beyond.

These changes in statute of limitations have dramatically altered the legal landscape for sexual abuse claims. Specifically, the number of suits alleging claims from earlier years that would otherwise have been barred by the applicable limitations period has surged. These suits have forced the BSA to look backward—past the decades of progress and leadership in youth protection—to the mid- to late-twentieth century, when the vast majority of the Abuse in Scouting occurred. Claims alleging Abuse within the last thirty years make up a small fraction of total known Abuse claims.[11] The vast majority of the claims the BSA is now facing allege child sexual abuse from the 1940s to the 1980s. Fairly compensating victims that were Abused during this time frame has placed tremendous financial pressure on the BSA and its local partners.

## 2. Other Defendants

As discussed above, several organizations work together to deliver the Scouting program, including Local Councils and Chartered Organizations that are independently incorporated and chartered by the BSA. Historically, claims against the BSA, Local Councils, and Chartered Organizations, including the Pending Abuse Actions, generally have been litigated and administered solely by the BSA. The unique relationship between the BSA and these entities, as discussed above, has led the BSA to take a leading role in administering such litigation. In practice, the BSA coordinates with Local Councils and Chartered Organizations to efficiently respond to and manage such cases, while minimizing the risk of inconsistent treatment of actions and victims.

This approach also stems from the fact that the allegations made by plaintiffs in the Pending Abuse Actions and unfiled claims are substantially directed at the BSA. The resolution of the Pending Abuse Actions thus requires the BSA to pay careful attention to a wide variety of litigation matters, including, for example, responses to broad discovery requests, the overwhelming majority of which are directed at the BSA as opposed to Local Council or Chartered Organization defendants. Through this approach, the BSA has, among other things, facilitated the retention of joint defense counsel, responded to the vast majority of discovery requests, coordinated with insurance carriers, and authorized and funded the payment of any settlement amounts related to the Pending Abuse Actions or similar, previously resolved, claims. Given the complexity of the issues involved the Pending Abuse Actions, and the BSA's central

---

[10] *See Does 1-8 v. Boy Scouts of America*, Case No. 20–00017 (D.D.C.)
[11] Of the approximately 1,700 pending or asserted abuse claims against the BSA, approximately 1,500 involve claims alleging abuse that occurred before 1988.

role in litigating them, the organization has retained national coordinating counsel to oversee the handling of claims against it and the Local Councils and Chartered Organizations.

### 3.  Insurance

The BSA has historically procured commercial, general-liability insurance ("CGL") policies from multiple insurers to protect itself from a myriad of risks, including claims of sexual abuse or sexual misconduct. These policies date back to 1962 and over time came to include both primary and excess insurance coverage that provide substantial limits of liability in many years. As set forth below, the BSA's insurance coverage has varied over time with traditional insurance in some years and fronting policies in other years. Also, while the amount of coverage remains substantial in many years, the insolvency of certain insurers and the resolution of sexual-abuse and other claims have either eroded, eliminated, or exhausted the liability limits for certain policies. In some instances, the availability of certain insurance policies remains contingent upon the resolution of active pending litigation between the BSA and some of its insurers. Nonetheless, with respect to most (if not all) policy years, at least some level of coverage under the CGL policies is available for bodily injury claims, including claims arising out of sexual abuse and sexual misconduct.

### a.  Overview of the BSA's Insurance Program

The type of coverage provided for by the BSA's insurance program has varied over the last six decades. Between 1962 and 1982, the BSA acquired insurance policies where each claim of bodily injury allowed the BSA to access the limits of liability under the applicable insurance policies.[12] These are more commonly referred to as "per-occurrence" policies. Beginning in 1983, the BSA shifted its insurance program to policies that contained overall aggregate limits of liability. The BSA purchased these types of policies from 1983 to the end of 1985. As a counterbalance to the imposition of aggregate limits, the BSA's towers of insurance in 1983 through 1985 included significant limits of liability and excess layers of coverage.

The BSA substantially altered its insurance program beginning in 1986 and through 2018, procuring primary insurance and excess policies where the deductible matches the policy's limit of liability. These policies are more commonly referred to as "fronting" policies. In addition, beginning in late-1990, the BSA procured significant insurance with limits of liability exceeding $100 million. In 2019, moreover, the BSA reverted to traditional insurance and expects to continue with such insurance in 2020.

### b.  The BSA's Insurance Coverage for the Local Councils and Chartered Organizations

For decades, the BSA has undertaken and committed to procuring general liability insurance coverage for Local Councils and volunteers. Starting around 1971, the BSA began adding certain Local Councils as additional insureds under its CGL policies. Then, in 1978, the BSA formalized this practice through the implementation of a General Liability Insurance Program ("GLIP"), whereby the BSA agreed to procure general liability insurance for all Local Councils by including them in the definition of "Named Insured" in all of the BSA CGL policies.

---

[12] For purposes of simplicity, this analysis is limited to the BSA's primary insurance policies.

Similarly, starting in 1978, the BSA began to provide insurance coverage under its CGL policies to certain Chartered Organizations.

### B.  The BSA Engaged in Extensive Efforts to Reach a Global Resolution of Abuse Claims Before the Commencement of these Proceedings.

In late 2018, the BSA retained legal and financial advisors to explore its restructuring options in light of, among other factors, the increasing number of Abuse Claims asserted against the BSA as a result of changes in state statutes of limitation. The BSA determined at the outset of this strategic review to pursue a potential agreement with a critical mass of Abuse victims and other relevant stakeholders that could be implemented through a prearranged chapter 11 plan. A prearranged bankruptcy filing was the most desirable option as it represented the quickest, most efficient, and least costly bankruptcy process. As a non-profit corporation, considerations of economy and speed are of the utmost importance to the BSA. A prearranged case would have avoided an open-ended bankruptcy process that could, without an appropriate sense of urgency, result in irreparable damage to the BSA's mission.

In connection with these strategic efforts, the BSA recognized that it would ultimately need to structure a settlement around a plan of reorganization that provides for channeling injunctions with respect to both current and potential future Abuse Claims.[13] Accordingly, the BSA determined, in consultation with its advisors, that it was necessary and appropriate to engage an independent third-party representative for holders of Future Abuse Claims. After considering possible candidates for the role, the BSA selected James L. Patton, Jr. in early 2019 to serve as prepetition future claimants' representative. The BSA selected Mr. Patton due to his significant experience in complex mass tort cases in the chapter 11 context and his reputation for integrity in serving as a fiduciary in bankruptcy proceedings. Mr. Patton, in turn, retained legal and financial advisors to assist him in conducting an analysis of the BSA's liabilities and assets and in negotiations with the BSA and other stakeholders.

The BSA also engaged in discussions with an ad hoc group of attorneys representing significant numbers of holders of Abuse Claims. The ad hoc group was advised on restructuring matters by James Stang of Pachulski Stang Ziehl & Jones LLP. The BSA provided information to these attorneys, including Mr. Stang, regarding its liabilities and assets, and some attorneys for Abuse victims provided information to the BSA regarding additional Abuse Claims that they asserted would be filed against the BSA in the future. In particular, the attorneys asserted that they represented hundreds of Abuse victims who had not yet filed suit.

---

[13] Unlike a future claim in other mass tort contexts, there is no latency period for abuse. In the abuse context, a future claim is properly understood as a claim related to abuse that has already occurred but which is held by an individual who (a) has not attained 18 years of age, (b) suffers from "repressed memory" such that he or she is not aware that he or she holds an abuse claim, or (c) has not discovered the injury or the connection between the injury and the abuse and who could not in the exercise of reasonable care have discovered the injury or connection between the injury and the abuse. Given (i) the significant advertising and publicity surrounding abuse in scouting over the past year; (ii) the highly publicized nature of this restructuring; and (iii) the robust and comprehensive claims and noticing procedures that the BSA will implement through these cases, the BSA expects that the vast majority of potential claimants will be identified as part of the bar date process in these Chapter 11 Cases and does not expect that there will be significant future claims relating to prior abuse in the BSA's Scouting programs.

In addition, the BSA engaged in discussions with certain of its insurers about the nature and extent of available coverage for pending and additional Abuse Claims that have not yet been filed. As noted above, the BSA has procured CGL policies from multiple insurers since 1962 to protect itself from risks including claims of sexual abuse or sexual misconduct. Local Councils were subsequently included as "additional insureds" under these policies. As a general matter, the amount of remaining coverage under these policies is substantial, and the BSA expects that the proceeds of these policies will comprise a significant portion of the assets contributed to any victims compensation trust.

These prepetition restructuring efforts involved several meetings with attorneys representing Abuse victims, including a two-day mediation in early November 2019 with many of these attorneys, as well as the prepetition future claimants' representative and certain of the BSA's insurers. The mediation, unfortunately, was unsuccessful. It became apparent that attorneys for Abuse victims believed that certain Local Councils with significant Abuse liabilities have significant assets that could be used to compensate victims. Further, it was clear to the BSA that attorneys for Abuse victims would only accept information about the nature and extent BSA's available assets if provided through a court-supervised process. The attorneys for holders of Abuse Claims have indicated a strong preference for the BSA to file for relief under chapter 11 so they can compel the production of information regarding the BSA's and Local Councils' liabilities and assets, as well as other data relating to Abuse Claims. Accordingly, the BSA recognized in late 2019 that there were no meaningful prospects for a global resolution of Abuse Claims without the commencement of these Chapter 11 Cases.

### C. Given the BSA's Inability to Reach Agreement on a Prearranged Reorganization, the BSA has Taken Several Immediate Steps to Promote Efficiency at the Outset of these Chapter 11 Cases.

Beginning after the conclusion of the November 2019 mediation, the BSA and its advisors turned their attention to preparing for these Chapter 11 Cases. The BSA recognized that prolonged bankruptcy proceedings would be costly and deplete funds available to compensate Abuse victims. As a non-profit that relies on member fees and donations to sustain its operations, delays caused by protracted litigation and discovery, for example, would also negatively impact these revenue sources and ultimately jeopardize the BSA's capability to carry out its mission to serve young men and women, families, and communities. Accordingly, both prior to and immediately upon the commencement of these Chapter 11 Cases, the BSA took several decisive steps designed to ensure that these Chapter 11 Cases would proceed expeditiously, in the interest of safeguarding the future of the BSA's mission and maximizing the value of the Debtors' estates for the benefit of Abuse victims and other stakeholders, all as further detailed in the informational brief filed in these Chapter 11 Cases. *See* D.I. 4.

### ARTICLE IV. THE CHAPTER 11 CASES

#### A. Voluntary Petitions

On February 18, 2020, the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Concurrently with the filing of this Disclosure Statement, the Debtors have requested joint administration and procedural

consolidation of these Chapter 11 cases pursuant to rule 1015(b) of the Federal Rules of Bankruptcy Procedure. The Debtors have continued, and will continue until the Effective Date, to operate their organization as debtors-in-possession.

