1

2

                        UNITED STATES BANKRUPTCY COURT
                             DISTRICT OF DELAWARE

3                                       .    Chapter 11
        IN RE:                          .
4                                       .    Case No. 20-10343 (LSS)
        BOY SCOUTS OF AMERICA and       .
5       DELAWARE BSA, LLC,              .
                                        .    Courtroom No. 2
6                                       .    824 North Market Street
                                        .    Wilmington, Delaware 19801
7                                       .
                          Debtors.      .    February 19, 2020
8       . . . . . . . . . . . . . . . .      10:30 A.M.

9                            TRANSCRIPT OF HEARING
              BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                     UNITED STATES BANKRUPTCY JUDGE

11      APPEARANCES:

12
        For the Debtor:            Derek C. Abbott, Esquire
13                                 Andrew R. Remming, Esquire
                                   Joseph C. Barsalona, II, Esquire
14                                 Eric W. Moats, Esquire
                                   Paige N. Topper, Esquire
15                                 MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                                   1201 North Market Street, 16th Floor
16                                 P.O. Box 1347
                                   Wilmington, Delaware 19899
17

18
        Audio Operator:           Ginger Mace
19

20      Transcription Company:    Reliable
                                   1007 N. Orange Street
21                                 Wilmington, Delaware 19801
                                   (302)654-8080
22                                 Email:  gmatthews@reliable-co.com

23      Proceedings recorded by electronic sound recording, transcript
        produced by transcription service.
24

25

1  APPEARANCES (Continued):

2  For the Debtors:        James F. Conlan, Esquire
                           Thomas A. Labuda, Esquire
3                          Michael C. Andolina, Esquire
                           Matthew E. Linder, Esquire
4                          SIDLEY AUSTIN LLP
                           One South Dearborn Street
5                          Chicago, Illinois 60603

6                          - and -

7                          Jessica C. Boelter, Esquire
8                          SIDLEY AUSTIN LLP
                           787 Seventh Avenue
9                          New York, New York 10019

10 For the U.S. Trustee:   David Buchbinder, Esquire
                           Hannah McCollum, Esquire
11                         UNITED STATES DEPARTMENT OF JUSTICE
                           OFFICE OF THE UNITED STATES TRUSTEE
12                         844 King Street, Suite 2207
                           Lockbox 35
13                         Wilmington, Delaware 19801

14
   For The Church of Jesus Adam J. Goldberg, Esquire
15 Christ of Latter-Day-   LATHAM & WATKINS LLP
   Saints:                 885 Third Avenue
16                         New York, New York 10022

17                         - and -

18                         Michael J. Merchant, Esquire
19                         RICHARDS, LAYTON & FINGER LLP
                           One Rodney Square
20                         920 North King Street
                           Wilmington, Delaware 19801
21
   For Girl Scouts of the  Eric Lopez Schnabel, Esquire
22 United States of        DORSEY & WHITNEY LLP
   America:                1000 N West Street, Suite 1410
23                         Wilmington, Delaware 19801

24

25

1   APPEARANCES (Continued):

2   For Abuse Survivors:        Mike Finnegan, Esquire
                                JEFF ANDERSON & ASSOCIATES
3                               366 Jackson Street, Suite 100
                                St. Paul, Minnesota 55101
4
                                - and -
5
6                               Stephen Neuberger, Esquire
                                THE NEUBERGER FIRM, P.A.
7                               P.O. Box 4481
                                Wilmington, Delaware 19807
8
                                - and -
9
10                              Paul Mones, Esquire
                                PAUL MONES PC
11                              13101 Washington Boulevard
                                Los Angeles, California 90066
12
                                - and -
13
14                              Stephen F. Crew, Esquire
                                CREW JANCI LLP
15                              1200 NW Naito Parkway, Suite 500
                                Portland, Oregon 97209
16
                                - and -
17
18                              Gilion Dumas, Esquire
                                DUMAS & VAUGHN
19                              3835 NE Hancock Street, Suite GL-B
                                Portland, Oregon 97212
20
                                - and -
21
                                Michael T. Pfau, Esquire
22                              PFAU COCHRAN VERTETIS AMALA
                                403 Columbia Street, Suite 500
23                              Seattle, Washington 98104

24

25

1  APPEARANCES (Continued):

2  For Interested Parties:   James Stang, Esquire
                            PACHULSKI STANG ZIEHL & JONES LLP
3                           10100 Santa Monica Boulevard
                            13th Floor
4                           Los Angeles, California 90067

5                           - and -

6                           James E. O'Neill, Esquire
7                           PACHULSKI STANG ZIEHL & JONES LLP
                            919 North Market Street, 17th Floor
8                           Wilmington, Delaware 19801

9                           - and -

10                          Ilan D. Scharf, Esquire
                            PACHULSKI STANG ZIEHL & JONES LLP
11                          780 Third Avenue, 34th Floor
                            New York, New York 10017
12
13 For Abused in            Richard N. Goldfarb, Esquire
   Scouting:                ZUCKERMAN SPAEDER LLP
14                          1800 M Street NW, Suite 1000
                            Washington, DC 20036
15
                            - and -
16
                            Richard S. Cobb, Esquire
17                          LANDIS RATH & COBB LLP
                            919 N Market Street, Suite 1800
18                          Wilmington, Delaware 19801

19
20 For Ad Hoc Committee:     Richard G. Mason, Esquire
                            WACHTELL, LIPTON, ROSEN & KATZ LLP
21                          51 W 52nd Street, Suite 29
                            New York, New York 10019
22

23

24

25

APPEARANCES (Continued):

```
JPMorgan Chase:          Matthew Ward, Esquire
                         WOMBLE BOND DICKINSON
                         1313 North Market Street
                         Wilmington, Delaware 19801

                         - and -

                         Louis R. Strubeck, Esquire
                         NORTON ROSE FULBRIGHT US LLP
                         2200 Ross Avenue
                         Dallas, Texas 75201
```

MATTERS GOING FORWARD:

#4)  Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (D.I. 3, Filed 2/18/20)

**Ruling: 63**

#5)  Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to the Prepetition Secured Party Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363 and 507; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b); and (IV) Granting Related Relief (D.I. 5, Filed 2/18/20)

#6)  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and (II) Granting Related Relief (D.I. 6, Filed 2/18/20)

**Ruling: 82**

#7)  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of Essential Vendors, Foreign Vendors, Shippers, Warehousemen, Other Lien Claimants, and 503(b)(9) Vendors, and (II) Granting Related Relief (D.I. 7, Filed 2/18/20)

**Ruling: 87**

#8)  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain and Administer Prepetition Customer, Scout, and Donor Programs and Practices and (B) Pay and Honor Related Prepetition Obligations, and (II) Granting Related Relief (D.I. 8, Filed 2/18/20)

**Ruling: 95**

#9)  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to File (A) a Consolidated List of Counsel Representing the Largest Numbers of Abuse Victims and (B) a Consolidated List of Other Unsecured Creditors of the Debtors, (II) Authorizing and Approving Special Noticing and Confidentiality Procedures, (III) Authorizing and Approving Procedures for Providing Notice of Commencement, and (IV) Granting Related Relief (D.I. 9, Filed 2/18/20)

**Ruling:  108**

#10)  Debtors' Motion for Entry of an Order (I) Extending Time to File (A) Schedules of Assets and Liabilities and Statements of Financial Affairs and (B) Rule 2015.3 Reports and (II) Granting Related Relief (D.I. 10, Filed 2/18/20)

**Ruling:  112**

#11)  Debtors' Application for Entry of an Order Appointing Omni Agent Solutions as Claims and Noticing Agent, *Nunc Pro Tunc* to the Petition Date (D.I. 11, Filed 2/18/20)

**Ruling:  114**

#12)  Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Services, (III) Approving Procedures for Resolving Additional Adequate Assurance Requests, and (IV) Granting Related Relief (D.I. 12, Filed 2/18/20)

**Ruling:  116**

#13)  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Using Existing Cash Management System, Including Existing Bank Accounts, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Business Forms; and (II) Waiving the Requirements of 11 U.S.C. § 345(b); and (III) Granting Related Relief (D.I. 13, Filed 2/18/20)

#14) Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Authorizing Applicable Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers, and (III) Granting Related Relief (D.I. 14, Filed 2/18/20)

**Ruling:  148**

#15)  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Obligations Under Shared Services Arrangements, (II) Authorizing Continued Performance of Obligations Under Shared Services Arrangements, and (III) Granting Related Relief (D.I. 15, Filed 2/18/20)

**Ruling:  163**

1  EXHIBITS:                          ID      Rec'd

2  Declaration of Brian Whittman                 63

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commence at 10:37 a.m.)

2               THE CLERK:  Please rise.

3               THE COURT:  Please be seated.  Mr. Abbott.

4               MR. ABBOTT:  Good morning, Your Honor.  Derek

5    Abbott of Morris Nichols Arsht & Tunnell here for the

6    debtors, Boy Scouts of America and Delaware BSA, Your Honor.

7               First, I want to thank the court for making this

8    time available.  I understand we dropped quite a large stack

9    of papers on Your Honor, and we'll talk about most of those

10   today.

11              I thought I would start, Your Honor, very quickly

12   by just introducing Jessica Boelter from Sidley, Your Honor,

13   who will be making most of the presentation, starting the

14   presentation, as well as Steve McGowan, Your Honor, general

15   counsel of the Boys Scouts.

16              THE COURT:  Mr. McGowan.

17              MR. ABBOTT:  And Brian Whittman who is from

18   Alvarez Marsal, our financial advisor.

19              The other thing I wanted to do, Your Honor, I know

20   there's a number of folks in the courtroom that are going to

21   want to say something today.  Ricky Mason from Wachtell

22   Lipton is here on behalf of the steering committee of local

23   councils.  I thought for today's purposes, I would just move

24   his admission *pro hac* so he could address the court in due

25   course.

1        THE COURT:  Of course.

2        MR. ABBOTT:  And then lastly, Your Honor, I have a

3 stack of proposed orders with redlines.  And I guess preview

4 of coming attractions, we have heard from two parties about

5 comments to our proposed orders.  They are the United States

6 Trustee and Mr. Stang representing a group of abuse claim

7 holders.

8        I think we've accommodated all of those objections

9 or will accommodate all of those.  And they're not so much

10 objections as clarifications and questions.  But I think

11 largely, we are there on the orders.  But if I could approach

12 with clean and blacklines, Your Honor, just so you have a

13 stack of them.

14        THE COURT:  Yes.  Thank you.

15        MR. ABBOTT:  And with that, Your Honor, I will

16 cede the podium to Ms. Boelter.

17        THE COURT:  Ms. Boelter.

18        MS. BOELTER:  Good morning, Your Honor.  Jessica

19 Boelter, Sidley Austin for the Boy Scouts of America and

20 Delaware BSA, LLC.

21        I think as Mr. Abbott alluded, we thought it would

22 make most sense, Your Honor, to start with a brief opening

23 statement to give the court a sense of some of the salient

24 points in our informational brief.  I'm not going to repeat

25 those points, but I'd rather sort of draw from those points

1  things that we think the court should be aware of and should

2  draw from the, I know what were hundreds of pages of written

3  materials that you received.  After we conclude that

4  presentation, we would then move toa presentation with

5  respect to the first day motions.

6              THE COURT:  Okay.

7              MS. BOELTER:  Thank you, Your Honor.

8              I'm going to start by providing the court with an

9  overview of the Boy Scouts of America.  Again, I'm not going

10 to belabor points that were covered extensively in the brief

11 or in Mr. Whittman's declaration.

12             I will then go to a brief description of how we

13 found ourselves in this courtroom today.  And then I'll

14 conclude by walking the court what our objectives are for

15 these Chapter 11 cases and how we intend to achieve those

16 objectives.

17             So starting with the overview of the Boy Scouts of

18 America. As I know Your Honor knows, we are charitable non-

19 profit, non-stock corporation.  We are a DC corporation.  We

20 were founded in 1910, actually February 8th of 1910, so we

21 just passed our 110-year anniversary.

22             We were subsequently chartered by Congress and

23 that law was signed into law by President Woodrow Wilson in

24 1916.  In fact, the Boy Scouts of America charter can

25 actually be found in the United States Code.  It's at 36 USC

1  30901 to 30908.  So, suffice it to say, the Boy Scouts of

2  America have had a long and rich history here in the United

3  States, its territories and military bases.

4        That history includes the fact that more than a

5  130 million Americans have participated as youth in our

6  programming.  And as that group of individuals has grown up

7  in the United States, they have appeared in every aspect of

8  our lives from business and cultural leaders.  They are

9  volunteer first responders.  They're politicians.  They're

10  our partners.  They're colleagues and friends.  People that

11  we deal with on a day-to-day basis.

12        The Boy Scouts, Your Honor, are so engrained in

13  the fabric of America that the famed American artist, Norman

14  Rockwell, painted dozens of paintings featuring the Boy

15  Scouts.  And that is just such a tribute to this

16  extraordinary organization.

17        But that is part of our very rich history.  The

18  Boy Scouts are still very much a part of America today.  We

19  are a vibrant and incredibly active organization and I'm sure

20  Your Honor saw, there are tons of -- not dozens of pages in

21  our informational brief and in our pleadings that describe

22  the programming that Boy Scouts offers to America's youth.

23        We do that through 81,000 units that are in

24  virtually every corner of the United States.  We have 2.2

25  million registered youth participants; 800,000 adult

1 volunteers, thousands of which, by the way, Your Honor,

2 actually parents of people that have children that

3 participate in scouting.

4 　　　　And since 2017, over 200,000 girls have

5 participated in scouting.  In fact, in 2020, we are going to

6 recognize our first class of female Eagle Scouts.  So, it's a

7 pretty exciting time for this organization.

8 　　　　The mission, Your Honor, of the Boy Scouts is to

9 train youths in responsible citizenship, character

10 development and self-reliance through a wide range of outdoor

11 activities, educational programs, and for older children

12 career-oriented programs.

13 　　　　Now, I've mentioned a mission and you probably saw

14 it repeated multiple times in our pleadings. We are aware

15 that Your Honor sees for profit corporations in Chapter 11

16 all the time.  Those for-profit corporations often have

17 mission statements.  We have a mission too.  But in this

18 case, the mission contains very special significance.

19 　　　　Unlike a for profit corporation, a not for profit

20 corporation actually has a fiduciary duty to preserve its

21 mission.  That fiduciary duty is part of the duty of

22 obedience.  So when we talk about the mission, it's not

23 simply because those are words that we live by, it's actually

24 a fiduciary obligation of our board, our senior management

25 team, and our organization to preserve the mission.  So that

1  will be a concept, Your Honor, that we return to again and

2  again in these Chapter 11 proceedings.

3         Now, I gave you the shorthand and I would be

4  remiss if I didn't give you the long-form version which also

5  appears in our statements.

6         The formal version of our mission is to prepare

7  young people to make ethical and moral choices over their

8  lifetime by instilling in them the values of the scout oath

9  and the scout law.  The scout oath is,

10         "On my honor I will do my best to do my duty to

11  God and my country and to obey the scout law, to help other

12  people at all times, to keep myself physically strong,

13  mentally awake, and morally straight."

14         The scout law says,

15         "A scout is trustworthy, loyal, helpful, friendly,

16  courteous, kind, obedient, cheerful, thrifty, brave, clean,

17  and reverent."

18         To be eligible for scouting, all of our youth

19  participants are volunteers and our leaders must sign up to

20  that law and that oath.  And as I said, Your Honor, that's

21  also a fiduciary obligation of our board of directors.

22         Now for a moment, I'm going to come back to some

23  mechanical issues concerning the Boy Scouts of America.  I'm

24  going to briefly review the organizational chart, the debt

25  structure, and sources of revenue before I turn to how we

1  ended up here, and you know what our objectives are for the

2  Chapter 11 case.

3       In order to do that, Your Honor, I do have a few

4  demonstratives, and I would like to hand them up if I can

5  approach.

6       THE COURT:  You may.

7       MS. BOELTER:  Thank you.

8       THE COURT:  Thank you.  Okay, Your Honor, I'm

9  going to start with reviewing the organizational chart.  And,

10 again, I'm going to do this in summary fashion.  If there are

11 questions that you may have from your review of the papers,

12 please don't hesitate to slow me down, but I think many of

13 these entities were covered fairly exhaustively in our papers

14 and, in particularly, Mr. Whittman's declaration.

15       As Your Honor, undoubtedly knows, there are only

16 two debtors in this Chapter 11 case -- the Boy Scouts of

17 America, you see at the top.  You received hundreds of pages

18 of information concerning the Boy Scouts of America.  It does

19 many things in terms of its youth programming.

20       The one thing that I think I would mention to the

21 court today is that the Boy Scouts of America, as you may

22 have seen in our papers, runs four high-adventure bases.  And

23 when we think about those high-adventures bases, they really

24 are the pinnacle of scouting.  I think of it as advanced

25 scouting.  It's what our young participants in Boy Scouts are

1  striving to achieve.  And, in fact, if you talk to

2  individuals that have attended any one of our four high-

3  adventure bases, they will tell you those are life changing

4  experience.

5          There are three that are actually owned by the

6  debtors, Boy Scouts of America.  That's the Northern Tier

7  which is located in the boundary waters of Minnesota, the

8  Philmont Scout Ranch which is located in North Eastern New

9  Mexico, and the Florida Sea Base which is located, as the

10  name suggests, in Florida.

11          The fourth high-adventure base that I mentioned,

12  Your Honor, which is Summit Bechtel Reserve, is operated by

13  the Boy Scouts of America but it's actually owned by a

14  separate entity on the org chart.

15          Just to draw your attention to that, if you look

16  in the lower left-hand corner, you'll see six sort of, I

17  guess, orange colored boxes.  It's the one Arrow West

18  Virginia, Inc., the top row on the left-hand side.  That is a

19  nondebtor in these proceedings, but it does happen to own the

20  Summit High-Adventure Base.

21          And we'll hear a little bit more about that entity

22  later when my partner, Mr. Thomas Labuda, presents the cash

23  collateral motion because that entity is liable with respect

24  to the JPMorgan debt.

25          You know a final note on Summit held at Arrow West

1  Virginia last year, and this will come up later, that entity

2  or that high-adventure base hosted a worldwide jamboree that

3  had over 45,000 participants from over 160 countries.  It's a

4  pretty remarkable property and very core to the mission that

5  we're delivering to the youth here in the United States.

6           The other debtor is Delaware BSA.  You'll see it

7  outlined in red.  That's a 501(c)(3) charitable and

8  educational entity.  It's not currently operational.

9           So why don't I move through the rest of the org

10  chart, and I'm just going to start on the upper left-hand

11  side and work my way around counter clockwise.

12           You'll see New World 19 LLC.  I mention the

13  worldwide jamboree that was held at the Summit, that entity

14  was essentially formed to facilitate that event.

15           Texas BSA, LLC is a Texas 501(c)(3) corporation.

16  Currently, it's a shell corporation without any operations.

17  We talked about Delaware BSA.  That brings us to BSA Asset

18  Management, LLC.

19           That entity is the general partner and the BSA

20  comingled endowment fund which I'll come back to.  But when

21  you think about BSA Asset Management, and you'll occasionally

22  hear us refer to that as BSAM, think of it as the investment

23  manager for that particular fund, which then brings me to the

24  BSA Comingled Endowment Fund LP.

25           Our team has often remarked that that is an

1  unfortunate name for this legal entity, because the funds in

2  this entity are not, in fact, comingled.  There are multiple

3  investors in the entity, mainly local councils which I'll

4  come back to and the Boy Scouts of America.  There are

5  limited partners. They own limited partnership interest in

6  that entity and they hold funds that are invested through

7  separate accounts in that entity.

8        BSA, as we sit here today, currently has $83

9  million dollars invested in the BSA Comingled Endowment Fund.

10 All of those funds are restricted.

11       You will then see, I'm going to move to the six --

12 I'm calling them orange, but I'm not sure that that's exactly

13 the right color; the six boxes to the left, the BSA Endowment

14 Master Trust.  This, quite simply, is we, on occasion,

15 receive donations that are required to be held in trust.

16 This is an actual trust that holds those donations. There's

17 about $5 million dollars there.

18       The National Boy Scouts of America Foundation --

19 immediately below that is a charitable DC non-profit, non-

20 stock organization that essentially provides support for

21 major fundraising efforts at the Boy Scouts.

22       Learning for Life is another District of Columbia

23 non-profit, non-stock entity.  It administers the Boy Scouts'

24 exploring club which is essentially a career educational

25 program for young men and women.

1          We've covered Arrow and then that brings me to the

2   two Canadian entities: Atikokan and Antikaki.  These two

3   entities actually -- so I mentioned the high-adventure base,

4   the Northern Tier, which is in the boundary waters of

5   Minnesota.  As the name suggests, those boundary waters

6   actually are on the border of Minnesota and Canada.  These

7   entities operate the Canadian side of the Northern Tier.

8          And then, finally, Your Honor, you'll see the

9   green box in the middle.  That is the local councils and we

10  also have chartered organizations.  We're going to talk more

11  about the local councils and chartered organizations when we

12  get to the shared services agreement motion.  But because

13  this concept touches many aspects of the BSA, I thought it

14  might make sense to give you just a very brief overview.

15         If you turn to the second demonstrative chart that

16  I handed up, Your Honor, you can see that this is our effort

17  to depict in a picture how BSA's mission is delivered to the

18  2.2 million youth that I cited before.

19         So, you'll see on the left-hand side, BSA

20  National, a singular organization, and you'll see on the far

21  right-hand side we have 81,000 units.  What connects BSA to

22  81,000 units it's two sets of organizations.  The local

23  councils, there's 261 one of them.  They are separate,

24  independent 501(c)(3) organizations.  And then they work to

25  with our chartered organizations, and there are 41,000

1  chartered organizations.

2        When I say chartered organization, I would think

3  of that as a church, a synagogue, a school, another civic

4  organization within the community that permits the unit and

5  the troop to actually use their premises for scout meetings

6  or recruits leaders out of their individual chartered

7  organization to be a unit leader within scouting.  But that's

8  how we get our mission from the singular BSA, all the way

9  down to the 2.2 million individuals that participate in our

10 units.

11        You may have seen -- I should say one more thing.

12 I think this is very clear to the court, but we want to make

13 sure it's clear to the audience in the courtroom as well.

14 The local councils and chartered organizations are not

15 debtors in this Chapter 11 proceedings.  The preceding only

16 pertains to Boy Scouts of America and Delaware BSA, LLC.

17        You may have seen in our papers, Your Honor, that

18 approximately six weeks before the petition date, the local

19 councils formed an ad hoc committee. The chair of that ad hoc

20 committee is actually in the courtroom today.  In fact, you

21 just admitted him *pro hac vice*, Mr. Ricky Mason from the

22 Wachtell firm.  I understand when I'm done with my remarks

23 that he may want to make a few opening remarks to the court.

24 And then I also understand that we have a representative of a

25 chartered organization who may want to approach the court

1  when we're done as well.

2         So that brings me to, again, a very brief overview

3  of the BSA liabilities.  Our only funded debt is held by

4  JPMorgan.  I'm not going to go into detail on that now

5  because, again, my partner, Mr. Labuda, will review the

6  JPMorgan debt when we get to cash collateral.

7         The organization also has around $20 million

8  dollars of trade debt.  We have $23.6 million dollars of

9  retiree claims which approximately eight million of that is

10  allocable to retirees and employees of the local councils.

11  And we will touch on that briefly when we discuss the shared

12  services motion.

13         We also have non-abuse claims, Your Honor.  As I

14  just mentioned, we have high-adventure bases.  And while we

15  take extreme safety precautions, unfortunately, accidents do,

16  on occasion, happen at our high-adventure bases.  And when

17  they do, they result in claims against the organization.

