**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

In re:

BOY SCOUTS OF AMERICA AND
DELAWARE BSA, LLC,[1]

        Debtors.

Chapter 11

Case No. 20-10343 (LSS)

(Jointly Administered)

**Hearing Date:  March 24, 2020 at 10:00 a.m. (ET)**
**Objection Deadline: March 17, 2020 at 4:00 p.m. (ET)**

**Ref. Docket Nos. 8 and 69**

**SUPPLEMENT TO DEBTORS' MOTION FOR ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) MAINTAIN
AND ADMINISTER PREPETITION CUSTOMER, SCOUT, AND DONOR
PROGRAMS AND PRACTICES AND (B) PAY AND HONOR RELATED
PREPETITION OBLIGATIONS, AND (II) GRANTING RELATED RELIEF**

The Boy Scouts of America (the "BSA") and Delaware BSA, LLC, the non-profit

corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "Debtors"), submit this supplement (this "Supplement") to their *Motion for

Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain and Administer

Prepetition Customer, Scout, And Donor Programs and Practices and (B) Pay and Honor

Related Prepetition Obligations, and (II) Granting Related Relief* [Docket No. 8] (the

"Motion")[2] and request that the Court enter a final order, substantially in the form attached

hereto as **Exhibit A** (the "Revised Proposed Final Order"), (i) approving the Motion, as

supplemented by this Supplement to include relief regarding the Debtors' pooled income funds

(each, a "Pooled Income Fund" and, collectively, the "Pooled Income Funds"), on a final basis,

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax
identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The
Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]    Capitalized terms used but not defined in this Supplement shall have the meanings ascribed to such terms in the
Motion.

and (ii) granting related relief.   In support of this Motion, the Debtors respectfully state as follows:

## STATUS OF THE CASES AND JURISDICTION

1.      On February 18, 2020 ("Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").   The Debtors continue to operate and maintain their non-profit organization and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   The Debtors' chapter 11 cases are jointly administrated pursuant to Bankruptcy Rule 1015(b).   No party has requested the appointment of a trustee or examiner in these cases.

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent, pursuant to Local Rule 9013-1(f), to the entry of a final order or judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory and other predicates for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code.

## BACKGROUND

5.      The Debtors filed the Motion on the Petition Date, which requested that the Court grant the Debtors interim and final relief (i) to maintain and administer their prepetition customer, Scout, and donor programs and practices, (ii) to pay and otherwise honor prepetition

and postpetition obligations to customers and donors under the customer, member, and donor programs and practices in the ordinary course, in the Debtors' discretion, (iii) to pay or otherwise honor credit card chargebacks, returns, and/or processing fees, including authorizing the applicable credit card processors to set off such obligations in the ordinary course, and (iv) to pay or otherwise honor the fees of third-party administrators of their prepetition customer, Scout, and donor programs and practices, as well as granting related relief, including scheduling the Final Hearing.

6.      The Court entered an order granting the Motion on an interim basis on February 19, 2020 [Docket No. 69] (the "<u>Interim Order</u>").  The Final Hearing is scheduled for March 24, 2020 at 10:00 a.m., prevailing Eastern Time.

7.      The Debtors have determined that they require additional relief to continue and honor their prepetition obligations with respect to the Pooled Income Funds, which were not addressed in the Motion.  Accordingly, by this Supplement, the Debtors are requesting that at the Final Hearing, the Court enter the Revised Proposed Final Order, substantially in the form attached hereto as **<u>Exhibit A</u>**,  which includes relief regarding the Pooled Income Funds in addition to the Debtors' prepetition customer, Scout, and donor programs and practices described in the Motion.  A redline showing changes between the Proposed Final Order, which was attached to the Motion as Exhibit B, and the Revised Proposed Final Order is attached hereto as **<u>Exhibit B</u>**.

**<u>RELIEF REQUESTED</u>**

8.      By this Motion, the Debtors request entry of the Revised Proposed Final Order, substantially in the form attached hereto as **<u>Exhibit A</u>**, (i) approving the Motion, as

3

supplemented by this Supplement to include relief regarding the Pooled Income Funds and (ii) granting related relief.

