## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>**Hearing Date: April 15, 2020 at 10:00 a.m. (ET)**<br>**Objection Deadline: March 31, 2020 at 4:00 p.m. (ET)** |

### DEBTORS' MOTION FOR ENTRY OF AN ORDER APPOINTING JAMES L. PATTON, JR., AS LEGAL REPRESENTATIVE FOR FUTURE CLAIMANTS, *NUNC PRO TUNC* TO THE PETITION DATE

The Boy Scouts of America and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (together, the "Debtors") submit this motion (this "Motion") for entry of an order (the "Proposed Order"), substantially in the form attached hereto as **Exhibit A**, authorizing the appointment of a legal representative for Future Claimants (as defined below) and appointing James L. Patton, Jr., as such legal representative for Future Claimants (the "Future Claimants' Representative" or "FCR"), *nunc pro tunc* to the Petition Date (as defined below), pursuant to sections 105(a) and 1109(b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"). In support of this Motion, the Debtors  respectfully state as follows:

### STATUS OF THE CASES AND JURISDICTION

1. On February 18, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").  The Debtors continue to operate and maintain

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

their non-profit organization and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On February 19, 2020, the Court entered an order [Docket No. 61] authorizing the joint administration and procedural consolidation of the chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

2.      On March 5, 2020, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of tort claimants (the "Tort Claimants' Committee") and an official committee of unsecured creditors (the "UCC") pursuant to section 1102 of the Bankruptcy Code [Docket Nos. 141, 142].  No party has requested the appointment of a trustee or examiner in these chapter 11 cases.

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Amended *Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, to the entry of a final order or judgment by the Court in connection with this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105(a) and 1109(b).

## FACTUAL BACKGROUND

6.       The Boy Scouts of America (the "BSA") is a federally chartered nonprofit corporation under title 36 of the United States Code.  36 U.S.C. §§ 30901-08.  The BSA is

exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code.  Founded in 1910 and charged by an act of Congress in 1916, the BSA is one of the largest Scouting organizations in the world and one of the largest youth organizations in the United States, with approximately 2.2 million registered youth participants and approximately 800,000 adult volunteers.  In 2019, nearly three million Scouts and adult leaders were involved in Scouting and helped deliver more than 13 million Scouting service hours to communities across the country.  As a non-profit corporation, the BSA is required to adopt and carry out a charitable, religious, educational, or other philanthropic mission.  The BSA's mission is to prepare young people for life by instilling in them the values of the Scout Oath and Law,[2] encouraging them to be trustworthy, kind, friendly and helpful, while also training youth in responsible citizenship, skills development and self-reliance through participation in a wide range of outdoor activities, educational programs, and, at older ages, career-oriented programs in partnership with community organizations.  The BSA operates traditional Scouting by granting charters to local organizations, such as faith-based institutions, clubs, civic associations, educational organizations, businesses, and groups of citizens, which implement the Scouting program for youth within their communities (collectively, the "Chartered Organizations").  Units are led by adult volunteers appointed by the chartered organization, who are supported by local councils assigned to the geographic area in which the unit is located (collectively, the "Local Councils") using both paid professional adult leaders with assistance from volunteers.

---

[2] **Scout Oath:** "On my honor I will do my best to do my duty to God and my country and to obey the Scout Law; to help other people at all times; to keep myself physically strong, mentally awake, and morally straight."  **Scout Law:** "A Scout is trustworthy, loyal, helpful, friendly, courteous, kind, obedient, cheerful, thrifty, brave, clean, and reverent."

*Abuse Claims Asserted against the BSA*

7.     The safety of children in its programs is the most important priority of the BSA. The BSA today enforces a robust set of multilayered policies and procedures to protect the young men and women involved in Scouting.  These measures are informed by respected experts in the fields of child safety, law enforcement, and child psychology.  The BSA is committed to the protection of its Scouts, and that commitment is integral to the BSA's identity and mission as it continues to instill values of leadership, service, and patriotism in millions of children who participate in Scouting programs across the country.

8.     Despite its current record, in the past, predominately at a time when there was little expertise across any organization about the topic of abuse prevention, predators were able to use Scouting and other youth programs to access children.  Given these events and recent changes in the legal landscape governing sexual abuse claims, the BSA and Local Councils are defendants in hundreds of lawsuits related to acts of sexual abuse in its Scouting programs.  As of the Petition Date, there were approximately 275 pending civil actions asserting personal injury claims against the BSA and certain Local Councils and Chartered Organizations related to abuse suffered by a Scout at the hands of a Scouting leader, volunteer, or another member of the BSA (collectively, the "Pending Abuse Actions").  The BSA has been made aware of approximately 1,400 additional claims of abuse that have not been formally asserted in a Pending Abuse Action.

9.     The Debtors are committed to preventing future abuse and ensuring that the survivors of sexual abuse are treated respectfully and equitably.  The number of Pending Abuse Actions and known additional claims of abuse, and the unknown number of additional abuse claims that may be asserted against the Debtors in the future, make it clear that the Debtors cannot continue to address each of those claims in courts across the country in a "one-off" nature

while also fulfilling the BSA's mission of training youth through its character development and values-based leadership programs. Through these chapter 11 cases, the Debtors seek to achieve dual objectives: (a) timely and equitably compensating survivors of abuse in Scouting and (b) ensuring that the BSA emerges from bankruptcy with the ability to continue its critical charitable mission.

