1             UNITED STATES BANKRUPTCY COURT
2                  DISTRICT OF DELAWARE

3   IN RE:                          .   Chapter 11
                                    .
4   BOY SCOUTS OF AMERICA and       .   Case No. 20-10343 (LSS)
5   DELAWARE BSA, LLC,              .
                                    .
6   _____Debtors._____        .
    BOY SCOUTS OF AMERICA,          .   Adv. Pro. No. 20-50527 (LSS)
7                                   .
                Plaintiff.          .
8                                   .   Courtroom No. 2
        v.                          .   824 North Market Street
9                                   .   Wilmington, Delaware 19801
    A.A., *et al.*,                 .
10                                  .
                Defendants.         .   March 24, 2020
11  . . . . . . . . . . . . . . . .   10:00 A.M.
12
              TRANSCRIPT OF TELEPHONIC HEARING
13      BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
              UNITED STATES BANKRUPTCY JUDGE
14
    TELEPHONIC APPEARANCES:
15
    For the Debtor:        Derek C. Abbott, Esquire
16                         Andrew R. Remming, Esquire
                           Joseph C. Barsalona, II, Esquire
17                         Eric W. Moats, Esquire
                           Paige N. Topper, Esquire
18                         MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                           1201 North Market Street, 16th Floor
19                         P.O. Box 1347
                           Wilmington, Delaware 19899
20
    Audio Operator:        Ginger Mace
21

22  Transcription Company: Reliable
                           1007 N. Orange Street
23                         Wilmington, Delaware 19801
                           (302)654-8080
24                         Email:  gmatthews@reliable-co.com
25
    Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.

TELEPHONIC APPEARANCES (Continued):

For the Debtors:            Thomas A. Labuda, Esquire
                            Michael C. Andolina, Esquire
                            Matthew E. Linder, Esquire
                            Andrew O'Neill, Esquire
                            Eric Thomas, Esquire
                            SIDLEY AUSTIN LLP
                            One South Dearborn Street
                            Chicago, Illinois 60603

                            - and -

                            Jessica C. Boelter, Esquire
                            SIDLEY AUSTIN LLP
                            787 Seventh Avenue
                            New York, New York 10019

For Girl Scouts of the      Eric Lopez Schnabel, Esquire
United States of            DORSEY & WHITNEY LLP
America:                    1000 N West Street, Suite 1410
                            Wilmington, Delaware 19801

For the Committee:          Rachel Ringer, Esquire
                            KRAMER LEVIN NAFTALIS & FRANKEL LLP
                            1177 Avenue of the Americas
                            New York, New York 10036

For LG-37:                  Richard Weisbeck, Esquire
                            LIPSITZ GREEN SCIME CAMBRIA LLP
                            42 Delaware Avenue, Suite 120
                            Buffalo, New York 14202

For Tort Claimants:         James Stang, Esquire
                            PACHULSKI STANG ZIEHL & JONES LLP
                            10100 Santa Monica Boulevard
                            13th Floor
                            Los Angeles, California 90067

ADVERSARY PROCEEDING:

*Boy Scouts of America v. A.A., et. al., Adv. Pro. No. 20-50527*

**Preliminary Injunction.**  The BSA's Motion for a Preliminary Injunction Pursuant to Sections 105(a) and 362 of the Bankruptcy Code (A.D.I. 6, Filed 2/18/20)

STATUS CONFERENCE:

**Relief from the Automatic Stay.**  Girl Scouts of the United States of America's Motion for Relief From the Automatic Stay to Resume Trademark Action (D.I. 155, Filed 3/10/20)

DEBTORS' WITNESS:

**BRIAN WHITTMAN**

| | |
|---|---|
| Cross Examination by Mr. Weisbeck | 13 |
| Redirect Examination by Mr. Andolina | 25 |
| Recross Examination by Mr. Weisbeck | 27 |

**ADRIAN AZER**

| | |
|---|---|
| Cross Examination by Mr. Weisbeck | 30 |

| EXHIBITS | I.D. | REC'D |
|---|---|---|
| Declaration of Brian Whittman | | 48 |
| Declaration of Adrian Azer | | 48 |

1          (Proceedings commence at 10:06 a.m.)

2          THE COURT:  Good morning, counsel.  This is Judge

3  Silverstein.  We're here for the hearing in the Boy Scouts of

4  America case; Case Number 20-10343.

5          I was waiting to start the hearing because there

6  are two people that I thought were supposed to be on Skype

7  that are not on Skype.  And that is Mr. Weisbeck and Ms.

8  Ringer.

9          MR. WEISBECK:  Good morning, Judge. This is

10  Richard Weisbeck.  I have to work remotely and I was unable

11  to get Skype in the location I am at presently.

12          THE COURT:  Okay.

13          MS. RINGER:  Your Honor, this is Rachel Ringer.  I

14  am in a similar position.  I was having technical

15  difficulties with Skype this morning.  So, I have a live line

16  and I'm on the line.

17          THE COURT:  Okay.  Well, Mr. Weisbeck, I realize

18  that this creates problems.  I think we're all working

19  remotely at this point, except for me.  I happen to be in the

20  courtroom, but I'm the only person in the courtroom.  So, I

21  guess I would give you an option.  We have the witnesses on

22  both Skype, which recognize you can't see, and on CourtCall.

23  So, we can proceed.

24          Well, let me hear from debtors' counsel and let me

25  hear from you, Mr. Weisbeck, on how you would like to

1  continue.

2         MS. BOELTER:  Your Honor, this is Jessica Boelter

3  of Sidley Austin with respect to the debtors.

4         Your Honor, its our understanding -- and

5  incidentally, Your Honor, we had actually encouraged the

6  parties to try to move this to April 15th in the hope that

7  maybe we would see some of us moving out of our homes, and

8  back into courtrooms and office buildings, but that was not

9  something that was acceptable to the remaining objector with

10 respect to the preliminary injunction which is LG-37.

11        As a result, as you undoubtedly saw, Your Honor,

12 we submitted three declarations with respect to the

13 preliminary injunction, the declaration of Mr. Whittman, the

14 declaration of Mr. Azer and then we also filed a supplemental

15 declaration of Mr. Azer on Sunday in connection with our

16 reply.

17        It's our understanding, Your Honor, as late as

18 yesterday that LG-37's counsel does want to cross-examine the

19 two witnesses.  My partner, Michael Andolina, is going to

20 handle the evidentiary presentation today.  I may ask Mr.

21 Andolina to weigh-in as to what his views are in terms of

22 cross examination of our witnesses over the telephone which

23 we have managed to produce from bedrooms and offices around

24 the country.

25        MR. ANDOLINA:  Your Honor, its Mike Andolina on

1  behalf of the debtors.

2          This is not, obviously, an ideal situation, but

3  since we are all gathered here, since the witnesses are

4  available on CourtCall, and since we're available to argue

5  the motion, unless Mr. Weisbeck has an objection I think we

6  would like to go forward and have him cross-examine Mr.

7  Whittman and Mr. Azer telephonically and then have Ms.

8  Boelter argue the motion so the court can rule.

9          THE COURT:  Mr. Weisbeck?

10          MR. WEISBECK:  Yes.  We're prepared to go forward,

11  Your Honor, to cross-examine these two witnesses based on

12  their declarations that were submitted to the court.  Then,

13  because they submitted additional evidence following our

14  objection after the cross-examination is finished we'd like

15  an opportunity to submit some further argument and law on

16  these issues based on their testimony and other information

17  revealed through cross examination.

18          THE COURT:  Okay.  Well, I'm not going to rule on

19  whether or not I need anything post-hearing until I hear the

20  evidence.  I will let you make that request later, but this

21  was the time and place for the hearing and they're available

22  for cross examination.  So, let's get started with the

23  evidentiary hearing.

24          Mr. Andolina?

25          MR. ANDOLINA:  Your Honor, Mike Andolina, again,

1 on behalf of the debtors.

2         As Ms. Boelter mentioned, both Mr. Whittman and

3 Mr. Azer are available for cross examination to the

4 objector's counsel.  Before we begin I just wanted to thank

5 all of the parties, in particular the TCP and the UCC counsel

6 for their incredible efforts over the last week to get us to

7 the point where we have a proposed consent order with respect

8 to all the parties with the exception of the objector.

9         I was on the frontline of all of the discussions

10 with the TCP, the UCC and the objectors.  And I greatly

11 appreciate the responsiveness and the professionalism of all

12 of the lawyers involved under very trying circumstances.  A

13 lot of times we, obviously, rely on face to face meetings to

14 hash things out.  We're certainly not able to do that in

15 these circumstances.  So, we all had to put a lot of extra

16 work in.  I also want the court to know the debtors did

17 everything possible in an effort to avoid burdening the court

18 with this hearing.

19         Finally, the debtors greatly appreciate the

20 court's accommodation in setting up this hearing including,

21 in particular, the court's letter of March 20th providing

22 very important direction for this process.  I really never

23 wanted to be in Delaware so badly as I do today, but it's

24 certainly very much appreciated on behalf of the debtors that

25 the court is allowing us to go forward in this manner.

1          That being said, we have submitted two

2   declarations from Mr. Azer and one declaration from Mr.

3   Whittman.  Our view is that rather than spend the court's

4   time going through a direct examination with respect to these

5   witnesses we would just tender the witnesses to Mr. Weisbeck,

6   the objector, to allow for cross examination on the three

7   declarations.  Then we would seek to have the declarations

8   and the testimony admitted into evidence.

9          My suggestion is that we proceed, first, with Mr.

10  Whittman's cross examination if that's acceptable to the

11  court.  Mr. Whittman submitted a declaration at AD-8 in

12  support of BSA's motion for preliminary injunction.  His

13  declaration covers a broad range of topics.  Mr. Azer's

14  declaration is far more limited.  To the extent that Mr.

15  Weisbeck believes he needs to cross-examine Mr. Azer after we

16  finish with Mr. Whittman I think we'd like to proceed in that

17  manner.

18          So, unless the court has any concerns about

19  proceeding in this way we would ask that Mr. Whittman be

20  sworn and that we tender the witness to Mr. Weisbeck for

21  questioning.

22          THE COURT:  Okay.  Can I have (inaudible)?

23          Mr. Whittman, can you raise your right hand

24  please.

25          BRIAN WHITTMAN, DEBTOR WITNESS, SWORN

1          THE COURT:  Will you please state your full name

2   and spell your last name for the record.

3          MR. WHITTMAN:  Brian Whittman, W-H-I-T-T-M-A-N.

4          THE COURT:  Thank you.

5          Mr. Weisbeck, you can start your cross

6   examination.

7          MR. WEISBECK:  Thank you very much, Your Honor.

8   Prior to doing so, may I make an inquiry as to whether the

9   other witness is excluded at this time from hearing the

10  testimony of Mr. Whittman?

11         THE COURT:  He is not.

12         MR. WEISBECK:  May I ask that he be excluded.

13         THE COURT:  Mr. Andolina?

14         MR. ANDOLINA:  Your Honor, I think in light of the

15  circumstances and in light of the fact that both of these

16  witnesses have testified in their declarations as to

17  insurance coverage there is no reason to have Mr. Azer

18  excluded from listening to Mr. Whittman's testimony.  In

19  fact, I think it may be beneficial for the court that Mr.

20  Azer hears Mr. Whittman's testimony.

21         MR. WEISBECK:  Well, may I make a comment, at

22  least without Mr. Azer hearing this comment, Your Honor?

23         THE COURT:  Okay.  We're in a tricky situation

24  because Mr. Azer --

25         MR. ANDOLINA:  Your Honor, I'm looking at Mr. Azer

1 | now and I could ask that Mr. Azer put his phone down.  He has

2 | a headset so that he can put his phone down so that Mr.

3 | Weisbeck can make an inquiry without Mr. Azer hearing his

4 | inquiry.

5 |           THE COURT:  Thank you.

6 |           MR. ANDOLINA:  Mr. Azer is now putting his phone

7 | down.  His phone is down.

8 |           MR. WEISBECK:  All right.

9 |           THE COURT REPORTER:  Excuse me, Your Honor?

10 |           THE COURT:  Yes.

11 |           THE COURT REPORTER:  This is Ginger.  I apologize,

12 | but is this going to be off the record then or under seal or

13 | something?

14 |           THE COURT:  No.  This is not off the record.

15 | We're still on the record.  Thank you, Ginger.

16 |           THE COURT REPORTER:  Thank you.

17 |           MR. WEISBECK:  May I speak, Your Honor?  This is

18 | Richard Weisbeck.

19 |           THE COURT:  Yes.

20 |           MR. WEISBECK:  Your Honor, Mr. Azer submitted an

21 | affidavit or the declaration, the second one, which states

22 | that there is no insurance coverage for the actions in any

23 | calendar year other then 1983 for when my client was

24 | victimized.  And he was victimized in 1983, '84, '85, '86 and

25 | '87.  Mr. Whittman, in his declaration testimony at Paragraph

1  11, states that with respect to any given policy or, at

2  least, some level of coverage under the CGL policies for each

3  subject here is available for bodily injury claims including

4  the pending abuse actions.  And because there is a

5  contradiction between those two testimonial declarations I

6  wanted to exclude Mr. Azer.

7          MR. ANDOLINA:  Your Honor, as both Mr. Whittman

8  and Mr. Azer can explain in their testimony, Mr. Weisbeck, I

9  believe, is mistaken in his understanding of the testimony

10 that was submitted by Mr. Whittman.  This has to do with the

11 first occurrence provision of the policies and agreements.

12 And those can be explained by the witnesses.  I don't think

13 there is any reason to exclude Mr. Azer from hearing Mr.

14 Whittman's testimony.

15         MS. BOELTER:  And, Your Honor, this is Jessica

16 Boelter.

17         Just to supplement that, Mr. Azer's supplemental

18 declaration, which was filed at Docket Number 41 over the

19 weekend, actually explains the first encounter agreement both

20 in Footnote 4 and in Paragraph 6 of that declaration as an

21 agreement between the debtors and certain of their insurers

22 to treat the insurance applicable to any particular abuse

23 claim as the insurance policy that's, in effect, in the first

24 year an encounter occurred.

