## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
|  | **Ref. Docket Nos. 155, 157** |

### DEBTORS' OBJECTION TO GIRL SCOUTS OF THE
### UNITED STATES OF AMERICA'S MOTION FOR RELIEF FROM
### THE AUTOMATIC STAY TO RESUME TRADEMARK ACTION

The Boy Scouts of America and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession (together, the "BSA" or the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), hereby object to Girl Scouts of the United States of America's ("GSUSA") Motion for Relief from the Automatic Stay to Resume Trademark Action (Mar. 10, 2020) [Docket No. 155] (the "Motion").[2]

### PRELIMINARY STATEMENT

1.        Less than one month into these Chapter 11 Cases, GSUSA seeks relief from the automatic stay to pursue its trademark infringement action (the "Trademark Action") in the U.S. District Court for the Southern District of New York (the "District Court"). The BSA categorically denies that it is infringing GSUSA's marks and considers the Trademark Action legally meritless. The BSA and the Debtors' bankruptcy estates will be significantly prejudiced

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] See also Girl Scouts of the United States of America's Brief in Support of its Motion for Relief from the Automatic Stay to Resume Trademark Action (Mar. 10, 2020) [Docket No. 157] (the "Brief" or "Br.").

if the Trademark Action resumes during these Chapter 11 Cases because precious managerial, financial, legal, and other resources would be diverted away from their restructuring efforts.

2.      Here, the automatic stay is particularly essential given the magnitude of the BSA's ongoing litigation across the country, and the BSA's need to marshal all of its resources to negotiate a consensual plan of reorganization that provides the means to timely and equitably compensate victims of abuse in Scouting and ensure that the BSA emerges from bankruptcy with the ability to continue its charitable mission.  It is crucial that the BSA be able to maintain the "breathing spell" afforded to debtors under the Bankruptcy Code rather than having to defend against piecemeal litigation, including the Trademark Action.

3.      Although GSUSA claims it will incur "great harm" if the stay is not lifted immediately, GSUSA's own allegations, coupled with its conduct during the Trademark Action, belie that claim.  GSUSA alleges the claimed infringement dates back to 2017, yet it did not sue the BSA until a full year later, in November 2018—and even then, GSUSA never once sought a preliminary injunction, temporary restraining order, or any other expedited relief suggesting exigent circumstances.  In fact, the potential harm to the Debtors' estates if the stay were lifted far outweighs any inconvenience GSUSA may experience if the stay remains in place. Accordingly, GSUSA has not demonstrated the requisite "cause" to lift the stay on the Trademark Action.

4.      GSUSA also half-heartedly argues that the automatic stay does not apply to its request in the Trademark Action for an injunction enjoining the BSA from continuing what GSUSA characterizes as "ongoing" trademark infringement.   Courts around the country, however, including this Court, have made clear that the automatic stay prohibits the pursuit of such claims for non-monetary relief absent the stay being lifted for cause.  As noted above,

GSUSA has failed to demonstrate cause, and accordingly, this argument also fails.  The Motion should be denied.

## BACKGROUND

I.    **Overview of the BSA and Bankruptcy Proceedings**

5.    Founded in 1910, the BSA is one of the most iconic non-profit organizations in the United States, preparing this nation's youth for nearly 110 years to make good ethical and moral choices over their lifetimes.

6.    On February 18, 2020, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the District of Delaware.[3] To date, the BSA has made significant progress in the bankruptcy proceedings.  This includes:

a.    **Data Room.**  To avoid the delays and expense of protracted discovery, the BSA has established and populated an electronic data room, which it is using to proactively make financial and non-financial information available to various constituencies, including counsel and advisors to the Unsecured Creditors Committee (the "UCC"), of which GSUSA is a member, and the Tort Claimants' Committee (the "TCC", together with the UCC, the "Committees").    This data room includes, among other things: (i) organizational documents of the BSA; (ii) financial information of the BSA, including trial balances, weekly cash flow reports, annual and monthly financial statements, accounts receivable reports; (iii) shared services agreements between the BSA and one or more non-BSA entities; (iv) asset and liability information, including documents identifying property of the estate; (v) historical abuse claims information; (vi) financial and other information pertaining to Local Councils; and (vii) insurance policies and coverage charts.[4]

b.    **Coordination with the Ad Hoc Committee of Local Councils.**  Prior to the commencement of these Chapter 11 Cases, the BSA assisted in the formation of an ad hoc committee of Local Councils comprised of eight Local Councils

---

[3] Further background about the Debtors and these Chapter 11 Cases is available in the Debtors' Informational Brief (Feb. 18, 2020) [Docket No. 4] (the "Informational Brief").  Capitalized terms that are not defined herein shall have the meaning ascribed to them in the Informational Brief.

[4] Most of the materials in the data room has been made available to counsel for the Committees.  Certain information, including Local Council financial information and historical claims information, will be made available following the entry of an agreed protective order governing the exchange and handling of material in the Chapter 11 Cases.

of various sizes from every region of the country (the "<u>Local Council Committee</u>"). The Local Council Committee has been instrumental in coordinating the BSA's continuing efforts to collect and organize Local Council asset information.

c. **Future Claimants Representative.** The BSA moved for the appointment of a Future Claimants Representative. <u>See</u> Debtors' Motion for Entry of an Order Appointing James L. Patton, Jr. as Legal Representative for Future Claimants, *Nunc Pro Tunc* to the Petition Date (Mar. 17, 2020). [Docket No. 213].

d. **Motion for Appointment of a Judicial Mediator.** The BSA has been engaged in negotiations with several constituencies to reach an agreement on one or more mediators in connection with the comprehensive resolution of abuse claims. The BSA and the Committees are working diligently on a process for the appointment of mutually agreeable mediators.

e. **Consolidated Removal of Pending Abuse Actions.** The BSA successfully coordinated the near-simultaneous removal of nearly 200 cases alleging sexual abuse that were pending in various state courts throughout the country. Soon thereafter, the BSA filed a motion seeking the nationwide transfer and consolidation of those actions to the U.S. District Court for the District of Delaware under 28 U.S.C. § 157(b)(5).

f. **Nationwide Extension of Stay of Pending Abuse Actions to Non-debtor Related Entities.** The BSA has coordinated with the Committees, the Local Council Committee, and others to enter a consent order extending the automatic stay to all Local Councils, as well as all Chartered Organizations and affiliated entities named as defendants, in approximately 300 pending abuse actions throughout the country. The Court entered this order on March 30, 2020. <u>See</u> Consent Order Pursuant to 11 U.S.C. §§ 105(a) and 362 Granting the BSA's Motion for a Preliminary Injunction (Mar. 30, 2020) [Adv. Docket No. 54].

g. **Stipulated Protective Order.** The BSA has prepared a proposed stipulated protective order governing the exchange of discovery material in these Chapter 11 Cases, including information provided voluntarily through the electronic data room. Since the petition date, the BSA, the Committees, and the Local Council Committee have conferred regularly and exchanged multiple drafts of a proposed order that aims to account for both the complex scale of these cases and the unique sensitivities around much of the discovery material.

7. Many of these tasks—including, critically, the identification and assembly of financial and other information necessary to negotiate a plan of reorganization and meet ongoing

bankruptcy-related administrative requirements—demand a tremendous amount of management and other organizational resources within the BSA.  See Declaration of Brian Whittman in Support of Debtors' Objection to Girl Scouts of the United States of America's Motion for Relief from the Automatic Stay to Resume Trademark Action, at ¶¶ 4-6, 8 (Mar. 31, 2020) ("Whittman Decl.")  In the coming months, the BSA will need to continue to focus these resources on a successful restructuring that achieves the dual objectives of these Chapter 11 Cases:  an equitable compensation regime for survivors of abuse in Scouting and the continued fulfillment of the BSA's vital mission.[5]  Id. at ¶ 8.

