# Exhibit A

## PROFESSIONAL SERVICES AGREEMENT

This PROFESSIONAL SERVICES AGREEMENT (the "Agreement") is made and entered into as of September 1, 2016 (the "Effective Date"), by and between Boy Scouts of America, a not-for-profit corporation chartered by the U.S. Congress with offices at 1325 West Walnut Hill Lane, Irving, TX 75015-2079 ("BSA"), and Pearson Education, Inc., with offices at 221 River Street, Hoboken, NJ 07030 ("Pearson").

The parties hereto are referred to, each separately, as a "Party" and, collectively, as the "Parties".

### Background

The Parties entered into that certain Master Services Agreement dated as of June 10, 2013 (the "June 2013 MSA"), whereby Pearson provided a variety publishing services to BSA.

By mutual agreement, the Parties have cancelled the June 2013 MSA in order to restructure their business relationship.

BSA desires to retain Pearson to provide certain editorial and creative services, certain technology platforms, and any new services the Parties may determine, in each case upon the terms and conditions hereinafter set forth, and Pearson is willing to perform such services.

The Parties desire that this Agreement supersede the June 2013 MSA.

### Agreement

NOW, THEREFORE, in consideration of the mutual promises set forth herein, BSA and Pearson hereby agree as follows:

1. **Definitions.** For the purposes of this Agreement, the following terms have the meanings assigned to them below, unless context clearly requires some other meaning. All defined terms include both plural and singular.

"BSA Facility" has the meaning ascribed to it in Section 3.3.

"BSA Materials" means (a) the logos, insignia, emblems, mottos, proprietary words and phrases, trade names, federally-registered and common law (i.e., unregistered) trademarks, and other brand indicia used by BSA to distinguish its goods and services from those of another, and (b) works of authorship created by or on behalf of, or licensed by or on behalf of, BSA.

"BSA Software" means the software applications provided by BSA or licensed by BSA in connection with the Services, including PlanSystem from Van Gennep, Adobe CreativeCloud, Adobe Experience Manager, TruEdit, Shutterstock, CMS and DMS software applications licensed from a third party software vendor.

"BSA Policies" means those written policies of BSA attached hereto in Schedule 3.7.

"Change Proposal" has the meaning ascribed to it in Section 6.2.

"Compilation" means a Deliverable, regardless of the form of media, formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term "Compilation" includes works, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole.

"**Deliverable**" means the work product or output resulting from the Services performed by Pearson for BSA under this Agreement.

"**Derivative Work**" means a Deliverable, regardless of the form of media, based upon preexisting BSA Material, such as a translation, fictionalization, sound recording, art reproduction, abridgment, condensation, software application, or any other form in which such preexisting BSA Material may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications made by Pearson which, as a whole, represent an original work of authorship, is a "Derivative Work".

"**Digital Magazine**" means the interactive digital versions of BSA's magazines *Boys' Life* and *Scouting*. BSA's magazine *Eagles' Call* is not included

"**Final Deliverable**" means a Deliverable that has been accepted by BSA in accordance with the terms of this Agreement.

"**iMBP**" means the interactive digital versions of BSA's Merit Badge pamphlets.

"**Job**" means a collection of coordinated tasks and milestones, all within the scope of Services under this Agreement, whose purpose is to produce a Deliverable to meet certain specifications.

"**Pearson Material**" has the meaning ascribed to it in Section 8.2.

"**Pearson Personnel**" means all Pearson employees, contractors, and subcontractors performing the Services on behalf of Pearson.

"**Pearson Software**" means the software applications used by Pearson to provide the Services at any given point, including software applications owned by Pearson and software applications licensed by Pearson from a third party. MAZ, Inkling, and P3 are examples of Pearson Software as of the Effective Date. Pearson Software may be transitioned to other vendors or decommissioned entirely, provided that there is no degradation of the Services and Pearson receives BSA's approval, not to be unreasonably withheld. Pearson Software does not include software applications used by Pearson but licensed directly by BSA from a third-party software provider.

"**Project**" means a discrete service that is excluded from or reasonably outside the scope of the Services. Projects include (a) services set forth in an executed Statement of Work or other written documentation signed by the Parties or (b) services described in Schedule 3.2 attached hereto.

"**Services**" means the services, functions and responsibilities, including management thereof, that are described in Schedule 2.1, as it may be amended from time to time by the Parties, or as set forth in an executed Statement of Work.

"**Statement of Work**" means the document used by the Parties to memorialize their agreement for Pearson to perform certain work that is outside the scope of Services.

"**Term**" has the meaning ascribed in Section 7.1.

"**Third Party Content**" has the meaning ascribed to it in Section 8.3(c).

"**Third Party Services**" has the meaning ascribed to it in Section 6.2(c).

2. **Services**

   2.1. During the Term, Pearson shall provide to BSA the Services.

   2.2. Pearson will control and direct the means, manner and method by which the Services are performed, subject to any requirements specified in this Agreement and any applicable Schedule. Pearson will provide the Pearson Software and the other equipment, materials and tools specifically required by this Agreement or an applicable Statement of Work or otherwise agreed to by the Parties in writing.

3. **Pearson's Obligations**

   3.1. Pearson will perform the Services: (a) in a workmanlike and professional manner; and (b) in a manner that meets or exceeds, on a consistent basis and in all material respects, the published standards of quality, accuracy, completeness, timeliness, and efficiency of other companies providing similar services. Neither BSA nor any employee of the BSA will take any action that serves to inhibit or prevent Pearson from fulfilling its obligations hereunder.

   3.2. Pearson will appoint: (a) subject to the reasonable approval of BSA, a Pearson employee to serve as a primary contact with respect to the day to day operations under this Agreement (the "Pearson Account Director"); and (b) an initial team of twenty-two (22) Pearson Personnel (which includes the Pearson Account Director) to perform the Services, each of whom will be suitably skilled, experienced and qualified to perform their respective portion of the Services. The Pearson Account Director together with the Pearson Personnel will comprise Pearson's BSA Account Team, the organization of which is illustrated in Exhibit A and will be implemented no later than January 1, 2017. Pearson will consult in good faith with BSA on the selection of all Pearson Personnel without limiting BSA's right to approve the Pearson Account Director in particular. The Pearson Account Director will have chief responsibility for the supervision, operation and performance of the BSA Account Team but any written notice, demand or other communication concerning matters other than the day-to-day provision of Services will be addressed to the person or persons specified in Section 12.2. The Pearson Account Director may designate an alternate or deputy to act in his or her place in case of illness, vacation or other absence.

   3.3. Pearson will situate the BSA Account Team on-site at BSA's offices located at 1325 West Walnut Hill Lane, Irving, Texas (the "BSA Facility"); provided, that Pearson Personnel may work outside of the BSA Facility from time to time if such location would not affect their ability to perform the functions in this Agreement. Any permanent placement of Pearson Personnel by Pearson outside the BSA Facility must be approved by BSA. Notwithstanding their physical location, Pearson Personnel will continue to be employed by and under the control of Pearson, and Pearson and BSA will not be co-employers of any Pearson Personnel. Pearson Personnel will not be eligible to participate in any BSA employee benefits plans or programs, including but not limited to any insurance plans or programs that BSA provides to its employees. Pearson is responsible for all Pearson Personnel, including the supervision thereof, and for the payment of their compensation, including, if applicable, withholding of income taxes, and the payment and withholding of social security and other payroll taxes, unemployment insurance, workers' compensation insurance payments and disability benefits.

   3.4. Pearson will use reasonable efforts to maintain the same Pearson Account Director and Pearson Personnel throughout the Term.

   3.5. Pearson Personnel Changes

      (a) Scale Down. Upon BSA's request, Pearson will reduce the BSA Account Team by the equivalent of one (1) full-time Pearson Personnel (each such reduction, a "Scale Down"),

subject to only the following three conditions:

(1) No Scale Down may occur before January 1, 2018.

(2) No more than one Scale Down may occur in a calendar year; however, if BSA does not request a Scale Down in a calendar year, then it may exercise that calendar year's Scale Down in any subsequent calendar year without limiting its right to the Scale Down applicable to such subsequent calendar year (*e.g.*, if BSA does not request a Scale Down in 2018, then it will be entitled to reduce the BSA Account Team by the equivalent of two [2] full-time Pearson Personnel in 2019).

(3) BSA must request a Scale Down in writing (a "Scale Down Notice") no later than July 31 of the year prior to the year when such Scale Down is to be effective (*e.g.*, a Scale Down that is to be effective on January 1, 2018, should be noticed no later than July 31, 2017).

(4) All Scale Downs shall be effective as of January 1 of any applicable calendar year.

A Scale Down is not and will not be construed as an order or recommendation by BSA to terminate an individual's employment. BSA will not be liable for any damages, losses, liabilities, or claims suffered by or brought against Pearson as a result of its independent decision to terminate an individual's employment at the time of a Scale Down or afterwards.

Each Scale Down will result in an adjustment of fees payable by BSA, pursuant to Section 3(b) of Schedule 5.1.

(b) Replacement for Cause. If BSA gives Pearson written notice that a Pearson Personnel violated this Agreement in some material respect, then after consultation between the Parties, if the issues are not resolved to BSA's reasonable satisfaction, Pearson will remove the affected individual from BSA's account. No such removal shall be deemed to require Pearson or any of its subcontractors to terminate any individual's employment or take disciplinary action. If Pearson gives BSA written notice that a BSA employee violated this Agreement in some material respect, then after consultation between the Parties, if the issues are not resolved to Pearson's reasonable satisfaction, BSA will remove the affected individual from BSA's account.

3.6. At its own expense, Pearson will obtain, and at all times during the Term maintain, all necessary licenses and consents applicable to the Pearson Software, including but not limited to appropriate licenses for third-party software applications used by Pearson to deliver the Services or made available to BSA for its employees' use under this Agreement. Notwithstanding the foregoing, Pearson is not responsible for obtaining licenses for the BSA Software or the use of Third Party Content.

3.7. Pearson will ensure that all Pearson Personnel comply with, all reasonable rules, regulations and policies of BSA that are described in Schedule 3.7 or otherwise communicated to Pearson in writing, including security procedures concerning systems and data and remote access thereto, building security procedures, and general health and safety practices and procedures.

3.8. Subcontracting.

(a) Except as otherwise provided below, Pearson may not delegate performance of any of its duties, obligations and responsibilities under this Agreement to any subcontractor without BSA's prior written approval in each instance, which will not be unreasonably withheld, delayed or qualified. BSA approvals will not be required for: (i) engagement of individuals as subcontractors, directly or through an agency, to create Custom BSA Content (as defined in Section 8.3), (ii) subcontractors for print services, commodity supplies (*e.g.*, paper) or for support services (*e.g.*, security at Pearson's facilities) not directly related to performance of

the Services, or (iii) subcontractors, software licensors or contractors used by Pearson to provide Services under the June 2013 MSA. If BSA gives Pearson notice that any subcontractor has violated this Agreement or BSA Policies in any material respect, then Pearson shall remove the affected subcontractor as soon as reasonably practicable and either perform the relevant Services directly or engage another subcontractor reasonably approved by BSA to do so.

(b) All subcontracts related to the Services shall contain provisions consistent with, and at least as stringent as, the provisions of this Agreement concerning compliance with laws and BSA Policies, confidentiality, intellectual property, use of the BSA Facility, and replacement of personnel. Pearson will be and remain fully and solely responsible for all subcontracted Services, for the acts and omissions of its subcontractors, and for payment to its subcontractors.

3.9. Pearson will provide regular reporting and periodic status reports, including key performance indicators, in each case as specified in Schedule 3.9 or as otherwise agreed by the Parties.

3.10. Pearson will accept Jobs from any person or business unit within BSA, provided they (a) are within the scope of Services in Schedule 2.1 under this Agreement and , (b) have been submitted to Pearson in accordance with the Jobs submission process agreed upon by the Parties,

## 4. BSA's Responsibilities

4.1. BSA Contract Manager. BSA shall designate an individual to whom all communications from Pearson may be addressed, and who has the authority to act for BSA in connection with all aspects of this Agreement (the "BSA Contract Manager"), but any written notice, demand or other communication concerning matters other than the day-to-day provision of Services will be addressed to the person or persons specified in Section 12.2. The BSA Contract Manager may designate an alternate or deputy to act in his or her place in case of illness, vacation or other absence.

4.2. BSA Facility. BSA shall provide, at no charge to Pearson, regular use of reasonably furnished office space, related utilities, and janitorial service at the BSA Facility. BSA shall provide Pearson Personnel working at the BSA Facility with adequate land-line phone service, desks and office furniture, and Internet and e-mail connections, at no charge to Pearson; provided, BSA will not provide any computer hardware, mobile phone handsets, or mobile phone service contracts. Pearson, its employees and subcontractors shall comply with BSA Policies in all material respects governing access to and use of the BSA Facility. Pearson shall refrain from any nuisance or waste, and return BSA Facilities to BSA in the condition received, subject to normal wear and tear, when the Agreement expires or terminates. Pearson shall not make any alteration or improvement to <span style="font-size:smaller">04/06/20 Page 6 of 68</span> the BSA Facility without BSA's prior written consent, which may be given or withheld in BSA's sole discretion. Pearson acquires no right, title, leasehold or other interest in the BSA Facility. Rather, its permitted use is a license, revocable by BSA at any time. If BSA revokes Pearson's license to use the BSA Facility during the Term and without cause, then BSA will provide, at its cost, an alternate suitable location from which Pearson employees can accomplish the same Services as they provided at the BSA Facility.

4.3. Accounts.

(a) BSA shall provide Pearson Personnel with online account(s) for access to BSA's online platforms, websites, networks and systems, including without limitation access to a protected wifi network, for the exclusive purpose of enabling Pearson Personnel to perform the Services. Pearson Personnel shall also be entitled to access Pearson's online platforms, websites, and the Pearson network, at Pearson's cost and expense, in order to perform the Services. The account(s) shall be of the type determined by BSA to be necessary for Pearson

to perform its duties hereunder. Pearson shall be responsible for the actions taken under or through its account(s). Upon termination of this Agreement, the account(s), and any associated usage and related screen names or similar rights, shall automatically terminate.

(b) BSA agrees that it will not monitor the contents of Pearson Personnel emails or any other communications made by Pearson Personnel via a BSA platform, website or network or violate any encryption protections used by Pearson Personnel without reasonable cause. In the event that BSA has reason to believe that a Pearson Personnel has violated a BSA Policy, BSA will first provide Pearson Account Director with prompt written notice of such violation, including the details relating thereto. Thereafter, and with the written consent of the Pearson Account Director, BSA will have the right to monitor emails or communications of Pearson Personnel solely in connection with BSA's investigation of such violation. BSA further agrees to notify Pearson upon the conclusion of its investigation, at which time it shall no longer have any right to monitor the contents of Pearson Personnel emails or other communications made by Pearson Personnel.

(c) Pearson acknowledges BSA's interests in protecting its computer networks and other technology infrastructure from viruses, malware, intrusions, and other cybersecurity threats. Notwithstanding Section 4.3(b), BSA is not and will not be limited in or prohibited from executing any IT network security procedures and protocols that it deems necessary or appropriate to protect its interests, provided they do not involve reviewing the contents of Pearson Personnel emails or any other communications made by Pearson Personnel except in accordance with Section 4.3(b) above. Furthermore, such procedures and protocols will not be subject to oversight, review or approval by Pearson. For the avoidance of doubt, the Parties agree that using automated processes to scan email for viruses, malware and other cybersecurity threats, obscenities, and sensitive, non-public personal information such as social security numbers is permitted.

4.4. <u>Workplace Conditions</u>. BSA shall treat all Pearson Personnel and Pearson Personnel shall treat all BSA employees and contractors, in compliance with applicable federal, state, and local laws, regulations, and rules relating to the treatment of employees and workplace safety, including without limitation harassment and discrimination laws, EEOC and other employment laws, and laws regulating workplace conditions, employee health and safety (including but not limited to OSHA), use of labor, and human rights.

## 5. Fees and Expenses; Payment Terms

5.1. In consideration of the provision of the Services by Pearson and the rights granted to BSA under this Agreement, BSA shall pay the fees set forth in Schedule 5.1. The fees will be paid to Pearson in monthly installments as set forth in Schedule 5.1. Payment to Pearson of such fees and the reimbursement of expenses pursuant to this Section 5 shall constitute payment in full for the performance of the Services, and, BSA shall not be responsible for paying any other fees, costs or expenses unless specifically agreed by the Parties in a Statement of Work or other writing signed by both Parties.

5.2. <u>Payment Terms</u>.

(a) On or about the first (1st) business day of each month during the Term, Pearson shall issue invoices to BSA for the fees that are then payable, together with detailed information of any reimbursable expenses or Incremental Costs.

(b) Fees and expenses payable by BSA in accordance with this Section 5 will be due within thirty (30) days of the date of an invoice therefor. BSA shall make all payments due hereunder by wire transfer, check, or ACH transfer, such payment method to be determined by BSA, to an account designated by Pearson, in immediately available funds.

