## IN THE UNITED STATES BANKRUPTCY
## COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors. | Jointly Administered |

### DECLARATION OF BRUCE R. EWING IN SUPPORT OF MOTION OF GIRL SCOUTS OF THE UNITED STATES OF AMERICA FOR RELIEF FROM AUTOMATIC STAY TO RESUME TRADEMARK ACTION

BRUCE R. EWING, under penalty of perjury, declares:

1. I am a partner at the firm of Dorsey & Whitney LLP, 51 West 52nd Street, New York, New York. I am lead counsel for the Girl Scouts of the United States of America ("Girl Scouts") in the proceeding pending in the U.S. District Court for the Southern District of New York (the "District Court") captioned as *Girl Scouts of the United States of America v. Boy Scouts of America*, Case No. 18-cv-10287 (AKH) (the "Trademark Action"). I submit this Declaration in reply to the Objection filed by Debtors Boy Scouts of America ("Boy Scouts") and Delaware BSA, LLC (collectively, "Debtors") to the Motion for Relief From Automatic Stay to Resume Trademark Action (the "Motion"). Unless otherwise indicated below, I have personal knowledge of the facts set forth herein.

2. This Declaration addresses the following points:

    a. The Genesis and Opening Stages of the Trademark Action;

    b. The Progress of the Trademark Action Pre-Petition;

    c. The Current Status of the Trademark Action; and

    d. Recent Instances of Confusion and/or Unauthorized Use of Girl Scouts Trademarks.

**The Genesis and Opening Stages of the Trademark Action**

3. The discussion of the Trademark Action set forth in the Declaration of Rachel Kassabian filed by Boy Scouts in support of its Objection to the Motion [Dkt. 322] and the Objection itself [Dkt. 320] is incomplete in a number of material respects.

4. As Boy Scouts acknowledges at paragraph 9 of its Objection, it announced on October 11, 2017 that girls would be allowed, for the first time, to join as members of its CUB SCOUTS and BOY SCOUTS programs, the latter of which was subsequently re-named SCOUTS BSA. Boy Scouts' announcement acknowledged the "historic" nature of this expansion of membership in these "iconic" programs to girls for the first time. *See* Exhibit 1. In 2016, the year prior to the announcement, publicly available data disclosed by Boy Scouts shows that the CUB SCOUTS and BOY SCOUTS programs, then only offering membership to boys, accounted for the vast majority of participants in programs offered by Boy Scouts – over 80%[1] – with the balance accounted for by specialized programs called VENTURING, EXPLORING, SEA SCOUTS and what was then a pilot program called STEM SCOUTS. *See* Exhibit 2 at BSA00000576.

5. After the announcement, between November 1, 2017 and October 19, 2018, Girl Scouts wrote numerous letters to Boy Scouts protesting multiple instances in which Girl Scouts' trademarks, images of its founder, mission statement, and other designations associated with it were being used in advertising, marketing, and recruiting efforts for Boy Scouts' programs in different parts of the country without authorization from Girl Scouts. *See* Exhibit 3. Unfortunately, all of this correspondence sent over almost a year did not result in the cessation of new instances of infringing conduct that recurred frequently; there was and continues to be a systemic pattern of unauthorized trademark use.

---

[1] This calculation omits participants in programs offered by an entity called Learning for Life, Inc., which is a separately incorporated not-for-profit entity affiliated with Boy Scouts that is, as far as I understand, not a party to these proceedings.

6. In addition, on October 25, 2018, Girl Scouts' Chief Executive Officer, Sylvia Acevedo, wrote an email to Michael Surbaugh, who was then Boy Scouts' Chief Scout Executive, in which she stated that:

> Unfortunately, people are starting to assume associations between our organizations, and those assumptions extend well beyond a shared word in our names. . . . Girl Scouts has sent many letters in the past to address confusion, so I must reiterate our request that Boy Scouts clearly state its name and brand in its communications, and stop using Girl Scouts' name or references to Scouts in a manner that is leading people to confuse our organizations.

*See* Exhibit 4. The documents produced by the parties in the Trademark Action do not reflect a response from Mr. Surbaugh to Ms. Acevedo's email received prior to the initiation of the Trademark Action.

