**IN THE UNITED STATES BANKRUPTCY
COURT FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors. | Jointly Administered |

**NOTICE OF FILING OF PROPOSED REDACTED VERSION OF GIRL SCOUTS OF
THE UNITED STATES OF AMERICA'S REPLY BRIEF IN SUPPORT OF ITS
MOTION FOR RELIEF FROM THE AUTOMATIC STAY TO RESUME TRADEMARK
ACTION**

DORSEY & WHITNEY (DELAWARE) LLP

Eric Lopez Schnabel (DE Bar No. 3672)
Alessandra Glorioso (DE Bar No. 5757)
300 Delaware Avenue, Suite 1010
Wilmington, Delaware 19801
Telephone:  (302) 425-7171
Facsimile:  (302) 425-7177
E-mail:  schnabel.eric@dorsey.com
        glorioso.alessandra@dorsey.com

-and-

DORSEY & WHITNEY LLP

Bruce R. Ewing (*pro hac vice*)
Eric Lopez Schnabel (DE Bar No. 3672)
51 West 52nd Street
New York, New York 10019
Telephone:  (212) 415-9200
Facsimile:  (212) 953-7201
E-mail:  ewing.bruce@dorsey.com
        schnabel.eric@dorsey.com

*Counsel to Girl Scouts of the United States of
America*

Dated:  April 10, 2020

## IN THE UNITED STATES BANKRUPTCY
## COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors. | Jointly Administered |

## GIRL SCOUTS OF THE UNITED STATES OF AMERICA'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR RELIEF FROM THE AUTOMATIC STAY TO RESUME TRADEMARK ACTION

DORSEY & WHITNEY (DELAWARE) LLP

Eric Lopez Schnabel (DE Bar No. 3672)
Alessandra Glorioso (DE Bar No. 5757)
300 Delaware Avenue, Suite 1010
Wilmington, Delaware 19801
Telephone:  (302) 425-7171
Facsimile:  (302) 425-7177
E-mail:  schnabel.eric@dorsey.com
          glorioso.alessandra@dorsey.com

-and-

DORSEY & WHITNEY LLP

Bruce R. Ewing (*pro hac vice*)
Eric Lopez Schnabel (DE Bar No. 3672)
51 West 52nd Street
New York, New York 10019
Telephone:  (212) 415-9200
Facsimile:  (212) 953-7201
E-mail:  ewing.bruce@dorsey.com
          schnabel.eric@dorsey.com

*Counsel to Girl Scouts of the United States of America*

Dated:  April 10, 2020

## TABLE OF CONTENTS

Table of Authorities ............................................................................................................ iii

I.      Summary of the Argument............................................................................................ 1

II.     Supplemental Factual and Procedural Background .................................................... 2

        A.      The Boy Scouts Infringement of Girl Scouts' Trademarks Is Continuing ............. 2

        B.      Pre-Litigation Efforts to Resolve Girl Scouts' Claims ............................................ 5

        C.      Relevant Post-Petition Bankruptcy Case Events ...................................................... 6

III.    Argument ........................................................................................................................ 7

        A.      Leaving the Stay in Place Permits Boy Scouts' Conduct to Continue
                Harming the Public and Girl Scouts ........................................................................ 7

                1.      Adjudication of Girl Scouts' Claims is Necessary to Protect the
                        Public, in Addition to Girl Scouts............................................................... 7

                2.      Trademark Law Dictates that Girl Scouts Must Protect its
                        Trademarks .................................................................................................. 10

                3.      A Permanent Injunction is the Appropriate Remedy on Girl
                        Scouts' Infringement Claims ...................................................................... 12

        B.      Cause Exists to Modify the Stay to Permit Adjudication of the Post-
                Petition Injunctive Relief Claims, as Well as the Post-Petition Damages
                Claim and Pre-Petition Damages Claim ................................................................ 13

                1.      As Girl Scouts Seeks Relief from the Automatic Stay to Proceed
                        with the Post-Petition Injunctive Relief Claims, Whether Those
                        Claims Are Subject to the Automatic Stay or Not is
                        Inconsequential ........................................................................................... 14

                2.      Girl Scouts' Claims Must Be Resolved at Some Point, and the
                        Trademark Action Would Be the Most Efficient and Logical
                        Vehicle for Their Resolution ...................................................................... 16

        C.      Cause Exists to Grant Relief from the Automatic Stay Under the *Curtis*
                Factors....................................................................................................................... 17

                        (a)     Complete Resolution of Disputes ................................................. 17

                        (b)     Lack of Interference with the Bankruptcy Case ........................... 18

(i)    The Trademark Action Would Have Little Impact on
Managerial and Personnel Resources at this Stage ...................... 18

(ii)    Issues Related to the Covid-19 Pandemic ......................... 19

(iii)    Litigation Costs Alone Are Not Enough to Prohibit
Relief from the Automatic Stay ........................................ 19

(c)    Specialized Tribunal ...................................................................... 21

(d)    Insurer Responsibility for Boy Scouts' Defense .......................... 21

(e)    Prejudice to Other Creditors ........................................................ 21

(f)    Judicial Economy .......................................................................... 22

(g)    Preparedness for Trial .................................................................. 22

(h)    Balance of Harms .......................................................................... 23

D.    The Cases Cited by Boy Scouts Do Not Support Denial of Girl Scouts'
Motion For Relief From the Automatic Stay ........................................ 23

IV.    Conclusion ....................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Angel Flight of Georgia, Inc. v. Angel Flight America, Inc.*,
    522 F.3d 1200 (11th Cir. 2008) ............................................13

*Axicom Corp. v. Axiom, Inc.*,
    27 F.Supp. 2d 478 (D. Del. 1998).............................................8

*In re Bally Total Fitness of Greater New York, Inc.*,
    402 B.R. 616 (S.D.N.Y. 2009)................................................23

*Bonito Boats v. Thunder Craft Boats*,
    489 U.S. 141 (1989)...............................................................8

*Century 21 Real Estate Corp. v. Sandlin*,
    846 F.2d 1175 (9th Cir. 1988) ..............................................13

*Corning Glass Works v. Jeannette Glass Co.*,
    308 F. Supp. 1321 (S.D.N.Y. 1970).......................................13

*In re Curtis*,
    40 B.R. 795 (Bankr. Utah 1984) ...........................................17

*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*,
    604 F.2d 200 (2d Cir. 1979)....................................................8

*Dart Drug Corp. v. Schering Corp.*,
    320 F.2d 745 (D.C. Cir. 1963) .................................................8

*Dominic's Rest. of Dayton, Inc. v. Mantia*,
    683 F.3d 757 (6th Cir. 2012) .................................................15

*Duraco Products, Inc. v. Joy Enterprises, Ltd.*,
    40 F.3d 1431 (3d Cir. 1994)...................................................15

*Empresa Cubana Del Tabaco v. Culbro Corp.*,
    No. 97-8399, 2004 U.S. Dist. LEXIS 4935 (S.D.N.Y. Mar. 26, 2004) ...................................8

*In Re Fairchild Corp.*,
    No. 09-10899, 2009 Bankr. LEXIS 3815 (Bankr. D. Del. Dec. 1, 2009)...............................23

