**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>                Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>**Re: D.I. 5** |

**DECLARATION OF BRIAN WHITTMAN IN SUPPORT OF
THE DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO UTILIZE CASH COLLATERAL
PURSUANT TO 11 U.S.C. § 363; (II) GRANTING ADEQUATE PROTECTION
TO THE PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 105(a),
361, 362, 363 AND 507; (III) SCHEDULING A FINAL HEARING PURSUANT
TO BANKRUPTCY RULE 4001(b); AND (IV) GRANTING RELATED RELIEF**

      I, Brian Whittman, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief:

      1.      I am a Managing Director at Alvarez & Marsal North America, LLC ("A&M"), a limited liability corporation, which has served as a restructuring advisor to the Boy Scouts of America (the "BSA") and Delaware BSA, LLC ("Delaware BSA"), the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (together, the "Debtors"), since October 2018. I have twenty-five years of financial restructuring and bankruptcy experience.[2] I have served as a Managing Director in A&M's Restructuring & Turnaround group since 2008 and the group's co-head of the Midwest region since 2019. Prior

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] For the past twenty-five years I have advised companies requiring performance improvement or financial restructuring across a wide range of industries, including automotive, communications, distribution, manufacturing, media, mining and retail. I have also led complex engagements for companies, secured lenders and creditors, serving in both interim management and advisory roles. I am a Certified Insolvency and Restructuring Advisor and a Certified Public Accountant.

to joining A&M in 2002, I spent seven years working as a director in restructuring at a former "Big Five" accounting firm.

2.  I submit this declaration (this "Declaration") in support of the *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, 364 and 507; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b); and (IV) Granting Related Relief* [Docket No. 5] (the "Cash Collateral Motion").

3.  Except as otherwise stated in this Declaration, all facts set forth herein are based on my personal knowledge, materials provided by, or my discussions with, members of the Debtors' management team, information provided by the Debtors' advisors, or information obtained from my personal review of relevant documents.[3] Additionally, the views asserted in this Declaration are based upon my experience and knowledge of the Debtors' operations, financial condition, and liquidity. If called upon to testify, I would competently testify to the facts set forth herein.

I.  **The Interim and Proposed Final Cash Collateral Orders**

4.  On February 20, 2020, the Court entered that certain *Interim Order (I) Authorizing the Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to the Prepetition Secured Party Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, 364 and 507; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b); and (IV) Granting Related Relief* [Docket No. 90] (as amended by the *Omnibus Order Amending*

---

[3] Certain information set forth herein relates to matters (a) contained in the Debtors' books and records and (b) within the knowledge of other A&M employees, and is based on information provided by such employees.

*Certain Interim Orders for First Day Motions* [Docket No. 276], the "Interim Cash Collateral Order").[4]

5. In the weeks since the entry of the Interim Cash Collateral Order, the Debtors' professionals have worked closely with counsel and other professionals acting on behalf of JPMorgan Chase Bank, National Association ("JPM"), the Official Committee of Unsecured Creditors (the "UCC"), the Official Tort Claimants Committee (the "TCC") and the Future Claimants' Representative (the "FCR") to resolve informal comments and objections to the entry of an order granting final relief on the Cash Collateral Motion.

6. After several weeks of arms-length and good faith negotiations, the Debtors, JPM, the UCC, the TCC and the FCR have all agreed to the terms and conditions concerning the use of cash collateral as set forth in that certain proposed *Final Order (I) Authorizing the Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to the Prepetition Secured Party Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, 364 and 507; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b); and (IV) Granting Related Relief* (as filed, the "Proposed Final Cash Collateral Order"), a copy of which is being filed contemporaneously herewith. Each party listed above has reviewed the Proposed Final Cash Collateral Order and the terms of the global settlement that it embodies and does not object to its entry.

7. Additional information concerning the Debtors' use of cash collateral to date and expected use of cash collateral is set forth below.

---

[4] All capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Interim Cash Collateral Order.

