## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

IN RE:

BOY SCOUTS OF AMERICA AND
DELAWARE BSA, LLC,

                Debtors.

Chapter 11
Case No. 20-10343 (LSS)

(Jointly Administered)

**Related Docket No. 204**

## CENTURY'S OBJECTION TO DEBTORS' APPLICATION
## FOR ENTRY OF AN ORDER AUTHORIZING THE RETENTION
## AND EMPLOYMENT OF SIDLEY AUSTIN LLP AS ATTORNEYS
## FOR THE DEBTORS AND DEBTORS IN POSSESSION,
## *NUNC PRO TUNC* TO THE PETITION DATE

STAMOULIS & WEINBLATT LLC
800 N. West Street
Third Floor
Wilmington, Delaware 19801

—and—

O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036-6537

*Counsel for Century Indemnity Company, as
successor to CCI Insurance Company, as
successor to Insurance Company of North
America and Indemnity Insurance Company
of North America, Ace Insurance Group,
Westchester Fire Insurance Company and
Westchester Surplus Lines Insurance
Company*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ......................................................................... 1

STATEMENT OF FACTS .............................................................................. 3

    *Sidley has represented Chubb for at least fifteen years.* ............................................. 3

    *Sidley's legal representation of Chubb/Century with respect to the Boy Scouts.* ..................... 4

    *Rule 1.7(b)(4) and Sidley's retention agreement with Chubb require it to obtain written conflict waivers.* ................ 5

    *Sidley fails to get a written conflict waiver without disclosing its concurrent and conflicting representation of the Boy Scouts.* ......... 5

    *Chubb discovers and objects to Sidley's concurrent and conflicting representation of the Boy Scouts.* .............. 7

    *Sidley threatens and bullies its client, telling Chubb to "live with" the situation or risk being dropped in active cases.* ............. 8

    *Sidley drops Chubb as a client like a hot potato after it files the Boy Scouts' bankruptcy.* ............ 8

    *Sidley's proposed representation of the Debtors will prejudice Chubb/Century and the Estate.* ............ 10

ARGUMENT ........................................................................................ 12

POINT I.    THE DEBTORS' RETENTION OF SIDLEY VIOLATES MULTIPLE RULES OF PROFESSIONAL CONDUCT. ............................. 13

    A.    Sidley's Proposed Representation Violates Rule 1.7(a). ..................... 13

        1.    Sidley's Proposed Retention Is "Directly Adverse" to Century in Violation of Rule 1.7(a)(l). .......... 13

        2.    Sidley's Proposed Retention Violates Rule 1.7(a)(2). ........... 15

    B.    Sidley Cannot Recast Century as a Rule 1.9 "Former Client" to Benefit From Its Wrongful Termination of Century. ............. 18

    C.    No Exception Exists Under Rule 1.7(b) to Permit Sidley's Concurrent Representation Despite the Conflict. ............ 21

POINT II.    WRONGFUL TERMINATION HAS BEEN REGULARLY REJECTED BY COURTS AS A DEFENSE TO DISQUALIFICATION. .............. 22

POINT III.    SIDLEY'S RETENTION BY THE BOY SCOUTS WOULD BE IMPROPER EVEN IF CENTURY WAS EVALUATED AS A FORMER CLIENT UNDER RULE 1.9 ............ 24

i

**TABLE OF CONTENTS**
(continued)

Page

POINT IV.    SIDLEY'S DISABLING CONFLICTS CANNOT BE CURED  BY
UNTIMELY AND INADEQUATE POST-HOC SCREENS OR
EMPLOYING SPECIAL COUNSEL. ................................................................... 27

POINT V.    SIDLEY'S FAILURE TO MEET ITS OBLIGATION TO THIS COURT
AND DISCLOSE ALL POTENTIAL CONFLICTS IS AN
INDEPENDENT GROUND FOR DENYING THE RETENTION. .................... 29

CONCLUSION ........................................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atasi Corp. v. Seagate Technology*,
  847 F.2d 826 (Fed. Cir. 1988)................................................................. 28

*Atl. Specialty Ins. Co. v. Premera Blue Cross*,
  No. C15-1927-TSZ, 2016 WL 1615430 (W.D. Wash. Apr. 22, 2016) .................................. 18

*Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*,
  321 B.R. 147 (D.N.J. 2005) ................................................................. 13

*Certain Underwriters at Lloyd's London v. Westchester Fire Ins. Co.*,
  489 F.3d 580 (3d Cir. 2007)................................................................. 4

*Chemical Bank v. Affiliated FM Ins. Co.*,
  No. 87 Civ. 0150, 1994 WL 141951 (S.D.N.Y. Apr. 20, 1994) ........................................ 19

*Davis v. Kraft Foods N. Am*,
  No. CIV.A. 03-6060, 2006 WL 237512 (E.D. Pa. Jan. 31, 2006) ..................................... 22

*Ehrich v. Binghamton City School District*,
  210 F.R.D. 17 (N.D.N.Y. 2002)............................................................. 19

*Florida Ins. Guar. Ass'n v. Carey Canada, Inc.*,
  749 F. Supp. 255 (S.D. Fla. 1990) .......................................................... 19

*Gibson v. Ellis*,
  126 S.W.3d 324 (Tex. App. 2004) .......................................................... 23

*Harrison v. Fisons Corp.*,
  819 F. Supp. 1039 (N.D. Fla. 1993).......................................................... 22

*Illaraza v. Hovensa, L.L.C.*,
  Nos. 2008-0059, 2007-0125, 2012 WL 1154446 (D.V.I. Mar. 31, 2012) ........................ 18

*In re Agway, Inc.*,
  No. 02-65872, 2005 WL 3806043 (Bankr. N.D.N.Y. Dec. 9, 2005)...................................... 19

*In re B.E.S. Concrete Prods., Inc.*,
  93 B.R. 228 (Bankr. E.D. Cal. 1988) .................................................... 30

*In re Berger McGill, Inc.*,
  242 B.R. 413 (Bankr. S.D. Ohio 1999)......................................................... 13

*In re C&C Demo, Inc.*,
  273 B.R. 502 (Bankr. E.D. Tex. 2001) ..................................................... 29

*In re Cendant Corp. Sec. Lit.*,
  124 F. Supp. 2d 235 (D.N.J. 2000) .......................................................... 14, 17, 28

*In re Congoleum Corp.*,
  426 F.3d 675 (3d Cir. 2005) ........................................................... 12, 24

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*In re Corn Derivatives Antitrust Litigation*,
   748 F.2d 157 (3d Cir. 1984)..................................................................................... 26

*In re Diamond Mortg. Corp. of Ill.*,
   135 B.R. 78 (Bankr. N.D. Ill. 1990).......................................................................... 31

*In re Envirodyne Indus., Inc.*,
   150 B.R. 1008 (Bankr. N.D. Ill. 1993)...................................................................... 31

*In re eToys, Inc.*,
   331 B.R. 176 (Bankr. D. Del. 2005) .......................................................................... 31

*In re EWC, Inc.*,
   138 B.R. 276 (Bankr. W.D. Okla. 1992) ................................................................... 31

*In re Filene's Basement, Inc.*
   239 B.R. 845 (Bankr. D. Mass. 1999)........................................................................ 29

*In re Leslie Fay Cos.*,
   175 B.R. 525 (Bankr. S.D.N.Y. 1994) ....................................................................... 31

*In re Park-Helena Corp.*,
   63 F.3d 877 (9th Cir. 1995)........................................................................................ 29

*In re Star Broadcasting, Inc.*,
   81 B.R. 835 (Bankr. D.N.J. 1988) ............................................................................. 12

*In re Sullivan*,
   No. 91-5501, 1992 WL 68613 (E.D. Pa. Mar. 31, 1992)........................................... 13

*In re The Brown Sch.*,
   368 B.R. 394 (Bankr. D. Del. 2007) .......................................................................... 23

*In re Thorpe Insulation Co.*,
   677 F.3d 869 (9th Cir. 2012)...................................................................................... 15

*In re Universal Bldg. Prods.*,
   486 B.R. 650 (Bankr. D. Del. 2010) ..................................................................... 13, 30

*Int'l Longshoremen's Ass'n, Local Union 1332 v. Int'l Longshoremen's Ass'n*,
   909 F. Supp. 287 (E.D. Pa. 1995) .............................................................................. 22

*Intellectual Ventures I LLC v. Checkpoint Software Techs. Ltd.*,
   No. CIV. 10-1067-LPS, 2011 WL 2692968 (D. Del. June 22, 2011) ....................... 25

*Madukwe v. Delaware State Univ.*,
   552 F. Supp. 2d 452 (D. Del. 2008)................................................................. 26, 27, 28

*Merck Eprova AG v. ProThera, Inc.*,
   No. 08CIV0035RMBJCF, 2009 WL 10696470 (S.D.N.Y. Oct. 6, 2009) ................ 19

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Mitchell v. Metro. Life Ins. Co.*,
No. 01 CIV. 2112 (WHP), 2002 WL 441194 (S.D.N.Y. Mar. 21, 2002) ............................. 28

*Pulsecard, Inc. v. Discovery Card Services, Inc.*,
1994 U.S. Dist. LEXIS 19635 (D. Kan. Dec. 29, 1994) ....................................................... 19

