**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] Debtors. | Case No. 20-10343 (LSS) |
| | (Jointly Administered) |
| | **Ref. Docket Nos. 204, 426** |
| | **Hearing Date: May 4, 2020 at 10:00 a.m. (ET)** |

**RESPONSE BY SIDLEY AUSTIN LLP IN FURTHER SUPPORT OF THE DEBTORS' APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF SIDLEY AUSTIN LLP AS ATTORNEYS FOR THE DEBTORS AND DEBTORS IN POSSESSION, *NUNC PRO TUNC* TO THE PETITION DATE**

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................................1

BACKGROUND ....................................................................................................6

    A.    Sidley's Retention By BSA ...................................................................6

    B.    Sidley's Relationship With Century ......................................................7

    C.    BSA's Retention Of Sidley Is Publicly Reported In December 2018 And
        Sidley's Representation Of Century Continues Without Objection ...............11

    D.    Century Participates in Discussions Regarding BSA's Potential
        Restructuring Without Objection ..........................................................13

    E.    Century Belatedly Raises A Potential Conflict In Late October 2019 .................14

    F.    The Attorney-Client Relationship Breaks Down And Sidley Withdraws
        From Representing Century ..................................................................15

    G.    BSA's Application To Retain Sidley And Century's Objection ....................18

ARGUMENT ........................................................................................................19

I.    Sidley Meets The Standards For Retention. .............................................................19

    A.    Section 327 Requires Disinterestedness And The Absence Of An Adverse
        Interest To Protect The Fairness And Integrity Of The Proceeding. ...............19

    B.    Sidley Satisfies Section 327's Requirements Because It Is Disinterested
        And Holds No Interest Adverse To The Estate. .....................................21

    C.    Century's Request That Sidley Be Disqualified Based On Alleged Ethical
        Violations Should Be Denied................................................................23

        1.    Disqualification Is An Extreme Measure.................................................23

        2.    Century Unreasonably Delayed in Raising Its Claims. ............................25

        3.    The Dispute Between Sidley And Century Can Be Addressed In An
            Alternative Forum. ...................................................................27

        4.    If The Court Does Entertain Disqualification As A Potential
            Sanction, Sidley's Representation Of BSA Does Not Violate Rule
            1.9 Regarding Duties To Former Clients.................................................28

            a.    Century Is A Former Sidley Client Both In Fact And Under The
                Ethical Rules. ...................................................................28

i

          b.      Century Has Admitted That Sidley's Representation Of BSA Is Not "Substantially Related" To Its Representation Of Century In Reinsurance Collection Actions.....................................................31

     5.    Even If Century's Relationship With Sidley Is Evaluated Under The Present Client Standard, Sidley's Representation Of BSA Did Not Violate Rule 1.7. .......................................................................36

          a.      Sidley Was Not "Directly Adverse" To Century At Any Point Before Its Withdrawal....................................................37

          b.      Sidley's Representation Of Century Was In No Way "Materially Limited" By Its Representation Of BSA. .....................................40

II.     Sidley's Disclosures Were Appropriate Under Federal Rule Of Bankruptcy Procedure 2014.............................................................................................................42

III.    Sidley Is Prepared To Take Appropriate Steps To Address Any Potential Concerns. .......43

CONCLUSION.................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Ampal-Am. Israel Corp.*,
    691 F. App'x 12 (2d Cir. 2017) ........................................................21

*Arnett v. Mid-Cont'l Cas. Co.*,
    No. 08-cv-2373, 2010 WL 11507481 (M.D. Fla. Apr. 13, 2010)...........................26

*In re AroChem Corp.*,
    176 F.3d 610 (2d Cir. 1999)...........................................................19

*BancInsure, Inc. v. McCaffree*,
    No. 12-cv-2110, 2013 WL 5769918 (D. Kan. Oct. 24, 2013) ................................31

*Bd. of Regents of Univ. of Neb. v. BASF Corp.*,
    No. 04-cv-3356, 2006 WL 2385363 (D. Neb. Aug. 17, 2006)................................34

*In re Best Craft Gen. Contr. & Design Cabinet, Inc.*,
    239 B.R. 462 (Bankr. E.D.N.Y. 1999) ...................................................19

*In re BH & P Inc.*,
    949 F.2d 1300 (3d Cir. 1991)........................................................19, 20

*Bos. Sci. Corp. v. Johnson & Johnson Inc.*,
    647 F. Supp. 2d 369 (D. Del. 2009) ....................................................24

*In re Caesars Entm't Operating Co., Inc.*,
    561 B.R. 420 (Bankr. N.D. Ill. 2015) ..................................................20

*Chem. Bank v. Affiliated FM Ins. Co.*,
    No. 87-cv-0150, 1994 WL 141951 (S.D.N.Y. Apr. 20, 1994) ................................32

*City of Joliet v. Mid-City Nat'l Bank of Chi.*,
    998 F. Supp. 2d 689 (N.D. Ill. 2014) ..................................................30

*Conley v. Chaffinch*,
    431 F. Supp. 2d 494 (D. Del. 2006).....................................................26

*Elonex I.P. Holdings, Ltd. v. Apple Computer, Inc.*,
    142 F. Supp. 2d 579 (D. Del. 2001).....................................................24

*Emp'rs Ins. Co. of Wausau v. Munich Reinsurance Am., Inc.*,
    No. 10-cv-3558, 2011 WL 1873123 (S.D.N.Y. May 16, 2011) ................................32

*In re Empire State Conglomerates, Inc.*,
  546 B.R. 306 (Bankr. S.D.N.Y. 2016) ...................................................................22

*End of Rd. Tr. v. Terex Corp.*,
  No. 99-477, 2002 WL 242464 (D. Del. Feb. 20, 2002) ...........................................24

*In re Enron Corp.*,
  No. 01-16034, 2002 WL 32034346 (Bankr. S.D.N.Y. May 23, 2002) ..........................25, 43

*In re Fairvue Club Properties LLC*,
  No. 09-13807, 2010 WL 569561 (Bankr. M.D. Tenn. Feb. 12, 2010) ...................................22

*Finmeccanica S.p.A. v. Gen. Motors Corp.*,
  No. 07-cv-08222, 2008 WL 11340060 (C.D. Cal. Apr. 29, 2008) .........................................26

*In re First Jersey Sec., Inc.*,
  180 F.3d 504 (3d Cir. 1999) ...................................................................19, 22

*In re Fullenkamp*,
  477 B.R. 826 (Bankr. M.D. Fla. 2011) ...................................................................35

*In re Glob. Indus. Techs., Inc.*,
  645 F.3d 201 (3d Cir. 2011) ...................................................................38

*In re Golden Guernsey Dairy, LLC*,
  No. 13-10044, 2015 WL 3669932 (Bankr. D. Del. June 12, 2015) ...................................20, 23

*In re Harold & Williams Dev. Co.*,
  977 F.2d 906 (4th Cir. 1992) ...................................................................20

*Hernandez v. Helm*,
  No. 18-cv-7647, 2019 WL 5922233 (N.D. Ill. Nov. 12, 2019) ...............................................42

*High 5 Games, LLC v. Marks*,
  No. 13-cv-7161, 2018 WL 2278103 (D.N.J. May 18, 2018) ...................................................23

*Intelli-Check, Inc. v. Tricom Card Techs., Inc.*,
  No. 03-cv-3706, 2008 WL 4682433 (E.D.N.Y. Oct. 21, 2008) .............................................25

*Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization, LLC*,
  616 F. Supp. 2d 461 (S.D.N.Y. 2009) ...................................................................21

*Jackson v. Rohm & Haas Co.*,
  366 F. App'x 342 (3d Cir. 2010) ...................................................................23

*In re Jade Mgmt. Servs.*,
  386 F. App'x 145 (3d Cir. 2010) ...................................................................20

*Macheca Transp. Co. v. Phila. Indem. Co.*,
    463 F.3d 827 (8th Cir. 2006) ...............................................24

*In re Mack Indus., Ltd*,
    606 B.R. 313 (Bankr. N.D. Ill. 2019) ...................................34

*In re Marvel Entm't Grp., Inc.*,
    140 F.3d 463 (3d Cir. 1998)......................................19, 20, 21, 22

*Merck Eprova AG v. ProThera, Inc.*,
    08-cv-0035, 2009 WL 10696470 (S.D.N.Y. Oct. 6, 2009)......................28

*Mitchell v. Metro. Life Ins. Co.*,
    No. 01-cv-2112, 2002 WL 441194 (S.D.N.Y. Mar. 21, 2002)................32

*In re Muma Servs., Inc.*,
    286 B.R. 583 (Bankr. D. Del. 2002) ...........................21, 22, 39

*N. River Ins. Co. v. Emp'rs Reinsurance Corp.*,
    197 F. Supp. 2d 972 (S.D. Ohio 2002) .................................31

*In re Onejet, Inc.*,
    No. 18-24070, 2020 WL 1879029 (Bankr. W.D. Pa. Mar. 27, 2020) .............23, 24

*P&L Dev. LLC v. Bionpharma Inc.*,
    No. 17-cv-1154, 2019 WL 357351 (M.D.N.C. Jan. 29, 2019) ................34

*Raba v. Suozzi*,
    No. 06-cv-1109, 2006 WL 8435604 (E.D.N.Y. Nov. 17, 2006) ............35

*Ransburg Corp. v. Champion Spark Plug Co.*,
    648 F. Supp. 1040 (N.D. Ill. 1986) ...................................29

*Reeves v. Town of Cottageville*,
    No. 12-cv-02765, 2014 WL 4231235 (D.S.C. Aug. 26, 2014)...............26

*Regalo Int'l, LLC v. Munchkin, Inc.*,
    211 F. Supp. 3d 682 (D. Del. 2016)...........................19, 23, 33

*In re Relativity Media, LLC*,
    No. 18-11358, 2018 WL 3769967 (Bankr. S.D.N.Y. July 6, 2018) ........41

*Sanchez v. Navigators Specialty Ins. Co.*,
    No. 12-cv-00724, 2012 WL 12336234 (C.D. Cal. July 24, 2012)..........21

*Santacroce v. Neff*,
    134 F. Supp. 2d 366 (D.N.J. 2001) ...................................29

*Sonos, Inc. v. D & M Holdings Inc.*,
No. 14-cv-1330, 2015 WL 5277194 (D. Del. Sept. 9, 2015)............................................22, 33

*Spear v. Fenkell*,
No. 13-cv-02391, 2014 WL 6676660 (E.D. Pa. Nov. 25, 2014) ............................................26

*In re Star Broad., Inc.*,
81 B.R. 835 (Bankr. D.N.J. 1988) ......................................................................................39

*Stonebridge Cas. Ins. v. D.W. Van Dyke & Co.*,
No. 10-cv-81157, 2015 WL 8330980 (S.D. Fla. Oct. 23, 2015) ............................................38

*Talecris Biotherapeutics, Inc. v. Baxter Int'l Inc.*,
491 F. Supp. 2d 510 (D. Del. 2007)..................................................................32, 33, 34, 36

*In re Tate*,
No. 19-00237, 2019 WL 3294073 (Bankr. D.D.C. July 22, 2019).........................................27

*In re Thorpe Insulation Co.*,
677 F.3d 869 (9th Cir. 2012) ........................................................................................37, 38

*Tipton v. Canadian Imperial Bank of Commerce*,
872 F.2d 1491 (11th Cir. 1989) ..........................................................................................39

*TQ Delta, LLC v. 2Wire, Inc.*,
Nos. 13-cv-1835, 13-cv-1836, 13-cv-2013, 2016 WL 5402180 (D. Del. Sept.
26, 2016) ......................................................................................................................24

*United States v. Prevezon Holdings Ltd.*,
839 F.3d 227 (2d Cir. 2016)................................................................................................27

*United States v. Wilson*,
503 U.S. 329 (1992).......................................................................................................21

*Universal City Studios, Inc. v. Reimerdes*,
98 F. Supp. 2d 449 (S.D.N.Y. 2000).................................................................................26

*Vanguard Sav. & Loan Ass'n v. Banks*,
No. 93-cv-4627, 1994 WL 284222 (E.D. Pa. June 28, 1994)................................................42

*In re Washington Mut., Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) ...................................................................................41

*Worley v. Moore*,
807 S.E.2d 133 (N.C. 2017)................................................................................................35

