# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

IN RE:

BOY SCOUTS OF AMERICA AND
DELAWARE BSA, LLC,

                  Debtors.

Chapter 11
Case No. 20-10343 (LSS)

(Jointly Administered)

**CENTURY'S REPLY IN FURTHER SUPPORT OF OBJECTION TO
DEBTORS' APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING
THE RETENTION AND EMPLOYMENT OF SIDLEY AUSTIN LLP AS
ATTORNEYS FOR THE DEBTORS AND DEBTORS IN POSSESSION,
*NUNC PRO TUNC* TO THE PETITION DATE**

STAMOULIS & WEINBLATT LLC
800 N. West Street
Third Floor
Wilmington, Delaware 19801

—and—

O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036-6537

*Counsel for Century Indemnity Company, as
successor to CCI Insurance Company, as
successor to Insurance Company of North
America and Indemnity Insurance Company of
North America, Ace Insurance Group,
Westchester Fire Insurance Company and
Westchester Surplus Lines Insurance Company*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................... 1

COUNTERSTATEMENT OF FACTS ................................................................. 3

    *Sidley represented Chubb on Boy Scouts*
    *cases when the bankruptcy started.* ........................................................... 3

    *Sidley represented Chubb on many*
    *matters for more than a decade.* ................................................................. 4

    *Chubb's reinsurance is an important asset*
    *and is valuable to its overall business.* ...................................................... 5

    *The reinsurance matters that Sidley was*
    *handling include forward-looking requests*
    *for declaratory relief about future claims.* ............................................... 5

ARGUMENT ........................................................................................................ 6

    I.    SIDLEY HAD A CONTRACTUAL AND ETHICAL OBLIGATION TO OBTAIN
           INFORMED, WRITTEN CONSENT FROM ITS CLIENT
           ABOUT REPRESENTING THE BOY SCOUTS. .................................................. 6

           A.    Sidley was obliged to obtain Chubb's written
                  consent before it started representing the Boy Scouts. ............................ 6

           B.    Sidley does not contest that it failed to
                  obtain Chubb's informed, written consent. ............................................... 8

           C.    The law does not recognize waiver through delay
                  where there is no pending forum in which to litigate. ............................ 10

    II.    SIDLEY'S CONFLICT MUST BE ASSESSED AS A CONCURRENT REPRESENTATION
           AND, IN ANY EVENT, EVEN UNDER RULE 1.9, SIDLEY'S REPRESENTATIONS OF
           THE BOY SCOUTS AND CHUBB ARE SUBSTANTIALLY RELATED. ........................... 13

    III.    SIDLEY HAS NOT CARRIED ITS BURDEN OF DEMONSTRATING
           THAT THE COURT SHOULD APPROVE THE RETENTION
           APPLICATION OR THAT IT OBTAINED A VALID WAIVER. ........................................ 17

CONCLUSION .................................................................................................. 21

# TABLE OF AUTHORITIES

**Page**

## <u>CASES</u>

*Arnett v. Mid-Cont'l Cas. Co.*,
No. 8:08-CV-2373-T-27EAJ, 2010 WL 11507481 (M.D. Fla. Apr. 13, 2010)...................... 12

*Baldasarre v. Butler*,
625 A.2d 458 (1993) ........................................................................................................... 7

*Celgene Corp. v. KV Pharm. Co.*,
No. 07-4819SDW, 2008 WL 2937415 (D.N.J. July 29, 2008)................................................. 7

*CenTra, Inc. v. Estrin*,
538 F.3d 402 (6th Cir. 2008) ............................................................................................. 8, 9

*Chem. Bank v. Affiliated FM Ins. Co.*,
No. 87 CIV. 0150 (VLB), 1994 WL 141951 (S.D.N.Y. Apr. 20, 1994) ......................... 13, 14

*Conley v. Chaffinch*,
431 F. Supp. 2d 494 (D. Del. 2006)................................................................................... 9, 12

*Employers Ins. Co. of Wausau v. Munich Reinsurance Am., Inc.*,
No. 10 CIV. 3558 PKC, 2011 WL 1873123 (S.D.N.Y. May 16, 2011) ................................ 15

*Enron*,
No. 01-16034(AJG), 2002 WL 32034346 (Bankr. S.D.N.Y. May 23,
2002), *aff'd*, No. 02 CIV. 5638 (BSJ), 2003 WL 223455 (S.D.N.Y. Feb. 3,
2003) ....................................................................................................................................... 11

*Finmeccanica S.p.A. v. Gen. Motors Corp.*,
No. CV0708222SJOPJWX, 2008 WL 11340060 (C.D. Cal. Apr. 29, 2008)......................... 12

*Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*,
No. 13 CIV. 6577 (LGS), 2020 WL 995860 (S.D.N.Y. Mar. 2, 2020) ................................ 16

*In re BH&P, Inc.*,
949 F.2d 1300 (3d Cir. 1991)................................................................................................. 18

*In re Congoleum Corp.*,
426 F.3d 675 (3d Cir. 2005).................................................................................................... 6

*In re Corn Derivatives Antitrust Litig.*,
748 F.2d 157 (3d Cir. 1984)............................................................................................. 15, 17

*In re Devonshire PGA Holdings LLC*,
548 B.R. 689 (Bankr. D. Del. 2016) ....................................................................................... 6

# TABLE OF AUTHORITIES
### (continued)

**Page**

*In re Duvall*,
No. 19-112272, 2020 WL 1492769 (Bankr. W.D. Ky. Mar. 25, 2020) ................................. 17

*In re Fisker Auto. Holdings, Inc. S'holder Litig.*,
No. CV 13-2100-DBS-SRF, 2018 WL 3991470 (D. Del. Aug. 20, 2018)........................ 6, 17

*In re Fleming Cos.*,
305 B.R. 389 (Bankr. D. Del. 2004) ..................................................................... 18

*In re IH 1, Inc.*,
441 B.R. 742 (Bankr. D. Del. 2011) .............................................................. 6, 7, 9

*In re Marvel Entm't Grp., Inc.*,
140 F.3d 463 (3d Cir. 1998)................................................................................ 18

*In re Philadelphia Athletic Club, Inc.*,
20 B.R. 328 (E.D. Pa.1982) ............................................................................... 18

*In re Pillowtex*,
304 F.3d 246 (3d Cir. 2002)......................................................................... 17, 18

*In re Thorpe Insulation Co.*,
677 F.3d 869 (9th Cir. 2012) ............................................................................. 19

*Int'l Bus. Machines Corp. v. Levin*,
579 F.2d 271 (3d Cir. 1978)................................................................................. 9

*Int'l Longshoremen's Ass'n, Local Union 1332 v. Int'l Longshoremen's Ass'n*,
909 F. Supp. 287 (E.D. Pa. 1995) ...................................................................... 13

*Madukwe v. Delaware State Univ.*,
552 F. Supp. 2d 452 (D. Del. 2008)................................................... 10, 11, 15, 16

*Mitchell v. Metro. Life Ins. Co.*,
No. 01 CIV. 2112 (WHP), 2002 WL 441194 (S.D.N.Y. Mar. 21, 2002).............................. 15

*Pennwalt Corp. v. Plough, Inc.*,
85 F.R.D. 264 (D. Del. 1980) .............................................................................. 9

*Reeves v. Town of Cottageville*,
No. 2:12-CV-02765-DCN, 2014 WL 4231235 (D.S.C. Aug. 26, 2014) ............................... 12

*Santacroce v. Neff*,
134 F. Supp. 2d 366 (D.N.J. 2001) ..................................................................... 13

**TABLE OF AUTHORITIES**
(continued)

Page

*Spear v. Fenkell*,
No. CIV.A. 13-02391, 2014 WL 6676660 (E.D. Pa. Nov. 25, 2014) .................................... 12

*Talecris Biotherapeutics, Inc. v. Baxter Int'l Inc.*,
491 F. Supp. 2d 510 (D. Del. 2007) ...................................................................................... 14

