## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |

### DECLARATION OF WILLIAM M. SNEED IN SUPPORT OF RESPONSE BY SIDLEY AUSTIN LLP IN FURTHER SUPPORT OF THE DEBTORS' APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING THE RETENTION AND EMPLOYMENT OF SIDLEY AUSTIN LLP AS ATTORNEYS FOR THE DEBTORS AND DEBTORS IN POSSESSION, *NUNC PRO TUNC* TO THE PETITION DATE

I, William M. Sneed, being duly sworn, state the following under penalty of perjury:

1.      I am over 21 years of age and I am fully competent to make this declaration

("Declaration") in support of the *Response by Sidley Austin LLP in Further Support of the*

*Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Sidley*

*Austin LLP as Attorneys for the Debtors and Debtors in Possession, Nunc Pro Tunc to the*

*Petition Date*. I am a partner in the law firm Sidley Austin LLP ("Sidley") based in its office

located at One South Dearborn, Chicago, Illinois, 60603.[2]

2.      Except as otherwise stated in this Declaration, all facts set forth herein are based

on my personal knowledge or information obtained from my personal review of relevant

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the *Response by Sidley Austin LLP in Further Support of Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Sidley Austin LLP as Attorneys for the Debtors and Debtors in Possession,* Nunc Pro Tunc *to the Petition Date* filed contemporaneously herewith.

documents. The views asserted in this Declaration are based upon my experience and knowledge of insurance and reinsurance disputes generally, as well as the matters on which Sidley's Reinsurance Team represented Century, specifically. If called upon to testify, I would competently testify to the facts set forth herein.

3.      Beginning on October 5, 2018, Sidley was retained by Century to perform consulting work relating to a dispute between Century and certain Lloyd's of London Syndicates (the "Lloyd's Matter"). Joshua Schwartz, Managing Counsel, Director of Reinsurance Litigation for Century, was Sidley's primary point of contact at Century for the Lloyd's Matter.

4.      At the time, Century brought Sidley on solely in a consulting capacity to review the record of a prior arbitration between Century and Lloyd's in which Century had been represented by a different law firm, ███████████ with that arbitration hearing taking place from April 30 to May 3, 2018 (the "First Arbitration"). The First Arbitration had involved a claim by Century to Lloyd's for reimbursement for payments made in settling certain abuse cases in which Century had defended and indemnified BSA. *Certain Underwriters at Lloyd's v. Century Indemnity Co.*, 2020 WL 1083360, at *2 (D. Mass. Mar. 6, 2020). Lloyd's had reinsured Century for losses arising from Century's entire book of business in a certain years—*i. e.*, "treaty reinsurance"—which included coverage for eight annual policies of insurance that Century issued to BSA from 1963 to 1970. *Id.* Beginning in or about February 2016, Century notified and billed Lloyd's for a portion of the payments it had made in settling those cases under the reinsurance treaties. Lloyd's refused to pay Century, and in the First Arbitration, the arbitrators resolved that dispute adversely to Century. *Id.* Following the arbitration ruling, Century submitted new reinsurance bills for the same abuse claims in August 2018—this time in conformity with the arbitration ruling—that Lloyd's likewise refused to pay. *Id.* at *3.

5.      When Century retained Sidley, the only remaining substantive issue of significance in the Lloyd's Matter was whether Century could permissibly re-issue reinsurance billings to Lloyd's that accumulated separate abuse claims as a single "occurrence" under the reinsurance treaties—an issue that the panel in the First Arbitration had declined to decide. *Id.* In October and November of 2018, Sidley was asked to analyze this accumulation issue, along with certain questions regarding a motion to confirm the First Arbitration award.

6.      On November 30, 2018, Mr. Schwartz called and asked me if Sidley would take the role of lead counsel respecting a new arbitration demand against Lloyd's that had been issued by Century's prior counsel, ██████████████ on November 9, 2018. This new arbitration demand sought recovery on the August 2018 billings that Lloyd's had refused to pay. *Id.* ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ The Lloyd's matter was officially opened in Sidley's system on November 30, 2018. I prepared a petition to compel this arbitration in federal court— this time based on Lloyd's denial of Century's re-submitted bills. This petition was filed in the District of Massachusetts on May 6, 2019. *Id.*[3]

7.      The only materials that Sidley received in connection with this work were as follows:

- Filings related to Lloyd's motion to confirm the First Arbitration award;

- The record of the First Arbitration; and

- Placement records respecting negotiations between Century and its reinsurers regarding the reinsurance treaties, dating from the 1950s and 1960s.

