# Exhibit A

2006 WL 8434062
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia, Rome Division.

MUZZY PRODUCTS CORPORATION, Plaintiff,

v.

PRIMOS, INC., Defendant.

CIVIL ACTION FILE NO. 4:05-CV-0182-HLM
|
Signed 08/21/2006

**Attorneys and Law Firms**

[Ansel Franklin Beacham, III](), [Robert Maddox Brinson](), Brinson Askew Berry Siegler Richardson & Davis, LLP, Rome, GA, [Gerald E. Helget](), [John B. Lunseth, II](), [Michael M. Lafeber](), Briggs & Morgan, Minneapolis, MN, for Plaintiff.

[Brett L. Foster](), [L. Grant Foster](), [Mark A. Miller](), Holland & Hart, LLP, Salt Lake City, UT, [Robert Harris Smalley, III](), McCamy Phillips Tuggle & Fordham, Dalton, GA, for Defendant.

ORDER

[Harold L. Murphy](), UNITED STATES DISTRICT JUDGE

 *1  This case is before the Court on Defendant's Motion to Disqualify Plaintiff's Counsel [25], the Report and Recommendation of United States Magistrate Judge Walter E. Johnson [46], and Defendant's Objections to the Report and Recommendation [62].

**I. Procedural Background**
On February 21, 2006, Defendant filed its Motion to Disqualify. counsel. According to Defendant, Attorney Helget attempted to discuss settlement with Mr. Primos and the two men then discussed the merits of the case. Because in-house counsel for the law firm representing Plaintiff responded to complaints from Defendant's counsel, denying the complaints, Defendant seeks to impute Attorney Helget's disqualification to the entire law firm. Defendant contends that disqualifying Attorney Helget and his law firm will not prejudice Plaintiff, because this case is in its early stages.

Plaintiff disputes Defendant's characterization of the exchange, contending that Mr. Primos initiated the exchange and that Mr. Primos, not Attorney Helget, attempted to discuss the merits of the case. According to Plaintiff, Attorney Helget refused to discuss the merits of the case, and stopped to talk with Mr. Primos only because Attorney Helget was attempting to contact donors for a [cancer]() foundation. Plaintiff argues that Attorney Helget's contact with Mr. Primos would not warrant disqualification, even if Defendant's allegations are taken as true, and contends that disqualifying Attorney Helget would cause great prejudice to Plaintiff.

In its reply brief, Defendant argues that Attorney Helget violated Rule 4.2 by discussing this case directly with Mr. Primos and by probing Mr. Primos' subjective views on settlement and mediation, and that the Court should not adopt a "no harm, no foul" rule. Defendant contends that the unauthorized communication has prejudiced its ability to defend this case and severely prejudiced any hope for a settlement. Defendant argues that Attorney Helget misrepresented the circumstances of his communications with Mr. Primos, and that Mr. Primos conveyed confidential information to Attorney Helget concerning Defendant's subjective willingness and attitude concerning the possibility of settlement through mediation, and Mr. Primos' subjective feelings on claim construction and non-infringement issues. Defendant contends that this case is in its infancy, and that Defendant has agreed to extensions of time so as not to prejudice Plaintiff if the Court disqualifies Plaintiff's counsel. Defendant argues that the public's interest and the prejudice to Defendant outweigh any interest that Plaintiff might have in retaining its counsel and any possible prejudice that might result to Plaintiff if the Court disqualifies Plaintiff's counsel. Defendant urges the Court to resolve all credibility issues in its favor.

On June 26, 2006, Judge Johnson held an evidentiary hearing pertaining to the Motion to Disqualify. On June 29, 2006, the Court entered an Order referring the Motion to Disqualify to Judge Johnson for a Report and Recommendation nunc pro tunc.

 *2  On June 29, 2006, Judge Johnson issued his Report and Recommendation. Judge Johnson recommends that the Court deny the Motion to Disqualify Plaintiff's counsel, reasoning that Defendant failed to meet its burden of proof with respect to the Motion to Disqualify. Defendant has objected to the Report and Recommendation, arguing that Judge Johnson

Case 20-10343-LSS    Doc 573-1    Filed 05/06/20    Page 3 of 13

Muzzy Products Corporation v. Primos, Inc., Not Reported in Fed. Supp. (2006)
2006 WL 8434062

improperly made a credibility determination, and that, in any event, the testimony establishes a violation of Rule 4.2.

**II. Evidence Submitted By the Parties**

    **A. Declaration of Wilbur R. Primos**

According to Mr. Primos, on February 11, 2006, Mr. Primos was at the Primos booth at the annual Shooting, Hunting, and Outdoor Trade ("SHOT") Show in Las Vegas, Nevada. (Decl. of Wilbur R. Primos ¶ 2.) While talking to a customer, Mr. Primos looked up and saw Attorney Helget inside the Primos booth. (Id. ¶ 3.) Mr. Primos contends that he recognized Attorney Helget because a few years ago, Attorney Helget "personally offered legal services" to Mr. Primos, which Mr. Primos declined. (Id.) Mr. Primos contends that when he first saw Attorney Helget on this occasion, Attorney Helget was standing inside the Primos booth with a notepad in his hand, looking at a display of Primos products. (Id. ¶ 4.)

Mr. Primos approached Attorney Helget inside the Primos booth, greeting him with " 'Hey Gerry, Will Primos. How are you doing?' " (Primos Decl. ¶ 4.) According to Mr. Primos, Attorney Helget responded, " 'Hey, I'm trying to get this case settled.' " (Id.) Mr. Primos contends that he informed Attorney Helget that he was not interested in settling the case, and that he did not think Plaintiff had any grounds to sue Defendant, because Defendant's game call product has an encumbered path for the sound for the game call, while Plaintiff's patent requires an unencumbered path for the sound emanating from the game call, and because Defendant's call used a different technology than the technology in Plaintiff's patent. (Id. ¶ 5.) According to Mr. Primos, Attorney Helget stated, " 'Well, I've got a third party that you'll find out about. You know who it is. If they look at it and say that you're right or wrong or that I'm right or wrong, would you agree with that?' " (Id. ¶ 6.)

