```
                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
IN RE:                          . Chapter 11
                                . Case No. 20-10343 (LSS)
BOY SCOUTS OF AMERICA AND       .
DELAWARE BSA, LLC,              .
                                . Courtroom 2
                                . 824 Market Street
Debtors.                        . Wilmington, Delaware 19801
                                .
                                . Wednesday, May 6, 2020
. . . . . . . . . . . . . . . .
                    TRANSCRIPT OF TELEPHONIC HEARING
           BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN

                    UNITED STATES BANKRUPTCY JUDGE
```

APPEARANCES:

For the Debtors:            Derek C. Abbott, Esquire
                            MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                            1201 North Market Street
                            16th Floor
                            Wilmington, Delaware 19899

                            -and-

                            James W. Ducayet, Esquire
                            SIDLEY AUSTIN, LLP
                            One South Dearborn Street
                            Chicago, Illinois 60603


(APPEARANCES CONTINUED)

Electronically
Recorded By:                Ginger Mace

Transcription Service:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            Telephone: (302) 654-8080
                            E-Mail: Gmatthews@reliable-co.com


Proceedings recorded by electronic sound recording:
transcript produced by transcription service.

APPEARANCES (CONTINUED):

```
 1   For Century Indemnity
     Company:                   Stamatios Stamoulis, Esquire
 2                              STAMOULIS & WEINBLATT, LLC
                                800 N. West Street, Third Floor
 3                              Wilmington, Delaware 19801

 4                              -and-

 5                              Tancred Schiavoni, Esquire
                                O'MELVENY & MYERS, LLP
 6                              Times Square Tower
                                7 Times Square
 7                              New York, New York 10036

 8
     For the U.S. Trustee:      Hannah C. McCollum, Esquire
 9                              OFFICE OF THE UNITED STATES TRUSTEE
                                J. Caleb Boggs Federal Building
10                              844 King Street
                                Suite 2207, Lockbox 35
11                              Wilmington, Delaware 19801

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                    INDEX

2

3    ARGUMENTS                                         PAGE

4    By Mr. Ducayet                                       5

5    By Mr. Abbott                                       58

6    By Mr. Schiavoni                                    65

7    By Mr. Ducayet                                     109

8    BY Mr. Schiavoni                                   123

9    By Mr. Abbott                                      123

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    AFTERNOON SESSION

2           THE COURT:  Good afternoon, Counsel.  We're here on

3    The Boy Scouts of America matter, case number 20-10343 for

4    continuation of our Monday hearing, and specifically argument

5    on the retention of Sidley filed by B.S.A.  So, let me turn

6    it over to Debtor's Counsel.  We can take argument in any

7    fashion, it's Debtor's application.  So, I can start with

8    Debtor's Counsel, who I know filed their own supporting --

9    filed the application and supporting papers, or we can start

10   with Sidley.  And, I want to make sure I've got everybody

11   who's arguing.  So --

12          MR. ABBOTT:  Your Honor, this is Derek Abbott,

13   Morris Nichols, here for the debtors.  Your Honor, I'll be

14   arguing for the debtors.  Mr. Ducayet will be arguing on

15   behalf of Sidley, but essentially for the debtors, Your

16   Honor.  It's our application, obviously.  We've given some

17   thought to how we might proceed, and if it's okay with Your

18   Honor I would prefer to cede the podium to Mr. Ducayet for

19   what I'll call sort of the -- the main effort, Your Honor.

20   I'll pick up at the end of his argument, then the Court may

21   hear additional parties in support that wish to be heard, and

22   then turn it over to the objectors with some time for

23   rebuttal by Sidley and the debtors; if we may, Your Honor?

24          THE COURT:  Okay.  And, who's going to be arguing

25   for Century -- Chubb?

1          MR. STAMOULIS:  Your Honor, this is Stam Stamoulis,

2    Delaware Counsel for Century.  Mr. Schiavoni from O'Melveny

3    and Myers will be presenting on behalf of Chubb.  And, I saw

4    his box -- oh there -- there it is.  I see it -- I see it

5    now.  Okay.

6          THE COURT:  Okay.

7          MR. STAMOULIS:  So, Mr. Schiavoni appears to be on.

8    And, if he could mute his Zoom and -- then he'll speak

9    through Courtcall.

10         THE COURT:  Okay.  Very good.  And, Ginger, before

11   we start then can you remind everyone of the protocol?

12         MS. MACE:  It is extremely important that you put

13   your phones on mute when you are not speaking.  When

14   speaking, please do not have your phone on speaker as it

15   creates feedback.  This also helps with the background noise

16   so that we can hear the person that is speaking and get an

17   accurate record.  Also, it is very important that you state

18   your name each and every time you speak for an accurate

19   record.  Your cooperation in this matter is greatly

20   appreciated.  Thank you.

21         THE COURT:  Thank you.  Mr. Ducayet?

22         MR. DUCAYET:  Good afternoon, Your Honor.  Jim

23   Ducayet on behalf of Sidley Austin in support of the debtor's

24   application for the retention of Sidley on behalf of the

25   debtors.  Thank you for hearing this afternoon and thank you

1    for having us after what ended up being a fairly lengthy

2    evidentiary submission on Monday.  Your Honor, we've given

3    some thoughts, as Mr. Abbott indicated to how to proceed

4    today.  And, taking into account the question or questions

5    that Your Honor posed at the end of the hearing on Monday we

6    did file this morning a very short notice of supplemental

7    authority to specifically address the legal question that

8    Your Honor presented, and -- and I can touch on that in the

9    course of my remarks.  We also, Your Honor, put together a

10   few slides, and I have my colleague Mr. Rodheim on the line,

11   who hopefully will be able to put those up on screen.  We

12   sent those over to Chambers and to opposing counsel a couple

13   of hours ago, just to make sure that Your Honor had a chance

14   to a -- to receive it, and also to ensure that to the extent

15   that Counsel for Century had any issues, they could let us

16   know about that.  And, so with Your Honor's permission I'd

17   like to use those slides as I go through my remarks this

18   afternoon.

19            THE COURT:  That's fine for me.  I assume it's --

20   it's a demonstrative and it's -- it's for your remarks and

21   arguments, it's not even a demonstrative, it's for argument

22   and that's fine.  I do have those.  I did not see the

23   supplemental authority.

24            MR. DUCAYET:  Okay.

25            THE COURT:  That was filed this morning.  And,

1    while Century also filed something and submitted it to

2    Chambers, I received it just very shortly before the hearing

3    and I have not read it yet.  So, people can inform me what is

4    in those filings.

5            MR. DUCAYET:  Yes, Your Honor, I -- I confess I

6    just got it about ten minutes ago, as well, and have had a

7    chance to -- to look at it quickly.  Your Honor, what I'd

8    propose to do is you know keeping with the question that Your

9    Honor posed, which how should you be thinking about this

10   issue?  And, in particular how should you be thinking about

11   this issue in a -- in a context in which there's a pretty

12   sharp disagreement between the parties over whether there is

13   a conflict or not.  And, you know we thought it might be

14   useful to kind of lay out a framework -- at least this is the

15   way that we think it would be useful to kind of analyze the

16   issues.  And, so if I could ask Andy to put up on the screen

17   the slide, in particular slide number two.  See if this

18   works, Your Honor.

19       (Pause)

20           MR. DUCAYET:  Okay.  And -- Andy, if you could make

21   that slide a little bit bigger on the screen, and so that we

22   only see the one page there?  There we go.  Okay, great.

23           Your Honor, we -- we thought that it really

24   ultimately as you think about these issues you know comes in

25   the form of kind of three different sets of inquiries.  And,

1    I would propose to sort of walk through each of these and tie

2    them back to the arguments that parties have made and the

3    evidence that came in on Monday.  And, you know the first

4    issue, as you'll see in this slide, is is this the proper

5    forum?  Is this the place in which the dispute between

6    Century and Sidley is appropriately resolved?  And, I want to

7    speak to that issue.  The second I think question becomes if

8    it is an issue that the Court needs to resolve here, you know

9    what does the evidence show with respect to whether or not

10   there is in fact a conflict.  And, there obviously is a -- a

11   whole series of issues that sort of flow into that question

12   that I'll address.  And, then the final question, Your Honor,

13   is even if Your Honor is ultimately going to conclude that

14   there is a conflict, the question is well what do we do about

15   that?  And, so we've identified as sort of the third category

16   or third issue to be considered, what is the appropriate

17   remedy here and -- and is it possible given the circumstances

18   should Your Honor conclude that there's a -- a conflict here?

19   Are there ways to address that conflict?  And, as Your Honor

20   knows in our papers we sort of set forth a number of

21   different things that Sidley is prepared to do in order to

22   address any legitimate concerns raised by -- by Century.

23          So, let me start with the first point.  And, Andy

24   if I could just ask you to take that down for a second?  Let

25   me address, Your Honor, the issue of the forum.  Now,

1    fundamentally, Your Honor, this is about the debtors and it's

2    about whether or not the debtors can retain its chosen law

3    firm, Sidley, who's been working with the debtors for going

4    on a good year and a half now.  I think it's clear from the

5    testimony on Monday that Century is no longer a client of

6    Sidley's.  There's obviously a dispute, and a pretty sharp

7    dispute about the circumstances surrounding that.  And, you

8    heard from the witnesses, Ms. Russell (phonetic) and Mr.

9    Schwarz (phonetic) on Monday that the service level agreement

10   that governs this relationship contains an alternative

11   dispute resolution mechanism, which they have invoked, and

12   which they intend to pursue.  And, obviously, Sidley denies

13   quite emphatically that we did anything that breached the

14   S.L.A., but that's a matter that's going to get resolved

15   presumably in the course of the arbitration proceeding.  And,

16   so the question I think as a threshold matter, Your Honor, is

17   is this even an issue that Your Honor should be considering

18   at all?  And, to that end, Your Honor, I point you to the

19   language of 327 on its face, which is focused on really

20   whether or not the firm has a -- an interest that is adverse

21   to Boy Scouts.  And, you know frankly I think over the course

22   of that long day of testimony I don't think there was really

23   any evidence that we have an interest that's adverse to Boy

24   Scouts.  This was all about whether or not the -- the work

25   that we did for Century was somehow adverse or substantially

1    related.  So, viewing it from the perspective of what the

2    interests vis-a-vis Sidley and Boy Scouts, I don't think that

3    is an issue.

4         And, moreover, Your Honor, 327 is really focused in

5    its language upon the present circumstances.  And, as I said

6    I don't think there's any dispute we no longer represent

7    Century.  The language -- the text of the statute obviously

8    focuses on sort of present interest, whether or not Sidley

9    holds an interest, whether or not it's disinterested and the

10   like.  We cite some cases to that effect, Your Honor, in our

11   papers.  And, that the ultimate objective here under 327 is

12   focused on the present circumstances as the Court finds them.

13   And, by the way that's not a controversial view.  You know

14   you --

15        THE COURT:  What is -- what is not a -- what's not

16   a controversial view?  The -- the --

17        MR. DUCAYET:  That --

18        THE COURT:  That 327 speaks in the present tense?

19        MR. DUCAYET:  Yes, Your Honor.  And, my point there

20   is you heard from Mr. Splinina (phonetic), who was the expert

21   for Century, testify that he's advocated position in his work

22   representing firms in a bankruptcy proceeding.  And, so --

23        THE COURT:  So, what's the -- so, what's the

24   relationship, if any, between the hot potato rule and 327(a)?

25   Because 327(a) just not -- doesn't just say that Sidley can't

1  hold an interest adverse to the estate, it also says they

2  can't represent an interest adverse to the estate.  There's

3  two parts to 327.

4          MR. DUCAYET:  Yes, Your Honor.  Yes, Your Honor.

5  And, we do not represent a interest adverse to the state --

6  to the estate.  And, that -- that --

7          THE COURT:  Not now.

8          MR. DUCAYET:  We -- we don't, Your Honor.  We don't

9  now represent an interest adverse to the estate.  I think

10 that is undisputed.  And, you know we pointed out in our

11 papers, Your Honor, there is no case law in the 3rd Circuit

12 adopting the hot potato rule in this circumstance, and I

13 think that's precisely because the focus is on what the

14 relationship is now.  Do we presently have an interest that

15 is adverse to the estate?  And, the answer to that is no.

16 Because we no longer --

17         THE COURT:  Well, two things -- two questions.  Two

18 questions, and I recognize this is going to be a little bit

19 more difficult by video.

20         MR. DUCAYET:  Sure.

21         THE COURT:  But, one, do you agree that previously

22 when Sidley was representing Chubb undisputably that it --

23 that Sidley represented an interest adverse to the estate?

24         MR. DUCAYET:  Your Honor, I -- I -- I don't think I

25 would agree with that.  And, I say that for the following

1  reasons.  And, I'll get to this in a moment in my remarks.

2  You saw in Ms. Fulcher's (phonetic) testimony the specific

3  terms of the engagements for Boy Scouts.  And, that

4  engagement specifically carved out any representation of them

5  relating to insurance coverage issues.  And, so you know that

6  is the -- that is the specific scope of the work that we are

7  doing.  It has the express carve out.  Moreover, Your Honor,

8  as a practical matter since the outset of our representation

9  Sidley has divided the -- I should the debtors have divided

10  responsibility between Sidley and Haynes and Boone with

11  respect to insurance coverage issues.

12          THE COURT:  Okay.  Well, we'll have to get into

13  that perhaps a bit later.  As for the hot potato rule, the

14  3rd Circuit hasn't said one way or the other; has it whether

15  it applies in this situation?

16          MR. DUCAYET:  --

17          THE COURT:  They haven't said it doesn't --

18          MR. DUCAYET:  Agreed.

19          THE COURT:  And, they haven't said it does; right?

20          MR. DUCAYET:  I agree with that, Your Honor, yes,

21  that's true.

22          THE COURT:  So --

23          MR. DUCAYET:  And -- and --

24          THE COURT:  Don't I have to grapple with that?

25          MR. DUCAYET:  Your Honor, I don't think that you

1   do.  And, the reason I don't think you do, is because again

2   if you look to the present tense language of 327 the hot

3   potato issue is really a matter that is going to be addressed

4   in the arbitration proceeding.  It's essentially a claim that

5   we've breached our duty of loyalty to Century.  Century will

6   pursue that claim and seek whatever relief they can persuade

7   the arbitrators to provide them.  But, it doesn't in -- in

8   our view relate to the question of whether we currently hold

9   a present adverse interest to the estate.  We don't think we

10  do.

11          THE COURT:  So, let's assume for the moment a

12  situation where it's agreed that a law firm represented an

13  interest adverse to the estate --

14          MR. DUCAYET:  Mmm hmm.

15          THE COURT:  Pre-filing of a bankruptcy petition.

16  And, then they filed -- and -- but they file a bankruptcy

17  petition.  Is it -- is it acceptable that they drop their

18  other client either immediately before the filing or perhaps,

19  because some of the case talk about looking at the presence

20  tense as of the time an objection was filed, or at the time

21  that the Court's considering the matter, that they drop it --

22  their client in their interim period; that's acceptable?

23          MR. DUCAYET:  Well, Your Honor, a couple of things.

24  First of all, you know obviously we don't concede that we

25  dropped --

1           THE COURT:  Right.

2           MR. DUCAYET:  The client because of the client.  We

3    -- we were in a position frankly where the relationship had

4    broken down.  So, I think in that circumstance, Your Honor,

5    that's correct.  It -- it -- it would not implicate the

6    issues under 327 for purposes of whether or not we should be

7    retained by Boy Scouts.

8           THE COURT:  Okay.  But, I'm asking a hypothetical

9    questions, because I'm under -- trying to understand how I'm

10   supposed to, if at all, apply the rules.  So, my question is

11   if there is actually agreement, no dispute that the

12   restructuring law firm pre-filing represented a -- an adverse

13   interest and in contemplation of filing they dropped that

14   client, because they wanted to take the bankruptcy matter.

15   Is that not something I consider with 327?  And, if not; why

16   not?

17          MR. DUCAYET:  Yes, Your Honor, and accepting

18   obviously that this is a hypothetical -- Your Honor, I think

19   you could consider it.  But, I think then the question would

20   become a matter of whether or not there is a substantial

21   relationship between the matters that the firm was previously

22   handling and the matters that they're handling right now.

23   And, so the question ultimately is still one a present

24   adverse interest.  It's possible that there could be an

25   adverse interest by reason of information if that matter that

1  was previously active is substantially related.  And, I can

2  obviously speak, Your Honor, to the standard for substantial

3  relationship.  But, in either instance, Your Honor, you would

4  treat this as a former client situation.  For purposes of a

5  conflict you'd look at the -- the standard under 1.9.  And,

6  only if Your Honor were to conclude that there is a

7  substantial relationship such that information that was

8  provided would materially advance the position you know in --

9  in respect of the representation of the debtor could that be

10  relevant.  And, that's not the case here.

11          THE COURT:  Okay.  I'm -- I'm not sure I -- I still

12  follow your answer, but as you can see I'm grappling with the

13  -- with the question of what is the relationship, if any,

14  between the hot potato rule and 327 --

15          MR. DUCAYET:  Yes --

16          THE COURT:  As opposed between the hot potato rule

17  and the professional rules of responsibility.

18          MR. DUCAYET:  Yeah --

19          THE COURT:  And, the case law that suggests there -

20  - the present -- 327 looks at the present relationship.  And,

21  that's what I'm --

22          MR. DUCAYET:  Your Honor, let me --

23          THE COURT:  Looking for.

24          MR. DUCAYET:  Yes, Your Honor.  Let me see if I can

25  be a little bit more direct.  I don't think actually that the

1    hot potato rule itself if relevant on the 327 issue.  I will

2    concede it's possible that if -- if the nature of the

3    relationship is such that there was a substantial

4    relationship that could give rise to a present interest.

5    But, that's sort of a different question in -- in terms of

6    whether or not there's a hot potato --

7            THE COURT:  Mmm hmm.  Okay.  Thank you.

8            MR. DUCAYET:  Okay.  So, Your Honor, as I said the

9    -- the 327 standards are -- are focused on the present

10   circumstances.  And, again, just to pick up on the -- the

11   colloquy that we just had, I am quite certain that Century

12   will advance their argument that this a hot potato situation.

13   We don't agree with that.  But, that will get sorted out in

14   the arbitration.  It does not create an adverse interest

15   under 327 for purposes of our representation of Boy Scouts.

16           So, Your Honor, that's the issue of the forum.

17   And, we cited a number of case that say, look if -- if the

18   issue here can really be better addressed in a different

19   forum, be it an arbitration proceeding, be it another

20   lawsuit, be it a disciplinary proceeding under extreme

21   circumstances -- that -- that's the better forum in which

22   this issue should be resolved.  And, we would suggest that

23   that's the case here.

24           But, let me move on to the conflict issue.

25           THE COURT:  Now, let me ask another question first.

1  Let me ask another question first about the forum.  So, let's

2  -- let's assume a disqualification scenario and -- and Sidley

3  cited me to a lot of disqualification decisions, I'm not sure

4  that those decision are fully relevant here, but assuming for

5  the moment are.  Is -- is a -- a former client -- a client or

6  a former client limited to some direct lawsuit against their

7  firm, or former firm in resolving issues?  Or, can't they

8  raise a disqualification motion in the pending litigation

9  where their firm or former firm is representing the other

10  side?

