## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re:* | ) Chapter 11 |
| | ) |
| | ) Case No. 20-10343 (LSS) |
| | ) |
| BOY SCOUTS OF AMERICA AND | ) Jointly Administered |
| DELAWARE BSA, LLC,[1] | ) |
| | ) |
| | ) |
| Debtors. | ) |

**DECLARATION OF JON R. CONTE, PH.D. IN SUPPORT OF THE OBJECTION OF THE TORT CLAIMANTS' COMMITTEE TO (A) DEBTORS' MOTION, PURSUANT TO 11 U.S.C. § 502(B)(9), BANKRUPTCY RULES 2002 AND 3003(C)(3), AND LOCAL RULES 2002-1(E), 3001-1, AND 3003-1, FOR AUTHORITY TO (I) ESTABLISH DEADLINES FOR FILING PROOFS OF CLAIM, (II) ESTABLISH THE FORM AND MANNER OF NOTICE THEREOF, (III) APPROVE PROCEDURES FOR PROVIDING NOTICE OF BAR DATE AND OTHER IMPORTANT INFORMATION TO ABUSE VICTIMS, AND (IV) APPROVE CONFIDENTIALITY PROCEDURES FOR ABUSE VICTIMS [DKT. NO. 18] AND (B) SUPPLEMENT TO BAR DATE MOTION [DKT. NO. 557]**

I, Jon R. Conte, Ph.D., submit the following declaration as my testimony in this matter and state, under penalty of perjury, the following:

1. I am an individual over the age of 21 years and suffer no disability that would interfere with my ability to testify truthfully to the matters set forth herein.

2. I am a Professor Emeritus in the School of Social work at the University of Washington in Seattle, Washington and Director of the Joshua Center on Child Sexual Abuse at the University. My academic Curriculum Vitae is attached to this declaration.

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware the BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

3. I have almost four decades in the study of childhood sexual abuse, am published in that area and have trained multidisciplinary audiences on various aspects of childhood sexual abuse, including issues in forensic practice nationally and internationally.

4. Over the course of my career, I have served on a Panel on Child Abuse and Neglect at the National Academy of Sciences; on a research review committee at the National Institute of Mental Health; was the founding President of the American Professional Society on the Abuse of Children; was on the Board of Councilors of the International Society for the Prevention of Child Abuse and Neglect; and served on State and local committees in Illinois, Washington, and Kentucky.

5. I maintained a small private clinical practice specializing in the treatment of children, youth, and adults with histories of child sexual abuse first in Chicago and then in Seattle after returning to Seattle in 1990. I have evaluated literally thousands of child, youth and adult victims of childhood sexual abuse who allege harms and damages resulting from childhood sexual abuse from the mid-1980s to the present. I have evaluated victims abused in conjunction with their participating in the Boy Scouts in Illinois and also in Washington.

6. I have testified as an expert over one hundred and sixty times in Washington, Oregon, California, Arizona, Colorado, Nebraska, New Hampshire, Florida, South Carolina, and British Columbia Canada. I have previously served as an expert to Creditors' Committees in the Bankruptcies of the Archdioceses of Portland and Milwaukee. A partial list of my expert testimony is attached as Appendix 1 to my Curriculum Vitae.

7. I am the Editor of the <u>Journal of Interpersonal Violence</u> and the journal <u>Trauma, Violence, and Abuse</u>. I am generally aware of the research on various aspects of

DOCS_LA:329435.4 85353/002

childhood sexual abuse.  I have coauthored three manuscripts in the last 12 months and am working on a fourth.  All manuscripts have been based on a review of extensive research on various issues surrounding childhood sexual abuse.

8.  I have been retained by the Tort Claimants' Committee in this matter to provide expert testimony of various aspects of the current matter.

