**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>            Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered) |

**SUPPLEMENTAL DECLARATION OF SHANNON R. WHEATMAN, PH.D
IN SUPPORT OF PROCEDURES FOR PROVIDING DIRECT
NOTICE AND SUPPLEMENTAL NOTICE PLAN TO PROVIDE
<u>NOTICE OF BAR DATE TO ABUSE SURVIVORS</u>**

I, Shannon R. Wheatman, being duly sworn, hereby declare as follows:

1.      I am the President of Kinsella Media, LLC ("<u>KM</u>"), an advertising and notification consulting firm in Washington, D.C. specializing in the design and implementation of class action and bankruptcy notification programs. My business address is 2101 L Street, NW, Suite 800, Washington, D.C. 20037.

2.      On May 4, 2020, I filed a declaration [Docket No. 556] (the "<u>Initial Declaration</u>") in support of the *Debtors' Motion, Pursuant to 11 U.S.C. § 502(b)(9), Bankruptcy Rules 2002 and 3003(c)(3), and Local Rules 2002-1(e), 3001-1, and 3003-1, for Authority to (I) Establish Deadlines for Filing Proofs of Claim, (II) Establish the Form and Manner of Notice Thereof, (III) Approve Procedures for Providing Notice of Bar Date and Other Important Information to Abuse Victims, and (IV) Approve Confidentiality Procedures for Abuse Victims* [Docket No. 18] (the "<u>Bar

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtors' federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

<u>Date Motion</u>")[2] and the Supplemental Notice Plan described in the Bar Date motion and filed as

**<u>Exhibit 1</u>** to the *Supplement to Debtors' Bar Date Motion* [Docket No. 557-1] (the "<u>Supplement</u>").

3.      I submit this supplemental declaration in further support of the Bar Date Motion

and the Supplemental Notice Plan and in response to the *Declaration of Jon R. Conte, Ph.D in*

*Support of the Objection of the Tort Claimants' Committee to (a) Debtors' Motion, Pursuant to*

*11 U.S.C. § 502(b)(9), Bankruptcy Rules 2002 and 3003(c)(3), and Local Rules 2002-1(e), 3001-*

*1, and 3003-1, for Authority to (I) Establish Deadlines for Filing Proofs of Claim, (II) Establish*

*the Form and Manner of Notice Thereof, (III) Approve Procedures for Providing Notice of Bar*

*Date and Other Important Information to Abuse Victims, and (IV) Approve Confidentiality*

*Procedures for Abuse Victims [Dkt.. No. 18] and (b) Supplement to Bar Date Motion [Dkt.. No.*

*557]* [Docket No. 601-6] (the "<u>Conte Declaration</u>"), which the Official Committee of Tort

Claimants (the "<u>Tort Claimants' Committee</u>") filed in support of its objection to the Bar Date

Motion and the Supplement [Docket No. 601].

4.      My role as a notice expert in the Debtors' restructuring cases is to design a noticing

and bar date program to inform potential abuse survivors about their rights in this bankruptcy.  The

objective of this program is to ensure the Debtors reach potential claimants with a comprehensive

notice program that will capture their attention and provide them with all of the information they

need to act on their right to file a Sexual Abuse Claim.  I recognize that survivors of sexual abuse

who have not yet come forward have a painful decision to make in regards to filing a claim.  The

bar date notices and Supplemental Notice Plan proposed by the Debtors present information in a

neutral manner and include a definition of sexual abuse that encompasses the breadth of potential

---

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bar Date Motion or the proposed order approving the Bar Date Motion.

claimants who could have a claim in the bankruptcy based on sexual abuse.

5.    As stated in my Initial Declaration, I have been involved in three legal notice programs involving abuse survivors and understand the sensitivities in providing notice to potential claimants in these cases. (*See* Initial Decl. ¶ 13.)  I have also reviewed and am familiar with the notice programs in various chapter 11 cases involving sexual abuse claims.  The Supplemental Notice Plan proposed by the Debtors in these cases far exceeds what has been implemented in any other sexual abuse case in the United States.  The notices have been drafted to be accessible to laypersons, who are unfamiliar with bankruptcy and likely do not understand what "chapter 11" means.  The extensive media plan proposed by the Debtors in the Supplemental Notice Plan will effectively reach and provide potential claimants with multiple opportunities to learn about the Abuse Claims Bar Date.

