Exhibit 1

haynesboone

Adrian Azer
Direct Phone: 202.654.4537
Direct Fax: 202.654.4273
adrian.azer@haynesboone.com

May 11, 2020

Tancred Schiavoni
O'Melveny & Myers LLP
7 Times Square
New York, NY 10036

Todd Jacobs
Bradley Riley Jacobs PC
320 W. Ohio Street, Suite 3W
Chicago, IL 60654

Ryan Smethurst
McDermott Will & Emery LLP
500 North Capitol Street, NW
Washington DC 20001

Joshua Weinberg
Shipman & Goodwin LLP
1875 K. Street, NW, Suite 600
Washington, DC 20006

**_VIA ELECTRONIC MAIL_**

      Re:    <u>In re: Boy Scouts of America and Delaware BSA, LLC – Comments to the Draft</u>
                 <u>Protective Order, Comments to the Mediation Order, and Information Within the</u>
                 <u>Data Room</u>

Dear Tanc, Josh, Ryan, and Todd:

      This letter is in response to various communications from the Insurers, including (1) letters and emails received from Mr. Schiavoni on behalf of Chubb on Friday, May 8, regarding the Proposed Confidentiality and Protective Order (the "Proposed Protective Order") and proposed order seeking the appointment of mediators and referring certain matters to mandatory mediation (the "Proposed Mediator Order"), (2) certain communications from Mr. Weinberg on behalf of Hartford regarding the Proposed Protective Order and Proposed Mediator Order, (3) certain letter and email communications with Messrs. Jacobs, Smethurst, and Schiavoni regarding access to the

**Haynes and Boone, LLP**
**Attorneys and Counselors**
800 17th Street, NW
Suite 500
Washington, D.C. 20006
T (202) 654-4500
F (202) 654-4501
www.haynesboone.com

**haynes**boone

Counsel to Various Insurers
May 11, 2020
Page 2

secure data room maintained by Debtors in connection with these chapter 11 cases and certain materials contained in the data room.

As set forth more fully below, Debtors' positions and intentions with regard to these three issues are as follows:

- Later today, the Debtors intend to file a motion seeking the entry of the Proposed Protective Order attached hereto as **Exhibit 1**. This Proposed Protective Order incorporates the majority of revisions proposed by the Insurers and has the support of the Official Committees, the Future Claimants Representative, and the Ad Hoc Committee of Local Councils. Debtors request that the Insurers also support the entry of this order.

- Debtors intend to file a notice seeking the entry of the Proposed Mediator Order attached hereto as **Exhibit 2**. This Proposed Mediator Order includes the appointment of Tim Gallagher to mediate insurance issues and is supported by the Official Committees, the Future Claimants Representative, and the Ad Hoc Committee of Local Councils. Debtors request that the Insurers also support the entry of this order. Attached hereto as **Exhibits 3-4** are disclosures that were provided to Debtors and the TCC for Paul Finn and Eric Green, which the Insurers have requested.

- Debtors will provide outside counsel to the Insurers access to the BSA data room on a professional-eyes-only basis, pending the entry of the Proposed Protective Order. With regard to communications with insurers that were contained in the data room, Debtors do not agree with the Insurers' position that these materials are protected from disclosure. Nevertheless, Debtors have removed the communications from the data room, pending the resolution of this disagreement. Attached hereto as **Exhibit 5** is a list of all communications between Debtors and the insurers that were previously included in the data room.

## A.    <u>Confidentiality and Protective Order</u>

The entry of a Confidentiality and Protective Order governing the parties' discovery material is essential to continued progress in these chapter 11 cases.

Debtors recognized the importance of a protective order at the outset of these cases, and accordingly, filed an initial Proposed Protective Order with their first-day papers on February 18, 2020. (D.E. 4, Ex. 3.) The Debtors have since revised the Proposed Protective Order with input from the various constituencies, including the Official Committee of Tort Claimants (the "TCC"), the Official Committee of Unsecured Creditors (the "UCC"), the Insurers, the Future Claimants Representative (the "FCR"), and the Ad Hoc Committee of Local Councils (the "AHCLC").

haynes*boone*

Counsel to Various Insurers
May 11, 2020
Page 3

Debtors circulated an initial draft of the Proposed Protective Order to the Insurers approximately 25 days ago. (*See* Apr. 14 Email from A. Azer.) None of the Insurers commented on the initial draft or responded to Debtors' email with feedback regarding the document. Meanwhile, Debtors continued to negotiate with other constituencies regarding the sharing of confidential discovery material, and on April 30, circulated to the Insurers a near-final version of the Proposed Protective Order. (Apr. 30 Email from A. Azer.)

