<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3                                    .   Chapter 11
      IN RE:                          .
 4                                    .   Case No. 20-10343 (LSS)
      BOY SCOUTS OF AMERICA and       .
 5    DELAWARE BSA, LLC,              .   Courtroom No. 2
                                      .   824 North Market Street
 6                                    .   Wilmington, Delaware 19801
                                      .
 7                    Debtors.        .   May 29, 2020
      . . . . . . . . . . . . . . . .    11:00 A.M.
 8

 9                       TRANSCRIPT OF HEARING
            BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                  UNITED STATES BANKRUPTCY JUDGE

11    APPEARANCES:

12
      For the Debtor:          Derek C. Abbott, Esquire
13                             MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                               1201 North Market Street, 16th Floor
14                             P.O. Box 1347
                               Wilmington, Delaware 19899
15
                               - and -
16
      For the Debtors:         Michael Andolina, Esquire
17                             Karin Basaria, Esquire
                               SIDLEY AUSTIN LLP
18                             787 Seventh Avenue
                               New York, New York 10019
19
      Audio Operator:          Nicki Barksdale
20
      Transcription Company:   Reliable
21                             1007 N. Orange Street
                               Wilmington, Delaware 19801
22                             (302)654-8080
                               Email:  gmatthews@reliable-co.com
23

24    Proceedings recorded by electronic sound recording;
      transcript produced by transcription service.
25
</pre>

APPEARANCES (Continued):

For Century Indemnity:    Tancred Schiavoni, Esquire
                          O'MELVENY
                          7 Times Square
                          New York, New York 10036


For Interested Parties:   John Morris, Esquire
                          PACHULSKI STANG ZIEHL JONES LLP
                          780 Third Avenue
                          New York, New York 10017

1

INDEX

2

#2) Debtors' Motion for Entry of an Order Approving Stipulated
3   Confidentiality and Protective Order (D.I. 613, Filed
5/12/20).

4

#3) Debtors' Motion for Entry of an Order (I) Appointing a
5   Judicial Mediator, (II) Referring Certain Matters to
Mandatory Mediation, and (III) Granting Related Relief (D.I.
6   17, Filed 2/18/20).

7   Application to Retain Sidley Austin      **Ruling: 46**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  (Telephonic hearing commenced at 11:10 a.m.)

2  THE COURT:  Thank you.  Good morning, counsel,

3  this is Judge Silverstein.  We're here for the hearing in

4  case number 20-10343, Boy Scouts of America case.

5  And I think it's Nicki on the phone today.  Can

6  you please give everyone the protocol for the call, please?

7  THE CLERK:  It is extremely important that you put

8  your phones on mute when you are speaking.  When speaking,

9  please do not have your phone on speaker as it creates

10 feedback.  This also helps with the background noise so that

11 we can hear the person that is speaking and get an accurate

12 record.

13 It's also is very important that you state your

14 name each and every time you speak for an accurate record.

15 Your cooperation in this matter is appreciated.  Thank you.

16 THE COURT:  Okay.  Thank you.  And if we can all

17 heed to that, I appreciate it.  I already am getting some

18 feedback this morning.

19 I will turn it over to Mr. Abbott.  I'm not sure

20 if I see him.

21 MR. ABBOTT:  Thank you, Your Honor. Good morning.

22 THE COURT:  Good morning.

23 MR. ABBOTT:  And thanks for yet, again, convening

24 another one of these Zoom calls.  We're all anxious, of

25 course, to get back in the courtroom live, but we appreciate

1  the court's flexibility in allowing us to do this on Zoom and

2  telephonically.

3           Your Honor, one late breaking development I just

4  wanted to make the court aware, the debtors and other parties

5  have reached agreement with Hartford, and I think based on a

6  slight tweak and I believe another redline should be working

7  its way to Your Honor, if it hasn't but that will certainly

8  be explained in due course as we get to it, Your Honor.

9           But we thought as the agenda indicates, Your

10  Honor, you had indicated to the parties that you were going

11  to deliver a ruling on the Sidley retention issue.  That is

12  number one on our agenda.  And unless Your Honor wishes

13  otherwise, we thought we would just run through the agenda

14  that and the protective order motion, then the status

15  conference on the mediation, if that made sense to the court.

16           THE COURT:  No, I'd like to go right into the

17  contested matter and what's remaining on the protective

18  order. We'll cover the agenda and then I'll give my ruling at

19  the end.

20           MR. ABBOTT:  That's fine, Your Honor.  With that,

21  I will turn it over to Mr. Basaria from Sidley who will

22  address the protective order motion, Your Honor.

23           THE COURT:  Okay.  Thank you.

24           And, Mr. Basaria, what I'm really interested in is

25  what's remaining.  I've read the papers.  I don't need a back

1  and forth on, you know, who shot John and who said what and

2  who delayed and who didn't.  I really just need to know what

3  are the three or four matters that are unresolved.  Looks

4  like the parties cooperated a lot and I just need to resolve

5  the issues that couldn't get resolved.

6              MR. BASARIA:  Sure, Your Honor, and thank you for

7  that.  Karin Basaria from Sidley Austin on behalf of the

8  debtors on the motion for the protective order.

9              Your Honor, this is a motion that the debtors

10  filed seeking the entry of a protective order a couple of

11  weeks ago, Docket Entry 613.  And there are also a few

12  joinders, the tort claimant's committee, the unsecured

13  creditors committee, and the future claimants representative

14  have filed joinders, joinder papers at Docket 616, 665, and

15  722.

16              Your Honor, in terms of the open issue at this

17  point as Mr. Abbott mentioned at the outset, I'm happy to

18  report that the debtors have reached an agreement with

19  Hartford.  You may have seen that their objection was very

20  narrow and focused on single definitional issue. We have an

21  agreement there now and we'll be filing a redline reflecting

22  that change compared to the one that we filed yesterday

23  afternoon momentarily.

24              So the remaining objector, Your Honor, is Century.

25  And they filed a paper at Docket Entry 697 that contains,

1  among other things, objections to really four provisions,

2  most of which relate to the same issue and that issue is the

3  treatment of privileged materials.  Like I said, that's the

4  only objection at this time, and I won't go through the play

5  by play on how we got to this point, but I do want to stress

6  how important it is, at this stage, to have a protective

7  order entered.

8       THE COURT:  Well I'm going to enter a protective

9  order.  The question is what's the remaining four issues, and

10  I'm going to decide them right now, so let's just get to

11  them.

12       MR. BASARIA:  Great.  So, Your Honor, the four

13  issues that have been raised, the first objection, the first

14  provision of the protective order that Century has objected

15  to concerns paragraph 7.2(o) of the document.  And 7.2(o) of

16  the protection order appears if you look at Docket Entry 714,

17  Exhibit A, which is the certification of counsel we filed

18  yesterday afternoon.  It's at page 18, it begins at page 18

19  and ends at page 20.  It's a pretty long provision.

20       Just to be clear, so 7.2, paragraph 7.2 governs

21  the disclosure of confidential material and who may receive

22  material that's been produced in the case and designated as

23  confidential.  The purpose of paragraph 7.2(o) is to make

24  clear that a party who signs the acknowledgment and agreed it

25  to be bound by the order can do confidential discovery

1  material if the producing party agrees to it.

2       And Century objects to this provision and

3  essentially argues that this provision creates a loophole

4  that would allow the disclosure of Chubb privileged

5  information and other privileged information to the tort

6  claimants.  And that's not the case at all, Your Honor.

7       There's language throughout the order including at

8  paragraph 8.4, paragraph 10.4, paragraph 12.9 that all makes

9  clear that nothing in this order permits the disclosure of

10  common interest material or privilege material.  And nothing

11  in this provision 7.2(o), suggests that this creates a

12  loophole or a carve-out from that.

13       Again, the sole purpose of paragraph 7.2(o) is to

14  allow parties who signed the acknowledgment and agreement to

15  be bound to view confidential material if the producing party

16  agrees to that.  And I'll also note that 7.2(o) is

17  incorporated into paragraph 7.3 so it could apply to highly

18  confidential material as well if the producing party agrees

19  that those materials may be viewed.  Again, there's no

20  loophole here.

21       If Your Honor has any questions, I can take those

22  now or I can go onto the next paragraph that's contested or

23  that is subject to Century's objection.

24       THE COURT:  Actually, I'd like to hear from Mr.

25  Schiavoni.  Can you address that one particular issue,

1  7.2(o)?

2       MR. SCHIAVONI:  Yes, Your Honor, I will.  And

3  after I do that, I might just suggest and we'll proceed

4  anyway you want, but it might be more efficient for me as the

5  objector to just quickly walk through or any way you want

6  what our objections are instead of having to sort of re-

7  explain what they are from how the debtors are characterizing

8  and then they can respond any way they want.  It just might

9  be quicker.

10       But with respect to the one, there's really -- you

11  know, Century really has just three objections here, okay.

12  This is one of them.  This provision, 7.2(o), is not in the

13  Imerys order and it makes this order very different.  It

14  allows the debtor here to pass on materials to anybody

15  whatsoever.  It overrides all the other provision in the

16  order as long as they just simply agree to acknowledge to be

17  bound.

18       You heard debtor's counsel well, gosh, some

19  prohibition on common interest material being exchanged, but

20  common interest material isn't in lowercase, it's in

21  uppercase, and it's a defined term.  And it limits that

22  definition, just material that's being physically shared with

23  the insurer and shared at that time.  So that to the extent

24  Sidley has in its file's memos and communications about

25  Chubb's work, it doesn't technically fall within their

1  definition of "common interest material."

2        It's also the case that "common interest material"

3  because defined it's just material that's physically shared

4  and physically shared at the time, not six months later or a

5  year later that the material, the privileged material

6  generated by our underlying defense counsel, the underlying

7  defense counsel that is running the defense now were

8  (indiscernible) Chubb's administrator administering those

9  claims and previously which Chubb is paying for those claims.

