## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BOY SCOUTS OF AMERICA AND | ) | Case No. 20-10343 (LSS) |
| DELAWARE BSA, LLC, | ) | |
| | ) | Jointly Administered |
| Debtor. | ) | |
| | ) | **Re: Docket No. 204** |

## BENCH RULING DELIVERED MAY 29, 2020
## ON DEBTORS' APPLICATION TO RETAIN SIDLEY AUSTIN LLP AS
## ATTORNEYS FOR THE DEBTORS AND DEBTORS IN POSSESSION

This is my ruling on Debtors' application to retain Sidley Austin as their restructuring counsel under section 327(a) of the Bankruptcy Code. The sole objection to Sidley's retention was filed by Century Indemnity Company, a subsidiary of Chubb, and one of Debtors' many insurers. I held an evidentiary hearing on May 4, entertained argument on May 6 and took the matter under advisement.

**Facts**

While the witness testimony reflects vastly different views of the dealings between Century and Sidley, based on the record before me, the following facts are largely undisputed, but in any event, I find that:

- Chubb is a longtime client of Sidley's Insurance and Financial Services Group. Over the years, Sidley represented Chubb and/or its predecessors and subsidiaries on various reinsurance matters, including both specific arbitration proceedings and general counseling matters.
- On October 5, 2018, Century retained Sidley in connection with Century's efforts to obtain reinsurance from Lloyd's of London for claims Century paid or in the future would pay to BSA under insurance policies Century issued to BSA. Sidley was brought on to review the work of previous counsel which had resulted in an arbitration award adverse to Century. That arbitration proceeding is the subject of a

decision of the United States District Court for the District of Massachusetts styled *Certain Underwriters at Lloyd's, London v. Century Indemnity Company* and found at 2020 WL 1083360.

- In August, 2019, Century again retained Sidley in connection with Century's efforts to obtain reinsurance from another insurer for claims Century paid or in the future would pay to BSA under insurance policies Century issued to BSA.
- At substantially the same time that Sidley took on its first BSA-specific engagement for Century, Sidley's restructuring group was hired by BSA to render restructuring planning, advice and implementation.
- At no time did Sidley obtain from Century a waiver of any conflict with respect to its concurrent representation of Century in reinsurance matters and BSA in restructuring matters.
- On January 16, 2020, Sidley wrote Chubb stating its intention to withdraw from all of its pending representations of Century and Chubb and set out a timeframe and methodology for that process. The last action taken to withdraw from any Chubb matter was either on February 20 or 24, 2020.
- In the meantime, BSA filed its bankruptcy petition on February 18, 2020.
- Century's insurance policies with BSA are assets of the BSA bankruptcy estate. Those policies include the same underlying Century/BSA insurance policies for which Century sought to collect reinsurance from Lloyds and the second reinsurer.
- The operative agreement between Sidley and Century with respect to the Sidley engagement on reinsurance matters is a 2015 Service Level Agreement. Generally, Chubb's service level agreement is Chubb's standard agreement by which it engages counsel. Chubb has chosen not to negotiate separate engagement letters with each law firm it engages.
- The 2015 Service Level Agreement with Sidley provides that if Century and Sidley are unable to resolve any dispute with respect to a matter handled by the law firm, the sole means for redressing that dispute shall be an arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules. Century is pursuing this remedy.

**Parties' Positions**

Century argues that Sidley's retention application cannot be granted because Sidley does not meet the standard of section 327 as Sidley's representation would violate Rule 1.7 of the Rules of Professional Responsibility in that Sidley would be representing one current client—BSA—against another current client—Century.

2

Sidley argues that Rule 1.7 is not relevant to its retention. It argues that Century is a former client, not a current client, and that under Rule 1.9 of the Rules of Professional Responsibility, Sidley does not need a waiver from Century because Sidley's representation of BSA in its restructuring is not substantially related to its previous representation of Century in reinsurance matters. It further argues that it does not hold or represent any interest adverse to the BSA estate and is disinterested. Finally, Sidley argues that Sidley was never adverse to Chubb/Century even when Century was a client because Haynes and Boone is BSA's insurance coverage counsel in connection with the restructuring.

