# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>                Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>Jointly Administered<br><br>**Ref. Docket No. 17, 617, 648, & 650** |

### MEMORANDUM IN SUPPORT OF HARTFORD'S OBJECTION TO CERTAIN MEDIATORS THAT DEBTORS NOMINATED AND IN FURTHER SUPPORT OF LIMITED OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPOINTING A JUDICIAL MEDIATOR, (II) REFERRING CERTAIN MATTERS TO MANDATORY MEDIATION, AND (III) GRANTING RELATED RELIEF

Hartford Accident and Indemnity Company, First State Insurance Company and Twin City Fire Insurance Company (collectively, "Hartford") respectfully submit this supplemental memorandum in support of Hartford's limited objection to *Debtors' Motion for Entry of an Order (I) Appointing a Judicial Mediator, (II) Referring Certain Matters to Mandatory Mediation, and (III) Granting Related Relief* [D.I. 17] ("Motion") and to object to two of the individuals that Debtors have nominated to serve as mediators in this case -- Eric Green and Paul Finn.[2] The Rule 2014 disclosures that the Court ordered all candidates to submit have confirmed that Mr. Green and Mr. Finn have deep ties to the parties, attorneys and claims at issue in this case. The Court cannot conclude that they are free from bias or impartiality in this case and, indeed, any reasonably objective observer would conclude just the opposite. The other mediator candidates have

---

[1]     The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Lane, Irving, Texas 75038.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

1

tremendous experience with issues at the heart of this case and do not have the entanglements that Messrs. Green and Finn present. Accordingly, the Court should decline to appoint Mr. Green and Mr. Finn.[3]

## PRELIMINARY STATEMENT

### A. Debtors Try to Ram Through the Appointment of Messrs. Green and Finn.

1. For nearly two months following the petition date, Debtors ignored Hartford's request to participate in discussions regarding identifying an appropriate mediator. It is now apparent that, at the same time they were ignoring requests to participate from Hartford and BSA's other insurers, Debtors were deep in discussions with other parties concerning their favored candidates to mediate this case.

2. On April 13, 2020, when Debtors first provided Hartford with a proposed order identifying Messrs. Green and Finn as mediators, Hartford (and others) requested that Debtors consider alternative candidates. Other than recognizing an artificially limited role for Mr. Gallagher, Debtors have steadfastly refused to do so.

3. Indeed, Debtors have resisted providing information that might be relevant to whether Mr. Green and/or Mr. Finn should serve as mediators here. For example, in support of the Sidley retention application, Debtors' counsel submitted correspondence from Chubb discussing the November 2019 mediation. *See Declaration of Jessica C.K. Boelter in Support of Response by Sidley Austin LLP in Further Support of the Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Sidley Austin LLP as Attorneys for the*

---

[3] Hartford has previously raised concerns regarding Debtors' proposed form of order compelling mediation. *See Supplemental Memorandum in Support of Limited Objection of Hartford Accident and Indemnity Company to Debtors' Motion for Entry of an Order (I) Appointing a Judicial Mediator, (II) Referring Certain Matters to Mandatory Mediation, and (III) Granting Related Relief* [D.I. 648-1]. Rather than restate those arguments, Hartford incorporates its points by reference herein.

2

*Debtors and Debtors in Possession, Nunc Pro Tunc to the Petition Date* [D.I. 500], Ex. 2 [D.I. 500-2]. That correspondence contains numerous details concerning that mediation, including mention of a claims matrix that was prepared for a mediation aimed at resolution of more than a thousand abuse claims. But none of those details was redacted. The *only* detail that Debtors redacted from the letter was the name of the mediator. The reason for that redaction, when other details concerning the mediation were not excised, is obvious: Debtors did not want the record to reflect that Mr. Finn has been involved in global mediation discussions, and undoubtedly has formed opinions about the case.

4. Debtors' resistance included their initial refusal to provide complete disclosures of their proposed mediators' connections to this case. Following the April 15 status conference, the insurers reiterated requests for Rule 2014 disclosures so that they could determine whether the Debtors' proposed candidates had conflicts that would prevent them from serving as mediators. The Debtors originally declined to provide any information at all, then produced brief, one-page "disclosures" that provided a list of names that the proposed mediators had worked with in the past, and Mr. Green's disclosure also identified some of the Trusts and FCR engagements where his work overlapped with Young Conaway. *See Declaration of Abigail W. Williams in Support of Supplemental Brief in Support of Limited Objection of Creditors First State Insurance Company and Twin City Fire Insurance Company and Party In Interest Hartford Accident and Indemnity Company to Debtors' Motion for Entry of an Order (I) Appointing a Judicial Mediator, (II) Referring Certain Matters to Mandatory Mediation, and (III) Granting Related Relief* [D.I. 650] ("<u>Williams Decl.</u>"), Ex. 5 and Ex. 6. But those lists were far from complete disclosures; they did not provide any information on current relationships or engagements with other parties

in this case.

