IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE Boy Scouts, LLC,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>Jointly Administered<br><br>**Ref. Docket No. 17** |

### NOTICE OF FILING OF DISCLOSURES PURSUANT TO
### FED. R. BANKR. P. 2014 FOR MEDIATOR CANDIDATE
### KENNETH FEINBERG

PLEASE TAKE NOTICE that Century respectfully submits notice that the declaration of Kenneth Feinberg is filed concurrently with this notice providing disclosures, pursuant to Rule 2014 of the Federal Rules of Bankruptcy Procedure and Rule 2014-1(c) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (together, "Rule 2014"), as a candidate to serve as a mediator in the above-captioned chapter 11 cases.

PLEASE TAKE FURTHER NOTICE that on May 18, 2020, the Court held a status conference regarding the Debtors Motion to appoint a mediator [D.I. 17]. On the record at such status conference, the Court ordered that the potential mediator candidates proposed by the parties submit disclosures pursuant to Rule 2014.

PLEASE TAKE FURTHER NOTICE that in accordance therewith, Century submits

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware Boy Scouts, LLC (4311). The Debtors' mailing address is 1325 West Walnut Law, Irving, Texas 75038.

1

Mr. Feinberg as a potential candidate to serve as mediator in the above-captioned cases while reserving its rights on scope and nature of a mediation and whether mediation is appropriate at this time.

Mr. Feinberg is perhaps the most famous mediator in the United States with a storied thirty year career. National publications such as the New York Times and the Wall Street Journal have profiled Mr. Feinberg and praised his experience and work on mass tort cases. *See* Appendix A and B.

Mr. Feinberg served as Special Master of the U.S. government's September 11th Victim Compensation Fund and ran the BP Deepwater Horizon Disaster Victim Compensation Fund, a $20 billion fund to pay claims resulting from the BP Gulf oil spill. He has also managed compensation systems relating to the Aurora and Virginia Tech shootings and the Boston Marathon bombing, and processed more than 4000 claims for victims of faulty GM ignition switches. A copy of Mr. Feinberg's bio is attached to his declaration.

As is reflected in his biography, Mr. Feinberg has successfully mediated molestation claims. He has experience in bankruptcy and serves co-mediator in the *Purdue* bankruptcy.

| | |
|---|---|
| Dated:  June 3, 2020 | Respectfully Submitted, |
| | By:  */s/ Stamatios Stamoulis*<br>Stamatios Stamoulis (#4606)<br><br>STAMOULIS & WEINBLATT LLC<br>800 N. West Street<br>Third Floor<br>Wilmington, Delaware  19801<br>Telephone:   302 999 1540<br>Facsimile:    302 762 1688<br><br>O'MELVENY & MYERS LLP<br>Tancred Schiavoni (*pro hac vice*)<br>Janine Panchok-Berry (*pro hac vice*)<br>Times Square Tower<br>7 Times Square<br>New York, New York  10036-6537<br>Telephone:   212 326 2000<br>Facsimile:    212 326 2061<br><br>*Counsel for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America, Ace Insurance Group Westchester Fire Insurance Company and Westchester Surplus Lines Insurance Company* |

# **APPENDIX A**

THE WALL STREET JOURNAL.
This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.
https://www.wsj.com/articles/SB10001424052748703309704575413404274531476

# Mr. Fairness

The pay czar, BP claims administrator, and 9/11 victims fund manager talks about how he makes decisions that alter lives.

By *Kimberley A. Strassel*
Updated Aug. 7, 2010 12:01 am ET

In the Bible, King Solomon is granted his wisdom so that he might better judge the rights and wrongs of his kingdom. In the United States, the man who might most appreciate Solomon's plea for a little insight is Ken Feinberg, the nation's arbitrator-in-chief.

Unlike Solomon, Mr. Feinberg hasn't (yet) had to threaten to cut up any babies. But as I step into the humming Feinberg Rozen offices in Washington, D.C., this week, the bespectacled 64-year-old attorney is in his final lap as the Obama administration's pay czar. He's hip deep in his new job deciding which Gulf residents will receive money, and how much, from BP's $20 billion oil-spill fund. These jobs follow on Mr. Feinberg's roles deciding payments for the victims of the Virginia Tech shooting, for the families of those killed on 9/11, and for Vietnam veterans claiming damage from Agent Orange.

Sitting in his office—adorned with letters and pictures from notables—I attempt to tactfully ask Mr. Feinberg what exactly, in his opinion, qualifies him to sit in such extraordinary judgment. Before I can even finish, he interjects: "Experience. I don't think that what I'm doing is rocket science. I think there are thousands, maybe millions, of people who could do what I'm doing.

