**Exhibit B**

**2018 BSA Audit Engagement Letter**

2018-1205-002



September 24, 2018

Mr. Michael Ashline
Chief Financial Officer
Boy Scouts of America
1325 Walnut Hill Lane
Irving, Texas 75038-3096

Dear Mr. Ashline:

The purpose of this letter is to confirm our understanding of the terms of our engagement as independent accountants of Boy Scouts of America National Council (the "National Council").

<u>Services and related report</u>

We will audit the consolidated financial statements of the National Council which comprise the consolidated statement of financial position at December 31, 2018 and related consolidated statements of activities and changes in net assets, of functional expenses and of cash flows for the year then ending. Upon completion of our audit, we will provide the National Council with our written audit report on the financial statements referred to above. We cannot provide assurance that an unmodified opinion will be expressed. Circumstances may arise in which it is necessary for us to modify our opinion or add an emphasis-of-matter or other matter paragraph(s). If for any reason relating to the affairs or management of the National Council we are unable to complete the audit, we may decline to issue a report as a result of this engagement.

Our engagement as independent accountants contemplates that we will provide the following additional services to the National Council as part of our 2018 audit:

- Provide reports to and attend meetings of the Audit Committee to review the scope of our audit and our findings.

- Issue a management letter setting forth constructive recommendations for improvements in controls and for improving operating procedures, if necessary.

- Consult as necessary on reporting matters relating to the audited financial statements.

<u>Our responsibilities and limitations</u>

Our audit will be conducted with the objective of our expressing an opinion on the financial statements. We will conduct our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement. An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

In making our risk assessments, we consider internal control relevant to the National Council's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in

PricewaterhouseCoopers LLP, 2001 Ross Avenue Suite 1800 Dallas, Texas 75201-2997
T: 214 999 1400; F: 214 754 7991, www.pwc.com/us

the circumstances but not for the purpose of expressing an opinion on the effectiveness of the National Council's internal control. However, any significant deficiencies and material weaknesses, and other deficiencies (i.e., those deficiencies in internal control over financial reporting that are of a lesser magnitude) relating to internal control over financial reporting identified during our audit will be communicated to the National Council.

We will design our audit to obtain reasonable, but not absolute, assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error. Absolute assurance is not attainable because there are inherent limitations of an audit that result in most of the audit evidence, on which we draw conclusions and base our opinion, being persuasive rather than conclusive and due to the characteristics of fraud. Our audit will not include a detailed audit of transactions, such as would be necessary to disclose errors or fraud that did not cause a material misstatement of the financial statements or other illegal acts having an indirect or immaterial financial statement impact. It is important to recognize that there are inherent limitations in the auditing process. An audit is based on the concept of selective testing of the data underlying the financial statements, which involves judgment regarding the areas to be tested and the nature, timing, extent and results of the tests to be performed. Because of the inherent limitations of an audit, together with the inherent limitations of internal control, an unavoidable risk exists that some material misstatements may not be detected, even though the audit is properly planned and performed in accordance with auditing standards generally accepted in the United States of America. Because of the characteristics of fraud, particularly those involving concealment through collusion, falsified documentation and management's ability to override controls, an audit designed and executed in accordance with auditing standards generally accepted in the United States of America may not detect a material fraud. Further, while effective internal control reduces the likelihood that errors, fraud or other illegal acts will occur and remain undetected, it does not eliminate that possibility. For these reasons we cannot ensure that errors, fraud or other illegal acts, if present, will be detected. However, we will communicate to the National Council, as appropriate, any such matters identified during our audit.

We also are responsible for determining that the Audit Committee is informed about certain other matters related to the conduct of the audit, including (i) any disagreements with management about matters that could be significant to the National Council's financial statements or our report thereon; (ii) any serious difficulties encountered in performing the audit; (iii) information relating to our independence with respect to the National Council; (iv) other matters related to the National Council's financial statements including its accounting policies and practices; and (v) all significant deficiencies and material weaknesses identified during the audit, as previously mentioned. Lastly, we are responsible for ensuring that the Audit Committee receives copies of certain written communications between us and management, including management representation letters and written communications on accounting, auditing, internal control or operational matters.

