```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2
                                       .    Chapter 11
 3      IN RE:                         .
                                       .    Case No. 20-10343 (LSS)
 4      BOY SCOUTS OF AMERICA and      .
        DELAWARE BSA, LLC,             .
 5                                     .
                                       .
 6      _____Debtors._____.
        BOY SCOUTS OF AMERICA,         .    Adv. Pro. No. 20-50527
 7                                     .
                        Plaintiff.     .
 8                                     .
             v.                        .    Courtroom No. 2
 9                                     .    824 Market Street
        A.A., et al.,                  .    Wilmington, Delaware 19801
10                                     .
                        Defendants.    .    June 8, 2020
11      . . . . . . . . . . . . . . . .     10:00 A.M.

12

13                   TRANSCRIPT OF TELEPHONIC HEARING
              BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
14                  UNITED STATES BANKRUPTCY JUDGE

15      TELEPHONIC APPEARANCES:

16      For the Debtor:          Derek C. Abbott, Esquire
                                 MORRIS, NICHOLS, ARSHT & TUNNELL LLP
17                               1201 North Market Street, 16th Floor
                                 P.O. Box 1347
18                               Wilmington, Delaware 19899

19

20      Audio Operator:          Ginger Mace

21      Transcription Company:   Reliable
                                 1007 N. Orange Street
22                               Wilmington, Delaware 19801
                                 (302)654-8080
23                               Email:  gmatthews@reliable-co.com

24      Proceedings recorded by electronic sound recording;
        transcript produced by transcription service.
25
```

TELEPHONIC APPEARANCES (Continued):

For the Debtors:          Jessica C. Boelter, Esquire
                          Michael Andolina, Esquire
                          SIDLEY AUSTIN LLP
                          787 Seventh Avenue
                          New York, New York 10019

                          - and -

                          Richard Mason, Esquire
                          WACHTELL LIPTON ROSEN & KATZ
                          51 West 52nd Street
                          New York, New York 10019

                          - and -

                          Shannon Wheatman, Esquire
                          KINSELLA MEDIA
                          Washington, D.C. 20037

For the U.S. Trustee:     David Buchbinder, Esquire
                          OFFICE OF THE UNITED STATES TRUSTEE
                          844 King Street, Suite 2207
                          Wilmington, Delaware 19801

For the Committee:        Rachel Ringer, Esquire
                          KRAMER LEVIN NAFTALIS & FRANKEL LL
                          1177 6th Avenue
                          New York, New York 10036

For Future Claimants:     Robert Brady, Esquire
                          YOUNG CONAWAY STARGATT & TAYLOR, LLP
                          1000 North King Street
                          Wilmington, Delaware 19801

For National Surety       Harris Winsberg, Esquire
Corporation and Allianz   TROUTMAN SANDERS LLP
Global Risks US           600 Peachtree Street, Suite 3000
Insurance Company:        Atlanta, Georgia 30308

For Interested Parties:   James Stang, Esquire
                          PACHULSKI STANG ZIEHL JONES LLP
                          919 North Market Street, 17th Floor
                          Wilmington, Delaware 19801

TELEPHONIC APPEARANCES (Continued):

```
For AIG:                Susan Gummow, Esquire
                        FORAN GLENNON PALANDECH PONZI
                           & RUDLOFF, P.C.
                        222 North LaSalle Street, Suite 1400
                        Chicago, Illinois 60601

For Agricultural        Taylor Meehan, Esquire
Insurance Company:      CLYDE & CO US LLP
                        101 2nd Street
                        San Francisco, California 94105

For First State         James Ruggeri, Esquire
Insurance Company:      SHIPMAN & GOODWIN LLP
                        1875 K Street NW, Suite 600
                        Washington, DC 20006
```

<u>MATTERS GOING FORWARD</u>:

Debtors' Motion for Entry of an Order (I) Appointing a Judicial Mediator, (II) Referring Certain Matters to Mandatory Mediation, and (III) Granting Related Relief (D.I. 17, Filed 2/18/20).

**Ruling:   54**

<u>ADVERSARY PROCEEDING</u>:

*Boy Scouts of America v. A.A. et al., Adv. Pro. No. 20-50527*

Second Stipulation and Agreed Order by and Among the Boy Scouts of America, The Official Committee of Survivors of Abuse, and The Official Committee of Unsecured Creditors Modifying the Consent Order Granting the BSA's Motion for a Preliminary Injunction Pursuant to 11 U.S.C. §§ 105(a) and 362 and Further Extending the Termination Date of the Standstill Period (A.D.I. 76, Filed 6/2/20).

**Ruling:   10**

1          (Telephonic hearing commenced at 10:09 a.m.)

2          THE COURT:  Good morning, counsel.  This is Judge

3 Silverstein.  We're here in the Boy Scouts of America case;

4 Case No. 20-10343.

5          Ginger, can you please remind everyone of the

6 protocol for the hearing?

7          MS. MACE:  It is extremely important that you put

8 your phones on mute when you are not speaking.  When speaking

9 please do not have your phone on speaker as it creates

10 feedback.  This also helps with the background noise so that

11 we can hear the person that is speaking and get an accurate

12 record.  Also, it is very important that you state your name

13 each and every time you speak for an accurate record.

14          Your cooperation in this matter is appreciated.

15 Thank you.

16          THE COURT:  Thank you.

17          Mr. Abbott?

18          MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

19 here for the debtors.

20          Your Honor, although there was a lengthy agenda

21 most of the items have either had an order entered or been

22 adjourned.  There are two matters going forward, Your Honor;

23 Docket Items No. 8 and 10.  Docket Item No. 8, Your Honor, is

24 the mediator motion from Docket Item 17 in the case.  Docket

25 Item 10, Your Honor, is the further stipulation regarding the

1  preliminary injunction.

2          Your Honor, that we don't believe is contested,

3  No. 10, and some of how that has evolved will impact a little

4  bit the discussion of No. 8.  So, Your Honor, I would

5  propose, unless Your Honor wishes to do it otherwise, to

6  tackle No. 10 first if that would please the court.

7          THE COURT:  That's fine.  As I read the agenda

8  this matter was going forward as a status conference. So,

9  let's go forward with that.

10         MR. ABBOTT:  Thank you, Your Honor.  And on that

11  basis I will turn it over to Mr. Andolina if I may.

12         MR. ANDOLINA:  Good morning, Your Honor.  Mike

13  Andolina, Sidley Austin, on behalf of the debtors.  Happy

14  Monday.

15         Your Honor, you will recall that when the parties

16  were before you on May 18th the court had entered a short

17  extension of the preliminary injunction with respect to the

18  impending abuse actions until today, June 8th.  Your Honor,

19  we're pleased to report that as a result of extensive

20  negotiations we now have an agreement and stipulation to

21  extend that preliminary injunction through the bar date of

22  November 16th.  That stipulation was filed in the adversary

23  proceeding last Tuesday, Your Honor, June 2nd, at Docket No.

24  76.

25         The stipulation, Your Honor, provides that each of

1 the local councils, to the extent that they wish to receive

2 the continuing protection of the preliminary injunction, must

3 sign an acknowledgement and agreements on or before July 6th,

4 2020 and agree to provide certain information to the BSA on a

5 going forward basis.  Your Honor, the form of acknowledgement

6 and agreement is at Docket No. 76, Exhibit 4, Pages 2 and 3.

7 This agreement in the overall stipulation was negotiated

8 between the committees, the BSA, and also the ad hoc

9 committee of local councils.

10        We want to thank Mr. Stang, and Mr. Luca, as well

11 as Ms. Ringer, and Mr. Mason and his colleagues for their

12 efforts over the past several weeks.  All of the parties

13 believe this is a fair process that will keep the local

14 councils involved in the negotiations, but also provide the

15 committees the information they have requested.

16        Your Honor, as the agenda noted we did receive

17 three objections to the prior stipulation.  The debtors have

18 been in touch with all three parties and they have each

19 agreed that their objections, to the extent that we are

20 unable to resolve them will be continued until the July 9th

21 hearing in accordance with the stipulation.  In that regard,

22 Your Honor, the stipulation will be filed in all of the

23 pending abuse dockets and additional parties will have until

24 June 19th to object with replies due on July 2nd.

25        One additional note, Your Honor, the second

1  stipulation includes language describing an alternative

2  procedural mechanism for further extensions of a preliminary

3  injunction, specifically Paragraph 8, Your Honor, the second

4  stipulation provides that BSA may file an extension motion no

5  later than twenty-five days prior to the termination date

6  with this court and serve all counsel in the pending abuse

7  action with stipulations that sets forth a briefing

8  scheduling culminating on that extension motion.

9          The parties understood, Your Honor, that a

10  protocol along these lines was preferable to the court on a

11  going forward basis.  So, we wanted to include that change

12  and alert the court.

13          I'm happy to answer any questions, Your Honor,

14  with respect to the stipulation, but the debtors would

15  request that it be entered by the court.

