<pre>
1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2
                                     .   Chapter 11
3      IN RE:                         .
                                      .   Case No. 20-10343 (LSS)
4      BOY SCOUTS OF AMERICA and      .
5      DELAWARE BSA, LLC,             .   Courtroom No. 2
                                      .   824 North Market Street
6                                     .   Wilmington, Delaware 19801
                                      .
7                     Debtors.        .   May 18, 2020
       . . . . . . . . . . . . . . . .    10:00 A.M.
8

9                        TRANSCRIPT OF HEARING
            BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                   UNITED STATES BANKRUPTCY JUDGE

11     APPEARANCES:

12
       For the Debtor:          Derek C. Abbott, Esquire
13                              MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                                1201 North Market Street, 16th Floor
14                              P.O. Box 1347
                                Wilmington, Delaware 19899
15
                                - and -
16
       For the Debtors:         Jessica C. Boelter, Esquire
17                              Michael Andolina, Esquire
                                SIDLEY AUSTIN LLP
18                              787 Seventh Avenue
                                New York, New York 10019
19
                                - and -
20
                                Richard Mason, Esquire
21                              WACHTELL LIPTON ROSEN & KATZ
                                51 West 52nd Street
22                              New York, New York 10019
23
                                - and -
24
                                Shannon Wheatman, Esquire
25                              KINSELLA MEDIA
                                Washington, D.C. 20037
</pre>

```
1   Audio Operator:         Ginger Mace

2   Transcription Company:  Reliable
                            1007 N. Orange Street
3                           Wilmington, Delaware 19801
                            (302)654-8080
4                           Email:  gmatthews@reliable-co.com

5
    Proceedings recorded by electronic sound recording;
6   transcript produced by transcription service.

7
    APPEARANCES (Continued):
8
    For the U.S. Trustee:   David Buchbinder, Esquire
9                           OFFICE OF THE UNITED STATES TRUSTEE
                            844 King Street, Suite 2207
10                          Wilmington, Delaware 19801

11
    For Century Indemnity:  Tancred Schiavoni, Esquire
12                          O'MELVENY
                            7 Times Square
13                          New York, New York 10036

14  For Abuse Survivors:    Paul Mones, Esquire
                            PAUL MONES PC
15                          13101 Washington Boulevard
                            Los Angeles, California 90066
16
    For Interested Parties: James Stang, Esquire
17                          PACHULSKI STANG ZIEHL JONES LLP
                            919 North Market Street, 17th Floor
18                          Wilmington, Delaware 19801

19                          - and -

20
                            Alan Kornfeld, Esquire
21                          Linda Cantor, Esquire
                            10100 Santa Monica Boulevard
22                          Los Angeles, California 90067

23                          - and -

24
                            John Lucas, Esquire
25                          150 California Street
                            San Francisco, CA 94111-4500
```

APPEARANCES (Continued):

For Hartford:              James Ruggeri, Esquire
                           SHIPMAN & GOODWIN LLP
                           1875 K Street NW, Suite 600
                           Washington, D.C. 20006

For Future Claimants:      Robert Brady, Esquire
                           YOUNG CONAWAY STARGATT & TAYLOR
                           1000 North King Street
                           Wilmington, Delaware 19801

1

## INDEX

2

#10) Debtors' Motion for Entry of an Order (I) Appointing a
Judicial Mediator, (II) Referring Certain Matters to
Mandatory Mediation, and (III) Granting Related Relief (D.I.
17, Filed 2/18/20).

**Ruling: Order Entered**

#11) Debtors' Motion, Pursuant to 11 U.S.C. § 502(b)(9),
Bankruptcy Rules 2002 and 3003(c)(3), and Local Rules 2002-
1(e), 3001-1, and 3003-1, for Authority to (I) Establish
Deadlines for Filing Proofs of Claim, (II) Establish the Form
and Manner of Notice Thereof, (III) Approve Procedures for
Providing Notice of Bar Date and Other Important Information
to Abuse Victims, and (IV) Approve Confidentiality Procedures
for Abuse Victims (D.I. 18, Filed 2/18/20).

**Ruling: 70**

#12) Debtors' Motion for Entry of an Order Approving
Stipulated Confidentiality and Protective Order (D.I. 613,
Filed 5/12/20).

**Ruling: Adjourned**

3

4

5

6

7

8

9

10

11

12

13

14

15

DEBTOR'S WITNESS(s)

16

**SHANNON WHEATMAN**

17

        Cross Examination by Mr. Schiavoni      11

18

19

INTERESTED PARTIES WITNESS(s)

20

**JON CONTE**

21

        Cross Examination by Mr. Schiavoni      16

22

        Redirect Examination by Mr. Kornfeld    22

23

24

25

| | EXHIBITS | I.D. | REC'D |
|---|---|---|---|
| 1 | | | |
| 2 | Declaration of Dr. Shannon Wheatman (556, 631) | | 10 |
| 3 | Declaration of Dr. Jon Conte | | 15 |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

1          (Telephonic hearing commenced at 10:06 a.m.)

2          THE COURT:  Good morning, counsel, this is Judge

3     Silverstein.  We're here for the hearing in the Boy Scouts of

4     America case, case number 20-10343.

5          And, Ginger, would you please remind everybody of

6     the protocol for the hearing.

7          THE CLERK:  It is extremely important that you put

8     your phones on mute when you are not speaking.  When

9     speaking, please do not have your phone on speaker as it

10    creates feedback.  This also helps with the background noise

11    so that we can hear the person that is speaking and get an

12    accurate record.

13          Also, it is very important that you state your

14    name each and every time you speak for an accurate record.

15    Your cooperation in this matter is greatly appreciated.

16    Thank you.

17          THE COURT:  Thank you.

18          Okay.  Mr. Abbott.

19          MR. ABBOTT:  Good morning, Your Honor.  Derek

20    Abbott here for the Boy Scouts, affiliated debtor.  Your

21    Honor, thank you for making the time today.

22          There were, I should say, a number of agendas

23    filed.  Most recently this morning, there were also a number

24    of relatively late filings, Your Honor; unfortunately, some

25    Friday afternoon and, finally, one status matter this

1  morning.

2              Your Honor, but if I could just roll through that

3  third amended agenda, if the court has received that.

4              THE COURT:  I don't have it, but -- I don't have

5  that one, but I'm sure I'll be able to follow, so just go

6  ahead.

7              MR. ABBOTT:  Thank you, Your Honor.  It looks like

8  orders have been entered on agenda items number 1 through 4.

9  Five, six and seven there were certificates filed and there

10  weren't hearings unnecessary, unless the court has questions

11  and so, I wanted to, obviously open up to the court to see if

12  there were questions on five, six and seven.

13              Number five, Your Honor, was the committee's

14  application to retain the Reed Smith as counsel.  And I have

15  not seen an order on that one, Your Honor.

16              THE COURT:  Okay.  Thank you.  Yes, now, I'm

17  embarrassed to say I have not -- I wasn't focused on these

18  applications, so I will review them and if I have any

19  questions, I will reach out individually to counsel and let

20  them know and we'll get those resolved quickly.

21              MR. ABBOTT:  Thank you, Your Honor.  Much

22  appreciated.

23              Your Honor, numbers eight and nine have been

24  adjourned which brings us to the matters that are going

25  forward today, Your Honor.  And with respect to those, Your

1    Honor, I would propose that we go slightly out of order, Your

2    Honor, because the bar date motion which is Docket Item

3    Number or -- excuse me -- agenda item number 11, Docket Item

4    number 18.

5         Your Honor, that has a couple of witnesses and we

6    thought given the witnesses' participation in the hearing, we

7    probably ought to run that one first and then excuse them, if

8    possible, once we're through that motion.  And if that's

9    acceptable to the court, I think that's where we ought to

10   start.

11        THE COURT:  I agree.  Let's take the matter with

12   the witnesses first.

13        MR. ABBOTT:  Thank you, Your Honor.

14        So, then Docket Item Number 11, I will turn the

15   mike, as it were, to Ms. Boelter.

16        MS. BOELTER:  Thank you, Your Honor.  Jessica

17   Boelter, Sidley Austin on behalf of the debtors.

18        Your Honor, as Mr. Abbott indicated that brings us

19   to the bar date motion which is agenda item number 11. The

20   bar date motion was filed at Docket Number 18.

21        Our presentation, Your Honor, essentially has two

22   parts.  The first is to walk the court through the various

23   filings that have been made over the last couple of months,

24   at a very high-level just because I understand there's been

25   quite a few filings.  This order does involve seven different

1  exhibits.  And just given that we are in our virtual

2  courtroom, we thought it might make sense to walk the court

3  through that.

4          Once that concludes, Your Honor, we would turn to

5  walking through the remaining objections.  And the good news

6  is, Your Honor, we think that they are very discreet, at this

7  point.  The parties have worked tirelessly over the last

8  several weeks, and even through the weekend, up until three

9  o'clock this morning to get these pleadings in a condition

10  such that we believe we have resolved the vast majority of

11  the remaining objections.

12          As Mr. Abbott indicated, the debtors did submit

13  two declarations from Dr. Shannon Wheatman.  We do not

14  believe that the remaining objections implicate Dr.

15  Wheatman's testimony, but we will -- Dr. Wheatman is on the

16  line.  You may see her on Zoom right now.

17          What we'd like to do is proffer her two

18  declarations that appeared at Docket Number 556 and then a

19  supplemental declaration at 631 into evidence.  We are

20  proffering Dr. Wheatman into evidence as an expert on, you

21  know, designing and implementing noticing programs,

22  particularly with respect to bar dates and other class

23  actions, mass tort situations.

24          So, with that, Your Honor, I'd like to move her

25  declarations into evidence.  And, again, she's available for

1   cross-examination or any questions that the court may have.

2           THE COURT:  Does anyone object to the admission of

3   Dr. Wheatman's declaration and supplementation declaration?

4           MR. SCHIAVONI:  We don't object -- Your Honor,

5   Your Honor, this is Tancred Schiavoni for Century.  We don't

6   object to the tender of the declaration, but we do have a few

7   questions.

8           THE COURT:  Okay.  Well, I hear no objection to

9   the declarations coming into evidence, so they are admitted.

10      (Declaration of Dr. Shannon Wheatman, Dockets 556, 632,

11  admitted)

12          THE COURT:  And I will, of course, permit cross,

13  so.

14          MS. BOELTER:  And, Your Honor, just one -- this is

15  Jessica Boelter, again, for the debtors.

16          THE COURT:  Yes.

17          MS. BOELTER:  With respect to the cross, the

18  evidentiary portion of the bar date motion, I, myself, and my

19  partner, Michael Andolina, will be handling that together.

20  He'll be handling the evidentiary portion to the extent we

21  need to do any redirect examination.

22          THE COURT:  Okay.

23          MR. SCHIAVONI:  And, Ms. Wheatman, are you there?

24  This is Tancred Schiavoni for Century?

25          MS. WHEATMAN:  Yes, I am here.

1       MR. SCHIAVONI:  Okay.  Are you --

2       THE COURT:  Hold on; hold on, Mr. Schiavoni,

3   because I need to swear the witness in.

4       Here, she is.  Okay.

5       Dr. Wheatman, this is Judge Silverstein, I'm going

6   to swear you in.  Can you raise your right hand, please?

7                SHANNON WHEATMAN, WITNESS, SWORN

8       THE COURT:  Please state your full name and spell

9   your last name for the record?

10      THE WITNESS:  Shannon R. Wheatman; W-H-E-A-T-M-A-

11  N.

12      THE COURT:  Thank you.  Mr. Schiavoni

13                     CROSS-EXAMINATION

14  BY MR. SCHIAVONI:

15  Q    Ms. Wheatman, are you offering testimony as part of

16  your expert affidavit as an expert on the legal elements of

17  the claims in the various states for which claims will be

18  submitted?

19      UNIDENTIFIED SPEAKER:  Objection as to the form of

20  the question, Your Honor.  I don't know what Mr. Schiavoni is

21  referring to when he says claims?

22      THE COURT:  Can you restate your question?

23      MR. SCHIAVONI:  Yes.

24  BY MR. SCHIAVONI:

25  Q    Ms. Wheatman, as part of offering -- Ms. Wheatman, in

1  offering the opinions you have for your expert affidavit, are

2  you offering opinion as to the legal element of the abuse

3  claims or the claims that are subject to the notice in the

4  multiple states for which claims will be submitted?

5  A    My opinions are strictly on the efficacy of the actual

6  notice program to reach potential claimants in

7  (indiscernible) states.  So, as far as anything regarding to

8  legal claims that's not my area of expertise.

9         MR. SCHIAVONI:  Your Honor, I have no further

10  questions.  Thank you very much.

11         THE COURT:  Thank you.

12         Does anyone else have any questions for Dr.

13  Wheatman?

14     (No verbal response)

15         THE COURT:  I hear no one.

16         Dr. Wheatman -- Mr. Andolina, I assume you don't

17  have any follow-up?

18         MR. ANDOLINA:  No follow-up, Judge.  Thank you.

19         THE COURT:  Okay.  Thank you.

20         Dr. Wheatman, you are excused.

21     (Witness excused)

22         THE WITNESS:  Thank you.

23         MS. BOELTER:  Thank you, Your Honor.  Jessica

24  Boelter again, Sidley Austin, for the debtors.

25         May I proceed with the presentation?

1          THE COURT:  Well, let me find out if there is any

2    other evidence that any party is going to adduce.

3          MR. KORNFELD:  Good morning, Your Honor.  Alan

4    Kornfeld, Pachulski Stang Ziehl & Jones for the tort

5    claimants committee.

6          Your Honor, yes, the tort claimants committee also

7    has a witness, Dr. Jon Conte.  Dr. Jon Conte is present in

8    the conference, and we would like to offer his testimony.

9    May I go forward with that?

10          THE COURT:  Yes.

11          MR. KORNFELD:  Thank you, Your Honor.

12          Dr. Conte, as I said is present virtually in

13    court.  He has, as admitted in his declaration which is at

14    Docket Number 601, extensive experience in the areas of child

15    sexual abuse and research methodology on issues related to

16    childhood sexual abuse.

17          He is the professor emeritus in the School of

18    Social Work at the University of Washington and director of

19    the Joshua Center on Child Abuse at that university.  He

20    spent four decades in the field of study of childhood sexual

21    abuse.  He's extensively published as detailed in his CV

22    which is at Docket Number 603.

23          He's served on panels of the National Academy of

24    Science, the National Institute of Mental Health, and various

25    other institutions, all in the areas of childhood sexual

1  abuse.

2          He has evaluated literally thousands of child

3  youth and adult youth of childhood sexual abuse throughout

4  his career.  He has evaluated victims of childhood sexual

5  abuse, survivors of childhood sexual abuse who have

6  participated in Boy Scouts in the states of Illinois and

7  Washington.

8          Dr. Conte has testified as an expert, Your Honor,

9  over 160 times in various states throughout the country.  He

10 has also served as a court-approved expert in the creditor's

11 committees of the bankruptcies of the Archdiocese of Portland

12 and Milwaukee.  He's the editor of various journals on

13 childhood sexual abuse.

14          And, Your Honor, based on his training and very

15 extensive experience, I would move the court to accept

16 Professor Conte as an expert in the field of and issues

17 related to the effects of childhood sexual abuse on adult

18 youth and children who are survivors of that abuse.  And on

19 the issues related to research methodologies on the studies

20 of issues with respect to childhood sexual abuse.

21          THE COURT:  Does anyone object?

22          MR. SCHIAVONI:  Your Honor, this is Tancred

23 Schiavoni for Century.  Given the tort claimant's limitation

24 on the scope of Mr. Conte's area of expertise being limited

25 to that of the effects of child abuse and, I take it, the

1  psychological impacts of the child abuse, we have no

2  questions.

3           I understand him not being tendered as an expert

4  on the legal elements of childhood abuse.

5           MR. KORNFELD:  Your Honor, if I may, that is

6  correct.  Dr. Conte is not a lawyer.  He is an expert on

7  childhood sexual abuse.  I would, again, move his admission

8  as an expert in that area.  And as long as we're doing this

9  together, I would move the admission of his declarations into

10 evidence and he's available for cross-examination if anybody

11 has cross-examination questions.  I would, again, reserve the

12 right to redirect if Dr. Conte is cross-examined.

13          THE COURT:  Okay.  Let me ask if anyone objects to

14 Dr. Conte being offered as an expert in the field that Mr.

15 Kornfeld has stated or the admission of Dr. Conte's

16 declaration?

17      (No verbal response)

18          THE COURT:  I do not hear anything.  He's accepted

19 as a witness and the declaration admitted.

20      (Declaration of Dr. Jon Conte, admitted)

21          THE COURT:  Let me ask if there is any cross-

22 examination of Dr. Conte?

23          MR. SCHIAVONI:  Your Honor, it's Tancred

24 Schiavoni, just very briefly.  I have just two things.

25          THE COURT:  Okay.  Let me see if I can find Dr.

1    Conte.  Dr. Conte, I need to swear you in.  There you are.

2          Can you raise your right hand, please?  Thank you.

3          MR. CONTE:  Yes, ma'am.

4                JON CONTE, WITNESS, SWORN

5          THE COURT:  And will you please state your full

6    name and spell your last name for the record?

7          THE WITNESS:  It's Jon, J-O-N; last name is Conte

8    -- C-O-N-T-E.

9          THE COURT:  Thank you.  Mr. Schiavoni.

10                CROSS-EXAMINATION

11   BY MR. SCHIAVONI:

12   Q    Mr. Conte, is it -- I've read your declaration, is my

13   understanding correct that one of the things you tried to do

14   in your declaration is try to convey your concern that some

15   questions that are posed in the proof of claim might

16   discourage claimants from filing a claim?

17   A    Yes, sir, it is.

18   Q    In making the comments you made to the questions that

19   are posed, was one of the things you tried to do was

20   generally just make it easier for people to fill out the

21   proof of claim?

22   A    Yes, sir, to make it easier, but also sensitive to the

23   experience of filed victims who are now adult survivors of

24   sexual abuse.

25   Q    Okay.  And can you tell us what questions did you add

1  to the proof of claim to try to eliminate the prospect that

2  people that didn't have meritorious claims wouldn't fill out

3  the form?

4  A     I tried -- well, yeah, that's a good question.

5        There are several areas.  I suggested more categories

6  of harm or damage.  I also suggested more behaviorally

7  specific language as to what sexual abuse is and then wrote

8  down various types of sexual abuse that would be potentially

9  relevant in judging a claim.

10 Q     And by adding boxes for more different types of sexual

11 abuse, what aspect by adding those boxes made it more

12 difficult for people who didn't have a valid claim to sort

13 those out by the form?

14 A     I --

15        MR. KORNFELD:  Your Honor, objection.  That's

16 vague and, if particular, what he's talking about people who

17 don't have a valid claim.  People's claims have not been

18 submitted, much less adjudicated at this point.

19        THE COURT:  I'm going to overrule that objection

20 and see if Dr. Conte can answer the question.

21 BY MR. SCHIAVONI:

22 A     No one question on the proposed proof of claim goes

23 directly to validity.  I would assume you would determine

24 validity of claims by looking at the responses to a number of

25 different questions that are throughout the form.

1       The checklist provides an opportunity for an adult

2    survivor hasn't processed abuse, who can't describe the

3    intimate details without getting triggered for summarizing

4    the types of conduct they experienced.

5       And then providing an optional narrative also gives

6    survivors, who are able, to provide a description of the

7    abuse they experienced.  The narrative is more complicated

8    because most of these predators will have been abused more

9    than one time, some of them multiple times over many years.

10   And so, describing multiple events of sexual abuse is

11   extremely difficult.

12      But given the option and then dealing with a

13   combination of the boxes which describe experience which is

14   less threatening (indiscernible) to fill out and then an

15   optional narrative seems to provide the information that

16   you're asking for, along with other answers about

17   credibility.

18   Q    Mr. Conte, am I-- you used the word optional several

19   times.  Am I correct that one of the changes made by the

20   committee throughout was to make narrative submissions of the

21   claims entirely optional so that the claimant, if they chose,

22   to just check the boxes?

23   A    I think in terms of the describing the abuse that's

24   true.  In terms of describing the harms and damages, in

25   addition to the checking off various harms and damages, there

1  is required narrative where the survivor can describe from

2  their own perspective how they've been harmed.

3       So, I think the only optional area really has to do

4  with describing the abuse in detail which is likely to be the

5  most triggering, the most complicated.  Fundamentally, I

6  don't think it addresses the question of credibility of the

7  claim that you raised.

8  Q    Is there anything that would prevent someone -- just

9  assume for a moment that there might be some people out there

10 who, you know, after a national advertisement campaign, you

11 know, might be ill-motive and might be inclined to fill out

12 the boxes, you know, with ill-motive.  Is there anything that

13 would allow you identify those fellows or ladies who filled

14 out the form in such a manner?

15 A    No.  You have to look at --

16              MR. SCHIAVONI:  Your Honor -- I have no further

17 questions, Your Honor.

18              THE COURT:  Does anyone --

19              MR. KORNFELD:  Your Honor, this is Alan Kornfeld,

20 I will have redirect, if there's no other cross.

21              THE COURT:  Let me ask.  Is there any other cross?

22       (No verbal response)

23              THE COURT:  Okay.  I have one question and maybe

24 it's best to do it first before -- Mr. Kornfeld, before you

25 do the redirect.

1        Dr. Conte, from the perspective of the abuse

2    victim, is it better to fill out a tort (phonetic) form first

3    with respect to its claim and then a longer form that asks

4    for all of the details that is contemplated in these proposed

5    forms or is it better to do it all at once?  So, basically,

6    is it best to get asked once or twice for information?

7        THE WITNESS:  I think it's much better to ask

8    twice within an initial shorter set of questions and then

9    more detailed later.

10        You have to remember, it's many of the people who

11    will be responding to this don't have lawyers; they haven't

12    come forward before.  They get the notice and they have to

13    make a really complicated decision recognizing that there is

14    a bar date, a certain after which they cannot respond.

15        They really have to weigh the pros and cons of

16    coming forward. And so, I think to give them the initial

17    notice, let them file it, and then have a chance to come back

18    and provide additional information is likely to be more

19    supportive of those predators who are going to be the most

20    difficult to reach because of the ones that haven't come

21    forward yet.

22        THE COURT:  Okay. Thank you.

23        Do you have --

24        MR. KORNFELD:  Thank you, Your Honor.

25        THE COURT:  Well, no let me ask a follow-up

1   question.  I'll take the liberties all lawyers do when they

2   say they only have one question.

3           MR. KORNFELD:  Very well.

4           THE COURT:  Dr. Conte, do you have a view as to

5   how short that initial form should be, what question should

6   be in the first form and what question should be in the

7   follow-up form?

8           THE WITNESS:  I guess it would depend, Your Honor,

9   on what the purpose of the first form is.  If it's to make a

10  general assessment of whether or not this is a potentially

11  valid claim then you would want to know what involvement they

12  had with the scouts, potentially where, summarizing the types

13  of abuse they experienced, and some sense of the harm would

14  be an initial cut.

15          And then other questions such as whether they were

16  witnesses, whether they told anybody, that kind of thing to

17  be asked in a follow-up.  And if you decided that a narrative

18  really was important for some reason, the first form would

19  sensitize the untreated and currently unidentified survivor

20  with a notice that they had to be able to provide more

21  information later.

22          THE COURT:  Thank you.  And I will let Mr.

23  Kornfeld ask any questions.  For Mr. Schiavoni, also, follow-

24  up with anything based on what I asked.

