```
 1                      UNITED STATES BANKRUPTCY COURT
                            DISTRICT OF DELAWARE
 2

 3                                      .   Chapter 11
      IN RE:                            .
 4                                      .   Case No. 20-10343 (LSS)
      BOY SCOUTS OF AMERICA and         .
 5    DELAWARE BSA, LLC,                 .
                                        .   Courtroom No. 2
 6                                      .   824 North Market Street
                                        .   Wilmington, Delaware 19801
 7                                      .
                            Debtors.    .   April 15, 2020
 8    . . . . . . . . . . . . . . . .   .   10:00 A.M.

 9                 TRANSCRIPT OF TELEPHONIC CONFERENCE
             BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                  UNITED STATES BANKRUPTCY JUDGE

11    TELEPHONIC APPEARANCES:

12    For the Debtor:          Derek C. Abbott, Esquire
                               Andrew R. Remming, Esquire
13                             Joseph C. Barsalona, II, Esquire
                               Eric W. Moats, Esquire
14                             Paige N. Topper, Esquire
                               MORRIS, NICHOLS, ARSHT & TUNNELL LLP
15                             1201 North Market Street, 16th Floor
                               P.O. Box 1347
16                             Wilmington, Delaware 19899

17

18    Audio Operator:          Nicki Barksdale

19

20    Transcription Company:   Reliable
                               1007 N. Orange Street
21                             Wilmington, Delaware 19801
                               (302)654-8080
22                             Email:  gmatthews@reliable-co.com

23    Proceedings recorded by electronic sound recording, transcript
      produced by transcription service.
24

25
```

```
 1  TELEPHONIC APPEARANCES (Continued):

 2  For the Debtors:           Thomas A. Labuda, Esquire
                               Michael C. Andolina, Esquire
 3                             Matthew E. Linder, Esquire
                               Andrew O'Neill, Esquire
 4                             SIDLEY AUSTIN LLP
                               One South Dearborn Street
 5                             Chicago, Illinois 60603

 6                             - and -

 7
                               Jessica C. Boelter, Esquire
 8                             SIDLEY AUSTIN LLP
                               787 Seventh Avenue
 9                             New York, New York 10019

10                             - and -

11
                               Ernest Martin, Jr., Esquire
12                             HAYNES & BOONE, LLP
                               2323 Victory Avenue, Suite 700
13                             Dallas, Texas 75219

14  For Girl Scouts of the     Eric Lopez Schnabel, Esquire
    United States of           DORSEY & WHITNEY LLP
15  America:                   1000 N West Street, Suite 1410
                               Wilmington, Delaware 19801
16

17  For Future Claimants:      Edwin Harron, Esquire
                               YOUNG CONAWAY STARGATT & TAYLOR LLP
18                             1000 North West Street
                               Wilmington, Delaware 19801
19

20  For the U.S. Trustee:      David Buchbinder, Esquire
                               UNITED STATES DEPARTMENT OF JUSTICE
                               OFFICE OF THE UNITED STATES TRUSTEE
21                             844 King Street, Suite 2207
                               Lockbox 35
22                             Wilmington, Delaware 19801

23  For Hartford:              Joshua Weinberg, Esquire
                               SHIPMAN & GOODWIN LLP
24                             1875 K Street NW, Suite 600
                               Washington, DC 20006
25
```

1  TELEPHONIC APPEARANCES (Continued):

2  For Pearson Education,     Jeffrey Waxman, Esquire
   Inc.:                     MORRIS JAMES LLP
3                            500 Delaware Avenue, Suite 1500
                             Wilmington, Delaware 19801
4

5  For Tort Claimants:        James Stang, Esquire
                             PACHULSKI STANG ZIEHL & JONES LLP
6                            10100 Santa Monica Boulevard
                             13th Floor
7                            Los Angeles, California 90067

8  For the Committee:         Rachel Ringer, Esquire
                             KRAMER LEVIN NAFTALIS & FRANKEL LLP
9                            1177 6th Avenue
                             New York, New York 10036
10

11 For Century Indemnity:     Tancred Schiavoni, Esquire
                             O'MELVENY & MYERS LLP
12                           Times Square Tower
                             7 Times Square
13                           New York, New York 10036

14

15

16

17

18

19

20

21

22

23

24

25

1    <u>MATTERS GOING FORWARD</u>:

2    #18)  Debtors' Motion for Entry of an Order (I) Appointing a
     Judicial Mediator, (II) Referring Certain Matters to Mandatory
3    Mediation, and (III) Granting Related Relief (D.I. 17, Filed
     2/18/20)
4
     **Argument:  14-21**
5
     #19)  Girl Scouts of the United States of America's Motion for
6    Relief From the Automatic Stay to Resume Trademark Action (D.I. 155,
     Filed 3/10/20)
7
     **Ruling:  Ruling will be made from the Bench**
8
     #20)  Debtors' Application for Entry of an Order Authorizing the
9    Retention and Employment of Haynes and Boone, LLP as Special
     Insurance Counsel for the Debtors and Debtors in Possession, *Nunc*
10   *Pro Tunc* to the Petition Date (D.I. 210, Filed 3/17/20)

11   **Ruling:  Order Entered**

12   #21)  Application for Entry of an Order Authorizing the Proposed
     Future Claimants' Representative to Retain and Employ Young Conaway
13   Stargatt & Taylor, LLP as his Attorneys, Effective as of the
     Petition Date (D.I. 243, Filed 3/20/20)
14
     **Ruling:  Matter Continued**
15
     #22)  Debtors' Motion For Entry of an Order (I) Authorizing the
16   Debtors to Reject Professional Services Agreement with Pearson
     Education, Inc. and (II) Granting Related Relief (D.I. 318, Filed
17   3/31/20)

18   **Ruling:  Order Entered**

19   #23)  Motion of the Official Tort Claimants' Committee for an Order
     Clarifying the Requirements to Provide Access to Confidential or
20   Privileged Information (D.I. 332, Filed 4/1/20)

21   **Ruling:  35**

22   <u>EXHIBITS:</u>                                    <u>ID</u>    <u>Rec'd</u>

23   Declaration of Rachel Kassabian                           49

24   Declaration of Brian Whittman                             49

25   Declaration of Eric Lopez Schnabel                        49

     Declaration of Bruce Ewing                                49

1      (Proceedings commence at 10:05 a.m.)

2           THE COURT:  Good morning, counsel.  This is Judge

3  Silverstein.  We are here for the Boy Scouts of America case;

4  Case No. 20-10343.

5           Ginger, will you please remind us all of the

6  protocol?

7           MS. MACE:  It is extremely important that you put

8  your phones on mute when you are not speaking.  When speaking

9  please do not have your phone on speaker as it creates

10  feedback.  This also helps with the background noise so we

11  can hear the person that is speaking and get an accurate

12  record.  Also, it is very important that you state your name

13  each and every time you speak for an accurate record.

14           Your cooperation in this matter is greatly

15  appreciated.  Thank you.

16           THE COURT:  Okay.  Thank you, Ginger.

17           Mr. Abbott?

18           MR. ABBOTT:  Yes, Your Honor.  Derek Abbott of

19  Morris Nichols here for the debtors.  Thank you again for

20  this time and notwithstanding our difficulties it seems like

21  we have half a loaf on the video, but we will do our best,

22  Your Honor.

23           I'd like to start by introducing, again, Ms.

24  Boelter who will run through the agenda for the court and

25  proceed from there, if I may.

1          THE COURT:  Yes.  Ms. Boelter?

2          MS. BOELTER:  Thank you, Your Honor.  Jessica

3  Boelter, Sidley Austin, on behalf of the debtors.

4          Just one housekeeping, Your Honor, to follow-up on

5  something that Mr. Abbott mentioned.  We are recognizing

6  that, at least, on the Sidley software system Skype is not

7  working that well.  Some of us are on our Mac computers and

8  can see some folks, but not others.  So, just bear with us.

9  We will continue to work with our IT department as we work

10 through the COVD-19 issues.  Hopefully, if we have another

11 hearing you will be able to see all of us.

12         THE COURT:  Thank you.

13         Let me say, this hearing, I understand, there are

14 no witnesses. So, it wasn't as critical that we be on Skype,

15 but I personally find it helpful to be able to see counsel

16 during argument.  So, that is why I requested that it be by

17 Skype as well.

18         So, logistic issues I do understand, though, and

19 we will work through all of that.

20         MS. BOELTER:  Very good, Your Honor.

21         Then turning to the agenda, last night the debtors

22 filed a third amended agenda with respect to the matters

23 scheduled for hearing today.  The first thirteen items on

24 that agenda have been resolved and orders have been entered.

25 Thank you very much, Your Honor.  In addition, I believe we

1 saw this morning that Item No. 17 on the agenda, the cash

2 collateral order, has also been entered.

3        That brings us to the matters on the agenda for

4 which orders have not yet been entered and matters that we

5 think are going to go forward today.

6        The first item falling under that category is

7 Agenda Item No. 14, that's on Page 10 of your agenda.  This

8 is the debtors' motion for entry of an order appointing James

9 Patton as the future claimant's representative.  We received

10 informal comments from the survivor committee with respect to

11 the form of order that was filed with the motion.  We have

12 incorporated those into the form of order after circulating

13 them to the parties.  Both clean and blackline of those

14 orders were filed under certification of counsel at Docket

15 No. 360.

16        From our perspective, Your Honor, a hearing is not

17 necessary unless, of course, Your Honor has any questions

18 with respect to the order or the relief that the debtors have

19 sought.

20        THE COURT:  I did have some questions.  I do have

21 some questions.  The connection with the application the

22 debtors filed the declaration of Mr. Patton in which he

23 discloses certain connections that he has with the case.  And

24 I have questions regarding Paragraphs 12, 13 and 14 of his

25 disclosures.  And I don't know if Mr. Patton is on the phone.

1    I see Mr. Harron on Skype.

2              MR. HARRON:  Yes, Your Honor.

3              THE COURT:  And I wanted to explore those three

4    paragraphs in the context of the request that Mr. Patton be

5    appointed the future claims representative.

6              MS. BOELTER:  Very good, Your Honor.  I will cede

7    the podium to Mr. Harron and Mr. Patton if he happens to be

8    on the phone.

9              MR. HARRON:  Good morning, Your Honor.  This is Ed

10   Harron.  I am also on the video, I think.

11             THE COURT:  Yes.

12             MR. HARRON:  Mr. Patton hasn't dialed in.  We

13   weren't certain of the nature of the court's questions, but

14   he is standing by on telephone.  We could attempt to patch

15   him in or I could attempt to address your questions, if you

16   would like.

17             THE COURT:  Well, let me ask some of the questions

18   and remind people what is in the declaration that I would

19   like some more color around, then we can take it at this

20   point or we can take it at the end if you would like some

21   time to speak with Mr. Patton and we can get him on.  These

22   are questions I have.

23             Paragraph 12 says that as a child Mr. Patton

24   participated in the scouting program.  And it also discloses

25   that other attorneys or staff were involved in the scouting

1  program.  I'm not concerned about others.  My question is I

2  would like to know more about his participation in the Boy

3  Scouts program.  I do note that Mr. Patton feels it

4  appropriate that no attorneys or staff currently involved in

5  the scouting program are or will be part of the team.  And

6  I'd like the thoughts on past participation in the Scouts

7  program.

8          Paragraph -- and I'd like to hear from the debtors

9  as well in terms of their selection process, not that that's

10  definitive in any sense, but whether they explored

11  participation in the scouting program with the, I think,

12  three they said, candidates that they interviewed for this

13  position.

14          Then in Paragraph 13 it says that Young Conaway

15  represented the Catholic Diocese in Wilmington in its case

16  which the disclosures say stemmed from clerical sexual abuse.

17  So, I'd like to understand Mr. Patton's involvement, if at

18  all, in representing the catholic diocese in the Diocese of

19  Wilmington case here in Wilmington.

20          Then I note Paragraph 14 that Young Conaway

21  represented the Delmarva Council, which I take it is a local

22  council --

23          MR. ABBOTT:  Correct, Your Honor.

24          THE COURT:  -- in 2009 in connection with two

25  cases in which plaintiffs asserted sexual abuse claims

1 against the council and DSA.

2      Again, I think I'd like to understand if Mr.

3 Patton was at all involved in that representation.  And I

4 have to say that representation alone wouldn't particularly

5 concern me because it also ended in 2012.  But I would like

6 to understand more about, I guess, Young Conaway's

7 involvement and if Mr. Patton had any involvement, which I

8 kind of doubt from the nature of it, but I would like to

9 understand that.

10      So, those are the questions I have surrounding

11 this application.  And as I said, happy to take it up now or

12 take it up later so that you have an opportunity to think

13 about it, address it and get information if you need to do

14 that.

15      MR. HARRON:  Your Honor, I think I could address

16 some of Your Honor's questions right now, but it's probably

17 more efficient if we accept your invitation, we convene with

18 Mr. Patton.  I'm hopeful that by the end of the hearing we

19 will be prepared to fully respond to each of your questions.

20      THE COURT:  Okay.  Thank you.  I will certainly

21 give you that time. And if you need additional time we can

22 schedule another time to reconvene on that, but I thought it

23 would be helpful to put my questions out there.  And,

24 obviously, the answers in light of the standard for

25 appointing an FCR is helpful and I note the debtors' standard

1  in Paragraphs 34 and 35, I think, reflect where this court is

2  with respect to that standard.  So, thank you. I appreciate

3  that.

4          MR. HARRON:  Understood, Your Honor.  Thank you.

5          THE COURT:  Ms. Boelter?

6          MS. BOELTER:  Yes.  Jessica Boelter again, Sidley

7  Austin, on behalf of the debtors.

8          I'm happy, Your Honor, to address the question for

9  the debtor now; however, it may make sense to package all of

10  the future representative issues towards the end of the

11  hearing after Mr. Harron has had the ability to confer with

12  Mr. Patton.

13          THE COURT:  That's fine.

14          MS. BOELTER:  Very good, Your Honor.

15          The next two items on the agenda, Items 15 and 16,

16  are matters that have been adjourned to the May 18th hearing.

17          Item No. 15 was the debtors' motion for entry of

18  an order scheduling certain deadlines in connection with

19  property disputes.  We have extended the objection deadline

20  as represented in the agenda for the creditors committee, the

21  survivor committee, the FCR, the United States Trustee and

22  JPMorgan to May 4th at this point.  But, again, that is not

23  before the court today.

24          Item No. 16 is Sidley Austin's application to be

25  retained *nunc pro tunc* to the petition date as counsel to the

1  Boy Scouts of America.  Since filing this agenda, Your Honor,

2  last night during the overnight hour Century Indemnity

3  Company filed an objection to Sidley's retention application.

4  Again, this matter is not before the court today, but we

5  didn't have the opportunity to update the agenda, Your Honor.

6  So, we wanted to make sure the court was aware that they

7  have, in fact, now filed a formal objection.

8         I believe they have also filed, although we have

9  not had the opportunity to go through the documents, but I do

10 believe they filed a motion to file one of the declarations

11 in support of that objection under seal.  And they may have.

12 Again, Your Honor, we just haven't had the opportunity to

13 review the documents, but they may have sought to have that

14 heard today and their counsel may be on the phone that can

15 address that.

16        From our perspective, because this retention

17 application is not before the court today, and, quite

18 frankly, we have not had the opportunity to review and

19 process the objection, we would just submit that the under

20 seal motion, to the extent its live for today, could be also

21 adjourned to the May 18th hearing and dealt with after the

22 parties have had the opportunity to review it.

23        THE COURT:  Sounds good to me to carry that.  Does

24 counsel for Century Indemnity have a different view?

25        MR. SCHIAVONI:  Your Honor, this is Tancred

1  Schiavoni for Century Indemnity.  I apologize, I'm not on

2  Skype.  I hope you don't miss my face today.

3       (Laughter)

4       MR. SCHIAVONI:  What I'd like to tell you about

5  this motion is we have no objection to carrying over the

6  motion to seal and to work that out with the U.S. Trustee and

7  the debtor.  The debtor consented to an extension of time for

8  us to file an objection.  That is subject to a separate

9  stipulation between the parties.

10      So, the objection is timely, as I'm sure Ms.

11 Boelter will confirm if necessary.  It's an objection which I

12 think should be heard promptly.  I will defer to the U.S.

13 Trustee on scheduling that motion.  It is something that we

14 made extraordinary efforts to try to resolve, you know,

15 including meet and confers, and mediation.  We were not able

16 to resolve it and it raises issues for us that are

17 tremendously prejudicial.  I would like to work with the U.S.

18 Trustee to set a date that the U.S. Trustee is comfortable

19 with that we could hear perhaps the next omnibus.

20      MR. BUCHBINDER:  Your Honor, this is Dave

21 Buchbinder on behalf of the U.S. Trustee.

22      I have had an opportunity to review the various

23 pleadings that were filed last night and I think it would be

24 in the best interest of all parties concerned, including all

25 creditors and parties in interest in the case, if this

1  objection were heard prior to May 18th.  I get the impression

2  from reading the pleadings that it will be disputed.  It may

3  require evidence, but in any event both sides to the issue

4  will be prejudiced if the matter is delayed for, in essence,

5  more than another month then I think the court should

6  consider hearing it in advance of the May 18th hearing.

7          Having said that, with the adjournment of the

8  motion to seal that is my comment for this morning.

9          THE COURT:  Okay.  Well, I haven't read the

10  objection.  If, in fact, it needs to be heard before the next

11  hearing we will find a time for it.  So, I'd like the parties

12  to confer and see if there is agreement that it should be

13  heard before the next hearing.  And as I said, if there is,

14  we will find a place for it.

15          MS. BOELTER:  This is Jessica Boelter, again, Your

16  Honor.  Thank you.

17          We will confer with both Century's counsel as well

18  as the United States Trustee with respect to a hearing on

19  Sidley's retention application.

20          THE COURT:  Thank you.

21          MS. BOELTER:  Your Honor, that brings me to Item

22  17.  Again, as I mentioned previously, an order was entered

23  this morning with respect to Item 17, that's the cash

24  collateral order.  Thank you very much.

25          That then brings us to Item 18 which is the

 1  debtors' motion for entry of an order appointing a judicial

 2  mediator.  I'm ultimately going to hand the podium over to

 3  Michael Andolina.  I just wanted to mention, Your Honor, as

 4  we're going through these matters that received, in some

 5  cases, multiple objections we would propose, Your Honor, that

 6  Item No. 19, which is the Girl Scouts motion for relief from

 7  the automatic stay, because we think that's going to take the

 8  most amount of time this morning we would propose that that

 9  get moved to the end of the agenda so that individuals who

10  are not necessarily active with respect to that motion may,

11  with the court's consent of course, drop off the line.

12  Otherwise, I will continue to lead us through and I will hand

13  the podium over to Michael Andolina on Item No. 18.

14           THE COURT:  Okay.

15           MR. ANDOLINA:  Good morning, Your Honor.

16           THE COURT:  Good morning.

17           MR. ANDOLINA:  It's nice to see you virtually from

18  snowy Chicago.

19           Your Honor, there is not a proposed order before

20  the court on the debtors' mediation motion, but we did want

21  to provide the court with an update on the status of that

22  motion and the party's significant efforts to commence

23  mediation.

