1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

.   Chapter 11
IN RE:                              .
.   Case No. 20-10343 (LSS)
BOY SCOUTS OF AMERICA and           .
DELAWARE BSA, LLC,                  .   Courtroom No. 2
.   824 North Market Street
.   Wilmington, Delaware 19801
.
Debtors.        .   May 4, 2020
. . . . . . . . . . . . . . . . .   10:00 A.M.


TRANSCRIPT OF HEARING
BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:          Derek C. Abbott, Esquire
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899

Audio Operator:          Ginger Mace

Transcription Company:   Reliable
1007 N. Orange Street
Wilmington, Delaware 19801
(302)654-8080
Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1  APPEARANCES (Continued):

2  For the Debtors:          James Ducayet, Esquire
                            SIDLEY AUSTIN LLP
3                           One South Dearborn Street
                            Chicago, Illinois 60603
4
5  For the U.S. Trustee:     David Buchbinder, Esquire
                            UNITED STATES DEPARTMENT OF JUSTICE
6                           OFFICE OF THE UNITED STATES TRUSTEE
                            844 King Street, Suite 2207
7                           Lockbox 35
                            Wilmington, Delaware 19801
8
9  For Century Indemnity:    Tancred Schiavoni, Esquire
                            Gary Svirsky, Esquire
10                          O'MELVENY
                            7 Times Square
11                          New York, New York 10036

12                          - and -

13                          Stamatios Stamoulis, Esquire
                            STAMOULIS & WEINBLATT LLC
14                          800 North West Street, Third Floor
                            Wilmington, Delaware 19801
15

16

17

18

19

20

21

22

23

24

25

1                                INDEX

2
#1) Debtors' Application for Entry of an Order Authorizing the
3  Retention and Employment of Sidley Austin LLP as Attorneys
   for the Debtors and Debtors in Possession, Nunc Pro Tunc to
4  the Petition Date (D.I. 204, Filed 3/17/20).

5
DEBTOR'S WITNESS(s)
6
**WILLIAM SNEED**
7
8          Direct Examination by Mr. Ducayet      16

9          Cross Examination by Mr. Schiavoni     47

10         Redirect Examination by Mr. Ducayet    76

11         Recross Examination by Mr. Schiavoni   82

12
**JESSICA BOELTER**
13
           Cross Examination by Mr. Schiavoni     86
14
           Redirect Examination by Mr. Ducayet   101
15
           Recross Examination by Mr. Schiavoni  103
16
17 **NANCY RAPOPORT**

18         Cross Examination by Mr. Schiavoni    110

19         Redirect Examination by Mr. Ducayet   119

20
CENTURY'S WITNESS(s)
21
22 **CHRISTINE RUSSELL**

23         Direct Examination by Mr. Schiavoni   128

24         Cross Examination by Mr. Ducayet      157

25         Redirect Examination by Mr. Schiavoni 183

**JOSHUA SCHWARTZ**

    Direct Examination by Mr. Schiavoni    184

    Cross Examination by Mr. Ducayet    203


**CHRISTOPHER CELENTANO**

    Cross Examination by Mr. Ducayet    229

    Redirect Examination by Mr. Schiavoni    232

    Recross Examination by Mr. Ducayet    234


**CHIP SLANINA**

    Direct by Mr. Svirsky    238

    Cross by Mr. Ducayet    245


**WILLIAM SNEED**

    Redirect Examination by Mr. Ducayet    252

    Recross Examination by Mr. Schiavoni    257

    Redirect Examination by Mr. Ducayet    263

    Recross Examination by Mr. Schiavoni    263


| **EXHIBITS** | **I.D.** | **REC'D** |
| --- | --- | --- |
| Debtors Exhibits attached to Declarations | | 65 |
| Century's Exhibit 2/21 Email String | | 65 |
| Century's Exhibit 2/28 Email String | | 66 |
| Declaration of Nancy Rapoport | | 109 |
| Declaration of Brian Whittman | | 126 |
| Declaration of Ann Rappleye | | 127 |
| Declaration of Joshua Schwartz | | 203 |
| Declaration of Chip Slanina | | 245 |
| Declaration of William Sneed | | 267 |

1          (Telephonic hearing commenced at 10:24 a.m.)

2          THE COURT:  Good morning, counsel, this is Judge

3  Silverstein.  We're here in the case of Boy Scouts of

4  America, case number 20-10343.

5          My apologies for the delay in starting.  There

6  were several matters, several documents that were filed,

7  filings made Friday and over the weekend that,

8  notwithstanding my prep yesterday, I did not see.  So, I've

9  only just quickly read this morning what was filed Friday and

10  over the weekend.

11          So, let's turn it over to debtor's counsel.

12          MR. ABBOTT:  Thank you, Your Honor. Derek Abbott

13  here from Morris Nichols on behalf of the debtors.

14          We did outline those additional documents, Your

15  Honor, in a fourth amended agenda this morning that I assumed

16  the court may have seen.

17          THE COURT:  Didn't see it, but that's okay.

18          MR. ABBOTT:  I just want to make sure, the last

19  item that I'm aware of that was filed, and I just wanted to

20  make sure Your Honor had a chance to look at it was late last

21  evening, it was a declaration of Chris Celentano.  I don't

22  know if that is among the documents that you had a chance to

23  look at.

24          THE COURT:  It is.

25          MR. ABBOTT:  That was filed by Century, Your

1 Honor.  Okay. Fair enough.  I just wanted to make sure that

2 the court had, at least the latest.

3          Your Honor, I'm obviously here for the debtors.

4 We appreciate the court making the time for this important

5 hearing.  Mr. Ducayet from the Sidley firm is going to handle

6 the bulk of this argument from the Sidley perspective. So, if

7 I may, Your Honor, cede the podium to him.  He's got some

8 thoughts about how we ought to proceed this morning,

9 obviously, subject to Your Honor's comments.

10          THE COURT:  Thank you.  Mr. Ducayet.

11          MR. DUCAYET:  Good morning, Your Honor.  Good

12 morning, Your Honor.  Jim Ducayet on behalf of Sidley Austin,

13 LLP.  Can you hear me okay?

14          THE COURT:   I can but that reminds me, we should

15 probably go over the rules. So, Ginger, can you please inform

16 everyone how we're proceeding.

17          MS. MACE:  It is extremely important that you put

18 your phones on mute when you are not speaking.  When

19 speaking, please do not have your phone on speaker as it

20 creates feedback.  This also helps with the background noise

21 so that we can hear the person that is speaking and get an

22 accurate record.

23          Also, it is very important that you state you name

24 each and every time you speak for an accurate record.  Your

25 cooperation in this matter is greatly appreciated.  Thank

1  you.

2          THE COURT:  Thank you.  Mr. Ducayet.

3          MR. DUCAYET:  Thank you, Your Honor.  And let me

4  just echo Mr. Abbott's in expressing my appreciation for

5  making yourself available and for doing this hearing under

6  these unusual circumstances. This is, obviously, a very

7  important matter for our firm and we appreciate your taking

8  the time to hear us today.

9          Your Honor, in terms of how we would propose to

10 proceed today, Your Honor, as I told the court last Wednesday

11 at the status conference, there are essentially three

12 witnesses that we would propose to put on.  The way we would

13 intend to proceed, Your Honor, if it's acceptable, would be

14 to go in the order that we indicated in the witness list that

15 we filed on Wednesday.  And we would propose to have Mr.

16 Sneed testify in direct.  We'll try to make that as brief as

17 possible, but I do think it's important that Your Honor hear

18 from Mr. Sneed.

19         And then we would propose, Your Honor, to proffer

20 the declaration of Ms. Boelter who is my restructuring

21 partner, as well as the declaration of Professor Rapoport's

22 who is our expert.  Obviously, both of them are available for

23 any questions that Your Honor may have or any cross-

24 examination that counsel for Century may want to conduct.

25         Mr. Abbott, as he said, is representing the

1  debtors here.  I anticipate at that point, we would have Mr.

2  Abbott put in the declaration of Mr. Whittman who is the

3  financial advisor to Boy Scouts, and that would then

4  conclude, essentially, the presentation of evidence with

5  respect to the application.

6          THE COURT:  Okay.  Let me hear from Mr. Schiavoni

7  to see if that's acceptable.  Let me note that I do not see

8  Professor Rapoport on Zoom.

9          MR. DUCAYET:  Yes, Your Honor.  She is standing by

10 and ready to dial in when we get to her.

11         THE COURT:  Very good. Thank you.

12         MR. SCHIAVONI:  Your Honor, this is Tancred

13 Schiavoni for Century and the Chubb Companies.

14         We spoke about the witnesses earlier in the week.

15 Your Honor was told at that time that there is significant

16 privilege and confidentiality issues at stake here about our

17 client, information that our clients provided to Sidley.

18 This is a situation where the debtor and, in a sense, Sidley

19 carry the burden.

20         They made the application.  They submitted on

21 reply, and they had a full opportunity to reply an extensive

22 declaration for Mr. Sneed.  There is nothing that's been

23 offered that suggests he needs to go outside the scope of

24 that declaration.

25         I would submit, Your Honor, that they should go

1 forward on the declaration. We face, otherwise, significant

2 questions about whether or not further privileges and further

3 confidences in connection with our work for Mr. Sneed will be

4 disclosed.

5           We're essentially here being put in a position

6 where Mr. Sneed, Chubb's lawyer, is disclosing and wants to

7 disclose the details of his work with Chubb. That work and

8 the nature of it is highly contested.  We very much seriously

9 contest the accuracy of Mr. Sneed's description of his work

10 but it puts us, Chubb, in the position of client.  And the

11 only way we can cross -- we can impeach him or cross-examine

12 him is to reveal further details of his work for Chubb.  It

13 puts us in an absolutely impossible situation and it's not

14 one envisioned by the rules.

15           Sidley will make that worse by putting this

16 gentleman on the stand and offering testimony beyond what's

17 in his declaration.  There is no reason why after weeks and

18 weeks, you know, in fact, over a month Sidley needs to put in

19 anymore testimony than what they decided, they needed to put

20 into a very length declaration for which there was extensive

21 back and forth about what was appropriate for them to

22 disclose.

23           We very much contest that they disclose

24 appropriate matters in what they disclosed and we're

25 extremely concerned that if he takes the stand in an open-

1  ended matter that we have no idea where the hearing is going

2  to go and we're in a sort of extra problem because of this

3  video that it's very difficult to sort of address the

4  situation on an ongoing basis.

5          So as I indicated earlier in the week, I think

6  Sidley ought to go forward on its case, the prima facie case

7  it made on its papers, on its declaration from Mr. Sneed.

8          MR. DUCAYET:  Your Honor, if I could be heard on

9  that.

10          THE COURT:  Yes.

11          MR. DUCAYET:  Your Honor, as I represented to the

12  court on Wednesday and as I will further represent to you

13  this morning, we do not intend to have Mr. Sneed testify

14  beyond the scope of his declaration. We have addressed

15  successfully the objections that Century has raised about the

16  substance of what it is that Mr. Sneed put into his

17  declaration.

18          But, Your Honor, the reality is that Century is

19  accusing my partner, Mr. Sneed, some fairly serious things.

20  You just heard it right now.  He's accusing Mr. Sneed of not

21  having accurately represented the work that he did.

22          I do think it would be useful for Your Honor to

23  hear from Mr. Sneed directly as you assess his credibility.

24  And, you know, we will endeavor, Your Honor, to, you know,

25  work with Century in connection with this examination.  But I

1 can tell you right now, the examination will be relatively

2 brief and it will be limited to what has been agreed to in

3 terms of what would be disclosed.  It will be within the

4 corners of the declaration.

5          THE COURT:  Okay.  I reviewed the declaration.  I

6 do think it's important that I hear some extent from Mr.

7 Sneed.  I recognize the difficulty that the video, the nature

8 of the video hearing has on the hearing process.

9          So what I would like to happen is that Mr.

10 Ducayet, you ask your questions.  Mr. Sneed, you pause before

11 answering the question so that I can entertain any objection

12 that Chubb has to the question.

13          Mr. Schiavoni, are you going to be defending this

14 or is one of your partners going to be -- not defending --

15 I'm sorry; is going to be handling this witness or is one of

16 your partners going to be handling this witness?

17          MR. SCHIAVONI:  Your Honor, Tancred Schiavoni.  I

18 will be handling the witness.

19          THE COURT:  Okay.  So, we need to give Mr.

20 Schiavoni an opportunity to object prior to any answer, Mr.

21 Sneed, so please pause to we see if there's an objection.

22          Mr. Ducayet.

23          MR. DUCAYET:  Very well, Your Honor.  We will do

24 that.

25          MR. BUCHBINDER:  Your Honor, this is Dave

1  Buchbinder on behalf of the U.S. Trustee.  I'm hoping to take

2  a moment here and save the court and the parties sometime

3  this morning.

4          Despite all the discussions about sealed

5  documents, the parties did that with our office the various

6  pleadings that have been filed partially sealed.  They filed

7  seal objections. We are satisfied with the proposed

8  redactions and we will minimize our comments to the extent

9  that these issues come up further.  But in terms of the

10 redactions, we've reviewed them and we're satisfied, Your

11 Honor.  Thank you.

12          THE COURT:  Thank you.

13          Mr. Sneed, I'm going to swear you in.

14          MR. DUCAYET:  Your Honor, I'm sorry to interrupt

15 you.  If I could, before we get started.  I'm not quite sure

16 who Century intends to call in their case.  But to the extent

17 that they do intend to offer any of the declarants, I just

18 request at this point that they be excluded under Rule 615

19 while we go into testimony.

20          THE COURT:  Mr. Schiavoni.

21          MR. SCHIAVONI:  Your Honor, we have an expert

22 witness here.  I don't think he should be excluded. We also

23 have our client representative is here, Christine is, in

24 essence, the client.  I think it's entirely where under the

25 rules it's entirely appropriate for her to be present.

1    I see no reason why Mr. Schwartz who is the

2  director of litigation ought not also to be present.  I have

3  no way to consult with them about whether or not

4  attorney/client privileges are being disclosed unless they're

5  aware what Mr. Sneed is doing.

6    MR. DUCAYET:  Your Honor, I don't have an

7  objection to Ms. Russell remaining on the line, as well as

8  their expert.  I do believe that's appropriate.  However, I

9  think if Mr. Schwartz is going to be providing evidence here,

10 it would be appropriate for him to be excluded.

11   MR. SCHIAVONI:  Mr. Schwartz is our director of

12 litigation for reinsurance matters.  He's the one who hired

13 Mr. Sneed.  I need him to know what's being said so that I

14 can consult with him about privileges and attorney/client

15 privilege.

16   It's one of the problems about --

17   MS. MACE:  Excuse me, Your Honor. Can we have

18 people say who they are before they speak so we can get an

19 accurate record?

20   THE COURT:  Thank you.  That was Mr. Schiavoni.

21   MR. SCHIAVONI:  I apologize.  Tancred Schiavoni.

22   I have no way to consult because Mr. Schwartz is

23 the fellow who is going to, director of litigation for

24 reinsurance who hired Mr. Sneed.  I need to be able to

25 consult with him about what's being disclosed.

1          It's one of the problems about presenting here,

2    Your Honor, and if I could just again, you know, make a pitch

3    to you here that substantively the facts are not really in

4    dispute here.  And, you know, hearing argument before these

5    witnesses take the stand, I actually think would be helpful

6    because it's really the legal standards that apply to these

7    facts that are in dispute.

8          You know, a lot of papers were submitted to Your

9    Honor in the forty-eight hours going into the weekend, and I

10   apologize that we submitted papers on Friday, but we only got

11   Sidley's submission mid-week.  But in that submission, it's a

12   lengthy submission, are really key admissions that really

13   narrow the factual issues in dispute.

14         There is not a reason to put on the stand a

15   lawyer, our lawyer, to talk about his work his work for his

16   client.  I think if the court heard argument on what facts

17   are actually still in dispute and what the legal standards

18   here are, they would significantly narrow what the testimony

19   needs to be that the court needs to hear.

20         THE COURT:  I have quickly, while I've read the

21   submissions that were made and quickly read what was

22   submitted Friday and I agree that the parties often talk past

23   each other on what the relevant legal standards are.  But I

24   still think there's an aspect of this case that, at least, at

25   this moment appears to me to require some evidence as to the

1  scope of the representations, the representation of Chubb in

2  the reinsurance.

3        And there was in Mr. Sneed's declaration some

4  discussion of reinsurance litigation and, in particular, what

5  was done here.  So, I still regardless of the argument, I'm

6  going to need to understand the scope of the reinsurance

7  litigation representation.  So, I'm going to hear Mr. Sneed.

8  But under these circumstances, I am not going to prevent --

9  I'm not going to exclude Mr. Schwartz.

10       Okay.  Mr. Ducayet -- I'm Mr. Sneed.  Please raise

11  your right hand.

12              WILLIAM SNEED, WITNESS, SWORN

13       THE WITNESS:  (indiscernible).

14       THE COURT:  I did not hear that.

15       THE WITNESS:  I'm sorry, Your Honor.  I was on

16  mute.  I apologize.

17       THE COURT:  Okay.

18       THE WITNESS:  Your Honor, William Sneed, and I do.

19       THE COURT:  Thank you.  Can you please state your

20  full name and spell your last name for the record?

21       THE WITNESS:  William N. Sneed; spelled S-N-E-E-D.

22       THE COURT:  Thank you.  Mr. Ducayet.

23                   DIRECT EXAMINATION

24  BY MR. DUCAYET:

25  Q    Mr. Sneed, just before we get started, can you confirm

1  for us that no one is in the room with you where you're

2  providing testimony this morning?

3  A    That's correct; no one is in the room with me.

4  Q    Okay. And where are you physically right now?

5  A    I'm in my office in Chicago.

6  Q    Okay.  So, Mr. Sneed, let's start with just a couple of

7  background questions.  What's your current occupation, sir?

8  A    I'm an attorney, a partner at Sidley Austin.

9  Q    And when did you join Sidley?

10 A    1995.

11 Q    And do you have an area of specialty of practice at

12 Sidley?

13 A    Reinsurance contract disputes is my specialty.

14 Q    Okay.  And for those of us who have, you know, a

15 passing familiarity with reinsurance, let me just start with

16 the basic question which is what's the difference between

17 reinsurance and insurance?

18 A    Well insurance is an issue, sort of a policy to a

19 direct policyholder, state farm insurer or John Smith auto

20 driver.  The insurance is insurance of an insurance company

21 respecting the liabilities it incurs under its policies.

22     There's different kinds of reinsurance, a policy

23 specific reinsurance.  There's programs, wide reinsurance.

24 There's catastrophe reinsurance.  But, in the event, the

25 basic views that reinsurance is insurance covering insurance

1 | companies.

2 | Q      Okay.  And you said that you have a specialty in

3 | reinsurance contract disputes.  Can you describe what you

4 | mean by that?

5 | A      Well, I've been working in the area since 1987, since I

6 | started.  Reinsurance contracts disputes arises when an

7 | insurance company has settled a loss with direct policyholder

8 | involving a direct policyholder and then tries to recover its

9 | reinsurance.  So usually there's an issuance of a bill or the

10 | reinsurer fails to pay or refuses to pay.  There's some

11 | exchanges and eventually the insurer has to decide whether to

12 | put that in dispute.

13 |        Most reinsurance contract disputes are arbitrated, but

14 | some are litigated.  I'd say about 80 percent in my

15 | experience are arbitrated.  And the goal of the insurer, and

16 | I typically represent the insurer, is to understand why the

17 | reinsurer isn't paying and then address it.  And convince the

18 | arbitrators or the judge or the jury that the reinsurance

19 | contract requires payment.  It's a dispute under a

20 | reinsurance contract.

21 | Q    Okay.  And, Mr. Sneed, is it usually the case that the

22 | underlying insurers are parties to that reinsurance dispute?

23 | A      Never.  I've been doing it for thirty-three years.

24 | I've never seen a policyholder involved in a reinsurance

25 | contract dispute.  It's between the reinsurer and the

1  insurer, under our court decisions that -- there's no privity

2  with the policyholder.  They're not a party to the

3  reinsurance contract.  It's a contract between the insurer

4  and its reinsurer.

5  Q    And, Mr. Sneed, is it common for insurance companies to

6  have separate and distinct groups that address direct claims

7  versus reinsurance claims?

8  A    Yes.  It's really basically in the industry an article

9  of faith that the folks who handle direct insurance are

10 defensive claims and coverage disputes, if any, are not

11 assisted or supplemented by people who deal with reinsurance

12 contract disputes. They're separate.

13      The insurance lawyers inside a client and the outside

14 counsels aren't involved in the direct insurance.  In fact,

15 they're purposely kept out of the direct insurance disputes

16 because companies want to handle their claims, their direct

17 claims without regard for reinsurance. There's basic reasons,

18 vis-à-vis, the policyholder for that, and there's vis-à-vis

19 the reinsurers for that.

20      So the reinsurance lawyers, inhouse or outside, are not

21 advising or dealing with the direct insurance disputes.  It's

22 kept separate.

23      I had a client who testified --

24          MR. SCHIAVONI:  Your Honor -- actually, Bill, Mr.

25 Sneed, I'm going to ask you to stop there.  I don't want you

1  to get into anything that may be privilege.

2          THE WITNESS:  Oh, I'm sorry.  I'm sorry.  I won't.

3  I was just referring to a different client of mine who

4  testified in his deposition that it's church and state.

5  BY MR. DUCAYET:

6  Q      Okay. So, Mr. Sneed, let's turn now to the specific

7  work that you were asked to undertake on behalf of Century

8  that's at issue here.

9          Did you handle certain matters, certain reinsurance

10 disputes for Century beginning in the fall of 2018?

11 A      Yes.

12 Q      And when were you actually retained?

13 A      The first conversation I had about reinsurance contact

14 was on October 5, 2018 and the first time I recorded a bill

15 to the client was October 9, 2018.

16 Q      And as of that time, Mr. Sneed, did you have any active

17 matters for Century or Chubb?

18 A      No.

19 Q      When was the last time that you had done any work for

20 Century or Chubb?

21 A      It had been about ten months, the nine, ten months

22 prior was the last activity involving Century or Chubb?

23 Q      Okay. And did any of the matters that you were asked to

24 undertake in October of 2018 involve or relate to payments

25 that Century had made under its policy issues to the Boy

1  Scouts?

2  A     Yes.

3  Q     And let me ask you to identify those matters consistent

4  with the agreement that we have with Century about disclosing

5  the names of, at least, one of the reinsurers?

6  A     Okay.  The call and my involvement in October of 2018

7  was specific to reinsurance contract to speak with Lloyds of

8  London Syndicate.  And about nine, ten months later, Century

9  engaged us on a separate dispute with another reinsurer that

10 related to a Boy Scout settlement.  So in October of 2018, it

11 was just Lloyd's.

12 Q     Okay.  And let's focus the testimony now just on the

13 Lloyd's matter. We can deal with the second matter

14 afterwards.

15       But with respect to this Lloyd's engagement, when you

16 were retained in early of 2018, what was the scope of the

17 representation that you were asked to undertake?

18 A     I was asked to consult, to review an arbitration

19 record, a past arbitration and to advise Century on remaining

20 issues.  There had been an arbitration between Century and

21 Lloyd's about a Boy Scout settlement billing.  The

22 arbitrators had ruled for Lloyd's.

23       I and my firm had no involvement whatsoever in that

24 arbitration.  The award was issued in May of 2018.  But they

25 issued a narrow ruling.  And it allowed Century to rebill the

1 same claims that it already paid but to package them up a

2 little differently and rebill them to the same reinsurance

3 contract.  That had happened and there was going to be a

4 dispute about whether Lloyd's paid those.

5     And there was a large issue that wasn't ruled on in the

6 first arbitration as I was asked to look at that issue

7 because the thought was it was going to come up in a second

8 arbitration which, at the time, they first talked to me

9 hadn't been demanded yet.

10 Q    Okay.  And now, Mr. Sneed, in connection with the

11 representation that you just described what materials were

12 you provided?  And when you describe this please, limit it to

13 just the categories of information.  I don't want you to

14 reveal the content of any information that you received.

15 A    There were three categories.  There was a paper that

16 Lloyd's had filed in the Federal Court of Massachusetts to

17 confirm the result in that first arbitration.  There was the

18 record of the first arbitration, the hearing transcripts, for

19 instance.

20     Later on, not at this stage in October or the fall or

21 November of 2018, but later on I was provided with what I

22 call placement records, historical records regarding

23 negotiations of the reinsurance treatise between Century and

24 Lloyd's dating back to the 1950's, 1950's and 1960's

25 documents; those three categories.

1  Q    Okay.  Did there come a point in time, Mr. Sneed, where

2  the scope of the work that you were doing in the Lloyd's

3  matter extended?

4  A    Yes.

5  Q    And when was that?

6  A    November 30, 2018.

7  Q    And how did it expand?

8  A    Josh Schwartz called me and said that they wanted to

9  retain me and our firm to handle the second arbitration with

10 Lloyd's which they had, in fact, demanded.  Another firm had

11 demanded it on November 9.  And Lloyd's had responded in some

12 fashion to that demand later in November. And on November 30,

13 Josh Schwartz called and said we want you to handle this

14 second arbitration.  There's probably going to need to be

15 litigation to get it to go forward.  And that was the scope

16 of the engagement.

17 Q    Okay. Any connection with that expanded scope did you

18 receive any categories of additional materials?

19       MR. SCHIAVONI:  Your Honor, I would just -- Your

20 Honor, respectfully.  This is Tancred Schiavoni for Century.

21 I would object to Mr. Sneed lifting or describing the

22 substantive communications he had with multi reinsurance

23 lawyers or Chubb.

24       If he's only going to list the papers that's fine,

25 the categories of papers.  But I would, at least, want notice

1  in advance if he's going to describe the various lawyers that

2  he spoke to and the privilege information that they conveyed

3  to him.

4         THE COURT:  Okay.  At this point, I think the

5  question was the category of documents, is that right, Mr.

6  Ducayet?

7         MR. DUCAYET:  Yes, ma'am.

8         THE COURT:  Okay. So, let's restrict it to that.

9  And let me comment my experience is that lawyers are

10 notoriously bad witnesses because they anticipate questions

11 and where it's going.  But, Mr. Sneed, I think you're doing a

12 very good job of just answering the question that's asked, so

13 I would ask you to continue to do that.

14        THE WITNESS:  Yes, Your Honor.

15        Can I get the question again, please?

16 BY MR. DUCAYET:

17 Q    Sure, I just wanted to know if in connection with the

18 expanded scope of the Lloyd's representation at the end of

19 November whether there were any additional categories of

20 documents that you received?

21 A    The answer to that is no; nothing additional.

22 Q    Okay.  Did the work that you were doing for Century in

23 connection with the Lloyd's reinsurance dispute involve any

24 past or present insurance coverage disputes between Century

25 and Boy Scouts?

1  A      It did not.

2  Q      Did you ever obtain any information relating to the

3  substance of any insurance coverage disputes between Century

4  and Boy Scouts?

5  A      I did not.

6  Q      Did you need that information in order for you to do

7  the work that you've been asked to do?

8  A      I did not.

9  Q      And why not?

10  A      The dispute between Century and Lloyd's was narrow and

11  it was a classic reinsurance contract dispute.  The

12  reinsurer, Lloyd's, was saying the way you prevented these

13  (indiscernible) to me violates a definition in my reinsurance

14  contract, a definition that deals with people in this area

15  called accumulation.

16        Century had paid multiple molestation claims; the

17  defendants settled them.  How do you package it and present

18  it to the reinsurer?  Century said I can combine different

19  claims together as one loss and get into the reinsurance that

20  way.  The reinsurer said, you can't.  It violates the

21  definition in the reinsurance contract, a particular term

22  about occurrences arising out of an event.  And that was the

23  dispute.

24        This particular term has been disputed between

25  reinsurers and insurers for thirty years.  And this is what

1  our work was about was that definition in the reinsurance

2  contract.

3  Q    Okay.  And, Mr. Sneed, if I'm understanding you

4  correctly, did the claims at issue here, did those involve

5  payments that had already been made by Century on behalf of

6  Boy Scouts?

7  A    Yes.  Past settlement.

8  Q    Okay.  And by the way, you mentioned I think at the

9  outset when you were describing what reinsurance is that

10  there are different kinds of reinsurance.  Can you explain,

11  you familiar with the term treatise reinsurance versus

12  facultative reinsurance?

13  A    Yes.

14  Q    Can you explain the difference between those two?

15  A    I can.  Treatise reinsurance is a treaty.  It's like a

16  treaty between nations.  It's basically defines the overall

17  relationship between the insurer and the reinsurer and

18  typically runs for a year and covers a whole gamut, a whole

19  book of business like all auto policies you issue in 1966 or

20  all medical malpractice you issue in 1995.  And those are

21  broad agreements.  They're not policy specific.  They cover

22  everything that's described in the scope.  They're entered

23  into at the beginning of the year and they cover what the

24  insurer, or rights throughout the year.

25        Facultative reinsurance and contracts are policy

1  specific.  So State Farm wants to insure John Smith who wants

2  high limits.  So, it doesn't want to retain all of that risk,

3  so it goes and it buys specific reinsurance to cover that

4  policy.  That's known as facultative reinsurance.  It's

5  different than Treaty.  It's policy specific.

6  Q     Okay.  And was the Lloyd's reinsurance policy, was that

7  a treaty policy or was it facultative?

8  A     Lloyd's is all treaty.

9  Q     Okay.  Let's turn briefly then, if we could, to the

10  second reinsurance matter.  And, again, I caution you, don't

11  reveal the name of the reinsurer in connection with any of

12  the answers that you're going to give me.

13     But did there come a time when Century asked you to

14  become involved in a reinsurance dispute with a second

15  reinsurer?

16  A     Yes, it did.

17  Q     And when did that happen?

18  A     It was in July of 2019.

19  Q     Okay.  And in connection with your engagement in that

20  matter, again keeping it limited to sort of the categories

21  and not getting into any of the substance of the

22  communications or the information that you were provided,

23  what are the categories of documents that you were given?

24  A     It was exchanges between Century and that reinsurer

25  about some particular billings Century had issued for

1 particular settlements that had happened in 2018 and 2018.

2 And I think at one stage, I also got a deposition transcript

3 of an abuse claimant because there was an issue being raised

4 about when --

5 Q    Bill, let me stop you there and you don't need --

6 A    Okay.  The categories were the exchanges between

7 Century and the reinsurer and a deposition transcript.

8 Q    Okay.  Thank you.

9      Did the dispute with that second insurer, like the

10 Lloyd's dispute, involve claims that had already been paid by

11 Century on behalf of Boy Scouts?

12 A    It did.

13 Q    And did the dispute with the second reinsurer involve

14 any question about the underlying coverage that was provided

15 by Century to Boy Scouts?

16 A    The answer to that is no.

17 Q    Okay.  All right and in connection with the work on

18 that second matter did you ever receive any confidential or

19 privileged information relating to the payment of any of

20 those claims that were at issue in the reinsurance matter?

21 A    No.

22 Q    Okay.  Mr. Sneed, let me change topics here and I want

23 to ask you some questions about some communications that you

24 had with Century in late 2018 and into the 2019.

25      I think you mentioned earlier that at the time that you

1  were asked to get involved in the Lloyd's matter, you didn't

2  have any other active matters for Century.  Did that have any

3  impact on the practice that you went through internally at

4  Sidley's to open up a matter?

5  A    It did.

6  Q    How was that?

7  A    When I tried to open the matter on Lloyd's and a

8  separate one involving a different Chubb entity unrelated to

9  Boy Scouts, the people I submitted the papers to at the firm

10  to get the matters open responded to me that Century and

11  Chubb had been identified in the system as inactive or

12  former.  And I had to go do things in order to get these

13  matters signed up.

14  Q    And what were the things you needed to do?

15  A    I had to go get advance waiver, get an engagement

16  letter with Chubb.

17  Q    And at the time that you were asked to do this -- well,

18  let me strike that.

19      Did you, in fact, reach out to Century about an

20  engagement letter including an advanced waiver provision?

21  A    I did.

22  Q    And do you recall when that was?

23  A    It was in November of 2018.

24  Q    And at the time that you reached out to Century about

25  that advanced waiver, were you aware of the fact that Sidley

1  had been retained by the Boy Scouts?

2  A    I was not.

3  Q    Let me ask you, Mr. Sneed -- well, Mr. Sneed, you said

4  you reached out in late November of 2019.  What exactly did

5  you communicate to Century?

6  A    It was November of 2018.  And when Josh Schwartz called

7  and say we want you to handle this Lloyd arbitration, I said

8  my firm's requiring me to get an advanced waiver and a

9  standard engagement letter.  I need to go through that

10 process.

11 Q    And does Century typically give engagement letters; do

12 they do engagement letters?

13 A    No.  They do not.

14 Q    And does Century typically define the relationship

15 between itself and the law firm that it retains?

16 A    Century issues what's called a service level agreement

17 or an SLA to the firm with a variety of provisions.  And

18 that's what they say governs the relationship.

19 Q    Okay. So going back to my original question, what is it

20 that you communicated to Mr. Schwartz at the end of November

21 of 2018?

22 A    My firm was requiring me to negotiate an engagement

23 letter on the terms that Sidley typically wanted now being

24 the protocol we were under.  And so, I was going to send him

25 through waiver language, and I did in December of 2018 and

1  non-contentious, I think transactional.

2  Q     Okay.  And did Mr. Schwartz respond?

3  A     He did.

4  Q     And how did he respond?

5  A     Pretty immediate rejection.

6  Q     Notwithstanding Mr. Schwartz's rejection did the

7  discussions with Century about an advanced waiver continue?

8  A     It did.

9  Q     And when did those discussions after the initial

10 rejection when did those continue, respectively?

11 A     They continued throughout the beginning of the next

12 year, January, February, March of 2019.

13 Q     Okay.  So, Mr. Sneed, let me ask you, you have your

14 declaration in front of you or behind you?

15 A     I do.

16 Q     Okay. Can I ask you to take a look at Exhibit 2 to your

17 declaration?

18         MR. DUCAYET:  And, for the record, Your Honor,

19 this is Docket 532-2 which is a March 4th, 2019 email from

20 Mr. Schwartz to Mr. Sneed.

21 BY MR. DUCAYET:

22 A     I have it front of me.

23 Q     Okay.  Do you recognize this document?

24 A     I do.

25 Q     What is it?

1   A      It is an email from Josh Schwartz to myself dated March
2   4, 2019.
3   Q      Okay.  And what did you understand this communication
4   from Mr. Schwartz to be?
5   A      We've been having exchanges over advanced waiver
6   language and request and this was what Chubb was offering to
7   us, specific to bankruptcy insolvency matters.
8   Q      Okay.  And this is a topic that you had been discussing
9   with Mr. Schwartz, this time?
10  A      Yes, we've been discussing it in 2019 prior to this.
11  Q      And do you know if Mr. Schwartz was consulting with
12  anyone within Chubb who had experience in bankruptcy?
13  A      I do know that.
14  Q      And what was said in that regard?
15  A      Well, it's even in the email itself, the exhibit, right
16  at the start.  But I recall in our discussion Josh had to go
17  to people in his company with experience and expertise in
18  bankruptcy and insolvency to address and spell out specific
19  things that are happening in the bankruptcy or in insolvency.
20  And the result was this email to me.
21  Q      Okay.  And, ultimately, did Sidley agree to the three
22  conditions that are laid out in this exhibit?
23  A      He would not.
24  Q      Okay.  And why is that?
25  A      I'm sorry -- some background.

1       The view at our firm was that individually negotiating

2    specific provisions like this would become unwieldy and for

3    that reason, we didn't accept this.  That there would be too

4    many variations across clients and it would be difficult to

5    keep track of and (indiscernible).

6    Q    Okay.  Mr. Sneed, I want to switch topics again.  And

7    if I could ask you to take a look at Exhibit 5 to your

8    declaration.  And for the record, that is Docket 532-5.

9    A    I have it.

10   Q    Okay.  And can you identify that for the record,

11   please?

12   A    This is an email chain that begins December 13, 2018 to

13   Josh Schwartz.  Then it flipped to me, and I respond, and

14   Josh responds to me.

15   Q    Okay.  Let me direct your attention to the first email

16   in the chain, that's the December 13th email from Mr.

17   Schwartz to you.  Do you see that?

18   A    The first email or the second?

19   Q    The first email in sequence, so the original email that

20   was sent by Mr. Schwartz to you.

21   A    Well the original one from him to me, I have that, yes.

22   Q    Okay.  And let me just ask you to read, if you could,

23   the first sentence of that email after good morning?

24   A    Okay.  Now, good morning appears in the email to Josh,

25   not the one to me.

1  Q    Excuse me, I'm sorry.  Thank you for clarifying that.

2  This is a forwarding of an email that was sent to Josh,

3  correct?

4  A    Correct.

5  Q    Okay.  Thank you for clarifying that, Mr. Sneed. Could

6  you just read that first sentence of the original email that

7  was sent to Mr. Schwartz that was then forwarded to you?

8  A    Okay.  It says,

9       "Good morning.  As you can see from the article from

10 this morning's *Wall Street Journal*, BSA is considering filing

11 for Chapter 11 bankruptcy."

12 Q    And then could I ask you to read the last sentence of

13 that paragraph?

14 A    "BSA has retained Sidley to advise it on the bankruptcy

15 issues."

16 Q    Okay.  "So that was forwarded to you by Mr. Schwartz.

17 And so, the next email in the chain, which is right up above,

18 can you just read the first line of that?

19 A    Josh writes to me, "Hi Bill, FYI below."

20 Q    Okay.  And the version that's been agreed to by the

21 parties for purposes of this public proceeding have some

22 redactions in it, but let me just ask you.  In either of the

23 redacted or the unredacted language that appears after FYI

24 below, did Mr. Schwartz raise any issue or concerns about the

25 representation, potential representation of Boy Scouts by

1  Sidley?

2  A    He did not.

3  Q    And did you respond to Mr. Schwartz?

4  A    I did.  I responded the same day.

5  Q    And what did you tell him?

6  A    I told him that I needed -- I emailed him, that I

7  needed to figure out some things and get some information

8  that my firm and then get back to him.

9  Q    And did you get back to him?

10  A    We spoke the next morning.

11  Q    And what did you tell Mr. Schwartz the next morning on

12  your call?

13  A    I told Josh that I had, in fact, spoken with people at

14  my firm including someone who could speak to this *Wall Street*

15  *Journal* article and that I couldn't confirm or deny what was

16  in a press report in the *Wall Street Journal*.  We had

17  confidentiality duties. We couldn't speak to that.

18       But I had also told Josh that we didn't consider,

19  Sidley didn't consider representation of an insurer to

20  collect its reinsurance to be adversity to the policyholder

21  who's been paid by the insurer, in this case Boy Scouts.  And

22  so, I told him we did not consider that we had a conflict

23  that prevented us from representing Century against Lloyd's

24  on the Boy Scout's reinsurance billings that hadn't been

25  paid.

