REDACTED PUBLIC VERSION

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:* <br><br> BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] <br><br> Debtors. | Chapter 11 <br><br> Case No. 20-10343 (LSS) <br><br> Jointly Administered |

Objection Deadline: July 2, 2020 at 4:00 p.m. (ET)
Hearing Date: July 9, 2020 at 10:00 a.m. (ET)

## OBJECTION OF THE TORT CLAIMANTS' COMMITTEE TO HARTFORD'S MOTION FOR RECONSIDERATION, IN PART, OF THE COURT'S ORDER (I) APPOINTING MEDIATORS, (II) REFERRING CERTAIN MATTERS TO MEDIATION, AND (III) GRANTING RELATED RELIEF

The official committee of survivors of childhood sexual abuse (the "Tort Claimants' Committee" or the "TCC") hereby objects (the "Objection") to *Hartford's Motion for Reconsideration, in Part, of the Court's Order (I) Appointing Mediators, (II) Referring Certain Matters to Mediation, and (III) Granting Related Relief* (the "Motion"), Docket No. 860, and to *Century's Joinder to Hartford's Motion for Reconsideration, in Part, of the Court's Order (I) Appointing Mediators, (II) Referring Certain Matters to Mediation, and (III) Granting Related Relief*, Docket No. 888 (the "Joinder").

In support of the Objection, the Tort Claimants' Committee respectfully represents as follows:

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

1

# I

# **INTRODUCTION**[2]

Hartford and Century (together, the "Movants") seek reconsideration of the Mediation Order based on four e-mails and a "matrix" (the "Matrix" and, together with the e-mails, the "Documents") that they contend constitute "new evidence."[3] The Motion should be denied because the Documents are not "new evidence" warranting reconsideration and, even if they were, they do not undermine any substantive representation made to the Court or the reasons justifying Mr. Finn's appointment as a mediator.

As a threshold matter, it is worth noting that the Matrix is the BSA's work-product and the BSA's alone. There is no evidence that Mr. Finn (a) had any input into the creation of the Matrix, (b) adopted the Matrix for any purpose, or (c) formed a view about claim values or anything else relevant to these cases. In fact, Mr. Finn has steadfastly stated that he didn't recall receiving the Matrix—which is not surprising because there is also no evidence that it was ever referred to, used, or relied upon by anyone for any purpose during the prepetition "mediation."

Substantively, the Documents cannot credibly be described as "new" evidence. Prior to the hearing on the Mediation Motion, all litigants and the Court knew that the Matrix existed and was provided by the BSA in connection with last fall's "mediation" in which Mr. Finn participated. Importantly, (a) the Matrix was available prior to the hearing but Hartford took no

---

[2] Capitalized words not defined herein shall have the meanings ascribed to them in the Motion.

[3] The Matrix and one e-mail, dated October 28, 2019, was filed on behalf of Hartford as Exhibit A to the *Declaration of Abigail W. Williams in Support of Hartford's Motion for Reconsideration, in Part, of the Court's Order (I) Appointing Mediators, (II) Referring Certain Matters to Mediation, and (III) Granting Related Relief*, Docket No. 860 ("Williams Ex. A"). Three other e-mails, dated between October 15 and October 22, 2019, were filed on behalf of Century as Exhibits 1,4, and 5, respectively, to the *Declaration of Janine Panchok-Berry in Support of Century's Joinder to Hartford's Motion for Reconsideration, in Part, of the Court's Order (I) Appointing Mediators, (II) Referring Certain Matters to Mediation, and (III) Granting Related Relief*, Docket No. 888 (the "Century Exhibits")

2

steps to obtain it, apparently content to accept the Debtors' promise to provide it after the protective order was entered, and (b) Century waited until the eve of the hearing to serve document requests on the Debtors but voluntarily participated in the hearing without the Documents and without seeking an adjournment. In any event, there is no dispute that the "failed mediation" and the Matrix were the foundation of the Movants' objection to Mr. Finn's inclusion as a mediator. Thus, the Documents (including the Matrix), which were plainly available to the Movants, do nothing but corroborate the very facts previously relied upon and therefore cannot be considered "new" evidence.

