## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>            Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>**Ref. Docket Nos. 812, 860 & 888** |

### DEBTORS' OBJECTION TO HARTFORD'S MOTION FOR RECONSIDERATION OF THE COURT'S MEDIATION ORDER AND CENTURY'S JOINDER THERETO

The Boy Scouts of America (the "BSA") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (together, the "Debtors"), submit this objection (this "Objection") to the motion [D.I. 860] (the "Motion") for reconsideration of the *Order (I) Appointing Mediators, (II) Referring Certain Matters to Mediation, and (III) Granting Related Relief* [D.I. 812] (the "Mediation Order") filed by Hartford Accident and Indemnity Company, First State Insurance Company, and Twin City Fire Insurance Company (collectively, "Hartford") and the joinder thereto [D.I. 888] (the "Joinder") filed by Century Indemnity Company ("Century," and together with Hartford, the "Movants"). In support of the Objection, the Debtors respectfully state as follows.[2]

### BACKGROUND

1. In the Debtors' first day filings, they detailed their prepetition efforts to explore a potential global resolution of abuse claims. *See* D.I. 4, at Section IV. Those efforts culminated in a two-day mediation in November 2019 with counsel for certain abuse survivors, including

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300); and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] All capitalized terms not defined in this Objection shall have the meanings ascribed to them in the Mediation Order, the Motion, or the Joinder, as applicable.

James I. Stang, then counsel to an ad hoc committee of abuse survivors, James L. Patton, Jr., then prepetition future claimants' representative, and multiple of the BSA's insurers, including Century. Paul Finn, one of the Mediators appointed by the Court under the Mediation Order, served as a neutral mediator.

2.      In advance of the November 2019 mediation, the BSA provided the other participants, including Century, with information that included an illustrative abuse claims matrix pursuant to a non-disclosure agreement. The BSA notified Hartford two weeks before the November 2019 mediation that it intended to engage in a mediation of abuse claims with various important constituencies. Despite multiple follow-up inquiries by the BSA, Hartford never responded and thus never received the information, including the claims matrix, that was provided to the mediation participants. *See* D.I. 664, at Ex. 2.

3.      Although the BSA had hoped that its prepetition efforts would result in an agreement with a critical mass of abuse survivors and other relevant stakeholders that could be implemented through a prearranged plan of reorganization, those efforts, including the November 2019 mediation, were ultimately unsuccessful. It became apparent to the BSA that attorneys for abuse survivors believed that local councils had considerable assets that could be used to compensate survivors. It was also clear to the BSA that attorneys for abuse survivors would only accept information about the nature and extent of the BSA's available assets if provided through a court-supervised bankruptcy process. Accordingly, in late 2019, the BSA recognized that there were no meaningful prospects for a global resolution of abuse claims without the commencement of bankruptcy proceedings. The Debtors thus commenced these chapter 11 cases on February 18, 2020.

4.      As a charitable non-profit organization with limited resources, the importance to the Debtors of reaching an expedient mediated resolution, rather than a protracted litigated resolution, of these chapter 11 cases is paramount. Accordingly, shortly after the commencement of these cases, the Debtors commenced discussions with each of their constituencies regarding the terms of a comprehensive mediation. In May, after many weeks of good-faith negotiations, the Debtors, the Official Committee of Tort Claimants (the "Tort Claimants' Committee"), the Official Committee of Unsecured Creditors (the "Creditors' Committee"), the Future Claimants' Representative (the "FCR"), and the Ad Hoc Committee of Local Councils of the Boy Scouts of America (the "Local Council Committee") agreed on terms for the mediation and three acceptable mediators. *See* D.I. 617 & 782.

5.      In parallel, the Debtors also pursued a substantive dialogue with their principal general liability insurers regarding the mediation. As a result of that dialogue, the Debtors and the other Mediation Parties agreed to a number of substantial changes to the terms of the mediation and agreed to include an insurance-focused mediator, Timothy V.P. Gallagher, who had been hand-selected by the insurers. Nonetheless, several insurers, including both of the Movants, continued to oppose the proposed mediation order. *See, e.g.*, D.I. 646, 648, 658, 756, 759 & 761. Following two hearings on the insurers' objections, on June 9, the Court entered the Mediation Order appointing three Mediators: (1) Mr. Gallagher; (2) Judge Kevin J. Carey (ret.); and (3) Paul A. Finn. *See* D.I. 812. Notably, two of the three appointed Mediators—Messrs. Gallagher and Carey—were proposed by the insurers. *See* D.I. 648, at ¶¶ 8 & 35; D.I. 756, at ¶ 2; D.I. 759, at ¶ 18; D.I. 771; June 8 Hr'g Tr. at 30:4–23, 46:5–8, 47:23–48:7.

