<pre>
 1                 UNITED STATES BANKRUPTCY COURT
                      DISTRICT OF DELAWARE
 2
                                  .   Chapter 11
 3   IN RE:                       .
                                  .   Case No. 20-10343 (LSS)
 4   BOY SCOUTS OF AMERICA and    .
     DELAWARE BSA, LLC,           .
 5                                .
                                  .
 6   _____Debtors.____ .
     BOY SCOUTS OF AMERICA,       .   Adv. Pro. No. 20-50527
 7                                .
                  Plaintiff.      .
 8                                .
         v.                       .   Courtroom No. 2
 9                                .   824 Market Street
     A.A., et al.,                .   Wilmington, Delaware 19801
10                                .
                  Defendants.     .   July 9, 2020
11   . . . . . . . . . . . . . . . .   10:00 A.M.

12

13              TRANSCRIPT OF TELEPHONIC HEARING
          BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
14               UNITED STATES BANKRUPTCY JUDGE

15   TELEPHONIC APPEARANCES:

16   For the Debtor:         Derek C. Abbott, Esquire
                             Andrew R. Remming, Esquire
17                           Eric W. Moats, Esquire
                             Paige N. Topper, Esquire
18                           MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                             1201 North Market Street, 16th Floor
19                           P.O. Box 1347
                             Wilmington, Delaware 19899
20

21   Audio Operator:         Ginger Mace

22   Transcription Company:  Reliable
                             1007 N. Orange Street
23                           Wilmington, Delaware 19801
                             (302)654-8080
24                           Email:  gmatthews@reliable-co.com

25
     Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.
</pre>

TELEPHONIC APPEARANCES (Continued):

For the Debtors:              Jessica C. Boelter, Esquire
                              SIDLEY AUSTIN LLP
                              787 Seventh Avenue
                              New York, New York 10019

                              - and -

                              Thomas A. Labuda, Esquire
                              Michael C. Andolina, Esquire
                              Matthew E. Linder, Esquire
                              Blair M. Warner, Esquire
                              SIDLEY AUSTIN LLP
                              One Dearborn Street
                              Chicago, Illinois 60603

For the Committee:            Rachel Ringer, Esquire
                              KRAMER LEVIN NAFTALIS & FRANKEL LL
                              1177 6th Avenue
                              New York, New York 10036

For Future Claimants:         Robert Brady, Esquire
                              YOUNG CONAWAY STARGATT & TAYLOR, LLP
                              1000 North King Street
                              Wilmington, Delaware 19801

For Tort Claimants:           James Stang, Esquire
                              PACHULSKI STANG ZIEHL JONES LLP
                              919 North Market Street, 17th Floor
                              Wilmington, Delaware 19801

                              - and -

                              John Morris, Esquire
                              780 Third Avenue, 34th Floor
                              New York, New York 10017

For Century Indemnity         Tancred Schiavoni, Esquire
Insurance Company:            O'MELVENY & MYERS LLP
                              Times Square Tower
                              7 Times Square
                              New York, New York 10036

TELEPHONIC APPEARANCES (Continued):

```
For First State          James Ruggeri, Esquire
Insurance Company:       SHIPMAN & GOODWIN LLP
                         1875 K Street NW, Suite 600
                         Washington, DC 20006

For the Ad Hoc           Richard G. Mason, Esquire
Committee of Local       WACHTELL LIPTON ROSEN & KATZ
Councils of the Boy      51 West 52nd Street
Scouts of America:       New York, New York 10019
```

MATTERS GOING FORWARD:

**#15.**  Debtors' Motion for Entry of an Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof (D.I. 858, Filed 6/16/20)

**Ruling:  26**

**#16.**  [SEALED] Hartford's Motion for Reconsideration, in Part, of the Court's Order (I) Appointing Mediators, (II) Referring Certain Matters to Mediation and (III) Granting Related Relief (D.I. 860, Filed 6/16/20)

**Ruling:  57**

1          (Telephonic hearing commenced at 10:05 a.m.)

2          THE COURT:  Good morning, counsel.  This is Judge

3  Silverstein.  We're here in the Boy Scouts of America case;

4  Case No. 20-10343.

5          I'll turn it over to -- first, let me ask Ginger

6  to remind of us the protocol for the call.

7          MS. MACE:  It is extremely important that you put

8  your phones on mute when you are not speaking.  When speaking

9  please do not have your phone on speaker as it creates

10  feedback and background noise, and it makes it very difficult

11  to hear you clearly.  Also, it is very important that you

12  state your name each and every time you speak for an accurate

13  record.

14          Your cooperation in this matter is greatly

15  appreciated.

16      (Phone interruption)

17          THE COURT:  Okay.  I trust everybody now has their

18  phones on mute except for Mr. Abbott who is going to speak to

19  me.

20          MR. ABBOTT:  Thank you, Your Honor.  Your Honor,

21  Derek Abbott from Morris Nichols here, Delaware counsel to

22  the debtors.

23          Your Honor, we sent over, a very short while ago,

24  an amended agenda that reflects a number of the orders that

25  the court has entered based on certificates filed in the last

1   day or two.

2          Your Honor, I would, otherwise, ask the court to

3   go in order with one exception.  Your Honor, Item No. 17 on

4   that agenda was the Lianfen Qian motion for lift stay.  There

5   was a certificate on that and that is the one that the court

6   did not sign an order on.  And we weren't sure if that, Your

7   Honor, was just an administrative oversite or if the court

8   had a question on that.

9          So, I raise that.  Then, otherwise, I would move

10  in order of the agenda, Your Honor.

11          THE COURT:  I think I actually approved that, but

12  my assistant is so efficient that she gave me your amended

13  agenda and not the one I had marked on.  So, I think I

14  approved that.  If I didn't I'm certain that it's similar to

15  the other stipulations that I approved, and I will approve

16  it.

17          MR. ABBOTT:  It is, Your Honor.  Thanks very much.

18          So with that, Your Honor, I think we go to the

19  first item which is No. 15, Your Honor, on the agenda.  It

20  appears on Page 14 of the amended agenda.  It is the debtor's

21  motion to extend exclusivity at No. 858.  And I will cede the

22  podium to Ms. Boelter for that matter, Your Honor.

23          THE COURT:  Ms. Boelter?

24          MS. BOELTER:  Thank you, Your Honor.  Good

25  morning.  Jessica Boelter, Sidley Austin, on behalf of the

1  debtors.

2         Your Honor, the debtors file a motion to extend

3  their exclusive periods to file a plan of reorganization and

4  to solicit votes thereon by a period of 120 days, which would

5  bring us out to October 15th and December 15th, respectively.

6         Notably, no parties objected to the relief that

7  the debtors were seeking in the motion.  And that is,

8  honestly, with good reason.  We are in the early stages of

9  this case, but we've already, as Your Honor knows, made

10 tremendous progress.

11        We have a preliminary injunction through November

12 16th.  Your Honor has appointed three mediators who are

13 already up and running, and who have met with the parties.

14 The debtors have provided voluminous voluntary discovery

15 pursuant to the terms of a protective order that, as Your

16 Honor knows, was contested by various parties and ultimately

17 resolved by the court.

18        So we've achieved a lot, Your Honor, in this

19 initial stage of the debtor's Chapter 11 case.  And I would

20 be remiss if I did not give credit where credit is due.  That

21 is not only because of the debtor's efforts, but it's also

22 because of the efforts and the cooperation of the survivor

23 committee, the official committee of unsecured creditors, the

24 future claimants representative as well as the ad hoc

25 committee of local Councils.

1          Now both committees did file responsive statements
2   to our exclusivity motion.  Again, I note that neither
3   committee objected specifically to the relief that was set
4   forth in the motion, but the committees did raise two issues.

5          The first issue was that both committees indicated
6   that they wanted to see progress made during the next phase
7   of the case, during the extension of our exclusive period.
8   And, Your Honor, we absolutely agree with the committees on
9   that.  Progress must be made during the next phase of these
10  cases.  They are incredibly complicated, but we need to push
11  these cases forward for all the reasons that Your Honor is
12  aware of.

13         Boy Scouts of America cannot linger in this
14  Chapter 11 proceeding.  But as we all know, it takes two to
15  tango.  So, in order for us to progress the cases it's going
16  to depend on the cooperation of not only our official
17  constituents, but also our unofficial constituents and the
18  group of insurers.  And it's going to depend upon the party's
19  willingness to refrain from impeding the debtor's
20  reorganization efforts.

21         So, with the party's cooperation we believe we
22  can, and should, and must progress these cases during the
23  second phase.  We agree with the committees on that point.

24         Second, Your Honor, the committees raised, and it
25  was, really, I think the tort committee or the survivor

1  committee in particular, raised some concerns about the local

2  Councils and the potential for the Local Councils to transfer

3  assets.

4         Just as a threshold matter, Your Honor, we think

5  that's wholly irrelevant to the relief that is before the

6  court with respect to the exclusivity motion.

7         Just as a reminder, and I'll be brief because,

8  again, I don't think it at all goes to the merits of what the

9  debtors have requested, the local Councils are not debtors in

10  these Chapter 11 proceedings.  They are each separate

11  entities.  They are not even subsidiary organizations.  They

12  are separate 501(c)(3) non-profit entities.  They have their

13  own board, their own management team, their own employees,

14  and they have to exercise their own business judgment.

