**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| | Jointly Administered |
| Debtors. | |

**Objection Deadline: August 21, 2020 at 4:00 p.m. (ET)**
**Hearing Date: September 9, 2020 at 10:00 a.m. (ET)**

**MOTION OF OFFICIAL COMMITTEE OF TORT CLAIMANTS
ENFORCING AUTOMATIC STAY UNDER 11 U.S.C. §§ 362(A)(3)
AND 541(A) AGAINST MIDDLE TENNESSEE COUNCIL ARISING
FROM TRANSFERS OF PROPERTY OF THE ESTATE**

The official committee of tort claimants (consisting of survivors of childhood sexual abuse) (the "***Tort Claimants' Committee***") appointed in the above-captioned cases hereby moves this Court (the "***Motion***") for the entry of an order, pursuant to sections 362(a)(3) and 541(a)(1) of title 11 of the United States Code (the "***Bankruptcy Code***") and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), enforcing the automatic stay against the Middle Tennessee Council, Boy Scouts of America (the "***Middle Tennessee Council***") arising from transfers of property of the estate of Boy Scouts of America (the "***BSA***" or "***Debtor***") and rendering such transfers to be void *ab initio*.  In support of the Motion, the Tort Claimants' Committee respectfully states as follows:

---

[1] The debtors (together, the "Debtors") in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

# I.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. sections 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. section 157(b)(2).

2.      Venue of this proceeding and this Motion is proper in this District pursuant to 28 U.S.C. sections 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 362(a)(3) and 541(a) of the Bankruptcy Code and Bankruptcy Rules 4001 and 9014.

# II.

## BACKGROUND

4.      On February 18, 2020 (the "***Petition Date***"), each of the Debtors commenced a chapter 11 case by filing a voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code.  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate as debtors in possession.  No trustee or examiner has been appointed in these cases.  On March 4, 2020, the Office of the United States Trustee (the "***U.S. Trustee***") formed the Tort Claimants' Committee consisting of nine survivors of childhood sexual abuse.

# III.

## INTRODUCTION

5.      On July 1, 2020, the Middle Tennessee Council transferred substantially all of its real and personal property to an irrevocable asset protection trust (the "***Transfer***") for no consideration.  At the time of the Transfer, the BSA had reversionary property interests in the assets pursuant to the BSA's and Middle Tennessee Council's organizational charters and bylaws.  The Transfer, made with the knowledge of BSA's bankruptcy, violated the automatic

stay and is void *ab initio*.  Despite having a self-admitted interest in the transferred properties, BSA has not taken any action to enforce the automatic stay and restore the estate's property rights notwithstanding the Tort Claimants' Committee demands.  Therefore, The Tort Claimants' Committee seeks an order of the Court voiding the Transfer as a violation of the automatic stay.

6.    Section 541(a) of the Bankruptcy Code broadly defines property of the estate to include all legal and equitable interests of a debtor, including contingent, future interests.  The automatic stay is intended to protect creditors and the estates and may not be waived by the BSA.

7.    This Motion seeks redress for the willful violation of the automatic stay by the Middle Tennessee Council arising from the Transfer of property in which BSA has an interest.  As property of BSA's bankruptcy estate, the Transfer of property into an asset protection trust resulted in the diminution of the estates' property because the Transfer put the property outside the reversionary interest BSA has in such property and outside the reach of BSA's and the Middle Tennessee Council's creditors.

8.    Specifically, the Middle Tennessee Council took real and personal property in which the Debtor had a valuable reversionary interest, and with knowledge of the Debtor's pending bankruptcy case, transferred its property into a self-described "asset protection trust."  The Middle Tennessee Council conveyed the real property by quitclaim deeds for no consideration.[2]

9.    On July 10, 2020, the Tort Claimants' Committee sent a cease and desist letter to the Middle Tennessee Council demanding that it stop or unwind the Transfer.  The Middle Tennessee Council has failed to directly respond to the TCC's letter.  Instead, the BSA,

---

[2] The Tort Claimants' Committee has information that establishes the Middle Tennessee Council's intent behind these transfers.  The intention is irrelevant to this Motion which seeks to enforce the automatic stay.

acting on behalf of the Middle Tennessee Council, asserted that the Transfer was proper -- while simultaneously admitting that the BSA has an interest in the property.  The BSA has refused to take any action in response to the Middle Tennessee Council's actions despite numerous conversations with BSA's counsel about transfers like these.  For the reasons stated herein, the Tort Claimants' Committee seeks an order voiding the Transfers made by the Middle Tennessee Council.

