# EXHIBIT A

# BURNSVILLE CROSSINGS

# SHOPPING CENTER LEASE

THIS LEASE, Made this *25* day of *January* 1999 by and between **Ryan/Flying Cloud Associates Limited Partnership**, a Minnesota limited partnership (the "Landlord"), and **Boy Scouts of America** (the "Tenant"). Tenant's address is: Boy Scouts of America, c/o Larry Knapp, 1325 West Walnut Hill Lane, P. O. Box 152079, Irving, Texas 75015-2079.

WITNESSETH:

Landlord hereby leases to Tenant, and Tenant leases from Landlord, the store unit hereinafter identified, located in the Burnsville Crossings Shopping Center, Burnsville, Dakota County, Minnesota, legally described in Exhibit A attached hereto and made a part hereof (the "Shopping Center"). The store unit leased to Tenant, which contains approximately 1,800 square feet of space, is crosshatched on Exhibit B, which is by reference made a part hereof (the "Leased Premises"). The address of the Leased Premises is 14250 Plymouth Avenue South, Burnsville, Minnesota 55337. The Shopping Center name is subject to change by Landlord.

## ARTICLE 1: TERM

Section 1: TO HAVE AND TO HOLD the Leased Premises unto Tenant for a term of ten (10) years and zero (0) months commencing on the _____ day of _____, 19___, and ending on the _____ day of _____, (the "Term") unless sooner terminated as hereinafter provided, on the following terms and conditions:

Section 2: The blank with respect to the commencement date of this Lease has been left blank.

The blank with respect to the commencement date of the Term shall be completed as follows: A date thirty (30) days after Landlord or Landlord's architect issues a Certificate of Substantial Completion of Landlord's Work in the Leased Premises or the date on which Tenant actually opens for business, whichever is earlier. Landlord shall have the right to insert the commencement date as so determined or the said date may be set by amendment hereto if requested by either party. In the event a dispute occurs as to whether or not the Landlord's Work in the Leased Premises is substantially completed, the certificate of Landlord's architect that the Leased Premises is so

completed shall be conclusive and binding upon the parties hereto.  The term "Lease Year" is defined in Article 3, Section 1 hereof.

## ARTICLE 2:  MINIMUM RENT

Section 1:  The fixed annual minimum rent shall be payable by Tenant in equal monthly installments, on or before the first day of each month in advance, to Landlord and delivered to Landlord's managing agent, Ryan Properties, Inc., 700 International Centre, 900 Second Avenue South, Minneapolis, Minnesota 55402, or at such other place as may from time to time be designated by Landlord.  Said fixed annual minimum rent shall be:

| YEARS | PSF | ANNUALLY | MONTHLY |
|-------|-----|----------|---------|
| 1-5 | $10.75 | $19,350.00 | $1,612.50 |
| 6-7 | $12.75 | $22,950.00 | $1,912.50 |
| 8-10 | $13.75 | $24,750.00 | $2,062.50 |

The first month's fixed annual minimum rent shall be paid at the time of execution of this Lease.  Equitably prorated minimum rental for any partial month at the beginning of the Lease Term shall be payable on the commencement date of the Lease Term.

Section 2: Tenant waives and disclaims any present or future right to apply any payment or part payment of rent, or to set off in any action for rent.

Section 3:  All rental and other sums payable hereunder by Tenant which are not paid on or before the due date shall bear interest from the date due to the date paid at the rate of 18% per annum or the highest rate permitted by law, whichever is less.  In addition to the above, Tenant shall pay Landlord a $50.00 service charge for all monthly minimum rent payments not paid by the 5th day of the month for which they are payable.  Said $50.00 charge is a service charge to partially cover extra expense involved in handling delinquent payments.

## ARTICLE 3:  GROSS SALES DEFINITION

Section 1:  The term "Gross Sales" is hereby defined to mean sales of Tenant and of all licensees, concessionaires and tenants of Tenant, from all business conducted upon or from the Leased Premises and whether such sales be evidenced by check, credit, charge account, exchange or otherwise, and shall include, but not be limited to, the amounts received from the sale of goods, wares and merchandise and for services performed on or at the Leased Premises, together with the amount of all orders taken or received at the Leased Premises, whether such orders be filled from the Leased

Premises or elsewhere, and whether such sales be made by means of merchandise or other vending devised in the Leased Premises, and shall include all deposits not refunded to purchasers.  Gross Sales shall not include sales of merchandise for which cash has been refunded, or allowances made on merchandise claimed to be defective or unsatisfactory, provided that the sales price thereof shall have been included in Gross Sales; and there shall be deducted from Gross Sales the sales price of merchandise returned by customers for exchange, provided that the sale price thereof shall be included in Gross Sales.  Gross Sales shall not include the amount of any sales, use or gross receipt tax imposed by any governmental authority directly on sales and collected from customers separately.  Gross Sales shall not include merchandise transferred out of the Leased Premises and transported to another store of Tenant or an affiliate of Tenant where such exchange of merchandise is made solely for the convenient operation of the business of Tenant and not for the purpose of consummating a sale which has theretofore been made at, in or from the Leased Premises nor the amount of returns to shippers or manufacturers.

Section 2:  Tenant shall keep at a location, notice of which shall have been furnished to Landlord, a permanent accurate set of books and records of all sales of merchandise and all revenue derived from business conducted in the Leased Premises kept according to sound accounting principles, including excise tax reports and state sales tax, business and occupation tax and gross income tax reports; and such pertinent records will be kept, retained and preserved for at least four (4) years after the expiration of each Lease Year.  All records shall be open to inspection of Landlord at all reasonable times during ordinary business hours.

## ARTICLE 4:  COMMON AREAS

Section 1: The term "Common Areas" shall be defined as that portion of Shopping Center improvements excepting that area which is presently or hereinafter available for lease to tenants.  Landlord has made no representation as to identity, type, size or number of other stores or tenancies in the Shopping Center, and Landlord reserves the unrestricted right to change the building perimeters, driveways, parking areas, store sizes and identity and type of other stores or tenancies and add buildings and other structures provided only that the size of the Leased Premises, reasonable access to the Leased Premises, and minimum parking facilities as required by governmental authorities having jurisdiction shall not be substantially or materially impaired, subject to the provisions of Article 8 hereof.

Section 2: Landlord hereby grants to Tenant, its employees, agents, customers and invitees, the nonexclusive right for and during the Term of this Lease and any renewal thereof to use the Common Areas from time to time constituted.  Such use is to be in common with Landlord and all tenants of Landlord, its and their employees, agents, customers, invitees and others to whom Landlord has or may hereafter grant rights, except when the same are being repaired.

Section 3: Landlord agrees to manage, operate and maintain during the Term of this Lease all common facilities within the Shopping Center. The manner in which such facilities shall be maintained shall be at the discretion of Landlord, who shall have the right to adopt and promulgate reasonable nondiscriminatory rules and regulations, from time to time, including the right to designate parking areas for the use of employees of tenants of the Shopping Center and to restrict such employees from parking areas designated exclusively for customers. Tenant agrees to cooperate with Landlord by requiring its employees to park in designated areas. Landlord shall have the right to use portions of the Common Areas for the purpose of displays, promotions, programs, games, or other uses which may be of interest to all or part of the general public. Landlord shall have the right to close portions of the Common Areas from time to time for repairs, to prevent accruing of public rights therein and for any other legitimate purpose.

## ARTICLE 5: OPERATING COSTS

Section 1: Tenant agrees to pay as additional rent Tenant's proportionate share of all Operating Costs expenditures incurred by Landlord including, but not limited to, the cost of maintaining security, repairing, lighting, cleaning, snow removal, roof repair, line painting, replacement and maintenance of the Shopping Center Common Areas in monthly payments with the monthly rent payments. Said expenditures shall include such management fees as may be paid to a third party or to the Landlord to supervise and administer the Shopping Center. Operating Costs shall also include the yearly amortization of capital costs, including financing costs and disposal costs incurred by the Landlord for replacements, improvements or structural repairs to the Shopping Center (including Shopping Center Systems) required to comply with any changes in the laws, rules or regulations of any governmental authority having jurisdiction, or for purposes of reducing Operating Costs, which costs shall be amortized over the useful life of such replacements, improvements or repairs, as reasonably estimated by the Landlord. Tenant's share of such costs shall be based on the proportion of the total square foot area in the Leased Premises bear to the total square foot rentable area in the Shopping Center. The monthly payments shall be based on Landlord's reasonable estimate of the costs subject hereto made at the beginning of each Calendar Year. At the end of each Calendar Year, Landlord shall furnish a statement of all costs subject hereto and Tenant's share thereof certified to by Landlord. If, at the end of any Calendar Year, the amount paid by Tenant is less than its share, the balance as shown on said statement shall be paid with the next monthly rent payment. If, at the end of any such Calendar Year, the amount paid by Tenant is greater than its share as shown on said statement, the excess shall be credited against the next rent payments due hereunder.

Section 2: Notwithstanding any other provision herein to the contrary, it is agreed that in the event that Shopping Center is not fully occupied at any time during the Term, an adjustment shall be made in computing the Operating Costs for such year so that the

Operating Costs shall be computed for such year as though the Shopping Center had been fully occupied during such year.

## ARTICLE 6:  SALES REPORTS

Section 1:  On or before thirty (30) days following the end of each Lease Year, Tenant shall deliver to Landlord a yearly statement of Gross Sales verified by Tenant.  Such statements shall be delivered whether or not percentage rent is payable.  If Tenant shall fail to deliver the foregoing to Landlord, Landlord shall have the right thereafter to employ an independent Certified Public Accountant to examine such books and records as may be necessary to certify to the amount of Tenant's Gross Sales for such Lease Year or month and Tenant shall promptly pay to Landlord the cost thereof.

## ARTICLE 7:  USE

Section 1:  The Leased Premises may be used and occupied only for the sale at retail of Boy Scouts of America authorized merchandise and other items reasonably related thereto and for no other purpose without the written consent of the Landlord or in conflict with any of the Prohibited Uses outlined in Exhibit D.  Tenant agrees to occupy the Leased Premises upon the commencement date of the Term hereof and to operate the entire Leased Premises, fully stocked and adequately staffed during the Term of the Lease, unless prevented from doing so by causes beyond Tenant's control, and to conduct its business at all times in good faith, in a high grade and reputable manner. Tenant shall promptly comply with all laws, ordinances and regulations affecting the Leased Premises and promulgated by any duly constituted governmental authority and including insurance company requirements affecting the cleanliness, safety, use and occupancy of the Leased Premises.  Tenant shall warehouse, store and/or stock in the Leased Premises only such goods, wares and merchandise as Tenant intends to offer for sale at retail at, in or from the Leased Premises.  Without limiting the general prohibition against other uses, it is expressly agreed that Tenant in no event will use the Leased Premises for the uses set forth in Exhibit D.

