# EXHIBIT 1



O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036-6537

T: +1 212 326 2000
F: +1 212 326 2061
omm.com

File Number:
0705810-00073

July 31, 2020

**Tancred Schiavoni**
D: +1 212 326 2267
tschiavoni@omm.com

**VIA FEDEX**

David J. Molton, Esquire
BROWN RUDNICK LLP
Seven Times Square
New York, New York 10036

Re:     ***In Re Boy Scouts***

Dear Mr. Molton:

Yesterday, in your Rule 2019 submission, you invited any party in interest who sought the identity of the claimants making up the 10,000 individuals represented by the entity you represent called "Coalition of Abused Scouts for Justice" to write you to request it.  I am writing in response to your submission to request the list.  The Protective Order in place in this case contains provisions negotiated by the TCC that cover claimant information and you may designate the list as subject to the Order.

Our client is by order of the court a party to the mediation. We represent Century Indemnity.

Please confirm that you provide us the list and when you will do so.

I look forward to working with you.

Thank you.

Sincerely,

  _/s/ Tancred Schiavoni_
Tancred Schiavoni
of O'MELVENY & MYERS LLP

# EXHIBIT 2

| | |
|---|---|
| **From:** | Beville, Sunni P. <SBeville@brownrudnick.com> |
| **Sent:** | Wednesday, August 5, 2020 7:27 PM |
| **To:** | Schiavoni, Tancred |
| **Cc:** | Molton, David J.; Axelrod, Tristan G.; Kirschenbaum, Andrew |
| **Subject:** | RE: BSA/Coalition 2019 Statement |

**[EXTERNAL MESSAGE]**

Correct.  We are not, at this time, providing the name and address information to protect the identity of the victims.  That information will be filed with proof of claim form pursuant to the Bar Date Order.  However, we are working with BrownGreer to collect and organize the claims information so that it can be sorted, organized and presented in different ways that will be helpful in mediation and otherwise.  Happy to discuss.

Regards,

**Sunni P. Beville, Esq.**
**Brown Rudnick LLP**
sbeville@brownrudnick.com
617.856.8475

---

**From:** Schiavoni, Tancred <tschiavoni@omm.com>
**Sent:** Wednesday, August 5, 2020 7:13 PM
**To:** Beville, Sunni P. <SBeville@brownrudnick.com>
**Cc:** Molton, David J. <DMolton@brownrudnick.com>; Axelrod, Tristan G. <TAxelrod@brownrudnick.com>; Kirschenbaum, Andrew <akirschenbaum@omm.com>; Schiavoni, Tancred <tschiavoni@omm.com>
**Subject:** RE: BSA/Coalition 2019 Statement

**External E-mail. Use caution accessing links or attachments.**

---

Sunni

Do I understand your email as conveying that you will not identify the claimant?

---

**From:** Beville, Sunni P. <SBeville@brownrudnick.com>
**Sent:** Wednesday, August 5, 2020 7:11 PM
**To:** Schiavoni, Tancred <tschiavoni@omm.com>
**Cc:** Molton, David J. <DMolton@brownrudnick.com>; Axelrod, Tristan G. <TAxelrod@brownrudnick.com>
**Subject:** BSA/Coalition 2019 Statement

**[EXTERNAL MESSAGE]**

Tanc,

David Molton forwarded to me your correspondence requesting information relating to the 2019 Statement filed by the Coalition of Abused Scouts for Justice.  Thank you for reaching out to us.  We look forward to working with you.

Subject to confidentiality restrictions, the Coalition has agreed to provide the following information to parties:

- Current City, State of victim
- Date(s) of incident(s)
- Location of Incident and/or responsible Local Council (to the extent it is immediately available)

We are currently compiling this information and will send this information as soon as possible.   Before doing so, can you confirm whether you are subject to the Confidentiality and Protective Order governing these chapter 11 cases and if so, that you agree to treat the information provided as "COMMITTEE ADVISOR ONLY"?

Please feel free to contact us with any questions or to discuss further.

Regards,

**brown**rudnick

**Sunni P. Beville**
Managing Director, Dispute Resolution & Restructuring

Brown Rudnick LLP
One Financial Center
Boston, MA 02111
T: 617.856.8475
M: 617.899.6972
F: 617.289.0457
sbeville@brownrudnick.com
www.brownrudnick.com

Inclusion and self-expression are professional and personal values of mine.
One way I practice these values is to share my preferred gender pronouns.
Mine are she / her / hers.

Please consider the environment before printing this e-mail

*********************************************************************

The information contained in this electronic message may be legally privileged and confidential under applicable law, and is intended only for the use of the individual or entity named above. If the recipient of this message is not the above-named intended recipient, you are hereby notified that any dissemination, copy or disclosure of this communication is strictly prohibited. If you have received this communication in error, please notify Brown Rudnick LLP, (617) 856-8200 (if dialing from outside the US, 001-(617)-856-8200) and purge the communication immediately without making any copy or distribution.

To the extent Brown Rudnick is a "data controller" of the "personal data" (as each term is defined in the European General Data Protection Regulation) you have provided to us in this and other communications between us, please see our privacy statement and summary here which sets out details of the data controller, the personal data we have collected, the purposes for which we use it (including any legitimate interests on which we rely), the persons to whom we may transfer the data and how we intend to transfer it outside the European Economic Area.

*********************************************************************


*********************************************************************

The information contained in this electronic message may be legally privileged and confidential under applicable law, and is intended only for the use of the individual or entity named above. If the recipient of this message is not the above-named intended recipient, you are hereby notified that any dissemination, copy or disclosure of this communication is strictly prohibited. If you have received this communication in error, please notify Brown Rudnick LLP, (617) 856-8200 (if dialing from outside the US, 001-(617)-856-8200) and purge the communication immediately without making any copy or distribution.

To the extent Brown Rudnick is a "data controller" of the "personal data" (as each term is defined in the European General Data Protection Regulation) you have provided to us in this and other communications between us, please see our privacy statement and summary here which sets out details of the data controller, the personal data we have collected, the purposes for which we use it (including any legitimate interests on which we rely), the persons to whom we may transfer the data and how we intend to transfer it outside the European Economic Area.

*********************************************************************

# EXHIBIT 3

ABOUT OUR FIRM    OUR TEAM    CURRENT LITIGATIONS


THORNTON

BLOG ⌄    CONTACT

## Anne Andrews



For over twenty years, I have worked extensively with my founding partner, John C. Andrews, litigating personal injury product liability cases against major pharmaceutical companies resulting from the sale of dangerous drugs, medical devices and dietary supplements. Andrews & Thornton has unique experience in obtaining compensation for clients despite the wrongdoing company declaring bankruptcy.

### Experience to Excel in Opioid Bankruptcies

*Bankruptcy Leadership and Experience*

As you know, I represent Ryan Hampton and Cheryl Juaire on the Official Committee of Unsecured Creditors in the Purdue Bankruptcy. Together, Ryan, Cheryl, and I are fighting tooth and nail to draw attention to the real victims of this bankruptcy—those still suffering with addiction, those in recovery, and the families of those who have succumb to their opioid use.

I represent more than 1,000 additional creditors of Purdue. Each of these victims' stories are as tragic as the next, which hardworking, stable livelihoods being turned upside down or even ended early by these drugs. I have built my career out on representing victims of corporate greed and the bulk of my experience comes from litigating against the pharmaceutical industry. Not only do I take on traditional lawsuits, but my firm has focused on representing victims in bankruptcies just like Purdue's.

Most recently before Purdue, I have represented my client as Co-Chair of the Official Committee of Unsecured Creditors in **Insys Therapeutics** (*In re Insys Therapeutics, Inc.,* Bankruptcy No. 19-11292, Chapter 11). Insys, as the first pharmaceutical bankruptcy stemming from the over 2,600 opioid lawsuits filed by states, cities, and counties, has already covered some of the difficult ground required in these complicated bankruptcies. I am happy to say that the victims of Insys will be compensated fairly in light of the limited resources available.

Type and press enter to search

🔨 **Current Litigations**

## Recent News & Blog Posts

> **Boy** Scouts of America Bankruptcy April 14, 2020

> Helping Military Families Obtain Recovery In Purdue Pharma Bankruptcy March 20, 2020

> Breaking News: Purdue Files for Bankruptcy September 16, 2019

LIVE CHAT



In addition to my work in Insys, I have served on Unsecured Creditors' Committees in **TwinLab** (*In re TL Admin. Corp.*, Bankruptcy No. 03-15564, Chapter 11), **N.V.E.** (*In re N.V.E., Inc.*, Bankruptcy No. 05-35692, Chapter 11), and as the Chair of the Official Committee of Unsecured Creditors in **NECC** (*In re New England Compounding Pharmacy, Inc.,* Bankruptcy No. 12-19882, Chapter 11). I also participated in a bankruptcy proceeding on behalf of tort creditors in **Chemtura** (*In re Chemtura Corp.,* Bankruptcy No. 09-11233, Chapter 11), **Metabolife** (*In re MII Liquidation Inc.,* Bankruptcy No. 05-6040, Chapter 11), **MuscleTech** (*In re Ephedra Products Liability Litigation/In re Muscletech Research and Development, Inc.,* 349 B.R. 333 (S.D.N.Y. 2006), Chapter 15), **Dow Corning** (*In re Dow Corning Corp.,* Bankruptcy No: 95-20512, Chapter 11), and **PG&E** (*In re PG&E Corp.,* Bankruptcy No. 19-30088, Chapter 11). Earlier this year, I began serving on the Tort Claimants Creditors' Committee in **Boy** Scouts (*In re Boy Scouts of America*, Bankruptcy No. 20-10343, Chapter 11). Ms. Andrews was a cofounder of the "Coalition of Abused Scouts for Justice," an Ad Hoc Committee in the **Boy** Scouts Chapter 11 Bankruptcy. The committee is dedicated so that no victim will be left without compensation. For information regarding joining the coalition, please email me directly at bsa@andrewsthornton.com.

I have been fortunate enough to have held leadership positions on the tort committees for plaintiffs in the bankruptcy proceedings filed by Metabolife International, Inc., MuscleTech, and NVE, Inc. Due in large part to my firm's efforts, these bankruptcies generated over $300 million in settlement proceeds for the benefit of the claimants injured by ephedra. For *In re MII Liquidation, Inc.* (Metabolife – Chapter 11), I was selected by the Office of the United States Trustee for the Southern District of California to serve in a representative capacity for two of my clients on the Official Committee of Unsecured Creditors, and I was elected by that Committee as Committee Co-Chair. In that capacity, I assisted in successfully negotiating the settlement of 700 tort claims within the bankruptcy. I was also selected by the Office of the United States Attorney for the District of New Jersey to serve in a representative capacity for my client on the Official Committee of Unsecured Creditors for the *In re N.V.E., Inc.* Chapter 11 case, where I served as Lead Counsel in the negotiation and global resolution of tort claims. In addition, I was selected, per coordinated orders of Justice Farley of the Ontario Commercial Court in Ontario, Canada and Judge Rakoff in the Southern District of New York, to serve on the Ad Hoc Committee of Tort Claimants in the Canadian CCAA case and companion U.S. Chapter 15 case in *In re MuscleTech Research and Development, Inc.* This was one of the first Chapter 15 cases ever filed (Chapter 15 provides for ancillary U.S. proceedings in aid of foreign main insolvency proceedings). My firm was an integral component to the negotiation and global resolution of tort claims in that case.

I was selected by the Office of United States Trustee for the Southern District of New York to serve in a representative capacity for my client on the Official Committee of Unsecured Creditors in the *In re Chemtura Corporation* bankruptcy, which involved significant tort claims for injury resulting from exposure to diacetyl.

I also served on the Official Creditors Committee in the tragic case of a deadly fungal meningitis outbreak caused by contaminated steroid injections made by the New England Compounding Pharmacy. The bankruptcy was in parallel with the MDL 2419 in the District of Massachusetts, before the honorable Rya W. Zobel. As Co-Chair of the Official Creditors' Committee, I worked with a team of top national attorneys to secure



an unexpected 280-million-dollar settlement as compensation for the victims. I was fortunate to receive peer recognition for this work. My firm was a 2015 Products Liability Finalist for the National Law Journal's Elite Trial Lawyers. Additionally, I received acknowledgement for Distinguished Achievement (Top Gun) Award for Orange County Trial Lawyers Association (OCTLA).

In addition to my current committee work in opioid bankruptcies of **Insys** and **Purdue**, I represent a creditor seated on the Official Committee of Tort Creditors in PG&E. That case recently won court approval of a Restructuring Support Agreement that commits $13.5 billion to victims of wildfires.

*Expert development*

I have been fortunate enough to serve in multiple capacities in Federal MDLs and state coordinated litigations, as detailed below. In each litigation I have been able to commit the time and energy to recruit and prepare nationally recognized experts whose reports and testimony have been instrumental in the litigation.

Understanding the importance of knowledgeable qualified experts regarding the prescription opioid litigation, I have been working to contact and secure the commitment of a number of the world's leading experts in the issues confronting this litigation. I have been successful at assembling a distinguished panel of doctors and scientists with longstanding research interests in the epidemiology, pharmacology, neuroscience and public health issues of the opioid epidemic. Additionally, I have the ability to call on resources and contacts to bring additional expertise into litigations and bankruptcies as needed.

## *Professional Experience: Multidistrict and State Coordinated Leadership and Experience*

My firm, Andrews & Thornton, has extensive multidistrict federal and coordinated state experience. I was appointed to the *In Re: Power Morcellator Products Liability Litigation* (MDL 2652) Plaintiffs' Steering Committee involving Johnson and Johnson's Ethicon Power Morcellator under the Honorable Judge Kathryn H. Vratil in the United States District Court in the District of Kansas. We were involved in working with experts in alternative safer designs. The entire litigation settled at an early stage

I am currently honored to be appointed to the Plaintiffs' Executive Committee in the *In Re: Bair Hugger Forced Air Warming Devices Products Liability Litigation* (MDL 2666), where I am fortunate enough to work with a diverse and highly skilled group of attorneys from across the nation. Our firm located and developed an internationally renowned expert in fluid dynamics to model the effect of the Bair Hugger forced air warming device on airflow in the operating theater. The modeling successfully withstood a Federal Rule of Evidence Rule 702 challenge.  It will be important evidence in the upcoming trials.

I was appointed to the Plaintiffs' Executive Committee (PEC) by the Honorable Robert L. Miller, Jr. for *In Re: Biomet M2a Magnum Hip Implant* products liability litigation (MDL 2391), which settled for $56 million in 2014. I chaired the Regulatory Committee.

Honorable Barry Ted Moskowitz appointed me to the PSC for *In re Hydroxycut* (MDL 2087). We developed key expert witnesses at the outset of the litigation in the key areas



of nephrology, cardiology, pharmacology and neurology.

For *In re: Ephedra Products Liability Litigation* (MDL 1598), Hon. Jed. S. Rakoff of the Southern District of New York appointed me to the Plaintiffs' Coordinating Counsel. My partner and I successfully conducted an extensive FRE 702 hearing involving complex scientific issues. We retained and developed the key experts in pharmacology, cardiology and neurology. I have served as Co-Plaintiffs' Liaison Counsel in *In re Metabolife* for 356 Cases (Cal. JCCP 4360) before Honorable Ronald Styn in San Diego, CA.

My firm served as Lead Counsel in *In re Quinine* (JCCP 4565), which settled in 2011 with various manufacturers, including Teva and McKesson, for over $40 million. We developed top experts in the fields vital to the litigation: hematology and nephrology.

Currently, I serve as Lead Counsel for **USPLabs Dietary Supplement Cases** (JCCP 4808).

In addition, my firm has represented clients in various capacities for the following pharmaceutical MDLs and state coordinated proceedings:

- *In Re: Actos* (JCCP 4696);
- *In Re: Avandia* (JCCP 4578);
- *In Re: Byetta* (JCCP 4574);
- *In Re: C. R. Bard, Inc. Pelvic Repair System* (MDL 2187);
- *In Re: Diet Drugs* (Phentermine / Fenfluramine / Dexfenfluramine) products liability litigation (MDL 1203);
- *In Re: Fosamax / Alendronate Sodium* (JCCP 4644);
- *In Re: Gadolinium* (JCCP 4556 and MDL 1909);
- *In Re: Kugel Mesh* (MDL 1842);
- *In Re: PPA* litigation (MDL 1470);
- *In Re: Pradaxa* (MDL 2385);
- *In Re: Reglan Metoclopramide* (JCCP 4631);
- *In Re: Stryker Rejuvenate & ABG II Hip Implant* (MDL 2441);
- *In Re: Vioxx* (MDL 1657);
- *In Re: Yaz Yasmin* (JCCP 4608 and MDL 2100);
- *In Re: Zimmer Durom Cups* (MDL 2158);
- *In Re: Zoloft* (MDL 2342);

Currently, my firm advocates for victims injured by dietary supplements (OxyElite Pro), Risperdal (JCCP 4775), Bair Hugger Forced Air Warming Device (MDL 2666), Karl Storz Power Morcellator (Case No. BC581718), and several other harmful drugs and medical devices. In addition to my leadership experience in multiple litigations, I have held board positions in the following organizations: Consumer Attorneys of California (CAOC), Orange County Trial Lawyers (OCTLA), Orange County Bar Association (OCBA) and I am frequently invited to speak as a lecturer in frequent areas of law as a recognized expert in mass tort and bankruptcy around the country. I am past President of OCTLA and have led the Hydroxycut Litigation Group and Fungal Meningitis Litigation Group by the American Association for Justice (AAJ).

## SIGN UP FOR OUR NEWSLETTER

Email Address

Zip Code

First Name

Last Name

Submit

## LATEST TWEETS

The PG&E Bankruptcy may affect your rights as a wildfire victim! Andrews & Thornton has experience representing vi…

https://t.co/oLSYfZOZuf

550 days ago

https://t.co/iyPOwPvKF8 Contact Andrews & Thornton at (949) 748-1000 or via email at info@andrewsthornton.com if y…

https://t.co/VnkpEnXhVq

600 days ago

U by Kotex® Sleek® Tampons, Regular Absorbency, Recalled for Coming Apart During Removal. Tampon remnants could be…

https://t.co/TrzyDC8DhY

600 days ago

Follow us on Twitter

## ON FACEBOOK

Andrews Thornton updated their website address.



**Andrews Thornton updated their website address.**

www.facebook.com

1 years ago

View on Facebook · Share

2    0    0

Load more

© 2020 Andrews & Thornton, Attorneys At Law, A Law Corporation. All Rights Reserved

Site Developed by Christian Campos



LIVE CHAT

# EXHIBIT 4

# ABUSED IN SCOUTING

## 1-888-99-SCOUT

THE BOY SCOUTS OF AMERICA FILED FOR BANKRUPTCY. DEADLINE FOR FILING CLAIMS IS NOVEMBER 16: CALL NOW!

### SCOUTING ABUSE SURVIVORS

# Do Not Suffer in Silence or Shame Any Longer

If you were sexually abused while in the Boy Scouts of America, you are not alone. Hold the BSA accountable, prevent future abuse, and contact us today.

START NOW

LEARN MORE

How can we help you?

000001

As Featured In











How can we help you?

000002



# Boy Scouts of America Filed for Bankruptcy

The BSA filed for Chapter 11 Bankruptcy February 2020. This may limit your chances to seek justice for your abuse. Learn more about the Boy Scouts bankruptcy and how it impacts your claim by clicking below!

LEARN MORE



## Map of Scouting Abuse Locations

Click to view a list of locations by state, troop number, city, and camp ... nts reported they were abused by BSA leaders.

How can we help you?

**000003**

# We are Survivors: Join the Movement



Abused in Scouting started with a few voices in February 2019. Now we're a group of over 6,000 men who survived sexual abuse in BSA programs, united to fight against Scouting abuse. It's time to kill the secret of Boy Scout of America sexual abuse and let survivors know they are not alone. Come forward and talk to us today to protect the children of tomorrow.

CLIENT TESTIMONIALS

✉

How can we help you?

000004

**VIEW MAP**



## List of Confirmed BSA Abusers

Your abuser's name may be on our list. Search our list of confirmed child sex abusers within the Boy Scouts of America.

**VIEW LIST**

**BOY SCOUTS OF AMERICA SEXUAL ABUSE**

# Decades of Hidden Scouting Abuse

**Child abuse happened in nearly every Scouting program, including
Sea Scouting, Cub Scouting, Venturing, Scouts BSA, Exploring, and Learning for Life.**

How can we help you?    _ ABUSE FILES

**000005**

Since its founding in 1910, the Boy Scouts of America has kept thousands of secret files documenting sexual abuse in the Boy Scouts. These files, known as the "Perversion Files", hold the names of alleged sexual predators in the Boy Scouts of America going all the way back to 1919. The Perversion Files were held from the public for decades, the BSA refusing to disclose their secret blacklist to the public.

## FAILURE TO REPORT TO POLICE

However, investigators finally got to review some of these files in 2012. After reviewing over 1,600 confidential BSA files from 1970 to 1991, investigators indicated that Scouting officials often silenced sexual abuse cases by asking sexual predators to quietly resign instead of reporting them to local authorities. **In many of these cases, molesters in the Boy Scouts of America were not reported to the police.**

## QUIET DISMISSALS

The leaders of the organization allegedly created a system to maintain confidential files of all of these abusers and did everything to ensure such information never was discovered. The Boy Scouts dealt with these predators so much that the organization allegedly created a form letter to send to the thousands of leaders being dismissed over abuse allegations. The form letter stated, "We are making no accusations and will not release this information to anyone, so our action in no way will affect your standing in the community." This ensured that predators _____ heir patterns of abuse to innocent victims in _____ over this country.

How can we help you?

**000006**

## PUSHING BOUNDARIES

These sexual predators within the BSA took advantage of the innocence of children and/or enticed them with illegal activities. In the Boy Scouts of America files, hundreds show Scout leaders allowed boys to drink alcohol, drive cars, or look at pornography. As the trust continued to build, Scout leaders would often gradually test physical boundaries during skinny dipping, group showers, sleepovers and one-on-one activities.

Over time, abusive Scouting leaders would continue to twist these boundaries until they sexually abused children in the most horrific ways including rape, masturbation, and fondling. Scouting predators took advantage of children's trust to abuse them in the most horrific ways, and few have been punished for their crimes.

**Because of the Boy Scouts of America's negligence to report sexual abuse crimes or provide adequate protection for children, sexual predators were allowed to walk free and likely harm more children.**

# Am I Barred from Suing the BSA Becau

# my Abuse Happened so Long Ago?

How can we help you?

**000007**



Not necessarily. Many laws have changed to help victims who were abused, even many decades ago. Many state legislatures are sick of the Boy Scouts of America and other institutional cover-ups that allowed sexual predators to abuse millions of children over the past century. You do not have to suffer in silence anymore. **We are here to help victims of sexual abuse at the hands of the Boy Scouts of America: please contact us today to learn more**.

CONTACT US



How can we help you?

**000008**

"The Abused in Scouting organization

is allowing me and thousands of
others to come into the light and out
of the darkness."
~ *Anonymous Abused in Scouting
Client*

## ABUSED IN SCOUTING IN THE NEWS

# Chilling Stories of Sexual Abuse in the Boy Scouts

What is Abused in Scouting? - Call for Free Case Evaluation - 1.888.9...



How can we help you?

o o o o o o o o

**000009**

**LEARN MORE**

## TV Commercial

Boy Scouts History of Abuse



## Press Conference

AIS Legal Team Announces First Case Filed A...



How can we help you?

000010

FIRST NAME

LAST NAME

EMAIL

PHONE NUMBER

BRIEFLY DESCRIBE YOUR CASE

FREE EVALUATION

---

ATTORNEY ADVERTISEMENT

This website and the information contained herein has been prepared by AVA Law Group solely for informational purposes and nothing contained in this website is intended for nor should it be construed as rendering legal advice to the person reading the website.

Nothing in this website nor the transmission of the information in this website is intended to create, and as well the accessing of this website over the internet by a user does not in any way constitute, an attorney-client or lawyer-client relationship.

For a full review of our disclaimer, please click here. To view our full privacy policy, please click here.

# 1-888-99-SCOUT

---

# ^BUSED IN SCOUTING

How can we help you?

000011

How can we help you?



**000012**

# Time Magazine

## CONTACT US TODAY FOR
## YOUR FREE, IN-DEPTH CASE EVALUATION

$\rightarrow$ WE'RE ON YOUR SIDE

$\rightarrow$ WE'RE AVAILABLE 24/7

$\rightarrow$ NO FEES UNLESS YOU WIN

How can we help you?

## FREE IN-DEPTH
## OBLIGATION CASE EVALUATION

**000013**

# ABUSED IN SCOUTING

## 1-888-99-SCOUT

---

THE BOY SCOUTS OF AMERICA FILED FOR BANKRUPTCY. DEADLINE FOR FILING CLAIMS IS NOVEMBER 16: CALL NOW!

# Attorney Disclaimer

# Abused in Scouting Attorney Disclaimer

Andrew Van Arsdale, AVA Law Group, Inc. 3667 Voltaire Street, San Diego CA, 92106 is responsible for the content of this advertisement. No legal fee unless you win, but client may be responsible for costs of litigation and any awarded costs and fees. Your initial call may not be with a licensed attorney and does not constitute legal advice or create an attorney-client relationship. An attorney-client relationship will only be created by a written agreement between a law firm and a client. The statements made here do not fully state all the requirements needed for a successful case. Do not select an attorney solely based upon an advertisement. This advertisement is not a guarantee or warranty of any legal matter. No representation is made that the quality of legal services to be performed is greater than the quality of legal services performed by other lawyers or that any attorney involved with this advertisement is a licensed specialist of any state. Do not respond if you already have an attorney. Services may be performed by affiliated law firms of AVA Law Group, Inc. who be jointly responsible for your case. Free background information is available upon req ··· nowledge and agree to all of the above.

How can we help you?

**000014**

See disclaimer at www.abusedinscouting.com.

See disclaimer at www.abusedinscouting.com.

---

ATTORNEY ADVERTISEMENT

This website and the information contained herein has been prepared by AVA Law Group solely for informational purposes and nothing contained in this website is intended for nor should it be construed as rendering legal advice to the person reading the website.

