## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |
| | **Re: Docket No. 1145** |

### OBJECTION OF THE COALITION OF ABUSED SCOUTS FOR JUSTICE TO DEBTORS' MOTION TO SUPPLEMENT THE BAR DATE ORDER

The Coalition of Abused Scouts for Justice (the "Coalition"), by its undersigned counsel, hereby submits this Objection (the "Objection") to the *Debtors' Motion Pursuant to Section 105(a) of the Bankruptcy Code and ¶ 27 of the Bar Date Order for Entry of an Order (I) Supplementing the Bar Date Order and (II) Granting Related Relief* (the "Motion") [Docket No. 1145], and respectfully requests the Court deny the relief as requested in the Motion or, alternatively and if the Court believes it appropriate, set this matter for a full evidentiary hearing prior to any grant of relief requested therein.  In further support of this Objection, the Coalition states as follows:

### PRELIMINARY STATEMENT[2]

1.    The Debtors' proposed supplement to the original Bar Date Order (the "Proposed Order"), attached as Exhibit A to Motion, seeks an overly-broad, content-based prior restraint of speech.  The relief sought by the Debtors would apply to any person in the world who speaks to any Sexual Abuse Survivors regarding "matters described" in the Debtors' Bar Date Notice.

---

[1]  The Debtors in these Chapter 11 Cases, together with the last four digits of Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300); and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]  Capitalized terms used but not defined herein shall have the meaning ascribed such terms in the Bar Date Order (defined *infra*).

2.      The Debtors' legal analysis is accurate *to the extent that* courts have permitted prior restraints of commercial speech (1) in limited circumstances applicable to single speakers, (2) where false or misleading information is communicated, and (3) that false and misleading information presents a clear and present danger to a debtor's reorganization.  However, these factors are not satisfied here.

3.      For instance, the Debtors complain that certain attorneys, among other things, "falsely state" that "a Victims Compensation Fund is being set up," and that others state that compensation for creditors is somehow "ensured."[3]  Notably, however, the Debtors' *own website* contains an open letter to Sexual Abuse Survivors stating that they seek to "ensure we can equitably compensate all victims of past abuse in our programs, through a proposed Victim's Compensation Trust."[4]  The Debtors fail to provide any evidence to substantiate how such statements when made by the attorneys are false or misleading, or how they present a clear and present danger to the Debtors' reorganization.

4.      A debtor acting in a manner consistent with its duties to its creditors should welcome outreach assistance provided by law firms - at their own expense - to ensure active and complete representation of the creditor body.  This Motion is a thinly-veiled attempt to minimize participation and diminish the leverage of Sexual Abuse Survivors by limiting their ability to communicate with counsel of their choosing regarding their legal rights to representation in these proceedings.

---

[3]    *See*, *e.g.*, Roberts Decl. Ex. C-2, C-3.

[4]    Jim Turley, National Chair, Boy Scouts of America, "An Open Letter to Victims from the Boy Scouts of America," available at https://www.bsarestructuring.org/an-open-letter-to-victims-from-the-boy-scouts-of-america/ (last visited Aug. 27, 2020) ("BSA Open Letter").

# FACTUAL BACKGROUND

## A.  Formation of the Coalition

5.    The Coalition presently comprises more than 12,000 members (the "Coalition Members"), each of which is a sexual abuse victim holding claims against Debtor Boy Scouts of America, among other parties.  In July, the Coalition Members, by and through authorized representatives (the "Representatives"), formed the Coalition and then retained Brown Rudnick LLP and Blank Rome LLP (together, "Coalition Counsel") to represent them in connection with the Coalition's claims and interests in respect of the above-captioned debtors (the "Debtors") in the Chapter 11 Cases.  *See Amended Verified Statement of Coalition of Abused Scouts for Justice Pursuant to Bankruptcy Rule 2019*, Docket No. 1106 (the "2019 Statement").[5]

6.    The Coalition Members constitute a large majority of known tort claimants against the Debtors, who suffered Sexual Abuse while participating in activities associated with the Boy Scouts of America ("BSA").  As a result of the Sexual Abuse, it should be no surprise that the level of trust these individuals have with the BSA is limited, if any exists at all.

