1

```
 1                  UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
 2

                                   .    Chapter 11
 3    IN RE:                        .
                                    .    Case No. 20-10343 (LSS)
 4    BOY SCOUTS OF AMERICA and     .
      DELAWARE BSA, LLC,            .    Courtroom No. 2
 5                                  .    824 North Market Street
                                    .    Wilmington, Delaware 19801
 6                                  .
                     Debtors.       .    August 31, 2020
 7    . . . . . . . . . . . . . . . .    11:00 A.M.

 8

 9                        TRANSCRIPT OF HEARING
           BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                  UNITED STATES BANKRUPTCY JUDGE

11    APPEARANCES:

12
      For the Debtor:        Derek C. Abbott, Esquire
13                           MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                             1201 North Market Street, 16th Floor
14                           P.O. Box 1347
                             Wilmington, Delaware 19899
15
                             - and -
16
      For the Debtors:       Jessica C. Boelter, Esquire
17                           SIDLEY AUSTIN LLP
                             787 Seventh Avenue
18                           New York, New York 10019

19    Audio Operator:        Ginger Mace

20    Transcription Company: Reliable
                             1007 N. Orange Street
21                           Wilmington, Delaware 19801
                             (302)654-8080
22                           Email:  gmatthews@reliable-co.com

23    Proceedings recorded by electronic sound recording;
      transcript produced by transcription service.
24

25
```

```
 1   APPEARANCES (Continued):

 2   For Century Indemnity:    Tancred Schiavoni, Esquire
                               O'MELVENY
 3                             7 Times Square
                               New York, New York 10036
 4
     For Abuse Survivors:      Paul Mones, Esquire
 5                             PAUL MONES PC
                               13101 Washington Boulevard
 6                             Los Angeles, California 90066

 7
     For Interested Parties:   James Stang, Esquire
 8                             PACHULSKI STANG ZIEHL JONES LLP
                               919 North Market Street, 17th Floor
 9                             Wilmington, Delaware 19801

10
     For Herman Law:           David Klauder, Esquire
11                             BIELLI & KLAUDER, LLC
                               1204 North King Street
12                             Wilmington, Delaware 19801

13                             - and -

14                             Jeffrey Herman, Esquire
                               HERMAN LAW
15                             1800 North Military Trail
                               Boca Raton, Florida 33431
16
     For Coalition of          Stanley Tarr, Esquire
17   Abused Scouts:            BLANK ROME
                               1201 North Market Street
18                             Wilmington, Delaware 19801

19
     For Brown Rudnick:        Sunni Beville, Esquire
20                             BROWN RUCKNICK
                               One Financial Center
21                             Boston, Massachusetts 02111

22

23

24

25
```

MATTER GOING FORWARD:

#1) Debtors' Motion Pursuant to Section 105(a) of the
Bankruptcy Code and ¶ 27 of the Bar Date Order for Entry of
an Order (I) Supplementing the Bar Date Order and (II)
Granting Related Relief (D.I. 1145, Filed 8/25/20).

**Ruling: 65 - Matter Continued to September 9th**

| EXHIBITS | I.D. | REC'D |
|---|---|---|
| Declaration of Evan Roberts | | 11 |
| Declaration of Dr. Shannon Wheatman | | 11 |

1      (Proceedings commenced at 10:06 a.m.)

2          THE COURT:  Good morning, counsel, this is Judge

3   Silverstein.  We're here in the Boy Scouts of America LLC --

4   is it Boy Scouts of America; case number 20-10343.

5          And, Ginger, can you remind us of the protocol for

6   the hearing.

7          THE CLERK:  It is extremely important that you put

8   your phones on mute when you are not speaking.  When

9   speaking, please do not have your phone on speaker as it

10  creates feedback and background noise and it makes it very

11  difficult to hear you clearly.

12         Also, it is very important that you state your

13  name each and every time you speak for an accurate record.

14  Your cooperation in this matter is greatly appreciated.

15  Thank you.

16         THE COURT:  Let me turn it over to debtor's

17  counsel.

18         MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

19  of Morris Nichols here for the debtors. Good morning, Your

20  Honor.

21         First, I want to thank the court for making itself

22  available for on an expedited timeframe for this motion and,

23  second, Your Honor, just wanted to make sure that you had

24  received the amended agenda and response to pleadings that

25  were filed over the last several days.

1       THE COURT:  I have and I also received another

2   objection that was hand-delivered this morning.

3       MR. ABBOTT:  Thank you, Your Honor.

4       Ms. Boelter from the Sidley firm is going to

5   present this motion, so I will turn it over to her, if I may?

6       THE COURT:  You may.  Ms. Boelter.

7       MS. BOELTER:  Thank you, Your Honor.  Jessica

8   Boelter, Sidley Austin, on behalf of Boy Scouts of America.

9       Again, I would like to echo Mr. Abbott's remarks.

10  We very much appreciate Your Honor hearing this very

11  important matter on a shortened notice basis.

12      Today, we are here on the debtor's motion,

13  pursuant to 105(a) and paragraph twenty-seven of the bar date

14  order requesting that the court supplement the initial bar

15  date order.

16      We received, Your Honor, one informal response and

17  four other filed responses.  As Your Honor noted, there was

18  one filed this morning, actually for our purposes.  It did

19  not hit the docket until 10:56 a.m.  I haven't had the

20  opportunity to review it, but I did see it pop up on my

21  screen.

22      Let me at a very high-level talk through those

23  before we turn to the evidence and the argument for purposes

24  of today's hearing, just so the court understands where we're

25  at.

1      The informal response that we received was from

2  the Edelson, P.C. law firm.  Attached as Exhibits J-1 through

3  J-5 to Mr. Roberts' initial declaration, were transcripts of

4  television advertisements by an organization calling itself

5  The Sexual Abuse Survival Legal Helpline. And, again, those

6  ads were sponsored by a law firm titled, "Edelson, P.C."

7      Edelson has represented to the debtors that it is

8  no longer airing those ads and FTI, which as we'll get into,

9  is the debtor's media and communication consultant, has

10  confirmed that since the bar date order was entered on May

11  26th, Edelson, indeed, taken those advertisements down.

12      Edelson has also represented to the debtors that

13  it does not intend to run ads related to the BSA going

14  forward.  We thank them very much for that and for their

15  sensitivity to not only this case, but survivors, in

16  particular.

17      With respect to the actual filed objections and

18  responses, there were three objections filed, one joinder.

19  That joinder was filed by Century yesterday.  It was DI1196.

20      In short, and I'm sure Mr. Schiavoni would like to

21  be heard at some point, it's objecting to the Coalition's

22  pleading which I'll get to on the grounds of, among other

23  things, there are pending issues with respect to the

24  Coalition's 2019 filing.  So, I'm sure we will hear more

25  about that.

1    The two objections that I've had the opportunity

2  to review, again one just hit the docket at 10:56.  I don't

3  even know the name of the objecting party at this point. But

4  the two that I've been able to review were from Herman Law,

5  Docket Number 1186.

6    Herman Law, in essence, explains to us that it

7  represents survivors of sexual abuse, not only against the

8  BSA, but other youth serving organizations.  Herman Law is

9  concerned that the relief the debtors are seeking today may,

10  in fact, impact its advertisements with respect to these

11  other organizations.

12    We're happy to clarify, Your Honor, if it's not

13  already clear, that the relief we're seeking today pertains

14  to the BSA in light of the impending claims bar date.  It

15  does not apply to those other organizations.

16    To the extent, however, there are statements in

17  Herman Law's advertising pertaining to the BSA claims bar

18  dater, I will address those when we get to the argument

19  component of today's hearing.

20    I'd also just like to note, however, Your Honor,

21  that I thank Herman Law for pointing out in its pleading that

22  it has no objection to action being taken against parties

23  that are, in fact, utilizing false and misleading advertising

24  such as referring to a so-called $1.5 billion dollar fund.

25  We appreciate them pointing that out.

1          And then the other filed objection was filed by,

2  again, a group referring to itself as the Coalition of Abused

3  Scouts for Justice. This group has, I believe, six law firm

4  representatives.  Their arguments center on essentially First

5  Amendment issues.  And, again, when we get to the argument

6  portion of today's hearing, our argument is, in fact, going

7  to focus on those issues.

8          Again, I haven't had the opportunity to review the

9  new objection filed. We're happy to deal with that as it

10 comes up at the hearing and address any other issues on the

11 filing. But, if not, I would just recommend, Your Honor, that

12 we briefly turn to the evidence portion of the hearing and

13 then I can turn to argument.

14          THE COURT:  We can turn to the evidence.  I'm

15 happy to hear that.  But I have reviewed each of the

16 advertisements and some I do not find troubling at all.

17          So, we're going to need to hit this one by one.

18 And I need to understand, in particular, why I can enter on

19 this motion an order that, to me, could reach communications

20 that I do not think are an issue.

21          And that's what I'm going to need to understand

22 and I'm not sure if I'm going to fully appreciate it at this

23 emergency hearing.  But I want a targeted discussion because

24 the order, the one sentence couple of phrase order, to me, is

25 incredibly broad.

1    So, we can do the evidence and I'll hear argument,

2 but I'm letting you know in advance, I have reviewed each and

3 on many of these, I've written what's wrong with it, no

4 issue.  So, I need to understand how I can prohibit this type

5 of speech.

6    MS. BOELTER:  Fair enough, Your Honor.  And I

7 think what you will hear, as we walk through the

8 presentation, from the debtor's perspective, and I will walk

9 through, as I said, in a short time from now, there are

10 really five components that we think are essential to any

11 sort of communication or advertisement when it comes to

12 issues pertaining to the bar date.  But we're happy to walk

13 through some of the more trouble statements, as well as those

14 five components during the course of today's presentation.

15    THE COURT:  Okay.

16    MS. BOELTER:  So with that, Your Honor, and I

17 guess the good news is from the debtor's perspective the

18 evidentiary presentation is brief.  We don't intend to

19 present any affirmative testimony today.

