IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>Jointly Administered |

**THE OFFICIAL COMMITTEE OF TORT CLAIMANTS' OMNIBUS OBJECTION TO:**

**(1) MOTION FOR RELIEF FROM THE AUTOMATIC STAY OF MARGARET HENDERSON, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF N.G.H. DECEASED [DOCKET NO. 1104];**

**(2) MOTION OF MARCO ROMERO JR. AND AUDREY ROMERO FOR AN ORDER FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO SECTION 362(D) OF THE BANKRUPTCY CODE [DOCKET NO. 1120];**

The Official Committee of Tort Claimants (consisting of survivors of childhood sexual abuse) (the "Tort Claimants' Committee" or the "TCC"), appointed in the above-captioned cases, hereby files this omnibus objection (the "Omnibus Objection") to: *(1) Motion for Relief from the Automatic Stay of Margaret Henderson as personal representative of the estate of N.G.H.* [Docket No. 1104] (the "Henderson Stay Relief Motion"); *and (2) Motion Of Marco Romero Jr. and Audrey Romero, For An Order For Relief From The Automatic Stay Pursuant To Section 362(D) Of The Bankruptcy Code* [Docket No. 1120] (the "Romero Stay Relief Motion")*;* (collectively, the "Stay Relief Motions") , and respectfully states as follows:

---

[1] The Debtors in the chapter 11 cases, together with the last four digits of each Debtors' federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 W. Walnut Hill Ln., Irving, TX 75038.

I.

## Introduction

1.      As of the petition date, there were approximately 275 sexual abuse actions (the "Abuse Actions") filed against the Boy Scouts of America (the "Debtor" or "BSA"), Local Councils, and certain Chartered Organizations. The BSA filed a complaint in the adversary proceeding, Case No. 20-50527 (the "PI Action"), and obtained entry of a preliminary injunction that stays Abuse Actions against the non-debtor Local Councils and certain Chartered Organizations.

2.      The BSA states that it commenced its chapter 11 case primarily for the purpose of addressing the Abuse Actions in a consolidated manner so that the BSA can "timely and equitably compensate[e] victims of abuse in Scouting." Brief in Support of Preliminary Injunction, Adv. Docket No. 7, p. 3. The resolution of abuse claims will not and cannot be resolved in any comprehensive manner until after the claims bar date of November 16, 2020 (the "Claims Bar Date") passes. After passage of the Claims Bar Date the TCC, BSA, UCC, FCR, AHLC, and the numerous insurers can begin to evaluate the estate's true exposure and whether and to what extent the BSA has sufficient insurance coverage for all the sexual abuse and non-abuse claims that the TCC expects to be filed by the Claims Bar Date.  Significantly, when BSA filed its petition for bankruptcy, the estimated sexual abuse claims were estimated to be around 7,000.  Last month that number has increased to 16,000.  Some have suggested the number of abuse claims could be even be higher.  At the time the Stay Relief Motions will be heard, the date to file proofs of claim will be only nine weeks away.

3. Resolution of the Stay Relief Motions is premature for the following reasons: (a) the Court set the Claims Bar Date as November 16, 2020 and until then there will not be sufficient information or analysis to suggest that BSA's insurance is sufficient to cover both sexual abuse and non-sexual abuse claims, (b) there is nothing in the record supporting the speculation that there is sufficient excess insurance beyond the insurance that is the subject of the Stay Relief Motions; and (c) the Stay Relief Motions impact the same insurer, Old Republic Insurance Company ("Old Republic"), whose primary policy has a self-insured retention of $1 Million, and if granted will increase claims against BSA by virtue of JP Morgan's draw on secured letters of credit posted for Old Republic's benefit. For these reasons, discussed in more detail below, each of the Stay Relief Motions should be denied, without prejudice, given the status of the case and should not be reconsidered until after the Claims Bar Date.

## II.
## Background Regarding Stay Relief Motion

### A.    The Henderson Stay Relief Motion

4. The Henderson Stay Relief Motion seeks leave to continue a lawsuit against the BSA and the Corvallis Elks Lodge based upon the tragic death of a scout on October 13, 2018. The Henderson Stay Relief Motion does not provide any description of the progress of that litigation (commenced on the petition date, February 18, 2020). It also does not provide any insurance information and asserts without any foundation that "Upon information and belief, insurance coverage is available for Movant's claims in the Oregon Action and the Debtors' defense in the Oregon Action is being provided by the insurance carrier at its cost." Henderson Stay Relief Motion at Paragraph 16. Based upon the occurrence date, the relevant primary

policy for $1 Million (but subject to $1 Million deductible) and first excess policy (with an aggregate limit of $9 Million) were issued by Old Republic for the policy year 2018 – 2019.

