## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |
| | Re Docket No. 1144 & 1161 |

**OMNIBUS REPLY OF THE COALITION OF ABUSED
SCOUTS FOR JUSTICE TO OBJECTIONS TO (A) MOTION
FOR AN ORDER (I) AUTHORIZING THE COALITION TO FILE
UNDER SEAL EXHIBIT A TO THE AMENDED 2019 STATEMENT AND (II)
APPROVING THE SUFFICIENCY OF THE AMENDED 2019 STATEMENT, AND
(B) MOTION OF THE COALITION TO PARTICIPATE IN THE MEDIATION**

The Coalition of Abused Scouts for Justice (the "Coalition"), by its undersigned counsel,

hereby submits this omnibus Reply to the objections to (A) *Motion for an Order (I) Authorizing*

*the Coalition to File Under Seal Exhibit A to the Amended 2019 Statement and (II) Approving*

*the Sufficiency of the Amended 2019 Statement* (the "2019 Motion") [Docket No. 1144],[2] and

(B) *Motion of the Coalition to Participate in the Mediation* (the "Mediation Motion" [Docket

No. 1161] and, together with the 2019 Motion, the "Motions").[3]  In support of this Reply and the

Motions, the Coalition respectfully states as follows:

---

[1]  The Debtors in these chapter 11 cases, together with the last four digits of Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]  Capitalized terms used but not otherwise defined herein have the meanings given to them in the 2019 Motion or the Bar Date Order (as defined in the 2019 Motion).

[3]  Objections to the 2019 Motion were filed by David Lee Lambert (the "Mr. Lambert") [Docket No. 1219] (the "Lambert Objection", the United States Trustee (the "U.S. Trustee") [Docket No. 1223] (the "U.S. Trustee Objection"), Allianz Global Risks US Insurance Company and National Surety Corporation (together, "Allianz") [Docket No. 1224] (the "Allianz Objection"), and the Official Committee of Tort Claimants (the "TCC") [Docket No. 1228] (the "TCC 2019 Objection").  Objections to the Mediation Motion were filed by Hartford Accident and Indemnity Company, First State Insurance Company and Twin City Fire Insurance Company (collectively, "Hartford") [Docket No. 1222] (the "Hartford Objection"), Allianz [Docket No. 1224], Century et al. ("Century")

## PRELIMINARY STATEMENT

1.     The Coalition has disclosed its authorizing documents as required by Rule 2019(c)(4) and represents the vast majority of Sexual Abuse Survivors in these cases. Consistent with Third Circuit precedent and prior Orders of this Court, the Coalition properly filed its Rule 2019 disclosures under seal.  The TCC's objections, which fail to reflect the 2011 amendments to Rule 2019, are simply misplaced.  Likewise, the United States Trustee fails to properly account for the Rule 2019 disclosures made by the Coalition.  The Coalition intends to be a constructive party in these cases, including in the Mediation in which it seeks participation as a Mediation Party, and has tailored its Reply to the substance of the Objections filed in response to the Motions that are before the Court.

## REPLY

### A.     The Coalition Has Shown that It Represents Sexual Abuse Survivors

2.     The United States Trustee and the TCC argue that the Coalition has failed to show that it represents Sexual Abuse Survivors and that the Coalition's Rule 2019 Motion should be denied on this basis.[4]  The false premise underlying this argument is that unless the Coalition can produce engagement letters with Coalition Counsel signed by each of its 12,000 Members, Coalition Counsel does not and cannot represent the Members' interests in the Debtors' cases.

3.     The Coalition need not produce 12,000 engagement letters in order to comply with Rule 2019(c)(4), which provides that a verified statement must include "a copy of the

---

[Docket No. 1230] (the "Century Objection"), and the TCC [Docket No. 1231] (the "TCC Mediation Objection"). All of the foregoing objections are referred to herein collectively as the "Objections."

