```
 1                      UNITED STATES BANKRUPTCY COURT
                            DISTRICT OF DELAWARE
 2

 3                                     .   Chapter 11
     IN RE:                            .
 4                                     .   Case No. 20-10343 (LSS)
     BOY SCOUTS OF AMERICA and         .
 5   DELAWARE BSA, LLC,                 .   Courtroom No. 2
                                       .   824 North Market Street
 6                                     .   Wilmington, Delaware 19801
                                       .
 7                    Debtors.         .   September 9, 2020
     . . . . . . . . . . . . . . . .   .   11:00 A.M.
 8

 9                    TRANSCRIPT OF TELEPHONIC HEARING
            BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                    UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12
     For the Debtor:          Derek C. Abbott, Esquire
13                            MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                              1201 North Market Street, 16th Floor
14                            P.O. Box 1347
                              Wilmington, Delaware 19899
15
                              - and -
16
                              Jessica C. Boelter, Esquire
17                            Michael Andolina, Esquire
                              Matthew Linder, Esquire
18                            SIDLEY AUSTIN LLP
                              787 Seventh Avenue
19                            New York, New York 10019

20   Audio Operator:          Nicki Barksdale

21   Transcription Company:   Reliable
                              1007 N. Orange Street
22                            Wilmington, Delaware 19801
                              (302)654-8080
23                            Email:  gmatthews@reliable-co.com

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
```

APPEARANCES (Continued):

For Century Indemnity:      Tancred Schiavoni, Esquire
                            O'MELVENY
                            7 Times Square
                            New York, New York 10036

For Tort Claimants:         James Stang, Esquire
                            PACHULSKI STANG ZIEHL JONES LLP
                            919 North Market Street, 17th Floor
                            Wilmington, Delaware 19801

For Brown Rudnick:          Sunni Beville, Esquire
                            BROWN RUCKNICK
                            One Financial Center
                            Boston, Massachusetts 02111

For the U.S. Trustee:       David Buchbinder, Esquire
                            UNITED STATES DEPARTMENT OF JUSTICE
                            OFFICE OF THE UNITED STATES TRUSTEE
                            844 King Street, Suite 2207
                            Lockbox 35
                            Wilmington, Delaware 19801

For Marco & Audrey
Romero:                     Patrick Jackson, Esquire
                            FAEGRE DRINKER BIDDLE & REATH
                            222 Delaware Avenue
                            Wilmington, Delaware 19801

For Convulsion of the
Abused Scouts for
Justice:                    Rachel Mersky, Esquire
                            MONZACK MERSKY BROWDER HOCHMAN
                            1201 North Orange Street
                            Wilmington, Delaware 19801

For Napoli Shkolnik:        Brett Bustamante, Esquire
                            NAPOLI SHKOLNIK PLLC
                            360 Lexington Avenue
                            New York, New York 10017

For Andrew Vanarsdale
 & Timothy Kosnoff:         David Wilks, Esquire
                            WILKS LAW, LLC
                            Wilmington, Delaware

```
 1  APPEARANCES (Continued):

 2  For Coalition of Abused
    Scouts:                   David Molton, Esquire
 3                            BROWN RUDNICK
                              7 Times Square
 4                            New York, New York 10036

 5  For First State Insurance
    Company and Hartford
 6  Accident and Indemnity
 7  Company:                  James Ruggeri, Esquire
                              SHIPMAN & GOODWIN LLP
 8                            1875 K Street, NW, Suite 600
                              Washington, DC 20003
 9
    For National Surety Corp.
10  Allianz Global Risks US
11  Insurance Company:        Harris Winsberg, Esquire
                              TROUTMAN PEPPER HAMILTON SANDERS LLP
12                            600 Peachtree Street, N.E.,
                              Atlanta, Georgia 30308
13
    For Tort Claimants:       Iain Nasatir, Esquire
14                            PACHULSKI STANG ZIEHL & JONES
                              10100 Santa Monica Blvd.
15                            Los Angeles, California 90067

16  For Special Insurance
    Council:                  Meredith Neely, Esquire
17                            GILBERT LLC
                              700 Pennsylvania Avenue
18                            Washington, DC 20003

19

20

21

22

23

24

25
```

1  MATTERS GOING FORWARD:

2

3  #5) Motion of Marco Romero, Jr. and Audrey Romero for an
   Order for Relief from the Automatic Stay Pursuant to Section
4  362(d) of the Bankruptcy Code (D.I. 1120, Filed 8/19/20).

5  **Ruling: 25**

6  #7) Debtors' Application for Entry of an Order Authorizing
   the Retention and Employment of Quinn Emanuel Urquhart &
7  Sullivan, LLP as Special Litigation Counsel for the Debtors
   and the Debtors-in-Possession, Nunc Pro Tunc to August 1,
8  2020 (D.I. 1125, Filed 8/20/20).

9  **Ruling: Order Entered**

10 #8) Debtors' Motion Pursuant to Section 105(a) of the
   Bankruptcy Code and ¶ 27 of the Bar Date Order for Entry of
11 an Order (I) Supplementing the Bar Date Order and (II)
   Granting Related Relief (D.I. 1145, Filed 8/25/20).
12

13 **Ruling: Taken Under Advisement**

14 #9) Motion of the Coalition of Abused Scouts for Justice for
   an Order (I) Authorizing the Coalition to File Under Seal
15 Exhibit A to the Amended 2019 Statement and (II) Approving
   the Sufficiency of the Amended 2019 Statement (D.I. 1144,
16 Filed 8/24/20).

17 #10) Motion of the Coalition of Abused Scouts for Justice to
   Participate in The Mediation (D.I. 1161, Filed 8/26/20).
18

19 **Ruling: 123**

20
   EXHIBITS                              I.D.    REC'D
21
   Declaration of Dr. Wheatman                    46
22
   Declaration of John Dougherty                  46
23
   Declaration of Evan Roberts                    46
24

25

1    (Proceedings commenced at 10:13 a.m.)

2    THE COURT:  Good morning, counsel, this is Judge

3 Silverstein.  We're here in the Boy Scouts of America

4 bankruptcy case; case number 20-10343.

5    Ginger, please remind everyone of the protocol for

6 the hearing.

7    THE CLERK:  It is extremely important that you put

8 your phones on mute when you are not speaking.  When

9 speaking, please do not have your phones on speaker as it

10 creates feedback and background noise and it makes it very

11 difficult to hear you clearly.

12    Also, it is very important that you state your

13 name each and every time you speak for an accurate record and

14 your cooperation in this matter is appreciated.  Thank you.

15    THE COURT:  Thank you.  I will turn it over to

16 debtor's' counsel.

17    MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott

18 of Morris Nichols here for the Boy Scouts.

19    Your Honor, we do have quite a bit on the agenda

20 today, so my inclination is to get right to it.

21    The first matter on the agenda, going forward

22 today, is number five which is the motion of the Romero's for

23 lift stay, so I will cede the podium to their counsel.  Mr.

24 Linder will be handling that on behalf of the debtors, Your

25 Honor.

1          THE COURT:  Thank you.

2          MR. JACKSON:  Good morning, Your Honor, Patrick

3   Jackson for the record, Faegre Drinker Biddle & Reath on

4   behalf of Marco Romero, Jr. & Audrey Romero.

5          This is a lift stay motion as indicated with

6   respect to the continuation of state court litigation in

7   Nevada that's been pending since December 2014, upon account

8   of the personal injury sustained by Mr. Romero while

9   attending a Boy Scouts event in 2016.

10         I admit I was a little surprised that I'm standing

11  here today because we viewed this as a fairly routine motion

12  from the time we filed it.  Certainly, one of a piece of four

13  others, I believe, that had been granted prior to this.  This

14  is a straightforward Rexene Products motion, if you will --

15  the standard in this district.

16         We are seeking, for the sake of clarification,

17  because there does seem to be some confusion on this with the

18  objections that were filed; we're seeking relief from the

19  stay, to the extent necessary, to continue the litigation

20  through to the liquidation of Mr. Romero's claims against the

21  defendants.  And really, we only need stay relief to

22  liquidate those claims against BSA.

23         There's a number of other co-defendants that are

24  not debtors are not protected by any sort of extension of the

25  stay that was entered in these proceeding with respect to

1  certain other co-defendants of BSA.

2         So, we're seeking only to liquidate the claim.   In

3  the proposed form of order which is similar to the other

4  forms of order that have been entered thus far in the case,

5  it's specifically does not permit us relief from the stay to

6  execute any judgment resulting.  That would be subject to,

7  you know, further proceeding before this court.

8         So, with that, just quickly.  I think the

9  applicable standard for this is provided by 362(g) of the --

10  well, it's cause under 362(d) cause for lifting of the stay.

11  And the evidentiary burdens are laid out in 362(g) of the

12  Code and that provision provides that in any proceeding with

13  respect to relief from the stay, the movant bears the burden

14  of establishing the debtor's equity and property which is

15  really not an issue.  This is not a lack of equity stay

16  relief motion.  This is a cause stay relief motion under

17  Rexene.

18         And any party who's opposing the relief from stay

19  bears the burden on all other issues.  So from my perspective

20  what we needed to do, in our motion, and I believe we have

21  done, and I'll walk you through that quickly, is we need to

22  establish a prima facie case for cause for relief from the

23  stay.  And as I said, this is a Rexene Products matter.

24         That's the balancing test that's been used in

25  these type of motions since 1994 when it first came down.

1  And the three factors that are balanced in Rexene are: the

2  burden, if any, on the estate, on the debtors in the event

3  that the stay relief is granted; the next is the, you know,

4  relative harm to the movants if the stay relief is denied

5  and; then the third is the likelihood of the movant's success

6  on the merits.

7       And I'll take that one first because it's a very

8  low showing.  It doesn't mean that we have to prove to this

9  court that we're ultimately going to prevail in the lawsuit.

10 It just means that there's a chance, you know, that -- it's

11 sensible to imagine that we would prevail on the merits and

12 the fact that the state court has actually set a trial day is

13 enough.  Under Rexene actually that was enough that the case

14 had sufficiently advanced beyond pretrial motion practice.

15      So, I think that -- I don't think anybody's

16 quibbling that we satisfy the likelihood of success on the

17 merits such as that low bar is under Rexene.

18      As to the burden on the debtors, you've heard from

19 the debtors in support of our motion that they tend to agree

20 that there's no burden given the limited relief that we're

21 seeking, just to liquidate the claim.  As the debtors point

22 out and we agree, liquidation of a claim is something that's

23 going to need to happen, whether it's now or later.  It's not

24 something that would ordinarily be appropriate for this court

25 being that it's a personal injury claim and Your Honor could

1   only estimate it and wouldn't be able to liquidate it.

2         So the debtors are in agreement and I think the

3   debtor's agreement on the lack of prejudice to them certainly

4   satisfies my prima facie burden on that point.  And then the

5   prejudice to the movant, should stay relief be denied, is

6   ultimately one of timing.

7         This claim is going to be liquidated somewhere.

8   It's better for is and really better for all involved that it

9   would be liquidated in the courts that's already been

10  familiar with it since 2018, especially too given that

11  proceeding in Delaware, either under the context of a plan or

12  some sort of, you know, removal type proceeding here would

13  entail multiple layers of process given the court's

14  jurisdictional limitations.

15        And there's also a timing aspect of, you know,

16  witness' memory saved, documents become less available

17  overtime.  So really the prejudice to my client of not

18  proceeding before the Nevada state court on a rescheduled

19  timetable.  As we noted in our papers, the trial was set for

20  February 2021.  We don't think that's going to happen given

21  there will need to be a new schedule put in place for the --

22  to accommodate the bankruptcy delay.

23        But I do think that under the Rexene factors and

24  given the statutory evidentiary burden, I think we've

25  satisfied, at least, the prima facie case, largely with the

1    debtor's agreement on the prejudice point.

2            So turning very briefly to the objections.

3            What I saw in the objections really surprised me

4    because it just seems to me that I'm being caught up, my

5    clients are being caught up in something bigger than

6    themselves here.  The objection didn't really seem to be

7    directed toward the Rexene standard.  They didn't seem to be

8    directed toward, you know -- I didn't see any evidence being

9    put into the objections to sort of carry whatever burden the

10   objectors would have under 362(g).

11           What I saw were arguments that might have made

12   sense if Your Honor was being presented with a motion to

13   extend the automatic stay to cover the non-debtor defendants

14   in our action and to enjoy any, you know, use of insurance

15   proceeds interactions.  That's just not where we are

16   procedurally.

17           And it is where this case is procedurally on a

18   certain subset of personal injury claims against the debtors,

19   namely the abuse claims.  And those -- as Your Honor is well

20   aware, there's been an ancillary/adversary proceeding that

21   has swept up quite a few BSA related co-defendants, also non-

22   BSA related co-defendants.

23           And the central argument for tying up those

24   actions with successfully preliminary injunctions in the

25   adversary proceeding was very much an argument along the

1  lines of, you know, the importance of preserving the

2  insurance.  But, here's, that's just not where we are

3  procedurally, I think.

4         So, the FCR's objection, the committee's

5  objection, to me, that doesn't really make sense and it seems

6  like we're kind of two ships passing in the night.  They're

7  not particularly responsive to the motion.  They seem to be,

8  you know, emblematic of what's going on in the broader case

9  and I just can't speak to that because I'm here today on

10 behalf of a fairly straight-forward, you know, personal

11 injury movant seeking pretty straightforward relief under

12 Rexene.

13        So, with that, I'll cede the podium to others or

14 if Your Honor has questions, happy to answer them.

15        THE COURT:  I do not have any questions.  Thank

16 you.

17        Let me hear from the debtors first.

18        MR. LINDER:  Good morning, Your Honor, Matt Linder

19 of Sidley Austin on behalf of the debtors.  Can you hear me

20 okay?

21        THE COURT:  Yes.

22        MR. LINDER:  Your Honor, the debtors support the

23 Romero's lift stay motion for the reasons noted by counsel,

24 the movants and for the reasons stated in our response.

25        They are correct that we really view this as a

1   routine and limited lift stay request.  It would only allow

2   the plaintiff to liquidate but not to actually collect on any

3   judgment or possible settlement with respect to this action.

4   Either of those events would require counsel to come back to

5   the court and obtain a further order of the court, allowing

6   them to collect on their claim.

7           I just want to expand upon that briefly, if I

8   could, Your Honor.

9           The debtors support this motion for thee principal

10  reasons.  First, this is, as counsel notes, a personal injury

11  claim that is not related to sexual abuse.  Unlike abuse

12  claims, the debtors do not anticipate that this type of a

13  claim will be channeled to any trust or be the subject of any

14  trust distribution procedures.

15          So, absent the settlement, the claim will need to

16  be liquidated at some point or another.  So we really view

17  this as a matter of timing, whether that happens now or

18  later.  It needs to happen.

19          Second, this is precisely the same limited type of

20  stay relief that was granted in several previous instances.

21  The only funds that we anticipate being expended, if the

22  motion is granted, our defense cost.  And, again, it's

23  virtually certain that those defense costs will need to be

24  expended at some point in time to liquidate the claim,

25  whether it's now or later.  Those amounts will be expended.

1          Counsel for the movant touched on this point, but

2   I think it bears emphasis.  If the stay relief motion were to

3   be denied, it's possible, if not probable, that the plaintiff

4   could proceed against the non-debtor co-defendants in the

5   action.  Those co-defendants are additionally insurers under

6   the same Old Republic primary insurance policies that are

7   implicated by the claim.

8          This would have precisely the same effect from an

9   insurance perspective in terms of funding defense costs.  Old

10  Republic, as we know, Your Honor, has been expressly

11  authorized by the court to pay those defense costs on behalf

12  of non-debtor co-insurers. So, for those reasons, Your Honor,

13  the debtors support the limited relief requested in the

14  motion and we request that it be granted.

15          THE COURT:  Thank you.

16          Okay.  Let me hear from the tort claimants

17  committee.

18          MR. NASATIR:  Good morning, Your Honor.  This is

19  Iain Nasatir, Pachulski Stang.

20          Let me address that last point, first, if I may.

21          The idea that the case -- additional -- non-debtor

22  additional insurers will be supplied with unlimited insurance

23  is not correct.  The stipulation that the tort claimants

24  entered into with Old Republic was the ability to monitor

25  this, their costs in defense with a very low threshold.  So

1  there is not going to be a free-defense cost check by Old

2  Republic.  And that was the central parts of the Romero

3  motion.

4          Let me also deal, if I may, with the second to the

5  last point which is the survivor's clam and the tort and the

6  non-abuse claims are completely separately.  That remains to

7  be determined.  We don't know what the ultimate plan will

8  look like.

9          One thing we do know is those funds are going to

10 come from the same source as far as insurance is concerned.

11 It's going to come from the insurance policies.  And the

12 insurance policies cover those.  And we don't know right now

13 how much is going to be impacted any given year by the amount

14 of claims.

15         We do know that when the four relief from stay

16 granted motions came forward that we thought there was 7,000

17 claims.  We know now that it's gone to twelve and it's

18 estimated to go to sixteen and this is nine weeks out before

19 the claims (indiscernible).  So we really don't know that.

20         And while it's been suggested that there's no

21 evidence that there's towers of insurance available the fact

22 that those towers can be leaped up as lightning speed, if you

23 start taking into account exhaustion of policy, insolvency of

24 carriers, and unknown carriers at the top end who's never

25 been asked to pay anything.  So we're in another position, we

1  just don't know.

2          Another thing we don't know is what coverage

3  trigger will be determined.  It could be that it is every

4  instance of abuse versus the impact of an entry on a non-sex

5  abuse claim.  It could be a continuous trigger theory.  A

6  continuous theory would allocate occurrences on injury, an

7  injury occurring after the abuse to the physical impact which

8  would trigger the very policies we're talking about now.  We

9  don't know how coverage is determined then.

10          THE COURT:  I don't understand that.  I don't

11  understand that argument.  Can you say it again?

12          MR. NASATIR:  Sure; sure.

13          If a survivor was abused in 2000 and they had a

14  continuing physical manifestation from that abuse and their

15  medical studies suggest that occurs, whether it's in touching

16  cases or types of cases.  Subsequent manifestation of that

17  injury say in 2016 would trigger the 2016 policy under 2008

18  injury.

19          That is a viable legal theory of coverage. Whether

20  it is the right theory that the court will accept in this

21  instance, we don't know.

22          THE COURT:  That's not the debtor's theory, is it?

23          MR. NASATIR:  No, the debtor is not going to have

24  that theory.  It's going to be the tort claims who want to

25  maximize the coverage.

1          THE COURT:  Okay.

2          MR. NASATIR:  So this idea the four cases found

3    before and, therefore, this is just the run of the mill case,

4    that's not exactly correct.  And I do think that the Romero

5    counsel was correct in saying to some degree, they are

6    getting caught up in this.

7          But the court cases that came before Torres were

8    very different. First of all, they came at a time early on in

9    the case.  We really thought that the coverage or the claims

10   number would be different. But they also came with request

11   from the tort debtor saying, look these are very limited

12   cases.  Would you please let these things go forward?

13         The Erickson case and the Kwon (ph) case, these

14   have impact policies in the last year of coverage.  That

15   particular carrier doesn't have a deductible because it's

16   only one coverage.  There's no aggregate.  Let these guys go

17   forward.

18         And in the case of Erickson, we did.  And then

19   hindsight, I wonder if that was the right decision.  And in

20   Kwon, we were told this is a unique case.  There's a

21   prepetition settlement.  All the money has been spent that

22   needs to be spent except $150,000 dollar settlement.  It

23   would be a waste of money not to take advantage of this week

24   to week to be a favorable (indiscernible).

25         And we're like, well you know we're a little

1  concerned that this (indiscernible) will get us in trouble

2  later.  No, no, no.  This is a unique circumstance.  Okay.

3  We let it go.

4         So, now I think it's ironic to be told why didn't

5  you -- if you let these others go, you should let everyone

6  go, and that's precisely our concern because defense costs

7  are going to be incurred.

8         We were told there are, at least, forty, at a

9  minimum, forty other non-abuse claimants out there.  And are

10 they not going to come into and what basis will we have

11 (indiscernible) and tell them not to do it.

12        But for every dollar that's spent on defense cost,

13 even if it's just taking, liquidating these claims, there's a

14 dollar that comes out of BSA because Old Republic has a

15 million-dollar deductible.  And so, there isn't, in fact.

16 This is just -- the Romero case is not just one case.  It's

17 the many more that will follow.

18        And I don't know how we are going to be able to

19 make distinctions in the future if we don't take a stand now

20 and say, come on guys.  Let's -- we're asking this court,

21 please deny this motion with (indiscernible) until we get the

22 claims bar date.  We will no longer be speculating on the

23 abuse funds.

24        And perhaps --

25        THE COURT:  And what will happen at the claims bar

1  date because now we know the universe of claims?  I still

2  cannot liquidate this claim which is going to have to be

3  liquidated.

4         MR. NASATIR:  Right.  Will happen by that point in

5  time is or hopefully by that point in time. There will be an

6  understanding about how much insurance is available and

7  whether it is a raise to the courthouse or not to get those

8  claims, and whether it is necessary for everybody to litigate

9  what their claim is worth.

