**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>                Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>Jointly Administered |

**Objection Deadline: October 7, 2020 at 4:00 p.m. (ET)
Hearing Date: October 14, 2020 at 10:00 a.m. (ET)**

**MOTION OF THE OFFICIAL TORT CLAIMANTS' COMMITTEE PURSUANT TO
BANKRUPTCY RULE 2004 AND LOCAL RULE 2004-1 FOR AN ORDER
AUTHORIZING THE ISSUANCE OF SUBPOENAS FOR DISCOVERY FROM
<u>DEBTORS AND CERTAIN LOCAL COUNCILS</u>**

The official committee of tort claimants (consisting of survivors of childhood sexual abuse) (the "Tort Claimants' Committee" or the "TCC") appointed in the above-captioned cases (the "Cases") hereby submits this motion (the "Motion"), pursuant to Rules 2004 and 9016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for the entry of an order (the "Rule 2004 Order"), substantially in the form annexed hereto as **Exhibit A**, authorizing the TCC to issue subpoenas to and directing discovery from Boy Scouts of America ("BSA" or the "Debtor"), members of the Ad Hoc Committee of Local Councils of the BSA (the "Local Council Committee Members"), and those local councils specifically listed on **Exhibit B** hereto (the "Additional Local Councils," together with the Local Council Committee Members, the "Local Councils" and, together with

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

the BSA, the "Examinees").  In support of the Motion, the TCC respectfully represents as

follows:

### PRELIMINARY STATEMENT

1.      The TCC seeks the entry of an order authorizing the issuance of narrowly

tailored subpoenas pursuant to Bankruptcy Rules 2004 and 9016 for the production of (a)

documents and information regarding assets that the Examinees contend are "restricted assets"

(the "Restricted Assets," and the documents and information concerning Restricted Assets, the

"Restricted Asset Information"),[2]  (b) troop and camp rosters (the "Rosters"), and (c) Insurance

Policies for claims arising from or concerning sexual abuse (the "Insurance Policies" and,

together with the Restricted Asset Information and the Rosters, the "Discovery Requests")[3] from

the BSA and the Local Councils.  The TCC needs to review and analyze this information so that

it can participate in substantive discussions regarding a possible global resolution among the

Debtors, TCC, the Local Councils, and the other mediation parties.[4]

---

[2] "Restricted Assets" are defined in the Discovery Requests to mean "(a) any real or personal property owned or controlled by [an Examinee], or owned or controlled for [an Examinee's] benefit, (b) that [an Examinee] contend[s] was obtained or received by [the Examinee] with a restriction as to use or purpose, whether by actual or constructive trust or otherwise, (c) that [an Examinee] contends would not constitute "property of the estate" under section 541(a) of the United States Bankruptcy Code if [the Examinee] were a debtor in a bankruptcy case, and (d) that [the Examinee] reasonably believes has a fair market value equal to or in excess of $250,000."  *See* Exhibit C annexed hereto at 3.

[3] "Insurance Policies" are defined in the Discovery Requests to mean  (a) "with respect to the BSA, all general liability or other insurance policies, or evidence of such policies, pursuant to which the BSA has coverage, or may have coverage, for any liability arising from claims of sexual abuse, including but not limited to (1) all such policies for each year prior to 1963, and (2) all policies listed on Schedule A annexed hereto, and (a) with respect to each Local Council, all general liability or other policies, or evidence of such policies, that might provide coverage for sexual abuse claims independent from the coverage provided under the BSA policies or a representation that no such policies exist."  *See* Exhibit C annexed hereto at 3.

[4] The TCC acknowledges that the BSA and certain of the Examinees have produced a substantial volume of documents to date.  But the Restricted Asset Information and Insurance Policies are of such vital importance that the TCC must make sure that all responsive documents and information concerning those topics are produced; and, as discussed below, the Examinees uniformly refuse to produce any of the Rosters.  For the avoidance of doubt, the TCC does not seek the production of any documents or information responsive to the Discovery Requests that has previously been produced. *See* Exhibit C, Instructions for Document Requests No. 1 at 7 ("The Document Requests seek only documents that have *not* been previously produced by" each Examinee).

2.      Specifically, the TCC needs the Restricted Asset Information to, among other things, assess (a) the merits of the Examinees' contentions that certain assets constitute Restricted Assets that are unavailable for distribution to creditors and cannot be considered in formulating a plan, and (b) the Local Councils' assets and liabilities to determine whether the Local Councils have the means to provide a substantial contribution sufficient to support a channeling injunction.

