# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA and<br>DELAWARE BSA, LLC,[1]<br><br>　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br>Hearing Date: October 14, 2020 at 10:00 a.m. (ET)<br>Objection Deadline: October 7, 2020 at 4:00 p.m. (ET)<br>Re: Docket No. 1379 |

## BALTIMORE AREA COUNCIL'S OBJECTION TO
## TORT CLAIMANTS' COMMITTEE'S RULE 2004 MOTION
## FOR AN ORDER AUTHORIZING THE ISSUANCE OF A SUBPOENA

The Baltimore Area Council Boy Scouts of America, Inc. (the "**Council**"), by and through its undersigned attorneys, submits this objection (the "**Objection**"), pursuant to Rules 2004 and 9016 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 2004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), to the *Motion of the Official Tort Claimants' Committee Pursuant to Bankruptcy Rule 2004 and Local Rule 2004-1 for an Order Authorizing the Issuance of Subpoenas for Discovery from Debtors and Certain Local Councils* (the "**Motion**"), [D.I. 1379], filed by the Official Tort Claimants' Committee (the "**TCC**"), and respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

**PRELIMINARY STATEMENT**

1.     The TCC seems to be under the impression that each of the 250+ local councils of the Boy Scouts of America (the "**BSA**") *must* participate in any channeling injunction. From that starting point, the TCC believes that it should be permitted to obtain, and rummage through, each of 47 separate local council's records for the purpose of identifying unrestricted assets that *will be* contributed to support any such channeling injunction. The TCC has it wrong.

2.     If, after November 16, 2020 (the "**Bar Date**"), a particular local council has no valid and enforceable claims asserted against it, that local council is unlikely to voluntarily participate in a channeling injunction. Actual, valid and enforceable claims are the driver in all of this—not the amount and nature of any particular local council's assets. The actual question before the Court is whether the TCC has demonstrated a basis to treat 47 local councils identically and issue 47 identical subpoenas to them, even if certain of those local councils have virtually no reason to participate in a channeling injunction. There is no basis or need for the TCC to obtain documents and information from a local council that is not subject to any valid and enforceable claims.

3.     Here, the Council is not subject to a single pending abuse claim in any adjudicative body, including before a state or federal court. There is a reason for that: there are no valid and enforceable claims against the Council. For all of the TCC's assertions that its national advertising campaign has resulted in the submission of "thousands of claims," *see* Motion at ¶ 29, nothing has changed for the Council. Indeed, even if the TCC's efforts over the last several months have resulted in its gathering of dozens of claims against the Council, there will be no valid and enforceable claims against it—even before any evaluation of whether the claims have merit in the first instance. There is, therefore, no basis or need for the TCC to obtain documents and information from the Council to evaluate its "assets and liabilities to determine whether [it has] the

means to provide a substantial contribution sufficient to support a channeling injunction." *See* Motion at ¶ 2. There is similarly no basis or need for the TCC to "assess the factual and legal [grounds] for any claimed restriction [by the Council] for the purpose of making [its own] … financial assessment of [the Council]." *See id*. at ¶ 19. With only *in*valid and *un*enforceable claims against it, the Council will determine at the appropriate time whether to voluntarily participate in a channeling injunction and, if so, whether it has adequate assets to do so. The Court should deny the TCC's request for authority to issue a subpoena to the Council.

## JURISDICTION AND VENUE

4. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, which is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of the above-captioned debtors' bankruptcy case is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The Council consents, pursuant to Local Rule 9013-1(h), to the entry of a final order by the Court in connection with the Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

**A.   CASE BACKGROUND**

6. On February 18, 2020 (the "**Petition Date**"), the BSA and Delaware BSA, LLC (together, the "**Debtors**") commenced these jointly-administered bankruptcy cases (the "**Bankruptcy Cases**").

7. On March 4, 2020, the United States Trustee formed the TCC.

8. The Council—a non-profit charitable entity formed under the laws of the State of Maryland—is not a party to these Bankruptcy Cases.

**B.    THERE ARE NO PENDING ABUSE CLAIMS AGAINST THE NON-PARTY COUNCIL**

9. As the TCC acknowledges in its Motion, it seeks "Restricted Asset Information," "[Troop] Rosters" and "Insurance Policies" from local councils to assist in "formulating a plan," "analy[zing] … the abuse claims against the Local Councils," and determining whether "Local Councils have the means to provide a substantial contribution sufficient to support a channeling injunction" as a "source of recovery for … [claimants]." *See* Motion at ¶¶ 2, 3.

10. However, unlike other local councils, there are no abuse claims pending against the Council in any adjudicative body in any jurisdiction—including in the state and federal courts of Maryland. Among other reasons for the absence of any pending claims, the Council has multiple affirmative defenses that bar such claims as a matter of Maryland law. With no valid and enforceable claims against it, the Council need not participate in any "channeling injunction" or contribute assets as a "source of recovery for … [claimants]." *See* Motion at ¶¶ 2, 3. On the other hand, the Council may determine on its own initiative—at some point later in these Bankruptcy Cases—that it has the ability to contribute assets to a channeling injunction and elect to participate. Accordingly, the TCC's broad-brush rationale for seeking discovery from non-parties like the Council is misplaced and serves no basis for an Order authorizing the TCC to issue a subpoena to the Council.

