## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| | (Jointly Administered) |
| Debtors.[1] | Re Docket No. 1144 & 1161 |

### SUPPLEMENTAL BRIEF OF THE COALITION OF ABUSED SCOUTS FOR JUSTICE IN SUPPORT OF (A) MOTION FOR AN ORDER APPROVING THE SUFFICIENCY OF THE AMENDED 2019 STATEMENT, AND (B) MOTION OF THE COALITION TO PARTICIPATE IN THE MEDIATION

The Coalition of Abused Scouts for Justice (the "Coalition"), by its undersigned counsel, hereby submits this Supplemental Brief in support of (A) *Motion for an Order Approving the Sufficiency of the Amended 2019 Statement* (the "2019 Motion") [Docket No. 1144],[2] and (B) *Motion of the Coalition to Participate in the Mediation* (the "Mediation Motion" [Docket No. 1161] and, together with the 2019 Motion, the "Motions").[3]  In support of the Motions, the Coalition respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the 2019 Motion, the Bar Date Order (as defined in the 2019 Motion), or the *Second Amended Verified Statement of Coalition of Abused Scouts for Justice Pursuant to Bankruptcy Rule 2019* ("Second Amended Verified Statement") [Docket No. 1429].

[3] Objections to the 2019 Motion were filed by David Lee Lambert (the "Mr. Lambert") [Docket No. 1219] (the "Lambert Objection", the United States Trustee (the "U.S. Trustee") [Docket No. 1223] (the "U.S. Trustee Objection"), Allianz Global Risks US Insurance Company and National Surety Corporation (together, "Allianz") [Docket No. 1224] (the "Allianz Objection"), and the Official Committee of Tort Claimants (the "TCC") [Docket No. 1228] (the "TCC 2019 Objection").  Century et al. ("Century") filed a Motion to Compel Compliance with Rule 2019 [Docket No. 1164] (the "Motion to Compel").  Objections to the Mediation Motion were filed by Hartford Accident and Indemnity Company, First State Insurance Company and Twin City Fire Insurance Company (collectively, "Hartford") [Docket No. 1222] (the "Hartford Objection"), Allianz [Docket No. 1224], Century [Docket No. 1230] (the "Century Objection"), and the TCC [Docket No. 1231] (the "TCC Mediation Objection").  All of the foregoing objections are referred to herein collectively as the "Objections."

{00219477-1}

## PRELIMINARY STATEMENT

1.     The purpose of this Supplemental Brief is to update the Court on the progress made since the September 9th hearing on the Motions (the "Hearing") and to address issues raised at Hearing by the Court, the U.S. Trustee, the TCC, and the Insurers.[4]

2.     The Coalition has grown and now includes over 28,000 Members.  More than 4,500 Members have executed an "Affirmative Consent" consenting to becoming a Member of the Coalition and authorizing their respective State Court Counsel to instruct Brown Rudnick and Monzack Mersky Browder and Hochman, P.A. ("MMBH") in connection with these cases.  The Coalition expects that many more of its Members will soon sign the Affirmative Consent.

3.     The Affirmative Consent makes it clear that the fees and expenses incurred by Coalition Counsel will be paid by State Court Counsel—**not** by the Members—and that any payment of such fees and expenses by State Court Counsel will **not** increase the fees and expenses owed by Members to their State Court Counsel.  The Affirmative Consent is not required under Bankruptcy Rule 2019.  The Coalition went beyond Rule 2019's disclosure requirements to address the concerns raised at the Hearing so that these cases can move forward.

4.     The Debtors believe that the Coalition has satisfied the disclosure requirements of Bankruptcy Rule 2019 and should be designated as a Mediation Party.  *See* Docket No. 1269-1 at ¶¶ 3, 7.[5]  The Mediators want the Coalition to be included.  *Id.* at ¶ 7 & fn. 11.  The TCC and the Insurers stand together and seek to exclude representatives of over 28,000 Sexual Abuse

---

[4]  The "Insurers" as referenced throughout this Motion include a combination of Century, Hartford, and other insurance companies that have joined themselves to the various Motions filed by Century and Hartford.

[5]  The Debtors also made it clear at the Hearing that it is most productive for the Court to grant the Coalition a seat at the table.  *See* Hr'g Tr. 137:3-5; 138:5-13 ("We would just urge the Court, as you consider a schedule for additional discovery and hearing on the 2019, to keep [that time is not the Debtors' friend] in mind.  The Debtors are prepared to engage as quickly as possible with all of the constituencies, but obviously, a hearing like this is extremely expensive for the estate and we are very anxious to get to the table and see if we can reach a resolution that allows for survivors to be fairly compensated and allows scouting to continue its very, very critical mission.").

Survivors from participating in the Mediation and, as a result, prevent the Coalition from having access to financial, insurance and other confidential mediation information that the Coalition needs to be a constructive participant in the Mediation.  Any process that permits this outcome has limited chance of success.

5.      The Coalition respectfully asserts that it has complied with Bankruptcy Rule 2019's disclosure requirements; and that the Coalition should be designated as a Mediation Party.

## SEPTEMBER 9TH HEARING

6.      On September 9, 2020, the Court held and continued a hearing on the Motions. At the Hearing, and in their court filings, the U.S. Trustee, the TCC and the Insurers challenged the sufficiency of the Coalition's Rule 2019 disclosures.   The U.S. Trustee noted that the Coalition's Rule 2019 statement was not verified and argued that the Coalition's empowering documents should be filed publicly in unredacted form.[6] *See* Hr'g Tr. 97:1-98:1-2.

