**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>Debtors. | Chapter 11<br>Case No. 20-10343 (LSS)<br>Jointly Administered<br><br>Obj. Deadline: Oct. 9, 2020 at 4:00 p.m. (ET)[2]<br>Hearing Date: Oct. 14, 2020 at 10:00 a.m. (ET) |

**OBJECTION OF DANIEL WEBSTER COUNCIL TO MOTION OF THE OFFICIAL TORT CLAIMANTS' COMMITTEE PURSUANT TO BANKRUPTCY RULE 2004 AND LOCAL RULE 2004-1 FOR AN ORDER AUTHORIZING THE ISSUANCE OF SUBPOENAS FOR DISCOVERY FROM DEBTORS AND CERTAIN LOCAL COUNCILS**

The Daniel Webster Council (the "DWC") submits this objection (the "Objection") to the *Motion of the Official Tort Claimants' Committee Pursuant to Bankruptcy Rule 2004 and Local Rule 2004-1 for an Order Authorizing the Issuance of Subpoenas for Discovery from Debtors and Certain Local Councils* [D.I. 1379] (the "Motion"),[3] filed by the official committee of tort claimants (the "TCC"). In support of this Objection, the DWC respectfully states as follows:

**PRELIMINARY STATEMENT**

1. While broad, Bankruptcy Rule 2004's inherent balancing requirement precludes overreaching requests—especially when aimed at third-party nonprofits and their individual members—where a much narrower, surgical request at a more appropriate time would do. The DWC thus objects to the Motion as being beyond the scope of Bankruptcy Rule 2004, or as being moot because the requested information has already been voluntarily provided.

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] By agreement with the TCC (as defined below).

[3] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Motion.

2. Promptly after this Court entered a protective order [D.I. 799-1] (the "Protective Order"), the DWC consented to the BSA's sharing with the TCC the summary of the DWC's real property and asset restrictions (the "Restricted Asset Analysis") previously provided to the BSA. After performing the labor-intensive (but important) step of searching all its historical files for the gift and real property documents substantiating those restrictions (collectively, the "Substantiating Documents"), the DWC produced those documents to the BSA and also consented to them being shared with the TCC. The Restricted Asset Analysis and the Substantiating Documents together comprise the Restricted Asset Information requested in the Motion, and thus have already been provided voluntarily. Promptly after the Motion was filed, the DWC began the process of reviewing its historical files for evidence of independent Insurance Policies. The DWC has provided and will voluntarily provide this information in continuance of its efforts to support the formulation of a consensual plan in the BSA's chapter 11 case, which the DWC believes is the best path to preserving Scouting and its charitable mission.

3. But the request for the Rosters is a different matter. The breadth of that request far exceeds even the TCC's stated purpose, let alone the scope of Bankruptcy Rule 2004. If confirming the troop number for those survivors who cannot remember is the goal, the DWC will cooperate with the TCC in supplying and/or confirming troop numbers if and when such information gaps materialize. But the universe of claimants requiring troop number confirmation will not be known until the November 16 bar date (the "Bar Date").[4] Even confirming troop numbers for 100% of the claims allegedly implicating the DWC would be a substantially less burdensome task than researching and producing all troop rosters, for every DWC-affiliated

---

[4] If the TCC knows now that there are claimants implicating the DWC who do not remember their troop number, the DWC welcomes targeted information requests. But to date, the TCC has refused to provide any detail regarding any claims before the Bar Date.

2

troop, for the entirety of the DWC's history. And if the goal is instead to identify additional nondebtors against whom the TCC's constituents might assert claims, that is an impermissible use of Bankruptcy Rule 2004. In either event, the TCC has not sustained its burden under Rule 2004.

4.     Because the DWC has already produced the Restricted Asset Information and will promptly produce any Insurance Policies, that portion of the relief requested is moot. And because the TCC's request for the Rosters exceeds the scope of Rule 2004 and would be overly burdensome on the DWC while the targeted, timely information requests proposed by the DWC would work no hardship upon the TCC, that portion of the relief requested should also be denied.

