## Exhibit A

**Limited Objection**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>Ref. Docket No. 1379 |

**DEBTORS' LIMITED OBJECTION TO THE MOTION OF THE OFFICIAL
TORT CLAIMANTS' COMMITTEE PURSUANT TO BANKRUPTCY RULE 2004
AND LOCAL RULE 2004-1 FOR AN ORDER AUTHORIZING THE ISSUANCE
OF SUBPOENAS FOR DISCOVERY FROM DEBTORS AND
CERTAIN LOCAL COUNCILS**

The Boy Scouts of America (the "BSA") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (together, the "Debtors"), submit this limited objection (this "Limited Objection") to the *Motion of the Official Tort Claimants' Committee Pursuant to Bankruptcy Rule 2004 and Local Rule 2004-1 For an Order Authorizing the Issuance of Subpoenas for Discovery From Debtors and Certain Local Councils* [Docket No. 1379] (the "Rule 2004 Motion").[2] In support of this Limited Objection, the Debtors submit the *Declaration of Blair Warner In Support of Debtors' Limited Objection to the Motion of the Official Tort Claimants' Committee Pursuant to Bankruptcy Rule 2004 and Local Rule 2004-1 For an Order Authorizing the Issuance of Subpoenas for Discovery From Debtors and Certain Local Councils* ("Warner Declaration"), attached hereto.

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Rule 2004 Motion.

**PRELIMINARY STATEMENT**

1. In its Rule 2004 Motion, the official committee of tort claimants (the "Tort Claimants' Committee" or "TCC") seeks "Troop Rosters." In other words, the TCC seeks lists of *every* individual who ever participated in the Boy Scouts as a child and *every* adult who ever volunteered for a Boy Scouts troop, from the founding of the organization. As the TCC acknowledges, the Rosters contain not just names, but other identifying information, including each child member's "*name, age, address, and contact information*," and each adult volunteer's "*name, address, contact information*, and leadership position." Rule 2004 Motion ¶ 26 (emphases added). The vast majority of the individuals listed on the Rosters have nothing to do with these cases. And even abuse survivors listed on the Rosters may choose for their own personal reasons not to participate, as is their right. These individuals reasonably would expect that their personal information would not be made available without good cause—which the TCC has not shown.

2. The TCC admits that the primary reason it wants the Rosters is to determine whether non-debtor third parties may be liable to abuse survivors. *See, e.g.*, Rule 2004 Motion ¶ 3 ("The Rosters are critical to the TCC's analysis of the abuse claims against the Local Councils *and the determination of whether, and to what extent, other parties may also be liable* for the thousands of survivor claims involving the Local Councils.") (emphasis added); *see also id.* ¶¶ 14, 22, 32. But that is not a proper use of Rule 2004. Despite Rule 2004's breadth, it is not a mechanism for creditors to identify third parties in addition to the debtor who may also be liable to them. *See In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 628 (Bankr. D. Del. 2016); *see also In re J & R Trucking, Inc.*, 431 B.R. 818, 822 (Bankr. N.D. Ind. 2010) ("As for movants' desire to identify third parties who may also be liable to them, that, quite simply, is neither this court's concern nor the purpose of Rule 2004.").

3. The secondary reason the TCC offers for requesting the Rosters is that they might be helpful to abuse survivors in providing information for their claim forms and in corroborating claim forms. *See* Rule 2004 Motion ¶¶ 29–31. But the TCC's speculation that the Rosters might be useful at some point down the road does not establish "good cause" for the production of the Rosters at this time. Indeed, as the TCC concedes, use of information in the Rosters "could be incorporated into trust distribution procedures or a post-confirmation vetting process." *Id.* ¶ 34.

4. The Debtors submit that the post-confirmation trust process is the appropriate time and place for the Rosters to be used, should that become necessary at all. The Debtors have serious and well-founded concerns about the personal information in the Rosters being misused if it is made available in these proceedings at this time. As this Court is aware, plaintiffs' firms are engaged in widespread advertising campaigns to solicit abuse survivors as clients. Over the past several weeks, members of the BSA community have received multiple unsolicited text messages and emails regarding filing abuse claims. *See, e.g.,* Warner Decl. at Ex. D (Text Message: "Rachel, there's a free claim evaluation for you for Boy Scouts abuse compensation. View frlrs.me/7DH1xE4eld for details."); *see also id* at Exs. A, B. C, E, & F. BSA is attempting to address these harassing, unlawful, and unethical communications directly with the senders. But given these circumstances, the privacy rights of the individuals identified on the Rosters outweigh any possible need the TCC has for this information at this time. During the post-confirmation claims administration process, should the trustee determine there is a need to review certain Roster information, Rosters can be provided then, when there will be far less potential for abuse. Thus, even if the TCC had established good cause for the Rosters—which it has not—the Court should exercise its discretion to deny the request for Troop Rosters.

