# EXHIBIT 2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| | Jointly Administered |
| Debtors. | **Ref. Docket No. 812** |

## <u>DECLARATION OF NANCY J. MOORE</u>

### <u>Introduction</u>

1. My name is Nancy J. Moore. My date of birth is June 30, 1949. My office address is 765 Commonwealth Ave., Boston, MA 02215. I am over 18 years of age, of sound mind, and competent to make this Declaration in support of *Century and Hartford's Motion to Compel the Attorneys Representing the Entity Calling Itself the "Coalition" to Submit the Disclosures Required by Federal Rule of Bankruptcy Procedure 2019*.

2. I have been asked by O'Melveny & Myers LLP, on behalf of Century Indemnity Company, and Shipman & Goodwin LLP, on behalf of First State Insurance Company, Hartford Accident and Indemnity Company, First State Insurance Company and Twin City Fire Insurance

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Lane, Irving, Texas 75038.

Company, to consider the following questions:  (a) whether Brown Rudnick LLP ("Brown Rudnick") has established an attorney-client relationship with the Ad Hoc Committee of Boy Scouts of America Sexual Abuse Survivors ("the Ad Hoc Committee") or "the Coalition of Abused Scouts for Justice" ("CASJ"); (b) whether Brown Rudnick has established an attorney-client relationship with  the approximately 12,000 individual clients ("the Law Firm Clients") of the law firms of Eisenberg, Rothweiler, Winkler, Eisenberg & Jack, P.C., Kosnoff Law PLLC, and the AVA Law Group, Inc., (collectively "the AIS law firms"),   Slater Slater Schulman, LLP, ("Slater"), and Andrews & Thornton and ASK LLP (collectively "the Andrews & Thornton/AK" law firms); and (c) whether there are ethical improprieties in the retention agreements between the law clients ("the Law Firm Clients") and these six law firms ("the Six Law Firms").

3.  In formulating my opinions I have reviewed documents provided to me and listed in Exhibit 1 attached, and I base my opinions on the contents of these documents:

4.  Some of the documents refer to the Ad Hoc Committee, while other documents refer to CASJ. I have been informed and I assume that these names refer to the same group, and I use them interchangeably.

5.  I am being compensated at my regularly hourly rate of $800.

## My Qualifications

6.  I am Professor of Law and Nancy Barton Scholar at Boston University School of Law ("BU"). I have been a tenured full professor at BU since January 1999. From 1976 through December 1998, I was employed at Rutgers School of Law-Camden ("Rutgers") as an assistant professor, tenured associate professor, associate dean for academic affairs, and tenured full professor. I

am a Member and former Chair of the Multistate Professional Responsibility Test ("MPRE")
Drafting Committee. In addition, I was Chief Reporter to the American Bar Association's
Commission on Evaluation of Professional Rules of Conduct ("Ethics 2000 Commission"). I
also served as an adviser to the American Law Institute's Restatement of the Law (Third)
Governing Lawyers and as a member of the ALI's Members Consultative Group for its
Principles of Aggregate Litigation. I served twice as Chair of the Professional Responsibility
Section of the Association of American Law Schools. I have authored numerous articles on
legal ethics, including articles on plaintiffs' lawyers' conflicts of interest in mass tort cases and
lawyers purporting to represent informal associations of individuals.

7.   I have testified as an expert on legal ethics via deposition, declaration and in various state and
federal tribunals, including testimony in courts in Connecticut, Florida, Maine, Maryland,
Massachusetts, New Jersey, New York, and Pennsylvania. I am currently licensed to practice
law in the Commonwealth of Massachusetts. I have spoken on topics in legal ethics numerous
times in the last forty years at continuing legal education seminars and professional
conferences, including national bar conferences. In addition to regularly teaching the basic
course in Professional Responsibility (formerly at Rutgers and now at BU), I teach a seminar
on Professional Responsibility for Business Lawyers. A current copy of my Curriculum Vitae
is attached as Exhibit 2.

<u>My Opinions</u>

I.   <u>Brown Rudnick has not established an attorney-client relationship with either the Ad Hoc
Committee or CASJ</u>

A.   <u>The Brown Rudnick Engagement Letter provides no evidence of a valid retention on
behalf of the Ad Hoc Coalition or CASJ</u>

8.  Brown Rudnick signed an engagement agreement dated July 21, 2020 ("the Brown Rudnick

    Engagement Letter" or "the Engagement Letter"). It was also signed by the Six Law Firms,

    each of which "represent[ed] and warrant[ed] that they ha[d] the authority to sign this

    Engagement Letter on behalf of their respective Law Firm Clients and bind the Law Firm

    Clients to the terms thereof." Despite the fact that the Engagement Letter was signed by the

    Six Law Firms "on behalf of their respective Law Firm Clients" (who were to be individually

    bound to the terms of the Engagement Letter), the Engagement Letter states that "[Brown

    Rudnick] is being retained by the Ad Hoc Committee, and not by any individual member of

    the Ad Hoc Committee."

9.  Because the Six Law Firms stated that they were signing the Engagement Letter, not on

    behalf of the Ad Hoc Committee, but rather on behalf of their "respective Law Firm Clients,"

    there is an inherent contradiction as to the identity of the client (or clients) within the

    Engagement Letter itself. No one signed or purported to sign the Engagement Letter on

    behalf of the Ad Hoc Committee. As a result, the Engagement Letter does not provide

    evidence of any valid retention of Brown Rudnick by the Ad Hoc Committee or CASJ, as

    opposed to the Law Firm Clients.

    B.  The Six Law Firms had no authority to enter into a retention agreement with Brown
        Rudnick on behalf of the Ad Hoc Coalition or CASJ

10. Even if the Six Law Firms had purported to enter into the Engagement Letter on behalf of the

    Ad Hoc Committee, I have seen no evidence that the Six Law Firms had the authority to do

    so. First, I have seen no documents establishing the existence of a group, association, or

    entity to be called either the Ad Hoc Committee or CASJ. Second, I have seen no documents

authorizing the Six Law Firms to establish such a group, association or entity on behalf of their Law Firm Clients.

a.  I have seen a document entitled "Representative State Court Counsel Communication to Clients Seeking Consent of Coalition Member-client's Representation by the Coalition." That document, however, merely announced, *after the fact,* that the law firm had *already* joined an *existing* coalition, CASJ, which had *already* retained counsel, including Brown Rudnick, and that Brown Rudnick had *already* begun negotiating with the Boy Scouts of America. The "member-clients" were given the option of becoming non-participants; however, the burden was on them to affirmatively contact the law firm in order to do so. Moreover, contrary to the law firm's obligations under the ABA Model Rules of Professional Conduct 1.2(a) and 1.4,[2] the law firm provided no information on which the "member-clients" could rationally base a decision whether to withdraw their participation in the coalition.

b.  I have reviewed three form engagement letters used to establish attorney-client relationships between the AIS law firms, Slater, and the Andrews & Thornton/AK law firms and their respective Law Firm Clients. In my opinion, none of them provided the Six Law Firms with the authority to establish a group, association, or entity of which the individual Law Firm Clients would be members.

---

[2] Rule 1.2(a) provides that "a lawyer shall abide by a client's decisions concerning the objectives of representation and, as required by Rule 1.4, shall consult with the client as to the means by which they are pursued." Rule 1.4(a)(2) requires that a lawyer "reasonably consult with the client about the means by which the client's objectives are to be accomplished." Rule 1.4(b) further provides that "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation. All of the representations discussed in this Declaration concern the assertion of claims in the United States Bankruptcy Court for the District of Delaware. Local Rule 9010-1(f) of that court provides that attorneys practicing before the court are governed by the current version of the ABA Model Rules of Professional Conduct.

c.  According to the Restatement of the Law Governing Lawyers, courts "should construe a contract between lawyer and client as a reasonable person in the circumstances of the client would have construed it."[3] Thus the provisions of the three form engagements letters should be construed as a reasonable person in the position of The Law Firm Clients would have construed them. I assume that the Law Firm Clients---individuals alleging sexual abuse by persons associated with the Boy Scouts of America ("BSA")--- are not sophisticated or experienced in retaining lawyers.

d.  The "Professional Employment Agreement" prepared by the AIS law firms provides only that the attorneys "are granted the right to associate with other law firms *in the prosecution of the claim[s]."* (Emphasis added.) In my opinion a reasonable person in the circumstances of the Law Firm Clients would construe that right as limited to the right to associate with other counsel to assist *in the representation of the AIS law firms' clients* and would not construe that provision as including the right to form an organization that would become "a client" (indeed the only client) for purposes of retaining yet another law firm to negotiate a settlement with the Boy Scouts of America ("BSA") *on behalf of that organization.*[4] This is particularly so when members of the organization would include persons not represented by the AIS law firms, whose lawyers would have no duty of loyalty to the AIS law firms' clients who were parties to the Professional Employment Agreement.

---

[3] Restatement (Third) of the Law Governing Lawyers §18(2) (2000).

