# EXHIBIT 3

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>Jointly Administered<br><br>**Ref. Docket No. 812** |

## SUPPLEMENTAL DECLARATION OF NANCY J. MOORE

### Introduction

1. I am Professor of Law and Nancy Barton Scholar at Boston University School of Law. I am submitting this Declaration ("Supplemental Declaration") to supplement my Declaration dated October 7, 2020 ("Original Declaration").

2. I concluded in my Original Declaration that: (a) Brown Rudnick has not established an attorney-client relationship with either the Ad Hoc Committee or CASJ;

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Lane, Irving, Texas 75038.

1

(b) Brown Rudnick has not established an attorney-client relationship with the individual Law Firm Clients; and (c) that there are ethical improprieties in the retention agreements between the Law Firm Clients and the Six Law Firms.

3.  In this Supplemental Declaration, I confirm my prior conclusions, extend my opinions to include the retention of Monzack Mersky Broweder and Hochman, P.A. ("MMBH") purportedly by the Ad Hoc Committee or CASJ (now also referred to as "the Coalition"), and extend my opinions to include additional law firms[2] ("the New State Court Counsel") representing individual clients (included as additional "Law Firm Clients").

4.  In addition to the material specifically listed in my Exhibit 2 to my Original Declaration, I have reviewed the Second Amended Verified Statement of Coalition of Abused Scouts for Justice Pursuant to Bankruptcy Rule 2019 ("Second Amended 2019 Statement"), including the attached exhibits. I have also reviewed the Employment Boy Scouts of America Litigation sample engagement letter prepared by Krause and Kinsman, LLC ("Krause").

5.  The Supplemental Declaration is intended to be supplemental to, and should be read in conjunction with, my Original Declaration, including the legal authority provided therein.

## My Opinions

I.  Neither Brown Rudnick nor MMBH has established an attorney-client relationship with the Ad Hoc Committee or the Coalition

A.  Neither the Brown Rudnick nor the MMBH engagement letter provides evidence of a valid retention on behalf of the Ad Hoc Committee or the Coalition.

---

[2] The additional law firms are: Motley Rice LLC ("Motley Rice"); Napoli Shkolnik PLLC ("Napoli"); Marc J. Bern & Partners LLP ("Bern"); Junell & Associates ("Junell"); Reich & Binstock LLP ("Reich") and Krause & Kinsman Law Firm ("Krause"). Two of the original Six Law Firms---Kosnoff Law Firm PLLC and AVA Law Group, Inc., are no longer included as State Court Counsel for the Coalition members. *See* Second Amended 2019 Statement at 3.

6. The Brown Rudnick Engagement Letter attached to the Second Amended 2019 Statement is the same Engagement Letter that I reviewed in my Original Declaration. For the reasons set forth therein, it is my opinion that the Brown Rudnick Engagement Letter provides no evidence of a valid retention by the Ad Hoc Committee or the Coalition.

7. MMBH signed an engagement agreement dated September 13, 2020 ("the MMBH Engagement Letter"). It was also signed by the Six Law Firms. It is virtually identical in content to the Brown Rudnick Engagement Letter, including the representation and warranties of the Six Law Firms that they had the authority to sign on behalf of and to bind their Law Firm Clients, as well as the contradictory statement that MMBH was being retained "by the Ad Hoc Committee, and not by any individual member of the Ad Hoc Committee."

8. Because no one signed or purported to sign either the Brown Rudnick Engagement Letter or the MMBH Engagement Letter on behalf of the Ad Hoc Committee, neither engagement letter provides evidence of a valid retention of Brown Rudnick or MMBH by the Ad Hoc Committee or the Coalition, as opposed to the Law Firm Clients.