### B. First Day Relief

On the Petition Date, the Debtors filed a number of "first day" motions and other pleadings. These were proposed to ensure the Debtors' orderly transition into chapter 11. The following table describes a number of the first day motions:

| Description of Relief Requested | Docket No. |
|---|---|
| Joint administration of the Chapter 11 Cases | 3 |
| Utilize the Debtors' cash collateral and to provide adequate protection to the Prepetition Secured Parties (as defined therein) | 5 |
| Pay certain prepetition taxes | 6 |
| Pay prepetition claims of critical vendors, as well as shippers, warehousemen, and other lienholders | 7 |
| Maintain and administer the Debtors' customer, member, and donor programs and practices and honor related prepetition practices | 8 |
| Approval of notice procedures | 9 |
| Additional time to file schedules of assets and liabilities, statements of financial affairs, and Rule 2015.3 Reports | 10 |
| Employ Omni Agent Solutions as the claims and noticing agent | 11 |
| Prohibit utilities from discontinuing service and for approval adequate assurance of payment to utilities | 12 |
| Continued use of the Debtors' prepetition cash management system and maintain their existing business forms | 13 |
| Pay employee wages and honor employee-related programs | 14 |
| Pay certain prepetition obligations under shared services arrangements and to continue such services | 15 |

### C. Other Relief Requested on the Petition Date

#### 1. Scheduling Motion for Asset Characterization Disputes

Concurrently with the commencement of these cases, the Debtors sought to establish a schedule for the Bankruptcy Court to hear and adjudicate any disputes regarding whether certain identified property of the BSA is subject to enforceable restrictions under applicable law and/or is otherwise unavailable to satisfy creditor claims.

#### 2. Bar Date Motion

Concurrently with the commencement of these cases, the Debtors filed a motion to establish comprehensive procedures for providing notice of the applicable bar dates to the Debtors' creditors and for creditors, including holders of Abuse Claims, to file proofs of claim.

### 3. *Consolidation and Stay of Pending Abuse Lawsuits*

Concurrently with the commencement of these cases, the Debtors began taking measures to consolidate and stay all pending abuse litigation against the BSA, Local Councils, and Chartered Organizations. In particular, the BSA has removed to federal district court all Abuse Claims pending in state courts throughout the country against the BSA and/or the Local Councils and Chartered Organizations. The Debtors will also be filing a motion with the District Court to transfer all of the removed abuse actions to that court under 28 U.S.C. § 157(b)(5). Finally, the Debtors also are commencing an adversary proceeding seeking a preliminary injunction against the continued prosecution of Abuse Claims.

### 4. *Motion for Appointment of a Judicial Mediator*

Concurrently with the commencement of these cases, the Debtors sought the immediate appointment of a sitting bankruptcy judge as a mediator and the referral to mandatory mediation of all issues related to a global settlement of Abuse Claims through a consensual plan of reorganization.

## ARTICLE V. OVERVIEW OF THE PLAN

### A. Distributions

One of the key concepts under the Bankruptcy Code is that only claims and interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an Allowed Claim means that the Debtors agree, or if there is a dispute, the Bankruptcy Court determines, that the Claim, and the amount thereof, is in fact a valid obligation of the Debtors. A detailed discussion of the treatment and anticipated means of satisfaction for each Class of Allowed Claims is set forth in <u>Section V.D</u> and <u>Section V.E</u> of this Disclosure Statement.

### B. Exit Facilities

On the Effective Date, the Reorganized Debtors shall enter into one or more Exit Facilities and provide any related guarantees, and such Exit Facilities shall be made available to the Reorganized Debtors pursuant and subject to the terms and conditions set forth in the Exit Facility Documents. The Confirmation Order shall constitute approval of the Exit Facilities (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith), and authorization for the Reorganized Debtors to enter into and perform under the Exit Facilities Documents and such other documents as may be required or appropriate.

### C. Sources of Consideration for Plan Distributions

The Debtors, or the Reorganized Debtors, as applicable, shall fund Plan Distributions using (1) Cash on hand and (2) the proceeds of the Exit Facilities. Cash on hand refers to the Debtors' or the Reorganized Debtors' Cash that does not constitute Identified Property.

### D.  Treatment of Unclassified Claims

#### 1.  *Unclassified Claims Summary*

| Claim | Estimated Allowed Amount[14] | Plan Treatment | Projected Plan Recovery |
|---|---|---|---|
| Administrative Expense Claims | $[__] | Paid in full in Cash | 100% |
| Professional Fee Claims | $[__] | Paid in full in Cash | 100% |
| Priority Tax Claims | $[__] | Paid in full in Cash | 100% |

#### 2.  *Unclassified Claims Details*

##### a.  Administrative Expense Claims

###### (i)    Administrative Expense Claims Bar Date

Except as provided for in the Plan or in any order of the Bankruptcy Court, and subject to section 503(b)(1)(D) of the Bankruptcy Code, holders of General Administrative Expense Claims must file and serve on the Debtors requests for the payment of such Claims not previously Allowed by a Final Order in accordance with the procedures specified in the Confirmation Order, on or before the Administrative Expense Claims Bar Date, or such Claims shall be automatically Disallowed, forever barred from assertion, and unenforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court, and any such Claims shall be deemed fully satisfied, released, and discharged.

###### (ii)   Administrative Expense Claims Generally

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment with respect to such Allowed Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Claim, payment of Cash in an amount equal to such Allowed Administrative Expense Claim on or as soon as reasonably practicable after the later of: (a) the Effective Date; (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; (c) such other date(s) as such holder and the Debtors or the Reorganized Debtors shall have agreed; or (d) such other date ordered by the Bankruptcy Court; provided, however, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' operations during the Chapter 11 Cases may be paid by the Debtors or the Reorganized Debtors in the ordinary course of business and in accordance with the terms and conditions of the particular agreements governing such obligations, course of dealing, course of operations, or customary practice.

---

[14] Figures with respect to the Allowed amounts of the Claims set forth in this chart are based upon the Debtors' best estimates of such Claims as of the date of this Disclosure Statement.

### (iii)    Professional Fee Claims

All Professionals or other Persons requesting the final allowance and payment of compensation and/or reimbursement of expenses pursuant to sections 328, 330, 331 and/or 503(b) for services rendered during the period from the Petition Date to and including the Effective Date shall file and serve final applications for allowance and payment of Professional Fee Claims on counsel to the Debtors and the United States Trustee no later than the first Business Day that is forty-five (45) days after the Effective Date. Objections to any Professional Fee Claim must be filed and served on the Reorganized Debtors and the applicable Professional within twenty-one (21) calendar days after the filing of the final fee application that relates to the Professional Fee Claim (unless otherwise agreed by the Debtors or the Reorganized Debtors, as applicable, and the Professional requesting allowance and payment of a Professional Fee Claim).

Allowed Professional Fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court on or as soon as reasonably practicable after the later of: (a) the date upon which an order relating to any such Allowed Professional Fee Claim is entered; and (b) such other date(s) as the holders of the Allowed Professional Fee Claim and the Debtors or the Reorganized Debtors, as applicable, shall have agreed.

The Reorganized Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred by their Professionals after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

### b.  Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, at the sole option of the Debtors or the Reorganized Debtors, as applicable: (1) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; provided, however, that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium; or (2) regular installment payments in Cash of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim over a period ending not later than five years the Petition Date.

### E.  Classification of Claims and Interests

### 1.  *Classified Claims and Interests Summary*

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor. Except for the Claims addressed in Article II of the Plan, the Debtors have placed all Claims and Interests into Classes for each of the Debtors. In accordance with section 1123(a)(1) of the

Bankruptcy Code, the Debtors have not classified Administrative Claims or Priority Tax Claims, as described in Article II of the Plan.

The summary of Classes of Claims and Interests set forth below classifies Claims and Interests for all purposes, including Confirmation and distribution pursuant to the Plan. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and any Claim or Interest shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim (other than an Abuse Claim) is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid, released, or otherwise settled prior to the Effective Date. All Abuse Claims are included in Class 6 and all Interests of Delaware BSA, LLC are in Class 7.

The Plan establishes a comprehensive classification of Claims and Interests. The table below summarizes the classification, treatment, voting rights, and estimated recoveries of the Claims and Interests, by Class, under the Plan.

| Class | Claim or Interest | Estimated Allowed Amount[15] | Voting Rights | Treatment | Plan Recovery |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | $[___] | Not Entitled to Vote / Presumed to Accept | Paid in full / Reinstated / Unimpaired | 100% |
| 2 | Other Secured Claims | $[___] | Not Entitled to Vote / Presumed to Accept | Paid in full / Collateral Returned / Reinstated / Unimpaired | 100% |
| 3A | 2010 Credit Facility Claims | $[___] | Entitled to Vote | Reinstated with modifications / Impaired | 100% |
| 3B | 2019 RCF Claims | $[___] | Entitled to Vote | Reinstated with modifications / Impaired | 100% |
| 4A | 2010 Bond Claims | $[___] | Entitled to Vote | Reinstated with modifications / Impaired | 100% |
| 4B | 2012 Bond Claims | $[___] | Entitled to Vote | Reinstated with modifications / Impaired | 100% |
| 5 | General Unsecured Claims | $[___] | Entitled to Vote | *Pro Rata* share of GUC Plan Distribution / Impaired | [___]% |
| 6 | Abuse Claims | $[___] | Entitled to Vote | Channeled to Victims Compensation Trust / Impaired | [___]% |
| 7 | Interests in Delaware BSA, LLC | $[___] | Not Entitled to Vote / Presumed to Accept | Reinstated / Unimpaired | 100% |

---

[15] Figures with respect to the Allowed amounts of the Claims set forth in this chart are based upon the Debtors' best estimates of such Claims as of the date of this Disclosure Statement.

### 2. *Classified Claims and Interests Details*

Except to the extent that a Debtor and a Holder of an Allowed Claim or Interest, as applicable, agree to a less favorable treatment, such Holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

### a. Class 1—Other Priority Claims

(i)     Classification: Class 1 consists of all Other Priority Claims.

(ii)     Treatment: Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment of such Claim, in exchange for full and final satisfaction of such Allowed Other Priority Claim, at the sole option of the Reorganized Debtors: (i) each such holder shall receive payment in Cash in an amount equal to such Allowed Other Priority Claim, payable on or as soon as reasonably practicable after the last to occur of (x) the Effective Date, (y) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, and (z) the date on which the holder of such Allowed Other Priority Claim and the Debtors or Reorganized Debtors, as applicable, shall otherwise agree in writing; or (ii) satisfaction of such Allowed Other Priority Claim in any other manner that renders the Allowed Other Priority Claim Unimpaired, including Reinstatement.

(iii)     Voting: Allowed Other Priority Claims in Class 1 are Unimpaired. Each holder of an Other Priority Claim shall be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Claims shall not be entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Priority Claims.

### b. Class 2—Other Secured Claims

(i)     Classification: Class 2 consists of all Other Secured Claims. To the extent that Other Secured Claims are Secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2 for purposes of voting to accept or reject the Plan and receiving Plan Distributions under the Plan.

(ii)     Treatment: Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment of such Claim, in exchange for full and final satisfaction of such Allowed Other Secured Claim, each holder of an Allowed Other Secured Claim will receive, at the sole option of the Reorganized Debtors: (i) Cash in an amount equal to the Allowed amount of such Claim, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, payable on or as soon as reasonably practicable after the last to occur of (x) the Effective Date, (y) the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, and (z) the date on which the holder of such Allowed Other Secured Claim and the Debtors or Reorganized Debtor, as applicable,

shall otherwise agree in writing; (ii) satisfaction of such Other Secured Claim in any other manner that renders the Allowed Other Secured Claim Unimpaired, including Reinstatement; or (iii) return of the applicable collateral on the Effective Date or as soon as reasonably practicable thereafter in satisfaction of the Allowed amount of such Other Secured Claim.