18         And then, finally, Your Honor, that brings me to

19  the sexual abuse liability of the organization.

20         As of the petition date, there were 275 pending

21  filed civil actions.  Now, this week, Your Honor, the

22  National Chair of the Boy Scouts of America, Mr. Jim Turley,

23  issued an open letter to victims where he apologized to all

24  victims of child abuse and scouting.

25         I reiterate that apology here today.  BSA cares

1  deeply about all victims of child sexual abuse, and we urge

2  through these proceedings and otherwise for those victims to

3  come forward.

4        Now I say that, Your Honor -- I also want to be

5  mindful of the fact that during the course of this

6  proceeding, we on the BSA side, may not always see eye to eye

7  with the attorneys for the plaintiffs.  That should not be

8  interpreted as a failure on our side to appreciate the

9  tremendous hardship that their clients have endured.  It

10  should not detract from our commitment to provide equitable

11  compensation to their clients, nor should it suggest or

12  detract from BSA's commitment to safety in scouting.

13        With that, Your Honor, I would like to just move

14  to the final sort of nuts and bolts piece of the BSA overview

15  and that's our sources of revenue.

16        This organization has between $350 to $400 million

17  dollars of gross and that's an important point, their gross

18  revenue annually.  Some of the big baskets of that revenue

19  are donations, both restricted and unrestricted, and that's

20  around $30 million dollars.  Membership fees, these are fees

21  that are paid by or on behalf of because they're paid by

22  parent's individual scouts.

23        In 2019, that number was around $62 million.  Due

24  to the increased costs of ensuring this organization, we've

25  had to increase our membership fees and we expect revenue in

1  the realm of approximately $100 million dollars in 2020 from

2  membership fees.

3           We get fees from high-adventure bases.  That's

4  around or that was around $58 million dollars in 2019.

5           We received revenue from our scout stores and our

6  online scout sales, that's around $120 million dollars.

7           We do have investments with respect to our

8  donations.  And during 2019, our investment gain was around

9  $50 million dollars.

10           And then finally, Your Honor, the local councils

11 pay fees to the national organization.  Again, we'll come

12 back to that in connection with the shared services motion.

13 That's around $9 million dollars. And then we have other

14 interest like Scout Magazine and oil and gas interest that

15 account for the Delta.

16           So that concludes our presentation on the

17 overview.  Let me, if it's okay with the court, turn briefly

18 to the background of the filing, why we're here today.

19           In 1988, the BSA adopted enhanced youth protection

20 strategies and has continued to enforce robust youth

21 protection policies. That has resulted in a dramatic decrease

22 of child sexual abuse claims related to the BSA.

23           That being said, in recent years, as you may have

24 seen in the informational briefs, states have begun changing

25 the lookback period for child sexual abuse claims.  Coupled

1   with that, societal norms have reduced the stigma on victims

2   for coming forward.  And, by the way, we think that's a good

3   thing.

4           As a result of these events, BSA has been

5   subjected to an increase number of historical sexual abuse

6   claims.  As I mentioned, there were 275 pending claims as of

7   the petition date, and we have been informed of, at least,

8   one thousand additional claims that are subject to further

9   review and investigation.

10          It became clear over a year ago that BSA could not

11  fulfill its mission which is its fiduciary obligation without

12  attempting to come up with a global solution for the abuse

13  claims.

14          To that end, you probably saw in our papers a

15  future claimant's representative was appointed pre-

16  bankruptcy, Mr. Jim Paton. We also began discussions with an

17  ad hoc group of plaintiffs represented by Mr. Jim Stang of

18  the Pachulski Stang law firm.  All of those discussions

19  ultimately resulted in a mediation in November of 2019.

20          All the parties came to the table.  We actually

21  think we had some very productive discussions. From our

22  perspective, we thought a process had been put in place or

23  that we were proposing that could potentially globally

24  resolve abuse liability through a prepackaged or prearranged

25  bankruptcy proceeding.  As you know, because I'm standing

1 here now, that was not successful.

2          You know what we heard from plaintiffs at a very

3 high-level and over the course of the last year was that

4 local councils needed to provide enhanced contributions in

5 order to receive a release.  And we also received feedback

6 that they wanted the oversite of a Federal Bankruptcy Court

7 over the process, not only because they wanted the Federal

8 Bankruptcy Court to, you know, review the asset information

9 that we were providing to the plaintiffs, but they also

10 thought it was critically important that a bar date be

11 established.  So when the mediation failed, Your Honor, we

12 found ourselves preparing for this managed Chapter 11 filing.

13          Our objectives in this filing are essentially

14 twofold.  We want to provide for equitable compensation to

15 victims of abuse and we want to preserve our mission.  We

16 think it's critically important for both of those objectives

17 that this organization expeditiously exit Chapter 11.  It's

18 essentially to provide relief to victims and its essential

19 for the preservation of our mission.

20          Why is that?  Our ability to develop and provide

21 our mission to the youth in America, all of the young men and

22 women is completely dependent upon parents and charitable

23 donors.  Parents are our number one source of volunteers and

24 they are also providing fees, as I mentioned before, in

25 excess of $100 million dollars of fees for their children to

1  participate in BSA programming.  They have a lot of options

2  for their kids and we want them to continue to choose

3  scouting.

4          Now we know that our scouting families are strong

5  and resilient and they know that scouting is safe.  But a

6  prolonged bankruptcy proceeding has the acute risk of eroding

7  the trust and confidence that our parents have in this

8  organization.  So, from our perspective and for our parents

9  and or youth, we need to move through this bankruptcy as

10 quickly as possible.

11         Also, on that side of things are charitable donors

12 that I mentioned.  By definition, these are voluntary

13 donations to a charitable organization.  Our donors want to

14 know that their dollars are being spent on the mission and

15 not being spent on what's happening this courtroom and on the

16 legal fees and other fees that are generated by this

17 courtroom.

18         It is absolutely essential that we convey to our

19 parents and donors that while scouting is going to continue

20 during the course of these cases, we absolutely need to

21 expeditiously get out of bankruptcy so we restore their trust

22 and confidence in this organization.

23         So how do we want to achieve our goals?  And,

24 again, our goals are equitable compensation for victims,

25 mission preservation, expeditious exit from Chapter 11.

1              We put together a four-part approach to these

2    proceedings. First part, we are prepared to provide immediate

3    transparency to the official committee or committees that are

4    appointed in these cases on key issues.  As I sit here today,

5    we have already established data rooms that contain asset

6    information on BSA -- and, by the way, including

7    documentation concerning gift restrictions with respect to

8    our assets.

9              We provided into the data room BSA liability

10   information, BSA financials, information concerning local

11   council assets and insurance information concerning the BSA.

12   We are ready to make this information available to the

13   official committees once they are appointed.  In fact, to

14   facilitate that, we filed, as an exhibit to the informational

15   brief, a draft of proposed protective order that we would use

16   as soon as those official committees are appointed, and we

17   stand ready to talk to the official committees about that

18   protective order once one or more is appointed.

19             And I shouldn't leave to Mr. Paton.  We view him

20   as an official representative as well.  We would be filing a

21   motion before the court to have him appointed and the same

22   protocol would apply to him.

23             The second part of our four-part approach is that

24   we want to establish immediately processes to resolve what we

25   know are going to be gating issues.  On the petition date, we

1   filed a bar date motion.    That's obviously not before the

2   court today.    But as I noted for Your Honor, we heard loud

3   and clear from the plaintiff lawyers that they thought a bar

4   date was critically important in these Chapter 11 cases. We

5   filed that motion.    We've indicated in that motion.    We

6   expect to supplement that motion particularly with respect to

7   notice to unknown claimants which is I know a topic that is

8   of particular concern to not only us, but also them. We

9   expect to have those discussions with the official committee

10  once its appointed.

11          So, we've got that out there and we're ready to go

12  as soon as the committee has had the opportunity to review

13  it.

14          We also, Your Honor, filed on the petition date a

15  scheduling motion that proposes a process to resolve key

16  disputes concerning our assets.    Your Honor, we've look at,

17  for example, the Diocese cases.    There are some parallels

18  because they involve abuse liability but also as charitable

19  organizations, they have asset restrictions.

20          In the vast majority of the Diocese cases, the

21  official committees actually filed complaints to determine

22  asset restrictions that the debtor had placed.    We understand

23  that that's likely going to happen here.

24          Rather than sitting back and waiting for that to

25  happen, we filed on the petition date a motion to establish a

1 schedule to deal with asset disputes.  That's not before you

2 today.  And we look forward to discussing that schedule,

3 again, with the official committee, once its appointed, but

4 we wanted to hit the ground running.

5          The third part of our four-part approach.  The

6 debtors really need breathing room with respect to all of the

7 abuse litigation.  To give us a chance to succeed, we need

8 all abuse litigation to stop.

9          Now as you know, the debtors have the benefit of

10 the automatic stay.  But in several instances of abuse

11 litigation, we have been named as co-defendants with the

12 local councils and chartered organizations that are relevant

13 to that particular piece of litigation with respect to the

14 exact same claims.  Because of that, concurrently with the

15 petition, we commenced an adversary proceeding.

16          We filed with that adversary proceeding, a request

17 for a preliminary injunction to stay abuse litigation with

18 respect to the name chartered organizations and local

19 councils.  We intend to set that up on normal notice.  We

20 recognize that the committee, once appointed, may want to

21 have a say in that litigation.

22          So that's how we intend to proceed but it's really

23 important to note, Your Honor, that while we've set that up

24 on normal notice, we think that it's possible we could be

25 back before this court in the next few days, if not week, to

1  discuss a TRO if the underlying litigation is not voluntarily

2  stayed.

3          To compliment this aspect of our approach to these

4  cases, we also filed removal papers with respect to state

5  court litigation.  That occurred on the petition date and I

6  believe if it's not yet completed, it's almost completed.

7  And we also stand ready to file a motion in the District

8  Court for Delaware seeking nationwide transfer of all of that

9  litigation into Delaware.

10          The fifth or, excuse me, the fourth and final

11  aspect of our approach to these Chapter 11 cases is really

12  something that I think resonated when I began this component

13  of my remarks.  We really have to drive to a global

14  resolution of these cases sooner rather than later.

15          To that end, on the petition date, we filed a plan

16  and disclosure statement.  We view that plan and disclosure

17  statement as a placeholder and we hope that they can be used

18  in future negotiations with all of the key constituents that

19  are represented here today and may be represented in the

20  cases.

21          We also filed on the petition date, Your Honor, a

22  motion to appoint a judicial mediator. That is not before the

23  court today.  We will likely be discussing that with you at

24  the second day hearing.  But, again, we think this case is

25  ripe for the immediate appointment of a judicial mediator.

1  We've been at this for over a year.  We know what the issues

2  are, but we'll discuss that with you when we come back for

3  the second day hearing.

4          So to conclude, Your Honor, the scout motto is to

5  be prepared. That's exactly what we are.  We are prepared to

6  work as hard as possible with all of the constituents to

7  reach a resolution of these cases as expeditiously as

8  possible.  We hope the other constituents will support us in

9  that approach, but that's really where we're going with these

10  Chapter 11 cases.

11          With that, unless Your Honor has any other

12  questions, I know there's a couple of folks that want to take

13  the podium and provide some opening remarks, so I'll cede it.

14          THE COURT:  Thank you.

15          MS. BOELTER:  Thank you.

16          MR. MASON:  Good morning, Your Honor.  Ricky

17  Mason, Richard G. Mason appearing in my capacity as the

18  volunteer chair of the ad hoc committee of local councils.

19          I'm also honored to be the volunteer president of

20  the Greater New York Councils which serves tens of thousands

21  of scouts in the five boroughs of New York City.

22          And I'm also a bankruptcy lawyer and the chair of

23  the restructuring and finance department at the Wachtell

24  Lipton Rosen & Katz law firm.

25          I hope Your Honor will not take insult when I say

1  that while it is always a pleasure to be in this court with

2  all of my friends from Delaware, this is not quite so true

3  today.

4          I've had a lifetime affiliation with scouting,

5  starting when my mother told 11-year old Ricky to join the

6  troops sponsored by my synagogue in Richmond, Virginia and to

7  become an Eagle Scout as my older brother did.  I was told to

8  follow in his path.

9          I fulfilled her wish.  It seemed like the safest

10 thing to do and earned my eagle badge at the age of fourteen.

11 I attended Philmont which Ms. Boelter described, New Mexico

12 high-adventure base that you'll hear a lot about in these

13 proceedings.  And I hiked its tallest mountain 12,500 feet

14 the wrong way, straight up the face, thanks to a ranger named

15 George, whom I will never forget and neither will any of you

16 now.

17          Scouting transformed me and helped to make me who

18 I am today.  But there's nothing particularly unique about

19 me. Scouting has millions of adult volunteers who are

20 dedicated to its mission.  Eight of those volunteers,

21 including me, sit on the ad hoc committee of local councils.

22 The committee is drawn from across the United States to give

23 the 261 separate local councils an informal voice as a group

24 in connection with these proceedings.

25          To be clear, Your Honor, we are not fiduciaries

1  for the local councils and the committee has no authority to

2  bind them.  But if the court pleases, we do anticipate

3  speaking for local council interest at appropriate times in

4  this case privately and, perhaps, publicly like today.

5          Your Honor, to explain very briefly, as Ms.

6  Boelter said, the local councils are responsible for

7  delivering the mission of scouting in their communities,

8  consistent with the charters that they have received from the

9  National BSA.

10         As Your Honor knows and Ms. Boelter indicated, but

11 to reiterate for the public and the media, no local council

12 has filed for bankruptcy.  There are cub scout packs, scout

13 troops, explorer posts, camps and other facilities and

14 programs are open and operating today.

15         Each local council was a charity organized under

16 the laws of its own state and overseen by a volunteer board.

17 Council owns its own property and investments.  And this, in

18 other respects, the local councils are independent of the BSA

19 and also of each other.

20         The local council employs its own scout staffers

21 from field and camp staff, all the way up to the scout

22 executive.  Local council employees are paid with council

23 funds raised in the community.  They might also be

24 beneficiaries under medical and retirement programs with the

25 National BSA.

1              Your Honor, scouting can be thought of as similar

2    to a franchise organization and the local councils are in the

3    position of the franchisees.  To illustrate my own council,

4    the Greater New York Councils, is a 501(c)(3) charity

5    organized under New York law and overseen by the volunteer

6    board of which I am honored to be the president.  We have a

7    full-time staff led by a scout executive.

8              In New York we serve tens of thousands of kids in

9    our various programs and all income levels throughout the

10   city and we own three very active camp properties in New York

11   and New Jersey.  Without us, Your Honor, many of the kids in

12   our program would have no other youth activity to which they

13   could turn.

14             Now, Your Honor, as scouting volunteers my

15   colleagues and I have been horrified to read about the claims

16   of abuse that have led to this proceeding.  Any incident of

17   abuse of a child or young person is one incident too many.

18   This is why starting in the 1980's scouting implemented, and

19   continues to this day, some of the most stringent youth

20   protection protocols in the country.  But, regrettably,

21   today's robust protocols are cold comfort to people who were

22   abused in an earlier era.

23             We support the BSA's effort in this Chapter 11

24   proceeding to find an equitable solution to the abuse claims

25   while continuing the mission of scouting.

1          A few words, Your Honor, about the ad hoc

2   committee's participation in the BSA's effort to resolve

3   these issues.

4          Media reports have highlighted the ostensible net

5   worth of councils across the country and some of the

6   claimant's attorneys have said that we are rich.

7   Respectfully, Your Honor, the committee submits that a

8   reality check is in order.

9          And so, with the BSA's support, we have been

10  working with the local councils to populate a database with

11  information about their assets to be made available to the

12  claimant's attorneys and other stakeholders upon your entry

13  of a protective order.

14         As I'm sure Your Honor can imagine to gather and

15  obtain such information voluntarily from 261 independent

16  entities, each with its own board, is quite an exercise.  It

17  has not made me a popular person in many quarters of the

18  country.  But, nevertheless, from a standing start a few

19  weeks ago, the project is well underway, and I hope it will

20  be largely concluded soon.

21         If my own councils' finances are any guide, I

22  think we will see that most of the local council investments

23  have donor restrictions that make them unavailable for

24  anything other than their dedicated purpose under state law.

25  Same might well be true of our camp properties which are core

1 to our mission and, in many cases, have legal or practical

2 restrictions that make them usable only as camps.  But the

3 facts will be what they will be and they should be known

4 soon.

5         A final word, Your Honor, about this case and

6 where it is going.  The motions will be high here; certainly,

7 higher than in other Chapter 11 proceeding in my own thirty-

8 odd years of experience.  On the one hand, you will see

9 victims of abuse outraged, appropriately, about the conduct

10 to which they were subjected.  And on the other, scouters,

11 like me, who while horrified by that abuse and supportive of

12 efforts to address it, are determined to continue the mission

13 of scouting in the safe and effective manner in which it

14 serves millions of kids today.

15         The legal issues are very complex and the stakes,

16 if you will, Your Honor, are quite high.  Interest across the

17 country is intense.  This is, as they say, a cultural moment.

18 A non-profitable organization like the BSA would be

19 challenged to survive in a long and contentious Chapter 11

20 and, if it doesn't, literally millions will suffer from its

21 failure.

22         So, we think the best path here, Your Honor, is a

23 mediated solution.  Indeed, in my view, the case will cry out

24 for one where all parties are put into a room by you to see

25 if a consensual solution can be achieved sooner rather than

1  later.

2          When it's before you, Your Honor, I hope that you

3  will favorably consider the motion for appointment of a

4  mediator by the debtors that was filed last night.   Thank

5  you.

6          THE COURT:   Thank you.

7          MR. GOLDBERG:   Your Honor, Adam Goldberg of Latham

8  & Watkins on behalf of the Church of Jesus Christ of Latter

9  Saints, if I may be heard very briefly.

10          THE COURT:   Mr. Goldberg.

11          MR. GOLDBERG:   Thank you, Your Honor.

12          The Church of Latter-Day Saints is one of the

13  chartered organizations which as described with the local

14  councils plays a key role in the overall scouting experience.

15          The church has a very long history of involvement

16  with the Boy Scouts having been a chartered organization for

17  105 years until the end of 2019; that is going back virtually

18  to the inception of the Boy Scouts.

19          The church is a co-defendant with the Boy Scouts

20  in a number of the actions that the debtors have described

21  and are subject to the debtors' motion to remove.

22          As a charter organization, the church is also a

23  co-insured party under certain of the debtors' insurance

24  policies and the church expects to be a claimant in these

25  cases.

1              I rise just to introduce myself and also my

2    partner, Jeff Bjork, on the phone today to Your Honor and to

3    the parties in the courtroom so that we may have an

4    opportunity to work together.

5              The church supports the debtors' goal in

6    delivering timely and equitable compensation to the victims

7    of abuse and we share in the debtors and Mr. Mason's

8    recognition of this historical moment of these cases.

9              I look forward to being a productive part of the

10   solution.  Thank you for your time, Your Honor.

11             THE COURT:  Thank you.

12             Mr. Schnabel.

13             MR. SCHNABEL:  Good morning, Your Honor. For the

14   record, Eric Lopez Schnabel of Dorsey & Whitney on behalf of

15   the Girl Scouts of the United States of America.

16             Your Honor, I rise just to make two brief points

17   today.  First, I want to make crystal clear for the record so

18   as to avoid any confusion whatsoever that the Girl Scouts are

19   wholly unrelated and not affiliated with the Boy Scouts and

20   their debtors.

21             The Boy Scouts filed for bankruptcy.  The Girl

22   Scouts have not.  Your Honor, the Girl Scouts balance sheet

23   is strong and we continue to operate as the preeminent best-

24   known leadership development services for American girls, as

25   we have done for over a hundred years.

1            Now, Your Honor, I make this point, unfortunately,

2    because the Boy Scouts through their conduct have caused

3    people to confuse the Boy Scouts and the Girl Scouts, even

4    though they are separate and distinct entities and they have

5    historically served boys and girls separately, historically.

6            Your Honor, that transitions to point number two

7    I'd like to make today.

8            Point number two is that in November of 2018, the

9    Girl Scouts filed a trademark infringement lawsuit against

10   the Boy Scouts in the Southern District of New York. That

11   action seeks to enjoin the Boy Scouts from using actual Girl

12   Scouts' intellectual property such as the term Girl Scouts or

13   using other terms like Scouts or Scout or Scout BSA or Scout

14   BN that have caused rampant marketplace confusion in

15   connection with services for girls.

16           Your Honor, the District Court action seeks

17   damages and an injunction against the Boy Scouts.  Now,

18   although the prepetition -- the damages relating to

19   prepetition conduct are obviously now going to be a general

20   unsecured claim in this bankruptcy case, likely, I think, the

21   largest general unsecured claim in this bankruptcy case.

22           The injunctive relief for infringement seeks to

23   enjoin the Boy Scouts from conduct that is ongoing and

24   continuous.  It's post-petition.  So, accordingly, that

25   aspect of the suit, that aspect of the infringement, the

1  injunction, is not subject to the automatic stay.

2           So, Your Honor, I wanted to preview these

3  different issues we have in connection with that lawsuit, so

4  the court will understand that this is something we're going

5  to bring to Your Honor's attention and seek certain relief

6  upon in the very near future, likely on an expedited basis.

7           And unless you have any questions, Your Honor,

8  that's all I have at this time.

9           THE COURT:  No questions.

10          MR. SCHNABEL:  Thank you, Your Honor.

11          THE COURT:  Thank you for the preview.

12          MR. O'NEILL:  Good morning, Your Honor.

13          THE COURT:  Good morning.

14          MR. O'NEILL:  James O'Neill, Pachulski Stang Ziehl

15  & Jones appearing.  We have a number of interested parties

16  that we're working with in the case.

17          I wanted to introduce to the court my partner,

18  James Stang -- Jim Stang who's been active in these cases

19  prepetition. We will file a motion for his admission *pro hac*

20  *vice* at the appropriate time.

21          THE COURT:  Thank you, Mr. O'Neill.  Mr. Stang.

22          MR. STANG:  Good morning, Your Honor.

23          Your Honor, there are, at least, ten law firms

24  present today that would like to make very short comments to

25  you after I'm done.  They all represent child sexual abuse

1  survivors and in total probably more than 2700.

2           Your Honor, since 2018, fall of 2018, my law firm

3  has been consulting to one degree or the other with these ten

4  law firms and others.  I'm referenced in the papers as

5  counsel for an ad hoc committee.  At certain times from that

6  period to today, there has been an ad hoc committee with

7  organizational type documents.  And sometimes that has broken

8  down because conversations with the Boy Scouts was going

9  nowhere fast and the group kind of dissipated and they came

10 back together again as conversations aimed up.

11          If I'm fortunate enough to be selected as

12 committee counsel, of course, we'll spill out all those

13 relationships for the court.

14          I was asked to consult with these firms because

15 since 2004, I have represented fifteen creditors committees

16 focused on child sexual abuse in Catholic Diocese or

17 religious order cases, including the case of the Diocese of

18 Wilmington.

19          I was counsel to the creditors committee in the

20 Weinstein Company case and I'm currently counsel to the

21 Womens and U.S.A. Gymnastics who, for the most part, were

22 abused by Larry Nassar.  And I tell you that because while

23 every case is different and every judge is different, there

24 may be occasions when that experience can be helpful to the

25 court and to the process.  And I just wanted you to know my

1    personal background in doing these cases.

2              These cases are extremely complex and they're very

3    challenging.  Your colleagues on the bench who have had to

4    deal with these cases have said on the record and off the

5    record that they are unlike any case they have ever had.

6    And while the church cases involve First Amendment issues

7    that are somewhat unique, and this one doesn't, the legal

8    issues are complex, the non-profit issues, the Delaware

9    restrictions that you've heard about, but there's also the

10   very nature of the claims.