## THE POOLED INCOME FUNDS

9.      As a means of raising funds in support of Scouting and furthering the BSA's charitable mission and the charitable missions of the local councils (which are not debtors in these chapter 11 cases), the BSA at various times established three separate Pooled Income Funds.  Each of the Pooled Income Funds is governed by a plan document (the "Plan Document"), which governs the terms and conditions of the Pooled Income Funds and the relative rights of (a) the BSA, (b) the donors to the Pooled Income Fund (each, a "Participant" and, collectively, the "Participants") and their chosen beneficiaries, and (c) the local councils, with respect to the assets of the Pooled Income Funds.[3]

10.      When a Participant chooses to make a gift to a Pooled Income Fund, the Participant enters into an agreement with the BSA (each, a "Life-Income Agreement"), which incorporates the terms of the Plan Document, describes the cash or property donated, and designates one or two life-income beneficiaries in connection with the gift (each, a "Life Income Beneficiary").[4]  The Participant also designates the BSA and/or one or more of the local councils as the remainder beneficiary of the gift upon termination of the Life-Income Agreement.[5]

11.      The BSA maintains a segregated account at State Street Global Advisors ("State Street") for each of the three Pooled Income Funds.  In the great majority of cases, funds or

---

[3]    For the purposes of this Supplement, "Pooled Income Fund Program" shall refer to the program under which the BSA has established its three Pooled Income Funds, and "Pooled Income Fund Obligations" shall refer to all of the BSA's obligations under the Pooled Income Fund Program, including without limitation the payment of amounts owed to Life Income Beneficiaries in accordance with the Plan Document, fees earned by State Street on account of its administration of the Pooled Income Funds, and the transfer of reversionary gifts to the local councils designated on the applicable Life-Income Agreement upon the death of applicable Life Income Beneficiaries.

[4]    The Participant is generally named as a Life Income Beneficiary.

[5]    Each of the currently-active Life-Income Agreements designates one or more of the local councils as the remainder beneficiary, rather than the BSA.

property donated pursuant to the Pooled Income Fund Program are directly transferred by the donor Participant to, and are subsequently held in, the applicable State Street account.[6] Donations made pursuant to the Pooled Income Fund Program are commingled with donations made by other Participants in the same Pooled Income Fund and invested pursuant to the guidelines set forth in the Plan Document.  In exchange for the Participant's donation, the Life Income Beneficiaries designated in the Participant's Life-Income Agreement are assigned participating units in the Pooled Income Fund *pro rata* in accordance with the relative value of their gift to the total value of the Pooled Income Fund on the date of the gift.  Units in a Pooled Income Fund entitle the Life Income Beneficiary holding the units to periodically receive income from the Pooled Income Fund in an amount determined by the rate of return earned by the Pooled Income Fund (net of payment of all expenses of the Pooled Income Fund) and calculated pursuant to the terms of the Plan Document.  The Pooled Income Funds make periodic distributions, on a quarterly basis, to Life Income Beneficiaries only if the Pooled Income Funds generate net income.  In the twelve months ending December 31, 2019, the Pooled Income Funds paid out $58,276.88 in net investment income to Life Income Beneficiaries.

12.    Each Pooled Income Fund account at State Street contains only the assets of the applicable Pooled Income Fund.  As of January 31, 2020, the combined asset value of the three Pooled Income Funds was approximately $1.268 million.  State Street administers the Pooled Income Fund Program, invests the assets of the Pooled Income Funds pursuant to the terms of the Plan Document and under the supervision of the BSA, and makes payments on account of the Pooled Income Fund Program to Life Income Beneficiaries.  State Street earns fees for managing

---

[6]    In a small minority of cases, funds or securities donated pursuant to the Pooled Income Fund Program are transferred by the Participants to a different account held by the BSA. In those cases, the BSA liquidates the property (if applicable) and promptly transfers the donated funds or proceeds of the donated property to the appropriate State Street account.

the Pooled Income Fund Program, which amounts constitute Pooled Income Fund Obligations.[7] In the twelve months ended December 31, 2019, State Street's fees for administering the Pooled Income Fund Program totaled $6,459.67.