*Prepetition Negotiations Regarding Global Resolution of Abuse Claims*

10.     In late 2018, the BSA retained legal and financial advisors to explore its restructuring options in light of, among other factors, the increasing number of abuse claims asserted against the BSA as a result of changes in state statutes of limitation. The BSA determined at the outset of this strategic review to pursue a potential agreement with a critical mass of abuse survivors and other relevant stakeholders that could be implemented through a prearranged chapter 11 plan. The BSA believed that a prearranged bankruptcy filing was the most desirable option as it represented the quickest, most efficient, and least costly bankruptcy process. In connection with these strategic efforts, the BSA recognized that it would ultimately need to structure a settlement around a plan of reorganization that provides for a channeling injunction with respect to both current and potential future abuse claims.

11.     To ensure that future claimants were actively and fairly represented during the pre-petition negotiations, the BSA, in consultation with its advisors, determined that it was necessary and appropriate to engage an independent third-party representative for holders of Future Abuse Claims (as defined below). After considering possible candidates for the role, the BSA selected James L. Patton, Jr., in late 2018 to serve as prepetition future claimants' representative, based on his significant experience in complex mass tort cases in the chapter 11 context and his reputation for integrity in serving as a fiduciary in bankruptcy proceedings. Mr.

Patton, in turn, retained legal and financial advisors to assist him in conducting an analysis of the BSA's liabilities and assets and in negotiations with the BSA and other stakeholders.

*Objectives for These Chapter 11 Cases*

12.     Ultimately, the prepetition negotiations were unsuccessful, and the Debtors were unable to reach a global resolution of the abuse claims with the various stakeholders.  On the Petition Date, the Debtors commenced these chapter 11 cases.  The Debtors have taken several steps in an effort to facilitate an expeditious proceeding and promote efficiency at the outset of these chapter 11 cases, with the interest of safeguarding the future of the BSA's mission and maximizing the value of the Debtors' estates for the benefit of abuse survivors and other stakeholders.  Specifically, on the Petition Date, the Debtor filed, among other items, (i) a motion to establish a schedule for adjudicating disputes regarding whether assets are available to satisfy creditor claims, (ii) a motion to establish comprehensive procedures for providing notice of applicable bar dates to the Debtors' creditors and for creditors, including holders of abuse claims, to file proofs of claim, (iii) a motion for the appointment of a sitting bankruptcy judge as a mediator and for the referral to mandatory mediation of all issues related to a global settlement of abuse claims through a consensual plan of reorganization, and (iv) a plan of reorganization[3] and accompanying disclosure statement to provide the framework for ongoing negotiations with the Debtors' stakeholders.  The Debtors are requesting the appointment of Mr. Patton as the FCR to ensure that Future Claimants are fully and fairly represented during the course of these chapter 11 cases.

13.     Additional information regarding the Debtors and the commencement of these chapter 11 cases is set forth in the *Declaration of Brian Whittman in Support of the Debtors'*

---

[3] *See Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 20] (the "Plan").

*Chapter 11 Petitions and First Day Pleadings* [Docket No. 16] and the *Debtors' Informational Brief* [Docket No. 4].

## RELIEF REQUESTED

14.    By this Motion, the Debtors request entry of an order appointing James L. Patton, Jr., as the Future Claimants' Representative, *nunc pro tunc* to the Petition Date to represent holders of Abuse Claims (as defined below) that are unable to assert such Abuse Claims by the applicable bar date established by this Court (the "Future Claimants"), including individuals holding a claim based on Abuse that occurred prior to the Petition Date, but who, as of the date immediately preceding the Petition Date:

(a)    had not attained eighteen (18) years of age,

(b)    were not aware of such Abuse Claim as result of "repressed memory" or other condition that constitutes a valid legal excuse that tolls the statute of limitations under applicable law for bringing a claim of sexual abuse, or

(c)    had not discovered the injury or the connection between the injury and the Abuse and who could not in the exercise of reasonable care have discovered the injury or connection between the injury and the Abuse.[4]

15.    The Debtors request that Mr. Patton shall have the following rights as Future Claimants' Representative in these chapter 11 cases:

(a)    Standing:  The Future Claimants' Representative shall have standing under section 1109(b) of the Bankruptcy Code to be heard as a party-in-interest in all matters relating to the Debtors' chapter 11 cases and shall have such powers and duties of a committee, as set forth in 11 U.S.C. § 1103, as are appropriate for a Future Claimants' Representative;

(b)    Right to Receive Notices:  The Future Claimants' Representative and professionals retained by the FCR and approved by the Court shall have

---

[4] The foregoing definition of Future Claimants is without prejudice to the right of the Debtors or the Future Claimants' Representative to file a motion seeking entry of an order modifying the definition of Future Claimants, or for the Court to modify such definition in connection with confirming a plan of reorganization for the Debtors.

the right to receive all notices and pleadings that are required to be served upon any statutory committee and its counsel pursuant to applicable law or an order of the Court.