25         So, in the case of LG-37, which is Mr. Weisbeck's

1   client, because the abuse spanned from 1983 to 1987 the first

2   encounter agreement, which, again, is a document between the

3   insurers and BSA, provides that the applicable insurance is

4   the policy in 1983.  When we get to argument I don't think

5   that changes anything before the court today, but that was,

6   in fact, covered in two locations in Mr. Azer's supplemental

7   declaration.

8          MR. WEISBECK:  I appreciate that, Your Honor.  I

9   don't think we've ever been given the underlying documents

10  about first encounter agreement.  And I'm taking at face

11  value what Mr. Whittman testified to at Paragraph 11.

12         THE COURT:  Okay.  I'm reading Paragraph 11.  I'm

13  not so sure I see it as inconsistent.  I see it as broader.

14  And I certainly think you can cross-examine both witnesses

15  with respect to this.

16         I'm going to grant the request.  I would ask that

17  Mr. Azer -- we will cross-examine Mr. Whittman first and then

18  Mr. Azer can join in.

19         MR. ANDOLINA:  Thank you, Your Honor.  Can I

20  signal to him to pick-up his phone and I can instruct him

21  them that he should put his phone down until Mr. Whittman's

22  testimony is concluded?

23         THE COURT:  Yes.

24         MR. ANDOLINA:  We will do that.

25         Mr. Azer, the court has requested that you keep

1  your phone down for the time period of Mr. Whittman's

2  testimony.  We will signal you via video when to pick your

3  phone back up for your testimony.

4            MR. AZER:  Okay.  Thank you.

5            MR. ANDOLINA:  Thank you.

6            THE COURT:  Thank you.

7            Okay.  Mr. Weisbeck, cross-examine.

8            MR. WEISBECK:  Thank you very much, Your Honor.

9                      CROSS EXAMINATION

10  BY MR. WEISBECK:

11  Q     Mr. Whittman, good morning sir.  I apologize that I'm

12  not able to see you in person.  Can you hear me okay?

13  A     I can.

14  Q     Thank you.  On Paragraph1 11 of your declaration, with

15  respect to insurance coverage, you stated on any given policy

16  or at least some level of coverage under the CGL policies for

17  each such years available for bodily injury claims including

18  pending abuse actions.  Correct, sir?

19  A     That is correct.

20  Q     And would that be true for the years that my client was

21  victimized including 1984, '85, '86 and '87?

22  A     With respect to the first encounter agreement there is

23  coverage in each of those years, but the agreement would

24  indicate that the coverage for a specific claim is available

25  for the first year of the abuse.

1    MR. WEISBECK:  I'm sorry, Your Honor, I didn't

2  hear that clearly.

3  BY MR. WEISBECK:

4  Q    Could you repeat that, Mr. Whittman?

5  A    The -- pursuant to the first encounter agreement a

6  claim for abuse would go against the insurance, in effect, in

7  the first year of abuse.  There is insurance in all of the

8  years that you asked me about, but the only insurance that

9  would apply is the first year.

10 Q    Okay.  So, is there a policy that names the Greater

11 Niagara Council to cover the years that it's been accused of

12 negligent conduct including 1984, '85, '86 and '87?

13 A    All of -- yes, all of local counsel including the

14 Niagara Council are named insured during the years you

15 referenced.

16 Q    Okay.  And other then the policy that's been referenced

17 by Mr. Azer is there any other policy that you're

18 referencing?

19 A    I'm sorry, are you referring to insurance policy?

20 Q    Yes.  Insurance policy.

21 A    I am not aware of any other insurance policies during

22 those years other than the insurance policies maintained by

23 BSA for the benefit of both BSA and its local counsel.

24 Q    I'm sorry.  I was just specifically referencing the

25 Greater Niagara -- our claim against the Greater Niagara

1  Council for those four years.  Are you aware of any other

2  ones that were procured by the BSA?

3  A    I am not.

4  Q    Okay.  Now at Paragraph 16 of your declaration, sir --

5  do you have that in front of you?

6  A    I do.

7  Q    Okay.  You make the claim that, historically, claims

8  against BSA and other organizations, including the pending

9  abuse claims, have, with very limited exception, been

10  litigated and administered solely by the BSA.

11      With respect to the claim for the Niagara Council would

12  you agree, sir, that you have not testified and you have not

13  submitted any document where there is a contractual indemnity

14  agreement whereby the BSA will indemnify the Niagara Council,

15  correct?

16          MR. ANDOLINA:  Objection to the form of the

17  question.  I believe its compound.

18          THE COURT:  You want -- Mr. Weisbeck, can you

19  rephrase your question?

20  BY MR. WEISBECK:

21  Q    You'd agree, sir, that you submitted no documentation

22  to show that there is any indemnity, contractual indemnity

23  agreement requiring the BSA to indemnify the Niagara Council?

24  A    I don't recall if I submitted anything in that regard.

25  Q    And if the record doesn't contain it then you'd agree

1  you didn't submit any evidence, correct?

2  A    I believe there are documents on the docket that

3  reflect there is an indemnity.  So, I can't answer your

4  question.

5  Q    Okay.  You believe there is a written contractual

6  indemnity agreement between the BSA and the Greater Niagara

7  Frontier Council.  Is that your testimony?

8  A    I believe that BSA indemnifies all of its local

9  counsels including Greater Niagara.

10  Q    I'm asking for whether there is a written contractual

11  indemnity agreement that you submitted?

12  A    I am not sure.

13  Q    Sir, you, in support of this request for a preliminary

14  injunction, stayed the actions against the co-defendants.  It

15  said, in Paragraph 17, that the BSA is necessarily involved

16  in a wide variety of litigation matters including, for

17  example, responses to discovery requests.  You'd agree, sir,

18  that once the BSA filed the Chapter 7 bankruptcy proceeding

19  we cannot issue any discovery requests against the BSA due to

20  the statutory stay.  Correct, sir?

21  A    It is my understanding that as long as BSA is in

22  Chapter 11 that you are prohibited from doing so under the

23  automatic stay.

24  Q    And, therefore, when you say that in support of the

25  preliminary injunction, at Paragraph 19, that the BSA's

1  involvement would include formulating defense strategies,

2  assisting in discovery, protecting against disclosure of

3  privilege or, otherwise, protected documents, attending

4  depositions, preparing witnesses and a myriad of other

5  litigation talks you would agree that the BSA isn't required

6  to attend any deposition in this case due to the stay.

7  A     I don't know.

8  Q     Would you agree, sir, that the BSA isn't required to

9  prepare any witnesses with respect to the co-defendants due

10 to the stay?

11 A     The BSA has been closely involved.  They're the party

12 responding to all this including your litigation prior to the

13 filing and has significant information pertaining to the

14 litigation.  I don't know.

15 Q     So, that's what the BSA did before it sought the

16 protection of the bankruptcy court.  I'm asking you, sir, as

17 the representative of the BSA you'd agree that any

18 preparation of witnesses by the BSA is not necessary because

19 there is a stay issued and you are not required to

20 participate in any way, shape or form in the action against

21 the other two defendants?

22 A     I think it depends on what the court orders.

23 Q     Absent a court order you're not required to do that,

24 correct?

25 A     I don't believe so.

1  Q     Okay.  And let's say, for example, that counsel, we

2  request some documentation from them, they can provide the

3  documentation they have independent of the BSA in the current

4  stay.  Correct, sir?

5  A     I'm sorry, I'm not sure I'm following you.

6          MR. ANDOLINA:  Objection.  It's calling for a

7  legal conclusion.

8          MR. WEISBECK:  No.  It calls for action.

9  BY MR. WEISBECK:

10 Q     Would you agree, sir, that --

11          THE COURT:  I'm going to overrule that objection;

12 although, I think, many questions have asked for legal

13 conclusions.  But you can ask this particular question, I

14 don't think.

15          THE WITNESS:  Can you repeat the question?

16          THE COURT:  Yes.  Please repeat your question.

17          MR. WEISBECK:  I'm sorry.  I forget exactly which

18 one I asked, Judge.  I thought --

19 BY MR. WEISBECK:

20 Q     Let's assume the District counsel is requested to

21 provide some document in its possession in the course of the

22 state discovery proceeding against it, would you agree, sir,

23 that they can do that independent of the BSA in the current

24 stay?  You wouldn't have to be involved at all.  There would

25 be no requirement you get involved.

1  A    I believe that is correct that local council could

2  produce what is in its possession.

3  Q    And if we wanted to take the testimony of a

4  representative of the local council from the mid 1980's who

5  had knowledge that the co-defendant, Douglas Nail, was

6  sexually assaulting boys in this Boy Scout group that person

7  can testify without any involvement whatsoever of the BSA.

8  Correct, sir?

9  A    I believe that it would impact the BSA or the co-

10 defendant and impact the insurance that we both share.  It

11 would be prudent for the BSA to be involved in any such

12 activity.

13 Q    There is no law that would require you to get involved

14 to your knowledge?

15 A    Not to my knowledge.

16         MR. ANDOLINA:  Objection; legal conclusion.

17         THE COURT:  Okay.

18 BY MR. WEISBECK:

19 Q    So, what --

20         THE COURT:  Excuse me, this is the court.  Let me

21 make a suggestion.

22         Mr. Whittman, before you answer give your counsel

23 a second to see if he has any objections.

24         Mr. Andolina, you were trying to object there.

25         MR. ANDOLINA:  I was, Your Honor.  Thank you for

1  admonishing my own witness.

2         THE COURT:  Okay.  I'm sorry, what was your

3  objection because I could not hear it.

4         MR. ANDOLINA:  I believe Mr. Weisbeck's question

5  calls for a legal conclusion.

6         THE COURT:  Sustained.

7  BY MR. WEISBECK:

8  Q    Would you agree, sir, that given the statutory stay

9  that the action against Douglas Nail could proceed without

10  any involvement of the BSA?

11  A    Yes.

12  Q    When you testified through your declaration about the

13  involvement of the BSA, essentially, what you're saying is

14  joint coordination between a district council that's been

15  sued and the BSA that's been sued, correct?

16         MR. ANDOLINA:  Objection to the form of the

17  question.  I didn't understand it.  I'm not sure if the

18  witness did.

19         THE COURT:  Yes.  I'm not sure that I did either.

20  Can you ask that question again, please?

21  BY MR. WEISBECK:

22  Q    I'm just trying to understand your testimony, sir.  It

23  seems like what you've testified to is that prior to filing

24  the Chapter 11 bankruptcy proceeding the BSA was involved

25  with the district council in jointly defending the claims

1  against each one of them.

2  A    That is correct.  The BSA coordinated the defense for

3  both the BSA and the local council defendants.

4  Q    Right.  And now that -- and the BSA was really in

5  control of that litigation, correct?

6  A    Yes.

7  Q    Of the BSA --

8  A    The BSA was --

9  Q    -- and the district council, right?

10 A    That is correct.  BSA was leading the defense.

11 Q    Now --

12        MR. ANDOLINA:  Can I just clarify, Mr. Weisbeck,

13 with respect to your questioning for the court.  When you say

14 district council are you referring to local council as in the

15 Greater Niagara Local Council?

16        MR. WEISBECK:  Yes.

17        MR. ANDOLINA:  Is that what you are intending?

18        MR. WEISBECK:  Yes.

19        MR. ANDOLINA:  Okay.  I just want the record to be

20 clear on that.  Thank you.

21 BY MR. WEISBECK:

22 Q    Now would you agree, sir, that one of the things that

23 the BSA is attempting to do after it filed for the protection

24 under the bankruptcy law that it still wants to control

25 litigation against the co-defendant, the Niagara Frontier

1  Council that did not file bankruptcy?

2  A    I can't speak to that motivation.

3  Q    And wouldn't you agree that once the BSA filed for

4  protection under bankruptcy law that entity must relinquish

5  certain control over its operations including the defense of

6  claims against co-defendants?

7          MR. ANDOLINA:  Objection; calls for a legal

8  conclusion.

9          THE COURT:  Sustained.

10  BY MR. WEISBECK:

11  Q    Would you agree, sir, that you know of no court order

12  currently requiring you to attend any depositions against the

13  two co-defendants?

14          MR. ANDOLINA:  Objection to the use of the word

15  "you."  Are you referring to --

16          MR. WEISBECK:  Meaning the BSA.  I'm sorry, Judge,

17  the BSA.

18          MR. ANDOLINA:  Could you repeat the question for

19  the witness?

20          THE WITNESS:  I'm not aware.

21  BY MR. WEISBECK:

22  Q    All right.  Would you agree that there is no court

23  order requiring the BSA to prepare witnesses that are testing

24  concerning the two co-defendants in the state tort action?

25  A    I am not aware of any.

1  Q     Would you agree that there is no court order that

2  requires the BSA to assist either the two co-defendants in

3  the state tort action in responding to discovery?

4  A     I am not aware of any.

5  Q     Would you agree that there is no court order requiring

6  BSA to prepare any witnesses from either the two co-

7  defendants in the state tort action?

8  A     I don't appreciate -- that sounds like the same

9  question to me, but I'm not aware of any.

10 Q     You said that in Paragraphs 21, 22 and 23 of your

11 declaration that key BSA personnel will be involved in the

12 defense of any action proceeding against the co-defendants,

13 correct?

14 A     That is correct.

15 Q     You'd agree, sir, that there's no court directive that

16 any of the BSA personnel be involved in strategies by either

17 of the co-defendants in the state action?

18 A     I'm not aware of any court directive.

19 Q     You'd agree that there is no court directive that

20 requires the BSA to develop strategies for either co-

21 defendant in this state tort action?

22 A     I am not aware of any directives.

23 Q     Would you agree that there is no court directive that

24 requires the BSA to approve any settlement negotiated by

25 either co-defendant in the state tort action?

1  A      Could you repeat that question?

2  Q      Would you agree that there is no court directive

3  requiring the BSA to approve any settlement negotiated

4  against either of the two co-defendants in the state tort

5  action?