## II.    The BSA's Half-Century of Programs for Girls and Use of its SCOUTS and SCOUTING Marks

8.    When founded in 1910, the BSA organization was directed toward boys.  Over the past 50 years, however, the BSA has offered various programs to both girls and boys.  For example, the BSA has welcomed female youth into its co-ed programs since 1971, when it welcomed girls and young women into its Exploring program.  As of June 2018, girls and young women made up at least one-third of the membership in four of the BSA's programs, including two programs with the word "Scouts" in their name:  STEM Scouts, Sea Scouts, Exploring and Venturing.  In addition, the BSA has always welcomed female volunteer "Scouters," who have been instrumental to the organization's growth.

9.    On October 11, 2017, the BSA publicly announced its plan to welcome girls into its Cub Scouts and Boy Scouts programs, and on January 15, 2018, the BSA welcomed an initial group of young girls into Cub Scouts.  On May 2, 2018, the BSA announced "Scouts BSA" as

---

[5]  The ongoing COVID-19 pandemic has amplified the strain on the BSA's senior management and other organizational resources during these Chapter 11 Cases.  In light of the social distancing measures adopted throughout the country, as well as the concomitant drain those measures have had on the BSA's revenues, the BSA was forced to furlough a large portion of its workforce effective April 1, 2020.  This substantial reduction in staff will further burden those employees who remain.  Whittman Decl. at ¶ 7.

the new name for its Boy Scouts program (along with the new slogan "Scout Me In"), and as of February 1, 2019, girls and young women officially began joining the Scouts BSA program. Since 2017, over 200,000 girls have participated in the BSA's Scouting programs, including approximately 130,000 in Cub Scouts, 30,000 in Scouts BSA, and 65,000 in Venturing, Sea Scouts, and Exploring.[6]

10.     The BSA has used the terms SCOUT, SCOUTS and SCOUTING, both alone, and when accompanied by non-gender-specific terms (the "SCOUT Marks"), throughout the twentieth century, and now twenty-first century, to market its single-gender and co-ed Scouting programs. For example, the BSA has run promotional pieces in its *Scouting* magazine on female BSA members' activities dating back to at least 1973. The BSA also has frequently promoted and marketed the involvement of female SCOUTERS—both volunteer and professional— through stories and promotional campaigns.

## III.   The Trademark Action

11.     On November 6, 2018, over one year after the BSA announced the changes to its Cub Scouts and Boy Scouts programs, GSUSA filed suit against the Boy Scouts of America in the U.S. District Court for the Southern District of New York. See Girl Scouts of the U.S.A. v. Boy Scouts of America, No. 18-cv-10287 (AKH) (S.D.N.Y. Nov. 6, 2018). In the Trademark Action, GSUSA alleges, among other things, that the BSA's use of its SCOUT Marks in connection with its Cub Scouts and Scouts BSA programs, now offered to both boys and girls, infringe and dilute GSUSA's marks. GSUSA also alleges the BSA tortiously interfered with GSUSA's prospective business relations. Through its Complaint, GSUSA ostensibly seeks to prohibit the BSA from using its trademarks SCOUTS or SCOUTING in connection with the

---

[6] See Informational Brief at 13.

BSA's continued efforts to offer youth or leadership programs that include both boys and girls. That is, despite the BSA's longstanding, ubiquitous use of SCOUTS and SCOUTING, GSUSA now seeks to prohibit the BSA from calling its own members Scouts. In particular, GSUSA claims that because the BSA re-named one of its core programs "Scouts BSA" (replacing the prior "Boy Scouts" name), used the new slogan "Scout Me In" in its advertising, and refers to both boy and girl members of Cub Scouts and Scouts BSA as "Scouts," it has somehow infringed GSUSA's mark GIRL SCOUTS. GSUSA's lawsuit also demands the BSA not be permitted to continue using its SCOUT-formative branding, which the BSA has used for more than a century, because of these program changes.

12.    At no point between the commencement of the alleged infringement in Fall of 2017 and the BSA's filing of its Petition in February 2020 has GSUSA undertaken any steps to seek emergency relief in connection with its purported claims. GSUSA waited over one year after the alleged infringement to file its Complaint in 2018. See Declaration of Rachel Kassabian in Support of Debtors' Objection to Girl Scouts of the United States of America's Motion for Relief from the Automatic Stay to Resume Trademark Action, at ¶ 3 (Mar. 31, 2020) ("Kassabian Decl."). Then, even after suing, GSUSA did not seek a temporary restraining order or a preliminary injunction, nor has it sought any other form of expedited relief in the Trademark Action. Id. at ¶ 5.

13.    Further, GSUSA has not identified any specific post-petition infringing conduct by the BSA that is distinct from the pre-petition conduct. Rather, the conduct at issue continues to be the same conduct in kind alleged in the Complaint.[7]

---

[7] Although the Motion baldly claims that there have been incidents of post-petition infringement (Br. at 11), none are identified, and no supporting evidence of any such alleged infringement was submitted by GSUSA in connection with the Motion.

14. The Trademark Action is far from its resolution. Prior to the stay, various clean-up fact discovery work was still weeks from completion. Id. at ¶¶ 11, 18. Expert discovery, which the BSA anticipates would be significant, has hardly begun. Id. at ¶¶ 12-16, 18. The BSA anticipates expert discovery would include depositions of multiple experts and the preparation and analysis of those experts' reports—indeed, GSUSA has already identified at least three expert reports it intends to prepare and serve. Id. at ¶¶ 12, 15. Thereafter, the BSA intends to file for summary judgment. Id. at ¶¶ 14-15, 18. If the BSA's motion does not resolve the entire case, the parties will have to prepare pre-trial materials (including witness lists, exhibit lists, Daubert motions, motions in limine, trial briefs, deposition designations and related materials). Id. at ¶ 18.

15. Finally, and most potentially burdensome, preparation for and participation in trial would require significant expenditure of resources and attention, at the expense and concentration of resources to the Debtors and their estates. Id. at ¶ 21; see also Whittman Decl. at ¶ 8. Based on the parties' initial disclosures, there are 37 fact witnesses identified by name that the parties could call as witnesses to support their respective claims or defenses at trial. Kassabian Decl. at ¶ 19. The vast majority of the BSA's witnesses are located in Texas, and none are located in New York, where GSUSA filed the action. Id. at ¶ 20. If the Trademark Action were to proceed to trial, among other onerous effects, key members of the BSA's senior leadership would be called as witnesses or need to assist the BSA as it prepares for summary judgment and trial, and thus would be impeded from using the "breathing spell" to focus on the organization's restructuring efforts. Id. at ¶ 22; see also Whittman Decl. at ¶¶ 6, 8.[8]

---

[8] Based on the parties' initial disclosures in the Trademark Action, the depositions taken by GSUSA, and the GSUSA's request for custodial emails, it is reasonably likely that the following individuals will play a significant role in the Trademark Action, and thus would be impeded from performing their usual day to day responsibilities for the BSA and from supporting the BSA's restructuring efforts: (a) Steve McGowan, General Counsel; (b) Patrick

8

16.     Despite being nearly one-and-a-half years old, the Trademark Action has proceeded at a slower-than-expected pace due, at least in part, to GSUSA's litigation strategy. For example, most recently, GSUSA refused to defer non-survey expert reports so that the parties could proceed more quickly to summary judgment, which the BSA believed would significantly narrow, if not eliminate, the need for such reports and the issues to be resolved at trial. Kassabian Decl. at ¶¶ 13-16. Earlier, GSUSA prolonged the litigation by making invasive and sweeping discovery demands. For instance, the District Court rejected GSUSA's attempt to obtain through discovery any document over a three-year period mentioning GSUSA's marks, finding that GSUSA's request was "disproportionate and unduly burdensome." Id. at ¶ 10. Based on GSUSA's conduct in the Trademark Action thus far, the BSA anticipates that the remaining discovery, motion practice, and trial would require tremendous financial and organizational resources from the BSA, and continue to proceed at a slower pace than GSUSA projects in the Motion and the Brief. Id. at ¶¶ 18-22.