(c) Any portion of an invoice that remains unpaid after forty-five (45) days from the date of such invoice shall incur interest at the rate of four percent (4%) per annum. If any portion of an invoice remains unpaid after ninety (90) days from the date of such invoice, then Pearson will have the right to suspend the Services and/or Deliverables until such payment is made in full; provided, if an unpaid invoice arises under a Statement of Work for a discrete, out-of-scope Project, then Pearson's right to suspend performance will apply only to that Statement of Work.

5.3. BSA will not pay any expenses incurred by Pearson in the performance of the Services except (a) the Incremental Costs set forth in Schedule 5.1, (b) expenses specifically stated in this Agreement, and (c) those expenses, if any, for which BSA has agreed, in advance and pursuant to an executed Statement of Work or other written communication, to reimburse Pearson.

5.4. Taxes. BSA will be responsible for payment of any applicable sales, use, excise, or similar transactional taxes that may be applicable to the performance of the Services, if any. BSA may provide Pearson with a certificate acceptable to the taxing authorities exempting BSA from payment of these taxes. BSA shall not be liable for taxes based on Pearson's net income, net worth, capital stock, franchise, property or conduct of business.

5.5. If any services furnished by Pearson under a Statement of Work are provided on a time and materials basis, then the fees payable for such services will be calculated in accordance with Pearson's hourly fee rates for the Pearson Personnel set forth in the applicable Statement of Work and payable within 30 days. Pearson will issue invoices to BSA monthly in arrears for its fees for time for the immediately preceding month, calculated as provided in this Section 5.5, together with a detailed breakdown of the incurred expenses for such month which BSA has agreed in writing to pay, if any. For the avoidance of doubt, BSA is not responsible for reimbursing Pearson for any expenses unless specifically stated in this Agreement or the Parties otherwise agree in writing in advance or as set forth in the Statement of Work.

6. Contract Management

   6.1. Governance

       (a) *Executive Sponsors.* Each Party shall appoint one or more Executive Sponsors, who shall be Vice Presidents or other corporate officers of at least equal rank with executive responsibility for relevant functions and oversight of this Agreement and the Parties' relationship. BSA's initial Executive Sponsor shall be its Chief Digital Experience Officer, and Pearson's initial Executive Sponsor shall be its Vice President, Professional Services. The Parties may designate successor Executive Sponsors from time to time in their reasonable discretion, but acknowledge the importance of continuity, active participation and appropriate seniority to effective governance of the Parties' relationship.

       (b) *Managers.* The BSA Contract Manager (in the case of BSA) and the Pearson Account Director, supported by Pearson's BSA Account Team (in the case of Pearson), and their respective subordinates and designees will have primary responsibility for day-to-day performance of the Agreement, including performance and management of Services, including without limitation: management of the relationship; supervision of the delivery and receipt of Services; reporting; invoicing, payments, budgets, financial plans, estimates and other financial matters; investigation and resolution of incidents (including root cause analysis); quality assurance; compliance with applicable policies, procedures, and laws; consideration of Change Proposals; planning; and other responsibilities described by any applicable Schedule, Statement of Work, or other portion of the Agreement.

       (c) *Quarterly Review.* Beginning in 2017, within the first thirty (30) days of each quarter of every calendar year during the Term, the Parties' Executive Sponsors (Section 6.1(a)) and others

by invitation of the Executive Sponsors shall meet (in person or via phone call) and undertake a joint review of the Agreement and the Parties' relationship, considered as a whole, including:

(1) Service quality, as measured through surveys of user satisfaction, key performance indicators, and other appropriate means;

(2) Outstanding issues or incidents;

(3) Active and pending Jobs at a summarized level;

(4) Such other matters as either Party may wish to review;

(5) Effectiveness of governance procedures in this Section 6 and other provisions of the Agreement;

(6) Adjustments to the scope of Services;

(7) Possible amendments to the Agreement; and

(8) Improvements in Services, reductions in the size of Pearson's BSA Account Team; changes in Pearson's methods, procedures and solutions; other developments anticipated to affect performance of Services and the Parties' relationship;

Review by the Executive Sponsors will be based on a joint report, prepared by the BSA Contract Manager, the Pearson Account Director, and their respective designees, which shall summarize the Parties' views concerning the foregoing. Where the Parties differ, their respective views shall be summarized for discussion and further consideration. Neither Party will be obligated to amend the Agreement, approve any Change or take any other action as a result of the foregoing review (unless required by other provisions of the Agreement) but each Party shall consider the other Party's concerns and proposals in good faith.

(d) *Resolution of Issues.* Either Party may identify a question, difference of opinion or interpretation (each, an "Issue") to the other through written notice, delivered to the other Party's Manager (Section 6.1(b)) or his or her designee, describing the Issue with reasonable particularity, including any proposed resolution. Disputed Issues that the Parties are unable to resolve through consultation by the Managers will be referred to the Executive Sponsors (unless otherwise agreed, and if either or both Executive Sponsors were direct participants in the disputed matters the relevant Parties shall designate other knowledgeable executives of comparable seniority). Thereafter, Issues not resolved will be resolved in accordance with Section 11.5 of the Agreement concerning disputes (subject to the Parties' obligations to continue performance pending resolution of any dispute).

(e) Without limiting anything contained in this Section 6.1, Schedule 6.1 is hereby incorporated into this Agreement for the purpose of further defining the manner in which the Parties intend to govern their relationship.

6.2. Out-of-Scope Services; Third-Party Providers.

(a) If BSA requests services ("Other Services") that are not reasonably within the scope of Services described in 2.1, then Pearson will perform such Other Services without any additional fees as long as such request can be accommodated using the Pearson Personnel assigned for performance of Services and such Pearson Personnel have the bandwidth (based on standard Pearson working hours) and expertise (as evidenced by their then-existing skill-sets) necessary to perform such Other Services. Pearson's performance of such Other Services will be subject to the Parties' execution of a Statement of Work (in a form substantially similar to Exhibit B hereto or such other form as the Parties may mutually agree), unless such Other Services require *de minimis* time and effort, in which case the Other

Services will be managed as if it were an ordinary Job. All Statements of Work will be subject to the terms and conditions of this Agreement.

(b) If and to the extent any request for Other Services cannot be accommodated as described in Section 6.2(a) hereof, then Pearson will, at BSA's option and upon BSA's request, (i) cooperate with a third party designated and engaged by BSA to perform the Other Services or (ii) identify and solicit proposals from third parties whom BSA may consider to perform the Other Services. BSA will have the right, but not the obligation, to engage any third party to perform the Other Services. To the extent a third party ("Third-Party Provider") is engaged to perform the Other Services, which will be at BSA's sole discretion, BSA will be responsible for contracting with and paying the Third-Party Provider for services rendered.

(c) Pearson will manage the Third-Party Provider to the full extent necessary to complete the Other Services assigned to the Third-Party Provider. Pearson shall not bind or obligate BSA to any Third-Party Provider, and Pearson shall not renew, modify, terminate, or request or grant any consents or waivers under, any contract between BSA and a Third-Party Provider. Furthermore, Pearson will not have any ownership rights in or to the work product of Third-Party Providers who have been engaged to perform Other Services ("Third-Party Provider Work Product"), which shall remain the property of BSA (subject to any rights retained by the Third-Party Providers pursuant to their individual contracts with BSA).

6.3. Acceptance of Deliverables

(a) BSA, within ten (10) days of receipt of each Deliverable, shall notify Pearson, in writing, of any failure of such Deliverable to comply with this Agreement, including non-compliance with the Job specifications provided by BSA, or of any other reasonable objections, revisions, corrections, or changes BSA wishes made to such Deliverable. Any such written notice will be sufficient to identify with clarity any reasonable objection, revision, correction or change, and Pearson will promptly undertake to make the same and return such Deliverable to BSA for review of the modified portion(s) as soon as reasonably practicable. If and to the extent any deficiencies remain, the foregoing procedures may be repeated as necessary to correct the deficiencies that remain (or others revealed by further review after corrective work). Notwithstanding the foregoing, if written notice is not received by Pearson within the ten-day time period specified herein, such Deliverable will be deemed accepted by BSA. Any and all objections, corrections, changes or amendments shall be subject to the terms and conditions of this Agreement.

(b) After acceptance of such a Deliverable by BSA, Pearson will have no further responsibility for correcting defects, errors, bugs, or deficiencies unless BSA submits a new Job to correct defects, errors, bugs or deficiencies in the Deliverable (each, a "Fix Job"). There is no limit on the timing, number or frequency of Fix Jobs that BSA may submit, and Pearson may not unreasonably refuse any Fix Job, except as set forth hereinafter. If a Fix Job would reasonably require the re-performance of services performed by a Third-Party Provider (pursuant to Section 6.2(b) hereof) because such services were not performed properly or fully in the first instance, then Pearson will request the Third-Party Provider re-perform such services at no additional charge. If the Third-Party Provider refuses Pearson's request, then the Person Account Director shall notify the BSA Contract Manager and Pearson may suspend the Fix Job until such time as the BSA Contract Manager notifies the Pearson Account Director that the Third-Party Provider has agreed to re-perform its services or the BSA has engaged another Third-Party Provider to perform the necessary services.

7. Term and Termination

7.1. Term. This Agreement begins as of the Effective Date and will continue through August 31,

2021, unless sooner terminated in accordance with the provisions of this Agreement (the "Term").

7.2. <u>Termination for Breach.</u> Either Party may terminate this Agreement at any time in the event of a material breach by the other Party that remains uncured after sixty (60) days' written notice thereof. Such notice shall include all relevant details relating to the reason for the material breach. In any event, the Parties agree that, prior to any termination of this Agreement, each will use their best efforts to resolve any questions, issues, differences of opinion, or other disputed matters relating to this Agreement in accordance with Section 6.3(d).

7.3. <u>Termination for Bankruptcy/Insolvency.</u> Either Party may terminate this Agreement immediately following written notice to the other Party if the other Party (a) ceases to do business in the normal course, (b) becomes or is declared insolvent or bankrupt, (c) is the subject of any proceeding related to its liquidation or insolvency (whether voluntary or involuntary) which is not dismissed within ninety (90) calendar days or (d) makes an assignment for the benefit of creditors.

7.4. <u>Disengagement.</u> Upon expiration of, or the effective date of termination of, this Agreement for any reason, and at BSA's request, Pearson shall, at the option of BSA, provide to BSA transition assistance services necessary to affect an orderly transition of the Services from Pearson to BSA or to a third-party service provider designated by BSA. Such assistance will include, but not be limited to, making the then-current configuration of BSA's instance of P3 available to BSA and, if applicable, BSA's new third-party service provider, in each case at a mutually agreed cost and on mutually agreed terms and subject to the consent of the P3 software vendor. The termination assistance services shall be paid by BSA, at an agreed-upon amount on a time-and-materials basis, for the time necessary to accomplish an effective transition (but not to exceed six months). A complete description of and price for such transition assistance services will be memorialized in a Statement of Work pursuant to the procedures set forth in Section 6.2 of this Agreement.

7.5. <u>Return of Data.</u> Upon termination of the Agreement for any reason, or at the specific written request of the Disclosing Party (as defined in Section 9.1 below), the Receiving Party (as defined in Section 9.1 below) shall return any Confidential Information to the Disclosing Party which the Receiving Party may have in its possession within thirty (30) days or certify the destruction of such Confidential Information; <u>provided, however,</u> that nothing shall require either Party to return or destroy any Confidential Information whose retention is necessary for a Party to comply with, or fulfill its obligations under, this Agreement. This provision shall not apply to the extent that (i) the Receiving Party is required to retain any such Confidential Information by any applicable law, rule or regulation, or pursuant to any internal record retention policy, or by any competent judicial, governmental, supervisory or regulatory body; or (ii) Confidential Information is contained in Receiving Party's backup computer systems that cannot be reasonably deleted. Any Confidential Information that is not returned or destroyed shall remain subject to the provisions of this Agreement and shall survive any expiration or termination hereof.

7.6. <u>Survival.</u> The following provisions of this Agreement shall survive the termination or expiration of this Agreement: Sections 5 (inclusive), 7 (inclusive), 8 (inclusive), 9 (inclusive), 10 (inclusive), 11 (inclusive), 12.9, 12.10.

8. <u>Intellectual Property</u>

8.1. <u>BSA Materials.</u> During the Term, and subject to the terms and conditions of this Agreement, BSA hereby grants to Pearson a non-exclusive, royalty-free license to reproduce, make derivative works from, distribute copies of, adapt, and display BSA Materials solely for the purpose of performing the Services. Pearson acquires no right, title or interest in the BSA Materials, other than the rights authorized by this Agreement, which shall expire on expiration or termination of

this Agreement or any agreed-upon termination assistance services. Pearson shall not convey, assign, or otherwise transfer its rights to any BSA Materials to any third party, unless required by this Agreement.

8.2. <u>Pearson Materials</u>. Pearson shall own all right, title and interest in and to any Pearson Materials. "Pearson Materials" shall include (a) all content, art, graphics, images and third-party materials contained in the Deliverables that were provided, created or acquired by Pearson ("Pearson Content"), (b) all technology, know-how and publishing methods used by Pearson in the performance of the Services, except software applications licensed by Pearson from third-party software providers; (c) all Pearson Confidential Information; and (d) all intellectual property and trade secrets of Pearson and its affiliates used in connection with the Services.

8.3. Work Product.

(a) <u>Compilations and Derivative Works.</u> All Compilations and Derivative Works, independent of any Pearson Content therein (which Pearson shall continue to own pursuant to Section 8.2), and all BSA Material included in such Compilations and Derivative Works, will be BSA's exclusive property and are deemed "works made for hire" under United States copyright laws.

(b) To the extent a Compilation or Derivative Work contains Pearson Content which is owned or created exclusively by Pearson or Pearson Personnel (as opposed to content that is licensed or permissioned from a third party) ("Pearson-Owned Content"), then Pearson hereby grants to BSA a limited, worldwide, non-exclusive, non-transferable royalty-free license to use such Pearson-Owned Content solely (i) as part of such Compilation or Derivative Work, (ii) in the form of media in which such Compilation or Derivative Work was originally delivered, and (iii) during the Term, plus an additional five (5) years. Thereafter, BSA shall have the right to request from Pearson, on mutually agreed terms, permission to use such Pearson-Owned Content for additional time. Upon request, BSA shall certify in writing that it no longer uses any Pearson Content in connection with a Compilation or Derivative Work; provided, the foregoing shall not limit BSA's rights under this Agreement. Upon BSA's request, Pearson shall deliver to BSA a written report identifying all Pearson-Owned Content contained in all Deliverables furnished by Pearson up to the date of BSA's request.

(c) To the extent a Compilation or Derivative Work contains Pearson Content which is licensed or permissioned by Pearson from a third-party ("Third Party Content"), then (i) Pearson shall notify BSA in writing prior to the incorporation of any such Third Party Content into the Compilation or Derivative Work; and (ii) Pearson agrees to work in good faith with BSA to 04/06/20   Page 12 of 68 obtain the right, license or permission (each, a "Content License"), on mutually-agreed terms, for BSA to use such Third Party Content solely as part of the Compilation or Derivative Work; *provided,* BSA's use of such Compilation or Derivative Work will be free of any further consent requirements or royalty obligations to Pearson or to the third-party, except as set forth in the Content License. BSA shall comply with the terms of all Content Licenses. BSA shall be responsible for paying all license or permission fees for the use of any and all Third Party Content.

(d) To the extent BSA wishes to create new, original works of authorship which (1) are created by Pearson or Pearson Personnel at the specific request of BSA for use as a contribution to a Compilation or Derivative Work or as a standalone Deliverable, and (2) will not include any Pearson Content that existed prior to BSA's request (such works being deemed "Custom BSA Content"), such Custom BSA Content will be BSA's exclusive property and are deemed "works made for hire" under United States copyright laws.

(e) All rights to use Pearson Content under this Section 8.3 shall be subject to BSA's compliance with its obligations under this Agreement. Notwithstanding anything to the contrary set forth in this Section 8.3, neither Party may reproduce or otherwise use the proprietary material of the other Party separately from the relevant Compilation or Derivative Work without the other Party's prior written consent.

(f) BSA acknowledges that, with respect to any unique Deliverable (i) the Pearson-Owned Content to be used in such Deliverable cannot include more than 20% of the total content contained in a particular Pearson product (*i.e.*, text, magazine, article, course, etc.) from which the Pearson-Owned Content is derived and (ii) the Pearson-Owned Content cannot comprise more than 10% of the content contained in such Deliverable. Pearson acknowledges that, from time to time, BSA shall request Pearson-Owned Content that exceeds the parameters set forth herein. Pearson agrees to act in good faith to consider all such requests.