7. Only after these communications failed to produce results satisfactory to Girl Scouts did it, as a last resort, file the Trademark Action on November 6, 2018. Girl Scouts' Complaint is attached as Exhibit A to the Motion and the Kassabian Declaration, and the first type of relief sought is an injunction against Boy Scouts and those acting in concert with it from: "(i) using the GS Marks,[2] or any confusingly similar variations thereof, in connection with the marketing, promotion, advertising, sale or rendering of any of Defendant's services, (ii) using the marks SCOUT, SCOUTS, SCOUTING, SCOUTS BSA, or any variation thereof, alone without an inherently distinctive or distinguishing term appearing immediately before it, in connection with the marketing, promotion, advertising, sale or rendering of any of Defendant's services directed to girls . . . ." Kassabian Dec., Exh. A at pp. 47-48. These two prongs of the injunctive relief sought by Girl Scouts in the Trademark Action encompass **both** the unauthorized use of trademarks like GIRL SCOUTS that belong to GSUSA, as well as terms like SCOUT, SCOUTS, SCOUTING and SCOUTS BSA that Girl Scouts' contends

---

[2] The term "GS Marks" is defined in paragraphs 27 and 28 of Girl Scouts' Complaint.

have caused confusion in the marketplace when used in connection with services offered to girls.

8. On December 4, 2018, I had my first telephone conversation with Ms. Kassabian, and she suggested that the parties consider the possibility of trying to resolve their dispute amicably, a position with which Girl Scouts agreed. In the months that followed, and then at later points in the Trademark Action, the parties engaged in settlement discussions that did not result in a resolution of their dispute.

9. Thereafter, on January 16, 2019, I sent Ms. Kassabian a draft, proposed scheduling order providing for the completion of fact discovery by May 31, 2019 and expert discovery by August 31, 2019. *See* Exhibit 5. Ms. Kassabian responded on January 23, 2019 by providing me with a draft, proposed scheduling order contemplating the completion of fact discovery by November 8, 2019 and expert discovery by March 27, 2020. *See* Exhibit 6. I responded by advising Ms. Kassabian that the schedule Boy Scouts favored was far too long for Girl Scouts to accept. Specifically, I told Ms. Kassabian on January 24, 2019 by email that the reason Girl Scouts wanted a faster schedule was because it:

> gets emails almost every day from volunteers about instances of confusion, complaints about BSA marketing activities using GSUSA intellectual property, and questions asked all the time by parents and others about which programs are being offered by which organization. They are tired of dealing with these issues, and the longer this goes on, the worse it will get.
>
> To allow this case to go on until mid-2020 just to get to the end of summary judgment briefing, as your draft order contemplated, is not something the client will agree to.

10. The morning of the parties' initial conference, which took place on January 25, 2019, I was supplied with another proposed, revised scheduling order by one of Ms. Kassabian's colleagues that contemplated the completion of fact discovery by October 25, 2019 and expert discovery by March 20, 2020 – both dates about a week sooner than in Boy Scouts' first proposal. *See* Exhibit 7. This schedule was also unacceptable to Girl Scouts

because it was too long and would allow the confusion described in Girl Scouts' Complaint to persist. After discussion with the District Court at the January 25, 2019 conference, a scheduling order was entered that required fact discovery to be completed by September 25, 2019, but that also required the service of initial expert reports "showing the results of any consumer surveys" to occur that same day. Kassabian Dec., Exh. C. This was a longer schedule than Girl Scouts had sought, but it also accommodated its desire to move the Trademark Action along more quickly than Boy Scouts had proposed so that its claims could be decided as promptly as feasible.

11. As Ms. Kassabian notes in her Declaration in paragraph 6, Boy Scouts filed a motion under Fed. R. Civ. P. 12(b)(6) to dismiss Girl Scouts' claim for tortious interference with contract, and Girl Scouts' claim to possess common law trademark rights in the terms SCOUT or SCOUTING when used alone, on January 23, 2019. At no time, before or since, has Boy Scouts ever filed any other motion seeking dismissal or an early adjudication of any of Girl Scouts' other causes of action pleaded in the Complaint.

12. At the January 25, 2019 initial conference, upon hearing a description of the motion, the District Court *sua sponte* advised Boy Scouts' counsel that it would not grant a Rule 12(b)(6) motion given the asserted grounds for dismissal and the nature of the claims. Boy Scouts' counsel, upon hearing the District Court's views, indicated in response that their client might withdraw the motion without prejudice in order to obviate the need for a court order, and that withdrawal is in fact what happened on February 1, 2019. *See* Kassabian Dec., Exh. B.