*Island Insteel Systems, Inc. v. Waters*,
    296 F.3d 200 (3d Cir. 2002)....................................................8

*James Burroughs Ltd. v. Sign of Beefeater, Inc.*,
    540 F.2d 266 (7th Cir. 1976) ...................................................................7

*Larami Ltd. v. Yes! Entm't Corp.*,
    244 B.R. 56 (D.N.J. 2000) .......................................................................15

*In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*,
    140 B.R. 969 (N.D. Ill. 1992) .................................................................15

*Mazer v. Stein*,
    347 U.S. 201 (1954) .................................................................................15

*Metro. Life Ins. Co. v. Metro. Ins. Co.*,
    277 F.2d 896 (7th Cir. 1960) ....................................................................8

*In re Nat'l Shoes, Inc.*,
    18 B.R. 507 (Bankr. Maine 1982) .............................................................9

*In re Nw. Airlines Corp.*,
    No. 06-1793, 2006 WL 2583642 (Bankr. S.D.N.Y. Jul. 7, 2006) ...........23

*Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. DE C.V.*,
    188 F. Supp. 3d 22 (D.D.C. 2016) ..........................................................12

*In re Penn-Dixie Indus., Inc.*,
    6 B.R. 832 (Bankr. S.D.N.Y. 1980) ........................................................24

*In re Rexene Prods. Co*,
    141 B.R. 574 (Bankr. D. Del. 1992) .......................................................17

*Rhino Assocs., L.P. v. Berg Mfg. & Sales Corp.*,
    482 F. Supp. 2d 537 (M.D. Pa. 2007) .....................................................15

*Rosenberg Bros. & Co. v. Elliott*,
    7 F.2d 962 (3d Cir. 1925) ..........................................................................8

*S & R v. Jiffy Lube Inter., Inc.*,
    968 F.2d 371 (3d Cir. 1992) .........................................................13, 16, 17

*In re SCO Group, Inc.*,
    395 B.R. 852 (Bankr. Del. 2007) ............................................................21

*Scott Paper Co. v. Scott's Liquid Gold, Inc.*,
    589 F.2d 1225 (3d Cir. 1978) ...............................................................7, 23

*In re Spansion, Inc.*,
    418 B.R. 84 (Bankr. D. Del. 2009) ..........................................................15

*Stahly, Inc. v. M. H. Jacobs Co.*,
    183 F.2d 914 (7th Cir. 1950) ........................................................................8, 10

*In re SunEdison, Inc.*,
    557 B.R. 303 (Bankr. S.D.N.Y. 2016) ...................................................................23

*Sweetzel, Inc. v. Hawk Hill Cookies, Inc.*,
    No. 95-2632, 1995 U.S. Dist. LEXIS 13495 (E.D. Pa. Sep. 14, 1995) ...................................8

*Turn & Bank Holdings, LLC v. AVCO Corp.*,
    No. 1:19-CV-503, 2019 U.S. Dist. LEXIS 168350 (M.D.N.C. Sep. 30, 2019).......................13

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
    505 U.S. 763 (1992)....................................................................................7, 9

*United States Jaycees v. Phila. Jaycees*,
    639 F.2d 134 (3d Cir. 1981)...........................................................................11

*In re VidAngel, Inc.*,
    593 B.R. 340 (Bankr. D. Utah 2018) ...................................................................22

*In re Walker*,
    927 F.2d 1138 (10th Cir. 1991) ........................................................................20

**Statutes**

36 U.S.C. § 80305...........................................................................................10

Bankruptcy Code Section 362(d)(1) .........................................................................24

Lanham Act, 15 U.S.C. 1051 *et seq.*..........................................................................1

Lanham Act Section 43, 15 U.S.C. § 1125(a) ..................................................................9

U.S. CONST. art. I, § 8, cl. 8 ...............................................................................15

**Other Authorities**

McCarthy on Trademarks and Unfair Competition ..........................................................8, 13

S. Rep. No. 1333, 79th Cong., 2d Sess., 3 (1946) ...........................................................9

Girl Scouts of the United States of America ("Girl Scouts") hereby submits this reply brief in support of its Motion for Relief from the Automatic Stay to Resume Trademark Action [Docket No. 155] (the "Motion")[1] and in opposition to Boy Scouts' Objection to the Motion [Docket No. 320] (the "Objection").

## II.    Summary of the Argument

Boy Scouts' Objection reads just like numerous oppositions filed in other cases before this Court by debtors opposing efforts by creditors to liquidate their garden-variety, pre-petition money damages claims in the original trial court.  As the Girl Scouts' Opening Brief makes clear, however, the gravamen of its claim in the Trademark Action is for injunctive relief under the Lanham Act, 15 U.S.C. 1051 *et seq.*, and this unique claim makes this Motion anything but garden-variety.

By failing to discuss the Lanham Act and Girl Scouts' claim for injunctive relief, Boy Scouts would have the Court ignore the controlling law of the Third Circuit on trademark law and the few cases on point that consider when a creditor – like Girl Scouts – holds a trademark claim and seeks to obtain injunctive relief against post-petition infringement.  Simply put, any analysis for cause and the balancing of the harms on whether to lift the stay necessarily requires consideration of the public interest protected under the Lanham Act, as articulated by the Third Circuit.

Although cited and discussed in the Opening Brief, the importance of the public interest to Lanham Act claims is consciously ignored by Boy Scouts.  Instead, the Objection is premised on non-trademark cases that do not implicate the public interest, the alleged harm Boy Scouts

---

[1] Concurrently with the Motion, Girl Scouts filed a brief in support of the Motion [Docket No. 157] (the "Opening Brief").  Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Opening Brief.

will suffer if the stay is lifted, and the supposed distraction that will result.  As set forth in the

Opening Brief and in more detail below, the claims of harm and distraction are illusory – only

***trademark*** counsel and experts (not ***restructuring*** counsel and experts) will be devoting time to

the Trademark Action when the stay is lifted; the restructuring professionals and management

will have no role.  Furthermore, the existence of insurance ███████████████████████

██████ – which policies were never produced in the Trademark Action – adds another important

factor supporting relief from stay, ████████████████████████████████████

████████████████████████████████.  In sum, in order to protect the

public interest, as provided for in the Lanham Act and Third Circuit precedent, and because the

harm to the estate is minimal and the harm to the public and Girl Scouts is great, this Court

should grant the Motion and allow the Trademark Action to continue.

### III.    Supplemental Factual and Procedural Background

### A.    The Boy Scouts Infringement of Girl Scouts' Trademarks Is Continuing

The damage to Girl Scouts' iconic brand has been ongoing since 2017 and has continued

post-petition since Boy Scouts commenced the Bankruptcy Case.  This damage results from the

continued infringing conduct of Boy Scouts and its local councils, and the actual, rampant

confusion on the part of the consuming public attributable to this ongoing, infringing activity.

Of prominent concern, this Bankruptcy Case – and the spotlight it has cast on the sexual abuse

claims at the heart of the Bankruptcy Case – are being associated with Girl Scouts, causing

further erosion and tarnishment of the Girl Scouts' brand.