**II.    The Prepetition Collateral of the Prepetition Secured Parties**

8.    As described in the Cash Collateral Motion, pursuant to the Prepetition Loan Documents, each Debtor granted to the Prepetition Secured Parties certain liens in all of the "Prepetition Collateral," which term is defined as having the same definition as the term "Collateral" under the Prepetition Loan Documents.  The Prepetition Collateral is limited to (i) a first-priority lien on the organization's headquarters in Texas and high-adventure facilities in Florida, New Mexico, and Minnesota;[5] and (ii) a first-priority lien on the "accounts" and certain property arising out of or otherwise relating to "accounts,"[6] "deposit accounts," "securities accounts" and "investment property" (each as defined in Article 9 of the Uniform Commercial Code) and "proceeds and products of any or all of the foregoing" of the Debtors and non-debtor affiliate Arrow, <u>but</u> excluding all (a) amounts payable in connection with any agreement by a donor, grantor or other Person to donate or otherwise contribute funds to a Debtor if the use of such funds to be donated is restricted by such Person or applicable state law to a purpose other than the Project (collectively, the "<u>Restricted Amounts</u>") and (b) Excluded Property.[7]

---

[5] The Prepetition Secured Parties do not have a direct mortgage on the BSA's high adventure base in West Virginia (the "<u>Summit</u>"), however, the Prepetition Secured Parties have a first priority security interest in all of BSA's right, title, and interest in (i) that certain $350.0 million *Promissory Note* with the BSA as lender and non-debtor affiliate Arrow WV, Inc. ("<u>Arrow</u>") as borrower dated June 30, 2010 (as amended, the "<u>Intercompany Promissory Note</u>"), and the proceeds thereof, and (ii) the mortgage on the Summit property securing the Intercompany Promissory Note. As such, the Summit is not considered part of the Prepetition Collateral

[6] "Prepetition Collateral" also includes "all of the following evidencing, governing, securing, guaranteeing, arising out of or otherwise relating to any Accounts: (i) all documents; (ii) general intangibles; (iii) instruments; (iv) letter of credit rights; (v) supporting obligations; (vi) chattel paper; (vii) any and all books and records, in whatever form, or medium including electronic media, that at any time evidence or contain information relating to any of the foregoing or interests in the foregoing or are otherwise necessary or helpful in the collection thereof or realization thereon; and (viii) all substitutions and replacements of, any and all of the foregoing."

[7] "Person," "Debtor," "Project" and "Excluded Property" have the same meaning in the Interim Cash Collateral Order and Proposed Final Cash Collateral Order ascribed to them in that certain *Third Amended and Restated Security Agreement* (the "<u>Security Agreement</u>") dated as of March 21, 2019, by and among BSA and Arrow, as debtors, JPM, in its capacity as collateral agent, JPM, in its capacity as the lender under the Credit Agreements, and as holder under the Bond Agreements.

9. As the Debtors stipulated in the Interim Cash Collateral Order, Cash Collateral consists of all of the Debtors' cash as of the Petition Date, including cash in their deposit accounts and other accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, *provided*, *however*, that the definitions of "Cash Collateral" and "Prepetition Collateral" specifically exclude all Restricted Amounts and Excluded Property (as defined in the Security Agreement).

10. Pursuant to the Interim Cash Collateral Order, any Postpetition Funds have been deemed segregated from Prepetition Funds and Postpetition Funds were not deemed "Collateral" (as defined in each respective Prepetition Loan Document) of the Prepetition Secured Parties solely by virtue of being in possession or control of the Prepetition Secured Parties. The Proposed Final Cash Collateral Order maintains this procedural deemed segregation.