*Ransburg Corp. v. Champion Spark Plug Co.*,
648 F. Supp. 1040 (N.D. Ill. 1986) ................................................................................. 21, 24

*Santacroce v. Neff*,
134 F. Supp. 2d 366 (D.N.J. 2001) ............................................................................ 19, 20, 22

*Snapping Shoals Elec. Membership Corp. v. RLI Ins. Corp.*,
No. 1:05 CV 1714-GET, 2006 WL 1877078 (N.D. Ga. July 5, 2006) ................................... 22

*Unified Sewerage Agency of Wash. v. JELCO, Inc.*,
646 F.2d 1339 (9th Cir. 1981) ............................................................................................... 18

*United States ex rel. Bahsen v. Bos. Sci. Neuromodulation Corp.*,
147 F. Supp. 3d 239 (D.N.J. 2015) ........................................................................................ 28

**Statutes**

11 U.S.C. § 101(14) ................................................................................................................. 29

**Rules**

D. Del. L.R. 83.6(d) ................................................................................................................. 12

Del. Bankr. L.R. 1001-1(b) ...................................................................................................... 12

Fed. R. Bankr. P. 2014 .............................................................................................................. 29

Model R. Prof'l Conduct 1.16(d) .............................................................................................. 22

Model R. Prof'l Conduct 1.7(a) ................................................................................................ 13

Model R. Prof'l Conduct 1.7(a)(2) ........................................................................................... 16

Model R. Prof'l Conduct 1.7(b) .......................................................................................... 21, 23

Model R. Prof'l Conduct 1.7, cmt. [2] ..................................................................................... 23

Model R. Prof'l Conduct 1.7, cmt. [3] ..................................................................................... 23

Model R. Prof'l Conduct 1.7, cmt. [6] ..................................................................................... 14

Model R. Prof'l Conduct 1.7, cmt. [8] ..................................................................................... 16

Model R. Prof'l Conduct 1.8(b) ............................................................................................... 17

Model Rule Prof'l Conduct 1.10 .............................................................................................. 28

## TABLE OF AUTHORITIES
(continued)

Page(s)

**Treatises**

1 Collier on Bankruptcy, § 8.01[1] (15th ed. 2002)....................................................... 24

1 Collier on Bankruptcy, § 8.02[2] (15th ed. 2002)....................................................... 24

1 Collier on Bankruptcy, § 8.03[1] (15th ed. 2002)....................................................... 24

9 Collier on Bankruptcy ¶ 2014.03 (15th ed. 2004) ..................................................... 30

Charles W. Wolfram, *Symposium: Restatement of the Law Governing Lawyers, Former-Client Conflicts*, 10 Geo. J. Legal Ethics 677 (1997) ............................................................ 22

Geoffrey C. Hazard, Jr. and W. William Hodes, *The Law of Lawyering* § 20.10 (3d ed. 2001) ................................................................................................................................. 22

Richard W. Painter, *Advance Waiver of Conflicts*, 13 Geo. J. Legal Ethics 289 (2000)............. 22

Century Indemnity Company ("Century") and the Century entities identified in the signature block below object to the Debtors' proposed order to retain Sidley Austin LLP ("Sidley") as attorneys for the Debtors and Debtors in Possession.

## PRELIMINARY STATEMENT

Chubb, Century's parent company, is a longtime Sidley client as is its subsidiary Century and its affiliates.  On the very day that Sidley signed the Boy Scouts' bankruptcy petition, Sidley was Chubb's counsel representing its subsidiary Century in arbitrations seeking to obtain reinsurance for the Boy Scouts' sexual molestation claims.  These representations involve the same insurance policies that the Boy Scouts have told this Court will be the foundation for this reorganization.  Chubb and the Boy Scouts are thus adverse in this matter—regardless of whether Sidley calls itself "bankruptcy" counsel here and "coverage" counsel in the arbitrations.

These facts present a textbook violation of Rule of Professional Conduct 1.7(a), which prohibits lawyers from undertaking simultaneous representation of two directly adverse clients. Sidley also violates Rule 1.9, which bars representing a client whose interests are materially adverse to a former client in a matter that is substantially related to the former representation. Indeed, the mere possibility that information obtained in the former representation is relevant to the current representation makes the matters substantially related.  Here, Sidley was not only aware of confidential information regarding Century's policies and litigation strategies; it was also deeply involved in litigating reinsurance disputes involving the Boy Scouts' policies. Without doubt, there is more than a mere possibility that information obtained in the former representation is relevant here.

Informed consent "confirmed in writing" is what Rule 1.7(b) requires for current clients and what Rule 1.9(a) requires for former clients.  Sidley's retention agreement with the Chubb

companies requires it to obtain written waivers of any conflicts.  But Chubb never granted a

waiver to Sidley, written or otherwise.  Just the opposite, Chubb made clear that given the

sensitive information Sidley possessed, it should not represent the Boy Scouts.  Unhappy with

that, Sidley attempted to bully its client, telling Chubb/Century to "live with" the situation or risk

being abandoned as a client in active cases.  When Chubb refused, Sidley simply dumped Chubb

like a hot potato, choosing a client that would pay more in a high-profile retention.

Sidley's strategy to avoid the conflict by belatedly attempting to drop Chubb as a client

violates Sidley's duty of loyalty to Chubb, violates Rule 1.16, and harms Chubb.  Sidley's abrupt

withdrawal from several pending matters prejudiced Chubb and its subsidiary Century.  Chubb

had to scramble to find replacement counsel and incur the expense of getting them up to speed

on complex issues, and the cases were each at critical stages when Sidley unilaterally withdrew

as counsel.

Sidley's other post-hoc attempts to cure its conflict of interest by offering a post-hoc

screen and using other counsel for future issues are equally weak.  Ethical screens alone do not

cure a Rule 1.7 violation.  In any event, an ethical screen must be erected ***before*** an actual or

potential conflict emerges—Sidley began representing the Boy Scouts in October 2018 and did

not implement a screen until November 2019.  And Sidley's prepetition involvement in this case

along with the central role of the Century policies in this bankruptcy are too extensive for

conflicts counsel to be an effective remedy.

Chubb made extensive efforts to try to resolve this issue in a manner that could have

brought about a smooth transition.  When initial efforts to resolve this out of court failed,

Century sought out a leading ethics expert in Delaware, Charles Slanina—whose expert

declaration Century submits in support of this objection—to get his independent perspective.

Guided in part by his advice, Chubb initiated the process of seeking to resolve the matter through the dispute resolution clause of its engagement agreement with Sidley, by inviting Sidley to meet and confer.

Sidley's response?  It promptly filed its retention application after Century asked to meet and confer.  Sidley effectively forced Century to litigate before this Court.  This was not Century's preferred route.

## STATEMENT OF FACTS

### *Sidley has represented*
### *Chubb for at least fifteen years.*

Chubb is a longtime client of Sidley's Insurance and Financial Services Group.  Over just the last decade, Sidley has represented Chubb and its predecessors and their subsidiaries in over a dozen matters.[1]  The vast majority of these matters involved reinsurance, an area of insurance law in which Sidley has a specialty.[2]  Because of Sidley's unique expertise in this area of the law, Chubb retained Sidley in many of its most significant reinsurance disputes.

These disputes gave Sidley access to highly sensitive Chubb propriety information, as well as its legal theories and strategies.  Indeed, many cases were by agreement (or order) privately arbitrated to protect information that was the subject of the disputes.[3]  Thus, during its years of work for Chubb, Sidley developed extensive knowledge of highly confidential information about Chubb's insurance and reinsurance programs that apply beyond any single policyholder or matter.[4]

---

[1]     Declaration of Joshua R. Schwartz ("Schwartz Decl.") ¶ 2.

[2]     *Id.* ¶ 2; Declaration of Janine Panchok-Berry ("Panchok-Berry Decl.") ¶ 2, Ex. A.

[3]     *Id.*

[4]     *Id.* ¶ 3.

### *Sidley's legal representation of Chubb/Century with respect to the Boy Scouts.*

On October 5, 2018, Chubb retained Sidley to represent Century in connection with the Boy Scouts'[5] insurance for molestation claims and Chubb's efforts to obtain reinsurance for those claims.[6]  Reinsurance is a means by which insurers transfer portions of their risk from the insurance they issue to other parties (reinsurers) by some form of agreement to reduce the likelihood of paying a large obligation resulting from an insurance claim alone.[7]  Given the nature of this arrangement, there is an interrelationship between the insurance and the reinsurance in any analysis of the reinsurance or effort to collect it.

This first Boy Scouts arbitration involved a reinsurance dispute with Lloyd's of London over policies that Century issued to the Boy Scouts.[8]  As of August 2019, Sidley was also advising Century in an arbitration with a second reinsurer involving policies Century issued to the Boy Scouts and reinsurance for claims under those policies.[9]  As Century's counsel, Sidley was privy to highly confidential information about Chubb's insurance coverage for the Boy Scouts and agreements concerning it.[10]  This includes privileged information concerning the disputes between Century and the Boy Scouts over its insurance coverage, Century's legal analysis of the Boy Scouts' claims, and Century's legal strategies and defenses in these matters.[11]

---

[5]   The Debtors in the chapter 11 cases, together with the last four digits of each Debtors' federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 W. Walnut Hill Ln., Irving, TX 75038.