*Wyeth v. Abbott Labs.*,
692 F. Supp. 2d 453 (D. N.J. 2010) ..............................................................................25, 35

**Statutes & Rules**

11 U.S.C. § 101(14) ....................................................................................................20, 23

Federal Rule Of Bankruptcy Procedure 2014 .........................................................42, 43

**Other Authorities**

ABA Formal Op. 05-435 (Dec. 8, 2004) ........................................................................38

ABA Model Rule 1.7 ................................................................................................ *passim*

ABA Model Rule 1.9 ................................................................................................ *passim*

ABA Model Rule 1.16 ....................................................................................................30

3 Collier on Bankruptcy ¶ 327.04[1] ...........................................................................18

Reinsurance, Black's Law Dictionary (11th ed. 2019) ...................................................31

Ronald D. Rotunda & John S. Dzienkowski, Legal Ethics: The Lawyer's
    Deskbook on Professional Responsibility § 1.7-1(f) (2018-2019 ed.) ...................27

1.     Sidley Austin LLP ("Sidley") hereby files this response to the Objection to Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Sidley Austin LLP as Attorneys for the Debtors and Debtors in Possession, *Nunc Pro Tunc* to the Petition Date (ECF No. 426) (the "Objection") filed by Century Indemnity Company ("Century"), and in further support of Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Sidley Austin LLP as Attorneys for the Debtors and Debtors in Possession, *Nunc Pro Tunc* to the Petition Date (ECF No. 204) (the "Application"). In further support of the Application and this response, Sidley submits: (1) the Declaration of William Sneed ("Sneed Decl."); (2) the Declaration of Jessica Boelter ("Boelter Decl."); and (3) the Declaration of Professor Nancy Rapoport ("Rapoport Decl.").[2]

## PRELIMINARY STATEMENT

2.     By the Application, the Debtors are seeking to retain Sidley as their restructuring counsel in these cases. For the past year and a half, the professionals at Sidley have been working closely with Debtors in this complex and unusual matter. During that time, Sidley has become intimately familiar with BSA, its mission, and the unique, historic, and complicated challenges presented by this bankruptcy—the first involving a congressionally chartered non-profit corporation. Sidley has substantial historical and ongoing working relationships with the many different parties in interest to this proceeding. These include representatives of abuse survivors, the future claimants' representative, insurers, and Local Councils. Simply put, Sidley has deep institutional knowledge and substantial ties to the Debtors that would not be easily or quickly replaceable.

---

[2] Sidley is submitting the Sneed Declaration, Rapoport Declaration, and certain portions of this brief in camera pending resolution of confidentiality issues raised by Century.

3.      The sole objection to Sidley's retention comes from Century. Although styled as an objection under Section 327 of the Bankruptcy Code, Century's objection is in substance a motion to disqualify Sidley from continuing to represent the Debtors in any capacity. Century's objection relies solely on Sidley's previous work for Century in certain reinsurance collection actions, which are entirely unrelated to these Chapter 11 cases. As Sidley disclosed in Ms. Boelter's declaration in support of the Application, the reinsurance dispute at issue involved claims under insurance policies Century or its predecessors issued to BSA. Critically, however, BSA had already received payment under its insurance policies with Century, and BSA was not a party to, and has no interest in, the outcome of the disputes between Century and its reinsurers.

4.      Century seeks this relief two months after Sidley filed the Debtors' Chapter 11 petition and substantial progress has been made. Tellingly, the Objection was filed literally on the eve of a hearing on April 15 to address the selection of mediators as part of the carefully designed process intended to move these cases toward a conclusion. Century claims that the draconian sanction of disqualification is the only possible way to address Sidley's purported "irrefutable conflict" between its representation of Debtors and its ethical duties to Century.

5.      Over the years, the lawyers at Sidley have earned a deserved reputation for zealous and thoughtful representation of clients and for scrupulous adherence to the canons of ethics and professionalism. Sidley's lawyers take their ethical obligations with the utmost seriousness. Sidley has made repeated efforts to fairly address any legitimate concerns raised by Century, and we hoped that it would not be necessary to air our dispute in this forum. But given Century's very serious accusations, let there be no mistake: Sidley categorically and unequivocally denies any breach of duty or other wrongdoing in this matter, and firmly rejects Century's claims that it is conflicted from continuing as Debtors' counsel in this matter.

6.      The Objection provides an incomplete and misleading presentation of the issues. When the record is corrected and the facts are reviewed fairly and in their entirety, it is clear that there is no basis under which to grant the relief that Century asks of this Court. In particular:

- **Century was aware of Sidley's work for BSA long before October 2019.** Century claims that it only first learned of Sidley's work for BSA in October 2019. But the *Wall Street Journal* reported that BSA had hired Sidley in connection with a potential restructuring in December 2018—*i.e.*, almost a year before Century claims it first learned of Sidley's retention. In fact, Sidley and Century discussed the issue at the time. And while Sidley, consistent with its ethical duties to BSA, could not confirm its role, Sidley nevertheless explained that representation of Century with respect to a reinsurance dispute would not constitute adversity to a Century insured such as BSA. At no point during that conversation or in subsequent discussions—that is, until nearly a year later—did Century ever assert a possible conflict, much less the view that a representation of BSA or any other Century insured in a bankruptcy would be a "textbook" or "shocking" breach of duty.

- **The reinsurance disputes did not involve the same policies and issues that are at issue in the bankruptcy.** Century now asserts that Sidley's work for Century involved the same policies and issues that are at issue in this bankruptcy. That is not how Century defined the scope prior to this dispute. In fact, the agreement that Century claims governs the relationship describes Sidley's work as involving "Non-Claims Legal Services," *i.e.*, "services performed by [Sidley] for [Century] that are *unrelated to the defense of an insurance claim or a related insurance coverage claim*." Consistent with that description, the reinsurance disputes addressed historical payments by Century for which it was seeking reimbursement from its reinsurer under a separate and distinct reinsurance contract. BSA was not a party to and has no interest in the outcome of the disputes between Century and its reinsurers, and nothing about those disputes would have any impact or influence on the estate or be relevant to any legal advice that Sidley is giving to BSA in this proceeding.

- **Sidley's representation of BSA predated its representation of Century.** Century attempts to portray itself as a longtime substantial client of Sidley that had an existing attorney-client relationship at the time BSA retained Sidley as restructuring counsel. Not so. BSA retained Sidley *before* Century hired Sidley to represent it in the reinsurance actions at issue. Century's narrative that Sidley dropped an existing client—Century—like a "hot potato" to take on a new and more remunerative matter—the BSA restructuring—is wrong.

- **Any purported conflict can be addressed through conflicts/coverage counsel.** Assuming, arguendo, that a conflict does exist (which it does not), Century claims any potential issues associated with Sidley participating in the bankruptcy are impossible to address through separate coverage counsel, screens, and delineation

3

of roles between Sidley and other counsel. In fact, as discussed below, well before this dispute, Century *itself* offered to grant Sidley a waiver of any potential conflicts, subject to certain limited exceptions that are entirely consistent with how Sidley proposes to proceed here. Moreover, the Court has already approved BSA's retention of Haynes and Boone LLP ("Haynes and Boone") to serve as special insurance counsel—a role they held before Sidley was hired—and to advise on issues related to general liability insurance, including the treatment of insurance under any Chapter 11 plan. And the Court has also approved Morris Nichols Arsht & Tunnell LLP ("Morris Nichols") as BSA's Delaware-based bankruptcy co-counsel.

- **Sidley disclosed its prior representation of Century to the Court.** Finally, Century castigates Sidley for failing to adequately disclose the alleged conflict. Ms. Boelter's declaration filed in support of the Application, however, prominently disclosed the nature of Sidley's prior representation of Century—in the body of the declaration and not simply in a footnote or an attached list. As discussed below, Century fails to identify for the Court the relevant paragraph of Ms. Boelter's declaration in which this information was expressly disclosed. And ironically, Century appears to assert that Sidley was obligated to disclose certain additional information about the prior representation that Century itself expressly directed Sidley *not* to disclose, as well as information that Century has redacted from the information that it submitted to the Court under seal.

7.      Courts in Delaware and elsewhere have been appropriately skeptical of disqualification motions because they are frequently wielded tactically for purposes of delay or to disrupt or increase the cost of the proceedings. That caution is especially warranted where, as here, the specific dispute between the lawyer and its former client can and should be addressed in a different forum (in an arbitration proceeding that Century already took steps to commence); where, as here, the Debtors have conflicts counsel (both special insurance counsel (Haynes and Boone) and bankruptcy co-counsel (Morris Nichols) for any Century coverage or other dispute); and where, as here, counsel (Sidley) is prepared to agree, as part of its retention, to maintain an existing ethical wall and clear demarcation of the respective roles and responsibilities of various counsel in the retention order.

8.      Moreover, delay would be enormously destabilizing at a critical juncture. BSA is a non-profit organization with limited funding. An expeditious exit from bankruptcy is vital to

preserving its mission. Since filing, Debtors' position has become even more precarious as a result of the COVID-19 pandemic. Under these circumstances, depriving Debtors of their chosen counsel and requiring them to retain a different law firm would squander precious time and estate resources. And it would seriously jeopardize the Debtors' ultimate goal of achieving a restructuring that provides for equitable recoveries to abuse survivors and that preserves the mission of BSA as an ongoing institution.

9.      As stressed from the outset, BSA's goal is to proceed through bankruptcy with minimal expense and the utmost efficiency in order to preserve its mission. Additionally, delay caused by BSA being forced to jettison its chosen counsel at this critical juncture would be devastating. Sidley possesses unique knowledge of the complex issues and interests at play in this proceeding and has unique experience in navigating bankruptcies, like this one, involving mass tort claims. The time necessary to replace that expertise would all but preclude an efficient exit from bankruptcy, and the attendant expense would not only further burden BSA, but also reduce the funds available to abuse survivors. And the extreme remedy of disqualification that Century is proposing is wholly unnecessary in light of the involvement of Haynes and Boone and Morris Nichols, and the willingness of Sidley to clearly delineate the role it will take in this matter going forward.

10.     For all the reasons discussed below, Sidley satisfies the Bankruptcy Code's requirements for retention, and Century has provided no basis for the drastic remedy of disqualification. As such, Sidley's retention should be approved. A decision to the contrary is not warranted as a matter of fact or law and would severely prejudice BSA and run counter to the interests of the many parties to this proceeding. Century's Objection should be denied.

## BACKGROUND

### A.    Sidley's Retention By BSA

11.    On September 26, 2018, BSA engaged a team of Sidley restructuring attorneys (the "Restructuring Team") to explore its restructuring options in light of, among other factors, the increasing number of abuse claims asserted against BSA. (Boelter Decl. ¶¶ 3-4; *see also* ECF No. 4, Informational Brief at 39.)[3] The Sidley Restructuring Team has substantial experience in navigating restructurings involving mass tort claims,[4] and the team has leveraged that experience over the past year and a half to plot BSA's course to financial viability.

12.    Since the fall of 2018, and culminating in the Chapter 11 filing on February 18, 2020, the Sidley Restructuring Team has dedicated significant time and energy to this matter and leveraged its experience to counsel BSA regarding a host of issues, including retaining a future claimants' representative, discussions with an ad hoc group of attorneys representing significant numbers of current abuse claimants, the formation of the Local Council Committee, and strategies for reaching a global resolution of BSA's abuse liability. (ECF No. 4, Informational Brief at 37-46; Boelter Decl. ¶ 6.)

13.    In addition to Sidley, BSA has also been represented by Haynes and Boone, Morris Nichols, and Ogletree, Deakins, Nash, Smoak & Stewart, P.C. ("Ogletree Deakins"). Haynes and Boone is special insurance counsel to BSA. In connection with the work described above, lawyers at Haynes and Boone have taken the lead on all insurance coverage matters and advised BSA on other insurance issues, including, among other things, analyzing policies held by

---

[3] The engagement letter is dated October 3, 2018. (Boelter Decl. ¶ 4, Ex. 1.)