*United States v. Gordon*,
334 F. Supp. 2d 581 (D. Del. 2004) ...................................................................................... 17

## OTHER AUTHORITIES

Model R. Prof'l Conduct 1.0 cmt. [6] ...................................................................................... 9, 17

Model R. Prof'l Conduct 1.0(e) ...................................................................................... 6

Model R. Prof'l Conduct 1.7 cmt. 20 ...................................................................................... 7

Model R. Prof'l Conduct 1.7(b) ...................................................................................... 6

Model R. Prof'l Conduct 1.9(a) ...................................................................................... 6

Nancy J. Moore, *Revisions Not Revolution,* ABA J., DECEMBER 2002 ...................................................................................... 6

## PRELIMINARY STATEMENT

Sidley's lengthy brief and four additional declarations are remarkable for what they do not dispute: (i) that Sidley was obliged under its engagement agreement with Chubb and Rule 1.7(b) to obtain a written conflict waiver; (ii) that Sidley tried to get a written waiver under the guise of seeking a general prospective waiver without disclosing the Boy Scouts engagement, (iii) that Sidley did not obtain such a waiver—or any waiver—before it started representing the Boy Scouts to arrange a reorganization plan centered around Chubb insurance policies; and (iv) that Sidley kept working for Chubb and did not withdraw until *after* filing the Boy Scouts' bankruptcy petition.  Under the Chubb engagement letter (called the Service Level Agreement or SLA), Rules 1.7 and 1.9, and applicable case law, this Court cannot allow Sidley to represent the Boy Scouts in the face of this breach of the duty of loyalty.  This Court can and should decide this matter without getting into irrelevant factual allegations—about the nature of Sidley's work for Chubb—that Sidley belatedly raises on reply.

Sidley has no answer here.  It does not mention, let alone quote, the SLA's express statement that "the Client shall not be deemed to have waived any conflict unless the Client provides a waiver in writing."[1]  Instead, Sidley focuses on the alleged harm to its preferred client, the Boy Scouts, which is not a relevant consideration here.  Sidley goes so far as to call Chubb a client that was not "substantial" (*i.e.*, not lucrative enough).  Sidley then ties itself in knots trying to explain its disloyal conduct, relying on self-serving declarations—all immaterial in light of its obligation to obtain written consent to any conflict, an obligation of which Sidley was undeniably aware.

---

[1]    April 9, 2020 Declaration of Joshua R. Schwartz ("Schwartz Decl.") Ex. 1 ("Service Level Agreement") at 6.

Sidley's argument boils down to asserting that Chubb is not a current client and that there is no adversity between the two. But Sidley admitted adversity when it requested a prospective waiver from Chubb in January 2019 for bankruptcy engagements, stating that it wished to make clear that "we may be ***directly adverse to you in the bankruptcy proceeding***."[2] Sidley then specifically noted that the adversity may involve "***confirming or supporting a plan over*** creditor or ***insurer objections***."[3]

Sidley obviously understood that it needed to obtain written consent from Chubb to any conflicted representations—even those the firm claims do not reflect adversity. This is evident from Sidley's efforts to obtain waivers in October 2019 for a transactional matter as well as a subpoena it wished to serve on Chubb. Neither representation bore what Sidley claims are the "hallmarks" of adversity, which no case actually speaks about.

Now, instead of offering proof of consent, Sidley pretends that Chubb's opposition to the retention application should be treated as a disqualification motion, and contends that Chubb has not carried the burden—on ***Sidley's*** retention application. Plainly, Chubb has no burden of proof on Debtors' application to retain Sidley. Sidley also tries to escape the strict requirement of Rule 1.7(b) for written consent to any waiver by recasting a current client as a former client— one that it jettisoned just a few weeks before asking the Court to approve its retention. But even that does not help Sidley because Rule 1.9 bars a lawyer from representing a client whose interests are materially adverse to a former client in a matter that is substantially related to the former representation. Indeed, the mere possibility that information obtained in the former representation is relevant to the current representation makes the matters substantially related.

---

[2]    Janine Panchok-Berry's April 30, 2020 Declaration Ex. 1 (emphasis added).

[3]    *Id*. (emphasis added).

This is much more than a mere possibility here: Sidley was integral to litigating reinsurance disputes involving Chubb's Boy Scouts policies

The closest Sidley comes to addressing the requirement that Chubb waive any conflicts of interest is by asserting that Chubb sat on its rights. Sidley absurdly contends that Chubb should have prophylactically moved for a declaration from this Court *before* Debtors applied to retain Sidley. But until the Boy Scouts filed the bankruptcy petition there was no forum to adjudicate the conflict. And the law does not recognize waiver through delay where there is no pending forum in which to litigate a conflict. In any case, Chubb objected as soon as Sidley made clear that it would plow ahead by filing its retention application. Sidley alone drove the timing. Sidley was free to mediate or seek other proper relief when it became aware of the conflict, which was in December 2018, when it first sought a prospective waiver from Chubb.

Also, there can be no delay where a client is unaware of a conflict, and Chubb did not have any details of Sidley's involvement with the Boy Scouts, other than a press report that Sidley declined to confirm and assurances from Sidley that there would be no problem. In fact, Sidley admits that it did not disclose basic facts about its Boy Scouts representation, which were exclusively in its possession. In response to Chubb's questions about the press report, Sidley wrote that "consistent with its ethical duties to BSA, [it] *could not confirm its role*."[4]

## COUNTERSTATEMENT OF FACTS

### *Sidley represented Chubb on Boy Scouts cases when the bankruptcy started.*

At a pretrial conference on April 29, 2020, Sidley claimed that it withdrew from representing Chubb before the petition. Yet in its brief, Sidley admits that it represented Chubb and its affiliate on the petition date: "the process of communicating that withdrawal to the

---

[4]    Sidley Reply ¶6; *accord* ¶ 25.

relevant courts and arbitrators was complete as of February 20, 2020, *i.e.*, just **days after BSA's bankruptcy filing**."[5]  It was not until February 26, 2020, that William Sneed advised his client that the withdrawal was complete.[6]  While Sidley takes umbrage at the suggestion that it was not candid with this Court in its 2014 filings, Sidley does not dispute that it failed to disclose that Chubb was its client—on Boy Scout matters—on the petition date.[7]  And Sidley says nothing about its Rule 2014 disclosures regarding the Boy Scouts other insurers.

*Sidley represented Chubb on many*
*matters for more than a decade.*

Sidley claims that "it did not have an attorney-client relationship on the date BSA retained Sidley as restructuring counsel."[8]  But Sidley represented Chubb on many matters, not just those involving the Boy Scouts.[9]  Their relationship goes back more than a decade.[10]  Indeed, Sidley was Chubb's counsel in another matter in October 2018, when Sidley first started representing the Boy Scouts.[11]  Mr. Sneed admits this in his declaration, stating that that matter started "around May 2017."[12]  That matter was not closed in 2018 (though there was not much activity on it), is very much active now, and Sidley only sought to withdraw from it on the eve of the bankruptcy filing in 2020.

---

[5]  Sidley Reply ¶ 55 (emphasis added).

[6]  William Sneed's April 27, 2020 Declaration ("Sneed Decl.") ¶ 37.

[7]  Sidley Reply ¶¶ 78–79.

[8]  Sidley Reply ¶ 56.

[9]  Schwartz Decl. ¶¶ 2–3.

[10]  *Id.*

[11]  Sneed Decl. ¶ 9; Schwartz Decl. ¶ 8.

[12]  Sneed Decl. ¶ 9.

Sidley did not disclose to Chubb that it had started representing the Boy Scouts.  That is now uncontested.  Instead, Sidley claims that its relationship with Chubb lapsed—though it does not quite allege that it ended.[13]

Further, Mr. Sneed now admits that, when asked about a press report, he told Chubb he could not say because he felt bound by confidentiality obligations.[14]  Nor does Sidley deny this failure to advise Chubb.  Rather, Sidley tiptoes around these stubborn facts.