---

[3] Those efforts were successful, and on March 6, 2020, the District of Massachusetts directed that the new arbitration would proceed. *See Lloyd's*, 2020 WL 1083360, at *6.

8.      In July of 2019, Century also asked me to represent it in a reinsurance collection

dispute with ███████████████████████████████████████████████

██████ and its affiliate (the "███████ Matter"). The ███████ Matter was officially opened at

Sidley on August 5, 2019. Joshua Schwartz was also my primary point of contact for the ██████

matter. Like the Lloyd's Matter, the ████████ Matter involved efforts to collect reinsurance arising

from payments made under Century policies issued to BSA—this time with different reinsurers.

In connection with the ███████ Matter, the only materials that Sidley received were emails between

Century and ████████ relating to claims settlements that Century had reached in 2018 and 2019,

along with a deposition transcript ████████████████████████████████

which was reviewed for purposes of addressing the reinsurer's question on ████████████

██████████████.

9.      Sidley also represented and counseled Chubb and its affiliates in various other

matters with no connection to BSA:

- On or around May 23, 2019, Sidley opened a matter in which it represented
  Chubb in a reinsurance arbitration against ██████████████████.

- Starting around May 17, 2019, Sidley sporadically counseled Chubb respecting
  its affiliate ████████████████████ in connection with questions
  raised by a reinsurer with respect to certain treaties.

- Starting around May 2017, Sidley reopened a matter in which it sporadically
  counselled Century in connection with issues respecting the ████████████
  ████████████████.

10.     I was personally involved in and primarily responsible for Sidley's representation

of Chubb or its affiliates in each of the representations listed above. As discussed further below,

Sidley did not receive "confidential information about Chubb's insurance coverage for the BSA

and agreements concerning it," "privileged information concerning the disputes between Century

and the Boy Scouts over its insurance coverage, Century's privileged legal analysis of the BSA's

claims," or "Century's privileged legal strategies and defenses in these matters." (*See* Schwartz Decl. ¶ 5.).

11.     Generally, a reinsurance contract dispute arises when an insurer issues a bill to a reinsurer, and the reinsurer fails or refuses to pay. The insurer then tries to determine the reason why the reinsurer has failed or refused to pay and address that reason. For the specific BSA reinsurance matters Sidley was retained on, Century billed the reinsurers for abuse claims against BSA that Century had already defended and settled. The reinsurers refused to pay the bills for two reasons: ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

12.     This is a typical scenario in reinsurance contract disputes. The law of reinsurance generally does not permit reinsurers to avoid liability under a reinsurance contract by second-guessing the insurer's claim decisions (*i.e.*, whether to pay a claim and how much to pay). Consequently, reinsurers instead try to avoid liability by arguing that the claim payments should have been allocated to policies they do not reinsure or that the claim payments do not comply with a particular definition in the reinsurance contract (*i.e.*, whether payments made for multiple individual claims arise out of a single "occurrence" under the reinsurance contract).

13.     For the Lloyd's ████████████, Century had originally allocated the claim payments to the underlying BSA policies pursuant to what was referred to as the First Encounter

Agreement ("FEA"), which is an agreement that BSA and Century entered into in 1996. It is a mechanical agreement that serves to determine the date of loss for an abuse claim, when that claim involves abuse allegedly happening over multiple policy years. Under the FEA, the date of loss is the date when the first act of abuse took place, even if additional acts of abuse took place under subsequent policy periods. All damages for such a claim are deemed to have been incurred in the policy year when the abuse began. The defense and indemnity for such a claim will be under the policy in effect when the abuse began. One way to describe this mechanism is "telescoping." The FEA is part of the historical record respecting Century and BSA.

14.    At no point was the Reinsurance Team asked to advise Century with respect to Century's rights under the FEA. In fact, at the time Century retained Sidley, the FEA was not at issue.

15.    With respect to the Lloyd's Matter, the FEA was not at issue due to the ruling in the First Arbitration. Lloyd's had raised three defenses in the First Arbitration: (a) late notice, (b) a challenge to Century's accumulation of multiple individual claims as a single "occurrence" under the reinsurance treaties, and (c) a complaint that Century could not show that it had undertaken a reasonable and businesslike investigation before entering into the FEA. The arbitrators ruled in favor of Lloyd's on the last defense only and set aside the reinsurance billings at issue. Century responded by issuing new bills that spread its defense and indemnity payments for each individual abuse claim across all policy years during which abuse took place and then once again accumulated multiple individual claims as a single "occurrence" under the reinsurance treaties. Sidley's representation of Century in the Lloyd's Matter was limited to pursuing payments of the new bills that that had not been allocated to individual policies according to the FEA.