Mr. Primos states that he told Attorney Helget "that under no circumstances would Primos settle." (Primos Decl. ¶ 7.) Mr. Primos contends that Attorney Helget responded, " 'Gosh, if I'm wrong, I have to tell my client that I was wrong,' " and indicated that doing so would be difficult. (Id. ¶ 8.) According to Mr. Primos, he stated, " '[W]e had some similar situations like that with the case we just finished,' " speaking of a recent, unrelated case involving Defendant, and Attorney Helget responded, " 'Yes, I know about that.' " (Id. ¶ 9.) Mr. Primos contends that Attorney Helget stated, " 'You're not going to go to your lawyers and tell them we were having a big argument are you?' " (Id. ¶ 10.) Mr. Primos states that he responded, " 'Well, they're here. They're here at the show. I don't think we're arguing at all. I thought we had a pretty nice conversation, but I am going to tell my lawyers that we talked.' " (Id.)

Mr. Primos then asked Attorney Helget about Dr. Arnold Leonard and Rob Evans, mutual friends. (Primos Decl. ¶ 11.) Mr. Primos recalls that Attorney Helget told him of a new light product that Attorney Helget was working on with Mr. Evans. (Id.) According to Mr. Primos, Attorney Helget never informed Mr. Primos that they should not talk about the case, and Mr. Primos was not aware of "any rules prohibiting a lawyer from speaking to an opposing party in a case without consent from that party's lawyers." (Id. ¶¶ 12-13.)

    **B. Declaration of Gerald Helget**

**\*3** Attorney Helget is a patent attorney at the law firm of Briggs and Morgan. (Decl. of Gerald E. Helget ¶ 1.) Attorney Helget has prosecuted patents for over twenty-two years, and has extensive experience and expertise in the outdoor industry. (Id.) Attorney Helget is an endorsed legal service provider from the Archery Trade Association. (Id. ¶ 3.)

Attorney Helget has represented Plaintiff for Plaintiff's trademark and patent issues since early 2001. (Helget Decl. ¶ 4.) Attorney Helget prosecuted the patent at issue in this suit. (Id.)

On February 11, 2006, Attorney Helget attended the Las Vegas SHOT Show. (Helget Decl. ¶ 2.) Attorney Helget regularly attends such shows as part of his involvement in the hunting and outdoor products industry. (Id.) Attorney Helget also attended the SHOT Show to contact past donors to the Arnold S. Leonard Cancer Research Fund ("ASL"). (Id.) The ASL Fund Chairman, Rob Evans, gave Attorney Helget a list of past donors, and Attorney Helget spoke with donors to thank them for their donations, to remind them that additional donations would be appreciated, and to distribute a brochure for ASL's 14th Annual "Hunt for a Cure" charity event, to be held on March 14, 2006, in Minneapolis, Minnesota. (Id.)

On that same day, Mr. Primos was speaking with someone in the Primos booth before Attorney Helget spoke with Mr. Primos. (Helget Decl. ¶ 3.) According to Attorney Helget, Mr. Primos knows Attorney Helget personally from Attorney Helget's years of donations, fund raising, and pro bono work for ASL and from Mr. Primos' participation in, and donations to ASL during the last four or five years. (Id.) When Attorney Helget first met Mr. Primos, Attorney Helget introduced

Case 20-10343-LSS    Doc 573-1    Filed 05/06/20    Page 4 of 13

Muzzy Products Corporation v. Primos, Inc., Not Reported in Fed. Supp. (2006)
2006 WL 8434062

himself as a patent attorney in the outdoor industry, and did not personally solicit Mr. Primos' patent or trademark business. (Id.)

Attorney Helget contends that he never was inside Primos' booth on February 11, but that he instead stood in the aisle so that he would not interrupt exhibitors conducting business at the show. (Helget Decl. ¶ 5.) According to Attorney Helget, he did not carry a notepad, but instead carried a list of names of past donors to ASL and a bag of ASL brochures. (Id.) Attorney Helget recalls that when Mr. Primos saw him, Mr. Primos rushed out to Attorney Helget and greeted him by name, and the two men shook hands. (Id.) Attorney Helget contends that he did not respond to Mr. Primos' greeting with a statement such as " 'Hey, I'm trying to get this case settled.' " (Id.) Instead, Attorney Helget recalls that the two men primarily discussed the ASL "Baldy Award" hair cut in Atlanta, Georgia, at the National Archery Trade Show convention, and that Attorney Helget told Mr. Primos that ASL had raised approximately $67,000 for cancer research. (Id.) Attorney Helget states that he asked Mr. Primos if he needed more brochures, and Mr. Primos responded that he did not. (Id.) According to Attorney Helget, he asked Mr. Primos if he planned to attend the fundraising pheasant shoot in Minneapolis, Minnesota, on March 14, 2006, and Mr. Primos stated that he was so busy with video productions, new products, and family commitments that he could not attend. (Id.) Attorney Helget contends that he stated that family time was most important. (Id.)

According to Attorney Helget, he and most of the hunting industry know that Mr. Primos is a very aggressive and contentious patent litigant. (Helget Decl. ¶ 6.) Mr. Primos volunteered to Attorney Helget that Defendant's product did not infringe Plaintiff's product because Defendant's product had no "unencumbered path," and Attorney Helget contends that he informed Mr. Primos, " 'We cannot talk about any issues of the lawsuit, as I am one of Muzzy's lawyers. You have your lawyers. We simply cannot talk about any substance of the lawsuit.' " (Id.) According to Attorney Helget, Mr. Primos attempted to say something to the effect that he would settle under no circumstances, and continued to talk over Attorney Helget when Attorney Helget informed him that they could not talk about the case, and that portion of the conversation lasted only seconds. (Id. ¶ 8.) Attorney Helget denies that Mr. Primos suggested that Defendant's product was a "different technology" or that Mr. Primos stated that Defendant "was not going to settle the case." (Id.) Attorney Helget denies stating, " 'Well, I've got a third party that you'll find out about. You know who it is. If they look at it and say that you're right or wrong or that I'm right or wrong, would you agree with that?' " (Id. ¶ 7.) Attorney Helget also states that he did not say, "Gosh, if I'm wrong, I have to tell my client that I was wrong, which would be a difficult thing." (Id. ¶ 9.)

**\*4** Attorney Helget recalls that Mr. Primos stated that Defendant just finished a lawsuit with Hunter's Specialties that Defendant won, and that Attorney Helget responded that he and the whole industry knew that. (Helget Decl. ¶ 10.) Attorney Helget also recalls that he and Mr. Primos discussed Dr. Leonard and Mr. Evans, and that they discussed a new light product that Attorney Helget and Mr. Evans were bringing to market. (Id. ¶ 12.) After Mr. Primos asked what the product was, Attorney Helget described it to Mr. Primos, and Mr. Primos stated that he believed Knight & Hale had a similar product and Attorney Helget should investigate it. (Id.) Mr. Primos and Attorney Helget then spoke briefly about other mutual acquaintances. (Id.)