11      MR. DUCAYET:  They absolutely can, Your Honor.  We

12  don't deny that all.  The -- the point that we made in our

13  papers and then I'll make right now is that Courts, I think,

14  legitimately look at these kinds of situations with a certain

15  degree of scepticism, because filing a disqualification

16  motion is a you know fairly serious you know act.  And, it

17  can be used tactically for purposes of delay and for purposes

18  of sort of tactical litigation advantage.  And, that's why

19  the cases talk about the issue of an alternative forum.  It's

20  a -- it's a way of -- of sort of addressing the possibility

21  that a -- a motion for disqualification can be used as a

22  tactical matter to sort of derail the litigation and delay

23  things.  In that instance it's appropriate for the Court to

24  say there's another place in which this dispute can be

25  resolved.

1          THE COURT:  Okay.  So, what -- what if the Court

2    does not believe that the motion being -- disqualification

3    motion is being used tactically?

4          MR. DUCAYET:  Hmm --

5          THE COURT:  Then is it -- then should the matter

6    proceed in another forum or not?

7          MR. DUCAYET:  I -- I think Your Honor has the

8    discretion to -- the Court would have the discretion to make

9    that decision.  And, you know my only point, Your Honor, is

10   that it is precisely because of the possibility of a tactical

11   use and -- you know the -- the very real, I think, you know

12   chance that it's being used for purposes for -- other than

13   you know the -- the purpose of the motion, that you'd look to

14   the alternative forum.  But, I think Your Honor in any Court

15   would have full discretion to determine whether or not to

16   consider that issue or instead to have it be addressed in

17   that alternative forum.

18         THE COURT:  Okay.

19         MR. DUCAYET:  So, Your Honor, let me turn; if I

20   could, to the second issue which is, I think, anticipated by

21   your comments just now.  And, that is let's assume you know

22   the Court determines that this is not you know a tactical

23   filing and that you should go on to consider the conflict

24   itself.  And -- and -- and, Your Honor, as I've said already

25   -- if Your Honor decides you need to consider the conflict

1    issues, this is really a matter involving a former client and

2    the appropriate standard for your review would be the former

3    client rule of 1.9.  And, the inquiry under that rule is

4    whether or not the matters are substantially related.  And, I

5    think it's important to put a little bit of flesh on the

6    bones of what that means.  And, if you look at the comments

7    to model rule 1.9 there's a definition of what substantially

8    related means.  A matter is substantially related for

9    purposes of the rule if there is a substantial risk -- a

10   substantial risk that confidential factual information as

11   would normally have been obtained in the prior representation

12   would materially advance the client's position in the

13   subsequent matter.

14          And, Your Honor, we think the evidence shows that

15   that is not the case here.  And, let me just walk you through

16   what came in on Monday and how it demonstrates that these are

17   not substantially related.  They don't present a substantial

18   risk that the representation would materially advance the

19   representation of Boy Scouts.  And, if I could ask Andy to

20   put up back on the screen the -- the demonstrative.

21       (Pause)

22          MR. DUCAYET:  Could you make that a little bit

23   bigger?

24       (Pause)

25          MR. DUCAYET:  So, Your Honor, what you have in

1    front of you is -- is a demonstrative that's intended to show

2    the -- the various definitions of the representations that we

3    have.  And, Your Honor, what you have here is really the only

4    contemporaneous documentation of exactly what it was what we

5    were doing for Century, exactly what it was that we were

6    doing for Boy Scouts.  And -- and in edition we've identified

7    the role that Haynes and Boone will play based upon the

8    application that they made to the Court.  And, as you heard

9    in the testimony on Monday, Your Honor, Century doesn't do

10   engagement letters; right?  Normally when you're trying to

11   determine the scope of -- of work in a particular engagement,

12   you'd look at the engagement letter, typically that's the

13   first or second paragraph of the engagement letter, it'll say

14   scope and then it'll define what the scope is.  And,

15   Century's position is that this is the agreement; right?

16   This is the -- this is the agreement by which they're seeking

17   you know to claim that we were required to get a waiver, and

18   by which they seek to seek alternative dispute resolution.

19   And, Your Honor, you know this point I think came across you

20   know a number of times during the course of the testimony on

21   Monday, but on it's face, Your Honor, the S.L.A. says that

22   this applies to services performed by Sidley that are

23   unrelated to the defense of an insurance claim or a related

24   insurance claim.  Again, that's the contemporaneous scope of

25   the work that was done here.

1              And so, Your Honor, just to pause for a second,

2    again, contract that with -- with the definition of

3    substantial relationship this says its unrelated.  The 1.9

4    standard talks about a substantial risk that it would

5    materially advance the representation, so it's an even higher

6    standard here.  Century's own document shows that these

7    matters were unrelated.  Now, in their sur-reply they -- they

8    pointed to a different provision of the S.L.A., which says

9    that a -- you know the S.L.A. should not be taken as any form

10   of instruction to limit your role or reduce the quality of

11   representation provided.  Now, as an initial matter, Your

12   Honor that -- that -- unfortunately that portion is not in

13   the record, because Century asked that it be redacted.  They

14   went on to quote it in their sur-reply.  But, you know more

15   importantly, Your Honor, they didn't quote in their sur-reply

16   the next sentence, which reads as follows:  It reads, rather

17   it should be regarded as a reasonable managerial requirement,

18   which provides a template for your representation of a

19   client.  The managerial requirement is not in any way

20   intended to broaden the scope of the work for which Century

21   retained us.

22              Now, on the right hand side you've got the Century

23   engagement, that's as I said the only contemporaneous

24   document that establishes the scope of the work.  On the left

25   hand side at the top, Your Honor, you have the Sidley

1    engagement letter.  You heard from Ms. Bolter (phonetic)

2    about the specific carve our relating to insurance coverage

3    matters.  And, below that you have the Haynes and Boone

4    application, which again sort of fills the hole that's

5    created by the representation carve out in the Sidley

6    representation.  Haynes and Boone will be responsible for the

7    insurance issues, consistent with the language that's set

8    forth here.

9         So, Your Honor, again, just starting from the

10   premise of are these matters substantially related?  What you

11   can see is the way in which the parties defined their

12   relationships at the time is consistent with our position

13   that these matters are not substantially related.  They are

14   not matters which would present a substantial risk that they

15   could materially advance our representation of Boy Scouts.

16        The second issue, Your Honor, with respect to

17   defining the scope of the matters for purposes of substantial

18   relationship are you know an issue that came about sort of

19   late in the day in the evidentiary hearing, and that is the

20   declaratory judgment action.  And, having had a chance to

21   very quickly scan the filing that was just made, you know

22   that's another -- you know it focuses on that, as well.

23        And, Your Honor, let me just say a couple things

24   about this.  And, let's just be clear on what we're talking

25   about here.  There is a declaratory judgment action pending

1    in Texas.  It was filed by Boy Scouts against Century and

2    others.  Sidley does not represent Boy Scouts in connection

3    with that matter.  That's consistent with the engagement

4    letter that you see in the blue circle.  So, we're not

5    handling that, that's outside of the scope of our engagement.

6    Now, what they have argued is that the fact that there is a

7    declaratory judgment action between Boy Scouts and Century

8    and others, and that there was discovery propounded -- again,

9    not by Sidley, but by Counsel for Boy Scouts relating to re-

10   insurance that that somehow is -- proof that these are

11   matters that are related.  And, a couple of things to say on

12   that.  So, first of all, Your Honor, maybe it's useful just

13   to make sure we're clear on what the issues are in the D.J.

14   action versus what the issues are in the re-insurance action.

15   And, Andy, could I ask you actually to take the -- take the

16   brief that was just filed half an hour ago and put page six

17   up?

18        (Pause)

19        MR. DUCAYET:  And, if Your Honor will just bear

20   with us for a moment, as we -- as we -- we pull this up?

21        (Pause)

22        MR. DUCAYET:  Okay.  Your Honor, this may be a

23   little hard to read, but I'll -- I'll do my best.  So, this

24   is a chart that appears in what Century just filed.  And, the

25   chart is intended to, or purports to demonstrate the

1  relationship between the work that Mr. Sneed (phonetic) did

2  and the issues in the -- the -- the declaratory judgment.

3  So, on the right hand column there are quotations from the

4  complaint that was filed in the declaratory judgment action.

5  And, on the left hand side are quotes from the Sneed

6  declaration.  And, the suggestions is, well you know both of

7  them dealt with allocations, both of them deal with

8  occurrence, so they must be related -- they must be

9  substantially related.

10       Your Honor, let's be careful here, because you

11  heard Mr. Sneed testify yesterday for example about

12  occurrence and what he was talking about -- and he made this

13  very clear, and I can give Your Honor a cite.  He testified

14  to this at page twenty-four and twenty-five of the

15  transcript.  He was talking about the definition of

16  occurrence in the re-insurance contract; okay?  That's a

17  separate and distinct contract from the underlying insurance.

18  All right?  He -- he was very clear that that's an issue -- I

19  think he testified something like this is something that

20  people have been fighting about for thirty years, the

21  definition of an occurrence under a re-insurance contract.

22       Now, if you look on the right hand column what the

23  excerpts of the complaints talks about here is which

24  insurance policies the definition of occurrence applies to.

25  And, the insurance policies that that's talking about is not

1   the re-insurance policies that Mr. Sneed was advising on,

2   they're the underlying policies.  They're two separate

3   policies, Your Honor.  And -- and frankly the same issue --

4   the same is true with respect to the allocation question.

5   Allocation for purposes of a re-insurance dispute you know

6   most often follows the allocation of the underlying dispute,

7   but it doesn't have to, and it's different.  And, in fact you

8   know that was -- was part of the issue in the first Lloyds

9   (phonetic) arbitration.  So, I simply want to point this out

10  to Your Honor as this is a little bit confusing, because

11  while it's true that the occurrence language appears in -- in

12  both Mr. Sneed's declaration and -- and the complaint, we're

13  talking about two different contracts.  And, they're separate

14  and distinct for all the reasons that Mr. Sneed testified

15  about yesterday.  Now -- and, Andy why don't you take that

16  down?

17       (Pause)

18       MR. DUCAYET:  So, Your Honor, the argument that was

19  made or the position that was taken both in this filing and

20  in connection with the questioning of the witnesses on Monday

21  was that well the fact that the Boy Scouts sought discovery

22  of the re-insurance matters is somehow additional evidence

23  that these things are substantially related.  But, Your

24  Honor, for -- from you know it -- you know Ms. Russell, Mr.

25  Schwarz, Mr. Salintano (phonetic) that the position that

1  Century's taken in those cases is that the re-insurance

2  matters are entirely irrelevant, that there is no discovery

3  that is permissible with respect to that, because the matters

4  in the re-insurance dispute have nothing to do with the

5  dispute that's the subject of a declaratory judgment action.

6  And -- and just so there's no mistake about this, the

7  standard for relevancy in Texas is a broad one, consistent

8  with you know the -- the broad standards for relevance in --

9  you know in Illinois, and -- and Delaware, and in Federal

10  Court.

11        And, so again it's not even the point that this is

12  not substantially related, they're saying again there's no

13  relationship whatsoever.  It is not relevant at all.  It

14  would not even lead -- be reasonably calculated to lead to

15  the -- to a discovery of admissible evidence.  And, again,

16  Your Honor, I think it's important to take a look at the

17  positions that have been taken before there was this dispute,

18  versus the way in which the positions are being articulated

19  now.  And, I don't think they can have it both ways.

20        THE COURT:  Well, I understand Mr. Sneed's

21  testimony, but we also had testimony from I believe it was

22  Ms. Russell.

23        MR. DUCAYET:  Mmm hmm.

24        THE COURT:  That in order for Counsel to properly

25  advise her in her re-insurance matters they need to fully

1  understand the underlying claims issues, so that in fact they

2  can advise properly on the re-insurance issues.

3          MR. DUCAYET:  Okay.

4          THE COURT:  And, I'm not as articulate as she was

5  on that, but that's my recollection of -- big picture of what

6  she was testifying to.

7          MR. DUCAYET:  Agreed, Your Honor.

8          THE COURT:  So, in that instance while the lawsuit

9  itself may be separate from the underlying abuse litigation -

10  -

11          MR. DUCAYET:  Mmm hmm.

12          THE COURT:  Her testimony was you need to

13  understand what happened in that in order to properly counsel

14  her on the re-insurance obligations.  And, then of course it

15  would depend on what the defenses were that were brought by

16  the re-insurer as to whether there is any overlap between --

17          MR. DUCAYET:  Yes --

18          THE COURT:  The re-insurance and the underlying

19  litigation.

20          MR. DUCAYET:  I -- I agree with all that, Your

21  Honor.  And, that is what she said.  My only point is it is

22  Century's position that there is no overlap.  And, that's --

23  that's -- that's the position they've taken in this

24  litigation.  It's not even that it's privileged, they're take

25  -- they're simply taking the flat out position that it is

1   irrelevant, it has nothing to do with one another.  And, to

2   your question --

3          THE COURT:  Well, could -- well could -- well could

4   the -- the re-insurance litigation have no relevancy to the

5   underlying litigation, but not the converse?

6          MR. DUCAYET:  Yeah.  So, I -- I -- Your Honor, that

7   -- that is what Ms. Russell was trying to suggest.  I -- I'd

8   have to confess I'm genuinely mystified by that.  I don't

9   understand how that could be true.  The whole point is if

10  it's true that you need to know about the underlying

11  insurance issues for re-insurance purposes then I guess I

12  don't understand how it could only be a one way street.  The

13  information that the re-insurance lawyer has would thereby --

14  by definition be relevant to the underlying dispute.  I just

15  -- I -- I don't --

16         THE COURT:  I don't --

17         MR. DUCAYET:  See it.

18         THE COURT:  Say -- say that last part again?  The -

19  - the information --

20         MR. DUCAYET:  Yeah, so if the argument is that the

21  information may be relevant for the re-insurance to see it,

22  but it's not relevant for the underlying insurance dispute

23  the whole premise of the substantial relationship argument

24  that's being made here is that the information about the

25  underlying insurance dispute is relevant.  It's -- it's

1   something that the re-insurance lawyers need to know.

2           THE COURT:  It's relevant to the bankruptcy.  It's

3   relevant to the bankruptcy.  And -- and there are -- I

4   thought was the argument -- the -- and I've been struggling

5   with this from the beginning, as well.  There's two

6   perspectives to look at here.  There's the perspective of --

7   and maybe it's more in a 1.7 context, I don't know.  But,

8   there's the perspective of who's adverse to who in the re-

9   insurance litigation, and the perspective of who's adverse to

10  who in a bankruptcy case.

11          MR. DUCAYET:  Mmm hmm.

12          THE COURT:  Those are different perspectives.  And,

13  I'm wondering if there's a similar -- similar difference of

14  perspective when you're looking at what are issues in the re-

15  insurance litigation versus what are issues in the underlying

16  litigation?

17          MR. DUCAYET:  Yeah, I -- I -- I think I understand

18  Your Honor's questions.  I don't -- I don't see how there

19  would be given the way in which Ms. Russell -- defended what

20  the -- described what the relationship is.  And, you know to

21  Your Honor's question about adversity in connection with the

22  bankruptcy matter, that's precisely why we have insurance

23  coverage counsel.  We're not involved in that.  That's not

24  simply not something that Sidley is going to handle.  But, I

25  don't think, Your Honor, that it makes a lot of sense to say

1   well you know these direct coverage disputes are you know

2   directly related to the re-insurance matters, and therefore

3   there's a substantial relationship.  But, then to turn around

4   and say, but it has no relevance whatsoever in a declaratory

5   judgment action that seeks to declare the rights you know

6   vis-a-vis the insurer of Boy Scouts.  That doesn't -- that

7   doesn't make any sense.  Your Honor, and so I think that's an

8   important distinction.

9           And, again, I will just emphasize this is not a

10  Sidley issue in the sense that we're not representing Boy

11  Scouts.  We don't represent you know Boy Scouts in connection

12  with that litigation or in -- in any other coverage dispute.

13          THE COURT:  Mmm hmm.

14          MR. DUCAYET:  That's a -- that's an important

15  element, Your Honor, of what -- you know what Century has

16  offered by way of evidence that these matters are

17  substantially related.  And, again I think it's very

18  important not to sort of confuse issues that are really re-

19  insurance issues with issues that are underlying insurance

20  issues.  And, you've heard from Mr. Sneed about how in

21  connection with the work that he actually did here, he didn't

22  -- the matters that he was asked to look at given the

23  procedural posture that they were in didn't require him to

24  get into you know the underlying coverage issues, because

25  there weren't coverage issues.  These are matters that had

1   been paid and the dispute was really at the re-insurance

2   level over whether or not the terms of the re-insurance

3   contract would cover those claims, and to what extent, and

4   how.  Those were the issues that Mr. Sneed was working on.

5   And, you heard him say very clearly that you know he got a

6   record of the first arbitration proceeding and a few other

7   documents.  But -- but you know -- you know Ms. -- Ms.

8   Russell admitted that he never interviewed any of the

9   underlying claims people, it just wasn't relevant to what he

10  was doing.  And, so you know, Your Honor, the -- the point

11  here is that in this circumstance, given this defined

12  representation there isn't any substantial relationship

13  between the coverage issues that may be at issue in the

14  bankruptcy that will be handled by Haynes and Boone and any

15  of the work that Mr. Sneed did in connection with the -- the

16  other matter.

17          THE COURT:  Okay.

18          MR. DUCAYET:  So, Your Honor, if I could move on?

19  The -- the -- again, as you're thinking about the issue of

20  the substantial relationship, you heard testimony from Ms.

21  Russell, Mr. Schwarz, Mr. Salintano that within Chubb, within

22  Century, re-insurance and direct insurance disputes are

23  handled by totally different groups.  And, indeed one of the

24  things that Mr. Salintano said in his declaration was that

25  the reason why it took them several weeks to sort of piece

1   together this -- this issue was -- was precisely because

2   they're just different -- they're -- they're totally

3   different groups.  They don't -- they don't work together.

4   They're handled you know separately by different departments.

5   And, in our review that just underscores -- as Mr. Sneed said

6   it's -- it's sort of Church and State; right?  These things

7   are separate.  There are reasons that Mr. Sneed testified to

8   as to why you'd keep them separate.  But, that I think also

9   underscores our point that these are not substantially

10   related.

11         Moving on, Your Honor to some of the testimony.

12   Now, Mr. -- you heard from Mr. Sneed.  He testified about

13   what it was the received.  And, he testified about what it is

14   that he needed to do the work that was asked to do.  This

15   involves a separate re-insurance dispute.  Boy Scouts is not

16   a party to that dispute.  It doesn't have an interest in that

17   dispute in the sense that it -- it -- it doesn't have any

18   active claims that are relevant to that re-insurance dispute.

19   This -- this -- these matters involve payments that have

20   already been made to -- to claimants on behalf of Boy Scouts.

21   And, you know the -- the fact of the matter is that --

22   ultimately even if there were declaratory judgments that was

23   being sought, the fundamental declaration that's -- that's

24   being sought in those actions relates to the terms of the re-

25   insurance contract.

1          And, you know ultimately, Your Honor, the fact is

2    Mr. Sneed was very clear, and even Ms. Russell conceded that

3    yeah he -- he did describe you know the categories, the

4    documents that he received.  He was very clear that he had no

5    need to and did not look into any of the underlying coverage

6    issues.  The -- the analogy is the Government -- you know

7    getting Government benefits is a good one.  You know these

8    are background facts, which were necessary for him to be

9    aware of for purpose of -- of presenting the claim to the re-

10   insurance arbitral panel, but they're not matters that he

11   needed to provide advice on.  And, frankly they're sort of

12   taken as a given for purpose of a dispute over the terms of

13   the re-insurance agreement.