**Summary of Opinions**:

9.  The questions I have been asked to address and my summary opinions responding to those questions are the following:

   a.  **Is the proposed Bar date of early October sufficient, fair to potential claimants and sensitive to the actual process where a victim of the BSA receives notice and decides to make a claim?**

   The proposed October bar date is extremely short and is not sufficient.  It establishes an unrealistic, too short in the future date, which does not allow an adult survivor of childhood abuse enough time to file a claim a claim.  The too-short bar date: (i) fails to appreciate the difficulty encountered by an adult survivor who must come to a point where he is able to file a claim; (ii) ignores the time that is required after notice is received to make a reasoned decision; (iii)is unconnected to a review of the actual dates on which various notice efforts will actually take place; and (iv) ignores the new reality and disruption to life of COVID-19.

   b.  **Is the Proof of Claim form proposed by BSA sensitive to and likely to generate responses from Child Sexual Abuse Survivors (the "Survivors")?  It is not.**  The Proof of Claim form is: (i) confusing; (ii)fails to actually define

abuse; (iii) uses overlapping terms for the same behavior; (iv) confuses abuse with reasons that an adult may abuse a child; (v) asks questions which appear more appropriate to discovery: (vi) asks questions which have a high likelihood of triggering traumatic reactions in Survivors or discourage them from submitting a proof of claim;(vii) asks potential Survivors to provide detailed information which goes beyond what is necessary to describe the basis of a claim;  and (viii) is deficient for other reasons described below (see paragraphs 11 a- c and 12):

c.  **Is the Notice of Claim sensitive to and likely to generate responses from Child Sexual Abuse Survivors**? The proposed Notice is not sensitive to the Survivors and is not likely to generate responses from many survivors.  The Proposed Notice is: (i) complex; (ii) calls for a recall of experiences, which is unnecessarily detailed at this point of time: (iii)calls for a narrative of traumatic and distressing experiences; (iv) asks for information which is unnecessary, more appropriate to discovery, and appears intended to discourage Survivors from filing claims.

d.   **Is the manner of reaching claimants sufficient and likely to actually reach potential claimants?** The proposed manner of reaching claimants is; (i) not sufficient in reaching potential claimants; (ii) it makes incorrect assumptions about in which portions of the current US population or States potential claimants may be found; (iii) provides complex and non-user friendly language; (iv) provides a global rather than more focused process of contacting potential claimants; and (v) fails to provide messages including television, radio, social

4

media and print adds which are tailed to and likely to connect with adult Survivors. (For the basis of my opinions see paragraphs 15 A-J below.)

**Basis of Opinions:**

10. **Is the proposed Bar date of early October sufficient, fair to potential claimants and sensitive to the actual process where a victim of the BSA is prepared to identify themselves?**

Debtors' proposed bar date of early October is extremely short for a number of reasons.

    a.  No one knows how many potential claimants there are.  Anecdotal information indicates that thousands of survivors have already retained attorneys.  So if the creditors who are the most willing to come forward or are the most likely to appreciate that they have been harmed have come forward, then the unknown number of remaining potential claimants are the most difficult to find. There is nowhere near enough time to find and give notice to those potential claimants who are not represented by counsel and the most difficult of Abuse Survivors to find and provide proper Notice.

    b.  Survivors of abuse are reluctant to disclose their abuse. The research is clear. Delay in disclosure is the norm with only thirty percent of child victims I have studied disclosing immediately.  Reasons for that are often complex and there may be more than one reason for reluctance to disclose abuse operative in any given survivor's experience.  My evaluation of child and adult survivors indicates that reasons for non-disclosure include:  fear of the consequences of reporting, stigma associated with being a victim, protecting aging parents who did not know or protect the survivor when the abuse was taking place, avoidance of the pain

associated with memories of the abuse, psychological defenses including denial, suppression and others or maladaptive coping such as substance abuse, or not wanting partners or children to know about the abuse.

c.  For a Survivor, the act of knowing that he was abused, being willing to identify as an abuse survivor, and deciding to take some action is difficult and complex.   As is generally understood, disclosure is not a single step but rather a process.  Once a potential claimant has received the notice it is likely that for many it will take a period of reflection.  That reflection will include the difficult and painful process of weighting the reasons that they have not previously disclosed or identified themselves as a victim, and considering the implications and enormously significant consequences of completing the Notice of Claim.

d.  Finally, it is also important to recognize the time in which we live (both seasonally and in the fact of COVID-19).  Debtor is proposing a notice campaign largely over the summer months.  Traditionally summer months are not a good time for research surveys which a Notice and Proof of Claim are akin to.  More importantly for many people, COVID-19 is a source of worry and preoccupation. I have had contact with several prior clients who report that the isolation and fear of social distancing has triggered abuse memories and feelings.

e.  This time has caused many people to alter how they work and live and what they think about.  Therapists have switched clients to video or phone therapy. Millions of Americans including probably some who are potential claimants are unemployed and preoccupied with how they are going to feed their families.