I.    **Response to Conte Declaration**

6.    I have reviewed the Conte Declaration and believe it is necessary to address the following misconceptions and unfounded statements about the Supplemental Notice Plan:

a.    **The Supplemental Notice Plan will only reach 10 million potential claimants.**  Mr. Conte incorrectly states that the Supplemental Notice Plan will reach 10 million potential claimants. (*See* Conte Decl. ¶ 15.)  As stated in my Initial Declaration, "[w]e anticipate that over 10 million potential claimants will be reached ***through email***." (Initial Decl. ¶ 25) (emphasis added).  In total, the media notice segment of the Supplemental Notice Plan will reach more than 107 million men age 18 years and older ("Men 18+").

b.    **The primary target of men 50 years of age and older ("Men 50+), assumes that all Men 50+ are potential claimants.**  Mr. Conte asserts that "more energy

should go into reaching" Men 50+.  (Conte Dec. ¶ 15(h)(i).)  But as Mr. Conte concedes, the Supplemental Notice Plan is estimated to reach approximately 95.9% of Men 50+.  In order to demonstrate that the recommended plan satisfies due process and is in line with delivery of noticing programs previously approved in bankruptcy cases involving unknown claimants, we must provide delivery estimates for the media we are recommending.  Media delivery to sexual abuse survivors is not available because this audience is not measurable by any media survey data.  Therefore, we have provided delivery estimates for measurable target audiences that include potential claimants.  There is no other way for us to provide delivery estimates to the Court than to use a measured audience.

      c.      **It is unclear why a younger age group (18-49 years old) was reviewed.**
Dr. Conte questions why we created "such a large 'younger' age group."  (Conte Decl. ¶ 15(e).)  This age group, 18 to 49, was introduced to show the difference in the media habits of the younger segment of potential claimants to the older segment of potential claimants.  Our media will reach potential claimants in multiple age groups, which is why different media and programming were considered based on media usage/media habits.

      d.      **Potential claimants under age 20 are likely to have different media usage habits than others.**  Dr. Conte notes that potential claimants under 20 are likely to have different media usage habits than those over 30 years of age.  (Conte Decl. ¶ 14.e).)  This is true, which is why the Supplemental Notice Plan includes multiple media vehicles to reach different audiences and age groups.  Specifically, we have included media vehicles in the Supplemental Notice Plan (Connected TV, streaming and satellite radio, social media, and online ads) to reach this younger group of potential claimants.

e.      **Adult volunteers are not likely to be potential claimants**.  Dr. Conte asserts that adult volunteers are "not likely to be potential claimants."  (Conte Decl. ¶ 15.d.) The media notice segment of the Supplemental Notice Plan is focused on former Scouts and, other than the digital edition of Scouting Magazine, which will be provided at no cost by BSA, there are no other components in the media notice segment that specifically target volunteers.  However, volunteers will be reached since they are consuming media that is included in the Supplemental Notice Plan.

f.      **The Supplemental Notice Plan should take into account there may be a different number of potential claimants in some states versus others.**  Dr. Conte asserts that the Supplemental Notice Plan should take a "stratified" approach, where "more time and money" is "spent in areas where there may be more creditors."  (Conte Decl. ¶ 15.b.) As stated in my Initial Declaration, I reviewed information on the number of scouts by state over the past 20 years as well as pending claims against the BSA, either through filed litigation or reported by plaintiffs' attorneys.  After consideration of state-specific media buys in states with either a high number of Scouts or pending claimants, I concluded that a nationwide notice program was more appropriate because former Scouts could live anywhere at this time.  It is my opinion that a nationwide notice program not only provides greater cost-efficiency but ultimately, that greater fairness would be achieved by ensuring that a high percentage of potential claimants are reached regardless of where they currently live.  Moreover, when considering moving rates, the 2018 U.S. Census Bureau data found that, on average, 40.5% of people do not live in the state where they were born.[3]

---

[3] U.S. Census Bureau, *State Populations By Place of Birth*, at https://www.census.gov/data/tables/time-series/demo/geographic-mobility/state-of-residence-place-of-birth-acs.html (last visited May 12, 2020).

g.     **Traditionally summer months are not a good time for research surveys.**
Dr. Conte states that summer months are not a good time for research surveys.  (Conte
Decl. ¶ 10.b.)  I have studied seasonality in relationship to response in the notice programs
that my firm has implemented.  We found no drop off in response during the summer
months, and this year may be better with more people canceling vacation plans and opting
to stay at home.

h.     **The manner of reaching claimants is not sufficient**.  Dr. Conte concludes
that the manner of reaching potential claimants "is not sufficient."  (Conte Decl. ¶ 14.)  In
determining the adequacy of notice I look at the reach[4] and the frequency[5] of the
Supplemental Notice Plan against the target audiences that include potential claimants.
Reach and frequency estimates are standard methods used by every major advertising and
media-buying firm in the country to help select media to reach particular targets, to measure
the reach of those targets, and to calculate the average number of opportunities individuals
within the target audience had to see the notice.  Moreover, bankruptcy courts across the
country have relied on reach and frequency data provided by notice experts in evaluating
the adequacy of notice programs.

i.     Here, the Supplemental Notice Plan will deliver the following:

i.   An estimated 95.8% of Men 50+ will be reached with an average
estimated frequency of 6.5 times.

ii.   An estimated 89.8% of Men 18+ will be reached with an average
estimated frequency of 4.6 times.