Debtors have since received two correspondences from the Insurers regarding the Proposed Protective Order, the first from counsel Hartford and the second from counsel for Chubb. Debtors have carefully assessed these materials and revised the Proposed Protective Order as set forth below:

1.      Hartford's Proposed Revisions to the Proposed Protective Order

On May 5, Debtors received an email from Hartford's counsel attaching a revised draft of the Proposed Protective Order. (May 5 Email from J. Weinberg.) Debtors reviewed and have accepted the majority of Hartford's proposed changes, including the following substantive revisions:

- Debtors added the Insurers as Parties to the Proposed Protective Order[1];

- Debtors revised the Proposed Protective Order to allow the sharing of Protected Material designated "Confidential" with the Insurers and their Counsel and Other Retained Professionals;

- Debtors revised the Proposed Protective Order to allow the sharing of Protected Material designated "Highly Confidential" or "Committee Advisor Only" with the Insurers' Outside Counsel and Other Retained Professionals;

- Debtors accepted Hartford's proposed revision requiring the Insurers' agreement before Discovery Material produced by the Insurers is used in any proceeding not currently contemplated under the Proposed Protective Order;

- Debtors added the Insurers' Outside Counsel and Other Retained Professionals to the "Prepetition Distribution Group," a small group of parties that will be given access to certain documents produced by the BSA in prepetition lawsuits;

---

[1] The insurers identified in Exhibit B to the Proposed Protective Order will be Parties. Additional insurers who are parties in interest and execute a copy of the "Acknowledgment and Agreement to be Bound" in Exhibit A to the Proposed Protective Order may also become Parties.

haynes*boone*

Counsel to Various Insurers
May 11, 2020
Page 4

- Debtors accepted Hartford's proposed language making clear that a Producing Party may request the return of any document inadvertently produced and that the Receiving Party shall return or destroy such documents;

- Debtors accepted Hartford's proposed language making clear that a party that publicly disseminates its Discovery Material or files such material unsealed may not subsequently restrict other parties' public use of the same Discovery Material on grounds that such material constitutes Protected Material; and

- Debtors accepted Hartford's proposed revision requiring the Insurers' approval before any amendment to the Protective Order can be made.

Debtors did not accept certain other substantive revisions Hartford proposed making to the Proposed Protective Order. Specifically, Debtors did not incorporate the following substantive revisions:

- **Production of Existing Confidentiality Agreements Under Limited Circumstances.** Debtors did not accept Hartford's proposed deletion of a provision in Section III of the Proposed Protective Order requiring the production of Existing Confidentiality Agreements under certain circumstances. While Debtors did not initially propose this language, (*see* D.E. 4, Exhibit 3 at Section III (Proposed Protective Order filed on petition date)), Debtors believe it reasonable that a Party relies on an Existing Confidentiality Agreement be required to produce such agreement where there is a dispute over the degree of protection afforded. Debtors are also of the view that it appropriate to require that any disputes over the terms and scope of an Existing Confidentiality Agreement, as applied to Discovery Material, be resolved in accordance with the procedures set forth in Section VI of the Proposed Protective Order.

- **Involvement in Determinations Regarding Treatment of Ineligible Volunteer Files.** Debtors did not accept Hartford's proposed addition of language to paragraph 5.8 of the Proposed Protective Order that would involve the Insurers in discussions regarding the treatment of the Ineligible Volunteer Files (the "IV File"). Issues related to the IV Files are best resolved through discussions between the TCC and Debtors, with the assistance of a Plan Mediator. As an initial matter, Debtors do not believe the Insurers, UCC, FCR, and AHCLC need to be involved in the process of determining how the IV Files will be treated.

- **Insurers' Access to Prepetition Confidential Documents.** Debtors did not accept certain of Hartford's proposed revisions paragraph 5.9 of the Proposed Protective

haynesboone

Counsel to Various Insurers
May 11, 2020
Page 5

> Order, which governs access to confidential documents produced by the BSA in prepetition lawsuits. Debtors agree with—and have accepted—Hartford's proposal that the Insurers be included in the "Prepetition Distribution Group" of parties who will receive access to Prepetition Confidential Documents provided by plaintiffs in prepetition lawsuits to the TCC. However, Debtors do not agree with Hartford's proposed language requiring that the Insurers first consent to the production of such documents to the TCC. As the Proposed Protective Order makes clear, the Prepetition Confidential Documents are documents the BSA has already produced to plaintiffs in underlying abuse litigation. There is no basis to require that these documents be pre-vetted by the Insurers before the plaintiffs provide these documents to the TCC.[2]

- **Insurers' Access to "Highly Confidential" and "Committee Advisor Only Material."** As explained above, Debtors have accepted Hartford's proposed revisions to paragraphs 7.2–7.4 providing the Insurers access to Protected Material designated "Confidential," "Highly Confidential," and "Committee Advisor Only" material. However, Debtors have amended Hartford's proposed language by limiting access to "Highly Confidential" and "Committee Advisor Only" material to the Insurers' outside counsel and other retained professionals. This is consistent with other constituencies' access to these materials, (*See* Exhibit 1 at ¶¶ 7.3(b)-(c), 7.4(b).)