10 But to the extent privilege material in their files paid for

11 by Chubb was not physically shared with us at the time that

12 they're free to share that with anybody under the terms of

13 the order.

14       What we've asked for is extremely simple.  Okay.

15 All it is, is we asked for one line to be added in the next

16 paragraph at 7.2(o), it just says privileged material

17 generated in connection with the defense of the abuse claim

18 that's subject to a shared privilege or otherwise shall be

19 disclosed.  All we're asking for is that our privileged

20 materials and that privilege material about the underlying

21 defense not be disclosed, seemingly a very simple assurance

22 here is one that they don't need, putting aside whether

23 there's any shared privileges, you know we can get into some

24 debate about that.

25       The bottom-line is the privilege that the debtor

1  has to the defense is an important asset of the estate.  And

2  that asset, the waiver of that privilege, it shouldn't take

3  place unless they come to the court -- just like the transfer

4  of any other asset -- and seek permission. So, they can do

5  it.  They can waive those privileges, but we're just saying

6  if they want to do it, they should do what happened in

7  Imerys.

8           Cyprus came to the court and asked for permission

9  to, you know, with respect to (indiscernible).  It's just a

10 simple line we asked and that's one of the three changes. And

11 it goes to our really unique position of having privilege

12 material with the debtor's counsel and, you know, our

13 continuing role in the defense through ESIS, the ongoing

14 defense right now which the court will hear about further on

15 June 6th in connection with the pending lift stay motion, and

16 in connection with our participation of the defense over the

17 years.

18          In those ways, you know, frankly, we're in kind of

19 a different (indiscernible) than Hartford and Hartford has,

20 you know, a different more limited view here.  Hartford isn't

21 involved in the ongoing defense on a going forward basis, but

22 we are. And it's important to us.

23          THE COURT:  Okay.  Well, let me ask this question,

24 though. There is nothing in this protective order that

25 permits the debtor to -- or any party, to turn over

1  privileged information, right? There's just nothing that

2  would permit a party to turn over privileged information --

3  well, let me put it this way.

4          Where there's a common interest privilege because

5  I suppose a party can always turn over their own privileged

6  information if they want to.  I don't know why they would,

7  but okay.  But there's nothing in here that permits a party

8  to turn over documents.  This seals with confidential

9  documents, private documents, documents that parties

10  generally -- that are generally not in the public domain and

11  that people want to keep confidential.

12          Those confidential and privileged don't equate,

13  right?  So, there may be confidential documents that are

14  privileged or maybe every privileged document is

15  confidential, but not every confidential document is

16  privileged, right?  So this doesn't absolve anybody of their

17  obligation to maintain common interest privilege, right?

18          MR. SCHIAVONI:  Your Honor, first of all, I don't

19  think the issue is so much confidential, as opposed to

20  privileged.  The focus here is much more on privilege. And

21  with respect to privilege, the real, you know, it's a problem

22  that they added this provision 7.2(o) into the protective

23  order because it affirmatively seemed to order, you know

24  provide them the ordering cover that they can share with

25  anyone any material.

1       And I heard what Your Honor said about a party can

2  waive privilege and, you know, that's something that can

3  happen.  And, you know, they may have that right but as a

4  debtor-in-possession, you know I don't think they can waive

5  privileged to the underlying claims which the whole

6  bankruptcy is about.  They can't waive that privilege.  It's

7  an important asset of the estate without coming to the court.

8       So they shouldn't have a provision that says that,

9  in essence, they can do that.  Okay.  And, you know, I also

10  would say, you know, I heard what Your Honor said about

11  common interest privilege.  And they do have a defined term

12  for it but, again, they cabin it, they crib it so that it's

13  only documents that were shared.

14       And just imagine, you know, here what means.  To

15  the extent underlying --

16       THE COURT:  Well, Mr. Schiavoni, I'm not sure why

17  anybody would want a definition of common interest material

18  because I agree, it cabins it and it is what it is.  You

19  know, parties have to make decisions everyday about what

20  documents they produced in discovery and in response to and

21  in response to discovery requests.  And if there's common

22  interest protected material, not defined term but just

23  generally, one party unilaterally can't waive the privilege

24  and they shouldn't be turning over the documents.  If they

25  do, I guess there's some remedy for it.

1        But let me ask, Mr. Basaria, why do we need

2   7.2(o)?

3        MR. BASARIA:  Sure, Your Honor, I can respond to

4   that and if Your Honor would indulge me, I'd like to respond

5   to some of the points Mr. Schiavoni made.

6        So, again, 7.2(o) is simply a provision that

7   provides a mechanism where we have this protective order.

8   There are certain parties that are parties in the order,

9   under the order, as set forth in the opening paragraph.

10  However, if a party agrees to be bound by the terms of the

11  protective order and signs the acknowledgement to be bound,

12  that person or entity becomes a party as set forth in the

13  opening paragraph.

14       What 7.2(o) does is it simply makes clear that a

15  person or entity that does that if the debtor or if the

16  producing party agrees can also view confidential material.

17  So that's the purpose of 7.2(o).

18       And, again, Your Honor, I mean you said it also,

19  nothing in this order allows us or anyone else to disclose

20  any privileged material or any common interest material.  And

21  I would go a step further and say that at paragraph 12.9 of

22  the order makes that clear.  It makes clear that nothing in

23  the order, it's at the bottom of page 36, shall be deemed to

24  waive any applicable privilege or to limit relief available

25  and to any producing party.

1            And so, I also want to talk a little bit about

2    this definition of common interest that we have in here

3    because Mr. Schiavoni raised it and Your Honor also commented

4    on it.

5            The definition, common interest privileged

6    material, is a defined term in the order because it drives

7    certain, very specific obligations under the order that

8    insurers requested and that the parties have agreed to.  And

9    those are set forth in paragraph 18.4 principally, but there

10   are other obligations that are related to involving a holder

11   of a common interest with respect to common interest

12   privileged material in the meet and confer process before

13   materials are used in court or in connection with any

14   discussions related to a clawback.

15           The reason there's a defined term there is not

16   because the order limits the scope of what is considered

17   common interest privilege.  Certainly, we agree that such

18   material shouldn't be produced.  However, it was important to

19   us if we were going to add this provision which also in the

20   Imerys order -- and I think at that hearing, Your Honor

21   recognized that it imposes a burden -- if we added this

22   provision that requires the producing party to disclose

23   common interest privilege material to the other holder of any

24   protections over that material, we wanted to make sure there

25   was something prescriptive that allowed us to make that

1  assessment because, otherwise, we would have this obligation

2  under the order, but not have the appropriate direction to

3  make sure we were complying with it.

4      So, the definition is really a mechanism that's

5  tied to paragraph 8.4.  But it does not limit what would fall

6  under the common interest privilege because we do agree that

7  it is somewhat cabined and the revised definition that Your

8  Honor will see in the version that reflects our agreement

9  with Hartford is a little different and a little broader, but

10 that's the purpose of the definition of term.

11     The other thing I'll note, Your Honor, is the

12 language that Century is seeking, the affirmative language

13 and in the objection, it's phrased as language the debtor

14 shall not disclose any privileged material or materials

15 subject to any other privilege, that language is not in the

16 Imerys order. And, in fact, I believe from the transcript

17 from that hearing, the insurer in that case, also represented

18 by Century's counsel here, asked for something like that and

19 that request was rejected.

20     We don't think that language is necessary.  We've

21 made it very clear that we do not intend to turn over any

22 privileged information.  And I've never had of privileged

23 being characterized as an asset of the estate.  But we

24 certainly have no interest or desire to turn over privileged

25 information.

1        As a final point, Mr. Schiavoni mentions in his

2   objection, Century states in its objection, he refers to

3   Sidley's possession of materials that are privileged to

4   Chubb. We think the record from the hearing is clear on that.

5   Here were conversations and that there are no privileged

6   materials related to the underlying abuse action in Sidley's

7   possession in connection with its prior representation of

8   Century.

9        So, again, 7.2(o) is a very narrow provision.

10  Nothing in the order allows for the disclosure of privileged

11  material. The order doesn't cabin the common interest

12  privilege to only those materials that constitute common

13  interest protected material.  And for that reason, it's our

14  position and, really, for every other party except for

15  Century's position, that paragraph 7.2(o) should remain in

16  its current form.

17        THE COURT:  Okay.  Let me ask this question.

18  Since there's a whole list of parties in Section 7.2 who a

19  receiving party may disclose information to. . . as otherwise

20  ordered by. . . submitted in writing by the producing party,

21  a receiving party may disclose information to. . .

22        Who is anticipated to be. . .

23        MR. SCHIAVONI:  Our concern is it's the underlying

24  plaintiff's lawyers, Your Honor.

25        THE COURT:  Yeah, I understand that.

1       Who are you contemplating here would be a party

2   that isn't one of these already listed parties who would need

3   to have the documents?

4       MR. BASARIA:  Your Honor, so I'll just use an

5   example.  So, first of all, the access to the data room which

6   contains the large volume of material that the debtors are

7   providing, producing in this case we don't expect access to

8   those materials, at least, I can't think of anyone off the

9   top of my head, outside of the parties, for the most part;

10  however, we do have adversary proceedings.  We have an

11  adversary proceeding, you know, with respect to the

12  preliminary injunction.

13      There are hundreds of defendants in those cases.

14  We would like those defendants to be bound by this protective

15  order, to the extent they receive documents.  And that's

16  clear in the scope section of this protective order.

17      If there's a subset of documents that need to be

18  produced to someone else in connection with the contested

19  material for adversary proceeding, we would like the ability

20  to do that, if the producing party agrees to do that and make

21  such person or individual a receiving party under this

22  protective order with the provision here is 7.2(o) that

23  allows such party to view confidential discovery material.