Debtors argue that they will be severely prejudiced if they cannot retain Sidley because of the extensive work that Sidley performed in preparing BSA for these chapter 11 cases and in representing BSA both pre- and post-petition in negotiations with all relevant constituencies over the past 18 months. Replacing Sidley would not only delay the restructuring, but impose additional significant expense on BSA. The impact of the covid-19 pandemic has caused BSA to close almost all of its 175 Scout Shops and BSA is facing the potential cancellation or reduction of its programming at its high adventure facilities this summer. These events have or will cause a significant decrease in BSA revenue.

**Discussion**

### A. Section 327

The starting point for a professional retention is section 327(a). In *BH&P*,[1] the Third Circuit states that § 327(a) creates a two-part test. To be employed, a professional (i) may not hold or represent an interest adverse to the estate and (ii) must be disinterested. The

---

[1] *In re BH & P, Inc.*, 949 F.2d 1300 (3d Cir. 1991) (addressing a professional's concurrent representation of related bankruptcy estates).

purpose behind these requirements is to ensure effective representation of the estate; in other words, it is to ensure that the professional is able to act in the best interest of the estate and can competently and vigorously represent the trustee or debtor-in-possession.

This purpose is also consistent with subsection 327(c). Subsection (c) provides that a professional is not disqualified for employment solely because of such person's representation of a creditor unless there is an objection by another creditor or the UST and there is an actual conflict of interest. Again, the concern embodied in subsection (c) is that the estate be adequately represented.

Section 327 does not seek to vindicate the rights of non-debtor entities. The Third Circuit cases interpreting section 327 bear out this perspective. In *BH&P*, the Third Circuit examined whether a single trustee could be appointed to represent multiple related debtors and whether his counsel could be approved under section 327 to concurrently represent related bankruptcy estates. The Court did not find error in the bankruptcy court's factual findings that the existence of current inter-debtor disputes created an actual conflict of interest because of "the possibility that [the professionals] would favor one estate over the other in their attempt to serve all of them." In *Pillowtex*, the Third Circuit examined whether a professional against which a "facially plausible claim of a substantial preference" exists may hold an interest adverse to the estate. The Court recognized that if a transfer is avoided, the professional will become a creditor of the estate.[2] And, in *Marvel Entertainment*, the Third Circuit reversed the district court, and permitted the debtor's retention of its chosen law firm over objection notwithstanding that prepetition the firm represented a

---

[2] *In re Pillowtex, Inc.*, 304 F.3d 246, 255 (3d Cir. 2002).

major secured creditor of the estate; the firm's representation was on matters unrelated to the bankruptcy case, and the attorney client relationship had been consensually severed in anticipation of the firm's retention in the bankruptcy case.[3] In each instance, the Court looked at the factual scenario in front of it from the perspective of the estate.

Here, the only party objecting to Sidley's retention is Century. Neither the UST nor another creditor has objected to Sidley's retention and the only party arguing that Sidley cannot adequately represent the estate is Century. Under these circumstances, even assuming an actual conflict, the per se disqualification rule of section 327(c) does not kick in. And, I am in no way convinced that Sidley generally cannot effectively represent BSA. This is not a situation where the court is concerned that proposed counsel has a bias in favor of a non-debtor entity such as a parent or significant creditor.

Further, and important in the context of the arguments made here, section 327 (including both subsections (a) and (c)) are written in the present tense. As Judge Walrath observed in *In Re Muma Services, Inc.*, Congress' use of a verb tense is significant in construing statutes, and section 327 is phrased in the present tense.[4] Quoting from the Second Circuit's *AroChem* decision, Judge Walrath agreed that "counsel will be disqualified under § 327(a) only if it **presently** 'holds or represents an interest adverse to the estate,' notwithstanding any interests it may have held or represented in the past."[5] So, section

---

[3] *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 477 (3d Cir. 1998).

[4] *In re Muma Servs., Inc.*, 286 B.R. 583, 591 (Bankr. D. Del. 2002) (citing *United States v. Wilson*, 503 U.S. 329, 333 (1992).

[5] *Muma* at 591 quoting *Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610, 623 (2d Cir. 1999); 11 U.S.C. § 101(14)(B) (emphasis added).
  The term 'disinterested person' means a person that—
    (A) is not a creditor, an equity security holder, or an insider;

327's prohibition against representing an adverse interest does not work to prohibit Sidley's retention because of its previous representation of Chubb. Whether the attorney-client relationship ended as Sidley asserts with its January 16, 2020 letter to Chubb, or as Century asserts several days after the bankruptcy petition was filed is of no consequence. For purposes of section 327, the attorney-client relationship has ended. I note that Chubb has not cited any case law to the contrary. Therefore, I conclude that Sidley meets the two-part test of section 327 in that it does not hold or represent an interest adverse to the estate and it is disinterested.