5.      Debtors refused to supplement their disclosures in accordance with Rule 2014, and likewise refused once again to consider alternative candidates. Instead, Debtors insisted on pushing ahead at the May 18 hearing to try to obtain an order installing Mr. Green and Mr. Finn as mediators over the insurers' objections. Recognizing the need for a fair process and mediators whose impartiality cannot be questioned, the Court instructed the parties to secure Rule 2014 disclosures from all of the mediator candidates, and continued the hearing on Debtors' motion to June 8.

B.    **The Rule 2014 Disclosures Reveal Pervasive Entanglements.**

6.      On May 28, 2020, Debtors filed the required Rule 2014 disclosures for Messrs. Green, Finn and Gallagher. *See Declaration of Eric D. Green In Connection with Debtors' Motion for Entry of an Order (I) Appointing Mediators, (II) Referring Certain Matters to Mandatory Mediation, and (III) Granting Related Relief* [D.I. 712] ("Green Decl.") and *Declaration of Paul A. Finn, Mediator, Pursuant to Rule 2014 of the Federal Rules of Bankruptcy Procedure with Respect to Debtors' Motion for Entry of an Order (I) Appointing Mediators, (II) Referring Certain Matters to Mandatory Mediation, and (III) Granting Related Relief* [D.I. 710] ("Finn Decl."). Those disclosures show why Debtors were anxious to fast-track the appointment of Mr. Green and Mr. Finn without proper conferrals, vetting and Rule 2014 disclosures.

7.      Mr. Green's disclosures reveal a long and close history with Mr. Patton, the FCR in these chapter 11 cases, and Young Conaway, Mr. Patton's law firm, which is counsel to the FCR in these cases. Mr. Patton has served as Mr. Green's trusted counsel in at least nine different cases -- six involving mass tort bodily injury claims, and another three involving monitoring of

financial institutions. *See Appendix 1 to Green Decl.* [D.I. 712-1] at 8-9.

8. Mr. Green's disclosures are opaque on the issue of whether all of these representations are ongoing (perhaps purposefully so), but he continues to serve as FCR for a number of these trusts, including DII and Bondex, with Mr. Patton and Young Conaway continuing to serve as his counsel. *See Supplemental Declaration of Abigail W. Williams in Support of Memorandum in Support of Hartford's Objection to Certain Mediators that Debtors Nominated and in Further Support of Limited Objection to Debtors' Motion for Entry of an Order (I) Appointing a Judicial Mediator, (II) Referring Certain Matters to Mandatory Mediation, and (III) Granting Related Relief* ("Williams Suppl. Decl."), Ex. 1 at Certificate of Service and Ex. 2 at Certificate of Service. Insofar as the asbestos trusts that Mr. Green has identified continue to operate and pay claims, Mr. Patton and Young Conaway continue to have a trusted, confidential attorney-client relationship with Mr. Green on mass tort matters.

9. In his ongoing capacity representing future tort claimants in pending mass tort matters, Mr. Green (with Mr. Patton's law firm, Young Conaway, as his counsel) has regularly adopted positions hostile to insurers on issues that are similar or identical to issues he will be asked to mediate, as a neutral party, if appointed in this case. Examples include:

- Mr. Green opposed insurers objections to plan confirmation with regard to insurance neutrality, scope of injunctions and maintenance of policy rights going so far as to advocate that insurers objections should not be heard in bankruptcy in *In re Mid-Valley, Inc. et al.,* Case No. 03-35592-TPA (Bankr. W.D Pa.) ("DII"). *See* Williams Suppl. Decl., Ex. 3.

- Mr. Green argued against insurers' objections to provisions addressing various aspects of insurance neutrality in DII. *See* Williams Suppl. Decl., Ex. 4.

- Mr. Green argued against insurers' objections to terms purporting to allow and value claims contrary to policy rights in DII. *See* Williams Suppl. Decl., Ex. 5.