Advertisement

"I think that in [the Gulf] case, the administration and BP felt that with 9/11 and with Agent Orange and with Virginia Tech, that there's a sort of built in credibility." He pauses, and then adds in his distinct Boston-area accent, "that credibility can disappear in an instant, I assure you."

He's acutely aware of that risk, and it is why in his every public event, in his every decision, he projects impartiality. He has even been criticized for not showing more emotion in issuing his life-altering decisions. He accepts that his job will leave some people unhappy.

"Why weren't grandparents eligible to apply for the death of their grandson or granddaughter in 9/11? Why do you give everybody in 9/11 the same formula for pain and suffering? Why do you say that fiancés shouldn't be treated like spouses when it comes to eligibility in 9/11? Why pay students and faculty the same in Virginia Tech, when a faculty member is earning an income and a student isn't," he says, reeling off a few of the tougher issues on which he's pronounced.



Ken Feinberg
ZINA SAUNDERS

In the quiet of his office, a French opera playing in the background, he concedes his job is often about judgment calls. "I have a tremendous amount of self-doubt about all of this. You always toss and turn wondering if you're doing the right thing, if there's a better way, a more equitable way. You know you are going to receive criticism. You do the best you can. If other people think they can do better, they are entitled to their opinion. It isn't as if there's a mathematical formula that determines success in this business."

When I ask what he thinks about the circumstances under which BP was made to cough up $20 billion—under threat of federal criminal indictment—he says only that "the administration and BP got together . . . and decided, both, that coming up with a guaranteed sum to pay eligible claims was a creative alternative to years and years of protracted litigation."

Whatever the impetus for establishing the BP fund, it is certain to test Mr. Feinberg's skills. Tens of thousands of Gulf residents potentially have a claim for compensation, and they mobbed him on a recent tour through the region. Trial lawyers are bitter, as they feel the fund—which will require those who get payouts to ultimately release BP from legal liability—is robbing them of a day in court. Mississippi Attorney General Jim Hood and his Alabama counterpart, Troy King, have taken up the lawyers' cause, blasting the Feinberg plan.

Mr. Feinberg expects to issue his ground rules for claims by the middle of this month, and to be "up and running and replacing BP" by the week after that. While he holds BP responsible for "this tragedy," he also credits the oil giant for allowing him to move swiftly. Whereas in other funds he had to start a claim process from scratch, "here, much to BP's credit, they've already established 35 offices, 1,500 people, at a cost of heaven knows what, and they've paid out over $250 million. I think we can do better. I think we can do it in a more accelerated, principled way . . . but I must say I can't fault BP for trying." He was promised total independence and he says so far neither the administration nor BP "want to get near this. And that's appropriate."

His team is still noodling over specifics, but Mr. Feinberg voices the animating principles. Payout rules will be based broadly on federal oil-spill law and Gulf-state tort law, though they will also be "more generous" than what a court might reward. That approach, he says, will encourage claimants into the fund, foregoing the "long, litigation route" and allowing BP to "corral as many claimants as possible." The overall message, he says, is this: "If we're not going to pay, nobody's going to pay. That's my philosophy on this thing."

Those are the comments that rile the tort-law community, which risks losing plaintiffs to the fund. Mr. Feinberg is courteous but not apologetic. The trial lawyers "may feel that I've said things—in an effort to entice people into this program—that are anti-trial lawyer. I certainly don't mean that; I'm a trial lawyer and have a lot of respect for trial lawyers. It's just that I'm trying to attract as many people as I can into this program."

The tort bar and state attorneys general, he says repeatedly, have raised "very legitimate" policy issues about releasing BP from liability before all the damage of the spill is known. And those concerns, he says, help explain why he intends to allow people to receive emergency payments of up to six months with no legal release. Only later, if claimants want a "final settlement," will they have to release BP from liability. Besides, "If the trial lawyers believe that they can do better than what I'm offering, this is a purely voluntary program. Nobody is required to participate."

Advertisement

As generous as he intends the payments to be, Mr. Feinberg makes clear he won't be handing them out on the street. BP, under pressure, has up to now been writing checks to pretty much anyone who asks. Isn't it possible, I ask, that fewer residents will receive money once he takes over?

"I don't think there's any question about that," he says. "I'm totally independent . . . Nothing will undercut the credibility of what I'm doing more than inconsistent treatment, unfairness, the perception of bias or the perception of fraud. If somebody received a payment from BP, in a time of beleaguered emergency, that just cannot be justified, I will not apply that principle so that everybody else receives an unjustifiable amount."