The audit will not be planned or conducted in contemplation of reliance by any specific third party or with respect to any specific transaction. Therefore, items of possible interest to a third party will not be specifically addressed and matters may exist that would be assessed differently by a third party, possibly in connection with a specific transaction.

Management's responsibilities

Our audit will be conducted on the basis that management acknowledges and understands that they have responsibility for the preparation and fair presentation of the financial statements referred to above in accordance with accounting principles generally accepted in the United States of America. Management also acknowledges and understands their responsibility for the design, implementation and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error. Management is responsible for informing us (i) about all known or suspected fraud affecting the entity involving (a) management, (b) employees who have significant roles in internal control over financial reporting, and (c) others where the fraud could have a material effect on the financial statements; and (ii) of its knowledge of any allegations of fraud or suspected fraud affecting the entity received in communications from employees, former employees, analysts, regulators, short sellers, or others. Management is responsible for (i) adjusting the financial statements to correct material misstatements and for affirming to us that the effects of any uncorrected misstatements aggregated by us are immaterial, both individually and in the aggregate, to the financial statements taken as a whole; and (ii) notifying us of all material weaknesses, including other significant deficiencies, in the design or operation of the National Council's internal control over financial reporting that are reasonably likely to adversely affect the National Council's ability to record, process, summarize and report external financial data reliably in accordance with generally accepted accounting principles. Management also is responsible

for identifying and ensuring that the National Council complies with the laws and regulations applicable to its activities.

Management also acknowledges and understands their responsibility for providing us, on a timely basis, with access to all information of which management is aware that is relevant to the preparation and fair presentation of the financial statements such as records, documentation and other matters; additional information that we may request from management for the purpose of the audit; and unrestricted access to persons within the entity from whom we determine it necessary to obtain audit evidence. As required by auditing standards generally accepted in the United States of America, we will make specific inquiries of management and others about the representations embodied in the financial statements and the effectiveness of internal control over financial reporting. As part of our audit process, we will request from management written confirmation concerning representations made to us in connection with the audit. The results of our audit tests, the responses to our inquiries and the written representations comprise the evidential matter we intend to rely upon in forming our opinion on the financial statements.

Management acknowledges that internal auditors providing direct assistance to support our audit will be allowed to follow our instructions and management will not intervene in the work the internal auditors perform for us in a direct assistance capacity.

Management acknowledges and understands its responsibility for the preparation of the supplemental information in accordance with the applied criteria. Management also acknowledges and understands its responsibility to include our report on the supplemental information in any document that contains the supplemental information and indicates we have reported on it.

Other documents

Auditing standards generally accepted in the United States of America require that we read any annual report (or similar document) that contains our audit report. The purpose of this procedure is to consider whether other information in the annual report, including the manner of its presentation, is materially inconsistent with information appearing in the financial statements. We assume no obligation to perform procedures to corroborate such other information as part of our audit.

The National Council may wish to include our report on these financial statements in a registration statement proposed to be filed under the Securities Act of 1933 or in offering materials for other securities offerings, including without limitation offerings under Rule 144A and other offerings exempt from registration under the Securities Act of 1933. You agree that the aforementioned audit report, or reference to our Firm, will not be included in any such offering without our prior permission or consent. Any agreement to perform work in connection with an offering, including an agreement to provide permission or consent, will be a separate engagement.

Additionally, regulations established by certain non-U.S. countries include a requirement for the auditor to be registered in that country if the National Council offers its securities to the public in the non-U.S. country or provides financial information to a non-U.S. regulator or government. The potential consequences of our non-compliance with these regulatory regimes in a timely manner can be severe for both our Firm and the National Council. Accordingly, you will notify us of (i) your current or planned offerings of securities on a regulated market in a non-U.S. country or (ii) when you have provided or plan to provide audited financial statements to a non-U.S. regulator or government in connection with your access to its public capital markets, whether or not you include or refer to our report or include reference to our Firm.

Release and indemnification

Because of the importance of oral and written management representations to an effective audit, the National Council releases and indemnifies PricewaterhouseCoopers LLP and its personnel from any and all claims, liabilities, costs, and expenses attributable to any knowing misrepresentation by management.