16          THE COURT:  Thank you.

17          MR. STANG:  Your Honor, this is Mr. Stang.  When

18  appropriate I'd like to make a comment.

19          THE COURT:  This is an appropriate time.

20          MR. STANG:  It is or is not?

21          THE COURT:  Yes, it is.

22          MR. STANG:  Oh, okay.  Sorry, Your Honor.  Thank

23  you.

24          Your Honor, I'm responding to the comment that Mr.

25  Andolina made about the discovery that is connected with this

1  injunction.  We are, both committees, I speak for Ms. Ringer,

2  if I may, are anticipating a substantial data download from

3  BSA that relates to the local councils.  Members of the ad

4  hoc local council have delivered some discovery to our

5  committee on a professional eyes only basis and we are

6  anticipating that as local councils sign-up to this protocol

7  that additional discovery will be forthcoming as well.

8         The reason for my comments are twofold.  First,

9  the stipulation was very clear, we think, that to the extent

10  the discovery we are getting from the local councils, which

11  is all being done now on a voluntary basis, is not adequate

12  or doesn't cover the topics that we feel we need that the

13  stipulation does not bar us from seeking discovery through

14  process.

15         The second thing is, and I usually don't do

16  something like this, but I'd ask your indulgence, Your Honor,

17  the release of the information to the committee's is

18  dependent on the execution of the -- or the entry of the

19  protective order.  And we have several meetings lined up this

20  week with the debtor and amongst the committee that

21  anticipated that the protective order would be signed by now.

22  And I know that it's on your desk and from a scheduling

23  perspective some very important meetings when we might expect

24  an entered order in whatever version it comes down.

25         So that's it, Your Honor.  Thank you.

1          THE COURT:  Thank you.  My goal is to enter that

2  protective order today.

3          Does anyone else wish to be heard?

4          MS. RINGER:  Your Honor, its Rachel Ringer from

5  Kramer Levin on behalf of the unsecured creditors committee.

6          I don't have anything to add.  I just -- Mr.

7  Stang, I think, covered it.  I know he said that he wanted to

8  speak for me. I think he covered it and I certainly don't

9  disagree with anything that he said.

10          THE COURT:  Thank you.

11          Anyone else?

12      (No verbal response)

13          THE COURT:  Okay.  I reviewed the stipulation and

14  I will enter it as requested given that there's an agreement

15  from the three objectors to postpone their objection to July

16  9th.  And I will hear those objections on that date unless,

17  of course, there is a resolution ahead of time.  And I would

18  encourage the parties to talk in that regard.

19          I do believe that a mechanism where parties can

20  object to a further extension prior to the time that the

21  current extension lapses is appropriate.  So, I will enter

22  that stipulation which I understand to be Docket 76.

23          MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

24  for the debtors again.

25          Your Honor, I think that brings us to Docket Item

1  No. 8 which is the mediator motion, again Docket Item 17.  I

2  will ask Ms. Boelter to address the court regarding that if

3  we may.  Thank you, Your Honor.

4           THE COURT:  Thank you.

5           MS. BOELTER:  Thank you.  Jessica Boelter, Sidley

6  Austin, on behalf of the debtors.

7           Your Honor, this is a continuation of the hearing

8  on the debtors' motion to appoint a mediator at Docket No.

9  17.  As with our last hearing on this motion we believe there

10 still are three remaining objecting parties, namely the

11 objecting insurers Hartford, Century and Allianz.

12           In contrast to the last hearing, I think in light

13 of additional disclosures and filings that have been made

14 we've managed to, at least, crystalize the issues that are

15 before the court.  And what I would like to do, Your Honor,

16 is walk you through what we think is still in dispute.

17           The objections, Your Honor, largely fall into what

18 I call three of the five W's; when, who and what.  I am going

19 to take them in that order.  That is when should a mediator

20 or mediators be appointed?  Who should those mediators be?

21 And what should the proposed form of order say about the

22 mediators and the mediation process?

23           Starting with the when, when should the mediator

24 be appointed, we believe the answer is now.  The other

25 official constituents in this case agree with us, the TCC,

1  the UCC, the FCR, even the ad hoc committee of local

2  councils, we all agree a mediator needs to be appointed now.

3  Now I understand the insurers pointed to some comments made

4  by counsel to the TCC pertaining to the fact the notion of a

5  global resolution of the debtors' abuse liability really

6  couldn't occur until after the bar date of November 16th.

7          And, in fact, one of the insurers even suggested,

8  incredibly, that we could use this time to take discovery of

9  our proposed mediators.  Your Honor, we think that's just

10  wrong.  The TCC has clarified its statement in its filing

11  that was made, I believe that was on Friday afternoon.  I'm

12  not sure if Your Honor has had the opportunity to see that,

13  but the TCC, the  UCC and the debtors have each identified

14  issues that could be mediated and, in fact, should be

15  mediated in advance of the bar date.

16          Just to put a little more meat on that bone,

17  you've probably seen in the agenda the identified property

18  dispute scheduling motion.  We've kind of tossed that concept

19  around a few times in our pleadings and, again, in the

20  agenda, but it's really an essential issue to this Chapter 11

21  case.  And the notion behind that motion was to establish a

22  schedule to litigate disputes pertaining to the debtors'

23  property.

24          When I say that I'm really referring to the High

25  Adventure Bases.  The debtors believe that the High Adventure

1 Bases are restricted assets; in other words, should not be

2 made available to satisfy the claims of creditors and are

3 core to the mission in that the debtors should not be forced

4 to monetize those assets to satisfy the claims of creditors.

5         It will come as no surprise to Your Honor that Mr.

6 Stang and Ms. Ringer absolutely disagree with that position.

7 We've heard from both the TCC, and the UCC, and the FCR, as

8 well as the United States Trustee that they have a problem

9 with that scheduling motion and that they would object to it

10 very vociferously if it comes before the court.  We've

11 continued to push it out because we actually believe those

12 issues are ripe for mediation.

13         We think they should be mediated.  We think it

14 would be much more efficient to mediate those issues and

15 those issues are not dependent in any way, shape or form on

16 the bar date in November or even -- nor do they implicate the

17 insurers' interests.  So, that is one very concrete example,

18 Your Honor, of an issue that's going to be ultimately central

19 to the plan, that can be mediated relatively immediately.

20         The second reason, Your Honor, that we think we

21 need to get started with mediation right away is, frankly,

22 the cost of these Chapter 11 cases.  It's just becoming much

23 too burdensome for the debtor.  If you simply look at the

24 filed fee applications which really only cover through March

25 and some of the significant retained professionals have not

1  actually filed fee applications, we've already got $8 million

2  dollars of fee apps sitting on the docket and the debtors

3  estimate that if you project that forward through April we're

4  looking at $17 million dollars of professional fees for $2

5  and a half months of this case.  That is absolutely not

6  sustainable for this charitable non-profit organization.

7          We cannot afford to litigate our way through this

8  Chapter 11 case.  There is only one way to get there and that

9  way is to get there through mediation, through the central

10  issues that we know are going to come up ultimately at plan

11  confirmation.  So, to answer the first W, the when, the when

12  is now and we think that's pretty crystal clear from the

13  pleadings.

14          So, that brings me to the second W, the who, who

15  should the mediator or mediators be.  As Your Honor is aware

16  we scheduled -- excuse me, we proposed, along with the UCC,

17  the TCC, the FCR, and the ad hoc committee of local council a

18  panel of three mediators.  And we really viewed this and

19  continue to view this as the perfect solution for a mediator

20  problem that we would, otherwise, encounter in this case.

21          We have three individuals that have very different

22  backgrounds and very different areas of expertise, each of

23  which we believe are necessary for purposes of mediating the

24  cases.  You have Eric Green who is an undisputed expert in

25  bankruptcy mass torts.  You got Mr. Finn who has mediated

1  hundreds of abuse survivor cases.  And as we have all come to

2  learn during this proceeding abuse survivors have very

3  particular and sensitive issues that it really takes an

4  expert to understand, like Mr. Finn and I'm sure Mr. Stang

5  would tell us more about that.  Then finally we've got Mr.

6  Gallagher who is an individual who has extensive coverage

7  mediation experience and that the parties were informed was

8  universally acceptable to the insurers.

9         So, in the wake of our last hearing, Your Honor,

10  each of these three original panelists provided the 2014

11  disclosures.  And from the debtors perspective and I don't

12  want to speak for the TCC, UCC or FCR, but I think they would

13  agree nothing has changed.  And, in fact, from our

14  perspective there were no surprises in those disclosures.

15         Now the insurers have wanted to make much about

16  the relationship between Mr. Green and Mr. Patton, the FCR.

17  The insurers pointed this out before, the 2014 said the same

18  thing; it's no surprise that Mr. Patton and Mr. Green have

19  worked together.  They are each the foremost experts in their

20  respective areas. And it's because of that expertise that Mr.

21  Patton was selected as the future claimant's representative

22  for this particular case and it's because of that expertise

23  that Mr. Green was also selected as a mediator.