25          MR. KORNFELD:  Thank you, Your Honor.  This is

1  Alan Kornfeld again.

2                    REDIRECT EXAMINATION

3  BY MR. KORNFELD:

4  Q     Dr. Conte, Mr. Schiavoni asked you about your

5  suggestion that the narrative description of the abuse that

6  the survivor had suffered by optional. That is, the survivor

7  either has opportunity to check the box or to provide the

8  narrative or both.  Why do you suggest that the narrative be

9  optional?

10 A     Well any manner that is potentially traumatic, it

11 potentially overloads the respondent because most of these

12 claimants will have abuse, multiple incidents over abuse

13 often over a long duration. And it doesn't really answer the

14 question about the validity of the claim.

15      This research summarized by Dr. Siegel, the

16 psychiatrist at Stanford, about witness statements.  And he

17 points out that there's no research that suggests that a

18 motion that is consistent with what is being described or

19 detailed in memory necessarily tells you whether it is an

20 accurate memory or not

21      So because it is potentially off-putting and

22 potentially traumatizing, I think it's more important to give

23 the respondent an opportunity to provide it, if they want to.

24 And, to be clear, some claimants will probably want to.  But

25 you could have a very detailed, very emotional description of

1    a series of horrible events and that's not necessarily a true

2    event.

3         It's probably IQ.  If someone is very smart and they've

4    seen enough movies, they could probably describe an

5    experience as if they had had it and convinced the reader

6    that they had it when, in fact, they never had the

7    experience.  It's a fiction.

8    Q    And that brings us to another issue that Mr. Schiavoni

9    raised with you that I want to ask you about too.  Mr.

10   Schiavoni in one of his questions talked about those with an

11   ill-motive.  And I believe what he meant was those who might

12   lie on the form, fabricate, prevaricate, people who would

13   commit a fraud on the court.

14        Does a narrative requirement mean if there is a

15   narrative on the form that you will be able to ascertain

16   whether the form is accurate and truthful?

17             MR. SCHIAVONI:  Objection.  Your Honor, I would

18   just object that there's no foundation that Mr. Conte's done

19   any studies on this, looked into, considered it at all.

20   There's been no foundation.

21             THE COURT:  No --

22             MR. KORNFELD:  Well, it's interesting, Your Honor,

23   that Mr. Schiavoni was asking Dr. Conte questions in the

24   area.

25             THE COURT:  Yeah, I'm going to overrule the

1  objection.

2  BY MR. KORNFELD:

3  Q     Dr. Conte, do you have my question in mind?

4  A     Yeah, if you could ask it again, just to be clear.

5  Q     Sure.  In simple terms, does requiring a claimant to

6  fill out a narrative description of the abuse that the

7  claimant survivor suffered translate into giving anybody

8  information that will allow them to determine whether the

9  claim is accurate and truthful?

10 A     It does not.

11 Q     Would you explain to the court why it does not, please?

12 A     Well, again, the smarter the person is making a

13 fraudulent claim is and the more movies about abuse they

14 could describe in intimate detail what a post-traumatic

15 stress intrusive image is because they've seen it documented

16 or displayed in multiple movies.

17      So the amount of detail, the richness of detail, the

18 emotion that is communicated is immaterial or unrelated to

19 validating a statement of a witness, and that's what Dr.

20 Spiegel essentially summarized many years ago.

21      This is a terribly important question.  It comes up all

22 the time when you have kids as witnesses, as well as adults.

23 How do you determine what someone said is accurate or not?

24 And in a rare exception of when somebody describes something

25 that's physically impossible.

1      For example, if somebody said I was abused by every

2  member of my troop, that's very unlikely to have happened.

3  So, in that rare circumstance a narrative might tell you

4  something.  But in all the others, it can be rich in detail

5  or somebody may also not have complete memory.  They may say

6  well it happened and, you know, I was in a tent and the next

7  thing I know my pants were down.

8      Now they may not, in some people's judgment, make a

9  valid claim but the lack of risk detail is simply because the

10  traumatized person can dissociate when the abuse is taking

11  place.  So rich detail or absent of detail doesn't really

12  provide an answer as to credibility of a claim.

13          MR. KORNFELD:  Your Honor, at this time, I have no

14  further questions.

15          THE COURT:  Thank you.  Anyone else with questions

16  for Dr. Conte?

17      (No verbal response)

18          THE COURT:  I hear no one.  Thank you, Dr. Conte.

19  You're excused.

20      (Witness excused)

21          MR. CONTE:  Your Honor, do I need to stay on the

22  Zoom or do I leave?

23          THE COURT:  You do not need to stay, but you are

24  welcome to if you choose.

25          MR. CONTE:  Thank you, Your Honor.

1        THE COURT:  Thank you.  Okay. Do we have anymore

2  witnesses?  I'm not aware that we do, but I just want to

3  doublecheck.

4        MR. KORNFELD:  Your Honor, the tort claimants

5  committee does not have anymore witnesses.  And with

6  admission of Dr. Conte's evidence, which the court has done,

7  we rest the evidentiary portion of our case.

8        THE COURT:  Thank you.

9        Okay.  Ms. Boelter.

10       MS. BOELTER:  Thank you, Your Honor. Again, for

11  the record, Jessica Boelter, Sidley Austin, on behalf of the

12  Boy Scouts of America and Delaware BSA, LLC.

13       Your Honor, I'm going to start by providing the

14  court with an overview of essentially how we got to this

15  point with respect to the bar date.  And then, hopefully,

16  finish with some good news in the sense that we have

17  significantly narrowed the issues that parties had objected

18  to with respect to the bar date motion which we hope will

19  streamline and, again, hopefully, shorten this component of

20  today's proceeding.

21       Your Honor, as you'll recall we filed the bar date

22  motion on the petition date, on the first date of this

23  bankruptcy case.  It's present at Docket Number 18.  And as

24  we explained to the court, both in our informational brief,

25  as well as at the first day hearing, we recognize, at the

1  outset of these cases, that establishing a claims bar date,

2  particularly for abuse survivors, was particularly important

3  for both the debtors and the survivor constituency.

4         The abuse survivors had communicated to the

5  debtors prior to the commencement of the Chapter 11 cases

6  that they felt like a bar date was essential and that it

7  would be essential to advancing negotiations around a global

8  resolution of the bankruptcy cases.  So in light of those

9  discussions, we wanted to put a bar date on the table

10  immediately.  That's why we filed the bar date motion on the

11  petition date.

12         But we indicated multiple times in the motion that

13  we knew that it would need to be supplemented, particularly

14  with respect to matters pertaining to the abuse survivors and

15  their bar date.  We didn't want to take that action

16  unilaterally.  We didn't want to do it without the feedback

17  from official constituencies once appointed.  We did not, you

18  know, have an official committee of abuse survivors at the

19  outset of these cases, nor did we have an official future

20  claimant's representative.

21         So, as we indicated at that time, we viewed there

22  as being sort of a significant hole in the bar date motion as

23  of February 18th.  And that dealt with abuse survivors.  And

24  when we think about the bar date as it pertains to abuse

25  survivors, we're really dividing that into two components.

1          The first is just the notion of noticing, the

2   actual due process component of the bar date motion.  As Your

3   Honor undoubtedly saw from our papers, we, you know, similar

4   to other bar motions and mass tort cases, have effectively

5   looked at this from both a known and an unknown claimant

6   perspective.

7          The known claimants, of course, are those that are

8   reasonably ascertainable to us.  And we have proposed a

9   first-class mail and email notice program that will reach in

10  excess of ten million individuals.  But it was also

11  incredibly important to us to reach unknown potential abuse

12  survivors.  And, again, the unknown concept here for the Boy

13  Scouts of America, it's particularly complicated.

14         As we said in our papers and as Dr. Wheatman noted

15  in her declaration, we're talking about individuals that may

16  not have had any experience with the organization literally

17  for decades. They may no longer live in their childhood home.

18  And, as a result, we retain Lesomey (phonetic) and Kinsella

19  Media, Dr. Wheatman who devised a noticing program so that we

20  could reach the universe of potential unknown abuse

21  survivors.

22         We presented that program over the course of the

23  month of April to the official constituents in the Chapter 11

24  cases.  And by the time we got to May 4th which is when we

25  filed the description of the publication program with respect

1   to the abuse survivors, as well as Dr. Wheatman's initial

2   declaration.  While we didn't have buy-in yet from any

3   constituency in this case, we felt that Dr. Wheatman's work,

4   which as she indicated in her declaration, is going to reach

5   over one hundred million individuals, a 95 percent rate, with

6   respect to men over the age of fifty which is our number one

7   target audience.  We thought that was pretty extraordinary

8   and pretty incredible.

9           But that did not and does not come without a cost.

10  As you may have also seen in Dr. Wheatman's declaration, the

11  combination of both the known abuse survivor noticing

12  protocol so that the mailing and the emailing, as well as the

13  media component of the protocol, the component for the

14  unknown claimants, the total cost of that will be $6.8

15  million dollars.

16          There's also a significant timing component with

17  respect to the noticing protocol.  Not only does the protocol

18  require us to develop content for the notices, but we need to

19  buy that content within a specific period of time with

20  respect to the particular types of media outlet.  And then

21  that content needs to run for a period of time.  And as Dr.

22  Wheatman described in her declarations that could be between

23  four to seven weeks, depending upon the type of media that

24  we're talking about, whether that's television, radio, print.

25          And then, of course, once the media component is

1  concluded, there needs to be sufficient time for the abuse

2  survivors to process what they've heard, review the noticing

3  and the bar date forms, and ultimately file their claim. And

4  the reason -- I understand that's laid out in great detail in

5  our papers, but I raise it again here, Your Honor, because

6  I'm going to come back to this a couple of times during the

7  presentation.

8          We have tried very hard to be sensitive to the

9  issues confronting abuse survivors, but we had to balance

10  that with expense and we had to balance that with time.  So

11  we filed the supplement with Dr. Wheatman's original

12  declaration on May 4th.  That supplement is at Docket Number

13  557.  Also on that same date at Docket 558 noticed out this

14  hearing and an objection deadline which was May 11th at that

15  point in time for today's hearing.

16          We received initially two formal objections, one

17  from the tort committee.  That was on Docket Number 601 and

18  they also submitted Mr. Conte's declaration which was

19  supplemented at Docket Number 611.  And then the United

20  States Trustee also filed an objection initially and that was

21  at Docket Number 610.

22          Your Honor, in light of those two objections, the

23  debtors sought leave to reply, and actually attached a reply

24  to that motion.  That was Docket 630 and we submitted a

25  supplemental declaration of Dr. Wheatman at 631.

1          Incidentally, Your Honor, I don't know that that

2   motion for leave to reply has been granted yet.  I'd be happy

3   to address any issues with the motion for leave if you have.

4   But, if not, I would be happy to just continue on with the

5   presentation.

6          THE COURT:  You can continue.  I've read it.

7          MS. BOELTER:  Thank you.

8          Your Honor, following that motion for leave on

9   Friday, I think the date was the 15th, we received three

10  additional objections or joinders from three insurers:

11  Hartford, Century and Alion (phonetic).

12         We continued to work with the constituents

13  throughout this weekend.  You know, as I indicated in my

14  opening remarks, we've had some pretty late nights.  We were

15  on with the tort committee until after midnight tonight.  And

16  I think at around three o'clock in the morning, this morning,

17  our team filed updated drafts of the exhibits and the

18  proposed form of order which we believe addresses the vast

19  majority of objections that were outstanding with a handful

20  of exceptions which I'll get to at a moment.

21         But we did significantly narrow the issues, and I

22  thank all of the parties for working with us.  I understand

23  that the tort committee members themselves were actually

24  meeting late into the evening to discuss the proof of claim

25  form.  It's an extraordinary effort for an extraordinary

1  notice program.

2          With that, Your Honor, I think I'll turn to what I

3  believe are the remaining objections.  But let me start with

4  some good news.

5          The good news is one of the most significant

6  issues between the debtors and the tort committee has been

7  resolved, and that's the bar date itself.  You may recall

8  that the debtors had proposed a bar date of October 6th.  The

9  tort committee had preferred a bar date in late December.

10  And over the weekend, we agreed to a bar date of November

11  16th, a perfect compromise.  So the blackline documents that

12  were filed during the early morning hours, this morning

13  reflect that agreement.

14          Another couple points to note, there are no open

15  issues to our knowledge with respect to the general bar date.

16  And there are no open issues to our knowledge with respect to

17  the broad abuse survivor notice program. So, again, the

18  program that was designed by Dr. Wheatman.

19          The open issues, as we sit here today, really fall

20  into three categories, Your Honor.  Category one are specific

21  issues on the abuse survivor proof of claim form itself.

22  Category two would be specific issues or, I believe, it's

23  just one issue, at this point, on the abuse survivor long-

24  form notice.  The long-form notice, I mean, is not the

25  publication notice, but the bar date notice that's Exhibit 2

1  to the order.  And then, finally, it's our understanding that

2  there are two specific issues with respect to the form of

3  order itself.

4       If you like, Your Honor, I'm happy to go through

5  in detail the remaining issues with respect to those three

6  categories of open matters.

7       I guess what I would ask before I dive into that

8  is did Your Honor receive the filings that were made very

9  early this morning, blacklines of the order and the various

10  exhibits?

11       THE COURT:  Yes, I have.  I have not looked at it,

12  but I've got in front of me Docket 667.

13       MS. BOELTER:  Excellent.  So, Your Honor, if you

14  could pull up Docket 667.  I'm going to start with specific

15  issues that remain open on the abuse survivor proof of claim

16  form.  That's Exhibit 6 to the actual form of order when we

17  get to that point.  It's in 667-2.  And just to orient you,

18  I'm going to be speaking on page 59 of 75 of the ECF PDF

19  verse 667-2.

20       THE COURT:  Great. Thank you.

21       MS. BOELTER:  So with respect to this order, there

22  are call it three open issues with a couple of subparts on a

23  few of them.  The first open issue appears on, again, it's

24  page 2 of 16 of the proof of claim form which is also page 59

25  of 75 of 667-2.   And that is the scope of the definition of

1  sexual abuse.

2          Your Honor, the debtors made significant changes

3  to this definition in response to the objection that was

4  filed by the TCC last week.  Most of those changes were

5  reflected in the revised form of order that we filed last

6  Thursday, so you don't see them here.  But just to draw a

7  finer point on that.

8          One of the issues that the TCC had raised in their

9  objection was that the definition of sexual abuse in the

10  original form was actually a definition of abuse.  And it

11  included forms of abuse, non-sexual forms of abuse such as

12  bullying, physical abuse, or any other types of abuse of a

13  non-sexual nature.

14          We have agreed with the TCC to pull non-sexual

15  abuse from the sexual abuse proof of claim form.  There's

16  language at the end of this what is sexual abuse basket that

17  directs those individuals to file a general proof of claim

18  form, but that was one issue.  It was raised in their

19  objection. We resolved it.

20          The issue that has not yet been resolved is

21  essentially whether this proof of claim form should apply

22  only to children or whether it should apply to children in

23  non-consenting adults.  The TCC's perspective is that this

24  should only be a child sexual abuse claim form.

25          From the debtors' perspective, the debtors

1  actually have individuals up to the age of 21 participating

2  in their programs. We do have a handful of programs that

3  permit use to continue to participate after they turn 18.  In

4  addition, as you can imagine, abuse for some individuals may

5  start prior to the age of 18 and continue after the age of

6  18.

7          From the debtors' perspective, declaring that this

8  should be a solely child abuse form doesn't necessarily take

9  into account the total types of sexual abuse that could

10  occur.

11          Now, we understand that filed sexual abuse is not

12  only is it terrible, but we are not trying to diminish child

13  sexual abuse in any way by including adults in this proof of

14  claim form, but we do believe that it is possible for non-

15  consenting adult participants.  So, again, individuals over

16  the age of 18 but under the age of 21 would have a

17  (indiscernible) claim and we simply don't have another form

18  for them to fill out other than the general proof of claim

19  form.

20          We think it's appropriate to leave these

21  individuals in this form because it's the exact same

22  information we would want to solicit from them with respect

23  to their claim.  So that is one open issue. And I have no

24  doubt you will hear from Mr. Stang or his colleagues with

25  respect to the appropriateness of including non-consenting

1  adult scouting participants.

2          I would just note, Your Honor, you may see this in

3  the blackline on page 59 of 75.  The language prior to today

4  simply just said non-consenting adult.  We have no limited

5  that to non-consenting adult scouting participants which is a

6  term that is used in the boy scouts to define individuals

7  that have exceeded the age of 18 that are still participating

8  in certain of our programs.  That's open issue one with

9  respect to this form.

10         THE COURT:  Ms. Boelter, is that -- it's not a

11 defined term, but is that definition somewhere or is there a

12 reference to 18 to 21-year-old or 21 and below anywhere in

13 the form?

14         MS. BOELTER:  There is not, Your Honor.  The

15 notion of an adult scouting participant actually is defined

16 in the Boy Scouts' bylaws.  I think we could provide

17 additional color with respect to what that means with respect

18 to this form if that's where the parties and the court land.

19 But that should be a relatively straightforward change that

20 we can make.

21         THE COURT:  Okay.

22         MS. BOELTER:  Your Honor, I then go to page 5 of

23 16 or if you're looking at the PDF page numbers at the top of

24 Docket Number 667-2.  It's page 62 of 75.

25         And the next two issues really go to the heart of

1  matters that you were discussing with Mr. Conte during his

2  testimony.  There are two questions on the form that we

3  understand from the tort committee late last night do not

4  provide sufficient optionality between checking the box or

5  filling out the narrative.  The tort committee has requested

6  that we make it very clear, more clearer than is in the form

7  right now, I should say, that the abuse survivor has the

8  option of either checking the box or filling out the

9  narrative.

10           From the debtors' perspective, and I'm going to

11  walk through some language that's already in the form, we

12  believe that this is already adequately addressed in the

13  form, based upon prior comments that we took from the tort

14  committee.  We also think, and this is going to go back to my

15  efficiency and timing point, and it piggybacks on some of the

16  questions that Your Honor asked Mr. Conte. From an efficiency

17  and timing perspective, we don't want to get these forms in

18  on November 16th and then have a month or two months of

19  follow-up questions simply not so that we can liquidate the

20  claims, but simply so that we can assess the sorts of claims

21  that have been asserted against us.

22           From the debtors' perspective, we think that it is

23  helpful for individuals to add additional color with respect

24  to the check-the-box answers that they're already providing.

25  We just can't get everything from a check the box. We are

1  very sensitive to the issues that were raised by Mr. Conte,

2  and we're sensitive to the notion that victims could

3  potentially be re-victimized or traumatized by filling out

4  the narrative.

5         But, in light of that, you know, we already added

6  significant additional information to the proof of claim

7  forms and I'm sure you will hear from Mr. Schiavoni that from

8  the insurer's perspective having individuals complete both

9  check the box and the narrative is critical to their ability

10 to understand the nature of the claim.

11        So just to point out a couple of points here.  On

12 page 5 of 16, and again that's page 62 of 75, Part Four,

13 "Nature of the Sexual Abuse," the general instructions with

14 respect to Part Four. For example, the first sentence: "For

15 Each of the questions listed below, please complete your

16 answers underlying to the best of your recollection."

17        We also say after the note, you'll see the

18 paragraph or the free-standing sentence after the word, note,

19 "Please answer each of the following questions, to your best

20 ability.  If you do not know or recall, please so indicate."

21        The question that has caused, as we understand it,

22 the most consternation in, at least, Section four of the

23 proof of claim form occurs on page 9 of 16, which is, again,

24 66 of 75 of the PDF redline.  This question sets up a number

25 of check the boxes that individuals can check, and then it

1  says, "Please describe the sexual abuse in as much detail as

2  you can recall in the lines below."

3          Again, we believe that the insert of the words, as

4  you can recall, which had been previously requested by the

5  tort committee, coupled with the introductory words of this

6  section provide significant sensitivity to the abuse

7  survivors, but also our design to elicit information that we

8  think is important to understand the check-the-box answers

9  that the survivors provide.

10          This, Your Honor, occurs in one other instance on

11  this form, and that is in Part Five.  Part Five is on page 12

12  of 16, or page 69 of 75 of the PDF.

13          Part Five, again, we've added the first sentence

14  of Part Five to address exactly this concern and it says in

15  the parenthetical, "If you currently cannot describe any harm

16  you have suffered on account of the sexual abuse, you may

17  omit this section for now; however, you may be asked to

18  provide the information requested at a later date."

19          Again, that language was inserted at the request

20  of the tort committee to take into account the exact

21  sensitivities that Mr. Conte testified about.  That said we

22  understand from the tort committee that that's not

23  sufficient, that Part 5(a) which is you'll see a number of

24  check the boxes.

25          Incidentally, the blacklining is due to the fact

1  that the tort committee requested a number of parentheticals

2  providing further description of the type of harm that an

3  individual could suffer from the sexual abuse, and we took

4  those comments verbatim.

5          But as the please describe at the end, it says,

6  "Please describe how you were impacted in ways that you now

7  connected being related to the sexual abuse you described

8  above."  And then it says, "in as much detail as you can

9  recall in the lines below."  And, again, we felt that that

10  was being sensitive to re-victimization, as well as memory

11  loss points, but also asked for a narrative which we know is

12  important for us to be able to understand simple check-the-

13  box claims and important, as we understand it, to the

14  insurers.

15          Your Honor, with respect to the proof of claim

16  form itself, those are the only language issues, I'll call

17  them, with respect to the form. As you may have seen in the

18  objections that were filed by the insurers on Friday evening,

19  the insurers have a very broad objection to the form, most of

20  which deals with sort of an either/or proposition pertaining

21  to language in the proposed form of order.  If we don't have

22  language in the proposed form or order indicating that this

23  basically under Section 502 of the Code is not prima facie

24  evidence of the claim, then they would want a different

25  proposed form of order, and that proposed form of order was

1  attached to Hartford's objection.

2         I'm going to deal with that particular issue when

3  we get to the form of order itself because it's really a more

4  broad-based issue that doesn't deal with specific language in

5  this other than I think there's probably ten-plus additional

6  questions that the insurers would like.  We, in fact,

7  presented those to the tort committee, and it's my

8  understanding that those questions were all rejected by the

9  tort committee.  But I'd like to deal with that issue when I

10  get to the form of order, if that's okay, Your Honor.

11         THE COURT:  That's fine.  I want to make sure I

12  understand the issue with the narrative, which I think Dr.

13  Conte testified and is not necessarily the best for winnowing

14  out the truth of validity of someone's claim of sexual abuse,

15  either because it can be too detailed or conversely the lack

16  of detail, neither of which may help someone winnow out the

17  truth of the assertion.  That's my interpretation of his

18  testimony.

19         So is the concern here that whether it's optional

20  or not?  Is that the disagreement among the parties?

21         MS. BOELTER:  That's exactly right, Your Honor.

22  The disagreement among the parties is that it's not crystal

23  clear that this is optional.  The tort committee would like

24  it to be optional for the reasons that Dr. Conte testified to

25  that the act of filling out a narrative may essentially re-

1  victimize the abuse survivor, and that act, in and of itself,

2  may not even elicit the type of information that is required,

3  determine the type of claim or the veracity of the claim.

4        And I don't want to speak for Mr. Schiavoni, but

5  as I understand it and the debtors agree, that we do want to

6  encourage individuals to complete the narrative on the form,

7  not because we want to cause greater trauma to those

8  individuals, but we do think it's helpful to have words, in

9  the claimant's own words, that actually describe the abuse

10  that they suffered.

11        It maybe that we can learn more from those words

12  than, you know, a check-the-box.  We tried to come up with a

13  lot of different boxes that you can check, but, Your Honor,

14  we confess we may not have covered everything.  And getting

15  from the claimant, in their own words, in a form that, you

16  know, clearly -- I know Mr. Conte addressed the possibility,

17  you know, if you're trying to deal with veracity of the claim

18  issues, narrative doesn't do much for you because individuals

19  could watch a movie and actually draft a narrative based upon

20  actions that they saw in a movie.