24           As the court is aware, the selection of a mediator

25  was one of the key prongs to BSA's reorganization strategy

1  and we have made significant progress due to the efforts of

2  all the constituencies here.  First, the good news, the TCC,

3  the UCC, the proposed FCR and the ad committee of local

4  counsel have been engaged in near constant discussion over

5  the past few weeks and have agreed on two mediators with

6  extensive experience to assist in this case; Eric Green of

7  Resolutions LLC and Paul Finn of Commonwealth Mediation.

8           We also received input from JPMorgan and came to a

9  consensus on a proposed mediator structure.  That structure,

10 Your Honor, includes a mechanism for an additional insurance

11 mediator which was one of the issues raised in several of the

12 objections that we received from our insurers, who we have

13 also engaged with the insurer group that filed objections to

14 the mediation motion.  We received comments to that proposed

15 mediation order from the insurer group late last evening and

16 Mr. Azer, who you will recall was a witness, from Haynes &

17 Boone followed up with the insurers to discuss.

18           I think it's fair to say that it's likely that the

19 parties will consider adding an additional mediator with

20 insurance expertise for the mix.  My understanding is the

21 insurers have proposed an individual named Mr. Ken Gallagher

22 to fulfill that role.

23           Again, the insurers have not agreed to the form of

24 order, nor have the TCC, the UCC and the debtors agreed to

25 the insurers proposed revision.  Given the progress I'm

1  cautiously optimistic that we can reconcile some of the

2  insurer's requests and have an agreed order to present to the

3  court so that we can move forward in short order.  Your

4  Honor, if we are unable to do so we would ask that the court

5  consider hearing from the parties prior to the next omnibus

6  hearing.

7         As I mentioned, having mediators involved early in

8  the process is a key part to achieving our goal of fairly

9  compensating survivors and preserving the BSA's mission.

10  There have been preliminary conversations already with Mr.

11  Green and Mr. Finn, and we think all the constituencies are

12  interested in moving the process along as quickly as

13  possible.

14         So, if Your Honor has any questions I'm happy to

15  address them, but that is the update from the debtors'

16  perspective.

17         THE COURT:  I do not have any questions.  Thank

18  you.

19         MR. STANG:  Your Honor, this is James Stang.  May

20  I make a comment?

21         THE COURT:  Yes.  And everyone identify

22  themselves, please.

23         MR. STANG:  Your Honor, this is James Stang

24  counsel for the committee.

25         We're pleased that we were able to agree upon

1  mediators.  Not only have I -- I know Mr. Finn from prior

2  experience.  I knew of Mr. Green.  He and I had a 90 minute

3  conversation over the weekend and then he had a meeting with

4  the committee members yesterday that lasted over an hour.

5  Mr. Finn participated in that as well.  And the committee

6  members are comfortable with the selection and the selection

7  process.

8          The committee members are not convinced that an

9  additional insurance mediator is necessary.  I don't think

10  Mr. Finn and Mr. Green believe that one is necessary.  They

11  will speak for themselves at some point on the issue if the

12  court thinks their opinions are relevant.  We are not, as a

13  matter of principal, against it, but we're also not convinced

14  it's necessary.

15          So, we will look through the comments that Mr.

16  Andolina has provided to us on the order.  And we look

17  forward to trying to work things out.

18          Thank you, Your Honor.

19          THE COURT:  Thank you.

20          Does someone else wish to be heard?

21          MR. WEINBERG:  Your Honor, this is Joshua Weinberg

22  on behalf of Hartford Accident & Indemnity Company, First

23  State Insurance Company, Quincy Fire Insurance Company.

24          Hartford is one of the insurers that had commented

25  and objected to the original proposed order from the debtors

1  here.  And a few comments, Your Honor.

2        The proposed language and order that the debtors

3  provided to us was first provided to the insurers late Monday

4  afternoon.  So, less than 48 hours ago.  That was the first

5  notice that the insurers received of the other parties; the

6  debtors, the tort claimants committee, the FCR had all agreed

7  on Mr. Green and Mr. Finn being selected as mediators.  That

8  was concerning to us, Your Honor, because we all had asked,

9  literally, from day one to be involved in that process, to

10  have input into that process.  So, we really have not had any

11  opportunity to review the credentials, as you will, for those

12  two mediators.  So, we will need a little bit of time to look

13  at that issue.

14        We appreciate Mr. Andolina's comments.  We look

15  forward to working with them on the order.  We think that an

16  insurance mediator, someone with Mr. Gallagher's credentials,

17  will be essential here.  So, we look forward to working with

18  everybody, but because we did just receive this proposal late

19  Monday afternoon there is going to be a little bit of time on

20  the insurers end.  And we did endeavor to get comments back

21  to everybody quickly.

22        Thank you, Your Honor.

23        THE COURT:  Thank you.

24        MS. RINGER:  Your Honor --

25        UNIDENTIFIED SPEAKER:  Your Honor, for -- I'm

1  sorry, go ahead.

2          MR. RINGER:  Your Honor, this is Rachel Ringer

3  from Kramer Levin on behalf of the committee.

4          I just wanted to echo the comments of Mr. Stang

5  from the tort claimants committee.  We -- as Mr. Andolina

6  reported we are, likewise, supportive of the two mediators on

7  the terms of the outline.  We don't yet have a position on

8  whether or not a third mediator is needed.  We also just

9  received the comments from the insurers on the orders.  So,

10 we are likewise reviewing those and will, obviously, be

11 working with and following up with the debtors on those.

12         THE COURT:  Thank you.

13         MR. SCHIAVONI:  Your Honor, this is Tancred

14 Schiavoni for the Chubb Companies and for Indemnity here.

15         We participated in the defense of the Boy Scouts

16 prepetition.  Worked with them for many years on the defense

17 of these claims.

18         It is apparent, I think, from what you heard from

19 Hartford's counsel, we weren't consulted or in any way

20 included in any way whatsoever with the selection of Mr.

21 Green as a mediator.  The first time we've heard his name was

22 the other day.  We haven't been included whatsoever in any

23 aspect of preparing this order.  I'm glad to hear that

24 they're interested now in discussion it with us.

25         Among the fundamental concerns we have here is

1  that the order doesn't impose any structure at all on the

2  mediation period.  And what it does is, effectively, cloak

3  the entire plan process, all negotiations, anything about the

4  plan with mediation confidentiality.  It really takes away

5  from the court any oversight on, really, the negotiation of

6  the plan.  We're going to deal with Sidley Austin which is

7  negotiating this with us.

8        I think the one issue that the parties agree upon

9  is that the plan significantly involves insurer interest.

10 Among the other issues, specifically noted in the motion for

11 mediation is how the plan is going to deal with shared

12 insurance among different parties in the case, how that

13 insurance will be liquidated, how things will be allowed; all

14 the things implicated are right.  We want to participate.  We

15 would want to have a role in the selection of a mediator.

16       To have a mediation proceed, effectively, one

17 would think that would be taken into account and it wouldn't

18 just simply imposed upon us on a mandatory basis with 48

19 hours' notice.  So, we stand prepared to negotiate with them

20 going forward.

21       THE COURT:  Okay.  Well, certainly nothing is

22 being imposed today.

23       Is there anyone else before we move on?

24    (No verbal response)

25       THE COURT:  Thank you.

1        Ms. Boelter?

2        MS. BOELTER:  Thank you, Your Honor.  Jessica

3   Boelter, Sidley Austin for the debtors.

4        As I mentioned, Your Honor, we would propose that

5   Item No. 19 on the agenda, which is the Girl Scouts motion

6   for relief from the automatic stay be moved to the end of the

7   agenda simply because while it will not involve witnesses, as

8   you noted at the outset, I do believe it will involve some

9   extensive argument.  So, we would, again, propose that we

10  move that and proceed with Item No. 20 on the agenda if

11  that's acceptable to the court.

12       MR. SCHNABEL:  Your Honor, its Eric Lopez

13  Schnabel.

14       We, of course, have no problem with that.

15       THE COURT:  Thank you, Mr. Schnabel.  Yes.

16       MS. BOELTER:  Okay.  Item No. 20 on the agenda is

17  the debtors' application to retain and employ Haynes & Boone

18  as special insurance counsel for the debtors.  We understand

19  that the court requested a hearing with respect to this item.

20  My colleague, Matthew Linder, will be handling this and we

21  also have representatives from Haynes & Boone on the phone to

22  the extent the court has questions of those representatives.

23       MR. LINDER:  Good morning, Your Honor; Matt

24  Linder, Sidley Austin, on behalf of the debtors.

25       We did file a certification of counsel with

1  respect to the Haynes & Boone retention as Docket No. 335.  I

2  believe it just reflected one minor change, just to make

3  clear, that Haynes & Boone's prepetition retainer would not

4  be held through the case.  It would be actually applied to

5  the invoices of Haynes & Boones to incur fees and expenses in

6  these cases.

7      Other than that, Your Honor, I'm happy to address

8  any questions or to the extent that you would like to hear

9  from Mr. Martin or Mr. Azer who are also on the phone.  I'm

10  happy to have them jump in as well.

11      THE COURT:  I had one question on the declaration,

12  and I'm searching around for that.

13      Okay.  I need one minute.  I must have left that

14  on my desk.  I will be right back.

15      (Pause)

16      THE COURT:  Okay.  So, the question I have on in

17  the declaration of Ernest Martin and its Paragraph 23 of his

18  declaration.  I think I know the answer, but I want to make

19  sure I understand.

20      It says that Haynes & Boone discloses that it has

21  historically represented and continues to represent both the

22  BSA and certain local council in the coverage matters.  And

23  Haynes & Boone intends to continue to represent the BSA and

24  the local council in the coverage matters if the matters are

25  not stayed.

1          So, I want to understand that in the coverage

2   litigation there is no difference.  There is no difference in

3   position between the BSA and the local counsel in the

4   coverage matters that they are on the same side of all issues

5   in the coverage matter which I assume to be the case, but I

6   want to make sure I understand Haynes & Boone's

7   representation there.

8          MR. LINDER:  Thank you, Your Honor.  This is Matt

9   Linder again from Sidley for the debtors.

10         That is my understanding, but perhaps Mr. Martin

11  could speak to that.  If there is any additional changes made

12  to the order we can address that as well.

13         MR. MARTIN:  Yes.  Your Honor, this is Ernest

14  Martin with Haynes & Boone. I'm happy to address that.

15         Your Honor is correct that Haynes & Boone's

16  representation of the local councils along with BSA, those

17  interest are aligned.  Both the local council and BSA share

18  the insurance and those entities are involved in underlying

19  litigation for which coverage is sought, but the interest of

20  both local council and BSA are aligned completely.

21         THE COURT:  Thank you.  Aligned was the word I was

22  searching for and not coming up with.

23         My recollection from the previous hearing is that

24  Haynes & Boone does not represent either the BSA or the local

25  councils in the underlying abuse litigation, is that correct?

1           MR. MARTIN:  That is correct, Your Honor.

2           THE COURT:  Okay.  Thank you.  That is the only

3  matter I wish to make certain I understood.

4           With that I will approve the retention of Haynes &

5  Boone as requested.  I did not have any questions with

6  respect to the order.

7           MR. LINDER:  Thank you, Your Honor.

8           MS. BOELTER:  Thank you, Your Honor.  This is

9  Jessica Boelter again, Sidley Austin, for the debtors.

10          That brings us to Item 21 which is the proposed

11  future claimant's representative application to employ Young

12  Conaway.  Again, I believe Mr. Harron is on the line and I

13  presume he would be addressing this application.

14          MR. HARRON:  Hello, again, Your Honor.  It's Ed

15  Harron.

16          I assume the court would agree that this

17  application is premature until we answer your questions to

18  Agenda Item 14.  But if Your Honor had any questions about

19  the Young Conaway application that don't relate to the status

20  of the motion to appoint the FCR I'd be happy to address

21  those.

22          THE COURT:  I did not have any further questions.

23  I don't think I saw a certificate of no objection on this

24  application.

25          MR. HARRON:  We would have filed one, Your Honor,

1   until you approved the FCR motion.

2          THE COURT:  Okay.  Very good.  So, no, I take it

3   you didn't have other objections from any party?

4          MR. HARRON:  That's correct.

5          THE COURT:  Okay.  Thank you.  We will address it

6   later.

7          MR. HARRON:  Understood.

8          MS. BOELTER:  Your Honor, again, Jessica Boelter,

9   Sidley Austin, for the debtors.

10          That brings us to Agenda Item No. 22 which was the

11   debtors' motion for entry of an order authorizing the debtors

12   to reject the professional services agreement with Pearson

13   Education.

14          As was reflected in the agenda that was filed

15   yesterday evening, Your Honor, we have now reached an

16   agreement with respect to the proposed form of order and we

17   filed that form of order under certification of counsel.

18   Given that resolution from the debtors' perspective a hearing

19   is not necessary with respect to this particular motion, but,

20   of course, if the court has any questions we're happy to

21   answer those.

22          THE COURT:  I haven't seen the certification of

23   counsel, but I assume that it will be acceptable.  I did read

24   the motion and the response.  So, unless there is something

25   unusual in the stipulation I don't think there will be an

1   issue.

2           MR. WAXMAN:  Your Honor, this is Jeff Waxman of

3   Morris James on behalf of Pearson.  If I may be heard

4   briefly.

5           THE COURT:  Yes, Mr. Waxman.

6           MR. WAXMAN:  Your Honor, this was the product of

7   considerable back and forth among the parties.  And it

8   resolves both the debtors' motion as well as our request

9   that's set forth in the cross motion.  And it provides for

10  the payment of the prorated amount for April as well as the

11  return of the property of the debtors.  And we would ask that

12  the order be entered.

13          Thank you, Your Honor.

14          THE COURT:  Okay.  I'm not surprised to hear that

15  that could have been a resolution.  So, I'm certain when I

16  see the COC I will sign the order.

17          MR. WAXMAN:  Thank you, Your Honor.  If I may be

18  excused.

19          THE COURT:  You may.

20          MR. WAXMAN:  Thank you.

21          MS. BOELTER:  Your Honor, Item No. 23 on the

22  agenda is the tort claimant's committee motion for an order

23  clarifying requirements to provide access to confidential or

24  privileged information.  I believe Mr. Stang is on the phone.

25  I am not sure if he would like to take up this motion or one

1  of his colleagues.

2          MR. STANG:  Good morning, Your Honor.  James Stang

3  for the tort claimants committee.  I will handle it.

4          Your Honor, this is what we thought was a fairly

5  straightforward motion providing for the tort claimants

6  committee's communications with the constituency.  And

7  providing that we did not have to -- we're not obligated to

8  share with our constituency confidential information that we

9  might get from the debtor.

10         To the extent that parties are concerned about

11 what the debtor is providing to us, whether it's confidential

12 or not, whether they should be copied with it or not, we

13 think they should be talking to the debtor.  This motion is

14 about what we are saying to our constituency, not what the

15 debtor is saying to us.

16         The parties -- well, the debtor, and the tort

17 claimants committee and some of the other parties are working

18 through a confidentiality order.  We're not there yet in

19 terms of having consensus on it, but we think that, if you

20 will, this is the other side.  This is about us talking to

21 our creditors, not about the debtor talking to us.

22         That's all I have, Your Honor.

23         THE COURT:  Thank you.

24         MR. SCHIAVONI:  Your Honor, this is Tancred

25 Schiavoni for the Chubb Companies, Century Indemnity here.

1            The Chubb Companies parties participated, as I

2    indicated, before in the defense of the Boy Scouts for many

3    years going into the bankruptcy filing.  We generated, in

4    connection with that, a significant volume of materials that

5    falls under the common interest privilege in defending these

6    claims.  We talked to the Boy Scouts about continuing to work

7    with them in connection with the bankruptcy in the scope of

8    that common interest.

9            That privilege material about the defense of

10    extraordinary significance to use would be extraordinarily

11    prejudicial if it was turned over to the tort claimants.  We

12    now have a party or counterparty to Boy Scouts which is

13    looking for a release.  The loss of that privileged material

14    would be very prejudicial to us.

15            We have, secondly, here a different, but related

16    concern.  As Your Honor will see, as we go forward with this

17    other matter at a later date the Sidley Austin Firm

18    represented our client, Chubb, going into the bankruptcy, on

19    the petition date, on matters concerning the Boy Scouts,

20    concerning the Boy Scouts insurance, for their insurance.

21    They have some extraordinarily privileged information from

22    their representation of the Chubb Companies.

23            The protection of those privileges are of

24    extraordinary concern to us.  We went to extraordinary

25    lengths to try to deal with this issue with Sidley.  We were

1  not able to.  Our objection was filed last night.  But we are

2  now in a position where we're extremely concerned about the

3  sharing of information between the debtor and the tort

4  claimants.

5        The motion that the tort claimants filed, by its

6  nature, seems to envision that the debtors will be giving or

7  have given privileged to the committee, to the tort

8  claimants.  We found out through the motion that apparently

9  information has continued to be exchanged up until now with

10  the committee.  That is referenced in the motion to a

11  protective order being discussed and circulated among the

12  parties.  We were completely and totally excluded from any

13  discussions about a protective order or any exchanges of

14  information privileged or, otherwise, with the tort committee

15  from the petition date forward.

16        We only got a copy of the protective order that

17  was circulated just the other day from the debtors.  The tort

18  committee declined to give it to us.  Told us that, you know,

19  too many cooks in the kitchen.  We didn't have a -- they

20  didn't want to give us a copy of it.

21        Normally the way the local rule works -- you know,

22  I know that we have a local rule here in Delaware that says

23  that information can be shared in contemplation of a

24  protective order being entered, but as a practical matter in

25  most instances that is involving the two parties to the

1  material and not to the exclusion of other parties who have

2  an interest in the privileged material.

3          So, we have a situation here where material has

4  apparently continued to be exchanged while a protective order

5  has been negotiated to which we excluded from.  We think

6  all of that sharing should basically cease until that

7  protective order is entered and we have a handle on what

8  actually has been exchanged.

9          As far as this order goes its either premature or

10 as part of its entry a provision should be put in it that

11 explicitly states that the tort committee should not be

12 getting privileged information from the debtors that has

13 anything to do with the underlying claims or insurance

14 without us getting an opportunity to see it first and have an

15 opportunity to be heard because, again, with the blinders

16 drawn on us and not knowing what is being exchanged we're in

17 just a terrible situation here and one that is of

18 extraordinary concern to Chubb as a result of that, Your

19 Honor.

20         THE COURT:  Thank you.

21         MR. ANDOLINA:  Your Honor, its Mike Andolina on

22 behalf of the debtors.  If I could just be heard briefly on

23 this.

24         THE COURT:  Well, I think I had another -- I have

25 a joinder of Hartford.  I don't know -- let me see if any

1  other insurer or any other objector wants to be heard first

2  and then, Mr. Andolina, I will come back to you.

3            MR. WEINBERG:  Your Honor, this is Josh Weinberg

4  on behalf of Hartford.

5            I don't think that we have any additional

6  comments.  Thank you.

7            THE COURT:  Thank you.

8            Mr. Andolina?

9            MR. ANDOLINA:  Thank you, Your Honor.  Mike

10 Andolina on behalf of the debtors.

11           Your Honor, I don't think any of the comments that

12 Mr. Schiavoni made are particularly relevant to the actual

13 order that is under consideration, but I did want to note for

14 the court with respect to the protective order there was a

15 protective order that was filed early-on in the case, first

16 of all.  That will -- the protective order will ultimately

17 control the documents that are produced.  We also announced

18 publicly at the first day hearing that we were populating the

19 data room with information.

20           Even more directly to the point that Mr. Schiavoni

21 raised is we received comments on the draft protective order

22 from the UCC yesterday.  So, nothing has been baked and we

23 immediately provided the current draft of the protective

24 order to Mr. Schiavoni.  Nothing has been entered.  No final

25 negotiations have been made with respect to the protective

1  order.  We're not producing privileged documents to the TCP.