1  Q     And what was the basis for that?

2  A     The representation of the insurer against the reinsurer

3  is about a reinsurance contract to which the policyholder is

4  not a party.  The policyholder is not interested in or have

5  privity with the reinsurer.

6       If I can give an analogy, I thought about this.

7       Let's assume I specialize in unemployment insurance

8  benefits and someone is laid off and comes to me and says I

9  need to try to file for unemployment.  And I say well I know

10 how to get that from the state; here are the things you need

11 to do.  I will be interested.  Where did you work?  When were

12 you laid off?  What was your benefits -- in order that I can

13 advise on collecting from the unemployment fund?

14      But I'm not adverse to his employer or former employer.

15 I'm not.  And we mention earlier reinsurance and direct

16 claims being kept separate and distinct and they are.  The

17 reinsurance dispute is not the insurance dispute.  We don't

18 offer advise to the insurer about what its doing with its

19 policyholder.  Not only do we not do that, they don't want us

20 to do that.  It doesn't happen.

21 Q     Okay.  Mr. Sneed, did Mr. Schwartz respond at all to

22 the explanation that you gave him?

23 A     In our call he was pleased to hear that we had no

24 conflict and could continue to represent Century against

25 Lloyd's.

1  Q    Okay.  And at any point during that telephone call with

2  Mr. Schwartz did he ever say in sum or substance, look, I

3  understand you can't confirm this, but if it's true that you

4  represent Boy Scouts, we're going to have a major problem?

5  A    He did not.

6  Q    Did he say we review this as a textbook unwaivable

7  conflict?

8  A    He did not.

9  Q    Okay.  Did the topic of Sidley's representation of Boy

10  Scouts come up in any of the discussions that you had in

11  early 2019 about the advanced waiver?

12  A    It did a couple of times.

13  Q    And how did it come up?

14  A    We had multiple calls, myself with Josh at one time, an

15  additional partner of mine and me with Josh about trying to

16  bang out language both sides could agree to.  There was give

17  and take and discussion about what happens in a bankruptcy

18  and what is actual adversity and different gradations of it.

19      During these discussions, at least twice, Josh

20  commented to me this is all because you guys represent Boy

21  Scouts, isn't it?  And I just (indiscernible).  I said it's

22  not.  In fact, these requests I'm getting to negotiate

23  advanced waivers they're coming from management, not the

24  restructuring partners.  This is broader and not specific to

25  a particular policyholder or insurer.

1    Q     Mr. Sneed, based on your interactions with Mr. Schwartz

2    over this time period, is there any doubt in your mind that

3    Mr. Schwartz was aware of, at least, the possibility that

4    Sidley was representing Boy Scouts?

5    A     There's no doubt in my mind.

6    Q     Okay.  Let's fast forward then, if we could, Mr. Sneed,

7    to October of 2019.  Did there come a point in time when Mr.

8    Schwartz did, in fact, raise a concern about Sidley's

9    representation of Boy Scouts?

10   A     Yes.

11   Q     And when was that?

12   A     On October 29, 2019.

13   Q     And how did Mr. Schwartz raise that issue?

14   A     He reached me on my cell phone and called to tell me he

15   hated to be the bearer of bad news but they just learned that

16   our firm represented Boy Scouts in the restructuring and they

17   were going to have to consider that and needed information

18   about it.  And he was calling to let me know that.

19   Q     Okay.  Did you have any reaction to his statement that

20   he had just learned about Sidley's representation?

21   A     I did.

22   Q     And what was that reaction?

23   A     I was incredulous.  To me was something that he knew

24   from ten months ago, had raised with me a couple of times in

25   early 2019, and this whole notion that we just discovered

1  this was surprising and annoying to me.

2  Q    Did you express that to Mr. Schwartz?

3  A    Yes.

4  Q    Did that -- during that conversation did Mr. Schwartz

5  definitively state that he believed that Sidley's

6  representation of Boy Scouts was a conflict?

7  A    No.  No.  It was cast in terms of potential need to

8  consider it.  It wasn't flat out you're conflicted period.

9  It was cast at that time and forward for the next few months

10  as we need information to make a determination.

11  Q    Okay.  And how did you leave things at the end of that

12  call?

13  A    Well he told me he was going to send me an email, and I

14  said I'll wait for it, and I got it, and I would notify the

15  other people in my firm about this.  And then it was

16  basically follow what they instructed me to do.

17  Q    Okay.  And let me ask you, if you could, to turn to

18  Sneed Exhibit 7 which, for the record, is Docket Number 532-

19  7.

20  A    Yes, I have it.

21  Q    And this is another email string, Mr. Sneed, so let's

22  see I can get this right this time.

23       Looking at the first email in sequence which is at the

24  end of the chain; do you see that?

25  A    Yes.

1  Q     And that's an email from Mr. Schwartz to you on October

2  29th at 5:48 p.m., do you see that?

3  A     Yes.

4  Q     And is this the email that you were just describing

5  that was sent to you after the conversation that you had?

6  A     It was.

7  Q     Now after you had this discussion with Mr. Schwartz on

8  October 29th, who did you understand was going to be taking

9  sort of the primary responsibility for addressing with

10  Century its issues about Sidley's representation of the Boy

11  Scouts?

12  A     The restructuring lawyers at our firm involved with Boy

13  Scouts were going to take the lead on that.

14  Q     And when was the next time that you spoke with Century

15  about this issue?

16  A     December 18 of 2019.

17  Q     Okay.  And did you initiate that call?

18  A     I asked for it, yes.

19  Q     And what was the purpose of you initiating that call?

20  A     The purpose was to try to make progress. Following

21  October 29 there had been exchanges between Chubb and Century

22  representatives and folks from my firm.  I was copied on

23  them.  I wasn't really corresponding.

24      They were -- they struck me as unproductive posturing

25  and bickering.  And I wanted to tell Josh, and Christie

1   Russell was also on the call, that we needed to get past

2   this. We needed to resolve this.  We needed to meet and get

3   past posturing and have a discussion about the true concerns

4   and that was the purpose for my call.

5   Q     And, Mr. Sneed, I'm sure that you're aware, at this

6   point, that Century has accused you of threatening and

7   bullying them on that call in December; are you aware of

8   that?

9   A     I'm aware.

10   Q     And is that accurate?

11   A     No, it is not.

12   Q     Did you ever threaten Century?

13   A     No.  What I did, the call at the start, said I've seen

14   these exchanges.  They're not productive.  We want to

15   continue to do this reinsurance work for you, but it's not

16   going to be possible if this letter writing contest and

17   accusations keep coming back and forth.  We need to get past

18   it.

19       Our firm's view, our representation of Boy Scouts and

20   the restructuring was not a conflict, vis-à-vis Chubb.  We

21   weren't going to withdraw from representing them. We wanted

22   to continue to represent Century in the reinsurance matters

23   they entrusted to us.  But I wasn't going to keep getting

24   letters and emails and bickering from my own client.

25       I wanted this worked out.  I wanted a call of the more

1  senior people instead of the lawyers.  You know I used the

2  word posturing and I used this during the call and it

3  antagonized them, but I wanted to get past the posturing.

4  Q    And, Mr. Sneed, how were things at the conclusion of

5  that call?

6  A    Well at the conclusion of the call, I thought there was

7  a good chance we were going to have this conference I asked

8  for, you know, among the senior people.  Christie and Josh

9  said they would consider it.  And they said, you know, we

10  have multiple constituencies here.  We might not get back to

11  you right away, but we'll get back to you.  So, I was hopeful

12  that maybe we would get beyond letter writing and into a

13  discussion about what to do.

14  Q    And after this telephone conversation what was the next

15  communication that you received from Century?

16  A    I was copied on a letter emailed to our firm on January

17  3 of 2020, a Friday.

18  Q    Okay.  Let me ask you then to take a look at -- do you

19  have Mr. Schwartz's declaration in front of you?

20  A    I have it.

21  Q    Okay.  And just so the record is clear, this is the

22  Schwartz declaration with the exhibits that the parties have

23  agreed to concerning redactions and confidentialities, is

24  that the version you have in front of you?

25  A    I have a redacted version.

1  Q     Okay.  And it should be Docket Number 539, is that

2  correct?

3  A     Correct.

4  Q     Okay.  Let me ask you to turn to Exhibit 5 which is at

5  page 47.

6  A     Yes.  I have it.

7  Q     Okay.  Is that the letter you were just talking about?

8  A     Yes.

9  Q     Okay.  And if I could just direct your attention to the

10 second paragraph there in the middle, do you see where it

11 says, "we are unable to rule out that your firm's

12 representation of Boy Scouts," do you see that?

13 A     I see it, the fourth line.

14 Q     And was it your understanding that --

15        MR. SCHIAVONI:  Excuse me; Your Honor.  And this

16 Tancred Schiavoni.  If I might just ask Mr. Ducayet if he

17 could just give us the exhibit number for the Schwartz --

18        MR. DUCAYET:  Yeah.  It's Exhibit 5.  And I'll

19 wait, Mr. Schiavoni, until you have that in front of you.

20        MR. SCHIAVONI:  That's fine.  Thank you very much.

21        MR. DUCAYET:  Okay.  Thank you.

22 BY MR. DUCAYET:

23 Q     So, Mr. Sneed, the second paragraph says,

24        "We're unable to rule out that your firm's

25 representation of Boy Scouts of America constitutes the

1  conflict, the potential conflict of interest with the duties

2  that Sidley owes to the Chubb Companies."

3          Do you see that?

4  A    I see that.

5  Q    Were you surprised that Century was still taking the

6  position even in early January that it wasn't sure if there

7  was a conflict or not?

8  A    Well that was how they had -- that was how they had put

9  it.  And the narrative from October of 2019 forward that we

10  can't rule this out.  And I did think after a few months of

11  exchanges and thinking about it they should have been beyond,

12  you know, wondering whether there was a conflict or not.

13  Q    Well, let me just ask you this, Mr. Sneed.  You're

14  aware of the fact that in the papers that have been filed in

15  response to our application motion that Century has

16  characterized this as a textbook violation of the ethics

17  rules, are you aware of that?

18  A    I am aware.

19  Q    Is that consistent with any of the positions that they

20  articulated to you over the course of beginning in late

21  October through to the beginning of January?

22  A    No, the position as outlined, as you can see from the

23  exhibits, is we need information to make a determination.

24  Q    So as a result of this letter, what happens with

25  respect to the relationship between Sidley and Century?

1  A      Well, in my view, this was most inflammatory of the

2  exchanges since October when I asked that we get past letter

3  writing.  This was more of the same and worse.  They called

4  our behavior shocking and offensive.  In my view, we weren't

5  going to go on representing them.

6  Q      And so was there a decision made to withdraw from the

7  representation?

8  A      Yes.

9  Q      Was that communicated to Century?

10 A      Yes, I sent them a letter.

11 Q      Okay.  Let me ask you to turn back to your declaration

12 Exhibit 9.

13          MR. DUCAYET:  And just so the record is clear,

14 this also is an exhibit to Mr. Schwartz's declaration.  It's

15 Sneed Exhibit 9 ECF532-9.

16 BY MR. DUCAYET:

17 A      I have it.

18 Q      And is that the letter that you sent to Century and

19 Chubb giving notice of the firm's withdrawal?

20 A      Yes.

21 Q      Okay.  And in your view was there any ambiguity

22 expressed in this letter about whether or not Sidley was

23 prepared to continue to represent Century?

24 A      No.  The point of the letter was to tell them we were

25 going to withdraw and here's how we are going to do it and

1  outlining a timeframe for it.

2  Q     And did Century respond to this?

3  A     I believe they did a couple weeks later.

4  Q     So two weeks later they gave you a response to this?

5  A     I believe it was still in January, yeah, yes.

6  Q     Okay.  Now, again, in connection with the papers that

7  had been filed in this matter, there's been some suggestion

8  that the timing of the withdrawal is relevant in that various

9  administrative or ministerial staff necessary to accomplish

10  that withdraw had not been accomplished by the time the

11  petition was filed; are you aware of that?

12  A     I'm aware of that claim.

13  Q     And from your perspective do you think that there was

14  any doubt that as of January 16th that the attorney/client

15  relationship had but for the ministerial or administrative

16  things necessary had terminated?

17  A     No doubt.  That was the point of my letter.

18  Q     Okay.  Let me ask you, you mentioned earlier about the

19  service level agreement and let me just ask you, if I could,

20  to take a look at the service level agreement itself which is

21  Exhibit 1 to Mr. Schwartz's declaration.

22  A     I have it.

23  Q     Okay.  And if you look at the cover page of that, you

24  see it?

25  A     You got to tell me what you mean?

1  Q      Yeah, sorry.  Let me give you a specific page

2  reference.  Let me ask you to turn to page 2 which is in the

3  Docket Number -- it's Docket 539 page 13 of 83; you see that?

4  A      Yes, I have that.

5  Q      Okay.  And what's the title at the top of that?

6  A      Service level agreement for the petition of non-claims

7  legal services.

8  Q      Okay.  And are you aware of the fact that non-claims

9  legal services is a defined term?

10 A      I am aware.

11 Q      And if I could ask you to turn to page 4, please?

12 A      I have it.

13 Q      And can you read for the record the definition of non-

14 claims services?

15 A      "Non-claim services are services performed by the law

16 firm for a client that are unrelated to the defense of an

17 insurance claim or related insurance coverage clam."

18 Q      Okay.  And let me just ask you this question, Mr.

19 Sneed.  Is that description of non-claims services consistent

20 with the scope of the work that you actually did in this

21 matter?

22 A      Yes.  Absolutely.

23          MR. DUCAYET:  Okay.  I don't have any further

24 questions.  I tender the witness.

25          THE COURT:  Thank you.

1              Cross, Mr. Schiavoni.

2              MR. SCHIAVONI:  Well, Your Honor, this is Tancred

3    Schiavoni, may I proceed?

4              THE COURT:  You may.

5              THE WITNESS:  Your Honor, William Sneed.  Can I

6    get a glass of water before?

7              THE COURT:  Yes.

8              THE WITNESS:  I'll be back in one minute.

9              THE COURT:  Yes, well why don't we take five

10   minutes and then Mr. Schiavoni, you can proceed.

11             THE COURT:  Thank you.

12        (Recess at 11:34 a.m.)

13        (Telephonic Proceedings resume at 11:41 a.m.)

14             THE COURT:  Mr. Schiavoni.

15             MR. SCHIAVONI:  Thank you, Your Honor.

16                      CROSS-EXAMINATION

17   BY MR. SCHIAVONI:

18   Q    Mr. Sneed, this is Tancred Schiavoni from Century.  I'm

19   going to ask you some questions.  It is not my intention that

20   you reveal any attorney/client communications that you have

21   as Chubb's lawyer.  And I would ask you if you think a

22   question I ask you requires you to disclose such information,

23   if you could tell us that first before you go ahead and do

24   so.  Can we have an agreement on that?

25   A    Yes.

1  Q    Okay.  Does Sidley have a policy or practice of running

2  conflict searches before taking on a new matter for an

3  existing client?

4  A    Yes.

5  Q    Did you run a conflict search before taking on for

6  Chubb new matters concerning reinsurance disputes for the Boy

7  Scouts, related to the Boy Scouts?

8  A    I did that twice.

9  Q    And when did you do it for the first time?

10  A    September or October of 2018 respecting Lloyd's.

11  Q    And when did you do it the second time?

12  A    July 2019 respecting the other reinsurer.

13  Q    And what were the entities for which you ran conflict

14  searches for, the names?  I don't want you to reveal the

15  names of the reinsured parties of the reinsurers.

16  A    The reinsurers.

17  Q    Okay.  Did you run as part of your search, did you run

18  a search for Boy Scouts?

19  A    I did not.

20  Q    Does Sidley's conflict mechanism, does it allow for the

21  designation of a party in connection with a conflict search

22  as a related party to a matter?

23  A    Yes.

24  Q    At what -- so did -- all right, so it's fair to say

25  that when you open the matter you hadn't run a search for Boy

1  Scouts?

2  A     Correct.

3  Q     When you were asked to take on by Chubb the reinsurance

4  matters concerning Boy Scouts the September time period time

5  period of 2018, did you tell Chubb that Sidley represented

6  what was anticipating taking on Boy Scouts as a client?

7  A     No.  Let me just say something about your question and

8  I might have misheard it.  But the request to me in September

9  or October of 2018 could we take on a reinsurance matter

10  adverse to Lloyd's.  It wasn't specific about Boy Scouts.

11  And the next question you had was did I tell them whether I

12  had -- I'm sorry; could you re-ask the second one?

13  Q     Sure.  At some point you learned before opening a

14  matter for Chubb that Boy Scouts was involved in that matter,

15  isn't that right?

16  A     I wouldn't put it that way.  I did learn the underlying

17  insurer with Boy Scouts.

18  Q     Who among your partners in 2018 did you speak to about

19  the Boy Scouts' matter, Sidley's representation of the Boy

20  Scouts?

21  A     At any time in 2018?

22  Q     Yeah when was the first time you spoke to your partners

23  about Sidley representing the Boy Scouts?

24  A     It was around December 12 or 13 of 2018.

25  Q     And who did you speak to?

1   A       Jim Conlan.

2   Q       And who else did you speak to?

3   A       I spoke to -- they might not have been partners.  I

4   spoke to people in the OGC, the office of general counsels,

5   office of general counsel group at our firm.

6   Q       Okay.  Does Mr. Conlan have a sort of management

7   position within Sidley's?  Is he on the executive committee,

8   the policy committee or any other management committee's?

9   A       I think he's probably on the executive committee, but

10  not the management committee.  I can't always keep those

11  straight, but I think he would be on the executive committee.

12  Q       And is that an important committee within Sidley?

13  A       Oh, sure.

14  Q       Did Mr. Conlan is he the originating partner for the

15  Boy Scouts' representation?

16  A       I don't know.

17  Q       Is he involved in the Boy Scouts' representation?

18  A       I assume he is.

19  Q       Well why did you speak to him?

20  A       There was the email from Josh about the *Wall Street*

21  *Journal* article and I needed information.  And Jim is the

22  fellow I think of as the restructuring partner.

23  Q       When you spoke -- if we could just go to Sneed Exhibit

24  Number 5.  Mr. Stamoulis, if you could pull that up for us.

25  A       Yes.

1  Q     And, Mr. Sneed, I'd like you to go to the email you

2  sent Mr. Schwartz on December 13th, 2018.

3  A     Yes.

4  Q     Okay.  Do you see this -- is this a true and correct

5  copy of the email you sent Mr. Schwartz on December 13 at

6  11/01/2018?

7  A     Yes.

8  Q     And this email was sent in response to Mr. Schwartz's

9  passing onto you an article that indicated that an unnamed

10  source had indicated that Sidley might represent the Boy

11  Scouts, is that right?

12  A     I'm sorry.  I was trying to get this -- I'm trying to

13  get the screen; it has people instead of the document so I

14  was a little distracted.

15  Q     Mr. Sneed, the email your December --

16  A     Go ahead, go ahead.

17  Q     Your December 13th email you sent to Mr. Schwartz after

18  he passed on a *Wall Street Journal* article to you that named

19  an unnamed source as indicating that Sidley may be

20  representing the Boy Scouts, am I right?

21  A     I'm not sure.  Oh, all right.  I'm reading the email in

22  the Josh Schwartz.  Says, "BSA has retained Sidley."  If you

23  look at the article itself, the second paragraph of the

24  article itself says the leaders of the Boy Scouts have hired

25  law firm Sidley according to people familiar with the matter.

1  Q     All right, so the article attributes to an unnamed

2  source the possibility that Sidley represents the Boy Scouts,

3  am I right?

4  A     It says people familiar with the matter have said this.

5  Q     Okay.  So Mr. Schwartz passes that article onto you,

6  right?  He does it on December 13th, am I right?

7  A     Yes.

8  Q     And then you sent him back this email on December 13th,

9  2018 at 11:01, responded to his forwarding that article to

10 you, am I right?

11 A     Correct.

12 Q     And your response was I'm in information gathering mode

13 here, re Boy Scouts, right?

14 A     Yes.

15 Q     And what you did in response was, you contacted Jim

16 Conlan who is the originating partner on the Boy Scouts'

17 matter, a member of the executive committee, the head of your

18 bankruptcy group, right?

19        MR. DUCAYET:  Objection to the question as it

20 assumes facts not in evidence; mischaracterizes the

21 (indiscernible).

22        THE COURT:  Sustained.  Sustained.

23 BY MR. SCHIAVONI:

24 Q     I'm sorry, Mr. Sneed; can you answer?

25 A     I thought it was sustained.

1  Q      Oh.  Attached to Ms. Boelter's declaration is a copy of

2  the retention agreement between the Boy Scouts and Sidley,

3  are you aware of that?

4  A      No.

5  Q      What did Mr. Conlan tell you about the Boy Scouts'

6  engagement?

7           MR. DUCAYET:  And, Mr. Sneed, before you answer

8  that question, I would just caution you not to reveal the

9  substance of any privilege communications that may have been

10  provided to you by Mr. Conlan but, otherwise, you should go

11  ahead and answer that.

12  BY MR. SCHIAVONI:

13  A      Jim told me that we couldn't confirm or deny press

14  reports.  And that's what I should tell anyone who asked

15  about Boy Scouts and Sidley.  And then we talked about the

16  reinsurance matter we had for Century against Lloyd's.  And

17  whether we could handle that matter given that Boy Scouts was

18  involved in the sense that the underlying losses had been

19  paid under policies that covered Boy Scouts.

20  Q      Was this the only discussion you had with Mr. Conlan

21  about the Boy Scouts' representation?

22  A      I think it's the only one I had in 2018.

23  Q      When was the next one that you had?

24  A      I think I had at least one since October 29, 2019.

25  Q      Okay.  When was the next one?

1  A     The next one was, I think, in early November of 2019.

2  Q     If you go to -- Mr. Stamoulis, if you can pull up

3  Boelter Exhibit 1?

4          MR. DUCAYET:  And, Your Honor, forgive me for

5  interrupting here.  I don't mean to impede on Mr. Schiavoni's

6  examination.  I think it would be helpful just for the record

7  to clarify whether or not Mr. Sneed has the Boelter

8  declaration in front of him.

9          MR. SCHIAVONI:  We're going to present a copy of

10 it on the system here.  There is it.  Exhibit 1.

11 BY MR. SCHIAVONI:

12 Q     Will you go to the last -- this is -- if we go to the

13 last page of it, please?  By the way, stop there at the first

14 page.

15       This is a letter, Mr. Sneed, to the Boy Scouts.  That's

16 what's indicated on the front page there, the general

17 counsel.  It's dated October 3, 2018.

18       If you go to the signature page on the last page.

19 A     I see it.

20 Q     Okay.  Is that the James Conlan you spoke to in 2018?

21 A     Yes.

22 Q     Okay. And is it anyway refresh your memory that Mr.

23 Conlan was directly involved in the Boy Scouts'

24 representation?

25 A     No.

```
 1  Q    Okay.  If you go to page of this --

 2            THE WITNESS:  an we stop for a second.  I asked

 3  the person to show me how to keep the documents from coming

 4  on the screen.  I prefer to see the people, particularly if I

 5  have the document.

 6            Your Honor, could I have this fellow help me for a

 7  second?

 8            THE COURT:  Yes.

 9            THE WITNESS:  Thank you.

10       (Pause)

11  BY MR. SCHIAVONI:

12  Q    Well, Mr. Smeltzer if you could go to the attachment,

13  roman numeral III.

14  A    I'm sorry?

15  Q    Yeah, Mr. Sneer, I just asked you to go to the

16  attachment to the engagement letter for the Boy Scouts.

17  A    Yes.

18  Q    Where it says the title, "Publicity."

19  A    Yes.

20  Q    It says here that, "Unless the client --" I'm reading

21  the first line on publicity.

22       "Unless the client instructs otherwise, Sidley may for

23  conflicts resolution purposes disclose to other clients and

24  potential clients the engagement letters or otherwise that

25  the client is represented by Sidley."
```

1       Have I read that correctly?

2  A    Yes.

3  Q    Is that a standard term in Sidley's engagement letter

4  that you're familiar with from other letters?

5  A    No.

6  Q    Oh is this a special term for the Boy Scouts?

7  A    I don't know.

8  Q    So you don't know one way or the other?

9  A    Correct.

10 Q    Okay.  Did Mr. Conlan tell you --

11 A    I'm sorry.  I'm not recognizing it in anything I've

12 attached to my letters.

13 Q    Okay.  Did Mr. Conlan tell you that the Boy Scouts had

14 specifically instructed him or Sidley not to disclose the

15 engagement to Chubb?

16 A    I don't remember him saying that, that there was a

17 specific instruction from Boy Scouts.

18 Q    Why is it that you believe that you were prohibited

19 from conveying to Chubb anything about the Boy Scouts'

20 engagement?

21 A    Well Jim Conlan told me we can't confirm or deny what's

22 in the press report, so that's what I conveyed to Josh in my

23 call.

24 Q    Did there come a time where you sought a waiver from

25 Chubb to take on bankruptcy matters where you would be

1  adverse to Chubb?

2  A    There were discussing in the first three months of

3  January 2019 about advance waiver which included bankruptcy

4  insolvency.

5         MR. DUCAYET:  And this is Jim Ducayet.  I

6  apologize for interrupting.  If we could just get back on the

7  screen, take the document down if we're off with that and put

8  the folks back up.  Thank you.

9  MR. SCHIAVONI:

10 Q    Can we just go to Sneed Exhibit 1?

11 A    Blow that up for a second.

12 Q    The first email that appears on Exhibit 1 is an email

13 dated December 7, 2018 from Mr. Schwartz to you, Mr. Sneed.

14 It's sent at 2:08; do you see that?

15 A    This is my Exhibit 1?

16 Q    Yes.

17 A    The top email is December 7 at 2:08, correct.

18 Q    Right.  And is this a true and correct copy of that

19 email that was sent to you?

20 A    Yes.

21 Q    And Mr. Schwartz in this email advised you that Chubb

22 is unable to provide you with a written waiver, isn't that

23 right?

24 A    He says, "I am sorry.  But we are unable to provide a

25 perspective waiver."

1  Q    Did Sidley or was it Chubb that raised the concept of

2  the waiver after this?

3  A    Sidley.

4  Q    Okay.  So you went back -- despite this communication,

5  you went back to Chubb after this and asked again for a

6  waiver, am I right?

7  A    Yes.

8  Q    And how long after this email did you do that?

9  A    It was either later in December or early January of

10  2019.

11  Q    The discussions that you subsequently had with Chubb

12  over a waiver, did you end up at the end of them withdrawing

13  all requests for a perspective waiver?

14  A    Yes.

15  Q    Did Chubb ever grant you a waiver?

16  A    On what?

17  Q    For anything with respect to the Boy Scouts' matter or

18  for a perspective waiver?

19  A    I (indiscernible) not.

20  Q    Was the relationship that you were engaged with and the

21  work you were doing in December, January, February, March was

22  it pursuant to the SLA, the service level agreement, that you

23  talked about at the end of your direct examination?

24  A    Yes.

25  Q    And, Mr. Sneed, there's no question but that Sidley

1  acknowledged that agreement and that that's the agreement

2  that controls the relationship?

3  A    Well, it depends on what you mean by that.  They issued

4  that to us and we did acknowledge it in 2014 or 2015.  And as

5  these later disputes have arisen, that was the one that

6  Century has told us governs.

7  Q    Well you referred to this in your papers and at the end

8  of your testimony, in some way, governing the relationship,

9  am I right or am I wrong?

10  A    I don't know exactly what's said in the papers.  But I

11  think my declaration does say this is what Chubb has said

12  governed.  You know I don't want to say quibbling with you

13  been on this is that exactly how it governs in terms of going

14  forward.  I have, you know, I have my doubts but it is -- we

15  accept that this SLA is the agreement that governed our

16  relationship, vis-à-vis these reinsurance collection matters.

17  Q    All right, so you agree that this SLA governs the

18  reinsurance matters that you handled in 2018, 2019 and 2020

19  for Chubb, right?

20  A    2018 and 2019.  We withdrew in early 2020.

21  Q    And this is the agreement that governs?

22  A    It's -- yes, this is the SLA.  This is the operative

23  SLA.

24  Q    At any point did you convey to Chubb that you didn't

25  think the SLA applied?

1   A     Well depends on which SLA.  I mean I asked them in

2   November of 2018 to send through an SLA and this all was sent

3   through, but this is the one they say governs.  So, there was

4   a little back and forth on that.

5   Q     But as we stand here today there's no disagreement that

6   this SLA governs the relationship?

7   A     Yes, given some potential disagreement over what that

8   exactly means.  Yes, I'm not challenging you on that.

9   Q     All right and one of the things that you knew from your

10  historical dealings with Chubb, as well as your reading of

11  the SLA in 2018 was that Chubb required written waivers in

12  order to memorialize any type of waiver, am I right?

13  A     I think so.  I don't have the SLA provision in mind,

14  but that's what I believe.

15  Q     Well, Mr. Sneed, on multiple occasions you went to

16  Chubb, didn't you in 2019 to seek waivers for other matters,

17  not involving the Boy Scouts, am I right?

18  A     Yes.

19  Q     And you were insistent on those occasions that you

20  receive a written letter, providing a written waiver for

21  those other matters, am I right?

22  A     I don't recall what my email said in terms of insisting

23  or not, but we would email them and ask them for a waiver at

24  times, and then they would supply it.

25  Q     Even the occasion where they sent you a waiver letter

1  and it wasn't signed and you went back to them and said, geez

2  I have to have a signed one, right?

3  A     I remember getting something from them.  It wasn't

4  correct.  It was miscaptioned and asking it to be corrected.

5  Q     Okay.  But there's no question here, Mr. Sneed, but

6  that you had the SLA, you were familiar with its terms, and

7  you knew those terms required Sidley to obtain written

8  waivers for any -- to memorialize any type of conflict

9  waiver, right?

10  A     I think that's right.  That if there was a conflict and

11  we wanted a waiver, we had to communicate with them and they

12  would communicate back and it was, I believe the SLA probably

13  says in writing.

14  Q     Okay.  Now when you went to Chubb to try to get, to

15  renew the discussion of a waiver in 2020, who was it

16  internally at Sidley that asked you to do so?

17  A     Yvette Ostolaza.

18  Q     If you would go for a moment to -- I'm going to call up

19  an exhibit.  I can only display it.  Sent it to the court his

20  morning.  It's Tab number 30.  If you go to the 2/20/19

21  email, Mr. Stamoulis.

22  A     I'm sorry, Mr. Schiavoni. Could you describe this

23  document a little bit more in detail?  I've got the ones that

24  you emailed around but I can't figure out which one is Tab

25  30.

1  Q     Yeah, it's an email chain on -- you know, containing

2  emails on 2/20 and 2/21 of 2019 between Mr. Schwartz and Mr.

3  Sneed.

4  A     Okay so the top email is 2/21 at 12:42, is that right?

5  Q     Right.

6  A     Okay.  Thank you.

7  Q     If you just go down a little bit further, the first one

8  in the chain, Mr. Stamoulis.  The one that says from Mr.

9  Sneed, the results -- there it is, right there.

10      Mr. Sneed, if you look at the email dated February 20,

11  2019, it was sent at 6:45.

12  A     Yes.

13  Q     Is this a true and correct copy of an email that you

14  sent to Mr. Schwartz at that time?

15  A     Yes.

16  Q     And one of the things you conveyed was that a

17  bankruptcy proceeding is a litigation and that is intended to

18  be encompassed in the waiver, am I right?

19  A     That's what it says.

20  Q     Who was it at Sidley that told you they wanted to get a

21  bankruptcy waiver?

22  A     The discussions I had internal at the firm were there

23  were three prongs to a waiver which we would seek.  One

24  (indiscernible), litigation two, transactional three is

25  insolvency restructuring.  And we assumed there's be given

1  take and negotiations with individual clients over the three,

2  but what we wanted to pursue was the three.  And then we

3  would see how the negotiation went.

4  Q    Am I right that the form of the waiver you were seeking

5  changed from the first time you asked for it in December to

6  when you later had exchanges in January and March?

7  A    Yes.

8  Q    Did you have -- did the firm have more information

9  about what was going on at the -- you know, with respect to

10  the Boy Scouts' engagement during this time?

11  A    No, that's not why.

12  Q    I didn't ask you why.  I just asked whether more

13  information was obtained?

14  A    I'm not sure what you mean.

15  Q    Well in connection with drafting these waivers, did the

16  people involved in drafting the waivers obtain more

17  information about what was going on, on the Boy Scouts'

18  engagement from Mr. Conlan?

19  A    I don't know.

20        MR. DUCAYET:  Objection; foundation.,

21  BY MR. SCHIAVONI:

22  A    Yeah, I don't know.

23  Q    All right, if we look at the next --

24        THE COURT:  Sorry.  Overruled.  He's answered.

25  You can go on.

1          THE WITNESS:  Sorry, Your Honor.

2          THE COURT:  It's okay.

3  BY MR. SCHIAVONI:

4  Q    All right, if you just look at the email a little

5  further down or maybe it's up, December -- oh this is Tab 31;

6  if you pull that one up next.

7  A    Tab 31?

8  Q    Yeah.

9          MR. SCHIAVONI:  Your Honor, if I could just for

10  that email, that exchange that was just up, if I could just

11  offer it into evidence.

12          THE COURT:  Well we haven't yet taken all the

13  documents.  That's something I meant to ask all of you about

14  is whether the series of documents are agreed.  So, but let

15  me ask if there's any objection?

16          MR. DUCAYET:  Your Honor, Jim Ducayet for Sidley.

17  There's no objection to this document and I don't think there

18  is any objection to any of the documents that are attached to

19  any of the declarations and so maybe if it's just easier as a

20  housekeeping matter just to move those in.

21          MR. SCHIAVONI:  And so, Your Honor, there's not

22  going to be objection to the documents attached to the

23  declaration, to the extent the email we just showed, that

24  email exchange, we'd ask for that to go into evidence since

25  it's not part of the declarations.  And then just one other

1  one I'd like to do the same with.

2           THE COURT:  Okay.

3           MR. DUCAYET:  No objections to those.

4           THE COURT:  Okay.  Well then all of the exhibits

5  attached to the declarations are admitted.

6       (Debtors' Exhibits Attached to Declarations, admitted)

7           THE COURT:  And I will admit this email.  I want

8  to make sure I have the right one.  I did print them out from

9  this morning.

10          MR. SCHIAVONI:  It's the string that --

11          THE COURT:  The string we were just talking about

12 okay.

13          MR. SCHIAVONI:  Yes.

14          THE COURT:  That's admitted.

15      (Century's Exhibit, admitted)

16          MR. SCHIAVONI:  All right now if you bring up one

17 other one that's not an exhibit, exhibit to a declaration

18 that's Tab 31 Mr. Stamoulis.

19 BY MR. SCHIAVONI:

20 Q    And, Mr. Sneed, I want to draw your attention to the

21 email here that you sent to Mr. Schwartz on February 28 at

22 8:42.  Do you see that?

23 A    I do.

24 Q    And that's an email that you did send at that time,

25 right?

1    A      Yes.

2            MR. SCHIAVONI:  We can move this email string into

3    evidence also, Your Honor.

4            THE COURT:  Any objection?

5            MR. DUCAYET:  No objection.

6            THE COURT:  It's admitted.

7        (Century's Exhibit 2/28 email, admitted)

8    BY MR. SCHIAVONI:

9    Q     If you go to the end, this is an email string where

10   you're now presenting an alternative form of a perspective

11   waiver, am I right.

12   A     Well it's different than what has been exchanged

13   before.

14   Q     And it's got -- if you go to the last paragraph.

15   A     Yes.

16   Q     And then the last sentence talks about adversity,

17   direct adversity.  You see the sentence I'm talking about?

18   A     Yes.  The second paragraph or the first paragraph?

19   Q     It's the sentence that starts intended to make clear.

20   A     I can --

21   Q     If you can highlight that.

22   A     Yes, I see it.

23   Q     Okay.  And the sentence says, "It's intended to make

24   clear that we," that's a reference to Sidley, right, we?

25   A     Yes.

1  Q      "We may directly adverse to you in a bankruptcy

2  proceeding."  I read that correctly so far.  It's not the

3  whole sentence, right?

4  A      Yes.

5  Q      Okay.  Who was it that provided you wit this text about

6  direct adversity in a bankruptcy?

7  A      I don't remember who in particular.  My discussions

8  were percolating up and down with different people.  And we

9  were trying to respond to Chubb and the point it had raised.

10 Q      And you go on, Mr. Sneed, in this email, in the form of

11 perspective waiver to describe what cold constitute direct

12 adversity in a bankruptcy, am I right?

13 A      I can read the sentence.  It says, "We may be directly

14 adverse to you in a bankruptcy proceeding."  And then it

15 said, "Including but not limited to those various things."

16 Q      Okay.  And one of the things that you identified that

17 could give rise to direct adversity in a bankruptcy

18 proceeding involving an insurer was objecting, Sidley

19 objecting to insurer's request for relief in a bankruptcy, am

20 I right?

21 A      I'm reading it.  I mean it reads; it says what it says.

22 I can read it.

23 Q      Okay.  And one of the other things, Mr. Sneed, that you

24 put in this request for a perspective waiver was a statement

25 that Sidley acting to confirm or support a plan over

1  uninsured's objections, that could also give rise to direct

2  adversity, am I right?

3  A     That's not really what it says, but it's included in

4  the list of, included but not limited to after the first part

5  of that sentence.

6  Q     Okay.  Is Sidley's representation of a debtor in

7  confirming or supporting a plan over an insurer's objection

8  something that could give rise to direct adversity?

9          MR. DUCAYET:  I'm going to object to that question

10  as an incomplete hypothetical.

11  BY MR. SCHIAVONI:

12  Q     Let me withdraw the question and ask it a little bit

13  differently.  And I'll add something different.

14          Another thing you conveyed to Chubb was that it could

15  be direct adversity in Sidley's representation of a debtor in

16  Sidley objecting to or supporting motions or taking other

17  actions over an insurer's objection.

18  A     I don't quite agree with that.  And then if you want, I

19  can explain why.

20  Q     Did you convey this from waiver request to Chubb?

21  A     Yes.

22  Q     That's reflected in this exhibit?

23  A     Yes.

24  Q     Did Mr. Schwartz raise concerns with you about Sidley

25  ever being in a position in an adversarial manner where it

1  was adverse to Chubb?

2  A    Well, I can answer that by reference to one of the

3  exhibits.  I mean -- my explanation, if I can give it, is

4  that --

5  Q    Well, first of all can you just answer that question

6  yes or no or not?

7  A    I can't answer it yes or not.  It's more complicated

8  than that.  There was a particular subset of things that they

9  didn't want to happen.  The general representation of a

10  debtor was okay.  I wasn't in this email trying to say this

11  is what we all agree to direct adversity.  I was trying to

12  spell things out not to define direct adversity, to flush

13  things out given our discussions.  They were okay with a

14  whole set of things.  There was a subset of things they

15  weren't okay with.  And I was trying to hammer that out.