Even if the Documents constituted "new" evidence, they provide no basis to "call into question the credibility of representations made to the Court by Mr. Finn." Motion ¶ 8. Mr. Finn previously disclosed that he participated in the prepetition mediation and understood that "a matrix was distributed by one of the parties." Docket No. 710-1. Thus, if anything, Williams Ex. 1 merely corroborates the substance of Mr. Finn's candid disclosures. Moreover, while Williams Ex. 1 has apparently refreshed his recollection that the Matrix was sent to him, Mr. Finn still doesn't recall contemporaneously receiving or reviewing the Matrix nor has he reviewed the Matrix since these matters came to the fore.[4] In the end, the Documents do not undermine the substance of any of Mr. Finn's disclosures.

Nor do the Documents demonstrate that the TCC's counsel said anything that could cause the Court to "reasonably question" Mr. Finn's impartiality. Motion ¶ 8. During argument, the TCC's counsel said, among other things:

---

[4] *See Supplemental Declaration of Paul A. Finn, Mediator, Pursuant to Rule 2014 of the Federal Rules of bankruptcy Procedure with Respect to Debtors' Motion for Entry of an Order (I) Appointing Mediators, (II) Referring Certain matters to Mandatory Mediation, and (III) Granting Related Relief,* filed on July 1, 2020, at Docket No. 918 ("Finn. Supp. Dec."), Attachment A.

3

- he [TCC's counsel] "never had a substantive exchange with any person who's a Boy Scouts principal,"

- "when someone told me a few weeks ago that there was a matrix distributed, I had no recollection of it and it was only when it was shown to me that I went, Oh, yeah, we got that"; and

- "calling it a mediation suggests there's negotiation. There was none."

Williams Ex. 3 at 50:18-51:19.

There are no facts in the record—including Williams Ex. 1 or the Century Exhibits—that undermine anything said by the TCC's counsel such that there is no basis for Hartford's contention that counsel's statements "call[] into question" Mr. Finn's partiality.

Finally, the Documents do not undermine the bases for the Court's Mediation Order. On the decisive point, the Court stated that it didn't "have anything that suggests to me that [Mr. Finn] has a formed view already." The Documents (none of which were authored by Mr. Finn) do nothing to change that.

For the reasons set forth above and below, the Motion should be denied.[5]

## II

## OBJECTION

### A. The legal standard on a motion for reconsideration[6]

Courts in the Third Circuit have established clear rules that limit significantly a litigant's ability to reverse or alter an order on a motion for reconsideration.

---

[5] The Movants do not contend that Mr. Finn is unqualified. Nor do they contend that Mr. Finn is anything but disinterested or that he has a relationship with any mediation party that would render him partial and disqualify him from serving as a mediator. Instead, the Movants focus squarely on Mr. Finn's veracity.

[6] Perhaps to avoid drawing attention to it, the Movants did not bother to identify the high legal standard they must meet to succeed on a motion for reconsideration, citing to just one case without discussion. See Motion ¶ 8.

The United States District Court for the District of Delaware summarized the rationale for such narrow rules in *In re W. R. Grace & Co.*, 398 B.R. 368, 371-72 (D. Del. 2008), where the court stated:

> Given a court's interest in the finality of it[s] judgments, '[m]otions for . . . reconsideration should be granted sparingly and may not be used to rehash arguments which have already been briefed by the parties and considered and decided by the Court." *Ciena Corp. v. Corvis Corp.*, 352 F. Supp. 2d 526, 527 (D. Del. 2005). Reconsideration is not permitted simply to allow "a second bite at the apple." *Bhatnagar v. Surrendra Overseas, Ltd.*, 52 F.3d 1220, 1231 (3d Cir. 1995). Litigants who fail in their "first attempt to persuade a court to adopt its position may not use a motion for reconsideration either to attempt a new approach or correct mistakes it made in a previous one . . . [or] *to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided*." *Kennedy Indus. v. Aparo*, 2006 U.S. Dist. LEXIS 46075, at *5 (E.D. Pa. July 6, 2006).

*Id.* (emphasis added).