6.      In the weeks preceding the Court's appointment of the Mediators, the Debtors represented to the Movants that they would produce the information provided by the BSA to the

other participants in the November 2019 mediation, including the claims matrix, upon the Court's entry of a protective order. As the Court is aware, the Debtors reached an agreement on the form of a stipulated protective order nearly two months ago with the Tort Claimants' Committee, the Creditors' Committee, the FCR, and the Local Council Committee. *See* D.I. 613. However, certain of the insurers, including both of the Movants, objected (and, in the case of Century, re-objected) to the entry of such an order. *See, e.g.*, D.I. 696, 697, 707 & 750. After extensive briefing, an initial hearing on May 29, and more briefing, on June 8, the Court entered the *Order Approving Confidentiality and Protective Order* [D.I. 799] (the "Protective Order").

7.    Consistent with their representation to the Movants, following the Court's entry of the Protective Order, the Debtors promptly produced all communications relating to the claims matrix that they distributed in advance of the November 2019 mediation. On June 10, the Debtors produced the claims matrix itself, along with the email transmitting it to Messrs. Stang and Finn in advance of the November 2019 mediation. On June 18, the Debtors produced the remainder of their communications relating to the claims matrix. In total, there were eight such communications, most of which were non-substantive and did not include Mr. Finn.

8.    Following the production of the claims matrix by the Debtors, Hartford filed the Motion, which requests that the Court reconsider its appointment of Mr. Finn as a Mediator, and Century filed its Joinder to the Motion. *See* D.I. 860 & 888. In their papers, the Movants articulate two principal grounds that they believe warrant reconsideration of the Mediation Order and the disqualification of Mr. Finn as a Mediator. First, the Movants cite purported "new evidence" relating to the November 2019 mediation that supposedly calls into question Mr. Finn's impartiality. *See* D.I. 860. Second, Century argues that Mr. Finn is a "fact witness" in Hartford's adversary proceeding against the BSA because Mr. Finn participated as a neutral-

party in the November 2019 mediation, and Hartford has asserted that the BSA's conduct in connection with that mediation breached its contractual duty to cooperate. *See* D.I. 888. Both arguments fail, and the Motion should be denied.

## ARGUMENT

9.      The standard for prevailing on a motion for reconsideration is high, and the Movants have not come close to meeting it. The Movants' submissions are nothing more than the latest installment of their bad-faith campaign to delay and obstruct the Debtors' progress toward a successful resolution of their restructuring by opposing any relief that would bring the Debtors and their stakeholders to the bargaining table. Notably, the Mediators solicited input from the Mediation Parties on Mediation Issues and related matters on June 15, and the Mediation Parties submitted responses to the Mediators on June 22. The Mediators also held meetings with each of the Mediation Parties via videoconference on July 1 and 2. Accordingly, if the Court were to disqualify Mr. Finn as a Mediator (which it should not), it would result in a significant setback to the Mediation.

10.     Motions to reconsider "should be granted sparingly and may not be used to rehash arguments which have already been briefed by the parties and considered decided by the Court." *In re W.R. Grace & Co.*, 398 B.R. 368, 371–72 (D. Del. 2008) (quoting *Ciena Corp. v. Corvis Corp.*, 352 F. Supp. 2d 526, 527 (D. Del. 2005)). "Reconsideration is not permitted to allow a 'second bite at the apple.'" *Id.* at 372 (quoting *Bhatnagar v. Surrenda Overseas Ltd.*, 52 F.3d 1220, 1231 (3d Cir. 1995)). "Litigants who fail in their 'first attempt to persuade a court to adopt its position may not use a motion for reconsideration either to attempt a new approach or correct mistakes it made in its previous one . . . [or] to argue new facts or issues that inexcusably were

not presented to the court in the matter previously decided." *Id.* (quoting *Kennedy Indus. v. Aparo*, Case No. 04-05967, 2006 WL 1892685, at *1 (E.D. Pa. July 6, 2006)).

11.     Instead, the purpose of a motion for reconsideration is to "correct manifest errors of law or fact or to present newly discovered evidence." *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985). A party seeking reconsideration must demonstrate at least one of the following: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion . . . ; or (3) the need to correct a clear error of law or fact or prevent a manifest injustice." *Max's Seafood Café by Lou Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).