15         Like the national organization the local Councils

16  are also in a very difficult circumstance right now.  The

17  impact of COVID has been extraordinarily difficult for us not

18  only here at national, but also at the local level.  Seventy-

19  two percent of the local Councils have had to cancel summer

20  camps this year.  That is their principal source of revenue.

21         So, we've got very severe financial issues

22  occurring at the local Council level.  And I think it is

23  premature and inappropriate to pass judgment on the local

24  Council's business judgment decisions with respect to their

25  very own assets that are exercised by their very own board of

1  directors.

2          Now I should note, Your Honor, that

3  notwithstanding these difficulties and the issues that were

4  raised by the survivor committee in their pleading, and I

5  believe Mr. Andolina will get to this later on in today's

6  agenda, but there is good news, all local Councils other than

7  eight of them signed the acknowledgement to the protective

8  order.  That -- I'm sorry, the preliminary injunction.

9          That acknowledgement, in connection with the

10 preliminary injunction, requires local Councils in order to

11 receive the benefit of that preliminary injunction to provide

12 both historical and current information on asset transfers.

13 They also need to provide notice in advance of an asset

14 transfer to the national organization.  And the national

15 organization is reviewing those notices as they come in, as

16 well as supporting documentation for the decisions that the

17 local Councils are making.

18          So with that, Your Honor, again we don't think

19 that has any bearing on the exclusivity motion.  We think

20 there is nothing -- we think all parties agree that the

21 exclusivity motion should be granted and unless Your Honor

22 has any questions for me I would just simply ask that you

23 enter the order granting our request to extend the exclusive

24 periods by 120 days respectively.

25          I also understand that Mr. Mason, on behalf of the

1   ad hoc committee of local Councils, would like to speak a few

2   words in support of the motion.

3            THE COURT:  Thank you.

4            Mr. Mason?

5            MR. MASON:  Yes.  Thank you, Your Honor.  Can you

6   hear me?

7            THE COURT:  Yes.

8            MR. MASON:  Thank you.  Good morning, Your Honor.

9   Ricky Mason of Wachtell Lipton Rosen & Katz on behalf of the

10  ad hoc committee of local Councils.

11           Your Honor, I will be very brief because the

12  debtor's exclusivity motion is not contested, but I would

13  like to emphasize, if I might, a couple of points that Ms.

14  Boelter made.

15           While both the TCC and the UCC have filed

16  responses to the motion neither of them argue that the debtor

17  isn't progressing to make a plan of reorganization and we

18  certainly agree that it is critical that progress be made

19  over the next exclusivity period and neither of them has

20  objected to the proposed extension of exclusivity.

21           The TCC's response, Your Honor, suggests that

22  local Councils are transferring assets, and I'm going to

23  quote, "Presumably for the purpose of putting the real

24  property beyond the reach of creditors."  From the local

25  Council committee's perspective, Your Honor, these comments

1  are unfounded.

2          First, as the TCC's response, itself, shows local

3  Councils are completely separate entities from the national

4  BSA.  They are separately incorporated under the laws of over

5  fifty jurisdictions.  Each has its own board, officers and

6  employees drawn from the local community.  And each owns

7  property in its own name and uses that property, like any

8  non-profit organization would in service of its charitable

9  mission.

10          At any given time, Your Honor, it's safe to say

11  that numerous local Councils, and there are, as you know,

12  literally hundreds of them are evaluating their real estate

13  holdings and making decisions about whether to continue

14  maintaining camps or to sell them.  And as Ms. Boelter

15  indicated, with COVID-19, cancelling summer camp and closing

16  down scout shops around the country local Councils have had

17  to make hard financial decisions to keep their operations

18  going.  That is one of the unfortunate realities that we have

19  here, Your Honor.

20          The TCC's response implies that local Councils are

21  somehow violating the law by selling real estate or

22  transferring their own assets.  Again, our committee has

23  heard nothing that would suggest that this is true and

24  literally just days ago nearly 250 local Councils, virtually

25  all of them, I believe all but eight, as Ms. Boelter

1  indicated, signed an acknowledgement agreeing to provide the

2  TCC with information about their property sales and

3  transfers, both going back six years and prospectively.  And

4  that, Your Honor, is on top of the asset information that

5  hundreds of local Councils have already provided for the

6  TCC's review.

7           Respectfully, Your Honor, that is not the kind of

8  thing that you would do if you're trying to hide your assets.

9  And the TCC's suggestion that the national BSA has a

10  contingent reversionary interest in local Council properties,

11  which they also raised in their papers, that that somehow

12  means that local Councils can't continue to manage their

13  properties like they always have.  In our view it also rings

14  hollow.

15           All local Council properties, in our view, are

16  determined by the laws of the states in which the Councils

17  are incorporated, not in the bylaws of the national BSA which

18  is a completely separate, legally separate entity.  I only

19  mention this, Your Honor, I wouldn't have done so otherwise

20  because the TCC has brought it up in their response and I

21  thought it was deserving of some mention here and not to let

22  the points go unsaid.

23           Your Honor, none of this is before the court

24  today.  As Ms. Boelter indicated, the BSA, the TCC, the UCC,

25  the local Council committees and others, including,

1   hopefully, the insurers are prepared to mediate these issues

2   and others over the coming weeks.  Local Councils have

3   already spent thousands of hours, volunteer hours, included,

4   Your Honor, collecting information about their assets to

5   provide to the TCC.

6           My committee is prepared to spend many more hours

7   discussing local Council assets and other issues with the

8   mediators, the TCC and others.  So, we hope, Your Honor, that

9   you will grant the debtor's exclusivity motion so we can

10  continue moving that process forward.

11          Thank you.

12          THE COURT:  Thank you.

13          Let me hear from the tort claimants committee.

14          MR. STANG:  Good morning, Your Honor.  This is

15  James Stang for the tort claimants committee.

16          Your Honor, the tort claimants committee believes

17  that there will be more than 10,000 sex abuse claims filed

18  against BSA and, by virtue of knowing where the abuse

19  occurred, against local Councils as well.  The debtor's

20  papers said maybe as many as 7,000.  I can report to you that

21  based on information from the attorneys who represent

22  committee members, which excludes a whole universe of

23  plaintiff lawyers, we are already over 10,000 claims.  That

24  is our constituency.

25          Although we did not file an objection to the

1  actual extension of the exclusivity, if we had known what we

2  have learned in the last forty-eight hours I am certain that

3  our committee would have done so.  These exclusivity -- I'll

4  tell you why in a few minutes.  These exclusivity motions are

5  kind of, in my opinion, especially at the beginning of the

6  case, a little bit like a report card.  How has the debtor

7  done?  And the debtor's moving papers, and their presentation

8  today, and Mr. Mason's presentation today all talk about what

9  progress they have made and what a good job they have done.

10 This is a report card written by the student.

11         I'd like to spend a few minutes telling you what

12 an objective view is.  Again, information has come in through

13 the document productions in the last few days and we've

14 learned something about asset transfers in the last few days.

15         The debtor, since its first day of this case, and

16 it did it in the exclusivity motion and Ms. Boelter just did

17 it again, talked about the importance of the cooperation of

18 unofficial parties.  That, she referenced the insurance

19 companies, but throughout all their papers they always talked

20 about the local Councils.

21         While they make a presentation today to you about

22 their separateness, if you go through all of these documents,

23 and the handbooks, and the protocols evidencing the

24 relationship between Boy Scouts of America and the Local

25 Councils we have come to a very different conclusion.  While

1   they may be separately incorporated saying they are not

2   strangers to one another is a gross understatement.

3           The BSA -- if you had to toll out one factor that

4   really shows the true relationship between these parties, the

5   BSA, without cause, in its charter, has the right to

6   terminate every local Council in the United States.  Those

7   provisions are reflected in the local Council charters to

8   themselves.  Those provisions are referenced through the

9   annual application that each local Council makes. These are

10   annual charters where it recognizes the applicability of

11   BSA's national charter which has the specific provisions that

12   allow them to not renew on an annual basis and to terminate

13   at will.

14           So, one of the ground works, the exclusivity

15   motion talks about the extension ground work that's been laid

16   for getting this case settled.  One of those ground works is

17   this preliminary injunction.  And, Your Honor, you may

18   remember that the preliminary injunction gives notice, and

19   Council has talked about it this morning, requires that

20   anyone who signs an acknowledgement, at local Council has

21   signed an acknowledgement that they then have certain

22   reporting obligations.  To date, as Mr. Mason reported, all

23   but eight have signed.

24           To the extent there is a noticing obligations

25   regarding historical transfers or prospective transfers the

1   notice goes to BSA.  And Ms. Boelter said BSA reviews that

2   notice information.  But what she neglected to tell you was

3   that BSA had committed to the tort claimant's committee that

4   it would pass on that notice to us because notice to the BSA

5   doesn't help us at all unless we're informed about it.

6           In the negotiations, for that provision, we were

7   asked not to insist that it come directly to us because of

8   the impact and the messaging that might have to the local

9   Councils.  And we relied on the commitment that we would get

10  notice when BSA got notice.  You will hear in few minutes

11  that didn't happen.