## IV.

### RELIEF REQUESTED

10.    By this Motion, pursuant to sections 362(a)(3) and 541(a) of the Bankruptcy Code and Bankruptcy Rules 4001 and 9104, the Tort Claimants' Committee seeks entry of an order voiding the Transfer of the Assets (as defined below), and granting such other and further relief as may be just, equitable and proper.  A proposed form of order is annexed hereto as **Exhibit A**.

## V.

### STATEMENT OF FACTS

A.    **BSA's Preliminary Injunction**

11.    On the Petition Date, the BSA attributed its need for bankruptcy protection to "numerous lawsuits related to historical acts of sexual abuse in its programs." [Docket No. 4 at p. 3].  In BSA's words, it commenced this case "to achieve dual objectives: (a) timely and equitably compensating victims of abuse in Scouting and (b) ensuring that the BSA emerges from bankruptcy with the ability to continue its vital charitable mission." *Id*. at 6-7.

12.    To this end, the BSA initiated an adversary proceeding (Adv. Case No. 20-50527) (the "***Adversary Proceeding***") seeking preliminary and permanent injunctive relief

against the survivors of childhood sexual abuse claims in pending lawsuits against BSA, non-debtor local councils, and others in state and federal courts around the nation (the "***Pending Abuse Actions***").    Accompanying the Adversary Proceeding was *The BSA's Motion for a Preliminary Injunction Pursuant to Sections 105(a) and 362 of the Bankruptcy Code* (the "***Preliminary Injunction Motion***").

13.    After the filing of the Preliminary Injunction Motion, the Tort Claimants' Committee, BSA, and other parties commenced negotiations regarding scope and terms of a proposed injunction over the Pending Abuse Actions.    Thereafter, on March 30, 2020, the Court entered its *Consent Order Pursuant to 11 U.S.C. §§ 105(a) and 362 Granting the BSA's Motion for a Preliminary Injunction* (the "***Consent Order***"), which generally stayed the Pending Abuse Actions and protected approximately 260 local councils (the "***Local Councils***") who, like the BSA, are also subject to thousands of sexual abuse claims.

14.    After a brief extension of the Consent Order, on June 9, 2020, the parties filed their *Second Stipulation and Agreed Order By and Among the Boy Scouts of America, the Official Committee of Survivors of Abuse, and the Official Committee of Unsecured Creditors Modifying the Consent Order Granting the BSA's Motion For A Preliminary Injunction Pursuant to 11 U.S.C. §§ 105(A) and 362 and Further Extending the Termination Date of the Standstill Period* [Adv. Docket No. 77] (the "***Second Stipulation***"), which extended the preliminary injunction (the "***Preliminary Injunction***") granted under the Consent Order to November 16, 2020, but also required each non-debtor Local Council seeking the benefit of the injunction to execute an "Acknowledgment and Agreement" (Exhibit 4 to the Second Stipulation) that provided, among other things, the following:

> 3.    … [P]rovide 30 days' notice to BSA of any corporate action pertaining to the marketing, sale, transfer, or lease of any

real property owned by Local Council and copies of any documents related thereto.

4.      … [P]rovide 30 days' notice to BSA of any sale or transfer of personal property having an appraised or book value in excess of $25,000 outside of the ordinary course of Local Council's operations.

5.      … [N]otify BSA within 10 days of executing an Acknowledgment and Agreement if it intends to take any of the actions described in paragraphs 3 or 4 above on or before July 6, 2020.