Section 2:  Tenant shall not conduct any auction, fire, closing-out or bankruptcy sales in the Leased Premises nor use the Common Areas for business or display purposes; nor abuse walls, ceilings, partitions, floors, wood, stone, iron work; nor use plumbing for any purpose other than that for which constructed; nor make or permit any noise or odor objectionable to the public, to other occupants of the Shopping Center or the Landlord to emit from the Leased Premises; nor create, maintain or permit a nuisance thereon; nor do any act tending to injure the reputation of the Shopping Center; nor place or permit any radio or television antenna, loud speaker or sound amplifier, or any phonograph or other devices similar to any of the foregoing on the roof or outside of the Shopping Center or at any place where the same may be seen or heard outside of the Shopping Center; nor where loading or delivery areas are provided, use or permit to be

used other areas for delivery or pick-up of merchandise or supplies to or from the Leased Premises. Tenant shall not permit any blinking or flashing light to emit from the Leased Premises. Tenant shall keep the Leased Premises and loading platform areas allowed for the use of Tenant, clean and free from rubbish and dirt at all times. Tenant shall dispose of trash in the manner prescribed from time to time by Landlord.

Section 3: Tenant shall conduct its business in the Leased Premises during the regular customary days and hours for such type of business in the trade area in which the Shopping Center is located; notwithstanding, Tenant shall not be required to be open on Sundays or holidays.

Section 4: In the event the Tenant should at any time vacate or abandon the Leased Premises for a period of more than sixty (60) days (except for closing of the Leased Premises due to strikes or damage or destruction by fire or other cause covered by all risk insurance coverage), the Landlord shall have the continuing option of terminating this Lease provided that the Tenant has not reopened the store on the Leased Premises or given written notice of its intention to reopen within thirty (30) days and actually has reopened within said thirty (30) day period, irrespective of whether the Tenant may not otherwise be in default of the terms and provisions of this Lease. The Landlord may exercise such option to terminate this Lease by sending written notice to the Tenant of its intention, whereupon the Tenant will be permitted thirty (30) days from the date of such notice to remove its personal property, fixtures, and equipment from the Leased Premises in the manner heretofore provided. At the expiration of said thirty (30) day period, this Lease shall be deemed to have terminated and the Tenant shall surrender possession of the Leased Premises to the Landlord in the condition and in the manner hereinafter provided. All rentals payable by the Tenant and all other obligations of the Tenant hereunder shall be adjusted as of said termination date.

Section 5: Tenant agrees not to open or operate any other retail store directly or indirectly whether itself, through an affiliate or otherwise, within a radius of three (3) miles of the Leased Premises.

## ARTICLE 8:  UTILITIES

Section 1: The Leased Premises are constructed to utilize individual heating and air conditioning systems. Tenant agrees to keep the air conditioning and heating systems operating at levels sufficient to satisfy the requirements of the Leased Premises. Tenant shall pay for all heating, air conditioning, electricity, gas, water (including any Water Service Availability Charge), sewer service (including any Sewer Service Availability Charge) and other utilities used in the Leased Premises, commencing upon the date Landlord's Work in the Leased Premises is complete. If Landlord elects to supply electricity to the Leased Premises, Tenant shall use only electricity supplied by Landlord in the Leased Premises. Tenant shall pay for all electricity so supplied by

Landlord to the Leased Premises at rates not greater than if supplied by the public utility which would otherwise service the Leased Premises.

Section 2: Landlord shall not be liable if the furnishing by Landlord or by any other supplier to the Leased Premises shall be interrupted or impaired by causes beyond Landlord's control.

## ARTICLE 9: REPAIRS

Section 1: Landlord shall keep the foundations, exterior walls (except plate glass or glass or other breakable materials used in structural portions) and roof in good repair, and if necessary or required by proper governmental authority, make modifications or replacements thereof. The cost of such repairs, modification or replacement, shall be initially paid by Landlord, subject to reimbursement by Tenant as Operating Costs. Landlord shall not be required to make any such repairs, modifications or replacements which become necessary or desirable by reason of the negligence of Tenant, its agents, servants or employees, or by reason of anyone illegally entering in or upon the Leased Premises.

Section 2: Except as provided in Section 1 of this Article, the Landlord shall not be obliged to make repairs, replacements or improvements of any kind upon the Leased Premises, or any equipment, facilities or fixtures therein contained, including any equipment serving the Leased Premises solely even if located outside the Leased Premises, which shall at all times be kept in good order, condition and repair by Tenant, and in a clean, sanitary and safe condition.

Section 3: Tenant shall forthwith at its own cost and expense replace with glass of the same quality any cracked or broken glass, including plate glass or glass or other breakable materials used in structural portions, and any interior and exterior windows and doors in the Leased Premises. Tenant shall maintain during the term of the Lease a policy, or policies, in acceptable Bureau companies insuring Landlord and Tenant, as their interest may appear, against breakage of all such glass in the Leased Premises and shall deposit such policy or policies, or certificates evidencing their existence, together with evidence of the payment of the premiums thereon, with Landlord at the commencement of the term and at least thirty (30) days prior to the expiration of each such policy.

## ARTICLE 10: INSTALLATIONS, ALTERATIONS AND SIGNS

Section 1: As soon as reasonably possible, Tenant shall have the privilege, rent free but in all other respects subject to the terms of this Lease Agreement, of entering the Leased Premises for the purpose of making leasehold improvements, setting Tenant's fixtures and storing Tenant's merchandise, all to be done without interference with the work of Landlord. Tenant shall, as soon as possible, proceed to get the Leased

Premises ready for occupancy so that the Leased Premises are ready to open for business as soon as possible thereafter.

Section 2:  Tenant, at its own expense, shall maintain necessary store fixtures and floor covering required by it and all interior painting and decorating.

Section 3:  Tenant shall not erect or install any advertising media or window or door lettering or placards or other signs without Landlord's prior written consent.  Use of roof is reserved to Landlord.

Section 4:  Tenant shall not make any repairs, alterations or additions to the Leased Premises without first procuring Landlord's written consent and delivering to Landlord the plans and specifications and copies of the proposed contracts and necessary permits, and shall furnish indemnification against liens, as may be required by Landlord. All alterations, additions, improvements and fixtures, other than trade fixtures, which may be made or installed by either of the parties hereto upon the Leased Premises and which in any manner are attached to the floors, walls or ceilings, at the termination of this Lease, shall become the property of the Landlord, and shall remain upon and be surrendered with the Leased Premises as a part thereof, without damage or injury; any floor covering affixed to the floor shall likewise become the property of Landlord, all without compensation or credit to Tenant.

Section 5: Tenant shall promptly pay all contractors and material suppliers, so as to minimize the possibility of a lien attaching to the Leased Premises, and should any lien be made or filed, Tenant shall bond against or discharge the same within ten (10) days after written request by Landlord.  Nothing contained in this Lease shall be construed as a consent on the part of the Landlord to subject the Landlord's estate in the Leased Premises to any lien or liability under the Lien Laws of the State in which the Leased Premises are located.

## ARTICLE 11:  INDEMNITY

Section 1:  Tenant agrees to indemnify Landlord against any and all claims, demands, damages, costs and expenses, including reasonable attorney's fees arising from the business conducted by Tenant in the Leased Premises or from any breach or default on the part of Tenant in the performance of any covenant or agreement on the part of Tenant to be performed pursuant to the terms of this Lease, or from any act or negligence of Tenant, its agents, contractors, servants, employees, sublessees, concessionaires or licensees.  In case of any action or proceeding brought against Landlord by reason of any such claim, upon notice from Landlord, Tenant covenants to defend such action or proceeding by counsel reasonably satisfactory to Landlord. Landlord shall not be liable and Tenant waives all claims for damage to person or property sustained by Tenant or Tenant's employees, agents, servants, invitees and customers resulting from the Shopping Center in which the Leased Premises are located or by reason of the Leased Premises or any equipment or appurtenances

thereunto appertaining becoming out of repair, or resulting from any accident in or about the Leased Premises, or resulting from any act or neglect of any other tenant in said Shopping Center. The preceding shall apply especially, but not exclusively, to the flooding of the Leased Premises and to damage caused by refrigerators, sprinkling devices, air conditioning apparatus, water, snow, frost, steam, excessive heat or cold, falling plaster, broken glass, sewage, gas, odors or noise, or the bursting or leaking of pipes or plumbing fixtures. All property belonging to Tenant or any occupant of the Leased Premises shall be there at the risk of Tenant or such other person only, and Landlord shall not be liable for damage thereto or theft or misappropriation thereof.

Section 2: Landlord hereby waives and releases all claims, liabilities and causes of action against Tenant and its agents, servants, and employees for loss or damage to, or destruction of, the buildings and other improvements situated on the Shopping Center resulting from fire, explosion or other perils included in standard all risk insurance, whether caused by the negligence of any of said persons or otherwise. This waiver shall remain in force so long as Landlord's insurer shall consent thereto without additional premium, and if additional premium is charged, Tenant shall be required to pay the same to keep this waiver in force. Landlord shall give Tenant written notice if Landlord's insurer shall refuse to consent to this waiver. Likewise, Tenant hereby waives and releases all claims, liabilities and causes of action against Landlord and its agents, servants and employees for loss or damage to, or destruction of, any of the improvements, fixtures, equipment, supplies, merchandise and other property, whether that of Tenant or of others in, upon or about the Leased Premises or the buildings or improvements of which the Leased Premises are a part resulting from fire, explosion or other perils included in standard all risk insurance, whether caused by the negligence of any of said persons or otherwise. This waiver shall remain in force as long as Tenant's insurer shall consent thereto without additional premium, and if additional premium is charged, Landlord shall be required to pay the same to keep this waiver in force. Tenant shall give Landlord written notice if Tenant's insurer shall refuse to consent to this waiver. The foregoing mutual waivers are given in consideration of each other, and the termination or suspension of one shall with like effect terminate or suspend the other.

## ARTICLE 12: HAZARDOUS MATERIALS

Section 1: Tenant shall not (either with or without negligence) cause or permit the escape, disposal or release of any biologically or chemically active or other hazardous substances or materials. Tenant shall not allow the storage or use of such substances or materials in any manner not sanctioned by law or by the highest standards prevailing in the industry for the storage and use of such substances or materials, nor allow to be brought into the Shopping Center any such materials or substances except to use in the ordinary course of Tenant's business, and then only after written notice is given to Landlord of the identity of such substances or materials. Without limitation, hazardous substances and materials shall include those described in the Comprehensive

Environmental Response Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601 et. seq., any applicable state or local laws and the regulations adopted under these acts. If any lender or governmental agency shall ever require testing to ascertain whether or not there has been any release of hazardous materials, then the reasonable costs thereof shall be reimbursed by Tenant to Landlord upon demand as additional charges if such requirement applies to the Leased Premises. In addition, Tenant shall execute affidavits, representations and the like from time to time at Landlord's request concerning Tenant's best knowledge and belief regarding the presence of hazardous substances or materials on the Leased Premises. In all events, Tenant shall indemnify Landlord in the manner elsewhere provided in this Lease from any release of hazardous materials on the Leased Premises occurring while Tenant is in possession, or elsewhere if caused by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of the Lease Term.