Nothing in this website nor the transmission of the information in this website is intended to create, and as well the accessing of this website over the internet by a user does not in any way constitute, an attorney-client or lawyer-client relationship.

For a full review of our disclaimer, please click here. To view our full privacy policy, please click here.

## 1-888-99-SCOUT

---

# ABUSED IN SCOUTING

How can you help you?

000015

## ABUSED IN SCOUTING

THE BOY SCOUTS OF AMERICA FILED FOR BANKRUPTCY. DEADLINE FOR FILING CLAIMS IS NOVEMBER 16: CALL NOW!

# Boy Scouts of America Bankruptcy



How can we help you?

**000016**

# Boy Scouts of America Bankruptcy Filing

On February 18, 2020, the Boy Scouts of America filed Chapter 11 Bankruptcy in the United States Bankruptcy Court for the District of Delaware.
It is important for those abused in Scouting—no matter what their age or the state where they live—to come forward now!

CALL NOW     LEARN MORE

## What is Chapter 11 Bankruptcy?

- The Chapter 11 bankruptcy process offers the opportunity for BSA to come up with a reorganization plan to meet its obligations to creditors, including Scouting abuse survivors, and to restructure itself so that it can come out of bankruptcy and continue operating.

## How Does the Boy Scouts of America Bankruptcy Impact Scouting Abuse Survivors?

- First, the Chapter 11 bankruptcy process means that the bankruptcy court will set a deadline for filing claims, approximately 6 months or so. This deadline severely limits Scouting abuse survivors' time to file claims for their abuse, so coming forward now is of the essence.
- On Monday May 18, the bankruptcy court set the deadline for filing claims for November 16, 2020.
- Second, the bankruptcy filing means that to reach a settlement with the thousands of Scouting abuse survivors across the U.S., individual survivors will not get their day in court. However, the streamlined nature of settlement process may mean abuse survivors will get the compensation they deserve more quickly and efficiently than having future individual trial dates.

How can we help you?

000017

# What Will Happen Next?

- One of the next steps in the bankruptcy process will be the establishment of a "committee of unsecured creditors," or a group of people made up of creditors to whom BSA owes unsecured obligations—including the potential legal liability to abuse survivors.
- It will be essential for the United States Trustee to form an "abuse survivors" or "tort claimants" committee separate and distinct from a committee of general unsecured creditors. Such committees have regularly been created in other bankruptcies involving sex abuse or other tort claims, e.g., US Gymnastics. One will be necessary in this case to enable adequate representation of the diverse community of sex abuse victims.

# What Will AIS Do During the Bankruptcy Process?

**Our goal is to achieve a measure of justice and fair compensation to the survivors.**

- Currently, AIS is advocating for the inclusion of local councils in the bankruptcy proceeding, as well as a way to hold the sponsoring organizations accountable if they had knowledge of the abuse.

- We are preparing and will be filing claims on behalf of **all** members of AIS as soon as the Court finalizes that bankruptcy procedure. We are actively preparing each file to meet the criteria the Court will require.

- We have a representative on the Torts claimant committee (Abuse Survivors Committee) and will participate in that process throughout the duration of the bankruptcy proceeding.

# What are the Boy Scouts Doing to Compensate Scouting Abuse Victims?

How can we help you?

…ay they plan to use the Chapter 11 Bankruptcy process to establish a Trust that will provide just

**000018**

compensation for Scouting abuse victims.

- We hope that BSA will take the opportunity, in addition to providing compensation to past victims of sex abuse, to take the significant steps that are necessary both to "come clean," and provide all stakeholders and law enforcement all of the information in their files about past and current abusers, and to reform BSA programs to guarantee the safety of all current and future scouts.

## Why Should Scouting Survivors Come Forward Now?

- It is important for those abused in Scouting—no matter what their age or the state where they live—to come forward now. The bankruptcy court just set a window of time for the filing of claims, and this window could be the last chance for abuse victims to seek justice.
- The deadline for filing claims against the BSA for sexual abuse is November 16, 2020.
- After this five-month window of time is over, Scouting abuse survivors may no longer get to hold the BSA accountable for their abuse.

# More Information

**ABUSED IN SCOUTING ANNOUNCES THE BOY SCOUTS OF AMERICA FILED FOR BANKRUPTCY**



**BOY SCOUTS OF AMERICA FILES FOR BANKRUPTCY AMIDST SEXUAL ABUSE LAWSUITS**



How can we help you?

**000019**

**CONTACT US TODAY** FOR

YOUR FREE, IN-DEPTH CASE EVALUATION

→ WE'RE ON YOUR SIDE

→ WE'RE AVAILABLE 24/7

→ NO FEES UNLESS YOU WIN

## FREE IN-DEPTH
## NO OBLIGATION CASE EVALUATION

FIRST NAME

LAST NAME

EMAIL

PHONE NUMBER

BRIEFLY DESCRIBE YOUR CASE

FREE EVALUATION

ATTORNEY ADVERTISEMENT

This website and the information contained herein has been prepared by AVA Law Group solely for informational purposes and nothing contained in this website is intended for nor should it be construed as rendering legal advice to the person reading the website.

Nothing in this website nor the transmission of the information in this website is intended to create, and as well the accessing of this website over the internet by a user does not in any way constitute, an attorney-client or lawyer-client relationship.

For a full review of our disclaimer, please click here. To view our full privacy policy, please click here.

1-888-99-SCOUT ✉

# ABUSED IN SCOUTING

How can we help you?

**000020**

How can we help you?

**000021**



Media - Abused in Scouting

THE BOY SCOUTS OF AMERICA FILED FOR BANKRUPTCY. DEADLINE FOR FILING CLAIMS IS NOVEMBER 16: CALL NOW!



# Media

**HELPING SURVIVORS OF BOY SCOUT ABUSE**

# Nationally Acclaimed Dedication







How can we help you?

000022





000023



How can we help you?





**000024**

☰

# A Reckoning For The Boy Scouts Of America And Its History Of Sexual Abuse

Sexual abuse allegations continue to pile up against the Boy Scouts of America as changes to statutes of limitations pave the way for future lawsuits. Abused in Scouting Attorney Tim Kosnoff joined Diane Rehm to explain why hundreds have contacted him in recent months to report the abuse, and what he wants to see done to hold the Boy Scouts accountable.

**LISTEN NOW**

# Abused in Scouting On the Air

In 2012, NPR ran a story featuring lawyer Timothy Kosnoff describing 1,900 Boy Scout Leaders accused of Child Sex Abuse. Listen now!



How can we help you?

✉

000025



☰

# AIS In The News



New lawsuit identifies 350 predator Boy Scout scoutmasters







How can we help you?

**000026**







ATTORNEY ADVERTISEMENT

This website and the information contained herein has been prepared by AVA Law Group solely for informational purposes and nothing contained in this website is intended for nor should it be construed as rendering legal advice to the person reading the website.

Nothing in this website nor the transmission of the information in this website is intended to create, and as well the accessing of this website over the internet by a user does not in any way constitute, an attorney-client or lawyer-client relationship.

For a full review of our disclaimer, please click here. To view our full privacy policy, please click here.

### 1-888-99-SCOUT





# ABUSED IN SCOUTING

How can we help you?

000027

# EXHIBIT 5

### The Washington Post

*Democracy Dies in Darkness*

# Victims of sexual abuse in the Boy Scouts were encouraged to come forward. Hundreds responded.

By **Kayla Epstein**

April 25, 2019 at 1:04 p.m. EDT

A lawyer who has worked for years to bring allegations of sexual abuse within the Boy Scouts of America to light says that as of Thursday he has gathered about 220 new clients who allege they were abused while participating in the program as children. The new allegations add to an already extraordinary tally of such claims against organization dedicated to fostering the leadership and personal growth of young people.

Tim Kosnoff, the attorney who has gathered the claims, has worked on sexual abuse cases involving the Boy Scouts as well as the Church of Jesus Christ of Latter-day Saints and said he felt a "moral imperative" to bring their stories to light.

"Kids are still being abused in scouting," Kosnoff told The Washington Post in a phone conversation Wednesday. "This is not historical."

His team says the allegations they've received span from 1953 to June 2018. The accusers are as old as 75 and as young as 15, and hail from 33 states. The crimes alleged range from showing lewd photos to Scout members to molestation.

The Post reviewed a partially redacted document, compiled by Kosnoff and his team, that tallied 150 of the people who have signed on as clients. The document contains details for about 110 of them, such as their age, the age at time of the alleged abuse and what they say happened to them. The list was not yet updated with all the clients who had signed with Kosnoff when The Post viewed it.

They have not yet filed a lawsuit, and Kosnoff said he was still gathering information from new clients and was waiting to see whether the Boy Scouts would file for bankruptcy.

Kosnoff was spurred into action by reports in December that the Boy Scouts, which have rebranded as Scouts BSA, have considered filing for Chapter 11 bankruptcy, which could significantly narrow the window for accusers to file claims and ensure those claims remained confidential.

"By declaring bankruptcy, institutions like the Boy Scouts or a Catholic diocese are often able to freeze ongoing litigation for a period of time, which can be frustrating and hard on survivors who have often gone a lifetime without the answers and justice they deserve," said Michelle Simpson Tuegel of Seeger Weiss LLP, who is working with survivors of abuse within USA Gymnastics.

Support journalism you can trust when it matters most. **Get one year for $29**

Depending on the nature of the bankruptcy, it could also extinguish or severely limit any claims in the future after the bar date. The bankruptcy process can sometimes take years, thereby discouraging survivors while allowing the defendant to avoid much of the public scrutiny involved in the normal court system and process.

As another incentive, the statute of limitations for childhood sexual abuse had also been extended in states such as California and New York, giving many victims a new path to having their cases heard.

This year, Kosnoff, in collaboration with the Eisenberg Rothweiler law firm and San Diego attorney Andrew Van Arsdale, began running television ads and launched a website, abusedinscouting.com, where victims could contact the lawyers with their stories.

The Boy Scouts of America kept extensive records about sexual abuse of Scouts for decades, but only in the past few years have those documents become public.

In a statement provided to The Post, the Boy Scouts of America said the records were an "ongoing tool the BSA uses to keep youth safe from potential perpetrators." They said individuals were added to the list if they violate, or were suspected of violating, company policy, and were subsequently banned from the Boy Scouts.

"Every instance of suspected abuse is reported to law enforcement," the statement said.

In a separate announcement this week, attorney Jeff Anderson released a January testimony from professor Janet Warren of the University of Virginia, who had been contracted by the Boy Scouts for five years to pore over their "ineligible volunteer" or "perversion" files from 1946 through 2016. Her team identified 12,254 victims and 7,819 perpetrators in those documents.

The revelation came as Warren provided expert testimony for a case that centered on allegations of child abuse at a children's theater company in Minnesota. Anderson's firm represented the plaintiff in that case.

Anderson also released a list of offenders in New York state, which recently voted to extend its statute of limitations for cases of childhood sexual abuse. Those names were collected from "perversion files" that had been published by the Los Angeles Times in 2012.

In response to Anderson's news conference and Warren's testimony, the Boy Scouts of America said in a statement that, "We care deeply about all victims of child abuse and sincerely apologize to anyone who was harmed during their time in Scouting."

"We believe victims, we support them, and we have paid for unlimited counseling by a provider of their choice," they continued. "Nothing is more important than the safety and protection of children in Scouting and we are outraged that there have been times when individuals took advantage of our programs to abuse innocent children.

The statement also said they "have enacted strong youth protection policies to prevent future abuse, including mandatory youth protection training and a formal leader-selection process that includes criminal background checks."

Warren also emphasized in a news conference call convened by the Boy Scouts on Wednesday that she had found "no evidence of a coverup" during her analysis.

The Boy Scouts also have a helpline for members to report abuse.

In 2010, Boy Scouts of America was forced to pay $18.5 million in punitive damages in a case brought by a man who said he was assaulted by an assistant troop leader in the 1980s, when he was about 12. That lawsuit led to the partial

disclosure of the files. In 2012, the Oregon Supreme Court ordered the full release of files after the lawyers for accusers and media organizations fought for access to the documents.

Also in 2012, the Los Angeles Times published a multipart investigation into the perversion files, obtaining documents that spanned from 1947 to 2005. They published a database containing information of 5,000 men and some women who were ousted from the organization because of suspected abuse during this time.

Several of the cases collected by Kosnoff in recent months did not appear in any of the files. He described the new allegations he had discovered as "rich in detail" and said that some clients broke down when they recounted their stories to his team. As part of the vetting process, they asked alleged victims questions such as their age at the time of the assault, their troop number and location, and details about what had happened to them.

While Kosnoff said the claims have not yet been verified with the Boy Scouts or in discovery, he was requiring accusers who wished to retain his services to sign a document saying they were prepared to give a sworn statement to law enforcement — as it would be a crime to do so falsely. But he was not surprised that so many had kept their stories secret for so long.

"It's humiliating, kids don't tell, they carry the secret into adulthood, their coping strategy is not to tell anyone," Kosnoff said. "Many of these men have indicated that they have suffered and struggled their entire lives with this burden."

**Read more:**

Parents reported their 5-year-old son missing. Now they're charged with murder.

Police came to a house to serve a citation — and found guns, ammo and kids in cage-like cribs

Opinion: The Boy Scouts are rebranding. But they're still excluding a big group.

Scouts' recruitment war raises questions about what it means to be a girl or a boy

# EXHIBIT 6



MENU

# TOP-NOTCH REPRESENTATION



Often times, passionate representation requires a team of lawyers, and AVA Law Group works with a number of co-counsel firms to ensure each of our clients is connected to the legal representation that meets the needs of every single case. We continue to work on each mass tort and personal injury case and facilitate ease of access to some of the most reputable law firms in the United States.

**FREE CASE EVALUATION**

**ABOUT US**

# MISSION STATEMENT

> **AVA Law Group Inc. represents the people against the powerful.**

We connect you with the representation your personal injury case deserves and respect the trust you put in us. We advocate and fight for truth, justice, and, ultimately, healing for people who have been victimized by powerful entities. Whether this is an insurance company unwilling to adequately compensate a family, a religious or non-religious institution unwilling to acknowledge its complicity in child sex abuse, or a corporate organization that puts profits over people, their power should not minimize or remove your rights. AVA Law Group Inc. strives to use our legal expertise and voice to promote yours.

# MEET OUR LEGAL TEAM



Founding Attorney

## ANDREW VAN ARSDALE

✉

Attorney Andrew Van Arsdale created AVA Law Group, Inc. so you could have easy access to the justice system and efficient legal representation.

Originally from Billings, Montana, Andrew Van Arsdale moved to San Diego, California to pursue a career in law to ensure people could  access legal representation after being wronged by powerful corporations. Andrew earned his law degree in from the University of San Diego in 2018 and is licensed to practice law in California, Montana and Nevada. For years Andrew has helped people struggling from negligence-related injuries seek maximal compensation from responsible parties, ensuring client satisfaction at all times.

Van Arsdale's work pursuing justice for Scouting sexual abuse survivors through Abused in Scouting has been widely recognized by the media and featured on platforms including CNN, ABC News, NBC News, etc. He has extensive experience connecting sexual abuse survivors to the representation they deserve and handling abuse cases from a wide range of organizations including the Catholic Church, the Mormon Church, and the Boy Scouts of America.

**Bar Admissions**
- State Bar of California, 2018
- State Bar of Montana, 2019
- State Bar Nevada, 2019

**Professional Association Memberships**
- American Association for Justice
- Los Angeles County Bar Association
- Nevada Justice Association
- San Diego County Bar Association





Paralegal

# DONNELL ALLEN

Paralegal Donnell Allen ensures the operational quality of AVA Law so co-counsel and clients receive top-notch care.

Donnell maintains the integrity of clients' cases by completing background checks on

potential clients, maintaining case quality assurance, and drafting legal documents necessary for case qualification and correspondence. Donnell heads communication between AVA Law

Group and co-counsel firms to make certain clients are informed and updated on cases.

Donnell has substantial experience working as a linguist for the U.S Government in federal court as an interpreter and translator. She transitioned into the role of a criminal defense trial paralegal and mitigation specialist in both federal and state courts, lending her knowledge and experience to AVA Law's services.

# OUR HISTORY

> **Andrew started AVA Law Group to continue in helping protect individual interests against powerful entities.**

Over the years he's helped thousands of people who have been injured because of the irresponsible actions of other seek justice. The sad truth is in single event cases, like trucking accidents or car accidents, it's not the irresponsible person whose conduct deprived the injured party of justice; it's the insurance companies who represent their responsible person that deliver injustice day after day. The insurance companies who represent drivers do not want justice, because it's all about year-end bonuses generated through keeping costs down and profits high.

In product and pharmaceutical cases, it's the dollar and cents analysis conducted every day in corporate America---the analysis that justifies putting a product out in the market---that could hurt or kill a certain percentage of the people that use it. How is that ok?

Because, in the corporate world, often the amount of money a company can make from selling the product offsets the costs it will end up having to pay the families of the people killed or permanently injured. Incredibly, under this analysis the profits justify the injuries and death of individual people. When someone is hurt or killed because of the irresponsible actions of another, it's imperative they have adequate representation to help them navigate the minefield that's obtaining justice in our country.

# NATIONALLY ACCLAIMED DEDICATION





---

**CONTACT US TODAY** FOR YOUR FREE, IN-DEPTH
CASE EVALUATION

WE'RE ON YOUR SIDE

WE'RE AVAILABLE 24/7

NO FEES UNLESS YOU WIN

FREE IN-DEPTH
NO OBLIGATION CASE EVALUATION

Because, in the corporate world, often the amount of money a company can make from selling the product offsets the costs it will end up having to pay the families of

the people killed or permanently injured. Incredibly, under this analysis the profits justify the injuries and death of individual people. When someone is hurt or killed because of the irresponsible actions of another, it's imperative they have adequate representation to help them navigate the minefield that's obtaining justice in our country.

# VIDEOS AND MEDIA





NATIONALLY ACCLAIMED DEDICATION

## NO OBLIGATION CASE EVALUATION

FIRST NAME

LAST NAME

EMAIL

PHONE NUMBER

BRIEFLY DESCRIBE YOUR CASE

FREE CONSULTATION



## QUICK LINKS

PRACTICE AREAS

CASE UPDATES

LEARN MORE

NEWS

CONTACT US

# CONTACT INFO

3667 Voltaire Street,
San Diego, CA 92106

2718 Montana Ave. Suite 222
Billings, MT 59101

Phone: 1-800-777-4141

Fax: (619) 374-2705

support@ava.law

© Copyright 2020
Privacy Policy
Terms of Use
Montana Law Firm Portal

ATTORNEY ADVERTISEMENT: Not available in all states, Andrew Van Arsdale, supervising attorney is licensed only in California, Montana and Nevada, but associates with attorneys throughout the country, Principal office: 3667 Voltaire Street, San Diego, California 92106.

Consult a doctor on all medical decisions. Do not stop taking a prescribed medication without first consulting with your doctor. Discontinuing a prescribed medication without your doctor's advice can result in injury or death. No representation is made that the quality of the legal services performed is greater than the quality of the legal services performed by other lawyers. AVA Law Group, Inc. not accepting cases in states where this advertising conflicts with laws or state rules. Legal representation is not offered or available in Tennessee. While AVA Law Group, Inc. maintains joint responsibility, most cases are referred to other attorneys for principal responsibility.

# EXHIBIT 7



**Google** Maps    Untitled



Image capture: Jan 2020    Images may be subject to copyright.

 james Pe

Photo - Jan 2020



# EXHIBIT 8

About Us – Reciprocity Industries

406.831.1760



ABOUT US

# Reciprocity Industries, LLC.

Combining cutting-edge expertise and experience to serve across the globe.

# Who We Are

Reciprocity Industries is a software development, website management, and SEO &PPC marketing company with specialist expertise in legal and television advertising and call center services. We pride ourselves on staying up to date on technological insights and advancements to provide our clients with only the best-of-the-best services.

RI was founded by friends Tyler Cross and  Andrew Van Arsdale in 2008. RI started as a small software developing and PPC marketing firm and has since substantially expanded over the years to provide for clients across the globe. We are located in Billings, MT where our dedicated team ensures efficiency and quality with every project we take on.



## Our Services

Our services include software development, website management, SEO & PPC marketing, television advertising, legal advertising, and call center services.



## Law Firms

RI has had a legal advertising focus since its inception, and we utilize that expertise to assist law firms with their marketing needs.

# Meet the Team

## Owners



Chief Technology Officer

## Tyler Cross

Tyler Cross earned his degree in Computer Science from Montana State University - College of Engineering in 2004 and immediately after began his professional career developing software for an online marketing company. After helping dramatically grow the software division of the marketing company and their overall revenue, in 2008 he partnered with Andrew Van Arsdale to form his own software and marketing company Reciprocity Industries. Tyler currently leads a team of 8 full time developers in an Agile workflow to produce professional quality software solutions.



Operations Director

## Andrew Van Arsdale

Andrew Van Arsdale attended Montana State University Bozeman, earning his Bachelor of Science in Sociology with a minor in History. After graduating from MSU Bozeman he moved to San Diego, California, where he worked for plaintiff law firms in advertising and intake for 11 years. He later went on to earn his law degree from the University of San Diego and is currently licensed to practice law in California, Montana, and Nevada. Andrew has worked directly with over one hundred and fifty plaintiff law firms that handle mass tort cases in the assistance of their marketing and screening criteria since 2008.

# EXHIBIT 9

(https://kosnoff.com)

📞 **TOLL FREE :** 1-855-LAW-4-CSA (tel:855-529- 4272)

✉ **TIM KOSNOFF :** tim@kosnoff.com (mailto:tim@kosnoff.com)

f 🐦 (HTTPS://TWITTER.COM/#!/SEXABUSEATTYS)



‹          ›

*If you have suffered abuse in scouting or Mormonism and would like to learn more about your options please click below.*

**ABUSED IN SCOUTING? (HTTPS://WWW.ABUSEDINSCOUTING.COM/)**

**ABUSED IN MORMONISM? (HTTPS://ABUSEDINMORMONISM.COM/)**

# ABOUT TIM KOSNOFF



Tim Kosnoff practiced law for forty years as a prosecutor, defense attorney and as a lawyer representing victims of child sexual abuse. He has extensive experience handling complex civil child abuse cases & litigation throughout the United States and Canada. He has handled thousands of complex child sexual abuse cases against religious and secular organizations including the Boy Scouts of America, the Mormon Church, the Catholic Church and a wide spectrum of other organizations. Tim has recovered more than $500 million dollars in settlements and jury verdicts. Tim has extensive experience successfully guiding his clients through the complexities of the United States bankruptcy court process which has become the last bastion of defense by these pedophile-shielding organizations.

Helping Sex Abuse Survivors Return to a Life of Their Own – Law Firm

(https://kosnoff.com)

Tim has been extensively profiled by the media in the United States and Canada for his decades-long battle to expose sexual predators and the institutions that hide them.

Tim has transitioned to a new phase of his celebrated career. He is now available to serve as a consultant, expert witness, mediator, lecturer and media commentator.

## Why He Fights

Tim Kosnoff has devoted more than 30 years exclusively to helping child sexual abuse survivors. He has not only taken on individual sexual predators but also brought lawsuits against the institutions and organizations that protect, harbor and enable sexual abusers.

# Child abuse prevention & support



| CONSULTANT | ⌄ |
| --- | --- |

| AVAILABLE TO SERVE AS MEDIATOR IN CHILD SEXUAL ABUSE CASES | ⌄ |
| --- | --- |

| EXPERT WITNESS TESTIMONY | ⌄ |
| --- | --- |

| ADVOCATE AT LARGE FOR VICTIMS OF CHILD SEXUAL ABUSE | ⌄ |
| --- | --- |

| PUBLIC SPEAKER/LECTURER | ⌄ |
| --- | --- |

MEDIA COMMENTATOR
(https://kosnoff.com) 

Contact Tim For Help (Https://Kosnoff.Com/Contact-Us/)

# MY PREVIOUS SUCCESSFUL CASES

Catholic Dioceses
(https://kosnoff.com/catholicdioceses/)

The Latter Day
Saints
(https://kosnoff.com/latterdaysaints/)

Salvation Army
(https://kosnoff.com/salvationar

See All Cases (Https://Kosnoff.Com/Past-Cases/)

# BLOG

‹ ›

## It's Time for Congress to Hold Hearings on....

*Posted on by bgrant_britebuzz (https://kosnoff.com/author/bgrant_brite*

Throughout its 109-year history, Boy Scouts of America has consistently held itself out to the public as a
and safe environment for young boys to participate in healthy outdoor....

*Read More (https://kosnoff.com/time-for-congress-hearings-*



Helping Sex Abuse Survivors Recoup Their Power | The Law of Tim Kosnoff

Kosnoff
(https://kosnoff.com)

More Blogs (Https://Kosnoff.Com/Blog/)



**"The Sins of Brother Curtis"** A Story of Betrayal, Conviction, & the Mormom Church

"… a David vs. Goliath case featuring an obsessive lawyer, Tim Kosnoff, who … eventually wins a $3 million settlement." – The New York Times

Read More (Https://Kosnoff.Com/Sinsofbrothercurtis/)

# VIDEOS

# Tim Kosnoff
(https://kosnoff.com)



(https://youtu.be/0iuIVQWp-sc?t=779)

Boy Scouts America Have Pedophile Epidemic, Hiding Hundreds – NBC Nightly News



(https://www.facebook.com/344945289678961/videos/vb.344945289678961/2298126013556323/?type=2&theater)

AIS Legal Team to Announce First Case Filed Against BSA for Child Sex Abuse

(https://www.youtube.com/watch?v=0D85ug6mdF0)

New Lawsuit Identifies 350 Predator Boy Scout Scoutmasters | MSNBC

### Tim Kosnoff
(https://kosnoff.com)



(https://www.washingtonpost.com/video/national/how-the-boy-scouts-is-changing-amid-recent-controversies/2018/05/14/b697edbe-57aa-11e8-9889-07bcc1327f4b_video.html)

BSA failed to stop hundreds of previously unreported sexual predators



(https://www.youtube.com/embed/XBofWPZXc3s)

Former Boy Scouts Allege Abuse – NBC Today Show



(https://www.youtube.com/embed/K-1GO1WcsEE)

Sexual abuse in the Boy Scouts -The Fifth Estate Program

More Videos (Https://Kosnoff.Com/Read-More/)

Kosnoff

(https://kosnoff.com) **ABUSED IN SCOUTING? ( HTTP://WWW.ABUSEDINSCOUTING.COM/)**

**ABUSED IN MORMONISM? ( HTTPS://ABUSEDINMORMONISM.COM/)**

## About Us

Tim Kosnoff practiced law for forty years as a prosecutor, defense attorney and as a lawyer representing victims of child sexual abuse. He has extensive experience handling complex civil child sexual abuse litigation throughout the United States and Canada. He has handled thousands of complex child sexual abuse cases against religious and secular organizations including the Boy Scouts of America, the Mormon Church, the Catholic Church and a wide spectrum of other organizations.