7.    Many of the Coalition Members have reported interactions with the BSA in which the BSA dismissed or belittled the harm they suffered.  It is likely that other Sexual Abuse Survivors have shared similar experiences with the BSA.

## B.  The Coalition's Interest in the Speech Rights of Creditor Counsel

8.    In light of experiences noted above and in the public record, it is important that Sexual Abuse Survivors are made aware of the rights afforded to them in these Chapter 11 Cases

---

[5]  As disclosed in the 2019 Statement, the current Representatives are: (i) Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C., (ii) Kosnoff Law PLLC, (iii) AVA Law Group, Inc., (iv) Andrews & Thornton, (v) ASK LLP, and (vi) Slater Slater Schulman, LLP.  The sufficiency of the 2019 Statement is subject to a pending motion scheduled for hearing at the September 9 omnibus hearing.

before they are extinguished under the Bar Date Order.  Additionally, Sexual Abuse Survivors are entitled to representation of their own counsel if they so choose.  As discussed below, the use of advertising to make Sexual Abuse Survivors aware of these rights and options is a constitutionally protected right.

9.    Moreover, while the Coalition will not vote on any plan of confirmation or file proofs of claim on behalf of its Members, the size of the Coalition membership makes it a significant and valuable voice in these Chapter 11 Cases.  The Coalition has sought to become an active and beneficial party to mediation in these Chapter 11 Cases, an issue directly tied to its Members' ability to influence the Chapter 11 Cases through, among other things, voting on a plan that adequately compensates them for harm suffered.  *See* 11 U.S.C. §§ 1126, 1129; *see also Motion of the Coalition of Abused Scouts for Justice to Participate in the Mediation* [Docket No. 1161] (describing efforts of Coalition to join Court-approved mediation, including outreach to the Debtors and other parties; such motion is pending and scheduled for hearing at the September 9 omnibus hearing).

10.    As a result, the Coalition and its Members have an interest in ensuring that potential future Members are able to communicate openly with counsel regarding their legal rights and ability to seek compensation in these cases.  Prior restraints on the ability of prospective counsel to communicate to Sexual Abuse Survivors regarding the "matters described" in the Bar Date Order – such as the definition of sexual abuse, the nature of chapter 11 restructuring, and the deadlines and processes for filing proofs of claim – will hamper the ability of prospective counsel to explain to potential clients, in a compelling manner, why active participation in these Chapter 11 Cases might be beneficial to the Sexual Abuse Survivor.

C.  **The Long History of Counsel Outreach to the Debtors' Creditors**

11.    Outside the confines of their representative capacity for Members of the Coalition, some Representatives of the Coalition, like many attorneys, have published informational advertisements to encourage potential claimants to retain their law firms as legal counsel to seek compensation for their claims.  As the Debtors are well-aware, these efforts began long before the Debtors filed voluntary petitions to commence these Chapter 11 Cases.

12.    Indeed, law firms have been soliciting Sexual Abuse Survivors to bring claims against the Boy Scouts for decades, as reflected by the ample references to sexual abuse lawsuits against the Boy Scouts of America in the Debtors' own disclosures.  *See generally Debtors' Informational Brief*, Docket No. 4 (the "Informational Brief").

13.    The Debtors claim that "no one contemplated a parallel 'noticing' scheme to Sexual Abuse Survivors."  Para. 23.  The suggestion that the Debtors, let alone the plaintiff bar, expected attorneys to cease soliciting new clients after more than 20 years, simply due to entry of this Court's Bar Date Order, is incredible and defies the reality of other mass tort bankruptcy cases, such as Purdue and PG&E, where large scale attorney advertising and material debtor bar date noticing programs existed and co-exist side-by-side.  All parties in interest in these Chapter 11 Cases knew that the plaintiff bar would continue soliciting new clients, and part of that solicitation process is to inform prospective clients regarding the "matters described" in a Bar Date Notice.