20    We did submit three declarations.  The first was

21 attached as Exhibit B to the debtor's motion and it was the

22 declaration of Mr. Roberts, Evan Roberts.  He's a senior

23 director at FTI Consulting, which is the debtor's public

24 relations and communications consultant.

25    FTI accessed the various advertisements and

1   transcribed those for purposes of the motion and, obviously,

2   y our review.  Those transcripts, as you note, are attached

3   to Mr. Roberts' initial declaration.

4           We also submitted the declaration of Dr. Shannon

5   Wheatman. The court will recall that Dr. Wheatman designed

6   the initial noticing program that was effectively uncontested

7   at the initial bar date hearing and was really designed and

8   is designed to reach 110 million Americans. So, that's 95

9   percent of men over the age of 50.

10          That program, by the way, Your Honor, and is why

11  we very much appreciate you hearing us today, is scheduled to

12  launch today.  And it is scheduled to conclude on October

13  17th.

14          Dr. Wheatman has reviewed the ads and expressed

15  concern over the confusion that's going to result and the

16  issues that this was present for the court-approved

17  advertising program.

18          We also submitted last night supplemental

19  declaration of Mr. Roberts.  That was at DI1192.  FTI, again,

20  where Mr. Roberts is employed, engaged a third-party, Deep

21  Root Analytics, to review certain of the paid advertisements

22  pertaining to the BSA.

23          I say certain, Your Honor, because the universe of

24  advertisements that they reviewed was essentially eleven ads

25  that were played in ninety-one markets, approximately between

1  10- and 11,000 times after the court entered the bar date

2  order.  Those are the ads that Deep Root evaluated. They

3  don't include commercial ads that were playing in local cable

4  network. They don't include infomercials and they certainly

5  didn't review Internet or radio or news media, printed news

6  media advertisements.

7         So, Your Honor, as I indicated, we don't intend to

8  present affirmative testimony.  The debtors are prepared to

9  rely upon the declarations.  And with that, we would like to

10  move those declarations into evidence, both Dr. Wheatman and

11  Mr. Roberts.  I see Dr. Wheatman and there's Mr. Roberts are

12  on the Zoom and their available, if parties would like to

13  cross-examine them.

14         THE COURT:  Let me ask, is there any objection to

15  the admission into evidence of Ms. Wheatman's declaration and

16  the two declarations of Mr. Roberts?

17      (No verbal response)

18         THE COURT:  I hear no objection.  They're

19  admitted.

20      (Declaration of Dr. Shannon Wheatman, received into

21  evidence)

22      (Declaration of Evan Roberts, received into evidence)

23         THE COURT:  Does anyone wish to cross-examine?

24  Let's start with Ms. Wheatman.

25      (No verbal response)

1          THE COURT:  I do not hear anyone.

2          Does anyone wish to cross-examine Mr. Roberts?

3     (No verbal response)

4          THE COURT:  I do not hear anyone.

5          Ms. Boelter.

6          MS. BOELTER:  Thank you, Your Honor.

7          And with that, we will move along to the argument

8    portion of the presentation.

9          The real substantive objection that the debtors

10   received to the relief requested in the motion was the

11   objection that was filed by the Coalition.  And that

12   objection largely raised First Amendment issues, and because

13   of that, my remarks today are going to be focused on First

14   Amendment issues, pertaining to the relief that we're

15   seeking.

16          As a threshold matter, Your Honor, not all speech

17   is created equal when it comes to the First Amendment. The

18   Supreme Court has clearly recognized time and again that

19   commercial speech is a different animal.  And the Supreme

20   Court has distinguished between commercial speech and non-

21   commercial speech when it comes to the application of the

22   First Amendment.

23          To be clear, Your Honor, the universe of speech at

24   issue in today's hearing is commercial speech. We're talking

25   about paid for print advertising, paid for Internet

1  advertising, radio advertising, television advertising.  And

2  by television advertising, I'm referring to both commercial

3  and infomercials. These are all advertisements that were paid

4  for by sponsoring organizations.

5         And as I mentioned previously, we surveyed a

6  number of the television ads.  It was actually too voluminous

7  and nearly impossible to get here in time to survey all of

8  them, but that's what we're talking about.

9         We are not talking about the ability of plaintiff

10 lawyers, other lawyers or other parties in interest to talk

11 to media outlets.  Indeed, the USA Today and the Wall Street

12 Journal has covered not only this motion, but also the

13 bankruptcy case more generally and we're not seeking any

14 relief with respect to those communications.  We may not

15 agree with those communications, but we're not seeking any

16 relief with respect to those communications.

17        Now, the Supreme Court has repeatedly found that

18 attorney advertising which is largely what we're talking

19 about here is commercial speech.  And that makes sense when

20 you look at Supreme Court jurisprudence under Zauder and many

21 of the other cases that articulate how the court looks at

22 commercial speech.

23        So the Supreme Court applies an effectively

24 straightforward approach, a common-sense approach, as it

25 calls it, and it says that it distinguishes between speech

1 proposing a commercial transaction and other varieties of

2 speech.  In this case, all of what we are talking about is

3 clearly of the commercial variety.

4         There are attorneys or organizations, on the one

5 hand, trying to engage with perspective clients, on the

6 other, in exchange for a form of compensation.  In fact, I

7 know this was suggested in the Coalition's pleading that some

8 of the ads may be intended for informational purposes or for

9 educational purposes, but they simply aren't.  They're

10 selling a good to potential claimants, and that's legal

11 services.

12         And, in fact, I should note, Your Honor, that

13 there was not a single objection to the debtor's expansive

14 noticing program which, again, was designed to reach 110

15 million people on the grounds that the noticing program was

16 inadequately informative or would fail to educate

17 individuals.  There just isn't an information or an education

18 gap with respect to the debtor's noticing program.

19         And, in fact, you may also remember that parties

20 actually argued, including the United States trustee and the

21 TCC, that the initial form of our notices contained too much

22 information about the bar date and what the debtor's

23 intentions were for these Chapter 11 cases.

24         So if these ads were motivated by information or

25 educational purposes, the individuals in question, the law

1  firms in question could have coordinated with the debtors.

2  None of them did that.  I wish they would have.  We would

3  have saved the estate millions of dollars if they had done

4  that, but they didn't.

5          The advertisements --

6          THE COURT:  Did they have to?  I'm not sure I

7  understand the point of that, what the import of that is.

8          First of all, I don't know that they got notice.

9  Second of all, was it any obligation on their part to engage

10  in the bar date order motion?

11          MS. BOELTER:  So, Your Honor, from our

12  perspective, certain of these attorneys definitely received

13  notice and they've been involved in these cases including, at

14  the time of the petition date.  They knew about the

15  bankruptcy case.  The advertisements talk about the

16  bankruptcy case in many instances, so clearly, they were

17  aware.

18          If the Coalition wants to shield the

19  advertisements by suggesting that there is inadequate

20  information or inadequate education about the debtor's

21  bankruptcy practice, what we're arguing, Your Honor, is that

22  simply doesn't make sense.  There's definitely enough

23  information and there's definitely enough education.  And if

24  people wanted the debtors to say more, we would have been

25  happy to do so.

1        In our view, these are clearly commercial

2   advertisements.  They're not informative pieces.  They're not

3   education pieces.

4        And as commercial speech, the Supreme Court's

5   guidance basically says we look at this through two separate

6   lenses.  Lens one, as we look at the nature of the

7   expression.  In other words, whether the commercial speech is

8   deceptive, false or misleading.

9        Then for non-deceptive commercial speech, the

10  court considers the governmental interest that is served by

11  the restriction the parties are seeking.

12       In this case, I'm going to go over both, Your

13  Honor, because we have issues on both of those inquiries. So

14  let's start with commercial speech; that is deceptive, false

15  and misleading.

16       This speech simply does not have First Amendment

17  protection.  The court has said that time and again.  The

18  Federal Government, including arms of the Federal Government,

19  like this court, is free to prevent the dissemination of

20  deceptive, false and misleading commercial advertisements.

21       Now, FTI, working with Deep Root Analytics,

22  analyzed seven of ten test metrics that we gave to them with

23  respect to the eleven ads that they looked at. And this is

24  more pervasive, as I mentioned, in the eleven ads that were

25  shown thousands and thousands of time.  But I want to focus

1   on, I think, four or five issues that came up clearly in the

2   eleven ads and other ads that we have seen.

3          So let's start with the term anonymous.  This term

4   is not the same as confidential, which is what the Coalition

5   contends.  Anonymous means that your name will be assigned a

6   John or Jane Doe designation in the claim's submission

7   process.

8          The Coalition suggested anonymous is the same as

9   confidential. Confidential just means the information is not

10  going to be made publicly available. And we struggled over

11  both confidentiality and anonymity when we were preparing the

12  confidentiality provision of the bar date order.

13         This is extremely complicated and the TCC was very

14  sensitive to the ability of survivors to come forward and

15  issues relating to the ability of survivors to come forward.

16  So we spent extensive time on anonymity as opposed to

17  confidentiality with the TCC and the confidentiality protocol

18  in the bar date order.

19         And now while the survivor proofs of claims will

20  remain confidential, per the bar date order, and by

21  confidential, I mean they will not be made publicly

22  available; according to paragraph 7(e) of the bar date order,

23  the survivor proof of claims forms, including the forms with

24  the individual's names, can be provided up to fourteen

25  separate categories of people, not individuals; categories of

1   people.

2          That ranges from advisors to the debtors, the

3   debtor's officers, directors, employees, local counsel that

4   may have been implicated in the survivor proof of claim form.

5   And, by the way, just to demonstrate the difference between

6   anonymity and confidentiality, the ad hoc committee of local

7   counsels is only entitled to receive, again, on a

8   confidential basis, redacted survivor proof of claim forms,

9   redacted for identifying information.  That's anonymity.

10          All of these other parties, debtors, debtor's

11  officers, employees, some local counsel where claims were

12  asserted against them, the TCC's advisors, the United

13  Trustee, the insurers and their counsel, the FCR and its

14  counsel, and the mediators, all of these parties are entitled

15  to receive, on a confidential basis, unredacted survivor

16  proof of claim forms.