**B.     The Romero Stay Relief Motion**

5.     The Romero Stay Relief Motion seeks leave to continue litigation against BSA and the Las Vegas Area Council arising out traumatic eye and other injuries suffered by Romero on February 6, 2016.  The Romero Stay Relief Motion does not describe any significant progress made in the pending litigation commenced in December 2018 and no trial date is disclosed.  It does state, without any foundation: "the Debtor had one or more liability insurance policies that covered bodily injuries, including that liability insurance policy attached hereto as Exhibit B….[and therefore] the Debtors' estate will not depleted by the Debtor's defense of Romero's claim in the State Court Action, but rather such claims likely would be payable by the Debtor's existing insurance coverage."  Romer Stay Relief Motion at paragraph 24.   Exhibit B to the Romero Stay Motion shows the Old Republic policy implicated is the 2015 – 2016 period, which has $1 Million deductible.

6.     Old Republic itself has represented to this Court that <u>BSA has the ultimate financial responsibility for all amounts paid under the primary policies implicated by the Stay Relief Motions</u>.  *See*, e.g., Old Republic Stay Relief Motion, Exhibit A. [Docket No. 568].  Moreover, BSA's obligation to pay that $1 million per occurrence is secured by cash collateralized letters of credit issued by JP Morgan Chase in an amount, on information and belief, of $61 million.  Old Republic acknowledges BSA's financial exposure: "Old Republic will continue to draw on JP Morgan L/Cs [Letter of Credit] as needed to cover costs and expenses."  Old Republic Stay Relief Motion at Paragraph 12.

**III.**

**SECTION 362(D) AND THE RELEVANT CASE DOES NOT SUPPORT STAY RELIEF**

7. The Stay Relief Motions should be denied because the relief sought will undermine the very purpose of the automatic stay. In the Third Circuit, "[i]t has long been the rule . . . that insurance policies are considered part of the property of a bankruptcy estate." *ACandS, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 260 (3d Cir. 2006) (citing *Estate of Lellock v. Prudential Ins. Co. of Am.*, 811 F.2d 186, 189 (3d Cir. 1987)). The automatic stay was enacted to protect debtors *and* creditors by preventing an unfair distribution of estate assets among creditors. *Superior Paint Mfg. v. Lopez-Soto* (*In re Lopez-Soto*), 764 F.2d 23, 27 (1st Cir. 1985), citing House Rep. No. 595, 95th Cong., 2d Sess. 340, *reprinted in* 1978 U.S. Code Cong. & Admin. News 5963, 6297 ("[W]ithout it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors.").

8. Consistent with this policy, courts have denied relief from stay. *See, Tringali v. Hathaway Machinery Co.*, 796 F.2d 553 (1st Cir. 1986); *Forty-Eight Insulations, Inc.*, 54 B.R. 905 (Bankr. N.D. Ill. 1985) ("If this Court were to allow the defendants to proceed against Forty-Eight's insurers, it would literally be firing the starting gun for the race to the courthouse. Eventually, and more probably sooner than later, the judgments would exceed the policy limits and a few claimants would have very substantial payments while the majority of claimants would end up with nothing."); *MacArthur Company v. Johns-Manville Corporation*, 837 F.2d 89, 92-93 (2d Cir. 1988) (under section 362(a) of the Bankruptcy Code, a bankruptcy court has authority to

enjoin suits against bankrupt's insurers where tort claimants sought to collect insurance proceeds that are property of the estate).

9. The leading treatise on bankruptcy law recognizes this policy -

> Application of the automatic stay to the recovery of policy proceeds enables the bankruptcy court to assure that available assets are being distributed in an equitable fashion among creditors. When there are multiple claimants to the policy proceeds, the court should be able to oversee the allocation of the proceeds among claimants. Although policy proceeds are not available to all creditors, and in that sense are different from other property of the estate, they may be available to a class of creditors whose claims are covered by insurance, and may be insufficient to satisfy that class fully. In such a case, oversight by the court is necessary to assure an equitable distribution of the available assets. The automatic stay assures that the court will be able to determine the sufficiency of the policy proceeds before any particular claimant seeks to recover those funds.

3 Collier on Bankruptcy ¶ 362.03 (16th Ed.)

10. **The Stay Relief Motions** seek to upend the automatic stay's primary purpose by giving the movants the opportunity to deplete the insurance proceeds and thereby leaving no insurance coverage for all tort claimants whether they are personal injury or sexual abuse claims.

### IV.
### **FACTORS AGAINST GRANTING RELIEF**

11. The Stay Relief Motions each seek relief that affects the BSA estate because both claims are insured by Old Republic policies that have $1 million deductibles secured by cash collateralized letters of credit issued by JP Morgan. If these Stay Relief Motions are denied, the estate and its cash remain unaffected until claims are evaluated and addressed on an organized basis.

12. The insurance implications go far beyond the sex abuse claims and the movants' personal injury claims. For a decade Old Republic issued policies to BSA that provided

coverage for sex abuse survivors' claims, non-sex abuse claims, and employment liability claims. With no evidence in the record about additional excess insurance, and no evidence about the claims that may exist that are covered by the same $9 million Old Republic policies, allowing these movants to proceed would prejudice <u>all</u> claimants who are covered by these Old Republic policies. Until the claims bar date, no one will know with any certainty the totality of covered claims.