[4] *See* U.S. Trustee Objection at ¶ 12 ("Not one single page of the Unverified Exhibit A evidences the written consent of an abuse survivor to be represented by the Coalition"); *Id.* at ¶ 28 ("The Coalition has provided no information or evidence supporting its position that it has the affirmative consent of each one of more than 12,000 confidential individuals to act on their behalf."); TCC Objection at 11 ("There is no evidence that any client of a particular Law Firm … knew of, let along [sic] consented to, the terms and conditions of the BR Engagement Letter"); *Id.* at 19 ("[I]t is unclear who Brown Rudnick represents because it acknowledges that the Law Firms' Survivor clients are not clients of Brown Rudnick.")

instrument, **if any**, authorizing the entity, group, or committee to act on behalf of creditors or equity security holders." Fed. R. Bankr. P. 2019(c)(4) (emphasis added).

4.      Each Member has signed an engagement letter with his or her State Court Counsel—*i.e.*, the survivor's litigation counsel retained for the purpose of asserting claims on the survivor's behalf against the BSA. As the exemplars show, these engagement letters explicitly authorize State Court Counsel to associate with co-counsel. *See* **Exhibit 1**, attached hereto.[5] State Court Counsel, two of whose former clients are TCC members, determined that it was necessary and appropriate to associate with bankruptcy counsel for the benefit of their survivor clients.

5.      Pursuant to the authority given to them by their clients in their written engagement letters, six law firms (the "Law Firms")[6] engaged Brown Rudnick LLP ("Brown Rudnick") on behalf of the clients. *See id.* The Brown Rudnick Engagement Letter provides that the "Law Firms each represent and warrant that they have the **authority** to sign this Engagement Letter on behalf of their respective Law Firm Clients and **bind** the Law Firm Clients to the terms hereof." *Id.* (emphasis added).

---

[5] **Purpose of Representation**. The undersigned hereby agree(s) to employ Eisenberg Rothweiler, Kosnoff Law, and AVA Law Group as attorneys-at-law to represent the undersigned in claims against the Boy Scouts of America. The undersigned agrees that said attorneys are granted the right to associate with other law firms in the prosecution of the claim, if they feel that such is in the client(s) best interests.

<u>**Association of Counsel**</u>. Client understands and agrees that the two separate law firms of ANDREWS & THORNTON, AAL and ASK LLP will be associating on this matter. Client authorizes the Firms to associate co-counsel as the Firms may deem necessary and to share any fees contemplated in this contract with such co-counsel with the express understanding that associating with co-counsel will NOT increase the fees set forth below.

I understand that attorneys may, at their own expense, use or associate other attorneys in the representation of the aforesaid claims of the Client. Attorney may participate in the division of fees in this case and assume joint responsibility for the representation of the client either in the event the Attorney retains associate counsel or that the client later chooses new counsel, provided that the total fee to the client does not increase as a result of the division of fees and that the attorneys involved have agreed to the division of fees and assumption of joint responsibility.

[6] As disclosed in the 2019 Statement, the Law Firms are: (i) Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C., (ii) Kosnoff Law PLLC, (iii) AVA Law Group, Inc., (iv) Andrews & Thornton, (v) ASK LLP, and (vi) Slater Slater Schulman, LLP.

6.      The Brown Rudnick Engagement Letter further provides that Brown Rudnick's engagement is with the "Ad Hoc Committee as a whole, and not any individual member thereof." *Id.* This is a group representation, meaning that the Members, by and through their chosen counsel, retained Brown Rudnick to represent their collective interests in and as an *ad hoc* committee in respect of the Debtors and their cases, as set forth in the "Scope of Engagement." The Brown Rudnick Engagement Letter provides that "[t]he Firm shall not act on behalf of the Ad Hoc Committee in a manner that is contrary to any direction we receive from the Law Firms." *Id.*

7.      Though not necessary, the Law Firms provided written notice of their association with Brown Rudnick to their clients: "We are pleased to announce that [FIRM] has joined a coalition to better achieve compensation for survivors of Boy Scout sexual abuse. The Coalition of Abused Scouts for Justice is an ad hoc committee representing the interests of its members (i.e., abused scouts) in the Boy Scouts Chapter 11 bankruptcy case. The Coalition has retained experienced bankruptcy counsel, Brown Rudnick LLP and Delaware counsel Blank Rome LLP, and has commenced productive negotiations with the BSA and their insurance carriers to obtain compensation for its members." *Id.*

8.      The aforementioned documents reflect the authority of the Coalition to "act on behalf of creditors" in these cases and were attached to the 2019 Statement in accordance with Rule 2019(c)(4). This is what Rule 2019(c)(4) requires, nothing more. These documents show that based on the authority granted to the Law Firms in their engagement letters, Brown Rudnick was retained and is authorized to represent the Coalition's interests in respect of the Debtors and their cases. It follows that the Coalition has shown that it represents the collective interests of its

Members in these cases.  Any argument to the contrary simply ignores the Coalition's 2019 Statement.