10        The abuse claimants -- the survivors right now

11  unable to liquidate their claims to get to the very thing

12  insurance that the non-sex abuse claimants are seeking to do.

13        THE COURT:  Well and also the potential of

14  collateral estoppel issues.  Okay.  And these claims are --

15  are these particular claims stayed against others?

16        MR. NASATIR:  In this case, I don't know.  That

17  wasn't made clear in the Romero motion.  There's a pie.  And

18  in this pie, some of the additional insurers are

19  (indiscernible) to the preliminary injunction and those cases

20  are stayed and subject to the automatic stay and those cases

21  are stayed.

22        The sliver of pie that is not where you have non-

23  debtor additional insurer who are not subject to any

24  injunction or stay, we have a stipulation protecting the

25  insurance proceeds going out the door.  They have a

1  stipulation that owes the public to which the FTR is a party,

2  we're a party, and there is a settlement path.  There is a

3  per month review of expenses, very carefully negotiated in

4  order to make sure that all the water didn't go down the

5  drain because we left a little of the drain (indiscernible).

6         So we are very concentrated on making sure

7  insurance proceeds as to survivors, as to non-sex abuse

8  claimants stays inside the sink until we have appointed which

9  we feel comfortable at saying no, there's not going to be an

10 adverse impact to anybody.

11        THE COURT:  When is that going to be that you can

12 possible feel comfortable that going forward with this

13 lawsuit will not what adversely impact, what?  I don't

14 understand when that would even happen.

15        MR. NASATIR:  Well it certainly can't happen for

16 nine weeks because we don't get to the claims bar date.  So

17 that's the minimum.  What I think Your Honor is suggesting is

18 when will it occur.  And my response to -- you know, it may

19 be neve and, therefore, we still have to liquidate these

20 claims.

21        I think that's what Your Honor is suggesting and

22 my answer to that is you might be right.  That you also not

23 be wrong, but you might be pleasantly surprised once we get

24 to that nine week cutoff, we'll be able to have a sense of

25 much better sense of the insurance because that work is going

1    on now and where it falls who has it, what the impact is.

2            And we may have a better sense at that point in

3    time whether the non-abuse claimants and the survivors are

4    going to be cheated in tandem in completely separately ways

5    and how that will be --

6            THE COURT:  What authority is there in any case to

7    include personal injury claim that these precise of personal

8    injury claimants into an abuse victim's compensation trust

9    fund?

10           MR. NASATIR:  I'm not aware of any cases and I

11   can't remember a case in which I've had both that I've been

12   involved in the insurance coverage.  But I can certainly

13   think of cases where non-abuse tort claimant have been put

14   into a mandatory mediation program before relief from stay

15   was granted in order to preserve some of the -- another

16   situation where you had to deduct the (indiscernible), except

17   in this case it was a self-insured retention.  And it was a

18   way to reduce defense costs.

19           I don't know how -- and I'm not suggesting that

20   would be applicable here.  I'm just answering the question as

21   best I can.

22           THE COURT:  Okay.

23           MR. NASATIR:  So, Your Honor, we would ask you in

24   terms of time and prejudice let them come back after the

25   claims bar date.  We may have no better answer and then Your

1   Honor can say you have no better answer.  But let us have the

2   time to, at least, know the universe of the survivors is,

3   vis-à-vis, the non-abuse claimants.  Thank you.

4              THE COURT:  Okay.  Thank you.

5              Okay.  Let me hear from the FTR.

6              MS. NEELY:  Good morning, Your Honor.  This is

7   Meredith Neely of Gilbert LLC on behalf of the FCR.

8              We agree with the TCC's position and would simply

9   add that these are (indiscernible) policies where debtor has

10  the obligation to pay the first million-dollar deductible.

11  That obligation is secured by letters of credit in which the

12  debtor has a reversionary interest.

13             Defense costs are being paid within those limits.

14  So even though the claimants are not seeking to receive

15  payments for their claims at this point, the liquidation

16  process will draw on the debtor's estate.

17             And, Your Honor, we would just ask that we be

18  given time after the bar date to see how the claims may

19  change again, given that the last time we were confronted

20  with this issue, we had a much different picture of the

21  claims in front of us and the number of claims has gone up

22  dramatically since then.

23             We think that it would be prudent to wait until

24  after the bar date to see what kind of claims come in. And if

25  at that point the FTR would be a better position to say

1  whether allowing the Romero claims to go forward would impact

2  the right to future claimants.

3          THE COURT:  Okay.  Thank you.

4          Does anyone else object?

5      (No verbal response)

6          THE COURT:  Mr. Jackson, do you want to respond?

7          MR. JACKSON:  Yes.  Thank you, Your Honor.  Just

8  very briefly.

9          Hopefully, this will be helpful.  The atmospheric

10 fact of the four prior orders was all it was.  I was bringing

11 it up as to explain why it is that I'm a little surprised to

12 be here today.  I'm not asking you to grant this because it

13 was granted four times before.  I suppose people have the

14 reasons for not objecting to it before.  I'm not sure I

15 understand those reasons.

16         But just to bring it back to where I started.  I'm

17 not asking you to grant it because you did four times before.

18 I'm asking you to grant it because there is a standard.

19 There's a burden and it's been satisfied.

20         I believe that I've made my prima facie case.  The

21 burden is on those opposing it to explain something more than

22 might's and maybe's and speculations and hypotheticals about

23 how this might play out.  Why lift stay should not be lifted,

24 given that there is agreement between the movant and the

25 debtor.

1        And a lot of the facts that or a lot of the

2  considerations that committee counsel through out and the FTR

3  counsel echoed really have to do with things outside of this

4  contested matter.  It's the issue about what's the overall

5  insurance coverage.

6        As I mentioned that might be something that's

7  relevant if there was later a push by the committee and the

8  FTR to try to expand the preliminary injunction to capture

9  any case where the BSA counsel's and co-insureds are subject

10  to, you know, are co-liable.  That's not where things stand

11  right now.

12        That's not any relief that's been sought and this

13  is an odd procedural vehicle to kind of seek it like, you

14  know, that to say that we're not going to grant any stay

15  relief because there might be an implication on insurance

16  proceeds.

17        The better procedural vehicle for that would be

18  parties taking that position to actually seek to expand the

19  preliminary injunction to cover the universe which hasn't

20  been done and I'm not suggesting we want that to be done.

21  But this is not something that should be done sort of in a

22  backdoor way through an opposition to this or possibly other

23  stay relief motions that are going to come down the pike.

24        And the issue about the letter of credit, I don't

25  -- I can't begin to, you know, speak on how the mechanics of

1  that work, other than that's not really my client's issue.

2  If there's a reason why a letter of credit should not be

3  tapped that's something that there are procedures for that

4  and outside the context of this.

5          So, we're not asking specifically for anything to

6  happen to any letter of credit.  All we're asking is to go

7  forward with our case.  And if there are ancillary effects

8  that going forward with the case has on insurance assets and

9  the like, there are people far better suited than I am to

10 understand with all those effects are.  And, if necessary,

11 come before Your Honor and seek appropriate relief.

12         But, again, I don't think an objection to a very

13 straightforward Rexene motion is really the way to kind of

14 backdoor all of that relief.  There are broader issues raised

15 by the idea that there might be more motions like this coming

16 down the pike.  That is what it is.  I'm just here today on

17 this motion that is before you today and on the burdens as I

18 laid them out.

19         So I believe -- I would ask respectfully, Your

20 Honor, that our motion be granted.  And, obviously, granting

21 this motion is without prejudice to future motions.  I'm not

22 here on behalf of any future movants.  I'm just here on

23 behalf of my client. Thank you, Your Honor.

24         THE COURT:  Okay.  Thank you.

25         Well, the standard for motion for relief from stay

1  in this context is <u>Rexene</u>.   There are three factors that we

2  balance and they're the likelihood of success on the merits

3  which is a very low bar.   And I find that the plaintiffs have

4  met.   There's no suggestion.   It's a personal injury claim.

5          The relative harms to the movants and the burden

6  on the estate, the debtors have said there is no harm.   And I

7  view this as a timing issue.   I cannot liquidate this claim

8  by statute.   It's a timing issue.

9          As far as sort of the knock-on implications that's

10  not a concern on this particular motion for relief from stay.

11  I have not had evidence.   No one provided me with evidence

12  about the 2016 insurance policies, about the letter of

13  credit, about anything related to concern with respect to

14  those policies and how they may be impacted.

15          And, quite frankly, I don't see that the bar date

16  is going to make a difference with respect to this motion.

17  From what everyone is telling me and from I gather is the

18  concern that the committee and the FTR are expressing is that

19  we're going to have a lot greater claims and that's what

20  we're going to know.   That there are more claims then the

21  debtors anticipated receiving; more proofs of claim filed.

22          And that's where we're going to be.   So I don't

23  think we're going to have any clearer notion of anything.   I

24  see no reason to keep this particular lawsuit from going

25  forward on the record that's been made here.   So I am going

1  to grant the motion for relief from stay to liquidate this

2  claim.

3          MR. JACKSON:  Thank you, Your Honor.

4          MR. ABBOTT:  Your, Honor, I guess the only --

5  Derek Abbott for the debtors.

6          The only question is I don't know if Mr. Jackson

7  has uploaded an order or how he wants to, or the court wants

8  parties to send an order.

9          THE COURT:  I don't know if there was one.  I will

10  let the parties talk and you can communicate with Chambers

11  and let me know.

12          MR. ABBOTT:  Thank you, Your Honor.

13          MR. JACKSON:  There was on attached to the order -

14  - attached to the motion, but I will await -- Mr. Abbott and

15  I will connect after the hearing.

16          Thank you.

17          THE COURT:  Please.  Thank you.

18          MR. ABBOTT:  Your Honor, Agenda Item No. 6 was the

19  Henderson lift stay.  That has been -- a C&O was filed on

20  that late last night.  So, we don't need a hearing on that

21  unless the court has questions based on what was submitted

22  last night.

23          THE COURT:  I haven't seen it, but I assume I

24  won't.  I will assume I will sign it. If I have any questions

25  I will let you know.

1        MR. ABBOTT:   Thank you, Your Honor. Agenda Item

2  No. 7 is the debtor's application for the retention of Quinn

3  Emanuel who Your Honor may recall was a special litigation

4  counsel and has been handling, among other things, perhaps

5  the litigation with the Girl Scouts.  I will cede the podium

6  to Mr. Linder to present that motion, Your Honor, or that

7  application.

8        THE COURT:   Thank you.

9        MR. LINDER:   Again, Matt Linder for the record,

10  Your Honor.

11        As Mr. Abbott noted, this is the debtor's

12  application to retain Quinn Emanuel as special litigation

13  counsel in connection with the Girl Scouts trademark action

14  under Section 327(e) of the Bankruptcy Code.

15        Your Honor will recall that you entered an order

16  back in April which lifted the stay for a period of

17  approximately three months to allow the action to be mediated

18  and then the stay was subsequently lifted on July 23rd when

19  the parties were not able to reach a resolution within the

20  allotted period of time.

21        The Quin Emanuel Firm has represented the BSA in

22  the trademark action since late 2018.  It's been serving as

23  an ordinary course professional in these cases including

24  during the lift stay period that expired on July 22nd.  Now

25  that the stay has been fully lifted and the trademark action

1  has resumed in full the debtors anticipate that Quin Emanuel

2  may exceed the tier one OCP cap which is what prompted the

3  filing of this application.

4         Quinn Emanuel is familiar, obviously, with all

5  aspects of the trademark action.  The firm is well-qualified

6  and able to continue to represent the debtors in that action

7  as a retained professional under Section 327(e).  Ms. Tomasco

8  of the Quinn Emanuel Firm has submitted a declaration stating

9  that it does not hold -- Quinn Emanuel does not hold or

10 represent any interest adverse to the debtors with respect to

11 the matters on which it will be employed.

12        After we filed the application we received

13 informal comments from the tort claimant's committee asking

14 us to clarify in the proposed order that the debtors are only

15 seeking to retain Quinn Emanuel solely with respect to the

16 trademark action and no other piece of litigation.  That is

17 certainly what we intended, Your Honor, and we have revised

18 the order and filed the revised order at Docket No. 1243

19 making that change.  We understand that change is acceptable

20 to the tort claimants committee.

21        After we had agreed to that change with the tort

22 claimant's committee we received a limited objection of

23 Century Indemnity Company asking for the same modification to

24 the proposed order.  We understand or we believe, at least,

25 that that change does resolve Century Indemnity Company's

1  comments.

2          So, we would ask, Your Honor, that the order be

3  entered authorizing the debtors to retain Quinn Emanuel as

4  special counsel.

5          THE COURT:  Okay.  Thank you.

6          Let me hear from Century.

7          MR. SCHIAVONI:  Your Honor, we filed the objection

8  because the proposed order didn't limit the scope of the

9  engagement and said that there would be other engagements.

10 They modified that to limit it.

11         Quinn Emanuel is spending $700,000 a month in the

12 months leading up to the bankruptcy.  That is what led that

13 concern.  It just -- we did also ask for a status report on

14 how it is that they could be going forward now at $700,000 a

15 month, you know, litigating into Girl Scouts given all the

16 problems they have. We have gotten the answer for that.

17 We're satisfied wiht the proposed form of order

18         For what it's worth, Judge, I do think this case -

19 - submitting it to a settlement judge for maybe a little bit

20 more robust effort to try to pass a settlement, I mean I'm

21 sorry if I'm the voice in the wilderness on this, but it just

22 seems like engaging in $700,000 a month for litigation with

23 all these other problems just seems like a lot, but we

24 withdraw our objection.

25         THE COURT:  Okay.  Thank you.

1        For the record that was Mr. Schiavoni.

2        Does anyone else wish to be heard?

3     (No verbal response)

4        THE COURT:  Okay.  Well my understanding is that

5  the revised form of order is acceptable to both the TCC, I

6  think it was, who raised an informal objection and to

7  Century.  So, I haven't seen it, but I will find it and I'm

8  sure that I will sign it and approve it.

9        You know, as for sending it to a settlement judge,

10  a New York judge, I think its New York who wants to -- who is

11  overseeing that wants to do that, certainly that is up to him

12  or her.

13        What's our next matter?

14        MR. ABBOTT:  Thank you, Your Honor.  The next

15  matter is Agenda Item No. 8 which is the debtor's motion for

16  an order supplementing the bar date order.  There has been a

17  substantially revised form of order submitted.  I wanted to

18  make sure the court had seen that.

19        THE COURT:  No, but let me look in the newest

20  folder I got.

21        MR. ABBOTT:  It should be Item 8(f), Your Honor,

22  on the agenda.

23        THE COURT:  Okay.  I see theat.

24        MR. ABBOTT:  Its Docket item 1281.

25        THE COURT:  I see that in the binder.

1            MR. ABBOTT:  Thank you, Your Honor.

2            Ms. Boelter will be handling this matter for the

3  debtor.  So, I will turn it over to her.

4            MS. BOELTER:  Thank you, Your Honor.  Jessica

5  Boelter, Sidley Austin, on behalf of the debtors.

6            Your Honor, at the conclusion of the hearing on

7  August 31st the court asked for a handful of follow-up items

8  which were largely reflected in filings that occurred on

9  Friday which was the filing deadline.

10            I'm not sure if Your Honor had the opportunity to

11  review them, but the debtors filed a supplemental filing, the

12  coalition filed a supplemental filing, and then Century, on

13  either Monday night or early Tuesday morning, also filed a

14  supplemental filing. And as Mr. Abbott just referenced, we

15  filed a revised form of order yesterday evening.

16            Given the, I guess, gravity of the matter that is

17  the subject of the debtors' motion to supplement the bar date

18  order I've prepared a brief presentation for the court to

19  walk through how we satisfied the court's questions and

20  concerns.  I am happy to start there, Your Honor, unless you

21  would like me to start somewhere else.

22            THE COURT:  No.  I appreciate a fulsome

23  presentation.  I did have an opportunity to spend some time

24  with this.  But I guess I want to know, first of all, is the

25  revised form of order -- I guess I had questions on the

1    original one even if I were to grant it.

2            Is the revised form of order a negotiated form of

3    order or is it just a further revised form of order?

4            MS. BOELTER:  It is a negotiated form of order,

5    Your Honor.  So, taking the recommendation of the court at

6    the end of the last hearing that the parties consult with

7    each other and try to reach a resolution, in the wake of that

8    hearing the debtors had multiple discussions with the

9    coalition over whether we could reach some form of agreement.

10           We were very pleased when we saw the coalition's

11   filings on Friday evening and compared those to our own

12   filings that we were actually quite close.  There were a

13   couple of issues that were remaining between the two, but we

14   were much closer than we thought.

15           We engaged in further discussions with Mr. Molton

16   and Ms. Beville over the weekend.  I am pleased to say, Your

17   Honor, the form of order that we filed yesterday evening does

18   reflect an agreement between ourselves, the debtor and the

19   coalition.

20           There were three principal changes to the form of

21   order that was filed last night, Your Honor.  The first of

22   those changes was the removal of the notion that the word

23   substantial or significant are misleading and, therefore,

24   should be precluded from advertising.  In the debtor's

25   original form of order we proposed removing "substantial" or

1  "significant".  The coalition took issue with that and as

2  part of our compromise we've agreed to remove that from the

3  form of order.

4          I should note, Your Honor, though, that this

5  notion of the $1.5 billion dollar fund is still in the form.

6          Another change that was requested by the coalition

7  was that the coalition legal representative apparently

8  following the hearing on the 31st had already begun to amend

9  their advertising to take down language that the debtors had

10 problems with.  So, there was a portion of the order that,

11 essentially, assumes that parties will take down the ads and

12 then they put the ads back up.

13         Because the coalition had already taken down a

14 number of those ads we streamlined the order to simply

15 provide that parties had five business days to remove the

16 troubling language, or to correct, or add the language

17 pertaining to the bar date itself for the claims website

18 which I will come back to later in the presentation.

19         The third thing that the coalition requested that

20 the debtors agreed tow as a paragraph that appears at the end

21 of the order that, essentially, provides the order has no

22 precedential effect when it comes to future cases.  From the

23 debtors' position, obviously, we're concerned about the Boy

24 Scouts of America and misleading advertising that may have

25 taken place with respect to the Boy Scouts of America

1   bankruptcy case.  From our perspective whether that has any

2   effect on another case is not of our concern.  As a result

3   the debtors were willing to agree to that order.

4         I should note, Your Honor, that, and I will go

5   through the rest of the presentation, Mr. Schiavoni did file

6   a pleading, like I mentioned, I think it was Monday night or

7   Tuesday morning, and while the order that I'm discussing

8   reflects an agreement between the movant, the debtors and the

9   coalition on the other hand, Mr. Schiavoni who joined in our

10  motion may have issues that he wants to discuss as well.

11        THE COURT:  Okay.  With respect to that, and we

12  will get to your presentation, so that I understand, does the

13  coalition, and I know we're going to get to that later, but

14  does it include each of the law firms or sponsoring entity

15  that is listed on the exhibits to the order?

16        MS. BOELTER:  So, I will let Ms. Beville address

17  that, but a couple of quick points, Your Honor.

18        One, we understand that the legal representatives

19  that are part of the coalition or that represent members of

20  the coalition, those law firms have each agreed to this form

21  of order.

22        With respect to the law firms that are reflected

23  in the exhibits the coalition members are some, but not all

24  of those law firms.  The debtors did notice this out to all

25  of the law firms that are listed on the exhibit.  They also

1  received notice of our original motion.

2           THE COURT:  Okay.

3           MS. MERSKY:  Your Honor, Rachel Mersky on behalf

4  of the coalition.  I'd like to introduce myself as the

5  Delaware counsel and co-counsel to the coalition.  I believe

6  Ms. Beville will be able to address any issues relating to

7  the coalition and the negotiated order.

8           I'd like to note that we appreciate the

9  willingness of the debtors to work with us over the holiday

10 weekend extensively to get to where we are today. And I will

11 leave it now to Ms. Beville.

12          THE COURT:  Okay.  Thank you.

13          I guess my question is which law firms are

14 sponsoring entities are not part of this agreement.  We can

15 have the presentation and then if some of those are on the

16 line, clearly, I will hear from them as well.  The reason I

17 ask the question is to know who has consented to this form of

18 order and who has not.

19          MS. BOELTER:  Fair point, Your Honor.  We will do

20 our best to identify for you which ones are, in fact,

21 coalition members or legal representatives of coalition

22 members.  I would just note that because there's a little bit

23 of a black curtain on some of these advertisers, while we've

24 notified them we may just need the assistance of Brown

25 Rudnick to specifically identify which ones are, in fact,

1  related to coalition legal representatives and which ones are

2  not.

3        So, Your Honor, that brings me to, I guess, what I

4  would call two other categories of information an expansion

5  that the court requested at the conclusion of the August 31st

6  hearing.

7        The first category is the court requested

8  additional legal support on two issues.  The first issue was

9  additional support in the bankruptcy context for the type of

10  relief that the debtors were seeking here today.  Our

11  pleading, Paragraph 6, cited a number of cases.  I would say

12  for purposes of today's hearing, I am not going to go through

13  all of them, but I will note that the Mirant case is probably

14  the most analogous.  That is at 334 B.R. 787, Bankruptcy

15  Northern District of Texas 2005.

16        In that case the court enjoined a firm and counsel

17  who were soliciting rejection of a plan.  The court concluded

18  that the speech at issue was, in fact, commercial speech.