3.      The Rosters are critical to the TCC's analysis of the abuse claims against the Local Councils and the determination of whether, and to what extent, other parities may also be liable for the thousands of survivor claims involving the Local Councils.  The Rosters identify, among other things, the Local Council, sponsoring organization, troop/unit number, the adult supervisors/volunteers, and the scouts/participants, at particular moments in time.  This information will enable the TCC to assess the validity and strength of claims, identify other insurance policies and potential defendants, and analyze any proposed resolution against the "best interests of creditors" test.

4.      And, of course, the Insurance Policies are a substantial source of recovery for the sexual abuse survivors.

5.      The information sought is extremely narrow in scope and well within the confines of Rule 2004 discovery and is needed by the TCC to participate in a productive mediation.  While certain of the Examinees have been working with the TCC regarding the TCC's informal document requests, the Examinees have either (a) provided insufficient information concerning certain of the Restricted Assets; (b) provided a list of Restricted Assets without documentary support for the alleged restrictions; or (c) provided no Restricted Asset

Information at all.[5]  Moreover, the Examinees have uniformly rejected the TCC's repeated requests for the Rosters.  Finally, while the TCC is aware that the BSA has produced certain insurance policies and has retained an "archivist" to assist in identifying Insurance Policies, few, if any, of the Local Councils have provided any Insurance Policies even though they generally had independent insurance coverage prior to 1980.  The Examinees must use their best efforts to locate and produce all Insurance Policies.

6.      Since the first day of this case, the Debtor has beseeched all of the parties to move quickly towards the negotiation of a plan because it is a nonprofit entity and could not endure a lengthy and expensive chapter 11 process.  That message has been echoed by the Ad Hoc Committee of Local Councils.  With that exhortation comes the responsibility to provide prompt and fulsome discovery responses.  The Examinees have slow-walked information on the Local Councils' Restricted Assets and stonewalled on the Roster requests, and the TCC has no confidence that all of the Insurance Policies have been produced.  The Examinees have failed to hold up their end of the bargain and erected roadblocks to the TCC's ability to perform the due diligence required in the performance of its fiduciary duties.

7.      For the reasons set forth above and below, the Motion should be granted.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding under 28 U.S.C. § 157(b).  Venue of the Debtor's bankruptcy case and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[5] The issue of whether assets are "restricted" is of vital importance because if validly asserted, such assets would be unavailable for distribution to creditors.  Thus, the Restricted Asset Information generally includes (a) interrogatories seeking the identity of Restricted Assets and the basis for each Examinee's contentions that such assets are "restricted," and (b) documents and communications concerning the purported Restricted Assets that have not been previously produced.

9. The statutory predicates for the relief sought herein are section 105 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 2004 and 9016, and Rule 2004-1 of the Local Rules.

## BACKGROUND

### A.    Case Background

10. On February 18, 2020 (the "Petition Date"), the BSA and Delaware BSA, LLC commenced the Cases by filing voluntary petitions for relief under Chapter 11 of Title 11, United States Code (the "Code"). Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate as debtors in possession.

11. On March 4, 2020 the United States Trustee (the "U.S. Trustee") formed the Tort Claimants' Committee consisting of nine survivors of childhood sexual abuse and the official committee of unsecured creditors (the "UCC").

### B.    Requests for Production

12. On March 25, 2020, shortly after its formation, the TCC sent its initial set of informal document requests to the BSA which included, among other things, the following: (a) "[a]sset listings / schedules detailing unrestricted (including designated), temporarily restricted and permanently restricted assets owned or controlled by the BSA or any of the BSA Related Entities," (b) "[a]ll supporting documentation for assets referred to in the prior request, including but not limited to wills, bequests, letters, and correspondence," (c) "[t]roop rosters for the BSA and each of the BSA Related Parties," and (d) "[a]ll insurance policies for the BSA and each of the BSA Related Parties." The Local Councils fell within the definition of "BSA Related Entities."