**C.    THE NON-PARTY COUNCIL'S PRIOR VOLUNTARY PRODUCTIONS**

11. As the TCC acknowledges in its Motion, "certain of the [current subpoena targets already] have produced substantial documents to date." *See* Motion at 2 n.4. Although the Council is not a party to these Bankruptcy Cases, and although the Council has no valid or enforceable claims against it, the Council nevertheless has previously produced substantial information concerning its assets.

12.     *First*, at the outset of these Bankruptcy Cases, the Council voluntarily provided an asset schedule that details its interests in real property and restricted assets (the "**First Voluntary Production**").  The Council did not have to volunteer this information.

13.     *Second*, on July 23, 2020, at the TCC's request, the Council voluntarily produced (i) documentation reflecting real property sales since July 15, 2014 and (ii) a copy of each of its leases with third parties in connection with real property owned by the Council (the "**Second Voluntary Production**").  Further, as a part of the Second Voluntary Production, the Council executed and delivered an *Acknowledgment and Agreement* (the "**Acknowledgement**"), pursuant to which it agreed, on a going-forward basis, to provide advance notice of (a) any action pertaining to future marketing, sales, transfers or leases of any real property, in addition to copies of any related documents, and (b) any sale or transfer of personal property outside of the ordinary course of business in excess of $25,000, in addition to copies of any related documents.

14.     The Council did not have to volunteer any of these productions or agree to notify anyone about future sales of property (which, in any event, have not occurred); rather, the Council agreed to submit documents and information in response to reasonable requests for same—to cooperate with the Debtors, the TCC and other parties to these Bankruptcy Cases.

D.     **THE TCC'S ONGOING HARASSMENT OF THE NON-PARTY COUNCIL**

15.     Although the Council is not a party to these Bankruptcy Cases, and although the Council has no enforceable claims against it, and although the Council nevertheless has previously cooperated with requests and produced substantial information concerning its assets, the TCC continues to harass the Council through unreasonable demands for information.  The TCC's most recent effort is the first before the Court.  Through its Motion, the TCC seeks the Court's authority to issue a subpoena to the Council for unnecessary information.

16. Even after the Council made its First Voluntary Production, the TCC's attorneys sent a letter to the BSA's attorneys on May 19, 2020, demanding that the BSA obtain a burdensome set of documents and information from each local council concerning real property interests and leases.

17. Thereafter, the TCC's attorneys sent a letter directly to the Council on July 9, 2020 (rather than to the Council's undersigned attorneys, whose appearances have been entered in these Bankruptcy Cases since April 2020, *see* [D.I. 405]), <u>*falsely*</u> accusing the Council of seeking to encumber a real property asset, <u>*wrongly*</u> accusing the Council of violating the automatic stay, and <u>*threatening*</u> "swift legal consequences …." A simple telephone call would have obviated the need for such action, but that approach runs counter to the TCC's favored strategy of harassing non-party local councils, including those with no valid and enforceable claims against them, like the Council.

18. And even after the Council made its Second Voluntary Production, the TCC's attorneys sent a letter (again) directly to the Council on July 31, 2020, demanding information "about the funds necessary for [the Council] to obtain a channeling injunction" "to pay … each creditor who has a claim against [the Council]," even though there are no valid and enforceable claims against the Council.

19. Thereafter, the TCC's attorneys sent another letter (again) directly to the Council on September 4, 2020, attaching a document request seeking 42 categories and subcategories of documents and information dating back to 1950.

20. The Motion is the TCC's most recent attempt to bully and harass the Council.

**RELIEF REQUESTED**

21. By this Objection, the Council respectfully requests the Court to enter an order denying the Motion inasmuch as the TCC seeks authority to issue a subpoena to the Council. Further, the Council understands that the BSA, the Ad Hoc Committee of Local Councils of the BSA (the "**Ad Hoc Committee**") and other local councils may be filing responses to the Motion. The Council reserves the right to join in those additional challenges to the Motion.[2]

**BASIS FOR RELIEF**

22. "There are … limits to the use of Rule 2004 …." *In re Washington Mut., Inc.*, 408 B.R. 45, 50 (Bankr. D. Del. 2009). Significantly, "[i]t may not be used for purposes of abuse or harassment and it cannot stray into matters which are not relevant to the basic inquiry" of discovering assets. *Id.* (internal citations and quotation marks omitted); *see also In re Mathews*, No. 18-153-LPS, 2018 WL 5024167, at *3 (D. Del. Oct. 17, 2018) (same). The party seeking Rule 2004 discovery "has the burden of showing good cause for the [discovery] it seeks." *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 627 (Bankr. D. Del. 2016). "An investigation into the existence of … claims against non-debtor [t]hird [p]arties does not fall within the scope or purpose of Rule 2004 as it is not an investigation into the 'property or to the liabilities and financial condition of the debtor[.]'" *Id.* at 628 (quoting FED. R. BANKR. P. 2004(b)).