7.      The TCC argued that the Coalition's empowering documents do not make it clear which individuals or entities the Coalition Counsel represents—the State Court Counsel or the Members—and that potential ethical deficiencies in the Coalition Representative Firm engagement letters negate Coalition Counsel's authority to act on behalf of the Members. *See id.* at 111:23-113:6. Before the Hearing, certain Insurers filed a lengthy brief arguing that attorney advertising undertaken by two lawyers—Mr. Timothy Kosnoff and Mr. Andrew Van Arsdale— do not comply with the Rules of Professional Conduct or state mandates concerning attorney

---

[6] The Coalition is continuing to work with the US Trustee to resolve any concerns that may remain. We provided a draft Amended Verified Statement to the US Trustee on October 6th and, to the extent there are any unresolved issues, we will continue our efforts with the US Trustee to resolve them before the hearing.

advertisements.  *See* Docket No. 1266.[7]   At the Hearing, the Insurers demanded that the Coalition publicly file its unredacted empowering documents and provide the Insurers with the sealed client lists and incident data.  *See* Hr'g Tr. 92:16-93:8. The Insurers and this Court sought clarification on how the Coalition's fees and expenses are being paid.  *See id.* at 133:7-134:17.

8.      The Court resolved the Coalition's motion to seal at the Hearing.  *Id.* at 122:12-123:13.  The Court granted the Coalition authority to file all personally identifiable information under seal but required the Coalition to file unredacted empowering documents publicly except for pricing information relating to State Court Counsel's fees.[8]  *See* Hr'g Tr. 122:12-123:12.

9.      Since the Hearing, the Coalition has worked diligently to resolve remaining objections to its Motions.  The Coalition filed an amended Rule 2019 statement.  This statement includes an explanation of the Coalition's Affirmative Consent solicitation efforts, clarification of the Coalition Counsel's fee payment arrangement, and verified versions of all exhibits.  This Supplemental Brief addresses the requirements of Bankruptcy Rule 2019, how the Coalition has complied with these requirements, and refutes the remaining objections to the Coalition's Motions.

---

[7]  Messrs. Kosnoff and Van Arsdale resigned from the Coalition after the Hearing, and they and their Law Firms are no longer part of it.  The Coalition brings this fact to the Court's attention, although it has no impact on the sufficiency of the Coalition's Rule 2019 disclosures for the reasons stated herein.

[8]  The Coalition prepared a proposed order, which was approved by the U.S. Trustee, granting the motion to seal to the extent ordered by the Court at the Hearing, namely:  (1) the client list is filed under seal, (2) the incident data is filed under seal, (3) the State Court Counsel retainer letters are filed publicly but with fee information redacted, and (4) the Brown Rudnick and MMBH letters are filed publicly.  The personally identifiable information filed under seal shall be shared by the Coalition upon request of a Permitted Party (as defined by the Bar Date Order), and the Coalition is authorized but not required to share the information with non-Permitted parties under the Committee Advisor only designation of the Protective Order.  *See* Coalition September 14, 2020 Letter to the Court [Docket No. 1315].  The Insurers filed a letter with the Court [Docket No. 1320] attaching a proposed order requesting immediate access to the personally identifiable information filed under seal and that the order be amended to reflect only restrictions and processes identified in the Protective Order, rather than the Bar Date Order.  The TCC filed an opposing proposed order [Docket No. 1321] which amended the order to remove any reference to the Coalition, and rather identify Brown Rudnick and the State Court Counsel firms individually.  The Coalition in response to these letters filed an Amended Proposed Order on the motion to seal incorporating portions of the Insurers' edits.  The Coalition provided verification of the State Court Counsel exemplars in its Second Amended Verified Statement.

## SUPPLEMENT

### A.    Bankruptcy Rule 2019 and Third Circuit Case Law

10.    Bankruptcy Rule 2019 requires disclosure.  It is not a gating statute designed to preclude parties in interest from participating in a bankruptcy case.  The Rule's intention to require disclosures is evident from both the plain language of Rule 2019 and Third Circuit case law.

11.    Rule 2019 was derived from Rule 10-211 under Chapter X of the Bankruptcy Act of 1898, as amended by the Chandler Act of 1938.  *See In re Premier Int'l Holdings, Inc.*, 423 B.R. 58, 71 (Bankr. D. Del. 2010); *In re Washington Mutual, Inc.*, 419 B.R. 271, 277 (Bankr. D. Del. 2009).  The Coalition has not located any case law since 1938 where a court has determined if counsel has complied with the Rules of Professional Conduct or state mandates concerning attorney advertisements in determining the sufficiency of a Rule 2019 disclosure.

12.    The absence of such case law is hardly surprising.  The fact that disclosures made under Rule 2019 may be used to show compliance with state ethical rules is of no concern to a rule that simply requires disclosure.  In fact, case law concerning Rule 2019 generally concerns two unrelated issues:  *first*, whether disclosures must be made by *ad hoc* groups; and *second*, whether information that is disclosed should be a matter of public record in mass tort bankruptcies.

### 1.    Application of Bankruptcy Rule 2019 to *Ad Hoc* Groups

13.    Prior to the 2011 amendments to Rule 2019, courts were divided on whether Rule 2019 applies to *ad hoc* groups.  Some Judges in this District found that *ad hoc* groups were required to make disclosures under Rule 2019.[9]   Other courts and Judges in this District

---

[9]   *See Washington Mutual*, 419 B.R. at 280 (J. Walrath) (granting motion filed by JPMorgan Chase to compel a group of noteholders to make Rule 2019 disclosures); *In re Sea Containers, Ltd.*, Case No. 06-11156, Transcript

disagreed.[10]  This split was resolved when Rule 2019 was amended in 2011.[11]  *Ad hoc* groups like the Coalition are required to make Rule 2019 disclosures.  The TCC's objection fails to reflect the 2011 amendments to Rule 2019, which, as set forth herein, specifically require *ad hoc* groups such as the Coalition to make Rule 2019 disclosures.