## ARGUMENT

### A.    The Information Sought by TCC Not Already Voluntarily Provided Exceeds the Scope of Bankruptcy Rule 2004

5.     The DWC has already voluntarily provided the Restricted Asset Information to the TCC.[5] And despite the TCC's never having had a "meet and confer" with the DWC (the TCC's meet and confer was only with the Ad Hoc Committee of Local Councils), the DWC is in the process of following the BSA's roadmap for uncovering historical Insurance Policies unknown to current DWC leadership, and will provide any uncovered Insurance Policies to the TCC. The relief requested relating to the Restricted Asset Information and the Insurance Policies should thus be denied as moot. But the TCC's request for Rosters far exceeds the scope of Bankruptcy Rule 2004 in that it seeks information wholly unnecessary to assist survivors in asserting legitimate proofs of claim, while placing an unworkable administrative burden on an already overtaxed nonprofit organization.

---

[5] The DWC will supplement that production with any additional Substantiating Documentation it may find.

3

6. Although the scope of a Bankruptcy Rule 2004 examination is broad, it is not unfettered, and "the granting of a Rule 2004 examination is dependent on the discretion of the court." In re Millennium Lab Holdings II, LLC, 562 B.R. 614, 626 (Bankr. D. Del. 2016). In particular, Rule 2004 "may not be used for purposes of abuse or harassment and it cannot stray into matters which are not relevant to the basic inquiry." In re Wash. Mut., Inc., 408 B.R. 45, 50 (Bankr. D. Del. 2009) (internal quotation omitted). Rule 2004 requires "a balancing of the competing interests of the parties, weighing the relevance of and necessity of the information sought by examination." Millennium, 562 B.R. at 626 (internal quotation omitted). The party seeking to conduct a Rule 2004 examination has the burden of showing good cause therefor, established by showing that the examination is "necessary to establish the claim of the party seeking the examination, or if denial of such request would cause the examiner undue hardship or injustice." *See* id. at 627 (internal quotation omitted).

7. The DWC does not dispute that in certain appropriately tailored instances, Rule 2004 permits a creditor to seek information from a nondebtor related to a debtor's financial affairs, or which may affect the administration of a debtor's estate or the formulation of a plan. But the TCC's request for the Rosters far exceeds that scope on several fronts.

8. *First*, the request for Rosters would appear to be a collateral attack on this Court's order establishing, among other things, the deadline by which claimants must file proofs of claim in the chapter 11 cases [D.I. 695] (the "Bar Date Order"). By the Bar Date Order, this Court determined the appropriate mechanisms for notifying potential abuse survivors to ensure their due process rights were protected. The TCC now requests the Rosters in what appears to be a thinly veiled attempt to procure names and contact information of former and current Scouts so that the TCC can duplicate the BSA's noticing efforts and potentially unearth additional claims.

Apart from constituting an impermissible collateral attack on a final order, such duplication would waste estate resources—the BSA's efforts were (appropriately) comprehensive—and would serve to harass people who have notice of these chapter 11 cases and have chosen not to participate.  The TCC should not be permitted to second-guess this Court's findings in the Bar Date Order, *see* Barnard v. Verizon Commc'ns, Inc., 451 Fed. App'x 80, 86 (3d Cir. 2011) (affirming the district court's dismissal of a claim that was "essentially a collateral attack on [a] final judgment of the Bankruptcy Court"), waste estate resources by contacting those same individuals at the estate's expense, *see* Millennium, 562 B.R. at 626 (explaining that Rule 2004 requires balancing the need for the requested information and the impact upon the examinee), or simply harass members of troops associated with the DWC, *see* Wash. Mut., 408 B.R. at 50.

9. ***Second***, the TCC concedes that it wants the Rosters to analyze "the abuse claims against *the Local Councils* and [to] determin[e] . . . to what extent, *other parties* may also be liable for the thousands of survivor claims involving the Local Councils."  Mot. ¶ 3 (emphasis added).  The TCC thus concedes that the Rosters do not relate to the business operation or financial condition of the *Debtors*, nor can they be viewed as affecting the administration of the Debtors' estate or as relevant to the formulation of a plan.  *Compare* Fed. R. Bankr. P. 2004.  Rather, the Rosters are relevant to whether claimants may have claims against *Local Councils*.  Such fishing for claims against nondebtor third parties falls outside the scope of Rule 2004, which "is not available to creditors seeking to . . . deal with their special problems," or to obtain "a strategic advantage in fishing for potential private litigation."  *See* Millennium, 562 B.R. at 626-27, 629 (internal quotations omitted).