5. Furthermore, as the BSA has repeatedly explained to the TCC, the BSA has Rosters only from approximately the last twenty years in its possession. Specifically, the BSA's electronic registration

3

system was not implemented until 1999. *See* Warner Decl. ¶ 12. Based on the historic nature of claims held by sexual abuse survivors and the robust set of expert-informed youth-protection policies and procedures that the BSA implemented during the last several decades, it is highly unlikely that the Rosters in the BSA's possession will be relevant to adjudicating the vast majority of sexual abuse survivor claims. *See Debtors' Informational Brief* [Docket No. 4], at 3-4.

## BACKGROUND

6.      In the Rule 2004 Motion, the Tort Claimants' Committee requests entry of an order authorizing it to issue subpoenas to the BSA and certain local councils, including members of the Ad Hoc Committee of Local Councils (collectively, the "Examinees"). The subpoenas that are the subject of the Rule 2004 Motion would require the Examinees to produce certain information regarding Restricted Assets, Rosters, and Insurance Policies.

7.      Attorneys for the BSA and the Ad Hoc Committee of Local Councils have met and conferred with attorneys for the Tort Claimants' Committee regarding the subject matter of the Rule 2004 Motion and have reached an agreement with respect to production of information regarding Restricted Assets and Insurance Policies (the "Stipulation") [Docket No 1479]. The Stipulation provides that the parties shall brief the Tort Claimants' Committee request in the Rule 2004 Motion for "All Rosters" (the "Rosters Request") and that the Rosters Request shall go forward at the omnibus hearing scheduled for October 14, 2020. For the reasons stated herein, the Debtors object to the Rosters Request.

## ARGUMENT

8.      The purpose of a Rule 2004 examination "is to enable the trustee to discover the nature and extent of the bankruptcy estate." *In re Washington Mut., Inc.*, 408 B.R. 45, 50 (Bankr. D. Del. 2009) (citing *In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 708 (Bankr. S.D.N.Y. 1991)). The scope of Rule 2004 is broad, but there are limits. *Id.* A 2004 examination

"*may relate only to* the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge." Fed. R. Bankr. P. 2004 (emphasis added); *see also In re Coffee Cupboard, Inc.*, 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991) (noting that "[a] 2004 examination should only be used for the legitimate purpose of obtaining information" set forth in Rule 2004). Additionally, "parties do not have an absolute right to Rule 2004 examinations—the granting of a Rule 2004 examination is dependent on the discretion of the court." *In re Millennium Lab Holdings II, LLC*, 562 B.R. at 626. "The rule requires a balancing of the competing interests of the parties, weighing the relevance of and necessity of the information sought by examination." *Id.* (internal quotation marks and citation omitted).

**I.    The Rosters Request is Not a Proper Use of Rule 2004.**

9.    The Rule 2004 Motion makes clear that the TCC intends to use the Rosters to determine whether abuse survivors have claims against third parties, and whether those third parties have insurance policies available to satisfy abuse claims. *See, e.g.*, Rule 2004 Motion ¶¶ 3, 22–23, 28. Courts have held, however, that attempts by creditors to identify other potentially liable parties is not an appropriate use of Rule 2004. For example, in *In re Millennium Lab Holdings II, LLC*, 562 B.R. at 628–29, a Lenders' Trust that held third party creditor claims sought a Rule 2004 examination in order to investigate potential causes of action they had against non-debtor entities. This Court denied the Lenders' Trust's 2004 motion, determining that "[a]n investigation into the existence of the Consenting Lenders' claims against non-debtor Third Parties does not fall within the scope or purpose of Rule 2004." *Id.* at 628. *See also In re J & R Trucking, Inc.*, 431 B.R. at 822 ("As for movants' desire to identify third parties who may also be liable to them, that, quite simply, is neither this court's concern nor the purpose of Rule 2004."). Because the Rosters Request is designed precisely for this improper purpose, it should be denied.

10. There are far more efficient ways for the TCC and the BSA to determine whether abuse survivors have claims against non-debtors, including by evaluating the claims information that is already in the possession of the TCC and the state court counsel who represent its members. The Debtors are willing to work with the TCC to assist in their efforts to identify non-debtors implicated by abuse claims. To this end, the Debtors have repeatedly requested that the TCC provide claims information to the Debtors in advance of the bar date. The TCC has refused the Debtors' requests.