[4] Although the individual Law Firm Clients retain the right to accept or reject any settlement offer,  those offers were to be negotiated by a law firm (Brown Rudnick) that was not representing them, but rather was representing an organization with a substantial number of members whose interests might differ significantly from their own interests.  Brown Rudnick was in a position to substantially influence both the total amount of any settlement offer and how it was allocated among all of the Law Firm Clients. Because it agreed to take direction from the Six Law Firms, law firms representing only some but not all of the Law Firm Clients would also have the ability to shape individual settlement offers made to all of the Law Firm Clients.

e.  The "Boy Scouts of America—Attorney-Client Agreement," prepared by the Andrews & Thornton/ASK law firms also contains a provision concerning the Association of Counsel. (¶2) After explaining that the two separate law firm "will be associating on this matter," the provision states that "Client authorizes the Firms *to associate co-counsel* as the Firms may deem necessary". (Emphasis added.) The term "co-counsel" is commonly understood, to mean "an attorney who assists in or shares the responsibility of representing a client."[5] In my opinion, a reasonable person in the circumstances of the Law Firm Clients would understand this provision to authorize the Andrews & Thornton/ASK law firms to associate with other counsel to assist in the representation of the Andrews & Thornton/ASK law firms' clients and would not construe that provision as including the right to form an organization that would become "a client" (indeed the only client) for purposes of retaining yet another law firm to negotiate a settlement BSA *on behalf of that organization*. This is particularly so when members of the organization would include persons not represented by the Andrews & Thornton/ASK law firms, whose lawyers would have no duty of loyalty to the Andrews & Thornton law firms' clients who were parties to the Boy Scouts of America—Attorney-Client Agreement..

f.  The "Retainer Agreement" prepared by Slater has a provision stating that the "attorneys may, at their own expense, use or associate other attorneys *in the representation of the aforesaid claims*." (Emphasis added.) In my opinion a reasonable person in the circumstances of the Law Firm Clients would construe that right as limited to the right to associate with other counsel to assist *in the representation of Slater's clients* and would not construe that provision as including the right to form an organization that would

---

[5] "Co-counsel." *Merriam-Webster.com Legal Dictionary*, Merriam-Webster, https://www.merriam-webster.com/legal/co-counsel.

become "a client" (indeed the only client) for purposes of retaining yet another law firm to negotiate a settlement with the BSA" *on behalf of that organization*. This is particularly so when members of the organization would include persons not represented by the AIS law firms, whose lawyers would have no duty of loyalty to the AIS law firms' clients who were parties to the Retainer Agreement.

11. Even if the Six Law Firms had validly established the Ad Hoc Coalition or CASJ, I have seen no evidence that either the Ad Hoc Coalition or CASJ validly authorized the Six Law Firms to retain Brown Rudnick to represent it in connection with its members' bankruptcy claims. In addition, I have seen no any evidence that the individual Law Firm Clients authorized any of the Six Law firms to retain Brown Rudnick on behalf of the Ad Hoc Coalition or CASJ. As set forth above, the three form engagement letters I reviewed may have authorized the Six Law Firms to associate with other lawyers, but in my opinion, such authority was limited to retaining other counsel as "co-counsel"[6] to assist in the representation of the retaining law firm(s)' own clients, not to represent an organization, particularly one that consisted of individuals represented by other law firms who had no duty of loyalty to the retaining law firm(s)' clients.

C. As an informal group or association with no agreed-upon decision-making structure, the Ad Hoc Committee or CASJ is not capable of being represented as an organization separate from its individual members.

12. Even if the Six Law Firms had the authority of the Law Firm Clients to enter into a retention agreement on behalf of a group or association entitled the Ad Hoc Committee or CASJ, it is

---

[6] See Andrews & Thornton/ASK Boy Scouts of America—Attorney-Client Agreement ¶2. See also Slater Retainer Agreement at p. 2 (attorneys may "use or associate other attorneys *in the representation of the aforesaid claims of the Client*") (emphasis added); the AIS law firms' Professional Employment Agreement, ¶1 (granting the attorneys "the right to associate with other law firms *in the prosecution of the claim*") (emphasis added).

my opinion that Brown Rudnick could not validly represent this group or association as an "organization" or "entity" separate from its individual members, the Law Firm Clients.

a.  Unlike Official Committees, which are appointed by the court and typically adopt a structured form of decision-making, ad hoc committees in bankruptcy are voluntary associations of creditors that are typically unstructured.[7] The individual members act collectively as a group, sharing expenses such as legal fees. If a single law firm represents the group, that law firm is generally understood to be engaging in a joint representation of the individual members, rather than a single representation of the committee as a whole.[8] In my opinion, an informal group of approximately 12,000 members that has no agreed-upon decision-making structure is not capable of being represented as an organization separate from its individual members.

b.  Rule 1.13(a) of the Model Rules of Professional Conduct provides that "[a] lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents."[9] The rule is most commonly applied to the representation of organizations that are legal entities, such as a corporation or partnership, that "cannot act except through its officers, directors, employees, shareholders and other constituents."[10]  (Emphasis added.) Comment [1] to Rule 1.13 states that the rule also applies to "unincorporated associations," but case law has generally limited that term to

---

[7] See Robert J. Rosenberg, et al, Ad Hoc Committees and Other (Unofficial) Creditor Groups: Management, Disclosure and Ethical Issues, 080403 American Bankruptcy Institute 267 (April 2008).

[8] Id. Although these authors assume that the attorney's clients are the individual members of the committee, rather than "the committee as a whole," they acknowledge that a prior article took the contrary position. Id. at n. 33 (citing Evan D. Faschen & Kurt A. Mayr, Ad Hoc Committees and the Misuse of Bankruptcy Rule 2019, 16 Journal of Bankruptcy Law & Practice 992 (Dec. 2007)). That prior article, however, cited no authority for the proposition that an attorney can lawfully represent an ad hoc committee as an organization or entity separate from its members, nor did it address whether or how such a committee can be represented as a separate client in the absence of an agreed-upon decision-making structure.

[9] ABA Model Rules of Professional Conduct, Rule 1.13(a).

[10] Id. at cmt [1].

trade associations, labor unions, governmental units and other types of formal associations that are not corporations.[11]

c.   There is almost no authority for treating other informal groups as organizations entitled to entity status under Rule 1.13(a). There are a few cases recognizing the retroactive application of entity status to a group of founders of a corporation or partnership, but these cases only apply when an entity with formal legal status comes into being.[12] In addition, there are a few commentators who support granting organizational client status to some informal groups, but even they concede that this would require "appropriate documentation and advance agreement," including designating a "duly authorized constituent" who can direct the lawyer.[13]

d.   I have seen no evidence that the members of the Ad Hoc Committee or CASJ have agreed to act as a unit and to reach collective decisions or that the members have agreed upon an "established chain of command." The Amended 2019 Statement states that the Coalition has an "Advisory Board," consisting of 6 members, which "was created to participate in meetings of the Coalition and assist in deliberation concerning actions taken by the Coalition."[14] But this statement provides no indication of how the Advisory Board was created, how its members were selected, or whether or how the Advisory Board members (or anyone else) can authorize the Coalition to take any action. The

---

[11] See 1 Geoffrey C. Hazard, Jr. et al, The Law of Lawyering 18-16 ((2016-1 Supp.) (Rule 1.13 applies to labor unions, unincorporated associations, governmental units and "other formal organizations with established chains of command").

[12] See Nancy J. Moore, Forming Start-Up Companies: Who's My Client? 88 Ford. L. Rev. 1699, 1707-1715 (2020) (describing and criticizing two court decisions applying retroactive entity status). There is also a state ethics opinion asserting that a lawyer can prospectively represent an entity that has not yet been formed, but the newly formed entity must formally ratify the corporation's pre-incorporation act of retaining the lawyer to represent it. See id. at 1715-1718 (describing and criticizing Arizona Ethics Opinion 02-06).

[13] Hazard et al, supra, at 18-16 to 18-18 (illustrating how "an informal 'entity'" retains counsel).

[14] See Objection of the Tort Claimants' Committee to Motion of the Coalition of Abused Scouts for Justice to Participate in the Mediation at p. 7 (quoting Amended 2019 statement).

Representative State Court Counsel Communication to Clients Seeking Consent of Coalition Member-client's Representation by the Coalition similarly says nothing about how the Coalition will decide how to instruct Brown Rudnick in its negotiations with the BSA; indeed, it does not even mention the Advisory Board.

e.   In the absence of an "established chain of command," or at least a designation of the group's "duly authorized constituent," there is no one with the authority to direct Brown Rudnick in representing the Ad Hoc Committee or CASJ in its negotiations with the BSA or the insurers. Perhaps in recognition of this lack of an established decision-making structure within the Ad Hoc Committee or CASJ, the Brown Rudnick Engagement letter provides that "[t]he Firm shall not act on behalf of the Ad Hoc Committee in a manner that is contrary to any direction we receive from the Law Firms," thereby establishing that only the Six Law Firms have the authority to direct Brown Rudnick. Even if the Six Law Firms were authorized to direct Brown Rudnick in its representation of the Ad Hoc Committee or CASJ (which they are not), looking to the Six Law Firms for direction is no substitute for an established decision-making structure within the Ad Hoc Committee or CASJ: a client may, at any time, revoke authority it has given to an attorney to act on its behalf,[15] but there is no one can act on behalf of the Ad Hoc Committee or CASJ to revoke any authority granted to the Six Law Firms (or to Brown Rudnick).