9. I have reviewed six documents entitled "Amendment and Joinder to Engagement Letters" ("Amendment and Joinder"), signed by Brown Rudnick, MMBH, and, respectively, each of the New State Court Counsel. These six documents are identical except with respect to the name of the New State Court Counsel. These documents purport to amend both the Brown Rudnick and MMBH Engagement Letters, but only to the extent that the New State Court Counsel are added as Law Firm signatories (on behalf of their Law Firm Clients) for all of the same purposes as the original Six Law Firms. It does not otherwise amend those

Engagement Letters and therefore does not alter my opinion the no one signed the Brown Rudnick or MMBH Engagement Letters on behalf of the Ad Hoc Committee or the Coalition.

B. <u>Neither the Six Law Firms nor any of the New State Court Counsel had authority to enter into a retention agreement with Brown Rudnick or MMBH on behalf of the Ad Hoc Committee or the Coalition.</u>

10. I have not seen any evidence establishing the existence of a group, association, or entity to be called either the Ad Hoc Committee or the Coalition. The Amendment and Joinder documents refer to Bylaws governing the Coalition effective as of September 14, 2020, but I have not seen those Bylaws, nor does the Second Amended 2019 Statement provide any explanation of how or by whom those Bylaws were adopted or how they establish or evidence the establishment of the existence of a group, association, or entity to be called either the Ad Hoc Committee or the Coalition.

11. The Brown Rudnick and MMBH Engagement Letters were signed before the Amendment and Joinder documents purported to add the New State Court Counsel to those Engagement Letters. I have seen no evidence that either the Six Law Firms who signed the Engagement Letters or any of the New State Court Counsel added as signatories to the Engagement Letters (collectively "the Law Firms") had the authority to enter into them on behalf of the Ad Hoc Committee, which is identified as the sole client.

   a. I have seen a document entitled Request for Written Acknowledgment ("Request") that the Law Firms have represented that they sent to all their Law Firm Clients. The Requests were sent *after* the Engagement Letters between the Law Firms and their respective Law

4

Firm Clients were signed, *after* the Coalition was formed in July 2020, and *after* the Six Law Firms executed the Brown Rudnick and MMBH Engagement letters.[3] The Request, which as of the date of the Second Amended 2019 Statement had been signed by only approximately 4,500[4] of the now over 28,000 Law Firm Clients, purports to "acknowledge and agree" that the Law Firms "joined, as a representative of its clients," the Coalition, described as "an ad hoc committee representing the collective interests of its members" in the BSA bankruptcy proceedings. In my opinion, this statement is false and misleading, in violation of ABA Model Rule 7.1, because it asserts that the Law Firms, not the individual clients, are members of the Coalition, a statement that contradicts all of the other descriptions of the Coalition that I have seen. Although the Request subsequently provides that the signing Law Firm Clients "consent and agree to becoming a member of the Ad Hoc Committee in accordance with and subject to the terms of the Engagement Letters," this statement can only further confuse the Law Firm Clients, given the earlier statement that the Law Firms themselves had joined the Coalition "as a representative for its clients."

b. The Request also purports to "acknowledge and agree" that the Coalition has retained Brown Rudnick and MMBH "to represent the collective interests of its members." In my opinion, even when signed, the Request does not constitute valid authorization for the Law Firms to have entered into the Brown Rudnick and MMBH Engagement Letters on behalf of the Coalition as its sole client. Although the Request states that the Law Firm Clients were given "access to and an opportunity to review" the Engagement Letters, they

---

[3] *See* Second Amended 2019 Statement at ¶13 (Request sent after the September 9, 2020 hearing).
[4] *See id.*

were not actually given the Engagement Letters themselves. And even if they took advantage of the opportunity to review the Engagement Letters, the Engagement Letters are inconsistent and contradictory in their identification of the client(s), stating on the one hand that the sole client is the "Ad Hoc Committee as a whole, and not … any individual member of the Ad Hoc Committee," and on the other hand that the Law Firms were signing "on behalf of their respective Law Firm Clients" who were to be individually bound to the terms of the Engagement Letters.