(iii) <u>Voting</u>: Allowed Other Secured Claims in Class 2 are Unimpaired. Each holder of an Other Secured Claim shall be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims shall not be entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Secured Claims.

### c.  Class 3A—2010 Credit Facility Claims

(i)     <u>Classification</u>: Class 3A consists of all 2010 Credit Facility Claims.

(ii)     <u>Allowance</u>: On the Effective Date, all 2010 Credit Facility Claims shall be Allowed pursuant to section 506(a) of the Bankruptcy Code in the principal amount of $[__] and not subject to any counterclaim, defense, offset, or reduction of any kind. Because all 2010 Credit Facility Claims are deemed fully Secured, there are no unsecured 2010 Credit Facility Claims, and the holders of such Claims do not have or hold any Class 5 Claims against the Debtors on account of any 2010 Credit Facility Claim.

(iii)     <u>Treatment</u>: Except to the extent that a holder of an Allowed 2010 Credit Facility Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed 2010 Credit Facility Claim, the Reorganized Debtors shall enter into, execute and deliver the Restated 2010 Credit Facility Documents.

<u>Voting</u>: Allowed 2010 Credit Facility Claims in Class 3A are Impaired. Each holder of a 2010 Credit Facility Claim shall be entitled to vote to accept or reject the Plan.

### d.  Class 3B—2019 RCF Claims

(i)     <u>Classification</u>: Class 3B consists of all 2019 RCF Claims.

(ii)     <u>Allowance</u>: On the Effective Date, all 2019 RCF Claims shall be Allowed pursuant to section 506(a) of the Bankruptcy Code in the principal amount of $[__] and not subject to any counterclaim, defense, offset or reduction of any kind. Because all 2019 RCF Claims are deemed fully Secured, there are no unsecured 2019 RCF Claims, and the holders of such Claims do not have or hold any Class 5 Claims against the Debtors on account of any 2019 RCF Claim.

(iii)     <u>Treatment</u>: Except to the extent that a holder of an Allowed 2019 RCF Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed 2019 RCF Claim, the Reorganized Debtors shall enter into, execute and deliver the Restated RCF Documents.

Voting: Allowed 2019 RCF Claims in Class 3B are Impaired. Each holder of a 2019 RCF Claim shall be entitled to vote to accept or reject the Plan.

### e.  Class 4A—2010 Bond Claims

(i)  Classification: Class 4A consists of all 2010 Bond Claims.

(ii)  Allowance: On the Effective Date, all 2010 Bond Claims shall be deemed fully Secured and Allowed pursuant to section 506(a) of the Bankruptcy Code in the principal amount of $[___] and not subject to any counterclaim, defense, offset, or reduction of any kind. Because all 2010 Bond Claims are deemed fully Secured, there are no unsecured 2010 Bond Claims, and the holders of such Claims do not have or hold any Class 5 Claims against the Debtors on account of any 2010 Bond Claim.

(iii)  Treatment: Except to the extent that a holder of an Allowed 2010 Bond Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed 2010 Bond Claim, the Reorganized Debtors shall enter into, execute and deliver the Restated 2010 Bond Documents.

(iv)  Voting: Allowed 2010 Bond Claims in Class 4A are Impaired. Each holder of a 2010 Bond Claim shall be entitled to vote to accept or reject the Plan.

### f.  Class 4B—2012 Bond Claims.

(i)  Classification: Class 4B consists of all 2012 Bond Claims.

(ii)  Allowance: On the Effective Date, all 2012 Bond Claims shall be deemed fully Secured and Allowed pursuant to section 506(a) of the Bankruptcy Code in the principal amount of $[___] and not subject to any counterclaim, defense, offset, or reduction of any kind. Because all 2012 Bond Claims are deemed fully Secured, there are no unsecured 2012 Bond Claims, and the holders of such Claims do not have or hold any Class 5 Claims against the Debtors on account of any 2012 Bond Claim.

(iii)  Treatment: Except to the extent that a holder of an Allowed 2012 Bond Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed 2012 Bond Claim, the Reorganized Debtors shall enter into, execute and deliver the Restated 2012 Bond Documents.

(iv)  Voting: Allowed 2012 Bond Claims in Class 4B are Impaired. Each holder of a 2012 Bond Claim is entitled to vote to accept or reject the Plan.

### g.  Class 5—General Unsecured Claims

(i)  Classification: Class 5 consists of all General Unsecured Claims.

(ii)  Treatment: Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in exchange for full

36

and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed General Unsecured Claim, each holder thereof shall receive such holder's *Pro Rata* share of the GUC Plan Distribution.

(iii)    Voting: Allowed General Unsecured Claims in Class 5 are Impaired. Each holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

### h. Class 6—Abuse Claims

(i)    Classification: Class 6 consists of all Abuse Claims.

(ii)    Treatment: As of the Effective Date, liability for all Abuse Claims shall be assumed in full by the Victims Compensation Trust without further act, deed, or court order and shall be satisfied solely from the Victims Compensation Trust as set forth in the Trust Documents. Pursuant to the Channeling Injunction, set forth in Article IV of the Plan, each holder of an Abuse Claim shall have his or her Abuse Claim permanently channeled to the Victims Compensation Trust, and such Abuse Claim shall thereafter be asserted exclusively against the Victims Compensation Trust and resolved in accordance with the terms, provisions, and procedures of the Trust Documents. Holders of Abuse Claims are enjoined from prosecuting any outstanding, or filing any future, litigation, Claims, or Causes of Action arising out of or related to such Abuse Claims against any of the Protected Parties and may not proceed in any manner against any such Persons in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue their Abuse Claims solely against the Victims Compensation Trust as provided in the Trust Documents.

**HOLDERS OF ABUSE CLAIMS (OTHER THAN FUTURE ABUSE CLAIMS) SHALL BE REQUIRED TO SUBMIT A PROOF OF CLAIM ON OR BEFORE THE ABUSE CLAIMS BAR DATE IN ACCORDANCE WITH THE BAR DATE ORDER. HOLDERS OF ABUSE CLAIMS MAY BE REQUIRED TO SUBMIT ADDITIONAL DOCUMENTATION REGARDING SUCH CLAIMS IN ACCORDANCE WITH THE TRUST DOCUMENTS.**

(iii)    Voting: Abuse Claims in Class 6 are Impaired. Each holder of an Abuse Claim shall be entitled to vote to accept or reject the Plan.

### i. Class 7 Interests in Delaware BSA, LLC

(i)    Classification: Class 7 consists of all Interests in Delaware BSA, LLC.

(ii)    Treatment: On the Effective Date, Interests in Delaware BSA, LLC shall be Reinstated, and the legal, equitable, and contractual rights to which holders of Interests in Delaware BSA, LLC are entitled shall remain unaltered to the extent necessary to implement the Plan.

(iii)    Voting: Interests in Delaware BSA, LLC in Class 7 are Unimpaired. Each holder of an Interest in Delaware BSA, LLC shall be conclusively presumed

to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Interests in Delaware BSA, LLC shall not be entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Interests in Delaware BSA, LLC.

### 3. Elimination of Vacant Classes

Any Class of Claims against or Interests in the Debtors that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class. For the avoidance of doubt, this section shall not apply to Class 6 or Class 7.

## F. The Victims Compensation Trust

### 1. Establishment and Purpose of the Victims Compensation Trust

The Victims Compensation Trust shall be established on the Effective Date. The Victims Compensation Trust shall be administered and implemented by the Victims Compensation Trustee as provided in the Trust Documents. Specifically, the Victims Compensation Trust shall, without limitation: (1) assume liability for all Abuse Claims; and (2) hold and administer the Trust Assets, liquidate the Abuse Claims, and make Trust Distributions to holders of Abuse Claims from the Trust Assets.

The Victims Compensation Trust shall, as applicable, administer, process, settle, resolve, liquidate, satisfy, and make Trust Distributions from the Trust Assets on account of Abuse Claims in such a way that the holders of Abuse Claims are treated equitably and in a substantially similar manner, subject to the applicable terms of the Plan Documents and the Trust Documents. From and after the Effective Date, the Abuse Claims shall be channeled to the Victims Compensation Trust pursuant to the Channeling Injunction set forth in Article IV of the Plan and may be asserted only and exclusively against the Victims Compensation Trust.

### 2. Receipt of Trust Assets

On the Effective Date, all Trust Assets shall be automatically and without further act or deed, transferred to, vested in and assumed by the Victims Compensation Trust; provided, however, that to the extent that certain Trust Assets, because of their nature or because such assets will accrue or become transferable to the Victims Compensation Trust subsequent to the Effective Date, cannot be transferred to, vested in and assumed by the Victims Compensation Trust on the Effective Date, such Trust Assets shall be automatically, and without further act or deed, transferred to, vested in and assumed by the Victims Compensation Trust as soon as practicable after the Effective Date. Notwithstanding anything in the Plan to the contrary, no monies, causes of action, and/or assets comprising the Trust Assets that have been transferred, granted, assigned, or otherwise delivered to the Victims Compensation Trust shall be used for any purpose other than in accordance with the Plan and the Trust Documents, including the payment or administration of Abuse Claims as set forth in the Trust Documents. Any applicable

Insurance Proceeds recovered or received by the Victims Compensation Trust will be allocated as set forth in the Trust Documents.

### 3.  The Trust Distribution Procedures

On the Effective Date, the Victims Compensation Trust shall implement the Trust Distribution Procedures in accordance with the terms of the Trust Agreement. From and after the Effective Date, the Victims Compensation Trustee shall have the authority to administer, amend, supplement, or modify the Trust Distribution Procedures in accordance with the terms thereof and the Trust Agreement. From and after the Effective Date, the Victims Compensation Trust shall liquidate and make Trust Distributions to holders of Abuse Claims in accordance with the Trust Documents.

### 4.  Discharge of Liabilities to Holders of Abuse Claims

Except as provided in the Plan, the transfer to, vesting in and assumption by the Victims Compensation Trust of the Trust Assets as contemplated by the Plan shall, as of the Effective Date, discharge all obligations and liabilities of and bar any recovery or action against the Protected Parties for or in respect of all Abuse Claims, including all Indirect Abuse Claims (and the Confirmation Order shall provide for such discharge). The Victims Compensation Trust shall, as of the Effective Date, assume sole and exclusive responsibility and liability for all Abuse Claims and such Claims shall be paid by the Victims Compensation Trust from the Trust Assets or as otherwise directed in the Trust Documents.

### 5.  Imposition of Channeling Injunction

From and after the Effective Date, all Abuse Claims shall be subject to the Channeling Injunction pursuant to section 105(a) of the Bankruptcy Code and the provisions of the Plan and the Confirmation Order. From and after the Effective Date, the Protected Parties shall not have any obligation with respect to any liability of any nature or description arising out of, relating to, or in connection with any Abuse Claims.