11             It was fifteen minutes into Ms. Boelter's

12   presentation before she noted why we are here.  We're not

13   here because the Boy Scouts do such a great job taking care

14   boys or training boys.  There's a very dark side to their

15   history. And while that was ultimately acknowledged in her

16   one minute or less statement of apology before she got into

17   the details of why they were here, I think Mr. Mason was,

18   frankly, a little more appropriate given the sex abuse

19   constituency sentiments.

20             It spoke volumes to us.  And it spoke volumes to

21   hear about their fiduciary duty to their mission.  I didn't

22   hear the phrase fiduciary duty to creditors which is a pretty

23   sterile term, even that when you're talking about men who are

24   sexually abused as children.

25             They came to this court voluntarily.  They cannot

1  be put into bankruptcy because of their non-profit status.

2  The balancing between the fiduciary duty to their mission and

3  the fiduciary duty to the men who are children when they were

4  sexually abused was something that I found utterly lacking.

5          The people who are going to come before you as

6  creditors are their average ages probably in excess of forty

7  years old.  But we can't forget, I don't forget, no one in

8  this courtroom should forget, that these were the children of

9  their respective communities.

10         There's a child advocacy organization called Child

11 USA which published something yesterday about the data that

12 they have on the claims in this case.  Some of that data has

13 been shared by some of the plaintiff's law firms, but not

14 all.

15         Child USA noted that the range of age of children

16 who were abused while they were scouts and because they were

17 scouts was 5 years old to 17 years old.  The average age of

18 these children was 12 years.  And the average duration of

19 their abuse was two years.

20         And taking that average that wasn't once during

21 the -- twice during the two years.  In instances that will be

22 conscious shaking, I don't know how to describe it, multiple

23 times during those years; sometimes multiple times during a

24 month.  We can't forget that.  That's why we are here.

25         And we ask survivors to fill out proofs of claim

1  forms under the debtors' proposal, eighty days from the time

2  their told they have a deadline, these are not sixty-year-old

3  men filling out their claim forms.  As someone observed to

4  Judge Warren in the Diocese of Rochester case, just a few

5  days ago, when we were going through the proof of claim form,

6  these are eight-year-old children filling out the forms.

7  They're being asked to go back to very painful memories,

8  decades ago, to recall facts that the debtor wants to have,

9  what the counsels want to have, that their insurers want to

10  have, often times without appreciating the journey these men

11  are going to be going through to come up with this

12  information, even if their memories are perfect as to what

13  happened.

14          Mr. Mason talked about emotions.  People will be

15  emotional.  People will be angry.  And the message -- and I'm

16  sure -- he's right.  People are emotional, people are angry.

17          But what I want to address for a few minutes is

18  how survivors perceive that sort of comment and also this

19  entire process which as counsel pointed out even for someone

20  with your experience, with our experience is a lot of paper.

21  And I think someone said hundreds and hundreds of pages.  How

22  does that feel to an abuse survivor?

23          And I'll tell you, I've met some abuse survivors

24  who are bankruptcy professionals and its overwhelming.

25  People are emotional.  People are angry, but that doesn't

1  mean they're unreasonable.  That doesn't mean that they don't
2  understand what is happening to them.

3          And that comment makes -- I've heard it before and
4  I'm not imputing any intentions to Mr. Mason when he said
5  that, other than good ones, but it starts to infantilize, if
6  that's the right pronunciation, people who are adults, and in
7  some ways, they are children.  But to say, to suggest to
8  imply to them, that's how they might hear it, that they can't
9  make decisions about their rights is injurious in itself.

10          The -- a common characteristic of an abuse
11  survivor is that they feel powerless.  They lost control over
12  their bodies when they were eight years old because someone
13  touched them and abused them.  They lose control in their
14  relationships with their children.  I've had abuse survivors
15  tell me they can't hold their children for fear that they
16  will hold them too long.

17          They can't talk to their parents about this
18  because the parents -- the guilt for not protecting your
19  children is enormous.  And I now a lot of abuse survivors who
20  will not come forward until their parents have died because
21  they don't want them, the parents, to have to confront what
22  they might perceive as having allowed it to happen to their
23  kids.

24          I describe what happened -- and let's not forget
25  this.  This is a crime against these men.  This was criminal

1  conduct against these men.  And it's a generational crime

2  because of the impact on their children, grandchildren, and

3  other members of their family because it takes someone and it

4  has distorted them and hurt them.

5        So, when they get hundreds of pages of pleadings

6  or hear about them, pleadings that go from soup to nuts, that

7  tells them, in effect -- this is what they hear.  I'm not

8  imputing an intention to the Boy Scouts, that they meant

9  this.  But what the survivor hears is you're powerless again.

10  Yeah, you went into State Court and you sued someone, you

11  sued your perpetrator, you sued the BSA, you sued the local

12  council, you may have even taken some discovery.

13        Your Honor, I'm very sorry.  I thought I had cut

14  that off.

15        You may have even taking discovery.  You are on

16  the verge of picking a jury.  There's a jury in Oregon that's

17  supposed to be picked next week.  You now have

18  accountability.  And all of a sudden, that's lost, and it's

19  lost in a blizzard of paper.

20        They did not have to file as a first-day pleading

21  a mediation motion.  They did not have to file as a first-day

22  pleading a bar date motion -- which, incidentally, is 80 days

23  from notice.  When you have jurisdictions like New York, New

24  Jersey, and California, which, through intensive legislative

25  effort, have fixed appropriate periods of time for people

1 coming forward, through these statute of limitations windows.

2 They did not have to file a disclosure statement the first

3 day, they did not have to file a plan the first day.  They

4 did not have to file a scheduling order on restricted assets

5 that is one of the most aggressive schedules I have ever seen

6 in my 15 years of representing people in these cases, where

7 restricted assets is a big deal.

8         And while there was -- if we had to use the term

9 "Ad Hoc Committee," it's a shorthand for what was going on

10 with the plaintiffs and how they coordinate their counsel.

11 In the last 60 days, 90 days, no effort was made to show me

12 or the people they were dealing with at that mediation, draft

13 pleadings not with stay in effect, we asked.

14         So, again, I'm not standing up here telling you

15 that there was a litigation strategy by the Boy Scouts to

16 hurt survivors by all these pleadings.  But I want you to

17 have some appreciation from the perspective of an abuse

18 survivor how this all feels and how they react.

19         There are a couple of issues that Ms. Boelter

20 touched upon about how they want to progress in the case that

21 I just want to comment on.  And I appreciate that lots of

22 what was said is their presentation.  You're not making

23 findings of fact today, you're not making conclusions of law.

24 There may be a couple of pleadings where we ask you to just

25 reiterate that you're not doing that, like in the cash

1  management motion.  But we'll try to keep that to a minimum

2  because we understand this is just kind of introduction for

3  you.

4          But the Boy Scouts are a donation-based

5  organization.  In lots of cases -- mostly the church cases --

6  donations are solicited with a footnote, sometime a fairly

7  large-font footnote that says none of the money will be used

8  to pay sex abuse settlements because the solicitor is

9  convinced that no one will give money to pay for sex abuse

10  claims.

11          Now I don't know if that's true.  Some people

12  think that's kind of almost in conventional wisdom.  In the

13  gift annuities motion -- which we'll get to -- they make

14  reference to a certain balance going to their charitable

15  mission.  I don't know if that's a solicitation, that it has

16  to impute donative [sic] intent by the person making the gift

17  annuity.  But we are very concerned -- again, fiduciary duty

18  to creditors, fiduciary duty to abuse survivors -- that the

19  Boy Scouts, in soliciting their donations, are doing so in a

20  way that meets their fiduciary duty as a debtor-in-

21  possession.

22          Second, she talked about transparency on key

23  issues.  And it will be interesting to see what's in the

24  database.  Mr. Mason said he started a few weeks ago to

25  gather this data.  This has been the subject of informational

1  requests from the groups I have worked with for much more

2  than just a few weeks.  And this case is being put on

3  (indiscernible) they call it the "rocket docket."  Some

4  things just need to slow down.

5          But we are more cognizant than anyone else in this

6  courtroom that clients are dying, that many of them are

7  elderly, many of them are sick, many of them have

8  psychological counseling needs, and that they need fair

9  compensation quickly, but it has to be fair.  And a rush to

10 accommodate their mission isn't necessarily what should set

11 this time table.

12         But in the data room, will it include what's

13 called the "ineligible volunteer files"?  These are files

14 which -- some of which have been published, for certain

15 periods of time.  But there are some that have been

16 published, some have been produced in discovery subject to

17 confidentiality orders.  But this is where we get the story,

18 the dark history of the Boy Scouts.  Are those -- and this

19 may be a rhetorical question.  Maybe someone will stand up

20 and tell us.  Will those be in the data room?

21         Because I can assure you that, when we get to the

22 proof of claim process, there are going to be lots of

23 questions by the insurers, by the debtor, by the councils.

24 You've seen it in U.S.A. Gymnastics; they had a thirty-five-

25 page proof of claim in that case.  We have just gone through

1  the process in the Diocese of Rochester.  It was like

2  interrogatories with multiple subparts, all the information

3  flow from the survivor.

4        Do we get the information flow from the Boy Scouts

5  to understand the full scope of their liabilities?  And how

6  do those files play in, ultimately, to their notice program

7  for the bar date?  Because there are names in those files.

8  There might be names with some old addresses, but there are

9  names in those files.

10        They talked about gating issues, the bar date.

11  We're going to have a long discussion about lots of things

12  relating to the bar date, including how long it should be.

13  And as I noted, the window in New York closes mid-August of

14  this year; New Jersey, it's about two years from last

15  December; California is three years.  I'm not sitting here

16  arguing for a particular duration, but those deadlines -- but

17  -- and there are other states, literally as we're sitting

18  here, who are considering legislation for their own windows.

19        New Mexico, just last week, where the Philmont

20  property is located, just last week, the Assembly there

21  passed a window bill.  It's going before the Senate.  It will

22  be resolved shortly because New Mexico, perhaps trying to

23  lead the nation, has a thirty-day legislative session every

24  year.  So we'll find out sooner than later.

25        We talked a little bit about restricted -- I

1  mentioned restricted gifts and how those donations are

2  solicited.

3          The injunction motion, predictable.  We've all

4  seen it in these kinds of cases and in other mass tort cases.

5  But now anyone who has filed a lawsuit has 30 days to seek

6  remand of that removal.  And maybe we can work out something

7  with the debtor to modify that remand date, but it's going to

8  put hundreds and hundreds of people -- and as I think someone

9  noted, sometimes these cases have multiple plaintiffs, so

10 it's not just 275 odd people who've sued, there are more --

11 are now being put to the issue of bringing remand motions, if

12 they want their matters -- if they want to be resolved and

13 liquidated, have them resolved in their home courts, venues

14 they selected, venues near their homes, and in a judicial

15 process that may have very different jury requirements than

16 the federal process.

17         The other lawyers in the case, the plaintiffs'

18 lawyers, Your Honor, would like to make some comments to you.

19 There was a lot that was presented to you this morning by the

20 BSA and the councils and by me.  I hope it was informative,

21 and I look forward to continuing to play that role for you.

22         THE COURT:  Thank you.

23         Mr. Cobb.

24         MR. COBB:   Good morning, Your Honor.  Richard

25 Cobb of Landis, Rath & Cobb.  I'm here with my friend Andrew

1  Goldfarb of the Zuckerman Spaeder firm.  Andrew's firm

2  represents a group of claimants under the banner of

3  "Abused in Scouting."

4            THE COURT:  Thank you.

5            MR. COBB:  I'd like -- does he have permission to

6  speak to the Court this morning?

7            THE COURT:  He does.

8            MR. COBB:  Thank you, Your Honor.

9            THE COURT:  Mr. Goldfarb.

10            MR. GOLDFARB:  Good morning, Your Honor.  "Abused

11  in Scouting" is a group of law firms that represents a

12  diverse group of over 2,000 victims of scouting-related child

13  sex abuse.  Our clients come from and suffered abuse in all

14  50 states.  They range in age from 8 to 91, maybe 92 years

15  old.  And I thank Mr. Stang for his eloquent remarks.  I --

16  our clients show that this is not just an issue of the past.

17  While significant delay in reporting is a feature of abuse

18  and these types of situations, we also have many young -- we

19  have many teens and young adults as clients, as well, so it

20  is not just a problem of the past.

21            We think that all victims of the BSA-related sex

22  abuse deserve a fair remedy.  And we think that this

23  bankruptcy presents an opportunity for exploring a resolution

24  that can achieve that result.  It will need to involve all

25  major stakeholders, and provide both a fair opportunity for

1  people to come forward and fair and meaningful compensation

2  for all victims.  We hope and look forward to working

3  constructively with all the stakeholders to pursue consensus

4  around a fair and appropriate solution to this very, very

5  significant problem.  Thank you.

6              THE COURT:  Thank you.

7              MR. MONES:  Good morning, Your Honor.  My name is

8  Paul Mones, I am from the law firm in Los Angeles Paul Mones,

9  PC.

10             I stand here today as the co-lead counsel in a

11 case that was important in Oregon in 2010, along with my

12 dearly departed friend Kelly Clark.  In that case, the

13 perversion files that you heard mentioned was the first time

14 they were publicly used in a case in the United States.  As a

15 result of that case, we are -- probably why we're here today

16 -- because thousands of men throughout the United States

17 found out about the problem of the BSA with regard to its

18 sexual abuse problem.

19             All I'll say is that I represent men throughout

20 the United States, teenagers all the way through adults.  And

21 while I look forward to working with all the parties in this

22 case, it is very clear to me that, up to the present time,

23 Your Honor, while the Boy Scouts' mission is to serve youth,

24 that, up until very, very recently -- and even, I believe, up

25 until today -- the Boy Scouts have staked their reputation

1  over the protection and safety of youth throughout the United

2  States.  And unfortunately, we have been driven to this point

3  today.

4         And I will say that -- echo Mr. Stang's comments

5  that -- for example, I will get to it -- not to argue it

6  substantively -- but the 80 days is wholly insufficient and

7  really belies the reality, Your Honor, of the place in which

8  many of these men find themselves in today.  All of us -- my

9  -- all of my colleagues who are here today have been fielding

10 phone calls since the bankruptcy was filed by confused,

11 upset, and angry men.  And we think the process needs to be

12 more transparent as we move forward, in terms of the Boy

13 Scouts' assets.

14        And I'll finish on that point.  While it's been

15 represented that the councils are wholly independent, as Your

16 Honor will find out through pleadings as we move forward,

17 that independence is on paper only; and that, for example,

18 the Boy Scouts of America actually is a vertically integrated

19 corporation where the Boy Scouts determine, basically, the

20 life blood of each of the councils.

21        And just one final example.  When there is a

22 council, for example, in Ohio, when there are not enough

23 people to go into each council, the Boy Scouts of America

24 have a right to collapse those councils.  So, while in 2010,

25 there were about 300 plus councils when we filed our case of

1 <u>Kerry Lewis v. Boy Scouts of America</u> in Portland, Oregon, now

2 there are 260.  And the reason there are 260 is the Boy

3 Scouts of America have the right to collapse those councils

4 into smaller entities.

5          And with that, I will yield to my colleagues.  But

6 I appreciate the opportunity to appear before you.  And I

7 know my clients are relying on the justice that this Court

8 can give them.  Thank you.

9          THE COURT:  Thank you.

10          MR. CREW:  Good morning, Your Honor.

11          THE COURT:  Good morning.

12          MR. CREW:  My name is Steve Crew, I'm with the law

13 firm of Crew Janci in Portland, Oregon.  We were co-counsel

14 with Mr. Mones on the trial in 2010.

15          We -- over the years, the last 12 years, we've

16 represented about 100 boys in -- actually men now -- in

17 litigation against the Boy Scouts.  We currently have about

18 200 cases across the country.  We also have clients ranging

19 in age from 15, 16 years old, up to 70 years old.  We have

20 three cases that were set for trial very soon in Oregon:  One

21 set for June, one set for July, and one set for September.

22 All of those cases, of course, are now subject to the

23 automatic stay.  We've been litigating those cases with the

24 Boy Scouts for the last two years.

25          We each what Mr. Stang has said.  We appreciate

1  the time and look forward to seeing this matter get resolved.

2  Thank you, Judge.

3           THE COURT:  Thank you.

4           MR. PFAU:  Good morning, Your Honor.  My name is

5  Michael Pfau, the law firm is Pfau Cochran.

6           I want to -- I'm not -- I'm going to try not to

7  repeat what's been said, but I wanted the opportunity to

8  introduce myself to you and the professionals in the room.

9  We represent about -- well, I'm a Seattle-based lawyer that

10 has a national practice, specializing in representing victims

11 of childhood sexual abuse.  We represent approximately 300

12 Boy Scouts abuse survivors across 24 states.

13          In listening to the comments this morning, I was

14 struck by something Mr. Mason said.  And he said, when he was

15 Little Ricky in Virginia, scouting transformed him.  I was a

16 scout.  I'm also a veteran of five of the Catholic

17 bankruptcies across the country.  I was also an altar boy.

18 Fortunately, I was not an abuse victim.  But those words

19 stuck with me, and I hope they stick with everyone in this

20 courtroom, when he said "scouting transformed me."  Scouting

21 also transformed the 300 men that I represent across the

22 country.

23          I would urge you, Your Honor -- and I'm not going

24 to repeat what Mr. Stang said -- but to look at this case.

25 And the abuse survivors would like a thorough, thoughtful --

1  and if takes longer than the Scouts envision or want --

2  process because a number of these men have been waiting 50,

3  60, 70 years for justice.

4        A side note.  The issue of removal and remand is

5  of particular concern to the plaintiffs' lawyers.  It is a

6  procedural issue -- I know nothing is before you now -- that

7  really needs to be addressed as soon as possible.  And I'll

8  leave it to the bankruptcy professionals to deal with that,

9  Your Honor.  But I wanted to mention that in making my

10  remarks.  Thank you.

11        THE COURT:  Thank you.

12        MS. DUMAS:  Hello, Your Honor.  My name is Gilion

13  Dumas, I practice in Portland, Oregon at the firm of Dumas &

14  Vaughn.  We also have cases around the country.  We

15  represented hundreds of abuse survivors in the Boy Scouts and

16  other organizations.  Right now, we have about three dozen

17  cases against the Boy Scouts; most of them are already filed

18  in Oregon, California, Montana, and other states.

19        Most of our clients are in the 50s and -- their

20  50s and 60s, and most of them -- many of them waited for

21  years, particularly in California, for the statute of

22  limitations to open up.  Others too decades before they

23  understood that the child abuse that they suffered as kids in

24  scouts caused them the problems that they lived with through

25  their lives.  So, by the time they came forward and were

1  ready to file their litigation, it was a real commitment for

2  them, and it was really, really difficult.

3         And now, all of a sudden, their claims are gone in

4  State Court, and they're being told they have to move into

5  this bankruptcy proceeding.  And that wasn't their choice.

6  And they're going to live with it, they have to.  But it's

7  going to take them some time to process that, and it's going

8  to take them some time to understand that, just as they did

9  not have control over the situation when they were being

10 abused as children, they don't have control anymore over

11 their choice of venue and their choice of forum.  And they're

12 going to have to resolve their claims in bankruptcy.  And for

13 a lot of them, that's really difficult.

14        In particular, one of my clients, who was going to

15 start picking a jury in his case this Friday, and he was

16 ready to start going to trial this Friday, and all of a

17 sudden, he feels like the rug was pulled out from under his

18 feet.  And so that's a big transformation for him.

19        So they -- they're going to need process.  All of

20 a sudden, the focus is not on the history of abuse in Boy

21 Scouts or really even their abuse, but it's on what assets do

22 the Boy Scouts have.  And that wasn't what they were thinking

23 about when they went into this.  So that transformation is

24 going to take some time for them, too, to get used to.

25        We heard the Boy Scouts talking about

1  transparency.  But I think my clients are worried that

2  transparency about the Boy Scouts' assets is not really what

3  they care about in their hearts.  What they are worried about

4  is transparency about the Boy Scouts' history of not

5  protecting children like them.

6          And one of the big things that they want to know

7  about -- and Jim Stang raised this -- is:  What is in those

8  IV files, all of them, not just ones that are on the internet

9  now, but all of them?  And will the full story of the Boy

10 Scouts' history of abuse?  Will there be disclosure of all

11 credibly accused child molesters in Boy Scouts, come out

12 during this proceeding?  And I know that isn't about the Boy

13 Scouts' assets, but that's what my clients are concerned

14 about.  So I just wanted to bring that to your attention.

15 Thank you.

16          THE COURT:  Thank you.

17          MR. FINNEGAN:  Good morning.  I wanted to see what

18 the time was, if it's still morning.

19          THE COURT:  Good morning.

20          MR. FINNEGAN:  Mike Finnegan with Jeff Anderson &

21 Associates, Your Honor.  And we represent approximately 250

22 men that were abused in scouting as kids.

23          And one of the things that I heard from counsel

24 that I had a reaction to and that I'd ask counsel and

25 everybody to keep in mind, the word "historic" was used in

1  the context of describing these sex abuse claims.  And these

2  wounds for the survivors of abuse, the ones that we represent

3  and the ones that my colleagues represent, are not historic.

4  They are very real today.  They're dealing with alcohol,

5  drugs, depression, anxiety.  We've lost a lot of these men to

6  suicide.  And these are wounds that are hurting today.

7         And the last point, Your Honor, that I wanted to

8  raise was what Mr. Stang and Mr. Mones raised, is

9  transparency.  They have that as the number one point on

10  their four-point plan.  And we took the deposition -- we had

11  an expert that was hired by the Boy Scouts, Dr. Janet Warren,

12  who testified that, in her review of all the ineligible

13  volunteer files, there were 7,819 perpetrators who had

14  sexually molested kids in scouting throughout the years.

15         And if we really want transparency here, Your

16  Honor, there are still thousands of those names that have

17  never been made known to anybody in the public, anybody in

18  the community.  Putting them in a database is not going to do

19  it.  And what I would encourage all of us to work on and what

20  we're going to be working on early is to make sure that those

21  names are made public, so that the communities can know and

22  kids can be safe.  Thank you.

23         THE COURT:  Thank you.

24         MR. NEUBERGER:  Good morning, Your Honor.

25         THE COURT:  Good morning.

1          MR. NEUBERGER:  My name is Steve Neuberger, I'm

2    with the Neuberger firm, I'm a local lawyer.

3          Just briefly, I just want to build on something

4    that Mr. Stang said.  This Court is going to be faced with

5    many of the same issues that now Chief Judge Sontchi faced in

6    the Diocese of Wilmington bankruptcy some 10 or 11 years ago,

7    in this same building.  I was counsel for about two-thirds of

8    the survivors in that case.

9          And one of the things that we were very heartened

10   by in coming before this Court was the sensitivity that the

11   Court showed in recognizing that abuse survivors are not the

12   typical commercial creditors.  The term that Judge Sontchi

13   used numerous -- excuse me.  The term that Chief Judge

14   Sontchi used on numerous occasions was that their injuries

15   are "truly unique."

16         And he ultimately recognized that the irreparable

17   -- that irreparable injury was caused to survivors by having

18   their day in court, their day in the court of their choosing,

19   having their trials taken away.  He recognized that as being

20   irreparable injury because of the truly unique damages that

21   these survivors must face and deal with every day, and

22   sometimes, just how the standard operation of bankruptcy

23   procedures and tactics, how, in this truly unique context,

24   sometimes it can go so far as to be bad faith actions.