13.     A Life Income Beneficiary's interest in his or her units, and BSA's obligation to pay any Life Income Beneficiary his or her proportionate share of the Pooled Income Fund's net income, terminates with the last regular periodic payment prior to his or her death.  Upon the death of a Life Income Beneficiary, the relevant assets of the Pooled Income Fund are severed from the other assets of the Pooled Income Fund and become the property of the BSA and/or local council designated as the remainder beneficiary by the Participant in the Life-Income Agreement.[8]  In the twelve months ended December 31, 2019, the remainder beneficiaries under the Pooled Income Funds became entitled to $27,242.68 from the Pooled Income Funds following the death of Life Income Beneficiaries.[9]

14.     Donations to the Pooled Income Funds are irrevocable.   The assets of the Pooled Income Funds are assets of the BSA, subject to the rights of Life Income Beneficiaries to payment of investment income for life and the rights of the local councils to remainder gifts under the Life-Income Agreements that designate such local councils as the remainder beneficiary.  The assets of the Pooled Income Funds are not held in trust for the benefit of the

---

[7]     Historically, State Street and its predecessor agents' fees were paid by the National Boy Scouts of America Foundation (the "Foundation"), a non-Debtor.  Beginning in January 2019, the Foundation ceased paying such fees and the Pooled Income Funds began to pay State Street's fees out of their assets on a monthly basis, as permitted by the Plan Documents.

[8]     Prior to the Petition Date, the BSA and local councils had a long-standing practice whereby State Street would transfer fifteen percent (15%) of the remainder gift to the Foundation to compensate the Foundation for paying certain administrative costs of the Pooled Income Program, including the fees of State Street and its predecessors (until the policy change regarding payment of fees in January 2019 described at footnote 7, *supra*), and transfer the remaining eighty-five percent (85%) of the remainder gift to the designated local council(s) chosen by the Participant. During the pendency of these chapter 11 cases, the BSA will direct the full remainder gifts to the beneficiary or beneficiaries designated by Participants.

[9]     Due to a time lag between the death of a Life Income Beneficiary and the distribution of the associated remainder gift, such amount was paid to the remainder beneficiaries in January 2020.

Participants or the Life Income Beneficiaries.  The Participants and Life Income Beneficiaries do not have an interest in any particular property or asset of the Pooled Income Funds.

15.     By this Supplement, the Debtors are not requesting that the Court determine whether the assets of the Pooled Income Funds are property of the Debtors' estates.  Instead, the Debtors are requesting authority to continue the Pooled Income Fund Program in the ordinary course and satisfy prepetition Pooled Income Fund Obligations, including without limitation the payment of amounts owed to Life Income Beneficiaries in accordance with the Plan Document, fees earned by State Street on account of its administration of the Pooled Income Funds, and the transfer of reversionary gifts to the local councils designated on the applicable Life-Income Agreement upon the death of applicable Life Income Beneficiaries.

## BASIS FOR RELIEF

I.     **Payment of Claims under the Pooled Income Fund Program Is Appropriate Under Section 363(b) of the Bankruptcy Code Even in the Absence of a Trust Relationship.**

16.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Under section 363 of the Bankruptcy Code, a court may authorize a debtor to pay certain prepetition claims if a sound business purpose exists for doing so.  In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999) (requiring that debtor show a "sound business purpose" to justify its actions under section 363 of Bankruptcy Code); see also In re Phoenix Steel Corp., 82 B.R. 334, 335–36 (Bankr. D. Del. 1987).  Moreover, if "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  In re Johns-Manville Corp., 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); see also In re Tower Air, Inc., 416 F.3d 229, 238 (3d Cir.

2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

17.     Payment of Pooled Income Fund Obligations as they become due in the ordinary course is a sound exercise of the Debtors' business judgment.  The Debtors' continued payment of these obligations will avoid a potentially value-destructive interruption to the Debtors' fundraising efforts in support of their charitable mission.  Any failure or inability of the Debtors to honor their obligations under the Pooled Income Fund Program will dissuade prospective Participants from entering into new Life-Income Agreements, thereby cutting off a historical source of funding for the local councils and, when named as the residual beneficiary under Life-Income Agreements, the BSA.

18.     The damage that would be done to the Debtors' fundraising efforts if they are not permitted to continue the Pooled Income Fund Program and meet their prepetition Pooled Income Fund Obligations are likely to be significantly further-reaching than just an inability to solicit new donations pursuant to the Pooled Income Fund Program.  Any interruption to the Pooled Income Fund Program could erode the public's confidence in the Debtors' organization and cause potential donors to direct their charitable giving to other nonprofit organizations, thereby hampering the Debtors' ability to carry out their charitable mission.  And because the average age of the Life Income Beneficiaries is approximately 84 years, many of the Life Income Beneficiaries are particularly financially vulnerable, significantly raising the likelihood of negative news coverage if the Debtors were to stop distributions under the Pooled Income Fund Program.  The intense reputational risk inherent in a default on the Debtors' obligations under the Pooled Income Fund Program provides a sound business purpose for the relief being requested herein.