(c)     Engagement of Professionals:  The Future Claimants' Representative may, with prior approval from the Court pursuant to sections 105(a) and 1103 of the Bankruptcy Code and consistent with the treatment afforded other professionals in these Chapter 11 Cases, retain attorneys and other professionals;

(d)     Compensation:  The Future Claimants' Representative shall apply for compensation in accordance with the Bankruptcy Code, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court of the District of Delaware (the "Local Rules"), and any order entered by the Court establishing procedures for interim compensation and reimbursement of expenses of professionals.  Subject to Court approval, Mr. Patton shall be compensated as his hourly rate of $1,400, subject to periodic adjustment, plus reimbursement of reasonable expenses.

## BASIS FOR RELIEF

### I.     A Future Claimants' Representative Is Appropriate and Necessary to Achieve Goals of Restructuring

16.     The Bankruptcy Code broadly defines a "claim" as "(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured."  11 U.S.C. § 101(5).  In the Third Circuit, "a 'claim' arises when an individual is exposed pre-petition to a product or other conduct giving rise to an injury."  *Jeld-Wen, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114, 125 (3d Cir. 2010).  Accordingly, any claims against the Debtors based upon Abuse[5] that

---

[5] Under the Plan, "Abuse" is defined as "sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault and/or battery, rape, pedophilia, ephebophilia, sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation, any other sexual misconduct or injury, contacts or interactions of a sexual nature, including the use of photography, video, or digital media, or other physical abuse or bullying without regard to whether such physical abuse or bullying is of a

occurred prior to the Petition Date are pre-petition claims that will ultimately need to be addressed through the Debtors' plan of reorganization.

17.     The Debtors have filed the Bar Date Motion,[6] and will seek approval of robust noticing procedures to provide notice of the deadline for filing Abuse Claims[7] against the Debtors (the "Abuse Claims Bar Date") to known and unknown holders of Abuse Claims.  The Debtors encourage individuals to submit proofs of claims prior to the Abuse Claims Bar Date in accordance with the procedures described in the Bar Date Motion.  However, the Debtors

---

sexual nature, between a child and an adult, between a child and another child, or between a non-consenting adult and another adult, in each instance without regard to whether such activity involved explicit force, whether such activity involved genital or other physical contact, and whether there is or was any associated physical, psychological, or emotional harm to the child or non-consenting adult." Plan, § I.A.17.

[6] *See Debtors' Motion, Pursuant to 11 U.S.C. § 502(b)(9), Bankruptcy Rules 2002 and 3003(c)(3), and Local Rules 2002-1(e), 3001-1, and 3003-1 for Authority to (I) Establish Deadlines for Filing Proofs of Claim, (II) Establish the Form and Manner of Notice Thereof, and (III) Approve Procedures for Providing Notice of Bar Date and Other Important Information to Abuse Victims, and (IV) Approve Confidentiality Procedures for Abuse Victims* [Docket No. 18] (the "Bar Date Motion").

[7] Under the Plan, an "Abuse Claim" is defined as "a liquidated or unliquidated Claim against any Protected Party that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively, Abuse that occurred prior to the Petition Date, including any such Claim that seeks monetary damages or other relief, under any theory of law or equity whatsoever, including vicarious liability, *respondeat superior*, conspiracy, fraud, including fraud in the inducement, any negligence-based or employment-based theory, including negligent hiring, supervision, retention or misrepresentation, any other theory based on misrepresentation, concealment, or unfair practice, public or private nuisance, or any other theory, including any theory based on public policy or any act or failure to act by any Protected Party or any other Person for whom any Protected Party is alleged to be responsible.  Notwithstanding the foregoing, with respect to Contributing Chartered Organizations, the term "Abuse Claim" shall be limited to any Claim that is attributable to, arises from, is based upon, relates to, or results from, Abuse that occurred prior to the Petition Date but which, as of the date immediately preceding the Petition Date, was held by a Person who, as of such date, (a) had not attained eighteen (18) years of age, (b) suffered from "repressed memory" such that the holder of the Abuse Claim was not aware that he or she held an Abuse Claim as of such date, or (c) had not discovered the injury or the connection between the injury and the Abuse and who could not in the exercise of reasonable care have discovered the injury or connection between the injury and the Abuse." Plan, § I.A.66.

The Plan further defines a "Future Abuse Claim" as "any Abuse Claim against any Protected Party that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively, Abuse that occurred prior to the Petition Date but which, as of the date immediately preceding the Petition Date, was held by a Person who, as of such date, (a) had not attained eighteen (18) years of age, (b) suffered from "repressed memory" such that the holder of the Abuse Claim was not aware that he or she held an Abuse Claim as of such date, or (c) had not discovered the injury or the connection between the injury and the Abuse and who could not in the exercise of reasonable care have discovered the injury or connection between the injury and the Abuse." Plan, § I.A.66.

recognize that there are likely a subset of holders of Abuse Claims that are unable to assert such Abuse Claims by the Abuse Claims Bar Date. As other courts have acknowledged, sexual abuse can cause "cognitive and psychological injuries" that impede a survivor's ability to recognize the abuse and its effects. *See In re Roman Catholic Archbishop of Portland in Oregon*, Case No. 04-37154, 2005 WL 148775, at *4 (Bankr. D. Or. Jan. 10, 2005). As a result, the Debtors believe it is critically important that the Court appoint a future claimants' representative to represent the interests of these Future Claimants in connection with these chapter 11 proceedings, including the negotiations regarding the plan of reorganization, the victims' compensation trust, and the channeling injunction.[8]