6  A      I'm not sure if there is a court directive, but BSA has

7  a fiduciary duty to preserve its assets for its creditors

8  including its insurance assets, and any such settlement would

9  implicate BSA's insurance proceeds. I think BSA would have a

10 duty to be involved in such a situation.

11          MR. WEISBECK:  Judge, may I ask that the witness

12 be directed to answer the question rather than answer another

13 question.  I didn't ask him what he thought the duty of the

14 BSA was.  I was asking him about a court directive.

15          THE COURT:  Okay.  Well, I think he did answer

16 that question.  He added something else and, Mr. Whittman,

17 your counsel will be able to redirect if there's something

18 that he believes is important to bring out.

19          THE WITNESS:  Yes, ma'am.

20 BY MR. WEISBECK:

21 Q      Would you agree, sir, that the bankruptcy court has not

22 directed any member of the BSA to monitor the action of my

23 client against either co-defendant in the state tort action?

24 A      I'm not aware of any such order.

25 Q      And you submitted no evidence as to how much time, if

1   any, would be expended if any one member of the BSA were to

2   review a settlement document, correct?

3   A     Not to that --

4   Q     With respect to either co-defendant.

5   A     No.

6          MR. WEISBECK:  Thank you, sir.  I have no further

7   questions.

8          THE COURT:  Thank you.

9          Mr. Andolina, redirect.

10         MR. ANDOLINA:  Yes.  Just a few short questions,

11  Your Honor.

12                   REDIRECT EXAMINATION

13  BY MR. ANDOLINA:

14  Q   Mr. Whittman, do you recall Mr. Weisbeck asking you

15  some questions about the BSA's involvement in potential or

16  existing litigation even if the case is stayed as to the BSA.

17  Do you recall those series of questions?

18  A     Yes, I do.

19  Q   Can you describe the activities that even if the case

20  is stayed as to BSA, that BSA would be involved in regarding

21  local council litigation?

22  A   We would be involved in proving materials in terms of

23  information requests or discovery requests to support the

24  local council in that litigation.  I believe we would want to

25  monitor that litigation so that we were aware of the

1  potential impact to the BSA's estate in terms of the

2  potential diminution of our access including our insurance

3  policies through the resolution of that litigation.

4  Q    In your experience where is information that is

5  typically requested or required in litigation against local

6  councils housed; in terms of what entity has the bulk of that

7  information?

8            MR. WEISBECK:  I'm going to object to that, Your

9  Honor.  There was no foundation laid for him to have that

10  information.

11            THE COURT:  Sustained.

12  BY MR. ANDOLINA:

13  Q    Mr. Whittman, in your declaration you set forth that

14  you have experience in reviewing the litigation history of

15  BSA and various sexual abuse cases.  Is that correct?

16            MR. WEISBECK:  Objection to the --

17            THE WITNESS:  That is correct.

18  BY MR. ANDOLINA:

19  Q    Could you describe your experience and your background

20  in understanding the litigation that has been brought against

21  the BSA?

22  A    Yes.  I have had conversations with a number of

23  individuals in BSA's legal department to understand the type

24  of discovery produced in recent and historical litigation,

25  who produces that discovery, and things of that nature.

1  Q      You also reviewed some of the complaints that have been

2  filed against BSA?

3  A      I have reviewed some of the complaints that have been

4  filed against BSA.

5  Q      And various discovery requests in connection with those

6  actions?

7  A      I'm sorry, there's a lot of static.  Can you repeat

8  that?

9  Q      Yeah.  And various discovery requests in connection

10 with those actions.

11 A      I have seen some of the discovery requests, yes.

12 Q      And based on that background can you answer the

13 question of where the information that is typically requested

14 by plaintiffs in connection with litigation against BSA and

15 local council is housed?

16             MR. WEISBECK:  Same objection, Your Honor.

17             THE COURT:  It's overruled.  You can answer.

18             THE WITNESS:  A significant portion of the

19 information is provided by BSA.

20             MR. ANDOLINA:  No further questions, Your Honor.

21             MR. WEISBECK:  May I have recross, Your Honor?

22             THE COURT:  You may.

23                        RECROSS EXAMINATION

24 BY MR. WEISBECK:

25 Q      Sir, you'd agree that given the stay any actions by the

1  BSA with respect to discovery against either co-defendant in

2  this action would be voluntary on the part of the BSA and not

3  required?

4  A    I'm not sure if that's true.  I mean there are

5  discovery procedures in the bankruptcy.  I just don't know if

6  that's true.

7  Q    And would you agree, sir, that you have no personal

8  knowledge as to whether the Greater Niagara Frontier Council

9  can respond to our discovery demands without the involvement

10 of the BSA?

11 A    I don't know.  It depends on the specific demand.

12 Q    And would you agree, sir, that if we have discovery

13 demands against the district council and they don't have

14 documents then we will just proceed forward with our action

15 against them without those documents?

16          MR. ANDOLINA:  Objection; calls for speculation.

17          THE COURT:  Sustained.

18          MR. WEISBECK:  No further questions, Your Honor.

19          THE COURT:  Okay.

20          MR. ANDOLINA:  Nothing further, Your Honor.

21          THE COURT:  Thank you.  Thank you, Mr. Whittman.

22          THE WITNESS:  Thank you.

23     (Witness excused)

24          MR. ANDOLINA:  Your Honor, would you like me to

25 signal to Mr. Azer that he can pick-up his phone?

1          THE COURT:  Yes.

2          MR. ANDOLINA:  Okay.  Mr. Azer how now picked up

3 his phone, Your Honor. I believe he's on the line.

4          THE COURT:  Okay.  Mr. Weisbeck, are you ready to

5 go or would you like five minutes?  I know it's just more

6 difficult in the logistical position we're in.

7          MR. WEISBECK:  It might help just to get me

8 organized.  I have to put down the phone and move some

9 papers.

10          THE COURT:  Okay.  Let's do that.  Let's take five

11 minutes and then we will reconvene.  We're in recess.

12          MR. WEISBECK:  Thank you, Your Honor.

13      (Recess taken at 10:49 a.m.)

14      (Proceedings resumed at 11:10 a.m.)

15          THE COURT:  Okay.  Mr. Azer, I see you're on the

16 phone and I have Mr. Andolina.

17          Do I have Mr. Weisbeck?

18          MR. WEISBECK:  Yes, Your Honor.

19          THE COURT:  Okay.  Are we ready to proceed?

20          MR. WEISBECK:  Yes, Your Honor.

21          THE COURT:  Okay.  Thank you.

22          Mr. Azer, I'm going to swear you in.  Can you

23 raise your right hand, please?

24              ADRIAN AZER, DEBTOR WITNESS, SWORN

25          THE COURT:  And can you please state your full

1  name and spell your last name for the record.

2          THE WITNESS:  Adrian Christopher Azer, A-Z-E-R.

3          THE COURT:  Thank you.

4          Mr. Weisbeck?

5          MR. WEISBECK:  Thank you very much, Your Honor.

6                    CROSS EXAMINATION

7  BY MR. WEISBECK:

8  Q    Good morning, Mr. Azer. I'm sorry that I'm not able to

9  meet you in person.  If you can't hear me any time please let

10 me know, sir, okay.

11 A    Good morning. Will do.

12 Q    Okay.  Thank you.

13         You're an attorney who specializes in insurance

14 coverage, correct?

15 A    That's correct.

16 Q    Okay.  And I wanted to go over what you provided and

17 what perhaps isn't provided.  You provided to the court, in

18 your declaration, the declaration page of an insurance policy

19 issued by Insurance Company of North America for the calendar

20 year 1983, correct?

21 A    Yes.  That is the only policy that remains available in

22 that year.

23 Q    Right.  So, in this declaration page does that apply

24 both the declaration pages for the primary policy and the

25 excess and umbrella policies, correct?

1   A      No.  Sir, I think you have a misunderstanding.  So, if
2   you look at the pages that was presented on my second
3   declaration that's not a declaration page.  And I'm not
4   trying to waste time, but that's an excess policy.  So,
5   excess policies are what they call follow form policies.
6        So, the policy you have, which is Exhibit A, to my
7   second declaration that is the full policy that exists.  It
8   just follows form to the underlying insurance policy which is
9   referenced as INA policy number, comp, auto and general
10  liability TBA 1-1-82 to '83.  So, the policy you have is a
11  complete excess policy.  It's not just a declaration page.
12  Q      Okay.  So, let's just go through it.  The first page is
13  the declaration page, correct?
14  A      That's correct.
15  Q      Okay.  The second page references that the Insurance
16  Company of North America is going to insure the named
17  insureds under the terms of the primary policy which,
18  basically, then is adopted, correct?
19  A      Correct.
20  Q      And then there's the nuclear exclusion and the named
21  insured endorsements, right?
22  A      Correct.
23  Q      Okay.  So, what we don't have is that underlying policy
24  that sets forth the terms and conditions that had been
25  adopted by the excess carrier, correct?

1  A     To an extent.  So, for example, the limited liability

2  are specifically enumerated in the excess policy.  So, those

3  are not a doctrine incorporated within the file form excess.

4  So, if you're talking about what is the trigger of coverage,

5  yes, that is in the underlying, but that's not disputed.  INA

6  recognizes that sexual abuse claims trigger coverage.  If

7  you're talking about exclusions, yes, that is in the

8  underlying, but when you talk about the limited liability and

9  how those limits apply that is specifically set forth in the

10  excess policy.

11  Q    Understood.  I'm just saying we don't have the

12  underlying policy that sets forth all the terms and

13  conditions.

14  A     The underlying policy was not attached to my

15  declaration.

16  Q    All right.  So, the declaration page where it says

17  there's 25 million and 25 million, is there 25 million or 50

18  million in excess coverage?

19  A     It is a $25 million dollar combined single limit.  What

20  that means is that there is an overall aggregate limit and

21  what happens is, is that once that limit is gone or paid out

22  for either defense costs or indemnity payments that policy is

23  gone.

24  Q    Understood.  There's a $25 million dollar policy,

25  right?

1  A      Well, it's not $25 million dollars anymore.  It's been

2  eroded through prepetition --

3  Q      Sorry, sir.  The limits of the policy was 25 million?

4  A      Yes.  The limits for policies were $25 million dollars.

5  Q      How much is left?

6  A      Approximately 18 million, I think.  So, BSA entered

7  into certain prepetition settlements of other sexual abuse

8  claims that eroded those remaining limits or those limits.

9  Q      So, 18 million?

10 A      Approximately.

11 Q      And that covers the calendar year 1983, correct?

12 A      Correct.  For any abuse claimant alleging a claim

13 against any local council or the BSA pursuant to, and I don't

14 know how much Mr. Whittman talked about this, the first

15 encounter agreement only those limits remain for claimants

16 who allege first abuse in 1983.

17 Q      So, anybody who alleges abuse in 1983 there's $18

18 million dollars left on the policy, right?

19 A      No.  It's the person who alleges the first instance of

20 abuse in 1983 has rights to access the policy.

21 Q      Now we also don't have what you called the first

22 encounter agreement?

23 A      I don't know. It's not attached to my declaration.  I

24 don't know if it's been made available or otherwise.  I don't

25 know that.

1  Q    Okay.  You certainly didn't make it available and put

2  it as part of your testimony, right?

3  A    No.  It is not attached to my declaration.

4  Q    Now the first encounter agreement, is that an agreement

5  made between BSA and its insurance carriers?

6  A    The first encounter agreement was made initially

7  between BSA, and the local counsel, and Insurance Company of

8  North America.  That's the express agreement as between those

9  two parties.  Then, other insurers, almost all of BSA's other

10  insurers, had ascribed to that first encounter arrangement.

11  Q    And when was that first encounter agreement made?

12  A    May 12th of 1996.

13  Q    So, is it your testimony that the policy that you have

14  referenced, the Insurance Company of North America, would

15  cover up to the limits of the policy or whatever is remaining

16  for any abuse claim that started in 1983 and continued

17  thereafter?

18  A    I'm sorry.  I want to make sure I understand your

19  question.  You're asking me if INA will pay for abuse claims

20  that have a first encounter in 1983.  Is that the question?

21  Q    But continues for years afterwards.

22  A    Only the 1983 policy would be implicated.  So, for

23  example, with your claimant, your claimant alleged abuse

24  between 1983 and 1987.  Because the first encounter occurred

25  in 1983 only the 1983 policy is available.

1  Q    For the entire period of abuse, though, correct?

2  A    Correct.  Any damages that your claimant has is limited

3  to the coverage in this last remaining INA excess policy.

4  Q    Now you'd agree that this insurance policy does not

5  cover the co-defendant, Douglas Nail, correct?

6  A    No, not necessarily.  I don't think coverage is

7  afforded given he is the perpetrator.  So, I'm not sure I

8  agree with you that the policy doesn't cover volunteers and

9  scout masters, but it certain doesn't cover -- I am not an

10 insurance carrier so I would assume that the insurance

11 company would deny coverage given the conduct by the

12 perpetrator.

13 Q    Right, because the conduct of Douglas Nail is alleged

14 to be an intentional criminal action, correct?

15 A    Yes; although, I do think that you have alleged

16 negligence as well in your complaint.

17 Q    No.  We've alleged --

18 A    You --

19 Q    -- intentional tort by the perpetrator, negligence

20 against the other defendants.  So, as an insurance coverage

21 specialist do you know there's never coverage for intentional

22 tortious conduct is against public policy, correct?

23 A    That's not always correct, but it is -- I would -- let

24 me answer this.  I'm not an insurance carrier. I can't opine

25 of how INA will respond if the perpetrator submitted a claim.

1  Q     Now would you agree, sir, that in your declaration you

2  submitted no evidence that any judgment has been filed for

3  which this insurance carrier on this policy would be required

4  to pay?

5  A     I'm sorry.  I don't understand your question.

6             MR. ANDOLINA:  Objection to the form of the

7  question.  It's compounded and confusing to me, at least.

8             THE COURT:  Can you rephrase the question, please?

9  BY MR. WEISBECK:

10 Q     Sir, I'm just asking you would you agree that you have

11 submitted no evidence that there's any money judgment that's

12 been filed for which this insurance carrier that you've

13 referenced in your declaration in this policy would be

14 required to pay that judgment?