17.     In addition to being far from over, the District Court also has yet to engage with the substantive facts or legal issues in the Trademark Action via dispositive motions. The District Court never issued an opinion on the BSA's Motion to Dismiss, nor was it ever fully briefed, as the BSA voluntarily withdrew it. Id. at ¶ 6. To date, the District Court has only resolved discovery-related disputes. Id. at ¶¶ 9-10, 17.[9] In other words, with respect to the merits of GSUSA's claims and the BSA's defenses, the Trademark Action is still in its early

---

Sterrett, Assistant Chief Scout Executive; (c) Effie Delimarkos, Communications Director; (f) Michael Ramsey, Director of Marketing & Brand; (g) Pat Wellen, Director of Research & Strategy; (h) April McMillan, Director of Program Development; (i) Trent Nichols, Director of Research & Program  Development; and (j) Ray Macaluso, Practice & Compliance Manager. Kassabian Decl. at ¶ 22.

[9] In connection with these rulings, the District Court has also ruled that evidence related to abuse lawsuits was irrelevant and excludable under Fed. R. Evid. 403. Kassabian Decl. at ¶ 17. The exclusion of such evidence effectively extinguishes GSUSA's trademark dilution claim.

stages with respect to the merits of GSUSA's claims and the BSA's defenses, as the Court has

not yet even set a schedule for briefing and hearing summary judgment.

## ARGUMENT

18.     The purpose of the automatic stay is "to prevent certain creditors from gaining a

preference for their claims against the debtor; to forestall the depletion of the debtor's assets due

to legal costs in defending proceedings against it; and, in general, to avoid interference with the

orderly liquidation or rehabilitation of the debtor." In re Rexene Prods. Co., 141 B.R. 574, 576

(Bankr. D. Del. 1992) (quoting Borman v. Raymark Ind., Inc., 946 F.2d 1031, 1036 (3d Cir.

1991)).  The automatic stay is thus "one of the fundamental protections provided to debtors by

the Bankruptcy Code." In re W.R. Grace & Co., No. 01-1139, 2007 WL 1129170, at *2 (Bankr.

D. Del. Apr. 13, 2007) (citing Midlantic Nat'l Bank v. New Jersey Dept. of Envtl.

Protection, 474 U.S. 494, 503 (1986)).[10]  It permits the debtor "to concentrate on rehabilitating

its business without interference by actions of creditors or litigation that would hinder the

reorganization process." In re Nw. Airlines Corp., No. 05-17930, 2006 WL 687163, at *1

(Bankr. S.D.N.Y. Mar. 10, 2006) (citing Eastern Refractories Co. v. Forty Eight Insulations, Inc.,

137 F.3d 169, 172 (2d Cir. 1998)).

## I.    GSUSA Has Failed to Establish Cause for Relief from the Automatic Stay.

19.     A party seeking to lift the automatic stay to pursue litigation in another court must

make a threshold showing of "cause."  11 U.S.C. § 362(d)(1).  Although the Bankruptcy Code

does not define what constitutes "cause" in this context, requests for relief from the automatic

stay "are customarily evaluated under the three-factor test articulated in In re Rexene Products

---

[10] The automatic stay does not simply serve to protect the debtor; it also protects the estate and its creditors. See, e.g., Acands, Inc. Travelers Cas. And Sur. Co., 435 F.3d 252, 259 (3d Cir. 2006) ("[T]he automatic stay serves the interests of both debtors and creditors."); Krystal Cadillac Oldsmobile GMC Truck, Inc., 142 F.3d 631, 637 (3d Cir. 1998) ("The automatic stay also provides creditor protection.").

Co." In re Abeinsa Holding, Inc., No. 16-10790, 2016 WL 5867039, at *2 (Bankr. D. Del. Oct. 6, 2016). Specifically, courts look to whether: "a) [a]ny great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit, b) the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship of the debtor, and c) the creditor has a probability of prevailing on the merits." Rexene, 141 B.R. 574, 576–77 (Bankr. D. Del. 1992). In the absence of compelling evidence demonstrating that these factors significantly weigh in the movant's favor, relief from the automatic stay should be denied. See, e.g., W.R. Grace, 2007 WL1129170, at *3 (denying motion to lift stay because movant "presented no compelling evidence that the balance of hardships [was] in its favor"); In re RNI Wind Down Corp., 348 B.R. 286, 299 (Bankr. D. Del. 2006) (denying motion to lift stay because movant failed to demonstrate "that the balance of hardships from not obtaining relief tips significantly in [its] favor.").[11]

### A.    Lifting the Stay Would Significantly Prejudice the BSA and the Estates.

20.    As set forth more fully in the Informational Brief, the BSA commenced these Chapter 11 Cases to achieve dual objectives: (1) timely and equitably compensating victims of abuse in Scouting; and (2) ensuring that the BSA emerges from the bankruptcy with the ability to continue its vital charitable mission. Lifting the automatic stay and allowing the Trademark Action to proceed would result in significant prejudice to the BSA and estates because it would divert limited managerial, financial, and other resources away from the BSA's restructuring efforts and would imperil both objectives.

---

[11] The standard for demonstrating "cause" to lift the stay is particularly stringent for unsecured creditors. See, e.g., In re Brown, 311 B.R. 409, 413 (E.D. Pa. 2004) ("Unsecured creditors are generally entitled to relief from an automatic stay only in extraordinary circumstances."); In re Eagle Enters., Inc., 265 B.R. 671, 680 (E.D. Pa. 2001) (same); In re Stranahan Gear Co., 67 B.R. 834, 838 (Bankr. E.D. Pa. 1986) ("Several factors militate strongly against the allowance of any relief in this case—or in any but the most extraordinary set of circumstances—where the moving party is an unsecured creditor.").

21.     It has long-been established that "conserving the resources and energies of the Debtor which would be otherwise expended in litigating claims in other forums" is an important consideration in determining whether to lift the automatic stay.  In re Int'l Endoscope Mfrs., Inc., 79 B.R. 620, 622 (Bankr. E.D. Pa. 1987).  With this consideration in mind, courts have denied requests to lift the automatic stay and proceed with concurrent litigation where such relief would divert critical resources, such as management and other organizational leadership, away from the debtor's restructuring efforts.  See, e.g., In re Fairchild Corp., No. 09-10899, 2009 WL 4546581, at *6 (Bankr. D. Del. Dec. 1, 2009) (finding that "it would be distracting for the Debtors' management and professionals to be entangled in" the underlying litigation because "expert reports and depositions have not yet occurred" and "many hours by the Debtor and its professionals would be needed to prepare for such a trial"); In re SunEdison, Inc., 557 B.R. 303, 308 (Bankr. S.D.N.Y. 2016) (denying motion to lift stay where defending separate lawsuit would "divert[] the Debtors' resources and personnel at a critical time in the case"); In re R & G Fin. Corp., 441 B.R. 401, 411 (Bankr. Dist. P.R. 2010) (denying motion to lift automatic stay where doing so would cause the estate to incur not only the cost of litigation but also require the debtor's "limited managerial resources [to] be diverted in assisting toward the preparation for such proceedings"); In re Bally Total Fitness of Greater New York, Inc., 402 B.R. 616, 623 (Bankr. S.D.N.Y. 2009) (denying motion to lift stay where "allowing the actions to proceed would distract the Debtors' management from the bankruptcy proceeding by forcing them to litigate the [underlying action] and hinder its ability to perform its fiduciary duty of maximizing the value of the Debtors' estates, thereby affecting the interests of other creditors"); In re Nw. Airlines Corp., No. 05-1793, 2006 WL 2583642, at *2 (Bankr. S.D.N.Y. Jul. 7, 2006) (noting that debtors faced several "significant tasks" in their bankruptcy proceedings, including

"negotiating with their creditor constituencies and other stakeholders regarding formulation of a plan of reorganization," and "should not have to divert their management resources" to defend the actions before other courts); In re Penn-Dixie Indus., Inc., 6 B.R. 832, 835 (Bankr. S.D.N.Y. 1980) (holding that the "key to determining whether to permit an action to proceed in another tribunal" is whether that case will cause "interference with the pending bankruptcy case").