8.4. Assignment. If any court of competent jurisdiction finds that any Compilation, Derivative Work, or Custom BSA Content is not a work made for hire under applicable law, Pearson will thereupon irrevocably assign to BSA, without further consideration, all of Pearson's right, title and interest in and to such Compilation, Derivative Work, or Custom BSA Content, excluding any Pearson Content contained therein (which Pearson shall continue to own pursuant to Section 8.2). Pearson shall execute any documents and take any other action reasonably requested by BSA to accomplish the purpose of this Section 8.4, including but not limited to providing reasonable cooperation to BSA to ensure BSA's rights in and to said Compilation, Derivative Work, or Custom BSA Content. BSA may apply to register and register its copyright in such Compilation, Derivative Work, or Custom BSA Content in all countries; provided, that BSA acknowledges Pearson's ownership in any Pearson Content contained therein.

8.5. Pearson Licenses. Pearson shall, at its expense, install, operate and maintain any Pearson Software needed to provide the Services. Pearson shall not use in performing the Services any Pearson Software that is (i) not commercially available to Customer or a successor supplier of services at the time Pearson commences its use and (ii) not capable of being assigned or licensed to Customer or a successor supplier of services. Any such assignment or license shall be on mutually agreed terms. In the case of P3, the commercially available version shall refer to the non-customized version. For the avoidance of doubt, the foregoing sentence shall not limit or supersede Pearson's obligations with respect to P3 under Section 7.4. Pearson agrees to provide to BSA, at Pearson's expense, licenses to use the Pearson Software listed in Schedule 8.5 during the Term for the purpose of exchanging information with Pearson as necessary or appropriate to advance a Job or Project (e.g., submit a Job request, provide feedback to Pearson regarding a Job) or contribute to a Deliverable. BSA's use of Pearson Software pursuant to the foregoing license is, in each case, subject to any costs, payments, fees or limitations in Schedule 8.5 attached hereto. BSA will be responsible for all costs and fees for any Pearson Software that exceed such limitations.

9. Confidential Information.

9.1. Definition. For purposes of the Agreement, "Confidential Information" means all data and information, of a confidential or proprietary nature or otherwise, disclosed during the Term by one party ("Disclosing Party") to the other party ("Receiving Party"), as well as information that the Receiving Party knows or should know that the Disclosing Party regards as confidential including, but not limited to: (a) a Party's proprietary technology, trade secrets, methods, business plans, strategies, know how, marketing plans, suppliers, sources of material, customer lists, customer data, the names of and other information about members (in the case of BSA), subscriber data, finances, business relationships, pricing, employees, trade secrets and other non-public or proprietary information whether written, oral, recorded on tapes or in any other media or format; (b) the material terms of the Agreement; and (c) any information marked or

designated by the Disclosing Party as confidential. Confidential information shall not include any information that the Receiving Party can verify with substantial proof that: (i) is generally available to or known to the public or becomes generally available to or known to the public through no wrongful act of the Receiving Party; (ii) was independently developed by the Receiving Party without the use of Confidential Information; or (iii) was disclosed to the Receiving Party by a third party who, to the knowledge of the Receiving Party, is legally in possession of such Confidential Information and under no obligation of confidentiality to the Disclosing Party.

9.2. Duty of Confidentiality. The Receiving Party agrees to hold all Confidential Information in trust and confidence and, except as may be authorized by the Disclosing Party in writing, shall not use such Confidential Information for any purpose other than (in regards to Pearson, to perform its obligations under the Agreement, and in regards to BSA, to receive and use the Services as intended) or as expressly permitted in the Agreement or disclose any Confidential Information to any person, company or entity, except (1) to those of its and its affiliates' employees, independent contractors and professional advisers (collectively "Representatives"): (a) who need to know such information in order for the Receiving Party to perform its obligations hereunder or enforce the Agreement; and (b) who have entered into a confidentiality agreement with the Receiving Party with terms at least as restrictive as those set forth herein, except for professional advisers under ethical obligations and (2) as required by law, subpoena or court order. Each Receiving Party shall be responsible for any violation of this Section 9.2 by its respective Representatives.

9.3. The Receiving Party agrees that monetary damages for breach of confidentiality may not be adequate and that the Disclosing Party will be further entitled to seek injunctive relief for any breach of Section 9.2. This Section 9 shall survive termination of the Agreement: (a) in perpetuity, with respect to BSA's member data, customer lists, and subscriber lists, and (b) with respect to all other Confidential Information of either Party, for as long as the applicable Confidential Information remains a trade secret under applicable law.

10. Representations, Warranties and Covenants

10.1. Mutual Representations, Warranties, and Covenants. Each Party represents and warrants that (a) it has obtained all necessary corporate approvals to enter into this Agreement and that no consent, approval, or withholding of objection is required from any external authority with respect to the entering into of this Agreement; (b) to the best of its knowledge, it is under no obligation or restriction, nor will it assume any such obligation or restriction, that would in any way interfere or conflict with any obligations under this Agreement; and (c) it will comply, in all material respects, with all applicable laws and regulations in its conduct pursuant to this Agreement. Case 20-10343-LSS  Doc 350-2  Filed 04/06/20  Page 14 of 68

10.2. BSA Representations, Warranties, and Covenants. BSA represents and warrants to Pearson that (a) BSA is the owner or lawful licensee of the BSA Materials and, as such, is authorized to grant Pearson permission to use BSA Materials in accordance with the terms of this Agreement; and (b) to the best of BSA's knowledge, the BSA Materials do not and will not infringe any copyright, trademark, trade secret, or publicity right of any third party, or contain any libelous or unlawful matter, and (c) BSA has no knowledge of any such claim or potential claim in that regard, and (d) BSA has obtained all necessary rights and permissions for Pearson to utilize any BSA Software as contemplated hereunder for the performance of the Services.

10.3. Pearson Representations, Warranties, and Covenants. Pearson represents and warrants to BSA that (a) Pearson's use of the Pearson Software and other Pearson technology, processes, methodologies, or practices does not, to Pearson's knowledge, violate any copyright, patent, or other proprietary right of any third party, and (b) Pearson has no knowledge of any such claim or potential claim in that regard; and (c) as delivered by Pearson to BSA, the Deliverables do not, to

Pearson's knowledge, infringe any copyright, trademark, trade secret, publicity right, or any other proprietary right of any third party. The representations and warranties set forth in this subsection 10.3 shall not apply to any infringement or claim, litigation or other proceedings to the extent arising out of (i) any BSA Materials or any instruction, information, designs, specifications or other materials provided by BSA to Pearson, (ii) use of the Deliverables in combination with any materials or equipment not supplied or specified by Pearson, if the infringement would have been avoided by the use of the Deliverables not so combined, or (ii) any modifications or changes made to the Deliverables by or on behalf of any person other than Pearson.

10.4. Disclaimers. EXCEPT FOR THE FOREGOING, EACH PARTY EXCLUDES AND DISCLAIMS ALL WARRANTIES, CONDITIONS OR STATEMENTS, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTIBILITY AND FITNESS FOR A PARTICULAR PURPOSE OR THAT ANY DELIVERABLE WILL BE ERROR-FREE.

## 11. Remedies.

### 11.1. Insurance.

(a) Pearson shall maintain, at its expense during the Term, the following coverage in the following minimum amounts: (i) Commercial General Liability insurance, including contractual liability coverage, with a limit for bodily injury and property damage of not less than $1,000,000 per occurrence and $2,000,000 in the aggregate; such policy shall include BSA as an additional insured. To the extent additional insured status applies, the policy shall respond on a primary basis (ii) Workers' Compensation insurance for Pearson's own employees that meets applicable statutory requirements; (iii) Employer's Liability insurance with limits of $1,000,000 for bodily injury each accident, $1,000,000 for bodily injury by disease, and $1,000,000 for bodily injury to each employee; and (iv) Professional Liability (errors & omissions) insurance with limits of liability of $2,000,000 per claim and shall include coverage for defamation. The Commercial General Liability and Workers' Compensation policies shall be occurrence-based policies.

(b) The insurance requirements listed above are BSA's minimum requirements and will not be considered indicative of the ultimate amounts and types of insurance needed by Pearson. Neither failure to comply nor full compliance with the insurance provisions of this Agreement shall limit or relieve Pearson from its obligations under this Agreement.

(c) The insurance required of Pearson under Section 11.1(a) shall remain in effect throughout the Term, and Pearson shall provide updated certificates of insurance as necessary.

### 11.2. Indemnification

(a) Mutual Indemnities. Each Party (the "Indemnitor," as applicable) shall indemnify, defend, and hold harmless the other Party, including its officers and directors, employees, agents, and representatives (collectively, the "Indemnitee," as applicable), from and against any damages, costs, attorneys' fees, penalties, fines, liabilities, or expenses that arise from third-party actions or claims against the Indemnitee (collectively, "Losses"), to the extent the Indemnitor has proximately caused (i) death or injury to persons; or (ii) damage to real or tangible property.

(b) Furthermore, the Indemnitor shall indemnify, defend, and hold harmless the Indemnitee from and against any Losses: (i) directly resulting from a claim from an individual who was hired or fired by Indemnitor as a result of Indemnitor's independent decision to employ or terminate such individual; (ii) directly resulting from claims brought by an employee or subcontractor of the Indemnitor for employment benefits or compensation; (iii) directly

resulting from a breach of Section 4.4; or (iii) directly resulting from Indemnitor's breach of its warranties in Section 10.2 (if the Indemnitor is BSA) or Section 10.3 (if the Indemnitor is Pearson).

(c) <u>Proportional Liability.</u> With respect to indemnification under Section 11.2(b), neither Party will have any liability to the extent that any Losses are attributable to acts or omissions of the other Party. In cases of infringement, an Indemnitor will have no liability to the extent that the claims of infringement concern: (i) materials supplied by the Indemnitee; (ii) unauthorized modifications or uses of Deliverables or other intellectual property supplied by the Indemnitor; or (iii) acts or omission of the Indemnitee (other than use of infringing matter supplied by the Indemnitor to the extent permitted hereunder).

(d) <u>Indemnification Procedures.</u> Promptly after an Indemnitee receives notice of any claim for which it will seek indemnification pursuant to the Agreement, the Indemnitee will notify the Indemnitor of the claim in writing. No failure to so notify the Indemnitor will abrogate or diminish the Indemnitor's obligations if the Indemnitor has or receives knowledge of the claim by other means or if the failure to notify does not materially prejudice its ability to defend the claim. Within fifteen (15) business days after receiving an Indemnitee's notice of a claim, the Indemnitor will notify the Indemnitee in writing as to whether the Indemnitor acknowledges its indemnification obligation and elects to assume control of the defense and settlement of the claim (a "Notice of Election"). In issuing a Notice of Election, the Indemnitor waives any right of contribution against the Indemnitee unless the Notice of Election expressly states that Indemnitor believes in good faith that the Indemnitee may be liable for portions of the claim that are not subject to indemnification by the Indemnitor, in which case the Indemnitee will have the right to participate in the defense and settlement of the claim at its own expense using counsel selected by it.

(e) If the Indemnitor timely delivers a Notice of Election, it will be entitled to have sole control over the defense of the claim, except as provided in the immediately preceding Section 11.2(d). After delivering a timely Notice of Election, the Indemnitor will not be liable to the Indemnitee for any attorneys' fees subsequently incurred by the Indemnitee in defending or settling the claim. In addition, the Indemnitor will not be required to reimburse the Indemnitee for any amount paid or payable by the Indemnitee in settlement of the claim if the settlement was agreed to without the written consent of the Indemnitor. Settlements or compromises reached by an Indemnitor will be subject to the prior written consent of the Indemnitee, which shall not be unreasonably withheld or delayed. In cases of claims of infringement, the Indemnitor may in its sole but reasonable discretion: (i) procure a license authorizing use of the disputed intellectual property in the Deliverable; or (ii) develop or obtain a non-infringing substitute with equivalent functionality. If none of the foregoing alternatives is commercially practicable, then the allegedly infringing matter will be withdrawn from the Deliverable, and related fees and expenses and performance obligations will be equitably adjusted to reflect that withdrawal.

(f) If the Indemnitor does not deliver a timely Notice of Election for a claim, the Indemnitee may defend and/or settle the claim in such manner as it may deem appropriate, and the Indemnitor will promptly reimburse the Indemnitee upon demand for all Losses suffered or incurred by the Indemnitee with respect to the claim.

11.3. <u>Limitation of Liability</u>

(a) Except as provided in Section 11.3(c) below, neither Party will be liable for any indirect, special, punitive, exemplary, speculative or consequential damages, including, but not limited to, any loss of use, loss of data, business interruption, and loss of income or profits, irrespective of whether it had an advance notice of the possibility of any such damages.

(b) Except as provided in Section 11.3(c) below, each Party's total aggregate liability (in contract or tort) for any and all acts or omissions arising from or relating to its performance of this Agreement will be limited to an amount equal to the fees payable to Pearson (excluding expense reimbursements, if any) during the three (3) months preceding accrual of the last claim asserted by a Party.

(c) The limitations in Sections 11.3(a) and 11.3(b) shall not apply to (i) BSA's payment obligations, or (ii) the acts or omissions of a Party or its employees, officers, agents, contractors, or affiliates that constitute, involve, or relate to: (1) gross negligence or recklessness; (2) intentional misconduct; (iii) a Party's indemnification obligations under Section 11.2; or (iv) a Party's breach of its confidentiality obligations hereunder (Section 9).

11.4. Continued Performance. Except where clearly prevented by the issue in dispute, both Parties agree to continue performing their respective duties, obligations and responsibilities under this Agreement (including, among others, their respective duties to perform and pay for Services) while the dispute is being resolved in accordance with Section 11.5, unless and until such obligations are lawfully terminated or expire in accordance with the terms of this Agreement.

11.5. Disputes.

(a) Negotiation as a Condition Precedent. In the event of any dispute, claim, question, or disagreement arising from or relating to this agreement or the breach thereof, the Parties hereto shall use their best efforts to settle the dispute, claim, question, or disagreement. To this effect, they shall consult and negotiate with each other in good faith and, recognizing their mutual interests, attempt to reach a just and equitable solution satisfactory to both Parties. If they do not reach such solution within a period of 60 days, then, upon notice by either Party to the other, all disputes, claims, questions, or differences shall be finally settled by arbitration administered by the American Arbitration Association ("AAA") in accordance with Section 11.5(b) of this Agreement and the provisions of the AAA's Commercial Arbitration Rules.

(b) Arbitration. Within 15 days after the commencement of arbitration, each party shall select one person to act as arbitrator and the two selected shall select a third arbitrator within ten days of their appointment. If the arbitrators selected by the parties are unable or fail to agree upon the third arbitrator, the third arbitrator shall be selected by the American Arbitration Association. Each Party will pay the costs of its arbitrator and the Parties will share equally the cost of the third arbitrator. The arbitration will take place in New York, New York. Judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

12. General Provisions

12.1. Force Majeure. Other than with respect to payment obligations arising under the Agreement, neither Party will be liable for, or will be considered to be in breach of the Agreement on account of, any delay or failure to perform as required by the Agreement as a result of any causes or conditions that are beyond such Party's reasonable control. If any force majeure event occurs (which shall include, without limitation, acts of God, telecommunications, Internet or network failure, results of vandalism or computer hacking, fire, explosion, storm or other natural occurrences, any conflicting order, direction, action or request of the United States government (including, without limitation, state and local governments) or of any regulatory department, agency, commission, court, bureau, corporation or other instrumentality, or of any civil or military authority, national emergencies, insurrections, riots, wars, strikes, lockouts, work stoppages or other such labor difficulties), the affected Party will give prompt written notice to the other Party and will use commercially reasonable efforts to minimize the impact of such

event. Notwithstanding the foregoing, the Parties' obligations to one another shall be excused and/or postponed during and only for the duration of the applicable force majeure event and shall resume as soon as practicable after the force majeure event has ended.

12.2. Notice. Any notice given by either Party hereunder will be deemed served: (a) if delivered in person, the day when the notice is delivered to the representatives of the other Party at the addresses given below; or (b) if sent via overnight delivery service (e.g., FedEx, UPS), the next business day after the notice is deposited with the delivery service, properly addressed to the representatives of the other Party at the addresses given below; or (c) if sent via the United States Postal Service, three (3) business days after the notice is deposited in the U.S. mail, properly stamped with the required postage and addressed to representatives of the other Party at the addresses given below.

If to BSA:

Boy Scouts of America
1325 West Walnut Hill Lane
Irving, TX 75015-2079
Attn: Assistant Chief Scout Executive/CFO

With copies to:

Boy Scouts of America
Legal Department
1325 West Walnut Hill Lane
Attn: General Counsel

Boy Scouts of America Supply Group
2109 Westinghouse Blvd.
Charlotte, NC 28273-6310
Attn: Group Director

If to Pearson:

Pearson Education, Inc.
2154 East Commons Avenue
Centennial, CO 80122
Attn: Vice President, Professional Services

With a copy to:

Pearson Education, Inc.
200 Old Tappan Road
Old Tappan, NJ 07675
Attn: Associate General Counsel, North America

12.3. No Waiver. No waiver or failure of either Party to strictly enforce any provision or condition of this Agreement will be construed as a waiver of the future performance of that provision or condition or of any other provision or condition.