13. In paragraph 24 of her Declaration, Ms. Kassabian states that "the BSA and its insurance carriers have been paying all defense costs in connection with defending the Trademark Action, including Quinn Emanuel's fees and costs, and the BSA's expert fees and costs." And, in its Fed. R. Civ. P. 26 initial disclosures served in the Trademark Action on

February 6, 2019, Boy Scouts advised that it would "make available for inspection a true and accurate copy of any insurance agreements under which an insurance business may be liable to satisfy all or part of any possible judgment in this action or to indemnify or reimburse for payments made to satisfy any possible judgment."  However, notwithstanding this statement in its initial disclosures, and even though Rule 26 provides that insurance policies, like the other information that is the subject of initial disclosures, must be "provide[d]" to an adverse party "for inspection and copying as under Rule 34" "without awaiting a discovery request," Boy Scouts did not produce any such insurance policies in the Trademark Action.  Indeed, the first time I saw any such policies was on Monday of this week, after Debtors' counsel in this proceeding supplied two such insurance policies to us, upon request.  Those policies are attached to the accompanying Declaration of Eric Lopez Schnabel and filed under seal.

**The Progress of the Trademark Action Pre-Petition**

14.     In her Declaration, Ms. Kassabian states that "[t]hroughout the Trademark Action, GSUSA has pressed aggressively for extensive amounts of discovery, leading to increased costs for the BSA in defending the case." Kassabian Dec., ¶ 10.  It is not my understanding that one part of this Court's task in resolving this Motion is to determine which party was more "aggressive[]" in pursuing discovery that has already occurred.  But, so the record is clear, the volume of discovery Boy Scouts has sought from Girl Scouts in the Trademark Action has substantially exceeded what Girl Scouts has sought, as the table below shows:

|  | Girl Scouts | Boy Scouts |
| --- | --- | --- |
| Number of Document Requests Served | 74 | 97 |
| Number of Pages of Documents Produced by Parties and Their Respective Councils | 299,316 | 183,418 |

| | | |
|---|---|---|
| Number of Email Custodians From Whom Documents Were Collected and Searched, From Parties Themselves and Their Respective Councils | 85 | 70 |
| Number of Requests to Admit Served | 74 | 273 |
| Number of Depositions Noticed and Taken | 10 | 27, with one pending[3] |
| Number of Document Subpoenas Served on Third Parties Other Than Their Respective Councils | 4 | 11 |

15. In paragraph 16 of its Objection, Boy Scouts claims that the Trademark Action has progressed "at a slower-than-expected pace due, at least in part, to [Girl Scouts'] litigation strategy." In fact, the two agreed-upon extensions of the original fact discovery cutoff from September 25 to December 20, 2019 resulted from many causes, notably including 14 document subpoenas served on Girl Scouts councils only at the end of August 2019, and eleven third-party subpoenas served on Girl Scouts advertising agencies, market research firms, and other vendors only at the end of October 2019.

16. In paragraph 11 of her Declaration, Ms. Kassabian refers to what is portrayed as an additional, unreasonable request for documents propounded by Girl Scouts in December 2019 for the collection and production of responsive documents from

---

[3] Many of the depositions Boy Scouts insisted on taking were of employees of Girl Scouts' councils located around the country with knowledge of instances of actual confusion. Boy Scouts took the position that because Girl Scouts had designated these witnesses under Fed. R. Civ. P. 30(b)(6) to address instances of interference, mistaken association, and actual confusion with which they had personal experience or that were personally reported to them, Girl Scouts either had to produce many of the witnesses for examination at the offices of Boy Scouts' counsel in New York, or pay for Boy Scouts' counsel's travel time and travel expenses incurred in going to the deposition locales. After refusing Girl Scouts' proposal to conserve both of the parties' resources by conducting these examinations by videoconference, Boy Scouts asked the District Court to order Girl Scouts to produce these witnesses in New York or pay the expenses for which Boy Scouts wanted reimbursement. The District Court denied Boy Scouts this relief. *See* Exhibit 8.

approximately 160 additional custodians. What I believe she is referring to is a demand Girl Scouts made in that month for an explanation as to why many Boy Scouts councils (not Boy Scouts itself) that had been served with document subpoenas from Girl Scouts had not searched the files of particular council employees whose duties involved interacting with the public on recruiting matters. This demand was made when the document production from one Boy Scout council that was provided only on November 20 – nearly three months after Girl Scouts served its subpoena on that council – contained evidence of previously undisclosed incidents of actual confusion and interference in the correspondence of an employee of that council holding such a position. Girl Scouts thereafter demanded that other Boy Scouts councils that received subpoenas search the emails of their employees holding the same job title as this employee.