As set forth in the Opening Brief and the Complaint attached thereto, numerous incidents

of trademark infringement (e.g., the unauthorized use of Girl Scouts trademarks like "Girl

Scouts" or the distinctive Girl Scouts logo in Boy Scouts marketing materials) and resulting,

actual public confusion between the two distinct and separate organizations (e.g., the public

mistakenly thinking the two organizations have merged) have repeatedly occurred since the 2017

announcement that girls would be admitted to the CUB SCOUTS and BOY SCOUTS programs

(the latter now known as SCOUTS BSA).  *See* Opening Brief, Exh. A, Complaint, ¶¶ 56-68.

But, these examples of infringing conduct and public confusion are not historic, they continue

today. [2]

For example, the most recent incident occurred in March, after this Bankruptcy Case

began.  Ewing Dec., ¶ 26.  The March incident involved a flyer created by the Boy Scouts of the

Heart of New England Council that advertised "Scouts BSA Girl Troops."  This flyer

prominently featured SCOUT ME IN marketing collateral that was created and disseminated by

Boy Scouts to help recruit girls and that was distributed to Boy Scouts councils and units via its

online Brand Center. *Id.*, Exh. 13 at p. 17.  The Boy Scouts Brand Center, which is accessible

through Boy Scouts' website, serves as a vehicle for Boy Scouts councils and units across the

country to download Boy Scouts-approved marketing materials.  Ewing Dec., ¶ 28, Exh. 14.

When this flyer was sent around by a local school, the pdf was incorrectly titled "**Girl Scout**

**Flyer 2020**." *Id.*, Exh. 11 (emphasis added).  The person who named and circulated this flyer

was obviously confused and failed to recognize that the sponsor was not Girl Scouts but Boy

Scouts – two organizations that are and have been separate and distinct for over 100 years.

Upon discovery of this flyer, Girl Scouts sent a cease-and-desist letter to the local

council.  *Id.*  Boy Scouts itself, ***not*** the local council, responded to Girl Scouts last week by

attempting to blame an unknown third party for the incorrectly named flyer, and insisting that

---

[2]  The Declaration of Bruce R. Ewing ("Ewing Dec.") filed concurrently herewith, and the exhibits thereto, provide
further detail regarding recent Girl Scouts' pre-litigation attempts to persuade Boy Scouts to cease its infringing
activity, recent examples of infringing activity, and evidence of confusion on the part of the public, as well as the
history and progress of the Trademark Action.

nothing about the flyer would confuse consumers.  *Id.*  However, the facts of the incident itself

defeat Boy Scouts' effort to deflect blame, because the person who renamed the flier had to have

misunderstood who its sponsor was and the programs it was promoting, due to the confusing

presentation of SCOUT ME IN imagery to promote girls' services.  Furthermore, this incident is

just one example from a consistent pattern of behavior by Boy Scouts dating back to 2017 that

has caused confusion in the marketplace and been a frequent subject of protests from Girl Scouts.

*Id.*, ¶ 5, Exh. 3; Complaint, ¶¶ 56-68.

Moreover, SCOUT ME IN imagery like that appearing in the above example is still

readily accessible at the Boy Scouts' online Brand Center.  Ewing Dec., ¶ 28, Exh. 13.  Despite

the ongoing Bankruptcy Case, Boy Scouts has not taken down the previously posted materials

that have been the subject of Girl Scouts' prior protests, and Boy Scouts local councils are still

able to access the Brand Center and download posters, fliers, social media images, and other

material that they can edit and customize for their marketing and recruiting needs.  *Id.*, Exh. 13.

The continued use of these infringing materials contributes to the already widespread confusion

by the public.[3]

Girl Scouts has continued to see other evidence, post-petition, of the confusion caused by

the use of these materials, as well as by Boy Scouts' other infringing and unauthorized conduct

over the past three years.  *Id.*, Exh. 12.  Third parties continue to confuse the two organizations

in social media postings, such as by incorrectly labeling pictures of female Boy Scouts as "Girl

---

[3]  The fact that the most recent incident known to Girl Scouts involving an infringing flyer disseminated by a local Boy Scouts Council occurred in the beginning of March likely has more to do with the current pandemic, which has caused in-person group activities, such as meetings and activities of both Boy Scout and Girl Scout troops, to cease temporarily.  Now, Boy Scouts and Girl Scouts are generally operating more and more online, where Girl Scouts' policing and discovery of the infringing conduct by Boy Scouts is more difficult.  When the current social distancing guidelines are lifted and in-person meetings and recruiting activities resume, Girl Scouts expects the more easily discoverable "off-line" dissemination of confusing and misleading Boy Scouts materials to resume.

Scouts." *Id.* Although such confusion alone continues to erode the value of the Girl Scouts' brand, far more damaging is the recent spate of advertisements aimed at Boy Scouts sexual abuse victims. Some of these ads specifically mention Girl Scouts, through the use of the "@girl scouts" handle. *Id.*, ¶ 27, Exh. 12. These sexual abuse claim advertisements were disseminated post-petition and state that the Boy Scouts is "filing for bankruptcy[,] how convenient[,] all the victims have to take extra steps to get a compensation due to the abuse." *Id.*, Exh. 12. These advertisements directly contribute to the erosion and tarnishment of the Girl Scouts' brand, causing consumers to associate incorrectly this iconic and trusted brand with sexual abuse. It is highly likely that advertisements like this will be circulated publicly for as long as Boy Scouts is in bankruptcy proceedings.

## B.    Pre-Litigation Efforts to Resolve Girl Scouts' Claims

Girl Scouts initiation of the Trademark Action was a step taken as a last resort, after Girl Scouts had spent a great deal of time and resources making Boy Scouts aware of the breadth of the violations of Girl Scouts' trademark rights and the resulting confusion in the marketplace. In response, Boy Scouts did not undertake any effective systemic efforts to address the ongoing harm Girls Scouts was suffering, or to prevent infringement and resulting confusion from continuing, necessitating the Girl Scouts' filing of the Trademark Action. Again, the Trademark Action was not initiated after one or two isolated incidents of trademark infringement, but a continuing, systematic pattern of wrongful behavior. Complaint, ¶¶ 56-68; Ewing Dec., Exh. 3. Further, contrary to the impression Boy Scouts tries to create in its Objection, the Trademark Action was not brought simply to halt the confusing use of terms like SCOUTS, SCOUTING, SCOUTS BSA and SCOUT ME IN in connection with girls youth leadership and development services, but *also* to put an end to the ongoing, unauthorized use of Girl Scouts trademarks like

GIRL SCOUTS and the distinctive GIRL SCOUTS logo design.  Complaint, ¶¶ 56-68; Ewing

Dec., ¶¶ 5, 7, Exh. 3, Exh. 10.

The filing of the Trademark Action could not have come as a surprise to Boy Scouts.