11. It is my understanding that the Prepetition Secured Parties reserved all of their rights to assert that some or all of the Postpetition Funds – including certain prepetition registration fees that are collected after the commencement of these cases (the "Registration Fees") – are "Collateral" of the Prepetition Secured Parties under the Prepetition Loan Documents. The TCC, the UCC and the FCR have all reserved the right to challenge whether the Registration Fees constitute the Cash Collateral of the Prepetition Secured Parties. Further, all rights of the Prepetition Secured Parties, the Creditors' Committee, the Tort Committee and the FCR are expressly reserved to dispute or otherwise contest whether the Restricted Amounts should be treated as restricted or unrestricted and, if unrestricted, whether such alleged Restricted Amounts constitute collateral of the Prepetition Secured Parties. The Debtors are tracking receipt of the Registration Fees and Restricted Amounts in the event, in the future, it becomes necessary to resolve these issues by agreement or order of the Court.

**III.    The Debtors' Use of Cash Collateral Since the Commencement of these Cases**

12.   Pursuant to the Interim Cash Collateral Order, the Debtors were authorized, subject to the terms and conditions of the Interim Cash Collateral Order (including the provision of adequate protection to the Prepetition Secured Parties) and compliance with the Budget, to use Cash Collateral to the extent unencumbered funds were unavailable.

13.   Attached hereto as **Exhibit A-1** is an analysis comparing the projected cash receipts and disbursements and the actual cash receipts and disbursements on a weekly basis from the Petition Date through the week ending April 3, 2020 (the "Variance Analysis").

14.   The Variance Analysis shows the Debtors' use of funds since the Petition Date. As shown in the Variance Analysis, even under the assumptions most favorable to the Prepetition Secured Parties with respect to the Registration Fees and the definition of "Prepetition Cash Collateral" (*i.e.*, assuming, *arguendo*, that the Registration Fees are JPM's Cash Collateral), the Debtors have not used any Cash Collateral as of the week ending April 3, 2020.

**IV.    The Debtors' Expected Use of Cash Collateral**

15.   Attached hereto as **Exhibit A-2** is a 13-week cash flow forecast setting forth all projected cash receipts and disbursements on a weekly basis, starting with the week ending April 10, 2020 and ending on July 3, 2020 (the "13-Week Cash Flow Forecast").[8]  This 13-Week Cash Flow Forecast is updated from the forecast attached to the Interim Cash Collateral to reflect, among other things, certain assumptions with respect to the impact of COVID-19 on the Debtors' operations.  Also attached hereto as **Exhibit A-3** is a monthly cash flow forecast setting

---

[8] The 13-Week Cash Flow forecast is for the Debtors unrestricted liquidity and thus does not include receipts of restricted donations although it does reflect any releases from restriction.

forth all projected cash receipts and disbursements on a monthly basis through December 2020 (the "Monthly Cash Flow Forecast").

16. The 13-Week Cash Flow Forecast shows, among other things, when the Debtors expect to start using Cash Collateral under different assumptions for which funds are the Cash Collateral of the Prepetition Secured Parties. Specifically, as shown in the 13-Week Cash Flow Forecast, the Debtors will start using Cash Collateral during the week ending April 17, 2020 if the Registration Fees are JPM's Cash Collateral. Even if the Registration Fees are not JPM's Cash Collateral, however, the Debtors will start using JPM's Cash Collateral during the week ending May 29, 2020 and are projected to continue to use such Cash Collateral throughout the remainder of 2020.

## V. Conclusion

17. I believe that the Debtors' continued ability to use Cash Collateral as requested in the Debtors' Cash Collateral Motion is essential to preserve and maintain the going-concern value of the Debtors' estates. The Debtors' ability to continue their operations without interruption is essential for the Debtors to maximize the value of their estates for the benefit of all stakeholders and avail themselves of the "breathing room" afforded by a chapter 11 restructuring. Absent the relief requested in the Cash Collateral Motion, the Debtors will not have sufficient liquidity to continue to fund their operations, fund employee payroll and benefits obligations, pay vendors of necessary goods and services, and satisfy other operational requirements during their restructuring. All of the foregoing expenditures are essential to preserve the value of the Debtors' estates as a going concern.

*[Remainder of Page Intentionally Left Blank]*

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: April 13, 2020
       Highland Park, Illinois

*/s/ Brian Whittman*
Brian Whittman
Managing Director
Alvarez & Marsal North America, LLC