[6]   *Id.* ¶ 4.

[7]   *E.g., Certain Underwriters at Lloyd's London v. Westchester Fire Ins. Co.*, 489 F.3d 580, 582 n.1 (3d Cir. 2007) ("In essence, reinsurance is insurance for insurance companies, whereby a reinsured . . . cedes some of its risk to a reinsurer (in this case, the Underwriters), and shares its premium with the reinsurer." (internal citations and quotation marks omitted)).

[8]   Schwartz Decl. ¶ 4.

[9]   *Id.*

[10]  *Id.* ¶¶ 5, 26–27.

[11]  *Id.*

While working on the Boy Scouts matters, Sidley was also advising on other matters for Chubb, including an arbitration against a third reinsurer.[12]

### Rule 1.7(b)(4) and Sidley's retention agreement with Chubb require it to obtain written conflict waivers.

Sidley was bound to abide by Rule 1.7(b)(4) which requires that it obtain the informed consent of its client, ***confirmed in writing,*** to any conflict.  As a condition to accepting engagements from Chubb for Century, Sidley agreed to abide by the companies' Service Level Agreement ("SLA") for law firms.[13]  Pursuant to this agreement, Sidley agreed "to identify and bring to the attention of the Client, ***in writing***, any circumstances that may create or involve a conflict of interest."[14]  On any newly retained matter, Sidley agreed to "confirm the absence of any conflicts of interest."[15]  Sidley further agreed that if it "identifies a potential conflict after it has begun work for [Chubb], it shall make all reasonable efforts to resolve that conflict in a manner that will allow [Sidley]'s continued representation of [Chubb]."[16]

### Sidley fails to get a written conflict waiver without disclosing its concurrent and conflicting representation of the Boy Scouts.

Without telling Chubb, Sidley took on the Boy Scouts representation and continued to do that work while still engaged by Chubb on Boy Scout matters for Century and on other matters.[17]

---

[12]   *Id.* ¶ 4.

[13]   Schwartz Decl. Ex. 1.

[14]   *Id.* at 6.

[15]   *Id.*

[16]   *Id.*  The SLA further provides:  "The Law Firm is required, without charge to the Client, to conduct or have conducted appropriate searches and inquiries with regard to any actual or potential conflict of interest, and to consult with the Client accordingly."  *Id.* at 15.  The first page of Exhibit 1 to the Declaration of Joshua R. Schwartz submitted with this Objection shows that Sidley acknowledged these guidelines on September 4, 2015.

[17]   Schwartz Decl. ¶ 8.  As part of its Rule 2014 disclosures, Sidley did not disclose when it entered into an engagement letter with the Boy Scouts or whether it did.  Ms. Boelter merely states that "[s]ince October 2018, Sidley has been advising the BSA regarding various strategic options for reaching an equitable global resolution of abuse claims against the BSA, including restructuring alternatives."  *See* Application Ex. B, Boelter Decl. at 2, ECF No. 204.  All references to docket numbers relate to

Sidley did not identify and bring to Chubb's attention, let alone *in writing*, that it took on the Boy Scouts as a client.  Nor did Sidley obtain a written waiver from Chubb.[18]

On January 8, 2019, the Sidley lawyer who led the work for Century on the Boy Scouts matter, William Sneed, advised Chubb that Sidley's new leadership wanted prospective waivers for non-litigation matters and stated that he could not accept new assignments without the prospective waiver.[19]  On February 20, 2019, Mr. Sneed and Mike Goldman, head of Sidley's Insurance and Financial Services Group and a member of its Executive Committee, advised Chubb that Sidley had modified its request from a month earlier and was now only seeking a prospective waiver for bankruptcy/insolvency matters.[20]  Crucially, Sidley said nothing in the proposed waiver about representing the Boy Scouts, even though Sidley had already undertaken that representation.[21]

In fact, Sidley disclosed none of the specific matters for which it sought waivers.  After failing to secure a written waiver, on March 21, Sidley dropped the request.[22]  In August 2019, Mr. Sneed told Century that he had cleared conflicts for Sidley to represent Century in an arbitration with another reinsurer stemming from molestation claims against the Boy Scouts.[23]  To be clear, Century *never* granted any waiver to Sidley, prospective or otherwise.[24]

---

the instant Bankruptcy Matter, *In re Boy Scouts of America*, No. 20-10343, unless otherwise stated.
[18]  Schwartz Decl. ¶ 8.
[19]  *Id.* Ex. 2.
[20]  *Id.* ¶ 10.
[21]  *Id.*
[22]  *Id.* ¶ 11.
[23]  *Id.*
[24]  *Id.* ¶¶ 11, 18, Ex. 5.

***Chubb discovers and objects to Sidley's concurrent
and conflicting representation of the Boy Scouts.***

In late September 2019, the Boy Scouts invited the Century people handling its coverage to a meeting on October 14, 2019, at which Sidley appeared.[25]  But it was not until the end of October that anyone on the reinsurance side learned about the October 14 meeting and realized that Sidley was concurrently representing Century and the Boy Scouts.[26]

On October 29, 2019, Chubb told Mr. Sneed (at Sidley) that it was concerned about the conflict, asked for an explanation, and said that Chubb did not consent to the dual representation.[27]  Mr. Sneed summarily denied a conflict.  He said that he had an opinion that there was no conflict, but declined to provide a copy of the opinion or other analysis, even when Chubb asked for it, or offer any other explanation.[28]

While denying that a conflict existed, Sidley asked Chubb to consent to Sidley's representation of the Boy Scouts while concurrently working on behalf of Century in the reinsurance arbitration matters.[29]  Sidley also said on December 3 that it had instituted a "screen" to avoid information sharing between its Boy Scouts and reinsurance lawyers.[30]  But that only raised more concerns since Sidley confirmed that no screen—or any other precautions—had been in place before November 4.[31]

---

[25]  *Id.* ¶ 12.

[26]  On November 3, 2019, the Chubb representatives handling the Boy Scouts coverage separately advised Sidley and the Boy Scouts that they had just learned about the concurrent representation, advised them that Chubb had not consented to a dual representation, and proposed adjourning a planned mediation.  *Id.* ¶ 14.

[27]  *Id.* Ex. 3.

[28]  *Id.* Ex. 4.

[29]  *Id.* ¶ 15.

[30]  *Id.*

[31]  *Id.*

***Sidley threatens and bullies its client,
telling Chubb to "live with" the situation
or risk being dropped in active cases.***

Chubb asked Sidley several times to provide its opinion or other analysis to back up its claim there was no conflict of interest.[32]  Sidley refused.  Instead, on December 16, 2019, Sidley called Chubb's concerns about a conflict a "distraction."[33]  Two days later, Mr. Sneed threatened Chubb that if it could not "live with" the situation, then Sidley would unilaterally terminate their attorney-client relationship.[34]  In other words, Sidley gave its client an ultimatum: either waive the conflict and accept a belated screen or risk being dropped as a client in active, complex matters.

***Sidley drops Chubb as a client like a hot potato
after it files the Boy Scouts' bankruptcy.***

In January 2020, Chubb advised that it would not waive the conflict[35] and instructed Sidley not to discuss the conflict with arbitrators or opposing parties without its written permission.[36]  Sidley ignored its client's instructions and—without allowing Century to better position itself for its counsel's withdrawal—Sidley plowed ahead with its unauthorized attempt to withdraw from the active matters involving Century.[37]

On January 27, 2020, shortly before the Boy Scouts' bankruptcy filing, Sidley filed a motion to withdraw from litigation related to the Lloyd's matter in the United State District

---

[32]   *Id.* ¶¶ 13, 16, 28, Ex. 3, 8.
[33]   *Id.* ¶ 16.
[34]   *Id.* ¶ 18.
[35]   *Id.* Ex. 5.
[36]   *Id.* Ex. 8.
[37]   *Id.* ¶¶ 21–22, Ex. 9, 10.

Court for the District of Massachusetts.[38]  To add insult to injury, Sidley requested that the court expedite Century's response time from 14 to 7 days.[39]

On February 18, 2020, the Boy Scouts filed for bankruptcy.  Two days after the bankruptcy filing, and without Chubb's consent, Sidley emailed the arbitration panels in two reinsurance matters to withdraw.[40]  On February 24, 2020, similarly without Chubb's consent, Sidley called the arbitrators in the Lloyd's matter to withdraw.[41]

Sidley's abrupt withdrawal from its pending matters for Chubb materially prejudiced its interests in each matter.  Just before Sidley's withdrawal, one of the reinsurance arbitrations was stayed so the parties could attempt to reach a settlement.[42]  Sidley was well aware of those circumstances because Chubb had emphasized the precarious stage of the matter in a letter to Sidley on January 30, 2020, and asked Sidley to continue working on the matter to avoid damaging Chubb's position.[43]  Undeterred, Sidley walked away.  Sidley's withdrawal put Chubb in a bad light before the panel and destabilized the settlement discussions.[44]  It also left Chubb adrift without counsel in the midst of a critical part of the case.[45]  Sidley had been intimately familiar with the matter, and Chubb incurred significant cost having to scramble to bring new counsel up to speed.[46]

---

[38]  *Id.* ¶ 21.