[4] Specifically, the Sidley Restructuring Team includes lawyers involved in *In re TK Holdings Inc.*, No. 17-11375 (Bankr. D. Del.), *In re Yarway Corp.*, No. 13-11025 (Bankr. D. Del.), *In re Owens Corning et al.*, No. 00-03837 (Bankr. D. Del.), *In re Federal Mogul Global Inc., et al.*, No. 01-10578 (Bankr. D. Del.), *In re Montreal, Maine & Atlantic Railway, Ltd.*, No. 13-10670 (Bankr. D. Me.), and certain of the Catholic archdiocese bankruptcy cases. (Boelter Decl. ¶ 5.)

BSA and drafting certain portions of the proposed Plan of Reorganization pertaining to insurance matters, such as the language relating to insurance neutrality. (Boelter Decl. ¶ 7.) BSA filed an application to retain Haynes and Boone as special insurance counsel, which the Court granted without objection. (ECF No. 463.) Morris Nichols is additional Delaware-based bankruptcy co-counsel to BSA. Morris Nichols' retention was approved by this Court without objection. (ECF No. 339.) Ogletree Deakins represents BSA in the abuse claims litigation. (Boelter Decl. ¶ 7.) This Court also authorized Ogletree Deakins' retention without objection. (ECF No. 364.) As discussed in more detail, BSA and Sidley intend for Haynes and Boone to continue on in its role as special insurance counsel as the case progresses, and, in conjunction with Morris Nichols, will handle any coverage or other disputes with Century, including any adversary actions that may arise out of these proceedings, and handling any Century-specific objections to the proposed Plan of Reorganization. (*See* Boelter Decl. ¶ 7.)

### B. Sidley's Relationship With Century

14. In light of Century's allegations, a detailed review of the nature and scope of Sidley's work for Century is necessary. Although it now characterizes Sidley's reinsurance work as substantially related to the underlying coverage issues with BSA, that is not how Century described it before this dispute arose. In connection with its retention, Century provided Sidley with a "Service Level Agreement" ("SLA"), a document that spells out the duties and obligations of the respective parties and that Century views as governing the relationship between itself and outside counsel. The SLA that Century claims is applicable describes the work as being "Non-Claims Legal Services," *i.e.*, "services performed by [Sidley] for [Century] that are *unrelated to the defense of an insurance claim or a related insurance coverage claim*." (Sneed Decl. Ex. 4 at 4 (emphasis added).) Put differently, Century retained Sidley for work that was "unrelated" to any claim under the policies Century issued to BSA.

15.    That description is entirely consistent with the scope of the work that Sidley was

asked to do. ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████ Joshua Schwartz, Managing Counsel, Director of Reinsurance

Litigation for Century, was Sidley's primary point of contact at Century for the Lloyd's Matter.

(*Id.* ¶ 3.)

16.    The prior Lloyd's arbitration, in which Sidley had no involvement, involved a

claim by Century to Lloyd's for reimbursement for payments made in settling certain abuse cases

in which Century had defended and indemnified BSA. (Sneed Decl. ¶ 4 (citing *Certain*

*Underwriters at Lloyd's, London v. Century Indemnity Co.*, Nos. 18-cv-12041, 19-cv-11056,

2020 WL 1083360, at *2 (D. Mass. Mar. 6, 2020)).) Lloyd's had reinsured Century for losses

arising from Century's entire book of business in a given year—*i.e.*, "treaty reinsurance"—which

included, among many other policies, coverage for eight annual policies of insurance that

Century issued to BSA from 1963 to 1970. *Lloyd's*, 2020 WL 1083360, at *2. Beginning in or

about February 2016, Century notified and billed its reinsurer, Lloyd's, for a portion of the

payments it had made in settling those cases. *Id.* But Lloyd's refused to pay Century under those

reinsurance contracts. *Id.* That dispute had been arbitrated and resolved adversely to Century. *Id.*

Following the arbitrators' ruling, Century submitted new re-insurance bills for the same abuse

claims in August 2018—this time in conformity with the ruling—that Lloyd's likewise refused

to pay. *Id.* at *2-3.





21.     At the time Century hired Sidley in connection with the Lloyd's Matter, Century's relationship with Sidley had lapsed. (*Id.* ¶ 22.) Mr. Sneed was required to obtain a new engagement letter and open a new matter in keeping with Sidley's standard protocol. (*Id*. ¶ 23.) Pursuant to that protocol, which had changed since Century had last opened a new matter, Mr. Sneed raised the need for an advance waiver for non-contentious (transactional) matters orally with Mr. Schwartz on or around November 30, 2018, and sent a follow-up email in that regard on December 7, 2018. (Sneed Decl. ¶ 23, Ex. 1.)[8]

22.     Discussions regarding the advance waiver continued into March of 2019.[9] (*Id.* ¶ 24.) Century eventually proposed an advance waiver that included a restructuring waiver to

---

[8] Century's Objection incorrectly places the start of these conversations in January 2019, *i.e.*, after the BSA's retention of Sidley had been publically reported. (Objection at 6.)

[9] Despite Century's claim that "it was not until the end of October that anyone on the reinsurance side learned about the October 14 meeting and realized that Sidley was concurrently representing Century and the BSA" (Schwartz Decl. ¶ 12), during February 2019, Mr. Schwartz on more than one occasion inquired whether the advance waiver was meant to protect Sidley in its representation of BSA in its restructuring. Mr. Sneed, however, had initiated the advance waiver negotiations per the firm's new protocol before he was even aware that BSA had retained Sidley bankruptcy attorneys. (Sneed Decl. ¶¶ 23, 25.)

allow Sidley to represent an entity insured by a Century affiliate in a bankruptcy proceeding, with the following conditions:

- There must be a wall between the Sidley [Restructuring] team and any attorneys at Sidley who work on any [Century] matters, which prohibits such Sidley lawyers from working on any bankruptcy or insolvency matter involving [Century] insurance or reinsurance policies.

- Sidley would have no direct or indirect involvement in any motions to compel arbitration involving [Century] filed in a bankruptcy or insolvency proceeding, nor in any arbitration that subsequently ensues.

- Sidley would not have any direct or indirect involvement in disputes regarding: a) [Century] collateral agreements; b) asset purchase agreements in which the debtor sells assets to a third party and there is a dispute between [Century] and the buyer; and c) coverage disputes (including allegations of bad faith/ECO).

(*Id.* ¶ 24, Ex. 2.)

23.     Ultimately, Sidley determined to proceed with the Century engagement without an advance waiver to avoid imposing myriad individually negotiated obligations on an advance basis. (Sneed Decl. ¶ 24.) As a result, the engagement was memorialized in a "Service Level Agreement" between Sidley and Century. (*Id.* ¶ 24, Ex. 4.)

      **C.**      **BSA's Retention Of Sidley Is Publicly Reported In December 2018 And Sidley's Representation Of Century Continues Without Objection**

24.     In the midst of Sidley and Century's advance waiver discussions, the *Wall Street Journal* published an article that publicly revealed Sidley's representation of BSA in its potential restructuring. (*See* Sneed Decl. Ex. 6, Katy Stech Ferek, *Boy Scouts of America Considers Bankruptcy Filing Amid Sex-Abuse Lawsuits*, WALL ST. J. (Dec. 12, 2018).) On December 13, 2018, Mr. Schwartz forwarded the *Wall Street Journal* article to Mr. Sneed as an "FYI" without

further discussion, and then proceeded to discuss the transition of the Lloyd's Matter to Sidley. (Sneed Decl. ¶ 26, Ex. 5.)[10]

25.    The following day, on December 14, 2018, Mr. Sneed and Mr. Schwartz spoke on the phone. (Sneed Decl. ¶ 27.) Mr. Sneed indicated he had spoken to one of his partners and—consistent with Sidley's duty of confidentiality—told Mr. Schwartz that he was not able to expressly confirm or deny what was stated in the *Wall Street Journal* article respecting Sidley's representation of BSA. (*Id.*) Nonetheless, Mr. Sneed explained to Mr. Schwartz that it was Sidley's view that the firm's representation of an insurer with respect to collecting reinsurance due it following payment to an insured does not constitute adversity to the insured; thus, Sidley would have no conflict in continuing to represent Century against Lloyd's on the BSA reinsurance dispute. (*Id.*) Mr. Schwartz told Mr. Sneed that he was pleased to hear that Sidley was not conflicted. (*Id.*) At no point did Mr. Schwartz contest Sidley's view regarding the lack of conflict. (*Id.*) Nor did Mr. Schwartz raise a concern that Century might view Sidley's representation of BSA as a conflict of interest (*id.*), much less a "textbook" or "irrefutable" conflict (Objection at 1, 23).

26.    After the December 14, 2018 phone call, Century proceeded to transition the Lloyd's Matter to Sidley. At no point during the transition did Mr. Schwartz or any representative from Century raise a concern that Century would view Sidley's possible representation of BSA as a conflict of interest. (Sneed Decl. ¶ 28.)

---

[10] Notably, that same day Chubb representative Eric Samansky, Vice President of External Communications, North America, is quoted in a similar article published by NBC News, which also highlights Sidley's representation of BSA. *See* Corky Siemaszko, *Boy Scouts of America Considering Bankruptcy*, NBC NEWS (Dec. 14, 2018), https://www.nbcnews.com/news/us-news/boy-scouts-america-pushed-brink-bankruptcy-battles-insurers-n948181.

27.     These are not the only occasions on which Sidley and Century discussed the matter. On or around October 3 or 4, 2019, Mr. Sneed and Mr. Schwartz spoke during a coffee break at the ARIAS reinsurance industry conference in New York City. (*Id.* ¶ 29.) Robert Omrod, an executive at Brandywine Holdings, another Century affiliate, also participated in the conversation. (*Id.*) During that exchange, Mr. Schwartz and Mr. Sneed discussed the Lloyd's Matter, and Mr. Omrod remarked that he was aware that Sidley represented BSA in its potential restructuring. (*Id.*) At no point in that conversation did Mr. Schwartz or Mr. Omrod express a view that Sidley's role posed a conflict of interest. (*Id.*)

**D.     Century Participates in Discussions Regarding BSA's Potential Restructuring Without Objection**

28.     In the late summer and fall of 2019, BSA was intensively working to reach a global resolution among all interested stakeholders that would result in a prepackaged bankruptcy to effect a global resolution of outstanding tort claims. BSA involved Haynes and Boone, its dedicated insurance counsel, from the outset of its restructuring negotiations. (Boelter Decl. ¶¶ 7-8.) Through Haynes and Boone, BSA initiated substantive discussions with its insurers including Century, which has policy obligations that do not contain aggregate limits for abuse claims arising in certain of these policy years. (*Id.* ¶ 9.)

29.     In late September 2019, Haynes and Boone reached out to set up a meeting with Century that included BSA's restructuring counsel—*i.e.*, Sidley. (Objection at 7; Boelter Decl. ¶ 10.) That meeting took place on October 14, 2019, at Sidley's Chicago office and included three individuals from Century (and its affiliates), a lawyer from Haynes and Boone, and members of the Sidley Restructuring Team. (Boelter Decl. ¶ 11.) Shortly before the meeting, Sidley was informed that Century had hired Tancred Schiavoni of O'Melveny & Myers LLP as outside restructuring counsel, and Mr. Schiavoni attended the meeting. (*Id.*) Century said nothing

13

about Sidley's role as restructuring counsel before, during, or in the days after that meeting, much less claim that it conflicted with its representation of Century. (*Id.* ¶ 12.) On October 17, 2018, Century sent a letter to Haynes and Boone addressing the substance of the October 14 meeting. That letter did not express any concerns over Sidley's participation in the process. (*Id.* ¶ 13, Ex. 2.)

30.    The following week, a Century representative attended three days of meetings in Sidley's Chicago office (although Sidley attorneys did not attend) to discuss the future claims matrix. (Boelter Decl. ¶ 14.) Again, no concerns were brought to Sidley's attention following those meetings. (*Id.*)

### E.    Century Belatedly Raises A Potential Conflict In Late October 2019

31.    On October 29, 2019, Century first expressed its view that Sidley's role as BSA's restructuring counsel might create a conflict. On that date, Messrs. Sneed and Schwartz spoke by phone, after which Mr. Schwartz sent an email stating that he had "just learned" that Sidley represented BSA, that Century did not "waive any conflict" presented by Sidley's "potential representation" of BSA in connection with its restructuring, and promising to "discuss this issue internally and circle back to you after we conclude those discussions." (Sneed Decl. ¶ 30; Schwartz Decl. Ex. 3.) As Mr. Sneed reminded Mr. Schwartz on the phone call, any claim that Century was surprised to learn of Sidley's role with BSA was simply not accurate given their prior discussions. (Sneed Decl. ¶ 30.)