***Chubb's reinsurance is an important asset***
***and is valuable to its overall business.***

Sidley tries to downplay the significance of the reinsurance matters it was handling.  But they are significant to Chubb.  Just as the insurance policies are an important asset to the Boy Scouts, reinsurance is an important asset to Chubb.  Nor is Sidley in any position to judge the value of reinsurance to Chubb's business.   Mr. Sneed's admissions about his work and the information to which he had access only proves this point.

***The reinsurance matters that Sidley was***
***handling include forward-looking requests***
***for declaratory relief about future claims.***

The reinsurance matters that Sidley was handling include claims for declaratory relief about future claims (rather than reinsurance for closed, already-paid claims only, as Sidley contends).  As these matters are both forward-looking and ongoing, bankruptcy developments could negatively affect the reinsurance litigation.  But the Court need not delve into the details of the engagement.  Mr. Sneed made the point himself in describing the adversity in an insurance-driven bankruptcy when he tried to get a prospective waiver.  If Sidley were approved as bankruptcy counsel, it would invariably be advocating positions that could adversely affect Chubb's reinsurance position.

---

[13]   Sidley Reply ¶¶ 21, 57.

# ARGUMENT

I.  **SIDLEY HAD A CONTRACTUAL AND ETHICAL OBLIGATION TO OBTAIN INFORMED, WRITTEN CONSENT FROM ITS CLIENT ABOUT REPRESENTING THE BOY SCOUTS.**

   A.  **Sidley was obliged to obtain Chubb's written consent before it started representing the Boy Scouts.**

Both parties agree that the SLA—which Mr. Sneed attaches to his declaration—governs the relationship between Sidley and Chubb.[15]  The SLA is explicit about Sidley's "***responsibility . . . to identify and bring to the attention of the Client, in writing***, any circumstances that may create or involve a conflict of interest as herein described."[16]  Sidley's obligation was not only to advise the client in writing about a conflict but also to obtain a waiver in writing:

> If the Law Firm identifies a potential conflict after it has begun work for the Client, it shall make all reasonable efforts to resolve that conflict in a manner that will allow the Law Firm's continued representation of the Client.  Any request by the Law Firm for the client to waive a real or potential conflict of interest must be in writing and directed to the ACE Liaison.  Regardless of the nature or timing of any conflict, ***the Client shall not be deemed to have waived any conflict unless the Client provides a waiver in writing***.[17]

This express requirement mirrors Sidley's obligation under Rules 1.7(b) and 1.9(a), which call for informed consent to any conflict "confirmed in writing."[18]  In 2016, Chief Judge Sontchi held that the same provisions in the Delaware Rules of Professional Responsibility "require that a conflicted attorney secure a ***written waiver from the affected clients***."[19]

---

[14]   Sneed Decl. ¶ 27.

[15]   Sneed Decl. ¶ 24; see also Ann Rappleye's May 1, 2020 Declaration .

[16]   Schwartz Decl. Ex. 1 at 6 (emphasis added).

[17]   *Id*. (emphasis added).

[18]   Model R. Prof'l Conduct 1.7(b), 1.9(a).

[19]   *In re Devonshire PGA Holdings LLC*, 548 B.R. 689, 701 (Bankr. D. Del. 2016) (emphasis added); *see also In re Fisker Auto. Holdings, Inc. S'holder Litig.*, No. CV 13-2100-DBS-SRF, 2018 WL 3991470, at *3 (D. Del. Aug. 20, 2018); *In re IH 1, Inc.*, 441 B.R. 742, 746 (Bankr. D. Del. 2011) ("A client may consent to conflicts, whether present or future, by signing a waiver.").

In addition to having an obligation to obtain a written waiver, a lawyer has to make sure that the waiver is based on "truly ***informed consent***," as the Third Circuit requires.[20]  For consent to be informed, the client must understand the material risks of waiving the conflict, and it is the attorney's responsibility to ensure that.[21]  As Judge Walsh recognized, "'Informed consent' denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."[22]  In fact, the ABA added the written requirement to Rule 1.7 so there would be a record that the client's consent was informed.[23]

It was Sidley's responsibility, as Chubb's lawyer, to ensure that its client's consent would be informed.[24]  As counsel, Sidley was "in the best position to ensure that the [informed consent] requirement is met," and Sidley had and has "responsibility for safeguarding the client's interests."[25]  But there is no evidence that Sidley told Century how its work for the Boy Scouts overlapped with its ongoing work for Chubb.

A written waiver also makes sense because it avoids exactly the sort of he-said-she-said dispute in which Sidley now wishes to engage.  That is precisely how a comment to Rule 1.7 explains it: "the writing is required in order to impress upon clients the seriousness of the decision the client is being asked to make and to avoid disputes or ambiguities that might later occur in the absence of a writing."[26]  A written waiver frees the court from wading into a messy,

---

[20]  *See In re Congoleum Corp.*, 426 F.3d 675, 691 (3d Cir. 2005) (emphasis added).

[21]  *In re IH 1, Inc.*, 441 B.R. at 746; *see also In re Fisker Auto. Holdings*, 2018 WL 3991470, at *4.

[22]  *In re IH 1, Inc.*, 441 B.R. at 746 (quoting Model R. Prof'l Conduct 1.0(e)).

[23]  Nancy J. Moore, *Revisions Not Revolution,* ABA J., DECEMBER 2002, at 48, 49.

[24]  *In re IH 1, Inc.*, 441 B.R. at 746.

[25]  *Celgene Corp. v. KV Pharm. Co.*, No. 07-4819SDW, 2008 WL 2937415, at *7 (D.N.J. July 29, 2008) (quoting *Baldasarre v. Butler*, 625 A.2d 458, 464 (1993)).

[26]  Model R. Prof'l Conduct 1.7 cmt. 20.

lengthy, and unnecessary evidentiary contest (much less by video conference in this case). Evidence of what anyone communicated orally—even if it were otherwise admissible—is simply irrelevant.  Thus, the Court does not need to evaluate Sidley's claim that "[a]s a factual matter, Sidley did not receive confidential privileged information related to Century that could compromise its representation of BSA in this bankruptcy."[27]  While that statement is untrue, it is also irrelevant.

### B.    Sidley does not contest that it failed to obtain Chubb's informed, written consent.

Sidley does not even contest that it failed to obtain a written waiver.  Sidley's hired expert, Professor Rapoport, actually acknowledges "that Century has not provided informed written consent to Sidley with respect to the BSA representation."[28]  That should be the end of the matter.

But the admitted facts here are worse.  Sidley admits it did not seek or obtain a written waiver for the Boy Scouts representation.  Doing so would have required affirmative disclosure of the Boy Scouts engagement and the nature of what was contemplated.  Sidley admits that instead it tried to get a waiver under the guise of seeking a general prospective waiver.

Specifically, Sidley requested a prospective waiver from Chubb on January 8, 2019 (without ever mentioning that it was for its Boy Scouts representation).[29]  But Chubb refused, and after some back-and-forth, Sidley abandoned the issue two months later.  Chubb later confirmed in an email "that the advance waiver is no longer being requested."[30]  Later, in October 2019, Mr. Sneed emailed to ask about waivers for a transactional matter and a subpoena

---

[27]   Sidley Reply ¶ 63.

[28]   Nancy Rapoport's April 27, 2020 Declaration ("Rapoport Decl.") at 8 n.5.

[29]   *See* Schwartz Decl. Ex. 2.