16. ████████████████████████████████████████████████

████████████████████████████████████████████ Although Sidley

was provided with the record of the First Arbitration, it contained only a handful of documents

respecting the FEA, almost all of which were letters exchanged between BSA and Century (or

Century's predecessor) in the 1990s. None of these documents reveal privileged or confidential

information.

17.    With respect to the ████ Matter, Century's position ██████████████

██████████████ .

18.    Consistent with the scope of these representations and issues being litigated and

arbitrated in the reinsurance context, Sidley did not receive any confidential information with

respect to any coverage dispute involving the primary policies issued by Century to BSA during

the course of either the Lloyd's Matter or the ████ Matter. Sidley did not receive pleadings,

motions, or other filings related to any pending insurance coverage litigation, much less

confidential information in that regard—which would not have been relevant to the reinsurance

disputes. Sidley did not speak with, interview, or have any exchange with any Century

representative involved with the abuse claims or coverage litigation or relating to the BSA

restructuring. The Reinsurance Team's interactions with Chubb and Century were with

representatives responsible for collecting reinsurance.

19.    Sidley was not asked to and did not provide any advice to Chubb or Century relating

to insurance coverage issued to BSA or insurance disputes with BSA.

20.    At no point did any Sidley attorney on the Reinsurance Team perform legal services

on behalf of BSA in connection with its restructuring.

21.     The only interaction of any sort I had with any insurance coverage dispute came in connection with discovery requests issued in unrelated coverage litigation, examples of which are cited by Century in its Objection at 28 n. 114 (citing Panchok-Berry Decl. at ¶¶ 7-8 & Exs. F-G). Because those requests sought documents pertaining to the Lloyd's Matter, I was required to contact Lloyd's counsel to advise Lloyd's of the requests pursuant to a confidentiality agreement governing the First Arbitration, which I did via email. I did not obtain, review, or produce any materials in that litigation.

22.     At the time that Century approached Sidley about consulting on the Lloyd's Matter, there had been a lapse of active Century matters at the firm for about a year.

23.     Due to that lapse, I was directed to obtain an engagement letter and open a new matter in keeping with Sidley's standard protocol. Pursuant to that protocol, which had changed since Century had last opened a matter with Sidley, I raised the need for an advance waiver for at least non-contentious (transactional) matters orally with Mr. Schwartz on or about November 30, 2018, and sent a follow-up email in that regard on December 7, 2018. A true and correct copy of the December 7, 2018 email is attached hereto as Exhibit 1. When I initiated these discussions in 2018, I did not know that Sidley represented BSA in any capacity.

24.     Discussions regarding the advance waiver continued into March of 2019.  Century eventually proposed an advance waiver that included a restructuring waiver to allow Sidley to represent an entity insured by a Century affiliate in a bankruptcy proceeding, with the following conditions:

- There must be a wall between the Sidley bankruptcy team and any attorneys at Sidley who work on any Century matters, which prohibits such Sidley lawyers from working on any bankruptcy or insolvency matter involving Century insurance or reinsurance policies.

- Sidley would have no direct or indirect involvement in any motions to compel arbitration involving Century filed in a bankruptcy or insolvency proceeding, nor in any arbitration that subsequently ensues.

- Sidley would not have any direct or indirect involvement in disputes regarding: a) Century collateral agreements; b) asset purchase agreements in which the debtor sells assets to a third party and there is a dispute between us and the buyer; and c) coverage disputes (including allegations of bad faith/ECO).

A true and correct copy of the email from Joshua Schwartz proposing these conditions, dated March 4, 2019, is attached hereto as Exhibit 2. Ultimately, Sidley determined to proceed with the Century engagement without an advance waiver to avoid imposing myriad individually negotiated obligations on an advance basis. As a result, the engagement was memorialized in a "Service Level Agreement" between Sidley and Century. A true and correct copy of a letter from Robert Turrin, Senior Counsel to Chubb, to Sidley, dated March 16, 2020, identifying the relevant Service Level Agreement is attached hereto as Exhibit 3; the March 16, 2020 letter's attachment, an unredacted copy of the relevant Service Level Agreement, is attached hereto as Exhibit 4.