According to Attorney Helget, he never instructed Mr. Primos not to inform his lawyers that Attorney Helget and Mr. Primos had talked, and that the two were not arguing at all. (Helget Decl. ¶ 11.) Attorney Helget contends that Mr. Primos never stated that Mr. Primos would tell his lawyers that the two men talked. (Id.) Attorney Helget states that he advised Mr. Primos, "I will have the lawyers amongst themselves talk about the lawsuit, settlement, or maybe mediation," and that Attorney Helget mentioned having the mediation performed " 'by someone in the hunting industry.' " (Id. ¶ 14.) Mr. Primos and Attorney Helget shook hands, and Attorney Helget then went to another booth to find another ASL donor on his list. (Id. ¶ 15.)

### C. Declaration of Michele Eichler

Michele Eichler is one of the owners of Plaintiff, and serves as Plaintiff's Chief Executive Officer. (Decl. of Michele Eichler ¶ 1.) Ms. Eichler states that Attorney Helget and his law firm, Briggs and Morgan, serve as Plaintiff's exclusive intellectual property counsel, and that Attorney Helget helped to prosecute the patent at issue in this lawsuit. (Id. ¶ 2.) According to Ms. Eichler, Plaintiff selected Attorney Helget as its intellectual property counsel because of his experience, expertise, and reputation in the wildlife or outdoor industry. (Id. ¶ 3.)

Ms. Eichler asserts that Plaintiff has expended considerable time, energy, and money pursuing this litigation, including

Case 20-10343-LSS    Doc 573-1    Filed 05/06/20    Page 5 of 13

Muzzy Products Corporation v. Primos, Inc., Not Reported in Fed. Supp. (2006)
2006 WL 8434062

having Attorney Helget and his law firm perform a detailed evaluation and infringement analysis of Defendant's product and developing a litigation strategy. (Eichler Decl. ¶ 4.) According to Ms. Eichler, finding replacement counsel with the experience, depth of knowledge, and understanding of the patent, Defendant's product, and the industry that Attorney Helget and his law firm have would be extremely difficult. (Id. ¶ 5.)

**D. Letters Between Counsel Relating to This Incident**

On February 13, 2006, counsel for Defendant sent a letter to Attorney Helget that stated, in relevant part:

> Brett and I were shocked and dumbfounded when Will Primos told us about your visit to the Primos booth at the SHOT Show on Saturday, 11 February 2006. We arrived at the Primos booth shortly after you left. Mr. Primos informed us that when he approached you to find out what you were doing at his booth, your initial words were that you were "just trying to get the case settled." Mr. Primos responded by stating that he was not going to settle the case because it does not have any merit. Thereafter, you engaged in a detailed conversation with Mr. Primos for several minutes. You discussed a number of substantive issues in the case, including specifically whether the Primos device has an "unencumbered" path (one of the absolute core issues in this case!). You further asked Mr. Primos if he would be willing to agree to have a third party mediate the case. This is truly unbelievable. At the outset of the conversation, rather than immediately explain to Mr. Primos your ethical obligation as an officer of the court not to speak with him as a party represented by counsel, you instead engaged in a lengthy dialogue about the case. You even instructed Mr. Primos not to tell us (his counsel) that you and Mr. Primos were "arguing about the case." Mr. Primos saw that you had a notepad in your hand and thus you may have taken notes before, during, and subsequent to your conversation with Mr. Primos.

> **\*5**  We are contemplating the appropriate sanctions we intend to seek from the court for this clear breach of ethics, including disqualification of your firm. In the meantime, we ask that you immediately provide us with a copy of all notes you took before, during, and after your conversation with Mr. Primos. We further demand that you immediately provide us with your written assurance that you will refrain from any further direct contact whatsoever with our client.

(Def.'s Mot. Disqualify Pl.'s Counsel Ex. B.) On February 15, 2006, in-house conflicts and ethics counsel for Attorney Helget's law firm responded with a letter stating, in relevant part:

> I serve as in-house counsel for Briggs and Morgan. Your letter of February 13, 2006 to Gerald Helget has been referred to me. After making inquiry of Mr. Helget, it appears that your letter is based upon false accusations and factual inaccuracies. Mr. Helget's communications with Mr. Primos did not violate the Rules of Professional Conduct.

> Gerald Helget attended the SHOT Show in Las Vegas in part to contact past donors to the Arnold S. Leonard (ASL) Cancer Research Fund. Mr. Helget was provided with a list of donors from ASL Fund Chairman Rob Evans. Mr. Helget was visiting people on the list to thank them for their donations to ASL, remind them additional donations would be appreciated, and hand out brochures for ASL's 14th Annual "Hunt for the Cure" charity event on March 14, 2006 in Minneapolis (a copy of the brochure is enclosed).

> Mr. Primos and Mr. Helget have been friendly acquaintances for several years and share a common goal to raise money for cancer research. As you may be aware, Mr. Primos is an active participant and donor to the ASL fund. In fact, Mr. Primos recognized Mr. Helget in the aisle outside the Primos booth and came out of his booth to greet Mr. Helget and shake hands.

> Contrary to the accusations contained in your letter, Mr. Helget did not "discuss" or "argue" a "number of substantive issues" in the pending litigation between Muzzy and Primos. Rather, Mr. Primos volunteered the unsolicited statement that Primos did not infringe the Muzzy patent because the accused product has "no unencumbered path."[1] In response, Mr. Helget[ ] reminded Mr. Primos he was one of Muzzy's lawyers and that they could not discuss the pending lawsuit.

> Mr. Helget and Mr. Primos did discuss matters completely unrelated to the pending litigation. They talked about the ASL "Baldy Award" hair cut in Atlanta and the fact it raised approximately $67,000 for the charity. Mr. Helget asked Mr. Primos if he would be attending the upcoming "Hunt for the Cure" event in Minneapolis and whether he needed any brochures. Mr. Primos indicated he was so busy with video productions, new products and family commitments [that] he would be unable to attend. Mr. Helget discussed

Case 20-10343-LSS    Doc 573-1    Filed 05/06/20    Page 6 of 13

Muzzy Products Corporation v. Primos, Inc., Not Reported in Fed. Supp. (2006)
2006 WL 8434062

a new light product he is bringing to market with Rob Evans. Mr. Primos indicated he thought Knight & Hale had a similar product which Mr. Helget should check out. They also discussed some mutual acquaintances.