14          So, Your Honor, in terms of the conflict and

15   whether or not this is a current or a former client

16   situation, we've already talked a little bit about the hot

17   potato rule.  The other argument that Century makes here is

18   that we should be regarded as a current client, because at

19   the moment the petition was filed on February 18th we were

20   still in the process of -- of withdrawing -- going through

21   sort of the administrative steps of withdrawing from the

22   various matters.  And, Your Honor, I think it -- as -- as an

23   initial matter it's not clear why the dates of the filing

24   would matter.  After all the Century position is that we were

25   adverse from the moment we took on the representation back in

1   2018.  But, putting that to the side the evidence I think is

2   unambiguous that we communicated with Century on January 16th

3   of this year that we were withdrawing.  And, I don't think

4   there can be any doubt about that.  Now, there were certain

5   ministerial steps that needed to be taken, and obviously we

6   have an obligation to work with our former client to ensure

7   an orderly transition.  But, I -- I don't think it can be

8   fairly said that Century had any reasonable expectation that

9   we were continuing to act as their lawyer.  And, in fact

10  you'll recall that I asked you know Mr. Schwarz well you know

11  didn't you understand that as of January 16th we weren't

12  representing you anymore?  And, he said well I had hoped you

13  know maybe we could work something out.  And, I asked him,

14  well how would that be possible?  And, his answer was, well

15  maybe Bill could leave and go found his own law firm.  That

16  might happen.  And, Your Honor, I don't think that's --

17  that's a very realistic approach here.  And, I think Your

18  Honor should view the termination or the cessation of the

19  relationship as having occurred on January 16th.

20          And, so -- and moreover, Your Honor, that's a --

21  that's a sensible way to think about it, because ultimately

22  you know this is a matter that's -- that's sort of you know

23  the -- the reasonable expectations of the parties.  And, were

24  it otherwise you could sort of have the potential for all

25  sorts of shenanigans.  You know we -- you know party -- law

1   firm withdraws from representation and the client just

2   ignores it, never acknowledges it, and continues to take the

3   position that you're representing me -- that's, again, sort

4   of rife with potential for mischief.  And, the fact that we

5   were still in the process of -- of sort of going through the

6   ministerial acts of withdrawing in these arbitration matters

7   doesn't convert us into a current client.  We just don't

8   think that's -- that's accurate.

9             THE COURT:  I think that's tied into the hot potato

10   rule.

11            MR. DUCAYET:  It -- it is, Your Honor.

12            THE COURT:  And -- and -- and whether Sidley was

13   proper in withdrawing, because its client was questioning the

14   conflict issue.

15            MR. DUCAYET:  Yes, Your Honor, and --

16            THE COURT:  So, I think that's tied into that.

17            MR. DUCAYET:  It is, Your Honor.  Although, again,

18   the point here is you know we have a right to withdraw from

19   representation upon a breakdown of a relationship provided

20   that we don't materially prejudice our client.  And, to be

21   fair Century's claiming they were materially prejudiced.

22   But, that's exactly what that arbitration's going to be

23   about.  We don't agree with that.

24            THE COURT:  Yeah, but what was the breakdown caused

25   by?  So, I don't know -- the breakdown caused, because your

1   client's challenging you about a conflict issue.  I -- I

2   don't know the answer to that question, about --

3           MR. DUCAYET:  Your Honor, I don't think --

4           THE COURT:  Whether's that a withdrawal, or a hot

5   potato, or -- or what.

6           MR. DUCAYET:  Your Honor, I don't think you need to

7   get to that point.  Again, I think that's the kind of fact

8   bound determination that the arbitration will resolve.  I

9   think for -- for present purposes you know I think the issue

10  is you know do we have an adverse interest to the estate?

11  And, we don't, because we're no longer representing Century.

12      (Pause)

13          UNIDENTIFIED MALE:  So, Your Honor, if I --

14          THE COURT:  And, it's your -- and it's your

15  position -- and it's your position as well that even prior to

16  January 16th, 2019 -- 2020 that Sidley was never adverse to a

17  current client?

18          MR. DUCAYET:  Your Honor that is -- that is our

19  position.  And, again that's a function of the limitation of

20  the scope of our representation.  That's exactly why we have

21  the carve out.  And, I will just say, Your Honor, that the

22  view that Century has articulated about the -- the nature of

23  the adversity is extremely broad.  And, you know you'll see

24  in Professor Rappaport's (phonetic) declaration you know she

25  talks about and say look it -- it -- it just -- it can not be

1   the case.  That's it so broad, if that were true it would

2   never be possible for any significantly sized law firm to

3   ever -- ever represent a debtor.  You know we took steps

4   right from the outset to ensure that insurance issues were

5   going to be handled -- you know insurance coverage issues

6   would be handled by a different firm precisely so that we

7   didn't have an adversity situation.

8            THE COURT:  Okay.  And, maybe we'll get to this

9   with -- Counsel, but this is mass tort insurance -- this is a

10  mass tort bankruptcy, and I'd like to understand at some

11  point, and maybe even at this point what Haynes and Boone --

12  well, I'm not sure I have any evidence on the totality of

13  Sidley handled versus what Haynes and Boone handled.

14           MR. DUCAYET:  Well --

15           THE COURT:  But -- but maybe we'll get to that.

16  I'm not sure that his carve out answers that question.  And,

17  I'll -- I will look back at the Sidle engagement, but --

18           MR. DUCAYET:  Yes, Your Honor.

19           THE COURT:  I see the quote in the -- in the deck

20  that you circulated.

21           MR. DUCAYET:  Yes, Your Honor.  And, I also believe

22  there's evidence in the declaration of -- that describes the

23  nature of the relationship here.  And, that -- and that we

24  would propose, Your Honor, on a going forward basis to

25  memorialize that in an order, so that it can be perfectly

1    clear to everybody sort of who's responsible for what.

2            THE COURT:  Okay.

3            MR. DUCAYET:  Your Honor, if I could?  Again, sort

4    of following the -- the overview of sort of how to think

5    about this.  I want to turn to the third point, which is what

6    should be the appropriate remedy here?  And, Your Honor, even

7    if the Court were to determine that there was conflict we

8    respectfully submit that's not the end of the matter.

9    Because, it is I think fundamentally an act of discretion on

10   your part whether or not to approve Sidley's retention.  And,

11   you know the -- the case by the way that we cited this

12   morning, Your Honor, our supplemental filing, stand for the

13   proposition that if reasonable attorneys could disagree about

14   whether or not there's a -- a conflict or an ethical

15   violation, that you should not disqualify.  And, again, that

16   I think is a -- a -- an example of the kind of discretion

17   that Your Honor has in these kinds of circumstances.  And, by

18   the way those are cases, which I think support the relevance

19   of Professor Rappaport's opinion that it was reasonable for

20   Sidley to believe these were not substantially related

21   matters.

22           But, it -- look at a minimum there's a -- you know

23   there's a theory of dispute here.  You know at a minimum a

24   close call as to whether or not there's a real issue here.

25   And, we would sub -- respectfully submit, Your Honor, that in

1    exercising that discretion, that's a relevant factor that you

2    should keep in mind.  So, what I'd like to do, Your Honor, is

3    I think there are probably about five or so factors that Your

4    Honor should consider when you're exercising your discretion

5    in determining how to -- to deal with that.

6          Let me -- if I could ask Andy to just put up on

7    screen that -- that page for me?

8      (Pause)

9          MR. DUCAYET:  So, Your Honor, what -- what -- what

10   is reflected on this page is -- you know several or five

11   different factors that I think Your Honor should take into

12   account.  Some of these we already talked about and I won't

13   spend too much time on them.  So, for example you know in

14   determining you know is this appropriate to simply you know

15   forbid Sidley from having any role in the case going forward,

16   or are there other ways such the use of conflict counsel that

17   these issues could be addressed?  You know the first factor

18   is, is there an alternative forum?  And -- and we've already

19   discussed that at some length, and I won't repeat myself in

20   that score.  There is an alternative forum here, and in fact

21   Century has invoked their rights to make use of that.

22         The second factor, Your Honor, is -- and, Andy, if

23   I could ask you to -- to blow that out a little bit, if you

24   could?  I'm having a hard time seeing it.  There we go.

25   Second factor, Your Honor, is delay.  And, let me be clear

1   about what I mean by that.  So, this was an issue that was at

2   least first identified as a -- as a -- as a potential

3   conflict or a -- a conflict that -- that Century believed

4   existed back in October.  And, you know the petition was

5   filed in the middle of February.  And, it was two months

6   before Century filed their objection.  And, in their sur-

7   reply Century makes the argument well we shouldn't have had

8   to file something or do anything until the petition was

9   filed.  And, we agree with that.  There are -- there were

10  things you could have done, but having sort of the petition

11  filed and then waiting another two months we do think is

12  undue delay.  And -- and look the fact of the matter is that

13  Century could have shown up at the first day hearing and said

14  to Your Honor, look we've got a big problem here.  You know

15  maybe -- trying to work it out or whatever.  But, what

16  actually happened was they waited -- they didn't even file an

17  appearance until early April and didn't file their objection

18  until the middle of April.  And, during those two months,

19  Your Honor, this is not sort of just a normal two months of

20  the bankruptcy -- of any bankruptcy, there's a lot that was

21  happening in those two months.  There's been a lot that has

22  been accomplished.  There's been very substantial activity.

23  And, again, we're not saying they needed to file something

24  before the petition was filed.  And, we're not even saying

25  frankly that they needed to you know file a -- a motion to

1   disqualify.  But, the idea that they would sort of sit on

2   this until you know a lot of stuff has happened in this case

3   is again a factor that you ought to consider in determining

4   exactly how you want to address this issue.

5          The third factor, Your Honor, is there is very

6   significant discrepancies between what Century is arguing to

7   this Court now versus what they argued then.  And, if I could

8   ask -- Andy, could you put up the next slide here?  And, I'm

9   not sure how legible this is, Your Honor, but this is just a

10  list of some of the issues in which there are just you know

11  fundamentally different positions that are being asserted now

12  at a time when there is a -- a dispute versus the positions

13  that were taken prior to this dispute.  And, so the most

14  fundamental of which of course is you know the claim that

15  Century didn't learn about this until October of 2019 is

16  squarely belied by the fact that both Ms. Russell and Mr.

17  Schwarz were made aware of this issue back in December of

18  2018, and that Mr. Schwarz and Mr. Sneed had a conversation

19  about it back then.

20         And, again, you know we're not trying to suggest,

21  Your Honor -- let me be absolutely clear about this.  We're

22  not trying to argue -- and I think there's a -- there's a

23  real sort of shift in the night quality to the papers at this

24  point.  We're not suggesting that there was a waiver here.

25  We're not arguing that Century gave us a waiver either

1    written or implied.  The reason we're raising these issues is

2    because they show, again, that to the extent that they're

3    claiming now this is a text book, obvious violation of the

4    ethical rules that no reasonable person could have believe

5    otherwise is just not consistent with how they behaved back

6    then.  The claim that they're surprised in October to learn

7    about all of this is not consistent with the evidence.

8           And -- and also -- and this is the issue with

9    respect to the advance waiver discussions, the proposition

10   that's being asserted right now is that this is a disabling

11   conflict that can not be cured.  That's their position in the

12   brief.  Your Honor, that's not the position that they took

13   earlier.  You know there were discussions that happened in

14   early 2019 in which you know Mr. Schwarz consulted with his

15   bankruptcy colleagues within you know Chubb and made

16   proposals about you know ways in which it would be okay from

17   their perspective for Century -- for Sidley to represent a --

18   an insured of -- of Century.  And, you know frankly

19   everything that was discussed back then is consistent you

20   know with the role that we're proposing Sidley have on a

21   going forward basis.  So, again, the issue of whether or not

22   there was a waiver, whether there's a written waiver, those

23   are all issues about whether or not we complied with the

24   S.L.A., and those are contract disputes.  Those are matters

25   that are committed really I think best to the arbitral panel

1    and not to this Court.  We're simply raising these issues to

2    show that there's a -- there's a big -- there's a big gap

3    between what's being argued to the Court now, versus the

4    positions that were taken earlier.

5              Your Honor, let me just make one point if I could?

6    This is a little bit of a digression, and -- and, Andy, if

7    you could put down the -- that slide there?

8              THE COURT:  Okay.

9              MR. DUCAYET:  Your Honor, if I could, again, sort

10   of, following the -- the overview of, sort of, how to think

11   about this.  I want to turn to the third point, which is what

12   should be the appropriate remedy here and, Your Honor, even

13   if the Court were to determine that there was a conflict, we

14   respectfully submit that's not the end of the matter because

15   it is, I think, fundamentally an act of discretion on your

16   part whether or not to approve Sidley's retention and, you

17   know, the -- the cases, by the way, that we cited this

18   morning, Your Honor, our supplemental filing, stands for the

19   proposition that if reasonable attorneys could disagree about

20   whether or not there's a conflict or an ethical violation

21   that you should not disqualify and, again, that, I think, is

22   an example of a kind of discretion that Your Honor has in

23   these, kind of, circumstances and by the way, those are cases

24   which, I think, support the relevance of Professor

25   Rappaport's opinion that it was reasonable for Sidley to

1   believe these were not substantially of related matters, but

2   look, at a minimum, there's a -- you know, there's a theory

3   of dispute here.  You know, at a minimum, a close call as to

4   whether or not there's a real issue here and we would

5   respectfully submit, Your Honor, that in exercising that

6   discretion, that's a relevant factor that you should keep in

7   mind.

8           So, what I'd like to do, Your Honor, is I think

9   there's about five or so factors that Your Honor should

10  consider when you're exercising your discretion in

11  determining how to deal with that.

12          Let me -- if I could just have Andy put on the

13  screen that -- that page for me.  Your Honor, what -- what is

14  reflected on this page is, you know, several or five, you

15  know, different factors that I think Your Honor should take

16  into account.  Some of these we've already talked about that

17  I won't spend too much time on them.  So, for example, you

18  know, in determining, you know, is it appropriate to simply,

19  you know, forbid Sidley from having any role in the case

20  going forward or are there are other ways, such as the use of

21  conflict counsel that these issues can be addressed.  You

22  know, the first factor is (indiscernible) and we've already

23  discussed that at some length and I won't repeat myself.  So,

24  there is no alternative form and in fact Century have evoked

25  their rights to make use of that.

1            The second factor, Your Honor, is -- and Andy, if I

2    can ask you to blow that out a little bit if you could.  I am

3    having a hard time seeing it.  There you go.  Second factor,

4    Your Honor, is delay, and let me be clear about what I mean

5    by that.  So, this was an issue that was at least first

6    identified as a -- as a potential conflict or a conflict that

7    Century I believe existed back in October and, you know, this

8    was filed in the middle of February and it was two months

9    before Century files their objection and in their reply,

10   Century makes the argument, "Well, we shouldn't have had to

11   file something or do anything until the petition was filed

12   and we agree with that, there were things you could've done,

13   but having, sort of, the petition filed and then waiting

14   another two months, we do think is undue delay and look, the

15   fact of the matter is that Century could've shown up at the

16   first day of hearing and said to Your Honor, "Look, we have a

17   big problem here," you know, maybe they were trying to work

18   it out or whatever, but what actually happened was they

19   waited -- they didn't even file an appearance until early

20   April and didn't file their objection until the middle of

21   April and during those two months, Your Honor, this is not,

22   sort of, just the normal two months of a bankruptcy, of any

23   bankruptcy.

24           There's a lot that's happening in those two months.

25   There's been a lot that has been accomplished.  There's been

1   very substantial activity and again, we're not saying they

2   needed to file something before the petition was filed and

3   we're not even saying frankly that they needed to, you know,

4   file a motion to disqualify, but the idea that they would,

5   sort of, sit on this until, you know, a lot of stuff happened

6   in this case is again a factor that you ought to consider in

7   determining exactly how you want to address this issue.

8

9           The third factor, Your Honor, is there is very

10  significant discrepancies between what Century is arguing to

11  this Court now versus what they argued then and if I can ask

12  Andy, could you put up the next slide here and I am not sure

13  how legible this is, Your Honor, but this is just a list of

14  some of the issues in which there are just, you know,

15  fundamentally different positions that are being asserted now

16  at a a time when there is a dispute versus positions that

17  were taking prior to this dispute and so, the most

18  fundamental of which of course is, you know, the claim that

19  Century didn't learn about this until October of 2019 is

20  squarely a lie by the fact that both Ms. Russell and Mr.

21  Schwartz were made of this issue back in December of 2018 and

22  that Mr. Schwartz and Mr. Sneed had a conversation about it

23  back then and again, you know, we're not trying to suggest,

24  Your Honor -- let me be absolutely clear about this.  We're

25  not trying to argue and I think there's a real, sort of,

1   ships in the night quality to papers on this point.  We're

2   not suggesting that there was a waiver here.  We're not

3   arguing that Century gave us a waiver either written or

4   implied.  The reason we're raising these issues is because

5   they show, again, that to the extent that they're claiming

6   now this is a textbook obvious violation of the ethical rules

7   that no reasonable to believe a person could believe

8   otherwise, it's just not consistent with how they behaved

9   back then.  The claim that they're surprised in October to

10  learn about all of this is not consistent with the evidence

11  and -- and also -- and this is the issue with respect to the

12  advanced waiver discussions, the proposition that's being

13  asserted right now is that this is the (indiscernible)

14  conflict (indiscernible) in the brief.

15          Your Honor, that's not the position (indiscernible)

16  earlier.  You know, there were discussions that happened in

17  early 2019 in which, you know, Mr. Schwartz consulted with

18  his bankruptcy colleagues within, you know, Chubb and made

19  proposals about, you know, ways in which it would be okay

20  from their perspective for Century -- for Sidley to represent

21  an insured (indiscernible) Century and, you know, frankly

22  everything that was discussed back then is consistent, you

23  know, with the role that we're proposing Sidley had on a

24  going forward basis.

25          So, again, the issue of whether or not there was a

1  waiver, whether there's a written waiver, those are all

2  issues about whether or not we complied with the

3  (Indiscernible) and those are contract disputes.  Those are

4  matters that are committed really I think best to the

5  (indiscernible) panel and not just to this Court.  We're

6  simply raising these issues to show that there's a -- there's

7  a -- there's a big gap between what's being argued to the

8  Court now versus the positions that were taking earlier.

9         Your Honor, let me just make one point if I could.

10  This is a little bit of a digression and, Andy, if you could

11  put down the -- that slide there.  Your Honor, there's just

12  one thing I want to make sure I say because over the course

13  of the hearing on Monday, there were -- there was testimony

14  that really, sort of, called into question the integrity of

15  my partners, Mr. Andolina and Ms. Boelter and I really would

16  be remiss if I didn't address that squarely, Your Honor.

17  With respect to Mr. Andolina, I've known Mr. Andolina for 20

18  years.  We've worked together for almost 20 years and Mr.

19  Andolina is a lawyer.  He's spectacularly talented and he's a

20  person of tremendous integrity and professionalism and I

21  think you're going to see that, Your Honor, as this case

22  progresses should you approve the retention, but I just want

23  to put on the record that the suggestion that he was acting

24  improperly is just not consistent.  I am sorry to make this

25  personal, but I just had to say that.  The same is

1   true with Ms. Boelter.  Ms. Boelter is fantastic.  There is a

2   reason why Ms. Boelter is now the co-head of our -- our

3   restructured practice.  She is a fantastic lawyer, a person

4   of tremendous integrity and professionalism and, again, any

5   suggestion that either she or Mr. Andolina would behave

6   improperly is just wrong and I just have to say that so that

7   the record is clear and, so, again, I apologize, Your Honor.

8   That's a little bit of a personal comments, but these are --

9   these are colleagues and partners of mine who have worked

10  here for many years and I just have to make sure that I have

11  that.