6

11. Given these concerns I can see no reason to further abuse Survivors by not allowing a reasonable time period after they receive notice to reflect seriously and make a decision which one way or the other is likely to have a significant impact on their lives. The November date proposed by the Claimants is a reasonable and fair time period assuming the Notice plan is revised to increase targeting of potential creditors and language is changed to speak meaningfully in common English to potential creditors.

12. **Is the Proof of Claim form proposed by BSA sensitive to and likely to generate responses from Child Sexual Abuse Survivors?**

It is not. Regarding the **Abuse Survivor's Proof of Claim** prepared by the Debtor the basis for my opinions are as follows:

a. A definition is a statement of the meaning of a term. Using different words to describe the same thing (e.g. sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation,) is not a definition.

b. Regarding the content provided in the Claim Form **What is Abuse?** (page 2) the proposed language is extremely problematic for a number of reasons:

i. Paragraph 4b provides a poor definition of what is sexual abuse. It uses confusing and professional terms that most potential creditors are unlikely to understand (e.g. ephebophilia).

ii. The paragraph employs global terms such as "sexual abuse or molestation" or "rape" (which is actually a legal term) and provides no behaviorally specific descriptions or definitions of behavior. Lay opinions (i.e. opinions of potential creditors) vary greatly. For example, some males believe that only girls can be "raped" or that masturbation is not abuse.

Terms such as "sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault and/or battery" are not a definition of abuse.  Rather, they are alternative terms for sexual abuse. There is no agreed upon professional definitions for abuse vs. molestation. "Battery" is a concept most survivors are unlikely to know. In working with literally thousands of survivors as a therapist and an expert witness I have never heard a survivor say he/she was "battered".

iii. It has been known for some time that global descriptions of abuse generate lower rates of disclosure than multiple questions with specific behavioral definitions.  For example, in and early and important analysis of research on how widespread sexual abuse was Wyatt and Peters (1986) [2]sought to understand why estimates of the prevalence of sexual abuse in studies around that time differed widely.  The authors conclude:

"A feature common to Wyatt's… and Russell's… studies is the emphasis on questions pertaining to particular types of sexual behavior. The use of behaviorally specific questions may facilitate recollection of abuse incidents by clarifying for the subject the nature of the experiences being inquired about or by triggering memories that might not be retrieved in association with a more general question." (p. 248)

An example of a more behaviorally specific question than "were you ever sexually abused?"  is one that breaks the types of sexual behavior into behaviorally specific terms such as ""During childhood and adolescence, did anyone ever expose themselves (their sexual organs) to you?" (p. 248)

---

[2] Wyatt, Gail Elizabeth and Stefanie Doyle Peters (1988) "Methodological considerations in research on the prevalence of child sexual abuse" in **Child Abuse and Neglect**, 10, 241-251.

DOCS_LA:329435.4 85353/002

iv. Another issue with the Debtor's definition of abuse is that it confuses potential reasons for someone sexually abusing children such as "pedophilia or ephebophilia". There is no way the average person is going to know if a sexual offender has ephebophilia which is arousal to post puberty youth under the age of consent.  More critically terms such as pedophilia or ephebophilia may be meaningless anyway for many sexual offenders who abused Survivors who are creditors because many offenders are polyperverse and engaged in many types of sexual deviancy or have both appropriate and inappropriate sexual relationships.  For example, in the cases I have evaluated the Scout personnel have been married with children and yet sexually abused youth.

v. The proposed definition also confuses behaviors which might constitute abuse (e.g. sexual misconduct) with the effects of abuse( e.g. sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation").

vi. The Debtors' definition also appears to lump potential claimants who have had very different experiences with BSA.  Adults abused as adults, potential creditors who were bullied or psychologically mistreated are fundamentally different than adults who were sexually abused in childhood. As a professional I am unsure if such adults abused as adults and/or potential creditors who were bullied would even have a claim. More importantly the inclusion of these other individuals in an effort to identify sexual abuse survivors is potentially confusing to adult Survivors and minimizes their experience vs. someone who is bullied.