---

[4] Reach is the estimated percentage of a target audience reached through a specific media vehicle or combination of media vehicles.

[5] Frequency is the estimated average number of opportunities an audience member has to see the notice.

iii.   An estimated 80.0% of Women 18+ will be reached with an average estimated frequency of 3.9 times.

    j.      The combination of reach and frequency of the target audiences in these chapter 11 cases compares favorably to other high-profile bankruptcy and class action cases that involved noticing programs for unknown claimants.  In each of the following cases, for example, the court was provided with reach and frequency data:

| CASE | REACH | FREQUENCY |
|---|---|---|
| In re PG&E Corp., Case No. 19-30088 (Bankr. N.D. Cal.) | 95% | 8.0 |
| In re Garlock Sealing Tech. LLC, Case No. 10-31607 (Bankr. W.D.N.C.) | 95% | 4.4 |
| In re Takata Airbag Prods. Liability Litig., MDL No. 2599 (M.D. Fla.) | 95% | 4.0 |
| In re Oil Spill by Oil Rig Deepwater Horizon, MDL No. 2179 (E.D. La.) | 95% | 4.0 |
| In re W.R. Grace & Co., Case No. 01-01139 (Bankr. D. Del.) | 91% | 3.7 |
| In re Babcock & Wilcox Co., Case No. 00-10992 (Bankr. E.D. La.) | 94% | 4.4 |

## II.   Plain Language Noticing

    7.      It is my opinion that the Abuse Claims Bar Date Notice, including the questions and background information that the Tort Claimants' Committee and U.S. Trustee have objected to, presents necessary information in a plain-language format that gives potential claimants enough context and explanation to make informed decisions with respect to filing a claim in this bankruptcy case.

    8.      I have been studying ways to effectively communicate information to laypersons for over 20 years.  Based on my experience as a communications expert, I have learned that plain language, or "plain English," is not just simplified language that eliminates legalese, jargon, and complex syntax.  Plain language relies on principles of clarity, organization, layout, and design.  It is a joinder of content and format, focusing not just on what is written but how that text appears on a page and how laypersons will interpret the information.

Case 20-10343-LSS    Doc 631    Filed 05/14/20    Page 8 of 10

9.      Besides my direct experience with legal noticing programs, I have also conducted empirical studies and focus groups to study the way laypersons interact with legal notice. I have also worked with the Civil Rules Advisory Committee to draft plain language notices for class actions. This research found that when people are unfamiliar with the intricacies of legal terms, such as the term "class action," they will fall back on their preconceived notions of a term, which are often incorrect. Recently, in the *PG&E* bankruptcy case, we learned that many claimants thought a bankruptcy meant that the debtor was going out of business and had no money to pay the claim of fire victims. Moreover, the specific type of bankruptcy (chapter 11 vs. chapter 7) is meaningless to laypersons. It is my opinion, based on this research and experience, that the Abuse Claims Bar Date Notice should describe what a chapter 11 case is and the steps in a bankruptcy case. In particular, this gives laypersons who are not represented by attorneys an opportunity to better frame and understand the information that is being presented to them.[6]

10.     Furthermore, I measured the readability of the Abuse Claims Bar Date Notice using the Flesch-Kincaid readability test, which resulted in a grade level of 11.[7] This means that this notice will be understood by potential claimants who have an eleventh-grade education. In my opinion, this Abuse Claims Bar Date Notice provides the opportunity for the Debtors to maximize the number of claims submissions by Sexual Abuse Survivors in these chapter 11 cases. The Abuse Claims Bar Date Notices facilitate the main objective with respect to noticing of the Abuse Claims Bar Date, which is to reach a very high percentage of potential claimants with clear, plain, and attention-getting notices.

---

[6] The full plain language model notices for class actions include a description of "what this lawsuit is about" and "why is this case a class action."
[7] The most widely used readability scales is the Flesch-Kincaid Grade Level Readability Test. The formula for calculating Flesch-Kincaid analyzes the average sentence length and the average number of syllables per word.

8

## **CONCLUSION**

11.     It continues to be my opinion that the reach of the target audiences and the number of exposure opportunities to the notice information is adequate and reasonable under the circumstances, and it is consistent with the standards employed by KM in notification programs designed to reach potential claimants.

*[Remainder of Page Intentionally Left Blank]*

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:  May 14, 2020
   Souderton, Pennsylvania

_____

Shannon R. Wheatman, Ph.D.
President
KINSELLA MEDIA, LLC