2.     <u>Century Indemnity's Inquiries Regarding the Proposed Protective Order</u>.

On May 8, 2020, Debtors received a letter from counsel for Chubb addressing the Proposed Protective Order Debtors circulated on April 30. (May 8 Ltr. from T. Schiavoni.) The May 8 letter focuses on paragraph 5.9 of the Proposed Protective Order, which governs sharing certain documents produced by the BSA in prepetition lawsuits that are subject to existing confidentiality agreements. Chubb requests "a copy of what is defined as the 'Existing Confidentiality Agreement' and copies of what are described as the Prepetition Documents that were shared with the tort claimants under this agreement."

**Request for Copies of "Existing Confidentiality Agreements."** Chubb's request suggests some confusion regarding the terms and purpose of paragraph 5.9. The term "Existing Confidentiality Agreement" does not refer to a specific document, but rather to any protective order or other confidentiality agreement governing the sharing of confidential material produced by the BSA in a prepetition lawsuit. Presumably, each prepetition lawsuit in which a protective

---

[2] As described more fully below, Debtors do not intend to produce any Prepetition Confidential Documents pursuant to paragraph 5.9. Rather, paragraph 5.9 permits plaintiffs in prepetition lawsuits that have received documents produced by the BSA to provide such documents to the TCC..

**haynes**boone

Counsel to Various Insurers
May 11, 2020
Page 6

order was entered will have its own "Existing Confidentiality Agreement," and accordingly, there are likely numerous documents that fall within this definition.

Paragraph 5.9 of the Proposed Protective Order permits a small group of parties (the "Prepetition Distribution Group"), which includes the Insurers, to access confidential material produced by the BSA in prepetition lawsuits without violating such Existing Confidentiality Agreements. Under the terms of the Proposed Protective Order, the only circumstance under which an Existing Confidentiality Agreement would need to be produced is where a party relies on the protections of such an agreement and there is a dispute over whether the Existing Confidentiality Agreement or the Proposed Protective Order affords greater protection. (*See id.*) No such dispute has arisen thus far. Accordingly, Debtors have not collected or produced – and do not presently intend to collect and produce – any Existing Confidentiality Agreements in connection with these chapter 11 cases.

However, upon receiving Chubb's request, Debtors have clarified paragraph 5.9 to make clear that the Existing Confidentiality Agreements referenced therein are agreements governing documents "in the Prepetition Lawsuits in which they were produced." (*See* Exhibit 1 at ¶ 5.9.)

**Request for Copies of Prepetition Documents.** Chubb also requests "copies of what are described as the Prepetition Documents that were shared with the tort claimants under this agreement." To be clear, Debtors do not intend to produce Prepetition Documents to the TCC or to any other party under the terms of paragraph 5.9. Rather, paragraph 5.9 allows "[t]he *plaintiffs* in the Prepetition Lawsuits" to share with the TCC documents the BSA has produced in those lawsuits, without violating any Existing Confidentiality Agreement that might apply to such documents. (*See* Exhibit 1 at ¶ 5.9.) Pursuant to paragraph 5.9(c), counsel to the TCC is required to provide "Debtors' Outside Counsel copies of any Prepetition Confidential Documents" it obtains from a plaintiff "as soon as practical after receipt." To Debtors' knowledge, plaintiffs in the prepetition lawsuits have not shared any such documents with the TCC to date.

In light of Chubb's inquiry and the comments received from Hartford, Debtors have revised the Proposed Protective Order to include the Insurers in the Prepetition Distribution Group. Accordingly, should the TCC receive Prepetition Confidential Documents from a plaintiff in a Prepetition Lawsuit and provide such materials to Debtors, the Insurers will be provided the same documents.

\*    \*    \*

Enclosed as **Exhibit 1** is a final Proposed Protective Order, which incorporates the revisions described above. This version has the support of the TCC, UCC, FCR, and AHCLC. Debtors ask that the Insurers also support this Proposed Protective Order so that the parties can receive important asset information and continue to make progress toward a global resolution in

haynes*boone*

Counsel to Various Insurers
May 11, 2020
Page 7

these cases. Debtors intend to file a motion today seeking the entry of this Order, and will request that the Motion be heard at the May 18 hearing.

**B.    Order Appointing Mediators, Referring Certain Matters to Mandatory Mediation, and Granting Related Relief**

The Debtors made clear on the petition date that "the appointment of a Mediator at the outset of these cases is a cornerstone of the Debtors' restructuring strategy," given the "complexity and sheer number of issues" involved. D.E. 17 at ¶ 17. Recognizing the importance of seeking the help of a mediator in the early stages of this bankruptcy, Debtors filed concurrently with their petitions a motion seeking the appointment of a judicial mediator. *Id.* Over the last several weeks, Debtors have engaged in good faith with every constituency, including the Insurers, to reach an agreement regarding the Proposed Mediator Order. Debtors address the Insurers' comments regarding the Proposed Mediator Order below.