24  So that's the intention there.  It's really to make sure that

25  there's a mechanism in case a production needs to be made to

1 | someone else.

2 | MR. SCHIAVONI:  And, Your Honor, that's exactly

3 | our concern.  I mean it would be catastrophic to literally

4 | have the materials circulated among hundreds of people. And I

5 | just want to make one point to you that should be very clear.

6 | I think Your Honor is, to some extent, taking

7 | comfort from the clause 8.4 which was in the Imerys order

8 | that basically sort of said nothing in this order shall, you

9 | know, authorize you to, you know, share, you know, privileged

10 | material.  I think that's how Your Honor likely has that

11 | clause sort of fixed in your mind.

12 | But look carefully and how it was changed.  It was

13 | changed to take away privileged material and put in the

14 | defined term common interest material which is limited to

15 | just material that was actually shared and was shared at the

16 | time.  It guts the provision entirely.  And then we're left

17 | with this provision that says you can share with anyone.

18 | At an absolute minimum that term 8.4 we need to

19 | take the define term out of common interest and just put

20 | nothing in this order authorizes anyone to share any

21 | privileged information.  I don't think that's what Your Honor

22 | is thinking in signing the order that you're doing that.  I

23 | think you're thinking leave the parties to what the law is.

24 | That's the reason at a minimum we have to change.

25 | MR. BASARIA:  Your Honor, may I respond to that

1  point?

2  　　　　THE COURT:  Yes.

3  　　　　MR. BASARIA:  Your Honor, paragraph 8.4, again, is

4  a mechanism for determining whether material should be

5  shared, which materials need to be shared under the

6  protective order with the holder of a common interest.  And

7  then there's a process where those parties would confer in

8  the event of the disagreement over whether that information

9  is subject to a common interest privilege. And if they can't

10 agree to bring that to the court's attention.  So 8.4 deals

11 specifically with the defined term common interest privilege

12 with common interest privileged material.

13 　　　　Paragraph 12.9 is broader.  Paragraph 12.9 of the

14 order makes clear that nothing contained in the order waives

15 any privileges and certainly that would include, it doesn't

16 limit -- it's not limited to the defined term common interest

17 protected material.  And so, for that reason, it would

18 include anything that's attorney/client privilege, attorney

19 work product or anything that's lowercase common interest

20 protected.

21 　　　　And so, again, we don't think it's necessary to

22 change -- certainly not necessary or appropriate to add

23 specific language naming an individual party nor is it

24 necessary to change paragraph 8.4 which is really focused on

25 the materials that producing parties will be obligated under

1  the order to show to a holder of a common interest as that

2  term is defined.

3          THE COURT:  Okay. Well, we're moving into a whole

4  lot of paragraph and I understand why because, obviously,

5  this order works together.  Okay.  But when I'm looking at

6  12.9 nothing herein shall be deemed away of any applicable

7  privilege or immunity or to limit the relief available to any

8  producing party.  How about to anybody?

9          I mean it's not just a producing party who may

10 have whatever remedies.  It's somebody who is not a producing

11 party but who has a privilege attached to a document that was

12 produced by a producing party.  And that's the concern here.

13         I understand the concern because I've dealt with

14 it in _Imerys_.  I did not go back and look at my _Imerys_ order

15 because each of these orders go in every protective order --

16         MR. BASARIA:  -- the second --

17         THE COURT:  And they're generally the same, but

18 they're all unique.  And this one is unique.  Okay.

19         So, no, it's not what it says.  The second

20 sentence doesn't solve the problem in the first sentence.

21 The second sentence says, "Nothing in this protective order

22 shall require disclosure of information that is protected by

23 the attorney/client privilege."

24         Well, yeah, nothing requires it.  Nothing mandates

25 it.  Nothing permits it.  I am not giving anybody, anybody a

1  path if they produce documents that are privileged in which

2  another party says, wait a second, that was my privilege and

3  you've now reached something.  And I did have a discussion

4  with the Imerys people about how would this happen outside of

5  bankruptcy.  It cannot be unique to bankruptcy.  I'm not sure

6  I ever got a super-satisfactory answer as to that.

7            But this should be, order should be neutral on

8  privileged information.  I understand the need to have a

9  process to determine whether a document is, in fact,

10 privileged, subject to common interest privilege, et cetera,

11 and that's the process that, unfortunately, I had to actually

12 use, okay, in Imerys and go through document by document.

13 Okay.

14           But this order needs to be neutral.  Every part,

15 just like in any non-bankruptcy litigation has to be

16 cognizant of their responsibilities, whatever they are, to

17 another party.  And nothing I'm ordering is going to absolve

18 that.  People are going to have to look at their documents,

19 one by one, and make a decision -- is this subject to

20 attorney/client, work product, and then common interest.

21           I'm not the -- I'm not absolving anybody.  So,

22 with that in mind, it strikes me in paragraph 7.2(o), is it

23 7.2 -- yeah, (o), we just need notice.  If you want to give

24 these documents to somebody who is not a listed party in the

25 context of this case where we have the issues that have been

1  raised here, there needs to be notice, so that if somebody

2  has an issue they can come in and I'll deal with it at the

3  time.  I can't pre-judge the issue.  I don't know who that

4  party would be.  Five days' notice, something like that, so

5  parties can come in and raise an issue, if there is one.  And

6  if there's no notice then great. The documents can be

7  provided.

8         But I think it is important in the context of this

9  case and the issues that are involved that and the carefully

10 negotiated document we already have that there not be some

11 open ended party, some open-ended category of, quite frankly,

12 unknown person who could receive the documents, given all the

13 protections that we're providing people, so we just need a

14 notice period.  And if there's an issue, I will resolve it.

15        MR. SCHIAVONI:  Your Honor, I think, I heard you

16 on that.  I also heard you say basically that you weren't

17 absolving anybody from what their privilege obligations are.

18 We would be happy if the court would just add, you know, in

19 its own words one sentence to the order that said that.  We

20 proposed a term.  You know, the debtor has a term.

21        It's cribbed by the definition, but I think we

22 just need a basic term that says nothing in this order is

23 intended to authorize anyone to produce privileged material

24 and if they're on their own eyes.  You can phrase it anyway

25 the court, you know, thinks its most appropriate.  If that

1  would go where 8.4 is.

2             THE COURT:  8.4.

3             MR. MORRIS:  Your Honor, this is John Morris --

4             THE COURT:  I'm not sure it goes in 8.4, but --

5  okay.  I'm sorry; who wanted to address me?

6             MR. MORRIS:  Your Honor, this is John Morris.

7             THE COURT:  I'm not sure it goes in (8)(4), but --

8  okay, I'm sorry, who wanted to address me?

9             MR. MORRIS:  This is John Morris from Pachulski

10  Stang Ziehl & Jones on behalf of the TCC.  Can you hear me?

11             THE COURT:  Yes, Mr. Morris.

12             MR. MORRIS:  Okay.  Thank you.

13             I just want to make sure that I can be heard on

14  this.  The issue of common interest is vitally important to

15  the TCC.  It has been strongly suggested, and I think I'm

16  being charitable in the way I'm describing it.  It's been

17  strongly suggested that the disclosure of common interest

18  material could jeopardize coverage.  And, obviously, as the

19  counsel to the sexual abuse survivors we take that threat

20  very seriously.

21             So, we have asked repeatedly for both the debtors

22  and for Century to identify the substantially similar common

23  legal interests that they're looking to protect.  That is the

24  standard under Teleglobe.  It is unambiguous and to this day

25  nobody has been able to articulate that.  So, we are now in

1  the place, and this is my biggest concern, of the trap for

2  the unwary.  The debtor doesn't really know what common

3  interest material is. They haven't agreed with Century what

4  common interest material is and you're proceeding at your own

5  risk with a very substantial suggestion that production of

6  common interest material could blow coverage.  That is my

7  concern here, Your Honor.

8         So, when you consider additional language I would

9  hope that we could, at least, say the disclosure of common

10 interest material, you know, knowingly and intentionally

11 because we have lots of provisions in here for inadvertent

12 production.  It may be that in the production of tens of

13 thousands of documents that something is inadvertently

14 produced.  I will tell you, Your Honor, that that's already

15 occurred and I personally found the document and I personally

16 notified the debtors immediately.  They thanked me for

17 returning the document.

18        So, inadvertent production happened.  I cannot

19 allow the TCC to fear the loss of coverage because the

20 debtors knowingly produce a document that they learned later

21 is claimed to be subject to common interest.  This is fraught

22 with danger, it really is.  And it's fraught with danger

23 precisely because of the threat that's been made.

24        THE COURT:  I do understand that.  I'm sure I had

25 this conversation in Imerys as well, but inadvertent

1  production, I think, is in here.  I think it's in the rules,

2  right.  And we all know how to deal with inadvertent

3  production. It sounds like you dealt with it appropriately.

4  I am not giving anymore protections to the insurance

5  companies or anyone else with respect to inadvertently

6  produced documents.

7       What everybody is trying to do is to get me to

8  decide up front how to handle issues that I'm not sure I need

9  to or are any different in bankruptcy then they are anywhere

10  else.  The parties, in the first instance, have to work

11  through it.  I don't know if something is subject to a common

12  interest privilege protection until I see the documents.

13  That is what I had to do in <u>Imerys</u>. I had to look at each

14  document just like a judge would in any case that's in front

15  of them in civil litigation.

16       MR. MORRIS:  May I respectfully suggest that

17  that's not the case when it comes to common interest.  When

18  it comes to attorney/client privilege, when it comes to

19  attorney work product, I would completely agree with you

20  because everybody knows whose control of the privilege.