Nonetheless, the Rules of Professional Responsibility are not irrelevant to a retention application. First, there are some decisions in which courts have denied retention because of a professional's violation of its ethical responsibilities that do not implicate section 327. These courts generally rely on the court's ability to monitor the conduct of the attorneys practicing before it or note an impact on the integrity of the bankruptcy process. For example, in *Universal Building Products*,[6] Judge Walrath denied the committee's application to retain a law firm that violated professional rules of conduct in soliciting committee members. Second, Chubb argues that Sidley is not capable of effectively representing the debtors because whether Chubb is a current client or a former client, Sidley cannot be adverse to Chubb in this bankruptcy case. Chubb contends that insurance issues in a mass

---

(B) is not **and was not**, withing 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and

(C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or *for any other reason*.

[6] *In re Universal Building Products*, 486 B.R. 650 (Bankr. D. Del. 2010) (denying retention application in part because of violations of Rules 7.3 and 8.4 of the Model Rules of Professional Conduct).

tort case are so pervasive that Sidley's inability to be adverse to Chubb means Sidley's retention cannot be approved. Thus, a review of Rules 1.7 and 1.9 are necessary.

### B. *The Model Rules of Professional Conduct of the American Bar Association*

Unlike section 327 of the Bankruptcy Code, Rules 1.7 and 1.9 of the Model Rules of Professional Responsibility address the attorney-client relationship.

Rule 1.7 looks out for the interest of the client. It prevents an attorney from representing one current client against another current client absent a written waiver. As the comments to Rule 1.7 make clear "a lawyer may not act as an advocate in one matter against a person the lawyer represents in some other matter, even when the matters are wholly unrelated."[7] Thus, Rule 1.7 reflects the complete and undivided loyalty an attorney owes to its client: a lawyer can never be adverse to a current client.

Rule 1.9 similarly looks out for the interest of the client. It provides that a lawyer cannot represent a party against a former client in the "same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client." The rule is designed to serve three purposes: (i) to prevent even the potential that a former client's confidences and secrets may be used against him; (ii) to maintain public confidence in the integrity of the bar; and (iii) to uphold the duty of loyalty owed to a client.[8]

---

[7] Model Rules of Prof'l Conduct R. 1.7 cmt. 6 (2019).
[8] *Golden Guernsey Dairy, LLC*, 2015 WL 3669932, at *4 (Bankr. D. Del. June 12, 2015) (citing *In re Corn Derivatives Antitrust Derivatives Litig.*, 748 F.2d 157, 162 (3d Cir. 1984)).

To determine whether a "substantial relationship" exists, courts generally look to three factors: (i) the nature and scope of the prior representation, (ii) the nature and scope of the current representation; and (iii) the possibility that the former client disclosed confidences to his attorney in the prior representation which could be relevant to the current action and used to the detriment of the former client in the current action.[9]  Simply put, the question is whether the attorney learned things in the prior matter that would give the lawyer's new client an advantage in the current matter.  In assessing the nature of the action and the types of information that might be disclosed to a lawyer in that action, the former client need not disclose the privileged information imparted.  Rather, the court should make a realistic appraisal of the possibility that confidences have been disclosed which would be harmful to the client in the other matter.[10]

The testimony of Mr. Sneed, Ms. Russell and Mr. Schwartz addressed all three factors.  Mr. Sneed drew a bright line between reinsurance and the underlying claims for which reinsurance is sought.  Mr. Sneed's testimony is that his work on reinsurance matters is never adverse to the insured on the underlying policy (here, BSA).  He testified that a reinsurance dispute involves only a dispute on the reinsurance contract between the ceding insurer (here, Century) and the reinsurer (here, Lloyds of London and a second reinsurer) and that matters related to the underlying insurance claims are not implicated.  Mr. Sneed also testified that in the two BSA-related reinsurance matters he was handling for Century he received a

---

[9] *Talecris Biotherapeutics, Inc. v. Baxter Healthcare LLC*, 491 F.Supp. 2d 510, 514 (D. Del. 2007).
[10] *Golden Guernsey*, 2015 WL 3669932, at *4.

limited and extremely narrow set of documents, the documents did not implicate the underlying claims and that the arbitration proceeding only included claims that Century had already paid, not future claims. Any declaratory relief regarding future BSA claims in the reinsurance matter was boilerplate.