5

- Mr. Green opposed the debtors' attempts to obtain more information with which to evaluate mass tort claims in *In re: Specialty Products Holding Corp., et al.*, Case No. 10-11780 (LSS) (Bankr. Del.).  *See, e.g.*, *See* Williams Suppl. Decl., Ex. 6.

10. On top of all that, Mr. Green reports that he and the FCR are currently "social friends." *See Appendix 1 to Green Decl.* at 9.  It is hard to envision a more privileged relationship, or a greater advantage for a mediation, than having your friend and lawyer serve as mediator.

11. The disclosures from Mr. Finn are also troubling.  As an initial matter, Mr. Finn acknowledges that he has relationships with counsel in this case, and that in at least one case -- the Diocese of Milwaukee -- he obtained post-confirmation work as the claim reviewer for the Trust.  Mr. Finn may be angling for a similar position here; Mr. Finn's disclosures do not identify whether he has been promised any post-confirmation position or has had conversations with Debtors or others on that issue.

12. Mr. Finn's pre-petition involvement in the case is problematic as well.  Mr. Finn concedes what Debtors in their earlier filings sought to conceal, namely, that Mr. Finn was involved in the failed mediation that BSA conducted last fall -- a mediation that BSA concealed from Hartford and most of its other insurers.  Mr. Finn tries to downplay his involvement by stating that he was involved in mediating "one claim with Sidley Austin" in fall 2019.  *See Attachment A to Finn Decl.* [D.I. 710-1], 1(K).  That carefully crafted phrase, however, omits the number of claims that he mediated this past fall with the Ogletree firm -- which is BSA's *defense counsel*.  Moreover, Mr. Finn states that a claims matrix was distributed in the context of last fall's mediation.  It makes no sense to distribute a claims matrix to resolve a single claim; the purpose of a matrix is to agree on criteria and values to resolve lots of claims.

13. That prior involvement is extremely prejudicial to Hartford, as well as to others who were not present or (like Hartford) not even invited to participate.  Mr. Finn states that the

6

mediation lasted for a couple of days. *See id.* Hartford would be forced to operate at an unfair disadvantage where the other parties (including Debtors and the FCR, who was retained by Debtors on a pre-petition basis) had two days to set out their positions without any opportunity for Hartford to respond. The other parties to the mediation undoubtedly have discussed claim values, claim resolution procedures and a host of other critical issues with the mediator. Over the course of that two-day mediation, Mr. Finn no doubt has formed opinions about the case based on last fall's mediation.

14. Moreover, those opinions and impressions may be due to incorrect information. For example, Mr. Finn states in his disclosure that he was told that all of BSA's insurers were invited to participate in the mediation. *Id.* That is not true; Hartford did not even know that a global mediation was taking place. Nor does Hartford have any way to know what other information -- accurate or inaccurate -- was presented to Mr. Finn. Without bringing all of the proposed Mediation Parties into the prior mediation "bubble" to find out what was discussed, the Mediation Parties in this case will have no basis to know what information or arguments have been made, nor how Mr. Finn may have come to any conclusions regarding the underlying claims. That cannot be squared with the requirement that the mediators here come to the mediation with an open mind and without pre-petition notions of how the case should resolve, and that the proceedings be free from any appearance to the contrary. Particularly here, where there are alternative mediators who do not present the same appearances of influence, the Court should decline to appoint Mr. Green and Mr. Finn.

## ARGUMENT

### A. Legal Standard

15. As an initial matter, Debtor's motion seeks the appointment of mediator(s); it is

not a response to a motion for disqualification. This Court has broad discretion to appoint mediators that are best suited for this case and that are free from even the appearance of bias, influence or partiality. Debtors' statement, during the May 18 hearing, that the appointment is governed by the federal judicial recusal statute is therefore incorrect, and the Court can and should use its discretion to decline to select Mr. Green or Mr. Finn for this case.

16. To the extent that the Court is inclined to look to the local rules regarding disqualification as a guide, the rules confirm that it would not be appropriate to select Mr. Green or Mr. Finn here. Local Rule 9019-2(e)(iii) governs the disqualification of a mediator. It provides that:

> Any person selected as a mediator or arbitrator may be disqualified for bias or prejudice in the same manner that a Judge may be disqualified under 28 U.S.C. § 44. Any person selected as a mediator or arbitrator shall be disqualified in any matter where 28 U.S.C. § 455 would require disqualification if that person were a Judge.