And he's firm that residents will be required to prove their claim. "When I go to the Gulf, I hear a lot about the underground economy. 'Mr. Feinberg, I got paid $5,000 a month all cash. Do I have a claim?' Well, you have to prove your claim. There's nothing illegal about all cash business, but do you have your tax return? . . . Do you have documentary evidence? . . . Will your ship captain vouch for the $5,000? . . . I need something. I can't be paying claims that can't be proven. And I can tell you that this is going to be a big issue."

All this drama is notable, given that Mr. Feinberg only just finished his controversial tenure as pay czar. His restrictions on executive pay for the top 25 officials at seven bailed-out institutions earned him boos from the financial sector and free-market advocates. His final report last month stating 17 companies had made questionable compensation payouts in the early days of the bailout—but refusing to name the bankers or demand clawbacks—earned him boos from populist types.

Mr. Feinberg is unrepentant. "Why would I name names of individuals? The companies were the ones that authorized the payments and we named the companies. . . . At the time these companies made these outlandish payments, it was legal, Congress hadn't yet spoken on the subject, and there's a lot of armchair quarterbacking going on here." Besides, he says: "11 of the

17 companies that I focused on as making inappropriate payments have repaid the taxpayer—with interest."

Mr. Feinberg's position commanded enormous attention, and he himself talked of using his "prescriptions for pay"—linking executive compensation to long-term performance—to alter Wall Street's wider compensation culture. Yet today he tones down his role. "In a sense, as one newspaper reported, what I was doing was sort of a sideshow. It was such a limited role I had—very few companies, very few individuals. The real test on executive pay is going to come from the other initiatives out there being promoted by the administration."

Advertisement

If his role was so limited, I ask, then why have the pay czar in the first place? Wasn't this just an attempt by Congress to soothe the angry public mob? "Congress felt that if we were going to give billions of dollars to save these companies, there should be a price to pay for that . . . If you look back at the history of our country, you can usually see . . . a tension between Main Street and Wall Street and this is the latest manifestation of that. But I don't think it's unique to 2010 or 2009."

Behind the creation of the pay czar job was, of course, the argument that somehow executive compensation precipitated the financial crisis. Does he really believe that? "I don't know. Congress apparently did. I don't know. It certainly seems to have been a factor—I don't know what weight to give it." He acknowledges that it would probably not be wise to believe pay restrictions alone will save us from another crisis.

The final Feinberg report does recommend that banks give their compensation committees the right, in times of crisis, to void pay contracts. But isn't a contract a contract, I ask? "A contract is a contract. I'm saying that, prospectively, we should openly adjust expectations with the notion of a break provision."

I note that one effect of his pay rules was to cause employees at targeted banks to jump ship. Can government really change the pay culture? "I'm not sure you can in a free market and an

open society. I'm not sure you can or should tackle that culture. I do think that every company is different—we saw that. And I do think that the more you set principles in place and strengthen the power of regulators and independent compensation committees and private boards of directors—the more you allocate to them the primary responsibility of linking compensation to respective performance—the better."

So how much does a person deserve to be paid? How much is a person's business worth in the wake of an oil spill? How much is the family of a terror victim owed? None of the questions Mr. Feinberg makes a living deciding sounds like very much fun. Why does he do it? "If you're asked to serve, you serve," he says matter-of-factly.

A wry smile appears on his face. There is, after all, "a pretty low bar of success." What does he mean? "Well, there are a lot of people who think that all this is hopeless, and you'll end up just being completely vilified, and that goes with the territory." In the end, he says, "you try and do the best you can." King Solomon might understand.

*Ms. Strassel writes the Journal's weekly Potomac Watch column from Washington.*

Copyright © 2020 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

# **APPENDIX B**

**The New York Times**

# Another View: In Praise of Kenneth Feinberg

By Dealbook    October 26, 2009 12:21 pm

*Jeffrey Sonnenfeld, a Yale business professor, discusses why the Obama administration's pay czar may be the Walter Cronkite or King Solomon of resolving financial disputes.*

Kenneth R. Feinberg, the Treasury Department's special master on executive compensation at troubled financial institutions, made headlines last week with pragmatic remedies to surging public outrage over unjustified bonuses to leaders of failed financial firms. Astoundingly, political critics on the left and the right, as well as financial reporters and analysts, have had no problem picking over what Mr. Feinberg did not accomplish.

No, he did not reform the compensation practices of the entire financial world or ensure pay for performance as the new norm across corporate America.