In no event shall PricewaterhouseCoopers LLP be liable to the National Council, whether a claim be in tort, contract or otherwise, for any consequential, indirect, lost profit or similar damages relating to PricewaterhouseCoopers LLP's services provided under this engagement letter, except to the extent finally determined to have resulted from the willful misconduct or fraudulent behavior of PricewaterhouseCoopers LLP relating to such services.

In the event that our report is subsequently included in a filing with the Securities and Exchange Commission (unless our report is included as a result of Rule 3-05 or Rule 3-14 of Regulation S-X), we and the National Council hereby agree that the preceding two paragraphs in this "Release and Indemnification" section of this letter and any paragraphs covering the same issues in our previous engagement letters for previously issued reports included in the filing will be null and void and will no longer confer any rights or obligations on the parties. Such engagement letters will be deemed to be amended accordingly at the time of such filing, without further action by either party. Any letters so amended will remain in full force and effect unless otherwise amended by the parties.

<u>Dispute resolution procedures</u>

Any controversy or claim between the parties arising out of or relating to this engagement letter, the services provided hereunder, or any prior audit engagement letters or services (a "Dispute") shall be submitted first to non-binding, confidential mediation, and if not resolved by mediation, then to binding arbitration as described herein. The mediation shall be conducted in accordance with these procedures and, except to the extent inconsistent with these procedures, the Mediation Procedure of International Institute for Conflict Prevention and Resolution ("CPR") then in effect.

A party shall submit a Dispute to mediation by written notice to the other party or parties. The mediator shall be selected by mutual agreement of the parties. If the parties cannot agree on a mediator, the CPR shall designate a mediator in accordance with its Mediation Procedure. Any mediator must be acceptable to all parties and must confirm in writing that he or she is not, and will not become during the term of the mediation, an employee, partner, executive officer, director, or substantial equity owner of PricewaterhouseCoopers LLP or any PricewaterhouseCoopers LLP audit client.

The mediator shall conduct the mediation as he/she determines, with the agreement of the parties. The mediation shall be treated as compromise and settlement negotiations under the standards set forth in the Federal Rules of Evidence and all applicable state counterparts, together with any applicable statutes protecting the confidentiality of mediations or settlement discussions. The mediator may not testify for either party in any later proceeding relating to the Dispute. The mediation proceeding shall not be recorded or transcribed. Each party shall bear its own costs (including attorneys' fees) of the mediation. The parties shall share equally the fees and expenses of the mediator.

If the parties have not resolved a Dispute within 90 days after the written notice beginning the mediation process is served (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the Dispute shall be settled by binding arbitration. The arbitration shall be conducted in accordance with these procedures and, except to the extent inconsistent with these procedures, the Rules for Non-Administered Arbitration of the International Institute for Conflict Prevention and Resolution ("Rules") then in effect. The arbitration shall be conducted before a panel of three arbitrators selected using the screened process provided in the Rules. The arbitration panel, and not any federal, state or local court or agency, shall have exclusive authority to resolve any dispute regarding the extent to which a Dispute is subject to arbitration, or relating to the interpretation, applicability, enforceability or formation of the engagement letter.

Any Dispute between the parties, including any claims or defenses asserted, and the interpretation of the engagement letter shall be governed by the law of New York State, without giving effect to its choice-of-law rules. The arbitrators may render early or summary disposition of some or all issues, after the parties have had a reasonable opportunity to make submissions on those issues. Discovery shall be conducted in accordance with the Rules. Upon a showing that the evidence sought is material to the Dispute, hearing sessions attended by one or more panel members may be convened to secure (i) documents from third-party witnesses, if the production cannot reasonably be obtained by other means; and/or (ii) testimony from third-party witnesses who could not be compelled to attend the arbitration hearing at its scheduled location.

Judgment on an arbitration award may be entered in any court having jurisdiction. All aspects of the arbitration shall be treated as confidential, except to the limited extent necessary to obtain entry of the award by a court. The arbitration panel shall have no power to award non-monetary or equitable relief of any sort.

The arbitration panel shall have no power to award damages that are punitive in nature, that do not measure a party's actual damages, or that are inconsistent with the Release and Indemnification provisions or any other terms of the engagement letter. The parties further agree that if the arbitration panel determines to award pre- or post-judgment interest, any such interest shall be computed on a simple basis at a rate of three percent. The parties accept and acknowledge that any demand for arbitration must be issued within one

year from the date the demanding party becomes aware or should reasonably have become aware of the facts that give rise to the alleged liability and, in any event, no later than two years after the cause of action accrued.