24         Notably, it's not Mr. Patton that is pushing Mr.

25  Green forward, it's the debtor, it's the unsecured creditors

1 committee, and it's the TCC.  And by the way, there has been

2 no suggestion that Mr. Green has a relationship with the TCC.

3 And it's also the ad hoc committee.  This was a panel of

4 three that everyone agreed to.

5       Now they also -- the insurers also make something

6 of the fact that Mr. Green disclosed that he is social

7 friends with Mr. Patton or a somewhat of a social

8 relationship.  For the reasons in our paper we don't think

9 that's the disqualifying at all.  Moreover, the insurers'

10 position fails to take into account the checks that are

11 already built into this mediation proposal before the court.

12 First, as we pointed out the FCR role in this case is very

13 limited.  The FCR represents individuals that are currently

14 under the age of 18 and represents individuals who have

15 repressed memory.  That is a very limited universe.  The TCC,

16 Mr. Stang's group, represents the vast majority of the abuse

17 survivors and, again, there has been no suggestion that Mr.

18 Stang has any issue with Mr. Green.

19       I'd also point out, and I think Your Honor took

20 note of this in our last hearing, this is a three mediator

21 panel.  There are two other mediators that provide a very

22 important check on each of the other mediators.  That is why

23 this panel was, essentially, a perfect solution from the

24 debtors' perspective and the other constituent's perspective.

25 And then finally --

1          THE COURT:  Ms. Boelter?

2          MS. BOELTER:  Yes.

3          THE COURT:  Do you want to explain that check to

4   me because I really -- I have never been involved in a three

5   mediator mediation and I'd like to understand what you

6   believe the check is on that, on each mediator.

7          MS. BOELTER:  Yes, Your Honor.  So, I think it

8   goes back to, essentially, it's a twofold response.  One is

9   because of the complexity of this case each of the mediators

10  provides a unique perspective.  We've got the coverage

11  mediator that provides the perspective of understanding the

12  insurers having been involved in numerous insurance coverage

13  disputes.  You've got Mr. Finn who while he doesn't

14  necessarily have bankruptcy expertise he has mediated

15  numerous abuse survivor proceedings.

16          Again, as I suggested before, I think Mr. Stang

17  will tell you and as I think he's repeated often in these

18  proceedings, the abuse survivor perspective is one that's

19  emotional, it's sensitive and it requires a particular party

20  that understands abuse survivors, what they've been through

21  and the damages that they have suffered.  Then finally you

22  have Mr. Green who has extensive bankruptcy expertise

23  including what may be the center of this particular

24  bankruptcy, a channeling injunction that involves releases

25  for not only the debtor, but also potentially the local

1  councils.

2         So, with that we've got expertise checks on the

3  system, but we also have checks on the system from a

4  familiarity perspective.  Mr. Finn, again, is familiar with

5  the abuse survivor constituency.  Mr. Gallagher is familiar

6  with the insurance constituency.  Mr. Green, from our

7  perspective, actually, is quite familiar with all aspects of

8  the constituencies because he's mediated all different types

9  of cases.

10         Each of those individuals brings an important

11  check to the other.  As we look at, for example, the mediator

12  order, when it comes to the process for mediation and as I

13  will get to in a moment, the issues to be mediated rather

14  than legislating how the mediators are going to interact with

15  one another we're proposing, Your Honor, that the mediators

16  confer amongst themselves in terms of the process for the

17  mediation.  They will also confer with the parties as well as

18  the issues to be mediated and how they will be mediated as

19  among those mediator parties.

20         So, we believe that there are checks, Your Honor.

21  We also believe that the mediation -- you know, we took Your

22  Honor's comments to heart at the last hearing and the

23  insurers' remarks and we've modified the mediator order so

24  it's not mandatory.  If the insurers don't want to

25  participate you're not mandating that they do so.

1          Now, while we continue to believe that the

2    original panel offered the, really, perfect solution for the

3    divergent interests that will be subject to the mediation we

4    also heard Hartford's counsel on the record a few weeks ago

5    mention Mr. Carey's name.  I believe both Hartford and

6    Allianz mentioned Mr. Carey in their pleadings.  And as the

7    debtor represented in our pleadings no one can deny that Mr.

8    Carey has extensive expertise in complicated bankruptcy

9    matters.  And I don't think that anyone can call into

10   question his impartiality here.

11          I say that, Your Honor, notwithstanding the fact

12   that his 2014 disclosure did include the fact that Mr.

13   Carey's law firm is general counsel to the Girl Scouts which

14   is a member of the creditors committee and, as you know, an

15   adverse litigant to the Boy Scouts.  We believe that Mr.

16   Carey can adequately deal with that and we don't think that

17   in any way should call into question his ability to mediate

18   these cases.

19          So, as we indicated in our papers if the original

20   panel is not acceptable to the court we think that Mr. Carey

21   is absolutely acceptable to mediate these disputes, but I

22   understand the UCC and the TCC may have something to say

23   about that.

24          That gets me, Your Honor, to what is in the

25   proposed form of order.  As I indicated, for purposes of

1  this, sort of, opening remark I don't intend to go through

2  line by line.  I imagine there are other parties that would

3  like to be heard before we get to that point, but I do want

4  to provide an overview of the changes that were made because

5  I think they really do address the concerns that the

6  remaining three objectors have raised.

7        Again, we've changed the order so that mediation

8  is no longer mandatory.  We also heard at the last hearing

9  parties struggle with identifying the topics that would be

10 mediated, how that would, sort of, work vis-à-vis each of the

11 individual mediators.  The order now includes a process for

12 parties to the mediation to propose a topic on notice to the

13 other parties and for the mediators to confer among

14 themselves on how to conduct the mediation with respect to

15 those topics.

16       Again, Your Honor, we thought it was probably not

17 wise to pre-legislate how the mediators would proceed as far

18 as that goes, but we did want to provide guidance in the

19 order with respect to that issue because we heard the parties

20 loud and clear that they needed a little bit additional

21 guidance in the form of order.

22       That brings me, I think, to three additional

23 issues that don't appear in the proposed form of order, but

24 were raised by Century as things that they would like to see

25 in the proposed form of order.

1          The first is Century, as they've expressed in

2  connection with the protective order, has concerns that the

3  mediation could result in the transfer of privileged

4  information by the debtors to a party that's not within the

5  scope of that privilege such as the TCC or the FCR.

6          First, Your Honor, it's our view that the

7  protective order that Mr. Stang just raised will govern the

8  provision and production of information in connection with

9  all aspects of this Chapter 11 case including the mediation

10  itself. I don't believe that's currently in the order right

11  now, but we can absolutely state that the provision of

12  information in connection with the mediation is subject to

13  the terms of the protective order.

14          And as we heard at our last hearing the protective

15  order now contains very clear language with respect to the

16  fact that individuals can't be violating privilege when

17  they're providing information in connection with these

18  Chapter 11 cases.  We're happy to cross-reference that

19  language or cross-reference the protective order. The

20  mediation order, itself, is not about information sharing,

21  it's simply about the appointment of a mediator.  We think

22  that should resolve that issue.

23          Second, Century has requested language in the

24  mediation order that provides that prior to the mediation

25  information that was shared with the FCR prior to the

1  bankrutpcy case and what is in, essence, the predecessor of

2  the TCC, the ad hoc committee of survivors that existed prior

3  to the bankruptcy case, Century has requested that they be

4  provided that information.  Your Honor, we don't think the

5  mediation order is an appropriate document to order

6  production of documents or to deal with production of

7  documents at all for that matter.

8          What I will say and we've represented this to

9  Century before and I will say it again, once the protective

10 order is entered the debtors will provide, in accordance with

11 the protective order, the information that had been provided

12 to the FCR and the ad hoc group of claimants prior to the

13 bankruptcy case.  That information had been provided to those

14 constituencies prior to the bankruptcy subject to a very

15 extensive non-disclosure agreement.  We view the protective

16 order as providing that same type of protection now that

17 we're in the Chapter 11 case and we're happy to represent to

18 Century that in accordance with the protective order the

19 information will be provided.

20          Finally, Century has requested in its most recent

21 pleading, by the way, I'm referring to Docket 761 filed on

22 June 2nd, a short form of, what I'll just sort of casually

23 refer to as, insurance neutrality language.  Again, Your

24 Honor, the mediation order we don't believe in any way

25 effects the substantive rights of the parties.  It's really

1  only intended to get the mediators appointed and up and

2  running.  That being said the debtors certainly would be

3  amendable to adding some type of insurance neutrality

4  language to the form of order.  In fact, I believe that

5  language may have been exchanged with insurers several weeks

6  ago if that satisfies the concern of Century with respect to

7  that topic.

8          So, that is where we are from the debtors'

9  perspective, Your Honor, with respect to the mediation order.

10 I am happy to answer any other questions or cede the podium

11 to other parties that may want to be heard.