21        From our perspective, one, obviously, the form is

22  subject to the penalty of perjury.  And, by the way, for

23  those that fill it out electronically, there will be a pop-up

24  box indicating that the form is truthful.  But for anyone

25  that's ever been bound to fill in a check-the-box form and

1  has felt that there were no boxes that necessarily applied to

2  that individual's situation or tried to understand an

3  individual situation based solely upon boxes that would be

4  made available to potentially multiple thousands of people.

5  We just didn't think that made a lot of sense.

6          We think the narrative really does enhance our

7  ability to understand the boxes, understand and test the

8  level of abuse and the type of harm that may have occurred.

9  And we believe that we have done that with sensitive

10  disclosures around those requests that try to take into

11  account that, one, these victims may not recall precisely

12  what happened to them.  We're asking them to do their best.

13          And, two, if, for whatever reason, they don't fill

14  out the form, like we said in the lead-in to Part Five, we

15  may, at a later date, ask them for more information, so

16  they're aware that we may have to go back and do it again.

17  But that, you're right, Your Honor; the issue is really do we

18  make the language in the form more optional then it currently

19  is.

20          THE COURT:  Okay.  Thank you.

21          MS. BOELTER:  Okay.  So, let's deal with specific

22  issues on the abuse survivor notice.  And just to orient you,

23  Your Honor, this is the abuse --

24          MR. STANG:  Your Honor -- Your Honor, this is Mr.

25  Stang.  If I could just interrupt Ms. Boelter for a moment.

1           We have a lot of pleadings that we're looking at

2   that were filed, for us, really early in the morning on the

3   West Coast.  We're struggling to try to get through these and

4   be able to be responsive to you throughout this hearing.

5   Could we deal with the proof of claim issues and then go to

6   the notice?  It might make it easier to check off that we've

7   taken care of something.

8           It's up to you, but we're going to have a long

9   presentation then Ms. Boelter.  Then Mr. Schiavoni may give -

10  - you know insurance companies may give long presentation on

11  all these different issues.  Is it -- would you -- I'm asking

12  you if it would help you to say, all right, let's get the

13  claim nailed down, and now let's move onto the next thing and

14  so, I'm just putting that out there.

15          MR. SCHIAVONI:  Your Honor, Tan Schiavoni.  I

16  would just suggest that that almost puts the cart before the

17  horse because the threshold issue is really the form of

18  order, what it is we're trying -- what is the purpose of the

19  proof of claim.  If that issue might narrow the disputes

20  about the proof of claim itself.

21          MS. BOELTER:  And, Your Honor, I'm happy -- we can

22  proceed however the court and parties would like.  We can

23  also turn immediately to the form of order to address, as Mr.

24  Schiavoni called it, perhaps could be a threshold issue with

25  respect to the insurers.

1           THE COURT:  Okay.  Well, I'd like to probably

2  understand the totality of the issues between the parties,

3  but if there is an overarching issue with respect to the

4  order, why don't we turn to that?

5           MS. BOELTER:  Very good, Your Honor.

6           There are two issues in the proposed form of

7  order, but one pertains to the issue that Mr. Schiavoni just

8  raised.  And what I would ask Your Honor is the form of order

9  appears in Docket 667-2, it's Exhibit B.  The paragraph in

10  question that the parties have the dispute over occurs on

11  page 15 of 75 of the PDF.  It's actually page 14 of that

12  blackline order and it's paragraph eleven.

13           THE COURT:  Okay.

14           MS. BOELTER:  Your Honor, the issue between the

15  TCC, the debtors, to a certain extent, although our position

16  is clearly reflected in paragraph eleven, and the insurers is

17  essentially what is the legal significance of the abuse

18  survivor proof of claim.

19           From the debtors' perspective, the abuse

20  survivor's proof of claim tells us who may be creditors of

21  the debtor.  It tells us that not only for voting purposes,

22  but it tells us that also for purposes of when we get to plan

23  time what we need to do with respect to those claims.

24           The pleadings or the notices say repeatedly

25  throughout if you don't file a proof of claim form, you are

1  by definition not a creditor.  Your claim is essentially

2  barred.  It's a bar date, unless an exception applies and the

3  exceptions are clearly set forth in the rules.

4           But if you do file an abuse survivor's proof of

5  claim, it's the debtors' position that that does not mean

6  that your claim is liquidated.  It does not mean that we have

7  set your claim up to be liquidated.  It simply means that you

8  are a party that is asserting a claim in connection with

9  these cases and that claim is an abuse survivor claim.

10          We believe and it's consistent with virtually

11  every mass tort case that the plan of reorganization that is

12  ultimately negotiated in this case will provide a process for

13  allowing abuse survivor claims and liquidating abuse survivor

14  claims that will either be set forth in the plan itself or in

15  the trust distribution procedures.  So the proof of claim

16  form itself is not a form to liquidate an abuse survivor

17  proof of claim.

18          So, to that end, following discussions with the

19  insurers, we added, and it doesn't reflect in this blackline

20  because it was added to the version that was filed last

21  Thursday, but we added paragraph eleven which says, "the

22  allowance and the process for allowance of sexual abuse

23  claims and the treatment thereof will be subject in all

24  respects the terms of any confirmed plan or reorganization

25  for the debtors and any trust distribution procedures that

1  may be approved in connection therewith."

2          The insurers will likely give Your Honor their

3  position.  I know they will, in fact.  But as we understand

4  it, they thought the language should go further.  And

5  essentially say that the abuse survivor proof of claim would

6  be utilized for voting and for the mediation.  But from a 502

7  perspective would not have the prima facie validity of the

8  claim.

9          From the debtors' perspective that went beyond the

10  four corners of the relief that we had asked for in the

11  original motion.  It was an issue that was raised with us in

12  the middle of last week.  We feel that the language in

13  paragraph eleven adequately protects their rights and our

14  rights with respect, and the sexual abuse claimant's rights,

15  with respect to the liquidation and future allowance of the

16  claim and the process for doing that.

17          As I'm sure you'll hear from Mr. Stang, the tort

18  committee has now requested that we add language to paragraph

19  eleven.  That is exactly the opposite of what the insurers

20  have asked for.  They want paragraph eleven to say that the

21  proof of claim form is, in fact, prima facie evidence of the

22  validity of the claim, unless it's objected to.

23          So that sets up the disputes between the parties,

24  Your Honor.  Again, we, the debtors, believe that eleven is

25  not only consistent with what we see in virtually every mass

1  tort case, but it's really consistent with the position of

2  all parties which are that the claims truly will be allowed

3  and they truly will be liquidated in accordance with the

4  terms of a plan and the trust distribution procedures.  And

5  that these proof of claim forms will be utilized for a number

6  of purposes including establishing the fact that an abuse

7  survivor is asserting a claim against the debtors.

8        So that's the overarching issue that Mr. Schiavoni

9  referred to.

10        THE COURT:  Okay.  Well, let me hear from parties

11  on that issue because I have not had to deal with this issue

12  before in the mass tort case, and I'm finding this whole

13  proof of claim form process really interesting and, quite

14  frankly, contrary to what I think the Code provides in the

15  terms of the filing of a proof of claim.  So, I'd like to

16  hear from the parties on this issue.

17        MR. STANG:  Your Honor, this is Mr. Stang.  Would

18  you like me to go first?

19        THE COURT:  Sure.

20        MR. STANG:  Your Honor, a rose is a rose is a

21  rose.  The proof of claim is a proof of claim is a proof of

22  claim.

23        The proof of claim has certain impacts and

24  consequences and the Code and the Rules tell us what those

25  are.  Your claim is allowed, unless it is objected to.  And

1  Rule 3001 says its prima facie evidence.  And I don't know

2  how an order changes what the rule says the proof of claim is

3  or changes what the Code says is in terms of allowance.

4       Now, it is true the process after the claim was

5  filed would go to the liquidation of the claim and the plan

6  will go to the treatment of the claim, but the claim has been

7  filed.  The bar date sets up preclusionary effect.  Anything

8  after, it's late.  You have to meet the standard for a late

9  proof of claim.

10      The problem with paragraph eleven that we have, it

11 says that the allowance of the claim will be subject to the

12 terms of a plan of reorg and trust distribution procedures.

13 That's not correct.  The claim is allowed when it is filed

14 unless there is an objection.

15      And if this said the treatment of the claim is

16 subject to a plan, the liquidation of the claim is subject to

17 a plan or objection that's fine.  But I don't know how you

18 get around 502.  These are not placeholders.  These are not

19 raise your hand if you'd like to file a claim later.

20      These are proof of claim.  And they are

21 requirements as to the content -- we'll get to that.  We're

22 not having that discussion at the moment.  This is as to the

23 impact.  And I just simply do not understand how someone

24 through an order, proposed order, can wipe out a specific

25 section of the Bankruptcy Code and a specific statement in

1  the Rules of Bankruptcy Procedure.

2          THE COURT:  Well, Mr. Stand, I would tend to agree

3  with that, but how does that comport with this extensive

4  proof of claim form?  Because a proof of claim form and what

5  the Code requires and the Rules require is basically a short

6  and simple here's my claim.  It doesn't require ten pages of

7  explanations of your claim.

8          So how does that position you're taking on the

9  order comport with the position the committee is taking on

10  this long form proof of claim?

11          MR. STANG:  Your Honor, we are not advocating that

12  the claims form be -- initially.  We would navigate for 15,

13  20-page form proof of claim, but we appreciate.  We're

14  sensitive to the needs of the Boy Scouts and the needs of the

15  insurance companies to have more than just I'm here.

16          And so, I don't think anything precludes asking

17  the survivors to put some detail to it. We're going to get

18  into how much detail is appropriate and what should be the

19  standard.  But it is important for all parties, including our

20  committee, the official committee, possibly the future

21  claim's rep, and all the others I've mentioned to know a

22  little bit more.

23          And as I've told you at the beginning of the first

24  day hearing, I've done a lot of these.  And in every case, we

25  have had a special proof of claim form because we

1  acknowledged the needs of the other parties -- and, honestly,

2  Judge, even from the tort claimant's perspective they just

3  need sometimes to get some of it on the table and address

4  some of the table.  It's important for them to do that as

5  well.

6          But I have never, and I don't think anyone can

7  cite to a single case in the sexual abuse context, where

8  there has been anything that addresses or modifies 502 or

9  3001.  I can't remember one.

10          So, it is a balance in terms of the detail in this

11  proof of claim, but I don't think it changes the idea that it

12  is still a proof of claim form.

13          THE COURT:  Okay.  Thank you.

14          MR. BUCHBINDER:  Your Honor, this is Dave

15  Buchbinder.  May I be heard?

16          THE COURT:  Yes.

17          MR. BUCHBINDER:  Thank you, Your Honor. This is

18  Dave Buchbinder on behalf of the United States Trustee.

19          The United States Trustee filed an objection to

20  certain to certain of the language in the abuse survivor

21  notice and those issues have been essentially resolved.  And

22  we also objected to the form of the abuse questionnaire and

23  essentially our objection defers to Mr. Stang's tort claim

24  committee.

25          With respect to the specific issue at hand, I

1  don't see anything offensive about paragraph eleven.  I think

2  it preserves everyone's rights.  But to the extent that an

3  entity would want to rewrite Section 502(a) of the Code, it's

4  pretty straightforward and it's pretty short and it says, in

5  part and in part, "A claim or an interest, proof of which is

6  filed under Section 501 of this title, is deemed allowed,

7  unless a party in interest objects."  That's a substantive

8  provision.  And to quote the Supreme Court Justice, "The

9  Statute means what it says and says what it means."  And

10  502(a) is quite simple.

11          With respect to the contents of the form, Your

12  Honor, just to be a little helpful.  I've been lucky enough

13  or unfortunate enough to be involved deeply in both TK

14  Holdings which was in this district and along with my

15  colleague, Ms. McCollum.  We've been heavily involved in the

16  PG&E cases.

17          And I'll agree with Mr. Stang it's not uncommon in

18  the mass tort cases to customize a proof of claim form to

19  make it easier to sort out the types of claims in the future.

20  But to the extent this form exceeds basic information and

21  evolves into what would be a set of interrogatories that's

22  where we've deferred to Mr. Stang and what the tort committee

23  feels is appropriate questions here.

24          But with respect to the 502(a) issue, the statute

25  means what it says and says what it means.  And you don't get

1  to rewrite the Code in an objection to a motion or in an

2  order to a motion.  That requires a visit to the Congress.

3  Thank you, Your Honor.

4           THE COURT:  Thank you.

5           Mr. Schiavoni, are we taking a visit to Congress?

6           MR. SCHIAVONI:  That would be interesting, Judge,

7  and I think we'd all have lots of things to say, but I don't

8  think we need to do that.

9           You know, a couple of threshold points.  First of

10  all, it is true that in some of the sexual abuse cases that

11  have involved defined sets of claims in defined geographic

12  areas where there's a diocese, or a hospital, or school at

13  issue they've done bar dates and proofs of claims, but

14  overwhelmingly in mass tort cases where there's a national

15  distribution of claims and a future claimant representative

16  is appointed, right, because in most of those cases where

17  there's a national distribution of claims there's an FCR

18  appointed.

19           There is no bar date at all and there's no proof

20  of claim form.  And the reason for that really goes to the

21  fact that tort claims they're just not as subject to being

22  reduced to 502 treatment as pay a bond, or a secured loan, or

23  a vendor claim.  They're totally different in nature.

24  They're almost -- in the vast majority of those cases, and I

25  could list almost all of the major cases that have been in

1   Delaware, there's an FCR, and a process is put in place.

2          First, there's a process for, sort of, just

3   identifying people to vote, but as far as liquidating and

4   adjudicating the claims, after claimants come forward and

5   identify themselves the whole process has been put in place

6   to deal with those that is, sort of, particularized to what

7   the response is and particularized to the individual claims.

8   And there's good reason for that because the claimants with

9   valid claims is subject to being, in essence, victimized by

10  people just checking boxes who don't have valid claims and

11  taking money from a limited source.

12          If you want to, sort of, focus and Imerys is a

13  good example of that.  You have a plan was filed on Friday,

14  there's no bar date there, there's no proof of claim in that

15  case.  There's a future's representative and the plan they

16  filed purports to set out a way to, sort of, deal with those

17  claims on a going forward basis.  That is the majority

18  history in Delaware on how mass tort claims are dealt with.

19  There isn't this, sort of, debate over how you form a proof

20  of claim questioning to validate prima facie claims across

21  the United States, you know, that's going to be done,

22  distributed to 100 million people.  It is utterly

23  impractical.

24          Let's just focus now on just, sort of, what the

25  basic rules are.  Here, when this motion was filed, there was

1  no proof of claim form with any questions on it. There's

2  reference in the original motion, C-2, it's a blank form.

3  The form was only filed in May, you know, proposing questions

4  under Rule 9013.  You're required to set forth the relief

5  you're seeking in the moving paper.  You don't, sort of,

6  change as you go, you know, a week or two weeks before the

7  hearing on such -- especially on such a massively significant

8  issue.

9          The notion that people have been working around

10  the clock on these questions that may be true, but it's

11  essentially been to the exclusion of the insurers.  Nobody

12  spoke to us over the weekend.  Nobody was on the phone with

13  us, you know, at three o'clock in the morning.  And we

14  weren't copied on any of the communications shared between

15  the debtor and the committee.  Yes, we got a draft last week

16  and we had a draft, I suppose, last night or yesterday

17  morning, but that's not really substantive input on the

18  drafts.

19          Let's turn to, sort of, quickly like the real

20  dispute and what the issue is.  Is there really a dispute

21  here, okay.  You heard from the debtor what they envisioned

22  is going to happen, that the proof of claim really isn't

23  intended to validate, you know, the actual elements of the

24  claim; that there is, in fact, a valid claim here.  That is

25  what they put in the proposed form of order.  That is what

1  they have told us about the purpose of the proof of claim.

2          You heard their witness.  Their witness is really

3  offering testimony about the noticing program, but not that

4  the elements of the claim are satisfied by this proof of

5  claim form, nor could it be.  I mean keep in mind that the

6  definition of abuse claim is incredibly broad.  It covers,

7  sort of, verbal bullying all the way to, you know, some

8  intentional crimes like rape.  It's extremely broad.  You

9  can't cover the elements of that in a few questions,

10 especially check the box questions, and the debtor doesn't

11 purport to do so.

12         You know, you also heard -- we heard from Mr.

13 Stang, but you heard from the debtors -- from the tort

14 claimants' witness and you heard from the tort claimants'

15 counsel in connection with that witness that their witness,

16 Mr. Conte acknowledged, I believe -- I don't have the

17 transcript in front of me, but my notes anyway seem to

18 suggest that like what he said was that he wasn't proposing

19 these questions to go to the validity of the claims, that he,

20 himself, either he said this, I believe he said it, but I

21 believe also tort claimants' counsel said it that that would

22 be subject to a separate process of adjudication through the

23 plan or otherwise to try to prove up all the elements of

24 these claims through a series of check the boxes questions.

25 We'd be significantly -- if the debtor chooses to do that on

1   its own that perhaps is one thing, but they risk vitiating

2   coverage by admitting to liability on that basis.

3          It's also true that we would be significantly

4   prejudiced by just a, sort of, quickie check the box form

5   that creates, you know, some sort of like immediate validity

6   for claims.  It's also true that like where that will take us

7   on a noticing program that is designed to go to 100 million

8   people it could cause more chaos here for everyone.  Nobody

9   knows what result we're going to get from these boxes, okay.

10         I mean I got it that Mr. Conte is concerned about

11   the impact on those valid claims from abuse claimants and

12   wants to make it easy for people to submit the form.  That is

13   -- you know, there's a sort of balancing act that the court

14   has to deal with, with that, but the easier that is just

15   think what will happen. It's like we don't know. It could

16   take us into a place where just a significant volume of

17   claims comes in that really needs to be sorted out.

18         So, we think that a clause in the order that just

19   makes clear that you aren't setting a presumptive validity of

20   the claims here by a few check the box questions which,

21   frankly, are suggestive of what the answers are, you know,

22   for a claim would be curative here about what questions have

23   to be posed.  Yes, we would have significantly more detailed

24   questions and requirements for evidence that would

25   corroborate a claim and also make out the elements of the

1  claims in multiple different states.  That is really the

2  purpose here.

3          I don't think that what they've submitted achieves

4  that.  And those courts that, you know, have tried to, sort

5  of, deal with this through a proof of claim process; <u>In Re</u>

6  <u>Delaco</u> is one, we cite another court in our papers that we

7  submitted to you.  You know, they went forward with, sort of,

8  like a proof of claim to identify claimants and preserve

9  their claim for the bar date, but then had detailed

10 questionnaires and other steps to be taken as a secondary

11 process.

12         We don't have a problem with using a proof of

13 claim.  I don't think one should really be used with an FCR<

14 but if one is going to be used to preserve claims for voting

15 purposes and to collect information for mediation that's

16 fine.  It seems to be consistent with what both the committee

17 and the debtor are suggesting or indicating what their intent

18 is, but if they're using it to set prima facie evidence of

19 these claims it's going to set us -- first of all, its

20 insufficient for that.  We don't think there's an evidentiary

21 basis for it and it should be denied if that's the purpose of

22 it.

23         If that is the purpose and that is what it's

24 approved its going to set us off into areas where what are we

25 to do like ask for depositions of hundreds of people on a

1  going forward basis and bog the case down.  That's one of the

2  reasons why bar dates haven't been set in the vast majority

3  of these cases.

4        So, we don't think there's anything wrong with

5  including in the bar date approval order a provision that

6  makes clear what the purpose is.  Yes, we would ask for

7  something a little bit more robust then what the debtor has

8  so we don't face confusion down the line.  It just says its

9  simply -- you know, we suggested language like this in our

10 written paper that, you know, would add that it really

11 doesn't set a prima facie validity for the claims going

12 forward, but there's certainly nothing wrong with the type --

13 with that type of valuator language in the bar date order

14 itself, Your Honor.

15       Thank you very much.

16       THE COURT:  Let me ask a question -- and I'll

17 apologize, I've got Hartford's objection.  I don't seem to

18 have Century's objection.

19       So, in those cases that don't set bar dates they

20 send out some sort of informational form and request people

21 return it, what is the effect of not returning that?  What

22 happens in those cases?

23       MR. SCHIAVONI:  So, you know, Imerys is one that's

24 before you and, frankly, I'm still reading it myself, but --

25       THE COURT:  I haven't looked at it.

1    MR. SCHIAVONI:  -- what's done typically in the

2   cases in Delaware has been in some respects what Ms. Boelter

3   suggested, I think she envisions here, that there'd be a

4   process -- if a process for dealing with the claims embedded

5   in the plan or otherwise would adjudicate whether or not the

6   merits of the -- to make determinations about the merits of

7   those claims on a going forward basis as they come in.

8    You know, keep in mind here we're not just -- if

9   you have an FCR the question is what is he doing.  If

10  everything is supposed to be resolved through the proof of

11  claim form then one would question what is the FCR for.  In

12  these other cases the FCR is, you know, developing with all

13  the parties as part of a plan a process for resolving those

14  claims both to their validity and to their dollar amount.

15  The claims don't go into that process having a presumption

16  that they're valid.

17    THE COURT:  How do people vote?  How do we know

18  who gets to vote on the plan if we don't have a bar date?

19  Present claims; I'm not talking about future claims, FCR.

20  Present claimants.

21    MR. SCHIAVONI:  Right.  So, in Imerys you will see

22  that, you know, the solicitation proposal is made to vote on

23  submissions that people have.  It's a, sort of -- I forget

24  the rule number they use, but they make a, sort of, summary

25  submission to vote. That is not used for 502 purposes.

1          MS. BOELTER:  Your Honor, this is Jessica Boelter.

2    May respond?

3          THE COURT:  Yes.  I am going to let you respond to

4    all of this.  Before you do, I want to make sure you hear

5    everyone you need to respond to.

6          Is there anyone else who wants to weigh-in on this

7    issue, this big picture issue?

8          MR. RUGGERI:  Your Honor, James Ruggeri for

9    Hartford.  Thank you for letting me appear today.  We did

10   file an objection on Friday in response to the revised proof

11   of claim notice.

12         Let me respond, I join in what Mr. Schiavoni

13   provided to the court, but our confusion really was based on,

14   Your Honor, with the original motion papers which, frankly,

15   don't square, at least my understanding with what the debtors

16   are representing today.  In the original motion paper at

17   Docket 18, on Page 23 of 30, tells us the purposes that

18   debtors were telling us was the purpose of the proof of claim

19   form.  Those purposes include assisting the debtors and

20   party's interests in evaluating and resolving the abuse

21   claims, then going onto say the information requested is

22   critical to assessing the debtors' aggregate liability both

23   overall and for different categories of claims.

24         That, to us, is pretty close to the information

25   that is going to be used for purposes other than just as a

1  place holder for the filing of a claim and getting a whole

2  lot closer to soliciting or eliciting information that was

3  intended to allow people to adjudicate or figure out the

4  validity of the claims.  That is why when we saw Paragraph 11

5  in debtors' revised proposed orders we said it's not clear

6  enough for the reader.  I can't square it with what you told

7  the court in the motion papers and we offered language making

8  clear, as Mr. Schiavoni said, that same point blank that the

9  proof of claim form does not replace a claims process or the

10 tort system, the requirements that they will impose.

11             That is the process that I hear today everyone

12 envisions taking place.  Our position is it should be stated

13 clearly.  If, in fact, the purpose is more aligned to what we

14 see in Paragraph 36 on Page 23 of 30, Docket 18, that's why

15 Hartford provided the questions that is sought to be added to

16 the proof of claim form.  We're not going to go into that

17 now, but I also think the court heard testimony from Dr.