2  Again, this is just a disruption to the motion, and comments

3  that don't relate to the motion that is on file.

4          So, we look forward to continuing to work with the

5  insurers and providing them information.  And we set-up a

6  process through the data room to do that.  We will continue

7  to populate the data room with information.  The insurers

8  will have access to that pursuant to the protective order and

9  the case will proceed.

10         THE COURT:  Have I signed a protective order?

11         MR. ANDOLINA:  No, Your Honor, because we haven't

12  finished negotiating it which is exactly the point.

13         THE COURT:  Okay.  I thought you said one was

14  filed early-on?

15         MR. ANDOLINA:  Yeah.  A proposed protective order

16  was filed and we've been negotiating off of that document.

17  I'm sorry if I wasn't clear, Your Honor.

18         THE COURT:  Okay.

19         UNIDENTIFIED SPEAKER:  Your Honor, you see what

20  the problem is.  We just got this confirmation that, again,

21  here on the record that information has been exchanged, that

22  there is some sort of data room created.  The suggestion that

23  there is some sort of process for us to see that, we're

24  hearing that this week.  We haven't been given access to any

25  of those documents period.  Nobody consulted us before they

1 were turned over.  And our efforts to try to obtain, before

2 this hearing, some sort of written order or confirmation that

3 privileged material isn't being turned over or hasn't been

4 has gotten us nowhere.

5          So, that is why we think that we need that

6 protection now because they're going forward continuing to

7 share information.  And they don't have a protective order in

8 place that deals with whether or not privileged information

9 would be turned over.  We have a motion before us from the

10 committee that assumes that it will received privileged

11 material and I don't know whether they already have

12 privileged material.

13          MR. STANG:  Your Honor, this is Mr. Stang for the

14 committee, for the tort claimants committee.

15          I feel like a young child getting caught in the

16 argument between the two arguing parents.  This is something

17 the debtor has to take up with its carriers.  And we want

18 this information to move this case along.  We have financial

19 advisors employed who are trying to get a handle over the

20 assets and liabilities of this debtor.  And if the insurers

21 want the information that we're getting this is not our

22 issue.

23          If the debtor wants to turn over to the insurers

24 what we have been getting God bless them.  There are not

25 secrets as far as we're concerned.  Whether we receive

1  privileged information or not, I don't think we have.  I

2  would rely on Mr. Andolina's statement that we haven't

3  received it.  So, we'd like to keep this case going.  We'd

4  like to continue to protect the interest of child sex abuse

5  victims.  And if these two parties have a problem take it

6  outside, or let them figure it out, or come back to you at

7  some point.

8         We have a statutory obligation to stay in touch

9  with our constituencies.  We want to fulfill that obligation.

10  This constituency is especially vulnerable and concerns about

11  whether there are secrets being maintained or kept from them.

12  The nature of an abuse survivor's view of the world.

13         So, we would like to have this approved so that we

14  can have the communications appropriate to our committee and

15  let the debtor and the insurers figure  this out in terms of

16  what the insurers are entitled to.

17         Thank you, Your Honor.

18         THE COURT:  Thank you.

19         Okay.  Well, I view the motion that's in front of

20  me as one that involves what the tort claimant's committee

21  can share.  And, in fact, it wants to clarify what need not

22  be shared with constituents given Congress's vague notion of

23  what has to be done -- what has to be shared by an official

24  committee.  And this does not, this order does not give

25  permission for the debtors to turn over privileged

1   information that is subject to a common interest. It does

2   nothing with respect to whatever the debtors' obligations are

3   with respect to material information, documents subject to a

4   common interest privilege.  It doesn't provide permission.  I

5   don't view this as giving permission for that to happen.

6           So, this to me, the motion in front of me is a

7   vanilla motion that, in fact, provides that the tort

8   claimants committee is not required to disseminate what would

9   either be confidential or privileged information.  So, I

10  think it's appropriate to enter this.  If there are going to

11  be issues with respect to what information is shared with the

12  committee that may be subject to a common interest privilege

13  that should be addressed.  I would suggest, based on my

14  experience, that we get that resolved quickly.  Okay.

15          That's all I'm going to say.  But the issues out

16  there, it needs to be resolved.  This won't be the first case

17  that that's an issue in.  So, I would encourage the parties

18  to discuss a method for insuring that we don't have privilege

19  issues popping up in this case before they're able to be

20  addressed.

21          So, I am going to sign the form of order. I think

22  it was revised, but I will take a look at whether I had a COC

23  or a CNO.  So, that all I have for that one.

24          What is our next matter?

25          MS. BOELTER:  Your Honor, that brings us to the

1  end of the agenda with the exception -- again, this is

2  Jessica Boelter for the debtors -- with the exception of the

3  two matters that we had held off on.  One was Agenda Item No.

4  14, the application to employ James Patton as the future

5  claimant's representative, and then Agenda Item No 19 which

6  is the Girl Scouts motion.

7           I understand that Mr. Harron was able to get Mr.

8  Patton on the line.  So, if I may, Your Honor, I guess I

9  would hand the virtual podium over to Mr. Harron and Mr.

10 Patton to address the court's questions.  Then, of course, we

11 understand that the court continues to have, at least, one or

12 two questions for the debtors on that application and I will

13 take those up at the conclusion of their discussions.

14           THE COURT:  Thank you.

15           MR. HARRON:  Hello, again, Your Honor.  For the

16 record Ed Harron.

17           Thanks for the time to allow us an opportunity to

18 get answers to the questions you had.  As Ms. Boelter noted,

19 Mr. Patton is on the line.  We have conferred with him and I

20 can offer you a reaction to the questions you had on

21 Paragraphs 12, 13 and 14, and then if you have any follow-up

22 questions Mr. Patton is on the phone to address them.

23           THE COURT:  Okay.

24           MR. HARRON:  With respect to Paragraph 12 you

25 wanted more information on Mr. Patton and Young Conaway's

1  involvements with the program.  Mr. Patton was a Cub Scout,

2  Boy Scout as a child in the 60's and 70's.  Since then he has

3  had no involvement with scouting.

4          As far as the team, Mr. Brady was a Cub Scout in

5  the 70's, has had no involvement since.  I was a Boy Scout in

6  the early 1980's and my son was a Cub Scout about ten years

7  ago.  But since that time I have had no involvement with the

8  scouts.  We are the only members of our team that have had

9  scouting involvement, but no one has current involvement.

10         Mr. Patton has reviewed these disclosures,

11  considered the issues.  He is confident that neither he nor

12  the members of his team have any emotional ties to the Boy

13  Scouts that would in any way impact his or the team's loyalty

14  to future claimants.

15         With respect to the Diocesan representation that's

16  noted at Paragraph 13 of the declaration Mr. Patton was a

17  senior member of the team and his involvement was more

18  consultant then courtroom.  He did participate in a mediation

19  before Judge Gross that ultimately led to a consensual

20  resolution of the case.  Mr. Patton was not involved in any

21  way in litigation regarding any of the sexual abuse cases

22  that led the diocese to file for Chapter 11.

23         Then with respect to the Delmarva Council that's

24  disclosed at Paragraph 14 of the declaration Mr. Patton had

25  no involvement in that representation.  None of the members

 1  of the team here at Young Conaway that will represent Mr.

 2  Patton had any involvement in that representation.

 3          As Your Honor noted, Young Conaway's participation

 4  in that engagement concluded in 2012.  We were substituted in

 5  by -- substituted out.  National council came in and we had -

 6  - our involvement in those cases was very limited.  And all

 7  the substantive work occurred after national council came in.

 8          Your Honor, those are the -- I'm hopeful that that

 9  answers Your Honor's questions and satisfies Your Honor's

10  concerns.  We're happy to put this information into a

11  declaration we could put on the record.  Mr. Patton is on

12  the line, as I mentioned, he could vouch for the accuracy of

13  these representations or if Your Honor has further questions

14  we'd be happy to address them.

15          MR. STANG:  Your Honor, this is Mr. Stang.  May I

16  make a comment?

17          THE COURT:  Yes.

18          MR. STANG:  James Stang for the committee.

19          Your Honor, I was committee counsel in the Diocese

20  of Wilmington Chapter 11 case.  I did ask either Mr. Harron

21  or Mr. Brady whether the Diocese of Wilmington was a

22  chartering organization for the Boy Scouts in which or

23  through which it was sued on account of any Boy Scout claims.

24  I simply don't recollect from the diocese case whether there

25  were any such cases.  They told me, in our due diligence

1  regarding Mr. Patton, that they were not aware of any claims

2  against the Diocese of Wilmington on account of its status as

3  a chartering organization by the Boy Scouts.

4        MR. HARRON:  That's correct, Your Honor.  We did

5  respond to Mr. Stang's inquiry.  His representation and

6  recollection is accurate.  We're not aware of any overlap

7  between the diocesan case and allegations of sexual abuse

8  against the Boy Scouts.  We did review our files in that

9  respect.

10       THE COURT:  Thank you.

11       MS. BOELTER:  Your Honor, this is Jessica Boelter

12 of Sidley Austin for the debtors.  If I may just respond to

13 the questions that the court posed with respect to the

14 debtors' analysis of this particular issue.

15       Your Honor, when we first approached Mr. Patton

16 back in December of 2018 it was after giving due

17 consideration and extensive consideration to the type of

18 process that the Boy Scouts of America may need to employ to

19 globally resolve sexual abuse claims asserted against the

20 organization.  As Your Honor is aware and as was reflected in

21 both the application and Mr. Patton's declaration Mr. Patton

22 has an exemplary record.  We, of course, posed the question

23 to him and his team as to whether they thought they had a

24 conflict with representing Boy Scouts, I should say the

25 future claimants in the Boy Scouts matter and they assured us

1  that they didn't.

2         Based on what we have heard today from Mr. Harron

3  I would just reiterate, I guess, my words from our original

4  first day hearing and the informational brief.  There are

5  over 130 million individuals that participated in scouting at

6  some point or another.  And 35 million individuals that have

7  volunteered in connection with scouting.  That doesn't

8  include the numerous parents, like Mr. Harron, and mothers

9  that are parents of individuals that have participated in

10 scouting.  What we have found is that is actually -- it can

11 be sometimes difficult to find individuals who have not been

12 touched by Boy Scouts and their movement in some way, shape

13 or form.

14         Based upon the remarks that Mr. Harron just made

15 we don't believe that that presents any meaningful

16 prohibition in terms of their, Mr. Patton's ability to serve

17 as the future claimants representative.  I would note that

18 the claimants that he is, in fact, representing were at some

19 point or another scouts.  So, his ability to have that

20 understanding of the organization, even though it dates back

21 to his youth, I think is probably a good thing for the folks

22 that he is here to represent, not a bad thing.

23         So, from the debtors' perspective, you know, we

24 stand behind our application and believe that Mr. Patton is

25 appropriate for this role in this case.

1                THE COURT:  Thank you.

2                Mr. Stang, do you have a view as to whether

3   victims of abuse would have a reaction one way or the other

4   to their proxy having been involved in the past as a Boy

5   Scout?

6                MR. STANG:  Your Honor, in a different context I

7   raised with the committee yesterday that someone associated

8   with case had been an Eagle Scout a number of the committee

9   members, at least one, tried to become an Eagle Scout but his

10  abuse experience prevented that process from being completed.

11  I was really looking, with a Zoom call, for the reaction to

12  whether being an Eagle Scout was, in effect, a disqualifier.

13  I didn't get that reaction at all.

14                I don't know that it helps or it hurts.  The

15  committee has considered Mr. Patton.  Its focus, actually,

16  was on his constituency as opposed to his scouting

17  experience.  And, honestly, I don't think that people would

18  feel that it's particularly relevant one way or another

19  especially given how long ago it was.

20                THE COURT:  Well, it was a question I had as to

21  whether Mr. Patton was an Eagle Scout or not. I take it not

22  because it wasn't mentioned.

23                MR. HARRON: I'm guessing, Your Honor by

24  (inaudible) diverged, but I will let him speak for himself.

25                MR. PATTON:  I apologize.  Your Honor, this is Jim

1 Patton.  If I may.

2          THE COURT:  Yes.

3          MR. PATTON:  I guess I'm testifying from the

4 phone.  The short answer is no, I was not an Eagle Scout.

5          THE COURT:  I wouldn't have bet on that.

6      (Laughter)

7          MR. STANG:  How many merit badges did he have?

8          THE COURT:  Ms. Boelter, I think the application

9 said that you interviewed three candidates.  Do you know

10 where the other two -- did the other two have some

11 affiliation with Boy Scouts as well?

12          MS. BOELTER:  Your Honor, I'm glad you raised that

13 because I did want to correct the record on that point.  The

14 application, and I apologize, I don't have the citation in

15 front of me, discloses that we considered multiple

16 candidates, but not that we interviewed candidates.  We did

17 not interview multiple candidates.

18          I will say, Your Honor, that had we been aware of

19 Mr. Patton having extensive experience with respect to the

20 Boy Scouts he likely would not have been on the list for

21 precisely the reasons that the court is raising today, but we

22 were not aware of that and we were not aware of him being

23 particularly active at all with respect to Boy Scouts.  As a

24 result it did not become a factor in our consideration.  He

25 was selected based upon his experience not only representing

1  future claimant's representatives in the past but also

2  serving as a future claimant's representative.

3          THE COURT:  Okay.  I would like a supplemental

4  declaration from Mr. Patton with respect to the matters we

5  have discussed.  And I'd like to see that before I make my

6  final decision.  I asked the question to Mr. Stang purposely

7  to see what his reaction -- what his response was.  It's

8  helpful to hear that perspective and I want to consider that

9  as well.

10          So, please get that on file promptly so that I can

11  handle this matter promptly.

12          MR. HARRON:  Thank you, Your Honor.  We will do

13  so.

14          THE COURT:  And if I have further questions I will

15  let you know.

16          MR. HARRON:  Understood.  Thank you.

17          THE COURT:  Thank you.

18          MS. BOELTER:  Your Honor, this is Jessica Boelter.

19  That brings us back to Item No. 19 on the agenda which is the

20  Girl Scouts motion.  I will hand the podium over to the Girl

21  Scouts attorney who is on video and on the line.

22          I would just note for the court, Your Honor, that

23  my partner, Andrew O'Neill, will ultimately be handling this

24  argument with respect to the motion when his time comes.

25          THE COURT:  Thank you.

1        MR. SCHNABEL:  Good morning, Your Honor.  It's

2  Eric Lopez Schnabel of Dorsey & Whitney on behalf of the Girl

3  Scouts.  Can you hear me okay?

4        THE COURT:  I can.

5        MR. SCHNABEL:  Great.  Your Honor, I think I', one

6  of those people who has some Skype problems because I can see

7  myself, Mr. Harron and Ms. Ringer, but, unfortunately, I

8  cannot see you.  I think it's more important that it work on

9  your end then on mine.

10       THE COURT:  Can others see me, because I'm getting

11 used to this and I was positive my camera was on.

12       MR. SCHNABEL:  I think, Your Honor, it might be a

13 Mac problem as opposed to a PC problem.  I don't seem to be

14 able to have a gallery view.  So, I only see four people at a

15 time and myself.  The rest are just kind of hidden without a

16 thumbnail picture.

17       THE COURT:  You have to click on that and my son

18 would be like rolling his eyes that I'm giving advice to

19 somebody on how to do this.  You click on a picture and pull

20 it up.

21       MR. SCHNABEL:  I'm a homeschooler now so maybe I

22 should get my son in here and help me, but I'm not going to.

23       THE COURT:  There you go.

24       MR. SCHNABEL:  Your Honor, I think at the outset

25 before we get into the lift stay motion we ought to handle

1  the motion to seal and those issues which we filed in

2  connection with the reply brief and a transmittal declaration

3  that I filed attaching two insurance policies.  If that's

4  okay, I think we should start off there.

5          THE COURT:  Okay.

6          MR. SCHNABEL:  So, Your Honor, when we read the

7  Boy Scouts objections that were filed last Monday or on the

8  31st, apologies, we noticed a reference to insurance policies

9  which we were not aware of before from the trademark action

10 because they weren't produced to us at that point, although

11 they should have been, but regardless we asked them for a

12 copy, they agreed to give us copies of the two insurance

13 policies under a professional eyes only basis which in an

14 email agreement we agreed to subject to that protective order

15 which has not been finalized.  It is still being negotiated.

16         So, we filed the two insurance policies under seal

17 and we also filed our brief, our reply brief under seal

18 because there are a couple provisions, sentences and

19 paragraphs, in there that we make reference to those

20 policies, what they mean, what they cover, what they don't

21 cover.

22         Your Honor, you know, we don't really take a big

23 position with regard to the insurance policies themselves;

24 although, frankly, I think with regards to the reply brief

25 Girl Scouts don't believe that the sentences in there and the

1  argument in terms of who are the insurers, what is the amount

2  of coverage, what claims do fall under the insurance policies

3  and what claims do not fall under the insurance policies.

4  You know, that is all we really got into in the brief and

5  that shouldn't be under seal.  But I will let the Boy Scouts

6  kind of carry the water on that one because it's really their

7  issue, not ours.

8         I do want to say, Your Honor, that for oral

9  argument today we discussed, you know, how to proceed and

10  what we have agreed is that when I get into the insurance

11  policies piece of the argument that I will name the policies,

12  I'll name the amount of coverage and I will disclose

13  provisions and speak to provisions that define claims and,

14  you know, which claims are excluded from our view under those

15  two policies.  I think I can do that verbally and point you

16  to the provisions in the insurance policies while we do that

17  without having to disclose anything more than that.

18         I will, obviously, speak a little slower then I'm

19  speaking now so that if I get into something they don't like

20  they have an opportunity object and we can discuss it at that

21  time.  So, Your Honor, with that, I think I will cede to the

22  debtors because it's really their document that they are

23  seeking to keep confidential.

24         THE COURT:  Okay.

25         MR. O'NEILL:  Hi, Your Honor.  Andrew O'Neill for

1  the debtors.

2        We did talk with Mr. Schnabel prior to the hearing

3  and are comfortable with the way in which he's going to

4  proceed.  So, he's going to cite certain things in the

5  policies and we're comfortable with that.

6        THE COURT:  Okay.  So, I take it the debtor still

7  believes that the insurance policies, themselves, need to be

8  under seal and that the reply brief, the way it's written,

9  needs to be under seal.

10        MR. O'NEILL:  Yes, Your Honor.  We think there is

11  some sensitivity there and as you know we're working through

12  the protective orders.  At this point I will defer to my

13  colleague, Mr. Andolina, a little bit on this point, but we

14  believe at this point they should be under seal.

15        THE COURT:  Okay.  Well, I'm for the moment I will

16  permit the insurance policies to be under seal.  I actually

17  didn't print out the unsealed brief so I'm not sure exactly

18  what was redacted.  But only those, you know, particular

19  sentences or paragraphs should be redacted.  The parties

20  should work to make sure that is the case.

21        I don't know -- well, that is what we will do for

22  now.  It will be subject to revisiting if anybody wants to

23  revisit the sealing and ask for permission to see this I will

24  deal with it then.

25        MR. O'NEILL:  Very good, Your Honor.  Thank you.

1          MR. SCHNABEL:  Your Honor, I think the next point,

2   administrative matter before we get into the motion is we

3   have, basically, three witnesses; one for the Girl Scouts, my

4   partner Chris Ewing, and two witnesses for the Boy Scouts.