16  Q    Okay.  So is one of the subset of things that you were

17  told was that Chubb had -- would not agree to Sidley being

18  involved even indirectly in a bankruptcy in a coverage

19  dispute?

20  A    I'd have to look at the March 4 email that Josh sent

21  me.  I don't remember that.  I mean we were agreed we weren't

22  going to be representing the coverage order against an

23  insurer.  That was a given.  But there were three things that

24  came out on their side on what they wanted in this waiver

25  scenario, and I don't remember them off the top of my head,

1   but I've been shown them this morning.

2   Q    Why don't we go, we're go to your March 4 email.  Why

3   don't you go to that?  We don't have to call it up on the

4   screen.

5   A    Can you tell me which exhibit that is?

6   Q    That's your exhibit number 2.

7   A    All right.

8   Q    And if you go to paragraph 3 in that exhibit, I'll read

9   it to you.  Tell me when you have it in front of you, Mr.

10  Sneed.

11  A    I have it.

12  Q    Okay.  It says there, this is from Mr. Schwartz.  It is

13  one of the requirements.  Sidley would not have any direct or

14  indirect involvement in disputes.  Right, I have read that

15  correctly?

16  A    Yes.

17  Q    Okay.  And that includes indirect involvement in any

18  coverage disputes, right?

19  A    See after that intro is coverage disputes.

20  Q    Right.  And one of the reasons why Sidley was unwilling

21  even to accept this form of waiver was because it was not

22  adequate to give you a waiver in bankruptcy to take on a

23  bankruptcy where the insurance was getting targeted as part

24  of the bankruptcy and impaired by the plan, am I right?

25  A    No, not at all.

1  Q     Am I correct that Sidley didn't accept this form of

2  perspective waiver, right?

3  A     That's correct.

4  Q     And, in fact, there was no agreement on any waiver at

5  all?

6  A     No, the negotiations ended in March without an

7  agreement.

8  Q     There came a point in time where you left Mr. Schwartz

9  a voicemail saying that you had withdrawn all requests for a

10 perspective waiver, right?

11 A     Yes.

12 Q     And no waiver was ever obtained specific to the Boy

13 Scouts, am I right?

14 A     Correct.

15 Q     And throughout the course of these discussions about a

16 perspective waiver, you maintained your position that you

17 couldn't disclose any information whatsoever about

18 representation of the Boy Scouts or whether you did, in fact,

19 represent the Boy Scouts, am I right?

20 A     No, I wouldn't agree with that exactly.  I think you're

21 overstating it.

22 Q     Oh, I thought during your direct you acknowledged that

23 you told Mr. Schwartz that you couldn't admit or deny whether

24 or not Sidley represented the Boy Scouts, am I wrong in that,

25 is that what you told them or not?

1  A    I told him I couldn't admit or deny what was in the

2  press report.

3  Q    At any point thereafter before October of 2019, did you

4  provide Mr. Schwartz with any information about the substance

5  of any engagement that Sidley had with the Boy Scouts?

6  A    No, no.  The way you asked that, I would say no.

7  Q    Did you Sidley obtain the consent of the Boy Scouts to

8  disclose anything about what its engagement was or the fact

9  that the engagement even existed?

10  A    I don't know.

11  Q    So you talked a little on direct about the work that

12  you did for your client Chubb.  One of the things you talked

13  about was the first encounter agreement, am I right?

14  A    You're referring to the declaration?

15  Q    And your direct testimony.

16         MR. DUCAYET:  I'm going to object to that.  I

17  actually didn't -- I was quite intentional about not getting

18  into that.

19         THE WITNESS:  I don't remember testifying about

20  that.

21  BY MR. SCHIAVONI:

22  Q    Can you tell us yes or no whether or not the first

23  encounter agreement that you referred to in your declaration

24  includes a settlement of coverage disputed issues?

25  A    I don't know without having it in front of me.  My

1  recollection of the agreement is that it is an agreement that

2  this is where we'll put the date of loss for a molestation

3  claim that goes on for a period of time.

4  Q    It's not an insurance policy, am I right?

5  A    I'm sorry.  I missed the first part.

6  Q    Okay.

7  A    I just didn't hear you right.

8  Q    Okay.  Does the FEA embody a settlement of disputed

9  coverage issues; yes or no?  If you can't answer, that's

10  fine.

11  A    I don't know.  Without looking at it, I don't know.

12  Q    Did you tell Mr. Schwartz repeatedly in 2019 when he

13  asked anything about the Boy Scouts that you had no conflict?

14  A    2019?

15  Q    Yes.

16  A    The only time he raised it in terms of it's a conflict

17  was from October 29 on or a potential conflict.  We had

18  discussed it earlier in 2019 in the first three months, not

19  this is a conflict.  But he was acknowledging, I know you

20  represent the Boy Scouts.  This is why you're seeking all of

21  this waiver.  We didn't talk there about is it a conflict or

22  not.  After October 29 we did.

23  Q    You wrote Ms. Russell and Mr. Schwartz that you wanted

24  to deal with management level employees, am I right?

25  A    I wrote?

1  Q    Yes.

2  A    I'm not recalling the writing but if you can show me, I

3  won't disagree, but I'm just not remember a particular

4  writing.

5  Q    Sure.  Did you request a management level meeting?

6  A    I recall in December 18 asking that these issues get

7  discussed at a higher level; whether you want to call it

8  management, but that was something I asked for and thought

9  would be productive.

10 Q    Okay.  And isn't that what you called it a -- you said

11 that you weren't satisfied with dealing with Ms. Russell and

12 Mr. Schwartz because you wanted to deal with management level

13 people?

14 A    No.  That's -- I certainly wouldn't say that.  I wanted

15 to get away from litigation lawyers.  I wanted to get it to

16 business people.

17 Q    Does Ms. Russell have a business role at Chubb?

18 A    Yes, she does.

19 Q    Is she a senior vice president at Chubb?

20 A    I believe so, but she's reinsurance.

21 Q    She was your client?

22 A    Century is the client.  Christie Russell is the senior

23 V.P. of reinsurance.  Remember that's (indiscernible)

24 separation.  The issues being drenched up about Boy Scouts

25 were coming from the direct side not the reinsurance side.  I

1  wanted someone at that level to be involved, not that

2  Christie couldn't be involved.  I wanted to get it up and out

3  of letter writing contest.

4  Q    You were counsel, you know, in January of 2020, you

5  were counsel in more than one arbitration for Chubb, am I

6  right?

7  A    I'm thinking of one and there was another that was tied

8  up in court, whether there would be one or not.

9  Q    And the arbitrators in those matters your name had been

10 disclosed to them and they knew that you were Chubb's

11 counsel, right?

12 A    Well the one didn't have a full set of arbitrators but

13 the one that did, yes.

14 Q    Am I correct that you didn't notify the arbitrators of

15 your withdrawal until after the bankruptcy was filed.

16 A    I don't know exactly when the bankruptcy was filed, but

17 I do remember notifying the arbitrators during the week of

18 February 17th of this year.

19         MR. SCHIAVONI:  Thank you, Your Honor. I have no

20 further questions of Mr. Sneed.

21         THE COURT:  Thank you.  Redirect?

22         MR. DUCAYET:  Yes, Your Honor.  Jim Ducayet on

23 behalf of Sidley.  Just give me a moment to get my screen set

24 up here.

25              REDIRECT EXAMINATION

1  BY MR. DUCAYET:

2  Q    Mr. Sneed, I just have a couple of questions for you.

3       So, first of all, Mr. Schiavoni asked you some

4  questions the very outset of his cross-examination about the

5  process of setting up the matter and the way in which parties

6  were identified in the Sidley system, do you recall that?

7  A    Yes.

8  Q    And he asked you a question about whether you had ever

9  identified Boy Scouts as a related party when you set up the

10 Lloyd's matter, do you recall that?

11 A    I do.

12 Q    Okay.  Why didn't you identify Boy Scouts as a related

13 party when you set up the Lloyd's matter?

14 A    You know they weren't -- I go back to the testimony I

15 gave this morning and said I had to repeat, but the

16 representation of an insurer on a reinsurance dispute is not

17 adversity to the policyholder -- different contracts,

18 different agreements.  Boy Scouts is not involved in the

19 reinsurance arbitration against Lloyd's and the other.

20 They're not.

21 Q    And so, from your perspective does that mean that Boy

22 Scouts is unrelated as a party to the (indiscernible)?

23 A    Yes.

24 Q    Okay.

25 A    I don't want to prolong this but I've been doing this

1  for thirty-three years.  I've never run a conflict on the

2  underlying insured.

3  Q    Mr. Sneed, let me ask you to turn to, if you have in

4  front of you the Sidley engagement letter that Mr. Schiavoni

5  asked you about -- Exhibit 1 to the Boelter declaration.

6  A    Okay.  I have it.

7  Q    Okay.  Let me ask you to turn to the page that Mr.

8  Schiavoni asked you about.  It's romanette (iii).  And for

9  the record, this is ECF Number 500-1 and I'm referring Mr.

10 Sneed to page 8 of 8.  Do you have that in front of you?

11 A    I do.

12 Q    Okay.  Mr. Schiavoni asked you about the second

13 paragraph in that document which is labeled publicity; see

14 that?

15 A    Yes.

16 Q    And he asked you some questions about the first

17 sentence of that paragraph which said, "Unless the client

18 instructs otherwise, Sidley may for conflicts resolution

19 purposes disclose to other clients and potential clients in

20 engagement letters or otherwise if the client has represented

21 by Sidley."

22       Did I read that right?

23 A    Yes.

24 Q    Can you read the next sentence, please?

25 A    The next sentence reads,

1    "Sidley will not, however, disclose that it represents

2    or has represented the client in a particular matter without

3    client consent unless matter has been publicly disclosed such

4    as by a filing with the court or regulatory authority or by

5    the client's issuance of a press release."

6    Q    As of December of 2018, had the fact that Sidley was

7    representing Boy Scouts been disclosed in the filing with the

8    court a regulatory authority?

9    A    My understanding is no.

10   Q    Had it been disclosed through the Boy Scouts' issuance

11   of a press release?

12   A    Same answer; it had not.

13   Q    Do you have any understanding based on this language

14   whether or not under this engagement letter you were

15   authorized to disclose the representation of Boy Scouts to

16   anybody?

17   A    I don't really know, but I had negotiated --

18            MR. SCHIAVONI:  Objection; calls for speculation.

19            THE WITNESS:  Well the answer is no, if you read

20   it.

21            THE COURT:  I'm going to sustain the objection.

22   Go on.

23            MR. DUCAYET:  Okay.  And we'll withdraw the

24   question, Your Honor.  I'll move on.

25   BY MR. DUCAYET:

1  Q    If I could ask you, Mr. Sneed, to turn back a couple of

2  pages to romanette (i).  This is page 6 of 8; do you see

3  that?

4  A    Yes.

5  Q    The first paragraph there reads, "Limitations on the

6  Scope of the Matter," do you see that?

7  A    I do.

8  Q    Could you just read that into the record, please?

9  A    "Unless otherwise agreed by Sidley in writing, our

10 engagement in the matter or in any other representation

11 contemplated by this letter will not include (indiscernible)

12 insurance coverage issues.

13     We will provide advise concerning notification of

14 insurance carriers.  It will not be responsible for notifying

15 such carriers or for follow-up communications with the

16 carriers regarding the status of the matter.  Period.

17 Q    And, Mr. Sneed, have you seen a provision like this in

18 engagement letters?

19 A    Yes.

20 Q    Is this a typical provision that Sidley puts into its

21 engagement letters?

22 A    Yes.

23 Q    And to your understanding is that consistent with the

24 role that Sidley has, in fact, taken, in connection with its

25 representation of Boy Scouts?

1    MR. SCHIAVONI:  Objection; no foundation.  Your

2  Honor, we would ask for the foundation for (indiscernible).

3  In fact, this witness knows about the Boy Scouts'

4  representation, given what he said about (indiscernible).  We

5  ask for foundation on this.

6    THE COURT:  Sustained.

7  BY MR. DUCAYET:

8  Q    Okay.  Well let me just ask the question.  Do you know,

9  Mr. Sneed, if Sidley has provided advice to Boy Scouts on

10 insurance coverage issues?

11 A    I know of --

12    MR. SCHIAVONI:  Objection; no foundation.

13    MR. DUCAYET:  I'm trying to lay a foundation.

14    THE COURT:  He's asking if he knows.  Overruled.

15 BY MR. DUCAYET:

16 A    I do know.

17 Q    Okay.  And what do you know?

18 A    Sidley is not the insurance counsel for Boy Scouts.

19 Haynes and Boone is.  Sidley is not offering advice about the

20 insurance.  There is a separate set of lawyers who handle the

21 insurance coverage disputes.  It's not our firm.

22 Q    All right.  And, Mr. Sneed, let me just ask you a

23 couple questions about the discussions in early 2019 about an

24 advance waiver.

25    I think you testified in response to one of Mr.

1  Schiavoni's questions that in the course of those discussions

2  that Century/Chubb had agreed that as a general proposition

3  representing a debtor would be acceptable.  And if the

4  dispute was over specific categories of things that Sidley

5  would not be able to do, is that fair?

6  A      Yes.

7  Q      And with respect to the documents that were shown to

8  you, you were shown an email in which there was a statement

9  that included sort of a parenthetical thing.  We won't be

10  directly averse to you and then parentheticals about the

11  kinds of things you wouldn't be doing.  Is that correct?

12  A      That was 30 or 31.

13  Q      Yep.  And taking a look at Exhibit 2 to your

14  declaration that's the March 4th email?  Do you have that in

15  front of you?

16  A      Yes.

17  Q      Were these categories of information consistent with

18  what you just described?  These are the things, the

19  particular categories of activity that Chubb indicated to you

20  would need to be carved out.

21  A      Yes.

22  Q      And was this email after the earlier email that was

23  exhibit or Tab 30 or 31?

24  A      It was.  It's a subsequent.

25  Q      Okay.  And was this sort of the final word on the

1  matter, if you will?

2  A    I think there were no further exchanges after this on

3  the language.

4  Q    Okay.

5         MR. DUCAYET:  All right, I have nothing further.

6         MR. SCHIAVONI:  Your Honor, if I could just have

7  two minutes here.

8                      RECROSS-EXAMINATION

9  BY MR. SCHIAVONI:

10  Q    The final word on the matter -- this is Tancred

11  Schiavoni -- Mr. Sneed, was that Sidley withdrew the request

12  for perspective waiver and none was granted, isn't that

13  right?

14  A    Yes, I think we've gone over this.  I told Josh we were

15  not pursuing this anymore.

16  Q    All right.  And a moment ago, you offered testimony

17  about the scope nature of Sidley's bankruptcy engagement. Do

18  you remember just generally that question and answer?

19  A    Just like five minutes ago?

20  Q    Yes.

21  A    Yes.

22  Q    Okay.  What is the foundation, how do you know about

23  what the scope and nature is of Sidley's bankruptcy

24  engagement for the Boy Scouts?

25  A    Reading the papers in this, you know, before this

1  hearing; reading the papers that had been filed about this.

2  Q    Okay. So you weren't testifying based on your personal

3  knowledge.  You're saying that you read -- if you didn't read

4  Mrs. Boelter's declaration you indicated earlier, right?

5  A    Whose?

6  Q    Janine.  I asked you earlier today about your

7  bankruptcy partner's declaration and you indicated you

8  haven't read that, right?

9  A    Well, no.  I hadn't read all the exhibits to every

10  declaration.  I read the objection and the reply.  I also

11  know that our firm doesn't sue insurance companies about

12  coverage.  They don't

13  Q    Have you spoken to any of the bankruptcy partners that

14  have worked on the Boy Scouts' matter?

15  A    Well after October 29, 2019, a call with Josh when

16  things started to proceed after that, I remember speaking

17  with some of the bankruptcy lawyers.

18  Q    And who did you speak to?

19  A    I remember Jim Conlan and a couple of others whose name

20  escape me right now.  It was about a mediation whether it was

21  going to go or not because of the Century objection.  And I

22  think it was in November of 2019.

23  Q    Okay.  Did you speak to Mike Andolina, one of the

24  Sidley bankruptcy partners then?

25  A    I don't remember speaking with Mike Andolina.  It's

1  possible, but I just don't remember that.

2  Q    So I have this right that in October you spoke to Mr.

3  Conlan who signed the engagement letter for the Boy Scouts

4  and you spoke to other bankruptcy partners about the Boy

5  Scouts matter?

6  A    No, you don't have it right.

7  Q    Oka.  "Did you speak to any of the -- to Mr. Conlan or

8  any of the bankruptcy partners or associates working on the

9  Boy Scouts' matter after that mediation which was on November

10  4 and 5 of November of 2019?

11  A    No.

12  Q    Did you tell Mr. Conlan anything about the

13  representation of Chubb?

14  A    I think I missed the first part of that question.  It

15  was a little muffled. Can you repeat it?

16  Q    Sure.  What did you talk to Mr. Conlan about in

17  connection with the mediation that was going forward?

18  A    Mr. Conlan just called to tell me that someone was

19  refusing to mediate because of this and he wanted to let me

20  know that and that was about it.

21  Q    And what did you tell him?

22  A    I don't remember besides noted.

23  Q    You don't remember?

24  A    I don't remember anything beyond that.

25  Q    Thank you, Mr. Sneed.

1    THE COURT:  Okay.

2    MR. SCHIAVONI:  Nothing further, Your Honor.

3    THE COURT:  Thank you.  Okay.  Mr. Sneed's

4  testimony is concluded.

5    MR. DUCAYET:  Your Honor, if I could just make one

6  point very quickly.  I would like to reserve the possibility

7  of providing any testimony in rebuttal to anything that's

8  offered by Century including through additional testimony of

9  Mr. Sneed but, otherwise, we're content to take him off the

10  stand.

11    THE COURT:  Okay.

12    THE WITNESS:  All right, I can depart, Your Honor?

13    THE COURT:   As far as I'm concerned, you are

14  excused.  Thank you.

15    THE WITNESS:  Thank you.

16    (Witness excused)

17    THE COURT:  Okay.  Mr. Ducayet, what's the next --

18  who's the next witness?

19    MR. DUCAYET:  Your Honor, at this point, we would

20  proffer the declaration of my bankruptcy partner, Jessica

21  Boelter into evidence.

22    THE COURT:  Okay.  Mr. Schiavoni, I assume that

23  that's acceptable, subject to cross?

24    MR. SCHIAVONI:  Yes, Your Honor.  We'd like to

25  cross.

1          THE COURT:  You intend to cross.  How long do you

2  think the cross will be?

3          MR. SCHIAVONI:  We'll be very efficient, Your

4  Honor; fifteen minutes maybe, twenty minutes.

5          THE COURT:  Okay.  Then let's go forward with Ms.

6  Boelter's cross-examination.

7          Ms. Boelter, can you raise your right hand,

8  please.

9              JESSICA BOELTER, WITNESS, SWORN

10          THE COURT:  And can you please state your full

11  name and spell your last name for the record?

12          THE WITNESS:  Yes.  My full name is Jessica Carey

13  Knowles Boelter.  And my last name is spelled, B- as in boy

14  O-E-L-T as in Thomas -E-R.

15          THE COURT:  Thank you.  Mr. Schiavoni.

16                    CROSS-EXAMINATION

17  BY MR. SCHIAVONI:

18  Q    Hi, Ms. Boelter, this is Tancred Schiavoni for Century.

19  In your declaration, you refer to yourself as the head of the

20  team on the restructuring, am I right?

21  A    That's correct.

22  Q    And as head of the restructuring team, can you tell us

23  whether you ran a conflict search when you opened up the Boy

24  Scouts' matter?

25  A    I'm actually currently the head of the restructuring

1  team.  I was not involved in the running of conflict searches

2  when this matter was opened.

3  Q    Who was in charge of the Boy Scouts -- well, let me ask

4  you.  When did you become in charge?

5  A    I would say it was late 2019, early 2020.

6  Q    Who was in charge before you?

7  A    Jim Conlan.

8  Q    And can you tell us do you know what conflict searches

9  were run before 2019 for the Boy Scouts' matter?

10  A    I do not know.

11  Q    Did the Boy Scouts instruct Sidley not to tell Chubb

12  that Sidley had been retained?

13  A    We were instructed to maintain the confidentiality of

14  the engagement.  The instruction was not specific with

15  respect to any particular party.

16  Q    When did you first receive that instruction?

17  A    At the time we were engaged in late September, early

18  October of 2018.

19  Q    Okay. And how do you know that, Ms. Boelter?'

20  A    How do I know that instruction was received?

21  Q    Yes.

22  A    I was involved in the matter at that time and was the

23  recipient, among others on our team, of that instruction.

24  Q    Okay. To the extent you were involved, were you

25  involved in any way in helping identify entities to run a

1  conflict search at that time?

2  A    I was not.

3  Q    Do you know who did that?

4  A    I do not know.

5  Q    Did you later run a conflict search?

6  A    In connection with our retention application our team

7  of associates ran conflict searches on a number of parties.

8  Those parties are listed on the attachment to my original

9  declaration.

10  Q    Okay.  And did you run one for Chubb?

11  A    Century and Chubb are included on that list.

12  Q    Okay. And why was it that you ran a conflict search for

13  Century, Chubb?

14  A    As I mentioned in connection with our retention

15  application, we were -- are required to disclose our

16  connections to parties in interest.  The list that was

17  prepared included Chubb and Century.

18  Q    Do you know if anyone ever went to the Boy Scouts and

19  asked them for their consent to advise Chubb that Sidley was

20  representing them?

21  A    I'm not aware.

22  Q    There was a meeting in October, on October 14th of 2019

23  that you refer to you in your declaration, am I right?

24  A    Yes.

25  Q    Okay.  And Chubb was invited to that meeting, right?

1  A     Yes.

2  Q     In advance of that meeting what did you do to confirm

3  that the Boy Scouts didn't have any objection to Chubb being

4  invited and being told that Sidley, in connection with that

5  meeting, was representing them?

6  A     I'm not sure that I understand the question.  The Boy

7  Scouts were present at the October 14th meeting.  Our general

8  counsel was there, as well as coverage counsel and national

9  coordination counsel on abuse claims.

10 Q     Okay.  My question is this, Ms. Boelter, if I got this

11 right the view was that somehow confidentiality of the Boy

12 Scouts would be violated if Chubb was told that Sidley

13 represented them in December, January, February, March et

14 cetera, right?

15 A     I don't have personal knowledge of that.  I'm told that

16 Mr. Sneed or I just heard from Mr. Sneed's testimony that he

17 did not tell them. But yes, my specific instruction in late

18 2018 and 2019 was that we were not to disclose the engagement

19 without the consent of the Boy Scouts.

20 Q     Okay.  So what did you do to get the consent of the Boy

21 Scouts before inviting Chubb to the meeting on October 14

22 where you'd be present?

23 A     Well, again, the Boy Scouts were integrally involved in

24 scheduling that meeting. They attended the meeting. They were

25 aware of the meeting and they certainly knew that they were

1  attending that meeting with their restructuring counsel, as

2  well as their other lawyers.

3  Q    Is it fair to say you didn't, you can't identify

4  anything you did to ask for that consent or any need to sort

5  of seek it for that meeting?

6  A    Well, we had several conversations leading up to that

7  meeting and many other meetings at that point, so I guess we

8  had consent if that's what you mean.

9  Q    In 2019, before the bankruptcy was filed, is one of the

10 things you did was to interview and select someone to

11 represent future claimants against the Boy Scouts?

12 A    No.

13 Q    Did you interview candidates to serve as a future

14 claim's representative?

15 A    No.

16 Q    Who did?

17 A    Candidates were not interviewed in connection with the

18 future claimant's representative process.

19 Q    One of the things in your declaration, I believe, is a

20 statement that you've leveraged your experience to bring

21 about a variety of results including obtaining a futures

22 claimant representative --

23 A    Yes.

24 Q    Does that generally -- so what did you do to aid in the

25 selection of a future claimant's representative?

1   A      Without going into privileged information, we

2   obviously, and I think we said this previously publicly

3   considered multiple candidates, ultimately selected Mr.

4   Patton as the best possible candidate for purposes of this

5   position.

6   Q      Okay. Did you speak with or meet with Mr. Patton before

7   he was selected?

8   A      I don't recall.

9   Q      Did anyone on your team?

10  A      I don't know.

11  Q      Is one of the things that you did was agree on behalf

12  of the Boy Scouts to fund Mr. Gilbert as Mr. Patton's counsel

13  in 2019?

14  A      No.

15  Q      Did you have to, Ms. Boelter, negotiate any type of

16  agreement with Mr. Patton in order to finance his activities

17  in 2019?

18  A      There is an engagement letter between the Boy Scouts of

19  America and Mr. Patton.

20  Q      And who negotiated that?

21  A      I don't know for certain.

22  Q      You weren't in any involved in that?

23  A      I think Mr. Conlan handled that as well as one of my

24  other partners.

25  Q      In connection with -- there was a mediation on November

1 | 4, am I right?

2 | A    Yes.

3 | Q    In advance of that mediation Chubb conveyed to you

4 | their concern about the concurrent representation of both the

5 | Boy Scouts and Chubb, am I right?

6 | A    Chubb conveyed to us their concerns, yes.

7 | Q    And they told you that they didn't consent to the

8 | concurrent representation, right?

9 | A    I would have to go back and read the email that was

10 | sent to us by Mr., I think Mr. Celentano sent it.  It's

11 | attached to my declaration.

12 | Q    Did you reveal Mr. Celentano's declaration this

13 | morning?

14 | A    As I understand it, it was filed late yesterday.  I've

15 | had the chance to review it briefly on my computer screen.

16 | Q    Okay.  And he refers in that declaration to an email

17 | that you sent him concerning the mediation, am I right?

18 | A    That's right.  So we, as I refer to in my declaration,

19 | we had a very early meeting with yourself, as well as

20 | representatives from Chubb on that Monday which I believe the

21 | date was November 4th.  We all agreed that we would move

22 | forward with the mediation provided that Chubb was reserving

23 | all rights.  And I believe the email that you're referring to

24 | was memorializing that agreement.

25 | Q    It's an email from you expressly agreeing on behalf of

1  Sidley that Chubb's rights and objections to Sidley's

2  concurrent representation were preserved, right?

3  A    Again, I'd like to go back and read the email before

4  characterizing. As a general matter, my recollection of the

5  email is that it reserves Chubb's rights with respect to the

6  engagement.

7  Q    And Sidley agreed to that, right?

8  A    We, Sidley -- I sent that email on behalf of Sidley.

9  Q    And all I'm getting is that Sidley agreed that Chubb's

10  rights were reserved, right?

11  A    Sidley agreed to the terms of that email.  Again, I

12  would like to go back and read the email before testifying as

13  to what it says.

14  Q    All right, do you have Mr. Celentano's declaration

15  there?

16  A    I do not.  I don't have printing capabilities here and

17  it was filed yesterday, so I can go on my other computer and

18  pull it up.

19  Q    All right, Mr. Stamoulis why don't we pull it up for a

20  second, if you could?  Pull up the Exhibit 1 to Celentano's

21  declaration.

22         MR. STAMOULIS:  This is Stan Stamoulis, just bear

23  with me for one second.

24  BY MR. SCHIAVONI:

25  A    And I've actually found the declaration on my computer,

1  so if you'd like I can just look at directly from here.

2  Q    Why don't you look at it and Mr. Stamoulis will

3  continue to try to find it here for a second, but why don't

4  you just read it for a moment.

5         There we have it.  So, Ms. Boelter, we have on the

6  screen Celentano Exhibit 1 which is an email from you to Mr.

7  Celentano dated November 4 2019.  And is that an email you

8  sent at that time?

9  A    It is.

10  Q    Okay.  And am I correct that you agreed on behalf of

11  the Boy Scouts and Sidley, you acknowledged and agreed that

12  Chubb's continued presence at that mediation on the 4th

13  and 5th would not constitute a waiver of Chubb's argument

14  that Sidley was conflicted?

15  A    That is what the first sentence says, yes.

16  Q    Well, is that true?

17  A    Yeah.  We, on behalf of ourselves and our client,

18  acknowledged that Chubb's participation in the mediation

19  would not constitute a waiver of this issue.

20  Q    Is there any reason that you didn't -- well, strike

21  that.

22         Why is it that you didn't disclose this email and this

23  agreement as part of the declaration that you submitted?

24  A    My read of this email is that it's a reservation of

25  rights by all sides and, in fact, I did disclose this and we

1  disclosed it in our reply.  If you'd like, I can point you to

2  the specific spot in my declaration where we note that --

3  here, I can find it right now.

4  Q    Well, I can take you to it.

5       What you disclosed was that Chubb reserved its rights,

6  but you didn't disclose that the Boy Scouts and Sidley had

7  agreed to that reservation, right?

8  A    You're right.  Paragraph 17 says, "Century agreed to

9  participate in the mediation without waiving its rights."

10  Q    Okay.  Now, am I correct that the people who were

11  invited at Chubb to attend the meeting on October 14th, and

12  then there were two calls thereafter, those were people on

13  the claims side.  They were claims handlers for Chubb; am I

14  right?

15  A    That's my understanding.

16  Q    Okay.  And you listened in on Mr. Sneed's testimony,

17  right?

18  A    I did.

19  Q    Okay.  And one of the things that Mr. Sneed talked

20  about was how the claims people are sort of separate from the

21  reinsurance people, right.

22       Do you remember that testimony?

23  A    I do.

24  Q    And the Sidley representation here was on the

25  reinsurance side, right?

1  A      There were two, so (indiscernible) correct.

2  Q      Okay.

3  A      Correct.  Sidley represented Chubb or Century on the

4  reinsurance side.

5  Q      Okay.  Now, Ms. Boelter, I don't think this is a

6  controversial point, but I mean, it just should be clear,

7  right, that at no point during the meeting on October 14 were

8  the two subsequent calls that you refer to in your

9  declaration to either you or Mr. Andolina or anyone else on

10  behalf of Sidley, tell the claims people who were there that,

11  Hey, we just want to let you know that we also represent

12  Chubb on the reinsurance side, right?

13  A      That's correct.  I don't think the team was aware of

14  the engagement, as I indicated in my declaration.

15  Q      Okay.  So, it's fair to say there was no disclosure to

16  these, but Chubb people on the claims side who came to these

17  meetings, there was no disclosure to them by Sidley that,

18  Hey, you know, like, we -- Sidley represents Chubb at the

19  same time, right.  They didn't know that when they came.

20  A      I don't know whether they knew it, but I can affirm

21  your statement that there was not a disclosure at those

22  meetings of the reinsurance engagement.

23  Q      Okay.  Now, you also refer in your declaration to

24  somebody from the claims side coming to Chicago a week after

25  the October 14 meeting and meeting with underlying defense

1  counsel for the Boy Scouts.

2       Do you -- am I correct?

3  A     So, the week after October 14th, there was a meeting at

4  Sidley's offices not involving Sidley lawyers, between

5  individuals from Ogletree, which is national defense

6  coordinating counsel, and individuals from Century or Chubb.

7  Q     Okay.  The Chubb person went to that was Shelly

8  Williams, who's the claims handler involved in handling the

9  Chubb's role in connection with the underlying defense; am I

10 right?

11 A     I'll take your word for it.  I don't know,

12 specifically, what her role is.

13 Q     Okay.  And --

14 A     If you tell me that's true, I will take that.

15 Q     All right.  Well, my point is simply that there was no

16 disclosure to her when she came to Chicago, either, that

17 Sidley was representing Chubb, right?  She's on the claims

18 side, she comes to Chicago to talk about the underlying

19 defense.  Nobody disclosed, from Sidley, to her, their

20 engagement, right?

21 A     Not to my knowledge.

22 Q     Okay.  And when she was there to talk with -- the

23 counterparty for the Boy Scouts who was there, he was the

24 national defense counsel in the underlying cases, right?

25 A     I believe Bruce Griggs from Ogletree was present at

1  that meeting.

2  Q     Okay.  And --

3  A     He was national defense counsel.

4  Q     And he is not a bankruptcy lawyer, right?

5  A     That's correct.

6  Q     All right.  And one of the things that came up at the

7  October 14th meeting was Chubb was complaining it didn't

8  necessarily have up-to-date claims information about the

9  claims in the tort system, right?

10 A     I don't recall that, specifically.  That may have

11 happened, but I don't recall.

12 Q     Okay.  Is what -- Ms. Williams traveled to Chicago the

13 following week to meet with national defense counsel in the

14 underlying cases was to talk about and try to get information

15 about the -- like, the current information on the tort

16 claims; am I right?

17 A     Yeah.  My understanding of that meeting was they were

18 going to sit down and talk about pending claims.

19 Q     Exactly.  All right.

20       They weren't there to talk about negotiating or

21 drafting terms of a plan, right?

22 A     Not to my knowledge, no.

23 Q     And they weren't there to talk about drafting trust-

24 distribution procedures or any exhibits to them, right?

25 A     Not to my knowledge, no.

1  Q    Okay.  And they weren't drafting a claims matrix

2  either, right?

3  A    There was a claims matrix that had been circulated to

4  Chubb, I believe, by coverage counsel in advance of the

5  October 14th meeting.  I think that was reviewed at the

6  meeting that was at Sidley's offices, but, again, I was not

7  present at the meeting that you were referring to, so I'm not

8  sure if they discussed it or not.

9  Q    Because the information you had was that they were to

10  talk about the claims, right?

11  A    In light of the claims matrix.  So, there was a

12  discussion at the October 14th meeting about a claims matrix

13  that had been circulated to Chubb in advance of that meeting

14  by Haynes & Boone, which is Boy Scouts' coverage counsel.

15  My understanding was the claims were then to be discussed by

16  national coordinating counsel, as well as Chubb, to help

17  Chubb better understand, I believe, that proposed claims

18  matrix.

19  Q    Right.  So, they were there, Ms. Williams was there in

20  Chicago with the national underlying defense counsel to talk

21  about the claims information, right?

22  A    In light of the proposed claims matrix, yes.

23  Q    Okay.  But just to be clear, when you signed -- when

24  you submitted this declaration, what you chose to put in was

25  that they were there to talk about the matrix.

1        You didn't put in that they were there to talk about

2   the claims in light of the matrix, right?

3   A    I'd have to refer to my declaration.

4   Q    Why don't you do that.

5   A    Right.  I say in Paragraph 14:

6        "The following week, Sidley hosted additional meetings

7   at its Chicago office, although, Sidley attorneys did not

8   attend, which involved the representative of Century and

9   Chubb, as well as attorneys from Ogletree Deakins, regarding

10  a proposed claims matrix."

11  Q    Right.  They weren't there to discuss terms of a

12  bankruptcy plan.  They were there to just discuss the

13  specifics of the tort claims, right?

14  A    I agree.  They were not there to discuss the terms of a

15  proposed bankruptcy plan.

16  Q    And the whole sort of point of your declaration is to

17  sort of convey that Chubb came to these meetings knowing that

18  Sidley represented Chubb and they didn't object, right?

19  A    No.

20  Q    You're not -- that's not the point of your declaration?

21  A    No.

22  Q    Okay.  All right.

23       Well, then there's not really much disagreement about

24  it, then.

25       Thank you, Ms. Boelter.  I very much appreciate your

 1  answering my questions.

 2          THE COURT:  Thank you.  Any redirect?

 3          MR. DUCAYET:  Yes, Your Honor, and I'll be brief.

 4                  REDIRECT EXAMINATION

 5  BY MR. DUCAYET:

 6  Q    Ms. Boelter, could I ask you to take a look at that

 7  Celentano declaration again.

 8  A    Yeah, one moment.  I just need to pull it up on my

 9  iPad.

10      I have the declaration and the exhibits.

11  Q    Okay.  Let me ask you to turn to Paragraph 18, please.

12  A    One moment.  Yes, I've got it.

13  Q    Okay.  And Mr. Schiavoni asked you a number of

14  questions regarding what was and what was not discussed

15  during that October 14th, 2019, meeting.

16      Do you recall that?

17  A    Yes.

18  Q    And if you could look at Paragraph 18 and, in

19  particular, let me just read to you the second sentence of

20  Paragraph 18.  Actually, let me read the whole paragraph.

21          THE COURT:  Excuse me, Mr. Ducayet.

22          Will everyone please make certain that when you're

23  not speaking, you're muted.  I'm getting someone's typing.

24          Thank you.  Go ahead.

25  BY MR. DUCAYET:

1  Q     Yes.  Paragraph 18 of Mr. Celentano's declaration reads
2  as follows:

3        "The role that Ms. Boelter acknowledges that Sidley has
4  taken in her declaration puts Sidley at the opposite side of
5  the table in negotiating with Chubb over the term of a plan
6  and prosecuting confirmation of a plan.  I saw this at the
7  meeting on October 14th, 2019, where Ms. Boelter and
8  Mr. Andolina of Sidley led the discussion, presented Chubb
9  with plan terms implicating Chubb's rights, pressed that
10 those terms be offered to the tort claimants and then did so
11 over our objection."

12       Do you see that?
13 A     I do.

14 Q     Is that an accurate characterization of what happened
15 at the October 14th, 2019, meeting?

16 A     Not at all.

17 Q     What happened in that meeting?

18 A     Sure.  So, as I mentioned, prior to that meeting,
19 Haynes & Boone had circulated a claims matrix to Century.
20 That matrix was not part of a plan of reorganization; rather,
21 it was intended to be a measurement by which we could
22 approach the mediation with the plaintiffs on November 4th
23 and 5th.

24       At the meeting on the 14th, we, on the restructuring
25 side, conveyed to Chubb that the Boy Scouts was looking for a

1 global resolution of abuse liability.  That in consideration

2 of that, we had a desire to organize a global mediation

3 particularly aimed towards current claimants, that in

4 furtherance of that, after working with Ogletree, Boy Scouts

5 had devised a claims matrix that they wanted to share with

6 the plaintiffs and asked Chubb for its feedback with respect

7 to that matrix.

8     We did not have a proposed plan.  There was not a plan

9 that was drafted.  Plan terms were not presented to Chubb.

10 We merely described the process that we were going to, and,

11 in fact, we were hoping to reach some sort of pre-packaged or

12 pre-negotiated agreement with all parties and simply

13 suggested to Chubb that we wanted to partner with them in

14 furtherance of that objective.

15 Q     Okay.

16         MR. DUCAYET:  Thank you, Ms. Boelter.  I have

17 nothing further.

18                     RECROSS-EXAMINATION

19 BY MR. SCHIAVONI:

20 Q     Well, I -- this is Mr. Schiavoni -- I do have a few

21 questions.

22     Ms. Boelter, you told us that you were negotiating a

23 pre-packaged plan.  You weren't negotiating an agreement.