Based on these guiding principles, a motion for reconsideration may only be granted if the moving party demonstrates at least one of the following: "'(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court issued its prior order; or (3) the need to correct a clear error of law or fact or to prevent a manifest injustice.'" *See Howard Hess Dental Labs v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010) (quoting *Max's Seafood Café v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)); *Awala v. United States*, 2010 U.S. Dist. LEXIS 21586, *1 (D. Del. March 9, 2010) (same).

The Movants rely on the second prong, claiming that the Court should reconsider the Mediation Order because they "received new evidence"—the Matrix and the Century Exhibits— shortly after the Court approved Mr. Finn's appointment. Motion ¶¶ 8-9; Joinder at 2-3.

But it is blackletter law in the Third Circuit that "'new evidence,' for reconsideration purposes, does not refer to evidence that a party obtains or submits to the court after an adverse

ruling. Rather, *new evidence in this context means evidence that a party could not earlier submit to the court because that evidence was not previously available.*" *Howard Hess*, 602 F.3d at 252 (emphasis added) (citing *De Long Corp. v. Raymond Int'l, Inc.*, 622 F.2d 1135, 1139-40 (3d Cir. 1980), *overruled on other grounds by Croker v. Boeing Co.*, 662 F.3d 975 (3d Cir. 1981)). *See also Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985) (affirming district court's denial of motion for reconsideration because the movant "filed only his own affidavit containing evidence that was available prior to the summary judgment.").

As shown below, Century proved that, for purposes of a motion for reconsideration, the Documents were all "available" prior to the entry of the Mediation Order. Thus, the Movants have not met and cannot meet their heavy burden; the Motion should be denied.

**B.      The Documents are not "new evidence" for purposes of the Motion**

Hartford knew that BSA shared the Matrix in connection with the prepetition mediation that Mr. Finn participated in no later than April 28, 2020. *Supplemental Memorandum in Support of the Limited Objection of Creditors First State Insurance Company and Twin City Fire Insurance Company and Party in Interest Hartford Accident and Indemnity Company to Debtor's Motion for Entry of an Order (I) Appointing a Judicial Mediator, (II) Referring Certain Matters to Mandatory Mediation, and (III) Granting Related Relief*, filed on May 15, 2020 (the "May Objection"), Docket No. 648-1 ¶ 13 ("We know from filings in this case that at that mediation BSA shared a claims matrix and protocol that established minimum claim values for negotiation.") (citing Docket No. 500-2 filed on April 28, 2020).

Indeed, Hartford expressly relied on the two-day "mediation" and the Matrix to press its demand for Mr. Finn's exclusion. *Id. See also Memorandum in Support of Hartford's Objection to Certain Mediators That Debtors Nominated and in Further Support of Limited Objection to Debtors' Motion for Entry of an Order (I) Appointing a Judicial Mediator, (II)*

6

*Referring Certain Matters to Mandatory Mediation, and (III) Granting Related Relief*, filed on June 2, 2020, Docket No. 756 (the "June Objection").

In its May Objection, Hartford stated, among other things, that:

- "We know from filings in this case that at [the] mediation BSA shared a claims matrix and protocol that established minimum claim values for negotiation."

- "Hartford (and many of the other insurers) was not invited to that mediation; Hartford therefore had no opportunity to discuss the matrix with the mediator or to weigh in on values that Hartford may have felt were inappropriate."

- "If Mr. Finn participated in the private mediation last fall, he obviously would come to the table now with opinions on claims criteria and claim values before Hartford and the other insurers who were excluded from last falls' sessions were heard on those issues. That would be unfair to Hartford and the other insurers."

May Objection ¶ 13.

As part of its June Objection, Hartford stated that:

- "Mr. Finn was involved in the failed mediation that the BSA conducted last fall";

- Mr. Finn stated "that a claims matrix was distributed in the context of last fall's mediation";

- Mr. Finn's "prior involvement is extremely prejudicial to Hartford, as well as to others who were not present";

- "Hartford would be forced to operate at an unfair disadvantage where the other parties . . . had two days to set out their positions without any opportunity for Hartford to respond";

- Mr. Finn should come to the "mediation with an open mind and without pre-petition notions of how the case should resolve; and

- "The Debtors have already disclosed significant detail regarding [the prepetition] mediation, *including the development of the matrix*, as part of their filings in support of the Sidley Austin retention application."