12.     The Movants largely ignore the *Max's Seafood* standard, but their pleadings suggest that they are seeking reconsideration of the Mediation Order under the "new evidence" prong. *See, e.g.*, D.I. 860, at ¶ 8 ("Hartford has received new evidence . . . ."); D.I. 888, at 1–3 (similar). However, the supposed "new" evidence identified by the Movants—namely, communications relating to the claims matrix distributed by the BSA in advance of the November 2019 mediation—reveal nothing that was not already known to the Movants when they submitted their papers and was discussed on the record at the June 8 hearing. *See In re New Century TRS Holdings, Inc.*, Case No. 07-10416, 2014 WL 2511339, at *1–2 (Bankr. D. Del. May 30, 2014) (denying motion for reconsideration where "new" evidence was already addressed in prior briefing and at hearing and thus considered by the court).[3]

13.     Indeed, Mr. Finn's participation in the November 2019 mediation, as well as his contemporaneous receipt of the claims matrix, were a primary focus of the insurers' previous

---

[3] *See also CHNJ Inv'rs, LLC v. Koger*, Case No. 12-1467, 2020 WL 1864574, at *2 (D.N.J. Apr. 14, 2020); *In re Prof'l Conduct of Mazzei*, Case No. 14-00205, 2014 WL 4385746, at *5 (Bankr. W.D. Pa. Sept. 4, 2014); *In re New Century TRS Holdings, Inc.*, Case No. 07-10416, 2011 WL 6097910, at *1–2 (Bankr. D. Del. Dec. 7, 2011); *In re Trinity Enterprises, LLC*, Case No. 09-20579, 2009 WL 4110207, at *2–3 (Bankr. E.D. Pa. Nov. 23, 2009).

objections to the Court's appointment of Mr. Finn as a Mediator. In the memorandum in support of its previous objection, Hartford argued that Mr. Finn's receipt of the matrix and presumed knowledge of its contents "may have set expectations and/or ground rules for the mediation that will go forward in this case" and that such information, "along with the remainder of two days of meetings, likely has already created impressions about the various strengths and weaknesses of the parties' claims." D.I. 756, at ¶ 39. Hartford also expressly called into question Mr. Finn's impartiality based on his role as a neutral-party in the previous mediation. *See id.*, at ¶ 30. Another insurer, Allianz, argued that "Mr. Finn has disqualifying connections to the Debtors and other parties herein" because he "presided over the 2019 Mediation—an acknowledged attempt to reach a global resolution of alleged abuse claim." D.I. 759, at ¶ 16 (internal quotation marks omitted).

14.     The parties addressed both of these issues at length during the June 8 hearing, and the Court ultimately afforded them little weight in its decision to enter the Mediation Order. *See, e.g.*, June 8 Hr'g Tr. at 34:9–40:6, 57:11–58:1. Hartford admits as much in its Motion, stating that "Hartford objected to Mr. Finn's appointment because he was involved in a two-day global mediation that involved the distribution and discussion of a claims matrix and claims protocol. . . . [T]he Court, on June 8, 2020, overruled Hartford's objection as to Mr. Finn and approved his appointment." *See* D.I. 860, at ¶ 9; *see also id.* at ¶¶ 10–16.

15.     Nevertheless, Hartford asks the Court to reconsider its appointment of Mr. Finn, asserting that he purportedly mischaracterized his involvement in the November 2019 mediation and "decided to conceal" his receipt of the claims matrix. *Id.* at ¶¶ 19–20. These serious allegations are belied by Mr. Finn's own Rule 2014 disclosures—filed twelve days before the June 8 hearing—in which he expressly acknowledged having previously mediated numerous

claims involving the BSA, various local councils and chartered organizations, and victims of abuse in Scouting. *See* D.I. 710-1, at 1(d) ("There are numerous other chartered organizations that were involved with mediations I have done for through the years for the BSA"), *id.* 1(e) ("Since the time I began mediating claims for the BSA, I have mediated numerous claims involving the BSA's local councils"), *id.* at 1(l) ("I have also mediated numerous sexual abuse claims with Ogletree's former partner Ellen Perloni and with partner Bruce Griggs."). In addition, Mr. Finn acknowledged attending the November 2019 mediation. *Id.* at 1(l). He also acknowledged that a claims matrix was distributed by one of the parties in advance of the mediation, though he did not recall receiving it and could not find a copy of it. *Id.* All of this information was disclosed by Mr. Finn, and thus known by the Mediation Parties and the Court, in advance of the June 8 hearing and entry of the Mediation Order.