12          So, what hasn't happened?  Well, what hasn't

13  happened is an adequate document production by local

14  Councils.  I should point out that Mr. Mason, through the ad

15  hoc local Council committee, did send out a request to all

16  the local Councils to provide information.  That schedule

17  that he sent out, it was kind of an empty spreadsheet, if you

18  will, saying please fill this out, was done without any

19  consultation with us.  We were not asked what information,

20  other then I think a conversation where we told him generally

21  what we wanted.  We did not know that he was sending that

22  schedule out.  He did not show that to us in advance to get

23  our comments.  He just sent it out.

24          I suspect that was done, in part, so that he could

25  come back at some point, and he had done it today, to tell

1 you what great efforts have been made to produce documents.

2 And that if we asked for follow-up documents he would talk

3 about the burden given that they produced so many things.

4          So, what did they produce?  Well, in fact, 215

5 local Councils (indiscernible), Your Honor.  The data room

6 has 257 folders for local Council information.  215 folders

7 have some documents.  The balance have no documents at all.

8 Of the 215 Councils that have produced something 109 gave --

9 reported on this asset schedule with some supporting

10 documentation, but in our opinion only a few Councils, and a

11 couple, literally a handful did a very good job.  Very few

12 Councils did both the asset schedules and robust supporting

13 documentation.

14          Eighty-nine of the Councils have an asset

15 schedule, but no support at all as requested by the schedule.

16 Seventeen of the Councils have support, but no asset

17 schedule.  In many cases the support given was publicly

18 available information such as other financial statements

19 which some of the local Council published on their website.

20          In thirty-eight cases where asset schedules were

21 provided they indicate that support document was included or

22 attached.  It was not put in the data room.  We have -- I'm

23 sorry, Your Honor, we have raised that particular issue with

24 BSA and I do not believe have received any response.

25          So, what did we do?  What we did was serve

1  requests for document production on the eight local Councils

2  making up the ad hoc local Council committee.  We did that, I

3  believe it was yesterday or the day before.  We sent it to

4  Mr. Mason and asked him if he would confirm that that was

5  service upon the members of the ad hoc committee.  I don't

6  know if he has responded to that yet.  I'm not suggesting

7  that, you know, his response would be untimely if he hasn't,

8  but that's what we did.

9       I would note -- so, that is on the document

10  production.  Mr. Mason made a point of telling you that this

11  was all work by volunteers.  Thousands of hours -- thousands

12  of volunteers.  Well, let's go through for a moment these so-

13  called volunteers and look at the local Council.

14       The local Council has in New York -- one of the

15  members of the ad hoc local Council has six paid employees.

16  The highest one is $424,000 dollars between compensation and

17  other compensation.  The low in that Council is $119,000

18  dollars.  The Atlanta area Council, a member of the ad hoc

19  committee which, by the way, did not sign an acknowledgement,

20  its highest paid executive gets almost $600,000 dollars.

21       Your Honor, these numbers are based on published

22  IRS 990 statements.

23       The third Council in the ad hoc committee,

24  Crossroads of America, their highest paid executive makes

25  $362,000 dollars.  The Denver area Council its highest paid

1  executive makes $507,000 dollars.  The Mid-America Council

2  its highest executive makes $225,000 dollars.  The Grand

3  Canyon Council $242,000 dollars.  The -- I'm sorry, the --

4        THE COURT:  Mr. Stang, what's the point of going

5  through --

6        MR. STANG:  The point is --

7        THE COURT:  -- the compensation that people make?

8        MR. STANG:  Because these are not volunteers.

9  These are highly paid executives who should be taking the

10  time to provide complete reduction even when it's voluntary.

11  So that was the point, Your Honor.  I'll move on.

12        Second, we know there are eight Councils that did

13  not sign acknowledgements.  We, pursuant to the court order,

14  the day after the deadline sent eight notices after those

15  Councils and notified them that they had ten days to sign the

16  acknowledgement or we were going to send you a certification

17  of counsel to terminate the preliminary injunction.  And we

18  filed those letters in the adversary proceeding at Docket No.

19  85.  The deadline was ten business days and that is July

20  21st.

21        Third, Your Honor, we don't believe that BSA has

22  done nearly enough to protect its own assets.  We believe

23  that BSA has a reversionary interest in these assets that's

24  documented by the charter, that's documented by the Local

25  Council charters.  Every Local Council signs an annual

1   application for a renewal of its charter.  It references the

2   applicability of the bylaws.

3          So, Your Honor, we think that's not a very -- it's

4   not a good status quo.  But yesterday we learned that bad

5   went to much worse.  And we heard today, oh, there have been

6   no asset transfers by any of the Local Councils.  That is not

7   true.  We have documentation from the Mid-Tennessee Council

8   evidencing that they transferred an asset to a date described

9   as -- a date self-described as an asset protection trust on

10  July 6th, just a few days ago.

11         This was not COVID related, Your Honor.  The

12  minutes of their board meeting go back to January 28th of

13  this year where they acknowledge the existence of liability

14  for a couple of sex abuse claims, and with certainty that at

15  least one claim is liable.

16         Then on February 5th, 2020 they published a white

17  paper and this is what this white paper says,

18         "The trust should provide ancillary benefits to

19  the business advantages discussed above.  The trust will be

20  established under Tennessee law as an asset protection trust.

21  This type of trust is immune from creditors of the trust

22  settlor, i.e. the Council.  The trust structure may have the

23  ancillary effect of protecting assets holding the trust from

24  claims or future claims that may be made against the

25  Council",

1        Against the background of the January 20th where

2    the board acknowledged that they have sex abuse liability

3    claims coming against them.  Had that Council transferred

4    property to that foundation -- I'm sorry, that asset

5    protection trust less than three days ago.  That Council

6    signed an acknowledgement.  I don't know the date of the

7    acknowledgement, but the deadline for getting the

8    acknowledgements in was July 6th.  They didn't report to us -

9    - well, they reported it to BSA, Your Honor, then we've got a

10   serious problem in this case.  BSA had the obligation to tell

11   us -- BSA had the obligation to stop that if they knew.

12       In addition, Your Honor, there is a Local Council

13   called the CODA Council [phonetic].  The CODA Council signed

14   the acknowledgement.  The CODA Council, based on

15   (indiscernible) reports at the end of June transferred

16   assets.  Now I don't know -- I think it may have been a sale

17   transaction as opposed to the Mid-Tennessee fraudulent

18   conveyance, but no one told us that that was done. We had to

19   find it in newspaper articles.  And it turns out that BSA

20   knew and didn't tell us.  Maybe it slipped between the

21   cracks, a lot was going on.

22       We have two examples of asset transfers, one in

23   the context of us not being notified that BSA knew and the

24   other in the context of it absolutely documented intentional

25   fraudulent transfer.

1          This is what we are going to do.  We sent a letter

2   to BSA saying you got to do something about the threats to

3   transfer assets and now we just learned about this yesterday

4   afternoon, Your Honor, and we haven't put BSA on written

5   notice of this, but an actual fraudulent transfer.

6          Second, we, as the committee, are going to assert

7   violations of the automatic stay of these actions.  We're

8   going to seek compensatory damages on behalf of the estate.

9   We're going to seek punitive damages on behalf of the estate.

10  And, Your Honor, if it turns out that BSA knew about this

11  Mid-Tennessee transfer we will consider seeking the

12  appointment of a trustee on this case.

13         This is unacceptable.  If these people are so

14  important to the reorganization of BSA it has got to

15  something about this.  It is not doing anything about it.

16         So, that's the report card, Your Honor.  It's not

17  all A's. And I understand we didn't object to an extension of

18  exclusivity.  We understand the early status of the

19  mediation, but this case is not going to succeed if people

20  can't trust one another.  Right now, with these Local Council

21  issues there is a gross lack of trust on our part.

22         That is all I got, Your Honor.

23         THE COURT:  I'll hear from anyone else.

24         MS. RINGER:  Your Honor, its Rachel Ringer.  If I

25  may be heard.

1          THE COURT:  Ms. Ringer.

2          MS. RINGER:  Thank you, Your Honor.  Rachel Ringer

3   from Kramer Levin on behalf of the committee.

4          Your Honor, we filed a brief statement with

5   respect to the exclusivity extension as well as has been

6   noted.  And while I certainly don't want to belabor the

7   points raised by the TCC I do think it's important to note

8   that the UCC does share the TCC's concern regarding the Local

9   Council assets and needing to preserve estate assets and

10  estate claims during the bankruptcy case.

11         Obviously, a lot of this information is coming to

12  light real time. The transfers described by Mr. Stang are

13  equally troubling to the committee.  And as I'm sure Your

14  Honor can appreciate, to the extent these are estate assets

15  or that estate claims exist against the Local Councils or

16  those estate claims and estate assets should inure to the

17  benefit of all unsecured creditors.  And the UCC and its

18  constituency have a direct interest in preserving those

19  assets during the case.

20         While Mr. Stang also talked about the notice

21  provisions with respect to the acknowledgement forms and the

22  noticing passed forward from the debtors to the official

23  committee I thought it's worth noting that we had understood

24  we would be receiving those notices as well.  We believe we

25  should for the exact same reasons articulated by the TCC.

1  And we have not received any of those notices to date.

2          So, while I don't want to belabor the points

3  raised by the TCC, the UCC does share those concerns and,

4  obviously, a lot of this is happening real time, but I

5  thought it was worth noting that the UCC is in a very similar

6  position.