*See* Second Stipulation at Exhibit 4.  Although the Middle Tennessee Council's plan to transfer the Assets was well under way at this time, it did not provide advance notice to the TCC (nor perhaps the BSA) regarding its intentions and instead chose to execute the Acknowledgement on the deadline under the Second Stipulation, presumably to ensure the Transfer was complete.

**B.      The Middle Tennessee Council's Postpetition Transfers**

15.      The Middle Tennessee Council operated Boy Scout camps on land known as Boxwell Reservation (Wilson County), Latimer Reservation (Van Buren County), Grimes Canoe Base (Perry County), and Parish Reservation (White County) and also owned the Middle Tennessee Council office building in Nashville (Davidson County).  It also maintained bank and securities accounts. Indeed, just one of those accounts – the "Capital Fund" – contained $2,923,803 on March 31, 2020.  The foregoing real property and accounts are collectively referred to herein as the "*Assets*."

16.      The Middle Tennessee Council executed its plan in two steps.  First, on or about June 12, 2020 – just three days after the Second Stipulation was entered – Larry Brown (the Council Scout Executive) and John Bright Cage (the Council President) executed a Properties Trust Agreement dated June 12, 2020, that irrevocably established a trust into which the Assets were to be placed (the "*Asset Protection Trust*").  Thereafter, on or about June 30,

2020, Mr. Brown signed quitclaim deeds (the "***Quitclaim Deeds***") for each of the five real property Assets, and those deeds were recorded in the respective counties on July 1, 2020. True and correct copies of the Quitclaim Deeds for the four camp properties are annexed hereto collectively as **<u>Exhibit B</u>**.  The TCC is informed and believes that the Middle Tennessee Council took similar steps with regard to its cash and deposit account Assets.

17.     On July 6, 2020, and in response to the obligations imposed upon it by the Second Stipulation, the Middle Tennessee Council executed and delivered an Acknowledgement and Agreement that included an addendum containing a narrative and attached documents.  In the Acknowledgment and Agreement, the Middle Tennessee Council not only disclosed the Transfer of the Assets but also that it now leases the property from the Asset Protection Trust.

18.     Prior to and at the time of the transfer of the Assets, the Middle Tennessee Council had actual knowledge of the BSA's chapter 11 case and the minutes of its board meetings reflect this knowledge. The Middle Tennessee Council was among the hundreds of Local Councils that the BSA sought to protect by way of the Preliminary Injunction.  Indeed, on March 3, 2020, Mr. Brown, one of three members of the Middle Tennessee Council's executive board, published an opinion piece in the Tennessean in response to BSA's February 18, 2020 bankruptcy filing.  *See  https://www.tennessean.com/story/opinion/2020/03/03/boys-scouts-middle-tennessee-developing-and-protecting-youth/4929974002/* ("With the recent news of a National Boy Scouts of America (BSA) bankruptcy, I want to share my perspective as the Scout Executive for the Middle Tennessee Council, BSA (MTC)").

C.      <u>BSA's Rights in Middle Tennessee Council's Assets</u>

19.     The *Charter and Bylaws of the Boy Scouts of America* ("***BSA Bylaws***") contain numerous provisions evidencing the reach of its various property interests and the broad

scope of BSA's powers with regard to the formation, governance, and continuation of local councils, including, but not limited to the disposition of a Local Council's property.  A true and correct copy of the BSA Bylaws is annexed hereto as **Exhibit C**. As with all other Local Councils, BSA has sole discretion over the chartering of the Middle Tennessee Council and sets the size of the councils and their governing body.  BSA Bylaws, Art. VI §§ 2 and 3.  Charters must be renewed annually and the BSA has sole discretion to decide whether to renew the charter of each Local Council, including Middle Tennessee Council. BSA Bylaws, Art. VI, Sec. 1.  Moreover, BSA may revoke or modify the charter of any Local Council at any time in its sole discretion.  BSA Bylaws, at Art. VI, § 4.