## ARTICLE 13:  INSURANCE

Section 1: Tenant shall not carry any stock of goods or do anything in or about said Leased Premises which will increase insurance rates on said Leased Premises or the Shopping Center in which the same are located. If Landlord shall consent to such use, Tenant agrees to pay as additional rental any increase in premiums for insurance against loss by risks resulting from the business carried on in the Leased Premises by Tenant. Tenant shall, at its own expense, comply with the requirements of insurance underwriters and insurance rating bureaus and governmental authorities having jurisdiction.

Section 2: Tenant agrees to maintain a policy or policies of insurance, at its own cost and expense, insuring Landlord and Tenant from all claims, demands or actions for injury or death of any person in an amount of not less than $1,000,000 and for injury to or death of more than one person in any one accident in an amount of not less than $5,000,000 and for damage to property in an amount of not less than $100,000, made by or on behalf of any person or persons, firm or corporation arising from, related to, or connected with, the Leased Premises. Tenant shall carry like coverage against loss or damage by boiler or internal explosion by boilers, if there is a boiler in the Leased Premises. Said insurance shall not be subject to cancellation except after at least twenty (20) days prior written notice to Landlord, and the policy or policies, or duly executed certificates for the same, together with satisfactory evidence of the payment of premium thereon, shall be deposited with Landlord at the commencement of the term and renewals thereof not less than thirty (30) days prior to the expiration of the term of such coverage.

Section 3: Landlord shall procure, at its initial expense, all risk coverage (including coverage for rental loss in connection with damage and destruction covered by said all risk coverage insurance) public liability and other reasonably necessary insurance on

the Shopping Center. Tenant shall, in the manner specified in Article 5, reimburse Landlord for its share of the actual net cost and expense to Landlord of such insurance.

## ARTICLE 14: DAMAGE BY FIRE OR OTHER CASUALTY

Section 1: In case the Shopping Center of which the Leased Premises are a part of shall be partially or totally destroyed by fire or other casualty insurable under standard all risk coverage insurance so as to become partially or totally untenantable, the same shall be repaired as speedily as possible at the expense of Landlord unless Landlord shall elect not to rebuild, as hereinafter provided, and a just and proportionate part of the rent shall be abated until so repaired based upon the time and to the extent the Leased Premises are untenantable.

Section 2: In case the Shopping Center buildings shall be destroyed or so damaged by fire or other casualty as to render more than fifty percent (50%) thereof untenantable or in case of any material destruction not covered by Landlord's insurance, then Landlord may, if it so elects, rebuild or restore said buildings within a reasonable time as provided for in Section 1 above, or may, at its election, by notice in writing within sixty (60) days after such destruction or damage terminate this Lease.

Section 3: In no event, in the case of any such destruction, shall Landlord be required to repair or replace Tenant's stock in trade, leasehold improvements (whether initially provided by Landlord or Tenant), fixtures, furniture, furnishings or floor coverings and equipment. Tenant covenants to make such repairs and replacements and to furnish Landlord, on demand, evidence of insurance assuring its ability to do so.

## ARTICLE 15: EMINENT DOMAIN

Section 1: If the whole of the Leased Premises shall be taken under the power of eminent domain (which shall include the exercise of any similar governmental power or any purchase of or other acquisition in lieu thereof), then the term of this Lease shall cease as of the day possession shall be taken by the condemning authority, and the rent shall be paid up to that date.

Section 2: In the event more than ten percent (10%) in area of land in the Shopping Center be so taken, the Landlord shall have the right to terminate this Lease at the time and with the rent adjustment as in Section 1 provided, by giving Tenant written notice of termination within thirty (30) days after the taking of possession by the condemning authority.

Section 3: If ten percent (10%) or more of the Leased Premises or forty percent (40%) or more of the parking area in the Shopping Center shall be so taken, then Tenant shall have the right either to terminate this Lease or subject to Landlord's right of termination as set forth in Section 2 of this Article, to continue in possession of the remainder of the

Leased Premises upon notice in writing to Landlord of Tenant's intention within ten (10) days after such taking of possession.  In the event Tenant elects to remain in possession, and Landlord does not so terminate, all of the terms herein provided shall continue in effect except that the rent shall be proportionately and equitably abated if the taking was of any part of the Leased Premises, and Landlord shall make all necessary repairs or alterations to improvements of the Leased Premises originally constructed by it.

Section 4: All damages awarded for any such taking under the power of eminent domain shall be the property of Landlord, whether such damages shall be awarded as compensation for diminution in value of the leasehold or to the fee of the Leased Premises; provided, however, that Landlord shall not be entitled to any separate award made to Tenant for the value and cost of removal of its personal property and fixtures or any relocation payment or allowance made to Tenant.

## ARTICLE 16:  ASSIGNMENT AND SUBLETTING

Section 1:  Tenant shall not assign or in any manner transfer this Lease or any interest therein, nor sublet said Leased Premises or any part thereof, nor permit occupancy by anyone with, through or under it, without the previous written consent of Landlord. Consent by Landlord to one or more assignments or to one or more sublettings shall not operate as a waiver of Landlord's rights as to any subsequent assignment or subletting.  No assignment shall release Tenant of any of its obligations under this Lease or be construed or taken as a waiver of any of Landlord's rights or remedies hereunder.  For the purpose hereof, if Tenant is a corporation or other entity, any change in the control of Tenant shall be deemed to be an assignment which shall require Landlord's consent.

Section 2: Tenant shall notify Landlord of the advertised name of the business operated in the Leased Premises.

Section 3:  Neither this Lease nor any interest therein, nor any estate thereby created, shall pass to any trustees or receiver in bankruptcy, or any assignee for the benefit of creditors, or by operation of law.

## ARTICLE 17:  ACCESS TO PREMISES

Section 1:  Landlord shall have the right to enter the Leased Premises at all reasonable hours for the purpose of inspecting the same or of making repairs, additions, alterations thereto or to the Shopping Center in which the same are located, or for the purpose of exhibiting the same to prospective tenants, purchasers or others.  Landlord shall not be liable to Tenant in any manner for any expense, loss or damage by reason thereof, nor shall the exercise of such right be deemed an eviction or disturbance of Tenant's use or possession.

## ARTICLE 18:  DEFAULT AND REMEDIES

Section 1: Landlord may terminate this Lease and the term demised upon the happening of any one or more of the following events, and the same are not remedied within thirty (30) days (within five (5) days in regard to the payment of rent) after written notice to Tenant:  (a) the making by Tenant of an assignment for the benefit of its creditors; (b) the levying of a writ of execution or attachment on or against this Lease; (c) in the event proceedings are instituted in a court of competent jurisdiction for the reorganization, liquidation or involuntary dissolution of Tenant, or for its adjudication as a bankrupt or insolvent, or for the appointment of a receiver of the property of Tenant, and said proceedings are not dismissed, and any receiver, trustee or liquidator appointed therein discharged, within sixty (60) days after the institution of said proceedings; (d) the failure of Tenant to pay an installment of rent when due or to perform any other of its covenants under this Lease.

Section 2:  Upon the termination of the estate pursuant to Section 1 hereof, Landlord may re-enter the Leased Premises with or without process of law using such force as may be necessary and Landlord shall not be liable for damages or otherwise by reason of such re-entry.   Notwithstanding such termination, the liability of Tenant for performance of the terms hereof shall not be extinguished for the balance of the term remaining after said termination.

Section 3:  In the event of any breach hereunder by Tenant, Landlord may immediately or at any time thereafter, without notice, cure such breach for the account and at the expense of Tenant.  If Landlord at any time by reason of such breach, is compelled to pay, or elects to pay, any sum of money to do any act which will require the payment of any sum of money, or is compelled to incur any expense, including reasonable attorneys' fees, the sum or sums so paid by Landlord, with interest thereon at the rate of eighteen percent (18%) per annum or the highest rate permitted by law, whichever is less, from the date of payment thereof, shall be deemed to be due from Tenant to Landlord on the first day of the month following payment of such respective sums or expenses.

Section 4:  Landlord is hereby given a first lien upon all property of Tenant which shall come in or be placed upon the Leased Premises and whether acquired by Tenant before or after the date hereof to secure the payment of rent and the performance of each and every covenant herein contained to be performed by Tenant.  Upon any default hereunder and failure to cure as herein provided, Landlord, without notice or demand, may take possession of and sell such property without legal process of any kind, at public or private sale after one publication of a notice thereof in a daily newspaper published in the county where the Leased Premises are situated, not less than ten (10) days before such sale or by giving minimum notices required by law.  The proceeds of such sale shall be applied first to the payment of expenses hereof, second to the discharge of the rent or other liability hereunder unpaid, and the balance, if any, to be held for the account of the Tenant.  Tenant agrees to execute and record any

financing statements and other documents necessary to perfect or record the lien herein granted.

Section 5:  Should Landlord be in default under the terms of this Lease, Landlord shall have reasonable and adequate time in which to cure the same after written notice to Landlord by Tenant.

## ARTICLE 19:  SURRENDER OF POSSESSION

Section 1:  At the expiration of the tenancy created hereunder, whether by lapse of time or otherwise, Tenant shall surrender the Leased Premises in good condition and repair, reasonable wear and tear and loss by fire or unavoidable casualty excepted.  If the Leased Premises be not surrendered at the end of the term or the sooner termination thereof, Tenant shall indemnify Landlord against loss or liability resulting from delay by Tenant in so surrendering the Leased Premises, including without limitation, claims made by any succeeding tenant founded on such delay.  Tenant shall promptly surrender all keys for the Leased Premises to Landlord.

Section 2:  In the event Tenant remains in possession of the Leased Premises after the expiration of the tenancy created hereunder, and without the execution of a new lease, it shall be deemed to be occupying the Leased Premises as a tenant from month to month, at twice the minimum rent, subject to all other conditions, provisions and obligations of this Lease insofar as the same are applicable to a month-to-month tenancy, provided said possession is with Landlord's consent.

Section 3:  Upon the expiration of the tenancy hereby created, if Landlord so requires in writing, Tenant shall promptly remove any additions, fixtures, and installations placed in the Leased Premises by Tenant and designated in said request, and repair any damage occasioned by such removals at Tenant's expense, and in default thereof, Landlord may effect such removals and repairs, and Tenant shall pay Landlord the cost thereof, with interest at the rate of eighteen percent (18%) per annum, or the highest rate permitted by law, whichever is less, from the date of payment by Landlord.

## ARTICLE 20:  SUBORDINATION

Section 1: Tenant agrees that this Lease shall be subordinate to any mortgages or trust deeds that may hereafter be placed upon the Leased Premises.  Tenant further agrees that upon notification by Landlord to Tenant, this Lease shall be or become subordinate to any mortgages or trust deeds that may heretofore or hereafter be placed on the said Leased Premises.  Tenant shall execute and deliver whatever instruments may be required for the above purposes, and failing to do so within ten (10) days after demand in writing, does hereby make, constitute and irrevocably appoint Landlord as its attorney-in-fact and in its name, place and stead to do so.