---

## Contact Info

📕 1321 Upland Drive PMB 4685
Houston , TX 77043

✉ Email : Tim@Kosnoff.Com (Mailto:tim@Kosnoff.Com)

☎ Main : 206-257-3590 (Tel:206-257-3590)
Fax : 206-837-9690
Toll Free : 1-855-LAW-4-CSA (Tel:1-855-LAW-4-CSA)
855-529- 4272 (Tel:855-529- 4272)

---

## Quick Links

(https://kosnoff.com)

> About Tim (Https://Kosnoff.Com/About-Us/)

> Child Abuse Help And Advocacy (Https://Kosnoff.Com/How-Can-Tim-Help/)

> Past Cases (Https://Kosnoff.Com/Past-Cases/)

> Read More (Https://Kosnoff.Com/Read-More/)

> Contact Us (Https://Kosnoff.Com/Contact-Us/)

---

2019 All Rights Reserved.

# EXHIBIT 10

📞 **TOLL FREE :** 1-855-LAW-4-CSA (tel:855-529- 4272)

✉️ **TIM KOSNOFF :** tim@kosnoff.com (mailto:tim@kosnoff.com)

f 🐦 (HTTPS://TWITTER.COM/#!/SEXABUSEATTYS)

Kosnoff
(https://kosnoff.com)



# Firm Overview

The attorneys at Kosnoff Law are dedicated to assisting the survivors of sexual abuse.  Tim Kosnoff has spent more than 20 years focusing exclusively on representing child sexual abuse survivors.  From our offices in Seattle, Washington and now San Juan, Puerto Rico we have successfully represented clients throughout the United States, Canada and Latin America.  Our attorneys are devoted to applying their experience, advocacy skills, and dedication to fight the sexual abuse of children.  We have successfully represented survivors of child sexual abuse in cases involving child molestation, parental child abuse, and cover-ups by the Catholic diocese, the Latter Day Saints, the Boy Scouts of America, the Jesuits and other religious orders.  Our current cases involve actions against the Spokane Diocese, Milwaukee Archdiocese, Helena Diocese, Great Falls Diocese, and the Boy Scouts of America.

In pursuing any sexual abuse case, we will thoroughly investigate your case, identify every responsible party, work with expert witnesses, and work to resolve your case effectively and in a manner that serves your individual objectives.

**We protect individuals by taking legal action against the institutions that protect abusers.**

Part of the battle against child sexual abuse is taking individual pedophiles to court and making sure they are punished to the fullest extent of the law.  However, as recent well-publicized cases against the Catholic Church have shown, the battle must also be waged against institutions that cover up incidents of molestation and protect abusers.

**Extensive Experience as Trial Lawyers and Advocates**

The attorneys at the Kosnoff Law Firm have nearly 40 years experience as trial lawyers and advocates for their clients. The attorneys at the Kosnoff Law Firm have the experience and resources necessary to take on virtually any opponent.

The attorneys at Kosnoff Law have successfully handled many large-scale lawsuits.  These lawsuits have resulted in extensive recoveries for Kosnoff Law clients, including many clients who participated in the $166.1 million settlement with the Society of Jesus, Oregon Province.  With experience handling so many large-scale lawsuits, Mr. Kosnoff frequently appears on television and in newspaper articles. They often use the opportunities afforded by media coverage to shine a light on sexual predators and their protectors, while publicizing the devastating societal costs and individual costs of childhood sexual abuse.

Our attorneys network with other sexual abuse attorneys around the country.

The attorneys at Kosnoff Law take no action, in the press or the courtroom, without the full consent of their clients.  They treat every client with compassion and consideration, assuring each client that the abuse was not the client's fault and that the client can experience healing by pursuing justice.  With the consent of every survivor, the attorneys at Kosnoff Law aggressively pursue legal action against every party responsible for the survivor's trauma.

**Contact Us**

"Getting justice, dignity and compensation for survivors of childhood sexual abuse is what matters." We will handle your case confidentially and discreetly. For more information about our firm and services, contact the attorneys at the Kosnoff Law Firm. We assist survivors throughout the United States and Canada. Free initial consultations.

# Our information

## TIM KOSNOFF

1321 Upland Drive PMB 4685
Houston , TX 77043

**Email:** tim@kosnoff.com (mailto:tim@kosnoff.com)
**Main:**  206-257-3590
**Fax:**  206-837-9690
**Toll Free:**   1-855-LAW-4-CSA (tel:1-855-LAW-4-CSA), 1-855-529-4272 (tel:1-855-529-4272)

Contact Tim For Help (Https://Kosnoff.Com/Contact/)

2019 All Rights Reserved.

# EXHIBIT 11

## Timothy David Kosnoff

| | |
|---|---|
| License Number: | 16586 |
| **License Type:** | Lawyer |
| Eligible To Practice: | Yes |
| **License Status:** | Active |
| WSBA Admit Date: | 11/14/1986 |

## Contact Information

| | |
|---|---|
| Public/Mailing Address: | Kosnoff Law PLLC |
| | 1321 Upland Dr |
| | Houston, TX 77043-4718 |
| | United States |
| Email: | Tim@Kosnoff.com |
| Phone: | (425) 837-9690 |
| Fax: | (855) 211-4459 |
| Website: | |
| TDD: | |

## Practice Information Identified by Legal Professional

| | |
|---|---|
| Firm or Employer: | Kosnoff Law PLLC |
| Office Type and Size: | Solo practice |
| Practice Areas: | Personal Injury |
| Languages Other Than English: | None Specified |

## Professional Liability Insurance

| | |
|---|---|
| Private Practice: | No |
| Has Insurance? | - Click for more info |
| Last Updated: | 11/30/2019 8:00:00 AM |

## Committees

Member of these committees/boards/panels:

None

## Disciplinary History

*In some cases, discipline search results will not reveal all disciplinary action relating to a Washington licensed legal professional, and may not display links to the official decision documents.*

# EXHIBIT 12

Google Maps    1321 Upland Dr



Map data ©2020 Google    200 ft



# 1321 Upland Dr

Houston, TX 77043
Building


Directions


Save


Nearby


Send to your phone


Share

## Photos



# EXHIBIT 13

| Your Questions | 🔍 |

**USGM Help Center < https://www.usglobalmail.com/help/>**     / Available addresses

## Getting Started

**< https://www.usglobalmail.com/help_category/getting-started/>**

## Key Features

**< https://www.usglobalmail.com/help_category/key-features/>**

## Receiving Mail

**< https://www.usglobalmail.com/help_category/receiving-mail/>**

## Addresses

**< https://www.usglobalmail.com/help_category/mail-forwarding-addresses/>**

**Using your USGM address < https://www.usglobalmail.com/help_category/using-your-usgm-address/>**

**Issues & Questions < https://www.usglobalmail.com/help_category/issues-questions/>**

**Available addresses < https://www.usglobalmail.com/help_category/available-addresses-for-mailforwarding/>**

Help

Plans & Pricing

**< https://www.usglobalmail.com/help_category/plans-pricing/>**

Shipping & Receiving

**< https://www.usglobalmail.com/help_category/shipping-receiving/>**

Payment & Billing

**< https://www.usglobalmail.com/help_category/payment-billing/>**

Cancellation

**< https://www.usglobalmail.com/help_category/canceling-your-mail-forwarding-service/>**

Partnership

**< https://www.usglobalmail.com/help_category/partnership/>**

Frequently Asked Questions

**< https://www.usglobalmail.com/help_category/frequently-asked-questions/>**

# Available addresses

Your address will be a street address, not a PO Box. So you can recieve both mail and packages at your address. Find out what your address will look like.

## In This Section

- What if I want my address to be in LA or NY or FL etc.?
- Where will my address be?
- What will my address be?

## What if I want my address to be in LA or NY or FL etc.?

Your address with mail forwarding services is state-agnostic. Once you fill out a redirect form with USPS, it will forward your mail to the new address, irrespective of where it is in the US. That means the senders don't need to know your address in Houston and can keep sending mail to your old address. You can receive your mail as if your address never changed.

If you are moving overseas, the State of your address is in matters even less. You access your mail 24/7 via the Virtual Mailbox.

## Where will my address be?

Your address will essentially be in the cloud!

We own and operate our warehouses in Houston, TX, which is where your address will reside. We have complete control over receiving, sorting and shipping your mail. Which is really important for the safety of your mail.

Many of the other mail forwarding services provide multiple addresses in different states. Usually this means they are contracting with 3rd party mom and pop stores or individuals to receive, handle and then ship your mail to their central location. This delays your access to mail by 2-3 business days and opens it to unnecessary risks.

We prefer to not compromise on the security of our customers mail and provide a faster and more efficient service where your mail gets uploaded to your Virtual Mailbox the same as it is delivered; scans are usually available within 4 hours and shipments placed by 1pm are shipped the same day.

## What will my address be?

Your address will be an actual Street Address, not a PO Box. It will be:

Your Name or Company

1321 Upland Dr.

PMB NNNN

Houston, TX

77043

USA

*NNNN is the box number. PMB stands for Personal Mail Box, but once your address is moved, you can use Suite, Apartment or Office number.

Didn't find what you were looking for? Contact us

# Still unsure?

Step inside and see how US Global Mail is revolutionizing the way we do mail

**Sign up now <**                    Contact us

**https://www.usglobalmail**

**.com/pricing/>**

## US Global Mail

1321 Upland Drive Houston, TX 77043

Trustpilot  *****
TrustScore 9.1 | 623 Reviews

## Worldwide ERC

**SERVICES**

Mail Forwarding <
https://www.usglobalmail.com/mail-
online-services/personal/>

Virtual MailBox <
https://www.usglobalmail.com/virtual-
mailbox/>

Virtual Address <
https://www.usglobalmail.com/virtual-
address/>

Virtual PO Box <
https://www.usglobalmail.com/virtual-po-
box/>

Mail Scanning <
https://www.usglobalmail.com/mail-
scanning/>

Enterprise Mail <
https://www.usglobalmail.com/enterprise-
mail-management/>

**ABOUT US**

About <
https://www.usglobalmail.com/about-us/>

Reviews <
https://www.usglobalmail.com/reviews/>

**SOLUTIONS FOR**

Individuals <
https://www.usglobalmail.com/individuals
/>

Small Businesses <
https://www.usglobalmail.com/mail-
online-services/business/>

Enterprise <
https://www.usglobalmail.com/enterprise-
mail-management/>

HR/Relocation <
https://www.usglobalmail.com/mail-
online-services/corporate/>

**SUPPORT**

Help Center <
https://www.usglobalmail.com/help/>

Contact Us <
https://www.usglobalmail.com/contact-

us/>

Refer a Friend <
https://www.usglobalmail.com/referral-program/>

Term Of Services <
https://www.usglobalmail.com/terms-of-service/>

Security <
https://www.usglobalmail.com/secure-mailbox/>

Community <
https://www.linkedin.com/groups/8327259/>

Job Opportunities <
https://www.usglobalmail.com/job-opportunities/>

Affiliate Program <
https://www.usglobalmail.com/affiliate/>

Shipping Calculator <
https://www.usglobalmail.com/get-shipping-rates/>

My Address <
https://www.usglobalmail.com/my-address/>

Privacy <
https://www.usglobalmail.com/privacy-policy/>

Blog <
https://www.usglobalmail.com/blog/>

© 2020 US Global Mail <
https://www.usglobalmail.com/>

All rights reserved.

# EXHIBIT 14



Email or Phone

Password

Log In

Forgot account?



SUFFER NO LONGER

1-888-99-SCOUT

## Abused In Scouting
@AbusedinScouting

**Home**

Reviews

Photos

Videos

Posts

About

Community

Create a Page

Like    Share

Send Message

### Photos

> Thank you for all you are doing to advocate for me and for the entire sexually abused population. As this case moves forward and is covered by the press, people will talk about sexual abuse with each other. This will build awareness and a path for healing. Because of this case, men will feel more comfortable talking about it. It will feel less shameful to be a victim. It sends the message that victims are not alone. This happened to others. This will begin the process of healing and will be a warning and empowerment to youth to speak up if any inappropriate behavior happens to them. Talking openly about the problem of sexual abuse will help to stop it!

> I am most grateful the AVA Law Firm and the help your team [with Abused in Scouting] is providing to those in Scouting Programs who experienced unfortunate incidents. And for those former Boy Scouts emotionally and psychologically scarred by perpetrators, the compensation they'll be provided with will assist in their emotional healing and provide some very long overdue peace of mind that some form of Justice has taken place.

> I guess I would just like to say that because of the AIS team I have been able to talk about what happened to me those so many years ago. That summer was the turning point in my life, and I'm sure that things would have been a lot different for me if it wasn't for Scout camp...Looking back now, I can see when everything changed. I had not told a soul of this until I told my wife about ten years ago. I never mentioned it again until I spoke with Andrew Van Arsdale and the team from AIS. Andrew and his team are the best thing that's happened to me in a long time. I've been carrying around this shame, yes that's how it feels, like I'm ashamed of my self for letting this happen to me. Because of Andrew, I don't feel that way anymore.

BOB, AIS CLIENT

See All

### Videos

### Abused In Scouting
Lawyer & Law Firm in San Diego, California

4.2

ABOUT ABUSED IN SCOUTING

**Abused in Scouting - Who We Are**

Abused in Scouting was formed by AVA Law Group, Eisenberg Rotheweiler, and Kosnoff Law because we be...

See More

### Community
See All

👍 208 people like this

📶 232 people follow this

### About
See All



◇ 3667 Voltaire Street (2,433.53 mi)
San Diego, CA 92106

Get Directions

📞 (888) 997-2688

💬 Contact Abused In Scouting on Messenger

🌐 abusedinscouting.com

▭ Lawyer & Law Firm

**See more of Abused In Scouting on Facebook**

Log In    or    Create New Account



## Abused In Scouting
@AbusedinScouting

- **Home**
- Reviews
- Photos
- Videos
- Posts
- About
- Community

Create a Page

Boy Scouts Bar Date Set for…

Happy National Compliment …

See All

See More

### Related Pages

**AVA Law Group, Inc.**
Lawyer & Law Firm

**Dr Robert Anderson Abuse Laws…**
Internet Company

**Boy Scouts of America Lawsuit I…**
Internet Company

**Boy Scout Abuse Claims**
Legal Service

**Loko Wrestling**
Sports & Recreation

See More

### Pages Liked by This Page

**Hope for Heath Stocks**

Places · San Diego, California · Abused In Scouting

English (US) · Español · Português (Brasil) · Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices · Cookies · More
Facebook © 2020

**See more of Abused In Scouting on Facebook**

Log In    or    Create New Account

# EXHIBIT 15

7/6/20 REUTERS LEGAL 11:06:56

REUTERS LEGAL
Copyright (c) 2020 Thomson Reuters

July 6, 2020

Mass tort TV advertising jumps amid coronavirus pandemic

Nate Raymond

Television advertising by law firms seeking clients for lawsuits against the makers of drugs and consumer products has escalated in 2020, as prices for ads dropped amid the coronavirus pandemic, according to an attorney ad tracking firm.

Lawyers and referral services have from January to May spent $67 million on mass tort TV advertising, up 6.6% from the same time last year, when law firms aired fewer spots that cost more money, according to data analyzed by X Ante.

Rustin Silverstein, the firm's president and founder, said the COVID-19 pandemic may have played a role in those trends, as state-ordered lockdowns aimed at slowing the virus' spread may have caused a pullback in advertising from other industries.

Those include movie studios, restaurants and retailers that are typically big advertisers. Their business troubles may explain the cheaper ad rates that law firms have enjoyed while increasing their ad buys, Silverstein said.

Oriana Senatore, senior vice president for research at the U.S. Chamber of Commerce's Institute for Litigation Reform, said the business group also has seen a surge in ads, including those advising consumers they might have claims related to COVID-19.

"People have largely been at home, especially beginning at pandemic, and probably watching more TV than ever before," she said. "So it probably makes sense that plaintiff lawyers would want to capitalize on that."

Brand name and generic versions of Sanofi AG's heartburn drug Zantac rank No. 1 for mass tort ad spending so far this year, with $22.8 million spent on 31,819 spots, according to X Ante, citing data from ad tracking firm Kantar CMAG.

In May alone, ads costing $9.1 million were aired concerning Zantac and ranitidine, as it is generically known. The drugs since 2019 have become the subject of lawsuits alleging they contains a known carcinogen and can cause cancer.

Coming in at No. 2 for spending with $15.8 million for the year and $4.13 million in May are spots concerning talcum power, such as Johnson & Johnson's Baby Powder, which thousands of lawsuits claim can causes cancer. J&J denies the allegations.

Zantac and talc in May overtook Bayer AG's Roundup, which for the year still ranks first by total number of ads.

Bayer on June 24 agreed to pay as much as $9.6 billion to settle about 94,000 lawsuits alleging Roundup and its active ingredient glyphosate cause cancer and another $1.25 billion to support an agreement to address potential future claims.

Bayer denies the allegations.

The top sponsors of ads in May by dollars were the marketing company Knightline Legal, followed by Goldwater Law Firm in Phoenix, Arizona; Prime Clerk LLC; Davis & Crump in Gulfport, Mississippi; and Ferrer, Poirot & Wansbrough in Dallas, Texas.

Those firms did not respond to requests for comment.

Prime Clerk serves as the court-appointed claims and noticing agent for OxyContin maker Purdue Pharma LP, which filed for bankruptcy last year amid thousands of lawsuits alleging it fueled the U.S. opioid crisis.

Purdue has undertaken a $23.8 million advertising campaign featuring "Chicago Hope" actor Héctor Elizondo to advertise a July 30 deadline for people who believe they were harmed by opioid manufacturer to file claims against it.

(This story has been updated to correct the spelling of Oriana Senatore's first name.)


## ---- Index References ----

Company: BAYER AG; JOHNSON AND JOHNSON; Prime Clerk; PURDUE PHARMA LP; SANOFI SA

News Subject: (Business Management (1BU42); Sales & Marketing (1MA51))

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    2

Industry: (Advertising (1AD82); Advertising & Public Relations (1AD83); Advertising Expenditure (1AD68); Coronavirus (1CV19); Healthcare (1HE06); Infectious Diseases (1IN99); Pharmaceuticals & Biotechnology (1PH13); Pharmaceuticals Marketing & Sales (1PH83); Viral (1VI15))

Region: (Americas (1AM92); Mississippi (1MI74); North America (1NO39); Texas (1TE14); U.S. Southeast Region (1SO88); U.S. Southwest Region (1SO89); USA (1US73))

Language: EN

Other Indexing: (Knightline Legal) (Ferrer; Héctor Elizondo; Rustin Silverstein; Davis & Crump; Oriana Senatore)

Keywords: antitrust; arbitration; bankruptcy; busimm; banking; capmarket; corpgov; commercial; dataprivacy; employment; energy; ebec; fedlit; health; immigration; insurance; ip; legindustry; litigation; ma; products; realestate; securities; tax

Word Count: 549

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 16

**CONSUMER JUSTICE** Foundation (http://www.consumerjusticefoundation.com)

Need Help? Call: (858) 381-0309 (tel:(858) 381-0309)

About Us (http://www.consumerjusticefoundation.com/about-us/)    Contact Us (http://www.consumerjusticefoundation.com/contact-us/)
News (http://www.consumerjusticefoundation.com/news/)

Search

🔍

MENU

G+ (https://plus.google.com/+Consumerjusticefoundation/posts)    🐦 (https://twitter.com/MedAlertBlogger)

f (https://www.facebook.com/ConsumerJusticeFoundation)

Home (http://www.consumerjusticefoundation.com) ➝ News (http://www.consumerjusticefoundation.com/news/) ➝ Legal
(http://www.consumerjusticefoundation.com/news/legal/) ➝ Boy Scouts of America Creates Sexual Abuse Compensation Program
(http://www.consumerjusticefoundation.com/news/boy-scouts-of-america-creates-sexual-abuse-compensation-program/)

# Boy Scouts of America Creates Sexual Abuse Compensation Program

**Written by Faith Anderson on March 5, 2020**

Following last month's announcement that the Boys Scouts of America (BSA) was filing for Chapter 11 bankruptcy in order to "equitably compensate victims who were harmed during their time in Scouting and continue carrying out its mission for years to come," the organization is now calling for individuals with claims against the Boy Scouts to file through a sexual abuse compensation program. If you or someone you love suffered sexual abuse at the hands of a Scout leader or another member of the Boy Scouts organization, you may be entitled to financial compensation for your pain and suffering and other damages. Contact our consumer advocates at Consumer Justice Foundation today to speak to an experienced child sexual abuse attorney about your claim against the BSA.

## BSA Files for Chapter 11 Bankruptcy

Facing a growing number of lawsuits involving childhood sexual abuse that allegedly occurred within the organization, the Boy Scouts of America filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code in February, a move that was reported on the BSA website. At the time of the bankruptcy announcement, the organization explained its intention to "use the Chapter 11 process to create a Victims Compensation Trust that would provide equitable compensation to victims." The BSA launched a restructuring website with the goal of ensuring that all survivors of childhood sexual abuse in Boy Scouts programs understand how they can receive the compensation they deserve.

"The BSA encourages all victims to come forward to file a claim in the case. However, the deadline for filing abuse claims has not yet been set by the Bankruptcy Court," the restructuring website notes. "As a next step, the BSA will ask the Bankruptcy Court for approval of a proof of claim form for abuse victims. Once the Bankruptcy Court approves that form, the deadline for filing claims will be set. We expect that deadline to be later this year." The bankruptcy filing and the development of this new compensation program come at a time when plaintiffs across the country are pursuing legal claims against the organization for sexual abuse that occurred during their time in the Scouts. Several states, including Pennsylvania, New York and New Jersey, have implemented new statute of limitations laws that allow adult victims of childhood sexual abuse to pursue claims against their abusers that would have otherwise been time-barred. Not surprisingly, these new statute of limitations laws spurred a mass filing of claims against the BSA.

## Lawsuits Against BSA for Childhood Sexual Abuse

The explosive sexual abuse scandal in the United States implicates not just the Boy Scouts of America, but also the Catholic Church and other high-profile organizations and institutions accused of enabling child sexual abuse, protecting known sexual predators and covering up complaints of abuse for years. These new laws extending the statute of limitations on sexual abuse claims and the lawsuits that were filed as a result of the laws have been cited as the primary reasons the Boy Scouts of America declared bankruptcy.  Hundreds of lawsuits have already been filed against the Boy Scouts of America over the past year, all of which involve similar allegations that the organization ignored and covered up problems with known child sex abusers, allowing the widespread abuse to continue for decades.

## BSA Accused of Covering Up Child Sexual Abuse

According to the Boy Scouts restructuring website, "Approximately 90% of claims relate to abuse that occurred more than 30 years ago." Indeed, many of the plaintiffs pursuing legal claims against the Boy Scouts of America are adults who were abused as children by known sexual predators who worked with the organization. "As our nation's foremost youth program of character development and values-based leadership training, we have an important duty to keep children safe, supported and protected while preparing them for their future," the restructuring website states. Instead of keeping them safe, however, the BSA is accused of knowing about threats to children and allowing the ongoing abuse to continue for years by burying information about individuals within the organization who were considered sexual predators in their secret "perversion files."

## Thousands of Boys Reported Sexual Abuse by Scout Leaders, Volunteers

Ultimately, more than 12,200 boys reported experiencing sexual abuse (https://abcnews.go.com/US/12000-boy-scout-members-victims-sexual-abuse-expert/story?id=62573567) at the hands of at least 7,800 perpetrators who were either troop leaders or volunteers with the Boy Scouts of America between 1944 and 2016, and for those hoping to recover compensation from the organization, reports of the bankruptcy filing and subsequent compensation program come as mixed news. Says one survivor, a 58-year-old man who says he was sexually assaulted by two different Scout Masters during his time as a boy scout, "Their mission statement was to raise boys into fine young men, and they knowingly put boys in harm's way for decades. I don't trust an organization like that to curb bad behavior on their own. They didn't do this because they suddenly had a crisis of conscience about something they had been covering up for 50 years. It's because there's a financial hammer coming down on them. I hope that hammer comes down hard."

**Posted Under:** **Legal (http://www.consumerjusticefoundation.com/news/legal/)**, **News (http://www.consumerjusticefoundation.com/news/)**

## START CLAIM NOW

### Do you deserve compensation?

An attorney will review your situation for FREE and help you found out what really went wrong.

**How Can We Reach You?**

First Name

Last Name

Address

City

**State...**

Zip Code

Primary Phone (Required)

Email Address (Required)

How Were You Injured (Drug, Product...)?

**Please Explain Your Situation**

By clicking the "Submit" button below, you agree that law firms you are matched with may contact you by telephone even if you are on a federal or state Do Not Call registry. Up to 10 law firms may respond to your request within approximately 2 weeks. In some cases 3 or more firms may respond to your request after 30 days. Use of this site is subject to our Terms of Use (http://www.consumerjusticefoundation.com/terms-use/).