## OBJECTION

14.    The Debtors' attempt to thwart dissemination of speech regarding these Chapter 11 Cases should be denied as an unconstitutional prior restraint of free speech.  Free and open communication between a legal representative and client is an essential tenet of effective representation.  *See generally Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S. Ct. 677, 682,

5

66 L. Ed. 2d 584 (1981).  Restraints on that free flow of communication between legal representative and client, or potential clients, is strongly disfavored.  *See, e.g., Gulf Oil Co. v. Bernard*, 452 U.S. 89, 95, 101 S. Ct. 2193, 2197, 68 L. Ed. 2d 693 (1981).

15.    The First Amendment prohibits restriction of "expression because of its message, its ideas, its subject matter, or its content."  U.S. Const., Amdt. 1.  The Supreme Court has explicitly held that legal advertisements, like the type targeted by Debtors' Proposed Order, constitute speech protected by the First Amendment.  See *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995); *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651, 105 S. Ct. 2265, 2282, 85 L. Ed. 2d 652 (1985).  The constitutional protection of this form of speech is grounded in the First Amendment rights of the listener; here, the current and potential sexual abuse tort claimants.  *Zauderer*, 471 U.S. at 651 ("the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides").

16.    In recent jurisprudence, the Supreme Court has clarified its commitment to applying the strictest standard of review when evaluating the constitutionality of content-based restraints on speech, even in a presumptively commercial context. See *Barr v. AAPC*, 591 U. S. ____, 140 S.Ct. 812 (June 25, 2020) (holding that an exception to a debt collection statute which distinguished between speech related to governmental debt and other debt was an unconstitutional content-based restraint to speech).[6]

---

[6] Prior to the Supreme Court's very recent decision in *Barr*, this case likely would have fallen cleanly within the Court's commercial speech intermediate scrutiny doctrine primarily espoused in *Hudson. See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980); *see also generally also Massachusetts Ass'n of Private Career Sch. v. Healey*, 159 F. Supp. 3d 173, 192 ("Although only a small number of courts have addressed First Amendment challenges to commercial-speech regulations since Reed, almost all of them have concluded that Reed does not disturb the Court's longstanding framework for commercial speech under Central Hudson.").  However, the *Barr* Court affirmed that strict scrutiny applies whenever the speech at issue is being

## I.    **The Proposed Order is Fatally Overbroad**.

17.    The Debtors are asking this Court to issue a prior restraint on the speech of literally *any person*, *anywhere*, regarding communications with any Sexual Abuse Survivor.  Such a broad restriction on the content of communications between unknown persons is a plainly unconstitutional content-based prior restraint which necessarily fails strict scrutiny review.  *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163, 135 S. Ct. 2218, 2226, 192 L. Ed. 2d 236 (2015) ("Content-based [restrictions] —those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.").  It has long been established that content-based prior restraints "constitute the most serious and the least tolerable infringement on our freedoms of speech."  *United States v. Quattrone*, 402 F.3d 304, 309 (2d Cir. 2005) (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976)).

18.    Courts have held numerous times that this type of order proposed by Debtors, banning communications or solicitations from counsel to potential class members without the prior approval of the Court, are unconstitutionally broad restrictions on First Amendment speech.  *See, e.g., Gulf Oil Co. v. Bernard*, 452 U.S. 89, 95, 101 S. Ct. 2193, 2197, 68 L. Ed. 2d 693 (1981) (vacating order banning communication "including any solicitation of legal representation of