17          This is far from anonymous.  By the time that

18  process is done, there may be 100 or more individuals that

19  have seen the entirety of the form.  We were very careful

20  about using words confidential and anonymous separately, and

21  they mean very different things to survivors of abuse.

22          THE COURT:  Okay. So, Ms. Boelter, before you go

23  on, I will say that this is one area where I -- that was on

24  the papers persuasive to me that there's a difference in the

25  term. And the only question is, how do I approach this and

1  what's the right way to approach this?

2          But the difference between anonymous and

3  confidential, I think, is an issue.  I don't know yet what

4  I'd do about it, but that was one area that I thought the

5  debtors were justified in bringing to my attention.

6          MS. BOELTER:  Thank you, Your Honor.

7          And we have some thoughts that I'll get to on how

8  to remedy some of these circumstances, particularly if the

9  court feels uncomfortable with the breadth of the order

10  that's been proposed.

11          The second issue that the debtors are particularly

12  concerned about are statements that the compensation fund

13  could be in excess of $1.5 billion dollars.  We, Your Honor,

14  have actually no idea where this number came from.  It's

15  certainly not grounded in any facts of this case.

16          We believe that this is a false statement.  But,

17  at best, it is misleading and deceptive to potential

18  survivors.  It just has no basis, that we can see, in

19  anything that is before the court.

20          Third, Your Honor, and I'll concede, this is a

21  closer call.  But the debtors take issue with any statements

22  that a fund currently exists.

23          Now aspirationally, yes, the debtors have

24  indicated that their objection for the Chapter 11 case is to

25  establish a victim's compensation fund.  But as the court

1  knows, a lot of parties have to agree before we get to that

2  point.  That's why Your Honor appointed a mediator.  That's

3  why the debtors are working hard with other parties in

4  interest through the mediation process.  But we cannot

5  provide that assurance.  It's our goal, but I can't provide

6  that assurance.

7           And, in fact, as I referenced a few moments ago,

8  you'll recall that the TCC objected to exactly this type of

9  language concerning the potential outcome of this Chapter 11

10 case and the plan itself in the court approved notices.

11          Fourth, Your Honor, somewhat related but I also

12 view this as falling within the anonymous category.

13          Statements that there will be a substantial or

14 significant distribution to abuse survivors.  A substantial

15 or significant distribution to abuse survivors is highly

16 dependent on a number of factors which are actually being

17 mediated right now.

18          There's a lot of unknowns there, but one of the

19 biggest unknowns is the participation of non-debtor third-

20 parties in this bankruptcy proceeding and, in particular, the

21 plan.  That may make the difference between a modest

22 distribution and a substantial distribution.

23          Now the Coalition, I believe, in their pleading

24 tried to suggest that statements concerning substantial or

25 significant distributions are essentially equivalent to the

1  debtor's statements that they want to equitably compensate

2  survivors.

3          Your Honor, this makes no sense.  These are very

4  discreet concepts.  Equitable compensation means similar

5  creditors are treated similarly, regardless of dollar value

6  recoveries.  A plan could be found to treat creditors

7  equitably when that plan only provides a few cents on the

8  dollar. A plan could also be found to treat creditors

9  equitably when it provides for payment in full.

10          There is simply no relation to the notion of

11  equitable compensation and a substantial or significant

12  recovery.  And, at least, 11 percent of the ads that the FTI

13  organization reviewed contained -- I'm sorry 36 percent of

14  those ads contained that type of language.

15          We think those are two very distinct concepts, and

16  we think it is, again, false to say substantial or

17  significant, but if you don't agree with that, at least, at

18  best, it's misleading to survivors.

19          And then, fifth, Your Honor, --

20          THE COURT:  Should we tell survivors they're going

21  to get a minimal recovery?  I mean what's the -- are you

22  going to get into this in your second part of the standard?

23          MS. BOELTER:  From our perspective, Your Honor --

24  yes, fair question.

25          From the debtor's perspective, you know, I think

1   the court would agree that I can't make any representations

2   about creditor recoveries outside of an approved disclosure

3   statement under Section 1125 of the Bankruptcy Code.  So,

4   from our perspective, any sort of -- if the debtor makes the

5   statement it's not supported under 1125 in the Code

6   generally.  And any other statement, again, it's just not

7   rooted in reality.

8            So when I get to the second piece, which is if you

9   disagree with us that these types of statements are false,

10  misleading or deceptive, we think the court, otherwise, still

11  should under the second scope of the Supreme Court's analysis

12  take actions to restrict this type of statements.

13           And then the final piece, Your Honor, that was

14  troubling to us, particularly in light of the history of

15  these cases, is that some of the ads have left the claimant

16  to believe that they must hire a lawyer to submit a claim, so

17  they include statements like, you must call 1-800-dot, dot,

18  dot now and work through our organization.

19           There is no requirement in this case that a

20  claimant retain a lawyer to submit a claim.  Going back to

21  Mr. Stang's comments at the original bar date order hearing,

22  he explained to the court that the actual members of his

23  committee, not the attorney members, but the actual members

24  of his committee spent several hours reviewing the proof of

25  claim forms and the notices themselves because they wanted to

1  ensure that survivors like them could understand the notices,

2  understand the form, and complete the form without the aid of

3  an attorney.

4          These types of statements, and we pointed out

5  others in our pleadings, we believe don't get the benefit of

6  the First Amendment because we believe they are, in fact,

7  false, misleading, and deceptive.

8          If Your Honor disagrees with that, with respect to

9  any of these components, then I would turn to the next

10 portion of our presentation where the Supreme Court has

11 clearly held that the court may --

12         THE COURT:  Let's go back.  Let's go back.  I want

13 to make sure I understand your last argument, that an ad that

14 says or that may be -- an ad that says at the end of it call

15 us and here's our helpline number.  And a compassionate

16 person is on the other end, you think that's something that

17 tells people they have to hire a lawyer?

18         Don't all ads we see from lawyers have information

19 on how to contact them?  And you don't ever need a lawyer to

20 file a lawsuit.  So how is that false or misleading?

21         MS. BOELTER:  So containing contact information

22 for the law firm that is conducting the advertisement, we

23 don't think it's false or misleading.  The ads contain

24 statements like, you must act now; you must call --

25         THE COURT:  How is that now true?  They need to

1  act.  Claimants need to act.

2         MS. BOELTER:  Agree with that, Your Honor, but

3  it's often said without the bar date and it's coupled with a

4  statement that in order to act, you need to call this 1-800

5  number, not the official claim 1-800 number, but the 1-800

6  number for a particular law firm.  That that is the vehicle

7  to acting.  That's where we have an issue.

8         THE COURT:  You don't think that people understand

9  this is advertising for a law firm to get clients?  You don't

10  think that?

11        MS. BOELTER:  We're very concerned about it.  And

12  it's our discharge and our reorganization that that risk, if

13  we are wrong about this.

14        THE COURT:  If you're wrong about this and I were

15  to say that people can't -- well draw some line and I'm not

16  sure what line it would be between people contacting lawyers

17  and not, then won't we also run the risk that people, in

18  fact, are unrepresented?

19        And my experience is, both as a lawyer and a

20  judge, that represented people in any circumstance do better.

21  Just in general, they do better.  And I have a concern that

22  if we're discouraging people from, who want to, to retain

23  counsel that that is disadvantageous to them.

24        MS. BOELTER:  Your Honor, fair point.  And that is

25  certainly not the debtor's intention with respect to this

1  particular motion.

2        You know, if the court feels that this is overly

3  road, I think there are certain basics that could not only

4  inform the public who is -- and actually provide the

5  information and education, that the Coalition suggest they're

6  getting from these ads, but that also permits them to access

7  an attorney.

8        So, for example, many of the ads don't contain the

9  actual bar date itself.  Many of the ads don't refer to an

10  official claim's agent or the claims agent's website.

11        I have no issue with an attorney soliciting a

12  client in conformance with ethical rules in their particular

13  jurisdiction, but I don't want the client to think that they

14  are bound by only that law firm or that attorney because

15  that's the advertisement that's in front of them and they

16  haven't yet seen the debtor's advertisement, which makes it

17  very clear it's an official communication that provides

18  official contact.

19        THE COURT:  Okay.

20        MS. BOELTER:  So what I would say, Your Honor, is

21  that, again, and we can talk about how to craft this to deal

22  with, again, what we think are false and misleading deceptive

23  statements.

24        But I would note, Your Honor, that even for

25  commercial speech that is not deceptive, the court may

1  restrict that speech, provided there is a substantial

2  governmental interest in restricting the speech.

3          And multiple courts have found that the bankruptcy

4  court and the bankruptcy laws provide a substantial

5  governmental interest.  In fact, I think there's -- I'm

6  looking at the Zoom screen now.  I see a lot of bankruptcy

7  lawyers and, obviously, you yourself, Your Honor, I don't

8  think any of us can seriously question the importance of the

9  federal bankruptcy system to our legal system, the American

10  legal system and our economy.  It's one of the fundamental

11  underpinnings of the American economy.

12          And the bankruptcy system has a number of key

13  components that feed into a Chapter 11 debtor's ability to

14  reorganize.  Component one is this is a collective action.

15  And it permits all parties with interest in the debtors to

16  come forward.  It provides the debtors with a breathing spell

17  from creditors.  It provides an organized process for the

18  submission of claims against the debtors.  That's why we're

19  here today.

20          And it's that organized claims process that

21  facilitates the debtor's reorganization and discharge.  And,

22  of course, underneath all of that, is the notion of due

23  process which is what we grappled with extensively in putting

24  together the noticing program, not only from a breadth

25  perspective, but also from a content perspective.

1          You know the claims process, Your Honor, in this

2  case, was so important that we spent several hours before the

3  court walking through the objections and the language and the

4  notices.  As I said at that time, Your Honor, that followed

5  multiple months of negotiations between the debtors and the

6  TCC representing the survivors.  In fact, we went back and

7  looked at it and just leading up to that bar date cost the

8  estate $600,000 dollars which is on top of the $6.8 million

9  that the noticing program is designed, you know is going to

10  cost the debtor's estate.