13. In May 2020, the TCC believed that no less than approximately 7000 sex abuse claims will be filed. That number has increased substantially. There could be as many as 16,000 sex abuse claims but it is nine weeks away from the Claims Bar Date and the number could be even higher.

14. There is no evidence before the Court as to the total number of non-sexual abuse personal injury claims, but the Tort Claimants Committee has been informed of at least 40 claims. The Old Republic policies also respond to employment liability claims. The Tort Claimants Committee has no information on the number or scope of such claims. Plus, there is no reason why insured personal injury claims should be permitted to proceed while insured sexual abuse claims should be required to wait.

15. Granting the Stay Relief Motions will benefit the movants to the detriment of other claimants, be they sex abuse survivors, non-sex abuse claimants, or employees, because the amount of Old Republic's insurance diminishes BSA's available cash dollar for dollar by the payment of movants' claims. Any assertion as to the adequacy of remaining insurance or the unlikelihood of claims during the coverage years is pure speculation.

16. The Henderson Stay Relief Motion places great weight upon the fact that two prior relief from stay motions were granted. *See* Knight and Spahr Orders [Docket No. 989 & 990]. (Henderson Stay Relief Motion at paragraph 18). While it is undeniably true that two prior stay relief movants received relief from the automatic stay, circumstances have changed. Those orders were granted on July 8, 2020. The claims bar date was more than four months away. It is now nine weeks away. When those relief from stay orders were entered, the TCC believed the abuse claims filed would amount to 7,000. It now believes the number to be 16,000 or more. The concerns about the sufficiency of the insurance available to satisfy both abuse and non abuse claims alike has become heightened since July 8, 2020. Lastly, one of the two relief from stay orders did not involve Old Republic and did not implicate the deductible nor the Debtor's liability for the letters of credit backing that per claim $1 Million deductible.

17. The Court should also be mindful of the differences between the sex abuse claims to the non-sex abuse claims as they relate to the triggering of insurance coverage. Claims like the Henderson claim and the Romero claim are each the result of a single occurrence. That means there is only one year's worth of coverage that is triggered by their claims, albeit different years in their cases. However, claims by sex abuse survivors, depending on the application of different theories of triggers and different interpretations by state courts of their state's insurance law, can cover multiple years. This volatility and unpredictability means that certain years of coverage can be heavily overloaded with claims, while others remain relatively untouched. There is nothing currently before the Court that would assist it in concluding that the policies and years invoked by the movants' claims are going to be either well supplied with available insurance or sapped by the exhaustion of policies hit by multiple claims. Parties in interest will

be unable to draw any firm conclusions before the passage of the Claims Bar Date and sometime after when the TCC and other stakeholders have evaluated the claims filed and the insurance available to pay such claims.

18.     The Tort Claimant Committee is necessarily mindful and sensitive to the need of the individual movants for resolution of their claims but the TCC is equally mindful and sensitive to the need of resolving the sexual abuse claims.  The TCC simply does not want to foster a premature race to insurance proceeds, which is one of the primary purposes of the automatic stay and the preliminary injunction.  The TCC believes that the better course at this early stage in the case is to hold off litigation and its concomitant expenses until there is a better understanding of how much insurance is available relative to the claims covered in any given year.  It seems from both Stay Relief Motions that none have progressed significantly, and there is no immediate trial date set.  Also, one cannot ignore the trial setting ramifications of Covid-19 and the need for protected courtrooms.  As such, it appears that all trials will be delayed for some period of time, which reduces the prejudice to these individual Movants.

## V.

## THE RELIEF SOUGHT SHOULD BE DENIED

19.     The Henderson and Romero Stay Relief Motions should be denied without prejudice and should not be reconsidered until after the Claims Bar Date.  Although they only seek to liquidate their claims, and not to collect insurance or enforce any judgment, they nonetheless will cause BSA and its insurers to spend policy proceeds to defend the insured defendants, and will give two non-abuse claimants a leg up on abuse claimants and other non-abuse claimants in terms of resolving their claims.  And, of course, upon liquidation of the

claims, it is likely another motion will be filed seeking to collect on insurance. With the Claims Bar Date within sight, the Tort Claimants' Committee submits the better course is to afford all parties in interest the opportunity to evaluate all covered claims after the Claims Bar Date.

Dated:  September 2, 2020	PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
James I. Stang (CA Bar No. 94435) (admitted *pro hac vice*)
Iain Nasatir (CA Bar No. 148977) (*pro hac vice* submitted)
John A. Morris (NY Bar No. 2405397) (admitted *pro hac vice*)
James E. O'Neill (DE Bar No. 4042)
John W. Lucas (CA Bar No.271038) (admitted *pro hac vice*)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
Email: jstang@pszjlaw.com
         inasatir@pszjlaw.com
         jmorris@pszjlaw.com
         joneill@pszjlaw.com
         jlucas@pszjlaw.com

*Counsel for the Tort Claimants' Committee*