**B.    The Information Set Forth on "Exhibit A" Should be Sealed**

9.    The United States Trustee does not object to sealing the identifying information of Sexual Abuse Survivors.  U.S. Trustee Objection at 4, fn. 4.  The United States Trustee contends that the Coalition has not shown that the pages of Exhibit A that are "not subject to the Confidentiality Procedures" should be protected—namely, the "retention agreements and other documents purporting to represent the Coalition's authority to act."  U.S. Trustee Objection at ¶ 22.  The Coalition has disclosed the parts of the engagement letters that speak to the Coalition's authority to act on behalf of its Members.  The redacted portions do not speak to the issue of authority and, therefore, need not be disclosed under Rule 2019(c)(4).

10.    Moreover, engagement letters are among the types of documents that Courts in the Third Circuit routinely protect in mass tort bankruptcies.  *See In re Pittsburgh Corning Corp.*, No. 05-4781, 260 Fed. Appx. 463, at *465 (3d Cir. Jan. 10, 2008) (affirming order permitting law firms in mass tort bankruptcy to file exemplars of "the relevant empowering documents" and permitting such documents to be filed under seal subject to the filing of an "access challenge"); *In re Motions for Access of Garlock Sealing Techs., LLC*, 488 B.R. 281, 302 (D. Del. 2013) (permitting debtor to access 2019 exhibits "solely for the purpose of using them in connection with the estimation proceedings in its own bankruptcy case," and prohibiting debtor from having access to any "retention agreements between lawyers and potential claimants"); *Certain Underwriters at Lloyds v. Future Asbestos Claim Representatives (In re Kaiser Aluminum Corp.)*, 327 B.R. 554, 557 (D. Del. 2005) (affirming bankruptcy court order restricting access to "empowering documents" filed by law firms in mass tort bankruptcy).

11.    The redacted portions of the engagement letters contain commercially sensitive information—*e.g.*, the fees and rates agreed to by survivors and State Court Counsel (*i.e.*, their litigation counsel)—and should be protected.  *See generally In re El Toro Exterminator of Florida, Inc.*, No. 05-60015, 2006 WL 2882519, at *3 (Bankr. S.D. Fla. 2006) (pricing information in government contracts that the debtor sought to protect was confidential commercial information for purposes of 11 U.S.C. § 107(b)(1)).

12.    *Baron & Budd, P.C. v. Unsecured Asbestos Claimants*, 321 B.R. 147 (D.N.J. 2005), the case upon which the United States Trustee relies, is distinguishable.  In *Baron & Budd*, the bankruptcy case had progressed to a point where the "facts and circumstances in connection with the employment of counsel" had a bearing on the fairness of the plan's classification system.  *Id.* at 165.  Here, by contrast, the facts and circumstances are different.  The Debtors have not filed a plan.  No party has offered an explanation as to why they currently need to review unredacted versions of the engagement letters, particularly given that the portions of the engagement letters that are relevant under Rule 2019 have been fully disclosed.

C.    **The Coalition Is an Ad Hoc Committee that Is Subject to Rule 2019**

13.    The TCC exhorts in detail its opinion that the Coalition is not an "entity" subject to Rule 2019 and, therefore, cannot participate as a mediation party or in the Debtors' cases.  *See* TCC 2019 Objection at 14-15; TCC Mediation Objection at 13-15.  In support of this conclusion, the TCC relies the holdings in *Premier* and *Philadelphia Newspapers*.  *See In re Premier Int'l Holdings, Inc.*, 423 B.R. 58 (Bankr. D. Del. 2010) (denying motion to compel *ad hoc* committee compliance with Rule 2019); *In re Philadelphia Newspapers, LLC*, 422 B.R. 553, 568 (Bankr. E.D. Pa. 2010) (accord).  Such reliance is misplaced because the Rule 2019 language relevant in those cases changed in connection with an amendment of Rule 2019.