19  The court concluded that the commercial speech at issue was

20  misleading.

21        Notably, in the court's analysis it went through

22  several different categories of language that appeared in the

23  attorney advertising and analyzed how each of those

24  categories was misleading with respect to the case at issue.

25        You will see, Your Honor, when we come to the

1   proposed form of order we have similarly provided factual

2   findings and I think that was another request that the court

3   had made at the last hearing that relates to the fact that

4   the certain statements we're taking issue with, in our view,

5   are, in fact, misleading.  We have provided factual support

6   for that.

7          The court, again, went through the misleading

8   statements, determined that those statements were misleading

9   and, in fact, and this will come up when I get to the second

10  legal issue that the court requested some expansion on,

11  included in the opinion a paragraph that was acceptable to

12  the court that the attorney at issue could use if it wanted

13  to continue its commercial speech or its advertising.

14         That, Your Honor, brings me to the next issue that

15  the court had requested expansion on which was legal support

16  for the notion that the court could require specific

17  information in the attorney advertising.  In this case, Your

18  Honor, and where we're at today in the revised form of order,

19  the only specific information that we're asking that it be

20  included in the ads is the bar date itself, November 16th,

21  and the claims agent's website.

22         At the August 31st hearing we talked about a phone

23  number or website.  I think the court raised the issue that

24  if there's two phone numbers that might be a little

25  confusing.  We have now landed on the website alone.  We have

1  seen that in other cases, as we've noted, in our pleading.

2         As I just said, the Mirant Court supports the

3  notion that this court has authority to, in fact, require

4  specific disclosures and really that comes from the Supreme

5  Court's opinion.  Take Zauderer, for example, that's at 471

6  U.S. 626, 1985, which is one of the Seminole cases on

7  attorney advertising, commercial speech and the interplay

8  with the first amendment.

9         In that case the court notes that disclosure

10 requirements are actually different then prohibitions on

11 speech.  In fact, they trench, as the court said, much more

12 narrowly on the advertisers speech itself.  And in that case

13 the court held that a disclosure requirement concerning

14 attorney compensation was justifiable in light of first

15 amendment jurisprudence.

16        We also cited, in our pleading, the Dwyer case.

17 That's the case from the Third Circuit where the court

18 evaluated an underlying state bar regulation that if the

19 attorney at issue was going to, sort of, tout the fact that

20 various courts had said favorable things about that attorney

21 in their legal opinions that he could just cite the quote

22 itself.  The regulation at issue mandated that the attorney

23 cite the entirety of the legal opinion.  And the Third

24 Circuit said,

25        "No, not so fast.  That is too burdensome."

1          And in this case, again, Your Honor, we're not

2    asking for any type of disclosure like was at issue in the

3    Third Circuit.  We're talking about two very simple things;

4    the bar date, itself, and the website.

5          We think with those two items, one, it will ensure

6    that claimants know that they must file a claim by a date

7    certain and we think that is extremely important and, two,

8    they have another place to go to particularly if they need

9    some sort of curative disclosure with respect to what they

10   have heard in the past or with respect to attorneys they may

11   have taken or they may have discussed issues with in the

12   past.

13          THE COURT:  Let me ask you this, Ms. Boelter,

14   because I spent some time or I spent the time I had with the

15   Dwyer case, which I found really interesting in a whole lot

16   of ways, but Judge Ambro is pretty methodical in terms of

17   going through the standards and the difference between

18   restrictions, and disclosures, and burdensomeness which is a

19   layer on top of everything.

20          One of the -- and, of course, whether the remedy

21   requested would -- whether the relief requested would remedy

22   the harm that was suggested by the defendant, I guess, in

23   that case.  One of the things that struck me about the

24   holding, the ruling, was this idea of -- well, it's not

25   proportionality, that's not  how they talk about it, but if,

1  in fact, the restriction or the disclosure would effectively

2  rule out the ability of the attorney to employ the particular

3  type of advertisement.  And one of the examples was the

4  business card with somebody's CFA or CPA on it and they

5  wanted her to add three sentences.  Well, effectively, of

6  course, she couldn't have anything on a business card.

7          One of the questions, and I may have even asked it

8  last week by chance, not by any informed view, was what about

9  the radio advertisements versus written because the focus of

10 the debtors' motion, I think, was more on written

11 advertisement in the sense that, and even now as you're

12 describing it to me we want you to put this on your website,

13 and the examples in the footnote that you gave me of Purdue

14 Pharma, PG&E they were really extensive websites that

15 somebody had either specifically for soliciting claimants or

16 their general website.

17         I think that is a distinction from a thirty second

18 add that somebody has on -- I've heard them on CNN, I've

19 heard them on MSNBC radio, not the TV.  I haven't seen those,

20 but I just happen to hear them in the car.  So, they're like

21 a thirty second, at most, maybe, advertisement.

22         Has the proposed form of order or the agreement

23 distinguished between written and a thirty second radio ad?

24         MS. BOELTER:  Your Honor, I was just going to go

25 back and look at the proposed form of order.  We do have --

1  the instance -- there is an instance, actually three

2  instances of radio advertisements at issue here.  And from

3  the debtor's perspective, and I take your point, and it was

4  made clearly in the Dwyer case which was an extreme example

5  where the court -- excuse me, the regulatory authority wanted

6  the entirety of a legal opinion appended to an advertisement

7  which, as a practical matter, could never really work, right?

8         In this instance we think we have narrowly

9  tailored the affirmative disclosure that, well, yes, in a

10 printed form it's easier to put the fine print of the www,

11 you know, claims agent website, but I still think in the

12 radio context it is quite possible to quickly say off the

13 name of the actual website as well as, of course, the bar

14 date itself.

15        I think many of us have heard, for example,

16 advertisements for pharmaceuticals or other legal services

17 where the ads are required to contain base level information

18 and you will hear at the very end of the ad a speaker

19 speaking very quickly to get through the mandatory legal

20 disclosures for purposes of making that ad acceptable.

21        So, we do not distinguish between television,

22 print, internet or radio.  We would like the affirmative

23 disclosures to apply to all of the above and we think we have

24 limited them in such a way that it should not, you know,

25 burden the parties that are promulgating those

1  advertisements.

2          THE COURT:  Okay.  Let's go back to your

3  presentation.

4          MS. BOELTER:  Sure.  Then the final category of

5  issues that the court expressed concern about really come

6  into the -- are, essentially, greater specificity.  The court

7  was looking for greater specificity with respect to the

8  precise problematic language.  Greater specificity with

9  respect to the advertisements themselves and greater

10  specificity with respect to the advertisers that were running

11  the ads themselves.

12          We have done that, Your Honor. We have broken down

13  the categories to, essentially, five buckets.  Three of which

14  fall into the false misleading category.  That's the word

15  "anonymous" which we covered, I think, fairly extensively at

16  the last hearing.  The reference to the $1.5 billion dollar

17  fund which the debtor still cannot understand where that

18  number came from.  Then statements such as "you don't need to

19  appear in court," "you will never have a deposition," that

20  sort of thing.

21          We have identified those three categories of false

22  and misleading.  We have identified the specific

23  advertisements and we've identified the specific firms or

24  organizations that are running the problematic ads.  I will

25  come back to the firm point because there was one issue there

1   that we struggled with.

2           We also, on the curative side of the affirmative

3   disclosures, limited this to just two things as we just

4   discussed.  The bar date itself, November 16th, and, again,

5   the claim's agent's website.  We have appended exhibits to

6   the form of order that identifies the advertisements in

7   question that run afoul of those two items and that

8   identifies the law firms that are running those

9   advertisements.

10          So, we think we've provided the court with

11   specificity when it comes to language, the specific ads at

12   issue and the specific law firms that are running the

13   specific problematic ads.

14          On the specific law firm point I'm sure the court

15   noted in the proposed form of order that we did propose

16   procedures for dealing with new ads.  The reason for that is

17   a few fold.  One, while we utilized FTI and the third-party

18   vendor to identify to the best of our ability the advertisers

19   that were running problematic ads today we know that they

20   were unable to access local cable markets.  It seems daily

21   were getting a barrage of emails and phone calls relating to

22   new problematic ads.

23          Rather than coming back to the bankruptcy court

24   every time we get another phone call or have another ad that

25   is forwarded to us we wanted to propose procedures that,

1  essentially, enabled the debtor to use some self-help with

2  the assistance of the TCC and rely upon the court as a last

3  resort for purposes of correcting problematic ads that we

4  found in this proceeding run afoul of the base line rules

5  that we're trying to establish here.

6          That is how we're dealing with the law firm issue

7  because we are concerned, Your Honor, that even if the

8  coalition and the other parties go ahead and make corrections

9  there are other law firms that are simply going to fill that

10 gap.

11         We also took note, Your Honor, that the first

12 amendment jurisprudence, and the court pointed this out at

13 the last hearing, requires targeted restrictions.  So, that

14 is what we did in the form of order and specific findings of

15 fact that back-up the court's targeted restrictions.  So, you

16 undoubtedly -- we proposed a much more robust form of order

17 for the court to review and, if persuaded, enter at the end

18 of this hearing.

19         Finally, and I guess this is more of a

20 housekeeping point, Your Honor, you will recall at the first

21 hearing we had submitted declarations from Dr. Wheatman, who

22 is our noticing expert, as well as Evan Roberts at FTI.  When

23 we filed our supplement on Friday we filed an additional

24 declaration from Dr. Wheatman and a declaration from John

25 Dougherty who is at Omni Agent Solutions.

1          As Chambers may have been informed Dr. Wheatman

2    who is available for cross-examination wasn't crossed at the

3    last hearing, had a medical issue and was unable to attend

4    today's hearing.  We contacted all of the parties yesterday

5    evening to confirm whether or not anyone had any interest in

6    cross-examining Dr. Wheatman.  No one said they did, but I

7    did want to let Your Honor know that, unfortunately, Dr.

8    Wheatman is not present here today.

9          John Dougherty is present today, I think I saw him

10   at some point on the Zoom, as well as Mr. Roberts.

11         We would like to move all of the -- the initial

12   Wheatman and Roberts were moved into evidence at the last

13   hearing.  We'd like to move into evidence the supplemental

14   declarations that were filed on Friday.

15         THE COURT:  Okay.  Let me ask, does anyone have an

16   objection to the entry into evidence of the supplemental

17   declaration of, I'll start with, Ms. Wheatman?

18        (No verbal response)

19         THE COURT:  I hear no one. It's admitted.

20        (Declaration of Dr. Wheatman, admitted)

21         THE COURT:  Does anyone have an objection to the

22   entry into evidence of the declaration of Mr. Dougherty that

23   was filed on Friday?

24        (No verbal response)

25         THE COURT:  I hear no one.  It's admitted.

1          (Declaration of John Dougherty, admitted)

2          THE COURT:  Ms. Boelter, I don't remember a third

3    declaration.

4          MS. BOELTER:  The Roberts declaration that I

5    referenced was filed with the original motion, Your Honor. I

6    apologize for that confusion, but he is present today.

7          THE COURT:  Okay.  Does anyone object to Mr.

8    Roberts's declaration being admitted into evidence?

9          (No verbal response)

10          THE COURT:  I hear no one. It's admitted.

11          (Declaration of Evan Roberts, admitted)

12          MS. BOELTER:  So, Your Honor, that concludes our

13    affirmative presentation.  I am happy to answer any of the

14    court's questions or walk through the form of order unless

15    you want to hear from other parties first.

16          THE COURT:  Let me hear from other parties first.

17    We will start with the coalition's objection.

18          Ms. Beville?

19          MS. BEVILLE:  Good morning, Your Honor.  Sunni

20    Beville here on behalf of the coalition.

21          Your Honor, I am going to have limited comments in

22    light of our agreement to the proposed order.  But I do just

23    want to clarify the record and make a couple observations in

24    light of the objection that was filed by Century just

25    yesterday.

1          Just to clear the record, Your Honor, we do

2    represent the coalition and not the individual law firms.

3    Here, Your Honor, asking the question earlier the debtors did

4    ask us to determine if the law firms, themselves, consented

5    to make the modifications set forth in the proposed order.

6    So, I asked each of the law firms individually and they did

7    respond that they consent to make the modifications in the

8    proposed order.

9          I appreciate the distinction, Your Honor, that

10   with the coalition signing off it was not necessarily signed

11   off by the individual law firms as well.  We did get that

12   confirmation from the law firms directly.

13          THE COURT:  Can you tell me who those law firms

14   are so that I know?

15          MS. BEVILLE:  Yes.  So, Your Honor, the law firms

16   are Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C.

17   These law firms, Your Honor, are notated in the coalition

18   filings themselves.

19          The next law firm, Your Honor, is Kosnoff Law,

20   PLLC.  The next law firm is AVA Law Group, Inc.  The next law

21   firm is Andrews & Thornton.  Then ASK, LLP.  Lastly, Your

22   Honor, Slater Slater Schulman LLP.

23          Your Honor, I believe that of those law firms two

24   of those law firms were included in the advertising impended

25   to the debtors' proposed order.

1           THE COURT:  That's what I'm looking at.  So --

2           MS. BOELTER:  Your Honor, if I may just jump-in.

3  As they're listed on the -- this is, again, Jessica Boelter

4  for the record.

5           As they're listed on the proposed form of order

6  there are three firms or three -- one entity, I guess, and

7  two other firms that were on Ms. Beville's list Abused in

8  Scouting appears on the exhibits.  AVA Law Group, Inc.,

9  appears on the exhibits and Slater Slater & Schulman LLP

10  appears on the exhibits.

11          There are then a number of other firms that are on

12  the exhibits.  I'm also happy to list those, if that would be

13  helpful, who we don't believe or it doesn't sound like

14  they're affiliated with the coalition, but we did provide

15  them notice of the proceeding.

16          MR. SCHIAVONI:  Your Honor, this is Tancred

17  Schiavoni.

18          If I could just ask how notice -- if Your Honor

19  could ask how notice was provided to Abused in Scouting and

20  is it a law firm.

21          THE COURT:  Okay.  Well, first, I guess I would

22  have assumed that notice was sent to everyone on the list;

23  although, I guess it's a fair question if -- and, you know,

24  how do you send notice to 1-800-LAW-HELP.  I mean how does

25  notice -- you know, a firm you know how to get to a firm.

1   How do you get to somebody that's not an established firm or

2   you don't know who is sponsoring it?

3           MS. BOELTER:  Right.  So, we, as you would expect,

4   Your Honor, did our diligence.  We did internet research, we

5   called 1-800 numbers.  There were some instances where,

6   unfortunately, we didn't have a facsimile address, but we

7   sent the notice to whatever contact information that we were

8   able to obtain from actually following the trail of the

9   particular advertisement that we saw.

10           With respect to Mr. Schiavoni's remarks it is the

11   debtors' understanding that the Abused in Scouting, and,

12   again, Ms. Beville can expand upon this, is associated with

13   the members or the legal representatives of coalition and in

14   particular Mr. Kosnoff and Mr. Van Arsdale.  They certainly

15   received notice and as I understand it consented to the form

16   of order as Ms. Beville just said.

17           THE COURT:  Thank you.

18           Ms. Beville, you can continue.

19           MS. BEVILLE:  Thank you, Your Honor.

20           I do want to make note, as there are being

21   targeted questions here with respect to Mr. Kosnoff, Mr. Van

22   Arsdale and their law firms they are represented by counsel

23   here today, Your Honor.  So, if you have specific questions

24   started towards them they do have representation here.

25           Your Honor, I would just like to clarify a few, I

1  think, perhaps inaccuracies, mischaracterizations that were
2  contained in some of the filings that were filed over the
3  weekend by Century.  Your Honor, the coalition itself has
4  done no advertising of any kind.  In its papers Century uses
5  Abused in Scouting and the coalition somewhat interchangeably
6  and they are not the same.  We represent the coalition, Your
7  Honor.
8          I'd like to get to, Your Honor, I think you may
9  have questions with respect to, you know, the scope of the
10 order.
11         We worked with the debtors over the weekend to
12 narrow the scope of the order, make sure there were specific
13 findings and try to limit the request to specific disclosures
14 that were not overly burdensome on law firms, but at the same
15 time still allowed the attorney advertising to reach
16 listeners, to reach the sexual abuse victims who they could
17 hear their rights and hear from other people besides the
18 debtors.
19         Your Honor, we think that the proposed order does
20 accomplish that.  You know, we were disappointed to see the
21 motion filed by Century that in our view took some steps
22 backwards in regards to seeking an outright ban on the
23 advertisements in their related infomercials as well which,
24 Your Honor, we believe constitute a content directed prior
25 restraint on free speech.

1          As you heard from us last week, Your Honor, the

2    Supreme Court recently determined that whenever speech at

3    issue is being regulated due to its content even if the

4    speech is regulated in a presumptively commercial context it

5    is subject to a strict scrutinous standard.

6          Here, Your Honor, I think it's clear, and the

7    Supreme Court jurisprudence in other cases implementing those

8    decisions, that content based prior restraints on free speech

9    are the most disfavored under First Amendment law and are

10   presumptively unconstitutional.

11         Your Honor, even if the advertisements were

12   considered solely commercial speech and some of them, Your

13   Honor, are purely commercial speech, any attempt to prohibit

14   any portions of that speech are still subject to, at least,

15   intermediate scrutiny under the Central Hudson standard.

16   And, again, Your Honor, we walked through that analysis last

17   week.

18         To summarize, under Hudson the insurers would need

19   to require and prove a substantial state interest that is

20   directly advanced by the speech restriction.  And the

21   restriction, Your Honor, most importantly, must not be any

22   more extensive than necessary.  And as discussed at that last

23   hearing the blanket prohibition on advertising similar to

24   that requested by the insurers here have failed to satisfy

25   that standard.

1          We do agree, Your Honor, the insurer cited to

2   Zauderer, as Ms. Boelter has discussed already here before

3   the court today.   Zauderer is the governing Supreme Court

4   precedent on the standard for requiring disclosures to cure

5   potentially misleading speech.

6          Your Honor, while the insurers the note the

7   standard in Zauderer they have failed to specifically

8   identify the Zauderer holdings that warnings or disclaimers

9   might be appropriately required in attorney advertising to

10  dissipate possibility of consumer confusion or deception.

11  Your Honor, as the Zauderer court found that disclosures were

12  warranted are the appropriate alternative to a prohibition on

13  attorney advertising such as the one that Century requests

14  here.

15          Your Honor, as Ms. Boelter stated earlier,

16  Zauderer specifically supports disclosures which trench much

17  more narrowly on advertiser's free speech rather than a band

18  such as the one proposed by Century.   And, Your Honor, it is

19  those disclosures which are intended to be more narrow and

20  more directed in a way that's not overly burdensome is the

21  form of agreement, form of proposed order that the debtor

22  submitted late yesterday.

23          So with that, Your Honor, I am available to answer

24  any questions that you may have.

25          THE COURT:   Okay.   I'm not sure that I have

1  specific questions of you, Ms. Beville; although, part of

2  your argument or clarification would really seem to suggest

3  that I shouldn't be entering an order.  I don't think I have

4  any questions.

5          My screen -- okay, there we go.  I was going to

6  say we're totally frozen.  Hopefully people could hear me.

7          As for the restrictions, yes, my understanding is

8  the Central Hudson standard, but that is if it's not

9  misleading.  So, my understanding from Dwyer is there's three

10  categories of restrictions, non-misleading, potentially

11  misleading and misleading or inherently misleading.  And

12  they're treated differently under the standards.  That is

13  what I have been trying to wrap my head around.  You all have

14  had longer to address this and perhaps have partners who do

15  first amendment work.

16          Okay.  Anyone -- I'll hear from -- I'd like to

17  hear from anyone, any law firm who is on the phone who has an

18  issue with the revised form of order that's been submitted or

19  perhaps hasn't seen it yet.

20          MR. BUSTAMANTE:  Hello, Your Honor, this is Brett

21  Bustamante from the Napoli Firm.

22          I'd first like to say we appreciate the

23  coalition's efforts to argue on behalf of us.  And although

24  we were not included in the negotiations.

25          We would take small respite with the idea of

1  requiring to list the website.  As Your Honor noted last time

2  giving multiple points of contact may be potentially

3  confusing.  And our concern is they might go to the website,

4  claimants might go to the website believing that they're

5  receiving legal counsel when they are, in fact, not.

6          THE COURT:   Okay.  Mr. Bustamante, tell me which

7  firm, again, that you are here on behalf of?

8          MR. BUSTAMANTE:  I'm sorry, Your Honor.  My name

9  is Brett Bustamante appearing on behalf of Napoli Shkolnik

10 PLLC and I have a *pro hac vice* pending in the court right

11 now.

12         THE COURT:  That's fine.  Okay.  And I see --

13         MR. BUSTAMANTE:  And if Your Honor would like I

14 could also address the specific concerns levied against our

15 firm by the debtors.

16         THE COURT:  Yes.  Are your ads -- are yours

17 advertisements or websites?  I just would like to understand

18 the type of advertising that your firm is doing.

19         MR. BUSTAMANTE:  I believe we have television

20 advertisements and online websites as well.

21         THE COURT:  Okay.

22         MR. BUSTAMANTE:  Certainly you can count our

23 website as advertising.