13. On March 30, 2020, at the BSA's request, the TCC sent a follow-up set of "priority" requests that included, among other things, the following:  (a) "[d]etailed asset listings

/ schedules detailing each and every unrestricted (including board designated and donor advisory funds), temporarily restricted and permanently restricted assets owned or controlled by the BSA or any of the BSA Related Entities," (b) "[t]o the extent not already in the data room, all documents that the Debtors contend support their position that the 'Identified Property' "is subject to enforceable use restrictions," as alleged in the *Debtors' Motion for Entry of an Order (I) Scheduling Certain Deadlines in Connection with Potential Disputes Regarding the Debtors' Identified Property and (II) Granting Related Relief*, filed at Docket No. 19," and (c) "[t]o the extent not already in the data room, all insurance-related documents."

14.     On May 10, 2020, the TCC wrote to counsel for the Local Council Committee Members concerning its request for Rosters and stated as follows: "The TCC needs the Troop Rosters from each Local Council going back as far as they are available.  This was part of the TCC's original requests and, as we presume [Debtor's counsel] has conveyed to you, an issue we have frequently pressed.  The Troop Rosters provide information concerning, among other things, potentially responsible parties (*e.g.*, sponsoring organizations) that is frequently unknown to survivors but that is critical with statutes of limitation expiring in various jurisdictions at various times.  We don't believe this is a burdensome request, but note that Troop Rosters were not among the categories of information included in the information spreadsheet provided to Local Councils."[6]

15.     On or about July 16, 2020, counsel for the TCC sent letters to each of the Local Council Committee Members requesting the informal production of documents, including,

---

[6] Without any discussion with the TCC or its advisors, at the outset of these Cases (or perhaps before) counsel to the Ad Hoc Local Council Committee provided a spreadsheet to all of the Local Councils that sought a very narrow set of documents and information.  To the TCC's frustration, the responses by the Local Councils to even this narrow set of documents and information have been extremely inconsistent.

among other things, the Restricted Asset Information, the Rosters, and the Insurance Policies. [7]
Counsel for the TCC and each Local Council Committee Member have had at least two "meet
and confer" telephone conferences and have exchanged numerous written communications
regarding the TCC's requests.  While each Local Council Committee Member has provided (and
in some cases, continues to provide) documents responsive to at least some of the requests, most
have not provided the underlying support for asset restrictions (including, for examples, copies
of the key source documents such as wills, bequests, and agreements).  In addition, none of the
Local Council Committee Members have demonstrated an ability to specifically identify and
trace restricted funds from origination to current date (including, for example, the identification
of the account where the asset was originally deposited, transferred to, or now resides and
whether the asset has been commingled with non-Restricted Assets), nor have any of the Local
Council Committee Members produced any information concerning the Insurance Policies or
any Rosters.

16.     On July 28, 2020, after learning from certain Local Council Committee
Members that the BSA possessed certain of the documents requested, counsel for the TCC
emailed the BSA's counsel regarding the production of documents related to the Local Council
Committee Members, including the Rosters.  Counsel met and conferred on August 13, 2020.
The Debtors have produced certain documents, but have refused to produce the Rosters.

17.     On September 4, 2020, the TCC wrote to each of the Additional Local
Councils and included informal document requests that specifically sought, among other things,

---

[7] The TCC specifically requested, among other things, (a) copies of all "insurance policies in effect at any time from
1950 through the present issued to, sold to, acquired by, purchased by, or naming or including any Local Council as
an insured, named insured or additional," (b) "[a]sset listings / schedules detailing unrestricted (including
designated), temporarily restricted and permanently restricted assets owned or controlled by each Local Council,"
and "[a]ll supporting documentation" for such assets, and (c) "Troop / unit rosters (including names, troop / unit
numbers, time periods covered, etc.)."

the Restricted Asset Information, the Rosters, and the Insurance Policies.  None of the Additional

Local Councils responded.

C.    **Document Requests**

      1.    **Restricted Asset Information**

      18.    The TCC seeks Restricted Asset Information from the Examinees.  The

Additional Local Councils were identified based on the number of claims that have been filed or

are currently expected to be asserted against such Additional Local Councils and their respective

assets as reported in their IRS Forms 990.

      19.    The TCC needs the Restricted Asset Information to assess the factual and

legal basis for any claimed restriction for the purpose of making an accurate financial assessment

of each Local Council.  Determination of whether donor-restricted assets should be excluded

from a financial analysis is complicated, and may require some or all of the following

information:

- The donor or source of the asset;

- The identity of the initial recipient of each asset;

- Whether the recipient entity was independent from BSA or was a trust for which
  the trustee was unrelated to BSA;

- The source, manner, and timing of conveying any alleged donor restriction;

- The nature and specific language of such alleged donor restriction;

- Whether the donor restriction expressly indicated that BSA or its related party
  was to hold the asset in trust;

- The type of asset (*e.g.*, cash or real property);

- How the assets were and are now held; and

- Whether the assets were commingled or transferred or spent such that their
  continued existence cannot be proven.