23. In its continuing pattern of bullying local councils throughout these Bankruptcy Cases, the TCC now asks the Court for authority to pursue unjustifiable discovery against the Council, even though there are no valid and enforceable claims against it. In its Motion, the TCC seeks authority to issue a subpoena to the Council for three categories of documents. *First*, it seeks "troop rosters" in advance of the Bar Date to broaden the "scope of abuse claims against

---

[2] The Council reserves all rights to seek relief from any subpoena that the Court may authorize the TCC to issue to the Council.

… Local Councils ….." *See* Motion at ¶¶ 1, 22.  This is not a proper purpose of Rule 2004 discovery—especially in light of the extraordinary advertising campaign that the TCC has undertaken in this case to identify claims.  *Second*, the TCC seeks insurance policies from local councils, *see* Motion at ¶¶ 35-37, even though local councils need no encouragement to report their discovery of any independently-obtained policies, and even though "the BSA … has retained an 'archivist' to assist in identifying [i]nsurance [p]olicies." *Id*. at ¶ 36.  Thus, in addition to local councils' own investigations, an "archivist," paid by the estates, also is taking necessary steps to identify any lost-and-forgotten insurance policies.[3]  There is no need for the TCC to issue a subpoena to the Council for this information.

24.     *Third*, the TCC treats the 47 local council subpoena targets as though they are identically situated and seeks information about each of their "restricted assets" to independently "assess" those assets and "determine whether the Local Councils have the means to provide a substantial contribution sufficient to support a channeling injunction." *See id*. at ¶¶ 2, 19.  The TCC also asserts that each of the 47 local council subpoena targets is "central to the resolution of these [Bankruptcy] Cases," *see id*. at ¶ 42, without explaining why the other 200+ local councils are not.

25.     At the hearing on this Motion, the Council looks forward to hearing more from the TCC about how it devised its list of 47 local council subpoena targets.  That answer will be revealing.  But two things are known for sure right now: the list is not based on those local councils that are most likely to have valid and enforceable claims asserted against them and, if it is, the TCC inadvertently included the Council on that list.

26.     Unlike other local councils, there are no abuse claims pending against the Council in any adjudicative body in any jurisdiction—including the state and federal courts of

---

[3] The Council already has undertaken efforts to identify independently-obtained insurance policies and has not identified any.  If it did, it would have advised the BSA and its archivist.

Maryland—because there are no valid and enforceable claims against the Council. Local councils with pending claims against them may have a strong incentive to participate in a "channeling injunction" and contribute assets as a "source of recovery." *See* Motion at ¶¶ 2, 3. By contrast, the Council does not. And, in any event, if the Council later chooses to participate, it will be able to evaluate for itself whether and to what extent it has the ability to contribute assets. There is no basis for the TCC to obtain asset information from a non-party, like the Council, that has no demonstrable need to participate in a channeling injunction in these Bankruptcy Cases; that might explain why the TCC fails to offer the Court any authority for the proposition that it has the right to seek discovery from the Council under these circumstances.

27. The Court should deny the Motion to the extent the TCC seeks authority to issue a subpoena to the Council.[4]

## **CONCLUSION**

28. For each of the foregoing reasons, the Council respectfully requests that the Court enter an Order denying the Motion with respect to the TCC's request for authority to issue a subpoena to the Council.

---

[4] The TCC remarks in passing that "the BSA has the power to revoke or terminate the Local Councils' charters or let them expire by refusing to renew, which causes the Local Councils' assets to revert to BSA in accordance with the BSA's and Local Councils' by-laws and regulations." *See* Motion at ¶ 21. The TCC is wrong as a matter of law and, in any event, the TCC has misread the applicable corporate governance documents, including by-laws and regulations.

Dated:  October 7, 2020
       Wilmington, DE

WHITEFORD, TAYLOR & PRESTON LLC[5]

/s/ *Richard W. Riley*
Richard W. Riley. (DE ID 4052)
The Renaissance Centre
405 N. King Street, Suite 500
Wilmington, Delaware 19801
Telephone:     (302) 357-3265
Email:              rriley@wtplaw.com

      - and -

WHITEFORD TAYLOR & PRESTON LLP
Todd M. Brooks (*pro hac vice* admission pending)
Seven Saint Paul Street
Baltimore, MD, 21202-1636
Telephone:     (410) 347-8700
Email:              tbrooks@wtplaw.com

*Attorneys for the Baltimore Area Council*
*Boy Scouts of America, Inc.*

---

[5] Whiteford, Taylor & Preston LLC operates as Whiteford Taylor & Preston L.L.P. in jurisdictions outside of Delaware.