## 2.   Public Disclosure Not Required in Mass Tort Bankruptcies

14.    The second body of case law concerns whether information that is disclosed under Rule 2019 should be a matter of public record in mass tort bankruptcies—*i.e.*, cases involving asbestos victims.[12]  This body of case law recognizes the need to protect identifying information about tort victims from widespread disclosure.  Consistent with this case law, this Court ruled that Coalition Counsel's engagement letters should be filed in unredacted form, that State Court Counsel may redact disclosures that reflect their monetary arrangements with clients, and that personally identifiable information of the Sexual Abuse Survivors shall be filed under seal consistent with the Court's prior orders.  *See* Hr'g Tr. 122:12-123:12.

---

of Hr'g, at 35 (Bankr. D. Del. May 14, 2008) (J. Carey) (requiring a group of five bondholders to make Rule 2019 disclosures); *In re Accuride Corp.*, Case No. 09-13449, Transcript of Hr'g, at 116-17 (Bankr. D. Del. Jan. 20, 2010) (J. Shannon) (granting a motion of the official committee of equity security holders to compel an *ad hoc* noteholder group to make Rule 2019 disclosures).

[10] *See Premier*, 423 B.R. at 63 (J. Stontchi) (denying motion of an official committee of unsecured creditors to compel an informal committee of noteholders to make Rule 2019 disclosures and holding that Rule 2019 does not apply to *ad hoc* groups); *accord In re Philadelphia Newspapers, LLC*, 422 B.R. 553, 567 (Bankr. E.D. Pa. 2010) (J. Raslavich) (following *Premier* and holding that a steering group of prepetition lenders was not required to make Rule 2019 disclosures).

[11] *See* Advisory Committee Notes, 2011 Amendments Subdivision (b), Fed. R. Bankr. P. 2019 ("In addition to an entity, group, or committee that represents more than one creditor or equity security holder, the amendment extends the rule's coverage to groups or committees that consist of more than one creditor or equity security holder.")

[12] *See, e.g.*, *In re Pittsburgh Corning Corp.*, No. 05-4781, 260 Fed. Appx. 463, at *465 (3d Cir. Jan. 10, 2008); *In re Motions for Access of Garlock Sealing Techs., LLC*, 488 B.R. 281, 302 (D. Del. 2013); *Certain Underwriters at Lloyds v. Future Asbestos Claim Representatives (In re Kaiser Aluminum Corp.)*, 327 B.R. 554, 557 (D. Del. 2005); *see also Baron & Budd, P.C. v. Unsecured Asbestos Claimants*, 321 B.R. 147 (D.N.J. 2005).

### 3.    Bankruptcy Rule 2019 Is a Disclosure Rule

15.    Apart from the question of whether Rule 2019 applies to *ad hoc* groups and whether personally identifying information about tort victims must be publicly disclosed, the plain language of Rule 2019 and case law make it clear that Rule 2019 simply requires disclosure.

16.    The words "disclosure," "disclosable," and "disclosed" appear in Rule 2019 ten times.  *See* Fed. R. Bankr. P. 2019.  The word "disclose" is defined to mean "to make known; reveal."  Webster's College Dictionary 383 (1996).  The word "disclosure" is defined to mean "[t]he act or process of making known something that was previously unknown; a revelation of facts."  Black's Law Dictionary 477 (7th ed. 1999); *see also Premier*, 423 B.R. at 63 (encouraging a "plain meaning" reading of Rule 2019).

17.    Rule 2019 requires "disclosure by groups" through the filing of a "verified statement."  Fed. R. Bankr. P. 2019(b).  This verified statement must disclose the information specified in subdivision (c) of Rule 2019—*i.e.*, [1] the pertinent facts and circumstances concerning the group's formation, including the name of each entity at whose instance the group was formed or for whom the group has agreed to act, [2] with respect to each creditor represented by a group, their name and address, and the nature and amount of each disclosable economic interest held in relation to the debtor as of the date of the statement, and [3] a copy of the instrument, if any, authorizing the group to act on behalf of creditors or equity security holders.

18.    The use of the phrase "if any," used in subdivision (c)(4) of Rule 2019 indicates that an *ad hoc* group that has no authorizing instruments must make a Rule 2019 disclosure.  Fed. R. Bankr. P. 2019(c)(4).  By implication, an *ad hoc* group may fully comply with Rule 2019

without disclosing *any* authorizing instruments, assuming no such instruments exist.    If authorizing instruments exist, Rule 2019 *simply mandates that they be disclosed*. *Id.*

19.    Case law demonstrates that compliance with Rule 2019 turns on whether a group has *disclosed* the required information.    For example, in *Baron & Budd*, a group of insurers challenged whether law firms representing tort victims had complied with Rule 2019.    321 B.R. at 154.    The law firms filed a verified statement under Rule 2019 but did not disclose their fee sharing agreements.    *Id.* at 165, 167.    The issue was whether such agreements were "pertinent facts and circumstances" under Rule 2019.    *Id.*    The insurers argued that such agreements were governed by "ethical codes" of states and that disclosure was "inextricably intertwined" with the overall fairness of the proposed plan—namely, the "plan's classification system."    *Id.* at 162-65.