10. ***Third***, an examination pursuant to Rule 2004 is at the discretion of the Court.  *See* Millennium, 562 B.R. at 626.  In exercising its discretion, the Court must "balance[e] . . . the

5

competing interests of the parties, weighing the relevance of and necessity of the information sought by examination" and the burden it would impose on the examinee. *See* id. (internal quotation omitted); *see also* In re Countrywide Home Loans, Inc., 384 B.R. 373, 393 (Bankr. W.D. Pa. 2008) (in considering a 2004 motion, court must balance needs of the movant against "the potential intrusiveness involved"). Putting aside the clearly impermissible use of fishing for claims against nondebtor third parties, the Rosters are not *necessary* to the TCC's goal of bolstering survivor claims. That goal could be furthered by a much narrower, targeted request as to any survivor who cannot remember their troop affiliation.

11. By way of illustration, the TCC notified the DWC that it is aware of 57 claims implicating New Hampshire in some way. Of that number (which admittedly could grow by the Bar Date), many of the claims will identify troop numbers, and some may not implicate the DWC at all, despite allegedly having some New Hampshire connection.[6] Should the TCC (or any individual claimant) request confirmation that an individual was a member of a DWC troop (or the particular troop number), the DWC would certainly accommodate such a targeted request. But the TCC's request is not so tailored. The Motion's sweeping request for Rosters would place an enormous administrative burden on the DWC for the limited potential benefit of perhaps a handful of survivors, whose individual requests for troop number or membership confirmation would be promptly granted should they be made.

12. Because (a) the Motion's wide-reaching request for Rosters exceeds even the broad scope of Bankruptcy Rule 2004, *see* Millennium, 562 B.R. at 626-27, 629; (b) complying with Roster request is unnecessary to further the TCC's goal and would be unduly burdensome

---

[6] For example, a few units that used to belong to a Massachusetts council were transferred to the DWC over the past few years, and several current Massachusetts councils operate summer camps in New Hampshire. Alleged abuse related to former Massachusetts troops or Massachusetts council camps would not implicate the DWC.

on the DWC, *see* id. at 626; and (c) denial of the relief requested would work no "undue hardship" on the TCC, *see* id. at 627 (internal quotation omitted); the Motion should be denied as to the Roster request.

**B.     The Motion Seeks to Evade the Protections Afforded by the Federal Rules**

13.     The Motion seeks to bypass the protections afforded by Rule 45 of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rules 2004 and 9016.  Rule 45 provides a party served with a subpoena an opportunity to object to or move to quash or modify such subpoena.  *See* Fed. R. Civ. P. 45(d)(2)(B), (d)(3).  But the relief requested would require the DWC to produce responsive documents within 14 days of an order granting the Motion, stripping the DWC of an adequate opportunity to object or move to quash.  Mot. ¶ 38, proposed order ¶ 3.  To the extent the relief requested by TCC is granted at all (which it should not be), it should be confined to the issuance of appropriately limited subpoenas, leaving the DWC with all rights available under the Federal Rules.  More practically, were the TCC to engage with the DWC over what it reasonably needed, both the estate and the DWC would be relieved of the burden and expense of providing agreed-upon information within a reasonable scope.

## CONCLUSION

**WHEREFORE**, for the reasons set forth above, the DWC respectfully requests that the Motion be denied.

Dated: October 9, 2020

Respectfully submitted,

*/s/ Joseph H. Huston, Jr.*
Joseph H. Huston, Jr. (No. 4035)
STEVENS & LEE, P.C.
919 North Market Street, Suite 1300
Wilmington, Delaware 19801
Tel: (302) 425-3310
Email: jhh@stevenslee.com

and

Lindsay Zahradka Milne
Bernstein, Shur, Sawyer & Nelson
100 Middle Street, P.O. Box 9729
Portland, ME 04104-5029
Tel: (207) 774-1200
Email: lmilne@bernsteinshur.com

*Counsel to Daniel Webster Council*