11. In addition, the Rosters Request is improper under the "pending proceeding rule." Under that rule, "Rule 2004 examinations may be inappropriate 'where the party requesting the Rule 2004 examination could benefit their pending litigation outside of the bankruptcy court against the proposed Rule 2004 examinee.'" *In re Washington Mut., Inc.*, 408 B.R. at 50 (quoting *In re Enron Corp.*, 281 B.R. 836, 842 (Bankr. S.D.N.Y. 2002)). In *In re Enron Corp.* the bankruptcy court denied a Rule 2004 Examination where the movants' purpose was to bypass a discovery stay in pending non-bankruptcy litigation. 281 B.R. at 842–43. Likewise here, the TCC admits that the Rosters Request will allow abuse survivors to by-pass the automatic stay and injunction that is currently in place in state court actions. *See* Rule 2004 Motion ¶ 30 (noting that because of the automatic stay and the injunction, "claimants who have filed state court actions cannot issue discovery to the Debtor or the Local Councils"). The Rosters Request should be denied for this reason as well.

## II. The TCC Has Not Met Its Burden To Show Good Cause For the Rosters Request.

12. Not only is the TCC attempting to use Rule 2004 for improper purposes, but it also has not otherwise established good cause for the Rosters Request. As the party seeking to conduct a 2004 examination, the TCC "has the burden of showing good cause for the examination it seeks." *In re Millennium Lab Holdings II, LLC*, 562 B.R. at 627. "The burden of showing good cause is

an affirmative one in that it is not satisfied merely by a showing that justice would not be impeded by production of the documents." *In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. at 712. Moreover, showing that documents are relevant "does not alone demonstrate that there is good cause for requiring their production." *Id.*  Instead, good cause is generally shown if the requested documents are "necessary to establish the claim of the party seeking the examination, or if denial of such request would cause the examiner undue hardship or injustice." *In re Millennium Lab Holdings II, LLC*, 562 B.R. at 627; *In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. at 712.

13. The TCC has failed to meet its burden here, as it not shown that the Rosters are necessary or that denial of such request would cause undue hardship or injustice.  The TCC posits that the Rosters *may* be helpful to abuse survivors who do not recall, or do not accurately recall, certain information, or whose claims are objected to.  *See, e.g.,* Rule 2004 Motion ¶ 31 ("For example, Rosters *may help* such claimants recall or identify information . . . ") (emphasis added); *see also id.* ¶ 32.  Similarly, the TCC argues for production of the Rosters because, at some point in the future, certain local councils and chartered organizations "*may* want to participate in the bankruptcy and obtain the benefits of a channeling injunction." Rule 2004 Motion ¶ 27.

14. But we are not at that stage of the proceedings.  The bar date to submit abuse claims has not yet passed, and no Sexual Abuse Survivor Claims are being adjudicated now.  Indeed, it is unlikely any Sexual Abuse Survivor Claims will be processed or adjudicated until a compensation trust is established and implemented pursuant to the terms of a confirmed plan of reorganization, whereby all such claims will be channeled to the trust and handled in accordance with approved trust procedures.  At that time, to the extent more information is needed evaluate Sexual Abuse Claims, information from the Rosters may become relevant and may need to be provided.  However, right now, the Rosters Request is premature.  And in any event, the BSA only has

Rosters from approximately the last twenty years in its possession. *See* Warner Decl. ¶ 12. Due to the historic nature of claims held by sexual abuse survivors and the robust set of expert-informed youth-protection policies and procedures that the BSA implemented over the last several decades, *see Debtors' Informational Brief* [Docket No. 4], at 3-4, it is highly unlikely the Rosters in the BSA's possession will be of aid to the TCC on either of these scores. Today, the BSA is regarded as "one of the safest youth-serving organizations in the world." *Id.* (quoting Janet I. Warren, *Boy Scouts of America Volunteer Screening Database: An Empirical Review 1946-2016*, at 91 (2019)).

15. The TCC appears to recognize that its request is premature. In the Rule 2004 Motion, the TCC acknowledges that "the importance of the Rosters to the validation of claims against the Debtors could be incorporated into trust distribution procedures or a post-confirmation vetting process." Rule 2004 Motion ¶ 34. The TCC may believe it would be more convenient to obtain the Rosters now, but that does not suffice. Denying the Rosters Request at this time would not cause undue hardship or injustice to the TCC. On the other side of the equation, however, and as explained further below, there is the potential for very real harm to ordinary individuals in providing the Rosters at this time. .