13. For the reasons set forth in paragraph 12, it is my opinion that neither the Ad Hoc Committee nor CASJ is a group, association, or entity capable of being represented as an organization under Rule 1.13(a).

---

[15] See, e.g., ABA Model Rules of Professional Conduct, Rule 1.2 cmt [3] ("At the outset of a representation, the client may authorize the lawyer to take specific action on the client's behalf without further consultation….The client may, however, revoke such authority at any time.").

II.    <u>Brown Rudnick has not established an attorney-client relationship</u>

<u>with the individual Law Firm Clients</u>

14. Although the Brown Rudnick Engagement Letter says that the client is the Ad Hoc

Committee, and not any individual member of the Ad Hoc Committee, elsewhere Brown

Rudnick has asserted that it is appearing on behalf of the individual members themselves,[16]

that is, the Law Firm Clients. I have seen no evidence that the approximately 12,000 Law

Firm Clients have agreed to retain Brown Rudnick to represent them in their individual

claims. As set forth earlier in paragraphs 10-11, the three engagement letters may have

authorized the respective law firms to associate with other law firms, but that could only

mean associating with other law firms as "co-counsel," that is, associating with other law

firms that would assist in the representation of the retaining clients' themselves, not

associating with lawyers who were simultaneously representing other individuals with actual

or potentially conflicting interests.

15. Even if the approximately 12,000 Law Firm Clients had consented to being represented by

Brown Rudnick, that representation would be improper because it violates Model Rule 1.7

governing conflicts of interest. Rule 1.7  provides that a concurrent conflict exists whenever

"there is a significant risk that the representation of one or more clients will be materially

limited by the lawyer's responsibilities to another client…."[17] Brown Rudnick's ability to

diligently and loyally represent each of the 12,000 Law Firm Clients is undoubtedly limited

by its duty to consider the individual interests of *all* of the other Law Firm Clients, given the

inevitable differences in the nature and size of their claims, as well as their different goals in

---

[16] See Objection of the Tort Claimants' Committee to Motion of the Coalition of Abused Scouts for Justice to
Participate in the Mediation at p. 7 (quoting Amended 2019 Statement), 10-11 (quoting Brown Rudnick statements
at Aug. 31, 2020 Hearing).
[17] Model Rule 1.7(a)(2).

the settlement negotiations. Most importantly, these differences will inevitably surface in determining how any settlement proceeds will be allocated among all of the claimants. Although individual clients retain the right to accept or reject any settlement offer,[18] Brown Rudnick, if allowed to participate in the Mediation, will play a significant role in determining what offers will be made to each of the Law Firm Clients, which is a function in part of allocating the total proceeds among the claimants. Each of the approximately 12,000 Law Firm Clients has an interest in the size of their individual offers, and their individual interests are necessarily different.

16.   Rule 1.7 does not prohibit the representation of clients with conflicting interests in all circumstances. Having large numbers of clients in mass torts cases provides a law firm with the resources and leverage to enhance the total amount of recovery on behalf of the group. However, because of the risks inherent in the representation of conflicting interests, Rule 1.7 requires the law firm to determine that it can "provide competent and diligent representation to each client,"[19] and then that it obtain the "informed consent [of each affected client], confirmed in writing," [20]

17.   Comment [18] to Rule 1.7 explains that "[i]nformed consent requires that each affected client be aware of the relevant circumstances of the material and reasonably foreseeable ways that the conflict could have adverse effects on the interests of that client."  In the context of mass tort plaintiffs' representation, informed consent requires that the clients be informed

> that the lawyer represents a large number of similarly situated plaintiffs and "that such collective representation offers a number of advantages that benefit the plaintiffs as a group, but may involve trade-offs that do not work to the advantage of each plaintiff individually." The attorney should further

---

[18] The Slater Retainer Agreement provides that "[t]he Client hereby further agrees not to settle this action in any manner without the attorneys' written consent"; however, his provision is clearly unethical. See infra at ¶ 21.
[19] Rule 1.7(b)(1).
[20] Rule 1.7(b)(4).

advise that "[p]otential conflicts may arise between group interests and the client's individual interests, and that the lawyer intends to resolve such conflicts in favor of pursuing group interests." [In addition] an agreement should explain "the types of inter-plaintiff conflicts that may arise during the litigation."[21]

18. I have seen no evidence that the Law Firm Clients consented (either confirmed in writing or otherwise) to Brown Rudnick's conflicts of interest.[22] Nor have I seen any evidence that the Law Firm Clients were informed of "the relevant circumstances and of the material and reasonably foreseeable ways that the conflict could have adverse effects on the interests of that client," as Rule 1.7 requires.

III.    There are ethical improprieties in the retention agreements between the Law Firm Clients and the Six Law Firms

19. It is my understanding that the three law firm groups---the AIS law firms, Slater, and the Andrews & Thornton/AK law firms---each represents thousands of individuals with sexual abuse claims against the BSA. Despite this mass representation, two of the three engagement letters do not even acknowledge the existence of conflicts of interest. The third engagement letter acknowledges the existence of a conflict of interest and requires the client to "waive[] any conflict of interest," but provides no information as to the nature or possible consequences of such conflict.

a. As set forth in paragraph 16 supra, Model Rule 1.7 provides that a concurrent conflict exists whenever "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client…."  For the

---

[21] Nancy J. Moore, Ethical Issues in Mass Tort Plaintiffs' Representation: Beyond the Aggregate Settlement Rule, 81 Ford. L. Rev. 3233 (2013) (quoting Howard Erichson, Beyond the Class Action: Lawyer Loyalty and Client Autonomy in Non-class Collective Representation, 2003 U. Chi. Legal F. 519, 562-563)).

[22] Of course, it is also the case that each of the Six Law Firms are also representing multiple clients with conflicting interests, and I have seen no evidence that they obtained their clients' consent to such conflicts See infra at ¶ 19.

same reasons set forth in paragraph 16 with respect to Brown Rudnick, the ability of each

of these law firms to diligently and loyally represent each of its several thousand Law

Firm Clients is undoubtedly limited by its duty to consider the individual interests of all

of its other clients, whose interests in determining what individual offers will be made in

any settlement will necessarily be different. As a result, it is my opinion that each of the

Six Law Firms were representing clients with conflicts of interest under Rule 1.7.

b.  As further set forth in paragraph 17 supra, Rule 1.7 does not prohibit the representation of

clients with conflicting interests in all circumstances; however, at the very least, "each

affected client" must give "informed consent, confirmed in writing." Neither the AIS law

firms' Professional Employment Agreement nor the Slater Retainer Agreement even

mention conflicts of interest. As a result, it is my opinion that those attorneys clearly

violated their obligations under Rule 1.7.

c.  The Andrews & Thornton/ASK law firms' Boy Scouts of America---Attorney-Client

Agreement contains the following paragraph:

> 11.  Conflict of Interest: Representation of Other Individual Claimants.
> Firms represent other individuals whose claims may be pursued in
> bankruptcy. By its nature, the funds available to claimants in a bankruptcy
> will be limited, and because the Firms could be representing multiple
> parties with respect to multiple claims in that bankruptcy, there is a
> conflict of interest. By signing this agreement, Client waives any conflict
> of interest.

As set forth in paragraph 17 supra, Comment [18] to Rule 1.7 explains that in the context

of a conflict of interest under that rule, "[i]nformed consent requires that each affected

client be aware of the relevant circumstances and of the material and reasonably

foreseeable ways that the conflict could have adverse effects on the interests of that

client." Paragraph 11 of the Andrews & Thornton/ASK law firms engagement letter fails

to provide any information about the nature of the conflict or the ways in which it could have adverse effects on the clients' interests. In particular, it fails to explain the difference between representing a collective and representing an individual, including the "tradeoffs that do not work to the advantage of each plaintiff individually," and the lawyer's intent to resolve differences between group interests and the client's individual interests "in favor of pursuing group interest." These differences include likely differences in the nature and size of the individual clients' claims and the inability of the law firms to advocate in settlement negotiations for settlement allocations tailored to meet the best interest of each of its clients. As a result, it is my opinion that the Andrews & Thornton/ASK lawyer clearly violated their obligations under Rule 1.7.