c. The Request further states that the signatories "had the opportunity to consult with [their] legal counsel about the terms of the Brown Rudnick and MMBH engagement and [their] participation as a member of the Coalition." In my opinion, this "opportunity" to consult was no substitute for the Law Firms' obligations under ABA Model Rules to consult with their clients about the means of the representation (Rules 1.2(a) and 1.4(a)(2)) and to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation" (Rule 1.4b). Such consultation was especially important, in my opinion, given the inconsistencies and contradictory statements in both the Engagement Letters and the Request itself, as well as the difficulty of understanding what it means to say that that the Coalition retained Brown Rudnick and MMBH "to represent the collective interests of its members," including members who were represented by lawyers with no duty of loyalty except to their own clients (and that those same lawyers were being granted the authority to direct bankruptcy counsel in matters affecting the interests of members who were not their clients). In any event, signatures from less than 20% of the Law Firm Clients constituting the Coalition members is hardly effective to "ratify" conduct by the Law Firms that was otherwise clearly unauthorized.

d.  I have reviewed six additional form engagement letters from the New State Court Counsel. Four of the six contain language similar to that found in the initial three engagement letters I reviewed, authorizing the Law Firm "to affiliate with or retain co-counsel."[5] However, as I explained in my Original Declaration, association with co-counsel means retaining other counsel *to assist in the representation of the retaining clients,* not the right to form an organization that would become "a client" (and indeed the only client) for purposes of retaining yet another law firm to negotiate a settlement with the BSA on behalf of that organization. This is particularly so when members of the organization include persons who are not represented by the retaining clients' own Law Firm and whose lawyers have no duty of loyalty to the retaining clients.

   i.  The Junell engagement letter provides that "Client understands and agrees that J&A may associate other lawyers *to assist in representing Client, subject to Client's consent*" (emphasis added). This provision would clearly be interpreted by a reasonable client to be limited to the right to associate other lawyers who will perform in the role of co-counsel, that is, to assist in representing the client---not the right to associate with lawyers representing other persons or entities. In addition, this provision clearly states that the client must consent to the retention of co-counsel.

   ii. The Bern engagement letter states that the client authorizes Bern "to employ any other additional legal assistance that they deem need *to fully represent my interest"* (emphasis added). This provision would clearly be interpreted by a reasonable

---

[5] Second Amended 2019 Statement at ¶8.

7

client to be limited to the right to associate other lawyers who will perform in the role of co-counsel, that is, to assist in representing the client---not the right to associate with lawyers representing other persons or entities.

iii. The Motley Rice engagement letter provides that it "may choose to associate with additional law firms…*as additional counsel of record*" and that the firm has the right to "bring[] in additional law firms to work with the Attorneys *on the case*" (emphasis added). These provisions would clearly be interpreted by a reasonable client to be limited to the right to associate other lawyers who will perform in the role of co-counsel, that is, to assist in representing the client---not the right to associate with lawyers representing other persons or entities. [6]

iv. The Napoli engagement letter provides that the law firm may "use or associate other attorneys *in the representation of the aforesaid claims of the Client*" (emphasis added). This provision would clearly be interpreted by a reasonable client to be limited to the right to associate other lawyers who will perform in the role of co-counsel, that is, to assist in representing the client---not the right to associate with lawyers representing other persons or entities.

v. The Reich engagement letter has no provision concerning the right to associate with other counsel.

---

[6] The Motley Rice engagement letter also provides that it does not cover representation "on appeal or in bankruptcy," thus raising a serious concern whether the law firms named in the engagement letter are validly representing their clients in this bankruptcy proceeding.

  vi. The Krause engagement letter has no provision concerning the right to associate with other counsel.[7]

 C. <u>As an informal group or association with no agreed-upon decision-making structure, the Ad Hoc Committee or the Coalition is not capable of being represented as an organization separate from its individual members.</u>

12. In my Original Declaration, I concluded that there was no evidence that the members of the Ad Hoc Committee or the Coalition had agreed to act as a unit and to reach collective decisions or that the members had agreed upon an "established chain of command;" as a result, it was my opinion that under ABA Model Rule 1.13(a), the group cannot be treated as an "organization" client separate from its members. Nothing in the Second Amended 2019 Statement or its attached exhibits changes my opinion with respect to the ability of Brown Rudnick or MMBH to represent the Ad Hoc Committee or the Coalition "as a whole," as opposed to its individual members.