### 6.  Insurance Rights Transfer

In furtherance of the purpose of the Victims Compensation Trust:

a.    as of the Effective Date, the Protected Parties shall irrevocably transfer, grant, and assign to the Victims Compensation Trust, and the Victims Compensation Trust shall receive and accept, any and all of the Insurance Rights. To the extent any Insurer consented to a prepetition settlement agreement with respect to an Abuse Claim or otherwise has consented to pay an Abuse Claim on behalf of one or more of the Protected Parties, then the applicable Protected Parties shall transfer and assign to the Victims Compensation Trust the right to enforce such Insurer's obligation. This Insurance Rights Transfer is made to the Victims Compensation Trust for the benefit of Persons that have a Claim for compensation for damages against the Protected Parties on account of Abuse Claims;

b.    the Insurance Rights Transfer is made free and clear of all Claims, Liens, Encumbrances, or Causes of Action of any nature whatsoever, except available limits of

liability for coverage of certain types of claims under one or more of the Insurance Policies that may have been reduced by certain prepetition payments made by an Insurer under any of the Insurance Policies;

        c.    the Victims Compensation Trust shall be solely responsible for satsifying, to the extent required under applicable law, any premiums, deductibles, self-insured retentions, and fronting obligations arising in any way out of any and all Abuse Claims;

        d.    the Victims Compensation Trust shall comply with any notice obligations required under the Insurance Policies and applicable law;

        e.    the Insurance Rights Transfer is made to the maximum extent possible under applicable law;

        f.    the Insurance Rights Transfer is absolute and does not require any further action by the Protected Parties, the Victims Compensation Trust, the Bankruptcy Court, or any other Person;

        g.    the Insurance Rights Transfer is not an assignment of any insurance policy itself and shall be valid and enforceable in accordance with the terms of any Insurance Policy, in each case notwithstanding any anti-assignment provision in or incorporated into any Insurance Policy; and

        h.    the Insurance Rights Transfer shall be governed by, and construed in accordance with, the Bankruptcy Code and the laws of the state of Delaware, without regard to its conflict of law principles.

For the avoidance of doubt, the Insurance Rights Transfer that is the subject of <u>Section IV.F</u> of the Plan shall not, and shall not be deemed to, transfer, grant, or assign to the Victims Compensation Trust any insurance rights of the Debtors or the Local Councils that pertain to any Insured Non-Abuse Claims. Nor shall the Insurance Rights Transfer violate or be deemed to violate any cooperation clause of any Insurance Policy. The insurance rights of the Debtors or the Local Councils that pertain to Insured Non-Abuse Claims are expressly reserved for the Debtors, the Reorganized Debtors, or the Local Councils, as applicable, and the Plan Documents shall not, and shall not be deemed to, transfer, grant, or assign such rights to the Victims Compensation Trust. Moreover, for the avoidance of doubt, the insurance rights of any Person that is not a Protected Party are expressly reserved for such Person (including any rights of any director, manager, officer, or employee of the Debtors or any Local Council under the D&O Liability Insurance Policies), and the Plan Documents shall not, and shall not be deemed to, transfer, grant, or assign such rights to the Victims Compensation Trust.

In that regard and notwithstanding the transfer of Insurance Rights pursuant <u>Section IV.F</u> of the Plan, with respect to any Insurance Policy with an inception date of January 1, 2000 to the present, the Debtors and the Reorganized Debtors expressly reserve the right to (1) tender any Insured Non-Abuse Claims to those Insurance Policies and (2) access the limits of liability of those Insurance Policies to settle or otherwise resolve Insured Non-Abuse Claims. Further, the Victims Compensation Trust cannot settle, compromise, or otherwise resolve any rights, duties, or obligations under those Insurance Policies issued after January 1, 2000 without the express

written consent and approval of the Debtors or the Reorganized Debtors, as applicable. Nonetheless, the Victims Compensation Trust shall have the same rights as the Debtors and the Reorganized Debtors with respect to any Insurance Policy with an inception date of January 1, 2000 to the present insofar as the Victims Compensation Trust may: (a) tender Abuse Claims to those Insurance Policies; and (b) access the limits of liability of those Insurance Policies to pay Abuse Claims pursuant to the Trust Distribution Procedures.

Moreover, for the avoidance of doubt, the insurance rights of any Person that is not a Protected Party are expressly reserved for such Person, and the Plan Documents shall not, and shall not be deemed to, transfer, grant, or assign such rights to the Victims Compensation Trust.

### 7. *Indemnification Obligation*

If for any reason an Abuse Claim is asserted against a Protected Party on or after the Effective Date in violation of the Channeling Injunction, the Victims Compensation Trust shall indemnify and hold each of the Protected Parties harmless from and against any and all Abuse Claims, as well as indemnify and reimburse such parties for all associated fees, costs and expenses, to the extent set forth in the Trust Documents.

In connection with the indemnification that must be provided by the Victims Compensation Trust, each Protected Party has the express right to:

a.     appoint defense counsel of its choosing, subject to consent by the Victims Compensation Trust regarding the hourly rates to be charged, such consent not to be unreasonably withheld;

b.     manage the defense of any such Claim subject to appropriate updates being provided to the Victims Compensation Trust, but the Victims Compensation Trust shall not control the defense of the Protected Party to any such Claim;

c.     settle or otherwise resolve any Claim that is subject to indemnification by the Victims Compensation Trust, provided that notice of any such settlement or resolution is provided to the Victims Compensation Trust, but the Victims Compensation Trust is not required to consent to any such settlement or resolution; and

d.     proceed to trial and verdict with respect to any Claim that is subject to indemnification by the Victims Compensation Trust, subject to the consent and approval by the Victims Compensation Trust to proceed to trial and verdict.

### 8. *Excess Assets in Victims Compensation Trust*

On the Trust Termination Date, after the payment of all Abuse Claims that are entitled to a Trust Distribution from the Victims Compensation Trust and all Trust Expenses that have been provided for, and the liquidation of all assets then held by the Victims Compensation Trust, any remaining value in the Victims Compensation Trust shall be distributed to a charity to be selected jointly by the Victims Compensation Trustee and the Reorganized Debtors.

### 9. *Trust Expenses*

The Victims Compensation Trust shall pay all Trust Expenses from the Victims Compensation Trust, as provided for in the Trust Agreement. The Protected Parties shall have no obligation to pay any Trust Expenses.

### 10. *Victims Compensation Trustee*

There shall be one Victims Compensation Trustee. On the Confirmation Date, the Bankruptcy Court shall appoint the Victims Compensation Trustee to serve in accordance with, and who shall have the functions and rights provided in, the Trust Agreement. Any successor Victims Compensation Trustee shall be appointed in accordance with the terms of the Trust Agreement. For purposes of any Victims Compensation Trustee performing his or her duties and fulfilling his or her obligations under the Victims Compensation Trust and the Plan, the Victims Compensation Trust and the Victims Compensation Trustee shall be deemed to be "parties in interest" within the meaning of section 1109(b) of the Bankruptcy Code. The Victims Compensation Trustee shall be the "administrator" of the Victims Compensation Trust as such term is used in Treas. Reg. Section 1.468B-2(k)(3).

### 11. *Compensation of Victims Compensation Trustee and Retention of Professionals*

The Victims Compensation Trustee shall be entitled to compensation as provided for in the Trust Agreement. The Victims Compensation Trustee may retain and reasonably compensate, without Bankruptcy Court approval, counsel and other professionals as reasonably necessary to assist in his or her duties as Victims Compensation Trustee, subject to the terms of the Trust Agreement. All fees and expenses incurred in connection with the foregoing shall be payable from the Victims Compensation Trust as provided for in the Trust Agreement.

### 12. *Future Claimants' Representative*

The Trust Agreement shall provide for the continuation of the Future Claimants' Representative to serve as an advisor to the Victims Compensation Trust representing the interests of holders of Future Abuse Claims. The Future Claimants' Representative shall have the functions and rights set forth in the Trust Agreement. The Victims Compensation Trustee shall consult with the Future Claimants' Representative on matters pertaining to the administration of the Victims Compensation Trust and must obtain the consent of the Future Claimants' Representative as set forth in the Trust Agreement and the Trust Distribution Procedures. The Victims Compensation Trustee shall meet with the Future Claimants' Representative no less frequently than quarterly. The Future Claimants' Representative shall receive reasonable compensation for his services from the Victims Compensation Trust and may utilize counsel and other professionals as reasonably necessary to assist in the performance of his or her duties, and the Future Claimants' Representative and his professionals shall be entitled to reasonable reimbursement of expenses by the Victims Compensation Trust, subject to compliance with an agreed-upon budget that shall be set forth in the Trust Agreement.

### 13. Consent Rights of the Debtors and the Reorganized Debtors

The Trust Documents may not be amended or modified without the consent of the Debtors or the Reorganized Debtors, as applicable, which shall not be unreasonably withheld. The Debtors shall also have consent rights with respect to any successor Victims Compensation Trustee and Trust Advisory Committee members, which consent shall not be unreasonably withheld. Notwithstanding any of the foregoing, the Indemnification Obligations of the Victims Compensation Trust described in Section IV.G of the Plan may not be amended or modified without the consent of the Protected Party that is otherwise entitled to indemnification pursuant to those provisions.

### 14. Cooperation; Transfer of Books and Records

As provided in Section IV.P of the Plan, on the Effective Date or as soon as reasonably practicable thereafter, the Debtors and the other Protected Parties shall transfer and assign, or cause to be transferred and assigned, to the Victims Compensation Trustee (1) copies of all of their books and records that pertain to Abuse Claims, including all ineligible volunteer files to the extent authorized and directed by the Court pursuant to the Confirmation Order, (2) copies of all Insurance Policies, (3) information relating to Abuse Claims previously noticed, tendered, or submitted under the Insurance Policies or paid by any Insurer so long as such information is presently stored and readily accessible on the Protected Parties' then-current electronic record-management systems, and (4) any other information reasonably necessary to operate the Victims Compensation Trust and preserve, secure, or obtain the benefit of the Insurance Rights. If at any time after the Effective Date, any of the Reorganized Debtors or the other Protected Parties discover the existence of an Insurance Policy that provides or may provide coverage for Abuse Claims, the Person discovering such policy or evidence of the existence of such policy shall promptly inform the Victims Compensation Trustee.

### 15. No Liability

Neither the Protected Parties nor the Local Council Committee shall have or incur any liability to, or be subject to any right of action by, any Person for any act, omission, transaction, event, or other circumstance in connection with or related to the Future Claimants' Representative, the Victims Compensation Trust, the Victims Compensation Trustee, or the Trust Documents, including the administration of Abuse Claims and the distribution of property by the Victims Compensation Trust, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to the foregoing.

### 16. U.S. Federal Income Tax Treatment of the Victims Compensation Trust

The Victims Compensation Trust shall be a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1. The Victims Compensation Trust shall file (or cause to be filed) statements, returns, or disclosures relating to the Victims Compensation Trust that are required by any governmental unit. The Victims Compensation Trustee shall be responsible for the payment of any taxes imposed on the Victims Compensation Trust or the Trust Assets, including estimated and annual U.S. federal income taxes in accordance with the terms of the Trust Agreement. The Victims Compensation Trustee may request an expedited

determination of taxes on the Victims Compensation Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Victims Compensation Trust for all taxable periods through the dissolution of the Victims Compensation Trust.