25         Without repeating and -- without repeating much

1  else, I think one of the things that we ultimately concluded

2  in that bankruptcy, in the same court, was that Justice

3  Brandeis said it best more than 100 years ago, sometimes

4  sunlight truly is the best disinfectant.  Thank you, Your

5  Honor.

6          THE COURT:  Thank you.

7          MR. STANG:  Your Honor, I believe that is all the

8  plaintiffs' counsel that are present (indiscernible)

9          THE COURT:  Well, I'll give the opportunity to

10  anyone else who would like to address the Court on a

11  preliminary, introductory basis.

12      (No verbal response)

13          THE COURT:  Okay.  I hear no one and I see no one.

14          Okay.  I take it we're prepared to get into the

15  first-days.  Let's take five minutes, and then we'll start.

16          COUNSEL:  Thank you, Your Honor.  Thank you,

17  Judge.

18      (Recess taken at 11:59 a.m.)

19      (Proceedings resume at 12:09 p.m.)

20      (Call to order of the Court)

21          THE COURT:  Please be seated.

22          MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

23  again, Your Honor.  I'm going to cede the podium to Tom

24  Labuda from Sidley, who will handle the first at least

25  handful of those first-day motions, if I may.

1          THE COURT:  Okay.

2          MR. LABUDA:  Good morning, Your Honor.  Thomas

3   Labuda of Sidley Austin, on behalf of the Boy Scouts of

4   American and Delaware BSA, LLC.

5          And thank you for that break.  After all of those

6   passionate statements, I think it's difficult to turn to

7   mundane Bankruptcy Code sections, cash collateral order

8   provisions, and the like.

9          As an initial housekeeping matter, Mr. Brian

10  Whittman was introduced, he is our first-day declarant and we

11  filed a declaration in support of all the first-day motions

12  that we will be going through.  I'd like to move that into

13  evidence as it relates to all of these motions.  And Mr.

14  Whittman, of course, is here to answer any questions.

15          THE COURT:  Does anyone object?

16      (No verbal response)

17          THE COURT:  I hear no one, it's admitted.

18      (Whittman Declaration received in evidence)

19          MR. LABUDA:  The first matter on the agenda is the

20  motion for joint administration.  As Your Honor heard, we do

21  only have two debtors, Boy Scouts of America and Delaware

22  BSA, LLC.  But we do think that consolidating the matters

23  will promote efficiency, reduce the volume of paper a bit,

24  and it is only for procedural purposes.  So we do not believe

25  there is any prejudice to any parties-in-interest here.

1           THE COURT:  Thank you.

2           Does anyone object to joint administration?

3      (No verbal response)

4           MR. LABUDA:  Your Honor, I know that you were

5  given redlines.  The only change from what was filed was some

6  language in the preface that the Office of the United States

7  Trustee requested, which we were fine with, and has been put

8  in all of the proposed orders.

9      (Pause in proceedings)

10          MR. LABUDA:  It's basically a change from saying

11 the Court being able to issue a final order, that the debtor

12 consents to entry of a final order by the Court under Article

13 III of the Constitution.

14          THE COURT:  Does the U.S. Trustee know something I

15 don't know?

16          MS. MCCOLLUM:  Your Honor, Hannah McCollum for the

17 U.S. Trustee.  We just remain concerned about the whole

18 issue, so we wanted to make it clear that the debtors

19 consent, other people can come in, their rights are reserved.

20          THE COURT:  Okay.  Thank you.

21          Okay.  I reviewed this, and there being no

22 objections, I'm signing the order as revised.

23          MR. LABUDA:  Thank you, Your Honor.

24          The next matter on the agenda is a motion to use

25 cash collateral.  It's Docket Number 5.  We note, typically,

1  cash collateral is held until the end because it's typically

2  objected to.  You know, but with Your Honor's permission, we

3  wanted to move it up because, one, we believe we have the

4  consensual use here.  We did have comments from the United

5  States Trustee.  We do not anticipate other objections, but

6  we will see.  And we certainly wanted to get the message out

7  as soon as possible that the debtors have authority to use

8  the funds necessary to continue the mission during these

9  cases.

10         So I would start with just a brief summary of the

11  terms of this order.  I know, in accordance with the rules,

12  the motion has a, quote, "summary" at the beginning, but it's

13  13 pages, single-spaced; it's not quite a summary.  I think I

14  can do a little bit better job.

15         On use, the debtor is basically getting the use of

16  its cash collateral to operate during this case, including

17  the payment of professional fees.  We have one lender here,

18  it's JPMorgan, as you've heard.  That arises under really

19  four different facilities:  A 2010 credit facility, two bond

20  issuances, and a 2019 facility.  But to simplify matters,

21  they are all covered by a single security agreement.  So,

22  while there are four separate facilities here, it's one

23  security agreement.

24         And pursuant to that, most of the assets of the

25  debtors are pledged.  There are exceptions --

1          THE COURT:  I didn't read it that way.

2          MR. LABUDA:  Sure.

3          THE COURT:  So can you tell me what the collateral

4  package is?  Because that's not how I understand the

5  declaration.

6          MR. LABUDA:  The declaration or in the motion,

7  Your Honor?

8          THE COURT:  Well --

9          MR. LABUDA:  I think it's in both.

10         THE COURT:  Wherever.

11         MR. LABUDA:  Sure.  In the motion, the summary of

12  the indebtedness starts with Paragraph 18.  And again, there

13  were differences at the start.  And where it all came

14  together was in 2019, you know, with the entry into the 2019

15  revolving credit facility, at which time there was a single

16  security agreement for all of them, and that was pledged --

17  and the assets were pledged in connection with that.

18         So, if you start with Paragraph 20, that talks

19  about the 2010 revolving credit facility; that was the

20  initial one.

21         THE COURT:  I'm back at Paragraph 19.

22         MR. LABUDA:  Yes.

23         THE COURT:  What's the collateral package that was

24  given to JPM?

25         MR. LABUDA:  Under the original facility or under

 1  the subsequent one?  Because that's where, I think, some of

 2  the confusing arises.

 3          THE COURT:  Okay.  Where is the current collateral

 4  package described?

 5          MR. LABUDA:  It would be in the -- just give me a

 6  second, Your Honor.  I have ...

 7      (Pause in proceedings)

 8          MR. LABUDA:  In Paragraph 27:

 9          "As of the petition date, the RCF agreement is

10  secured by the pre-petition collateral pari passu with the

11  other pre-petition secured facilities."

12          So the "collateral" is defined then in the

13  agreement.

14      (Pause in proceedings)

15          MR. LABUDA:  I think it may actually help to go

16  back to the beginning with each facility.  So, if you start

17  where you were in 19, where it says "each pre-petition

18  secured facility," because it's under the same facility, "is

19  secured of a first priority lien on account" --

20          THE COURT:  Uh-huh.

21          MR. LABUDA:  "-- and the property arising out or

22  otherwise relating to the account, deposit accounts, security

23  accounts, and investment property, and proceeds and products

24  of all of the foregoing of both the debtor and affiliate

25  Arrow" --

1          Which did guarantee both the 2010 facility and the

2    2019 facility.

3          THE COURT:  Uh-huh.

4          MR. LABUDA:  Arrow is also a party to the bond

5    agreements.  Although it is not directly an obligor on those,

6    it did pledge its assets pursuant to the security agreement

7    on account of those bonds.  So that is there.

8          And then, in 2019, the debtors put mortgages in

9    connection with an increase of the facilities to provide

10   letters of credit that were required for general liability

11   insurance purposes on various properties, including the

12   headquarters in Texas and the high adventure bases in

13   Florida, Minnesota, and Canada.

14         THE COURT:  Right.

15         MR. LABUDA:  So that is the package of the

16   collateral as of this time.

17         THE COURT:  Okay.  So that's not an all asset

18   package.

19         MR. LABUDA:  It's not all assets.

20         THE COURT:  Or close to.

21         MR. LABUDA:  Well, the restricted assets are

22   certainly excluded.  There is a distribution center that is

23   excluded, but significant --

24         THE COURT:  Well, how about inventory?  How about

25   IP?  How about -- that's not -- I don't see any of that.

1            MR. LABUDA:  I'm not aware, standing here, whether

2   or not that would be included in it.  But to the extent that

3   there is IP and others like that, correct.  I don't see that

4   included in this.  So there are -- we've always known there

5   are some unencumbered assets here, we accept that and we know

6   there are some.  But certainly the key assets -- the cash,

7   the properties -- are all mortgaged.

8            THE COURT:  How is the cash mortgaged?

9            MR. LABUDA:  It's under the control in deposit

10  accounts at JPM.

11           THE COURT:  Okay.  So the cash on the petition

12  date -- which I'd like to know how much that was -- that may

13  be cash collateral.  But what about the cash that comes in

14  this week and next week and the week after that?  How is that

15  cash collateral?

16           MR. LABUDA:  Well, certainly, the restricted

17  donations do not; they go into separate accounts and those

18  will be separate.

19           THE COURT:  Right.

20           MR. LABUDA:  But I do believe, under the cash

21  management system, the cash will be coming into the JPM

22  accounts, as well.

23           THE COURT:  But it --

24           MR. LABUDA:  The unrestricted.

25           THE COURT:  Yes, but it's not there now.  So if we

1   put --

2              MR. LABUDA:  It's not there now.

3              THE COURT:  -- it in a different account, it

4   wouldn't come into those accounts.  I'm trying to understand

5   the collateral package.

6              MR. LABUDA:  Sure.

7              THE COURT:  I -- this is what I saw in Paragraph

8   19.  And to me, when I read that, it is not anywhere close to

9   a blanket lien.

10              MR. LABUDA:  It's not a blanket lien, that's

11   correct, Your Honor.

12              THE COURT:  And my understanding of where the

13   revenues come from is why I'm asking these questions because

14   the revenue, as I understand it, comes from the sales of

15   merchandise, BSA merchandise in the scout stores; that's

16   inventory.  I don't see inventory listed here.  So, if cash

17   comes from -- is generated, revenue generated from inventory

18   and comes in this week, how is that the bank's cash

19   collateral?

20              MR. LABUDA:  I think, from our perspective, we

21   negotiated this because the cash that comes in will not be

22   sufficient to cover the operations.  But I see Your Honor is

23   asking a different question there.

24              THE COURT:  I'm trying to understand the budget

25   and I'm trying to understand the collateral package.  And I'm

1  trying to understand why it is that the adequate protection

2  that's been requested is appropriate.  That's what I'm trying

3  to figure out.

4          MR. LABUDA:  Sure, Your Honor.  I believe the

5  response to that would be because we need to use the cash

6  that is their cash collateral.  And Mr. Whittman is here in

7  the courtroom and can perhaps get into a bit more detail on

8  that.  But we need to use that cash.

9          THE COURT:  Do you?  And let's concentrate on the

10 four-week period between now and the final hearing.  And I'm

11 just looking at the budget and I just have questions.

12         MR. LABUDA:  Sure.

13         THE COURT:  So I don't -- I would like to know

14 what the cash position on the date of the petition was.  Does

15 any -- can anyone give me that?

16         MR. LABUDA:  You know, Your Honor, I question if

17 it would be helpful to have Mr. Whittman answer some of these

18 questions as --

19         THE COURT:  I'm happy --

20         MR. LABUDA:  -- from the --

21         THE COURT:  -- for you to --

22         MR. LABUDA:  -- financial perspective.

23         THE COURT:  -- to consult with Mr. Whittman.

24         MR. LABUDA:  Sure.

25      (Participants confer)

```
 1              MR. LABUDA:  Thank you, Your Honor.  I've
 2   confirmed it's approximately $210 million as of the petition
 3   date.
 4              And you know, we think we know where you are
 5   coming from, in that they do not have a blanket lien, which
 6   we never believed.  But they did require, as adequate
 7   protection for the diminution in their value of the
 8   collateral, replacement liens on essentially all assets,
 9   excluding restricted assets.
10              THE COURT:  I fully understand that.
11              MR. LABUDA:  Sure.  And it's only to the extent of
12   diminution in value.
13              THE COURT:  And I understand that, as well,
14   although, quite frankly, the order doesn't read that way.
15   But I'm still -- okay.  So 210 million.  So, of the two ten,
16   does that include the unrestricted endowment balances and the
17   RBT balance?
18              MR. LABUDA:  Yes, Your Honor.
19              THE COURT:  Okay.  So how much -- so that's fifty-
20   three eight and sixty-five two, at least -- and it seems to
21   stay that way.  So what's that?
22         (Participants confer)
23              THE COURT:  So a hundred and fifteen -- a hundred
24   and -- a hundred and eighteen --
25              MR. LABUDA:  Approximately.
```

1            THE COURT:  -- 119 million --

2            MR. LABUDA:  Yes.

3            THE COURT:  -- of unrestricted.  So that's like

4   ninety -- 101 million?  Okay.  So you actually had more ...

5        (Pause in proceedings)

6            THE COURT:  Okay.  So it's about 100 million --

7            MR. LABUDA:  Correct.

8            THE COURT:  -- 1ould be in the total beginning

9   unrestricted cash balance line at the top of this budget, in

10  other words, instead of the one fourteen or the seventy-

11  three.

12            MR. LABUDA:  I believe that's right, Your Honor.

13            THE COURT:  Okay.  So, at the end of the four-week

14  period, the projection -- and it should be greater because

15  you're starting at something greater -- was 114 million.

16            MR. LABUDA:  I see that, Your Honor, yes.

17            THE COURT:  Okay.  So, during that time frame, the

18  cash position goes up.  There's use, but the cash position

19  goes up.  And it goes up -- and it's going to be higher than

20  that because we're starting out with higher.

21            MR. LABUDA:  Correct.

22            THE COURT:  So it's like a forty-million-dollar

23  increase.

24            MR. LABUDA:  So, potential --

25            THE COURT:  Unless I'm misreading.

1          MR. LABUDA:  Just one minute, Your Honor.

2          THE COURT:  Uh-huh.

3      (Participants confer)

4          MR. LABUDA:  Yeah.  Your Honor, we're actually

5  starting more week one forecast, week ending 2/21 there.  So

6  we're actually starting at the 73 million, I'm advised,

7  actually.

8          THE COURT:  Well, okay.

9          MR. LABUDA:  So it --

10         THE COURT:  So we're starting at 73 million,

11 that's the cash collateral use, that's the cash collateral.

12         MR. LABUDA:  Today -- or the end of this week.

13         THE COURT:  Okay.  So, today, there's 73 million

14 in cash that's not in one of these -- that's available for

15 use.

16         MR. LABUDA:  Correct.

17         THE COURT:  Okay.  And at the end of the week -- I

18 think we scheduled a second day on the 24th of March.

19         MR. LABUDA:  That's correct.

20         THE COURT:  So, on March 27th, after expenditures

21 of funds, there's 114 million of cash, total ending

22 unrestricted cash balance.

23         MR. LABUDA:  That's correct.

24         One additional factor I think it's important to

25 keep in mind, we're in a period of the year where revenues

1  are coming in at significant amounts.  This is not going to

2  remain --

3          THE COURT:  I'm not --

4          MR. LABUDA:  -- the same.

5          THE COURT:  -- worried about --

6          MR. LABUDA:  Right.

7          THE COURT:  -- what's going to happen after a

8  final hearing.  We're at the interim hearing.  And what

9  should we do in this interim?  Okay.  And in this interim --

10 somebody can do the math for me -- if we add up the

11 disbursements and we add up the receipts, are we net positive

12 or net negative?  And I suspect we're net positive.

13         MR. LABUDA:  Net positive for this period.

14         THE COURT:  Okay.  So the money that's coming in -

15 - which I'm not convinced yet is the bank's cash collateral,

16 but I'd like to hear why I'm wrong, and I very well could be

17 -- it's not being diminished over this period of time; it's,

18 in fact, increasing.  So why should the bank get anything --

19         MR. LABUDA:  Sure.

20         THE COURT:  -- during this period of time, where

21 there's no apparent diminution in value?

22         MR. LABUDA:  I think the primary reason, Your

23 Honor, is that we are getting a commitment here subject to a

24 final order to, essentially, an open-ended use of cash

25 collateral.  There are no milestones here.  There is no

1  termination.  We are getting a commitment from JPM that when

2  the revenues go down, as membership fees and things go down

3  at the beginning of the year, we're getting a commitment that

4  we can use their cash collateral throughout this case without

5  any sort of plan milestone, end date, termination date, like

6  that, which is very important to us.

7          THE COURT:  Okay.  I don't know how that comports

8  with what is supposed to happen on an interim and the fact

9  that I can only approve what's necessary.  Actually, I don't

10  think -- I'm not sure you're using cash collateral.

11          I have to understand this package.  I have to

12  understand what's happening --

13          MR. LABUDA:  Well --

14          THE COURT:  -- because there's -- I would say

15  there are yes-no milestones.  There are a lot of restrictions

16  on what can be done with the debtors' cash -- lots of them in

17  the order.

18          And so, need to understand what's -- why the

19  relief is necessary between now and the final.  And there

20  might be some appropriate order that should be entered, but I

21  need an explanation.

22          MR. LABUDA:  Well, Your Honor, again, I would come

23  back that we do need to use this cash collateral.

24          THE COURT:  Are -- do you?  That's the question I

25  have.

1          MR. LABUDA:  Well, even going from week one to

2   week two, there's approximately eight or $9 million projected

3   to come in.

4          THE COURT:  Week one to week two --

5          MR. LABUDA:  If you look at the total --

6          THE COURT:  Week two --

7          MR. LABUDA:  -- beginning unrestricted cash

8   balance --

9          THE COURT:  No, there's twelve million six --

10          MR. LABUDA:  Right.

11          THE COURT:  -- then next week there's another 18

12   and the next week, there's another 13.

13          MR. LABUDA:  Right.

14          THE COURT:  And my question is, number one, is

15   that the bank's cash collateral?

16          I don't know, because I don't know what the source

17   of those funds are.  But if all the bank has is a control

18   agreement on these accounts, then this money isn't theirs.

19          MR. LABUDA:  The new money coming in, that's

20   right.

21          THE COURT:  Yes?

22          MR. LABUDA:  Yes.

23          THE COURT:  So, I need to understand that.

24          MR. LABUDA:  Okay.

25          THE COURT:  And I think the debtor needs to

1 understand that -- what's happening here -- and I could be

2 wrong.  I've had these papers for, you know, not that long.

3 I'm just trying to understand it.

4 　　　　　　MR. LABUDA:  Yeah.  Well, we can come back --

5 maybe put this to the end.

6 　　　　　　The package, to the extent it wasn't clear, was

7 intended to only be adequate protection liens and claims to

8 the extent that diminution of value of their collateral, but

9 we will revisit this issue to see exactly what is needed in

10 the interim period, as opposed to committing for a long term

11 on --

12 　　　　　　THE COURT:  I think we need to understand that,

13 and then while you're looking at it -- and I had a lot of

14 questions about this form of order -- but one of the big

15 questions and one thing I did not understand at all, was this

16 concept of an adequate protection obligations, as opposed to

17 what that meant and the idea that you could pay in full pre-

18 petition obligations and there would still be adequate

19 protection obligations.  I don't understand that.

20 　　　　　　MR. LABUDA:  I don't think that was the intent,

21 Your Honor.

22 　　　　　　THE COURT:  It's what it says in multiple places.

23 　　　　　　So, I need to understand that concept, which I

24 have never seen before.  I've never even seen the term

25 "adequate protection obligation," like it's some additional

1  plane you have on top of whatever pre-petition claims you

2  have.

3           I have a lot of questions about the form of order,

4  but my more basic --

5           MR. LABUDA:  Sure.

6           THE COURT:  -- questions are what's the collateral

7  package the banks have, what's the source of the revenue

8  that's coming in, and whether there are already liens on that

9  source or not.

10          MR. LABUDA:  Sure.  Yeah, we can provide that

11  additional information by the end of the hearing.

12          THE COURT:  Okay.

13          MR. LABUDA:  The next matter on the agenda, Your

14  Honor, is the tax motion; that's Docket Number, I think

15  it's 6.  And this is basically seeking to continue in the

16  ordinary course, the deal with the tax obligations that

17  arise, which would payments, as well as complying with audits

18  and so forth.

19          There is a breakdown of these taxes on

20  Paragraph 11 of the motion.  The total estimated amount

21  coming due in the interim period is approximately

22  $1.32 million.  The total amount we estimate is 1.6.

23          Almost two-thirds of that amount are sales-and-use

24  taxes.  The rest -- there's a small amount that's property.

25  The other large amount are import taxes.

1          The justifications for paying these vary, but as a

2  general rule for those sales-and-use taxes, it's pretty clear

3  in our view it's not property of the estate that's held in

4  trust.  For almost all of them, potentially, they could be

5  priority claims, but more importantly, if we do not comply

6  with these tax obligations, there could be audits and other

7  things that would distract the company from these

8  organization efforts that, likely, would outweigh, you know,

9  the fairly modest cost of these taxes.

10          So, we would submit that it's in the sound

11  exercise of the debtors' business judgment to just continue

12  to comply with these tax obligations in the ordinary course.

13          THE COURT:  Thank you.

14          Does anyone wish to be heard -- Mr. Stang?

15          MR. STANG:  Your Honor, it wasn't entirely clear

16  to us from the list whether the penalties needed to be paid

17  and what, in fact, if all of these were priority taxes, when

18  they list those taxes, we don't know if (indiscernible) are

19  priority taxes.

20          With that, I acknowledge that some of these sums

21  are relatively small and wouldn't move the needle much for

22  survivor recovery, but it just seemed to us that some of the

23  representations, in general, as to whether they were -- each

24  of these taxes was priority.  So, an observation, not an

25  objection.

1          MR. LABUDA:  The penalties, Your Honor, was

2    approximately $40,000 and it relates to the 2018 filing which

3    the company is dealing with now.  Again, you know, it

4    generally behooves all of us to honor the Government's

5    claims, but for a nonprofit, I think it's particularly

6    important to unsure that they don't do anything that could

7    lead Government entities to challenge or question their

8    charitable status.

9          So, given the small amount, we'd ask that Your

10   Honor provide authority to pay that amount.

11         THE COURT:  Okay.  I am going to permit the

12   payment of the taxes in the ordinary course as they come due

13   and during this interim period.  The majority of these are

14   sales-and-use taxes; certainly, the sales taxes are a pass-

15   through in a collection for the taxing authority and use

16   taxes are owed where there's no sales tax and, I'm sure, fall

17   within the priority period.

18         I do think it's also important to, even to the

19   extent that some of these are not priority, to pay these

20   taxes to ensure that there are no further audits and I

21   actually do agree that with respect to not-for-profit, it

22   could create an additional hurdle.  So, I'm going to permit

23   it on an interim basis, as requested.

24         MR. LABUDA:  Thank you, Your Honor.

25         And in the revised order, we have the language of

1   the United States Trustee, as well, and in this, and the next

2   few motions, you will hear where we always said authorizing,

3   but not directing, the request was made to delete the "but

4   not directing," which we have done at the request of the

5   United States Trustee.

6                    THE COURT:   Okay.   That order is signed.

7                    MR. LABUDA:   Thank you, Your Honor.

8                    The next motion is the motion for authority to pay

9   certain essential vendors, lien claimants; it's Docket

10  Number 7.

11                   I think before going to the rationale behind these

12  claims, it's helpful to go through the categories and

13  different type of claims and their respective amounts to give

14  some context.   On an interim basis, the debtors are seeking

15  to pay a total of $8.5 million of pre-petition claims,

16  pursuant to this motion.

17                   From largest to smallest, these claimants are in

18  the following categories.   More than half are lien

19  claimants -- $4.5 million -- these are shippers,

20  warehousemen, mechanic lien claimants.   The second largest

21  bucket is $2 million of 503(b)(9) claims.   And then there are

22  two million of vendor claims; 1.5 million are of what we are

23  calling "critical vendors" and 500,000, which are foreign

24  vendors.