**II.      The Court Should Also Authorize the Payment of Pooled Income Fund Obligations Under Section 105(a) of the Bankruptcy Code and the Doctrine of Necessity.**

19.      The Court may also authorize the payment of prepetition claims in appropriate circumstances under section 105(a) of the Bankruptcy Code and the doctrine of necessity when such payment is essential to a debtor's continued operations.  See, e.g., In re Just for Feet, Inc., 242 B.R. 821, 824–25 (Bankr. D. Del. 1999) (holding that section 105(a) of Bankruptcy Code provides a statutory basis for payment of prepetition claims under the doctrine of necessity and noting that "[t]he Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11"); In re Columbia Gas Sys., Inc., 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (confirming that doctrine of necessity is standard in Third Circuit for enabling a court to authorize payment of prepetition claims prior to confirmation of a reorganization plan). Such prepetition amounts need not be entitled to priority of payment in bankruptcy to be eligible for payment under the doctrine of necessity.  See Transcript of Oral Argument at 20-22, In re Gibson Brands, Inc., Case No. 18-11025 (July 12, 2018), Docket No. 428 (statements of Judge Sontchi that "[t]he doctrine of necessity doesn't rely on the provisions of Section 507 of the [Bankruptcy] Code" and motions to pay prepetition amounts may be approved "based on a showing that there's a risk of irreparable harm to the debtors' business.").

20.      In addition, the Court has the authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein, because such relief is necessary for the Debtors to carry out their fiduciary duties under section 1107(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105.  Section 1107(a) of the Bankruptcy Code "contains an implied duty of

the debtor-in-possession" to "protect and preserve the estate, including an operating business' going concern value," on behalf of a debtor's creditors and other parties in interest. <u>See</u> <u>In re CEI Roofing, Inc.</u>, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting <u>In re CoServ, L.L.C.</u>, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)); <u>see also</u> <u>In re Penick Pharm., Inc.</u>, 227 B.R. 229, 232–33 (Bankr. S.D.N.Y. 1998) ("[U]pon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of a bankruptcy trustee.").

21.    As discussed above, payment of claims under the Pooled Income Fund Program as they come due is warranted under the circumstances of these chapter 11 cases because the BSA's continued payment of its obligations under this program is necessary both to preserve and promote a historical source of funding in support of the Debtors' charitable mission and to avoid negative consequences associated with a failure to pay.  It is vital to prospective donors' and the public's confidence in the BSA's ability to deliver its charitable mission that the BSA honor its existing obligations under the Pooled Income Fund Program.  Accordingly, it is essential to the Debtors' reorganization that the Pooled Income Fund Program not be impacted by these chapter 11 cases.

## NOTICE

22.    Notice of this Motion will be provided to (i) State Street; (ii) the U.S. Trustee; (iii) the twenty-five (25) law firms representing the largest numbers of abuse victims asserting claims against the Debtors; (iv) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis, other than abuse-related claims; (v) counsel to JPMorgan Chase Bank, N.A.; (vi) the County Commission of Fayette County (West Virginia), as issuer of those certain Commercial Development Revenue Bonds (Arrow WV Project), Series 2010A, 2010B

and 2012; (vii) representatives of the prepetition Ad Hoc Committee of Local Councils; (viii) counsel to the prepetition Future Claimants' Representative; (ix) counsel to the prepetition ad hoc group of attorneys representing significant numbers of abuse victims; (x) the United States Attorney's Office for the District of Delaware; (xi) the Internal Revenue Service; (xii) the United States Department of Justice; and (xiii) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested herein, no other or further notice need be given.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter the Revised Proposed Final Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and in the Motion and such other and any further relief as the Court may deem just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated:  March 3, 2020
Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Derek C. Abbott*

Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Joseph C. Barsalona II (No. 6102)
Eric W. Moats (No. 6441)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email:  dabbott@mnat.com
        aremming@mnat.com
        jbarsalona@mnat.com
        emoats@mnat.com
        ptopper@mnat.com

– and –

SIDLEY AUSTIN LLP
Jessica C. K. Boelter (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 839-5300
Email:  jboelter@sidley.com

– and –

SIDLEY AUSTIN LLP
James F. Conlan (admitted *pro hac vice*)
Thomas A. Labuda (admitted *pro hac vice*)
Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Email:  jconlan@sidley.com
        tlabuda@sidley.com
        mandolina@sidley.com
        mlinder@sidley.com

PROPOSED COUNSEL TO THE DEBTORS
AND DEBTORS IN POSSESSION