18.    Section 1109(b) of the Bankruptcy Code gives a bankruptcy court the authority to appoint a representative to protect the interests of future tort claimants as "part[ies] in interest." *See Fogel v. Zwell*, 221 F.3d 955, 961-62 (7th Cir. 2000) (collecting cases); *see also Jones v. Chemetron Corp.*, 212 F.3d 199, 209-10 (3d Cir. 2000); *In re Johns-Manville Corp.*, 36 B.R. 743, 749 (Bankr. S.D.N.Y. 1984) ("Future claims are undeniably parties in interest to these reorganization proceedings pursuant to the broad, flexible definition of that term enunciated by the foregoing authorities. The drafting of 'party in interest' as an elastic concept was designed for just this kind of situation."); *In re UNR Indus., Inc.*, 46 B.R. 671, 675 (Bankr. N.D. Ill. 1985). Without a representative, future tort claimants cannot participate in the bankruptcy case, even by

---

[8] Unlike a future claim in other mass tort contexts, there is no latency period for abuse. In the abuse context, a future claim is properly understood as a claim related to abuse that has already occurred but which is held by an individual who (a) has not attainted 18 years of age, (b) suffers from "repressed memory" such that he or she is not aware that he or she holds an abuse claim, or (c) has not discovered the injury or the connection between the injury and the abuse and who could not in the exercise of reasonable care have discovered the injury or connection between the injury and the abuse. Given (i) the significant advertising and publicity surrounding abuse in scouting over the past year; (ii) the highly publicized nature of this restructuring; and (iii) the robust and comprehensive claims and noticing procedures that the Debtors will implement through these cases, including as set forth in the Bar Date Motion, the Debtors expect that the vast majority of potential claimants will be identified as part of the bar date process in these chapter 11 cases and do not expect that there will be significant future claims relating to prior abuse in the BSA's Scouting programs. Nevertheless, it is important to the Debtors' restructuring efforts that the interests of any Future Claimants be adequately represented throughout these chapter 11 cases.

proxy. Thus, "due process considerations are often addressed by the appointment of a representative to receive notice for and represent the interests of a group of unknown creditors." *Chemetron Corp.*, 212 F.3d at 209.

19.     Although the Tort Claimants' Committee has been appointed by the U.S. Trustee to represent parties holding Abuse Claims, the interests of the parties that are able to assert Abuse Claims against the Debtor by the Abuse Claims Bar Date may not be aligned in all respects with those of the Future Claimants. It is therefore necessary and appropriate for the Court to appoint a separate representative and advocate for the interests of the Future Claimants. *See In re Amatex Corp.*, 755 F.2d 1042-43 (3d Cir. 1985) ("[N]one of the parties currently involved in the reorganization proceedings have interests similar to those of future claimants, and therefore future claimants require their own spokesperson."); *In re Johns-Manville Corp.*, 552 B.R. 221, 245 (Bankr. S.D.N.Y. 2016) (explaining that the future claimants' representative was appointed to avoid "a conflict of interest between future asbestos claimants and present asbestos health claimants"); *In re UNR Indus.*, 46 B.R. at 675 (recognizing that the interests of future claimants were not adequately represented by the debtors or by the official committees of unsecured creditors).

20.     Courts addressing bankruptcy cases involving significant numbers of sexual abuse claims have regularly appointed future or unknown claimants' representatives to represent claimants that were unable to identify their injury at the time of the bankruptcy case. *See, e.g.*, *In re Archbishop of Agaña*, Case No. 19-00010 (FTG) (D. Guam Mar. 3, 2020), Dkt. No. 355 (appointing unknown claimants' representative); *In re USA Gymnastics*, Case No. 18-09108 (RLM) (Bankr. S.D. Ind. 2019), Dkt. No. 516 (appointing futures representative to represent future abuse claimants); *In re Roman Catholic Bishop of Great Falls, Montana*, Case No. 17-

60271 (JDP) (Bankr. D. Mont. June 18, 2018), Dkt. No. 383 (same); *In re Christian Brothers' Institute*, No. 11-22820 (RDD) (Bankr. S.D.N.Y. Apr. 21, 2014), Dkt. No. 688 (appointing future claimants' representative post-confirmation to administer trust to settle sexual abuse claims); *In re Catholic Bishop of Northern Alaska*, No. 08-00110 (DMD) (Bankr. D. Alaska May 30, 2008), Dkt. No. 179 (appointing future claimants' representative on behalf of potential sexual abuse claimants); *In re Diocese of Davenport*, No. 06-02229 (LMJ) (Bankr. S.D. Iowa Nov. 7, 2007), Dkt. No. 198 (same); *In re Roman Catholic Bishop of San Diego*, No. 07-00939 (LA) (Bankr. S.D. Cal. July 13, 2007), Dkt. No. 753 (same); *In re Roman Catholic Archbishop of Portland in Oregon*, No. 04-37154 (ELP) (Bankr. D. Or. Dec. 20, 2004), Dkt. No. 723 (same); *In re Roman Catholic Church of the Diocese of Tucson*, No. 04-BK-04721 (JMM) (Bankr. D. Ariz. Nov. 1, 2004), Dkt. No. 107 (same).