15 A     For any claimant or for your claimant?

16 Q     No.  In other words, there's no outstanding judgment

17 that's been filed by any claimant for which this insurance

18 carrier under this policy would be required to pay as of

19 today.

20 A     I'm not aware of any.

21 Q     Okay.  And you didn't submit any evidence on that

22 issue, right?

23 A     I wouldn't be privy to that knowledge.

24 Q     Okay.

25 A     What people have submitted against INA?

1  Q     No.  This policy -- I'm sorry, this policy, not against

2  INA generally.  I'm talking about this policy, there is no

3  money judgment that -- you haven't submitted any evidence of

4  any money judgment that's been filed whereby this insurance

5  carrier on this policy would be required to pay that judgment

6  as of today.

7  A     I don't understand your question.  I am not aware of

8  any money judgment, but I'm not sure that I would necessarily

9  know.  I'm not really following your question.  I'm not

10 trying to be difficult. I just really don't understand your

11 question.  No.  I'm not aware of any money judgment, but I'm

12 not sure I would know that or be aware of that.

13 Q     Okay.  Aren't you the coverage counsel for BSA?

14 A     Right, but we don't --

15 Q     And you've looked at this policy and there's 18 million

16 left, right?

17 A     Let me answer your question.  We are coverage counsel

18 to BSA.  We are not privy to every underlying abuse claim

19 that is being litigated against BSA.  Where there are

20 insurance issues that arise we become involved. So, if there

21 are no insurance issues, if there are no disputes with the

22 carrier we are not necessarily always involved in every

23 claim.

24 Q     Okay.

25 A     We only step in when there is actually a disagreement.

1  Q     And would you agree, sir, that at least in your

2  declaration you haven't submitted any evidence to show that

3  the remaining $18 million dollars has been eroded since the

4  day of the filing of the bankruptcy proceeding?

5  A     We do not have -- I mean based upon the automatic stay

6  no claims have been eroding that policy limit since the

7  filing date.

8  Q     And you'd agree that you submitted no evidence that the

9  insurance carrier on this policy has any current agreement to

10 pay any settlement; thereby, further eroding the $18 million

11 dollars that remaining?

12 A     I'm sorry.  I just want to make sure I understand your

13 question.  I have no evidence that the insurance company has

14 entered into an agreement to pay any settlements.

15 Q     On this policy currently.

16 A     I am not aware of post-petition the INA policy making

17 any payments.  If you're asking me if the $18 million dollars

18 or approximately 18 million is still available that is

19 correct, but we have had a series of claims that have been

20 tendered that allege the first abuse of 1983.  So, you know,

21 presumably once those claims actually proceed one way or the

22 other they're going to make a demand under that policy for

23 those limits because we have had claims come in.  I mean even

24 prior to the petition there are a ton of claims that still

25 hit the 1983 policy.  There are, obviously, going to be

1 claims that are going to be --

2 Q    Right.

3 A    I'm sorry, let me just finish my answer, are going to

4 be filed that are going to hit the 1983 policy.  All those

5 claims who allege a first abuse in 1983 are all going to seek

6 access to those insurance assets when they ultimately come

7 out for payment.

8      So, I don't understand your question.  Ultimately, the

9 answer is yes, there are going to be claims out there.

10 Q    Okay.  I didn't ask you whether there's claims.  I'm

11 asking whether the insurance carrier has any current

12 obligation to pay any settlement eroding the $18 million

13 dollars.

14 A    I am not aware of a current settlement that exists that

15 is presently claims.

16 Q    Okay.  Let me ask you the next question, if I could.

17 A    Okay.  Sure.

18 Q    Now you earlier testified that you're really not privy

19 to all the litigation.  Would you agree, sir, that in your

20 testimony, your declaration, you did not submit any evidence

21 that there's any pending claim for the calendar year 1983

22 other then my client.  Your declaration doesn't make

23 reference to any other first encounter claim in 1983?

24 A    That's correct.  My declaration doesn't, but there are

25 claims out there.

1  Q    And you don't know whether the BSA has submitted any

2  evidence, aside from your testimony, as to whether there is

3  any existing first encounter claims in the calendar year

4  1983, correct?

5  A    I don't know if BSA did or didn't. I know that there

6  are claims out there.  I've seen the claim rosters.  I've

7  seen the claims that have been noticed.  So, immediately

8  prior to the petition date we submitted a myriad number of

9  claims that I was involved in, in providing notice to the

10 carriers and in drafting the notice.  I am absolutely aware,

11 unequivocally, that there are claims out there with a first

12 encounter in 1983.

13 Q    But you don't know whether we or the court have ever

14 been privy to that information?

15 A    I'm not aware whether you are or not.  I can't speak

16 for the all the filings that have been made in this case.

17 Q    Now you also are not involved with the Greater Niagara

18 Frontier Council as their coverage council, correct?

19 A    We are not.

20 Q    I'm sorry.

21 A    We are not their coverage council.  That is correct.

22 Q    And you're not their private attorney either, right?

23 A    That is correct.  We are not their private attorney.

24 Q    So, you can't submit any evidence as to whether the

25 Greater Niagara Frontier Council has other insurance policies

1  that could cover the claim against that organization,

2  correct?

3  A     No, that's not correct.  That is incorrect.  Let me

4  explain why.  So, I think you need to have a fundamental

5  understanding of BSA's insurance program and how it functions

6  to understand why, notwithstanding that I'm BSA's lawyer, I

7  can fairly certainly say that Niagara probably doesn't have

8  its own independent insurance.

9        So, prior to 1978, for the most part, local councils

10  had independent insurance obligations.  In other words, they

11  weren't uninsured under BSA's --

12  Q    I'm sorry. I wasn't asking for the history.  I was just

13  asking whether you would agree with that.

14  A     Sir, let me finish my answer.

15            MR. WEISBECK:  I'm wondering, Judge, if I'm cross-

16  examining the witness I can ask a question, yes or no, and he

17  can disagree with it and I can either move on or question him

18  further on it.

19            THE COURT:  That's correct.  Mr. Azer, would you

20  just try to limit yourself, please, to the question that's

21  been asked.

22            THE WITNESS:  Sure.

23            THE COURT:  And if your counsel wants a further

24  explanation he will ask it on redirect.

25            THE WITNESS:  Sure.  I think your statement is

1  incorrect.  And I can't opine that Niagara has independent
2  insurance.
3  BY MR. WEISBECK:
4  Q    All right.  I didn't ask you whether you had an
5  opinion.  I asked you whether you had any evidence.
6  A    I do have evidence.
7  Q    Okay.  Thank you, sir.
8       Sir, I want you -- you also testified that before the
9  bankruptcy filing BSA entered into some settlement agreements
10 prepetition eroding the $25 million dollars on the policy,
11 correct?
12 A    That's correct.
13 Q    And are those prepetition settlements subject to, to
14 your knowledge, the bankruptcy court approval because they
15 were agreed upon shortly before the filing in the petition?
16           MR. ANDOLINA:  Objection; calls for a legal
17 conclusion.
18           THE COURT:  Sustained.
19           MR. WEISBECK:  I'm just asking whether his
20 knowledge was they were within that timeframe.
21           THE COURT:  No.  That's not the question.  I'm
22 sustaining the objection to the question that was asked.  You
23 can ask another.
24           MR. WEISBECK:  Oh. I'm sorry, Judge.
25 BY MR. WEISBECK:

1  Q     Do you know the timeframe for those settlements that

2  eroded the $25 million dollars down to $18 million dollars on

3  this policy?

4  A     Yeah.  They were over a series of years prior to the

5  petition date.

6  Q     I'm sorry.

7  A     They were over a series of years prior to the petition

8  date.  So, there was a number of claims that were settled,

9  you know, leading up to the petition date, but before the

10  petition date that eroded the limits.

11  Q     Now, sir, I want you to assume that the case against

12  the Greater Niagara Frontier Council goes forward in New York

13  State Supreme Court, I want you to assume that in two years

14  the plaintiff is awarded a money judgement against Greater

15  Niagara Frontier Council, and assume that the Greater Niagara

16  Frontier Council at that point goes to this insurance company

17  on this policy and wanted it to partially or fully pay the

18  judgment under this policy.  At that point in time you would

19  agree that the policy could be exhausted and then the Greater

20  Niagara Frontier Council would have to, otherwise, deal with

21  the judgment through its own insurance or through its own

22  assets, correct?

23        MR. ANDOLINA:  Objection; calls for speculation,

24  compound, and I also think it also calls for a legal

25  conclusion.

1          THE COURT:  Sustained.

2          MR. WEISBECK:  He's a coverage specialist, Judge.

3  He's an expert.  And all I'm asking is, as a matter of

4  course, as an insurance counsel he would know that that if

5  the policy is exhausted what the insurer could do.

6          THE COURT:  Is your question about the possibility

7  that the coverage is exhausted in two years?

8          MR. WEISBECK:  Yes.

9          THE COURT:  Well, I guess we all -- I guess that

10 could be a possibility.  What is the further question?

11         MR. WEISBECK:  The reason I'm asking that

12 possibility is to show -- I'm leading up to something that

13 this Niagara Council would then either deal with the judgment

14 through its own insurance, if it had it, or its own assets.

15         THE COURT:  Okay.  He can ask that question.  You

16 can answer that question, Mr. Azer, if you know the answer.

17         THE WITNESS:  Yeah, I don't.  I mean I don't know

18 what would happen in the bankruptcy proceeding that may

19 impact whether the claim is released or not.  I mean it

20 depends on a number of assumptions that I can't factor in

21 like how is the policy.

22 BY MR. WEISBECK:

23 Q    I'm sorry, I wasn't factoring in any bankruptcy

24 proceeding.  I'm just factoring in that by the time we go to

25 trial and we get a money judgment if the policy had been

1 exhausted at that point in time then the Greater Niagara

2 Frontier Council would have to, otherwise, deal with the

3 judgment if it had its own insurance coverage or through its

4 own assets, or through a bankruptcy proceeding if they

5 decided to file.

6 A     Here's the only way I can answer your question; if the

7 policy is exhausted you cannot access that policy any longer.

8 There are no longer insurance assets to receive from that

9 policy, assuming it's exhausted.  I don't know whether it

10 will be or won't.

11 Q     Okay.  Now let's assume the same thing that the case

12 against the Niagara Frontier Council goes forward in the New

13 York Supreme Court, assume that in two years the plaintiff is

14 awarded a money judgment against the Greater Niagara Frontier

15 Council and then the Greater Niagara Frontier Council goes to

16 this insurance company under this policy and asks that it

17 either partially or fully pay the judgment, and there's money

18 left on the policy.  Wouldn't you agree, sir, if there were

19 competing claims between the BSA and the Greater Niagara

20 Frontier Council that at that time the court can apply

21 whatever is the applicable law and resolve those competing

22 claims?

23         MR. ANDOLINA:  Objection; calls for speculation

24 and a legal conclusion.

25         THE COURT:  It does, but I'll let you answer the

1  question if you can, Mr. Azer.

2           THE WITNESS:  Your Honor, I think there's two

3  points that he made.  One is if the Niagara Council is

4  allowed to proceed the defense costs it incurs are going to

5  erode the remaining limits.

6           THE COURT:  I'm sorry, that's not the question.

7           MR. WEISBECK:  I'm sorry.  I was just asking

8  whether the court --

9           THE WITNESS:  I don't know how to answer your

10  question.  I have no idea because it requires me to

11  understand state law.

12  BY MR. WEISBECK:

13  Q    All right.  So, would you agree, sir, that as coverage

14  counsel you know that there's law in existence as to how to

15  deal with competing claims on the same insurance policy when

16  there's a single limit, correct?  There's law out there,

17  right?

18  A    To be candid I've actually never dealt with that.  Most

19  of the time my clients are all --

20  Q    That's outside of your experience?

21  A    I've just never dealt with it.  I've never dealt with

22  competing claims under a policy.

23  Q    All right.  Okay.  Thank you.

24         Now going back to the policy that you have referenced

25  and that is at issue here today, after the declaration page

1  you had the policy, right, written verbiage, and in Paragraph

2  3 it says, C-1 -- I'm sorry, Paragraph C-1, the excess

3  insurance carrier is not obligated to assume charge of the

4  defense of any claim, correct?

5  A    That's what it says.

6  Q    And that's controlling.  That's the document that's in

7  existence for this policy, correct?

8  A    That doesn't mean they don't pay defense costs.

9  Q    I'm sorry, that's what it says.  Correct, sir?

10 A    Yes, that's the language.

11 Q    I'm sorry.  Thank you.  That's all I wanted you to

12 acknowledge.

13          THE COURT:  Mr. Weisbeck, could you refer me,

14 again, to where you're referring in the policy?

15          MR. WEISBECK:  Yes, Your Honor.  Forgive me, let

16 me go back to it.  It's Paragraph C-1.

17          THE COURT:  Thank you.

18          MR. WEISBECK:  It starts out with anything in the

19 certificate of the primary policy to contrary INA shall not

20 be obligated to assume… defense of any claim.

21          THE COURT:  Thank you.

22 BY MR. WEISBECK:

23 Q    Sir, you also, in your testimony, have not submitted

24 any contractual agreement whereby the BSA has indemnifying

25 the Niagara Frontier Council, correct?

1  A      I have not submitted anything showing that BSA is

2  indemnifying Niagara.

3              MR. WEISBECK:  Thank you, sir.  I have no further

4  questions.

5              THE COURT:  Mr. Andolina, redirect.

6              MR. ANDOLINA:  Your Honor, no redirect.  And we

7  just ask to move for the admission of the declarations of Mr.

8  Azer and Mr. Whittman, and their testimony today.

9              THE COURT:  The declarations are admitted.

10         (Declaration of Brian Whittman, admitted)

11         (Declaration of Adrian Azer, admitted)

12             MR. ANDOLINA:  Thank you, Your Honor.

13             THE COURT:  Thank you.

14             Okay.  Does that conclude the witness portion of

15  the hearing?