22.    The BSA is in the very early stages of these undeniably complex Chapter 11 Cases, but it has moved expeditiously to maintain its operations and lay the foundation for negotiations regarding a plan of reorganization and equitable resolution of its liabilities. Whittman Decl. at ¶ 5.[12]   As a non-profit, the BSA derives revenue primarily from membership fees, and its membership fee revenues, in turn, correlate directly with the public's confidence in the organization's ability to carry out its mission.   Thus, in this case, in addition to depleting assets that would otherwise be available to compensate victims, prolonged Chapter 11 Cases would erode the public's confidence in the BSA and slow the flow of membership revenues that are the lifeblood of the organization.

23.    Given these dynamics, within the first few weeks of these Chapter 11 Cases, the BSA has begun critical work and made meaningful progress on several important initiatives intended to facilitate an efficient and inclusive restructuring process.   For these reasons, GSUSA's assessment that the BSA has "yet to make significant progress toward its restructuring goals"—in a brief filed just three weeks after the petition date—is as wrong as it is premature. Br. at 25.   In fact, the BSA's restructuring efforts far outstrip the duration of these Chapter 11

---

[12] The Court recognized these efforts at the recent hearing regarding the BSA's Motion for a Preliminary Injunction. See In re Boy Scouts of America, et al., No. 20-10343 (LSS) (Bankr. D. Del. Mar. 30, 2020) [Adv. Docket No. 315], Hr'g Tr. 18:4-8 ("BSA has started discussion with its committees, as evidenced by the consent order.  It has focused on a path toward an exit that I previously characterized as BSA's organized approach to the case and a possible consensual resolution of all victims' claims.").

Cases, and GSUSA is undoubtedly aware of the progress being made—the BSA has been in regular contact with the counsel for the UCC, of which the GSUSA is a member, with regard to nearly all aspects of these Chapter 11 Cases since the formation of the UCC.[13]

24.    These tasks are resource-intensive, and they cannot be accomplished solely by the BSA's counsel and other advisors.  Much of the BSA's senior leadership team has dedicated and continues to dedicate a significant amount of its time to these Chapter 11 Cases.  Whittman Decl. at ¶¶ 5-6, 8.  The "breathing spell" afforded by the automatic stay has made this possible, and if such statutory relief is lifted, these individuals' ability to provide appropriate attention to bankruptcy administration and preserving ongoing operations, much less a successful restructuring, would be significantly compromised.  See id. at ¶¶ 6, 8.  Allowing debtors such as the BSA to concentrate on these core bankruptcy tasks is precisely why the automatic stay exists.  Therefore, it is crucial that the BSA not be mired in any concurrent litigation—including the Trademark Action—that would force it to divert precious resources.  See Boy Scouts of America, No. 20-10343 (LSS) [Adv. Docket No. 315], Hr'g Tr. 20:8-12 ("I see harm to debtor and other players in the bankruptcy case in a piecemeal approach to litigation at this stage of the bankruptcy case.  Debtor should be given an opportunity to see if it can forge an exit from bankruptcy."); see, e.g., SunEdison, Inc., 557 B.R. at 308 (counseling against effecting a "diver[sion] [of] the Debtors' resources and personnel at a critical time in the case"); Nw. Airlines, 2006 WL 2583642, at *2 (holding that, given the "significant tasks" required in the bankruptcy proceedings, the debtor "should not have to divert their management resources" to

---

[13] These steps have included, among other things:  (i) the creation and population of an electronic data room containing key relevant discovery materials; (ii) the successful negotiation with representatives of various constituencies regarding the entry of permanent relief in connection with various first-day motions filed with the court and a consent order enjoining all pending abuse claims against the BSA and BSA-related entities; (iii) the coordination with those same constituencies regarding the production of discovery material, the appointment of a judicial mediator, and the entry of a stipulated protective order; and (iv) the filing of a motion seeking the appointment of a future claimants representative.  Whittman Decl. at ¶ 5.

defend the actions before other courts); <u>In re U.S. Brass Corp.</u>, 173 B.R. 1000,1006 (Bankr. E.D. Tex. 1995) (holding that relief from the automatic stay to continue litigation would be "extremely prejudicial" because the debtor was "in the early stages of its reorganization efforts" and its "Chapter 11 case has more than ordinary complexity"); <u>see also</u> <u>Fairchild</u>, 2009 WL 4546581, at *6.

25.    Requiring the BSA to proceed in the Trademark Action would divert important human resources away from the Debtors' efforts to restructure.  <u>Whittman Decl.</u> at ¶ 8.  The depositions and documents GSUSA has sought make clear that numerous individuals from the BSA's senior leadership in Texas would be required to testify in New York as witnesses (and undertake the necessary preparations to do so).  <u>See</u> <u>Kassabian Decl.</u> at ¶¶ 19-22.  Sequestering such individuals for trial and preparation would almost certainly interfere with responding to information requests, participating in plan negotiations, providing input into crucial settlement documents, and attending critical hearings.  To require the BSA's senior leadership to juggle these matters with the Trademark Action, which would have its own scheduling demands and requirements, would needlessly put the organization's reorganization at risk.[14]

26.    Despite the clear deleterious effects that lifting the automatic stay would have on the organizational resources and human capital the Debtors need to effectively reorganize, GSUSA argues that the cost of continuing to litigate the Trademark Action would not be prejudicial to the BSA.  Br. at 21.  Neither the current procedural posture of the Trademark Action nor the events in the litigation to date support this argument.  Given the pace at which the litigation has progressed to date, and the manner in which it has been conducted, GSUSA's claim

---

[14] This prejudice is particularly acute in the current operating environment, as the BSA has, in response to the COVID-19 pandemic, been forced to furlough a significant portion of its workforce, further stretching organizational resources and burdening the employees who remain.  <u>Whittman Decl.</u> at ¶ 7.

that proceeding with the litigation will likely result in a trial in 2020 with minimal costs to the estates strains credulity.  See generally Kassabian Decl. at ¶¶ 3-22.  The BSA believes that the financial cost and organizational burden of seeing the Trademark Action to its resolution would be significant, and thus would be highly prejudicial to the bankruptcy estate and its creditors.[15] See Whittman Decl. at ¶ 8; Kassabian Decl. at ¶¶ 21, 23-24.

**B.    The Automatic Stay Imposes Minimal Hardship on GSUSA and the Balance of the Hardships Favors Maintaining the Stay.**

27.    The second Rexene factor is whether the "hardship to the non-bankrupt party by maintenance of the stay *considerably* outweighs the hardship of the debtor."  141 B.R. at 576 (emphasis added).  When balancing the hardships, the movant "bear[s] the heavy and possibly insurmountable burden of proving that the balance of hardships tips significantly in favor of granting relief as against the hardships to the debtor in denying relief."  In re Micro Design, Inc., 120 B.R. 363, 369 (E.D. Pa. 1990).  GSUSA fails to satisfy this heavy burden.