12.4. Amendment. No modification, amendment, or waiver of any of the provisions of this Agreement, including any and all related Schedules, Exhibits, or Appendices, will be effective unless made

in writing and signed by both Parties. With respect to Statements of Work (Section 6.2(a)), each Party's officers and Executive Sponsor (Section 6.1(a)) is hereby authorized to execute Statements of Work and bind such Party to the terms therein.

12.5. Entire Agreement. This Agreement, together with any and all Schedules, Exhibits, and Appendices, constitutes the entire and only agreement and supersedes any and all prior agreements, whether written, oral, express, or implied, of the parties with respect to the transaction set forth herein; provided, however, that this Agreement does not modify, cancel, or supersede that certain Agreement to Terminate and Restructure, made between Parties as of September 1, 2016. In the event of any conflict between the terms and provisions of this Agreement and those of any Schedule, Exhibit or Statement of Work, the following order of precedence shall govern: (a) first, this Agreement, exclusive of its Exhibits and Schedules; (b) second, the applicable Statement of Work; and (c) third, any Exhibits and Schedules to this Agreement.

12.6. Assignment. Neither Party shall sell, transfer, or assign the Agreement or the rights or obligations herein, other than to a parent or wholly-owned subsidiary, without the prior written consent of the other party. Notwithstanding the foregoing, without securing such prior consent, either Party shall have the right to assign or transfer the Agreement and its rights and obligations to any successor-in-interest of such Party by way of sale, merger, consolidation, reorganization, restructuring or the acquisition of substantially all of the business and assets of the assigning party or of more than fifty percent (50%) of the outstanding stock of the assigning party. Subject to the foregoing, the Agreement will be fully binding upon and inure to the benefit of the Parties hereto and their respective heirs, executors, administrators, legal representatives, successors-in-interest and permitted assigns.

12.7. Severability. Any provision in this Agreement which is prohibited or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of that prohibition or unenforceability without invalidating the remaining provisions or affecting the validity or enforceability of those provisions in any other jurisdiction.

12.8. Publicity. Except as required by law or securities regulations, neither Party may divulge the terms, pricing or conditions of the Agreement or issue any press release or make any public statement relating in any way whatsoever to the Services performed by Pearson or the relationship established by this Agreement, without the advance written consent of the other Party. Without limiting the generality of the foregoing, and subject to the Parties' confidentiality obligations, the Parties agree to issue a mutually-approved press release on or before December 31, 2016, to announce the extension of the Parties' business relationship as contemplated by this Agreement.

12.9. Governing Law and Venue. The Agreement and its terms are governed by and will be construed in accordance with the laws of the State of Texas, without regard to its conflicts of law principles.

12.10. Independent Contractor. Pearson is an independent contractor. Neither Pearson nor any of its employees, contractors, or subcontractors shall be deemed for any purpose to be an employee of BSA. BSA shall not be responsible to Pearson for any payroll-related taxes related to the performance of Services hereunder, including withholding taxes related to federal or state income tax, social security benefits or unemployment compensation. Neither Party is an agent, representative or partner of the other Party. Neither Party shall have any right, power or authority to enter into any agreement for or on behalf of, or incur any obligation or liability on behalf of, or to otherwise bind, the other Party. This Agreement shall not be interpreted or construed to create an employment relationship, an association, agency, joint venture or partnership between the Parties or to impose any liability attributable to such a relationship upon either Party.

12.11. Computing Time; Interpretation. In computing any period of time prescribed or allowed under

this Agreement, the day of the act, event or default from which the designated period of time begins to run shall be included. If the last day of the period so computed is not a business day, then the period shall run until the close of business on the first business day immediately following such period. The terms "hereof", "herein", "hereto", "hereunder" and words of similar or like import refer to this entire Agreement and not to any particular paragraph, Section, Schedule, Exhibit, Appendix or other subdivision of this Agreement. References to a particular "Section", "Schedule", "Exhibit", or "Appendix" are, unless otherwise noted, references to that Section of, Schedule to, Exhibit to, or Appendix to this Agreement. The words "include", "includes" and "including" are deemed to be followed by "without limitation" or "but not limited to". Headings in the Agreement are for reference only. In case of a conflict between a section's heading and its content, the content shall control.

12.12. Non-solicitation. Neither Party will, without the other Party's prior express consent, solicit or offer employment to an employee of the other Party during the Term who is performing Services hereunder. However, if a Party's employee resigns, then the other Party may, without obtaining further consent or approval, solicit or offer employment to such employee six (6) months after the date of such employee's resignation.

IN WITNESS WHEREOF, the Parties' duly authorized representatives, each acting under due and proper authority, have executed this Agreement as of the date set forth below, but to be effective as of the Effective Date.

Boy Scouts of America ("BSA")

By: _____

Print Name: _Michael B. Surbaugh_

Title: _Chief Scout Executive_

Date: _10/26/16_

Pearson Education, Inc. ("Pearson")

By: _____

Print Name: _DAVID DAN'Z_

Title: _MANAGIN VILE PEARSON_

Date: _10/24/16_

Case 20-10343-LSS   Doc 350-2   Filed 04/06/20   Page 20 of 68

## Schedule 2.1

### Services

This is Schedule 2.1 to the Professional Services Agreement, dated as of September 1, 2016 (the "Agreement"), between Boy Scouts of America ("BSA") and Pearson Education, Inc. ("Pearson"). This Schedule 2.1 describes the Services to be performed by Pearson, which include not only the services, functions and responsibilities specifically described herein but also those functions not specifically described herein but required for the proper performance of, and inherent in or necessary sub-tasks for, the Services.

### 1. Description of the Services

The Services shall be limited to the existing skill sets of the Pearson Personnel, and Pearson shall not be responsible for undertaking any Services, including Job requests, that fall outside of the experience and skill-sets of the existing Pearson Personnel that comprise the BSA Account Team. For the avoidance of doubt, the Services described below apply to BSA's publishing and communications channels, including marketing communications, program materials, saleable literature, internal business collateral, and electronic communications (including websites and mobile applications).

Pearson shall also be reimbursed for all travel expenses related to BSA activities undertaken outside of the BSA Facility if such travel is requested by BSA or approved in advance by BSA's Contract Manager. Pearson will pay for travel expenses through December 31, 2016, as previously agreed by the Parties.

Pearson's responsibilities consist of the following:

    a. Editorial and Creative Services

        i. Copywriting and writing text for publication on and through BSA's publishing and communications channels Technical writing is excluded.

        ii. Editing, including proofreading; correcting errors in spelling, grammar and punctuation, and syntax; and editing copy and manuscripts to clarify meaning, promote consistency, smooth the flow of the text, and/or improve overall composition.

        iii. Designing and creating graphics and other visual elements; page design—i.e., the selection and arrangement of visual elements, media (e.g., audio, video), typographic treatments and text.

        iv. Sorting, organizing, categorizing and apply metadata to BSA's digital assets for the purpose of ingesting such content into one of BSA's digital asset management ("DAM") or content management systems ("CMS"). No later than December 31, 2016, BSA, at its own expense, shall license a DAM and/or CMS directly from a third-party service provider of its choice and will provide Pearson such access to the DAM and CMS as is necessary for Pearson to perform its obligations. BSA must train Pearson Personnel on the use of any DAM and CMS.

        v. Rights Clearance, or the process of ensuring that all appropriate licenses and permissions are in place to use materials that may be subject to copyrights of third parties. Rights Clearance services include evaluating whether Pearson Content intended for use in a Deliverable may be subject to copyrights not controlled by Pearson; evaluating whether permission from a third party is required for the intended use of Pearson Content; identifying the owner (or other third-party rights holder) of such material; obtaining a license or other relevant permission to use such material in the Deliverable; and maintaining appropriate written documentation of all such licenses and permissions. For the avoidance of doubt,

Case 20-10343-LSS   Doc 50-2   Filed 04/06/20   Page 21 of 68

BSA shall be responsible to pay for all license and permission fees charged by third-party rights-holders or their agents. Such payment shall be made directly to the third party rights holders or their agents. Pearson will perform the foregoing functions for BSA Materials and any third-party materials that BSA desires to license, provided that BSA identifies all third-party rights holders.

vi. Receiving and logging Job requests (including Jobs requiring printing services); tracking Jobs through the appropriate editorial and/or creative processes; delivery of Deliverables to BSA, including but not limited to production-ready design files; and soliciting BSA feedback on each Job through Job-specific surveys distributed to BSA (BSA to pay all costs of the survey tool); and implementing performance improvement processes based on BSA feedback. To the extent a Job involves printing services (*i.e.*, printing tangible goods), Pearson will manage that Job (*i.e.*, record and monitor the Job in P3) even though it is not obligated to actually print the finished goods. For the avoidance of doubt, BSA, not Pearson, would procure printing services directly from a third party and pay all costs and expenses of such third-party printer for these services. For clarity, BSA shall pay the printer directly. Alternatively, pursuant to a Statement of Work agreed to by the Parties in accordance with the procedures described in Section 6.2 of the Agreement, BSA may procure printing services from Pearson at the price set forth in Section 4(b) of Schedule 5.1.

b. Technology Services

i. Use the MAZ (operated by MAZ Digital, Inc.) and Inkling (operated by Inkling Systems, Inc.) digital publishing platforms (collectively, the "Digital Publishing Platforms") to distribute digital versions of BSA's magazines and interactive Merit Badge pamphlets ("iMBPs") and provide maintenance and support services for the Digital Publishing Platforms. Using the Change Proposal procedures outlined in Section 6.2 of the Agreement, BSA may request to migrate the digital publishing operations to one or more different platform(s) hosted by Pearson, licensed by Pearson, or managed directly by BSA, or a combination of the foregoing. Such migration may result in an adjustment of fees payable by BSA, pursuant to Section 3(c) of Schedule 5.1. Pearson shall approve any and all migration requests, at its discretion, not to be unreasonably withheld.

ii. Authorize BSA users (as limited in Schedule 8.5) to use the workflow management tool known as "P3" and pay the P3 vendor for maintenance and support for BSA's instance of P3 during the Term of the Agreement. In addition, Pearson will complete (or arrange for the completion of) certain customizations of P3 as described by Schedule 2.1-A. Other than as stated in Schedule 2.1-A, no other customizations shall be provided and any further services would be via a Statement of Work. Pearson represents that certain background technology underlying BSA's instance of P3 is provided by a third-party, and Pearson will pass all service level guarantees provided by such third-party through to BSA. Using the Change Proposal procedures outlined in Section 6.2 of the Agreement, after the first anniversary of the date of this Agreement, BSA may request to migrate from P3 to one or more different workflow management tool(s) hosted by Pearson, licensed by Pearson, or managed directly by BSA, or a combination of the foregoing. Such migration may result in an adjustment of fees payable by BSA, pursuant to Section 3(c) of Schedule 5.1. Pearson shall approve any and all migration requests, at its discretion, not to be unreasonably withheld.

Case 20-10343-LSS Doc 350-2 Filed 04/06/20 Page 22 of 68

iii. Wind-down Equella and transition BSA data and operations to new content management system ("CMS") or digital asset management system ("DAM") licensed by BSA. Between September 1, 2016, and December 31, 2016, Pearson will cooperate with BSA and provide BSA with all reasonable and customary transition support, using resources from the Pearson Account Team, in order to assure the timely, orderly transfer of BSA's data, operations, and related matters from Pearson's Equella system to a new CMS selected by BSA. That assistance ("Equella Wind-Down Assistance") includes but is not limited to the assistance described by Schedule 2.1-B. Any use of Equella by BSA after December 31, 2016, may result in an adjustment of fees payable by BSA pursuant to Schedule 5.1, unless the transition from Equella to BSA's new CMS or DAM was delayed as a result of inadequate Equella Wind-Down Assistance by Pearson. Subject only to transition delays caused by Pearson, BSA will not use or have access to Equella after March 31, 2017. From January 1, 2017 until March 31, 2017, continued use of Equella will be provided with routine maintenance and support to the infrastructure provided by Amazon Web Services but without upgrades.

Case 20-10343-LSS   Doc 350-2   Filed 04/06/20   Page 23 of 68

## Schedule 2.1-A

## P3 Customizations

| PEARSON COMMITMENT / P3 CUSTOMIZATION | NOTES (IF APPLICABLE) |
|---|---|
| Add additional fields to the detail provided in the Job Widget for clients and internal users | (Meta) |
| A Specs document should be created for each Job type | (Meta) Each RFQ doc will be slightly different per product type, mainly in the spec fields that are pulled in |
| Create ability for clients to upload files after a Job has been submitted | Check with Pearson Tech Lead on notes from P3 about needed functionality. Process is documented. |
| Alter the existing "BSA Activity" report in P3 so that it shows the details for each Job | (Meta) |
| BSA needs to review how they use Campaign -> Project -> Job. Leaning towards using Campaign to match up with the Game Plan | (BSA and Pearson if Campaigns change) |
| work flow for 3rd-party invoices to BSA | (BSA and Pearson) |
| Need to develop the process by which an AE (PM role in P3) can obtain the approval for an estimate from the client | (Pearson) Tasks can be created to have the Job routed. Need a systematic way of capturing the client (or approving authority) approval. |
| Web to review P3 Job Categories, Job Complexities, and Deliverable Types | (BSA and Pearson if changes needed) |
| Create Client and production unit community feedback process | (BSA and Pearson) |
| Remove the "firewall" between groups (Pearson and BSA). | (Meta) Currently BSA cannot open projects assigned to Pearson and vice versa. This will allow for collaboration and more effective communication. Initial very high level rough estimate is 60 hours. |
| Create a field to enter the Supply PO # | (Meta) |
| Extend the impersonate capability to all groups | (Pearson) Will allow users to see all projects in their group (Supply, MM, etc.) or of other users in their group. |
| Ability for production unit (Pearson, Supply, MM, Web, etc.) to reject/return a Project/Job to the client before they begin work/approve the Job within P3 | (Meta) |
| Create accounts for Multimedia PMs and Train | (Pearson) |
| Create schedule templates based on the Job Tiers | (Pearson) |
| Create conditional logic in P3 that if Multimedia is selected as the group, then the multimedia list of Job complexities is displayed for selection | (Meta) |

Case 20-10343-LSS   Doc 350-2   Filed 04/06/20   Page 24 of 68

| PEARSON COMMITMENT / P3 CUSTOMIZATION | NOTES (IF APPLICABLE) |
|---|---|
| Create the ability within P3 to add a vendor estimate and/or document estimates and bid procedures from external vendors | (Meta) |
| Develop tasks for Print Buying and update schedule templates to include these tasks | (Pearson) |
| Create Print Buyer report in P3 | (Meta) |
| Adjust Print Specs export document to be inline with sample provided by BSA | (Meta) The export doesn't need to be exactly like the sample but must contain key elements ("Quote only" for example) |
| Develop and implement a "change order" process when clients want to modify request after submission | (BSA and Pearson) Pearson and BSA to jointly agree on a "change order" process. |
| (Pearson) Permission to proof annotations reply/respond button | (Pearson) When a designer with a higher-level system permission goes into a proof, he has 3 buttons to respond / reply to a user's annotation. Other designers do not have the respond/reply button. How can we get the rest of the designers (Supply) access to this functionality? This is required to keep conversation in P3. |
| P3 random crashes - Investigate and improve system stability | (Pearson) Pearson needs to investigate. |
| Disappearing files and proof history within workflow - Investigate and Improve | (Pearson) Currently under investigation by Pearson. Appears to be a workflow issue. Pearson to schedule a meeting with Supply to review findings and show the intended work flow. |
| Ensure newly uploaded Word docs be accessible by others? | (Pearson) Need to investigate issue, which appears to be only limited to Word files |
| PDF viewing issues - Investigate and Improve | (Pearson) Can't review PDF proofs more than 4 pages. Need to investigate. Case 20-10343-LSS  Doc 350-2  Filed 04/06/20  Page 25 of 68 |
| Change Annotation Sorting Default, this is a low priority item and a nice to have; further discussion with the BSA PM team is required | (Pearson) |
| Create Web group | (Meta) |
| Create Web group users | (Pearson) Dependent on the Web group being created first. |
| If necessary, Create Job Categories, Job Complexities, and Deliverable Types | (Meta) |
| Report to identify incoming big projects | (Meta) |
| Create schedule templates | (Pearson) |

## Schedule 2.1-B

### Equella Wind-Down Assistance provided by Pearson

This is Schedule 2.1-B to the Professional Services Agreement, dated as of September 1, 2016 (the "Agreement"), between Boy Scouts of America ("BSA") and Pearson Education, Inc. ("Pearson"). This Schedule 2.1-B sets forth the tasks, milestones, or other support that Pearson will perform or meet in order to assist BSA in its transition from Equella to BSA's new digital asset management and content management systems licensed by BSA from Adobe.