17.     In response to this demand, and after extensive discussion between the parties over nearly two months, Boy Scouts took the position for the first time on February 5, 2020 that it would be required to collect and review the files of 160 additional council custodians in order to comply, and that doing so would be unduly burdensome. When this issue was discussed with the District Court at the parties' February 7, 2020 conference, I suggested that this burden could be mitigated by limiting the number of additional council custodians whose emails would be searched to twenty, and that Girl Scouts would identify such additional council custodians so that Boy Scouts did not have to do so. The District Court agreed that Girl Scouts' proposal was reasonable and directed the relevant Boy Scouts councils to comply with it. The names of the additional twenty council custodians were supplied to Boy Scouts on February 13, 2020, but no production has occurred because Debtors commenced this bankruptcy proceeding on February 18, 2020.

**The Current Status of the Trademark Action**

18.  As Ms. Kassabian notes, fact discovery in the Trademark Action closed on December 20, 2019, and the parties exchanged their opening round of expert reports concerned with consumer surveys on December 19, 2019 – the two experts tested various stimuli in both test and control cells to determine whether they caused confusion among consumers.  Thereafter, the parties conferred on a schedule for expert discovery and were ultimately able to work out their disagreements, as shown by the current, jointly proposed scheduling order to which the parties agreed on the morning of the February 7, 2020 conference, and that is reflected in Exhibit I to the Kassabian Declaration.[4]

19.  It is true that, leading up to that agreement, Ms. Kassabian and I had a disagreement about whether expert discovery should be fully completed before any summary judgment briefing began, as Girl Scouts believed, or whether expert discovery should be effectively bifurcated into two pieces, with expert testimony on survey matters being completed before summary judgment briefing occurred, with any other expert testimony left for afterward, as Boy Scouts believed.  The problem with Boy Scouts' position from Girl Scouts' perspective was (and still is) that taking the unusual step of bifurcating expert discovery into two phases would be inefficient and further delay a trial of this matter, and also impossible in part because Girl Scouts intended (and still intends) to offer expert testimony from a marketing expert on issues pertaining to Girl Scouts' trademark dilution claim that the District Court would need to consider on summary judgment.  Ultimately, the schedule the District Court adopted requires completion of all expert discovery by May 15.

20.  In terms of the discovery that remains to be completed, both parties agreed to produce or to discuss producing a limited number of additional documents to each other that

---

[4] The scheduling order the District Court adopted does not contain a schedule for summary judgment briefing because the District Court indicated that it wanted to discuss such a motion with counsel before it was filed, at a conference to be held on June 19, 2020.

were not turned over prior to the commencement of this proceeding, and Boy Scouts had sought to depose one Girl Scouts' council employee whose deposition could not be completed by December 20, 2019 for medical reasons. As far as the parties are concerned, that is the extent of the remaining fact discovery; no further depositions of either party are contemplated, and no new discovery requests can be served. In addition, as noted, certain documents in the possession of third parties, including emails from the twenty additional Boy Scouts council custodians, remain to be turned over.

21.     As for expert discovery, Girl Scouts plans to serve two additional expert reports on non-survey issues – marketing and damages – promptly upon the lifting of the stay. Boy Scouts has not indicated that it plans to serve affirmative expert reports on any other subject. Thereafter, the parties, ideally, will work out a new schedule for the service of rebuttal expert reports and take expert depositions if they choose to do so. Ms. Kassabian's Declaration refers in paragraph 18 to "discovery motion practice on experts" as a step that remains to be completed, but no such expert discovery disputes had arisen before the initiation of this proceeding, and I am not aware of any as of now.