Indeed, the Trademark Action was filed a full year after Girl Scouts sent its first letter

complaining about infringing fundraising materials distributed by a Boy Scouts' council.  *See*

Ewing Dec., ¶ 5, Exh. 3 at GSUSA_00097326-330.  When the pattern of infringing conduct did

not abate after nearly a full year of sending letters alerting Boy Scouts to this problematic

conduct, Girl Scouts further tried to avoid litigation by reaching out directly to Boy Scouts

through its Chief Executive Officer, Sylvia Acevedo.  In October 2018, Ms. Acevedo wrote to

her Boy Scouts' counterpart at the time, Michael Surbaugh, letting him know that "people are

starting to assume associations between our organizations . . . so I must reiterate our request that

Boy Scouts clearly state its name and brand in communications, and stop using Girl Scouts'

name or reference to Scouts in a manner that is leading people to confuse our organizations." *Id.*,

Exh. 4.  Having received no reply to this communication, or any other indication that Boy Scouts

would take systematic action to curb the infringement and corresponding harm to the GIRL

SCOUTS brand, Girl Scouts saw no other option but to file the Trademark Action.

Girl Scouts' goal has always been to halt the infringement of its trademarks, and to do so

as rapidly as possible.  Even after it filed the Trademark Action, Girl Scouts continued to try and

resolve the disputes with Boy Scouts but such attempts proved unsuccessful.  *Id.*, ¶ 8.  Girl

Scouts also worked diligently during the Trademark Action to advance the case as rapidly as it

could, Boy Scouts' efforts to delay it notwithstanding.  *Id.*, ¶¶ 9-10.

### C.    Relevant Post-Petition Bankruptcy Case Events

On the Petition Date, Boy Scouts commenced adversary proceeding no. 20-5027-LSS.

(the "Adversary Proceeding") so as to extend the automatic stay to certain non-debtors referred

to as the "BSA Related Parties," which include local councils and chartered organizations, in approximately 275 pending state and federal civil actions asserting personal injury abuse claims and causes of action.  Through a consent order [Adv. Docket No. 54] negotiated with the official committees appointed in the Bankruptcy Case and the Court's rulings on the one contested matter, the Court extended the automatic stay as to the BSA Related Parties through and including May 18, 2020, which date may be further extended.

Thus, Boy Scouts sought and obtained the breathing spell it posits it needs to successfully reorganize.  Notably, nothing in the Adversary Proceeding or in the first day pleadings filed by the Boy Scouts discusses – let alone mentions – Girl Scouts or the Trademark Action.  Therefore, the catalyst for this bankruptcy has nothing to do with this unique lawsuit.

## IV.    Argument

### A.    Leaving the Stay in Place Permits Boy Scouts' Conduct to Continue Harming the Public and Girl Scouts

#### 1.    Adjudication of Girl Scouts' Claims is Necessary to Protect the Public, in Addition to Girl Scouts

Girl Scouts' claims for Post-Petition Injunctive Relief, Pre-Petition Damages, and Post-Petition Damages are premised primarily on federal and common law trademark and unfair competition claims.  The purpose of trademark law is "***to protect the consuming public from confusion***, concomitantly protecting the trademark owner's right to a non-confused public." *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1228 (3d Cir. 1978) (citing *James Burroughs Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 276 (7th Cir. 1976)) (emphasis added); *see also Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774 (1992) (noting that the Lanham Act's "purpose [is] to secure to the owner of the mark the goodwill of his business and to protect

the ability of consumers to distinguish among competing producers") (internal quotations and citations omitted).[4]

Thus, trademark laws exist ***first to protect the public***, and second to protect trademark owners. *Island Insteel Systems, Inc. v. Waters,* 296 F.3d 200, 209 (3d Cir. 2002) ("[O]ne of the Lanham Act's underlying purposes . . . is to protect consumers from confusion as to the source of goods and services."); *Axicom Corp. v. Axiom, Inc.*, 27 F.Supp.2d 478, 493 (D. Del. 1998)) ("The law of unfair competition has its roots in the common-law tort of deceit: its general concern is with protecting consumers from confusion as to source.") (quoting *Bonito Boats v. Thunder Craft Boats*, 489 U.S. 141, 157 (1989)); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 206 n.9 (2d Cir. 1979) ("[T]he primary purpose of the trademark laws is to protect the public from confusion…."); *Metro. Life Ins. Co. v. Metro. Ins. Co.*, 277 F.2d 896, 900 (7th Cir. 1960) (while "a deceptive situation giving rise to the likelihood of confusion in the public mind" "may tend to harm plaintiff[,]" "the paramount concern of the courts is the protection of the public interest."); 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION ("MCCARTHY") § 191:75 (4th ed. 2013) ("U.S. trademark law is based primarily on a policy of protecting consumers from confusion:  trademark law is seen as a form of consumer protection.").

---

[4]  *See also Rosenberg Bros. & Co. v. Elliott*, 7 F.2d 962, 965 (3d Cir. 1925) (noting that "the public has a right to be protected from deception in" the use of a trademark that has come to be regarded as the guaranty of a given product's quality); *Dart Drug Corp. v. Schering Corp.*, 320 F.2d 745, 748 n.10 (D.C. Cir. 1963) ("confusion to the public is the essence of both trademark infringement and unfair competition") (internal citation omitted); *Stahly, Inc. v. M. H. Jacobs Co.*, 183 F.2d 914, 917 (7th Cir. 1950) ("It must be remembered that the trade-mark laws and the law of unfair competition are concerned not alone with the protection of a property right existing in an individual, but also with the protection of the public from fraud and deceit, and ***it is obvious that the right of the public to be so protected is a right which transcends the rights of the individual trade-mark owner and is beyond his power to waive***.") (emphasis added); *Sweetzel, Inc. v. Hawk Hill Cookies, Inc.*, No. 95-2632, 1995 U.S. Dist. LEXIS 13495, at *16 (E.D. Pa. Sep. 14, 1995) ("'The purpose of the Lanham Act is to protect the public from the confusion and deception which flows from the copying of marks which, through their distinctiveness or exclusivity of use, identify the origin of the marked products.'") (citations omitted); *Empresa Cubana Del Tabaco v. Culbro Corp.*, No. 97-8399, 2004 U.S. Dist. LEXIS 4935, at *85 (S.D.N.Y. Mar. 26, 2004) (same).

As the Senate Report on Section 43 of the Lanham Act, 15 U.S.C. § 1125(a), details:

> The purpose underlying any trade-mark statute is twofold.  One is to protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get.  Secondly, where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats.  This is the well-established rule of law protecting both the public and the trade-mark owner.

S. Rep. No. 1333, 79th Cong., 2d Sess., 3 (1946); *Two Pesos, Inc.,* 505 U.S. at 782, n.15 (1992) ("By protecting trademarks, Congress hoped 'to protect the public from deceit, to foster fair competition, and to secure to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not.  This is the end to which this bill is directed.'") (quoting S. Rep. No. 1333, at 4).