[39]  *Id.*

[40]  *Id.* ¶ 22.

[41]  *Id.*

[42]  *Id.* ¶ 22, Ex. 13.

[43]  *Id.* Ex. 8.

[44]  *Id.* Ex. 13.

[45]  *Id.*

[46]  *Id.*

Likewise in Sidley's other representations, Chubb was left having to quickly put in place replacement counsel, clear conflicts, bring new lawyers up to speed, and shift deadlines.[47]  And in the Lloyd's matter, Chubb was left having to pay for new counsel to learn a case that had been ongoing for more than a year, and was getting set for an impending arbitration with which Sidley had been intimately involved.[48]

***Sidley's proposed representation of the Debtors
will prejudice Chubb/Century and the Estate.***

Chubb now finds itself in a position negotiating against Sidley on matters implicating its subsidiary Century's rights as an insurer of the Boy Scouts, including the trust distribution procedures, on privileged subject matter that Sidley is privy to as Century's lawyer.

The Proposed Plan that Sidley is charged with confirming impairs Century's (and other insurers') right to defend and settle claims, and adversely affects the corresponding obligation of the Debtors to cooperate and assist in the defense of claims, by transferring the rights to the policies to a claimant-controlled trust.[49]  The Plan then confers on the trust the right to settle its own constituents' claims on the terms it chooses,[50] with the resulting amount then passed on to insurers to pay or face suit by the trust.[51]  Article IV.G of the Proposed Plan then purports to take away any claim or defense that the policies have been breached by directing that the policies be deemed to be unimpaired and unaffected post-confirmation.

---

[47]  *Id.*

[48]  *Id.*  Litigation of the Lloyd's matter in the District of Massachusetts is also ongoing, as Lloyd's filed a motion for reconsideration on April 3, 2020.

[49]  Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC ("Plan") at Art. IV.F.I, ECF No. 20.

[50]  *Id.* at Art. IV.C.

[51]  *Id.* at Art. IV.S.

After enshrining in the terms of the Plan a complete revision of the fundamental bargain between insurer and policyholder, Article XII.I of the Proposed Plan purports to hold that all such rights and obligations arising under the Plan shall be governed by the laws of Delaware rather than the laws of Texas or Illinois, where the rights of insurers are being adjudicated.[52]

The Proposed Plan contains a clause that gives lip service to insurance neutrality but it is entirely illusory as it mandates that nothing in the Plan shall be deemed to impair the rights of the Debtors under any insurance policy.[53]  Indeed, the Proposed Disclosure Statement describes the transfer of insurance rights contemplated by the Proposed Plan as effective, notwithstanding any provision in or incorporated into any insurance policy.[54]

As an admission of the adversity, Sidley moved for an order compelling a mandatory mediation in the bankruptcy with a mediator charged with mediating between the Debtors and insurers issues concerning a plan of reorganization.[55]  If nothing else, this motion makes clear that the availability of insurance is directly relevant to the bankruptcy.[56]  Further, Chubb faces the immediate prospect of dealing with Sidley on motions and orders implicating the status of privileged documents concerning defense of tort claims and insurance.[57]

---

[52]  While admitting that "the availability of certain insurance policies remains contingent upon the resolution of active pending litigation between the BSA and some of its insurers," the plan fundamentally changes the parties' rights by purporting to insulate the Debtors from the outcome of their actions in the bankruptcy and the changes that they bring about through the Plan.  Disclosure Statement for the Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC ("Disclosure Statement") at 26, ECF No. 21.

[53]  Plan at Art. IV.T, ECF No. 20.

[54]  Disclosure Statement at 39, ECF No. 21.

[55]  Debtor's Motion for Entry of an Order (I) Appointing a Judicial Mediator (II) Referring Certain Matters to Mandatory Mediation, and (III) Granting Related Relief at 9, ECF No. 17 ("Mediator Motion").

[56]  *Id.* at 10.

[57]  Century Indemnity Company's Limited Objection To The Official Tort Claimants' Committee's Motion For An Order Clarifying The Requirements To Provide Access To Confidential Or Privileged Information, at 1–2, ECF No. 368.

*      *      *

On March 16, 2020, Chubb invited Sidley to meet and confer under paragraph 7.2 of the SLA.[58]  The following day Sidley filed its retention application.  Chubb pursued additional efforts thereafter to resolve these issues in connection with the Debtors, and Sidley stipulated in writing to extend the time for Chubb to object through the date of the filing of this Objection.

## ARGUMENT

Sidley, in seeking to be employed as counsel to a debtor in possession, must comply with both the relevant code of professional responsibilities as well as the requirements set forth in the Bankruptcy Code.[59]  As the Third Circuit put it, "[i]n addition to the standards established by professional ethics, attorneys retained in bankruptcy proceedings are also required to meet the restrictions imposed by section 327 of the Bankruptcy Code."  *In re Congoleum Corp.*, 426 F.3d 675, 688 (3d Cir. 2005).[60]  "Not only do state laws of professional responsibility apply in bankruptcy, but bankruptcy courts can enforce these laws through, among other mechanisms, disqualifications of counsel or disapproval of the appointment of counsel."[61]  The two standards focus upon different, but often overlapping,

---

[58]   Schwartz Decl. ¶ 22.

[59]   The Model Rules of Professional Conduct of the American Bar Association (the "Model Rules") govern the practice of law before this Court.  Del. Bankr. L.R. 1001-1(b) (adopting the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware); D. Del. L.R. 83.6(d) (incorporating the Model Rules).

[60]   *See also In re Star Broadcasting, Inc.*, 81 B.R. 835, 839 (Bankr. D.N.J. 1988) ("In addition to the standards in Section 327(a) . . . many courts have relied on the Rules of Professional Conduct for guidance in determining whether a conflict-of-interest exists in a law firm's representation of parties to a bankruptcy.").

[61]   *In re Berger McGill, Inc.*, 242 B.R. 413, 418 (Bankr. S.D. Ohio 1999); *see In re Universal Bldg. Prods.*, 486 B.R. 650, 661 (Bankr. D. Del. 2010) (violation of Model Rules was grounds to disqualify counsel from employment under section 327 of the Bankruptcy Code); *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 164 (D.N.J. 2005) ("Not only are state ethical laws imposed upon professionals in the bankruptcy context, but the Bankruptcy Code and Federal Rules of Bankruptcy Procedure contain specific references and directives imposing additional ethical obligations upon attorneys and other professionals.").

12

concerns:  the ethics rules are centered on the rights of a client and the behavior of counsel

toward that client, while the Bankruptcy Code is designed to protect the interests of a

debtor's estate.[62]  Here, Debtors' proposed retention of Sidley will not only offend multiple

provisions of the Model Rules but also fails to satisfy the requirements under Section 327(a)

of the Bankruptcy Code.

**POINT I.**

**THE DEBTORS' RETENTION OF SIDLEY VIOLATES MULTIPLE
RULES OF PROFESSIONAL CONDUCT.**

**A.**    **Sidley's Proposed Representation Violates Rule 1.7(a).**

Rule 1.7(a) provides that "a lawyer shall not represent a client if the representation

involves a concurrent conflict of interest.  A concurrent conflict of interest exists if:  (1) the

representation of one client will be directly adverse to another client; or (2) there is a

significant risk that the representation of one or more clients will be materially limited by

the lawyer's responsibilities to another client, a former client or a third person or by a

personal interest of the lawyer."[63]  Sidley's retention would violate both subsections (1) and

(2) of Rule l.7(a).

**1.**    **Sidley's Proposed Retention Is "Directly Adverse" to Century in Violation of
Rule 1.7(a)(l).**

Sidley was representing Century—and continued to do so through and after the petition

date—at the time that Sidley undertook the representation of the Boy Scouts, including on

matters concerning the Boy Scouts' insurance.  This dual representation constitutes a concurrent

conflict of interest prohibited by Rule 1.7(a)(l) because the interests of Century and the Boy

Scouts in the bankruptcy are directly adverse.  Because Rule 1.7(a)(1) is grounded in the notion

---

[62]    *See, e.g.*, *In re Sullivan*, No. 91-5501, 1992 WL 68613, at *5 n.3 (E.D. Pa. Mar. 31, 1992).

[63]    Model R. Prof'l Conduct 1.7(a).

that an attorney must provide complete and undivided loyalty to the client, "a lawyer may not act as an advocate in one matter against a person the lawyer represents in some other matter, even where the matters are wholly unrelated."[64]  To establish a violation under Rule 1.7(a)(1), "one does not have to prove prejudicial impact, negative result, or an exchange of confidential information. . . .  It is the interests of the client with which the rule is concerned, not the result obtained."[65]

At the time that Sidley took on the representation of the Boy Scouts, it was counsel to Chubb and its subsidiary Century.[66]  Sidley's representation of the Boy Scouts is adverse to Chubb's interests.[67]  Sidley designed a plan of reorganization that impacts the rights of insurers, which includes provisions for transferring insurance rights, enjoining rights of contribution, and setting trust distribution procedures that settle, value, and pay claims without insurer consent.[68]  While there are many options to structure a plan of reorganization for the Boy Scouts, this one is insurance-driven.  Indeed, Sidley touts in the disclosure statement that "it expects that the *proceeds of these policies will comprise a substantial portion of the assets contributed* to any victims compensation trust."[69]

There is inherent adversity between insurers and debtors in a mass tort bankruptcy proceeding such as this where there is even a question as to whether a plan of reorganization impairs an insurer's rights.[70]  Any plan that "may have a substantial economic impact on

---

[64]    Model R. Prof'l Conduct 1.7, cmt. [6] (emphasis added).