32.    Even following this exchange, however, Century continued to participate in discussions with Sidley's Restructuring Team without raising any issues relating to a potential conflict. On October 31, 2019, and continuing the following day, Century (and its outside counsel, Mr. Schiavoni), Haynes and Boone, and members of the Sidley Restructuring Team

participated in a video conference that involved, among other things, a presentation of BSA's revenue streams. (Boelter Decl. ¶ 15, Ex. 3.)

33.     Then, on Sunday, November 3, 2019, on the eve of the mediation, Century's bankruptcy counsel abruptly sent an email stating Century's view that the mediation could not "go forward with Sidley Austin as a participant" due to "concern[s]" that Sidley's role as BSA's restructuring counsel put it in an adverse position to Century. (Boelter Decl. ¶ 16, Ex. 4.) Ms. Boelter responded two hours later, stating that there was no conflict from Sidley's role as restructuring counsel and noting that Haynes and Boone had been retained as coverage counsel. (Boelter Decl. Ex. 4 at 2.) She also emphasized that, as had been explained to Century and its advisors at several points, the mediation had taken significant effort to plan and was of critical importance to BSA. (*Id.*)

34.     The following morning, Sidley attorneys met with Century before the mediation was set to begin at Sidley's New York office. (Boelter Decl. ¶ 17.) After discussion, it was agreed that the mediation would proceed without Century waiving any rights. (*Id.*) In an abundance of caution, and to assuage any concerns on Century's part, Sidley put in place a formal screen on November 4, 2019. (*Id*. ¶ 18, Ex. 5.) There had been no crossover of teams or confidential information prior to the implementation of the formal screen. (Boelter Decl. ¶¶ 17, 19.)

### F.      The Attorney-Client Relationship Breaks Down And Sidley Withdraws From Representing Century

35.     In the weeks following, Sidley repeatedly asked Century representatives to schedule a meeting or phone call to more fully discuss the perceived conflict. (*See* Schwartz Decl. Ex. 4; Boelter Decl. Ex. 4 (email dated Nov. 25, 2019).) Despite its assertions that Century engaged in "extensive efforts to try to resolve this issue" (Objection at 2), Century would not

15

agree to a meeting or call to discuss the issue, nor did Century articulate the basis for its belief that a conflict of interest existed. (*See* Sneed Decl. Ex. 7; Schwartz Decl. Ex. 4.) Instead, in response to Sidley's requests for a meeting or discussion, and as a precondition for engaging on the subject, Century continually requested Sidley first send a written "General Counsel's Opinion" explaining the absence of a conflict and conditioned its willingness to continue discussions on Sidley's production of that opinion. (*See, e.g.*, Sneed Decl. Ex.7 (Nov. 27, 2019 email from Mr. Schwartz: "Before we have a discussion, we would like to review Sidley's General Counsel opinion"); Schwartz Decl. Ex. 4 (Dec. 12, 2019 email from Mr. Schwartz: "We will gladly discuss the conflict issue further with you once Sidley has supplied the information requested").) In its Objection, Century claims that Mr. Sneed had given Century the idea that Sidley had such a written opinion during the October 29, 2019 phone call. (Objection at 7 (citing Schwartz Decl. Ex. 4 (December 2019 email exchange between Sidley attorney Michael Andolina and Mr. Schwartz on which Mr. Sneed was merely copied)).) Mr. Sneed said no such thing; he expressed a view (*i.e.*, *an* opinion), never referencing a *written* opinion. (Sneed Decl. ¶ 32.) Notably, contrary to the assertion in Century's brief, Mr. Schwartz's actual declaration makes no mention of Mr. Sneed having described a written General Counsel's opinion. (*Compare* Objection at 7, *with* Schwartz Decl. ¶ 13.)

36.     On December 18, 2019, Mr. Sneed was finally able to schedule a conference call with Mr. Schwartz and another Century representative in an attempt to understand and address Century's concerns. (Sneed Decl. ¶¶ 33-34.) Although Century accuses Mr. Sneed of "bull[ying]" and making "threat[s]" (Objection at 8), that is simply not the case. In fact, Mr. Sneed made clear that Sidley's preference was to continue to represent Century in its reinsurance matters. (*Id.* ¶ 34.) But Mr. Sneed also explained that Sidley would not withdraw from

representing BSA because no conflict existed, and due to the broad way that Century had framed its conflicts complaint, Sidley might be forced to withdraw from its representation of Century if the issue could not be resolved. (*Id.*) Throughout the call, Mr. Sneed urged Century to schedule a management-level conference to resolve the perceived conflict. (*Id.* ¶ 35.) No such conference was scheduled before BSA filed for bankruptcy. (*Id.*)

37.     In fact, in its next communication on January 3, 2020, while Sidley's invitation to schedule a management-level meeting or conference was still outstanding, Century sent a letter notifying Sidley that it had consulted with outside ethics counsel and accused Sidley of "shocking and offensive" behavior. (Schwartz Decl. Ex. 5.) At this point, it was clear that no headway would be made, as Century continued to assert that it could not "rule out" a conflict or potential conflict and would not agree to any waiver. (*Id.*)

38.     As a result of this breakdown in its relationship with Century, Sidley began an orderly withdrawal of its existing representations by providing notice to Century on January 16, 2020. (Sneed Decl. ¶ 37, Exs. 9-13.) The petition to compel arbitration relating to the new August 2018 reinsurance bills in the Lloyd's Matter had been fully briefed and awaiting judicial decision since September 2019. (Sneed Decl. Ex. 9.) Sidley filed an agreed motion to withdraw, which the court granted on February 21, 2020. (Sneed Decl. ¶ 37.) In the Second Matter, no arbitration schedule had been set, and Sidley provided Century with the required submissions for an upcoming organizational meeting before communicating its withdrawal to the arbitrators over a month later, on February 20, 2020. (*Id.* ¶ 37, Ex. 11.)[11] Sidley further informed Century that it was withdrawing from its remaining matters for Century, both of which involved sporadic advice

---

[11] In the remaining arbitration, Sidley offered to represent Century through the close of discovery (scheduled for February 14, 2020) (Sneed Decl. Ex. 9), but Century chose to retain substitute counsel and seek a new discovery schedule. (*Id.* Ex. 13.) Sidley communicated its withdrawal to the arbitrators on February 20, 2020. (*Id.* Ex. 12.)

(and one of which had been dormant for over two years). (Sneed Decl. Ex. 13.) As of February 21, 2020, Sidley no longer represented Century or any of its affiliated entities. (Sneed Decl. ¶ 38.)[12]

### G.    BSA's Application To Retain Sidley And Century's Objection

39.    BSA filed for bankruptcy on February 18, 2020. As Ms. Boelter explained during the first day hearing, BSA has two objectives in this proceeding: (1) to provide equitable compensation for abuse survivors and (2) to preserve BSA's mission. (First Day Hearing Tr. 25:13-19 (Feb. 19, 2020).) To achieve these objectives, it is critically important that this bankruptcy proceed expeditiously. To that end, Sidley proceeded to coordinate numerous tasks aimed at facilitating an efficient resolution of the case, including setting up a data room, coordinating with the Ad Hoc Committee of Local Councils, moving for appointment of a future claimants' representative and a judicial mediator, and items related to the nationwide litigation of abuse actions. (ECF No. 4, Informational Brief, at 7-9.)

40.    On March 17, 2020, BSA filed its application to retain Sidley as debtors' counsel. The declaration of Ms. Boelter accompanying that application disclosed that Sidley had previously represented Century but had since formally withdrawn from those representations and did not currently represent Century. (Application Ex. B, Boelter Decl. ¶ 22 (disclosing that Sidley had previously represented Century in reinsurance matters and that "[t]he underlying insurance claims … were claims under insurance policies Century or its predecessors issued to

---

[12] Century suggests that Sidley's communications were improper or unauthorized. However, as the correspondence makes clear, while Sidley was fully prepared to work with Century and Chubb to transition the matters, with respect to the remaining arbitration, Sidley became increasingly concerned that Chubb was creating a misleading impression on the part of the arbitral panel and other counsel that Sidley would continue to remain involved in the matters through their conclusion. That was wrong—Sidley had made clear that it intended to withdraw entirely from the matters. (Sneed Decl. ¶ 37.)

the BSA").) Notably, although Century argues that Ms. Boelter's application does not

sufficiently disclose the nature of the matters that Sidley had previously handled for Century,

Century itself does not cite to ¶ 22 of the Boelter Declaration, which contains the prominent

disclosure regarding Sidley's connections with Century. Sidley also disclosed that ESIS, Inc., a

Century affiliate, is a third-party claims administrator utilized by BSA and certain of its insurers.

(*Id.*)

## ARGUMENT

41.    A debtor's choice of counsel is entitled to substantial deference. *See* 3 Collier on

Bankruptcy ¶ 327.04[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). Accordingly,

rejection of a debtor's chosen counsel is "a drastic measure that should be avoided unless

absolutely necessary." *In re Best Craft Gen. Contr. & Design Cabinet, Inc*., 239 B.R. 462, 470-

71 (Bankr. E.D.N.Y. 1999); *cf. Regalo Int'l, LLC v. Munchkin, Inc.*, 211 F. Supp. 3d 682, 687

(D. Del. 2016) ("disqualification is disfavored, and the Court approaches motions to disqualify

counsel with cautious scrutiny, mindful of a litigant's right to the counsel of its choice"

(quotation omitted)). This is not one of the "rare cases" that would warrant depriving Debtors of

their chosen counsel.

## I.    Sidley Meets The Standards For Retention.

### A.    Section 327 Requires Disinterestedness And The Absence Of An Adverse Interest To Protect The Fairness And Integrity Of The Proceeding.

42.    Section 327 is meant to protect the fairness and integrity of the bankruptcy

process by ensuring debtor's counsel provides undivided loyalty to the estate. *See generally In re

BH & P Inc.*, 949 F.2d 1300, 1316 (3d Cir. 1991); *In re AroChem Corp.*, 176 F.3d 610, 621 (2d

Cir. 1999); *see also* Objection at 13 ("the Bankruptcy Code is designed to protect the interests of

a debtor's estate"). It accomplishes this goal by requiring that professionals retained by a debtor

"do not hold or represent an interest adverse to the estate" and are "disinterested persons."

11 U.S.C. § 327. A professional holds a prohibited "adverse interest" where that professional

holds or represents interests in competition with the debtor that would actually (as opposed to

speculatively) impair its service as an estate fiduciary. *See In re First Jersey Sec., Inc.*, 180 F.3d

504, 509 (3d Cir. 1999) ("A Court may consider an interest adverse to the estate when counsel

has a competing economic interest tending to diminish estate values or to create a potential or

actual dispute in which the estate is a rival claimant." (quotation omitted)); *In re Marvel Entm't*

*Grp., Inc.*, 140 F.3d 463, 477 (3d Cir. 1998). A disinterested person is defined, in pertinent part,

as someone without "an interest materially adverse to the interest of the estate or of any class of

creditors or equity security holders." 11 U.S.C. § 101(14).

43.    The court has considerable discretion in approving a debtor's retention of counsel

under the standards of Section 327 in light of the specific facts and circumstances of the case.

*Marvel*, 140 F.3d at 477; *BH & P*, 949 F.2d at 1313, 1316 ("historically, bankruptcy courts have

been accorded wide discretion in connection with … the terms and conditions of the employment

of professionals" (alteration in original) (quotation omitted)). Disqualification is mandated only

where there is "an actual conflict of interest." *Marvel*, 140 F.3d at 476. And the Third Circuit has

made clear that a "court may not disqualify an attorney on the appearance of conflict alone." *Id.*;

*see also In re Jade Mgmt. Servs.*, 386 F. App'x 145, 148 (3d Cir. 2010).

44.    Moreover, in exercising its discretion, the court should be wary of allowing

preemptive plan objections and unsupported allegations regarding prepetition conduct to

bootstrap a tactical disqualification that would improperly delay the proceedings or provide an

unfair advantage to a party in interest. *Cf. In re Golden Guernsey Dairy, LLC*, No. 13-10044,

2015 WL 3669932, at *2 (Bankr. D. Del. June 12, 2015); *see also In re Harold & Williams Dev.*

*Co.*, 977 F.2d 906, 910 (4th Cir. 1992) (court's discretion must be exercised with a view to the "protection of the interests of the bankruptcy estate and its creditors, and the efficient, expeditious, and economical resolution of the bankruptcy proceeding").