[30]   Janine Panchok-Berry's April 30, 2020 Declaration Ex. 2.

for another matter, thus acknowledging that Sidley knew it needed to obtain written waivers for matters that posed a potential conflict.[31]

Chubb did not have a chance to give its informed consent because Sidley never disclosed that any conflict existed. Sidley even admits that it did not disclose its Boy Scouts representation.[32] Only Sidley possessed the information that Chubb would have needed to grant its informed consent to this conflict.[33] Sidley cannot simply stand aside and wash its hands of its obligations.[34] Neither the engagement agreement nor the rules require a client to conduct its own independent investigation to uncover a lawyer's conflicts of interest.[35]

When Chubb asked in December 2018 about a press report, Sidley said that there was no problem and refused to say anything more.[36] Chubb relied on its attorney's assurances. Chubb had no obligation—or reason—to conduct additional diligence about Sidley's work after that.

---

[31] October 10, 2019 email from W. Sneed to J. Schwartz (document to be submitted later); October 17, 2019 email from W. Sneed to J. Schwartz (document to be submitted later).

[32] *Id.* at 464–65.

[33] *See CenTra, Inc. v. Estrin*, 538 F.3d 402, 415 (6th Cir. 2008) ("[P]roviding to the client anything less than full information runs the risk that the client is inadequately informed, thereby making any consent invalid.").

[34] *Int'l Bus. Machines Corp. v. Levin*, 579 F.2d 271, 282 (3d Cir. 1978) ("Clause (C) of DR 5–105 [of the 1969 ABA Model Code] specifically imposes upon an attorney the burden of affirmatively providing disclosure and obtaining consent. Clearly, full and effective disclosure of all the relevant facts must be made and brought home to the prospective client."); *Pennwalt Corp. v. Plough, Inc.*, 85 F.R.D. 264, 273 (D. Del. 1980) ("[T]he duty is upon the attorney to ferret out such conflicts [of interest], and not upon the client to divulge them."); *see also CenTra, Inc. v. Estrin*, 538 F.3d at 415 ("Courts interpreting the ABA and Restatement rules have made it clear that it is not sufficient to leave the client to infer the full nature of a conflict from only bits and pieces of actual or constructive knowledge.").

[35] Model R. Prof'l Conduct 1.0 cmt. [6] ("The lawyer must make reasonable efforts to ensure that the client or other person possesses information reasonably adequate to make an informed decision.); Schwartz Decl. Ex. 1 at 6 ("In all cases, it is the responsibility of the Law Firm to identify and bring to the attention of the Client, in writing, any circumstances that may create or involve a conflict of interest as herein described.").

[36] Sidley Reply ¶6; *accord* ¶ 25.

C.    **The law does not recognize waiver through delay
where there is no pending forum in which to litigate.**

Sidley's complaint about delay is another attempt to flip the burden.  Sidley should have

disclosed to this Court that it represented Chubb on the petition date and also filed accurate

Rule 2014 disclosures.  Instead, for its own strategic reasons, Sidley held its retention

application, attempted to withdraw, and then reported that Chubb was a former client—without

disclosing that its actions were both disputed and post-petition.  Now, Sidley is attempting to use

its strategic timing decision against Chubb.

But leaving that aside, waiver of the right to object occurs only where a client is aware of

a conflict and delays bringing a motion as a litigation tactic.[37]  The cases all involve clients that

are fully aware of the conflict (in many cases, where the conflict has been disclosed) and there is

an unreasonable delay in bringing a motion.[38]  Here, Chubb timely filed its objection to a

retention motion that Sidley delayed filing.  Knowing about the conflict before litigation breaks

out is not grounds for a delay-based waiver.[39]

*Madukwe* is instructive on this issue.  There, Delaware State University ("DSU") learned

that its former attorneys were representing two employees against the University in employment

disputes.[40]  When the firm appeared at a meeting on behalf of one of the employees in

October 2006, DSU sent a letter objecting to the representation.[41]  The former firm denied any

---

[37]    *In re IH 1, Inc.*, 441 B.R. at 746; *see also Conley v. Chaffinch*, 431 F. Supp. 2d 494, 498 (D. Del. 2006) (waiver is only a basis to deny a motion to disqualify "when a former client was concededly aware of the former attorney's representation of an adversary but failed to raise an objection promptly **when it had the opportunity to do so**" (emphasis added) (internal quotation marks and citation omitted)).

[38]    *Madukwe v. Delaware State Univ.*, 552 F. Supp. 2d 452, 463 (D. Del. 2008).

[39]    *Id.* at 464.

[40]    *Id.* at 456–57.

[41]    *Id.* at 456.

conflict existed.[42]  DSU did nothing when the same firm appeared on behalf of another employee

adverse to DSU.  It was not until 2008—after the employees sued and DSU answered—that DSU

renewed its conflict objections and moved to disqualify.[43]  The court found that, though DSU

might have done more to assert its rights between October 2006 and January 2008, when it

indisputably knew of the conflicted representation, it had not waived its right to object.[44]  The

court reasoned that DSU had never affirmatively assented to the representation and its former

attorneys were aware at the beginning of the litigation that the conflict was an issue.[45]  The court

also noted that any prejudice to the plaintiff was lessened because the issue was addressed at the

outset of litigation.[46]

By Mr. Sneed's own admission, he declined, when asked in late 2018, to tell Chubb what

Sidley was doing for the Boy Scouts.[47]  Chubb could not then have full knowledge of Sidley's

Boy Scouts representation.  When Chubb finally learned about Sidley's work for the Boy Scouts

in November 2019, Chubb pressed its concerns, pursued the meet and confers contemplated by

the SLA, mediated, and then timely objected to the retention application now before the Court.[48]

The notion that Chubb objected "on the eve of a hearing on April 15 to address the selection of

mediators" is disingenuous.  Sidley and the Boy Scouts stipulated with Chubb to extend the time

to object while they attempted to mediate.[49]

---

[42]  *Id.* at 456–57.

[43]  *Id.* at 457.

[44]  *Id.* at 463.

[45]  *Id.* at 464.

[46]  *Id.* at 464–65.

[47]  Sidley Reply ¶ 27.

[48]  Sidley Reply ¶ 25.

[49]  Sidley Reply ¶¶ 4, 52.

Sidley cites several cases where parties inexplicably or tactically delayed in bringing disqualification motions while litigation was pending. None resembles the facts in this case. *Enron* involved a creditor that remained silent as counsel for a UCC was approved, and then moved to disqualify two months later.[50] The objecting creditor further delayed by looking to push the hearing on its motion by a month.[51] Here, Chubb moved quickly to object as soon as the Boy Scouts filed the application to retain Sidley. In the other cases Sidley cites the courts found waiver where the facts were wildly different from those here, including delays during pending litigation.[52] *Conley* involved a lapse of nine months between when plaintiff learned of a conflict and when it moved to disqualify the attorney—while discovery proceeded and plaintiff's attorney had advised her former attorney that his client did not object to the representation.[53]

Sidley also alleges that in early October 2019 that the claims side of Chubb participated in meetings without objecting to the conflict. Chubb is a large company, and it took a few weeks for the relevant people in the reinsurance group to connect the dots. Of course, it was Sidley's obligation to advise its client about the dual representation, not the client's to figure out.

---

[50] *In re Enron Corp.*, No. 01-16034(AJG), 2002 WL 32034346, at *3 (Bankr. S.D.N.Y. May 23, 2002), *aff'd*, No. 02 CIV. 5638 (BSJ), 2003 WL 223455 (S.D.N.Y. Feb. 3, 2003).

[51] *Id.* at *4.

[52] *See Conley*, 431 F. Supp. 2d at 499 (plaintiff failed to bring a motion or raise the conflict issue while litigation was pending for nine months); *Spear v. Fenkell*, No. CIV.A. 13-02391, 2014 WL 6676660, at *2 (E.D. Pa. Nov. 25, 2014) (defendants failed to object or raise the conflict issue while litigation was pending for six months parties were in regular communication); *Arnett v. Mid-Cont'l Cas. Co.*, No. 8:08-CV-2373-T-27EAJ, 2010 WL 11507481, at *2 (M.D. Fla. Apr. 13, 2010) (defendant successfully moved to disqualify law firm from representing one of two plaintiffs, but inexplicably delayed five months during pending litigation before moving to disqualify the same firm from representation of the second client for the same reason); *Finmeccanica S.p.A. v. Gen. Motors Corp.*, No. CV0708222SJOPJWX, 2008 WL 11340060, at *3 (C.D. Cal. Apr. 29, 2008) (plaintiffs failed to disclose that they believed there was a conflict while litigation was pending and settlement talks were ongoing for six months); *Reeves v. Town of Cottageville*, No. 2:12-CV-02765-DCN, 2014 WL 4231235, at *1 (D.S.C. Aug. 26, 2014) (counsel for the town brought a disqualification motion less than two weeks before trial was set to start after knowing about the conflict for fifteen days).