25.    In February 2019, Mr. Schwartz suggested during our advance waiver negotiations that Sidley was seeking an advance waiver only because of its representation of BSA. I explained that was not the case; rather, the waiver request was standard for new engagements.

26.    On December 13, 2018, Mr. Schwartz forwarded to me a December 12, 2018 *Wall Street Journal* article reporting that BSA had retained Sidley to assist in a possible bankruptcy filing as an "FYI," without further comment. That email proceeded to discuss the ongoing transition of the Lloyd's Matter to Sidley. A true and correct copy of the emails between me and Joshua Schwartz dated December 13, 2018, is attached hereto as Exhibit 5. A true and correct copy of the *Wall Street Journal* article is attached hereto as Exhibit 6.

27.     The following day, on December 14, 2018, I spoke on the phone with Mr. Schwartz regarding the *Wall Street Journal* article and other issues related to the Lloyd's Matter. I told Mr. Schwartz that I had spoken with one of my partners and, pursuant to Sidley's duty of confidentiality, I was not able to expressly confirm or deny what was stated in the *Wall Street Journal* article respecting Sidley's representation of BSA. I also explained Sidley's view that the firm's representation of an insurer with respect to collecting reinsurance due it following payment to an insured does not constitute adversity to the insured; thus, Sidley had no conflict in continuing to represent Century against Lloyd's on the BSA reinsurance dispute. Mr. Schwartz told me that he was pleased to hear that Sidley was not conflicted. At no point did Mr. Schwartz contest Sidley's view that the representation of an insurer with respect to collecting reinsurance due it following payment to an insured does not constitute adversity to the insured. Nor did Mr. Schwartz raise a concern that Century might view Sidley's representation of BSA as a conflict of interest.

28.     After my December 14, 2018 phone call with Mr. Schwartz, Century proceeded to transition the Lloyd's Matter to Sidley. At no point during the transition did Mr. Schwartz or any Century representative raise a concern that Century would view Sidley's representation of BSA as a conflict of interest.

29.     Additionally, on October 3 or 4, 2019, I spoke with Mr. Schwartz during a coffee break at the ARIAS reinsurance industry conference in New York City. Robert Omrod, an executive at Brandywine Holdings, another Century affiliate, also participated in the conversation. During that exchange, Mr. Schwartz and I discussed the Lloyd's Matter, and Mr. Omrod remarked that Sidley represented BSA in its potential restructuring. At no point in that conversation did Mr. Schwartz or Mr. Omrod state that Sidley's representation of BSA was a conflict of interest or potential conflict of interest.

30.     On October 29, 2019, Century first expressed its view that Sidley's role as BSA's restructuring counsel created a conflict. Mr. Schwartz called me and advised me that it was Century's position that Century had "just learned" of Sidley's representation of BSA as restructuring counsel, and that Century did not "waive any conflict" presented by Sidley's "potential representation" of BSA in connection with its restructuring. (*See* Schwartz Decl. Ex. 3.) I disputed Mr. Schwartz's characterization that Century had "just learned" this information, because this was not consistent with my prior interactions with Mr. Schwartz. Mr. Schwartz indicated that Century would discuss the issue internally and circle back to me following those internal discussions. A true and correct copy of that email chain, dated October 29 to November 27, 2019, is attached hereto as Exhibit 7.

31.     Following my October 29, 2019 communications with Mr. Schwartz and until mid-December 2019, communications regarding Century's concerns were handled by the Sidley Restructuring Team. (*See* Schwartz Decl. Ex. 4.)

32.     At no point on October 29, 2019, or thereafter, did I claim that Sidley possessed a written opinion analyzing the alleged conflict of interest between the representations of BSA and Century. I am aware of no such document. I do not know why Mr. Schwartz repeatedly requested that Sidley send Century a written "General Counsel's Opinion" before it would engage in discussions with Sidley regarding the alleged conflict. (*See, e.g.*, Sneed Ex. 7 (Nov. 27, 2019 Email, "Before we have a discussion, we would like to review Sidley's General Counsel opinion"); Schwartz Decl. Ex. 4 (Dec. 12, 2019 Email, "We will gladly discuss the conflict issue further with you once Sidley has supplied the information requested.")