Before leaving the Primos booth, and after again cautioning Mr. Primos they could not discuss the lawsuit, Mr. Helget indicated [that] the attorneys for the respective parties should discuss settlement or mediation. The gentlemen shook hands, and Mr. Helget proceeded to another booth. Mr. Helget took no notes concerning this brief encounter (the "notepad" referenced in your letter was the list of [ASL] donors and [ASL] brochures). Lastly, Mr. Helget did not in any way "instruct Mr. Primos not to tell his counsel" about their brief encounter as alleged in your letter.

**\*6** I am troubled by what appears on the surface to be an attempt to mischaracterize an innocent meeting to gain some advantage in pending litigation. Nevertheless, Mr. Helget has indicated he will refrain from having further communication with Mr. Primos, even those regarding charitable causes. I am confident Mr. Primos will confirm the accuracy of Mr. Helget's description of this brief encounter and neither party will be forced to incur any more needless fees dealing with this issue.

(Id. Ex. C at 1-2 (footnote in original).)

[1]    This statement by Mr. Primos did not disclose anything of a confidential nature. I am advised that the parties have disclosed their respective positions regarding the "unencumbered path" claim language in multiple correspondence.

### E. Other Documents Submitted By the Parties

Plaintiff has submitted a copy of its patent for the turkey call at issue, purportedly to show that the patent at issue requires the turkey call to have an "unencumbered path." (Pl.'s Resp. Def.'s Mot. Disqualify Pl.'s Counsel Ex. A.) Plaintiff also has submitted a number of letters exchanged among counsel concerning the "unencumbered path" issue and the parties' respective positions. (Id. Exs. D-E.)

### F. Second Declaration of Wilbur R. Primos

Defendant submitted the Second Declaration of Wilbur R. Primos in connection with its reply brief in support of its Motion to Disqualify. Mr. Primos states that Attorney Helget's declaration "seriously mischaracterize[s] and misrepresent[s] the conversation that [Mr. Primos] had with [Attorney Helget]." (Second Decl. of Wilbur R. Primos ¶ 3.) Mr. Primos states:

5. Mr. Helget states that he "was never in Primos' SHOT Show booth on February 11, but rather was standing in the aisle." This is not true. On that day, Mr. Helget was standing at least three feet onto the carpet of Primos' booth. While in Primos' booth, Mr. Helget did not appear to be trying to contact anyone but rather was looking around at our display booth and was mostly focused in the direction of our Turkey call section of the display back board. At the time, I assumed he was looking to see if Primos was displaying "The Freak" game calls, which are the products being accused of patent infringement in this case, which was fine with me.

6. As I was finishing up my conversation with a customer, I noticed Mr. Helget turning to leave the booth, at which time I excused myself from the conversation, took about five steps to get to Mr. Helget which involved my stepping into the aisle and around one of Primos['] kiosks which merchandises Primos products. He was now on the edge of our booth but still in it. Since I had gone around one of our Kiosks, which merchandises our products[,] to greet him[,] I was not standing maybe one foot in the aisle and one foot in our booth. I stuck out my hand and said, "Hey Gerry, Will Primos. How are you doing?"

7. Following this greeting, Mr. Helget <u>immediately</u> said, "Hey, I'm trying to get this case settled." He did not mention any other purpose for coming into my booth. I did not make any reference to this case before Mr. Helget said that he was trying to get the case settled. I viewed Mr. Helget's very presence in my booth, while he was looking at Primos' turkey calls, as an indication he was there to see what Primos was up to, which was fine with me.

8. Mr. Helget's declaration states that he never said, "Hey, I'm trying to get this case settled." That is not true. Those were the first words from his mouth.

9. After Mr. Helget's statement that he was trying to get the case settled, I immediately and forcefully told Mr. Helget that I wasn't interested in settling the case, because the Primos call has an encumbered path, which is different from the unencumbered path required by the claims in Muzzy's patent. I was very adamant in my tone when making this statement. The only other people I had expressed my view to about this had been my attorneys. Had I known that Mr. Helget was not ethically supposed to

Case 20-10343-LSS Doc 573-1 Filed 05/06/20 Page 7 of 13

Muzzy Products Corporation v. Primos, Inc., Not Reported in Fed. Supp. (2006)
2006 WL 8434062

talk to me I would have said[,] "[W]e are not suppose[d] to talk about this[,] are we?"

**\*7** 10. Immediately following my comments, Mr. Helget asked me if I would agree to the views of a third party regarding whether Primos or Muzzy were right or wrong in this case. He then interjected that I knew the third party he had in mind and would find out soon enough who it was. I told him I would not agree.

11. Mr. Helget's declaration denies that he asked for my views on having a third party evaluate the case as explained above. This is not true. Mr. Helget's declaration also alleges that he only mentioned the idea of mediation or settlement in the context of saying that the lawyers will talk amongst themselves about it. That is also untrue. Why would he even say that if he was not supposed to talk to me about the case? Mr. Helget asked me for my personal view of having a third party evaluate the case. The only people I have expressed my view about settlement to, prior to this time, were my attorneys. Had I known that Mr. Helget was not ethically supposed to be talking to me, I would not have expressed my personal views about settlement and mediation to Mr. Helget in response to his statement about trying to get the case settled.

12. Mr. Helget's declaration also alleges that he told me: "We cannot talk about any issues of the lawsuit, as I am one of Muzzy's lawyers. You have your lawyers. We simply cannot talk about any substance of the lawsuit." This is a false statement. Mr. Helget never, and I mean NEVER, said he could not discuss the case with me. As I stated previously, he is the one [who] started talking about the case, not me. Mr. Helget seemed very comfortable talking about the infringement issues, settlement, and mediation with me. He did not hesitate in going into any of these issues. I simply listened to what he had to say, answered his question, and told him my personal views. In fact, Mr. Helget agrees that we had a nice conversation and weren't "arguing" about the case. I question how we could have a nice conversation about the case, if he told me we couldn't talk about it. We did talk about the merits of the case, settlement, and mediation with Mr. Helget expressing no reservations whatsoever about the content or the fact that he was talking directly to me without my lawyers.