12          THE COURT:  Well, I think Ms. Russell -- I think

13  Ms. Russell was surprised to be getting communications from

14  Sidley's restructuring council as opposed to her own lawyer

15  as she put it, her contact and that gap between October and

16  December of 2019, I'll have to say didn't serve Sidley very

17  well.

18          MR. DUCAYET:  Well, Your Honor, yes, we were trying

19  to get to the bottom of this and again, these are exactly

20  the, sort of, back and forth that I think is best to, sort

21  of, (indiscernible) commit to the arbitration.  I don't know

22  that you need to wait into it all, but the reality is, Your

23  Honor, we were trying to cut to the chase, let's get this

24  thing resolved and you heard -- you heard the evidence and,

25  you know -- you know, from our perspective, Your Honor, it

1    took a very long time, you know, to try to get to a point

2    where we can actually have a conversation with them about

3    what the issues were --

4              THE COURT:  Well, I think the concern was that

5    Sidley wasn't explaining its position as to why

6    (Indiscernible) no conflict so that in fact, Century could

7    make a determination with respect to it and what I am here

8    right now is obviously there was no conflict because Haynes

9    and Boone was handling all these matters.

10              MR. DUCAYET:  Yes, Your Honor.

11              THE COURT:  And Sidley let -- Sidley let this hang

12   out there.

13              MR. DUCAYET:  Your Honor, I don't agree with that.

14   Your Honor, Mr. Andolina made that point very clear right at

15   the outset and that was the reason why Mr. Andolina was

16   involved was that he was in a position to explain to them

17   what the role was of Sidley versus what the role was of

18   Haynes and Boone.  By this point, Your Honor, we had a law in

19   place.  This was not a conversation that Mr. Sneed could

20   have.  He wasn't privy to it, nor could he be privy to it

21   because of the law and, so, the reason why Mr. Andolina got

22   involved was that he was in a position to explain to Century

23   why there wasn't diversity, why there wasn't the conflict

24   precisely because of the -- of the defined roles of Sidley

25   and Haynes and Boone.

1          THE COURT:  Okay.

2          MR. DUCAYET:  So, Your Honor --

3          THE COURT:  (Indiscernible) -- well, I won't say

4    it.  Go ahead.

5          MR. DUCAYET:  Okay, Your Honor.  Your Honor, look.

6    We -- we were -- I'll just leave it at this.  We were trying

7    to get this worked out and I think I said this at the outset,

8    look, we regret that we're here.  We regret that we're in

9    this situation.  No firm likes to be in position of being

10   accused by a former client of something improper.  So, we're

11   sorry that we're here, but, you know, that being said, I just

12   have to -- I just have to speak up and say that I don't think

13   the suggestion that we weren't behaving properly by Mr.

14   Andolina or Ms. Boelter behaving improperly is -- is fair.

15   So, I'll leave it at that, Your Honor.

16         Your Honor, going back to the factors for

17   discretion and, you know, and this is anticipated by a lot of

18   what we said already, there are ways to deal with this and,

19   sort of, use of conflict counsel, use of insurance coverage

20   counsel is a -- is a way of, I think, addressing any

21   legitimate concerns that Century has, is the far left

22   (indiscernible), you know, way of addressing these issues

23   than forcing Boy Scouts to have to (indiscernible) counsel

24   has been working with, I think, for the better part of a year

25   and a half and, again, we tried to explain that, Your Honor,

1    to Haynes -- excuse me, to Century.  You'll see in Ms.

2    Boelter's declaration, she said the very first email

3    (indiscernible) you know, on November 3rd, this is in the

4    Docket at 500-4, she said, you know, we have Haynes and

5    Boone.  I don't think this is an issue precisely because we

6    have Haynes and Boone.  We think going forward, Your Honor,

7    that's the appropriate way to deal with the issue and we've

8    laid out in our papers all of the things that we would

9    propose to incorporate into our retention order that makes

10   clear what the roles and responsibilities will be of Sidley

11   versus what the roles and responsibilities will be of Haynes

12   and Boone.  Of course (indiscernible) also serving as a very

13   able bankruptcy counsel and they will be in position to take

14   on roles here as well and, so, Your Honor --

15           THE COURT:  So, perhaps you can explain to me

16   because this is something I've also been speaking about since

17   this issue first arose.  This is a mass tort case and in a

18   mass tort case and I think it's been said here from day one,

19   insurance is a significant issue.  It's not the only issue,

20   but it's a significant issue in the case.  So, when Sidley

21   took this on, it knew that it had a mass tort case and

22   insurance was going to be, I don't want to characterize it

23   yet, I'd like to hear how you characterize it as what, kind

24   of, an issue it's going to be as opposed to simply a company

25   bankruptcy and a company has insurance.  Okay?  I view those

1   as two different types of cases and is insurance so central

2   to a mass tort case that conflict counsel cannot solve the

3   problem or can it because those cases that do discuss

4   conflict counsel, look at how central the issues that

5   conflict counsel would have to address are to the case and --

6   and, so, whether it's really feasible and that's what I'd

7   like to understand here and I'd like to understand here what

8   is Sidley and Austin going to be handling and what is Haynes

9   and Boone going to be handling because just because you said

10  they're going to handle the coverage or the insurance issues

11  when you're talking about a mass tort case, I do not fully

12  appreciate what that means.

13          MR. DUCAYET:  Well, Your Honor, so, for example,

14  you know, there is a declaratory judgment action that's

15  pending, right.  Haynes and Boons is already representing Boy

16  Scout in connection with that matter (indiscernible) as a

17  result of bankruptcy filing to the extent --

18          THE COURT:  I'm not concerned about -- I am not

19  concerned about matters that are historic, that Haynes and

20  Boone have been handling, that Sidley has had no role in.  I

21  would of course expect them not to all of a sudden take a

22  role in that case.  I am talking about in the bankruptcy

23  case, what matters will Haynes and Boone be handling fully,

24  what matters will Sidley be handling fully, and how would

25  sharing take place and how will that work?

1          MR. DUCAYET:  Yes, Your Honor, and before I answer

2    that, let me just say the issue here for purposes of

3    analyzing the division of labor also needs to be informed by

4    whether or not there's potential relationship among these

5    matters, right?  So, the issue for example of coverage and

6    whether or not there is coverage, you know, for particular

7    policy (indiscernible) or for particular claims, those

8    coverage issues will be handled by Haynes and Boone.

9    Likewise, Your Honor, in the proposed plan that was filed,

10   you know, the sections that deal with the issue of insurance

11   neutrality, those were sections that were drafted by Haynes

12   and Boone, not by Sidley and, so, what we proposed, Your

13   Honor, the way it's been working so far is in, you know,

14   situation in which there area coverage questions, in

15   situations in which we're dealing with whether or not the

16   proposed plan (indiscernible) insurance neutral or not, those

17   are matters in which Haynes and Boone will be taking the

18   laboring over.

19          Obviously Sidley, as the coordinating counsel, you

20   know, will be handling, you know, all of the aspects of the

21   matter, but as you get into the issue that -- that caused

22   Century to object I think it is fair, Your Honor, you know,

23   to -- you know, to say (indiscernible) adversity here.  You

24   know, we will have Haynes and Boone handle those matters in

25   which there was diversity.  The problem of course, Your

1   Honor, is that Century view of the world is that absolutely

2   everything in this matter is adverse to them and I think that

3   is just not a -- not a fair way to look at this and, again,

4   the concept of insurance neutrality I think significantly

5   mitigates that concern because ultimately Your Honor is going

6   to have to make a determination as to whether or not any

7   ultimate plan of reorganization satisfies that insurance

8   neutrality, but to answer your question directly, you know,

9   we envisioned and have so far had Haynes and Boone dealing

10  with the specific coverage issues as they pertain to the

11  plan, as they pertain to the trust analyzed and that would be

12  the role Haynes and Boone on a going forward basis.

13          THE COURT:  And would that be as to all insurance

14  issues or just as to ones that impact Century?

15          MR. DUCAYET:  It would be as to the impact of

16  Century.  No other carrier has raised this issue, Your Honor.

17

18          THE COURT:  Okay.  So, then my question is let's

19  say that in the plan context, multiple insurance companies

20  raise the issue, for example, with insurance neutrality?

21          MR. DUCAYET:  Yes.

22          THE COURT:  Did Sidley going to be involved in that

23  at all?

24          MR. DUCAYET:  Yes.  Yes.  We think that is

25  permissible, Your Honor.

1          THE COURT:  And why is -- why would that be

2     permissible or why would that be effective?  Why would that

3     be effective to protect Century?

4          MR. DUCAYET:  Well, Your Honor, look, to the extent

5     that there are general insurance neutrality issues, you know,

6     the issue here is to protect Century against any, sort of,

7     supposed confidential information that we received as a

8     result of the insurance matter.  Now, we didn't receive any

9     of course and there's a (indiscernible) a screening within

10    the firm, but I -- I don't think that means that Sidley

11    cannot be involved in, sort of, general plan objections that

12    may be made by any of the 80 or 100 insurers who wrote

13    policies to Boy Scouts.  I don't think -- as you think about

14    how you're addressing this issue, sort of, (indiscernible)

15    Sidley from anything relating to the insurance I don't think

16    is necessary and I don't think it's appropriate given the

17    nature of the alleged conflict here.

18         Now, look, if Century comes in and has this

19    specific objection, that's something that Haynes and Boone

20    can handle, for sure.  At the extent that --

21         THE COURT:  What -- and what if it's an identical

22    issue that some other insurance company has raised?

23         MR. DUCAYET:  Well, Your Honor, I think it will be

24    a function of the terms of those, you know, those disputes

25    and, you know, there are I think 450 different policies at

1   issue here and, so, you know,  Your Honor, I think that the

2   point is if there's a Century specific issue, that is going

3   to be handled by Haynes and Boone.  If there is a general

4   overarching issue, which is not particular to the terms of

5   any specific policy, I think it's entirely appropriate for

6   Sidley to handle that and I don't think it impacts Century

7   interest in that regard.

8          THE COURT:  Okay.

9          MR. DUCAYET:  So, Your Honor, the last point I want

10  to make here is that Your Honor should consider ultimately

11  the potential prejudice of requiring the Boy Scouts to get

12  new counsel at a point in time where we've been working

13  together with them for the last, you know, year and a half.

14  We've made very substantial progress.  I am not going to

15  address that issue.  I am here on behalf of Sidley and not on

16  the behalf of Boy Scouts.  That's why Mr. Abbott filed a

17  separate submission and a separate evidentiary, you know,

18  submission from Mr. Whitman and -- but let me just say before

19  I turn it over to him, that it's a very relevant factor, Your

20  Honor, the Courts have considered, as you determined to

21  exercise your discretion and you'll hear form Mr. Abbott,

22  but, you know, Mr. Whitman's declaration makes it very, very

23  clear, especially given where we are in -- in connection with

24  the COVID-19 situation.  Forcing Boy Scouts to get new

25  counsel at this point in time will just be devastating and we

1   don't think it's necessary, Your Honor, we don't think it's

2   appropriate and it is an important factor that Your Honor

3   should take into account as you decide how ultimately to

4   address this issue and with that, Your Honor, I'll turn it

5   over to Mr. Abbott.

6            THE COURT:  Mr. Abbott?

7            MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

8   from Morris, Nichols, here for the Boy Scouts. Your Honor, I

9   want to get into prejudice and -- and before I do that,

10  there's one item Your Honor asked at the end of the last

11  hearing and I just wanted to give you a couple of short facts

12  about the insurance portfolio, if you will, because I think

13  it was obviously something of interest to Your Honor and will

14  help put this contest with (indiscernible) Century in

15  context,  Your Honor.

16           As Mr. Ducayet mentioned, the Boy Scouts have over

17  400 policies that have been issued over the course of, sort

18  of, its insurance life by 80 different insurers, including

19  Chubb, Hartford, Liberty, Old Republic, AIG, National

20  (indiscernible), among others, among many others, Your Honor,

21  but make no mistake, Chubb is an important insurer for the

22  Boy Scouts.  Obviously it's taken a strong interest in the

23  case.  It must be important, but -- but, you know, many

24  insurers have been involved in the BSA's insurance coverage

25  program and it's for that reason, Your Honor, and as

1   reflected in our proposed mediation order that we're inviting

2   a number of insurance to the mediation, including Chubb,

3   Hartford (indiscernible) National (indiscernible), Liberty

4   Mutual.  All of them are going to involved in working with

5   the debtors or contesting with the debtors of the progress

6   towards a plan developing appropriate (indiscernible) and

7   appropriate funding for the trust.

8          So, I just wanted to give your Court that -- or

9   Your Honor that quick background before I -- before I launch

10  into my discussion of the prejudice point and Your Honor, I

11  am not an expert in that as you heard at the state trial,

12  Your Honor.  That is Haynes and Boone's realm and I think

13  there is a representative of Haynes and Boone on the phone.

14  If we can answer -- if there's any further questions from

15  Your Honor about that coverage portfolio, but I would just

16  like to say Chubb is an important insurer, but is among one

17  of the many insurers for the Boy Scouts, Your Honor, but

18  getting back to the prejudice that Mr. Ducayet mentioned and

19  it's a good segue.

20         Your Honor may recall on the first day of the case,

21  the Boy Scouts filed an informational brief.  It was a big

22  document, Your Honor.  So, it's hard for any of us to forget

23  I think, but it laid out some history of the background of

24  the Boy Scouts organization, their mission, etcetera, but

25  importantly it laid out two principle goals for this Chapter

1   One proceeding.  The first is getting equitable compensation

2   into the hands of abuse victims.  The second was,  Your

3   Honor, preserving, you know, long held and -- and widely

4   spread charitable mission of the Boy Scouts and, Your Honor,

5   as reflected in that

6   -- that brief, Boy Scouts believed then and believe now that

7   an expeditious trip through these cases is critical to making

8   both these things happen effectively.  We've obviously got an

9   aging population of abuse victims.  We've got a critical

10  amount of work to do and an expensive amount of work to do,

11  Your Honor.  That plays into it as well, but expedition was

12  our goal at the beginning.  It's our goal now.  That brief

13  also, Your Honor, laid out a fairly comprehensive plan and

14  the approach that the Boy Scouts were going to take into that

15  expedition.

16         Number one, setting up a data

17  room to get critical and financial information into the hands

18  of the committee, not just about the Boy Scouts, Your Honor,

19  but also about the local councils.  The formation, obviously,

20  of an ad hoc committee of local councils who could help us

21  navigate through this case from the critical local council

22  perspective.   The early work and motion seeking appointment

23  of Mr. (Indiscernible), Your Honor.

24         We talked about a comprehensive bar (indiscernible)

25  strategy and Your Honor, as you may have seen, that's now

1   been filed.  We are in discussions as we speak, literally,

2   about the appropriate way to notice abuse claimants and how

3   that's going to work and we're working with the committees to

4   make that happen.

5          Another aspect to that strategy, Your Honor, was

6   the mediation motion, which Your Honor has heard about and

7   was the first time we heard from our friends at Century.

8   Those discussions are well underway.  The parties have

9   identified potential candidates and we're working towards it.

10  (Indiscernible) filed a plan as part of that expeditious

11  process and they also talked about, sort of, this

12  comprehensive strategy with respect to the underlying abuse

13  actions to remove them, consolidate them, and ultimately get

14  venue to Delaware if necessary or appropriate.

15         We did that, Your Honor heard the same motion,

16  which somewhat remarkably was really only contested by one,

17  maybe two, plaintiffs and the debtors are now working with

18  the committees and the (indiscernible) and those plaintiffs

19  with regards to that extension, which is critical to the

20  continued progress in these cases without distraction, but

21  just (indiscernible) challenging opportunity to participate

22  in proceedings due to COVID.

23         Your Honor, all that has happened in the not quite

24  two month that this case has been pending.  So, not only was

25  the plan to come in and move expeditiously.  That plan has

1   been achieved and quite candidly, Sidley was the architect of

2   that plan, Your Honor, along with obviously the Boy Scouts

3   and importantly the prime over in achieving many of those

4   things.  They -- they have achieved we think, Your Honor, on

5   behalf of our mutual client, meaningful momentum in these

6   cases and it's critical to Boy Scouts to keep it, again, to

7   serve those two missions, equitable compensation to the hands

8   of the abuse victims as quickly as possible and continuing

9   the charitable mission of the Boy Scouts.

10         Your Honor, the undisputed testimony of Mr. Whitman

11   was admitted into evidence and it takes about the substantial

12   ramp up that Sidley has had over these last 18 months and it

13   talks about, sort of, the disastrous effect that -- that

14   would occur or the Court unfortunately to require as a result

15   of these proceedings, the Boy Scouts to have to lose their

16   choice of counsel and have to find counsel.  That prejudice,

17   Your Honor, really comes in two ways, delay and cost.

18         Your Honor, obviously, bringing new counsel up to

19   speed after 18 months of -- of climbing the learning curve

20   that Sidley's done would count as delay.  There's no question

21   about that.  Sidley has been at it 18 months.  At least

22   several months would be required for any substitute counsel

23   to get up to speed and to understand the organization, the

24   structure, the underlying tort claim scenario, the various

25   stakeholders in this -- these cases.  Sidley has spent those

1   18 months, sort of, learning, navigating, and working with --

2   Your Honor, if I may say so, we believe pretty effectively

3   and to cause that several months of delay impacts how we can

4   get equitable compensation to abuse victims, but it also

5   refers to cost.

6          I wont be shy here, Your Honor.  18 months of

7   Sidley's work is quite expensive.  To reeducate counsel of

8   Sidley's caliber will also be quite expensive.  There's no

9   question about it.

10         In addition, Your Honor, those months of delay,

11  even regardless of the cost of getting new counsel on board

12  just would yield administrative burn.  Having a bankruptcy

13  case pending, particularly a bankruptcy case as large as

14  this, with as many parties as this, with as many moving piece

15  of this, sort of, (indiscernible) by its very nature a pretty

16  significant administrative expense burn, both in terms of

17  operating expenses and administrative expenses of the

18  company, as well as their counsel and other professionals

19  involved in the cases and while we  always are concerned

20  about cost and we weren't as concerned about COVID as we were

21  with it today -- excuse me, weren't as concerned we

22  (indiscernible) the cases today, COVID has had a couple of

23  implications and will have a couple of implications on how

24  this works.  Number one, as set forth in Mr. Whitman's

25  declaration, Your Honor, COVID Is causing a serious

1   impairment of the Boy Scouts revenue, both the operational

2   revenue from (indiscernible) adventure camps, outings,

3   etcetera, as well as, Your Honor, the fact that a huge

4   portion of their budget annually is driven by charitable

5   contributions and with the turmoil in the markets, charitable

6   giving is down and that's caused some serious problems.

7          The boy scouts have had, as Your Honor as heard

8   before, to take measures, to furlough employees, to reduce

9   staff.  Those measures will also make it much more difficult

10  for counsel to get up to speed effectively in this era where

11  we can't really travel and visit each other.  In short, the

12  cost would be extreme, the delay would be important, and it

13  would impair those two critical functions that we address on

14  the very first day of the case, equitable compensation to the

15  victims, and the continuation of the charitable mission.

16         Your Honor, we believe that the Boy Scouts are

17  entitled to their choice of counsel.  We ask the court to

18  deny the application to Sidley's application and I'd be happy

19  to answer your Honor's questions and I'd like to reserve some

20  time to respond to Mr. Schiavoni's arguments, if I may.

21         THE COURT:  All right.  Thank you.  I don't have

22  any questions.