vii. It is difficult to explain to those who never experienced sexual abuse in childhood, what the experience is like for the child.  Words do a poor job of

communicating the isolation, betrayal, stigma, fear, guilt, shame, and other negative and powerful emotions that a child feels when sexually abused by a more powerful and often trusted adult.

viii. Most children abused in Scouting are "groomed". "Grooming" describes a process where an offender separates the child from protective adults by becoming a trusted figure to the family and child.  It refers to a process of conditioning the child to touch with every increasingly sexual touch. Maintaining the child's compliance with the abuse in part by making the child feel the relationship is real and the offender really cares for the child and providing access to experiences or resources that the child wants or needs is one of the ways the child's silence is maintained. This process results in a child being largely unable to escape the abuse. It often creates a sense in the child of duplicity for not disclosing the abuse.  The guilt that results can and most often carries into adulthood which is one of the reasons Survivors do not disclose.  The secrecy which surrounds the abuse also separates the child from the parent because there is something the child cannot share with the parent and the parent cannot protect the child. Loss, feeling isolated, and guilty for being sexual and for not disclosing make the situation of being sexually abused extremely painful and distressing. These are the reasons that children do not disclose at the time of abuse and why so many adult survivors do not or are reluctant to disclose in adulthood.

ix. These aspects of abuse take place in the lives of immature youth who do not have the experience, coping, or other developmental capacitates that allow them to manage the experience and are potentially associated with significant and profound problems in adulthood.  Treating potential creditors who have had these experiences with

those who may have been bullied or harassed or had a fall because of some presumed negligence of BSA (e. g. by not properly securing canoe equipment at a summer camp) further abuses the sexual abuse survivor by minimizing their experience.  But more critically for the matter before this Court the failure to comprehend and implement in all legal matters the lived experience of the adult survivor directly works against a fair and reasonable Notice process.  As a professional I have appreciated the standard I understand the law often applies of a "reasonable person".  Further it is my understanding that the law recognizes that some experiences are so extreme that they alter the capacities of the individual. So for example, The Battered Person Syndrome asks not what would a "reasonable person" do or think in a situation but rather what would a battered person reasonable believe or do?  Sexual abuse is akin to battering (i.e. physical violence) albeit often more severely negatively impacting the victims' functioning; including the capacity to understand their experience as abuse, increasing a false sense of responsibility for their own abuse, and creating negative cognitions and emotions which work against understanding that they were abused or taking action to protect themselves.  In my opinion the standard to apply in this matter on issues such as definitions, nature of notice processes and others is a "reasonable Sexual Abuse Survivor".

x. It is unclear to me the relevancy of including physical abuse or bullying "without regard to whether such physical abuse or bullying is of a sexual nature" (in Debtors' proposed -Abuse Survivor Proof of Claim, What is Abuse? P. 2) The proposed definition is one hundred and forty-nine words which do not define abuse and is confusing, difficult to read and has numerous unexplained or undefined concepts.  A fair

notice to potential creditors would explain in understandable language specifically what acts or behaviors constitute sexual abuse.

xi.  Regarding Nature of the Abuse.  The Debtors ask for a narrative of where, when, and other questions about the alleged sexual abuse. This would be a relatively simple task for a potential creditor who was abused once or even a few times.  However, my experience having evaluated thousands of survivors of sexual abuse in childhood and a few of whom were victims of BSA. Most victims are abused multiple times, often over months or years, and in a large number of different ways (i.e. different sexual acts).  It is virtually impossible to list every single act of abuse.  Generally, the age of the survivor over the period abuse took place and whether the abuse involved penetration of the body or not, typically seem to be facts most, but not all, survivors are able to describe.  Asking for long narratives which describe acts, time frames, and locations which many survivors, if not most, will not be able to describe seems more an indirect means of obtaining discovery than asking questions relevant to a proof of claim.

xii. The Debtor asks for extremely detailed narratives of abuse experiences.  It is likely that some number of the abused creditors will have never had therapy and many more will have significant emotional and other mental health problems and the detailed recounting of abuse experiences will trigger negative reactions.  The nature of trauma is that when the Survivor recalls it the distance in time and space disappears and many Survivors become overwhelmed, symptoms increase, and they decompensate. The level of detail Debtor asks for is a disincentive to Survivors who understand that they can become triggered by anything that reminds of them of the abuse.  It is an effective way to discourage claimants from participating and because of the potential triggering aspects of

the narrative may discourage the most significantly harmed or damages adult survivors from submitting a claim.