1.    Debtors' Efforts to Engage the Insurers' and Reach a Compromise Regarding the Proposed Mediator Order

Much of the correspondence from the Insurers focus not on the substantive provisions of the Proposed Mediator Order but rather on the Insurers' apparent perception that they have not adequately been consulted during the process. The Insurers have accused Debtors of keeping them "in the dark," and of "cloak[ing] the plan process in secrecy." Debtors categorically reject these accusations, which are flatly contradicted by communications reflecting Debtors repeated efforts to engage the Insurers on this issue.

Debtors made clear on the petition date that they view insurance-related issues as a key to resolving these cases and the BSA's insurance providers as an integral part of the mediation process. Debtors' motion seeking the appointment of a mediator specifically identified insurance-related issues as among those that would "unquestionably benefit from mediation." (D.E. 17 at ¶ 17.) The Debtors not only welcomed the Insurers' participation, they explicitly requested that the Bankruptcy Court enter an order directing that the "applicable insurers under one or more insurance policies that afford the Debtors' rights, benefits, indemnity or insurance coverage with respect to abuse claims" be among the "Mediation Parties" to participate in the mediation. *Id.* ¶ 14.

Debtors' efforts to solicit the Insurers' input regarding potential mediators began over 35 days ago. This was before Debtors had even received a list of proposed mediators from the Official Committees, much less reached a compromise as to who those mediators would be. Debtors have since repeatedly sought the Insurers' input regarding the Proposed Mediator Order. Yet aside from Chubb's challenge to the retention of Debtors' counsel, the Insurers have been largely disengaged. Many of Debtors' communications and drafts of the Proposed Mediator Order have been ignored entirely. Others have led to responses that are not constructive or counter-productive. In response

Counsel to Various Insurers
May 11, 2020
Page 8

to the Insurers' accusation that Debtors have excluded them from the process, Debtors detail below their efforts and the Insurers' failure to work constructively toward a compromise:

- On April 2, Debtors initiated discussions with counsels for Hartford, Allianz, and National Surety regarding the Mediator Motion. (*See* Apr. 2, 2020 Email from A. Azer.) Debtors had not yet received any proposals from the Official Committees regarding who the mediators would be, and accordingly, informed the Insurers that they were still "working to identify potential judicial mediators." Debtors specifically "recognize[d] that a mediator specialized in insurance coverage w[ould] be necessary," solicited the Insurers' input on proposed mediators, and requested that the Insurers "coordinate to provide 3 to 4 recommended mediators" by early the following week. The Insurers did not provide a list of recommended mediators that week or early the following week.[3]

- On April 7, Debtors followed up with counsels for Chubb, Hartford, Allianz, and Liberty Mutual regarding "coverage mediators that the insurers would like to propose." (Apr. 7, 2020 Email from A. Azer.) Debtors did not propose, much less impose, any particular mediator. Nor could they—while Debtors continued to work with the Official Committees regarding potential mediators, they had not reached any agreement. Counsel for Allianz replied stating they were "discussing names" and proposed to "confer with Century/INA and other insurers . . . before responding to BSA." Debtors did not receive any further response or a list of recommended mediators that day or the following day.

- On April 9, Debtors followed up with Insurers a second time, stating the Debtors were now "considering several potential coverage mediators," including but not limited to Tim Gallagher, Layn Philips, David Geronemus. (Apr. 9, 2020 Email from A. Azer.) Debtors requested that, to the extent the Insurers had additional suggestions, that they provide a recommended list of mediators by Noon the following day. The Insurers did not reply with any recommendations. Instead, counsel for Hartford replied the following day complaining that the Insurers had been kept "in the dark" regarding the structure of the mediation. (Apr. 10 Email from J. Weinberg.) Debtors reminded counsel for Hartford that they were still "in the nascent stages of structuring the mediation" and thus could not offer significant detail as to how the mediation

---

[3] Counsel for Hartford responded with questions regarding the structure of the mediation and the scope of Insurers' participation. (Apr. 2, 2020 Email from J. Weinberg.) Debtors explained that they were still "at the preliminary stages of determining how the mediation would be structured" and reiterated that they would "welcome Hartford's participation in [the process of selecting a coverage mediator]." (Apr. 3, 2020 Email from A. Azer.)

haynes**boone**

Counsel to Various Insurers
May 11, 2020
Page 9

would be structured. Debtors explained, however, that they anticipated having at least two mediators participate in the process.[4]

- On April 13, Debtors circulated a draft of the Proposed Mediator Order identifying Paul Finn and Eric Green as proposed mediators. Debtors reiterated that they expected the insurers to "fully participate in the lead-up to the mediation and in the mediation process" and offered to arrange a call to discuss further. Later that day, counsels Debtors, Chubb, and Hartford convened via telephone conference to discuss the terms of the Proposed Mediator Order. Following that telephone call, Hartford's counsel informed Debtors that "a majority of the insurers have a strong preference for Tim Gallagher" as a proposed mediator. (Apr. 13, 2020 Email from J. Weinberg.) Debtors agreed to add Mr. Gallagher, the Insurers' first and only recommended mediator, as a third mediator to the Proposed Mediator Order.