21       With respect to the work product, I mean the

22  common the interest doctrine, and it's a doctrine not a

23  privilege, the party ought to know, and that's the

24  distinction between attorney/client privilege and attorney

25  word product.  Everybody knows I'm the lawyer.  Everybody

1   knows it's my work product. If I share it with somebody it

2   may get into a debate, right.  Whether it constitutes the

3   provision of legal advice you may get into a debate.

4          The debate that we're setting up here is to decide

5   after the fact whether people had a common interest and

6   didn't know it at the time.  (Indiscernible) after the fact

7   whether the parties had a substantially similar common legal

8   interest.  Those five words are from the Third Circuit,

9   they're binding.

10          I don't know what Imerys said.  I've been told

11  about it a million times and I was assuming that I would find

12  a considered opinion from the court, some judgement that I

13  could analyze; instead it's an agreement between the parties.

14  It's not an agreement that I'm prepared to accept, frankly.

15

16          Teleglobe is the Third Circuit authority on common

17  interest, substantially similar common legal interest.  I

18  don't know why it can't be defined today.  If they could

19  define that I would have no problem.

20          THE COURT:  I'm not sure it was defined in

21  Teleglobe.  I haven't read Teleglobe for a couple of months,

22  but I'm not sure it was defined in Teleglobe or defined pre-

23  dispute in Teleglobe.  So, why is this bankruptcy different

24  than in any other civil litigation where parties have to make

25  these decisions?

1          MR. MORRIS:  The common interest doctrine, Your

2   Honor, implicit is that there is an agreement.  I have, many

3   times, and I'm sure many people on the line today have

4   negotiated common interest agreements.  The tricky part of a

5   common interest agreement is defining the scope so that the

6   parties go forward with a meeting of the minds as to what

7   information is going to be subject to the common interest.

8          THE COURT:  Okay.

9          MR. MORRIS:  It doesn't have to be in writing.

10  I'm not --

11         THE COURT:  And I don't know, perhaps there is a

12  writing here. I don't know because nobody put anything in

13  front of me.  So, what you're saying is you want a

14  declaratory judgment action as to what is the common interest

15  between this debtor and this insurance company.  And if that

16  is what you want somebody can file that cause of action and

17  we will deal with it in time because that is what you're

18  asking me to do.  You're asking me for a declaratory

19  judgment, basically, when the parties have not put an issue

20  in front of me, as to whether there is a common interest and,

21  if so, what it is because Teleglobe doesn't tell me.

22         MR. MORRIS:  I'm not asking for that right now,

23  I'm really not.  I'm just asking for the parties to disclose

24  the nature of their agreement.  That's all.

25         THE COURT:  Well, that should happen outside of --

1 that shouldn't be happening here.

2          MR. MORRIS:  Okay.

3          THE COURT:  If that's an issue that needs to be

4 happening somewhere else.  If the debtors and the insurance

5 company cannot agree they need to figure out how they're

6 going to decide that issue.

7          MR. MORRIS:  Okay.

8          UNIDENTIFIED SPEAKER:  Your Honor, may I weigh-in

9 here?

10          MR. MORRIS:  I just wanted to note the concern,

11 Your Honor, because the threat was made and now, we're going

12 into a very dangerous area.  I just wanted to make that

13 point.

14          THE COURT:  I perfectly understand the concern and

15 the issue that's been raised.  I don't know that I have a way

16 to solve it, but I don't think I can solve that issue in the

17 context of a stipulated confidentiality and protective order

18 when the parties have not placed in front of me a dispute

19 over what is or is not a shared common interest privilege.

20 Maybe the debtor doesn't think it has one, I don't know.

21          MR. BASARIA:  Your Honor, Karim Basaria on behalf

22 of the debtors.

23          We, the debtors, are not seeking any type of

24 declaratory ruling through this order or, otherwise, on what

25 constitutes common interest material; however, because the

1  order contains a mechanism that obligates us to, essentially,

2  allow the insurers to do a pre-review of certain materials

3  and then go through a meet and confer process if there's a

4  disagreement for purposes of driving that mechanism we've

5  included common interest protective material as a defined

6  term which at this point, as of this morning, has been agreed

7  to by all of the parties and all of the insurers with one

8  exception.

9       MR. SCHIAVONI:  No.  It's not been agreed to by

10  all of the insurers.  It's been agreed to by two insurers.

11  It's just not a fair statement.

12       MR. BASARIA:  Your Honor, Hartford is the only

13  other insurer that filed an objection.  Their objection was

14  limited to that definition. (Indiscernible) joined the

15  Hartford objection.  And I understand that they are also

16  comfortable with the revised language that I know Your Honor

17  hasn't seen. No other insurer, to my knowledge, has weighed

18  in on this particular issue.

19       THE COURT:  Okay.  Well, I will look at the

20  language when I get it.

21       MR. SCHIAVONI:  Your Honor, we had two other

22  points, I can cover them very quickly if you'd like now.

23       THE COURT:  Okay.

24       MR. SCHIAVONI:  All right.  The second point deals

25  with provision 5.9 and what's at issue here is that

1 prepetition, in various State Courts, orders were entered

2 holding -- you know, protective orders were entered in those

3 proceedings.  The debtors have asked in 5.9 for the court to

4 override all those prior orders without identifying them,

5 without identifying the proceedings, without providing the

6 orders to us and without indicating who were parties to all

7 of the orders in each of those cases.

8          So, these confidentiality agreements and orders in

9 this other case is, sort of, like a cart blanche override of

10 them that then purports to say that they can share those

11 documents all among the constituency, sort of, in the order.

12 And I would just tell you two things about this.

13          First of all, it's not appropriate for a

14 protective order.  This is, sort of, a motion to compel that,

15 you know, overrides all these other agreements and orders.

16 This is a protective order.  If they want to bring out a

17 motion for this that's fine, but it doesn't belong in a

18 protective order, first of all.

19          Second of all, the relief they're seeking from the

20 court, you know, absolutely most respectfully like the court

21 doesn't have authority to override various undefined

22 unidentified state orders under basic principles of commodity

23 and mandatory abstention.  These State Court orders, whatever

24 they are, they deal with matters involved in those courts.

25 We don't know whether all the parties to those orders,

1  whether the third-parties were given notice or not.

2          What we asked for is would you please just -- like

3  we will cooperate with you and try to work with you on this

4  if it's a legitimate point, but, you know, share with  us

5  copies of the orders you want overridden.  Let's meet and

6  confer on it.  And if it's still an issue bring it to the

7  court, but bring it to the court outside of this protective

8  order.

9          So, we asked for that provision to be revised with

10  that in mind.  We just think it goes well beyond what a

11  protective order is about.  We think it's beyond, really,

12  what the court has authority to enter on this sort of motion.

13          THE COURT:  Yeah.  Let me ask, Mr. Basaria, what

14  is the authority under which I can, in an order, let people

15  violate orders of other courts?

16          MR. BASARIA:  Your Honor, so Paragraph 5.9, from a

17  very important practical purpose and it doesn't override, you

18  know, the other existing protective orders.  What Paragraph

19  5.9 does is, as Mr. Schiavoni said, and the BSA has

20  previously reviewed, calls for privilege and produced

21  documents in underlying prepetition abuse litigation,

22  produced documents to third-parties including tort claimants.

23  Because those documents were produced under existing

24  confidentiality agreements, under which those tort claimants

25  and their lawyers are bound, they are not able to share those

1 documents with the tort claimant's committee.

2         Rather than requiring the BSA to go through the

3 costly exercise of coordinating a reproduction of these

4 documents from the tort claimants, what Paragraph 5.9 --

5 through formal discovery what Paragraph 5.9 does is

6 essentially allows the TCC, the insurers, on a select group

7 of people, you know, the prepetition distribution group is

8 the defined term in Paragraph 5.9 to come under the tent of

9 those orders.

10         The documents produced in those cases, otherwise,

11 remain under those existing confidentiality orders and this

12 provision sides only to the documents produced by the BSA

13 because, for example, to the extent a local counsel, for

14 example, has produced documents in prepetition litigation

15 those documents would not be provided to anyone pursuant to

16 this order.

17         So, it's a provision that is specifically focused

18 on the BSA's production to third-parties in prepetition abuse

19 litigation and allows people, the tort claimants committee

20 and a select other group of people that includes the

21 insurers, to come under that tent rather than going through a

22 formal discovery to reproduce those documents.  We have added

23 protections here.

24         For example, we've made clear that those existing

25 confidentiality orders, otherwise, remain in effect.  We've

1  made it clear that the Chapter 11 cases can't be used

2  pursuant to this provision as, essentially, a clearing house

3  for documents produced in prepetition litigation.  In other

4  words, it can only be used for the purpose of these Chapter

5  11 cases and in prepetition litigation in which they were

6  originally produced.

7           So, our view is this is a reasonable appropriate

8  practical approach that is going to conserve resources.  And

9  we don't believe that there is any basis to revise the

10  provision the way Century proposes which would, essentially,

11  give Century the ability to pre-review these documents which

12  are not privileged.  They've already been produced. They've

13  already been reviewed and produced, or to do any pre-review

14  for relevance.  We think that would cause significant delay.

15  It would jam the process and really unnecessarily.

16           MR. MORRIS:  Your Honor, this is John Morris, if I

17  may be heard.

18           THE COURT:  Yes.

19           MR. MORRIS:  Thank you.  John Morris, Pachulski

20  Stang Ziehl & Jones for the TCC.

21           Your Honor, all of the documents that are subject

22  to Section 5.9 are already in the hands of our constituency.

23  What this provision is designed to do is to allow our

24  constituency to share those documents with us as counsel to

25  the TCC.  We have put in very specific provisions to make

1  sure that the only documents we're talking about today are

2  documents that were produced solely by the Boy Scouts, solely

3  to our constituency.