Ms. Russell's testimony was directly to the contrary. She testified that although a reinsurance claim does involve the interpretation of the reinsurance contact, in order to properly advise a client on reinsurance matters, a lawyer must familiarize himself with the underlying claims. She further testified that while Mr. Sneed testified truthfully about the categories of documents he received from Century in the BSA-related reinsurance matters, he downplayed the significance of what he received. She further testified that he did receive information regarding the underlying insurance that Century issued to BSA. And, that in the BSA-related reinsurance matters, the relief sought included not only relief with respect to claims already paid under the policy Century issued to BSA, but claims that BSA would make under the policy in the future. Ms. Russell further testified that those future claims were significant assets of Chubb. Finally, Ms. Russell testified that no decisions had been made about how to approach the second Lloyd's arbitration, rather that was exactly what Chubb would be discussing with counsel.

A review of the District Court's decision[11] regarding the arbitration against Lloyds of London that Sidley was engaged to take over in October 2018 supports Ms. Russell's testimony. The District Court states that in the arbitration Century sought an award requiring Lloyds to pay all outstanding bills and requiring Lloyd's to pay any future billings

---

[11] *Certain Underwriters at Lloyd's, London v. Century Indemnity Company*, 2020 WL 1083360 (D. Mass. Mar. 6, 2020).

related to BSA molestation claims. Further, in its recitation of facts, the District Court

describes the First Encounter Agreement entered into between BSA and Century in 1996

which sets forth a methodology for allocating molestation claims made against BSA under

the insurance policies issued by Century to BSA. The Court then sets forth a portion of the

Final Award entered in the reinsurance arbitration, as follows:

> Century has not demonstrated that the **First Encounter Agreement** ("FEA")
> that it entered into with BSA is the product of a reasonable and business-like
> investigation. Accordingly, Underwriters are not bound to follow the FEA.
> And thus, Century's Billings for sexual molestation claims submitted in this
> matter under [the Reinsurance Contracts] are not covered by those treaties.[12]

The District Court's description of the reinsurance matter shows that it did not involve only

the reinsurance contract. It also involved an agreement between BSA and Century—the

First Encounter Agreement. The First Encounter Agreement has already been the subject of

testimony in this court in connection with the BSA's motion for preliminary injunction with

respect to the abuse victims' lawsuits.

Further, the evidence shows that in the BSA coverage action brought against

Century in Texas, BSA propounded discovery to Century seeking all documents and

communications between Century and its reinsurers involving sexual abuse claims against

BSA, including in connection with Century's arbitration against Lloyds described in the

District Court opinion. Century's response to the discovery was that it was not relevant to

the coverage action. Accordingly, there is a disagreement on relevancy.

Based on the record before me, I conclude that the reinsurance litigation could be

"substantially related" to at least some aspects of Boy Scout's bankruptcy case for purposes

of Rule 1.9. Specifically, I find that Sidley received from Century information relevant to

---

[12] *Id.* at *2.

the BSA bankruptcy, but it is less clear exactly how that information could be used to Century's detriment in the bankruptcy case.

Sidley, however, contends that it is not representing BSA on any aspect of the bankruptcy case that could be an issue. The question becomes therefore whether, as Sidley contends, conflicts counsel solves any ills here.

### C.  Conflicts Counsel

Conflicts counsel is often used by debtors when their main restructuring counsel cannot be adverse to a particular party in a bankruptcy case. As noted by both Professor Rapoport in her declaration and by courts struggling with retention issues, mega bankruptcies can pose retention issues for debtors.

Here, from the outset and as reflected in Sidley's engagement letter with BSA, Sidley carved out from its engagement any advice on insurance coverage issues. The evidence is unrefuted that Haynes & Boone has taken the lead on all coverage-related matters, is the firm charged with both analyzing BSA's insurance policies and negotiating with its insurers. And, Haynes & Boone drafted the portions of BSA's placeholder plan of reorganization pertaining to insurance neutrality. Haynes & Boone was involved from the outset of the restructuring negotiations and initiated substantive discussions with BSA's insurers, including Century.