17. 28 U.S.C. § 455(a) provides that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." The test for disqualification under § 455(a) "is whether a reasonable person, with knowledge of all the facts, would conclude that the judge's impartiality might reasonably be questioned." *In re Kensington Intern. Ltd*, 368 F.3d 289, 301 (3rd Cir. 2004)[4]; *Selkridge v. United of Omaha Life Ins. Co.*, 360 F.3d 155, 169-70 (3d Cir. 2004) (finding plain error resulted from failure to recuse in light of appearance of impropriety). The "appearance of impropriety must be viewed from the perspective of the objective, reasonable layperson, who is not necessarily familiar" with the specifics of litigation, and does not require a showing of actual bias or prejudice. *Kensington*, 368 F.3d at 303. Here, substituting "mediator" for "judge" into

---

[4] Mr. Patton served as Mr. Green's counsel in the *Kensington* dispute.

the statute, the test for disqualification is met for both Mr. Green and Mr. Finn.

### B. Mr. Green's Connections to the FCR and Young Conaway Are Disqualifying Under 28 U.S.C. 455(a).

18. Mr. Green's disclosures confirm that he has extensive connections with Mr. Patton, the FCR in this case, and his firm Young Conaway (which also serves as counsel to Mr. Patton in this case). *See Appendix 1 to Green Decl.*, 8-9. Mr. Patton has been Mr. Green's counsel in nine separate engagements -- six involving mass torts and three involving financial matters. *Id.* Mr. Green is also "social friends" with Mr. Patton, though he provides no explanation for what that means and notably does not provide any details regarding the depth of their friendship. *Id.* These pervasive and ongoing connections -- at the very least -- would cause an objective observer to question whether *other* parties to a mediation could reasonably expect Mr. Green to be impartial and unbiased; that is disqualifying under 28 U.S.C. § 455(a).

19. Courts in similar contexts have found recusal or disqualification appropriate where a judge has been represented in the past by counsel for one of the parties in a case. For example, in *Smith v. Sikorsky Aircraft*, 420 F.Supp. 661 (C.D. Cal. 1976), the court determined that recusal was appropriate after the judge learned that a lawyer who had "*in the past* been and acted as attorney and counsel for the undersigned Judge, both personally and in judicial capacity" had become associated with the law firm that represented one of the parties. *Id.* at 662 (emphasis added). In doing so, the judge "expressly [found] that he ha[d] no personal bias or prejudice concerning any party herein or any personal knowledge of disputed evidentiary facts, and [did] not have any other personal interest in the proceedings herein which would tend to disqualify him, nevertheless [found] that his impartiality 'might be reasonably be questioned' as set forth in 28 U.S.C. 455(a)." *Id.; see also Catsimatidas v. Innovative Travel Group, Inc.*, 84 Civ. 5697 (SWK), 1988 WL 3420, at *2 (S.D.N.Y. Jan. 13, 1988) (concluding that § 455(a) required recusal

due to Court's prior retention and current friendly relationship with counsel for litigant).

20. Here, of course, the connections between Mr. Green and Mr. Patton/Young Conaway are far more direct and pervasive than those that warranted recusal in *Sikorsky*. Unlike the judge in *Sikorsky*, Mr. Green is represented directly by Mr. Patton, not just by an otherwise unrelated member of his firm. And unlike in *Sikorsky*, Mr. Green's relationship with Mr. Patton is ongoing and involves numerous current matters as well as a social friendship.

21. Indeed, in cases where an ongoing relationship exists, courts have had no trouble concluding that recusal is necessary. For example, in *Potashnick v. Port City Const. Co.*, 609 F.2d 1101 (5th Cir. 1980), the Fifth Circuit held that the trial judge's failure to recuse himself was an abuse of discretion. There, the Court of Appeals found that the relationship between the judge and counsel for one of the parties raised even more questions than the relationship in *Sikorsky* because the judge in *Potashnick* "was not only being represented albeit nominally, by [the attorney] during the [case], but he had business dealings with him as well." *Potashnick*, 609 F.2d at 1111. Based on those ties, the Fifth Circuit held that even if there was not actually evidence of bias or prejudice, the ties between the judge and the lawyer were sufficient to raise reasonable questions of impartiality requiring disqualification. Subsequent cases have affirmed that recusal is required when a judge retains a different lawyer from the same firm on unrelated business. *See, e.g., Morgan Stanley & Co. v. Sundlun, Inc.*, No. 88 Civ. 7966, 1988 WL 130937, at *3 (S.D.N.Y. Nov. 30, 1988) (finding that "present nature of the representation" which involved drafting will, "tips the 455(a) scale in the direction of disqualification" from presiding over unrelated litigation).