He didn't prevent reckless risk-taking in financial derivatives. No, he didn't define the conditions over which the public sector could intrude upon the decision making of private enterprise in free markets. He didn't explain how pay caps would affect the outflow of talent to higher-paying, healthier firms. He didn't find work for the 10 percent of Americans officially unemployed. He didn't bring peace to Afghanistan or find the cure for cancer. He didn't even tell us how to make more swine flu vaccine.

His mission was a narrow one — to address the supersize bonuses paid to 25 executives at each of seven financial institutions put on life support by American

taxpayers through extraordinary, unparalleled public support.

It is hard to find a professional more trusted than Mr. Feinberg — which is perhaps why he is clearly the Walter Cronkite of mediation or a modern-day King Solomon as an implicitly trusted voice of fairness and judgment. He worked as a top aide for such disparate public figures as former Mayor Rudolph W. Giuliani of New York and the late Senator Edward M. Kennedy of Massachusetts.

As a mediator, he successfully and quickly resolved disputes involving huge asbestos damage claims, defective contraceptive devices, Vietnam veterans and Agent Orange manufacturers, Attorney General John Ashcroft in the Bush administration and Treasury Secretary Timothy F. Geithner in the Obama administration. He transcends ideology and partisan politics as an ultimate pragmatist.

He also, refreshingly, avoids the opportunities to exploit his position — avoiding greed and grandiosity himself. As special master of the September 11 Victim's Fund, he worked 33 months pro bono on the huge volume of cases requiring patience in a complex regulatory maze and as gut-wrenching, emotionally draining situations as can be imagined. He personally adjudicated the decisions in 1,600 hearings, allocating $7 billion and winning over his harshest critics for his expertise, fairness and sensitivity. On other causes, he has worked pro bono as well, including in the aftermath of the Virginia Tech campus massacre.

Both political parties — the current and past administrations — have come to him for urgent, sensitive, timely, nonbureaucratic, low-key expert problem-solving. One Columbia law professor, John Coffee Jr., has said of Mr. Feinberg, "His natural talent is cutting a deal that everybody can live with."

So what did Mr. Feinberg actually accomplish here? He has established a process for addressing public outrage over the use of taxpayer money for unearned compensation by leaders of failed institutions and a means for examining the incentives required to bring these firms back to independent health.

He has also revealed a set of compensation guidelines that are worth the attention of others. Pay for performance, long-term incentives, princely perquisites

and other entitlements of office should not be controversial practices for the nation — except among those few who have come to enjoy them.

He is opposed to pay for retention — paying folks for showing up and breathing, as is the case with the $165 million in retention pay last year at the **American International Group**'s troubled financial products unit to be followed by another roughly $200 million this year. He believes in paying people well, but this should be based on their performance.

The new chief executive could receive $10 million, but only $1 million is salary — the rest is performance based restricted stock. He is opposed to showering princely perks (like **Citigroup**'s 2009 plans for a $50 million corporate jet, $10 million in luxurious office décor renovations and fancy club memberships).

Sure, entertainers and professional athletes may earn higher figures — but that is always performance-based. When, in 1930, people challenged Babe Ruth's salary of $80,000 for being more than President Herbert Hoover's salary of $75,000, he replied, "I know, but I had a better year than Hoover!" Bill Gates of **Microsoft**, Steven P. Jobs of **Apple**, Stephen A. Schwarzman of the **Blackstone Group** and Bernard Marcus of **Home Depot** did not become billionaires off of retention salaries or taxpayer bailouts but by risks with their own money matched by spectacular performance.

While Mr. Feinberg has a legal mandate to enforce his will going forward, he is not undermining constitutional law over the sanctity of contracts protected since Chief Justice John Marshall's decision in 1819. But moral suasion can produce results, like his pressure on **Bank of America**'s chief executive, Kenneth D. Lewis, to surrender his legal entitlements to any 2009 wages as he was forced down after losing his legitimacy to lead. Similarly, Mr. Feinberg helped inspire the sale of Citigroup's secretive **Phibro** energy trading unit to **Occidental Petroleum** and thus blocking Citigroup itself from paying the head of Phibro, Andrew J. Hall, $100 million in compensation.

When financiers scream, "Wait, you're driving our best talent away," the fears are overstated. Those few who hop to non-American companies may soon find pressures on compensation excesses from the Organization for Economic

Cooperation and Development and the Group of 20 industrialized and emerging nations, leading to some parallel practices soon.