In the event that our report is subsequently included in a filing with the Securities and Exchange Commission (unless our report is included as a result of Rule 3-05 or Rule 3-14 of Regulation S-X), we and the National Council hereby agree that the preceding paragraph in this "Dispute resolution procedures" section of this letter and any paragraphs covering the same issues in our previous engagement letters for previously issued reports included in the filing will be null and void and will no longer confer any rights or obligations on the parties. Such engagement letters will be deemed to be amended accordingly at the time of such filing, without further action by either party. Any letters so amended will remain in full force and effect unless otherwise amended by the parties.

Other PricewaterhouseCoopers firms and subcontractors

PricewaterhouseCoopers LLP is the U.S. firm of the global network of separate and independent PricewaterhouseCoopers firms (exclusive of PricewaterhouseCoopers LLP, the "Other PwC Firms"). PricewaterhouseCoopers LLP may, in its discretion, draw on the resources of and/or subcontract to its subsidiaries, the Other PwC Firms and/or third party contractors and subcontractors (each, a "PwC Subcontractor"), in each case within or outside the United States in connection with the provision of the services and/or for internal, administrative and/or regulatory compliance purposes. The National Council agrees that PricewaterhouseCoopers LLP may provide information PricewaterhouseCoopers LLP receives in connection with this agreement to the PwC Subcontractors for such purposes. PricewaterhouseCoopers LLP will be solely responsible for the provision of the services (including those performed by the PwC Subcontractors) and for the protection of the information provided to the PwC Subcontractors.

You agree that neither you nor any group entity will bring any claim, whether in contract, tort (including negligence) or otherwise against any PwC Subcontractor in respect of this engagement letter or in connection with the services herein. In the event that our report is subsequently included in a filing with the Securities and Exchange Commission (unless our report is included as a result of Rule 3-05 or Rule 3-14 of Regulation S-X), for independence purposes we and the National Council hereby agree that the immediately preceding sentence will be null and void and will no longer confer any rights or obligations on the parties. This letter will be deemed to be amended accordingly at the time of such filing, without further action by either party. The amended letter will remain in full force and effect unless otherwise amended by the parties.

Timing and fees

Completion of our work is subject to, among other things, 1) appropriate cooperation from the National Council's personnel, including timely preparation of necessary schedules, 2) timely responses to our inquiries, and 3) timely communication of all significant accounting and financial reporting matters. When and if for any reason the National Council is unable to provide such schedules, information and assistance, PricewaterhouseCoopers LLP and you will mutually revise the fee to reflect additional services, if any, required of us to complete the audit. Should the National Council be acquired, PricewaterhouseCoopers LLP will reserve the right to renegotiate the fees under mutually agreed-upon market rates.

Our fee estimates are based on the time required by the individuals assigned to the engagement. We estimate our fees for this audit engagement will be **$395,000**, subject to the terms and conditions above and exclusive of out of pocket expenses in the amount of **$10,000**. We will advise you should any other circumstances arise which may cause actual time to exceed that estimate.

Our fees and out-of-pocket expenses and internal charges will be billed as follows:

| 2018 | Audit Fee | Out-of-Pocket Expenses | Total |
|---|---|---|---|
| October | $100,000 | | $100,000 |
| November | 50,000 | $5,000 | 55,000 |
| December | 50,000 | | 50,000 |
| 2019 | | | |
| January | 50,000 | | 50,000 |
| February | 50,000 | | 50,000 |

5

| | | | |
|---|---|---|---|
| March | 95,000 | $5,000 | 100,000 |
| Total | **$395,000** | **$10,000** | **$405,000** |

Invoices rendered are due and payable upon receipt.

Any additional services that may be requested and we agree to provide will be the subject of separate arrangements.

<u>Other matters</u>

PricewaterhouseCoopers LLP is owned by professionals who hold CPA licenses as well as by professionals who are not licensed CPAs. Depending on the nature of the services we provide, non-CPA owners may be involved in providing services to you now or in the future.