12          THE COURT:  I don't have any questions right now.

13          Let me hear from Mr. Stang.

14          MR. STANG:  Thank you, Your Honor.  Your Honor,

15 this negotiation leading to the three person panel was

16 evolved. It was a lot of balancing going on between what we

17 wanted and what the other parties wanted.  I guess it's a

18 good compromise because we're not entirely happy, but we can

19 deal with it.  That is supposedly the essence of a good deal.

20          I don't know Judge Carey.  I don't think I have

21 ever appeared before him, but clearly his reputation proceeds

22 him.  Notwithstanding that, Ms. Boelter's comments about Mr.

23 Finn's unique qualifications are absolutely matters of great

24 concern to my committee.  Mr. Finn, as we said in our

25 pleading, is the most experienced sex abuse mediator in the

1  country and also can claim that title as to Boy Scouts sexual

2  abuse.  And if we don't have him as part of this group I

3  think the likelihood of the success of the mediation, from

4  our perspective, will be in real jeopardy.

5          So, he is a very important element for us and we

6  would ask that you approve the panel as presented to you as

7  representing the balance of everyone's interests. Thank you,

8  Your Honor.

9          THE COURT:  Thank you.

10         Ms. Ringer?

11         MS. RINGER:  Thank you, Your Honor.  Rachel Ringer

12  from Kramer Levin on behalf of the unsecured creditors

13  committee for the record.

14         I don't want to repeat what Ms. Boelter or Mr.

15  Stang said, but I think from the unsecured creditors

16  committee's perspective it was important to us that there be

17  a mediator in place that did have bankruptcy expertise.  So,

18  while we understood and respected the issues that were being

19  raised by the TCC we did think it was important that there be

20  someone in place with bankruptcy expertise to deal with

21  issues that may go beyond those issues that pertain to just

22  the issues that are attended to these claims in this case.

23         So, the fact that Mr. Green not only had

24  bankrutpcy expertise, but also had mass tort bankruptcy

25  expertise we thought was a positive.  That is why we had,

1   through the negotiations, ultimately agreed to initially Mr.

2   Green and Mr. Finn, then to address the issues raised by the

3   insurers the inclusion of Mr. Gallagher as well which we

4   think really rounds out the slate and makes for a good group

5   of mediators that can work together on these issues including

6   the issues that we have all identified in either the debtors'

7   reply, the TCC's joinder, the UCC's joinder.

8           As Mr. Stang indicated in connection with the

9   preliminary injunction status conference discovery for both

10  committees is going to be extremely important here, and

11  getting the information from the debtors with respect to the

12  identified property motion and the question of restricted

13  assets, and getting information from the local councils,

14  chartered organizations for questions relating to third-party

15  releases and estate claims and estate releases are all going

16  to be extremely important.

17          So, from our perspective getting a mediator in

18  place now can start facilitating those discussions, those

19  negotiations which can all happen pre bar date even though we

20  understand that the TCC views that a global resolution may

21  need to wait until that point, but we think a lot of progress

22  can be made in the interim.  So, we felt that this group of

23  mediators, in particular, was the right group for this case.

24          We did include in our joinder the note that, you

25  know, we recognize that former Judge Carey is eminently

1  qualified to assist here.  We saw what the debtors put in

2  their reply.  Given the extensive negotiations around the

3  three mediators that we are proposing we don't agree that

4  having Judge Carey get put in as the lead or sole mediator is

5  appropriate here and so we really stand by the slate of

6  mediators that's being proposed.

7         Obviously, if Judge Carey was being introduced we

8  would have to have yet another negotiation because the group

9  that is being presented through the order and through the

10 motion was the subject of a lot of negotiations. So, we do

11 stand by that.

12         THE COURT:  Mr. Brady?

13         MR. BRADY:  Thank you, Your Honor.  Robert Brady

14 on behalf of the FCR.

15         Your Honor, as you heard, this is now a voluntary

16 mediation.  The panel that's been agreed to has been agreed

17 to by all the major constituents, the TCC, the UCC, the FCR,

18 and the ad hoc committee of local counsels all, Your Honor,

19 have differing interests and yet they were able to come

20 together on this panel.  It's the right group for all the

21 reasons you've heard.  And we ask that the court enter the

22 proposed order that the debtor has submitted.

23         THE COURT:  Thank you.

24         Anyone else?

25         MR. MASON:  Your Honor, Richard Mason for the ad

1  hoc committee.  May I be heard?

2            THE COURT:  Yes.  Mr. Mason.

3            MR. MASON:  Thank you so much, Your Honor.

4  Richard Mason of Wachtell Lipton Rosen & Katz for the ad hoc

5  committee of local councils.

6            Your Honor, we support the position espoused by

7  the debtor, the tort claimants committee, the unsecured

8  creditors committee and the FCR.  We do think that we're at a

9  pivotal point in this case, Your Honor.  With your tremendous

10 assistance and orders we've gotten very important

11 preliminaries out of the way.  We have a preliminary

12 injunction extension under a heavily negotiated framework.

13 We have a proposed protective order and we have over 200

14 local councils, Your Honor.  That number, I believe, is

15 climbing.  And we have submitted asset information to be put

16 into the BSA's data base for release to other parties.  Even,

17 Your Honor, in a COVID environment where, at best, the

18 operations are highly constrained and at worst they are, at

19 least, for the moment shut down.

20            So, now, Your Honor, in our view we're poised to

21 begin to get to the heart of the matter.  For that we firmly

22 believe that there is a need for mediation.  And in a

23 mediation the first important step is parties coming together

24 to the best extent possible to select who the mediators are

25 subject to Your Honor's approval.  I would echo the

1  statements made that the negotiation around the mediation

2  order and the selection of the mediators has been intense, if

3  you will, and I think that the proposed resolution achieved

4  needs a balance as much as possible so that the different

5  parties' interests can be addressed.

6        As Mr. Stang said, the TCC feels very strongly

7  that Mr. Finn should be one of the mediators.  Mr. Gallagher

8  was proposed to address the insurers' concerns and for the

9  third mediator we have Mr. Green who has significant

10 expertise in bankrutpcy mediations.

11       From the ad hoc committee's perspective we're

12 comfortable with that package.  We would hope that it won't

13 be unraveled, if you will.  Using Ms. Boelter's

14 (indiscernible) of the three W's to us, Your Honor, the most

15 important W at the moment is when, when should the mediation

16 order be entered and when should the mediation commence.  And

17 we would respectfully urge you, Your Honor, to enter the

18 order today.  There is much, much work to be done to see if

19 we can get to a settlement, Your Honor.  I don't know that we

20 can.  I'm hopeful that we can, but I think we need, with the

21 assistance of mediators, to begin to try that now.

22       For all the reasons that Your Honor has heard

23 time, unfortunately, is not a friend of the scouting movement

24 in terms of the time that this will take, not a friend to

25 ultimately a potential settlement.  So, we would urge you,

1  Your Honor, respectfully to enter the order today.  Thank

2  you.

3         THE COURT:  Thank you.

4         Is there anyone else who wishes to speak in favor

5  of the debtors' motion?

6      (No verbal response)

7         THE COURT:  Okay.  Let me hear from -- I think I

8  see Mr. Ruggeri.

9         MR. RUGGERI:  Good morning, Your Honor.  James

10 Ruggeri for Hartford.

11        Your Honor, the first point I'd like to address is

12 Ms. Boelter's point that the mediation order is not intended

13 to legislate, how the mediation is going to work.  She said

14 that we're not yet at a stage going through the order line by

15 line, but I would like to call the court's attention to

16 Paragraphs 2 and 4.  And as we read Paragraphs 2 and 4 that's

17 exactly what the order is trying to do which is to legislate

18 and circumscribe, if you will, the role of Tim Gallagher in

19 the mediation.

20        On the one hand it says Mr. Gallagher is to

21 mediate insurance issues which distinguishes him from the

22 other and provides a limited role.  And in Paragraph 4,

23 though, it says that the issues are going to be teed up and

24 the mediators are going to decide for themselves who is going

25 to help on the issues and how.  I don't think those are

1  reconcilable.  I think the last sentence of Paragraph 2 needs

2  to be stricken so the mediators do have discretion, as Ms.

3  Boelter said, to mediate as they deem appropriate.

4          The other point, going back to the check on each

5  of the expertise, if you will, the expertise checks and the

6  familiarity checks that Ms. Boelter mentioned seems to me

7  that I've heard just about everyone say with regard to the

8  bankruptcy check, if you will, former Judge Carey universally

9  has been praised as eminently qualified; qualified both in

10  respect to general bankruptcy and qualified in respect of the

11  types of bankruptcy issues that he has wrestled with in his

12  distinguished career.  I don't think that the praise

13  (indiscernible) any of the others to the same degree as

14  former Judge Carey.  It seems to me that he certainly should

15  be a candidate that should be invited to participate on the

16  panel.  We have made the required disclosures with regard to

17  former Judge Carey.