18 Conte this morning that you have to tailor the proof of claim

19 to meet the purposes.

20             One of those purposes is the questions, he said,

21 will allow you to winnow out the credible claims from the not

22 credible claims.  That was the vein in which we made our

23 suggestion to the form itself, but on the order the language

24 we requested was intending to square what the debtor was

25 saying and avoid what we feared was the intended purpose from

1  Paragraph 36 of the motion.

2           Thank you, Your Honor.

3           THE COURT:  Thank you.

4           So, let me ask the same question that I asked Mr.

5  Schiavoni.  How do people vote on the plan?  How do claimants

6  vote on the plan if they haven't filed a proof of claim?

7           MR. RUGGERI:  I will allow my partner, Josh

8  Weinberg, to weigh-in on that issue because he's closer to

9  it.

10          I think there is a variety of mechanisms including

11 they are allowed to submit proofs of claims in my experience.

12 Those claims are estimated for voting purposes at a nominal

13 dollar amount.  That has been my experience outside the abuse

14 arena in the mass tort experience, Your Honor.

15          Mr. Weinberg has nothing to add to that, Your

16 Honor.  So, thank you.

17          THE COURT:  Thank you.

18          Okay, anyone else before I go back to Ms. Boelter?

19      (No verbal response)

20          MS. BOELTER:  Thank you, Your Honor.

21          Let me just start with a little bit of history

22 with respect to this particular form.  It was provided to all

23 of the insurers by Haynes & Boone, the debtors' coverage

24 counsel, on April 19th.  So, this was not a surprise or a

25 sneak attack on May 4th.  And we had given all parties in

1  interest a heads up in the original motion that we would be

2  providing these documents well in advance of the hearing and

3  well in advance of the objection deadline.  In fact, we had

4  extended the objection deadline as I think was reflected in

5  the agenda through the insurers, for the insurers until noon

6  last Wednesday.

7       We had provided and had multiple calls with the

8  insurers concerning the proof of claim form last week.  At no

9  point prior to Wednesday did any insurer raise with us what

10 appeared in, I think it was, Footnote 13 of Century's

11 objection filed on Friday night that there should be no bar

12 date in this case.  I want to address that.

13      First of all, Your Honor, as we said, I said it

14 today, I said it at the first day hearing, a bar date is

15 critical to our ability to advance these Chapter 11 cases

16 with respect to abuse claims.  That has been very clearly

17 conveyed to us by abuse survivors.  And from the debtors'

18 perspective, and I think this is true for all parties in

19 interest, we need to understand the body of claims that are

20 out there and we need to understand the type of those claims.

21 It is our view that that data will be imperative for us to

22 proceed with respect to the mediation and I think Mr. Stang

23 would back me up on that.  His constituents have said that to

24 us loud and clear, and we agree.

25      We disagree with Mr. Schiavoni that bar dates are

1  not in most mass tort cases.  Our experience has been exactly

2  the opposite.  Look no further then recent cases such as

3  PG&E, Takata, USA Gymnastics.  The reason that the form is

4  different from the official proof of claim form 401 in mass

5  tort cases is a couple of reasons.

6          One, we're dealing with individuals that don't

7  have a lot of bankruptcy experience.  We also know that there

8  is a particular type of data that would be helpful to

9  evaluating the claims.  So, for example, in a product

10 liability case there is often scientific evidence that can be

11 deduced and filled out in a check the box proof of claim form

12 that indicates whether the debtor's product was involved and

13 whether there was, in fact, scientific evidence of the type

14 of accident that occurred.

15         In this case, in the abuse cases it's far

16 different.  In these cases, we don't have necessarily a

17 scientific parameter that we can point to, to see abuse that

18 occurred thirty years ago.  We also have to deal with the

19 sensitivity of the individuals that are filling out the claim

20 form.  So, in order to understand the types of claims that

21 these individuals have and assess the magnitude of those

22 claims and the validity of those claims not ultimately to

23 liquidate the claims because that will be the job of the

24 trust. But in order to assess the debtors' aggregate

25 liability we need the data, and I think all parties are in

1  agreement that some form of additional data beyond official

2  claim form 401 is not only utilized in mass tort cases, its

3  common in mass tort cases and this is the type of form that

4  you would see in an abuse mass tort case.

5         With respect to, well, isn't this something that

6  the futures rep is supposed to do; just as a reminder, Your

7  Honor, the futures rep in this case is limited to repressed

8  memory minors.  So, we have a number of individuals that we

9  are trying to reach through our media program that simply

10  don't fall within that category and that are not actually

11  represented by the future claimants' representative.

12         Then, to just conclude on Hartford's point on

13  Paragraph 36 of the original motion, Your Honor, I'm

14  surprised at the reading.  We actually read it as consistent

15  with respect to what is Paragraph 11 in the order in the

16  sense that, you know, we say it is very important that we

17  understand the aggregate magnitude of the claims against the

18  debtor.  Not that this is going to replace distribution

19  procedures or the job of a trustee, but it will, in fact, be

20  used in terms of negotiations to Your Honor's point for

21  voting purposes.  Many of these claims will likely be filed

22  in an uncertain dollar amount.

23         When we get to voting on a plan of reorganization

24  individuals that submitted proofs of claim will likely be

25  given $1 dollar votes consistent with all other mass tort

1  cases that do, in fact, have bar dates and that do, in fact,

2  assign $1 dollar claims to individuals that filled out a

3  proof of claim form.

4         So, we think, one, that Paragraph 11 in the order

5  should satisfy the issues that the insurers have raised.  It

6  is, in fact, how we view the allowance process and the plan

7  process.  Again, ask that the court not only ultimately

8  approve the bar date, but also the order.

9         Again, not to conclude my remarks here because as

10 I mentioned, Your Honor, there is a handful of other issues

11 once we get into the other documents, but on this big

12 overarching issue that is where the debtors come down.

13        MR. STANG:  Your Honor, this is Mr. Stang.  May I

14 make a comment to what the insurer said?

15        THE COURT:  Yes.

16        MR. STANG:  To answer your question, Your Honor,

17 my experience in all the sex abuse cases, including USA

18 Gymnastics, abuse creditors are assigned a dollar through

19 vote and some through a plan solicitation procedures motion

20 that includes voting. That is the way it's been done in every

21 diocese case that I know of and that's how the court ordered

22 in USA Gymnastics as well.  So, that is how my experience is

23 in the voting context.

24        I would point out to you that the official form

25 for proofs of claim specifically states that it can be used

1  for personal injury.  And it doesn't have to be used for

2  personal injury. It doesn't preclude the use of a specialized

3  form, but the notion that personal injury claims cannot be

4  evidenced by a proof of claim simply ignores the fact that

5  the official form says that they can be.

6          The focus of our conversation, I thought, was on

7  Paragraph 11, but counsel went off on looking at the proof of

8  claim form itself.  We may get back to that, but I will point

9  out that form asks who did this to you and asks you to be

10 very specific about identifying the person.  It asks when did

11 this person do that to you, start dates, end dates, and if

12 you can't remember the dates seasons, (indiscernible).  It

13 asks what did they do to you?  Were you penetrated?  Is the

14 problem the insurers have that we didn't ask which orifice?

15 You know, were you orally copulated; I mean that's not

16 specific enough for them to get past a proof of claim

17 standard.

18         If people filled this claim form out, they would

19 need a motion to dismiss.  It tells you who, what, where and

20 when.  Also, it alleges consequences.  And while it doesn't

21 call for a dollar amount, if that's what people want people

22 put down dollar amounts.  So, the idea that this is just

23 check a few boxes tribulizing a claim form that calls out

24 specific conduct and specific consequences of that conduct is

25 not just checking a few boxes.

1           I've read a lot of these claim forms in other

2    cases.  If the narrative said I was abused in my tent,

3    period, that consents a narrative, what are they going to do

4    say the claim is automatically disallowed because you didn't

5    put in a sufficient narrative.  I've seen claim forms that go

6    on for dozens of pages.  I've seen claim forms that said I

7    was abused in my classroom.

8           So, the narrative will have a consequence.  It

9    will tell you something.  Dr. Conte talked about this.

10   Whether it goes to the voracity of the claim or not it might,

11   it might not, but the idea that your claim shouldn't be

12   allowed, understanding that it is unliquidated, understanding

13   it's still subject to objection.  One of the insurers said

14   this would preclude our ability to -- I think it was

15   Hartford, preclude the possibility of discovery.  Really?

16   There's' nothing in the order that says that.  It would

17   preclude the possibility of objections.  I didn't see that.

18           I just don't understand how they can rewrite the

19   code when we have a proof of claim form that's clearly within

20   the scope of what Congress anticipated and the court's

21   anticipated in the proving official form that gives all of

22   the elements of the tort claim and gives information far

23   beyond what would probably be required for a complaint in the

24   State Court proceeding.

25           Thank you, Your Honor.

1          THE COURT:  Thank you.

2          Okay.  With respect to this big picture issue I'm

3   going to permit a proof of claim form to go out and the

4   return of that proof of claim form has the effect that the

5   code gives it.  I am not going to alter the effects that the

6   code gives it.  Some of you may have heard me talk about

7   proofs of claims and objections to proofs of claims in other

8   cases.

9          My basic view of a proof of claim form is if I can

10  look at it and understand what it is that the claimant has

11  alleged, for example, breach of contract, breach of my

12  employment agreement, services performed, and if its signed

13  under oath and, otherwise, meets the requirements I think

14  it's a valid proof of claim.  And the debtor has to object to

15  it.  Quite frankly, the debtor has to object to it on more

16  then I just can't validate it.

17         So, I am going to permit bar dates to be set so

18  that parties will have an opportunity to vote the amount of

19  their claim, how they're allowed to be voted for, the amount

20  of the claim, and the numerosity we will deal with when we

21  get to that part of the bankruptcy proceeding, but I'm going

22  to permit it.  And I don't think we have to say anything

23  about what the effect of a proof of claim, filing a proof of

24  claim is in a proof of claim order because it is what it is

25  under the code.

1       So, Paragraph 11 to me may or may not be accurate.

2 If there is information -- and, quite frankly, I don't know

3 how many claimants are going to be reading the order as

4 oppose to the proof of claim form itself in the instructions.

5 So, I don't think it's very informative to these claimants

6 nor do I think they have a clue what it means when we talk

7 about the difference between allowance, a treatment, et

8 cetera.   So, I think Paragraph 11 is extraneous and doesn't

9 need to be in the order.

10      There should be nothing in this order which

11 deviates from the code.  I'm going to permit a longer form of

12 proof of claim form, but there should be nothing on a

13 substantive basis that deviates from what the code provides

14 in this order.

15      MR. STANG:  Your Honor, this is Mr. Stang.

16      There is one other provision in the order that --

17 well, there are two things in the order that we would like to

18 address specifically. I know we went from one issue over to

19 the order and I don't know how you would like to proceed, but

20 I just -- if you could take a note that if we are going to go

21 onto something else I'd like to revisit the order on at least

22 two issues.

23      THE COURT:  Ms. Boelter, let me ask you, are there

24 other issues in the order that you have on your plate to

25 address?

1          MS. BOELTER:  There was only one other issue and I

2    thought it was the only issue that was open between the

3    debtor and the TCC with respect to the order.  It sounds like

4    Mr. Stang has two.  So, I'm not aware of two, but I am aware

5    of one and that was the other issue with respect to the order

6    that I was going to address.

7          THE COURT:  Okay.  Let me hear that?

8          MS. BOELTER:  The issue that I'm aware of, Your

9    Honor, is that the TCC had requested language in the order

10   finding that the filing by an abuse survivor of a proof of

11   claim form did not waive that abuse survivor's right to a

12   jury trial.  Similar to the logic, I guess, that Your Honor

13   just applied with respect to Paragraph 11 and was argued by

14   Mr. Stang its the debtors' view, one, that we didn't ask for

15   any relief specifically with respect to the implications of

16   filing a proof of claim form on jury trial rights and, two,

17   the law is what the law is.  And adding language to this

18   order that may affect the current state of the law with

19   respect to the implication of filing a proof of claim form in

20   Delaware we just simply felt was inappropriate and have not

21   added the language.

22          That is the only open issue that we, the debtors,

23   are aware of in the proposed form of order.

24          THE COURT:  Thank you.

25          Mr. Stang, why should I deviate after you just

1  heard me talk about I'm not going to deviate from the code

2  and the law?

3          MR. STANG:  Your Honor, I generally ask for this

4  kind of provision in a bar date order in these cases because

5  of the Supreme Court's opinions about filing a proof of claim

6  constitutes a waiver of a jury trial right.  I am familiar

7  with the statute that says that nothing -- I'm paraphrasing,

8  nothing changes your right to a jury trial.  But it's because

9  of those Supreme Court opinions that talked about the impact

10  of filing a proof of claim.

11          THE COURT:  Okay.  I'm not going to add -- and I

12  think there does not need to be anything in this order with

13  respect to the effect of filing a proof of claim.  It is what

14  it is.  And if it becomes an issue in any particular case, we

15  will address it, but I'm not going to require anything about

16  the effect of filing a proof of claim form.  The parties have

17  choices to make.

18          MR. STANG:  Thank you.

19          THE COURT:  Thank you.

20          MR. STANG:  I can tell you know what the second

21  one it.  It was the subject of an email that we sent out last

22  night, but if everyone read every email that went out after

23  last night God bless them.

24          Your Honor, it's in Paragraph 5 of the order.

25  Actually, it's in Paragraph 4(h) of the order and Paragraph

1  5(ii) of the order.  The language is identical.  So, I think

2  if we just focus on 4(h) and address it the result will be

3  the same depending on your ruling.

4         Your Honor, there is a sentence that's about

5  halfway down that starts "For the avoidance of doubt," and

6  it's that sentence that I wanted to talk about.

7         THE COURT:  It's in which paragraph?

8         MR. STANG:  It's in Paragraph, I thought it was 4,

9  but I'm going to scroll up to make sure that I've got the

10 right cross reference.

11        MS. BOELTER:  Your Honor, if you're looking at

12 that blackline that I directed you to its on Page 8 of the

13 blackline that was filed early this morning.

14        MR. STANG:  Yes.  Thank you.

15        THE COURT:  Thank you.

16        MR. STANG:  It's the sentence, Your Honor, that

17 begins "For the avoidance of doubt."

18        THE COURT:  In the order?

19        MR. STANG:  The actual paragraph begins,

20        "Any sexual abuse survivor who believes that she

21 or he has. . ."

22        There it is, that's it.  Whoever's moving the

23 cursor that's the sentence.

24        THE COURT:  Okay.  Thank you.  I've got it.

25        MR. STANG:  So, after you're done reading it, Your

1  Honor, I'll tell you want my concern is.

2        THE COURT:  Okay.

3        MR. STANG:  All right.  So, Your Honor, it is the

4  tort committee's goal to have as many people file proofs of

5  claim as possible regardless of what they believe the statute

6  of limitations may be for asserting the claim.  Our focus on

7  that was because once the debtor has a discharge and if a

8  state statute of limitations is subsequently changed such as

9  a window opens up in Texas, a year after the debtor gets its

10 discharge that an argument could be made that the discharge

11 relief is in effect notwithstanding the subsequent change in

12 the statute of limitations.

13        There is a statute of limitations that is viewed

14 by most courts as a defense and you still have a right to

15 payment as defined by the code regardless of whether or not

16 there's a statute defense.  That is what we want people to

17 file claims even if under their state law an attorney would

18 advise that their statute barred.  That is why the notices

19 say no matter when you were abused or how old you are you

20 should file a proof of claim.  That is why that's in there.

21        This sentence says to someone if your claim is

22 time barred you should file your proof of claim to preserve

23 your claim if there's a subsequent change in the statute of

24 limitations.  Well, then it says you will not be treated as a

25 creditor with respect to such claim for purposes of voting

1   and distribution.  What we suggested that there be a period

2   after the sexual abuse claim and before in the event of a

3   change in the applicable statute of limitations.  Just put a

4   period that says you are required to file a proof of claim in

5   order to preserve your right to pursue that claim.

6          The reason that -- what we're concerned about is

7   if the court has determined your claim is time barred then

8   you shouldn't be getting any money, but that adjudication

9   happens at different levels.  It can be a trial court

10  decision that's on appeal.  It's not final till its final.

11         There have been instances in other cases where the

12  TBP's or allocation programs have given some distribution to

13  someone who was time barred to just try to settle the matter.

14  And in fairness if people whose claims are timely from a

15  statute perspective, who want to share some of their money

16  with a fellow abuse survivor whose claim is time barred we

17  would want the TBP's to allow that to happen.

18         Fundamentally, most survivors view statutes of

19  limitation as something that all the defendants want.  I have

20  seen a lot of survivors say, you know, we're not going to

21  distribute money on the basis that you were abused in Wyoming

22  and I was abused in New York with a window so I get all the

23  money and you get nothing.  Their brotherhood or sisterhood

24  overcomes that legal objection.  And the way this is written

25  -- I'm not saying that will happen in this case, but it might

1  happen in this case and the way this is written it precludes

2  a plan or a TBP to provide for that because it says you can

3  only get money if your statute of limitations changes to make

4  your claim timely and no longer time barred.

5          That's it, Your Honor.

6          THE COURT:  Okay.  So, Mr. Stang, you want the

7  sentence to end after in the event of a change in the

8  applicable statute of limitations?

9          MR. STANG:  No.  I would like it to read in order

10 to preserve the right to pursue a sexual abuse claim, period,

11 and then delete everything from in the event of a change to

12 the end of the sentence.

13         THE COURT:  Okay.

14         MR. STANG:  Yeah, to the end of the sentence.

15         THE COURT:  Okay.  Ms. Boelter?

16         MS. BOELTER:  Your Honor.

17         THE COURT:  Yes.

18         MR. STANG:  This is dictating treatment of the

19 claim.  That -- I guess that's it.

20         MS. BOELTER:  Your Honor, this Jessica Boelter.

21 If I may just respond because I actually don't think we have

22 a substantive disagreement with Mr. Stang here. I think this

23 is just a wording issue.

24         A little bit of background on the language in this

25 particular provision.  First, we are in agreement with Mr.

1  Stang that individuals should file proofs of claim regardless

2  of the status of the statute of limitations in their

3  particular jurisdiction because we further agree with Mr.

4  Stang that the debtors' ultimate discharge in this case would

5  discharge those claims in the event they were for the statute

6  of limitations change.  So, we think it's critically

7  important that individuals file proofs of claim regardless of

8  the state statute of limitations status in their particular

9  jurisdiction.

10         I think the confusion with this language, and it

11  doesn't just appear here, it also appears in respect of the

12  general bar date, in response to comments that the debtors

13  received, I believe, from the United States Trustees Office

14  this sentence at one point, I believe, concluded with, sort

15  of, standard bar date language or your claims shall be

16  forever barred, you know, you won't be able to assert it

17  against the debtors.

18         I believe it was at the request of the United

19  States Trustees Office, but Mr. Buchbinder can correct me if

20  I'm wrong.  The U.S. Trustee asked that we not use language

21  of that type and rather use language along the lines of such

22  individual just would not be treated as a creditor in the

23  bankruptcy case.  That appears in a couple of different

24  places, I believe, in this order.

25         So, while I don't think we have any substantive

1    disagreement with Mr. Stang on this, I think this is the

2    product of, you know, original language being modified to

3    satisfy a particular purpose.  And, you know, in Mr. Stang's

4    view not working for the purpose of sexual abuse survivors.

5    But we certainly, I don't think, were attempting to take an

6    action that he suggests.  We want these individuals to file

7    proofs of claim.  If they don't their claims will be

8    discharged.  We want to convey that very clearly.  If there

9    is a better way, we can do that, happy to have that

10   discussion with him.

11          THE COURT:  Okay.  I will let you have that

12   discussion, but it does seem to me that where Mr. Stang wants

13   the sentence to end conveys --

14          MS. BOELTER:  The message.

15          THE COURT:  -- the message that you want those

16   parties to file.

17          MS. BOELTER:  Your Honor, I agree with you.  I'm

18   looking at it and I don't have an objection to that.

19          THE COURT:  Okay.  Yeah.  The consequence of not

20   filing a proof of claim by the bar date I think is also

21   accurately reflected in the language that says they shall not

22   be treated as a creditor with respect to such claim for the

23   purposes of voting and distribution.  I'd have to look at

24   Rule 3003, but I think that's pretty verbatim from Rule 3003

25   which is where I look to, to determine the effect and often

1 have to change the language in a proposed bar date order to

2 insure that it merely reflects what the rules in this

3 instance provide, but I think the language in between may not

4 be necessary.

5          MS. BOELTER:  Yeah.  That is, I think, exactly,

6 sort of, the genesis of the change to the backend of this

7 clause and the use of this language. It was changed in other

8 portions of the form of order. It may not be reflected in

9 this particular draft because it occurred in prior drafts,

10 but it was to comport with that concept there at the tail

11 end.  And if we need to delete as you suggested, Your Honor,

12 in the event of a change in the applicable statute of

13 limitations the debtor has no objection to that.

14          THE COURT:  Okay.  Anymore issues that anyone has

15 with the order before we move on?

16          MR. BUCHBINDER:  Your Honor, this is Dave

17 Buchbinder.

18          I can simply confirm that the changed language

19 does conform to Rule 3003(c)(2).

20          THE COURT:  Thank you.

21          MS. BOELTER:  We're getting near the end, Your

22 Honor.

23          In my mind we have only one issue left to address

24 and that is on the, what we sort of colloquially refer to,

25 long form notice which is the sexual abuse survivors notice.

1  It is attached as an exhibit to the order. If you're looking

2  at 667-2, which was the overnight filing, it's in Exhibit B

3  in the blackline.

4         The first place I'd like to take you is Page 34 of

5  75 of that blackline.  This is not an issue, Your Honor.

6  It's a resolution, but I wanted to point it out because we

7  received multiple comments from parties on it.  What is the

8  bankruptcy about, you will see that deleted in the blackline,

9  as well as what is Chapter 11, and the flow chart in

10 connection with that what is Chapter 11 was objected to by

11 the TCC, the United States Trustee, I believe, and I also

12 believe that Century took issue with the flow chart.  We have

13 removed all of that material.  So, that should resolve those

14 objections.

15        Again, that was filed in the overnight hours and I

16 wanted to make it very clear on the record that we have, in

17 our view, satisfied that objection.

18        The only remaining issue, and I'm not sure if it

19 is, in fact, remaining due to the overnight filing, but I

20 think we should address it, occurs on Page 39 of 75 of 677,

21 its Page 8 of the actual notice itself.  That is the notion -

22 - you will see the question here, question is No. 9 now on

23 the blackline.  What could be released under the plan of

24 reorganization?

25        This had received an objection from the United

1  States Trustees Office.  We have modified language.  You

2  don't see it in this blackline because that was filed on

3  Thursday night.  We believe to have addressed their

4  objection, but I'm going to walk the court through it in any

5  event.  Then we also heard from the TCC last night that they

6  may, in fact, have an issue with this language.  So, I wanted

7  to bring it to the court's attention.

8         Originally, this language, essentially, said what

9  is being released under the plan or reorganization and said

10 in probably a more unequivocal fashion that a plan had been

11 filed and that the plan could provide for releases of third-

12 parties beyond just the debtors that it would potentially

13 provide for releases of the local counsel's and chartered

14 organizations.

15        We changed the language to say what could be

16 released.  We've noted that and we changed the words to be

17 "could, may," and midway down we've also said,

18        "Please note that a Chapter 11 plan has not yet

19 been proposed for solicitation or agreed to by any parties in

20 interest in the Chapter 11 proceeding."