5   What we have agreed to is to submit those three declarations

6   and their exhibits along with the two insurance policies and

7   my transmittal declaration to submit all that into the

8   record.  None of us are going to do any cross examinations of

9   the three witnesses and that way we can just proceed to

10  argument.

11         So, with that confirmation by the debtors I would

12  just say, I guess, that we should submit those three

13  declarations and then two insurance policies into the record.

14         MR. O'NEILL:  Agreed, Your Honor.  And to be

15  clear, the debtors' declarations are Rachel Kassabian at

16  Docket 322 and Brian Whittman at Docket 321.

17         Your Honor, both Ms. Kassabian and Mr. Whittman

18  are on the phone. As Mr. Schnabel noted there is no cross

19  that is planned, but, obviously, if Your Honor has questions

20  they're available via phone.

21         THE COURT:  Okay.  Those three declarations and

22  the other one is --

23         MR. SCHNABEL:  It's my transmittal declaration to

24  insurance policies.  Mr. Ewing is also on the phone, by the

25  way, Your Honor, in case you have any questions.  His

1  declaration was Docket 389.

2           THE COURT:  Yes.

3           MR. SCHNABEL:  And my transmittal declaration is

4  Docket 393 with the (indiscernible).

5           THE COURT:  Okay.  So those four declarations,

6  together with the exhibits, are admitted into evidence.

7           MR. SCHNABEL:  Thank you, Your Honor.

8           Your Honor, then, I think, unless anyone has

9  questions or so forth, and, obviously, if you have questions

10 during our (indiscernible), we would just the record being

11 closed, and we'll just move into oral arguments.

12          THE COURT:  Yes, record is closed.  We're moving

13 to argument.

14          MR. SCHNABEL:  Your Honor, thank you.

15          So, Your Honor, again for the record, it's Eric

16 Lopez Schnabel, Dorsey & Whitney, on behalf of the Girl

17 Scouts of the United States of America.

18          Your Honor, as you know, we've got quite extensive

19 briefing on this matter for today, and I just wanted to

20 address a few points and not rehash everything that's in the

21 briefing.  And I really want to make high-level points.

22          First, Your Honor, I want to discuss what the

23 trademark action of the Girl Scouts filed is about, and why

24 we filed it.

25          Second, I want to address the applicable legal

1  standards which involve harmonizing Federal Trademark law

2  under Lanham Act with the Bankruptcy Code.

3          And, finally, Your Honor, I want to address a few

4  points in the balancing of the harm's argument for the Boy

5  Scouts, on the one hand and, the Girl Scouts and the general

6  public, on the other, including what these declarations add

7  to that balance.

8          So, Your Honor --

9          THE COURT:  Okay.  Mr. Schnabel, before you start,

10  I'm sorry to interrupt, I thought I had something in front of

11  me that I don't, so give me a moment, and I'll be right back.

12  Let's take five minutes and then we'll proceed with your

13  argument. Sorry to disrupt you like that.

14          MR. SCHNABEL:  No, that's totally fine, Your

15  Honor.  No problem.

16      (Recess at 9:42 a.m.)

17      (Proceedings resume at 9:49 a.m.)

18          THE COURT:  . . . for the time, everyone.

19          MR. SCHNABEL:  Hi, Your Honor.  It's Eric Lopez

20  Schnabel for Dorsey & Whitney on behalf of the Girl Scouts.

21          THE COURT:  Thank you.  Let me make sure I've got

22  Mr. O'Neill.

23          MR. O'NEILL:  I'm still with you, Your Honor.

24          THE COURT:  Okay.  Mr. Schnabel, you can proceed.

25          MR. SCHNABEL:  Sure, Your Honor.  Let me just

1 start again because we're trying to tabulate the points I was

2 going to address in the argument today and (indiscernible)

3 many questions you might have.

4 　　　　　Your Honor, three main points.  First, I want to

5 discuss what our trademark action is about and why we filed

6 it.

7 　　　　　Second, I want to address the legal standards

8 under the Lanham Act and the Bankruptcy Code.

9 　　　　　And, finally, I want to address a few points, not

10 all of them, but a few points from the balancing of the harms

11 and the Boy Scouts, on the one hand, and the Girls Scouts and

12 the general public interest, on the other and including what

13 the evidentiary record you have before you add to this

14 balancing of the harm's analysis.

15 　　　　　So, Your Honor, in terms of point one, why do we

16 file trademarks November 2018?  Your Honor, in 2017, the Boy

17 Scouts announced that they were going to begin to allow girls

18 into the Boy Scout's program.  Now that's not an issue for

19 the Girl Scouts, that's not a problem.

20 　　　　　Boy Scouts have for years in other programs had

21 allowed girls to be members, but never in its Boy Scout

22 program which is kind of the 11 to 17-year old's program.

23 And it accounts for about 80 percent of their total

24 membership in the (indiscernible) declaration.

25 　　　　　Your Honor, it's not a problem that the Boy Scouts

1   admit girls.  The problem lies in the manner in which the Boy

2   Scouts have and continue to market themselves to girls.  They

3   can admit girls, but what they cannot do is market their

4   services to girls in a manner that infringes on the Girl

5   Scouts trademarks and exhaustible properties.

6           The Girl Scouts' trademark has, you know, its

7   exclusivity is based on federal law, Title 36 Section 80305.

8   And we have a very similar long history and mission as the

9   Boy Scouts do.  We just have always been about providing

10  leadership development services to girls.

11          And what the Boy Scouts have done in infringing on

12  our mark is they really have done it in three different kind

13  of categories, if you will.  One of them is the actual use of

14  Girl Scout marks such as Girl Scouts or the actual use of our

15  emblem which is, you know, clearly an infringement of our

16  trademark.

17          Second, they use terms such as scouts, scout man

18  or Scout USA when they're marketing themselves to girls and

19  that creates confusion in the marketplace about what

20  organization is marketing to these young girls and their

21  parents.

22          And, finally, there's been, because of this

23  confusion, Boy Scouts and representatives have told people or

24  have been misinformed and said that the two organizations

25  have merged and it's just one scouting organization now, as

1  opposed to what it's always been, it's two separate

2  unaffiliated organizations.

3          So, Your Honor, these are kind of the three

4  buckets as we set forth a lot of some examples, certain in

5  the complaint that was attached in our opening brief and then

6  (indiscernible) declaration.  But what I'd like to do is just

7  highlight a couple of them and I compiled some of the Ewing

8  exhibits into one PDF, and I've circulated this to the

9  debtors, the two committees, the future claim's rep and the

10  United States Trustee.  And if Your Honor does have that PDF,

11  I'd like to just quickly go through it.

12          THE COURT:  I do have it.

13          MR. SCHNABEL:  Okay. Great, Your Honor.

14          So if you, you know, Slide One is our interest

15  slide and everything here on the next slide, on the bottom

16  left, says what exhibit and the Ewing declaration and slide

17  comes from.

18          So if you go, Your Honor, to Slide Number 2, here

19  is a social media tweak or Instagram post that talked about a

20  Boy Scout charter opening for girls and they have, you know,

21  they tie in the Girl Scouts.  Now, again, this is not Girl

22  Scout chapter.  This is a Boy Scout chapter; yet, we're being

23  tied into this social media post.

24          If you go to Slide Number 3, you have kind of an

25  email flyer advertising a (indiscernible) troop, and it says

1   Girl Scouts BSA Troop.  And when you see that, it's very

2   confusing that whether is that the Girl Scouts or is it the

3   Boy Scouts, and this is a Boy Scout Troop, not a Girl Scout

4   Troop.

5            And you go to Slide Number 4, you have another

6   social media post that says Girl Scouts, Learning the

7   Skillset of Plumbing for the first time.  It says Girls

8   Scouts.  It has our hashtag, Girl Scouts, on it.  That

9   picture of that young girl she is not a Girl Scout. That is a

10  Boy Scout uniform.  She is -- this is a Boy Scout.  It should

11  be a Boy Scout post, but the Girl Scouts are being tagged

12  with this.

13           If you go to Slide Number 5, there's another flyer

14  which talks about a Girl Scout Troop.  This is not a Girl

15  Scout Troop. These two Troops that are in this flyer are both

16  Boy Scout Troops.  Again, we are being confused.  You can see

17  right below, Girl Scouts Troop, it's Scouts BSA.  That's the

18  Boy Scouts, not the Girl Scouts.  More confusion.

19           Same with Slide Number 6, another troop meeting

20  and it talks about Girl Scout Troop.  This is in between the

21  two circles.  This is not a Girl Scout Troop.  The same, Boy

22  Scout Troop.  They're using our trademarks to market

23  themselves.

24           Look at number 7, Slide Number 7.  This is a

25  social media post with someone very happy that they bought a

1   kettle of corn, and they say it's from the Girl Scouts. Girl

2   Scouts do not sell corn.  We sell cookies, like everybody

3   knows.

4          Corn is something that the Boy Scouts sell, but

5   this is not -- this picture of this young girl is not a Girl

6   Scout.  She is a Boy Scout selling corn. Again, the public

7   does not understand and is confused about who's doing what.

8           If you go to Slide Number 8.  These are two, on

9   the left and right, we have two different advertising

10  messages.  The left is a Boy Scout advertisement.  The right

11  is a Girl Scout advertisement. They're very similar and it's

12  hard to tell the difference between the two.

13         Next page, Slide 9.  You have an advertisement on

14  the left for the Boy Scouts; an advertisement on the right

15  for the Girl Scouts.  Again, very similar, really difficult

16  to tell the difference between the two.

17         And Slide 10, same thing.  This is girls doing

18  sign things.  Right is a Girl Scout advertisement, left is a

19  Boy Scout advertisement.  And all it says is Scout man.

20  Difficult to tell.

21         Your Honor, you get into more recent times because

22  some of those were over the past couple of years or year.

23  Just this year, we got a flyer that says (indiscernible) sent

24  out.  And if you look at the circle we've drawn on the flyers

25  that emblem there is the Girl Scout emblem, not the Boy Scout

1  emblem. That's our emblem, that's our mark, and it's been put

2  on an advertisement to join a Boy Scout Troop.

3          We sent this (indiscernible) whether it's the

4  Local Council for this and the Boy Scouts have not responded

5  to it.  And usually when we would send prepetition

6  (indiscernible) so we'd send them both to the Local Council

7  and to the National Organization.  And this one he didn't

8  because of the automatic stay, but sometimes they've

9  responded anyway.

10         And if you go to Slide 12, here's another example.

11 There's a flyer.  This is in Exhibit 11.  There's a flyer

12 that was sent out and the person who downloaded the flyer

13 from the National Organization kind of brand center, where

14 they can download material and send it out, called the PDF

15 Girl Scouts flyer 2020 and it's not a Girl Scout flyer, it's

16 a Boy Scout flyer.

17         We sent a cease and desist letter out to the Local

18 Council, the National Organization, not the Local.  And their

19 response to that and said oh, there's nothing confusion, you

20 know, about this and the reality is there is because this

21 person was sending it out thinking it was a Girl Scout item

22 when it's really a Boy Scout item.

23         Slide 13, there's a couple, another example in

24 Ewing Exhibit 12 of these is we're doing and some people who

25 are speaking out about the abuse claims and the Boy Scouts

1    are putting up some social media post.  And then they add the

2    Girl Scout hashtag, so we're being tied, you know, tagged

3    with this abuse claim concern.

4           And, you know, that's very alarming to us because,

5    you know, we understand the abuse claims and the Boy Scouts

6    bankruptcy and so forth, but the Girl Scouts don't have that

7    problem.  And here, we're being -- our brand and our image is

8    being tarnished because being pulled into that because people

9    are confused and they're seeing this as the same entity.

10           And, Your Honor, the last slide is what's on the

11    current website of the Boy Scouts of America.  If you go on

12    there and look at their programs on the first page, you'll

13    see the Scout BSA Program with a girl rock climbing.

14           And, you know, two years ago for decades as long

15    as there was internet or through hard media type of pamphlets

16    that wouldn't be a picture of a girl.  It would always be a

17    boy.  And it wouldn't say Scout BSA.  It would say Boy Scouts

18    because that was the name of the program until they rebranded

19    themselves.  So, Your Honor, that's the context of these

20    issues that the Girl Scouts faces and that's why we brought

21    the trademark action.

22           Now, you know, we have examples and there was some

23    briefing about that there's no post-petition examples, but as

24    the Ewing declaration makes clear, we have post-petition

25    examples. So, as we were facing this mixing of messages and

1   infringement of our trademark, we began for over a year

2   sending letters -- and the Ewing declaration sets forth many

3   of these, you know, pointing out problems, asking for the Boy

4   Scouts to correct this.  And those discussions and those

5   letters did not resolve in anything satisfactory for us.  And

6   so, we were forced then to protect our mark to file the

7   trademark action.

8          And one thing just to note because I made a big

9   deal about this in the briefing that we did not, you know,

10  seek for a TRO or preliminary injunction.  Well, we tried to

11  work with them for a year and when you do that and then you

12  file a suit, it's a little bit difficult; in fact, in the

13  Second Circuit, it's pretty much impossible to then move for

14  a TRO or PI if you've waited too long.

15         So, in essence, you know, no good deed goes

16  unpunished. We didn't want to file this lawsuit and we tried

17  to work it out and that's why we don't have, you know, a

18  motion for a TRO or PI in the trademark action.  And, Your

19  Honor, even after we filed the lawsuit, we tried to resolve

20  this and, unfortunately, we can't.  And that's why we filed

21  this motion.

22         Your Honor, I think you may recall in March 24th

23  at the preliminary hearing for this, we did let the court

24  know in terms of the District Court Judge's order that we

25  file a motion and move promptly for a stay relief or he was

1  going to dismiss the case, which is what we've done.

2          So, Your Honor, that's the context of what we've

3  done of the harm and confusion with our trademark that's out

4  there, and there's more evidence then just what we put

5  forward, but we've given you a sampling.

6          Your Honor, point number two and what I'd like to

7  talk to you about now is the case law.  And how the Lanham

8  Act interplays with Bankruptcy Code which is a little bit

9  different than any of the other cases; frankly, all the cases

10 that the Boy Scouts cite in their brief.

11         And we said in our opening brief and as we really

12 expanded upon in our reply brief, the purpose of trademark

13 law, the paramount purpose of trademark law is to protect the

14 public from confusion.  It's not the trademark holder.  It's

15 not the Girl Scouts.  It's to protect the public from

16 confusion.

17         And this has been, this is legislative history.

18 This is case law all across the country for many decades.

19 It's black letter law and we cite some, most importantly for

20 this court, Third Circuit cases that say just that.

21         And if you look at the Scott Paper Company case,

22 which is 689 F.2d 1225.  You know, you look at the Island

23 Insteel case which is 296 F.3d 200.  And even the District of

24 Delaware the Acxiom court case which is 27 F.2d 478, all

25 consistently say that the paramount purpose and the driving

1   force of trademark inference claims and injunctive relief

2   with respect thereto is to protect the public.

3           And, in fact, the Second Circuit said in S&R which

4   is 968 F.2d at 378, "Trademark infringement amounts to

5   irreparable injury as a matter of law."  And I think that's

6   very important because it's not like a traditional patent

7   infringement or copyright infringement or other kind of

8   litigant claim.  Trademark infringement is to protect the

9   public and it's irreparable injury as a matter of law, and

10  that's to protect the public.

11          Your Honor, the Boy Scouts assert that, you know,

12  virtually every court that's decided the issue the automatic

13  stay prohibits pursuant of injunctive relief claims.  But

14  these are trademark injunctive relief claims and that's a

15  very big distinction.  And that's why the Sixth Circuit,

16  which his something we put in our opening brief which Boy

17  Scouts ignored in their objection, which I don't know why, is

18  directly on point on this.

19          And what the Sixth Circuit said, which is a 2012

20  case.  It's after Spansion and after a lot of the cases they

21  cited, more recent case, is the Sixth Circuit said that in a

22  trademark context that the automatic stay was not applicable

23  for post-petition trademark injunctive relief.  And I think

24  that ties back into the Third Circuit and all the other

25  circuits, you know, mandate that trademark is about

1  protecting the public goods.

2          When you compare the Dominic case and the other

3  cases that are on point and there are not a lot of trademark

4  cases and stay motion cases out there; when you compare that

5  to what the Boy Scouts cite, you realize how -- what they're

6  focusing on is not applicable.

7          If you look at Spansion or you look at the

8  (indiscernible) case.  These are patent infringement cases.

9  They are not trademark infringement cases.  And that's a very

10  important distinction because in the Spansion case, you know,

11  you do an analysis like you a traditional lift stay motion

12  between the balancing of the debtor and the creditor and the

13  other side.  But in a trademark case you have to include the

14  public interest in that balancing, and that public interest

15  is for the stay to be lifted.  And that's why the Sixth

16  Circuit didn't even think the stay applied with regard to a

17  trademark infringement claim and an injunctive relief.

18          And we know that difference exists and the Third

19  Circuit has even told us that difference exists between

20  patent law and trademark law.  And that's in the Duraco

21  Products case which is 40 F.3d at 1431 which contrasted

22  patent law provision and trademark provision.  Patent law

23  purpose is to basically, you know, encourage innovation by

24  protecting the person who denies the product.

25          And if you have continuing infringement in

1  patents, you can award more damages for the patent holder.

2  You cannot do that in trademark.  The Girl Scouts cannot get

3  more money for damages and have that remedy, the purpose of

4  trademark law because it's to protect public confusion.  And

5  only injunctive relief will do that.

6        Giving the Girl Scouts more money doesn't remedy

7  anything for the public.  And that's why trademark is very

8  unique compared to a patent case where you could just invoke

9  the stay and the person might have a bigger claim and that's

10 not a big deal. Trademark is different.

11       Trademark is unique.  Our motion is unique, Your

12 Honor, and our claim is unique.  And that's why all these

13 arguments in terms of that we need to get in line, just like

14 every other creditor, is really inapplicable because the

15 public should not get in line like every other creditor.  The

16 public has an interest.

17       Your Honor, moving to kind of my last global

18 point, which is let's apply this law to the balance of the

19 harms, and I really want to touch upon four things.

20       One, I want to go through the declarations, the

21 three of them that you have, and the alleged distraction that

22 the Boy Scouts assert.  Two, I want to talk about the alleged

23 cost of the litigation and its applicably here to the balance

24 of harms.  I want to talk about quickly a comparative harm to

25 the Girl Scouts if the stay is not lifted, and also the

1  comparative harm to the public if the stay is not lifted.

2         Your Honor, what you have in the record in terms

3  of evidence are three declarations.  And if I may just start

4  with the Whittman declaration which, frankly, is really I

5  think irrelevant for the most part for your analysis because

6  it sets forth numerous things that the Boy Scouts have done

7  in the bankruptcy case and numerous things that the

8  restructuring professionals need to do or challenges with

9  COVID.  But it doesn't really tie any of that in terms of

10 what has to happen with regards to the trademark action.

11        There's one sentence that have the trademark

12 action and that's the last sentence in the declaration which

13 is, frankly, just a conclusory statement.  It doesn't really

14 get into any facts.  And so, you know, the Whittman

15 declaration, frankly, could have been filed in any opposition

16 to lift stay motion.  You just have to change the names and

17 some of the, you know, specific facts in terms of, you know,

18 how busy they've been.