24 You were negotiating a pre-packaged bankruptcy plan, right?

25 A     That was the objective.  We were not yet in

1    negotiations.

2    Q     And when you brought up --

3    A      (Indiscernible) the first step.

4    Q     Okay.  And when you brought up this matrix, you

5    actually made clear that the matrix, itself, was drawn by

6    Sidley from a (indiscernible) from another bankruptcy, right?

7    A     I don't recall that.

8    Q     Okay.  Well, who on your team prepared the matrix?

9    A     I believe it was a joint effort between the Ogletree

10   team that spent extensive time walking through sort of the

11   injury types and values that were assigned to those injuries,

12   and then there were members of our litigation team that

13   provided support for that.

14   Q     And the matrix was intended to be put into the trust-

15   distribution procedures; am I right?

16   A     If it were ultimately agreed to, the matrix -- and

17   that's pretty typical -- it does find its way into trust-

18   distribution procedures.

19   Q     And you told us at that meeting that you had

20   interviewed candidates to serve as a futures claimant

21   representative, didn't you?

22   A     I don't believe we said that.

23   Q     Well, what did you say about a future claimants

24   representative at that meeting?

25   A     I don't recall specifically what we said.

1  Q     Well, do you recall anything?

2  A     I recall that we had disclosed that in furtherance of

3  the process for some sort of pre-arranged or pre-packaged

4  bankruptcy filing, that we had a discussions with a future

5  claimants representative.  I believe in the WebEx that was

6  referenced on -- in my declaration that came a week or two

7  later, we had a specific discussion with Chubb about the

8  identity of the future claimants representative.

9  Q     And did Chubb object to the retention of Mr. Gilbert?

10 A     So, Mr. Gilbert is not the future claimants

11 representative.  Mr. Patton is.

12       I don't know that they lodged a specific objection, but

13 I also recall that conversation being somewhat contentious

14 over the identity of the future claimants representative.

15 Q     But you conveyed to Chubb that Mr. Gilbert was going to

16 be, whatever, partnered or counsel or, you know, retained at

17 counsel or connected in some way to Mr. Patton; am I right?

18 A     I believe you asked us whether Mr. Patton had engaged

19 the Gilbert firm and we, I believe, said, Yes, he has engaged

20 the Gilbert firm.

21 Q     And that was done prepetition with the Boy Scouts

22 financing that, right?

23 A     Yeah.  The Boy Scouts, I believe, provided Mr. Patton a

24 retainer for his professional fees.  I don't recall beyond

25 that.

1  Q    All right.  And the contentiousness or we could call it

2  adversity that you referred to, that was taking place between

3  Chubb and Sidley in connection with the whole discussion of

4  how Sidley was proceeding with respect to a pre-packaged

5  plan, right?

6  A    No, that is not an accurate characterization of the

7  conversation.

8  Q    Well, what was contentious then?  Was that contention

9  between someone else?

10  A    We had a conversation, I believe it was, as I said,

11  October 29th or 30th in my declaration.  We, on the Boy

12  Scouts' side, disclosed, at Chubb's request, who the future

13  claimants representative was and my recollection was that you

14  expressed to us disappointment in our selection of Jim Patton

15  as the future claimants representative.

16  Q    Wasn't it about Mr. Gilbert?

17  A    As a follow-up question, I believe you may have

18  asked -- again, I'm going -- I don't recall the precise

19  words -- but I think you had asked whether Mr. Patton had

20  retained the Gilbert firm and we said yes.

21  Q    The point of Mr. Celentano's declaration is in the

22  back-and-forth in that meeting and the one that followed,

23  that back-and-forth over how things were proceeding, that was

24  taking place between Sidley and Chubb, right?

25              MR. DUCAYET:  I'm not sure if that's a proper

1  question, Your Honor.  It's sort of characterizing what the

2  purpose of the declaration is (indiscernible).

3             MR. SCHIAVONI:  All right.  Fair enough.

4             I'll withdraw the question.

5  BY MR. SCHIAVONI:

6  Q    Sidley led the meeting, right, on the 14th?

7  A    I don't agree with that characterization.  There were

8  multiple parts to that meeting.  The part concerning the

9  restructuring, Sidley did take the lead on.

10            MR. SCHIAVONI:  I have no further questions, Ms.

11 Boelter.  Thank you very much.

12            THE COURT:  Thank you.

13            Mr. Ducayet, anything further?

14            MR. DUCAYET:  No, Your Honor.

15            THE COURT:  Okay.  Thank you, Ms. Boelter.

16            THE WITNESS:  Thank you, Your Honor.

17        (Witness excused)

18            THE COURT:  Okay.  Mr. Ducayet, what's your future

19 next witness?

20            MR. DUCAYET:  Your Honor, at this point, we would

21 intend to tender the declaration, proffer the declaration of

22 Professor Rapoport.  As I indicated, she is available, you

23 know, in case there is cross-examination or if Your Honor has

24 any questions and so we would like to proceed that way.  I

25 can notify Professor Rapoport that she should in if we want

1  to proceed now.

2          THE COURT:  Mr. Schiavoni, do you have cross-

3  examination for Professor Rapoport?

4          MR. SCHIAVONI:  Yes.  We can be very brief with

5  it.  So, if we could put her on, we can get done with her

6  quickly.

7          THE COURT:  Okay.  Well, I need a break and I

8  suspect some of you may, as well.  Let's take -- I've got

9  1:25.  Let's convene at two o'clock.

10          People can get something to eat.  You can --

11  Mr. Ducayet, you can reach out to Professor Rapoport, and we

12  will start at 2:00.

13          MR. DUCAYET:  Okay.

14          THE COURT:  We're in recess.

15          MR. DUCAYET:  Thank you, Your Honor.

16          THE COURT:  And we will keep this open and I'll

17  ask my chambers to do some activity which keeps it open

18  during this time frame, but everything, as my understanding,

19  should remain open.  If you want to call back into CourtCall,

20  you can, or you can leave it open.  It's up to you.  Thank

21  you.

22          MR. DUCAYET:  Thank you, Your Honor.

23      (Recess taken at 1:25 p.m.)

24      (Proceedings resumed at 2:06 p.m.)

25          THE COURT:  Okay.  Counsel, are we ready to begin?

1          MR. ABBOTT:  I believe so, Your Honor.  Thank you.

2  Derek Abbott.

3          MR. DUCAYET:  Your Honor, James Ducayet from

4  Sidley.  We're ready to proceed.

5          THE COURT:  Okay.  Thank you.

6          And I see Mr. Schiavoni.

7          Mr. Ducayet, I don't remember if you formally

8  tendered Ms. Rapoport's declaration or not.

9          MR. DUCAYET:  Your Honor, I'm not sure either, but

10  in the interest of completeness I will do so now.

11          THE COURT:  Okay.  Thank you.

12          It is admitted subject to cross examination.

13      (Declaration of Nancy Rapoport, admitted)

14          MR. SCHIAVONI:  Your Honor?

15          THE COURT:  Yes.

16          MR. SCHIAVONI:  Your Honor, I -- we do have

17  objections to the substance -- the admissibility of the

18  opinions themselves.  Perhaps I could just briefly make those

19  to preserve my rights on it at the end of the examination,

20  but I don't want to be seen as having waived those.

21          THE COURT:  Okay.  You haven't waived anything and

22  I can guess what those comments might be, but I will hear the

23  witness.

24          So, Professor Rapoport, if you can raise your

25  right hand, please, I will swear you in.

1           NANCY RAPOPORT, WITNESS, SWORN

2           THE COURT:  Will you, please, state your full name

3    and spell your last name for the record?

4           THE WITNESS:  My name is Nancy B. Rapoport.  My

5    last name is spelled R-A-P-O-P-O-R-T.

6           THE COURT:  Thank you.

7                     CROSS EXAMINATION

8    BY MR. SCHIAVONI:

9    Q     Thank you, Ms. Rapoport.  My name is Tancred Schiavoni

10   on behalf of Chubb.  I'm going to be asking just a few

11   questions here.

12         Ms. Rapoport, first, can you tell us how long did you

13   spend interviewing Bill Sneed?

14   A     I spent no time at all interviewing Mr. Sneed.  I

15   relied on his declaration.

16   Q     Okay.  Did you spend time interviewing Mr. Conlan?

17   A     No.

18   Q     Do you know who Mr. Conlan is and what role he plays in

19   the case?

20   A     No.

21   Q     Did you interview any of the bankruptcy lawyers working

22   on the Sidley engagement for the Boy Scouts?

23   A     No.

24   Q     Is it -- did you take everything that Mr. Sneed said in

25   his declaration as true, and accurate, and complete?

1  A      I used his declaration to help me form my opinions.

2  So, yes.

3  Q      Okay.  In formulating your opinion were you asked by

4  Sidley to assume that Mr. Sneed's declaration full described

5  all of the work that he did for Chubb?

6  A      I don't recall being asked by Sidley to do that, no.

7  Q      Okay.  In formulating your opinions did you assume that

8  Mr. Sneed's declaration fully portrays all of the work he did

9  for Chubb?

10  A      Yes.

11  Q      Is one of the assumptions that you made in formulating

12  your opinion is that Century is, in fact, a former client of

13  Sidley?

14  A      Yes.

15  Q      Okay.  Am I right that Sidley asked you to assume, for

16  purposes of formulating your opinions, that Century is a

17  former client?

18  A      Yes.

19  Q      So, all of the ethics rules you applied and the

20  bankruptcy rules you applied were all premised upon Sidley's

21  request that you assume that Century is a former client.  Am

22  I right?

23  A      That is correct.

24  Q      Okay.  Is another assumption that Sidley asked you to

25  make was that the two reinsurance disputes that Mr. Sneed

1  worked on with respect to reinsurance for Boy Scout matters

2  exclusively involved historic claims; claims that had already

3  been paid?

4  A    Yes.

5  Q    Now you reached -- you addressed two questions in your

6  report, is that right?

7  A    That is correct.

8  Q    Okay.  Who framed those questions for you to answer?

9  A    Sidley did.

10 Q    Okay.  Were there other questions that came out of the

11 facts that you read about this case that could have been

12 posed to you?

13 A    I'm sorry.  I don't quite understand your question.

14 Q    Fair enough. It was an awkward question.

15      Let me ask you about the first of the two questions you

16 were asked.  You were asked by Sidley to reach a conclusion

17 about the reasonableness of Sidley's thinking about

18 something, right?

19 A    That's correct.

20 Q    Okay.  That's Question 9-A in your report, am I right?

21 A    I'm happy to go look at my declaration, but I assume,

22 yes, that's the correct one.

23 Q    Okay.  The Model Rule 1.9, right -- you're familiar

24 with that model rule, right?

25 A    Yes.

1  Q    Does Model Rule 1.9 use the word "reasonable" anywhere
2  in the rule?
3  A    No.
4  Q    And is there anything about determining -- is there
5  anything in the rule that says that the clients -- strike
6  that.
7       Is there anything in the Rule 1.9 that says that the
8  lawyers subjective intent about reasonableness in any way it
9  goes into the determination of whether something is
10 substantially related or not?
11 A    No.  Rule 1.9 talks about whether matters are the same
12 or substantially related and material effect, but, no, not
13 about reasonableness.
14 Q    In the test that's applied in order to determine
15 whether something is substantially related is an objective
16 test.  It's not a subjective test as to what the lawyer
17 thinks, is it?
18 A    Well, I'm going to give you a king of complicated
19 answer.  Someone has to make the determination about whether
20 the matter was the same or substantially related.  And that
21 will determine what happens next in Rule 1.9.
22 Q    Okay.  The second question you were asked goes to
23 whether various actions could take place to mitigate or -- is
24 it to mitigate or is it to prevent damage to a client?
25 A    Let me take a quick look on how it's phrased in my

1  declaration.  Bear with me, please.

2      Issue two of my declaration asks,

3      "Could any potential issues or concerns with respect to

4  Sidley's prior representation be addressed by means of the

5  use in conflict counsel, screens and other steps in the

6  bankruptcy?"

7      And then the second part of issue two is,

8      "Does Century's description of the potential adversity

9  have implications with respect to the ability of large firms

10 to represent debtors and are there ways to address those

11 implications through some of the steps?"

12     So, those were the parts of issue two that I was asked

13 to address.

14 Q    Okay.  Now with respect to the first component of that,

15 which includes screens, for an ethical screen to be put in

16 place should it be put in place before the conflict manifests

17 itself?

18 A    If there is a conflict, yes.

19 Q    Okay.  Let's turn now to your reference here to

20 "conflict counsel."

21     Did you do any work to investigate whether there was

22 any -- whether the people at Haynes & Boone had any

23 experience in drafting plans of reorganization?

24 A    I did not.

25 Q    So, is it fair to say in formulating your opinion you

1  don't know whether it's a practical possibility to have this

2  Haynes & Boone Firm in Texas take over drafting the plan of

3  reorganization or parts of it?

4  A    Well, actually, as a Texas admitted lawyer, I'm quite

5  familiar with Haynes & Boone and its experience in

6  bankruptcy.  And I hold it in high regard.

7  Q    Okay.  I'm not insulting the firm.  I want to be clear

8  about that.

9  A    Sure.

10  Q    Let me confine it to the lawyers -- the insurance

11  coverage lawyers at Haynes & Boone that are working on this

12  matter, you didn't -- in formulating your opinion you didn't

13  make an evaluation of whether those particular lawyers have

14  any expertise, or skill, or the ability to really draft plans

15  of reorganization (indiscernible).  Do you?

16  A    I did not.

17  Q    Okay.  So, the documents -- did you review documents

18  other than the exhibits from Mr. Sneed's declaration?

19  A    All of the documents that I reviewed have been attached

20  to my declaration as Attachment 2.

21  Q    Okay.  Now, Ms. Rapoport, I want to just refer you to -

22  - and if you need to get your report, I'd like you to do it

23  because I'd like to refer you to Footnote 5 of your report.

24  A    All right.  Bear with me.  Yes, I see it.

25  Q    Who drafted Footnote 5?

1   A      I did.

2   Q      Okay.  And did Sidley ask you to include that in this

3   report or did you decide you should include it in the report?

4   A      I believe I did, yeah.

5   Q      Okay.  Could you read to us what Footnote 5 says?

6   A      Yes.  It is my understanding that Century has not

7   provided informed written consent to Sidley with respect to

8   the BSA representation.

9   Q      Okay.  And was that statement true when you signed the

10  report?

11  A      To the best of my understanding, yes.

12  Q      Okay.  And based on all the information you have seen

13  in the case is that statement true now?

14  A      To the best of my understanding, yes.

15  Q      Okay.  Now the rules, the model rules require for

16  informed consent that -- am I right that an attorney

17  disclosed information to the client?

18  A      Are you speaking in general about informed consent?

19  Q      Yes.

20  A      Yes.  Whenever you seek informed consent from a client

21  you have to provide the client with sufficient information

22  that the client can make a -- and I'm sorry to use the word

23  in its own definition, but an informed decision.

24  Q      Okay.  That imposes upon the law firm an obligation to

25  provide the client with adequate information in order to

1 reach a conclusion, right?

2 A    Yes.  If a law firm is seeking informed consent it has

3 to provide enough information that the client can understand

4 what the law firm is asking it to do and decide whether it

5 wants to consent to that.

6 Q    Okay.  Now you -- have you ever practiced -- you have a

7 very fine academic background, I want to be clear about that,

8 but have you ever -- your private practice you worked at

9 Morrison & Foerster, am I right?

10 A    Yes.  That is correct.

11 Q    Okay.  Were you in the bankruptcy group there?

12 A    I was.

13 Q    Good.  Good.

14      So, let me ask you this; are there some bankruptcy

15 engagements where a bankruptcy lawyer is consulted by a

16 client to give advice about insolvency matters or bankruptcy

17 matters, but doesn't actually take on the role of being

18 debtor's counsel itself?

19 A    Yes.

20 Q    Okay.  So, being in the position of being a bankruptcy

21 lawyer providing advice to a client you'd agree with me

22 there's a whole range of possibilities about what the scope

23 of that engagement could be, am I right?

24 A    Yes.

25 Q    It could be a counseling engagement where you don't

1  take on the debtor's role, right, that's one.

2  A      Sure.

3  Q      Right.  Is another possibility for representation is

4  that the debtor's -- you take on the debtor's counsel where

5  it can be more of a litigation engagement where you're trying

6  to put in place, say, a contested plan or cramming down a

7  plan, for lack of a better explanation.

8  A      Yes.

9  Q      Okay.  And to the extent you're a client and you're

10 trying to make an assessment about providing consent is the

11 provision of some information about the nature and scope of

12 the bankruptcy engagement, whether it's transactional advice

13 or whether it's more comprehensive, is that something that

14 goes into evaluating whether it's to inform consent?

15 A      Well before I answer that I have to ask a follow-up

16 question.  Are you asking me about informed consent generally

17 or informed consent with respect to Rule 1.9?

18 Q      I'm asking generally.

19 A      In general you have to provide enough information for

20 the client from which you're asking or for which you're

21 asking for, informed consent, so that the client can make a

22 well thought out decision.

23 Q      Okay.  Have you seen anything, Ms. Rapoport, that

24 (indiscernible) Chubb actually gave written consent in this

25 case?

1  A      No.

2          MR. SCHIAVONI:  Okay.  Thank you very much for

3  your testimony.

4          THE COURT:  Mr. Ducayet, redirect.

5          I will ask everyone to check to make sure they are

6  muted.  I'm getting some extraneous noise.  Thank you.

7          Mr. Ducayet?

8          MR. DUCAYET:  Thank you, Your Honor.  James

9  Ducayet on behalf of Sidley.

10                    REDIRECT EXAMINATION

11  BY MR. DUCAYET:

12  Q      Professor Rapoport, nice to see you.

13  A      Nice to see you.

14  Q      It's one of the oddities of the time that we live in

15  that we've worked together and, yet, never actually met in

16  person or even seen each other over a video conference.

17          Professor Rapoport, let me just pick up on a couple of

18  the questions that Mr. Schiavoni was just asking you.

19          In connection with the work that you did here did

20  Sidley ever ask you to analyze the issue of whether or not

21  Century had given informed consent in connection with the

22  representation here?

23  A      No.

24  Q      Okay.  And in terms of the application of Rule 1.9,

25  does 1.9 require written informed consent if the matters are

1  not substantially related?

2  A       No.

3              MR. DUCAYET:   I have nothing further.

4                      RECROSS EXAMINATION

5  BY MR. SCHIAVONI:

6  Q    Is there -- Ms. Rapoport, that last question assumed

7  that there was no possibility of a conflict, right?  Isn't

8  that correct?

9        I'll withdraw the question.  Let me ask the fresh,

10 okay?

11 A       Sure.

12 Q    If someone is seeking a waiver under 1.9, does Rule 1.9

13 require written consent?

14 A    Sorry, I was trying to make sure that I didn't have any

15 beeps in the background and I can't get rid of them.  My

16 apologies, Your Honor.  There are some things that Zoom

17 doesn't let me do.

18       So, to answer your question what would trigger a

19 request for informed consent is the first part of Rule 1.9.

20 Whether the matter was the same or substantially similar

21 would be the first part of the inquiry.  So, if the matters

22 are not the same or substantially similar you would never get

23 to an informed consent.

24 Q    Right.  My question, though, is to the extent one is

25 seeking a waiver, either a current waiver or prospective

1 waiver with regard to 1.9, am I right that Rule 1.9 requires

2 a written waiver for it to be effective?

3 A    To the extent that someone is seeking a waiver under

4 1.9 the language of 1.9 says the client -- the former client

5 gives informed consent confirmed in writing.  Law firms often

6 ask for waivers for a variety of reasons, but if they are

7 looking specifically at 1.9 that's the language of 1.9.

8 Q    Okay.  And one of the reasons why the model rules

9 require waivers in writing it's in the commentary to the

10 rules, and the academic discussion of it, for lack of a

11 better word, you know, commentary because a written waiver is

12 something that conveys to the client both the seriousness of

13 the request and assures that the waiver is granted by someone

14 internally who has the authority to grant it.  Am I right?

15          MR. DUCAYET:  Your Honor, if I could impose an

16 objection here.  I think this is getting beyond the scope of

17 my redirect.

18          THE COURT:  Sustained.  I will let her answer this

19 one question.

20          THE WITNESS:  Sorry.  Could someone please read

21 the question back?

22          THE COURT:  Mr. Schiavoni, give it a shot.

23 BY MR. SCHIAVONI:

24 Q    Okay.  I'm not going to read it back, but I'll just

25 tell you what I think I said.  Okay.  Is one of the reasons

1  why, you know, referred to in the commentary, in the academic

2  treatises and what not on Rule 1.9 for the reason why 1.9

3  requires a writing is because the writing conveys to the

4  client the seriousness of the request and that the request is

5  also one that's considered and approved internally by someone

6  with authority.

7  A    Certainly it's true that you want to convey the

8  seriousness of the request.  I'm trying to recall whether any

9  of the comments talk about a person with authority, but the

10  comments do say that they want a record which is why written

11  consent is required.

12  Q    Did anyone ever tell you at Sidley why you weren't

13  being asked to analyze whether there was informed consent and

14  a proper waiver here?

15          MR. DUCAYET:  I'm going to interpose the same

16  objection.

17          MR. SCHIAVONI:  It's my last question, Your Honor.

18          THE COURT:  Actually, I'm going to overrule that

19  objection.  You can answer it.

20          THE WITNESS:  Sure.  Sidley asked me to look at

21  one very specific set of facts and not to go beyond that set

22  of facts.

23          MR. SCHIAVONI:  I have nothing further, Your

24  Honor.

25          THE COURT:  Thank you.

1          Mr. Ducayet, does that prompt any further

2   questions from you?

3          MR. DUCAYET:  It does not, Your Honor.

4          THE COURT:  Okay.  Thank you.  Thank you,

5   Professor Rapoport.  You are excused.

6          THE WITNESS:  Thank you, Your Honor.

7       (Witness excused)

8          MR. SCHIAVONI:  Your Honor, just very briefly, we

9   do object to the admission of the opinions.  We think that

10  they would constitute net opinions that don't lack a

11  foundation in the subject matter.  The opinion about the

12  reasonableness has nothing to do with Rule 1.9 here.

13  Otherwise, the opinion is one that is a net opinion and not

14  to any foundation.  We would ask for it to be excluded on

15  that basis.

16         THE COURT:  Mr. Ducayet, a response?

17         MR. DUCAYET:  Yes, Your Honor.  We do think it's

18  appropriate.  The issues that Professor Rapoport was asked to

19  address relate to the ultimate question here which is under

20  the circumstances Sidley made a determination that these

21  matters are not substantially related.  We are very

22  cognizant, Your Honor, about not offering opinions on the

23  ultimate legal question.

24         Just by way of a spoiler alert, you know, we do

25  have that objection with respect to Mr. Slanina's

1 declaration.

2         The issue, Your Honor, of whether or not in

3 undertaking its analysis of whether or not these matters are

4 substantially related, you know, that's an objective

5 standard.  Reasonableness is an objective standard.  And it

6 certainly, I think, is probative of Sidley's good faith in

7 undertaking that analysis and that ultimately at the end of

8 the day, Your Honor, you have a lot of discretion in this

9 matter.

10         Among the things that are appropriate for you to

11 consider in exercising that discretion is whether or not

12 Sidley had a reasonable basis for taking the position that it

13 did.

14         THE COURT:  Okay.  I will consider the objection

15 as I consider my decision.  I am not sure if anyone provided

16 me with case law; although, I will confess, I haven't had as

17 much time to spend on the last filing that tells me exactly

18 what I do in this situation and how I judge a situation where

19 a law firm makes a determination of no conflict.  As I said,

20 I will consider that objection as I consider my decision.

21         Okay.  What's up next?

22         MR. DUCAYET:  Yes, Your Honor.  On behalf of

23 Sidley Austin that will conclude our evidentiary presentation

24 subject, of course, to offering anything in rebuttal to

25 anything that's presented by Century.  I do know that Mr.

1  Abbott, of the Morris Nichols Firm, on behalf of the debtors

2  filed a brief in support of the Sidley application.  So, I am

3  going to turn it over to Mr. Abbott at this point for his

4  evidentiary submission.

5          MR. ABBOTT:  Thank you, Your Honor.  It's Derek

6  Abbott of Morris Nichols.

7          Your Honor, I would like to offer, in support of

8  the debtors' application, the declaration of Brian Whittman

9  that had been filed at Document 499 on the docket.  Mr.

10  Whittman, as I understand it, is on CourtCall, on Zoom and

11  available for cross examination if necessary.  It's not my

12  understanding that any of what is covered in his testimony

13  has been contested, but he's here and available for that if

14  necessary, Your Honor.

15          THE COURT:  Okay.  Thank you.

16          Any objection to Mr. Whittman's declaration coming

17  into evidence?

18          MR. SCHIAVONI:  Your Honor, other than we think

19  it's irrelevant, we have no objection.

20          THE COURT:  Okay.  Well, its --

21          MR. SCHIAVONI:  We do object on relevance grounds,

22  but, otherwise, we don't.

23          THE COURT:  Okay.  Well, I will admit it and

24  determine whether it's relevant in the context of my

25  deliberations.

1         (Declaration of Brian Whittman, admitted)

2              THE COURT:  Mr. Schiavoni, do you have any cross

3    examination?

4              MR. SCHIAVONI:  I do not, Your Honor.  Thank you

5    very much.

6              THE COURT:  Okay.  Thank you.

7              Mr. Abbott, do you have anything further?

8              MR. ABBOTT:  Your Honor, I have nothing further to

9    offer on an evidentiary basis.  I, obviously, reserve my

10   right for argument in due course.

11             THE COURT:  Okay.  Thank you.

12             Mr. Schiavoni?

13             MR. SCHIAVONI:  Your Honor, I have several

14   witnesses, but there is one, I think, maybe non-

15   controversial.  Ann Rappleye offered a short declaration

16   about the execution of the SLA.  Based on Mr. Sneed's

17   testimony I don't believe it's at issue.  I still would like

18   to tender her declaration into the record.  She is not -- I

19   need to call her to get her available, but if there's not an

20   issue with this from Sidley I would just and if they could

21   tell us that now so we could put her declaration in.  If they

22   want to cross her we'll go to a different witness.

23             MR. DUCAYET:  Your Honor, Jim Ducayet on behalf of

24   Sidley.

25             We don't have an objection to the submission of

1  the declaration and we do not have any questions for her on

2  cross.

3          THE COURT:  Okay.  Thank you.

4          Can you -- Mr. Schiavoni, can you give me a docket

5  number for that.  It appears to be a declaration I did not

6  print out.

7          MR. SCHIAVONI:  Your Honor, it was attached as an

8  exhibit to our motion for leave to file a sur-reply on

9  Friday.

10         MR. BUCHBINDER:  Your Honor, this is Dave

11 Buchbinder.  It's Docket Entry 531, Your Honor; 5-3-1.

12         UNIDENTIFIED SPEAKER:  Your Honor, I think Ms.

13 Rapoport was 531.  I believe Ms. Rappleye is 540 if I'm not

14 mistaken.

15         THE COURT:  Okay.  I do see a declaration at 530-

16 1.  So, that is an exhibit to the Century reply brief filed

17 on the 1st.  Okay.  That is admitted without objection.

18      (Declaration of Ann Rappleye, admitted)

19         MR. STIMOULIS:  Your Honor, this is Sam Stimoulis.

20         I filed that also independently at Docket No. 540.

21 Just so it's clean and not as an attachment to another

22 filing.

23         THE COURT:  Thank you.  But its, otherwise, the

24 same?

25         MR. STIMOULIS:  Yes.

1          THE COURT:  Thank you.

2          That's admitted without objection and no cross

3  examination requested.

4          MR. SCHIAVONI:  Your Honor, next we'd like to call

5  Christine Russell.

6          THE COURT:  Ms. Russell.

7          MS. RUSSELL:  Good afternoon, Your Honor.

8          THE COURT:  Good afternoon.

9          Mr. Schiavoni, do I have a declaration for Ms.

10  Russell or no?

11          MR. SCHIAVONI:  You do not, Your Honor.  We were

12  able to get declarations to you for everyone else, but in the

13  time allotted we just couldn't get one done for Ms. Russell.

14          THE COURT:  That's fine.

15          Okay.  Ms. Russell, I'm going to swear you in.

16              CHRISTINE RUSSELL, WITNESS, SWORN

17          THE COURT:  Please state your full name and spell

18  your last name for the record.

19          THE WITNESS:  Christine Gellert Russell, R-U-S-S-

20  E-L-L.

21          THE COURT:  Thank you.

22                    DIRECT EXAMINATION

23  BY MR. SCHIAVONI:

24  Q    Ms. Russell, this is Tancred Schiavoni from O'Melveny.

25          Let me ask you this to start, by whom are you employed?

1   A       I'm employed by Chubb.  I actually work for a

2   subsidiary company, but Chubb is probably the easiest way to

3   state it.

4   Q       Ms. Russell, what is your position, your title at Chubb

5   right now?

6   A       I'm senior vice president, head of reinsurance for the

7   sub-group I was just talking about, the Brandywine Group of

8   insurance and reinsurance companies.

9   Q       Tell us, Ms. Russell, in general terms what your

10  responsibilities are at Chubb?

11  A       Sure.  I oversee a group of about 30 people responsible

12  for billing and collecting reinsurance.  So, when we are the

13  insurance company and we need to submit a bill and make

14  collections from our re-insurers I'm responsible for that.

15  About two-thirds of my group do that and then the other one-

16  third of my group we're also, what's called, an assuming

17  company.  So, we are also a re-insurer sometimes.  And I also

18  oversee the bills that come into us where other companies are

19  seeking collection from us for reinsurance.

20  Q       Okay.  In your reinsurance group are sometimes matters

21  contested requiring litigation, or arbitration, or other

22  adversarial processes?

23  A       Yes.  I'd say at any given time I oversee between 30 to

24  40 open disputes.  As Mr. Sneed said, the vast majority of

25  reinsurance disputes are in arbitration and a smaller

1  percentage are in court.

2  Q    Okay.  How long have you been in the role you have now?

3  A    I was a practicing attorney from 1995 to 2012 when I

4  took my current role.  And I've been in that role ever since.

5  Q    Okay.  And in private practice, before joining Chubb in

6  this reinsurance capacity, were you on a transactional side

7  or were you litigation?  What was the nature of your

8  practice?

9  A    I was involved in litigation my entire career.  The

10  latter 10 years largely reinsurance litigation.

11  Q    Okay.  Are you, effectively, the client in dealing with

12  Sidley Austin for Chubb?

13  A    Yes.

14  Q    Okay.  I want to talk about or have you come back and

15  talk about the Sidley relationship in a minute, but if we

16  just spend a minute on just covering reinsurance and what it

17  is for those of us who don't know too much.  Can you tell us

18  what reinsurance is?

19  A    Sure.  I think Bill did a reasonably good job with

20  this.  He explained that, you know, reinsurance is insurance

21  for insurance companies.  It's a risk spreading mechanism.

22  So, when the insurance company writes a risk they don't

23  necessarily want to keep the entire risk. So, it's a way of

24  sharing the risk with other companies, other risk bearing

25  entities.

1    As Bill said there are generally two types.  There is

2  treaty reinsurance that reinsures usually a large book of

3  business, or a particular set of risks or large set of risks.

4  Then there is risk specific reinsurance where it's one policy

5  that's reinsured specifically and that's called facultative

6  reinsurance.  It gives a much closer connection between the

7  insurance policy and the reinsurance.

8  Q    Mr. Sneed talked about, he used the word, facultative

9  reinsurance and treaty.  Is there any significance for what

10 we're going to be dealing with today between these different

11 types of reinsurance?

12 A    Sure.  So, in the two disputes in particular -- and I

13 will note that the two that Bill focused on are not the only

14 disputes that Sidley was handling for us at the time they

15 took on the representation with the Boy Scouts.  The two that

16 he did refer to, one of them was a treaty dispute, the other

17 is a facultative dispute.

18     I think it's important to note that, you know, there's

19 a concept in reinsurance where the reinsurers follow what the

20 insurance company does.  So, they're bound to follow

21 decisions that are made under the policies, but with

22 facultative it's important to note that there's a concept in

23 the -- facultative certificate, the contract if you will, is

24 often just a two page preprinted form and it's got a follow

25 the form provision, and it follows the terms and conditions

1  of the underlying policy.

2       So, in fact, in a case we had in the Southern District

3  of New York recently the court found, and I think correctly,

4  that the policy is part of the integrated reinsurance

5  agreement.  So, you can't construe the reinsurance contract

6  without construing the underlying policy.

7  Q    So, how is it that the insurance that an insurer issues

8  directly to a policyholder is relevant to billing reinsurers

9  or part of analyzing reinsurance?

10 A    It's very much a huge part of what I and my team do

11 every day.  If there's an insurance claim that we have there

12 are a few things. Once that claim is resolved in some way you

13 go through resolution by settlement or by judgment.  There

14 are a few things my team has to look at to figure out how to

15 build the reinsurance.  One is the reinsurance contracts.

16 The second most significant thing is the underlying claim and

17 the claim resolution.  And it's extremely important to know

18 how to bill your reinsurers that you understand the coverage

19 issues that existed in the underlying claim and how those

20 were resolved.  If you get into a dispute that's the evidence

21 that's most pertinent in addition to the contracts

22 themselves.

23 Q    Do you face situations where in the underlying

24 insurance matter, where there's the direct insurance to the

25 policyholder, where the terms of that insurance between

1  policyholder and insurer are in dispute?

2  A    (Indiscernible) dispute in the reinsurance case?

3  Q    Well let me ask it a little bit differently.  Do you

4  have situations, as a reinsurer, where costs are being

5  presented to you from the underlying insurance matter where

6  the terms of that coverage are in dispute between the

7  policyholder and the insurer?

8  A    Yes.  Very, very often.

9  Q    Okay.  And do you have to -- in connection with

10 assessing those situations do you need to have information

11 about how the legal analysis was done of the underlying

12 coverage?

13 A    Absolutely.  That is very typical evidence that we

14 share with our reinsurance lawyers that they need to

15 understand and pursue our collections is to understand that,

16 you know, things often get decided by judgment, but more

17 often than not things are resolved by settlement.  It's

18 really important that we share our evaluation of our

19 litigation risk, and how and why we settled the way that we

20 did.  Reinsurers ask that.

21     While there's a doctrine called Follow the Settlements

22 that doctrine requires us to demonstrate that what we did

23 was, at least, reasonable and businesslike.  So, we are often

24 called on to share with our counsel and it becomes an issue

25 in the reinsurance matter about what was decided and why, and

1  what our legal analysis was in the underlying case.

2  Q    Okay.  Is one of the ways that your reinsurance group

3  can get at that issue efficiently sometimes is by providing

4  that to counsel through exchanges with members of your legal

5  team at Chubb?

6  A    Yeah.  My legal team will exchange with my team and

7  sometimes even with the underlying claims handlers.  You

8  know, they have to interview them, put them on as witnesses.

9  Q    Okay.  Is the information that you need to provide or

10 need to consider in connection with a reinsurance dispute or

11 billing sometimes involve information about what the strategy

12 in the underlying action was with respect to the coverage?

13 A    Very often.

14 Q    If there are disputed issues on the direct coverage

15 level, this is where like the policy is issued directly to

16 the policyholder, that are resolved at that level what

17 information about the direct coverage is needed to address

18 the reinsurance claims and is that often privileged?

19 A    It is privileged and it's an issue that we struggle

20 with a lot because, you know, we've got, often times, still

21 an ongoing matter, an ongoing coverage dispute and yet we

22 have settled some things and we're going to bill our

23 reinsurers for their share.  They want to understand why we

24 entered into the settlement that we entered into.  And we

25 really have to -- we struggle, you know, with sharing our

1   information that is privileged.  And we certainly share it

2   with our own counsel and then we have to decide how much of

3   that we can share with the reinsurers.  So, it's a very

4   delicate balance, but certainly it's always shared with our

5   counsel.  I mean there is no doubt about that.  They can't

6   help us evaluate the claim without understanding our

7   privileged analysis.

8   Q      Does your work on reinsurance, on contested matters in

9   particular, does it often times, you know, involve your

10  team's analysis of the strengths and weaknesses of people who

11  would be witnesses in arbitrations from the underlying

12  matter?

13  A      Absolutely.

14  Q      And would those people be sometimes people who are

15  directly involved in the underlying coverage matters?

16  A      Certainly they are.  They are -- I'd say in my career

17  of doing this for 20 plus years it's the rare reinsurance

18  arbitration that doesn't have the underlying claim handlers

19  as a witness in one capacity or another.  Either they're

20  taking depositions or appearing at a hearing.

21  Q      Are the arbitrations in the reinsurance field, are they

22  usually public in nature or are they subject to

23  confidentiality agreements?

24  A      No.  They are typically subject to confidentiality

25  agreements.

1  Q      Why is it, Ms. Russell, that the arbitrations of the

2  reinsurance field are subject to confidentiality agreements?

3  A      There's a few reasons for it:

4         First of all because the business disputes between

5  insurers and reinsurers you have ongoing relationships and

6  they want to resolve their business disputes in a

7  confidential form and not out in the public.

8         Secondly, because as we were just talking about, a lot

9  of privileged information and proprietary information is

10  shared as evidence in those proceedings.  So, again, the

11  parties don't want that to be shared in the public forum.

12         Third, and I think I eluded to this a minute ago too,

13  because we are sharing privileged information with our

14  counsel and sometimes in the proceeding itself, and there can

15  be ongoing underlying litigation, we don't want to have to

16  turn over confidential or privileged material that might be

17  harmful to our policyholder.  So, it's an effort to protect

18  our policyholder from the disclosure of confidential

19  information.

20  Q      All right.  Let me turn to asking you some questions

21  about Sidley Austin and their connection to Chubb.

22         How long has Sidley Austin been a client of Chubb's?

23  A      Well, I think you mean we've been a client of Sidley

24  Austin.

25  Q      Oh, I got it backwards.  I apologize.

1  A     Yes.  I don't know the full extent of it, but I can

2  tell you from my personal experience it goes back at least 15

3  years.  When I first -- when I joined the last law firm I was

4  (indiscernible) right before coming to Chubb, I became

5  involved in matters in 2005 that Bill Sneed and Sidley were

6  also involved in.  And I know from then forward while my firm

7  was representing Chubb the Sidley Firm also was.  I had many,

8  sort of, common engagements where we interacted together as

9  outside counsel, sometimes co-counsel on matters.  Then once

10 I took my job in 2012; we continued to use Sidley and often

11 on some of our most significant matters, the biggest problems

12 confronting our reinsurance group.

13 Q     Over the period of time you've been running this

14 reinsurance group have Chubb used Sidley on more than one

15 matter?

16 A     Yeah, I don't know that I could count how many matters

17 we retained Sidley on while I've been at my job for the last

18 seven years, but, yeah, numerous, you know.  I don't know

19 exactly how many.