June Objection ¶¶ 12-14, and n.5 (emphasis added).[7]

---

[7] Despite having what it characterized as "significant detail regarding [the prepetition] mediation, including the development of the matrix," Hartford offered none of that detail to support the May Objection, the June Objection, or even the Motion, relying instead on its own description of the facts and its speculative arguments.

At the hearing on the Mediation Motion, counsel for Hartford vigorously pressed the exact same facts and arguments to oppose Mr. Finn's appointment, stating that:

> [A]ll I've learned about the matrix and the mediation is that it was distributed and at least some of the parties thought that the values were too high and the criteria was too relaxed, if you will. So, I worry that Mr. Finn comes to the table—and I don't know, but it's possible—that a global offer was made in the context of that mediation and it may or may not have been projected and those discussions could have taken place. So the floor, if you will, could be established.

Williams Ex. 3 at 38:25-39:10.

Thus, the May Objection, the June Objection, and Hartford's oral argument amply demonstrate that Hartford relied on the prepetition mediation and the Matrix to argue for Mr. Finn's exclusion and now simply seeks yet another bite of the apple based on purported "new" facts. But Williams Ex. 1 merely corroborates the basic facts previously relied upon and Hartford's current arguments echo those made earlier. *Compare* May Objection ¶ 13; June Objection ¶¶ 12-14, 26-30; and Williams Ex. 3 at 38:24-39:24 *with* Motion ¶¶ 9-10, 13, 17.

But most importantly for purposes of the Motion, Hartford offers no explanation why it sat on its hands and took no steps to obtain Williams Ex. 1 between April 28 (the latest date Hartford acknowledges knowing of the mediation and the Matrix (May Objection ¶ 13)) and the June 8 hearing, other than make two requests of the Debtor. *See* Motion ¶ 9.[8]

---

[8] Hartford suggests that there was something sinister about the Debtors' production of Williams Ex. 1 on June 10, 2020. Motion ¶ 9 ("Debtors ignored Hartford's request until June 10, 2020, two days **after** the Court, on June 8, 2020 overruled Hartford's objection as to Mr. Finn and approved his appointment."). Century joined in Hartford's conspiracy theory. Joinder at 2. But there was no conspiracy or dastardly deed. The Movants apparently fail to recall that Hartford told the Court that it knew a week earlier that the Matrix would be "provided [to Hartford] once the Court enters the protective order." Williams Ex. 3 at 39:25-40:4. The Court entered the protective order after the hearing on the Mediation Motion and the Debtors produced Matrix and related Documents shortly thereafter, exactly how Hartford was told it would play out.

8

The Matrix and the facts concerning the prepetition mediation were "available" if Hartford was interested in obtaining them. For example, nothing prevented Hartford from taking discovery of BSA or of Mr. Finn at any time during the forty-day period between April 28 and June 8.[9] Instead of exercising its rights, Hartford inexcusably waited until filing the June Objection to ask the Court for permission to take limited discovery of Mr. Finn—but even then, only "[t]o the extent that the Court, on the present record, is not satisfied" that Mr. Finn is conflicted. June Objection ¶¶ 31, 33. Hartford never needed the Court's permission to take discovery; and Hartford's suggestion that it be permitted to take discovery if the Court indicated that it was inclined to overrule the Objection had no basis in law.

Nevertheless, Hartford had still more options. In addition to taking formal discovery, Hartford could have just asked Century since that insurance company participated in the "failed mediation" and apparently received, or at least discussed, the Matrix with the Debtors. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

Or, even easier, Hartford could have simply sought an adjournment of the hearing on the Mediation Motion until after the protective order was entered and the Debtors fulfilled their promise to thereafter voluntarily provide a copy of the Matrix to Hartford. Williams Ex. 3 at 39:25-40:4 (as Hartford explained to the Court, the Debtors told Hartford a week prior to the hearing on the Mediation Motion that the Matrix would be "provided once the Court enters the protective order.").

---

[9] Hartford cannot contend that the "mediation privilege" barred discovery since Hartford contended prior to the entry of the Mediation Order that the Debtors had already waived any mediation privilege. June Objection n.5.