16.    As the Court has already held, the fact that Mr. Finn participated in the November 2019 mediation and received a claims matrix is not a basis upon which to deny his appointment as a Mediator. At the June 8 hearing, the Court recognized that Mr. Finn's "involvement in the two-day mediation" was "as a neutral" party. *See* Jun 8 Hr'g Tr. at 57:11–15. And the Court further found that there is nothing in the record to suggest that Mr. Finn "has a formed view already" of any of the likely Mediation Issues. *Id.* at 57:16–20. Indeed, at the June 8 hearing, the Court specifically asked counsel for Hartford to identify "what [he] thinks that concern is" with respect to Mr. Finn's receipt of the claims matrix. *Id.* at 38:20–23. In support of these rulings, the Court emphasized that "there was an insurance voice" in the form of Century having been "present at the meeting." *Id.* at 57:21–24. Under the circumstances, the Court concluded that Mr. Finn could "continue to work as a neutral" party in connection with these chapter 11 cases, *id.* at 57:25–58:1, and appointed him as one of the Mediators.

17.     Hartford's final argument appears to be that there is new evidence that the November 2019 mediation was more than "simply a meeting," and that this should somehow raise doubts about Mr. Finn's impartiality. *See* D.I. 860, at ¶ 21. This tortured argument has no legal merit and ignores Debtors' numerous references to the November 2019 mediation as just that: a mediation (albeit an unsuccessful one). *See*, *e.g.*, D.I. 4, at 6 & 41; D.I. 17, at ¶ 4; D.I. 782, at ¶¶ 9 & 27. At the June 8 hearing, the Court ascribed no importance to whether the November 2019 mediation was a "mediation" or a "meeting," concluding that, however it is characterized, "[t]he length of that mediation could suggest to me that it really wasn't a mediation that got into significant depth" and that, in any case, Mr. Finn "was there attending as a neutral." June 8 Hr'g Tr. at 57:11–15. Accordingly, this argument is a red herring, and the Court should summarily reject Hartford's attempt to impugn the integrity of Debtors' counsel for failing to correct counsel to the Tort Claimants' Committee when he characterized the mediation as a "meeting." *See* D.I. 860, at ¶ 21 (accusing one of the Debtors' lawyers for "s[itting] mute while his colleague argued Mr. Finn's candidacy").

18.     In its Joinder, Century puts its own spin on Hartford's arguments based on the prepetition communications that the Debtors produced following the Court's entry of the Mediation Order. Specifically, Century argues that the Debtors' document production revealed for the very first time that the BSA provided the matrix to Mr. Finn and the tort claimants. *See* D.I. 888, at 1–2. This assertion is refuted by the Debtors' consistent acknowledgements that the matrix was distributed to participants in the November 2019 mediation. *See*, *e.g.*, D.I. 710-1, at 1(k) & 1(l); May 4, Hr'g Tr. at 99:1–100:10, 102:18–103:7, 104:4–18. Indeed, the Movants, in their own filings, argument, and testimony, have repeatedly noted their awareness that Messrs. Finn and Stang received the matrix in connection with the November 2019 mediation. *See, e.g.*,

June 8 Hr'g Tr. at 35:6–20, 38:24–40:6; May 18 Hr'g Tr. at 150:25–151:17. In fact, at the May 4 hearing on Sidley's retention, Century's Senior Vice President of Coverage & Complex Claims, Christopher Celentano, testified that "[w]e were advised, I believe, the Friday before the mediation through Haynes & Boone that the Boy Scouts had provided the matrix to the plaintiffs." May 4 Hr'g Tr. at 236:7–11; *see also id.* at 233:23–234:4 & 235:5–236:6.

19.    Century's efforts to make hay out of certain prepetition communications referring to Mr. Finn as a "mediator" are equally unavailing. *See* D.I. 888, at 2–3. The Debtors (and the Tort Claimants' Committee) have often acknowledged that Mr. Finn's role at the prepetition mediation was as a mediator. For instance, in their reply to the Movants' objections to the entry of the Mediation Order, the Debtors stated that

> the mediation involved four sides: the Debtors, the tort claimants, the FCR, and one of the Objecting Insurers (*i.e.*, Century). Each of these parties had an opportunity to interact with Mr. Finn and "preview" their arguments and positions. The Objecting Insurers have cited no rule or case law purporting to bar ***the same person from mediating the same claims in and outside of bankruptcy.***