7          MR. MASON:  Your Honor, its Richard Mason.  Could

8  I just respond to one thing that Mr. Stang said?  I'll be

9  brief.  Thirty seconds, Your Honor.

10          Again, Richard Mason from Wachtell Lipton Rosen &

11  Katz on behalf of the ad hoc Local Council committee.

12          Your Honor, I'm going to leave the matter of

13  salaries aside.  We have extraordinary salary reductions and

14  staff reductions. Mr. Stang wouldn't necessarily know about

15  that, but it does put a strain on our resources collectively,

16  both on the Council's that are on the ad hoc committee as

17  well as nationwide.  It makes it difficult to respond to the

18  kinds of document requests that Mr. Stang also mentioned.

19          He did send an informal request either last night

20  or the night before.  We have not had the opportunity to

21  respond, but since he mentioned it to you, Your Honor, I'll

22  just say that we will respond at the appropriate time, but

23  the request is probably as over broad, maybe an over-used

24  term as I have seen in my career.  It asks for minutes going

25  back to 1950 which was before I was born.  In my case and my

1  counsel's case Irving Berlin was actually president.

2           I'd actually like to see those minutes, but I

3  don't think that they exist in the voluminous extraordinary

4  historical records that Mr. Stang wants could fill-up the

5  national archives.  So, I am concerned about the information

6  that they want and its relevance.  As I said, I'm only

7  mentioning it because he did and we will respond at the

8  appropriate time.

9           Thank you

10          THE COURT:  Thank you.

11          MR. STANG:  Your Honor, may I make one comment to

12 that?

13          THE COURT:  No.

14          MR. STANG:  Okay.

15          THE COURT:  I don't need anything further on this

16 motion.  The debtors file the motion.  There was responses,

17 but no objection.  It's the beginning of the case.  There are

18 a lot of things going on, but I'm going to grant it.  If

19 there is a basis for anyone to come in to seek to shorten the

20 time for debtor's exclusivity that motion can be brought.

21          I'm not going to comment on any of the statements

22 that have been made except to say that parties know how to

23 bring matters to the court's attention if they need to be

24 brought to the court's attention.  And while I am not saying

25 that some kind of update is never appropriate loose

1  discussions are not helpful on the docket.  And if there is a

2  basis for a motion of any sort the court is always available.

3  So, I'm granting the motion.

4          Let's move on.

5          MS. BOELTER:  Thank you, Your Honor.

6          MR. ABBOTT:  Your Honor, Derek Abbott of Morris

7  Nichols, again, counsel to the debtors.

8          Your Honor, the next agenda item is No. 16.  Your

9  Honor, that's Docket Item 860.  That is the motion for

10  reconsideration by Hartford of the mediation order.  So, I

11  will turn the podium over to counsel to Hartford.

12          THE COURT:  Yes.

13          MR. RUGGERI:  Good morning, Your Honor.  James

14  Ruggeri for Hartford.

15          Let me start by saying I'm aware that the court

16  has been very clear it doesn't intend to micromanage the

17  mediation process, and we all respect and agree with that.

18          This is the first time in my thirty years of

19  practice where I have moved a court to reconsider the

20  appointment of a mediator.  Your Honor, I did that because

21  this motion really is about candor, and credibility and

22  confidence.  The confidence that the parties can have that

23  Mr. Finn is going to serve as a mediator and not as an

24  adversary to the insurers.

25          Judge, here's the problem.  The court knows that

1   we objected to Mr. Finn.  We told the court we were concerned

2   about him and his connections to the claimants.  We told the

3   court we were concerned about his involvement in last

4   November's mediation.  We told the court we were concerned

5   because there were filings about a claims matrix that was

6   prepared and had been distributed, used perhaps without our

7   involvement.

8          We asked the court to require the candidates, each

9   of them, to make 2014 disclosures.  The court ordered that,

10  directed the candidates to do that on May 18th.  The court

11  told us that it was directing that so that the parties could

12  satisfy themselves that there was no predisposed bias, no

13  predisposed bias on the part of any of the candidates.

14  Again, the court said we were going to do that by requiring

15  2014 disclosures which other courts have said go to the heart

16  of the integrity of the bankrutpcy system.

17          So, what did we get from Mr. Finn?  We got a

18  declaration, under oath, under penalty of perjury, on May

19  28th that was in follow-up to the May 18th order.  What did

20  he tell us under penalty of perjury there?  He told us I

21  mediated one claim with Sidley Austin in November 2019.  I

22  was told all insurers for BSA had been invited.  Only one

23  insurer appeared.

24          Mr. Finn went on to say he understood that a

25  matrix was distributed by one of the parties,

1    "I do not remember the matrix being distributed

2  and I do not have a copy of the matrix."

3    I do not have a copy of the matrix; that's what he

4  told me, that's what he told the court, that's what he told

5  everyone.  Everyone knew from the May 18th hearing that I was

6  concerned about the matrix.  I was concerned about the

7  distribution, the use, the involvement of the matrix at last

8  November's mediation.

9    I thought that the other connections were

10  disqualifying, as the court knows, and I move to say, no, Mr.

11  Finn shouldn't be appointed.  The court overruled my

12  objection as to Finn relying on his declaration and the

13  representations of council about what did or didn't happen at

14  last November's mediation and who was and wasn't there

15  including that representation that it wasn't really a

16  mediation, it was, sort of, an invitation only get together

17  and nothing really happened because the claimants, sort of,

18  huddled with themselves and that was about it.

19    Judge, the hearing on the motion was adjourned to

20  June 8th and the court overruled my objection and appointed

21  Mr. Finn on June 8th.  Two days later we got a document

22  production by way of a data room and in the data room there

23  were a number of documents provided on the 10th and in the

24  days after the 10th, after the court had ruled.

25    Those documents included an email from October

1  28th, 2019 from Mr. Andolina to Mr. Stang, Mr. Finn and Mr.

2  Finn's colleague, Mr. Mone, that, in fact, showed that the

3  matrix was provided to Mr. Finn last October.  And among the

4  other documents there were emails, again, provided to Mr.

5  Finn that provided information not of one claim, but of

6  hundreds of claims that were at issue during last November's

7  mediation.

8         Judge, this is new information as to Hartford that

9  Hartford did not have and could not get before the court made

10 its ruling on June 8th.  We asked in writing, but it wasn't

11 provided to us.

12        So, what does the new information show?  The new

13 information shows that Mr. Finn's May 28th declaration is

14 inaccurate.  He told the court I mediated one claim with

15 Sidley.  We now know (indiscernible) over a thousand claims

16 that were mediated last November.  Mr. Finn told the court I

17 don't have a copy of the matrix.

18        Well, we know that's wrong too.  And we know that

19 Mr. Finn, in response to the court's order directing the 2014

20 disclosures, he didn't even bother to check his emails to see

21 what connections he had to the claimant's, to the debtors, to

22 the mediation going back to October 2019.  The matrix

23 included -- even though that was a focal point of our concern

24 and a reason why the court ordered those disclosures to be

25 made.

1          Your Honor, there is no excuse for why Mr. Finn

2   didn't go back when the court ordered the candidates to make

3   their 2014 disclosures.  There is no excuse, in my mind, why

4   he didn't go back and check his emails which seems like,

5   perhaps, the most simple of tasks and exercise in due

6   diligence to try to identify and then disclose your

7   connections.  That is certainly not what I thought the court

8   expected the candidates to do and that's not what I told

9   former Judge Carey and Mr. Gallagher that they were required

10  to do.  I told them to search through emails.  I said the

11  court expected it and I expected it.  And the other parties

12  expected it and that's what they did.

13          So, Judge, Mr. Finn was, sort of, caught.  The

14  documents produced in June show that his May 28th declaration

15  was not accurate.  We filed our motion for reconsideration.

16          Judge, what I hope, what I expect, what I hope

17  that Mr. Finn would say in response; I expected, I hoped that

18  he would make a full disclosure.  I hoped he would say, my

19  bad, I didn't do what the court expected me to do.  I did it

20  now.  I found these documents.  Here they are.  The mediation

21  did involve hundreds, if not over thousands of claims.  There

22  was discussions about a global mediation.  There was a matrix

23  that was distributed.  And I do have a copy of the matrix.

24  That is what I expected.  I didn't get that.

25          What we got was another June 26th declaration from

1  Mr. Finn inexplicably, stubbornly in my view, continuing this

2  notion that the mediation last November involved only one

3  claim.  Well, Judge that is not true.  I have Mr. Stang's

4  email from June -- from October 22nd to Mr. Finn providing

5  information in connection with that mediation of 201 claims

6  represented by one law firm.  So, that's not true.

7  And did Mr. Finn come and tell us that, you know, he did get

8  the matrix and remembers it all?

9          But, no.  He said he didn't even search his

10 emails.  I guess that was one moment of candor when he told

11 us he didn't search his email and he didn't search it and he

12 wouldn't have search it, but for, he said the newly

13 discovered information prompted him to search his old emails.

14         Well, I have no idea what the newly discovered

15 information was.  I thought the newly discovered information

16 was the Court ordered him to make a 2014 disclosure and to

17 identify his connections; again, matrix was a focal point of

18 what we were arguing to the Court.

19         And what does he say now about, under oath, about

20 the matrix that he now is forced to admit that he actually

21 has?