> 20.    The Rules and Regulations (the "***Rules and Regulations***") of the BSA provide the following with respect to a Local Council's ownership of real property in its own name:

> Any incorporated local council may hold title to real property in its own name provided that in the event of the dissolution of the unit or council or the revocation or lapse of its charter said trustee or trustees will, after satisfying any claims against such unit or council to which such real estate may be subject, convey said property or, if sold, pay the net proceeds of such sale to the Boy Scouts of America, which may hold or use said property or funds for the benefit of Scouting in such locality or elsewhere if there is not suitable opportunity to use said property or funds in such locality. Any incorporated local council holding title to real property in its own name must ensure that its certificate or articles of incorporation expressly provide for the conveyance of such property or the net proceeds from the sale thereof to the Boy Scouts of America in the event of the dissolution of the local council or the revocation or lapse of its charter in a manner consistent with this provision.

Rules and Regulations, Real Estate at 8-9 (emphasis added). A true and correct copy of the Rules and Regulations is annexed hereto as **Exhibit D**.

21.     BSA provides the Middle Tennessee Council, like all Local Councils, with a standard form of Articles of Incorporation and Bylaws (the "*LC Articles and Bylaws*").  A true and correct copy of the LC Articles and Bylaws is annexed hereto as **Exhibit E**.

22.     Like the Rules and Regulations, the LC Articles and Bylaws provide that:

> The property and assets of the Corporation are irrevocably dedicated to the charitable ............ purposes of carrying out the (and educational) program of the Boy Scouts of America. In the event of the dissolution or final liquidation of the Corporation or upon the revocation or termination of its charter from the Boy Scouts of America, none of such property or assets or the proceeds therefrom shall inure to the benefit of any individual but shall, after all liabilities and obligations of the Corporation have been paid or satisfied or provision otherwise made therefor, be distributed (a) to another local council of the Boy Scouts of America as specified by the Boy Scouts of America to be used for charitable ............ purposes, or (b) in the absence of such specification, to the Boy Scouts of America itself to be used for charitable ........... purposes, it being (and educational*) contemplated that in either instance such property and assets shall continue to be devoted to the furtherance of Scouting . . .

LC Articles and Bylaws, Art. X.

23.     Similarly, the LC Articles and Bylaws also provide that:

> The Corporation may hold title to real property in its own name as long as its Articles of Incorporation expressly provide for the conveyance of such property or the net proceeds from the sale thereof to the Boy Scouts of America in the event of the dissolution of the Corporation or the revocation or termination of its charter.

LC Articles and Bylaws, Art. X., Sec. 2, Clause 4.

24.     The LC Articles and Bylaws acknowledge that BSA may terminate or revoke the Middle Tennessee Council's charter and require it to dissolve when and if that occurs. LC Articles and Bylaws, Art. II, at 1. In addition to the foregoing powers, the standard application form (the "*Local Council Charter Application Form*") to apply for a charter

includes a specific reference to BSA's revocation power. A true and correct copy of a Local Council Charter Application Form is annexed hereto as **Exhibit F**.

25.     Each Local Council has acknowledged BSA's reversionary interest in its own organizational documents.  Specifically, both the 1976 and 2016 versions of the form Articles of Incorporation and Bylaws for local councils establish that all property acquired by a Local Council "shall be deemed to be received or acquired for the benefit of Scouting . . . in accordance with the Rules and Regulations and procedures from time to time adopted by the Boy Scouts of America."  Further, both versions require that in the event of the revocation or lapse of its charter, Local Council property and cash will be turned over to BSA after satisfaction of claims against such Local Council.

### D.     The Middle Tennessee Council is Subject to Many Sexual Abuse Claims

26.     As of the date of this Motion, the Tort Claimants' Committee is aware that the Middle Tennessee Council is subject to no fewer than 35 sexual abuse claims that have been or will be filed against BSA that implicate the Middle Tennessee Council.  Because the Bar Date for filing sexual abuse claims extends to November 16, 2020, the Tort Claimants' Committee expects more claims to be asserted against the Middle Tennessee Council.  As noted above, the existence of claims against Middle Tennessee Council is irrelevant to the stay violation but it is relevant it shows what motivated the council to irrevocably transfer the Assets for no consideration.