## ARTICLE 21:  NOTICES

Section 1:  Whenever this Lease provision is made for notice of any kind, such notice shall be in writing and shall be deemed sufficient notice and service thereof if such notice is to Tenant if actually delivered to Tenant or sent by registered or certified mail, return receipt requested, postage prepaid, to the last Post Office address of Tenant furnished to Landlord for such purpose, on page 1 of this Lease, and to Larry Knapp, Boy Scouts of America, 2109 Westinghouse Boulevard, P. O. Box 7143, Charlotte, North Carolina 28241-7143, or by nationally recognized overnight courier, or to the Leased Premises, and if to Landlord if actually delivered to Landlord or if sent by registered or certified mail, return receipt requested, postage prepaid, or by nationally recognized overnight courier, to the Landlord at the address furnished for such purpose, to the place then fixed for payment of rent.  If the holder of record of any mortgage or ground lessors interest covering the Leased Premises shall have given prior written notice to Tenant that it is the holder of said mortgage or lessors interest and such notice includes the address to which notices to such mortgagee or ground lessor are to be sent, then Tenant agrees to give to such party or parties notice simultaneously with any notice given to Landlord to correct any default of Landlord as hereinabove provided and agrees that such party or parties shall have the right, within thirty (30) days after receipt of said notice, to correct or remedy such default before Tenant may take any action under this Lease by reason of such default.

## ARTICLE 22:  CONSENTS

Section 1: The parties agree that whenever under this Lease provision is made for securing the written consent, permission or approval of either that such written consent, permission or approval shall not be unreasonably withheld or delayed.

## ARTICLE 23:  TAXES

Section 1: Landlord shall pay all real property taxes, installments of special assessments payable therewith and rental taxes on rentals payable during the term hereof on the Shopping Center.  Tenant shall, in the manner specified in Article 5, reimburse Landlord for Tenant's share of such payments of real property taxes and installments of special assessments.  Tenant shall also reimburse Landlord for rental taxes, if any, paid by Landlord on rentals from the Leased Premises.  Tenant shall pay all personal property and similar taxes on its property in the Leased Premises.

## ARTICLE 24:  MERCHANTS' ASSOCIATION

Section 1: If at the discretion of a simple majority of the tenants in the Shopping Center, on the basis of rentable square footage, a merchants' association is formed, Tenant agrees to pay any prorata based assessment.  Tenant further agrees to abide

by any reasonable and non-discriminatory rules that may be adopted by such merchants' association. Tenant agrees to maintain membership in the merchants' association and to pay the dues established by the merchants' association. Such sum shall be paid annually in advance. The payment shall be used only to establish a fund for the purpose of the general promotion of the Shopping Center as a whole, and for the general welfare of the Shopping Center as a whole.

Section 2: If formed, the merchants' association will be organized as a non-profit corporation, with voting membership limited to tenants in the Shopping Center. The merchants' association may also provide for non-voting members consisting of persons other than Shopping Center tenants. Tenant agrees that its rights in said association shall be subject to its Articles, By-Laws and all actions taken pursuant thereto to the extent consistent with the terms of this Lease.

## ARTICLE 25: GENERAL

Section 1: When, prior to the commencement of the term, Tenant shall be granted permission by Landlord to enter the Leased Premises for the performance of any work in order to suit the Leased Premises for Tenant's occupancy, then it is hereby agreed that any such entry shall be at Tenant's own risk. Without limiting the foregoing, Tenant hereby agrees that before entering upon the Leased Premises, Tenant will forthwith cause Landlord to be insured from the date provided in this Lease; and in addition will deliver to Landlord satisfactory proof that all workers of Tenant or any of Tenant's contractors or subcontractors are properly covered by worker's compensation insurance. All contractors and subcontractors performing work at the Leased Premises must be recognized and approved by the Building Trades Council having jurisdiction.

Section 2: Nothing contained herein shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto.

Section 3: The various rights and remedies herein contained and reserved to each of the parties hereto shall not be considered as exclusive of any other right or remedy of such party, but shall be construed as cumulative and shall be in addition to every other remedy now or hereafter existing at law, in equity, or by statute. No delay or omission of the right to exercise any power by either party shall impair any such right or power, or shall be construed as a waiver of any default or acquiescence therein. One or more waivers of any term of this Lease by either party shall not be construed by the other party as a waiver of subsequent breach of the same term. The consent or approval by either party to or of any act by the other party of a nature requiring consent or approval shall not be deemed to waive consent to or approval of any subsequent similar act.

Section 4: The headings of the several articles contained herein are for convenience only and do not limit the contents of such articles. All negotiations, considerations,

representations, and understandings between the parties are incorporated herein, and may be modified or altered only by agreement in writing between the parties.

Section 5: The covenants and obligations herein contained shall extend to, bind and inure to the benefit of not only the parties hereto, but their respective personal representatives, heirs, successors and assigns.

Section 6: Whenever a period of time is herein provided for either party to do or perform any act or thing, that party shall not be liable or responsible for any delays due to strikes, riots, acts of God, shortages of labor or materials, national emergency, acts of a public enemy, governmental restrictions, laws or regulations, or any other cause or causes, whether similar or dissimilar to those enumerated, beyond its reasonable control and the time to do or perform such act or thing shall be extended for the period of such delay.

Section 7: Tenant shall not record this Lease without the written consent of Landlord.

Section 8: No payment by Tenant or receipt by Landlord of a lesser amount than due herein shall be deemed to be other than on account of the earliest stipulated amount due, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance due or to pursue any other remedy in this Lease provided.

Section 9: Each of the parties represents and warrants that there are no claims for brokerage commissions or finder's fees in connection with the execution of this Lease, except as listed below, and each of the parties agrees to indemnify the other against all liabilities arising from any such claim (including, without limitation, the cost of counsel fees in connection therewith) except as follows:  United Properties Brokerage and Management Company ("UP").  Any commission due JBL Companies Real Estate Services, Inc. ("JBL") shall be pursuant to a separate agreement between UP and JBL.

Section 10: Anything to the contrary contained in this Lease notwithstanding, in the event that the term of this Lease shall not have commenced within one (1) year after the date hereof, then one (1) year from the date hereof this Lease shall automatically terminate and shall be of no further force or effect.

Section 11: Unenforceability of any provision contained in this Lease shall not affect or impair the validity of any other provision of this Lease.

Section 12: The laws of the State of Minnesota shall govern the validity, performance and enforcement of this Lease.

Section 13: Additional provisions, if any, are set forth on the attached Exhibit D, which is by reference made a part hereof.

Section 14: The    following    exhibits    are    part    of    this    Lease    Agreement:

Exhibit A:      Legal description of the Shopping Center
Exhibit B:      Shopping Center plot plan
Exhibit C:      Plans and Specifications
Exhibit D:      Additional Provisions
Exhibit E:      Sign Criteria

All said Exhibits are hereby incorporated herein and made a part hereof by this reference. All obligations therein contained shall bind the parties hereto as full as if set forth in the body of this Lease.

Section 15: The term "Landlord" as used in this Lease shall mean, at a given time, the owner or owners, collectively, for the time being (a) of the fee of all or any portion of the Shopping Center, and any successor or assignee thereof, but (b) so long as there is then a Lease of the fee of all or substantially all of the Shopping Center, the lessee thereunder and not the owner of the fee; it being intended and agreed that in a case where this (b) is applicable, such owner of the fee shall not be personally liable for the obligations of Landlord but such lessee shall be so personally liable.  If any such person, firm or corporation as "Landlord" shall sell or transfer the fee, or the leasehold interest the grantor or transferor shall thereafter be entirely relieved of all terms, covenants and obligations thereafter to be performed by Landlord under this Lease, provided (i) that any amount then due and payable to Tenant or for which Landlord or the then grantor or transferor would then owe to Tenant shall be paid to Tenant, (ii) any funds then in the hands of Landlord or the then grantor or transferor in which Tenant has an interest shall be turned over, subject to such interest, to the then grantee or transferee; and (iii) notice of such transfer and assumption shall be delivered to Tenant.

Section 16: Landlord shall have the right to install, maintain, use, repair and replace pipes, ducts, conduits, and wires leading through the Leased Premises and serving other parts of the Shopping Center in locations which will not materially interfere with Tenant's use thereof.

## ARTICLE 26:  SECURITY DEPOSIT

Section 1: Tenant hereby deposits with Landlord and shall maintain at all times on deposit with Landlord and keep whole and unencumbered the sum of $1,612.50, the receipt of which is hereby acknowledged, as security for the faithful performance by Tenant of every term and condition of this Lease, it being expressly understood and agreed that Tenant may not direct Landlord to apply said security in payment of rent for any month during the Lease Term.  If there shall be a breach or default  by Tenant in respect of any term of this Lease, Landlord may use all or any part of the security to perform same for the account of Tenant, or for any damages or deficiency in the reletting of the Leased Premises in this Lease, whether such damages or default occur

before or after re-entry by Landlord.  Landlord shall not be required to so use, apply or retain the whole or any part of said security nor shall the provisions herein contained limit the rights of Landlord pursuant to the terms of Article 18 of this Lease.  If Tenant shall fully and faithfully comply with all of the provisions of this Lease, including the provision contained in Article 19 hereof at the termination of this Lease, then said security or any balance thereof shall be repaid to Tenant within a reasonable time after such surrender.  It is understood that no interest on said security will be paid by Landlord to Tenant except to the extent required by law.  In the event of any transfer or the Landlord's interest under this Lease, Landlord may transfer said security to the transferee, and Landlord thereupon shall be released from all liability for the repayment of said security.  In no event shall any mortgagee of the Leased Premises be responsible for any security deposit made pursuant to this Article 26.

## ARTICLE 27:  SUBSTITUTE PREMISES

Section 1:  At any time after the execution of this Lease, Landlord may substitute for the Leased Premises other premises in the Shopping Center (the "New Premises"), in which event the New Premises shall be deemed to be the Leased Premises for all purposes hereunder; provided, however, that:

A.  The New Premises shall be similar in area and in appropriateness for Tenant's purposes;

B.  Any such substitution is effected for the purpose of accommodating a tenant that will occupy a portion of the area in which the Leased Premises are located; and

C.  If Tenant is occupying the Leased Premises at the time of any such substitution, Landlord shall pay the expense of moving Tenant, its property and equipment to the New Premises, and the expense of improving the New Premises with improvements substantially similar to those located in the Leased Premises.

## ARTICLE 28:  OFFSET STATEMENT

Section 1: Within (10) days after request therefore by Landlord, Tenant shall provide an offset statement in recordable form to any proposed mortgagee or purchaser, or to Landlord, certifying (if such be the case) that this Lease is in full force and effect and there are no defenses thereto, or stating those claimed by Tenant and certifying to such other matters as such party shall reasonably require.  In the event Tenant should refuse to execute and deliver said statement, Landlord shall have the right to cancel this Lease by giving Tenant an additional ten (10) days notice in writing, or Landlord may, as attorney-in-fact for Tenant, make such statement, Tenant hereby constituting and

irrevocably appointing Landlord its attorney-in-fact for such purpose. Landlord's mortgage lenders and/or purchasers shall be entitled to rely upon any statement so executed pursuant to this Article 28.