☑ By leaving this box checked, I agree to receive future offers and announcements from Consumer Justice Foundation, and its affiliates and partners

Submit Form

## Related Pages

Abuse in Scouting (http://www.consumerjusticefoundation.com/abuse-in-scouting/)

Sexual Abuse (http://www.consumerjusticefoundation.com/sexual-abuse/)

Heart Birth Defects (http://www.consumerjusticefoundation.com/zofran/zofran-heart-problems/)

## Popular Articles

Bayer Will Pay $10 Billion to Resolve Tens of Thousands of Roundup Cancer Claims (http://www.consumerjusticefoundation.com/news/bayer-will-pay-10-billion-to-resolve-tens-of-thousands-of-roundup-cancer-claims/)

Major Elmiron Warning Label Update Highlights Risk of Retinal Damage Side Effects (http://www.consumerjusticefoundation.com/news/major-elmiron-warning-label-update-includes-risk-of-retinal-damage-side-effects/)

Family Sues Zantac Makers Over Fatal Case of Pancreatic Cancer (http://www.consumerjusticefoundation.com/news/family-sues-zantac-makers-over-fatal-case-of-pancreatic-cancer/)

J&J Discontinues Talc-Based Baby Powder Amid Nearly 20,000 Cancer Claims (http://www.consumerjusticefoundation.com/news/jj-discontinues-talc-based-baby-powder-amid-nearly-20000-cancer-claims/)

Federal Judge Assigns More Than Two Dozen Attorneys to Leadership Positions in Zantac Cancer MDL

(http://www.consumerjusticefoundation.com/news/federal-judge-assigns-more-than-two-dozen-attorneys-to-leadership-positions-in-zantac-cancer-mdl/)

## Main Links

Products & Devices (http://www.consumerjusticefoundation.com/product-lawsuits/)
Accident, Injury & Side Effects (http://www.consumerjusticefoundation.com/accidents-injuries-side-effects/)
Work Related Injuries (http://www.consumerjusticefoundation.com/work-related-lawsuits/)
News (http://www.consumerjusticefoundation.com/news/)

## Contact Us

8+ (https://plus.google.com/+Consumerjusticefoundation/posts)    🐦 (https://twitter.com/MedAlertBlogger)

f (https://www.facebook.com/ConsumerJusticeFoundation)

### Email:

info@consumerjusticefoundation.com (mailto:info@consumerjusticefoundation.com)

## Consumer Justice Foundation Copyright 2015

Learn More 

All Rights Reserved Consumerjusticefoundation.com

Site Map (http://www.consumerjusticefoundation.com/sitemap_index.xml)

# EXHIBIT 17

1

1          UNITED STATES BANKRUPTCY COURT

2             DISTRICT OF MINNESOTA

3    -------------------------------------------------

4    In Re:

5     The Archdiocese of Saint Paul and Minneapolis,

6                        File No. 15-30125

7    -------------------------------------------------

8               BEFORE THE HONORABLE

9               ROBERT J. KRESSEL

10          United States Bankruptcy Judge

11                  * * *

12          TRANSCRIPT OF PROCEEDINGS

13             February 23, 2017

14                  * * *

15

16

17    Proceedings recorded by digitally recording,

18    transcript prepared by Court Reporting service.

19

20

21          NEIL K. JOHNSON REPORTING AGENCY
                   Suite 2625
22             322 Minnesota Street
             Saint Paul, Minnesota 55101
23

24             NEIL K. JOHNSON

25

         (651) 681-8550 phone    1-877-681-8550 toll free
                www.johnsonreporting.com

```
 1                    APPEARANCES

 2

 3            MR. BENJAMIN E. GURSTELLE, and

 4    MR. CHARLES B. ROGERS, Attorneys at Law,

 5    Suite 2200, 80 South Eighth Street,

 6    Minneapolis, Minnesota 55402 appeared

 7    on behalf of Debtor.

 8

 9            MR. ROBERT T. KUGLER, Attorney

10    at Law, Suite 2300, 150 South Fifth

11    Street, Minneapolis, Minnesota 55402,

12    appeared on behalf of Unsecured

13    Creditors Committee.

14

15

16            MS. ELIN M. LINDSTROM, Attorney

17    at Law, Suite 100, 366 Jackson Street,

18    Saint Paul, Minnesota 55101, appeared on

19    behalf of Creditors.

20

21

22            MR. DENNIS D. O'BRIEN, Attorney

23    at Law, Suite 400, 401 Second Avenue

24    North, Minneapolis, Minnesota 55401,

25    appeared on behalf of Creditors.
```

```
 1                    APPEARANCES (Cont'd)

 2

 3                MS. MARY JO JENSEN CARTER,

 4       Attorney at Law, 1257 Gun Club Road,

 5       White Bear Lake, Minnesota 55110,

 6       appeared on behalf of Certain Parishes.

 7

 8

 9                MR. JOSHUA WEINBERG, Attorney at

10       Law, Suite 600, 1875 K Street NW,

11       Washington, DC 20006, appeared via

12       telephone on behalf of Hartford

13       Insurance.

14

15

16                MR. JEFF D. KAHANE, Attorney at

17       Law, Suite 3100, 865 Figueroa Street,

18       Los Angeles, California 90017, appeared

19       via telephone on behalf of London Market.

20

21

22                MR. JAMES A. LODOEN, Attorney at

23       Law, Suite 4200, 80 South Eighth Street,

24       Minneapolis, Minnesota 55402 appeared on

25       behalf of Our Lady of Grace.
```

```
1                    APPEARANCES (Cont'd)

2

3              MS. CONNIE A. LAHN, Attorney at

4     Law, Suite 2800, 225 South Sixth Street,

5     Minneapolis, Minnesota 55402, appeared on

6     behalf of Catholic Mutual Relief Society.

7

8

9              MR. MARK J. KALLA, Attorney at

10    Law, Suite 2500, 120 South Sixth Street,

11    Minneapolis, Minnesota 55402, appeared on

12    behalf of St. Dominic and certain other

13    parishes.

14

15

16             MS. PAMELA J. TILLMAN, Attorney

17    at Law, 19th Floor, 111 East Kilbourn

18    Avenue, Milwaukee, Wisconsin 53202

19    appeared via telephone on behalf of

20    TIG Insurance.

21

22

23

24

25
```

```
 1                      REPORTER'S DISCLAIMER

 2

 3              The proceedings contained herein were

 4    transcribed via stenographic means from the official

 5    court audio file.

 6

 7              There was no court reporter present in

 8    order to capture the proceedings live and obtain

 9    clarifications, etc.

10

11              The spellings of case names and citations

12    contained herein are taken from the official court

13    docket produced in the matter to be utilized for

14    transcription purposes and may not be the correct

15    spellings and/or citations.

16

17              Any portions of the transcript identified

18    as "UNINTELLIGIBLE" are proceedings where the audio

19    file is not clear enough to understand the actual

20    spoken words, which may be due to distance from a

21    microphone, or other audio interference.

22

23              Every attempt has been made to produce the

24    most accurate transcript possible considering the

25    above limitations.
```

```
 1                    P R O C E E D I N G S

 2

 3                    THE COURT:  Why is everybody

 4        sitting down there?  Are we actually choosing

 5        up teams?  Is that what we're doing?

 6                    There are a couple motions this

 7        morning in the case of the Archdiocese of

 8        Saint Paul and Minneapolis.

 9                    I guess I'm going to keep with my

10        custom of rather than have you pop up and

11        give appearances, going down my list, will

12        the attorneys for the Debtor?

13

14            (Counsel present noted their appearance)

15

16                    THE COURT:  Good morning.

17            Creditors committee?

18

19            (Counsel present noted their appearance)

20

21                    THE COURT:  Personal injury

22        creditors.

23

24            (Counsel present noted their appearance)

25
```

Case 15-30125-DM3... Doc 987... Filed 03/06/17... Entered 06/06/2009... Page 106 of 217... Desc Main
Document     Page 7 of 53

7

```
 1
 2                    THE COURT:  Parish committee?
 3            Parish group.
 4
 5            (Counsel present noted their appearance)
 6
 7                    THE COURT:  Okay.  Is anyone
 8       appearing here or on the phone for Hartford
 9       insurance?
10                    MR. WEINBERG:  Good morning,
11       Your Honor.
12            Joshua Weinberg on behalf of
13       Hartford.
14                    THE COURT:  And London Market
15       Insurers?
16                    MR. KAHANE:  Good morning, Your
17       Honor.
18            Jeff Kahane on behalf of London
19       Market Insurers.
20                    THE COURT:  Thank you.
21            Is there someone appearing for the
22       Catholic Finance Corp, Church of St. Thomas
23       Becket?
24            Mr. Iannacone?
25            Anybody appearing for Our Lady of
```

1     Grace?

2        Okay.  Catholic Mutual Relief

3     Society, anybody appearing for them?

4

5        (Counsel present noted their appearance)

6

7          THE COURT:  The old St.

8     Margaret's and others?

9        I've got another page here.

10        Catholic Services Appeal?

11    Archdiocese Medical Benefits Plan?  North

12    American Banking?  Saint Charles Borromeo?

13    Saint Patrick?  Saint Dominic and Saint

14    Stevens?  De LaSalle?

15        Travelers?  Anybody appearing for

16    Travelers this morning?

17        Or for TIG Insurance?

18         MS. TILLMAN:  On the phone,

19    Pamela Tillman on behalf of TIG.

20         THE COURT:  How about Liberty

21    Mutual?  Anybody appearing for Liberty

22    Mutual?

23        Anybody I've missed.  Anybody

24    appearing on behalf of somebody who isn't on

25    my list?

```
 1              Okay.  Let's take up first the motion
 2      by the Debtor dealing with the solicitation
 3      procedures and the ballot.
 4                   MR. GURSTELLE:   Good morning,
 5      Your Honor.  Ben Gurstelle on behalf of the
 6      Debtor.
 7              We brought this motion in an effort
 8      to try to kick start the solicitation
 9      process.
10              A good deal of the proposed order
11      that we attached to the motion was
12      negotiated with the UCC and run by the clerk
13      of court prior to filing the motion.
14              We filed the motion after
15      negotiations on some of the remaining issues
16      kind of stalled out.
17              We have made actually since filing
18      the motion a couple more changes to the
19      proposed order after further discussions
20      with the UCC.
21                   Those changes are --
22                   Do you have the other copy of the
23      order?
24                   Paragraph seven of the order, we have
25      deleted the first sentence which said,
```

 1      counsel for holders of class six claims will

 2      converse separately with each client

 3      regarding --

 4              THE COURT:  I'm sorry.  You're

 5      really mumbling and talking very fast.

 6              MR. GURSTELLE:  We have deleted

 7      the first sentence which says, counsel for

 8      holders of class six claims will confer

 9      separately with each client regarding the

10      plans and the client's ballot.

11          We have deleted that.  We don't think

12      it's necessary because we believe that it's

13      an obligation of counsel to do anyway.

14          Then also in Paragraph 7 we have

15      changed the power of attorney being executed

16      by a lawyer to being executed by any

17      individual with capacity to execute and be a

18      power of attorney.

19          So with those changes, we believe the

20      order is agreeable to the UCC with two

21      exceptions:  Those are in paragraph two the

22      30-day timeline to get the solicitation

23      packages up -- deadline rather, to get the

24      solicitation packages out the door.

25          The UCC wants it to be a 20-day

1    deadline.

2         We plan, the Archdiocese plans, to do

3    this process as quickly as possible.

4         We want to get the solicitation

5    packages out the door very, very quickly so

6    our motivation and intention is to get these

7    out within 20 days, and hopefully even

8    sooner, but there are certain aspects of the

9    process that we do not control entirely.

10        We just don't want to set ourselves

11   up for failure in the event that the

12   packages get out the door on day 21 rather

13   than day 20.

14        As the Court knows, this is -- the

15   solicitation package is going to include

16   both the Debtor's plan and the Committee's

17   plan and so we just don't want to set

18   ourselves up so that all plan proponents are

19   in violation of the court order so that's

20   why we have the 20 day -- or 30 day rather

21   outside deadline rather than 20 days.

22        One of the issues that we foresee as

23   being an issue that may require us to take

24   more time to do it is that we haven't

25   ordered the flash drives that we plan to put

```
 1        the plan that's in the disclosure statements

 2        on yet because we haven't gotten an order

 3        from the Court to do it.

 4             I know that at the last hearing you

 5        indicated that a flash drive would be a good

 6        idea, but this is a very large purchase.  We

 7        have to buy in bulk several hundred flash

 8        drives and it's going to cost approximately

 9        $5,000 to get these flash drives and we just

10        didn't want to make the purchase until we

11        had a court order okaying it.  We have been

12        on shifting sand in this case before.

13             And also we have as a provision in

14        the order that we're authorized to serve the

15        disclosure statement and plans on counsel

16        for the tort claimants just one flash drive

17        and then that would be distributed by

18        counsel for tort claimants to their

19        respective clients.

20             If we had to do an individual flash

21        drive for each claimant that would up our

22        order significantly by several hundred

23        drives and so we haven't placed the order

24        until we have clearance from the Court in a

25        court order.
```

1          We're going to do that order

2     immediately upon entry, the order for the

3     drives immediately upon entry of an order by

4     this Court and we've taken -- we've already

5     gotten votes and we have an express delivery

6     with the drives being preloaded with the

7     documents that should take approximately ten

8     days, is what the vendor says, although, you

9     know, we don't control that and I don't want

10    to be caught in a situation where we're

11    rushing and we miss something because we

12    have a 20-day deadline and we haven't gotten

13    the drives yet.

14         The second issue, probably the more

15    pressing issue as expressed by the

16    committee, is the inclusion of a convenience

17    claim election on the ballot.

18         We think that is the only remaining

19    issue with the ballot, is whether that

20    convenience claim is in there.

21         We acknowledge that Your Honor wants

22    the ballot to be simple and that the

23    inclusion of this option adds something

24    extra to the ballot, but we believe the

25    inclusion of the convenience option makes

1    sense, is efficient and is important for how

2    this case goes forward.

3           So why do we think it's necessary?

4           First we want people to know that

5    this option for a $10,000 payment pretty

6    much immediately after confirmation is there

7    and that they consider that in making their

8    decision to vote on the plans, and under the

9    Debtor's plan, making that election now is

10   how it would work best under our process.

11          The UCC plan has a different process

12   for making a convenience election that takes

13   place later in the process of the tort

14   reviewing -- tort reviewer in the trust.

15          Second, we believe strongly that

16   this --

17                  THE COURT:  I'm sorry.  If

18   there are two different processes, how can

19   you put it on the ballot?

20          Are you going to put both processes

21   on, yours and the committee's on the ballot?

22                  MR. GURSTELLE:  Well, Your

23   Honor, in reviewing the committee's plan,

24   it's unclear to us how the convenience

25   election works for them.

1           Our process is that we make the

2     election as part of your vote and then you

3     would be entitled to that $10,000 payment

4     after a really initial cursory review of the

5     claim and see if there is a prima facie

6     case.

7           With the UCC's plan, if they don't

8     need to have that election made so that that

9     process can take place and those payments

10    can be made out, then it doesn't need to be

11    on the ballot.

12          If they want to put that on the

13    ballot as well, I suppose that would be fine

14    and we would include both elections on the

15    ballot and both elections would probably

16    affect how each plan plays out through

17    confirmation.

18          We do think it has an affect on

19    confirmation because it will help in

20    calculating the amount of money that will go

21    into the convenience class versus the amount

22    of money that would go into the full review

23    part of the class six claimants.

24          That would affect the per claimant

25    value.

1          So we think it's important and it's

2     material and it's likely to be important to

3     many members of the class.

4          We assume from the UCC --

5               THE COURT:  Of course, this is

6     all in the disclosure statement?

7               MR. GURSTELLE:  That's right.

8               THE COURT:  You just want to

9     bring out one little bit of the disclosure

10    statement and put it on the ballot?

11              MR. GURSTELLE:  We do think it

12    is a material part of how voting would work,

13    and although it isn't electing into a

14    separate sub class, it is electing a separate

15    type of treatment for that claimant and we

16    think it's important that those claimants be

17    allowed to make that decision at the outset

18    and we think that it is material and we

19    assume from the UCC's opposition to it that

20    they think it is too.

21          This is about fairness and openness

22    in the process, and at a minimum we think

23    that if that election was included, that the

24    ballot should include at least a sentence

25    alerting creditors to the fact they will

1    have the option to make that convenience

2    election.

3          Ultimately we believe that the

4    inclusion of this election makes sense.  It

5    will speed up the process in terms of both

6    initial distribution and will help the Court

7    assess the relative merits of the game

8    plans.

9          And so why does the UCC oppose it?

10   They say it will cause confusion and

11   prejudice.

12         With respect, we believe it would be

13   more confusing to have class six claimants

14   make a determination on voting for the plan

15   and have to make a second determination

16   later.

17         We think that doing it in one place

18   makes the most sense.  We don't think that

19   the language in the election is confusing

20   and we think it will be efficient.

21         As to alleged prejudice, the UCC

22   states that making an election would give

23   insight to Debtor and other parties into the

24   propensity for settlement in the event that

25   one of the plans is not confirmed.

```
1              First, the Archdiocese' goal, as it
2       has always been, is to confirm this plan,
3       which we believe is fair and achieves a
4       great result for creditors.
5              And again with respect, this case has
6       been in settlement talks for two years and
7       the parties are vigorously represented.  The
8       creditors want closure and are willing to
9       elect a convenience payment to get that
10      closure.  It's exactly the type of
11      information that would help get this case
12      across the finish line.
13             That's why we want the convenience
14      election in the ballot.  We think it makes
15      sense.  It does make sense for at least the
16      Debtor's plan.  We don't think it's
17      confusing and we don't think it's
18      prejudicial.
19             Other than that, I think the proposed
20      order has, like I said earlier, been agreed
21      to by the committee, and if you have any
22      questions I'll answer them.
23                  THE COURT:  Mr. Kugler?
24                  MR. KUGLER:  Thank you, Your
25      Honor.
```

 1              To the ballot issue first, I think

 2      that we all should want a clear and

 3      unambiguous ballot and I think that the

 4      inclusion of the convenience claim election

 5      has the potential to make the ballots

 6      confusing, particularly at the ballot

 7      tabulation stage.

 8              I can envision scenarios where a

 9      party might accept both plans, not check a

10      box regarding preference and then elect to

11      have their claim treated as a convenience

12      claim.

13              I'm not quite sure how that ballot

14      would be interpreted.  I'm sure that the

15      Archdiocese might have an interpretation

16      that is different than the interpretation

17      that the committee might have and that's

18      going to lead to further fights, further

19      expense, further delay.

20              Similarly, I could envision a

21      situation where a claimant rejects both

22      plans and then does not execute on the box

23      with a preference but then elects to have

24      their convenience claim treated as a

25      convenience claim, the claim treated as a

```
 1      convenience claim.

 2              Again, I'm not quite sure what that

 3      would mean, but I know that there would be

 4      multiple interpretations.

 5              I think for that reason alone it

 6      ought to be left off the ballot.  There will

 7      be plenty of time after confirmation for a

 8      convenience claim treatment to be afforded,

 9      folks who want to have their claim treated

10      in that fashion, and so I think that that

11      ought to be excluded from the ballot.

12              With respect to the timing, it seems

13      like a small nit, Your Honor, but the

14      committee wants to move forward in this case

15      quickly.

16              We didn't ask for 20 days, we asked

17      for ten days.  We agreed to resolve it at

18      the 20 days and that was rejected by the

19      Archdiocese.

20              I can tell you that the counsel for

21      the survivors has ordered 500 flash drives.

22      They ordered them, and for an $80 charge

23      they got them the next day.

24              This doesn't take weeks and weeks and

25      weeks.  They can have the flash drives
```

 1      tomorrow and they can load the stuff on.  It

 2      can be ready to go in ten days.

 3              So I'm not sure why there is interest

 4      in delay.  I'm kind of surprised we're here

 5      today.  I thought that after the last

 6      go-round we would have had ballots out by

 7      now and I would urge the Court to require

 8      that the Archdiocese get this stuff out in

 9      the next ten days.

10              Thank you.

11                  THE COURT:  Anyone else that's

12      want's to be heard on this motion?

13              Did you want to respond at all?

14              Mr. Gurstelle.

15                  MR. GURSTELLE:  Thank you, Your

16      Honor.

17              Ben Gurstelle again for the Debtor.

18              Again, we don't think the convenience

19      class election is confusing.

20              With respect to the scenario Mr.

21      Kugler just mentioned, I don't think a

22      convenience claim election would affect the

23      situation where no preference is checked on

24      the two plans.

25              The convenience claim election is

1       about treatment under the Debtor's plan, so

2       if they had accepted the Debtor's plan, they

3       accepted treatment as a convenience

4       claimant, then that's sort of the end of

5       that story.  I don't think it would be

6       confusing in tabulation.

7               With respect to an allegation we're

8       trying to delay the process, it's just the

9       opposite.  We brought this motion to jump

10      start the process and to try to get the

11      solicitation process lined up and under way.

12              And again I want to stress that we do

13      want to do this as quickly as possible.

14              The only reason we're asking for the

15      30-day outside deadline is we don't want to

16      be in violation of the court order on some

17      technicality.

18              Thank you.

19              THE COURT:  Well, let's turn to

20      the last one first, the ten or 20 or 30 days.

21              To describe it as a nit is an

22      understatement.  I can't believe you're here

23      either, Mr. Kugler, arguing about that.

24      You've been working at this for months and

25      months and the case is over two years old,

1    and whether we lose either another ten or 20

2    days in this process, because after

3    balloting it's going to go on for months

4    besides so this little period of time, this

5    arguing over is beyond silly.

6         I'll allow the 30 days.

7         And I understand it might not just be

8    the drives.  There is a lot of stuff that

9    can go wrong and a lot of technicalities and

10   a lot of things to do and I think we need to

11   allow the Debtor plenty of time to get all

12   those things done.

13        So I'll keep the 30 days in.

14        On the ballot, my view on the ballot

15   is a ballot is a ballot.  It's not a place

16   to put disclosure, it's not a place to

17   solicit.  The solicitation is in the

18   disclosure statement itself.

19        It is explained in the disclosure

20   statement, but the part about the plan is

21   explained in the plan, their opportunity to

22   make the election.

23        Unlike many plans which have a

24   convenience class, so you need to make the

25   election as part of the balloting because

1        you need to know which class to count the

2        ballot in, that is not this situation.

3        You're all in the -- all the victims are in

4        one class.

5              So putting that election at that

6        point it has the potential for confusion and

7        with no real upside that I can see so I'm

8        going to deny that part of the Debtor's

9        motion.

10             And you can redo the ballot and the

11       order and submit it, but with that language

12       taken out of the ballot.

13             Let's turn to the Debtor's motion,

14       the area where compliance with bankruptcy

15       Rule 2019.

16                  MR. GURSTELLE:  Thank you, Your

17       Honor.

18             Ben Gurstelle again for the Debtor.

19             This is a motion to compel Jeff

20       Anderson & Associates to comply with Rule

21       2019 in full.

22             This motion is all about fairness.

23       Transparency equates with fairness and the

24       rule requires it.

25             Rule 2019 requires that certain

Case 15-30125-DOT 15-30125-DOT Doc 617 Filed 03/06/17 Entered 06/10/20 09:12:10 09:12:10 Desc Main
Document    Page 25 of 53

25

1    disclosures are made when an entity such as

2    a law firm --

3                    THE COURT:  You're talking

4    louder, but you're still talking really fast.

5    Please slow down a little bit.

6                    MR. GURSTELLE:  I'll slow down.

7         Rule 2019 requires that an entity

8    such as a law firm that represents multiple

9    non-insider creditors who are acting in

10   concert to advance their common interest

11   make certain disclosures.

12        The disclosures are laid out in the

13   rule and our motion is to have the Anderson

14   firm comply with that rule.

15        We don't think that the Anderson firm

16   has complied with the rule and so we don't

17   think our motion is moot.

18        First, the Anderson firm has argued

19   that the rule does not apply do it because

20   although it represents 383 tort claimants,

21   or approximately 85 percent of the class six

22   claimants, the firm has not represented

23   these claimants acting in concert.

24        That assertion, Your Honor, frankly I

25   think, is impossible to square with reality.

```
 1              Since the very beginning of this case
 2       the Anderson firm has appeared at almost
 3       every single hearing on behalf of certain
 4       abuse survivors, never on behalf of any
 5       individual survivor, and they have also
 6       filed many, many motions in this case,
 7       responses, filed an appeal, the subcon
 8       order, all on behalf of certain abuse
 9       survivors, always acting selectively to
10       advance their common interests.
11              The only thing that the Anderson firm
12       has done on behalf of any individual
13       claimant is file proofs of claim.
14              So to say that they are not acting on
15       behalf of creditors in concert to advance
16       their common interests is just not true.
17       Clearly the rule applies to the Anderson
18       firm.
19              Second, the Anderson firm has argued
20       that it's met its obligations under Rule
21       2019 by its submission of a document last
22       Friday purporting to be a Rule 2019
23       disclosure.
24              With respect, this document is not a
25       proper 2019 disclosure and it doesn't comply
```

1    with the rule.

2         First, the disclosure does not

3    explain the facts and circumstances

4    concerning the formation of the abuse

5    survivor group as required by Rule

6    2019(c)(1)(A), so the questions we would

7    have are was the group as a result of

8    solicitations by the firm, did it come

9    together through specific referrals or did

10   the entire group simply form organically and

11   then seek to have the entity, the firm,

12   represent it.

13        We don't know because it's not

14   disclosed.

15        Second, the document does not

16   disclose the nature or amount of the

17   Anderson firm's own economic interest in the

18   outcome of this bankruptcy case as required

19   by Rule 2019(c)(2)(B).

20        Now, we assume, but we do not know

21   for certain because it hasn't been

22   disclosed, that the Anderson firm may have

23   various contingency fee arrangements with

24   its clients, but not all of the Anderson

25   firm's clients are similarly situated.   Some

1        are strong claims, some are weak claims,

2        some have multiple claims and some are

3        claims that are just not cognizable.

4            How does the Anderson firm's own

5        economic interest in this case affect how

6        its counsel -- how it will counsel its

7        clients regarding voting.

8            Have the Anderson firm's clients been

9        given informed consent as to possible

10       conflicts that these differences could lead

11       to?

12           We don't know because it hasn't been

13       disclosed.