---

regulated due to its content, even if the speech is regulated in a presumptively commercial context. *See Barr*, at 10 n.5 (noting that J.Breyer's dissent which argues for a commercial speech intermediate scrutiny review does not comport with "the Court's longstanding precedents, which we carefully follow here, [which] have not adopted that approach."). The Court reasons that a speech restriction "is content-based if a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Barr*, at 7 (quoting Reed v. Town of Gilbert, 576 U. S. 155, 163 (2015)).  The Court specifically held that irrespective of the economic nature of the speech that where, as here, the restriction "focuses on whether the [speaker] is speaking about a particular topic. . ." the law is a content-based restriction, and the fact that the restriction is targeted at a specific speaker does not render it content-neutral. *Barr*, at 8 (distinguishing from general economic regulations that have an incidental effect on speech which would not be subjected to strict scrutiny). Given that Courts grappled with the effect of *Reed* on existing commercial speech intermediate scrutiny precedent, despite the fact that *Reed* did not even deal with commercial speech, the Court's decision in *Barr* has an even more unclear effect on the commercial speech doctrine. To date, no Court has yet interpreted the effect of the *Barr* decision on First Amendment jurisprudence.

potential or actual class members, and any statements which may tend to misrepresent the status, purposes and effects of the class action" or "create impressions tending without cause, to reflect adversely on any party, any counsel, this Court, or the administration of justice."); *In re Cmty. Bank of N. Virginia*, 418 F.3d 277, 310 (3d Cir. 2005); *see also e.g. Amaraut v. Sprint/United Mgmt. Co.*, No. 3:19-CV-411-WQH-AHG, 2020 WL 1820120, at *2 (S.D. Cal. Apr. 10, 2020) ("Should a court find that clear abuses have taken place, it should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances, i.e., giving explicit consideration to the narrowest possible relief which would protect the respective parties."); *Jin Nakamura v. Wells Fargo Bank, Nat'l Ass'n*, No. 17-4029-DDC-GEB, 2018 WL 994706, at *5 (D. Kan. Feb. 21, 2018) ("even if there is clear evidence of abusive communications with potential class members, a court may only impose the narrowest possible relief which would protect the respective parties. . .[o]verly broad relief can violate the First Amendment"); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1239, 1242 (N.D. Cal. 2000) ("An injunction restricting communications must be the narrowest possible relief which would protect the respective parties.").

19.    By contrast, the Debtors cannot cite to a single case in which a court has granted relief so broad that it applies to *all content providers* (whether known or unknown) as to *all content* relating in any fashion to the Bar Date Order. *See, e.g.*, *In re Inslaw*, 76 B.R. 224 (1987) (denying motion to dismiss in two-party dispute); *S.E.C. v. Am. Bd. Of Trade, Inc.*, 830 F.2d 431 (2d Cir. 1987) (approving restraint on speech of defendant in class action lawsuit); *In re Andrus*, 189 B.R. 413 (N.D. Ill. 1995) (restraining speech of creditor who engaged in numerous and ostentatious violations of discharge order).

20.    While section 362 of the Bankruptcy Code provides some means and cause to restrict speech under fact-specific circumstances, law firms cannot be penalized or restricted from expressing their perspective on disputed facts. *See Wells v. Volf*, No. 4:04CV3184, 2005 WL 8176325, at *10 (D. Neb. Mar. 7, 2005) (declining to grant protective order limiting communications to putative class members in part because "[c]ommunications which present one party's position on disputed issues of fact may not for that reason alone be characterized as misleading."); *compare In re Inslaw, Inc.,* 76 B.R. 224, 240 (Bankr. D.D.C. 1987) (holding that an injunction on disparaging speech against debtor did not violate the First Amendment where the speech was false and malicious sufficient "to present a clear and present danger of significant interference with the Debtor's reorganization and with the functions of the bankruptcy court[.]"); *see also In re Stonegate Sec. Servs.*, Ltd., 56 B.R. 1014, 1019 (N.D. Ill. 1986) ("in order for § 362 to constitutionally curtail 'harassing' speech, the speech must be truly obstructive, that is, it must amount to conduct that seriously and effectively interferes with the judicial process itself—or presents a clear and present danger of doing so—***and involves no or at least limited First Amendment interest.***  It is not enough that the behavior be 'annoying[.]'")(emphasis supplied).

21.    The Debtors do not even attempt to satisfy the strict requirements to ensure the relief sought is constitutional.  Rather, their motion appears to be an attempt to  compel the known creditor representatives (that they are aware of) to abandon or modify their speech so as to put a brake on what they and their insurers have concluded is an expanding group of Sexual Abuse Survivors whose numbers will likely far exceed their expectations on the total aggregate compensation that would be required to resolve this case consensually.