11          Now, there's some notion that we've heard from the

12  plaintiffs that we're somehow trying to limit the number of

13  claims with this motion.  And I just want to address that

14  head on, Your Honor.  That's false.

15          As I said, we're launching today a noticing

16  program that goes out to 110 million individuals.  We have

17  repeatedly encouraged all survivors of abuse to come forward.

18  We're in no way trying to quash that with this motion or,

19  otherwise, impede their ability to file claims.

20          I take what Your Honor indicated to heart about

21  people deserve to be represented, if they so choose and that

22  is certainly not what we're trying to do here.  We are not

23  trying to cut off a claimant's ability for adequate

24  representation in connection with this case.

25          But no one said to us at the time and no one

1  objected on the grounds that somehow, we weren't reaching

2  enough people or that the noticing program wasn't designed to

3  appropriately reach potential survivors of sexual abuse.  So

4  we think our noticing program, just considering your, this

5  court's, substantial governmental interest.  We think the

6  noticing program and the bar date is critically important to

7  the claim's process which is one of the fundamental tenents

8  of the bankruptcy law and is fundamentally important to the

9  debtor's ultimate successful reorganization from these cases.

10  So we think we do have a substantial government interest.

11        Now let me turn to two of the principal concerns.

12  And I'm now, again, shifting away from false, misleading,

13  deceptive advertising to our concerns beyond that, just with

14  the advertising program, more generally.

15        One, we think it's creating confusion.  We have

16  received calls from individuals who called one of the 1-800

17  numbers, gave information to an attorney, can't recall who

18  the attorney was or what number they called because there are

19  a number of ads out there, and called us to say did you get

20  our information.

21        We had an individual call a local scout executive

22  because you can't tell from the ads the difference between

23  BSA and the local counsels, called a local scout executive

24  and said, they had also given their name in response to a 1-

25  800 number.  The thought they had completed the requisite

1  information.  They wanted to confirm that BSA had their

2  claim. And, of course, when we checked Russ Omni's website,

3  there was no -- with that individual's name there was no sign

4  of that individual.

5           So what we are very concerned about, Your Honor,

6  is that we are going to find ourselves, you know, there's no

7  wood near me, out of bankruptcy this time next year and

8  there's going to be an individual that comes forward that

9  says I respond to the 1-800 number, it said I had to act now,

10 I did.  I called the number.  And where's my claim?  You

11 know, I told the individual about my claim.  Where is it?

12          And that leads me to my next point in our second

13 area of concern is that the organizations running the

14 advertisements have essentially now anointed themselves the

15 gatekeepers of claims.  They're not fiduciary duties to all

16 claimants like the TCC. They're not agents of the court, like

17 the official claim's agent website.

18          The official claims agent takes in the

19 information, submits it to the claims process and that's

20 dealt with here with Your Honor.  They're not the United

21 States Trustee, the watchdog of the bankruptcy process.

22 They're not you.  They're not the federal district court

23 which has the ability to adjudicate these claims.

24          They're essentially commercial parties who are

25 making -- taking phone calls and making legal determinations

1   on the validity of claims, including whether they should be

2   submitted against the debtor's bankruptcy estate based on

3   their own compensation incentive.  That's what makes us very

4   concerned about the advertising program.

5           And from our perspective, Your Honor, it's not too

6   late to deal with this.  The media program that the debtors

7   are running launches today.  It's going to run through mid-

8   October and then we have another month before the bar date

9   itself.

10          We're asking the court to get involved because

11  we're concerned about these issues.  From the debtor's

12  perspective, and this may provide some roadmap to alleviating

13  maybe some of the concerns of the court.  If folks want to

14  run advertising with respect to the debtor's bar date, we

15  think it needs to have, what I'm going to call, five core

16  concepts.

17          Concept one should inform people about the bar

18  date itself.  It's not hard to put November 16th in your

19  advertisement.

20          Concept two, it needs to include somewhere orally

21  or in writing the official claim agent's website and phone

22  number.  That's not precluding plaintiff's lawyers from

23  including their own phone number and offering their own

24  services, but we do think that they need some direction to an

25  official site where they can get official documentation.

1          We also think, and this was, again, discussed

2   extensively at the hearing, and also with the TCC prior to

3   the hearing, that the language should be understood by

4   laypersons and should be sensitive to sexual abuse survivors.

5   I don't think that the ads that we're looking at today really

6   run afoul of that, Your Honor.  But I think as folks look

7   towards the future, that's very important.  It was important

8   to the TCC and it's important to the debtor.

9          Fourth, while we very much take your point that an

10  attorney should be able to include their own contact

11  information in the advertisement in question, it doesn't need

12  to say you must contact me.  It's okay to say you must act,

13  but you must contact me suggesting that the only way to

14  proceed is through an attorney.  We think that's deceptive

15  and misleading.

16         And then finally, we don't think there should be

17  statements in these advertisements about the size of the

18  fund.  The $1.5 billion dollars has no basis and any fact.

19  The magnitude of recovery that claimants can expect from the

20  Chapter 11 case, as I indicated if we were under 1125 or a

21  plan solicitation period, certainly the debtors could not

22  make any statements about the magnitude of recovery without

23  getting bankruptcy court approval.  And we don't think the ad

24  should be making statements about the magnitude of recovery

25  in this case.  It's just misleading and deceptive to

1  potential claimants.

2       And then finally, as Your Honor noted, we're very

3  concerned about the anonymity point.  And they should not be

4  representing that claimant will remain anonymous. We don't

5  think -- I don't think that those are controversial

6  principles that I just outlined.

7       Certainly, when the TCC submitted its alternative

8  notice, this was attached to the objection that filed to our

9  bar date, that alternative notice contained each of these

10  five core concepts.  Our notice contains them.  I think the

11  notices that are designed to not confuse the process should

12  include those components.  And I would be, I think a lawyer

13  would be hard-pressed to explain why each of those components

14  simply shouldn't be present in their ad.

15       With that, Your Honor, I don't have anything

16  further. I understand you may have questions.  I'm happy to

17  answer, can come back throughout the course of today's

18  proceeding to answer them.  And I'd, of course, like to

19  reserve some time to respond to the objections.

20       THE COURT:  Your talking in generalities.  And

21  while I may agree or disagree with some of the big

22  generalities, I don't -- I need to understand how I could

23  enter an order that would be streamlined to address whichever

24  of these issues I think fall into a category that could be

25  the subject of a prior restriction on speech.

1          And that's where in looking at the actual examples

2   of speech that the debtors put before me, I'm having some

3   issues.  And let me point out a few, and I'd like specific

4   responses.

5          So, Tab D. And actually, I think the Herman Law

6   Group replied but I didn't read their reply until after I had

7   read all of these.  I'll give you a moment to get them.

8          MS. BOELTER:  Apologies, Your Honor.

9          Too much paper.

10          THE COURT:  I know that.

11          Okay. So Tab D is an infomercial. And if I had to

12   guess it's a good twenty minutes, thirty minutes infomercial.

13   It is very general.  It mentions the Boy Scouts, if you will,

14   in passing.  Among a list of institutions that is being

15   discussed related to survivors of sexual abuse and sexual

16   exploitation.

17          And, in fact, in my read, it focuses on the

18   Catholic Diocese.  How could I possibly restrict this?  This,

19   to me, is not specifically directed at the Boy Scouts or at

20   the -- or at the bar date, or anything.  It just happens to

21   list Boy Scouts a couple of times as its mentioning the

22   Catholic Church, other churches, Temples, schools, foster

23   homes, orphanages and the Boy Scouts.

24          How does this fall into what you've just outlined

25   to me?

1        MS. BOELTER:  So, Your Honor, we agree with where

2  you are coming out on this.  We reviewed the Herman Law

3  objection, have looked at the infomercial again.

4        As I said at the outset of my remarks, we were not

5  and are not intending in any way to restrict Herman Law's

6  ability to make advertisements or infomercials of this

7  nature.  Our concern is if in the future there were

8  statements about the Boy Scouts and, in particular, the Boy

9  Scouts claim's process, we would ask for relief from this

10 court.  But as constituted, you know, Herman Law's

11 infomercial, which is much broader than anything happening

12 here, you know, we were not intending to restrict that.

13        THE COURT:  Okay.  But that was given to me as

14 something that should be restricted.  That is where, as I

15 started reading these, I have concerns.

16        Let's look at, and I'm just pulling them somewhat

17 at random here, F-3 which starts out by saying,

18        "This is a paid advertisement for legal services

19 by Attorney Andrew Van Arsdale."

20        I don't think there is any confusion that this is

21 an advertisement for attorney services.

22        Then what part of what he's saying in this

23 advertisement, what affirmative things that he is saying as

24 part of this advertisement is incorrect?

25        MS. BOELTER:  Good question, Your Honor.  Now

1  again, we don't have the video clip which often these have

2  words on the screen at the same time as the video.  As I look

3  at this, really what is missing from this particular ad is

4  the, as I mentioned, the second tenant that we would look for

5  which is some reference, whether in print or in the voice-

6  over, to the official claims website or official claims

7  (indiscernible).

8         THE COURT:  Okay.  So, there is nothing

9  affirmatively said in this advertisement that's an issue.

10 It's just you want more.  You want them to say something

11 more.  You want me to compel someone to add something to

12 their advertisement when they're advertisement, itself, has

13 not false speech or anything deceptive in it.

14        MS. BOELTER:  Yes.

15        THE COURT:  But you say there are gaps.  So, I

16 would have to do that under the governmental interest prong.

17        MS. BOELTER:  Correct.  Correct.  This is not

18 under prong one.  It would be under prong two.

19        THE COURT:  Okay.  I suspect, then, many of the

20 examples you have given me fall into prong two and not prong

21 one.