14.    Rule 2019 was amended in 2011. *The amendments abrogated the portions of the cases upon which the TCC relies*. *See* Advisory Committee Notes, 2011 Amendments Subdivision (b), Fed. R. Bankr. P. 2019 ("In addition to an entity, group, or committee that *represents* more than one creditor or equity security holder, ***the amendment extends the rule's coverage to groups or committees that consist of more than one creditor or equity security holder***. The rule ***no longer excludes official committees***, except as specifically indicated. The rule applies to a group of creditors or equity security holders that act in concert to advance common interests … even if the group does not call itself a committee.") (emphasis added).[7] The Coalition is a group that consists of more than one creditor acting in concert to advance common interests and is subject to Rule 2019.

15.    The TCC also argues that because the Coalition does not fit into the *Premier* and *Philadelphia Newspapers* Courts' interpretation of "entity" or "committee" under the prior version of Rule 2019, the Coalition is "fictitious." *See* TCC 2019 Objection at 16; TCC Mediation Objection at 16. But the 2011 Rule 2019 amendments expanded Rule 2019 to cover *ad hoc* groups in order to resolve disputes such as the ones in *Premier* and *Philadelphia Newspapers* over whether Rule 2019 applies to *ad hoc* committees or coalitions. *Compare* Fed. R. Bankr. P. 2019(b)(1) ("shall be filed by every group or committee that consists of or represents, and every entity that represents, multiple creditors or equity security holders that are (A) acting in concert to advance their common interests…"); *with Philadelphia Newspapers*, 422 B.R. at 565 (quoting Fed. R. Bankr. P. 2019(a)) ("every entity or committee representing more

---

[7] The TCC's Rule 2019 argument explains why the TCC has failed to file its own Rule 2019 statement in these cases even though Rule 2019 no longer excludes official committees. The Official Committee of Unsecured Creditors properly filed a Rule 2019 statement in these cases in April. *See* Docket No. 484.

than one creditor or equity security holder and unless otherwise directed by the Court … shall file a verified statement…").[8]

16.     The TCC's nitpicking over the Coalition's choice of its name—"the Coalition"—is precisely the argument the Court in *Philadelphia Newspapers* rejected as "a distraction." 422 B.R. at 557 ("The Court, for its part, views this entire aspect of the controversy to be a distraction and of no moment. . ."); *see also id.* at 557 fn. 6 (noting that ad hoc groups colloquial self-descriptions are of no import to the underlying status of the group).

17.     The TCC goes on to assert that the Coalition is illegitimate or "fictitious" because the Coalition is "comprised of its members, nothing more, nothing less."  *See* TCC 2019 Objection at 17; TCC Mediation Objection at 17.  But the current version of Rule 2019 now requires the Coalition to make a disclosure precisely because it is comprised of its Members.

18.     Moreover, while the *Premier* and *Philadelphia Newspapers* Courts held that the *ad hoc* committees need not comply with Rule 2019 disclosures under the old version of Rule 2019, neither held that the absence of that disclosure obligation denigrated the position or standing of that group in the bankruptcy proceedings.  *See*, *e.g.*, *Premier*, 423 B.R. at 73 (noting that the *ad hoc* committee had effectively petitioned for a cessation of the exclusivity period, proposed its own reorganization plan, and attained the support of the debtor).

19.     Even if, as the cases cited by the TCC hold, Rule 2019 disclosures did not apply to the Coalition, the TCC fails to explain in any way how such an omission from this disclosure