24         THE COURT:  The firm's website?

25         MR. BUSTAMANTE:  Correct.

1          THE COURT:  Okay.  And your concern is that adding

2   an additional website or listing the claims agent's website

3   on yours could be confusing?

4          MR. BUSTAMANTE:  Potentially so, yes.

5          MS. BOELTER:  Your Honor, just for reference -- I

6   was just going to -- to help the parties, the Napoli Firm

7   appears on Exhibit C to the proposed form of order.  If

8   you're looking at Docket No. 1281-1, which is Exhibit 1 to

9   the certification of counsel it's Page 19 of 27 -- I'm sorry,

10  Page 20 of 27 is where Napoli occurs.

11         The only issue with their ad is, again, the one

12  that counsel is raising concerning the website which I will

13  respond to in due course.  I just wanted to orient the court

14  for where they appear.

15         MR. BUSTAMANTE:  And if could entertain Your

16  Honor, the debtors have also specifically targeted our law

17  firms specifically for the statement, the $1.5 billion dollar

18  compensation fund.  If you would like us to address that now

19  I would be happy to do that.

20         THE COURT:  Yes.  I would like you to address both

21  of them, I think this is additional disclosures that the

22  debtors would like you to make.

23         MR. BUSTAMANTE:  Well, first, just initially it's

24  important to note that this is not a false or misleading

25  information in the sense that our marketing team -- after a

1   little bit of investigation I realized our marketing team had

2   received from multiple reputable news sources that a

3   compensation fund may include up to $1.5 billion dollars and

4   that's how that information got into the ad.  Then our ethics

5   review team was able to verify that through, again, multiple

6   reputable news sources.

7           Granted, if that is not accurate we have decided

8   to, regardless, take that out of our advertising completely.

9   Since that is the only allegation that the debtors have

10  against us we request that the relief requested with regard

11  to solely Napoli be rendered as moot.

12          THE COURT:  Okay.  So, my understanding is you're

13  representing that at this point and notwithstanding your

14  statements, with respect to the efforts the firm made to

15  verify its statements that the firm is now going to

16  voluntarily cease in its advertising a statement that there

17  is a fund that may be worth over $1.5 billion dollars.

18          MR. BUSTAMANTE:  Correct.  And the only proviso I

19  would add to that is we completely support the coalition's

20  efforts in terms of first amendment concerns and we strongly

21  believe that we have a first amendment right to state such.

22  Withstanding that we are removing the sentence from our

23  advertising.

24          THE COURT:  Okay.  So then the only remaining

25  issue that your particular firm has is adding the additional

1  -- adding the claims agent website on your firm's website or

2  other written advertising.

3           MR. BUSTAMANTE:  Correct, Your Honor.

4  And your argument is that that could create confusion?

5           MR. BUSTAMANTE:  Absolutely.  From my experience

6  with clients going to websites, at least, you know, they tend

7  to click on things. You know, a certain percentage of the

8  clients that visit a given website are going to click one

9  thing and another certain percentage are going to click on

10 another.  You really can't control, you know, necessarily

11 where they go on your website.

12          So, to that extent a certain percentage of the

13 claimants will click on the bankruptcy's website and they

14 will believe, since they went to our website first, that

15 their represented by counsel and they may sign-up a proof of

16 claim form and make all sorts of statements that haven't been

17 reviewed by us.

18          THE COURT:  By the fact that it's on your website

19 that's directing them somewhere?

20          MR. BUSTAMANTE:  Well if we're required to list it

21 on our website then it seems that we are endorsing.

22 Sometimes on websites, Your Honor, there's a separate pop-up

23 that comes up that sys this website does not endorse, you

24 know, you are leaving the Napoli website and it would say,

25 you know, we do not endorse anything that you see on this

1 further page.

2          I doubt Your Honor would even want that sort of

3 caption to appear, you know, in this context.  It may appear

4 as if the bars website is not reputable when, in fact, it's

5 supposed to be the most reputable.

6          THE COURT:  Okay.  Thank you.

7          Let me hear from any other law firms or sponsoring

8 entities.

9          MR. WILKES:  Your Honor, this is David Wilkes.  I

10 entered my appearance yesterday for Mr. Van Arsdale and

11 Kosnoff in their individual capacities.

12          I am only bothering Your Honor for a moment to

13 just repeat what Ms. Beville mentioned and that is my clients

14 are grateful for the efforts on the debtors' side.  We're

15 fully content with the order that has been presented to Your

16 Honor.

17          Thank you.

18          THE COURT:  Okay.  Thank you.

19          Anyone else, law firm or sponsoring entity?

20     (No verbal response)

21          THE COURT:  Okay.  I hear no one.  Let me go back

22 to, then, Ms. Boelter.

23          MS. BOELTER:  Thank you, Your Honor.  Jessica

24 Boelter, Sidley Austin, for the debtor.

25          First, I appreciate the Napoli Firm's agreement to

1  remove the $1.5 billion dollar reference from their ad.  That

2  is very constructive from the debtors' perspective.

3         With respect to the reference to the claims

4  agent's website we don't believe that it does cause

5  confusion.  It's very clear that this is an official website.

6  It enables survivors to directly access the proof of claim

7  form which has extensive instructions which were reviewed

8  with this court at our original bar date hearing that the TCC

9  reviewed in detail and that was ultimately agreed upon by the

10 parties.

11        Incidentally, they also say you should consult a

12 legal advisor if you have any questions.  I believe that type

13 of language appears in multiple spots in the notices that

14 went out to the survivors.  So, we think that it is actually

15 fairly clear that this is not another form of attorney

16 advertising and that victims or survivors should feel very

17 free to consult legal counsel when it comes to filling out

18 the claims form.

19        MR. STANG:  Your Honor, the tort claimants

20 committee would like to be heard when you feel --

21        THE COURT:  I am hearing somebody.  Somebody's

22 phone is not muted.

23        MR. STANG:  Your Honor, this is Mr. Stang for the

24 tort claimants committee.

25        THE COURT:  Mr. Stang, you're coming in very

1  faintly.

2         MR. STANG:  Your Honor, I will (indiscernible).

3         THE COURT:  Is that just me or are others having

4  difficulty hearing Mr. Stang?

5         MR. ABBOTT:  I think we all are, Your Honor.

6  Thank you.

7         UNIDENTIFIED SPEAKER:  Mr. Stang, I think you're

8  coming through your computer audio instead of the phone

9  audio.

10      (Pause in record)

11         THE COURT:  While we're waiting for Mr. Stang, Ms.

12  Boelter --

13         MS. BOELTER:  Yes, Your Honor.

14         THE COURT:  -- so I'm hearing, sort of,

15  conflicting confusion arguments, if you will.  The debtors'

16  argument is that victims may believe when they are on an

17  attorney's website or hearing an attorney advertisement that

18  they are going to the official -- that it is an official site

19  and they're filing a claim.  And they are clearly not if

20  they're speaking with the attorney, or on the attorney's

21  website, or looking at attorney advertisement.  At least one

22  of the declarations that was submitted in support of this

23  position, the debtor's position,  is that, in fact, the

24  claims agent has received some calls from claimants, from

25  victims who believe they have filed a proof of claim when, in

1  fact, they have not.

2         Mr. Bustamante makes the reverse argument, if you

3  will, that claimants actually seeking counsel may think if

4  they click through his firm's website to the claims agent

5  website that they have counsel somehow and they are -- the

6  statements they make or the form they fill out may be

7  reviewed by counsel or his firm may somehow be endorsing

8  statements that are being made if they click through and then

9  fill out a form and actually it will not be reviewed by

10  counsel and they don't have counsel.

11         So, I am hearing two types of confusion. And I

12  think both could be legitimate types of confusion.  Certainly

13  we want victims who want counsel to be able to obtain counsel

14  and get their advice.  And we want victims to be able to be

15  certain that they have filed a proof of claim form if that's

16  what they think they have done with the official claims agent

17  because, otherwise, they haven't.

18         MS. BOELTER:  So, Your Honor, I don't know if

19  counsel has spent much time on the official claims agent

20  website, but, again, we think it's very clear.  When you

21  visit the website it says this is an official claims agent

22  website.  So, this is not attorney advertising.  It's very

23  clear that this is an official website.

24         In fact, when you go to the FAQ's and it says how

25  do I know if I have a survivor claim it says you should

1  consult an attorney.  And we say that repeatedly.  In fact, I

2  think the debtors would be open, if it's not clear enough on

3  the website itself, to add language that makes it crystal

4  clear that this is the official website of the court approved

5  claims agent.  This is not an attorney website and that if

6  individuals wish to consult attorneys they should do so.

7        I don't think the debtor would have any problem,

8  if it's not clear, making that modification to our own

9  official website so there is no conclusion to survivors when

10  they click through, if they were to click through.

11        THE COURT:  Mr. Bustamante?

12        MR. BUSTAMANTE:  I would echo the same argument.

13  Unfortunately, our clients often come to us so that they

14  don't have to do legal work, so that they can avoid reading

15  lengthy documents.

16        I -- the fact that there is a strong possibility

17  that most people or a sizeable amount of people are not

18  reading everything on the claims website and especially if

19  they come to a lawyer's website first would expect that we

20  would handle that for them because that is commonly our

21  responsibility.

22        THE COURT:  Mr. Bustamante, what about some

23  statement before the link that indicates that -- I don't know

24  because I'm not going to draft it, but something on your

25  website that indicates -- please, everyone, check your phone.

1  I am getting conversation.

2         Something on -- I think that to the extent that I

3  would grant this request, I think there needs to be something

4  up front on the debtor's link that when you first get on it

5  that says this is the official claims site, you know, we're

6  not counsel.  If you want counsel to assist something, I

7  don't know.  And then something, I think, could be on the law

8  firm's website indicating that there is an official website,

9  here it is.  If you want our assistance in helping you fill

10 out the forms we will do so.

11        I am concerned about this both confusion.  I think

12 there could be confusion both ways.  And I think victims who

13 want counsel should have counsel and they should know they

14 got counsel in assisting them with the forms.

15        MS. BOELTER:  Your Honor, I think we would be

16 happy to craft appropriate language along the lines of what I

17 said and what you reiterated moments ago.  I will also just

18 note that Dr. Wheatman, unfortunately, is not with us today,

19 but she was very involved in the PG&E bar date noticing.  She

20 took note of the fact that the attorneys at issue there did

21 include the claims agent's website and she thought that was

22 critically important.

23        THE COURT:  You know, it's interesting, I clicked

24 on one of those to see what it looked like, I'm not sure I

25 ever found the official form on that website.  It was there.

1   Like when you clicked right on something it was there, but if

2   you went to the law firm I couldn't find it.  Now I'm not

3   tech savvy, but I will say that for what it's worth.  I also

4   don't know if that was -- I suspect since I have no order

5   that that was voluntary.

6               MR. BUSTAMANTE:  Your Honor, if I may.  I am

7   rather tech savvy and I have gone through the website,

8   myself, and found it very difficult.  That is partly where my

9   concern comes from is that if a client clicks to that link

10  and gets there my clients probably would be utterly confused.

11  It might be my law firm's fault for not, you know, explaining

12  to them not to go and do this on their own.

13              MS. BOELTER:  Your Honor, if I may, and then the

14  debtor's concern, though, is that we're confronted this time

15  next year with an excusable neglect application from various

16  claimants who didn't get accurate information, didn't have

17  the claims agent website, you know, didn't know where to go

18  assert their proof of claim because they were relying upon

19  attorney advertising.

20              So, from the estate's perspective we think it's

21  pretty critical that people understand where they go to get

22  official information, court approved information about the

23  bankruptcy case.  Again, we're happy to put in big bold print

24  that folks should consult an attorney.

25              THE COURT:  Maybe I need to click on the link. I

1 have not clicked on your link.

2           I hear the flipside of this is, though, that a law

3 firm could be held responsible somehow for redirecting

4 potential clients to the website and then the client looks to

5 this lawyer who didn't represent it and file any claim for

6 some sort of representation.  That is the countervailing

7 policy.

8           So, I need to give this some thought, and look at

9 your order, and maybe pull up the website for the claims

10 agent.  I understand the concern and certainly we want to

11 encourage everyone to file a claim that has a claim on the

12 official site.  And I don't want to get hit with a lot of

13 after the fact excusable neglect motions, but I'm not sure

14 that I'm going to be able to eliminate those.  And I am not

15 sure that there aren't countervailing policies.  This falls

16 within the disclosure side of the arguments.  So, I need to

17 look at the order with that in mind.

18           Mr. Stang, I know you've wanted to speak.

19           MR. STANG:  Thank you, Your Honor.  I apologize.

20 I think I got dropped from CourtCall and then I muted myself.

21 So, I think I'm back in good favor with the means of

22 communication with you.

23           Your Honor, the TCC, like any fiduciary supports

24 any kind of order that ensures that people are not mislead or

25 lied to.  The TCC has not had a chance to determine whether

1  it wants to be part of this violation notice procedure.  The

2  committee meets on Thursday evenings and we will take up

3  whether or not we want to be part of this meet and confer

4  process as provided for.  I think it's in Paragraph 7.

5          What I don't understand about this order is

6  Paragraph 9.  I've read it several times.  Its captioned non-

7  precedential effect.  And I don't understand what its purpose

8  is.  Your order has whatever precedential effect another

9  court might find it has or that you may find it has, but I

10  don't understand what's going on in Paragraph 9.  I would

11  like someone to explain that to me and you.

12          I just can't follow who is trying to protect what

13  by having this very lengthy provision which, frankly, I have

14  never seen in an order before.  Orders have --

15          THE COURT:  Well I understand what's going on, but

16  my question is, is it appropriate for an order and wouldn't

17  it be more appropriate in a stipulation.  And if the parties

18  want to stipulate to what their willing to do then fine, but

19  --

20          MR. STANG:  Well, Your Honor, this non-

21  precedential effect goes way beyond a given law firm of the

22  debtor.  This has implications to lots of people.

23          THE COURT:  Yeah, I don't know what this means.

24          MR. MOLTON:  Your Honor, can you hear me?  It's

25  David Molton for the coalition.

1            THE COURT:  Well, I don't know if Mr. Stang is

2    done.  I'm going to let him finish.

3            MR. MOLTON:  Oh, I'm sorry.

4            MR. STANG:  No problem, Your Honor.  I'm done.

5    Thank you.

6            THE COURT:  Thank you.

7            MR. MOLTON:  Thank you, Mr. Stang.

8            May I address that, Your Honor?

9            THE COURT:  Mm-hmm.

10           MR. MOLTON:  Thank you.

11           Judge, this language is actually taken or imported

12   from the Insys, I-N-S-Y-S, plan and confirmation order that

13   Judge Gross entered.  I can't tell what time, within last

14   year.  Every date seems like the next one.

15           In any event, this was important in the Insys case

16   in that the parties mediated under the supervision, by the

17   way, of retiring Judge Carey plan settlements in Insys.

18           And with the Purdue Pharma bankruptcy it was

19   important for everybody in that case to make sure that

20   whatever the plan settlements that were agreed to in the

21   Insys case had no effect or precedential impact on what was

22   going to happen, arguably, in Purdue.

23           So, it was language that was agreed to by the

24   debtor and the UCC in that case, and by the mediation parties

25   in that case.  It was put into the plan and confirmation

1 order.  It was approved and entered on the docket by Judge

2 Gross.  I think Your Honor is correct in noting -- and we,

3 basically, in terms of the coalition seeking to resolve the

4 debtor's motion that's presently being discussed now in a way

5 that could be satisfactory.

6 　　　　　We suggested that the debtor take a look at this

7 language and that it would serve to limit this order to the

8 extent that it does impact important first amendment rights,

9 it involves first amendment issues that it limits it to this

10 case.  So, that is the intent of that language.  The debtors

11 took a look at it and as far as I can tell they found it to

12 be helpful.  So, we suggested that it be put into this, as

13 you mentioned earlier, negotiated order.

14 　　　　　So that, Your Honor, is the little bit of the

15 context of where that came from and how it got used in this

16 order and the purpose it was used.  It is that whatever the

17 negotiated order here, it applies here in the context of the

18 issues here.  We're just assuring everybody out there that,

19 you know, it cannot be used elsewhere.

20 　　　　　MR. STANG:  Your Honor, if this is meant to deal

21 with future efforts to constraint advertising in another case

22 I think the language here goes way beyond that.  Maybe the

23 last sentence which starts with "further" starts to hone in

24 on what Mr. Molton was saying, but the context of what was

25 done by Judge Gross is totally different then what we have

1 | here.

2 | So, you said you get it.  I don't.

3 | THE COURT:  Yeah, I get it.  The -- I'm not sure I

4 | understand why you are objecting, but I get what the parties

5 | want.

6 | The problem is I don't have a negotiated order.  I

7 | have a partly -- I have an order that certain parties are

8 | proposing to me.  And in which I would impose on others.  So,

9 | this is a hybrid.  This isn't a fully negotiated resolution

10 | of a case.  This isn't a fully negotiated resolution of this

11 | particular issue.  This is an agreement or it reflects a

12 | negotiation among the debtors and certain law firms.

13 | So, I have to think about that and what is the

14 | import of my saying in an order as opposed to a stipulation

15 | that there is no precedential effect.  I am not even sure I

16 | can say that, but I don't know.  Well, let me put it this

17 | way; my rulings actually have no precedential effect on

18 | anybody as a matter of law, right.  Anything I do doesn't.

19 | So, it doesn't even bind me in the future, but much less it

20 | doesn't bind anybody else and it certainly has no

21 | precedential effect.  It has whatever persuasive effect it

22 | might have on anybody.

23 | The parties, however, you know, may not want to be

24 | bound by what they have agreed to this time.  So, I will

25 | consider that.

1       Okay.  I need to look at the terms of this new

2  order and spend some time with it and see if I'm comfortable

3  with it.  And I need to give Mr. Bustamante's counter-

4  confusion argument consideration.

5       Mr. Schiavoni, I did not see whatever you filed

6  last night.  So, let me know what you filed last night.

7       MR. SCHIAVONI:  This is Tancred Schiavoni, Your

8  Honor, for Century.

9       Here is why we filed last night, between the time

10  that the coalition filed its one page 2019 statement, without

11  attachments, and Friday we were provided with absolutely no

12  disclosure by the coalition of anything, its attachments or

13  any other information.

14       On Friday we also got no disclosure from this

15  thing that calls itself the Abused in Scouting.  On Friday

16  there were submissions that for the first time provided some

17  information about what the "coalition" is and what AIS is.

18  Those were made very late in the day on Friday before the

19  three day weekend.  We looked at those over the weekend and

20  our submission focuses on a very targeted problem with the

21  advertising. It also goes, candidly, very directly to the

22  2019 issues.

23       I would ask you to please consider that pleading

24  even though we only filed on a Friday because it's based on

25  information that is brand new and information that is very

1 important.  It was an email, among other things, that the

2 tort committee felt the need to turn over to the United

3 States Trustee that we didn't have either.  That information

4 was all very informative about what's been going on with this

5 advertising in a specific problem about it.

6        I'd like to just talk about that specific problem

7 for a minute, but, you know, the end of this is I'm going to

8 have two very targeted specific requests that the proposed

9 form of order had that, Your Honor, I will tell you you're

10 100 percent constitutionally protected on.

11        Century has a huge interest and any order that's

12 entered is, in essence, unappeasable. It's totally within the

13 constitution and the proposed change we have is very directed

14 in that point. I think you will find it's very supportable.

15        The overall problem here that, you know, is

16 driving a huge amount of concern, that is a case tainting

17 issue is that after the bar order was entered and

18 specifically after the court didn't adopt a Boy Scouts form

19 of order, but instead made clear that the fifteen questions

20 in the proposed form of order would deliver presumptive

21 validity to the claim.

22        The Boy Scouts in their submission, in support of

23 their advertising motion, actually include this, sort of,

24 chart showing how the advertising increased after that order

25 was entered and it's an astronomical increase because what

1  happened was there were certain folks who realized that if

2  they could fill out those forms, and fill out enough of them,

3  and gain numerosity over the other committee members they

4  could, in essence, take control of the committee.

5          The email that was submitted to the U.S. Trustees

6  Office is very specific about that.  It's an email by Mr.

7  Kosnoff who lists in his website a Texas address that he

8  advertises out of, and in his engagement letters a Puerto

9  Rico address, neither of which are two jurisdictions where he

10 is not admitted to the bar as far as our research with both

11 those bars state.

12         The email states his intent to, in essence,

13 exercise control over the committee, to run the process, to

14 stop the mediation, and to -- it's very candid what it says.

15 So, I am not going to characterize it.  I'd ask Your Honor to

16 take a look at it.  He refers to the committee members in

17 very derogatory ways and makes very clear what he is up to.

18         The advertising we're focused on is specifically

19 the advertising that he has run in conjunction with Mr. Van

20 Arsdale.  Mr. Van Arsdale owns an advertising company.  He

21 graduated law school in 2019.  He is a solo practitioner.