20.     Donative restrictions may include language in the relevant instrument making a donation an endowment (*e.g.*, only the income or return can be used) or limiting the purposes for which the asset may be used (*e.g*., by mandating it must be used for a particular purpose, such as construction of a building, or by prohibiting its use to pay debts).  While donor-imposed restrictions on gifts may prevent creditors from being able, non-consensually, to gain access to such funds, the TCC must be able to make an independent assessment rather than being forced to accept the Examinees' contention that any such assets are restricted.

21.     Without the facts in hand, the parties' mediation may stall.  The Restricted Asset Information will help facilitate a possible global resolution because the TCC will be able to assess whether a Local Council is making a substantial contribution that supports a channeling injunction with respect to that Local Council.  Further, BSA creditors may be entitled to be paid from the Local Councils' unrestricted assets because (a) the BSA has the power to revoke or terminate the Local Councils' charters or let them expire by refusing to renew , which causes the Local Councils' assets to revert to BSA in accordance with the BSA's and Local Councils' by-laws and regulations, (b) the BSA may have claims against the Local Councils  arising from  the BSA's general liability insurance program (GLIP) and / or pension plan or may have received fraudulent transfers that they are obligated to pay over to BSA, or (c) the Local Councils could be directly liable to survivors or BSA's other creditors.   It is impossible for the TCC participate in the mediation or other settlement regarding a plan without reviewing the Restricted Asset Information.

2.    **Rosters**

22.    The TCC seeks the Rosters from the Local Councils and BSA,[8] who the TCC is informed has the Rosters in its possession, custody and control.  The Rosters will enable the TCC to verify and assess the value and scope of abuse claims against the BSA, Local Councils, and chartered organizations.  In addition, the Rosters will help the TCC determine which sponsoring or chartered organizations may be implicated in abuse claims and whether such organizations have insurance policies available to satisfy the abuse claims.

23.    Abuse survivors may have a legal claim against at least three different entities recognized in the BSA Charter and By-laws and its Rules and Regulations:  (a) the BSA; (b) a "local council" that managed all Boy Scouting units (*e.g.*, a Boy Scout Troop or a Cub Scout Pack) in a defined geographic area; and (c) a "chartering organization", such as a school or church, that operated a particular Boy Scout unit in conjunction with the Local Council and BSA.

24.    Boy Scout units are usually created when a youth-serving organization, such as a ward or parish of a church or community organization decides to offer a Scouting unit to its members.  The youth-serving organization visits the Local Council for its geographic area and applies for a "charter" to operate a Scouting unit.  The Local Council transmits the application to the BSA for review and approval.  If the application for a charter is approved by the BSA, the organization pays a fee and becomes the "chartered organization" for its particular Scouting unit.  Pursuant to BSA Rules and Regulations and its Charter and Bylaws,  the BSA assigns to the charted  organization responsibility (subject to approval by BSA and the Local Council) for staffing its Scouting unit with adult volunteers, including any Scoutmaster,

---

[8] Through counsel, the BSA has represented that it possesses most Rosters for the past twenty years.

Assistant Scoutmasters, and other Scout leaders, and for recruiting children to become Scouts of the Scouting unit.

25.     The charter organization is responsible for collecting a fee from every adult volunteer and every child who participates in the Scouting unit.  The sponsoring organization then transmits the collected fees to the local council, who then transmits a portion of the fees to the Debtor.  This is one of the main ways that the Debtor generates revenue -- by collecting a fee from every adult and every child who participates in the Scouting program.