20.    In response, the Court ordered the disclosure of the fee agreements—*i.e.*, the remedy for non-compliance with Rule 2019 was disclosure.    *Id.* at 154, 166.    The Court did not determine whether the fee agreements complied with any state ethical codes, nor did it need to do so to satisfy Rule 2019.    Case law outside the Third Circuit shows that compliance with state ethical codes is a matter separate from whether disclosure is required under Rule 2019.    *See, e.g.*, *Matter of CF Holding Corp.,* 145 B.R. 124, 127 (Bankr. D. Conn. 1992) ("As noted, the respondents represented in the [Rule 2019] Statement that in their view no conflict exists in the multiple representations.    That issue will not be before the court, if at all, until such time as there has been a complete compliance by the respondents with Rule 2019."); *cf In re Johns-Mansville Corp.,* 68 B.R. 618, 632 (Bankr. S.D.N.Y. 1986) (holding that the terms of a contingency fee arrangement between asbestos claimants and their attorneys "is immaterial to these reorganization proceedings.    As such, these objections raise collateral disputes which this court is not empowered to act upon.")

4. **Disclosures Made in the Second Amended Verified Statement**

21.     As detailed in Second Amended Verified Statement, the Coalition has disclosed all required pertinent information and, therefore, has complied with Rule 2019. The Coalition has provided the pertinent facts and circumstances concerning the group's formation, including the name of each entity at whose instance the group was formed or for whom the group has agreed to act. *See* Second Amended Verified Statement at § 1.

22.     For Members that are part of the Coalition, the Coalition has provided their names and addresses, a description of their economic interest held in relation to the Debtors as of the date of the statement—*i.e.*, they hold unliquidated sexual abuse tort claims against the Debtors. *Id.* at § 2. The Coalition has provided copies of the instruments authorizing the group to act on behalf of its Members, since such instruments exist. *Id.* at § 3. Compliance with Rule 2019 depends on the act of disclosure itself—*i.e.*, the act of making known something that was unknown. *See* Black's Law Dictionary 477. Since everything has been disclosed, it follows that the Coalition has complied with Rule 2019.

23.     The Coalition's disclosures may be used for various purposes in these Chapter 11 Cases. But how, or if, such information is used has no bearing on whether the Coalition has complied with Rule 2019. The Insurers filed a 19-page brief arguing that attorney advertising undertaken by Messrs. Kosnoff and Van Arsdale—who are no longer part of the Coalition—do not comply with state mandates concerning attorney advertisements. *See* Docket No. 1266. This Court resolved the advertising motion and issued an order which moots the Insurers' arguments. *See* Docket No. 1331. To the extent that these arguments are repeated in connection with the 2019 Motion and Mediation Motion, there arguments are a red herring.

24.    The Court obviously has jurisdiction to regulate the professional responsibility of attorneys appearing before it.  *See Baron & Budd,* 321 B.R. at 163-64.  This jurisdiction was exemplified by the Insurers' earlier motion to disqualify Sidley Austin as the Debtors' counsel and this Court's hearing on that motion.[13]  But ethical concerns or conflicts of interest revealed by Rule 2019 disclosure may be dealt with, if at all, by the Court *after* full compliance and disclosure and by a separate motion addressing the specific case concerns.  *See CF Holding*, 145 B.R. at 127.

25.    The Insurers misconstrue the effect of underlying ethical issues on the sufficiency of a Rule 2019 disclosure; in truth, underlying conflicts of interest or ethical considerations may be revealed by Rule 2019 disclosure, but the revelation of such information does not negate Rule 2019 compliance.  To be clear, Brown Rudnick and MMBH are the counsel representing the Coalition before this Court.  To address the Court's question as to whether it must spend its time engaging in a 50-state survey of the nuances of professional responsibility rules for Coalition Member's State Court Counsel in order to rule on the Coalition's 2019 Motion, the answer is obviously "no."  *See* Hr'g Tr. 108:11-20.[14]

### B.    Concerns Raised Over the Coalition's Authority to Act Are Misplaced

26.    At the Hearing, the TCC and the Insurers also argued that the Coalition failed to establish a proper nexus of authorization between the Coalition Counsel and the individual Members.  *See* Hr'g Tr. 110:18-113:6.  But the Coalition has disclosed the authorizing

---

[13] *See In re Boy Scouts of Am.*, Case No. 20-10343, Bench Ruling Delivered May 29th (Bankr. D. Del. May 29, 2020) and related appeal, *Century Indemnity Co. v. Boy Scouts of America (In re Boy Scouts of America et. al)* Case 1:20-cv-00798-UNA (D. Del. 2020).

[14] To be clear, the Coalition disputes the Insurers' and the TCC's contentions that there are any ethical deficiencies. The potential issues raised regarding the State Court Counsel retention letters are complicated and implicate matters involving individual victims and their chosen counsel.  The Affirmative Consent noticing procedure employed by the Coalition expressly affirms the Coalition Counsel's authority to act on behalf of each Member who assents; thereby, addressing the root of the concerns raised by the Insurers and the TCC in their ethical attacks on the State Court Counsel engagement letters.  *See* Hr'g Tr. 112:15-116:113:1.

instruments that exist and, therefore, has satisfied its obligations under Rule 2019.  *See* Fed. R. Bankr. P. 2019(c)(4).  If the documents disclosed did not show any authority to act—which they plainly do—the consequence under Rule 2019 is that such documents would not have to be part of the Coalition's disclosure.  *See id.* (requiring disclosure of "a copy of the instrument, *if any*, authorizing" the group to act "on behalf of creditors or equity security holders") (emphasis added).