**III.    The Potential Harm to Individuals Identified on the Rosters Outweighs Any Benefit to Producing the Rosters at This Time.**

16. The potential harm to individual Scouts and volunteers outweighs any marginal benefit the TCC may obtain from getting the Rosters now, as opposed to providing them, as necessary, at a later date, including to the trust during the claims administration process. Since the last omnibus hearing, where the Court considered arguments related to false and misleading attorney advertising directed to potential sexual abuse survivors, the Debtors have become aware of what is conceivably an even more invasive and harassing form of attorney advertising. In violation of federal and state laws and attorney ethical rules, individuals associated with the BSA

are being specifically targeted with unsolicited direct text and email advertisements (the "Violating Direct Messages").[3]  While at this point the Debtors are endeavoring to handle these Violating Direct Messages without the aid of the Court, it is clear that the Violating Direct Messages are just one example of how the information included in the Rosters Request could be misused to harass former and current Scouts and adult volunteers if it is provided at this time.

17.    As set forth on **Exhibits A-F** of the Warner Declaration, certain Violating Direct Messages have been directly sent to Scouts and other members of the Scouting community by what appear to be attorney referral services,[4] though the entities identified as responsible for the text messages in such messages often do not exist.[5]  The communications often contain false and misleading information and material omissions similar to those addressed in the Court's supplemental bar date order [Docket No. 1331] directed at curtailing false and misleading

---

[3] These messages may violate various federal and state telemarketing laws.  For example, the Telephone Consumer Protection Act (the "TCPA") and accompanying rules from the Federal Communications Commission ("FCC") prohibit a number of types of text messages sent by an auto-dialer to a cell phone.  47 U.S.C. § 227; 47 C.F.R. 64.1200.  FCC regulations require prior express written consent for autodialed or prerecorded telemarketing calls to cell phone numbers, and an opt-out mechanism is required.  77 Fed. Reg. 112.  Text messages are considered "calls" under the FCC rules.  Federal "do not call" provisions are also applicable to attorneys and their agents.

[4] For example, the website associated with the text message in Exhibit A to the Warner Declaration states: "We are an advertising group that represents lawyers jointly advertising their services.  We are not a law firm or lawyer referral service," thereby disclaiming being a lawyer referral service.  However, it appears the purpose of the website is to collect information from potential claimants and turn that information over to lawyers, which is in substance an attorney referral service.  Further, the text messages may violate ethical rules on attorney advertising in California, where the text message in Exhibit A was received.  *See* Cal. Bus. & Prof. Code § 6155(a)(1) (West 2020) ("An individual, partnership, corporation, association, or any other entity shall not operate for the direct or indirect purpose, in whole or in part, of referring potential clients to attorneys, and no attorney shall accept a referral of such potential clients, unless . . . [t]he service is registered with the State Bar of California and . . . is operated in conformity with minimum standards for a lawyer referral service established by the State Bar . . . .").  As indicated in the statute, attorneys are prohibited from accepting referrals of potential clients from an unregistered referral service.  *Id.*  The text messages also may violate various provisions of the California Rules of Professional Conduct regarding attorney advertising.  Lawyers cannot shield themselves from these rules by acting through an intermediary.  Text messages fall squarely within the meaning of "electronic means of communication" under California Rule of Professional Conduct ("RPC") 7.2(a).  As such, these messages may violate various provisions of RPC 7.1–7.3.

[5] The text messages purport to be from "Digital Trend Metrics, Inc. (D/B/A "Join-Class-Action.com"), a Delaware corporation."  No such entity exists on the Delaware register.  Instead, Digital Media Metrics appears to be a registered business name of Texas Email Company LLC, which is owned by Advertising Worldwide LLC.  Warner Decl. ¶ 6.  The Debtors have sent cease and desist letters to these entities.

9

advertising directed at potential sexual abuse survivors. In addition, it appears no efforts have been undertaken by the senders of these Violating Direct Messages to ensure they are not sent to minors. *See Debtors' Supplemental Brief in Support of their Motion Pursuant to Section 105(a) of the Bankruptcy Code and ¶ 27 of the Bar Date Order for Entry of an Order (I) Supplementing the Bar Date Order and (II) Granting Related Relief* [Docket No. 1260] at p. 21 & Exhibit C. In fact, in addition to text messages and emails, the Debtors have received reports that youth members of the BSA are receiving unsolicited phone calls asking if they were ever abused by a scout leader or if they know anyone who was abused by a scout leader. *Id.* at p. 21–22 & Exhibit D.