20. The Brown Rudnick Engagement Agreement provides that Brown Rudnick will charge its Standard Hourly Fees," including standard hourly rates of $1,000 and $1,405. The Engagement Agreement also provides the Six Law Firms are "jointly and severally responsible for payment of [its] fees, [and related costs and expenses]," which are "payable monthly from the Law Firms" and "not from the individual members of the Ad Hoc Committee." But the Engagement Agreement is silent on whether and how the Six Law Firms will pass along the cost of Brown Rudnick's fees and expenses to the individual Law Firm Clients. After all, each of the Six Law Firms purported to sign "on behalf of their respective Law Firm clients" and to "bind the Law Firm Clients to the terms hereto."  The three engagement letters I have reviewed do not clarify whether and how Brown Rudnick's fees and expenses will ultimately be paid by the Law Firm Clients.

a. The Boy Scouts of America—Attorney-Client Agreement prepared by the Andrews & Thornton/ASK LLP law firms states in paragraph 2, entitled Association of Counsel, that

when the Firms "associate co-counsel," such co-counsel will share in the contingent fees contemplated in the contract, "with the express understanding that associating with co-counsel will NOT increase the fees set forth below." But as explained in paragraphs 10-11 above, Brown Rudnick is not performing in the role of co-counsel assisting in representation of the individual clients of the Andrews & Thornton/ASK LLP law firms. Thus, it is possible that these firms will characterize Brown Rudnick's hourly fees and expenses as "expenses associated with the prosecution of client's claim" under paragraph 8, which the attorneys would advance and then "be payable out of the Client's share of any recovery and will not affect the contingency rate or fees due to the Firms." In my opinion, any attempt to do so would be dishonest and in violation of Model Rule 8.4(c), which prohibits a lawyer from engaging in conduct involving dishonesty. Such an attempt would be dishonest because the law firms would be charging the clients for Brown Rudnick's "legal fees," and the firms had represented that associating another lawyer would not result in an increase in "legal fees." It is further my opinion that any such attempt would also violate Model Rule 1.5(b), which requires that "the basis or rate of the fees and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation." If the Law Firm Clients are responsible for paying Brown Rudnick's legal fees, in addition to their own lawyers' legal fees, then it is my opinion that the Andrews & Thornton/ASK LLP law firms were required to communicate the basis and rate of Brown Rudnick's fees and obtain their clients' agreement to pay those fees at the time Brown Rudnick was retained.

b. Even if the Andrews & Thornton/ASK LLP law firms intend to reimburse themselves for Brown Rudnick legal fees and expenses out of their own contingent fees, Model Rule 1.5(e) provides that "[a] division of a fee between lawyers who are not in the same firm may be made only if …the client agrees to the arrangement, including the share each lawyer will receive, and the agreement is confirmed in writing."[23] By failing to provide this information, these lawyers violated their obligations to their Law Firm Clients under Model Rule 1.5(e).

c. The Slater Retainer Agreement provides that "attorneys may, at their own expense, use or associate other attorneys in the representation of the aforesaid claims of the Client" and that "[a]ttorney may participate in the division of fees in this case and assume joint responsibility for the representation of the client either in the event the Attorney retains associate counsel or that the client later chooses new counsel, provided that the total fee to the client does not increase as a result of the division of fees and the attorneys involved have agreed to the division of fees and assumption of joint responsibility." As with the Andrews & Thornton/ASK LLP law firms' engagement letter, this provision appears to say that "associate counsel" fees will not add to the total fee under the agreement; however, "associate counsel," like "co-counsel," usually means an attorney assisting in the representation of Slater's Law Firm Clients, and Brown Rudnick is not performing in that role; therefore, Slater may attempt to characterize Brown Rudnick's hourly fees and expenses as part of the "costs and expenses of the action," which if advanced by the firm, will be deducted from the clients' share of any recovery. For the reasons set forth in

---

[23] Model Rule 1.5(e)(2). The rule also requires that "the division is in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation" and that "the total fee is reasonable." Id. at 1.5(e)(1) and (3). Brown Rudnick clearly did not assume joint responsibility for representing the Law Firm Clients, and it is unclear whether the division of fees would be in proportion to the work performed by each set of lawyers.

subparagraphs (b) and (c) above, it is my opinion that any such attempt would violate the Slater lawyers' obligations under Rule 8.4(c) and 1.5(b).

d.  Even if Slater intends to reimburse itself for Brown Rudnick's legal fees and expenses out of its own contingent fees, for the reasons set forth in subparagraph (c) above, it is my opinion that the Slater lawyers violated their obligations to their Law Firm Clients under Rule 1.5(e) by failing to advise their clients of the arrangement..

e.  The Professional Employment Agreement prepared by the AIS law firms provides only that the law firms have "the right to associate with other law firms in the prosecution of the claim." (Paragraph I.) It says nothing about how the fees and expenses of such an associated firm will be paid. The AIS law firms may attempt to charge Brown Rudnick's legal fees and expenses as "expenses incurred or advanced by said attorneys in handling such claims on [the client's] behalf." For the reasons set forth in subparagraphs (b) and (c) above, it is my opinion that any such attempt to do so would violate the AIS law firms lawyers' obligations under Rule 8.4(c) and 1.5(b).

f.  Even if the AIS law firms intend to reimburse themselves for Brown Rudnick's legal fees and expenses out of their own contingent fees, for the reasons set forth in subparagraph (c) above, it is my opinion that the law firm lawyers violated their obligations to their Law Firm Clients under Rule 1.5(e) by failing to advise their clients of the arrangement..

21. The Slater Retainer Agreement contains the following statement: "The Client hereby further agrees not to settle this action in any manner without the attorneys' written consent." This provision clearly violates Model Rule 1.2(a), which provides that "[a] lawyer shall abide by a client's decision whether to settle a matter." Comment [3] to Rule 1.2 states that "the client may authorize the lawyer to take specific action on the client's behalf without further

consultation," but that the "client may, however, revoke such authority at any time." By requiring the lawyer's written consent before its clients agree to accept a settlement offer, the Slater lawyers clearly violated their obligations under Rule 1.2(a).

22. The Slater Retainer Agreement does not purport to limit the representation to lawsuits against the BSA or to claims against the BSA in bankruptcy proceedings. If the Slater firm intends to limit its representation to claims against the BSA, and will not investigate or bring claims against other parties outside the bankruptcy proceeding, then the Slater lawyers are violating their obligations under Model Rule 1.2(c) to obtain the clients' "informed consent" to any limitation on the scope of the representation.

23. The AIS law firms' Professional Employment Agreement does limit the scope of the representation. It provides in paragraph II that "[by] signing this Engagement Agreement, you understand and agree that AIS Counsel is committing to represent you **only** in connection with the February 18, 2020 bankruptcy filing, or a related global resolution of sex abuse claims against BSA." As set forth above, however, Rule 1.2(c) requires that the clients give their "informed consent" to any limitation on the representation. Rule 1.0(e) defines that term to denote communication by the lawyer of "adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." The Professional Employment agreement provides no evidence that the clients gave their informed consent to the limitation on the scope of the representation.[24]

---

[24] For an example of the type of information that was required to be communicated under this Rule, see, e.g., the Andrews & Thornton/ASK Boy Scouts of America—Attorney-Client Agreement, ¶1 (explaining that firm will not be bringing claims against "parents, volunteers, outside organizations, or other individuals" that the statute of limitations will be running on those claims, and that to preserve any such claims, the client must immediately hire separate counsel).

24. The AIS law firms' Professional Employment Agreement uses letterhead that prominently displays at the top of the page the designation "AIS" and "Abused in Scouting." Underneath this heading, in much smaller font, are the names "Eisenberg Rothweiler," "Kosnoff Law" and "AVA Law Group," with a geographical designation under each such name. The geographical designation under Kosnoff Law is "San Juan, PR." For the reasons set forth below, it is my opinion that the use of this letterhead is false and misleading, in violation of Model Rule 7.1.

a. Rule 7.1 provides that "[a] lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it contains a material representation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading." Comment [5] to that rule states that "[f]irm names, letterhead and professional designations are communications concerning a lawyer's services" governed by the rule. Comment [7] states that "[l]awyers may not imply or hold themselves out as practicing together when they are not a firm…because to do so would be false and misleading."

b. In my opinion, the "AIS" and "Abused in Scouting" designations at the top of the letterhead constitute a false or misleading statement by communicating that there is a single law firm using that trade name, whereas in fact there are three separate law firms. Although paragraphs I and III mention Eisenberg Rothweiler, Kosnoff Law, and AVA Law Group as "attorneys-at-law", these paragraphs do not explain that these are three separate law firms (as opposed to separate offices of a single organization entitled "AIS" or "Abused in Scouting"), nor do they explain whether AIS or Abused in Scouting is a group or an entity separate from the three named "attorneys-at-law" or what the

relationship is between these "attorneys-at-law" and AIS or Abused in Scouting.[25] As a result, it is my opinion that the AIS group lawyers are violating Rule 7.1  in using this letterhead.

c.   The designations "Kosnoff Law" and "San Juan PR" clearly represent that there is a lawyer or lawyers who are actively practicing law with an office in San Juan, Puerto Rico. On visiting the Kosnoff Law website, however, there are no lawyers designated other than Tim Kosnoff, who is described as a former practicing lawyer who has "transitioned to a new phase of his celebrated career" and who "is now available to serve as a consultant, expert witness, mediator, lecturer and media commentator."[26] There is no office listed in San Juan, Puerto Rico; and the only "contact" location indicated is an address in Houston, Texas.[27] There is no indication whether Tim Kosnoff is currently licensed to practice or, if so, where he is licensed to practice. In my opinion, the designations "Kosnoff Law" and "San Juan PR" are false and or misleading and that not only Tim Kosnoff, but also the other lawyers in the AIS law firms are violating Rule 7.1 by using the AIS and Abused in Scouting letterhead.