 a. The only new information provided by the Second Amended 2019 Statement concerning the organization of the Coalition is a brief attempt to describe how the five members of the Advisory Board were selected: they "were selected based on a self-nomination process and were chosen by their respective State Court Counsel." It remains clear that the Advisory Board is merely advisory and does not constitute a "duly authorized constituent" for purposes of making decisions on behalf of the Coalition, including

---

[7] The Krause engagement letter contains a provision stating that "Client fully authorizes and directs the Firm to manage and handle my claims as they deem proper and to investigate and prosecute them, with or without filing a lawsuit, in any manner they deem advisable." (¶1.) In my opinion, a reasonable client would not understand this provision to include the authority to retain other lawyers to represent other persons or entities such as the Ad Hoc Committee or the Coalition.

    directing either bankruptcy counsel or the Law Firms directing bankruptcy counsel pursuant to the Brown Rudnick and MMBH Engagement Letters.

b. The Second Amended 2019 Statement confirms that the Law Firms, not the Ad Hoc Committee or the Coalition, "direct the actions of the Coalition Counsel." (¶ 7) Even if the Law Firms were authorized by their respective Law Firm Clients to "direct the actions of the Coalition Counsel" (which they are not), this would not be sufficient evidence that the Coalition members had agreed to act as a unit or that they had agreed upon an "established chain of command." Someone *within the Coalition* must be properly authorized to make decisions on its behalf, including the decision to revoke any authority previously granted to either bankruptcy counsel or the Law Firms to act on behalf of the Coalition with respect to the bankruptcy negotiations.

c. The Amendment and Joinder documents refer to Bylaws governing the Coalition effective as of September 14, 2020, but I have not seen those Bylaws, nor does the Second Amended 2019 Statement provide any explanation of how or by whom those Bylaws were adopted or how they establish or evidence the establishment of the existence of a group, association, or entity to be called either the Ad Hoc Committee or the Coalition, including designating a "duly authorized constituent" of the Ad Hoc Committee or the Coalition, who can revoke any authority previously granted to either bankruptcy counsel or to the Law Firms to act on behalf of the Coalition.

d. In the absence of an "established chain of command," or at least a designation of the group's "duly authorized constituent," I continue to hold the opinion that the Ad Hoc

Committee or the Coalition is not eligible to be treated as an organizational client separate from its over 28,000 individual members.

## II. Neither Brown Rudnick nor MMBH has established an attorney-client relationship with the individual Law Firm Clients

13. Although both the Brown Rudnick and the MMBH Engagement Letters say that the client is the Ad Hoc Committee, and not any individual member of the Ad Hoc Committee, elsewhere the law firms have indicated that they are appearing on behalf of the individual members themselves.

   a. In addition to the documents referenced in my Original Declaration, the Second Amended 2019 Statement provides: that the Law Firms (designated there as "State Court Counsel") direct bankruptcy counsel "on behalf of and in the best interest of their clients, the Coalition members." (¶7).

   b. The Second Amended 2019 Statement further provides that the Brown Rudnick and MMBH Engagement Letters provide for a "group representation, meaning that *the Members*, by and through their chosen counsel, *retained [Brown Rudnick and MMBH]* to represent *their collective interests*." (¶10) (Emphasis added.) In other words, it is "the Members," not the Coalition, who have retained these law firms, and they are being retained to represent the Members' interests. It is unclear how representing their "collective interests" differs from representing the collective interests of mass tort plaintiffs who join together to retain a common lawyer, properly identifying conflicts of interest and obtaining the individual clients' informed consent to such conflicts.