### 17. Institution and Maintenance of Legal and Other Proceedings

As of the Effective Date, the Victims Compensation Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Victims Compensation Trust. The Victims Compensation Trust shall be empowered to initiate, prosecute, defend, and resolve all such actions in the name of the Debtors if deemed necessary or appropriate by the Victims Compensation Trustee. The Victims Compensation Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred subsequent to the Effective Date arising from, relating to, or associated with any legal action or other proceeding brought pursuant to Section IV.R of the Plan and shall pay or reimburse all deductibles, retrospective premium adjustments, fronting obligations, or other charges which may arise from the receipt of the Insurance Proceeds by the Victims Compensation Trust. For the avoidance of doubt, the Victims Compensation Trust, pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and applicable State corporate law, is appointed as the successor-in-interest to, and representative, of the Debtors and their Estates for the retention, enforcement, settlement, or adjustment of all Abuse Claims.

### 18. Insurance Neutrality

As provided in Section IV.S of the Plan, nothing contained in any Plan Documents shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (1) the rights or obligations of any of any Insurer arising out of or under any Insurance Policy or (2) any rights or obligations of the Debtors arising out of or under any Insurance Policy.

### G. Due Authorization

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by members, creditors, directors, or managers of the Debtors, the Reorganized Debtors, or any other Person.

### H. Continued Legal Existence

Except as otherwise provided in the Plan, each of the Debtors shall continue to exist on and after the Effective Date as a separate Person, with all of the powers of such Person under applicable law in the jurisdiction in which each Debtor is organized, incorporated, or otherwise formed and pursuant to such Debtor's formation, organizational and governance documents in effect immediately prior to the Effective Date, without prejudice to any right of the Reorganized Debtors to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date.

### I.    Vesting of Assets in the Reorganized Debtors

In accordance with <u>Section V.I</u> of the Plan, and except as explicitly provided in the Plan, on the Effective Date, all property comprising the Estates, other than the BSA Trust Contributions, shall vest in each respective Reorganized Debtor free and clear of all Liens, Claims, interests, charges, other Encumbrances and liabilities of any kind unless expressly provided by the Plan or the Confirmation Order. On and after the Effective Date, each Reorganized Debtor may continue is operations and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

### J.    Cancellation of Indebtedness

Except as otherwise provided in the Plan, or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date, all agreements, instruments, and other documents evidencing or issued pursuant to the 2010 Credit Facility Documents, the 2010 Bond Documents, the 2012 Bond Documents, or any indebtedness or other obligations thereunder, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged, and of no force or effect, and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

### K.    Preservation of Causes of Action

In accordance with section 1123(b)(3) of the Bankruptcy Code, subject to <u>Section V.N</u>] of the Plan, all Causes of Action that a Debtor may hold against any Person shall vest in the applicable Reorganized Debtor on the Effective Date. Thereafter, subject to <u>Section V.N</u> of the Plan, the Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, whether arising before or after the Petition Date, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. **No Person may rely on the absence of a specific reference in the Plan or this Disclosure Statement to any specific Cause of Action as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan,** and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to any Cause of Action upon, after, or as a consequence of the Confirmation or the occurrence of the Effective Date.

### L.    Workers' Compensation Programs

As of the Effective Date, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation laws in all applicable states; and (b) the Workers' Compensation Program. All Proofs of Claims on account of the

Workers' Compensation Program shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the Workers' Compensation Programs; provided further, however, that nothing in the Plan shall be deemed to impose any obligations on the Debtors or their insurers in addition to what is provided for under the terms of the Workers' Compensation Programs and applicable state law.

## M. Local Council Charters

All charters granted to Local Councils before the Petition Date and not since revoked shall be deemed to be, and shall be treated as though they are, Executory Contracts under the Plan and deemed assumed under sections 365 and 1123 of the Bankruptcy Code.

## N. Treatment of Executory Contracts and Unexpired Leases

### 1. *Assumption of Executory Contracts and Unexpired Leases*

As set forth in <u>Section VI</u> of the Plan, on the Effective Date, all Executory Contracts and Unexpired Leases shall be deemed assumed by the applicable Reorganized Debtor as of the Effective Date without the need for any further notice to or action, order, or approval of the Bankruptcy Court under sections 365 and 1123 of the Bankruptcy Code, except for Executory Contracts or Unexpired Leases that:

a. are identified on the Rejected Contracts Schedule;

b. previously expired or terminated pursuant to their terms;

c. the Debtors have previously assumed or rejected pursuant to a Final Order of the Bankruptcy Court;

d. are the subject of a motion to reject that remains pending as of the Confirmation Date; or

e. as to which the effective date of rejection will occur (or is requested by the Debtors to occur) after the Confirmation Date

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumption or rejection, as applicable, of Executory Contracts or Unexpired Leases as set forth in the Plan or the Rejected Contracts Schedule, pursuant to sections 365 and 1123 of the Bankruptcy Code. Except as otherwise set forth in the Plan, the assumption or rejection of Executory Contracts and Unexpired Leases pursuant to the Plan shall be effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or a Final Order of the Bankruptcy Court shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any Final Order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Confirmation Date shall be subject to approval by a Final

Order on or after the Confirmation Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors

The Debtors' assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and payment of the applicable Cure Amount shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged as of the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (2) the effective date of such assumption or (3) the Effective Date, in each case without the need for any objection by the Debtors or the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

### 2. *Rejection Damages Claims*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim for Rejection Damages Claims, if any, must be filed within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Rejection Damages Claim that is not timely filed shall be automatically Disallowed, forever barred from assertion, and unenforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court, and any such Rejection Damages Claim shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary**. All Allowed Rejection Damages Claims shall be classified as Allowed General Unsecured Claims and treated in accordance with Section III.B.7 of the Plan.

### O. Provisions for Resolving Disputed Claims

### 1. *Objections to Claims*

The Reorganized Debtors shall exclusively be entitled to object to all Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, Other Secured Claims, and General Unsecured Claims. The Victims Compensation Trustee shall exclusively be entitled to administer and resolve Abuse Claims in accordance with the Trust Agreement and the Trust Distribution Procedures. After the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim to which they may object, except with respect to any Claim that is Allowed. The Reorganized Debtors shall serve and file any objection to a Proof of Claim on or before the Claims Objection Deadline; provided, however, that the Victims Compensation Trustee shall administer the Abuse Claims on a timeline determined by the Victims Compensation Trustee, in consultation with the Future Claimants' Representative and the Trust Advisory Committee, subject to approval by the

Bankruptcy Court. The expiration of the Claims Objection Deadline shall not limit or affect the Debtors or Reorganized Debtors' rights to dispute Claims asserted in the ordinary course of business other than through a Proof of Claim.

### 2. Resolution of Disputed Administrative Expenses and Disputed Non-Abuse Claims

On and after the Effective Date, the Reorganized Debtors shall have the authority to prosecute and withdraw objections to, compromise, settle, or otherwise resolve Administrative Expense Claims (other than with respect to Professional Fee Claims), Priority Tax Claims, Other Priority Claims, and General Unsecured Claims without approval of the Bankruptcy Court. For the avoidance of doubt, only the Victims Compensation Trustee shall have the authority to administer and resolve Abuse Claims in accordance with the Trust Agreement and the Trust Distribution Procedures.

### 3. Resolution of Abuse Claims

Abuse Claims shall be resolved in accordance with the Trust Documents, subject to the provisions of Article IV of the Plan and subject to the right of any Insurer to raise any Insurer Coverage Defense in response to a demand by the Victims Compensation Trust that such Non-Settling Insurer handle, defend, or pay any such Abuse Claim.

### 4. Payments and Distributions with Respect to Disputed Claims

Notwithstanding anything contrary in the Plan Documents, if any portion of a Claim is a Disputed Claim, no payment or distribution provided for in the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 5. Distributions After Allowance

After such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the holder thereof shall be entitled to Plan Distributions, if any, to which such holder is then entitled as provided in the Plan, without interest, as provided in Section VIII.I of the Plan. Such Plan Distributions shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court Allowing such Disputed Claim (or portion thereof) becomes a Final Order.

### 6. Estimation of Claims

The Debtors or the Reorganized Debtors, with respect to contingent, unliquidated, and/or Disputed Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, Other Secured Claims, and General Unsecured Claims, may at any time request that the Bankruptcy Court estimate any such contingent, unliquidated, or Disputed Claim or Class of Claims pursuant to section 502(c) of the Bankruptcy Code or otherwise, including to establish a reserve for Plan Distribution purposes, regardless of whether the Debtors, the Reorganized Debtors, or any other Person had previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim or Class of Claims at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court

estimates any contingent, unliquidated, or Disputed Claim or Class of Claims, the amount so estimated shall constitute either the Allowed amount of such Claim or Class of Claims, or a maximum limitation on such Claim or Class of Claims, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim or Class of Claims, the Debtors or the Reorganized Debtors, as applicable, may pursue supplementary proceedings to object to the allowance of such Claims; provided, however, that such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only.

### 7. No Distributions Pending Allowance

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or Plan Distribution shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 8. Claims Resolution Procedures Cumulative

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

### 9. Interest

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Effective Date, except as provided in Section VII.D of the Plan.

### 10. Insured Non-Abuse Claims

To the extent that an Insurer satisfies an Insured Non-Abuse Claim in whole or in part (based on either a settlement or judgment), then immediately upon such satisfaction, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court.

### P. Discharges, Channeling Injunction, Releases, Exculpations and Injunctions; Survival of Indemnification and Exculpation Obligations

### 1. Discharge

#### a. Discharge of the Debtors

**Except as expressly provided in the Plan or the Confirmation Order, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, termination and release of, all Claims and Interests of any nature whatsoever against or in the Debtors or any of their assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date, and, as of the Effective Date, each of the Debtors shall be deemed discharged and released, and each holder of a Claim or Interest and any**

successor, assign, and affiliate of such holder shall be deemed to have forever waived, discharged and released each of the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities, and all debts of the kind specified in section 502 of the Bankruptcy Code, based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date, in each case whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (c) a Claim based upon such debt is or has been Disallowed by order of the Bankruptcy Court, or (d) the holder of a Claim based upon such debt is deemed to have accepted the Plan.

### b.  Discharge Injunction

As of the Effective Date, except as expressly provided in the Plan or the Confirmation Order, all holders of Claims of any nature whatsoever against or in the Debtors or any of their assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date shall be precluded and permanently enjoined from prosecuting or asserting any such discharged Claim against the Debtors or the Reorganized Debtors or the property of the Debtors or the Reorganized Debtors. In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge or termination of all Claims, Interests and other debts and liabilities against or in the Debtors pursuant to sections 105, 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time to the extent such judgment relates to a discharged Claim.