25                   Three of these categories typically aren't too

1  controversial.  Lien claimants, you typically want to pay to

2  avoid liens and the holdup of any goods.  To the extent they

3  do have liens, they may be fully secured and you would have

4  to honor them in any plan.

5          The 503(b)(9) claims, typically, you know, have to

6  be paid in full under any plan, so you're really talking

7  about changing the timing of payment, as opposed to altering

8  any priorities.

9          And with respect to the $500,000 of foreign

10 vendors, the concern is always their adherence to the

11 automatic stay and if they don't, the problem enforcing the

12 automatic stay in foreign jurisdictions.

13         So, that leaves the 1.5 million of essential

14 vendors.  For the most part, these essential vendors are

15 vendors who supply the BSA with products and merchandise that

16 they sell in scout shops and directly to local councils.

17 Those vendors are critically important because this

18 merchandise is directly used and necessary to carry forward

19 this mission and without it, it would be very difficult to do

20 that -- this is everything from uniforms to books, merit

21 badges, and sort of.

22         These sales also represent about 30 percent of

23 BSA's annual revenues for 2019, so both in dollar amount and

24 in need, they are very critical.

25         And as further context here, BSA spends about $200

1   million a year in goods and services.  So, the 1.5 million is

2   truly a fraction of that, and BSA also deals with over 10,000

3   vendors and the number of critical vendors here is less

4   than 50.

5           They got to that number by a process that's

6   described in the motion that the debtor, along with its

7   professionals, did to determine who should qualify as a

8   critical vendor and this included looking at whether the

9   vendor was a sole or limited source of a product, whether or

10  not the BSA could get the goods from another vendor, what

11  would be the impact of a potential disruption -- some of

12  these goods need to go to these adventure bases where it's

13  sometimes difficult to replace vendors very quickly and/or

14  get goods there -- and, finally, whether or not a particular

15  vendor was contractually obligated.  So, we could try to

16  enforce that.  And after going through that process, they did

17  get down to the under 50 vendors -- the 1.5 million in

18  critical vendors.

19          So, given that process and given the need for

20  these products, the debtor would submit that it is in the

21  sound exercise of their business judgment to pay the small

22  fraction of the pre-petition claims.

23          THE COURT:  Thank you.

24          Any objections?

25          MR. STANG:  Your Honor, we would simply like to be

1  reassured, if it's true, that the local councils are not

2  obligors under any of these categories.  Surely BSA

3  (indiscernible.)

4          MR. LABUDA:  Yes.  My understanding is yes and our

5  declarant Brian Whittman has confirmed that.

6          MR. STANG:  Thank you, Your Honor.

7          THE COURT:  Thank you.

8          Any other questions on this?

9      (No verbal response)

10          THE COURT:  Okay.  I'm going to approve this

11  motion.  I've read it and based on Mr. Whittman's declaration

12  I think it is appropriate.  Counsel has gone through the

13  rationale, certainly in terms of the liens and shippers, that

14  is -- those are liens those entities have who possess the

15  goods and we need to get those goods delivered so that the

16  scout shops can sell them and bring in the revenue.

17          503(b)(9) I do view as more of a timing issue in

18  terms of payment and I think it's appropriate to go ahead and

19  do that.

20          Foreign vendors, I think the concern expressed by

21  counsel is a real concern that foreign vendors will hold onto

22  the product, and, again, we need to get it into the stores.

23          And as for the critical vendors, based on the

24  representations of Mr. Whitmore [sic], the debtor has gone

25  through a process to whittle down its vendors to those that

1  are truly critical, and, based, again, on those

2  representations, I will approve this as necessary to avoid

3  immediate and irreparable harm and consistent with the rules.

4         MR. LABUDA:  And with respect to the revised form

5  of order, we have the two changes from the United States

6  Trustee and the prior one about deleting, but not directing,

7  in the preparatory language.

8         There was one other comment in Paragraph 7 where

9  we had a statement, because we are going to try to get

10 them -- get critical vendors to agree to commit to terms and

11 do other things.  And if they do, we have a provision in here

12 that if they fail to comply to that, that these would be

13 avoidable, you know, post-petition transfers under 549.

14        We had a phrase that said, "shall be recoverable,"

15 which the United States Trustee asked us to replace that with

16 "we'd simply have the right to recover, as preserved," so we

17 have that change, as well.

18        THE COURT:  Okay.  That's fine.

19        I did notice -- but I think it's okay in this

20 particular order -- Paragraph 10 about what this order is

21 not.  We'll hit it in some subsequent forms of order, but the

22 last sentence that any payment made pursuant to this order is

23 not a waiver of the debtors' right to dispute such claims

24 subsequently.

25        I think it's okay here because of the fact that

1  you may have a vendor program out there and you may need to

2  recharacterize, but in some of your other orders, I'll need

3  some explanation for why that language is appropriate.

4  MR. LABUDA:  Understood, Your Honor.

5  THE COURT:  That order is signed.

6  MR. LABUDA:  Thank you, Your Honor.

7  The next motion is a somewhat similar motion.

8  It's a motion for authority to continue to maintain and honor

9  obligations under what we call "public programs"; it's Docket

10  Number 8.

11  These public programs really fall into three

12  categories.  One is a customer program and this involves

13  returns, gift cards, things Your Honor has undoubtedly seen

14  in many other retail-type cases, but the second and third

15  categories are somewhat unique to BSA and nonprofits.  One is

16  the BSA scouting program and the second one is the BSA donor

17  program.

18  Notably, some of the amounts here are pretty

19  small, you know, some of these are a thousand dollars a month

20  or something like that, but we really can't stress enough the

21  importance of these to the mission and maintaining the

22  confidence and the faith, especially with respect to the

23  scout and donor programs.

24  The customer program really has a couple different

25  components; one is returns and exchanges.  It's hard to

1 predict what the returns and exchanges will be; it varies

2 month by month.  The debtors estimate with all the scout

3 shops across the country, it could be approximately $600,000

4 of returns or exchanges, but each time this occurs, the

5 company is getting something in return; they're getting the

6 product back either in exchange or, a return, and they'd

7 certainly like to continue that practice.

8        There are 2.5 million of gift cards outstanding.

9 To put that in context, the BSA has about 100 million in

10 annual sales on these, you know, shops and online sales.  So,

11 it's actually a small percentage of that.

12        They want to continue that, just, obviously, to

13 continue the faith of customers, which are scouts and

14 members, local councils and so forth to be able to use those.

15 We know that there is some mixed law there; whether or not

16 those would really be deemed deposits and priority claims.

17 We know there's some law, in fact, in this district that says

18 that there's not at a bankruptcy level.  There's other courts

19 that say that they are.

20        We are also concerned, again as a nonprofit, that

21 there are consumer protection laws that vary have state to

22 state that we could potentially be causing concern with

23 states attorneys general.  So, the gift program is something

24 that we would like -- the gift card program, as well.

25        In connection with the gift cards, as well, there

1  are gift card fees.  There's a provider that actually

2  facilities the issuance and tracking of these.  The cost of

3  that is approximately one-to-one and a half thousand dollars

4  a month and the debtors estimate there's probably $7,000

5  outstanding in prepetition charges under this program.  And,

6  similarly, we have credit card processors, as well, that

7  charge fees for transactions.

8          And the prepetition issues come up in connection

9  with chargebacks, when products are returned.  BSA estimates

10 that there are probably approximately $115,000 in prepetition

11 amounts both, for the interim and final period, but all of it

12 is going to come due in the final period.

13         On this, we'd note that the overwhelming majority

14 of purchases are made through electronic means and credit

15 cards.  So, any sort of disruption in this could immediately

16 have a big impact, economic impact on the estate and would

17 also, perhaps, discourage, you know, parties from continuing

18 to make purchases and do that and provide that revenue to the

19 BSA.

20         The scouting program has three components we would

21 like to discuss.  One is deposits.  When there are camps

22 which are held every year at all these adventure bases,

23 deposits are typically made and BSA, as of 12/31 -- we think

24 it's pretty current now -- is holding about $27 million of

25 deposits, which makes sense, given that revenue from these

1  camps could typically be sixty, $70 million or more a year.

2          Almost universally, these deposits are applied

3  when the camp then occurs and the rest of the, you know,

4  pay -- fee for the camp is paid.  There are exceptions that

5  are sometimes made to give refunds, but those are not

6  common -- they're certainly not typical -- but BSA would like

7  to continue to do that to apply those deposits to camps and

8  in those rare instances, where they deem appropriate, give a

9  scout a refund of that deposit.

10          The second scouting program relates to

11  scholarships.  The BSA each year awards merit- and

12  achievement-based scholarships to members.  We believe for

13  this current academic year, 2019/2020, there's probably about

14  700,000 of scholarships that have been granted, but the funds

15  have not been paid yet.

16          This could be for a couple of reasons.  One,

17  second-semester bills might not have come through, but also,

18  recipients may be on religious missions or other things that

19  have delayed the education that the scholarship has to pay

20  for.

21          So, we estimate the prepetition amounts that have

22  been committed by scholarships given is about $700,000 and

23  the BSA believes it's very important to continue to honor

24  these scholarships for these, you know, merit- and

25  achievement-based awards.

 1              And the third part of the scouting program is that

 2   the BSA offers financial assistance to abuse victims and

 3   their families for counseling.  The average is cost is about

 4   $50,000 a year.  We do not believe that any amounts are

 5   currently due prepetition, but today, tomorrow, the next day,

 6   they could get a bill for a prepetition counseling service

 7   that occurred last week or the prior week.

 8              But these are small amounts and even more

 9   importantly, we think it's critical that we continue to do

10   this.  So, to the extent that some prepetition amounts come

11   up, they want authority to be able to pay that.

12              And then the final aspect of this are the donor

13   programs.  It consists of pass-through donations and gift

14   annuities, which Mr. Stang referenced.

15              On the pass-through donations, BSA sometimes

16   collects donations from individuals for certain international

17   scouting organizations, but remittance is typically not done

18   contemporaneously.  Currently, the BSA believes it's holding

19   about $30,000 earmarked for the International Scouting

20   Foundation and about a hundred thousand earmarked for the

21   World Friendship Fund; notably, these funds are held in

22   restricted accounts and BSA does not believe that it has any

23   beneficial interest in these funds.  But, to the extent

24   necessary, we would ask that the order cover allowance to

25   remit these funds and, certainly, to the extent this practice

1  continues in the future, the funds will continue to come into

2  a restricted account, earmarked, and then transferred to the

3  other foundations.

4         And on the gift annuity program, I'll be very

5  brief on this, because we're not seeking any authority on an

6  interim basis.  We do know that there have been issues in

7  other Diocese cases, abuse cases, as to these gift annuity

8  programs.  How they work is a donor makes a gift to BSA in

9  exchange for BSA agreeing to make a stream of payments to

10  that donor until their death and upon the death, then the BSA

11  uses that money to further its charitable mission.

12         Again, under the interim period, we're not seeking

13  any relief on this and under the final period, we're not

14  looking for any sort of ruling that the res -- we think

15  there's about $7 million in these gift annuity accounts --

16  we're not going to be seeking any ruling that this or is not

17  property of the estate, but we will be seeking to make

18  payments to those as being critical to the mission.  Because

19  if we do not continue to honor those obligations, the ability

20  to raise funds in that way and perhaps even other ways, could

21  materially be damaged.  But, again, we're not seeking any

22  relief on those programs -- on the gift annuity program for

23  the interim period.

24         THE COURT:  Okay.

25         MR. LABUDA:  So, given the reasons for all of

1  these, we would ask that the Court enter the order

2  authorizing us to continue these three different groups of

3  programs and make the payment I've described.

4           THE COURT:  Any objections?

5           MR. STANG:  Objection or a comment, Your Honor.

6           As to the academic scholarships matter, we

7  certainly do not want to hurt children who are looking to

8  continue their education with this support, but to the extent

9  there are funds that are restricted for that purpose, we

10  would want them to use those restricted funds first so

11  that -- I mean, I don't know if these would count for

12  scholarship money -- but some of it is grants, which could be

13  restricted.  Some of it might be donor-restricted, but some

14  of it may just be what the Boy Scouts are funding out of

15  their cash.

16           To the extent they can prioritize how that money

17  is -- which dollars are going out, we would want them to use

18  the restricted dollars first before they use the unrestricted

19  dollars.  I don't want to say more while he's consulting.

20           THE COURT:  Okay.  Let's get an answer to that --

21  that's a good question -- let's get an answer to that.

22           MR. LABUDA:  Can we just have a minute, Your

23  Honor?

24           THE COURT:  Yes.

25      (Pause)

1        MR. LABUDA:  Your Honor, I have confirmed to the

2   extent -- and it may vary; some may be restricted funds or

3   allocated for that, some do not have restricted -- but to the

4   extent addressing the concern, there are restricted funds

5   available for a particular scholarship, yes, those would be

6   used first.

7        THE COURT:  Okay.  So, let's revise the order to

8   reflect that.

9        MR. STANG:  My other two comments, Your Honor,

10  really are observations.  First of all, my personal

11  (indiscernible) is 50,000 a year counseling for all of these

12  survivors, I think, (indiscernible) how these survivors need

13  programs that are promoted by the institution that has

14  perpetrated their abuse.  This is not for judgment.

15       On the gift annuity program -- also an

16  observation, because they're not asking for interim relief --

17  they say this money is used for their charitable mission.

18  Charitable immunity has been aggregated in almost every state

19  of the Union.  So, if there's some effort here to say that

20  this money is for our charitable mission and not to pay

21  claims of abuse survivors, just a heads-up, I guess, that we

22  find those words kind of buzz words to mean we're taking this

23  money and putting it over here for what we think we need it

24  for, not for the obligations or the institution which may

25  have occurred in pursuit of its charitable mission.  So,

1  just --

2           MR. LABUDA:  Your Honor, the --

3           MR. STANG:  -- more of a heads-up than a

4  (indiscernible), Your Honor.

5           MR. LABUDA:  Sorry.  The intent of that statement

6  was not to allocate or restrict anything.  I was just

7  describing what's been done historically.  We will not be

8  seeking any ruling on a final hearing on whether or not

9  that's for this purpose or that purpose.

10          The sole thing that we will be asking for is to

11  continue the quarterly payments as we go and accept that this

12  issue will ultimately have to be resolved in connection with

13  the resolution of these cases.

14          THE COURT:  Okay.  Anyone else?

15      (No verbal response)

16          THE COURT:  Okay.  I've reviewed the motion and

17  will approve the continuation of what's been called the

18  "public programs" -- the returns, gift cards, the ability to

19  use credit card -- all essential to the scout shops and the

20  ability to sell inventory and I think necessary to keep

21  scouts purchasing inventory in the future.

22          As for the scholarship program, I agree with both

23  the debtors and Mr. Stang, those scouts who have earned those

24  grants and are counting on them to fund their education

25  should be able to receive those grants when they need them.

1    But I would like the order to be revised to reflect that

2    funds that -- restricted funds that can be used for that

3    purpose will be used for that purpose before unrestricted

4    funds.

5           And the financial assistance for counseling, of

6    course, that should continue and that should be paid -- those

7    prepetition amounts that are owed.

8           And I think the pass-through amounts for the

9    international scouting and the other program -- world

10   something --

11          MR. LABUDA:  Worldwide fund.

12          THE COURT:  Thank you.

13          -- those appear to be coming from restricted

14   accounts and a pass-through and so, I will permit that, as

15   well.  Thank you.

16          MR. STANG:  Your Honor, I apologize.  I try not to

17   do this.

18          When we get -- this will involve cash management

19   in a little bit -- when a dollar comes into the Boy Scouts,

20   we don't know where it goes.  I mean, maybe it goes to an

21   operating account that has trust and non-trust money in it

22   and then it finds its way to restricted accounts.

23          We would just -- and I think counsel said this

24   repeatedly, but sometimes I feel the need to repeat what may

25   be the obvious -- that your agreement to allow these

1  earmarked funds to go to these specific entities is not a

2  conclusion that those funds are -- have not been permeable

3  and are not property of the estate.

4              THE COURT:  I'm not making those findings today.

5              MR. STANG:  Thank you, Your Honor.

6              I apologize if --

7              THE COURT:  That's okay.

8              MR. STANG:  -- if I get redundant about this, but

9  I thank you.

10             THE COURT:  No -- and it's based on the

11 representations that have been given to me in the Whitmore

12 declaration.

13             MR. LABUDA:  Thank you, Your Honor.

14             I'm going to pass the podium to my colleague,

15 Matthew Linder for the next grouping, but I will be back to

16 see Your Honor on the cash collateral matters.

17             THE COURT:  Okay.

18             MR. LABUDA:  Thank you, Your Honor.

19             MR. LINDER:  Good afternoon, Your Honor.  Matthew

20 Linder of Sidley Austin on behalf of the debtors.

21             Your Honor, the first in my group of motions I'll

22 be handling is what we've been colloquially referring to as

23 the "noticing and confidentiality procedures motion."  This

24 is at Docket Number 9.

25             At a high level, Your Honor, this motion includes

1  or requests four primary groups of relief, the first of which

2  really pertains to the top creditors list that we filed on

3  the petition date.  As you'll have noted, we filed two

4  separate lists.  One list is the top 25 firms representing

5  the greatest numbers of abuse victims.  Those are sorted

6  alphabetically, based on the information available to the

7  debtors as of the petition date.

8        We did that separate and apart from our top-30

9  list of non-abuse claimants, really to ease the effort of the

10 U.S. Trustee's Office to review those parties and consider

11 the formation of one or more official committees, whether the

12 Office of the U.S. Trustee chooses to appoint two separate

13 committees.  So, there is a request in the motion to approve

14 what we've done with respect to those two lists.

15       The second and certainly the most important bucket

16 of relief that's requested through this motion is to specify

17 procedures for the redaction of certain information, with

18 respect to names and/or personal contact information, solely,

19 with respect to what's filed on the publicly available

20 docket.  I will further break down what we're trying to do

21 there into two main groups of creditors and parties in

22 interest.

23       The first group really consists of victims of

24 abuse, minors, and parents and legal guardians of minors who

25 are known to assert or have asserted claims against the

1  debtors.  We are seeking to redact both, the names and the

2  contact information, with respect to that group of

3  individuals.  Secondly, Your Honor, we're also seeking to

4  redact only the contact information for employees of the

5  debtors and volunteers of the BSA organization.

6       We believe all that relief, Your Honor, is

7  warranted under Section 107 of the Code and with respect to

8  the latter category -- employees and volunteers -- I

9  understand it's similar to what you've done recently in the

10 Melinta case in terms of redacting employee information on

11 the docket both, for considerations of identity theft and for

12 other reasons particular to this case.

13       THE COURT:  It was other reasons, as I recall.

14 Okay.

15       MR. LINDER:  There, there may have been poaching

16 concerns.  I don't think there are concerns about --

17       THE COURT:  Poaching concerns and threats.

18       MR. LINDER:  And, Your Honor, I think given the

19 subject matter of these cases -- and we certainly understand

20 that we have not been immune from those sorts of threats as

21 well in terms of the BSA's management and other employees --

22 for that reason, as well, I think we would request that

23 relief.

24       If I can continue, just to specify the other forms

25 of relief were requesting, and these, I think, are routine,

1  we'd like to have the notice of commencement served on abuse

2  claimants and their counsel and to direct the debtors to

3  cause the notice of commencement to be published nationwide

4  in three different publications, as well as to email out the

5  notice of commencement via the emails in the debtors'

6  database.  We expect that that includes employees,

7  volunteers, and parents that have been active in the BSA's

8  email address system within the last three years.  We expect

9  that that email distribution would reach approximately

10  3.2 million people.

11         We also had a comment from the U.S. Trustee's

12  Office that they would like to just make clear that all

13  required notices and mailings in the case would be served not

14  only on abuse claimants, themselves, but also on their

15  counsel, and that if any of these claimants contacted the

16  debtors, we would of course agree to add them to the

17  distribution list and to the creditor matrix.  And we

18  certainly -- that's consistent with the spirit of what we're

19  trying to accomplish.

20         With that, Your Honor, I think I've outlined the

21  relief we're requesting.  I'm happy to answer any questions,

22  with respect to that relief.

23         THE COURT:  I don't have any questions.

24         Mr. Stang?

25         MR. STANG:  Your Honor, just a couple of things.

1          I don't know how BSA would know the address of a

2    particular survivor.  It may have come out in litigation.  It

3    may have come out in a letter they wrote.  We'll have to deal

4    with this a little bit in the proof of claims process but

5    getting a notice of commencement of the BSA bankruptcy to

6    your home when people who see that mail don't know why you'd

7    be getting a BSA bankruptcy notice can be very troubling and

8    it's happened recently with USA Gymnastics.

9          So, to the extent that a survivor -- they have an

10   address for a survivor that is not care of a law office, is

11   not -- if that survivor says to them, I want all of my

12   correspondence addressed to my attorney, I would hope that

13   they would honor that request because, again, you know, a lot

14   of times the abuse has not been disclosed to people in the

15   household.  So, I don't know if that needs to be put in the

16   order or not, but it's something that I think does go to the

17   spirit of this motion, which is to protect the privacy of

18   survivors.

19         There are survivors, who, on the other hand, are

20   very public about their abuse and may want to use their own

21   names in pleadings.  I don't read anything in here that would

22   restrict a survivor saying, My confidentiality is mine and I

23   waive it if I want to.

24         THE COURT:  I didn't read it that way.

25         MR. STANG:  So, with that, Your Honor ...

1           MR. LINDER:  Certainly, with respect to the first

2  comment, Your Honor, I think we're amenable and I don't know

3  if the order provides for this, but, certainly, if an abuse

4  victim reaches out and would prefer -- if we have counsel

5  information for them -- subject to that caveat, I mean, we

6  would be amenable to providing notice solely to their

7  counsel.

8           THE COURT:  Okay.

9           MR. MONES:  Your Honor, may I be heard?

10          THE COURT:  Yes.

11          MR. MONES:  I want to echo what Mr. Stang -- oh,

12  I'm sorry, Your Honor.

13          THE COURT:  Can you please step forward.  I don't

14  have a court reporter.  It all gets recorded.

15          MR. MONES:  Thank you, Your Honor.  I apologize.

16          I think to the extent that Mr. Stang said in terms

17  of the problems that people have, having a letter sent to

18  their house sent from the Boy Scouts of America, even know --

19  and I can speak on behalf of my colleagues -- when we send

20  information out in terms of a questionnaire or a retainer,

21  most of them are extremely afraid, even to that coming to an

22  email that their family members may see -- their spouses,

23  children, et cetera -- some of them want to even have a

24  special post office box it's sent to or some other way.

25          So, I think more than just if counsel is present,

1  I think the Boy Scouts have to come up with some, in

2  consultation I think with us, some way in which they can

3  distribute that information that may be, you know, as an

4  alternative just to their home.  I think we can discuss

5  those, as well, in terms of the notice of these matters.

6          THE COURT:  So, I understand the concern and I'm

7  trying to think of how that gets addressed in the context

8  where the debtor, of course, is obligated to give notice

9  to --

10          MR. MONES:  Exactly.

11          THE COURT:  -- all of its creditors and we want to

12  ensure that widespread notice, but it needs to be balanced

13  against the concern that the two of you are expressing.

14          For purposes of today, what do I do with this

15  order, then?

16          MR. STANG:  Your Honor, I would suggest -- and I

17  don't know the timing needs of the U.S. Trustee's Office and

18  the debtor -- but set a very short deadline -- it could even

19  be 48 hours -- for counsel -- any counsel representing

20  survivors to notify the Boy Scouts of where they want notices

21  sent on behalf of those clients.  Again, I don't know that it

22  has to be tomorrow or the day after tomorrow -- I don't

23  know -- but maybe that's the way to address it.

24          And, you know, (indiscernible) the world is

25  supposed to read your orders?  There are people in the

1  courtroom who represent the vast, vast majority of survivors

2  and I think that's maybe one way to handle it.