## II.    The Appointment of Mr. Patton to Serve as Future Claimants' Representative Is in the Best Interests of Future Claimants

21.    The Debtors submit that the appointment of Mr. Patton to serve as the Future Claimants' Representative is in the best interests of the Future Claimants and of the Debtors' estates.  As the prepetition future claimants' representative, Mr. Patton and his advisors have conducted extensive due diligence regarding the Abuse Claims and the Debtors' assets and liabilities, and are well-positioned to effectively and efficiently represent Future Claimants throughout the bankruptcy proceedings.

22.    On December 12, 2018, the Debtors negotiated and entered into an engagement letter (the "Prepetition FCR Agreement") with Mr. Patton to serve as prepetition FCR and represent Future Claimants during the course of the prepetition negotiations.  A true and correct

copy of the Prepetition FCR Agreement is attached hereto as **Exhibit C**.[9]  Subsequent to his

engagement, Mr. Patton retained Young Conaway Stargatt & Taylor, LLP ("Young Conaway")

as counsel and Ankura Consulting Group, LLC ("Ankura") as claims analyst and financial

consultants to provide advice in connection with such representation.  Prior to the Prepetition

FCR Agreement, except as disclosed in the Patton Declaration, neither Mr. Patton nor Young

Conaway had any association or relationship with, or other connection to, the Debtors.

23.     The Prepetition FCR Agreement expressly provided that Mr. Patton's sole

responsibility and loyalty is to the rights of future sexual abuse personal injury claimants based

on personal injuries arising from sexual abuse for which the Debtors may be alleged to be liable.

*See* Exhibit C, ¶ 3.  The Prepetition FCR Agreement further provided that the Debtors have no

right to control or influence how Mr. Patton or his professionals carry out such duties.  *Id.*

24.     The primary work conducted under the Prepetition FCR Agreement by Mr. Patton

and his team was due diligence and analysis into the Debtors' liability for sexual abuse personal

injury claims, including future claims.  Together with his advisors, Mr. Patton initiated an

extensive diligence process into the Debtors' assets and abuse-related liabilities, subject to a

confidentiality agreement.  The Debtors worked constructively with Mr. Patton and his advisors,

producing thousands of pages of documents and providing responses to his information requests,

as well as attending in-person and telephonic diligence meetings prior to the Petition Date,

including a two-day mediation in early November 2019.  Mr. Patton became familiar with the

Debtors' assets, liabilities, Abuse Claims, and the issues that will need to be addressed and

---

[9] Pursuant to the Prepetition FCR Agreement, the Debtors agreed to compensate Mr. Patton and his counsel at their regular hourly rates for services rendered.  The Debtors also agreed to pay a retainer of $500,000 (the "Retainer") for the payment of fees of Mr. Patton and his counsel while due diligence concerning the Debtors and their abuse-related personal injury claims was conducted.  Under the terms of the Prepetition FCR Agreement, the Retainer is to be used as security for the unpaid fees and expenses of the Prepetition FCR and Young Conaway.  Accordingly, the Debtors have paid, in the ordinary course, fees and expenses reflected on invoices from the Prepetition FCR and Young Conaway as set forth in the attached Exhibit D.

resolved in these chapter 11 cases.  It is critically important that the chapter 11 cases proceed expeditiously in order to safeguard the future of the BSA's mission and maximize the value of the Debtors' estates for the benefit of Abuse survivors and other stakeholders.  The appointment of Mr. Patton as the Future Claimants' Representative is thus in the best interests of the Future Claimants and the Debtors' estates, and avoids the unnecessary expense, delay and duplication that would occur if a new future claimants' representative were to be appointed.

     **A.**    **Mr. Patton Has Unmatched Experience Serving As, or Representing, Future Claimants' Representatives in Mass Tort Chapter 11 Bankruptcies**

25.    As set forth in the *Declaration of James L. Patton, Jr., in Support of Debtors' Motion for Entry of an Order Appointing James L. Patton, Jr. as Legal Representative for Future Claimants, Nunc Pro Tunc to the Petition Date* attached hereto as **Exhibit B** (the "Patton Declaration"), Mr. Patton has more than 30 years of experience with bankruptcies and settlement trusts.  He is Chairman Emeritus of Young Conaway and a partner in its Bankruptcy and Corporate Restructuring section.   He specializes in corporate restructurings, mass tort insolvencies, complex asbestos bankruptcies, and post-confirmation settlement trusts.

26.    Mr. Patton is an independent and well qualified candidate, who has been found to possess the experience and qualifications necessary to serve as the Future Claimants' Representative.  Mr. Patton has extensive experience representing future claimants in the context of asbestos bankruptcies and asbestos settlement trusts.  Since May 8, 2006, he has served as the Future Claimants' Representative for the Celotex Asbestos Settlement Trust.  Prior to that appointment, Mr. Patton and Young Conaway served as counsel to David S. Shrager, who served as the Future Claimants' Representative for the Celotex Asbestos Settlement Trust until his death in November 2005.