16             MS. BOELTER:  Your Honor, this is Jessica Boelter

17  of Sidley Austin for the debtors.  It does from the debtors'

18  perspective.

19             MR. WEISBECK:  Yes, Your Honor.

20             THE COURT:  Okay.  Is there any other documents

21  that any party is seeking to admit into evidence?

22         (No verbal response)

23             THE COURT:  Okay.  I hear no one. So, the

24  evidentiary portion of this hearing is closed.

25             Let me ask a question.  I do not see myself on the

1 Skype screen in front of me.  Can you all see me?

2           MS. BOELTER:  Your Honor, we cannot.

3           MR. ANDOLINA:  We cannot, Your Honor.

4           THE COURT:  Okay.  I don't k now what happened

5 because you could see me in the beginning, couldn't you?

6           MR. ANDOLINA:  No, Your Honor.

7           THE COURT:  Never?

8           MR. ANDOLINA:  We've never been able to see you.

9           MR. ABBOTT:  Never, Your Honor.

10           THE COURT:  I did not realize that because I could

11 see me in the beginning and now I can't see me.

12           Okay.  We're going to take five minutes and I'm

13 going to try to correct that.  I apologize.  I should have

14 asked the question sooner, but I could see myself earlier and

15 now I can't.  So, we're going to take five minutes and see I

16 can rectify that.  Thank you.  I can see all of you.

17           MR. ANDOLINA:  Thank you, Your Honor.

18           MS. BOELTER:  Thank you.

19           THE COURT:  Thank you.

20      (Recess taken at 11:27 a.m.)

21      (Proceedings resumed at 11:38 a.m.)

22           THE COURT:  Okay.  I'm not quite sure when we took

23 our break, but it's probably been five minutes.  I see Mr.

24 Andolina, I see Ms. Boelter.

25           Mr. Weisbeck, are you back on the line?

1      MR. WEISBECK:  Yes, I am.  Thank you, Your Honor.

2      THE COURT:  Okay.

3      MR. ABBOTT:  Your Honor, its Derek Abbott for the

4 debtors.

5      Given that evidence has been closed would it be

6 acceptable for the court to excuse Mr.'s Azer and Whittman?

7      THE COURT:  Yes.

8      MR. ABBOTT:  Thank you, Your Honor.

9      THE COURT:  Okay.  Then let's have argument and

10 afterwards I know we still have the Girl Scouts matter and I

11 had questions on two of the certifications of counsel that

12 were filed and I don't want to forget to do those.  Probably

13 should have done them first, but I've been more focused on

14 this.

15      So, let's have argument on the preliminary

16 injunction matter, Ms. Boelter.

17      MS. BOELTER:  Thank you, Your Honor.  Jessica

18 Boelter, Sidley Austin, for the debtors.

19      Your Honor, one quick housekeeping point.  While I

20 understand that Mr. Andolina can see you, Mr. Abbott and I

21 cannot.  I would be inclined to just go forward with

22 argument, just bearing in mind that if you start signaling to

23 me or giving me dirty looks, I won't able to see you.  So, I

24 would appreciate hearing from you verbally if you need to

25 pull me back or change course in any way.

1          THE COURT:  Okay.  That's certainly fine, and I

2    couldn't pretend to tell you how to make me appear on your

3    screen, except that on mine, I know that some people are

4    minimized and you can arrange that, but I don't know how that

5    works.  But, yeah, let's go ahead if you're prepared.

6          MS. BOELTER:  Yes.  Very good, Your Honor.

7          So, why don't I start with where we're at with the

8    committees and the consent order that was filed over the last

9    couple of days.  As Your Honor saw, the debtor and the

10   official committees entered into a stipulation so that the

11   committees can intervene in this adversary proceeding and I

12   believe I saw Your Honor that you entered the order

13   authorizing that intervention.

14         In addition, we filed on Sunday, under

15   certification of counsel, a consent order with both, the

16   survivor committee and the unsecured creditors committee.

17   It's also, by the way, supported, Your Honor, by the proposed

18   future claimants' representative.

19         And that's not, I think, where we're at in this

20   proceeding quite yet, but if Your Honor had the opportunity

21   to review the consent order you will have noticed a number of

22   features.  I think critical from the committee perspective

23   were the recitals where the debtor agrees that they will

24   endeavor to produce and provide information to the two

25   committees that are information that is very important to the

1  committees' assessment of these Chapter 11 cases and their

2  view of how these cases will look moving forward; that was

3  critical to their agreement.

4          But I think what was also critical, particularly

5  to the survivor committee agreement is that we get the

6  support of the other plaintiffs in the underlying litigation

7  as party that are defendants here, as well as their group, to

8  avoid what would be an inevitable run to the courthouse,

9  which is exactly what we're worried about with respect to

10 LG-37, and I'll return to that.  With the support of the

11 survivor committee and the hundreds of other plaintiffs that

12 were defendants, with respect to the preliminary injunction,

13 we managed to stay that run to the courthouse.  We managed to

14 stay being able to prefer one particular claimant over

15 another and allow that claimant to get a first position in

16 line for very valuable insurance assets.

17          Now, that stay, Your Honor, is brief.  As you

18 know, we originally requested 180 days.  The stay is through

19 May 18th.  So it's a brief breathing spell so we can

20 determine where these cases are going.

21          And when it comes to LG-37, before I turn to the

22 merits of the argument, I want to just address a couple of

23 items that I think may be red herrings in the papers.  First,

24 we are not seeking to stay any action against any individual

25 perpetrator of abuse against any victim, including LG-37.

1  The stay that we are requesting only applies to the local

2  counsel at issue.  There are no perpetrators, individual

3  perpetrators on the exhibit that's appended to the

4  preliminary injunction order.

5          Similarly, we are not, through the stay, seeking

6  to abrogate anyone's right to file a claim in advance of the

7  expiration of any statute of limitations, including the

8  window that was opened up under the New York State Child

9  Victims Act.  I know LG-37 spent time in their pleadings

10  focused on that.  To be clear, Your Honor, LG-37 did exactly

11  what the statute in New York contemplated; it filed a lawsuit

12  during the one-year window in December 2019.

13          And also, Your Honor, the revisions to the

14  preliminary injunction order make it clear that we are not

15  prejudicing parties' rights to file parties' rights to file

16  complaints in advance of statute of limitations and it also

17  contains a tolling provision.

18          Finally, Your Honor, we are not prohibiting LG-37

19  from arguing that remand is appropriate when the stay the

20  ultimately lifted.  The stay would affect all of the

21  deadlines pertaining to remand and LG-37 retains its right to

22  argue remand.

23          Now, unfortunately, Your Honor, despite all of our

24  efforts over the last several days, including the efforts of

25  the survivors' committee, we were just unable to get there

1   with LG-37.  LG-37, Your Honor, has a proceeding pending in

2   the Western District of New York.  That is where it's pending

3   after its removal.

4           As you may recall, Your Honor, the debtors

5   effectuated a removal of all pending State Court actions on

6   the petition date.  That case was originally pending in the

7   State of New York Supreme Court, Erie County.  It was filed,

8   as I said, in December 2019, and as was elicited during

9   testimony, it pertains to abuse between the years 1983 and

10  1987.

11          Now, despite the testimony before the Court today

12  and the voluminous pleadings I think we delivered to the

13  Court, Your Honor, a virtual binder containing over 700 pages

14  of pleadings.  We think the issue before the Court is

15  actually relatively straightforward, and that is whether the

16  Court can and should enter a preliminary injunction, with

17  respect to LG-37 against the Greater Niagara Frontier

18  Council; that's what's before you today.  And we also think,

19  Your Honor, that the answer is equally straightforward:  The

20  answer is yes.

21          There has been no evidence presented by

22  declaration or otherwise and nothing in the cross-examination

23  today changed the conclusion that the evidence supports that

24  this Court should and can preliminarily enjoin the LG case

25  against the local council, Greater Niagara.

1             Now, this being said, there are essentially three

2    bodies of law that come to bear on the Court's decision

3    today.  The first is the Court's related-to jurisdiction to

4    issue the preliminary injunction.  The second is the Section

5    of 105(a) of the Bankruptcy Code to expand the scope of

6    Section 362 of the Code.  And the third is the issuance of

7    preliminary injunction under the traditional four-factor

8    test.

9             Because jurisdiction is where we should start,

10   that's where I'm going to start, Your Honor, and that's the

11   Court's related-to jurisdiction under 28 U.S.C. 1334.  From

12   our perspective, Your Honor, there's actually been no

13   challenge to this Court's jurisdictional authority to issue

14   the preliminary injunction.  As you know, the seminal case in

15   the Third Circuit is the Pacor case where the Court

16   established the conceivable effect test.  That test has been

17   further interpreted by the courts in this jurisdiction and

18   the inquiry has become whether the litigation at issue could

19   have a conceivable effect on the bankruptcy estate without

20   the intervention of another lawsuit.

21            We believe the answer to that is yes.  The court

22   have developed a number of inquiries -- and I'm going to walk

23   through them in a moment -- what I'll just say, Your Honor,

24   as I'm sure you're aware, the factors that the Court looks to

25   under a related-to jurisdictional analysis in many ways

1  overlap with the factors the courts look to under the 105(a),

2  as well as the four-factor test.  I'm going to endeavor not

3  to belabor those points and repeat them in my remarks.  I'll

4  try do it only once, but I will refer the Court back to

5  various arguments in portions of our papers, as necessary, to

6  get through the relevant tests.

7         So, starting with the first factor that the Court

8  would consider under related-to jurisdiction, and that's the

9  identity of interest.  As Your Honor heard at our first day

10 hearing and as seen throughout our papers, the BSA and the

11 local councils deliver the exact same charitable mission.

12 The local councils help deliver the Boy Scouts' programming;

13 in other words, the exact same program that's developed by

14 BSA national, they deliver that at the local level.

15        In fact, the Boy Scouts and the local councils are

16 so interrelated when it comes to the delivery of programming

17 in the mission, that with respect to the abuse actions, abuse

18 claims that have arisen in connection with the programming,

19 BSA not only takes the lead in defending those actions

20 against BSA and the local councils, but houses most of the

21 information that's relevant to that underlying litigation.

22 Mr. Whittman testified about that today and it was also

23 repeated in his declaration, which is at Docket 8, Paragraphs

24 17 through 18.

25        In fact, because of this close identity of

1   interest, if you look at the very complaint that's at issue

2   here with LG-37 -- that complaint, by the way, is attached as

3   Exhibit A to LG-37's response to the preliminary

4   injunction -- LG-37 has treated the BSA and the local council

5   at issue exactly the same.  In Paragraph 6 of their pleading,

6   they define the two entities together as a single term the,

7   "the Boy Scouts of America," and then they proceed in 47

8   paragraphs of the complaint to treat the Boy Scouts of

9   America as one combined unit.  They don't distinguish

10  activities that may have occurred at the local council level

11  versus the national level.

12        In you review the four corners of the complaint

13  it, in no way, distinguishes, with respect to these claims

14  between those entities and, in fact, if you look at the

15  counts of the complaint, there are eight of them.  The first

16  of them applies to the perpetrator and the other two

17  defendants defined as Boy Scouts of America -- and let me

18  just repeat:  We are not seeking to stay the claim against

19  the perpetrator -- and the following seven causes of action

20  apply to the defined terms, Boy Scouts of America, which is

21  defined as the local council and Boy Scouts of America

22  combined.

23        If you look at the verified answer to the

24  complaint, which attached as Exhibit C to LG-37's reply, the

25  answer adopts the same methodology.  The answer is filed by a

1  single law firm on behalf of Boy Scouts of America and the

2  local council.  In the initial stages of the verified answer,

3  it defines the two entities as, "the defendants," and in all

4  of the responses that follow, the responses are with respect

5  to the defendants.  There is no distinguishing between one

6  defendant versus another and, in fact, all of the affirmative

7  defenses are asserted, with respect to both of the

8  defendants.  In our view, Your Honor, with respect to LG-37

9  there, is, in fact, a complete identity of interest between

10  the Boy Scouts of America and the local council in terms of

11  the underlying case law in your related-to jurisdiction.

12          But, Your Honor, that's not all.  The next factor

13  the courts look to is the effect on the bankruptcy estate.

14  Here, we have the issue of shared insurance, which you've

15  heard testimony about today.  You've also seen two or

16  actually three declarations -- the Whittman initial

17  declaration and then two declarations from Mr. Azer.

18          I'm going to talk more about shared insurance when

19  I get into the automatic stay and preliminary injunction, but

20  I think there's a couple of points that are relevant.  First

21  of all, we submitted an INA policy covering 1983.  The

22  objector attempted to point out on cross-examination that

23  this is the excess policy; the underlying policy wasn't

24  included.

25          Your Honor, we had live testimony from Mr. Azer

1  stating that the underlying policy covers abuse claims, so

2  does the excess policy, which is before the Court.

3        We also think, Your Honor, that the first-

4  encounter agreement -- and I'm just going to touch on it

5  briefly because I don't think it's relevant here.  Whether or

6  not the first-encounter agreement exists, the fact of the

7  matter is there's a 1983 policy that has $18 million left on

8  it.  Even if we were talking about '84, '85, '86,

9  Mr. Whittman's declaration actually describes the fact that

10 those policies have aggregate limits on it.

11        So, whether or not there's a first-encounter

12 agreement, the fact of the matter is the uncontroverted

13 testimony is that we have insurance policies during the "'83

14 to and going forward" time frame where the named insureds are

15 not only BSA, but they are also all local councils.

16        Now, turning to the 1983 policy, which was

17 discussed today and attached to Mr. Azer's declaration, if

18 you look at the first page, the page we're calling the

19 "declaration page," that page, right up top says that the

20 named insureds include both, BSA -- so, this is both an asset

21 of BSA's bankruptcy estate -- and, "all local councils."

22        If you turn to the last page of that policy,

23 there's a named insured endorsement.  That named insured

24 endorsement very clearly provides that it is for BSA -- so

25 it's an asset of BSA -- and also includes, "all local

1  councils."  As Mr. Azer testified -- and you can also find it

2  in the Whittman declaration -- this is a policy that has an

3  aggregate limit.  That aggregate limit is $18 million.