28.    In contrast with the enormous hardship that the BSA would suffer if the Trademark Action were resumed, GSUSA has failed to show it would suffer any meaningful

---

[15] While the cost of litigation alone is generally not sufficient to justify maintaining an automatic stay where the circumstances otherwise warrant allowing the case to proceed, it is an important consideration to the balance-of-hardships analysis.  This is consistent with one of the key purposes of the automatic stay:  "to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it."  W.R. Grace, 2007 WL 1129170, at *2 (quoting Borman, 946 F.2d at 1036).  Accordingly, bankruptcy courts around the country routinely cite burdensome litigation costs as a basis for refusing to lift the automatic stay.  See, e.g., In re DVI, Inc., 306 B.R. 496, 505 (Bankr. D. Del. 2004) (denying relief from stay where relief would "cause the[] estate to incur substantial additional attorneys' fees fighting that fraud action and that their efforts are required instead in proposing a plan of reorganization and dealing with other administrative matters involved in this chapter 11 case."); In re Carraway Methodist Health Sys., 355 B.R. 853, 855 (Bankr. N.D. Ala. 2006) (refusing to "allow the State Court Action to go forward with the possible result of forcing the Debtors to incur defense costs and draining much-needed time and energy from the Debtors already limited management resources."); In re Montgomery, 285 B.R. 345, 347 (Bankr. D.R.I. 2002) (finding debtors "justly concerned over the cost associated with the litigation contemplated by the creditor is the stay is lifted"); In re Nierzwicki Holdings, LLC, 544 B.R. 136, 140 (Bankr. E.D. Ky. 2015) ("Looking at harm, the potential for serious damage to the Debtors' reorganization efforts is obvious.  The Debtors must spend a large portion of their limited time and assets to defend the state court action if the [plaintiff's] request for stay relief is granted."); In re Robinson, 169 B.R. 356, 358 (E.D. Va. 1994) ("[L]eaving the stay in effect will preserve the assets contained in the state, as the Debtor will not be required to litigate in two separate forums."); Tucker v. Sambo's Restaurants, Inc., 38 B.R. 764, 765 (9th Cir. B.A.P. 1984) (affirming bankruptcy court's denial of lift stay motion where debtor "would be burdened by defense costs" and there was no urgent need for relief).

16

hardship if the automatic stay is maintained, and in fact is no more prejudiced than any other potential creditor by the delay.  GSUSA argues that because the BSA's alleged infringement is ongoing, there is a more immediate need to litigate the Trademark Action.  However, GSUSA's approach to the BSA's alleged infringement over the last two-and-a-half years belies its argument.

29.     Despite alleging an emergent need to resolve its claims, GSUSA waited more than a year to bring the Trademark Action against the BSA after the alleged infringement began in 2017.  See Br. at 6, 13 (alleging infringement began in October 2017 and suit was brought in November 2018).  Even after filing suit, GSUSA never sought a temporary restraining order or a preliminary injunction to stay the alleged infringement, nor did it take any other steps reflecting a genuine belief that harm is imminent and that time is of the essence.  See Kassabian Decl. at ¶ 5. Rather than pursuing such expediting measures, GSUSA was content to wait for the Trademark Action to be resolved in the ordinary course of litigation, and indeed sought a more prolonged expert discovery schedule than the BSA believes is necessary, despite the BSA's request to first complete expert discovery on survey issues and set a briefing schedule for summary judgment. Id. at ¶¶ 13-16.  Further, through the Trademark Action, GSUSA has not provided any evidence that it has lost members as a result of the BSA's actions, nor that its brand has suffered any reputation harm.

30.     The purported examples of infringement GSUSA points to in the Motion also fail to support its sudden sense of exigency.  Each of these examples pertains to pre-petition conduct, many of which were cited in GSUSA's initial complaint and occurred months, if not years ago. Br. at 8-10.  GSUSA has not cited evidence indicating the BSA has engaged in any recent or post-petition conduct that is different in kind from the BSA's pre-petition use of the designations

at issue.   In other words, nothing has changed in months or years, much less since the commencement of these Chapter 11 Cases.   GSUSA has failed to show that it will suffer substantial hardship if it is required to wait—like every other creditor—while the BSA avails itself of the "breathing spell" afforded by the automatic stay.

31.     The hardship to GSUSA would be both minimal and unremarkable in the context of a bankruptcy, and it does not rise to a level that considerably outweighs that of the harm to the BSA.   The Trademark Action is far from over—transitioning from fact- to expert-discovery with little prior involvement from the District Court on the merits.   See Kassabian Decl. at ¶¶ 8-9, 12-16, 18.   Accordingly, the case is not in a posture that would be uniquely inconvenient to pause for an effective restructuring.   See, e.g., Bally Total Fitness, 411 B.R. at 147 (maintaining stay where underlying action was "nowhere near being ready for trial … even though substantial discovery ha[d] occurred"); Fairchild, 2009 WL 4546581, at *6 (maintain stay where underlying litigation was "not on the verge of trial and many hours by the Debtor and its professional would be needed to prepare for such a trial.").   This is not a case where the underlying litigation has proceeded to a substantive ruling on the IP at issue.   Nor is it a case where the underlying litigation is at the "door-step" of trial, which would result in wasted trial preparation and the inevitable cost of re-preparation.   In fact, deadlines for summary judgment briefing and a trial date have not yet even been set.   See Kassabian Decl. at ¶ 16.

32.     Compared to the tremendous hardship lifting the stay would cause to the BSA, the minimal hardship to GSUSA in maintaining the stay is insufficient for it to prevail on this factor. Accordingly, GSUSA has failed to meet its "heavy and possibly insurmountable burden" to prove otherwise.   Micro Design, 120 B.R. at 369.

**C.    The Authority Cited By GSUSA Does Not Support the Extraordinary Relief Sought.**

33.    GSUSA fails to cite any cases that support its argument that cause exists here to lift the stay to continue pre-petition litigation—extraordinary relief that is routinely denied by courts.  See In re Brown, 311 B.R. 409, 413 (E.D. Pa. 2004) ("Unsecured creditors are generally entitled to relief from an automatic stay only in extraordinary circumstances."); see also, e.g., Fairchild Corp., 2009 WL 4546581, at *6; SunEdison, Inc., 557 B.R. at 308; R & G Fin. Corp., 441 B.R. at 411; Bally Total Fitness of Greater New York, 402 B.R. at 623; Nw. Airlines Corp., 2006 WL 2583642, at *2; In re Vertis Holdings, Inc., et al., No. 12-12821 (Bankr. D. Del. Feb. 21, 2013) [Docket No. 759], Hr'g Tr. 49:3-52:7 (denying motion to lift stay, noting that "[i]t all comes down to the importance of the automatic stay, the reasons we have the automatic stay," and finding that movant had failed to "overcome the presumption and strong presumption that the automatic stay should stay in place").  In fact, far from supporting GSUSA's position that the automatic stay should be lifted, the cases it cites underscore the stark differences between the limited situations where lifting a stay is justified and the circumstances in these Chapter 11 Cases.

34.    GSUSA relies principally upon the U.S. District Court for the District of Colorado's decision in Innovative Office Prods. v. SpaceCo Bus. Sols., Inc., No. 07-12977, 2007 Bankr. LEXIS 4620 (Bankr. D. Colo. Oct. 18, 2007).  However, the Innovative court did not find that cause existed to lift the automatic stay simply because the underlying claim needed to be "determined at some time and in some forum."  Id. at *18.  Rather, the court engaged in fulsome analysis under the Tenth Circuit's Curtis factors and found significant that the district court had already conducted a Markman hearing, issued an "extensive" memorandum and order regarding

19

the patent at issue, and in the process had developed "specialized knowledge" and experience that justified allowing the case to proceed in its current form. Id. at *14–15, 20–21.

35.     Unlike in Innovative, in the Trademark Action the District Court has not issued a single opinion on the merits of GSUSA's infringement claims. In fact, GSUSA has not filed a single substantive brief or dispositive motion (or a response thereto) in the Trademark Action. The District Court's role thus far has been primarily to assess and rule on scheduling issues and various discovery disputes between the parties. Thus, the District Court has not come close to developing the type of "specialized knowledge" or familiarity that supported the Innovative court's decision to lift the automatic stay and allow the underlying litigation at issue in that case to move forward. Id. at 21.

36.     GSUSA also extensively cites In re SCO Grp., Inc., a case that is nothing like this one but that provides an example of circumstances in which lifting the automatic stay is appropriate. 395 B.R. 852 (Bankr. D. Del. 2007). In SCO Grp, the underlying litigation had been pending before the district court for four years, and the debtor filed for bankruptcy just three days before trial. Id. at 856. Moreover, the district court had already issued a "thorough 105-page opinion [on the parties' motions for summary judgment] carefully analyzing the facts and law." Id. at n.4. The bankruptcy court made clear at the outset that these factors were critical to its analysis of whether lifting the stay was justified:

> Before analyzing the applicable law, the Court notes that the circumstances surrounding this case are unusual. In particular, the parties were on the door-step of beginning a five-day trial of complex issues when Debtors filed their petitions. Another court has extensive knowledge of the facts and issues and has already made detailed findings.