1. Calls with Adobe Managed Services and Adobe Global Services regarding the API and migration of the data of the collections from Equella to Adobe Assets. This includes providing the detailed metadata tags in Equella to allow BSA to map to the new metadata structure in Adobe Assets.

2. Participate in creating new workflows and updating existing workflows for content ingestion in Adobe Assets, including content inventories of BSA files stores.

3. Support content migration strategy for all video, photo and editorial jobs collections: Catalog, BIN and Collateral jobs.

4. Provide and explain existing Equella requirements documentation and plans.

Case 20-10343-LSS   Doc 350-2   Filed 04/06/20   Page 26 of 68

### Schedule 3.2

### Projects

This is Schedule 3.2 to the Professional Services Agreement, dated as of September 1, 2016 (the "Agreement"), between Boy Scouts of America ("BSA") and Pearson Education, Inc. ("Pearson"). This Schedule 3.2 describes certain projects (each, a "Project") that Pearson and BSA shall work together in good faith to consider, though the Parties acknowledge that, with the exception of item 1 below, the ultimate implementation of the Projects may not be viable or feasible.

#### Projects

1. Pearson will provide and BSA will purchase digital marketing and media buying services in accordance with that certain Statement of Work executed by the Parties as of August 1, 2016 (the "Digital Marketing SOW", a copy of which is attached hereto as Exhibit C), which may not be cancelled or suspended except in accordance with the terms of the Digital Marketing SOW.

2. The Parties will consider an Explorer program career pathways using Pearson services and content

3. The Parties will consider an enhanced college program for Eagle Scouts

Case 20-10343-LSS   Doc 350-2   Filed 04/06/20   Page 27 of 68

## Schedule 3.7

### BSA Policies

This is Schedule 3.7 to the Professional Services Agreement, dated as of September 1, 2016 (the "Agreement"), between Boy Scouts of America ("BSA") and Pearson Education, Inc. ("Pearson").

From time to time during the Term, BSA will have the right to introduce reasonable policies regarding workplace conditions. Such policies will be deemed "BSA Policies" from the time they are received in writing by Pearson.

Case 20-10343-LSS   Doc 350-2   Filed 04/06/20   Page 28 of 68

## Schedule 3.9

## Reporting by Pearson

This is Schedule 3.9 to the Professional Services Agreement, dated as of September 1, 2016 (the "Agreement"), between Boy Scouts of America ("BSA") and Pearson Education, Inc. ("Pearson"). This Schedule 3.9 sets forth the types of information and reports Pearson will use its best efforts to provide or make available to BSA upon BSA's request; provided, however, that BSA recognizes that certain information requested below is not currently available in a single report and would need to be aggregated and/or collated by BSA from a variety of Pearson data sources that are available as of the Effective Date. Notwithstanding the foregoing, Pearson will, at its own expense, develop a data warehouse to capture and analyze the reporting metrics listed below and other metrics as the Parties may agree from time to time. Pearson will implement a minimally viable version of the data warehouse by December 31, 2016, and will continue to develop and configure the data warehouse throughout the first quarter of 2017, materially upgrading the quality and functionality of the data warehouse no less than twice before April 1, 2017.

1. Access to metrics captured by Pearson at the Job level (as of September 1, 2016), with the ability to aggregate such data by category (e.g., resource used, Job type, BSA business unit/department) across Jobs

2. Track existence of errors introduced and impact by jobs/resource

    i) Editorial/creative jobs: measure if errors exist driving re-work and hours of re-work within a job

    ii) Printing: measure if print ready files are correct on first delivery and if re-work required

3. Actual versus initial promised delivery date (able to see revised delivery dates as well)

4. Commencing as early as reasonably practicable, for each Job, a comparison of the work hours estimated by Pearson to complete the Job versus the actual work hours expended by Pearson to complete the Job.

5. For each Job, the number of reviews and revisions before delivery of the Final Deliverable

6. For each Pearson Personnel, the percentage of hours spent on his/her core Service responsibilities/functions versus other (e.g., administrative tasks), excluding vacation time, personal time, holiday time and sick days.

7. All responses to all customer satisfaction surveys conducted by Pearson, including responses to Job-specific customer satisfaction surveys

Case 20-10343-LSS   Doc 350-2   Filed 04/06/20   Page 29 of 68

8. A monthly report containing the following:

    (a) Hours worked by Pearson Personnel, itemized by Job

    (b) A list of Job completed in the relevant month, with a measure of On-Time delivery as compared with promised and/or requested delivery date

    (c) List of Jobs completed within estimated budget hours

    (d) List of works in progress

    (e) List of "On Hold" Jobs and the length of time each Job has been "On Hold"

## Schedule 5.1

### Fees and Expenses

This is Schedule 5.1 to the Professional Services Agreement, dated as of September 1, 2016 (the "Agreement"), between Boy Scouts of America ("BSA") and Pearson Education, Inc. ("Pearson"). This Schedule 5.1 sets forth the fees and expenses payable by BSA for the Services and other matters related to adjustments thereof.

1. **Description of Fees**

   a. Base annual fee for on-site Pearson BSA Account Team: $3,300,000.00 annually, payable in accordance with Section 2 of this Schedule 5.1.

   b. Base annual fee for technology services: $500,000.00 annually, payable in accordance with Section 2 of this Schedule 5.1.

   c. Fee for editorial and creative services: $6,200,000.00, payable in accordance with Section 2 of this Schedule 5.1.

   d. Fee for 2016 transition services: $450,000.00, payable in accordance with Section 2 of this Schedule 5.1.

2. **Payment Schedule and Amounts**

   a. For the period August 1, 2016, through December 31, 2016, BSA will pay Pearson in equal installments of Eight Hundred Eighty-Five Thousand Dollars and no Cents ($885,000) per month. The total fees for this period will be $4,425,000.00, to reflect increased efforts associated with transition services.

   b. For the period January 1, 2017, through December 31, 2017, BSA will pay Pearson in equal installments of Four Hundred Sixty-Four Thousand Nine Hundred Dollars and no Cents ($464,900) per month. The total fees for this period will be $5,578,800.00.

   c. For the period January 1, 2018, through August 31, 2021, BSA will pay Pearson in equal installments of Four Hundred Twenty-Seven Thousand Four Hundred Dollars and no Cents ($427,400) per month. The total fees for this period will be $18,805,600.00.

   d. The amounts set forth above in clauses (a)-(c) are subject to adjustment in accordance with Section 3 of this Schedule 5.1.

3. **Fee Adjustments**

   a. Cost of Living Adjustment ("COLA"). Beginning January 1, 2018, the base annual fee for the on-site Pearson BSA Account Team will be subject to an annual cost-of-living recalculation, equal to two percent (2%) of the then-current fee payable by BSA for the on-site Pearson team. COLA adjustments will be computed annually. By way of example and without limiting BSA's right to scale down the Pearson team, each annual COLA adjustment will increase the monthly installment amount payable by BSA as follows:

| A | B | C | D |
|---|---|---|---|
| Period | Base annual fee for the on-site Pearson team* | 2% COLA adjustment for the Period (column A) | Increase in monthly installment amount payable by BSA during the Period (column A) |
| January 1, 2018 – December 31, 2018 | $3,300,000.00 | +$66,000.00 | $5,500.00 |

| January 1, 2019 –<br>December 31, 2019 | $3,366,000.00 | +$67,320.00 | $5,610.00 |
| January 1, 2020 –<br>December 31, 2020 | $3,433,320.00 | +$68,666.40 | $5,722.20 |
| January 1, 2021 –<br>August 31, 2021 | $2,334,658.00 | +$70,040.00 | $5,836.67 |

\*The basis for Cost of Living (COL) Adjustment, Colum B in the chart above, will be recalculated to reflect increases and reductions, if any, in the size of the Pearson BSA Account Team. Adjustments may occur in the size of the Pearson BSA Account Team pursuant to BSA's Scale Down option described in Section 3.5(a) of the Agreement.

b. Each reduction of the BSA Account Team pursuant to BSA's Scale Down option under Section 3.5(a) of the Agreement will reduce the fees payable by BSA in each calendar year by the product of: One Hundred Thirty-Five Thousand Dollars and no Cents ($135,000.00) times the number of full-time equivalent Pearson Personnel removed from the BSA Account Team. Such fee adjustment will be effective January 1 of the year following BSA's delivery of a Scale Down Notice and amortized monthly.

c. If, pursuant to BSA's request under Section 1(b)(i) or 1(b)(ii) of Schedule 2.1, digital publishing (Section 1(b)(i)) or workflow management (Section 1(b)(ii)) migrates from the technology platforms named therein (MAZ and Inkling, in the case of digital publishing, and P3, in the case of workflow management) to different technology platforms (the "Target Platforms"), then the following fee adjustment shall apply: the annual fee for Technology Services will be equitably adjusted to reflect (A) increases in Pearson's costs of providing the Technology Services because of the migration (including incremental costs associated with the procurement of software licenses), (B) decreases in Pearson's licensing costs and other hard costs because of the migration; and (C) a reasonable allowance for profit, not to exceed the amount necessary for Pearson's post-migration profit margin on the Technology Services to equal its pre-migration profit margin on the Technology Services.

The adjustments described in this Section 3(c) will take effect as of the first month following substantial completion of the migration. "Substantial completion" means the Target Platform has been appropriately configured for BSA's business needs and is operating in a production environment without any material degradation of the Services. Each Party shall make available to the other the information reasonably necessary to determine the equitable adjustments described in this Section. However, Pearson will not be required to disclose its actual costs, profit or anticipated profit to BSA, unless the adjustment is disputed, in which case such information will be disclosed, upon request and in confidence, to mutually-agreed independent accountants or consultants (so that they may evaluate the reasonableness of the proposed adjustments and advise BSA). BSA shall pay the costs and expenses of such accountants and consultants. The independent auditors or consultants shall execute a non-disclosure agreement with both Parties, and may not disclose Pearson's costs or profit margins to BSA, but may provide sufficient information for BSA to assess the proposed change or equitable adjustment. If the Parties are unable to agree upon such adjustments within sixty (60) days after BSA delivers written notice that it disputes the proposed adjustments, the adjustments will be determined in accordance with the dispute resolution procedures described in Section 11.5 of the Agreement.

4. <u>Incremental Costs</u>

a. If BSA uses the Equella platform after December 31, 2016, and Pearson has provided all

required Equella Wind-Down Assistance pursuant to Schedule 2.1-B, then each month thereafter BSA will pay up to $17,000 of the actual invoiced amount charged to Pearson each month by the third-party provider of hosting services for BSA's Instance of Equella. All such amounts payable by BSA will be deemed Incremental Costs.

b. If Pearson provides any printing services to BSA after August 1, 2016, then BSA will pay Pearson the actual invoiced amount charged to Pearson by the third-party printer for such printing services plus either (i) five percent (5%) of the invoiced amount, in the case of printing a BSA magazine, or (ii) ten percent (10%) of the invoiced amount, in the case of all other print jobs.

Case 20-10343-LSS   Doc 350-2   Filed 04/06/20   Page 32 of 68

## Schedule 6.1

### Governance

This is Schedule 6.1 to the Professional Services Agreement, dated as of September 1, 2016 (the "Agreement"), between Boy Scouts of America ("BSA") and Pearson Education, Inc. ("Pearson"). This Schedule 6.1 sets forth a framework and process for management of the Parties' working relationship and performance of the Services.

#### Operational Goals

Both Parties shall act in a manner reasonably calculated to advance and achieve the following goals:

1. Manage the BSA personnel and ensure a stream-lined process for prioritizing projects for the Pearson Personnel.

2. Enter Projects into P3 in accordance with P3's Training and Process Documentation.

3. Review operational reports and KPIs to jointly evaluate the highest and best use of the Pearson Personnel.

4. Follow all documented processes and use a formal change management process to change process.

5. Communicate with consistency through the Pearson Account Director and the BSA Contract Manager or their respective designees, so that communications do not run through individual BSA departments.

6. Escalate issues in an orderly manner pursuant to an agreed process.

7. Provide all information necessary or reasonably requested for Pearson Personnel to initiate a Job.

8. Include the Pearson Account Director on regular updates on BSA strategy, initiatives, corporate communications, upcoming events, programs, etc., as necessary for or relevant to Pearson's performance of the Services.

9. Perform adequate and appropriate training and development of Pearson Personnel for BSA Software and relevant systems, e.g. new Adobe for content ingestion.

10. Follow best practices to determine and provide budget guidelines.

The foregoing goals are not intended, and shall not be construed to modify or limit the Parties' respective rights and obligations contained in the Agreement or any Statement of Work. Rather, the foregoing goals are intended to assure effective communication and provide an organizational framework for the mutual success of the Parties.

#### Service Levels

Both Parties desire to track and analyze Pearson's performance and acknowledge the importance of objective measurements. To that end, the Parties expect and intend to establish certain minimum levels of performance by Pearson (collectively, the "Service Levels").

The Parties will work together in good faith to establish mutually-agreeable Service Levels and associated metrics by April 1, 2017, to be effective no later than June 1, 2017. Upon agreement by the Parties, the Parties will incorporate such Service Levels into this Agreement by executing a written amendment in accordance with Section 12.4. Any violation of a Service Level after they are mutually agreed shall result in a performance review, where BSA's sole remedy, and Pearson's sole liability, will be a root cause analysis of the issue.

## Schedule 8.5

### Limitations on Pearson Software

This is Schedule 8.5 to the Professional Services Agreement, dated as of September 1, 2016 (the "Agreement"), between Boy Scouts of America ("BSA") and Pearson Education, Inc. ("Pearson"). This Schedule sets forth the limitations on BSA's use of the Pearson Software identified below.

The Parties will work together in good faith to ensure that BSA personnel requiring use of the Pearson Software have sufficient access and that user accounts are allocated appropriately.

| Software | Total Permitted Users |
|---|---|
| MAZ | Access to MAZ platform for unlimited users to support BSA mobile applications on platform |
| Inkling | 4 licenses for authoring and distribution by BSA users on or before March 31, 2017 at which point MAZ will have replaced Inkling. |
| Equella (through March 2017 only) | 157 BSA users (through final migration) |
| P3 Internal Users | Up to 70 BSA concurrent users for Virtual Ticket/Job Manager (desktop application) |
| P3 External Users | Up to 150 BSA concurrent users for Job Request Portal (web application) |

Case 20-10343-LSS   Doc 350-2   Filed 04/06/20   Page 34 of 68

## Exhibit A

### Proposed Organization of BSA Account Team

Jan 2017 Pearson BSA Team New Org Chart

*Total HC: 22*



Case 20-10343-LSS   Doc 350-2   Filed 04/06/20   Page 35 of 68

## Exhibit B

### Form of Statement of Work

This Statement of Work No. ___ ("SOW"), adopts and incorporates by reference the terms and conditions of the Professional Services Agreement (the "Agreement"), dated as of September 1, 2016, between Pearson Education, Inc., operating as Pearson Learning Solutions ("Pearson"), and Boy Scouts of America ("BSA"), as it may be amended from time to time.

This SOW is effective as of the last date shown below ("SOW Effective Date") and will remain in effect until all the Services herein have been performed, unless earlier terminated in accordance with the Agreement. The Parties' performance of this SOW is subject to the terms and conditions of this SOW and the Agreement. Capitalized terms used but not defined in this Statement of Work shall have the meanings set out in the Agreement.

1. **Description of the Services.** The services to be performed pursuant to this SOW are:

2. **Commence and Term of Work.** The date upon which the Project will commence and the term of this SOW are:

3. **Personnel.** The names of the key personnel involved with the work under this SOW are:

4. **Fees.** The fees and other charges to be paid to Pearson under this SOW, if any, are:

5. **Implementation Plan.** The timetable for performance and implementation of the Project is:

6. **Project Milestones and Payment Schedules:**

7. **Criteria for completion of the Project:**

8. **Procedures for the testing and acceptance** of the services and deliverables by BSA, to the extent such procedures differ from those set out in Section ___ of the Agreement:

9. **Any other terms and conditions** agreed upon by the parties in connection with the services to be performed pursuant to this SOW:

IN WITNESS WHEREOF, the Parties hereto have executed this SOW to be effective as of the last date shown below.

Pearson Education, Inc.