22.     Thereafter, if Boy Scouts insists on seeking summary judgment – a meritless effort that has no credible chance of succeeding from Girl Scouts' perspective – a schedule for the resolution of that motion would also need to be set. In light of the current pandemic, it is not clear what the remaining schedule would be, or when such a motion would be filed, let alone resolved, or when a trial would occur. Given the possibility that the Trademark Action could be further delayed by the current circumstances confronting the nation, it is imperative from Girl Scouts' perspective that this Court lift the stay and allow the District Court to address when and how the Trademark Action will be resolved, so that Girl Scouts can have its claims heard, and the confusion described in the Complaint remedied. As it is, even if the stay were to be lifted immediately, no trial of this action would appear to be likely

until the end of this year, at the earliest. Delaying the lifting of the stay would push the trial back even further.

23.  In paragraph 22 of her Declaration, Ms. Kassabian states that "numerous members of the BSA's senior leadership team would be called as witnesses or otherwise be needed for trial preparation" if a trial of this case were to occur, and she identifies eight Boy Scouts officers and employees as either likely witnesses at trial or individuals who would assist Boy Scouts as it prepares for trial. But Boy Scouts' website identifies a ten-member group of executives and "senior leadership team" that comprises its "National Leadership," only one of whom (Patrick Sterrett), is mentioned by Ms. Kassabian. *See* Exhibit 9. Of the remaining nine executives identified by Boy Scouts as members of its "National Leadership," none were deposed in the Trademark Action or even identified by Boy Scouts in its Fed. R. Civ. P. Rule 26 initial disclosures as likely witnesses.

24.  In particular, the Boy Scouts Chief Financial Officer, Michael Ashline, was not deposed in the Trademark Action, nor, as far as we understand, were any of his subordinates. Thus, to the extent there is any concern that individuals with knowledge of Boy Scouts' financial operations will be "distracted" if the Trademark Action were to resume, I do not believe that is likely. Furthermore, the Boy Scouts Chief Scout Executive was just recently hired – at the end of December 2019, according to press reports – and thus, he was never deposed and does not have any first-hand knowledge of the majority of the factual issues at the center of the Trademark Action.

**Recent Instances of Confusion and/or Unauthorized Use of Girl Scouts Trademarks**

25.  The damage to the Girl Scouts' iconic brand has been ongoing since 2017 and has continued post-petition since Boy Scouts commenced the Bankruptcy Case. The Complaint sets forth numerous examples of such infringing conduct and public confusion, and throughout the discovery process, many more examples have come to light. *See* Exhibit

10 (showing examples of infringement and public confusion, as well as marketing images used by Boy Scouts that resemble marketing images used by Girl Scouts). More importantly, since January 1, 2020, multiple instances of unauthorized use of Girl Scouts intellectual property have continued to appear in the marketplace.

26.     As shown in Exhibit 11, Girl Scouts has, on at least three occasions (on January 6, January 13 and March 12), written to Boy Scouts councils to object to the use of: (i) the GIRL SCOUTS trademark in a social media post; (ii) the GIRL SCOUTS logo on Boy Scouts recruiting materials; and (iii) the distribution of a "Girl Scout Flyer" that concerned SCOUTS BSA girl troops.  I am advised that neither the relevant Boy Scouts councils nor Boy Scouts itself responded to the first two communications.  Boy Scouts itself did respond to the third letter on behalf of its council, just last week, notwithstanding the current proceedings, and a copy of that response is included in Exhibit 11.

27.     As shown in Exhibit 12, third parties continue to make social media postings that misidentify female participants in Boy Scouts programs as "Girl Scouts."  Of the three posts shown in that Exhibit, the last is of great concern to Girl Scouts.  This last post appears to be part of a social media campaign to draw attention to the sex abuse allegations I understand played a key role in prompting Debtors to initiate these proceedings, but it lumps the Girl Scouts into these allegations, through the use of the "@girl scouts" handle.  This posting only came to Girl Scouts attention on April 1, and while it is making efforts to have its name removed from these postings, the public association of its trademarks with the allegations of sex abuse against the Boy Scouts is, in Girl Scouts' view, very harmful.

28.     Exhibit 13 contains a series of "Scouting" fliers, posters and related materials downloaded from the BSA Brand Center accessible at https://scouting.webdamdb.com/bp/#/folder/4599099/ on April 6, 2020.  As explained in

Exhibit 14, the BSA Brand Center is used by Boy Scouts to make advertising and promotional materials available to its councils and units.

    I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 10, 2020                                      */s/ Bruce R. Ewing*
                                                                                   Bruce R. Ewing