Incredibly, Boy Scouts does not even bother mentioning either the crucial importance of protecting the public against confusion that has been the guiding principle of U.S. trademark law for generations, or the controlling law in this Circuit adopting this position that was cited in Girl Scouts' Opening Brief.  In fact, Boy Scouts does not cite to a single case that discusses trademark infringement in the context of an application for relief from the automatic stay.[5]

The reason for this telling silence is obvious:  the Trademark Action is not just about protecting Girl Scouts, but more importantly about vindicating the rights of consumers not to be confused by infringing conduct that Boy Scouts has not ceased over the past three years, despite multiple efforts by Girl Scouts to get it to stop.  And to make matters worse, Boy Scouts is now

---

[5] Indeed, Boy Scouts only cites one case in its entire Objection that even involves a trademark infringement claim. *In re Nat'l Shoes, Inc.*, 18 B.R. 507 (Bankr. D. Maine 1982); Objection, fn 21.  In that case, the court declined to make any determination as to whether a post-petition trademark infringement suit violated the stay, opting instead to transfer venue to the bankruptcy court where the bankruptcy proceeding was pending. *Id.* at 509.

trying to use the automatic stay to give it free reign, for as long as possible, to continue its

unauthorized, infringing conduct and thereby deprive both Girl Scouts and, by extension, the

public of the remedies afforded under the Lanham Act and analogous state law.  The Bankruptcy

Code is not and should not be a shield that allows a wrongdoer like Boy Scouts to perpetuate an

ongoing pattern of trademark violations to the detriment of consumers and Girl Scouts.[6]

In its consideration of the "flexible concept" of "cause" under Section 362 and the

balance of hardship or harms under the *Rexene* and/or *Curtis* standards, discussed, *infra*, at pp.

17-23, the right of the public – namely girls and their families – to be protected from fraud and

deceit caused by Boy Scouts' use of Girl Scouts' trademarks, must be taken into account.  *Stahly,*

*Inc. v. M. H. Jacobs Co.*, 183 F.2d 914, 917 (7th Cir. 1950).  Absent Boy Scouts' agreement to

settle the Trademark Action or to cease its infringing conduct – neither of which is likely based

on its present assertion that Girl Scouts must await the end of the Bankruptcy Case, or some

other time that Boy Scouts never specifies, to pursue relief – the prompt resolution of Girl

Scouts' claims is necessary to protect the public and compel Boy Scouts to comply with U.S.

trademark law.

### 2.    Trademark Law Dictates that Girl Scouts Must Protect its Trademarks

The Court's analysis should also take into account the serious harm posed to Girl Scouts

if it is forced to "wait—like every other creditor," Objection, ¶ 30, for resolution of its

infringement claims:  the harm to the rights conferred upon Girl Scouts by Congress to exclusive

use of its GIRL SCOUTS trademarks.  *See* 36 U.S.C. § 80305 (granting Girl Scouts the

---

[6] In paragraph 29 of its Objection, Boy Scouts states that "through the Trademark Action, GSUSA has not provided any evidence that it has lost members as a result of the BSA's actions, nor that its brand has suffered any reputation [sic] harm."  This is categorically wrong.  As noted on page 8 of Girl Scouts' opening brief, there are multiple examples of parents who have signed up their daughters for Boy Scouts programs under the mistaken impression that they were signing up for Girl Scouts programs.

"exclusive right to use all emblems and badges, descriptive or designating marks, and words or phrases the corporation adopts . . . and to authorize their use, during the life of the corporation, in connection with the manufacture, advertisement, and sale of equipment and merchandise."). Girl Scouts is compelled under trademark law, and for the benefit of the public and itself, to protect these trademarks. *United States Jaycees v. Phila. Jaycees*, 639 F.2d 134, 140 (3d Cir. 1981) ("The purpose of the [requirement that a trademark owner exercise reasonable control over its trademark to protect their significance as an indication of origin] is the protection of the public. If a licensor does not maintain control of his licensees in their use of the license, the public may be damaged by products that, despite their trademark, do not have the normal quality of such goods."). If Boy Scouts is allowed to continue its infringing conduct, as it intends while Girl Scouts "waits," Girl Scouts' trademarks' ability to communicate that Girl Scouts is the exclusive source of its own services will diminish, and this would in turn, erode the value of the marks and imperil Girl Scouts' rights over them. Opening Br., p. 26.

If Girl Scouts is forced to wait the duration of the Bankruptcy Case to pursue injunctive relief against Boy Scouts, Girl Scouts would suffer an array of prejudice and harm. First, Boy Scouts would be free to continue its wrongful use of Girl Scouts' trademarks to attract unwitting girls to enroll in its programs – ***the most flagrant misconduct would have no redress***. As set forth in the Ewing Declaration, Girl Scouts is aware of post-petition instances of the use of phrases like "Scouts BSA Girl Troops" and "Girl Scout Flyer 2020" in connection with offending marketing materials. Ewing Dec., ¶ 26, Exh. 11. Additionally, materials promoting girls programs using the designations SCOUT ME IN and SCOUTS BSA in an infringing manner remain available on Boy Scouts' online Brand Center. *Id.*, ¶ 28, Exh. 13.

Second, absent relief from the automatic stay, deceived members of the public will continue to believe that Girl Scouts is somehow part of Boy Scouts, part of the Bankruptcy Case, and involved in the acts of sexual abuse alleged against Boy Scouts.  For example, subsequent to the Petition Date, a third party placed ads on Instagram regarding "Boy Scouts Abuse" and Boy Scouts' commencement of bankruptcy proceedings that tagged Girl Scouts using its handle, "@girlscouts."  *Id.,* ¶ 27, Exh. 12.  Such flagrant, harmful association is further compounded by continued confusion seen, for instance, in photos of girls in Boy Scouts' uniforms appearing on the internet where they are mislabeled as Girl Scouts.  *Id.*

Finally, Girl Scouts' inability to protect its marks by actively enforcing its trademark rights against Boy Scouts will diminish the value and enforceability of those marks.  To characterize this hardship as "minimal and unremarkable" in any context, as Boy Scouts does, is ludicrous and insulting.  Objection, ¶ 31.

Girl Scouts is not "like every other creditor."  In fact, there is no other creditor like Girl Scouts in this bankruptcy case.  Unlike unsecured creditors who hold purely legal claims, Girl Scouts cannot be made whole by an increased award of damages.  The interest of the public and basic trademark law and policy (as annunciated by the Third Circuit), combined with Girl Scouts' rights and obligations to protect its trademarks, compel the conclusion that Girl Scouts need not, and should not, "wait—like every other creditor" to have its proverbial day in court.

### 3.    A Permanent Injunction is the Appropriate Remedy on Girl Scouts' Infringement Claims

Girl Scouts seeks in the Trademark Action, among other relief, that Boy Scouts be permanently enjoined from engaging in conduct that infringes Girl Scouts' trademarks.  *See* Complaint, Prayer for Relief.  "[A] permanent injunction is the standard remedy in trademark infringement cases." *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. DE*

*C.V.*, 188 F. Supp. 3d 22, 117 (D.D.C. 2016) (quoting 5 MCCARTHY § 30:1 (5th ed.)); *see also*

*Turn & Bank Holdings, LLC v. AVCO Corp.*, No. 1:19-CV-503, 2019 U.S. Dist. LEXIS 168350,

at *23 (M.D.N.C. Sep. 30, 2019) (same).