[65]    *In re Cendant Corp. Sec. Lit.*, 124 F. Supp. 2d 235, 243 (D.N.J. 2000) (internal quotations omitted).

[66]    *See* Schwartz Decl. ¶ 4; Application Ex. B, Boelter Decl. at 2, ECF No. 204.

[67]    *Supra* Statement of Facts at 10–11.

[68]    *Supra* Statement of Facts at 10–11.

[69]    Declaration of Brian Whittman in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings at 24, ECF No. 16; *see also* Disclosure Statement at 28, ECF No. 21.

[70]    *In re Thorpe Insulation Co.*, 677 F.3d 869, 885 (9th Cir. 2012) (reversing confirmation and remanding to allow insurers to offer proof in contested hearing that plan impairs their rights).

insurers," as the Boy Scouts plan does, will thus find insurers and debtors on opposite sides of

the ledger, with the debtors advocating a plan that the insurers oppose.[71]

The adversity of Sidley's role is evident from who is sitting on the opposite end of the

table negotiating.  After Sidley surfaced its role, Chubb finds itself negotiating against Sidley

over the terms of the trust distribution procedures, orders for handling privileged documents, and

funding for a plan.[72]  The Court need look no further than the list of issues on which Sidley

moved for the mandatory appointment of a mediator to negotiate, among others, with its insurers:

- the relative treatment of abuse claimants under the Plan and trust distribution procedures;
- the funding of a victims compensation trust;
- the treatment of abuse claims related to Scouting that are asserted against entities that are not debtors in these cases;
- the enforceability of donor and other restrictions on the Debtors' and local councils' assets;
- issues pertaining to shared insurance between the Debtors and local councils; and
- coverage disputes between the Debtors and its insurers.[73]

Sidley leads these negotiations, not coverage counsel, and advocates positions over Chubb's

objection that impair its rights and are contrary to its interests.[74]  This is the definition of

adversity.

These facts, together with the fact that Chubb never granted consent to this engagement,

establish a *prima facie* case for violation of Rule 1.7(a)(l) requiring withdrawal of counsel.[75]

### 2.    Sidley's Proposed Retention Violates Rule 1.7(a)(2).

The Debtors' proposed retention of Sidley as Debtors' counsel will also place it in

conflict with Rule 1.7(a)(2).  Where Rule l.7(a)(l) addresses conflicts between clients whose

---

[71]  *Id.*

[72]  *See supra* Statement of Facts at 7.

[73]  Mediator Motion at 10, ECF No. 17.

[74]  *Id.*

[75]  Slanina Decl. ¶ 11.

interest are "directly adverse," Rule 1.7(a)(2) refers to instances where there is a "significant risk" that a lawyer's responsibilities to a third party—whether or not that party is a client—may "materially limit" that lawyer's representation of a client.[76]  Here, Sidley's duties to Chubb/Century and its simultaneous responsibilities to the Debtors create much more than a significant risk of divided loyalties that "materially limit" a lawyer's representation of a client.

This conflict has already manifested itself in various ways.  Sidley's duties to the Boy Scouts to maintain the confidentiality of bankruptcy planning led it away from disclosing its retention by the Boy Scouts to its other client, Chubb, demonstrating divided loyalty.[77]  This divided loyalty was exacerbated by Sidley engaging in discussions with the tort claimants, Scott Gilbert, Jim Patton, and their other representatives to the exclusion of Chubb in the run-up to the Debtors' bankruptcy filing.[78]  Afterwards, Sidley negotiated with these parties concerning the Boy Scouts' insurance and means for accessing that insurance.

As a result, if Sidley is permitted to take on the representation of the Debtors, Sidley will have to constantly balance its zeal in furthering the interests of one client against the prospect of a clash with the duties it owes to the other.  In large measure, this risk is increased from the sheer weight, complexity, and duration of Sidley's interactions with Chubb over the years—and the continuation of this relationship into the present—not to mention the immediately relevant body of highly privileged and confidential information that Sidley possesses about Chubb's insurance for the Boy Scouts from its handling of

---

[76]   Model R. Prof'l Conduct 1.7(a)(2); Model R. Prof'l Conduct 1.7, cmt. [8] ("Even where there is no direct adverseness, a conflict of interest exists if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests.").

[77]   Slanina Decl. ¶ 13.

[78]   *Id.*

reinsurance matters concerning those policies.  These positions will force Sidley to either violate its duties of loyalty and confidentiality to Chubb and Century or compromise its duty to the Debtors to zealously represent their interests.

Moreover, as a result of Sidley's ethical responsibility under Rule l.8(b) not to use client confidences to the disadvantage of Chubb, the firm would be handcuffed from performing on behalf of the Debtors any number of tasks associated with effecting the Debtors' strategy.[79]  Such tasks would include:

- drafting, negotiating, or advocating any plan of reorganization that implicates Century's insurance policies with the Boy Scouts or the agreements with the Boy Scouts concerning those contracts that were the subject matter of Sidley's representation of Century or that include provisions that were in any way derived from or peculiar to confidential information that was part of the Century engagements;

- advising the Boy Scouts on issues involving Century, including but not limited to responding to objections to a bankruptcy plan raised by Century based on its agreements, policy terms, privileged information, and coverage strategies to which Sidley is privy;

- advising the Boy Scouts in connection with issues that may give rise to an adversarial proceeding that may arise with Century;

- attacking the credibility and veracity of any testimonial or documentary evidence offered by Century; and

- questioning any Century witness, in particular any Century witness with whom Sidley has interacted in the course of its varied representations of Century.

Sidley's efforts at discovery on behalf of the Debtors against Chubb would also be hamstrung on the additional ground that it would be conducting discovery against a party to whom it owes a duty of loyalty.[80]

---

[79]   Model R. Prof'l Conduct 1.8(b) (prohibiting a lawyer from using "information relating to representation of a client to the disadvantage of the client unless the client gives informed consent").

[80]   *See In re Cendant Corp. Sec. Lit.,* 124 F.Supp.2d at 242 ("[A]s a general matter examining one's

For these reasons, Sidley would be compelled to breach its duties of loyalty to Chubb/Century, as well as those under Rule 1.8, to aggressively pursue the Debtors' interests.  Alternatively, Sidley's duties to Chubb/Century could force it to soft-pedal aspects of its representation of the Debtors.[81]  In light of these circumstances, there is a "significant risk" that Sidley would be constrained in maintaining its duties to both Chubb/Century and the Debtors contrary to the prohibitions of Rule l.7(a)(2).

## B.    Sidley Cannot Recast Century as a Rule 1.9 "Former Client" to Benefit From Its Wrongful Termination of Century.

By virtue of Sidley's wrongful termination of the relationship, Sidley is attempting to deem Chubb generally and Century specifically to be a "former client" and to argue that its representation of the Boy Scouts is not the same or a substantially related matter as Sidley's representation of Century in the reinsurance arbitrations concerning the Boy Scouts insurance. This stratagem does not change Sidley's obligations to Century.  The prohibitions imposed by the current client provisions of Rule 1.7(a)(1) apply whenever an attorney represents two clients with adverse interests at the same time, even if the representation of one of the clients ends before the time the challenge is raised.[82]  Sidley cannot recast Century as a "former client" to

---

own client as an adverse witness on behalf of another client, or conducting third party discovery of one's own client on behalf of another is likely to:  (1) pit the duty of loyalty to each client against the duty of loyalty to the other; (2) risk breaching the duty of confidentiality to the client-witness; and (3) present a tension between the lawyer's own pecuniary interest in continued employment by the client-witness and the lawyer's ability to effectively represent the litigation client.  All three may constitute material limitations on the lawyer's representation, so as to come under Rule [1.7(a)(2)]." (citation omitted)).

[81]   *See Illaraza v. Hovensa, L.L.C.*, Nos. 2008-0059, 2007-0125, 2012 WL 1154446 (D.V.I. Mar. 31, 2012).

[82]   *See, e.g.*, *Unified Sewerage Agency of Wash. v. JELCO, Inc.*, 646 F.2d 1339, 1345 n.4 (9th Cir. 1981) ("[T]he present-client standard applies if the attorney simultaneously represents clients with differing interests. *This standard continues even though the representation ceases prior to the filing of the motion to disqualify*." (emphasis added)); *Atl. Specialty Ins. Co. v. Premera Blue Cross*, No. C15-1927-TSZ, 2016 WL 1615430, at *13 (W.D. Wash. Apr. 22, 2016) ("As a threshold matter, the question under Rule 1.7 is whether there was concurrent representation of adverse clients, *i.e.*, whether 'the attorney undertook representation adverse to a present client,' and not whether there is

benefit from its wrongful termination of Century as a client.  The determination of whether a

client is "current" or "former" under the ethical rules is assessed ***at the time the conflict arises***.[83]

The rule is straightforward:  if, at the moment that the conflicted engagement

commences, both clients are current clients of the law firm, then Rule 1.7(a) applies and the law

firm must withdraw.  If, however, at the moment that the engagement commences, one of the

clients is a former client, then the "former" client standard under Rule 1.9 applies.