45.    While the initial burden of satisfying Section 327 rests on the applicant, that burden has been met by the filing of the Application. *In re Caesars Entm't Operating Co., Inc.*, 561 B.R. 420, 431 (Bankr. N.D. Ill. 2015). As a result, the "burden of going forward" has "shift[ed] to the objecting party"—that is, Century. *Id.* (citing *In re Brennan*, 187 B.R. 135, 145 (Bankr. D.N.J. 1995), *rev'd on other grounds sub nom. In re First Jersey Secs., Inc.*, 180 F.3d 504 (3d Cir. 1999)). Century has failed to meet that burden.[13]

### B.    Sidley Satisfies Section 327's Requirements Because It Is Disinterested And Holds No Interest Adverse To The Estate.

46.    In its Objection, Century says next to nothing about Section 327. That is hardly surprising: Sidley's compliance with Section 327's requirements cannot be seriously disputed. Consistent with the present-tense language of the provision itself, *e.g.*, "hold," "represent," "are disinterested," a professional may only be disqualified under Section 327 based on a *present* adverse interest. *See In re Ampal-Am. Israel Corp.*, 691 F. App'x 12, 15 (2d Cir. 2017) ("counsel will be disqualified under section 327(a) *only if it presently holds* or represents an interest

---

[13] Century relies on the "expert opinions" of Charles Slanina to attempt to meet this burden. (*See* Objection at 15, 16, 19, 21, 22.) Slanina's opinions, however, are little more than a recitation of the ABA Model Rules of Professional Conduct followed by Slanina's legal conclusions that those rules apply to Century's version of disputed facts. (*See, e.g.*, Slanina Dec. ¶¶ 7-8 (quoting Rule 1.7(a), and then applying the rule "[b]ased on the facts [Slanina] was provided"); ¶¶ 21, 24 (same with respect to Rule 1.9).) Slanina's declaration thus adds little of value to Century's Objection. *See Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization, LLC*, 616 F. Supp. 2d 461, 465 (S.D.N.Y. 2009) (giving little weight to a legal ethics expert's declaration on a conflict of interest question because it made "quite sweeping conclusions"); *see also Sanchez v. Navigators Specialty Ins. Co.*, No. 12-cv-00724, 2012 WL 12336234, at *2 n.1 (C.D. Cal. July 24, 2012) (expert opinions "comprised primarily of unsupported legal conclusions" are not entitled to weight).

[adverse] to the estate, *notwithstanding any interests it may have held or represented in the past*"

(quoting *AroChem*, 176 F.3d at 623)); *In re Muma Servs., Inc.*, 286 B.R. 583, 591 (Bankr. D.

Del. 2002). The Supreme Court has recognized that "Congress' use of a verb tense is significant

in construing statutes." *United States v. Wilson*, 503 U.S. 329, 333 (1992); *see also Marvel*, 140

F.3d at 475 (in interpreting § 327(a): "we must, of course, begin with the language of the

statute").

47.     Here, Sidley no longer represents Century, and therefore it has no present interest

adverse to the estate. *See, e.g.*, *Marvel*, 140 F.3d at 477-48 (reversing denial of retention

application where law firm had, among other things, "severed all attorney-client relations with

[the creditor] in anticipation of its selection"); *In re Empire State Conglomerates, Inc.*, 546 B.R.

306, 315 (Bankr. S.D.N.Y. 2016) (finding no "adverse interest" where purportedly conflicting

representation had already concluded); *In re Fairvue Club Properties LLC*, No. 09-13807, 2010

WL 569561, at *6 & n.4 (Bankr. M.D. Tenn. Feb. 12, 2010) (same); *cf. Muma Servs.*, 286 B.R.

at 591 (denying motion to disqualify under § 1103(b) where representation had terminated prior

to the motion to disqualify by analogizing to § 327(a) and noting that "counsel will be

disqualified under section 327(a) only if it presently 'holds or represents an interest adverse to

the estate,' notwithstanding any interests it may have held or represented in the past" (quoting

*AroChem*, 176 F.3d at 623)).[14] And Century does not identify any "competing economic interest

---

[14] To be sure, Century argues that it should be treated as a current client for purposes of the
ethics rules citing the so-called "hot potato" doctrine. (*See, e.g.*, Objection at 22-24.) But Century
provides no support for the notion that the Section 327 analysis should treat it as such. Indeed,
neither the Third Circuit nor the District of Delaware have recognized the "hot potato" doctrine
in the context of a Section 327 objection. *See Sonos, Inc. v. D & M Holdings Inc.*, No. 14-cv-
1330, 2015 WL 5277194, at *3 n.1 (D. Del. Sept. 9, 2015) ("The Third Circuit, however, has not
had occasion to adopt the hot potato doctrine."). Nor would there be a basis for doing so, given
Section 327's focus on present conflicts. At a minimum, while Sidley vigorously disagrees with
Century's claim that it improperly withdrew from representing Century, that is a matter between

tending to diminish estate values" held by Sidley, much less an interest held by Sidley that could "create a potential or actual dispute in which the estate is a rival claimant." *First Jersey*, 180 F.3d at 509 (quotation omitted). Indeed, Sidley's prior representation of Century in reinsurance collection disputes would not create such an interest even if still active. BSA was not a party to any of those disputes, and the outcome of the reinsurance collection actions would have no impact—much less a negative impact—on BSA. (*See also* Part I.C.5, *infra*.)[15]

### C.    Century's Request That Sidley Be Disqualified Based On Alleged Ethical Violations Should Be Denied.

#### 1.    Disqualification Is An Extreme Measure.

48.    Although styled as an opposition to Sidley's retention under Section 327, Century's Objection is in substance a motion to disqualify based on what it describes as "textbook" and incurable violations of the rules of ethics. (*See* Objection at 1, 13-17, 17-18.) The Third Circuit has described disqualification as an "extreme remedy." *Jackson v. Rohm & Haas Co.*, 366 F. App'x 342, 347 (3d Cir. 2010); *see also In re Onejet, Inc.*, No. 18-24070, 2020 WL 1879029, at *6 (Bankr. W.D. Pa. Mar. 27, 2020) (describing disqualification as a "draconian measure" (quoting *EEOC v. Hora, Inc.*, 239 F. App'x 728, 731 (3d Cir. 2007))). A party seeking disqualification bears a "heavy burden" and "must meet a high standard of proof before a lawyer is disqualified." *High 5 Games, LLC v. Marks*, No. 13-cv-7161, 2018 WL 2278103, at *2 (D.N.J. May 18, 2018); *see also Regalo*, 211 F. Supp. 3d at 687 ("a moving party has the burden to

---

Sidley and Century, not one that is properly part of this Court's consideration whether Sidley has a present "adverse interest" as to Debtors.

[15] In addition to having no interest materially adverse to the estate, to be disinterested an attorney cannot "have an interest materially adverse to the interest … of any class of creditors or equity security holders." 11 U.S.C. § 101(14)(C). There is no contention that Sidley possesses any such interest; indeed, Century, the lone objector here, is neither a creditor nor equity security holder. Even if Century were a creditor, the prior reinsurance work would not give Sidley an interest materially adverse to any class of creditors.

demonstrate that continued representation would be impermissible"). And because motions to disqualify are frequently used as a tactical device, they are disfavored. *See Onejet*, 2020 WL 1879029, at *6 ("The burden is an exceptionally heavy one as motions to disqualify are viewed with disfavor within our Circuit because of the potential for abuse as a litigation tactic."); *Golden Guernsey Dairy*, 2015 WL 3669932, at *2.

49.     Throughout its Objection, Century conflates the existence of a purported violation of the ethical rules with the remedy of disqualification on the assumption that the former automatically requires the latter. That is not the law. *See, e.g.*, *Bos. Sci. Corp. v. Johnson & Johnson Inc.*, 647 F. Supp. 2d 369, 374 n.7 (D. Del. 2009) (denying motion to disqualify despite violation of Rule 1.7: "In the Third Circuit, … whether disqualification is appropriate depends on the facts of the case and is never automatic"); *End of Rd. Tr. v. Terex Corp.*, No. 99-477, 2002 WL 242464, at *2-3 (D. Del. Feb. 20, 2002) (denying motion to disqualify despite admitted violation of Rule 1.7(a)). To the contrary, an attorney should be disqualified only when "***absolutely necessary***." *Onejet*, 2020 WL 1879029, at *6 (emphasis added) (quoting *Tiversa Holding Corp. v. LabMD, Inc.*, No. 13-1296, 2013 WL 6796538, at *2 (W.D. Pa. Dec. 20, 2013)); *see also Macheca Transp. Co. v. Phila. Indem. Co.*, 463 F.3d 827, 833 (8th Cir. 2006) ("A party's right to select its own counsel is an important public right and a vital freedom that should be preserved; the extreme measure of disqualifying a party's counsel of choice should be imposed only when absolutely necessary." (quotation omitted)).

50.     That is particularly so where the debtor would experience substantial prejudice, the proceeding would be derailed, and the case is complex. *See, e.g.*, *TQ Delta, LLC v. 2Wire, Inc.*, Nos. 13-cv-1835, 13-cv-1836, 13-cv-2013, 2016 WL 5402180, at *6 (D. Del. Sept. 26, 2016) (based on the complexity of the proceeding, if counsel was disqualified, the client "would

be prejudiced beyond mere inconvenience" and "getting new counsel up to speed[] would come at a substantial cost—in terms of both time and money"); *End of Rd. Tr.*, 2002 WL 242464, at \*3 (denying motion to disqualify despite admitted violation of Rule 1.7(a) where the firm "invested a substantial amount of time and effort," the case is "complex," and granting the motion for disqualification would "delay [the] case"); *Elonex I.P. Holdings, Ltd. v. Apple Computer, Inc.*, 142 F. Supp. 2d 579, 584 (D. Del. 2001) (client had "compelling" interest in retaining counsel because "[t]here [was] no doubt that it [would] be both inefficient and costly for [client] to get new counsel up to speed in this matter").[16] That is precisely the case here. As explained in the Debtors' Reply Brief, filed contemporaneously herewith, given the unique nature of this restructuring combined with the unprecedented economic impact of COVID-19, the burdens imposed on BSA if Sidley was removed as counsel would be devastating.

### 2. Century Unreasonably Delayed in Raising Its Claims.

51.     Judicial skepticism about disqualification is particularly warranted where, as here, the party seeking disqualification delayed in asserting its claim. *See In re Enron Corp.*, No. 01-16034, 2002 WL 32034346, at \*4 (Bankr. S.D.N.Y. May 23, 2002) (discussing a delay of two months after learning of the alleged conduct: "Delay in bringing any motion to disqualify counsel is generally frowned upon because of the disruption it would cause to the case"), *aff'd* No. 02-cv-5638, 2003 WL 223455 (S.D.N.Y. Feb. 3, 2003). "This is especially so in a bankruptcy reorganization in which a disruption, in addition to causing delay in getting a

---

[16] *See also Wyeth v. Abbott Labs.*, 692 F. Supp. 2d 453, 460 (D. N.J. 2010) ("if [client] were required to obtain new counsel, there would likely be some delay in this litigation as well as certain additional costs incurred by [client] while new counsel familiarized itself with this case"); *Intelli-Check, Inc. v. Tricom Card Techs., Inc.*, No. 03-cv-3706, 2008 WL 4682433, at \*5 (E.D.N.Y. Oct. 21, 2008) (party "would suffer harm if required to obtain new counsel at this stage in the litigation" and "[m]astery of this case would require substantial work on the part of a new firm, at a substantial cost to the Defendants, and a substantial delay to the case").

decision or a judgment or payment of money, causes a loss of value—value that cannot be regained." *Id.*.