[53] *Conley*, 431 F. Supp. 2d at 500.

**II.    SIDLEY'S CONFLICT MUST BE ASSESSED AS A CONCURRENT REPRESENTATION AND, IN ANY EVENT, EVEN UNDER RULE 1.9, SIDLEY'S REPRESENTATIONS OF THE BOY SCOUTS AND CHUBB ARE SUBSTANTIALLY RELATED.**

Sidley does not dispute that it began representing the Boy Scouts in October 2018, even asserting that the representation started a month earlier.[54]  But Sidley did not quit Chubb as a client until more than a year later; that was after Sidley signed the bankruptcy petition in this Court.[55]  Because the determination of whether a client is current or former under the ethical rules must be assessed at the time the conflict arises, Sidley's conflict must be assessed as a concurrent representation.[56]  That Sidley decided it would prefer to represent the Boy Scouts instead of Chubb does not change its status as a current client.[57]  Nor did Sidley have the right to drop Chubb like a hot potato to escape the requirements of Rule 1.7.[58]

Tellingly, Sidley's expert did not opine on the critical question of whether Sidley's conflict should be considered as a current representation.  Professor Rapoport simply assumed that Chubb is a former client.[59]  That is presumably what Sidley told her.

Sidley now concedes that while representing both the Boy Scouts and Chubb, it was extensively negotiating with the claimants' lawyers on preparing the bankruptcy filings, including the proposed Plan of Reorganization.[60]  That plan, which Sidley will try to confirm on the Boy Scouts' behalf, contemplates using Chubb's policies to fund the proposed trust to pay

---

[54]  Sidley Reply ¶ 11.

[55]  Sidley Reply ¶ 55.

[56]  *See* Point I-B in Chubb's opening brief and cases cited there.

[57]  *See Santacroce v. Neff*, 134 F. Supp. 2d 366, 370 (D.N.J. 2001) ("The Court looks to RPC 1.7 when the movant is an actual, not a former, client during the events pertinent to this motion.").

[58]  *Int'l Longshoremen's Ass'n, Local Union 1332 v. Int'l Longshoremen's Ass'n*, 909 F. Supp. 287, 293 (E.D. Pa. 1995) ("[A]n attorney may not drop one client like a "hot potato" in order to avoid a conflict with another, more remunerative client.").

[59]  Rapoport Decl. ¶ 8a.

[60]  Jessica Boelter's April 28, 2020 Declaration ¶ 8; Sidley Reply ¶ 28.

claimants under distribution procedures that Sidley will help craft (and which claimants will then run).[61]  These are the same policies that were at issue in the confidential arbitrations from which Sidley abruptly withdrew after the bankruptcy petition.

The cases Sidley cites to support its claim that these matters are not substantially related do not apply to current conflicts because each involves former or "vicarious" clients.[62]  In *Talecris* the court found no substantial relationship between the current action and prior patent infringement actions because the conflict involved a former client on a case that took six months to resolve, starting in 1992.[63]  Unlike here, there was no temporal overlap because the current action started in 2005, with the court writing its decision 15 years after the other case commenced and closed.  While the actions there involved different patents, this bankruptcy is based on funding a trust with the same Chubb insurance policies (and the same underlying claimants) that are the subject of the representations Sidley had been handling for Chubb.[64]

In *Chemical Bank*, the client relationship was "vicarious" and "attenuated" because the client was a member of a group of corporate entities represented by one firm.[65]  Recognizing this, the Second Circuit used the "substantial relationship" test, which it held only applies to former or attenuated clients.[66]  Moreover, the party seeking disqualification joined the client group late in the litigation, and through two years of litigation, the firm spent only three hours communicating with the movant individually.[67]  Despite technically concurrent representations,

---

[61]  Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC at Art. IV.F.I, ECF No. 20; Disclosure Statement at 39, ECF No. 21.

[62]  *Chem. Bank v. Affiliated FM Ins. Co*., No. 87 CIV. 0150 (VLB), 1994 WL 141951, at *10 (S.D.N.Y. Apr. 20, 1994); Sidley Reply ¶ 62.

[63]  *Talecris Biotherapeutics, Inc. v. Baxter Int'l Inc.*, 491 F. Supp. 2d 510, 515 (D. Del. 2007).

[64]  *Id.*

[65]  *Chem. Bank*, 1994 WL 141951, at *17.

[66]  *Id.* at *10.

[67]  *Id.* at *3.

the Second Circuit held that the less stringent "substantial relationship" test applied but cautioned that "[w]here the relationship is a continuing one, adverse representation is prima facie improper. . . . Putting it as mildly as we can, we think it would be questionable conduct for an attorney to participate in any lawsuit against his own client without the knowledge and consent of all concerned."[68]

In *Mitchell*, the court disqualified a law firm based on conflicts with a former client, noting that (as here) a screen was not imposed at the start of the current representation.[69] *Wausau* also involved a former client where the first matter closed two years before the second commenced.[70] The court held that the simple fact that both matters involved arbitrations did not make the matters substantially related when there were no other similarities.[71]

Sidley's substantial-relationship discussion misses the point. The standard does not require that the two matters are the same or that they overlap. Under Third Circuit precedent, the mere possibility that confidential information obtained in the first engagement could be relevant to the second makes the matters substantially related.[72] And "any doubts about whether disqualification is appropriate should be resolved in favor of the moving party, in order to ensure protection of client confidences."[73]

But even if the Court were to analyze the conflict under Rule 1.9, the current and former representations are substantially related. Debtors' stated purpose for filing for bankruptcy is to formulate a reorganization plan to address the tort claims against it, with insurance as the asset at

---

[68]   *Id.* at *10.

[69]   *Mitchell v. Metro. Life Ins. Co.*, No. 01 CIV. 2112 (WHP), 2002 WL 441194, at *9–10 (S.D.N.Y. Mar. 21, 2002).

[70]   *Employers Ins. Co. of Wausau v. Munich Reinsurance Am., Inc.*, No. 10 CIV. 3558 PKC, 2011 WL 1873123, at *2–3 (S.D.N.Y. May 16, 2011).

[71]   *Employers Ins.*, 2011 WL 1873123, at *5–6 (S.D.N.Y. May 16, 2011).

[72]   *See In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 162 (3d Cir. 1984).

its center.  Sidley's representation of Chubb on many matters and, in particular, its work related

to the Boy Scouts' insurance and reinsurance claims easily meets the mere-possibility test to

determine if natters are substantially related.[74]

Sidley asserts that the insurance policies and the reinsurance agreements are totally

different and unrelated contracts.  That is not so.  As Mr. Sneed admits, the reinsurance

agreements at issue reinsure the policies in the bankruptcy.  The policy coverage

determinations drive the reinsurance billing presentation.  Particularly in reinsurance

matters, the policy-related questions are very much alive.  Facultative reinsurance expressly

follows form to the policy.  Indeed, in *Global Reinsurance Corporation of America v.*

*Century Indemnity Company*, the court held that the underlying policy is part of the

integrated reinsurance agreement.[75]

Further, because insurance coverage is a central asset in the reorganization, knowing

Chubb/Century's legal analysis, strategy, and positions about this asset is obviously relevant to

formulating a plan and negotiating with tort claimants and other insurers.[76]  That information

would be at risk of being exposed to Debtors if Sidley were allowed to switch sides.  And that

would materially prejudice Century.