33.     On December 17, 2019, I reached out to Mr. Schwartz to have a call and was able to schedule time on December 18, 2019, to speak with him and Christine Russell, Senior Vice

President for Reinsurance, Brandywine Holdings (a Century affiliate). A true and correct copy of emails scheduling this call, dated December 17 to 18, 2019, is attached hereto as Exhibit 8.

34.     On our December 18, 2019 call, I explained that Sidley's Restructuring Team had been trying to understand what Century's concerns were and how they could be addressed, but no progress was being made in that regard. I made clear that Sidley's preference was to continue to represent Century in its reinsurance matters. I also explained that Sidley would not withdraw from representing BSA because no conflict existed, and due to the broad way that Century had framed its conflicts complaint, Sidley might be forced to withdraw from its representation of Century and its affiliates if the issue could not be resolved.

35.     I did not "bull[y]" or "threaten[]" my client. (Objection at 8.) I urged Chubb to schedule a management-level conference with Sidley in order to address these concerns. Mr. Schwartz and Ms. Russell indicated that they would think about it and address the proposed conference with various Chubb constituencies. No such conference was scheduled before BSA filed for bankruptcy.

36.     In fact, in its next communication, on January 3, 2020, while Sidley's invitation to schedule a management-level meeting or conference was still outstanding, Century sent a letter notifying Sidley that it had consulted with outside ethics counsel and accused Sidley of "shocking and offensive" behavior. (Schwartz Decl. Ex. 5.) At this point, it was clear that no headway would be made, as Century continued to assert that it could not rule out a conflict or potential conflict and would not agree to any waiver. *Id.*

37.     On January 16, 2020, I informed Century that as a result of a breakdown in the attorney-client relationship, Sidley was initiating an orderly withdrawal from its current representations of Century and its affiliates. A true, correct, and unredacted copy of my letter to

Joshua Schwartz dated January 16, 2020, notifying Century of Sidley's withdrawal, is attached

hereto as Exhibit 9. A true, correct, and unredacted copy of the letter from Joshua Schwartz, dated

January 30, 2020, is attached hereto as Exhibit 10. A true, correct, and unredacted copy of my

email withdrawing from the ████ Matter, dated February 20, 2020, is attached hereto as Exhibit

11. A true, correct, and unredacted copy of my email withdrawing from the ████ Matter, dated

February 20, 2020, is attached hereto as Exhibit 12. A true and correct copy of my letter to Joshua

Schwartz, dated February 26, 2020, discussing Sidley's withdrawal, is attached hereto as Exhibit

13. The withdrawal proceeded as follows:

- The Lloyd's Matter had been fully briefed and awaiting judicial decision since September 2019. Sidley filed an agreed motion to withdraw, which the court granted on February 21, 2020. *See*, Docket Report, *Certain Underwriters at Lloyd's, London v. Century Indem. Co.*, No. 18-CV-12041 (D. Mass.) (designating Sidley as terminated effective February 21, 2020).

- In the ████ Matter, no arbitration schedule had been set, and Sidley provided Chubb with a draft submission for an upcoming organizational meeting (which the parties had taken off calendar by agreement on February 7, 2020) before communicating its withdrawal to the arbitrators on February 20, 2020.

- In the ████ arbitration, Sidley offered to represent Chubb through the close of discovery (scheduled for February 14, 2020) (Sneed Ex. 9.), but Chubb chose to retain substitute counsel and seek a new discovery schedule. (Sneed Ex. 13.) Sidley communicated its withdrawal to the arbitrators on February 20, 2020, but only after Sidley requested that Chubb and its successor counsel accurately convey to the arbitrators and opposing counsel the fact that Sidley would not have any continuing role in the matter. As Chubb failed to do this and its statements to opposing counsel and the arbitrators about Sidley's continuing role were inaccurate, I sent an email to the arbitrators on February 20, 2020, that reads in its entirety as follows: "Please be advised that Sidley Austin LLP is withdrawing entirely from representation of Chubb in this matter. Please remove us from your service lists." (Sneed Ex. 12.)

- The ████ and ████ matters had involved only sporadic advice, and the ████ matter had been dormant for over two years. Sidley communicated its withdrawal from both matters to Chubb. (Sneed Exs. 9, 13.)

38. As of February 21, 2020, Sidley no longer represented Century or any of its

affiliated entities.

Pursuant to 28 U. S. C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:   April 27, 2020
         Chicago, Illinois

_William M. Sneed_
William M. Sneed
Partner
SIDLEY AUSTIN LLP

14