13. Mr. Helget's declaration also alleges that I tried to talk over him as he was trying to tell me that we could not discuss the case. This is a false statement. I am very surprised at Mr. Helget's willingness to change the facts of what transpired during our conversation. His declaration says that he spoke 30 words while I allegedly talked over him. That is a lot of talking over. If I was a lawyer, knowing I was not suppose[d] to discuss a case with an individual who was a Defendant in a case I would never have allowed the individual to get a word in. After explaining my unwillingness to agree to a third party's evaluation of the case, Mr. Helget then interjected that it would be real hard for him to tell his client, Muzzy, that he was wrong about this case. It seemed to me that he was indicating that he would have a difficult time dropping the case, because he would really hate to admit he was wrong. Mr. Helget's declaration denies that he made any statement to this effect. That is not true. Am I just supposed to be making this stuff up? Mr. Helget has also said in his Declaration, Paragraph 10, "Will did state he just finished a lawsuit with Hunter's Specialties that he won, and I responded that I and the whole industry knew of that fact." This is not true as I never mentioned Hunter Specialities['] name during our meeting at the Shot Show. Rather in response to Mr. Helget interjecting that it would be real hard for him to tell his client that he was wrong about this case I responded with "Yea we just finished a case where that was part of the case." That is the only reference I made to any other case and I never mentioned Hunter Specialties['] name.

**\*8** 14. At that point, Mr. Helget said, "You're not going to go to your lawyers and tell them we were over here arguing[,] are you?" I responded as indicated in my first declaration. That I thought we had a nice conversation. This portion of the conversation was very light-hearted. I did not know that our discussion of the case was improper, and I even told Mr. Helget that my lawyers were at the show and I was going to tell them that we had spoken. Mr. Helget's declaration alleges that this portion of our conversation never took place. That is not true. It took place as I have testified and I will say again[,] "[A]m I supposed to be just making this stuff up?"

15. After telling Mr. Helget that my attorneys were at the show and that I planned to tell them about our conversation, I asked Mr. Helget how Dr. Leonard was doing. Mr. Helget did not start this portion of our conversation, and I did. The remainder of the conversation followed as outlined in my first declaration. Contrary to Mr. Helget's assertions, it was the discussions relating to Dr. Arnold Leonard's cancer research that were incidental to the majority of the conversation, which primarily addressed this litigation. I do not believe Dr. Leonard's name would have come up if I had not mentioned it. I do not believe Dr. Arnold Leonard's

cancer research was the purpose for which Mr. Helget came to Primos' booth. Mr. Helget did not offer me any brochures regarding Dr. Arnold Leonard's cancer research at any time during the conversation.

(Id. ¶¶ 5-15 (emphasis and capitalization in original).) Approximately one hour later, Mr. Primos' attorneys stopped by the Primos booth, and Mr. Primos informed them of his conversation with Attorney Helget. (Id. ¶ 16.)

Mr. Primos states that if he had known about the applicable ethical rules, he would not have discussed the case with Attorney Helget. (Primos Second Decl. ¶ 17.) Mr. Primos also takes issue with Attorney Helget's statement that Mr. Primos is well known in the industry as an aggressive and contentious patent litigant, contending that Primos has been the plaintiff in only one patent suit. (Id.) Mr. Primos states that he invests a great deal of time and effort in Primos' intellectual property, and he greatly respects the intellectual property of others, but he does not intend to be blackmailed by Plaintiff, (Id. ¶ 18.) Mr. Primos feels that Plaintiff is attempting to blackmail him in this case, and that Attorney Helget "was trying to push that agenda on me in visiting my SHOT Show booth and trying to see if I would agree to mediation." (Id.)

Mr. Primos also states:

> It is clear to me that Mr. Helget has misrepresented what happened in our conversation to try to keep his law firm in the case. I have serious reservations about that. It is difficult for me to trust lawyers on the other side when I'm supposed to give them my highly confidential and proprietary information. In this case, they have already asked for our sales information, and our research and development information. While I understand that this information can be designated ATTORNEY'S EYES ONLY, the information will be in the hands of attorneys [who] are not being forthright and honest with the Court. If Mr. Helget is unwilling to be forthright and accept the consequences of his decision to speak to me about the case, I cannot be confident that he will honor the Protective Order and keep my company's secrets confidential. He is willing to compromise his integrity for the fees his firm will earn in this case. After the way in which Mr. Helget has handled this situation[,] I simply don't have trust in counsel for Muzzy.

(Primos Second Decl. ¶ 19 (capitalization in original).)

### G. Declaration of Brett L. Foster

**\*9** Attorney Brett L. Foster is counsel for Defendant in this case. (Decl. of Brett L. Foster 1.) Attorney Brett L. Foster, along with his brother and partner, L. Grant Foster, attended the SHOT Show in Las Vegas, Nevada, on February 11, 2006. (Id. ¶ 2.) On that day, Attorney Brett L. Foster and Attorney L. Grant Foster stopped by Defendant's booth to visit with Mr. Primos. (Id. ¶ 3.) Mr. Primos indicated that Attorney Helget had left the booth shortly before Attorney Brett L. Foster and Attorney L. Grant Foster arrived. (Id. ¶ 4.) Mr. Primos related to Attorney Brett L. Foster and Attorney L. Grant Foster the details of Mr. Primos' conversation with Attorney Helget, which, according to Attorney Brett L. Foster, correspond with the details given in Mr. Primos' declaration. (Id. ¶¶ 5-6.) Attorneys Brett L. Foster and L. Grant Foster explained to Mr. Primos that Attorney Helget's contact with Mr. Primos might have violated ethical standards, and Mr. Primos indicated that he was not aware of those standards. (Id. ¶ 6.)

Attorney Brett L. Foster states:

> 7. I am very disappointed that Mr. Helget elected to directly communicate with my client about this case. During the conversation, Mr. Helget was able to extract from Mr. Primos Primos' general strategy on defending the merits of the case, as well as its settlement strategy. These are issues that Mr. Primos has heretofore only discussed with counsel.
>
> 8. Plaintiff's counsel had not raised the issue of mediation with us, Primos' counsel, prior to Mr. Helget's introduction of that concept directly to Mr. Primos, which Mr. Primos immediately rejected without the opportunity to consult with counsel. I believe mediation is often a very productive method of amicably resolving disputes. However, Mr. Helget backed our client into a corner on that issue, which has resulted in a significant intrusion into the attorney-client relationship we enjoy with Primos.