23         MR. ABBOTT:  Thank you, Your Honor.

24         THE COURT:  Thank you.  Before turning to Mr.

25  Schiavoni, is there any other party who wants to speak up in

Page 65

1    favor of Sidley's retention?  Okay.  I hear no one.  Mr.

2    Schiavoni.

3          MR. SCHIAVONI:  Your Honor, this is Tancred

4    Schiavoni for Century.  First of all, at the outset, Your

5    Honor, let me just tell you, (indiscernible) I had to leave

6    the city very quickly and I did not -- when this crisis came

7    on, I did not have a suit jacket with me.  So, no disrespect

8    to the (indiscernible) Court.  I apologize for that.  I can

9    also just see from the video that I have no possible career

10   in Hollywood going forward, but with that being said, let me

11   go forward with what I have.  I'd first just like focus on

12   the basic facts that I think came out at the hearing itself

13   (indiscernible) what are we talking about here because I

14   think with the briefing that took place in advance of the

15   hearing and then the statements made at the hearing

16   (indiscernible) on the record, but what actually is in

17   dispute now I believe significantly narrower.  I am not going

18   to go through all the facts.  I think (indiscernible) Chubb

19   presenting evidence (indiscernible).  I would like to just

20   focus on seven or eight things that I contend Sidley has now

21   admitted (indiscernible) what this case is about and what law

22   should be applied to it.  (Indiscernible) I am going to pull

23   up a demonstrative exhibit that we have, (indiscernible) some

24   citations in the record, if you could just do that

25   (indiscernible).  Let me just walk through a couple of these

1  facts.  The storying point for us anyway is whether or not

2  the (indiscernible), the engagement agreement here

3  (Indiscernible) governed and we have, after the briefing on

4  this, acknowledgement from Sidley, it comes right from their

5  brief that the (indiscernible) spells out the duties and

6  obligations of the respective parties.

7          We also have from Mr. Sneed that he admitted at the

8  hearing (indiscernible) that agreement governs the parties

9  relationship with respect to the matter in dispute here at

10  the time that these motions were brought forward.  The next

11  page?  Okay.

12          What does the (indiscernible) say?  That's  not in

13  dispute either.  There are specific set of provisions in it

14  that deal with conflicts, they affirmative put the duty on

15  the lawyer here, Sidley, to be responsible to identify and

16  bring to the attention to the client in writing any

17  circumstances that may create or involve the conflict.  It

18  also (indiscernible) makes clear that any waiver sought must

19  be in writing.  Those requirements, you know, that

20  (Indiscernible) exhibited to Mr. Sneed's declaration and I

21  think Your Honor will find that we questioned about whether

22  there was a written requirement and he acknowledged it, but

23  he -- we also elicited testimony from him that Sidley was

24  diligent in taking written waivers for other matters and the

25  testimony -- other matters not dealing with the testimony

1   with the Boy Scouts, where they wanted to serve a subpoena,

2   where there was a -- they had a client involved

3   (Indiscernible) different client.  They were careful to ask

4   for a written waiver, to get it and Mr. Schwartz testified

5   (indiscernible) somehow it wasn't signed and it came back and

6   said, Please, we need a signature there" and (indiscernible).

7   They knew that that was a requirement.  They knew why it was

8   there and they knew it was important.  They knew what they

9   were dealing with and they knew how that process worked

10  internally at Chubb, that the requirements (indiscernible)

11  that this engagement letter are mirrored in Sidley's

12  obligations under the -- under the Rules, both 1.7 and 1.9

13  and that's a point that we drew that we need written consent.

14  That's a point that we drew from Sidley's expert, Ms.

15  Rappaport.  There were many things in her report that she

16  prefaces by saying that Sidley asked her to (indiscernible)

17  that. (Indiscernible) at the hearing was that this

18  acknowledgement that she understood that there was not a

19  written waiver providing informed consent.  That was

20  something that she felt she had to put in.  That would end up

21  in a footnote, footnote five, that she acknowledged that

22  that's a situation that she understands it and that was true

23  when she did her affidavit.  Go to the next page.

24          It's also admitted now that Century did not provide

25  informed written consent, that that comes from Ms. Rappaport

1    and Sidley acknowledges that it didn't seek or receive a

2    conflict waiver from Chubb with respect to Boy Scouts.  Mr.

3    Sneed was asked about that during the hearing and he affirmed

4    it also in his declaration.  Go to the next page, next page.

5    Okay.  There's a very interesting exchange that follows the

6    retention on these particular matters where out of the blue,

7    Sidley comes to Chubb and says (indiscernible) labor.  They

8    first ask (indiscernible) 2018 and were told no, we don't do

9    perspective waivers, that something that (indiscernible)

10   acknowledge (indiscernible) asked and told no.

11   (Indiscernible) Mr. Sneed acknowledged at the hearing

12   (indiscernible) declaration.

13        Sidley then came back again in 2019 saying that

14   "Oh, senior management was asking that they request this.

15   Now, Mr. Collin, the originating partner of the executive

16   committee, he didn't submit a declaration (indiscernible)

17   question him about whether that request was one that he was

18   aware of and behind, but we know that the request was

19   characterized to us, to Mr. Schwartz and didn't come from

20   senior management.

21        (Indiscernible) two very different variations,

22   there's no question about that, there was back and forth

23   about it.  It was very confuse (indiscernible) Mr. Sneed's

24   declaration (indiscernible) the timing of these are out of

25   order, but when do you look at these exhibits in order, what

1    you see is Mr. Schwartz pushing back and saying, "Gosh, if

2    (indiscernible) "transactional," right, which would be

3    something bankruptcy (indiscernible) like, renegotiating a

4    bond holder over (indiscernible) waiver.  Maybe we can deal

5    with that, but if anything that's adversarial or is going to

6    impact coverage directly or indirectly, we have a problem

7    with it and there was pushback on it and that follows through

8    in this exchange and at the end of the -- as the exchange

9    goes on, ultimately Sidley is just back -- just go back a

10   page, Sidley abandoned that -- that exchange. (Indiscernible)

11   suggestions, picking out one email out of context and, sort

12   of, offering it, and suggesting it was okay, but the evidence

13   that's actually on the record is that Sidley withdrew its

14   request for a perspective waiver and didn't get one.

15          The email that's pointed to that -- that Mr.

16   Ducayet (indiscernible) somehow (indiscernible) expressly

17   says in it that there should be some carveout for anything

18   that directly or indirectly (indiscernible) coverage.

19   There's also language at the top of the email that says that

20   these conditions would be added as well as the other

21   (indiscernible), something that he brought up.  The

22   communication to Chubb that Sidley was withdrawing requests

23   to wavier came to a voicemail, but it was memorialized in an

24   email that was attached (indiscernible) It was an email from

25   (idniscerinble) in essence thank you for the voicemail, you

1    know, I understand you are withdrawing it.  That's in the

2    record.  Mr. Sneed was asked about it and a copy of that

3    email, he acknowledged and it's in the record as well

4    (indiscernible).

5         The (indiscernible) then is what happened -- what

6    was disclosed and that issue I first read (indiscernible)

7    questions about, but that record on that is now crystal

8    clear.  Mr. Sneed acknowledged that when asked about the Boy

9    Scouts, he declined to admit or deny whether he was a

10    representation, but, you know, Mr. Sneed didn't offer any

11    other testimony that he ever told Century anything else, not

12    (indiscernible) answer, but he didn't provide any information

13    whatsoever about the engagement.

14         Now, we went during the examination to the Boy

15    Scouts engagement letter itself and quite curiously, it

16    actually contains a line saying that there was a carveout

17    allowing the client, allowing Sidley to ask or tell about

18    (indiscernible) relationship to the client but it was for

19    conflict purposes, but (indiscernible) qualifications it says

20    (indiscernible) subject to the Boy Scouts saying no

21    otherwise.  We don't have Mr. Collin.  So, we don't know

22    whether there was an instruction that actually came from the

23    Boy Scouts overriding that -- that provision of the contract

24    explicitly telling them not to tell Chubb, but then we get

25    any explanation from (indiscernible) because he claims, sort

1  of, not to have seen it, but that was (indiscernible).

2       The next thing to happen was that did Sidley

3  disclose to the Chubb people who came to this October 14th

4  meeting that was -- that they were representing them.  In

5  Sidley's papers, it's presented that, in essence, because

6  it's almost a waiver that, like, Chubb came to this meeting

7  on the 14th and that there were two calls after it and that

8  they didn't complain in any way about the -- about Sidley's

9  role.  This is when that role surfaced.  What came out in the

10  hearing was that Ms. Boelter acknowledged that she did not

11  tell those folks anything about Sidley's engagement and that

12  those people who were there, you have the declaration from

13  Mr. Saltando (phonetic), you heard his testimony.  They were

14  claims people.  They were coming from the claim's side, not

15  from the (indiscernible) side.  So, they weren't people that

16  were coming and seeing their lawyer on the other side.  They

17  were coming to a meeting that they were invited to by the Boy

18  Scouts and when people go to a meeting like that, they don't

19  normally (indiscernible) there.  They came to the meeting,

20  the information, you know, granted it took two weeks to get

21  through the company to the, sort of, other side with the

22  (indiscernible) before they realized it, but when they did

23  realize it, there was a meeting scheduled to go forward with

24  -- a meeting scheduled for possible mediation.

25       Ms. Boelter acknowledged at the hearing that she

1  affirmatively agreed that their attendance at the meeting

2  (indiscernible) meeting, which she told Chubb was important

3  for them to be at and that the Boy Scouts wanted them to be

4  there (indiscernible) Sidley was affirmatively agreeing that

5  Chubb's rights were reserved with respect to any conflict.

6  Chubb, before that meeting made it clear -- as soon as they

7  heard that there this concurrent relationship was going on,

8  they made it clear that they didn't consent to it and so

9  started this exchange about we'd like to know more about

10  what's going on, we'd like to get information from you, we'd

11  like to deal with this responsibly, but we do not consent to

12  what you're doing and that came out from Mr. Saltando in part

13  because of what he saw firsthand on October 14th where Sidley

14  was on one side of the table and Chubb was on the other side

15  of the table and they were being presented with terms that

16  were being embedded in trust distribution procedures.  There

17  was discussion of -- the mention that a plan wasn't drafted

18  so everyone understands the testimony was in the context of

19  Chubb being told a plan was going to be agreed upon and filed

20  before the year was out.  Evidence will ultimately show, I

21  think in this case, that a plan is being drafted at that

22  time, but in any event, Chubb was being presented with terms,

23  Chubb objected to the terms and (indiscernible) with Sidley

24  over those terms at that meeting and that's drawn out in the

25  letter that was written after the hearing, after that meeting

1    where Chubb laid out what the objections were and they

2    included the news that they had heard about the -- the effort

3    going on to engage the future claimants represented

4    (indiscernible) and Sidley arranging (indiscernible).  Go to

5    the next page. (Indiscernible) just have one more page?

6    There -- there you go.

7              So, we have here the cites from the hearing

8    transcript where after the news gets (indiscernible)

9    insurance group two weeks and, you know, I think if anything

10   now both sides are saying that the reinsurance group is

11   separate from the insurance group (indiscernible) Sidley had,

12   sort of, spun that in a way that I think is inconsistent with

13   other aspects (indiscernible) that shows that the reinsurance

14   -- that Mr. Sneed wouldn't have anything to do with the

15   coverage, but what the testimony was before Your Honor was

16   that the people on the reinsurance side don't get themselves

17   involved in coverage decisions and the handling and

18   management of the coverage claim on a day to day basis.  They

19   don't want the reinsurance decisions to be infected -- to be

20   infecting how the (indiscernible) case is being handled.  So,

21   that's precisely why they're at a meeting like this.  It's

22   also precisely why it took two weeks for them to figure out

23   the (indiscernible) that this meeting had taken place.

24             I don't think there's any dispute at all at this

25   point (indiscernible) at this point, Chubb conveys their

1  concern, makes it clear they object to a concurrent

2  relationship, that they could never agree to a

3  (Indiscernible) and -- and the parties go on to discuss it.

4  It's also uncontested now coming out of this (indiscernible)

5  Sidley representing Chubb and its affiliate, Century

6  (indiscernible), that they still (indiscernible) lawyer as of

7  that date, that there were matters that they (indiscernible)

8  counsel record for, at least one (indiscernible) got

9  arbitration and several other arbitrations that after the

10  filing was made, they rushed to send letters off to -- to

11  withdraw from those engagements.  Those are the basic acts

12  and many others that came out that are uncontested, but those

13  are basic facts coming out of the hearing.

14        So, what is the Court to do with this and I will

15  tell you the starting point on this is a very basic point and

16  that point is that in bankruptcy, the ethics rules aren't

17  superseded or eliminated by the bankruptcy code.  That is not

18  what the case law in 524-7 -- on 327 says, that if anything

19  the case (indiscernible) bankruptcy that say that the ethics

20  rules in bankruptcy, in essence, (indiscernible) higher than

21  are in the regular system because so many parties are

22  imposing a, sort of, fiduciary relationship and that both the

23  ethics rules apply and 327.  That's definitely not true the

24  327 applies to supersede or eliminate the ethics rules.

25        When you look at Sidley's argument, it's

1  fundamentally constructed on a basis that somehow the ethics

2  rules don't apply as normal in a bankruptcy, that somehow

3  superseded, that's somehow -- that under the disinterest in

4  this rule, if you fire your client the day before you find a

5  retention application or even say the day before the argument

6  on it, that you are as of that moment disinterested and it

7  doesn't matter any of the ethical consequences of that, that

8  the Court is supposed to look at --

9          THE COURT:  Let me (indiscernible) on that.  I

10  don't think that was quite the argument.  I think the

11  argument was that if you are no longer retained, that not --

12  not that 327 doesn't apply and you don't have to meet the

13  disinterest in this standard, but you're now a former client.

14  I think that was the argument is that I should consider

15  Sidley -- Chubb a former client of Sidley's.  So, there are

16  different rules than the 1.7 rule going forward because of

17  that.

18          MR. SCHIAVONI:  That is definitely the argument to

19  be made and I actually thought I was saying that, but I

20  didn't.  I accept Your Honor's correction.  The way I read

21  their argument is being that because in essence really only

22  disinterestedness applies.  So, to quit a client the day

23  before a retention application is filed, that from that --

24  retention application then be considered by the Court, they

25  can say, Look, you know, I'm now disinterested, you don't

1   need to consider the ethics rules because I fired my client

2   and I have no -- and I don't consider myself as having

3   further ties to them, but that construct would only work if

4   the ethics rules don't apply in (indiscernible) or supersede

5   it and they're not  The allegation --

6           THE COURT:  Let me ask you a question.  Let me ask

7   this question then.  How does what you're saying jive with

8   the cases that say 327 is a present requirement, that you

9   presently have no adverse interest and therefore, if you look

10  at it that way, it matters whether you're in a current or

11  former and I have a case right now where I have

12  (Indiscernible) counsel who have current relationships with

13  people.  So, I am looking at this in that context in another

14  case.  So, how does that -- how do those jive because I am

15  asking because I'd really love to hear other people's answers

16  to that question.  How do I pull those two lines of pieces

17  together?

18          MR. SCHIAVONI:  I think this is how you do it.  The

19  327 requirement of disinterestedness both assumes

20  (Indiscernible) ethic rules and the ethics rules run parallel

21  to it so that if there's an ethic's violation under 327, the

22  per say disqualifying (indiscernible) triggered

23  (Indiscernible) being a conflict of interest and a conflict

24  that (indiscernible) discussed the results of it being a

25  conflict of a per say disqualification would apply, that you

1   have -- that you don't get excused from your ethics

2   obligation to analyze whether or not there is a conflict of

3   interest under the ethics rule that you carry into the

4   bankruptcy as a result.

5           It's also true that the ethics violation itself is

6   one that causes a present issue with respect to

7   disinterestedness and you can -- I wanted to discuss this

8   forum issue a little separately, Your Honor, but you can --

9   you can actually reach that, you can see how this happened

10  almost in that connection.  Sidley is, sort of, suggesting

11  that you stand aside, let all these issues be dealt with in

12  arbitration and then somehow you can, sort of, merrily go

13  forward, but the obligations that Sidley has to Chubb are

14  both backward looking as a client and forward looking, no

15  matter how you look at what that client relationship is.  So,

16  an alternative forum, an arbitrator, they would be deciding

17  issues that deal with both backward nature and what would --

18  what would be done to address that, but also on a forward

19  basis and the very nature of such ruling by a separate forum

20  would, I think, -- like, it would introduce into their role

21  on a going forward basis a conflict because they're being

22  directed by arbitrators, you know, with a (indiscernible)and

23  otherwise about how they need to limit or modify or deal with

24  their relationship with the debtor to ensure that our rights

25  are protected.  That would all go directly into the

1    disinterestedness at that time.

2          THE COURT:  So, your position -- well, first of

3    all, let me ask you a couple of question.  One, the

4    (indiscernible)  does have an arbitration provision and the

5    arbitration provision states that -- let's see, if it's a US

6    dispute, which this is and it's not resolved at the senior

7    representative level, then it's to be resolved by arbitration

8    and arbitration shall be the sole means for addressing any

9    dispute.  So, first, they have that provision, which I, sort

10   of, wonder whether that means I should get into the issue.

11         The second, you're now also suggesting that in that

12   arbitration, the arbitrator could somehow limit what Sidley

13   is doing in the bankruptcy case before me?

14         MR. SCHIAVONI:  We'd be seeking, Your Honor, to

15   enforce the (indiscernible) entire package of rights in

16   connection with that proceeding.  So, some of those would be

17   historical in nature and others would be whether or not it

18   could resign and whether or not it could take down other

19   clients.  Though, that would be the whole package of issue

20   that would -- would have been addressed.  We would have

21   preferred to have that arbitration before the bankruptcy was

22   filed and although my questioning on this was a little

23   awkward and maybe it didn't really come out.  Now that you

24   have this before you, you see there's this provision in there

25   to, quote, "Management level employee."  When our client met

1   and conferred on the 18th and then met and conferred

2   afterwards, we thought we were, in essence, sort of, working

3   through that process.  It was only as we got further into

4   January -- by the way, without really insight on when a bankruptcy

5   filing might come, that Mr. Sneed came forward and conveyed

6   to us that we hadn't satisfied the meet (indiscernible)

7   confer and couldn't go forward and get our rights adjudicated

8   because we had to have someone on a management level.  Now,

9   you know, just as an aside, I'm going to stand aside and

10  think if you are Ms. Russell, who is an SVP, a very senior

11  official at Chubb, being told by Mr. Sneed that she's not --

12  she's not senior enough to qualify as management, you know,

13  that was -- you know, they have their own views about whether

14  or not Sidley was trying to delay that from going forward,

15  but we then tried to go forward what that.  It required us to

16  bring a president, okay, of -- of -- of (indiscernible) to a

17  session and we did that, but by the time we could do that,

18  the bankruptcy got filed and we had a mediation that would've

19  satisfied that.  Normally we would've gone forward.  I

20  would've come to you.  We were then presented with the whole

21  issue of whether or not seeking to adjudicate our rights like

22  this would require seeking Your Honor's permission

23  (Indiscernible) order, (indiscernible) wouldn't want to go

24  forward with that without I think, at least, advising the

25  Court.  Whether or not that is (indiscernible) issue is a

1   little bit complicated in my mind, but in any event, we

2   weren't able to do that and to be clear, we would have

3   preferred to deal with this whole package of issues in a non-

4   public setting.  That's not where we are.  We are where we

5   are right now today because of things that we think are

6   outside of our control, that has made the matter difficult to

7   deal with because, yes, it involves confidences and this is

8   an awkward forum to deal with those, but we think we're here

9   because of circumstances that Sidley has created and not us

10  and I don't really see a way, you know -- look, you could

11  abstain from ruling and refers us to another forum, but I

12  don't see how you do that and allow them to continue to be

13  counsel.  If you wanted to defer, they're (indiscernible) as

14  counsel for 30 days and we can try to get the arbitration

15  done, maybe that's something that can happen, but I don't --

16  I don't see how the two things live in the same world.  I --

17  you know, in essence, we're, kind of, stuck with, kind of,

18  trying to deal with their, you know, coming forward with this

19  application here as we are now.