    (a) Debtor question **I,** asks for a summary of the harms or damages resulting from the abuse. Frequently survivors of abuse do not know the impact of the abuse nor which of a range of mental health problems are directly related to abuse they may have suffered and which may be been a pre-existing risk factor (i.e. made them vulnerable to abuse). A meaningful answer to this question requires expert opinion based on direct evaluation of the survivor.

    (b) The broad categories of abuse (e.g. sexual abuse or sexual misconduct or sexual molestation) are also overlapping. What is a mental health vs. emotional health vs. psychological health harm? When is a harm to a marriage not a harm to romantic relationships? Broad categories of harms resulting from abuse should be discrete areas of functioning with examples so that an average person can summarize their functioning. At best however these are going to be superficial summaries and summaries which do not fully describe the survivors impact. For example, one of the significant harms associated with childhood sexual abuse is a profound impact on quality of life (QOL). QOL is a well-established factor to evaluated impacts for a wide range of events from natural disasters, breast cancer to automobile accidents and many other changes humans can experience. QOL is akin to suffering and results from countless aspects of life that may be changed or harmed from sexual abuse in childhood. Efforts to create blunt measures of harms or damages inherently place less articulate, less psychologically minded, and

13

survivors newer to understanding the impact of Debtor's conduct at a

disadvantage and one that does not seem relevant to an initial Proof of Claim.

13. Are the Proof of Claim and Notice of Bar Date sensitive to and likely to generate

responses from Child Sexual Abuse Survivors?  They are not.  The proposed Proof of

Claim is not sensitive to the Survivors and is not likely to generate responses from many

survivors.  My concern for sensitivity is not generated primarily for concerns about the

emotional reactions or distress potential claimants will experience in this matter but

rather is focused on what will produce a fair and adequate response to the Court by

creditors.  The Debtors' proposed Proof of Claim is overly complex, calls for recall of

experiences which is unnecessarily detailed at this point of time, calls for a narrative of

traumatic and distressing experiences, asks for information which is unnecessary, more

appropriate to discovery, and appears intended to discourage survivors from filing claims,

a.  The Debtors' Proof of Claim form is complex, asks for long narrative answers,

encourages the potential creditor to include multiple additional pages if necessary,

asks for information of unclear relevancy or highly sensitive information which

may trigger and discourage some claimants from moving forward with their

rights.

b.  **Notice of Deadline for Filing Abuse Claims in the Boy Scouts of America**

**Bankruptcy Case.**  The proposed Notice of Deadline prepared by the Debtor

suffers from the same problems I have outlined above.

The Notice of Deadline states: "You have an Abuse Claim if you experienced in

any of the following in Scouting: • Sexual conduct or misconduct, sexual abuse or

molestation, sexual exploitation, indecent assault and/or battery, rape, pedophilia,

14

or ephebophilia; • Sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation; • Any other sexual misconduct or injury, contacts or interactions of a sexual nature, including the use of photography, video, or digital media; or • Other physical abuse or bullying regardless of whether the physical abuse or bullying was of a sexual nature. The abuse did not have to involve explicit force. Additionally, the abuse did not have to involve genital or other physical contact, and you do not need to have any associated physical, psychological, or emotional harm to file an Abuse Claim."

c.  I will not review in detail the problems with this language as I have done so above.  In essence this is anything but plain English. It uses multiple terms to describe the same things (e.g. sexual abuse, sexual molestation). It confuses acts of abuse with the harms or damages which result from the abuse (e.g. humiliation, shock).  It combines multiple forms of abuse (sexual, psychological, harassment).

d.  Other problems (not identified above) include:

i.  **T & U. extra scouting relationships and potential witnesses**.  This also seems a discovery question and irrelevant to a potential claim. Questions to Survivors such as these, which are unnecessary, irrelevant, and/or  tend to discourage filing a claim because they appear to be threatening to survivors or ask the survivor to validate his/her own claim rather than the Court.