- On April 14 at 9:19 p.m. ET, counsel for Hartford provided comments on the Proposed Mediator Order. Debtors immediately convened calls with counsels for Chubb and Hartford at approximately 10:30 p.m. ET to discuss the Insurers comments. With regard to Messrs. Finn and Green, the Insurers informed Debtors they were reviewing for potential conflicts. Insurers did not identify—and to date, have not identified—any specific conflicts related to Messrs. Finn or Green. Nevertheless, Debtors agreed they would not seek entry of a mediator order at the April 15 hearing and would instead inform the Bankruptcy Court that efforts were under way to reach a compromise. (Apr. 15, 2020 Email from A. Azer.)

- On April 15 at 8:06 a.m. ET, Debtors circulated initial comments and thoughts on each of the Insurers' proposed revisions, noting that "many of the revisions require review and approval of both the Debtors and the various constituencies." Debtors informed the Insurers that they would not present the mediation order at the April 15 hearing, but instead would inform the Court that Debtors and Insurers' would continue to attempt to reach compromise on those revisions in coordination with the various committees. Debtors reiterated their desire to have the Insurers, including Chubb, involved in the mediation process and expressed optimism that the additional time would provide all parties an opportunity to reach a resolution regarding Insurers' comments. Debtors did not receive a response to their comments to the Insurers' proposed revisions.

---

[4] Debtors also followed-up with counsel to Chubb separately, requesting the insurers' recommendations as to mediators on insurance coverage.  (April 9, 2020 Email from A. Azer to T. Schiavoni).  In that email, Debtors also noted that "[w]e do not have a form of the order yet."

haynes*boone*

Counsel to Various Insurers
May 11, 2020
Page 10

- On April 16, Debtors provided a revised version of the Proposed Mediator Order accepting most of the Insurers' proposed revisions and requested additional information regarding certain proposed revisions that Debtors did not accept. (Apr. 16, 2020 Email from A. Azer.) Debtors noted that the TCC had not approved the order but that the Debtors would support it if the Insurers agreed. Once again, Debtors did not receive a response to the revised draft.[5]

- On April 17, Debtors sent a follow-up email asking whether the revised mediator order was acceptable to Insurers. Rather than engage with Debtors regarding the order, counsel for Century Indemnity, Allianz, and National Surety replied to Debtors counsel with separate, successive emails stating that Debtors already had the Insurers' objections and that they did not believe the mediation order "should go forward while Sidley's retention application is pending." (*See* Apr. 17, 2020 Emails from T. Schiavoni, R. Smethurst, and T. Jacobs.)

  In an effort to maintain constructive dialogue, Debtors replied by noting that they had already accepted the majority of the changes requested by the Insurers. (Apr. 17, 2020 Email from A. Azer.) Debtors conveyed that while the TCC had expressed some concern about the addition of Mr. Gallagher as a mediator, Debtors had expressed that Mr. Gallagher was important to the Insurers. Debtors expressed that they would like to work cooperatively toward a resolution and would be willing to schedule calls later in the day or over the weekend to that end. Debtors further stated that they did not think it was appropriate to link the parties' efforts on the mediation order with Chubb's objection to Sidley's retention. The Insurers again did not provide comments on the revised Proposed Mediator Order.

- On April 23, after continuing to work constructively with other constituencies, Debtors recirculated a draft order to the Insurers incorporating additional comments from the TCC. (Apr. 23, 2020 Email from A. Azer.) The Insurers did not respond to the revised draft.

- On April 24, Debtors followed up by circulating another updated draft of the Proposed Mediator Order, adopting many of the Insurers' revisions and certain of the TCC's revisions. Debtors expressed that the order represented a "fair compromise and will allow the parties to proceed to mediate issues without further delay and additional expense." (Apr. 24, 2020 Email from A. Azer.)

---

[5] Throughout that process, the Debtors also sought to discuss Chubb's proposed revisions, requesting that Chubb join a conference call, but Chubb refused to do so. (April 16, 2020 Email from A. Azer.)

haynes*boone*

Counsel to Various Insurers
May 11, 2020
Page 11

- On April 28, the Insurers informed Debtors that they could not accept the Proposed Mediator Order in its current form because Messrs. Finn and Green, who had been identified to the Insurers over two weeks prior, "were selected without our input and consent." The Insurers requested that Debtors "promptly provide disclosures regarding potential conflicts and alternative candidates need to be considered." The Insurers did not identify any conflicts or raised any specific objections regarding Messrs. Finn and Green. (Apr. 28, 2020 Email from J. Weinberg.)