4         If there is any other party to these

5  confidentiality agreements the documents can't be shared.  We

6  would have to go and obtain their consent.  So, let's be

7  clear, this is very narrow.  So, all you're doing is being

8  asked to permit the Boy Scouts to, effectively, allow under

9  their existing confidentiality agreement the documents to be

10 shared with the TCC.

11        Everybody is being treated equally.  It's very

12 important and very appropriate that this provision be

13 included in the protective order because there are strict

14 guidelines on the use and disclosure of these documents.

15 That is exactly why it's in the protective order.  So, not

16 only is it appropriate for the protective order it's also

17 designed to streamline this process, to make the process more

18 transparent, to make the process more efficient.

19        I just want to finish by saying, Your Honor, that

20 Century has no legally cognizable interest in this paragraph.

21 These are not their documents.  They are the Boy Scouts'

22 documents.  To the extent they're a party to any of these

23 agreements the documents won't be produced without their

24 consent.  The documents are not privileged.  They've already

25 been shared with third-parties.

1        Century may want to delay, and they want to review

2   documents, they may want to elevate their status, but this

3   provision has nothing to do with Century.  It's not their

4   documents.  They're not party to the confidentiality

5   agreement and the documents are not privileged.  This is,

6   basically, a mechanism to allow the Boy Scouts to, basically,

7   allow the TCC to get the documents without having to go

8   through the cost, delay and disruption of serving 2004

9   discovery.

10        Thank you.

11        MR. SCHIAVONI:  Your Honor, this is a debate about

12  what they want. We agree with what they want.  They want you

13  to override all the orders entered by these prior courts.

14  Everything else that you have heard, though, there's no

15  record for.  There is no affidavits, there's no disclosure of

16  what any of the orders are, how many there are, who they

17  apply to.  Whether they, in fact, only apply to the debtor or

18  whether they were entered to apply to third parties and

19  third-party subpoenas or whether they apply to documents that

20  were clawed back.  Everything else about this is just a black

21  box.

22        There is no authority to override State Court

23  orders like this without even knowing what they are.  The

24  provisions of mandatory abstention apply to this four-square.

25  It's not a big burden to ask them to say, please, could you

1  share copies of the orders that you want overridden and, at

2  least, have them in the record so we can all see them and

3  know what it is.

4        MR. MORRIS:  Your Honor, I find it ironic that

5  they would ask us to describe all of these, but they can't

6  describe the common interest that they have with the debtors.

7  The fact remains, Your Honor, that we're talking about

8  agreements.  We're not talking about, you know, orders that

9  were imposed by a court.  We're talking about an agreement

10  between the Boy Scouts and the recipients of the documents

11  who possess them today.  We're not talking about anything

12  else.  There is a footnote there that expressly says that the

13  Boy Scouts are not permitted to divulge any documents that

14  were produced by the Local Councils.

15        I'd be happy to amend that footnote to broaden it

16  to say that any party other than the Boy Scouts.  This is not

17  intended to implicate anybody but the Boy Scouts and our

18  constituents.  And if there is anybody who is party to an

19  agreement other than the Boy Scouts and our constituents it

20  can't be disclosed without their prior consent.  I mean we're

21  not trying to do anything nefarious here.  We're not trying

22  to get anybody's documents here but the documents that were

23  produced by the Boy Scouts.

24        THE COURT:  Okay.  Here's how I'm reading the

25  paragraph, on the one hand it's narrow and on the other hand

1  it seems to be a little broad.  And from what I'm hearing

2  from Mr. Morris it seems to be consistent with the, at least,

3  narrow nature of this is that during the course of the

4  prepetition lawsuits the BSA provided certain documents to

5  the plaintiff.  So, the plaintiffs already have these

6  documents.  The plaintiffs in the underlying lawsuits already

7  have these documents pursuant to whatever confidentiality

8  orders are in place in those lawsuits.

9           The concern I always hear Mr. Schiavoni talking

10 about is, is the concern that documents get to the plaintiffs

11 that they don't, otherwise, have or are not, otherwise,

12 entitled to receive.  Here, these plaintiffs already have

13 these documents.  And what is being asked of -- what is being

14 ordered in this paragraph is that the plaintiffs can share

15 those documents because the BSA is consenting to let them out

16 of that aspect and only that aspect of the confidentiality

17 order that would not permit the plaintiffs to pass-on those

18 documents to anybody else.

19          Here the plaintiffs have the documents that came

20 from the BSA and BSA is consenting to permit the plaintiffs

21 to use those documents, I assume, basically, for something,

22 quite frankly, other than the underlying lawsuit.

23          MR. MORRIS:  That's correct, Your Honor.

24          THE COURT:  I actually don't see the harm with

25 documents that the plaintiffs already have. They have them.

1  I do think it needs to be clear that nobody else is

2  consenting, nobody else's documents that have been produced

3  are going to be passed along so that the plaintiffs' counsel,

4  quite frankly, has to be very judicious in what they turn

5  over.  They cannot turn over documents that they received

6  from some other defendant; whether that be alleged

7  perpetrator, whether that's a local counsel, et cetera. The

8  plaintiffs' counsel, quite frankly, the onus is on them to

9  properly identify the documents.

10         MR. BASARIA:  Your Honor, Karim Basaria for the

11  debtors.

12         THE COURT:  I think the plaintiffs in the Boy

13  Scouts may want to notify the underlying courts that this

14  aspect of their order has -- I'm not sure I'm abrogating it,

15  but I'm permitting the Boy Scouts to turn over their own

16  documents.  The Boy Scouts could give them, presumably, to

17  the tort claimants committee and now we're permitting the

18  plaintiffs to do it.  I will let you decide whether -- the

19  plaintiffs' lawyers decide whether they feel they need to

20  inform the court that this is happening.  I might want to

21  know if it was in front of me.  That's all I'm saying.

22         MR. MORRIS:  And, Your Honor, I think that's fair.

23  I haven't seen any of these confidentiality agreements, but

24  if it's like most confidentiality agreements that I

25  negotiated there's a provision that if the parties agree to

1  share the documents with somebody else they're allowed to.

2  Whether that requires a court order, I think, Your Honor is

3  exactly right that the plaintiffs' counsel ought to read

4  their orders or their agreements before they do anything. I

5  completely agree with that.

6          THE COURT:  Yup.  Okay.  Next issue.

7          MR. SCHIAVONI:  Your Honor, happily the last issue

8  is very simple.  In reading the reply brief that the debtors

9  filed this morning or last night, whenever it was, I think my

10 instinct is there's agreement or there should be agreement

11 because it's really simple.  It's on inadvertent production.

12 Rule 26(b)(5) is the rule that deals with inadvertent

13 production.  The rule sets out specifically what one is

14 supposed to do when there's an inadvertent production, return

15 documents, et cetera.

16         The issue here is after that request to return a

17 document under the rule happens what are you supposed to do.

18 Okay.  So, the rule provides you are supposed to return the

19 document.  There's an exception, sort of, carved into the way

20 they've, sort of, rewritten the rule in 10.3 suggesting or

21 its, really, (indiscernible) of one that they may retain a

22 copy of the document, some just a challenge.  That's fine,

23 okay, but we just can't have that going on indefinitely and

24 that that is something that can turn up five years from now.

25         The Rule 26(b)(5) is very specific.  It says the

1   only use you can make is promptly with the court filing it

2   under seal with a challenge.  Now we don't have to debate

3   what that rule says.  All I'm asking is that in this clause

4   where it says a receiving party shall not use any discovery

5   material that is subject to a claim of privilege, immunity or

6   protection under this section for any purpose other than we

7   just strike their redefinition of it and say as provided by

8   Rule 26(b)(5)(b) of the Federal Rules of Civil Procedure.

9           So, you know, we go with the rule on what it can

10  be used for.  You know, our view is the rule says it has to

11  be promptly filed under seal with the court or destroyed.

12  But we don't have to debate that.  We just add, you know,

13  reference to the rule.

14          MR. BASARIA:  Your Honor, may I respond to that?

15          THE COURT:  Yes.

16          MR. BASARIA:  Your Honor, I don't think there is -

17  - I think they're very close to the same place here.  We

18  simply don't read Paragraph 10.1 to be inconsistent with Rule

19  26(b)(5)(b). I think the language that is at issue allows a

20  party who is the recipient of inadvertently disclosed

21  privileged material to return that material and destroy it

22  other than for purposes to challenge a claw-back.  It

23  requires that the party do that promptly.  I think Rule

24  26(b)(5)(b) requires the party to bring an issue to the

25  court.

1    I think here we have a requirement that the

2   parties first confer about the documents, but, otherwise, we

3   don't read Paragraph 10.1 to allow the recipient of an

4   inadvertently produced document that's privileged to do

5   anything other then what the rule allows.

6        MR. SCHIAVONI:  Your Honor, there ought to be no

7   issue then referring to the rule.  With that we're, sort of,

8   done going through the order. I would just ask, Your Honor,

9   the thing most important, I think, to us here is just having

10  -- we go with whatever formulation the court comes up with,

11  but just having something in here that says notwithstanding

12  anything else this order doesn't authorize anybody to produce

13  privileged information.

14       With that, Your Honor, I have nothing further.

15  Thank you very much.

16       MR. BASARIA:  Your Honor, Karim Basaria on behalf

17  of the debtors.

18       Again, I stated that we don't think anything in

19  the order authorizes the production of privileged material.

20  The debtors have made clear that they do not intend to

21  produce privileged material.  I don't think, as Mr. Schiavoni

22  projected earlier Paragraph 8.4 is the appropriate place for

23  that.  It's a very specific paragraph that deals with a

24  pretty unique mechanism we've agreed to with the insurers

25  dealing with, what's defined as, common interest perfected

1  material.  So, with that I don't -- it's our position that

2  other than the other points we discussed here with respect to

3  Paragraph 7.20 that no changes need to be made to the

4  protective order.