Further, both Mr. Sneed and Ms. Boelter testified that there have been no substantive discussions between Sidley's reinsurance group and BSA's restructuring team. Mr. Sneed has not passed on any information he received in the course of his representation of Century in the reinsurance matters. And, an ethical screen has been in place since November 4,

2019.  While a retroactive ethical screen may not work for purposes of violations of the
Rules of Professional Conduct, based on the unrefuted testimony, I conclude that any
confidential or privileged information that Mr. Sneed received in his representation of
Century in its reinsurance matters has not and will not be passed along to Sidley's
restructuring team.  I do not find this surprising given the nature of large firms with
specialized departments.

Also, one of Ms. Russell's primary concerns appears to be that the bankruptcy itself
could hurt Century in its reinsurance collections.  As Ms. Russell put it: "certain things that
could be said in the bankruptcy action by Sidley could harm us in our reinsurance
[collection] . . . and our [ceded] asset, our reinsurance collections are an important asset to
Chubb and that we could be harmed in that collection by things Sidley would say."[13]  This is
also consistent with the position taken by Century's counsel in argument that even if Sidley
had not taken on the two BSA-related reinsurance engagements, Sidley would still be
prohibited from representing BSA in this bankruptcy case.

It may be that certain legal positions taken in the bankruptcy case regarding the
BSA/Century insurance policies could be harmful to Century's efforts to collect on its
insurance—I make no conclusions on that.  But, if that is the case, that is a function of the
Bankruptcy Code and law, and not any information learned by Sidley in the reinsurance
litigation.

Accordingly, I conclude that Sidley may continue to represent BSA generally in this
bankruptcy case.

---

[13] Retention Hr'g Tr. 147:11-148:5, May 4, 2020, D.I. 572.

This decision is consistent with the numerous cases cited to me addressing

disqualification of counsel in the context of conflicts of interest with current or former

clients. Disqualification is never automatic.[14] Indeed, I was surprised with the

overwhelmingly body of caselaw (including in this district) in which courts deny

disqualification motions in the face of what appear to be obvious conflicts.[15] In doing so,

courts consider the facts and circumstances of each case and are particularly mindful of a

party's right to counsel of its choice.[16] Courts also consider the prejudice that could inure to

a client if it is required to obtain new counsel.[17]

---

[14] *Golden Guernsey,* 2015 WL 3669932, at *2 ("Although disqualification ordinarily is the result of a finding that a disciplinary rule prohibits an attorney's appearance in a case, disqualification never is automatic." (quoting *United States v. Miller,* 624 F.2d 1198, 1201 (3d Cir. 1980))); *Elonex I.P. Holdings, Ltd. v. Apple Computer, Inc.,* 142 F.Supp.2d 579, 583 (D. Del. 2001) ("Although disqualification is ordinarily the result of a finding that an ethical rule has been violated, disqualification is never automatic.").

[15] *Apple Computer, Inc.,* 142 F.Supp.2d at 583 ("Even if the court were to find that there was no waiver and that [conflicted counsel] has violated Rule 1.7(a), disqualification is not warranted in this case. As the court has already stated, disqualification is a severe sanction."); *Boston Scientific Corp. v. Johnson & Johnson Inc.,* 647 F.Supp.2d 369 (D. Del. 2009) (finding a violation of Rule 1.7, but denying disqualification motion); *End of Road Trust v. Terex Corporation,* 2002 WL 242464 (D. Del. 2002); *TQ DELTA, LLC, Plaintiff; v. 2WIRE, INC.,* 2016 WL 5402180, at *6-7 (D. Del. 2016) (finding violation of Rule 1.9, but denying disqualification motion). *See Airgas, Inc. v. Cravath, Swaine & Moore LLP,* 2010 WL 3046586 at *2 n.3 (E.D. Pa. Aug. 3, 2010) (recognizing that Delaware Chancery Court determined it need not resolve question of whether law firm breached its ethical obligations in denying disqualification motion). *But see Intellectual Ventures I LLC v. Checkpoint Software Technologies,* 2011 WL 2692968, at *15 (D. Del. 2011).