22. Here, Mr. Green's connections with Mr. Patton raise even more questions of impartiality than those in *Potashnick*, where the Fifth Circuit said recusal was required as a matter

of law.  Here, the connections between Mr. Green and Mr. Patton go even beyond current business dealings -- Mr. Green refers to Mr. Patton as a "social friend," suggesting that they have at least somewhat regular (and friendly) contact with each other outside of a normal work environment.  And, whereas the lawyer in *Potashnik* was "nominally" the judge's lawyer, here Mr. Patton has been anything but nominal as counsel.  Indeed, if there were any doubt that Mr. Green values his attorney-client relationship with Mr. Patton, that doubt would be dispelled by the fact that Mr. Green repeatedly chose to engage Mr. Patton -- at least nine times.

23. Under these circumstances, it is difficult to see how the standard of § 455(a), as the Third Circuit applied it in *Kensington* is not met.  While it involved different facts, *Kensington* remains instructive here.  In *Kensington*, the Third Circuit was faced with a dispute about whether a district judge was required to recuse himself from a number of asbestos bankruptcy cases over which he was presiding.  The judge had hired several of the lawyers that were advocates in those cases as "advisors" to provide him with a tutorial on the mechanics of asbestos cases.  The Court concluded that an objective layperson would believe that there might be an appearance of impropriety in permitting the judge to continue to preside over cases where his own "advisors" were acting as advocates on behalf of certain parties.  *Kensington*, 368 F.3d at 307-08.  As a result, the Court concluded that recusal was required even in the absence of any actual evidence of bias or wrongdoing.  *See id.*

24. The potential appearance of impropriety is no less present here.  Mr. Patton has occupied (and continues to occupy) a special place of trust as Mr. Green's friend and attorney.  Mr. Patton and Mr. Green undoubtedly have had, and will continue to have, personal, private discussions regarding mass tort bankruptcy cases and the manner in which they should proceed.  And Mr. Green's repeated retention of Mr. Patton shows that he clearly places great trust in the

advice that he receives from Mr. Patton and his law firm. *See Appendix 1 to Green Decl.*, 8-9. In light of the ongoing, trusted relationship that Mr. Green has with the FCR in this case, it is difficult to understand how an ordinary layperson could *not* conclude that Mr. Green would be predisposed towards Mr. Patton and the positions that he advocates in a mass tort case.

25.     Avoiding even the appearance of impropriety is critical in this case. In many cases, parties voluntarily agree to mediate and consult one another to reach agreement on a mutually agreeable mediator. In such circumstances, the parties' mutual assent helps dissipate any concerns about bias or partiality. But that is not what has happened here. From the beginning, Debtors have shut Hartford out of any discussions about who would be selected as mediator, while simultaneously seeking an order compelling Hartford and other insurers to mediate before a mediator who routinely represents interests that are hostile to Hartford, and whose counsel in those endeavors is the FCR in this case. This Court cannot appoint Mr. Green as mediator here consistent with § 455 and the Third Circuit's reasonable person test under *Kensington*.

        **C.**    **The Court Should Decline to Appoint Mr. Finn as Mediator.**

26.     Mr. Finn's disclosures also raise questions about his impartiality, though for different reasons. In at least one case where Mr. Finn has served as a mediator he also obtained post-confirmation work as a claims reviewer for the Trust, and Mr. Finn has not stated whether he intends to use his post as a mediator here to try to secure post-confirmation employment. If Mr. Finn is also seeking post-confirmation employment, it should be disqualifying under § 455(a). *See Pepsico, Inc. v. McMillen*, 764 F.2d 458 (7th Cir. 1985) (judge who appeared to be seeking employment from one party to litigation should recuse himself from case).

27.     In *Pepsico*, the Seventh Circuit found that recusal was required even though the judge was blameless and had told his representatives *not* to contact the counsel that were currently

before him. *See id.* at 460. At a minimum, Mr. Finn should be required to state whether he has spoken with anyone regarding post-confirmation employment (such as claims reviewer for the trust), or whether he intends to seek such a post. Even the appearance of having such a palpable interest in the proceedings would taint the process and cause an objective layperson to question whether the mediator was completely impartial.