Moreover, if some are driven to healthier firms that can pay better, isn't that the market working well? The market distortion is propping up failing institutions to reward the missteps of their same failed top leaders with lush compensation regardless of performance. The innocent thousands of high-performing professionals on the front lines are not driven away because only the top brass are reined in by Mr. Feinberg. When star talent is lured back at the top, as with A.I.G's new chief executive, Robert H. Benmoche, fair, attractive compensations levels can be properly determined.

In the worst of all cases, would it be so terrible if some of those Wall Street geniuses — or their potential successor generation — were lured back to science, engineering and other more productive fields rather than trying to figure out how to out-maneuver financial regulation with complex, intangible formulae for legal shell games. A brilliant, prominent Wall Street billionaire sadly died of a heart problem this month. The brilliant "high-priced" midtown Manhattan cardiothoracic surgeons who work on such Masters of the Universe top out at $500,000 a year or so, while the brilliant **Medtronic** engineers who design the stents that go into the hearts of such star financiers top out around $75,000. For that matter, President Obama earns $400,000 a year and Chief Justice John G. Roberts Jr. earns a mere $217,000 a year for pretty demanding responsibilities.

At the same time, while he may set a larger moral tone for other institutions to consider, Mr. Feinberg is not grandstanding for social change, and he religiously observes his legal mandate by focusing on only the 25 executives at the helm of each of seven once-troubled institutions who received life saving cash infusions from the taxpayers. It is not a welcome intrusion by corporate management, but one that was necessary, given the poor judgment of top management executives in allowing reckless risk to destroy the independent vitality of their enterprises, while paying themselves billions of dollars in compensation unjustified by their terrible performance.

After investing $85 billion, American taxpayers took 80 percent control of A.I.G. and 34 percent of Citigroup for $25 billion in emergency funds. For $30 billion in bankruptcy financing, the American taxpayers obtained 60 percent ownership of **General Motors**, with Canadian taxpayers owning 12 percent for their investment of $9.5 billion. Complaining about this taxpayer control over wages is like complaining over public scrutiny over the wages of Postmaster General John E. Potter. He may suffer almost more painful decisions of more lasting historic effect than any of these leaders of troubled, bailed-out firms. These leaders of "hybrid" business are not the independent captains of vibrant private industry but, in fact, also bear some similarities to civil servants.

While Mr. Feinberg is very concerned about Wall Street's tin ear toward the moral outrage of Main Street, he does not assume the imperial aura of a "czar." He even jokes that his Latvian grandmother would have been horrified by the casual use of the frightening position title of "czar!"

The "pay czar" should not speak to the appropriate levels of compensation for healthy, independent private enterprise — no matter how tempting it may be to address often apparently wrong-headed decisions of other boards. The corporate governance mechanisms of those enterprises should not be intruded upon if the business has not taken on government assistance nor worked in an unlawful manner. Companies should be allowed to make wrong strategic, compensation, product, staffing, production and other such decisions without micromanagement by the public sector.

Certainly, there are symbolic and moral codes of conduct and appropriateness modeled here, but private compensation decisions for all firms cannot be guided by legal and regal decrees of czars — or even by the confusion of crude city council-like ceremonial "say on pay" votes in a carnival atmosphere by distant shareholders who will never be involved in the hiring packages, where most of the damage is done. For appropriate larger effect, boards of directors must be more courageous and have "backbone" to say no to such unjustified greed as we have seen. The best way to do this is to more fully empower the voice of shareholders — the actual owners of the enterprise — with such vital mechanisms as the power to elect directors with simple majority votes.

Of course, there is one more missing ingredient that transcends pay czars, regulation and even diligent board governance. That is professional honor. Robert Willumstad stepped down as president of Citigroup in 2005 in career frustration, hoping to be a chief executive somewhere else with his path blocked at Citigroup . It was not until June 2008 that his ambition was answered with the position of chief executive of A.I.G. following the ouster of Martin Sullivan. Barely three months later, just as he was developing remedial responses to A.I.G. problems that predated him, then-Treasury Secretary Henry M. Paulson Jr. forced his replacement by a **Goldman Sachs** board member, Edward M. Liddy, a former insurance chief executive. Mr. Willumstad, though again suffering a career frustration, again left with quiet dignity. While entitled to a $22 million exit package, he voluntarily walked away, leaving it on the table.

*Jeffrey Sonnenfeld is the Lester Crown professor of management practice at the Yale School of Management and president of the Yale Chief Executive Leadership Institute.*

Go to Another View from DealBook »

Comments are no longer being accepted.

© 2017 The New York Times Company