Compliance with the auditor independence rules is a shared responsibility between a company and its independent auditor. Because the independence rules encompass not only the National Council but also its affiliates, as defined in AICPA Code of Professional Conduct 0.400.02, the National Council agrees to inform us periodically about the identity of each affiliate and will notify us in advance regarding any expected addition or removal of an affiliate, including, for example, due to certain changes in ownership or control and new acquisitions or significant investments. The National Council acknowledges that we will use this information confidentially to assess and/or reassess independence.

In the event we are requested or authorized by the National Council or required by government regulation, subpoena, or other legal process to produce our working papers or our personnel as witnesses with respect to our engagement for the National Council, the National Council will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such a request.

The National Council agrees that it will not, directly or indirectly, agree to assign or transfer this engagement letter or any rights, obligations, claims or proceeds from claims against PricewaterhouseCoopers LLP arising out of or in any way relating to this engagement letter, any services provided hereunder, or any fees for this engagement or such services, to anyone, except to an entity with which the National Council merges or an entity which acquires all or substantially all of the assets of the National Council and where, in either case, the assignee entity agrees to be bound by this provision. Any assignment or transfer by the National Council in violation of this paragraph shall be void and invalid.

PricewaterhouseCoopers LLP agrees to carry and maintain in force at all times during the term of this Agreement the lines of insurance coverage with policy limits as follows: (a) Workers Compensation – Statutory with limits as prescribed by applicable state law and Employer's Liability with limits of $1,000,000 per accident and by disease policy limit ; (b) Commercial General Liability with limits of $2,000,000, for bodily injury and property damage, per occurrence and in the aggregate; (c) Business Automobile Liability with limits of $1,000,000, combined single limit, each accident covering non-owned and hired vehicles; (d) Professional Indemnity (Errors and Omissions) coverage with a limit of $1,000,000 per claim and in the aggregate.

This engagement letter reflects the entire agreement between us relating to the services covered by this letter. It replaces and supersedes any previous proposals, correspondence and understandings, whether written or oral. The agreements contained in this engagement letter shall survive the completion or termination of this engagement.

The National Council agrees that PricewaterhouseCoopers may use the National Council's name and logo in experience citations.

* * * * *

We are pleased to have the opportunity to provide services to the Boy Scouts of America National Council. If you have any questions about this letter, please discuss them with Allen Bell (214) 756-1820. If the services and terms outlined in this letter are acceptable, please sign one copy of this letter in the space provided and return it to me. You may return the signed copy by hand, by mail, by air courier, by facsimile to my attention at (813) 375-8467, or attached to an email as a pdf, jpeg or similar file type sent to me at allen.bell@pwc.com.

Very truly yours,

*PricewaterhouseCoopers LLP*

PricewaterhouseCoopers LLP

The services and terms as set forth in this letter are agreed to.

Boy Scouts of America National Council

By: _____
Michael Ashline - Chief Financial Officer

_9/24/18_____
(Date)

4clean letter



**Amendment # 1 to Existing Engagement Letter**

June 2, 2020

Mr. Michael Ashline
Chief Financial Officer
National Council of Boy Scouts of America
1325 Walnut Hill Lane
Irving, Texas 75038-3096

Dear Mr. Ashline:

This letter reflects our agreement to amend our engagement letter of September 24, 2018 with the National Council of Boy Scouts of America (the "National Council") in the following respect.

As discussed and as a result of this change, we have incurred fees overruns and received $135,000 for these overruns prior to the National Council's Chapter 11 bankruptcy petition filed on February 18, 2020. We estimate, and the National Council agrees, that we may be compensated for additional estimated fee overruns ranging from $150,000 - $250,000 in connection with the audit of National Council's 2018 consolidated financial statements, subject to the bankruptcy court's approval.  All other provisions of our engagement letter of September 24, 2018 with the National Council remain unchanged.

If you have any questions regarding this amendment, please discuss them with Allen Bell (214) 756-1820.  If the services and terms outlined in this amendment to the engagement letter are acceptable, please sign one copy of this amendment in the space provided and return it to me.

Very truly yours,


PricewaterhouseCoopers LLP

The services and terms as set forth in this letter are agreed to.

National Council of Boy Scouts of America


By: _____
    Michael Ashline, Chief Financial Officer

    _____
    Date