18          The other candidate who nobody has been able to

19  raise questions about in partiality or for seconds of

20  impartiality is Tim Gallagher.  Tim Gallagher is another

21  person who mad the disclosures and comes to this hearing

22  without anybody raising any questions about Mr. Gallagher's

23  qualifications or impartiality.

24          Your Honor, as the court knows, the same isn't

25  said for the other two candidates sponsored by the debtors

1  and the other committees and that's Eric Green and Paul Finn.

2  Your Honor, it's not personal the objections made by Hartford

3  and are personal for either candidate, but we now know that

4  Mr. Patton and Mr. Green worked and still work together as

5  attorney/client.  We know they've written articles together

6  and we know that, in Mr. Green's words, he and Mr. Patton,

7  the future claim's representative, are social friends.

8         I don't know what social friends means in this

9  context. I don't know if it means if they go to dinner

10  together, I don't know if it means they vacation together, I

11  don't know if they means that one is the godparent of the

12  other's child.  I just don't know, but we submit that the

13  disclosure of social friends is pretty extraordinary when

14  we're talking about a standard and everyone agrees on the

15  standard.  The relevant standard is whether the impartiality

16  might reasonably be questioned and the cases have stressed

17  that that standard and the use of the word "might" to say

18  that if there are questions you should err on the side of

19  caution.

20         You've heard the debtors, again, today, repeat

21  what they've put in their papers, which is that Mr. Patton,

22  as the FCR, represents a narrowly circumscribed constituency.

23  We now learn that it means that the debtors don't believe

24  there are going to be many claimants to fall under the

25  category of the FCR's protection, if you will; currently,

1  claimants under 18 are those with repressed memories.

2          Well, we know one thing, Judge; it can't mean that

3  that circumscribed constituency means that the debtor don't

4  believe the FCR is important and has believed that the FCR is

5  important all along because Mr. Patton was nominated and

6  appointed by the debtors before the bankruptcy was filed and

7  invite and allowed him to participate in the last

8  (indiscernible) mediation, that Hartford was not invited and

9  allowed to participate in.

10          So, he certainly is important to the process as

11  the debtors' actions show, and I don't think, Your Honor,

12  that it means if there aren't many claimants it means that it

13  cuts in favor of his employment.

14          Now, this isn't an asbestos bankruptcy.  This

15  isn't a bankruptcy where the present claimants are fighting

16  with the future claimants and their interests are misaligned.

17  This is a unique bankruptcy involving abuse victims and the

18  interests of the present claimants or perhaps because of the

19  circumscribed constituency, the future claims representative

20  are aligned.

21          And from our perspective, Your Honor, any friend

22  of Mr. Patton is really a friend of the TCC.  And we know

23  from, you know, our experience, we put in there that

24  Mr. Green over the course of his career and his involvement

25  in these other bankruptcies has not proven to be a friend of

1  the insurers.  And I'm not saying that that is qualifying or

2  disqualifying, but as the Court can appreciate, it provides

3  cold comfort to my client as an insurer, that Mr. Green is

4  being appointed as someone who is supposed to be neutral.

5  And, again, it's the perception issue is the potential for

6  impartiality and the standard that we're talking about here

7  gives us concern about Mr. Green.

8           Debtors also say in their papers that Mr. Green

9  wouldn't have accepted the appointment if he didn't think he

10 could be fair.  I don't know about that, but that's really

11 not germane to the issue before the Court, because the Court

12 is the one who has to call the balls and strikes on Mr.

13 Green's apparent impartiality or not -- not Mr. Green to sort

14 of self-police that issue.

15          We've heard from the future claims representative

16 in the papers and, again, today, for his part, the FCR,

17 Mr. Patton merely says that Mr. Green is nationally

18 recognized an expert on these issues.  No one disputes that,

19 Judge.  Mr. Green is an expert and he's nationally recognized

20 as a mediator.  He has a very distinguished career as a

21 mediator and worked on a lot of cases.  But he's also worked

22 on cases of the parties to the bankruptcies and he also has

23 this relationship with Mr. Patton that, frankly, hasn't been

24 developed long enough for, I think, any of us to understand

25 it.

1          And we believe that our concerns are warranted,

2   that it's fair, it's appropriate to question Mr. Green's

3   impartiality and we think his candidacy doesn't meet the

4   standard to allow the Court to appoint him and, frankly,

5   there are other eminently qualified candidates to take that

6   place, Your Honor, and that one candidate, which you've heard

7   about this morning, again, is former judge, Kevin Carey, who

8   could certainly play any role that Mr. Green would play.

9          Your Honor, as to Mr. Finn, our concerns are a

10  little bit different.  We were concerned about his one-page

11  disclosure when he made it because it said nothing about his

12  involvement in last fall's mediation.  You'll recall the

13  papers were filed that told us about last fall's mediation

14  that involved the claims matrix, claims protocol, and the

15  papers that were filed were redacted, too.  I think redact

16  seven characters or eight characters I.

17         I had a guess.  Those eight characters spelled out

18  the name Mr. Finn with a space between the first and the

19  second words and we now know we were right.  Mr. Finn was

20  involved in last fall's mediation.

21         They say no harm, no foul because that mediation

22  involved Chubb and Chubb is an insurer.  Now, Your Honor, I

23  love Mr. Schiavoni like a brother -- maybe not like a

24  brother, maybe like a cousin or an in-law -- but I think what

25  the Court will see is that anyone who knows us, Judge, knows

1  that I don't represent Mr. Schiavoni and he doesn't represent

2  me.  We do get along most of the time, but his being at the

3  mediation does nothing to ameliorate the concern that

4  Hartford has over Mr. Finn's involvement and participation in

5  that mediation.

6           And, Judge, if you look at Mr. Finn's

7  disclosure -- I may be the slowest person in the room because

8  I don't kind of understand -- on the one hand, he says he was

9  involved.  He mediated one claim with Sidley Austin in New

10 York in November 2019.  That one claim is this global

11 resolution that was mediated without Hartford and then

12 Mr. Finn goes on to say and he acknowledges that a matrix was

13 distributed.

14          Judge, a matrix doesn't apply to one claimant.

15 You're not talking about discussing and distributing a matrix

16 if you're mediating one claim.  So, for me there's an

17 inconsistency in Mr. Finn's disclosure or maybe I don't

18 understand how he's referencing Sidley Austin.  Maybe I don't

19 understand many things, but I can't work through the

20 disclosure there to reconcile it.

21          Your Honor, the other issue we raise with regard

22 to Mr. Finn was this role as claims reviewer.  I think the

23 Court appreciates that it's a coveted and potentially very

24 lucrative role.  We asked, we said we wanted disclosure of

25 whether Mr. Finn has asked for the job, angled for the job,

1  talking about the job, and whether he was promised the job.

2          The debtors are very careful in their response.

3  They say he had not been promised that job.  They don't say

4  he has not broached the issue of whether he could serve in

5  that job capacity.  They then say because he hasn't been

6  promised that job, it's rank -- our concern is rank

7  speculation.

8          Well, it's not, Judge; again, they didn't say they

9  haven't had discussions about who's going to be the claims

10 reviewer.  They didn't say Mr. Finn hasn't asked about that

11 role.  And we know from his work in other cases that he has

12 been able to, you know, play the role of mediator on the

13 front side prior to confirmation, on the backside, then play

14 the role of claims reviewer.  That what he did in the

15 Archdiocese of Milwaukee case.

16          And, Judge, the other point I would just put a

17 fine point on is that, again, this is not a small job.  It's

18 not chump change.  We're talking about a job on a claims

19 reviewer on the backside that potentially pays millions of

20 dollars here.  We see Mr. Finn bills out at $1500 an hour.

21 We've heard in this case already that some parties expect as

22 many as 7,000 claimants to file claims.

23          You know, if Mr. Finn spends 15 minutes on each of

24 those claims, you know, we're talking about millions of

25 dollars that he will earn, and that's where the real money is

1  in this case for someone such as Mr. Finn, and that gave us

2  concerns.  If he's had discussions about that or wants that

3  job, we know who makes the nomination, subject to the Court's

4  approval or the claims reviewer, pursuant to the process

5  that's approved by the Court.  It's the claimants.  And if

6  Mr. Finn wants that job, we have concerns about his

7  impartiality and whether he could be fair to the insurers'

8  interests.

9          Judge, for those reasons, we think that the two

10 candidates who are eminently qualified, to borrow debtors'

11 phrase, are former Judge Carey and Tim Gallagher and that

12 they would work together well and I don't think the Court

13 should legislate their particular roles or minimize one over

14 the other's.  I think the last sentence of Paragraph 2 needs

15 to be stricken from the order and they both would serve the

16 interests of all parties fairly, impartially, and well, Your

17 Honor.  Thank you.

18          THE COURT:  Thank you.

19          With respect to Mr. Finn and this idea that he

20 might want a subsequent job, can't we solve that pretty

21 easily by indicating that the mediator job is the mediator

22 job and it's not a springboard to anything else and that the

23 mediators, in fact, shouldn't be or won't be retained on any

24 subsequent engagements.