21        Once it becomes available this is where you can

22 find it.  Then we finally added a sentence at the end of this

23 section that says,

24        "Again, please note BSA is the only debtor here.

25 Local counsel and chartered organizations are not.  So, if

1  you believe you have claims against them you may need to take

2  additional legal action."

3           That was language that was specifically requested

4  by the tort committee.

5           As I understand it there is some objection to

6  including this type of, what we view as, critical due process

7  language in a notice pertaining to the bar date particularly

8  because no party has yet agreed to any sort of releases for

9  local counsel, or chartered organizations, or any plan for

10 that matter.

11          For our perspective, Your Honor, we've

12 appropriately now caveated the language, but as I said at the

13 outset this is an extraordinary noticing program.  It's going

14 to go to 110 million individuals.  It's extraordinarily

15 expensive and it is very time consuming.  We think from a due

16 process perspective the fact that we have an ad hoc group of

17 local counsel, we know that they will be participating in the

18 mediation and we are very optimistic that we are going to

19 globally resolve these cases.

20          We think we would be remiss if we did not take

21 this opportunity to provide broad notice to all of the

22 potentially millions of people that are going to look at this

23 notice that the ultimate agreement in this case may affect

24 more than just BSA.  It may affect other parties.  We think

25 from a due process perspective that's critically important.

1  We don't want to incur the $7 million dollar cost again of

2  this notice.  So, that's why we've left the language in.

3           I don't want to speak for Mr. Buchbinder or Ms.

4  McCollum, but I think that with it being caveated the way it

5  is now it does resolve their objection.  Candidly, I'm not

6  sure where the TCC is at this morning with respect to this

7  particular language, but we think it is now (indiscernible)

8  to be appropriate for the type of noticing that we're

9  contemplating.

10          THE COURT:  Mr. Buchbinder?

11          MR. BUCHBINDER:  Yes, Your Honor.  Dave

12  Buchbinder.

13          The revised proposed language is acceptable to us.

14          THE COURT:  Thank you.

15          Mr. Stang?

16      (No verbal response)

17          THE COURT:  Mr. Stang, you're muted.

18          MR. STANG:  Thank you, Your Honor.  I apologize.

19          Your Honor, the language is not acceptable to us

20  because we do not think that a claim's notice for a specific

21  debtor could preview what that debtor wants to do in its

22  plan.  The problem is very practical.  You have states that

23  currently have windows of statutes of limitation that go

24  beyond the agreed upon bar date.  New York, if Governor

25  Cuomo's edict to extend the window in New York is effective,

1  he did it by order as opposed to legislative change, takes

2  you out into the beginning of January 2021.  New Jersey has

3  all of 2021 as an open window.  California had a total of

4  three years, it goes out to, I guess, 2022.

5          So, you have got a dynamic here where we have a

6  deadline for the Boy Scouts.  They're not arguing that your

7  order can't truncate a statute of limitations for the debtor,

8  we know that it can.  What your order cannot do is truncate

9  it for local councils, chartered organizations, or anyone

10  else.  What we're concerned about is that people are going to

11  think, well, if I file this proof of claim it's going to

12  count as against the counsels, it's going to count as against

13  the chartered organizations, so I don't have to do anything

14  else.  And meanwhile your window closes.  Obviously, every

15  state has some statute of limitations, but I'm focusing on

16  the windows particularly because that's clear.  Those states

17  have no statute of limitations for child sex abuse for the

18  period of that window.  And people don't file their law suits

19  or don't go to see a lawyer who could file the lawsuits for

20  them because they said, oh, I filed a BSA claim.

21          Now I know what BSA wants to achieve in its plan.

22  I know it wants to have a very broad challenging injunction

23  for the local councils and possibility for the chartered

24  organizations as well, but that's a very different bear to

25  wrestle with because there are just many more of them then

1  there are local councils, but I know what they want.

2        If I'm reading this and I am not in an attorney --

3  and how many times do you have people come in front of you

4  and say I'm an attorney, but I'm not a bankruptcy attorney,

5  so forgive me for all my mistakes.  And they read this and

6  they may go, well, I guess I crossed the T and dotted the I's

7  to the councils and the organizations.

8        And I appreciate the disclaimer down in whatever

9  paragraph number that is towards the bottom, but these

10  constant references to the local councils and local

11  organizations I think is very confusing. It's in the first

12  bullet point, it's in the third bullet point that if you do

13  not file a claim you may lose your rights against the local

14  councils and organizations.  Well, I filed a claim, I guess I

15  didn't lose my rights against them; ah, but you did if you

16  didn't file a lawsuit within the statute of limitations for

17  your state.  And that is the problem with this.

18        It's confusing because the disclaimers that we are

19  used to reading and understanding as sophisticated counsel

20  are not satisfactory for someone who doesn't have that

21  background and experience.

22        THE COURT:  Mr. Stang, where is the bullet point

23  that you're referring to which references --

24        MR. STANG:  It's in the first one, Your Honor, and

25  it's in the blackline.  It starts, "Please read this notice

1  carefully," that's the first time that they use it.  The

2  second time they use it -- there may be others, but if you do

3  not -- this is No. 3 I think it is, "If you do not file a

4  sexual abuse claim by the date you may lose rights against

5  BSA councils and organizations."  I read that to say if you

6  do it by the date you won't lose those rights.

7         THE COURT:  Is there somewhere in the form or the

8  notice maybe that says that filing a proof of claim here does

9  not -- I don't know if preserve is the right word, but does

10 not preserve your rights against the local councils?

11        MS. BOELTER:  There is, Your Honor.

12        MR. STANG:  Your Honor, I don't know if it's here,

13 but it's definitely in the proof of claim because when you're

14 asked to identify the chartered organization or the local

15 council there's a bracket that says, in effect, if you have

16 rights against these entities you have to do something else.

17 So, it does say that.

18        MS. BOELTER:  And, Your Honor, we may -- now that

19 Mr. Stang articulated his position, I think I understand it

20 better actually.  The language that we had inserted under

21 Question 9, which is the last sentence of that, "Please

22 further note that only BSA is the debtor in BSA's Chapter 11

23 proceeding and other third-parties are not."  And as Mr.

24 Stang just indicated, that language is present in the proof

25 of claim form on, at least, two occasions that I can think

1  of.

2          One, we can bold this language, but, two, we can

3  also copy and paste it into the front bullet points on the

4  first page of the notice so that individuals clearly

5  understand that if they believe they have claims against

6  local councils or the other organizations they need to take

7  additional legal action to preserve those claims.  We have no

8  issue with that.

9          THE COURT:  I think it needs to be bolded.  Maybe

10  the order if this paragraph, which is unusual, remains in,

11  this new Paragraph 9, maybe it needs to be flipped so that it

12  starts out with please note only BSA is the debtor and if you

13  have a claim you better file it against someone else, but

14  then underneath that the Chapter 11 plan may seek to do

15  something because I do have a concern.  I certainly don't

16  want anyone to think that they do not need to bring a

17  separate claim against a chartered organization or a local

18  counsel.  And I'm, of course, not pre-judging what the plan

19  is going to actual provide for when ultimately approved.

20          MR. STANG:  Your Honor, if we relocated -- not

21  relocated, but duplicated those last two sentences up at the

22  top where the first time it's mentioned about local councils

23  and flipped it the way you just described I think that

24  addresses our concerns.

25          THE COURT:  Okay.  I'd like you all to work on

1 that.

2           MS. BOELTER:  We will, Your Honor.  Thank you.

3           So, Your Honor, that concludes all of the open

4 issues that I am aware of with respect to the bar date order

5 and the seven exhibits.  Again, just to recap for the court

6 on the abuse survivors' proof of claim we had the non-

7 consenting scout participant issue as well as the two

8 narratives.  Then, finally, you know, the insurers, I

9 believe, wanted additional questions particularly if the

10 language in the proposed form of order that they had

11 submitted was not going to be accepted.  So, that's our open

12 issue there.  On the notice I think we just resolved all of

13 the open issues and I think we are resolved on the form of

14 order itself.

15           THE COURT:  Okay. So, I have not heard from others

16 on the proof of claim form.  The language regarding the

17 optional or not optional narrative and the language with

18 respect to non-consenting adult scouting participants.

19           MR. STANG:  Your Honor, can we start with the non-

20 consenting adult paragraph?

21           THE COURT:  That's fine.

22           MR. STANG:  And, Your Honor, at least one of the

23 attorneys representing a committee member, that attorney's

24 name is Paul Mones, is on the line and would like to

25 specifically speak to this issue, but let me give a preview.

1        We appreciate the importance to BSA of getting a

2    discharge for any claim that may be against it.  No debtor

3    wants to have exceptions to its discharge.  We understand

4    that.  But there has got to be a balance between that goal

5    and getting survivors a very clear message as to what the

6    claim form does and whether it applies to them.

7        The problem with including their language is that

8    they have introduced the concept of consent.  Nowhere in the

9    definition of sexual abuse, except in reference to the

10   adults, is there a reference to consent.  And this is the

11   dynamic that child sex abuse survivors have.  And if Mr.

12   Conte's declaration does not address this efficiently, he is

13   still on the phone and on the video.  But I would note that

14   his declaration at Page 9(vi) addresses this inclusion of

15   adults in the definition.

16       Someone who has been serially abused often is

17   confused about whether he or she consented to the physical

18   contact.  Let's just give an example; you're abused at a Boy

19   Scouts summer camp, and next year all your friends are going

20   again, and the year after that all your friends are going,

21   and you know that Scout Leader Joe is going to be there, he's

22   the one that touched you last time, and you go, and he does

23   it again, did you consent to his touching you?

24       Now we all know that someone under the age of 18

25   cannot legally consent to that.  No one has really disputed

1    that.  I don't think anyone disputes that.  But you as the

2    survivor say I went back, I knew he was going to be there,

3    and I went back and it happened again, well, so maybe I

4    didn't run out of the tent screaming, he touched me, he

5    touched me, I tolerated it and it's exactly what he did to me

6    last year.  Did I consent?

7            Now this form says non-consent as to the adult

8    and, well, maybe I consented and I should have filled this

9    out.  That is the problem from a claim perspective of

10   introducing the concept of non-consent.  Now I also believe

11   that the instances of non-consent, consent with an adult I

12   mean it's different.  I think Dr. Conte says it is different.

13           So, from my perspective that is the problem with

14   including this.  I do acknowledge that they want to capture

15   anyone who was in their scouting program from 18 to 21 who

16   had non-consensual abuse, I get it.  This claim form is

17   directed -- I believe it a meniscal part of the problem,

18   practically, probably, and Mr. Mones can speak to this,

19   possibly non-existent.  I get what the debtor is trying to

20   do.  This just isn't the right place for it.  So, much like

21   they have directed the bullying and hazing stuff to the

22   general claim form they could direct this particular type of

23   claim to the general claim form.

24           So, Your Honor, Mr. Mones would like to speak to

25   this as well.  He will introduce himself and tell you his

1  expertise in representing child sexual abuse victims.  Then

2  that would be the committee's comments on this part of the

3  proof of claim.

4              THE COURT:  Okay.

5              MR. MONES:  Good morning, Your Honor.  Paul Mones.

6              THE COURT:  Yes.

7              MR. MONES:  Good morning.  Thank you, Your Honor.

8              I have been representing abuse victims for other

9  thirty years and actually was the lead counsel in the

10 Portland case in 2010.  Your Honor may be aware of it, it

11 stared this whole avalanche of litigation against the Boy

12 Scouts which resulted in, unfortunately, their filing this

13 Chapter 11.

14             The mention of the non-consensual will not just be

15 confusing to claimants, but also be harmful, I believe.  That

16 is to say that in this situation people who are victims of

17 abuse as children always have, in addition to what Mr. Stang

18 said, an over-arching feeling of guilt that stays with them

19 their whole life that because of the nature of the abuse

20 which occurs after long periods of grooming and cajoling by

21 the leader who is in the position of authority, the person

22 doesn't, as an adult, view their behavior as oppositional.

23 They say I didn't do anything to oppose the perpetrator.

24             So, to that extent the notion of consent is always

25 something that is lingering in their consciousness.  By

1  inserting the notion of non-consenting adults into this,

2  really, almost out of left-field, Your Honor, in this claim

3  form we are really risking injecting confusion to large

4  segments of the potential claimants.

5          Moreover, the entire bankruptcy that the Boy

6  Scouts have filed here is predicated on victims of child

7  abuse.  In fact, if you look at their notice, in fact, it

8  doesn't mention adults at all; it talks about child sexual

9  abuse.  So, now at this later date they want to insert adults

10 into it.  You know, do adults between the ages of 18 and 21

11 have a potential position to make a claim, maybe, yes, that

12 has to be there.  But it's not in the child abuse claim form

13 whatsoever.  Those numbers would be so de minimis because if

14 we get into the weeds on it -- Your Honor, I know this may

15 not be specifically relevant to the claim form itself, but

16 consent under the laws in all 50 states is very, very narrow

17 for an adult.  It limits it to intoxication or somebody who

18 is mentally incapacitated in a way where they can't give

19 that, we say in the State Court law is a vulnerable person,

20 somebody who has mental challenges.

21         So, to that extent we're dealing with a de minimis

22 number of people to begin with and injecting that into this

23 claim form, we believe, unnecessarily risks of harm and

24 confusion outweigh any kind of potential benefits.

25         Thank you, Your Honor.  I appreciate the

1  opportunity to address the court.

2          THE COURT:  Thank you.

3          MS. BOELTER:  Your Honor, may I respond?  This is

4  Jessica Boelter.

5          THE COURT:  Yes.

6          MS. BOELTER:  Your Honor, I wanted to explain the

7  provision that Mr. Stang and Mr. Mones just spoke to and

8  provide a little more detail then I did at the beginning of

9  my remarks.

10          First, Mr. Stang is right. The reason the word

11  non-consensual was inserted into the draft is because by

12  definition children are unable to consent.  So, anyone under

13  the age of 18 is simply unable to consent to a sexual act as

14  described in the definition.  Adults are a different story.

15  Individuals over the age of 18.

16          I take issue and I hope I misunderstood Mr. Mones

17  when he said that there are very limited circumstances that

18  constitute non-consent to an adult limited to mental illness

19  or incapacitation because I'm quite certain there are a

20  number of victims of sexual assault that would disagree with

21  him vehemently with respect to that characterization.

22          The Boy Scouts are aware of or I'm aware of, at

23  least, one instance where an adult scout participant has

24  claimed an abuse claim based upon non-consensual sexual

25  activities as defined in this form. So, this is not something

1  that's not real.  It is, in fact, real.  And from the

2  debtors' perspective we just simply don't think it makes

3  sense if we need the exact same type of data from an adult

4  scout participant that we need from child scout participants

5  to defer those individuals to a different form or to create

6  yet another form that looks identical to this form, but only

7  deals with adults.

8          So, from our perspective we meant, one, no offense

9  or confusion and did not mean in any way to, sort of, re-

10  victimize individuals who seeing the word "non-consensual"

11  may be confused.  It was simply to differentiate between

12  children and adults, and consent issues for children and

13  adults, but we continue to believe that adult scout

14  participants which are, in effect, individuals under the age

15  of 21 we need to gather that information for those folks.

16  So, that's why it's included in the draft.

17          MR. STANG:  Your Honor, may I briefly respond?

18          THE COURT:  Yes.  And can you tell me, again,

19  where you point to Dr. Conte's declaration on this?

20          MR. STANG:  Your Honor, I believe I did.  My notes

21  show, I only have some many screens, I apologize, my notes

22  show that he addressed the issue of adult abuse victims at

23  his declaration which I believe is at Docket No. 601, Page 9

24  and I wrote down (vi).  That is where he does discuss adult

25  issues.  I am going to have to --

1          THE COURT:  Yes.

2          MS. BOELTER:  Your Honor, just one clarifying

3  point.  The draft of the form that Dr. Conte was opining on

4  was a form that just generically talked about non-consensual

5  adult/un-adult abuse.  Based upon conversations with the TCC

6  and, again, I understand they're still objecting, but based

7  upon conversations with the TCC we narrowed the scope to

8  adult scouting participants which, again, is a finite group

9  of individuals under the age of 21.

10          So, I'm looking at (vi) on Page 9 of his

11  declaration at 601, I just want to point out for the court

12  that the document that he was commenting on was just talking

13  about adults generically, not the 18 through 21-year-olds

14  that we have now modified the form to address.

15          THE COURT:  Okay.

16          MR. MONES:  Your Honor, this is Mr. Mones.  May

17  just give a brief response to Ms. Boelter's statement?

18          THE COURT:  Yes.

19          MR. MONES:  Thank you, Your Honor.

20          I wasn't meaning to exclude this other group of

21  adults who say they did not consent to the sexual abuse, but

22  the majority of cases would involve consent as I believe I

23  elucidated, if it did exist.  More importantly, I just want

24  to reiterate again people looking at it who are the vast

25  majority, the vast majority will look at the word non-

1  consensual and think that I consent.

2            That is the over-arching point, Your Honor, that

3  we cannot emphasize strongly enough because it doesn't say

4  under the sexual abuse for child sexual abuse children don't

5  consent even though Ms. Boelter said it's a definition by

6  law, that is not going to be the understanding of the vast

7  majority of Boy Scouts who have been victimized, especially

8  those who have not gotten any treatment and don't understand

9  that it's not their fault.

10           That's all I have to say about it, Your Honor.

11 Thank you very much.

12           THE COURT:  Thank you.

13           Well, I guess I have a couple of questions as I'm

14 reading this.  The definition lumps everyone together, it

15 lumps together in the same paragraph the child and then the

16 non-consenting adult scouting participant.  And I wonder if -

17 - and I'm just trying to balance additional forms.  There

18 would have to be, I suppose, some way to let non-consenting

19 adult scouting participants know, like you do in the last

20 paragraph here, in that section to file some other form.  So,

21 there's going to have to be a reference somewhere, I think,

22 to non-consenting adult scouting participants who lead them

23 somewhere else or -- I don't see how you get around that and

24 make sure that they're included.

25           Of course, I have no idea the relative numbers of

1   non-consenting adult scouting participants; although, clearly

2   this case is directed at child sexual abuse.  So, I'm

3   wondering if it could be divided into two parts where it's

4   clear that you have victims of what is sexual abuse, victim

5   of child sexual abuse, victim of non-consenting adult

6   scouting participant, somehow to distinguish between those

7   two.  I don't know that that ameliorates the harm.  But how

8   do you get around telling non-consenting adult scouting

9   participants that they have to go somewhere else.  It's going

10  to have to be mentioned somewhere in the form, isn't it?

11          MS. BOELTER:  Your Honor --

12          MR. STANG:  Your Honor, this is Mr. Stang.  I'm

13  sorry, Ms. Boelter, go ahead.

14          MS. BOELTER:  I was just going to say, Your Honor,

15  first of all, I think we hear your point that the word non-

16  consent does need to be in the form somewhere even if we were

17  direct folks to a different proof of claim form as we do in

18  the last sentence.  I don't know how else to -- we certainly

19  don't want to invite, you know, just all adults to be filing

20  claims.  It needs to be specific to this category of

21  individuals.

22          We can certainly -- with that and -- you know, I'm

23  interested to hear Mr. Stang's views because truly we just

24  want to get to the right answer here.  We're happy to work

25  with the TCC and Mr. Mones on, you know, moving that language

1   down, setting up a separate definition, but I do hear your

2   point that we're going to have to use the word and we're

3   going to need to find a mechanism for these individuals to

4   submit claims; whether it's this proof of claim form or

5   otherwise.

6           MR. STANG:  Your Honor, we'll work it out, but I

7   think you could add another paragraph either before or after

8   the reference to, what I call, the bullying or hazing

9   paragraph and say something very similar.  If you are a non-

10   consenting adult scout participant with a sexual abuse claim

11   you should consult the rest of the text from the hazing and

12   bullying.  Maybe we're taking a little bit of a bet here, but

13   if they got a number of these claims then they could follow-

14   up and say to those folks we would now like you to fill out

15   this form.  They have filed their proof of claim.

16           As I said before in connection with some of the

17   other comments, nothing here stops people from taking

18   additional discovery, nothing should stop the Boy Scouts from

19   having a follow-up with someone that they have questions,

20   that they want to pose questions to. Whether that takes the

21   form of a mandatory set of questions is something that they

22   can take up with us, the other committee, they can go to you

23   if they don't think we're being reasonable, but perhaps just

24   another paragraph much like the hazing and bullying one would

25   be sufficient.

1        MS. BOELTER:  Your Honor, I think we could make

2   that work.

3        MR. MONES:  Your Honor, this is Mr. Mones.

4        I would support Mr. Stang's argument in that

5   respect because what will happen, I think, and Ms. Boelter

6   maybe hinted at this as well is that if we put the word adult

7   in there in this form it's going to open the potential

8   floodgates for people who are not victims of sexual abuse,

9   but, for example, and 18-year-old is on a hike and an adult

10  says something to him, an off colored joke, well that person

11  can argue I didn't consent to that joke being told.

12       So, we don't want to get into the weeds on what I

13  do believe is -- I've been doing this for many, many years,

14  Your Honor, and while (indiscernible) is not evidence, I can

15  tell you that just for purposes of the burden that would

16  impose on the claim form putting adults in here just does not

17  seem to be worth what the unbelievable burden it would impose

18  upon the claims process and, again, the harm that would be

19  (indiscernible) Mr. Stang said and I'm sure Ms. Boelter and

20  us we can work this out.

21       Thank you, Your Honor.

22       THE COURT:  Okay.  I will give you an opportunity

23  to work it out. I do note that Dr. Conte says in (vi) he has

24  a slightly different take which is that the inclusion of

25  these other individuals which are the adults abused as

1  adults, potential creditors who were bullied or

2  psychologically mistreated, at least as I'm reading it, the

3  inclusion of them in an effort to identify sexual abuse

4  survivors is potentially confusing to adult survivors and

5  minimizes their experience versus someone who was bullied.

6         So, we have to be careful that the adult survivors

7  also have the opportunity to make their claims and that their

8  claims, the non-consenting, whatever we're calling them, non-

9  consenting adult scouting participants who, at least from my

10 very lay point of view, I would take the view that they could

11 be broader then the categories Mr. Mones suggested.  I would

12 agree with Ms. Boelter that saying no might evidence non-

13 consent.  That's me, that's my take.  I don't think that Ms.

14 Boelter actually said that.

15        So, we don't want to minimize their experience

16 either.  So, I'd give them an opportunity to make their

17 claims even if it's a smaller group of victims.  So, I think

18 we suggested a couple ways this might work.  I'd like the

19 parties to talk and see if they can agree on that.

20        MS. BOELTER:  Very good, Your Honor.  We will do

21 that.

22        THE COURT:  Okay.  We still have the optionality

23 issue that we addressed earlier that I don't think I heard

24 anyone speak about, the option to provide a narrative and

25 whether there needs to be more language around the option.

1          MR. STANG:  Yes, Your Honor.  This is Mr. Stang.

2          I appreciate Ms. Boelter's comments about how

3    they're trying to be sensitive, but we have no evidence that

4    they've consulted with anyone regarding the substance of this

5    proof of claim form as opposed to how you get it noticed out.

6    What the Boy Scouts think, if they think they're sensitive,

7    I'm sure everyone this call is well intentioned, but when a

8    child sex abuse survivor hears the Boy Scouts are being

9    sensitive that just doesn't ring too much with them.

10          I think in this area lot of deference should be

11   given to what the abuse survivors think.  Ms. Boelter, I

12   think, eluded to this.  Maybe it was Mr. Andolina.  My

13   committee members, not the counsel, my committee members have

14   probably spent over ten hours going over every word of these

15   notices and proofs of claim.  They are the ones who are going

16   to fill them out.  Now they're lucky.  They've got lawyers

17   and those lawyers are going to put down whatever they want to

18   put down and probably they're like Mr. Mones, you know, they

19   have a lot of experience and they will fill it out as

20   completely as they think they need to, to make their case.