19        I think the -- and I hope I don't pronounce here

20 name incorrectly, the Kasabian (phonetic) declaration, you

21 know, gets more into some of the details that are actually

22 relevant.  Now one thing that the Kasabian declaration does

23 is it does spend a lot of time about the litigation and who's

24 been more aggressive and so forth, and we dispute that.  We

25 think the Ewing declaration counteracts that sufficiently,

1  but we don't really believe that that's the relevant inquiry.

2         The relevant inquiry is really what's the balance

3  of the hardships.  And the Kasabian declaration makes really

4  two points.  One, it's about everything that needs to be

5  accomplished in the trademark action, you know, that remains

6  there to be done, and that's at paragraph nineteen of her

7  declaration.

8         And the second point that she makes is with regard

9  to the substantial cost, alleged substantial cost and time

10  commitment for a trial, if a trial happens for certain of the

11  management people, and that's at paragraph twenty-one and

12  twenty-two of her declaration.  And let me contrast these two

13  assertions by Ms. Kasabian with Mr. Ewing's declaration.

14         Paragraph nineteen of the Kasabian declaration she

15  sets forward eight to do's, if you will, tasks that need to

16  be run through in the trademark action.  And, frankly, it's

17  (a) through (h).  And, frankly, Your Honor, task (a) through

18  (g) are all very lawyer intensive non-restructuring lawyers

19  and expert intensive non-restructuring experts.  It's only

20  (h) where you have a jury trial where actually clients will

21  have to do something, but not all of them.

22         The Ewing declaration, Your Honor, at paragraph

23  twenty through twenty-two doesn't really disagree with what

24  tasks are left in the trademark action.  Both witnesses are

25  relatively in agreement; you know, small differences but not

1   on a high level.

2          And I think the issues that many months of expert

3   reports, rebuttal reports, and summary judgment motion

4   practice will occur before this case is trial ready.  And all

5   those things are going to be handled by Quinn Emanuel and

6   Dorsey trademark lawyers and experts who are not Alvarez and

7   are not AlixPartners and are not, you know, people who are

8   involved in this bankruptcy case.  They are all trademark

9   people and it really is not going to be a distraction of any

10  significance.  And the only issue becomes potentially when

11  there's a trial which, again, would be, at the earliest, at

12  the end of this year or, perhaps, the beginning of next year.

13         Ms. Kasabian at paragraph twenty-one and twenty-

14  two talks about the supposed substantial costs on the Boy

15  Scouts, and also talks about the, you know, distraction for

16  having a trial.  And it talks about, you know, the number of

17  witnesses and the location of the witnesses, and that such a

18  trial would, this is paragraph twenty-two, would, "Would

19  Impede from performing their usual day-to-day

20  responsibilities and/or supporting the restructuring

21  efforts."

22         And I think the word and/or in there is quite

23  significant in paragraph twenty-two.  It's not and that these

24  members, and I think she lists eight of them, that these

25  members that she lists that are important witnesses that they

1  are all involved in a restructuring, that would be and. It's

2  or.  So some of them are involved in the restructuring and

3  some of them are not.

4        And we submit and the Ewing declaration at

5  paragraph twenty-three and twenty-four, it challenges that

6  statement in that the or really only applies to one

7  individual.  It's the assistant chief scout.  That's really

8  the one individual who is operational, in some ways, but it

9  was proposed and it would be a potential witness at a trial.

10  Everyone else, you know, is not really of the high-level

11  senior management.

12        And how do we know what the high-level senior

13  management is?  Well, the Ewing declaration puts -- you know,

14  went to the website and found out who the top ten people

15  were.  They list them.  And none of these eight people in the

16  Kasabian declaration are on there, except for the assistant

17  chief scout executive.  In fact, the CEO, Your Honor, the

18  chief scout of the Boy Scouts is new; was never deposed in

19  the trademark action and neither was the CFO, nor the CFO's

20  financial team.  And those are the people who are going to be

21  required for the bankruptcy, not -- and they're not going to

22  be involved in the trial.  And I think, again, the trial is

23  not tomorrow or next month.  It's in, perhaps, you know, six

24  to ten months.

25        Your Honor, I think when you look at the competing

1   declarations here and really harmonize them for what they say

2   is that I think it's crystal clear if you lift the automatic

3   stay today that starting tomorrow, there's going to be two or

4   three months of expert reports.   Then there's going to be --

5   you know, which includes rebuttal experts.   Then there's

6   going to be a couple of months, one or two months of expert

7   depositions.   And then there's going to be the Boy Scouts

8   want to file summary judgment motion.   That's going to be

9   two, three, maybe four months of briefing until there's a

10  decision.

11          So, you're very easily five, six, nine months out

12  before this case is trial ready, before that one person who's

13  on the Boy Scot's senior management executive team would have

14  to travel to New York or through Skype to deal with it.

15  And, frankly, you know, if there's an issue going on in this

16  bankruptcy case, for example, that in January of next year

17  there's a confirmation hearing and the trial was also going

18  to be set the same time, that's something that Your Honor and

19  the District Court can manage.   The District Court can manage

20  its docket, not to interfere with the bankruptcy, and we

21  really don't see that as being a realistic fear.

22          THE COURT:   It's interesting, Mr. Schnabel, you

23  have the opposite argument that most people make.   Most

24  people make trials right here.   It's ready to go.   We need

25  the stay lifted.   You're arguing the fact trial is far away

1  and there's going to be incremental steps and so, there's no

2  harm.

3        MR. SCHNABEL:  Well, Your Honor, that's very true.

4  And usually that lift stay movement you have before you is

5  someone who purely has a legal claim, purely has prepetition

6  damages claim.  And the same -- look, all the work is ready

7  to be done.  Let the trial happen because that would be the

8  most efficient way to liquidate the claim.

9        That's the caboose of our argument.  Because the

10 engine of our argument is we have ongoing infringement today

11 and we have a right to seek an enjoinment and get injunctive

12 relief to stop that infringement.  And that has nothing

13 really to do with the prepetition liquidation of damages.

14       Now, we argue that it's most efficient to have

15 everything go forward in one forum than split it, but the

16 point is if the trial were tomorrow, you know, they would

17 have a different argument saying we're just starting the

18 case.  We need a breathing spell.  If the trial is tomorrow,

19 I can't have my assistant chief scout be there for a couple

20 of days or what have you.

21       But the trial is going to be, come at a point in

22 time where (indiscernible) plenty of a breathing spell.  And

23 the issue is that unlike a prepetition damages creditor who

24 can get in line just everybody else and wait, we shouldn't

25 have to do that.  It wouldn't be harmed if they get in line

1  and have to wait, just like everyone else.  There's really no

2  harm to liquidate your prepetition claim now versus six

3  months.  But there is harm in adjudicating the injunctive

4  relief piece, you know, in six, seven, eight months versus a

5  year or longer.  And the harm to that is that they keep

6  infringing.  We keep getting confused with Boy Scouts.  We're

7  getting dragged into abuse allegations with Boy Scouts by

8  social media posts tagging us when we don't have that

9  problem.  And that's the difference.

10      And I think the difference also is obviously the

11  public interest in that which an ordinary movant for lift

12  stay who has a prepetition litigation claim, there is no

13  public interest in that balancing.  In the Spansion case,

14  there's no public interest in the patent infringement, but

15  there is in trademark, and that's what the Third Circuit

16  tells us.

17      Your Honor, let me address the cost issue of the

18  litigation.

19      The Boy Scouts, you know, argue that there would

20  be a cost here.  It would cost a tremendous amount of money

21  if this -- if you lifted the stay.  Well, first of all, the

22  reality is our injunctive relief is going to get litigated

23  somewhere, someplace, sometime, one way or the other.  Our

24  post-petition administrative expense claim is going to get

25  liquidated and allowed or disallowed, at some point in time,

1  you know, in someplace, and the same with our prepetition

2  damages claim.  All three of those things have to happen, so

3  there is no real savings if you don't, you know, deny the

4  lift stay motion.

5         Ordinary lift stay claimant, you could deny the

6  lift stay motion and maybe they settled because it's a two-

7  cent case, and they realize it's not worth fighting.  That's

8  not going to happen to us because the injunctive relief is

9  the driver for this.  The money damages are important, of

10  course, but the injunctive relief is the driver.

11         And so, denying the motion is not exactly going to

12  and waiting to see what the distribution is going to be to

13  unsecured creditors is it's not going to help resolve this in

14  any way, unlike an ordinary lift stay claimant.

15         Your Honor, I think one of the important pieces

16  besides that its going to get liquidated one way or the

17  other, so you're not going to save any money is something

18  that we didn't know about before the bankruptcy filed.  And

19  what we didn't know is about the insurance because these were

20  not produced to us.

21         And what the insurance policies provide for, and

22  if I could try to point this out to you quickly in its

23  provisions, is they provide for both one is a $15 million

24  dollar policy and the other is a $10 million dollar policy.

25  And what they provide for is they provide coverage, both of

1  them expressly, for trademark infringement; both costs and

2  liability coverage.

3          And what they do not provide for one of them,

4  because of what the nature of what kind of insurance policy

5  it is, and the other one expressly, they do not provide for

6  any coverage for abuse claims.  The survivors and the tort

7  committee are not going to be looking at these two policies

8  for recovery and, frankly, I'm not sure what other claimant,

9  creditor at all, besides us, besides the Girl Scouts, could

10 you know, could have a claim that's applicable to these two

11 policies.

12         So in terms of dissolution of the estate or even

13 if there's some dissolution of these policies, there's really

14 no harm to anyone else.  And having applicable insurance is

15 an important element in allowing lift stay motions.  Usually

16 if you have insurance, the debtors would stipulate to it.

17         So, Your Honor, if I may, I can point you out to

18 those provisions in the policies because they are a little

19 bit hard to read.  Do you have my transmittal declaration in

20 front of you and the two insurance policies?

21         THE COURT:  Yes.

22         MR. SCHNABEL:  Okay.  Your Honor, I'm looking at

23 the Beasley (phonetic) policy.

24         THE COURT:  Okay.

25         MR. SCHNABEL:  So, Your Honor, if you go to page 4

1   of the PDF which actually at the bottom-right it says page 3

2   of 4, but it's 4 of the actual document, and there's a chart

3   of coverage schedule.

4           THE COURT:  Okay.

5           MR. SCHNABEL:  Okay. So if you look about towards

6   the bottom there's a liability heading, and then below that

7   it says media liabilities $15 million dollars.  This is a

8   list of all the different coverages that this policy gives.

9   And this is what's called a cyber policy basically.

10          And, you know, nothing in here like eCrime or so

11  forth really lends itself to any kind of abuse claims.  But

12  if you go to the definition of media policy which is at page

13  39 of the PDF.  And so, what you have to do is basically go

14  about halfway into the document and the page numbers start

15  saying, you know, page 7 of 23 or what have you.  And I'm

16  looking at page 10 of 23.

17          THE COURT:  Okay.

18          MR. SCHNABEL:  Okay.  So 10 of 23, it has a

19  definition of media liability which includes the insured

20  organization which is the Boy Scouts. And if you look at

21  number six, it has infringement trademark, tradename, trade

22  address, logo.  So, this policy clearly applies to our

23  trademark claim.

24          And if you look at the rest of this policy,

25  there's nothing in here about a tort type claim, abuse

1   claims.  And there's no express carve-out, just like your --

2   an insurance company can't carve out everything single type

3   of claim because if they miss one, they might, you know, by

4   reverse implication they might agree to cover that.

5          So certain types of policies will not, you know

6   would carve-out tort things, others wouldn't.  So abuse

7   claims, for instance, wouldn't be carved out in insurance

8   policy because it's an auto insurance policy and it makes no

9   sense.  And that's the same as the cyber policy.  There's

10  nothing in here that gives rise to a tort type abuse claim.

11         If you go to the second insurance policy on there

12  which is the RSUI policy.

13         THE COURT:  Okay.

14         MR. SCHNABEL:  And then you look at page number 2

15  of that policy, you see how it's a $10 million dollar

16  liability limit on item four and item three says, third party

17  liability coverage.  Yes.  This is almost a D&O type policy,

18  but it includes third party liability.

19         So now we have to go to page 47 of the PDF.  And

20  if you go about halfway into the document, maybe if you cut

21  it in half and start flipping through it, you're going to see

22  a section of the document that has a box around the page.

23  There's about four pages, and they have a box around it.  And

24  the title to that page, if I can find it here, is Directors

25  and Officers Liability Coverage Section, so the page is

1  framed around it.  It's at page 47 of a 62-page document.

2            THE COURT:  Okay.

3            MR. SCHNABEL:  All right.  And in that section one

4  that says insuring agreements, and then Section 1(c) says

5  insured organization.  So, it's not only the D&Os, but the

6  entity itself.

7            And then when you go to the page or, sorry; two

8  more pages after that, it says page 49 of the PDF.  It has

9  the definition of personal injury, wrongful act.

10            THE COURT:  Yep.

11            MR. SCHNABEL:  Okay.  And that F-4 there says,

12 Infringement of Copyright or Trademark.  And personal injury,

13 wrongful act is a wrongful act and that loops back up to the

14 coverage above.

15            And if you go two pages before that section,

16 earlier in the document before the directors and officer's

17 liability coverage section, go two pages before that.

18 There's a Texas-exclusion-sexual misconduct and child abuse.

19            THE COURT:  I see that.

20            MR. SCHNABEL:  Okay.  So that's the exclusion that

21 said that this policy is not available for claims of sexual

22 misconduct.  So, again, this is like the first policy.  This

23 $10 million dollars of coverage does apply to our claim or,

24 arguably, the insurers probably reserve the right, et cetera,

25 but, but it does not apply to abuse claims.

1          So, the whole point of this, Your Honor, is that

2    there is insurance here that is not going to our claim, our

3    damages claim, pre- and post are not going to dilute recovery

4    to survivors.  The abuse claims and survivors are not going

5    to be looking at these insurance policies because they're not

6    applicable to them.

7          And, in fact, the argument about how expensive the

8    litigation will be and so forth if it keeps going, which is

9    going to happen one way or the other is frankly not going to

10   diminish recovery for very much of any creditors at all

11   because these insurance policies are there and they cover us

12   and they don't really seem to cover anyone else, unless

13   there's another trademark claim or another D&O claim which,

14   you know, we're not, at least, aware of it.

15         So the insurance -- you know, the cost issue, the

16   alleged issue of cost here is going to happen one way or the

17   other and we have insurance to back it up anyway.  So that's

18   not really an argument that lends itself to deny the motion.

19   In fact, it's an argument that the motion should be granted.

20         Your Honor, let me quickly touch about the

21   comparative, you know, relevant inconvenience that the Boy

22   Scouts have mentioned to the harm of the Girl Scouts and the

23   harm to the general public.

24         Your Honor, as prior examples that we went through

25   show we are continually having confusion and misappropriation

1  of our marks by the Boy Scouts and the marketing of their

2  services to girls.  And that harm is continuing and, in fact,

3  just today we discovered another example and that's a website

4  that says discovery, connect, take action, which is Girl

5  Scout's terminology.  That's or mark, that's our slogan, not

6  the Boy Scouts.  Someone out there in the Local Council is

7  putting that up on a Boy Scout's website for, you know,

8  trying to get girls to join the Boy Scouts.  And we're going

9  to send them a cease and desist letter.

10           And part of the problem with waiting with any

11  delay in this is, any further delay in this is that, you

12  know, even with the COVID situation is a lot of the

13  infringement is harder to monitor and discover.  Things are

14  much more online now in terms of recruiting and much more

15  online now in terms of communications, Zoom communications,

16  et cetera and so forth, and that's hard for us to manage.

17           I mean you look at our complaint, you know, flyers

18  or they had posters out in front of the school or a church

19  that says, you know, Boy Scouts, Girl Scouts, you know, join,

20  but was it a Boy Scout thing or was it us.  Those are easier

21  to see.  It's getting a little harder to see now, and we

22  shouldn't have had our -- shouldn't have this continual harm

23  happen to us, this continual brand dilution happen to us, you

24  know, with this stay being --

25           THE COURT:  That's actually counterintuitive to

1  me.  As I was thinking about this and thinking about the

2  effect of COVID-19 on this, I thought well more will be

3  online and there will be less recruitment, but you're telling

4  me that's -- and I would have thought more online would be

5  easier to spot it, if you will, but you're telling me that's

6  not the case.

7          MR. SCHNABEL:  Well, I think, Your Honor, the

8  recruitment is moving online, right, so it's less in person

9  and more online.  And the problem with the online recruitment

10 from a monitoring perspective, you know we don't have some

11 agreement to monitor what gets sent out.  We have to somehow

12 find it.  And someone out in the public has to see something,

13 an, i.e., be on an email distribution list.  You know, we're

14 not on it.

15         Somebody out there in the public who they're

16 trying to bring into the Boy Scouts organization has to be in

17 that email, realize it's a problem and send it to us or we

18 have to monitor, you know, online social media post to see

19 where we're being tagged and which is how we found these

20 abuse claims.

21         So, some of this is -- yeah, some of it you might

22 be able to search on the web and it would be a little easier

23 than people driving around looking at posters, you know,

24 outside of church or a school that's having a meeting which

25 inappropriate using us, but other things are going through

1  email which are harder for us to be a part of if we're not

2  part of the email and no one is telling us what's in the

3  email.

4          THE COURT:  That's fair enough with the emails.

5          MR. SCHNABEL:  Yeah, so there's some difficulty.

6          But the point is it's happening.  You know, it's

7  continued to happen and we gave you the post-petition

8  examples, and the Ewing affidavit declaration.  That's

9  continual harm to us and it's continual harm to the public.

10 The public continues to be confused.  And, again, as the

11 Third Circuit said and all the trademark law says is that the

12 public interest is paramount in protecting them from

13 confusion.

14          Your Honor, I think one thing to point out too

15 with delay is that our post-petition claim increases the

16 longer this continues.  I mean the UCC actually made that

17 point and its limit to joinder.  The longer we go, the bigger

18 administrative claim we have.  And, you know, that's usually

19 not -- that's not the case in the run of the mill garden

20 variety lift stay motions.  They don't have an increasing

21 post-petition claim.  They don't have injunctive relief, the

22 cease and desist post-petition conduct. We have both those

23 things that, frankly, makes us unique.

24          So, Your Honor, really in closing, what we're

25 asking the court to do is to lift the stay so that we can

1   have our real day in court.  And, more importantly, so that

2   the public interest can be protected from confusion between

3   these two different brands and that's what the Third Circuit

4   tells us to do.

5          Your Honor, if the Boy Scout's objection is

6   successful then the result of that is going to be the Boy

7   Scouts, they're not going to settle with that.  They're not

8   going to allow us to go forward in court to protect our

9   trademark, to protect the public.  And it's going to allow

10  the Boy Scouts to continue to engage in marketing practices

11  that violate our trademarks and confuses the public.  And, in

12  fact, the most egregious conduct could happen like the flyer

13  that has our emblem on it.  And we wouldn't have any

14  recourse.  And that's why the lift stay has to be granted so

15  that we can have that recourse and be able to move forward to

16  get a trial, to get this thing resolved one way or the other.

17         Your Honor, we're not like every other creditor,

18  as they state.  In fact, we're very unique.  I have never

19  experienced a trademark lift stay motion, and it's different.

20  All their cases that they cite in their brief are not

21  trademark motions.  The balance and the harm analysis in

22  those cases are inapplicable because the public interest is

23  not paramount which it is in our case.