20 Q     Does knowledge of how Chubb's reinsurance programs and

21 underlying insurance programs work and the position that

22 Chubb takes play any role in hiring a firm like Sidley in

23 more than one matter?

24 A     Definitely.  You know, Sidley has a very deep long

25 understanding of our insurance program and our reinsurance

1  program.  You know, we certainly rely on that historical

2  knowledge when we retain them on a new matter.  We don't

3  reinvent the wheel every time.  And, you know, Bill, in

4  particular, has a deep understanding of our historical

5  issues, our historical concerns, how we present things,

6  disputes we've had in the past.  You know, yes, it's

7  important to us to have a partner that understands all of

8  that so we don't reinvent the wheel each time.

9  Q    You used the word partner.  Is that how you viewed

10  Sidley?

11  A    Yes.

12  Q    Some of the engagements you've had Sidley on involved

13  direct adversarial work, arbitrations, right?

14  A    Yes.

15  Q    Have you engaged Sidley on other matters where there's

16  more of a counseling role on an ongoing basis?

17  A    Yes, several.  In fact, one of the most significant

18  matters we've had over my tenure.

19  Q    And is there privileged information that's conveyed in

20  connection with those counseling matters?

21  A    Definitely.

22  Q    And has Sidley been asked to prepare a legal analysis,

23  and memos, and provide legal analysis in connection with

24  those matters?

25  A    Yes.

1  Q     I don't want you to refer to the specific name in the

2  matter, but was there a matter that Sidley commenced work on

3  in May of 2017, it's a counseling matter?

4  A     Yes.

5  Q     And was that one of the matters that was open that Mr.

6  Sneed sought to withdraw from in 2020?

7  A     Yes.

8  Q     And did you close that matter at any point in time

9  between May of 2017 and 2020?

10  A     No.  It's still an open ongoing matter.

11  Q     Now did there come a time when you learned that Sidley

12  was representing the Boy Scouts against Chubb in a

13  prepackaged bankruptcy where the insurance was directly put

14  at issue in the underlying matter?

15  A     Yes, I did.  I learned it right after Josh learned in

16  the October, late October timeframe.

17  Q     Now did you learn of that through some letters

18  exchanged with Mr. Andolina?

19  A     Actually, I think I first learned about it as soon as

20  Josh learned about it, and I think he talked to his boss.

21  I'm not sure of the timing, whether he talked to me first or

22  talked to his boss first, but, you know, in that same couple

23  of days or 24 hours Josh let me know.  Then, yes, I did see

24  some letters thereafter.

25  Q     Okay.  I'd like to take you to Schwartz Exhibit 4.

1  This is a letter from Mr. Andolina.

2  A    Yes, I have it.

3        MR. SCHIAVONI:  I'm not going to pull it up on the

4  screen right now, Your Honor.  I'm just going to ask the

5  witness some questions about it.

6  BY MR. SCHIAVONI:

7  Q    Do you have this letter in front of you, Ms. Russell?

8  A    Yeah.  I think (indiscernible).  Are you referring to

9  the first one of December 3rd or the second one of December

10 16th?

11 Q    Yeah.  So, let's look at the first one.

12 A    Okay.

13 Q    December 3rd.  Now was there anything significant about

14 this letter when you received it?

15 A    Yeah.  So, after Josh informed Bill Sneed that we were

16 concerned, you know, the next thing that seemed to happen

17 from my perspective was we started getting letters from Mr.

18 Andolina.  I thought that what he wrote was inaccurate.  It

19 struck me -- first of all, why was it from Mr. Andolina and

20 not from Bill Sneed, who is our lawyer.  Secondly, I thought

21 it was inaccurate in ways that Bill would know it was

22 inaccurate.

23        It seemed to be, you know, accusing of us of

24 knowledge of something that we didn't have.  So, you know, I

25 was taken aback by it and I thought, you know, and I think I

1  probably said that to some of my colleagues, you know, Bill

2  knows some of these things aren't true that are in here.  Why

3  is Mr. Andolina writing this and where's Bill in all this.

4  Q    So, Ms. Russell, can you give us an example of

5  something that caught your eye that wasn't really accurate in

6  your view that you were getting from Mr. Andolina at this

7  point in time?

8  A    Yeah.  He said that Sidley's work on, as BSA's

9  restructuring counsel, is unrelated to Sidley's work for

10 Chubb affiliates on reinsurance issues.  I thought there was

11 two problems with that because, one, he was saying it was

12 Chubb affiliates as if they were some companies that were

13 different then the companies in the bankruptcy, but it's

14 actually the exact same insurance policies that are at issue

15 in the bankruptcy are the ones that they were representing

16 us to collect the reinsurance on.  So, it wasn't -- I felt

17 like he was trying to make this distinction that they were

18 somehow affiliated companies in some attenuated way where

19 we're actually talking about the exact same policies for the

20 exact same company.

21     Then the other thing that struck me is that he said

22 that they were unrelated.  Again, I just really take issue

23 with the notion that the reinsurance collections are

24 unrelated to the coverage issues that are going to be part of

25 the bankruptcy reorganization when the policies are such an

1  important asset in the bankruptcy.  Those issues are what are

2  going to drive the reinsurance.

3  Q    Did you ask to speak to Bill Sneed after you had

4  learned about this issue?

5  A    I didn't.  We were just kind of talking internally on

6  what to do.  I believe we wrote back.  I think Josh is the

7  one who wrote back and had some questions. He directed -- but

8  we did decide that we would direct the note not just to Mike,

9  but to Bill as well because we did feel like Bill was our

10  lawyer.  So, you know, we formulated some questions and

11  raised some concerns with the accuracy of the letter and

12  wrote back.

13  Q    Did you listen to Mr. Sneed's testimony?

14  A    I did.

15  Q    Okay.  There were aspects of Mr. Sneed's testimony

16  where, at least to me, okay, he seemed to be casting fault at

17  Chubb for asking questions, and wanting to investigate, and

18  get information about what the conflicts were.  Were you

19  pursuing those things in any way other than in good faith?

20  A    We were absolutely pursuing it in good faith.  At some

21  point we had been told, I believe it was maybe Chris

22  Celentano had been told that they had asked their general

23  counsel about the situation.  They kept insisting that there

24  was no conflict in a very conclusory manner.  So, you know,

25  we wanted more information to assess whether there truly was

1  -- if they were right, there was no conflict, we don't know

2  why they wouldn't just explain that to us and yet we kept

3  asking and not getting the answer to that.  We were very much

4  acting in good faith.

5        You know, it seemed to me that very quickly, at least

6  the bankruptcy lawyers concluded that, I think they used the

7  word a distraction, that our concerns were just a

8  distraction.  So, you know, we repeatedly were just asking

9  for information and getting nothing back but conclusions.

10 Q    Did you end up having a call with Mr. Sneed?

11 A    We did ultimately, yes.

12 Q    And when did that take place?

13 A    That was December 18th, 2019, 2018 -- I'm losing track.

14 2019.

15 Q    2019, right?  That was last year?

16 A    Yes.

17 Q    All right.  As we get older, I forget what year it is.

18       So, in 2019.  What did you do to prepare for that call?

19 A    Well, first of all, Bill had reached -- as Bill said in

20 his testimony he reached out to Josh and said he would like

21 to have a call.  I was pleased because I had been sitting

22 here, you know, for a couple of months saying, you know,

23 where is Bill, why is Mike Andolina continually writing to us

24 accusing us of ill-motive and our lawyer hasn't even reached

25 out to us to talk since we initially alerted him to this

1   issue.  So, I was pleased to hear that Bill wanted to talk to

2   or talk to Josh.  I said to Josh, I would like to be a part

3   of that discussion.  I felt like I had a long good

4   relationship with Bill and I was optimistic that, you know,

5   this was a good sign that we were now going to be able to

6   talk with someone and have our questions answered.

7        I called Josh and said, you know, Josh, I've thinking

8   about this, I think we should take a listening approach on

9   this call. I think we should go with some questions we want

10  to have answered, but Bill asked for the call.  So, we should

11  listen first, but let's have some prepared questions that we

12  -- you know, the things we want to understand going into the

13  call.  So, we did that, we prepared a list of questions, Josh

14  wrote it and I edited it a little bit.  And that was the

15  approach we decided to take going into the call.

16  Q    What was your goal in preparing questions for the call?

17  A    My goal was that I felt like we had asked questions in

18  letters and we weren't getting answers, and we had a lot of

19  things we didn't understand not only about just why they

20  thought there was no conflict, but just what had transpired

21  and how we got to where we were that they were accusing us of

22  having known this for a long time and that somehow we sprung

23  it in some opportunistic way.

24       So, we wanted to understand how Sidley got the

25  perspective that they did and what their thinking was.  So, I

1  thought it was best to have some key points that we wanted to

2  come out of the call with answers to.

3  Q    I'm not sure if I drew this out before, but what day

4  did the call take place?

5  A    Yeah.  December 18th, 2019.

6  Q    Okay.  And did Mr. Sneed, on that call, provide you

7  with a fulsome explanation about why there wasn't a conflict?

8  A    No.  We started the call with some pleasantries and

9  then Bill just jumped right in and said I asked for this

10  call, and what I'm here to explain to you is that after Josh

11  contacted me on October 29th I reported this issue to our

12  general counsel's office, general counsel decided that the

13  bankruptcy team would handle the communications with Chubb.

14  So, I've been sitting on the sidelines watching this happen

15  for a couple of months.  He said I don't think it's been

16  productive.  I think there has been a lot of posturing.  I am

17  here to tell you that Sidley is not going to stop

18  representing the Boy Scouts and if Chubb can't live with that

19  I need to give back all the reinsurance matters.

20  Q    What was your reaction to hearing that Bill Sneed had

21  "stayed on the sidelines" as you referred?

22  A    I was quite surprised by that because he was our

23  lawyer.  I just -- having been outside counsel I just can't

24  imagine having a longstanding client relationship, and being

25  a client relationship person and not being the one who wants

1  to communicate and discuss the issue.  If there was a

2  resolution to be had, if Sidley really wanted to work things

3  out with us the way to do it would have been to have Bill

4  talk to his client and his client contacts; not have Mike

5  Andolina, sort of, accusing us in letters.

6       So, you know, the fact that he then got on the call too

7  -- and I thought he was going to be the one that was going to

8  talk with us and talk through the issues, and the fact that

9  he got on this call with the same posture was really

10  surprising to me.

11 Q    What did you tell Mr. Sneed in response to his

12 assertion that Sidley would drop Chubb as a client if it

13 didn't live with this situation?

14 A    Yeah.  We said we weren't ethics experts.  I think,

15 actually, Josh said this that we're not ethics experts, but

16 our understanding is that you're not allowed to drop one

17 client in favor of another, and he thought this would fall

18 into a rule that we both loosely as the hot potato rule and

19 ask Bill what he thought about that.  Bill, again, asserted

20 that he felt that rule required a conflict for it to be

21 applicable and he didn't think there was a conflict here.

22      We, again, pressed -- I think I then asked why

23 (indiscernible) ask me for your analysis, but there is no

24 conflict.  Why won't you just give us that?  If you really

25 believe there is no conflict what's the harm in giving us the

1  analysis and he said I'm not the person to address that, I'm

2  not here to address that.  We didn't get anywhere with that.

3  Q    Ms. Russell, I want to ask you -- my next question I

4  want to be clear, I don't want you to disclose

5  attorney/client privileged information.  And I know it's not

6  Chubb's intent to do that, but to the extent you can answer

7  the question without doing that I'd like you to do so.  My

8  question is did you talk to Mr. Sneed on the December 18th

9  call about how Sidley's engagement by the Boy Scouts could

10  cause harm to Chubb?

11  A    I did.  After we didn't get anywhere on the request for

12  the conflict analysis, we asked a few more questions.  We

13  asked about whether the prospective labor was being requested

14  because of the Boy Scouts.  He didn't answer that question.

15  Then -- in fact, several times in the call he accused us of

16  cross-examining him, that we weren't here to have these kinds

17  of discussions.  You know, we could stop cross-examining him

18  and, you know, that this should be resolved at a higher level

19  of the organizations.

20       I said let me ask you a question, Bill, because this is

21  something I felt strongly that felt strongly that Bill

22  understood that the bankruptcy lawyers would not understand.

23  I said, Bill, do you understand how certain things that could

24  be said in the bankruptcy action by Sidley could harm us in

25  our reinsurance election and you understand that our seeded

1  asset, our reinsurance collections are an important asset to

2  Chubb and that we could be harmed in that collection by

3  things Sidley would say.  I gave him a specific example that

4  I prefer not to repeat here.  He said, okay, now that's

5  something we can talk about, that's a legitimate concern.

6  Q     Now did you ask Mr. Sneed whether or not he had Boy

7  Scouts in mind when he had asked for a prospective waiver

8  with six or seven, whatever it was, eight months before?

9  A     I did ask him that question and he didn't answer it.

10  Q     Sitting here today have you -- in preparing for this

11  hearing did you have an opportunity to go back and look at

12  that correspondence about the prospective waiver request?

13  A     I did.

14  Q     And at any time during that exchange at the time the

15  prospective waiver request was being made did Mr. Sneed or

16  Sidley tell you anything about the Boy Scouts engagement

17  other then they couldn't admit or deny the representation?

18  A     I did not have any specific conversations with Bill or

19  Sidley about that.  Josh reported to me what was going on

20  that was happening.  It was not about the Boy Scouts as far

21  as we knew.

22  Q     Okay.  Did you do anything after the December 18th

23  call, you know, based on -- actually, let me ask you

24  something else about the December 18th call.  Over time, over

25  the course of, really, your career, right, working at Chubb

1  and then working with Mr. Sneed in private practice before

2  that you've had a lot of dealings with them over time, am I

3  right?

4  A    That's correct.

5  Q    Was there anything noteworthy about the tone or the

6  nature of the discussion on the 18th that stood out to you?

7  A    Yeah.  I was taken aback.  Really, I've said several

8  times to some of my colleagues since then that it was one of

9  the strangest professional conversations I've ever had during

10 my career.  I just couldn't believe that he came out of the

11 box so aggressively and gave us an ultimatum.  It was you

12 have to accept this or else.  That is not how I expected the

13 call to go.  As I said before, I was really pleased that Bill

14 was finally reaching out to talk to us and I expected a much

15 more conservatory approach, but it was not that.  It was an

16 ultimatum.

17      As I said, as we tried to ask our questions, which I

18 believe to this day were all very legitimate fair questions

19 for us to be asking trying to figure out what was going on,

20 he repeatedly said you're cross-examining me, this is

21 irrelevant, I'm not here to talk about that.  What he said

22 earlier today is true, he did suggest discussions at a higher

23 level of the company.  I didn't understand why we weren't

24 having that discussion on this call.  I don't know why we

25 were deferring the discussion. I thought I was having a

1  discussion with the person who could answer the questions

2  that I had.

3  Q    Now after that meeting on the 18th or the run-up to it

4  did you take any steps yourself to try to further an

5  investigation of what was happening, and what you needed to

6  do, and whether there was -- the extent of the conflict, et

7  cetera.

8  A    Yeah.  After that call we had a lot of internal

9  discussions.  You know, because this matter involved

10 different groups at Chubb and given the significance of both

11 the issues in the bankruptcy in terms of our insurance that's

12 at issue there and the very significant reinsurance asset

13 that I'm responsible for on the backend we had a lot of

14 discussions at very high levels in the company and trying to

15 figure out what to do.  We retained an ethics expert to

16 evaluate the issue.  You know, were we seeing, not seeing

17 something, was there something missing; you know, we felt

18 like this was a real problem and we took it very seriously.

19 Q    Prior to the December 18th meeting did you do anything

20 to -- strike that.

21      Up through this meeting had you conveyed to Sidley that

22 you did not consent to a concurrent relationship?

23 A    Yes.

24 Q    You listened to Mr. Sneed's testimony about the

25 information he was provided in connection with his engagement

1  according to Mr. Sneed.  Am I right?

2  A     Yes.

3  Q     Okay.  Did you also review Mr. Sneed's declaration?

4  A     I did.

5  Q     Without getting into disclosing specific privileged

6  information can you tell us does Mr. Sneed accurately portray

7  the scope of the privileged information which he was given?

8  A     No.

9  Q     And specifically with regard to the Boy Scout matter

10 did Mr. Sneed provide a complete list and explanation of the

11 privileged information he was provided?

12 A     I think his list is accurate.  I think he is trying to

13 walk a fine line in terms of explaining what exactly that

14 list means.  The full arbitration record from the

15 (indiscernible) matter is a lot of information and a lot of

16 confidential information including a lot about the underlying

17 coverage issues.  So, to downplay that as a minimal amount of

18 information is not accurate.

19      In addition, he neglects to recognize the 15 years of

20 historical information he has about our insurance coverage

21 and our reinsurance issues.  Each reinsurance matter is not

22 wholly unique.  The contractual issues, the coverage issues

23 repeat.  So, he has historical knowledge that he can bring to

24 bear on these matters.

25      Lastly, he focuses only on documents and not on

1  conversations with people in our legal group and on my team,

2  and myself, wherein, I think, anybody who has practiced

3  understands when you interview the key people that's when you

4  tend to tell your lawyers some of the, you know, what's

5  keeping you up at night; let's put it that way.

6  Q    Ms. Russell, as part of the arbitrations that are done

7  on reinsurance disputes do they deal just with the collection

8  of, sort of, outstanding bills or is declaratory relief

9  sought as often happens in coverage disputes in court?

10 A    Yeah, absolutely.  In fact, that is one place where I

11 think Mr. Sneed, unfortunately, was not accurate at all in

12 his declaration or today.  Both of the open Boy Scouts

13 matters that he was handling did not involve exclusively paid

14 claims as he indicated.  They both involved declaratory

15 relief and reinsurance coverage for future claims.  Thus, you

16 know, that's one of the big concerns because things that --

17 as I said to Bill on our call, I don't know what Sidley is

18 going to say or do in the bankruptcy that could impact my

19 future claims.

20 Q    In Ms. Rapoport's expert declaration she notes that she

21 was asked by Sidley to assume -- let me just find it here for

22 a second.  I'm looking at -- you don't necessarily need to

23 pull it up, but I'm looking at her expert report on Page 4 of

24 the declaration under (II) assumptions and questions

25 presented, 2-D.  It says,

1       "The two reinsurance disputes that Mr. Sneed was

2   engaged to work on involved historical paid claim, not

3   existing claim."

4       Is that in some way not complete or accurate?

5   A    No.  It's not true for the reasons I just stated.  The

6   future claims were every bit at issue and probably more

7   valuable, ultimately, to us then past paid claims.

8   Q    Okay.  Did you review the pleadings that were filed by

9   Boy Scouts in the underlying coverage disputes in court that

10  is pending today, you know, prior to today?

11  A    Yes.

12  Q    Okay.

13          THE COURT:  I'm sorry.  Mr. Schiavoni, can you

14  repeat that question?

15          MR. SCHIAVONI:  Yeah.  I'm sorry, Your Honor.

16          THE COURT:  No, it's me.

17  BY MR. SCHIAVONI:

18  Q    Ms. Russell, we've been struggling for a way to try to

19  address -- let me ask you this.  Have you been struggling

20  with a way to try to address how there is overlap between the

21  work that Mr. Sneed has done and issues that may be in

22  dispute in the bankruptcy without revealing non-public

23  privileged information?

24  A    I very much have been struggling with that.  If I can

25  explain a little bit.  I think with all due respect to Bill

1  he tried to walk a very fine line to say that the reinsurance

2  issues -- you know, what he was doing for us in the

3  reinsurance case isn't relevant to the insurance issues.  He

4  steered clear of explaining that the insurance issues are

5  very much relevant to the reinsurance.  To demonstrate that

6  would require me to explain some things in open court that

7  I'd rather not explain because they have the potential to be

8  harmful in the reinsurance collection matters.  Not harmful,

9  but just, you know, potentially harmful or potentially just

10  not things we want to talk about.  They are privileged

11  confidential information.

12      So, yes, I have struggled with that.  I think we've

13  found a way to do it and perhaps that is where you were

14  headed.

15  Q    Ms. Russell, tell us have you come across a way that

16  perhaps we can touch on this issue just based on public

17  information without going a step further?  If so, can you

18  explain, you know, what you have done?

19  A    Yeah.  Basically, if you look at even what Bill admits

20  in his declaration, the types of information he got and the

21  issues that he, himself, discusses as being issues in the

22  reinsurance matters and you look at the pending coverage

23  actions related to the bankruptcy or related to Boy Scouts

24  you can see that the issues are very much overlapping.  You

25  see that number of occurrences is something that is

1  discussed.  You see that allocation is something that is

2  discussed. You see the first encounter agreement is something

3  that is discussed in both.

4      So, as I testified earlier, you know, the underlying

5  insurance issues drive the reinsurance.  The underlying

6  insurance are almost always at issue in the reinsurance

7  matter.  There occasionally are matters that I think Bill

8  would like you to believe is what we have here where there is

9  strictly a contract question and it literally turns on the

10 reinsurance contract, but those are few and far between.

11     This matter is much more -- these matters are much more

12 typical particularly the one that Bill didn't talk much

13 about. They do involve a lot of overlap and interplay between

14 the insurance issues and the reinsurance issues.

15 Q    Did you go through the pleading in the coverage action

16 to try to find specific references to things and then try to

17 cross-reference those to statements that Mr. Sneed made in

18 his declaration?

19 A    I did. As I sit here, Tancred, I can't tell you have I

20 have total recall on where those things appear in the

21 pleadings, but I think what we just talked about that there

22 are talking about number of occurrences you see that in the

23 declaration, you see number of occurrences in the pleadings

24 as an issue.  You see allocation, you see allocation in the

25 pleadings.  Then you see the first encounter agreement and

1  that is also discussed as an issue in the insurance.

2      So, as I sit here, I can't give you chapter, line and

3  verse, but it is there.

4  Q    Let me ask you this, Ms. Russell, maybe we want to move

5  on, maybe we don't get into more detail, but would it be

6  possible for you to give cites to where allocation is

7  referred to by Mr. Sneed, just examples of them, and examples

8  of where they are on the DJ pleadings?

9          MR. DUCAYET:  Your Honor, if I could object to

10  this.  I don't know if Ms. Russell has a document in front of

11  her that she's referencing, but the idea that, you know, she

12  would be able to recall from memory particular cites, maybe

13  that's possible, maybe it's not, but if there is a document

14  that Ms. Russell is looking at we'd like to see a copy of it.

15  I will just remind the court that Ms. Russell did not submit

16  a declaration.  She is the only witness who did not do so.

17          So, I think it's important that to the extent that

18  there are specific documents that she's relying upon in

19  connection with this testimony that we be provided a copy of

20  this.

21          MR. SCHIAVONI:  Yeah.  The declaration of Mr.

22  Sneed and the Texas allocation pleading.  We can just make a

23  proffer of it.  It's in the record.  It's the Panchok-Berry

24  declaration, Exhibit D.  We can make a proffer of it when

25  we're done with the witness.

1          THE WITNESS:  I'm not actually looking at a

2    document.  I just want to be clear about that.  I actually

3    was just going to answer that without looking at a document I

4    probably can't give the sites.

5    BY MR. SCHIAVONI:

6    Q    Let me ask you another way we tried to, sort of, come

7    after this problem.  Has the Boy Scouts said or done anything

8    which indicates that if content that Mr. Sneed's legal work

9    is relevant to the issues in dispute between Chubb and the

10   Boy Scouts?

11   A    Yes.  The Boy Scouts sought discovery from us about

12   what went on in the arbitration.

13   Q    And was that discovery both document discovery and

14   interrogatories?

15   A    I believe that's right.

16   Q    In January of 2020, Ms. Russell, did Chubb have matters

17   outstanding with Sidley?

18   A    Yes.

19   Q    And how many matters were outstanding?

20   A    January of 2020 -- before Sidley started to withdraw I

21   would say four or five.  I think at least four, perhaps five.

22   Q    And was Sidley still counsel of record in a number of

23   those matters at the time that the bankruptcy was filed?

24   A    I'm sure for at least one, perhaps two.  I'm not a

25   hundred percent sure of the precise timing of the withdraws,

1  but I know at least one was not withdrawn until after.

2  Q     Did Chubb consent to Sidley withdrawing from those

3  matters that were active in 2020?

4  A     We did not consent.  In fact, we asked Bill not to

5  contain the parties or the arbitrators, and he did it over

6  our objection in many of the matters.  In the court case we

7  ultimately consented.  He unilaterally filed for a withdraw

8  without our consent and then we ultimately worked out consent

9  once we got new counsel.  That was the only one we ultimately

10  consented after he tried to do it without our consent.  The

11  rest of them we did not consent and he, nonetheless,

12  contacted our counterparties and our arbitrators without our

13  consent.

14          MR. SCHIAVONI:  Ms. Russell, thank you very much

15  for your testimony. I have nothing further, Your Honor.

16          THE COURT:  Thank you.

17          Ms. Russell, are you ready for cross or do you

18  need a break of any sort?

19          THE WITNESS:  I'm fine.  Thank you.

20          THE COURT:  Okay.  Thank you.

21          Mr. Ducayet?

22          MR. DUCAYET:  Yes.  Thank you, Your Honor.  Jim

23  Ducayet on behalf of Sidley.

24                    CROSS EXAMINATION

25  BY MR. DUCAYET:

1  Q    Ms. Russell, let me ask you, first, you described the

2  position that you hold within Chubb and you described it as,

3  I think, you're the head of the reinsurance disputes group

4  within Chubb.  Is that correct?

5  A    No.

6  Q    Okay.  I didn't mean to misidentify your position.

7  Maybe you could just refresh my memory and then we'll get a

8  question out.

9  A    Sure.  No problem.

10      It's a little bit complicated, but I am the head of the

11 reinsurance group for a subgroup of entities or claims within

12 Chubb.  So, there's the larger Chubb.  There are a couple

13 different reinsurance groups within Chubb.  I am the head of

14 one of them.

15 Q    Okay.  Thank you.

16 A    We largely do long tail and run-off claims.  Where you

17 were off a little bit in your characterization is not just

18 disputes.  My predominant part of my job is billing and

19 collecting reinsurance.  The disputes is actually a little

20 bit ancillary.

21 Q    Okay.  Thank you for that clarification.

22      Now am I correct that within Chubb that direct claims

23 and reinsurance claims are handled in two separate and

24 different departments?

25 A    That's true.

1   Q     And you heard Mr. Sneed testify earlier this morning

2   about some of the reasons why that's typical.  Do you agree

3   within that that's typical in the industry?

4   A     I don't remember exactly what he said about that topic

5   and why it's typical.  I think generally my experience is --

6   I'd say most larger companies have a separate direct claims

7   group and a separate reinsurance group, but I think many

8   smaller companies, the same people that handle and pay the

9   direct claims they bill the reinsurance as well.

10  Q     Okay.  In companies that are comparable in size, your

11  competitors, for example, at Chubb the direct claims are

12  typically handled by a different group, different department

13  then the reinsurance claims.  Is that correct?

14  A     Those that I'm familiar with, yes.  I think that's

15  generally true.

16  Q     Okay.  Thank you.

17        Now you provided some testimony in response to Mr.

18  Schiavoni's question about the general way in which the

19  underlying direct coverage issues may become an issue in a

20  reinsurance dispute.  Let me ask you this question, were the

21  terms of the BSA coverage, the coverage that Chubb provided

22  to Boy Scouts, were the terms of those policies in dispute in

23  either the Lloyd's reinsurance matter of the second

24  reinsurance matter that also involved Boys Scout policies?

25  A     Yes.

1  Q      In what way were the terms of the underlying policies

2  in dispute in the reinsurance dispute?

3  A      I'm going to try to formulate an answer to this without

4  revealing information I'd rather not reveal.  This is

5  actually putting me in the precise predicament that I was

6  worried about which is to tell you what issues are at issue

7  in the reinsurance matter will cause me to reveal what I'm

8  most concerned about being revealed.

9         Suffice to say that while Bill focused almost

10 exclusively on the Lloyd's matter, I think he was flat wrong

11 when he said that the Boy Scouts -- that the second matter

12 did not involve these issues.

13 Q     Okay.  I apologize. I don't mean to interrupt you.  I

14 want to try to make this easier for you to testify about

15 consistent with your concerns about revealing information.

16        So, let me break the question down just a little bit,

17 Ms. Russell.  So, let's just focus on the Lloyd's dispute.

18 Okay?

19 A      Yes.

20 Q      First of all, Lloyd's was a treaty, correct?

21 A      Yes.

22 Q      Okay.  And my question is were the terms of the

23 underlying coverage that Century provided to BSA, were those

24 in any way disputed by Lloyd's in connection with that

25 reinsurance dispute?

1  A      Yes.

2  Q      Okay.  Can you explain to me why?  And maybe I could

3  try to make it even a little bit more precise and that is to

4  the extent that the first encounter agreement was at issue in

5  the first litigation, which Sidley did not handle, was the

6  first encounter agreement at issue in the arbitration that

7  Sidley was asked to handle?

8  A      The arbitration -- first of all, whether or not it was

9  squarely at issue in the second arbitration, I'll come back

10 to that in a second, but whether it was or it was not there's

11 no way that Sidley could have evaluated the prior arbitration

12 record and discussed with us, strategized with us about going

13 forward in that matter without considering positions we took

14 vis-à-vis the first encounter agreement.

15 Q      Well, let me just ask you this question; was -- the

16 first encounter agreement was an issue with respect to the

17 first arbitration, and this is all public because its

18 revealed in the publicly filed decision in the District of

19 Massachusetts, and Century's reliance on the first encounter

20 agreement was rejected by the arbitration panel, first

21 arbitration, correct?

22 A      I wouldn't characterize it that way.

23 Q      Well, didn't the first arbitration panel conclude that

24 the allocation methodology that was used by Century, which

25 was based upon the first encounter agreement, was not the

1  product of a reasonable businesslike investigation?  Isn't

2  that what the panel said?

3  A    I think they concluded there was an absence of proof

4  that we acted reasonably in a businesslike manner.  I don't

5  know that they concluded it wasn't a reasonable business-like

6  settlement. I think that's a big distinction.  You know, it

7  was a question of whether we would ever get to put on that

8  proof again, I don't know.  You know, you're now pushing me

9  to get into strategic decisions that we would have discussed

10  with Bill.  But we don't think that award was clean and

11  bullet proof.  What we might be able to accomplish the next

12  time around is very much in discussion and subject to

13  strategic consideration.

14  Q    Okay.  Now the first encounter agreement is an

15  agreement between Boy Scouts and Century, right?

16  A    Yes.

17  Q    So, obviously, Boy Scouts is aware of the first

18  encounter agreement, correct?

19  A    Yes.  But not our internal (indiscernible) about it.

20  Q    Okay.  But the fact of the -- well, let me just ask you

21  this, Ms. Russell.  The position that Century took in the

22  first Lloyd's arbitration was that the first encounter

23  agreement was a valid finding and reasonable way to allocate

24  claims, right?

25  A    Yes.

1  Q    And in connection with the second Lloyd's arbitration

2  is Century taking any position with respect to the

3  applicability of the first encounter agreement?  Does that

4  have anything to do with the issues that have been submitted

5  to the second arbitration?

6  A    We have a --

7            MR. SCHIAVONI:  I'm sorry, Your Honor.  If I just

8  could caution Ms. Russell.  I don't -- you know, she doesn't

9  need to disclose privileged information.  I would ask Mr.

10 Ducayet, to the extent he's relying upon what he says is in a

11 district court decision, if he could do his questioning a lot

12 more safely by just quoting from that decision.

13           If you could answer, Ms. Russell, you know, within

14 the confines of not disclosing privileged information go

15 ahead.

16           THE WITNESS:  I think I can.  I was just going to

17 say that we haven't put any positions to a second arbitration

18 panel yet.  I think part of the problem that Bill has in

19 trying to minimize the extent of the information that he was

20 provided and, you know, the extent of the potential conflict

21 is because both of the arbitrations -- you know, Lloyd's was

22 just -- we just got an order that we can go forward with the

23 arbitration.  And the other one was in the very early stages

24 too.

25           So, we were still strategizing, thinking,

1  positioning ourselves.  You know, so what exactly were the

2  issues that we were going to have to confront and work

3  through with Bill, you know, I think we know some of them,

4  but I don't -- we haven't put any position to either

5  arbitration panel yet other than a very, very -- other then,

6  in the one matter, in a very preliminary way and the other

7  one not at all.  So, it's not so much what was before the

8  panel, but it was the strategic thinking that we were doing

9  with Bill about how we might position ourselves.

10 BY MR. DUCAYET:

11 Q    And -- okay.  Again, I'm not trying to pressure you to

12 disclose privileged information, but just to be clear wasn't

13 it the position of Century in the District of Massachusetts

14 case that the whole reason we should have a second

15 arbitration was because the rebilling that was made to

16 Lloyd's was no longer telescoped under the first encounter

17 agreement?

18 A    That was one of the reasons, yes.

19 Q    If you want, Ms. Russell, I can point you to the

20 decision.  Page 5 of the District Court decision in

21 connection with that says that that is the position that

22 Century was taking.

23 A    I agree with you.  The rebill was no longer under the

24 first encounter agreement.

25 Q    Okay.  Thank you.

1        You mentioned in connection with describing the work

2   that is done in connection with putting together a

3   reinsurance dispute, both receiving documents and then

4   conducting interviews, and you said that in many instances

5   the underlying --

6        (Phone interruption)

7            THE COURT:  Could everyone please mute their

8   phones.  I'm hearing a conversation.

9            Mr. Ducayet?

10           MR. DUCAYET:  Sorry, Your Honor.  I lost my train

11  of thought here.

12  BY MR. DUCAYET:

13  Q    You were asked some questions about the kind of work

14  that a lawyer would do in connection with preparing a

15  reinsurance dispute.  And I thought you mentioned the idea

16  that a reinsurance dispute counsel might interview those who

17  were involved in the underlying claims.  Did I understand

18  that correctly?

19  A    That's true.

20  Q    Did Mr. Sneed or anybody from Sidley conduct any

21  interviews along those lines in connection with either the

22  Lloyd's or the second matter?

23  A    Mr. Sneed had phone conversations with myself, with Mr.

24  Schwartz and two of my colleagues that report to me.  None of

25  us are direct claim handlers.  I anticipate he would have had

1  discussions with the direct claim handlers as the matters

2  went forward.

3  Q    Okay.  But he didn't, right?

4  A    Not yet.

5  Q    Okay.  And he's not going to because he's not

6  representing anymore, correct?

7  A    Apparently.

8  Q    Okay.  Now you testified in connection when you first

9  learned about the Boy Scout matter that it was about the same

10  time that Josh did.  I think you said in October or so 2019,

11  is that correct?

12  A    Yes.

13      Am I allowed to add something to my last answer that I

14  just thought of?

15  Q    Certainly.  Go ahead.

16  A    I just wanted to say that while Bill didn't interview

17  the underlying claim witnesses in the Lloyd's matter their

18  testimony was available to him in the full arbitration record

19  from the first arbitration.

20  Q    Okay.  It was part of the record that was provided to

21  the arbitral panel that, obviously, was shared both with the

22  panel and with the opposing counsel, right?

23  A    Yeah.  Under a confidentiality agreement.

24  Q    Yeah.  But you're not suggesting that's privileged, are

25  you?

1  A    I'm suggesting there are things that are privileged in

2  the underlying matter that are part of the arbitration

3  record.

4  Q    So, your suggestion is that the disclosure of

5  information to a reinsurer doesn't waive a privilege.  Is

6  that what you're saying?

7  A    It's a thorny issue and one we worry a lot about.

8  Q    Okay.

9  A    In my view --

10 Q    And you can say with absolute assurance that there was

11 no waiver by reason of having providing that information to a

12 litigation adversary?

13 A    I can't say that with a hundred percent certainty, but

14 if my counsel is going to try to establish that I waived my

15 privilege I got a real problem with that.

16 Q    Okay.  Getting back to the question I asked you in

17 terms of when you first became aware of the Boy Scout

18 representation by Sidley, let me ask you, Ms. Russell, if you

19 have in front of you, could you take Mr. Sneed's declaration

20 and take a look at Exhibit 5, please.

21 A    Hold on.  I think that's in the other book here.  Hold

22 on.

23 Q    Okay.

24 A    Did you say Exhibit 5?

25 Q    Yes.  To Mr. Sneed's declaration.

1   A       Okay.  I have it.

2   Q       Okay.  Let me ask you to turn the page to the first

3   email in the string which is an email that was sent to Mr.

4   Schwartz and a number of others on December 13th, 2018.  Do

5   you see that?  Subject is Boy Scouts.

6   A       I'm sorry.  What was the date?

7   Q       December 13th, 2018 at 7:19 a.m.

8   A       Okay.  Hold on.  7:19 a.m.?

9   Q       Yeah.

10  A       I'm not seeing 7:19 a.m.

11  Q       Okay.  Do you have Exhibit 5 in front of you?

12  A       Yeah.  The top email is December 13th, 2018 at 10:33

13  a.m.

14  Q       We're talking about Sneed Exhibit 5, right?

15  A       I believe so.

16  Q       Okay.  Docket No. 532-5.

17  A       I don't have a docket number.

18  Q       Okay.

19  A       I believe Sneed Exhibit 4 is the service level

20  agreement, correct?

21  Q       Exhibit 5.

22  A       Right.  It follows 5 though and I'm just confirming

23  that 4 is the service level agreement, right?

24  Q       Yes.  I believe that's correct.

25  A       Okay.  So, then when I turn to 5 the top email that I

1    have is Thursday, December 13th, 2018 10:33 a.m.

2    Q    Okay.  So, I want you to turn the page.

3    A    Okay.

4    Q    And you will see there's an email on that second page

5    December 13th at 7:19.  Do you see that?

6    A    Okay.  I do see that.  I'm sorry.

7    Q    Okay.  No problem.

8         Now at the time, December 2018, was your email address

9    christine.russell@brandywineholdings.com?

10   A    Yes.

11   Q    Okay.  If I were to represent to you that you are the

12   first recipient on this email would you have any basis to

13   disagree with me?

14   A    Not at all.

15   Q    This has been redacted by request of your counsel.  Do

16   you know why they asked that that be redacted?

17   A    I don't have the redacted one in front of me.  So, I'm

18   not sure what you mean by "that" being redacted.

19   Q    I see.  So, you have an un-redacted copy?

20   A    I do.

21   Q    Okay.  So, you can confirm for that the first addressee

22   in the to line is you, correct?

23   A    Yes.  I just said that.

24   Q    Okay.

25   A    I didn't realize it was redacted and I have no idea why

1  to answer your other question.

2  Q     Okay.  So, the issue of the potential representation of

3  Boy Scouts by Sidley was brought to your attention back in

4  December of 2018, correct?

5  A     Could you ask that again?  You said it very fast.

6  Q     The issue of Sidley's representation of Boy Scouts was

7  first brought to your attention back in December of 2018.