For its part, Century inexcusably waited until just days before the hearing to seek discovery on these matters[10] even though it participated in the mediation with Mr. Finn, and knew of the existence of the Matrix, in October 2019. And with the discovery demands outstanding, Hartford failed to seek an adjournment or even suggest to the Court that the discovery was needed before the Mediation Motion could be determined. Instead, like Hartford, Century voluntarily proceeded with the hearing during which it accepted the Debtors' offer to produce documents after the protective order was entered. Williams Ex. 3 at 21:23-22:19, 46:23-47:1.

The Documents cannot credibly be characterized as "new evidence" because they simply corroborate the substantive facts that were already proffered; indeed, with respect to the Documents, the Movants offer no argument in support of the Motion that wasn't previously made.[11] Moreover, as Century indisputably established, the Documents were "available" to the Movants prior to the entry of the Mediation Order had they not been content to wait for the entry of the protective order before the Debtors produced them.

For the foregoing reasons, under Third Circuit precedent, the Matrix and the other Documents do not constitute "new evidence" for purposes of a motion for reconsideration and the Motion can and should be denied on that basis alone.

---

[10] *See Declaration of Janine Panchok-Berry in Support of Joinder of Century Indemnity Company, Ace Insurance Group, Westchester Fire Insurance Company and Westchester Surplus Lines Insurance Company to Hartford's Memorandum in Support of Hartford's Objection to Certain Mediators the Debtors Nominated and in Further Support of Limited Objection to Debtors' Motion [DKT. 756] and Century's Objection*, filed on June 2, 2020, at Docket 762 (Exhibit 1, Century's Requests for Production of Documents Directed to Debtors).

[11] There is one exception: in a final attempt to remove Mr. Finn, Century contends that Mr. Finn might be a witness in Hartford's adversary proceeding. Joinder at 3-4. Given what was known prior to the hearing on the Mediation Motion (*see, e.g.*, the Disclosures), Century was required to make this argument before entry of the Mediation Order but inexcusably failed to do so. *See supra* at 4-6 ("The legal standard on a motion for reconsideration"). In any event, there is no reasonable basis to inject this argument since Williams Ex. 1 appears to resolve any dispute that the BSA provided "the matrix to participants in the mediation." *Id.* at 4.

C.  **Even if considered "new evidence," the Documents provide no basis to "call[] into question" Mr. Finn's credibility**

The Documents do nothing to call into question Mr. Finn's credibility. Motion ¶ 8.

Prior to the hearing on the Mediation Motion, Mr. Finn filed an eight-page disclosure in which he provided a detailed description of his relationships with anyone who might be involved in these cases. *See Declaration of Paul A. Finn, Mediator, Pursuant to Rule 2014 of the Federal Rules of Bankruptcy Procedure With Respect to Debtors' Motion for Entry of an Order (I) Appointing a Judicial Mediator, (II) Referring Certain Matters to Mandatory Mediation, and (III) Granting Related Relief*, filed on May 28, 2020, Docket No. 710 (the "Disclosures").

Hartford focuses on just one of the dozens of disclosures made by Mr. Finn, that which related to the "failed mediation" and the Matrix. As to that, Mr. Finn disclosed the following:

> I mediated one claim with Sidley Austin in November 2019 in New York City. Prior to that hearing, I was told all of the insurers for the BSA had been invited to the mediation in New York City. Only one insurer appeared and participated. The mediation lasted less than two days. I understand a matrix was distributed by one of the parties. I do not remember the matrix being distributed and I do not have a copy of the matrix.

Disclosures, Attachment A, at 3-4.

The Disclosures show that Mr. Finn flatly admitted that (a) he participated in the mediation in November 2019; and (b) regardless of what he may have been told in advance, only one insurer appeared at the mediation; and (c) that a matrix was distributed by one of the parties. Thus, if anything, the Documents corroborate the substance of Mr. Finn's Disclosures.