*See* D.I. 782, at ¶ 9 (emphasis added). Likewise, in their joinder to the Debtors' reply, the TCC explained that its "selection of Mr. Finn as a mediator was based in large part on his mediation experience in general and ***his mediation of the exact same childhood sexual abuse issues that will take place in these Cases and against the same party, the BSA***." *See* D.I. 785, at ¶ 2 (emphasis added); *see also* June 8 Hr'g Tr. 23:24–24:2 ("Mr. Finn, as we said in our pleading, is the most experienced abuse mediator in the country and ***also can claim that title as to Boy Scouts sexual abuse.***") (emphasis added). As noted above, Mr. Finn's role at the prepetition mediation was not lost on the Court. In appointing Mr. Finn as a Mediator in these chapter 11 cases, the Court emphasized that Mr. Finn participated in the earlier mediation as a "neutral" party and thus heard all of the relevant parties' positions. *See* June 8 Hr'g Tr. at 57:21–58:1; *see also id.* at 38:14–19.

20.     Century further argues that Mr. Finn cannot serve as a Mediator because Hartford's adversary complaint asserts that the BSA breached its duty of cooperation under the Hartford policies by providing the claims matrix to tort claimants, and that Mr. Finn "is a fact witness" on that issue. *See* D.I. 888, at 3–5. This argument, too, fails to withstand the most basic scrutiny. Apart from failing to satisfy the *Max's Seafood* standard, it is unclear why Mr. Finn would be a fact witness, given that the question of whether the BSA provided the matrix to tort claimants is not in dispute. Accordingly, there are no grounds for the Court to reconsider Mr. Finn's appointment.

21.     Finally, Century takes the position that the Debtors have "asserted a claim" against Century for filing objections to several of the motions filed by the Debtors in these chapter 11 cases. *See* D.I. 888, at 4. In truth, the Debtors sent Century a letter on June 18 providing notice that Century's blatant attempts to obstruct the timely resolution of abuse claims and its misrepresentations of the BSA's obligations under its policies constitute bad-faith conduct and violate the insurance laws governing the parties' relationship. *Id.* at Ex. 6. Although Century filed the letter under seal, the Debtors would respectfully urge the Court to review it when considering the Motion.

22.     In addition to notifying Century that its tolerance for Century's bad-faith conduct has reached an end point, the BSA's letter catalogued Century's extensive efforts to derail the Debtors' reorganization through its meritless objections to substantive motions and pattern of vexatious and counterproductive communications with Debtors' counsel. The Debtors and their counsel have been forced to expend substantial time and money addressing Century's bad-faith

conduct, thereby needlessly depleting the assets of the bankruptcy estate and hindering the Debtors' restructuring efforts.[4]

23.     The Debtors also sent their June 18 letter to Hartford in light of its own affirmative bad-faith conduct, including its filing of the instant Motion. Hartford has made only perfunctory efforts to satisfy the standard for reconsideration of an order of the Court. *See Max's Seafood Café*, 176 F.3d at 677 (3d Cir. 1999). Instead, it has simply "rehashed arguments which have already been briefed by the parties and considered and decided by the Court. *See In re W.R. Grace & Co.*, 398 B.R. at 371–72 (D. Del. 2008) (internal quotation marks omitted).

## **CONCLUSION**

For the reasons set forth in this Objection, the Debtors respectfully request that the Court deny the Motion.

*[Remainder of Page Intentionally Left Blank]*

---

[4] As the Debtors made clear in the June 18 letter, the Debtors remain willing to work with Century and would value its constructive input on pertinent aspects of the Debtors' restructuring strategy. The Debtors asked Century's counsel for a call, involving principals, to discuss the subject matter of the letter, but Century has failed to respond. Nevertheless, the Debtors remain hopeful that the parties can correct course, perhaps with the assistance of the Mediators. If Century's bad-faith conduct continues, however, the Debtors may seek intervention from the Court.

Dated:  July 2, 2020
     Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Paige N. Topper*
_____
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Eric W. Moats (No. 6441)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email:  dabbott@mnat.com
     aremming@mnat.com
     emoats@mnat.com
     ptopper@mnat.com

– and –

SIDLEY AUSTIN LLP
Jessica C. K. Boelter (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 839-5300
Email:  jboelter@sidley.com

– and –

SIDLEY AUSTIN LLP
Thomas A. Labuda (admitted *pro hac vice*)
Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Benjamin R. Brunner
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Email:  tlabuda@sidley.com
     mandolina@sidley.com
     mlinder@sidley.com
     bbrunner@sidley.com

ATTORNEYS FOR THE DEBTORS AND DEBTORS
IN POSSESSION