22         He says, I don't recall reading the email from

23 Mr. Andolina and I don't recall opening the attachment.

24 Judge, the attachments are titled "claim form" and "matrix."

25 I find it really, really hard to believe that an experienced

1  mediator such as Mr. Finn who receives an email from lead

2  restructuring counsel, Sidley Austin, Mr. Andolina doesn't

3  bother to open an email and doesn't bother to click the

4  attachments to see what in the world was attached by way of a

5  claim form and a matrix.

6           But, Judge, even more concerning, perhaps, than

7  that is why is there a mystery about whether he opened an

8  email?

9           Outlook tells us when you opened an email.  He

10  knows whether he opened the email before he went back and

11  submitted his second 2014 declaration.  I don't understand

12  the mystery here.

13          Something, in my view, isn't right.  I don't think

14  he took the Court's order seriously -- I'm disappointed by

15  that -- to identify and disclose his connections.  Mediators

16  are supposed to be neutrals.  Neutrals are supposed to be

17  impartial.  As the Court put it, we're supposed to know

18  whether there's any predisposed bias on any issue in favor of

19  any party.

20          Judge, the sequence of events, and even the

21  sequence of the declarations, both submitted under oath and

22  both that I don't think really withstand scrutiny, gives

23  Hartford reasonable doubts about Mr. Finn's candor and

24  credibility.  I don't dispute that he's an experienced

25  mediator.  I don't believe that he's done a lot of these

1   cases.   I don't believe that he was in -- I don't dispute

2   that he was involved in the Archdiocese of Milwaukee case,

3   which Mr. Stang has told us about, which, by the way,

4   included a matrix from the public documents that we've seen.

5          But we do have questions about Mr. Finn's

6   credibility and his candor with Court.   I don't know why he

7   didn't give a full and complete disclosure; perhaps, because

8   he thought based on the argument about the matrix that if you

9   disclose, that he had the matrix that it would have been

10  disqualifying or perhaps of concern to the Court.

11         Perhaps, it was, as I've seen documents that maybe

12  promises were made about the procedure, if not, the substance

13  of the mediation that's to take place with Mr. Finn and maybe

14  that was set in motion last fall.   I don't know.

15         But I do know that from my vantage point, it

16  doesn't appear that Mr. Finn made the disclosures that the

17  Court ordered the candidates to make last May.

18         Judge, there are a couple of other arguments just

19  quickly that the other parties make as to my motion.   The

20  debtors and the committee say the evidence isn't new.   Well,

21  it's new to Hartford.   I didn't have it on June 8th.   I asked

22  for it; I didn't get it.   The debtors declined to give it to

23  us until June 10th and the other documents even after

24  June 10th.

25         Debtors say that I was invited to participate in

1  the mediation last November.  We went over this las time,

2  but, you know, if you look at the October 23rd, 2019, email

3  that debtors' coverage counsel, Ernest Martin, sent me, if

4  that was an invitation, Judge, that was an invitation to go

5  to heck, because what that email told me is, Hey, there are

6  several matters that we're seeking to mediate that involve

7  your coverage.  We're not going to give you any additional

8  information and you're not going to be allowed to participate

9  in that mediation unless you drop your coverage defenses.

10          That's no invitation.  That's an invitation only

11  if you give up your rights that you have to challenges on

12  coverage.  That's not an invitation, Your Honor.

13          We were told unless we gave up our rights to

14  confess coverage, we were not going to get an additional

15  information and we were not allowed to participate in the

16  mediation that we were told involved several claims of

17  concern to Hartford.  Not a global mediation, certainly not a

18  mediation where a future claims representative was going to

19  be there, where a mediator was going to be there, Mr. Finn,

20  where it contemplated bankruptcy.  We weren't told any of

21  those things at all.  And we were told don't even ask for any

22  additional information unless you drop your coverage

23  defenses.

24          I think we saw a little bit from the committee's

25  papers and I think a little bit from the debtors' papers that

1  maybe they downplayed the mediation of last November, but

2  they said it's okay because, you know, everyone really knew

3  what would happen when we argued this last -- or argued this

4  last month, June 8th.  I didn't know.  I don't think the

5  Court knew.

6          I think that the Court -- the Court's comments on

7  June 8th and my review of the transcript in connection with

8  this hearing, told me the Court took seriously and credited

9  the comments that were made to the Court both, by Mr. Finn

10  about, you know, what he did, what he did, what he had, what

11  he didn't have, what he remembers, what he doesn't remember,

12  and by counsel on behalf of the parties about what happened

13  at last November's mediation and what it was and what it

14  wasn't.  I didn't know the details and I don't think the

15  Court did either.

16          Here are sort of the five facts that we do know

17  now, Judge, that I think they're on a motion:  One, Mr. Finn

18  received the detailed matrix from the Boy Scouts last October

19  even though he told the Court he didn't -- we know he did

20  have it and he does have it; two, there was a mediation

21  involving over a thousand claims and information about over

22  200 claims, at least was provided to Mr. Finn and the other

23  parties in connection with that mediation; three, Hartford

24  wasn't invited to participate in that mediation unless it

25  dropped its coverage defenses; four, Mr. Finn didn't search

1  his emails in preparation of his May 28th, 2004, disclosure;

2  five, Mr. Finn, now even after searching his emails, tells

3  the Court that he doesn't remember and know whether he opened

4  the email or the attachments -- something Outlook tells you

5  whether you did or whether you didn't do -- there shouldn't

6  be any issue there.

7         Judge, we don't believe Mr. Finn has been candid.

8  We don't believe he's been candid to this day.  We don't have

9  the confidence that parties should have that a mediator will

10 be neutral.  We believe that the events that we've outlined

11 in our motion for reconsideration qualifies as a reasonable

12 basis to questions and impartiality.  I don't think -- we

13 need to know for sure whether he will be (indiscernible) of

14 the questions, whether there's a reasonable basis to question

15 his impartiality.

16         And we think there is, based on the new evidence

17 that was provided to Hartford after the June 8th hearing.

18 For these reasons, Your Honor, we ask the Court to reconsider

19 its appointment of Mr. Finn and to allow the mediation to

20 take place on schedule, as planned, with two -- with the two

21 mediators, as to whom no one can challenge their

22 impartiality, candor, or credibility, and that is former

23 Judge Carey and Mr. Gallagher, who, by themselves, are able

24 and competent, without question, to proceed in the mediation

25 that the debtor has told the Court that it wants to engage

1  in.

2          Thank you, Your Honor.

3          THE COURT:  Thank you.

4          Let me ask you this, let's assume I were to agree

5  with you that I was at least disappointed in the disclosures

6  that were made prior to this hearing, given what has -- given

7  the subsequent disclosures.  You started out by saying that

8  Hartford had a concern that the Court appoint a mediator and

9  not adversary and that your concerned that Mr. Finn is

10 predisposed and has a bias either in favor of others or

11 against Hartford.

12         How does the lack of disclosure or lack of full

13 disclosure, assuming that what I were to find, how does the

14 lack of full disclosure mean that Mr. Finn is predisposed one

15 way or the other?

16         MR. RUGGERI:  Judge, for example, if Mr. Finn, on

17 his own at last November's mediation, suggested a resolution

18 that wasn't supported by anyone and made that proposal to the

19 claimants on his own, to me, that would be something that was

20 done by the mediator that's not in the scope of what the

21 neutral does in terms of hearing from all parties first

22 before moving in that direction.

23         And the same is with respect to the matrix.  The

24 matrix that we shared with Your Honor -- we filed it in

25 redacted form -- it actually has claim values in it, okay.

1  Those were put in place before the November mediation.  I

2  don't know who came up with those claim values.  I don't know

3  who commented on those claim values.  I don't know who came

4  up with the criteria, who commented on that criteria.

5           I don't know what Mr. Finn's involvement was.  I

6  don't know if Mr. Finn has agreed that we will now mediate

7  and try to come up with a global-claim value with -- if the

8  claimants believe it's in their interests, even though we

9  don't yet have the proof of claim forms, which I think

10  handicaps our ability to do that.

11          We're participating in the process, but there are

12  many ways where a mediator can, for example, establish the

13  floor for the negotiations that are going to take place.

14          THE COURT:  That, I understand, but that goes more

15  to what happened at the mediation than the disclosures before

16  this Court about the connections that Mr. Finn had and what

17  I'm really focused on is the disclosure that Mr. Finn made,

18  his original disclosure, and then his supplemental

19  disclosure, and whether that in and of itself is a reason for

20  me to reconsider -- not only to reconsider, but to strike him

21  from the panel.

22          MR. RUGGERI:  That's what we --

23          THE COURT:  So, that's what I'm focused on, the

24  disclosures to the Court, which would have seemed to be less

25  than fulsome, or at least, mistaken.

1        MR. RUGGERI:  Judge, I think if you go back to the

2   May 18th hearing that we had and the focus on the matrix,

3   that was the focus of my argument and my concern because I

4   saw filings about a matrix.  One of the comments I made

5   earlier today, I believe, was I really don't know why he

6   hasn't come clean, if you will, and made a complete

7   disclosure.

8        I don't know why we had to sort of play this

9   little game with regard to a matrix, whether he received it.

10  Now it's, Okay, I received it, but I don't recall opening the

11  email and the attachment.