### E.     Tort Claimants' Committee's Cease and Desist Letter

27.     On July 10, 2020, the Tort Claimants' Committee sent a cease and desist letter to the Middle Tennessee Council regarding the Assets (the "*July 10 TCC Letter*").  A true and correct copy of the July 10 TCC Letter is annexed here to as **Exhibit G**. To date, the Middle

Tennessee Council has not responded. Separately, and apparently on behalf of the Middle Tennessee Council, the BSA sent the Tort Claimants' Committee's counsel a letter in which the BSA admits that it has a contingent interest in the Assets.  Nevertheless, the BSA has refused to take any action against the Middle Tennessee Council to protect and preserve property of the estate even after acknowledging its interest in the Assets [3]

## VI.

## ARGUMENT

### A.    THE COMMITTEE HAS STANDING TO BRING THIS MOTION

28.    The party invoking federal jurisdiction bears the burden of establishing its standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. Standing involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Constitutional, or Article III, standing, "imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III." *Id.* To qualify for standing under Article III, "a claimant must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008).

29.    In addition, a movant must demonstrate prudential standing. "[P]rudential standing encompasses 'the general prohibition on a litigant's raising another person's legal rights,

---

[3] BSA contends that the transfer into an asset protection trust does not affect its reversionary interest but it does not explain the basis for its contention.

the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'" *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)); *accord Devlin v. Scardelletti*, 536 U.S. 1, 7 (2002).

30.    The Tort Claimants' Committee has Article III standing because "[a]ll they need show in order to demonstrate an Article III case or controversy is . . . some probability of a tangible benefit from winning the suit." *Tucker v. United States Dep't of Commerce*, 958 F.2d 1411, 1415 (7th Cir. 1992).  At this stage in the case, it is far from clear that the BSA will be able to reorganize.  If the BSA is unable to reorganize, and instead must liquidate, each Local Council charter will not be renewed, if not immediately revoked, thereby bringing the assets of all Local Councils, including those of the Middle Tennessee Council's, into BSA's bankruptcy estate by way of the corporate organizational documents cited above.  If the Middle Tennessee Council's assets were transferred outside the reach of the governing revisionary provisions then the constituency of abuse creditors represented by the Tort Claimants' Committee suffer actual injury. Accordingly, injury is directly traceable to Middle Tennessee Council's actions and the injury will be redressed by a favorable ruling if the Transfers violated the automatic stay.

31.    The Tort Claimants' Committee has standing to be heard to address this stay violation because it is a party in interest.  11 U.S.C. § 1109(b).  The automatic stay is plainly intended to protect the debtor and property of the estate, *see* H.R. Rep. No. 95-595, at 340 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6297, but it also protects creditors against the acts of a creditor who attempts to jump the line and seize property of the estate to satisfy its claim:

> The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain

> payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor's assets prevents that.

*Id.*; S. Rep. No. 95-989, at 49 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5835; *see Ostano Commerzanstalt v. Telewide Sys., Inc.*, 790 F.2d 206, 207 (2d Cir. 1986) ("Since the purpose of the stay is to protect creditors as well as the debtor, the debtor may not waive the automatic stay."). Thus, Middle Tennessee Council's actions impair sexual abuse creditors' distributions, which fall within the zone of interests protected by the automatic stay. The Tort Claimants' Committee was appointed to protect such interests and may enforce the automatic stay for that those very purposes.

## B.    BSA'S REVERSIONARY INTEREST IN THE ASSETS IS PROPERTY OF THE BANKRUPTCY ESTATE

32.    The Bankruptcy Code defines property interests broadly, encompassing "all legal or equitable interests of the debtor in property." 11 U.S.C. § 541(a)(1); *In re Triangle Laboratories, Inc.*, 663 F.2d 463, 466 n.4 (3d Cir. 1981). The "term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed." *Segal v. Rochelle*, 382 U.S. 375, 379 (1966).[4] Accordingly, property of the estate "includes all interests, such as . . . contingent interests and future interests, whether or not transferable by the debtor." *In re Prudential Lines, Inc.*, 928 F.2d 565, 572 (2d Cir. 1991) (quoting H.R. Rep. No. 95-595, 175-76 (1978)).