## ARTICLE 29:  TITLE

Section 1:  Landlord covenants that it has full right and authority to enter into this Lease for the full term hereof.  Landlord further covenants that Tenant, upon paying the rent and upon performing the agreements of this Lease to be performed by said Tenant, will have, hold and enjoy quiet possession of the Leased Premises.

## ARTICLE 30:  PREPARATION OF LEASED PREMISES

Section 1:  Landlord shall at its sole cost and expense construct the Leased Premises to the extent shown as Landlord's Work on the specifications attached hereto and made a part hereof as Exhibit C, which specifications are an outline of all specifications and plans for the portion of construction of the Leased Premises for which Landlord is responsible.  All more detailed plans and specifications which Tenant has heretofore been shown a copy of shall be delivered to Tenant upon execution hereof.  Thereafter, Tenant shall furnish to Landlord as soon as possible, but in no event more than sixty (60) days after execution hereof, working drawings for the Leased Premises including therein all work to be performed by Landlord and Tenant in completing the Leased Premises for occupancy.  For each day after the end of the sixty-day period in which Tenant has not furnished said working drawings, Landlord shall be entitled, in addition to all other remedies of Landlord, to receive from Tenant $100.00 per day as liquidated damages for the delays caused by failure to submit such drawings within such period. Within thirty (30) days after receipt of such drawings and if disapproved, the same shall be resubmitted to Tenant for revision to meet the objectives of Landlord thereto.  In the event of failure of Landlord to either approve or disapprove such drawings within said thirty-day period, Tenant shall be entitled, in addition to all other remedies of Tenant, to liquidated damages hereunder in the amount of $100.00 per day for each day after said thirty-day period in which Landlord shall fail to give its approval or disapproval.  After the working drawings have been approved, any material changes therein shall be submitted to Tenant for approval, which approval shall not be unreasonably withheld. In the event Tenant has not indicated its disapproval of any such changes within five (5) days after submission of the same to it, such approval shall be deemed to have been given and Landlord may proceed with the work contemplated by such plans, specifications and drawings.

Section 2:  The proposed location of the Leased Premises in the Shopping Center of which the Leased Premises form a part of is designated on the site plan attached marked Exhibit B.

Section 3: Landlord contemplates completion of the Leased Premises on or before January 19, 1999. In the event the Landlord is unable to complete construction and deliver possession of the Leased Premises to the Tenant on the contemplated commencement date, for any reason whatsoever, the Landlord shall not be liable to the Tenant for any damages whatsoever and this Lease shall remain in full force and effect and the Landlord shall continue to use its best efforts to complete construction of the same as soon as reasonably possible.

IN WITNESS WHEREOF, Landlord and Tenant have signed this Lease as of the day and year first above written.

**LANDLORD:**

**RYAN FLYING CLOUD ASSOCIATES LIMITED PARTNERSHIP**

By:     **Ryan Properties, Inc.**

Its:     **General Partner**

By:     _____

Its:     **Vice President**

**TENANT:**

**BOY SCOUTS OF AMERICA**

By: _____
        C. MICHAEL HOOVER, JR.

Its: _____
        **CHIEF FINANCIAL OFFICER**

## EXHIBIT A

### LEGAL DESCRIPTION

Lot 1, Block 1, Grand Addition, according to the recorded plat thereof and situate in the City of Burnsville, Dakota County, Minnesota.



N→

PETsMART
26,040 s.f.
#14290

Vacant
26,955 s.f.
14286
10/98
Deb Bloom
895-4452

Vacant
#14276
2,960 s.f.

Vacant
#14278
#14280
2,800 s.f.

Shaw
Industries
#14270
#14272
#14274
4,640 s.f.

Viking Enterprises
#14268  1,400 s.f.

Cabinets, Etc.
#14266  1,400 s.f.

Mechanical/Trash
Room - 900 s.f.
(All Tenants have ke
Ciatti's & Cabinets
have keys for roof
access)

Tuesday
Morning
#14262-#14264
6,040 s.f.

EXHIBIT B

Norwest Financial
#14260
2,100 s.f.

Shear Madness
#14256-#14258
2,100 s.f.

Golden Tan
#14252-#14254
3,600 s.f.

Vacant
#14250  1,800 s.f.

Travel Partners
#14248  1,200 s.f.

Ciatti's
#14240-#14246
7,800 s.f.

County Road 42

**BURNSVILLE CROSSING**

14240-14290 Plymouth Avenue South
Burnsville, Minnesota   55337
Jill Mosko, Property Manager
(612) 336-9776

Plymouth Avenue

## EXHIBIT C

## OUTLINE SPECIFICATIONS
## TYPICAL RETAIL STORE SPACE

1.  **Floor Slabs:**  4" concrete floor, cured and sealed.

2.  **Ceilings:**  10'0" ceiling height.  A 2' x 4' x 5/8" flat white fissured acoustical lay-in tile with an exposed grid system shall be furnished.

3.  **Perimeter Walls:**  Outside walls will be insulated, sheetrocked, taped and sanded.

4.  **Demising Walls:**  Two (2) demising walls sheetrocked to deck, fire taped above ceiling.  Finished wall below ceiling to be taped and sanded.

5.  **Plumbing/Bathrooms:**  Each retail space will have one uni-sex bathroom which includes:

    a)  Sheetrocked walls insulated to deck, taped and sanded to ceiling height.
    b)  One water heater, 6 gallon electric.
    c)  Ceramic tile floor.
    d)  Ceramic wainscot on 3 walls to 4'0".
    e)  One incandescent light fixture.
    f)  One exhaust fan to the exterior.
    g)  Plumbing handicap fixtures will include one toilet and one wall hung sink.
    h)  One fiberglass laundry tub.
    i)  Toilet accessories - toilet paper holder and paper towel dispenser.

6.  **Sprinkler:**  The building will be sprinkled as required by code and NFPA 13 standards.  Chrome pendant sprinkler heads will be spaced throughout each space and installed to ceiling height.

7.  **HVAC:**  Rooftop units sized to provide one ton of cooling for every 600 square feet of floor area.  One diffuser will be provided for each ton of cooling.

8.  **Electrical:**
    a)  Each space of 3,000 s.f. or less will be separately metered and provided with a 100 amp service panel.
    b)  One duplex outlet every 20' located on two demising walls.
    c)  One duplex outlet located near each electrical panel.
    d)  Conduit and wire provided for a single circuit for tenant signage located above front wall.
    e)  An average of one 2' x 4' - 4 lamp light fixture with an acrylics lens per 85 s.f. of floor area.

    f)     One empty phone conduit from electrical panel to the main telephone board.

    g)     Ceiling lighting to be controlled from the panel.

9.    **Note:**

    a)     All work outlined shall be performed as base building construction schedule dictates;

    b)     Signage shall be furnished and installed by Tenant and shall be in compliance with Landlord's sign criteria and attached hereto as Exhibit E; and

    c)     To the extent that there is a conflict between this Exhibit C and the work required for Tenant's specific use, Tenant shall be responsible for any additional cost.

10.    In addition to the foregoing, Landlord shall provide at Landlord expense:

    a)     A wall from the floor to the suspended ceiling dividing the sales floor and stock room with door;

    b)     One accessible dressing room per code, with bench seat;

    c)     Additional electrical outlets - one on each wall of sales floor at 84" on horizontal, one dedicated, isolated receptacle at sales counter area via a power pole, receptacles per code in stockroom. Tenant to provide exact locations for outlets;

    d)     Telephone service to the space;

    e)     Suspended ceiling and fluorescent lighting, as per vanilla box specifications; and

    f)     An allowance of $12.00 per square yard for carpeting in sales area.

<u>**EXHIBIT D**</u>

**ADDITIONAL PROVISIONS**

This Exhibit D to the Lease Agreement dated ___January 25, 1999___, ~~1998,~~ between **Ryan/Flying Cloud Associates Limited Partnership**, a Minnesota limited partnership (hereinafter called "Landlord") and **Boy Scouts of America** (hereinafter called "Tenant") is to clarify, expand, and add to said Lease Agreement.  This Exhibit D shall take precedence over any inconsistencies between the Lease Agreement and this Exhibit D.

1. **<u>PROHIBITED USES:</u>** Notwithstanding the foregoing, no use or operation shall be permitted in the Shopping Center which is inconsistent with a first-class retail shopping center.  Without limiting the generality of the foregoing, the following uses or operations shall not be permitted:

   a)      Any restaurant.

   b)      Financial services.

   c)      Window blinds, window coverings, and window treatments.

   d)      Cabinets and millwork.

   e)      Retail sales of pets (including, but not limited to, fish, birds, reptiles, dogs, cats, and other small mammals), pet grooming, veterinary and other pet services, pet food, pet accessories, and other pet products.

   f)      Tanning salon.

   g)      Floor covering, including sales of carpeting and tile, which shall not exceed ten percent (10%) of tenant's sales floor area.

   h)      Hair salon.

   i)      Travel agency.

   j)      None of the following uses shall be conducted or permitted within the Shopping Center:  nuisance; use causing loud noises or offensive odors; manufacturing facility; dry cleaner (except facilities for drop off and pick up of clothing cleaned at another location); automobile repair shop or service station or any facility for the storage or sale of gasoline or diesel fuel in or from tanks; used clothing other than high-quality used clothing as part of a retail store consistent with a first-class retail shopping center; pawn shop; consignment or thrift store or liquidation outlet; massage parlor; adult book shop or movie house; mortuary or funeral parlor; coin-operated laundry; cocktail lounge, bar or tavern, or sale of alcoholic beverages, whether or not packaged, except in conjunction with a restaurant permitted hereunder; night club; place of recreation (including, but not limited to, theater, bowling alley, skating rink, carnival, any business using exterior loud speakers, children's recreational, educational, or daycare facility, game arcade, or health spa); church, kiosk, or other like-kind structure; school of any nature; or any other use inconsistent with the operation of a high-quality retail shopping center.  As used

herein, "school" includes, but is not limited to, a beauty school, barber college, reading room, place of instruction, or any other operation catering primarily to students or trainees rather than to retail customers, it being the intent of this provision that the parking and the other common facilities should not be burdened by either large-scale or protracted use. In addition, the following uses must first be approved in writing by Landlord and PETsMART, Inc.: drive-throughs; restaurants occupying more than two thousand five hundred (2,500) square feet of Gross Floor Area; except that this provision shall in no event restrict the premises designated Restaurant on Exhibit A; offices and professional uses, except that office or professional uses shall be permitted which are (i) incidental to a retail use permitted hereunder; or (ii) consist of a bank, insurance agency, real estate broker's office, travel agency, or similar use oriented toward retail customers of a type commonly found in high-quality retail shopping centers in the metropolitan area where the Premises are located; and (iii) do not exceed, in the aggregate, ten percent (10%) of the Gross Floor Area of the Shopping Center.