14           And this brings us to the third major

15       deficiency, which is that Rule 2019 requires

16       that the disclosure include a copy of any

17       instruments authorizing that entity to act

18       on behalf of its client creditors.

19           Or its creditor clients.

20           This is very important to us.  It's

21       very important to the case.

22           While the Archdiocese is not seeking

23       the disclosure, we're not seeking the

24       disclosure of any personally-identifying

25       information of any of the clients, we don't

1      want their names, we don't want their

2      addresses, we're looking for the information

3      about the firm's economic interest and the

4      other information required by Rule 2019.

5           There is no exception to the rule for

6      any other part of the disclosure for the

7      Anderson firm.

8           It's important that this grievance be

9      public so that the Court and all parties in

10     interest may review them in light of the

11     competing plans and the impending votes to

12     be passed.

13          Now, this is especially true because

14     one of the plans is currently being promoted

15     and championed by the Anderson firm.

16          Finally, the Anderson firm has argued

17     that it's unfair for the Archdiocese to

18     demand that the Anderson firm make the

19     disclosure when it hasn't made the same

20     demands of other firms representing multiple

21     creditors.

22          First, the Archdiocese believes that

23     the rule is the rule and it applies across

24     the board and that anyone appearing in this

25     case on behalf of multiple creditors ought

1    to comply with it.  The rule is

2    self-effecting.

3         So we don't believe that we should

4    have to make any motion for disclosure in

5    the first place, but we have made this

6    motion with respect to the Anderson firm

7    because, frankly, we think that the Anderson

8    firm's disclosure is more important.

9         The Anderson firm has a different

10   type of interest in this case than other

11   firms do.

12        The Anderson firm has its own

13   disclosable economic interest as defined

14   under the rule that will be determined by

15   the outcome of this case.

16        The term "disclosable economic

17   interest" includes any other right or

18   derivative right granting the holder an

19   economic interest that is affected by the

20   value, acquisition or disposition of a claim

21   or interest.

22        Because its fee arrangements, or we

23   assume its fee arrangements, the Anderson

24   firm, unlike other firms, has that interest

25   and that we believe that it is important to

```
1     know how that will affect the process going

2     forward.

3             We think it's appropriate right now

4     before the solicitation stage to get that

5     disclosure.

6             In at least two other diocese cases

7     that disclosure has been made at or about

8     the solicitation stage.

9             And in the Delaware case, the

10    Wilmington case in Delaware, it was

11    specifically tied to solicitation.

12            Your Honor, we're not after the

13    survivors, we're not after Jeff Anderson.

14    We are trying to get to transparency and

15    fairness so that the process can move

16    forward in a way that is fair to everyone

17    and that's why we want the disclosure.

18            Thank you.

19            THE COURT:  Okay.

20    Ms. Lindstrom?

21            MS. LINDSTROM:  Good morning,

22    Your Honor.

23            Elin Lindstrom on behalf of Jeff

24    Anderson & Associates.

25            Mr. Finnegan and Mr. Anderson are
```

1      noticeably absent today.  This is an

2      important issue to our firm and they were,

3      unavoidably, out of the state so they

4      apologize for their absence.

5          I'm not going to belabor the points

6      raised in our response memorandum, but there

7      are a few points raised in the Archdiocese

8      reply brief that I would like to touch on

9      today.

10          Bringing this rule up now can only be

11      viewed as an attempt to call into question

12      the integrity of both the voting process and

13      of our firm's representation of these

14      survivors.

15          By focusing on this 2019 disclosure

16      now, the Archdiocese seems to be setting up

17      for some potential argument they may have

18      about our firm's participation in the voting

19      process if the survivors opt to rejection

20      the Archdiocese' plan.

21          The way the Archdiocese has framed

22      their argument makes it seem like our firm

23      is voting for our clients on their behalf,

24      and that is simply not the case.

25          Our firm is not participating in the

1       vote.

2               We will, as their attorneys, advise

3       these clients individually based on their

4       individual circumstances of the risks and

5       benefits of each plan, and we have a duty

6       and obligation under the rules of ethics and

7       under this court to do that.

8               Based on that advice, it will be our

9       client who cast the vote, not us.

10              It is unclear what our retainer

11      agreement or information in that agreement

12      has to do with this voting process or what

13      we would advise our clients about the vote

14      and the plans.

15              The Archdiocese seems to even be

16      going beyond the Rule 19 requirements under

17      the rule by requesting our fee agreement and

18      seemingly trying to step into the attorney/

19      client relationship that we have with our

20      clients and almost possibly interfering with

21      our privileged information and privileged

22      conversations that we have with our clients.

23              There was a provision in the ballot

24      order that was stricken by the Archdiocese

25      regarding us having an obligation to talk to

1    our clients.

2         We know we have that obligation.  We

3    don't need to be told by the Archdiocese

4    what to do in this voting process.

5         We think this is inappropriate.  We

6    are aware of the rules of ethics and will

7    continue to comply with those rules.

8         Further, Your Honor, while we

9    disagree that this rule applies to our firm,

10    we have filed a Rule 2019 disclosure, but

11    the Archdiocese is requesting two additional

12    requirements under the rule that we just do

13    not think are applicable here:  First,

14    regarding a copy of the instrument required

15    under Rule 2019(c)(4), the type of document

16    contemplated by this provision in this rule

17    is not our retainer agreement.

18         It would be an agreement made between

19    the claimants to coordinate their actions

20    and act in concert.

21         In some cases this may be a power of

22    attorney.  In some cases it may be a power

23    of attorney allowing the firm to cast a

24    proxy vote on behalf of an entire group of

25    claimants.

```
 1              This just does not exist in this
 2      case.
 3              And the Archdiocese has called the
 4      group of survivors exactly that, a group,
 5      that we formed a group of creditors.
 6              As I said of about, each of these
 7      people and survivors is voting individually
 8      and there simply is no group here and there
 9      is no documents giving authority or giving
10      rise to such a group.
11              In terms of appearing on the case on
12      behalf of all the claimants, so far all the
13      motions in this case, Your Honor, have
14      applied to all of our claimants.
15              It simply did not make sense for us
16      to come up here to the microphone 383 times
17      or to file 383 pleadings.
18              Further, Your Honor, the Archdiocese'
19      contention that Jeff Anderson & Associates
20      needs to comply and provide its own economic
21      interests under the 2019 rule is simply --
22      it's not a requirement under the rule.
23              The rule actually states that it is a
24      disclosable economic interest as it relates
25      to the Debtor.
```

1           Jeff Anderson & Associates has no

2    economic interest in the Debtor.  We are not

3    a creditor in this case and we are not a

4    claimant.

5           We represent individuals who are

6    creditors and have economic interests in the

7    Debtor.

8                  THE COURT:  You have a huge

9    economic interest in the case, however,

10   probably the biggest one.

11          No one has a bigger economic interest

12   in the case than you.

13          "You" being the Anderson firm, not

14   you personally.

15                 MS. LINDSTROM:  The Anderson

16   firm may get paid.  There are other attorneys

17   in this room that will get paid in this case

18   and have gotten paid.

19                 THE COURT:  Well, depending on

20   what your fee arrangement is, which we don't

21   know but many of us have speculated is a

22   contingency, the firm, depending on what plan

23   is confirmed, stands to collect 20,

24   $30 million in fees.

25                 MS. LINDSTROM:  We would

1    collect fees, Your Honor.  It is a

2    contingency basis.

3         But the Archdiocese --

4              THE COURT:  Well, it's a huge

5    economic interest in the case, like I said,

6    bigger than anyone else.

7         No one has a bigger interest than

8    Anderson & Associates.

9              MS. LINDSTROM:  I would

10   respectfully disagree with Your Honor or with

11   the Archdiocese that that rule requires us to

12   disclose our economic interest because, as

13   again, it says it's as it relates to the

14   Debtor.

15        And to insinuate, or the Archdiocese'

16   insinuation that we will somehow influence

17   our clients votes in order to up our fees or

18   our payment is absolutely insulting.

19        Your Honor, for these reasons, we

20   would ask to find that Jeff Anderson &

21   Associates has complied with the Rule 2019

22   motion.

23        If, however, the Court is inclined to

24   grant the Archdiocese further request for

25   further compliance, we would ask the Court

1          to allow us to do it in a way that does not

2          disclose any of our clients' identifying

3          information.

4              I know there are some asbestos cases

5          where even when exemplars or fee

6          agreements --

7              Sorry.  Excuse me, not fee

8          agreements, but where documents were filed

9          under seal in court, those were later

10         unsealed and the identities of those

11         individuals made public.

12             So if we are to comply with this

13         rule, that we can do so in a way that

14         protects the identities of the survivors,

15         and also that all the professionals in this

16         case that fall under this rule also have to

17         comply.

18             Thank you.

19             THE COURT:  Anyone else want to

20         be heard on the motion?

21             Mr. O'Brien.

22             MR. O'BRIEN:  Thank you, Your

23         Honor.

24             The parish committee did put in a

25         response simply supporting the 2019 motion

1    brought by the Debtor.

2         I'm not going to argue what the rule

3    requires.  I have never been faced with

4    having to deal with this rule when I was on

5    the bench, not a single time.

6         I read the rule once and then I put

7    it down and I picked it up and I read it

8    again and I read it again and I'm still is

9    not sure exactly what it means, but I'm sure

10   you know what it means and I'm sure you're

11   going to tell us all what it means.

12        What I want to just briefly talk

13   about here is the unique nature of this case

14   and perhaps the way the rule fits in to the

15   unique nature of this case.

16        I was some what surprised when I read

17   the initial response by Mr. Jeff Anderson to

18   the motion by claiming that this was

19   motivated by an attempt to intimidate

20   Mr. Anderson and his firm.

21        I don't know Mr. Anderson very well,

22   but in getting to know him in this case, he

23   impresses me as somebody who is not

24   intimidated by anything.

25        And then when the response, the 2019

```
 1        was filed, you look at it and there is
 2        absolutely nothing in there that would
 3        intimidate anybody about anything.
 4             So I wonder what else is going on
 5        here.
 6             You know, this is a rather unique
 7        situation in that, as you pointed out and as
 8        has been pointed out by others here, Mr.
 9        Anderson and his firm are the -- they have a
10        unique position in this case that no other
11        professional has, and that is that they have
12        a substantial personal financial interest in
13        the outcome of this case, a substantial
14        stake.
15             Now, if their compliance with the
16        rule by filing that document that they
17        filed, if that's the compliance with the
18        rule, then there needs to be some other, in
19        my view, transparency here that will satisfy
20        the integrity of the voting process.
21             This is not an attempt to interfere
22        with or to call into question the integrity
23        of the voting process.
24             This is an extremely unique situation
25        where this firm, which has a financial stake
```

1          in this case that is very substantial, is

2          going to take control and possession of the

3          ballots of the overwhelming number of

4          clients that it has and the overwhelming

5          number of people who make up the unsecured

6          creditors class.

7                There is nothing wrong with that, but

8          under those circumstances it seems to me

9          that in order to protect, rather than call

10         into question, the integrity of the process,

11         there has got to be some sort of perhaps

12         maybe extraordinary, then, if the rule has

13         been complied with, some other extraordinary

14         transparency.

15               It's not a matter of, well, we don't

16         trust you or we think you're being evil.

17         It's the old situation of trust but verify.

18               You know, there has got to be some

19         process here that will make up for what is

20         otherwise not a normal process in a Chapter

21         11 case.

22               I would suggest that if other

23         financial disclosures cannot be or will not

24         be made in this case, that the ballots of

25         the unsecured claimants be turned over not

1        to Mr. Anderson but to the unsecured

2        creditors committee.

3               The unsecured creditors committee

4        represents these people, as well as

5        Mr. Anderson does individually, and they

6        have got a fiduciary responsibility that is

7        much broader than Mr. Anderson's and there

8        is no reason in my mind why they can't, why

9        Mr. Kugler's office cannot fulfill the

10       responsibility to the unsecured creditors

11       through the committee by doing the same kind

12       of handling and securing the votes of these

13       members that could be done by Mr. Jeff

14       Anderson.

15              Again, it's not a matter of

16       disparaging Mr. Jeff Anderson.  You know,

17       it's a matter of either recognizing what are

18       the required procedures and processes in a

19       situation like this or to come up with some

20       alternative that protects the integrity of

21       the voting process.

22              Thank you.

23                    THE COURT:  Thank you.

24              Anyone else?  Anybody else want to be

25       heard on the motion?

```
1              Mr. Gurstelle.

2                   MR. GURSTELLE:  Thank you, Your

3      Honor.

4              Ben Gurstelle again for the Debtors.

5              Just a couple of responses.

6              Number one, I think the rule is clear

7      and it requires the information that we laid

8      out in our brief.

9              Next, the retainer agreement is --

10                  THE COURT:  Well, let me stop

11     you there.

12             Assuming that's true, is there some

13     reason to require them to disclose how many

14     clients they have?

15             I lost track of the number, 200

16     and --

17                  MR. GURSTELLE:  How many

18     claimants?

19                  THE COURT:  That they

20     represent.

21                  MR. GURSTELLE:  383.

22             We think --

23                  THE COURT:  You need 383 copies

24     of the retainer agreement?

25                  MR. GURSTELLE:  Your Honor, I
```

1         don't think we need every single retainer

2         agreement if there is a form agreement.

3                 We would want to see, and I think the

4         rule would require, disclosure of any

5         different types of retainer agreements that

6         Mr. Anderson's firm may have.

7                 For example, some of his clients were

8         retained before this case started and they

9         had ongoing litigation and some clients

10        signed up well into the course of this case.

11                There may be different retainer

12        agreements for those types of clients with

13        different fee arrangements.

14                We think the retainer agreement is

15        absolutely contemplated by the rule and has

16        set out in the Baron & Budd case that we

17        cited.

18                It's not a confidential document,

19        it's a document that is required to be

20        disclosed by the rule and there is a

21        discussion of that in Baron & Budd.

22                And it is important for the Court to

23        know the fee arrangement for the Anderson

24        firm because, as the Court pointed out, the

25        Anderson firm does have a distinct economic

1    interest in the outcome of the case and it

2    is a disclosable economic interest as

3    defined in Part A of the rule and it is

4    dependent on how these claims turn out.

5        You know, I can envision a situation

6    where the Anderson firm may believe that it

7    can get more money for the firm in a

8    situation where the case is dismissed or

9    where litigation ensues and that certain

10   claimants may do better in that situation

11   but certain claimants may not and that gives

12   rise to potential conflicts of interest.

13       Can those conflicts be waived?

14   Perhaps.  But it's important that the Court

15   and other parties in interest who are

16   invested in the solicitation process know

17   that.

18       So we believe that it's very

19   important that the rule be complied with.

20       Then as to Mr. O'Brien's comments, I

21   don't think we have a position on that, but

22   I do think that whether or not the ballots

23   go to the committee or to the Anderson firm,

24   the rule requires disclosure and it should

25   be complied with.

 1              Thank you.

 2                    THE COURT:  Ms. Lindstrom?

 3              Well, actually I would like you to

 4      step up.  I just have a question or two to

 5      ask you.

 6              Just generically, without talking

 7      about any individual client, how many

 8      different forms of retainer agreements would

 9      you have?

10              I'm guessing they are virtually

11      identical for most of them.

12                    MS. LINDSTROM:  Most of them

13      are virtually identical.  I can't say for

14      certain how many different examples we have

15      to date.  I think most of them are the same,

16      though.

17                    THE COURT:  Thank you.

18              Well, as to the why this is here now,

19      I mean we've nibbled around the edge of this

20      for two years.  I mean this is not a new

21      issue and the rule, to use the word of the

22      Debtor, is self-effectuating.

23              We don't need an order.  The Anderson

24      firm should have complied with it two years

25      ago and they should have complied with it a

1       year ago and six months ago.

2               The fact that we're here now on the

3       motion doesn't mean they no longer have to

4       comply with the rule, so I think they have

5       to comply, it has to comply with the rule.

6               If there is some sort of insult there

7       or distrust there, it's a distrust by the

8       Supreme Court who promulgated the rule, not

9       by the parties here or me.  The rule is the

10      rule is the rule.

11              And you might speculate that there is

12      some cynicism, if not distrust, behind the

13      rule of disclosure.

14              I really dislike the current trendy

15      word "transparency", but it's sort of

16      applicable here.

17              Bankruptcy sort of operates on

18      everybody knowing what's going on, me in

19      particular, but everybody knowing what's

20      going on, and this is one of those elements

21      that people, at least the Supreme Court

22      thought everyone should know.

23              So I think the Anderson firm must

24      comply with the rule.

25              One, it needs to be verified.  That's

1     easily taken care of.

2         It wasn't.  The thing that you filed

3     wasn't verified.  The rule certainly

4     requires that.

5         I'm sorry.  I just give no credence

6     to the suggestion that they are not acting

7     in concert.  Clearly you are.

8         I mean you may not have set out to

9     create a group, but you have a group.  You

10    have a group of clients who are acting in

11    concert through you, and the Anderson firm

12    is the representative of 383 people and the

13    rule, this is exactly the situation it's

14    designed to -- or one of the many situations

15    the rule is designed to tend to.

16        And I read the rule clearly as well,

17    and I think one of the important points of

18    the rule is to disclose the economic

19    interest in the case, what does the

20    representative have to gain.  That's the

21    point of the rule here.

22        So for whatever reasons we can

23    understand that there are different

24    interests or different motivations or just

25    different things going on, and so we need to

```
 1        know that.  That's something the entire body
 2        of people, the court and lawyers need to
 3        understand.
 4              So I'm going to order among the
 5        things that I think you --
 6              And I think sort of one of the other
 7        things of the group and one of the unique
 8        dynamics of this case from the beginning has
 9        been the Anderson firm represents a majority
10        of the members of the creditors committee,
11        so it's certainly my perspective of this
12        case that Jeff Anderson has been the
13        creditors committee.
14              That's sort of the dynamic here
15        that's at work here and so it makes it all
16        the more important, it seems to me, that
17        this rule be complied with.
18              So I think you need to go back and
19        comply with the rule.
20              Obviously no one has asked for and
21        I'm certainly not going to include the
22        requirement to disclose any names.
23              I think the list that you've done
24        with the name by claimant number is perfect,
25        but I think you also have to disclose the
```

```
 1          fee arrangement with each of those clients,

 2          whether it's hourly or contingent, includes

 3          costs and expenses, whatever, so that we can

 4          know what it is for each one of those

 5          clients.

 6                    And that would include --

 7                    And the reason I ask, I was hoping

 8          this wasn't going to be too onerous, but I

 9          don't want you to -- clearly don't want to

10          file the actual retainer agreements with

11          anybody's name in them, but somehow it seems

12          to me you should be able to have exemplars

13          that say here is the retainer agreement

14          exactly in this form that was signed with

15          claimants number one, two, three, four, 16,

16          18, 20, whatever, and if there is another

17          one, these five people signed this different

18          retainer agreement, so that at least we can

19          look at them and figure out what the fee

20          arrangement is and other arrangements for

21          representation are with each one of your

22          clients.

23                    Did I cover what we're looking for

24          here?

25                    I mean you need a little bit of time.
```

1     I'll give you about maybe a week from

2     tomorrow as the deadline to comply with the

3     order.

4              [UNINTELLIGIBLE]

5              I can pick Friday because then you

6     can't make your staff work on weekends.

7              [UNINTELLIGIBLE]

8              Sure.  Now it's gotten longer.  It's

9     not the following Monday, it's the following

10    Thursday?

11             [UNINTELLIGIBLE]

12             Okay.  Two weeks from today.

13

14                        * * *

15

16

17

18

19

20

21

22

23

24

25

1   STATE OF MINNESOTA)

2                    ss.

3   COUNTY OF DAKOTA  )

4

5       BE IT KNOWN, that I transcribed the digitally

6   recorded proceedings held at the time and place set

7   forth herein;

8

9       That the proceedings were recorded

10  electronically and stenographically transcribed

11  into typewriting, that the transcript is a true

12  record of the proceedings, to the best of my

13  ability;

14

15      That I am not related to any of the parties

16  hereto nor interested in the outcome of the action;

17

18

19      IN EVIDENCE HEREOF, WITNESS MY HAND AND SEAL.

20

21

22

23              _____

24                      NEIL K. JOHNSON

25

        (651) 681-8550 phone    1-877-681-8550 toll free
              www.johnsonreporting.com

# EXHIBIT 18

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

The Archdiocese of Saint Paul and
Minneapolis,

        Debtor.

BKY 15-30125

Chapter 11

## ORDER

This case is before the court on the debtor's motion for an order requiring compliance with Rule 2019 of the Federal Rules of Bankruptcy Procedure.

Based on the motion and file,

IT IS ORDERED:

On or before March 9, 2017, Jeff Anderson and Associates, P.A., shall comply with the provisions of Federal Rule of Bankruptcy Procedure 2019 by filing  a

verified disclosure containing the following:

A.      A complete copy of each form of retainer agreement, fee agreement, engagement agreement, referral agreement and all other applicable agreements authorizing the Anderson Firm to act on behalf of a creditor in this case or providing in any way for the payment of the Anderson Firm's fees and costs, including all amendments and modification to any such agreements.  The Anderson Firm shall provide exemplar copies of each version of the actual signed agreements entered into with creditors in this case.  The Anderson Firm may redact the personally identifying information of those creditor clients from such agreements but may not

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on 02/27/2017
Lori Vosejpka, Clerk, by LH

1

redact any other information.  The disclosure shall further set forth by claimant number which

exemplar agreements apply to each client.

B.       All other information and disclosures required by Fed. R. Bankr. P. 2019.


Dated: *February 27, 2017*                        /e/ Robert J. Kressel
                                                  Robert J. Kressel
                                                  United States Bankruptcy Judge


2

# EXHIBIT 19

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| THE ARCHDIOCESE OF NEW YORK,<br><br>       Plaintiff,<br><br>against<br><br>INSURANCE COMPANY OF NORTH AMERICA, AGCS MARINE INSURANCE COMPANY (F/K/A INTERSTATE INDEMNITY COMPANY), AIU INSURANCE COMPANY, AMERICAN EMPIRE SURPLUS LINES INSURANCE COMPANY (F/K/A GREAT AMERICAN SURPLUS LINES INSURANCE COMPANY), ARROWOOD INDEMNITY COMPANY (SUCCESSOR-IN-INTEREST TO ROYAL INDEMNITY COMPANY AND F/K/A ROYAL INSURANCE COMPANY OF AMERICA), CONTINENTAL INSURANCE COMPANY (SUCCESSOR-IN-INTEREST TO FIDELITY AND CASUALTY COMPANY OF NEW YORK AND NIAGARA FIRE INSURANCE COMPANY), EXECUTIVE RISK INDEMNITY INC. (SUCCESSOR-IN-INTEREST TO AMERICAN EXCESS INSURANCE COMPANY), FEDERAL INSURANCE COMPANY, FIREMAN'S FUND INSURANCE COMPANY, FIRST STATE INSURANCE COMPANY, GREAT AMERICAN ASSURANCE COMPANY (F/K/A AGRICULTURAL INSURANCE COMPANY), GREAT AMERICAN INSURANCE COMPANY OF NEW YORK (F/K/A AMERICAN NATIONAL FIRE INSURANCE COMPANY), GREAT NORTHERN INSURANCE COMPANY, HARTFORD UNDERWRITERS INSURANCE COMPANY (F/K/A NEW YORK UNDERWRITERS INSURANCE COMPANY), HUDSON INSURANCE COMPANY, INDEMNITY INSURANCE COMPANY OF NORTH AMERICA (F/K/A INA INSURANCE COMPANY), LEXINGTON INSURANCE COMPANY, CERTAIN LONDON MARKET COMPANIES, MARKEL AMERICAN INSURANCE COMPANY, MUNICH REINSURANCE AMERICA (F/K/A AMERICAN RE-INSURANCE COMPANY), NATIONAL FIRE INSURANCE COMPANY OF HARTFORD (SUCCESSOR-IN-INTEREST TO TRANSCONTINENTAL INSURANCE COMPANY), NATIONAL SURETY CORPORATION, NATIONAL UNION FIRE INSURANCE COMPANY OF | Index No.:<br><br>Date Summons filed: June 28, 2019<br><br>      **SUMMONS** |

PITTSBURGH, PA (SUCCESSOR-IN-INTEREST TO LANDMARK INSURANCE COMPANY), OHIO CASUALTY INSURANCE COMPANY, PACIFIC EMPLOYERS INSURANCE COMPANY, ST. PAUL SURPLUS LINES INSURANCE COMPANY, TIG INSURANCE COMPANY (SUCCESSOR-IN-INTEREST TO INTERNATIONAL INSURANCE COMPANY), TWIN CITY FIRE INSURANCE COMPANY, CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, WESTCHESTER FIRE INSURANCE COMPANY, and VIGILANT INSURANCE COMPANY,

Defendants.

**TO THE ABOVE NAMED DEFENDANTS:**

**YOU ARE HEREBY SUMMONED** to answer the attached complaint of the Plaintiff in this action and to serve a copy of your answer on the Plaintiff's attorneys at the address stated below.

If this summons was personally delivered to you in the State of New York, you must serve the answer within 20 days after service, excluding the day of service. If this summons was not personally delivered to you in the State of New York, you must serve the answer within 30 days after service of the summons is complete, as provided by law.

If you do not serve an answer to the attached complaint within the applicable time limitation stated above, a judgment may be entered against you, by default, for the relief demanded in the complaint.

The Plaintiff designates New York County as the place of trial.

The basis of venue is that one or more Defendants reside in New York County within the meaning of CPLR § 503.