## II.    The Debtors Have Not Proven that the Speech in Question is False or Misleading

22.    The Debtors insist that the cited speech acts are false or misleading.  *See* Motion at Ex. C [Docket No. 1145-4] (the "Wheatman Declaration").  While a finding of falsity is not strictly required to meet the standard for prior restraints, it is central to the Debtors' argument that the cited speech acts could lead to confusion that endangers their reorganization.  *Compare In re National Serv. Corp.*, 742 F.2d 859, 862 (5th Cir. 1984) (overruling issuance of prior restraint involving creditor's posting of billboard stating the "unassailable facts" that the debtor was in bankruptcy and could not pay its bills), *with In re Inslaw*, 76 B.R. 224, 240 (Bankr. D.D.C. 1987) (noting allegations of "false and malicious" speech and presuming truth of allegations upon motion to dismiss).

23.    However, the Debtors do not make factual allegations, let alone offer credible proof, as to any potential level of confusion sufficient to satisfy the standard necessary to justify a prior restraint of speech.  *See Cram v. Elec. Data Sys. Corp.*, No. 07cv1842-LAB-NLS, 2008 WL 178449, at *3 (S.D. Cal. Jan. 17, 2008) ("A mere ***possibility*** of confusion is insufficient to justify the district court's exercise of supervisory authority over parties' communications with potential class members") (emphasis supplied); *cf. Georgine v. Amchem Prod., Inc.,* 160 F.R.D. 478, 516 (E.D. Pa. 1995) (granting voiding of opt out orders and ordering dissemination of notice materials "***[b]ecause it is likely that class members were deceived***, the danger is real, serious, likely and imminent that individuals have been induced to act to their detriment in reliance upon the misrepresentations, deceptive letters or blatant falsehoods of counsel. . ." however, still declining to "restrain or burden speech prior to its articulation.") (emphasis supplied).

24.    In the Wheatman Declaration, Dr. Shannon Wheatman states that the advertisements "***could***" or "***may***" cause confusion, not that the advertisements are likely to mislead or have actually misled potential claimants.  *See id.* (emphasis supplied).  Likewise, Dr. Wheatman

states that the "ads that include false or misleading information ***may cause*** potential claimants to question the legitimacy of the Court-approved bar date noticing and advertisements." *Id.* at 4 (emphasis supplied).

25.    Dr. Wheatman does not state that it is her opinion that the actual law firm advertisements at issue are *in fact* false or misleading. *See* Wheatman Declaration.  The Wheatman Declaration equivocally states that "the law firms' advertising ***could*** cause potential claimants to believe they need to hire an attorney," and "if the law firms' advertising continues to run in its current form, it ***may*** be detrimental to the bar date notice program." *Id.* at 5 (emphasis supplied).

26.    The Coalition will not engage, in this Objection, in a point by point analysis of each example of speech cited by the Debtors in their Motion.   However, by way of example, the Coalition highlights the following statements by the Debtors:

- The Debtors complain that speakers have described the proof of claim process as "anonymous," whereas it is actually "confidential." *See* para. 3.  The Coalition's impression of the cited text is that prospective counsel to Sexual Abuse Survivors may have been attempting to describe the reality that the filing of a proof of claim would not render the claimant's identity a public record available to any person in the world, as is generally true of bankruptcy proofs of claim.  The word "anonymous" enjoys more colloquial popularity than "confidential," and non-lawyers may not appreciate the legal distinction between the two terms.

- The Debtors complain that ads "falsely assert that financial compensation for Sexual Abuse Survivors is 'ensured' or that there is 'significant' or 'substantial' compensation available." Motion, para. 3.  The Debtors' own letter to creditors, which is available on their website, states that they have "initiated a voluntary financial restructuring to *ensure* we can equitably compensate all victims of past abuse in our programs." *BSA Open Letter*.  And it is not clear that the language is misleading – among other things, the Debtors have conceded voluminous insurance coverage for sexual abuse claims, which is thus "available" in a contractual sense whether or not the Debtors and their insurers wish that to be true and whether or not it is "available" under a confirmed chapter 11 plan of reorganization.