22        MS. BOELTER:  That is likely right, Your Honor.  I

23 think the ones that -- I mean, they jump out of the page when

24 its, again, the word "anonymous" or the 1.5 billion.  Those,

25 you know, sort of immediately catch the eye.

1          The other ones are ones that from our perspective

2   maybe they don't contain the bar date at all, they may not

3   use the word "bankruptcy", or in the instance of the ad that

4   you just mentioned did not contain, you know, in addition to

5   the information to the lawyer or the official claims agent's

6   information.

7          THE COURT:  Okay.  And I will say the first add I

8   heard on the radio was one that contained the $1.5 billion

9   dollar number and it did strike me where did that come from.

10  But other than that I didn't find it incorrect.

11          Is there case law that says that I can require

12  someone who is making commercial speech to add something to

13  their speech if, in fact, what they are saying is not false

14  or misleading?

15          MS. BOELTER:  So, how I would respond to that,

16  Your Honor, is that there is case law that goes further than

17  that and so, sort of, by logical conclusion you could do

18  something less.  By that I mean there is case law in both the

19  class action context, and we cited these in our papers, there

20  is also a case, and I'm happy to provide the cite after maybe

21  a brief break, where this occurred at the federal level in

22  connection with the receivership.

23          Taking the class action context courts there have

24  certainly prohibited, essentially, attorney advertising to

25  members of the class.  Often that was, actually advertising

1   and encouraging class members to opt-out of the class by the

2   defendants, but the courts have found that they could, in

3   fact, actually put a full scale prohibition on that type of

4   advertising either under the false, misleading or deceptive

5   prong, or even under the substantial government interest

6   prong.

7           So, I would argue if courts can go that far we can

8   certainly indicate that an official component of, really, the

9   claims agent is an arm of the government for purposes of this

10  proceeding I think courts should be able to mandate that

11  their information is included in the attorney advertising.

12          THE COURT:  And the debtor doesn't think it would

13  be confusing to have both the official information in it as

14  well as the law firm's information in a single advertisement?

15          MS. BOELTER:  We don't, Your Honor.  More

16  information, in my view, is better than less.  It sort of

17  goes along the same lines of my approach has been more notice

18  is better than less notice.  That is how I would view this;

19  more notice as being better then less notice.

20          Certainly when they go to the official claims

21  agent's website, you know, the information there is there's a

22  bankruptcy case, this is how you submit a claim.  We don't

23  view that as confusing.

24          THE COURT:  Okay.  Thank you.

25          MS. BOELTER:  Thank you, Your Honor.

1    THE COURT:  Let me hear from the objectors.  I

2  will start with the Herman Law Group.

3    MR. SCHIAVONI:  Your Honor, this is Tancred

4  Schiavoni.  May I be heard briefly in support or would you

5  prefer not for me to speak or at the end?

6    THE COURT:  Okay.  I'm sorry, who is this?

7    MR. SCHIAVONI:  Tancred Schiavoni for Century.

8    THE COURT:  Ah, Mr. Schiavoni.  Sure, let's hear

9  from the supporters first.

10    MR. SCHIAVONI:  Okay.  So, Your Honor, we joined

11  in the relief that the Boy Scouts have sought.  To be clear,

12  we filed an objection to the bar date motion on the real

13  basis that -- and we sought an appeal on it because to the

14  extent the ultimate order went beyond what the Boy Scouts

15  actually asked for and granted presumptive validity for the

16  proofs of claim I cannot begin to tell you how important,

17  really, this issue is that the Boy Scouts have brought to the

18  court.

19    To the extent the court feels the proof somehow

20  isn't particularized enough I would ask you to seriously

21  consider carrying it over to allow the Boy Scouts to put on

22  more evidence.  The reason why this is so enormously

23  important is Century was defending the claims going to the

24  bankruptcy filing.  These claims were heavily advertised.  I

25  mean it's hard to say that claimants out there didn't know

1  that they could bring a claim against the Boy Scouts, but at

2  the petition date there were 275 claims in the tort system.

3         This entity that, sort of, calls itself the

4  "coalition" it was at the time of the mediation.  This was

5  part of the offers of proof made in connection with the

6  mediation order, the mediation that took place last year.

7  There were approximately another 1,200 claims that this group

8  contended that it had.

9         The claims now have exploded, absolutely exploded

10  as a result of this advertising being done by the coalition

11  to somewhere in the range of 12 to 15,000 claims.  They're

12  coming in, apparently, at a rate, if Mr. Van Arsdale's

13  statements from the press are correct, at over 1,200 a week.

14  That is well beyond anyone's ability to vet these claims in

15  any way at all.

16         What's happening here is this entity, the

17  coalition, is advertising and then channeling -- the ads are

18  being channeled to a website and it's on that website that

19  they're being told that there will be no deposition, no

20  appearance in court, that they will be anonymous.  These are

21  all code words in the mass tort advertising world for your

22  claims will not be tested or that's at least what some people

23  will interpret them to mean and then the website, itself,

24  conveniently channels them to a page which allows them to

25  draw information that could then be put in proofs of claim

1  about names of perpetrators, locations, et cetera.  It's all

2  provided there.

3          This entire process threatens, really, to taint

4  the entire proof of claim process, the vast number of claims

5  coming in through this coalition.  And let's just be clear

6  what this coalition is.

7          First of all, there is not a shred of evidence put

8  in on the 2019 statement by Brown Rudnick.  Really what it

9  is, is it appears to be really just an advertising consortium

10  led by this man, Mr. Arsdale.  And who is Mr. Van Arsdale?

11  Well, he has owned a business for the last decade called

12  Reciprocity which holds itself out as advertising and trading

13  in mass tort claims.  Apparently he graduated the bar in 2019

14  or 2018.  So, he's been a member of the bar in California for

15  a year or two years.

16          The website that people are channeled to they're

17  told that they're joining the coalition when there is no

18  evidence that that is really what it is.  It's really, you

19  know, some sort of advertising coalition.  And they're also

20  told that Mr. Van Arsdale is a lawyer and he's helped

21  thousands of claimants over his career; his career that's

22  lasted about a year and a half.

23          The other member of the coalition is a Mr.

24  Cosanoff [phonetic] who at one time was a real practicing

25  lawyer, but his website, itself, advertising him as no longer

1  practicing law, as being a media commentator, and as being

2  someone who consults on mass tort bankruptcies.  His address

3  in the website is in Texas.  That is where all the ads are --

4  if you are someone coming and reading this you're channeled

5  to this address in Texas when we've been able to find no

6  evidence that he's licensed in Texas or, in fact, has any

7  presence in Texas at all.

8        We sent someone to the address, it appears to be a

9  corporate mailbox drop address.  We have a picture of it in

10  there.  We also went to the address that Mr. Van Arsdale

11  claims to practice out of, it's a store front that appears,

12  more or less, to be mail drops for solo practitioners.

13        I heard Your Honor say people are better

14  represented by counsel.  This is not really what is going on

15  here.  And the ads they're being channeled through are not

16  ads that really in any way accurately present what the

17  situation is here.  They're ads that are designed to

18  encourage people to apply thinking that their claims won't be

19  tested.  That is an incredibly serious concern when we're

20  dealing with a proof of claim process that is going to confer

21  presumptive validity on someone filing the proof of claim.

22        There is a huge number of claims coming in through

23  this.  You could -- there are state by state violations about

24  presenting oneself not as a lawyer, but as a coalition or a

25  foundation.  The entities that are associated with this

1 coalition they're all limited liability companies,

2 professional corporations that under the state bar rules its

3 absolutely mandatory that they be named and hold themselves

4 out as law firms, but that is not what people are told when

5 they're channeled to the cites where they then sign-up.

6 They're being told that they're joining coalition, that it's

7 a foundation, the Boy Scouts trade mark is used on it.  This

8 is way beyond anything that we have seen elsewhere.  It's

9 generated at just an unbelievably adverse outcome.

10          There's just one other thing I would like to say

11 about this in that the claimants here are represented by

12 counsel.  They're represented by the tort committee, that

13 committee, the counsel for it has a fiduciary duty to

14 represent everyone, all the claimants, all similarly situated

15 claimants the same.  They have -- that committee has an

16 enormous interest in making sure that claimants with valid

17 claims are treated in a way that is appropriate and in a way

18 that their claims aren't diluted by claimants who were thrown

19 into this that don't have valid claims.

20          It's extremely telling that the committee has not

21 filed an objection or appeared separately.  What's happened

22 here is the group that represents, in theory, the majority of

23 the claims that was able to put committee counsel in place

24 they've sent Brown Rudnick in separately without the

25 requirement that they represent all claimants equally without

1  a fiduciary duty and they're going to try to now argue that

2  this kind of advertising is appropriate, that this should go

3  on, and, you know, the results here are incredibly damaging

4  both to the Boy Scouts in trying to confirm a plan and to

5  claimants with meritorious claims who will be lost in the sea

6  of claims that have been swept up by this craziness.

7         So, Your Honor, I just ask you to -- I got you

8  that the relief here is challenging.  This is a challenging

9  issue.  Ms. Boelter, I think, had to come to the court on

10 short notice and if the court wants more (indiscernible) her

11 I think she's prepared to give it.  But this issue is a very,

12 very valid issue and its one that really goes to the core of

13 what something is very wrong about this case.

14         Your Honor, thank you.

15         THE COURT:  Thank you.

16         I will let other people talk, obviously, but I

17 want to make clear that what I am looking at here is some

18 targeted relief.  If there are particular entities that are

19 causing as particular problem that should be singled out.

20 It's the broad sweeping nature of the relief that's been

21 requested and the examples put in front of me which, at least

22 on their surface, do not all fall within the categories that

23 could be troubling that I'm struggling with.

24         Let me say I just pulled that one that happened to

25 be Mister, whatever, Van Arsdale out of the air.  There are

1  others that are similar.  I don't know if they are in this

2  coalition or not.  I am not talking about the coalition.  I

3  understand there is some motion that is set for the next

4  hearing to deal with that and I will address that then.