---

[8]  *See also Bankruptcy Advisory Committee's Report to the Standing Committee*, June 14, 2010 (recommending the revision of Rule 2019 to include (i) "the addition of a definition of 'represent' or 'represents' in subdivision (a)(2) that limits the meaning of the terms to taking a position before the court or soliciting votes on a plan, thereby removing entities that are only passively involved in a case from coverage under the rule" and (ii) "the addition of a provision in subdivision (b)(1) providing that the covered groups, committees, and entities are those that represent or consist of multiple creditors or equity security holders that act in concert to advance their common interests and are not composed entirely of affiliates or insiders of one another").  It need be noted that the pre-2011 amendment Fed. R. Bankr. P. 2019(a) is analogous to current Fed. R. Bankr. P. 2019(b)(1), because the current Fed. R. Bankr. P. 2019(a) is now a definitions section.  The new Rule 2019(a) explicitly defines "represents," which the TCC instead defines through *Premier*.

obligation would affect the Coalition's rights to participate in the Mediation or these bankruptcy cases. The TCC's argument mistakenly views Rule 2019 as some sort of enabling act which imbues rights to bankrupt entities; rather than what it is, merely a disclosure requirement.

20. The *Premier* Court opines about *ad hoc* committees that "there is nothing neither nefarious nor problematic, in and of itself, in disparate parties banding together to increase their leverage. Indeed, enabling such is one of the primary rationales for the existence of the Bankruptcy Code." 423 B.R. at 76. The cases cited by the TCC stand staunchly against the tactics deployed by the parties, such as the Insurers, in objecting to the Coalition's Rule 2019 disclosures. The *Premier* Court noted that the party moving to compel 2019 disclosures from the *ad hoc* committee had "engaged in a litigation tactic to apply pressure on its current adversary … this conclusion is self-evident by the fact that the [party] has not sought application of Rule 2019 to its ***current ally***." 423 B.R. at 75 (emphasis added).

21. It is worth noting that neither the TCC nor the Ad Hoc Committee of Local Councils have filed a Rule 2019 Verified Statement in these cases. Each group is required under Rule 2019 to make such disclosures, both are named Mediation Parties, and neither has made any effort to comply with their Rule 2019 obligations. *Cf. Official Statement of the Official Committee of Unsecured Creditors Pursuant to Bankruptcy Rule 2019*, [Docket No. 484]; *see also* Advisory Committee Notes, 2011 Amendments Subdivision (b), Fed. R. Bankr. P. 2019 ("The rule no longer excludes official committees, except as specifically indicated."). The law firms representing multiple insurers have also failed to make Rule 2019 disclosures.[9]

22. TCC argues that the Coalition cannot be a Mediation Party because it is not an "entity" as defined by and subject to Rule 2019 disclosure, but then in the same breath argues

---

[9] The Coalition presumes that the law firms representing multiple insurers have not filed Rule 2019 disclosures because the insurers themselves are not creditors, equity security holders, or parties in interest in these cases.

that the Coalition cannot be a Mediation party—or participate in the bankruptcy cases at all—because it has not complied with Rule 2019.  *See* TCC 2019 Objection at 19.  The Coalition has never averred that it is not subject to Rule 2019 disclosures; or attempted to avoid such compliance.  As the Coalition explained in detail in its Objection to the Insurers' motion to bar the Coalition from these cases [Docket No. 1225], the Coalition has gone through great lengths to comply with its obligations under Rule 2019.

      **D.**    **The Coalition Does Not Have Contempt for the Bankruptcy Process**

23.    The TCC repeats its mantra (raised during the August 31st hearing regarding the Debtors' motion to modify the Bar Date Order with respect to attorney advertising) that the Coalition is a "marketing term," and argues that certain Law Firms that are part of the Coalition have "contempt for the bankruptcy process" and are "scheming to exert their control over the entire process" to prevent the Debtors' cases from moving forward.  TCC 2019 Objection at 3, 21.[10]

24.    The Coalition is an *ad hoc* committee that represents a supermajority of Sexual Abuse Survivors.  It is not a "marketing term."  The Law Firms that formed the Coalition for the benefit of its Members and elected to associate with Brown Rudnick as bankruptcy counsel for the Coalition (Brown Rudnick has recognized and significant experience representing official and ad hoc committees of victims and tort claimants in mass tort bankruptcies in this and other courts and achieving confirmation of consensual plans therein) are comprised of lawyers that

---

[10] The Coalition notes that the TCC selectively quoted from an email, of copy of which the TCC has failed to attach to its pleading, sent by an attorney at one of the Law Firms **prior to** the formation of the Coalition.  The email was sent on June 28th while the Coalition was formed in mid-July.  The email evidences that the Law Firms that eventually formed the Coalition on behalf of their respective clients had fundamental differences with the strategies and views adopted by the TCC and its professionals.  Parties are entitled to differing views, are entitled to retain their own representative counsel and are not precluded from doing so due to the existence of an official committee.

have dedicated decades of their lives to representing victims of horrific acts. They do not have contempt for the bankruptcy process.