22 Mr. Kosnoff holds himself out as no longer practicing law.

23         There was a massive jump in claims right after the

24 bar date order approved.  Almost 9,000 were added.  Now it's

25 being increased by almost 1,500 a week.  It's a pace that far

1  exceeds the ability to vet any of these claims.  The bulk of

2  these are being channeled to a specific website in the name

3  of an entity.  It holds itself out as an organization, the

4  Abused in Scouting.

5           When you go to that page it doesn't describe

6  itself, and it hasn't, in aggregating these claims as a law

7  firm.  It describes itself as an organization.  There is a

8  page that specifically asks who we are and it says we are an

9  organization.  It presents pictures of a group of people.

10  The lawyers on it -- you know, to the extent lawyers appear

11  they're described as the lawyers for this association, this

12  Abused in Scouting.  It's an unincorporated, un-organized

13  entity in any way.  We will get to that when we have argument

14  on the 2019 motions.

15           As part of that, Your Honor, that website then

16  channels them to a specific page where they're told -- this

17  is the website that was telling them that they won't have to

18  be deposed, they will be anonymous, they won't have to come

19  to court and then they're shown to a page where its

20  geographically organized where they can go to the specific

21  jurisdiction where they claim to have lived.  They can look

22  up a troop number, they can look up the name of a

23  perpetrator.

24           This is, we think, a way, essentially, to

25  basically prepare, very quickly, large numbers of proofs of

1  claim answering those fifteen questions.  There is nothing in

2  the website that -- the website, the whole thrust of it is

3  that this is an organization.  This is its own entity.  It

4  isn't described that Mr. Kosnoff is a solo practitioner and

5  that you're specifically hiring his firm or that Mr. Van

6  Arsdale is a solo practitioner and you're specifically hiring

7  his firm.

8          The individual states regulate this kind of

9  activity.  They regulate it under the constitutional

10 prohibitions that were set up by the Supreme Court.  In

11 California Section 3.154(b) of the California Business &

12 Professional Code states clearly that a law corporation may

13 practice law only under the name registered with the

14 secretary of state and appeared by the bar.

15         There are some states that flat out refuse to

16 allow lawyers to operate under an assumed name.  There are

17 others that say, well, you can do that, but if you do it, it

18 has to be a name that's not inherently in any way deceptive.

19 The one thing all the states are sort of on board with is

20 whatever name you pick that is what you have to hold yourself

21 out as.  You can't turn around and then say you're something

22 else.  And the reason for that is that's inherently deceptive

23 to say you're something else then what you are.

24         There's something else in those ads and that is

25 that under Rule 7.1 very clear in the comments that lawyers

1  may not imply or hold themselves out as practicing together

2  when they are not in a firm.  And it goes onto sort of say

3  that that is, that act is inherently deceptive.  When you

4  look at that website that is exactly what is going on.  It's

5  like it's down to the letter that they're saying they're

6  acting together.

7       When we get to the 2019 you will actually see the

8  engagement letter that Mr. Kosnoff and Mr. Van Arsdale are

9  using.  It appears on letter head for this assumed entity

10 Abused in Scouting as if it's a law firm.  Under it, it lists

11 the names of cities and their names above it as if they're

12 separate offices of that entity.  Then there is actually, in

13 the body of it, a description of the three lawyer's names.

14 They string them together with commas between them, and they

15 put the one with law group on the end so it appears that

16 they're with one entity.

17      We think that this is conduct that the states

18 have, under the model rules, absolutely said is prohibited.

19 It is absolutely deceptive. It's really targeted just to

20 these two individuals running this Abused in Scouting

21 website.

22      Now, Your Honor, I know you're approaching this

23 very cautiously.  If nothing else -- I'm always impressed by

24 the fluidity of this court to move from one issue to another

25 encyclopedically.  And I know you probably have concerns

1  about this.  I would tell you that these specific ads where

2  lawyers are holding themselves out as part of this entity

3  that doesn't exist are violate, deceptive, and under the

4  model rules shouldn't be permitted to be run.  Could easily

5  be enjoined and we would ask you to do that.

6          We have an alternative remedy that is extremely

7  simple, 100 percent constitutionally acceptable and that is a

8  number of the states including the states where Mr. Van

9  Arsdale and Mr. Kosnoff practice have a way to deal with

10  advertising.  They have a mandatory requirement in Nevada

11  where Mr. Van Arsdale is licensed and in Texas where Mr.

12  Kosnoff is practicing that advertisements be submitted to a

13  committee of the bar either before or concurrently where

14  they're run with the specific idea that the bar committee,

15  which knows deceptive advertising very well, can review those

16  types of ads and look for things that can't be defined in --

17  you know, that are difficult to define in a statute.

18          We would ask you, as part of the order that Ms.

19  Boelter has submitted, to just add a single line requesting

20  that those advertisements that are being run by this entity

21  Abused in Scouting, or coalition, or whatever it is that they

22  certify to the court in a one sentence declaration that the

23  ads that they're running have been or will be submitted to

24  those states that have mandatory filing requirements for

25  advertising.  That is Texas, that's Nevada and in our brief

1  that we submitted we identify the other states that have

2  mandatory advertising submission requirements.

3          Your Honor, that type of order there is nothing

4  that I think, you know, would lead to the order being

5  reversed.  It's just simply asking them to require, to

6  follow, to comply with the code sections in their individual

7  states where they're running these ads.

8          The other change I'd ask for, my goodness, is

9  really much, it absolutely should be uncontroversial is

10  there's a notice requirement in Ms. Boelter's proposed form

11  of order, this may just be an oversight, but you will see

12  when you look at the order it lifts for those entities in the

13  future send out a, sort of, request for meet and confer, they

14  list the emails and addresses just about everybody in the

15  case.

16          I'm sure it was an oversight, but somehow Century

17  got dropped off that list maybe because we weren't included

18  in the meet and confer over the weekend, but if JP Morgan is

19  listed on their we'd just ask that we be listed. We are happy

20  to work very cooperatively with Ms. Boelter and we might be

21  able to give her some good suggestions if we were listed.

22          Your Honor, thank you very much for listening to

23  us.

24          THE COURT:  Thank you.

25          Ms. Boelter, one of the questions I had that I did

1  not ask is why you need my permission to go meet and confer

2  with people or send a notice to somebody about what the

3  debtors believe is false or deceptive advertising or somehow

4  doesn't comply with my order.

5       MS. BOELTER:  So, Your Honor, as we understood the

6  last hearing the order was supposed to apply specifically to

7  the law firms that are running advertisements now, not the

8  entire body and universe of potential plaintiff lawyers out

9  there.

10       So, from our perspective if we were going to limit

11  the specific relief today to the five items that are

12  currently in the order and limit that relief just to the law

13  firms that are currently engaged in that advertising we felt

14  it was important that there be a court approved process by

15  which the new firm comes along and engages in the type of

16  advertising the debtors can say here's a notice, it was

17  approved by the bankruptcy court, the type of advertising

18  that you're running is not approved advertising, meet and

19  confer.

20       We would welcome Mr. Stang's committee to

21  participate in that process with us.  We thought he would

22  want to participate in that process with us.  I heard him to

23  say that maybe he doesn't.  But in any event we thought that

24  that process was important and we thought it was important to

25  get the blessing of the court so that we could apply it to

1  potential future issues.

2           THE COURT:  Okay.

3           MS. BOELTER:  Your Honor, if I may there's just --

4  I know you're taking under consideration the claims agent

5  website concept.  There is one thing that I just wanted to

6  add and that is, you know, we tried to keep this short and

7  simple, and not legislate how the claims agent website would

8  appear on a law firm's website or in their advertisement.

9           So, rather than saying, you know, these are the

10 words that must go around that disclosure we're only asking

11 that the disclosure is made, and Napoli and the other firms

12 that are engaged in advertising we think they can be the

13 judge about how to do it in a way that's not confusing.

14          So, for example, if they want to put a link on

15 their website that says, you know, if you want to go to the

16 official court website, by the way, this is not a lawyer,

17 click here or if you want to deal with us click here.  You

18 know, that's something that we leave it to the plaintiff

19 firms to put on their own websites in a way that works best

20 for them.  We only request that they provide that access to

21 that information.

22          THE COURT:  Okay.  Mr. Bustamante?

23          MR. BUSTAMANTE:  Yeah.  I would echo the same

24 concerns as before.  You know, it would likely cause

25 confusion and, you know, to the extent we're advertising and

1 | we're reaching out to clients the debtors are trying to

2 | subvert that process by having some of our clients go

3 | unrepresented and, instead, maybe even mistakenly happening

4 | upon the claims agent's website.

5 |          THE COURT:  Thank you.

6 |          Okay.  I do need to look at the new form of order.

7 | I need to consider the argument.  I am going to take a look

8 | at the website and I'll rule promptly.

9 |          What's next?

10 |          MR. ABBOTT:  Your Honor, Derek Abbott for the

11 | debtors.

12 |          The next issue or motion is Docket Item No. 9.

13 | It's the motion of the coalition for abused scouts for

14 | justice regarding sealing the exhibits to their 2019

15 | statement.  So, I will turn the podium over to Ms. Beville.

16 |          MS. BEVILLE:  Thank you, Your Honor.

17 |          Yes, Your Honor, the agenda item, to be clear, is

18 | the motion to file under seal and a request for a

19 | determination regarding the sufficiency of our 2019

20 | statement.  I also note, Your Honor, that Agenda Item No. 10

21 | is our motion to request participation in mediation.

22 |          Your Honor, I think we can treat those issues

23 | separately; however, the arguments that have been made and

24 | the objections that have been filed very much intermingle

25 | both issues.  So, what I will do, Your Honor, is walk through

1 the compliance with Rule 2019 and answer any questions that

2 you may have.  And if it makes sense to move into the record

3 the extent and scope of our participation in the cases then I

4 would turn it over to Mr. Molton to address those issues.

5 　　　　　MR. SCHIAVONI:  Your Honor, this is Tancred

6 Schiavoni.

7 　　　　　If I could just ask you if we could address the

8 motion to seal first.  The fact here is that Century -- like

9 the papers have been filed and not shared with us.  Often

10 time's motions to seal the papers are filed and they're

11 shared with the other parties they're being argued with on

12 the disputed motion under a protective order. That is not

13 what happened here.

14 　　　　　So, I have redacted briefs with redacted exhibits.

15 I don't even know what papers are before me before the court

16 to argue with.  They've -- essentially, they're arguing a

17 motion for which the papers have been redacted and I don't

18 have the benefit of even reading the full copies of the

19 briefs that have been submitted.

20 　　　　　MR. BUCHBINDER:  Your Honor, this is Dave

21 Buchbinder speaking for the U.S. Trustee.

22 　　　　　I would like to join in Mr. Schiavoni's request.

23 I think that if the court were to rule on the seal request

24 first it will make the discussion and the arguments with

25 respect to the 2019 aspect of the motion in compliance and a

1  lot of the other issues in connection with the mediation and

2  seal motions.  I think it will be easier to discuss them if

3  we discuss and rule on the seal issues first and then move to

4  the adequacy of the 2019 statement.

5          Thank you, Your Honor.

6          THE COURT:  Let's do the seal motion first.

7          MS. BEVILLE:  Okay.  Thank you, Your Honor.

8          Let me start by -- and I will address the seal

9  motion first, Your Honor, but I think it would be helpful to

10 identify the different buckets of information that we have

11 requested be filed under seal and the reason for doing so.

12 Then we can turn to the level of confidentiality that should

13 be afforded each of those buckets.

14         Your Honor, under Rule 2019(c)(1) requires --

15 actually, that will be as to the 2019 compliance.  So, I will

16 move onto (c)(2)(a), Your Honor, requires the name and

17 address of each member of our coalition.  Your Honor, that

18 information is personally identifiable information that is

19 highly confidential in these cases.  Your Honor, we're

20 speaking about sexual abuse victim survivors, Your Honor.

21 There is absolutely no basis to have those names put on a

22 public record.

23         Your Honor, my understanding is that the U.S.

24 Trustee has not objected to the confidentiality to the name

25 and address, but as to some of the other elements of our 2019

1   disclosure.  We did make available to the U.S. Trustee the

2   full list of names and address of each coalition member.  We

3   have offered to make that list available to counsel for the

4   TCC as well, but counsel has not accepted that information

5   yet as I believe counsel wanted to have a determination as to

6   the compliance of our 2019 efforts before accepting that

7   information.

8           Your Honor, the name and address of the sexual

9   abuse victims is subject to strict confidentiality

10  protections in the bar date order itself.  And it is also

11  subject to a high level of confidentiality under the

12  protective order.

13          For that reason, Your Honor, our motion to seal we

14  request that information remain confidential and not be

15  provided to other parties.  That information, Your Honor,

16  will be included and filed with proof of claims in connection

17  with the proof of claim process.  There is a process for

18  redaction which parties have access to that information.

19          So, the coalition members' participation in the

20  coalition we don't think is cause to make that information

21  more widely available then is required under the bar date

22  order.  The --

23          MR. SCHIAVONI:  Your Honor.  Sorry, go ahead.

24          THE COURT:  Ms. Beville, please continue.

25          MS. BEVILLE:  Your Honor, moving onto (c)(2)(b)

1   which requires the amount of each disclosable economic

2   interest, Your Honor, that is straight forward.  The members

3   of our coalition hold unliquidated tort claims.  There is no

4   real confidentiality concerns or issues with respect to seal

5   in connection with that information.  The other information,

6   Your Honor, that we have requested be filed under seal is

7   with respect to the date, the disclosable economic interest

8   was acquired.

9           Now, Your Honor, I know you are very familiar with

10  the history of 2019 and --

11          THE COURT:  Don't assume that.

12          MS. BEVILLE:  Your Honor --

13          THE COURT:  Don't assume that.

14          MS. BEVILLE:  And Rule 2019 really was geared

15  towards financial institutions, the buying and selling of

16  debt; that somebody who holds bonds, you know, as their

17  economic interest, did they buy it long?  Did they buy it

18  short?  And so, there was amendments to the rule to address

19  the acquisition of debt, at what times, and to have a better

20  economic understanding of what is the economic interest of

21  the group that debtors and others parties in interest may be

22  dealing with.

23          And here, Your Honor, in an attempt to comply with

24  this -- though it's not a financial claim of any sort -- the

25  date the claim arose was the date that the abuse occurred,

1  Your Honor.  So, what we have done to comply with this

2  requirement is put together an Excel spreadsheet that does

3  not include the name and address of the abuse victim, Your

4  Honor, but a client identification number, the current city

5  and state where the abuse victim resides, as well as the date

6  of any abuse incident or incidents that occurred and the

7  location of that incident and where it occurred, and to the

8  extent possible, Your Honor, we identified in that initial

9  disclosure, any local council that was implicated by that

10 incident of abuse.

11         And so, Your Honor, for that information, the

12 motion to file under seal has requested that that information

13 be treated for the same reasons, Your Honor; we're talking

14 about sexual abuse victims here, we're talking about

15 descriptions of trauma that these victims suffered, about

16 specific elements of abuse.  And so, Your Honor, we would

17 request that that information be maintained as confidential

18 and that it could be provided, Your Honor, and has been

19 provided to the debtors, to the mediators, we've also

20 provided it to counsel for the FCR, to the unsecured

21 creditors committee, and other mediators and parties, Your

22 Honor, who have requested the information, so long as they

23 agree to maintain that "information under committee advisor

24 only" designation under the protective order.

25         THE COURT:  Okay.  Go, run through that again for

1  me as to, specifically, what information is you want under

2  seal, because it's not the names.  The name and address,

3  personally identifiable information; that was the first

4  category.

5          MS. BEVILLE:  That's right.

6          THE COURT:  The second category you say is the

7  amount of each disclosable interest and that, you say, is

8  unliquidated, so, presumably, there's no need to seal that

9  because it says "unliquidated."

10         MS. BEVILLE:  That's correct.

11         THE COURT:  The third category, then, you say is

12 the date of, I guess, obtaining the disclosable interest and

13 there, you're saying -- you've got -- you're still not

14 identifying.  There's no personally identifiable information

15 in this bucket.  You have a claimant ID number, okay, which

16 there's a key somewhere else that's not being disclosed, but

17 you have your claimant ID number and then an Excel

18 spreadsheet presumably on the line with the claimant ID

19 number, you have the dates of the alleged abuse occurred,

20 a --

21         MS. BEVILLE:  A location.

22         THE COURT:  The location.

23         MS. BEVILLE:  A location.  Identification of the

24 local council, if that information was available.

25         THE COURT:  The local council, yeah, okay, got it.

1          MS. BEVILLE:  And the current city and state of

2    the victim.

3          THE COURT:  Okay.

4          MS. BEVILLE:  And, Your Honor, that information,

5    as I've indicated, we have provided it parties that have

6    requested it, so long as they receive it under the

7    confidentiality designation.

8          And the other bucket of information, Your Honor --

9          THE COURT:  Before you move on, what's the basis

10   for sealing the Excel spreadsheet that doesn't contain

11   personally identifiable information?

12         MS. BEVILLE:  Well, Your Honor, it includes client

13   IDs that ultimately could be tied -- when we provided the

14   names and addresses, that also includes a client ID number,

15   so, it would be possible with the pieces of information

16   together, to identify the name of the victim when compared to

17   the incident data.  So, it's really trying to protect that

18   information holistically.

19         So, it's in an effort to protect the victims and

20   the incident information and make sure that information is

21   maintained separately and is only available for, you know, a

22   limited purpose.

23         And, Your Honor, if I could get through

24   identifying the buckets, I'd like to just back up and walk

25   through, under 2019, how courts have treated this

1 information, because I think it's very relevant to the

2 process and the confidentiality afforded to this information.

3         Courts in the Third Circuit have routinely in the

4 mass-tort context, including Your Honor, recognized in a

5 decision by the Third Circuit, that 2019 requirements for

6 groups of or law firms or groups representing multiple abuse

7 victims is to have a limited 2019 on the docket and have

8 exhibits filed separately, under seal, or under

9 confidentiality, maintained by the Clerk's Office and then to

10 require a party in interest who wishes to access that

11 information, to file a motion with the Court indicating the

12 need for the information, the purpose for which the

13 information will be used, and if they are able to demonstrate

14 such a sufficient purpose, then the Court would issue a

15 narrowly tailored order that limits the use of information

16 for the stated purpose.

17         And in some cases, Your Honor, where including

18 where a debtor wanted to use the information for its own

19 estimation proceeding, limited the duration to which the

20 party in interest would have access to the information and

21 required the information be destroyed at the end of that

22 period of time.

23         And so, Your Honor, here, we think we have done

24 more than what would have been required under that Third

25 Circuit standard where we have filed our statement on the

1  docket, we have the exhibits available, we're not requiring

2  every party to file a motion and jump through those hoops to

3  get access to that information, but we're simply asking that

4  the information be treated as confidential, in accordance

5  with the protective order that has already been entered into

6  this case, and that many of these parties have already signed

7  onto, and we'll provide that information, and in many cases,

8  Your Honor, have already provided that information to certain

9  mediation parties that requested the information and agreed

10  to keep it confidential.

11          THE COURT:  Okay.  You have another bucket?

12          MS. BEVILLE:  I have another bucket.  The other

13  bucket is what I will call the C4 documents or the empowering

14  documents.  And so, Your Honor, these are the requirements

15  stated in Rule 2019 that requires a filing of the copy of the

16  instrument, if any, that authorizes the group to act on

17  behalf of the creditors.

18          And here, Your Honor, I think we've referred to

19  them sometimes as the three-legged stool there.  Are three

20  pieces of information that, in essence, connect the dots here

21  to demonstrate the authority that Brown Rudnick has to act on

22  behalf of the coalition and its members.

23          First, Your Honor, we have redacted copies of the

24  engagement letters between the coalition and Brown Rudnick.

25  Originally, Your Honor, we have engagement letters with Blank

1  Rome, but as you have noted, as Rachel Mersky noted earlier,

2  Blank Rome has withdrawn as counsel and Rachel Mersky has

3  come in as a substitution of counsel, and that engagement

4  letter will be subject to the same level of disclosure

5  determined for the Brown Rudnick engagement letter, but that

6  engagement letter is being finalized and signed by the

7  clients, even as we speak.

8           So, Your Honor, there's the engagement letter

9  between the coalition and the coalition counsel; it's Brown

10 Rudnick in here, Rachel Mersky.  There is the redacted

11 exemplars of the engagement letters between what I'll call

12 state court counsel and their clients.

13          And so, you'll recall earlier, Your Honor, I

14 listed the names of six law firms, are identified in our 2019

15 statement.  Those six law firms, Your Honor, have individual

16 engagement letters with each of their clients and so rather

17 than produce 12,000 copies of signed engagement letters, Your

18 Honor, the case law supports that to satisfy Rule 2019,

19 parties can provide exemplars of the engagement letters that

20 have been signed.

21          And so, here, Your Honor, we have made available

22 exemplars of the engagement letters between the individual

23 state court counsel and their clients; those are the

24 coalition members.

25          And, Your Honor, the third piece of information

1  that I don't believe is necessary under Rule 2019 or the

2  documents that have previously been identified, we've also

3  included exemplars of the notice that the state court counsel

4  sent to their clients that informed their clients about the

5  formation of the coalition, their clients' participation in

6  the coalition and the coalition's retention of Brown Rudnick

7  as counsel.

8         And so, Your Honor -- but those three documents, I

9  will call the "empowering documents" and we can get to later

10 in argument the sufficiency of those documents, those

11 documents have been provided, were publicly filed on Friday.