26.     In order to collect the appropriate fees, the Debtor requires the sponsoring organizations to renew their charters on an annual basis and to submit rosters that include the names of each adult volunteer and each child member.  This is done every year and the sponsoring organization must submit a fee for each adult and each child.  Most Rosters clearly provide the following information for the Scouting unit:

a.     The city, state, and county of the Scouting unit;

b.     The local council responsible for the Scouting unit;

c.     The name, city, state, and address of sponsoring organization responsible for the Scouting unit;

d.     The executive officer or other person from the sponsoring organization who was responsible for the Scouting unit (the "institutional representative");

e.     The location the Scouting unit held its meetings;

f.     Each child member in the Scouting unit, including their name, age, address, and contact information;

g.      Each adult volunteer in the Scouting unit, including their name, address, contact information, and leadership position (e.g., Scoutmaster);

h.      The name of each adult volunteer in the Scouting unit;

i.      The "expiration" date for the roster;

j.      The Troop or Pack or Explorer number.

27.      As a rule, Rosters clearly identify the local council and charter organization that may be liable for abuse by a Scout leader on the roster or for abuse of a Scout member on the Roster. Many of these councils and charter organizations may want to participate in the Debtor's bankruptcy and obtain the benefits of a channeling injunction, which means the TCC needs to know their identity and must be able to evaluate their respective liabilities to determine whether they have made a substantial contribution to the cases.

28.      Even if a council or charter organization does not choose to participate in the Debtor's bankruptcy, the TCC needs to know their identities so that it can explore whether these entities have insurance that may provide coverage for claims made in the bankruptcy. For example, it appears these entities may have purchased their own insurance separate and apart from the Debtor's insurance, including insurance that may have listed the Debtor as an additional insured.

29.      Second, the charters and Rosters will help the TCC, the Debtor, and other interested parties to corroborate certain claims, particularly if a claimant does not recall certain information about their Scouting unit. For example, from the thousands of claims that have already been submitted, the TCC is aware that many claimants do not recall their Scouting unit number (e.g., Boy Scout Troop #23), the name of the local council who was responsible for their

Scouting unit, or the name of the chartered organization that sponsored their Scouting unit.

Others do not recall the specific year(s) of the sexual abuse (which may be relevant to insurance

coverage issues). Some claimants do not recall the names of adults who received complaints and

ignored them or saw "red flag" behavior and ignored it.

30.     Since the vast majority of claimants were children and teens when they

were abused, it is completely understandable that they would not be able to recall this

information -- some of the claimants were in second or third grade when they were sexually

abused. The claimants also generally lack any meaningful ability to obtain the information

because of the automatic stay and the injunction -- claimants who have filed state court actions

cannot issue discovery to the Debtor or the Local Councils to obtain this information for use in

filling-out their claim forms.

31.     On the other hand, these claimants are struggling to recall and provide

important information that is contained in the charters and Rosters. For example, Rosters may

help such claimants recall or identify information such as the Troop number, the name of the

camp, the sponsoring organization, the Scout leader's name, the particular year(s) of abuse or the

location of the incident(s). Furthermore, where a claimant alleges he was abused in a Council

Camp but cannot recall the name, Roster would also be helpful to identify the name of the Camp

and may assist in identifying perpetrators and witnesses not associated with the Camp.

32.     Third, and related, the Debtor and other interested parties have suggested

they may object to claims if the claimant is unable to provide some of the information that many

claimants are already struggling to provide. Not only does the TCC need this information in

order to identify third parties who may want to participate in the bankruptcy, or who may have

insurance that covered the Debtor and/or parties who choose to participate, but no party has an

interest in waiting to obtain the charters and Rosters until the Debtor or third parties start objecting to claims. The claimants should have a fair opportunity to provide as much information as possible to avoid claim objections and the substantial amount of time and money that could be devoted to objections that will easily be rejected once the claimant is provided with the charters and/or rosters.

33. Fourth, and also related, the Debtor and other interested parties have suggested they may object to claims if a claimant and/or their alleged abuser are not listed on the roster(s) for their Scouting unit. As noted above, for many claimants this could simply be a result of the claimant believing they were a Boy Scout in Troop #75 in 1975 when they were actually a Boy Scout in Troop #75 in 1976. A review of the rosters for Troop #75 would quickly reflect the (understandable) error. On the other hand, many claimants may have joined a Scouting unit in-between the annual registration period, been abused, and then dropped out before the next registration period. Such claimants may not appear on the roster for that Scouting unit, but the other people identified on the unit's roster would be able to corroborate that the person was in the Troop with them.