27.     Assuming, *arguendo*, that the Coalition must prove that Coalition Counsel is authorized to act on behalf of the Members, the Coalition's disclosures show that Coalition Counsel is, in fact, so authorized.  *See* Second Amended Verified Statement at § 3.  The Coalition has explained the facts and circumstances of its authority to represent the Members.

28.     The Members are Sexual Abuse Survivors.  Each Member retained one of the State Court Counsel firms and signed an engagement letter that include provisions allowing the State Court Counsel to affiliate with or retain co-counsel.  *Id.*  The State Court Counsel retained the Coalition Counsel and executed engagement letters with Brown Rudnick and MMBH.  *Id.*[15] The State Court Counsel sent notification to all the Members of the Coalition Counsel retention. *Id.*

29.     In a good faith effort to respond to the concerns raised at the Hearing, the Coalition engaged in an additional, affirmative noticing scheme to Coalition Members.  *Id.*  The State Court Counsels sent a request for express written acknowledgment and consent for

---

[15] The Brown Rudnick Engagement Letter provides that the "Law Firms each represent and warrant that they have the **authority** to sign this Engagement Letter on behalf of their respective Law Firm Clients and **bind** the Law Firm Clients to the terms hereof." *Id.* at § 3 and Exhibit A.  (emphasis added).  The Brown Rudnick Engagement Letter further provides that Brown Rudnick's engagement is with the "Ad Hoc Committee as a whole, and not any individual member thereof." *Id.*  This is a group representation, meaning that the Members, by and through their chosen counsel, retained Brown Rudnick to represent their collective interests in and as an *ad hoc* committee in respect of the Debtors and their cases, as set forth in the "Scope of Engagement."  The Brown Rudnick Engagement Letter provides that "[t]he Firm shall not act on behalf of the Ad Hoc Committee in a manner that is contrary to any direction we receive from the Law Firms." *Id.*

Coalition Counsel to represent the collective interests of such Members, and authority for each Member's respective State Court Counsel to represent such Member's interests and to direct and instruct Coalition Counsel in connection with the activities of the Coalition.  *Id.*

30.    Over 4,500 Members have signed and returned these Affirmative Consents acknowledging Coalition Counsel's authority to act on behalf of the collective interests of the Members.  *Id.*  The Coalition expects to receive the same affirmative consent from many of its other Members.  The Coalition has filed a verified exemplar of this notification.  *Id.*  Coalition Counsel has the authority to act on the behalf of its Members in the same manner as counsel to virtually every *ad hoc* group of bondholders that has appeared in chapter 11 cases pending in this District.  There is no reason to treat *an hoc* group of sexual abuse survivors differently.

31.    In response to the Court's request for clarification on how the Coalition Counsel's fees are being paid—*see* Hr'g Tr. 133:23-134:17—the Affirmative Consent also makes it clear that the fees and expenses incurred by Coalition Counsel will be paid by State Court Counsel—**not** by the Members—and that any payment of such fees and expenses by State Court Counsel will **not** increase the fees and expenses owed by Members to their State Court Counsel.  *See* Second Amended Verified Statement at ¶ 11.

**C**    **Remaining Objections Are Misplaced and Should be Overruled**

32.    The TCC and the Insurers, both at the Hearing and in their pleadings filed in response to the Motions, made additional arguments that should be overruled.

**1.**    **The Insurers Are Not Parties in Interest and Lack Standing**

33.    Before addressing these arguments, the Coalition notes, as a threshold matter, that the Insurers lack standing to object to the Coalition's Rule 2019 disclosures.  Section 1109(b) of the Bankruptcy Code addresses who has the right to be heard in a chapter 11 case.  *See* 11 U.S.C.

§ 1109(b).  Section 1109(b) provides that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, ***may raise and may appear and be heard*** on any issue in a case under this chapter."  *Id.* (emphasis added).

34.    The Insurers are not a debtor, a trustee, a creditors' or an equity security holders' committee, an equity security holder, a creditor, an equity security holder, or an indenture trustee.  They do not qualify as a "party in interest" that has a general right to be heard in a chapter 11 case.

35.    Third Circuit case law does permit insurers that do not qualify as parties in interest to be heard in a chapter 11 proceeding, ***but*** only when the matter specifically impacts the insurer's rights.[16]  There may be contested matters in these cases that specifically impact the Insurers.  On these issues, the Insurer may have a right to be heard.  But the fact that the Coalition has made disclosures under Rule 2019 is not one of them, particularly where, as here, the Insurers have been granted access to the Coalition's Rule 2019 disclosures in their entirety.

36.    If the Insurers are somehow parties in interest, then they should be required to immediately comply with Rule 2019 themselves.  Century's counsel alone represents *multiple* insurers in these cases.  *See In re Oklahoma P.A.C. First Ltd. P'ship*, 122 B.R. 387, 392 (Bankr. D. Ariz. 1990) (law firm representing five creditors required to make Rule 2019 disclosure).  And, under Rule 2019, as amended in 2011, the TCC and the Ad Hoc Committee of Local

---

[16]  *Compare In re Combustion Eng'g*, 391 F.3d 190, 218 (3d Cir. 2004) (insurer does not have standing to challenge insurance neutral provisions in a chapter 11 plan); *Pittsburgh Corning*, 260 Fed. Appx. at 466 (insurers lacked standing to challenge Rule 2019 order based on alleged "conflicts of interest on the part of plaintiffs' lawyers" and alleged need to investigate 'fraudulent asbestos claims'"); and *Kaiser*, 327 B.R. at 558 (insurers lacked standing to challenge Rule 2019 order that restricted their access to information about tort victims); *with In re Global Indus. Techs., Inc.*, 645 F.3d 201, 211-12 (3d Cir. 2011) (party must show some "injury in fact, i.e., some specific, identifiable trifle of injury" and finding insurers had standing to object to the confirmation of plan that substantially increased—"by more than 27 times"—their prepetition liability exposure); and *Baron & Budd*, 321 B.R. at 158-59 (insurers "had standing with respect to plan confirmation" where plan impacted the insurers' rights).