18.     This type of direct attorney solicitation not only violates federal and state laws and professional responsibility rules for attorneys related to direct solicitation, but it also is harmful and harassing to the individual Scouts being targeted.[6] Indeed, the TCPA was put in place to stop just this type of harassment and invasion of privacy. *See, e.g.*, 137 Cong. Rec. S16205 (daily ed. Nov. 7, 1991) ("These machines are out of control, and their use is growing by 30 percent every year. It is telephone terrorism, and it has got to stop. . . ."); H.R. Rep. No. 102–317, at 18 (1991)

---

[6] The Violating Text Messages may violate various provisions of the Model Rules of Professional Conduct, including, but not limited to, the following:

- RPC 7.3(a) prohibits an attorney from contacting a party via telephone or electronically to solicit professional employment when a significant motive for doing so is the attorney's pecuniary gain.

- RPC 7.1 prohibits the transmission of text messages that contain a false, misleading, or non-verifiable communication about a lawyer's services. Even a truthful statement is misleading if it omits a fact necessary to make the lawyer's communication considered as a whole not materially misleading. The message in Exhibit A, for example, falsely states that "compensation is available" without providing any detail or context.

- RPC 7.3 requires a party sending a message to have a reasonable belief that the prospective client is in need of legal services in a particular matter. Further, RPC 7.3 requires a text message to state (1) how the lawyer learned of the need for legal services, and (2) include the word "ADVERTISEMENT" at the beginning and end of the message unless it is apparent from the context that the message is an advertisement. Here, there is no basis to believe that individuals receiving the text messages have a need for legal services, and many of them do not. Nor do the text messages state that they are advertisements.

- RPC 7.2(c) requires the messages to disclose the sponsoring lawyer or law firm responsible for the content. As these messages do not, they may be in violation of this rule.

("Whether an individual or a machine is on the other end of the line, consumers find unsolicited telemarketing calls an intrusive, often frustrating, invasion of their privacy.").

19. At this time, the Debtors do not know how the contact information of individual Scouts was acquired by the entities involved in the Violating Direct Messages. But given that providing the Rosters to the parties in these cases may lead to further harassment of individuals, that weighs heavily on the scale of denying the Roster Request.[7] Indeed, should such solicitation continue unchecked, it is highly likely that the BSA will suffer irreparable harm due to loss of current and future Scout participation. While many of these communications have been brought to the BSA's attention by adult members of the Scouting community, the BSA has also heard from concerned parents who are understandably upset by communications regarding sexual abuse being targeted to their children. Given that the TCC has not established good cause for the Rosters, balanced against the competing interest in protecting the privacy rights of the thousands of ordinary individuals identified on the Rosters, the Court should exercise its discretion to deny the Rosters Request.

## CONCLUSION

WHEREFORE, for the reasons stated herein, the Debtors respectfully request that the Court deny the Rule 2004 Motion, and grant such other and further relief as the Court deems proper.

---

[7] Nor do the Debtors believe that the TCC's proposed plan to mark certain information in the Rosters as "HIGHLY CONFIDENTIAL" pursuant to the *Order Approving Confidentiality and Protective Order* [Docket No. 799] will prevent the potential for such harassment from occurring. Although the BSA has no reason to believe the lawyers for the TCC would engage in these tactics, if the Rosters were provided pursuant to the Rule 2004 Motion, they would be available to various other parties and law firms.

| | |
|---|---|
| Dated:  October 11, 2020<br>Wilmington, Delaware | **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**<br><br>*/s/ Eric W. Moats*<br>Derek C. Abbott (No. 3376)<br>Andrew R. Remming (No. 5120)<br>Eric Moats (No. 6441)<br>Paige N. Topper (No. 6470)<br>1201 North Market Street, 16th Floor<br>P.O. Box 1347<br>Wilmington, Delaware 19899-1347<br>Telephone:  (302) 658-9200<br>Email:  dabbott@mnat.com<br>           aremming@mnat.com<br>           emoats@mnat.com<br>           ptopper@mnat.com<br><br>– and –<br><br>**WHITE & CASE LLP**<br>Jessica C. K. Boelter (*pro hac vice* pending)<br>1221 Avenue of the Americas<br>New York, New York 10020<br>Telephone:  (212) 819-8200<br>Email:  jessica.boelter@whitecase.com<br><br>– and –<br><br>**WHITE & CASE LLP**<br>Michael C. Andolina (*pro hac vice* pending)<br>Matthew E. Linder (*pro hac vice* pending)<br>111 South Wacker Drive<br>Chicago, Illinois 60606<br>Telephone:  (212) 881-5400<br>Email: mandolina@whitecase.com<br>           mlinder@whitecase.com<br><br>*Counsel and Proposed Co-Counsel for the Debtors and Debtors in Possession* |