---

[25] I visited the Abused in Scouting website and discovered that there no explanation of the nature of the entity or group called "AIS" or "Abused in Scouting," and that none of the three law firms is mentioned in the website, except in a section entitled "Attorney Advertisement," which states that the AVA Law Group prepared the contents of the website. See https://abusedinscouting.com/about-us/ . In fact, the website represents that Abused in Scouting is an organization that victims may "join," but when s visitor to the website clicks for information on joining, the visitor is directed to a page that provides for a "no obligation case evaluation," presumably by one of the three law firms in anticipation of offering an attorney-client engagement agreement Id. It is my opinion that this website clearly contains false and/or misleading communications about the lawyers' services, in violation of Delaware Rule 7.1.

[26] https://kosnoff.com/about-us/

[27] Id.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 7, 2020.

_____

Nancy J. Moore

## Exhibit 1

### List of Documents Reviewed[1]

1. Brown Rudnick Confirmation of Engagement by the Ad Hoc Committee of Boy Scouts of America Sexual Abuse Survivors

2. Blank Rome Confirmation of Engagement by Coalition of Abused Scouts for Justice

3. "Exemplar" Abused in Scouting Professional Employment Agreement

4. "Exemplar" Andrews & Thornton and ASK LLP Attorney-Client Agreement

5. "Exemplar" Slater Slate Schulman LLP Retainer Agreement

6. Verified Statement of Coalition of Abused Scouts for Justice Pursuant to Bankruptcy Rule 2019 (Dkt. 1053)

7. Amended Verified Statement of Coalition of Abused Scouts for Justice Pursuant to Bankruptcy Rule 2019 (Dkt. 1106)

8. Motion of the Coalition of Abused Scouts for Justice for an Order (I) Authorizing the Coalition to File Under Seal Exhibit A to the Amended 2019 Statement and (II) Approving the Sufficiency of the Amended 2019 Statement (Dkt. 1144)

9. Motion of the Coalition of Abused Scouts for Justice to Participate In the Mediation (Dkt. 1161)

10. Objection of the tort Claimants' Committee to Motion of the Coalition of Abused Scouts for Century and Hartford's Motion to Compel the Attorneys Representing the Entity Calling Itself the "Coalition" to Submit the Disclosures Required By Federal Rule of Bankruptcy Procedure 2019 (Dkt. 1164)

11. Objection of the Coalition of Abused Scouts for Justice to Century and Hartford's Motion to Compel the Attorneys Representing the Entity Calling Itself the "Coalition" to Submit the Disclosures Required By Federal Rule of Bankruptcy Procedure 2019 (Dkt. 1225)

12. Justice for an Order (I) Authorizing the Coalition to File Under Seal Exhibit A to the Amended 2019 Statement and (II) Approving the Sufficiency of the Amended 2019 Statement (Dkt. 1227)

13. Objection of the tort Claimants' Committee to Motion of the Coalition of Abused Scouts for Justice to Participate in the Mediation (Dkt. 1229)

14. Objection of Century and Other Listed Insurers to the Motion Filed By the Entity Calling Itself the Coalition of Abused Scouts for Justice to Participate In the Mediation (Dkt. 1230)

15. Omnibus Reply of the Coalition of Abused Scouts for Justice to Objections to (A) Motion for an Order (I) Authorizing the Coalition to File Under Seal Exhibit A to the Amended 2019 Statement and (II) Approving the Sufficiency of the Amended 2019 Statement, and (B) Motion of the Coalition to Participate In the Mediation (Dkt. 1257)

---

[1] All docket citations refer to the docket in *In re Boy Scouts of America*, No. 20-10343 (Bankr. D. Del.).

16. Exhibit 1 to Omnibus Reply of the Coalition of Abused Scouts for Justice to Objections to (A) Motion for an Order (I) Authorizing the Coalition to File Under Seal Exhibit A to the Amended 2019 Statement and (II) Approving the Sufficiency of the Amended 2019 Statement, and (B) Motion of the Coalition to Participate In the Mediation (Dkt. 1257-1)

17. Century's Joinder In the Objection of the United States Trustee [D.I. 1223] to the Motion of the Entity Calling Itself the "Coalition" Filing Under Seal All the Exhibits to Its Motion and Amended 2019 Statement [D.I. 1144] (Dkt. 1261)

18. Century's Supplemental Submission in Support of Its Joinder to the Debtors' Motion [Dkt. 1145] Century's Separate Request for Relief, Objection to the Coalition's Motion That Its Rule 2019 Statement Be Accepted [Dkt. 1190] Objection to the Coalition's Motion to Be Deemed a Mediation Party (Dkt. 1266)

19. Debtors' Omnibus Response to the Motions of the Coalition of Abused Scouts for Justice (A) for an Order (I) Authorizing the Coalition to File Under Seal Exhibit A to the Amended 2019 Statement and (II) Approving the Sufficiency of the Amended 2019 Statement and (B) to Participate In the Mediation (Dkt. 1269-1)

20. American Bar Association, *No More Ad Lib: The Nuts & Bolts of Ad Hoc Bankruptcy Committees* (Dec. 17, 2014), https://www.americanbar.org/groups/business_law/publications/blt/2014/12/02_kevane/

21. American Bankruptcy Institute, *Ad Hoc Committees and Other (Unofficial) Creditor Groups: Management, Disclosure and Ethical Issues*, 080403 ABI-CLE 267 (2008)

22. Evan D. Flaschen & Kurt A. Mayr, *Ad Hoc Committees and the Misuse of Bankruptcy Rule 2019*, 16 J. Bankr. L. & Prac. 6 Art. 3 (Dec. 2007)

EXHIBIT 2

**NANCY J. MOORE**
Professor of Law and Nancy Barton Scholar
Boston University School of Law
nmoore@bu.edu
617-358-0501

EDUCATION:

--------Columbia Law School

      Degree:  J.D. l973
      Member of the Board of Editors, Columbia Law Review
      Harlan Fiske Stone Scholar
      Class of 1912 Prize

--------Smith College

      Degree: B.A. 1970, magna cum laude
      Major:  English Honors
      Honors: Phi Beta Kappa

EMPLOYMENT:

----------January 1, 1999 to present:

      Professor of Law and Nancy Barton Scholar
      Boston University School of Law
      765 Commonwealth Avenue
      Boston, MA 02215

      Subjects taught: Professional Responsibility, Lawyering in the 21st Century, Torts.

----------July 1, 1989 to December 31, 1998:

      Professor of Law
      Rutgers School of Law - Camden
      Fifth and Penn Streets
      Camden, New Jersey 08102

      (Asst. Prof. of Law, 1976-1980; Assoc. Prof. of Law with tenure, 1980-1989: Prof. of Law, 1989-1998; 1994-1997: Assoc. Dean for Academic Affairs)

      Subjects taught include Professional Responsibility, Law and Biomedical Ethics, Torts, Evidence, and Seminar in Professional Ethics.

----------Spring, 1987:  Visiting Lecturer
                        University of Graz
                        Graz, Austria

----------Summer, 1988: Visiting Associate Professor of Law
                        University of North Carolina at Chapel Hill
                        Chapel Hill, North Carolina

----------1974-1976: Assistant Attorney General. Commonwealth of Pennsylvania, Office of the
        Special Prosecutor. Philadelphia, PA.

----------1973-1974: Associate. Debevoise, Plimpton, Lyons & Gates (now Debevoise &
        Plimpton). New York, NY.