14. I have seen no evidence that the now over 28,000 Law Firm Clients consented to retain Brown Rudnick and MMBH to represent them in their individual claims. As set forth earlier in paragraph 11, most of the engagement letters with the Law Firms may have authorized the Firms to associate with other law firms, but that can only mean associating with other law firms as "co-counsel," that is associating with other law firms to assist in the representation of the retaining clients themselves, not associating with lawyers who were simultaneously representing other individuals with actual or potential conflicts of interest.

15. In addition, for reasons set forth earlier in paragraph 11b-c, the Requests sent by the Law Firms to their clients do not operate as an effective "ratification" of the retention of Brown Rudnick and MMBH to represent either the Coalition "as a whole" or the individual Law Firm Clients. The document contains false and misleading statements and is confusing and contradictory with respect to the identity of both the Coalition and the client(s) of the Brown Rudnick and MMBH Engagement Letters. In addition, providing the Law Firm Clients with the "opportunity" to review the Engagement Letters, as well as the "opportunity" to consult with their respective Law Firm, was no substitute for the Law Firms' obligations under the ABA Model Rules to consult with their clients about the means of the representation (Rules 1.2(a) and 1.4(a)(2)) and to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation" (Rule 1.4(b)).

16. Even if the approximately 28,000 Law Firm Clients had consented to being represented by Brown Rudnick and MMBH, for reasons set forth in paragraph 15 of my Original Declaration, that representation would be improper because it violates Model Rule 1.7 governing conflicts of interest. I have seen no evidence that the Law Firm Clients were advised of or consented to the obvious conflicts of Brown Rudnick and MMBH in

representing over 28,000 Law Firm Clients whose individual interests necessarily differed, particularly with respect to the allocation of any settlement proceeds.

### III. Ethical improprieties in the retention agreements between the Law Firm Clients and the Law Firms

17. The Second Amended 2019 Statement purports to clarify that Brown Rudnick and MMBH will be paid by the Law Firms and not their Law Firm Clients, stating that the Law Firms will be responsible for "a portion of the fees and expenses incurred" by those law firms, and that "any payment of such fees and expenses…will not increase the fees and expenses owed" by the Law Firm Clients "under the terms and conditions of" their individual engagement letters with the Firms. Nevertheless, none of the sample engagement letters provide for the clients' agreement to the division of legal fees between the Law Firms and Brown Rudnick and MMBH, including the share each of those law firms would receive, as required by ABA Model Rule 1.5(e). Although the Requests provided the Law Firm Clients with an "opportunity" to review the Engagement Letters, which would have revealed the hourly fees of both Brown Rudnick and MMBH, the Requests themselves did not provide that information. In any event only approximately 4,500 out of over 28,000 Law Firm Clients had signed the Requests as of the date of the Second Amended 2019 Statement.

18. In my Original Declaration, I concluded that there were concurrent conflicts of interest among thousands of Law Firm Clients represented by each of the Six Law Firms, but that these firms had not obtained their clients' informed consent to these conflicts, as required by ABA Model Rule 1.7. Similarly, the additional Law Firm engagement letters I have subsequently

reviewed do not acknowledge the existence of conflicts of interests or provide the information necessary to obtain their clients informed consent to these conflicts, as required by Rule 1.7.[8]

19. The Motley Rice engagement letter provides that if the client and the attorneys "disagree over advice given to Client with respect to settlement of the Client's individual claims, the Attorneys shall have the right to withdraw as counsel with respect to Client." In my opinion, this provision violates ABA Model Rule 1.2(a) because it effectively deprives the client of the absolute right to accept or reject a settlement offer.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on October 13, 2020.

_____

Nancy J. Moore

---

[8] The Krause engagement letter contains a provision entitled "Multiple Clients," which concludes with the statement that "Client consents to the Firm representing more than one client in this matter." (¶5) However, with respect to explaining the material risks of representation burdened by conflicts of interest, the provision states only that "the Client might gain or lose some advantages if represented by separate counsel," that "the Firm cannot serve as advocate for one client against another client," and "the Firm must deal impartially with every client." In my opinion, this disclosure was insufficient to satisfy the requirements of Rule 1.7(b) that the lawyer obtain the "informed consent" of the client.