### 2.  *Channeling Injunction*

### a.  Terms

Subject to the Reservations as described in <u>Section X.D</u> of the Plan, to preserve and promote the settlements contemplated by and provided for in the Plan and to supplement, where necessary, the injunctive effect of the discharge as provided in sections 1141 and 524 of the Bankruptcy Code and as described in <u>Article X</u> of the Plan, pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court and the District Court under section 105(a) of the Bankruptcy Code, all Persons that have held or asserted, currently hold or assert, or that may in the future hold or assert, any Abuse Claim against the Protected Parties, or any of them, shall be permanently and forever stayed, restrained and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery from any Protected Party with respect to any such Abuse Claim, including:

(i)  commencing, conducting, or continuing, in any manner, whether directly or indirectly, any suit, action, or other proceeding of any kind in any forum with respect to any such Abuse Claim against any Protected Party or any property or interest in property of any Protected Party;

(ii)    enforcing, levying, attaching, collecting or otherwise recovering, by any manner or means, either directly or indirectly, any judgment, award, decree, or other order against any Protected Party or any property or interest in property of any Protected Party with respect to any such Abuse Claim;

(iii)    creating, perfecting, or enforcing in any manner, whether directly or indirectly, any Lien or Encumbrance of any kind against any Protected Party or any property or interest in property of any Protected Party with respect to any such Abuse Claim;

(iv)    asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, whether directly or indirectly, against any obligation due to any Protected Party or any property or interest in property of any Protected Party with respect to any such Abuse Claim; and

(v)    taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents with respect to any such Abuse Claim.

### b.  Reservations

Notwithstanding anything to the contrary in <u>Section X.D</u> of the Plan, the Channeling Injunction shall not enjoin:

(i)    the right of any Person to the treatment afforded to such Person under the Plan, including the rights of holders of Abuse Claims to assert such Abuse Claims in accordance with the Trust Documents solely against the Victims Compensation Trust;

(ii)    the right of any Person to assert any Claim for payment of Trust Expenses solely against the Victims Compensation Trust;

(iii)    the Victims Compensation Trust from enforcing its rights under the Trust Documents; or

(iv)    the rights of the Victims Compensation Trust and the Reorganized Debtors (to the extent permitted or required under the Plan) to prosecute any action against the Insurers based on or arising from the Insurance Policies.

### 3.  *Provisions Relating to Channeling Injunction*

### a.  Modifications

There can be no modification, dissolution, or termination of the Channeling Injunction, which shall be a permanent injunction.

### b.  Non-Limitation.

Nothing in the Plan or the Trust Documents shall or shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction or the Victims Compensation Trust's assumption of all liability with respect to Abuse Claims.

### c.  Bankruptcy Rule 3016 Compliance

The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute or be deemed to constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

### d.  No Duplicative Recovery.

In no event shall any holder of an Abuse Claim be entitled to receive any duplicative payment, reimbursement, or restitution from any Protected Party under any theory of liability for the same loss, damage, or other Claim that is reimbursed by the Victims Compensation Trust or is otherwise based on the same events, facts, maters, or circumstances that gave rise to the applicable Abuse Claim.

### e.  District Court Approval

The Debtors shall seek an order of the District Court approving (a) the Channeling Injunction and the Victims Compensation Trust's assumption of all liability with respect to Abuse Claims and (b) the releases by holders of Abuse Claims for the benefit of the Protected Parties, each as set forth in Article X of the Plan.

### 4.  *Injunction Against Interference with Plan*

**Upon entry of the Confirmation Order, all holders of Claims and Interests shall be precluded and enjoined from taking any actions to interfere with the implementation and consummation of the Plan.**

### 5.  *Releases*

#### a.  Releases by the Debtors

**As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Released Parties to facilitate and implement the reorganization of the Debtors, as an integral component of the Plan, the Debtors, the Reorganized Debtors, and the Estates shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each and all of the Released Parties of and from any and all Causes of Action (including Avoidance Actions), any and all other Claims, Interests, obligations, rights, demands, suits, judgments, damages, debts, remedies, losses and liabilities of any nature whatsoever (including any derivative claims or Causes of Action asserted or that may be asserted on**

behalf of the Debtors, the Reorganized Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to the Debtors, the Reorganized Debtors, the Estates, their respective assets and properties, the Chapter 11 Cases, the Plan Documents, and any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth in <u>Section X.G</u> of the Plan shall not be construed as (a) releasing any Released Party from Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted fraud, gross negligence or willful misconduct or (b) releasing any post-Effective Date obligations of any Person under the Plan or any document, instrument, or agreement executed to implement the Plan or Reinstated under the Plan.

### b.  Releases by Holders of Abuse Claims

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Released Parties to facilitate and implement the reorganization of the Debtors, as an integral component of the Plan, and except as otherwise expressly provided in the Plan or the Confirmation Order, to the maximum extent permitted under applicable law, as such law may be extended subsequent to the Effective Date, all holders of Abuse Claims shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release each and all of the Protected Parties and their respective property and successors and assigns of and from all Abuse Claims and any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Abuse Claims.

### 6.  *Exculpation*

From and after the Effective Date, the Exculpated Parties shall neither have nor incur any liability to, or be subject to any right of action by, any Person for any act, omission, transaction, event, or other circumstance in connection with or related to the Debtors, the Reorganized Debtors, the Estates, their respective assets and properties, the Chapter 11 Cases, the Plan Documents, the pursuit of Confirmation, the administration and implementation of the Plan, including the distribution of property under the Plan, or

any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to the foregoing; <u>provided</u>, <u>however</u>, that <u>Section X.H</u> of the Plan shall not apply to release (a) obligations under the Plan or any contracts, instruments, releases, agreements, and documents delivered, Reinstated or assumed under the Plan, (b) any Claims or Causes of Action arising from or related to an act or omission that is judicially determined by a Final Order to have constituted fraud, gross negligence or willful misconduct, or (c) any Claims or Causes of Action against the Debtors or the Reorganized Debtors that are Reinstated under the Plan or otherwise survive the Effective Date

### 7. *Injunctions*

#### a. Injunction Related to Releases

As of the Effective Date, all holders of Claims that are the subject of <u>Section X.G.2</u> of the Plan are, and shall be, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Released Party or its property or successors or assigns on account of or based on the subject matter of such Claims, whether directly or indirectly, derivatively or otherwise: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including any judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien or Encumbrance; and/or (d) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under <u>Section X.C</u> of the Plan or released under <u>Section X.G.2</u> of the Plan.

#### b. Injunction Related to Exculpation

As of the Effective Date, all holders of Claims that are the subject of <u>Section X.H</u> of the Plan are, and shall be, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Exculpated Party and, solely to the extent provided by section 1125(e) of the Bankruptcy Code, any Section 1125(e) Party or its or their property or successors or assigns on account of or based on the subject matter of such Claims, whether directly or indirectly, derivatively or otherwise: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including any judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien or Encumbrance; and/or (d) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under <u>Section X.C</u> of the Plan or released under <u>Section X.H</u> of the Plan.

### Q.  Reservation of Rights

Notwithstanding any other provision of the Plan to the contrary, no provision of Article X of the Plan shall be deemed or construed to satisfy, discharge, release or enjoin claims by the Victims Compensation Trust, the Reorganized Debtors, or (subject to Article IV of the Plan) any other Person, as the case may be, against (1) the Victims Compensation Trust for payment of Abuse Claims in accordance with the Trust Distribution Procedures, (2) the Victims Compensation Trust for the payment of Trust Expenses, or (3) any Insurer that has not performed under an Insurance Policy or an Insurance Settlement Agreement.

### R.  Disallowed Claims

On and after the Effective Date, the Debtors and the Reorganized Debtors shall be fully and finally discharged of any and all liability or obligation on any and all Disallowed Claims, and any Order Disallowing a Claim that is not a Final Order as of the Effective Date solely because of a Person's right to move for reconsideration of such Order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date. The Confirmation Order, except as otherwise provided in the Plan, shall constitute an Order: (a) Disallowing all Claims (other than Abuse Claims) to the extent such Claims are not allowable under any provision of Section 502 of the Bankruptcy Code, including time-barred Claims, and Claims for unmatured interest and (b) in relation to each Debtor, Disallowing or subordinating to all other Claims, as the case may be, any Claims for penalties, punitive damages or any other damages not constituting compensatory damages.

### S.  Retention of Jurisdiction

#### 1.  General Retention

Until the Chapter 11 Cases are closed, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(c) and 1142 of the Bankruptcy Code to the fullest extent permitted by law, including the jurisdiction necessary to ensure that the purposes and the intent of the Plan are carried out. Following Confirmation, the administration of the Chapter 11 Cases will continue until the Chapter 11 Cases are closed by a Final Order of the Bankruptcy Court. The Bankruptcy Court shall also retain jurisdiction for the purpose of classification of any Claims and the re-examination of Abuse Claims and Claims that have been Allowed for purposes of voting, and the determination of such objections as may be filed with the Bankruptcy Court with respect to any Claims. The failure by the Debtors to object to, or examine, any Claim for the purposes of voting, shall not be deemed a waiver of the rights of the Debtors, the Reorganized Debtors or the Victims Compensation Trust, as the case may be, to object to or re-examine such Claim in whole or part.

#### 2.  Specific Purposes.

In addition to the foregoing, the Bankruptcy Court shall retain jurisdiction after Confirmation of the Plan for each of the specific purposes enumerated in Section XI.B of the Plan. Notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, and related to, the

Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(c) and 1142 of the Bankruptcy Code and to the fullest extent permitted by law, including the following purposes:

       a.     modify the Plan after Confirmation pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules;

       b.     correct any defect, cure any omission, reconcile any inconsistency or make any other necessary changes or modifications in or to the Plan, the Trust Documents or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance in the Plan in the event the Effective Date does not occur as provided herein so that the intended effect of the Plan may be substantially realized thereby;

       c.     to enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or if distributions pursuant to the Plan or the Trust Documents are enjoined or stayed;

       d.     to hear and determine all applications for compensation of Professionals and reimbursement of expenses under sections 328, 330, 331 and/or 503(b) of the Bankruptcy Code;

       e.     to hear and determine any Causes of Action arising during the period from the Petition Date to the Effective Date, or in any way related to the Plan or the transactions contemplated hereby, against the Debtors, the Reorganized Debtors, the Victims Compensation Trust, the Victims Compensation Trustee, or the Official Committees or the Future Claimants' Representative and their respective officers, directors, employees, members, attorneys, accountants, financial advisors, representatives and agents;

       f.     to determine any and all motions, including motions pending as of Confirmation, for the rejection, assumption or assumption and assignment of Executory Contracts or Unexpired Leases and the Allowance of any Claims resulting therefrom;

       g.     to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

       h.     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

       i.     to determine any and all motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date (which jurisdiction shall be non-exclusive as to any such non-core matters);

       j.     to determine the Allowance and/or Disallowance of any Claims against the Debtors or their Estates, including any objections to any such Claims and the compromise and settlement of any Claim against the Debtors or their Estates;

k.      to determine all questions and disputes regarding title to the assets of the Debtors or their Estates or the Trust Assets;

l.      to ensure that Plan Distributions to holders of Allowed Claims and that Trust Distributions to holders of Abuse Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes relating to distributions under the Plan or the Trust Documents;

m.      to construe, enforce and resolve all questions and disputes relating to employment agreements existing or approved by the Bankruptcy Court at or before Confirmation;

n.      to hear and determine the Insurance Actions and to determine all questions and issues arising thereunder;

o.      to hear and determine any matters related to the Victims Compensation Trust's indemnification obligations under <u>Article IV</u> of the Plan and the Trust Documents;

p.      to hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Chapter 11 Cases;

q.      to enter in aid of implementation of the Plan such orders as are necessary, including orders in aid of the implementation and enforcement of the releases, the Channeling Injunction, and the other injunctions described herein;

r.      to enter and implement such orders as may be necessary or appropriate if any aspect of the Plan, the Victims Compensation Trust or the Confirmation Order is, for any reason or in any respect, determined by a court to be inconsistent with, to violate, or to be insufficient to satisfy any of the terms, conditions, or other duties associated with any Insurance Policies; and

s.      to enter a Final Order or decree concluding or closing the Chapter 11 Cases.