3          MR. MONES:  I guess, Your Honor, I would have just

4  one other concern, aside from what Mr. Stang said, is that

5  there'll be people out there who the Boy Scouts know about --

6  again, getting back to this idea of the perversion files, as

7  you know, only 1965 through 1985 has been released between to

8  the public.  There was another release between '86 and '91.

9          My colleagues have gotten files for other time

10 periods up until very recently.  So, the Boy Scouts know when

11 the perversion files are, Your Honor -- and not to get too

12 much into the weeds because I know it's just first day -- but

13 they'll know in their files the names of the scouts that have

14 been perpetrated against over this period of history and many

15 of those people, just because of the predilection not to even

16 want to come forward or deal with this problem, will be

17 subject to that list, perhaps, and the Boy Scouts can use

18 that list to send out.

19         We haven't had that discussion and I'm wondering

20 whether or not it's worthwhile for counsel, following this

21 hearing, for the Court to hold the Court's decision in

22 abeyance until we have a time to talk.

23         MR. STANG:  Your Honor, as I said, some of this

24 ties back to the proofs of claim process and this notice

25 issue of what the direct (indiscernible) are going to look

1  like is different than what the notice of commencement

2  necessarily looks like, because I know there's urgency to get

3  that out.

4         And so, Mr. Mones raises a very good issue as to

5  how direct notice is going to be -- how that program is going

6  to be instructed.  Perhaps we can only do what we can do in

7  terms of (indiscernible) and how deeply we go into those for

8  purposes of notice of commencement.

9         THE COURT:  Okay.  Let me have a response.

10        MR. STANG:  Thank you, Your Honor.

11        MR. LINDER:  Your Honor, I think stepping back, we

12  have to keep in mind, I think as you alluded to, we have to

13  get the notice of commencement out to all known creditors.

14  So, I think at this early juncture to be on a very -- even on

15  a very short notice, reaching out to current Plaintiffs'

16  counsel, who are aware and try to coordinate pulling some

17  abuse victims off of the creditor matrix within a very short

18  period of time to facilitate this initial notice might be

19  cumbersome.

20        Certainly, we are amenable to folks reaching out

21  to us and letting us know proactively that they would like

22  correspondence to be directed to their attorneys.  I just

23  don't know that what's been proposed is really feasible.

24        THE COURT:  So, when does that notice have to go

25  out?  What's the rule on that?

1          Do you know, Mr. Buchbinder?

2          MR. BUCHBINDER:  I'll give you my best efforts,

3   Your Honor.  Dave Buchbinder, for the record, on behalf of

4   the U.S. Trustee.

5          The notice of commencement will not go out until

6   we file with the Court a notice of request to set a 341 date,

7   which we have not selected yet.  So, that's not going to

8   happen for a few days.

9          But the notice of commencement that goes out, it

10  goes out from the Bankruptcy Court.  It doesn't go out on

11  letterhead of the Boy Scouts of America.  So, people

12  receiving it are going to get a notice that says United

13  States Bankruptcy Court.  It could be Pier 1.  It could be

14  PES.  It could be any of any myriad of cases.

15         Perhaps the best suggestion -- I understand what

16  everyone is saying -- I want to speak for the creditors,

17  themselves, including the ones that counsel is

18  representing -- there was a case, a consumer case reported

19  last year out of New Jersey -- I can't remember the name

20  right now -- but the underlying facts were that the creditors

21  were creditors of a contractor who had committed fraud.  They

22  had filed a State Court fraud claim against the contractor,

23  but they didn't speak English.

24         They got bankruptcy notices.  They took them to

25  their attorney who told them not to worry about them and they

1  never did anything and it turned out in the opinion the

2  biggest problem was the language problem.  But the end result

3  was that the creditors had not received notice to file their

4  523 complaint and the Court had to throw out their claim and

5  of course you can read between the lines in that opinion --

6  and you know the next case was going to be the case against

7  counsel.

8              My concern here would be that if we're going to

9  process where only counsel is getting notice, if counsel

10  doesn't do his or her job properly, then we have victims who

11  just became victims again.  So, we need to be very careful of

12  what we do in this process.  My suggestion for today would be

13  that, perhaps, we enter in as an interim order so we can form

14  a committee and counsel can chime in on how we should best

15  deal with the issues that everyone has properly identified

16  going forward.

17              But I don't think we can resolve them this

18  afternoon, but the notice of commencement that goes out,

19  doesn't go out on BSA letterhead or envelopes; it's from the

20  Bankruptcy Court.

21              THE COURT:  Okay.

22              MR. LINDER:  Your Honor, Matt Linder, again, for

23  the record.

24              Just to remind the Court and the parties, we did

25  actually set this up as interim and final relief in part so

1  we could have a dialogue and discuss these considerations in

2  terms of the longer duration of these cases.  So, I would

3  propose that, as Mr. Buchbinder suggested, we move forward

4  with the interim order and we can revisit, particularly, once

5  the committee or committees are formed.

6          THE COURT:  Okay.  Yes.  So, let's enter this on

7  an interim basis, with respect to the relief, and I will

8  approve the request to submit the top 25 firms list.  I will

9  approve the request to, I guess, it was aggregate the top 30

10  separate list in terms of procedures for redaction of

11  information, with respect to victims of abuse; yes, I will

12  approve those.

13          I would like some more -- I would like some

14  evidentiary support for at the final hearing for redacting

15  the contact information of employees.  In some cases, I have

16  done it and in some cases I have not, and where I have done

17  it, it's been based on evidence that's been presented to me

18  that merits the redaction, as balanced, against, obviously

19  access, public access to what's happening in this courtroom.

20          So, I will do that and I will approve this on an

21  interim basis and in the meantime, would encourage the

22  parties to talk about an appropriate balancing notice to

23  parties, recognizing that, I think Mr. Buchbinder is correct,

24  that we need to ensure that notice gets to parties, okay.

25          MR. LINDER:  Understood, Your Honor.  Thank you.

1                 And we will be happy to supplement the record with

2       the evidence, with respect to redaction of employee and

3       volunteer contact information before the final hearing.

4                 THE COURT:  Okay.  Were there changes made to this

5       form of order?

6                 MR. LINDER:  There were, Your Honor.

7                 In addition to the changes my colleagues have

8       noted in recitals to the order, there was an insertion that

9       we made in new Paragraph 7 of the order.  What that provides

10      is that -- and I think I alluded to this earlier in my

11      presentation -- is that required notices, mailings, and other

12      communications are going to be made both, one, to holders of

13      claims, for whom we have sufficient contact information and,

14      two, to their counsel of record, to the extent that we have

15      them.

16                And those are both for abuse victims of which the

17      debtors are aware for the prepetition period and with respect

18      to anyone who reaches out affirmatively to contact us to be

19      put on that list of parties who should receive notice.

20                THE COURT:  Okay.  I will approve that for

21      purposes of this notice of commencement, but we'll have to

22      deal with a similar issue, I suspect, in connection with the

23      bar date and we'll deal with appropriate notice of the bar

24      date and whether that's going to be the same or not, I don't

25      know.

1            MR. LINDER:  Okay.

2            THE COURT:  I will approve that for purposes of

3  the commencement of the case notice, again, on an interim

4  basis.

5            MR. LINDER:  Thank you, Your Honor.

6            With, that we'd move on to the next agenda item,

7  which is Docket Number 10; it's the motion to extend the

8  debtors' deadline to file their schedules and statements, as

9  well as their Rule 2015.3 reports.

10            What we've requested, Your Honor, in the motion is

11  a 30-day extension of those deadlines beyond the 28-day

12  extension that we're afforded under the Local Rules by virtue

13  of having 200 or more creditors.  We discussed this with the

14  U.S. Trustee's Office and my understanding is that this

15  motion is unopposed by the U.S. Trustee's Office.

16            Certainly, we've had, as you can tell by the stack

17  of papers on your desk, we've had quite a lot to do, quite a

18  lot to accomplish and a lot of documents to prepare, and a

19  lot of work behind the scenes and we will need additional

20  time to complete the schedules and statements, as well as the

21  reports.

22            THE COURT:  Does anyone want to comment?

23            MR. STANG:  Your Honor, no objection to the

24  extension with the notation of Paragraph 12 BSA represents

25  (indiscernible) 2015 (indiscernible.)  We talked about

1  (indiscernible.)  We would not be surprised to hear if people

2  may contend that the local councils are also compelled

3  entities and this (indiscernible) order does not define who

4  is or is not subject to those reports, but that issue may

5  come forward at the final hearing.

6            MR. LINDER:  Your Honor, just if I could --

7            THE COURT:  Just an extension of the time?

8            MR. LINDER:  It's just an extension of the time.

9            MR. STANG:  And we said no objection to that, Your

10 Honor.

11           MR. LINDER:  So, I could say more on that topic,

12 but we don't need to address that today.

13           THE COURT:  Mr. Buchbinder?

14           MR. BUCHBINDER:  Good afternoon, again, Your

15 Honor.  Dave Buchbinder, on behalf of the United States

16 Trustee.

17           This might be a good time to announce that the

18 formation meeting is going to take place on February 27 at

19 10:00 a.m. at the Doubletree Hotel.

20           THE COURT:  February 27.

21           MR. BUCHBINDER:  At 10:00 a.m. at the Doubletree

22 Hotel.

23           And it's not likely that the notices will be

24 posted before the end of the day or possibly not until

25 sometime tomorrow --

1          THE COURT:  Okay.  Thank you.

2          MR. BUCHBINDER:  -- but they will be there.

3          I do have a couple of observations, comments to

4    make on this particular motion.  We did not oppose it;

5    however, I will observe and note for counsel that we cannot

6    conduct a meaningful 341 hearing without statements and

7    schedules being filed.  So, if they have not been filed by

8    the first date that we select for the hearing, then we will

9    be required to adjourn the hearing.

10         And a second observation to make is there's been

11   some discussion mentioned by various counsel today about

12   seeking a bar date order and an 80-day bar date order.

13         One thing that is certain and a position that the

14   U.S. Trustee will take, is that whatever the time period is,

15   will be triggered by the later of sending out the notice or

16   the filing of the schedules.  No time period will begin

17   without schedules being filed for the important reason that

18   creditors need to know how they're listed in schedules before

19   they make a decision whether or not to file a claim.

20         THE COURT:  Thank you.

21         Anyone else?

22      (No verbal response)

23         THE COURT:  Okay.  I've reviewed the motion.

24   There are no objections, so I will extend the time, as

25   requested.

1          MR. LINDER:  Thank you, Your Honor.

2          The next item on the agenda is Docket Number 11,

3   which is the debtors' application to retain Omni Agent

4   Solutions as their claims and noticing agent in these cases

5   under Section 156(c) of Title 28 of the Code.

6          Your Honor, Omni has obviously provided these

7   services in many cases before.  In this instance, the claims

8   agent protocol that's in place for this district was

9   followed.  Three proposals were reviewed by the debtors.  The

10  proposal of Omni was determined by the debtors to be the most

11  favorable and best proposal for the debtors.

12         We've put in a form of order, the typical language

13  that the U.S. Trustee requires, with respect to the standard

14  modifications to indemnities and the like.  We've made some

15  modifications that I can speak to in a minute.

16         I know that Mr. Stang had a comment prior to the

17  hearing that he wanted to ensure that Omni would be able to

18  facilitate, to the extent that creditors wanted to serve

19  documents out on parties, the addresses of which are redacted

20  on the creditor matrix, that those parties would be able to

21  be served through Omni and that's acceptable to the debtors.

22         And I think the representation on the record

23  should be sufficient.

24         THE COURT:  Okay.

25         MR. LINDER:  I'm happy to walk Your Honor through

1  the changes to the order -- they're minor.

2          THE COURT:  I've reviewed them.

3          Any comments, questions?

4      (No verbal response)

5          THE COURT:  Okay.  I've reviewed the order, as

6  well as the revisions that were made to it and as it's

7  required that there be a claims agent and Omni has filed its

8  declaration showing its disinterestedness and the debtor has

9  gone through the process in this district, I will approve it.

10         MR. LINDER:  Thank you, Your Honor.

11         Moving on to Docket Number 12, which is our motion

12  to provide adequate assurance and related procedures to the

13  debtors' utility providers.

14         This motion, Your Honor, requests customary relief

15  relating to the debtors' utility providers.  That relief

16  includes the determination that the debtors have provided

17  adequate assurance in accordance with Section 366 of the

18  Bankruptcy Code.

19         Again, this is -- we're seeking this on an interim

20  basis today, prohibiting utilities from altering, refusing,

21  or discontinuing services, and approving procedures for

22  resolving adequate assurance disputes.

23         Just briefly, as we stated in the motion, there

24  are approximately 60 utilities that we've listed on the

25  schedules.  They provide service primarily at the debtors'

1  headquarters in Irving, Texas, as well as their scout shops

2  and certain other locations around the country.

3          What we're proposing to provide as adequate

4  assurance is a total of approximately $302,000 into a

5  segregated adequate assurance account within the debtors'

6  cash management system.  This amount was calculated based on

7  the average two-week spend in terms of the amount of the

8  utilities based on an historical 12-month rolling average in

9  most cases.

10          And the order, Your Honor, provides for standard

11  procedures, and we did receive comments from U.S. Trustee's

12  Office that were primarily intended to streamline those

13  procedures, all of which we've agreed to incorporate and

14  should be reflected in the redline.

15          THE COURT:  Does anyone wish to be heard?

16      (No verbal response)

17          THE COURT:  Okay.  I had a couple of comments.

18          It looks like the Office of the United States

19  Trustee picked up on some of the comments or questions that I

20  have but not all.

21          MR. LINDER:  Okay.

22          THE COURT:  So, in Paragraph 4 of the order, the

23  adequate assurance deposit is not a net number.  So, it is

24  going to be the two weeks, and it's not less the amount of

25  existing deposits; it's existing deposits that utilities have

1  are theirs to apply towards prepetition.  So, the adequate

2  assurance deposit needs to be in the two-week amount, full

3  amount, not less the existing deposits.

4          MR. LINDER:  Okay.  That's -- thank you, Your

5  Honor.  We'll incorporate that into the order.

6          THE COURT:  In Paragraph 7, the adequate assurance

7  deposit can be returned to the debtor upon reconciliation,

8  but that reconciliation needs be on notice to the utility,

9  giving them an opportunity to check your reconciliation.

10         MR. LINDER:  We'll incorporate that.

11         THE COURT:  Same with Paragraph 8(d) and the same

12  with Paragraph 11 -- two comments in 11; the deposit language

13  needs to be -- the "less any amounts on deposit" language

14  needs to be deleted and the last sentence, subject to notice

15  an opportunity to dispute.

16         Okay.  With those changes, I will approve an

17  interim order, submitted under certification of counsel,

18  providing adequate assurance of payment to utilities, as

19  necessary to ensure uninterrupted service.

20         MR. LINDER:  Thank you, Your Honor.

21         Next on our agenda is the cash management motion;

22  this is filed at Docket Number 13.

23         We're seeking entry of an interim order, really

24  covering the panoply of different forms of relief that are

25  typically requested in these motions.  We're seeking relief

1  to permit the debtors to continue to use their existing cash

2  management system in the ordinary course of their operations,

3  including existing bank accounts without modification, to pay

4  or allow the banks to debit bank fees, to authorize the

5  debtors to continue their purchase card programs, to utilize

6  business forms, subject, of course, to starting to use --

7  starting to print forms with the debtor-in-possession label

8  on them after 15 days and, finally, to suspend the

9  requirements of Section 345(b) of the Bankruptcy Code for a

10  period of 60 days while we work with the U.S. Trustee's

11  Office to satisfy their concerns, with respect to those

12  considerations, under Section 345.

13          Just a brief, overview, Your Honor, with respect

14  to cash management.  As you will have seen based on the

15  schematic that's attached to the cash management motion, this

16  is certainly a complex cash management system.  Like other

17  large organizations, both profit and non-profit, that have a

18  national scope and reach like the Boy Scouts, the cash

19  management system is comprised of 66 bank accounts at 23

20  banks and it's overseen by the debtors' centralized Treasury

21  Department located in Texas.

22          Obviously, there are numerous accounts.  They

23  serve different functions.  There are depository accounts,

24  concentration accounts, receipts accounts, disbursement

25  accounts, investment accounts; these all work in coordination

1  to further the Boy Scouts' charitable mission.

2          As our papers made clear -- I think we touched on

3  this in several areas -- it's really unique in that it's of

4  the restricted nature of a lot of the contributions to the

5  Boy Scouts, so there's essentially two subsystems within the

6  broader cash management system.  There are certain accounts

7  that are intended, primarily to receive process and remit

8  funds that are subject to donor restrictions and then there

9  are other accounts that are primarily intended to support the

10  other functions of the Boy Scouts, including scout shop

11  receipts and other receipts and member fees, et cetera.

12          You know, I wanted to note -- and I think this

13  picks up on a comment that Mr. Stang made earlier -- we are

14  certainly not seeking, with respect to any restrictions that

15  may exist on the debtors' cash, we're not seeking a

16  determination, with respect to restrictions.  We're not

17  seeking a finding of fact or conclusion of law as to the

18  validity of any of those restrictions.

19          All we're seeking to do, and what we've taken care

20  of to highlight in our papers, is that everything remains

21  subject to challenge by any creditor constituency that wishes

22  to do so, wishes to challenge those restrictions.  We're

23  merely seeking to continue the cash management system as we

24  would on any other first day, and, certainly, the debtors'

25  rights, as well, are reserved, with respect to all of those

1   issues.

2            In terms of prepetition amounts that are sought to

3   be paid on an interim basis by virtue of the cash management

4   order, there are bank fees.  We are seeking relief to pay

5   these, whether they arise pre- or post-petition.  They are

6   modest.  I think they are about $25,000 a month.  We expect

7   that $17,500 of bank fees will come due during the interim

8   period on account of pre- and post-petition bank fees and we

9   seek authorization to pay those fees.

10           We would also like to be able to continue our

11  purchase card programs.  I believe there are 14 purchase

12  cards that employees of the debtors hold and are able to use

13  for preauthorized travel and other incidental items -- point-

14  of-purchase sales -- these are not used to pay large invoices

15  that are remitted to the debtors, and, again, we'd be

16  requesting authority to pay and satisfy those balances,

17  whether they arose pre or post-petition.

18           With that, Your Honor, I'm happy to answer any

19  questions, with respect to the cash management motion.

20           THE COURT:  Okay.  I didn't have as much time to

21  spend on this as I would have liked to, given the 66

22  accounts, but let me hear from others.

23           MR. STANG:  Your Honor, James Stang.

24           I appreciate counsel's statement about the

25  restrictions and I understand this is an interim order.  We

1   are operating on the assumption that the reservation of

2   rights, if you will, applies from the ownership of funds and

3   not just whether or not those (indiscernible.)  But as an

4   interim order, we understand all rights are (indiscernible.)

5            MR. LINDER:  I would certainly agree with that

6   statement, as well.

7            THE COURT:  Okay.  I guess the only concern I have

8   with respect to the relief that's being given ties into the

9   questions that I had with respect to the cash collateral

10  motion, which is that normally it's not a problem to continue

11  use of the same accounts because the pre-petition lender has

12  a lien on everything and the cash coming into those accounts

13  it already has, but that, at least to date, I don't know that

14  that's the case here.

15           So, I would have some concern of using the same

16  accounts.  So, we need to figure out how to address that

17  concern if it is one in the context of the cash collateral

18  motion.

19           MR. ABBOTT:  Your Honor, Derek Abbott.

20           We're about at a point where we would switch

21  presenters.  There are two more motions in addition to cash

22  collateral.  We were going to -- obviously, we're at 1:30.

23  We started some time ago --

24           THE COURT:  Yes.

25           MR. ABBOTT:  -- we wanted to inquire whether the

1   Court wanted to take a break --

2           THE COURT:  Yes.

3           MR. ABBOTT:  -- for lunch or otherwise.

4       (Laughter)

5           MR. ABBOTT:  But maybe we can have that discussion

6   during --

7           THE COURT:  Yes.

8           MR. ABBOTT:  -- a longer break to sort of

9   coordinate that -- push this back with cash collateral so we

10  can get those done at the same time to respect that concern,

11  Your Honor.

12          THE COURT:  Yes.  Okay.  So, this is a good break

13  time.  So, what time do you suggest we come back?

14          MR. ABBOTT:  2:30, Your Honor?

15          THE COURT:  Let's make it 2:45 so you can have

16  discussions, okay.

17          MR. ABBOTT:  Thank you, Your Honor.

18          THE COURT:  We're in recess.

19      (Recess taken at 1:34 p.m.)

20

21

22

23

24

25

1       (Proceedings resumed at 2:54 p.m.)

2               THE COURT:  Please be seated.

3               Mr. Abbott?

4               MR. ABBOTT:  Good afternoon, Your Honor.  Thank

5    you for that break.  I think we've done our best to put it to

6    good use.  I think we will pick-up with the agenda on the

7    remaining two motions we haven't discussed and then grab cash

8    collateral and cash management, that little tweak at the end

9    if we may, Your Honor.

10              THE COURT:  That's fine or not.

11              MR. ABBOTT:  How about cash collateral first, Your

12   Honor.

13              THE COURT:  Okay.

14              MR. ABBOTT:  Fair enough.

15              MR. LABUDA:  Good afternoon, Your Honor; Thomas

16   Labuda, again, on behalf of the debtors.

17              We wanted to give you an update, importantly

18   answers to your questions, and then our thinking on possible

19   paths forward to gage your reaction.

20              As we said before, the collateral does include

21   accounts which would include AR, investment property, deposit

22   accounts, securities accounts.  So, as we said before,

23   inventory is not covered and that's agreed with JPM.  IPA --

24   IP would not be covered, that's agreed as well.

25              The issue we have in sources of money coming in is

1  it's mixed.  There's some AR that will come in and when we

2  calculate it with Mr. Whittman over the next six weeks

3  approximately $73 to $80 million dollars could come in.

4  Expenses are definitely less than that.

5           The money coming in will be AR --

6           THE COURT:  AR from what?

7           MR. LABUDA:  From, you know, if there's pledge

8  accounts where things were actually invoiced and money comes

9  in.  This is important because the big issue, the biggest

10 amount that comes in are membership fees.  And there's an

11 issue of whether or not that --

12          THE COURT:  Are those an account receivable?

13          MR. LABUDA:  There could be a dispute over that.

14 Our view is that it may not be because we don't actually

15 invoice it.  These are things that just come in and time is

16 uncertain.  JPM is not willing to concede that point yet, but

17 realizes it's an issue.

18          THE COURT:  Okay.

19          MR. LABUDA:  There is some sale of inventories.

20 You know, that's not a huge portion of this.  That clearly

21 isn't, but there is an AR portion.

22          The problems we're facing with this is, one, we're

23 not certain whether or not we will need their cash collateral

24 in the next four to five weeks.  While we're projecting that

25 these membership dues would come in, again, they're not

1  invoiced.  It's not a certainty that they will come in.

2  Furthermore, even if they do come in they could be

3  mismatched.  So, everything could come in on a Friday of a

4  week when all the expenses could be Monday or Tuesday.  So,

5  we're just not certain whether or not we will need to tap

6  into the existing cash.

7         The second problem is a practical problem.  The

8  money that does come in automatically does come in there and

9  we simply don't have the time to actually set-up a whole new

10 cash management system, certainly not for disbursements that

11 are coming up in the next couple days.  And it could take as

12 long as a month.

13        So, one of the things we have been discussing with

14 JPM, and we wanted to raise with Your Honor, is a concept as

15 follows; that we would deem any money that comes in from the

16 petition date through the final order to be deemed

17 segregated, its simply not possible to send it elsewhere, and

18 that that money would use a LIFO system, that that last money

19 in would be used first.  And if that is sufficient to cover

20 the expenses until that final order or if it's not

21 subsequently determined that it is their collateral then the

22 adequate protection obligations would not kick in.