27.    Mr. Patton also served as the Future Claimants' Representative in the bankruptcy cases of *In re Leslie Controls, Inc.*, Case No. 10-12199 (Bankr. D. Del.), following his appointment on July 12, 2010; *In re United Gilsonite Laboratories*, Case No. 5:11-bk-02032 (RNO) (Bankr. M.D. Pa.), following his appointment on June 30, 2011; *In re Yarway Corp.*, Case No. 13-11025 (Bankr. D. Del.), following his appointment on April 22, 2013; and *In re Maremont Corp.*, Case No. 19-10118 (KJC) (Bankr. D. Del.), following his appointment on March 13, 2019.  He continues to serve as the Future Claimants' Representative for the asbestos personal injury settlement trusts established from those cases.  In addition, Mr. Patton currently serves as the Future Claimants' Representative in *In re The Fairbanks Co.*, Case No. 18-41768 (PWB) (Bankr. N.D. Ga.) and *In re Imerys Talc America, Inc.*, Case No. 19-10289 (LSS) (Bankr. D. Del.).  A motion is pending for his appointment as the future claimants' representative in *In re Paddock Enterprises, LLC*, Case No. 20-10028 (LSS) (Bankr. D. Del.).  Mr. Patton and Young Conaway also have represented other future claimants' representatives in connection with numerous mass-tort related bankruptcy cases, as detailed in the Patton Declaration.

28.    Mr. Patton has the necessary qualifications to serve as the Future Claimants' Representative in the Debtors' chapter 11 cases.  In the past year alone, three bankruptcy courts (two of them in Delaware) have approved Mr. Patton's appointment as a future claimants' representative, finding that he had the necessary experience and expertise to represent future claimants.  Most recently, in *Imerys*, this Court overruled certain objections to Mr. Patton's appointment and observed that "there is no question that Mr. Patton is up to the task.  His curriculum vitae . . . as well as his testimony show that he has the knowledge, experience and expertise to be the legal representative for demand holders.  In fact, no one really questions his experience or professionalism."  Bench Ruling on Motion to Appoint James L. Patton, Jr. as the

Legal Representative for Future Talc Personal Injury Claimants, *In re Imerys Talc America, Inc.*, Case No. 19-10289 (LSS), [Docket No. 503], at 10 (Bankr. D. Del. May 8, 2019) (hereinafter "Imerys Bench Ruling").

29.     Judge Bonapfel of the Northern District of Georgia in Fairbanks noted, in approving Mr. Patton as future claimants' representative, that a substantial factor in his appointing Mr. Patton was his "significant experience in mass tort bankruptcy cases," which the court determined would, among other things, enable him to "expedite and prioritize issues in order to minimize costs and maximize returns." *In re Fairbanks Co.*, 601 B.R. 831, 842-43 (Bankr. N.D. Ga. 2019).   And, in overruling the U.S. Trustee's objection to Mr. Patton's appointment as future claimants' representative in *In re Maremont Corp.*, No. 19-10118 (KJC) (Bankr. D. Del.), Judge Carey held that the U.S. Trustee had failed to make a "showing that Mr. Patton would be anything but someone with undivided loyalties and effective and independent." Transcript of March 8, 2019 Hearing ("Maremont Tr.") [Docket No. 126], at 102:21-23.   Other courts have similarly recognized Mr. Patton's depth of experience in appointing him as a future claimants' representative.  *See e.g.*, *In re Leslie Controls, Inc.*, Case No. 11-0013 (JBS) (D. Del. Mar. 25, 2011), Additional Findings in Support of Affirmation Order [Docket No. 28] (hereinafter "Leslie Findings"), at 14 ("Both Mr. Patton and his counsel made clear the unique value of experience with these types of trusts; the successful establishment and operation of such trusts turns on difficult predictions that are easier to make in the light of the experience of similar trusts.").

**B.     Retaining an Experienced Future Claimants' Representative is in the Best Interests of Future Claimants**

30.     The bankruptcy courts' rulings appointing Mr. Patton as the future claimants' representative in *Imerys*, *Fairbanks*, and *Maremont* are just three recent examples in a long line

of cases in which courts have held that an FCR's experience was a key and pivotal consideration in his or her appointment. *See, e.g.*, *In re Duro Dyne*, Case No. 18-27963 (MBK) (Bankr. D.N.J. Oct. 16, 2018), Transcript ("<u>Duro Dyne Bankr. Tr.</u>") at 17:14-19 ("As acknowledged by the Office of the U.S. Trustee at oral argument, when asked how the Court could be assured of any [FCR] applicant's effectiveness at the early stage of the proceeding, the obvious answer to the Court was that the Court must look to the applicant's experience and knowledge."); *In re Thorpe Insulation Co.*, Case No. 2:07-19271-BB (Bankr. C.D. Cal. Dec. 12, 2007), Transcript at 19:13-15 ("THE COURT: [T]he fact that [the proposed future claimants' representative] has served as a futures representative in other cases, I think that's a good thing. He's got experience. He knows how this process works.").

31.    The benefits of retaining an FCR experienced in mass tort bankruptcies with channeling injunctions and post-confirmation trusts cannot be overstated. The technical details regarding the structure and timing of trust contributions, the scope of the channeling injunction, and procedures governing trust distributions are largely unique to mass tort bankruptcies. An FCR requires a significant and substantive understanding of the unique provisions governing mass tort chapter 11 proceedings and practical, real-world experience addressing those provisions in the context of negotiations. *See, e.g.*, S. Elizabeth Gibson, *Fed. Judicial Ctr., Judicial Management of Mass Tort Bankruptcy Cases* 67 (2005) ("In deciding whom to appoint, judges should look for persons with the training and experience needed to deal competently with the tort, bankruptcy, corporate, financial, and constitutional issues that will be involved in representing the interests of future claimants.").