4          And while the objector may try to suggest that

5  they wouldn't get a judgment for two years, and at that point

6  the policy could be exhausted, the fact of the matter is, if

7  this case is not stayed, there's no assurance that the local

8  council, the objector's client LG-37, and INA couldn't settle

9  the policy and erode that limit to the detriment of all of

10 the other BSA creditors.  And Mr. Azer credibly testified to

11 the fact that there are several 1983 claimants in BSA's abuse

12 claimant files that have claims in the 1983 time period.

13         So, the to the extent the local council and LG-37

14 were to make a claim against that policy, that would be to

15 the detriment of all of BSA's creditors and it would deprive

16 them of the ability of that asset and that asset to be

17 distributed equitably among all of the creditors of BSA.

18 Again, that means there's a dollar-for-dollar reduction --

19 and it could be a dollar-for-dollar reduction in favor of

20 LG-37 to the detriment of our claimants and that is clearly

21 an adverse effect on the bankruptcy estate.

22         We think that is more than sufficient for related-

23 to jurisdiction and also, Your Honor, I would also just note

24 that it is a logical byproduct of Your Honor's jurisdiction

25 over property of the estate, however held, and wherever

1  located.

2          Finally, I would just say, Your Honor, that

3  another factor that the courts look to in the related-to

4  jurisdiction analysis is whether the claims are inextricably

5  intertwined.  Again, I've walked through the complaint and

6  the answer to the complaint.  There can be no dispute that

7  the disputes between LG-37 and the BSA and the local councils

8  involve the same nucleus of operative facts and involve the

9  same law.

10          And while I understand that the objector attempted

11  to elicit testimony from Mr. Whittman that Boy Scouts would,

12  in fact, not obligated to participate on account of the

13  automatic stay or similar, you know, legal conclusions, the

14  fact of the matter is, if the lawsuit goes forward, BSA would

15  actually be deprived the benefit of the automatic stay

16  because it would be forced to go into court and pay attention

17  to what's happening, with respect to facts and law that

18  directly implicate claims that are being asserted against

19  BSA.

20          From our perspective, Your Honor, to go back to my

21  starting question, you absolutely can enter the preliminary

22  injunction with respect to LG-37 and the local Niagara

23  council for the limited period of time that we're seeking.

24  With that, let's turn to whether you should.

25          And, again, we think the evidence resoundingly

1   demonstrates that the answer to that question is yes.  And,

2   again, the stay that we're asking for today is limited in

3   duration.  It's through May 18th.  It's not the 180-day stay

4   that we originally sought.  This is to give the case a chance

5   and the parties a breathing period to work together.

6          Now, I mentioned at the outset of my remarks that

7   there are essentially two bodies of law that we've covered in

8   our pleading pertaining to your substantive authority to

9   enter -- issue a stay.  The first is whether we're utilizing

10  Section 105(a) of the Bankruptcy Code to extend the automatic

11  stay under Section 362 or whether we're applying the four-

12  factor preliminary injunction test.

13         To be candid, Your Honor, the case law, not only

14  in this jurisdiction, but in others, is somewhat muddy as to

15  whether the best course under 105 or the preliminary

16  injunction.  We elected to brief both and I'm going to

17  briefly cover both.  And as I mentioned previously, Your

18  Honor, a lot of the factors are duplicative of what we look

19  at in a related-to jurisdiction context, so as a result, I'm

20  going to make my remarks brief to the extent the factors

21  overlap.

22         Starting with the Section 105 extension of the

23  automatic stay there, are two factors that the Court looks

24  to.  The first is identity of interest; again, this is

25  essentially the same as the related-to jurisdiction analysis.

1  We demonstrated that the local council and the national

2  organization do, in fact, have an identity of interest; they

3  have the same charitable mission.  The local council assists

4  with delivering BSA national programming.  And as I also

5  explained, at that time, BSA really is the defendant in the

6  underlying litigation.  As you will have seen, the complaint

7  defines the Boy Scouts of America as the principal defendant

8  and that's defined together with the local council.

9          The second factor -- and we think this one is a

10  critically important in this case -- is the adverse impact

11  that the underlying action could have on the reorganization

12  and, again, this implicates the shared insurance, and I

13  mentioned before that I wanted to come back to this and

14  discuss it in more detail in my remarks.

15          The fact of the matter is, if the LG-37 case is

16  permitted to go forward, it will essentially permit LG-37 to

17  jump to the front of the line, with respect to a limited and

18  finite pool of insurance.  It will literally encourage a race

19  to the courthouse against nondebtors that have access to our

20  insurance policies and thereby depriving creditors of BSA of

21  the ability to avail themselves of that very valuable estate

22  asset.

23          As we have said from the beginning, our goal is to

24  equitably compensate survivors of abuse and the best way we

25  can do that is to preserve joint assets, such as the shared

1  insurance, for the benefit of all survivors of abuse.

2         We also think -- and let me just pause on one

3  other moment on this -- the objector asserts both in -- and I

4  think we'll hear about it in rebuttal -- that we should

5  consider whether local councils have their own insurance;

6  this was an argument that appeared in their pleading.  From

7  our perspective, Your Honor, this is of no moment.  The fact

8  of the matter is the uncontroverted testimony is that both,

9  the BSA and the local councils, are additional insureds under

10  the relevant policy and there is no evidence that the

11  additional insured cannot go against that policy as a named

12  insured under the policy of the policy, itself, is crystal

13  clear as far as that is concerned.

14         Also, Your Honor, under the adverse impact on the

15  reorganization, as I mentioned before, we do have concerns

16  about fact and issue preclusion.  This complaint sets up BSA

17  and the local council as one in the same.  The legal issues

18  that would come up if this complaint were permitted to go

19  forward with respect to the local council, are the same legal

20  issues that we would be dealing with in our bankruptcy case

21  when it comes to the claims asserted against Boy Scouts of

22  America.

23         As a result, we do believe, despite the objector's

24  views, that BSA would absolutely need to participate in that

25  proceeding to protect not only BSA's interests, but also, the

1  interests of other competing creditors that have claims

2  against BSA's estate.  Not only would that result in a

3  diversion of resources, but it could extremely, negatively

4  disadvantage BSA in connection with its discussions with

5  other creditors.  That concludes the 105(a) analysis.

6          To turn briefly to the preliminary injunction

7  analysis, as you know, under Bankruptcy Rule 7065, the courts

8  consider a four-factor test.  The first factor is the

9  reasonable likelihood of discuss, which, in a bankruptcy

10 context, has been interpreted as the debtors' ability to

11 successfully reorganize.  In the objector's pleadings, they

12 essentially argue that there has been no demonstration that

13 the debtor BSA can, in fact, successfully reorganize.

14         First, Your Honor, I'd like to note that we are in

15 the early stage in it case.  I think we are a little barely

16 over a month in, but second, and probably most importantly,

17 everything that BSA has done since filing for bankruptcy

18 indicates that we are absolutely committed to a successful

19 reorganization in this matter.

20         We have already filed a plan of reorganization to

21 form a placeholder for negotiations.  We have filed a motion

22 to appoint a judicial mediator to hopefully, consensually

23 resolve the bankruptcy cases.  We have filed a bar date

24 motion and we're working with the official creditor

25 constituencies to set that up for hearing in the coming

1  months.  We've tried to establish a schedule to resolve

2  disputes requiring litigation. Everything before the Court

3  today suggests that BSA is absolutely committed to a

4  successful reorganization and deserves the runway to make

5  that happen.

6         The next factor, irreparable harm:  I'm not going

7  to belabor the insurance point more or the issue, in fact,

8  preclusion point more.  I think Your Honor has heard our

9  position on that, but we believe that if this matter were

10  permitted to go forward, there is an acute danger of further

11  erosion of the insurance policy to the detriment of other

12  1983 claimants.

13         Balance of harms:  Your Honor, with respect to

14  this factor, it appears the objector is focusing on the

15  interplay between the Child Victims Act and the preliminary

16  injunction.  I said it before, I just want to say it again to

17  be crystal clear, we believe that the objector accomplished

18  exactly what the Child Victims Act was contemplating.  The

19  objector filed its complaint in December of 2019.  The debtor

20  is asking for an opportunity to provide equitable and speedy

21  compensation to that victim, to that survivor through this

22  bankruptcy case.  We do not think this, in any way,

23  contravenes that particular Act.

24         In addition, I think the objector in their papers

25  expressed concern over, again, the concept of remand.

1    There's nothing in our preliminary injunction that would

2    prohibit them when the stay expires from arguing that the

3    case, which was removed to the Western District of New York,

4    should be remanded to State Court.  We don't abrogate the

5    rights of the complaint to argue equitable remand or

6    permissive or mandatory abstention; all of those arguments,

7    as well as all of the different subparts of those arguments,

8    are available to the claimant.

9         If the objector is concerned about forum

10   selection, as Your Honor may recall, I mentioned during the

11   first days of the case that the debtor intended to file a

12   motion in the Delaware District Court seeking nationwide

13   transfer of venue, with respect to all of the removed cases.

14   We did, in fact, file that venue-transfer motion, but we also

15   filed with that venue-transfer motion, a motion with the

16   District Court, indicating that we wanted any hearing, with

17   respect to the venue-transfer motion stayed without prejudice

18   to the other parties to argue it, pending the outcome of the

19   preliminary injunction.  There will be no prejudice in

20   LG-37's right to argue against that venue-transfer motion if

21   and when that time comes.

22        And then, finally, Your Honor, the fourth factor

23   brings us to the weighing of the public interests; again, the

24   objector is focused on the Child Victims Act.  We are not

25   affecting any parties' rights to file a claim within the one-

1  year window that was established by the Child Victims Act.

2  We do not believe that that is, in any way, abrogated by this

3  preliminary injunction.

4         What is at issue, though, is not only the debtors'

5  interests -- the public's interests in the debtors' ability

6  to reorganize, but also the public's interests in providing

7  all survivors -- not just LG-37 -- but all survivors,

8  equitable compensation from the Boy Scouts of America with

9  respect to their claims.  The public has huge interest in

10  treating all survivors of abuse equitably as they pertain to

11  Boy Scouts of America and we think this factor weighs very

12  strongly in favor of the issuance of the preliminary

13  injunction.

14         Your Honor, in consolidation, we believe, as I

15  said, that you have -- that you can enter the preliminary

16  injunction.  We respectfully think that you should enter the

17  preliminary injunction for all of the reasons that I stated.

18         I'm happy, Your Honor, to answer any questions

19  that you may have.  I would also just like to note that in

20  Mr. Weisbeck's opening remarks, he suggested that he may be

21  making new legal arguments in light of the reply brief that

22  we filed on, I think it was Sunday night, so if I may, Your

23  Honor, I'd just like to reserve the opportunity for rebuttal

24  and then also, you know, depending upon the nature of those

25  arguments, we may need to discuss whether supplemental

1   briefing is necessary.

2           THE COURT:  I do not have any questions.

3           Mr. Weisbeck?

4           MR. WEISBECK:  Thank you very much, Your Honor.

5           MR. STANG:  Your Honor, this is --

6           MR. WEISBECK:  We're discussing a preliminary

7   injunction and one thing that throughout the remarks of

8   counsel, she frequently referred to what the Boy Scouts of

9   America wants to do.  But we're losing sight of the fact that

10  if the Boy Scouts of America wants to compensate my client,

11  as a victim, and other victims, they'll do so through the

12  Chapter 11 proceeding.  What they're really seeking to do is

13  to protect the local council without the local council filing

14  bankruptcy and getting the benefit of the bankruptcy stay and

15  bankruptcy protection throughout the duration of the

16  bankruptcy proceeding.

17          And if we're talking about a preliminary

18  injunction, they have the burden of proof of showing unusual

19  circumstances.  It seems that they're making two arguments

20  about unusual circumstances.  Somehow, they're going to be

21  involved and they are required to be involved until the

22  discovery phase of our action against the two non-bankrupt

23  defendants.  Nothing in the law requires them to become

24  involved; they have the benefit of the stay.  We're happy to

25  proceed against the local council without the BSA being

1   involved whatsoever.  We're not looking for documents from

2   the BSA.

3           We have evidence that the local council was

4   negligent because they knew about the activities of the child

5   molester against Boy Scouts well before they reported it to

6   the national Boy Scouts organization; they're independently

7   negligent.  We've alleged that in each of the complaints that

8   each of those Boy Scouts organizations have their own

9   negligent actions that resulted in harm to our client.  So,

10  there's nothing that requires them to be involved in any

11  aspect of our proceeding against the local council.

12          They're using the insurance policy as the tail

13  wagging the dog.  They're saying in the next 120 days somehow

14  the insurance policy is going to be eroded.  The insurance

15  policy isn't going to be eroded because there's a stay

16  against the bankruptcy -- against the Boy Scouts of America

17  and if we proceed against the local council, there is no

18  chance that there is anything that's going to happen in the

19  next 90 days because we don't even have a trial date yet.

20  So, the idea that there's a rush to the courthouse, we simply

21  want to proceed with discovery against the two non-bankrupt

22  defendants.

23          The Boy Scouts of America have not submitted any

24  evidence of any other pending claim for this policy.  The Boy

25  Scouts of America have not submitted any evidence that

1  they're required to, through contract, defend and indemnify

2  the local council.  So, what's the unusual circumstance?

3          There's an insurance policy out there that they

4  believe that may someday be jointly shared between the local

5  council and the Boy Scouts of America.  If that ever comes to

6  a head, then the Court, whether it's you or some other

7  Court -- whatever the appropriate court is -- would decide on

8  those competing interests.  I'm sure there's law on that

9  issue.

10          And the idea that somehow merely because there's

11  an insurance policy that could indemnify a non-bankrupt

12  defendant that leads to a stay against that non-bankrupt

13  defendant because the bankrupt organization might want to

14  draw on the same insurance policy, let the law decide that.

15  There's no need to stay the discovery in the underlying tort

16  action.  Those are separate proceedings, separate matters.