Id. at 857.

20

37.     In assessing the burden that would be imposed on the debtor and the estate if the underlying case were to proceed to trial, the <u>SCO Grp.</u> court determined that "because this bankruptcy case was filed on the eve of trial, both parties have already spent all of the necessary time and resources in preparation." <u>Id.</u> at 858.  Indeed, because the case was trial-ready, the court reasoned that "[t]he longer the trial is delayed, the more burdensome it [would be] to both parties to ready themselves again." <u>Id.</u>  The court also made clear that "[t]he District Court's mastery of the facts and law pertaining to the [underlying lawsuit]" was a "powerfully important consideration in the Court's decision to lift the stay." <u>Id.</u> at 856 n.4.  The "specialized knowledge that the District Court [had] developed in presiding over the Lawsuit for four years" was of "particular importance" to the court in finding that the interests of judicial economy and the expeditious and economical resolution" of the litigation would be served. <u>Id.</u> at 859-60.

38.     The circumstances here could hardly be more different, and <u>SCO Grp.</u> is not instructive.  Far from being at the "door-step" of trial, in the Trademark Action the parties have not yet completed fact discovery, and expert discovery regarding non-survey issues has hardly commenced.  Dispositive and <u>Daubert</u> motion practice are still forthcoming.  No pre-trial proceedings or preparations have been undertaken.  Substantial litigation lies ahead and the District Court has not even begun to develop the type of specialized knowledge or expertise that have, together with other factors not present here, created the type of unique situations justifying the type of extraordinary relief GSUSA seeks here.  <u>See</u>, <u>e.g.</u>, <u>Bally Total Fitness</u>, 411 B.R. at 147; <u>Fairchild</u>, 2009 WL 4546581, at *6.

39.     The remaining cases GSUSA relies upon are also readily distinguishable.  In <u>In re Scarborough–St. James Corp.</u>, the movant, unlike GSUSA here, had secured a ruling in its favor in an arbitration, a judgment in its favor from a state court in New York, and injunctive relief in

its favor from a court in Michigan—all before the petition date. 535 B.R. 60, 63–64 (Bankr. D. Del. 2015) (Silverstein, J.). In addition, the debtor in Scarborough, unlike the BSA, had continued to initiate litigation against the movant, including by commencing an adversary proceeding over the very lease at issue in the underlying litigation. Id. at 70.

40. Similarly, in In re VidAngel Inc., another case upon which GSUSA relies, the court was asked to assess whether cause existed to lift a stay over a lawsuit in which both the district court and the Ninth Circuit had ruled in the movant's favor, developing significant expertise in the case along the way. 593 B.R. 340, 332–33 (Bankr. Dist. Utah 2008). In addition, the debtor had filed for bankruptcy while the parties were in the midst of summary judgment briefing. The VidAngel court found both factors relevant to its decision to lift the stay and allow the movant's case to proceed:

> [T]he California District Court has extensive history and experience with the parties, their claims, and their defenses and has already issued a comprehensive decision affirmed by the Ninth Circuit. Additionally, the Studios' summary judgment motion is still pending before the California Court. This gives the California District Court greater expertise as to the specific facts and law relevant to a resolution of the Copyright Complaint. It would require an excessive amount of resources both by the parties and another court to arrive at the same level of knowledge and expertise. Thus, the California District Court has the greater expertise in deciding the copyright dispute between these parties.

Id. at 348. Here, the District Court has developed no such expertise, notably because there have been no comprehensive decisions or summary judgment briefing.

41. The cases GSUSA cites to support its assertion that the costs associated with continued litigation do not weigh against lifting an automatic stay are also distinguishable. In GSUSA's leading cases, the bankruptcy courts dismissed concerns about onerous litigation costs because the debtor was pursuing at its own initiative nearly identical disputes in other fora. For instance, in In re Cont'l Airlines, Inc., where the movant sought to lift a stay in order to proceed

22

on a single discrete motion, the Delaware bankruptcy court emphasized that the debtor was "presently litigating, at its own initiative, a full blown lawsuit over similar issues."  152 B.R. 420, 424 (D. Del. 1993).   The court found that "[t]he difference between filing briefs and preparing for oral argument in [one court] as opposed to [another court] is negligible in terms of added litigation expenses and diverted attentions."  Id. at 424-25.  Similarly, in VidAngel, the court pointed to the debtor's "willing[ness] to simultaneously prosecute" a similar declaratory relief action as evidence that the continuation of pending litigation would not be unduly burdensome.  593 B.R. at 348.  And, in SCO Grp., the bankruptcy court noted that the "Debtors' trial counsel in the [underlying lawsuit] [was] being compensated on a contingency fee basis and therefore the expense of the trial will not unduly burden Debtors."  395 B.R. at 858 n.6.

42.    All of these cases are easily distinguished by the facts at hand.  The BSA has not sought to continue litigation against GSUSA during the pendency of its reorganization, either through the Trademark Action or any other litigation.  Nor has the BSA taken any other action that suggest it is "using its bankruptcy case as a 'sword'"; rather, it is simply seeking to maintain the benefit of the "shield" provided by the automatic stay under Section 362 of the Bankruptcy Code.  Furthermore, it is indisputable that, if the automatic stay is lifted with respect to the Trademark Action, the BSA will be forced to expend substantial amounts of its limited resources in defending itself.  Unlike the debtor in SCO Grp., the BSA has no contingency arrangement with its defense counsel in the Trademark Action.  See Kassabian Decl. at ¶ 23.  The cost of defense will be funded both by the organization directly and by its insurers—which will, in turn,

effectively deplete the property of the estate and the availability of assets to other creditors.  Id. at ¶ 24.[16]

43.    GSUSA notes repeatedly that its claims against the BSA will need to be adjudicated at some point.  Br. at 19–20, 22.  This is entirely unremarkable in the context of these Chapter 11 Cases, and none of the cases cited by GSUSA support the "need to adjudicate at some point" as cause to lift the stay.[17]  In fact, the case law cited further demonstrates that there is no cause to proceed with costly, resource-diverting, concurrent litigation in an action just finishing fact discovery, before a court that has hardly weighed in on the merits of any claims or defenses in the Trademark Action.  There is nothing unique about GSUSA's claims in the Trademark Action that entitle it to special or accelerated treatment—particularly since GSUSA itself has not undertaken any step in the two-and-a-half years since the alleged infringement began to obtain expedited relief.

### D.    GSUSA Is Unlikely to Succeed on the Merits of the Trademark Action.

44.    The third Rexene factor—whether GSUSA is likely to succeed on the merits of its claims against the BSA—does not weigh in favor of lifting the automatic stay.  While the standard for establishing a probability of success under the Rexene framework is lenient, see,

---

[16] The fact that certain of the BSA's costs of defense in the Trademark Action are covered by insurance does not change the outcome of the analysis.  Courts routinely recognize in the context of assessing related-to jurisdiction in bankruptcy proceedings that insurance policies that could be made available to creditors should be viewed as property of the estate.  See, e.g., A.H. Robins v. Piccinin, 788 F.2d 994, 1008 (4th Cir. 1986) (sustaining injunction and transfer of claims against non-debtors in part because such claims, if successful, would reduce insurance funds available to debtor's estate); In re Quigley Co., 676 F.3d 45, 58 (2d Cir. 2012) ("[W]here litigation of the [lawsuits against non-debtor] would almost certainly result in the drawing down of insurance policies that are part of the bankruptcy estate of [debtor], the exercise of bankruptcy jurisdiction to enjoin these suits was appropriate."); see also In re Johns-Manville Corp., 837 F.2d 89, 92 (2d Cir. 1988) ("[A] debtor's insurance policies are property of the estate, subject to the bankruptcy court's jurisdiction.").  This Court recently reached a similar finding while assessing an objector's effort to pursue concurrent litigation against another named insured on the applicable BSA policy.  See Boy Scouts of America, No. 20-10343 (LSS) [Adv. Docket No. 315], Hr'g Tr. 16:18-24.