By: _____

Name:

Title:

Date:

Boy Scouts of America

By: _____

Name:

Title:

Date:

# Exhibit B

## 2.17.20 Insights
These totals do not include jobs that may have been opened and closed during the same week





| Total Number of Jobs per Tier | 2/17/2020 | 2/10/2020 | % Difference |
|---|---|---|---|
| Tier 1 | 0 | 0 | -- |
| Tier 2 | 85 | 80 | 6% |
| Tier 3 | 34 | 36 | -6% |
| Tier 4 | 17 | 10 | 70% |
| Total Jobs | 136 | 126 | 8% |
| Summary | There was a percentage increase in the number of jobs in Tier 2 and 4. There was a percentage decrease in the number of jobs in Tier 3. The overall number of jobs increased by 8% this week. | | |



| Total Number of Jobs | 2/17/2020 | 2/10/2020 | % Difference |
|---|---|---|---|
| Open | 102 | 95 | 7% |
| Completed | 8 | 9 | -11% |
| On Hold | 8 | 8 | 0% |
| New | 18 | 14 | 29% |
| Cancelled | 0 | 0 | -- |
| Total Jobs | 136 | 126 | 8% |
| Summary | Total number of open and new jobs increased from last week. Total number of completed jobs reduced from last week. There was no change in On-Hold jobs from last week. There were no cancelled jobs this week. | | |









## 2.17.20 Insights
These totals do not include jobs that may have been opened and closed during the same week



Completed Jobs by Job Complexity and Week



Total Jobs by Job Complexity and Week



Total Jobs by Status and Week

| Total Number of Jobs per Tier | 2/17/2020 | 2/10/2020 | % Difference |
|---|---|---|---|
| Tier 1 | 0 | 0 | -- |
| Tier 2 | 85 | 80 | 6% |
| Tier 3 | 34 | 36 | -6% |
| Tier 4 | 17 | 10 | 70% |
| Total Jobs | 136 | 126 | 8% |
| Summary | There was a percentage increase in the number of jobs in Tier 2 and 4. There was a percentage decrease in the number of jobs in Tier 3. The overall number of jobs increased by 8% this week. | | |

| Total Number of Jobs | 2/17/2020 | 2/10/2020 | % Difference |
|---|---|---|---|
| Open | 102 | 95 | 7% |
| Completed | 8 | 9 | -11% |
| On Hold | 8 | 8 | 0% |
| New | 18 | 14 | 29% |
| Cancelled | 0 | 0 | -- |
| Total Jobs | 136 | 126 | 8% |
| Summary | Total number of open and new jobs increased from last week. Total number of completed jobs reduced from last week. There was no change in On-Hold jobs from last week. There were no cancelled jobs this week. | | |



Top 6 Client Department Names for 2/17/2020



Top 6 Client Department Names for 2/10/2020



Top 6 Project Types for 2/17/2020



Top 6 Project Types for 2/10/2020

## 2.17.19 Overview of Work In Progress

| BSA Department | Job Count | Product Quantity |
|---|---|---|
| Central Region | 6 | 325 |
| Health & Safety Service | 9 | 9 |
| Legal Counsel Administration | 1 | 1 |
| Magazine Department | 1 | 1 |
| Marketing Experience/Brand | 14 | 970 |
| Marketing Group | 2 | 129 |
| Membership Growth | 18 | 18 |
| NESA Department | 2 | 2 |
| Northeast Region | 1 | 500 |
| Outdoor Programs | 7 | 73 |
| Pilots & Program Development | 61 | 143,151 |
| Scouting U | 2 | 450 |
| Sea Base Facilities | 2 | 80,500 |
| Southern Region | 1 | 1,000 |
| Venturing | 1 | 1 |
| Grand Total | 128 | 227,330 |

| Product Type | Job Count | Product Quantity |
|---|---|---|
| Banner | 1 | 1 |
| Booklet/Pamphlet | 5 | 4,441 |
| Books | 1 | 10,000 |
| Brochure | 3 | 504 |
| Card | 1 | 80,000 |
| Certificate | 11 | 805 |
| Copy Editing | 18 | 18 |
| Digital Booklet/Pamphlet | 2 | 2 |
| Digital Books | 4 | 4 |
| Digital Certificate | 1 | 1 |
| Digital Chart/Infographic | 4 | 901 |
| Digital Fact Sheet | 4 | 4 |
| Digital Flyer | 2 | 2 |
| Digital Form | 4 | 4 |
| Digital Newsletter | 1 | 1 |
| Digital Patch | 1 | 1 |
| Form | 2 | 2 |
| Handbooks | 1 | 2,000 |
| Logo | 2 | 4 |
| Merit Badge Pamphlets | 54 | 127,248 |
| Miscellaneous Books | 1 | 1,000 |
| Other | 3 | 130 |
| Web Banner | 2 | 57 |
| Grand Total | 128 | 227,330 |

| Tier Complexity | Job Count |
|---|---|
| Tier 2 | 78 |
| Tier 3 | 33 |
| Tier 4 | 17 |
| Grand Total | 128 |

| Job Status | Job Count |
|---|---|
| On Hold | 8 |
| Open | 120 |
| Grand Total | 128 |

| Account Services | Job Count |
|---|---|
| Lauren Safranski | 56 |
| Tito Lopez | 72 |
| Grand Total | 128 |

| Print Buyer Activity | Job Count |
|---|---|
| In Progress | 3 |
| Upcoming | 35 |
| Grand Total | 38 |

| Job Number | Job Name | Activity | Activity_Status | Date_Due |
|---|---|---|---|---|
| 109193 | SBAFA Endowment Brochure | Print Buyer to Quote | Upcoming | 3/2/2020 |
| 109193 | SBAFA Endowment Brochure | Pull Vendor Files from Print Buyer Folder | Upcoming | 3/26/2020 |
| 109300 | Handbook Venturers VT | Pull Vendor Files from Print Buyer Folder | Upcoming | 2/20/2020 |
| 109693 | Inland Northwest Council Infographic | Pull Vendor Files from Print Buyer Folder | Upcoming | 2/11/2020 |
| 109697 | Southern Region Illustrated (SRI) Magazine | Print Buyer to Quote | Upcoming | 3/2/2020 |
| 109697 | Southern Region Illustrated (SRI) Magazine | Pull Vendor Files from Print Buyer Folder | Upcoming | 4/1/2020 |
| 109700 | Cub Scout Song Book 2020 | Pull Vendor Files from Print Buyer Folder | Upcoming | 3/4/2020 |
| 109706 | Q2 2020 Supply Literature - Animal Science MBP | Pull Vendor Files from Print Buyer Folder | Upcoming | 3/10/2020 |
| 109707 | Q2 2020 Supply Literature - Aviation MBP | Pull Vendor Files from Print Buyer Folder | Upcoming | 3/10/2020 |
| 109708 | Q2 2020 Supply Literature - Camping MBP | Pull Vendor Files from Print Buyer Folder | Upcoming | 3/10/2020 |
| 109709 | Q2 2020 Supply Literature - Cooking MBP | Pull Vendor Files from Print Buyer Folder | Upcoming | 3/10/2020 |
| 109710 | Q2 2020 Supply Literature - Environmental Science MBP | Pull Vendor Files from Print Buyer Folder | Upcoming | 3/11/2020 |
| 109711 | Q2 2020 Supply Literature - Geology MBP | Pull Vendor Files from Print Buyer Folder | Upcoming | 3/11/2020 |
| 109712 | Q2 2020 Supply Literature - Pioneering MBP | Pull Vendor Files from Print Buyer Folder | Upcoming | 3/11/2020 |
| 109713 | Q2 2020 Supply Literature - Safety MBP | Pull Vendor Files from Print Buyer Folder | Upcoming | 3/11/2020 |
| 108859 | Scouting is Ministry Program | Print Buyer to Quote | Upcoming | 3/4/2020 |
| 108859 | Scouting is Ministry Program | Pull Vendor Files from Print Buyer Folder | Upcoming | 4/3/2020 |
| 109757 | New York Report to the State Infographic | Pull Vendor Files from Print Buyer Folder | In Progress | 2/14/2020 |
| 109766 | First Aid Log | Pull Vendor Files from Print Buyer Folder | Upcoming | 3/16/2020 |
| 109762 | North Star Award Cert | Pull Vendor Files from Print Buyer Folder | Upcoming | 2/17/2020 |
| 109764 | Honor Medal Cert | Pull Vendor Files from Print Buyer Folder | Upcoming | 2/24/2020 |
| 109758 | Silver Buffalo Certificate | Pull Vendor Files from Print Buyer Folder | Upcoming | 2/19/2020 |
| 109761 | Silver Antelope Certificate | Pull Vendor Files from Print Buyer Folder | Upcoming | 2/17/2020 |
| 109765 | Heroism Award Cert | Pull Vendor Files from Print Buyer Folder | Upcoming | 2/24/2020 |
| 109768 | Tidewater Council Infographic | Pull Vendor Files from Print Buyer Folder | Upcoming | 3/2/2020 |
| 109721 | Q2 2020 Supply Literature - Disability Awareness MBP | Pull Vendor Files from Print Buyer Folder | Upcoming | 3/3/2020 |
| 109733 | Q2 2020 Supply Literature - Nuclear Science MBP | Pull Vendor Files from Print Buyer Folder | Upcoming | 3/3/2020 |
| 109737 | Q2 2020 Supply Literature - Pulp and Paper MBP | Pull Vendor Files from Print Buyer Folder | Upcoming | 3/5/2020 |
| 109763 | Honor Medal with Crossed Palms Cert | Pull Vendor Files from Print Buyer Folder | Upcoming | 2/24/2020 |
| 109008 | Q2 2020 Supply Literature - Genealogy MBP | Pull Vendor Files from Print Buyer Folder | Upcoming | 3/18/2020 |
| 109780 | 2019 Report to the Nation | Print Buyer to Quote | In Progress | 2/19/2020 |
| 109780 | 2019 Report to the Nation | Pull Vendor Files from Print Buyer Folder | Upcoming | 2/21/2020 |
| 109781 | 2019 Report to the Nation - Small | Print Buyer to Quote | In Progress | 2/19/2020 |
| 109781 | 2019 Report to the Nation - Small | Pull Vendor Files from Print Buyer Folder | Upcoming | 2/21/2020 |
| 109783 | 721-676 Commissioning with Honors Certificate | Print Buyer to Quote | Upcoming | 2/20/2020 |
| 109783 | 721-676 Commissioning with Honors Certificate | Pull Vendor Files from Print Buyer Folder | Upcoming | 3/4/2020 |
| 109782 | 721-676 Commissioning Certificate | Print Buyer to Quote | Upcoming | 2/19/2020 |
| 109782 | 721-676 Commissioning Certificate | Pull Vendor Files from Print Buyer Folder | Upcoming | 3/5/2020 |

## 2.24.20 Insights

These totals do not include jobs that may have been opened and closed during the same week





| Total Number of Jobs per Tier | 2/24/2020 | 2/17/2020 | % Difference |
|---|---|---|---|
| Tier 1 | 0 | 0 | -- |
| Tier 2 | 79 | 85 | -7% |
| Tier 3 | 33 | 34 | -3% |
| Tier 4 | 18 | 17 | 6% |
| Total Jobs | 130 | 136 | -4% |
| Summary | There was a percentage increase in the number of jobs in Tier 4. There was a percentage decrease in the number of jobs in Tier 2 and 3. The overall number of jobs decreased by 4% this week. | | |



| Total Number of Jobs | 2/24/2020 | 2/17/2020 | % Difference |
|---|---|---|---|
| Open | 107 | 102 | 5% |
| Completed | 12 | 8 | 50% |
| On Hold | 9 | 8 | 13% |
| New | 2 | 18 | -89% |
| Cancelled | 0 | 0 | |
| Total Jobs | 130 | 136 | -4% |
| Summary | Total number of Open, Completed and On-Hold jobs increased from last week. Total number of new jobs reduced from last week. There were no cancelled jobs this week. | | |









# Overview of Work in Progress 2.24.20

| BSA Department | Job Count | Product Quantity |
|---|---|---|
| Central Region | 3 | 215 |
| Health & Safety Service | 9 | 9 |
| Legal Counsel Administration | 1 | 1 |
| Marketing Experience/Brand | 14 | 670 |
| Marketing Group | 2 | 129 |
| Membership Growth | 15 | 15 |
| Northeast Region | 1 | 500 |
| Outdoor Programs | 5 | 5 |
| Pilots & Program Developme | 61 | 143151 |
| Scouting U | 2 | 450 |
| Sea Base Facilities | 3 | 80501 |
| Southern Region | 1 | 1000 |
| Venturing | 1 | 1 |
| (blank) | | |
| Grand Total | 118 | 226647 |

| Status | Job Count |
|---|---|
| On Hold | 9 |
| Open | 109 |
| (blank) | |
| Grand Total | 118 |

| Project Type | Job Count | Product Quantity |
|---|---|---|
| Banner | 1 | 1 |
| Booklet/Pamphlet | 4 | 4401 |
| Books | 1 | 10000 |
| Brochure | 3 | 504 |
| Card | 2 | 80200 |
| Certificate | 6 | 666 |
| Copy Editing | 16 | 16 |
| Digital Booklet/Pamphle | 1 | 1 |
| Digital Books | 4 | 4 |
| Digital Certificate | 1 | 1 |
| Digital Chart/Infographi | 3 | 401 |
| Digital Fact Sheet | 4 | 4 |
| Digital Flyer | 2 | 2 |
| Digital Form | 4 | 4 |
| Digital Patch | 1 | 1 |
| Form | 2 | 2 |
| Handbooks | 1 | 2000 |
| Logo | 2 | 4 |
| Merit Badge Pamphlets | 54 | 127248 |
| Miscellaneous Books | 1 | 1000 |
| Other | 3 | 130 |
| Web Banner | 2 | 57 |
| (blank) | | |
| Grand Total | 118 | 226647 |

| Tier Complexity | Job Count |
|---|---|
| Tier 2 | 68 |
| Tier 3 | 32 |
| Tier 4 | 18 |
| (blank) | |
| Grand Total | 118 |

| Account Services | Job Count |
|---|---|
| Lauren Safranski | 48 |
| Tito Lopez | 70 |
| (blank) | |
| Grand Total | 118 |

| Print Buyers | Job Count |
|---|---|
| Upcoming | 28 |
| (blank) | |
| Grand Total | 28 |

Case 20-10343-LSS   Doc 350-2   Filed 04/06/20   Page 47 of 68

| Status | Hit Name | Project Type | BSA Program | Tier Complexity | Project ID | Job Number | Job Name | BOM QAT | SKU | Quantity | Cost Center | Cforal Department Name | Requester Name | Entry Date | Due Date | Projected Delivery Date | Current Tasks | Current Actors |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| On Hold | Lauren Safranski | Booklet/Pamphlet | National Office | Tier 2 | 19417 | 209774 | 512 NE Northeast Region Short Archived Brochure | 442-1160 | | 500 | 1580 | Northeast Region | Kathie Franks | 2/13/2020 | 5/1/2020 | On Hold | *On Hold Starting 2/19/20 | *Lauren Safranski |
| Open | Lauren Safranski | Logo | Venturing | Tier 4 | 19418 | 209773 | Year of the Venturer Logo | | | 1 | 0943 | Pilots & Program Development | Owen McCulloch | 2/13/2020 | 1/20/2020 | | *All Name | *Lauren Safranski |
| Open | Lauren Safranski | Card | National Office | Tier 2 | 19420 | 209779 | 2020 Thank You Note Postcard | 419-118 | | 100000 | 1413 | See Base Facilities | Andrew Miller | 2/24/2020 | 3/1/2020 | 3/16/2020 | *Design Layout/Conf. Specs | *Lauren Safranski |
| Open | Lauren Safranski | Other | Marketing/Brand | Tier 2 | 19421 | 209590 | 2019 Report to the Nation - Large | 419-119 | | 4 | 1090 | Marketing Group | Anna Drinkob | 2/24/2020 | 2/17/2020 | 3/2/2020 | *Finish Print Proof | *Lauren Safranski |
| Open | Lauren Safranski | Other | Marketing/Brand | Tier 2 | 19422 | 209591 | 2019 Report to the Nation - Small | 419-120 | | 125 | 1090 | Marketing Group | Anna Drinkob | 2/24/2020 | 2/17/2020 | 3/2/2020 | *Finish Print Proof | *Lauren Safranski |
| Open | Lauren Safranski | Certificate | Scouting U | Tier 2 | 19423 | 209581 | 711-ENCommissioning Certificate | 711-ENx1 | | 125 | 4320 | Scouting U | Jennifer Robinson | 2/24/2020 | 3/4/2020 | 3/16/2020 | *QC/Conf. Specs | *Lauren Safranski |
| Open | Lauren Safranski | Certificate | Scouting U | Tier 2 | 19424 | 209582 | 711-ENCommissioning with Honors Certificate | 711-ENx1 | | 125 | 4320 | Scouting U | Jennifer Robinson | 2/24/2020 | 3/4/2020 | 3/16/2020 | *Send Sample Photo/Proof | *Lauren Safranski |
| Open | Lauren Safranski | Card | STEM | Tier 4 | 19425 | 209784 | 56-NS Chemistry Leader Guide | 500-1485 | | 1 | 1560 | Membership Growth | Brittney Avila | 2/17/2020 | 4/20/2020 | 3/12/2020 | *Create Estimate/Review *Close | *Lauren Safranski *B |
| Open | Lauren Safranski | Copy Editing | STEM | Tier 4 | 19426 | 209785 | 56-NS Chemistry Scout Handbook | 500-1495 | | 1 | 1560 | Membership Growth | Brittney Avila | 2/17/2020 | 4/20/2020 | 3/12/2020 | *Create Estimate/Review *Close | *Lauren Safranski *B |
| Open | Lauren Safranski | Copy Editing | STEM | Tier 4 | 19427 | 209786 | 56-NS Sports Leader Guide | 500-1486 | | 1 | 1560 | Membership Growth | Brittney Avila | 2/17/2020 | 4/23/2020 | 4/7/2020 | *Create Estimate/Review *Close | *Lauren Safranski *B |
| Open | Lauren Safranski | Copy Editing | STEM | Tier 4 | 19428 | 209787 | 56-NS Sports Scout Handbook | 500-1498 | | 1 | 1560 | Membership Growth | Brittney Avila | 2/17/2020 | 4/27/2020 | 4/7/2020 | *Create Estimate/Review *Close | *Lauren Safranski *B |
| Open | Lauren Safranski | Card | Venturing | Tier 1 | 19429 | 209793 | Venturing Crew Budget plan | 519-176 | 519-176 | 1 | 0943 | Pilots & Program Development | Owen McCulloch | 2/17/2020 | 2/28/2020 | 2/16/2020 | *Design Layout/Conf. Specs | *Lauren Safranski |
| Open | Lauren Safranski | Digital Flyer | Marketing/Brand | Tier 2 | 19430 | 209738 | Newborn Hire Council Infographic | 519-636 | | 300 | 1370 | Marketing Experience/Brand | Karen Katz | 2/16/2020 | 3/17/2020 | 3/26/2020 | *Proofreading | *Tonya Tyler |
| Open | Lauren Safranski | Certificate | National Office | Tier 4 | 19434 | 209790 | Eurport Equipart Legacy Fellowship | 442-611 | | 1 | 2415 | Sea Base Facilities | Matthew Richard | 2/19/2020 | 4/2/2020 | | *All Name | *Lauren Safranski |