Permanent injunctions are typically granted in trademark infringement cases because

there are no other adequate remedies at law. *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d

1175, 1180 (9th Cir. 1988); *see also Angel Flight of Georgia, Inc. v. Angel Flight America, Inc.*,

522 F.3d 1200, 1209 (11th Cir. 2008).  Monetary relief for future injuries is inadequate because

the continuing injury to the trademark holder's goodwill and reputation is irreparable, as is the

harm done to the public.  *See S & R v. Jiffy Lube Inter., Inc.*, 968 F.2d 371, 379 (3d Cir. 1992)

("Where a likelihood of confusion arises out of the concurrent use of a trademark, the infringer's

use damages the public interest…[i]n this respect, harm to the public interest is much like

irreparable injury to the trademark owner.") (internal citations omitted); *Corning Glass Works v.

Jeannette Glass Co.*, 308 F. Supp. 1321, 1328 (S.D.N.Y. 1970) (finding an injunction warranted

because "[w]hile plaintiff [was] injured when consumers purchase[d] Lady Cornellia ovenware

believing it to be CORNING WARE, consumers, too, [were] directly victimized," and an

injunction was necessary to avoid "further fraud"); 5 MCCARTHY § 30:1 (5th ed.).  Thus, the

injunctive relief Girl Scouts seeks against Boy Scouts is typical and appropriate to remedy the

ongoing harm caused by infringement.

**B.      Cause Exists to Modify the Stay to Permit Adjudication of the Post-Petition Injunctive Relief Claims, as Well as the Post-Petition Damages Claim and Pre-Petition Damages Claim**

Much of Boy Scouts' Objection reads as though Girl Scouts holds only pre-petition,

general unsecured claims for money damages, all but ignoring GSUSA's request for Post-

Petition Injunctive Relief and the relevant Third Circuit law regarding the paramount importance

of protecting the public interest in deciding trademark infringement claims.

For example, in its "balance of hardships argument," Boy Scouts states "GSUSA has failed to show it would suffer any meaningful hardship if the automatic stay is maintained, and in fact is no more prejudiced than any other potential creditor by the delay."  Objection, ¶ 28.  This statement by Boy Scouts ignores Girl Scouts' claim of ***continuing*** infringement, its concerns of rampant public confusion, and its request for injunctive relief.  For the reasons detailed in the Opening Brief and discussed further below, cause exists to modify the automatic stay to protect the interests of the public and to allow Girl Scouts to proceed with adjudication of its Post-Petition Injunctive Relief Claims, as well as the Post-Petition Damages Claim and Pre-Petition Damages Claim.

> **1.     As Girl Scouts Seeks Relief from the Automatic Stay to Proceed with the Post-Petition Injunctive Relief Claims, Whether Those Claims Are Subject to the Automatic Stay or Not is Inconsequential**

Boy Scouts devotes a significant portion of the Objection to disputing Girl Scouts' assertion that the automatic stay does not necessarily bar Girl Scouts' pursuit of its Post-Petition Injunctive Relief Claims.  These arguments are a red herring because, as stated in the Opening Brief, Girl Scouts nonetheless contends that cause exists for the Court to grant relief from the automatic stay to pursue the Post-Petition Injunctive Relief Claims, in addition to the Post-Petition Damages Claim and Pre-Petition Damages Claim.  Opening Br., p. 17.

Nonetheless, Girl Scouts disagrees with Boy Scouts' assertions that "[v]irtually every court to have decided the issue has held that the automatic stay prohibits the pursuit of injunctive relief claims, even if the claimant is seeking to prevent alleged post-petition conduct" and that only "older" cases support Girl Scouts' point.  Objection, ¶¶ 51, 53.  Notably, Boy Scouts statement focuses on the generic "injunctive relief claims" but not "**trademark** injunctive relief claims" because, by adding the term "trademark," that assertion would be categorically wrong.

For example, in *Dominic's Rest. of Dayton, Inc. v. Mantia* – cited in the Opening Brief but (like so much else) ignored by Boy Scouts – the Sixth Circuit concluded that the automatic stay was inapplicable to a post-petition **trademark** injunctive relief claim in a case commenced pre-petition.  683 F.3d 757 (6th Cir. 2012).  The *Dominic's* court reasoned:

> The automatic stay provision 'was intended to prevent interference with a bankruptcy court's orderly disposition of the property of the estate, it was not intended to preclude post-petition suits to enjoin unlawful conduct.  If this section were read to prevent the injunctive relief [against mark infringement] sought here, bankrupt businesses which operated post-petition could violate [plaintiffs'] rights with impunity.'

*Id.* at 760-61 (quoting *Larami Ltd. v. Yes! Entm't Corp.*, 244 B.R. 56, 60 (D.N.J. 2000)).

The *Dominic's* holding is not distinguished by the Boy Scouts in its Objection, and instead it cites and relies on inapposite, non-trademark cases. For example, the cases of *In re Spansion, Inc.*, 418 B.R. 84 (Bankr. D. Del. 2009), and *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 140 B.R. 969 (N.D. Ill. 1992), are distinguishable from the Trademark Action because both cases involved *patent* infringement claims, not trademark infringement claims.

Patent laws do not serve the public interest against confusion the way trademark laws do. *See Duraco Products, Inc. v. Joy Enterprises, Ltd.*, 40 F.3d 1431, 1446, n. 10 (3d Cir. 1994) (contrasting the dual purposes of the trademark statute, "to avoid consumer confusion and to protect the trademark owner", with that of patent and copyright law, "to implement a policy of encouraging innovative designs by protecting them once designed").  Rather, "patent law promotes public innovation by rewarding individual inventors with a limited monopoly over their designs." *Rhino Assocs., L.P. v. Berg Mfg. & Sales Corp.*, 482 F. Supp. 2d 537, 543 (M.D. Pa. 2007) (citing U.S. CONST. art. I, § 8, cl. 8; *Mazer v. Stein*, 347 U.S. 201, 219 (1954)).  Put

another way, patent infringement is capable of being remedied by an award of money damages in a way that trademark infringement is not. *Only* injunctive relief can protect the public from confusion and, secondarily, the trademark owner from ongoing harm. *See S & R,* 968 F.2d at 378-79 ("[T]rademark infringement amounts to irreparable injury as a matter of law.").

Regardless, as stated above, the Court could, but need not, decide between the *Dominic's* analytical approach and the off-topic *Spansion* and *Mahurkar* analytical approach, because Girl Scouts seeks relief from the automatic stay to resolve its claims in the Trademark Action.