In *Santacroce v. Neff*, a law firm simultaneously represented Santacroce in various

matters, as well as the estate of Santacroce's deceased boyfriend.[84]  During this time, Santacroce

contemplated filing a suit against the boyfriend's estate for palimony payments and delivered a

draft complaint to the estate's executor.  Upon learning of her intent, the firm withdrew as

Santacroce's attorney.  Santacroce filed the complaint several weeks after the firm's withdrawal.

When the law firm appeared on behalf of the estate against Santacroce, she sought

disqualification of the firm, contending that the firm violated Rule 1.7(a).  In response, the firm

---

dual representation at the time disqualification is sought."); *Merck Eprova AG v. ProThera, Inc.*, No. 08CIV0035RMBJCF, 2009 WL 10696470, at *6 (S.D.N.Y. Oct. 6, 2009) ("[W]here counsel have simultaneously represented clients with differing interests, the standard for concurrent representation applies even if the representation ceases prior to the filing of a disqualification motion."); *Florida Ins. Guar. Ass'n v. Carey Canada, Inc.*, 749 F. Supp. 255, 261 (S.D. Fla. 1990) ("The cases addressing the issue are in agreement:  in the absence of an immediate withdrawal upon discovery, clients who were concurrently represented *at any point during the conflict* are treated as concurrent clients for purposes of the disqualification motion." (emphasis added) (collecting cases)).

[83]   *See In re Agway, Inc.*, No. 02-65872, 2005 WL 3806043, at *2 (Bankr. N.D.N.Y. Dec. 9, 2005) ("In determining whether a law firm is simultaneously representing two adverse parties, courts must assess the status of the law firm's relationship with the adverse parties at the time the conflict arises, not at the time the motion to disqualify is presented to the Court.  Otherwise, the law firm could eliminate the conflict by abandoning the disfavored client."); *Pulsecard, Inc. v. Discovery Card Services, Inc.*, 1994 U.S. Dist. LEXIS 19635, at *11 (D. Kan. Dec. 29, 1994) ("The critical inquiry in determining whether Pulsecard is an existing or former client, for purposes of conflict of interest analysis, is when the conflict arose.") (emphasis added); *see also Ehrich v. Binghamton City School District*, 210 F.R.D. 17, 25 (N.D.N.Y. 2002) ("[T]he critical event is when the conflict arose, not when the motion was brought."); *Chemical Bank v. Affiliated FM Ins. Co.*, No. 87 Civ. 0150, 1994 WL 141951, at *10 (S.D.N.Y. Apr. 20, 1994) ("[T]he status of the relationship is assessed at the time the conflict arises"); *see also* Slanina Decl. ¶ 24.

[84]   134 F.Supp.2d at 368.

argued that their attorney-client relationship had ceased prior to the filing of the complaint, and therefore Santacroce was a "former"—not "current"—client, rendering Rule 1.7(a) inapplicable.[85]

Judge Lifland disagreed, reasoning that "the complaint's actual filing date is not particularly significant" when the actual conflict of interest arose prior to that date.[86]  In particular, the district court found that the status of the attorney-client relationship should be determined on the date that "precipitated the events pertinent to this [disqualification] motion"— in that case, the date on which the adversity between the two law firm clients emerged (*i.e.*, when the draft complaint was delivered to the estate).[87]  Because on that day, Santacroce—like Century here—was still a current client of the firm, the court found that Rule 1.7(a) applied and disqualified the firm for having concurrently represented two clients whose interests were directly adverse to one another.[88]

An attorney may not withdraw after a conflict arises and then downgrade the conflict by arguing that the "former" client clause in Rule 1.9 applies as opposed to Rule 1.7:

> To hold otherwise would allow such unethical behavior to continue unrestricted because a law firm could always convert a present client to a former client merely by ***seeking to withdraw after suing a present client***.[89]

So too here.  Sidley's conflicted representation arose before the petition date, when Sidley began advising the Boy Scouts on a potential restructuring while concurrently representing Century on multiple matters, including providing advice on the Boy Scouts'

---

[85]    *Id.* at 370.

[86]    *Id*.

[87]    *Id*.

[88]    *Id*.

[89]    *Ransburg Corp. v. Champion Spark Plug Co.*, 648 F. Supp. 1040, 1044 (N.D. Ill. 1986) (emphasis added).

insurance coverage for molestation claims and the reinsurance for it.  At that point, Sidley indisputably concurrently represented both Century and the Boy Scouts—a dual representation of two directly adverse clients that was bound to materially limit the firm's representation.[90]

## C.    No Exception Exists Under Rule 1.7(b) to Permit Sidley's Concurrent Representation Despite the Conflict.

No exception exists to permit the concurrent representation despite the conflict.  Rule 1.7(b) provides that a lawyer can represent a client, not assuming a concurrent conflict of interest, if:

> (1)  The lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; (2)  the representation is not prohibited by law; (3)  the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and (4)  each affected client gives informed consent, confirmed in writing.[91]

Sidley is unable to meet these exceptions to the prohibition on concurrent conflicts. Sidley's representation of the Boy Scouts in the bankruptcy matter will involve an assertion of claims by one client, the Boy Scouts, against another client, Century, and drafting, negotiating, and prosecuting of a plan of reorganization that impacts the rights of both parties.[92]  And Chubb/Century declined to provide consent to this conflicting concurrent representation.

---

[90]  *See supra* Point I, A.1.
[91]  Model R. Prof'l Conduct 1.7(b).
[92]  Slanina Decl. ¶ 15.

## POINT II.

## WRONGFUL TERMINATION HAS BEEN
## REGULARLY REJECTED BY COURTS
## AS A DEFENSE TO DISQUALIFICATION.

Sidley may not drop one client in favor of a "more remunerative" or favored client.[93]
This unethical conduct is grounds for disqualification, "as it violates attorneys' duty of
loyalty."[94]  Attempting to avoid a conflict in this manner—by taking on a conflicted
representation, then "curing" the conflict by withdrawing from the original representation—
violates the concurrent conflict prohibitions of Rule 1.7.[95]  It is fundamentally wrong for a firm
to violate its duty of loyalty to clients it represents by bowing to such incentives, financial or
otherwise.[96]

Sidley's representation of Chubb goes back at least fifteen years, covers multiple matters,
and predates its representation of the Boy Scouts.  At the time that Sidley contemplated filing the
Boy Scouts bankruptcy petition, it represented Chubb in many matters, including arbitrations
involving reinsurance for the Boy Scouts' insurance for the very claims that are the subject of

---

[93]  *See Santacroce*, 134 F. Supp. 2d at 370–71; *Snapping Shoals Elec. Membership Corp. v. RLI Ins. Corp.*, No. 1:05 CV 1714-GET, 2006 WL 1877078 (N.D. Ga. July 5, 2006) ("A lawyer may not evade ethical responsibilities by choosing to jettison a client whose continuing representation becomes awkward." (quoting *Harrison v. Fisons Corp.*, 819 F. Supp. 1039, 1041 (N.D. Fla. 1993))).

[94]  *Int'l Longshoremen's Ass'n, Local Union 1332 v. Int'l Longshoremen's Ass'n*, 909 F. Supp. 287, 293 (E.D. Pa. 1995); *see also Davis v. Kraft Foods N. Am*, No. CIV.A. 03-6060, 2006 WL 237512, at *12 (E.D. Pa. Jan. 31, 2006) (lawyer's "unseemly" suggestion that he would drop a four-years long representation of an individual in order to avoid a conflict would violate the "hot potato rule"); Model R. Prof'l Conduct 1.16(d) (withdrawing attorneys must take reasonable steps to protect the clients' interests, including giving reasonable notice and allowing time for employment of replacement counsel); *see also* Slanina Decl. ¶ 20 (noting that the "Hot-Potato gambit of terminating a client to cure a concurrent client conflict of interest has been roundly condemned").

[95]  *Santacroce v. Neff*, 134 F. Supp. 2d 366, 370–71 (D.N.J. 2001) (Rule 1.7(a) precludes a law firm from dropping a client in order to avoid a conflict with a more remunerative client).

[96]  *See* Geoffrey C. Hazard, Jr. and W. William Hodes, *The Law of Lawyering* § 20.10 at 20–24 (3d ed. 2001); Richard W. Painter, *Advance Waiver of Conflicts*, 13 Geo. J. Legal Ethics 289, 322 (2000); Charles W. Wolfram, *Symposium:  Restatement of the Law Governing Lawyers, Former-Client Conflicts*, 10 Geo. J. Legal Ethics 677, 708 (1997).

this bankruptcy.  In the face of this irrefutable conflict and Chubb's objection to the engagement, Sidley chose to dump its longstanding client Chubb rather than pass up the Boy Scouts engagement where it is charging much higher rates:  the Debtors' retention application for Sidley lists rates for partners in excess of $1,000 and for many associates over $800, which is beyond the market rates of Sidley's reinsurance work.[97]

In response to this conflict Sidley did not—as it was obligated to—decline the conflicting representation or withdraw as soon as the conflict became apparent.[98]  Sidley did not even disclose the conflict to Century as Rule 1.7 requires.[99]  Instead, Sidley waited for Chubb to discover the dual representation and *then* demanded Chubb waive the conflict (while at the same time denying the existence of any conflict).  Even after Chubb discovered the conflict, Sidley continued the adverse engagement over Chubb's objection.