52.     Century concedes it has been on notice of this alleged conflict since October 2019. (*See, e.g.*, Objection at 7.) Century could have filed this objection two months ago after BSA filed its petition. Instead, Century did not even appear in this case until April 8. (ECF No. 362.) And Century waited until April 14 to file its Objection, literally on the eve of the hearing at which the Debtors' motion for appointment of mediators—to which Century had objected (ECF No. 388)—was to be heard. *See Universal City Studios, Inc. v. Reimerdes*, 98 F. Supp. 2d 449, 455 (S.D.N.Y. 2000) (denying motion to disqualify and finding "substantial reason to believe" the motion was "motivated at least partly by tactical considerations" where movant "knew of" but "did not even raise" conflict for nearly a month, during which significant case developments had occurred).

53.     This delay alone merits denial of Century's request to disqualify Sidley based on supposed violations of the ethical rules. A party waives the right to seek disqualification when it was aware of the alleged conflict "but failed to raise an objection promptly when he had the opportunity." *Conley v. Chaffinch*, 431 F. Supp. 2d 494, 498-99 (D. Del. 2006). That is the case here. *See, e.g.*, *id.* (finding waiver of objection to continued representation when movant waited almost nine months after becoming aware of the representation); *Spear v. Fenkell*, No. 13-cv-02391, 2014 WL 6676660, at *1-3 (E.D. Pa. Nov. 25, 2014) (finding waiver of right to relief on its motion to disqualify when movant delayed for six months after it became aware of the basis for the alleged conflict); *Arnett v. Mid-Cont'l Cas. Co.*, No. 08-cv-2373, 2010 WL 11507481, at *2-3 (M.D. Fla. Apr. 13, 2010) (movant waived right to object to law firm's continued representation of client because it waited five-plus months to bring a motion for

disqualification); *Finmeccanica S.p.A. v. Gen. Motors Corp.*, No. 07-cv-08222, 2008 WL 11340060, at *3-5 (C.D. Cal. Apr. 29, 2008) (holding motion to disqualify untimely because movant waited six months after discovering alleged conflict to seek relief); *cf. Reeves v. Town of Cottageville*, No. 12-cv-02765, 2014 WL 4231235, at *3 (D.S.C. Aug. 26, 2014) (movant waived objection to opposing counsel where its counsel knew of alleged conflict five weeks before filing motion for disqualification).

### 3. The Dispute Between Sidley And Century Can Be Addressed In An Alternative Forum.

54. This is fundamentally a dispute between Sidley and Century. It does not have any bearing whatsoever on Sidley's ability to represent BSA's interests in this matter. As discussed below (*see* Part I.C.4.b, *infra*), Sidley's representation of Century was not substantially related to its work for BSA, and Haynes and Boone has been retained by Debtors as special insurance counsel. As such, Sidley's prior representation of Century will have no impact on the integrity of this proceeding. Accordingly, the dispute is best left to another forum. *See United States v. Prevezon Holdings Ltd.*, 839 F.3d 227, 241 (2d Cir. 2016) ("disqualification is called for only where 'an attorney's conduct tends to taint the underlying trial,' because federal and state disciplinary mechanisms suffice for other ethical violations." (quoting *Bd. of Educ. of City of N.Y. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979))); Ronald D. Rotunda & John S. Dzienkowski, Legal Ethics: The Lawyer's Deskbook on Professional Responsibility § 1.7-1(f) (2018-2019 ed.) ("However, if the alleged ethical violation does not affect the fact finding process or the fairness of the trial, then the court should leave any enforcement of the alleged violation to the other fora for remedying conflicts of interest."); *see also In re Tate*, No. 19-00237, 2019 WL 3294073, at *1 (Bankr. D.D.C. July 22, 2019) ("courts are admonished that 'unless an attorney's conduct tends to taint the underlying trial'"—either because "there is a

serious question of the attorney's ability to zealously represent the client" or "the attorney is in

the position to potentially create an unfair advantage by the use of privileged information of the

other side"—to "be quite hesitant to disqualify an attorney" (quotations omitted)). Indeed,

Century gave Sidley notice of its intent to proceed with an arbitration regarding the matters at

issue here on March 10, 2020, although no arbitration case has yet been filed. (Schwartz Decl.

Ex. 13, Sneed Decl. Ex. 3.)

> **4.    If The Court Does Entertain Disqualification As A Potential Sanction, Sidley's Representation Of BSA Does Not Violate Rule 1.9 Regarding Duties To Former Clients.**
>
> > **a.    Century Is A Former Sidley Client Both In Fact And Under The Ethical Rules.**

55.    It cannot be disputed that Sidley no longer represents Century in any ongoing

matter and that the attorney-client relationship between Sidley and Century has terminated. As

the result of a breakdown in the attorney-client relationship, Sidley notified Century on January

16, 2020, that it would be withdrawing from all matters in which it represented Century and its

affiliates. And the process of communicating that withdrawal to the relevant courts and

arbitrators was complete as of February 20, 2020, *i.e.*, just days after BSA's bankruptcy filing.

Century, however, seeks to have Sidley's ethical obligations judged under the current client

standard, citing the so-called "hot potato" doctrine to argue that Sidley impermissibly jettisoned

Century, its current client, to take on a more lucrative new client in BSA. (Objection at 22-27.)

According to Century, because Sidley began consulting on the Lloyd's Matter on October 5,

2018, Rule. 1.7 required Sidley to decline to represent BSA or withdraw from representing BSA

as soon as a conflict emerged. (*Id.* at 23-24.) While Century is incorrect as to what Rule 1.7

requires (*see* Part I.C.5, *infra*), Century's invocation of the "hot-potato" doctrine likewise fails on its own terms.[17]

56.     As an initial matter, Century has the timing backward. Sidley and Century did not have an attorney-client relationship on the date BSA retained Sidley as restructuring counsel. To the contrary, BSA retained Sidley first. As noted above, BSA retained Sidley to be its restructuring counsel on September 26, 2018, which was memorialized in a formal engagement letter on October 3, 2018. Century did not retain Sidley as a consultant in the Lloyd's Matter until October 5, 2018, and advance waiver discussions continued until March 2019. So according to Century's own logic, if direct adversity existed as of October 2018, which, as explained elsewhere, it did not, the proper course of action would have been to decline representation of *Century*, not BSA. Contrary to Century's suggestion, Sidley did not abandon an existing client to take on a more remunerative representation.[18]

57.     Century further attempts to confuse the relevant timeframes by repeatedly referring to a "fifteen year" relationship and status as a "longtime" or "longstanding" client. (Objection at 1, 3, 22-23.) To be sure, Sidley had represented Century in the past. Tellingly, however, Century does not identify a single matter that Sidley was handling for Century that was

---

[17] Century also relies on authority suggesting a rule that the present-client standard applies even if the concurrent representation ceased prior to the disqualification motion. (Objection at 18-19 & nn.82-83.) As Century's own authority recognizes, however, this rule and the hot potato doctrine are simply two sides of the same coin. *Merck Eprova AG v. ProThera, Inc.*, 08-cv-0035, 2009 WL 10696470, at *6 (S.D.N.Y. Oct. 6, 2009) ("[W]here counsel have simultaneously represented clients with differing interests, the standard for concurrent representation applies even if the representation ceases prior to the filing of a disqualification motion.… More colloquially, this is referred to as the 'hot potato' rule ….") (cited in Objection at 18-19 n.82).

[18] *Santacroce v. Neff*, 134 F. Supp. 2d 366 (D.N.J. 2001), and *Ransburg Corp. v. Champion Spark Plug Co.*, 648 F. Supp. 1040 (N.D. Ill. 1986), both of which Century features in its Objection (at 18-19), are readily distinguishable. Both cases involved concurrent representation of parties that were directly adverse because they had sued or were imminently planning to sue the other, which would place them on opposing sides of the "v." in active lawsuits—a situation in which consent cannot be given.

29

active as of October 2018 when Sidley was retained to consult in the Lloyd's Matter. (*See generally* Schwartz Decl.) That is because at the time period in question—that is, fall 2018—the attorney-client relationship between Century and Sidley had lapsed. Thus, what is relevant here, as evidenced by the focus in Century's own papers, are the Lloyd's Matter and BSA restructuring.

58.    More fundamentally, the "hot potato" doctrine prevents attorneys from dropping one client to avoid a *conflict* with another client. There was no conflict to be avoided here, particularly given that the reinsurance matters were not related to any coverage issues that might present themselves in the bankruptcy and in light of the use of coverage counsel, Haynes and Boone, to address any coverage-related disputes. (*See* Part I.C.5, *infra*.)[19] Century's insistence that there was a conflict when there was none and its baseless accusations that Sidley had engaged in "shocking and offensive" behavior led to a breakdown of the attorney-client relationship that, in turn, precipitated Sidley's withdrawal. That withdrawal was entirely proper. *See* ABA Model Rule 1.16(b)(1), (6)-(7) ("a lawyer may withdraw from representing a client if … withdrawal can be accomplished without material adverse effect on the interests of the client," the representation "has been rendered unreasonably difficult by the client," or for "other good cause"); *City of Joliet v. Mid-City Nat'l Bank of Chi.*, 998 F. Supp. 2d 689, 693 (N.D. Ill. 2014) ("withdrawal for good cause includes a withdrawal based on a breakdown in the attorney-client relationship" (quotation omitted)). Accordingly, because Sidley had withdrawn before any conflict arose, Rule 1.9 applies.

---

[19] It also bears noting that Century supports its Rule 1.7 arguments, which form the basis of its hot potato theory, with actions taken by Sidley in this proceeding that post-date Sidley's withdrawal. (*E.g.*, Objection at 15, 17.) Such evidence cannot be used to suggest that a conflict existing at the time of withdrawal made that withdrawal invalid.

**b.** **Century Has Admitted That Sidley's Representation Of BSA Is Not "Substantially Related" To Its Representation Of Century In Reinsurance Collection Actions.**

59.     Contrary to Century's suggestion (Objection at 24-26), Sidley's representation of BSA is not "substantially related" to its prior representation of Century in reinsurance collection actions. Before this dispute arose, Century admitted as much. As noted above (at ¶ 14), under the SLA that Century claims governs the relationship, Century described the work that Sidley did as "*unrelated to the defense of an insurance claim or a related insurance coverage claim*." That should be the end of the matter.

60.     In any event, however, Sidley's actual work was consistent with Century's prior description of the engagement as being "unrelated" to any direct insurance claim. ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████ █

61.     ██████████████████████████████████████████████

████████████████████████████████████████

---

[20] While Century asserts in a general sense that insurance and reinsurance are "inextricably intertwined" (Objection at 26), that is true only in that by definition reinsurance is "[i]nsurance of … one insurer's risk by a second insurer." Reinsurance, Black's Law Dictionary (11th ed. 2019). Insurance and reinsurance arrangements are governed by separate agreements, with different terms and between different parties that give rise to distinct issues for litigation. *See, e.g.*, *BancInsure, Inc. v. McCaffree*, No. 12-cv-2110, 2013 WL 5769918, at *6 (D. Kan. Oct. 24, 2013) ("Policy terms, conditions, and exclusions between insurance and reinsurance can be materially different."); *cf. N. River Ins. Co. v. Emp'rs Reinsurance Corp.*, 197 F. Supp. 2d 972, 980 (S.D. Ohio 2002) (noting, in a choice-of-law decision, that "the location of the underlying insured was immaterial to the determination of a reinsurance dispute" and "individuals who are not parties to the reinsurance contract have no right of action against the reinsurer").

███████████████████████████████████

████████████████████████████████████

███████████████████████████████████

██████████████████████████████

███████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████

62.    Courts have found that no substantial relationship exists even when there is some

degree of overlap in matters. *See, e.g.*, *Talecris Biotherapeutics, Inc. v. Baxter Int'l Inc.*, 491 F.

Supp. 2d 510, 515 (D. Del. 2007) (holding no substantial relationship between the prior and

current litigation even though the "two litigations overlap[ped] to some degree" because "'the

underlying question is whether the lawyer was so involved in the matter that the subsequent

representation can be justly regarded as a changing of sides in the matter in question.'" (quoting

Rule 1.9 cmt. [2])); *Emp'rs Ins. Co. of Wausau v. Munich Reinsurance Am., Inc.*, No. 10-cv-

3558, 2011 WL 1873123, at *6 (S.D.N.Y. May 16, 2011) (holding that lawyer's previous

representation of a client in reinsurance arbitration was not substantially related to later

reinsurance arbitration against the now-former client despite both involving issue of how to

define an "occurrence" for determining if retention was exceeded). Indeed, even Century's own

authority holds that a "substantial relationship" merits disqualification "only upon a showing that

the relationship between issues in the prior and present cases is patently clear," meaning

"identical or essentially the same." *Chem. Bank v. Affiliated FM Ins. Co.*, No. 87-cv-0150, 1994

WL 141951, at *12 (S.D.N.Y. Apr. 20, 1994) (quotations omitted) (cited in Objection at 19

n.83); *see also, e.g.*, *Mitchell v. Metro. Life Ins. Co.*, No. 01-cv-2112, 2002 WL 441194, at *4

(S.D.N.Y. Mar. 21, 2002) (cited in Objection at 28 n.113). That is not the case here.