With no case law to rely on, Sidley proffers Professor Rapoport's opinion that "Sidley

was reasonable in its belief that the reinsurance work was not substantially related to its work for

BSA."[77]  But no case holds that whether the lawyer was reasonable in his or her belief is the

---

[73]  *Madukwe*, 552 F. Supp. 2d at 458.

[74]  *Supra* Counterstatement of Facts at 10–11.

[75]  No. 13 CIV. 6577 (LGS), 2020 WL 995860, at *6–7 (S.D.N.Y. Mar. 2, 2020).

[76]  *See Madukwe*, 552 F. Supp. 2d at 462 (finding substantial relationship where attorney had "specific
     knowledge" of former client's "interpretation, understanding, and application" of internal policies).

[77]  Rapoport Declaration ¶ 24; Sidley Reply ¶ 64.

standard for determining whether two matters are substantially related under Rule 1.9.  And

Professor Rapoport does not say otherwise.

### III. SIDLEY HAS NOT CARRIED ITS BURDEN OF DEMONSTRATING THAT THE COURT SHOULD APPROVE THE RETENTION APPLICATION OR THAT IT OBTAINED A VALID WAIVER.

Sidley tries to place the burden of proof on Chubb by claiming that the "Objection is in

substance a motion to disqualify."[78]  To be clear, this is Debtors' motion to approve Sidley as

bankruptcy counsel.  Chubb is plainly not the movant here and has not requested disqualification

or any other relief.  Sidley's theory could apply to every objection to a retention application,

which would result in switching the statutory burden to the objector.

Even if the Court were to consider this as a disqualification motion—which it is not—

Sidley has the burden of showing that Chubb consented to waive any conflict of interest.  In

*Corn Derivatives*, the Third Circuit held that "the burden of showing consent is on" the law firm

facing disqualification.[79]  As discussed in Point I-B above, the requirement to obtain informed

consent by its nature puts the burden on the lawyer to disclose information about the conflicted

engagement to his or her client.  A comment to Rule 1.0 explains as follows:

> The lawyer must make reasonable efforts to ensure that the client or other
> person possesses information reasonably adequate to make an informed
> decision.  Ordinarily, this will require communication that includes a
> disclosure of the facts and circumstances giving rise to the situation, any
> explanation reasonably necessary to inform the client or other person of
> the material advantages and disadvantages of the proposed course of

---

[78]  Sidley Reply ¶ 48.

[79]  *In re Corn Derivatives Antitrust Litig.*, 748 F.2d at 162 (holding that "the burden of showing consent is on" the law firm facing disqualification"); *In re Fisker Auto. Holdings*, 2018 WL 3991470, at *3 n.5 ("[T]he burden shifts to the attorney seeking permission to pursue an otherwise impermissible dual representation in the context of the informed consent analysis."); *accord United States v. Gordon*, 334 F. Supp. 2d 581, 587 (D. Del. 2004); *see also In re Duvall*, No. 19-112272, 2020 WL 1492769, at *2 (Bankr. W.D. Ky. Mar. 25, 2020) ("While the burden of proof in seeking disqualification of opposing counsel is on the party seeking disqualification, a professional seeking appointment under Section 327 bears the initial burden of proof that they meet all qualifications of the statute in order to obtain appointment.").

conduct and a discussion of the client's or other person's options and alternatives.[80]

Sidley has come nowhere close to carrying its burden to show that it provided Chubb with information reasonably adequate to make an informed decision.

In this Circuit, Sections 327(a) and (c) require the *per se* disqualification of any attorney who has an actual conflict of interest.[81]  That is a statement of law with which Sidley agrees.[82]  Under the undisputed facts here, Sidley cannot be approved as Debtors' counsel.  This is how the *Pillowtex* court put it:

> [A] conflict is actual, and hence *per se* disqualifying, if it is likely that a professional will be placed in a position permitting it to favor one interest over an impermissibly conflicting interest. . . . [T]he term 'actual conflict-of-interest' is not defined in the Code and has been given meaning largely through a case-by-case evaluation of particular situations arising in the bankruptcy context.[83]

Here, Sidley has already conceded adversity.[84]  When Sidley requested a prospective waiver from Chubb—which it never obtained—Sidley proposed the following language:

> It is intended to make clear that we may be directly adverse to you in the bankruptcy proceeding, including, but not limited to, objecting to creditor claims, **opposing relief sought by creditors and insurers, confirming or supporting a plan over creditor or insurer objections, and prosecuting,**

---

[80]  Model R. Prof'l Conduct 1.0 cmt. [6].

[81]  *See In re Pillowtex*, 304 F.3d 246, 251 (3d Cir. 2002); *see also In re Fleming Cos.*, 305 B.R. 389, 393 (Bankr. D. Del. 2004) ("[S]ection 327(a) [of the Bankruptcy Code] imposes a *per se* disqualification on any professional who has an actual conflict of interest."); *In re Philadelphia Athletic Club, Inc.*, 20 B.R. 328, 334 (E.D. Pa.1982) ("professionals engaged in the conduct of a bankruptcy case should be free of the slightest personal interest which might be reflected in their decisions concerning matters of the debtors' estates, or which might impair the high degree of impartiality and detached judgment expected of them.").

[82]  Sidley Reply ¶ 43 (citing *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 477 (3d Cir. 1998) and stating that disqualification is mandated where there is "an actual conflict of interest").

[83]  *Pillowtex, Inc.*, 304 F.3d at 251 (citations omitted) (quoting *In re BH&P, Inc.*, 949 F.2d 1300, 1315 (3d Cir. 1991)).

[84]  Sidley Reply ¶¶ 6, 14, 59.

> *objecting to, or supporting motions or taking other actions over creditor or insurer objections*—including where you are the creditor or insurer.[85]

Sidley clearly understood that bankruptcy proceedings would make it adverse to Chubb. This guts Sidley's argument that the bankruptcy is distinct from coverage issues—where Sidley has deep knowledge about Chubb.[86]

Adversity is not always as direct as cross-examining a witness. It can come in the form of knowing your client's strategies and sensitive information, as Sidley does here. That is especially so in a mass-tort bankruptcy, as the *Thorpe* court recognized when it observed that there is inherent adversity between insurers and debtors.[87] Indeed, Mr. Sneed's above-quoted language proves that Sidley well understands this too.[88]

Finally, that Chubb refers to its reinsurance as "non-claims" that are "unrelated to the defense of an insurance claim" in the SLA does not change any of the above or alter the information to which Sidley was privy.[89] Also, that is not language that defines the scope of a lawyer's engagement, as the SLA expressly states that "[n]otwithstanding" that the "SLA pertains to Non-Claims Services, . . . [it] *should not be taken as any form of instruction to limit your role* or to reduce the quality of the representation provided." Not only does the non-claims

---

[85] Janine Panchok-Berry's April 30, 2020 Declaration Ex. 1 (emphasis added).

[86] Sidley Reply ¶¶ 68–72.

[87] *In re Thorpe Insulation Co.*, 677 F.3d 869, 885 (9th Cir. 2012) (reversing confirmation and remanding to allow insurers to offer proof in contested hearing that plan impairs their rights).

[88] Sidley's citation to Formal Opinion 05-435 is off target. *See* Sidley Reply ¶ 71. That opinion considers whether a firm may represent an insurer and not be conflicted if it represents a plaintiff suing a defendant that is insured by the insurer. But here, Sidley does not represent the tort claimants suing the Boy Scouts. Sidley represents the Boy Scouts, an entity directly making demands against Chubb.

[89] *In re Thorpe Insulation Co.*, 677 F.3d 869, 885 (9th Cir. 2012) (reversing confirmation and remanding to allow insurers to offer proof in contested hearing that plan impairs their rights).

definition not affect the scope of engagement, it also does not affect the SLA's requirement for a written conflict waiver.[90]

---

[90]    Sidley Reply ¶ 14 (emphasis added).