Case 20-10343-LSS    Doc 573-1    Filed 05/06/20    Page 9 of 13

Muzzy Products Corporation v. Primos, Inc., Not Reported in Fed. Supp. (2006)
2006 WL 8434062

9. With regard to the merits, Mr. Primos consults with counsel; we provide advice; and, following our discussions, Primos makes its decisions on how to proceed. The same process is followed in regard to settlement discussions. The same process is followed in regard to mediation.

10. While counsel for Muzzy attempts to minimize the nature and impact of the improper communication, it is very significant from my viewpoint. Counsel for Muzzy knows what Primos' key claim construction issue is; Muzzy knows what Primos' settlement position is; and Muzzy knows what Primos' mediation position is by directly talking with Mr. Primos. I am certain that if the shoe were on the other foot, and our firm had approached the principal of Muzzy to interrogate them directly about the key issues in the case and its bottom line settlement position, it would be absolutely outraged and would seek disqualification. Allowing Mr. Helget to take a "free shot" at interrogating my client has robbed our firm of an opportunity to filter this confidential information through counsel, after obtaining our advi[c]e. This is very troubling.

11. In view of what has transpired, and particularly Mr. Helget's failure to forthrightly acknowledge what he did, Primos does not have trust for counsel for Plaintiff in this case. Allowing Mr. Helget's firm to remain in the case, in my opinion, will make the case more difficult to manage. It will likely make the case more difficult, if not impossible, to amicably resolve. It will likely increase the costs of both parties.

12. Disqualification of Mr. Helget and his law firm will improve our ability to manage this case from the Defendant's standpoint, reduce the costs to litigate this case, and give us at least a hope of an amicable resolution, which right now does not exist.

(B. Foster Decl. ¶¶ 7-11.)

### H. Declaration of L. Grant Foster

Attorney L. Grant Foster is counsel for Defendant in this case. (Decl. of L. Grant Foster ¶ 1.) Attorney L. Grant Foster, along with his brother and partner, Brett L. Foster, attended the SHOT Show in Las Vegas, Nevada, on February 11, 2006. (Id. ¶ 2.) On that day, Attorney Brett L. Foster and Attorney L. Grant Foster stopped by Defendant's booth to visit with Mr. Primos. (Id. ¶ 3.) Mr. Primos indicated that Attorney Helget had left the booth shortly before Attorney Brett L. Foster and Attorney L. Grant Foster arrived. (Id.) Mr. Primos related to Attorney Brett L. Foster and Attorney L. Grant Foster the details of Mr. Primos' conversation with Attorney Helget, which, according to Attorney L. Grant Foster, correspond with the details given in Mr. Primos' declaration. (Id. ¶ 4.) Attorney L. Grant Foster explained to Mr. Primos that Attorney Helget's contact with Mr. Primos might have violated ethical standards, and Mr. Primos indicated that he was not aware of those standards, (Id. ¶ 3.)

**\*10** Attorney L. Grant Foster states:

5. We have represented Primos in connection with intellectual property matters as well as other business matters for nearly 12 years. We have enjoyed a wonderful relationship. Mr. Helget's unilateral decision to approach Will Primos at his booth has compromised my ability to effectively represent Primos in connection with this lawsuit.

6. Over the course of my nearly 17 years practicing law, which was included substantial litigation and trials, I have never heard of any conversation such as the one between Mr. Primos and Mr. Helget. Mr. Helget was able to communicate directly with my client with regard to his thoughts, impressions, body language, expressions, and other forms of communication relevant to some of the most critical aspects in this lawsuit, including one of the key claim construction terms[,] "unencumbered path," settlement of the case, and, more specifically, mediation of the case.

(G. Foster Decl. ¶¶ 5-6.)

### I. The June 26, 2006, Hearing

On June 26, 2006, Judge Johnson held an evidentiary hearing with respect to the Motion to Disqualify Plaintiff's Counsel. As Judge Johnson observed in his Report and Recommendation:

At that hearing, both Mr. Primos and Mr. Helget testified and reiterated the assertions made in their respective Declarations. In sum, Mr. Primos asserts that Mr. Helget approached his company's booth at the trade show and immediately raised the issue of settling the instant litigation. However, Mr. Primos stated that he was not interested in settling because plaintiff had no grounds to sue, given that defendant's product has an encumbered path for the sound from the game call, while plaintiff's product has an unencumbered path. According to Mr.

Primos, Mr. Helget suggested that he had a third party who could mediate their dispute, but Mr. Primos rejected that suggestion.

Mr. Helget disputes the characterization of the encounter provided by Mr. Primos. Plaintiff's counsel contends that he attended the trade show to contact past donors to the Arnold S. Leonard Cancer Research Fund ("ASL"), thank them for their donations, remind them that additional donations would be appreciated, and to hand out brochures for ASL's upcoming fourteenth annual "Hunt for a Cure" charity event. Mr. Helget contends that, as he was in the area around defendant's booth, Mr. Primos came out to greet him, but he (Helget) never broached the idea of settlement. Instead, they talked primarily about ASL's "Baldy Award" given at the recent Archery Trade Show convention in Atlanta and how much money had been raised there for research. Mr. Helget contends that, as they were discussing these non-litigation topics, Mr. Primos volunteered that defendant had not infringed plaintiff's patent because there was no unencumbered path in his company's game call. Mr. Helget asserts that he immediately told Mr. Primos that they could not talk about the lawsuit. When Mr. Primos stated that his company would not settle, Mr. Helget contends that he again stated that they could not talk about the lawsuit. Mr. Helget concedes, however, that when informing Mr. Primos that he would have the lawyers talk amongst themselves about the lawsuit, settlement, or mediation, he mentioned the idea of having someone in the hunting industry act as a mediator.

**\*11** (Report & Recommendation at 2-4 (footnotes omitted).)

During the June 26, 2006, hearing, Judge Johnson also heard testimony from Michele Eichler, who serves as Plaintiff's president. Ms. Eichler testified primarily concerning Mr. Primos' alleged unwillingness to resolve this litigation and Plaintiffs reliance upon Attorney Helget as its counsel. Specifically, Ms. Eichler testified that she had discussions with Mr. Primos prior to the filing of this case, and that Mr. Primos consistently asserted that he would not settle the dispute. Ms. Eichler further testified that the instant dispute has been ongoing since 2003, that Plaintiff has invested a significant amount of time and money in this dispute, and that Plaintiff has relied heavily upon Attorney Helget's advice in connection with this dispute and in connection with other matters.