20          We do think you should -- no (indiscernible) from

21  at least a backward looking issues about, you know, whether

22  or not your findings would apply to us or not, but the whole

23  -- the whole -- you know, the reason why I, sort of, got into

24  this now is that three -- the ethics rule definitely apply

25  (indiscernible) here because yes, (indiscernible) deemed to

1   be a former client or if you're a current client, that

2   implicates disinterestednesss on a going forward basis.

3            THE COURT:  It does, but -- and I read Marvel

4   (Phonetic) again in contemplation for this hearing and I have

5   a question as to whether the conflict in Marvel -- conflict

6   language in Marvel means the same thing as a professional

7   ethics conflict because at the end, the Court is very

8   concerned about how could a law firm with any prior

9   relationship to a (indiscernible) secured creditor ever

10  served (indiscernible) counsel, it's a concern they have that

11  in Marvel, the firm never represented it was Chase on a

12  matter related to the bankruptcy and there they did sever

13  consensually all attorney/client relationships with Chase in

14  anticipation of its selection of trustee's counsel and the

15  District Court nonetheless disqualified the firm and the

16  Court's concerned that if they upheld the District Court

17  disqualification in those circumstances, how could anybody --

18  how could any law firms who represented in unrelated matters

19  a party, a significant party in this case, how could they

20  ever be trustee's counsel and suggesting that that can't be

21  the situation, that that can't be the situation and I think

22  -- I think all the facts that you stated are consistent with

23  my recollection of the testimony, your undisputed facts.  I

24  think Mr. Ducayet would say they're not relevant.  They're

25  not relevant because in fact Haynes and Boones was handling

1    all insurance related matters and, so, I think Mr. Ducayet

2    says Sidley has never been adverse to Century, even

3    prebankruptcy.

4              So, I certainly want to hear your response to that,

5    but to some extent, you guys are still talking past each

6    other on the issues and where you think they are and Mr.

7    Ducayet, at this point is not even arguing that he should've

8    done anything before the petition date.  So, I want to make

9    sure I understand I -- I am still struggling with how the 327

10   and the ethics rule worked together and I -- because I see

11   different language in different cases, but I guess I want to

12   know how far your position would go?  Would your position go

13   so far enough even if Sidley had not -- had not taken the BSA

14   matters, if they had thought better of it and said, you know

15   what, we have the Boy Scouts now as a client, we're just

16   going to -- we're going to decline the Chubb new reinsurance

17   matters.  Would -- would Chubb still take the position that

18   Sidley's cannot represent the debtors?

19             MR. SCHIAVONI:  I want to answer your question,

20   Your Honor, but before I do, I would just refer you to one

21   other case on the -- on the per say disqualification because

22   (indiscernible).  It's the Fleming (phonetic) 305

23   (Indiscernible) This is a bankruptcy decision, not a circuit

24   decision, but it's out of the district of Delaware.

25             THE COURT:  Yes.  I remember that one.

1          MR. SCHIAVONI:  Yes. (Indiscernible).

2          THE COURT:  What did it say -- what did it say

3    though?

4          MR. SCHIAVANI:  Well, I think it -- I think it

5    talks more directly that 327A poses a per say

6    disqualification where any profession (indiscernible) has an

7    actual conflict and I think this is a triggering event that

8    if you come to the bankruptcy having representing a Boy Scout

9    matters as of the day of the petition that you have an actual

10   conflict.  I don't think the Court is going to -- I don't

11   think the circuit is going to excuse lawyers from the

12   standard that applies under 1.7.  It -- it (indiscernible)

13   creates, like, a special exception for bankruptcy,

14   (Indiscernible) bankruptcy lawyers to (indiscernible) their

15   clients after the petition date so they can carry on the

16   matter.  You know, the bankruptcy court has other ways to

17   deal with things.  I mean, the issue is under 1.7

18   (Indiscernible) adversity and yes, I -- I think we're -- you

19   know, we're prepared -- I think that's is the playing field

20   on which you often decide the case and we think in that

21   playing field, Sidley is also in essence admitting, you know,

22   that there's adversity.   I -- by statements they made and --

23   and, sort of, guidance they gave about in this context, in

24   this case, in a mass tort insurance (indiscernible)

25   bankruptcy, what it would be that they would need a waiver

1   for to protect themselves in this, kind of, context from a

2   claim that there was material adversity and that was exactly

3   what Mr. Sneed put in his perspective waiver.  He -- he

4   professed, sort of, not to know where it came from, but

5   Sidley's general counsel or someone else, you know, obviously

6   put it in there.  It talks about those emails and they're in

7   the record.  The -- one of them talks about in this context,

8   in this type of case a bankruptcy being a litigation.  You

9   don't always hear bankruptcy lawyers always talk about cases

10  that way, but, you know, I think the District of Delaware

11  knows that these mass tort cases really are -- are really

12  very, very different and with the time (indiscernible) that

13  the district referred them all out or referred many of them

14  out, I think largely because of the view that they were

15  really very different from commercial cases.

16          In that same chain of email, the one that follows

17  is a -- is a February 28th, 2019 email.  It's (indiscernible)

18  April 30th, 2020 declaration (indiscernible) that one --

19  that's the one that Mr. Sneed is conveying something that has

20  been given because (indiscernible) specifically a mass tort

21  bankruptcy where it literally includes in it language about

22  insurer and it says, "If we are going to present a plan" --

23  "if we present a plan against you and you're opposing, that

24  may well give rise to material adversity."  It talks about

25  seeking relief against insurers by motion.  It takes relief

1    -- it also talks about other types of relief sought by

2    debtors and bankruptcy and it takes about that -- that

3    material adversity.

4          Now, you know, (indiscernible) Your Honor, I got

5    it, but, like, we're not looking to God knows create a rule

6    that, like, somehow, you know, prevents lawyers, you know,

7    (indiscernible) my firm from practicing in Delaware or other

8    bankruptcy Courts, but these cases are different, they're

9    very unique and they really -- you know, I know you have a

10   couple of them right now, but as you see them play themselves

11   out, I think you get a better sense of what is really going

12   on at (indiscernible) insurance (indiscernible) bankruptcy,

13   the real objective is how do you get the insurer in

14   (indiscernible) the table to participate?  We're interested

15   in doing that and, you know, Your Honor, I -- the Bliss

16   (Phonetic) case was a case, I know you read some of the

17   decisions there.  You know, there was some (indiscernible),

18   like, in every case at the beginning, but that's one where my

19   clients basically brought forward a consensual plan and

20   worked on one with the plaintiff's lawyers and we got one

21   done that, right, but when it's nonconsensual (indiscernible)

22   debtors (indiscernible) and they tried to exclude the

23   insurers and that's effectively what happened here, I men, to

24   be clear (indiscernible) is a different one.  What's going on

25   is how do we use the plan and a bankruptcy code to take away

1   from the insurers their rights to participate in the defense,

2   decide what a settlement should be made, and obtain the

3   cooperation of the debtor in defending the claims?  How do we

4   design a plan that robs them of that so they have no choice

5   but to pay anything that they are presented with and that's a

6   matter of strategic use of a -- of a plan itself and of a

7   bankruptcy code.  There's no interest there in dealing with

8   an adjudication of the matters in (indiscernible) court.  I

9   -- you have other cases before you where we brought lift stay

10  motion that have the (indiscernible) matters decided and the

11  level of opposition that came forward is, you know, typically

12  huge because there is no interest in having those matters

13  really adjudicated.  Something else is going on here and

14  that's where debtor's counsel is playing that role using the

15  plan strategically.

16          When you look at Ms. Boelter's declaration here,

17  and I questioned her a little about it -- and to be clear

18  here -- you know, Ms. Boelter is a very nice person.  No one

19  is throwing any stones at her.  She's executing on what Mr.

20  Collin, Jim Collin has told her what to do, I have no doubt

21  and she's doing it thinking this is somehow the right path,

22  but this is a path where (indiscernible) causes a tremendous

23  amount of adversity because what's going on is she describes

24  herself in there as the team leader for coming about with a

25  global resolution of all the -- the entire matter, meaning

1   the settling of the claims, settling the insurance, all at

2   once.  You should -- to the very fact that we were not -- we

3   quite clearly from this record were kept almost completely in

4   the dark going into October when otherwise the declaration

5   from a debtor's financial consultant and from Ms. Boelter,

6   they communicate there were extensive meetings going on with

7   the tort claims during that period of time, presents exactly

8   the, kind of, adversity issues that we're concerned about to

9   the extent that we had a right for consent to defend that

10  we're (indiscernible) defense and whatnot.  For the tort

11  claimants and the Boy Scouts to have, sort of, spent, you

12  know, months meeting together and other constituents meeting

13  to our complete exclusion is all focusing on putting together

14  a plan, which we never saw until it was filed in the Court.

15  It's all the very type of adversity that Mr. Sneed is -- is

16  highlighting in that waiver he tried to get, that somebody

17  inside his firm gave us a lot of thought, tried to draft just

18  to give the protection on that very point.

19         So, I think that issue about whether there's

20  adversity, that's where I think the matter really gets

21  decided because under 1.7, that's what the Court has to

22  decide and it's not something that would apply, you know, in

23  some broad, you know, across the board way that

24  (Indiscernible) qualify, you know, bankruptcy lawyers and

25  multiple different kinds of cases isn't there.  You know, the

1   other thing that's, sort of, worth noting, just in that

2   regard is that this notion of bankruptcy firms, how many

3   bankruptcy firms -- how many firms have a bankruptcy practice

4   in a big insurance -- in a real insurance coverage practice?

5   It's only a handful.  I am one of them, but, you know, my

6   firm, we really don't do -- I don't know that we had a mass

7   tort bankruptcy where we've represented the debtor.  It would

8   pose issues.  We'd have to get waiver for it.  Sidley,

9   (indiscernible) declaration, the prior cases, you know, the

10   prior experience on mass tort cases, I don't want to undercut

11   or in any way suggest that some of the individual lawyers are

12   not experienced lawyers, but the cases they cite with

13   (indiscernible) declaration (indiscernible) experience, I

14   think those are the cases where the lawyers are coming from

15   other firms into Sidley (indiscernible), but those aren't --

16   or maybe Sidley played some role, but I don't believe Sidley

17   was the debtor counsel in those cases.  Why?  Well, it poses

18   an issue if, like, Sidley, Sidley has a major coverage

19   practice.  It does -- or insurance practice.  It -- it's

20   shown here --- it's not just Mr. Sneed, but like the other

21   work in they do in that field, it's pretty comprehensive.

22   There's a declaration -- Ms. (Indiscernible) has attached to

23   her declaration an exhibit that -- that shows that of the

24   insurers of the Boy Scouts.  It appears that Sidley

25   represents or represented almost every one of them.  Okay?

1  That creates a very special problem for them.  You know, I am

2  not walking away from that, but that is not a problem that

3  you're going to find that (indiscernible) has (indiscernible)

4  dozens of other firms that practice in -- in Delaware because

5  there's not that many of those firms that have -- that

6  (indiscernible) insurers.  It's just -- that's the bottom

7  line.  It's, like, lots of (indiscernible).  Firms make their

8  choices about what they select and get into.

9       So, we will tell you 1.7 applies, that 1.7 requires

10  a test of adversary.  Where Sidley wants to go on this is is

11  to, sort of, jump out and say, "No, 1.7 doesn't apply, we can

12  get to 1.9," where, then, they want to, sort of, present the

13  whole battlefield on we have to explain to you exactly what

14  it is that happened in our privileged attorney/client

15  relationship and it puts is (indiscernible) if we do so,

16  making it almost impossible for someone ever to complain and

17  that's (indiscernible) flip side.  If you want to look at,

18  sort of, the (indiscernible) about results, that's the other

19  ones that would come forward here, if you make it -- if in

20  fact bankruptcy lawyers didn't have to comply with the ethics

21  rules, it could terminate their client relationships the

22  moment before they file, they (indiscernible) you know, on a

23  continuous basis because they'd be free of any of the

24  restrictions that otherwise 1.7 applies. (Indiscernible).

25       THE COURT:  I don't know that -- I do want to get

1   to that, but I don't know that attorneys are going to

2   wantingly (sic) do that.  They subject themselves to

3   disciplinary procedures.  It's a -- if the other client's

4   correct, they subject themselves to arbitrations, lawsuits,

5   etcetera.  I do have some concerns, obviously.  You can tell

6   from the questioning that I -- questions I've asked, but I am

7   still trying to reconcile 327 in the present tense versus a

8   professional ethics rules and I am not sure there's a good

9   reconciliation of the cases, which seem to suggest different

10  results and then we know the disqualification cases where

11  Courts fairly frequently say, Yes, I see a -- either see a

12  violation of the ethics rule or there's a very large

13  potential for the violation of the ethics rule, but given the

14  -- given the harm to the client as opposed to the conduct of

15  the attorney, I am going to permit the attorneys to continue

16  to represent the client and deny the disqualification motion

17  and I am surprised at how many of those cases they are, but

18  that seems to be pretty frequent result.

19          MR. SCHIAVONI:  Your Honor, I would just --you know

20  our position on that, but we think in this circuit it's not

21  an issue of discretion.  It is a conflict of -- there has to

22  be a disqualification here.  You know, I am -- you have our

23  cases on that.  I think it would set a bad precedent if

24  somehow we departed from that and we were looking at

25  (indiscernible) lawyers to basically drop clients for the

1   more profitable bankruptcy work that's out there and do it on

2   a routine basis.  I just don't think it will happen

3   otherwise.  I mean, that's how they would present themselves,

4   but its fundamentally an issue of law at the end of the day

5   whether or not those circuit decisions and, you know, apply

6   here.  I think they do. To the extent Your Honor thinks they

7   don't apply, I don't think what has been characterized as

8   discretionary factors weigh in favor in this particular case

9   of keeping Sidley (indiscernible) on.

10          One of the things that the debtor doesn't get into

11   -- the most striking thing from my perspective about the

12   debtor (indiscernible) is there is no declaration from

13   anybody at the Boy Scouts.  Okay?  There's a declaration from

14   a consultant in Chicago that does a lot of work for Sidley

15   often in multiple bankruptcies, but who doesn't really say

16   much other than the COVID-19 -- that the Boy Scouts have

17   financial issues and that with COVID-19, those issues are

18   worse.  He doesn't really get into explaining what -- what

19   Sidley did that's particular or special here that they could

20   change things.  I would submit to you that if you wanted to

21   get a balance here of whether or not keeping Sidley, what the

22   prejudice would be of the Boy Scouts of keeping Sidley in the

23   case versus having him step aside, you -- you come away with

24   the conclusion that this is almost a neutral outcome.

25          You know, Sidley here, to the extent it goes

1  forward -- you know, I think like you said, like, if this

2  doesn't go forward -- like, the circuit itself is going to,

3  sort of, end up addressing some of these issues about how

4  these conflict rules go forward.  So, that the issue doesn't

5  die, it doesn't go away tomorrow.  If, for some reason,

6  there's a separate, like, arbitration that goes forward, if

7  the ruling's there, we'll somehow -- in some limited way or

8  some way deal with how we can perform on a going forward

9  basis and the actions that were taken pre-petition and now,

10  kind of, continue to infect and paint the case, the notion

11  here that Sidley itself introduced evidence to say, Hey, we

12  weren't the ones -- like, we had a provision in our retention

13  agreement with the Boy Scouts that would've allowed us to

14  tell Chubb that there was a consult with him about a

15  conflict, we couldn't invoke that because a provision says

16  subject to what -- instructions (indiscernible) Boy Scouts or

17  whatever precisely it says, they put the Boy Scouts directly

18  at issue there with their role going forward and whether or

19  not in doing that, if it wasn't just Sidley (indiscernible)

20  itself that they themselves ended up putting an issue whether

21  their voided the coverage or undermined the coverage from the

22  actions that they took going into the bankruptcy.  Their

23  continued role here is one that is (indiscernible) in another

24  way.

25           Buried in the 2014 disclosure of Ms. Boelter is a

1    disclosure that (indiscernible) parties and interests here

2    who have -- who represent more than one percent of Sidley's

3    client base, one of them is JP Morgan Chase.  JP Morgan

4    Chase, as I understand it, I did not have Mr. Collin there to

5    question, but I believe they're a bondholder that holds

6    hundreds of millions of dollars of Boy Scout bond, turns out

7    is at the same time of a major client, you know, one of the

8    -- you know, one of the top clients (indiscernible) to Ms.

9    Bolter's declaration in the case and they're obviously a key

10   player in the bankruptcy (indiscernible) statement of Ms.

11   Boelter saying anything like, "Well, anything about them,

12   we'll deal with separately."  Well, the plan to come forward

13   as I understand it and, you know, maybe I haven't read it

14   right, (indiscernible) Sidley client, the bondholder is

15   unimpaired.

16          So, you know, they have a whole package of issues

17   that flowed from that and how that goes forward.  Not having

18   them in the case would free them from that and also there's

19   -- as far as the balancing of the prejudice is here -- you

20   know, I can only be straightforward about it.  Mr. Abbott is

21   one of the finest lawyers in the state, his firm is a great

22   firm.  He's a tremendous advocate as he just demonstrated to

23   all of us.  There's no reason he can't pick this thing up

24   seamlessly and move it forward without any, kind of, break

25   down.  The notion by the way that somehow you're going to

1   move to a quick resolution, I mean, just think, sort of,

2   where we are.  They've excluded the insurers up to now, they

3   only told us who they were proposing as a mediator very

4   recently and there's significant dispute about that, the

5   notion that somehow, like, with all of that, like, peace is

6   going to break out overnight?  Like, it boggles my mind a

7   little bit that there are better ways to proceed, but in any

8   event, that issue with the prejudice, I don't think it's one

9   that really goes into the

10  Decision-making.  I also think if you reach that, if you --

11  to the extent that that's at the back of your mind, that's

12  this is not -- the balancing of the prejudice is a mutual

13  outcome.

14          THE COURT:  Okay.  Let me ask you another question

15  before we get off of 327 and I am looking at the statute and

16  again thinking about Marvel and BHP and your position that

17  these cases stand for the fact that a conflict of interest is

18  an absolute disqualifying factor for retention.  327A talks

19  about disinterestedness (indiscernible) employ one or more

20  attorney that does not hold a (indiscernible) and that s

21  otherwise a disinterested person.  327C says that in a

22  Chapter 11 case, a person is not disqualified for employment

23  under this section solely because of such person's employment

24  by or representation of a creditor unless there is an

25  objection by another creditors and not the one that they're

1   employed by or the office of the (indiscernible).

2          So, this suggests that retention is not denied

3   solely because the proposed counsel has been employed by or

4   represents a creditor.  How does that jive with an absolute

5   prohibition on employing someone under 327A (indiscernible)

6   currently even represent the creditor?