14. **Is the manner of reaching claimants sufficient and likely to actually reach potential claimants?**  The proposed manner  of reaching claimants is not sufficient in reaching

15

potential claimants, it makes assumptions about in which portions of the current US population potential claimants may be found, provides complex and non-user friendly language, provides a global rather than more focused process of contacting potential claimants, fails to provide messages including television, radio, social media and print adds which are tailored to and likely to connect with adult survivors.

15. Declaration Of Shannon R. Wheatman, Ph. D In Support Of Procedures For Providing Direct Notice And Supplemental Notice Plan To Provide Notice Of Bar Date To Abuse Survivors.  Dr. Wheatman has proposed a Notice Plan for Debtor which is extremely expensive and will be aided by a greater appreciation of knowledge about childhood sexual abuse and adult survivors which I have detailed here in this Declaration. To be clear in no way am I questioning Dr. Wheatman's expertise in general Notice planning but rather that her talents and the Notice plan would be aided by abuse-specific knowledge. She has an impressive list of professional activity in the bankruptcy area of the law but I can see any experience or expertise with victims of childhood sexual abuse who are fundamentally different debtors than found in the typical bankruptcy matter.  As noted above this fact calls for a standard of a "reasonable abuse survivor" not a "reasonable person" standard which the Notice Plan and other documents from BSA appears to be employing.

   a. How many potential claimants are there?  The Notice Plan indicates that it will reach 10 million potential claimants.  It is unclear how this figure was calculated. It is my understanding that 110 million Americans have participated in Scouting since it was founded in 1910.  Just for sake of argument let's assume that 100 million Americans have been in Scouting over the last seventy years.  Assuming a

rate of abuse of males in the general population to be 20% that would mean that

there are 20 million potential claimants. [3]  The portion of this 20% who are

potential creditors of the BSA is unclear so there is little comfort in the fact 10

million people will be reached.  The target group of BSA potential creditors is

much smaller and efforts should be made to more specifically and meaningfully

target this smaller group.

b.  The Notice Plan also is based on an assumption that the IV files indicate claims in

all 50 states and Puerto Rico.  While this is true a careful review of the data

indicates large variation in the number of entries in the IV files.[4]  Assuming that

the IV files provide some indication of locations where claimants might be found

the percent of entries varies greatly with some states having as few as 1% of

entries and others of 2% to 4%[5]  A Notice Plan should take into account that there

may be a differential number of potential claimants in some states versus others.

In other words a stratified contact plan should be based on spending more time

and money in areas where there may be more creditors.

c.  The Notice Plan suggests that 54% of potential claimants are 50 years or age or

older (p. 12) The Gallup Survey cited by the Plan reports that 45% of men in

Scouts are aged 50 or older (vs. 27% aged 18 to 24).   The specific percent of

older potential claimants is not particularly relevant at this point other than to

---

[3] This is only illustrative.  Since it is generally understood that BSA has had a problem with sexual abuse then the rate of abuse may be higher than 20% and it is generally known that the rate of abuse varies from year to year and certainly over decades.

[4] I am unclear why the Notice Plan refers to the entries in the IV files as claims.  The files contain individuals who have been judged to be inappropriate volunteers not claims.

[5] I am social distancing at a location where I do not have access to the actual data, but these percentages are roughly accurate of the distribution across states.

indicate that proportionate efforts to reach one age group or one or more states (see b above) would seem appropriate.

d. The Notice Plan indicates objective is to reach potential claimants who include current and former Scouts and ***volunteers*** (italics added for emphasis). Adult volunteers are not likely to be potential claimants.

e. A critical question and one that the Notice Plan attempts to address is what media outlets potential claimants are most likely to frequent. The Notice Plan appears to define a younger group consisting of 18 to 49-year old. It is unclear the rationale for creating such a large "younger" age group. Additionally, potential claimants under age 20 or so likely to have different media usage habits that are different than those over 30 years of age. I don't have access to the MRI-Simmons data the Notice Plan cites but on the face of it and without additional details I question the media use data when collapsing such a large age range into a single group.

f. The Notice Plan points to the use of television "spots". In addition to the direct mailing efforts this is likely to be an extremely important notice procedure. This however is also an area where fair Notice can be negatively impacted by the nature of the message. There is no research to inform this question. Adult survivors are likely to resonate with different kinds of messages than non-survivors. If nothing else the nature of the spots should be focus grouped with survivors. What information is most helpful to survivors.? Should the spot include information about the possible positive and negative consequences of responding to the Claim form? Should the message be delivered by survivors vs.