- On April 29, counsel for Hartford circulated a revised Proposed Mediator Order reflecting the Insurers' comments. The comments, however, were substantially similar – and in some cases, virtually identical – to the comments the Insurers had provided two weeks earlier on April 14, and to which Debtors had responded on April 15. (Apr. 29, 2020 Email from J. Weinberg.)

Based on this record, the insurers cannot fairly contend that Debtors excluded them from the process.

Further, the Insurers' suggestion that Debtors have violated the cooperation provision of their policies is without merit. As the record above make clear, the Debtors fully involved the Insurers at every stage of the process. The cooperation provisions do not require the Debtors consult provide the Insurers with veto power over mediators selected as a compromise among a group of constituents. The mere selection of a mediator has no financial impact on the Insurers or their ability to negotiate. Furthermore, the selection of a mediator neither compels the Debtors nor the Insurers to any financial obligations. Thus, this purported violation of the cooperation provision has no basis.

2.      The Insurers' Proposed Revisions to the Mediator Order

Regarding the Insurers' comments on the Proposed Mediation Order, Debtors understand there are four issues that are of concern to the Insurers. While these issues are set forth as "essential points" in Chubb's May 8 letter, Debtors note that these are the same issues the Insurers raised nearly a month ago, on April 14—and to which Debtors responded on April 15. Debtors respond to each item below.

**Privileged Information.** The Insurers suggest that the mediation order should contain a provision that "privileged information should not be given to the tort claimants or otherwise disclosed under the guise of the mediation order." The Insurers urge that such a provision is important so that the BSA has a basis to recall any privileged material that is "mistakenly turned over." (May 8 Ltr. from T. Schiavoni regarding Proposed Mediator Order.)

**haynes**boone

Counsel to Various Insurers
May 11, 2020
Page 12

As an initial matter, contrary to the suggestion in the letter, Debtors do not seek to disclose privileged material to the tort claimants "under the guise of the mediation order." Indeed, Debtors have redacted hundreds of pages from documents provided through the data room because they contain information protected by the attorney-client privilege or work product doctrine, and nothing in the mediation order suggests otherwise. Debtors agree with Insurers that it is important for there to be a mechanism to recall privileged material inadvertently provided to an adverse party, and that inadvertent disclosure should not constitute a waiver of any privilege that might apply to such material or related material. Accordingly, there is a provision in the Confidentiality and Protective Order that addresses that issue.

**Access to Documents.** The Insurers state that the Proposed Mediator Order "should include a provision ensuring that the insurers are provided with copies of all the documents that the Boy Scouts have provided to date pre or post-petition to the tort claimants, bondholders and others." As Debtors have conveyed previously through email, this proposed language is both misplaced and moot.

First, the Mediator Order is not an appropriate place to insert discovery-related provisions. The Proposed Protective Order addresses that issue, and the parties have accepted Hartford's proposed revisions to the Protective Order allowing the Insurers and their counsel access to discovery material bearing all three levels of confidentiality contemplated in the order.

Second, Debtors have already provided outside counsel to Hartford and Chubb access to the BSA's secure data room on a professional-eyes-only basis, subject to the entry of a protective order. The data room contains the materials Debtors have provided to counsels for the Official Committees, JP Morgan Chase, and the FCR. We understand that other insurers have similarly requested access to the data room, and Debtors are willing to provide them the same level of access Debtors have provided to counsels for Hartford and Chubb.

**Good Faith Finding.** The insurers seek to include language in the Proposed Mediator Order providing that, "if the good faith finding is sought or put at issue in any subsequent action concerning insurance coverage the insurers' right to seek discovery is preserved."

As Debtors stated on April 15 in their comments to Hartford's proposed revisions, the Debtors do not agree to this proposed revision. The Proposed Mediator Order includes the Insurers as among the "Mediation Parties," and in so doing, gives the Insurers the full opportunity to participate in any mediation. It is unclear what concerns the Insurers have regarding a "good faith finding," and despite having Debtors' response to this proposed language for over 25 days, the Insurers still have not articulated a basis for this language. Furthermore, the information exchanged in the mediation may or may not be relevant to a coverage dispute and/or may include information that is so highly sensitive (including claimant information) that it should not be subject to discovery.

haynesboone

**Conflict Information Regarding Messrs. Finn and Green.** Regarding the Insurers request for information regarding Messrs. Finn's and Green's "connections to other parties-in-interest in the case," Mr. Finn and Mr. Green have confirmed that they do not have any conflict of interest with any of the constituencies or the Insurers. Nor have the Insurers identified any potential conflicts with regard to Messrs. Finn and Green. Attached as **Exhibits 3-4** are disclosures that were provided to Debtors and the TCC.

*     *     *

Enclosed as **Exhibit 2** is a *Proposed Order (I) Appointing Mediators, (II) Referring Certain Matters to Mandatory Mediation, and (III) Granting Related Relief* (the "Proposed Mediator Order").  This order has been approved by the TCC, UCC, FCR, and AHCLC. You will note that it includes the appointment of Tim Gallagher, whom the Insurers proposed, to mediate insurance issues among the mediation parties. Debtors intend to file a notice seeking the entry of the order with the Court later this week, and request that the Insurers let us know if we have their agreement.