5          MR. MORRIS:  Your Honor, finally, John Morris.

6          THE COURT:  Yes.

7          MR. MORRIS:  If you're going to entertain any such

8  language two cautions.  I would respectfully request that the

9  court add knowingly and intentionally, and omit any such

10 phrase as notwithstanding anything else because everything

11 else in there includes, among other things, inadvertent

12 production.  And without the words knowingly and

13 intentionally we're just creating another trap.

14         Thank you.

15         MR. SCHIAVONI:  We have no intention, Mr. Morris.

16 We're totally fine to incorporate inadvertent production.

17 That is totally fine.

18         THE COURT:  Okay. I'm going to let the parties

19 draft a simply sentence nothing authorizes knowingly and

20 intentionally production of privileged materials.

21         Mr. Morris, why don't you take the lead?

22         MR. MORRIS:  I'd be delighted.

23         THE COURT:  And with respect to --

24     (Judge reading document)

25         THE COURT:  I don't know that it's that far off

1  from the rule, but I'd have to say I haven't seen that

2  parenthetical in a protective order that I've bene asked to

3  approve before.  But I will say what I usually say with

4  respect to DIP orders, it should mirror the rule, okay.  We

5  don't need to re-invent the rule.  So, let's just make it

6  mirror the rule or be subject to the rule.

7            MR. MORRIS:  Thank you, Your Honor.

8            THE COURT:  Thank you.

9            Okay.  So, we're through with the protective

10  order, yes?

11            MR. MORRIS:  I believe we are, Your Honor.

12            THE COURT:  Okay.  What's next?

13            MR. ABBOTT:  Your Honor, Derek Abbott.

14            I think the next matter on the agenda would be the

15  status conference, with respect to the mediation or mediator

16  motion, Your Honor, and that's -- so, for that, I'll turn it

17  over to Mr. Andolina, if I may?

18            THE COURT:  Yes.  Mr. Andolina?

19            MR. ANDOLINA:  Good morning, Your Honor.  Thank

20  you for your time.  Mike Andolina, Sidley Austin, on behalf

21  of the debtors.

22            Your Honor, I'll be brief.  I do know the Court

23  continued the debtors' motion to enter a mediation order to

24  June 8th.  At the May 18th hearing, I think as the Court

25  heard from really all the parties that we're aligned, that we

1  need a group of mediators and we need them immediately.

2  From the debtors' perspective, the events of the

3  past two weeks have continued to bear that out, although, I

4  do think there is some good news, that we continued to make

5  progress with the ad hoc committee represented by Mr. Mason

6  and the TCC, in connection with extending the preliminary

7  injunction that we discussed during our last hearing with the

8  Court.

9  With respect to the Court's ruling on May 18th

10 regarding disclosures, the debtors have coordinated with all

11 the mediation parties and the three proposed mediators and

12 yesterday, disclosures were filed as to Mr. Finn, Mr. Green,

13 and also Mr. Gallagher.  Mr. Finn and Mr. Green also

14 responded to a series of follow-up email requests from Mr.

15 Schiavoni.

16 The parties have now conferred and respectfully

17 request that the Court allow briefly additional submissions

18 regarding the disclosures to be submitted by Tuesday,

19 June 1st at 5:00 p.m. eastern with any replies due on

20 Thursday, June 3rd, by 5:00 p.m. eastern, as well.

21 So, that's the request, Your Honor, and we'd

22 appreciate the Court's consideration and the Court's time

23 today.

24 MR. RUGGERI:  Your Honor, James Ruggeri for

25 Hartford.  May I be heard?

1          THE COURT:  Yes.

2          MR. RUGGERI:  I think Mr. Andolina got his dates

3  wrong.  It was Tuesday, June 2nd, and Thursday, June 4th, and

4  the one caveat I would note is that, at least with respect to

5  Judge Carey, we expect that we will provide his disclosures

6  early next week, which we assume will not be a problem for

7  the parties to address his candidacy, if you will, after we

8  produce those connections.

9          THE COURT:  Okay.  1st, 3rd, 2nd, 4th, it doesn't

10 matter to me.

11      (Laughter)

12         MR. RUGGERI:  Thank you, Your Honor.

13         THE COURT:  So, I assume nobody would mind getting

14 an extra day, so we'll go with the 2nd and 4th.

15         And, yes, when Judge Carey's disclosures are made,

16 people can respond to them appropriately.

17         Okay.  So, I guess that means we're back to the

18 ruling on the Sidley retention?

19         MR. ABBOTT:  It does, Your Honor.  Thank you.

20         THE COURT:  Okay.  Thank you.  And I'll apologize

21 in advance if it's a little lengthy, but I will read it and

22 then I will put the bench ruling on the docket so that

23 parties have it in writing.  It will be -- it has some

24 footnotes that I won't read with case citations, et cetera,

25 but it will be available for the parties.  The transcripts

1   we're getting these days, you know, are as good as they can

2   be, but I think given the matter, it's important that it be

3   on the docket.

4          Okay.  This is my ruling on debtors' application

5   to retain Sidley Austin as their restructuring counsel under

6   Section 327(a) of the Bankruptcy Code.

7          The sole objection to Sidley's retention was filed

8   by Century Indemnity Company, a subsidiary of Chubb, and one

9   of debtors' many insurers.

10          I held an evidentiary hearing on May 4,

11   entertained argument on May 6th and took the matter under

12   advisement.  While the witness' testimony reflects vastly

13   different views of the dealings between Century and Sidley,

14   based on the record before me, the following facts are

15   largely undisputed, but in any event I find that Chubb is a

16   long time client of Sidley's Insurance and Financial Services

17   Group.  Over the years, Sidley represented Chubb and/or its

18   predecessors and subsidiaries on various reinsurance matters,

19   including both, specific arbitration proceedings and general

20   counselling matter.

21          On October 5, 2018, Century retained Sidley in

22   connection with Century's efforts to obtain reinsurance from

23   Lloyds of London for claims that Century paid, or in the

24   future would pay to BSA under insurance policies Century

25   issued to BSA.  Sidley was brought on to review the work of

1  previous counsel, which had resulted in an arbitration award

2  adverse to Century.  That arbitration proceeding is the

3  subject of a decision of the United States District Court for

4  the District of Massachusetts filed, <u>Century Underwriters at</u>

5  <u>Lloyd's, London v Century Indemnity Company</u> and found at

6  2020WL1083360.

7  In August 2019, Century, again, retained Sidley in

8  connection with Century's efforts to obtain reinsurance from

9  another insurer for claims Century paid, or in the future

10  would pay to BSA, under insurance policies Century issued to

11  BSA.  At substantially the same time that Sidley took on its

12  first BSA-specific engagement for Century, Sidley's

13  restructuring group was hired by BSA to render restructuring,

14  planning, advice, and implementation.

15  At no time did Sidley obtain from Century, a

16  waiver of any conflict with respect to its concurrent

17  representation of Century in reinsurance matters and BSA in

18  restructuring matters.

19  On January 16, 2020, Sidley wrote Chubb, stating

20  its intention to withdraw from all of its pending

21  representations of Century and Chubb and set out a time frame

22  and methodology for that process.  The last action taken to

23  withdraw from any Chubb matter was either on February 20 or

24  24 of 2020.  In the meantime, BSA filed its bankruptcy

25  petition on February 8, 2020.

1    Century's insurance policies with BSA are assets

2  of the BSA bankruptcy estate.  Those policies include the

3  same underlying Century BSA insurance policies for which

4  Century sought to collect reinsurance from Lloyd's and the

5  second reinsurer.  The operative agreement between Sidley and

6  Century, with respect to the Sidley engagement on reinsurance

7  matters is a 2015 service-level agreement.

8    Generally, Chubb's service-level agreement is

9  Chubb's standard agreement by which it engages counsel.

10  Chubb had chosen not to negotiate separate agreement letters

11  with each law firm it engages.

12    The 2015 service-level agreement with Sidley

13  provides that if Century and Sidley are unable to resolve any

14  dispute with respect to a matter handled by the law firm, the

15  sole means for redressing that dispute shall be arbitration,

16  administered by the American Arbitration Association, in

17  accordance with its commercial arbitration rules.

18    Century is pursuing this remedy.  Century argues

19  that Sidley's retention application cannot be granted because

20  Sidley does not meet the standard of Section 327, as Sidley's

21  representation would violate Rule 1.7 of the Rules of

22  professional responsibility and that Sidley would be

23  representing one current client, BSA, against another current

24  client, Century.

25    Sidley argues that Rule 1.7 is not relevant to its

1  retention.  It argues that Century is a former client, not a

2  current client and that under Rule 1.9 of the Rules of

3  Professional Responsibility, Sidley does not need a waiver

4  from Century, because Century's representation of BSA in its

5  restructuring is not substantially related to its previous

6  representation of Century in reinsurance matters.  It further

7  argued that it does not hold or represent any interests

8  adverse to the BSA estate and is disinterested.

9          Finally, Sidley argues that Sidley was never

10  adverse to Chubb or Century, even when Century was a client

11  because Haynes and Boone is BSA's insurance coverage counsel

12  in connection with the restructuring.

13          Debtors argued that they would be severely

14  prejudiced if they could not retain Sidley because of the

15  extensive work at that Sidley performed in preparing for

16  these Chapter 11 cases and in representing BSA both, pre- and

17  post-petition in negotiations with all relevant

18  constituencies over the past 18 months.  Replacing Sidley

19  would not only delay the restructuring but impose additional

20  significant expense on BSA.

21          The impact of the COVID-19 pandemic has caused BSA

22  to close almost all of its 175 scout shops and BSA is facing

23  the potential cancellation or reduction of its programming at

24  its high-adventure facilities this summer.  These events have

25  or will cause a significant decrease in BSA revenue.

1          The starting point for a professional retention is

2   Section 327(a).  In BH&P, the Third Circuit states that

3   Section 327(a) creates a two-part test.  To be employed a

4   professional, one may not hold or represent an interest

5   adverse to the estate and, two, must be disinterested.