[16] *TQ DELTA, LLC,* 2016 WL 5402180, at *6-7 ("[S]ome of the factors weighed by courts in the Third Circuit: attorney loyalty, prejudice to parties, protection of the integrity of the judicial process, geography, timing of disqualification motion, duration of prior representation, delay, stage of proceedings, whether confidential information from the prior representation had passed to the client, cost to obtain new counsel, complexity of the case, size of the firm, nature and degree of prior involvement, and whether there was any ulterior motive for filing the motion to disqualify. . . . I am cognizant of the need to balance 'the sacrosanct privacy of the attorney-client relationship (and the professional integrity implicated by that relationship) and the prerogative of a party to proceed with counsel of its choice.'" (citation omitted)).

[17] *Apple Computer, Inc.,* 142 F.Supp.2d at 584 ("Also, in light of [conflicted counsel's] knowledge of the case, it is certain that [client] will be prejudiced if it has to retain new counsel. There is no doubt that it will be both inefficient and costly for [client] to get new counsel up to speed in this matter.").

Here, once again, the testimony was unrefuted. Mr. Whittman's declaration describes the significant prejudice that would befall BSA if it is forced to replace Sidley, which has been working with BSA for almost 18 months.

Having concluded that Sidley may remain BSA's restructuring counsel, Haynes and Boone must handle all matters adverse to Century that address the substantive treatment of BSA's insurance policies with Century, claims thereunder, proceeds therefrom or that otherwise implicate insurance coverage. This is consistent with the self-imposed restriction in Sidley's engagement letter with BSA that does not permit Sidley to work on coverage matters. I believe that conflicts counsel can work here given Haynes & Boone's involvement with the restructuring since its inception. Both Sidley and Haynes & Boone will need to continue to be tuned in to their respective scope of work.

Permitting Sidley to continue to work on the BSA bankruptcy case does not leave Chubb without further remedies. As already stated, the 2015 Service Level Agreement contains an arbitration provision and Chubb is invoking it. Violations of the professional rules of conduct will be addressed in that forum, which was Chubb's chosen forum for Sidley's breach of the terms of engagement.

In all events, I am comfortable that no privileged information that Sidley obtained in its work for Century can or will be used in this bankruptcy case in any way.

Chubb contends that my approval of Sidley's retention will encourage law firms to impermissibly drop clients in order to take on more lucrative bankruptcy cases. Perhaps I should be more cynical, but I still believe the law is a profession and persons take their

14

professional obligations seriously. I do not think any law firm wants to become embroiled in disqualification motions or in arbitrations or lawsuits with their clients or former clients.

### D. *Three Final Items*

Finally, I note three more items.

#### i. *Disclosures*

First, Century objected to Sidley's Rule 2014 disclosure of its connections. Having reviewed the disclosures, I find them sufficient. Paragraph 22 of Ms. Boelter's declaration specifically addresses Chubb and Century. While Chubb quarrels with the characterization of the representation, it accurately reflects Sidley's view of the representation and provides parties and the court with enough information to ask questions.

#### ii. *Waiver/Tactical Use of Objection to Retention*

Second, in its pre-hearing submission and in the testimony adduced at the hearing, Sidley spent significant time arguing and adducing evidence to support its position that Chubb knew of Sidley's representation of BSA in December, 2018 and that its delay in taking any action regarding the alleged conflict was either tactical or constitutes a waiver. At argument, however, Sidley abandoned any argument that Chubb's pre-bankruptcy conduct constituted a waiver, and instead argued that Chubb waited too long post-bankruptcy filing to raise the matter. While Chubb could have been more proactive once the bankruptcy case was filed, it filed a timely objection to Sidley's retention. Having heard the evidence, I do not find that Chubb's actions, or lack thereof, postpetition, amount to a waiver of its position.

*iii.    Expert Opinions*

Third, each side objected to the admission into evidence of the declaration of the other's expert and/or the consideration of his/her respective testimony. I took the objections under advisement. I overrule both objections, but quite frankly find that neither opinion aided my consideration. This was through no fault of the respective experts. Both were hamstrung by the assumptions they were asked to make and the limited facts they were provided. I appreciate their time and would have liked to hear their respective views on the issues I struggled with it coming to my conclusion. Unfortunately, I don't get to frame the questions they opine on.

Dated:  June 2, 2020

Laurie Selber Silverstein
United States Bankruptcy Judge