28. Mr. Finn's involvement in this matter pre-petition also raises questions regarding his ability to serve effectively as an impartial and open-minded mediator. Mr. Finn disclosed that he was involved in the two-day mediation that BSA held this past fall with many of the same parties here -- Debtors, the FCR (then the pre-petition FCR) and a group of plaintiffs' attorneys -- but excluding Hartford. Mr. Finn states that his mediation with Sidley involved "only one claim," but he also acknowledges that a claims matrix was distributed (which the parties would have no reason to devote time to develop for the resolution of one claim). *See Attachment A to Finn Decl.*, 1(K).

29. While Mr. Finn states that he did not retain the claims matrix, he does not deny (1) having had it during the course of the mediation, or (2) knowledge of its contents. That information is critical, because it may have set expectations and/or ground rules for the mediation that will go forward in this case. In addition, that information, along with the remainder of two days of meetings, likely has already created impressions about the various strengths and weaknesses of the parties' claims.

30. It is difficult to see how Mr. Finn could mediate the same claims in a second mediation without having formed opinions based on the prior mediation, which raise questions regarding his impartiality. To require Hartford to mediate with Mr. Finn, when other parties have had a two-day headstart in explaining their positions is requiring Hartford to mediate with one

arm tied behind its back. That is particularly true here, where Hartford has no understanding of what was discussed (other than the matrix), and therefore, Hartford has no way of knowing what pre-mediation conceptions it may need to dispel. Any objective layperson would readily perceive the unfair disadvantage, and there is no basis for mandating a mediation before someone who has already formed opinions about the case.

> **D.    In The Alternative, The Court Should Permit Hartford To Take Discovery From Mr. Green and Mr. Finn.**

31.     To the extent that the Court, on the present record, is not satisfied that Mr. Green and/or Mr. Finn are conflicted from serving as mediator(s), Hartford asks that it be permitted to seek limited discovery from each candidate. As noted, the disclosures from both Mr. Green and Mr. Finn raise significant questions.

32.     Mr. Green has not provided any details regarding the nature of his "social friendship" with Mr. Patton, nor how that would affect his engagement. Nor has Mr. Green provided any details regarding the extent of his ongoing retentions of Mr. Patton and the Young Conaway firm. Answers to those questions likely would reveal further degrees of question that would cause any objective onlooker to question the evenhandedness of mediation.

33.     Similarly, Mr. Finn's disclosure is silent regarding attempts to obtain post-confirmation employment. Nor has he provided complete disclosure regarding his involvement in the prior mediation, which may reveal pre-conceptions about a global resolution that Mr. Finn would bring to this case based on his pre-petition involvement.[5]

34.     The discovery for both candidates can be limited in scope and duration, including

---

[5] The Debtors have already disclosed significant detail regarding that mediation, including the development of the matrix, as part of their filings in support of the Sidley Austin retention application. No one objected to the disclosure of those facts and documents; they cannot complain that other, similar information about the mediation is insulated now.

a half-day deposition for each individual. But this discovery is necessary given that Debtors shut Hartford out of the mediator selection process, as well as the fall 2019 two-day pre-petition mediation. There is no prejudice to any party from limited discovery; the TCC recently stated that mediation cannot begin in earnest until after the November 16 bar date, which is more than five months away. *See The Official Committee of Tort Claimants' Omnibus Objection* [D.I. 702], 3. But all parties should have the opportunity fully to understand and raise with the Court any issues that may impact Mr. Green's or Mr. Finn's ability to act as an impartial mediator.

## CONCLUSION

Hartford respectfully requests that the Court sustain Hartford's supplemental objections as stated herein and decline to enter Debtors' proposed order.

Date: June 2, 2020
  Wilmington, Delaware

BAYARD, P.A.

*/s/ Gregory J. Flasser*
Erin R. Fay (No. 5268)
Gregory J. Flasser (No. 6154)
600 North King Street, Suite 400
Wilmington, Delaware 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
Email: efay@bayardlaw.com
    gflasser@bayardlaw.com

- and -

James P. Ruggeri (admitted *pro hac vice*)
Joshua D. Weinberg (admitted *pro hac vice*)
Abigail W. Williams (admitted *pro hac vice*)
Shipman & Goodwin LLP
1875 K Street, NW, Suite 600
Washington, DC 20003
Tel: (202) 469-7750
Fax: (202) 469-7751

- and -

Eric S. Goldstein (admitted *pro hac vice*)
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Tel: (860) 251-5000
Fax: (860) 251-5099

*Attorneys for First State Insurance Company, Hartford Accident and Indemnity Company and Twin City Fire Insurance Company*