25          MR. RUGGERI:  Thank you, Your Honor.  I thought

 1  that's what we would be able to flush out through our

 2  objection, but the (indiscernible) was made that he hasn't

 3  been promised a job, but, yes, your inquiry could be made and

 4  that assurance could be provided.

 5          THE COURT:  Well, I'm not talking about an

 6  assurance.  I'm talking about my determination that --

 7          MR. RUGGERI:  Understood, Your Honor.

 8          THE COURT:  -- the mediators are not going to be

 9  subsequently employed in other capacities.

10          You know, as far as -- let me ask you this -- as

11  far as Mr. Finn's participation in what I understand to be a

12  two-day sales mediation, I'm not anticipating this is a two-

13  day mediation, not from everything that people are telling

14  me.  And I understand that Hartford wasn't involved, but as

15  in any mediation, the mediators are going to meet with the

16  group, the mediators are going to meet one-on-one,

17  presumably, with each of the parties to be getting

18  information from them on their perspective views which may or

19  may not be shared with the other parties to the mediation.

20          So, I'm trying to understand more the concern that

21  Mr. Finn received a matrix, which he says he does not recall

22  and he doesn't have -- he didn't keep -- and what do you

23  think that concern is?

24          MR. RUGGERI:  I wasn't at the mediation, so I

25  can't speak from firsthand knowledge, but I think all I've

1  learned about the matrix and the mediation is that it was

2  distributed and at least some of the parties thought that the

3  values were too high and the criteria was too relaxed, if you

4  will.

5          So, I worry that Mr. Finn comes to the table --

6  and I don't know, but it's possible -- that a global offer

7  was made in the context of that mediation and it may or may

8  not have been projected and those discussions could have

9  taken place.  So, the floor, if you will, could be

10 established.

11          And, certainly, what Mr. Finn learned at that

12 mediation, he can't wipe his mind clean of and our objection

13 there is that we didn't have an opportunity to participate

14 and sort of navigate on those issues or dealing with those

15 issues before, you know, certain views may have been formed.

16          So, we think it's more fair to Hartford if someone

17 comes in to the process who hasn't been, I wouldn't say, you

18 know, affected, Your Honor, but certainly influenced, at

19 least, or educated on those issues from the perspective of

20 the parties that didn't include Hartford.

21          So, we're worried about a floor being established,

22 that he can't take away what happened there, but in terms of

23 the specifics of what was said there, I don't know because I

24 wasn't there.  I just know what I've learned from the papers.

25          The other point, Your Honor, is that we have asked

1  for the matrix and the protocol and so far, we have not --

2  they have not been provided to us.  And we've been told as

3  recently as last week that it will be provided to us once the

4  Court enters the protective order, but we don't have it, so I

5  don't even know what it says in terms of the value to the

6  criteria, Judge.

7          THE COURT:  Thank you.

8          Mr. Schiavoni, the brother/cousin/in-law?

9          MR. SCHIAVONI:  Your Honor, I noted how slickly my

10  brother transitioned from calling me a brother to an in-law,

11  and knowing my own family, I sort of wondered about that and

12  I'm going to follow-up with Jim about that later.

13          But I'd like to just focus on something a little

14  more basic than what Mr. Ruggeri covered.  Your Honor is very

15  familiar with the In re Congoleum decision by the Circuit and

16  there's two aspects of that decision or I guess it's really

17  one aspect that I would like to just suggest gives some

18  guidance about how to approach this kind of motion in this

19  case.

20          The Court, a panel, a unanimous panel and that

21  Court found that the insurers had a fundamental interest in

22  the integrity of the process.  The Court really emphasized

23  the process and the decision.  A good deal of the oral

24  argument, the questions from the panel focused on that

25  integrity of the process.

1      And then the Court in its decision on the last

2  page talks about how in a case where a mass-tort case where

3  insurance is at issue and debtor wants a release,

4  essentially, at all costs, it's particularly important,

5  because of how the incentives line up and how many of the

6  lawyers involved can be incentivized by goals that are

7  different from a normal bankruptcy, where here we have

8  contingencies driving a significant number of the tort

9  claimant lawyers, that it's important that the Court

10  exercises particular vigilance on the process.

11      And let's be clear like what is really happening

12  with this order.  Changing it from voluntary to mandatory is

13  from our perspective, Chubb's perspective, it's really

14  illusory.  It's not what's at issue here.

15      Because we've seen what's happened in the

16  mediation in Imerys and these other cases, which is

17  completely excluded.  You know, in Imerys, there's sort of

18  like a, we're just sort of put in a different room on a

19  different floor by ourselves and not -- so they can say we

20  participated, but there's no participation.

21      Here, the order purports to basically put in place

22  confidentiality, mediation confidentiality on, in essence,

23  the entire plan formation process and then puts the plan

24  formation process in the hands of a gentleman who may be very

25  knowledgeable about bankruptcies, but who represents tort

1 claimants, the future claimants in four to seven different

2 cases.  He represents them there now.  He aggressively

3 advocates a particular set of positions, has done that over

4 and over again, and has, as his lawyer in those cases, the

5 FCR and his counsel in this case.

6 　　　　　Here, we think transparency is absolutely

7 fundamental to this process and important to it, but I just

8 want to give you just, like, one very basic concern that

9 jumps out immediately.  You just heard Ms. Boelter say that

10 in the face of the tort claimants saying they don't want to

11 negotiate the claims until the bar date -- and by the way,

12 it's hard to imagine like how you could really have a

13 settlement without negotiating the claims -- but they want to

14 focus on the "high-adventure facilities."

15 　　　　　And just a very brief moment on what those are is,

16 those are, the Boy Scouts developed these sort of large

17 properties into kind of Boy Scouts amusement parks.  They

18 physically, like, spent money on all kinds of amusements at

19 the facilities.  They spent hundreds of millions of dollars

20 on this and lenders, very-big lenders spent a lot of money on

21 this.

22 　　　　　The main lender is JPMorgan.  There's lots of

23 bonds involved in that.  The plan that was proposed seems to

24 suggest that JPMorgan should be completely unimpaired as part

25 of the bankruptcy.

1        What they want to negotiate first is the carve-out

2   of all of these properties where JPMorgan is involved as the

3   lender to, you know, any participation in the bankruptcy.

4        Well, in Ms. Boelter's declaration that she

5   submitted as part of the disclosures for the retention,

6   JPMorgan is identified as a current client of the firm.

7   Mr. Cohen (phonetic), the man who signed the retention

8   agreement for the Boy Scouts, is JPMorgan's counsel.  He --

9   this is perhaps Sidley Austin's biggest client today.  They

10  represent JPMorgan in dozens and dozens of bond offerings.

11       So, submitting the very first issue to a

12  completely confidential, completely mediation-disclosed,

13  covered type of proceeding removes all checks and balances

14  about how that will go forward and it puts it in the hands of

15  someone who doesn't have the experience as a judicial

16  officer, but is interested as an interested party, has an

17  interest in sort of like in outcomes of these cases.

18       We would suggest that this is not the way to go,

19  that this is just going to cause problems down the line.

20  It's going to leave the bankruptcy subject to taint and

21  challenge.

22       Former Judge Carey, as a judge, wrote a decision

23  in Tribune that really talks about the interaction between

24  this extensive mediation confidentiality and the plan process

25  and what discovery is proper and whatnot.  It's an issue that

1   can cause chaos.

2           We don't think you need to have a mediator

3   covering the entire plan formation process.  There's no

4   reason they can't discuss, negotiate these kinds of issues

5   without that kind of cloak.  But if Your Honor is going to

6   pursue that cloak, put it in the hands of someone trusted

7   with some integrity.

8           What we saw in _Blitz_, by the way, was even after a

9   deal was struck with the committee, there were groups of tort

10  claimants who objected to the deal, challenged it.  Having

11  former -- at this point, I think it was Judge Gross served as

12  the mediator, that helped get that case done and it sort of

13  quashed some of the challenges about what had happened.

14          Leaving Mr. Green and Mr. Finn in there, it's just

15  an invitation for issues down the line.

16          The notion that there's been some sort of

17  extensive negotiation and that these fellows are the result

18  of extensive compromise, there's no record to support that at

19  all.  I haven't seen anything to suggest that anyone but

20  Mr. Finn was suggested by the committee or ever considered,

21  nor have I seen anything, there's nothing in the record that

22  suggests that anybody but Mr. Green was suggested and

23  proposed.

24          The other constituencies here, it's sort of an

25  echo chamber among them about what they want to do, but

1  they're aligned in the same pursuit of getting this done.

2  The creditors want the lenders to be unimpaired and the tort

3  claimants want Mr. Finn in there to press their claims on the

4  tort claims.

5          There's no reason right now for the Court to have

6  to address whether Mr. Finn is necessary or not necessary.