21   And they know their audience.

22          Someone who doesn't have counsel is, in effect,

23   being told you must do it this way.  The pleas, it softens it

24   a little bit, but it's not the same.  So, I would ask the

25   court to consider the fact that the people who actually have

1  to put off this claim for actually made these comments, not

2  just coming from lawyers arguing what they would like to see.

3  Dr. Conte's testimony which is uncontroverted except for an

4  advocate for the Boy Scouts saying we're being sensitive.

5          So, I don't think that comments that counsel made

6  for the insurance companies -- at one point, I wrote it down,

7  he said the proof of claims it doesn't validate the claim.

8  Well, no one is asking this proof of claim to be

9  unchallenged.  No one is saying there can't be follow-up.

10 The suggestion that these checking the boxes is somehow easy,

11 and that kind of started to tie into maybe these folks are

12 lying because you could check a box.

13         Some of the conduct that's in those check the

14 boxes is pretty specific.  I suspect that that's hitting a

15 lot of the basis. If insurance counsel has a few more

16 examples of sexual abuse and molestation that they think we

17 didn't include they should tell us, but you're still filling

18 that box out when you're a survivor.  You're still saying

19 that someone penetrated you by checking the box.

20         I think the idea that you're telling a survivor

21 that they must put this in, that their prior description

22 isn't good enough in the context of a claim form, especially

23 for the unrepresented people, it goes to all of the issues

24 that Dr. Conte had in his declaration about how the claim

25 form can do harm.

1    We understand that everybody needs to know

2  something about these claims.  Saying I was abused is going

3  to lead to more questions, but this claim form does so much

4  more than that.  I think that survivors who are, some of whom

5  will be addressing this abuse for the first time in the

6  context of a legal proceeding with a deadline that, you know,

7  they're being told you must do something by a certain date

8  need to be given the consideration that Dr. Conte addresses

9  and that the committee members, themselves, feels is

10  necessary.

11    THE COURT:  Mr. Stang, do you -- thank you -- do

12  you have specific language -- and I'm trying to look back to

13  where it started about -- do you have specific language that

14  you want to see before the narrative section?

15    MR. STANG:  Your Honor --

16    THE COURT:  You're not suggesting we eliminate the

17  narrative; you're suggesting it be optional.

18    MR. STANG:  Yes, we are not suggesting elimination

19  of the narrative and, Your Honor, Ms. Cantor, my partner, is

20  on the phone, and I don't have the exact words in my head,

21  but she has been working on this for weeks and maybe she

22  knows the exact words that we're looking for.

23    MS. CANTOR:  Yes, Your Honor, Linda Cantor.

24    We've suggested language, "If you wish to provide

25  a narrative, please do so below."

1          THE COURT:  Okay.  Well, based on the testimony of

2   Dr. Conte with respect to narratives, I agree that the

3   narratives should be -- should express that it is optional in

4   some fashion, whether it's if you wish to do this or please

5   further describe if something, you know, something that

6   suggests that additional information is welcomed, I think is

7   the way to put it.

8          And I was trying to find the place, Ms. Boelter,

9   where you said it occurs in the beginning of the form, but I

10  think it would be helpful to not only have it there, but to

11  have language right where you get to the narrative and you're

12  going to provide it.

13          MS. BOELTER:  Understood, Your Honor.  We will

14  work with the TCC for purposes of Parts 4 and 5 of the form.

15          THE COURT:  Okay.  Do you have any other issues

16  outstanding that I have not ruled on with respect to the form

17  of order or attachments for the proof of claim?

18          MR. BRADY:  Your Honor, Robert Brady.  No

19  additional issues.  I just wanted to -- Robert Brady on

20  behalf of the FCR -- we had two issues that we raised with

21  the debtors.  They made both of our changes, so we have no

22  issue with the proposed form of order.

23          THE COURT:  Thank you, Mr. Brady.

24          MS. RINGER:  Your Honor, if I --

25          MR. RUGGERI:  Your Honor, James Ruggeri --

1           THE COURT:  Ms. Ringer?

2           MR. RUGGERI:  Your Honor, James Ruggeri for

3    Hartford --

4           THE COURT:  Let me hear from Ms. Ringer first and

5    then I'll hear from Hartford.

6           MR. RUGGERI:  I'm sorry.  Thank you, Your Honor.

7           MS. RINGER:  Thank you, Your Honor.  Rachael

8    Ringer from Kramer Levin, on behalf of the committee.

9           Just very briefly, we also raised a number of

10   issues with the debtor through revisions to both, the form of

11   order and the notice, as well, for the general proof of

12   claim.  All of those have been incorporated.  There were a

13   couple of issues that were particularly important for

14   claimants, for non-abuse claimants that need information from

15   the debtors specifically in order to actually calculate their

16   claims and the debtors worked with us to put in additional

17   information into the notice for those claimants.  And so with

18   those changing, we were okay with the general proof-of-claim

19   form and the notices accompanying it.

20          THE COURT:  Thank you.

21          Counsel for Hartford?

22          MR. RUGGERI:  Yes, Your Honor, James Ruggeri.

23          I didn't know if the Court's question dealt with

24   specific questions regarding the sexual abuse survivor proof

25   of claim, which is attached as an exhibit.

1           THE COURT:  It includes everything.

2           MR. RUGGERI:  Okay.  Thank you, Your Honor.

3           Hartford does have a few suggestions there and I

4    would start by, I do think it's a little unfair.  On a couple

5    of occasions, committee's counsel has suggested that there

6    was some sort of focus on forms of sexual abuse and questions

7    that Hartford and the insurers that were posing and that's

8    not correct as to Hartford or, I believe, any of the other

9    insurers.

10          Our questions or the questions that we would like

11   to be added go to allowing us to cross-check the allegations

12   and the information provided elsewhere in the proof-of-claim

13   form.  For example, education -- the proof-of-claim form, as

14   it currently stands, asks the claimant to state what is his

15   or her highest level of education completed or degree

16   obtained.

17          If you go to the section involving the effects of

18   the abuse, you'll see one of the alleged effects is

19   education.  We propose to have the claimants identify by name

20   and address, all the schools they attended to the best of

21   their recollection, beginning with elementary school and

22   continuing to secondary school and post-secondary schools.

23   Do that because the form requires the claimant to identify

24   the scout unit number and the physical location of the

25   scout -- of the unit where they were abused and allow or

1  identifying or causing the claims to provide substantial

2  information about their education allows us to cross-check

3  the information about where the person said he or she was

4  abused.

5         Also causing the claimant to identify all of the

6  schools where he or she attended and the periods and the

7  highest degree they earned also allows us to cross-check the

8  alleged impact of the abuse when it comes to education.  If

9  someone achieved a Ph.D. or a BA, that may tell us something

10  as we're going into a mediation (indiscernible) or in this

11  process, Your Honor, about the valuation -- the number and

12  the valuation.

13         The same is true with regards to employment, Your

14  Honor.  The proof-of-claim form, as proposed by debtors,

15  asked the person to state his or her current employment

16  status.  We have proposed to amend the form to ask the

17  claimant to list all of their employment history dates and

18  for each job and location.  Again, the effects portion of the

19  proof-of-claim form says do you believe that the abuse has

20  affected your employment?

21         We think that information which is purely factual

22  allows us to cross-check that answer and also allows us to

23  have an effect or causing -- allowing all the parties to have

24  a better understanding of the valuation of that claim

25  depending on how the information squares or it does not.

1    The same, Your Honor, is true with regard to the

2    claimant's involvement with scouting.  The proof-of-claim

3    form, as proposed by the debtor, asks the claimant to state

4    whether he or she has ever been affiliated with scouting

5    and/or a scouting program.

6    We propose to ask the claimant to identify all

7    involvement with the Scouts, including units and positions

8    and the various Boy Scouts, Cub Scouts, Exploring Scouts, Sea

9    Scouts, and also ask whether they're currently involved in

10   scouting; again, let's us cross-check and lets us form an

11   opinion on what effect the abuse had on a person in terms of,

12   perhaps, the trust that he or she had in scouting and, again,

13   we believe goes to valuation.

14   The other question that we believe, Your Honor, is

15   appropriate for consideration is to ask the claimants if they

16   suffered other unrelated forms of abuse, unrelated to Boy

17   Scouts.  We're not suggesting in any way that if the answer

18   is yes, disqualifies the claimant from participating in their

19   claim against the Boy Scouts, but we do believe it's relevant

20   and we're not trying to inflict any injury or emotional harm

21   to the people doubting what they've already experienced.

22   We do believe it's relevant because if there are

23   contributing causes to the same injury, then it could affect

24   one view of the valuation of that injury both, on an

25   aggregate and on an individual basis, Your Honor.

1          Those are the factual questions, Your Honor,

2    unrelated to act of sex abuse or anything along those lines

3    that we would ask the Court to consider to include in the

4    proof-of-claim form, again, purely factual questions, Your

5    Honor.  Thank you.

6          MR. SCHIAVONI:  Your Honor, Century has some

7    additional ones.  We can deal with Hartford's first, then

8    ours or however you want to proceed.

9          THE COURT:  No, let me hear yours.

10         MR. SCHIAVONI:  So, Your Honor, we heard Mr. Stang

11   talk about the elements of liability, really.  He collapsed

12   them, really, just into was someone injured.  But whether

13   there's proof, you know, there's some questions that go to

14   just basic elements of was a tort committed on you that

15   required the tortfeasor to be identified, but to the extent

16   that's another scout or some other person, that doesn't

17   establish liability with respect to the Boy Scouts of

18   America.

19         There were questions in a prior form of the order

20   or the form that went to, you know, the fundamental elements

21   about whether or not the Boy Scouts were, in fact, committed

22   a tort of failing to warn or, themselves, you know, weren't

23   actually negligent in the particular instance.  They're very

24   basic questions.  They were taken out by the tort -- by, I

25   believe, either the tort claimants or the Boy Scouts in this

1  draft over the weekend.

2         We just asked for a basic series of questions that

3  asked, Did you or anyone on your behalf ever contact the Boy

4  Scouts about abuse?  And if the answer is yes to that, who

5  was it and when at the Boy Scouts did you or this other

6  person on your behalf contact the Boy Scouts?

7         If there was a writing sent to the Boy Scouts

8  conveying that, please attach it, provide it.  If the person

9  knows -- if the claimant otherwise had some reason to

10 personally know or any reason to believe that the Boy Scouts

11 knew about the abuser to provide that -- to say so and to

12 provide some specific information about that, who was it at

13 the Boy Scouts who knew about this abuser, how did that

14 person learn of that information, that's sort of the sum of

15 it.  It's attached to our submission.

16        And then just one other way that sort of gets at

17 something that Mr. Ruggeri said that's a very common question

18 in these sorts of noticing programs is have you asserted or

19 have you filed a claim asserting abuse in any other case or

20 bankruptcy, sexual abuse, and if so, what is that case or

21 bankruptcy?

22            THE COURT:  Okay.

23            MR. WINSBERG:  And, Your Honor, if I may?  Harris

24 Winsberg on behalf of the Allianz insurers.  We filed

25 joinders to the Hartford objections and we support the

1  positions and believe that the additional information will be

2  helpful in assessing the value of the claims.

3            THE COURT:  Thank you.

4            MR. WINSBERG:  Thank you, Your Honor.

5            THE COURT:  Ms. Boelter?

6            MS. BOELTER:  Yes, Your Honor.  Let me just

7  respond briefly to the additional questions, and I think,

8  probably the TCC should weigh in more particularly.

9            I'm just starting with the few points that were

10  made by Hartford in connection with educational history, as

11  well as employment history.  On the form that was originally

12  proposed, I believe, by Hartford and attached to their

13  pleading, requested that individuals describe their entire

14  educational history from, I assume, kindergarten through

15  post-graduate degree, and details pertaining to those

16  schools.  They've also asked for the entirety of the

17  employment history.

18            From the debtors' perspective, we don't deny that

19  that information would be extremely helpful; however, when we

20  were reviewing the proof-of-claim form, we needed to balance

21  the sensitivities that Mr. Conte spoke of and that we've

22  heard from Mr. Stang on numerous times with the burden of the

23  form, itself, which is why we ultimately agreed with the TCC

24  to remove those particular questions.

25            With respect to the questions that Mr. Schiavoni

1  pointed out, if you look at, again, Docket 667-2,

2  Exhibit B -- and I'm looking at -- if I can figure out what

3  page -- I think it's going to be Page 67 of 75 of the PDF or

4  Page 10 of 16.  We did, in fact, remove the question

5  pertaining to did you or anyone on your behalf tell someone

6  involved with scouting about the abuse?

7          But we rephrased the questions so that they were

8  less harmful on the abuse survivor and less burdensome for

9  the abuse survivor to read.  So, you'll see N specifically

10 says:  Did you tell anyone involved in scouting?  O:  Have

11 you ever reported the sexual abuse to law enforcement or

12 investigators?  And then P:  If you can remember anyone that

13 you may have ever told about sexual abuse at the time,

14 including anyone involved with scouting, friends, relatives,

15 and/or law enforcement, please list their name and when you

16 told them.  So, we did, in fact, maintain that concept.  I

17 understand that it may just appear slightly different than

18 how Mr. Schiavoni would like to see it.

19         And then, finally, I think he pointed out on the

20 additional information, which is Part 6, if you go to Page 13

21 of 16, I think he submitted that we removed the question

22 concerning whether prior bankruptcy claims had been

23 submitted.

24         That's just not the case.  We still state, Prior

25 bankruptcy claims, have you ever filed any claims in any

1  other bankruptcy case relating to the sexual abuse you've

2  described in this proof-of-claim form?

3            This question is still in.  We think it's

4  relevant.  There is overlap between, for example, sexual

5  abuse claims asserted against the Boy Scouts and, for

6  example, the Diocese of Guam.  So, we have seen, which is in

7  bankruptcy, for Your Honor's benefit.  So, we have seen that

8  and we have maintained that question.

9            So, from the debtors' perspective, while we are

10  always supportive of getting more information rather than

11  less information, we were put in a position where we really

12  needed to balance concerns about abuse survivors, concerns

13  about putting together an overly burdensome proof-of-claim

14  form with, you know, the practicalities of getting not only

15  the TCC and other constituents onboard, but getting this form

16  approved so that we can launch it and get this process

17  started.

18            MR. SCHIAVONI:  Your Honor, this is Mr. Schiavoni.

19            And just to be clear, the questions that we posed,

20  I just posed to you a second ago, were in the debtors'

21  original form.  Ms. Boelter, herself, proposed in P, which

22  was deleted, the question.  The two she read just leaves a

23  sort of, you know, it's a sort of leading, yes-no, that by

24  itself provides no confirmatory response.

25            Did you -- so, the yes-no is, Did you or anyone on

1   your behalf inform anyone in scouting, yes-no, end of story.

2          The next one is, Did you ever tell anyone who was

3   in law enforcement, yes-no, end of story.

4          What the debtor had is P, the one that followed

5   was, If your answer to either of the previous two questions

6   is yes, please state the name of each person who was told,

7   the date when they were told, and the person's relationship

8   to you.

9          That information, yeah, it's critical toward

10  establishing whether or not the Scouts were really liable or

11  not.  It's an element that goes to *prima facie* liability

12  here.  It's not at all burdensome to pose that question.  The

13  debtor, itself, proposed the question.  It's very

14  straightforward and it elicits information that would be

15  extremely helpful in winnowing out good claims from bad

16  claims.

17         The same thing with the change on this, the last

18  question.  Yes, there's a question in there that asks, Did

19  you file a proof of claim for this abuse, this very abuse in

20  this bankruptcy?

21         Well, of course, that question, in essence, has

22  been neutered because, no, it's like this is the proof of

23  claim for this case, right.  As Mr. Ruggeri laid out, to the

24  extent there's been claims for other abuse by the same

25  person, it goes to how the -- it goes to causation on the

1  damages for the individual claim.  It's not harmful; it's

2  very straightforward.  Did you file a proof of claim in

3  another bankruptcy for sexual abuse, period?

4         MR. STANG:  Your Honor, I'd be happy to address

5  these on behalf of the committee, and, Your Honor, I'd point

6  out that, again, if you had questions regarding the impact of

7  some of these specific items on survivors, Dr. Conte is still

8  on the call and he can answer your questions directly.

9         There has to be a difference between the questions

10  in a proof-of-claim form and discovery, not just because

11  there should be a difference.  I think at one point, I don't

12  know if it was the Hartford one objection or Century

13  objection, but I counted the additional questions, including

14  subparts.  There were over 30 and it just highlighted to me

15  that this is an effort to conduct discovery for defenses, yet

16  survivors, whose cases are stayed, do not have an opportunity

17  to conduct discovery against the Boy Scouts, the local

18  organizations, given the preliminary injunction, and the

19  charter organizations.  And so, this feels very much like a

20  one-way process as we get into questions that have the tenor,

21  tone, and numerosity of interrogatories.

22         Now, to address the specific issues, if I stopped

23  my education at high school, why do they want to know where I

24  went to elementary school?  Why do they want to know where I

25  went to high school?

1    Do they want to see if I'm lying about whether I

2  got a high school diploma?  If I say I have a Ph.D., why do

3  they need to know my high school and the dates I attended?

4    Because maybe they want to contact that high

5  school.  Maybe they want to contact the teachers or they can,

6  through year books, discover my classmates.  So, there's no

7  restriction here when we start to give them this information

8  about whether they will go and tell people who had no

9  knowledge that I was sexually abused.  Hey, you know, did

10 that happen to Jim?

11    The same is true with the employment.  I get what

12 counsel said.  If you say you can't hold a job, they'd like

13 to know how many jobs you couldn't hold, but are they going

14 to start calling employers?

15    Why is Century Insurance Company calling my

16 employer to ask about whether I had issues with authority?

17 What is that about?  And so, there are no protections here,

18 given the information that they're eliciting.

19    I am currently an adult scout volunteer.  Why does

20 that matter?  Does it mean I wasn't abused because I'm going

21 back to Scouts or does it mean that I care a lot about boys,

22 I want to protect them from what happened to me, so I'm going

23 to be a scout leader.

24    I don't understand where the question takes them.

25 It takes them to lots more questions, but they will cast

1   doubt on the validity of a claim if I decided that I was

2   going to do the hard thing and go back to the organization

3   where I was abused and try to protect kids again.

4           Other unrelated abuse, counsel said it, this is

5   causation.  This is damages.  I mean, this is a claim form.

6   If they want to ask -- if they want to try to make some kind

7   of link that the abuse I suffered at scouts is somehow, you

8   know -- I don't even know where they're going with this, to

9   be honest with you.  I don't get it.

10          I echo what Ms. Boelter said and for all that I

11  said before about sensitivity and the Boy Scouts, they were

12  right on this one.  They were right to take the questions

13  regarding these basic elements that counsel mentioned.  You

14  know, some of them implied a legal conclusion, so, it's

15  effectively, you know, were the Boy Scouts negligent?  And

16  how is someone going to answer that?

17          These questions regarding notice, they're legal

18  questions.  The Boy Scouts may have known about a particular

19  volunteer, even though I never told my parents that I was

20  abused or my parents, having been told, didn't tell the Boy

21  Scouts.  Because the Boy Scouts might know about that

22  volunteer being an abuser.  That's the one-way discovery

23  aspect of this.

24          As I said earlier, no one is saying that if these

25  insurers or the Boy Scouts -- I don't think the Boy Scouts

1  were intending to -- but the insurers or other parties in

2  interest want to file objections to claims and start a

3  process, that's fine.  And it doesn't have to be one by one.

4  It can be dealt with in kind of a -- depending on how many

5  claims they have questions about, we can try to deal with it

6  in some global fashion.

7          But adding another 30 questions to this proof-of-

8  claim form aims to turn this into a discovery project with no

9  protections to survivors on the follow-up and how they use

10  this information, and the survivors' hands are totally tied

11  in terms of them being able to take actions to establish

12  their cases more completely, given the automatic stay.

13          That's all I have on that, Your Honor.

14          MR. SCHIAVONI:  Your Honor, Mr. Stang really wants

15  his cake and eat it, too.  He wants the effect of 502's *prima*

16  *facie* presumption, but, you know, he's got a form here that

17  doesn't provide the basic elements to establish the Boy

18  Scouts' liability as opposed to the tortfeasor that actually

19  physically did the abuse.  The basic questions that go to who

20  and when did you tell at the Boy Scouts and, you know, the

21  documentation that support that go right to a necessary

22  element.

23          THE COURT:  I don't think it goes to a proof-of-

24  claim form.

25          The -- let me ask you this, Mr. Stang, in terms of

1    the question that asks what type of scouting unit were you

2    involved with and then it has to check the box for the

3    different types, what harm would there be in, in asking for

4    their troupe numbers or something that identifies a

5    particular location?

6              MR. STANG:  Your Honor, I think, first of all,

7    there's no harm in that, but I think it's asked already.

8    Section -- question G says:  What was the scouting unit

9    number?

10             This is -- I (indiscernible) Boy Scouts, so some

11   of this language doesn't necessarily -- I can't really say

12   whether it works or not, but the unit number, I think, was

13   meant to be troupe number, I mean, that's how I would

14   interpret it.  Location, again, that kind of, you know, I was

15   in Miami Beach, Florida, and my elementary school and if I

16   don't remember the troupe number, then I can remember the

17   chartered organization.

18             Now, look at H; it gives you that information.  We

19   actually call people out a little bit saying, Was it a

20   church?  Was it a school?  Religious institution?

21             So, I think those questions are there and to

22   (indiscernible) those points, the local councils maintain

23   troupe rosters.  I won't speak to how far they go back.  They

24   know.  I don't.  That troupe roster shows you who was your

25   scout volunteer, who is the chartered organization -- when I

1  say, "scout volunteer," there are obviously several in the

2  troupe -- they show at least who the head is, if not all of

3  them -- it shows every child's name.

4            Now again, I'm not going to speak to how long they

5  maintain these rosters, and so --

6            THE COURT:  Thank you.  I see that information.

7  It actually looks like you asked for the same information

8  multiple times.

9            Okay, in terms of the type of scouting, one is

10 more generally and one is, then, during the sexual abuse.  I

11 see.  Okay.

12           I'm not going to require the additional

13 information.  I don't actually know if -- and certainly not

14 based on Mr. Conte's declaration or even what I heard today

15 in his testimony, that more information is necessarily

16 better.  It might be different and it may or may not be

17 helpful.

18           Certainly, factual information, more specific,

19 concrete factual information about places and times and

20 things like that, that could be helpful, but I don't know

21 that the relevance of the person's education levels and

22 whether they -- whether that's a relevant factor and whether

23 they've been abused, reported the abuse, is lying, is not

24 lying, I don't know that that's relevant to anything.

25           I think this form is more than sufficient to

1  provide the debtors with information in which to be able to

2  use it to, for what I thought was the purpose, which is to

3  try to come to a consensual resolution.  And I don't know

4  that more information is better and I do have a concern that

5  the more intrusive the information is or the more it suggests

6  that there's going to be contact with institutions or persons

7  that are listed, it will discourage parties, abuse victims

8  from coming forward and we don't want to do that.  So, I'm

9  not going to require that additional information.

10         And the specific information that I didn't see

11 first by looking at Paragraph E, I see is in the section on

12 involvement with scouting, I see is required or requested in

13 the section on nature of the sexual abuse.

14         So, I think now we've dealt with all of the issues

15 that anyone has?

16    (No verbal response)

17         THE COURT:  I'll take the silence as a yes.

18         UNIDENTIFIED:  Your Honor, the TCC has nothing

19 more.