24         THE COURT:  Well, I agree with you, Mr. Schnabel,

25  that's it's a little different.  And I don't hear you saying

1  that there's not a public interest in bankruptcy

2  reorganizations and providing debtors' time to reorganize.  I

3  hear you saying there's a competing public interest that is

4  both proprietary to the Girl Scouts but, more importantly,

5  the public interest and not having confusion out there

6  between the Boy Scouts and the Girl Scouts, and that that

7  public interest has to be weighed in the balance, and that is

8  a public interest component that we don't normally see.

9          Am I right on that?

10         MR. SCHNABEL:  I think you are, Your Honor, and I

11  think you're articulating it in a great way. Because the

12  public interest to see a restructuring occur, right, to allow

13  the Boy Scouts under Federal Law to restructure themselves.

14         It's not going to be enjoined if you lift the stay

15  for our trademark action.  Right?  There's no injunction

16  prohibiting the Boy Scouts from moving forward with their

17  bankruptcy.  And the people who are pushing the bankruptcy

18  forward, working the bankruptcy are not the trademark lawyers

19  and not the trademark experts.

20         Alternatively, if you -- so that public interest

21  will go forward if the trademark action is allowed to

22  proceed.  There's no injunction for that.  If you don't lift

23  the automatic stay, Your Honor, there will be an injunction

24  with regards to the public and just concern of trademark

25  protection and to prevent confusion.  There is an injunction

1  right now with regards to trademark protection and public

2  confusion.

3         So if you're balancing this kind of a public

4  interest, if you will, on the two sides which is the greater

5  harm would be in denying the motion then it would be in

6  granting it because, again, granting the motion does not

7  enjoin the debtor at all.  The debtor just has to move

8  forward.

9         And yes, Quinn Emanuel and some experts are going

10 to work on expert reports, but none of that is going to

11 distract or prevent the restructuring from occurring.  And I

12 think that's why the balance, this trademark issue is

13 different and why somebody like the Sixth Circuit basically

14 said for injunctive relief, the (indiscernible) doesn't even

15 apply.

16        You know in our brief we say in our reply brief,

17 Your Honor, you don't have to make that determination whether

18 it applies or not because we believe under cause we've shown

19 cause, just for the same reason I articulated.  Denying the

20 motion stays the trademark action.  Granting the motion does

21 not stay the bankruptcy.

22        So granting the motion allows both public interest

23 components to move forward in some fashion.  And we don't

24 believe it will be overly distracting.  It's, at best, minor.

25 And in trademark the public interest is the greatest concern.

1  In bankruptcy, I don't think the public interest is

2  necessarily the greatest concern.

3        I mean the public is served by the bankruptcy

4  process, but you know plan confirmation or the business

5  judgment of the debtor to do, you know, to reject the

6  contract or what have you, you know the debtor has its

7  interest, creditors have their interest, the committee,

8  lenders, and there's a Code, Your Honor, in which courts

9  will, you know, calls the balls and strikes with regard to

10 that.  It's not the same as the paramount public interest and

11 trademark.

12       You know, I don't think there's Third Circuit law

13 that talks about the paramount public interest of a debtor

14 not having slight distraction because its trademark lawyers

15 have to litigate a trademark action.  So, we think you could

16 look at the two, but the scale heavily weighs on lifting the

17 stay because, otherwise, there is an injunction on that

18 public interest component.

19       THE COURT:  Thank you.

20       MR. SCHNABEL:  So, Your Honor, just in closing, we

21 ask that the court grant the motion.  We don't believe we're

22 like every other creditor.  We think we're unique. We think

23 this trademark claim is unique in the lift stay context.  And

24 we think that the injunctive relief component of our claim

25 has to go forward in order to serve the public interest

1  appropriately and protect our rights.  And that the damages

2  component ought to go forward as well and be liquidated in

3  the Southern District because that's the most efficient and

4  economic way to do it for the parties and for judicial

5  economy as well.

6  　　　　　THE COURT:  Thank you.

7  　　　　　MR. SCHNABEL:  And that's all I have unless you

8  have more questions, Your Honor.

9  　　　　　THE COURT:  I don't.  I think I hear you saying

10 the slight distraction to the debtor reorganization doesn't

11 outweigh the harm to the public for the confusion that's

12 caused.  And perhaps --  this is not you, this is me; perhaps

13 there could be a different calculation if, in fact, the

14 business people involved in the restructuring were the same

15 as the business people involved in the trademark litigation,

16 but you're saying that the evidence does not show that, does

17 not bear that out.  In fact, goes the opposite way.

18 　　　　　MR. SCHNABEL:  That's true, Your Honor.  And you

19 can just look at some of the job titles in the Kasabian

20 declaration at -- if I can find where it was, paragraph --

21 　　　　　THE COURT:  That paragraph twenty-two, I think.

22 　　　　　MR. SCHNABEL:  Twenty-two, I believe.  You know,

23 trademark is about the marketing, right.  It's about the, you

24 know, the flyers and the terminology that's used.  You know,

25 it's research and strategy and research and program

1   development, market, you know director of communications,

2   marketing and brand director.  It's not the CFO.  It's not,

3   you know, the accounting finance team that's going to have to

4   figure out operations and how money comes in, and all those

5   things that are very important to bankruptcy.

6          Our claim doesn't -- those people weren't deposed

7   and they were never listed as witnesses as the Ewing

8   affidavit, declaration makes clear.  They were never listed

9   as witnesses by the Boy Scouts.  So, yes, there are some

10  people that are going to be needed for their trial which is

11  many, many months away, but those are not bankruptcy

12  restructuring kind of people.  They're marketing people.

13          THE COURT:  Thank you.

14          MR. SCHNABEL:  Thank you, Your Honor.

15          THE COURT:  Mr. O'Neill.

16          MR. ANDREW O'NEILL:  Good morning, Your Honor, or

17  I guess it's the afternoon in Delaware now; it's still

18  morning in Chicago.  Andrew O'Neill on behalf of the debtors.

19          I'd like to just thank you, again, for making the

20  technology available for video; although, sadly, I'm also an

21  IT casualty, so I'm on the phone only and I'll have to make

22  do.  But please slow me down or ask questions at any time,

23  obviously, but this is what I'm working with.

24          Your Honor, there's a lot to respond to, I think,

25  there.  A lot of it I disagree with and I will address most

1  of that in my prepared comments.  You know, to start, I think

2  beyond the declarations, I wasn't planning on spending too

3  much time on background because I think that we did provide

4  the relevant details in our paper and you continue to hear

5  more so during the hearing today.

6         You know, a lot of our discussion about the

7  background is, of course, about any bankruptcy cases and how

8  much is going on, how much there needs to be addressed by the

9  BSA, and not just the professionals, but by the actual people

10 at the BSA, and I think that's been borne out today like all

11 other hearings in this case.  But if there's more background,

12 I'd, of course, be happy to answer any questions you have to

13 the best of my ability.

14        I think, you know, I'll address Mr. Schnabel's

15 first two points about, you know, this slide deck that he

16 walked through in the first instance and then this conflating

17 of the trademark legal question of public interest and

18 potential harm to the public and the bankruptcy standard,

19 which is about balancing of the harms to the plaintiff and

20 the debtors and their estates, and then I'll move into my

21 discussion of the balancing of those harms which, well, we

22 think clearly demonstrates that the prejudice here is to

23 debtors and the estates and their creditors and not to the

24 Girl Scouts.

25        So, before we get to that, you know, Mr.

1    Schnabel's presentation and Mr. Ewing's declaration, the Girl

2    Scouts are trying to obscure the straightforward question

3    that I've just described, which is whether cause to lift the

4    stay exists and presenting some -- and I'm using their

5    quotes -- no video, but evidence meant to support their

6    underlying claims.  These examples, which could have and

7    should have been submitted in the underlying motion so that

8    we could have properly responded to them in our objection,

9    are not probative of potential prejudice to the Girl Scouts.

10   Only a couple of these examples actually involve conduct of

11   the BSA, which is what, after all, the law is seeking to

12   enjoin.

13           Many of them, I think, save one or two, do not

14   allege post-petition conduct.  I could go through each one of

15   these slides, Your Honor, and provide an explanation of how

16   each one of these are not the conduct of BSA or is not

17   demonstrative of ongoing harm to the public or to the Girl

18   Scouts, but I actually think the slides largely speak for

19   themselves.

20           THE COURT:  Why do you think this doesn't go to

21   the factors I have to look at for lift stay when one of the

22   factors is probability of prevailing on the merits?

23           MR. ANDREW O'NEILL:  Your Honor is just a little

24   bit ahead of me, which is not surprising at all.  I think, if

25   anything, that's exactly what these slides can be used for;

1  although though, I think, typically, the probability of

2  success factor is analyzed looking at what's going on in the

3  underlying litigation and not through, you know, additional

4  evidence submitted to, as Your Honor is not the trier of fact

5  in the underlying litigation.  I think at the end of the day,

6  these slides actually don't help determine probability of

7  success, but, you know, it's in the eyes of the beholder.

8         Not surprisingly, Mr. Schnabel recoils with horror

9  at some of these.  You know, I look a little more

10 (indiscernible), especially at, you know, online postings and

11 Instagram accounts and things that have nothing to do with

12 the BSA, and, again, this is actually, you know, I'm sure

13 after scouring the internet for all of the best evidence and

14 this is what we have here.

15         In any event, I don't think the probably of

16 success factor, you know, will really carry the day here.

17 I'm going to argue, you know, for a minute or two that it

18 hasn't been met just because of where we are in the

19 underlying litigation, but I do tend to agree with Your Honor

20 that to the extent these slides are to be considered, they

21 should be considered in connection with that factor, which

22 is, of course, part of the Rexene analysis that should guide

23 the Court today in determining whether to lift the stay.

24         THE COURT:  Okay.  Then I guess I misunderstood.

25         What don't you think they should be considered as

1  part of?

2          MR. ANDREW O'NEILL:  As part of the prejudice to

3  the Girl Scouts or, more importantly -- and this goes to the

4  next thing that I wanted to address based on Mr. Schnabel's

5  comments -- are this perceived public interest or harm to the

6  public prong that the Girl Scouts are trying to read into the

7  analysis, the Rexene analysis.

8          Now, you know, I won't get into the weeds of

9  trademark law, although, Mr. Schnabel did misstate a couple

10  of things about trademark law, such as a trademark

11  infringement constitutes irreparable harm as a matter of law.

12  That's not true.

13          But more importantly, no Court has ever read this

14  public interest or public harm factor into a lift stay cause

15  analysis.  None of the trademark cases cited by the Girl

16  Scouts, none of the patent infringement cases -- which by the

17  way, we do think are important and there is a public interest

18  component in patent law -- no case has ever done what Mr.

19  Schnabel is asking Your Honor to do, which is to look at

20  evidence put forth of, you know, pulled from the website,

21  much without a context or, you know, juxtaposed next to Girl

22  Scouts branding, and ask the Court to then read into that

23  some harm to the public that should be considered in the

24  context of balancing the harm of the debtors and their

25  estates versus that of the plaintiffs.

1          So, I'll just pause there, Your Honor, and to the

2    extent I haven't been, let me be very clear.  We do not think

3    there is public interest or harm to the public should be

4    included in the prejudice calculus.  It never has been.  It

5    hasn't been shown here, but even if it were, this is really

6    about balancing the harms to the debtors and the potential

7    harms to the Girl Scouts.

8          THE COURT:  Did the debtors cite to me a trademark

9    case so that I could look at the factors that are used in a

10   trademark-specific scenario?

11         MR. ANDREW O'NEILL:  You know, the case actually

12   that Mr. Schnabel referred to, Dominic's is the one trademark

13   case that they referred to that they're relying on here.  In

14   that case there's absolutely no discussion of public interest

15   or harm to the public.  There's no alteration of the normal

16   factors considered on whether cause should be or it's sound

17   to lift the stay.

18         In that case, Your Honor, there were two TROs

19   entered by the District Court prior to the bankruptcy filing.

20   The debtor there filed in order to get away from a contempt

21   ruling from the District Court.  That case is completely, you

22   know, in our view, useless in this context.  That's why we

23   didn't pay it any shrift in our objection, much less short

24   shrift.  Is it a trademark case.  That's about the only thing

25   that it has in common with what is going on here.

1          Your Honor, that case, nor any other that we could

2    find, has any reference -- and I'm talking about bankruptcy

3    cases here where there's relief to lift the stay requested

4    and a Court employs a cause analysis.  There's no case out

5    there cited by the Girl Scouts that breathes in this public

6    interest, you know, what I'll call "grafting on the public

7    interest" test from trademark law into the cause analysis.

8          THE COURT:  Okay.

9          MR. ANDREW O'NEILL:  So, Your Honor, I could go

10   into this in greater detail.  I'm attempted not to because I

11   think I just summed it up for Your Honor pretty concisely.

12         What Mr. Schnabel is advocating for is just not

13   supported in the case law.  He made a (indiscernible)

14   argument that there's a public interest here.  We obviously

15   disagree with that, but to the extent, you know, that there

16   is some question about that, it shouldn't be about a part of

17   the balancing of the harms here.

18         So, Your Honor, I think, you know, I'd like to

19   stay away from sort of distinguishing all of the slides for

20   Your Honor and telling you why they don't apply, but, you

21   know, other than to potentially this likelihood of success,

22   but I would just caution Your Honor that, you know, looking

23   at these with a very jaundiced eye is probably a very good

24   idea, given -- and I think Mr. Schnabel described why in his

25   overriding comments.

1        THE COURT:  But why do I have to look at them with

2   a jaundice eye when I look at the exhibits to Mr. Ewing's

3   declaration, which includes letters from the Boy Scouts

4   acknowledging -- it's not infringement -- acknowledge that

5   they shouldn't have been advertising in the way they did and

6   apologize for it.

7        MR. ANDREW O'NEILL:  I'm not sure that admitting

8   some non-BSA entity should have done something differently is

9   probative of anything, much less a harm to the public.

10        THE COURT:  Okay.  I was off of harm to the

11   public.

12        I guess you're telling me ignore the slides, and

13   they're not probative of anything?

14        MR. ANDREW O'NEILL:  That's right.  I think that's

15   my major point.  I think if they are to be probative of

16   anything, it's to fill the void, which is a big void, in the

17   probability of success portion of the Rexene factors just

18   based on the lack of any substantive analysis down at the

19   District Court level.  You know, we'd argue that they haven't

20   met that burden.

21        Unlike all of the cases they cite or, you know,

22   all of them that come to mind where the cases were

23   substantially far into, you know, the substantive portion of

24   the case, and Your Honor brought this up in your comments,

25   which was, you're flipping the script, Mr. Schnabel;

1  typically, this is the eve of trial or there's already been a

2  trial, the debtor is trying to avoid the judgment or avoid

3  the trial and that's why they filed for bankruptcy.  And, in

4  fact, that's the case in almost all of these cases where

5  there's been a successful lifting of the stay and, you know,

6  in those cases, they can easily show probability of success.

7            We're not sure that's true here, so, again, if

8  they're probative, maybe they're probative of that, so --

9            THE COURT:  Okay.  But what about in terms of

10  harm -- and, again, I'm just struck by your comment that I

11  shouldn't give any weight, except, perhaps, when we get to

12  probability of success on the merits, to these exhibits when

13  I'm looking at a letter from the Boy Scouts of America

14  National Council which says, you know:

15            "Thanks for your letter and we apologize for the

16  inadvertent use of your slogan and appreciate the opportunity

17  to correct the error and educate our volunteers.  As soon as

18  we received your letter, we began working with the Greater

19  St. Louis Area Council to take corrective actions."

20            So, the Boy Scouts, why isn't that some evidence

21  of also harm to -- not only on the merits -- but harm to the

22  Girl Scouts by the Boy Scouts' admission that they're using

23  the Girl Scouts' slogan and that's an error?

24            MR. ANDREW O'NEILL:  The Boy Scouts, I don't

25  think, based on what you just read, are admitting that they

1  did it.

2          But more importantly here, Your Honor, I think,

3  and, look, we left them an opportunity to respond to this

4  new --

5          THE COURT:  This isn't new; this is in the

6  exhibits that were, I guess, attached to the reply.

7          MR. ANDREW O'NEILL:  Right, exactly.  Which, you

8  know, again, I think the Girl Scouts could have provided

9  those, along with the motion, so that we properly could have

10 responded to them, and we haven't had a chance to do so.

11         I think, you know, I'll return to this sort of

12 overarching point, which is there's a lot of evidence in the

13 underlying case.  That's potentially one piece of it.  I'm

14 sure there's countervailing evidence, and I don't have the

15 answer for you right now, but, again, you know, if that

16 speaks to the success on the merits, potentially, for Your

17 Honor, I'm willing to accept that -- I don't agree with it --

18 but, you know, the bigger question, of course, is in the

19 balancing of the harms.

20         THE COURT:  Okay.  So, let's talk about that.

21 Give me your argument about that.

22         MR. ANDREW O'NEILL:  Yeah.  What I've got here on

23 my sheet is my "primary argument," although it took us a bit

24 to get here.

25         You know, again, the real question here is whether

1   there was cause to lift the stay to continue the trademark

2   action in the Southern District of New York right now in the

3   middle of these bankruptcy cases.  Your Honor, we believe

4   that the Girl Scouts have failed to meet their burden and

5   demonstrate that it would be considerably more prejudiced

6   than the BSA if the stay were to remain in place.

7          We're looking to Rexene, which we believe is

8   proper in this district and, of course, Rexene looks to

9   whether there's a great prejudice to the bankruptcy estate or

10  the debtor resulting from the continuation of the civil suit,

11  the hardship to the non-bankruptcy party by maintenance of

12  the stay considerably outweighing the hardship of the debtor,

13  and then, third, as we've discussed, the creditor has the

14  probability of prevailing on the merits.

15          And, Your Honor, all of the sort of quotes I'll

16  read you are in our brief.  Would you prefer for me to also

17  give you a pin cite when I quote or refer to a case?

18          THE COURT:  Sure.

19          MR. ANDREW O'NEILL:  Okay.  Well, that's from

20  Rexene, 141 B.R. 574, 576, 577.

21          So, when you're balancing the hardships as

22  prescribed by Rexene, the movant bears the heavy and

23  potentially insurmountable burden of proving that the balance

24  of hardships tips significantly in favor of granting relief

25  as against the hardships to the debtor in denying those.

1  That's from Micro Design, which is 120 B.R. 363, 369 from the

2  Eastern District of Pennsylvania.  As I've noted already, and

3  we'll get into in greater detail, the Girl Scouts have failed

4  to satisfy this heavy burden.

5          As the Court in Northwest Airlines noted, Your

6  Honor, the purpose of the automatic stay is to allow the

7  "debtor to concentrate on rehabilitating its business without

8  interference by actions of creditors or litigation that would

9  hinder the reorganization process," and that's 2006WL687163,

10 at Page 1.

11         Few cases require as much concentration, I would

12 submit, as the case at hand and the BSA cannot afford any

13 distractions that could hinder its reorganization process.

14 There is simply too much at stake here, Your Honor, and any

15 interference in the case would be great prejudice.  Multiple

16 courts have found, including in this district, that denying

17 requests and have denied requests to lift the automatic stay,

18 whereas here, such relief would divert critical resources,

19 such as management and other organizational leadership, away

20 from the debtors' restructuring efforts.

21         The Girl Scouts argue that these cases are not

22 instructive because they do not involve trademark cases, but

23 clearly that cannot be the case, as this distinction has not

24 been drawn in a couple of trademark cases cited by the Girl

25 Scouts; again, this returns to the grafting on of the public

1  interest or public harm piece to the balancing of the harms

2  analysis employed in lift stay cases.