8  Isn't that correct?

9  A     I was informed that there was a press release that

10  suggested that Sidley was representing the Boy Scouts, yes.

11  Q     Okay.  And that was in December 2018, right?

12  A     Yes.

13  Q     Okay.  Now you made some mention in your testimony

14  about the discussions that Mr. Schwartz had with Mr. Sneed

15  and others about the advanced waiver requests in early 2019.

16  Do you recall that?

17  A     Yes.

18  Q     Were you made aware of those discussions at the time

19  they occurred or did you just learn about them later on?

20  A     I think I was aware of them as they were ongoing.

21  Q     Okay.  So, you saw, for example, the March 4th email

22  that Mr. Schwartz sent to Mr. Sneed laying out the three

23  conditions under which Century would be okay with Sidley

24  representing a debtor in a bankruptcy proceeding, right?

25  A     I don't think I did see that contemporaneously when it

1  was happening.  I think that Josh was -- you know, Josh and I

2  talk on the phone a lot and I think he was keeping me orally

3  informed of what was going on, but I don't think I was being

4  copied in on the emails.

5  Q    Okay.  But Josh wasn't acting in a sort of unauthorized

6  basis, right?  He was conveying the position of Century Chubb

7  at that time, right?

8  A    I certainly believe he was.  Josh is very conscientious

9  about making sure he gets authority, but that authority would

10  not have come from me with respect to prospective waivers.

11  That would have come from a much higher level in the

12  organization.

13  Q    Okay.  So, just to be clear then the proposal that was

14  made on March 4th that lays out the three conditions that was

15  approved at the very highest level of the company.  Is that

16  what you are saying?

17  A    I think that's my understanding, but you would have to

18  ask Josh to be sure.

19  Q    All right.  Now you gave some testimony about the

20  coverage litigation that is ongoing in Texas and I think

21  there is a case in Illinois as well.  Do you recall that?

22  A    Yes.

23  Q    I think Mr. Schiavoni elicited testimony from you that

24  you had gone through the pleadings and the documents in

25  connection with that coverage litigation.  Is that fair?

1  A    I won't say I went through everything involved in the

2  coverage litigation.  I've seen some of the pleadings,

3  excerpts, I would say, and I think I saw t eh discovery

4  request that was served on us at one point in time.  Over

5  time I've seen a lot of the pleadings, but I can't say that

6  I've seen everything.  I certainly saw excerpts that I was

7  referring to more recently.

8  Q    Okay.  So, let me just ask you then with respect to the

9  discovery that you looked at this was discovery that had been

10  served by Boy Scouts upon Century?

11  A    Yes.

12  Q    And you know, right, that Sidley is not representing

13  Boy Scouts in connection with any of that coverage

14  litigation, right?

15  A    I know that I believe Haynes & Boone is counsel of

16  record and I've been told that Sidley is not representing the

17  Boy Scouts with respect to that coverage litigation, but I

18  don't know for a fact, you know, how much involvement Sidley

19  has in assisting with the coverage issues.  I don't know that

20  one way or the other.

21  Q    Okay.  Well, if I were to represent to you that Sidley

22  doesn't have any role whatsoever in connection with that

23  insurance coverage litigation do you have a basis to disagree

24  with me?

25  A    No.  I just think there is a lot of overlap between

1  what Sidley is doing in the bankruptcy and the coverage

2  issues where the insurance policies are one of the

3  significant estate assets.  So, not being a bankruptcy

4  lawyer, I don't know fully what Sidley's role is, but I

5  imagine there is a fair bit of overlap.  It's hard for me to

6  imagine that there isn't; that you can draw a clean line and

7  Sidley has nothing to do with coverage issues at all.

8  Q    Okay.  But I'm asking a different question, Ms.

9  Russell.  I'm talking about the coverage litigation in Texas

10 and in Illinois.  If I were to represent to you that Sidley

11 has no involvement in that coverage litigation would you have

12 a basis to disagree with me?

13         MR. SCHIAVONI:  Your Honor, asked and answered.

14 This is something we address in our brief that deals with the

15 plan itself.

16         THE COURT:  Sustained.

17         MR. DUCAYET:  Okay.  Your Honor, we'll move on.

18 BY MR. DUCAYET:

19 Q    Let me just ask you about the discovery.  You reviewed

20 the discovery requests?

21 A    I did.

22 Q    Okay.  And did you review the responses to the

23 discovery requests?

24 A    I don't know.  I can't remember.

25 Q    Isn't it the case, Ms. Russell, that the position that

1  Century took in the insurance coverage litigation in Texas

2  and Illinois was that it would not provide documents

3  responsive to those requests because they were irrelevant?

4  A    Yes.  I believe that the reinsurance issues are -- the

5  reinsurance discovery is irrelevant to the insurance case.

6  That doesn't mean that the converse is true which is what

7  Bill tried to imply in his testimony that the insurance

8  record is relevant to the reinsurance case.  The reinsurance

9  record is not relevant to the insurance case.

10 Q    Well, hold on a second.  You testified that the

11 reinsurance record contains information that you think would

12 be harmful if it were disclosed to Boy Scouts.  So, how could

13 it be irrelevant?

14 A    I said potentially harmful.

15 Q    Okay.  Then how is that irrelevant?

16 A    Irrelevant but for the -- of course, some of the

17 privileged discussions which should be maintained privileged.

18 Q    Okay.  But that is a not a qualification that was made.

19 The position that has been taken is that these are totally

20 irrelevant.  They have nothing to do with the coverage

21 litigation, isn't that right?

22 A    That is right.

23 Q    Let me just ask you a couple questions about the call

24 that happened on December 18th.  Look, I think there is,

25 obviously, a significant disagreement between you and my

1  partner about exactly what happened on that call. And I don't

2  want to test the patience of the court in terms of trying to

3  get the ultimate bottom of who said what exactly, but isn't

4  it true, Ms. Russell, that Mr. Sneed told you and Mr.

5  Schwartz in the course of that call that the idea that Sidley

6  had confidential information simply wasn't true?  Didn't he

7  say that?

8  A    I don't recall him saying that at all.  No, he did not.

9  Q    Now Century had invoked its rights under the SLA to

10 seek arbitration of the dispute that it has with Sidley.

11 Isn't that right?

12 A    Could you ask that again?  I'm sorry.  I missed the

13 beginning of your question.

14 Q    Sure.  Sure.  Sure.

15     Let me focus your attention to the SLA, the service

16 level agreement, between Sidley and Century.

17 A    Yes.

18 Q    That SLA contains and arbitration clause, does it not?

19 A    It does.

20 Q    And Century has indicated its intention to pursue that

21 arbitration as a result of what it believes to be breaches of

22 the SLA by Sidley, correct?

23 A    Yes.

24 Q    And does Century intend to pursue that arbitration?

25 A    I think I just said yes.

1    Q    Okay.  By the way, is there a reason why you did not

2    submit a declaration in this matter?

3    A    The only reason I understood was that my testimony was

4    largely rebuttal to what Bill put into his and the timing was

5    such that it was -- you know, with the COVID-19 virus, and

6    us all being at home, and the short timeframe it just --

7    there wasn't time.  They would just put me on as a witness.

8    That is what I understand.

9    Q    Okay.  You know that Mr. Celentano he submitted a

10   declaration, right?

11   A    I do.

12   Q    Ms. Rappleye also submitted a declaration?

13   A    Who?

14   Q    Ann Rappleye.  I may be pronouncing it incorrectly.

15   Ann Rappleye.

16   A    I know that both of those people did, yes.

17   Q    Okay.  And in connection with your preparation for your

18   testimony today did you spend time yesterday working with Mr.

19   Schiavoni?

20   A    A little bit.

21   Q    Okay.  And you understood that the testimony that you

22   were going to provide would be in rebuttal to Mr. Sneed's

23   declaration, correct?

24   A    In large part, yes.

25   Q    Okay.  And you also understood that I had represented

1  to the court that Mr. Sneed would not testify beyond the

2  scope of what he said in his declaration, right?

3  A    I think I heard you say that this morning.

4  Q    Well, were you aware of that before this morning?

5  A    No.

6  Q    I think you testified, Ms. Russell, that the categories

7  of documents that Mr. Sneed received was accurate.  Your

8  dispute was over the language he had -- you said walked a

9  fine line.  Is that a fair summary of what your testimony

10  was?

11  A    I think I said it was inaccurate to the extent that he

12  didn't really explain what all was in the arbitration record

13  and the 15 years of historical knowledge and records that he

14  has reviewed over 15 years.

15  Q    Okay.  Just to be clear you are not suggesting that Mr.

16  Sneed's description of the categories of documents that he

17  received was inaccurate, correct?

18  A    Only that he was trying to minimize it as much as

19  possible.

20  Q    Okay.  Is that a yes?

21  A    Yes.

22  Q    So, you made reference, by the way, to having consulted

23  with an expert.  Do you recall that?

24  A    Yes.

25  Q    When did that happen?

1   A     Well, we actually consulted with several experts.

2   Q     Okay.  Let me ask you to take a look at Mr. Schwartz's

3   declaration.  In particular I'm going to ask you to focus on

4   Exhibit 5.

5   A     Yes.

6   Q     And Exhibit 5 is a letter from Mr. Schwartz to Mr.

7   Andolina at Sidley.

8   A     Yes.

9   Q     And its dated January 3rd, 2020?

10  A     Yes.

11  Q     And if you look at the very last paragraph, the second

12  to last sentence reads,

13        "We also consulted with outside ethics counsel."

14  A     Yes.

15  Q     Okay.  Was that Mr. Slanina?

16  A     I don't know when we first reached out to Mr. Slanina.

17  Q     Okay.  Let me go back in that document to the second

18  paragraph.  Are you there?

19  A     Yes.

20  Q     In the third sentence it says that,

21        "We are unable to rule out that your firm's

22  representation of Boy Scouts of America constitutes a

23  conflict or potential conflict of interest of the duties that

24  Sidley owes to the Chubb companies."

25        Do you see that?

1  A      Yes.

2  Q      And so as of January 3rd even having consulted with one

3  or potentially even more than one outside ethics expert you

4  were still unable to say that this was a textbook in obvious

5  violation of Sidley's obligations, correct?

6  A      We believed internally that that was the conclusion we

7  were reaching and the advice we were getting, but we were

8  still interested in having Sidley answer the questions we had

9  been asking and we weren't getting answers to.  So, rather

10 than come out with a flat accusation we, again, were trying

11 to gather information to check ourselves and say what are we

12 missing.  This seems very obvious to us, but what are we

13 missing.  Help us.

14 Q      By the way, you accused Mr. Sneed of having this

15 unusual tone and being very bullying in his December 18th

16 call.  There is no reference to any of that in this letter,

17 is there?

18 A      I don't know.  I'd have to re-read the whole letter,

19 but if you tell me there's not I will believe you.

20 Q      Okay.  Ms. Russell, in connection with the application

21 that Sidley is making here Sidley has indicated that it is

22 not representing Boy Scouts in connection with coverage

23 disputes and that the firm of Haynes & Boone will be involved

24 on those issues.  Are you aware of that?

25 A      I'm aware that Sidley has said that.

1  Q     Do you have reason to doubt that Sidley has, in fact,

2  done that?  That that is the division of responsibilities?

3  A     Yes.  I do have doubts.  I said this a few minutes ago

4  because I think that in the context of this bankruptcy I find

5  it -- just what I've learned just since I've been involved to

6  the extent to which the bankruptcy plan is going to hinge

7  largely on the insurance assets and in particular Chubb's

8  policies, I find it hard to believe that Sidley can

9  completely detach itself from the reinsurance issues and not

10  be adverse to Chubb.  I think -- you know, Bill said as much

11  when he explained to Josh why they needed the prospective

12  waiver.  Without mentioning the Boy Scouts, he explained the

13  extent to which, you know, a bankruptcy plan can have

14  significant adversity to the insurers.

15       So, I think -- and I think we're seeing that play out

16  already from what I understand in some of these meetings that

17  have happened.  And Sidley being on the other side of the

18  table and trying to force us to a mediation on behalf of the

19  Boy Scouts.  So, I think from what I'm seeing I doubt that

20  that line can be drawn the way Sidley suggests very cleanly.

21  Q     Okay.  And you have not been involved in these

22  meetings, right?  You are just repeating what you've heard?

23  A     I have heard from my colleagues and my counsel that

24  were at these meetings.

25  Q     And you heard Ms. Boelter describe her view of those

1 | meetings today in court, didn't you?

2 | A    I heard her talk about some of the earlier ones.  I

3 | don't think she talked about the more recent ones.

4 | Q    Are you aware of the concept of insurance neutrality,

5 | Ms. Russell, in bankruptcy?

6 | A    Could you ask the question again?  I'm sorry.

7 | Q    Sure.  Let me ask it a little bit differently.

8 |      Are you familiar with the concept that in the

9 | bankruptcy context that a plan that materially impacts the

10 | rights of an insurer may give rise to the ability of an

11 | insurer to lodge an objection to the plan of confirmation?

12 | A    I'm familiar with the fact that an insurer can lodge an

13 | objection to the plan, yes.

14 | Q    And do you understand that that can only happen if the

15 | court determines that the plan is not insurance neutral?

16 | A    I wasn't aware of that, no.

17 |           MR. DUCAYET:  Your Honor, just give me one second.

18 | I'm going to just look at my notes.

19 | BY MR. DUCAYET:

20 | Q    You made some pretty strong statements about Mr.

21 | Andolina in your direct testimony.  Did you ever speak with

22 | Mr. Andolina?

23 | A    Not at all which is partly why it was shocking to me

24 | that he was writing these things accusing us of ill-motive

25 | when I had never met him before and my own lawyer wasn't

1  contacting me.

2  Q    Okay.  So, you never had a conversation with him?

3  A    No.

4       MR. DUCAYET:  Your Honor, at this point I don't

5  have any further questions for Ms. Russell.  Thank you.

6       THE COURT:  Thank you.

7       Redirect?

8                    REDIRECT EXAMINATION

9  BY MR. SCHIAVONI:

10 Q    Let me ask one question.  Ms. Russell, do you think

11 there is -- are there any of the answers that you have given

12 or questions that you feel you need to clarify anything?

13      MR. DUCAYET:  I'm going to object to that

14 question.

15      THE COURT:  It's pretty broad.  Sustained.

16      MR. SCHIAVONI:  Your Honor, I thought that

17 question might be appropriate in the new video world where

18 I'm so far away.  I have no further questions.

19      THE COURT:  Okay.  Thank you.

20      Okay.  Ms. Russell's testimony is concluded.

21 You're excused if you wish to be.

22      THE WITNESS:  Thank you, Your Honor.  I prefer to

23 stay on if that's okay.

24      THE COURT:  Yes.  You're the client

25 representative, yes.  Okay.

1       Mr. Schiavoni, what's next?

2       MR. SCHIAVONI:  Yes, Your Honor.  We have Mr.

3  Schwartz.

4       THE COURT:  Okay.  And are you offering his

5  declaration, are you doing direct or both?

6       MR. SCHIAVONI:  I'm going to offer his declaration

7  and I have some supplementation to add.

8       THE COURT:  Okay.  Mr. Schwartz?

9       MR. SCHWARTZ:  Yes, Your Honor.

10       THE COURT:  There you are.  People keep moving

11  around.

12               JOSHUA SCHWARTZ, WITNESS, SWORN

13       THE COURT:  Please state your full name and spell

14  your last name for the record?

15       THE WITNESS:  My name is Joshua Robert Schwartz,

16  S-C-H-W-A-R-T-Z.

17                    DIRECT EXAMINATION

18  BY MR. SCHIAVONI:

19  Q    Mr. Schwartz, if you could just briefly tell the court

20  what your positon and title is?

21  A    Managing counsel, director of reinsurance litigation

22  for the Chubb Group.

23  Q    And what generally are your responsibilities at Chubb?

24  A    I manage and oversee the reinsurance disputes for the

25  Chubb Group.  We're in 54 different countries.  I oversee

1  both seeded disputed where we're the insurance company, we

2  pay the claimant, and now we're looking to our reinsurers to

3  make their contribution.  I also counsel (indiscernible)

4  where we're the assuming reinsurer and we've been presented

5  with the bill.  So, I see both sides.  I also work on both

6  the legacy or run-off book of business that Ms. Russell

7  manages as well as the active book of ongoing active

8  policies.

9  Q    How long have you worked with Sidley Austin?

10 A    Since about 2016.  I moved back from Bermuda.  I was

11 the general counsel at ACE Bermuda and then at the beginning

12 of 2016 I met Bill -- I'm sorry, I met Mr. Sneed as well as

13 the Sidley Austin Law Firm other attorneys.  Right at the

14 beginning of my tenure in 2016 because we had an ongoing

15 litigation that was set for trial in June that had already

16 been up to the Court of Appeals.  Sidley had been on it for

17 about four or five years.  The case actually got adjourned

18 for another year.  So, that was a year and a half of very,

19 very heavy activity on that one as well as others.

20 Q    Have you been involved in retaining Sidley Austin in

21 more than one matter?

22 A    Yes, multiple.

23 Q    What is the general nature of those matters that you

24 retained them in?

25 A    They're reinsurance disputes.  Some where we're the

1 (indiscernible), others where we're the assuming reinsurer.

2 The case I was talking about that I inherited we were an

3 assuming reinsurer on that one.  So, we worked on reinsurance

4 disputes in both directions.

5 Q     Were there counseling matters that were open at the

6 time that you hired Sidley for the Boy Scouts reinsurance

7 matter?

8 A     Yes.

9 Q     Okay.  And were those counseling matters among the

10 matters that Mr. Sneed sought to resign from and sent you a

11 letter resigning from in 2020?

12 A     Yes.

13 Q     Did you engage Sidley to represent Chubb in connection

14 with reinsurance matters for the Boy Scouts insurance

15 coverage?

16 A     Yes.

17 Q     Okay.  And can you tell us when did you first contact

18 Mr. Sneed about that?

19 A     I contacted him in September of 2018 and then he needed

20 to address certain kinds of issues on his end.  By October

21 5th I had sent him materials. He was clear of the conflicts

22 and we were off to the races.

23 Q     With a conflict matter --

24 A     On the Lloyd's matter.  I'm sorry, Tanc.

25 Q     Right.  With the conflict matters that he was

1  addressing did those deal with who the reinsurers were in the

2  case?

3  A    Yeah.  It was the reinsurer issue, yes.

4  Q    Okay.

5  A    One of the challenges in this line of business that,

6  you know, certain law firms can't represent us in certain

7  disputes because of conflicts and we play by the rules.

8  Q    Okay.  And did Mr. Sneed tell you that he was conflict

9  free to take on the Boy Scouts matter?

10 A    Yes, he did.

11 Q    When -- at the time you approached him to take on the

12 Boy Scouts matter and then, you know, into October when you

13 sent him materials on it did he tell you that Sidley

14 represented the Boy Scouts?

15 A    No.

16 Q    Did you provide -- first of all, was Sidley operating

17 under the service level agreement when you approached him

18 about the Boy Scouts matter?

19 A    Yes.

20 Q    And did he ask you for a copy of the current form of

21 the agreement?

22 A    I believe that happened in November of (indiscernible).

23 It didn't happen before the engagement commenced.  They had

24 already approved our SLA on the online system.  So, we

25 already had a binding agreement at that time and he asked to

1  see a copy of it in November 2018.

2  Q    And did you provide it to him?

3  A    I believe so.  I sent him the SLA in November of 2018,

4  yes.

5  Q    And if you look at (indiscernible) did Mr. Sneed send

6  you an email where he acknowledged that Sidley had worked for

7  Chubb under the SLA?

8  A    Yes.  And we also discussed it at times as well.

9  Q    Okay.  And that's Sneed Exhibit 1.  Could you just go

10  to that exhibit for a second?

11  A    Sure.  Hang on.  My materials don't have tabs.  So, it

12  might take me a second to get to the exhibits.  Okay.  I'm

13  there.

14  Q    Okay.  And on December 7th, 2018 did Mr. Sneed send you

15  an email where he indicated that Sidley had operated under

16  the SLA?

17  A    Yes.  If you turn to Page 2 of this Exhibit 1 you will

18  see my bill as requested with the SLA.  Then he had spoken to

19  me -- I had forgotten about this December 7th outreach when I

20  submitted my declaration.  I read Mr. Sneed's and it

21  refreshed my memory.  He had called me at the end of November

22  and said that, you know, he's being asked to ask us for a

23  prospective waiver for all matters.  He knew that it was a

24  non-starter and that, you know, we don't just do blanket

25  prospective waivers.  We're always very quick to accommodate

1  their request for waivers.  So, I was a little bit surprised

2  by it, but then he put it in writing and we told him no.  I

3  think I even mentioned -- yeah, I mentioned that we've been

4  very willing to provide transactional waivers.  So, I hope

5  that that provides the necessary comfort going forward when I

6  told him no on December 7th.

7  Q    So, did you write Mr. Sneed in 2018 declining his

8  request for a prospective waiver?

9  A    Yeah.  That is the first email on this Exhibit 1.  It

10 says,

11      "Bill, I'm sorry, but we aren't able to provide a

12 prospective waiver.  As you know, our company has been very

13 welling to provide transactional waivers on a case by case

14 basis.  I hope that provides the necessary comfort."

15 Q    Does the SLA set out a procedure for disclosing

16 conflicts and consummating waivers for them?

17 A    Yeah.  It's incumbent on our partner law firms to bring

18 to our attention any conflicts or potential conflicts and to

19 obtain a written waiver if -- you know, they're a lot to ask

20 for.  (Indiscernible) decide whether or not we want to do it.

21 With prospective waivers, you know, those are disfavored and

22 require approval.  I'm not sure if (indiscernible) SLA or

23 not, but I know that we have to have approval from the

24 general counsel of Chubb Group and the chief claims officer

25 of Chubb Group in order to provide a prospective waiver.

1  Q     And Mr. Schwartz, did Mr. Sneed get waivers for you on

2  matters other than the Boy Scouts that indicated to you we

3  understood the terms of the SLA with regard to written

4  waivers?

5  A     Yeah.  You know, I took a look back we had three

6  requests in 2019.  There was one for a reinsurance

7  transactional matter.  There was one for a subpoena and we

8  had a lot of back and forth on that one because I needed to

9  know if there was a contentious subpoena or if this was just,

10 you know, here's the subpoena, give me the documents and, you

11 know, it would be a non-contentious one.  What I explained to

12 Sidley is that if it's non-contentious, you know, we're just

13 going to agree on search terms and give you a document;

14 that's one thing.  We would not provide a waiver for a

15 contentious subpoena.

16        Then we also had one other one where, I believe, Chubb

17 was the shareholder in an entity and they were looking to do

18 a transaction.  So, we had to address that one.  And with

19 that one I think that the claims administrator folks had made

20 an error and put the wrong header on it or something.  So, I

21 had that.  Then (indiscernible), and I said why do we need to

22 find one?  I don't think these things are signed.  Then they

23 showed me, oh, no, you signed this one so please have this o

24 ne signed.  So, I had to get that one executed with a wet

25 signature as well.

1  Q    Okay.  Did there come a time where someone sent you a

2  copy of this Wall Street Journal article about the Boy Scouts

3  potentially pursuing bankruptcy?

4  A    Yes.  It was in mid-December.  The counsel that had

5  been replaced on the matter, I think I communicated that a

6  day or too earlier and it got sent over to me that Wall

7  Street Journal article that has been the topic of testimony

8  today.  I forwarded it along to Bill so that he could have a

9  discussion about it.  And we had that discussion the next

10 day.

11 Q    Why did you sent it to Bill?

12 A    Because I needed to ensure that there wasn't a conflict

13 that would prevent our ability to work together on a matter.

14 Q    Did Mr. Sneed tell you whether or not Sidley

15 represented the Boy Scouts?

16 A    No.  He told me that, you know, he can't confirm or

17 deny that Sidley has not commented on press stories.  He

18 assured me that we are conflict free and there is no problem,

19 and that he could represent us in our manner.

20 Q    Did you rely on what Mr. Sneed told you?

21 A    Of course.  He's my counsel.  I am not an ethics

22 specialist.  Most of the time when I'm involved in a conflict

23 process the law firm -- actually, I think every time I've had

24 it the law firm comes to me and says this is the issue, we'd

25 like to get a conflict. Then I work with senior leadership,

1    you know, to see what decision those folks want to make.  I

2    am the relationship manager of Sidley and, you know, I view

3    my goal as to ensure that I can facilitate a prompt dialog so

4    that we're not leaving counsel out on a lurch for a period of

5    weeks with a waiver request.  I try to get them done as

6    quickly as possible.

7    Q    Okay.  After you hire Sidley, after you got assurance

8    that they weren't conflicted from Mr. Sneed, and even after

9    he assured you again after this article was sent did they

10   come back to you and ask for a prospective waiver again?

11   A    I'm sorry.  Could you please repeat the question?  My -

12   - I'm at home and I just got nervous that my wife's blue

13   tooth was going to catch my phone.  So, I was giving her the

14   cell phone to make sure that didn't happen.  I apologize.  I

15   got distracted.

16   Q    No problem.  I have my cat here that keeps biting my

17   ankles.  Okay.  So, I got my own problems.

18        So, just tell me -- Mr. Sneed provided you assurance

19   that he was conflicted after you passed on the Wall Street

20   Journal article, right?

21   A    Yeah.  I inquired and he said conflict free, and I

22   moved forward, yes.

23   Q    Okay.  After that exchange did Sidley come back to you

24   and try to seek a prospective waiver for bankruptcy matters?

25   A    Well, eventually, yes.  I believe in early January we

1  were trying to give Bill another important case.  He

2  explained that he can't take on anymore matters because there

3  is new firm leadership and there's an initiative within the

4  firm that requires prospective waivers and that they have

5  flexibility on litigation matters, but they need it -- you

6  know, it was explained to me it was for transactional and for

7  restructuring bankruptcy matters.

8          So, I was provided with some wording on January

9  10th, 2019.  That required a lot of work on my end to see if

10 we would even be willing to contemplate it, but when Sidley

11 explained that we can't work with them, otherwise, you know,

12 I explained that internally and we tried to make something

13 work.

14 Q    Were you -- where were you trying to draw the line

15 on -- in an exchange on a prospective waiver?

16 A    Well, the way it worked, just to bring you up to speed,

17 the line that they had drawn eventually was we only want it

18 for restructuring.  We're not interested in transactional

19 anymore.  And -- but I think that was by mid-February.

20     I think on February 20th, I spoke with Mr. Sneed and

21 the head of his insurance -- their insurance group at Sidley.

22 The two of them spoke with me and, you know, I explained to

23 them on that call that litigation in bankruptcy is the issue.

24 That I know that internally people are going to want to have

25 carved out.

1      You know, we had a good talk and they said they're

2  going to need to talk to people internally some more and they

3  sent me over proposed wording on February 20th, which didn't

4  address the litigation in the bankruptcy context.  And I'm

5  trying to give Bill a new case and, you know, I think you had

6  just introduced a new document at the beginning of the case

7  and I said, Can we cut to the chase?  Like, give me the

8  wording that we can, like, try to get this, this going with,

9  and that led to the February 28th wording.

10 Q      Were -- did you reach agreement on granting a

11 prospective waiver?

12 A      No.

13 Q      Were you told that a request for a prospective waiver

14 was being pushed by Sidley's management?

15 A      Yes.

16 Q      Okay.  Did anyone disclose to you that Mr. Conklin on

17 the executive committee was the originating partner for the

18 Boy Scouts matter?

19 A      No, I didn't know that Sidley was representing them at

20 that time.

21 Q      Okay.  And did you -- did a point come where these

22 waiver discussions broke down?

23 A      They didn't break down.  It was withdrawn by Sidley.

24 It was -- I mean, I remember when I got the voicemail from

25 Bill I just was like, Oh my goodness, this was a real waste

1  of a couple months' effort.

2       But at least it's gone and we can move forward and I

3  know we can work on other matters together.  So, I was

4  pleased that it was behind us.  I wasn't pleased to have gone

5  through the process for no -- for naught.

6  Q    Did you -- after you got the voicemail from Mr. Sneed

7  withdrawing the request for a prospective waiver, did you

8  memorialize that that was what he had told you in some way?

9  A    Yeah, I sent him an email like right after.  I had --

10  we were playing phone tag and he wound up leaving me the

11  voicemail.  So, I said, Bill, thanks for your voicemail.  I

12  just have to wait for a second and, you know, I'm glad that

13  we're no longer -- that you're no longer seeking one.

14  We're -- you know, we're done at the thing.

15            MR. SCHIAVONI:  Okay.  Your Honor, that email is

16  in the record of exhibits.  I'm not going to go to it, but we

17  can -- it's cited in the papers.

18  BY MR. SCHIAVONI:

19  Q    Were you -- did you become aware at some point, Mr.

20  Schwartz, that -- of this meeting that took place on October

21  14, between the Chubb coverage people and the reinsurance --

22  and the bankruptcy team at Sidley?

23  A    In 2019, October 14, yes, I did learn about that a

24  couple of weeks after --

25  Q    Okay.  Did you know, at the time, that that meeting was

1  going to take place?

2  A    No.

3  Q    When did you learn that it took place?

4  A    It was a couple of weeks after.  I think it was the

5  Sunday night, October 27th.

6  Q    Okay.  What did you do after you heard about that

7  meeting?

8  A    I immediately started to analyze what's going on.  As I

9  mentioned earlier, I'm not an ethics expert.  I'm also not a

10  bankruptcy expert.  So, I wanted to understand what happens

11  in a bankruptcy because irrespective of whether there is or

12  isn't a conflict, I was -- wanted to be able to provide a

13  recommendation upwards on, you know, how this might be

14  negative for us.

15      So, I consulted with a number of different people.  I

16  mentioned -- I told Ms. Russell because it's, you know, her -

17  - Sidley is her law firm and, you know, this is -- this was a

18  big issue and I -- by Tuesday the 29th, I notified Sidley.  I

19  didn't want to just send Bill an email, so I gave him a phone

20  call as a courtesy heads-up and I followed that up with an

21  email.

22  Q    Did you speak to Mr. Sneed after this?

23  A    I spoke to Mr. Sneed on October 29, yes.

24  Q    Okay.  And what happened in that phone call?

25  A    Well, it was a pretty quick call, but there were a

1   couple of things that I was surprised about.  You know, I

2   called and said, Gee, I haven't thought about this since the

3   spring and I was just silent because I didn't think -- you

4   know, I -- that prospective waiver request wasn't about the

5   Boy Scouts to me and I'm like, Wait, we talked about this in

6   December of '18.  So, I was silent in response to that

7   comment.  He also said, This is going to cause a lot of

8   issues internally, especially for me.

9        I wasn't happy about any of that, but I needed to put

10  them on notice and, you know, what I was looking to do was to

11  start a fact-finding mission to understand, you know, whether

12  there's -- why they don't think there's a conflict and, you

13  know, let's -- help us understand.  Maybe we're missing

14  something and we can analyze what we'd be willing to do.

15  But, unfortunately, we didn't have a lot of information

16  sharing or dialogue over the coming weeks.

17  Q    What was the next call you had with Mr. Sneed?

18  A    After that October 29 call I didn't speak with him

19  again until December 18.

20  Q    Okay.  And that was the -- the December 18th call was

21  the one that Ms. Russell described?

22  A    Yes.

23  Q    Okay.  Is there anything that Ms. Russell described

24  that is not in accord with your recollection of what happened

25  in that call?

1  A      No, it was pretty consistent.  For me, you know, Bill,

2  when he testified earlier today he said something about how

3  he was upset or used the most-sophisticated word to express

4  his frustration when I called him.  He didn't express any

5  frustration with me.  He treated me like a client, very

6  kindly.

7        But on this December 18 call, I've never had any

8  experience like this before professionally where it just

9  wasn't the same Bill.  He got on the phone and, you know,

10 after a few pleasantries, just dove in with a prepared

11 speech; it was an ultimatum.

12       He was like, We're not dropping the Boy Scouts and if

13 you've got a problem with that, we're going to drop -- we're

14 going to withdraw from you on these matters, and then he

15 listed a series of matters that he was going to be

16 withdrawing from.

17       Anytime I tried to, you know, get into an

18 understanding, Well, help us understand what is the conflict

19 and he'd be like, You're cross-examining me now and, you

20 know, that's not what this call is about.  And, frankly, that

21 was what the call was about, was to understand, you know,

22 their position so that we could then make an informed

23 decision and, you know, we were just being blocked on any

24 substantive discussion about the issue.

25 Q      After the December 18th call, did you try to do other

1  things to address this issue or resolve it?

2  A     Yes.

3  Q     And what did you do, Mr. Schwartz?

4  A     Well, I know that we needed to provide a response to

5  their ultimatum and we consulted internally and we said that

6  we're not going to waive the conflict.  But we -- you know,

7  you can see throughout all of our correspondence that we were

8  not trying to be adversarial; we were trying to ask questions

9  to understand the situation best so that we could make a

10 decision.

11      And even in that January 3 letter, it was, If you have

12 other information, please let us know.  And, you know, I'm

13 not looking at the document in front of me, but if I'm not

14 mistaken, I mentioned how we had asked for their analysis,

15 whether it's a GC opinion or otherwise, like, we wanted to

16 understand their analysis as to why there was no conflict

17 with the concurrent representation of us in Boy Scouts.

18      We have since learned, and I'm sure Mr. Slanina is

19 going to explain that, you know, if we're both current

20 clients and there's adversity between the two of us, that's

21 the end of the game.  And here, we had two DJ actions pending

22 between us and Boy Scouts at the time that we're having all

23 this dialogue.  So, we were trying to learn all this until,

24 you know, December of '19 and January of '20, but we're just

25 trying to figure out what's going on and we were just getting

1  stonewalled.

2  Q    Did you review Mr. Sneed's declaration?

3  A    Yes, I did.

4  Q    Okay.  And does it accurately portray the scope of

5  privileged information which he was given?

6  A    No.

7  Q    And when you got into the January 2020 time period, did

8  Chubb have open matters with Sidley?

9  A    Yes, multiple.

10 Q    Okay.  And did you agree to consent to allow Sidley to

11 withdraw from those matters?

12 A    No.  The only matter we consented to was the District

13 of Massachusetts proceeding while making clear that we

14 weren't releasing him from the Lloyd's arbitration, itself.

15      And in the district court, they had filed a motion and

16 the last thing we wanted was to have a dispute before, you

17 know, before Judge Kasper who was going to be ruling on our

18 motion to compel, who had a rapport with the Sidley lawyers

19 in Boston.  We were not looking to have any sort of dispute

20 in that forum and we consented with an express agreement that

21 was on without a prejudice basis to the issues associated

22 with this conflict.

23 Q    As of the time that Sidley filed the bankruptcy on

24 February 18th, was Sidley still counsel of record in

25 arbitrations with Chubb?

1  A      Yes.

2  Q      Okay.  And did you attach to your declaration

3  correspondence from Mr. Sneed to the arbitrators in those

4  matters on and after the bankruptcy where he was, in essence,

5  making an effort to withdraw after the bankruptcy?

6  A      Yes, I shared correspondence between me and Sidley

7  after the filing on February 18 where Sidley said they were

8  going to be withdrawing and, you know, I felt that they were

9  at delicate points in the matters and I didn't understand why

10 they needed to withdraw, other than, you know, in connection

11 with this proceeding.

12      I mean, we had one matter where the other side had

13 approached us to stay the arbitration and conduct an audit

14 and try to settle.  We did not want our adversary to, you

15 know, be privy to this type of information.

16      We had another matter where the umpire was also an

17 umpire in an arbitration that we had that was about to start

18 and, you know, we did not want this to be -- we didn't want

19 to be here right now.  We wanted to address this in another

20 way and, you know, after that filing, I was like, Why do you

21 need to withdraw on us in these matters, it's going to be

22 destabilizing.  And we didn't even have counsel secured in

23 one of the matters, so I would be the designated person to

24 serve, which, you know, we eventually got other counsel to

25 serve on.

1       We had to hire four different law firms to replace

2   Sidley because of conflict issues with various of the

3   counterparties in those remaining insurance disputes.

4   Q     Did you or Chubb, to your knowledge, consent to Sidley

5   writing the arbitrators to withdraw after the bankruptcy was

6   filed?

7   A     No, I actually pleaded with Mr. Sneed not to do so.

8   Q     Did you see anything -- was there anything about the

9   specifics about what was happening in the arbitrations that

10  indicated that there was any reason to withdraw, other than

11  the timing -- strike that.  Strike that.

12      Was there anything about the timing of the withdrawals

13  that suggested that there was any reason for the withdrawals,

14  other than the bankruptcy, itself?

15  A     No, it was really not, because in one of the matters

16  that wasn't, you know, involving Boy Scouts claims, the

17  discovery period had been extended to February 28.  I think

18  they talk about the original discovery period in some of the

19  papers of February 4th.

20      So, Sidley was offering to take all those depos and

21  then, you know, that would have been going until February 28

22  and they, you know, told that panel on February 20th that

23  they're not -- that they've withdrawn.

24  Q     Mr. Schwartz, you prepared a declaration that you filed

25  with Chubb's objection in that case; is that right?

1  A      Yes.

2  Q      Are the statements contained in that declaration

3  accurate to the best of your ability?

4  A      Yes.

5          MR. SCHIAVONI:  Okay.  Your Honor, we'd offer the

6  declaration into evidence and I have no further questions.

7          THE COURT:  Thank you.  It's admitted.

8      (Schwartz Declaration received in evidence)

9          THE COURT:  Mr. Ducayet, cross?  Mr. Ducayet, I

10 can't hear you.  You must have muted.

11         MR. DUCAYET:  I'm sorry, Your Honor.  I had it on

12 mute for the call.

13         THE COURT:  Yes, thank you.

14                    CROSS-EXAMINATION

15 BY MR. DUCAYET:

16 Q      Good afternoon, Mr. Schwartz.

17 A      Good afternoon.

18 Q      Prior to going in-house, you practiced for the firm,

19 right?

20 A      I worked at two law firms.  I also clerked for a

21 federal judge in Miami.

22 Q      Okay.  And the firm that you were at immediately prior

23 to going in-house was O'Melveny, wasn't it?

24 A      That's correct.

25 Q      Okay.  And did you know Mr. Schiavoni --

1   A      Yes.

2   Q      -- when you were there at O'Melveny?

3   A      Yes.

4   Q      Okay.  Did you work with him?

5   A      A very little bit.

6   Q      Now, prior to the retention in the Lloyd's Insurance

7   dispute in the fall of 2018, Sidley had never worked on any

8   matters involving a Century policy that had been issued to

9   the Boy Scouts, right?

10  A      Before the October 2018 engagement, Sidley had not

11  provided counsel on Boy Scouts' policies as far as I know.