Knowing that, the Movants focus on the inconsequential. Hartford, for example, takes aim at Mr. Finn for not recalling that that he received the Matrix. Objection ¶ 19 ("Hartford does not understand how Mr. Finn could represent on May 28, 2020, in his Rule 2014 disclosure

11

that he did not recall receiving a matrix protocol that was provided to him [seven] months ago as part of a global resolution leading to a bankruptcy case."). Williams Ex. 1 has apparently refreshed Mr. Finn's recollection that he did, in fact, receive the Matrix. *See* Finn Supp. Dec., Attachment A. But given that there is no evidence that the Matrix was discussed, used, relied upon, or presented at the mediation, or even that offers were exchanged, Mr. Finn's continued failure to recall should not be at all surprising. Indeed, Mr. Stang found himself in the exact same position. Williams Ex. 3 at 51:11:14.

The Movants also believe that Mr. Finn's credibility has been shattered because he referred in his Disclosures to having mediated "one claim" with Sidley Austin. Objection ¶¶ 13, 19; Joinder at 3. This is not a serious argument and cannot be a rational basis for questioning Mr. Finn's credibility. It was public knowledge that the BSA was a defendant in many sexual abuse cases throughout the country. Besides the BSA, no one knew that better than the Movants. Perhaps Mr. Finn should have used the word "case" instead of "claim." But the notion that Mr. Finn thought he could minimize last fall's events by tricking the Court into believing that only one "claim" was mediated is absurd – particularly since he knew that Century participated in the mediation and would have an opportunity to weigh in.

As the Court observed, Century (the successor to Chubb) participated in the mediation. Williams Ex. 3 at 57:21-24. And there is no dispute that Century was contemporaneously aware of the Matrix. Williams Ex. 1. Despite these uncontested facts, Century is unable to offer any evidence to "suggest[] to [the Court] that [Mr. Finn] has a formed view already." Williams Ex. 3 at 57: 11-19. Indeed, Century now offers three e-mails exchanged prior to the mediation, but

no facts about what actually happened *at* the mediation. And the Century Exhibits themselves do nothing to call into question Mr. Finn's impartiality and credibility.[12]

In the end, and notwithstanding the existence of the Documents, there is no evidence that:

- Mr. Finn had any input into the creation of the Matrix or that anyone other than the BSA prepared the document; or that

- Mr. Finn (or anyone else) reviewed or analyzed the Matrix in connection with the prepetition mediation; or that

- Mr. Finn (or anyone else) expressed any views concerning the Matrix; or that

- Mr. Finn (or anyone else) adopted the data included in the Matrix for any purpose; or that

- Mr. Finn (or anyone else) believes the values in the Matrix constitute a "floor"; or that

- Mr. Finn (or anyone else) engaged in any discussions with anyone at any time concerning the Matrix (except, apparently, Century and BSA); or that

- Any of the mediation parties exchanged any offers of any kind; or that

- The Matrix was physically presented at the mediation.

The absence of any evidence suggesting (let alone proving) that Mr. Finn has "formed a view" or that there was any substantive error in his Disclosures is fatal to the Motion.

---

[12] Century Exhibit 1 was not sent to Mr. Finn and doesn't contradict the substance of any of his Disclosures. While Century attempts to portray the parties' "objectives" as somehow prejudicial (Joinder at 2), there is no evidence that Mr. Finn subscribed to the objectives; that any attempt was made to accomplish the objectives; or that any of the objectives were achieved. Curiously, Century fails to disclose what *its* "objectives" were in participating in the mediation. Next, Century Exhibit 4 contained certain information regarding the clients of one lawyer. As the Court likely expects, claims information will be provided to anyone who mediates these cases so there can be no reasonable claim of prejudice – the mediators are going to get information on *thousands* of claims at some point, including some form of the very information that was provided in Century Exhibit 4. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Century's manufactured arguments concerning the Century Exhibits lack credibility. Prior to the hearing on the Mediation Motion, everyone knew that Mr. Finn, the BSA, certain lawyers representing sexual abuse survivors, and Century, participated in the mediation. The Century Exhibits may shed a little light on issues that were already know or are otherwise inconsequential, but they do nothing to undermine Mr. Finn's impartiality and credibility.

13

**D.    Counsel said nothing that could cause the Court to "reasonably question" Mr. Finns impartiality**

The Movants fare no better in their attempt to smear the TCC's counsel, James Stang. Objection ¶ 8, 15, 19, and 21; Joinder at 2-3. A fair reading of the transcript shows that the Documents do nothing to undermine anything Mr. Stang told the Court.