12       I have no idea why we've gone through this

13  pattern, except that I have to believe that perhaps the focus

14  of the matrix and the concern or the attention it got at the

15  May 18th hearing, he believed that he should have given us

16  all the details about the matrix and his connection to it

17  because he was concerned that it wouldn't lead to an

18  appointment.

19       I don't know.  I'm troubled because I don't

20  understand why we haven't had full and complete disclosure to

21  this date and every time I get a declaration from him is -- I

22  think it's noteworthy that nobody really credits his

23  June 26th declaration.  The debtors don't try to credit it,

24  what he said there.

25       I mean, people are sort of arguing around it and

1  saying that, well, it's not new evidence because everyone

2  really knew.  I didn't know.  The Court didn't know.

3            So, I can't get in his head.  I haven't sat down

4  with Mr. Finn to get in his head and ask why.  Why didn't you

5  check your emails?  Why wouldn't you check your emails?  Why

6  didn't you make these connections?  Why didn't you tell us

7  that you had -- that you have the matrix?  Why won't you tell

8  us that you opened your email when you got the email from

9  Mr. Andolina in October?

10           I mean, it just creates more question marks in my

11 mind about why isn't this candidate being candid?

12           THE COURT:  Thank you.

13           MR. RUGGERI:  Thank you, Your Honor.

14           THE COURT:  Mr. Schiavoni, I think I saw you at

15 some point.

16           MR. SCHIAVONI:  I'm sorry, Your Honor --

17           THE COURT:  I know you filed a joinder or a

18 response of some sort.

19           MR. SCHIAVONI:  Your Honor, Chubb stands on its

20 papers.  I'd like to add just one thing and that is the

21 inaccuracy of the original disclosure and even the subsequent

22 disclosure is inaccurate because it says it's only one party

23 there when there were more than one insurer.  Allianz is on

24 the line.  Allianz was there.

25           It seems to me, calls into question the accuracy

1  and the reliability of the disclosure in the first place.

2  You can't rely upon the 2014 disclosure that's in because

3  it's been shown to be not accurate.  It's not just this

4  inaccuracy; we don't know what else is missing as a result.

5        But, you know, there are other things that Chubb

6  is particularly concerned about.  We joined Hartford on about

7  the impartiality here.  This mediation that took place, we

8  have affidavits in it.  You heard evidence about our people

9  who were there and even though we physically were there, we

10 were largely excluded from the discussions.

11       But, you know, in some respects, our hands are

12 tied about the discussions we had with Mr. Finn there.  It's

13 clear that I have a client who knows what was discussed with

14 him by Mr. Finn is not reflected in -- is not accurately

15 reflected in his submissions.  So, I've got a problem already

16 with a client dealing with him in that respect.

17       So, we joined Hartford in expressing their

18 concerns here, Your Honor, we thank you for considering them,

19 Your Honor.

20       THE COURT:  Thank you.

21       Let me hear the response.

22       MS. BOELTER:  Your Honor, this is Jessica Boelter,

23 Sidley Austin, on behalf of the debtors.  Maybe I should kick

24 it off and then I believe the survivor committee also filed

25 an opposition to Hartford's reconsideration motion.

1        Your Honor, just at the outset, the sole basis for

2   the reconsideration motion, once again, relates to

3   disclosures pertaining to the November 2019 mediation.

4        THE COURT:  Uh-huh.

5        MS. BOELTER:  I guess the good news is we all

6   agree now that there should be a mediation and, by the way,

7   that mediation has gone forward.  The issue is what is the

8   impact of that November 2019 mediation and Mr. Finn's role at

9   that mediation on his role as a mediator today.

10       The only things that we've heard today are, one,

11  Mr. Finn couldn't recall receiving the matrix initially.

12  There was an email demonstrating that he did, in fact,

13  receive it and, two, he characterized the mediation as

14  involving one claim.

15       I'm going to be brief because we're largely going

16  to rest on our papers but let me make a handful of points

17  pertaining to that mediation.  One, we attempted a mediation

18  in November of 2019.  We, the debtors, have always been up

19  front about the mediation.  It was in our informational

20  brief.  I addressed it in my opening remarks at our first day

21  hearing, and we have been open about that and transparent

22  about the mediation, subject to the mediation privilege, at

23  each step of these Chapter 11 cases.

24       Two, Mr. Finn was the mediator for the November

25  2019 mediation.  No party has denied that.

1        Three, there were numerous plaintiff lawyers at

2   the mediation.  They were represented as an ad hoc committee

3   by Mr. Stang.  The debtors said in our opening pleading, we

4   said, again, at the first day hearing, and I've said

5   repeatedly, that there was a group of plaintiffs that were at

6   the November 2019 mediation.

7        Hartford, not understanding that, only suggests to

8   me that they haven't followed the docket and the hearings in

9   these Chapter 11 cases.  There were multiple plaintiff

10  lawyers at the mediation.

11       We, the debtors, had big goals for the mediation;

12  I cannot dispute that.  And we told the Court that and the

13  parties in interest that numerous times.  We wanted a global

14  resolution of the abuse liability.  We believe to facilitate

15  that, it required an agreement to a matrix.  It required

16  mediating numerous current claims.  Our goal for the November

17  mediation was a global resolution; in fact, while we had put

18  aside -- we said two days, there were actually four days that

19  we had hoped to mediate the claims and the global resolution.

20       Sadly for us, the mediation never got off the

21  ground and we called it a failed mediation numerous times.

22  It abruptly ended on the second day in the morning of the

23  second day when we said we want to discuss global resolution

24  and the plaintiff said they wanted us in bankruptcy, full

25  stop.  They would not engage in a negotiation with us outside

1  of a bankruptcy proceeding and we have said that numerous

2  times.

3  　　　　　So, it's no wonder that Mr. Finn, and likely

4  others, don't have any recollection of a matrix, receiving a

5  matrix, or discussions about the matrix, because we didn't

6  negotiate a matrix at the November mediation.  It failed the

7  very first day because we wanted to talk global resolution

8  and the plaintiffs wanted BSA in bankruptcy.

9  　　　　　So, here we are, we filed, failed mediation, we're

10  now in the bankruptcy proceeding.  Now, as we stated before,

11  Mr. Finn was a critical part of the three-part panel.

12  Mr. Finn brought a unique experience and sensibility,

13  particularly sensitivities, to abuse claimants that our other

14  mediators did not bring to the table and he was important to

15  the constituents and the survivor committee, in particular,

16  as a package deal.

17  　　　　　So, for that reason, Your Honor, we ask that we

18  continue on with our three-panel mediators.  We think the

19  November 2019 mediation is, frankly, a red herring, with

20  respect to this issue, because it never got off the ground,

21  and we ask that you sustain the debtors' objection to the

22  motion to reconsider and overrule the relief that Hartford

23  has sought.

24  　　　　　THE COURT:  Thank you.

25  　　　　　MR. MORRIS:  Good morning, Your Honor.

1            THE COURT:  Mr. Morris?

2            MR. MORRIS:  This is John Morris from Pachulski

3    Stang Ziehl & Jones, for the committee.

4            I find it interesting, Your Honor, that the

5    movants have now had three opportunities and they're moving

6    papers in their reply and in their argument to talk about the

7    law.  I think the law matters and I think under binding Third

8    Circuit precedent, the Court cannot consider any of the

9    documents or the matrix as newly discovered evidence for

10   purposes of the motion for reconsideration.

11           The evidence, obviously, was available.  Century

12   has proven that.  They served document requests and they got

13   the documents.

14           As the Court was made aware at the last hearing,

15   the Boy Scouts did not withhold this information.  They told

16   both, Century and Hartford that the information would be

17   provided upon the entry of a protective order and that's

18   exactly what happened.

19           So, this is not information that was not

20   unavailable to the parties.  Century, who actually

21   participated in the mediation in October 2019, waited until

22   days before the hearing to serve their document requests.

23   Hartford, who was fully aware of the mediation, fully aware

24   of the matrix on April 28th, never asked for it.

25           So, I believe, as an as a matter of law --

1        THE COURT:  I have to say -- I have to say, Mr.
2   Morris, I'm not persuaded by that argument.
3        The debtors filed a motion.  They, at first, as I
4   recall, I had to continue the hearing because, in fact, no
5   information was provided about disclosures.  The debtors or
6   someone took the position that it wasn't necessary and I
7   said, No, it was, and I summarily, without, I think, much
8   discussion at all of the motion, said, It's being continued
9   and disclosures need to be made.
10        And disclosures were made, but not all disclosures
11   were made --
12        MR. MORRIS:  So, let's --
13        THE COURT:  And the debtor, who wants relief,
14   needs to ensure when requested for information, that it
15   provides the information in a timely fashion because if
16   Hartford had come in and try to delay the hearing because
17   they didn't get the documents they requested, I would have
18   heard that it shouldn't be delayed and the hearing should go
19   forward.
20        So, yes, there's all the technicalities and all
21   the niceties, but sometimes when you want relief and you want
22   it quickly, you need to do what you need to do so the Court
23   is prepared to have the hearing.  So, I'm not persuaded by
24   that argument.
25        What I really want to hear is the question that I

1  asked Mr. Ruggeri, but I'll ask it to you differently, which

2  is, given the disclosure, the first disclosure, which

3  obviously was inaccurate, whether by design or not -- and

4  let's say not -- what am I supposed to do with new

5  information and does it matter, the new information, with

6  respect to whether Mr. Finn should be a mediator?