33.    The Third Circuit has held that a potential future recoupment of the surplus from a debtor's pension plan (*i.e.*, something that might or might not exist) is property of

---

[4] This case of one of many that inspired the drafting of the Bankruptcy Code and has been followed by many courts. *In re Neuton*, 922 F.2d 1379, 1382 (9th Cir. 1990).

the estate and its transfer subject to recovery. *Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp. Retirement Plan No. 003* (*In re Fruehauf Trailer Corp.*), 444 F.3d 203, 211 (3d Cir. 2006). It is also well established that "the mere opportunity to receive an economic benefit in the future" is property with value under the Bankruptcy Code. *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L.* (*In re R.M.L.*), 92 F.3d 139, 148 (3d Cir. 1996).

34.     Other courts have also found that section 541(a)'s definition of "property" is broad enough to encompass reversionary interests. *See e.g.*, *In re Wray*, 258 B.R. 777, 785 n.8 (Bankr. D. Idaho 2001) (finding reversionary interest in real estate property of bankruptcy estate); *In re Hernando Healthcare, Inc.*, 157 B.R. 701, 703-04 (Bankr. M.D. Fla. 1993) (finding reversionary interest in reserve fund to be part of bankruptcy estate). *See also*, *In re Labrum & Doak*, 227 B.R. 391, 405 (Bankr. E.D. Pa. 1998) ("Property of the estate includes all legal and equitable interests of the debtor in property . . . 'the term property has been construed most generously and an interest is not outside its reach because it is novel . . . in fact, every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541.'") (*quoting Carlson v. Brandt*, 1997 U.S. Dist. LEXIS 12821,*28 (N.D. Ill. Aug. 22, 1997)).

35.     Preservation and preventing premature disposition of property of the estate is essential in any bankruptcy case because such property forms the basis of a debtor's rehabilitation and reorganization. *United States v. Whiting Pools*, 462 U.S. 198 (1983) (holding that the "reorganization effort would have small chance of success, however, if property essential to running the business were excluded from the estate."). The Middle Tennessee Council's Assets are essential to running the scouting operation and that is why the BSA has a revisionary interest in these and all other Local Council property.

36.     In this case, BSA's reversionary interests the Middle Tennessee's Council's assets and the assets of all other Local Councils, is no different from the future and contingent interests described in the foregoing cases.  BSA's reversionary interests are established by the BSA Bylaws, the Rules and Regulations, and the LC Articles and Bylaws, and were acknowledged by the BSA in its response to the July 10 TCC Letter. As the United States Supreme Court held in *Whiting Pools*, the preservation of all BSA's assets, whether they are actual, contingent, or future interests, is of paramount importance.

37.     If the BSA cannot reorganize and converts its case to a chapter 7 case, a chapter 7 trustee would either revoke the Local Council charters or not renew them.  In either instance, BSA's current reversionary interest in the Middle Tennessee Council's Assets would vest into full ownership and the Assets would be available to pay the claims of childhood sexual abuse claimants as provided for in the organizational documents.  The Middle Tennessee Council's Transfer of the Assets into the Asset Protection Trust thus diminishes BSA's bankruptcy estate at the expense of creditors.

38.     To the extent Local Councils will seek releases from liability for sexual abuse claims, the Local Councils' assets, including those of the Middle Tennessee Council, are relevant to the BSA's ability to confirm a chapter 11 plan.  A number of courts have held that when a plan proposes the release of non-debtor third parties, the "Best Interests of Creditors Test" requires the inclusion of asset values of such non-debtor third parties in the hypothetical, alternative liquidation recovery comparison: "[T]he best interests equation also properly mandates consideration of creditors' comparative recoveries on non-debtor claims, to the extent the plan is treating those non-debtor claims by release." *Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 9 (D.Conn.2006); *see also In re Ditech Holding Corp.*, 606 B.R. 544, 614 (Bankr. S.D.N.Y. 2019) (same); *In re Washington Mutual, Inc.*, 442 B.R. 314, 359-60

(Bankr. D. Del. 2011) ("in a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at lease as well under chapter 11 plan as they would in a chapter 7 liquidation"); *In re Quigley*, 437 B.R. 102, 145 (Bankr. S.D.N.Y. 2010) ("The confirmation of the Fourth Plan and discharge of Pfizer will affect the dissenting Non-Settling Claimants because they would "retain" their right to sue Pfizer if Quigley were liquidated under chapter 7. As the parties recognize, the critical question is whether I should consider the value of these derivative claims in deciding whether the Fourth Plan is in the "best interest" of the dissenting Non-Settling Claimants. I conclude that I must.").