2.    **MONUMENT:** Tenant shall have the right to place a sign panel on the existing monument sign, but not the pylon sign, if any, provided by Landlord. Said panel shall be placed in a location to be determined by Landlord. All costs associated with the installation and maintenance of the sign panel shall be paid by Tenant.

**LANDLORD:**

**RYAN/FLYING CLOUD ASSOCIATES LIMITED PARTNERSHIP**

By:    **Ryan Properties, Inc.**

Its:    **General Partner**

By:    _____

Its:    Vice President

**TENANT:**

**BOY SCOUTS OF AMERICA**

By:    _____

Its:    C. MICHAEL HOOVER, JR.
          CHIEF FINANCIAL OFFICER

## EXHIBIT E

### SIGN CRITERIA

I.    **GENERAL**

    A)    Only the area above the Tenant's premises shall be identified by a sign.  The furnishing and installation of a sign and the costs incurred shall be the responsibility of the Tenant.

    B)    It is intended that the signing of the retail stores on the center shall be developed in an imaginative and varied manner, and although previous and current signing practices of the Tenant will be considered they will not govern signs to be installed on the retail stores.

    C)    Each Tenant will be required to identify its premises by a sign.

    D)    Service doors will be provided with uniform signs identifying stores by the Landlord.  Tenant shall not post any other additional signs.

II.    **SIGN CRITERIA**

    A)    The wording of the signs shall be limited to the store name only, and such name shall not include any items sold therein.

    B)    The use of corporate shields, crests, logos, or insignias will be permitted (subject to Landlord's approval), provided such corporate shields, crests, logos, or insignias shall not exceed the average height for sign letters.

    C)    Multiple or repetitive signing will be allowed only with the approval of the Landlord provided the area of such signing conforms to the limitations set forth herein.

    D)    All signs and identifying marks shall be within the limitations of the sign facia as set forth hereinafter, and not to exceed 10% of the front elevation of the building per City code.

    E)    The average height of sign letters or components shall not exceed 30".  Capital letters shall not exceed 36".

F)  Sign length shall be determined by centering the lease frontage area, holding back a minimum of 2' from lease line on each end for 20' fronts and 4' for 40' fronts and larger.

> Example:        40' wide space could have a 32' maximum length
> 20' wide space could have a 16' maximum length

G)  The sign letters to be constructed with internally illuminated letters.

H)  Letters shall not project beyond the brick face more than five (5) inches.

I)  The following design standards will be adhered to:

   1.  Letters to be fabricated from aluminum medium bronze finish, trim cap edge with translucent acrylic face, in a color approved by Landlord.

   2.  Illumination to be supplied by neon tubing powered by 60 M.A. transformers.

III.  **PROHIBITED TYPES OF SIGNS OR SIGN COMPONENTS**

A)  Moving or rotating signs.

B)  Back illuminated signs.

C)  Signs employing moving or flashing lights.

D)  Signs employing exposed raceways, ballast boxes, or transformers.

E)  Signs employing painted and/or non-illuminated letters.

F)  Signs of box or cabinet type employing transparent, translucent or luminous plastic background panels.

G)  Cloth, wood, paper or cardboard signs, stickers, decals or painted signs around or on exterior surfaces (including interior and exterior surfaces of doors and/or windows) of the premises.

H)  Signs employing noise making devices and components.

I)  Signs, letters, symbols, or identification of any nature painted directly on surfaces exterior to the premises.

J)      Free-standing signs.

K)      Roof-top or exterior signs.

IV.    **PROCEDURE FOR SIGN DRAWINGS**

A)      Tenant shall submit three (3) sets of blueline prints of the drawings and specifications, including samples of materials and colors, for all its proposed sign work.   The drawings shall clearly show location of sign on storefront elevation drawing, graphics, color and construction and attachment details.

Full information regarding electrical load requirements and brightness in footcandles is to also be included.

B)      As soon as possible after receipt of the sign drawings, Landlord shall return to Tenant one (1) set of such sign drawings with its suggested modification and/or approval.

# FIRST AMENDMENT TO LEASE

This First Amendment to Lease, dated as of _January 25_, 1999 (First Amendment), between Ryan/Flying Cloud Associates Limited Partnership (Landlord) and Boy Scouts of America (Tenant).

**WITNESSETH**, that:

     **WHEREAS**, Landlord and Tenant have entered into a Lease dated January 25, 1999 (Lease) for 1,800 square feet of area, whereby Landlord has leased to Tenant certain premises located Burnsville Crossings Shopping Center, in the City of Burnsville, County of Dakota, State of Minnesota, consisting of the Leased Premises, as such Leased Premises are defined in the Lease; and

     **NOW, THEREFORE**, Landlord and Tenant desire and intend hereby to amend the Lease as specifically hereinafter set forth and provided:

1. The Term of the Lease shall commence on March 22, 1999 and terminate on March 31, 2009.
2. Monthly Minimum Rent and Operating Costs to commence on March 22, 1999.

     **EXCEPT** as expressly amended or supplemented herein, the Lease as amended shall remain and continue in full force and effect in all respects.

     **IN WITNESS WHEREOF**, the First Amendment is hereby executed and delivered effective as of the date and year first above written.

**LANDLORD:**    **RYAN / FLYING CLOUD ASSOCIATES LIMITED PARTNERSHIP**
              **By Ryan Properties, Inc.**
              **Its General Partner**

BY: _____

Its: _____

**TENANT:**      **BOY SCOUTS OF AMERICA**

BY: _____
              C. MICHAEL HOOVER, JR.

Its: _____
              **CHIEF FINANCIAL OFFICER**

j:properti/leases/amendment/Boy Scouts #1.DOC /4/22/99

BURNSVILLE CROSSING
BOY SCOUTS OF AMERICA

**Note # corresponds to Article/Section # of the Lease.**

1) <u>**TERM**</u>
   Lease terminates 10 years and 0 month from the Commencement date.

   Lease Term of lease commences the earlier of (a) 30 days after Landlord's architect issues a Certificate of Substantial Completion of Landlord's work in the Leased Premises or (b) date that tenant opens for business.

3) <u>Gross Sales:</u> Sales of Tenant and of all licensees, concessionaires and tenants of Tenant, from all business conducted from Leased Premises. Gross sale shall include sales by vending machine in the Leased Premises and all deposits not refunded to purchasers.
   Gross sales shall exclude:
   - Refunds for merchandise returned which was previously included in gross sales,
   - Allowance or adjustments granted to customers, transfers of merchandise from the Leased Premises to any other restaurants or warehouse of tenant,
   - Sales, excise and like taxes which are added to the selling price of merchandise and paid for by the customer,
   - Merchandise transfer out from Leased Premises to another store of Tenant where such exchange is make solely for the convenient operation of the business of Tenant and not for the purpose of consummating a sale which had been made from the Leased Premises.
   - Amount of returns to shippers or manufacturers.

   Tenant shall a permanent accurate set of books and record of all sales of merchandise and all revenue derived from business conducted in the Leased Premises at a location which notification has been given to Landlord. Tenant shall also keep pertinent records such as gross income tax reports for at least 4 years after the expiration of each Lease Year and open to inspection by Landlord at all reasonable times during ordinary business hours.

5) <u>**OPERATING COSTS**</u>
   Tenant agrees to pay monthly, together with its monthly rent payment, its proportionate share of all Operating Costs expenditures incurred by Landlord including, but not limited to:
   - Repair and maintenance of the Shopping Center Common Area,
   - Cleaning,
   - Snow removal,
   - Lighting,
   - Line painting
   - Roof repair,
   - Security,
   - Any management fees the Landlord pays to a third party to administer the Shopping Center and the Retail Property.
   - Yearly amortization of capital costs, including financing costs and disposal costs incurred by the Landlord for replacements, improvements or structural repairs to the Shopping Center and Retail Property. Or for purposes of reducing Operating Costs, and to the extent Operating Costs are reduced, such costs shall be amortized over the useful life of such replacements, improvements and repairs, as reasonably estimated by the Landlord.

   Tenant's share of such costs shall be based on the proportion of the total square foot area in the Leased Premises bear to the total square foot rentable area in the Shopping Center. The monthly payments shall be based on Landlord's reasonable estimate of the costs subject hereto made at the beginning of each calendar year. At the end of the year, the Landlord will furnish a statement of all the actual costs with the Tenant's actual share. Any overpayment or underpayment for the year will be adjusted according at the end of the year.

BURNSVILLE CROSSING
BOY SCOUTS OF AMERICA

If the Shopping Center is not fully occupied at any time during the Term, an adjustment shall be made in computing the Tenant's share of the Operating Cost.  Tenant's share will be computed for such year as though the Shopping Center had been fully occupied during the year.

**9)  <u>REPAIRS</u>**

Landlord shall keep the foundations, exterior walls (except plate glass or other breakable materials used in structural portions) and roof in good repair and Tenant shall reimburse Landlord for such cost as Operating Costs.  Landlord shall not be required to make any such repairs or replacements if it is a result negligence of Tenant, or it's agents, servants or employees.

Landlord shall not have to make any repairs, replacements or improvements of any kind upon the Lease Premises or upon any equipment, facilities or fixtures within the Leased Premises, including any equipment locating outside the Leased Premises that serves the Leased Premises exclusively.  Such area and equipment shall be repaired and maintained in a clean, sanitary and safe condition by the Tenant.

Tenant shall replace, at its own cost and expense, any broken glass or other breakable materials used in exterior windows and interior doors with glass and material of the same quality.  Tenant shall maintain during the term of the Lease, a policy, or policies, insuring Landlord and Tenant against breakage of all such glass in the Leased Premises.  Tenant shall deposit such policy, together with evidence of the payment of the premiums, with the Landlord at the commencement of the Term and at least 30 days prior to the expiration of such policy.

**12)  <u>HAZARDOUS MATERIALS</u>**

Tenant is prohibited in using Demised Premises of production, sale or storage of such toxic or hazardous chemicals, wastes, materials or substances, pollutants or contaminants. If any lender or governmental agency shall ever require testing to ascertain whether or not there has been any release of hazardous materials, then the reasonable costs thereof shall be reimbursed by Tenant to Landlord upon demand as additional charges if such requirement applies to the Leased Premises.  Tenant indemnifies Landlord against any claims, demands, judgments, fines etc., resulting from any release of hazardous materials on the Leased Premises occurring while Tenant is in possession, or elsewhere if caused by Tenant or persons acting under Tenant.  This covenants will survive the expiration or earlier termination of the Lease Term.

**13)  <u>INSURANCE</u>**

Tenant shall not carry any stock of goods or do anything in or about said Leased Premises that will increase insurance rates on the Leased Premise.  If Landlord shall consent to such use, than Tenant agrees to pay as additional rental any increase in premiums due to such use.  Tenant shall also at its expense, comply with the requirements of insurance underwriters and insurance rating bureaus and governmental authorities having jurisdiction.