2

Dated: New York, New York
      June 28, 2019

**BLANK ROME LLP**



By:_____

    James R. Murray
    Jared Zola
    Robyn L. Michaelson
    1271 Avenue of the Americas
    New York, New York 10020
    Telephone: (212) 885-5209
    Facsimile: (917) 591-8538
    jmurray@blankrome.com
    jzola@blankrome.com
    rmichaelson@blankrome.com

    James S. Carter
    (*pro hac vice* application to be submitted)
    1825 Eye Street NW
    Washington, DC 20006
    Telephone: (202) 420-3409
    Facsimile: (202) 420-2201
    jscarter@blankrome.com

    *Counsel for the Archdiocese of New York.*

TO:

AGCS Marine Insurance Company
225 W. Washington Street
Suite 1800
Chicago, Illinois 60606

AIU Insurance Company
175 Water Street
24th Floor
New York, New York 10038

American Empire Surplus Lines Insurance Company
c/o The Corporation Trust Company
1209 Orange Street
Wilmington, Delaware 19801

Arrowood Indemnity Company
c/o Corporation Service Company

3

251 Little Falls Drive
Wilmington, Delaware 19808

Continental Insurance Company
100 Matsonford Road, Suite 200
Radnor, Pennsylvania 19087

Executive Risk Indemnity Inc.
c/o CT Corporation System
1209 Orange Street
Wilmington, Delaware 19801

Federal Insurance Company
c/o CT Corporation System
150 West Market Street, Suite 1800
Indianapolis, Indiana 46204

Fireman's Fund Insurance Company
c/o CT Corporation System
818 W 7th Street, Suite 930
Los Angeles, California 90017

First State Insurance Company
c/o CT Corporation System
67 Burnside Avenue
East Hartford, Connecticut 06106

Great American Assurance Company
301 East 4th Street
Cincinnati, Ohio 45202

Great American Insurance Company of New York
301 East 4th Street, 24th Floor
Cincinnati, Ohio 45202

Great Northern Insurance Company
c/o CT Corporation System
150 West Market Street, Suite 1800
Indianapolis, Indiana 46204

Hartford Underwriters Insurance Company
c/o CT Corporation System
67 Burnside Avenue
East Hartford, Connecticut 06108

Hudson Insurance Company
c/o The Corporation Trust Company

4

1209 Orange Street
Wilmington, Delaware 19801

Certain Underwriters at Lloyd's, London
c/o Mendes & Mount
750 Seventh Avenue
New York, New York 10019

Indemnity Insurance Company of North America
c/o CT Corporation System
600 North 2nd Street, Suite 401
Harrisburg, Pennsylvania 17101

Insurance Company of North America
c/o CT Corporation System
600 North 2nd Street, Suite 401
Harrisburg, Pennsylvania 17101

Lexington Insurance Company
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, Delaware 19808

Lexington Insurance Company
Counsel, Legal Department
200 State Street
Boston, Massachusetts 02109

Certain London Market Companies
c/o Mendes & Mount
750 Seventh Avenue
New York, New York 10019

Markel American Insurance Company
c/o Richard R. Grinnan
4521 Highwoods Parkway
Glen Allen, Virginia 23060

Munich Reinsurance America
c/o Corporate Service Company
251 Little Falls Drive
Wilmington, Delaware 19808

National Fire Insurance Company of Hartford
151 N. Franklin Street
Chicago, Illinois 60606

5

Case 20-10343-LSS    Doc 1166    Filed 08/26/20    Page 162 of 217

National Surety Corporation
225 W. Washington Street, Suite 1800,
Chicago, Illinois 60606

National Union Fire Insurance Company of Pittsburgh, PA
c/o Corporation Service Company
2595 Interstate Drive, Suite 103
Harrisburg, Pennsylvania 17110

Ohio Casualty Insurance Company
c/o Corporation Service Company
10 Ferry Street, Suite 313
Concord, New Hampshire 03301

Pacific Employers Insurance Company
c/o CT Corporation System
600 North 2nd Street, Suite 401
Harrisburg, Pennsylvania 17101

St. Paul Surplus Lines Insurance Company
c/o The Prentice-Hall Corporation System, Inc.
251 Little Falls Drive
Wilmington, Delaware 19808

St. Paul Surplus Lines Insurance Company
c/o Nicholas Seminara, President
445 Minnesota Street, Suite 900
St. Paul, Minnesota 55101

TIG Insurance Company
c/o CT Corporation System
818 West Seventh Street, Suite 930
Los Angeles, California 90017

Twin City Fire Insurance Company
c/o CT Corporation System
150 West Market Street, Suite 800
Indianapolis, Indiana 46204

Westchester Fire Insurance Company
c/o CT Corporation System
600 North 2nd Street, Suite 401
Harrisburg, Pennsylvania 17110

Vigilant Insurance Company
55 Water Street
New York, New York 10041

6

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| THE ARCHDIOCESE OF NEW YORK, | |
| Plaintiff, | Index No. |
| against | **COMPLAINT** |
| INSURANCE COMPANY OF NORTH AMERICA, AGCS MARINE INSURANCE COMPANY (F/K/A INTERSTATE INDEMNITY COMPANY), AIU INSURANCE COMPANY, AMERICAN EMPIRE SURPLUS LINES INSURANCE COMPANY (F/K/A GREAT AMERICAN SURPLUS LINES INSURANCE COMPANY), ARROWOOD INDEMNITY COMPANY (SUCCESSOR-IN-INTEREST TO ROYAL INDEMNITY COMPANY AND F/K/A ROYAL INSURANCE COMPANY OF AMERICA), CONTINENTAL INSURANCE COMPANY (SUCCESSOR-IN-INTEREST TO FIDELITY AND CASUALTY COMPANY OF NEW YORK AND NIAGARA FIRE INSURANCE COMPANY), EXECUTIVE RISK INDEMNITY INC. (SUCCESSOR-IN-INTEREST TO AMERICAN EXCESS INSURANCE COMPANY), FEDERAL INSURANCE COMPANY, FIREMAN'S FUND INSURANCE COMPANY, FIRST STATE INSURANCE COMPANY, GREAT AMERICAN ASSURANCE COMPANY (F/K/A AGRICULTURAL INSURANCE COMPANY), GREAT AMERICAN INSURANCE COMPANY OF NEW YORK (F/K/A AMERICAN NATIONAL FIRE INSURANCE COMPANY), GREAT NORTHERN INSURANCE COMPANY, HARTFORD UNDERWRITERS INSURANCE COMPANY (F/K/A NEW YORK UNDERWRITERS INSURANCE COMPANY), HUDSON INSURANCE COMPANY, INDEMNITY INSURANCE COMPANY OF NORTH AMERICA (F/K/A INA INSURANCE COMPANY), LEXINGTON INSURANCE COMPANY, CERTAIN LONDON MARKET COMPANIES, MARKEL AMERICAN INSURANCE COMPANY, MUNICH REINSURANCE AMERICA (F/K/A AMERICAN | JURY TRIAL REQUESTED |

RE-INSURANCE COMPANY), NATIONAL FIRE INSURANCE COMPANY OF HARTFORD (SUCCESSOR-IN-INTEREST TO TRANSCONTINENTAL INSURANCE COMPANY), NATIONAL SURETY CORPORATION, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA (SUCCESSOR-IN-INTEREST TO LANDMARK INSURANCE COMPANY), OHIO CASUALTY INSURANCE COMPANY, PACIFIC EMPLOYERS INSURANCE COMPANY, ST. PAUL SURPLUS LINES INSURANCE COMPANY, TIG INSURANCE COMPANY (SUCCESSOR-IN-INTEREST TO INTERNATIONAL INSURANCE COMPANY), TWIN CITY FIRE INSURANCE COMPANY, CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, WESTCHESTER FIRE INSURANCE COMPANY, and VIGILANT INSURANCE COMPANY,

Defendants.

Plaintiff the Archdiocese of New York (the "Archdiocese"), by and through its attorneys, brings this Complaint against Insurance Company of North America ("INA"), AGCS Marine Insurance Company (f/k/a Interstate Indemnity Company), AIU Insurance Company ("AIU"), American Empire Surplus Lines Insurance Company (f/k/a Great American Surplus Lines Insurance Company) ("American Empire"), Arrowood Indemnity Company (successor-in-interest to Royal Indemnity Company and f/k/a Royal Insurance Company of America) ("Arrowood Indemnity"), Continental Insurance Company (successor-in-interest to Fidelity and Casualty Company of New York and Niagara Fire Insurance Company) ("Continental"), Executive Risk Indemnity Inc. (successor-in-interest to American Excess Insurance Company) ("Executive Risk"), Federal Insurance Company ("Federal"), Fireman's Fund Insurance Company ("Fireman's Fund"), First State Insurance Company ("First State"), Great American Assurance Company (f/k/a Agricultural Insurance Company) ("Great American Assurance"), Great American Insurance Company of New York (f/k/a American National

2

Fire Insurance Company), Great Northern Insurance Company ("Great Northern"), Hartford
Underwriters Insurance Company (f/k/a New York Underwriters Insurance Company) ("Hartford
Underwriters"), Hudson Insurance Company ("Hudson"), Indemnity Insurance Company of North
America (f/k/a INA Insurance Company) ("IINA"), Lexington Insurance Company ("Lexington"),
certain London Market Companies, Markel American Insurance Company ("Markel"), Munich
Reinsurance America (f/k/a American Re-Insurance Company) ("Munich Re"), National Fire
Insurance Company of Hartford (successor-in-interest to Transcontinental Insurance Company)
("National Fire"), National Surety Corporation ("National Surety"), National Union Fire Insurance
Company of Pittsburgh, PA (successor-in-interest to Landmark Insurance Company) ("National
Union"), Ohio Casualty Insurance Company ("Ohio Casualty"), Pacific Employers Insurance
Company ("Pacific Employers"), St. Paul Surplus Lines Insurance Company, TIG Insurance Company
(successor-in-interest to International Insurance Company) ("TIG"), Twin City Fire Insurance
Company ("Twin City"), certain Underwriters at Lloyd's, London, Westchester Fire Insurance
Company ("Westchester Fire"), and Vigilant Insurance Company ("Vigilant") (collectively, the
"Insurers"), and alleges as follows:

## **BACKGROUND**

1.      This is a civil action for declaratory judgment and breach of contract relating to
the Insurers' obligations pursuant to their respective insurance policies to provide coverage for claims
and lawsuits against the Archdiocese based on allegations of childhood sexual abuse and to assist in
compensating alleged victim-survivors.

2.      The insurance coverage issues raised in this case not only affect the
Archdiocese, but also other religious organizations, schools, hospitals, and other institutions
throughout the State of New York.  The resolution of such issues could significantly impact the ability

3

of such organizations to continue their operations and, at the same time, provide meaningful compensation to sexual abuse survivors.

3.      On February 14, 2019, Governor Andrew Cuomo of New York signed into law the Child Victims Act ("CVA"). The CVA revives liability for claims based on sexual abuse that were previously barred by the statute of limitations. The CVA opens a one-year "window" for claimants to commence civil actions alleging revived sexual abuse claims. The "window" in New York opens in August 2019.

4.      Prior to the enactment of the CVA, the Archdiocese undertook significant efforts to address allegations of sexual abuse. As part of these efforts, the Archdiocese announced in 2016 its Independent Reconciliation and Compensation Program ("IRCP"). Through the IRCP, the Archdiocese addressed the allegations of sexual abuse of more than 300 victim-survivors of abuse.

5.      Despite these efforts, the Archdiocese is among the many institutions in New York that face potential liability due to the CVA for revived sexual abuse claims. The CVA permits claimants who did not participate in the Archdiocese's IRCP to bring revived claims and suits against the Archdiocese alleging that the Archdiocese is liable for damages stemming from its purported negligence based on alleged sexual abuse of minors by clergy members. Although the "window" has not opened, alleged victim-survivors have prematurely begun filing petitions and/or lawsuits against the Archdiocese, which will become effective once the "window" opens.

6.      The Archdiocese purchased liability insurance policies from the Insurers, paying premiums over the years. The Insurers are obligated to provide coverage to the Archdiocese and other insureds under the liability policies for claims and lawsuits alleging sexual abuse and physical abuse.

7.      On information and belief, the Insurers, however, intend to dispute, limit, and/or deny coverage for claims and lawsuits alleging sexual abuse and physical abuse alleged against the Archdiocese, and certain Insurers have informed the Archdiocese that they intend to raise numerous

4

defenses to providing coverage.

## THE PARTIES

8.      The Archdiocese has been in existence since 1808 when it was canonically established as an unincorporated Catholic diocese by the Holy See of the Roman Catholic Church. Later established as an archdiocese by the Holy See, the Archdiocese of New York was incorporated under the New York Religious Corporations Law in 1981. The Archdiocese is comprised of ten counties—New York, Bronx, and Richmond counties in New York City and seven counties in the northern suburbs: Westchester, Rockland, Orange, Putnam, Dutchess, Ulster, and Sullivan counties. There are numerous separate not-for-profit corporations within the geographical boundaries of the Archdiocese that engage in religious, charitable and educational activities.  These services range from hospital and medical care to helping homeless families with meals, emergency shelter, and affordable housing.  Approximately 300 incorporated parishes and approximately 200 schools operate and provide services within this region, as well.

9.      Upon information and belief, Interstate Indemnity Company changed its name to AGCS Marine Insurance Company, which is a corporation organized under the laws of Illinois with its principal place of business in Chicago, Illinois and is licensed to operate in the State of New York. Upon information and belief, Interstate Indemnity Company sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

10.      Upon information and belief, AIU is a corporation organized under the laws of New York with its principal place of business in New York, New York.  Upon information and belief, AIU is licensed to operate in the State of New York and sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

11.      Upon information and belief, Great American Surplus Lines Insurance Company

5

changed its name to American Empire, which is a corporation organized under the laws of Delaware with its principal place of business in Cincinnati, Ohio.  Upon information and belief, Great American Surplus Lines Insurance Company sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

12.     Upon information and belief, Royal Indemnity Company merged into, and Royal Insurance Company of America changed its name to, Arrowood Indemnity, which is a corporation organized under the laws of Delaware with its principal place of business in Charlotte, North Carolina and is licensed to operate in the State of New York.  Upon information and belief, Royal Indemnity Company and Royal Insurance Company of America sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.   Arrowood Indemnity is a member of the Chubb Group of Insurance Companies.

13.     Upon information and belief, Fidelity and Casualty Company of New York and Niagara Fire Insurance Company merged into Continental, which is a corporation organized under the laws of Pennsylvania with its principal place of business in Chicago, Illinois and is licensed to operate in the State of New York.  Upon information and belief, Fidelity and Casualty Company of New York and Niagara Fire Insurance Company sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

14.     Upon information and belief, Executive Risk is a corporation organized under the laws of Delaware with its principal place of business in Wilmington, Delaware.  Upon information and belief, Executive Risk is licensed to operate in the State of New York and is a successor-in-interest to Executive Re Indemnity Inc., which is a successor-in-interest to ERIC Reinsurance Company, which is a successor-in-interest to American Excess Insurance Company, which sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-

6

survivors allege abuse. Executive Risk is a member of the Chubb Group of Insurance Companies.

15.     Upon information and belief, Federal is a corporation organized under the laws of Indiana with its principal place of business in Indianapolis, Indiana. Upon information and belief, Federal is licensed to operate in the State of New York, and sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse. Federal is a member of the Chubb Group of Insurance Companies.

16.     Upon information and belief, Fireman's Fund is a corporation organized under the laws of California with its principal place of business in Chicago, Illinois. Upon information and belief, Fireman's Fund sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

17.     Upon information and belief, First State is a corporation organized under the laws of Connecticut with its principal place of business in Boston, Massachusetts. Upon information and belief, First State sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

18.     Upon information and belief, Agricultural Insurance Company changed its name to Great American Assurance, which is a corporation organized under the laws of Ohio with its principal place of business in Cincinnati, Ohio and is licensed to operate in the State of New York. Upon information and belief, Agricultural Insurance Company sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

19.     Upon information and belief, American National Fire Insurance Company changed its name to Great American Insurance Company of New York, which is a corporation organized under the laws of New York with its principal place of business in Cincinnati, Ohio. Upon information and belief, American National Fire Insurance Company sold insurance policies providing

coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

20.     Upon information and belief, Great Northern is a corporation organized under the laws of Indiana with its principal place of business in Indianapolis, Indiana.  Upon information and belief, Great Northern is licensed to operate in the State of New York, and sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.  Great Northern is a member of the Chubb Group of Insurance Companies.

21.     Upon information and belief, New York Underwriters Insurance Company changed its name to Hartford Underwriters, which is a corporation organized under the laws of Connecticut with its principal place of business in Hartford, Connecticut and is licensed to operate in the State of New York.  Upon information and belief, New York Underwriters Insurance Company sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

22.     Upon information and belief, Hudson is a corporation organized under the laws of Delaware with its principal place of business in New York, New York.  Upon information and belief, Hudson is licensed to operate in the State of New York and sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

23.     Upon information and belief, INA Insurance Company changed its name to IINA, which is a corporation organized under the laws of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania and is licensed to operate in the State of New York.  Upon information and belief, INA Insurance Company and IINA sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

8

24.     Upon information and belief, INA is a corporation organized under the laws of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania and is licensed to operate in the State of New York.  Upon information and belief, INA sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.  INA is a member of the Chubb Group of Insurance Companies.

25.     Upon information and belief, Lexington is a corporation organized under the laws of Delaware with its principal place of business in Boston, Massachusetts.  Upon information and belief, Lexington sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

26.     Upon information and belief, certain London Market Companies that subscribed to liability policies that the Archdiocese purchased through Arthur J. Gallagher & Co. and its affiliates are organized under the laws of the United Kingdom with their principal places of business in London, England.  Upon information and belief, London Market Companies sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

27.     Upon information and belief, Markel is a corporation organized under the laws of Virginia with its principal place of business in Glenn Allen, Virginia.  Upon information and belief, Markel is licensed to operate in the State of New York and sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

28.     Upon information and belief, American Re-Insurance Company changed its name to Munich Re, which is a corporation organized under the laws of Delaware with its principal place of business in New Jersey and is licensed to operate in the State of New York.  Upon information and belief, American Re-Insurance Company sold insurance policies providing coverage to the

9

Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

29.    Upon information and belief, Transcontinental Insurance Company merged with National Fire, which is a corporation organized under the laws of Illinois with its principal place of business in Chicago, Illinois and is licensed to operate in the State of New York.  Upon information and belief, Transcontinental Insurance Company sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

30.    Upon information and belief, National Surety is a corporation organized under the laws of Illinois with its principal place of business in Chicago, Illinois.  Upon information and belief, National Surety is licensed to operate in the State of New York and sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

31.    Upon information and belief, Landmark Insurance Company merged with National Union, which is a corporation organized under the laws of Pennsylvania with its principal place of business in Harrisburg, Pennsylvania.  Upon information and belief, National Union is licensed to operate in the State of New York.  Upon information and belief, National Union and Landmark Insurance Company sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

32.    Upon information and belief, Ohio Casualty is a corporation organized under the laws of New Hampshire with its principal place of business in Boston, Massachusetts.  Upon information and belief, Ohio Casualty is licensed to operate in the State of New York and sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

33.    Upon information and belief, Pacific Employers is a corporation organized under the laws of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania.

10

Upon information and belief, Pacific Employers is licensed to operate in the State of New York and sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse. Pacific Employers is a member of the Chubb Group of Insurance Companies.

34.     Upon information and belief, International Insurance Company merged into TIG, which is a corporation organized under the laws of California with its principal place of business in Manchester, New Hampshire and is licensed to operate in the State of New York. Upon information and belief, International Insurance Company sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

35.     Upon information and belief, Twin City is a corporation organized under the laws of Indiana with its principal place of business in Hartford, Connecticut. Upon information and belief, Twin City is licensed to operate in the State of New York and sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

36.     Upon information and belief, St. Paul Surplus Lines Insurance Company is a corporation organized under the laws of Delaware with its principal place of business in Hartford, Connecticut. Upon information and belief, St. Paul Surplus Lines Insurance Company sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.

37.     Upon information and belief, certain Underwriters at Lloyd's, London that subscribed to liability policies that the Archdiocese purchased through Arthur J. Gallagher & Co. and its affiliates are organized under the laws of the United Kingdom with their principal places of business in London, England. Upon information and belief, certain Underwriters at Lloyd's, London sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during

11

which the victim-survivors allege abuse.

38.     Upon information and belief, Westchester Fire is a corporation organized under the laws of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania.  Upon information and belief, Westchester Fire is licensed to operate in the State of New York and sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.  Westchester Fire is a member of the Chubb Group of Insurance Companies.

39.     Upon information and belief, Vigilant is a corporation organized under the laws of New York with its principal place of business in Philadelphia, Pennsylvania.  Upon information and belief, Vigilant is licensed to operate in the State of New York and sold insurance policies providing coverage to the Archdiocese in New York for certain time frames during which the victim-survivors allege abuse.  Vigilant is a member of the Chubb Group of Insurance Companies.

## JURISDICTION AND VENUE

40.     This matter falls within this Court's general original jurisdiction pursuant to Judiciary Law § 140-b and Article VI, § 7 of the New York Constitution.

41.     This Court has personal jurisdiction over the Insurers pursuant to N.Y. C.P.L.R. §§ 301, 302(a), and 311. At all times relevant herein, the Insurers transacted business within the State of New York and contracted to provide services within this State by insuring risks in New York.

42.     The Commercial Division of this Court has jurisdiction over this action pursuant to § 202.70 of the Rules of the Commercial Division in that the matter in controversy, exclusive of punitive damages, interest, costs, disbursements, and counsel fees claimed, exceeds $500,000, and involves the claims of declaratory relief and breach of contract.

43.     Venue is proper in this Court pursuant to N.Y. C.P.L.R. § 503 inasmuch as the Archdiocese has its principal place of business in New York County.

12

## INSURANCE POLICIES PURCHASED BY THE ARCHDIOCESE

44.    Upon information and belief, at various times from at least 1954 to the present, in consideration of premiums paid by or on behalf of the Archdiocese, the Insurers, among others, sold or acquired responsibility for primary general liability insurance policies, as well as certain umbrella and/or excess liability policies, including the policies listed in the attached Exhibit A (collectively, the "Insurance Policies"). The Insurance Policies provide coverage for the Archdiocese and, as indicated in the policies, certain incorporated parishes, schools, and other Roman Catholic entities as listed in the Official Catholic Directory and which lie within the Archdiocese's territory.

45.    Upon information and belief, the Insurance Policies provide valuable coverage for damages that the insured becomes legally obligated to pay through judgments or settlements because of bodily injury, including settlements or judgments based on claims and lawsuits alleging sexual abuse and physical abuse.

46.    Upon information and belief, many of the Insurance Policies also require the Insurers to pay defense costs and expenses, including attorney's fees, incurred by the insured in the investigation and defense of allegations by victim-survivors. This obligation applies even if the allegations are groundless, false, or fraudulent.

47.    Upon information and belief, the Archdiocese timely paid all premiums due under the Insurance Policies.

## THE IRCP

48.    In or about October 2016, the Archbishop of New York announced the Independent Reconciliation and Compensation Program or, as it is referred to herein, the IRCP as part of its ongoing effort to bring healing and provide compensation to the victim-survivors who allegedly suffered sexual abuse as a minor by a priest or deacon of the Archdiocese.

49.    The program was independently administered by Mr. Kenneth Feinberg. Mr.

13

Feinberg and his colleagues had complete autonomy in assessing the allegations and determining compensation for participating victim-survivors, if any, and the Archdiocese has abided by their determinations.

50.    As of April 2019, 323 victim-survivors of abuse have participated in the IRCP, and have received approximately $65 million in compensation.  The victim-survivors who voluntarily participated in the IRCP provided full releases to the Archdiocese.

### CVA AND SEXUAL ABUSE CLAIMS

51.    Over the past several years, a number of states have passed so-called "window" statutes to allow claimants to assert previously time-barred claims alleging sexual abuse against schools, religious institutions, and other organizations that employed or supervised perpetrators.   In such states, numerous claimants have brought suits, exposing defendants to enormous liabilities.

52.    Efforts in New York State have been underway for many years to pass a statute reviving the statute of limitations for time-barred claims of sexual abuse.

53.    As a result of these efforts, it was widely believed that New York would eventually pass a statute allowing sexual abuse victims to bring time-barred suits.  Indeed, New York passed the CVA, which was signed by Governor Cuomo on February 14, 2019.

54.    The CVA allows claimants to file suits alleging sexual abuse that were previously barred by the statute of limitations by reopening the statute of limitations for a one-year period.  The one-year "window" in New York opens in August 2019.

55.    If the experience in other jurisdictions that have passed "window" statutes is any indication, when the one-year "window" opens pursuant to the CVA, numerous claimants who did not participate in the IRCP will likely assert claims and file suits against the Archdiocese alleging sexual abuse and physical abuse and seeking damages.

56.    As a result of the CVA, the Archdiocese faces substantial potential liability for

14

damages for alleged injury from sexual abuse and physical abuse.

## NORMAN SUIT

57.     Although the "window" has not opened, individuals alleging claims based on sexual abuse against the Archdiocese have prematurely begun to file actions, which will become effective once the "window" opens.

58.     On or about April 18, 2019, the Archdiocese was served with a lawsuit entitled *John Michael Norman v. Archdiocese of New York, et al.*, which was filed in the Supreme Court of the State of New York, County of New York (the "Norman Suit"). A copy of the summons and complaint for the Norman Suit is attached as Exhibit B.

59.     The Norman Suit alleges negligence claims against the Archdiocese based on allegations that two clergy members sexually abused the claimant.

60.     The Norman Suit alleges that Father Arthur N. Fernando ("Father Fernando") abused the claimant from approximately 1972 through approximately 1973.

61.     The Norman Suit alleges that Rev. Monsignor Jeremiah Brennan ("Monsignor Brennan") abused the claimant for six months during 1974.

62.     The Norman Suit alleges claims against the Archdiocese sounding in negligence, including (1) "Negligent Hiring/Retention/Supervision/Direction," (2) "Negligence/Gross Negligence," and (3) "Negligent Infliction of Emotional Distress."

63.     In support of the negligence claims, the Norman Suit sets forth alternative allegations regarding the Archdiocese's alleged knowledge of the abuse. For example, the Norman Suit alleges that the Archdiocese "knew and/or reasonably should have known, and/or knowingly condoned, and/or covered up, the inappropriate and unlawful sexual activities of Father Fernando and Monsignor Brennan who sexually abused Plaintiff." Ex. B ¶ 21. Similarly, the Norman Suit alleges that the Archdiocese's "willful, wanton, grossly negligent and/or negligent act(s) of commission and/or

15

omission, resulted directly and/or proximately in the damage set forth herein at length." *Id.* ¶ 46; *see also id.* ¶ 80.