- The Debtors complain that ads contain false representations regarding "a Victim's Compensation Fund [that] is being set up that may be worth over $1.5 billion."  Motion, para. 3.  The Debtors' own communications confirm their

actions in proposing a "Victim's Compensation Trust" through these proceedings, and the cited speech is by its own terms speculative as to the value of that fund.  Non-lawyers may not appreciate the distinction between a fund that is "being set up" and one that is "proposed" in the context of the chapter 11 plan confirmation and prosecution process, and it is not clear that the distinction would matter to potential claimants.

- The Debtors complain of the use of words such as "coverup" to describe their pre-petition behavior.  The Debtors' own disclosures discuss their years-long attempts to keep their sexual abuse files from public view.  *See* Informational Brief, Ex. 2 at 18-19 (describing public disclosure of files containing sexual abuse information following lengthy attempt by Debtors to maintain confidentiality in litigation).  Moreover, many of the Coalition Members, among other individuals and publications, have experienced and documented the Debtors' resistance to addressing sexual abuse issues over many decades.

27.   Moreover, if these statements are false and misleading, then the Debtors are guilty of misleading their own creditors, and this Court.  The Debtors do not appear to have withdrawn or altered the BSA Open Letter to clarify that no compensation is "ensured" by their initiation of these Chapter 11 Cases.  Likewise, the Debtors cannot credibly assert, and do not assert in the Motion, that the phrase "equitably compensate" is inconsistent with "significant or substantial compensation" in the context of persons who were sexually abused as children.

28.   In sum, the Debtors fail to offer any evidence that any solicitations, never mind generally as to all solicitations (as the Debtors seek to restrict), are actually false or misleading.  That the Debtors' declarant avers that certain solicitations ***may*** be false or misleading falls woefully short of the evidentiary burden borne by the Debtors.  *See* Wheatman Declaration at 4-5.

### III.   The Speech in Question Does Not Present a Clear and Present Danger to these Judicial Proceedings.

29.   A movant seeking a prior restraint of speech in relation to the debtor in a bankruptcy proceeding must show that the speech, whether or not false or misleading, presents a clear and present danger to the debtor's reorganization.  *See Inslaw,* 76 B.R. at 225; *cf. Jin Nakamura v.*

*Wells Fargo Bank, Nat'l Ass'n*, No. 17-4029-DDC-GEB, 2018 WL 994706, at *4 (D. Kan. Feb. 21, 2018) ("The moving party, therefore, must demonstrate the communication at issue is abusive in that it threatens the proper functioning of the litigation."); *Perkins v. Benore Logistics Sys., Inc.*, No. 16-13717, 2017 WL 445603, at *4 (E.D. Mich. Feb. 2, 2017) (holding that the proposed restrictions on communications between Plaintiff counsel and putative class members would violate the First Amendment because "[p]laintiff's counsel [had] not engaged in the type of subterfuge and subversion that constitutes an intolerable affront to the authority of the district court to police class member contacts" sufficient to allow the extreme remedy of restricting Plaintiff's counsel speech).

30.    The Debtors cite ***only one case*** in which a court found "clear and present danger," in which the "clear and present danger" to the debtor's reorganization was presumed as a matter of law.  In *In re Inslaw*, the debtor accused the United States Department of Justice ("<u>DOJ</u>") of "a truly outrageous course of conduct over a period of years . . . [that] resulted in DOJ's improper acquisition and exercise of control over Inslaw's corporate lifeblood—that is, its valuable enhancements to" a computerized case management software system. 76 B.R. at 225.  The debtor accused the DOJ of essentially stealing its business assets through fraud and deceit, denying payment for goods and services provided, and then disparaging its product. *See id.* at 225-26, 240.  Because *Inslaw* was an opinion on the DOJ's motion to dismiss, the court took the pleaded facts as true.  *Id.* at 240.  The court held that the DOJ's actions, if true, constituted violations of the automatic stay and presented a clear and present danger of significant interference with the Debtor's reorganization. *See id.*; *cf. S.E.C. v. Am. Bd. Of Trade, Inc.*, 830 F.2d 431, 442-43 (2d Cir. 1987).