5           What I am trying to understand is what I can do

6  today and, at least, so far the debtor has recognized that,

7  at least, one of the example, the infomercial, the general

8  infomercial is not the type of communication that should be

9  restricted.  This is what I am struggling with.  The broad

10 relief --

11          UNIDENTIFIED SPEAKER:  Your Honor?

12          THE COURT:  -- did not, the targeted relief that

13 may or may not be appropriate.

14          Let's hear from others.

15     (No verbal response)

16          THE COURT:  Mr. Stang, you're muted.

17          MR. STANG:  Thank you, Your Honor.

18          As you know, the tort claimant's committee did not

19 file an objection today.  The tort creditor's committee does

20 intend to file an objection to the coalition's motion for

21 approval of its Rule -- of the Brown Rudnick Rule 2019

22 statement or the one that was filed by them.  It does intend

23 to object to the coalition being admitted as a mediation

24 party.

25          The law -- some of the law firms that had been

1   talked about today Mr. Van Arsdale is part of a group called

2   Abused in Scouting.  Some of the law firms that are called at

3   the debtor's pleadings at one time did represent committee

4   members.  Two committee members were represented by one or

5   more of those law firms.  Those law firms no longer represent

6   committee members.  Those committee members continue to serve

7   and we're glad.  I say we, the committee is glad they have

8   continued to serve.

9          The coalition entity -- well, I agree with Mr.

10  Schiavoni, and you will see this in our objection, we're not

11  quite sure what this thing called "coalition" is.  It may be

12  nothing more than a marketing label, but they did not --

13  those law firms did not procure my firm's employment.  No law

14  firm has more than one person on the committee.  And if

15  there's a suggestion here that somehow the committee is

16  letting these lawyers do something on its behalf that could

17  not be farther from the truth.

18         I'm not sure what Mr. Schiavoni's point was about,

19  you know, the law firms getting my firm employed, but I just

20  wanted you to know that objections will be filed and we did

21  not think this hearing was the right time to get into these

22  issues regarding Brown Rudnick's representation of this thing

23  called a "coalition."

24         THE COURT:  Thank you.

25         Okay.  Let me hear from the objectors and I see

1  Mr. Klauder.  Mr. Klauder, I believe you filed an objection.

2          MR. KLAUDER:  Yes.  Thank you, Your Honor.  David

3  Klauder on behalf of Herman Law.

4          With me is Jeffrey Herman, also, obviously, of

5  Herman Law.  You just entered his *pro hac* order.  I think he

6  does want to be heard.

7          MR. HERMAN:  Good morning, Your Honor.  Jeff

8  Herman from Herman Law.

9          Given that in response to the court's questioning

10 to debtor's counsel they indicated they no longer are seeking

11 to restrict the infomercial in anyway.  Unless the court has

12 questions for me or I misunderstood that I will just stand

13 down.

14         THE COURT:  Thank you, Mr. Herman.

15         No.  I do not have any questions for you.  And I

16 heard Ms. Boelter make that concession and I have no

17 intention of restricting that infomercial.

18         MR. HERMAN:  Thank you, Your Honor.

19         THE COURT:  Thank you.

20         This morning I received an objection on behalf of

21 Napoli Shkolnik, PLLC.  Is someone from that firm on the

22 phone or on the line?

23         MR. HRUBIEC:  Yes, Your Honor.  This is R.J.

24 Hrubiec of Napoli Shkolnik.  Also joining is my colleague

25 from New York, Brett Bustamante.  He is appearing by phone.

1          Essentially, we join in the objections that were

2    filed by other counsel in this matter.  We are only noticed

3    with this matter and (indiscernible) on Friday.  And if Your

4    Honor would like additional briefing we're happy to do so.

5          THE COURT:  Okay.  I see one advertisement,

6    Exhibit O, it looks like of the debtor's presentation

7    submission.  I do see the statement in your advertisement,

8    your firm's advertisement that as a result of this bankrutpcy

9    a victim's compensation fund is being set-up that may be

10   worth over $1.5 billion dollars.

11         Can you give me any context for why that statement

12   is in there or where the $1.5 billion dollar number came

13   from?

14         MR. HRUBIEC:  Your Honor, we have not had the

15   opportunity to file a formal *pro hac vice* of Mr. Bustamante,

16   but with the court's permission I would like him to address

17   that issue.

18         THE COURT:  Yes, certainly.

19         MR. BUSTAMANTE:  Hello, Your Honor.  Can you hear

20   me?

21         THE COURT:  I can, but I'm getting some feedback.

22   If you could pick-up your phone it might help.  And let me

23   remind everyone who is not speaking to mute their phone, I am

24   now getting feedback.

25         MR. BUSTAMANTE:  I believe that's me, Your Honor.

1   I am speaking through a cell phone.  I was only able to join

2   through the CourtCall.

3         Its Napoli's position that it's the likely total

4   value of the Boy Scouts of American and local counsel.  That

5   could be the value of the tort claimants.  As we addressed in

6   our briefing, you know, speculation of the value of the total

7   funds that maybe it is not misleading.  As well as the fact

8   that even if we make those statements to clients it's not

9   detrimental to the lawsuit in any way.

10        THE COURT:  Thank you.

11        I'm not sure if it is and I'd like to hear a

12   response at some point from Ms. Boelter about that.  As I

13   said, when I heard that number, and it wasn't in an ad by

14   Napoli Shkolnik, but when I heard that it did strike me as

15   notable, but I'm not sure why it's necessarily detrimental to

16   anybody filing a proof of claim to know that there is, what I

17   would characterize, as a significant fund that may be

18   available.

19        Thank you for that.

20        Okay.  Other objections; I think the only other

21   objection I received is from this coalition and for purposes

22   of today I will hear the objection. I recognize that there is

23   an issue out there, but for purposes of today, given the

24   broad implications of the relief that the debtor is seeking,

25   I will hear counsel for the coalition.

1          Mr. Tarr?

2          MR. TARR:  Your Honor, my co-counsel from Brown

3   Rudnick, Sunni Beville, will address the matter. And I

4   apologize, I know she intended to speak a little bit earlier,

5   but got disconnected.  So, Sunni is connected now.

6          THE COURT:  Ms. Beville?

7          MS. BEVILLE:  Hi, Your Honor.  Can I just confirm,

8   can you hear me okay?

9          THE COURT:  I can, but stay close to the

10  microphone.

11         MS. BEVILLE:  Okay.  So, excuse the lean-in here

12  then.  Your Honor, Sunni Beville from Brown Rudnick on behalf

13  of the coalition of abuse scouts suggested.

14         I would just like to make note, Your Honor, that

15  the arguments that you heard from insurance counsel and from

16  the TCC are (indiscernible) next week at the September 9th

17  hearing.  We appreciate that their concerns that they have

18  raised with respect to the coalition we believe we have fully

19  complied with 2019 and we appreciate, Your Honor, the

20  courtesy of you hearing us today while those matters remain

21  disputed.  I will get to some of those points later on in my

22  presentation.

23         Your Honor, I just want to start by noting why we

24  are not here. We are not here as a fiduciary for sexual abuse

25  victims.  That is what Mr. Stang is here for and that is for

1   the TCC.  We are here representing abuse survivors with a

2   common story; physically, emotionally, and otherwise.  Our

3   coalition members have an interest in seeing a fair and

4   equitable process that makes this bankruptcy and the

5   compensation that may be available within the bankruptcy,

6   make it available to as many sexual abuse survivors as

7   possible.

8           We do not represent the individual law firms.  We

9   do not represent the attorneys here as to the specifics of

10  the individual ads themselves.  To the extent, Your Honor,

11  that any of the attorney advertising, as you noted, is

12  blatantly false and misleading (indiscernible) debtors to

13  address that.  That is why targeting specific preliminary

14  injunctive relief against specific violators as to specific

15  ads and specific content.  And respectfully, Your Honor, that

16  is not what the debtors have done here.

17          Here, the debtors are asking for over-broad

18  (indiscernible) relief without any showing that there is a

19  clear and present danger to the debtor's reorganization.

20          So, why are we here, Your Honor.  We are here on

21  behalf of the coalition members themselves, the sexual abuse

22  survivors who have a principal position regarding the relief

23  sought in this motion.  We believe it is important for the

24  sexual abuse survivors to hear unfiltered communication as to

25  the issues in this bankruptcy from the Boy Scouts, from

1  public interest firms, any other law firms.

2  The coalition favors extensive notice and outreach

3  to sexual abuse survivors including, as maybe from attorney

4  advertising to inform sexual abuse survivors of their right

5  to retain counsel if they so choose and to make that

6  opportunity readily available to them.  And, Your Honor, that

7  right, and I will get to it further in my argument, is

8  clearly recognized and protected expressly both by the U.S.

9  Supreme Court and by the Third Circuit.

10  Your Honor, it's clear, as you've heard from the

11  arguments here today, that the debtors and certainly the

12  insurers would prefer that there not be a large and active

13  body of sexual abuse creditors.  The size of the coalition

14  and the creditor body in general threatens their ability to

15  concern a consensual plan without a substantial asset pool

16  available for all creditors including sexual abuse survivors.

17  As a result they are objecting to the creditors'

18  ability to engage counsel of their own choosing through their

19  2019 objections, and they'd like to restrict all counsel from

20  reaching out to more prospective clients through the debtor's

21  pending motion.

22  Your Honor, I am not intending to get into the

23  factual record here.  We believe the debtors have not

24  provided sufficient evidence.  Our specific objections are

25  stated in our response, but I do think it is worth

1   reiterating two facts.

2          Many of the statements the debtor's cite in these

3   attorney advertisements are similar or identical to the text

4   from their own open letter to creditors which has been

5   available on their website from both before and after the

6   entry of the bar date notice.  The fact that attorneys are

7   soliciting tort victims before and after the bar date notice

8   is consistent with every other recent large Chapter 11 case

9   involving mass tort liability, including, for instance, in

10  Perdue and PG&E.

11         No party had a reasonable expectation that

12  attorneys would cease contacting potential clients simply

13  because the court entered a bar date notice.  In Perdue, for

14  example, Your Honor, the debtors implemented a $20 million

15  dollar noticing program alongside attorney advertising from

16  many plaintiff lawyers.  This advertising campaign by the

17  debtors and from other attorneys resulting in filing of over

18  110,000 personal injury claimants prior to the bar date.