25.     Rather, they are here precisely because they support the bankruptcy process and understand what must occur for there to be a consensual resolution. For the Debtors to confirm a consensual plan, they must solicit and obtain the acceptance of tort victims in the threshold amounts set forth in 11 U.S.C. § 1126(c)—*i.e.*, "at least two-thirds in amount and more than one-half in number." The Debtors have indicated that they are interested in confirming a plan that includes a channeling injunction and third-party releases for contributing non-debtors. Under *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 272 (Bankr. D. Del. 2017), this will require a supermajority of survivor votes to confirm such a plan. The Coalition's interest in these cases flows from its genuine desire to move the Debtors' cases forward.

**E.     Excluding the Coalition from the Mediation Is Not Proper or Constructive**

26.     The TCC and Hartford both seek to exclude the Coalition from the Mediation. The TCC argues that the Coalition should be excluded because the "existing Mediation Parties must know who they are negotiating with, who the other parties represent, and that their counsel has the authorization to bind their clients." TCC Mediation Objection at 1.

27.     Hartford argues that permitting a Coalition that "represents the majority of sexual abuse claimants against the Debtors" to participate in the Mediation is inconsistent with "how a chapter 11 proceeding works" and that the TCC's function is to "ensure that all legitimate abuse claim holders are treated fairly with respect to one another." Hartford Objection at 4-5.

28.     The Coalition seeks the confirmation of a consensual plan. For this to occur, the Coalition Members must overwhelmingly vote in favor of plan confirmation. The Coalition obviously cannot "bind" its Members. As an *ad hoc* committee, the Coalition itself will not vote

on any plan of reorganization or file proofs of claim. The issue is how to negotiate and formulate a plan that Sexual Abuse Survivors will support.

29. Currently in the Mediation are, among other parties, the BSA, Insurers and the TCC. As a result of the Sexual Abuse, the level of trust that Sexual Abuse Survivors have with the BSA is limited, if any exists at all. The Insurers, including Hartford, want to avoid liability under their insurance policies and have an interest in few victims having representation and participating in the bankruptcy process. This is not a moral judgment, but a statement of their economic incentives.

30. The TCC, after failing to object to the BSA's motion to silence attorney communications, through its counsel, stands in a quite remarkable unholy alliance with the Insurers by joining with the Insurers in seeking to bar representatives of over 12,000 Sexual Abuse Survivors from participating in the Mediation and, unfortunately, has resorted to selectively quoting from emails in publicly filed documents and other personal attacks to accomplish its objective. Such tactics are never constructive and do little to engender the Coalition Members' confidence in a plan process that includes the BSA, the Insurers, and the TCC, but purposefully excludes their chosen representatives.

31. Unlike counsel for the Debtors, the TCC, and the Insurers, the Law Firms were specifically retained by Members to bring claims against the BSA and other parties; and the Law Firms formed the Coalition for the benefit of its Members and retained counsel to represent the collective interests of the Members. A process that includes the Coalition and their chosen bankruptcy counsel is the best path forward. That the parties may have differing views is *exactly* the type of discourse contemplated by a mediation process. *See In re A.T. Reynolds & Sons, Inc.*, 424 B.R. 76, 84 (Bankr. S.D.N.Y. 2010) ("Mediation permits, indeed often requires,

consideration of underlying interests, causes or values that produce conflict and thus permits the management, handling or resolution of broader concerns than just those 'disputes' which crystallize at the tip of the iceberg.").