12        Your Honor, let me provide you -- they were filed

13 on Friday at Docket Number 1257-1.  So, those engagement

14 letters and exemplar notifications are publicly available as

15 Exhibit 1 to our omnibus reply.

16        Portions of the engagement letters were redacted

17 as those portions were redacted, Your Honor, because they're

18 not relevant to 2019.  We included the provisions that

19 provide for the authorization and those are the elements that

20 were required, so that's what was disclosed, and we did

21 redact the remainder or the irrelevant portions of those

22 retainer agreements, and primarily, as to relevance, but

23 also, Your Honor, there is commercially sensitive information

24 as far as, you know, pricing or whatnot that we did not -- we

25 sought to protect under the motion to file under seal.

1    And so, Your Honor, that was the -- those are the

2  buckets of information that we request to file under seal.

3  And, again, Your Honor, it's not for file under seal and

4  forever hide from anybody or anyone; it's simply the ability

5  to not have that information available on the docket and that

6  if a party would like access to it, have signed on to the

7  protective order, they'll agree to maintain the

8  confidentiality of those documents.

9    And then if for some reason there's disagreement

10  as to the ability to access the documents or the use of the

11  documents, there's the ability under the proposed order to

12  come before the Court, have the requesting party file a

13  motion, and be heard by this Court, as is contemplated by

14  other cases in the Third Circuit, Your Honor.

15    THE COURT:  Okay.  Thank you.

16    MR. SCHIAVONI:  Your Honor, this is Tanc

17  Schiavoni.  A lot of what was said just isn't actually what

18  has happened.  Century made a request for this information

19  over a month ago in writing.  It's a party to the protective

20  order.  We weren't given anything.  We made it clear, we're

21  prepared to provide by the protective order.  We've handled

22  individual claims for years before the petition date.  We had

23  this sort of information -- names of claimants, et cetera --

24  it, nonetheless, wasn't provided to us.

25    We've complained bitterly about it between over a

1  month ago and now.  We even filed a motion, so this notion

2  that, like, well, you have to file a motion to explain why

3  you need it -- we did that.

4          Our motion is on file to be heard today; it's on

5  the agenda.  We have no problem with the individual names and

6  identifying personally identifiable information of the

7  claimants being provided to us and others under the

8  protective order, but, in essence, we've been given nothing.

9          The three buckets that were described to you, they

10  don't include the other bucket, which is the redactions to

11  the briefs, themselves.  I don't think the redactions that

12  have been made to the briefs, including the corresponding

13  redactions that the TCC has had to make to things that they

14  got from Brown Rudnick have anything to do with the names of

15  any individuals; it's referring to other documents in the

16  file that we just don't have the ability to see or to talk

17  about.

18          All of that could have been given to us if there

19  was a legitimate protection for it under the protective order

20  and it wasn't, and there's been plenty of notice of our

21  objection to it.

22          This information is also extremely relevant and

23  the subject of our motion to compel, we make out a good cause

24  need for the information.  We pointed out from the get-go

25  that Brown Rudnick's co-counsel was representing multiple

 1   archdiocese across the country, including a number of

 2   archdioceses that are co-defendants or sponsors with the Boy

 3   Scouts, including, most notably, the diocese in Guam, which

 4   has generated a lot of claims.  We made issues about the

 5   sharing of confidential information under those

 6   circumstances.

 7          It's an issue directly under Third Circuit

 8   precedent about whether or not you can represent both, the

 9   defendant in an action and claimants against them, which is

10   exactly what we think has happened.  We would need the names

11   of the claimants to match them up.

12          None of that was provided.  I got it that, now,

13   Blank Rome, you know, wants to withdraw, but, in fact, they

14   haven't withdrawn and, in fact, they don't -- when you get

15   into the retention documents, they're the only ones that any

16   retention material has been provided for.  So that

17   information is all directly relevant to us.

18          We're not in any way suggesting that any

19   personally identifiable information be submitted, but I see

20   no reason for any of the materials to not be provided to us.

21   If you even went so far, and after we've learned about this,

22   and after we learned that this is what was filed on Friday

23   night, to ask to question Mr. Kosnoff, Mr. Van Arsdale about

24   it, both of them declined to appear today at today's hearing.

25          So, you know, we're kind of running blind on all

1  of these things and these are things that are materials that

2  are absolutely essential to grant somebody's 2019 submission.

3            THE COURT:  Okay.  Your Honor --

4       (Audio feedback)

5            MS. BEVILLE:  That was my fault, Your Honor.  I

6  got a button on the computer instead of the phone.

7            THE COURT:  I'm trying to keep, at the request of

8  parties, I thought, the seal motion separate from other

9  issues.

10           And I think, Mr. Schiavoni, I hear you saying --

11 well, certainly, I clearly hear you saying you don't have any

12 problems with personally identifiable information being filed

13 under seal, and I'm not sure that I heard you say you have a

14 problem with any of the rest filed under seal, as long as

15 Century has access to it, which I think are two different

16 questions.

17           So, first, I'm trying to figure out, is there an

18 issue with information being filed under seal?

19           We can deal with redactions, we can deal with

20 access, but let me hear from the Office of the United States

21 Trustee with respect to the sealing of information.

22           Mr. Buchbinder?

23           MR. BUCHBINDER:  Thank you, Your Honor.  Dave

24 Buchbinder, for the record, on behalf of the U.S. Trustee.

25           I want to stresses that the U.S. Trustee's

1  objection made it clear, and I'll make it abundantly clear

2  today, there is a first day order in effect it to protect the

3  identity of all the sexual abuse survivors.  We are not

4  opposing the portions of this motion that continue to

5  maintain those confidentiality procedures in effect and I

6  stress that.

7          I want to move on to the other aspects of the seal

8  motion that remains, because a number of the filings that

9  have taken place over the past few days have rendered some

10 portions of this motion moot, particularly, the various

11 retention agreements and the document that's being produced

12 as evidence that the 12,000 confidential victims have somehow

13 consented to be represented by this coalition.  Those

14 documents were originally all filed entirely under seal.

15         And all that really remains at this point are the

16 redactions to the retention agreements, themselves, that were

17 filed in a redacted manner.  They show up in Docket

18 Entry 1257.  Those are the same retainer agreements that are

19 attached to the entirely filed under seal 1143.

20         So, the only issue remaining for the seal motion

21 is whether the redacted information in 1257-1 satisfies

22 Section 107 or 9018.

23         None -- because the retention agreements submitted

24 are exemplars, none of them, as the Court has indicated with

25 the other materials, identify any personally identifiable

1  information.  I have had an opportunity to examine the

2  materials and I can state that they are simply routine

3  retainer agreements.  There is nothing commercially sensitive

4  about them there.  Are provisions contained in the redactions

5  that might implicate various Rules of Professional Conduct

6  and people might not want other people to see those

7  provisions.

8           But scandalous or defamatory matter, as the Third

9  Circuit has ruled, is not material that requires sealing or

10  that passes muster Section 107 or 9018.  And the Third

11  Circuit has also ruled that public access to the courts is

12  paramount.

13           And so, here, all these parties want redacted is

14  information that hides their retention agreements, their

15  compensation terms, and other terms that have nothing to do

16  with commercially sensitive information or any other aspect

17  of Section 107 or Rule 9018.

18           I don't know if the Court has had an opportunity

19  to review the fully unredacted documents, but I have had that

20  opportunity, Your Honor.  If you have not had an opportunity,

21  you may want to review them before making your ruling on the

22  seal aspect of the motion.

23           Thank you, Your Honor.  And that is my argument

24  with respect to the seal aspect of the motion.

25           I would also reserve that the main document we're

1  arguing about in this group of motions Docket Entry 1144, the

2  alleged Exhibit A to the 2020 statement filed at an earlier

3  date, the exhibit that everyone that the coalition wants

4  everyone to rely upon was not verified.

5          Thank you, Your Honor.

6          MR. SCHIAVONI:  Your Honor, if I just -- there's

7  one thing to be -- it's a nuance here, but it's an important

8  one.

9          Filing something under seal on a disputed motion,

10 normally, your adversary has a copy of it and they have a

11 copy of it under a protective order so they can be heard.

12         What they're effectively seek for this hearing

13 today is authority to file these documents *in camera* and then

14 have argument on them without opposing parties having had an

15 opportunity to see them and that, we object to.

16         THE COURT:  Okay.  Well, I'm looking at the

17 binders that were sent over to me and I'm not --

18         MS. BEVILLE:  Your Honor, they should --

19         THE COURT:  -- and I'm not sure if I have -- and

20 I'm not sure that I have the unredacted copy.

21         MS. BEVILLE:  Your Honor, the section of your

22 binder that includes the C4 documents -- and I apologize,

23 because I don't have a copy of the binder in front of me --

24 but it includes both, an unredacted and redacted copy of the

25 exemplar documents in the retention agreements.

1          THE COURT:  Does it?  The one that's on green

2  paper?

3          Because what I'm looking at --

4          UNIDENTIFIED:  It came this morning.

5          THE COURT:  Oh, something came this morning?  Let

6  me see.

7          UNIDENTIFIED:  It's the second amended agenda for

8  this morning before the hearing.

9      (Pause)

10          THE COURT:  I don't think this would have been in

11  there.

12          MS. BEVILLE:  I apologize, Your Honor.

13          The binder was provided by Blank Rome, so I don't

14  have the ability to reach out to them and find out how it was

15  presented.  My understanding was that it did include both,

16  the redacted and unredacted versions.

17      (Pause)

18          THE COURT:  It does, but has this not been

19  given -- has this not been shared?

20          Who's this been shared with?

21          MS. BEVILLE:  We have provided copies of the

22  unredacted version to Your Honor and to the United States

23  Trustee.  We put -- filed publicly, the redacted versions of

24  the exemplar documents.

25          And, Your Honor, just for the record, we did

1  receive requests for copies of the redacted versions of the

2  engagement letter and to my knowledge, we responded to each

3  request and provided those copies.

4          I don't have a record, Your Honor, of

5  Mr. Schiavoni asking for those documents.  I know he filed a

6  number of pleadings alleging our deficiencies, but he never

7  asked us for a copy of those documents, Your Honor, finding

8  them subject to a confidentiality agreement.  So, I just

9  wanted to clarify the record on that point.

10          MR. SCHIAVONI:  Fortunately, a copy of our letter

11 to your firm is attached to our pleading.

12          THE COURT:  Okay.

13          MS. BEVILLE:  And, Your Honor, I guess, also, if I

14 may, just turn back to one of the points that I made earlier

15 about the incident information and personally identifiable

16 information.

17          And I thank Mr. Buchbinder for clarifying,

18 regarding the protection of the identities of the sexual

19 abuse victims.  And, similarly, with the incident data, we

20 are confirmed that some of the -- where some of the incidents

21 occurred may be small towns, small rural areas where simply

22 providing the data of the incident and location of the

23 incident, it could be a small enough community that it could

24 raise questions as to who might be the victim that is

25 referenced here, even the thought of that being questioned

1  could cause trauma or re-trauma to the victims here, and so

2  the effort to keep the incident data is part and parcel, with

3  the effort to protect the personally identifiable information

4  of the sexual abuse victims here.

5          THE COURT:  Okay.  I'm not sure I heard an actual

6  objection to the -- to what was your second bucket -- no,

7  your third bucket, the Excel spreadsheet.

8          What I'm hearing an objection to is what termed

9  the "fourth bucket," the empowering document, which are the

10  redacted engagement letter of the coalition and Brown

11  Rudnick, the exemplars, the agreements between state law

12  council and their clients, and then I think a consent email

13  or letter.

14          And I have not had an opportunity to look at the

15  redactions and others haven't either.

16          MS. BEVILLE:  Your Honor, the redactions that we

17  have proposed relate primarily to pricing and the attorney

18  fee arrangements.

19          THE COURT:  Well, that's not what I'm looking at

20  right here.  Some of this goes to the scope of the

21  representation and the limitations on it.

22          MS. BEVILLE:  Is that the redaction?

23          THE COURT:  Uh-huh.

24          MR. SCHIAVONI:  Uh-huh.

25          MR. RUGGERI:  Your Honor, James Ruggeri, for

1  Hartford.  The nature of the redactions suggests it goes far

2  further than what I believe Ms. Beville believes it goes.

3          THE COURT:  Yes.

4          MR. RUGGERI:  There are heavy redactions in all of

5  these items --

6          THE COURT:  There are.

7          MR. RUGGERI:  -- James Ruggeri for Hartford.

8  Thank you.

9      (Pause)

10         THE COURT:  Well, let me ask you this,

11  Ms. Beville, is there a reason that these documents cannot be

12  shared under the protective order so that parties to it have

13  that information and then as it becomes relevant to speak to

14  the specifics, once people have seen it, we'll have to deal

15  with what we do with that, but why -- because we have an

16  order in place -- can't the parties who have concerns about

17  the 2019 representation be provided with this information?

18         MS. BEVILLE:  Your Honor, I have no objection in

19  doing that on behalf of Brown Rudnick.  I would just need to

20  confirm that with our state court counsel and I can do that

21  if you could take a few-minute break and then report back.

22         THE COURT:  Okay.  Well, here's what I'd like to

23  happen because it's one o'clock, I'd like to take a lunch

24  break and then during that lunch break, I'd like you to

25  consult with all of the people you need to consult with and

1  if there are no objections, then I'd like you to circulate

2  the documents to those who, on this call, have requested

3  them.

4         And if there is an objection, then I'll deal with

5  it when we get back.  But in the meantime, I will also take

6  the time to look at this.  Did not realize that I had both,

7  redacted and unredacted, in one folder.

8         What I'm looking at, just so I make sure that I'm

9  looking at everything, and I don't have a document number on

10  this, but the first redacted agreement I have is on

11  letterhead that says, "AIS, Abused in Scouting," and that's a

12  professional employment agreement.  So, that has been

13  redacted.

14         MS. BEVILLE:  That's --

15         THE COURT:  The next thing I have -- oh, well,

16  that's kind of interesting.  Okay.  That's one page.

17         Then I have one that's Anderson Thornton, ASK;

18  that's a separate attorney-client contingency fee retainer

19  agreement.  That's several pages -- four pages.

20         And then I have a Slater Slater Schulman LLP

21  retainer agreement that's two pages.

22         Okay.  Then I have the Brown Rudnick,

23  July 21, 2020, letter to six -- it looks like law firms.

24  That's redacted.

25         Okay.  Those are the documents I have that have

1  been redacted.

2           Is there something else?

3           MS. BEVILLE:  No, Your Honor.

4           And the only other document that was provided was

5  the exemplar notice to clients, but that was not in redacted

6  form; that was simply an exemplar that was sent.

7           MR. SCHIAVONI:  Your Honor, there are the

8  redactions to the TCC's brief which are driven by requests, I

9  believe, by the coalition.

10          MS. BEVILLE:  Your Honor, the TCC filing motion is

11 separate and relates to an email that is unrelated to the

12 coalition and coalition counsel's representation of the

13 coalition.  An email was sent a few weeks before the

14 coalition was even born, so to the extent that Your Honor

15 wishes to take argument on that now, I would ask that that be

16 treated separately, as they're not related in --

17          THE COURT:  Okay.  I --

18          MR. STANG:  Your Honor, it's Mr. Stang.

19          That's not entirely correct.  We redacted portions

20 and quoted portions of these letters that you're talking

21 about now -- it wasn't exclusively the email -- and we

22 redacted them because the Brown Rudnick folks told us that we

23 got that stuff under confidentiality, so ...

24          THE COURT:  Okay.  So, I'm going to deal right now

25 with the sealing issue.  If there's -- specifically to

1  Rule 2019.

2            If there is another document, parties can confer

3  during the break about that, too.  And we'll have to see

4  where we go, if I determine that certain parts of this should

5  not be filed under seal, then we may need to continue the

6  hearing.  I don't know what we're going to do with respect to

7  other motions that are in front of me that are coalition-

8  related, because parties didn't -- if I determine that

9  parties didn't have information that's relevant that they

10  needed to have before the hearing, so we'll have to figure

11  that out.

12            But that's the danger, of course, of bringing a

13  seal motion at the same time that you're asking for

14  substantive relief; usually, it's not an issue, but

15  occasionally, it is.  So, we'll have to figure it out.

16            So, given that I need to review this, parties need

17  to talk and, perhaps, exchange information.  We're going to

18  take an hour and we'll resume at two o'clock.

19            MR. STANG:  Your Honor?

20            THE COURT:  Yes.

21            MR. STANG:  Your Honor, this is Mr. Stang.

22            I just wanted Ms. Beville to know that we sent her

23  just a moment or two ago, a request that the TCC receive the

24  unredacted engagement letters.  You made reference to people

25  who've made the request for them.  I just wanted to draw it

1   to her attention that we made that request.

2           THE COURT:  Okay.  Ms. Beville, stay on top of

3   your emails for requests.

4           MS. BEVILLE:  Duly noted, Your Honor.

5           THE COURT:  Okay.

6           MS. BEVILLE:  And I just want to reiterate, Your

7   Honor, part of our purpose for that redaction is the

8   relevancy of that information to the 2019, so I just thought

9   that as we review, we keep that in mind, as well.

10          THE COURT:  Okay.  But I'm not sure relevancy is a

11  reason to redact something, so you'll have to explain that to

12  me, as well, when we get back.

13          Okay.  We're adjourned until 2:00.

14      (Recess taken at 1:01 p.m.)

15      (Proceedings resumed at 2:04 p.m.)

16          THE COURT:  Okay.  Thank you.  We are back on the

17  record after a recess in the Boy Scouts matter.

18          I do not -- there's Ms. Beville.

19          MS. BEVILLE:  Top of the screen.

20          THE COURT:  Okay.  In terms of supplying redacted

21  documents, tell me where we are on that.

22          MS. BEVILLE:  Your Honor, anyone who emailed me

23  directly, we provided a copy of the unredacted engagement

24  letters and then we did our best and I think we got

25  everything to everyone that we sent the redacted copies to,

1  upon request, we sent each of those parties unredacted

2  copies, as well.  So, everyone who had received the redacted

3  version prior to the hearing should now have the unredacted

4  version.

5          The only note I'll make, Your Honor, is the one

6  piece that remains redacted is the Exhibit A to the Brown

7  Rudnick engagement letter, which is the list of the names and

8  addresses of the coalition members --

9          THE COURT:  Okay.

10         MS. BEVILLE:  -- and that, Your Honor, is actually

11 really a separate Excel spreadsheet that we've been

12 maintaining.

13         THE COURT:  Okay.  That's what I was going to ask

14 you, because that's redacted in my unredacted version, but

15 that's that extensive Excel spreadsheet.

16         MS. BEVILLE:  Correct.

17         THE COURT:  Okay.  So, with respect to the motion

18 to file under seal, now that parties have seen the

19 redactions, are there any objections?

20         MR. RUGGERI:  Yes, Your Honor.  James Ruggeri for

21 Hartford.

22         I guess my objection is we have now received most

23 of the unredacted documents, but I do believe the U.S.

24 Trustee raised an issue about the ethical compliance of these

25 documents with the various applicable rules, and I would ask

1   on behalf of Hartford that the matters be adjourned.

2           We still don't have Exhibit A unredacted and I

3   believe the TCC filed documents in a redacted form that we

4   don't have unredacted on the motion, with regard to the 2019

5   disclosures and the mediation motion.

6           So, I know on behalf of my client, a number of

7   these provisions in the various documents call many issues

8   into question and I would request that we reset these matters

9   when we have an opportunity to actually review them in

10  earnest as opposed to just a few minutes before reconvening.

11          THE COURT:  Well, let me ask you this question,

12  Mr. Ruggeri:  Let's assume for the moment -- and I'm not --

13  I'm just assuming -- your premise that the U.S. Trustee's

14  premise that there are some -- that the redacted portions of

15  these engagement letters raise the possibility of some

16  ethical violations.

17          Is that within the province of what I should be

18  ruling on in connection with I'll broaden it from the motion

19  to file it under seal, but in connection with Rule 2019, is

20  that something that's within my purview?

21          MR. RUGGERI:  Your Honor, the reason why I raise

22  it is Ms. Beville made an argument about a three-legged

23  stool; it talked about the empowering documents and the three

24  legs of that stool.  And I would -- to use that metaphor, I

25  would say that if any one of those legs is rotted out, then

1   the stool collapses.

2           And I can point you to various provisions, for

3   example, the Anderson Thornton ASK, LLP retainer agreement

4   that I have questions about, whether it complies with the

5   ethical rules, including, for example, instructing a client

6   that it may not -- that it can't unilaterally settle any

7   portion of its claim outside of that contract.  I mean, I'd

8   like to think about that and research that issue.

9           I think about, even at the first document, the

10  abuse in the scouting, the paragraph two that's redacted.

11  Now, we see it's unredacted as a reference to AIS counsel; I

12  mean who is that?

13          You see the reference to those three lawyers at

14  the top, or retired lawyers, including Mr. Kosnoff.  There's

15  a reference to Puerto Rico; a San Juan, Puerto Rico.

16          As a layperson, I'm reading this and thinking that

17  I'm represented by three law firms, but we know that Ms.

18  Kosnoff is not practicing law.  So, again, because the

19  argument was made that all of these documents are the

20  empowering documents in support of the requests regarding the

21  adequacy of the 2019 disclosures, I do believe they are

22  related and I do think that the Court and the parties would

23  benefit from having some time to analyze these documents

24  before we proceed further.