34. The Rosters are necessary for the TCC to understand the potential claims and contributions, whether from insurance proceeds or third parties, without which the TCC may be unable to support a global resolution of the Debtors' cases. The TCC recognizes that the importance of the Rosters to the validation of claims against the Debtors could be incorporated into trust distribution procedures or a post-confirmation vetting process. However, in light of the insurance companies' incessant attacks on the credibility of the claims, which is subsumed in their Rule 2019 motions/objections, the Rosters should be produced now so that those attacks can be addressed.

3.      **Insurance Policies**

35.    There is no dispute that the Insurance Policies are a potential source of recovery for the survivors of sexual abuse.

36.    TCC acknowledges that the BSA has produced certain insurance policies and has retained an "archivist" to assist in identifying Insurance Policies.  While it remains to be seen what work the "archivist" has done, the BSA has not produced (a) any Insurance Policies from prior to 1963, or (b) any of the Insurance Policies listed on Schedule A of the Discovery Requests.  Moreover, none of the Local Councils have provided any Insurance Policies even though they generally had independent insurance coverage prior to 1980.

37.    Given the importance of the Insurance Policies, the TCC believes that formal discovery is warranted and that the Examinees must use their best efforts to locate and produce all Insurance Policies.

## RELIEF REQUESTED

38.    The TCC moves for the entry of an order authorizing the issuance of subpoenas to each of the Examinees pursuant to Bankruptcy Rules 2004 and 9016 for the production of Restricted Asset Information and Rosters, as set forth in the Discovery Requests attached hereto as **Exhibit C**.  The TCC further requests that documents and information responsive to the Discovery Requests be delivered to James E. O'Neill, Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, P.O. Box 8705, Wilmington DE 19801 within fourteen (14) days after entry of an order granting this Motion or at such other place and time as the parties may agree.

## BASIS FOR RELIEF

39.    Bankruptcy Rule 2004 provides that the Court may order the examination and the production of documentary evidence of "any entity" concerning any matter that relates

15

"to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or . . . any matter relevant to the case or the formulation of a plan." Fed. R. Bankr. P. 2004(b); *see also Harrow v. Street (In re Fruehauf Trailer Corp.)*, 369 B.R. 817, 827-28 (Bankr. D. Del. 2007) (noting the "extensive document discovery" that occurred pursuant to a subpoena issued under Fed. R. Bankr. P. 2004).

40.    The scope of a Rule 2004 examination is "unfettered and broad," as the plain language of the rule indicates. *See In re Countrywide Home Loans, Inc.*, 384 B.R. 373, 400 (Bankr. W.D. Pa. 2008). Indeed, Bankruptcy Rule 2004 affords parties-in-interest an extremely broad right of discovery and "is even broader than that of discovery permitted under [the Federal Rules of Civil Procedure], which themselves contemplate broad, easy access to discovery." *In re Valley Forge Plaza Assocs.*, 109 B.R. 669, 674 (Bankr. E.D. Pa. 1990) (citations omitted). *See also In re Teleglobe Communications Corp.*, 493 F.3d 345, 354 n. 6 (3rd Cir. 2007) (Rule 2004 allows parties with an interest in the bankruptcy estate to conduct discovery into matters affecting the estate); *In re Washington Mutual*, 408 B.R. 45, 50 (Bankr. D. Del. 2009) (a "Rule 2004 [examination] is commonly recognized as more in the nature of a 'fishing expedition'") (citations omitted).

41.    Plainly, the broad access afforded by Rule 2004 extends to third parties such as the Local Councils that are critical to the Debtors' "formulation of a plan" and that have information relating to the Debtors' financial affairs and other actions taken on behalf of the Debtors. *See e.g., In re Wilcher,* 56 B.R. 428, 433 (Bankr. N.D. Ill. 1985) (Bankruptcy Rule 2004 examination "may extend to creditors and third parties who have had dealings with the debtor"). This is because "[t]he clear intent of Rule 2004 . . . is to give parties in interest an opportunity to examine individuals having knowledge of the financial affairs of the debtor in

order to preserve the rights of creditors." *In re GHR Cos., Inc.*, 41 B.R. 655, 660 (Bankr. D. Mass. 1984).

42.     The non-Debtor Local Councils are not just any "third parties."  Rather, they are central to the resolution of these Cases as intended beneficiaries of (a) the extension of the automatic stay sought by the Debtors at the outset of these Cases,[9] and (b) the channeling injunction that is a material element of the Debtors' proposed plan of reorganization.[10]

43.     Thus, an order pursuant to Rule 2004 directed to the Local Councils is both appropriate and necessary.  Specifically, the Discovery Requests will enable the TCC to assess the Local Councils' assets and liabilities to determine whether the Local Councils have provided a contribution sufficient enough to support a channeling injunction.  The Restricted Asset Information is needed to determine the available *assets* of each Local Council, and the credibility of each Local Council's assertion that certain assets are restricted and should not be considered in assessing its ability to contribute to a plan.