Councils are also required to make Rule 2019 disclosures, which, to date, both failed to do.[17] The selective application of Rule 2019 to an *ad hoc* group of tort victims is improper. *See Premier*, 423 B.R. at 74 (finding that party had "engaged in a litigation tactic" was "self-evident" by the fact that the party did not seek application of Rule 2019 to its allies in the cases even though Rule 2019 plainly applied to them).

## 2. The TCC's Arguments Ignore the 2011 Amendments to Rule 2019

37.     The TCC's arguments ignore the 2011 amendments to Rule 2019. The TCC argues that the Coalition cannot be a Mediation Party because it is not an "entity," as defined by and subject to disclosure under Rule 2019, and then turns this argument on its head by asserting that the Coalition cannot be a mediation party—or participate in the bankruptcy cases at all— because it has not complied with Rule 2019. *See* TCC 2019 Objection at 19. This makes no sense at all.

38.     The TCC's assertion that the Coalition is not an "entity" is grounded in case law holding that *ad hoc* groups are not subject to Rule 2019 disclosures, as discussed above. TCC 2019 Objection at 16; *see Premier*, 423 B.R. at 63; *Philadelphia Newspapers*, 422 B.R. at 567. The TCC argues that because Coalition does not fit into the *Premier* and *Philadelphia Newspapers* Courts' interpretation of "entity" or "committee" under the *prior* version of Rule 2019, the Coalition is "fictitious." *See* TCC 2019 Objection at 16. The TCC goes on to assert that the Coalition is illegitimate or "fictitious" because the Coalition is "comprised of its

---

[17]    Neither the TCC nor the Ad Hoc Committee of Local Councils have filed a Rule 2019 Verified Statement in these cases. Each group is required under Rule 2019 to make such disclosures, both are named Mediation Parties, and neither has made any effort to comply with their Rule 2019 obligations. *Cf. Verified Statement of the Official Committee of Unsecured Creditors Pursuant to Bankruptcy Rule 2019*, [Docket No. 484]; *see also* Advisory Committee Notes, 2011 Amendments Subdivision (b), Fed. R. Bankr. P. 2019 ("The rule no longer excludes official committees, except as specifically indicated.")

members, nothing more, nothing less." *See* TCC 2019 Objection at 17; TCC Mediation Objection at 17.

39.    But the *current* version of Rule 2019, as amended in 2011, requires the Coalition to make a disclosure precisely because it is comprised of its Members.  The 2011 amendments expanded Rule 2019 to cover *ad hoc* groups in order to resolve disputes such as the ones in *Premier* and *Philadelphia Newspapers* over whether Rule 2019 applies to *ad hoc* committees or coalitions.[18]  The Coalition has never averred that it is not subject to Rule 2019 disclosures or attempted to avoid such compliance.  But if, as the cases the TCC cites hold, Rule 2019 disclosures are <u>not</u> required by *ad hoc* groups like the Coalition—*i.e.*, the Coalition is not an "entity" subject to Rule 2019—the TCC fails to explain how an exception from a disclosure provision could possibly affect the Coalition's right to participate in the Mediation or in these bankruptcy cases.

40.    The TCC mistakenly views Rule 2019 as some sort of enabling act which imbues rights to creditor groups; rather than what it is, merely a disclosure requirement.  The *Premier* Court opined about *ad hoc* committees that "there is nothing neither nefarious nor problematic, in and of itself, in disparate parties banding together to increase their leverage.  Indeed, enabling such is one of the primary rationales for the existence of the Bankruptcy Code."  423 B.R. at 76.

---

[18] *Compare* Fed. R. Bankr. P. 2019(b)(1) ("shall be filed by every group or committee that consists of or represents, and every entity that represents, multiple creditors or equity security holders that are (A) acting in concert to advance their common interests…"); *with Philadelphia Newspapers*, 422 B.R. at 565 (quoting Fed. R. Bankr. P. 2019(a)) ("every entity or committee representing more than one creditor or equity security holder and unless otherwise directed by the Court … shall file a verified statement…"); *see also Bankruptcy Advisory Committee's Report to the Standing Committee*, June 14, 2010 (recommending the revision of Rule 2019 to include (i) "the addition of a definition of 'represent' or 'represents' in subdivision (a)(2) that limits the meaning of the terms to taking a position before the court or soliciting votes on a plan, thereby removing entities that are only passively involved in a case from coverage under the rule" and (ii) "the addition of a provision in subdivision (b)(1) providing that the covered groups, committees, and entities are those that represent or consist of multiple creditors or equity security holders that act in concert to advance their common interests and are not composed entirely of affiliates or insiders of one another").  It need be noted that the pre-2011 amendment Fed. R. Bankr. P. 2019(a) is analogous to current Fed. R. Bankr. P. 2019(b)(1), because the current Fed. R. Bankr. P. 2019(a) is now a definitions section.  The current version of Rule 2019(a) explicitly defines what it means to "represent," which the TCC instead defines in its objection through *Premier*.