PUBLICATIONS:

----------PROFESSIONAL RESPONSIBILITY FOR BUSINESS LAWYERS (casebook under
        contract with WoltersKluwer; expected publication 2022);

----------"Forming Start-up Companies: Who's My Client?" 88 Fordham L. Rev. 1699(invitational
        symposium; expected publication 2020)

----------"Restating Intentional Torts: Problems of Process and Substance in the ALI's Third
        Restatement of Torts," 10 J. Tort Law 1515 (2017);

----------"The Future of Law as a Profession," 20 Chapman L. Rev. 255 (2017)
          (invitational symposium on future of the legal profession)

----------"Lawyering in the Regulatory State: Foreword," 84 *Fordham L. Rev.* 1811 (2016);

----------"Why is There No Clear Doctrine of Informed Consent for Lawyers?" 47 *Toledo L. Rev.*
        133 (2015);

----------"Financial Rewards for Whistleblowing Lawyers," 56 *B.C. L. Rev.* 1697 (2015);

----------"Ethical Issues in Mass Torts Plaintiffs' Representation: Beyond the Aggregate
        Settlement Rule," 81 *Fordham L. Rev.* 3233 (2013);

----------"Implications of Globalization for the Professional Status of Lawyers in the US and
        Elsewhere," 40 *Fordham Urban L. J.* 217 ( 2012);

----------"Who Will Regulate Class Action Lawyers?", 44 *Loy. U Chi. L. J.* 577 (2012);

2

----------"Regulating Conflicts of Interest in Global Law Firms: Peace in Our Time?" 80 *Fordham. L. Rev*. 2541 (2012) (co-authored with Janine Griffiths-Baker);

----------"Intent and Consent in the Tort of Battery: Confusion and Controversy," 61 *Amer. U. L. Rev*. 1585 (2012), reprinted in 63 Defense L. J. 65 (May 2014);

----------"The Complexities of Lawyer Ethics Code Drafting: The Contributions of Professor Fred Zacharias," 48 *San Diego L. Rev*. 335 (2011)

----------"The Absence of Legal Ethics in the ALI's Principles of Aggregate Litigation: A Missed Opportunity—And More," 79 *Geo. Wash. L. Rev.* 717 (2011)

----------"Is the Appearance of Impropriety an Appropriate Standard for Disciplining Judges in the Twenty-First Century?" 41 *Loy. U Chi. L. J.* 285 (2010);

----------"Mens Rea Standards in Lawyer Disciplinary Codes," 23 *Geo. J. Legal Ethics* 1 (2010);

----------"Choice of Law for Professional Responsibility Issues in Aggregate Litigation," 14 *Roger Williams L. Rev*. 73 (2009) (symposium issue);

----------"Litigators and the Public: The Evolving Role of Ethics Codes," in *Litigation Ethics: Celebrating the Canons Centennial.* L.J. Fox, S.R. Martyn, & A. S. Pollis, eds. (ABA Section of Litigation 2009);

----------"The ALI's Draft Proposal to Bypass the Aggregate Settlement Rule: Do Mass Tort Clients Need (or Want) Group Decision-making?" 57 *DePaul L. Rev*. 395 (2008);

----------"*Mr. Prinzo's Breakthrough* and the Limits of Confidentiality," 51 *St. Louis L.J*. 1059 (Summer 2007);

----------"Informed Consent in the Practice of Law," in 4 Encyclopedia of Philosophy 680 (2d ed. 2006);

----------"Regulating Law Firm Conflicts in the 21[st] Century: Implications of the Globalization of Legal Services and the Growth of the 'Mega Firm,'" 18 *Georgetown J. Legal Ethics* 521 (2005);

----------"Who Should Regulate Class Action Lawyers?" 2003 *U. of Illinois Law Review* 1477;

----------Regulating Self-Referrals and Other Physician Conflicts of Interest," 15 *Healthcare Ethics Forum* 134 (2003);

----------"'In the Interests of Justice': Balancing Client Loyalty and the Public Good in the

3

Twenty-First Century," 70 *Fordham Law Review* 1775 (2002);

----------"Lawyer Ethics Code Drafting in the Twenty-First Century," 30 *Hofstra Law Review* 923
(2002)

----------"Foreward: Lawyering for the Middle Class," 70 *Fordham Law Review* 623 (2001);

----------"What Doctors Can Learn From Lawyers About Conflicts of Interest," 81 *BU Law
Review* 445 (April 2001);

----------"Ethics Matters, Too: The Significance of Professional Regulation of Attorney Fees and
Costs in Mass Tort Litigation—A Response to Judith Resnik," 148 *University of
Pennsylvania Law Review* 2209 (2000);

----------"The Ethical Role and Responsibilities of a Lawyer-Ethicist: The Case of the
Independent Counsel's Independent Counsel," 68 *Fordham Law Review* 771 (1999)
(symposium: ethics issues raised by Independent Counsel investigation of Pres. Clinton);

--------"The Case Against Changing the Aggregate Settlement Rule in Mass Tort Lawsuits," 41
*South Texas Law Review* 149 (1999) (symposium on emerging professional responsibility
issues in litigation);

---------"Conflicts of Interest For In-House Counsel: Emerging Issues in the Expanding Role of
the Attorney-Employee," 39 *South Texas Law Review* 497 (1998);

---------"The Ethical Dilemmas of Insurance Defense Lawyers: Are Special Solutions Required?"
4 *Connecticut Insurance Law Journal* 259(1997);

----------"Ethical Issues in Third Party Payment: Beyond the Insurance Defense Paradigm,"
16 *Texas Review of Litigation* 586 (1997);

----------"Restating the Law of Lawyer Conflicts" 10 *Georgetown J. Legal Ethics* 541 (1997);

----------"Implications of *Circle Chevrolet* for Attorney Malpractice and Attorney Ethics," 28
*Rutgers L.J* 57 (1996);

---------"Conflicts of Interests in Representing Children," 64 *Fordham L. Rev.* 1819 (1996);

----------"Entrepreneurial Doctors and Lawyers: Regulating Business Activities in the Medical
and Legal Professions, in R. Spece and R. Shimm, eds., *Conflicts of Interest in Medical
Practice* (1995, Oxford University Press);

----------"Expanding Duties of Attorneys to 'Non-Clients': Reconceptualizing the Attorney-Client

4

Relationship in Entity Representation and Other Inherently Ambiguous Situations," 45 *S. Carolina L.Rev.* 659 (1994)

----------"Intra-Professional Warfare Between Prosecutors and Defense Attorneys: A Plea For an End to the Current Hostilities," 53 *U. Pitt. L.Rev.* 515 (1992)

----------"Professionalism: Rekindled, Reconsidered or Reformulated?" 19 *Cap. U.L. Rev.* 1121 (1990)

----------"The Usefulness of Ethical Codes," 1989 *Ann. Surv. Amer. Law* 7

----------"`Two Steps Forward, One Step Back:' An Analysis of New Jersey's Latest `Right-To-Die' Decisions," 19 *Rutgers Law Journal* 955 (1988);

----------"Professionalism Reconsidered," 1987 *ABF Res. J* 773;

----------"Commentary," 4 *Bus. & Prof. Ethics J*. 83 (1985) (essay reviewing article by Professor David Luban on equality of access to legal services);

--------- "Limits to Attorney-Client Confidentiality:  A Philosophically Informed' and Comparative Approach to Medical and Legal Ethics" 36 *Case Western Res. L. Rev.* 177 (1985-86);

---------"Conflicts of Interest in the Simultaneous Representation of Multiple Clients:  A Proposed Solution to the Current Confusion and Controversy," 61 *Tex. L. Rev.* 211 (1982);

---------"Disqualification of an Attorney Representing Multiple Witnesses Before a Grand Jury: Legal Ethics and the Stonewall Defense," 27 *UCLA Law Rev.* 1 (1979);

---------"Implications of the *Younger* Cases for the Availability of Federal Equitable Relief When No State Prosecution is Pending," 72 *Colum. L. Rev.* 874 (1972) (student note).

PRACTICE PUBLICATIONS:

----------"Ethical Issues in Transnational Legal Practice: the U.S. Lawyer Goes Abroad," 76 Bar Examiner 29(2007);

----------"Not Quite a Client," 90 ABAJ 50 (Jan. 2004);

----------"Sex with a Client: Adopt the ABA's Specific Prohibition," 19 GPSolo 37 (2002);

----------"Lawyer Ethics in a State of Flux: Revisions, Not Revolution," 88 ABAJ 48 (2002);

----------"Ethics Code Rework: Written Communications," 87 ABAJ 62 (2001);

----------ALI-ABA Committee on Continuing Professional Education, *A Practical Guide to Achieving Excellence in the Practice of Law* (1992)(Chief Reporter);

----------"Professional Liability of Lawyer to Clients and Non-Clients under United States Common Law," in Jonge Balie Congress 1991, *Bereopsaansprakelijkheid: Recht op een scheve schaats* 139 (W.E.J. Tjeenk Willink Azwolle 1991)(prepared for conference of Young Dutch Lawyers Organization in Noordwijk, The Netherlands).

FELLOWSHIPS AND GRANTS:

----------1988-1990: Director, N.J. Department of Higher Education Humanities Grant, "Introducing Ethics into the Core Curriculum of Undergraduate Legal Education";

----------1987-1990: Participant, N.J. Department of Higher Education Technological Grant, "AIDS:A Course in Science, Technology and Society" (one of three participants planning and team-teaching a required interdisciplinary undergraduate course);

----------1985-1986: Co-Director, N.J. Department of Higher Education Humanities Grant, "Humanistic Concerns in Legal and Medical Education" (introduction of law and medical ethics courses in law and medical schools; development of humanistic perspectives);

----------1983-1984: Fellow, Center for the Study of Values, University of Delaware.