To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the foregoing matters, the reference to the "Bankruptcy Court" in Section V.S of this Disclosure Statement and Article XI of the Plan shall be deemed to be replaced by the "District Court."

## ARTICLE VI. ACCEPTANCE OR REJECTION OF THE PLAN

### A.  Classes Entitled to Vote on the Plan

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan. Holders of Claims in Classes 1 and 2 and holders of Interests in Class 7 are

Unimpaired under the Plan and are therefore conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, no holders of Claims or Interests in such Classes shall be entitled to vote to accept or reject the Plan.

Each of Classes 3A (2010 Credit Facility Claims), 3B (2019 RCF Claims), 4A (2010 Bond Claims), 4B (2012 Bond Claims), 5 (General Unsecured Claims), and 6 (Abuse Claims) are Impaired and the holders of Allowed Claims in Classes 3A, 3B, 4A, 4B, and 5, and all Claims in Class 6, are entitled to vote to accept or reject the Plan.

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package, including a Ballot setting forth detailed voting instructions. If your Claim is included in the Voting Classes, you should read your Ballot and carefully follow the instructions included in the Ballot. Please use only the Ballot that accompanies this Disclosure Statement or the Ballot that the Debtors otherwise provided to you.

## B.  Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted. Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims in such class that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims in such class that have voted. Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests in such class that have voted.

## C.  Certain Factors to Be Considered Prior to Voting

There are a variety of factors that all holders of Interests entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors, which may impact recoveries under the Plan, include the following:

1.  unless otherwise specifically indicated, the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

2.  although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

3.  the Debtors may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

4.  any delays of either Confirmation or the occurrence of Effective Date could result in, among other things, increased Administrative Expense Claims and Professional Fee Claims.

While these factors could affect distributions available to holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a re-solicitation of the votes of holders of Claims in the Voting Classes.

For a further discussion of risk factors, please refer to <u>Article VIII</u> of this Disclosure Statement, entitled "Risk Factors."

## ARTICLE VII. CONFIRMATION PROCEDURES

### A.  Hearing on Plan Confirmation

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, shall hold a hearing to confirm a plan of reorganization. The Confirmation Hearing pursuant to section 1128 of the Bankruptcy Code will be held on [_____], 2020 at [_].m. prevailing Eastern Time, before the Honorable Judge [_____], United States Bankruptcy Judge for the District of Delaware, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market Street, [___] Floor, Courtroom [____], Wilmington, Delaware. The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the entities who have filed an objection to the Plan, if any, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation. Any objection to Confirmation of the Plan must: (i) be made in writing; (ii) state the name and address of the objecting party and the nature of the claim or interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Plan; and (iv) be filed with the Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy court so that they are received on or before [_____] at [_]:00 [_].m. prevailing Eastern Time.

### B.  Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that the Plan (i) is accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) is feasible and (iii) is in the "best interests" of holders of Claims and Interests Impaired under the Plan.

The Plan fully complies with the statutory requirements for Confirmation listed below.

1.      The proponents of the Plan have complied with the applicable provisions of the Bankruptcy Code.

2.      The Plan has been proposed in good faith and not by any means forbidden by law.

3.      Any payment made or to be made by the Debtors (or any other proponent of the Plan) or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases is subject to the approval of the Bankruptcy Court as reasonable.

4.      The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after Confirmation, as a director or officer of the Reorganized Debtors, any Affiliate of the Debtors reorganized under the Plan, or any successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and holders of Interests and with public policies.

5.      The Debtors have disclosed the identity of any Insider that will be employed or retained by the Reorganized Debtors and the nature of any compensation for such Insider.

6.      With respect to each Holder within an Impaired Class of Claims or Interests, each such Holder has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such Holder would so receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code on such date.

7.      With respect to each Class of Claims or Interests, such Class (a) has accepted the Plan or is Unimpaired under the Plan (subject to the "cram-down" provisions discussed below).

8.      The Plan provides for treatment of Claims, as applicable, in accordance with the provisions of section 507(a) of the Bankruptcy Code.

9.      If a Class of Claims or Interests is Impaired under the Plan, at least one Class of Claims or Interests that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any Insider.

10.     Confirmation is not likely to be followed by the liquidation or the need for further financial reorganization, of the Reorganized Debtors, or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

11.     All fees payable under 28 U.S.C. § 1930 have been paid or the Plan provides for the payment of all such fees on the Effective Date.

**AS EXPLAINED IN <u>SECTION VIII.B</u> OF THIS DISCLOSURE STATEMENT, THE BANKRUPTCY CODE CONTAINS PROVISIONS FOR CONFIRMATION OF A PLAN EVEN IF IT IS NOT ACCEPTED BY ALL CLASSES. THESE SO-CALLED "CRAM-DOWN" PROVISIONS ARE SET FORTH IN SECTION 1129(b) OF THE BANKRUPTCY CODE, WHICH PROVIDES THAT A PLAN OF REORGANIZATION**

**CAN BE CONFIRMED EVEN IF IT HAS NOT BEEN ACCEPTED BY ALL IMPAIRED CLASSES OF CLAIMS AND INTERESTS AS LONG AS AT LEAST ONE IMPAIRED CLASS OF NON-INSIDER CLAIMS HAS VOTED TO ACCEPT THE PLAN.**

### C.  Best Interests of Creditors / Liquidation Analysis

Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Six Classes of Impaired Claims, 2010 Credit Facility Claims (Class 3A), 2019 RCF Claims (Class 3B), 2010 Bond Claims (Class 4A), 2012 Bond Claims (Class 4B) General Unsecured Claims (Class 5), and Abuse Claims (Class 6) are Impaired under the Plan.

To calculate the probable distribution to holders of each impaired class of claims and interests if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtors' assets if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a sale of the Debtors' assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors and interest holders would be reduced by the claims of any secured creditors to the extent of the value of their collateral, by the costs and expenses of liquidation, and by other administrative expenses and costs of both the chapter 7 cases and the Chapter 11 Cases. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtors in the Chapter 11 Cases (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the chapter 7 cases, litigation costs, and any claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases.

Once the Bankruptcy Court ascertains the recoveries in liquidation of secured creditors and priority claimants, if any, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

Six Classes of Impaired Claims, 2010 Credit Facility Claims (Class 3A), 2019 RCF Claims (Class 3B), 2010 Bond Claims (Class 4A), 2012 Bond Claims (Class 4B), General Unsecured Claims (Class 5), and Abuse Claims (Class 6), are Impaired under the Plan. If the Debtors were liquidated under chapter 7 of the Bankruptcy Code, holders of General Unsecured Claims (Class 5) and Abuse Claims (Class 6) would receive lesser distributions than under the Plan, as explained in detail in the Liquidation analysis, to be attached to a subsequent amendment to this Disclosure Statement as **Exhibit B**.

Here, the Plan is in the best interests of claimants and interest holders and meets the requirements of section 1129(a)(7) of the Bankruptcy Code.

### D.  Feasibility

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan of reorganization is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet obligations under the Plan. The Debtors, with the assistance of their advisors, have prepared projections for the calendar years 2020 through [20__], including management's assumptions related thereto, to be attached to a subsequent amendment to this Disclosure Statement as **Exhibit C** (the "Financial Projections"). The Financial Projections assume that the Plan will be implemented in accordance with its stated terms. The Debtors are unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the Financial Projections due to a material change in the Debtors' prospects. As reflected in the Financial Projections, the Debtors anticipate that they will timely meet all of their collective obligations and will be financially viable after Confirmation of the Plan. Accordingly, the Debtors believe that Confirmation is not likely to be followed by liquidation or the need for further reorganization.

### E.  Acceptance by Impaired Class

The Bankruptcy Code requires, as a condition to confirmation, that each class of claims or interests that is impaired under a plan of reorganization, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. As stated above, the Voting Classes are Impaired Class and is comprised of the holders of Claims in Class 3A, Class 3B, Class 4A, Class 4B, Class 5, and Class 6. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as an affirmative vote of more than one-half in number of total allowed claims in such class that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims in such class that have voted. Thus, the Voting Classes described herein will have voted to accept the Plan only if one-half of the holders of Allowed Claims, as applicable, with at least two-thirds of the total dollar amount of the Allowed Claims, as applicable, vote on the Plan to accept.

### F.  Conditions Precedent to Confirmation of the Plan

Confirmation of the Plan shall not occur unless following conditions precedent have been satisfied:

1.   the Confirmation Order shall be in form and substance acceptable to the Debtors;

2.   The Confirmation Order shall approve and implement the Channeling Injunction set for in Section X.D of the Plan; and

3.   The Plan Documents shall be in form and substance acceptable to the Debtors.

### G.  Conditions Precedent to the Effective Date

The Effective Date of the Plan shall not occur unless following conditions precedent have been satisfied or waived in accordance with <u>Article IX</u> of the Plan:

1.  the Confirmation Order, in form and substance acceptable to the Debtors, shall have been entered by the Bankruptcy Court, shall have become a Final Order, and shall have been adopted, affirmed, issued or ratified by the District Court;

2.  the Trust Agreement and the Trust Distribution Procedures shall have become effective in accordance with the terms of the Plan;

3.  the Trust shall have been established and funded in accordance with the Plan;

4.  the Debtors shall have obtained all authorizations, consents, certifications, approvals, rulings, opinions or other documents that are necessary to implement and effectuate the Plan;

5.  all actions, documents, and agreements necessary to implement and effectuate the Plan shall have been effected or executed; and

6.  the Debtors shall have filed a notice of occurrence of the Effective Date.

### H.  Waiver of Conditions Precedent to the Effective Date

Except for the conditions precedent set forth in <u>Section VII.G</u> of this Disclosure Statement, each of the conditions precedent to the occurrence of the Effective Date set forth above may be waived in whole or in part by the Debtors without notice to or leave or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan. The failure to satisfy any condition precedent to the to the Confirmation Date or satisfy or waive any condition precedent to the Effective Date may be asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied.

### I.  Vacatur of Confirmation Order; Non-Occurrence of Effective Date

If the Confirmation Order is vacated or the Effective Date does not occur within 180 days after entry of the Confirmation Order (subject to extension by the Debtors in their sole discretion), the Plan shall be null and void in all respects and nothing contained in the Plan or this Disclosure Statement shall (1) constitute a waiver or release of any Causes of Action by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any holders of a Claim or Interest or any other Person; (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders, or any other Person in any respect; or (4) be used by the Debtors or any other Person as evidence (or in any other way) in any litigation, including with respect to the strengths and weaknesses of positions, arguments or claims of any of the parties to such litigation.

### J.  Alternatives to Confirmation and Consummation of the Plan

The Debtors have evaluated several alternatives to the Plan. After studying these alternatives, the Debtors have concluded that the Plan is the preferred approach to effectuating the Debtors' restructuring and maximizing the prospects of a continuation of their mission and value for all stakeholders and, therefore, is in the best interests of all constituencies. If the Plan is not confirmed, the Debtors' ability to continue operating as a going concern could be severely jeopardized. The realistic alternatives likely will be (1) the preparation and presentation of an alternative plan of reorganization, (2) an out-of-court restructuring involving a dismissal of the proceedings, or (3) a liquidation under chapter 7 of the Bankruptcy Code.