23        They would agree that merely the fact that it's in

24 their possession does not give them a lien on it, but they're

25 not giving up either that perhaps membership dues are, in

1   fact, collateral.  So, in that even the adequate protection

2   obligations would only come in with those two scenarios.  The

3   one thing that is in there is that there is a one interest

4   payment that will come due in the interim period that I think

5   they would like paid, and we're comfortable paying.  It's

6   about $800,000 dollars.

7        They would take the view that even if we're not

8   using their collateral, adequate protection, they're over-

9   secured, it's an interest payment which could always be

10  subject to re-characterization if that turned out incorrect.

11       So, that is the proposal after a lot of going

12  through the documents.  We would still have to draft it

13  quickly to see how the ripple effect would work through the

14  documents, but if --

15       THE COURT:  You want to start with just a plain

16  new document, not this one, and it ought to be that simple.

17       MR. LABUDA:  Well, the one counter to that, Your

18  Honor, is that there is no doubt in our minds that we will be

19  using their cash collateral at some point.

20       THE COURT:  I have no basis -- that's not this

21  four weeks.

22       MR. LABUDA:  That's correct, Your Honor.

23       THE COURT:  This four weeks -- I've looked at the

24  rule, it's very clear, okay, all I can authorize is the use

25  of that amount of cash collateral as is necessary to avoid

1 immediate and irreparable harm to the estate pending a final

2 hearing.  I think the corollary of that has to be and I can't

3 provide adequate protection related to that that's vastly in

4 excess of what could be necessary.

5          MR. LABUDA:  The only problem, Your Honor, is that

6 we may very well be using their -- this is not a certainty

7 that the money will come in.  If it doesn't come in, we

8 clearly will be using their cash collateral.  So, our

9 thinking was to say that all the adequate protection

10 obligations only are relevant, only kick-in to the extent

11 it's at a later date proven that we have used their cash

12 collateral.

13          So, it is sort of like a contingent adequate

14 protection package, but that way it is in place and they're

15 not put in the position that, okay, if you have to use it you

16 can use it even though we have no adequate protection.

17          THE COURT:  Not all the other bells and whistles

18 though.  No releases, no you can't use the money for X

19 because, guess what, it might not be their money.  All of the

20 other bells and whistles that look like a full-fledged final

21 order I'm not convinced are appropriate in this circumstance.

22          MR. LABUDA:  But, Your Honor, we did discuss some

23 of those issues and, for instance, the termination rights if

24 we're not using their cash collateral what does the

25 termination rights -- what impact do they have on the estate.

1 The limitations on using their cash collateral, if we're not

2 using their cash collateral those limitations really have no

3 effect.

4         THE COURT:  So, why do they need to be in my

5 order?

6         MR. LABUDA:  Because if we do use their cash

7 collateral this is the terms and conditions of their consent

8 to use their cash collateral.

9         THE COURT:  But we're not going to know that until

10 after the four-week period, right?  We're not going to know

11 whether we're using their cash collateral till after the

12 four-week period.  So, then something we're putting in the

13 cash collateral order in this four-week period is irrelevant

14 or it ends up somehow with an effect that I can't determine

15 what that is.

16         MR. LABUDA:  But it would only take effect if

17 there is a determination by Your Honor at a later date that

18 we did use their cash collateral.

19         THE COURT:  Well, I don't -- so, do they get

20 retroactive termination rights?  What do they get?  I get the

21 idea of something that says if we used your cash collateral

22 in this four-week period you're entitled to adequate

23 protection for the diminution, if any, because maybe it will

24 get made up in the next four-week period, I don't know --

25         MR. LABUDA:  Correct.

1    THE COURT:  -- if any.  But when you start adding,

2  then, all the bells and whistles that are in this order I

3  don't understand the purpose of them during this four-week

4  period, nor do I fully understand the effect of having them

5  in there.  What termination right are they going to exercise

6  if we don't know during this four-week period what their

7  liens are on?  What does that mean?

8    MR. LABUDA:  I don't think they would have a

9  termination right unless and until Your Honor found that

10  their cash collateral was, in fact, used.

11    THE COURT:  So, that's what I'm asking.  So,

12  that's retroactive.  It springs back into time termination

13  right?

14    MR. LABUDA:  No.  I don't think a termination

15  right could. I think something that does have a retroactive

16  issue is like the stipulations where the debtor is

17  stipulating to the validity of the debt and things like that.

18  I do think that would go back retroactively, but as a

19  practical matter there is no way to terminate something that

20  happened in the past.

21    THE COURT:  Why do we need any of that before the

22  final?

23    MR. LABUDA:  The issue is we could come up on a

24  day's notice that we need to use their cash collateral and we

25  will need their consent to it.  And I don't know that it's

1 possible for us to come in that quickly when, you know, we

2 may find out on a Monday that no money came in today and if

3 no money comes in Tuesday all of a sudden we need to use cash

4 collateral on Wednesday.

5         THE COURT:  So, let me ask this question.  What is

6 the -- the debtor takes the position that the lenders are

7 over-secured --

8         MR. LABUDA:  That's correct, Your Honor.

9         THE COURT:  -- based on what?  On what collateral?

10         MR. LABUDA:  Based upon the cash, the collateral

11 they have and the properties.  There have not been valuations

12 done. I admit that, Your Honor, but that was a requirement

13 just like all of the stipulations.

14         THE COURT:  I understand requirements.

15         MR. LABUDA:  Right.

16         THE COURT:  Okay. And I understand that this is

17 not the usual, this is not a secured lender with a blanket

18 lien.  This is a question of whether, in fact, membership

19 fees are accounts receivable or not, and I take no position

20 because I don't know the answer to that question.

21         The debtor may not even be using cash collateral.

22 And even -- and the inventory is 30 percent of the receipts.

23 So, I am struggling, for purposes of this interim period, why

24 a secured lender whose cash collateral may not be used during

25 this period should get all the significant protections on

1  first day.

2         MR. LABUDA:  I would reiterate one important point

3  to the debtor that I said before is that in return for these

4  protections we really do believe we're getting open ended use

5  of cash collateral without any termination rights in six

6  months, in a year, or anything in a time period when we know

7  we're absolutely going to be using their cash collateral.

8         THE COURT:  Okay.  I'm going to reiterate Rule

9  4001-2 which constrains what I can do.  So, the fact that we

10  may need it in the future at some unspecified time, while I

11  appreciate it, doesn't answer what I can do.  It does not

12  directly address what I can do.

13        So, I am willing to entertain some paired down

14  form of order that gives JPMorgan adequate protection for any

15  diminution in value of their cash collateral to which they

16  are absolutely entitled, okay.  I don't have a problem with

17  that concept, but it needs to be paired down.  And I guess if

18  they're not willing to do that we'll just have a fight over

19  it because I'm not sure they're using cash collateral and

20  JPMorgan hasn't put anybody on to tell me they are.  We just

21  have a bunch of questions.

22        So, I'm certainly willing to give them adequate

23  protection to the extent of diminution, but the order, I have

24  to say, my mark-up of it was incredible, incredible.

25        MR. LABUDA:  Understood, Your Honor.  We hear you.

1  We will meet with them immediately and work on a revised

2  order.  The one thing I would ask to flag for you, and I

3  don't know your availability, I do believe from Mr. Whittman

4  by the end of the week we may need to make some

5  disbursements.  So, we're going to have to act very quickly

6  here and get back to you very promptly, as in tomorrow.

7           THE COURT:  Well, I have a two o'clock hearing.  I

8  don't know if it's contested or not.

9           Mr. Ward, is it contested or is it not?

10          MR. WARD:  I was hiding in the corner, Your Honor.

11          I am hoping, Your Honor, that the two o'clock

12  tomorrow is not going to be a super long hearing.

13          THE COURT:  Okay.  Do we know if the --

14          MR. WARD:  I believe that the --

15          THE COURT:  -- guy from Alaska is --

16          MR. WARD:  -- he is resolved and the settlement

17  motions that we filed are being pushed.  That is my

18  understanding.

19          THE COURT:  Okay.  So, I have some time in the

20  morning and before that hearing.  We will have to take a

21  break around the 12 o'clock that I have, and then I may have

22  time after that.

23          MR. WARD:  I would also note, Your Honor, that my

24  colleague from Norton Rose, Louis Strubeck, would like to

25  make some observations as well.

1              THE COURT:  Of course.

2              MR. WARD:  Thanks, Your Honor.

3              THE COURT:  Of course.

4              MR. STRUBECK:  Good afternoon, Your Honor.  I know

5    your dying to hear something from JPMorgan Chase's counsel.

6    So, let me see if I can help you with that.  It's good to see

7    you again.  Lou Strubeck on behalf of JPMorgan, and I am with

8    Norton Rose Fulbright.

9              Judge, I want to just kind of dispel a perception,

10   to the extent it exists, in terms of JPMorgan Chase as being

11   heavy handed here.  We spent a lot of time, as Mr. Labuda and

12   everyone to the right here can attest to in terms of trying

13   to come up with what we thought was a cash collateral order

14   that, frankly, was pretty straight down the middle the fair

15   way.  Apparently, we didn't succeed, Your Honor, given some

16   of your comments, but we really did try to achieve that.

17             I think the thing that we're struggling here with

18   -- and the take away is that if there weren't questions about

19   whether cash collateral is going to have to be used, I think

20   that you would conclude that the protections that are

21   contained within that order are the kind of typical

22   protections that you always see a lender get under these

23   circumstances.  And maybe what got us started off on the

24   wrong track here was a misperception that we, like we

25   typically have in other cases, had a lien against everything.

1  We don't.  And what Mr. Labuda said is a pretty accurate

2  overview of what it is that we have liens against.

3         We think that the cash that exists right now,

4  other than the non-restricted cash we have liens against, I

5  think that if the chief financial officer for the Boy Scouts

6  were to testify today you would hear him say that they can't

7  say that they're not going to have to use what they agree is

8  our cash collateral.

9         So, what we were trying to figure out a way to do,

10 Your Honor, was to fashion what I think is the typical kind

11 of adequate protections you get for diminution in value

12 during this interim period of time.  We weren't trying to

13 lock anybody in.  The deadline is that you couldn't get

14 relief from further on down the road.

15        The second thing that I wanted to say is we

16 haven't drawn a line in the sand when we had discussion while

17 you were out.  We were trying to find a constructive solution

18 to it because we understood what you were struggling with.

19 Again, I don't want to give you the perception that JPMorgan

20 Chase is being heavy handed here.  That is actually

21 institutionally not the way we typically react to a cash

22 collateral situation.

23        We actually took a lot of what's in this cash

24 collateral order from another situation, and I know everyone

25 is different, that's before Your Honor.  So, we appreciate

1  this is a little bit different situation --

2          THE COURT:  Before or after I marked it up?

3          MR. STRUBECK:  Before you marked it up.  I haven't

4  seen your mark-up.  So, I'm not sure exactly, you know, what

5  you're thinking about.

6          THE COURT:  But I meant in the other case.

7          MR. STRUBECK:  It was actually after the mark-up.

8          THE COURT:  Really?

9          MR. STRUBECK:  Yes, Your Honor.  So, we weren't

10 trying to reach, we weren't trying to do things that were

11 going to unfairly bind people so that if later on, you know,

12 after committee's were appointed the adequate protection that

13 was granted to us and other rights weren't things that could

14 be challenged or re-looked at.

15          This is a different kind of situation because, as

16 was just said, there's money that's coming in and if you were

17 to assume, maybe, that that money that's coming in was money

18 that we didn't have a lien against then maybe it's true that

19 our cash collateral wouldn't have to be used, but that money

20 that's coming in, at least a very good portion of it, we

21 either clearly have liens against, which I don't think there

22 will be any dispute about, or we have a grey area where we

23 think we have liens and maybe the Boy Scouts think that we

24 don't have liens, then there's another piece of it where it's

25 probably cash that comes in that we don't have liens against.

1            To me, the most important thing about all this is

2    the Boy Scouts cannot unequivocally say that during this

3    interim period they're not going to have to use our cash

4    collateral.  So, really what we're trying to achieve is to

5    protect us from diminution in value in that cash collateral

6    that's being used.

7            It's funny, Judge, because I can't tell you how

8    many times in over 35 years of doing this I've heard judges

9    say to me across the country, you know, why does it take a 50

10   page cash collateral order to say something that you all can

11   typically should be able to say in 20 pages or 15 pages.  And

12   all I can tell you is we worked really hard prior to coming

13   in here today to try to pair this down to get something that

14   was actually, based on my experience, probably 10 or 15 pages

15   less then what you typically see in this kind of case.

16           So, I think maybe with the benefit of having a

17   little bit more time and coming back to see you tomorrow we

18   can help address some of these concerns that you have, but I

19   wanted to dispel any notion that this was a situation where

20   we were being unreasonably aggressive in terms of our ask

21   because we weren't.  We spent a lot of time trying to narrow

22   down these issues in the hope that we wouldn't have some of

23   these concerns today.  And the hour that we spent was, I

24   think, pretty constructive in terms of trying to find a

25   solution that we thought might work for you.

1            THE COURT:  I appreciate that. And what you have

2    described as the foundation of what you will work off of

3    sounds fine to me. I do have concerns. So, I think you should

4    go through the order, and many people in this room have had

5    the pleasure of sitting through one of my first day hearings

6    on DIP orders, to see what the things are that I just don't

7    think are appropriate.  And here where it looks like to me,

8    based on the math, that the debtor is going to be getting $80

9    million dollars and spending 35 so that there is $45 million

10   dollars in current money.  It makes it a little bit more

11   difficult.

12           Now, I understand the issue.  As I said, I don't

13   know what the answer to that question is, but some portion of

14   that is certainly cash -- it's almost certainly not the

15   bank's cash collateral and, therefore, restrictions on what

16   can be done with the use of funds in that scenario has got to

17   be figured out.  So, I will let you all take another shot at

18   it.

19           As I said before, though, this concept in here of

20   an adequate protection obligation I don't understand it.

21   It's not how I think of adequate protection.  So, that needs

22   to come out or be explained better to me.

23           MR. STRUBECK:  That is the one thing, Your Honor,

24   that I feel pretty confident in that we can get you

25   comfortable with in terms of that was probably a poor choice

1  of words when it came to what it is that we were trying to

2  define. So, I think we could get you comfortable with that.

3        The last thing I will say is, again, this is a

4  different situation in terms of the uncertainty about money

5  that comes in and whether they're subject to JPMorgan's liens

6  or not an how much money is going to have to be used during

7  this interim period and whether there is going to have to be

8  a use of JPMorgan's cash collateral.

9        So, those are things that we're having a really

10  difficult time, despite having some really wonderful

11  advisors, quantifying.  So, what we have tried to do here is

12  to come up with a prophylactic salutation in terms of

13  preserving everybody's rights, not prejudicing anybody and

14  maybe there's a better and simpler way to say it, but that is

15  what we're trying to achieve.

16              THE COURT:  Okay.  Thank you.

17              MR. STRUBECK:  Thanks.

18              MR. ABBOTT:  Your Honor, just a point of

19  clarification.  I've heard what the court said and it seems

20  to me that your concern is, effectively, remedies during the

21  interim period.  I'm just trying to get a little more contour

22  around what we need to carve out of what's there to scratch

23  the itch that's bothering the court.

24              THE COURT:  Well, as I said, I had a pretty heavy

25  mark-up of this.  What I think you need to do is go through

1  it and figure out what is absolutely necessary during this

2  interim period.  And dictating the use of cash collateral

3  during this interim period I don't think is necessary.  I am

4  not sure it's even necessary to -- you can establish the

5  challenge period, I guess, but there was some stuff in that

6  section that I didn't like to me is not customary.

7          You don't need to define what adequate protection

8  is, okay.  You get adequate protection for diminution in

9  value.  We don't have to say and that includes if it's for

10  this, or this, or this, or this.  Just say you get it for

11  diminution in value.

12          I guess the question ultimately will be should

13  JPMorgan get a lien on everything that they do not currently

14  have liens on for diminution.  And if they do maybe

15  marshaling has to stay in effect.  I'm not sure.  We have to

16  figure that out because this is not a situation where they

17  had a blanket lien prepetition.  So, there are a lot of

18  things that are coming up in here that might be okay in a

19  case with a blanket lien that aren't here.  So, those are

20  concerns that I had as well.

21          You can look on the flipside and say, well, it's

22  only for diminution so what does it really matter.  I've had

23  some crazy diminution arguments made to me lately and I want

24  to make sure we're not giving away too much.  That is why I

25  asked the question what are they over-secured by because the

1  cash is constrained to whatever they had -- the current cash

2  is constrained to whatever they had on the petition date.

3  Anything above that at this moment is still in play.  We

4  don't know. So, what are they over-secured by?

5          So, as I said, several of you have sat through my

6  discussion of DIP orders.  I don't want to do anything that

7  prejudices anybody not in this room.  And I think it ought to

8  be limited to what is necessary to ensure that the bank is

9  adequately protected during this period in the even their

10 cash is actually used, but not more than that.  And

11 everything else should wait till final.

12         MR. ABBOTT:  That's helpful, Your Honor.  Thank

13 you.

14         MR. LINDER:  Good afternoon, Your Honor; Matt

15 Linder on behalf of the debtors.

16         I am coming back up on the cash managment motion.

17 I know that Your Honor had raised concerns about granting the

18 relief requested in that motion in light of what we just

19 discussed regarding cash collateral. I am wondering if

20 there's a potential solution that we can craft separate and

21 apart from the cash collateral issues that will allow the

22 debtors to continue to use all of their accounts, 23 of which

23 are JPM accounts.  They are the primary cash managment bank

24 in this system.  For example, the primary cash concentration

25 account that sits in the middle of the schematic of the bank

1 | accounts is a JPM account.

2 |     I'm wondering if during the interim period we

3 | could, obviously subject to the input of JPM's counsel, come

4 | up with a construct whereby we could, for that period of

5 | time, agree that the cash that flows into the system there

6 | would be a reservation of whether that cash would be subject

7 | to JPM's liens.

8 |     THE COURT:  Well, I think the concept of deemed

9 | segregation that the bank's put forward should be

10 | incorporated into the cash management system order.  Then I

11 | think that would take care of my concerns.

12 |     MR. LINDER:  Okay.  Well, why don't we try to come

13 | up with some language, Your Honor, and then we can -- would

14 | Your Honor be okay if we submitted a proposed order or should

15 | we --

16 |     THE COURT:  Yes.

17 |     MR. LINDER:  Okay.  Thank you, Your Honor.

18 |     THE COURT:  As long as it's circulated and

19 | everybody has signed off on it.  If anybody has questions, we

20 | will address it tomorrow.

21 |     MR. LINDER:  Thank you, Your Honor.

22 |     MR. BUCHBINDER:  Your Honor, Dave Buchbinder on

23 | behalf of the U.S. Trustee.

24 |     I have to ask the court permission for me to be

25 | excused in about five minutes because I have a 3:30 hearing

1  before Judge Shannon.  Ms. McCollum is here to adequately --

2         THE COURT:  Shannon?  You're going to give up me

3  for Shannon?

4      (Laughter)

5         MR. BUCHBINDER:  I'll be back.

6         THE COURT:  Okay.

7         MR. BUCHBINDER:  You're warned.  I'll be back.

8      (Laughter)

9         THE COURT:  Okay.

10        MR. BUCHBINDER:  Ms. McCollum is here to cover for

11 us.

12        THE COURT:  Of course.  Anyone who needs to leave

13 for any purposes is, of course, welcome to.  Thank you.

14        MS. BOELTER:  Jessica Boelter, again, Sidley

15 Austin on behalf of Boy Scouts of America and Delaware BSA,

16 LLC.

17        Your Honor, we have two items left on the agenda

18 for this afternoon.  The first is Agenda Item 14 which is

19 also Docket Number 14, that the debtors' wage motion.  By

20 that motion the debtors are seeking authority to pay

21 prepetition amounts due to their employees as well as

22 continue their wage and benefit compensation programs in the

23 ordinary course of business.

24        Your Honor, as I'm sure you saw in our pleadings,

25 the debtor employs 1,650 individuals.  A thousand of those --

1    and I'm talking the debtor, itself, right now.  Shared

2    services, obviously, picks up benefit programs as they

3    pertain to the local councils.  But the debtor, itself,

4    employs over 1,600 individuals both full-time, part-time, and

5    seasonal employees.  As you can imagine, Your Honor, our

6    employees are absolutely essential to our ability to move

7    forward.  They're critical to our ability to reorganize.

8            From my perspective there were three or four

9    points that I just wanted to make sure that I made clear to

10   the court with respect to that particular motion.

11           First, as we represent in the motion, no employee

12   or independent contractor is owed more than the statutory

13   priority cap.  There are two exceptions to that, though, Your

14   Honor.  The first is, as we explained in the motion, BSA is a

15   self-insured employer from a medical and dental benefit

16   perspective. We are unable to predict what claims are going

17   to come into BSA that need to be satisfied, but even if I

18   could I would venture to say given the cost of healthcare in

19   the United States it would probably be in excess of the cap.

20   So, we need -- what we have requested is that the cap not

21   apply to healthcare and medical -- excuse me, medical and

22   dental benefits.

23           I should note, and this may have come up in the

24   cash management motion, itself, we have actually set aside

25   amounts to satisfy those types of claims. They're in a

1   segregated bank account. So, we certainly have sufficient

2   funds, in our view, to satisfy any medical and dental benefit

3   claims that come through.

4          The second exception to the statutory priority cap

5   in the motion is our paid time off policy.  We are proposing

6   to honor paid time off through the duration of the case in

7   excess of the cap.  That being said, if an individual

8   employee leaves its employment, under the prepetition program

9   they would have been entitled to receive a cash pay-out with

10  respect to their paid time off that could have exceeded a

11  cap.  We're still proposing to give them a cash payout at

12  termination, but we're proposing to make that subject to the

13  cap.  So, we will honor paid time off for active ongoing

14  employees in excess of the cap.  We would propose to impose

15  the cap on employees when they leave service and are entitled

16  to a cash payment.

17         One other point, I guess, I should note is the

18  Workers Compensation Program we are seeking to honor all

19  Workers Compensation claims.  I don't necessarily believe

20  that they fall within the 507(a)(4) or (a)(5) cap, but just

21  to be in full disclosure, Your Honor, we are seeking

22  authority to honor those claims in whatever amount they come

23  in.

24         Another point to note, Your Honor, we are not

25  seeking approval today of any retention incentive or

1  severance program at any point with respect to any of our

2  employees.  We are seeking, at the second day hearing, to

3  honor the non-insider severance program, but, again, that's

4  not before the court today.  Nothing we are asking for today

5  would approve any type of retention, incentive or severance

6  program for insiders or non-insiders.

7           Then I think the final point to make, Your Honor,

8  is I think it's important to just explain how this motion

9  works with the shared services motion because the shared

10 services motion certainly describes a lot of what may appear

11 to be overlapping benefits.  We actually went through great

12 pains to ensure that the relief requested in the wage motion

13 doesn't, in fact, overlap with the relief requested in the

14 shared services motion.  So, you're not signing the same type

15 of relief in two separate types of orders.

16          As set forth in the shared services motion BSA

17 provides benefits to 6,600 employees of the local councils.

18 The payment of prepetition amounts with respect to those

19 benefits for local council and employees is covered in the

20 shared services motion.  So, in the event you were to sign

21 this order you're not signing off on what is in that motion.

22          What is in this motion that does pertain to local

23 councils is the fact that there are a number of

24 administrative fees that BSA pays to third-party benefits

25 providers.  Those administrative fees are invoiced to the

1  BSA.  They -- the bills come in BSA's name and they are often

2  for benefit programs that benefit both our employees and

3  local council employees.