32.    Appointing an experienced FCR here is critical to ensure that Future Claimants will be properly represented in negotiations and will have a zealous advocate in, among other

things, establishing and negotiating appropriate trust distribution procedures and related documentation that will govern any trust created pursuant to section 105(a) of the Bankruptcy Code. Appointment of an experienced FCR also minimizes the potential for missteps that could prolong the reorganization process, delay payments to claimants, and result in substantially increased professional fees and other bankruptcy-related expenses. Mr. Patton will readily be able to achieve the goals of zealous and efficient representation not only because of his extensive experience in mass tort bankruptcies but also because his work as prepetition FCR provided a detailed understanding of the Debtors, their assets, their abuse-related liabilities, and other crucial information necessary to fully protect the rights of Future Claimants.

### C.     Mr. Patton Meets the Standard for Appointment of a Future Claimants' Representative

33.     The Bankruptcy Code does not address the standard for determining whether an individual qualifies to serve as a future claimants' representative, but Courts have generally applied either a guardian *ad litem* standard, or the disinterestedness standard. Mr. Patton satisfies both standards.

34.     Mr. Patton satisfies the guardian *ad litem* standard, which was recently applied by this Court to the appointment of a future claimants' representative. *See* Imerys Bench Ruling, at 10 (concluding that the legal representative is "much more like a guardian ad litem than those persons in the Code subject to the disinterestedness standard") (citing *Fairbanks*); *see also In re Fairbanks Co.*, 601 B.R. at 839 (relying on the guardian ad litem standard in appointing a legal representative for future asbestos claimants). In *Imerys*, this Court held that a future claimants' representative must "be independent of the debtor and other parties-in-interest in the case and be able to effectively speak for this constituency" and his or her "loyalties must lie with the demand holders for whom he acts as a fiduciary, that is—the future claimants." Imerys Bench Ruling, at

10. The *Fairbanks* court similarly held that a future claimants' representative must "not only be disinterested and qualified" but "capable of acting as an objective, independent, and effective advocate for the best interests of the future claimants." *In re Fairbanks Co.*, 601 B.R. at 841 ("The Court must be satisfied that, like a guardian ad litem, an FCR will provide representation that is diligent, competent, and loyal.").

35.    Both this Court in *Imerys* and Judge Bonapfel in *Fairbanks* determined that Mr. Patton satisfied the guardian ad litem standard and appointed Mr. Patton as the future claimants' representative in their respective cases. *See In re Imerys*, Order Appointing James L. Patton, Jr. as Legal Representative for Future Talc Personal Injury Claimants, [Docket. No. 647]; *In re Fairbanks Co.*, 601 B.R. 831, 839 (Bankr. N.D. Ga. Apr. 17, 2019). Specifically, this Court noted in *Imerys*, that there was "no question that Mr. Patton [wa]s up to the task" and his "curriculum vitae . . . as well as his testimony show that he has the knowledge, experience and expertise to be the legal representative for demand holders." Imerys Bench Ruling, at 10. In addition, the Court found that Mr. Patton was independent and the mere fact that he was hired by the Debtors prepetition did not impact his independence. *See id.* In *Fairbanks*, Judge Bonapfel selected Mr. Patton over three other candidates, stating that the court was "confident that future claimants, if asked who they would hire in this case, would select Mr. Patton" and, in hindsight, such future claimants would be further "satisfied that the Court selected the best candidate from several qualified ones." *In re Fairbanks Co.*, 601 B.R. 831, 844 (Bankr. N.D. Ga. Apr. 17, 2019).

36.    Other courts that have appointed Mr. Patton have similarly found him to be highly qualified as a future claimants' representative. *See also* Leslie Findings at 14 ("Mr. Patton . . . was clearly a qualified choice for the position, who exercised his responsibilities in good faith.

He spoke with knowledge and evident wisdom with respect to the challenges of representing the future claimants, revealing a reassuring level of sophistication in his analysis of the issues."); *In re Leslie Controls, Inc.*, Case No. 10-12199 (CSS) (Bankr. D. Del. Aug. 9, 2010), Transcript at 72:18-73:5 ("Mr. Patton is well-known to the asbestos bar.  He's well-known to the bankruptcy bar nationally.  He's well-known to the Delaware bar.  And I have no doubt in my mind that he will work diligently on behalf of the future claimants. . . . [I]f the debtor were simply to come to me and say look, Judge, you need to find us a future claims representative, quite frankly I would have called Mr. Patton because I know of his experience in the area and I know of his reputation."); *In re the Celotex Corp.*, Case No. 90-10016-8B1 (Bankr. M.D. Fla. May 8, 2006), Order Approving the Appointment of James L. Patton, Jr. as the Successor Legal Representative for Unknown Asbestos Bodily Injury Claims at ¶ 6 ("This Court has carefully reviewed Mr. Patton's qualifications and background.  It has determined that he will ably carry out the duties and responsibilities of the Legal Representative under the Trust Agreement and fully represent the interests of future holders of asbestos-related personal injury demands as to matters concerning the Trust.").