17  If there's no policy available to the local council -- well,

18  if we get a money judgment, we'll just go against the

19  personal assets of the corporation.

20          And the one thing that the Boy Scouts of America

21  is continuing to argue is that the Boy Scouts and the local

22  council are the same entity and they point to simply naming

23  those two as "Boy Scouts of America" in our complaint.

24  That's a pleading; that's not a bill of particulars.  It's

25  not evidence.

1        We separately claimed, and the defendants

2   admitted, that there are two separate corporate organizations

3   totally independent of each other.  They have their separate

4   assets.  They have their separate corporate structure.

5        And to give a stay to a local council that's not

6   in bankruptcy, a temporary stay or a preliminary injunction,

7   is just not justifiable here.  There's really no reason to do

8   so.  There's not going to be any erosion of any assets in the

9   next 90 or 120 days -- whatever they're seeking.

10        And they really want to keep control of our

11  lawsuit against the local council and they're seeking to

12  bring my client and the co-defendants to Delaware to try this

13  case eventually.  That is unfair and not equitable, Judge.

14  Why should we, where in Western New York where all this

15  happened, be required to go to the state of Delaware to try

16  to bring witnesses that far away and have a trial in that

17  courthouse in that courtroom when everything is located in

18  the state of New York?  So, there's no reason for a stay now

19  and there's no reason for a stay in the future.  And they

20  have the burden of proof and we don't think they've met that

21  burden of proof, Judge.

22        I'm not able to talk about all the nuances of

23  Section 104 and the other things, because I'm not a

24  bankruptcy attorney, but the one thing we know is in their

25  answer, they admitted they're separate corporate

1  organizations.  So, they're not treated the same.  They don't

2  have the identity of interests because the assets are

3  different.  They operate in different places and they do

4  different things.

5        This would be no different than McDonald's

6  Corporation filing for bankruptcy and saying one of its

7  franchises should get the benefit of the stay.  It just

8  doesn't happen.  If we're suing the local franchise because

9  of their negligence, we would be permitted to go forward with

10  that claim.

11        We just simply need to sever the Boy Scouts from

12  the rest of the defendants and let us move forward.  And

13  that's why, when we talk about the equity and the frustration

14  that my client has as someone who's been permitted to start a

15  lawsuit, is he's here in New York and he has a local

16  defendant -- two local defendants and he's being dragged to

17  the state of Delaware.  The equitable and fair thing would be

18  to sever the claims and let my client continue on against the

19  two local, non-bankrupt defendants.

20        But I can assure you, Judge, there's no erosion of

21  any bankrupt defendants' assets over the course of the next

22  couple of months.  We're not at a trial level.  We're trying

23  to get back to State Court.  So, there could never be any

24  trial in the next few months, and so, we would respectfully

25  request that the Court deny the motion for preliminary

1  injection because the debtor has failed to meet its burden

2  of proof based on the record before you.

3          And I would request some period of time to

4  research the law on joint assets between the debtor and a

5  nondebtor in a bankruptcy proceeding because I believe that

6  when it comes to insurance policies, that's considered an

7  asset.  The Court can deal with that down the road.  It's not

8  necessary to deal with it now.

9          Thank you, Judge.

10         THE COURT:  Thank you very much.

11         MR. STANG:  Your Honor --

12         THE COURT:  Yes?

13         MR. STANG:  -- Your Honor, this Mr. Stang,

14 appearing for the tort claimants' committee, and the Court

15 has signed an order allowing the intervention of a committee.

16         May I make a comment or two before --

17         THE COURT:  -- yes.

18         MR. STANG:  -- you proceed?

19         First of all, Your Honor, I want to make very

20 clear that the tort claimants' committee unanimously voted in

21 approval of the consent order.  The State Court lawyers who

22 represent committee members were unanimous in their support

23 of entering into the consent order and they represent,

24 literally, thousands of abuse survivors.  We feel enormous

25 sympathy and support for this particular survivor who's

1  opposing the consent order, but we have to look at the entire

2  constituency and not just one individual person.

3        And while this hearing was going on, I emailed the

4  State Court counsel who represent committee members to ask

5  them how many claims they had that would be first-encounter

6  claims in 1983.  Not all of them answered, but the ones that

7  did answer said that, collectively -- I added them up -- they

8  have over a hundred clients who have first-encounter 1983

9  claims.

10        And if the Court would -- since counsel suggested

11  that maybe the Court would defer a ruling so he could do

12  additional briefing -- if the Court wanted, I could get

13  affidavits from the State Court counsel attesting to how many

14  clients they have currently -- it's a moving target, because

15  new clients come in all at time -- but how many clients they

16  have currently have that first-encounter 1983 claims.

17        Thank you, Your Honor.

18        THE COURT:  Thank you.

19        Before I go back to Ms. Boelter, is there anyone

20  else who would like to comment?  I'm not sure there's anybody

21  else in the lawsuit.

22        MS. RINGER:  Your Honor, very briefly, this is

23  Rachael Ringer from Kramer Levin on behalf of the unsecured

24  creditors' committee.

25        I'm certainly not going to belabor a lot of the

1  points that Ms. Boelter and Mr. Stang have already made, but

2  I just wanted to appear and confirm what has been put in the

3  record with respect to the official committee in that we also

4  support the limited stay and have agreed to the form of

5  consent order and have also -- you know, we are part of the

6  stipulation to intervene that I know Your Honor entered

7  yesterday, but I just wanted to reiterate and confirm the

8  committee's support for the form of consent order that was

9  submitted.

10            THE COURT:  Thank you, Ms. Ringer.

11            Ms. Boelter?

12            MS. BOELTER:  Thank you, Your Honor.

13            And I will be brief there.  Are just two points

14  that I wanted to address in Mr. Weisbeck's remarks.  The

15  first is with respect to this notion of the same entity.

16            Your Honor, we've made it crystal clear in our

17  pleadings that the local councils are, in fact, separate

18  organizations from BSA national, but when we consider the

19  identity of interest prong under the case law, whether we're

20  looking at related-to jurisdiction or 105(a) extension of 362

21  or the four-factor test under the preliminary injunction, the

22  test is not whether there are two different legal entities;

23  in fact, by definition, we're talking about two different

24  legal entities.

25            The question is whether the two entities share an

1  identity of interest such that a claim against the nondebtor

2  party could have an adverse effect on the bankrupt parties'

3  bankruptcy estate.  And if you look at the jurisprudence, if

4  you boil all of the case law down that I was talking about

5  earlier, whether we're looking at W.R. Grace, Combustion

6  Engineering, Federal-Mogul, Takata, the Delaware District

7  Court opinion in Imerys, there's really three things that the

8  courts have focused on when they're talking about identity of

9  interests.

10         One is whether or not we're talking about the

11  exact same claim.  Here, as we discussed, the complaint --

12  the four corners of the complaint shows that we are.  The two

13  co-defendants, the Boy Scouts and the local council, are

14  named as one entity and they're named -- or excuse me -- as

15  one defendant and they're named through each of the eight

16  counts of the complaint.

17         In cases like W.R. Grace and Combustion

18  Engineering, that's where parties got (indiscernible),

19  because we had two separate products and two separate sets of

20  claims.  That is not what's before the Court today.  It is

21  the exact same claim against BSA and the local council.

22         When we turn to evidence of shared insurance --

23  and Mr. Weisbeck referenced there's no evidence of

24  contractual indemnity -- here, the Court has evidence that's

25  uncontroverted of an insurance policy with an eighteen-

1  million-dollar limit that clearly provides on its face that

2  the additional -- that the named insureds -- not even

3  additional insureds -- the "named insureds" are both Boy

4  Scouts of America and the local councils.  If you look at the

5  case law around shared insurance and identity of interests,

6  the courts didn't have that kind of evidence.  You have it

7  here.

8            Finally, another issue that the courts have looked

9  to is whether the debtor actually supports and acknowledges

10  that there's an identity of interest.  I believe Your Honor

11  is the judge in Imerys and may be aware of the Delaware

12  District Court's ruling there.  The Delaware District Court

13  ruled on many grounds, but it took note of the fact that in

14  that particular case, Johnson & Johnson was proceeding with a

15  related-to jurisdiction argument that implicated identity of

16  interest, which flows throughout our argument, that Johnson &

17  Johnson was proceeding on its own and the debtor had remained

18  silent.  The Court also took note of the fact that there was

19  no obvious interaction between Johnson & Johnson and Imerys.

20  Johnson -- they were former affiliates, but that was no

21  longer true.

22            Again, in this case, we, as the debtor, are

23  acknowledging a very strong, complete identity of interests

24  when it comes to delivering the charitable mission and our

25  programming, which is what gave rise to the claims that are

1  at issue in LG-37's complaint.

2           With that, Your Honor, again, unless you have any

3  questions, I have no further comments, with respect to the

4  preliminary injunction, but we respectfully request that you

5  enter it with respect to LG-37 and also the consent order

6  that's pending before the Court.

7           THE COURT:  Thank you.  I do not have any

8  questions.

9           I want to thank counsel for their arguments.  I am

10 going to -- I have thoughts, but I want to get them collected

11 -- I am going to, therefore, defer ruling.  I will probably

12 rule tomorrow or the next day.  I will have Ms. Johnson reach

13 out to everyone; it will be by telephone CourtCall and I will

14 issue a bench ruling, but I want to collect my thoughts.

15          MR. WEISBECK:  Thank you, Your Honor.

16          THE COURT:  Thank you.

17          MR. ABBOTT:  This is Derek Abbott for the debtors.

18 I think probably next on the agenda would be the Girl Scouts'

19 motion for lift stay status conference that's on the agenda,

20 Your Honor.

21          THE COURT:  Yes.  And let me add, if there are

22 people who were just interested in the preliminary injunction

23 motion, please feel free to disconnect or hang up as you

24 think is appropriate.

25          UNIDENTIFIED:  Thank you, Judge.

1              THE COURT:  Thank you.

2              MR. SCHNABEL:  Hello, Your Honor.  It's Eric

3   Schnabel with Dorsey & Whitney.

4              Can you hear me okay?

5              THE COURT:  I can, Mr. Schnabel.

6              MR. SCHNABEL:  That's great.

7              MR. O'NEILL:  Hello, Your Honor.  This is Andrew

8   O'Neill from Sidley Austin on behalf of the debtors.

9              On the GSA piece, perhaps, you know, I can lead

10  off if that's okay with Your Honor and just describe where we

11  are, having had a conversation with Mr. Schnabel yesterday.

12             THE COURT:  It's up to you all.

13             MR. SCHNABEL:  Well, Your Honor, it's my motion,

14  so why don't I lead off.

15             THE COURT:  It is your motion, Mr. Schnabel.  You

16  can lead off.

17             MR. SCHNABEL:  Thank you.

18             So, Your Honor, I just want to make two brief

19  points before I cede, I guess, the virtual podium.  One is

20  just to describe, very briefly, the context and timing of

21  this motion and how it relates to April 15th and then,

22  second, I do want to talk about the meet-and-confer that we

23  had regarding how we feel the April 15th hearing is going to

24  proceed.

25             So, Your Honor, first, as you recall, a day after

1   the petition of the first day hearing on February 19th, I did

2   preview that we would be, in short order, potentially filing

3   the lift-stay motion to deal with the Girl Scouts' trademark

4   infringement action that was or is pending in the Southern

5   District of New York.

6          Thereafter, we met and conferred with the Boy

7   Scouts to see if we could resolve the stay issue without

8   motion practice.  I had few calls with Mr. Abbott, but,

9   unfortunately, we had no resolution.

10          Your Honor, on March 9th, the District Court in

11  the Southern District of New York entered an order in our

12  trademark infringement action that the plaintiff, i.e., the

13  Girl Scouts, had to seek relief from the stay via a motion

14  before the end of the month or the action in the Southern

15  District would be dismissed by that District Court judge;

16  that was a March 9th order.  Accordingly, on March 10th, we

17  filed our motion and our accompanying brief and we noticed

18  that motion on today for the preliminary hearing, per the

19  Local Rules.

20          Your Honor, since then, we've met and conferred

21  regarding a briefing schedule.  We contacted chambers to get

22  the April 15th date for our final hearing.  We've extended

23  the deadline for the Boy Scouts to March 31 to respond to our

24  motion and brief and the two committees and the future claims

25  rep have until April 6th and then our reply will be due April

1    10th.

2            Your Honor, I just want to say that we need that

3    final hearing to be April 15th because the infringement is

4    ongoing and we wanted to have our preliminary hearing within

5    the statutory 30-day period and our final hearing within the

6    30-day period thereafter that, and today, April 15th gives us

7    that timing.

8            Now, of course, we do understand, Your Honor, the

9    reality of what's been happening right now across the country

10   and the world and we understand this Court's incredibly busy

11   calendar and challenges right now; however, we really do not

12   want our motion to be continued past April 15th and would

13   like to have that hearing on April 15th.  Your Honor, so

14   that's the context just in terms of the motion we're filing

15   and the hearing dates.

16           Your Honor, with regard to my second point, we met

17   and conferred with the Boy Scouts regarding April 15th and

18   what we're trying to understand is, is this going to be an

19   evidentiary hearing or is this just going to be legal

20   argument?

21           Our view is we think it is just going to be legal

22   argument.  If there is going to be any evidence, I think it

23   would be rather limited.  And one thing we discussed is once

24   they filed their response, perhaps, that the parties will get

25   together and try to maybe enter into a stipulation of facts

1  to the extent there are any facts that can be stipulated to,

2  and that we could have the most streamlined hearing for you

3  on the 15th with regards to our motion.

4           Your Honor, unless you have any questions, those

5  are the only two real points that I wanted to make today for

6  the Court.

7           THE COURT:  Thank you.  I don't have any

8  questions.

9           Mr. O'Neill?

10           MR. O'NEILL:  Yeah, and I apologize, Your Honor, I

11  didn't mean to try and steal Mr. Schnabel's thunder.