[17] For the reasons set forth in Section II, the fact that the Trademark Action seeks injunctive relief for alleged ongoing infringement does not except such portion of the Trademark Action from the automatic stay.

e.g., Cont'l Airlines, 152 B.R. at 426, the Trademark Action fails to meet this *prima facie* threshold.

45.     GSUSA argues that "the fact that the Trademark Action has moved past the motion to dismiss stage … demonstrates that GSUSA has easily met the standard of showing a probability of success on the merits."  Br. at 28.  This vastly overstates the procedural history in the Trademark Action.  While the BSA did file a motion to dismiss, the motion was limited in scope—it did not seek dismissal of the majority of the claims in Trademark Action, but rather a subset (primarily, GSUSA's claim of tortious interference with prospective economic relations).  Kassabian Decl. at ¶ 6.  What is more, the District Court never denied the motion on the merits, or even issue an opinion reflecting its view of the pleadings or the BSA's motion.  Id.  Rather, the BSA voluntarily withdrew the motion without prejudice following the District Court's comment that it would not entertain a Rule 12(b)(6) motion at that time.  Id.

46.     GSUSA cannot credibly claim that this procedural history is in any way indicative of the merits of its claims in the Trademark Action.  In fact, the District Court has not issued a single opinion on the merits in the Trademark Action.  Id. at ¶ 9.  Thus, unlike every case GSUSA relies upon for this factor, there is no indicia from the record in the underlying litigation suggesting that GSUSA is likely to prevail on its claims against the BSA.  Tellingly, GSUSA's statements and arguments in its Motion are based entirely on its nearly year-and-a-half old Complaint—not on any record evidence, despite the fact that the parties have engaged in a full year of extensive fact discovery.  This void is consistent with the numerous admissions and documents the BSA has secured in the Trademark Action undercutting GSUSA's claims,

supporting the BSA's defenses, and making clear that GSUSA's claims in that action are meritless.[18]

47.     Lastly, while the standard for likelihood of success on the merits is lenient, courts weigh this factor against the balance of harms.  See, e.g., In re Spansion, Inc., 418 B.R. 84, 97 (Bankr. D. Del. 2009) (probability of success "not crucial" where other considerations weigh in favor of maintaining automatic stay); Cont'l Airlines, 152 B.R. at 426 ("Given the Court's conclusions above that the balance of hardships weighs in favor of [the Appellant], the Court concludes that [the Appellant's] probability of success is sufficient to support modifying the stay.").  Given the significant threat to the BSA's ability to reorganize if the stay is lifted—and the minimal harm that GSUSA will incur if the stay is maintained—this final factor should favor denial of GSUSA's motion, or at worst should be neutral in the Court's analysis.

### E.      Other Factors Weigh in Favor of Maintaining the Automatic Stay.

48.     In addition to the three-factor test articulated in Rexene, some courts in this jurisdiction have also considered the twelve policies identified by the Second Circuit in Sonnax Indus., Inc. v. Tri Component Prods. Corp., 907 F.2d 1280 (2d Cir. 1990), when deciding whether to grant a motion to lift the automatic stay.  See, e.g., SCO Grp., 395 B.R. at 859-60.[19] As other courts have recognized, many of the Sonnax policies are addressed within the Rexene

---

[18]   Under the parties' Stipulated Protective Order entered in the Trademark Action, GSUSA had the ability to provide this Court with GSUSA's own documents that it had designated as Confidential or Highly Confidential in connection with the Motion, and GSUSA also could have sought the BSA's consent to use documents that the BSA designated as Confidential or Highly Confidential.  GSUSA chose not do either.

[19] The twelve policies are:  "(1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms." Sonnax, 907 F.2d at 1286 (citing In re Curtis, 40 B.R. 795, 799-800 (Bankr. D. Utah 1984)).

factors,[20] including "7) whether litigation in another forum would prejudice the interests of other creditors," "10) the interests of judicial economy and the expedition and economical resolution of litigation," "11) whether the parties are ready for trial in the other proceedings," and "12) impact of the stay on the parties and the balance of the harms." Sonnax, 907 F.2d at 1286. For the reasons discussed above, these policies weigh heavily against granting GSUSA's request for relief from the automatic stay. See supra at Section I.A-B.

49.     Other Sonnax policies also support maintaining the automatic stay. For instance, the Trademark Action does not "[3] involve[] the [BSA] as a fiduciary" or "[6] primarily involve[] third parties." 907 F.2d at 1286. To the contrary, the Trademark Action is a two-party litigation between two separate youth-serving organizations. And the BSA's insurer has not "[5] assumed full responsibility for defending it." Id. Likewise, no "[4] specialized tribunal with the necessary expertise has been established" to adjudicate the Trademark Action. Id. District courts are courts of general, not specialized, jurisdiction, and bankruptcy courts routinely adjudicate intellectual property matters.

## II.     GSUSA's Claims for Injunctive Relief Are Not Subject to the Automatic Stay.

50.     GSUSA is among hundreds of creditors in these Chapter 11 Cases whose potential claims stem from litigation against the BSA in another forum. In an effort to cast its commercial litigation action as unique, GSUSA asserts at the outset of its Brief that the automatic stay may not bar it from pursuing post-petition injunctive relief against the BSA. Br. at 17. According to GSUSA, "[a] request for injunctive relief to prevent a debtor from violating intellectual property rights does not amount to an attempt to exercise control over estate

---

[20] Cf. In re Liquidation of Freestone Ins. Co., 143 A.3d 1234, 1253 (Del. Ch. 2016) ("Decision applying this more general framework [from Rexene] nevertheless appear to take into account many of the same considerations identified in the Curtis factors" adopted in Sonnax).

property," "does not interfere with the orderly disposition of estate property," and thus "should not be prohibited by the automatic stay." Id. at n.7.  GSUSA is wrong on the law; the automatic stay prohibits it from pursuing any aspect of the Trademark Action, including its request for injunctive relief.

51.    The filing of a voluntary chapter 11 bankruptcy petition operates as an automatic stay of "the commencement or continuation … of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title." 11 U.S.C. § 362(a)(1).  Virtually every court to have decided the issue has held that the automatic stay prohibits the pursuit of injunctive relief claims, even if the claimant is seeking to prevent alleged post-petition conduct.  See, e.g., Spansion, 418 B.R. at 91-92 (holding that patent infringement litigation was barred by the automatic stay where plaintiff sought only to prevent the debtors' post-petition patent infringement activities); In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig., 140 B.R. 969, 976-77 (N.D. Ill. 1992) (holding that litigation on plaintiff's request for an injunction against post-petition patent infringement was barred by the automatic stay).[21]

52.    In the leading case, Mahurkar, the plaintiff argued the automatic stay only barred his patent infringement claim against the debtor insofar as he sought damages; according to the

---

[21] See also, e.g., In re AMR, No. 12-8180, 2013 WL 1155434, at *5 (S.D.N.Y. Mar. 21, 2013) ("[Plaintiff]'s [patent infringement] claims involve conduct that, as it concedes, began pre-petition and continued post-petition. To litigate such a claim, [Plaintiff] would need to obtain relief from the automatic stay."); Alloc, Inc. v. Unilin Decor N.V., No. 02-1266, 2005 WL 3448060, at *9 (E.D. Wis. Dec. 15, 2005) ("[W]hen allegedly infringing conduct began pre-petition, the fact that a plaintiff does not include otherwise actionable conduct in its complaint and alleges only post-petition claims, does not, alone, save the claims from the automatic stay."); Advanced Computer Services of Michigan, Inc. v. MAI Sys. Corp., 161 B.R. 771, 774-75 (E.D. Va. 1993) (claim for non-monetary relief from alleged antitrust violation was brought pre-petition and thus was barred by the automatic stay); In re Nat'l Shoes, Inc., 18 B.R. 507, 509 (Bankr. Me. 1982) (action seeking injunctive relief from trademark infringement, unfair competition, and deceptive trade practices that were ongoing post-petition was barred by the automatic stay when the alleged harm began pre-petition and the action could have been brought before the commencement of the bankruptcy proceeding); Municipality of San Juan v. Puerto Rico, 919 F.3d 565, 576-77 (1st Cir. 2019) ("[T]here is no indication that the automatic stay in Section 362 does not apply to injunctions.").