| Job Number | Job Name | Activity | Activity_Status |
|---|---|---|---|
| 109193 | SBAFA Endowment Brochure | Print Buyer to Quote | Upcoming |
| 109193 | SBAFA Endowment Brochure | Pull Vendor Files from Print Buyer Folder | Upcoming |
| 109300 | Handbook Venturers VT | Pull Vendor Files from Print Buyer Folder | Upcoming |
| 109693 | Inland Northwest Council Infographic | Pull Vendor Files from Print Buyer Folder | Upcoming |
| 109697 | Southern Region Illustrated (SRI) Magazine | Print Buyer to Quote | Upcoming |
| 109697 | Southern Region Illustrated (SRI) Magazine | Pull Vendor Files from Print Buyer Folder | Upcoming |
| 109700 | Cub Scout Song Book 2020 | Pull Vendor Files from Print Buyer Folder | Upcoming |
| 109706 | Q2 2020 Supply Literature - Animal Science MBP | Pull Vendor Files from Print Buyer Folder | Upcoming |
| 109707 | Q2 2020 Supply Literature - Aviation MBP | Pull Vendor Files from Print Buyer Folder | Upcoming |
| 109708 | Q2 2020 Supply Literature - Camping MBP | Pull Vendor Files from Print Buyer Folder | Upcoming |
| 109709 | Q2 2020 Supply Literature - Cooking MBP | Pull Vendor Files from Print Buyer Folder | Upcoming |
| 109710 | Q2 2020 Supply Literature - Environmental Science MBP | Pull Vendor Files from Print Buyer Folder | Upcoming |
| 109711 | Q2 2020 Supply Literature - Geology MBP | Pull Vendor Files from Print Buyer Folder | Upcoming |
| 109712 | Q2 2020 Supply Literature - Pioneering MBP | Pull Vendor Files from Print Buyer Folder | Upcoming |
| 109713 | Q2 2020 Supply Literature - Safety MBP | Pull Vendor Files from Print Buyer Folder | Upcoming |
| 108859 | Scouting is Ministry Program | Print Buyer to Quote | Upcoming |
| 108859 | Scouting is Ministry Program | Pull Vendor Files from Print Buyer Folder | Upcoming |
| 109766 | First Aid Log | Pull Vendor Files from Print Buyer Folder | Upcoming |
| 109768 | Tidewater Council Infographic | Pull Vendor Files from Print Buyer Folder | Upcoming |
| 109721 | Q2 2020 Supply Literature - Disability Awareness MBP | Pull Vendor Files from Print Buyer Folder | Upcoming |
| 109733 | Q2 2020 Supply Literature - Nuclear Science MBP | Pull Vendor Files from Print Buyer Folder | Upcoming |
| 109737 | Q2 2020 Supply Literature - Pulp and Paper MBP | Pull Vendor Files from Print Buyer Folder | Upcoming |
| 109008 | Q2 2020 Supply Literature - Genealogy MBP | Pull Vendor Files from Print Buyer Folder | Upcoming |
| 109783 | 721-676 Commissioning with Honors Certificate | Pull Vendor Files from Print Buyer Folder | Upcoming |
| 109782 | 721-676 Commissioning Certificate | Pull Vendor Files from Print Buyer Folder | Upcoming |
| 109779 | 2021 Florida Sea Base Postcard | Pull Vendor Files from Print Buyer Folder | Upcoming |
| 109719 | Q2 2020 Supply Literature - Dentistry MBP | Pull Vendor Files from Print Buyer Folder | Upcoming |
| 109789 | Hawkeye Area Council Infograpnic | Pull Vendor Files from Print Buyer Folder | Upcoming |

**Date_Due**
3/3/2020
3/27/2020
2/28/2020
2/11/2020
3/4/2020
4/3/2020
3/4/2020
3/10/2020
3/10/2020
3/10/2020
3/10/2020
3/11/2020
3/11/2020
3/11/2020
3/11/2020
3/5/2020
4/6/2020
3/16/2020
2/25/2020
3/3/2020
3/3/2020
3/9/2020
3/18/2020
2/24/2020
2/25/2020
3/11/2020
3/12/2020
3/11/2020

## 3.2.20 Insights

These totals do not include jobs that may have been opened and closed during the same week





| Total Number of Jobs per Tier | 3/2/2020 | 2/24/2020 | % Difference |
|---|---|---|---|
| Tier 1 | 0 | 0 | -- |
| Tier 2 | 80 | 79 | 1% |
| Tier 3 | 32 | 33 | -3% |
| Tier 4 | 18 | 18 | 0% |
| **Total Jobs** | **130** | **130** | 0% |
| Summary | No significant change in Tier numbers from last week to the previous week | | |



| Total Number of Jobs | 3/2/2020 | 2/24/2020 | % Difference |
|---|---|---|---|
| Cancelled | 0 | 0 | |
| Completed | 9 | 12 | -25% |
| On Hold | 10 | 9 | 11% |
| Open | 100 | 107 | -7% |
| New | 11 | 2 | 450% |
| **Total Jobs** | **130** | **130** | 0% |
| Summary | Significant jump in new jobs submitted during the past week (11) over previous week (2) | | |





| Top 6 Departments | | 3/2/2020 | Percentage Of Total Number of Jobs |
|---|---|---|---|
| 1 | Pilots & Program Development | | 57% |
| 2 | Marketing Experience/Brand | | 14% |
| 3 | Membership Growth | | 10% |
| 4 | Health & Safety Service | | 8% |
| 5 | Magazine Department | | 6% |
| 6 | Sea Base Facilities | | 5% |

| Top 6 Departments | | 2/24/2020 | Percentage Of Total Number of Jobs |
|---|---|---|---|
| 1 | Pilots & Program Development | | 52% |
| 2 | Membership Growth | | 13% |
| 3 | Marketing Experience/Brand | | 12% |
| 4 | Health & Safety Service | | 8% |
| 5 | Outdoor Programs | | 4% |
| 6 | Central Region | | 3% |
| 6 | Sea Base Facilities | | 3% |

| Top 6 Project Types | | 3/2/2020 | Percentage Of Total Number of Jobs |
|---|---|---|---|
| 1 | Merit Badge Pamphlets | | 62% |
| 2 | Copy Editing | | 13% |
| 3 | Brochure | | 7% |
| 3 | Certificate | | 7% |
| 5 | Digital Fact Sheet | | 6% |
| 6 | Chart/Infographic | | 5% |

| Top 6 Project Types | | 2/24/2020 | Percentage Of Total Number of Jobs |
|---|---|---|---|
| 1 | Merit Badge Pamphlets | | 66% |
| 2 | Copy Editing | | 14% |
| 3 | Certificate | | 5% |
| 4 | Booklet/Pamphlet | | 4% |
| 4 | Digital Books | | 4% |
| 4 | Digital Fact Sheet | | 4% |
| 4 | Digital Form | | 4% |

| Number of days remaining for Job Completion in terms of Projected Delivery Date | Number of Jobs | Notes |
|---|---|---|
| <=10 | 11 | |
| 11 - 20 | 26 | |
| 21 - 30 | 36 | |
| >30 | 13 | 4-STEM, 3- Scouts BSA, 2-General |
| Unknown | 35 | All 35 jobs have been with the client beyond the alotted review time, i.e.; LDS, 7- Health & Safety; 6-MBPs; 4-Mkt/Brand; Outdoor brochures/syllabus; Council Infographics; 10 jobs On Hold, etc. |
| **Total Open Jobs** | **121** | |

# 3.2.20 Overview of Work In Progress

| BSA Department | Job Count | Product Quantity |
|---|---|---|
| Central Region | 3 | 215 |
| Health & Safety Service | 9 | 9 |
| Legal Counsel Administration | 1 | 1 |
| Magazine Department | 6 | 6 |
| Marketing Experience/Brand | 15 | 870 |
| Membership Growth | 11 | 11 |
| Northeast Region | 1 | 500 |
| Outdoor Programs | 4 | 4 |
| Pilots & Program Development | 62 | 145,530 |
| Scouting U | 2 | 450 |
| Sea Base Facilities | 5 | 80,651 |
| Southern Region | 1 | 1,000 |
| Venturing | 1 | 1 |
| Grand Total | 121 | 229,248 |

| Product Type | Job Count | Product Quantity |
|---|---|---|
| Banner | 1 | 1 |
| Booklet/Pamphlet | 1 | 1 |
| Books | 1 | 10,000 |
| Brochure | 6 | 1,154 |
| Card | 1 | 80,000 |
| Certificate | 6 | 666 |
| Chart/Infographic | 5 | 801 |
| Copy Editing | 12 | 12 |
| Digital Booklet/Pamphlet | 4 | 4 |
| Digital Books | 4 | 4 |
| Digital Chart/Infographic | 2 | 2 |
| Digital Fact Sheet | 6 | 6 |
| Digital Flyer | 1 | 1 |
| Digital Form | 3 | 3 |
| Digital Patch | 1 | 1 |
| Form | 2 | 2 |
| Handbooks | 1 | 2,000 |
| Logo | 2 | 4 |
| Merit Badge Pamphlets | 58 | 133,528 |
| Miscellaneous Books | 1 | 1,000 |
| Other | 1 | 1 |
| Web Banner | 2 | 57 |
| Grand Total | 121 | 229,248 |

| Tier Complexity | Job Count |
|---|---|
| Tier 2 | 72 |
| Tier 3 | 32 |
| Tier 4 | 17 |
| Grand Total | 121 |

| Job Status | Job Count |
|---|---|
| On Hold | 10 |
| Open | 111 |
| Grand Total | 121 |

| Print Buyer Activity | Job Count |
|---|---|
| In Progress | 11 |
| Upcoming | 44 |
| Grand Total | 55 |

| Job Number | Job Name |
| --- | --- |
| 109193 | SBAFA Endowment Brochure |
| 109193 | SBAFA Endowment Brochure |
| 109300 | Handbook Venturers VT |
| 109693 | Inland Northwest Council Infographic |
| 109697 | Southern Region Illustrated (SRI) Magazine |
| 109697 | Southern Region Illustrated (SRI) Magazine |
| 109700 | Cub Scout Song Book 2020 |
| 109706 | Q2 2020 Supply Literature - Animal Science MBP |
| 109707 | Q2 2020 Supply Literature - Aviation MBP |
| 109708 | Q2 2020 Supply Literature - Camping MBP |
| 109709 | Q2 2020 Supply Literature - Cooking MBP |
| 109710 | Q2 2020 Supply Literature - Environmental Science MBP |
| 109711 | Q2 2020 Supply Literature - Geology MBP |
| 109712 | Q2 2020 Supply Literature - Pioneering MBP |
| 109713 | Q2 2020 Supply Literature - Safety MBP |
| 108859 | Scouting is Ministry Program |
| 108859 | Scouting is Ministry Program |
| 109766 | First Aid Log |
| 109721 | Q2 2020 Supply Literature - Disability Awareness MBP |
| 109733 | Q2 2020 Supply Literature - Nuclear Science MBP |
| 109737 | Q2 2020 Supply Literature - Pulp and Paper MBP |
| 109008 | Q2 2020 Supply Literature - Genealogy MBP |
| 109779 | 2021 Florida Sea Base Postcard |
| 109719 | Q2 2020 Supply Literature - Dentistry MBP |
| 109789 | Hawkeye Area Council Infograpnic |
| 109630 | Q2 2020 Supply Literature - Oceanography MBP - Gender Neutral Revisic |
| 109631 | Q2 2020 Supply Literature -  Pottery MBP - Gender Neutral Revisions |
| 109734 | Q2 2020 Supply Literature - Personal Management MBP |
| 109741 | Q2 2020 Supply Literature - Veterinary Medicine MBP |
| 109796 | Q2 2020 Supply Literature - Horesmanship MBP |
| 109797 | Q2 2020 Supply Literature - Woodcarving MBP |
| 109797 | Q2 2020 Supply Literature - Woodcarving MBP |
| 109801 | 2020 Tarpon Spouses Brochure |
| 109801 | 2020 Tarpon Spouses Brochure |
| 109715 | Q2 2020 Supply Literature - Automotive Maintenance MBP |
| 109802 | 2020 Tarpon Program Brochure |
| 109802 | 2020 Tarpon Program Brochure |
| 109723 | Q2 2020 Supply Literature - First Aid MBP |
| 109716 | Q2 2020 Supply Literature - Chess MBP |
| 109726 | Q2 2020 Supply Literature - Golf MBP |
| 109730 | Q2 2020 Supply Literature - Indian Lore MBP |
| 109739 | Q2 2020 Supply Literature - Robotics MBP |
| 109739 | Q2 2020 Supply Literature - Robotics MBP |
| 109717 | Q2 2020 Supply Literature - Citizenship in the Nation MBP |
| 109717 | Q2 2020 Supply Literature - Citizenship in the Nation MBP |
| 109718 | Q2 2020 Supply Literature - Climbing MBP |

| 109718 | Q2 2020 Supply Literature - Climbing MBP |
| 109724 | Q2 2020 Supply Literature - Game Design MBP |
| 109724 | Q2 2020 Supply Literature - Game Design MBP |
| 109732 | Q2 2020 Supply Literature - Metalwork MBP |
| 109732 | Q2 2020 Supply Literature - Metalwork MBP |
| 109803 | Chester County Council Infographic |
| 109803 | Chester County Council Infographic |
| 109162 | Q2 2020 Supply Literature -  Traffic Safety MBP - Gender/Female Photos |
| 108944 | Q2 2020 Supply Literature -  Woodwork MBP - Gender/Female Photos |

| Activity | Activity_Status | Date_Due |
|---|---|---|
| Print Buyer to Quote | In Progress | 3/3/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/25/2020 |
| Pull Vendor Files from Print Buyer Folder | In Progress | 2/27/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 2/11/2020 |
| Print Buyer to Quote | Upcoming | 3/16/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 4/15/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/4/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/3/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/10/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/2/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/10/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/11/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/11/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/11/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/11/2020 |
| Print Buyer to Quote | Upcoming | 3/5/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 4/6/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/16/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/3/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/16/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/9/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/18/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/11/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/12/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/9/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/3/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/5/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/18/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/16/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/19/2020 |
| Print Buyer to Quote | In Progress | 3/3/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/16/2020 |
| Print Buyer to Quote | In Progress | 3/3/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/18/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/5/2020 |
| Print Buyer to Quote | In Progress | 3/3/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/18/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/5/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/5/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/5/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/5/2020 |
| Print Buyer to Quote | In Progress | 3/4/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/5/2020 |
| Print Buyer to Quote | In Progress | 3/4/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/5/2020 |
| Print Buyer to Quote | In Progress | 3/4/2020 |

Case ... Doc 350-2   Filed 04/06/20   Page 55 of 68

| | | |
|---|---|---|
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/5/2020 |
| Print Buyer to Quote | In Progress | 3/4/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/5/2020 |
| Print Buyer to Quote | In Progress | 3/4/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/5/2020 |
| Print Buyer to Quote | In Progress | 3/3/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/18/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/2/2020 |
| Pull Vendor Files from Print Buyer Folder | Upcoming | 3/10/2020 |