> **2.      Girl Scouts' Claims Must Be Resolved at Some Point, and the Trademark Action Would Be the Most Efficient and Logical Vehicle for Their Resolution**

Girl Scouts pointed out repeatedly in its Opening Brief that its claims must inevitably be resolved and liquidated at some point in time. Opening Br., pp. 19, 21, 22. In response, Boy Scouts simply opposes proceeding with the Trademark Action, while failing to offer *any* alternative, let alone a reasonable one, to resolve Girl Scouts' claims. Accordingly, it bears re-emphasis that the Court should grant the requested relief from the automatic stay for the Post-Petition Injunctive Relief Claims to proceed so Girl Scouts can pursue urgently needed injunctive relief. *Id.*, p. 20. The Court should also grant Girl Scouts' requested relief with respect to the Post-Petition Damages Claim and Pre-Petition Damages Claim, because excising them from the Trademark Action will only result in inefficiency and duplication of effort. *Id.*, pp. 20-22. Rather than engage in separate proceedings in this Court or elsewhere to liquidate those claims, the District Court can determine them alongside the Post-Petition Injunctive Relief Claims. *Id.*

16

### C.   Cause Exists to Grant Relief from the Automatic Stay Under the *Curtis* Factors

Cause exists to grant relief from the automatic stay under both the *Rexene* factors and the *Curtis* factors.  The cases cited by Boy Scouts do not show otherwise.  The *Rexene* factors consider a three part test while the Curtis factors utilize an expanded eight part test.  *Compare In re Rexene Prods. Co*, 141 B.R. 574, 576-677 (Bankr. D. Del. 1992) with *In re Curtis*, 40 B.R. 795, 799-800 (Bankr. D. Utah 1984).  Girl Scouts is entitled to relief from the stay under either test.

### (a)   Complete Resolution of Disputes

The disputes between Girl Scouts and Boy Scouts can be most efficiently resolved in their entirety in the Trademark Action.  As set forth above, Girl Scouts is seeking a permanent injunction prohibiting Boy Scouts from engaging in conduct that infringes on Girl Scout's trademarks.  Boy Scouts has infringed on Girl Scout's trademarks post-petition and continues to do so now.  *See* Ewing Dec., ¶¶ 21-23, Exh 11.  As a result, Girl Scouts will also be entitled to an award of both pre-petition and post-petition damages arising from the continuing infringement.

Unless and until the infringing conduct is enjoined, the public interest will not be served, as rampant confusion between the two organizations and their programs will continue to occur. *See S & R Corp.*, 968 F.2d at 379.  At the same time, Girl Scouts will continue to suffer harm and sustain damage from Boy Scouts' actions, making any determination of the amount of such damages fluid.  Allowing the Trademark Action to proceed would resolve all issues between the parties, including Girl Scouts' request for a permanent injunction to prohibit Boy Scouts' continued infringement, and a determination of any applicable pre- and post-petition damages resulting from the infringement.

**(b)**        **Lack of Interference with the Bankruptcy Case**

(i)        **The Trademark Action Would Have Little Impact on Managerial and Personnel Resources at this Stage**

Boy Scouts asserts that lifting the stay "would divert important human resources away from the Debtors' efforts to restructure."  Objection, ¶ 25.  This argument lacks merit.  As noted, the Debtors retained their restructuring counsel prior to the filing of the Trademark Action. *See* Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Sidley Austin LLP as Attorneys for the Debtors and Debtors in Possession, *Nunc Pro Tunc* to the Petition Date ¶ 11 [Docket No. 204] (the "Retention Application").   Given the substantial fees incurred by Boy Scouts' restructuring counsel prior to the bankruptcy filing (over $8m), it is apparent that Boy Scouts' personnel, management, and its restructuring professionals actively participated in the pre-petition restructuring process all throughout the Trademark Action, including during the duration of fact discovery and depositions.

Equally unavailing is the claim that allowing the Trademark Action to proceed would "significantly compromise" the ability of Boy Scouts' leadership team to dedicate time to the bankruptcy case.  Objection, ¶ 24.  In fact, out of the ten people that Boy Scouts lists as part of its "National Leadership" on its website, only one was deposed in the Trademark Action, and he is the lone member of that leadership team that Boy Scouts has identified as a potential trial witness. Ewing Dec., Exh. 9; Kassabian Dec., ¶ 22.  Furthermore, none of the Boy Scouts counsel of record or retained experts in the Trademark Action are involved in the Bankruptcy Case or reorganization, and thus continuing the Trademark Action will have no effect on the Boy Scouts' professionals' ability to focus on the Bankruptcy Case.  Fact discovery in the Trademark Action is all but complete, and expert discovery, summary judgment, and pre-trial motion

practice are not client-intensive efforts, especially compared with the 37 depositions completed prior to the bankruptcy filing.  Ewing Dec., ¶¶ 14, 20.

Moreover, not only was Boy Scouts able to manage (through its non-restructuring counsel) the Trademark Action during the pre-petition restructuring process lasting over a year, but it also had to manage all of the abuse suits and claims against Boy Scouts that are now stayed.  The incremental time required of Boy Scouts' leadership and personnel in the Trademark Action will be minimal unless and until the Trademark Action is ready for trial, and that trial is many months away.  Ewing Dec., ¶ 22.

The mere fact that a handful of mostly mid-level Boy Scouts executives may need to travel over half a year from now to testify at a trial is insufficient to show interference with the Bankruptcy Case.  Even if the stay were to be lifted immediately, trial would not occur for many months.  As such, by the time the limited number of personnel from Boy Scouts' leadership would be required to spend any significant amount of time on the Trademark Action, Boy Scouts would have already achieved its goal of a "breathing spell."  To the extent additional time is needed to allow Boy Scouts to properly prepare for trial, the District Court can address those timing issues in the Trademark Action to the extent the parties cannot agree.

(ii)    **Issues Related to the Covid-19 Pandemic**

Boy Scouts cites to the current Covid-19 pandemic as an additional reason to continue the automatic stay.  Girl Scouts is well aware of the operational challenges imposed on both organizations given the current pandemic.  As discussed above, for many months the activities in the Trademark Action will not require the attention of management or other personnel who are required to deal with the pandemic; rather it is trademark trial counsel and non-restructuring experts who will be focused on expert reports, expert discovery, and summary judgment.

19

Furthermore, any restrictions on travel or face-to-face meetings/hearings will not affect any of these aspects of the Trademark Action.

(iii)    **Litigation Costs Alone Are Not Enough to Prohibit Relief from the Automatic Stay**

As discussed in the Opening Brief, the cost of defending a civil action is not sufficient to deny a creditor relief from the automatic stay. *See In re Walker*, 927 F.2d 1138, 1143-44 (10th Cir. 1991) ("While the cost of defending in a civil action has been given serious consideration by bankruptcy courts, no case has found the cost of defending, by itself, to be 'great prejudice' as to bar modification of the [section 362] stay") .

In this instance especially, potential litigation costs should not weigh against the relief Girl Scouts requests. Boy Scouts retained its expensive restructuring professionals in October 2018, the month prior to Girl Scouts' commencement of the Trademark Action. During the entire time the Trademark Action has been pending, Boy Scouts was also paying to litigate the now-stayed abuse lawsuits. Additionally, during that same time period, Boy Scouts paid more than $8 million pre-petition to its restructuring counsel. Retention Application, ¶ 23. Boy Scouts is funding its restructuring with cash and is no longer incurring the separate fees of litigating more than 270 abuse lawsuits. Thus, Boy Scouts' litigation costs are not radically different now from what they were at the inception of the Trademark Action.

Moreover, continuation of the automatic stay would not ultimately result in any benefit to Boy Scouts' estate, as it will be required to incur the litigation costs related to the Trademark Action at some point in the future. The Post-Petition Injunctive Claims will be litigated somewhere, at some point, and the Post- and Pre-Petition Damages must also be liquidated at some point in time. To the extent insurers are funding part or all of Boy Scouts' litigation costs in the Trademark Action – a fact Girl Scouts was unaware of until the filing of the Objection;

20

Ewing Dec., ¶ 13 – this would further support granting relief from the stay to allow the Trademark Action to proceed.