When Chubb continued to object, Sidley tried to strong-arm Chubb, and then attempted to wrongfully terminate its representation of Chubb's subsidiaries in multiple reinsurance arbitrations, including two active matters for Century involving reinsurance for the Boy Scouts' insurance.  Under Rule 1.16(d), lawyers withdrawing from a representation are required to take steps to protect the client's interests, including by giving reasonable notice to the client.  Chubb's

---

[97] *See* Debtors' App. at 8, ECF No. 204.

[98] Model R. Prof'l Conduct 1.7, cmt. [3] ("Loyalty to a current client prohibits undertaking representation directly adverse to that client without that client's informed consent."); *id.* cmt. [4] ("If a conflict arises after representation has been undertaken, the lawyer ordinarily must withdraw from the representation, unless the lawyer has obtained the informed consent of the client under the conditions of paragraph (b).").

[99] Model R. Prof'l Conduct 1.7(b); Model R. Prof'l Conduct 1.7, cmt. [2] (requiring a law firm to seek informed consent of both parties before undertaking a conflicting representation); *see also In re The Brown Sch.*, 368 B.R. 394, 412–13 (Bankr. D. Del. 2007) ("An attorney breaches his fiduciary duty when he benefits improperly from the attorney-client relationship by, among other things, subordinating his client's interest to his own . . . improperly using client confidences, failing to disclose conflicts of interest, or making misrepresentations to achieve these ends."  (quoting *Gibson v. Ellis*, 126 S.W.3d 324, 330 (Tex. App. 2004))).

reinsurance matters were at critical stages at the time Sidley unilaterally withdrew, and Chubb's interests in those cases were prejudiced by Sidley's unilaterally advising the arbitrators in these cases of its withdrawal.

To permit Sidley to escape the ethical prohibitions of Rule 1.7(a), which mandates withdrawal in this circumstance, would be tantamount to "allow[ing] such unethical behavior to continue unrestricted because [Sidley] could always convert a present client to a former client."[100]  Accordingly, Sidley cannot now artificially "terminate" the attorney-client relationship to shun its obligations under Rule 1.7(a).[101]  The Court should not condone Sidley's tactics by permitting Sidley to reap the benefits of its wrongful and unethical conduct.  Rather, such conduct mandates the application of Rule 1.7, under which Sidley should be disqualified.

**POINT III.**

**SIDLEY'S RETENTION BY THE BOY SCOUTS WOULD BE IMPROPER EVEN IF CENTURY WAS EVALUATED AS A FORMER CLIENT UNDER RULE 1.9.**

A conflict of interest under Rule 1.9 exists if (1) the lawyer had an attorney-client relationship with the former client; (2) the present client's matter is the same or a "substantially related" matter; (3) the interests of the second client are materially adverse to the interests of the former client; and (4) the former client did not consent to the representation after consultation.[102] As to the first and fourth prongs, there is no dispute that Sidley represented Chubb and various

---

[100]  *See Ransburg,* 648 F. Supp. at 1044.

[101]  Nothing in the Bankruptcy Code supersedes or replaces this notion under the applicable state ethics rules.  *See* 1 Collier on Bankruptcy, § 8.02[2] (15th ed. 2002) ("These state [ethics] rules are not preempted by federal bankruptcy law under the Supremacy Clause of the Constitution."); *see also id.* at ¶ 8.01[1] ("Ethical rules are often considered more necessary and applicable in bankruptcy cases."); *id* at ¶ 8.03[1] ("Conflict of interest rules are more strictly applied in the bankruptcy context than in other areas of the law, at least insofar as they relate to professionals retained by the estate."); *see also In re Congoleum,* 426 F.3d at 688.

[102]  *Intellectual Ventures I LLC v. Checkpoint Software Techs. Ltd.*, No. CIV. 10-1067-LPS, 2011 WL 2692968, at *5 (D. Del. June 22, 2011).

Chubb-related entities in many matters, including Century in connection with the Boy Scouts'
insurance claims and obtaining reinsurance for those claims, and that Chubb never consented to
Sidley's representation of the Boy Scouts.

With respect to the third prong, Sidley's representation of the Debtors was and is
materially and directly adverse to Chubb's interests.  As bankruptcy counsel for the Debtors,
Sidley is charged with negotiating, drafting, and advocating the approval of the Debtors' plan
that maximizes insurers' contribution—while minimizing the Debtors' contribution.  This, in
turn, will require Sidley to argue against Chubb/Century and in favor of a plan that shifts as
much of the obligation for claims as possible away from the Debtors and onto Chubb/Century,
and otherwise impairs Century's rights.[103]

This adversity is already present at this early stage.  As it seeks to be appointed
bankruptcy counsel for the Debtors, Sidley took a direct role in negotiations for the Debtors
concerning renewing an agreement for handling ongoing claims through an affiliate of Chubb.
In this role, Sidley also negotiated with Chubb directly over the trust distribution procedures.

With respect to the second prong—whether the conflict arises in the "same or a
substantially related matter"—courts focus on the nature and scope of the prior and current
representations and whether information gained from the attorney-client relationship could
possibly be used in the current matter to the detriment of the former client.  Under Third Circuit
precedent, the ***mere possibility*** that confidential information obtained in the former
representation is relevant to the current representation makes the matters substantially related.[104]
Moreover, "any doubts about whether disqualification is appropriate should be resolved in favor

---

[103]   *Supra* Statement of Facts at 10–11.
[104]   *See In re Corn Derivatives*, 748 F.2d at 162.

of the moving party, in order to ensure protection of client confidences."[105]  Breaching client confidences also violates Rule 1.6.

The Debtors' stated purpose for filing for bankruptcy is to formulate a plan of reorganization to address the tort claims against it, with insurance being identified as an asset around which a reorganization is substantially premised.  Sidley's representation of Chubb/Century on multiple matters and, in particular, its work for Century on the Boy Scouts' insurance and reinsurance claims concerning the Boy Scouts easily meets the mere-possibility test to determine if a matter is substantially related.[106]

Reinsurance is issued on the back of insurance it reinsures and the issues relevant to determining reinsurance are substantially related, indeed inextricably intertwined, with the direct insurance.  As Chubb's counsel on reinsurance for the coverage Century issued to the Boy Scouts, Sidley received Chubb/Century's privileged information about the Boy Scouts insurance coverage disputes, privileged legal analysis of the sexual molestation claims, and privileged legal strategies and defenses.[107]  As insurance coverage is a central asset around which a reorganization is planned, knowing Chubb/Century's legal analysis, strategy, and positions about this asset is obviously relevant to formulating a plan and negotiating with tort claimants and other insurers about the terms of a plan.[108]  That information would be at risk of being exposed to the Debtors if Sidley is allowed to switch sides now.  And that would materially prejudice Century.[109]

---

[105]  *Madukwe*, 552 F. Supp. 2d at 458.

[106]  *Supra* Statement of Facts at 10–11.

[107]  Schwartz Decl. ¶¶ 5, 26–27.

[108]  *See Madukwe*, 552 F. Supp. 2d at 462 (finding substantial relationship where attorney had "specific knowledge" of former client's "interpretation, understanding, and application" of internal policies).

[109]  For instance, the Debtors' motion for a preliminary injunction turns on Debtors' claims about its insurance coverage, including the policies issued by Century.  *See* BSA's Opening Brief in Support of

**POINT IV.**

**SIDLEY'S DISABLING CONFLICTS CANNOT BE CURED
BY UNTIMELY AND INADEQUATE POST-HOC SCREENS
OR EMPLOYING SPECIAL COUNSEL.**

Apart from dumping Chubb and Century as a client after it failed to obtain a written waiver, Sidley suggests that it can cure its conflicts, and avoid disqualification, by belatedly erecting a screen after client confidences had been unprotected for months or designating Morris Nichols to work as "conflicts counsel."  These attempts all fail.

Conflicts of interests that deal with a firm's duty of loyalty cannot be cured by simply erecting a barrier between groups of individuals.  While "ethical walls" have been utilized to address problems under Rules 1.10 and 1.11 and, perhaps, in cases where the affected client had consented to the adverse representation, violations of Rules 1.7 cannot be cured solely by such means.[110]

And if Rule 1.9 were to apply, the screen Sidley says it implemented is not, as a matter of law, effective.  Ethical screens must be erected *before* an actual or potential conflict emerges.  Sidley represented Century long before Sidley's belated offer to erect a screen.  The Model Rules apply a presumption of shared confidences among members of the same firm.[111]  The belated offer to implement a screen by Sidley—after Chubb had called out the conflict—does nothing to

---

Motion for a Preliminary Injunction at 10–13, 27–29, ECF No. 7.  This motion involves Sidley in negotiations with the tort claimants over what insurance information to turn over and how to craft an insurance around issues concerning the insurance.