63.    Century asserts that Sidley will be forced to "compromise" its representation of

BSA because Sidley obtained "highly privileged and confidential information … about

[Century's] insurance for the Boy Scouts" during the course of its representation of Century in

reinsurance disputes. (Objection at 16.) That is wrong. ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ Put another way, Sidley's representation of Century was not related to the defense of

any underlying insurance claims that have been or might be made by BSA against Century. It

thus makes sense that Sidley, as noted above, did not obtain any confidential privileged

information from Century about those underlying policies. *See Talecris Biotherapeutics*, 491 F.

Supp. 2d at 515 ("the court should not allow its imagination to run free with a view to

hypothesizing conceivable but unlikely situations in which confidential information 'might' have

been disclosed which would be relevant to the present suit." (citation omitted)).[21]

---

[21] Moreover, whatever confidential information on which Century bases its complaints cannot be information already known to BSA either through its being a counterparty to the relevant insurance agreements or prior coverage litigation. Rule 1.9 cmt. [3] ("Information that has been disclosed to the public or to other parties adverse to the former client ordinarily will not be disqualifying.").

64.    In this regard, Century relies on little more than conclusory assertions that Sidley received various categories of "confidential information" concerning the insurance coverage between BSA and Century that are inconsistent with the scope of Sidley's representation. (*See* Objection at 1, 3-4, 16-17, 35; Schwartz Decl. ¶¶ 3, 5.) [22] Century provides no particulars suggesting that whatever confidential information received by Sidley in the reinsurance disputes would bear in specific issues at play in this bankruptcy, much less that would "materially advance" BSA's position relative to Century on an issue that Sidley would handle (as opposed to Haynes and Boone). Rule 1.9 cmt. [3]. [23] Century's "vague and unsupported" allegations do not suffice. *Talecris Biotherapeutics*, 491 F. Supp. 2d at 515 & n.2 (denying motion for disqualification because movant failed to demonstrate that "any confidential information [firm] might have learned" in the first case would bear on the issues being litigated in the second case); *see, e.g.*, *P&L Dev. LLC v. Bionpharma Inc.*, No. 17-cv-1154, 2019 WL 357351, at *8 (M.D.N.C. Jan. 29, 2019) (denying motion for disqualification where the former client's

---

[22] Century claims that Sidley received confidential information about Century's insurance and reinsurance programs generally. (*See, e.g.*, Objection at 1, 3; Schwartz Decl. ¶ 3.) Even if that were the case, this sort of generic information about a former client has long been held insufficient to create a conflict. *See Sonos*, 2015 WL 5277194, at *4 (knowledge of former client's "general strategy … is not enough to warrant disqualification"); *Regalo*, 211 F. Supp. 3d at 692 ("[I]f the generalized citation to counsel's knowledge of a prior client's 'litigation philosophies,' 'strategies' and 'risk tolerances' necessarily demonstrated that the past representations were 'substantially related' to any new matter where an attorney is adverse to the prior client, the floodgates for disqualification would open wide."); *In re Mack Indus., Ltd*, 606 B.R. 313, 325 (Bankr. N.D. Ill. 2019) ("[G]eneral knowledge of a client's policies and practices ordinarily will not preclude a subsequent representation." (citing *Watkins v. Trans Union, LLC*, 869 F.3d 514, 522 (7th Cir. 2017))).

[23] To be sure, Century need not provide the Court with the actual privileged and confidential information that it claims Sidley possesses and that would damage Century. But that does not mean that it may simply rely on vague and conclusory assertions that are inconsistent with the actual scope of the work that it asked Sidley to do. Otherwise, a client could handcuff a lawyer forever into the future by vaguely characterizing the engagement in general terms, and then later asserting that "confidential" information should be presumed to have been provided relating to that general engagement.

"speculative" concerns provided "the only path towards the conclusion that there is a substantial risk that confidential information [counsel] normally would have acquired from [former client] would materially advance [current client's] position here"); *Bd. of Regents of Univ. of Neb. v. BASF Corp.*, No. 04-cv-3356, 2006 WL 2385363, at *8 (D. Neb. Aug. 17, 2006) (denying motion to disqualify despite affidavit that "in broad, conclusory terms" stated the firm was privy to confidential information, because movant "produced no evidence describing any specific items of such information" and "no evidence that any such information relates to [] claims in [the present] litigation"); *see also Worley v. Moore*, 807 S.E.2d 133, 140 (N.C. 2017) ("A former client's subjective perception or conclusory allegations that he shared confidential information during the past representation should not be considered.").[24] As explained in the Expert Declaration of Professor Nancy Rapoport, these circumstances support the reasonableness of Sidley's belief that nothing about the prior engagement would preclude it from representing BSA here. (*See* Rapoport Decl. ¶¶ 22-24.)

65.    Finally, as it does throughout its Objection, Century's position likewise ignores the specific roles of the different law firms representing BSA in this proceeding. Haynes and Boone, not Sidley, will be involved in any negotiation or adversary proceeding regarding

---

[24] And even if Mr. Sneed did possess such information, which he did not, that information would not have come into the possession of the Bankruptcy Team. There was no overlap between Sidley's Reinsurance and Bankruptcy Teams and no sharing of client information between those teams at any point. Since Century first raised its concerns about Sidley's representation of BSA, a formal screen has been in place between those teams. That is more than sufficient to alleviate any concerns. *See In re Fullenkamp*, 477 B.R. 826, 833 (Bankr. M.D. Fla. 2011) (granting retention application over objection where "any concern[] about confidential information can be remedied by screening"); *cf. Wyeth*, 692 F. Supp. at 459 (denying motion to disqualify because, amongst other reasons, there was "no [firm] personnel overlap on the two matters" and the firm "put up an ethical screen between the[] personnel to ensure confidential information does not pass between them"). Century complains that Sidley erected its formal screen too late. (Objection at 2.) But it did so as soon as any concern was raised by Century. Moreover, courts have rejected such arguments where no confidential information was in fact shared. *See*, *e.g.*, *Raba v. Suozzi*, No. 06-cv-1109, 2006 WL 8435604, at *12-13 (E.D.N.Y. Nov. 17, 2006).

Century's obligations under the policies it issued to BSA. So even if those policies had been at issue in the reinsurance collection matters, which they were not, there would not be a substantial relationship between those matters and Sidley's representation of BSA as restructuring, *not coverage*, counsel.

66.    Put simply, Sidley's service as BSA's restructuring counsel and prior representation of Century in reinsurance disputes do not "involve the same transaction or legal dispute." Rule 1.9 cmt. [3] (discussing the "substantial relationship" standard). Nor did Sidley obtain "confidential information" in the course of representing Century that could "materially advance" BSA's position in this proceeding. *Id.* Accordingly, Century has failed to "meet its burden in establishing that a substantial relationship exists," *Talecris Biotherapeutics*, 491 F. Supp. 2d at 514, and Sidley's continued representation of BSA does not violate Rule 1.9.

### 5.    Even If Century's Relationship With Sidley Is Evaluated Under The Present Client Standard, Sidley's Representation Of BSA Did Not Violate Rule 1.7.

67.    Century asserts that Sidley's representation of BSA is a "textbook violation" of the ethical rules and created an "irrefutable conflict" from the moment it commenced in the fall of 2018. (Objection at 1, 20, 23.)[25] Specifically, Century argues that Sidley's representation of BSA was "directly adverse" to Century and "materially limited" Sidley's ability to represent Century in the reinsurance actions from its inception. (*Id.* at 13-22.) Both arguments are without merit.

---

[25] This is a new position. Until filing this motion, Century equivocated as to whether an actual or even potential conflict existed. Even as late as January 3, 2020, the last written communication between Sidley and Century on this matter before Sidley's withdrawal, Century merely stated that it was "unable to rule out that [Sidley]'s representation of Boy Scouts of America constitutes a conflict or potential conflict of interest with the duties that Sidley owes to the [Century] companies." (Schwartz Decl. Ex. 5 at 1.) Despite having already "consulted with outside ethics counsel" (*id.* at 2), Century did not definitely state that even a potential conflict existed.

### a.   Sidley Was Not "Directly Adverse" To Century At Any Point Before Its Withdrawal.

68.     During the period prior to Sidley's withdrawal, the relationship between Century and Sidley bore none of the hallmarks of direct adversity. No lawsuit was filed by Sidley against Century on BSA's behalf, nor did Sidley's role as restructuring counsel result in Sidley conducting a hostile examination of a Century witness or otherwise advocating against Century directly. Rather, Century's primary "direct adversity" argument is that *any* BSA reorganization will necessarily involve contributions from insurers like Century, and thus *any* involvement by Sidley in such a reorganizing inherently creates direct adversity with insurers (or, for that matter, any party who could conceivably contribute funds to the debtor in connection with a reorganization).

69.     For example, Century asserts that the proposed plan is "insurance-driven" and that, in restructurings involving mass tort claims, it is inevitable that any plan will "find insurers and debtors on opposite sides of the ledger." (Objection at 14-15; *see also id.* at 26.) This argument proves too much. There are myriad parties in interest, not just insurers, involved in these bankruptcy cases, including two official committees, a future claimants' representative, and secured and unsecured creditors. BSA also has multiple "assets" that could conceivably be at issue in the bankruptcy proceeding. Disputes regarding those assets may arise in the course of the bankruptcy. Or they may not. But it simply cannot be that a law firm is directly adverse to all parties involved in a bankruptcy case, including those with interests that include assets of the debtor, from the moment it takes on a client in connection with the case. Were it otherwise, a law firm would be unable to represent a debtor if it also represented any person or entity that was a contractual counterparty to the debtor or possessed any other interest that the debtor might conceivably view as an "asset" of the estate. That is not the law.

37

70.     Indeed, Century does not cite a single example in which direct adversity has been found under such a theory, much less resulting in a law firm's disqualification. The lone case Century cites in making its "direct adversity" argument is *In re Thorpe Insulation Co.*, 677 F.3d 869 (9th Cir. 2012). (*See* Objection at 13-15 & nn.70-71.) But *Thorpe* did not even address disqualification, much less include a finding of direct adversity. Rather, the cited discussion stands for the proposition that a plan that may have a substantial economic impact on insurers is not "insurance neutral," and the plan at issue expressly limited otherwise available defenses to the debtors' insurers, thus those insurers were parties in interest with standing to challenge the plan. *Thorpe*, 677 F.3d at 884-88.[26]

71.     Moreover, the Standing Committee on Ethics and Professional Responsibility of the American Bar Association, which is charged with issuing formal opinions on ethical issues arising from the Model Rules of Professional Conduct, has made clear that the mere fact that a proceeding might result in payments from an insurer does not create direct adversity under Rule 1.7. ABA Formal Ethics Opinion 05-435 addresses the situation in which a lawyer simultaneously represents a liability insurer and a plaintiff-client who has brought suit against a defendant insured by the liability insurer. ABA Formal Op. 05-435 (Dec. 8, 2004). While acknowledging that the liability insurer has an interest in the litigation, *i.e.*, any damages resulting from the lawsuit could result in payments under the policy, the opinion concluded that

---

[26] If anything, the requirement of "insurance neutrality"—and Century's ability to assert its rights in that regard—underscores that mechanisms are in place to prevent any confirmed plan from altering Century's legal rights with respect to its policies with BSA (absent its consent). A plan is insurance neutral if it does not "materially alter the quantum of liability that the insurers would be called to absorb." *In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 212 (3d Cir. 2011). To be confirmed here, this Court will need to conclude that a plan meets that test. But Haynes and Boone, not Sidley, drafted that part of the plan and will, if needed, address any concerns raised by Century regarding the insurance neutrality provisions in that or any subsequent version of the plan.