## CONCLUSION

Century respectfully requests that the Court deny Debtors' application to retain Sidley

and grant such other relief as is just and proper.

Dated: May 1, 2020                                       Respectfully Submitted,
       Wilmington, Delaware

By:  */s/ Stamatios Stamoulis*
     Stamatios Stamoulis (#4606)

STAMOULIS & WEINBLATT LLC
800 N. West Street
Third Floor
Wilmington, Delaware 19801
Telephone:   302 999 1540
Facsimile:   302 762 1688

O'MELVENY & MYERS LLP
Tancred Schiavoni (*pro hac vice*)
Janine Panchok-Berry (*pro hac vice*)
Times Square Tower
7 Times Square
New York, New York 10036-6537
Telephone:   212 326 2000
Facsimile:   212 326 2061

*Counsel for Century Indemnity Company, as
successor to CCI Insurance Company, as
successor to Insurance Company of North
America and Indemnity Insurance Company of
North America, Ace Insurance Group Westchester
Fire Insurance Company and Westchester
Surplus Lines Insurance Company*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,<br><br>                        Debtors. | Chapter 11<br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered) |

**DECLARATION OF JANINE PANCHOK-BERRY IN SUPPORT OF
CENTURY'S REPLY IN FURTHER SUPPORT OF OBJECTION TO
DEBTORS' APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING
THE RETENTION AND EMPLOYMENT OF SIDLEY AUSTIN LLP AS
ATTORNEYS FOR THE DEBTORS AND DEBTORS IN POSSESSION,
*NUNC PRO TUNC* TO THE PETITION DATE**

I, Janine Panchok-Berry, pursuant to 28 U.S.C. § 1746(2), under penalty of perjury, hereby declare as follows:

1.      I am an associate at the firm O'Melveny & Myers LLP, attorneys for Counsel for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America, Ace Insurance Group, Westchester Fire Insurance Company and Westchester Surplus Lines Insurance Company. I submit this declaration based on my personal knowledge of the proceedings in *In re Boy Scouts of America and Delaware BSA, LCC*, and review of the pleadings and documents listed below.

2.      Attached as Exhibit 1 is a true and correct copy of an email from William Sneed to Joshua Schwartz dated February 28, 2019.

3.      Attached as Exhibit 2 is a true and correct copy of an email from Joshua Schwartz to William Sneed dated March 21, 2019.

Dated:  May 1, 2020

Respectfully Submitted,


By:  */s/ Janine Panchok-Berry*

JANINE PANCHOK-BERRY

# EXHIBIT 1

| **From:** | Sneed, William M. <wsneed@sidley.com> |
| **To:** | Schwartz, Joshua R |
| **Sent:** | 2/28/2019 8:42:38 PM |
| **Subject:** | [EXTERNAL] Chubb -- Proposed Advance Waiver |

Josh:

Following our discussion with you last week, Mike Goldman and I have worked to flesh out the insolvency/restructuring advance waiver language, in order to respond to your questions.

Here is the language our firm proposes:

> We have numerous clients that rely upon us for general representation, including clients that may be directly or indirectly insured by you, may be indebted to, or may be a creditor of, you or one or more of your affiliates. Current or future clients (collectively, the "Other Clients") may ask us to represent them in connection with potential or actual insolvency or restructuring matters that are adverse to you and may negatively impact your interests. If we are not representing you in such matter, and the matter in which you and an Other Client have adverse interests is not substantially related to our current or past representation of you, you agree that we may represent such Other Client, you waive any alleged conflict of interest arising from such representation, and you agree that you will not seek to disqualify or otherwise prevent us from representing such Other Client. You acknowledge that you have had an opportunity to consult with other counsel (in-house or otherwise) and to raise any questions you may have with us before agreeing to this waiver.

> The foregoing advance waiver is not intended to authorize us to bring an action against you alone (in contrast to a group of which you are a member) seeking an affirmative recovery, recovery of a voidable preference or fraudulent transfer, or seeking to void your security. It is intended to make clear that we may be directly adverse to you in the bankruptcy proceeding (including, but not limited to, objecting to creditor claims, opposing relief sought by creditors and insurers, confirming or supporting a plan over creditor or insurer objections, and prosecuting, objecting to, or supporting motions or taking other actions over creditor or insurer objections — including where you are the creditor or insurer).

If you have any questions about this, please give me a call.

WILLIAM M. SNEED

**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
+1 312 853 7899
wsneed@sidley.com
www.sidley.com
**SIDLEY**

*********************************************************************************

This e-mail is sent by a law firm and may contain information that is privileged or confidential. If you are not the intended recipient, please delete the e-mail and any attachments and notify us immediately.

*********************************************************************************

# EXHIBIT 2

| | |
|---|---|
| **From:** | Schwartz, Joshua R </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C108B446449C44F083045CD97132678D-SCHWARTZ, J> |
| **To:** | 'Sneed, William M.' |
| **Sent:** | 3/21/2019 3:06:43 PM |
| **Subject:** | phone tag |

Hi Bill, thanks for your v/m. I left my desk for a second and missed you. I am glad that the advance waiver is no longer being requested. I will endeavor to as quickly as possible address any waiver requests that Sidley makes in the future.
Best regards, Josh

CHUBB

**Joshua R. Schwartz**
Managing Counsel - Director of Reinsurance Litigation

436 Walnut Street, Philadelphia, PA 19106
O 215-640-2107 M 267-449-6058 F 215-640-4020

ACE and Chubb are now one.

**IN THE UNITED STATES BANKRUPTCY
COURT FOR THE DISTRICT OF
DELAWARE**

In re:

BOY SCOUTS OF AMERICA AND
DELAWARE BSA, LLC,

                    Debtors.

Chapter 11

Case No. 20-10343 (LSS)

(Jointly Administered)

### DECLARATION OF ANN RAPPLEYE

I, Ann Rappleye, pursuant to the provisions of 28 U.S.C. § 1746 declare under the

penalty of perjury as follows:

1.     I am Operations Counsel in the Global Legal and Compliance group at Chubb,

a position I have held since November 2015.  In that capacity, I serve as Chief of Staff to the

Executive Vice President and Global General Counsel of the Chubb Group of Companies, as

well as manage various Global Legal Operations matters.   One of the legal operations

matters I am responsible for is the oversight and management of the Legal and Compliance

group's engagements with outside counsel.  This includes oversight of our e-billing tool –

T360 or TyMetrix -- through which our outside counsel submit bills for payment.

2.     Reporting to me in this capacity are a T360 manager, who handles day-to-

day administration of the T360 network, as well as an administrative assistant, who assists

with such tasks as onboarding new law firms, setting up new matters, and answering basic

questions from both internal stakeholders and outside law firms.  I also work with the Vice

President, Claims Optimization, who is the product owner of the T360 system and

supervises the administration of T360 in the Claims organization at Chubb.

3.     Given the number of firms that the Legal and Compliance group engage, we

made a decision not to negotiate separate engagement letters with each firm.  Rather,

Chubb has a standard Service Level Agreement ("SLA") that the Company uses to memorialize the terms of engagement between Chubb and the law firms.

4.      We require new firms to electronically execute, acknowledge, and accept the SLA when they are on-boarded into the T360 network.  We also require different office locations of the same firm to acknowledge and accept the SLA when those offices are on-boarded into T360.  For example, if the New York office of Firm X has acknowledged and accepted the SLA and then the Chicago office of Firm X is assigned a new matter, the Chicago office of Firm X must also acknowledge and accept the SLA.

5.      Acceptance and execution of the SLA is performed electronically through the T360 tool.  The acknowledgement requires that the person accepting the SLA affirm that he or she is authorized to act on behalf of the firm.  The person accepting the SLA must also acknowledge that acceptance of the SLA is a condition precedent to the firm serving as counsel to Chubb.  The Acknowledgement Form as it appears to the law firm in T360 is attached as Exhibit A.