### III. Standard of Review for a Report and Recommendation

28 U.S.C.A. § 636(b)(1) requires that in reviewing a magistrate judge's report and recommendation, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." The Court therefore must independently consider those factual issues to which the parties object. Jeffrey S. by Ernest S. v. State Bd. of Educ., 896 F.2d 507, 513 (11th Cir. 1990); United States v. Gaddy, 894 F.2d 1307, 1315 (11th Cir. 1990); LoConte v. Dugger, 847 F.2d 745, 750 (11th Cir. 1988). Legal conclusions, of course, are subject to de novo review regardless of whether a party specifically objects. United States v. Warren, 687 F.2d 347, 347 (11th Cir. 1982).

### IV. Discussion

#### A. Standard for Granting a Motion to Disqualify

"It is 'beyond dispute that lawyers are officers of the court and that the courts have the inherent authority to regulate their professional conduct.' " Nuri v. PRC, Inc., 5 F. Supp.2d 1299, 1302 (M.D. Ala. 1998) (quoting In re Gopman, 531 F.2d 262, 266 (5th Cir. 1976)). Attorneys who practice in the Northern District of Georgia "shall be governed by and shall comply with the specific rules of practice adopted by this court and, unless otherwise provided, with the Georgia Rules of Professional Conduct contained in the Rules and Regulations of the State Bar of Georgia and with the decisions of this court interpreting these rules and regulations." N.D. Ga. L.R. 83.1C. The Court therefore must look to the Georgia Rules of Professional Conduct when evaluating motions to disqualify.

"An order for disqualification is 'a drastic means which courts should hesitate to impose except when absolutely necessary.' " Metrahealth Ins. Co. v. Anclote Psychiatric Hosp., Ltd., 961 F. Supp. 1580, 1582 (M.D. Fla. 1997) (quoting Freeman v. Chicago Musical Instrument Co., 689 F.2d 715, 721-22 (7th Cir. 1982)). "Consideration of a motion to disqualify involves a balancing of competing interests, and disqualification is not something that follows mechanically from a violation." Nuri, 5 F. Supp.2d at 1303 (collecting cases). The interests that the Court must balance when deciding whether to grant a motion to disqualify include "maintaining the integrity of the legal community and the legal process, protecting litigants from prejudice caused by violations of the rules, and respecting a person's ability to choose his or her own counsel." Id.

**\*12** "Because of the impact a motion to disqualify has on the party losing her counsel, the moving party is held to a high standard of establishing the basis for the motion, and the need for disqualification." Nuri, 5 F. Supp.2d at 1303; see also Metrahealth, 961 F. Supp. at 1582 ("The burden of proof to establish grounds for disqualification is on the party moving for disqualification."). A party seeking to disqualify an opposing party's counsel must show: (1) a reasonable possibility that the opposing party's counsel committed an ethical violation; and (2) the likelihood of public suspicion outweighs the social interests that will be served if the opposing party's counsel continues to participate in the case. Woods v. Covington County Bank, 537 F.2d 804, 813 & n. 12 (5th Cir. 1976) ("We emphasize that an attorney need not be disqualified even where there is a reasonable possibility of improper professional conduct. As we have seen, a court must also find that the likelihood of public suspicion or obloquy outweigh[s] the social interests which will be served by a lawyer's continued participation in a particular case.") [2]

[2] Opinions of the Fifth Circuit issued before October 1, 1981, the date marking the creation of the Eleventh Circuit, are binding precedent on this Court. Bonner v. City of Prichard, 661 F.2d 1206, 1209-11 (11th Cir. 1981) (en banc).

If reasonable minds could differ as to the propriety of counsel's conduct, the court should deny the motion to disqualify. In re Finkelstein, 901 F.2d 1560, 1565 (11th Cir. 1990) ("This Court will 'not deprive an attorney of the opportunity to practice his profession on the basis of a determination after the fact that conduct is unethical if responsible attorneys would differ in appraising the propriety of that conduct.' ") (quoting In re Ruffalo, 390 U.S. 544, 556 (1968)).

Finally, because parties may use motions to disqualify as tactical weapons, the Court should exercise extreme caution when considering such motions. Nuri, 5 F. Supp.2d at 1304. The Court must ensure that the party who filed the motion to disqualify is not using the motion to harass opposing counsel or the opposing party. Id. ("[B]ecause a motion for disqualification is such a 'potent weapon' and 'can be misused as a technique of harassment,' the court must exercise extreme caution in considering it to be sure it is not being used to harass the attorney sought to be disqualified, or the party he represents.")

### B. Georgia Rule of Professional Conduct 4.2

Rule 4.2(a) of the Georgia Rules of Professional Conduct states: "A lawyer who is representing a client in a matter shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by constitutional law or statute." Ga. Rules of Prof'l Conduct R. 4.2(a). Comment one to Rule 4.2 provides:

> This Rule does not prohibit communication with a represented person, or an employee or agent of such a person, concerning matters outside the representation. For example, the existence of a controversy between a government entity and a private party, or between two organizations, does not prohibit a lawyer for either from communicating with nonlawyer representatives of the other regarding a separate matter. Also, parties to a matter may communicate directly with each other and a lawyer having independent justification or legal authorization for communicating with a represented person is permitted to do so. Communications authorized by law include, for example, the right of a party to a controversy with a government entity to speak with government officials about the matter.

Id. R. 4.2 cmt. 1. Comment three to Rule 4.2 explains: "This Rule applies to communications with any person, whether or not a party to a formal adjudicative proceeding, contract or negotiation, who is represented by counsel concerning the matter to which the communication relates." Id. R. 4.2 cmt. 3. Finally, comment seven to Rule 4.2 provides:

> **\*13** The anti-contact rule serves important public interests which preserve the proper functioning of the judicial system and the administration

of justice by a) protecting against misuse of the imbalance of legal skill between a lawyer and layperson; b) safe-guarding the client-attorney relationship from interference by adverse counsel; c) ensuring that all valid claims and defenses are raised in response to inquiry from adverse counsel; d) reducing the likelihood that clients will disclose privileged or other information that might harm their interests; and e) maintaining the lawyers ability to monitor the case and effectively represent the client.

Id. R. 4.2 cmt. 7.