7          MR. SCHIAVONI:  Your Honor, I think the two work

8   together well because I think all that is saying is just

9   because you are a creditor, that's not this -- just because

10  you may represent a creditor, it's not disqualifying by

11  itself and if that's the only factor, then you can see in

12  many circumstances why it wouldn't be.  It would be all sorts

13  of ways to deal with that creditor claim.  That's how they're

14  going forward apparently with respect to the bondholders

15  here.  You know, probably a minor creditor, but that's how

16  they're going forward with respect to them, but I don't think

17  you can read -- I don't think you can read 327 as excluding

18  application of ethics rules.  In other words, okay, 327 says,

19  fine, you may possibly represent a creditor, but if someone

20  comes in and is able to demonstrate under 1.7 and satisfy all

21  of the requirements associated with it, then I think you have

22  a different circumstance.  There are other cases out there

23  that make clear that the ethics rule apply in a bankruptcy

24  and they're not modified or changed.  So, it can't be that if

25  we satisfy the elements of 1.7 here, that somehow, like, 327

1    excuses (indiscernible) otherwise would be the conflict that

2    would (indiscernible) from 1.7.

3            THE COURT:  Okay.  Go ahead.

4            MR. SCHIAVONI:  I'm sorry, Your Honor.  I could --

5            THE COURT:  No, that's okay.  I know I am throwing

6    you off by some questions and I want to make sure you get to

7    argue fully what you want to argue.  I think you were getting

8    to the hot potato rule and I certainly want you to talk about

9    that, but I certainly don't want to throw you off.

10           MR. SCHIAVONI:  So, a wise, old lawyer once told me

11   the questions the juddge ask are more important than what you

12   want to say.  Okay?  So, you know, Your Honor, don't -- if

13   you have questions, cut me off.  So, I just -- briefly, what

14   I would just like to add on the hot potato rule is a client

15   is able to quit, withdraw under 1.6, but I think it's pretty

16   clear from the cases that deal with this, I think the reason,

17   for there to be permissive, permissive withdrawal from a

18   current client, the reason can't be because there's a

19   conflict and that's really the evidence before the Court here

20   that the parties had a meeting, they definitely had different

21   views about things, but fundamentally, what Mr. Sneed

22   testified and what our folks testified coming out of that was

23   that our folks were saying, "Look, we stand by our assertion

24   that we are not going to consent," and Mr. Sneed was telling

25   them in essence that, you know, If you are not going to

1   consent, you know, that's it, I am going to quit and that

2   really isn't no other reason offered for why they quit

3   otherwise and the timing and manner in which they quit almost

4   (indiscernible) exactly that they were basically trying to

5   clear themselves and get the benefit of the different

6   standard (indiscernible) bankruptcy was filed.

7        So, I don't think the whole exchange changes the

8   application of the cases (indiscernible) hot potato rule and

9   the other thing I am just want to add on the hot potato rule,

10  it doesn't matter (indiscernible) who hired who first.  I

11  think the record here is very strong that Sidley was

12  continuously a client, and was a client when they took on the

13  Boy Scout matters, but even if they weren't for some period

14  of time, which I tell you the record will show that they

15  were, the -- the -- who took on who first doesn't change the

16  application of the rule.  The rule is basically you can't --

17  you can't withdraw basically to get the benefit of the

18  different ruling and the standard (indiscernible) 1.7 is

19  really important because it doesn't require the Court to

20  delve into this, sort of, incredible (indiscernible) issues

21  about what the privileges are here and what not.

22        Let me turn (indiscernible) what if we did apply

23  Rule 1.9 here.  You know, how would you handle that and, you

24  know, whether or not, maybe, some of the questions you got

25  (indiscernible) the questions you posed the other day were,

1   sort of, directed at that and by the way, Your Honor, what we

2   did was in advance of this hearing, we tried to put together,

3   sort of, like, a bench memo, pocket memo, whatever you call

4   it, that addressed the two questions you had because I

5   thought you wanted to have the legal citations from

6   (indiscernible).  So, you know, we submitted, like, six or

7   seven page paper that just addressed those two questions, the

8   question about who Century is, so to speak, and the other

9   question about how to deal with when there's a disagreement

10  over the conflict.

11         So, 1.9, what do you deal with here, okay, because

12  I think you do have a record in part where you have both

13  parties saying (indiscernible) can tell you some stuff, but

14  you know, but we both have our hands tied about telling you

15  everything per say, but, you know, we do think that Sidley

16  went further than they probably should have and

17  (Indiscernible) back and forth, it puts us in particular

18  peril because it's hard to be able to have come back and be

19  even more specific about what was said and where the

20  conflicts arise, but how do you deal with that and maybe

21  that's one of the questions you're trying to get at, but what

22  we did was, in our submission we sent in earlier today, we --

23  you know, we cited cases (indiscernible) Sidley was the

24  applicant here really carries the burden and that for 1.9,

25  the -- some of the cases that we cite, they talk about a

1   presumption (indiscernible) at risk, if there's any overlap

2   or possible overlap in the matters.  We disagree on what

3   actually constitutes the -- what (indiscernible) as far as

4   the conflict itself.  From our perspective, it really has to

5   be under (indiscernible) case we'll refer you to that they --

6   a mere possibility that the confidential information could

7   (indiscernible), but we aren't held to, you know, a burden

8   (indiscernible) coming in and showing exactly what would be

9   conveyed, but there's a (indiscernible) precedent that

10  (indiscernible) talking about this mere possibility of

11  confidential information obtained in the first engagement

12  could be relevant to the second.  That's what makes the

13  matter substantially related.  That's (indiscernible)

14  derivative litigation 748 (indiscernible) 157 and that's, you

15  know, this other case and I will refer you to both

16  (Indiscernible) how to deal with the burden, but also how to

17  deal with when the parties have made a showing and said they

18  can't just go any further is (indiscernible) Madcow

19  (Phonetic) 552 (indiscernible) 450, where the Court

20  specifically talks about how (indiscernible) doubts whether

21  the disqualification has appropriate should be resolved

22  (indiscernible) to ensure that the protections of the

23  attorney/client communications are protected.

24          So, how do we try to -- how do we try to show that

25  there was substantial relationship under what we believe was

1  that test and I think Sidley has  --  Mr. Ducayet

2  (Indiscernible) in fairness, I kind of, understand how we

3  were presenting it.  We're not saying that the coverage,

4  like, the issues specific to the coverage necessarily give a

5  conflict, but in trying to show where the connection was

6  between Mr. Sneed's work for us and the disputes in the --

7  you know, between the Boy Scouts and Chubb, we tried to look

8  for things that were objective, that were out in the public,

9  that we could show where it was overlap without going a step

10  further and have to, sort of, draw the further guideline of

11  exactly connecting it all up, but what we did was presented

12  in that brief and he brought -- he bought it up briefly, we

13  walked through the allegations the Boy Scouts are making

14  against us in pleadings and specifically what they're saying

15  is at issue in coverage and it's not necessarily just whether

16  or not there is coverage or not, but how you allocate it and

17  -- and, you know, there's a series of other issues embedded

18  there and where the Boy Scouts talk about those issues there

19  and then we went through Sneed's declaration and we pulled

20  out paragraphs where he's talking about the same exact

21  topics.  We don't think we need to go -- like, we've already

22  been pushed to the point where we've had Sidley's partner

23  questioning Ms. Russell, cross examining her on whether she's

24  waived her privilege on the same, a spectacle that we'd never

25  thought we'd get to.

1      We don't think we need to go further, that when we
2  you look at (indiscernible) and these other cases, that we
3  have gotten close enough that Sidley didn't meet its burden
4  and that's a presumption applies that lets us fill the gap
5  here, if there's any gap.  If not, you know, we're prepared
6  to make a presentation in camera.  One of the awkwardness
7  about the entire bankruptcy is that -- that presents other
8  issues and problems with the case.  I understand that, but
9  we're prepared to do that and some of the ethics cases talk
10  about that, but what they don't require is that we have to
11  come forward and exactly close the line on it.

12      Now, the other thing we put forward here was, yes,
13  discovery, being sought by the Boy Scouts in the bankruptcy
14  (indiscernible) the issue there, the point wasn't
15  (Indiscernible) bankruptcy necessary discovery or that Mr.
16  Sneed is somehow directly involved in that.  The point
17  forward is point clearly the Boy Scouts think that Mr.
18  Sneed's work and Sidley's work for us is relevant, the
19  disputes between us, because they're pursuing multiple
20  requests.  We couldn't get a specific -- the specific
21  requests are all in evidence, but you know, we highlight thme
22  in those briefs, and yes, it's true that Century has pushed
23  back.  So, they don't want to answer those requests, offer
24  various objections, even asserted that they are not relevant,
25  but Mr. Ducayet is missing the point and there's an element

1   in connection with that that is not really fair, okay?  He's

2   missing the point.  The point is not what we have put out to

3   defend ourselves, but that the work that Sidley has done is

4   being targeted by the Boy Scouts for discovery.  That dispute

5   isn't resolved.  That's ongoing.  We're going to have to

6   defend ourselves on that.  So, whatever our position that we

7   took in opposing it, that's one thing, but what's relevant

8   about it is that that dispute is there and the one there

9   we're not here from Mr. Ducayet or the Boy Scouts is an

10  explanation why is it that they want this material?  That

11  would be revealing, I suppose, but they haven't put that

12  forward.  Instead, they put the burden on us.  All right?

13          But that gets us, we think, close enough that we

14  don't have to go a step further to basically lay out exactly

15  what our privileged information is and the case s we cite

16  there, the Courts are still dealing with that

17  (Indiscernible).  Now look, every one of these disputes is

18  different.  I think the (indiscernible) probably comes

19  closest to the paradigm I'm talking about here in talking

20  about a presumption, but yes, the facts are, sort of, in each

21  case idiosyncratic and a little bit different than ours, but

22  the Court (indiscernible) do I need the exact proof and the

23  Court concluded no, I don't and here's why and explained that

24  there should be a presumption when it gets (indiscernible).

25          So, what is Sidley (indiscernible)?  Like, what are

1  they (indiscernible) put up on the 1.9?  Let me just, sort of

2  go through them quickly.  (Indiscernible).  I think some of

3  this is -- on the -- first of all, they said, Well, the

4  relationship here really isn't what Chubb said at all because

5  just look at the service level agreement.  It's somehow

6  defined as a non-claim's agreement.  This is bordering on

7  almost a desperate as an argument.  Chubb is an insurance

8  company.  It hires a lot of law firms.  It has a service

9  (indiscernible) agreement for the underlying lawyers, like

10 the ones that handle defense cases (indiscernible) claim

11 agreement.  It has another form of (indiscernible) -- then it

12 has another agreement for claims lawyers, lawyers who would

13 handle directly the coverage claims.  Then it had another

14 agreement called the non-claims agreement, I guess for lack

15 of a better definition.  Okay?

16      MR. DUCAYET:  Your Honor, I apologize.  This is Jim

17 Ducayet from Sidley.  I don't think any of this is in the

18 record.  I think is (indiscernible) argument.

19      THE COURT:  I recognize that this evidence is not

20 in the record.  Thank you.

21      MR. DUCAYET:  Thank you, Your Honor.

22      MR. SCHIAVONI:  In any event, non-claims agreement,

23 what isn't in the record is any support at all for the notion

24 that the non-claims agreement is that the use of the term

25 non-claims agreement is in connection with a -- what we are

1   all used to seeing an engagement letter, which is a

2   limitation on -- on the -- or definition of the scope of the

3   engagement.

4         Mr. Ducayet hasn't (indiscernible) that actually

5   says that non-claims is used in the title of the agreement

6   and he knows that in the redacted text, there is a section

7   that says purpose of the agreement and I am happy to un-

8   redact that with him, but he's basically using the fact that

9   it's redacted to argue that this is a limitation on the

10  nature of the work when it's not, it is absolutely not.  It

11  is just a description (indiscernible) applies to and it's

12  utterly an inconsistent interpretation of it to -- you know,

13  with respect to the work that Sidley was doing and, you know,

14  Sidley (indiscernible) at issue what's below those

15  redactions?  Yes.  We were prepared to lift those redactions.

16        The next point I would like to cover is the whole

17  notion that somehow the separation between claims and

18  reinsurance somehow means that Sidley wasn't involved in

19  reinsurance at all.  All that is is -- and you heard it from

20  the witnesses was that the people working in reinsurance

21  aren't in the day to day business of overseeing the claims.

22  They don't want to be involved in that.  It doesn't

23  (indiscernible) insurance people don't get information about

24  the claims because you heard testimony from Ms. Russell about

25  precisely how many of these agreements (indiscernible) so-

1   called (indiscernible) meaning corporate (indiscernible)

2   coverage and you have to use that to make (indiscernible).

3        There are two other points (indiscernible) make the

4   point that its restructuring team is limited by the scope of

5   the -- in the Boy Scouts retention agreement, it does have a,

6   sort of, traditional scope of retention and there's some

7   reference there to not handling insurance.  First of all,

8   citing that is a limitation of what they've done in the

9   bankruptcy.  It's inconsistent with what is in Ms. Boelter's

10  declaration in Paragraph 6 about -- which has a much broader

11  definition of what they are doing, leveraging their

12  experience to counsel Boy Scouts regarding all strategies

13  regarding the global resolution of claims, etcetera.  It's

14  also inconsistent with the facts on the ground on what you

15  heard at the hearing about what Sidley has done so far in the

16  bankruptcy.

17       It's also inconsistent with Mr. Sneed's description

18  on what (indiscernible) or at least what he passed on through

19  his prospective waiver.  Let me just turn (indiscernible) to

20  Haynes and Boone and the issue of Haynes and Boone

21  (Indiscernible) take over and handle (indiscernible).  I

22  think (indiscernible) factual issue (indiscernible) and a

23  legal issue.  When you look for guidance on whether or not

24  (indiscernible) case over (indiscernible) the difference

25  between 327A counsel and 327E counsel and there the real

1   point is can't -- you know, they (indiscernible) here that

2   they were going to handle insurance matters.  The lawyers who

3   (indiscernible) are insurance coverage lawyers, state

4   insurance coverage lawyers. (Indiscernible) perform the role

5   here or not?  Well, given how we describe and how we think

6   Sidley, through Mr. Sneed's perspective waiver right up

7   (indiscernible).  The adversity lies in how the plan is being

8   constructed so that the coverage matters could never be

9   decided.

10        You heard Mr. Ducayet refer, I believe, and if I am

11   mistaken I apologize, but I think he referred in part of his

12   presentation that some effort to basically transfer all the

13   cases and bring them to Delaware.  It's just another way to

14   change how (indiscernible) to change how the cases are

15   defended.  The battleground is in the bankruptcy and these

16   cases that look at whether you're at the 327A counsel or E

17   counsel (indiscernible) draw the line where they say you can

18   have -- you can be special counsel on a matter and not have

19   to satisfy other aspects of the retention code.  As long as

20   you can show you are to getting yourself involved in

21   drafting, preparing, strategizing the plan itself.  That's

22   where this activity is taking place in this, kind of, case.

23        I'd be the first to tell you that in the vast

24   majority of bankruptcies, you can -- because of insurance

25   dispute and its dealing with some other issue, a factory

1    burns down, you know, or what have you, it's like, it can be

2    easily carved out and made into a 327E engagement, but here,

3    where the whole aspect of what is going on is how to design

4    the plan and how to design plan relief to basically checkmate

5    the insurers, you can't -- it's impossible to suggest that

6    somehow Haynes and Boone can handle this.  (Indiscernible) in

7    a case so far, but they are -- the lawyers that have applied

8    are not qualified -- or respectfully, they are not bankruptcy

9    lawyers. They are not lawyers that draft a plan.  It's a

10   (indiscernible) to suggest that they will be driving that

11   versus just simply being (indiscernible) to report to us, but

12   basically have Sidley behind the scenes running the show.

13   So, we don't think that there's a real notion that they are

14   remedy here to deal with what the core problem is.  And with

15   that, Your Honor --

16         THE COURT:  Would they -- I think Mr. Ducayet would

17   make a distinction between a 1.7 adversity and a 1.9

18   adversity.  So, if you were a 1.7 adversity, then the broader

19   adversity, I am not sure he can see this, but this broader

20   adversity would be applicable.  "You can't just be adverse to

21   me in any way whatsoever because I am a current client,

22   versus a 1.9, "Do I need to find the adversity based on the

23   specific issues and the reinsurance case and how they are

24   substantially similar" or whatever the words are in 1.9 to

25   the issues that are being addressed by Sidley versus Haynes

1    and Boone in the bankruptcy case.  So, does it matter for

2    what you just argued whether it's 1.9 or 1.7?

3              MR. SCHIAVONI:  I don't think it does, Your Honor.

4    Look, if the resulting determination is different, Your Honor

5    concludes there's no conflict (indiscernible) even need them,

6    right, but if there's a conflict under either 1.7 or 1.9, I

7    don't think it changes how you would employ special counsel.

8    You know, in either case, the question would be, "Are you

9    removing from a planned process?"  You cannot remove better

10   counsel from the planned process.  It's just unrealistic.

11   It's completely unrealistic.  I mean, just look -- just look

12   at -- is it any coincidence at all that Sidley gets hired

13   and, you know, the main bondholder here walks here unimpaired

14   as part of the plan right out of the box?

15             THE COURT:  That's a different issue and nobody has

16   raised that issue in terms of what other conflicts are maybe

17   out there.  So, I am not prepared to address those.

18             MR. SCHIAVONI:  Your Honor, just to be clear, I

19   wasn't raising for that -- I was raising it more

20   illustratively.  Okay?  Because how is it -- some of these

21   decisions about -- like, some of these issues are big picture

22   strategic picture issues that are made without, like -- they

23   aren't involving lots of hours of Haynes and Boone's time.

24   Somebody is sitting down and designing how (indiscernible)

25   structure of this plan.  The notion that you can ask three or

1  four (indiscernible) lawyers from the Haynes and Boones firm

2  to show up and just to draft the, quote, "Insurance part of

3  the plan," okay, I don't know.  It's like -- it's like, you

4  couldn't have them draft a couple of clauses of it, how to

5  structure, how to pursue the strategic options?  That's

6  exactly what Ms. Boelter is saying she's doing, right, and

7  that's what key here.  That's really what's key.

8          THE COURT:  Thank you.  Okay.  We've been going or

9  three hours.  I would like to take ten minutes.  No?  I'd

10 like to go 5:5 and then we will come ab ck and I will let Mr.

11 Ducayet respond.

12         MR. SCHIAVONI:  Thank you, Your Honor.

13         THE COURT:  5:15.  We're in recess.

14         THE COURT:  Mr. Ducayet.

15         MR. DUCAYET:  Thank you, Your Honor.  And let me say,

16 Your Honor, we appreciate your patience today for -- I guess for,

17 as you said before the break, three hours.  And I'll do my

18 best not to continue to test your patience and keep my

19 remarks relatively brief.

20         Your Honor, let me just address a few points.

21 First of all, with respect to the 327 issue that Your Honor

22 asked me about and asked Mr. Schiavoni about, I think the issue

23 on 327 here is that what Century is trying to do is to take the

24 language from Filotext (phonetic) and otherwise that talk about an

25 actual adverse interest creating a per se -- per se rule and

1    then using that to try to put into or smuggle into the ethics

2    rules.

3              And I think, as Your Honor knows, we're not

4    suggesting the ethics rules are irrelevant here, nor are we

5    suggesting that 327 somehow supercedes or otherwise, you know,

6    limits the ethics rules.  But the relevance of 327 is upon,

7    you know, what Your Honor must do, which is confirming whether or not

8    Boy Scouts can represent us -- or Boy Scouts can have us

9    representing them and whether or not there is an interest, a

10   present interest that's adverse to the estate.  And there

11   isn't a present interest that's adverse to the estate.  There

12   is no actual conflict that would fall within the per se rules

13   that are discussed in Filotext and Marvel and the like.