18

a well-known person?  While I have made the point several times in this declaration about the importance of behaviorally specific language I appreciate that many media outlets may find too specific a language a problem.  It behooves those developing the specific adds, messages, etc. to have a consultation group of adult survivors review the language.  I can anticipate that objection will be raised to this as costly or time consuming but as a researcher I can image a short questionnaire administered to a small group of survivors that could be done easily. The Tort Claimants' Committee in this matter would be an ideal source to provide such feedback.

g.  The pre-testing or review by Survivors (e.g. focus groups) of television spots or print media notices/adds is a critical step in assuring that the Notice efforts are sensitive to survivors and have a high likelihood of success.   Given a proposed budget of $6.8 million spending some time constructing and testing the various forms of Notice seems critical.

h.  **Supplemental Notice Plan**.  Debtor indicates in SUPPLEMENT TO DEBTORS' BAR DATE MOTION several issues which tend to mislead the Court on important matters.

i.  Debtor indicates that the Supplemental Notice plan is estimated to reach approximately 95.9% of men over the age of 50 (p. 4) Dr. Wheatman in her analysis identifies the primary target to be men 50 years or older. (p. 15) Unfortunately this analysis appears to assume that all men aged fifty or older are potential claimants hence a broad Notice campaign which targets every American is proposed. Not every male over fifty is at a

DOCS_LA:329435.4 85353/002

greater risk for several reasons. First a relatively small percentage of the US population were ever scouts. The Gallup Survey which Dr. Wheatman cited estimates that 39% of Americans have responded to the Gallup Survey reported being involved in scouting at one time or another in their lives. The Scouts report declines numbers since the 1950s and 1960s. These data would suggest that more energy should go into reaching the older group (e.g. men 50 fifty plus).

ii. Second, using the IV files as an indication of relative risk for sexual abuse then the risk is not evenly distributed across all states. (see 14.c above). A stratified plan which devotes more energy (i. e funds) to reach States and age groups where survivors more likely to be found is far more fair and reasonable than a blanket approach.

iii. The reality is that no one knows how many potential claimants there are. No one really has a particularly clear methodology for estimating how many there are. It is clear that literally thousands of adult survivors of abuse in the BSA have come forward as a result of current attention this matter. One would argue that the easiest potential claimants have already self-identified. Adult survivors who have not come forward as of this date are likely to be the hardest to reach. Perhaps they are the most damaged? Perhaps they have the worst extenuating circumstances? Perhaps they were damaged in way by the abuse in ways that even today prevent them from easily coming forward. I do not mean in any way to detract from the pain and harms suffered by survivors who have come forward. I do

DOCS_LA:329435.4 85353/002

believe that fairness and justice requires targeted efforts to reach those adult survivors who so far have been unwilling or unable to come forward. The reality that the Court will set a date after which these individual have less reason to come forward demands of Debtor a targeted, stratified and reasonable approach to get Notice to these survivors.

    iv.   The Notice Plan should reflect a stratified Notice effort which targets those areas and groups (e.g. men fifty or older) where potential Claimants are most likely to be found and links this increased risk to specific media outlets most likely to be used by these stratified areas and groups and show the related costs.

16. In conclusion, a serious effort to provide potential creditors of the BSA would involve the following steps throughout the process:

    a.   The use of behaviorally specific and clear language describing what sexual abuse is.

    b.   Forms which require responses which are sensitive to the potential trauma caused by Debtor and responses which provide necessary information to the Court and this process without unnecessarily traumatizing or decompensating the claimant and do not serve the purpose of premature discovery.

    c.   Targeting Notice efforts more directly to those more likely to be potential claimants than the general population.

    d.   Developing written, video, and audio Notices which have been pre-tested to provide potential claimants information about their rights and the meaning of bar dates.

    e.   Setting a bar date which accurately reflects the difficulties and complexities of an individual who has not previously disclosed abuse by BSA and recognizes the unique complexities of these processes in the face of COVID-19.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 11th day of May, 2020 in Whidbey Island, WA.

*/s/ Jon R. Conte* .
Jon R. Conte, Ph.D.