## C.   <u>Information Included Within the Data Room</u>

Since April 30, 2020, Debtors and Chubb have been engaged in discussions regarding the information that should be included in the secure data room Debtors are maintaining to facilitate the exchange of discovery material and other information in these chapter 11 cases. Chubb contends that certain letters between the BSA and the insurers should not have been included in the data room because they are privileged or otherwise protected. Debtors have attempted to work with Chubb (and now the other insurers) to resolve this issue, but the Insurers have been unwilling to cooperate. Below is the history of the communications and Debtors' position.

On April 30, Chubb sent a letter identifying certain communications it contended should not be included in the secure data room. In response, Debtors sent an email on May 1, 2020 stating:

> *We have reviewed the documents identified in your April 30, 2020 letter and do not agree that these documents were improperly included in the data room. For the most part, these were communications between BSA and its insurers regarding claims where the insurers were denying their coverage obligations either in part or in full. BSA's letters were setting forth its position that the insurers, including Chubb, are obligated to provide coverage and pay any settlement amounts in full.*
>
> *Given the context of these letters, we do not understand (or agree) that these communications can be withheld. To the extent that Chubb has identified case law to support its position that BSA can withhold from disclosure communications with*

haynesboone

Counsel to Various Insurers
May 11, 2020
Page 14

> *its insurers where the insurer is denying coverage, please identify that authority so we can review.*
>
> *Nevertheless, in an effort to work cooperatively with Chubb, for the time being, we will withdraw the letters from the data room. We would like to have a discussion regarding the basis for your position and are generally available early next week; please let us know what works best for your schedule. If we are unable to schedule a call in short order, then we intend to re-load the letters into the dataroom so that the TCC and FCR cannot contend that the Debtors are improperly withholding otherwise discoverable documents.*

(May 1, 2020 Email from A. Azer.)

As noted above, notwithstanding Debtors' disagreement with Chubb, Debtors immediately withdrew these communications from the data room, requested authority supporting Chubb's position, and requested a conference call with Chubb to discuss this further. Out of an abundance of caution and respect for Chubb's position, Debtors also withdrew additional communications with insurers that were in the data room but not identified in Chubb's April 30 letter.

Instead of providing authority to support its position or participating in a call, Chubb responded "[t]his material is indisputably subject to the common interest doctrine." (May 1, 2020 Email from T. Schianvoni). Debtors responded noting that Chubb's blanket statement did not provide support for its position, "especially where an insurer has denied their coverage obligations . . ." (May 1, 2020 Email from A. Azer.) Debtors then again requested a conference call to discuss Chubb's position.

Between May 1 and May 7, Chubb refused to participate in a conference call or otherwise engage with Debtors on this issue. On May 7, Chubb re-engaged with Debtors, and Debtors reiterated that they did not understand Chubb's position given the circumstances surrounding the underlying communications, requested authority supporting Chubb's position, and proposed a conference call to discuss the issue. (May 7, 2020 Email from A. Azer.) Again, Chubb failed to provide authority or participate in a conference call, instead opting to make generalized statements: "This is a pretty straight forward issue on which you know the law." (May 7, 2020 Email from T. Schiavoni.)

On May 7, Debtors sent a calendar invite to Chubb, requesting a conference call for 10 a.m. ET on May 8. Chubb did not respond to Debtors' request for a call on May 8 or accept the calendar invite. Instead, Chubb stated that Debtors should violate their obligation to comply with the discovery rules merely because these communications may not benefit them: "We have also asked you both what the practical purpose is of what you are doing and how it advances the Boy Scouts interests." (May 7, 2020 Email from T. Schiavoni.) To add to Chubb's request that Debtors

haynesboone

Counsel to Various Insurers
May 11, 2020
Page 15

violate their discovery obligations, Chubb acted in an unprofessional manner: "Adrian is not focused on the big picture."

On the morning of May 8, Debtors responded that Chubb's proposed approach would require us to violate our obligations to comply with the Rules because, in Chubb's view, the production of these documents does not 'advance the Boy Scouts interest.' That is not a valid basis to withhold discoverable information." (May 8, 2020 Email from A. Azer.) Debtors again requested authority from Chubb to support its position, noting that "the Debtors do not believe communications between the BSA and its insurers in which the insurer is denying its coverage obligations are privileged or protected work product . . ." (*Id.*). Debtors then offered to discuss this issue with Chubb at 10 a.m. ET on May 8.