6          The purpose behind these requirements is to ensure

7   effective representing of the estate; in other words, it is

8   to ensure that the professional is able to act in the best

9   interests of the estate and can competently and vigorously

10  represent the trustee or debtor in possession.

11         This purpose is also consistent with

12  Section 327(c).  Subsection C provides that a professional is

13  not disqualified for employment solely because of such

14  person's representation of a creditor unless there is an

15  objection by another creditor or the United States Trustee

16  and there is an actual conflict of interest; again, the

17  concern embodied in Subsection C is that the estate be

18  adequately represented.

19         Section 327 does not seek to vindicate the rights

20  of nondebtor entities.  The Third Circuit cases interpreting

21  Section 327 bear out this perspective.  In BH&P, the Third

22  Circuit examined whether a single trustee could be appointed

23  to represent multiple related debtors and whether his counsel

24  could be approved under Section 327 to concurrently represent

25  related bankruptcy estates.

1          The Court did not find error in the Bankruptcy

2     Court's factual findings that the existence of current inter-

3     debtor disputes created an actual conflict of interest

4     because of a possibility that the professionals would favor

5     one estate over the other in their attempt to serve all of

6     them.

7          In _Pillowtex_, the Third Circuit examined whether a

8     professional against which a facially plausible claim of a

9     substantial preference exists, may hold an interest adverse

10    to the estate.  The Court recognized that if a transfer is

11    avoided, the professional will become a creditor of the

12    estate.

13         And in Marvel Entertainment, the Third Circuit

14    reversed the District Court and permitted the debtors'

15    retention of its chosen law firm over objection,

16    notwithstanding that prepetition, the firm represented a

17    major secured creditor of the estate.  The firm's

18    representation was on matters unrelated to the bankruptcy

19    case and the attorney-client relationship had been

20    consensually severed in anticipation of the firm's retention

21    in the bankruptcy case.

22         In each instance, the Court looked at the factual

23    scenario in front of it from the perspective of the estate.

24    Here, the only party objecting to Sidley's retention is

25    Century.  Neither the United States Trustee, nor another

1  creditor have objected to Sidley's retention, and the only

2  party arguing that Sidley cannot adequately represent the

3  estate is Century.

4           Under the circumstances, even assuming an actual

5  conflict, the first day disqualification rule of 327(c) does

6  not kick in and I am, in no way, convinced that Sidley,

7  generally, cannot effectively represent BSA.  This is not a

8  situation where the Court is concerned that proposed counsel

9  has a basis in favor of a nondebtor entity, such as a parent

10 or significant creditor.

11          Further, and important in the context of the

12 arguments made here, Section 327, including both

13 Subsections A and C, are written in the present tense.  As

14 Judge Walrath observed in, In re MUMA Services, Inc.,

15 Congress' use of a verb tense is significant in construing

16 statutes and Section 327 is phrased in the present tense.

17          Quoting from the Second Circuit's AroChem

18 decision, Judge Walrath agreed that:

19          "Counsel will be disqualified under Section 327(a)

20 only if it presently holds or represents an interest adverse

21 to the estate, notwithstanding any interests it may have held

22 or represented in the past."

23          So, Section 327's prohibition against representing

24 an adverse interest does not work to prohibit Sidley's

25 representation because of its previous representation of

1  Chubb.   Whether the attorney-client relationship ended, as

2  Sidley asserts, with its January 16, 2020, letter to Chubb or

3  as Century asserts, several days after the bankruptcy

4  petition was filed, is of no consequence.

5        For purposes of Section 327, the attorney-client

6  relationship has ended.  I note that Chubb has not cited any

7  case law to the contrary; therefore, I conclude that Sidley

8  meets the two-part test of Section 327 and that it does not

9  hold or represent an interest adverse to the estate and it is

10 disinterested.

11       Nonetheless, the Rules of Professional

12 Responsibility are not irrelevant to a retention application.

13 First, there are some decisions in which courts have denied

14 retention because of a professional's violation of its

15 ethical responsibilities that do not implicate Section 327.

16 Those courts generally rely on the Court's ability to monitor

17 the conducted of the attorneys practicing before it or note

18 an impact on the integrity of the bankruptcy process.

19       For example, in Universal Building Products, Judge

20 Walrath denied the committee's application to retain a law

21 firm that violated Professional Rules of Conduct in

22 soliciting committee members.

23       Second, Chubb argues that Sidley is not capable of

24 effectively representing the debtors, because whether Chubb

25 is a current client or a former client, Sidley cannot be

 1 adverse to Chubb in this bankruptcy case.  Chubb contends

 2 that insurance issues in a mass-tort case are so pervasive

 3 that Sidley's inability to be adverse to Chubb means that

 4 Sidley's retention cannot be approved; thus, a review of

 5 Rules 1.7 and 1.9 are necessary.

 6 Unlike Section 327 of the Bankruptcy Code,

 7 Rules 1.7 and 1.9 of the Model Rules of Professional

 8 Responsibility, address the attorney-client relationship.

 9 Rule 1.7 looks out for the interests of the client.  It

10 prevents an attorney from representing one current client

11 against another current client, absent a written waiver.

12 As the comments to Rule 1.7 make clear, a lawyer

13 may not act as an advocate in one matter against a person the

14 lawyer represents in some other matter, even when the matters

15 are wholly unrelated; thus, Rule 1.7 reflects the complete

16 and undivided loyalty an attorney owes to its client.  A

17 lawyer can never be adverse to a current client.

18 Rule 1.9 similarly looks out for the interests of

19 the client.  It provides that a lawyer cannot represent a

20 party against a former client in the same or a substantially

21 related matter in which that person's interests are

22 materially adverse to the interests of the former client.

23 The rule is designed to serve three purposes:  to

24 prevent even the potential that a former client's confidences

25 and secrets may be used against him, to maintain public

1   confidence in the integrity of the Bar, and to uphold the

2   duty of loyalty owed to a client.

3           To determine whether a substantial relationship

4   exists, courts generally look to three factors:  the nature

5   and scope of the prior representation, the nature and scope

6   of the current representation, and the possibility that the

7   former client disclosed confidences to his attorney in the

8   prior representation, which could be relevant to the current

9   action and used to the detriment of the former client in the

10  current action.

11          Simply put, the question is whether the attorney

12  learned things in the prior matter that would give the

13  lawyer's new client an advantage in the current matter.  In

14  assessing the nature of the action and the types of

15  information that might be disclosed to a lawyer in that

16  action, the former client need not disclose the privileged

17  information imparted; rather, the Court should make a

18  realistic appraisal of the possibility that confidences have

19  been disclosed which would be harmful to the client in the

20  other matter.

21          The testimony of Mr. Sneed, Ms. Russell, and

22  Mr. Schwartz address all three factors.  Mr. Sneed drew a

23  bright-line between reinsurance and the underlying claims for

24  which reinsurance was sought.  Mr. Sneed's testimony is that

25  his work on reinsurance matters is never adverse to the

1  insured on the underlying policy, here, BSA.  He testified

2  that a reinsurance dispute involved only a dispute on the

3  reinsurance contract between the seating insurer, here

4  Century, and the reinsurer, here Lloyds of London, and a

5  second reinsurer, and that matters related to the underlying

6  insurance claims are not implicated.

7         Mr. Sneed also testified that in the two BSA-

8  related reinsurance matters he was handling for Century, he

9  received a limited and extremely narrow set of documents.

10  The documents did not implicate the underlying claims, and

11  that the arbitration proceeding only included claims that

12  Century had already paid, not future claims.  Any declaratory

13  relief regarding future BSA claims in the reinsurance matter

14  was boilerplate.

15         Ms. Russell's testimony was directly to the

16  contrary.  She testified that although a reinsurance claim

17  does not involve the interpreting of the reinsurance -- I'm

18  sorry -- she testified that although a reinsurance claim does

19  involve the interpretation of the reinsurance contract, in

20  order to properly advise a client on reinsurance matters, a

21  lawyer must familiarize himself with the underlying claim.

22         She further testified that while Mr. Sneed

23  testified truthfully about the categories of documents he

24  received from Century in the BSA-related reinsurance matters,

25  he downplayed the significance of what he received.

1        She further testified that he did receive

2   information regarding the underlying insurance that Century

3   issued to BSA and that in the BSA-related reinsurance

4   matters, the relief sought included not only relief with

5   respect to claims already paid under the policy Century

6   issued to BSA but claims that BSA would make under the policy

7   in the future.

8        Ms. Russell further testified that those future

9   claims were significant assets of Chubb.

10       Finally, Ms. Russell testified that no decisions

11  had been made about how to approach the second Lloyd's

12  arbitration; rather, that was exactly what Chubb would be

13  discussing with counsel.

14       A review of the District Court decision regarding

15  the arbitration against Lloyds of London says that Sidley was

16  engaged to take over in October 2018, supports Ms. Russell's

17  testimony.  The District Court states that in the

18  arbitration, Century sought an award requiring Lloyd's to pay

19  all outstanding bills and requiring Lloyd's to pay any future

20  billings related to BSA-molestation claims.

21       Further, in its recitation of facts, the District

22  Court described the first-encounter agreement entered into

23  between BSA and Century in 1996, which set forth a

24  methodology for allocating molestation claims made against

25  BSA under the insurance policies issued by Century to BSA.

1          The Court then sets forth a portion of the final

2   award entered in the reinsurance arbitration as follows:

3          "Century has not demonstrated that the first-

4   encounter agreement that is entered into with BSA is the

5   product of a reasonable and business-like investigation.

6   Accordingly, underwriters are not bound to follow the first-

7   encounter agreement and, thus, Century's billings for sexual

8   molestation claims submitted in this matter under the

9   reinsurance contracts are not covered by those treaties."