7  The tort claimants have made it 100 percent clear in their

8  filing on this motion and on the motion to oppose the lift

9  stay that other insurers have filed with regard to the

10 current claims, that they're not going to negotiate the

11 claims until the bar date.  And it's hard to imagine how you

12 can unless there's some disclosure from the tort claimants

13 about the claims that they have.

14         So, there's really nothing for Mr. Finn to do

15 right now.  Certainly, nothing has been suggested that he

16 would do right now if the tort claimants aren't prepared to

17 disclose who their clients are, so I would suggest that that

18 could be put aside, the issue of whether Mr. Finn or someone

19 like Ken Feinberg, who, if he is to mediations what Babe Ruth

20 was to baseball, that he is as well-known and -- we attached

21 an article from *The Wall Street Journal* actually titled

22 "Mr. Fairness."  He's someone who has mediated dozens of --

23 he's running the voluntary mediation program for a number of

24 the archdiocese.  He's, I think, mediated upwards of $400

25 million worth of those molestation cases, so he's hardly

1  someone with no expertise.  But he doesn't have any

2  connections to any of the parties, including to my client

3  here.  He would be another candidate.

4          But you don't need to consider Mr. Finn's role now

5  because there is nothing for him to do.  If there's something

6  for someone to do, Carey is the one to put in because it

7  would give some sense of confidence about what actually will

8  happen behind closed doors.

9          Now, last, I just would like to briefly address on

10  the proposed forms of order.  Ms. Boelter seemed to suggest

11  that she doesn't really have an issue with the things that we

12  suggested, so we take that up.  She said she would agree to

13  some basic insurance-neutrality clause.  That's terrific.

14          All we're really looking for is that, as the Court

15  knows, we think we have in our contracts, a duty of

16  cooperation that we need to be included with the debtors in

17  the negotiations and just because there's a mediation, I

18  don't think anybody is blessing the notion that they can

19  exclude us and do deals sort of, in essence, without us, and

20  maybe just ask for some basic language along those lines, but

21  it sounds like Ms. Boelter is willing to agree to that.  We

22  were happy to propose that with her with the form of order.

23          She also indicated she's willing to give us the

24  documents that were shared prepetition.  And I don't see, if

25  that's the case, why a simple line saying that shouldn't make

1  that clear.

2          So, with that, Your Honor, I'd suggest that right

3  now there really isn't a basis to enter an order as

4  comprehensive as has been suggested.  If there's no reason

5  the parties can't negotiate, there's been no suggestion why

6  they can't negotiate without the cloak of total

7  confidentiality, but if that's the route you're going to go,

8  we'd ask that Judge Carey be put in and we'd defer for the

9  moment whether Mr. Finn or someone else should handle the

10 tort claims.  Thank you.

11          THE COURT:  Thank you.

12          MR. STANG:  Your Honor this, is Mister -- I'm

13 sorry.

14          THE COURT:  I believe I had a joinder from another

15 insurance company, but I don't remember counsel.

16          MR. WINSBERG:  You did, Your Honor.  Harris

17 Winsberg from Troutman Sanders for the Allianz insurers.

18          THE COURT:  Yes.

19          MR. WINSBERG:  And just -- and not to repeat the

20 comments of, but we echo and support the arguments that were

21 made by Hartford and Chubb.  We believe, you know,

22 impartiality of the -- from the mediators is critical here.

23 Nobody can dispute that Judge Carey is impartial and would do

24 an excellent job here leading the mediation and would avoid

25 the appearance of a lack of neutrality by Mr. Green who has

1  an attorney-client relationship with the FCR and his law firm

2  or Mr. Finn who participated and appears to be in a pre-

3  bankruptcy mediation.

4         And with those comments, Your Honor, we would just

5  ask Your Honor if you're going to enter a mediation, and we

6  certainly support mediation, that Judge Carey be the lead

7  mediator.  Thank you, Your Honor.

8         THE COURT:  Thank you.

9         Anyone else before I go back to Ms. Boelter?

10         MS. GUMMOW:  Yes, Your Honor.  Susan Gummow on

11  behalf of the AIG companies.

12         We filed a joinder to Hartford's original

13  objection and would just join the arguments made.  And I

14  would note that AIG was not consulted at all with regard to

15  the selection of mediators, so we believe that these two

16  mediators, Mr. Finn and Mr. Green, cannot act as neutrals

17  here.  Thank you.

18         MR. MEEHAN:  Good morning, Your Honor.  This is

19  Taylor Meehan for Agricultural Insurance Company.

20         And we would reiterate our joinder in Hartford's

21  supplemental objection for the purpose of supporting their

22  objections to the appointment of Professor Green and

23  Mr. Finn, as well.

24         THE COURT:  Thank you.

25         Anyone else?

1          Ms. Boelter?

2          MS. BOELTER:  Thank you, Your Honor.  Jessica --

3          MR. STANG:  Your Honor this, is Mr. Stang --

4          MS. BOELTER:  -- Boelter, Sidley Austin, for the

5    debtors.  I'll be brief.

6          THE COURT:  Just a second, Ms. Boelter.  I think I

7    did hear somebody else.

8          MR. STANG:  Your Honor this, is Mr. Stang.

9          I -- it's up to Ms. Boelter and to you as to

10   whether you want her to do that cleanup, but I was counsel to

11   the committee in Milwaukee, so I can speak to that.  I was at

12   the meetings in November and subject to the mediation

13   privilege, I can speak to that.

14         Maybe that opens me up to Mr. Schiavoni's demand

15   that I be deposed at some point, but if you would like some

16   information about those two things, I'd be happy to share it

17   now or after Ms. Boelter.

18         THE COURT:  You can go ahead.

19         MR. STANG:  All right.  Thank you, Ms. Boelter.  I

20   appreciate you letting me cut in.

21         Your Honor, I was counsel to the committee in the

22   Archdiocese of Milwaukee case.  Mr. Finn was our third

23   mediator.  The first two mediators, one was a retired

24   bankruptcy judge, Chief Judge of the Northern District of

25   California, and the other was -- I don't remember her name --

1 was a bankruptcy judge in Minneapolis.

2           Mr. Finn got it done.  That case was very, very

3 tough.  People talk about how long these cases can last.

4 Milwaukee took the longest.  It was probably the first or

5 second most litigious one.  Mr. Finn got it done.

6           That (indiscernible) involved a, except, I think,

7 for the future claim piece, a resolution of all the insurance

8 policies by virtue of buy-backs and basically cashing out the

9 policies.  So, the carriers didn't have a continued interest

10 in what we'd done with the money.

11           We asked Mr. Finn to be the allocator.  He didn't

12 come to us and ask us for the job.  We asked him to do it.

13 And it seemed appropriate -- and I'd also pointed out in that

14 case that one attorney, one law firm represented probably 95

15 percent of all the claimants.  And so, that lawyer was okay

16 with it, the committee was okay with it.  Mr. Finn did not

17 seek out the job.

18           As to the meeting in November, I'd like to call it

19 a meeting, as opposed to a mediation, and I signed a

20 confidentiality agreement, but I can -- I think I can tell

21 you what didn't happen.  What didn't happen was any offer

22 from the attorneys who were kind of an ad hoc tort committee,

23 I guess, to anyone.  We never asked Mr. Finn to convey an

24 offer.  I don't think we ever got a monetary offer.

25           The attorneys who were at that meeting today

1    represent probably well over half of the claims that I know

2    about, and so it was a meeting.  It was, frankly, a meeting

3    amongst ourselves.  We never -- I do not believe that we ever

4    had a meeting with any principal of the Boy Scouts.  I think

5    Mr. Andolina came into the room once or twice, Ms. Boelter

6    may have come in, but we've never had a substantive exchange

7    with any person who's a Boy Scouts principal.

8            I don't think the attorneys who were attending on

9    behalf of tort claimants, other than myself and

10   (indiscernible), had any substantive meeting with Mr. Patton.

11   Honestly, when someone told me a few weeks ago that there was

12   a matrix distributed, I had no recollection of it and it was

13   only when it was shown to me that I went, Oh, yeah, we got

14   that.

15           So, calling it a mediation suggests there's

16   negotiation.  There was none.  So, I just -- a lot has been

17   made about what happened there and a lot of speculation about

18   what happened there.  I can't tell you what didn't happen

19   there.

20           As far as Mr. Schiavoni's comments are concerned,

21   I hope it was in the excitement of his advocacy where he said

22   we need someone with integrity.  Too many courts have

23   appointed Mr. Green, too many people in courts have appointed

24   Mr. Finn to let the suggestion stand that they have no

25   integrity go unchallenged.

1              Are there things to mediate now?  Yes.

2              Can we reach a global resolution of all issues

3  (indiscernible) a bar date?  I don't think so.

4              The protective order, itself, anticipates that

5  there will be a mediation about the (indiscernible) claims.

6  There's something that we can do.

7              And it's not just a high-adventure basis.  We've

8  got local councils who, as soon as the protective order is

9  signed, we're going to get let's of information about their

10 assets.  And you just have to look at their IRS 990 forms to

11 know that they're going to claim restrictive assets, as well,

12 and their online financial statements.  Not all of them have

13 them, but a lot do.  There's lots to talk about.