20         THE COURT:  Thank you.  Okay.

21         MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

22 here for the debtors.

23         Okay.  We've gotten through one of our agenda

24 items.  We have another, Your Honor, and given that we've

25 been going for almost three and a half hours, I wonder if the

1  Court would like to take a break and reconvene at some point.

2  I'm sure all the participants would welcome that opportunity.

3          THE COURT:  Yes.  So, it's about 1:20 East Coast

4  time.  We will reconvene at two o'clock East Coast time.

5          MR. ABBOTT:  Very well.  Thank you, Your Honor.

6          THE COURT:  Thank you.

7          UNIDENTIFIED:  Thank you, Your Honor.

8      (Recess taken at 1:20 p.m.)

9      (Proceedings resumed at 2:02 p.m.)

10          MR. ABBOTT:  Your Honor, Derek about on behalf of

11  the debtors.  Your Honor, the one issue that was added to the

12  agenda really in the nature of a discussion of a status

13  conference was in the preliminary injunction matter.  Your

14  Honor, that's Docket Item Number 13 on the third amended

15  agenda and we thought, given the timing of that, it might

16  make sense to go to that next and if that's okay with the

17  Court, I would ask Mr. Andolina to address Your Honor.

18          THE COURT:  Okay.

19          MR. ANDOLINA:  Good afternoon, Your Honor.  Mike

20  Andolina on behalf of the debtors.

21          You know, Judge, as Mr. Abbott mentioned, this is

22  an issue that is time-sensitive, but also, we hope

23  noncontroversial.  So, we're going to ask for the Court's

24  assistance and provide an update on the status of the

25  stipulation to extend the consent order.

1          As the Court may recall in late March, the Court

2    entered a consent order on a preliminary injunction motion

3    that was supported by both committees and the FCR.  The

4    extension or the preliminary injunction termination date is

5    today, Your Honor, and the good news is that we have reached

6    an agreement to extend the preliminary injunction until

7    June 8th.

8          The mechanism in Paragraph 12 of the consent order

9    requires the parties to file a stipulation with the Court,

10   which we have done.  Once that's stipulation is filed, the

11   consent extension is then served on all of the plaintiffs in

12   the underlying abuse actions and filed in those courts.  That

13   provides a 10-business-day deadline for parties to object to

14   the extension of the preliminary injunction.

15         That period would end on June 2nd and then there's

16   a hearing date on June 8th, so not a very significant window.

17   Our hope is, and we worked diligently with the TCC, the FCR,

18   the UCC, and the ad hoc committee, that our next extension

19   would be more significant.  But that's the current status.

20         One issue to raise with the Court, the Court may

21   recall during the last preliminary injunction hearing, there

22   was a filing by an incarcerated plaintiff, Mr. Swindler (ph),

23   and the Court noted at that time that Your Honor would treat

24   Mr. Swindler's objection as an objection to the next

25   extension.

1          The debtors plan to reach out to Mr. Swindler and

2   attempt to resolve that objection.  If we cannot do so by

3   June 2nd, that objection would be treated as an objection to

4   the extension.  We would file a reply and then I guess the

5   issue would be heard on June 8th or some other time that the

6   Court deems appropriate.  But we did want the Court to know

7   that we recall that issue and we'll work to try to resolve

8   that particular objection.

9          So, the request would be, Your Honor, that the

10  Court sign the stipulation today, given that today is the

11  last day of the preliminary injunction period, and the

12  promise would be that going forward will give the Court more

13  time on the next extension period and if the parties will

14  work diligently, I think to create what should be a more-

15  efficient timing in terms of the extension.  There's just a

16  lot going on and I think there's some open discovery issues

17  that we're working hard with the various committees and the

18  ad hoc committee on.

19          THE COURT:  Okay.  Did I hear you correctly that

20  this extension is only through June 8th?

21          MR. ANDOLINA:  That's correct, Your Honor.

22          I'd be happy for the Court to extend it further,

23  but this is the deal that we reached.

24          THE COURT:  I think you need to reach your next

25  vehicle because -- and I don't remember the specifics of the

1  mechanics in the stipulation, but I don't think we're

2  providing the plaintiffs an effective opportunity to object

3  to a further extension of the consent stipulation.

4           So, I understand the desire to keep the debtors on

5  a short rank, you know, a short lease, which I assume is what

6  drives this, what, not even 20-days, maybe, extension, but it

7  strikes me that I ought to be having hearings on an extension

8  before the time period lapses.

9           And I'm happy -- again, I don't remember the

10  mechanism and maybe this mechanism was built in -- but if our

11  next hearing is on June 8 and that's when this stipulation

12  expires, then what have I ordered?  I think we need to be

13  having the hearing on any further extensions on that date and

14  I think we need to get that out there.

15           So, I'm not mandating that, but I don't -- the

16  timing is not working for me and it's not that it's not

17  working for me personally -- I'll review the stip and I'll

18  sign it because I, quite frankly, am not sure I have an

19  option -- but it's not working for me in terms of notice to

20  all the plaintiffs.

21           MR. STANG:  Your Honor, this is Mr. Stang.  I

22  think we may have been the ones driving the short extension.

23  And I don't think it's in the spirit of the stipulation

24  (indiscernible) going to what our problem is unless you

25  specifically want to know.

1          If you want a couple of more days after the

2    hearing so that you're not up against the same-day issue, we

3    want to do what makes sense for you.  But the issue that

4    caused us to agree to only a short extension is one that is

5    significant to us and we didn't want to see it go out for a

6    considerably longer period of time than what we agreed to.

7          THE COURT:  Okay.  But then what can I expect for

8    the next one?  So, when we get to June 8th, if, in fact,

9    there's going to be a consensus, when are we going to rule on

10    that extension?  And if there's not going to be, then, okay,

11    there's not going to be.  Then I maybe would be having a

12    contested hearing.

13          So --

14          MR. STANG:  Well, I could preview the --

15          THE COURT:  -- I don't need to know the specific

16    issue.  I don't need to know the specific issue.

17          I'm just telling you really from a due process

18    perspective for the plaintiffs in the underlying litigation,

19    they need to have an opportunity to weigh in before an

20    extension is effectively granted without their ability to do

21    so and that's what I'm looking for in the future.

22          MR. ANDOLINA:  Your Honor --

23          MR. STANG:  So, Your Honor, but for this issue, we

24    would have had a much longer extension by a multiple of

25    probably at least three times.  But this issue is one that we

1  felt was important.  It came upon us relatively recently.  We

2  didn't want the debtor to be jammed up against today's date

3  and that's why we agreed to, because they haven't had time.

4  They said they have not had time to digest and be responsive

5  to our demands and so without kicking it out too long,

6  because I think our demand is -- our intentions

7  (indiscernible) issues are a great concern to us, we said,

8  okay, we'll give you until the next omnibus date.

9           So, A, if you feel you don't want to be up -- have

10  the hearing the same day as the expiration, you know,

11  that's -- we hope that you wouldn't make it too much longer

12  in terms of the injunction, and if you're wondering, am I

13  going to see (indiscernible) 30-day extensions, I will tell

14  you but for this issue, we were negotiating a much-longer

15  extension.

16           MR. ANDOLINA:  Your Honor, to address -- and you

17  must have been overhearing my conversations for the last

18  several days -- but to address the issue of due process, I

19  think the mechanism in the consent order makes perfect sense

20  in terms of notifying the plaintiffs in various state court

21  actions.

22           The problem here is that the extension expires on

23  June 6th, which is -- the 10-day period is not the issue, I

24  don't think, Your Honor.  I think 10 business days is a

25  reasonable period but incentivizing them to object to

1 essentially a 4-day extension doesn't make a tremendous

2 amount of sense.

3         And I certainly don't want to (indiscernible), but

4 I do want to make clear that from a process perspective and

5 from the debtors' perspective in terms of estate resources,

6 we would hope that maybe the Court would consider -- and I'll

7 defer to Mr. Stang on this -- entering a very short extension

8 of a few days and to see if we can then come up with a

9 process that the parties may agree to for a bit more of time.

10         THE COURT:  Well, I haven't reviewed the order,

11 but I will do so and I'm sure I will enter it, but I would

12 like -- and that'll take the time out to the 8th, which was

13 the agreed-upon date, but I think in the meantime, you need

14 to be looking forward for the next extension or not if

15 there's not going to be one.

16         But this short period of time, yes, I do not want

17 a series of short periods of time and, second, I am concerned

18 about the impact on the individual plaintiffs.  So, I've said

19 what I've said and I assume the parties will talk about how

20 they're going to proceed in the future.

21         MR. ANDOLINA:  Your Honor, I think we're all

22 committed to focusing on an extended period for the next

23 extension and I will say to the extent that there's an

24 objection in this limited period, it may be that we can

25 negotiate a process, that that objection would be handled and

1  addressed as to a longer stay.

2           So, I think that's probable with the structure

3  and, certainly, we don't want to waste the Court's time in

4  terms of a very limited extension.  So, we'll work very hard

5  with the TCC and the ad hoc committee to try to make that

6  happen.

7           THE COURT:  Okay.  Thank you.

8           MR. ANDOLINA:  Thank you, Your Honor.

9           MR. ABBOTT:  Thank you, Your Honor.

10          Derek Abbott, again, for the debtors.  That brings

11  us to Item Number 10 on the agenda, which was the debtors'

12  motion for entry of an order appointing a mediator.  Your

13  Honor, that was filed at Docket Item Number 7.  We've

14  discussed it a couple of times since, but I'll also defer to

15  Mr. Andolina on this motion, as well, Your Honor.

16          MR. ANDOLINA:  Good afternoon, Your Honor.

17  Michael Andolina on behalf of the debtors.

18          Your Honor, if I may be heard on the mediator

19  motion?  As a threshold matter, Your Honor, although the

20  motion was filed by the debtors, at this point, it truly is a

21  joint motion.  I know that representatives from the TCC, the

22  UCC, the FCR, and the ad hoc committee of local councils

23  would like to be heard on this motion, so I will attempt to

24  be brief.

25          Your Honor, I think the consensus that we have

1   here on this motion, frankly, speaks for itself.  All the

2   constituencies are now at a point where they believe that

3   engagement with mediators will help the parties make progress

4   on a path to global resolution.

5           In that regard, I can reference the issue that we

6   just discussed, with respect to discussions between the TCC

7   and the ad hoc committee.  That's resulted in the stipulation

8   that Your Honor saw and the parties have worked in good faith

9   to bridge their gaps, but the debtors, and I believe the

10  other parties, do feel strongly that engaging with the

11  mediator at this point is critical to the process.

12          On my end, I've tried and I've definitely failed,

13  per our last discussion, so on some issues, I think we could

14  use some professional help.

15          I did want to address, Your Honor, the series of

16  objections from the insurers that were filed on Friday if the

17  Court will allow me to do so?

18          THE COURT:  Yes, I'd like to hear a response.

19          MR. ANDOLINA:  Okay.  Really, I think the

20  insurers' objections fall into three categories.  The first

21  is that the insurers were excluded from the process.  The

22  second relates to conflicts of interest and third are demands

23  for additional terms in a mediation order.

24          On the first issue, Your Honor, as a threshold

25  matter and what is really ignored in the objections is that

1    the debtors largely through Mr. Azer (phonetic), engage with

2    the insurers on the issue of mediation extensively.  And I

3    don't know if the Court received the filing this morning,

4    which is Mr. Azer's affidavit.  It was filed at Document 664.

5            Did Your Honor receive that?

6            THE COURT:  No, I haven't seen it.

7            MR. ANDOLINA:  Okay.  Well, Your Honor, I will

8    summarize the two documents that were filed.  We didn't file

9    a surreply or seek leave to file a surreply, but we did file

10   a 17-page discovery letter that was sent on May 11th last

11   Monday in response to a number of the issues that are going

12   on between the debtors and the insurers, including this issue

13   on the mediator order.

14           And what that letter shows is that as early as

15   April 2nd, Mr. Azer was reaching out to the debtors for input

16   on mediators.  He subsequently communicated with them on

17   April 7th, April 9th, April 13th, April 14th, April 15th,

18   16th, 17th, 23rd, 24th, 28th, 29th.

19           We don't necessarily think those emails back and

20   forth are, frankly, relevant to the Court's decision to

21   appoint the mediator, but we did want to correct the record

22   because we think the filings on Friday seriously

23   misrepresented the communications between the parties.

24           The second attachment to Mr. Azer's declaration is

25   an email from October of year regarding the November

1  mediation or as it turned out, the non-mediation.  Hartford

2  suggested in its papers that it was not invited to that

3  mediation and it was somehow excluded from the process back

4  in November.

5          Exhibit 2 to Mr. Azer's declaration makes clear

6  Haynes Boone notified Hartford's outside counsel Mr. Ruggeri

7  of BSA's intent to mediate two weeks in advance of that

8  mediation.  This was despite the fact that Hartford's

9  position was and has been that it has no coverage obligation

10  on any of the claims that were being mediated and that's

11  because their position is that all of BSA's sexual abuse

12  claims in the matter of the claimant, perpetrator,

13  jurisdiction abuse are one single occurrence.  So, we did

14  notify them of that mediation.  The email from Haynes and

15  Boone to Mr. Ruggeri is provided as Exhibit 2 to Mr. Azer's

16  declaration, and we also wanted to correct the record on that

17  fact.

18          But getting back to the process issue, Your Honor,

19  there's no question that we were in constant communication in

20  April and what our understanding was, was that it was

21  essential for the insurers for the Court to appoint a

22  specialized mediator to address insurance issues.  There are

23  a limited pool of such experts and the insurers told the

24  debtors in no uncertain terms that Timothy Gallagher was

25  their first choice.  The debtors agreed to accept Mr.

1 Gallagher, and after a lot of discussion, so did the other

2 parties.

3          I am confident that TCC will tell Your Honor that

4 there was extreme hesitation about adding a third mediator,

5 but the parties ultimately were willing to compromise and

6 come to the agreement in the mediation order that we

7 submitted.  So, the insurers, ultimately, got number one, an

8 insurance mediator, and number two, their top choice.  That

9 fact is not disputed.

10          So, a final point on the process issue, Your

11 Honor, we did want to clarify the record on the

12 communications, but we think this is, frankly, a moot point.

13 There's not a due process right for the selection of a

14 mediator, nor should the insurers have presumably what

15 they're seeking here, which is a veto over the negotiated

16 choice of the five other parties.  We now have three highly

17 qualified mediators with different skill sets and expertise

18 prepared to engage with the parties immediately and we should

19 proceed accordingly.

20          So, the second issue, Your Honor, I want to

21 address was this issue on conflict.  Importantly, none of the

22 insurers have raised a specific conflict that their clients

23 have with Mr. Fynn (ph) or Mr. Greene (ph), as far as I can

24 tell.  Instead, they've demanded more robust disclosures,

25 which are not contemplated by the Local Rules and raised

1  issues about the relationships to many of the parties.

2          On the disclosure issue, I think the insurers

3  concede there's no requirement in the Local Rules of the

4  court that mediators complete 2014(a) disclosures; indeed,

5  under the Local Rules here, mediator appointment is governed

6  by Local Rule 9019-2(e).  That section requires that

7  mediators disclose disqualifying events, which are defined by

8  reference to the standard for disqualification of a federal

9  judge.  Any person selected as a mediator, "Shall be

10 disqualified in any matter where 28 U.S.C. 455 would require

11 disqualification if that person were a judge."  So, none of

12 the rules, the Local Rules dealing with mediation reference

13 the disinterested standard of Section 324 or Rule 2014.

14         The insurer cites to the In re Smith case from the

15 Bankruptcy Court in the Southern District of Texas and they

16 also state that a number of Bankruptcy Courts have Local

17 Rules providing the mediator or the professional are required

18 to make 2014 disclosures.  In the first instance, Your Honor,

19 we think that In re Smith is distinguishable and has not been

20 followed by any Court that we're aware of.  That was a

21 Chapter 7 case where the parties selected a form bankruptcy

22 court judge to mediate and scheduled a mediation without the

23 knowledge of the Court.  They then went in and asked the

24 Court for a *nunc pro tunc* appointment of the mediator.  The

25 Court felt that mediation in that case was not necessary and

1   was also worried about the appearance of judicial cronyism

2   and, Your Honor, I would submit that that's hardly the case

3   here.

4           In the first instance, more importantly, Your

5   Honor, the insurers' reliance on the Local Rules from other

6   districts actually undermine their argument.  Given how

7   detailed the court's Local Rules are on the subject of

8   mediation -- and I think they're covered in 919-2, 3,

9   and 5 -- if the Local Rules wanted to subject mediators to

10  disclosures under 2014 or Section 327, then it would have

11  done so.  This seems particularly clear, given that Local

12  Rule 9019-2 references the term "disclosure" specifically and

13  lists the standard that I quoted above.

14          In any event, Your Honor, Mr. Greene and Mr. Fynn

15  have confirmed that they do not have any conflicts and at the

16  TCC and the debtors' request, they have provided a list of

17  lawyers they have worked with.  I would note that these

18  materials were put together in a response to inquiries from

19  TCC committee members and provided to the TCC.

20          It is wholly unsurprising from our perspective,

21  Your Honor, that Mr. Fynn, Mr. Greene, and Mr. Gallagher have

22  worked with some of the various parties and attorneys in this

23  case.

24          As an aside, Your Honor, there's another factually

25  error in the insurers' papers.  Sidley Austin did not

1  represent the debtor in the <u>Takata</u> case.  We represented non-

2  debtor third-party Honda.  Pachulski actually represented the

3  debtor in that case.

4          Ironically, the insurers find fault with the

5  mediators for the exact reason that the five parties

6  supporting in motion selected them.  The fact that Mr. Greene

7  has served as an FCR, that he has served as a bankruptcy

8  trustee, that he's familiar with the bankruptcy and claims

9  process, the issues we discussed this morning, is an

10  advantage to all the parties; likewise, the fact that

11  Mr. Fynn is familiar with the plaintiffs' lawyers here, has

12  mediated cases, many prior sexual abuse cases.  Those are

13  things that qualify him.

14          Notably, none of the parties has express concerns

15  that Mr. Gallagher has worked closely with the insurers and

16  their counsel.  In the debtors' view, at least, the fact that

17  the insurers wanted his participation and felt strongly that

18  he was the right person for the job, was, frankly, a good

19  reason to include him.

20          The final issue, Your Honor, that we wanted to

21  address is the insurers' demand for additional terms in the

22  mediation order.  That issue is -- primarily relates to the

23  issues of document production and from our perspective, this

24  is a wholly inappropriate and unnecessary addition to the

25  mediation order for several reasons.

1          First, as these issues can and will be ironed out

2   in the protective order.  And as the Court is aware, the

3   hearing is scheduled on that item for May 29th.  Again, after

4   literally months of work, all the parties, except the

5   insurers, have reached an agreement on that.

6          But I have breaking news.  Yesterday afternoon,

7   the insurers requested a call with the debtors to discuss the

8   protective order.  We're hoping to get all of the parties

9   together for a call on Tuesday afternoon and we're hoping to

10  avoid another Zoom party on May 29th and we will work

11  diligently to do that.

12         Second, Your Honor, Paragraph 6 of the mediation

13  order provides that the mediators and the parties will work

14  together on the structure of the sessions and the submissions

15  of the parties.  Any documents issues regarding specific

16  mediation sessions can be flushed out by the parties and the

17  mediators in connection with that process.

18         And, third, Your Honor, as a practical matter, the

19  debtors have already made available to the insurers, all of

20  the documents that have been provided to other parties.

21  Since April 17th, counsel for Chubb has had access to the

22  data room that contains materials provided to counsel for the

23  committees and the FCR and the debtors have offered all of

24  the other insurers' counsel that same access, and that's on

25  Page 13 of Mr. Azer's letter from May 11th.

1           Indeed, the only documents that haven't been

2    loaded to the data room are highly confidential documents,

3    including local counsel documents that cannot be produced

4    until a protective order is entered and that brings us back

5    to the insurers' objection to the protective order.  Again,

6    we hope to resolve that, but we're in a bit of a circle here

7    with them refusing to mediate and then until they have

8    documents and refusing to enter into a protective order.

9           So, aside from the document issues, I think the

10   other issue on terms the insurers propose is language on the

11   right to take discovery regarding good faith findings and on

12   Page 8 of Century's brief.  Your Honor, this is yet another

13   factual error in the papers that were filed on Friday.  The

14   exact language they request is actually included word-for-

15   word in Paragraph 7 of the proposed mediation order.  Indeed,

16   in addition to accepting Mr. Gallagher, the parties accepted

17   a number of the insurers' proposals, with respect to the

18   mediation order.

19          So, finally, Your Honor, I just wanted to address

20   the insurers' suggestion that they have a right to veto

21   Mr. Fynn, Mr. Greene, and the parties should just restart the

22   process.  This would be incredibly prejudicial to the

23   debtors, to the other parties, and to the process, itself.  I

24   am confident that Your Honor now has a good sense of the

25   dynamics in this case and how challenging it has been to get

1  five different parties not only to agree to a three-person

2  mediation team, but to craft and agree to a mediation order

3  that is both, thoughtful and flexible, and provides for the

4  addition of additional mediation parties.

5            We've done that here, Your Honor, and we've also

6  adopted and order that accepts the insurers' top choice of

7  the mediator.  We respectfully request, Your Honor, that the

8  Court enter the proposed order without further delay.

9            THE COURT:  Thank you.

10           MR. LUCAS:  Your Honor, this is John Lucas for the

11  tort committee, may I be heard?

12           THE COURT:  Yes.

13           MR. LUCAS:  Your Honor, the tort committee fully

14  supports everything that Mr. Andolina said, but I wanted to

15  make one quick correction.  That my firm did not represent

16  the debtor in Takata but represented the tort committee.

17           Your Honor, the mediation order, as Mr. Andolina

18  stated, reflects substantial compromises with the insurers,

19  none of which were really mentioned by insurers.  The TCC

20  believes that Fynn and Greene have sufficient knowledge of

21  insurance issues from other mass-tort cases and another

22  insurance mediator is really unnecessary, will add cost, and

23  might complicate the process; nevertheless, the BSA persuaded

24  the TCC not only to accept the concept of an insurance

25  mediator, but to accept Mr. Gallagher, who the insurers

1  agreed to, as part of a global, consensual deal on the

2  selection of mediators.

3          The proposed mediation order is an agreement among

4  all stakeholders and itself is a compromise among the

5  mediation parties.  Whether by design or mistake, the

6  insurers suggest that the proposed mediation order is an

7  agreement between the debtor and the TCC.  That suggestion is

8  wrong.

9          The proposed order is the product of consensus

10  reached among the debtor, the TCC, the UCC, the FCR, and the

11  ad hoc local council committee, as well as the insurers,

12  themselves, as established by the inclusion of Mr. Gallagher

13  and the acceptance of many of their comments, which in the

14  end, reflect a carefully constructed set of compromises.  The

15  Court can and should assume that Fynn and Greene and also

16  Gallagher were not the first two choices of the mediation

17  parties.  After numerous discussions, Fynn and Greene, then

18  Gallagher, were deemed acceptable to the proponents of the

19  package.

20          The objectors do not challenge Fynn and Greene's

21  qualifications.  They just demand more disclosure concerning

22  possible conflicts.  The objectors do not contend, nor could

23  they do so credibly, that Fynn and Greene lack the skills and

24  expertise to conduct the mediation; instead, the insurers

25  want more disclosure in an attempt to delay the process.