3          In fact, the BSA will be prejudiced if the stay is

4  lifted.  As Your Honor is well aware, these cases are

5  relatively recent, but there's been a flurry of activity in

6  these cases and the BSA is moving as expeditiously as

7  possible towards plan negotiations and resolutions of claims,

8  while attempting, during a very trying time, to maintain its

9  mission and keep its finances on track, in spite of the

10  challenges to manage these cases and, of course, the current

11  COVID-19 environment.

12          And, Your Honor, I think this goes to something --

13  and I'm just getting a little bit ahead here in my notes --

14  but something you and Mr. Schnabel dialogued about, which is

15  it's all hands on deck right now at the Boy Scouts.  Every

16  person that remains in the organization -- and as you know,

17  hundreds have been furloughed -- are trying to further this

18  reorganization.  It's not true that certain people that are

19  going to be involved if it goes forward in the trademark

20  action are not involved in running this business, trying to

21  maximize the mission, trying to keep revenues coming in; all

22  of those are critical to this reorganization and absolutely

23  mission-critical to keeping the BSA around as we know it.

24          So, it's not simply, Oh, that person is in

25  marketing, so being involved in the Girl Scouts trademark

1   action won't take them away from the bankruptcy case or the

2   restructuring; that's not the case at all.  Critically, and I

3   just alluded to this, the debtors just can't have any of

4   their resources diverted to the trademark litigation while

5   these cases are pending.

6            THE COURT:  Are you suggesting, then, that however

7   long this case is pending, this trademark litigation should

8   never go forward?

9            MR. ANDREW O'NEILL:  I don't know that I'm saying

10  that right now, Your Honor, but I'm saying right now it

11  shouldn't go forward; again, and I was going to get to this

12  later in my comments, but I'll fast-track to right now,

13  Mr. Schnabel claims that this will have to go forward at some

14  point.

15           I reject that as a false --

16           THE COURT:  Why?

17           MR. ANDREW O'NEILL:  Well, like in any bankruptcy,

18  negotiations takes place.  Who knows what will happen?

19           There could be a settlement.  Sure, it could pass

20  through a plan and be, you know, preserved in the Southern

21  District of New York and go forward after the cases.  That

22  plan could be confirmed, not in years from now, but

23  relatively soon.

24           THE COURT:  But this is not a claim.  There's

25  multiple parts of this.  Part of this is injunctive relief so

1  that infringing stops.

2          How is this not going to go forward at some point

3  in time?

4          MR. ANDREW O'NEILL:  But that is still something

5  that the parties could negotiate and agree on; again, and,

6  you know, there is a big claim component here, as well, which

7  I think Mr. Schnabel was glossing over a bit in his comments,

8  but to answer Your Honor's question, courts have found that

9  injunctive relief actions can remain stayed during cases.

10 There isn't some, you know, unique aspect of this; although,

11 you know, as we discussed, there's sort of a unique quality

12 to the trademark cases.  There just aren't a lot of them, but

13 the cases have stayed injunctive relief claims.

14         And I'm not saying it's specifically because of

15 what we're talking about that you can settle them, but you

16 could settle them and, again, I'm not giving the Court any

17 tea leaves and --

18         THE COURT:  I don't think the courts consider

19 whether a matter might be settled as part of the standard of

20 the Rexene factors.

21         MR. ANDREW O'NEILL:  I'm not saying they do, Your

22 Honor, specifically.  I was just responding to you question

23 of why this won't inevitably have to go forward at some

24 point.

25         THE COURT:  I will tell you that's my gut reaction

1  and my gut reaction is the trademark infringement piece has

2  to go forward and it's not going forward here.  It's not

3  going forward in front of me.

4           So, my question is, really, what I've been

5  grappling with in reading the papers is what's the

6  appropriate timeline?

7           Because this is -- the allegation is ongoing

8  infringement and why isn't ongoing infringement -- forget

9  harm to the public -- why isn't that harm to the Girl Scouts,

10  equal in harm to the Boy Scouts?

11           MR. ANDREW O'NEILL:  We don't think they've

12  demonstrated that, Your Honor, is the simplest answer, but

13  more fundamentally in this case -- and we get into this in

14  our papers and it's a big component of the argument about why

15  they're not going to be prejudiced here -- they've never

16  sought a TRO or a preliminary injunction.  This case has gone

17  on for over a year with just fact discovery.  They haven't

18  sought to fast-track discovery.  They haven't sought to seek,

19  you know, relief with respect to the ongoing harm immediately

20  in the context of the underlying litigation.

21           They're coming in now and sort of changing their

22  game plan and we don't think that the estate should be

23  prejudiced and bear the risk of hurting the reorganization

24  prospects because the Girl Scouts just decided that it's all

25  of a sudden an issue that must be heard right now.

1    I can't speak to Your Honor's question about a

2   timeline.  I think, you know, the basic principle is that

3   there are significant plan-related and bankruptcy-related

4   issues that the debtors are attending to right now, and I'm

5   going to get into a couple of the details on who and what,

6   but any, you know, side litigation that will take significant

7   resources -- and I'm talking more about organizational

8   resources than the people involved than having to address,

9   you know, what will be daily issues -- that taking those

10  folks away from the bankruptcy and the restructuring is a

11  great prejudice to the debtors and the estates.

12    So, Your Honor, there has been some discussions.

13  It's in, you know, the declarations and Mr. Schnabel raised

14  it, about, you know, what will the actual prejudice be.  And,

15  you know, there's been some allusion to the fact that this is

16  mostly handled by professionals, by the lawyers.

17    That was certainly not the case prior to the

18  bankruptcy when this litigation was active.  There was an in-

19  house legal person at the BSA who spent quite a bit of time

20  on this and he was just one of many who spent time on it.

21  And going forward, the legal team would have a lot of

22  responsibility if that matter were to continue.

23    To say that it's just a matter of when people who

24  are going to be witnesses would be sequestered to New York

25  for a trial is just not the case.  You know, the Legal

1  Department, specifically, I'm talking about here, would be

2  involved in expert discovery.  They would be reading reports

3  and providing feedback.  They would be involved in the

4  ongoing digestion of the facts and anything that comes up in

5  the cases.  They would be involved in dispositive motions,

6  summary judgment.  They would be, of course, involved in all

7  of the prep for trial and the trial itself.

8          And I'll just note that this legal team, which is

9  now smaller due to the furlough, is also taking a lead role

10  in many of the bankruptcy tasks that are charged to the

11  company; again, in a bankruptcy, as we all know, it's not

12  just the lawyers and the financial advisors that do all the

13  work.  In addition to their day jobs, which have become

14  incredibly more complicated in recent times, they're also

15  attending to numerous bankruptcy tasks.

16          You know, just a few are assembling information to

17  allow the outside professionals to prepare statements and

18  schedules, identifying materials responsible to various

19  discovery requests and making sure those are getting into the

20  data room.  They've, you know, to date, provided over 5100

21  documents and a hundred thousand pages of information,

22  engaging with and fielding requests from various media

23  organizations regarding the restructuring, assisting in the

24  preparation for meetings and presentations with the two

25  creditors' committees here and the FCR, implementing cost

1  reduction and other improvements necessary to meet the

2  current landscape.

3          You know, in addition, Your Honor, these tasks are

4  resource-intensive and numerous and they're only, frankly,

5  going to get more intense the further we get into these cases

6  in the plan process and other issues.  So, you know, as I

7  noted earlier, it's these folks in the Legal Department in-

8  house that would also largely bear the brunt of working on

9  the concurrent litigation, were it to continue, and these

10 folks are absolutely critical to the bankruptcy and to the

11 BSA's mission, so it would be highly prejudicial to require

12 them to attend to those, you know, piecemeal litigation tasks

13 on the side.

14         In addition, there are other members of management

15 that would need to weigh in on the strategy and factual

16 issues during the litigation and they're also simultaneously

17 providing support during the bankruptcy cases, which I noted.

18 This is, again, only going to increase, most likely, during

19 these cases.  These people, again, their work is critical to

20 the bankruptcy and if they were materially diverted through

21 this trademark action, it could impair the bankruptcy process

22 and the restructuring.

23         THE COURT:  Well, let me ask you this.  I know the

24 Boy Scouts disagree with the allegations in the trademark

25 litigation, but if, in fact, the Girl Scouts have an

1  administrative claim, is it going to be necessary to

2  liquidate that claim so that you can confirm a plan?

3         MR. ANDREW O'NEILL:  Well, again, Your Honor,

4  that's a complicated question at this point in the cases,

5  but, you know, one thing is there is the insurance, which

6  Mr. Schnabel alluded to and I think, based on what I

7  understand about the damages in these cases or what the Girl

8  Scouts are alleging as potential damages, they're not saying

9  there's been a loss of business; they're saying, basically,

10 they're accruing damages by the ongoing case.  So, a stay

11 would have something to do with limiting those.

12         And so, outside of the insurance, you know, could

13 you confirm a case with an unknown administrative claim where

14 you reserve for that claim?

15         I think you probably could, especially if it

16 hasn't been judged in a dollar value.  So, I don't see this

17 claim, by any stretch, or this action, as a showstopper from

18 a plan process, but, again, Your Honor, the assumption is

19 that the Girl Scouts are a creditor, they're on the UCC,

20 they're going to be around the table.

21         There are going to be opportunities to work all

22 these issues out, but it will be easier to do that if there's

23 an actual plan process and restructuring ongoing because the

24 debtors' resources haven't been diverted outside of the

25 bankruptcy to other litigation.  That's, you know, again why

1  the stay is there and we believe it's merited to stay in

2  place there.

3          So, I've talked about, you know, some of the

4  people, some of the functions.  In the Kassabian declaration,

5  which Mr. Schnabel referred to, you know, the main thrust of

6  that declaration was just to show how intensive and how

7  arduous this litigation has been.  There's no reason for us

8  to think that that will change and so, you know, again, we

9  think it would be quite harmful if the stay were lifted,

10 quite prejudicial to the estates.

11         One Court, In re U.S. Brass Corp., I think fairly

12 characterized the issue here and held that the relief from

13 the automatic stay to continue litigation would be extremely

14 prejudicial to the debtor in that case simply because the

15 debtor was in the early stages of its reorganization efforts

16 and its Chapter 11 case is one of an ordinary complexity.

17         Surely, the same could be said of these cases,

18 Your Honor, regarding the stage and complexity, and I'll add,

19 I think the same could be said about, you know, the

20 underlying trademark action in terms of its stages and high

21 complexity.

22         So, again, you know, we've heard from the Girl

23 Scouts that they don't think this is real prejudice.  You

24 know, the record is littered with cases where there's talk

25 about prejudice to management and -- or, I'm sorry --

1  diverting management and how that's prejudicial to the

2  debtors and how that can be a reason to deny lifting the

3  stay.

4          And I'll just note, Your Honor, the shield, such

5  as it is, you know, we've been using this to the best of the

6  BSA's ability during the beginning of these cases and to

7  somehow, you know, take away the shield at this point doesn't

8  seem commensurate, you know, with the situation or the

9  perceived prejudice to the Girl Scouts or, frankly, the

10  cases.

11          THE COURT:  Do you perceive no prejudice to the

12  Girl Scouts?  Why aren't the Girl Scouts being harmed?

13          MR. ANDREW O'NEILL:  Well, I think the Girl

14  Scouts, you know, are arguing that they're potentially being

15  harmed because they have to wait and this has to be

16  adjudicated soon.

17          But the cases where harm is found for the parties

18  in the Girl Scouts' position are the cases we discussed,

19  which are you're on the eve of trial or you have a judgment

20  or you've got a temporary restraining order and somebody

21  continues to use your restaurant name.  You know, these are

22  demonstrable instances of harm.

23          Here, I think the big reason the Girl Scouts have

24  added in this public interest argument and the public harm

25  argument is to help, you know, help in that respect because

1  there isn't a lot of harm here in waiting to figure this out

2  later, either through the litigation or through the plan

3  construct.

4          THE COURT:  Do you think there's no harm in the

5  Girl Scouts being confused with the Boy Scouts from the Girl

6  Scouts' perspective?

7          MR. ANDREW O'NEILL:  Well, again, I think from the

8  Girl Scouts' perspective they think that but I don't see any

9  evidence of demonstrating confusion to the public; again,

10  this is not walking into a restaurant --

11          THE COURT:  I think the Boy Scouts have admitted

12  that they have improperly used, someone in the organization,

13  and the Boy Scouts have said in the beginning that their

14  mission is done through the local councils.  So, the Boy

15  Scouts have admitted in these letters some improper use of

16  Girl Scouts, I think it was slogans, and I forget exactly

17  what this says, "We apologize for the inadvertent use of your

18  slogan."

19          So, the Boy Scouts have a mission which they are

20  trying to preserve.  The Girl Scouts also have a mission,

21  okay.

22          So, are you telling me that the Girl Scouts, that

23  any confusion or any use by the Boy Scouts of the Girl

24  Scouts' slogan, because that's what I have something specific

25  on here, doesn't harm the Girl Scouts?  There's no harm?

1    Because that's what I hear you saying.  I hear you

2 saying there's no harm to them and comparing them to cases

3 where they're trying to liquidate a prepetition claim, this

4 is a different scenario than a prepetition claim.

5    There may be some of the same factors.  There may

6 be distraction by management.  It may be the wrong timing.

7 I'm just trying to understand your argument as to why there

8 is no harm to the Girl Scouts.

9    MR. ANDREW O'NEILL:  Again, I mean I'd like the

10 opportunity to respond to that letter because I don't think

11 that letter, in and of itself, shows that the Girl Scouts are

12 being harmed.  I mean, that is the subject of the underlying

13 litigation.

14    But to Your Honor's question, if there were some

15 harm, you know, it would still be balanced against the harm

16 to the greater harm, respectively, to the debtors and to the

17 estates.

18    THE COURT:  No, I'm trying to balance the greater

19 harm, so I'm trying to understand the harm to each of the Boy

20 Scouts and the Girl Scouts.  And so what I hear you saying is

21 there's just no harm to the Girl Scouts.

22    MR. ANDREW O'NEILL:  I don't think harm has been

23 demonstrated and, again, there's harm to the Girl Scouts and

24 harm to the public, which I think the Girl Scouts, and Mr.

25 Schnabel made, you know, most of the argument revolve around.

1  We don't have evidence of, you know, at least in connection

2  with that and through the slide deck, of people unlike

3  walking into a restaurant and buying a hamburger that you

4  think is a, you know, a McRib or a Big Mac and it not be,

5  people walking into Boy Scouts meetings thinking they're Girl

6  Scouts meetings and signing up for the Boy Scouts; that would

7  be confusion to the public and harm to the public.

8           THE COURT:  Why isn't that harm to the Girl

9  Scouts, as well, that they didn't get a member?

10          MR. ANDREW O'NEILL:  But, Your Honor, there's no

11 evidence of that happening.  Would it be?

12          Sure.  But, again, then you have to get into the

13 facts and understand whether it was the BSA doing this or

14 some voluntary that, you know, nobody has, you know, control

15 over at a local council that's unconnected.  I mean, again, I

16 really would like the opportunity to respond to the letter

17 separately if that is, you know, an issue that is concerning

18 to Your Honor, and I'm gathering that it is.

19          THE COURT:  It is.  It is an issue that's

20 concerning to me.

21          The Boy Scouts have made their mission the

22 hallmark of this case, along with the rectification of the

23 victim abuse and the Girl Scouts, as I said, also have a

24 mission.  Confusion in this time where the Boy Scouts are

25 dealing with victim abuse would seem to be an issue, and this

1   is ongoing, or the allegation is that it's ongoing, that the

2   confusion is still ongoing and it's happening through -- I

3   don't know at the BSA level -- but through the local

4   councils.

5          And the representations of how this organization

6   is run, is that the mission?  Is -- I don't have the words in

7   front of me -- but it's carried out through the local

8   council.

9          So, I have concern.  To me, it's a question of

10  when does this litigation go forward and, quite frankly, I

11  don't know when it interferes the least with the

12  reorganization.

13         I am very concerned about interfering with

14  progress in the case; I am, I think that's a legitimate

15  factor.  I don't know, though, if it's better to have a trial

16  at the end of the year or better to have a trial a year from

17  now and which interferes least.  So, that's what I'm

18  struggling with.

19         But this is not the liquidation of a prepetition

20  claim.  This is a lawsuit regarding alleged, continuing

21  infringement.

22         MR. ANDREW O'NEILL:  Understood, Your Honor.

23         THE COURT:  I guess I'll let you have some

24  response to these papers if you want to submit something

25  that's going to counter the idea that the Boy Scouts

1   recognizes on some level that its local councils and

2   others -- and I don't know -- have, on occasion, improperly

3   used the Girl Scouts' slogan.  I've seen the Girl Scouts'

4   logo.  So, yes, it creates some concern.

5            MR. ANDREW O'NEILL:  Understood, Your Honor.  And

6   I think we would like that opportunity.  You know, I'll

7   just -- and I hear Your Honor loud and clear, you know, I

8   just think that -- I don't want to have the last word -- but,

9   you know, to say one thing about this to correct, the

10  communication by local council is not the same thing as

11  saying there's ongoing harm that is of such urgency that the

12  stay needs to be lifted.  Again, that might very well go to

13  the merits of the underlying claim, but the harm is a

14  different question.  But, again, we would like, you know, the

15  opportunity to talk about that more.

16           You know, in terms of Your Honor's broader

17  question about timing and when this goes forward, you know,

18  the answer from the BSA would be, you know, once we've gotten

19  to a place where, you know, the restructuring is under

20  control and we're guiding toward a plan process and in the

21  midst of that or in the process we might have gotten to a

22  deal with the Girl Scouts, potentially.

23           But I know one thing.  If the case is just -- if

24  the stay is listed and the case reverts to the District

25  Court, you know, we've heard from Mr. Schnabel that, of

1  course, there'd be no distraction but at the end of the day I

2  don't know that we know that.  We don't know what the

3  scheduling would be or what the District Court would do, and

4  we know that things are going to be hot and heavy in going

5  forward in many different directions in the foreseeable

6  future.

7           So, I understand Your Honor grappling with that

8  question, but I would just leave you with that consideration

9  on that front.

10          THE COURT:  I think that's fair, and I am

11  concerned about how these two matters can both go forward.  I

12  think that's fair.

13          MR. ANDREW O'NEILL:  And, really, Your Honor,

14  that's the crux of our argument, is that, you know, there is

15  so much to do in this bankruptcy.  And we also acknowledge,

16  given where the trademark action is, there's a lot to do

17  there, as well, and we simply can't risk the success of these

18  cases on how that interplays timewise, resource-wise, cost-

19  wise.  So, again, we think on the balance that the prejudice

20  here is greater to the BSA.

21          Your Honor, I'm just going through my notes, but I

22  think in sort of talking through your questions about the

23  prejudice or potential prejudice to the Girl Scouts, we've

24  gotten to that prong of the argument; again, I mean, I think

25  it shouldn't be lost on the Court that it never sought

1  immediate relief in the underlying action.

2          THE COURT:  And what's your response to

3  Mr. Schnabel's reason for why they didn't?

4          MR. ANDREW O'NEILL:  I think it's a convenient

5  response.  I don't think that, you know, they actually didn't

6  do that consciously because they were trying to be good guys.

7          I think that they made a choice that they did not

8  need a TRO or a preliminary injunction and that behavior

9  during the cases or during the underlying trademark action

10  reinforces that take.

11          And so, you know, to Your Honor's point about this

12  going on at some point, maybe that's the right approach, but,

13  again, it's not right now and it's not at this point in these

14  cases, given the prejudice that the BSA will experience.