12  Q      Okay.  And now, you testified in your direct

13  examination about some insurance coverage litigation between

14  Boy Scouts and Century, do you recall that?

15  A      And other insurers, yes.  I referred to it as the "DJ

16  actions," declaratory judgment actions.  I believe there were

17  two pending that were stayed, if I'm not -- actually, I know

18  there were stay motions.  I don't know if they were stayed.

19  I don't follow it that closely.

20  Q      Yeah.  And I think your testimony was that one of the

21  things that were sort of, you know, wanting to consult with

22  ethics counsel about was the fact that there were these

23  pending declaratory judgment actions and didn't that make

24  Sidley directly conflicted, right?

25  A      No.  I learned, eventually, what the rules are.  Like,

1  I didn't even know that there was a 1.7 and a 1.9 until this

2  event.  So, I learned through the process, you know, what the

3  obligations of a lawyer are.

4       You know, I left private practice before being put up

5  for partner, so I went in-house, so I had never been the

6  person who has to address conflicts with bringing business in

7  like a partner in a law firm would.

8            MR. DUCAYET:  Okay.  I'm going to move to strike

9  that as nonresponsive.

10            THE COURT:  No, overruled.

11            MR. DUCAYET:  Okay.  Your Honor, thank you.

12  BY MR. DUCAYET:

13  Q    The DJ actions, as you've referred to them, the

14  proceedings in Texas and Illinois, you're aware of the fact

15  that Sidley does not represent Boy Scouts in connection with

16  those matters, right?

17  A    Yes, I'm aware of that.

18  Q    And you don't have any personal involvement in those

19  matters, because you sit on the reinsurance side of the

20  business and not the direct claims side of the business,

21  right?

22  A    That's correct.  I do not have any involvement with the

23  declaratory judgment actions, like management of the

24  declaratory judgment actions, just to be clear.  I'm thinking

25  about that document request that you guys were talking about

1  earlier.

2  Q    Right.  And you understand, of course, that the

3  position that Century has taken in connection with those

4  document requests is that the information about the

5  reinsurance matters simply isn't relevant in any of those

6  claims, right?

7  A    Yeah, it's a one-way street where the information is

8  relevant to the reinsurance, but these are closed claims that

9  we've already settled with the Boy Scouts and so, you know,

10  what happened in the underlying and how the underlying policy

11  operates is relevant, but it's not a two-way street.

12  Q    Well, let me ask you this, the matters that Sidley was

13  retained to represent Century on in connection with the

14  Lloyd's reinsurance dispute and the other reinsurance

15  dispute, those were settled matters too, weren't they?

16  A    Yes, they were settled matters.

17  Q    Okay.  And nevertheless, as I understand the testimony

18  of you and your colleagues, even though they're settled

19  matters, there's still a sufficient relationship between the

20  underlying direct insurance disputes and the reinsurance

21  disputes that it is effectively a textbook conflict of

22  interest, right?

23  A    Sidley cannot advise us on the re-bill without full

24  analysis of the first-encounter agreement, without a complete

25  understanding of what happened in the underlying.

1      You know, Mr. Sneed's declaration references certain

2  documents that were given.  I had a number of conversations

3  with him about a whole host of issues.  So, he was privy to

4  privileged information.

5      I don't agree with Ms. Russell that there's privileged

6  information that was exchanged.  I can't think of anything

7  privileged, you know, like legal advice from our coverage

8  counsel that we shared in the Boy Scouts case, but I

9  certainly shared with Mr. Sneed, orally, a lot of

10 information, including privileged information that I learned.

11 Q    Okay.  So, none of the documents -- you agree with

12 Mr. Sneed none of the documents contained privileged

13 information with respect to the underlying direct insurance

14 claims, right?

15 A    I haven't analyzed the full records.  I wouldn't be

16 comfortable giving you an answer.  My general understanding

17 is that there is none -- I don't know, but I don't believe

18 so.

19 Q    Okay.  Now, Boy Scouts was not a party to the dispute

20 between you and Lloyd's, correct?

21 A    That's correct, (indiscernible) underlying subject

22 (indiscernible) parties.

23 Q    Okay.  And those are that the dispute over bills that

24 you tendered to Lloyd's in connection with matters that had

25 already been paid out on behalf of Boy Scouts, correct?

1  A      That's correct, yes.

2  Q      Now, in the original Lloyd's arbitration, the one that

3  Sidley did not handle, the reinsurers in that matter were not

4  challenging the decisions by Century to actually make the

5  payments for defense indemnity, correct?

6  A      I'm not certain I can answer that question without

7  divulging confidential arbitration information.

8  Q      Well, wasn't Lloyd's saying that what Century should

9  have done was it should have allocated the claims that it

10  paid in a different way, pursuant to the terms of the

11  reinsurance agreement, wasn't that their position?

12  A      That's in the public record and I agree that that is

13  one of the things, yes.

14  Q      Okay.  And they never said, Lloyd's never said, Look,

15  you shouldn't have paid these at all.  Forget about which

16  policy they belong in.  This is not within the scope of the

17  coverage.

18  A      They did not take that position, that's correct.

19  Q      Okay.

20  A      The public issue was application in the first-encounter

21  agreement.

22  Q      Right.  And with respect to the issue that the policy

23  that was at issue in the Lloyd's reinsurance matter, that was

24  a treaty policy, correct?

25  A      Yes, a treaty policy.  The treaties have a

1  (indiscernible) provision that incorporates the terms of the

2  underlying policy into the reinsurance contract, as well,

3  yeah.

4  Q    Okay.  Now, Mr. Sneed discussed with you -- strike

5  that.  Let me set it up a little bit better.

6        You were forwarded a copy of that *Wall Street Journal*

7  article in December of 2018, correct?

8  A    Correct.

9  Q    And you had a subsequent conversation with Mr. Sneed

10  about that article, correct?

11  A    Correct.

12  Q    And I'm just curious, because you said in your direct

13  testimony that the purpose of forwarding that to him was to

14  determine whether or not there was a conflict.

15        Was that your testimony?

16  A    I think I might have said something more specific, that

17  I wanted to make sure that he wanted blocked on working on

18  our matter for one reason or another, like -- but, yeah, I

19  wanted to make sure there wasn't a conflict that needed to be

20  addressed.

21  Q    Did you say that in the email (indiscernible)?

22  A    No.

23  Q    Okay.  You just said, FYI, right?

24  A    And they he wrote back, I've got to go talk to a bunch

25  of people.  Let's make the call tomorrow instead of today.

1  We both knew what we were talking about.

2  Q    Well, you said, FYI, and then you went on to discuss

3  some specifics about the transmission of the matters to

4  Sidley, right?

5  A    That's correct, yeah.

6  Q    Okay.  And then you had a conversation with Mr. Sneed

7  the next day, correct?

8  A    That's correct.

9  Q    And I think it's now undisputed Mr. Sneed said to you,

10  Look, I just can't confirm or deny the recording here, but

11  you don't deny, Mr. Schwartz, that Mr. Sneed told you that he

12  did not believe that there was any conflict representing

13  both, an insurance company that has a dispute with a

14  reinsurer and the underlying insured, that the insurance

15  company's policies cover, correct?

16  A    I don't have a specific recollection of him saying

17  that.  I do know that he told me we're conflict-free and that

18  was where I left things, because I rely on my counsel to tell

19  me if there's a conflict or a potential conflict, anything

20  that we need to -- anything that needs to be explored in more

21  detail.

22  Q    Well, you didn't say in sum or substance to Mr. Sneed,

23  Look, if you guys are really representing Boy Scouts, that's

24  a textbook violation.  That's a fundamental conflict that

25  we're not going to be able to get over.

1      Did you?

2   A    Well, I didn't know if they were or weren't

3   representing them.  You know, sometimes someone will leak,

4   you know, will plant something in the press.  I mean, you

5   know, like, to try to encourage the tort claimants settle

6   more quickly.

7       I didn't know.  Maybe they were assigned to, you know,

8   analyze what's going to happen if we do bankruptcy with our

9   campgrounds and, you know, just getting a legal opinion, so I

10  didn't know.

11      And I also didn't know the ethics rules that I've

12  learned over the last couple of months or so back then.  As I

13  testified to earlier, I rely on my counsel to come to me and

14  present the issue and then I facilitate a dialogue with

15  senior management in order to determine whether or not we

16  want to do it.  We would consent to a conflict after it's

17  been presented to us.

18  Q    Mr. Schwartz, based upon Mr. Sneed's comment to you

19  that he could not comment one way or the other, couldn't

20  admit or deny the recording, did you assume from that

21  response Sidley was not representing the Boy Scouts?

22  A    I didn't make an assumption one way or the other.  I

23  thought either they weren't or if they are, they're doing

24  something that is not a conflict.  Those are the only two

25  options.

1  Q    Well, let me just ask you this, you would agree with me

2  that under the ethics rules, you don't have a duty of

3  confidentiality unless someone is either a current or former

4  client, right?

5  A    I don't know.  I'm not that well-versed in those rules.

6  I apologize.

7  Q    Let me ask you this, if Boy Scouts was not a client,

8  would it violate any duty to Boy Scouts or anybody else to

9  say, No, that's not true?

10 A    I do not believe that there would be a confidence.  No,

11 I don't know.

12     I do know that my company always says we don't confirm

13 or deny.  We don't comment on press stories, and many press

14 stories are inaccurate.

15     So, you know, from my perspective, that *Wall Street*

16 *Journal* article caused me to make sure that I was still

17 secure with my counsel and there were no conflict issues and

18 I was provided with that assurance and I kept it moving.

19 Q    Okay.  Let me -- and, again, I think you never

20 expressed to Mr. Sneed in that telephone conversation that,

21 Hey, look, I'm just telling you, if you guys are representing

22 Boy Scouts, we're going to have a major problem.

23 A    No, we had a -- it was a long call.  We were planning

24 out a lot of strategy on multiple different fronts and it was

25 just at the end of my to-do list was to say, Hey, what's the

1  story with that *Wall Street Journal* article?  Are you guys

2  representing them?  Do we have a problem?

3      And what Mr. Sneed explained to me is that Sidley is

4  not commenting on the press, you know, can't confirm or deny,

5  but I'm fine working for you.  So, that was it for me.

6  Q    Okay.  And my question just called for a yes-or-no

7  answer.

8      Let me ask you, if connection with the discussions that

9  occurred about an advanced waiver, as you said, your memory

10 was refreshed that the discussion was initiated back in early

11 December of 2018; is that correct?

12 A    Yeah, my memory was refreshed, because in my mind, you

13 know, after I spoke to Mr. Sneed in October of 2019, the

14 whole prospective waiver was all about Q1 of 2019.  I had

15 forgotten that there was that initial request on December --

16 in November 30 and in writing on December 7, which we

17 rejected.  So, I had forgotten about that one.

18 Q    Okay.  And, again, I'm just trying to get a yes-or-no

19 answer to this.

20     So, now that your memory is refreshed on that point,

21 that interchange occurred prior to *The Wall Street Journal*

22 article, correct?

23 A    Yes.

24 Q    And you heard Mr. Sneed testify earlier today that when

25 he reached out to you on this issue, he was not aware of the

1  fact that Sidley was representing Boy Scouts.

2  A    In December of 2018, yes.

3  Q    Okay.

4  A    That's what he's testified to.

5  Q    Yeah.  And in connection with the advanced waiver

6  discussion, you described a process whereby there were

7  different aspects of the waiver request that were being made

8  and that with respect to the bankruptcy discussions, the

9  focus was on litigation, right, the direct adversity like in

10 a bankruptcy context.

11     Did I understand your testimony correctly?

12 A    Yes.

13 Q    And in connection with that, you were working with

14 people internally at Chubb who included, which included, you

15 know, folks who were familiar with the bankruptcy process,

16 right?

17 A    That's correct.

18 Q    And that included Paul Beck, for example?

19 A    Yes.

20 Q    And I think Ms. Russell testified that you were keeping

21 her apprised of those discussions, as well, correct?

22 A    Yes, because we were trying to staff Mr. Sneed -- I'm

23 sorry -- we were trying to staff Sidley on some Brandywine

24 matters.

25 Q    Okay.  And in connection with the discussions, it was

1  Mr. Beck who came up with those three conditions in the

2  March 4th, 2019, email, correct?

3  A    We sat down together and discussed the issues and

4  worked out what it would be and, yeah.

5  Q    And did you express to Sidley the view that there were

6  simply no circumstances under any situation in which a firm

7  representing Century could ever represent a debtor that was

8  also a Century insured?

9  A    Well, the waiver that we were contemplating, the

10  prospective one, wouldn't allow any direct or indirect

11  involvement with coverage issues; moreover, the March 4 email

12  I sent was not standalone integrated agreement.  It

13  references the proposal from Sidley on February 28 and said

14  that this supplements that.  So -- and that if you guys are

15  onboard with these things, I can then go and put together a

16  formal letter that we can then all sign off on.  So, that's

17  where we were in the process.

18      You know, I was optimistic that we were making some

19  headway one way or the other and then, you know, they said,

20  We don't need it.  So, that was the end of it.

21  Q    Okay.  Mr. Schwartz, please, just listen to my

22  question.

23      I asked you if you ever expressed to Sidley the view

24  that there were simply no circumstances in which a firm

25  representing Century could also represent a debtor that was a

1  Century insured, yes or no?

2  A    I want to say yes or no.  It's correct that I never

3  said that there's no circumstance.  I just want to make sure

4  I'm answering the negative or the, you know, the yes or the

5  no properly, so I apologize for my words.

6  Q    Oh, okay.

7       And, ultimately, is it your understanding, sir, that

8  Sidley has publicly committed that it is not going to bring

9  an adversary proceeding against Chubb in connection with this

10 matter?

11 A    My understanding is that the issues involved with the

12 plan, I mean, this is -- I believe that this is -- my

13 understanding is that the plan and the insurance are integral

14 and interrelated, but I'm not the best person to speak to

15 those issues.

16      But I understand that the main asset that the Boy

17 Scouts is looking to fund the tort claims with is the

18 insurance and that's the plan, from what I understand.  I

19 think they want to maintain their real estate holdings and

20 not have that be part of any of the funds.  That's my general

21 understanding, but I'm not speaking on behalf of my company;

22 I'm just letting you know what my general understanding --

23 Q    Oh, okay.  And, again --

24 A    -- but definitely people more knowledgeable that can

25 speak to what's going on.  Yeah.

1  Q    I'm asking you a very simple question.  Do you

2  understand Sidley has publicly committed that it will not

3  bring an adversary proceeding against Chubb, yes or no?

4  A    I'm not aware specifically.  If you want to direct me

5  to something, I'm happy to look at something.

6  Q    Have you read the brief?  Have you read Sidley's

7  response?

8  A    I did read it once.

9  Q    Okay.  Are you aware of the fact that there's a section

10  at the end of that brief that articulates precisely what it

11  is Sidley would and wouldn't do (indiscernible)

12  responsibilities would be divvied up among itself, Morris

13  Nichols, and (indiscernible)?  Were you aware of that?

14  A    I didn't focus as much on that component.  I'm a

15  witness, not managing this litigation, so I was more focused

16  on making sure I was providing accurate information and, you

17  know, analyzing what was being said that was inaccurate.  So,

18  I wasn't as focused on that.

19       But if you want -- I do have the pleading in front of

20  me.  If you want to tell me what you want me to look at, I

21  can look at something if that would be helpful.

22  Q    Okay.  Let's move on.

23       Let me ask you, you testified about various

24  circumstances under in you were communicating with Sidley

25  over the withdrawal and the way in which that withdrawal

1    would occur.

2         Do you remember that?

3    A    I agree with everything, except the last comment, the

4    way in which the withdrawal would occur.  We weren't agreeing

5    that they could withdraw, so I just took issue with the last

6    part of your question.

7              MR. DUCAYET:  Okay.  Then I'll strike my last part

8    of my sentence and the answer can stand.

9    BY MR. DUCAYET:

10   Q    Now, the SLA that you refer to, Mr. Schwartz, has an

11   arbitration provision in it, correct?

12   A    Yes.

13   Q    And has Century submitted to Sidley its notice that it

14   intends to commence an arbitration?

15   A    We've submitted our notice.  Where we are in the

16   process is that we thought we had satisfied the -- there's a

17   meet-and-confer requirement, pre-arbitration -- we thought we

18   had satisfied that.  You said we didn't, so we, then, engaged

19   in that process and that turned into an unsuccessful

20   mediation and we will be pursuing our rights in terms of

21   monetary damages in an arbitration.

22   Q    Right.  And among the monetary damages that you will be

23   seeking are, you know, costs associated with what you claim

24   arise from Sidley's allegedly improper withdrawal, correct?

25   A    Yes.

1  Q     Okay.  Take a look, if you could, sir, at Exhibit 9.

2  A     Exhibit to what, my declaration?

3  Q     I'm sorry, excuse me.  I'm sorry.  Exhibit 9 to Mr.

4  Sneed's declaration.

5  A     I'm --

6  Q     And I can tell you, Mr. Schwartz, this is also

7  Exhibit 7 to your declaration, so whichever one is easier.

8  A     Thank you.  I'm ready when you are.

9  Q     Okay.  And that's a letter that was sent by Mr. Sneed

10 on January 16th, 2020?

11 A     Yeah.

12 Q     And that's a letter in which Mr. Sneed communicated

13 that Sidley withdraw from its existing representations of

14 Century and Chubb, correct?

15 A     It had said it intended to proceed.  It said it had

16 become a point of breakdown and I was like, Well, because we

17 won't waive the conflict.  So, yeah, this was his attempt to

18 withdraw.

19     And then I wrote back saying, We don't consent to the

20 withdrawal.  I know that law firms can't just withdraw on

21 their clients because they won't waive a conflict.

22 Q     Well, Mr. Schwartz --

23          MR. SCHIAVONI:  Your Honor, I apologize, Your

24 Honor.

25          If Mr. Ducayet could say -- could you just -- I

1   just didn't hear what the exhibit number was.  If you could

2   just repeat it?

3           I apologize.

4           MR. DUCAYET:  Sure.  It's (indiscernible) Sneed,

5   Exhibit 9 and Schwartz Exhibit 7.  So, it's the same

6   document.

7           MR. SCHIAVONI:  Thank you.  I apologize for

8   interrupting.

9   BY MR. DUCAYET:

10  Q    Now, Mr. Schwartz, you are aware of the fact that under

11  the Rules of Professional Responsibility, a firm or a lawyer

12  may withdraw from representation in the event of a breakdown

13  in the relationship, right?

14  A    I have not studied that.  I heard -- I don't know the

15  canon of that and what it -- I don't know the contours of

16  that, you know, that maxim.

17  Q    Okay.  So, turn if you could, to the next exhibit,

18  which is a letter that you sent back to Mr. Sneed.

19  A    Yeah.

20  Q    Okay.  And you'll notice that that letter is dated

21  January 30th, right?

22  A    That's correct, yeah.

23  Q    So, that's two weeks later, right?

24  A    Yeah, it was January 3rd and then you guys wrote back

25  two weeks later on January 16 and we wrote back two weeks

1  later, yeah.

2  Q    Okay.  And at the time that you received the

3  January 16th letter, you were aware of the fact that public

4  reports that Boy Scouts was going to be filing bankruptcy in

5  the very-near future, correct?

6  A    When I received the January 16 letter, I was in the

7  middle of an arbitration.  I don't recall what I knew or

8  didn't know of.  I knew that they were talking about filing,

9  but I didn't know exactly when.

10 Q    So, Mr. Schwartz, you weren't slow-rolling this

11 response here in order to make the argument that counsel for

12 Century is now making in its proceeding, which is that Sidley

13 had not withdrawn by the time the petition was filed, were

14 you?

15 A    Absolutely not.

16      The trial ended the middle of the next week.  I had to

17 catch my breath.  And then I'm not the only one who need -- I

18 am signing this letter under my name, but I needed to make

19 sure that the, you know, the direct claims folks, the

20 Brandywine folks, the senior legal folks -- there are a

21 number of people who need to be consulted, and the only

22 reason why I didn't work on this sooner was because I was in

23 the middle of an arbitration.

24 Q    Now, Mr. Schwartz --

25 A    I, frankly, thought that you can't break up with us, so

1  it wouldn't matter, any of this email, like, in any event;

2  that is where my mind was.

3  Q    Okay.  So, even in the event of a breakdown in the

4  relationship?

5  A    The only breakdown in the relationship was that we

6  wouldn't waive a conflict.  I don't know what -- like, I

7  really don't know what you mean about this breakdown in our

8  relationship.  It sounds like -- I don't really understand

9  where you're going or what you're asking about.

10 Q    So, Mr. Schwartz, you know very well that it was

11 Sidley's position that there wasn't a conflict and you

12 believe that there was, right?

13 A    In the end I believed that there was and they never

14 explained to me why there wasn't.

15 Q    Okay.

16 A    All they did was, you know, try to transform us into a

17 former client to then have a debate over whether the matters

18 are substantially related.  So, I --

19 Q    Well, let me ask you this, as of January 16th, was

20 there any doubt in your mind that it was Sidley's intention

21 to withdraw from all of the Chubb matters?

22 A    Once I got this letter -- I mean, my hope was that we

23 were going to somehow work something out so that we would be

24 able to work with Sidley or the Sidley team, that there'd be

25 something that could be done and that was my hope.

1  Q      Well, how could we have worked something out when we

2  engaged in a textbook violation of the ethics rules?

3  A      My understanding is that, well, I mean, the reinsurance

4  practice group could have gone to another firm.  That would

5  have been -- you know, that could have happened.

6        There are a number of things that could have happened

7  if we were all working collaboratively and trying to, you

8  know, proactively address the situation.  Well, proactively

9  would have been a lot earlier.

10        But we want -- we started this process on October 29,

11  trying to understand what is the basis for your conclusion

12  there is no conflict because we're trying to evaluate this

13  and once we understood the conflict issue, we could maybe get

14  to second base, which is, all right, are we willing to waive

15  this?

16        But we, you know, we were just being treated very

17  unfairly.

18  Q      Well, isn't it true, Mr. Schwartz, that you refused to

19  have a meeting with Sidley until you were provided with a

20  written opinion, setting forth the reason why Sidley believed

21  there wasn't a conflict; that was a precondition wasn't it?

22  A      What we said was that we would like to see your

23  analysis before the meeting and that would be, you know, make

24  for a more-informed discussion.  I don't think I would refer

25  to it as a "precondition."

1    We did meet on December 18 without any analysis

2  beforehand, other than the December 3, Mr. Andolina

3  correspondence where he said, We, you know, we already -- we

4  knew about this and we waived our right, you know, and it's

5  unrelated.

6    And, you know, all of these points that -- well, not

7  all, just a few points; there's just a short paragraph there

8  where we're being, you know, criticized and he's questioning

9  our motives and saying, you know, a nine-day delay in writing

10 back is too long when it took him two weeks to get back to us

11 in the first instance.  So, there was a lot of -- yeah, I

12 mean, I -- by January, I was hoping -- frankly, all along we

13 were all hoping and, you know, in the end, we weren't able to

14 get there.

15 Q    Okay.  Mr. Schwartz, just a last couple of questions.

16    In respect of the withdrawal and the arbitration

17 proceeding, did there come a point where Sidley articulated

18 to you a concern that the panel and opposing counsel in one

19 of those arbitrations was being misled about the role that

20 Sidley was going to have going forward?

21 A    I know that our adversary said that, but it was

22 inaccurate.  We had assigned co-counsel because we weren't

23 sure how that other matter was going to go and the co-counsel

24 called up the other side and said, you know, we're being

25 brought on as co-counsel, and for whatever the reason the

1  other side interpreted that as you're replacing them.

2      And we were trying to work out a joint communication

3  with the panel and the other side is like, No, you said this.

4  So, there was some correspondence back and forth that

5  clarified the situation.  Everything was fine and then

6  Mr. Sneed told the panel that he is withdrawing on

7  February 20th.

8  Q    Didn't Sidley insist that you tell the panel and

9  opposing counsel accurately that Sidley was not going to be

10 involved in the case through its completion?

11 A    Well, we were at a point where Sidley wrote and said,

12 If you don't notify them within 24 hours what's going on, we

13 will.

14     And so we said, We'll do it, and we wrote to the panel

15 and explained the situation.

16     And then Mr. Sneed came back and said, Well, you didn't

17 say that we've withdrawn.

18     And I said, Well, you haven't withdrawn.  We have not

19 accepted your withdrawal.

20     And then he said, Well, I'm going to tell the panel.

21     I said, Please don't, and I explained, you know, that

22 it would not -- you know, that it would be prejudicial to us

23 and he proceeded to do it anyhow.

24 Q    Well, sir, is there any doubt in your mind as of

25 January 16th that Sidley was going to withdraw?

1  A    I don't know how these things work when a law firm

2  wants to withdraw because you won't waive a conflict.  I

3  don't know how that works and, you know, maybe someone who

4  knows more about the subject matter could illuminate the

5  Court on that.

6  Q    Okay.  Mr. Schwartz, in the Massachusetts litigation in

7  the Lloyd's matter --

8  A    Uh-huh.

9  Q    -- the firm that replaced Sidley in that matter was

10  O'Melveny & Myers, wasn't it?

11  A    Along with -- yes, along with Sugarman, which is a

12  local firm.  And Sidley had a DC office, so we were able to

13  do a little bit of one-stop shopping, whereas we needed to

14  hire two law firms, but not Mr. Schiavoni.  We have a

15  different dedicated team that works on that matter.

16  Q    Okay.

17          MR. DUCAYET:  I don't have anything further?

18          THE COURT:  Do you have any redirect?

19          MR. SCHIAVONI:  I'm sorry.  Your Honor, I have

20  nothing further.  This is Mr. Schiavoni.

21          THE COURT:  Okay.  Thank you.

22          Mr. Schwartz, your testimony is concluded.

23          THE WITNESS:  Thank you.

24      (Witness excused)

25          THE COURT:  Mr. Schiavoni, what's next?

1    MR. SCHIAVONI:  We have Chris Celentano.  Your

2  Honor, he was with -- you should have his declaration.

3  Unfortunately, I think it was put in Saturday.  It's

4  relatively discreet; it's under 10 pages.

5    I would offer his testimony through the

6  declaration.

7    THE COURT:  Mr. Ducayet, any objection?

8    MR. DUCAYET:  I don't object to that, Your Honor.

9  I will register my -- no, no objection, Your Honor.

10    THE COURT:  Okay.  Any cross?

11    MR. DUCAYET:  Very limited, Your Honor.

12    THE COURT:  Is Mr. Celentano on video?

13    MR. SCHIAVONI:  Your Honor, I think he is on

14  standby.  Hold on just one second.

15    (Pause)

16    THE COURT:  Okay.  I see him.

17    MR. SCHIAVONI:  Stan, could you please call him on

18  his cell phone.  I'm not sure whether he's just having a

19  technical problem, but I believe he's on the phone.

20    MR. CELENTANO:  Can you hear me?

21    MR. SCHIAVONI:  Is that you, Mr. Celentano?

22    MR. CELENTANO:  Yes, it's Chris.  Christopher

23  Celentano.

24    Can you hear and see me?

25    THE COURT:  I can, but are you on CourtCall?

1          MR. CELENTANO:  I am.

2          THE COURT:  Okay.  Can you disconnect your audio

3  on the video so that just your audio goes through CourtCall.

4          MR. CELENTANO:  I did.  I believe I did.

5          THE COURT:  Okay.  Can everyone see Mr. Celentano?

6  I can.

7          UNIDENTIFIED:  Your Honor, I think so.  Is he

8  wearing a set headphones?

9          THE COURT:  Yes.

10          MR. CELENTANO:  That is me, yes.

11          UNIDENTIFIED:  Okay.  Very good.

12          THE COURT:  Okay.

13          MR. SCHIAVONI:  Thanks, Your Honor.

14          THE COURT:  Okay.  Mr. Celentano, can you raise

15  your right hand, please.

16      CHRISTOPHER CELENTANO, WITNESS FOR CENTURY INDEMNITY

17                     INSURANCE/AFFIRMED.

18          THE COURT:  And please state your full name and

19  spell your last name for the record.

20          THE WITNESS:  Christopher Celentano, C-E-L-E-N, as

21  in Nancy, T-A-N-O.

22          THE COURT:  Thank you.

23          Mr. Ducayet, cross?

24          MR. DUCAYET:  Thank you, Your Honor.  Jim Ducayet,

25  on behalf of Sidley.

1                          CROSS-EXAMINATION

2   BY MR. DUCAYET:

3   Q    Mr. Celentano, good afternoon.  I just have a couple of

4   questions for you.

5        Could you get your declaration out in front of you.

6   A    Yes.

7   Q    Can I direct your attention to the last paragraph,

8   Paragraph 18.

9   A    Yes.

10  Q    In Paragraph 18, you're describing a meeting that

11  occurred in October of 2019; is that right?

12  A    Correct.

13  Q    And in that paragraph you say that the meeting was on

14  October 14th, 2019, and that Ms. Boelter and Mr. Andolina of

15  Sidley presented Chubb with plan terms implicating Chubb's

16  rights.

17       Do you see that?

18  A    Yes.

19  Q    And do you recall in that meeting, Ms. Boelter and

20  Mr. Andolina telling you that no plan had yet been drafted?

21  A    They did not present us with a plan document at that

22  time.  I don't recall a specific statement that they did not

23  have a drafted plan, but they did not present us with a plan

24  document.

25  Q    Okay.  Thank you.

1    And you're aware of the fact that after that meeting

2  that your outside coverage counsel Walker Wilcox sent the

3  letter to Haynes & Boone talking about what had happened in

4  an October 14th meeting?

5  A    Yes.

6  Q    And the letter raised certain issues with respect to,

7  you know, some of the discussions that had occurred, but it

8  didn't say anything about presenting plan terms, did it?

9  A    I'd have to look back at the letter to verify that.  If

10 you have it in front of you and you're presenting that it

11 doesn't say those exact words, I'll believe you.

12 Q    I think in the interests of time, let just keep going.

13 I will make that representation.

14    If I understand your declaration, Mr. Celentano,

15 correctly, one of the reasons why it took a couple of weeks

16 for Century and Chubb, internally, to put together the fact

17 that Sidley was representing Boy Scouts in the bankruptcy was

18 because the reinsurance and the direct claims are handled by

19 different units, different departments; is that right?

20 A    Correct.

21 Q    And, in fact, your office is in New Jersey, correct?

22 A    Correct.

23 Q    And the reinsurance group, including Ms. Russell and

24 Mr. Schwartz, they're in Philadelphia, correct?

25 A    Ms. Russell and Mr. Schwartz are in Philadelphia.  The

1  entire reinsurance department of Chubb, I do not believe it's

2  entirely in Philadelphia, but those two employees are.

3  Q    Okay.  Now, looking, again, at your declaration in

4  Paragraph 14, 15, and 16, you discuss certain lawsuits that

5  are pending in Illinois and Texas involving Boy Scout

6  coverage.

7  A    Correct.

8  Q    Do you see that?

9  A    Yes.

10  Q    And just as a preliminary matter, you understand that

11  Sidley is not counsel to the Boy Scouts in any of those

12  matters, correct?

13  A    Correct.

14  Q    And in Paragraph 16 you talk about some discovery that

15  the Boy Scouts served on Century asking for information about

16  the reinsurance arbitrations, right?

17  A    Yes.

18  Q    Okay.  Did you ever review the responses to those

19  discovery requests?

20  A    I did.

21  Q    And so you're aware of the fact that Century took the

22  position that the information that was being sought was not

23  relevant to any of the issues in the insurance coverage

24  action, correct?

25  A    That is our position, yes.

1  Q      Okay.

2              MR. DUCAYET:  I have nothing further.

3              THE COURT:  Thank you.

4              Any redirect?

5              MR. SCHIAVONI:  Yes, just briefly, Your Honor.

6  Tancred Schiavoni.

7                      REDIRECT EXAMINATION

8  BY MR. SCHIAVONI:

9  Q      Mr. Celentano, you were asked some questions about

10  whether or not a plan had been drafted or prepared.

11         Did you remember those questions?

12  A      Yes.

13  Q      Okay.  At the meeting on October 14th, did the Sidley

14  lawyers tell Chubb that they hoped to have a pre-package

15  bankruptcy plan agreed to and filed before Christmas?

16  A      Yes.

17  Q      The letter that -- if we could just go to the letter

18  for a second that Mr. Ducayet referred you to, it's Boelter

19  Exhibit 2.

20  A      Okay.

21              MR. SCHIAVONI:  And to the extent you don't have

22  it quickly handy, I'm just going to ask Mr. Stamoulis to pull

23  that up, the first page of it.

24              And is that it on the screen, Mr. Stamoulis?

25         (No verbal response)

1         THE WITNESS:  Okay.  I see it and I found it in

2   Ms. Boelter's declaration.  Okay.  I have it.

3         MR. SCHIAVONI:  Okay.  Hold on.  Through the magic

4   of Zoom, I have -- oh, there it is.  Okay.  Good.  I couldn't

5   see it.  We can't have the witness see it and not the lawyer.

6         If you could go to the first page, Mr. Stamoulis,

7   the second paragraph, middle of the page there.

8   BY MR. SCHIAVONI:

9   Q    This is a letter -- you saw this letter before it went

10  out to the Boy Scouts, right?

11  A    Yes.

12  Q    Okay.  In the second paragraph there, the author, Mr.

13  Wadley said that at the meeting -- do you see the second

14  paragraph, second sentence, At the meeting -- and that's a

15  reference to the October 14th meeting, right?

16  A    Yes.

17  Q    Okay.  Boy Scouts disclosed that it engaged in

18  significant discussions with the claimant lawyers regarding

19  the settlement of current claims and part of a pending

20  bankruptcy and then the sentence goes on.

21       Have I read that right?

22  A    Yes.

23  Q    Okay.  And did the Sidley lawyers tell you that at this

24  meeting that this matrix was part of that bankruptcy that

25  they were trying to negotiate?

1  A     That was their plan, yes.

2  Q     Okay.

3  A     The plan was to use the matrix to settle the abuse

4  claims.

5  Q     Okay.  And if you go to the next page of this letter,

6  the last -- the first sentence at the very top, it says:

7       "Last, BSA disclosed that it has also engaged in

8  discussions with a potential future claims representative."

9       Have I read that right?

10  A     Yes.

11  Q     Okay.  And did the Sidley lawyers who were present,

12  were they the ones who disclosed that and said that, that

13  they had engaged in discussions with a "potential future

14  claims representative"?

15  A     Yes.

16  Q     Okay.  Thank you very much, Mr. Celentano.

17            MR. SCHIAVONI:  I have nothing further, Your

18  Honor.

19            THE COURT:  Mr. Ducayet, does that prompt any

20  questions?

21            MR. DUCAYET:  Just one, Your Honor:

22                      RECROSS-EXAMINATION

23  BY MR. DUCAYET:

24  Q     Mr. Celentano, looking, again, at Paragraph 18, the

25  sentence that we were talking about on my cross goes on to

1  say that Chubb presented -- excuse me -- Sidley presented

2  Chubb with plan terms implicating Chubb's rights, pressed

3  that those terms be offered to the tort claimants and then

4  did so over our objection.

5       And my question is, did Sidley give Chubb the

6  opportunity to provide comments on that draft matrix?

7  A    When they presented the matrix to us at that meeting,

8  at the meeting, we -- and that was the first time we had saw

9  it -- and at the meeting we told them that we did not think

10  that they should be presenting this matrix, especially with

11  values inserted in the matrix, to plaintiffs at this initial

12  mediation session that they had said that they already

13  scheduled.  So, they did invite our comments which we began

14  memorializing in that October 17th letter and then we started

15  the process of trying to get claim information from the Boy

16  Scouts about which claims they were actually considering

17  settling.

18       And that's what the meeting with my colleague Shelly

19  Williams had attended in Chicago the following week, which

20  was in Ms. Boelter's declaration, also.  That was the purpose

21  of that meeting, was to obtain claims information for the

22  claims that might be subject to this matrix.

23  Q    Okay.  And didn't Chubb provide comments to Sidley,

24  with respect to this draft claims matrix before it went to

25  the plaintiffs?

1  A    We noted our objection to providing a matrix to the

2  plaintiff before the mediation.  We did not give any, to the

3  best of my knowledge, substantive commentary on the

4  descriptions, the injury-tiering descriptions and the values

5  because we just did not have any information to give that

6  commentary.

7       So, we noted our objection at the October 14th meeting.

8  We noted our objection, again, at -- prior to mediation.  We

9  were advised, I believe, the Friday before the mediation

10  through Haynes & Boone that the Boy Scouts had provided the

11  matrix to the plaintiffs and then there was no further

12  discussion.

13  Q    Mr. Celentano, do you know if the version that went to

14  the plaintiffs reflected any of the comments that had been

15  provided?

16  A    The version that went to the plaintiffs, I'm not sure;

17  I'd have to go back and look.

18  Q    Okay.  All right.

19        MR. SCHIAVONI:  I apologize, Your Honor, that was

20  more than one question, but I don't have anything further.

21        THE COURT:  Thank you.

22        Okay.  Mr. Celentano, your testimony is concluded

23  and you may be excused.

24        THE WITNESS:  Thank you, Your Honor.

25        THE COURT:  Thank you.

1        (Witness excused)

2              MR. SCHIAVONI:  Your Honor, we have Mr. Slanina

3    next.

4              THE COURT:  Okay.  Is he your last witness?

5              MR. SCHIAVONI:  He is, Your Honor.  He's an

6    expert.  I don't know what Your Honor's intention is, whether

7    to take this on the papers when he's done or whether you

8    intended to have -- or, you know, thought argument would be

9    helpful at another time.  If you did, we could continue and

10   deal with Mr. Slanina then or we could do him now.  It's up

11   to the Court.

12             THE COURT:  I'd like to get all of the testimony

13   in today, but I'd like to take five minutes and then we'll

14   reconvene and then we'll do Mr. Slanina's testimony.

15             So, I've got 5:34, so 5:40, we'll reconvene.

16             MR. SCHIAVONI:  Okay.  Thank you, Your Honor.

17             THE COURT:  Thank you.

18         (Recess taken at 5:34 p.m.)

19         (Proceedings resumed at 5:40 p.m.)

20             THE COURT:  Let get back on the record.  I see

21   Mr. Ducayet.  I see Mr. Schiavoni.  I see Mr. Slanina.

22             MR. SCHIAVONI:  Your Honor, this is Mr. Schiavoni.

23   My partner Mr. Svirsky is going to present Mr. Slanina.

24             THE COURT:  Very good.

25             Mr. Svirsky?

1          MR. SVIRSKY:  May I proceed, Your Honor?

2          THE COURT:  Let me swear in Mr. Slanina first.

3          MR. SVIRSKY:  Yes, Your Honor.

4          THE COURT:  Okay.  Mr. Slanina, can you raise your

5    right hand, please.

6      CHARLES SLANINA, WITNESS FOR CHUBB CENTURY INDEMNITY,

7                         AFFIRMED.

8          THE WITNESS:  It's Charles Slanina, spelled

9    S-L-A-N-I-N-A.

10         THE COURT:  Okay.  Mr. Slanina, you're -- that was

11   a little garbled for me, so can you see if you can either

12   bring your speaker closer or maybe speak a little louder and

13   make sure you're slow.