During argument, Mr. Stang offered the following with respect to the mediation and the Matrix:

> *As to the meeting in November, I'd like to call it a meeting, as opposed to a mediation,* and I signed a confidentiality agreement, but I can -- I think I can tell you what didn't happen. What didn't happen was any offer from the attorneys who were kind of an ad hoc tort committee, I guess, to anyone. We never asked Mr. Finn to convey an offer to anyone. I don't think we ever got a monetary offer.
>
> The attorneys who were at that meeting today represent probably well over half of the claims that I know about, and so it was a meeting. It was, frankly, a meeting amongst ourselves. We never – I do not believe that we ever had a meeting with a principal of the Boy Scouts. I think Mr. Andolina came into the room once or twice, Ms. Boelter may have come in, but we've never had a substantive exchange with a person who's a Boy Scouts principal.
>
> I don't think the attorneys who were attending on behalf of the tort claimants, other than myself and (indiscernible), had any substantive meeting with Mr. Patton. *Honestly, when someone told me a few weeks ago that there was a matrix distributed, I had no recollection of it and it was only when it was shown to me that I went, Oh, yeah, we got that.*
>
> *So, calling it a mediation suggests there's negotiation. There was none.*

Williams Ex. 3 at 50:18-51:16 (emphasis added).

That's all Mr. Stang said on the relevant topics. Yet, the Movants argue that *Mr. Finn's* credibility and impartiality are impaired because of how *Mr. Stang* perceived the event last November:

14

> Mr. Stang provided cover for Mr. Finn and his representation that the mediation was not really a mediation at all, but rather a "meeting amongst ourselves" that Sidley attorneys popped into once or twice. Williams Decl., Ex. 3 at 51:2-3. But the email belies any notion that this was simply a meeting among counsel for the claimants. The email specifically mentions the upcoming "mediation" and makes a global settlement proposal to Mr. Stang.

June Objection ¶ 21. *See also* Joinder at 3 (lower box).

The Movants' supposed "gotcha" moment is not credible and fails for myriad reasons. First, whatever label Mr. Stang used, *Mr. Finn expressly used the word "mediation" in his Disclosures.* Second, Hartford itself used a form of the word "mediation" more than a dozen times in its June Objection (¶¶ 12-14) and during argument on the Mediation Motion so it's unclear what "new evidence" Williams Ex. 1 or the Century Exhibits provide in that regard. Third, Mr. Stang is entitled to his opinion—particularly where he provides a perfectly reasonable basis, one based on unrebutted facts. Williams Ex. 3 at 50:18-19, 51:15-16 (pointing to a lack of any negotiation, a common hallmark of mediation). Finally, the Court clearly heard Mr. Stang and concluded that the label put on the event was inconsequential. *Id.* at 57:11-15 ("As for Mr. Finn, he was—I understand his involvement in the two-day mediation or, as Mr. Stang called it, a meeting. The length of that meeting could suggest to me that it really wasn't a mediation that got into significant depth. That he was there attending as a neutral.").

Nothing in the Documents gives the Court a reasonable basis for concluding that Mr. Stang's comments call into question Mr. Finn's impartiality or credibility.

### III

### RESERVATION OF RIGHTS

The Tort Claimants' Committee reserves all rights with respect to the foregoing and reserves the right to raise any other and additional objections prior to or at the hearing on the Motion.

## IV

## CONCLUSION

For all of the foregoing reasons, the Tort Claimants' Committee respectfully requests that the Court deny Motion in all respects.

Date: July 2, 2020

**THE OFFICIAL COMMITTEE OF TORT CLAIMANTS**

*/s/ James E. O'Neill*
James I. Stang (CA Bar No. 94435)
John A. Morris (NY Bar No. 2405397)
James E. O'Neill (DE Bar No. 4042)
John W. Lucas (CA Bar No. 271038)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899 (Courier 19801)
Telephone: 302-652-4100
Facsimile: 302-652-4400
Email: jstang@pszjlaw.com
       jmorris@pszjlaw.com
       joneill@pszjlaw.com
       jlucas@pszjlaw.com

*Counsel for the Tort Claimants' Committee*