7           MR. MORRIS:   Thank you, Your Honor.

8           As we've made clear in the papers, and as I'll

9  directly answer your question, even if the Court does

10 consider this new evidence for purposes of the motion, it

11 kind of does nothing to address the basis on which the Court

12 made the original decision.  Originally, the Court focused on

13 whether there was any evidence to show that Mr. Finn had

14 formed a view.

15          And the only two statements that he's ever made in

16 connection with this motion or the initial disclosure, and

17 the supplemental disclosure -- and I dare say there's

18 absolutely nothing in either disclosure that suggests, that

19 could be implied, that could be inferred, that Mr. Finn is an

20 adversary of the movants or has a predisposed bias in favor

21 of anybody.

22          The information that has now been presented by the

23 movants has not been authored by Mr. Finn.  It has not

24 been -- there is no evidence that it has been adopted by

25 Mr. Finn.  There's no evidence that Mr. Finn has expressed

1  any view whatsoever about any of that information.

2          And I do think it's notable, Your Honor, that

3  Century, one of the movants here, was a participant in the

4  mediation.  They offered no evidence from what happened at

5  the mediation.  They offered no evidence for the Court to

6  even believe that Mr. Finn might be an adversary.

7          There is no evidence in the record of any kind to

8  support any notion that he's an adversary of any party; in

9  fact, Your Honor, I find it a little ironic that Century in

10  their papers actually suggests that Mr. Finn is an advocate

11  of both, the TCC and the Boy Scouts.

12          I think from the earlier argument that you heard,

13  Your Honor, I don't think that the Boy Scouts and the tort

14  claimants' committee are parties' in common interest here.

15  We're in an adversarial process and Mr. Finn is not an

16  advocate.  There's no evidence that he's an advocate for

17  either one of us.

18          If Your Honor is disappointed with the quality of

19  the disclosures, that's a judgment for Your Honor to make,

20  but if the Court is asking for a factual, evidentiary basis

21  on which it might conclude -- I won't even say it has to

22  conclude -- might conclude that there's bias, that Mr. Finn

23  is an adversary of the insurance company, there is none.

24  There is none.

25          And the reason being is that Century was at the

1    mediation.  Not only isn't there any evidence, but there's no

2    evidence offered by the movant who was there and that, I

3    think, is the best answer to Your Honor's question.  There is

4    simply no evidence to show an adversarial relationship, a

5    bias, or a predisposition.

6            And the conclusion, you know, for your purposes,

7    Your Honor, there's no evidence that he has formed a view of

8    any kind having to do with anything in this case.

9            THE COURT:  Thank you.

10           I don't recall whether anyone else filed a

11   response.  I believe there were further responses.  There

12   were at least joinders.

13           MR. BRADY:  Your Honor, Robert Brady on behalf of

14   the FCR.  We did file a joinder to the TCC's objection.

15           I have nothing further to add to the record.

16           THE COURT:  Thank you.

17           Mr. Ruggeri, do you have anything by way of a

18   reply?

19           MR. RUGGERI:  Your Honor, just briefly.

20           The Court asked whether it matters, the additional

21   information that we received since the June 8th hearing.

22   Well, obviously it matters under Local Rule 9019(2) and under

23   28 U.S.C. § 455, the standard that applies to the mediators.

24   That issue of disqualification isn't one that's just made at

25   the outset; it's one that continues through the case and if

1  there's a reason to question one's impartiality, the Rules

2  are clear that the effect is the same, that there should be a

3  disqualification or a recusal or a withdrawal of the

4  candidate.

5          Ms. Boelter said that 2019 is a red herring in her

6  view.  Well, I guess I'm pleased that she's not wearing the

7  robe, because it wasn't a red herring to me and it wasn't a

8  red herring to the Court and the 2019 mediation is one of the

9  reasons why the Court ordered the candidates, including Mr.

10 Finn, to make the 2014 disclosures.

11         Mr. Morris said that there is no evidence to

12 question his impartiality.  I would beg to differ.  We now

13 have two declarations, neither of which in my view, comes

14 clean in terms of the two thousand -- the November 2019

15 mediation or the matrix.  And, again, I'm sort of hard-

16 pressed because I'm asked to prove a negative, something that

17 I don't know.

18         I have been candid with the Court, I don't know

19 why he's chosen to go down the path that he's gone, but it

20 does call into question his candor, and in my view,

21 credibility.  And I have to surmise there's got to be a

22 reason for that, either, again, he felt it could jeopardize

23 his appointment or because there was something about those,

24 that session and the materials submitted in connection with

25 that session, that folks didn't want to be disclosed.

1           So, that's what I have in response to the

2    arguments that were made, Your Honor.  Thank you for the

3    Court's consideration.

4           We would ask the Court to remove Mr. Finn as a

5    mediator for all of the reasons that we've discussed in

6    writing and here this morning.

7           MR. MORRIS:  Your Honor, it's John Morris.

8           May I respond briefly?

9           THE COURT:  Yes.

10          MR. MORRIS:  Okay.  As I understand it, there are

11   three things that the movants focus on, with respect to

12   Mr. Finn's disclosure.  The first is that he states that he

13   went to Sidley to mediate a, quote, claim, closed quote.

14          As we mentioned in our papers, Your Honor, I think

15   that's a game of gotcha that belies any credibility in its

16   own right, frankly.  Everybody knew, including the movants,

17   that the Boy Scouts were defendants in hundreds of lawsuits

18   throughout the country and I don't think for a second that

19   Mr. Finn was trying to trick the Court into thinking that

20   there was one and only one claim that was going to be the

21   subject of discussion at the mediation.

22          The second thing is we've heard for the first time

23   now, which is not in evidence, that there was actually a

24   second insurance company at the mediation.  Your Honor, at

25   some point, we've got to get to a level of materiality here.

1  The fact that there was a second, and he said there was one,

2  is just -- it's really unfair to Mr. Finn in attacking him in

3  this way.

4         The only potential issue that I think the Court

5  should think about is whether Mr. Finn took the time to look

6  through the matrix the first time.  And as he pointed out, as

7  we've pointed out, as the evidence shows, the matrix was

8  never the subject of a discussion.  It was never exchanged at

9  the mediation.  It was not anything that Mr. Finn ever

10  discussed with anybody.

11         Century offers no evidence that even though they

12  participated in the mediation, that the matrix had anything

13  to do with anything.  And I think I'll speculate since

14  Hartford took liberty to speculate, I'll speculate that

15  Mr. Finn simply went on his memory and said -- the first

16  time -- and said, I don't recall it.

17         You know, he's heard about the matrix; that was in

18  his head somewhere, but he didn't remember seeing it.  And

19  after getting the motion, he went back and he found it and,

20  frankly, his disclosure, his supplement actually is an

21  acknowledgment that he did find it.

22         So, there's only three issues that we're even

23  talking about here, Your Honor.  One is whether we're going

24  to hold him, you know, to some heightened standard.  I mean

25  the guy made dozens and dozens of disclosures when he made

1  the 2014 disclosure.  It is pages long.  It involves dozens

2  and dozens of parties.

3        And we're now here challenging his credibility

4  because he said only one insurance company participated and

5  we're finding out now in oral argument for the first time,

6  according, you know, to not evidence in the record, according

7  to argument that there was a second, that he called it a

8  claim, and that he realized later on that he had, in fact,

9  received a matrix, a matrix which everybody knew about

10 before.

11       And I think as was pointed out by Hartford in its

12 argument, there's matrixes [sic] that are publicly available

13 in other cases.  So, again, we're still left with absolutely

14 no evidence showing that Mr. Finn has formed a view about

15 anything.

16       What we're doing is talking about three cases of

17 too-little disclosures, none of which go to bias, none of

18 which go to adversary.  We're going to focus and say, That

19 wasn't exactly right; it was two insurance companies who

20 attended, not one.  It was more than one claimant.

21       And I just don't think it's fair.  I don't think

22 it's fair to Mr. Finn.  I think this is really -- I think

23 this is just wrong.

24       Your Honor made the point initially that it would

25 be appropriate to have a mediator with experience mediating

1 sexual abuse claims.  And let's be clear, that's what the

2 insurance companies are fighting here; it's not Mr. Finn,

3 it's not the fact that he said claim, it's not the fact that

4 there were two insurance companies there instead of one, it's

5 not the fact that this has been realized after the fact that

6 he had, in fact, received the matrix.

7        We need a mediator with experience mediating

8 sexual abuse claims.  The Court took that into account last

9 time.  The Court came to the conclusion that there was

10 nothing in the wrong -- and I just want to get the quote --

11 to show that he had formed a view, and that remains the case.

12        Thank you, Your Honor.

13        THE COURT:  Thank you.

14        MR. SCHIAVONI:  Your Honor, just very quickly --

15 Mr. Schiavoni -- Century objected before the mediation to the

16 matrix.  Ms. Boelter put in our objection, it was a letter

17 with her declaration.  In that letter, that was at the Sidley

18 hearing, we objected to the matrix, itself, and it to being

19 shared with the tort claimants.