39.    Thus, the BSA plan value distributed to any non-consenting creditor (*e.g.*, that votes to reject the plan) must exceed the aggregate of the hypothetical chapter 7 distribution to that creditor from the BSA estate <u>plus</u> the value of that creditor's claims against the Local Councils. Accordingly, the Assets are property of the bankruptcy estate entitled to the protection of the automatic stay in BSA's bankruptcy case.

## C.    ACTIONS AGAINST OR TRANSFERS OF A DEBTOR'S CONTINGENT OR REVERSIONARY PROPERTY INTERESTS VIOLATE THE AUTOMATIC STAY

40.    Section 362 of the Bankruptcy Code provides for an "automatic stay" such that the filing of a chapter 11 petition operates as a stay, applicable to "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3); *Majestic Star Casino, LLC v. Barden Dev., Inc.* (*In re Majestic Star Casino, LLC*), 716 F.3d 736, 750 (3d Cir. 2013).  A transfer that violates the automatic stay is generally considered to be void without any action on the part of the debtor.  *Id.* (citing *In re Myers*, 491 F.3d 120, 127 (3d Cir. 2007); *In re Siciliano*, 13 F.3d 748, 750 (3d Cir.

1994) ("[T]he general principle [is] that any creditor action taken in violation of an automatic stay is void ab initio.")).

41.     Actions against or transfers of a debtor's contingent interest in real property violate the automatic stay. *Pac. Western Bank v. Ehrenberg* (*In re Levine*), 583 B.R. 231, 236-37 (C.D. Cal. 2018). In *Levine*, a debtor and non-debtor litigated their respective ownership of real property that was later resolved by way of a settlement agreement.  *Id*. at 236. The settlement agreement granted the debtor a future interest upon the short sale of the real property. *Id*. At the time of the action, the settlement agreement had not yet taken effect because the real property had not been sold. *Id.* Nevertheless, the district court affirmed the bankruptcy court's holding that the debtor's contingent interest in the real property would vest upon a future act and fell within the protections of the automatic stay. *Id.*

42.     Similarly, contingent, unvested interests in a decedent's estate were deemed to be property of estate such that any disposition of those interests violated the automatic stay. *Meeks v. Nalley* (*In re Nalley*), 507 B.R. 411, 416-18 (Bankr. S.D. Ga. 2014). In *Nalley*, co-debtors agreed to divide their interest in a decedent's estate so that all of the property would be distributed to one debtor and not the other debtor who was subject to non-dischargeable claims. *Id*. at 417. At the time of the agreement, the co-debtors' chapter 7 trustee controlled the debtors' interest in the decedent's estate and the debtors' entitled to the contingent interest depended upon the trustee's retention or abandonment, which hadn't occurred at the time of the debtors' agreement. The bankruptcy court held that the debtors' agreement to divide the contingent interest was a stay violation because they both stood to receive a distribution if the trustee abandoned the interest, and such abandonment had not occurred at the time of the agreement. *Id*.

43.     These principals apply here.  The Middle Tennessee Council's creation of a self-described "Asset Protection Trust" by quitclaim deeds took millions of dollars of value

away from the purview of the BSA and, by extension, the BSA's creditors.  The transfer stripped

the Middle Tennessee Council of assets that could have reverted to the BSA, which has the full

authority to not renew or revoke the Middle Tennessee Council's charter and cause it assets to be

transferred to the Debtor's estate.