Tenant agrees to maintain a policy or policies of insurance, at its own cost and expense, insuring Landlord and Tenant from all claims, demands or actions made by or on behalf of any person or persons, firm or corporation arising from, related to, or connected with, the Leased Premises:

- For injury or death of any person in an amount of not less than $1,000,000, and
- For injury to or death of more than one person in any one accident in an amount of not less than $2,000,000, and
- For damage to property in an amount of not less than $100,000, made by or on behalf of any person or persons, firm or corporation arising from, related to, or connected with,
- The Leased Tenant shall also carry like coverage against loss or damage by boiler or internal explosion by boilers, if there is a boiler in the Leased Premises.  The insurance cannot be cancel except after at least 20 days of written notice to Landlord.  The policy or policies, together with satisfactory evidence of the payment of premium, shall be deposited with Landlord, for a new policy, at the commencement of the term, and for renewal, within 30 days prior to the expiration of the existing policy.

2

BURNSVILLE CROSSING
BOY SCOUTS OF AMERICA

Landlord shall procure, at its initial expense, all risk coverage public liability and other reasonably necessary insurance on the Shopping Center. Tenant shall reimburse Landlord for its share of the Insurance in the manner stated in Article 5.

## 14)  **DAMAGE BY FIRE AND OTHER CASUALTY**

Section 1: If the Shopping Center is partially or totally destroyed by fire or other casualty insurable under standard all risk coverage insurance to become partially or totally untenantable, the damage shall be speedily repaired at Landlord's expense.  If the Landlord elects not to rebuild, a just and proportionate part of the rent shall be abated until the damage is repaired, based on the time and the extent the Leased Premises are untenantable.

Section 3: In the case of such destruction, Landlord is not responsible to repair or replace Tenant's stock in trade, leasehold improvements, any Tenant's personal property.  Tenant has to have insurance for such replacement.

## 18)  **DEFAULT AND REMEDIES**

Landlord may terminate this Lease and the term demised upon the happening of any one or more of the following events,  if the event is not remedied within 30 days (within 5 days for late payment of rent) after written notice to Tenant:

- Tenant making an assignment to its creditors,
- The levying of a write of execution or attachment on or against this Lease,
- In the even proceedings are instituted in a court of competent jurisdiction for the reorganization, liquidation or involuntary dissolution of Tenant and such proceedings are not dismissed or discharged within 60 days after the institution of the proceedings,
- The failure of Tenant to pay an installment of rent when due or to perform any other of its covenants under this Leased.

Upon the termination of the Lease pursuant to the preceding paragraph, Landlord may re-enter the Leased Premises with or without process of law using such force as maybe necessary and Landlord is not liable for any damages caused by such re-entry.

In the event of any breach by Tenant, Landlord may immediately, without any notice to Tenant, cure such breach at the expense of Tenant.  Any money or expense incur by Landlord under such event is reimbursable from the Tenant with interest of 18% per annum or the highest rate permitted by law, whichever is less, on the first day of the month following payment of such expenses.

Landlord is given a first lien upon all property of Tenant within the Leased Premises whether acquired by Tenant before or after the happening of the events mentioned in the first paragraph of this note.  Landlord can take possession of such property without notice or demand and can sell such property at public or private sale after one publication of a notice, not less than 10 days before such sale, in a daily newspaper published in the county where the Lease Premises is.  The proceeds shall be first applied to the payment of any expenses incur and second, to the discharge of the rent or other liability unpaid, with any remaining balance to be held for the Tenant's account.  Tenant agrees to execute any financing statements and other documents necessary to perfect or record the lien so granted.

Should Landlord be in default under the Lease, Landlord shall have reasonable and adequate time to cure the default after written notice to Landlord by Tenant.

BURNSVILLE CROSSING
BOY SCOUTS OF AMERICA

23) **TAXES**

Landlord shall pay all real property taxes and any installments of special assessments and Tenant will reimburse Landlord for its proportionate share. Tenant's share of such payment shall be in the ratio that the Tenant's gross floor area bears to the total gross floor area of all of the buildings constructed within the tax parcel where the Leased Premises is located.

Tenant shall also reimburse Landlord for rental taxes, if any, paid by Landlord on rentals from the Leased Premises.

Tenant shall pay all personal property and similar taxes on its property in the Leased Premises.

24.  **MERCHANTS ASSOCIATION**
- Tenant agrees to pay prorata share based assessments if simple majority is formed on an annual basis.
- Merchants Association is to be organized as a non-profit corp., with voting membership limited to tenants of the Shopping Center and may also provide for non-voting members consisting of persons other than Shopping Center tenants.

25) **GENERAL**

Section 10: If the term of this Lease have not commenced within 1 year after 1/25/99, then this Lease will automatically terminate.

27. **SUBSTITUTION OF PREMISES**
- New premises is similar in area and appropriateness
- Substitution is due to accommodating a tenant to occupy a portion of leased premises
- Landlord responsible for moving tenant, its property & equipment to new Premises & expenses of improving new premises with improvements substantially similar to leased premises

28. **OFFSET STATEMENT**

Tenant responsible for providing an offset statement to any proposed mortgagee or purchaser or landlord upon 10 days note. If tenant refuses, Landlord can cancel lease with an additional 10 days notice.

**EXHIBIT D**
1)  Prohibited Uses:
   a.  Any restaurant,
   b.  Financial services,
   c.  Window blinds, window coverings, window treatments,
   d.  Cabinet and millwork,
   e.  Retail sales of pets,
   f.  Tanning salon,
   g.  Floor covering, including sales of carpeting and tiles which shall not exceed 10% of Tenant's sales floor area,
   h.  Hair salon,
   i.  Travel agency,
   j.  Any use other than the one stated in article 7.

4

Ryan Properties, Inc.

700 International Centre
900 Second Avenue South
Minneapolis, MN 55402-3357
612/336-1200 corporate
612/337-5552 fax

*Building Lasting Relationships*

262 - 3

July 1, 1999

Mr. Larry Knapp
**BOY SCOUTS OF AMERICA**
2109 Westinghouse Boulevard
PO Box 7143
Charlotte NC  28241-7143

RE:    BURNSVILLE CROSSINGS - BURNSVILLE, MINNESOTA

Dear Larry:

Enclosed please find two fully executed copies of the First Amendment to Lease for your files.

If you have any questions, please do not hesitate to contact Jill Mosko at (612) 336-9776.

Sincerely,

**RYAN PROPERTIES, INC.**

Shelley C Bruns
Executive Assistant

Enclosure

cc:    Dan Levitt
       Dennis Buratti
       Lou Quilici

L. QUILICI
G. PECHTER
S. CARR
appraiser
Lender
Rich Lutin
Rick Plassner

LEASE AMENDMENTS

⑦

10285.3
4

2009-0720-001

## LEASE EXTENSION AGREEMENT

EXECUTED
DOCUMENT

THIS LEASE EXTENSION AGREEMENT is made and entered into as of the ___ day of _August_, 20__ by and between Inland Commercial Property Management, Inc., ("ICPM") as managing agent for Owner, hereinafter defined, and Boy Scouts of America (hereinafter referred to as "Tenant").

## RECITALS

A.   WHEREAS, Inland Ryan, LLC, a Delaware limited liability company ("Owner"), as successor in interest to Ryan/Flying Cloud Associates Limited Partnership, and Tenant own the interests of Landlord and Tenant respectively under a Lease dated January 25, 1999 (the "Lease"), relating to the premises commonly known as 14250 Plymouth Avenue South, Burnsville, Minnesota 55337 (the "Premises") located in the shopping center commonly known as BURNSVILLE CROSSING SHOPPING CENTER, located in Burnsville, Minnesota; and

B.   WHEREAS, ICPM is the managing agent for Owner and has the authority to modify the terms of the Lease on behalf of Owner; and

C.   WHEREAS, the Lease Term expired on March 31, 2009 and has continued on a month-to-month basis; and

D.   WHEREAS, ICPM and Tenant desire to extend the term of the Lease and to provide for the rental amounts to be paid during the Extension Period, defined herein, to provide for an additional option to further extend the Lease Term, and to amend the Lease.

NOW, THEREFORE, for good and valuable consideration including the mutual agreements contained herein, it is hereby agreed by and between ICPM and Tenant that the Lease is amended as follows:

1.   ICPM and Tenant agree that the term of this Lease shall be extended for a three (3) year period commencing April 1, 2009 and expiring on March 31, 2012 (the "Extension Period"). The extension is in replacement for and in lieu of any other options (or extensions) as are otherwise set forth in the Lease. Except as expressly set forth herein, no other options or extensions are available or granted to Tenant.

2.   Tenant shall pay to ICPM as fixed annual minimum rent the sum of Seventy Nine Thousand, Six Hundred Fifty and 00/100 Dollars ($79,650.00) during the Extension Period, payable in advance in monthly installments of Two Thousand Two Hundred Twelve and 50/100 Dollars ($2,212.50) on the first day of each month throughout such period.

3.   In addition to the fixed annual minimum rent due during the Extension Period, as set forth in paragraph two (2) above, Tenant shall pay all items of additional rent, and other charges required to be paid pursuant to the Lease, including, but not limited to, Operating Costs, as provided for in the Lease.

4.   Tenant is hereby granted the option  ("Option") to further extend the term of this Lease for one (1) additional three (3) year term (the "Option Term") immediately following the expiration of the Extension Period, commencing April 1, 2012 and expiring March 31, 2015. Tenant shall pay to ICPM as Minimum Rent a sum which reflects "Market Rent" at the time of exercise of Option.

The Option may be exercised only on the condition that, (i) at the time of the exercise of the Option, and (ii) upon commencement of the Option Term, Tenant has complied with and performed all the terms and condition of the Lease and (iii) no event of default has occurred prior to said dates.

The Option may be exercised only by Tenant delivering written notice to ICPM or its successors or assigns by no later than October 1, 2014. If the Option is not exercised as set forth herein, then the Option shall be

null and void.

For purposes of this Lease, the term "Market Rent" shall mean the minimum rental rate that Landlord should reasonably be able to obtain for the Premises, effective the first day of the Extended Term. Market Rent shall be based upon the prevailing rental rate for space comparable to the Premises in terms of size, location, condition and other relevant factors, and taking into account the term of the Extension Term, the permitted use and any other provisions of the Lease. Landlord shall provide notice to Tenant of its determination of the Market Rent within sixty (60) days after Tenant exercises its right to extend the Term. Within ten (10) days after receiving such determination ("Tenant's Review Period"), Tenant shall irrevocably elect, in writing, to do one of the following: (i) accept Landlord's determination, or (ii) object to Landlord's determination and with such objection set forth Tenant's determination of the Market Rent. If Tenant so objects, Landlord or Tenant shall use good faith efforts to agree upon such Market Rent. If Landlord and Tenant fail to reach agreement within fifteen (15) days following Tenant's Review Period, then the matter shall be submitted to arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association (or its successor or, if none, a like organization then in effect). Such determination shall be final and binding upon the parties. If Tenant fails to so accept or object in writing within the Tenant's Review Period, Tenant shall conclusively be deemed to have approved of the Market Rent determined by Landlord. If Tenant objects to Landlord's determination of the Market Rent in accordance with the above, during any period of the Extension Term that the Market Rent is being determined, Tenant shall pay Minimum Rent equal to 125% of the Minimum Rent at the highest rate during the preceding Term and, after the Market Rent is determined, if Tenant is underpaid Minimum Rent for said period, Tenant shall pay to Landlord the amount due within thirty (30) days after demand, and if Tenant overpaid Minimum Rent, a credit shall be given Tenant against the next Rent coming due under the Lease.