64. During the period of the alleged abuse, INA insured the Archdiocese pursuant to primary and excess insurance policies, some or all of which included a duty to defend. For example, INA Policy GLP 336428, whose policy period runs from September 7, 1972 to January 1, 1974, states that INA has the duty to defend "even if the allegations of the suit are groundless, false, or fraudulent." The duty to defend arises whenever any of the allegations within the four corners of the underlying complaint potentially give rise to a covered claim.

65. On or about April 29, 2019, the Archdiocese provided notice to INA pursuant to the Insurance Policies for which INA is responsible ("INA Insurance Policies") of the Norman Suit and provided a copy of the summons and complaint to INA.

66. On or about May 14, 2019, Chubb North America ("Chubb"), on behalf of INA, sent a letter denying any obligation to defend or indemnify the Archdiocese against the Norman Suit (the "Denial Letter"). A copy of the Denial Letter is attached as Exhibit C. As the Denial Letter shows, Chubb and INA relied exclusively on the allegations in the Norman Suit to formulate their coverage position.

67. The Denial Letter states that the underlying "Plaintiff alleges to have sustained injury that was expected and/or intended from the standpoint of the Archdiocese. These allegations do not give rise to an 'occurrence' under the INA Policies."

68. Based on its determination that the Norman Suit solely alleged expected or intended injury, Chubb and INA denied that INA had any duty to defend the Archdiocese against the Norman Suit, stating that "Chubb has no defense and no indemnification obligations in connection with the Norman Action and denies coverage accordingly."

69. Chubb and INA lack a reasonable basis to deny the duty to defend the

16

Archdiocese against the Norman Suit and ignore the terms of the Insurance Policies. The Norman Suit does not allege that the Archdiocese unequivocally expected or intended all of the alleged injury. Instead, the Norman Suit makes alternative allegations that the Archdiocese knew *or* should have known of the improper conduct of Father Fernando and Monsignor Brennan. The Norman Suit thus seeks to hold the Archdiocese liable even though the Archdiocese may not have expected or intended, or even had notice or knowledge of, the alleged abuse.

70.     Chubb and INA ignore that the Norman Suit does not identify who at the Archdiocese might have known of the abuse, what information was known to the Archdiocese, or when the Archdiocese was notified of the abuse. Chubb admits in the Denial Letter that the Norman Suit fails to "allege or discuss whether such information [about the alleged abuse] was ever received by the Archdiocesan Service Corporation."

71.     To the extent that the Norman Suit alleges that the Archdiocese had knowledge of the alleged abuse, the Norman Suit fails even to allege that the Archdiocese actually knew or received notice of Father Fernando's or Monsignor Brennan's pedophilic propensities prior to the alleged abuse, thus leaving open the possibility that the Archdiocese neither expected nor intended the abuse, if at all, until some point after it started.

72.     Chubb and INA also ignore that the Norman Suit does not allege that the Archbishop expected or intended the alleged abuse. Indeed, there has been no judicial determination that the Archbishop expected or intended the alleged abuse. Accordingly, whether the injury alleged in the Norman Suit was expected or intended is a question of fact and INA must defend the Archdiocese unless and until a court determines by a final, non-appealable judgment that the Archbishop expected or intended the alleged abuse.

73.     Chubb and INA ignore the provision of the INA Insurance Policies that provides that "Assault and Battery shall be deemed an occurrence unless committed by or at the direction of the

17

Case 20-10343-LSS    Doc 1166    Filed 08/26/20    Page 180 of 217

Insured . . . ." The Norman Suit, however, does not allege that the sexual abuse was committed by or at the direction of the Archdiocese.

74.     Contrary to Chubb's and INA's contentions, the allegations within the four corners of the Norman Suit do not unequivocally allege that the Archdiocese expected or intended all of the alleged abuse. INA, therefore, has a duty to defend the Archdiocese.

## COVERAGE DISPUTE

75.     The Archdiocese has fulfilled all of its duties and conditions under each of the Insurance Policies, including cooperating with the Insurers' reasonable requests.

76.     The Archdiocese is entitled to all benefits provided by the Insurance Policies.

77.     On information and belief, the Insurers intend to dispute, limit, or deny coverage for sexual abuse claims and lawsuits asserted against the Archdiocese as result of the CVA.

## COUNT I

### Declaratory Judgment Against All Insurers – Sexual Abuse Claims

78.     The Archdiocese repeats and re-alleges each and every allegation contained in paragraphs 1 through 77 above with the same force and effect as though fully set forth herein.

79.     The Archdiocese seeks a judicial determination of the rights and duties of the Archdiocese and the Insurers with respect to an actual controversy arising out of the Insurance Policies.

80.     Pursuant to the terms of the Insurance Policies, the Insurers agreed to provide coverage for damages because of bodily injury, and defense costs and expenses.

81.     The claims and lawsuits alleging sexual abuse and physical abuse that will be asserted against the Archdiocese when the "window" opens, and the significant potential liability arising out of such claims and lawsuits, implicate the Insurance Policies, including the umbrella and excess Insurance Policies.

18

82.     An actual controversy of a justiciable nature presently exists between the Archdiocese and the Insurers regarding the proper construction of the Insurance Policies and the rights and obligations of the parties thereto.  The controversy is of sufficient immediacy and magnitude to justify the issuance of a declaratory judgment.

83.     The issuance of declaratory relief by this Court will terminate some or all of the existing controversy between the parties.

## COUNT II

### Breach of Contract Against INA

84.     The Archdiocese repeats and re-alleges each and every allegation contained in paragraphs 1 through 84 above with the same force and effect as though fully set forth herein.

85.     The Archdiocese incurred damages under the Insurance Policies for which INA is responsible.

86.     The INA Insurance Policies are valid and enforceable contracts providing insurance coverage for the damages incurred by the Archdiocese.

87.     The Archdiocese has given timely notice.

88.     The Archdiocese substantially performed all material obligations on its part to be performed under the INA Insurance Policies.

89.     INA has refused to accept its legal obligations to provide coverage for allegations and claims of sexual abuse against the Archdiocese.

90.     INA's failure and refusal to make payments due under the Insurance Policies constitute a breach of the Insurance Policies.

91.     As a direct and proximate result of INA's breach of the INA Insurance Policies, the Archdiocese is suffering damages equal to the sums it would be entitled to recover as benefits under the INA Insurance Policies.

19

### COUNT III

**Bad Faith Against INA**

92.     The Archdiocese repeats and re-alleges each and every allegation contained in paragraphs 1 through 91 above with the same force and effect as though fully set forth herein.

93.     INA breached its duty to defend when it refused to defend the Archdiocese against the Norman Suit.

94.     INA's breach of its duty to defend on the basis of expected or intended injury lacked any arguable basis and constituted a bad faith denial of coverage.  No reasonable insurance company would, under the facts alleged in the Norman Suit, be expected to assert expected or intended injury as the basis for denying its duty to defend the Archdiocese.  INA's baseless denial of coverage and utter failure to investigate the claim amounted to complete abandonment of its insured and deprives the Archdiocese of the benefits of the liability coverage for which it paid premiums.

95.     As a direct and proximate result of INA's bad faith breach of its duty to defend, the Archdiocese has been forced to retain counsel and to prosecute this coverage action against INA and has incurred and will continue to incur attorneys' fees, costs, and disbursements.

### PRAYER FOR RELIEF

WHEREFORE, the Archdiocese prays for judgment as follows:

1.     On Count I, the Archdiocese requests that this Court enter a declaratory judgment in favor of the Archdiocese against each of the Insurers;

2.     On Count II, the Archdiocese requests that this Court enter a judgment awarding the payment of damages in an amount equal to the amount owed under the INA Insurance Policies, to be proven at trial, as well as pre- and post-judgment interest;

3.     On Count III, the Archdiocese requests that this Court enter a judgment awarding its attorneys' fees, costs, and disbursements in connection with INA's bad faith refusal to

20

defend the Archdiocese against the Norman Suit, in an amount to be proven at trial, as well as pre- and

post-judgment interest;

4.        Additionally, the Archdiocese requests such other and further relief as

this Court may deem just and proper.

## JURY DEMAND

The Archdiocese requests a trial by jury on any issue so triable.

Dated:  New York, New York
         June 28, 2019

Respectfully submitted,

**BLANK ROME LLP**

By: _____

James R. Murray
Jared Zola
Robyn L. Michaelson
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 885-5209
Facsimile: (917) 591-8538
jmurray@blankrome.com
jzola@blankrome.com
rmichaelson@blankrome.com

James S. Carter
(*pro hac vice* application to be submitted)
1825 Eye Street NW
Washington, DC 20006
Telephone: (202) 420-3409
Facsimile: (202) 420-2201
jscarter@blankrome.com

*Counsel for the Archdiocese of New York*

21

# EXHIBIT 20

Ford Elsaesser, ISB #2205
Bruce A. Anderson, ISB #3392
ELSAESSER ANDERSON, CHTD.
320 East Neider Avenue, Suite 102
Coeur d'Alene, ID  83815
Tel:    (208) 667-2900
Fax:    (208) 667-2150
ford@eaidaho.com
brucea@eaidaho.com

John C. Terlaje
LAW OFFICE OF JOHN C. TERLAJE
Terlaje Professional Bldg., Suite 216
194 Hernan Cortez Ave.
Hagåtña, Guam 96910
Telephone: (671) 477-8894/5
john@terlaje.net

*Proposed Counsel for Debtor-in-Possession*

### IN THE DISTRICT COURT OF GUAM
### TERRITORY OF GUAM
### BANKRUPTCY DIVISION

| | |
|---|---|
| In re:<br><br>ARCHBISHOP OF AGAÑA,<br>a Corporation Sole,<br><br>     Debtor. | Chapter 11 Bankruptcy<br><br>Case No. 19-00010<br><br>APPLICATION TO EMPLOY BLANK ROME, LLP AS SPECIAL INSURANCE COUNSEL FOR THE DEBTOR AND DEBTOR-IN-POSSESSION |

   The Archbishop of Agaña, a Corporation Sole, also known as the Roman Catholic Archdiocese of Agaña, the debtor and debtor-in-possession, (the "Debtor") in the above-captioned Chapter 11 reorganization case (the "Bankruptcy Case"), by counsel and pursuant to 11 U.S.C. §§ 327(e), 328, and 329, hereby requests the Court approve its employment of Blank Rome, LLP ("Blank Rome") as special insurance counsel for the Debtor in accordance with the

APPLICATION TO EMPLOY BLANK ROME, LLP AS SPECIAL INSURANCE COUNSEL
FOR THE DEBTOR AND DEBTOR-IN-POSSESSION -1

terms and conditions set forth below.  This Application is supported by the Verified Statement of James R. Murray under Bankruptcy Rule 2014 (the "Verified Statement"), which is filed herewith.  In further support of this Application, the Debtor states as follows:

1.      On January 16, 2019 (the "Petition Date"), the Debtor commenced this Bankruptcy Case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

2.      The Debtor is authorized to operate its businesses as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

3.      No creditors committee has yet been appointed in this case, nor has any trustee been requested or appointed.

4.      The Debtor wishes to employ Blank Rome as its special insurance counsel in this Bankruptcy Case as more particularly described below and in the Verified Statement.

5.      The employment of Blank Rome is appropriate and necessary to enable Debtor to successfully reorganize.  Blank Rome has expertise in insurance matters related to claims against the Debtor and has worked on many similar cases throughout the United States. A large part of a successful reorganization in similar cases has been the contributions to the Debtor's estate made by commercial insurance companies that wrote comprehensive general liability policies decades ago. Those policies were 'triggered' by the abuse in those years when the statute of limitations for abuse claims by minors was lifted. The insurers almost always retain sophisticated, experienced national coverage counsel to represent their interests and to advance many coverage defenses (largely similar to historical asbestos and pollution cases). It is important that the Debtor have experienced and highly-regarded coverage counsel familiar

APPLICATION TO EMPLOY BLANK ROME, LLP AS SPECIAL INSURANCE COUNSEL
FOR THE DEBTOR AND DEBTOR-IN-POSSESSION       -2

with all pertinent coverage issues in order to negotiate (and litigate if necessary) on behalf of the Debtor (and for the ultimate benefit of the abuse survivors).

6.      Subject to further order of this Court, it is proposed that Blank Rome be employed, effective as of the date of this filing to provide insurance advice and representation regarding possible negotiation and/or litigation relating to the underlying claims of abuse and the rights of the Archdiocese under historical general liability insurance policies.

7.      Blank Rome will not act as counsel with respect to bankruptcy matters generally.

8.      The services provided by Blank Rome will not duplicate or overlap the efforts of any other professional retained by Debtor, including bankruptcy counsel Elsaesser Anderson Chtd., local counsel John C. Terlaje or special counsel Patterson Buchanan Fobes & Leitch, Inc. P.S.  The services to be provided by each of these professionals are separate and different from the services to be provided by the other professionals and all are essential to the Debtor's reorganization efforts.

9.      To the best of the Debtor's knowledge, information, and belief, after making reasonable inquiry, Blank Rome has no connection with or any interest adverse to the Debtor, its creditors, or any other party in interest, or its respective attorneys and accountants, the United States Trustee for the District of Guam, or any person employed in the Office of the United States Trustee.  Accordingly, Blank Rome is a "disinterested person" as such term is defined in § 101(14) of the Bankruptcy Code.

10.      In light of the foregoing, the Debtor believes that Blank Rome is qualified to represent its interests and the interests of its estate.

APPLICATION TO EMPLOY BLANK ROME, LLP AS SPECIAL INSURANCE COUNSEL
FOR THE DEBTOR AND DEBTOR-IN-POSSESSION     -3

11.     The Debtor understands that Blank Rome intends to apply to the Court for allowances of compensation and reimbursement of expenses as permitted by and in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, Bankruptcy Local Rule 2016-1(a), the United States Trustee guidelines, and the Court's orders, for services performed and expenses incurred on and after the Petition Date. The fee applications will contain a detailed statement showing services performed by Blank Rome and compensation received in accordance with all applicable guidelines and Bankruptcy Local Rule 2016-1(a).

12.     Subject to Court approval, and to the extent it is able, Debtor proposes to pay Blank Rome its customary hourly rates for services rendered that are in effect from time to time, as discounted, as set forth in the Verified Statement, and to reimburse Blank Rome according to its customary reimbursement policies, subject to any applicable guidelines set forth by this Court or the United States Trustee, and submits that such rates are reasonable. Blank Rome's attorneys who may perform legal services for the Debtor include James R. Murray whose hourly rate is $980.00 (discounted to $755.00); and Jim Carter whose hourly rate is $705.00 (discounted to $543.00); any other personnel who may work on this matter including partners ($450 to $1,195 per hour); counsels ($440 to $1,070 per hour); associates ($315 to $695 per hour); and paralegals, clerks and librarians ($180 to $450); and members of E-Discovery, Analysis and Technology Assistance (eDATA") staff ($165 to $295 per hour). All timekeepers will have like discounts applied to their rates.

13.     Blank Rome itemizes and charges separately for certain reasonable costs and expenses, which may include postage, long distance telephone charges, travel, filing fees, computerized legal research, deposition expenses, and expert witness fees, at Blank Rome's

APPLICATION TO EMPLOY BLANK ROME, LLP AS SPECIAL INSURANCE COUNSEL
FOR THE DEBTOR AND DEBTOR-IN-POSSESSION     -4

actual cost.  Blank Rome also charges for faxes, photocopies ($0.10 per page), mileage at the

IRS mileage rate of $0.58 (2019), and gross receipts tax on fees and costs.

14.    The Debtor has not paid and Blank Rome has not received a pre-petition retainer in

any amount.

WHEREFORE, the Debtor respectfully requests the entry of an order, pursuant to

§§327(e), 328, and 329 of the Bankruptcy Code and Bankruptcy Local Rules 2014 and 2016,

authorizing Debtor to employ and retain Blank Rome as special insurance counsel for the

Debtor effective as of the date this Application was filed and granting Debtor all such other

relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 16th day of January, 2019.

ELSAESSER ANDERSON, CHTD.


*/s/ Bruce A. Anderson*
Ford Elsaesser
Bruce A. Anderson
-and-

LAW OFFICE OF JOHN C. TERLAJE

*/s/ John C. Terlaje*
John C. Terlaje


**CERTIFICATE OF SERVICE**

I hereby certify that, on January 16, 2019, in accordance with Fed. R. Civ. P. 5(b)(3), a true copy
of the foregoing Application for Employment of Attorney, was served via the Court's CM/ECF
notification facilities to those parties who are registered CM/ECF participants in this case, and
the U.S. Trustee.

*/s/ Bruce A. Anderson*
Bruce A. Anderson


APPLICATION TO EMPLOY BLANK ROME, LLP AS SPECIAL INSURANCE COUNSEL
FOR THE DEBTOR AND DEBTOR-IN-POSSESSION    -5

# EXHIBIT 21

8/19/2020    Montana victims alleging sex abuse in the Boy Scouts join national wave of suits | Crime and Courts | billingsgazette.com

Case 20-10343-LSS   Doc 1166   Filed 08/26/20   Page 191 of 217

https://billingsgazette.com/news/state-and-regional/crime-and-courts/montana-victims-alleging-sex-abuse-in-the-boy-scouts-join-national-wave-of-suits/article_59c73aab-334f-5b07-af24-b6bd24bcc8a7.html



TOPICAL

# Montana victims alleging sex abuse in the Boy Scouts join national wave of suits

Juliana Sukut
Nov 3, 2019

SALE! Subscribe for $1/mo.

A mid a flurry of lawsuits filed across the nation against the Boy Scouts of America alleging sexual abuse of young Scouts, a national group of attorneys is gearing up to file as many as 15 more in Montana.

More than a dozen men living in Montana have joined a national group, Abused in Scouting, and a trio of law firms is working with more than 1,300 men across the nation to bring a case against the BSA. The law group is also preparing to file a suit in Washington, D.C., with more than 700 clients.

The coalition of law firms is one of multiple legal groups bringing scores of lawsuits across the nation against the BSA. Abused in Scouting has already brought one case against the Boy Scouts of America **this year out of Pennsylvania**. Two suits were filed Wednesday against the Montana Council alleging sex abuse.

**Dozens of cases** have been filed in states like New York and New Jersey made possible by recently passed bills opening windows for victims of child sex abuses to file lawsuits against their abusers, even if the statute of limitations had expired.

Montana passed a similar **bill this year**, opening a one-year window beginning in May to allow victims to bring cases against their accused sexual abusers. That window closes in May of 2020.

## 15 men

In Montana, at least 15 men had joined the Abused in Scouting group as of Thursday. Tim Kosnoff, lead attorney for AIS, thinks there are likely more Montana men who haven't come forward yet.

"That is really not a reflection of how extensive the problem is in Montana," Kosnoff said of the 15 men during a phone interview with The Billings Gazette.

Despite the looming deadline for filing lawsuits in Montana, lead attorney Kosnoff said he is not rushed to file a suit.

Kosnoff is waiting to file amid rumors the BSA are preparing to file for Chapter 11 bankruptcy protection and are waiting on a "discussion" the law group is preparing to have with the Boy Scouts.

If the BSA does file for bankruptcy, all pending litigation against the BSA would freeze, slowing the process. Depending on the type of bankruptcy granted, it could also limit any future claims.

"Bankruptcy doesn't mean that the clients are not going to receive compensation," Kosnoff assured. "It just means that it's going to be processed through the bankruptcy court instead of hundreds of state courts."

In a statement to The Billings Gazette, the BSA said it has taken no formal steps toward filing for bankruptcy protection:

"The Boy Scouts of America is working with experts and exploring all options available so we can live up to our social and moral responsibility to fairly compensate victims who suffered abuse during their time in Scouting, while also ensuring that we carry out our mission to serve youth, families and local communities through our programs."

The law group is also waiting on a pending "discussion" to be had with the BSA, said Andrew Van Arsdale, one of the three lead attorneys. That discussion may be among the first steps toward remuneration.

"The BSA is trying to have discussions with us beforehand, and it's in our best interest to hear them out and not let them waste their resources on defense lawyers, which ultimately hurts our clients and chance of recovery," Van Arsdale said, adding that he wouldn't characterize it as a settlement and that no financial compensation has been discussed.

If there is no progress with those talks, then the group will file in Montana, Van Arsdale said.

"By Thanksgiving we can file all 15 of our Montana-based abuse cases under the window," he said.

Those cases would be filed individually against the Boy Scouts of America, the Montana Council and each individual's named perpetrator of abuse, he said.

## National push

Kosnoff said that the number of abused Boy Scouts across the country could be in the tens of thousands.

The law group has clients from every state except North Dakota, and has even received allegations of abuse that happened in military bases overseas, Kosnoff said.

Nationally, the Abused in Scouting group has gained momentum since February when it began running television ads and launched a **website** to encourage survivors of abuse to come forward.

Clients began quickly flooding in, and their client base has grown to more than 1,300 men. The law group also has an office in Billings with specialists to speak to men coming forward, as well as a **website** specific for the Boy Scouts' case.

The AIS group consists of Kosnoff, Billings native but San Diego-based attorney Andrew Van Arsdale, and the Eisenberg Rothweiler law firm, based in Philadelphia.

Victims range from teenagers to men in their 80s, Kosnoff said. Allegations vary from showing pornographic photos to Boy Scouts, to molestation and rape.

"It really is a tapestry of America over the last 50 years, and I think that's reflected in the various walks of life that people who have hired us come from," Kosnoff said.

AIS victims go through vetting processes to ensure their allegations can be supported, said Van Arsdale.

Background checks of both the alleged victim and the accused abuser are performed before the law group will represent the victim, he said.

Of about 10,000 men who have come forward, the law firms have accepted only about 1,300 as clients based on the provability of their accounts.

## History of abuse in Montana

The **lawsuits filed Wednesday** by two men, not affiliated with AIS, both specifically name the BSA's so-called "perversion files" as evidence of the BSA's negligence in protecting boys from deviant adult volunteers. Local troop leaders, and scoutmasters, are almost exclusively participate as volunteers.

8/19/2020 Montana victims alleging sex abuse in the Boy Scouts join national wave of suits | Crime and Courts | billingsgazette.com

Case 20-10343-LSS Doc 1166 Filed 08/26/20 Page 194 of 217

Following the founding of the Boy Scouts in 1910, a "red flag" system was developed as a way for Scout leaders to keep track of volunteers suspected of abuse.

The red flags would make others in the organization aware that those volunteers, and were categorized by type of offense.

**In the "perversion files," six men in Montana were named as abusers between 1965 and 1985, two who lived in Billings.**

The AIS' group also named three additional "confirmed" abusers in Montana among its personal database.

One other man has been named in a pending lawsuit out of New Jersey, he was an "ineligible volunteer" from Kentucky but served later as a Scout leader in Billings in the 1980s.

**In 1987, he was convicted in Billings of sexually assaulting two girls, ages 11 and 12, and sentenced to 8 years in prison.**

Those files, which came to light in 2012, have been a catalyst for some of the lawsuits — including the latest Montana suits — which claim the BSA has not done enough to protect boys, even when abuse was clearly documented.

The BSA even let known abusers relocate to different districts where they would have access to more children, the suits allege.

## Preventing future abuse

In a statement to The Billings Gazette, the BSA says no system is perfect.

"In the 1920s, the BSA created a system to bar individuals from Scouting who should not work with youth. That system continues to this day and has been continually updated and enhanced over time," the BSA said.

Since then the BSA has continually updated their Volunteer Screening Database, which is recommended by the Centers for Disease Control for other youth programs, the BSA said.

"(The VSD) remains a valuable tool in preventing known or suspected abusers from joining or re-entering our organization. The BSA has taken significant steps over many years to ensure that we respond aggressively and effectively to reports of sexual abuse. We believe victims and remove individuals from the program whenever there are allegations of inappropriate behavior. We recognize, however, that there were some instances in our organization's history when cases were not addressed in a manner consistent with our commitment to protect Scouts, the values of our organization, and the procedures we have in place today," the statement read, in part.

8/19/2020    Montana victims alleging sex abuse in the Boy Scouts join national wave of suits | Crime & Courts | billingsgazette.com

Case 20-10343-LSS    Doc 1166    Filed 08/26/20    Page 195 of 217

Currently the BSA does implement a variety of safety measures to prevent abuse, including criminal background checks on leaders, youth protection training for leaders, and even banning one-on-one interactions between adult leaders and Scouts. Those interactions include in person, online, over the phone or via text, it says.

The BSA is also a mandatory reporter, which by law requires the organization to report suspected abuse to law enforcement. In Montana, failure to report can be a felony.

"We are outraged that there have been times when individuals took advantage of our program to abuse innocent children," the BSA said.

## Sign up for our Crime & Courts newsletter

Get the latest in local public safety news with this weekly email.

| Email Address | Sign up! |

* I understand and agree that registration on or use of this site constitutes agreement to its user agreement and privacy policy.

**Juliana Sukut**
Day General Assignment Reporter
General assignment reporter for The Billings Gazette.

---

## Related to this story

### Series: Former Boy Scouts in Montana share their abuse stories
Feb 22, 2020

In this series of profiles, four men with Montana connections describe their experiences, and the lifelong aftermath, of being sexually abused…



### Boy Scouts let accused child molester serve in Montana after reports of abuse, attorneys say
Aug 30, 2019

Boy Scouts of America allowed a volunteer to work with kids in Montana in the 1980s, even after he had been accused of sexual abuse in another…

### Ex-Boy Scouts struggle for closure after childhood sexual abuse
Nov 3, 2019

Editor's note: In this series of profiles, four men with Montana connections describe their experiences, and the lifelong aftermath, of being …

### 2 men sue Montana Boy Scouts over alleged sex abuse

Oct 30, 2019

Two men say they were sexually abused in Boy Scouts in Montana and that the organization failed to report the abusers and protect the boys.

---

### Sharing his story empowers survivor of Boy Scouts sex abuse

Nov 3, 2019

Clayton "Kelly" Seale had heard the rumors about their Boy Scout district's scoutmaster. All the boys had.