31.    Additional bankruptcy cases not cited by the Debtors clarify that the question of "clear and present danger" is one that must be determined on a case-by-case basis upon evidence of actual harm or danger to the debtor's ongoing business operations.   For instance, in *In re Sechuan City, Inc.*, a court ordered a prior restraint against a creditor who posted signs outside the debtor's business saying, e.g., "PLEASE DON'T PATRONIZE THE SECHUAN GARDEN," and the court held an evidentiary hearing and found that the defendants "intended to harm the debtor's business [and] did in fact harm that business."  96 B.R. 37, 39, 44 (Bankr. E.D. Pa. 1989).  By contrast, in *In re Stonegate Security Services, Ltd.*, a creditor caused a truck containing messages that the debtor did not pay its suppliers to be parked outside the debtor's premises.  56 B.R. 1014, 1016 (N.D.Ill. 1986).  The bankruptcy court "took no evidence on countervailing interests, such as the damage done to [the debtor's] business."  *Id.* at 1020.

32.    This case is plainly different from *Inslaw* and *Sechuan* in that the cited speakers are not standing outside of Boy Scout meetings holding signs and attempting to convince people not to join the organization.  The subject advertising is directed to grown men to convince them that they should actively participate in these Chapter 11 Cases to seek compensation for harm suffered. And while the Debtors obviously disagree with some lawyers' choice of verbiage, "some self-serving advocacy for [the party]'s position" is insufficiently coercive or misleading to allow the grant of an order restricting communications with putative class members.  *See e.g. Wells v. Volf*, No. 4:04CV3184, 2005 WL 8176325, at *10 (D. Neb. Mar. 7, 2005) ("Communications which present one party's position on disputed issues of fact may not for that reason alone be characterized as misleading."); *Payne v. Goodyear Tire & Rubber Co.,* 207 F.R.D. 16, 20 (D. Mass. 2002) (manufacturer's website text stating no product defect existed, despite ongoing

products liability litigation regarding the defectively designed product, was neither coercive nor misleading).

33.    Again, the Debtors have failed to satisfy their evidentiary burden, or even offer any evidence, that the speech cited in the Motion presents a clear and present danger to the Debtors' reorganization.  The proposition that solicitation from prospective creditor counsels would "lay to waste" the assets spent by the Debtors in providing notice of their Chapter 11 Cases (Motion at para. 44) is no more persuasive in these cases than in virtually every other large chapter 11 case in which attorneys direct communications to tort creditors regarding prospective representation.

## CONCLUSION

34.    Simply put, the Debtors have failed to demonstrate that the relief sought in the Motion satisfies the strict scrutiny required to impose limitations on constitutionally protected right to free speech.  Accordingly, the Coalition respectfully requests that the Court deny the relief sought in the Motion.


[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

Dated: August 28, 2020
Wilmington, Delaware

**BLANK ROME LLP**

*/s/ Stanley B. Tarr*
Stanley B. Tarr (DE No. 5535)
1201 Market Street, Suite 800
Wilmington, Delaware 19801
Telephone:    (302) 425-6423
Facsimile:    (302) 252-0921
E-mail:    Tarr@BlankRome.com


-and-

**BROWN RUDNICK LLP**
David J. Molton, Esq.
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
E-mail: DMolton@BrownRudnick.com

and

Sunni P. Beville, Esq. (*Pro Hac Vice* Pending)
Tristan G. Axelrod, Esq. (*Pro Hac Vice* Pending)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
E-mail: SBeville@BrownRudnick.com
E-mail: TAxelrod@BrownRudnick.com

*Counsel to the Coalition of Abused Scouts for*
*Justice*