19         In PG&E, Your Honor, the debtors instituted a

20  vigorous noticing program, again, alongside attorney

21  advertising from many plaintiff's lawyers and this included

22  social media, billboards, print advertising.  And in that

23  case, Your Honor, resulted in the filing of over 80,000

24  claims prior to the bar date.

25         In each of these cases, Your Honor, the debtors

1  did not seek to restrict attorney advertising in any form,

2  but instead they welcomed the ability to reach out to more

3  victims and ensure that they had access to representation in

4  these cases.

5          So, Your Honor, what is at issue here?  We've

6  heard a lot of different arguments from different people.

7  What I think you hear today, Your Honor, is a constitutional

8  right to free speech.  Your right, Your Honor, Ms. Boelter

9  was correct, free speech of the commercial speech may be a

10 different animal, but it is still subject to protection.

11         The constitutional right to free speech is the

12 right of abuse victims to receive information relating to

13 potential claims and their right to retain counsel. This is a

14 principal that was filed in the U.S. Constitution and

15 defended by the United States Supreme Court.  Your Honor,

16 this is a basic fundamental right afforded to U.S. citizens.

17 I don't think anyone here disputes that the U.S. Supreme

18 Court has determined that attorney advertising and attorney

19 communications to clients and potential clients are protected

20 First Amendment rights.

21         The right to free speech, free commercial speech,

22 is grounded in a right of the consumer to the information

23 such speech provides.  The United States Supreme Court first

24 acknowledged this in Virginia Pharmacy Board v. Virginia

25 Consumer Council.  And, Your Honor, this can be found at 425

1   U.S. 748.  It was issued in 1976.  In this decision, Your

2   Honor, the Supreme Court noted that the First Amendment

3   protects the right to receive information and ideas and that

4   freedom of speech necessarily protects the right to receive

5   information.

6            Your Honor, this principal has been espoused in

7   many subsequent Supreme Court decisions.  And as I mentioned

8   before, it has also been identified in the Third Circuit as a

9   principal to protection of the courts.

10           Your Honor, we are here defending the coalition

11  members who desire to protect the constitutional right of the

12  sexual abuse survivors to receive information from parties

13  other than the debtors relating to, among other things, the

14  Boy Scouts Chapter 11 case, the right to compensation for

15  abuse they suffered, and the right to counsel to assist them

16  through the bankruptcy process.

17           What the debtors request is to deny sexual abuse

18  survivors that fundamental constitutional right.  The debtors

19  seek to impose a broad content based prior restraint on

20  speech.  It is the request of this court enjoin all parties

21  from any communication regarding particular content to

22  potential clients other than speech, Your Honor, that the

23  debtors prefer specific words over words that our attorney's

24  advertising has chose.

25           The Supreme Court has reiterated recently, Your

1   Honor, as recently as July, this past July, in <u>Barr v. AAPC</u>

2   that content based restrains on speech, even commercial

3   speech, are to be reviewed with strict scrutiny.

4          So, what does that mean, Your Honor, here in the

5   bankruptcy context?  Well, courts have addressed strict

6   scrutiny question in the context of speech that violates the

7   automatic stay or, otherwise, damages the debtors'

8   reorganization.  The courts permit issuance of higher

9   restraints in light of the government's compelling interest

10  in an effective bankruptcy routine only where, Your Honor,

11  the court finds as a matter of fact that there exists a clear

12  and present danger to the debtor's reorganization based on

13  the content and manner of delivery of speech by particular

14  speakers.

15         The debtors cite one case in their papers

16  (indiscernible) in our objection we added two more, <u>Sichuan</u>

17  and <u>Stonegate</u>.  There is no disagreement regarding the

18  standard as we noted in those cases, Your Honor.  Your Honor,

19  I posit that the court's analysis in <u>Stonegate</u> is

20  instructive.

21         As we all know, the goal of Title 11 is to protect

22  debtors and to enable debtors to reorganize and continue

23  their business.  Section 362 of the bankruptcy code limits

24  free speech to protect the effectiveness of the bankruptcy

25  court itself in fulfilling its role under the bankruptcy

1  code.

2       As a bankruptcy proceeding it necessarily involves

3  judicial process.  As a result, courts must apply the clear

4  and present danger test that is in order to limit First

5  Amendment protected free speech a sufficient likelihood of a

6  substantive (indiscernible) actually designed to impede the

7  course of justice must be established.  In order for Section

8  362 to be used to curtail speech, the speech must be truly

9  obstructive; that is it must amount to conduct that seriously

10 and effectively interferes with the judicial process itself

11 or prevents a clear and present danger of doing so, and

12 involves no or at least limited First Amendment interest.

13      Your Honor, with this reasoning the Stonegate

14 court concluded that absent some language presenting a clear

15 and present danger of some significant interference with the

16 debtor's reorganization or with the function of the

17 bankruptcy court, Section 362 cannot prohibit public

18 criticism.  The court ultimately ruled that the bankruptcy

19 court could not limit communication without evidence of

20 countervailing interest such as actual damage done to the

21 debtor's business or the impact of the criticism on

22 bankruptcy's ability to function.

23      The debtors can cite to no case, Your Honor, that

24 permits a blanket coalition on all communications by all

25 content providers as to any matters relating to a court order

1  or noticing program.  There are cases cited, Your Honor, and

2  Ms. Boelter referenced some of them that apply a similar

3  clear and present danger standard in the context of class

4  action litigation.  That context is the question of specific

5  attorney communications and whether they present a clear and

6  present danger to the judicial process.

7          Your Honor, in those cases the facts largely

8  relate to the propriety of court orders under Federal Rule of

9  Civil Procedure 23.  Whether or not limiting defendants and

10  counsel's ability to send misleading and cohesive letters to

11  plaintiffs advocating for plaintiffs to opt-out a proposed

12  class action settlement, whether those types of orders are

13  defensible or not.

14          In the cases, Your Honor, where there has been a

15  restraint on speech you can see that defendants have acted in

16  egregious secretive fashions where they are trying to change

17  the outcome of a proposed settlement by increasing opt-outs.

18  And I can go into more detail, Your Honor, as to each of

19  those cases, but I withhold given the Rule 23 standard that

20  it's a slightly different fact pattern that is not applicable

21  here.

22          Your Honor, even in a Rule 23 context no court has

23  ever been willing to enter an order prohibiting the entire

24  plaintiff bar from speaking to prospective clients to a

25  litigation.  In fact, Your Honor, the Third Circuit itself in

1  Community Bank of North Virginia, itself, opined that the

2  best notice, even under Rule 23, is notice that affords class

3  members the right to contact their own attorney's to

4  determine whether joining a proposed settlement is in their

5  best interest.

6          Moreover, Your Honor, the U.S. Supreme Court

7  decision in Gulf Oil in 1981 specifically states that a trial

8  court cannot limit prospective attorney communications to a

9  plaintiff class based solely on the content of those

10 communications.

11         Your Honor, the overly broad relief sought by the

12 debtors makes it clear that this is not about the facts of

13 any particular communication in this case; it's about the

14 debtors and their insurers wanting to limit the size and

15 effectiveness of a plaintiff class, just like many people

16 have tried and failed.

17         Your Honor, there has been no showing of a clear

18 and present danger to the debtor's reorganization that the

19 debtors would prefer certain words over another is not a

20 factual basis to limit the plaintiff's law firms and the

21 sexual abuse survivors rights to free speech under the first

22 amendment.

23         Here, attorneys are soliciting potential clients

24 to participate as creditors in these Chapter 11 cases.  They

25 are not stealing the debtor's property as what is the case in

1  Inslaw or posting signs outside a restaurant saying don't go

2  in as in Sichuan.  They are merely encouraging people to come

3  forward promptly not only to obtain compensation, but to be

4  represented by counsel who can advocate for themselves

5  effectively in Chapter 11.

6           Your Honor, the concerns raised as to an overflow

7  of claims, fraudulent claims, claims of no merit in washing

8  out those of valid sexual abuse victims, you know, that's a

9  concern, Your Honor, that everybody shares.  And as can be

10  demonstrated at the hearing next week the coalition has been

11  working with the debtors and other parties to ensure that

12  there is a system in place to make sure that the claims being

13  submitted are not fraudulent, are not duplicative and are

14  impact valid.

15           Your Honor, I'd like to make note that the

16  solicitation that you have seen attached to the debtor's

17  motion are not unusual.  This happens at every mass tort

18  Chapter 11 case.  Your Honor, these advertisements are not

19  intended to be notices of the bar date or intended to be part

20  of the debtor's noticing program.  This is attorney

21  advertising.  The debtors offer no reasonable explanation as

22  to why attorney advertising must contain the same information

23  in the same form as the debtor's bar date notice.

24           Creditors have a right now only to counsel of

25  their choosing, but to receive communications from

1   perspective counsel that contain such attorney's views on

2   legal proceedings and that make an argument for the value of

3   the attorney's services.  That the debtor's disagree with

4   that interest or dispute in attorney's views is not

5   sufficient to mandate a blanket cohabitation on First

6   Amendment protected free speech.  That is an express

7   component of several Supreme Court (indiscernible) and must

8   be protected by this court today.

9        We submit, Your Honor, that in light of the relief

10  requested and the numerous binding precedents on this topic

11  there is no need for evidence about a clear and present

12  danger to the debtor's reorganization. The debtors do not

13  even allege facts in much of the cases in which such findings

14  were made.

15       As a result, Your Honor, and as I can make note

16  that while Ms. Boelter made arguments during today's hearing

17  that the factual statements made during this hearing are not

18  admissible fact to be used on the record as the specific

19  findings that would be required to implement a more narrow

20  order.