32.     The results achieved in other mass tort bankruptcies support the truth of this assertion.  For example, in *Insys Therapeutics, Inc.*, No. 19-11292 (KG) (Bankr. D. Del. October 23, 2019) [Docket No. 803], the Bankruptcy Court ordered the Debtors, the Official Committee of Unsecured Creditors, counsel to the MDL Plaintiffs' executive committee (a judicially created administrative coordinating committee for plaintiffs in an MDL), and counsel to certain states to mediation to facilitate the resolution of disputes over the claims analysis protocol in the bankruptcy of an opioid manufacturer.  The Plaintiffs' executive committee, which could not bind and could only make recommendations to its constituency, was made a full mediation party by this Court.

33.     In *In re Purdue Pharma L.P.*, Case No. 19-23649 (Bankr. S.D.N.Y. 2019), the Bankruptcy Court entered a mediation order directing broad negotiations among no fewer than six (6) *ad hoc* committees of opioid litigation claimants.  *See id., Order Appointing Mediators* [Docket No. 895] (directing mediation among: "(i) the Debtors; (ii) the Official Committee of Unsecured Creditors; (iii) the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants; (iv) the Ad Hoc Committee of NAS Babies; (v) the Ad Hoc Group of Hospitals; (vi) the Ad Hoc Group of Non-Consenting States; (vii) the Multi-State Governmental Entities Group; (viii) the Ad Hoc Group of Individual Victims; (ix) counsel for Blue Cross Blue Shield Association, various third party payors and health insurance carrier plaintiffs; and (x) the group of individual health insurance purchasers, represented by Stevens & Lee P.C.").

34.     The *ad hoc* committees in *Purdue* are negotiating alongside the debtors and the official committee, including an *ad hoc* group of individual tort victims (where the official committee was partially comprised of, among various other types of non-governmental creditors reflected in the *ad hoc* committees, individual tort victims).  *Id.*

35.     Likewise, *In re PG&E Corporation*, No. 19-30088 (DM) (Bankr. N.D. Cal. Dec. 17, 2019), the Bankruptcy Court approved a Restructuring Support Agreement (the "**RSA**") that was signed by both the TCC *and* law firms representing individual tort victims holding approximately 70% in number of prepetition tort claims following a court-approved mediation that involved the Debtors, shareholders, the unsecured creditors committee, the tort claimants committee and the representative law firms.  *See id., Motion to Authorizing Debtors to Enter into Restructuring Support Agreement with the TCC, Consenting Fire Claimant Professionals, and Shareholder Proponents* [Docket No. 5038].

36.     Importantly, the RSA in PG&E did not purport to bind the law firms' clients to vote for or against plan confirmation.  *Id.*  Nor did it suggest that the tort claimants committee in those cases could bind tort victims, which it obviously could not.  The RSA in PG&E led to an accepting class because the tort victims' chosen counsel were included in the mediation and recommended that their clients support the plan.  *Insys Therapeutics*, *Purdue* and *PG&E* are clear examples of how chapter 11 proceedings ought to work.

37.     These cases will not move forward with insults and invective and disclosing non-current emails that may more truly reflect a writer's frustration or anger of the moment rather than some grand purported plan.  Broad support must be garnered for the confirmation of a chapter 11 plan that recognizes the horrific, irreparable injuries suffered by the Sexual Abuse

Survivors and seeks to fairly compensate them for their injuries.  This is why the Coalition is here.

## **CONCLUSION**

WHEREFORE, the Coalition respectfully requests that the Court enter orders granting the Motions and granting the Coalition such other and further relief as the Court deems just and proper.

Dated: September 4, 2020
Wilmington, Delaware

MONZACK MERSKY BROWDER & HOCHMAN, P.A.

*/s/ Rachel B. Mersky*
Rachel B. Mersky (DE No. 2049)
1201 North Orange Street, Suite 400
Wilmington, Delaware 19801
Telephone:    (302) 656-8162
Facsimile:    (302) 656-2769
E-mail:    RMersky@Monlaw.com


-and-

BROWN RUDNICK LLP
David J. Molton, Esq.
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
E-mail: DMolton@BrownRudnick.com

and

Sunni P. Beville, Esq. (admitted *pro hac vice*)
Tristan G. Axelrod, Esq. (admitted *pro hac vice*)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
E-mail: SBeville@BrownRudnick.com
E-mail: TAxelrod@BrownRudnick.com

*Counsel to the Coalition of Abused Scouts for Justice*