25          MR. BUCHBINDER:  Your Honor, this is David

1  Buchbinder.

2        The immediate issue before us is whether some or

3  all of this redacted material should be unredacted so that we

4  can move on to the next issue, which is the efficacy of the

5  2019 statement.  I do not believe that any of the redacted

6  materials in the retention agreements fall within the purview

7  of either Exception 107 or Rule 9018.  None of it is

8  commercially sensitive information; they are routine retainer

9  agreements.  None of it are specific engagement agreements,

10  as the coalition has, itself, told us, with specific clients,

11  so we're not violating any privileges of any kind, and there

12  are other provisions in here which, the parties who may have

13  entered into these agreements may not want us to see them,

14  but that doesn't mean we hide them from public view.

15        They have to pass muster with 107 or 9018 and

16  these redacted portions and these agreements, in our opinion,

17  clearly do not, and that is a precise issue before the Court.

18        MR. SCHIAVONI:  Your Honor, Tanc Schiavoni.

19        We submitted a citation in our moving brief to

20  compel compliance to the decision on Rule 2019 in, In re

21  Archdiocese of St. Paul in Minneapolis, where Judge Kressler

22  [sic] addressed what should be disclosed in connection with

23  the 2019 and we also provided the hearing transcript.

24        Judge Kressler, in connection with that,

25  specifically held that one of the issues to be addressed was

1  whether or not there was ethical compliance in a sense -- in

2  connection with the retentions, themselves, because the

3  concern was that the retentions, in essence, be valid in

4  retentions, that these folks really can bind their individual

5  clients.

6        There's a central issue, just with the Brown

7  Rudnick, which, you know, I'm a fast reader, but I couldn't

8  get through what had been withheld in terms of engagement;

9  whether or not they really represent any claimants.  And the

10 form of this that was previously filed that was redacted, it

11 showed exhibit -- the exhibit as being redacted as if it

12 listed the members.

13        What we just got is not redacted; it's just blank,

14 okay.  And so it terms in there that, say, things like you

15 consent to pay our fees, members, but by paying them we don't

16 have an attorney-client relationship with them.

17        That's not the kind of provision I run into very

18 often and we would like to consult with Charles Selena

19 (phonetic) on that and whether or not these are valid

20 retentions.  These are people that we can sit down and

21 negotiate with them and can actually bind the individual

22 members.

23        MR. STANG:  Your Honor, Mr. Stang on behalf of the

24 tort claimants committee.

25        Your Honor, your request is, as I understood it,

1  do I have to get into the issues of whether these agreements

2  comply with the ethical requirements of state law to deal

3  with the 2019 statement?

4           It is fundamental to -- an answer to that question

5  is, who makes up this so-called coalition?  Is it abuse

6  survivors?  Is it abuse survivors and law firms?  Is it law

7  firms only?

8           And to the extent -- and it's very clear, even

9  from the Brown Rudnick engagement letter that was redacted --

10  that it can only act upon the unanimous direction of the

11  (indiscernible) law firm.

12      (Audio feedback)

13           MR. STANG:  I'm getting an echo, but I'm not sure

14  why.

15           If the law firms have ethical issues in connection

16  with their underlying retentions, then I think it, in effect,

17  infects Brown Rudnick's ability to represent people, because

18  they can only take direction from -- if all of those law

19  firms unanimously consent.  Everything in the Brown Rudnick

20  engagement letter goes through the law firms.

21           There's -- in my quick read, there's not a single

22  provision that there that actually doesn't go through the law

23  firms, as communication consents, and as I read it, I

24  wondered if any of the 12,000 men have ever seen the Brown

25  Rudnick engagement letter, much less consented to it

1  provisions of it, which they are bound on repeated issues.

2           So, I would join in the request that we continue

3  this hearing and I do think, given the way this apparently is

4  structured, *vis-a-vis*, Brown Rudnick, that the underlying

5  agreements are certainly relevant to the approval of a 2019

6  statement.

7           THE COURT:  Let me hear from Ms. Beville.

8           MS. BEVILLE:  Your Honor, I think that we're now

9  getting to the substance of whether or not the disclosures

10 satisfy 2019 and I think, you know, the first question to

11 answer, at the request of the insurers and Mr. Stang, is

12 whether or not the motion to seal really should be granted.

13          And, so, Your Honor, if I could just perhaps

14 outline where I think we are on the motion to seal --

15          THE COURT:  Yes.

16          MS. BEVILLE:  -- we could hopefully make a

17 decision on that and then from there, I do think it would be

18 useful to hear argument on the sufficiency of the 2019, as it

19 is a disclosure issue, and I would like to address some of

20 the cases that have been referenced by the parties here.

21          You know, as to the motion to file under seal,

22 Your Honor, this is my understanding, at least of where we

23 may have landed on these issues.  We will file a -- I'll say

24 an amended verified statement to address the U.S. Trustee's

25 concerns about verification of the documents.  The names and

1    addresses of the sexual abuse victims and their relative

2    incident data will remain confidential.  The exemplar

3    engagement letters with the state court counsel and their

4    clients, the engagement letter with Brown Rudnick and the

5    coalition, and the engagement letter with Mr. Murphy's firm

6    and the coalition, once it's finalized, will be made

7    available in unredacted form to parties, subject to the

8    protective order, under committee advisor only.  And the

9    party in interest here, who have requested access to it, have

10   all received access to it, and I I believe, Your Honor, that

11   with those additional disclosures in that form, I believe

12   that would address the motion to seal.

13              I just want to confirm that is --

14              MR. SCHIAVONI:  But, Your Honor, there's also the

15   redacted -- the redactions in the TCC's brief which deals

16   with 2019.  I don't know if Brown Rudnick is consenting to

17   provide those to us or not.

18              THE COURT:  Well this, is a concern I have,

19   Ms. Beville, is assuming we were to go that direction -- and

20   I'll hear from the Office of the United States Trustee on

21   that -- how are we going to have a discussion that I

22   understand people want to have with respect to terms in the

23   retention agreements or the exemplars with them being under

24   seal?

25              MS. BEVILLE:  I think, Your Honor, the argument as

1  to the sufficiency of the 2019, and our case law addresses

2  it, goes to disclosure, Your Honor.

3         If there are other issues or concerns, then I can

4  address that in oral argument.  You know, there have been

5  concerns raised about, you know, the ability to settle

6  claims, ability to find the clients.

7         The cases, Your Honor, that have been cited to

8  here were instances where the law firm at issue was -- the

9  Baron v Budd case, Your Honor, was where a law firm was

10 actually collecting ballots on behalf of its clients and

11 voting.  There are other cases where the law firm that is

12 subject to the 2019 was acting on behalf of their clients,

13 Your Honor.

14        Here, Your Honor -- and it's stated in our

15 papers -- the coalition is a collective entity, it's an ad

16 hoc committee, and it is represented by the collective

17 interest.  We do not purport to bind the coalition members.

18 We do not purport to be able to file proofs of claim.  We do

19 not purport to be able to bind the coalition members to a

20 settlement agreement.

21        We do believe we are in a position to recommend to

22 the coalition members that they support or support the plan

23 or settlement, but that is not the coalition's role here,

24 Your Honor.

25        And we can get into more deeply in our argument,

1  the position that the coalition could play in this case, Your

2  Honor, as a representative body, as a party that can be heard

3  in argument, for example, with respect to the advertising

4  motion.  We are an ad hoc committee, Your Honor, that has

5  been able to provide significant claims information to the

6  debtors and to the mediators to be able to help to move the

7  mediation forward.

8         None of those things, Your Honor, required us to

9  bind our clients to any particular decision, and I would put

10  before you, Your Honor, that the engagement letter by the

11  state court counsel, explicitly authorized their counsel to

12  associate with other law firms or with other counsel.  The

13  state counsel, Your Honor, those six law firms that have been

14  identified previously, determined to retain, essentially,

15  special bankruptcy counsel and form a group to retain that

16  bankruptcy counsel to create the coalition.

17         And so, Your Honor, under the authority that they

18  have under their engagement letter, the representative law

19  firms signed engagement letters with Brown Rudnick to

20  represent the coalition, to represent the collective

21  interests of the members.  Your Honor, these ad hoc

22  committees are formed routinely in bankruptcy cases.

23         And I would just confirm that we are not in a

24  position where we are trying to make a statement that we are

25  binding members, but we really are representing a collective

1  voice here.  And so, that's where, Your Honor, I think it

2  would be helpful to go through Rule 2019.

3        The cases that have been cited in the brief by

4  objecting parties go to closure and that's exactly what we're

5  doing here.  And with the engagement agreements now being in

6  unredacted form made available, that is the relief, Your

7  Honor, that the parties were requesting, that we've provided.

8        The cases that they cited to expressly hold that

9  exemplars may be filed and in these cases, Your Honor, to go

10  back to the Third Circuit standard, these are cases, Your

11  Honor, in the Third Circuit where, again, the information on

12  the docket was limited, the exhibits remained -- were

13  private, and it was upon the motions of the parties to the

14  Court to have access to that information.

15        And so, Your Honor, I believe what we're doing

16  here is making that information available without the need

17  for a motion -- it's subject to signing the protective

18  order -- and if there's another party that comes in, then

19  they have the ability to file a motion.

20        So, Your Honor, I believe these questions as to

21  the ability to bind our members are really red herrings, and

22  so I do think it would be useful to make a determination on

23  the motion to file under seal and then hear the arguments on

24  those compliant with the 2019 disclosures and hear more about

25  the role that we would be able to hope to play in this case

1  as an ad hoc committee.

2          MR. STANG:  Your Honor, may I -- Mr. Stang -- may

3  I make a comment?

4          THE COURT:  Yes.

5          MR. STANG:  It goes to this disclosure issue.

6  There are apparently upwards of 12,000 people who are

7  directly implicated in the Brown Rudnick retainer letter and

8  their rights are affected.  They have legal obligations to

9  Brown Rudnick arising under these letters.

10          I don't care how much Ms. Beville charges per hour

11  or how much of a retainer they got, or for that matter, what

12  percentage contingency fee Mr. Kosnoff charges.  That might

13  be proprietary.  There are lots of people out there competing

14  for business and maybe it's appropriate not to let people

15  know that he charges X versus Y.

16          But how are you disclosing to these 12,000 men

17  what the deal is that they are bound to under this agreement,

18  that these documents are sealed and only made available to a

19  very -- literally, a handful or two handfuls of people versus

20  12,000?

21          Because I've yet to see anything in the record

22  that indicates that this retainer agreement was sent to those

23  12,000 people.

24          MR. BUCHBINDER:  Your Honor, this is David

25  Buchbinder, again, on behalf of the U.S. Trustee.

1        Ms. Beville's proposal is not acceptable, to the

2   extent that the engagement letters and the redactions in them

3   would still only be made available to a select group of

4   people.

5        The narrow issue before the Court with respect to

6   these letters is whether or not the redacted information

7   qualifies to be sealed under Section 107 or 9018.  There is

8   nothing in those redactions that passes muster as

9   commercially sensitive information, as personally

10  identifiable data -- remember, no one is objecting and no one

11  is opposed to protecting to the fullest extent with all of

12  the orders we have in place, the personally identifiable

13  information of the abuse survivors -- that's not the issue

14  before the Court -- the issue is whether the redactions in

15  the engagement letters pass muster and they clearly do not.

16       And so, to say that they should be limited to a

17  review by a select group of people is not appropriate because

18  it is the policy of the courts that there be full, public

19  access to the courts and these letters should be fully

20  unredacted and be made available to any and every party in

21  interest and the public, in general, and that is the position

22  of the United States Trustee.

23       If the parties feel that unredacting these

24  documents requires that the next phase of the 2019 matter,

25  the efficacy of the 2019 be adjourned, I'll leave that up to

1  the parties, but by ruling on the seal motion first, we can

2  have a more public, thorough, and robust discussion of the

3  efficacy of the 2019 without having to stop every five

4  minutes to think about what we can and cannot say about who

5  said what to where -- to who said what to whom when.

6           Thank you, Your Honor.

7           THE COURT:  Thank you.

8           I'm assuming these cases that deal with parties

9  trying to get access -- and I remember the -- I think it was

10 the Garloff case and some other cases out there -- they were

11 really parties who wanted to get access to underlying

12 information to be used in another context in another -- not

13 in the Bankruptcy Court, not to do with that, and were they

14 looking for the personally identifiable information so that

15 they could -- it could be used elsewhere?

16          MS. BEVILLE:  This those cases, Your Honor --

17          MR. SCHIAVONI:  Your Honor, Baron v Budd, is  a

18 district court case, out of the District of New Jersey --

19          THE COURT:  Right.

20          MR. SCHIAVONI:  -- it deals specifically in the

21 mass-tort context and the disclosures there were required,

22 really, to reveal both, confirmation of who people -- that

23 the ad hoc committee, who, in fact, they represented, and

24 that they had authority and whether there were conflicts.

25          The result of that was that if -- there was the

1   ultimate determination that there were kickbacks being paid

2   among the committee members, so it turned out to be directly

3   relevant to the case.

4          The In re Archdiocese of St. Paul case is a abuse

5   case.  It's particularly relevant.  There isn't a long

6   decision, but there is a transcript.  We've attached that as

7   an exhibit.

8          Judge Kressler issued that.  He's sitting -- he

9   sits in New York [sic] and he was specifically concerned

10  about whether or not -- because the claimants were so

11  aggregated into one firm, whether or not there was, in fact,

12  authority and whether there were conflicts and the

13  information was needed for that purpose.

14         We've head a showing here that one of the -- the

15  coalition's counsel, Blank Rome, which still is their counsel

16  and has been their counsel for an extended period of time and

17  has -- and during which confidential material was

18  disclosed -- represents an entity -- entities that are

19  sponsors with the Boy Scouts and, almost certainly, if we are

20  provided with the names of the claimants, we're likely to

21  find -- or there's at least good cause for us to look, for

22  everyone to look whether they, in fact, overlap with people

23  who are suing their same clients in those other cases.

24         There's other things that we've set out in our

25  motion to compel compliance that provide that good cause to

1  get a disclosure of the identity of the members under the

2  protective order and also the disclosure of what's in the

3  brief -- the redacted brief of the TCC.

4  And if Your Honor had not rude the email that was

5  submitted to the U.S. Trustee by the TCC's office, it's very

6  relevant.  It goes directly to what 2019 is about.

7  We cite justice Douglas in his -- before he was a

8  Supreme Court justice, explaining when he was an SEC lawyer,

9  the important purposes of 2019, and their there -- almost --

10  when you compare what he wrote -- and we cite to what's in

11  that email, it's a dead match-up.

12  THE COURT:  Okay.  Here's what we're going to do.

13  With respect to sealing, I've reviewed what was

14  filed under seal -- the exemplar letters and the Brown

15  Rudnick engagement letter -- and my reading of 2019 is that

16  those letters should be filed and not in a redacted form.

17  And the only thing I think that is even arguably

18  sensitive are the rates that are being charged by the

19  attorneys, which, quite frankly, didn't seem to me out of

20  line with what I understand the market to be, but nonetheless

21  I think if the attorneys feel they want to redact, very

22  specifically, what the monetary arrangement is, specifically

23  to percentages on the contingent fee, I'm okay with that.

24  As far as Brown Rudnick, their rates are not --

25  they're all over the -- my docket and everybody's docket and

1 the whole bankruptcy world's docket, so I don't consider them

2 to be proprietary.

3        So, I think these need to be filed in an

4 unredacted form, that is, except for Exhibit A, except for

5 the personally identifiable information of the abuse victims,

6 whose confidentiality, the confidentiality of their

7 information, I have already protected and will continue to

8 protect, consistent with my previous orders.

9        So, that's the motion to file under seal; it's

10 granted in part, it's denied in part, and I need a form of

11 order that reflects that.  Ms. Beville, I'm sure that you'll

12 work with others to come up with that.

13        Okay.  Now, with respect to the argument on -- and

14 I have grouped these together, all the coalition matters, 9,

15 10, and 11 -- so, we dealt with 9, I think, and we have 10

16 and 11 -- no, we dealt with a part of 9.  We still have the

17 sufficiency of the amended statement and then we have the

18 motion to participate in mediation of Century and Hartford's

19 motions to compel the attorneys to submit disclosures.

20        What, if anything, is left with respect to Century

21 and Hartford's motion to compel the disclosures required

22 under Rule 2019, now that I have required that?

23        Mr. Schiavoni, Mr. Ruggeri, what's left?

24        MR. SCHIAVONI:  Your Honor, first of all, there's

25 no --

1          MR. RUGGERI:  Your Honor, James Ruggeri --

2          Go ahead, Tanc.

3          MR. SCHIAVONI:  I'm sorry.  Go ahead, James.

4          MR. RUGGERI:  I was going to say for -- James

5   Ruggeri, for Hartford -- one issue that remains out there is

6   that there's been a representation that these letters are

7   exemplars as opposed to examples and I don't know that that

8   is true.

9          We don't dispute that in the Third Circuit some

10  courts have permitted the filing of exemplars, but to the

11  extent that there are were any changes in these agreements

12  with any of the claimants or the law firms, et cetera, et

13  cetera, then we believe we'd be entitled to those documents,

14  as well.

15          And with regard to Exhibit A, which the Court has

16  permitted to be filed in redacted form, again, as the Court

17  has heard, that document has not been shared in unredacted

18  form, nor has the TCC's filings been shared in an unredacted

19  form with Hartford, and I don't believe with Century, either.

20          So, I do think that at least those two portions of

21  our motion do remain.  One, we would like a complete

22  production of the exemplars and, two, we would like, also, to

23  see unredacted copies of Exhibit A and the other papers that

24  were filed in connection with the 2019 matters.

25          THE COURT:  Okay.  Well, Ms. Beville, I assume

1   that supplying Mr. Ruggeri and Mr. Schiavoni with the

2   unredacted Exhibit A, subject to the protective order, is not

3   an issue, correct?

4           MS. BEVILLE:  Your Honor, the unredacted Exhibit A

5   is the names and addresses of the sexual abuse victims.

6           THE COURT:  Uh-huh.  So, subject to the

7   confidentiality order, is that an issue?

8           MS. BEVILLE:  Your Honor, let me just -- I think

9   we can do that, Your Honor.  I'd also like to just make sure

10  that it's entitled to the same protections as that

11  information is provided under the bar date order, so that

12  there's not, I'll say, additional access, perhaps, given or

13  ability to share anything that's provided under the bar date

14  order.

15          THE COURT:  Okay.  I will let you look for that.

16          In terms of the TCC, I assumed those redactions

17  were related to the redactions in the exemplars and the

18  retainer letters, and, therefore, the TCC's filings can be

19  unredacted and filed on the public docket.

20          MS. BEVILLE:  Your Honor --

21          MR. STANG:  Your Honor, that is correct, with the

22  exception of our redacted exhibit of Mr. Kosnoff's email.

23  The redactions refer to conversations between committee

24  members and counsel -- not my firm -- but lawyers who operate

25  under a common interest agreement at the time with the

1  committee members and would divulge confidential committee

2  strategy.

3          And so, I mean it is true as to the pleading where

4  we redacted portions of the different matters that were sent

5  around by Ms. Beville during the break; yes, we can unredact

6  those.  But as to the exhibit that was filed, we would assert

7  that privilege and -- as to the redactions in that.

8          THE COURT:  So, how am I supposed to consider

9  that?

10          MR. STANG:  I can send it to you.

11          MR. WINSBERG:  Your Honor, if I may?

12          MR. STANG:  Well, Your Honor, it's -- we think

13  it's attorney-client privilege.

14          THE COURT:  I don't know, I haven't seen it.

15          MR. STANG:  I know.

16          THE COURT:  Who was speaking?

17          MR. WINSBERG:  Your Honor, it's Harris Winsberg,

18  for -- on behalf of the Allianz insurers.

19          THE COURT:  Yes.

20          MR. WINSBERG:  Okay.  We join Hartford and Chubb's

21  motion and we would ask that the information come to us

22  unredacted, as well, under the terms of the protective order.

23          THE COURT:  Okay.  Thank you.

24          MR. MEEHAN:  Your Honor, is this is Taylor Meehan

25  with Agriculture Insurance Company.

1          And we also filed a joinder to Hartford's

2  insurance motion, so we would like to be included, just as

3  Allianz said, too.

4          THE COURT:  Okay.  Thank you.

5          MS. BEVILLE:  Your Honor, if I may, I just want to

6  make sure that the parties that are asking for names and

7  addresses are those parties entitled to receive the

8  information under the bar date order, and if that's correct,

9  I think that's something that we can add into the order, but

10 I just want to make sure that there's not a "me too" and

11 everyone raises their hands and people getting access to

12 information that they might not have otherwise been able to

13 under the bar date order.

14         THE COURT:  Yes, my "okay" is an acknowledgment;

15 it's not a ruling at this point.  It's an acknowledgment that

16 people are chiming in.