44.     The Rosters are critical to analyzing the Local Councils' liabilities.  These Rosters identify the Local Council, sponsoring organization, troop/unit number, the adult supervisors/volunteers, and the scouts/participants, and will enable the TCC to resolve claims, identify applicable insurance policies and co-defendants who could be contributing to a global

---

[9]   *See BSA's Opening Brief in Support of Motion for Preliminary Injunction Pursuant to Sections 105(a) and 362 of the Bankruptcy Code*, filed on February 18, 2020, at Docket No. 7 in Adv. Pr. 20-50527 (the "Adversary Proceeding").  *See also* the consent order and stipulations that extended the automatic stay to November 16, 2020, for the benefit of, among others, the Local Councils, filed at Docket Nos. 54, 71, and 77, respectively, in the Adversary Proceeding.

[10]   *See Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LCC*, filed on February 18, 2020 [Docket No. 20], Article IV.E at 28 ("From and after the Effective Date, all Abuse Claims shall be subject to the Channeling Injunction . . . [and] the Protected Parties shall not have any obligation with respect to any liability of any nature or description arising out, relating to, or in connection with any Abuse Claims.").  The Local Councils are "Protected Parties" under the Debtors' proposed plan. *Id*. Article I.A.107 at 14-15.  *See also Id*. Article X.D, E at 50-52 for the exhaustive description of the scope of the Debtors' proposed Channeling Injunction which will inure to the benefit of, among others, each non-Debtor Local Council.

settlement or who have liability that must be calculated into the best interests test.  This inquiry

falls squarely within the permissible scope of discovery under Bankruptcy Rule 2004.

Accordingly, issuance of subpoenas to access the Restricted Asset Information and Rosters is

necessary for the TCC to obtain the discovery it seeks.[11]

45.     Finally, the Examinees must identify and produce all Insurance Policies

because they are a significant source of recovery for survivors of sexual abuse.  Indeed,

insurance policies are so fundamental to civil litigation that they "must" be disclosed "without

awaiting a discovery request."  Fed. R. Civ. P. 26(a)(1)(A)(iv).

## CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 2004-1

46.     Attached hereto as **Exhibit D** is a certification of James E. O'Neill,

counsel to the TCC, demonstrating compliance with Local Rule 2004-1, and stating that prior to

the filing of this Motion, counsel for the TCC communicated with counsel or representatives of

the Examinees with respect to the subject matter of this Motion and no agreement was reached.

## NOTICE

47.     Notice of this Motion has been given to the following parties or, in lieu

thereof, to their counsel, if known: (a) the Debtor; (b) the Office of the United States Trustee for

the District of Delaware; (c) counsel to the Local Council Committee Members; (c) the

Additional Local Councils, and their counsel to the extent known; and (d) those persons who

have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.  The

TCC submits that, in light of the nature of the relief requested, no other or further notice need be

given.

---

[11] The TCC recognizes that the Rosters contain sensitive and confidential information and proposes that any "below the line" information (*i.e.*, the identities of boys in a Scouting Troop) be marked as "HIGHLY CONFIDENTIAL" pursuant to the *Order Approving Confidentiality and Protective Order* entered on June 8, 2020, at Docket No. 799.

Case 20-10343-LSS    Doc 1379    Filed 09/29/20    Page 19 of 19

## NO PRIOR REQUEST

No prior request for the relief requested herein has been presented to this or any other court.

Date: September 29, 2020

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ James E. O'Neill*
James I. Stang (CA Bar No. 94435)
John A. Morris (NY Bar No. 2405397)
James E. O'Neill (DE Bar No. 4042)
John W. Lucas (CA Bar No. 271038)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899 (Courier 19801)
Telephone: 302-652-4100
Facsimile: 302-652-4400
Email:  jstang@pszjlaw.com
          jmorris@pszjlaw.com
          joneill@pszjlaw.com
          jlucas@pszjlaw.com

*Counsel for the Tort Claimants' Committee*

19

DOCS_LA:332634.9 85353/002