The Coalition is comprised of 28,000 *real* creditors—not insurance companies—that qualify as parties in interest and have a right to be heard. *See* 11 U.S.C. 1109(b).

### 3.    The Coalition Does Not Have Contempt for the Bankruptcy Process

41.    Since its formation, the Coalition has been the subject of attacks by the TCC and the Insurers. The TCC has referred to the Coalition as a "marketing term," and has gone so far as to assert that certain Law Firms that are part of the Coalition have "contempt for the bankruptcy process" and are "scheming to exert their control over the entire process" to prevent the Debtors' cases from moving forward. TCC 2019 Objection at 3, 21. Obviously, the Debtors and the Mediators do not agree. *See* Docket No. 1269-1 at ¶¶ 3, 7; Hr'g Tr. 137:3-5; 138:5-13.

42.    The Coalition is an *ad hoc* committee that represents a clear supermajority of Sexual Abuse Survivors—28,000 and growing. It is not a "marketing term." The Law Firms formed the Coalition for the benefit of and inclusion of their clients in the bankruptcy process and elected to associate with bankruptcy counsel to represent the Coalition. Brown Rudnick has recognized and significant experience representing official and *ad hoc* committees of victims and tort claimants in mass tort bankruptcies in this and other courts and successfully achieving confirmation of consensual plans therein. The Law Firms are comprised of lawyers that have dedicated decades of their lives to representing sex abuse victims and have experience in complex bankruptcy cases. None of these firms have contempt for the bankruptcy process. Rather, they are here precisely because they support the bankruptcy process and understand what must occur for there to be a consensual resolution.

43.    For the Debtors to confirm a consensual plan, they must solicit and obtain the acceptance of tort victims in the threshold amounts set forth in 11 U.S.C. § 1126(c)—*i.e.*, "at least two-thirds in amount and more than one-half in number." The Debtors have indicated that

they are interested in confirming a plan that includes a channeling injunction and third-party releases for contributing non-debtors.[19]  Under *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 272 (Bankr. D. Del. 2017), this will require a supermajority of survivor votes to confirm such a plan.

44.    The Debtors believe the Coalition has satisfied Rule 2019 disclosures and they support the Coalition's participation in the Mediation.  *See* Docket No. 1269-1.  And, since the Coalition appeared in these cases in late July, the Debtors have engaged in a productive dialogue with the Coalition's legal advisors, including restructuring counsel and state court counsel.  *Id.* at ¶ 5.  The Coalition recently provided Debtors' counsel with voluminous data regarding its Members and their abuse claims.  *Id.*  This detailed claim information is necessary for the parties to advance to the next stage of mediated plan negotiations in advance of the November 16 bar date.  *Id.*  The Debtors also identified the Coalition's good faith efforts to negotiate in a resolution on the advertising issue.  *Id.* at ¶ 6.

45.    The Coalition seeks to be a constructive participant in these cases.  As the Coalition's filings to date show, the decision to form an *ad hoc* group and retain Brown Rudnick as bankruptcy counsel to represent the collective interests of the Coalition's Members has made it possible for parties with similar issues in these cases to file one pleading and speak through one voice.  This provides the Court with the advantage of hearing a single voice stating the position of over 28,000 survivors as opposed to the numerous voices of the survivors' litigation counsel.  This provides benefits to the Debtors and streamlines a more effective, equitable process.

---

[19] *See Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC*, filed on February 18, 2020 [Docket No. 20], Article IV.E at 28.

46.     As the Court well-knows, and as the Debtors have repeated without contradiction on numerous occasions, time is of the essence to save the Debtors and scouting, and the most productive path forward to constructive progress in the Mediation and the bankruptcy proceeding is with the Coalition as an active party.  *See* Hr'g Tr. 137:3-5; 138:5-13.  The Coalition's interest in these cases flows from its genuine desire to move the Debtors' cases forward, which cannot happen if the Coalition is barred from participating in these cases.

### 4.     Excluding the Coalition from the Mediation Is Not Constructive

47.     The TCC and Insurers both seek to exclude the Coalition from the Mediation. *See* TCC Mediation Objection at 1; Motion to Compel at 29.  The TCC argues that the Coalition should be excluded because the "existing Mediation Parties must know who they are negotiating with, who the other parties represent, and that their counsel has the authorization to bind their clients."  TCC Mediation Objection at 1.  Hartford, one of the Insurers, argues that permitting a Coalition that "represents the majority of sexual abuse claimants against the Debtors" to participate in the Mediation is inconsistent with "how a chapter 11 proceeding works" and that the TCC's function is to "ensure that all legitimate abuse claim holders are treated fairly with respect to one another."  Hartford Objection at 4-5.

48.     The Coalition seeks the confirmation of a consensual plan.  For this to occur, the Coalition Members must overwhelmingly vote in favor of plan confirmation.  The Coalition obviously cannot "bind" its Members (and, of course, the TCC cannot "bind" the creditors it represents).  As an *ad hoc* committee, the Coalition itself will not vote on any plan of reorganization or file proofs of claim:  it, like the TCC, can at the appropriate time urge and recommend plan approval.  The issue is how to negotiate and formulate a plan that Sexual Abuse Survivors will support.