PRESENTATION OF SCHOLARLY PAPERS:

-------Oct. 2019: "Forming Start-up Companies: Who's My Client?" Fordham Law Review Symposium on Ethical Issues for Corporate Lawyers. New York, NY

-------Oct. 2014:  "Financial Rewards for Whistleblowing Lawyers." Legal Ethics Scholars' Roundtable. New York, NY.

-------Oct. 2014: "Financial Rewards for Whistleblowing Lawyers." BU Faculty Workshop Series. Boston, NA.

--------Nov. 2012: "Ethical Issues in Mass Torts Plaintiffs' Representation: Beyond the Aggregate Settlement Rule." Fordham Law School Conference on Group Representation. New York, NY.

---------Apr. 2012: "Implications of Globalization for the Professional status of Lawyers in the United States and Elsewhere." Fordham Law School Conference on The Law: Business or Profession? The Continuing Relevance of Julius Henry Cohen for the Practice of Law in the Twenty-First Century." New York, NY.

---------Apr. 2012: "Who Will Regulate Class Action Lawyers?" The Future of Class Actions and its Alternatives. Loyola University Chicago Law Journal Conference, Chicago, IL.

----------Oct. 2011: "Regulating Global Law Firm Conflicts: Peace in Our Time." Fordham Law School Conference on Globalization and the Legal Profession. New York.

----------Oct. 2011: "Intent and Consent in the Law of Battery: Confusion and Controversy." BU Law Faculty Workshop. Boston, MA.

----------Mar. 2010: "The Absence of Legal Ethics in the ALI's Principles of the Law of Aggregate Litigation: A Missed Opportunity---and More." George Washington Law Review Symposium on Aggregate Ligation: Critical Perspectives. Wash. D.C.

----------May 2009: "Mens Rea Standards in Lawyer Disciplinary Codes." 36th ABA National Conference on Professional Responsibility. Chicago, IL.

----------Apr. 2009: "The Appearance of Impropriety: Is It an Appropriate Standard for Discipline of Judges in the Twenty-First Century?" The Judiciary in the Twenty-First Century. Loyola University Chicago Law Journal Conference. Chicago, IL.

----------Feb. 2009: "Mens Rea Standards in Lawyer Disciplinary Codes." Joint Program of Association of Professional Responsibility Lawyers and National Organization of Bar Counsel. ABA Midyear Meeting. Boston, MA.

----------Apr. 2007: "The ALI Draft Proposal to Bypass the Aggregate Rule." Clifford Symposium on Challenges to the Attorney/Client Relationship." DePaul University College of Law. Chicago, IL.

---------Apr. 2002: "Who Should Regulate Class Action Lawyers?" Symposium on Ethics 2000 and Beyond: Reform or Professional Responsibility as Usual? Univ. of Illinois, Champaign, IL.

---------Feb. 2002: "Who Should Regulate Class Action Lawyers?" Faculty Workshop, Rutgers School of Law, Camden, NJ.

----------Feb. 2001: "Conflicts of Interest in Patent Representation." Patenting Genomics and Proteomics. American Conference Institute. New York, NY.

----------Nov. 1999: "Ethics Matters, Too: A Response to Judith Resnik." Mass Torts: A Symposium sponsored by the David Berger Program on Complex Litigation and the University of Pennsylvania Law School in conjunction with the Advisory Committee of Civil Rules of the Judicial Conference of the United States. Philadelphia, PA.

----------Mar. 1999: "The Case Against Changing the Aggregate Settlement Rule in Mass Tort

Lawsuits." Symposium on Emerging Professional Responsibility Issues in Litigation sponsored by South Texas Law Review. Houston, Texas.

----------Sept. 1997: "Conflicts of Interest For In-House Counsel: Emerging Issues in the Expanding Role of the Attorney-Employee." Annual Ethics Symposium sponsored by the South Texas Law Review. Houston, Texas.

----------Feb. 1997: "Restating the Law of Lawyer Conflicts." Symposium on the Restatement of the Law Governing Lawyers sponsored by the Georgetown Journal of Legal Ethics. Georgetown University Law Center. Washington, D.C.

----------Feb. 1997: "Ethical Issues in Third Party Payment: Beyond the Insurance Defense Paradigm." Conflicts of Interest Symposium sponsored by University of Texas Review of Litigation and Texas Center for Ethics and Professionalism. Austin, Texas.

---------Jan. 1997: "The Ethical Dilemmas of Insurance Defense Lawyers:  Are Special Solutions Required?" Joint Session of AALS Sections on Insurance Law and Professional Responsibility. AALS Annual Meeting. Washington, D.C.

---------May 1996: "Implications of *Circle Chevrolet* for Attorney Malpractice and Attorney Ethics." Conference on the Entire Controversy Doctrine. Rutgers Law School. Camden, N.J.

----------Sept. 1992: "Elaborating Standards of Professional Conduct." Strategic Planning Session of the Law Society of Upper Ontario. Toronto, Ontario, Canada.

----------Feb., 1990: "Professionalism: Rekindled, Reconsidered or Reformulated?" Symposium on Legal Ethics. Capital University Law Center. Columbus, Ohio.

----------Sept. 1989: "The Usefulness of Ethical Codes." University of Texas Law School Faculty Seminar. Austin, Texas.

----------April, 1989: "The Usefulness of Ethical Codes." Symposium on "Legal Ethics: The Social Responsibility of  the Lawyer." NYU Annual Survey of American Law. NYU School of Law. New York, New York.

----------Oct. 1987: "The History and Present Status of the Right  of a Competent Patient to Refuse Life-Sustaining Medical  Treatment." Annual General Meeting of the American Society of Law and Medicine. Boston, Mass.

----------April, 1984: "Limits to Attorney-Client Confidentiality: A `Philosophically Informed' and Comparative Approach to Medical and Legal Ethics." Faculty Seminar. Center for the Study of Values. University of Delaware. Newark, Delaware.

PROFESSIONAL RECOGNITION AND ACTIVITIES:

8

----------Member, Multistate Professional Responsibility Examination Drafting Committee (member since 1991, chair 1995-2018);

----------Member, Warren G. Burger Prize Committee, American Inns of Court (since 2004);

----------Member, Advisers for the ALI, Restatement Third, Torts: Intentional Torts to Persons (2013-current);

----------Member, ABA Center for Professional Responsibility, Organizing Committee for CPR National Conference on Professional Responsibility (2012-2018);

----------Member, ABA Center for Professional Responsibility Strategic Planning Task Force (2017-2018)

----------Member, Ma. Sup. Jud. Ct. Committee on Review of the Code of Judicial Conduct (2012-2015);

----------Advisor to ALI-ABA Board of Directors Program Committee for Professional Responsibility (2006-2008) (2010-2011);

----------Member, ABA Center for Professional Responsibility Policy Implementation Committee (2002-2010);

----------Member, ALI Principles of Aggregate Litigation Members Consultative Group (2005-2009);

----------Member, Supreme Court of Rhode Island Committee to Review Rules of Professional Conduct (2002-2006);

----------Chief Reporter, ABA Commission on Evaluation of the Rules of Professional Conduct ("Ethics 2000") (Co-Reporter, 1997-1998; Chief Reporter, 1998-Aug. 2002);

----------Member, Advisers for the Restatement of the Law, Third, The Law Governing Lawyers (1989-2000); member, American Law Institute (elected 1992);

----------Chair, AALS Section on Professional Responsibility (1997-1998)(1987-1988);

----------Chair, Planning Committee for Fall 1998 AALS Workshop on Professional Responsibility;

----------Member, New Jersey Supreme Court Committee on Women in the Courts (1994-1998);

----------Reporter, ALI-ABA Practice Evaluation Project (1988-91)(drafted *How to Achieve Excellence in the Practice of Law*);

----------Member, ALI-ABA group reviewing standards for continuing legal education programs (1988-90);

----------Member, Planning Committee for Spring 1988 AALS- sponsored Workshop on Teaching of Professional Responsibility (1987-88);

----------Trustee, N.J. Citizen's Committee on Biomedical Ethics (1988-1991);

----------Member, Institutional Review Board/Committee for the Protection of Human Subjects, UMDNJ-School of Osteopathic Medicine (1987-89)

----------Lectures and Panel Discussions:

June 2018: "Mass actions" mean mass problems: How the ethics rules restrict lawyers handling multi-plaintiff claims." Organizer and moderator. CPR National Conference on Professional Responsibility. Louisville, KY.

June 2017: "Can a Lawyer Be 'Independent' in Investigating a Client's Misconduct?" Organizer and presenter. CPR National Conference on Professional Responsibility, Scholars' Roundtable. Organizer and presenter. St. Louis, MO.