## ARTICLE VIII. RISK FACTORS

The following provides a summary of various important considerations and other risk factors associated with the Plan; however, it is not exhaustive. There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement.

### A.  Business-Related Risks

The Financial Projections are dependent upon the successful implementation of the Debtors' business plan and the validity of the other assumptions contained therein. These projections reflect numerous assumptions, including Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, certain assumptions with respect to competitors of the Debtors, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the projections may affect the actual financial results of the Debtors. Although the Debtors believe that the projections are reasonably attainable, variations between the actual financial results and those projected may occur and be material.

### B.  Bankruptcy-Specific Considerations

#### 1.  General

Although the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to the Debtors' mission, the Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. Even if confirmed on a timely basis, bankruptcy proceedings could have a material adverse effect on the Debtors' business operations. A delay in the bankruptcy proceedings will also involve additional expense and may divert some of the attention of the Debtors' management away from operation of the organization.

### 2. *Nonacceptance of the Plan—Confirmation by Nonconsensual "Cram-down"*

The Plan provides that six Classes of Claims are Impaired. If any impaired Classes of Claims are deemed to reject the Plan, the Bankruptcy Court nevertheless may confirm the Plan at the Debtors' request pursuant to the "cram-down" provisions of the Bankruptcy Code if at least one impaired Class of Claims has accepted the Plan (with such acceptance being determined without including the acceptance of any "insider" in such Class) and, as to each impaired Class which has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such impaired class.

Although the Debtors believe that the Plan would meet such tests, the Debtors cannot assure you that the Bankruptcy Court would reach the same conclusion.

### 3. *Objections to the Plan's Classification or Amounts of Claims and Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims or Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that parties in interest will not object to the classification or amounts of Claims and Interests under the Plan, or that the Bankruptcy Court will approve such classification or amounts.

### 4. *The Conditions Precedent to Plan Confirmation and the Effective Date of the Plan May Not Occur*

As more fully set forth in Article IX of the Plan, Plan Confirmation and the Effective Date are subject to a number of conditions precedent. If such conditions precedent are not satisfied or waived, Plan Confirmation, the Effective Date, or both will not occur.

### 5. *Non-Confirmation or Delay of Confirmation of the Plan*

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, findings by a bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under Chapter 7 of the Bankruptcy Code.

The Bankruptcy Court may determine that this Disclosure Statement and/or the solicitation procedures did not satisfy the requirements of the Bankruptcy Code or the Bankruptcy Rules or may decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes, or the Plan contains other terms disapproved of by the Bankruptcy Court. If the Debtors fail to achieve Confirmation, the Chapter 11 Cases would likely continue for a protracted period without indication of how or when the Chapter 11 Cases may be completed. Some of the risks that the Debtors face in a bankruptcy proceeding would become more acute in such a scenario, including certain risks that are beyond their control, such as deterioration or other changes in economic conditions, changes in the industry in which the Debtors operate, and potential revaluing of their assets due to chapter 11 proceedings.

Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court is not obligated to confirm the Plan as proposed. A dissenting Holder of a Claim or Interest against the Debtors could challenge the solicitation procedures as not being in compliance with the Bankruptcy Code, which could mean that the results of the Solicitation may be invalid. If the Bankruptcy Court determined that the solicitation procedures were appropriate and the results were valid, the Bankruptcy Court could still decline to confirm the Plan if the Bankruptcy Court found that any of the statutory requirements for confirmation had not been met.

If the Plan is not confirmed by the Bankruptcy Court, (a) the Debtors may not be able to successfully reorganize; (b) the distributions that holders of Claims or Interests ultimately would receive, if any, with respect to their Claims or Interests would be uncertain, and (c) there may be no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the holders of Claims or Interests.

### 6.  *Amendment of Plan Prior to Confirmation by the Debtors*

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan or waive any conditions thereto if and to the extent necessary or desirable for Confirmation. The potential impact of any such amendment or waiver on holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.

### 7.  *Failure to Obtain Approval of Releases, Injunctions and Exculpation*

As set forth in Section V.P of this Disclosure Statement, the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, the Reorganized Debtors, the other Released Parties and their respective Related Parties, as applicable. The releases, injunctions, and exculpations (including, for the avoidance of doubt, the Channeling Injunction and the definitions of Released Parties and Exculpated Parties) provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain

parties may not be considered Released Parties or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

### 8.  *Plan Based on Assumptions*

The Plan affects the capital structure and the structure and operation of the Debtors' organization and reflects assumptions and analyses based on the Debtors' experience and perception of historical trends, current conditions, and expected future developments, as well as other factors that the Debtors consider appropriate under the circumstances. Whether actual future results and developments will be consistent with the Debtors' expectations and assumptions depends on a number of factors, including the Debtors' ability to maintain the public's confidence in the Debtors' viability as a continuing entity and enterprise and to attract and retain sufficient interest in their organization and (c) ability to retain key employees. The failure of any of these factors could materially adversely affect the successful reorganization of the Debtors' business.

In addition, the Plan relies upon the Financial Projections, including with respect to revenues, EBIDA, debt service, and cash flow. Financial forecasts are necessarily speculative, and it is likely that one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate. Consequently, there can be no assurance that the results or developments contemplated by any plan of reorganization implemented will occur or, even if they do occur, that they will have the anticipated effects on the Debtors and their subsidiaries or their businesses or operations. The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful implementation of the Plan.

## ARTICLE IX.
## CERTAIN UNITED STATES FEDERAL INCOME TAX
## CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan and is for general information purposes only. This summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim or Interest. This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "Code"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the U.S. federal income tax consequences of the Plan. Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences of the Plan.

Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No ruling has been requested or obtained from the IRS with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto. The discussion

below is not binding upon the IRS or any court. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein. No representations or assurances are being made to the holders of Claims or Interests with respect to the U.S. federal income tax consequences described herein.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

### A. The Victims Compensation Trust

On the Confirmation Date, the Victims Compensation Trust shall be established in accordance with the Trust Documents. The Victims Compensation Trust is intended to qualify as a "qualified settlement fund" ("QSF") pursuant to Treasury Regulation section 1.468B-1. The Protected Parties are the "transferors" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Victims Compensation Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3). The Trust Documents, including the Trust Agreement, are incorporated herein by reference.

The primary tax consequences of the Victims Compensation Trust being characterized as a QSF are the following:

1. The Victims Compensation Trust must use a calendar taxable year and the accrual method of accounting.

2. If the Protected Parties fund the Victims Compensation Trust with appreciated property, the Protected Parties are deemed to sell the property to the Victims Compensation Trust. Accordingly, any gain or loss from the deemed sale must be reported by the Protected Parties.

3. The Victims Compensation Trust takes a fair market value basis in property contributed to it by the Protected Parties.

4. The Victims Compensation Trust's gross income less certain modifications is taxable at the highest federal tax rate applicable to trusts and estates. The Protected Parties' funding of the Victims Compensation Trust with Cash and other property is not reported by the Victims Compensation Trust as taxable income. However, earnings recognized from, for example, the short-term investment of the Victims Compensation Trust's funds will be subject to tax.

5. The Victims Compensation Trust may deduct from its gross income a limited number of administrative expenses; the Victims Compensation Trust is not entitled to deduct distributions paid to its beneficiaries.

6.   The Victims Compensation Trust will have a separate taxpayer identification number and will be required to file annual tax returns (which are due on March 15, or later if an extension is granted under applicable law). The Victims Compensation Trust will also be required to comply with a number of other administrative tax rules including filing information returns (generally IRS Form 1099) when approved payments are made to claimants.

### B.   Holder of Class 3A, 3B, 4A, and 4B Claims

The holder of the Class 3A, 3B, 4A, and 4B Claims is strongly urged to consult its own tax advisors regarding the specific tax consequences of the transactions described herein and in the Plan.

### C.   Holders of Class 5 and Class 6 Claims

The federal income tax consequences to a holder of a Class 5 or Class 6 Claim receiving, or entitled to receive, a distribution in partial or total satisfaction of a Claim may depend on a number of factors, including the nature of the Claim, the claimants' method of accounting, and their own particular tax situation. Because each claimant's tax situation differs, claimants should consult their own tax advisors to determine how the Plan affects them for federal, state and local tax purposes, based on their particular tax situations.

Among other things, the federal income tax consequences of a distribution to a claimant may depend initially on the nature of the original transaction pursuant to which the Claim arose. For example, a distribution in repayment of the principal amount of a loan is generally not included in the claimant's gross income. A distribution to a holder of an Abuse Claim may not be taxable as it may be considered compensation for personal injuries. The federal income tax consequences of a distribution to a claimant may also depend on whether the item to which the distribution relates has previously been included in the claimant's gross income or has previously been subject to a loss or bad debt deduction. For example, if a distribution is made in satisfaction of a receivable acquired in the ordinary course of the claimant's trade or business, and the claimant had previously included the amount of such receivable distribution in his or her gross income under his or her method of accounting, and had not previously claimed a loss or bad debt deduction for that amount, the receipt of the distribution should not result in additional income to the claimant but may, as discussed below, result in a loss.

Conversely, if the claimant had previously claimed a loss or bad debt deduction with respect to the item previously included in income, the claimant generally would be required to include the amount of the distribution in income when received.

A claimant receiving a distribution in satisfaction of his or her Claim generally may recognize taxable income or loss measured by the difference between (i) the cash and the fair market value (if any) of the property received and (ii) its adjusted tax basis in the Claim. For this purpose, the adjusted tax basis may include amounts previously included in income (less any bad debt or loss deduction) with respect to that item. This income or loss may be ordinary income or loss if the distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the claimant's trade or business for the performance of services or for the sale of goods

or merchandise. In addition, if a claimant had claimed an ordinary bad debt deduction for the worthlessness of his or her Claim in whole or in part in a prior taxable year, any income realized by the claimant as a result of receiving a distribution may be taxed as ordinary income to the extent of the ordinary deduction previously claimed. Generally, the income or loss will be capital gain or loss if the Claim is a capital asset in the claimant's hands

### D. Holders that are Non-United States Persons

Holders of Claims that are not "United States persons" (within the meaning of Section 7701(a)(30) of the Code) generally will not be subject to U.S. federal income tax with respect to property (including Cash) received in exchange for such Claims, unless (i) such holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes, or (ii) if such holder is an individual, such holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

### ARTICLE X.
### CONCLUSION AND RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result from any other scenario. Any alternative to Confirmation of the Plan, moreover, could result in extensive delays and increased administrative expenses. Accordingly, the Debtors believe that the Plan provides the best available recovery to their stakeholders and should be confirmed.

Dated: February 18, 2020

Boy Scouts of America and Delaware BSA, LLC

_____

Steven P. McGowan
Secretary and General Counsel

# **<u>EXHIBIT A</u>**
## **PLAN OF REORGANIZATION**
### **(previously filed)**

## <u>EXHIBIT B</u>
## LIQUIDATION ANALYSIS
### (to be supplemented)

## **EXHIBIT C**
### **FINANCIAL PROJECTIONS**
### **(to be supplemented)**