4          When we receive that invoice it's not bifurcated

5  between BSA national employees and local council employees.

6  So, we are seeking through this motion to pay the prepetition

7  amounts related to those invoices in full.  We thought that

8  was -- we just couldn't find a way to bifurcate that between

9  the two motions.  So, that's in the wage motion and in the

10 wage amounts that are set forth therein.

11         You may have also seen, Your Honor, in the shared

12 services motion that there's this concept called related non-

13 debtor entities.  Those are six of the entities that I

14 reviewed with you during the opening statement and that are

15 actually featured on our organizational chart.  Thirty-two

16 BSA employees actually provide services to six related non-

17 debtor entities.

18         In the wage motion we are seeking authority to pay

19 prepetition amounts owed to those employees because they are,

20 in fact, BSA employees.  The shared services motion, on the

21 other hand, says we want authority to continue just that

22 arrangement with the related non-debtor entities in the

23 ordinary course of business.  So, prepetition amounts are

24 covered here, the shared services arrangement is covered in

25 the shared services motion.

1          With that, Your Honor, I'm happy to respond to any

2    questions with respect to the motion itself.  There were a

3    couple of changes to the order and I note that our order, in

4    Paragraph 10, contains the language that you flagged earlier

5    in connection with other motions.  So, I am happy to review

6    that with you as well.

7          THE COURT:  The question I have with respect to

8    Paragraph 10, and then I'll hear from anyone else who would

9    like to be heard --

10          MS. BOELTER:  Sure.

11          THE COURT:  -- is if there's a payment made under

12   this pursuant to the authority granted in this order (b) a

13   waiver of the debtors' rights -- it says notwithstanding

14   anything --

15          MS. BOELTER:  Right.

16          THE COURT:  -- that I order and a payment that's

17   made pursuant to a valid order.  It's not a waiver of the

18   debtors' rights to subsequently dispute such claim or lien on

19   any grounds.  So, what does that -- what's the practical

20   effect of that; a payment that's been made and then the

21   debtor wants to subsequently challenge it.

22          MS. BOELTER:  So, Your Honor, what I would say in

23   the context of this motion, and I note it also occurs in the

24   next motion, so we can talk about it there, but I think the

25   logic still applies.  You know, we have, obviously, provided

1  estimated amounts based on invoices that we believe are going

2  to come in and are due during this period.  I could foresee

3  us -- by the way, in the context of the wage motion this is

4  not intended to go back to an employee and say we paid you in

5  a dollar amount and we want our money back.  This is not

6  about our employees.

7       If we were to pay an administrative service

8  provider, for example, with respect to an invoice and later

9  realized that we were over-charged with respect to that time

10  period I think this would reserve the debtors' right to go

11  back and say, actually, that invoice you sent us was

12  incorrect or there was some other issue with it and we need

13  to reduce another payment or dispute the claim that you

14  submitted pursuant to that invoice.  I think that's what this

15  language is intended to mean, at least in this context.

16       THE COURT:  Okay.  And I don't have a problem with

17  that concept of a subsequent reconciliation or some mistake

18  or something.  I think this language is a little broad.

19       MS. BOELTER:  Okay.

20       THE COURT:  I am okay with it on this interim

21  basis, maybe you can look at it for final.

22       MS. BOELTER:  Very good, Your Honor.

23       THE COURT:  Okay.  Others?  Ms. McCollum?

24       MS. MCCOLLUM:  Your Honor, Hannah McCollum for the

25  Office of the U.S. Trustee.

1          I want to make a point, and I think this is a

2    final order point, but to the extent that the debtors are

3    going to put a cap on paid out PTO some states, and I'm

4    thinking here of California, require that it be paid in full.

5    So, I don't think the debtors can necessarily put a

6    unilateral cap on that.  They may be required by other law to

7    make those payments.  So, it might that we just need to work

8    out some language to make that exception.

9          THE COURT:  Okay.  Thank you.

10          MS. MCCOLLUM:  You're welcome.

11          THE COURT:  Anyone else?

12      (No verbal response)

13          THE COURT:  Okay.  I reviewed the order and I

14    certainly think it's appropriate to pay the employees their

15    prepetition wages and to continue their benefit programs, and

16    Workers Comp, and all of the relevant programs under this

17    order.  We will deal with severance, retention, et cetera,

18    when and if those get in front of me.

19          In terms of the request here with respect to the

20    BSA employees I think it is necessary to pay them to keep

21    them employed and to ensure that the debtor is able to

22    continue to function, including to bring revenue into this

23    estate.  So, I will approve this and find that it complies

24    with Rule 6003.

25          MS. BOELTER:  Thank you, Your Honor.  We

1   appreciate that very much.

2           That then -- oh, I should have noted, Your Honor,

3   there was a blackline order that was handed up.

4           THE COURT:  Yes.

5           MS. BOELTER:  There were only -- in fact, I don't

6   believe there were any substantive changes beyond some that

7   have been described to you previously today.  We added a date

8   for the second day hearing and as I think you heard from one

9   of my colleagues, we deleted the but not directed language

10  throughout the order at the request of the United States

11  Trustee.  Those were the only modifications to the wage

12  motion order.

13          Your Honor, that brings me to Docket Number 15

14  which is also Item 15 on the agenda.  This is the debtors'

15  motion seeking authority to pay prepetition amounts due on

16  account of shared services and to continue operating in the

17  ordinary course of business with respect to the entities that

18  are parties to shared services arrangements with the debtor.

19          This is -- this order, Your Honor, I should note,

20  has been designated both interim -- we're only seeking

21  interim relief today.  There will, of course, be a final

22  hearing with respect to this motion once the committee is up

23  and running.

24          Now, Your Honor, I understand that the motion may

25  be somewhat dense.  I also understand it's rather late in the

1  day.  I have prepared, sort of, a more fulsome presentation

2  with respect to the motion including demonstratives if that

3  would be helpful to understand the shared services

4  arrangements particularly as they relate to BSA and the local

5  councils.  And if Your Honor can indulge me, I would like to

6  hand them up.

7            THE COURT:  Yes.  Thank you.

8            MS. BOELTER:  So, I'm going to, for the moment,

9  Your Honor, refer back to a chart that I handed you during

10  the opening presentation and that's the chart that was titled

11  delivery of the BSA's mission.  I'm not going to go over the

12  chart in exhaustive detail, but, again, I want to note that

13  the chart really does depict how the mission is delivered

14  from BSA National, the single entity, all the way down to our

15  81,000 units.  And a critical component of our mission

16  delivery is our local councils that stand right there almost

17  in the middle.  They interact directly with our chartered

18  organizations, the 41,000 chartered organizations, and they

19  also interact directly with our units.

20            In addition to that the local councils collect

21  fees on behalf of the BSA.  As we talked about, that's in

22  excess of potentially $100 million dollars for 2020.  And so,

23  they really are critical to our organization both on the

24  mission delivery side as well as on the revenue collection

25  side.

1        When we think about the shared services motion,

2  Your Honor, I'm going to divide it into a couple of different

3  sub parts just to unpack it for the court.

4        The first subpart -- well, let me state what the

5  two initial big baskets are. We got local council shared

6  services arrangements and then we've got the related non-

7  debtor entity shared services arrangements.  I'm going to

8  treat both of those separately in my remarks.

9        Let's start with the local council shared services

10  arrangements.  I'll just point you to the demonstrative tiled

11  Local Council Shared Services arrangements.  We have --

12  essentially, we're viewing the relief requested in this

13  motion in a couple of different buckets.  When you look at

14  the left side of this chart you will see fees charged going

15  from local councils to the BSA, services provided at cost.

16  This represents the whole host of services that BSA provides

17  to local councils literally at cost.  We think of those as

18  pass-through services.

19        So, for example, the benefit programs which

20  comprise the vast majority of the prepetition amounts we're

21  seeking authority to spend in this motion, the benefit

22  programs we literally charge to the local councils at cost.

23  We provide them with the health and benefit programs for the

24  employees and the local councils repay Boy Scouts of America

25  at cost for those benefit programs.  That is true for -- and

1   the number of different items that are listed here in the
2   chart on the left, director and officer insurance, shipping
3   and freight for wholesale purchases, it goes on and on,
4   registration systems.  We are literally billing the local
5   councils at cost.

6           Because for many of these items we're billing them
7   in arears we have the obligation to provide the prepetition
8   benefit to either them or often a third-party when we're
9   talking about medical benefits. Then they have the obligation
10  to reimburse us for the amount that we paid out.  So, again,
11  this is just amounts that we are going to pay. The next chart
12  will actually give you the prepetition amounts, but these are
13  amounts that we are paying a third-party service provider in
14  the case of medical benefits on behalf of local counsel
15  employees.  We bill the local councils; they pay us back.
16  So, that is bucket one; just sort of direct pass-through
17  costs.

18          On the right side of your chart are other services
19  that we provide to the local councils in exchange for, one, a
20  fee that the local councils pay to us.  You may recall I
21  mentioned when we went through our sources of revenue, we
22  actually receive a fee from the local councils themselves.
23  That's around $9 million dollars.  But it's also critically
24  important to note that the local councils provide us with
25  reciprocal services.

1          So, while we aren't charging them -- for example,

2   if you look at the top part of the chart on the right hand

3   side we don't charge them a pro rate share, for example, of

4   human resources that they use at BSA National, or for

5   accounting, or for the training programs, or for, you know,

6   general liability insurance coverage.  We do charge tem a

7   fee.  That fee doesn't necessarily cover these charges dollar

8   for dollar, but in return they are doing a tremendous service

9   for us.

10          They are collecting dues in the payment of fees.

11   Again, $100 million dollar source of revenue right there.

12   They're providing programing oversight at the unit level,

13   they're actually responsible for delivering scouting programs

14   at their own camps in accordance with goals, and rules and

15   regulations that BSA National sets up.  They recruit

16   volunteers, they recruit members who ultimately pay fees to

17   the BSA National Organization.

18          So, the local councils, again, as part of their

19   kind of critical mission delivery also do a lot for us.  That

20   is why we have this section of the chart at the right.  These

21   are just reciprocal services and services that we provide to

22   them also in exchange for the local council fee that I

23   mentioned.  The top part represents what we give them and the

24   bottom part represents what they give to us.

25          Now when we think about the relief that's

1  reflected in the form of order we're asking the court to do

2  two things.  First, we're asking the court to authorize us to

3  pay prepetition amounts due with respect to these programs.

4  And I will come to that in a moment.  That is on the next

5  demonstrative that I mentioned.  Second, we're asking the

6  court to authorize us to continue this shared services

7  arrangement with the local councils in the ordinary course of

8  business.

9        Again, I note they're critical to our mission, but

10  this is also an interim order.  So, we need this during, at

11  least, the interim period.

12        When we think about the prepetition amounts that

13  we're seeking to pay pursuant to this motion that's -- we

14  created a chart of that, that's the next demonstrative.  And

15  you will see each of the yellow boxes is a separate aggregate

16  number.  So, the first section is just the amounts that we're

17  seeking authority to pay on behalf of the local council

18  benefit programs.  That's' $1.7 million dollars during the

19  interim period.

20        I should note that, Your Honor, one of the

21  exceptions that I discussed in the wage motion applies here

22  to.  We are, with respect to the local council, self-insured

23  with respect to healthcare benefit programs.  So, this amount

24  -- because we can't predict what claims are going to be made

25  against us as the self-insured, we have asked that that not

1  be subject to any cap in this motion.  And that language is

2  actually reflected in the order.  And it's for the same

3  reasons that we didn't subject that amount to the cap that

4  was contained in the wage motion as well.

5        Again, this 1.7 million is a pass-through or an

6  expense that we charge the local councils at cost, but these

7  are amounts that we need to satisfy in terms of health

8  insurance, you know, life and accidental death insurance, et

9  cetera.  These are all amounts that we owe parties that we

10 will ultimately receive reimbursement from the local

11 councils.

12        The other two categories of items that appear on

13 this chart that don't fall into that direct, sort of, pass-

14 through category one is what we call the 457(b) plan. We are

15 asking for a very modest amount here today, $10,000 dollars,

16 but I do think I should pause for a moment, Your Honor, and

17 explain what that is because when we get to the final hearing

18 we're asking for a significantly larger amount.

19        The Boy Scouts of America maintained 457(b)

20 deferred compensation plans.  That plan established unsecured

21 claims with respect to the participants in that plan and with

22 respect to BSA National employees who participated in that

23 plan we did not ask for authority with respect to that plan

24 as the debtor.

25        In this instance local council employees actually

1  made individual contributions into the deferred compensation

2  plan.  Those funds are held at Fidelity.  Fidelity -- and I

3  believe this account was mentioned in the cash management.

4  It was, it was mentioned in the cash management motion.

5  Fidelity holds this account and maintains sub accounts, one

6  for BSA National and one for BSA local council employees.

7            During the interim period approximately $10,000

8  dollars will be owed to a local council retiree with respect

9  to the deferred compensation program.  We're asking authority

10 to pay that amount.  These are amounts that individuals,

11 themselves, actually deferred from their own compensation

12 that was deposited into the Fidelity account and that account

13 has been designated as a local council account.

14           The final piece, Your Honor, are the local council

15 scout shops and miscellaneous other local council expenses.

16 As you may have seen in the motion, Your Honor, our scout

17 shops in many instances are actually space that we rent from

18 local councils.  This is an amount that we would propose to

19 pay the local councils based on the fee for utilizing the

20 scout shops at prepetition amount.  So, the aggregate total

21 during the interim period for the local council shared

22 services expenses is $2.1 million dollars.

23           Your Honor, that then brings me to what I was

24 referring to as the related non-debtor entity shared

25 services.

1              THE COURT:  Before we go there -

2              MS. BOELTER:  Sure.

3              THE COURT:  -- and I think it was in the papers,

4    but there is an amount that's owed the other way prepetition

5    as well, isn't there, from the local councils to BSA

6    National.

7              MS. BOELTER:  Right. And I think it is our

8    expectation, particularly, for example, with respect to the

9    local council fees.  Those fees need to be paid to BSA.

10             THE COURT:  And do we have a sense of the amount

11   of that?

12             MS. BOELTER:  Apologies, Your Honor.  Mr. Whittman

13   informs me that's approximately $10 million dollars over the

14   next seven to eight weeks that we are collecting from the

15   local councils.

16             THE COURT:  Okay.  And is that inclusive of the

17   reimbursement of the million-seven in the local benefits

18   programs or is that in addition to?

19             MS. BOELTER:  It is inclusive of the reimbursement

20   of the 1.7 million.

21             THE COURT:  Okay.  Thank you.

22             MS. BOELTER:  Your Honor, if I may, that then

23   brings us to the second, sort of, large category I mentioned

24   which is the related non-debtor entities shared services. As

25   I was saying, the organizational chart that we reviewed this

1  morning, six of the entities are related to this particular

2  category of shared services.  BSAM which is BSA Asset

3  Management, Arrow WV, Learning for Life, the National Boy

4  Scouts of America Foundation, and then the two Canadian

5  entities.

6          Your Honor, as I mentioned in connection with the

7  wage motion, we, BSA, actually utilize our employees to

8  provide services for these entities.  They are essential to

9  BSA's operations.  They each form or provide different

10 services.  For example, as we talked about, the Canadian

11 entities operate the Canadian side of the Northern Tier High

12 Adventure Base.  Arrow owns the Summit which is one of our

13 High Adventure bases.  Learning for Life provides our career

14 oriented base programing for young men and women.  The

15 foundation we utilize for large scale fundraising

16 initiatives. Again, BSAM is the investment manager over the

17 BSA comingled endowment fund where we have $83 million

18 dollars.

19         These entities, for the most part, do not maintain

20 their own employees.  They don't have separate staff to deal

21 with accounting, HR, et cetera.  We supply our employees to

22 them and they utilize the services of Boy Scouts of America

23 to, essentially, function.

24         The amounts that are due for the prepetition

25 period are $1,000 dollars with respect to these entities.

1   It's absolutely, in my view, de minimis, but we do want

2   authority to continue to function under these shared services

3   arrangements post-petition and that's the critical component

4   of this motion as it pertains to the related non-debtor

5   entities.

6           With that, Your Honor, unless you have any other

7   questions, there was some language that was added to the

8   proposed form of order that was requested by the Office of

9   the United States Trustee.  In addition to entering the date

10  for the second day hearing, deleting the but not directing

11  type language at the back of the order the  United States

12  Trustees Office requested that we add language the debtor

13  shall maintain accurate and detailed records of all transfers

14  made under any of the shared services arrangements including

15  those to all non-debtor affiliates so that all transactions

16  may be readily ascertained, traced, recorded properly and

17  distinguished between prepetition and post-petition

18  transactions.  And we've agreed to add that language.

19          THE COURT:  Okay.  Does anyone wish to be heard

20  with respect to shared services?

21          MR. STANG:  Your Honor, I just wanted to know if

22  local councils are receiving benefits occurred under

23  obligations of the BSA and if they're more than 30 days in

24  arears (indiscernible) account receivable to BSA.

25          MS. BOELTER:  If I can have one moment, Your

1  Honor.

2           THE COURT:  Certainly.

3           MS. BOELTER:  Your Honor, I understand that there

4  are a handful of councils that are past due with respect to

5  their obligations.  Its approximately $500,000 dollars that

6  are due -- that were due more than 30 days ago.

7           MR. STANG:  Your Honor, I don't know if the debtor

8  is able to do this given the different kinds of services

9  provided, but if there are set-off rights that could be

10  effectuated I think the debtor should do that.  There is no

11  reason why those councils (indiscernible).

12           THE COURT:  I think it's a fair question.  I'm not

13  hearing an objection for the relief that's been requested.

14  What I am hearing is if we're going to pay them, they should

15  pay us which seems a fair request.

16           MS. BOELTER:  I'm just looking at Paragraph 10 of

17  the order which it's strange to me that it's Paragraph 10 in

18  several different orders, but this does happen to be the

19  general, sort of, reservation of rights language that appears

20  in the orders.  It does not, by its terms, although one could

21  argue it implicates it, but it does not specifically call out

22  by its terms the debtors' right to offset amounts.

23           If it would be acceptable to Mr. Stang, we can

24  certainly add a reference to setoff specifically with respect

25  to past due amounts owed by local councils assuming, of

1  course, there's a legal basis to offset those amounts.

2          THE COURT:  Well, I certainly don't think anything

3  in this order precludes it.

4          MS. BOELTER:  I agree with that.

5          THE COURT:  The -- well, I think nothing precludes

6  it.

7          MS. BOELTER:  I do agree with that, Your Honor.  I

8  think the complication here is, as Mr. Stang noted, we just

9  have to match up the setoff rights.  For example, are they

10 past due on something that we also have a corresponding

11 obligation going the other direction?  That I don't have an

12 answer to, but we certainly can commit to looking into that.

13 You know, taking appropriate action if we deem appropriate

14 action to be necessary.

15         THE COURT:  Okay.  I think that that is something

16 that should be looked at.  Other than that, my understanding

17 -- and I appreciate the demonstrative here, but my

18 understanding is that the amounts -- the bulk of the amount,

19 a million-seven, of the shared services prepetition amounts

20 due to the local councils is something that will be

21 reimbursed.

22         MS. BOELTER:  That's correct, Your Honor.  Mr.

23 Whittman confirmed that for me a moment ago.

24         THE COURT:  Okay.  I'll note there will also

25 presumably be future requests to pay these amounts so that

 1 | ultimate reconciliations can happen even subsequently if need
 2 | be.

 3 |         Okay.  Anyone else?  Ms. McCollum?

 4 |         MS. MCCOLLUM:  Your Honor, Hannah McCollum for the
 5 | U.S. Trustee.

 6 |         I want to thank the debtors for working with me on
 7 | this motion because this is somewhat of an unusual motion and
 8 | I understand that this case requires great transparency on
 9 | everybody's part.  So, I will be working with the debtors to
10 | determine if we can come up with matching language that we
11 | asked to be inserted, some form of reporting maybe in the
12 | NOR's that shows these transactions a little more in detail
13 | then as would normally just be shown as a disbursement on the
14 | NOR.  So, that would be point one.

15 |         The second point is as some of the counsel here
16 | know, in the break we spoke with Andy Vera, the U.S. Trustee,
17 | and he has requested that we move the formation meeting from
18 | the 27th of February to the 4th of March to give our office
19 | time to have questionnaires that are cohesive and coherent
20 | across what is now two mass tort cases.  Another diocese case
21 | just filed and we want to make sure that we are asking the
22 | right questions, and soliciting the right information, and
23 | being respectful of survivors and the information that we are
24 | asking them to provide.  And we want to make sure that we do
25 | that, sort of, uniformly.

1           THE COURT:  Thank you.

2           MS. MCCOLLUM:  Thank you.

3           MR. ABBOTT:  On that point just since everyone is

4   in the room, Your Honor, we had reservations made at the

5   DoubleTree for the 27th.  We are presently inquiring.  I hope

6   and expect that we will be able to continue to do it on that

7   date at the DoubleTree.  If that changes, we will work with

8   the U.S. Trustee's Office to set an appropriate date.

9           THE COURT: Okay.  Thank you.

10          I'm going to approve the requests here.  Again,

11  there was no objection to the actual requests made to permit

12  payment of these particular programs.  And they can continue.

13  I note that the order is very specific that I am not blessing

14  the arrangements made in the sharing services agreement, any

15  of the methodologies.  All of that is up for examination, but

16  I do think it's appropriate to permit these programs to

17  continue in the ordinary course as they deal with benefits

18  that are provided to individuals who are working at the local

19  council level, but providing services that will benefit the

20  BSA.  This is based on the declaration -- the first day

21  declaration that was submitted.

22          In terms of the shared services programs that go

23  to the non-related debtor entities that's de minimis

24  requests.  Again, I think it's appropriate in this interim

25  period to permit that program to continue to function as it

1  does, again, without prejudice to anybody's rights to

2  investigate that arrangement.

3          MS. BOELTER:  Thank you, Your Honor.

4          With that I think we have concluded the agenda for

5  today and our first day motion presentation.

6          I guess we're seeking you again tomorrow, Your

7  Honor, and we need a time for that.

8          THE COURT:  Yes.  So, I was going to ask you what

9  time you want to come in.  As I said, I've got something at

10 12 which its actually kind of interesting and I don't know if

11 it's going to be like 30 minutes or an hour, but it's going

12 to be in that range.  It's an interesting dispute.  I've got

13 Furie at two o'clock.

14         MR. LABUDA:  Your Honor, would you have anything

15 earlier in the morning?

16         THE COURT:  Yes.  We can do it earlier.

17         MR. LABUDA:  Perhaps something like 10 o'clock.

18         THE COURT:  We can do 10.

19         MR. LABUDA:  Okay.

20         THE COURT:  And if the parties aren't ready at 10

21 please call over and let us know, and please circulate that

22 to others as much as you can by email so that people aren't

23 showing up here and then it's continued like hourly.

24         MR. LABUDA:  Thank you, Your Honor.

25         THE COURT:  Okay.  10 o'clock tomorrow.  Anything

1   further?

2           MS. BOELTER:  Not from the debtors, Your Honor.

3           THE COURT:  Okay.  Thank you. We're adjourned.

4           MS. BOELTER:  Thank you, Your Honor.

5       (Proceedings concluded at 3:59 p.m.)

6

7

8                          CERTIFICATE

9

10      I certify that the foregoing is a correct transcript

11   from the electronic sound recording of the proceedings in the

12   above-entitled matter.

13
     /s/Mary Zajaczkowski                 February 14, 2020
14   Mary Zajaczkowski, CET**D-531

15

16

17

18

19

20

21

22

23

24

25