37.    Other courts within this District and the Third Circuit have determined that the applicable standard for assessing the proposed appointment of a future claimants' representative is that of "disinterestedness" under section 101(14) of the Bankruptcy Code.  *See Vara v. Duro Dyne Nat'l Corp. (In re Duro Dyne Nat'l Corp)*, 2019 WL 4745879, at *8 (D.N.J. Sep. 30, 2019); Duro Dyne Bankr. Tr. at 9:15-9:23 ("The Court followed the approach taken nearly universally by other courts in applying the disinterested person standard set forth in 11 U.S.C. Section 101(14) as the correct disqualification standard for assessing the appointment of a legal representative under Section 524(g). . . ."); Maremont Tr. at 98:5-8; 101:20-24 (recognizing that

"the majority of recent decisions by bankruptcy courts have determined the appropriate standing [sic] for assessing the proposed appointment of an FCR is that of disinterestedness"). Chief Judge Sontchi has stated that the disinterestedness standard is the "highest level of duty or standard in the Bankruptcy Code for the appointment of anybody" and emphasized "it's very strict." *In re Leslie Controls, Inc.*, Case No. 10-12199 (CSS) (Bankr. D. Del. Aug. 9, 2010), Transcript at 70:15-71:4. *See also In re Thorpe Insulation Co.*, Case No. 2:07-19271-BB (Bankr. C.D. Cal. Dec. 12, 2007), Transcript at 44:17-45:4 (applying the disinterestedness standard to appointment of a future claimant's representative and recognizing that disinterestedness is "a pretty high standard").

38.     As set forth more fully in the Patton Declaration, Mr. Patton is not a creditor of the Debtors, nor does he have an interest materially adverse to the Future Claimants. Accordingly, Mr. Patton is "disinterested" as such term is defined in section 101(14) of the Bankruptcy Code.

39.     Mr. Patton's prepetition engagement with the Debtors has no bearing on his level of disinterestedness or his independence. As this Court recently noted in *Imerys*, "many courts . . . have found that a nominee should not be disqualified solely on this basis. While admittedly an unusual situation, this process has worked in the asbestos/mass tort cases for decades. . . . The question is not whether the proposed legal representative performed some work prepetition, but whether there is a reason to doubt his independence based on that selection." Imerys Bench Ruling, at 10-11.

40.     In fact, courts have held that an FCR's prepetition engagement enables a more efficient administration of a debtor's estate, which saves valuable assets for distribution to current and future claimants, while preventing any due process concerns by affording Future

Claimants a seat at the table as prepetition diligence and negotiations are conducted. *See, e.g., In re Combustion Eng'g., Inc.*, 391 F.3d 190, 245 (3d Cir. 2005) (noting that it is appropriate for an FCR to be involved early in the bankruptcy process"); Maremont Tr. at 102:6-10 ("Much money and time has already been spent by Mr. Patton as his role, in his role as prepetition FCR and it seems under these circumstances counterintuitive to want to pay someone new to spend time and money getting caught up."); Duro Dyne Bankr. Tr. at 21:5-7, 22:2-10 ("The pre-petition selection of, negotiations with and payment to any pre-petition FCR is critical for a successful pre-negotiated case. . . . This Court will not . . . imperil this company's reorganization, add layers of additional administrative expenses, place at risk the jobs of hundreds of employees, or unnecessarily jeopardize the recoveries for present and future claimants by delaying this reorganization through the appointment of a new future rep, who must retain professionals, engage in his or her own due diligence, only to reach the same point of review to which [the prepetition FCR and proposed post-petition FCR] assents at this present time."); Leslie Findings at 6 ("Future claimants would otherwise be unrepresented in the [negotiation] process, and counsel for current claimants would have a conflict if asked to simultaneously represent future claimants in negotiations over limited funding resources.").

41.     Accordingly, Mr. Patton has the necessary experience to serve as the Future Claimants' Representative, and meets both the guardian ad litem and disinterestedness standards applied by courts. The Debtors respectfully request that this Court enter the Proposed Order appointing Mr. Patton to serve as the FCR.

### NOTICE

42.     Notice of this Motion will be provided to: (i) the U.S. Trustee; (ii) proposed counsel to the UCC; (iii) proposed counsel to the Tort Claimants' Committee; (iv) counsel to the proposed Future Claimants' Representative; (v) counsel to the Ad Hoc Committee of Local

Councils; (vi) counsel to JPMorgan Chase Bank National Association; (vii) the County Commission of Fayette County (West Virginia), as issuer of those certain Commercial Development Revenue Bonds (Arrow WV Project), Series 2010A, 2010B and 2012; and (viii) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order, substantially in the form attached hereto as Exhibit A, granting the relief requested herein and such other and any further relief the Court may deem just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated:  March 17, 2020
      Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Eric W. Moats*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Joseph C. Barsalona II (No. 6102)
Eric W. Moats (No. 6441)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email:  dabbott@mnat.com
       aremming@mnat.com
       jbarsalona@mnat.com
       emoats@mnat.com
       ptopper@mnat.com

– and –

SIDLEY AUSTIN LLP
Jessica C. K. Boelter (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 839-5300
Email:  jboelter@sidley.com

– and –

SIDLEY AUSTIN LLP
Thomas A. Labuda (admitted *pro hac vice*)
Michael C. Andolina (admitted *pro hac vice*)
Allison Ross Stromberg
Matthew E. Linder (admitted *pro hac vice*)
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Email:  tlabuda@sidley.com
       mandolina@sidley.com
       astromberg@sidley.com
       mlinder@sidley.com

PROPOSED COUNSEL TO THE DEBTORS
AND DEBTORS IN POSSESSION