12           He did, pretty accurately, describe our

13  conversation yesterday in the meet-and-confer.  I'll just

14  say, you know, obviously reserving on their need to go

15  forward on the 15th and what's causing that, we don't think

16  that will be a problem at all, and, in fact, what we

17  discussed yesterday was just what Mr. Schnabel said, which

18  is, you know, potentially limited evidence from us, at least,

19  in form of declarations and, you know, we're hopeful and

20  confident that we can talk through those and hopefully get a

21  stipulation in front of Your Honor so that we're not setting

22  forth evidence and having cross-examination like Your Honor

23  had to hear today over the phone.

24           So, we'll work together and endeavor to make that

25  happen in preparation for the 15th and, otherwise, the

1  briefing schedule is as described, and we'll plan on having

2  the hearing on the 15th.

3          THE COURT:  Okay.  That's fine.  The briefing

4  schedule is fine and we will plan to have it on the 15th.

5  Everyone knows the reality, things are changing day-by-day,

6  but at this point, the 15th is fine.

7          MR. O'NEILL:  Very good.  Thank you, Your Honor.

8          THE COURT:  And, obviously, if parties can

9  stipulate to the facts, that's preferable.

10         MR. SCHNABEL:  And that's fully understood, Your

11  Honor.  Thank you.

12         MR. O'NEILL:  Yes.  Thank you very much, Your

13  Honor.

14         MR. ABBOTT:  Your Honor, Derek Abbott, again, for

15  the debtors.  I guess that leaves us with the Court's

16  questions on the two remaining second day orders:  final

17  relief on the employee wage motion and, separately, the tax

18  motion, Your Honor.  * 12 wage motion

19         THE COURT:  Okay.  The question I had on the wages

20  order is in Paragraph 13 of that order, and I'm looking at

21  the blackline that is at Docket 263-2.

22         MR. LINDER:  Good morning, Your Honor.  It's Matt

23  Linder of Sidley Austin, on behalf of the debtors.

24         Do you have a particular question -- with respect

25  to that blackline, I think this is just preserving rights of

1  all parties in interest with respect to contesting the

2  validity of liens.

3           THE COURT:  Yes.  Here's the question that I have,

4  and it doesn't look to me like it was something that was

5  added, it looks to me like it was something in the original

6  form of order that maybe I didn't pick up on.  But that

7  paragraph, Subparagraph B talks about reserving the rights of

8  parties -- which I'm fine with all the parties -- to

9  subsequently dispute such claim or lien on any grounds.

10           And I guess the question I have is that if

11  something's already been paid, how does that work?  Or is

12  this only envisioning a dispute on a claim that has not been

13  paid?

14           MR. LINDER:  Yes, Your Honor.

15           I would interpret this language to address the

16  latter, in terms of a claim that has not been paid, but I'm

17  happy to cede the telephonic podium to the other parties to

18  chime in if they disagree, and we can certainly make any

19  appropriate changes to clarify that of Your Honor would like.

20           THE COURT:  Anyone else?

21           MS. RINGER:  Your Honor, this is Rachael Ringer

22  from Kramer Levin, on behalf of the creditors' committee.

23           I think that that is correct, although, the prior

24  portion of that paragraph is basically providing that the

25  order is not an admission; it's the validity or priority of a

1  claim.  So, if parties were later to challenge that such

2  claim was not entitled to priority or the like, I guess I'm

3  not sure where that falls in the spectrum of your question,

4  but I think with respect to claims that have been paid, I

5  mean, I think that (indiscernible), you know, would be

6  difficult to, you know, I guess (indiscernible) or the like,

7  but I think it was really just intended to reserve rights in

8  the event that claims that were entitled to some priority or

9  the like or, you know, just (indiscernible) liens in

10 particular.

11         MR. LINDER:  Your Honor, Matt Linder, again.

12         If I could just propose, perhaps, a solution in

13 Subparagraph B of Paragraph 13.  Perhaps, what we could do is

14 carve out the dispute of any claim that's paid pursuant to

15 this order.  I think that addresses Your Honor's concern if

16 I'm understanding you correctly; as well, we could maybe more

17 directly address what Ms. Ringer just mentioned in

18 Subparagraph A, with respect to priority or validity of the

19 lien.

20         THE COURT:  Okay.  That would be fine.  Why don't

21 you rework that and resubmit it.

22         But, also, I think I saw from my judicial

23 assistant that this particular certification of counsel was

24 withdrawn and there is or will be another one filed; is that

25 correct?

1        MR. LINDER:  Yes, Your Honor, that is correct.

2        We did withdraw the COC this morning.  I'm happy

3  to give you some background on that and give you a sense of

4  what we're still working through in terms of getting to an

5  agreed form of the final order.

6        We did get some comments last evening from the

7  debtors' third-party claims administrator, the name which is

8  ESIS.  They're the appointed administrator for the workers'

9  compensation program administered by the debtors.  And in

10 fairness to the claims administrator, there were some changes

11 that were made to the requested language submitted by ESIS in

12 the final order that the debtors made to accommodate comments

13 from the survivors' committee and those comments were

14 inadvertently not shared with ESIS before we filed the COC.

15       We believe, Your Honor, that we have a very

16 straightforward solution to the order that will assuage ESIS'

17 concerns, you know, due to time constraints; however, this

18 morning, you know, we've not been able to sufficiently

19 (indiscernible) with the survivors' committee and ESIS to

20 make sure that we are agreed on further language that would

21 resolve the concerns of ESIS and the survivors' committee.

22       Just to preview with you what ESIS has requested

23 that we insert into the order, you will have noted that there

24 are some provisions, I think it's Paragraphs (indiscernible)

25 that pertains specifically to the workers' compensation

1  program.  ESIS would like to just make it clear that nothing

2  in the order alters or amends the terms and conditions of any

3  of the agreements between the third-party administrator and

4  the debtors.

5          Certainly, Your Honor, the motion does not seek to

6  motion any contract period, but including, with respect to

7  (indiscernible) the debtors' contract and we don't think it

8  would be appropriate to create any implication that the order

9  is doing any of that.  So we hope to be able to get the

10 language that's agreed among the debtors, ESIS, and the

11 survivors' committee, and, of course, the other constituents,

12 but we're continuing to work on it.  We hadn't been able to

13 get there this morning during the hearing, but we very much

14 want to have a final order entered as soon as possible with

15 respect to employee wages, just for certainty -- to provide

16 certainty to the debtors' employees.

17         So, we're going to continue to work throughout the

18 day, Your Honor, to get a further revised form of order, but

19 I do want to be mindful of the possibility, however unlikely,

20 that we don't get to an agreement, given the fact that we

21 certainly don't want this matter to spill over to another

22 hearing and, certainly, we can either submit competing forms

23 of order or maybe it's that Your Honor is going to call us

24 back on the preliminary injunction tomorrow, we could have a

25 status conference on this matter tomorrow.  I just wanted to

1  flag that, in the unlikely event that we're not able to agree

2  to language.

3          THE COURT:  Okay.  Well, if there's no agreement

4  with language, we'll deal with that as it comes up.

5          Okay.  The other question that I had is on the

6  cash motion and I'm looking at Docket 262-2, which is the

7  blackline on the final order.

8          MR. THOMAS:  Yes, Your Honor.  This is Eric Thomas

9  of Sidley Austin on behalf of the debtors.

10         I can address any questions, you know, Your Honor

11  has with the changes in that order.

12         THE COURT:  Okay.  So, this order says -- I think

13  I understand the intent behind it, but I have to confess,

14  I've never seen a provision like this in probably any order.

15  So, it says that notwithstanding the making of the payment,

16  that the debtors' rights or any one of the debtors' estates

17  succeeding to certain rights of the debtor, that they can

18  use, presumably, the longer statute of limitations.

19         But then it says:

20         "And all such payments first shall be treated as

21  final upon confirmation thereof by a further order of the

22  Court so providing (indiscernible) an order confirming a

23  plan."

24         So, I guess I have two questions.  One, can I, in

25  an order, make this determination on a future statute of

1  limitations and, two, does that really mean that any payment

2  made under this order is a final at the moment that it's

3  made?

4          MR. THOMAS:  Your Honor, you are right.  That is

5  exactly the intent here.  The survivors' committee made the

6  request for this language and I believe the commercial

7  committee joined in that.

8          We raised the same issue, because this really

9  (indiscernible) we had not seen it before.  It was posed to

10  us that, Well, until a case is really over, you really don't

11  have the certainty.  And the one example that we were

12  provided was, you know, if a case ever converts, could a

13  trustee subsequently try to disgorge priority payments that

14  were made during the case?

15          I'm not really sure about the answer to that.  We

16  gave it some thought, as well.  You know, could there be, you

17  know, a Rule 60 motion to try to undo it?  Is there any

18  argument that this, you know, may not absolutely be final?

19          I don't think a 549 action, you know, would work

20  because Your Honor is approving the payments.

21          One thought we had is maybe after saying the

22  creditor rights are preserved is maybe add something "to the

23  maximum extent possible, if any," but this really did come

24  from the survivors' committee, so I would, you know, cede the

25  podium, perhaps, to the Pachulski firm to add in any further

1  thought that they may have.

2        MR. STANG:  Your Honor, this is Mr. Stang.

3        You are right.  We were trying to preserve the 10-

4  year reachback that we believe the IRS would have and,

5  therefore, the estate would have under 544 and we are

6  concerned that if the payment of the taxes was considered

7  final, albeit made after the petition date, that we would

8  lose the ability to assert that 10-year reachback.  That's

9  why we wanted to treat these as interim and not final before

10 the expiration of our opportunity to assert any avoidance

11 actions that had the 10-year reachback period.

12        THE COURT:  Okay.  So, that's really interesting.

13 I'll have to give this some thought.

14        And let me ask this question, since this is

15 something that was added in, has it been circulated to

16 anyone, including the taxing authorities who are going to

17 receive the payments?

18        MR. THOMAS:  I do not believe so, Your Honor,

19 unless they're getting, you know, the automatic notices.

20        THE COURT:  Well, I think that's a little

21 problematic from this perspective.  I recognize that this is

22 just an ordered authorizing the debtor to pay certain taxes;

23 nonetheless, it occurs to me that those parties receiving

24 those payments will naturally assume that those payments are

25 not some sort of an interim payment, but, in fact, a final

1  payment, which acts as some Rule 60 or some other kind of

2  motion.

3         And I agree, I don't know that a 549 would work,

4  absent this paragraph, or even with this paragraph maybe, but

5  people receiving these payments assume that they are final

6  and without circulating this, that causes me more concern

7  about signing this order.

8         So, I'm going to think about this one and I think

9  the parties should continue to talk.  I'm not sure that I'm

10  comfortable with this on two fronts.  One, that the order is

11  affective, with respect to the statute of limitations, but

12  I'm not sure that that is so much an issue as, two, this

13  finality issue.

14         MR. LABUDA:  Your Honor, Thomas Labuda, on behalf

15  of the debtors.

16         One suggestion -- and I know I'm just springing

17  this on Mr. Stang now, so he may need time to this about this

18  -- but one suggestion would be to keep the first half of the

19  provision that says the creditor's status is preserved to the

20  maximum extent possible and, perhaps, you know, deleting the

21  second half.

22         I don't know right now the next payment that is

23  due, but it's obviously very important for the State for the

24  reasons that we said at the first day hearing to make sure

25  that these tax payments are made.

1          MR. STANG:  Your Honor, this is Mr. Stang.

2          It isn't so much just trying to get money back

3  from the taxing authorities.  We wanted to -- we put this

4  language in because we were concerned that if a tax that was

5  owing as of the petition date was subsequently paid that it

6  would impact the right to assert or step into the shoes of

7  the creditor for the 10-year reachback.

8          So, this isn't about us trying to get the money

9  back from the IRS or state taxing -- well, from the IRS; it's

10 really about trying to preserve the 10-year reachback.  And

11 we thought that by making this an interim payment, as opposed

12 to a final payment, that in the event the defendant said to

13 us, Hey, you can't go back 10 years because the debt got

14 paid, that we would say, Yes, but the order preserved our 10-

15 year reachback because the order -- the payment wasn't final.

16 That's what we're aiming at.  It's not --

17         THE COURT:  Well, then, aren't you prejudging a

18 defendant?  And I don't have any of those defendants in front

19 of me to argue that, in fact, you can't do this.

20         I want the two of you to talk.  I understand what

21 you're doing.  I need to give it some more thought.  But what

22 I think you're trying to -- I understand what you're trying

23 to do and I'm not saying it's a bad thing, that you want to

24 preserve that longer statute of limitations if you can, but I

25 don't -- and I understand what you're saying about not

1  actually looking to claw back tax payments that have been

2  made, but nonetheless, the order says what it says, which

3  leaves it open to interpretation down the line, perhaps, not

4  by you, but somebody else.

5          So, I need to give this some thought.  This is why

6  I wanted to have this conversation and why I didn't sign it,

7  because I wanted to fully understand what I thought was the

8  intent behind this, and I need to give it some further

9  thought as to whether it is an appropriate provision to --

10 for me to sign off of in this order.

11         MR. STANG:  And we'll give it some more thought,

12 as well, Your Honor, to see if the language that counsel

13 suggested would help us still give the certainty to the

14 recipients of the tax payments.

15         THE COURT:  Thank you.

16         Okay.  So, we'll circle back on this one, as well.

17         UNIDENTIFIED:  Thank you, Your Honor.

18         MR. ABBOTT:  We will, Your Honor.

19         Derek Abbott for the debtors, Your Honor.  I

20 believe that is all the matters scheduled for today.  We'll

21 be on the lookout for word from Ms. Johnson about the

22 rescheduling a time to come back and hear the Court's ruling

23 on the preliminary injunction.

24         THE COURT:  Okay.  Thank you, everyone, for

25 participation and for your patience.

1          We're adjourned.

2              (Proceedings concluded at 12:50 p.m.)

3

4                          CERTIFICATE

5

6      I certify that the foregoing is a correct transcript

7  from the electronic sound recording of the proceedings in the

8  above-entitled matter.

9

/s/Mary Zajaczkowski              February 14, 2020
10 Mary Zajaczkowski, CET**D-531

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25