plaintiff, it did not bar the continued litigation of his request for injunctive or declaratory relief to the extent that the debtor's asserted infringement continued during the pendency of the bankruptcy. 140 B.R. at 971. Judge Easterbrook—sitting by designation for the U.S. District Court for the Northern District of Illinois—rejected this distinction and held that Section 362(a)(1) operates to automatically stay claims for non-monetary relief in the same way that it does claims for damages:

> Distinction between law and equity were abolished with the institution of the Rules of Civil Procedure in 1938. See Fed. R. Civ. P. 2. The Bankruptcy Code of 1978, following modern practice, speaks of an "action or proceeding:" rather than an action at law or equity. Nothing in § 362(a)(1) suggests any difference between legal and equitable relief. Section 362(b) supports this conclusion, for a number of its subsections exclude from the stay certain equitably proceedings. These exceptions are unnecessary if § 362(a) does not apply in the first place to requests for injunctions.

Id. at 976. The court reasoned that this conclusion also made good policy sense because "[b]ankruptcy is a collective proceeding, one in which creditors divide claims while the court attempts to maximize the total value of the assets," and "[i]njunctions requiring debtors to abandon one part of their business or dramatically change their methods of doing business have a high holdup value for creditors" and therefore may depress the collective value of the debtor's assets. Id. On that basis, the court concluded that the automatic stay barred the plaintiff from continuing to pursue not only damages but also injunctive or declaratory relief.

53.    GSUSA points to older cases holding that the automatic stay does not preclude a claimant from seeking injunctive relief against debtors for alleged post-petition trademark infringement. Br. at 17 n.7 (citing Bambu Sales, Inc. v. Sultana Crackers, Inc., 683 F. Supp. 899, 917 (E.D.N.Y. 1987), and Steak & Brew, Inc. v. Makris, No. 15-332, 1973 U.S. Dist. LEXIS 14907, at *8 (D. Conn. Feb. 14, 1973)). However, modern cases have distinguished those earlier decisions on the grounds that they rely upon the Bankruptcy Act of 1898 (which distinguished

"debts" and "damages" from other claims) or other cases interpreting it.  See, e.g., Mahurkar, 140 B.R. at 977 (describing Bambu Sales and Steak & Brew as "uninformative in litigation under a portion of the 1978 Code, § 362(a)(1), that changed dramatically" from the earlier 1898 Act); Advanced Computer Services, 161 B.R. at 775 n.6 ("[C]ontrary authority based on the pre-1978 Bankruptcy Code is inapposite given the thorough revision of the code in 1978.  And the same is true with respect to post-1978 decisions that rely on the older cases.") (internal citations omitted).  Section 362 of the Bankruptcy Code, in contrast, broadly applies to all types of legal proceedings, including those seeking injunctive or declaratory relief.  See 11 U.S.C. § 362(a)(1) (applying automatic stay to any "judicial, administrative, or other action or proceeding"); cf. 3 Collier on Bankruptcy ¶ 362.03 (16th ed. 2018) ("The stay includes actions seeking injunctive relief or similar relief as well as actions seeking money judgments … .  The stay provision of subsection (a)(1) is drafted so broadly that it encompasses all types of legal proceedings").[22]

54.    GSUSA also argues that courts interpret section 959(a) of the Bankruptcy Code—which provides that a debtor-in-possession may be sued without leave of the court with respect to acts or transactions in carrying on business connected with property under its control—as a *per se* exception to the automatic stay.  Br. at 17 n.7 (citing Voice Sys. & Servs. V. VMX, Inc., No. 91-88, 1992 U.S. Dist. LEXIS 21744, at *28 (N.D. Okla. Nov. 5, 1992)).  However, in Spansion, Judge Carey specifically rejected the *per se* exception adopted in Voice Servs. and

---

[22] The other cases advanced by GSUSA are even further afield.  In Larami Ltd. v. Yes! Entm't Corp., the court found that the plaintiff's patent infringement claim seeking injunctive relief could not have been commenced prior to the debtor's bankruptcy and thus section 362(a)(3) applied.  244 B.R. 56, 58 n.3 (D.N.J. 2000).  It was this provision of the Bankruptcy Code—as opposed to section 362(a)(1)—that the court found did not operate to automatically stay the plaintiff's request for injunctive relief.  Id. at 59-60.  Subsequent decisions have emphasized the importance of this distinction.  In Alloc, the court cited Larami in finding that a patent infringement claim that could not have been brought pre-petition was not automatically stayed under section 362(a)(3).  2005 WL 3448060, at *5.  In contrast, the same Alloc court cited Mahurkar in finding that a patent infringement claim that could have been brought pre-petition was automatically stayed under section 363(a)(1).  Id. at *9.  Here, GSUSA clearly could have, and indeed did, commence the Trademark Action prior to the filing of the Chapter 11 Cases.  As a result, section 362(a)(1) prohibits GSUSA from pursuing post-petition injunctive relief against the BSA during these cases.

instead employed a balancing of interests test used by other courts.  See Spansion, 418 B.R. at 96 & n.10 (citing In re Telegroup, Inc., 237 B.R. 87 (Bank. D.N.J. 1999), and In re Television Studio School of New York, 77 B.R. 411 (Bank. S.D.N.Y. 1987)); see also In re Ver Techs. Holdco LLC, et al., No. 18-10834 (Bankr. D. Del. Jun. 5, 2018) [Docket No. 419], Hr'g Tr. 120:1-122:25 (similar).  According to Judge Carey, a bankruptcy court has the authority to enjoin the filing of an action under Section 959(a) in the exercise of its sound discretion if it finds that "the action would embarrass, burden, delay or otherwise impede the reorganization proceedings."  Spansion, 418 B.R. at 96 (citation omitted).  After balancing the equities, Judge Carey held that the post-petition patent infringement actions "created an undue (and unnecessary) burden on the Chapter 11 Debtors' … efforts to reorganize."  Id. at 97.

55.     For the forgoing reasons, the injunctive relief sought by GSUSA in the Trademark Action is subject to the automatic stay.  As described above, GSUSA has failed to demonstrate cause to lift the stay with respect to any aspect of the Trademark Action.

## CONCLUSION

56.     For the reasons set forth herein, the Debtors respectfully submit that cause does not exist to lift the automatic stay, and that the Motion should be denied in its entirety.

Dated: March 31, 2020
      Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Derek C. Abbott*
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Joseph C. Barsalona II (No. 6102)
Eric W. Moats (No. 6441)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Email:  dabbott@mnat.com
       aremming@mnat.com
       jbarsalona@mnat.com
       emoats@mnat.com
       ptopper@mnat.com

– and –

SIDLEY AUSTIN LLP
Jessica C. K. Boelter (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Email:  jboelter@sidley.com

– and –

SIDLEY AUSTIN LLP
Thomas A. Labuda (admitted *pro hac vice*)
Michael C. Andolina (admitted *pro hac vice*)
Andrew F. O'Neill (*pro hac vice* pending)
Karim Basaria (admitted *pro hac vice*)
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Email:  tlabuda@sidley.com
       mandolina@sidley.com
       kbasaria@sidley.com

PROPOSED COUNSEL TO THE DEBTORS AND DEBTORS IN POSSESSION