# Exhibit C



# Pearson

## INVOICE

**Customer Bill-to:**
BOY SCOUTS OF AMERICA
1325 W WALNUT HILL LN
PO BOX 152079
IRVING, TX 75015-2079

**Attention:**
Accounts Payable

**Customer Ship-to:**
BOY SCOUTS OF AMERICA
1325 W WALNUT HILL LN
PO BOX 152079
IRVING, TX 75015-2079

**NCS Pearson, Inc.**
5601 Green Valley Dr.
Bloomington, MN 55437
Tel: 1-888-884-7325
**Email:**
**Tax ID No:**
41-0850527

| | |
|---|---|
| Invoice Number : | 15661 |
| Date : | 04-JAN-2020 |
| Due Date : | 03-FEB-2020 |
| Payment Terms : | 30 NET |
| Customer Account : | 552874 |
| Contract Number/IEP ID : | 6091646/1016306 |
| Currency : | USD |
| Shipment Terms : | |
| Purchase Order Number : | |
| Number of Pages : | Page 1 of 2 |

Terms And Conditions: https://www.pearson.com/social-impact/sustainability/policies--downloads/terms-conditions-for-sales-orders.html

| Total Ordered Quantity (No. Of Items) | : | 2 |
|---|---|---|
| Net Amount | : | USD | $864,588.00 |
| Tax Total | : | USD | $0.00 |
| Invoice Total | : | USD | $864,588.00 |
| Amount Due | : | USD | $864,588.00 |

**REMITTANCE INFORMATION**

**Make Checks Payable to:**
NCS Pearson, Inc.
13036 COLLECTION CENTER DRIVE
CHICAGO, IL 60693

| Bank Wire to: | |
|---|---|
| Bank Name | : Bank of America N.A. |
| Bank Address | : |
| ABA ACH No | : 071000039 |
| ABA Wire No | : 026009593 |
| SWIFT Code | : BOFAUS3N |
| A/C No | : 8188105388 |
| Bank Account Name | : NCS Pearson, Inc. |

Case 20-10343-LSS    Doc 350-2    Filed 04/06/20    Page 58 of 68



**Pearson**

Invoice Number: 15661

| Contract Number | PO Number | Item Number | Item Description | Quantity | List Price | Net Price | Tax | Line Total |
|---|---|---|---|---|---|---|---|---|
| 6091646 | | 1269130994 | JANUARY 2020 SERVICES | 1 | 432,294.00 | 432,294.00 | 0.00 | 432,294.00 |
| 6091646 | | 1269130994 | FEBRUARY 2020 SERVICES | 1 | 432,294.00 | 432,294.00 | 0.00 | 432,294.00 |

Invoice Comments: -

NEW 2020 FEES AUTHORIZED BY PATRICIA LACOUR

To pay your invoice online: Visit https://ipay2.bizsys.pearson.com/register to register.
Already registered? Access your online account by visiting https://ipay2.bizsys.pearson.com

| | Subtotal | Total Other Charges | Total Tax | Invoice Total |
|---|---|---|---|---|
| | USD | USD | USD | USD |
| Invoice Total | $864,588.00 | $0.00 | $0.00 | $864,588.00 |

Terms Details-

| Term ID: | Term Name: | Start Date: | End Date: | Census Date: |
|---|---|---|---|---|
| BSA SERVICES 2014-2020 | BSA SERVICES | 01-MAR-2014 | 31-DEC-2020 | |



# Pearson

## INVOICE

**Customer Bill-to:**
PEARSON CANADA INC
26 PRINCE ANDREW PL
NORTH YORK, ON M3C 2H4
Canada

**Attention:**
Accounts Payable

**Customer Ship-to:**

**Pearson Education, Inc.**
221 River Street
Hoboken, NJ 07030
Tel: 1-800-232-6556
Email:
credit@pearson.com
Tax ID No:
22-1603684

| | | |
|---|---|---|
| Invoice Number | : | 15661 |
| Delivery Number | : | |
| Date | : | 11-SEP-2018 |
| Due Date | : | 20-OCT-2018 |
| Payment Terms | : | PSO INTERCO |
| Customer Account | : | 593416 |
| Order Number | : | 30487872 |
| Currency | : | USD |
| Shipment Terms | : | |
| Purchase Order Number | : | |
| Number of Pages | : | Page 1 of 2 |

| Total Ordered Quantity (No. Of Items) | : | 2 |
|---|---|---|
| Net Amount | : | USD | $32.22 |
| Tax Total | : | USD | $0.00 |
| Invoice Total | : | USD | $32.22 |
| Amount Due | : | USD | $32.22 |

### REMITTANCE INFORMATION

**Make Checks Payable to:**
Pearson Education, Inc.
PO Box 409479
Atlanta, GA 30384-9479

| | | |
|---|---|---|
| **Bank Wire to:** | | |
| Bank Name | : | Bank of America N. A. |
| Bank Address | : | 2690 W Lucas Rd, Allen, TX, 75002 |
| ABA Wire No | : | 026009593 |
| SWIFT Code | : | BOFAUS3N |
| A/C No | : | 8188307145 |
| Bank Account Name | : | Pearson Education, Inc. |

**Terms And Conditions:** https://www.pearson.com/social-impact/sustainability/policies--downloads/terms-conditions-for-sales-orders.html

Case 20-10343-LSS   Doc 350-2   Filed 04/06/20   Page 60 of 68



**Pearson**

Invoice Number: 15661

| Order Number | PO Number | Item Number | Item Description | Quantity | List Price | Net Price | Tax | Line Total |
|---|---|---|---|---|---|---|---|---|
| 30487872 | | 9781323880722 | Pearson Collections MIT211A Computer Studies for M.L.T. Dyrda SAINT CLAIR COLLEGE | 2 | 3.58 | 3.58 | 0.00 | 7.16 |
| 30487872 | | 9781323880722 | Pearson Collections MIT211A Computer Studies for M.L.T. Dyrda SAINT CLAIR COLLEGE | 7 | 3.58 | 3.58 | 0.00 | 25.06 |

To pay your invoice online: Visit https://ipay2.bizsys.pearson.com/register to register.
Already registered? Access your online account by visiting  https://ipay2.bizsys.pearson.com

| | Subtotal | Total Other Charges | Total Tax | Invoice Total |
|---|---|---|---|---|
| | USD | USD | USD | USD |
| Invoice Total | $32.22 | $0.00 | $0.00 | $32.22 |

Case 20-10343-LSS   Doc 350-2   Filed 04/06/20   Page 61 of 68



# Pearson

## INVOICE

**Customer Bill-to:**
PEARSON CANADA INC
26 PRINCE ANDREW PL
NORTH YORK, ON M3C 2H4
Canada

**Attention:**
Accounts Payable

**Customer Ship-to:**

**Pearson Education, Inc.**
221 River Street
Hoboken, NJ 07030
Tel: 1-800-232-6556
Email:
credit@pearson.com
**Tax ID No:**
22-1603684

| | |
|---|---|
| Invoice Number : | 17132 |
| Delivery Number : | |
| Date : | 23-OCT-2018 |
| Due Date : | 20-NOV-2018 |
| Payment Terms : | PSO INTERCO |
| Customer Account : | 593416 |
| Order Number : | 31682445 |
| Currency : | USD |
| Shipment Terms : | |
| Purchase Order Number : | |
| Number of Pages : | Page 1 of 2 |

Terms And Conditions: https://www.pearson.com/social-impact/sustainability/policies---downloads/terms-conditions-for-sales-orders.html

| Total Ordered Quantity (No. Of Items) : | 6 | |
|---|---|---|
| Net Amount : | USD | $654.51 |
| Tax Total : | USD | $0.00 |
| Invoice Total : | USD | $654.51 |
| Amount Due : | USD | $654.51 |

**REMITTANCE INFORMATION**

**Make Checks Payable to:**
Pearson Education, Inc.
PO Box 409479
Atlanta, GA 30384-9479

| Bank Wire to: | |
|---|---|
| Bank Name | : Bank of America N.A. |
| Bank Address | : 2690 W Lucas Rd, Allen, TX, 75002. |
| ABA Wire No | : 026009593 |
| SWIFT Code | : BOFAUS3N |
| A/C No | : 8188807145 |
| Bank Account Name | : Pearson Education, Inc. |



# Pearson

| Order Number | PO Number | Item Number | Item Description | Quantity | List Price | Net Price | Tax | Line Total |
|---|---|---|---|---|---|---|---|---|
| 31682445 | | 9780134039503 | Professionalism: Skills for Workplace Success Plus NEW MyLab Student Success -- Access Card Package | 1 | 2.69 | 2.69 | 0.00 | 2.69 |
| 31682445 | | 9780133972986 | Developing Management Skills, Student Value Edition Plus MyLab Management with Pearson eText -- Access Card Package | 1 | 14.17 | 14.17 | 0.00 | 14.17 |
| 31682445 | | 9780133972986 | Developing Management Skills, Student Value Edition Plus MyLab Management with Pearson eText -- Access Card Package | 27 | 14.17 | 14.17 | 0.00 | 382.59 |
| 31682445 | | 9780133972986 | Developing Management Skills, Student Value Edition Plus MyLab Management with Pearson eText -- Access Card Package | 16 | 14.17 | 14.17 | 0.00 | 226.72 |
| 31682445 | | 9780133972986 | Developing Management Skills, Student Value Edition Plus MyLab Management with Pearson eText -- Access Card Package | 1 | 14.17 | 14.17 | 0.00 | 14.17 |
| 31682445 | | 9780133972986 | Developing Management Skills, Student Value Edition Plus MyLab Management with Pearson eText -- Access Card Package | 1 | 14.17 | 14.17 | 0.00 | 14.17 |

To pay your invoice online:  Visit https://ipay2.bizsys.pearson.com/register to register.
Already registered? Access your online account by visiting  https://ipay2.bizsys.pearson.com

| | Subtotal | Total Other Charges | Total Tax | Invoice Total |
|---|---|---|---|---|
| | USD | USD | USD | USD |
| Invoice Total | $654.51 | $0.00 | $0.00 | $654.51 |

Case 20-10343-LSS    Doc 350-2    Filed 04/06/20    Page 63 of 68



# Pearson

## INVOICE

**Customer Bill-to:**
BOY SCOUTS OF AMERICA
DEBTOR IN POSSESSION
1325 W WALNUT HILL LN
PO BOX 152079
IRVING, TX 75015-2079

**Attention:**
Accounts Payable

**Customer Ship-to:**
BOY SCOUTS OF AMERICA
DEBTOR IN POSSESSION
1325 W WALNUT HILL LN
PO BOX 152079
IRVING, TX 75015-2079

NCS Pearson, Inc.
5601 Green Valley Dr.
Bloomington, MN 55437
Tel: 1-888-884-7325
**Email:**
**Tax ID No:**
41-0850527

| | | |
|---|---|---|
| Invoice Number : | 18344 |
| Date : | 29-FEB-2020 |
| Due Date : | 30-MAR-2020 |
| Payment Terms : | NET 30 |
| Customer Account : | 7035717 |
| Contract Number/EP ID : | 7006328/1016306 |
| Currency : | USD |
| Shipment Terms : | |
| Purchase Order Number : | |
| Number of Pages : | Page 1 of 2 |

| Total Ordered Quantity (No. Of Items) | : | 1 |
|---|---|---|
| Net Amount | : | USD | $432,294.00 |
| Tax Total | : | USD | $0.00 |
| Invoice Total | : | USD | $432,294.00 |
| Amount Due | : | USD | $432,294.00 |

Terms And Conditions: https://www.pearson.com/social-impact/sustainability/policies---downloads/terms-conditions-for-sales-orders.html

**REMITTANCE INFORMATION**

Make Checks Payable to:
NCS Pearson, Inc.
13036 COLLECTION CENTER DRIVE
CHICAGO, IL 60693

| Bank Wire to: | |
|---|---|
| Bank Name | : | Bank of America N.A. |
| Bank Address | : | |
| ABA ACH No | : | 071000039 |
| ABA Wire No | : | 026009593 |
| SWIFT Code | : | BOFAUS3N |
| A/C No | : | 8188105388 |
| Bank Account Name | : | NCS Pearson, Inc. |


Pearson

# INVOICE

| | |
|---|---|
| **Customer Bill-to:** | **Customer Ship-to:** |
| BOY SCOUTS OF AMERICA | BOY SCOUTS OF AMERICA |
| DEBTOR IN POSSESSION | DEBTOR IN POSSESSION |
| 1325 W WALNUT HILL LN | 1325 W WALNUT HILL LN |
| PO BOX 152079 | PO BOX 152079 |
| IRVING, TX 75015-2079 | IRVING, TX 75015-2079 |

**NCS Pearson, Inc.**
5601 Green Valley Dr.
Bloomington, MN 55437
**Tel:** 1-888-884-7325
**Email:**
**Tax ID No:**
41-0850527

| | | |
|---|---|---|
| Invoice Number | : | 18344 |
| Date | : | 29-FEB-2020 |
| Due Date | : | 30-MAR-2020 |
| Payment Terms | : | NET 30 |
| Customer Account | : | 7035717 |
| Contract Number/EP ID | : | 7006328/1016306 |
| Currency | : | USD |
| Shipment Terms | : | |
| Purchase Order Number | : | |
| Number of Pages | : | Page **1** of **2** |

**Attention:**
Accounts Payable

**Terms And Conditions**: https://www.pearson.com/social-impact/sustainability/policies---downloads/terms-conditions-for-sales-orders.html

| Total Ordered Quantity (No. Of Items) | : | | 1 |
|---|---|---|---|
| Net Amount | : | USD | $432,294.00 |
| Tax Total | : | USD | $0.00 |
| Invoice Total | : | USD | $432,294.00 |
| Amount Due | : | USD | $432,294.00 |

### REMITTANCE INFORMATION

**Make Checks Payable to:**
NCS Pearson, Inc.
13036 COLLECTION CENTER DRIVE
CHICAGO, IL 60693

| **Bank Wire to:** | | |
|---|---|---|
| Bank Name | : | Bank of America N A |
| Bank Address | : | |
| ABA ACH No | : | 071000039 |
| ABA Wire No | : | 026009593 |
| SWIFT Code | : | BOFAUS3N |
| A/C No | : | 8188105388 |
| Bank Account Name | : | NCS Pearson, Inc. |


Pearson

| Invoice Number: 18344 | | | | | | | | Page **2** of 2 |
|---|---|---|---|---|---|---|---|---|
| Contract Number | PO Number | Item Number | Item Description | Quantity | List Price | Net Price | Tax | Line Total |
| 7006328 | | 1269130994 | APRIL 2020 SERVICES | 1 | 432,294.00 | 432,294.00 | 0.00 | 432,294.00 |
| **Invoice Comments: -** | | | | | | | | |
| NEW 2020 FEES AUTHORIZED BY PATRICIA LACOUR | | | | | | | | |

To pay your invoice online:  Visit  https://ipay2.bizsys.pearson.com/register to register.
Already registered? Access your online account by visiting  https://ipay2.bizsys.pearson.com

| Invoice Total | Subtotal | Total Other Charges | Total Tax | Invoice Total |
|---|---|---|---|---|
| | USD | USD | USD | USD |
| | $432,294.00 | $0.00 | $0.00 | $432,294.00 |

**Terms Details-**

| Term ID: | Term Name: | Start Date: | End Date: | Census Date: |
|---|---|---|---|---|
| BSA SERVICES 2020-2020 | BSA SERVICES | 01-APR-2020 | 31-DEC-2020 | |

# Exhibit D

**Sent:** Friday, March 13, 2020 10:31 AM
**To:** Rockman, Meg <Meg.Rockman@pearson.com>; Mike Goldman <Mike.Goldman@scouting.org>; Mark Winkelman <Mark.Winkelman@scouting.org>
**Subject:** RE: Pearson's Guiding Principles During Covid-19

Mark, Mike, Meg-
Here's what I'm suggesting go on Pearson employee desks.
Please make edits.
I'm suggesting Meg notify her staff that they will work from home effective end of business today until further notice as a safety caution related to the coronavirus.
All existing jobs in the queue will continue to be worked.
As soon as Meg tells her staff, the attached notice can go on their work stations.
BSA can then notify the impacted BSA staff of this action after Meg tells her team. It's not a BSA companywide notice.

Related but not exactly the same....
It's my understanding Pearson work will cease with the BSA at close of business April 17th.
When and how Pearson makes that notification to their employees is up to them.
BSA will wait to notify our staff until we hear from Pearson but no later than 3/23.
At that point, our notification to BSA employees will state that the contract has ended. All current work with Pearson will proceed thru April 17th.
All new work needs to go to Mike Goldman immediately. Existing work not completed by April 17 will be picked up by Mike and team.

Mike and I need to prioritize the existing jobs and we will do so ASAP.

Does all of this work?
Patrick

Patrick Sterrett
Assistant Chief Scout Executive – National DFS
M 469.571.5401