### (c)    Specialized Tribunal

Although the District Court may not be a "specialized" tribunal, it certainly has knowledge and background in the Trademark Action that encompass the claims, issues, and disputes between the parties that have been ongoing since its inception.  Therefore, this factor weighs in favor of lifting the stay.

### (d)    Insurer Responsibility for Boy Scouts' Defense

As stated above, Girl Scouts was previously unaware of the insurance policies ██████████ ████████████████████████████████████████████████████████.  *See* the accompanying Declaration of Eric Schnabel, Exhs. 1 and 2.  Upon reviewing the Objection, Girl Scouts requested copies of the policies referenced in it.  Objection, fn. 16.  Boy Scouts provided two insurance policies to Girl Scouts.  Based on Girl Scouts' preliminary review of the policies, it appears that ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

### (e)    Prejudice to Other Creditors

Unlike the multitude of abuse claims, the claims asserted in the Trademark Action are unique, and no other creditors have similar rights as those asserted in the Trademark Action. Even if the Trademark Action might dilute the ultimate amount of funds available to other

creditors, that would not constitute legal prejudice to the rights of those creditors. *See In re VidAngel, Inc.*, 593 B.R. 340, 349 (Bankr. D. Utah 2018). ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

dilution, it would occur regardless of whether the stay is lifted or not: one way or the other, the Post-Petition Injunctive Relief Claim will be litigated and the Post and Pre-Petition Damage Claims will be liquidated and allowed.

### (f)    Judicial Economy

As explained above, allowing the Trademark Action to proceed will resolve all outstanding disputes between the parties. The District Court is familiar with the claims, parties, and issues in the Trademark Action. Continuance and resolution of the Trademark Action is the most efficient way to resolve all of the parties' claims and eliminates any potential for duplicative litigation that may occur if Girl Scouts' claims are bifurcated. Conducting one proceeding for the Post-Petition Injunctive Relief Claim in New York and then a second proceeding before this Court for the Post and Pre-Petition Damage Claims cannot be a more cost effective and efficient path than allowing the District Court to resolve all the issues at once.

### (g)    Preparedness for Trial

Although the Trademark Action is not "on the eve of trial," it has progressed substantially over the past almost year and a half, Boy Scouts' efforts at delay notwithstanding. Despite Boy Scouts' misrepresentations to the contrary, Girl Scouts has pursued an expeditious case schedule to facilitate a timely resolution of the Trademark Action. *See* Ewing Dec., ¶¶ 9 - 10, 19. Regardless, this factor is at most neutral to a determination of whether relief should be granted.

(h)     **Balance of Harms**

The balance of harms weighs strongly against maintaining the automatic stay.  As stated above, the purpose of trademark law is first and foremost to protect the public.  *See Scott Paper Co.*, 589 F.2d at 1228.  The longer Boy Scouts is able to delay the Trademark Action and continue infringing Girl Scouts' trademarks, the more confusion will result and the more harm the public will suffer.  The only way to prevent additional harm to the public is to allow the Trademark Action to continue so that the Girl Scouts can seek a permanent injunction prohibiting further infringement of Girl Scouts' trademarks.  Girl Scouts is also suffering additional harm with every day that Boy Scouts continues to infringe upon Girl Scouts' trademarks.  Furthermore, the longer the delay in adjudicating the issues, the more the Post-Petition Damages claim grows – delay will result in a larger administrative expense claim:  a point ignored by Boy Scouts but not lost on the Official Committee of Unsecured Creditors.  *See* Limited Joinder of the Official Committee of Unsecured Creditors to the Debtors' Objection to Girl Scouts of the United States of America's Motion For Relief From the Automatic Stay to Resume Trademark Action, ¶ 7 [Docket No. 357].  As such, the balance of harms weighs heavily in favor of granting the motion and lifting the stay.

D.     **The Cases Cited by Boy Scouts Do Not Support Denial of Girl Scouts' Motion For Relief From the Automatic Stay**

All the automatic stay cases cited by Boy Scouts are off point because they only involved questions of whether to lift the automatic stay to allow the liquidation of pre-petition damages owed to an unsecured creditor.  *See In Re Fairchild Corp.*, No. 09-10899, 2009 Bankr. LEXIS 3815 (Bankr. D. Del. Dec. 1, 2009); *In re SunEdison, Inc.*, 557 B.R. 303 (Bankr. S.D.N.Y. 2016); *In re Bally Total Fitness of Greater New York, Inc.*, 402 B.R. 616 (Bankr. S.D.N.Y. 2009); *In re Nw. Airlines Corp.*, No. 06-1793, 2006 WL 2583642 (Bankr. S.D.N.Y. Jul. 7, 2006);

*In re Penn-Dixie Indus., Inc.*, 6 B.R. 832 (Bankr. S.D.N.Y. 1980).  None of these cases involved continuing, post-petition ***trademark infringement claims*** in which the movant sought relief to obtain a permanent injunction to protect both the public and the holder of the trademark.  While these cases may be relevant to some other hypothetical garden-variety motion, they have no bearing on a case like this one involving claims for injunctive relief to halt trademark violations. As set forth above, the continuing harm to the public and to Girl Scouts weighs in favor of granting the motion and lifting the stay.

## V.    Conclusion

For all of the reasons stated herein and in its Opening Brief, Girl Scouts respectfully requests that the Court enter an order substantially in the form attached to the Motion granting Girl Scouts relief from the automatic stay pursuant to Section 362(d)(1) of the Bankruptcy Code to permit the Trademark Action to resume for the purposes of (1) adjudicating Girl Scouts' request for Post-Petition Injunctive Relief, (2) liquidating and allowing the Post-Petition Damages Claim, and (3) liquidating and allowing the Pre-Petition Damages Claim.  Girl Scouts also requests that the Court waive the 14-day stay imposed by Federal Rule of Bankruptcy Procedure 4001(a)(3).

Dated:  April 10, 2020                    **DORSEY & WHITNEY (DELAWARE) LLP**

                                          */s/ Eric Lopez Schnabel*
                                          Eric Lopez Schnabel (DE Bar No. 3672)
                                          Alessandra Glorioso (DE Bar No. 5757)
                                          300 Delaware Avenue, Suite 1010
                                          Wilmington, Delaware 19801
                                          Telephone:  (302) 425-7171
                                          Facsimile:  (302) 425-7177
                                          E-mail:  schnabel.eric@dorsey.com
                                                   glorioso.alessandra@dorsey.com

                                          -and-

                                          DORSEY & WHITNEY LLP

                                          Bruce R. Ewing (*pro hac vice*)
                                          Eric Lopez Schnabel (DE Bar No. 3672)
                                          51 West 52nd Street
                                          New York, New York 10019
                                          Telephone:  (212) 415-9200
                                          Facsimile:  (212) 953-7201
                                          E-mail:  ewing.bruce@dorsey.com
                                                   schnabel.eric@dorsey.com

                                          **Counsel to Girl Scouts of the United States of America**