[110]  *See In re Cendant,* 124 F.Supp.2d at 248 (ethical walls "do not treat situations involving simultaneous representation of two clients where a violation of any subsection of Rule 1.7 is present").  Ethical walls are erected to prevent the disclosure of client confidences where attorneys lateral to other firms, which is not the circumstance here.

[111]  *See* Model Rule Prof'l Conduct 1.10.

mitigate the year-and-a-half risk that Century's confidential information was unprotected.[112]

Where, as here, there is any risk that confidential, privileged, or disadvantageous material could have already been disclosed, the failure to timely erect a screen requires disqualification.[113]  The Boy Scouts served discovery on Century seeking information on the reinsurance engagement on which Sidley represented Century.[114]  Even if the release of client confidences was inadvertent, to the extent this occurred, this violates Rule 1.6, which prohibits the disclosure of client information absent informed consent.

Nor can the Debtors cure the infirmities of Sidley's retention by delegating Morris Nichols to deal with issues implicating Chubb/Century.  The handling and treatment of the Debtors' insurance coverage is central to this bankruptcy.  Insurance is so intrinsic to the structure and purpose of this bankruptcy case that it simply cannot be uncoupled from the general role of formulating a plan of reorganization.  It is also too late for that.  Sidley has already involved itself in issues implicating the rights of Chubb generally and Century specifically by negotiating and drafting a plan of reorganization, trust procedures impairing its rights, and a host of other issues.

---

[112]  *See Madukwe*, 552 F. Supp. 2d at 458.  Separate and apart from these reasons why an ethical screen does not cure Sidley's conflict, there is a failure of proof whether Sidley has in fact implemented a screen.  Ms. Boelter does not state in her declaration when Sidley implemented a screen or what it did to implement a screen.  *See* Application Ex. B Boelter Decl. at 10, ECF No. 204.

[113]  *See United States ex rel. Bahsen v. Bos. Sci. Neuromodulation Corp.*, 147 F. Supp. 3d 239, 249 (D.N.J. 2015) (disqualifying firm for untimely erecting ethical wall where "no notice was given until after [client] discovered that its prior attorney was now employed by the firm suing it" and nothing prevented communication between attorneys at the firm when the conflict first arose); *Mitchell v. Metro. Life Ins. Co.*, No. 01 CIV. 2112 (WHP), 2002 WL 441194, at *10 (S.D.N.Y. Mar. 21, 2002) (disqualifying firm after holding that the firm did not formally implement an ethical screen until almost two months after it had actual notice of the conflict, which diminished the possibility that the screen remedied the conflict); *Atasi Corp. v. Seagate Technology*, 847 F.2d 826, 831 (Fed. Cir. 1988) (holding that presumption of shared confidences was not overcome where there was no evidence that screening measures were taken at the time of disqualified attorney's move to the firm).

[114]  *See* Panchok-Berry Decl. ¶¶ 7–8, Ex. F, G.

### POINT V.

### SIDLEY'S FAILURE TO MEET ITS OBLIGATION TO THIS COURT AND DISCLOSE ALL POTENTIAL CONFLICTS IS AN INDEPENDENT GROUND FOR DENYING THE RETENTION.

The inadequacy of Sidley's Rule 2014 disclosures preclude reliance by the Debtors on Sidley's disclosures. That is an independent ground for denying the retention.[115]

Under Rule 2014, a professional seeking employment must disclose all of its connections with creditors and reveal any interests potentially adverse to the estate.[116]  Schedule 2 of Sidley partner Jessica Boelter's declaration, attached to Debtors' application, provides nothing more than a bare-bones list of Sidley's representations of insurers.[117]  It does not identify the matters by name or provide any other details.

With respect to Chubb, Ms. Boelter characterizes the Chubb companies as former clients, but the duty of candor required Sidley to disclose that, as of the petition date, Century was a Sidley client on Boy Scout matters and Chubb was a client on other matters. Sidley's representation that its work for Century was not related is also utterly misleading.

---

[115] "The scope of disclosure required under Rule 2014 is much broader than the issue of conflicts and disqualification." *In re C&C Demo, Inc.*, 273 B.R. 502, 507 (Bankr. E.D. Tex. 2001) (citation omitted); *see also In re Park-Helena Corp.*, 63 F.3d 877, 882 (9th Cir. 1995) (even if no conflict of interests existed, failure to describe in detail circumstances of the payment of a retainer violated disclosure requirements of Rule 2014); *In re Filene's Basement, Inc.*, 239 B.R. 845, 849 (Bankr. D. Mass. 1999) ("It has been held that the [disclosure] requirements of [Fed. R. Bankr. P. 2014] transcend those of § 327(a), as they mandate disclosure of all connections with the named parties, rather than being limited to those which deal with disinterestedness."  (citation omitted)).

[116] *See* 11 U.S.C. § 101(14); Fed. R. Bankr. P. 2014.  Disclosure "goes to the heart of the integrity of the bankruptcy system."  *In re Universal Bldg. Prod.*, 486 B.R. 650, 663 (Bankr. D. Del. 2010) (failure of prospective counsel for committee to provide complete disclosure at the outset of their connections with creditors warranted denial of committee's applications); *In re B.E.S. Concrete Prods., Inc.*, 93 B.R. 228, 236–38 (Bankr. E.D. Cal. 1988) (disqualifying special counsel who failed to disclose that it represented co-defendants in litigation it was handling for debtor).

[117] Application Ex. B Boelter Decl. at Schedule 2(i), ECF No. 204.

29

Sidley does not disclose why so many of its insurance clients are parties in interest. Complaints in three pending coverage actions indicate that Sidley concurrently represents multiple insurers of the Boy Scouts.[118]  Sidley does not disclose the extent to which its other insurer clients are also insurers of the Debtors or otherwise have a direct financial interest in the terms of the bankruptcy.

Most importantly, Sidley fails to disclose whether it obtained a written waiver from the Boy Scouts to concurrently represent both the Boy Scouts and Century on Boy Scouts-related matters and, if so, when.  The duty to disclose conflicts of interest under Bankruptcy Rule 2014 is "sacrosanct."[119]  Timely and complete disclosure supports the bankruptcy court's obligation "to root out impermissible conflicts of interest under Bankruptcy Code §§ 327(a) and 328(c)."[120] Failure—even a *de minimis* failure—to disclose all actual or potential conflicts, and all relevant facts of those conflicts, is an independent ground for denying the retention.[121]

## CONCLUSION

For the foregoing reasons, Century respectfully requests that the Court deny Debtors' Application and grant such other relief as is just and proper.

---

[118]   *Compare id.*, *with* Panchok-Berry Decl. ¶¶ 3–5, Ex. B, C, D; *see also* Panchok-Berry Decl. ¶ 6, Ex. E.

[119]   *See, e.g.*, *In re Leslie Fay Cos.*, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994); *see generally* 9 Collier on Bankruptcy ¶ 2014.03 (15th ed. 2004).

[120]   *In re eToys, Inc.*, 331 B.R. 176, 189–90 (Bankr. D. Del. 2005).

[121]   *See In re Diamond Mortg. Corp. of Ill.*, 135 B.R. 78, 97 (Bankr. N.D. Ill. 1990) (holding that "any fact which would be relevant to the court's determination of whether the professional has a conflict of interest, is not disinterested or represents an adverse interest, must be disclosed" and noting that a reviewing court has no duty to search a file to find conflicts of interest); *In re Envirodyne Indus., Inc.*, 150 B.R. 1008, 1021 (Bankr. N.D. Ill. 1993) ("Failure to abide by the disclosure requirements is enough to disqualify a professional and deny compensation, regardless of whether the undisclosed connections were material or *de minimis*.") (citations omitted); *In re EWC, Inc.*, 138 B.R. 276, 280 (Bankr. W.D. Okla. 1992) ("Violation of the disclosure rules alone is enough to disqualify a professional and deny compensation, regardless of whether the undisclosed connections or fee arrangements were materially adverse to the interests of the estate or were *de minimis* . . . compliance with these requirements is necessary to maintain the integrity of the bankruptcy system.").

Dated:  April 14, 2020                    Respectfully Submitted,


                                          By:  *Stamatios Stamoulis*
                                               Stamatios Stamoulis (#4606)

                                          STAMOULIS & WEINBLATT LLC
                                          800 N. West Street
                                          Third Floor
                                          Wilmington, Delaware  19801
                                          Telephone:    302 999 1540
                                          Facsimile:     302 762 1688

                                          O'MELVENY & MYERS LLP
                                          Tancred Schiavoni (*pro hac vice*)
                                          Janine Panchok-Berry (*pro hac vice*)
                                          Times Square Tower
                                          7 Times Square
                                          New York, New York  10036-6537
                                          Telephone:    212 326 2000
                                          Facsimile:     212 326 2061


                                          *Counsel for Century Indemnity Company, as*
                                          *successor to CCI Insurance Company, as*
                                          *successor to Insurance Company of North*
                                          *America and Indemnity Insurance Company of*
                                          *North America, Ace Insurance Group Westchester*
                                          *Fire Insurance Company and Westchester*
                                          *Surplus Lines Insurance Company*