"economic adversity alone" between the liability insurer and its lawyer's concurrent client "is

not … the sort of direct adversity that constitutes a concurrent conflict of interest under the

Model Rules." *Id.*; *see also Stonebridge Cas. Ins. v. D.W. Van Dyke & Co.*, No. 10-cv-81157,

2015 WL 8330980, at *3 (S.D. Fla. Oct. 23, 2015). ("[liability insurer]'s alleged economic

interest in the litigation does not create direct adversity, thereby creating a conflict of interest").

72.    Century's remaining arguments for direct adversity likewise miss the mark. For

example, Century claims as evidence of direct adversity actions taken by Sidley in this

bankruptcy *after* Sidley's withdrawal from representing Century, *e.g.*, moving for the

appointment of mediators and negotiating the handling of confidential documents. (Objection at

15.) But these have little bearing on whether direct adversity existed at the time Sidley began

representing BSA in the fall of 2018. At that point, it was far from certain whether BSA would

even file for bankruptcy, and, if it did, what any such proceeding would look like. *See, e.g.*,

Corky Siemaszko, *Boy Scouts of America Considering Bankruptcy*, NBC News (Dec. 14, 2018,

8:40 PM), https://www.nbcnews.com/news/us-news/boy-scouts-america-pushed-brink-

bankruptcy-battles-insurers-n948181 ("The BSA said filing for chapter 11 bankruptcy is only

one option under consideration …."). Even if direct adversity had arisen with Century upon the

filing of this case, Sidley had withdrawn as Century's counsel at that point. *See Muma*, 286 B.R.

at 587-88 ("We conclude that Rule 1.7(a) is not applicable here, because [law firms]'s

representation of the [creditors' committee] was not directly adverse to [party seeking

disqualification] from the outset.").[27]

---

[27] Even if a conflict had arisen after the concurrent representations of Century and BSA began,
but before Sidley announced its withdrawal, the ethical rules would have permitted Sidley to
continue its representation of BSA. *See* Rule 1.7 cmt. [4] (permitting continued representation of
one client if "conflict arises after representation has been undertaken" provided the lawyer can
do so consistent with Rule 1.9 and its obligations to the client it continues to represent); *Tipton v.*

b.    **Sidley's Representation Of Century Was In No Way "Materially Limited" By Its Representation Of BSA.**

73.    Century further asserts that Sidley's representation of BSA may have "materially limited" its ability to represent Century in reinsurance collection actions. (Objection at 15-17.) That is incorrect. Century fails to describe even a single situation in which Sidley may have been unable to take actions necessary to zealously represent Century's interests in the reinsurance actions themselves because of its responsibilities to BSA. *Cf.* Rule. 1.7 cmt. [8] ("[A] conflict of interest exists if there is a significant risk that a lawyer's ability to consider, recommend or carry out *an appropriate course of action for the client* will be materially limited as a result of the lawyer's other responsibilities or interests.… The conflict in effect forecloses alternatives that would otherwise be available to the client." (emphasis added)). Nor would Sidley's representation of BSA provide any such incentive. BSA had no stake in the reinsurance actions, much less one adverse to Century's interests; BSA had already received payment under its insurance policies with Century. If anything, Century's ability to recover more money from its reinsurers could make future interactions with Century go more smoothly.

74.    While Century complains that Mr. Sneed was unable to expressly confirm Sidley's representation of BSA due to obligations of confidentiality Sidley owed to BSA (Objection at 16), it does not explain how that materially limited Sidley's ability to represent Century in the reinsurance collection actions in which Sidley was retained. The same is true of Century's objection to Sidley being involved in discussions with tort claimants without

---

*Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1498-99 (11th Cir. 1989) (declining motion to disqualify despite concurrent conflict, because the law firm withdrew from one client, and the attorney who represented that client did not share confidential information about her client with the attorneys who represented the other client adverse to the former client); *In re Star Broad., Inc.*, 81 B.R. 835, 844 (Bankr. D.N.J. 1988) (after finding an actual conflict existed in simultaneous representation of two Chapter 11 estates, permitting law firm to "elect which of the two Chapter 11 estates they will continue to represent") (cited in Objection at 12 n.60).

Century's being present. (*Id.*) Rule 1.7 does not require a lawyer to invite clients to meetings in other matters being handled by their firm in which the client might be interested.

75.    Century further asserts that Sidley's prior representation of Century will "handcuff" Sidley in performing certain tasks for BSA and require Sidley to "soft-pedal" certain aspects of that representation. (*Id.* at 16-18.) Not so. For example, Century's Objection includes a list of tasks, such as drafting plan language implicating insurance policies, advising BSA on any adversary proceeding that may arise with Century, or seeking discovery from Century, that Sidley would allegedly be unable to perform. (*Id.* at 16.) To begin with, this list is chock full of events that either have not (and may not) come to pass or post-date Sidley's withdrawal. Moreover, the items on this list fall in the province of Haynes and Boone—BSA's special insurance counsel—not Sidley. Indeed, Haynes and Boone drafted the very insurance language with which Century takes issue at, *e.g.*, pages 10-11 of its Objection. (Boelter Decl. ¶ 7.)[28]

76.    Finally, the Court has already approved Haynes and Boone's retention as "special insurance counsel" to continue handling coverage disputes as well as advice on matters regarding general liability insurance, "including the extent of available insurance assets and the treatment of insurance under any chapter 11 plan." (ECF No. 210 ¶¶ 8, 13; ECF No. 463.) The involvement of Haynes and Boone alleviates any concern about BSA being handcuffed in this proceeding. *See, e.g.*, *In re Relativity Media, LLC*, No. 18-11358, 2018 WL 3769967 (Bankr. S.D.N.Y. July 6, 2018) (approving debtor's retention of law firm subject to the debtor retaining

---

[28] That is not the only time Century conflates Sidley with BSA or BSA's other outside counsel. Elsewhere, Century asserts that "Sidley touts in the disclosure statement that 'it expects the proceeds of [BSA's insurance] policies will comprise a substantial portion of the assets contributed to any victims compensation trust.'" (Objection at 14 & n.69 (quoting ECF No. 16, Whittman Decl. at 24; ECF No. 21, Disclosure Statement at 28).) But what the quoted materials actually say is "*BSA* expects" such proceeds to fund such a trust. By replacing "BSA" with "it," Century has misleadingly misquoted the document to put words in Sidley's mouth.

separate conflict counsel to address disputes with law firm's client where law firm was in process of withdrawing from representation of that client); *see also In re Washington Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("in most cases the use of conflicts counsel solves the problem"); *see also* Rapoport Decl. ¶ 28.[29]

77.     Put simply, Century does not provide any examples of how Sidley's representation of BSA as restructuring counsel materially limited its ability to represent Century in the reinsurance proceedings or vice versa; hypotheticals or possibilities do not suffice. *See Hernandez v. Helm*, No. 18-cv-7647, 2019 WL 5922233, at *9 (N.D. Ill. Nov. 12, 2019) ("Vague and general inconsistencies of position giving rise to hypothetical conflicts in the mind of an opposing party will not justify so drastic a measure as disqualification." (quoting *Clay v. Doherty*, 608 F. Supp. 295, 303 (N.D. Ill. 1985))); *Vanguard Sav. & Loan Ass'n v. Banks*, No. 93-cv-4627, 1994 WL 284222, at *2 (E.D. Pa. June 28, 1994) (holding "[a] *possible* conflict does not preclude representation" under Rule 1.7's material limitation standard).

## II.     Sidley's Disclosures Were Appropriate Under Federal Rule Of Bankruptcy Procedure 2014.

78.     Century's assertion that Sidley has failed to comply with Federal Rule of Bankruptcy Procedure 2014(a) (Objection at 29-30) is likewise unfounded. Rule 2014(a) requires that a law firm seeking to be retained disclose all "connections" with "any … party in interest." Sidley satisfied this requirement by appending Schedule 2 to Ms. Boelter's declaration in support of BSA's application to retain Sidley. Schedule 2 plainly lists Sidley's connections to potential parties in interest in the restructuring. Further, Sidley's "connections" to Century were

---

[29] With respect to ESIS Inc., the Century-affiliated third-party claims administrator mentioned above, Century complains that Sidley took a "direct role" in negotiations concerning renewal of a contract. (Objection at 25.) While Sidley believes that position to be without basis, Haynes and Boone will handle negotiations with ESIS. (Boelter Decl. ¶ 7.)

prominently and expressly disclosed in the body of Ms. Boelter's declaration. Specifically, the declaration described the pertinent details of Sidley's prior representation of Century in the reinsurance collection actions. (Application Ex. B, Boelter Decl. ¶ 22.) Tellingly, Century itself does not disclose and cite to the Court this portion of Ms. Boelter's declaration. (*See* Objection at 29-30.) That Century would have preferred Sidley to go into greater detail or to have described its connections with Century in a pejorative manner that better suits Century's position (*id.*) in no way renders that disclosure invalid. Indeed, Century's position "would make disclosure under Rule 2014 an impossible task subject to endless litigation over what would be enough." *Enron Corp.*, 2002 WL 32034346, at *5 (rejecting argument that law firm failed to comply with Rule 2014 where disclosures provided "any party in interest with adequate information to enable them to take whatever action, if any, deemed necessary regarding [the firm]'s retention").

79. Century faulting Sidley for failing to disclose additional details of its prior representations—which include non-public arbitrations—is particularly ironic because *Century itself* specifically requested that Sidley not disclose that information to third parties. (*See* Sneed Decl. Ex. 10 at 1 ("Sidley is not authorized to talk with any third parties about this conflict issue without our advance written permission.").) Indeed, even the versions of the exhibits Century filed *under seal* in support of this Objection, *i.e.*, documents in a form that would only be seen by the Court, redacted that very information. (*See, e.g.*, Schwartz Decl. Ex. 7.) That Century now complains that Sidley did not disclose on the public docket information that it does not even want the Court to see strains credulity.

## III.   Sidley Is Prepared To Take Appropriate Steps To Address Any Potential Concerns.

80. For the reasons discussed above, there is no issue that precludes Sidley's retention as BSA's restructuring counsel. Nonetheless, for the avoidance of doubt, without conceding the

need for such steps, and in the interest of efficiency going forward, Sidley is prepared to agree to

adhere to the following guidelines should the Court so request:

- Sidley shall continue to maintain an ethical wall between any and all Sidley lawyers that were involved on Century reinsurance matters on the one hand and any and all Sidley lawyers that represent BSA in the bankruptcy on the other hand.

- Sidley shall not take discovery against Century in the bankruptcy; any such discovery will be handled by Haynes and Boone and/or Morris Nichols.

- Sidley shall not prosecute or advise BSA with respect to coverage issues involving Century, including but not limited to responding to any coverage-based objections to a bankruptcy plan raised by Century. Any such matters will be handled by Haynes and Boone and/or Morris Nichols.

- Sidley shall not prosecute or advise BSA in any adversary proceeding that may arise between BSA and Century in the BSA bankruptcy. Any adversary proceeding, should it occur, will be handled by Haynes and Boone and/or Morris Nichols

- Sidley shall not make any presentations to or engage in negotiations with the TCC regarding Century's policies.

BSA has approved these steps, which will not prejudice the estate going forward. As explained

in Professor Rapoport's Declaration, this approach is appropriate and customary and should

address any possible concerns arising from Sidley's prior work. (Rapoport Decl. ¶¶ 28-31.)

*[Remainder of Page Intentionally Left Blank]*

**<u>CONCLUSION</u>**

81.    For all of the reasons set forth above, Century's Objection should be overruled

and BSA's Application to retain Sidley should be granted.

Dated: April 28, 2020                CROSS & SIMON, LLC
       Wilmington, Delaware

                                     */s/ Christopher P. Simon*
                                     Christopher P. Simon (No. 3697)
                                     1105 North Market Street
                                     Suite 901
                                     Wilmington, DE 19801
                                     Telephone: (302) 777-4200

                                     – and –

                                     SIDLEY AUSTIN LLP
                                     James W. Ducayet (*pro hac vice pending*)
                                     One South Dearborn Street
                                     Chicago, Illinois 60603
                                     Telephone: (312) 853-7000
                                     Facsimile: (312) 853-7036
                                     jducayet@sidley.com

                                     *Attorneys for Sidley Austin LLP*

45