6.      Firms are prevented from submitting bills into T360 and, consequently, will not be paid, until they have accepted the SLA.

7.      Once the SLA is accepted, it applies to all legal and compliance matters a particular firm and office are assigned from that point forward.  Firms are not required to re-execute and accept the SLA with each new matter in the Legal and Compliance network of T360.  The SLA is therefore evergreen, i.e., it does not need to be renewed.

8.      The law firm Sidley Austin ("Sidley") acknowledged the Chubb SLA on September 4, 2015 in connection with the firm's engagement on a reinsurance matter.  A copy of the SLA Sidley acknowledged is attached as Exhibit B.  Nicole Talison electronically acknowledged the SLA on behalf of the firm, after representing that she had authority to do so.  I

understand that her title was Senior Client Arrangement Analyst at Sidley at the time.  The record of this acknowledgment in T360 is attached as Exhibit C.

9.      Sidley has been assigned eight (8) matters for the Legal and Compliance group since acknowledging the SLA in September 2015.  It billed over $2M and submitted more than 95 invoices through T360 on these matters.  It is my understanding that Sidley handled other matters prior to acknowledging the SLA in September 2015.

10.     Given my role in overseeing T360, I typically handle issues related to the SLA. For example, I would handle any questions or other issues related to the SLA with outside counsel.  I have not been made aware of any issues that Sidley has raised regarding the SLA, nor has anyone at the firm contacted me regarding the SLA.   In the December 7, 2018, email attached as Exhibit 1 to the declaration of Bill Sneed, Mr. Sneed confirms that he was aware of the SLA and that Sidley's representation has been pursuant to the SLA.

11.     The SLA addresses a host of issues ranging from case management and strategy to data security, reporting practices and billing procedures that are propriety to Chubb.  The public disclosure of the SLA would result in an unfair advantage to competitors and adversaries by providing them information as to the specifics of how Chubb manages its law firm relationships, the cases they handle and operations.  And, this information, if subject to public disclosure, would unfairly benefit Chubb's competitors and its adversaries in the legal system.

Dated:  May 1, 2020

Respectfully submitted,

*/s/ Ann Rappleye*_____

Ann Rappleye

**Acknowledgement Form**

> By clicking this button, I accept all of the terms and conditions of the Service Level Agreement ("SLA") and I represent
>
> to ACE INA Holdings Inc., (hereinafter referred to as "Chubb" as further defined in the SLA) that I have authority to act on behalf
>
> of my firm. I also acknowledge that my firm's acceptance of the SLA is a condition precedent to serving as Chubb's legal counsel.
>
> | SLA Guidelines | Acknowledgement |
> |---|---|
> | Acknowledged?: Yes | Date: 9/4/2015 |

---

Is your law firm currently providing, or planning to provide, legal services to Chubb on

matters subject to HIPAA privacy requirements?

| HIPAA: No | HIPAA Date: |
|---|---|

Please refer to the Document Library to view each regions Service Level Agreement ("SLA"),

as well as view or print Chubb's HIPAA Business Associate Agreement ("BAA"), if applicable.

# EXHIBIT B

# SERVICE LEVEL AGREEMENT
# FOR THE PROVISION OF NON-CLAIMS LEGAL
# SERVICES

**Between**

**ACE INA Holdings Inc.**
**(Hereinafter referred to as "ACE")**

**and**

_____
**(Hereinafter referred to as the "Law Firm")**

**Dated:** _____

# Service Level Agreement
# for the Provision of Non-Claims Legal Services

## Contents

## 1. Introduction

1.1. Definitions, Statement of Purpose, Privilege and Confidentiality, Safeguarding Client Information, Media Contact/Public Disclosure and Conflicts of Interest



4.13 Conflicts of Interest



## 7. Governing Law; Dispute Resolution



# Service Level Agreement
# for the Provision of Non-Claims Legal Services

## 1. Introduction

1.1. Definitions, Statement of Purpose, Privilege and Confidentiality, Safeguarding Client Information, Media Contact/Public Disclosure and Conflicts of Interest

1.1.1. <u>Definitions</u>:  This section defines some capitalized terms used in this Service Level Agreement ("SLA") and certain other terms and conditions.

| | |
|---|---|
| "ACE Group Company" | ACE or any of its parents, subsidiaries or other affiliates (at any time during the period of the Law Firm's representation of the Client) |
| "ACE Group of Companies" | all ACE Group Companies taken together (at any time during the period of the Law Firm's representation of the Client) |
| "ACE Liaison" | the Client's in-house lawyer or other principal liaison to the Law Firm |
| ██████████████ | ████████████████████████ |
| "Client" | any ACE Group Company that retains the Law Firm to provide Non-Claims Services with respect to any matter |
| "Non-Claims Services" | services performed by the Law Firm for a Client that are unrelated to the defense of an insurance claim or a related insurance coverage claim |
| ██████████████ | ████████████████████████ |

4





1.1.6. <u>Conflicts of Interest:</u>  In addition to the Law Firm's ethical responsibilities to avoid conflicts of interest, the ACE Group of Companies generally applies a Group-wide approach to conflict analysis.  The interests of all ACE Group Companies must be taken into account in analyzing whether a particular representation of a Client presents a conflict of interest.  Updated lists of all ACE Group Companies are filed with ACE Limited's SEC Forms 10-K and may be accessed via the www.acegroup.com and/or www.sec.gov websites. The ACE Group of Companies does not generally consider conflicts to result solely from representation of its business competitors, but specific circumstances can cause conflicts to arise in such situations.  In all cases, it is the responsibility of the Law Firm to identify and bring to the attention of the Client, in writing, any circumstances that may create or involve a conflict of interest as herein described.  Any Law Firm that is newly retained by an ACE Group Company is requested to confirm the absence of any conflicts of interest to the ACE Liaison.  If the Law Firm identifies a potential conflict after it has begun work for the Client, it shall make all reasonable efforts to resolve that conflict in a manner that will allow the Law Firm's continued representation of the Client.  Any request by the Law Firm for the client to waive a real or potential conflict of interest must be in writing and directed to the ACE Liaison.  Regardless of the nature or timing of any conflict, the Client shall not be deemed to have waived any conflict unless the Client provides a waiver in writing.



7



ACE Group Non-Claims - SLA







11





13



14

4.13. <u>Conflicts of Interest</u>

    4.13.1. The Law Firm is required, without charge to the Client, to conduct or have conducted appropriate searches and inquiries with regard to any actual or potential conflict of interest, and to consult with the Client accordingly (as further directed in section 1.1.6 above).



15



16



## 7. Governing Law; Dispute Resolution

7.2.     If a dispute arises related to this SLA with respect to any matter handled by the Law Firm for a Client, senior representatives of both parties, vested with authority to settle the dispute, will meet or speak and attempt in good faith to resolve the dispute.   The meeting or conversation will be held reasonably promptly (which the parties believe should be achieved within 10 working days) at the request of either party.

7.3.     If the parties are unable to resolve a dispute by negotiation as set forth in section 7.2 above, and the dispute relates to a matter handled by the Law Firm within the United States of America ("US Dispute"), either party may submit the dispute to be finally settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, in Philadelphia, Pennsylvania, U.S.A., by a single arbitrator selected in accordance with R-11.  All US Disputes related to this SLA shall, if not resolved between the parties as provided under section 7.2, be resolved by arbitration as provided herein, and arbitration shall be the sole means for redressing any dispute.  Each party shall bear its own costs and expenses and an equal share of the arbitrators' fees. The parties waive their respective rights to damages for "bad faith," punitive damages, statutory damages or penalties or other exemplary damages. Judgment upon the award rendered by the arbitrator may be entered by any court having jurisdiction.











# EXHIBIT C

Clicking on *SLA Guidelines Acknowledged?* and/or *Acknowledgement Date* will reveal in a pop up window the T360 user who signed off on the SLA.