**C. Discussion**

In his Report and Recommendation, Judge Johnson observed:

It is undisputed that Mr. Primos and Mr. Helget spoke at the trade show in February 2006. However, one man contradicts the other on virtually all relevant points. During rigorous cross-examination of Messrs. Primos and Helget, opposing counsel sometimes gained minor concessions; however, neither man retreated from the critical assertions made in his Declaration. This Court has been charged with making a critical credibility determination. After hearing Messrs. Primos and Helget testify on direct and respond on cross-examination, the Court is left with no firm conviction that one witness lied and the other told the truth. Instead, both men appeared to be credible and reliable reporters of what they perceived and recalled.

The burden of proof here lies with the movant, Primos, Inc. See Metrahealth, 961 F. Supp. at 1582; see also Plant Genetic Sys., 933 F. Supp. at 517 ("[T]he moving party has a high standard of proof to meet in order to prove that counsel should be disqualified."). Given defendant's inability to carry its burden of proof, the undersigned must recommend that the instant Motion be denied.

(Report & Recommendation at 7.)

Defendant has objected to Judge Johnson's conclusion that Mr. Primos and Attorney Helget gave equally credible testimony, arguing that Judge Johnson "may not have fully appreciated the import of all of the evidence that was adduced at the hearing." (Def.'s Objs. Report & Recommendation at 10.)[3] The Court has reviewed the transcript from the June 26, 2006, hearing, and cannot conclude that Judge Johnson's finding is erroneous. Indeed, given the testimony set forth in the transcript, the Court would be inclined to find Mr. Primos' testimony to be less credible than that of Attorney Helget. The Court bases that conclusion on several "exaggerations" made by Mr. Primos during his testimony and uncovered on further direct or cross-examination, such as his claim that Attorney Helget had personally offered him legal services, his claim that Attorney Helget had intentionally given him the cold shoulder at a function, and his claim that Ms. Eichler made it clear that he was not welcome at another function. Given Mr. Primos' apparent tendency to dramatize or misinterpret certain situations, the Court is reluctant to rely upon Mr. Primos' testimony.

[3] Defendant appears to be troubled by the fact that Judge Johnson issued his Report and Recommendation on the Motion to Disqualify only three days after the hearing on the Motion, and that Judge Johnson did not have the benefit of the hearing transcript. The Court observes that the hearing in this case was not lengthy, involved only three witnesses, and, despite Defendant's arguments to the contrary, did not involve complex legal issues. It certainly is possible to consider a matter fully and yet issue a prompt Order or Report and Recommendation. Indeed, it is not uncommon for the Court and its staff to issue very lengthy orders within a few days of hearings on complex motions. In any event, the Court is very familiar with the quality of the Reports and Recommendations issued by Judge Johnson and of his legal abilities and the abilities of his staff. The Court thus does not give credit to Defendant's argument that Judge Johnson did not fully appreciate the issues raised at the hearing or in Defendant's Motion.

**\*14** Judge Johnson, however, had a better opportunity to evaluate the witnesses' testimony because he actually observed the witnesses give live testimony. Under those circumstances, the Court will not disturb Judge Johnson's conclusion that both witnesses are equally credible. Indeed, the United States Court of Appeals for the Eleventh Circuit recently observed that a district court ordinarily should not disturb the findings of a magistrate judge concerning credibility without holding its own evidentiary hearing and rehearing the disputed testimony, particularly where those findings are dispositive. Amlong & Amlong, P.A. v. Denny's Inc., —— F.3d ——, ——, 2006 WL 2105980, at \*12 (11th Cir. July 31, 2006). The Court therefore accepts Judge

Case 20-10343-LSS    Doc 573-1    Filed 05/06/20    Page 13 of 13

Muzzy Products Corporation v. Primos, Inc., Not Reported in Fed. Supp. (2006)
2006 WL 8434062

Johnson's conclusion that Mr. Primos and Attorney Helget gave equally credible testimony.

Given Judge Johnson's finding that both Attorney Helget and Mr. Primos gave equally credible testimony, Judge Johnson correctly concluded that Defendant simply had not carried its burden of proof with respect to disqualification. The Court consequently overrules Defendant's objection to this portion of the Report and Recommendation.

Defendant also objects to Judge Johnson's alternative conclusion that disqualification would not be warranted in this case, even if Attorney Helget indeed discussed the subject matter with Mr. Primos, in violation of Rule 4.2. Judge Johnson observed:

> Even if Mr. Helget discussed the subject matter of the lawsuit with Mr. Primos in violation of Rule 4.2, disqualification would not be warranted for two reasons. First, Muzzy would be prejudiced by the disqualification of its counsel. Although this litigation may be in its early stages, the dispute is not; Mr. Helget prosecuted the patent and is knowledgeable about the issues here. Second, disqualification is not appropriate because Mr. Primos revealed nothing confidential (see supra note 5) even if his testimony is fully credited. Defendant's unwillingness to settle this case had been known since before the litigation began. Additionally, defendant's view that its product contains an encumbered path had been known since before the litigation began. The only "new" piece of information disclosed by Mr. Primos was that he would not agree to third-party mediation; however, that is hardly disclosure of confidential information. One must assume that a party who would not settle would also not agree to mediation.

(Report & Recommendation at 8.) The Court finds that Judge Johnson's determination is supported by the evidence in the record and by applicable law. Consequently, the Court overrules Defendant's objections to this portion of the Report and Recommendation.

In sum, the Court adopts the Report and Recommendation and overrules Defendant's Objections to the Report and Recommendation. For the reasons stated in this Order and the reasons given in the Report and Recommendation, the Court denies Defendant's Motion to Disqualify Plaintiff's Counsel. In making this determination, the Court observes that it certainly would have been more prudent for Attorney Helget to avoid conversing with Mr. Primos altogether, except in the presence of Mr. Primes' counsel; however, as Judge Johnson observed, Defendant simply has not carried its burden of proof to show that a violation of Rule 4.2 occurred. Under those circumstances, and given the substantial prejudice to Plaintiff that would result from a disqualification of its counsel, the Court denies the Motion to Disqualify Plaintiff's counsel.

**V. Conclusion**

ACCORDINGLY, the Court **DENIES** Defendant's Motion to Disqualify Plaintiff's Counsel [25], **ADOPTS** the Report and Recommendation of United States Magistrate Judge Walter E. Johnson [46], and **OVERRULES** Defendant's Objections to the Report and Recommendation [61].

**\*15** IT IS SO ORDERED, this the 21st day of August, 2006.

**All Citations**

Not Reported in Fed. Supp., 2006 WL 8434062