14             However, the ethics rules certainly can inform

15   the question and their independently relevance of an interest,

16   but they in no way give rise to a per se disqualification

17   standard.  And here where you've got a former client situation,

18   and put aside the issue of a hot potato or what have you, then, you

19   know, the question is really:  Is there a potential conflict

20   of interest that could give rise to an adverse interest?

21             And in that context, Your Honor, what we're

22   talking about is really a disqualification standard and that's

23   where you have the discretion, Your Honor.  And you've seen the

24   cases in the disqualification context and even in the 327 context.

25   It is completely appropriate for Your Honor in a situation where

 1    there may be a potential conflict of interest, and I'm not

 2    even sure I concede that, but let's assume for the sake of

 3    this argument that there is, Your Honor has full discretion

 4    here to determine how we should proceed and we've given Your

 5    Honor sort of a roadmap of how to do that.

 6            And Your Honor I think made the point, quite

 7    rightly, that 327(c) suggests that, you know, a proposed firm

 8    can even represent the creditor.  And then once another creditor

 9    objects, that is not an automatic per se rule.  And, of

10    course, you know, just to state the obvious, Chubb isn't a

11    creditor here.  You know, this is a situation in which there

12    are obviously an interest on the part of Boy Scouts with

13    respect to insurance proceeds by Chubb and other insurers,

14    but they're not even a creditor.

15            And so I don't think, Your Honor, that the idea that

16    there's just an automatic or per se rule that applies whenever there

17    is a conflict is correct under 327.  And I think the way to

18    reconcile that is to say there is no present adverse interest

19    under 327.  There is a claim that -- there's either a 1.7 or

20    a 1.9 violation.  And the question is, do any of those claims

21    create enough of a potential conflict of interest that Your

22    Honor would then determine that a retention is not

23    appropriate?  So that's how I would try to reconcile the

24    ethics rules and the 327 standard.

25            Your Honor, the other point I would make here is,

1   as I've said at the outset and I think was clear, this is

2   fundamentally a contract dispute and it rises and falls on

3   the language of the FLA, the claim that we're required to

4   give a written waiver.  I think Your Honor understands that

5   we're not saying that they gave us a written waiver.  What

6   we're using, the discussions about an advanced waiver and

7   their knowledge, is really for purposes of just demonstrating

8   that the picture they're trying to paint now, that there's

9   this absolute textbook of unwaivable conflict, just isn't the

10  case.

11          And why is that relevant?  Well, it's relevant

12  because Your Honor has to consider the extent to which what's

13  going on here is really motivated by concerns other than the pure

14  issue of ethics.  And, you know, Your Honor heard Mr.

15  Schiavoni, you know, frankly, go on for quite some time

16  almost as a fact witness, you know, testifying about, you

17  know, the ways in which, you know, the proceedings have gone

18  and raising issues about J.P. Morgan, which nowhere appear in

19  any of the briefs and, frankly, you know, taking potshots at

20  Haynes and Boone and my partners.

21          All of that, Your Honor, I think, you know, should

22  be kept in mind as you really determine what is the ultimate purpose

23  and the end game here.  And is it simply to kind of delay things

24  further or is it motivated by a general concern that there's

25  some ethical issue that cannot be abridged?  Well, the idea

1  that this cannot be addressed as a new position, that's not

2  the position they took in the past.  And we do not concede,

3  Your Honor, that there is either an issue under 1.7 or 1.9.

4          And let me just make one other point, Your Honor, and

5  that is the standard even under 1.7, and Mr. Schiavoni, I  was

6  looking very carefully to this, he said it's diversity.  It's

7  not.  It's direct diversity.  And that's actually important

8  because a lot of what Mr. Schiavoni was talking about, "Oh,

9  we weren't treated very well, we were excluded, you know,

10 from, you know, meetings," et cetera, et cetera, that's not

11 direct adversity.  In fact, you know, we cited in our papers

12 an ABA formal opinion that says, you know, look, we're there

13 financially where you're representing -- in that case you're

14 representing an insurer and you're also representing a

15 plaintiff who sued somebody who was insured by that insurer.

16         The fact that there's some financial interest

17 that your clients both have that are directly or that are sort

18 of in conflict with each other, that's not direct adversity.  And

19 the sort of world that Mr. Schiavoni set forth is one in

20 which there is adversity behind every corner and it simply

21 cannot be the case that, you know, simply because this is a

22 mass tort case that anything debtor's counsel does is thereby

23 automatically somehow adverse or directly adverse to an

24 insurer.  And, frankly, Your Honor, if that were the rule, it

25 would be almost impossible I think for any significantly

1  sized law firm to ever participate in these kinds of cases.

2           The reality is, again, we don't think there's direct

3  adversity and it doesn't matter because they're not a current

4  client.  And so, therefore, we can be adverse to them and,

5  you know -- and so, therefore, you know, again, I think this

6  is all kind of building upon a set of premises that simply

7  don't follow.

8           THE COURT:  I -- I looked at that opinion and it

9  struck me that that's -- that there's not a reciprocity there

10  between whether an insurer is -- whether in a reinsurance

11  situation  the insured, BSA in that instance, is adverse.  And

12  that for purposes of the reinsurance litigation really has nothing to

13  do with whether in a bankruptcy BSA is adverse to an

14  insurance company.  They're just not -- I don't know that one

15  informs the other.

16           Maybe you think I'm wrong, but I'm actually not

17  sure anybody has given me -- well, I think maybe Century cited one case

18  that dealt with adversity in a mass tort bankruptcy case.

19  But I don't think that just because BSA and Century are not

20  adverse in the reinsurance litigation means that BSA and

21  Century are not adverse in a bankruptcy case.

22           MR. DUCAYET:  Well, Your Honor, two responses to that.

23  I mean, number one, I think I agree with that, Your Honor,

24  except that, again, that's why we have Haynes and Boone to

25  deal with any potential adversity in this situation.  That's

1   the whole point behind that.  And my only -- my only point

2   here is that the view of the world that Mr. Schiavoni was

3   just espousing is that anything at all that's done by

4   debtor's counsel is automatically adverse to them just given

5   the nature of the case.  And if you say, Your Honor, the only

6   case they ever cite for that is the (inaudible) decision from

7   the Ninth Circuit, that's dealing with the issue of insurance

8   neutrality and does not deal with conflicts.

9              But in any event, insurance neutrality is anything

10  to provide sort of an additional reason about, you know, our ability to,

11  you know, continue in this case.  Whatever plan is eventually

12  put in front of Your Honor will have to satisfy the

13  requirements of insurance neutrality, it just will.  And so

14  this idea that, you know, we're, you know, trying to funnel

15  cases and we're doing all these things that are contrary to

16  their interests and so on and so forth, first of all, it's

17  not accurate.  Second of all, to the extent that it directly

18  implicates Century is being done by Hayes and Boone.  And,

19  you know, third of all, it's ultimately an issue that Your

20  Honor will review in the context of any potential objection

21  on the grounds of insurance neutrality.

22             THE COURT:  Well, I will, but I can't judge that now.

23  So I don't know whether or not any plan, and the one on file is

24  really a placeholder, but I don't know whether any plan will

25  be adverse, but certainly Century and any other insurance

1    company has to be free to argue that it is.

2            MR. DUCAYET:  Sure, absolutely.

3            THE COURT:  Okay.

4            MR. DUCAYET:  I don't disagree with that,

5    Your Honor.  My only point is, that's why we have Haynes and

6    Boone.  And it cannot be the case that simply there -- because

7    there might   be an insurance neutrality issue that, therefore,

8    any step that's taken by the debtor to move this case forward is

9    automatically adverse to the insurers.  I don't think that's

10   right.

11           THE COURT:  No, but I am struggling with the scope

12   of what -- what is within the ambit, if you will, of matters

13   in a mass tort case as opposed to any other type of case.

14           MR. DUCAYET:  I understand, Your Honor, and what I

15   can tell you is, you know, we've tried to -- we've tried to lay that

16   out.  We've tried to, you know, work with Haynes and Boone to

17   make sure that that's, you know, absolutely clear.  And, you

18   know, frankly, Your Honor, to the extent that you want more

19   detail about that, we would be happy to, you know, to provide

20   that more detail.

21           But ultimately the objective here, Your Honor,

22   is to address any legitimate concern.  And, you know, Sidley is

23   not going to be litigating against, you know, Century or any other

24   insurer.  We don't do that, consistent with our engagement

25   letter.  And that's precisely why we've had Haynes and Boone,

1  who have been representing Boy Scouts almost as long as we

2  have on insurance issues to come in and take on that role.

3           And, you know, Your Honor, look, the sort of potshot at

4  Haynes and Boone, well, they're not, you know, bankruptcy

5  lawyers.  I think, you know, you -- you heard Professor

6  Rapoport get her Texas up, you know, in connection with that

7  issue.  We'll deal with it.

8           THE COURT:  Right, and they're a fine -- they're a

9  fine firm, but the lawyers that are handling the insurance,

10  and I -- and one of them testified in front of me on another aspect of

11  this case, he handles state law insurance issues.  That's

12  what he does, he does coverage issues and that's what he

13  does.  I had partners -- I had partners who did coverage

14  work.  Could they handle -- could they handle the issues that

15  come up in a mass tort bankruptcy?  I think that's the

16  question.  I don't think Mr. Schiavoni was impugning those

17  lawyers for the work that they actually do.

18           I think what he's arguing, and this is where

19  I'm struggling with the scope, is in a mass tort bankruptcy

20  where insurance is a significant issue, are the guys who handle

21  state law coverage issues sufficiently knowledgeable in the bankruptcy

22  aspects of that, of the case?  I don't know, but my guess is

23  that's not what they do on a daily basis.

24           MR. DUCAYET:  Your Honor, I don't think that is what they do

25  on a daily basis, but we do have our -- the Boy Scouts has

1    great confidence that they're going to be able to handle the

2    issues as they may arise as we go forward and that's why we

3    sought to -- seek to have them retained.

4            Your Honor, just a couple of other points, if

5    I could.  So there was some discussion by Mr. Schiavoni about the

6    circumstances under which, you know, Mr. Sneed first

7    communicated back in December of 2018 and Mr. Schiavoni

8    pointed to the language of the engagement letter and said

9    there was no evidence in the record that we were ever

10   directed by Boy Scouts not to disclose the representation.

11   That's just wrong, and Ms. Boelter testified squarely on that

12   point and she testified she was directed, as was everybody on

13   the Sidley team, not to disclose the representation.

14           Frankly, there was a really good reason for that.

15   I mean, it was -- it was highly confidential and, you know, it

16   is often the case, which Your Honor knows, in restructuring

17   situations that public disclosure of the fact that somebody's

18   considering as an alternative a filing can be extremely

19   harmful.  And so, you know, that was the strict instruction.

20   There is evidence in the record to support that and that is

21   entirely I think consistent with the engagement letter

22   language that Mr. Schiavoni was focused on.

23           The other point, just to deal with the sort of set of, you

24   know, discussions that were occurring back in '18 and '19.

25   With respect to the advanced waiver, the whole point about

1    the advanced waiver, again, we're not suggesting they gave us

2    a waiver, we don't argue that, but what we're trying to make

3    clear here is that there are ways to address this.  And,

4    frankly, the language that Chubb itself proposed, you know,

5    after consultation with its internal bankruptcy counsel is,

6    you know, language that I think reflects the spirit of what

7    we're trying to propose to you now in terms of a delineation

8    in responsibilities and making clear that we will not be

9    directly adverse in ensuing -- pursuing adversary

10   proceedings, seeking discovery otherwise with respect to

11   Century.  So all of that I think is consistent, and I don't

12   think it is consistent with the current position that there's

13   simply no way possible to solve this issue.

14            Your Honor, with respect to the issue of the 1.9 standard,

15   and I do want to address this issue because the suggestion

16   was that somehow we put them in a difficult position.  Let me

17   just say, Your Honor, we took great pains not to put them in

18   any difficult position and not to disclose anything more than

19   was necessary, which is why, Your Honor, if you're trying to

20   define -- it is absolutely critical that you define the scope

21   of the representation for purpose of 1.9, absolutely

22   essential.  Because otherwise, you know, somebody could say,

23   "I retained, you know, you know, Joe Smith as my general

24   lawyer," and what's reasonably, you know, likely to be

25   provided to, you know, Ms. Smith in that context, well, it's

1    everything, you know.  But if that's not accurate, that

2    doesn't accurately reflect the scope of the engagement, then

3    Ms. Smith is certainly entitled to rebut that.  And the cases

4    that talk about a presumption of the sharing of information,

5    those are not the rebuttable presumptions, nor could they be.

6    You know, we ought to be able to, and we have, to provide

7    Your Honor with evidence of precisely what the scope of the

8    engagement was.  We think we were able to provide Your Honor

9    with that evidence without compromising any of the underlying

10   privileged information to the extent that it exists.  And,

11   Your Honor, the reality is if you look at just the objective

12   evidence, forget about the testimony, but if you look at the

13   objective evidence, you look at, you know, what is -- what

14   are the documents we have that define the scope?  Well, it's

15   the FLA.

16           Now, Mr. Schiavoni said I'm desperate for relying

17   on the FLA. It's the document that they say governs the relationship

18   and it's a document that on its face applies to non-claims legal

19   services.  That's a defined term.  That's not, you know, Boy

20   Scouts are simply trying to characterize the scope of the

21   work.  It is the actual language that Century insisted that

22   we agree to and that we did.  And, you know, likewise if you

23   kind of understand the scope of the representation, looking

24   at the objective evidence like our engagement letter, is I

25   think a way to avoid this issue of whether or not we were

1    privy to confidential information.

2            But in any event, Your Honor, you heard from Mr.

3    Sneed.  He was quite emphatic about this, that the scope of

4    the work that we actually did do is entirely consistent with

5    the way it's described in the FLA and it did not involve the

6    underlying direct insurance claims coverage disputes, it just

7    did not.  And, you know, frankly, Your Honor, again, if you

8    think about this from a 1.9 perspective, the question is, was

9    there information that could have materially advanced the

10   position of Boy Scouts in connection with any of that?  And,

11   you know, it was quite notable I think when you heard from

12   Ms. Russell and Mr. Schwartz, it was all pretty vague, Your

13   Honor.  And they may say, "Well, it's vague because we didn't

14   want to get into the details."  Well, Your Honor, I've got to

15   tell you, there are ways to describe things with some more

16   detail that doesn't necessarily compromise or reveal the

17   underlying information.  And, you know, that's -- it's simply

18   not what happened.  You know, we got some very general and

19   conclusory assertions about information that was shared.

20   And, you know, Mr. Sneed, you know, in his rebuttal case said

21   that's just not accurate.

22           And, again, Your Honor, the point is, we are entitled to

23   defend ourselves here.  And it just cannot be the case that

24   this is an irrebuttable presumption.  The whole purpose of

25   having Mr. Sneed provide some rebuttal testimony at the very

1    end was precisely because of the sort of vague and conclusory

2    assertions that were being made about information that was

3    shared just weren't consistent with what actually happened.

4              And so, Your Honor, that's the evidence in front

5    of you.  We don't think that under a Rule 1.9 standard that

6    these are matters that are substantially related.  And I'm not

7    going to repeat myself in terms of the other, you know, factors

8    that would go into that and the reasons why they were not

9    substantially related.  But simply on the testimony itself,

10   Your Honor, I think you heard, you know, from Mr. Sneed,

11   who's been doing this for a very long time.  He very clearly

12   explained to you what was and was not at issue and what

13   information was and was not provided, Your Honor, and I think

14   that ought to, you know, end the matter.

15             Your Honor, let me just conclude by saying, again,

16   I think the Kate's law affords you considerable discretion here.

17   And, you know, we would urge Your Honor to keep in mind as

18   you consider how to rule and how to exercise that discretion

19   what Mr. Abbott said, which is that, you know, ultimately the

20   reason why we're in front of you and the reason why Boy

21   Scouts have asked that you retain simply as their counsel is

22   to try to accomplish the goals that we explained, that Ms.

23   Boelter explained to you on the first day hearing, which is

24   to provide for equitable compensation to victims in a prompt

25   manner and to preserve the mission of the Boy Scouts.  And

1   I'm here on behalf of Sidley, but I can't help but just make

2   the point, Your Honor, that that's what we were retained to

3   do by Boy Scouts, that's what we intend to do on behalf of

4   our client.  We will do that with all appropriate vigor.  And

5   nothing with respect to our representation of Century will

6   compromise that, particularly in light of the use of Haynes

7   and Boone and the other structures that we proposed to put

8   into place.

9           And with that, Your Honor, unless you have any other

10  questions, I would urge that you grant the application of

11  Sidley as debtor's counsel.

12          THE COURT:  Thank you.  I do not have any questions.

13          MR. SCHIAVONI:  Your Honor, Tancred Schiavoni, just three

14  sentences.  One, we would like to lift the redactions for how

15  the word "non-claim services" is used in the agreement

16  because we think, basically, Sidley is taking advantage of

17  the redaction to make an assertion that's just completely

18  baseless about how that term is used.  It's not used for the

19  scope of the engagement.  In fact, it expressly says

20  otherwise.  And our offer stands to make a proffer in camera

21  about the conflict.  Thank you, Your Honor.

22          THE COURT:  All right.  Thank you.

23          MR. ABBOTT:  Your Honor, Derek Abbott from Morris Nichols.

24  If I may just very briefly, Your Honor.  The one thing that I

25  think is important for me to stress and happily Mr. Ducayet

 1    stole a little bit of my thunder here, so I'll be very brief.

 2              Your Honor, I am not prone to hyperbole and I am not

 3    exaggerating when I suggest to the Court that this proceeding

 4    is, you know, of an existential nature for the Boy Scouts,

 5    both financially and mission-wise.  They recognized that when

 6    they came into this proceeding.  They chose Sidley confident

 7    and Sidley's ability to help them through it, and they

 8    desperately need Sidley's continued help.  Obviously, there

 9    would be alternatives, but those are problematic alternatives

10    both in terms of time and in terms of money, both of which

11    are scarce for these debtors, Your Honor.  So I would urge

12    the Court to deny the objection and approve the application

13    of Sidley.  Thank you.

14              THE COURT:  Thank you very much.  Okay.  Well, I

15    am going to take this matter under advisement.  I would ask

16    that someone, as they did with the evidentiary hearing, order

17    a copy of the transcript on an expedited basis.  And, Mr.

18    Stamoulis, I would like a set of the five that you -- that

19    Century used, if that could be forwarded to Mrs.

20    Johnson and to other counsel.  If it hadn't been previously,

21    I would like a set of that.

22              MR. STAMOULIS:  I believe that was done just

23    moments before the hearing began at 2, Your Honor, so that

24    should be there.

25              THE COURT:  So I may have that, okay.  Thank you

1  very much. I appreciate the argument.  I -- I really -- I really

2  appreciate counsel helping me understand how I should

3  reconcile some of these cases, which I think is not

4  necessarily apparent from the cases themselves.  So I will

5  get back to you as soon as I can with a decision.  I

6  understand the need to have this matter resolved, at least at

7

8  the bankruptcy court level, and I will get back to you as

9  soon as I can.  We're adjourned.

10         MR. DUCAYET:  Thank you, Your Honor.

11             (Proceedings concluded)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          CERTIFICATION

3          We certify that the foregoing is a correct

4    transcript from the electronic sound recording of the

5    proceedings in the above-entitled matter to the best of our

6    knowledge and ability.

7

8    Transcriptionists:  Andrea Semanovich, Kristin Corrado and

9    Yvonne Amber

10

11

12   /s/ Andrea Semanovich                 May 7, 2020

13   Andrea Semanovich

14

15   /s/Kristin Corrado

16   Kristin Corrado

17

18   /s/Yvonne Amber

19   Yvonne Amber

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25