Chubb did not participate in the conference call at 10 a.m. ET on May 8, but at 11:03 a.m. ET, Chubb sent an email to Debtors noting its unavailability. (May 8, 2020 Email from T. Schiavoni.) Chubb then sent a separate email, copying all the insurers, reiterating its position that these communications are privileged. In doing so, Chubb omitted the week-long communications detailed above, including Debtors' repeated statements that these communications are not privileged, Debtors' repeated requests for authority from Chubb, and Debtors' proposals to have conference calls. (May 8, 2020 Email from T. Schiavoni.) Moreover, Chubb continued its unprofessional conduct, stating: "If no one on your end sees the increasingly big picture problem that this is causing, we face an even bigger problem than we envisioned." (*Id.*)

Counsel for Allianz then sent separate emails noting their agreement with Chubb, notwithstanding that they admittedly had not reviewed the documents at issue or previously discussed them with Debtors. (May 8, 2020 Email from T. Jacobs) ("We have not been provided access to the data room but if underlying defense counsel material has been provided to the tort claimants it should be clawed back.").

As noted in the numerous emails sent to Chubb, Debtors are willing to cooperate with the Insurers on this issue, consistent with their obligations under the rules and assessment that these letters are not subject to any privilege or protection.

First, Debtors placed these communications into the data room based on the TCC's and the Insurers' request that all information provided to the FCR pre-petition be included in the data room. Most (if not all) of the letters demand payment from the BSA's insurance carriers, notwithstanding the insurers' denial of their coverage obligations. The BSA provided the FCR these communications to enable the FCR to understand the available insurance coverage in 1980, 1983, 1984, and 1985. Indeed, as National Surety and Chubb are well aware, the remaining limits for their excess policies in 1983 and 1984 are contingent upon the outcome of these demands for reimbursement related to the certain claims.

haynes*boone*

Counsel to Various Insurers
May 11, 2020
Page 16

Chubb's email of May 8 also requests a copy of the information requests from the TCC that sought this information. A copy of Debtors' responses to those requests (which also includes the requests) is attached. Requests 3 and 21 encompass the communications at issue.

Second, as noted above, these communications are not subject to any privilege or protection because they involve claims for which the insurers were denying their coverage obligations. Indeed, numerous of the letters are responses from the insurers refusing to provide funding, noting that these issues will be resolved by either the Texas or Illinois coverage actions.  Based on this denial of coverage, Debtors are not aware of any authority that allows a policyholder to assert common-interest.

Third, Chubb's assertion that Debtors may withhold this information merely because it is not beneficial to their interests is wholly improper. As noted in Debtors' email to Chubb on May 7:

> It is the Debtors' responsibility to only assert positions that are consistent with applicable law. It is not Chubb that will have to defend those positions, so while you and Chubb have the luxury of making demands without legal support, the Debtors cannot take unsupported position. Unless we have a good faith basis to assert the position and there is authority that we can cite (which Chubb continues to refuse to provide), whether this is beneficial or detrimental to the Debtors' position is irrelevant – we cannot merely withhold documents merely because we want to.

(May 7, 2020 Email from A. Azer.)

\*       \*       \*

Even though Debtors disagree with the Insurers' position, Debtors are committed to working with the insurers to resolve this issue. The Debtors again reiterate their request for authority to support the Insurers' argument and a conference call to discuss this issue. Further, as previously noted, all such communications have been removed from the data room, and attached hereto as **Exhibit 5** is a list of all communications between Debtors and the insurers that were previously included in the data room.

To the extent Debtors and the Insurers cannot reach agreement regarding whether these communications are subject to a privilege or protection, Debtors are willing to have the Insurers discuss this issue with the TCC, FCR, and UCC. Debtors expect that these constituencies will demand that these documents be re-populated in the data room and, if the Insurers believe that there is a basis to assert a privilege over this information, the Insurers can handle this issue and present it to the Court. Absent authority from the

haynes*boone*

Counsel to Various Insurers
May 11, 2020
Page 17

Insurers, if the Court asks Debtors their position, Debtors will state that they do not believe
this information is privileged or protected.

D.      **Future Involvement of the Insurers in Debtors' Bankruptcy Proceedings**

As we have stated on numerous occasions, including at the outset of these chapter 11 cases,
Debtors want the Insurers involved in the process. To address the Insurers' concerns regarding
their involvement, Debtors propose a weekly conference call to discuss the status of various issues.
This would provide an opportunity for Debtors to provide an update regarding their progress in
the bankruptcy case and allow the Insurers to raise and discuss issues of importance to them. We
would propose a call every Monday at 10:30 a.m. Eastern Time.

Further, Debtors ask that the Insurers reevaluate the manner in which they are interacting
with Debtors. Professional disagreements over legal and strategic issues will arise, but are not a
reason to engage in unprofessional conduct. Thus far, Debtors' efforts to work constructively with
the Insurers has been hampered and made inefficient due to unprofessionalism. There is no need
for insults or pejorative statements and, if this conduct continues, Debtors intend to bring it to the
attention of the Bankruptcy Court.

Sincerely,

/s/ Ernest Martin and Adrian Azer