10         The District Court's description of the

11  reinsurance matter showed that it did not involve only the

12  reinsurance contract; it also involved an agreement between

13  BSA and Century, the first-encounter agreement.  The first-

14  encounter agreement has already been the subject of testimony

15  in this court in the hearing on BSA's motion for preliminary

16  injunction, with respect to the abuse-victims' lawsuits.

17         Further, the evidence shows that in the BSA

18  coverage action brought against Century in Texas, BSA

19  propounded discovery to Century, seeking all documents and

20  communications between Century and its reinsurers, involving

21  sexual abuse claims against BSA, including a connection with

22  Century's arbitration against Lloyd's, described in the

23  District Court opinion.  Century's response to the discovery

24  was that it was not relevant to the coverage action;

25  accordingly, there is a disagreement on relevancy.

1        Based on the record before me, I conclude that the

2   reinsurance litigation could be substantially related to at

3   least some aspects of Boy Scouts' bankruptcy case for

4   purposes of Rule 1.9.  Specifically, I find that Sidley

5   received from Century, information relevant to the BSA

6   bankruptcy, but it has left clear exactly how that

7   information could be used to Century's detriment in the

8   bankruptcy case.

9        Sidley, however, contends that it is not

10  representing BSA on any aspect of the bankruptcy case that

11  could be an issue.  The question becomes, therefore, whether,

12  as Sidley contends, conflict counsel solves any ills here.

13       Conflicts counsel is often used by debtors when

14  their main restructuring counsel cannot be adverse to a

15  particular party in a bankruptcy case.  As noted by both

16  Professor Rapoport in her declaration and by courts

17  struggling with retention issues, mega-bankruptcies compose

18  retention issues for debtors.

19       Here, from the outset, and as reflected in

20  Sidley's engagement letter with BSA, Sidley carved out from

21  its engagement, any advice on insurance-coverage issues.  The

22  evidence is unrefuted that Haynes and Boone have taken the

23  lead on all coverage-related matters.  It is the firm charged

24  with both, analyzing BSA's insurance policies and negotiating

25  with its insurers.

1         And Haynes and Boone drafted the portions of BSA's

2   placeholder plan of reorganization pertaining to insurance

3   neutrality.  Haynes and Boone was involved from the outset of

4   the restructuring negotiations and initiated substantive

5   discussions with BSA's insurers, including Century.

6         Further, both Mr. Sneed and Ms. Boelter testified

7   that there have been no substantive discussions between

8   Sidley's reinsurance group and BSA's restructuring team.

9   Mr. Sneed has not passed on any information he received in

10  the course of his representation of Century in the

11  reinsurance matters and an ethical screen has been in place

12  since November 4, 2019.

13        While a retroactive ethical screen may not work

14  for purposes of violation of the Rules of Professional

15  Conduct, based on the unrefuted testimony, I conclude that

16  any confidential or privileged information that Mr. Sneed

17  received in his representation of Century in its reinsurance

18  matters have not and will not be passed along to Sidley's

19  restructuring team.  I do not find this surprising, given the

20  nature of large firms and specialized departments.

21        Also, one of Ms. Russell's primary concerns

22  appears to be that the bankruptcy, itself, could hurt Century

23  in its reinsurance collection.  As Ms. Russell put it,

24  Certain things that could be said in the bankruptcy action by

25  Sidley could harm us in our reinsurance collection and our

1  seated assets, our reinsurance collections, are an important

2  asset to Chubb, and that we could be harmed in that

3  collection by things Sidley would say.

4  This is also consistent with the position taken by

5  Century's counsel in argument that even if Sidley had not

6  taken on the two BSA-related reinsurance engagements, Sidley

7  would still be prohibited from representing BSA in this

8  bankruptcy case.

9  It may be that certain legal positions taken in

10  the bankruptcy case regarding the BSA-Century insurance

11  policies could be harmful to Century's efforts to collect on

12  its insurance.  I make no conclusions on that.

13  But if that is the case, that is a function of the

14  Bankruptcy Code and law and not any information learned by

15  Sidley in the reinsurance litigation; accordingly, I conclude

16  that Sidley may continue to represent BSA generally in this

17  bankruptcy case.

18  That decision is consistent with the numerous

19  cases cited to me addressing disqualification of counsel in

20  the context of conflicts of interest with current or former

21  clients.  Disqualification is never automatic.

22  Indeed, I was surprised with the overwhelming body

23  of case law, including in this district, in which courts deny

24  disqualification motions in the face of what appear to be

25  obvious conflicts.  In doing so, courts consider the facts

1 and circumstances of each case and are particularly mindful

2 of a party's right to counsel of its choice.

3          Courts also consider the prejudice that could

4 inure to a client if it is required to obtain new counsel.

5 Here, once again, the testimony was unrefuted.

6 Mr. Whittman's declaration described the significant

7 prejudice that would befall BSA if it is forced to replace

8 Sidley, which has been working with BSA for almost 18 months.

9          Having concluded that Sidley may remain BSA's

10 restructuring counsel, Haynes and Boone must handle all

11 matters adverse to Century that address the substantive

12 treatment of BSA's insurance policies with Century, claims

13 thereunder, proceeds therefrom, or that otherwise implicate

14 insurance coverage.  This is consistent with the self-imposed

15 restriction in Sidley's engagement letter with BSA that does

16 not permit Sidley to work on coverage matters.

17          I believe that conflicts counsel can work here,

18 given Haynes and Boone's involvement with the restructuring

19 since its inception.  Both Sidley and Haynes and Boone will

20 need to continue to be tuned in to their respective scope of

21 work.

22          Permitting Sidley to continue to work on the BSA

23 bankruptcy case does not leave Chubb without further

24 remedies.  As I already stated, the 2015 service-level

25 agreement contains an arbitration provision and Chubb is

1   invoking it.  Violations of the Professional Rules of Conduct

2   will be addressed in that forum, which was Chubb's chosen

3   forum for Sidley's breach of the terms of engagement.

4           In all of this, I am comfortable that no

5   privileged information that Sidley obtained in its work for

6   Century, can or will be used in this bankruptcy case in any

7   way.

8           Chubb contends that my approval of Sidley's

9   retention will encourage law firms to impermissibly drop

10  clients in order to take on more lucrative bankruptcy cases.

11          Perhaps I should be more cynical, but I still

12  believe the law is a profession and persons take their

13  professional obligations seriously.  I do not think any law

14  firm wants to become embroiled in disqualification motions or

15  in arbitrations or lawsuits with their clients or former

16  clients.

17          Finally, I note three more items.  First, Century

18  objected to Sidley's Rule 2014 disclosure of its connections.

19  Having reviewed the disclosures, I find them sufficient.

20          Paragraph 22 of Ms. Boelter's declaration

21  specifically addresses Chubb and Century.  While Chubb

22  quarrels with the characterization of the representation, it

23  accurately reflects Sidley's view of the representation and

24  provides parties and the Court with enough information to ask

25  questions.

1          Second, in its prehearing submission and in the

2   testimony adduced at the hearing, Sidley spent significant

3   time arguing and adducing evidence to support its position

4   that Chubb knew of Sidley's representation of BSA in December

5   of 2018 and that its delay in taking any action regarding the

6   alleged conflict was either tactical or constitutes a waiver.

7          At argument, however, Sidley abandoned any

8   argument that Chubb's pre-bankruptcy conduct constituted a

9   waiver and, instead, argued that Chubb waited too long post-

10  bankruptcy filing to raise the matter.

11         While Chubb could have been more proactive once

12  the bankruptcy case was filed, it filed a timely objection to

13  Sidley's retention.  Having heard the evidence, I do not find

14  that Chubb's actions or lack thereof post-petition amount to

15  a waiver of its position.

16         Third, each side objected to the admission into

17  evidence of the declaration of the other's expert and/or the

18  consideration of his or her respective testimony.  I took the

19  objections under advisement.

20         I overrule both objections, but quite frankly find

21  that neither opinion aided my consideration.  This was

22  through no fault of the respective experts; both were

23  hamstrung by the assumptions they were asked to make and the

24  limited facts they were provided.  I appreciate their time

25  and would have liked to hear their respective views on the

1 issues I struggled with in coming to my conclusions;

2 unfortunately, I don't get to frame the questions they opine

3 on, and that concludes my ruling.

4          As I said, I will clean this up a bit and it will

5 be on the docket so that parties have it and can do whatever

6 they choose to do with it and I will enter the form of

7 order -- I need to go back and look at it -- but I assume I

8 will enter the form of order accompanying the application to

9 retain Sidley.

10          Okay.  So, Mr. Abbott, I assume that we have

11 concluded the matters on today's agenda?

12          MR. ABBOTT:  We have, Your Honor.

13          Thank you for your time, Your Honor.  Obviously,

14 upon reflection on that order, the Court has any questions,

15 we stand ready to respond to them as appropriate, Your Honor.

16          THE COURT:  Yes.  I will, I think, take a look at

17 it today.  I did have an emergency filing this morning, so I

18 have to look at that first, but we will get it on the docket.

19          If I have any questions, I will reach out.

20          MR. ABBOTT:  Thank you, Your Honor.

21          THE COURT:  Thank you very much, counsel.

22          We are adjourned.

23          COUNSEL:  Thank you, Your Honor.

24      (Proceedings concluded at 12:56 p.m.)

25

1                          CERTIFICATE

2

3        We, MARY ZAJACZKOWSKI and WILLIAM GARLING, certify that

4   the foregoing is a correct transcript from the electronic

5   sound recording of the proceedings in the above-entitled

6   matter.

7
    /s/Mary Zajaczkowski              June 1, 2020
8   Mary Zajaczkowski, CET**D-531

9
    /s/William J. Garling             June 1, 2020
10  William J. Garling, CE/T 543

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25