14             And the notion that we have to wait until

15 November 17th to have a conversation with folks that does

16 require the assistance of a mediator is, frankly, again, just

17 an overstatement and hyperbole.

18             So, I'm not going to share my knowledge of

19 Milwaukee with Your Honor.  I can tell you what didn't happen

20 at the meeting in November and I do appreciate Ms. Boelter

21 letting me go first.

22             And, Your Honor, thanks to you, as well.

23             THE COURT:  Thank you.

24             Ms. Boelter?

25             MS. BOELTER:  Thank you, Your Honor.  Jessica

1 Boelter, Sidley Austin, for the debtors.

2          Like Mr. Stang, I'm happy to answer any of the

3 questions that may have come up in the arguments by the

4 insurers' counsel that the Court may have; although, I think

5 probably the best way to close out this argument is actually

6 with a statement that Mr. Ruggeri made and that is:

7          "The Court is the one that has to call the balls

8 and strikes."

9          We absolutely agree with that, and that's you.

10 This mediation is not mandatory and it's not binding.  We are

11 have cognizant of the fact that if we are so lucky to have a

12 mediation result in a settlement with some or all parties, we

13 are going to have to come back before this Court to have that

14 settlement approved and this Court will have to apply the

15 applicable standards, whether we're proceeding under 9019 of

16 the Bankruptcy Code or 1129.  We will need to satisfy the

17 good faith standard and we will need to demonstrate that we

18 have satisfied that standard.

19          So, no, we are not trying to cloak our entire plan

20 process in confidentiality; rather, we are trying to reach an

21 efficient settlement of issues that we know are going to be

22 disputed.  But at the end of the day, it's going to be this

23 Court that decides whether that settlement should be approved

24 or not approved and we will have to bring our case to this

25 Court.

1       So, I think when it boils down to the arguments

2   that you've heard from the objecting parties, that's our

3   response: you call the balls and strikes, not the non-

4   binding, non-mandatory mediator that we are asking for the

5   Court to appoint today.

6       So, with that, Your Honor, we would ask the Court

7   to grant the order to appoint the mediator.  As Mr. Schiavoni

8   took note of and I mentioned on the record, the order that's

9   currently before the Court does need a couple of

10  modifications to take into account concessions that I've made

11  on the record today, but with that, Your Honor, unless you

12  have any other questions, we would just respectfully ask that

13  you grant that order.

14      THE COURT:  Thank you.

15      No, I don't have any more questions.  I spent some

16  time with this ahead of time with the disclosures, with the

17  cases that the parties have cited to me, and I am prepared to

18  rule.

19      And I saw some of the concessions that the debtors

20  made and changes made to this order.  I'm not sure that they

21  change my mind on anything in this sense.  Even though the

22  mediation is now voluntary, although I wasn't sure -- well,

23  maybe it's -- okay, I wasn't sure about Paragraph 8, but

24  maybe it's voluntary.  I think the insurers need to be there.

25  Calling it voluntary doesn't really solve that problem.

1          And I am going to, at the request of most of the

2    parties -- not the insurers -- appoint a three-panel -- a

3    three-person mediation panel, but I am not going to define

4    their roles, as requested in the order, nor appoint a chief

5    mediator, if you will.  I really do not know exactly how it's

6    going to work with a three-person panel, but I hear the

7    parties -- hear the debtors' and the committees' comments

8    that expertise is important and I do agree that expertise is

9    important.  This is a complicated bankruptcy case.

10          As to when, I'm going to appoint it now.  I think

11    it will take time for the three mediators to speak amongst

12    themselves, determine how they want to proceed with the

13    multiple parties who either are directed or will be in front

14    of them, and to give some greater thought as to who needs to

15    be in front of them.  And I'm not going to hamper them by

16    making them -- by shortcutting, in any way, their time to

17    consider that.

18          And if, in fact, some portions of the disputes can

19    go forward now, such as the local council issue and what are

20    the Boy Scouts' assets?  Well, that's fine.  And if other

21    parts have to wait, they may have to wait.

22          And the panel is going to be former Judge Carey,

23    Mr. Finn, and Mr. Gallagher.  And I am not going to appoint

24    Mr. Green, as requested, and that's not because of any lack

25    of expertise, obviously, or any lack of integrity -- he has

1  both -- but having read the cases, it seems clear to me that

2  his relationship with Mr. Patton would lead a reasonable

3  person to be concerned about his mediating this case.

4        This is an objective standard.  It has nothing to

5  do with subjectively whether Mr. Green believes that he could

6  mediate in a neutral fashion.  What we're looking for is true

7  neutrality and here there are multiple connections, past and

8  current, in which Mr. Patton and Mr. Green have business and

9  social connections.

10        The business connection is a connection of trust

11  with Mr. Green hiring Mr. Patton as an attorney repeatedly,

12  because, obviously, he values Mr. Patton's opinion and he

13  trusts his advice.  And they are also social friends.  I was

14  struck by the fact that that was disclosed and I think it

15  means something more than acquaintance and it means something

16  more than the friendship that many members of the Bar have

17  with each other as being in the same circles.

18        And when you look at Section 455 of Title 28, the

19  statute that deals with recusal of judges, which our Local

20  Rule refers to, it says that judges shall disqualify

21  themselves in any proceeding in which their impartiality

22  might reasonably be questioned; in other words, a judge must

23  recuse himself if there's a showing of an appearance of bias

24  sufficient to permit the average citizen reasonably to

25  question a judge's impartiality.

1             And I recognize the tension.  I recognize that

2   that statute can be used strategically, but nonetheless, I

3   think the connections are too close here and I think former

4   Judge Carey brings expertise that Mr. Green would have.  I

5   would suggest he also brings expertise that Mr. Green may or

6   may not have with respect to, for example, the disputes over

7   assets of the estate and with the local councils.  And as

8   everyone noted, former Judge Carey is eminently qualified and

9   no one has suggested he holds a bias or is not neutral in

10  this case.

11            As for Mr. Finn, he was -- I understand his

12  involvement in the two-day mediation or, as Mr. Stang called

13  it, a meeting.  The length of that mediation could suggest to

14  me that it really wasn't a mediation that got into

15  significant depth.  That he was there attending as a neutral.

16            And I have no reason to -- and his declaration

17  said he doesn't have the matrix, he doesn't remember the

18  matrix.  I don't see anything that suggests to me that he has

19  a formed view already and I will note that -- so, I don't

20  know the extent to which all parties at the mediation.

21            Chubb was there.  I recognize they're not

22  Hartford.  I recognize they're not AIG or Agricultural

23  Insurance Company or Allianz, but nonetheless, there was an

24  insurance voice present at the meeting and, again, Mr. Finn

25  was there as a neutral and I think he can continue to work as

1  a neutral.

2          So, I will take a look at a form of order that has

3  the revisions that Ms. Boelter and Mr. Schiavoni suggested,

4  but the order has to also be changed to reflect simply the

5  appointment of these three mediators.  And I'm not going to

6  try to micromanage any piece of this or suggest to those

7  mediators how they should proceed.

8          MS. BOELTER:  Thank you, Your Honor.  Jessica

9  Boelter, Sidley Austin, for the debtors.

10         We will modify the order in accordance with the

11  Court's ruling, as you've described, as well as the exchange

12  that I had with Mr. Schiavoni regarding issues that are

13  important to the insurers.  We will, of course, circulate

14  that form of order to all of the parties and endeavor to get

15  that to the Court within the next, you know, hopefully no

16  more than one business day.

17         THE COURT:  Right.  I don't anticipate that there

18  should be a lot of back-and-forth on this.  I don't view this

19  as an order that deals with document disputes.  I don't think

20  this deals with insurance issues.

21         But if there's agreed-upon language to solve those

22  minor, I would say in this context, concern, meaning minor

23  relative to this is a mediation order which appoints

24  mediators and doesn't attempt to deal with anything else,

25  then I will sign it when I get it.

1           MS. BOELTER:  Thank you, Your Honor.

2           THE COURT:  Okay.  Is there anything else for

3  today?

4           MR. ABBOTT:  Your Honor, Derek Abbott for the

5  debtors.

6           I don't believe so.  We appreciate the Court's

7  time and we'll get that to you as quickly as we can.

8           THE COURT:  Thank you.

9           We're adjourned.

10           COUNSEL:  Thank you, Your Honor.

11        (Proceedings concluded at 11:36 a.m.)

12

13                        CERTIFICATE

14

15      We, MARY ZAJACZKOWSKI and WILLIAM GARLING, certify that

16  the foregoing is a correct transcript from the electronic

17  sound recording of the proceedings in the above-entitled

18  matter.

19
    /s/Mary Zajaczkowski            June 9, 2020
20  Mary Zajaczkowski, CET**D-531

21
    /s/William J. Garling           June 9, 2020
22  William J. Garling, CE/T 543

23

24

25