1          The insurers had more than a month to address this

2    issue, as reflected by BSA's counsel and in a letter filed by

3    Haynes and Boone yesterday, the Azer letter on May 11th.

4    There were numerous emails sent on behalf of the debtors

5    trying to get the insurers to engage in the process.  There

6    is no evidence that the insurers made any effort to

7    communicate directly be Fynn and Greene or that the debtors

8    prevented them from doing so.  And when the TCC had

9    questions, that's exactly what they did, is they contacted

10   Fynn and Greene and had those questions answered.

11         The insurers apparently did, however, conduct

12   their own research and despite presenting what in the public

13   record, they are still unable to identify any disabling

14   conflict for Fynn and Greene.  This objection should be seen

15   exactly for what it is:  an attempt to delay the process.

16         The insurers' demands for a provision concerning

17   common interest materials is inappropriate and should be

18   rejected.  Issues concerning the scope and application of

19   common-interest privilege have no place in a mediation order

20   because that is an issue between the debtor and the insurers

21   alone.

22         Moreover, the proposed protective order addresses

23   inadvertent production and provides for the clawback of

24   privileged documents and the circumstances set forth therein.

25   Nothing can or should be added in the mediation order on this

1  topic.

2              In the end, the insurers suggest that the debtor

3  and the other parties are attempting to use the mediation as

4  a vehicle to cloak collusive settlements in confidentiality

5  and we believe that is absurd.  There can be no secret or

6  collusive settlement.  Every mediation party will have the

7  opportunity to weigh in on all proposed settlements and

8  (indiscernible) their own interests in any settlement will

9  require Court approval after the opportunity for all

10  stakeholders to object.

11              Like all mediations, there'll be private

12  discussions between and among one, some, or all the mediation

13  parties and one or more of the mediators.  That cannot be the

14  basis to object, let alone, take discovery.  The Court should

15  see this demand for what it is:  an attempt to gain an

16  unavailable tool to challenge the process, Your Honor.

17              Nothing further here unless Your Honor has some

18  more questions.

19              MS. RINGER:  Your Honor, if I may be heard?

20              THE COURT:  Yes.

21              MS. RINGER:  Good afternoon, Your Honor.  Rachael

22  Ringer, again, from Kramer Levin, on behalf of the unsecured

23  creditors' committee.

24              I just wanted to quickly echo what Mr. Andolina

25  and Mr. Lucas have both reported to the Court.  From the

1    creditors' committee's perspective, we believe that the

2    mediation structure, as now proposed, not only addresses the

3    issues and concerns that the unsecured creditors' committee

4    and the TCC have raised to date, but we believe it should

5    provide the insurers with, again, what I understand that

6    their chosen mediator to be involved in mediation of

7    insurance-related issues and the protective order, itself,

8    should, likewise, you know, provide for the protections of

9    documents that are produced in connection with the mediation

10   and the investigations that are undertaken by the TCC and the

11   UCC.

12           The UCC did not necessarily think a third mediator

13   was necessary initially, but, again, unlike the TCC, we were

14   willing to agree to this three-mediator structure,

15   notwithstanding potential additional complexities and costs

16   to try to accommodate the insurers' concerns.

17           I can confirm what Mr. Andolina and Mr. Lucas have

18   both said, that the committee -- that the creditors'

19   committee was involved in a process in negotiating the

20   mediation order, selecting the mediators.  We worked with the

21   parties.  We had a number of discussions among all of the

22   parties to reach resolution on those issues.

23           The unsecured creditors' committee constituency

24   has unique issues from those that involve the abuse claim and

25   that are going to need to be addressed in the context of a

1   Chapter 11 plan.  So, we believe that the order, as revised

2   and as proposed by the debtors, very much reflect the

3   (indiscernible) and we believe that it should be entered so

4   we can get the mediation process underway.

5           As you've heard now from multiple parties over the

6   course of today's hearing, delaying the process any more, we

7   believe, is not in the best interests of the estates and,

8   therefore, we would ask the Court to approve the mediation

9   motion and enter the order.

10          Thank you, Your Honor.

11          THE COURT:  Thank you.

12          MR. BRADY:  Your Honor, Robert Brady, may I be

13  heard?

14          THE COURT:  Yes.

15          MR. BRADY:  Thank you, Your Honor.

16          Again, for the record, Robert Brady, on behalf of

17  the FCR, and we agree with the prior comments of those in

18  support of the proposed order appointing mediators.  Your

19  Honor, this is a motion to appoint mediators in this case;

20  typically, noncontroversial, but I think Your Honor already

21  has an appreciation for some of the dynamics in this case.

22          This is a compromise by a number of parties with

23  differing views and goals in this case.  To upset that

24  compromise now really would send the parties all back to the

25  drawing board and that would be greatly prejudicial to the

1 parties, Your Honor, in the form of, really, unnecessary

2 delay and additional costs.

3         So, for all the reasons you've heard, the FCR

4 fully supports entry of the proposed order appointing

5 mediators.

6         MR. MASON:  Your Honor, Richard Mason, may I be

7 heard?

8         THE COURT:  Yes.

9         MR. MASON:  Thank you, Your Honor.

10        For the record, Richard Mason of Wachtell, Lipton,

11 Rosen & Katz.  I chair the ad hoc committee of local councils

12 and my firm represents the committee.  I'm also the volunteer

13 president of the Greater New York Councils, Your Honor, which

14 serves nearly 20,000 kids in New York City and is one of the

15 BSA's largest local councils.

16        Your Honor, the ad hoc committee strongly supports

17 the mediation motion.  In our view, the best and, frankly,

18 probably (indiscernible) out of this Chapter 11 case is a

19 mediated one.  The events in the past few months make us even

20 more convinced of that view.

21        The parties here, Your Honor, could literally

22 litigate on the issues which are extremely complex and if

23 they do, someone will win and someone will lose, which is

24 obvious in litigation and scouting, as a whole, will become

25 an artifact of history.

1          The kids we serve today, Your Honor, and I think

2   all stakeholders discovery better.  We owe it to them and to

3   ourselves to take our best shot at a negotiation and in our

4   view the only way to do that is with the help of mediators,

5   Mr. Andolina's great efforts, notwithstanding.

6          I've had a lot of respectful dialogue, Your Honor,

7   with Mr. Stang and I am sure that we will have a lot more,

8   but it's very clear and it's not surprising that while we do

9   listen to and hear each other, we come at this matter from

10  have different perspectives and it's clear to me that we, the

11  BSA, and other stakeholders, we need mediators to help us get

12  to a solution if one is possible and time, Your Honor, is not

13  our friend.

14         Scouting is a popular organization today, but like

15  every nonprofit at both, the national and local level, it

16  faces diminished donations and activity as a result of the

17  coronavirus on top of the effects of this Chapter 11 filing.

18  Now, the movement is adjusting to the current virtual

19  environments with Zoom meetings and camp-ins and the like,

20  but the core of what we do, like actual, real summer camp is

21  at risk and the upcoming fall recruitment season will

22  probably be like no other and that's not necessarily for the

23  better.

24         The longer the BSA lingers in Chapter 11, Your

25  Honor, with all of it added uncertainty, the less like the

1   BSA will come out.  But the congress is also true, the sooner

2   the BSA can get to a solution that works for the parties, the

3   greater the chance that scouting will emerge as a viable

4   entity that can pay its debts and serve kids.

5           Granting the mediation motion today, Your Honor,

6   is, in our view, an essential step towards that end and we

7   respectfully urge you to do so.  Thank you.

8           THE COURT:  Anyone else speaking in favor of the

9   motion?

10       (No verbal response)

11          THE COURT:  Okay.  Let me hear from the objectors.

12          MR. RUGGERI:  Your Honor, James Ruggeri for

13  Hartford.

14          THE COURT:  Yes.

15          MR. RUGGERI:  Your Honor, this motion is

16  frustrating for Hartford.  We don't object for any purpose of

17  delay.  Hartford has been trying to kick in the door, if you

18  will, for a very long time.  I'm disappointed that

19  Mr. Andolina said that we seriously misrepresented the

20  filings and the facts and I would encourage the Court to take

21  a look at the Azer declaration that was filed late last night

22  or this morning to get a flavor of what Hartford, for

23  example, was told in October of 2019.

24          Hartford wasn't told that there was going to be a

25  global mediation.  Hartford had asked and wasn't told that

1   Boy Scouts was planning to file bankruptcy.  Hartford wasn't

2   told that Boy Scouts were in discussions with anyone about a

3   pre-packaged bankruptcy filing.  We know all of this through

4   the filings that have taken place in this case so far.

5           What Hartford was told is that BSA, "Is in a

6   process of seeking to mediate several additional claims that

7   triggers Hartford's coverage obligation."  That's what

8   Hartford was told on October 23rd about the upcoming

9   mediation.  Hartford wasn't told anything else.

10          Mr. Andolina says that Hartford's position is that

11  its policies are exhausted.  That is incorrect with at least

12  one of our primary policies, which Mr. Azer's email

13  recognizes Hartford does not content is exhausted.  But,

14  again, that's another statement by Mr. Andolina that is

15  incorrect.

16          All we're looking for, Your Honor, is for the

17  process to be fair.  Initially, we were told, even though

18  we're a creditor again, but of only two primary carriers in

19  Boy Scouts' program (indiscernible) primary coverage pre-1998

20  that we would be allowed to participate in all aspects of the

21  mediation.  There's a fight to see that (indiscernible).

22          We were told and given a slate by Mr. Azer of

23  potential mediators.  Mr. Fynn wasn't on that slate.

24  Mr. Greene wasn't on that slate.  There were three mediators,

25  two of whom were Ben Gallagher and Elaine Phillips and I

1  don't remember the third -- and I apologize for that -- but

2  the third was not Mr. Fynn and it was not Mr. Greene.

3          The first time we saw those names and anyone

4  uttered those names to us in this case is when debtors filed

5  their proposed order on April 30th.  Mr. Gallagher was

6  suggested by Mr. Azer and Mr. Gallagher is someone the

7  insurers agreed to work with in this case.

8          If the Court focuses on the mediation order, I

9  can't even really tell where the division of responsibilities

10  is in the order in Paragraph 2, if there is a division, which

11  we submit there really shouldn't be.  It says up front that

12  Mr. Fynn and Mr. Greene are employed mediators for purposes

13  of mediating the comprehensive resolution of issues and

14  claims in the Chapter 11 case.

15          Does that include insurance issues?  I think it

16  must.  It must because those issues are important, as the

17  Court has heard since day one, including in the argument on

18  the objection to the Sidley application, insurance is

19  important and that's why Haynes and Boone is involved in

20  handling that part of it.

21          You go down to Mr. Gallagher, what is his job in

22  this case?  He's appointed as a mediator only to mediate the

23  insurance issues.  Again, I don't know where the line is

24  drawn.

25          Mr. Fynn, my concerns about Mr. Fynn, I've learned

1  during the course of this proceeding that there was a global

2  mediation last November at which the debtors presented a

3  claims matrix and claims protocol.  I've asked for a copy of

4  that claims matrix and claims protocol and am worried that if

5  Mr. Fynn was a mediator, he had access to that claims matrix

6  and claims protocol.  The debtors have not provided me a copy

7  of the claims matrix and claims protocol.  All I know is that

8  at least one of the participating parties at that mediation,

9  again, not Hartford, thought the claims matrix, the values

10 were too high and the protocol, the criteria for

11 qualifications were too low.

12         If Mr. Fynn participated in that session in

13 November, that is unfair to Hartford.  I can't put the

14 toothpaste back in the tube in terms of what he saw, what he

15 learned, what he knows about the parties' respective

16 position.  I can't undo what has already been done as sort of

17 a floor, if you will, for any sort of global discussions.

18         Mr. Greene, what do we know about Mr. Greene?  We

19 know he has close ties to Mr. Patton.  I don't know how close

20 those ties are.  I believe, I dare say that the Court may

21 conclude, as it can under the Local Rule 9019-5, which does

22 not say the debtor gets a priority in choosing a mediator,

23 the choice is the Court's.

24         My guess is that there are other candidates out

25 there who may be as good, if not better, and more

1  appropriate, given Mr. Greene's connections to Mr. Patton,

2  than Mr. Greene would be in this case.

3          All I know is the only mediator on whom all three

4  or all sides of this dispute agreed was Mr. Gallagher.  He

5  was vetted the proper way.  He was offered by debtor to all

6  the other constituencies.  We all agreed to Mr. Gallagher.

7  He's the only one to which we've agreed to anyone.

8          Your Honor, debtors, you know, in their moving

9  papers, if we can't agree on a mediator, the debtors said

10 that they were going to ask the Court to appoint a sitting

11 bankruptcy judge.  Clearly, that's a nod in favor of

12 Rule 9019-5.  I don't disagree with that with one tweak.  I

13 don't believe that it has to be a sitting bankruptcy judge.

14 There are several recently retired federal judges in Delaware

15 who I think would be perfectly good candidates here,

16 including Judge Farnan and Judge Carey.  Both are recently

17 retired.  We have reached out to both.  Both are interested

18 in serving as mediator and both are checking conflicts now.

19          What Hartford suggests, Your Honor, is we don't

20 need to do this in the next two days to get this ball

21 rolling.  What the Court should do is decline to enter the

22 order offered by debtors and, instead, enter an order that

23 allows all the parties to offer candidates that they want to

24 offer, and we do believe that the candidates should supply

25 information consistent with Rule 2014 disclosures.

1          And if we're unable to reach an agreement, then

2    the Court can decide whether it's one or more than one

3    candidate that should serve as mediator in this case, but the

4    Court's order should also make clear that all parties to the

5    mediation are allowed to participate in all aspects of the

6    mediation.  That all mediators, whether it's one or two, are

7    allowed and should mediate all aspects of the case and that

8    whatever information the debtors provided to the other

9    constituencies should be provided to the insurers.

10          It is not true to say that we have all the

11   information that the debtors provided to the claimants.

12   Mr. Azer sent me a letter that said that the debtors removed

13   information from the data room.  We know that those documents

14   were provided to the claimants.  So, again, that's just not

15   true as we sit here today.  I hope we work through those

16   issues, but right now it's not correct.

17          So, Your Honor, we ask the Court to decline to

18   enter the order proposed by the debtors and, instead, follow

19   a process that, in our view, is more favor to the parties in

20   interest.  Thank you, Your Honor.

21          MR. SCHIAVONI:  Your Honor, this is Tanc Schiavoni

22   for Century, may I speak?

23          THE COURT:  Yes.

24          MR. SCHIAVONI:  Your Honor, if I could boil this

25   down to what this order really is about, this is a mandatory

1  order.  This is not your normal mediation order that comes up

2  on the consent of the parties that have met and conferred,

3  that have negotiated, and they're now seeking mediate a

4  specific issue.  This is a mandatory order that applies to

5  everyone.  It delegates, in essence, the authority for

6  running the plan process to Mr. Greene.  It puts in place

7  total secrecy over everything that is then done in connection

8  with the formulation of the plan under the auspices of

9  mediation privilege under the form of order.

10          Mr. Greene is -- both Hartford and Century have

11  put in the information that is publicly available about him,

12  but that information, you know, it shows that Mr. Greene, a

13  significant part of his practice is representing tort

14  claimants, future tort claimants in mass-tort cases, in which

15  he is directly hostile to insurers and has taken positions

16  hostile and taken positions on issues that he would be asked

17  to mediate here in this case.

18          He has employed Young Conaway as his counsel in

19  those cases.  We're not able to access whether or not Young

20  Conaway is still his counsel, but I believe if we got 2014

21  disclosures, we'd find other connections between him and

22  Young Conaway and Mr. Patton, with whom he's also authored

23  law review articles.

24          In essence, we have the plaintiffs proposing a

25  plaintiffs' lawyer to not just mediate, but to decide all the

1   issues that are subject to mediation and then to cloak the

2   entirety of those discussions in mediation confidentiality.

3   That's an extreme concern to us, to Century, and I think some

4   of the other insurers because the policies in place here

5   provide to us, it's the most fundamental to the insurance, a

6   duty to cooperate from the debtor to the insurers.  That

7   means having us at the table with them when they negotiate.

8           What we found in Imerys what happened, and maybe

9   you heard it in some of the exclusivity discovery debates was

10  that, basically, the tort claimants in that case had

11  instructed Imerys not to allow J & J to negotiate separately,

12  that all discussions had to go through the debtors.

13          We were completely sidelined there and that's what

14  our concern is here; that we'd be put in a mediation room

15  entirely by ourselves, maybe send some food throughout the

16  process, but that all of the discussions between the debtor

17  and the tort claimants would take place with a plaintiffs'

18  lawyer essentially overseeing them to our exclusion.  Then,

19  with the blessing of the Court, under the terms of the

20  secrecy order that would then follow it, we'd be, essentially

21  lose all rights to the cooperation that we would otherwise

22  have.

23          The very atmosphere that collusion, you know,

24  thrives in and that's what we wanted to avoid.  There's no

25  reason for this level of secrecy that is invoked by this

1   order.  There's no reason to even rush to do it right now.

2   The notion that there's some sort of delay incumbent here,

3   you just heard argument this morning for several hours about

4   the necessity to have information of the claims in order to

5   mediate where the claimants have insisted that that

6   information shouldn't be provided until November.

7           It's not even clear to me how Boy Scouts can even

8   negotiate a monetary resolution of claims for which they have

9   no information and don't know what the number of those claims

10  are.  So, we're all in favor -- what this motion is not about

11  is, it's not about whether or not the parties could

12  participate in a consensual plan negotiation process.

13          We'd be happy to do so and Mr. Greene could come

14  as counsel to Young Conaway and the future claimants

15  representative in that context.  But if one appoints here

16  over our objection a mediator that doesn't have our

17  confidence as neutral, and I would argue just based on what

18  we already have probably triggers 2455, it sets up a process

19  that's not going to work and isn't going to instill

20  confidence and is going to taint the process because it's

21  going to draw objections later from complaints who are going

22  to contend that it shouldn't have all been held in secrecy.

23          So, Your Honor, we ask you to give thought to

24  Hartford's objections to require 2014 disclosure, but also to

25  open the process to former judges in Delaware.  You've heard

1  two very good candidates.  Judge Lewis, former Judge Lewis

2  from the Third Circuit is another candidate who's available,

3  as well as Ken Feinstein, who negotiated the 9/11 cases.

4         With some input from the U.S. Trustee, you know,

5  someone could be put in that would have facial neutrality if

6  there wasn't consensus among the parties.  Thank you.

7         MR. WINSBERG:  Your Honor, if I may speak?  Yes,

8  Your Honor, Harris Winsberg, on behalf of the Allianz

9  insurers, if I may speak briefly?

10        THE COURT:  Yes.

11        MR. WINSBERG:  Just real briefly, I just wanted to

12 echo the comments made by Chubb and Hartford and the Allianz

13 insurers support those positions.

14        One thing to point out, Your Honor, the mediators,

15 Mr. Fynn and Mr. Greene, they were not approved -- we weren't

16 consulted before they were selected by the other parties in

17 interest and they are going to mediate things, are proposed

18 to, that are very important to us, including the treatment of

19 claims and then the funding of a trust.  Those are things

20 that are really important to the insurers.

21        And the idea that you could segregate those issues

22 from "insurance issues" whatever that means, we don't really

23 think that that's realistic and we believe that the Court

24 should consider some other candidates, including some very

25 fine retired judges in your district that we think would do

1   an excellent job and bring some neutrality to the process;

2   otherwise, we have a court-ordered mediation that we believe

3   won't have a great likelihood of success.

4           And with that, Your Honor, I thank you for your

5   time.

6           MR. LUCAS:  Your Honor, this is John Lucas,

7   Pachulski Stang, for the TCC.  I didn't know if you were

8   going to allow proponents in favor of the motion to respond

9   to the insurers?

10          THE COURT:  I'm not sure I need a response.

11          MR. LUCAS:  Understood.

12          THE COURT:  Let me tell you where I'm coming from.

13  I'm going to continue this motion until June 8th.  My concern

14  is that unlike I think probably any order I've entered, I'm

15  mandating parties go to mediation and I'm not simply, as I

16  usually do, approving the consensual choice of parties to

17  mediation.  And I want to ensure that we have a successful

18  mediation because I hear all the parties saying that a

19  mediator would be helpful and, perhaps, is critical here to a

20  successful exit from bankruptcy.

21          And I do, in that context, think it is important

22  for all parties to understand the connections of any mediator

23  or mediators who are selected, so that parties can assure

24  themselves that there is not a predisposed bias in the way a

25  mediator may view issues.  So, I think while it may not be

1  necessary, it is not unreasonable to request disclosures of

2  connections as those words are used in Rule 2014, of any

3  candidate.

4          The idea of -- however, the idea of someone with

5  some expertise in the area, I think, is also not of an

6  improper or illogical criteria upon which to approve

7  mediators and so I don't necessarily rule out someone who's

8  knowledgeable, who's been involved in mass-tort bankruptcies,

9  but I think it's fair to understand that person's

10  connections.

11          Let me also say that in terms of the order, I did

12  not understand the division, necessarily, of -- in

13  Paragraph 2 between what Mr. Fynn and Mr. Greene were

14  requested to do and Mr. Gallagher.  I'm not sure that there's

15  a fine line there.  Perhaps there is, but it's not clear to

16  me and I certainly think the mediators, to the extent there's

17  going to be some division of duties, need to understand what

18  each of them is going to do.

19          I will also say that I'm not going to micromanage

20  the mediation.  So, I'm not going to determine who's stuck in

21  a room by themselves with maybe some food and who's not;

22  going to be for the mediators to determine.

23          And I'm not going to determine the right to

24  cooperation issues and insurance contracts, either, nor, of

25  course, do I think the insurers want me to, but as I said in

1  Imerys, to the extent that the debtors aren't meeting their

2  obligations under the insurance agreements, there may be

3  consequences to that under the policies and I'm not

4  sanctioning by virtue of sending anyone to mediation on

5  breaches of contracts by anybody, nor, of course, would I

6  sanction somebody in violation of their obligations under any

7  common-interest privilege.

8          So, there's a lot of issues.  I do, by the way,

9  think the common-interest privilege issue ought to be dealt

10  with in the protective order, which we're going to take up if

11  it can't be resolved, on the 8th.

12          So, those are my thoughts.  I'm not suggesting

13  today whether Mr. Fynn or Mr. Greene or Mr. Gallagher is an

14  appropriate mediator or not and it does seem to me that to

15  the extent some party is concerned that one or more of the

16  candidates may skew a little in one direction, having three

17  might balance that out and be appropriate.

18          But I think in the first instance, information in

19  this context is a positive, so that parties can get

20  comfortable that we have mediators whom they can deal with

21  and you result in a successful mediation.  So, I'm adjourning

22  this to the 8th.

23          Did you have anything else?

24          UNIDENTIFIED:  No, Judge.

25          MR. ABBOTT:  Well, Your Honor did just mention, of

1   course -- Derek Abbott for the debtors, Your Honor --

2   mention, of course, the protective order and the June 8th

3   conference.  I don't know if there's anything else that the

4   parties wish to present to the Court about that in terms of

5   status today but understand we will be hearing that on

6   the 8th, Your Honor.

7             UNIDENTIFIED:  I think my update served as a

8   status and, Your Honor, we hope not to see you about the

9   protective order and I'm sure you feel the same.

10            THE COURT:  Okay.  Well, I was going to say

11  something, but I guess I didn't have to, then.

12            Okay.  So, I think we've completed the docket for

13  today.

14            MR. ABBOTT:  We have, Your Honor.  Thanks very

15  much.

16            THE COURT:  Okay.  Thank you, everyone.

17            We're adjourned.

18        (Proceedings concluded at 3:03 p.m.)

19                      CERTIFICATE

20

21      I, MARY ZAJACZKOWSKI, certify that the foregoing is a

22  correct transcript from the electronic sound recording of the

23  proceedings in the above-entitled matter.

24
    /s/Mary Zajaczkowski            May 19, 2020
25  Mary Zajaczkowski, CET**D-531