15          One second, Your Honor, if you wouldn't mind

16  bearing with me.

17      (Pause)

18          MR. ANDREW O'NEILL:  Your Honor, I have notes here

19  agree addressing the longer factor tests.  I'm not sure

20  that's necessary, given that Mr. Schnabel didn't get into it.

21  I think Your Honor is rightfully focused on the balance of

22  the prejudice in Rexene.

23          THE COURT:  I'm sorry, which tests?

24          MR. ANDREW O'NEILL:  So, in the reply, the Girl

25  Scouts discuss one of the longer factor tests, Sonnax.

1          THE COURT:  Oh, <u>Sonnax</u>?

2          MR. ANDREW O'NEILL:  Yeah.

3          THE COURT:  Yeah, with its, like, 12 or 15 factors

4   or something.  Yeah, we don't need to get into all of those.

5          MR. ANDREW O'NEILL:  Okay.  And, again, you know,

6   we talked a little bit about likelihood of success at this

7   juncture.  I'm not sure how much Your Honor wants to hear

8   about that.

9          THE COURT:  Well, my understanding of the

10  likelihood of success is that there only needs to be some

11  slight likelihood of success.  We don't get into the

12  underlying merits.

13          And why isn't there even a slight likelihood of

14  success in this case?

15          MR. ANDREW O'NEILL:  So, again, I just don't know

16  that we have any indicia from the underlying case that

17  there's a slight likelihood of success.  Again, admittedly,

18  that is -- it's a low bar and so courts, you know, usually

19  get over it pretty easily.

20          The issue is that unlike most cases where the

21  probability of success is incredibly high, given that there's

22  already been a trial or a judgment or a ruling, some sort of

23  dispositive ruling, we don't have any of that here.

24          THE COURT:  Well, can't I take the fact that you

25  didn't file a motion to dismiss the same way or was that just

1  a convenient response, as well?

2          MR. ANDREW O'NEILL:  Well, again, you know, my

3  understanding is that only addressed a couple of issues and

4  the judge basically said that it would probably be better

5  brought after facts and so it was dismissed in that manner.

6          Again, Your Honor --

7          THE COURT:  So, everybody's reading the judge.

8          MR. ANDREW O'NEILL:  Correct.

9          Look, I think, at the end of the day, you know,

10 even if this factor is met or the threshold is cleared, this

11 is not an overwhelming factor supporting lifting the stay or

12 showing cause.  I think it's a borderline, you know,

13 borderline meeting this factor and that, again, only takes us

14 back to the prejudice to the debtors and the estates and had

15 the Girl Scouts compellingly shown that they would be more

16 harmed than the debtors and their estates.

17         You know, on that front, Your Honor, I think

18 there's a good wrap there.  I think in spite of everything

19 we've talked about, the bottom line is, Your Honor, the

20 prejudice here would be great.  It would put in peril, this

21 case, and the reorganization, potentially, and any chance of

22 that is not worth lifting the stay for this action to go

23 forward, given the potential harm to the Girl Scouts.

24         So, we would ask that Your Honor not lift the stay

25 at this point and, again, if Your Honor -- it would be

1  helpful, we'd like the opportunity to further address your

2  concerns with respect to the letter that you cite in the

3  Ewing declaration.

4            THE COURT:  Okay.

5            MR. SCHNABEL:  Your Honor, if I could --

6            THE COURT:  Yes, I'll let you have a chance,

7  Mr. Schnabel.

8            I'm not sure if it would be helpful, but it's not

9  just the one letter; I've flagged several things.  But I

10  think it's all the exhibits to the -- no, wrong name -- the

11  Ewing declaration.  So, thank you.

12            Mr. Schnabel?

13            MR. ANDREW O'NEILL:  Understood, Your Honor, and

14  we can easily do that and I think it makes sense, given when

15  those exhibits came in, you know, after we had already

16  objected.

17            MR. SCHNABEL:  Your Honor, can I just briefly

18  respond?

19            One thing:  The Boy Scouts know all about these

20  letters.  These know all about these exhibits, right.  I

21  mean, and we -- I just can't actually believe I heard today,

22  and just like in their objection, like there's no evidence of

23  confusion, because they know all of it, and yes, there is.

24            We have -- and they know this -- people who signed

25  up for Boy Scouts thinking they were signing up for Girl

1  Scouts.  That's a fact.  We have that.  We didn't want to

2  bring in the entire merits of the discovery and litigation of

3  the Southern District before this Court, you know, which is

4  why we put forward the complaint and some examples in our

5  opening brief.  And when they made the statement, there's no

6  evidence, we put more in.

7          But I think at some point it becomes quicksand and

8  that we've alleged a colorable claim.  I mean, I'm going to

9  do the Rexene factors backwards here, Your Honor.

10          I think that the probability of prevailing on the

11  merits is a low bar and we've met it.  They filed a motion to

12  dismiss.  They withdrew it.  We can each argue what the judge

13  really said.

14          But after they withdrew that, they never filed any

15  dispositive motion -- that's undisputed -- and we've taken 37

16  depositions between the two of us over, you know, a year and

17  a half and the Ewing declaration sets forth all the other

18  discovery that's in that court.  I mean, you don't do that

19  for a claim that has no merit.  You file your motion to

20  dismiss and you brief it and argue it or you bring it again

21  later, but they haven't done that.

22          So, I think we've met that bar.  And just looking

23  at the complaint and looking at material that has our mark on

24  it or says, "Girl Scouts," that's enough of a colorable claim

25  for likelihood of success on the merits.

1          Your Honor, in terms of the balancing the hardship

2    or prejudice to the estate versus us, Your Honor, day one if

3    the stay is lifted, expert reports, expert rebuttal reports,

4    expert discovery, summary judgment.  That just cannot be --

5    that is less of a distraction than the stereotypical lift

6    stay case where it's only a prepetition damages claim and the

7    stay is lifted to let a trial happen early in the case,

8    right.

9          And this is why this is a little bit of a

10   backwards, as you pointed out correctly, argument from us, is

11   that lifting the stay now will not cause a distraction that

12   will jeopardize the restructuring.  As we put out in our

13   papers in the Alvarez and Sidley retention applications point

14   out, they were retained in October of 2018.  We filed our

15   lawsuit in November of 2018.

16         The Boy Scouts were balancing an out-of-court

17   restructuring, which they tried to do, but failed.  They were

18   balancing our litigation with 37 depositions and tons of

19   document discovery and they were balancing hundreds of tort

20   claims across the country.

21         Now, they still have the restructuring, which is

22   like a prepetition workout which didn't work and they don't

23   have tort claims right now because they're stayed, and even

24   if you lift the stay on a trademark action, there's no more

25   fact discovery.  So, it's a much more relaxed, easier, and

1 manageable piece of the litigation.

2          And we could argue that we don't know how bad the

3 trademark is going to go when fact discovery is closed.  Of

4 course we do; it's not going to be as intense as it was when

5 we were taking 37 depositions.  So --

6          THE COURT:  Well, the bankruptcy does provide an

7 overlay of additional things that management has to do and we

8 do have the recent -- I don't know if it was a furlough or a

9 layoff or whatever of the staff because of COVID-19 -- so,

10 there is a reduced staff level that was used in this case.

11          MR. SCHNABEL:  And, Your Honor, that's a fair

12 point, but the additional requirements in a bankruptcy are

13 more on the finance side and the litigation is not about the

14 finance side of the house.  They weren't deposed.

15          But more importantly, again, none of this comes

16 into play with expert reports, rebuttal expert reports,

17 expert deposition, and a summary judgment brief.  That's

18 not --

19          THE COURT:  Well, legal team may be involved.

20          This is what I'm juggling, and I appreciate the

21 candor --

22          MR. SCHNABEL:  Yes, the legal team may be

23 involved.  The general counsel hasn't rehired his

24 replacement.  You know, he's working side by side with him

25 for at least over a month.  So they actually have two people

1  now in a way, when they had one in terms of a head guy.

2          And, Your Honor, I think the point is that, yes,

3  we're not saying there's absolutely none.  There is going to

4  be some.  It's the legal team, at best, in the long-term,

5  right, until the end of the year when, potentially, it's

6  trial-ready.

7          But balancing that to the Girl Scouts' harm and

8  the public harm, right, the Girl Scouts' harm is if someone

9  uses our symbol post-petition, which we put into the record,

10  we can't tell the Boy Scouts anything because they're in

11  bankruptcy because the stay is on us.

12          And to say that the public interest -- I mean,

13  about trademark, let me take a step back for a second.  You

14  asked the debtor whether they cited any trademark case

15  applying the lift stay and the answer to that question, Your

16  Honor, is no, they did not.

17          And the cases we cited, the Sixth Circuit case

18  doesn't do a cause analysis because it argued the stay didn't

19  even apply.  There are not, and I think I said this at the

20  outset, there's not this cause in the trademark infringement

21  context lift stay cases.  The body of law is just not there.

22          But what we do know is what the Third Circuit

23  tells us about the paramount importance in trademark

24  litigation.  We cited this in our opening briefs, Scott

25  Paper, a Third Circuit case, they never bothered talking

1  about it in their objection -- they mention it once -- and

2  the Third Circuit says public interest, protection against

3  confusion for the public is paramount.

4          In the record with the Ewing affidavit, they can

5  argue whatever they want about it, but clearly, some people

6  are confused because they're combining the two of us.  And

7  given what the Third Circuit says about trademark, how can

8  you not include the public interests in the balancing of the

9  harms when we're asking for the infringement action to go

10  forward and that, necessarily, the Third Circuit says,

11  implicates the public interests.

12          THE COURT:  So, could you say that the <u>Rexene</u>

13  factors have to be augmented in a trademark action?

14          MR. SCHNABEL:  Yes.  I mean, <u>Rexene</u> wasn't a

15  trademark action and the one case counsel, <u>Bass</u> case, you

16  know, cited (indiscernible) oral argument, it was not a

17  trademark action.

18          There's a uniqueness to it because, again, the

19  injunctive relief is for the public benefit and to the extent

20  that the Girl Scouts or the mark holder gets a benefit, it's

21  a (indiscernible); it's an offshot [sic] of it.  But the

22  reason it's there is for the public benefit.

23          Unlike patent cases where you don't necessarily

24  have an injunctive claim and that's what <u>Spansion</u> is

25  basically about because the stay was not lifted and, you know

1    what?  The person could be compensated by just having a

2    bigger claim from the continued infringement.

3            Trademark cannot be -- the injunctive claim cannot

4    be appropriately dealt with or dismissed by more compensation

5    to Girl Scouts because the public interests can't be

6    protected if we're paid more.  It can only be protected if

7    there's an injunction.

8            And that's why the analysis here on a trademark

9    claim is unique and different.  And to say that, you know,

10   perhaps we should wait until there's a plan in place before

11   we can move forward on the infringement claim, I mean,

12   that's -- and to say that we're not harmed by that, I just

13   don't understand how you can look at these pictures and not

14   say that there's arguably some harm and that the Southern

15   District of New York has to take that and assess it.

16           And, Your Honor, if you're concerned -- and I

17   understand the concern -- about, yes, we are on the

18   committee, we understand what's going on in this case in

19   terms of the restructuring and when a trial comes about,

20   because that's really when there's going to be a lot.  The

21   distraction argument has more legs to it than expert

22   testimony and so forth.

23           And, you know, you could lift the stay and have a

24   check-in on what's going on, you know, or talk to the

25   District Court judge to say, Look, if you're going to have a

1  trial, let's not do it in the middle of a confirmation or

2  something.  And they're going to be able to talk to the

3  District Court judge about those kinds of things.

4          THE COURT:  They will, but, ultimately, if I lift

5  the stay, certainly if I lift it entirely, it's up to the

6  District Court to determine when that case goes forward.

7  That is not within my control.

8          MR. SCHNABEL:  Well, understand.  But I mean just

9  like all judges, if your general counsel has to be in two

10 trials at the same time, courts work together on that and

11 parties work together on that.  We're not going to push, you

12 know -- I mean, we understand what's going on in the

13 bankruptcy process.  It's not like we're going to be

14 involved; we're on the committee.

15         I just think it's something that can be managed

16 and to say, you know, oh, it's impossible to manage and you

17 have to wait until the end of the case is just -- it doesn't

18 serve the public interest, which the Third Circuit says is

19 important and it doesn't allow us to have our day in court.

20         And as you said, you know, it's got to go forward

21 at some point and you're not going to have it go forward in

22 your courtroom, so we have to go forward with it in the

23 Southern District of New York.  What else can we do?

24         Your Honor, one last point is the local councils

25 and the Boy Scouts of the United States of America, the Boy

1  Scouts of the United States of America have their trademark

2  just like the Girl Scouts have our trademark and the local

3  councils, just like with our structure, use the intellectual

4  property of the Boy Scouts.  You know, it's in the Ewing

5  declaration, in terms of going to the brand site and

6  downloading flyers or materials to use for marketing

7  purposes.

8            And just like, you know, I mean we alleged this in

9  the complaint about the liability of the Boy Scouts for what

10 their local councils do, because as you stated, their

11 mission, the way they operate is through their local

12 councils.  And that's why in those letters, they apologize

13 for conduct of the local councils because they should be

14 managing that better.

15           And this is one of those cases -- we took 37

16 depositions; it's been going on for a year -- it's one of

17 those cases that's not one TV commercial and you're suing

18 about it where you could go for a TRO and, you know, litigate

19 that.

20           This is a repetitive pattern which we slowly

21 became aware of as they rebranded themselves and tried to

22 resolve and then a year later, you know, if two institutions

23 that charitable organizations that have been serving the

24 public good for over 100 years got locked up in litigation.

25 It's not something we did lightly and that's why we didn't

1  file for a TRO.

2          So, you know, again, I think taking a step back,

3  if the stay is lifted, their restructuring is not going to

4  collapse or be in jeopardy.  If the stay is not lifted, we

5  have no recourse at all and the public has no way to have

6  things move forward to protect itself from confusion.

7          And I think in the balancing of that, you have to

8  lift the stay.  Not lifting the stay does not put an

9  injunction on the bankruptcy -- I'm sorry -- lifting the stay

10  does not put an injunction on the bankruptcy.  Not lifting

11  the stay does put an injunction on the trademark action.

12          To me, both have to go forward at the same time;

13  we just have to work together.

14          MR. ANDREW O'NEILL:  Your Honor, just if I could

15  add one thing, and I know it's argument, but I just want to,

16  you know, emphasize, Mr. Schnabel's, you know, speculating

17  about who's doing what work in the BSA.

18          They're all working incredibly hard, day and

19  night, on the myriad of things going on in bankruptcy, so I

20  take exception with that characterization of how things are

21  working in the Legal Department and, specifically, with the

22  top person in that department.  You know, I disagree with a

23  lot of the rest, but I think it was all retread, so I won't

24  go over point by point, but I did want to add that; it's very

25  important.

1          THE COURT:  Okay.

2          MR. JAMES O'NEILL:  Your Honor, if I may?  This is

3  James O'Neill, the other Mr. O'Neill.

4          THE COURT:  Yes.

5          MR. JAMES O'NEILL:  Thank you, Your Honor.

6          And as you know, Your Honor, the tort claimant's

7  committee filed a joinder to the BSA's objection to this

8  matter and the tort claimants' committee's only concern is

9  the distraction which could result by lifting the stay at

10 this time and having the litigation resume.

11         And we're right at kind of at a crucial point

12 where we are onboard and moving forward and we wouldn't want

13 anything to slow down the debtors' efforts as we continue.

14 We have a number of matters as Your Honor is all aware of

15 because many of these were discussed today that are in

16 progress and we don't want to slow that work down.

17         We understand that this matter will have to be

18 dealt with at some point in time and we heard Your Honor say

19 it will go forward at some point and it's not going to go

20 forward before Your Honor, but we just think the timing is

21 inappropriate at this juncture and that maybe we could take a

22 look, again, in 60 days to see where we are or 90 days to see

23 where we are so that the matter, perhaps, could be continued

24 for that period of time just so we can make some more

25 progress in the underlying restructuring case and then

1 || perhaps revisit.

2 ||          So, I just wanted to voice that concern, Your

3 || Honor, and that's all I have to say.

4 ||          THE COURT:  Thank you, Mr. O'Neill.

5 ||          Anyone else?  I think there were some joinders.

6 ||          MR. HARRON:  Hello, again, Your Honor.  Ed Harron

7 || for the proposed future claimants' representative.

8 ||          Like the tort committee, we filed a limited

9 || joinder focused on the distraction this litigation may impose

10 || on the progress of the case and we would also ask that the

11 || Court defer lifting the stay, at least at this early stage in

12 || the case to give the parties an opportunity to focus on

13 || resolving the underlying bankruptcy.

14 ||          THE COURT:  Thank you.

15 ||          MS. RINGER:  Your Honor, this is Rachael Ringer

16 || from Kramer Levin on behalf of the committee.

17 ||          We also filed a limited joinder.  I'd certainly --

18 || you know, I'll be very brief.  We don't need to add anything

19 || to what either of the Mr. O'Neills have said.

20 ||          But one issue that we did raise in our limited

21 || joinder that I think Your Honor raised earlier is just adding

22 || to the balance of harms, the question of if deferring the

23 || determination has a potential to give rise to administrative

24 || claims.  That's, obviously, detrimental to the estate and

25 || unsecured creditors, so that's something that the creditors'

1  committee was concerned about and flagged in our joinder.

2            THE COURT:  Thank you, Ms. Ringer.

3            Okay.  While I think the debtors had sufficient

4  time to respond to what's been filed by the Girl Scouts,

5  including the reply, if the Boy Scouts want to file something

6  specifically dealing with the exhibits to the declaration of

7  Mr. Ewing, yes, Mr. Ewing, you can do so; you have a week,

8  whatever's a week from today.

9            MR. ANDREW O'NEILL:  Okay, Your Honor.  Understood

10 and thank you for that opportunity.

11           THE COURT:  And then I will rule from the bench.

12           If, in the meantime, the Boy Scouts and the Girl

13 Scouts want to talk about when might be an appropriate time

14 to lift the stay, you can do that during the week, too, and

15 if you come to an agreement, you can let me know, but,

16 otherwise, I will rule promptly after I receive that

17 submission.  I don't anticipate any further argument.  Okay.

18           MR. ANDREW O'NEILL:  Thank you, Your Honor.

19           THE COURT:  Thank you for the argument, Gentlemen.

20           MR. SCHNABEL:  And, Your Honor, this is Eric

21 Schnabel on behalf of the Girl Scouts.  Thank you and thank

22 you to chambers for working so (indiscernible) under the

23 circumstances.

24           THE COURT:  Certainly.

25           Okay.  Ms. Boelter, if you're still with us, do we

1  have anything further?

2          MS. BOELTER:  Your Honor, Jessica Boelter.

3          That concludes today's agenda.  Nothing further

4  for today.

5          THE COURT:  Thank you very much.  We're adjourned.

6          COUNSEL:  Thank you, Your Honor.

7      (Proceedings concluded at 1:27 p.m.)

8

9                    CERTIFICATE

10

11      We, MARY ZAJACZKOWSKI and WILLIAM GARLING, certify that

12  the foregoing is a correct transcript from the electronic

13  sound recording of the proceedings in the above-entitled

14  matter.

15
   /s/Mary Zajaczkowski              April 15, 2020
16  Mary Zajaczkowski, CET**D-531

17
   /s/William J. Garling             April 15, 2020
18  William J. Garling, CE/T 543

19

20

21

22

23

24

25