14         THE WITNESS:  Okay.  I can certainly do both of

15   those things.

16         THE COURT:  Oh, that's much better.

17         THE WITNESS:  Is that better?

18         THE COURT:  Yes, thank you.

19         Mr. Svirsky?

20         MR. SVIRSKY:  Thank you, Your Honor.

21                   DIRECT EXAMINATION

22   BY MR. SVIRSKY:

23   Q    Good afternoon, Mr. Slanina.

24   A    Good afternoon.

25   Q    Do you lecture on professional responsibilities and

1  ethics and write a monthly ethics column in *The Journal of*

2  *the Delaware State Bar Association*?

3  A     Yes, I do.

4  Q     And has your practice focused on professional

5  responsibility and ethics for many years?

6  A     For approximately the last 30 years.

7  Q     Now, have you been listening to the testimony today?

8  A     Yes.

9  Q     Did you hear anything today that has caused you to

10  change any of the opinions in the declaration that was

11  submitted on your behalf to the Court?

12  A     No, it did not.

13  Q     Now, did you review Sidley's brief and supporting

14  papers in support of this retention application?

15  A     Yes, I did.

16  Q     What, if anything, jumped out at you from the filings

17  that you reviewed?

18          MR. DUCAYET:  Your Honor, let me object to the

19  question.  Mr. Slanina has not filed any sort of supplemental

20  declaration in this matter.  He provided a declaration in

21  connection with the Century response brief that was filed

22  back on April 14th and so we would object to him offering any

23  opinions that are outside the scope of his declaration, which

24  is the only document that we have in front of us.

25          And to the extent that Counsel was asking him to

1    comment upon things that were filed after that declaration

2    was submitted, we think would be immaterial proper, would be

3    prejudicial, and not consistent with the rules requiring

4    disclosure of expert opinion.

5            THE COURT:  Mr. Svirsky?

6            MR. SVIRSKY:  Your Honor, they -- Sidley has

7    entered an opinion from its purported expert here and I'm

8    asking Mr. Slanina if he has a view on that opinion, if it

9    has caused his opinion to change as a result.  I think that's

10   proper and within the scope of this hearing.

11           MR. DUCAYET:  Your Honor, I think it's only proper

12   if the answer is no, because if the answer is yes, then I

13   think we're entitled to get disclosure of those opinions.

14           THE COURT:  Mr. Svirsky?

15           MR. SVIRSKY:  Mr. Ducayet will have an opportunity

16   to question him about any answers he gives, of course.

17           THE COURT:  Okay.  Well, first --

18           MR. DUCAYET:  Your Honor, that's really not the

19   way it works.

20           THE COURT:  Okay.  First, I'm not sure that was

21   the actual question, but, second, I think the testimony needs

22   to be limited to what Mr. Slanina's opinions are and that's

23   what I'm prepared to hear.

24           MR. SVIRSKY:  Okay.  Let me try a few questions on

25   that, Your Honor.

1  BY MR. SVIRSKY:

2  Q    Mr. Slanina, did you review the SLA, service-loan

3  agreement, in this case?

4  A    Yes, I did.

5  Q    And you heard the testimony about whether or not there

6  was written consent requested and given by Century in this

7  case?

8  A    Yes, I did.

9  Q    And what was -- you heard the testimony that Century

10 never gave written consent, right?

11          MR. DUCAYET:  Your Honor, I'm sorry to interrupt

12 again, Your Honor, but the SLA is not identified in the

13 declaration among the documents that he reviewed and I think

14 this is just another way to get out an opinion that was not

15 contained in the original declaration.

16          Mr. Slanina could have filed a supplemental

17 declaration.  He did not and in reliance upon him not filing

18 a supplemental declaration, you know, we're prepared to go

19 forward on what he originally put into the record, but

20 Counsel's questions, I think, go beyond that.

21          MR. SVIRSKY:  My question, Your Honor, was whether

22 he heard the testimony that Century didn't give consent to a

23 waiver.

24          THE COURT:  I'm sure he heard it because we all

25 heard it.

1    MR. SVIRSKY:  Right.

2  BY MR. SVIRSKY:

3  Q    And my next question is, what is the implication on the

4  rules -- under the rules of ethics of that fact?

5          MR. DUCAYET:  Again, Your Honor, I think that's --

6  the issue of whether there was a written waiver or not is

7  something that could have very easily been addressed in the

8  original opinion but was not.

9          THE COURT:  Well, it's (indiscernible).

10         MR. SVIRSKY:  Mr. Slanina opined about the need

11  for informed consent, Your Honor, in his report under

12  Rule 1.7.

13         THE COURT:  That, he did, and that's what I'm

14  looking for.

15         THE WITNESS:  If I may?

16  BY MR. SVIRSKY:

17  Q    Should I state the question or do you have it,

18  Mr. Slanina?

19  A    I think I have it and I can limit my response to what I

20  covered in the declaration.

21      I knew this after reviewing certain documents and

22  speaking to Mr. Schwartz, primarily, as a situation where

23  there was a concurrent conflict of interest, concurrent

24  client conflict of interest in Sidley's representation of the

25  Boy Scouts while still representing Century.  And under Rule

1 1.7, informed client consent confirmed in writing is required

2 if that conflict is to be cured.

3     I was presented no information in preparing my

4 declaration or after listening to the testimony today to

5 conclude that there was informed written consent provided by

6 Sidley to Century as part of my declaration and my analysis.

7     Also, I looked at Sidley's claim that this was a

8 Rule 1.9 analysis.  That Century was a former client, rather

9 than a concurrent client, a 1.9 analysis certainly can

10 appreciate why it is an attractive one for Sidley to argue

11 that they were in compliance with Rule 1.9.  It's a much more

12 lenient standard.  Much of their responses dealt with whether

13 or not the BSA representation was the same (indiscernible)

14 matter or whether their client confidence (indiscernible) --

15     MR. DUCAYET:  Your Honor, I think the witness, at

16 this point, is just conducting a narrative.  I don't think

17 there's really a pending question at this time.

18     THE COURT:  Sustained.  Let's ask a question,

19 please.

20 BY MR. SVIRSKY:

21 Q    Mr. Slanina, under Rule 1.7, about which you opined, is

22 the reasonableness of a lawyer's belief or of a relevant

23 consideration about whether or not there's a conflict?

24 A    No.

25 Q    Is screening an adequate remedy for a concurrent

1  conflict under Rule 1.7?

2  A     No.  It's not found in 1.7 at all.  I consider a

3  response to the contrary conflates a different rule, the

4  imputation rule which does permit screening under certain

5  circumstances, none of which I found to be present here.

6            MR. SVIRSKY:  I have no further questions, Your

7  Honor.

8            THE COURT:  Mr. Ducayet?

9            MR. DUCAYET:  Yes, and I'll be very brief, Your

10  Honor.

11            And similar to what Mr. Schiavoni said with

12  respect to Professor Rapoport, we also have objections to the

13  testimony here and I'll just put those on the record.  I'm

14  not going to belabor the point.

15            Our view is that this is an opinion which is

16  really just a legal opinion and it's improper, Your Honor,

17  for that reason.  Your Honor, of course, is the legal expert

18  in this proceeding and Mr. Slanina's declaration and his

19  testimony don't add anything if Your Honor can't, otherwise,

20  resolve for herself.

21            But with that said, let me just ask a couple

22  questions and we'll wrap it up.

23            THE COURT:  Okay.

24            MR. SVIRSKY:  Can I respond?

25            Your Honor, I can respond after Mr. Ducayet is

1  done, if you'd like to hear it on that issue.

2           THE COURT:  Let's have the questions and then I

3  will let you respond to the objection, which I will also take

4  into consideration as I rule, but let's finish the testimony.

5           MR. DUCAYET:  Very well, Your Honor.

6           MR. SCHIAVONI:  Your Honor, just a housekeeping

7  matter.  We would like to offer the declaration into

8  evidence.

9           MR. DUCAYET:  And, Your Honor, we don't object to

10 that, subject to our objections that Your Honor should not

11 give it any weight in connection with your analysis.

12          THE COURT:  Thank you.  Then it's admitted and

13 I'll determine how to use it.

14      (Slanina Declaration received in evidence)

15          MR. DUCAYET:  Very well, Your Honor.

16                       CROSS-EXAMINATION

17 BY MR. DUCAYET:

18 Q     Mr. Slanina, just a couple questions for you.

19      If you look at your declaration on Page 1, actually

20 flip the page.  Page 2, Paragraph 2, do you have that in

21 front of you?

22 A     Yeah.

23 Q     You say that you provided expert opinions and expert

24 testimony at trial and by deposition in at least nine

25 previous cases.

1    Do you see that?

2  A    Yes.

3  Q    Why do you say "at least"?  Is there some reason you

4  don't know exactly how many times you've testified as an

5  expert?

6  A    Well, my statement is to as to providing an expert

7  opinion and expert testimony.  Not all the time that I

8  provided an opinion was the opinion used.  There were times

9  when I -- my clients didn't like the opinion they got and

10  they chose not to use it or act on it.  So, I've done -- I've

11  offered the opinions, but they haven't always been used and

12  not all the cases go to trial.

13  Q    Well, but your sentence here reads you've provided

14  expert opinions and expert testimony at trial or and by

15  deposition in at least nine previous cases.

16    What you were just describing doesn't fit within that

17  language, does it?

18  A    So, is your question whether there are more than nine?

19  Q    I'm just wondering why --

20  A    You get the ones that I identified and I haven't kept a

21  running track of them.

22  Q    Oh, okay.

23    And based on the list that is contained in Paragraph 2,

24  I take it you've never testified in a bankruptcy proceeding?

25  A    I believe that is correct.

1    Q      Okay.  And now, you do provide expert testimony, but

2    your primary employment is as a practicing attorney; is that

3    correct?

4    A      That is correct.

5    Q      And your practice focuses on legal ethics matters,

6    correct?

7    A      It's pretty equally divided between disciplinary

8    defense, actually representing attorneys in disciplinary

9    matters and then doing advising and consult ing.  And in the

10   latter, I would put testifying as an expert.

11   Q      Okay.  But you're not a bankruptcy lawyer.  You

12   wouldn't characterize yourself as a bankruptcy lawyer, would

13   you?

14   A      Absolutely correct.

15   Q      Okay.  You have done some bankruptcy work in the past,

16   though, haven't you?

17   A      Not enough to really mention.

18   Q      Well, didn't you represent the law firm in a bankruptcy

19   matter once?

20   A      Which law firm?

21   Q      The firm of Paul, Hastings, Janofsky & Walker in the

22   Northwestern Corporation matter?

23   A      It was a bankruptcy matter, but I wasn't representing

24   them in the context of a bankruptcy issue.

25   Q      Right.  The issue there was similar to the issue here,

1  it's that a party was seeking to disqualify the Paul Hastings

2  firm, correct?

3  A    Exactly.  Just to make that point, I don't view myself

4  as practicing bankruptcy law by being an expert in this

5  matter.

6  Q    Okay.  And in representing Paul Hastings, you argued

7  that that firm should not be disqualified, correct?

8  A    I believe that's correct.

9  Q    And among other things, you said in the papers to the

10  Court that because motions to disqualify a debtor-in-

11  possession counsel can be used for tactical reasons, they are

12  frequently viewed with a certain amount of skepticism, right?

13  A    Correct.

14  Q    And you also argued in connection with that

15  representation that under the Section 327 standard for an

16  adverse interest, the relevant question is what the current

17  interests are that are held by the firm, not what it prior

18  representations were, right?

19  A    I defer to your view over my recollection, but yes.

20  Q    Okay.  That --

21  A    I (indiscernible) that to be true.

22  Q    Okay.  Very good.

23         MR. DUCAYET:  I don't have anything further.

24         THE COURT:  Any redirect?

25         MR. SVIRSKY:  No, Your Honor.

1           THE COURT:  Okay.  Thank you very much,

2  Mr. Slanina.

3           THE WITNESS:  Thank you.

4           THE COURT:  Your testimony is concluded and you're

5  excused.

6           THE WITNESS:  Thank you.

7           THE COURT:  Thank you.

8       (Witness excused)

9           MR. SCHIAVONI:  Your Honor, would you like a

10  response for the record on the objection to Slanina?

11           THE COURT:  Yes, please.  Thank you.

12           MR. SCHIAVONI:  Just to make a record on that,

13  Your Honor, Sidley hasn't argued, objected to the relevance

14  of Mr. Slanina's testimony.  He clearly possesses specialized

15  knowledge in the area of ethics.  It could assist the trier

16  of fact here and such testimony has been accepted in

17  Delaware, and I cite the Walt Disney case for the Court; that

18  is 907 A.2d 693, affirmed that 906 A.2d 27, there's nothing

19  unusual about taking guidance from an expert on ethics

20  issues.

21           THE COURT:  Okay.  Thank you.

22           MR. DUCAYET:  Your Honor, if I may?

23           THE COURT:  Yes.

24           MR. DUCAYET:  I understand it's been a long day,

25  Your Honor; probably longer than any of us anticipated.  And

1  I also understand Your Honor's desire to try to conclude, at

2  least, the testimony today.  That is a goal that I

3  wholeheartedly agree with and share.

4        I don't know what Your Honor's schedule would

5  permit.  I would, though, ask for Your Honor's indulgence if

6  I could just have about five minutes to consult with my

7  colleague, and the question that we're considering is whether

8  or not we need any rebuttal testimony; again, with a view

9  towards trying to get everything done today and obviously

10 cognizant of the fact that it's been a long day.

11       THE COURT:  Yes, I'll give you five minutes and I

12 will tell you my anticipation is not to start argument at six

13 o'clock at night, so I would, if possible, like to conclude

14 the evidentiary portion so we all know what the record is so

15 that argument is fruitful.

16       So, yes, take five minutes.  We're in recess.

17       MR. DUCAYET:  Okay.  Thank you, Your Honor.

18    (Recess taken at 5:59 p.m.)

19    (Proceedings resumed at 6:09 p.m.)

20       THE COURT:  Okay.  We're back on the record.

21       Mr. Ducayet?

22       MR. DUCAYET:  Good afternoon, Your Honor.  Thank

23 you for the opportunity to consult.

24       I am going to do a very short rebuttal

25 presentation and I'm going to ask Mr. Sneed to go back on the

1  stand.

2              Is Mr. Sneed on the line?

3              THE COURT:  I see Mr. Sneed, but I don't hear you.

4              MR. DUCAYET:  Okay.

5              THE COURT:  Now, are you on CourtCall, Mr. Sneed?

6         (No verbal response)

7              THE COURT:  Operator?

8              THE OPERATOR:  Yes, Your Honor?

9              THE COURT:  Can you see that Mr. Sneed's line is

10 live?

11             THE OPERATOR:  I'm checking now.

12        (Pause)

13             THE OPERATOR:  His line is open.

14             MR. SNEED:  Hello?

15             THE COURT:  Yes, now I can hear you.

16             Okay.  Thank you, Operator.

17             Okay.  Mr. Sneed, you are still under oath.

18             MR. SNEED:  Yes, Your Honor.

19  WILLIAM SNEED, REBUTTAL WITNESS FOR SIDLEY AUSTIN, PREVIOUSLY

20                     SWORN, RESUMES STAND.

21             THE COURT:  Mr. Ducayet?

22             MR. DUCAYET:  Sorry, Your Honor.  I had it on mute

23 again.

24                     DIRECT EXAMINATION

25  BY MR. DUCAYET:

1  Q      Good afternoon, Mr. Sneed.

2  A      Good afternoon.

3  Q      Did you have an opportunity to listen to the testimony

4  of Ms. Russell and Mr. Schwartz?

5  A      Part of Ms. Russell's and most of Mr. Schwartz.  I was

6  drawn away a couple of times, but most of it, yes.

7  Q      Okay.  I want to just ask you a couple of questions

8  about the testimony that they provided and let me start,

9  first of all, with the telephone call that occurred between

10 the three of you or among the three of you on December 18th

11 of 2019, okay.

12 A      Yes.

13 Q      Both Ms. Russell and Mr. Schwartz said that, in almost

14 identical language, that you were a different person on that

15 call and that the tone on that call was very, very different

16 than any communication you had had with them in the past.

17 Is that, in your mind, an accurate characterization of that

18 telephone call?

19 A      No, not as far as my demeanor or approach.  I was very

20 level and calm and they were quite agitated, but I got the

21 sense -- I think I heard more of that from Ms. Russell, that

22 after pleasantries I went and read them a speech and

23 something.  I don't agree with any of that.

24 Q      Okay.  What were you trying to accomplish on that call,

25 Mr. Sneed?

1  A    I was trying to get a conference or a meeting with

2  people to discuss the issues and get past this, you know,

3  precondition, Oh, we have to see all your analysis

4  beforehand.  I wanted to make progress to understand what

5  their issues were and get them addressed.

6      And I didn't bully them or issue them ultimatums.  I

7  asked that it be moved up and that we have a conference,

8  which is, I think, something that we'd been trying to get

9  since late October.

10 Q    Okay.  Now, Mr. Sneed, there was also some testimony

11 from Ms. Russell and Mr. Schwartz about the representation in

12 the Lloyd's matter and the other reinsurance arbitration

13 matter.

14     Did you have an opportunity to hear that testimony?

15 A    Yes, I did.

16 Q    And Ms. Russell, in particular, testified that while

17 the list of the categories of documents that you explained to

18 the Court that you had received from Century in connection

19 with the representation was accurate.  That you sort of

20 walked the line and tried to minimize the significance of

21 those documents in terms of their relevance to a potential

22 bankruptcy filing.

23     Did you hear that?

24 A    I did hear that.

25 Q    Do you agree with that?

1  A      No.  The Lloyd's arbitration record was the main thing

2  that we got as one category.  There was nothing in the

3  Lloyd's arbitration record about a pending sub or Century

4  BSA-coverage dispute.  It was a non-issue.  It wasn't what

5  was being fought over.  And this -- those (indiscernible)

6  coverage of the action involving BSA and Century in Texas and

7  Illinois, I gather.

8        None of that information was at issue in the Lloyd's

9  arbitration.  It's never been supplied to me.  I don't have

10 anything from that case.  No legal analysis about those cases

11 has ever been supplied to us.  I think Mr. Schwartz admitted

12 that during his cross-exam.

13       The bulk of the second category of information was the

14 treaty negotiations and the '50s and '60s have zero relevance

15 and reference anything to BSA.

16       And I get the sense that what's being proposed to the

17 Court is that while there was a good deal of discussion with

18 Sidley and Mr. Sneed about the insurance coverage disputes

19 with BSA and there was not.  There was none.  It wasn't the

20 issue.

21       The issue was, can you put more than one molestation

22 claim together as an event under a reinsurance contract from

23 the '60s.  That was the issue.

24       And that's what I addressed and, you know, there was

25 talk about, Well, the first encounter (indiscernible) somehow

1  still going to be at issue in the next case?

2       I was like, No, it wasn't.  The -- let me just read the

3  Massachusetts Court opinion.  The whole thrust of why we get

4  to arbitrate again is that that was the only issue they ruled

5  upon and that was a dead issue.

6       I think there's a good deal of characterization of

7  things going on that I disagree with.

8  Q    Okay.  Mr. Sneed, let me just ask you this, then.  One

9  of the points that Ms. Russell made was that the fact that

10 the arbitration sought declaratory relief was significant.

11 Can you comment on that, is that correct, is the fact that

12 the declaratory relief was being sought, does that somehow

13 change the analysis in your mind?

14 A    No.

15          MR. SCHIAVONI:  Your Honor, if he could just break

16 this down into two questions; one, whether, in fact, the

17 matter seeks declaratory relief for future claims and then,

18 second -- and then on the second question, where we can see

19 whether the question is framed in a way to draw out

20 confidential information, privileged information that isn't

21 out.

22          THE COURT:  Okay.  Mr. Ducayet, the concern about

23 confidential information, please break it down.

24          MR. DUCAYET:  Yeah.  Sure, Your Honor.  Of course.

25 BY MR. DUCAYET:

1  Q    Mr. Sneed, is it correct that the two arbitration

2  proceedings included requests for declaratory relief?

3  A    I think the second one did.  I'm not sure about the

4  first one.  I didn't draft that.

5  Q    Okay.  And then with respect to the question here --

6  and I don't want you to reveal, you know, privileged

7  information -- but the fact that there is a declaratory

8  judgment request in that second arbitration proceeding, does

9  that somehow change, in your mind, the analysis of whether or

10  not the information that you received would have some bearing

11  upon any of the issues in the bankruptcy proceeding?

12  A    It does not change my view or my analysis.  The DEC

13  relief request is boilerplate.  It basically means you're not

14  paying these bills.

15       Once we get on the record in the arbitration, what your

16  reasons are, we're going to ask the arbitrators to make you

17  pay the bills and to declare that your reasons are no good.

18  That's what the declaratory relief request is.  It's a

19  boilerplate.

20       And I heard a great deal of significance ascribed to it

21  and I don't accept that.  I don't think it changes anything

22  at all.  Those arbitrations dealt with claims that had

23  already been paid and the reasons the reinsurers weren't

24  paying those claims.

25  Q    Mr. Sneed, let me just ask you one final question.  In

1 the course of your representation by Century beginning all

2 the way back in October of 2018, at any point in time, have

3 you ever had any substantive conversation with anyone on the

4 bankruptcy team about any of the material that you received

5 or any of the information that you acquired from your

6 representation?

7 A    On the Sidley bankruptcy team?

8 Q    Yes.

9 A    None, zero.  Not one.

10 Q    And it's the case, is it not, that there's a screen in

11 place, right?

12 A    Yes.

13 Q    And you've adhered to that screen since it was put into

14 place?

15 A    Yes.  And beforehand there was never any discussion.

16              MR. DUCAYET:  Okay.  I have nothing further, Your

17 Honor.

18              MR. SCHIAVONI:  I have a few questions, Your

19 Honor.

20              THE COURT:  Yes?

21                    CROSS-EXAMINATION

22 BY MR. SCHIAVONI:

23 Q    You spoke -- this is Tancred Schiavoni, Mr. Sneed.

24      Good afternoon.

25 A    Good afternoon.

1  Q    You spoke to Mr. Conlan in 2018 on the Boy Scouts

2  matter; am I right?

3  A    I spoke with him on December 14th of 2018 about *The*

4  *Wall Street Journal* article and our representation of Century

5  against Lloyd's on reinsurance about the underlying lawsuit

6  of Boy Scouts.

7  Q    And you spoke to Mr. Conlan again on November 3, is

8  that right, 2019, about the Boy Scouts?

9  A    I don't know the exact date, but I did speak with him

10  in November, early November of 2019.

11  Q    And you spoke to Mr. Andolina -- well, let me ask it a

12  little differently, a little more precisely.

13      Did you exchange communications with Mr. Andolina or

14  receive communications from him on November 3?

15  A    No.

16  Q    Okay.  And have you spoken to him?

17  A    I don't think I ever have.  The only hesitation I have

18  is when Jim Conlan called me in November of 2019.  There

19  might have been another lawyer on the line, but the only one

20  who spoke was Jim Conlan.

21  Q    Okay.  So, now let me just ask you about the foundation

22  for your testimony about whether or not there could really be

23  harm to Century.

24      Did you ask the Boy Scouts or any of the Sidley people

25  working on Boy Scout matters why it was that the Boy Scouts

1  served discovery that targeted specifically three insurance

2  matters that you were working on?

3  A      Did I ask the Boy Scouts?  Yeah.

4  Q      Did you ask either, the Boy Scouts or any of the Sidley

5  lawyers, why is it that the Boy Scouts are seeking discovery

6  targeted specifically at the work that Sidley is doing for

7  Chubb?

8  A      Well, I think there's a few facts assumed --

9  Q      Well, it's a yes-or-no question in the first instance.

10        Did you ask them?

11 A      I'm going to answer.  I'd like to answer.

12        I think there's a few facts --

13 Q      Well, did you speak to them?

14 A      I never spoke to Boy Scouts at anytime, anyplace,

15 anywhere.  Never spoke to anyone from Boy Scouts ever.  I

16 never spoke to --

17 Q      All right.

18 A      -- a Sidley lawyer.  I'm trying to finish my answer.

19        I never spoke to any Sidley lawyer representing Boy

20 Scouts in the bankruptcy about anything to do with what was

21 going on in the bankruptcy or the insurance-coverage

22 litigation.  It never happened.  I never had such a

23 discussion.

24 Q      Okay.  And you also never had any discussion with

25 anybody at the Boy Scouts or any Sidley lawyers about why it

1  is that the Boy Scouts have propounded discovery specifically

2  targeted at your work for Chubb?

3  A    I think I've already answered that, but the problem

4  that I have with the question, besides that I already

5  answered it, is that you keep saying, specifically targeted

6  at our work for Chubb.

7        I thought that the discovery was directed at that first

8  arbitration, which we were involved with.

9  Q    Doesn't it seek all documents related in any way to the

10  Lloyd's work?

11  A    I don't know.

12  Q    Well, you just testified that you thought it was

13  limited.

14  A    The reason --

15  Q    Did you not know when you offered that testimony?

16  A    No, I did know, but I'd like to explain.

17        The only contact I ever had, and this is in my

18  declaration, regarding the coverage dispute between Boy

19  Scouts and Century was Josh Schwartz sent me a couple of

20  discovery requests in one of those litigations and said,

21  Because this seeks information regarding your first

22  arbitration with Lloyd's, we have under a confidentiality

23  agreement with them, the requirement to notify them and so I

24  did and that was it.

25        And that's why I think or thought those discovery

1  requests were directed at the first arbitration with Lloyd's,

2  which we had no involvement in.

3  Q     They're much broader than that, aren't they?

4  A     I don't know.

5        The reason I received them was to give notice to

6  Lloyd's.

7  Q     Okay.  So, let me just get back to this question,

8  because it really is key; it goes to the what the foundation

9  is for your testimony, all right.

10       Do you know why it is that the Boy Scouts are seeking

11 discovery about anything having to do with the reinsurance

12 work that you were associated with for Chubb?

13 A     I don't know why the Boy Scouts propounded their

14 discovery requests.  I don't agree with your characterization

15 of what those requests are routed to and I won't quibble with

16 you with it, but I have no idea why the Boy Scouts propounded

17 the discovery requests they propounded.

18 Q     Okay.  And I think you never asked anyone, either,

19 right?

20 A     No.

21 Q     And your testimony about the relationship of the two

22 matters, it's, in part -- it's given without you knowing why

23 it is that the Boy Scouts are seeking that information,

24 right?

25 A     I'm not sure how to answer that.  The -- I know what's

1  at issue in those reinsurance arbitrations.  I know very well

2  what's at issue.

3  Q    But my point is, you don't know what your partners have

4  put at issue in the bankruptcy and you don't know what the

5  Boy Scouts have put at issue because if we are to believe

6  what you've said, you haven't asked them and you haven't

7  spoken to them, right?

8  A    Whatever has been put at issue in the bankruptcy or by

9  the Boy Scouts in this insurance coverage litigation, it's

10  got to come from someone other than me.  I'm not aware of it.

11  But I can tell you what the reinsurance contract is.

12  Q    That's right.

13  A    I can.

14  Q    So -- and let me just say two other things about this

15  Boy Scout discovery.

16      I'm correct, am I not, that the Boy Scouts haven't

17  withdrawn that discovery and it remains outstanding as we

18  speak?

19  A    I don't know.

20  Q    And Sidley has been told that to the extent they put

21  you up on the stand and they went forward with this, that

22  it -- they were -- the consequence might follow from that,

23  right?

24  A    I don't understand that.  What was -- can you rephrase

25  it?

1          MR. SCHIAVONI:  I -- so, I think we've had enough.

2    I think it's -- I have no further questions.

3          Mr. Sneed, thank you very much for confirming you

4    don't understand why it is that the Boy Scouts have

5    propounded that discovery.

6          MR. DUCAYET:  Objection; I'd move to strike.  It's

7    argumentative.

8          THE COURT:  The last comment is argument.  Thank

9    you.

10          MR. DUCAYET:  Your Honor, just one question for

11    Mr. Sneed.

12                    REDIRECT EXAMINATION

13    BY MR. DUCAYET:

14    Q    Mr. Sneed, you were asked some questions about

15    conversations that you had with Mr. Conlan.

16          Do you recall that?

17    A    Yes.

18    Q    Did you ever disclose to Mr. Conlan any of the

19    substance of the communications that you had with Century in

20    connection with any of your insurance matters?

21    A    No, never did.

22          MR. DUCAYET:  Nothing further.

23                    RECROSS-EXAMINATION

24    BY MR. SCHIAVONI:

25    Q    Well, I mean, hold on.

1     Mr. Sneed, didn't you convey to him that Chubb had

2 complained about a contract?

3 A     The October 29 email to me, I flip to the OTC.  I

4 assume Mr. Conlan became aware of it thereafter, but I didn't

5 talk to Jim Conlan about that email or that call.

6 Q     Your communications were to the general counsel at

7 Sidley?

8 A     My communication of that email to me was to my firm's

9 Office of General Counsel.

10 Q     And do you know whether the Office of General Counsel

11 has communicated with Mr. Conlan about the conflict matters

12 that Chubb has raised?

13 A     I don't know.

14          MR. SCHIAVONI:  Okay.  Thank you.

15          THE COURT:  Thank you.

16 Thank you, Mr. Sneed.

17          THE WITNESS:  Can I depart, Your Honor?

18          THE COURT:  You can.  You're excused.  Thank you.

19      (Witness excused)

20          THE COURT:  Okay.  Anything further, Mr. Ducayet,

21 by way of rebuttal?

22          MR. DUCAYET:  No, Your Honor.

23          THE COURT:  Okay.  Thank you.

24          Okay.  So, as I said, I wasn't going to start at

25 6:00 and I'm not starting at 6:30 with argument on this

1  matter, but I do want argument.  I'm sure I have questions

2  for both, Sidley and Chubb, and so the question is, when can

3  we schedule it?

4          I believe my Wednesday is now cleared up.

5  Although, I need to issue some orders, I think my contested

6  hearing on Wednesday has come off and I believe I have time

7  Thursday afternoon.

8          Do either of those days and times work for

9  counsel?

10          MR. DUCAYET:  Your Honor, this is Jim Ducayet from

11  Sidley.  Both of those work for me.

12          MR. ABBOTT:  Your Honor, Derek Abbott.  Wednesday

13  is better for me than Thursday, but I'll make either work if

14  I need to.

15          THE COURT:  Okay.

16          MR. BUCHBINDER:  Your Honor, this is Dave

17  Buchbinder.  I have a matter at 10:30 on Wednesday morning,

18  otherwise, Wednesday is clear.  And Thursday, I'm actually

19  not here, I'm not available Thursday, but Ms. McCollum is.

20          THE COURT:  Okay.  Mr. Schiavoni, how does

21  Wednesday afternoon look?

22          MR. SCHIAVONI:  We'll make ourselves available at

23  the Court's convenience, Your Honor.  Thank you.

24          And the one thing I think all six of us, if there

25  were six of us, agree on is that it's a little bit of a

1  challenge presenting this way, but we all know it's more of a

2  challenge for Your Honor to go into court and you have our

3  collective thanks.

4          THE COURT:  Okay.  Then let's -- it was the

5  morning, Mr. Buchbinder, right, that you had --

6          MR. BUCHBINDER:  Correct.  I have a matter at

7  10:30 that shouldn't last any more than an hour would be my

8  guess, if it will last that long --

9          THE COURT:  Okay.  Let's --

10          MR. BUCHBINDER:  -- otherwise, I'm clear.

11          THE COURT:  Let's schedule argument at two o'clock

12  on Wednesday and as I said, I'm not sure either party really

13  addressed what I do in a situation where the lawyer and the

14  client disagree about whether there's a conflict.  And I'm

15  not saying that's the definitive question, but it is

16  certainly an issue that's, I think, raised here by the

17  testimony, among other issues that I've thought about as I've

18  gone through these papers, but, in particular, that

19  situation, I don't recall being addressed in any of the

20  submissions.  If I'm wrong and someone can point me to it,

21  that's great, but I'll tell you that in my years of practice,

22  I did not encounter that, so -- I encountered many conflict

23  issues, but not that one.

24          So, I will have more questions regarding the

25  papers and what was argued, but if people have thoughts on

1  that, I'd love to hear them on Thursday, or I'm sorry, on

2  Wednesday, even if not raised in the papers.

3          Okay.  Anything else we can accomplish this

4  evening?

5          MR. ABBOTT:  Your Honor, this is Derek Abbott.  I

6  don't believe so.

7          THE COURT:  Okay.

8          MR. DUCAYET:  Your Honor, Jim Ducayet from Sidley.

9          Just one housekeeping matter.  We would move the

10  introduction of Mr. Sneed's declaration into evidence.

11          THE COURT:  Yes.  It's admitted.

12      (Sneed Declaration received in evidence)

13          THE COURT:  And I have declarations -- well just

14  go through this.  Well, I have the original declaration of

15  Ms. Boelter that was filed with the application.  I assume I

16  can look at that and nobody has a problem with that.

17          Then I have, in no particular order:

18  Ms. Rappleye's declaration, which I think we addressed;

19  Mr. Slanina's objection, which we had objections to, but it's

20  been addressed; Mr. Celentano's declaration; Mr. Sneed's

21  declaration; Ms. Rapoport's declaration; Mr. Whittman's

22  declaration; and Ms. Boelter's declaration made specifically

23  in connection with this contested matter, Docket 500.  And I

24  believe that's all.

25          Did I miss any declarations?

1          MR. SCHIAVONI:  Your Honor, forgive me, but I may

2    not -- I may just be tired, but did you have Josh Schwartz on

3    that list?

4          THE COURT:  Did I have who?

5          MR. SCHIAVONI:  Joshua Schwartz, his declaration?

6          THE COURT:  Oh, sorry.  It's important, yes.  He's

7    the one I didn't take out.  Yes, I have Mr. Schwartz's

8    declaration, as well.  Thank you.

9          MR. SCHIAVONI:  Your Honor, there is one more

10   thing if you're -- I'm sorry, I didn't mean to interrupt --

11   if you're not finished, Your Honor.

12         THE COURT:  I actually have one other thought of

13   information I didn't get today if the parties can agree to it

14   and that is how many other insurers are involved in the case?

15         So, if there's -- I'm making up numbers -- if

16   there were $10 million in available insurance, or arguably

17   available insurance, is Century 8 million of it or are they

18   500,000 of it?  I don't have a sense of the magnitude of the

19   Century and Chubb's available insurance versus the entirety

20   of the insurance available.

21         And I don't know -- it's important, but it is

22   something that has crossed my mind as I was reading this.

23         So, if the parties agree on that and can let me

24   know on Wednesday, that would be great.

25         MR. SCHIAVONI:  Your Honor, we'll meet-and-

1  confer -- this is Mr. Schiavoni -- we'll meet-and-confer with

2  Mr. Ducayet on that.

3         I will tell you that there's a -- is -- in our --

4  in the declaration of Janine Panchok-Berry, attached to part

5  of our --

6         THE COURT:  And I didn't mention hers.  I didn't

7  mention hers and, yes, I've got her declaration, as well,

8  that attaches the documents in other cases.

9         MR. SCHIAVONI:  Right.  Her -- and she's not a

10  witness, so to speak --

11         THE COURT:  Right.

12         MR. SCHIAVONI:  -- really.  She's just

13  authenticating with the documents.

14         THE COURT:  Yes.

15         MR. SCHIAVONI:  But there's a chart attached to

16  her initial declaration that shows the insurers in the Boy

17  Scout actions, in the coverage actions in one column and then

18  in -- the debtor disclosed being a debtor in those actions.

19         In another column, that cross-references to

20  Ms. Boelter's 2014 disclosure indicating that Chubb -- that

21  Sidley has represented them or currently represents them.

22  It's just sort of unclear to us, but when you look at that

23  chart, because one of the things we complained about the 2014

24  disclosures, there's significant overlap, I mean, to the

25  numbers of carriers that are engaged in the coverage actions

1  and the ones that show up on the 2014; again, it's not clear

2  to me whether they're current or former in each instance, but

3  that's presented in that chart.

4          THE COURT:  I do recall that and I did look at

5  Ms. Boelter's declaration that was filed with the retention

6  application and I see the pages, I think there's about two

7  and a half pages of insurers that are listed and there's, on

8  the Schedule 1, a whole list of insurance companies that I

9  suppose were submitted by Boy Scouts (indiscernible) with a

10 current conflict search.

11         But the amount of insurance to me is a different,

12 slightly different question that, again, if there's an

13 answer, fine.  If there's not (indiscernible) that's okay,

14 too.  It's just something that came to mind.

15         Mr. Abbott?

16         MR. ABBOTT:  Thank you, Your Honor.

17         Just logistics.  We'll send out a notice appearing

18 for two o'clock on Wednesday, but given that we've gotten the

19 evidentiary record out of the way, did the Court want to do

20 this by CourtCall or Zoom and CourtCall, and if Zoom, could

21 we prevail on Ms. Johnson to shoot us a note to get everybody

22 lined up for that?

23         THE COURT:  Yes.  I prefer Zoom.  I prefer seeing

24 people, even at argument.  So, I would prefer that we do it

25 by Zoom and CourtCall.

1          And people who aren't arguing, however, can

2    certainly just be on CourtCall.

3          MR. ABBOTT:  Thank you, Your Honor.  And we'll

4    (indiscernible) from her.

5          THE COURT:  I want to make sure that I can see all

6    the people who are arguing.  The amount of people we had on

7    today was fine and I did figure out how to do the split

8    screen so I could see everybody and the documents, but that

9    really is about the apex of my technological ability.  So, I

10   just want to make sure I can see those people who need to

11   argue.

12         MR. ABBOTT:  Thank you, Your Honor.

13         THE COURT:  Okay.  Anything else?

14      (No verbal response)

15         THE COURT:  And Ms. Johnson will send around a

16   Zoom information that you can put on that notice for

17   everyone.

18         MR. ABBOTT:  Thank you, Your Honor.

19         THE COURT:  Okay.  Anything else?

20      (No verbal response)

21         COUNSEL:  No, Your Honor.

22         THE COURT:  Okay.  Thank you.

23         We're adjourned.  Everyone have a good evening.

24         COUNSEL:  Thank you, Your Honor.

25      (Proceedings concluded at 6:42 p.m.)

1                          CERTIFICATE

2

3         We, MARY ZAJACZKOWSKI and WILLIAM GARLING, certify that

4    the foregoing is a correct transcript from the electronic

5    sound recording of the proceedings in the above-entitled

6    matter.

7
     /s/Mary Zajaczkowski              May 6, 2020
8    Mary Zajaczkowski, CET**D-531

9
     /s/William J. Garling             May 6, 2020
10   William J. Garling, CE/T 543

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25