20        After that, we made multiple requests, multiple

21 requests for copies of the communications exchanged between

22 Sidley and the tort claimants in its answer to that mediation

23 and afterwards about what money had been discussed, the

24 matrix, the money, so we knew if any preconditions had been

25 set or, basically, expectations or, basically, a side deal

1  about what the money would be for the claims, in exchange for

2  preserving a certain amount of assets of the debtors.

3         We still haven't got fulsome disclosure of that.

4  We only got a copy of the matrix after the hearing on

5  Mr. Finn there.  Was no reason they couldn't have given us

6  that before the hearing.  Until we got that, after the

7  hearing on the mediation motion, we didn't know that they had

8  given the matrix to Mr. Finn.

9         The notion that -- you know, the suggestion here

10  that we haven't offered evidence about what happened at a

11  mediation that is supposed to be covered by mediation

12  confidentiality, Mr. Stang's repeated assertions of that is

13  an effort to try to get the mediation confidentiality lifted.

14  We've honored that mediation confidentiality.  There were

15  only a limited number of claimants -- claimant lawyers at

16  that hearing, so, you know, a small number of the group that

17  purport, at that time, to have controlled the claims, they

18  are bound by that mediation confidentiality.

19         The matrix, frankly, shouldn't be shared between

20  anyone beyond that control group.  Giving it to Mr. Finn and

21  then having Mr. Finn be the mediator here, ends up with all

22  those -- like the very thing we were concerned about being

23  broadcast.  Yes, I'm limited about what we can say at the

24  mediation and we're not going to say it, but I will say this,

25  it's like the notion that in a two-day mediation, money

1 wasn't talked about when there's a group of plaintiffs'

2 lawyers there is, you know, you can pinch yourself about

3 whether you can believe that that is true.

4         The second thing is the notion, you know, from

5 Ms. Boelter and Mr. Finn and Mr. Morris that somehow, you

6 know, in a mass-tort case where a matrix is exchanged with

7 money in it and money is talked about in the mediation, that

8 people could somehow forget, and it's a minor point what the

9 matrix is, is like saying you went to a horse race, but you

10 forgot there were horses there.  It's completely not credible

11 and it's not a small issue, and it's one that our clients,

12 going into the mediation with this fellow, know that's what

13 they're dealing with.  They think he's biased have the very

14 fact that he would make those submissions.

15         Thank you, Your Honor.

16         UNIDENTIFIED:  Your Honor, 10 seconds?

17         If you went to a horse race and the horse race was

18 cancelled, you might not remember the horses.

19         THE COURT:  Okay.  I read all this for the first

20 time pretty late last night.  I want to go back and read the

21 case -- I don't even remember the name -- but the Third

22 Circuit case that I originally read in connection with the

23 standards for a mediator.  It's not going to turn on whether

24 there was one or two insurance companies at a mediation.

25         I'm not sure that I actually have any evidence of

1  what happened at the mediation and I'll review that.

2          This was a hearing, as I recall it, though I'll

3  read the transcript thoroughly, of a question of who should

4  be a mediator, who should the mediators be, and are they, in

5  my mind, are they true neutral.

6          And layered on that now is a disclosure which was

7  admittedly inaccurate, because it's been corrected or

8  supplemented, and a suggestion that the supplementation

9  itself, is not accurate enough or should otherwise disqualify

10  Mr. Finn from continuing to serve as a mediator.

11          So, I want to give this some careful

12  consideration.  I'm going to let you know very shortly.  It

13  will not be -- it cannot be tomorrow -- but I will review

14  this over the weekend and I will let you know early next

15  week, my decision.

16          Okay.  What's next?

17          MR. ABBOTT:  Your Honor, Derek about of Morris

18  Nichols for the debtors.  Thank you, Your Honor.

19          I noticed during the hearing that one matter I

20  mentioned up front has hit the docket, so that's taken care

21  of, Your Honor.  It was just a (indiscernible) must have been

22  in processing the layer, what have you.

23          Your Honor, think we're up to Item 19 on the

24  agenda, Your Honor, which is just a status conference

25  regarding the consent order and preliminary injunction filed

1  early in the case, Your Honor.  I'll turn it over to

2  Mr. Andolina to handle that, if I may?

3            THE COURT:  Mr. Andolina?

4            MR. ANDOLINA:  Good morning, Your Honor.  Mike

5  Andolina, Sidley Austin, on behalf of the debtors.  This will

6  be very brief.

7            Your Honor, as the Court to aware, the second

8  stipulation and consent order extending the preliminary

9  injunction was agreed upon by the committees, the debtor, and

10  the ad hoc committee of local councils and entered by the

11  Court on June 9th.

12            As we've heard from Mr. Stang and Ms. Boelter,

13  that stipulation extends the preliminary injunction on

14  specified pending abuse cases until the bar date, subject to

15  local councils providing the acknowledgment and certain

16  information that you've heard a lot of discussion on today.

17            We did receive and resolve four objections to the

18  consent order, Your Honor.  We -- the debtors did want to

19  note for the record that our agreement with the Kentucky

20  defendants that was -- the objection was filed at

21  Docket 81 -- and who have brought one of only a handful of

22  cases relating to the Explorer Program that is sponsored by

23  nondebtor, Learning for Life.  In that case, Your Honor, the

24  debtors have consented to certain limited discovery as to

25  Learning for Life and the local council.

1          Finally, Your Honor, regarding the acknowledgment

2   and agreement that you've heard about, we've heard from

3   Mr. Stang in terms of, I think, the TCC's perspective on some

4   bad news with respect to a certain limited number of local

5   councils and, obviously, we don't have the same position on

6   that, but I did want to report to the Court that as of the

7   deadline, we had 245 local councils actually sign the

8   acknowledgment; only 8 did not.

9          And that from the debtors' perspective, combined

10  with the start of mediation activities, we feel like this is

11  good progress and we're looking forward to engaging with the

12  parties and the mediators, including the ad hoc committee of

13  local councils and the individual local councils that have

14  not yet signed the acknowledgment.

15          MR. STANG:  Your Honor, may -- this is

16  Mr. Stang -- could I be heard on what Mr. Andolina just said,

17  please?

18          THE COURT:  Yes.

19          But Mr. Andolina, I just want to confirm that you

20  have resolved all four, because I thought we had one open

21  objection, at least as of last night, but that's been

22  resolved, as well?

23          MR. ANDOLINA:  Yes, Your Honor.  That has been

24  resolved.  We have resolved all four.

25          THE COURT:  Okay.

1           MR. ANDOLINA:  Yeah.

2           THE COURT:  Okay.  Mr. Stang?

3           MR. STANG:  Thank you, Your Honor.

4           Your Honor, at 6:10 my time, Mr. Andolina -- I

5    already left -- but Mr. Andolina called me to tell me that

6    there had been a resolution with the objection filed by

7    Mr. Schneider's clients.

8           We would like, before the Court modifies the

9    preliminary injunction regarding that particular objection,

10   we would like to see the resolution in writing.  This may

11   have impact on insurance.  Mr. Andolina told me there's going

12   to be some discovery allowed.

13          I, obviously, had my head elsewhere in terms of

14   getting ready for today's hearing and as I pointed out to you

15   at the beginning, there are well over 10,000 claims that are

16   going to be filed in this case and while there may be

17   considerations as to whether Mr. Schneider's clients' claims

18   fall within an insurance year where there's a perception that

19   there's not a lot of claims, we would like to see whatever

20   agreement there has been reached in writing and have the

21   opportunity to opine on that before the objection is

22   modified.

23          MR. ANDOLINA:  Your Honor, Mike Andolina, on

24   behalf of debtors.

25          No problem providing Mr. Stang and Ms. Ringer with

1   that information so that they can weigh in.

2           THE COURT:  Okay.  So, am I going to be presented

3   with something that needs to be signed or have these matters

4   just been resolved in some other fashion?

5           MR. ANDOLINA:  Your Honor, Mike Andolina, on

6   behalf of debtors.

7           I do not believe that you will need a formal

8   document for the Court to execute, but if that changes, we

9   will certainly reach out to the Court with that new

10  information.

11          THE COURT:  Okay.

12          MR. STANG:  Your Honor, this is Mr. Stang.

13          I know that there's an injunction that has

14  Mr. Schneider's case on -- I believe has Mr. Schneider's

15  clients' case on the attachment and if we're going to modify

16  the order, I'd suspect that the records should show that.

17  But Mr. Andolina and I can take that up without taking any

18  more of your time.  And if we think it needs something on the

19  record, we'll certainly let the Court know.

20          THE COURT:  Thank you.

21          Okay.  Anything else for today?

22          MR. ABBOTT:  Your Honor, I believe that concludes

23  the agenda.  Derek Abbott for the debtors, again, obviously.

24          THE COURT:  Thank you very much.

25          Thank you, Counsel.

1              We're adjourned.

2         (Proceedings concluded at 11:36 a.m.)

3

4

5

6                        CERTIFICATE

7

8         We, MARY ZAJACZKOWSKI and WILLIAM GARLING, certify that

9    the foregoing is a correct transcript from the electronic

10   sound recording of the proceedings in the above-entitled

11   matter.

12
     /s/Mary Zajaczkowski              July 10, 2020
13   Mary Zajaczkowski, CET**D-531

14
     /s/William J. Garling            July 10, 2020
15   William J. Garling, CE/T 543

16

17

18

19

20

21

22

23

24

25