### D.      THE MIDDLE TENNESSEE COUNCIL'S TRANSFER IS VOID AB INITIO BECAUSE THE TRANSFER AFFECTED PROPERTY OF THE ESTATE

44.      Section 362 of the Bankruptcy Code provides

> Except as provided in subsection (b) of this section, a petition filed
> under section 301, 302, or 303 of this title, or an application filed
> under section 5(a)(3) of the Securities Investor Protection Act of
> 1970, operates as a stay, applicable to all entities, of— . . . (3) any
> act to obtain possession of property of the estate or of property
> from the estate or to exercise control over property of the estate;

U.S.C. § 362(a)(3); *see also, ACandS, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, (3d Cir.

2006) (holding that "[t]o avoid interfering with the broad purposes served by the automatic stay,

it was necessary for the arbitration proceeding to halt as soon as the scope of the parties'

submissions supported an award that could diminish ACandS's estate. By continuing beyond this

point, the proceeding violated § 362(a)(1), and the panel's deliberations and the resulting award

are therefore void.")

45.      As set forth above, the Middle Tennessee Council violated the stay when

it transferred the Assets to the Asset Protection Trust thereby insulating the Assets from its

creditors and destroying BSA's right to the reversion of the Assets. Like *Nalley*, the mere fact

that BSA currently may not intend to revoke the charter, let it lapse, or refuse to renew, or that

the BSA might be unable to formulate a confirmable plan, is irrelevant.

46.      The Third Circuit recently summarized the standard for the concept of a

"willful" violation of the automatic stay:

> It is a willful violation of the automatic stay when a creditor violates the stay with the knowledge that the bankruptcy petition has been filed.  Willfulness does not require that the creditor intend to violate the automatic stay provision, rather it requires that the acts which violate the stay be intentional . . . . [A] creditor's 'good faith' belief that he is not violating the automatic stay provision is not determinative of willfulness. . . .

*In re Lansaw*, 853 F.3d 657, 664 n.4 (3d Cir. 2017) (emphasis added) (quoting *In re Landsdale Family Rests., Inc*, 977 F.2d 826, 829 (3d Cir. 1992)); see also *In re Atlantic Business & Community Corp.*, 901 F.2d 325, 329 (3d Cir. 1990) ("the statute provides for damages upon a finding that the defendant knew of the automatic stay and that the defendant's actions which violated the stay were intentional") (citations omitted).

47.    There can be no dispute that the Middle Tennessee Council knew of the BSA's bankruptcy case; indeed, it accepted the protection of this Court prior to effectuating the Transfer.  The Middle Tennessee Council's internal communications expressly state that the Transfer was planned in anticipation of BSA's bankruptcy case.  Moreover, the Middle Tennessee Council was one among hundreds of other Local Councils that enjoyed the benefits of the Preliminary Injunction in BSA's bankruptcy case. Finally, and as noted above, a member of the Middle Tennessee Council's executive board published an opinion in a local newspaper on March 3, 2020, concerning the effects of BSA's chapter 11 case on the Middle Tennessee Council.

48.    The Court should void the Transfer of the Assets as a violation of the automatic stay.  The BSA is in a precarious position with respect to its ability to successful reorganize. Without access to the Middle Tennessee Council's assets, which are property of BSA's bankruptcy estate, it will only make it more difficult for BSA to propose a plan that fairly compensates the victims of childhood sexual abuse claims.

## VII.

## <u>CONCLUSION</u>

49.    For the reasons set forth above, the Tort Claimants' Committee respectfully requests that the Court grant the Motion and such other and further relief as may be just, equitable and proper.

Dated:  August 7, 2020          PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
James I. Stang (CA Bar No. 94435) (admitted *pro hac vice*)
Robert B. Orgel (CA Bar No. 10187) (admitted *pro hac vice*)
John A. Morris (NY Bar No. 2405397) (admitted *pro hac vice*)
James E. O'Neill (DE Bar No. 4042)
John W. Lucas (CA Bar No.271038) (admitted *pro hac vice*)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
Email:  jstang@pszjlaw.com
             rorgel@pszjlaw.com
             jmorris@pszjlaw.com
             joneill@pszjlaw.com
             jlucas@pszjlaw.com

*Counsel for the Tort Claimants' Committee*