5.    In addition to the fixed annual minimum rent due during the Option Term, Tenant shall pay all items of additional rent and other charges as are described in the Lease including, but not limited to, Operating Costs, as are described in the Lease.

6.    The following language is hereby added to the Lease:

ASSIGNMENT.  From and after the Effective Date, the Lease shall be amended so that in the event Tenant elects to assign the Lease, Tenant shall pay to Landlord a transfer fee of Two Thousand and 00/100 Dollars ($2,000.00) upon delivery of Tenant's request to assign the Lease in order to reimburse Landlord for all of its internal costs and expenses incurred with respect to the transfer, including, without limitation, costs incurred in connection with the review of financial materials, meetings with representatives of transferor and/or transferee and preparation, review, approval and execution of the required transfer documentation, and, in addition, Tenant shall reimburse Landlord for any out-of-pocket costs and expenses incurred with respect to such transfer.

7.    The following language is hereby added to the Lease:

OFAC CERTIFICATION.  Tenant certifies that (i) it is not acting, directly or indirectly, for or on behalf of any person, group, entity or nation named by any Executive Order or the United States Treasury Department as a terrorist, "Specially Designated national and Blocked Person", or other banned or blocked person, entity, nation or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control; and (ii) it is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity or nation.

8.    The following language is hereby added to the Lease:

RENTS FROM REAL PROPERTY.  Landlord and Tenant hereby agree that it is their intent that all Minimum Rent, Percentage Rent and all Additional Rent and all other charges payable to the Landlord under this lease (hereinafter individually and collectively referred to as "Rent") shall qualify as "rents from real property" within the meaning of Section 856(d) of the Internal Revenue Code of 1986, as amended,

(the "Code") and the Department of the U.S. Treasury Regulations promulgated thereunder (the "Regulations"). Should the Code or the Regulations, or interpretations thereof by the Internal Revenue Service contained in revenue rulings or other similar public pronouncements, be changed so that any Rent no longer so qualifies as "rent from real property" for purposes of Section 856(d) of the Code and Regulations, or any successor provision thereto then the parties agree to execute such further instrument as may reasonably be required by the Landlord in order to give effect to the foregoing provisions of this Section.

9.    <u>CONFIDENTIALITY</u>.  Tenant agrees to keep the terms of this Lease Extension Agreement confidential. In the event that Tenant discusses any portion of this Lease Extension Agreement with a third party, this Lease Extension Agreement will immediately become null and void and same shall be considered a default under the Lease.  The Landlord shall have all remedies provided thereunder.

10.    All capitalized terms, if not defined in this Lease Extension Agreement, shall have the same meaning as defined in the Lease.  Wherever the term, "term of this Lease" or "Lease Term" or similar phrase is used in the Lease, such term or phrase shall be deemed to include the Extension Period.

11.    Except as expressly modified herein, all of the provisions of the Lease shall remain unmodified and in full force and effect.

INLAND COMMERCIAL PROPERTY                    BOY SCOUTS OF AMERICA
MANAGEMENT, INC.,
as managing agent for the Owner

By: _____                    By: _____
          D. Scott Carr
Its: _____                    Its: _____
          President                                          assistant csel cfo

 Inland Commercial Property Management, Inc.

February 29th, 2012

Dan Richardson
Boy Scouts of America
2109 Westinghouse Blvd
PO Box 7143
Charlotte, NC 28241

RE:    Option Notice
       Burnsville Crossing
       14250 Plymouth Ave Burnsville, Minnesota

Dear Tenant:

Please be advised pursuant to the Lease dated January 25th, 1999 and followed by the Lease Extension Agreement dated August 13th, 2009, for the premises consisting of approximately 1,800 square feet and commonly known as Burnsville Crossing Shopping Center, 14250 Plymouth Ave, Burnsville, Minnesota, that current lease term expires March 31st, 2012.

The Lease does provide for an option to extend the term of the Lease for an additional Three (3) year term commencing April 1st, 2012 through March 31st, 2015, with the rent to be escalated as provided for below. All other terms and obligations shall be extended in full force and effect as they exist.

Year 1 (4/1/2012 – 3/31/2013) - $2,212.50 per month  $14.75 per square foot
Year 2 (4/1/2013 – 3/31/2014) - $2,212.50 per month  $14.75 per square foot
Year 3 (4/1/2014 – 3/31/2015) - $2,212.50 per month  $14.75 per square foot

If it is in your interest to exercise this option, this letter should be executed and returned to me before March 15th, 2012. This letter, when executed by a duly authorized individual, and returned to me, shall serve as official notice of your exercising this option to extend the Lease.

Should you have any questions, please do not hesitate to contact me at (651) 738-7777 or rettinger@inlandrealestate.com.

Sincerely,

INLAND COMMERCIAL PROPERTY MANAGEMENT, INC.

Suzie Rettinger
Property Manager

BY EXECUTING THIS LETTER, TENANT HEREBY EXERCISES THE OPTION TO EXTEND THE TERM OF THE LEASE PURSUANT TO THE OBLIGATIONS AND CONDITIONS DEFINED HEREIN.

BY: _____

ITS: ACSE/CFO

DATE: March 2, 2012

7117 10th Street North
Oakdale, Minnesota 55128
p 651.738.7777  f 651.738.2801
www.inlandrealestate.com

**LANDLORD'S
ORIGINAL**

[handwritten: Renewal/ Extension of 2
2009/0730/001]   85.03

### THIRD LEASE AMENDMENT

THIS THIRD LEASE AMENDMENT ("Amendment") is made and entered into as of the 31st day of March, 2015 by and between Inland Commercial Property Management, Inc., ("ICPM") as managing agent for Owner, hereinafter defined, and Boy Scouts of America (hereinafter referred to as "Tenant").

### RECITALS

A.    WHEREAS, Inland Burnsville Crossing, L.L.C., a Delaware limited liability company ("Owner") successor in interest Inland Ryan, LLC, a Delaware limited liability company, and Tenant own the interests of Landlord and Tenant respectively under a Lease dated January 25, 1999, as amended by that certain First Amendment to Lease dated January 25, 1999, and as further amended by that certain Lease Extension Agreement dated August 13, 2009 (collectively the "Lease"), relating to the premises commonly known as 14250 Plymouth Avenue South, Burnsville, Minnesota 55337 (the "Premises") located in the shopping center commonly known as BURNSVILLE CROSSING SHOPPING CENTER, located in Burnsville, Minnesota; and

B.    WHEREAS, ICPM is the managing agent for Owner and has the authority to modify the terms of the Lease on behalf of Owner; and

C.    WHEREAS, the Lease Term expires on March 31, 2015; and

D.    WHEREAS, ICPM and Tenant desire to extend the term of the Lease and to provide for the rental amounts to be paid during the Extension Period, defined herein, to provide for an additional option to further extend the Lease Term, and to amend the Lease.

NOW, THEREFORE, for good and valuable consideration including the mutual agreements contained herein, it is hereby agreed by and between ICPM and Tenant that the Lease is amended as follows:

1.    ICPM and Tenant agree that the term of this Lease shall be extended for a five (5) year period commencing April 1, 2015 and expiring on March 31, 2020 (the "Extension Period"). The extension is in replacement for and in lieu of any other options (or extensions) as are otherwise set forth in the Lease. Except as expressly set forth herein, no other options or extensions are available or granted to Tenant.

2.    MINIMUM RENT.    Tenant shall pay to Landlord fixed annual minimum rent during the Extension Period, payable in monthly installments of Two Thousand Two Hundred Twelve and 50/100 Dollars ($2,212.50) on the first day of each month throughout such period.

3.    In addition to the fixed annual minimum rent due during the Extension Period, as set forth in paragraph two (2) above, Tenant shall pay all items of additional rent, and other charges required to be paid pursuant to the Lease, including, but not limited to, Operating Costs, as provided for in the Lease.

4.    INSURANCE:  Tenant's insurance shall meet Landlord's current minimum standards as follows:

- General Liability limits minimum of:  $1,000,000 per occurrence.
- General Liability limits minimum of:  $2,000,000 in aggregate.
- General Liability policy must show evidence of Fire Legal Liability.
- Auto Liability limits minimum of:  $1,000,000 (if necessary)
- Umbrella (Excess) Insurance minimum of:  $3,000,000
- Worker's Compensation must have WC Statutory Limits
- Employers Liability policy limits minimum of:  $500,000 for each accident.
- Employers Liability policy limits minimum of:  $500,000 for each disease - employee.

- Employers Liability policy limits minimum of:  $500,000 for each disease - policy limit.
- Additional Insured endorsement of:

  Inland Commercial Property Management, Inc. as managing agent for the owner and Inland Burnsville Crossing, L.L.C. are endorsed as additional insured on liability policies and such insurance is primary non-contributory with any other insurance available to owner and property manager.

- Dram Shop/Liquor Liability minimum of:  $1,000,000 per occurrence.  (if necessary)
- Physical (a.k.a. Content or Property) Damage Insurance
- Plate Glass Insurance
- Extra Expense & Business Interruption loss of rents for a period of not less than twelve (12) months of Minimum Rent and Additional Rent naming Landlord as loss payee

5.    CONFIDENTIALITY.  Tenant agrees to keep the terms of this Lease Extension Agreement confidential.  In the event that Tenant discusses any portion of this Lease Extension Agreement with a third party, this Lease Extension Agreement will immediately become null and void and same shall be considered a default under the Lease.  The Landlord shall have all remedies provided thereunder.

6.    This Amendment is contingent on Landlord's receipt of:

a)  A copy of the current gross sales figures for the Premises for the past 6 months;

b)  A copy of the current service contract for the cleaning and servicing of the HVAC unit(s) serving the Premises; and

c)  A copy of the current certificate of insurance for the premises.

7.    All capitalized terms, if not defined in this Lease Extension Agreement, shall have the same meaning as defined in the Lease.  Wherever the term, "term of this Lease" or "Lease Term" or similar phrase is used in the Lease, such term or phrase shall be deemed to include the Extension Period.

8.    Except as expressly modified herein, all of the provisions of the Lease shall remain unmodified

and in full force and effect.

INLAND COMMERCIAL PROPERTY
MANAGEMENT, INC.,
as managing agent for the Owner

By: _____
          D. Scott Carr

Its: _____
          President

          7.2.15

BOY SCOUTS OF AMERICA

By: _____

Its: _____
          CFO

          3/30/15

REVIEWED
IRC LAW DEPT.