📷 +3

---

### Gazette opinion: Center for healing sexually abused Montana kids

Nov 10, 2019

A room at RiverStone Health has become a safe place to break the silence on crimes against children. The Yellowstone Valley Children's Advocac...

---

### Woman raped, impregnated by on-duty BIA officer seeks up to $15M in damages

Nov 20, 2019

Attorneys for a woman raped and impregnated by an on-duty police officer told a judge during a damages hearing Wednesday that his ruling "will...

---

### Montana Boy Scouts expect no regional changes amid nationwide bankruptcy

Feb 18, 2020

Despite the announcement of Chapter 11 bankruptcy protection from the Boy Scouts of America, the Montana Council is operating as usual.

---

8/19/2020 Montana victims alleging sex abuse in the Boy Scouts join national wave of suits | Crime and Courts | billingsgazette.com

Case 20-10343-LSS Doc 1166 Filed 08/26/20 Page 197 of 217

# EXHIBIT 22

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW MEXICO**

| | |
|---|---|
| In re: | Chapter 11 |
| ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF SANTA FE, a New Mexico corporation sole, | Case No.:  18-13027-t11 |
| Debtor. | |

## APPLICATION TO EMPLOY BLANK ROME, LLP AS SPECIAL INSURANCE COUNSEL FOR THE DEBTOR AND DEBTOR-IN-POSSESSION

The Roman Catholic Church of the Archdiocese of Santa Fe, a New Mexico Corporation sole, the debtor and debtor-in-possession (the "Debtor") in the above-captioned Chapter 11 reorganization case (the "Bankruptcy Case"), by counsel and pursuant to 11 U.S.C. §§ 327(e), 328, and 329, hereby requests the Court approve its employment of Blank Rome, LLP ("Blank Rome") as special insurance counsel for the Debtor in accordance with the terms and conditions set forth below.  This Application is supported by the Declaration of James R. Murray under Bankruptcy Rule 2014 (the "Declaration"), which is filed herewith.  In further support of this Application, the Debtor states as follows:

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and Miscellaneous Order No. 84-0324 filed in the United States District Court for the District of New Mexico on March 19, 1992. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      On December 3, 2018 (the "Petition Date"), the Debtor commenced this Bankruptcy Case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

3.      The Debtor is authorized to operate its businesses as a debtor-in-possession pursuant to 11

APPLICATION TO EMPLOY BLANK ROME, LLP AS SPECIAL INSURANCE COUNSEL FOR
THE DEBTOR AND DEBTOR-IN-POSSESSION    - 1

U.S.C. §§ 1107(a) and 1108.

4.     The Unsecured Creditors Committee was appointed in this case on December 18, 2018 at Docket # 53.

5.     The Debtor wishes to employ Blank Rome as its special insurance counsel in this Bankruptcy Case as more particularly described below and in the Declaration.

6.     The employment of Blank Rome is appropriate and necessary to enable Debtor to successfully reorganize.  Blank Rome has expertise in insurance matters related to claims against the Debtor and has worked on many similar cases throughout the United States. A large part of a successful reorganization in similar cases has been the contributions to the Debtor's estate made by commercial insurance companies that wrote comprehensive general liability policies decades ago. Those policies were 'triggered' by the abuse in those years when the statute of limitations for abuse claims by minors was lifted. The insurers almost always retain sophisticated, experienced national coverage counsel to represent their interests and to advance many coverage defenses (largely similar to historical asbestos and pollution cases). It is important that the Debtor have experienced and highly-regarded coverage counsel familiar with all pertinent coverage issues in order to negotiate (and litigate if necessary) on behalf of the Debtor (and for the ultimate benefit of the abuse survivors).

7.     Subject to further order of this Court, it is proposed that Blank Rome be employed, effective as of the date of this filing to provide insurance advice and representation regarding possible negotiation and/or litigation relating to the underlying claims of abuse and the rights of the Archdiocese under historical general liability insurance policies.

8.     Blank Rome will not act as counsel with respect to bankruptcy matters generally.

9.     The services provided by Blank Rome will not duplicate or overlap the efforts of any other professional retained by Debtor, including lead bankruptcy counsel Elsaesser Anderson Chtd. and

APPLICATION TO EMPLOY BLANK ROME, LLP AS SPECIAL INSURANCE COUNSEL FOR THE DEBTOR AND DEBTOR-IN-POSSESSION   - 2

local bankruptcy counsel Walker & Associates, P.C. The services to be provided by each of these professionals are separate and different from the services to be provided by the other professionals and all are essential to the Debtor's reorganization efforts.

10.     To the best of the Debtor's knowledge, information, and belief, after making reasonable inquiry, Blank Rome has no connection with or any interest adverse to the Debtor, its creditors, or any other party in interest, or its respective attorneys and accountants, the United States Trustee for the District of New Mexico, or any person employed in the Office of the United States Trustee.  Blank Rome has represented Bank of America in matters not related to the Debtor.  Accordingly, Blank Rome is a "disinterested person" as such term is defined in § 101(14) of the Bankruptcy Code.

11.     In light of the foregoing, the Debtor believes that Blank Rome is qualified to represent its interests and the interests of its estate.

12.     The Debtor understands that Blank Rome intends to apply to the Court for allowances of compensation and reimbursement of expenses as permitted by and in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, Local Rule 2016-1(a), the United States Trustee guidelines, and the Court's orders, for services performed and expenses incurred on and after the Petition Date. The fee applications will contain a detailed statement showing services performed by Blank Rome and compensation received in accordance with all applicable guidelines and Local Rule 2016-1(a).

13.     Subject to Court approval, and to the extent it is able, Debtor proposes to pay Blank Rome its customary hourly rates for services rendered that are in effect from time to time, as discounted, as set forth in the Declaration, and to reimburse Blank Rome according to its customary reimbursement policies, subject to any applicable guidelines set forth by this Court or the United States Trustee, and submits that such rates are reasonable. Blank Rome's attorneys who may perform legal services for the

APPLICATION TO EMPLOY BLANK ROME, LLP AS SPECIAL INSURANCE COUNSEL FOR THE DEBTOR AND DEBTOR-IN-POSSESSION   - 3

Debtor include James R. Murray whose hourly rate is $980.00 (discounted to $755.00); and Jim Carter whose hourly rate is $705.00 (discounted to $543.00); any other personnel who may work on this matter including partners ($450 to $1,195 per hour); counsels ($440 to $1,070 per hour); associates ($315 to $695 per hour); and paralegals, clerks and librarians ($180 to $450); and members of E-Discovery, Analysis and Technology Assistance (eDATA") staff ($165 to $295 per hour).  All timekeepers will have like discounts applied to their rates.

14.    Blank Rome itemizes and charges separately for certain reasonable costs and expenses, which may include postage, long distance telephone charges, travel, filing fees, computerized legal research, deposition expenses, and expert witness fees, at Blank Rome's actual cost.  Blank Rome also charges for faxes, photocopies ($0.10 per page), and gross receipts tax on fees and costs. Further, although considered normal expenses charged to its clients, Blank Rome has informed the Debtor that, limited to this bankruptcy case, it will not charge Debtor for any of the following services, pursuant to this Court's opinion in *In re Furr's Supermarkets, Inc.,* Case No. 11-01-10779 SA (Bankr. D.N.M. June 28, 2001): secretarial work, secretarial overtime, overtime meals, late work transportation allowances, and word processing, proofreading, or other miscellaneous support services.

15.    If the application to employ Blank Rome is granted, Blank Rome will render monthly statements to Debtor and other parties in interest. Blank Rome seeks authority to be paid monthly, upon receipt of Blank Rome's billing statements and before the fees and costs are allowed, 75% of billed fees and 100% of billed costs and gross receipts tax, to be paid from funds of the estate. All fees, costs, and gross receipts tax would be subject to ultimate approval of the Bankruptcy Court under 11 U.S.C. §§ 328, 330, and 331.  Blank Rome's fee applications would contain a detailed statement showing services performed by Blank Rome for compensation received.  As of the Petition Date, the Debtor does not owe Blank Rome any amounts for legal services rendered before the Petition Date.

APPLICATION TO EMPLOY BLANK ROME, LLP AS SPECIAL INSURANCE COUNSEL FOR THE DEBTOR AND DEBTOR-IN-POSSESSION   - 4

16.    The Debtor has not paid and Blank Rome has not received a pre-petition retainer in any amount.

WHEREFORE, the Debtor respectfully requests the entry of an order, pursuant to §§327(e), 328, and 329 of the Bankruptcy Code and Bankruptcy Rules 2014 and 2016, authorizing Debtor to employ and retain Blank Rome as special insurance counsel for the Debtor effective as of the date this Application was filed and granting Debtor all such other relief as the Court deems just and proper.

Respectfully submitted,

By: *filed electronically 12/31/2018*
     Stephanie L. Schaeffer
     Thomas D. Walker
     WALKER & ASSOCIATES, P.C.
     500 Marquette Ave NW, Suite 650
      Albuquerque, NM 87102
      Telephone: (505) 766-9272
      Facsimile: (505) 766-9287
     e-mail:  twalker@walkerlawpc.com

     -and-

      /s/ Bruce A. Anderson
     Bruce A. Anderson
     Ford Elsaesser
     ELSAESSER ANDERSON CHTD.
     320 East Neider Avenue #102
     Coeur d'Alene ID 83815
      Telephone: (208) 667-2900
      Facsimile: (208) 667-2150
     e-mail:  brucea@eaidaho.com

*Proposed Attorneys for Debtor in Possession*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on December 31, 2018, in accordance with NM LBR 9036-1 and Fed. R. Civ. P. 5(b)(3), a true copy of the foregoing was served via the Court's CM/ECF notification facilities to those parties who are registered CM/ECF participants in this case.

*/s/ Stephanie L. Schaeffer*
Stephanie L. Schaeffer

APPLICATION TO EMPLOY BLANK ROME, LLP AS SPECIAL INSURANCE COUNSEL FOR THE DEBTOR AND DEBTOR-IN-POSSESSION   - 5

# EXHIBIT 23

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 20-10322 |
| The Diocese of Buffalo, N.Y., | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

### *EX PARTE* APPLICATION FOR ORDER APPOINTING BLANK ROME, LLP AS SPECIAL INSURANCE COUNSEL TO THE DIOCESE

The Diocese of Buffalo, N.Y. (the "Diocese") hereby files this application (this "Application") for entry of an order, substantially in the form of the proposed order attached hereto as *Exhibit A*, authorizing the Diocese to employ and retain Blank Rome, LLP ("Blank Rome"), effective as of February 28, 2020, to act as the Diocese's special insurance counsel with respect to the Diocese's various insurance policies and insurance coverage related litigation in the above-captioned bankruptcy case.  In support of this application the Diocese respectfully represents as follows:

### BACKGROUND

1.    On February 28, 2020 (the "Petition Date"), the Diocese filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. § 101 *et seq*., the "Bankruptcy Code") with the United States Bankruptcy Court for the Western District of New York (the "Court"), commencing the Diocese's chapter 11 case (this "Chapter 11 Case").  The Diocese continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for a trustee or examiner has been made in this Chapter 11 Case.

3524967.1 4/9/2020

2.       On March 11, 2020, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to Bankruptcy Code section 1102 [Docket No. 92].

3.       Information regarding the Diocese's history, business operations and structure, and the events leading up to this Chapter 11 Case is set forth in the *Affidavit of Rev. Peter J. Karalus Regarding Structure and Pre-Filing History of The Diocese of Buffalo and in Support of the Chapter 11 Petition and First Day Pleadings* and the *Affidavit of Charles Mendolera Regarding the Diocese's Assets and Operations and in Support of the Chapter 11 Petition and First Day Pleadings*, each of which was filed on the Petition Date and is incorporated herein by reference [Docket Nos. 7, 8].

## JURISDICTION

4.       This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

5.       Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.       This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

7.       The statutory and rule-based predicates for the relief requested herein are sections 327(a), 329, 330, 503(b), 504 and 507(a)(2) of the Bankruptcy Code, Rules 2014, 2016, 5002, and 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2014-2 and 2016-1 of the Local Rules of Bankruptcy Procedure for the Western District of New York (the "Local Rules").

8.       The Diocese does not, by filing its petition for relief and other documents in this Chapter 11 Case, waive any of its rights under any applicable law, including, without limitation, the Code of Canon law, the First Amendment of the United States Constitution, the Constitution

3524967.1 4/9/2020

for the State of New York, the Religious Freedom Restoration Act, the church autonomy doctrine, charitable trust law, New York trust law, and the rights to object to disclosure of information and to contend that certain assets which may be discussed in the Motion are not property of the estate.

## **RELIEF REQUESTED**

*9.*    By this Application, the Diocese respectfully requests that the Court enter an order authorizing the Diocese to retain Blank Rome as special insurance counsel, effective as of the Petition Date.  In support of this Application, the Diocese submits the *Declaration of Attorney James R. Murray*, sworn to on the 21st day of April 2020 (the "Murray Declaration"), attached hereto as ***Exhibit B***.

10.    Prior to the Petition Date, the Diocese entered into an engagement agreement with Blank Rome with respect to various insurance coverage matters.  No retainer was paid in connection with the retention; rather, Blank Rome will seek to be paid from the Diocese's estate.

11.    On January 28, 2019 the New York Legislature passed the Child Victims Act (A.2683/S.2440) (the "CVA").  New York's governor signed the CVA legislation into law on February 14, 2019.  The CVA modified the statute of limitations and created a "window" for one year so that any child sex abuse victim that may have been barred by the statute of limitations could commence a civil action.  In addition, the CVA extends the statute of limitations and allows all child victims to commence civil litigation until they turn 55 years of age.

12.    Since the window has opened on August 14, 2019, over 250 plaintiffs have commenced actions against the Diocese alleging child sexual abuse.  In addition, demand letters or notices have been received from other claimants who have not yet commenced lawsuits

3

against the Diocese and the Diocese anticipates that in excess of 400 individuals may assert abuse claims for which they may seek to hold the Diocese responsible (the "CVA Claims").

13.    It is necessary to employ special insurance counsel to advise the Diocese with respect to the Diocese's various insurance policies and insurance coverage related litigation, including, but not limited to, insurance coverage litigation relating to CVA Claims.

## BASIS FOR RELIEF REQUESTED

14.    The Diocese respectfully submits that the retention of Blank Rome complies with section 327(e) of the Bankruptcy Code, which provides:

> [t]he trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

11 U.S.C. 327(e).

15.    Thus, the retention of special counsel is authorized under the Bankruptcy Code when: (i) the proposed special counsel has previously represented the debtor, (ii) the appointment of special counsel is in the best interest of the debtor's estate and (iii) counsel does not hold an interest adverse to the estate with respect to the matter for which counsel is to be employed.  *See Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610, 622 (2d Cir. 1999).

**A.    Previous Representation and Best Interest of the Diocese's Estate.**

16.    Blank Rome was retained by the Diocese pre-petition to render legal services and advise the Diocese regarding its insurance policies in anticipation of the Diocese filing this bankruptcy case.  Blank Rome's services will be essential to the reorganization of the Diocese

3524967.1 4/9/2020

because obtaining maximum insurance coverage increases the viability of confirming a chapter 11 plan of reorganization that adequately addresses the CVA Claims in this case.

17.     In addition, Blank Rome has specialized knowledge in the areas of policy audits, insurance coverage litigation, complex insurance settlements, and analyzing insurance programs and risk profiles.  James R. Murray was also retained as special insurance counsel in the Diocese of Rochester, Diocese of Spokane, Oregon Province, Society of Jesus, Diocese of Helena, Diocese of Duluth, Diocese of New Ulm, Archdiocese of Santa Fe, and Archdiocese of Agaña. The Diocese selected Blank Rome because of Mr. Murray's considerable experience in these fields and his demonstrated ability to deliver efficient, cost-effective results.

18.     The Diocese believes that Blank Rome is well qualified to represent it as special insurance counsel in its Chapter 11 Case and that such retention would be in the best interests of the its estate.

**B.     Blank Rome Holds No Adverse Interest**.

19.     Proposed counsel holds an adverse interest if they "(1) [possess or assert] 'any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant' or (2) [possess] 'a predisposition under circumstances that render such a bias against the estate.'"  *In re Residential Capital, LLC*, No. 12-12020 (MG), 2012 Bankr. LEXIS 3706, at *10 (Bankr. S.D.N.Y. 2012) (quoting *In re AroChem Corp.*).  Further, the review of potential conflicts is limited to the scope of the proposed special representation.  *See id*.

20.     The Diocese believes that Blank Rome does not represent any interest adverse to the Diocese in accordance with 11 U.S.C. § 327(e).  Although Blank Rome provided services to the Diocese prior to the Petition Date, Blank Rome does not hold claims against the Diocese for

3524967.1 4/9/2020

services rendered prior to the Petition Date, and the Diocese does not owe Blank Rome for any unpaid pre-petition invoices. Prior to the Petition Date, the Diocese paid Blank Rome $165,142.96 for pre-petition services rendered to the Diocese.

21.      Other than as set forth above and disclosed in the Murray Declaration, the Diocese believes that Blank Rome has no connection with the Diocese, its creditors, or any other party in interest, their respective attorneys and accountants, the Office of the United States Trustee, or any person employed in the Office of the United States Trustee and does not hold any bias towards or against the Diocese's estate.

22.      Blank Rome has indicated its willingness to act as special insurance counsel on the Diocese's behalf and to be compensated in accordance with the Bankruptcy Code, the Bankruptcy Rules and applicable orders of this Court entered in the Chapter 11 Case.

23.      The Diocese understands that it will be responsible to Blank Rome for all disbursements incurred by Blank Rome in representing the Diocese in all respects.

24.      During the course of representing the Diocese as set forth herein, the services of Blank Rome may be necessary for other duties not enumerated herein and not known at this time. In the event the services of Blank Rome are required for unusual or extraordinary matters beyond the scope or intent of this Application, the Diocese will make an additional application for such authorization.

**<u>NO PRIOR REQUEST</u>**

25.      The Diocese has not previously sought the relief requested herein from this or any other court.

6

3524967.1 4/9/2020

**WHEREFORE**, the Diocese respectfully requests that the Court enter an order in the form of the proposed order attached hereto as ***Exhibit A***, effective as of the Petition Date, permitting and authorizing the law firm of Blank Rome, LLP to act as special insurance counsel to the Diocese herein upon qualification.

Dated: April 22, 2020
      Buffalo, New York

                                /s/ Charles Mendolera
                                Charles Mendolera
                                Executive Director of Financial Administration

3524967.1 4/9/2020

# EXHIBIT 24

Order Filed on
**9/2/2004**
by Clerk U.S. Bankruptcy
Court District of New Jersey

---

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Caption in Compliance with D.N.J.LBR 9004-2©

STUTZMAN, BROMBERG, ESSERMAN &
PLIFKA
A Professional Corporation
2323 Bryan Street, Suite 2200
Dallas, Texas 75214
Tel (214) 969-4900
Fax (214) 969-4999

LEVITT & SLAFKES, P.C.
76 South Orange Avenue, Suite 305
South Orange, New Jersey 07079
(973) 313-1200
Attorneys for Motley Rice, LLC
BY: Bruce H. Levitt, Esq. (BL9302)

---

| | |
|---|---|
| In Re: | Case No.: 03-51524 |
| **CONGOLEUM CORPORATION et. al.,** | (Jointly Administered) |
| **Debtors.** | Adv. No.: |
| | Hearing Date: **July 26, 2004** |
| | Judge: Kathryn C. Ferguson |

**ORDER REQUIRING COMPLIANCE WITH BANKRUPTCY
RULE 2019 AND GRANTING OTHER RELIEF**

The relief set forth on the following pages, numbered two (2) through five (5) is hereby
ORDERED.

**DATED: 9/2/2004**

Honorable Kathryn C. Ferguson
United States Bankruptcy Judge

**Page 2**
Debtor: Congoleum Corporation, et. al.
Case No.: 03-51524 KCF (Jointly Administered)
Caption:    Order Requiring Compliance with Bankruptcy Rule 2019 and Granting Other
Relief

---

This core matter involving the administration of this bankruptcy case having come before the

Court on the Motion of Travelers Casualty and Surety Company and St. Paul Fire and Marine Insurance

Co. [docket no. 919], and on the separate Motion of Century Indemnity Co., ACE American Insurance

Co., and ACE Property and Casualty Insurance Co. [docket no. 922]; and the Court having considered all

pleadings, letters and statements filed in connection therewith and the arguments of counsel at the July

26, 2004 hearing; and it appearing that some counsel to asbestos tort claimants, including several of the

members of the pre-petition committee, represent multiple creditors in this Chapter 11 case and have not

filed statements required by Federal Rule of Bankruptcy Procedure 2019 promulgated under 28 U.S.C. §

2075; and it appearing that certain of the Rule 2019 Statements filed to date may not meet the

requirements of that Rule; and based on the Court's legal rulings at the conclusion of the July 26, 2004

hearing; and upon service of a proposed form of this Order, under the Five-Day Rule, Local Bankruptcy

Rule 9072-1(d), upon (i) the Master Service List, (ii) all parties filing opposition to the Motions, (iii) all

counsel appearing at the July 26, 2004 hearing on the Motions, (iv) all members of the pre-petition

committee, and (v) a list of counsel for asbestos tort claimants who  filed master ballots herein, which list

was furnished by the Debtors' counsel to Travelers' counsel on August 25 ("Asbestos Claimants Counsel

List")[, and consideration of objections thereto filed pursuant to the Five-Day Rule], IT IS HEREBY:

**ORDERED** that, all counsel representing more than one creditor herein (including by having

executed a ballot on the proposed plan of reorganization on behalf of more than one creditor) shall

(whether or not such counsel has filed a notice of appearance herein) file a Rule 2019 Statement, within

TEN (10) days after the entry of this Order on the electronic docket, fully complying with the

*Approved by Judge Kathryn C. Ferguson  September 02, 2004*

**Page 3**
Debtor: Congoleum Corporation, et. al.
Case No.: 03-51524 KCF (Jointly Administered)
Caption:    Order Requiring Compliance with Bankruptcy Rule 2019 and Granting Other
Relief

requirements of Rule 2019 except as hereby limited by subparagraph (c)(i) of the next **ORDERED**

paragraph; and it is further

**ORDERED** that, pursuant to Rule 2019 and this Order, such Rule 2019 Statement shall be sworn

under the penalty of perjury and shall include:

(a) a list of the names and addresses of all creditors (including creditors for whom the filing

counsel is acting as co-counsel), and a general statement about the nature of their respective claims and

when those claims arose;

(b) a certification that counsel has the authority to vote for each claimant on whose behalf

counsel executes a ballot on a proposed plan of reorganization, pursuant to (i) an executed separate

bankruptcy-specific power of attorney or (ii) a bankruptcy specific power of attorney clause that is part

of an executed retainer agreement or contract of representation, in either case authorizing the attorney to

vote on behalf of the client in this bankruptcy proceeding;

(c) attachment of the lesser of: (i) 25 executed bankruptcy-specific powers of attorney or other

bankruptcy-specific authorizing instruments or (ii) all bankruptcy specific powers of attorney or other

bankruptcy-specific authorizing instruments, executed by creditors in connection with this bankruptcy

case on whose behalf the counsel votes, with, if necessary, the redaction of any attorney-client privileged

information or other confidential information;

(d) a list and a detailed explanation of any type of co-counsel, consultant or fee-sharing

relationships and arrangements whatsoever, in connection with this bankruptcy case or claims against any

of the Debtors, and attachment of copies of any documents that were signed in conjunction with creating

that relationship or arrangement; and

*Approved by Judge Kathryn C. Ferguson  September  02, 2004*

**Page 4**
Debtor: Congoleum Corporation, et. al.
Case No.: 03-51524 KCF (Jointly Administered)
Caption:      Order Requiring Compliance with Bankruptcy Rule 2019 and Granting Other
             Relief

---

(e)  for any member of the pre-petition committee, in their respective Rule 2019 Statement, such

statement shall include the information required by Rule 2019 (including for the period prior to the filing

of the petition herein) with respect to the committee, including as required by clauses (3) and (4) of

Paragraph (a) of the Rule; and it is further

**ORDERED** that, if any counsel required to file a Rule 2019 Statement does not timely file its

Rule 2019 Statement in accordance with this Order or if a non-complying Statement is filed or if a

presently filed Rule 2019 Statement is not supplemented to comply with this Order, the Debtor is

directed to send the Disclosure Statement to the underlying claimants and allow the underlying claimants

to vote on the proposed plan of reorganization under procedures to be determined by this Court;

**ORDERED** that, Mr. Joseph F. Rice of Motley Rice LLC shall, within a reasonable time after

the 10-day period provided for above, and at a mutually convenient time and place, appear for the

continuance of his deposition herein, and Mr. Rice is instructed to answer all outstanding

deposition questions on any type of co-counsel, consultant or fee-sharing relationship whatsoever, and

such continued deposition shall not be covered by any discovery stay order the Court may issue in

connection with the deferral of the scheduled confirmation hearing from September 9, 2004; and it is

further

**ORDERED** that, nothing in this Order is a ruling on whether any Rule 2019 Statement filed to

date complies, or does not comply, with Rule 2019 or the legal effect of not filing a Rule 2019 Statement

or filing a non-complying Rule 2019 Statement, and the Court maintains jurisdiction with respect to such

matters and with respect to the interpretation and enforcement of this Order; and it is further

*Approved by Judge Kathryn C. Ferguson  September  02, 2004*

**Page 5**
Debtor: Congoleum Corporation, et. al.
Case No.: 03-51524 KCF (Jointly Administered)
Caption:    Order Requiring Compliance with Bankruptcy Rule 2019 and Granting Other
            Relief

---

**ORDERED** that, counsel for Travelers shall serve this Order on (i) the Master Service List

herein, (ii) all parties filing opposition to the Motions, (iii) all counsel appearing at the July 26, 2004

hearing on the Motions, (iv) all members of the pre-petition committee, and (v) counsel on the Asbestos

Claimants Counsel List, which service shall be effected by email, facsimile or regular mail, and that

such service and posting of the Order on the electronic docket herein shall be good and sufficient service

and notice hereof.

*Approved by Judge Kathryn C. Ferguson  September 02, 2004*