21       With that, Your Honor, we submit that there has

22  been insufficient evidence produced by the debtors to support

23  any findings in their favor.  That certain statements may

24  cause confusion or could be misleading falls far short of the

25  evidentiary burden borne by the debtors.  If the court wishes

1  to take evidence we ask that the court provide a schedule for

2  further briefings, confidentiality protections and a further

3  evidentiary hearing.

4         Your Honor, the coalition has approximately 12,000

5  members at this time and some of the members, themselves, and

6  their representatives will be willing to testify as to their

7  interactions with debtors and their communications with

8  prospective counsel.

9         Your Honor, the debtors filed this motion on an

10 emergency basis, but this was an emergency of the debtor's

11 own making.  The debtors have been well aware of the nature

12 and scope of advertising relating to the Boy Scouts case

13 since prior to the bankruptcy proceedings.  The debtors also

14 control the timing of their own supplemental notice plan

15 which was prescribed to this court in early May.

16        There has been insufficient time for the coalition

17 and probably any party to assemble countervailing evidence

18 against such broad proposed relief including against the

19 declaration that was filed late last night on the eve of the

20 hearing.  A fast finding in the debtor's favor at this time

21 would violate the due process rights of the coalition's

22 members and sexual abuse survivors in general.

23        Your Honor, taking a step back (indiscernible) and

24 returning to the motions regarding the compliance with Rule

25 2019 and the arguments you heard right before I came on, Your

1  Honor, the dynamic here is not that this advertising is false

2  and misleading, but if there is a concern that there will be

3  too many claims filed in this case, the goal here is to

4  minimize the number of claims, mitigate against the leverage

5  of the sexual abuse survivors as discussions ensue towards

6  what we all would hope to be a consensual plan.

7          I have no doubt, Your Honor, that the debtors

8  would prefer not to accuse 12,000 grown men, and we still

9  don't know, Your Honor, how many 20,000, 30,000 men of lying

10 about the fact that they were raped as young boys.  They

11 would prefer to argue that these men were tempted into

12 fibbery by the exaggerations of unscrupulous plaintiff's

13 attorneys.  That would be a far more palatable way to

14 discredit a large group of people who were abused as young

15 boys, but the fact is, Your Honor, these men are out there,

16 they experienced what they experienced and they are entitled

17 to receive information from parties other than the debtors

18 regarding the bankruptcy filing, that they are entitled to

19 choose their own counsel and to make that opportunity readily

20 available to them.

21         Your Honor, I remind you that these communications

22 aren't about opting out of a class action settlement or

23 accepting or rejecting a plan.  These are communications

24 seeking to help many participate in the bankruptcy process to

25 seek compensation for what they suffered.  It's about efforts

1   to give these men who suffered through heinous acts a voice

2   that has been silenced for too long.

3            THE COURT:  Ms. Beville, what about the concern --

4   I hear the concern expressed, that you are expressing that

5   debtors are attempting to squash voices, and minimize proofs

6   of claim, I don't know that I agree with that, but the --

7   what about the concerns that some of the claimants will call

8   the 800 numbers that are listed in these advertisements and

9   believe they have actually filed a proof of claim, and

10  believe that their claim has been registered appropriately

11  with the claims agent, but it, in fact, hasn't because

12  they've called an attorney advertising number?

13           Is that a, let me get the word right, governmental

14  interest that I can protect?  If not, why not?

15           MS. BEVILLE:  Your Honor, I think that's an issue

16  that is a potential issue in every bankruptcy case, never

17  mind in mass tort litigation cases where there are immense

18  amounts of advertising.  That goes to a more generalized

19  concern, not a specific concern.

20           Your Honor, if the debtors do have that concern

21  that there is confusion I don't think the debtors have proven

22  any factual evidence at the hearing today by any of their

23  witnesses that there is such confusion, that there is a

24  possibility of some confusion or that in some circumstances

25  there may be an issue I don't believe, Your Honor, rises to

1  the level that would enable the court to issue broad relief

2  that restricts the first amendment right to free commercial

3  speech.

4        THE COURT:  What about the ability to require an

5  attorney that wants to advertise to add some additional

6  information regarding the official claims website or phone

7  number?

8        MS. BEVILLE:  Your Honor, I haven't seen any

9  evidence for that in any case law.  The cases that Ms.

10  Boelter was referencing were issues under Rule 23 where there

11  had been a noticing program and where there had been

12  potentially misleading or actually misleading advertising. In

13  this case it's typically letters.  The court issued curative

14  notices that were court less documents.  The court, in many

15  instances, even in the case, Your Honor, cited by the

16  debtors, which was the Georgine v. Amchem Products, Inc.

17        In that case, Your Honor, what a debtor did find -

18  - I'm sorry, the court did find misleading statements made by

19  counsel writing letters to potential class members.  The

20  court determined that under the First Amendment is was

21  required to issue an order as narrow as possible to protect

22  all of the party's rights.  In that case the court determined

23  not to issue any communication ban, but to, instead, reissue

24  a curative notice.

25        Your Honor, here I think  the debtors have debtors

 1  given sufficient evidence that under the bar date notice

 2  during that hearing and the evidence that was submitted at

 3  that time, and what the input from the TCC and from others

 4  that the debtor's bar date notice is sufficient, is robust.

 5  It does take into consideration all of the input from other

 6  people.

 7           I haven't seen anything here today, Your Honor,

 8  that suggests that these advertisements are truly under-

 9  cutting that process.

10           THE COURT:  Thank you.

11           Okay.  Ms. Boelter, I'm sure that you have a lot

12  of responses.

13           MS. BOELTER:  I do, Your Honor.

14           THE COURT:  I am going to continue this hearing

15  until the September 9th.  I don't have my calendar in front

16  of me and I don't know how much time I have given Boy Scouts

17  on that day or what else is on that day, but I think that is

18  the day that someone said we have the next hearing.

19           MS. BOELTER:  That is our next scheduled hearing.

20           THE COURT:  Okay.  I need an opportunity to think.

21  I'm giving you that entire day.  I am not inclined to issue

22  the blanket type of order that you have requested because as

23  I think has become evident from the hearing it could

24  encompass communications that it doesn't -- that the debtors

25  say they don't  intend to encompass and that are neither

1  deceptive, false, or misleading, or do not need to be

2  restricted because of governmental interest.

3         I will take some more time between now and then to

4  look at these first amendment cases, but it does strike me I

5  have to make factual findings, I have to express specifically

6  parameters, and I need to be looking at something targeted.

7  And what's in front of me today isn't sufficient to get me

8  there.

9         I don't know whether -- and I also don't know

10  whether there is any authority for me to require attorneys to

11  add to their advertisements.  I am also not sure whether I

12  think that would make them more or less confusing.

13         So, I see the significance of the issue.  I am not

14  downplaying the significance of the issue either in terms of

15  making certain that we don't have an under participation in

16  the filing of proofs of claim because people are confused,

17  because claimants are confused and don't file their claims

18  with the claim's agent, but rather get confuse by the

19  multiple advertisements they may be hit with out there.  I

20  understand the concern about the over-inclusion, but I'm not

21  certain exactly what to do with that.

22         So, I am not downplaying the significance of the

23  concern, but, of course, that's juxtaposed against the rights

24  of attorneys to advertise, their First Amendment rights to

25  commercial speech, what restrictions can be imposed on them,

1   if any, and the broad sweeping nature of the relief that is

2   requested which I do believe would pick-up communications

3   that I do not intend to pick-up and I don't think could be

4   restricted under my current understanding of first amendment

5   rights related to commercial speech.

6          So, we are going to continue the hearing.  In the

7   meantime I would encourage parties to discuss whether there

8   is some kind of agreed upon resolution.  I don't know if

9   there can be or not.  I would also like the debtor to cull

10  out, C-U-L-L, of its submission any, upon further review,

11  advertisements that you do not think fall within the scope of

12  what you are asking me to do if there are any of those.

13         I would like a more targeted approach to the issue

14  recognizing the broader concerns that you have articulated.

15  Of course, if there is any further authority specifically in

16  the bankruptcy context I'd appreciate that as well.

17         I thought about the Rule 23 context and I read

18  several, though not all of the cases cited, and it's similar,

19  but it's also more targeted given the nature of those

20  communications which deal with the attempt to influence the

21  opt-out selection.  So, I am not sure how heavily I can rely

22  on those cases because, again, they're more targeted, at

23  least the ones I reviewed.

24         So, again, this is continued to September 9th.  We

25  start at ten o'clock.  I don't know what else is on the

1  docket.  I understand I've got the coalition issues on the

2  docket.  I don't know what else is on.

3          MS. BOELTER:  Your Honor, I believe we may have

4  some non-residential real property lease issues.  We're

5  coming up against the debtor's deadline, firm deadline under

6  the code.  At this point we don't expect those to take very

7  much time.  So, really, I think the time consumers on the 9th

8  will be the coalition issues that you just identified and

9  then the continuance of this matter.

10          If I may, I assume you don't want us to hit you

11  cold at the hearing with responses to some of these questions

12  and further information.  Is there a date by which the

13  debtors can file something that is responsive to the remarks

14  you just made?

15          THE COURT:  Yes.  That would be nice.  If I can

16  have any further submissions Friday I would appreciate it.

17          What's today?

18          MS. BOELTER:  Monday the 31st.

19          THE COURT:  Okay.  Yes, Friday.  Sorry, it's all

20  blurring.

21          MS. BOELTER:  For all of us.  Every day is a

22  Tuesday.

23          THE COURT:  I have to put that on a pillow.

24      (Laughter)

25          THE COURT:  Okay.  Thank you.

1          MS. BOELTER:  Thank you, Your Honor.

2          THE COURT:  I will see you all next week.  We're

3 adjourned.

4     (Proceedings concluded at 12:58 p.m.)

5

6                          CERTIFICATE

7

8     I certify that the foregoing is a correct transcript

9 from the electronic sound recording of the proceedings in the

10 above-entitled matter.

11
/s/Mary Zajaczkowski              September 1, 2020
12 Mary Zajaczkowski, CET**D-531

13

14

15

16

17

18

19

20

21

22

23

24

25