17         MS. BEVILLE:  Okay.  Thank you, Your Honor.

18         THE COURT:  Okay.  I'm trying to think if there

19 was a third thing, Mr. Ruggeri, that I forgot that was --

20         MR. RUGGERI:  Your Honor, those were the two big

21 ones.  Those are the two that I mentioned, thank you --

22         THE COURT:  Okay.

23         MR. RUGGERI:  -- with regard to Hartford.

24         THE COURT:  Okay.  So, that leaves us with the

25 motion -- the remainder of the coalition's motion with

1  respect to the sufficiency of the 2019 and their request to

2  participate in mediation.  And I think parties are entitled

3  to have an opportunity to look at the unredacted versions of

4  documents that are going to be filed, to which they did not

5  have access, you know, like more than two hours ago.

6          I would like to understand, though, Ms. Beville --

7  and it wasn't clear to me, quite frankly, from my quick read

8  of the unredacted versions of documents -- I'd like to have

9  your description of who your client is and how it works, so

10  we all come away from this hearing understanding who Brown

11  Rudnick believes it's representing and who it's taking

12  direction from and who it has obligations to and who it's

13  speaking on behalf of, so that we all have that understanding

14  and then parties can take a look at the documents, but I

15  would like to have that understanding.

16          MS. BEVILLE:  Thank you, Your Honor.  It's a fair

17  question.

18          So, Your Honor, Brown Rudnick represents the

19  Coalition of Abused Scouts for Justice, which is an ad hoc

20  committee.  It's an ad hoc committee, pursuant to Rule 2019.

21          We represent the collective interests of the ad

22  hoc committee's members and, Your Honor, the collective

23  interest of the ad hoc members is communicated or directed to

24  us through their retained law firm.  So, Your Honor, we take

25  direction from the law firms.  We have an advisory board

1  committee where we meet with representative members to

2  discuss different issues, but we are working with the law

3  firms as a representative of the collective interests of each

4  of their clients.

5          THE COURT:  Is the advisory committee made up of

6  individual victims?

7          MS. BEVILLE:  Yes, it is, Your Honor, of six

8  sexual abuse victims.  Your Honor, just to play that through

9  a little bit, I think it's like any other ad hoc committee

10 engagement, I think the most jarring thing people hear is the

11 numbers; it is a scary number.  It is jarring for people.

12         And I think it's important for people to remember

13 what that number represents and that is the number of people

14 that have been impacted by some of the behavior and

15 individuals that have been associated with the Boy Scouts.

16         And so, Your Honor, here, I mean, we do not -- and

17 we do not purport to bind the individual members themselves.

18 They have their state court counsel.  Submission of proofs of

19 claim, et cetera, is done separately.  We are trying to

20 coordinate that effort through the coalition as a

21 representative body, as a voice of the collective 12,000

22 individuals, but we -- the coalition is not binding the

23 individual members.

24         Your Honor, we are not binding the law firms,

25 individually, as you thought with the advertising motion.  We

1  were able to make arguments on behalf of the victims and

2  reach a resolution with the debtor to that proposed order,

3  but, ultimately, the debtors have at least sought

4  confirmation from the law firms individually that they, too,

5  agreed to the order.

6          And so, Your Honor, I do think it is something

7  that, you know, aside for the number, it is workable.  It is

8  something that we've seen in these cases, in mass-tort cases

9  before.

10          And in regular bankruptcy, as Your Honor is well

11  aware, the ad hoc committee represents the collective

12  interests.  Your Honor, you know, can think of an ad hoc

13  committee of bondholders.

14          THE COURT:  Uh-huh.

15          MS. BEVILLE:  The law firm who represents the ad

16  hoc committee isn't representing the individual interests of

17  each bondholder, it's representing the collective interests

18  of that group.  So, if it's 10 bondholders that collectively

19  own, you know, $500 million of bonds, you know, collectively,

20  the ad hoc committee is representing the interests in

21  $500 million of bonds.  And it's the same analogy here, Your

22  Honor, where the ad hoc committee represents the collective

23  interests of the members.

24          Your Honor, the members authorize their state

25  court counsel, through their engagement letter, to retain and

1    associate with other counsel.  And their law firms determined

2    that it was in their clients' best interests to form a group

3    and collectively retain specialty Bankruptcy Court counsel.

4    It was in their clients' best interests to have, you know, a

5    single law firm with experience in mass-tort bankruptcies and

6    large Chapter 11s.

7          We represent a collective interest that was a

8    right, if you will, that the clients authorized their law

9    firms to hire co-counsel, and, Your Honor, they did that.

10         THE COURT:  But let me ask a question about, that

11   because that did strike me.

12         When a client says their law firm can associate

13   with co-counsel, wouldn't the client expect that the co-

14   counsel would be representing them?

15         MS. BEVILLE:  Yes, Your Honor.

16         And, here, I appreciate there is a difference

17   between representing the client individually and its

18   interests collectively --

19         THE COURT:  Uh-huh.

20         MS. BEVILLE:  -- but we still believe that under

21   the terms of the engagement letter, they are authorized to

22   associate with counsel, and, here, Your Honor, they're

23   associating with Brown Rudnick as counsel to the coalition.

24   And so, we do think there's authority under the engagement

25   letter to work with Brown Rudnick as its associated counsel

1  in the bankruptcy that represents the collective interests of

2  a number of those clients and, here, that number is

3  horrifically large.  So, I do think that there is authority

4  there, Your Honor.

5          And, you know, there have been questions about,

6  you know, consent by the coalition members.  Well, Your

7  Honor, the coalition members expressly consented to the

8  association with counsel in their engagement letter.  We did

9  have -- the state court counsel did send notifications to

10  their clients regarding the formation of the coalition,

11  informed their clients that they intended that their clients

12  would participate in the coalition.  They informed their

13  clients they have the ability to not participate in the

14  coalition and to opt out, and they informed their clients

15  that, you know, Brown Rudnick was retained as its counsel.

16          And so, that, we do not think was necessary, but

17  it was done and that was an affirmative email or a notice or

18  however their state court counsel sent it, was sent to each

19  of their clients.  So --

20          THE COURT:  And you think that wouldn't be

21  necessary because of the original language in the -- the

22  language in the original engagement letter about associating

23  with counsel, okay.

24          MS. BEVILLE:  Exactly.

25          But, nonetheless, as we all say, to dot our Is and

1  cross our Ts and to make sure, Your Honor, that the clients

2  are informed and are aware of the association and do know

3  what is happening in the bankruptcy and how their interests

4  are being represented.  That notice was sent, so well, maybe

5  it wasn't necessary, it was important and it was done in

6  order to inform their clients of that association.

7          MR. SCHIAVONI:  Your Honor, even on a quick pass

8  here, when you look at this -- when you associate, you not

9  only represent a client, but you share within the

10 contingency -- just on a quick pass here, what's apparent is

11 Brown Rudnick is -- their fees are on top of the contingency

12 and that's not disclosed in the retention letter.

13          The retention letter talks about co-counsel

14 engagement.  This sort of form document that they claimed

15 went out to people, nothing in there said, Oh, gee, in

16 addition to taking 40 percent of your claim for filling out a

17 15-question proof of claim, we're also going to charge you

18 for Brown Rudnick's fees on top of that.

19          I'd be shocked --

20          THE COURT:  I actually --

21          MR. SCHIAVONI:  -- if a single claimant knows

22 that.

23          THE COURT:  I actually wasn't quite clear where

24 that was coming from, where payment for Brown Rudnick was

25 coming from; whether it was considered an expense, whether it

1  was on top or not, I don't know that, and that's probably

2  something that would be helpful to know.

3          And by asking questions -- and I'm not going to

4  let others ask and I don't need comments at this point,

5  because we're going to continue this -- but I do think it's

6  fair, and I'm just asking questions, not in an attempt to be

7  judgmental or to make any conclusions, but just so that at

8  the next hearing on this, we're not shooting in the dark and

9  across each other as to what the actual engagement terms are.

10          And I'm not precluding whatever is appropriate by

11 way of communication between parties, God forbid discovery,

12 but I want to have an understanding of Brown Rudnick's

13 engagement as I'm heading into the next hearing.

14          So, Ms. Beville, probably my last question, but

15 can you tell me how your hourly fee of getting paid and how

16 that relates to the -- if you know -- the underlying

17 arrangements between the victim and their state law counsel.

18          MS. BEVILLE:  Your Honor, I would prefer not to

19 try to answer that now.  I could give you an answer that I

20 believe is correct, but I would like to make sure it's

21 correct before I pass that on to you.

22          THE COURT:  Okay.

23          MS. BEVILLE:  But, Your Honor, I do just want

24 to -- and I appreciate your efforts here to clarify the

25 issues and to continue the hearing -- I do have some concerns

1  about what happens between now and then as far as what that

2  looks like, and I'll leave that to Your Honor to establish

3  whatever parameter that may be that we'll have to deal with

4  whatever comes as it comes, but --

5          MR. ANDOLINA:  Your Honor, it's Mike Andolina on

6  behalf of the debtors.  May I be heard briefly?

7          THE COURT:  Yes.

8          MR. ANDOLINA:  So, first of all, thank you, Judge,

9  for, I think, considering some very complicated and thorny

10  issues.  We agree with Mr. Schiavoni that your ability to

11  toggle between constitutional issues and Rule 2019 is

12  impressive.

13          The debtor does want to make a few comments on the

14  2019 and mediation issues, understanding that the Court will

15  continue the hearing.  First of all, we were extremely

16  disappointed to receive Mr. Kosnoff's email, which the Court

17  will have a chance to review.  We saw the redacted document

18  for the first time yesterday.

19          We were offended by the substance and the tone and

20  also the language that was used.  I think it was called an

21  amigo and a nitwit or maybe both, and accused of a failing

22  program with Mr. Stang.  I'm hopeful that we will have a

23  successful program at the end of this.

24          But from the debtors' perspective, Mr. Kosnoff's

25  words, as regrettable and insulting are they are, are words

1  and just words.  The debtors are focused on the actions of

2  the TCC and of the coalition and we want to make sure that

3  all survivors' voices are heard.

4           You know, in that regard, since Brown Rudnick has

5  appeared, the coalition has provided a full set of claims

6  data to the debtors and the mediators that's now going to be

7  produced to the insurers.  And, Your Honor, I confirm that

8  the bar date order does allow the insurers to receive claims

9  and claimant information, and I hear Ms. Beville saying that

10 that information will be turned over, in full, to the

11 insurers in short order.

12          As Your Honor saw earlier, we did engage in

13 constructive negotiations around the advertising issue

14 following the Court's suggestions after the last hearing.

15 And on some level, the coalition has taken a practical view

16 in terms of the engagement with the local councils, who are a

17 very important part of this process.  Recognizing their

18 engagement is key to this puzzle and solving it, but also

19 understanding that there are 261 independent, nonprofit

20 organizations.

21          I think the coalition has signaled to the

22 mediators, to the debtors, and to the local councils, they

23 are prepared to engage quickly and actively, as part of the

24 negotiated resolution that preserves the mission of scouting.

25          Now, we certainly share Mr. Schiavoni and the

1  insurers' concerns of how claims are being generated and, of

2  course, issues relating to State Court ethics, but we believe

3  those issues can be resolved, potentially, through 2004

4  discovery, through the mediation process, and through claims

5  review.  And we understand the Court's concerns completely in

6  terms of delaying a further hearing until the parties have

7  had a chance to review the additional 2019 materials; we get

8  that completely.

9           But from our perspective, we want to make it very,

10 very clear that the issue of a prompt negotiation is

11 absolutely critical to the debtors' dual goals of equitably

12 compensating survivors and preserving the mission of the BSA.

13          As Your Honor can imagine, the COVID-19 pandemic

14 has been disastrous to the BSA and for the local councils.  I

15 see Mr. Mason is on with us.  We are an organization that

16 brings boys and girls together to explore the outdoors, to

17 develop their minds and bodies, and to serve their

18 communities.

19          Although many local councils have are employed

20 creative, virtual programming, their ability to deliver the

21 mission of scouting in this environment is extremely

22 compromised.

23          Your Honor, simply stated, time is not our friend.

24 In the face of that reality, the mediators -- former Judge

25 Carey, Mr. Gallagher, and Mr. Finn -- have been working

1  diligently.  The debtors believe that sufficient progress has

2  been made.  The mediators are meeting on a weekly basis with

3  the constituencies, including the coalition, and these

4  sessions have been productive.

5         We would just urge the Court, as you consider a

6  schedule for additional discovery and hearing on the 2019, to

7  keep that in mind.  The debtors are prepared to engage as

8  quickly as possible with all of the constituencies, but,

9  obviously, a hearing like this is extremely expensive for the

10 estate and we are very anxious to get to the table and see if

11 we can reach a resolution that allows for survivors to be

12 fairly compensated and allows scouting to continue its very,

13 very critical mission.

14        Thank you, Your Honor.

15        MR. BUCHBINDER:  Your Honor, this is David

16 Buchbinder, again, for the U.S. Trustee.

17        I have one follow-up question for Ms. Beville that

18 I think is consistent with the Court's order of questions.

19        Ms. Beville, if you could, I think it might be

20 helpful to the Court and the others today if you could

21 explain how the advisory board was selected.

22        UNIDENTIFIED:  Ms. Beville, you're on mute.

23        MS. BEVILLE:  There you go.  Well, I can say I did

24 answer the question, you just didn't hear the answer.

25        Your Honor, the advisory board was selected by the

1  law firm representatives and it is a representative of

2  different clients from the different law firms, themselves.

3  So, it's a cross-section, if you will, of clients of each

4  individual law firm.

5           THE COURT:  Thank you.

6           MR. BUCHBINDER:  So, the law firms chose the

7  representatives, not the survivors?

8           MS. BEVILLE:  The law firm spoke with members to

9  see who would be interested and ultimately selected those who

10 would be the advisory board, yes.

11          MR. BUCHBINDER:  Thank you.

12          THE COURT:  Okay.  With respect to timing -- I

13 have to check with Mrs. Johnson -- I'm not sure when our next

14 hearing is, but let me say this, and I recognize I've got

15 some inconsistency here, but if the mediators have found it

16 useful to engage with the coalition, I'm not instructing the

17 mediators to stop that.

18          I guess we'll deal with what happens, if for some

19 reason -- well, I'm not even sure I know what the relief is

20 that I could grant -- but I'm not instructing the mediators

21 as to who and who not to engage with, and I'm fairly certain

22 the order would permit that, but, nonetheless, I'm not

23 instructing them.

24          If they want to come to me and ask for some

25 instruction, then I'll deal with that, but I'm not

1 | instructing the mediators who they can engage with or on what
2 | terms.
3 |        MR. STANG:  Your Honor, this is Mr. Stang.  May I
4 | just make one comment?
5 |        Because Mr. Andolina tried to set up the TCC
6 | against the coalition, it is not my job to make Mr. Andolina
7 | happy.  It is my job to represent, as the fiduciary --
8 |        THE COURT:  I don't think he thinks that's your
9 | job.
10 |        MR. STANG:  Well --
11 |        THE COURT:  I don't think he's under any allusion
12 | that that's your job.
13 |        MR. STANG:  Well, he loves the coalition for
14 | making him happy -- and I'm glad they're doing that -- but
15 | we're standing up for -- to remind them, selected by the
16 | U.S. Trustee, we're standing up for all of these survivors.
17 |        And if the coalition is giving him information and
18 | we're not, there are reasons and we will explore those with
19 | you at the next hearing.
20 |        THE COURT:  Okay.
21 |        MR. MOLTON:  Your Honor, it's David Molton.
22 |        Can I add something?
23 |        THE COURT:  Yes.
24 |        MR. MOLTON:  Okay.  I just want to say, Judge, we
25 | appreciate your direction to the mediators to continue

1  talking with us.  We've been engaged with them since --

2          THE COURT:  I didn't direct them to continue to

3  speak with you.

4          MR. MOLTON:  No, I understand.

5          But if they wanted to, so -- okay.  Sorry, I

6  didn't mean to say that in that way.

7          But what I did mean to say is that we appreciate

8  your statement regarding that.  One of the impediments that

9  we've had, Your Honor, is that the mediation submissions are

10 going forward.  We are not a mediation party and one of the

11 reasons that we made this motion was to become a mediation

12 party, and so, to fully and fulsomely participate in

13 mediation.

14         So, we have not had the benefit of the debtors'

15 submissions, nor have we had the benefit of the responses to

16 the debtors' submissions.

17         We would love to add our views and be able to,

18 while this matter proceeds, Your Honor, engage in that

19 process.  So, one of the things that I do want to say is to

20 the extent that the mediators do continue to engage with us,

21 you should realize, Your Honor, that to some extent, until we

22 become full mediation parties and are able to participate in

23 the disclosures that happen in mediation, we're going to be a

24 little bit handicapped.  So, I just wanted to say that, Your

25 Honor.

1          THE COURT:  And someone is unhappy right now.

2          MR. MOLTON:  Your Honor, that's my 5-year-old who

3   just came back from kindergarten, so I apologize.

4        (Laughter)

5          MR. MOLTON:  But, this is the life we're in, so in

6   any event --

7          THE COURT:  You're funny.

8          MR. MOLTON:  -- I just want to say something in

9   connection with Mr. Stang, as well as the committee.  You

10  know, we are not here to compete.  We're not here to

11  supplant.  We're not here to marginalize.  That's not why

12  we're here.

13         I'm looking forward to working with Jim Stang, who

14  I've known for many, many years.  We're here to be

15  constructive.  We have been constructive.

16         I think Your Honor has seen the value we have

17  already added here in connection with the advertising motion

18  and also the fact that, yes, you know, I agree with

19  Mr. Stang, reasonable folks, you know, representing similarly

20  situated clients, and I understand the committee has a

21  fiduciary duty to all of the abuse victims and we recognize

22  that and understand that, but folks can have different views

23  and that's why sometimes the ad hoc committees happen, even

24  though they're represented -- their constituency is

25  represented by the committee.

 1          But what Your Honor should not take of this is any

 2  feeling or perception that, you know, our client, the

 3  coalition, and the number of abuse victims that fall within

 4  its tent, is in any way, here, seeking to compete with or

 5  supplant the official committee, because that was something

 6  that was in the pleadings and I think that that was a

 7  misstatement.

 8          We're here to roll up our sleeves, work with the

 9  others --

10          MR. STANG:  Your Honor?

11          MR. MOLTON:  -- work with others, as we've done,

12  and go forward.

13          MR. STANG:  Your Honor, if those law firms wanted

14  to be constructive, maybe they should have told us while they

15  had their coalition formed, that they were sitting in on

16  confidential meetings of the committee -- so much for being

17  constructive.

18          THE COURT:  Okay.  Mr. Abbott, what else do we

19  have on the docket today?

20          MR. ABBOTT:  Well, Your Honor, let me just go

21  through it quickly.

22      (Pause)

23          MR. ABBOTT:  Your Honor, I think the last item

24  is -- well, the lease assumption is handled.  There's

25  Hartford's motion to file under seal, you know, the sort of

1  the more administrative -- I think that may be it, Your

2  Honor.

3         Because the adversary proceeding does not -- the

4  status conference has been adjourned, so, Your Honor, I think

5  other than trying to set a hearing to come back on this

6  issue, Your Honor, that's probably what we have.

7         Mr. Render (phonetic) will correct me if I'm

8  wrong.

9         I think our next omnibus, Your Honor, would be

10 October 14th, but candidly, that date is so far off, Your

11 Honor, that -- but I think -- I know the debtors sort of came

12 here from the beginning of the case to move with some

13 alacrity.  This seems to be a bit of a gating item for number

14 of participants.

15        If we could find some time on the Court's calendar

16 sooner that would allow us to get back and try to resolve

17 these issues so we could actually get around the table with

18 the mediators together and get something done, that would be

19 extraordinarily helpful, Your Honor.

20        MR. SCHIAVONI:  Your Honor, Tanc Schiavoni.

21        Just -- I mean, this should be obvious, but the

22 Boy Scouts are not shy about picking who they talk to, and as

23 the papers reflect, (indiscernible) talking to this coalition

24 over a month, and as far as the mediators, they're not shy

25 about who they talk to, either.  They make their own

1  decisions and you have in front of you that the coalition has

2  said that the last month they played "a productive role."

3          So, I don't think the house is falling down right

4  now over them not participating.  They have a committee to

5  also, through which they're able to participate, in

6  addition -- but the mediators pick up the phone and speak to

7  whoever they want.

8          THE COURT:  Well, I'm going to have to speak with

9  Mrs. Johnson in any event to get you in here --

10         MR. ABBOTT:  Understood, Your Honor.

11         THE COURT:  -- October 14th.  And it's a super-

12  tight calendar, as it is, but I will speak with her.

13         What I would like to happen, however, is that if

14  there is -- or any -- I would like people to get on top of

15  this issue and if there are going to be any filings, if

16  there's going to be any discovery, it needs to happen right

17  away.  I don't want it to wait.

18         And, of course, that means that people need to

19  move in an expedited fashion, notwithstanding, you know, 30

20  days for this and however many days it is for a notice of

21  deposition now.  And I'm not suggesting that we need

22  discovery; I'm just suggesting that --

23      (Audio concluded abruptly)

24

25

1                              CERTIFICATE

2

3        I certify that the foregoing is a correct transcript

4   from the electronic sound recording of the proceedings in the

5   above-entitled matter.

6
    /s/Mary Zajaczkowski              September 11, 2020
7   Mary Zajaczkowski, CET**D-531

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25