49.     Currently in the Mediation are, among other parties, the BSA, Insurers and the TCC.  As a result of the Sexual Abuse, the level of trust that Sexual Abuse Survivors have with the BSA is limited, if any exists at all.  The Insurers want to avoid liability under their insurance policies and have an interest in as few victims as possible having representation and participating in the bankruptcy process.  This is not a moral judgment, but a statement of their economic incentives.

50.     The TCC failed to object to the BSA's motion to silence attorney communications.  *See* Docket No. 1145, 1190 & 1264.  The TCC failed to object to the approval of a claim form that violates Bankruptcy Rule 3001(b) and imposes heightened filing obligations on tort victims.  *See* Docket No. 1388.  The TCC, through its counsel, now stands in a quite remarkable unholy alliance with the Insurers by joining with the Insurers in seeking to bar representatives of over 28,000 Sexual Abuse Survivors from participating in the Mediation. Such tactics do little to engender the Coalition Members' confidence in a plan process that includes the BSA, the Insurers, and the TCC, but purposefully excludes their chosen representatives.

51.     Unlike counsel for the Debtors, the TCC, and the Insurers, the State Court Counsel were specifically retained by Members to bring claims against the BSA and other parties; and the State Court Counsel formed the Coalition for the benefit of its Members and retained counsel to represent the collective interests of the Members in the bankruptcy process. A process that includes the Coalition and their chosen bankruptcy counsel is the best path forward.

52.     The results achieved in other mass tort bankruptcies support the truth of this assertion.  For example, in *Insys Therapeutics, Inc.*, No. 19-11292 (KG) (Bankr. D. Del. October

23, 2019) [Docket No. 803], the Bankruptcy Court ordered the Debtors, the Official Committee of Unsecured Creditors, counsel to the MDL Plaintiffs' executive committee (a judicially created administrative coordinating committee for plaintiffs in an MDL), and counsel to certain states to mediation to facilitate the resolution of disputes over the claims analysis protocol in the bankruptcy of an opioid manufacturer. The Plaintiffs' executive committee, which could not bind and could only make recommendations to its constituency, was made a full mediation party by this Court.

53.     In *In re Purdue Pharma L.P.*, Case No. 19-23649 (Bankr. S.D.N.Y. 2019), the Bankruptcy Court entered a mediation order directing broad negotiations among no fewer than six (6) *ad hoc* committees of opioid litigation claimants. *See id., Order Appointing Mediators* [Docket No. 895]. The *ad hoc* committees in *Purdue* are negotiating alongside the debtors and the official committee, including an *ad hoc* group of individual tort victims (where the official committee was partially comprised of, among various other types of non-governmental creditors reflected in the *ad hoc* committees, individual tort victims). *Id.* The result of a mediation that included the *ad hoc* groups was a term sheet for plan settlements between three *ad hoc* governmental entity groups and each of the principal *ad hoc* committees of private opioid claimants representing hospitals, neonatal abstinence syndrome babies, third party payors and personal injury plaintiffs. *See* Mediators' Report [Docket No. 1716]. This mediation would not have been successful if these *ad hoc* groups had been excluded.

54.     Likewise, *In re PG&E Corporation*, No. 19-30088 (DM) (Bankr. N.D. Cal. Dec. 17, 2019), the Bankruptcy Court approved a restructuring support agreement (the "RSA") that was signed by both the TCC *and* law firms representing individual tort victims holding approximately 70% in number of prepetition tort claims following a court-approved mediation

that involved the Debtors, shareholders, the unsecured creditors committee, the tort claimants committee and the representative law firms.  *See id., Motion to Authorizing Debtors to Enter into Restructuring Support Agreement with the TCC, Consenting Fire Claimant Professionals, and Shareholder Proponents* [Docket No. 5038].

55.    Importantly, the RSA in PG&E did not purport to bind the law firms' clients to vote for or against plan confirmation.  *Id.*  Nor did it suggest that the tort claimants committee in those cases could bind tort victims, which it obviously could not.  The RSA in PG&E led to an accepting class because the tort victims' chosen counsel were included in the mediation and recommended that their clients support the plan.  *Insys Therapeutics*, *Purdue* and *PG&E* are clear examples of how chapter 11 proceedings ought to work.  The parties that want to move these cases forward understand this.  Broad support must be garnered for the confirmation of a chapter 11 plan that recognizes the horrific, irreparable injuries suffered by the Sexual Abuse Survivors and seeks to fairly compensate them for their injuries.  This is why the Coalition is here.

## **CONCLUSION**

WHEREFORE, the Coalition respectfully requests that the Court enter orders granting the Motions and granting the Coalition such other and further relief as the Court deems just and proper.

Dated: October 7, 2020            MONZACK MERSKY
Wilmington, Delaware              BROWDER AND HOCHMAN, P.A.

*/s/ Rachel B. Mersky*_____
Rachel B. Mersky, Esq. (DE No. 2049)
1201 North Orange Street, Suite 400
Wilmington, Delaware 19801
Telephone:     (302) 656-8162
Facsimile:      (302) 656-2769
E-mail:         RMersky@Monlaw.com

-and-

BROWN RUDNICK LLP
David J. Molton, Esq.  (admitted *pro hac vice*)
Eric R. Goodman, Esq. (admitted *pro hac vice*)
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
E-mail: DMolton@BrownRudnick.com
E-mail: EGoodman@BrownRudnick.com

-and-

Sunni P. Beville, Esq. (admitted *pro hac vice*)
Tristan G. Axelrod, Esq. (admitted *pro hac vice*)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
E-mail: SBeville@BrownRudnick.com
E-mail: TAxelrod@BrownRudnick.com

*Co-Counsel to the Coalition of Abused Scouts for Justice*