June 2017: "A Difference of Opinion: Federal-State Conflict on Lawyer Ethics Matters." Co-organizer and panelist. CPR National Conference on Professional Responsibility. St. Louis, MO.

Mar. 2017: "Ethics Panel." Panelist. PLI 22nd Annual Consumer Financial Services Institute. New York, NY

July 2016:  "International Perspectives on the Business/Profession Dichotomy." Panelist. International Legal Ethics Conference VII. New York, NY.

June 2016: "Whistleblower Bounties: Is It Ethical for Lawyers to Seek Them?" CPR National Conference on Professional Responsibility. Philadelphia, PA.

May 2015: "Riding the Aggregate Settlement Bronco." Panel Organizer and Moderator. CPR National Conference of Professional Responsibility Lawyers. Denver, CO.

May 2015. Scholarship Roundtable. Organizer and Moderator. CPR National Conference of Professional Responsibility Lawyers. Denver, CO.

May 2013. "Ethical Issues for Lawyer Whistleblowers." Panel Organizer and Moderator. CPR National Conference of Professional Responsibility Lawyers. San Antonio, TX.

Apr. 2013. Response to Paper Presented by Prof. Ron Rotunda. Hofstra Law School Conference on the Ethical Infrastructure and Culture of Law Firms. Hempstead, NY.

Oct. 2012: "Corporate Lawyers as Whistleblowers." Co-presenter. LegalEd Center Webcast.

Feb. 2012: "Recent Developments in Aggregate Litigation." Panelist. Association of Professional Responsibility Lawyers Annual Meeting. New Orleans, LA.

Oct. 2011: "Legal Ethics in Pro Bono Practice." Panelist. Association of Pro Bono Counsel Annual Meeting. Boston, MA.

Dec. 2010: "The Future of Lawyers and Law Firms: An Ethics Perspective." Panelist. Second Annual FBA Hawaii Conference. Honolulu, HA

July 2010:"Ethics in U.S. Class Actions." Panelist. Stanford International Legal Ethics Conference. Palo Alto, CA.

April 2010: "The Future of Legal Ethics." Panelist. APRL's 20th Anniversary Celebration Conference. New Orleans, LA.

Aug. 2009: "The Ethics of Expert Witnesses: The Simon-Green Debate." Association of Professional Responsibility Lawyers. Chicago.

Apr. 2009: "Ethical Rules Applicable to Lawyers Representing Museums and Other Non-Profit Entities." Panel participant. Legal Issues in Museum Administration. Boston, MA.

Feb. 2009: "Strict Liability vs. Scienter---Filling the Mental-State Gaps in the Model Rules. Presenter and panel participant. Joint Program of Association of Professional Responsibility Lawyers/National Organization of Bar Counsel. Boston, MA.

Oct. 2008: "Developments in Ethics in Transactional Practice." ALI-ABA Program on Investment Management Basics." Boston, MA.

Apr. 2008:  "Litigators and the Public." Panel participant. ABA Section on Litigation's Celebrating the Canons Centennial. Washington, D.C.

Feb. 2008: "Making the Call on Material Limitation Conflicts."  Panel participant. Midyear Meeting of Association of Professional Responsibility Lawyers.  Pasadena, CA.

June 2007: "Joint Representation and Aggregate Settlements." Panel participant.

11

Annual Meeting of Association of Professional Responsibility Lawyers. San Francisco, CA.

June 2006: "Ethics in Transnational Legal Practice." Panel participant. 32nd National Conference on Professional Responsibility. Vancouver, Canada.

Oct. 2005: "Impact Litigation: Ethical Issues in Representing Workers in Class, Collective & Multiple Plaintiff Action." Panel participant. Conference of National Employment Lawyers Association. Boston, MA.

June 2005: "Contract Lawyering Risks." Panel participant. ABA Counsel Connect teleconference.

April 2005: "Contract Lawyering." Panel participant. Spring 2005 ABA National Legal Malpractice Conference." Boston, MA.

Sept. 2004: "Ethics and Media Relations." Speaker, Association of Defense Trial Attorneys, New England Regional Conference. Framingham, MA.

Aug. 2004:"Attorney-Client Privilege and Work Product in the Post-Enron Era: Confidentiality Under Siege." Panel Participant, ABA Annual Meeting. Atlanta, GA.

Jun. 2004: "What is Fraud and Why Does it Matter?" Moderator, Panel Discussion. 30th National Conference on Professional Responsibility. Naples, FL.

Apr. 2004: "Lawyers Caught in the Enron Spotlight." Panel Participant. ABA Section of Business Law. Seattle, WA

Jan. 2004: "Ethics and Class Action Reform." Panel Participant. AALS Annual Meeting, Section on Professional Responsibility. Atlanta, GA.

Jan. 2003: "Hot Topics in Legal Ethics." Mid-year meeting of Conference of Chief Justice. Williamsburg, VA.

Jun. 2002: "General Counsel and the Model Rules of Professional Conduct: When Ethical Issues Are Up-Close and Personal." Panelist. Nat'l Assoc. Of College and University Attorneys 42nd Annual Conference. Boston, MA.

May, 2002: "Ethics 2000: What Have They Done and Where Do We Go From Here?" Moderator, Panel Discussion. 28th Nat'l Conference on Professional Responsibility. Vancouver, British Columbia, Canada.

Apr. 2002: "The Assault on the Citadel of Privilege." Primary speaker. St. Thomas More Society of Rhode Island Fourth Annual Spring Seminar. Providence, RI.

Oct. 2001: "New Influences on Professional Responsibility." Principal speaker. 11th Annual Dan K. Moore Program in Ethics. Chapel Hill, NC.

June 2001: "Lawyers' Duties to Non-clients." Rhode Island Bar Association Annual Meeting. Providence, RI.

May 2001: "Changing the ABA Model Rules on Ethics: An Update." Moderator, ABA Teleconference program.

May 2001: "An Ethics 2000 Town Hall." Moderator, Panel Discussion. Annual meeting of Professional Responsibility Lawyers. Miami, FL.

May 2001: "Multijurisdictional Practice." Conference on "Stewardship of Bar Admissions: Maintaining Integrity in a Changing World sponsored by the National Conference of Bar Examiners. Madison, WI.

April 2001: "The Impact of Ethics 2000 and Restatement on Finance Practice." Co-presenter, Spring meeting of American College of Investment Counsel. Chicago, IL.

Feb. 2001: "Conflicts of Interest in Patent Representation." Conference on Patenting Genomics sponsored by the American Conference Institute.

July 2000: "Ethics 2000." Presentation and Panel Discussion. Annual Meeting of Conference of Chief Justices of State Supreme Courts. Rapid City, So. Dakota.

June 2000: "Ethics 2000." Moderator, Panel Discussion. ABA National Conference of Professional Responsibility Lawyers. New Orleans, LA.

Aug. 1999: "Lawyers Investing In and Doing Business With Their Clients." Panel discussion. ABA Section of Litigation. ABA Annual Meeting. Atlanta, Georgia.

March 1997: "Ethics Issues in Third Party Payment." Faculty Colloquium. Roger Williams University School of Law. Briston, RI.

Sept. 1996: "Is the Restatement Necessary?" Annual Meeting of Colorado Bar Association. Vail, CO.

April 1995: "Implications for Legal Malpractice of the ALI's Restatement of the Law Governing Lawyers." ABA Section on Professional Liability. Phoenix, Arizona.

Aug. 1993: "Professionalism and Law Firm Culture." American Bar Association Annual Meeting. New York, NY.

13

Sept. 1992: "Quality Assurance and the Practice Evaluation Project." State Bar of New Mexico Annual Convention. Ruidoso, New Mexico.

April 1992: "The ALI-ABA Practice Evaluation Project." Annual Conference of ABA Standing Committee on Lawyers' Liability. New Orleans.

November 1991: "Professional Liability of Lawyers to Clients and Non-Clients under United States Common Law." Conference of Young Dutch Lawyers' Organization. Noordwijk, The Netherlands.

Apr. 1991: "Legal and Ethical Aspects of Informed Consent." Rutgers-Camden anthropology class in Death and Dying. Camden, N.J. (Lecture also given in same class and in a graduate anthropology seminars in 1987-89 and in 1990.)

Feb. 1990: "Topics in Medical Malpractice." Course for fourth year medical students at UMDNJ-Rutgers-Camden. Camden, N.J. (Similar lectures also given in the winter terms of 1986-89).

Jan. 1990: "The Law of Informed Consent." Course in law and medicine. Pennsylvania College of Podiatric Medicine. (Similar lecture given in 1989.)

Dec. 1988: "Termination of Life-Sustaining Medical Treatment." Special law and medicine course for third-year medical students at UMDNJ-School of Osteopathic Medicine. Stratford, N.J.

Jan. 1988: "Professionalism: Rekindle or Reconsider?". Annual meeting of AALS Section on Professional Responsibility. Miami Beach, Fla. (Prepared and moderated panel discussion).