## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 20-10343 (LSS) |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Jointly Administered |
| | **Hearing Date: Feb. 17, 2021 at 10:00 a.m. (ET)** |
| Debtors. | **Objection Deadline: Feb. 5, 2021 at 4:00 p.m. (ET)** |

## INSURERS' MOTION FOR AN ORDER AUTHORIZING
## RULE 2004 DISCOVERY OF CERTAIN PROOFS OF CLAIM

STAMOULIS & WEINBLATT LLC
800 N. West Street
Third Floor
Wilmington, Delaware  19801

O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036-6537

*Counsel for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America, Ace Insurance Group, Westchester Fire Insurance Company and Westchester Surplus Lines Insurance Company*

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America ("BSA") (6300) and Delaware Boy Scouts, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Lane, Irving, Texas 75038.

**TABLE OF CONTENTS**

                                                                                    **Page**

PRELIMINARY STATEMENT ................................................................................. 1

JURISDICTION AND VENUE ............................................................................... 4

RELIEF REQUESTED............................................................................................. 4

FACTUAL BACKGROUND ................................................................................... 6

      A.    Abused in Scouting and other Coalition lawyers ran an aggressive, nationwide advertising campaign and made it easier to file false claims. ................................................................................................ 6

      B.    Abused in Scouting and Coalition lawyers conceded that their goal was to maximize the number of claims so they could control the bankruptcy.................................................................................................... 7

      C.    Plaintiffs' firms used hedge fund money to buy claims sight-unseen from the businesses that generate them. .......................................... 8

      D.    The Court has already recognized the potential for improper filings here. ...................................................................................... 9

      E.    The available evidence shows that attorneys who signed hundreds of claims in a single day likely did not even read those claims. .............. 10

      F.    A firm that filed thousands of claims announced on its website that it would "complete" forms on behalf of potential claimants who did not opt out. ................................................................................. 12

      G.    Claim-aggregating businesses played a major role in facilitating the explosion of lawyer-signed claims................................................... 12

ARGUMENT ......................................................................................................... 16

      POINT I RULE 2004 IS THE APPROPRIATE—AND, INDEED, IDEAL—VEHICLE FOR THE LIMITED, REQUESTED DISCOVERY WHERE THERE ARE OBVIOUS IRREGULARITIES WITH THE PROOF-OF-CLAIM-FILING PROCESS. ......................................................................................... 16

      A.    Rule 2004 is broad and the standard for obtaining discovery is low................................................................................................. 16

      B.    Mass-tort cases need to be policed for baseless filings........................... 17

      C.    In light of the evidence here, the need for Rule 2004 discovery is not a close call.......................................................................... 20

      POINT II A LAWYER WHO SIGNS A PROOF OF CLAIM BECOMES A FACT WITNESS ABOUT THE ASSERTED ALLEGATIONS AND WAIVES PRIVILEGE. ......................................................................................... 22

      A.    The law requires a pre-filing inquiry that is non-delegable. .................... 22

      B.    The ethical rules require a pre-filing inquiry. .......................................... 26

# TABLE OF CONTENTS
### *(continued)*

**Page(s)**

C.    Signing a proof of claim is an assertion  of personal knowledge of the facts. ................................................................................................. 26

POINT III THE NEED FOR REQUESTED DISCOVERY  FAR OUTWEIGHS ANY POTENTIAL BURDEN. .................................................................................. 28

CERTIFICATION OF COUNSEL................................................................................................. 29

NOTICE ........................................................................................................................................ 29

CONCLUSION .............................................................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Hannon v. Countrywide Home Loans, Inc. (In re Hannon)*,
421 B.R. 728 (Bankr.M.D.Pa.2009) ...................................................................... 23

*Hope 7 Monroe St. Ltd. P'ship v. Riaso, LLC (In re Hope 7 Monroe St. Ltd. P'ship)*,
743 F.3d 867 (D.C. Cir. 2014) ............................................................................... 16

*In re Arkin-Medo, Inc.*,
44 B.R. 138 (Bankr. S.D.N.Y. 1984) ..................................................................... 17

*In re Buick*,
174 B.R. 299 (Bankr. D. Colo. 1994) .................................................................... 27

*In re Congoleum Corp.*,
426 F.3d 675 (3d Cir. 2005) .................................................................................. 20

*In re Countrywide Home Loans, Inc.*,
384 B.R. 373 (Bankr. W.D. Pa. 2008) ................................................................... 16

*In re DeShetler*,
453 B.R. 295 (Bankr. S.D. Ohio 2011) .................................................................. 17

*In re Disciplinary Proceeding Against McGrath*,
178 Wash. 2d 280 (2013) ....................................................................................... 22

*In re Garlock Sealing Techs., LLC*,
504 B.R. 71 (Bankr. W.D.N.C. 2014) .................................................................... 19

*In re Gawker Media LLC*,
No. 16-11700 (SMB), 2017 WL 2804870 (Bankr. S.D.N.Y. June 28, 2017) ......... 27

*In re G-I Holdings Corp.*,
323 B.R. 583 (Bankr. D.N.J. 2005) ....................................................................... 19

*In re KTMA Acquisition Corp.*,
153 B.R. 238 (Bankr. D. Minn. 1993) ................................................................... 24

*In re M.A.S. Realty Corp.*,
326 B.R. 31 (Bankr. D. Mass. 2005) ..................................................................... 24

*In re Michalski*,
449 B.R. 273 (Bankr. N.D. Ohio 2011) ................................................................. 17

*In re Obasi*,
No. 10-10494 (SHL), 2011 WL 6336153 (Bankr. S.D.N.Y. Dec. 19, 2011 ............... 23, 24, 28

## TABLE OF AUTHORITIES
### *(continued)*

**Page(s)**

*In re Rivera,*
  342 B.R. 435 (Bankr. D.N.J. 2006), aff'd, No. CIV A 06-4278 KSH, 2007 WL 1946656
  (D.N.J. June 29, 2007) .................................................................................................. 23

*In re Rodriguez,*
  No. 10-70606, 2013 WL 2450925 (Bankr. S.D. Tex. June 5, 2013) ................................. 26, 28

*In re Subpoena Duces Tecum,*
  461 B.R. 823 (Bankr. C.D. Cal. 2011) ........................................................................... 18

*In re Sutera,*
  141 B.R. 539 (Bankr. D. Conn. 1992) ........................................................................... 16

*In re Taylor,*
  407 B.R. 618 (Bankr. E.D. Pa. 2009), *rev'd*, No. 09-CV-2479-JF, 2010 WL 624909 (E.D. Pa.
  Feb. 18, 2010), *aff'd in part, vacated in part, rev'd in part*, 655 F.3d 274 (3d Cir. 2011). 25, 26

*In re Taylor,*
  655 F.3d 274 (3d Cir. 2011) ......................................................................................... 24, 25

*In re Thomas,*
  337 B.R. 879 (Bankr. S.D. Tex. 2006) .......................................................................... 22

*In re Thomas,*
  337 B.R. 879 (Bankr.S.D.Tex.2006), *aff'd*, 223 Fed. Appx. 310 (5th Cir.2007) ................... 23

*In re USG Corp.,*
  290 B.R. 223 (Bankr. D. Del. 2003) .............................................................................. 19

*In re Valley Forge Plaza Assocs.,*
  109 B.R. 669 (Bankr. E.D. Pa. 1990) ............................................................................ 16

*In re Washington Mutual, Inc.,*
  408 B.R. 45 (Bankr. D. Del. 2009) ................................................................................ 16

*Knox v. Sunstar Acceptance Corp. (In re Knox),*
  237 B.R. 687 (Bankr.N.D.Ill.1999) ............................................................................... 23

*Swanson v. Trasino Park-Hudsons, LLC (In re Vission , Inc.),*
  No. 07-21957, 2008 WL 2230741 (Bankr. E.D. Wis. 2008) ............................................ 26

*Sweetland v. Szadkowski (In re Szadkowski),*
  198 B.R. 140 (Bankr. D. Md. 1996) .............................................................................. 16

*United States v. Connery,*
  867 F.2d 929 (6th Cir. 1989) ........................................................................................ 22

# TABLE OF AUTHORITIES
## *(continued)*

**Page(s)**

*W.R. Grace & Co*
   475 B.R. 34, 71 (D. Del. 2012) ............................................................................. 18

**Statutes**

18 U.S.C. § 152(4) .................................................................................................. 24

18 U.S.C. § 157 ...................................................................................................... 24

28 U.S.C. § 1334 .................................................................................................... 4

28 U.S.C. § 1408 .................................................................................................... 4

28 U.S.C. § 1409 .................................................................................................... 4

28 U.S.C. § 157 ...................................................................................................... 4

**Other Authorities**

ABA Model Rules of Professional Conduct 3.3 ........................................................... 3

James Lowery, *The Scourge of Over- Naming in Asbestos Litigation: The Costs to Litigants and the Impact on Justice*, Mealey's (Jan. 18, 2018) ........................................................ 19

Mark D. Plevin, *The Garlock Estimation Decision: Why Allowing Debtors and Defendants Broad Access to Claimant Materials Could Help Promote the Integrity of the Civil Justice System*, 23 No. 4 J. Bankr. L. & Prac. NL Art. 2 (Aug. 2014) ................................................. 19

Nora Freeman Engstrom, *Retaliatory Rico and the Puzzle of Fraudulent Claiming*, 115 Mich. L. Rev. 639 (2017) ............................................................................................ 19

S. Todd Brown, *Bankruptcy Trusts, Transparency and the Future of Asbestos Compensation*, 23 Widener L.J. 299 (2013) ..................................................................................... 19

**Rules**

Fed. R. Bankr. P. 9011 (b) ...................................................................................... 30

Century and Hartford (together, "Insurers") move for entry of an Order, substantially in the form attached as Exhibit A, authorizing them to serve Rule 2004 discovery on a (i) small group of plaintiffs' counsel who signed many proofs of claim and (ii) third parties that filled in the proofs of claims.[2]

## PRELIMINARY STATEMENT

When BSA filed for bankruptcy, it was a defendant in 275 cases with about 1,400 more possible claims on the horizon. That was after years in the tort system and advertisements by plaintiffs' firms. Yet only a few months after the Court set a bar date, BSA is suddenly inundated with over 95,000 claims. This explosion was not random. A group of for-profit claims aggregators with members of the Coalition of Abused Scouts for Justice ("Coalition") at the forefront engineered an aggressive, nationwide campaign to generate claims that channeled respondents to a website with information that encouraged the presentation of seemingly plausible claims. The stated objective of those behind the Coalition was to generate a supermajority of claims and thus control the bankruptcy, as revealed in an email that the TCC turned over to the U.S. Trustee. And the Coalition did just that.

To accomplish this objective, a handful of Coalition lawyers signed thousands of proofs of claim ("POCs") in the days just before the bar date, and a dozen lawyers each signed hundreds of POCs in one day. Astonishingly, members of the entity that holds itself out as Abused in Scouting—a fictitious firm acting as a front for three separate firms, two of which are one-man shops and the other a nine-lawyer outfit—filed almost 19,000 POCs alone. One of the solo

---

[2] "Century" refers to Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America, Westchester Fire Insurance Company and Westchester Surplus Lines Insurance Company. "Hartford" refers to Hartford Accident and Indemnity Company, First State Insurance Company and Twin City Fire Insurance Company.

1

practitioners and a self-proclaimed founder of the Coalition, Timothy Kosnoff, signed some 300 claims in a single day and more than 750 in total—nearly three times the total number of claims BSA faced pre-petition.  But he was not even close to the most prolific mass-signer.  That was Coalition attorney Adam Krause, whose signature was affixed to some 890 POCs in one day and nearly 2,500 in total.  Assuming an eight-hour workday with no breaks, Mr. Krause apparently executed one POC every 32 seconds.

A forensic document expert's analysis shows that in many instances someone photocopied a lawyer's signature page and attached it *en masse* to the POCs.  Some firms had an aggregator submit hundreds of POCs by adding an electronic signature in rapid-fire succession— sometimes only seconds apart—to batches of POCs.  One aggregator submitted hundreds of POCs for one of the firms, all bearing the same signature—but purportedly signed on behalf of different claimants.  Together with other irregularities, this suggests that plaintiffs' lawyers bought claims from aggregators and sent signature pages to them to attach to POCs for filing without the signing lawyer—or any lawyer—ever having seen them.

It is evident that these lawyers conducted no pre-complaint investigation:  Most of the mass-signed POCs lack critical information, are late, duplicates, or have issues with the alleged state or year of abuse.  In fact, it appears that more than three of every four Coalition claims suffer from these facial defects—and that does not even take into account the POCs' merits.  The Motion that Century and Hartford file concurrently with this one seeking discovery from a sample of claimants that this scheme generated, which Insurers incorporate, identifies in more detail examples of fraud and evidence of systemic abuses of this Court's claims process.

When the Coalition asked this Court to allow attorneys—rather than claimants—to sign the POCs, its counsel stated that "[a]ll claims . . . will be thoroughly vetted."[3] But the sheer number of attorneys participating in mass signings casts doubt on whether these lawyers kept their promise, let alone complied with the oath they affirmed by signing the POCs or their obligations under Federal Rule of Bankruptcy Procedure 9011, which states that by signing "a petition, pleading, written motion, or other paper, an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, ***formed after an inquiry*** reasonable under the circumstances . . . the allegations and other factual contentions ***have evidentiary support***." ABA Model Rules of Professional Conduct 3.3 imposes similar obligations on lawyers.

The proposed discovery targets a subset of the attorneys who signed POCs that suggest that they engaged in this conduct. The requested discovery will shed light on what—if any— pre-filing inquiry they conducted, exposing efforts to file POCs that this Court should not even consider. That, in turn, will help the parties determine what claims objections to advance. Insurers thus seek Rule 2004 discovery from a subset of 15 plaintiffs' attorneys, each of whom signed more than 500 POCs in total or who signed more than 200 in a single day. Insurers also propose to subpoena Verus Claims Services LLC, Consumer Attorney Marketing Group, Archer Systems, and Stratos Legal, which are claims aggregating businesses that the evidence shows collectively generated thousands of claims.

On September 9, 2020, Debtors' counsel told the Court that he "share[d Century's] and the insurers' concerns of how claims are being generated and, of course, issues relating to State Court ethics," and that he "believe[d] those issues can be resolved, potentially, through 2004

---

[3]    D.I. 1496 ¶ 41. Unless otherwise noted, docket cites refer to the docket in these bankruptcies.

discovery." The bar date has now passed. The proposed Rule 2004 discovery is essential to police the apparent fraud.

The Court and all parties—except those hoping to profit off fraudulent allegations of sexual abuse—will benefit from getting rid of meritless claims. A plan of reorganization that compensates real victims is impossible without this threshold investigation into abuses in the POCs and the elimination of improper ones. Each baseless claim dilutes the potential recovery for actual victims.

## JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The bases for the relief requested are Section 502 of the Bankruptcy Code, Rules 2004 and 3007 of the Federal Rules of Bankruptcy Procedure, and Local Rules 1001-1, 2004-1 and 3007-1.

## RELIEF REQUESTED

Insurers seek to take limited deposition and document discovery of the following plaintiffs' attorneys, each of whom signed (a) 200 or more POCs in a single day or (b) 500 or more POCs overall. The attorneys are listed on the table below with estimates of their relevant data.[4] As the chart indicates, the mass-signed claims are missing critical information (such as the name of the alleged abuser), are late, duplicates, or have issues with the alleged state or year of abuse. The proposed discovery is attached as Exhibit D.

---

[4]    *See* January 20, 2021 Declaration of Paul Hinton ("Hinton Declaration") tbls. 1, 3.

| Attorney | Firm | Total POCs Signed | POCs Signed in Single Day (Max) | |
|---|---|---|---|---|
| Adam W. Krause | Krause & Kinsman | 2,507 | 891 (11/13/20) | |
| David H. Stern | Ask LLP | 1,490 | 160 (11/12/20) | |
| Joshua B. Schwartz | Abused in Scouting | 1,438 | 314 (11/12/20) | |
| Stewart Eisenberg | Abused in Scouting | 963 | 190 (11/13/20) | |
| Sean T. Higgins | Andrews & Thornton | 955 | 776 (11/7/20) | |
| Deborah Levy | Junell & Associates | 811 | 797 (11/3/20) | |
| Timothy Kosnoff | Abused in Scouting | 784 | 304 (11/10/20) | |
| Steven Babin Jr. | Babin Law, LLC | 728 | 232 (11/15/20) | |
| Rochelle Guiton | D. Miller & Associates | 699 | 267 (11/16/20) | |
| Paul J. Napoli | Napoli Law | 672 | 137 (11/10/20) | |
| Joseph J. Cappelli | Marc Bern & Partners | 635 | 625 (11/14/20) | |
| James Harris | Paglialunga & Harris, PS[5] | 564 | 274 (11/6/20) | |
| Michael S. Werner | Slater Slater Schulman | 466 | 224 (11/10/20) | |
| Andrea McGinnis | Bailey Cowan Heckaman | 399 | 397 (11/12/20) | |
| Jonathan Schulman | Slater Slater Schulman | 259 | 259 (11/12/20) | |

Insurers also seek to issue subpoenas for limited deposition and document discovery directed to the entities listed in Exhibit C. The proposed document discovery for these entities is attached as Exhibit D.

Insurers have narrowly tailored its proposed discovery based on a review of exemplars of the POCs. Insurers are continuing its review, and, depending on its findings, may request additional discovery and the appointment of an examiner to investigate formally the solicitation and filing of POCs.

---

[5] Insurers understand that James Harris may claim that the name of the firm associated with the POCs that he submitted is Jim Harris Law rather than Paglialunga & Harris, PS. Insurers use the name "Paglialunga & Harris, PS" because that is the firm name reflected in the Omni data, but intend that name to be interchangeable with "Jim Harris Law" to the extent Jim Harris Law is the law firm associated with James Harris's POC submissions.

## FACTUAL BACKGROUND

A.    **Abused in Scouting and other Coalition lawyers
      ran an aggressive, nationwide advertising campaign
      and made it easier to file false claims.**

After the Court issued the bar-date Order, the entities and investors behind the

Coalition (such as Abused in Scouting) conducted advertising in all 50 states.  These

advertisements proclaimed—falsely—that people could submit claims anonymously:  "You're

never going to appear in court, you're never going to have to take a deposition. . . . You can

remain anonymous.  We handle everything."[6]  The advertisements added—also falsely—that

compensation was "ensure[d]."[7]

The Abused in Scouting website included a "Map of Scouting Abuse Locations" that

detailed the "locations by state, troop number, city, and camp name where our client*s* reported

they were abused by BSA leaders."[8]  The website also included a "List of Confirmed BSA

Abusers," allowing visitors to search a roster of allegedly "confirmed" sex abusers, again in all

50 states.[9]  Abused in Scouting also ran ads and produced longer, infomercial-style promotional

videos—many of which could be found on the Abused in Scouting website, social media

accounts, and YouTube.[10]  The ads directed viewers to contact Abused in Scouting and provided

the website and a phone number.

The website supplied all the information anyone would need to manufacture a potentially

passable claim.  As revealed in an email that the TCC turned over to the U.S. Trustee, the stated

---

[6]    August 24, 2020 Declaration of Evan Roberts ("Roberts Decl.") Ex. A-1, D.I. 1145-3.

[7]    *Id.*

[8]    *See* August 26, 2020 Declaration of Janine Panchok-Berry ("Panchok-Berry Decl.") Ex. 4 at 000003, D.I. 1166.

[9]    *See* Panchok-Berry Decl. ¶ 29, D.I. 1165.

[10]   *Id*. ¶¶ 26–28; Roberts Decl. Ex. A-1, A-2.

goal of the Coalition's founder was to generate numerical superiority of POCs to deliver control of the bankruptcy to the Coalition.[11]  And the Coalition appears to have accomplished its goal: Coalition attorneys filed 60% of the over 95,000 claims, many in mass filings in the days just before the bar date.

> ### B.    Abused in Scouting and Coalition lawyers conceded that their goal was to maximize the number of claims so they could control the bankruptcy.

Mr. Kosnoff—the self-proclaimed Coalition founder—admitted on June 28, 2020 that his group's "strategy" was to "keep focused on [their] marketing and media efforts going full tilt to Nov[ember]," and "the message" to the Debtors was "[w]e control 80% of the claims[.]  I.e. our coalition controls the case."[12]  Mission accomplished: Mr. Kosnoff and his group now claim to control the case and purport to speak for tens of thousands of claimants before this Court.

Many of the law firms that were recruited to be part of the Coalition have little or no experience in litigating sex abuse cases, including against BSA.  These firms, which specialize in mass filings, joined with two solo-practitioner Coalition founders, Mr. Kosnoff and Andrew Van Arsdale.  Mr. Van Arsdale graduated from law school in 2018, and the address for his firm is a storefront that appears to be a mail drop.[13]  He is the co-owner and founder of a legal marketing firm where he has worked for years and that provides call center, SEO, and other marketing services.[14]

Mr. Kosnoff's website represents that he is retired from the practice of law and lists other services (such as media commentator and mass tort bankruptcy consulting) that he offers.  On his

---

[11]  D.I. 1285-1.

[12]  *Id.*

[13]  Aug. 26 Panchok-Berry Decl. Ex. 6, D.I. 1166.

[14]  *Id.* Ex. 8.

website, Mr. Kosnoff identifies Houston as his business address on his website, but he is not

licensed to practice law in Texas, and the listed address is merely a mail drop.[15]  Insurers'

attempts to contact Mr. Kosnoff at this address and at the club in Puerto Rico where he docks his

boat were unsuccessful.[16]  As reflected in Mr. Kosnoff's June 28 email, he recruited these firms

to accumulate as many POCs as possible—as quickly as possible—to ensure his control over

the case.

### C.    Plaintiffs' firms used hedge fund money to buy claims sight-unseen from the businesses that generate them.

The money for this effort to run up the claim number came, at least in part, from

investment funds.  UCC filings detail the capital invested in generating claims and collateral

exchanged in return.[17]  In just one example, Catalur Capital Management, a New York-based

hedge fund, has provided financing to firms such as Andrews & Thornton and Slater, Slater &

Schulman, securing its investment with recoveries from the BSA litigation.[18]  Mr. Kosnoff

alludes to this in his email when he refers to "motherfunders" buying and selling claims.[19]

Investors such as Legal Bay, LLC have also been "actively funding the Boy Scout

claims"[20] by advancing money in exchange for "an equity partnership stake" in the claims.[21]

---

[15]   *Id.* Exs. 8, 9, 12, 13.

[16]   D.I. 1417.

[17]   Declaration of Andrew Kirschenbaum ("Kirschenbaum Decl.") Ex. 9, 15, 16.

[18]   *Id.*  Andrews & Thornton name-partner Anne Andrews' license was previously suspended by the California State Bar.  Kirschenbaum Decl. Ex. 7 (http://members.calbar.ca.gov/fal/Licensee/ Detail/103280).

[19]   D.I. 1285-1.

[20]   Kirschenbaum Decl. Ex. 10 (https://www.prnewswire.com/news-releases/legal-bay-lawsuit-funding-announces-focus-on-assisting-victims-of-boy-scout-sexual-abuse-cases-301084514.html).

[21]   *Id.* Ex. 11 (https://lawsuitssettlementfunding.com/faq.php#1487467133208-44e2f546-70ff).  Legal Bay's Christopher Janish became CEO of the company after he served several years in prison for orchestrating a $13 million stock manipulation scheme.  *Id.* Ex. 12 (https://www.nytimes.com/ 2018/01/28/business/metoo-finance-lawsuits-harassment.html); *Id.*  Ex. 13 (https://www.nj.com/ business/2008/07/exbroker_sentenced_to_prison_f.html).

After the number of claims dramatically increased, Legal Bay seemed concerned about its investments, stating it was "appalled at the final tally of over 92[,000] claims," and that the "high number of claims is putting a major strain on the settlement amounts awarded to plaintiffs at the culmination of their trials."[22]

> **D.    The Court has already recognized the potential for improper filings here.**

The Court recognized the risks created by permitting lawyers to sign proofs of claim. While ultimately allowing this practice, the Court noted that it is "ill-advised."[23]  The Court went on to caution that it would be "concern[ed]" if "a thousand claims [are] signed by a particular lawyer," adding that an attorney signing a claim "might be[come] . . . a fact witness" and "may be subject to a deposition."[24]

Those concerns proved to be well-founded.  Many plaintiffs' firms in the Coalition submitted thousands of lawyer-signed claims.  Coalition lawyer Adam Krause alone signed over 2,500 POCs, two other lawyers signed more than 1,400 claims each, and many others signed over 500 each.[25]  A dozen attorneys each signed hundreds of claims in a single day (though not the same day for all these attorneys).[26]

---

[22]    *Id.* Ex. 14 (http://www.prnewswire.com/news-releases/boy-scout-lives-matter-says-legal-bay-lawsuit-funding-as-they-near-100k-sex-abuse-claims-filed-via-bankruptcy-process-301179510.html).

[23]    Oct. 14, 2020 Hr'g Tr. at 190:12–17, D.I. 1520.

[24]    Oct. 14, 2020 Hr'g Tr. at 183:19–22; 170:2–12.

[25]    Hinton Decl. tbl. 1.

[26]    *Id.*

E.      **The available evidence shows that attorneys
who signed hundreds of claims in a single day
likely did not even read those claims.**

In addition to the eye-popping numbers, compelling independent evidence suggests

rampant disregard for the oath given when signing a POC and the requirement to conduct a pre-

complaint investigation (or perhaps worse).  Here are just four available examples:

*Example 1.*  Coalition attorney Deborah Levy (Managing Partner at Junell Associates)

signed 797 of her 811 POCs on November 3, 2020.[27]  Yet the "document properties" field for

her POCs reveals that the claim documents were created later, several days ***after*** she supposedly

signed them.[28]  Ms. Levy—or someone else, such as claims processor Stratos Legal ("Stratos"),

which submitted many of Ms. Levy's forms—affixed her electronic signature to the claims

before the claim forms were even filled out.[29]  This was no one-woman operation:  It was an

assembly line with a team of people working concurrently on affixing Ms. Levy's signature to

the claims—a time-stamp analysis shows that five of Ms. Levy's signatures were created within

a single 20-second span.[30]  It is improbable that Ms. Levy read the forms she submitted—much

less investigated them.

*Example 2.*  Coalition attorney Joseph Cappelli (of Marc J. Bern & Partners) signed 625

of the 635 total POCs he signed on one day—November 14, 2020.[31]  That was just before the bar

date.  Experts' analysis shows that all or nearly all of these POCs have an identical pre-printed

signature page appended to them.[32]  Someone scanned each claim form with this signature page

---

[27]   *Id.*

[28]   Declaration of Erich Speckin ("Speckin Decl.") ¶ 12.

[29]   *Id.* ¶¶ 13, 20.

[30]   *Id.* ¶ 13.

[31]   Hinton Decl. tbl. 1.

[32]   Speckin Decl. ¶¶ 7–8.

and then submitted them to Omni.  Mr. Cappelli almost certainly did not vet—or even read—the claim forms submitted under his name.

*Example 3.*   Another Coalition member, Jonathan Schulman (of Slater, Slater & Schulman) signed all of his 259 POCs on November 12, 2020, also just before the bar date.[33]  As with Mr. Cappelli's claims, there is an identical pre-printed signature page appended to these POCs.[34]  Someone scanned the POCs with the identical signature pages and submitted them.  It is difficult to imagine that Mr. Schulman had time to carefully review and vet each POC, but did not have two seconds to sign the form.

*Example 4.*   Coalition attorney Paul Napoli (of Napoli Shkolnik PLLC) allegedly signed over 500 POCs in the days leading up to the bar date (between November 9 and November 16, 2020).[35] ██████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████ ██ ██████████████████████████████████

Mr. Napoli did not even bother to sign the forms, instead using the "/s/" symbol.[37]  ████████

███████████████████████████████ ██

---

[33]   Hinton Decl. tbl. 1.

[34]   Speckin Decl. ¶ 10.

[35]   Speckin Decl. ¶ 14.

[36]   *Id.*

[37]   *Id.*

[38]   Hinton Decl. ¶ 13. ███████████████████████████████████████ He has previously been accused of misconduct by his former law partner.  *See* Affidavit of Marc J. Bern in Support of Defendant's Order to Show Cause ¶¶ 9–10, *Napoli v. Bern*, Sup. Ct. N.Y. Cty., No. 159576/2014, ECF No. 9; June 5, 2015 letter of Clifford S. Robert to Hon. Eileen Bransten, *Napoli v. Bern*, No. 159576/2014 (Sup. Ct. N.Y. Cty.), Dkt. No. 136.

**F.    A firm that filed thousands of claims announced its website that it would "complete" forms on behalf of potential claimants who did not opt out.**

Junell & Associates—which filed nearly 3,200 claims—advertised its intent to complete unfinished forms without input from claimants.  The firm posted a copy of an email sent to claimants on its website, proclaiming that the firm would "complete a BSA Claim Form on your behalf so that you do not miss the November 16 deadline for BSA claims.  You will receive a copy once completed for your files."[39]  The firm expressly states that it will "complete" the form, not simply submit it, and that it will do so based on nothing more than an intake call:

> Since time is quickly running out to meet the November 16 deadline, we can complete a Claim Form on your behalf with the information you provided over the phone during your first consultation with us about this litigation.[40]

The notice also explained that "[t]he Claim Form allows attorneys to sign on behalf of claimants."[41]  So some portion of the over-3,000 claims submitted by the Junell firm were not completed by claimants, but rather filled out on behalf of claimants based on a call to an intake center (unless the person affirmatively opted out), and then signed by an attorney.

**G.    Claim-aggregating businesses played a major role in facilitating the explosion of lawyer-signed claims.**

Many of the lawyers who signed and submitted hundreds of claims in a single day appear to have not actually submitted the claims themselves.  Rather, third-party claim-aggregators completed and submitted thousands of claims on their behalf.  It is not clear what, if any, role the signing attorney even played in the process.  A claim-aggregator is a for-profit company that generates claims, typically employing call centers through which traffic is funneled by

---

[39]    Kirschenbaum Decl. Ex. 1 (http://www.junell-law.com/boy-scout-sexual-abuse/claim-form-notice/).

[40]    *Id.*

[41]    *Id.*

advertising and social media.[42]  They either sell the claims they generate or work on contract.  It is a volume business.  Document experts who examined the POCs identified several third-party claim-aggregators that played a key role in churning out dubious claims.

*Verus Claims Services LLC ("Verus").*  Verus's website describes the company's role in the BSA case:  "Verus will be handling the ***complete process*** of the Proof of Claim form, as well as the actual submission to the administrator of the Chapter 11 Proof of Claim process."[43]  The website adds that Verus "[e]xplain[s] to the victim the Proof of Claim process," "[r]eview[s] data for quality purposes," and "[u]pload[s] POC form for submission."[44]  This full-service offer leaves little or nothing for the lawyer to do, so it is no wonder that Adam Krause, the attorney who signed some 2,500 claims (including 890 in a single day), chose Verus.[45]  Mr. Krause did not even have to bother signing the forms.  A forensic examination revealed that Verus simply pasted a PDF image of his signature on more than 1,900 POCs.[46]  This saved Mr. Krause the effort of even opening a form to place his own digital signature.  At the very least, this practice creates questions about Mr. Krause's and Verus' respective roles in the claim vetting and submission process.

Verus appears to have submitted thousands of claims, more than half of which were submitted less than two weeks before the bar date.[47] █████████████████████████

---

[42]  *See* Kirschenbaum Decl. Ex. 8 (https://www.wsj.com/articles/inside-the-mass-tort-machine-that-powers-thousands-of-roundup-lawsuits-11574700480) (describing how "lead-generation" companies screen respondents to TV and social media ads, after which they either send potential plaintiffs contracts for whatever law firm has hired them, or (for those that work on spec) "sell the leads to law firms," sometimes using brokers).

[43]  Kirschenbaum Decl. Ex. 2.

[44]  Kirschenbaum Decl. Ex. 3.

[45]  Hinton Decl. tbl. 1; Speckin Decl. ¶ 18.

[46]  Speckin Decl. ¶ 18.

[47]  Hinton Decl. tbl. 4.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████ █ ████████████████████████████

████████████████████ █

     ***Consumer Attorney Marketing Group ("CAMG").***  CAMG offered law firms an even broader array of services than Verus, not only handling claim submission, but also creating television and internet ads.  Indeed, CAMG asserts that it has mass torts "down to a science," marketing itself to firms as a "turn-key operation" and a "one-stop shop, with you throughout the process, from running your creative [advertising] through intake, contract processing," and more.[50]  Part of that "science" is apparently maximizing claims, with promises that CAMG's "comprehensive and innovative approach to institutional sex abuse campaigns," including "finely targeted demographics," "data-based campaigns," and even an "exclusive Sex Abuse infomercial," will "optimize [the law firm's] marketing investment."[51]

     Many law firms took CAMG up on its offer.  CAMG appears to have created television ads for Coalition members Napoli Shkolnik PLLC,[52] Babin Law,[53] and Marc J. Bern & Partners,[54] among others, with many ads falsely claiming that "a victim's compensation fund is being set up that may be worth over $1.5 billion dollars."  Some of the firms ran their own ads

---

[48]   Hinton Decl. tbl. 6.  "Multiples" refers to claimants who submitted more than one form

[49]   Hinton Decl. tbl. 5.

[50]   Kirschenbaum Decl. Ex. 4. (https://www.camginc.com/legal-areas/mass-tort/).

[51]   Kirschenbaum Decl. Ex. 5. (https://www.camginc.com/legal-areas/sex-abuse/).

[52]   Kirschenbaum Decl. ¶¶ 18–19.

[53]   *Id.*

[54]   *Id.*

but many included the same graphics that are part of "generic" Boy Scout ads on CAMG's Vimeo homepage.[55]

CAMG's efforts to "optimize" plaintiffs' firms' investment in the BSA bankruptcy did not stop at creating false advertising.  For example, CAMG submitted approximately 400 forms for the Morelli Law Firm, each purportedly signed by a different claimant.[56]  Yet they all bear the same signature.[57]  This goes beyond sloppiness and suggests outright fraud, or at least a complete disregard for checking the veracity of the submitted claims and the oath given in signing them.  Based on the investigation to date, CAMG's fingerprints are on hundreds of claims.  Discovery is urgently needed to determine how 400 purportedly claimant-signed POCs could have been submitted bearing the exact same digital signature, and whether the same level of care was taken to ensure the quality and veracity of other CAMG-submitted claims.

*Archer Systems ("Archer").*  Archer Systems describes itself as a business that processes and administers claims for the plaintiffs' bar.[58]  An Archer Systems employee's name is included in the computer code on the PDF that was submitted to the Court through Omni on more than 900 POCs for Marc Bern & Partners and more than 500 POCs for Junell & Associates.[59]

*Verus, CAMG, and Archer are the tip of an iceberg.*  Other claim-aggregators submitted or processed claims.  Stratos and Your Case Managers were involved in at least 5,200 forms.[60]

---

[55]  *Id.*

[56]  Speckin Decl. ¶ 16, 19

[57]  *Id*.

[58]  Kirschenbaum Decl. Ex. 6 (https://www.archersystems.com/).

[59]  Speckin Decl. ¶ 17.

[60]  Speckin Decl. ¶ 16.

# ARGUMENT

## POINT I

### RULE 2004 IS THE APPROPRIATE—AND, INDEED, IDEAL—VEHICLE FOR THE LIMITED, REQUESTED DISCOVERY WHERE THERE ARE OBVIOUS IRREGULARITIES WITH THE PROOF-OF-CLAIM-FILING PROCESS.

### A.    Rule 2004 is broad and the standard for obtaining discovery is low.

Rule 2004 provides that "[o]n motion of any party in interest, the court may order the examination of any entity."[61]  Discovery under Rule 2004 "may relate . . . to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge."[62]  Rule 2004 is commonly used for pre-litigation discovery,[63] and permits broader discovery than what is allowed by the Federal Rules of Evidence.[64]

Courts routinely allow parties-in-interest to use Rule 2004 to probe proofs of claim, as Insurers seek to do here.[65]  For example, in *In re Subpoena Duces Tecum*, Rule 2004 was used to obtain discovery from a claimant "about the preparation of [its] proofs of claim," including information about "internal processes and procedures" for filing proofs of claim and "documents,

---

[61]  Fed. R. Bankr. P. 2004(a).

[62]  Fed. R. Bankr. P. 2004(b).

[63]  *See*, *e.g.*, *Sweetland v. Szadkowski (In re Szadkowski)*, 198 B.R. 140, 141 (Bankr. D. Md. 1996) ("[D]iscovery under [Bankruptcy] Rule 2004 may be properly employed as a prelitigation device.").

[64]  *See In re Washington Mutual, Inc.*, 408 B.R. 45, 49 (Bankr. D. Del. 2009) (Rule 2004 permits "a fishing expedition"); *In re Countrywide Home Loans, Inc.*, 384 B.R. 373, 400 (Bankr. W.D. Pa. 2008) (describing Rule 2004 examination as "broad, unfettered and in the nature of a fishing expedition"); *In re Valley Forge Plaza Assocs.*, 109 B.R. 669, 674 (Bankr. E.D. Pa. 1990) ("The scope of a [Rule] 2004 examination is even broader than that of discovery permitted under the F. R. Civ. P., which themselves contemplate broad, easy access to discovery.").

[65]  *In re Sutera*, 141 B.R. 539, 541 (Bankr. D. Conn. 1992) ("It is well settled that a Rule 2004 examination is a proper procedure to inquire into the basis for a filed proof of claim."); *Hope 7 Monroe St. Ltd. P'ship v. Riaso, LLC (In re Hope 7 Monroe St. Ltd. P'ship)*, 743 F.3d 867, 874 (D.C. Cir. 2014) ("Bankruptcy courts have permitted Rule 2004 examinations relating to the validity of a proof of claim.").

records and information provided by [claimant]" to counsel before filing.[66]  The court there found that movant had established good cause for Rule 2004 discovery because the "subject matter of the examinations—the basis for the validity of . . . various proofs of claim—is pretty clearly related to the debtors' liabilities and the amounts to be paid."[67]  And the court ruled that there were good reasons, as here, to suggest "the possible existence of abuse in the proof of claim process."[68]

Similarly, in *In re Michalski*, Rule 2004 was used "to examine [claimant] Wells Fargo as to the liabilities of the Debtors with respect to Wells Fargo and to determine whether the proof of claim is valid or contains objectionable fees."[69]  The court allowed the requested examination, finding that movant "does not have to articulate a basis to dispute the Proof of Claim before exercising his right to conduct a Rule 2004 examination."[70]  The court allowed both written and deposition discovery, finding that "Rule 2004(a) specifically contemplates the in-person examination of an 'entity" and consequently, entitles movant "to conduct an in-person examination of Wells Fargo."[71]

**B.  Mass-tort cases need to be policed for baseless filings.**

Identifying and valuing valid claims is a pervasive challenge in mass-tort litigation.  This is particularly the case where, as here, advertisers solicit tens of thousands of claims, the minimal

---

[66]  461 B.R. 823, 826 (Bankr. C.D. Cal. 2011).

[67]  *Id*. at 829.

[68]  *Id*.

[69]  449 B.R. 273, 281 (Bankr. N.D. Ohio 2011).

[70]  *Id*. at 281.

[71]  *Id*. at 283; *see also In re DeShetler*, 453 B.R. 295, 306 (Bankr. S.D. Ohio 2011) ("2004 examination may be used . . . to investigate proofs of claim filed in bankruptcy cases provided that the examination is otherwise appropriate under Rule 2004."); *In re Arkin-Medo, Inc*., 44 B.R. 138, 139-140 (Bankr. S.D.N.Y. 1984) (allowing Rule 2004 examination of the "facts surrounding the signing of the guarantee held by [a creditor], which go directly to the validity of a $1,600,000 claim.").

information available on each claim and the concomitant lack of individual scrutiny of each claim, invites fraud and abuse.[72]   Discovery is frequently necessary to identify and evaluate abuses in the claims process, and courts routinely allow such discovery, whether under Rule 2004 or in other contexts.

*In re Silica Products Liability Litigation*, a multi-district case about silica injuries, offers a lesson.[73]   There, discovery uncovered abuse of the claim process.  The court ordered each plaintiff to submit a "Fact Sheet" detailing "specific information about when, where and how each Plaintiff alleged he or she was exposed to silica dust" and "medical information concerning each Plaintiff's silica-related injury."[74]   After discovering that only a handful of doctors diagnosed more than 9,000 plaintiffs, the court allowed defendants to take the depositions of nine physicians.  As a result of this discovery, the court concluded that it could "say with confidence" that only two "of the 10,000 Plaintiffs [were] genuinely injured."[75]

Similarly, in the *W.R. Grace & Co.* bankruptcy, the court allowed "extensive discovery" including a detailed questionnaire and the depositions of several plaintiffs' attorneys.[76]   So too in the *Garlock* bankruptcy, where discovery revealed pervasive abuses by mass-tort plaintiffs that

---

[72]   398 F. Supp. 2d 563 (S.D. Tex. 2005).

[73]   Such examples are not isolated.  As commentators have observed, mass-tort bankruptcies face significant abuse, including by some the same firms that filed claims against BSA.  *See* Nora Freeman Engstrom, *Retaliatory Rico and the Puzzle of Fraudulent Claiming*, 115 Mich. L. Rev. 639, 659–60 (2017) (listing examples). *See also* James Lowery, *The Scourge of Over- Naming in Asbestos Litigation: The Costs to Litigants and the Impact on Justice*, Mealey's (Jan. 18, 2018) (The "over-naming problem has become an epidemic, driving up costs for those entities that simply do not belong as defendants."); S. Todd Brown, *Bankruptcy Trusts, Transparency and the Future of Asbestos Compensation*, 23 Widener L.J. 299 (2013); Mark D. Plevin, *The Garlock Estimation Decision: Why Allowing Debtors and Defendants Broad Access to Claimant Materials Could Help Promote the Integrity of the Civil Justice System*, 23 No. 4 J. Bankr. L. & Prac. NL Art. 2 (Aug. 2014).

[74]   *Id.* at 567.

[75]   *Id.* at 642; *see also In re Subpoena Duces Tecum*, 461 B.R. 823, 826 (Bankr. C.D. Cal. 2011) (permitting discovery where the "concerns stem from a foundation suggesting the possible existence of abuse in the proof of claim process").

[76]   475 B.R. 34, 71 (D. Del. 2012).

made Garlock's historical settlement amounts unfit "as a predictor of [Garlock's] true liability" because they were "infected with the impropriety of some law firms."[77]  The court noted that "[t]he limited discovery allowed by the court demonstrated that almost half of those cases [where Garlock paid recoveries of $250,000 or more] involved misrepresentation of exposure evidence"—*i.e.*, plaintiffs withheld evidence of exposure to asbestos from other sources.[78]  The court decided that it "appear[ed] certain that more extensive discovery would show more extensive abuse," but "the startling pattern of misrepresentation that has been shown is sufficiently persuasive."[79]  While the precise type of abuse (misrepresentation of exposure evidence) may not apply here, that discovery is needed to uncover abuse of process is equally true in this case.

There are other examples.  In the *USG* bankruptcy, the court collected basic information that allowed it to "reject unsubstantiated claims, bogus medical evidence and fanciful theories of causation" and identify claimants who were "truly harmed."[80]  Likewise, in the *G-I Holdings* bankruptcy, the court ordered initial disclosures that allowed the debtor to object to claims it believed were "illegitimate or dispensable as a matter of law."[81]

The enormous financial incentives here create a moral hazard for the plaintiffs' lawyers, lenders, and investors behind the mass-generated claims.  Based on UCC filings, plaintiffs' lawyers alone stand to pocket up to 40 percent of what is paid on a POC.[82]  When one factors in bankruptcy counsel, experts, and expenses, which are in addition to the contingency, half the

---

[77]  *In re Garlock Sealing Techs.*, LLC, 504 B.R. 71, 73, 87 (Bankr. W.D.N.C. 2014).

[78]  *Id.* at 86.

[79]  *Id.*

[80]  *In re USG Corp.*, 290 B.R. 223 (Bankr. D. Del. 2003).

[81]  *In re G-I Holdings Corp.*, 323 B.R. 583, 622–23 (Bankr. D.N.J. 2005).

[82]  Kirschenbaum Decl. Ex. 9.

potential payout—sometimes less—goes to someone other than the claimant. The Third Circuit has cautioned that bankruptcy courts must be vigilant about these sorts of self-interested incentives in mass-tort cases.[83]

### C.   In light of the evidence here, the need for Rule 2004 discovery is not a close call.

Given the evidence, there is good reason to be concerned about the abuses of the claims process and more than ample reason to allow the requested discovery to proceed. The numbers speak for themselves—it is impossible for anyone to vet hundreds of claims in a single day or tens of thousands in just a few months. But the potential misconduct extended well beyond the numbers, including, by way of example, the following:

- Attorneys submitted hundreds of claims by affixing an electronic signature to bundles of claims just seconds apart in assembly-line fashion.[84]
- Other attorneys submitted photocopied pre-signed signature pages attached to hundreds of claims.[85]
- Attorneys relied on aggregators to churn out claims.[86]
- ███████████████████████████████████████████████
- A firm that filed thousands of claims announced that it would "complete" forms on behalf of potential claimants unless they opted out.[88]

Because they were not vetted, the vast majority of the mass-signed POCs reviewed are facially defective. They are missing critical information, are duplicates, or are barred by the statute of limitations.[89]

---

[83]   *In re Congoleum Corp.*, 426 F.3d 675, 692 (3d Cir. 2005).

[84]   Speckin Decl. ¶¶ 12–13.

[85]   Speckin Decl. ¶¶ 7–8, 10–11.

[86]   Hinton Decl. tbl. 4.

[87]   Hinton Decl. tbl. 1; Speckin Decl. ¶ 14.

[88]   Kirschenbaum Decl. Ex. 1.

[89]   Hinton Decl. tbl. 2, 3.

With the attorneys who engaged in mass signings conducting no pre-filing inquiry, it is not surprising that the following questionable claims can be found in the sample of mass-signed POCs that were reviewed:



The presence of aggregators and funders amplifies the need for scrutiny. These aggregators boast that they will handle the "complete process of the Proof of Claim form."[95] One aggregator advertises that it will "[e]xplain to the victim the Proof of Claim process," "[r]eview data for quality purposes," and "[u]pload POC form for submission."[96] In other words, it will relieve the lawyers who "signed" to POCs from doing anything.

Discovery is necessary here to learn "about the preparation of [the] proofs of claim," including information about "internal processes and procedures" for filing proofs of claim.[97] The proposed discovery will (i) show what, if anything, was done to vet the claims, particularly

---

[90] *See* Declaration of J. Weinberg ("Weinberg Decl.") Ex. 1.

[91] *See* Declaration of Todd Mercier ("Mercier Decl.") Ex. 4, 10.

[92] *See* Weinberg Decl., Ex. 4.

[93] *See* Mercier Decl. Ex. 1–3.

[94] *See* Weinberg Decl., Ex. 2.

[95] Kirschenbaum Decl. Ex. 2.

[96] Kirschenbaum Decl. Ex. 3.

[97] 461 B.R. 823, 826 (Bankr. C.D. Cal. 2011).

where an attorney signed the form—or allowed his or her signature to be placed on the form apparently without ever seeing it—and represented that he or she undertook a reasonable inquiry to confirm that the factual contentions in the claim have evidentiary support; (ii) uncover evidence that plaintiffs' lawyers bought claims and filed them without ever seeing them; and (iii) reveal additional third parties churning out claims on plaintiff firms' behalf. The "subject matter of the examinations—the basis for the validity of . . . various proofs of claim—is clearly related to the debtors' liabilities and the amounts to be paid," and, there are good reasons to suggest "the possible existence of abuse in the proof of claim process."[98] This discovery is essential to uncovering the truth about the suspicious late-breaking explosion of claims. This discovery will also aid the parties in narrowing and targeting objections to the POCs and the discovery that will accompany the objections.

## POINT II

### A LAWYER WHO SIGNS A PROOF OF CLAIM BECOMES A FACT WITNESS ABOUT THE ASSERTED ALLEGATIONS AND WAIVES PRIVILEGE.

**A.     The law requires a pre-filing inquiry that is non-delegable.**

An attorney undertakes a legal responsibility by affirming the oath above the signature line in a POC. Disregard for the oath exposes the attorney signing the POC to sanctions, disciplinary action, and even criminal penalties.[99] In addition, "Bankruptcy Rule 9011 has

---

[98]   *Id*. at 829.

[99]   *See e.g.*, *In re Disciplinary Proceeding Against McGrath*, 178 Wash. 2d 280, 294 (2013) (disbarring attorney who filed false proofs of claim in his wife's bankruptcy to make her assets seem more encumbered than they really were so as "to mislead and discourage . . . creditors from making claims against the secured property."); *see also* 18 U.S.C. §§ 152(4), 157; *United States v. Connery*, 867 F.2d 929, 932 (6th Cir. 1989) (attorney who "prepared" a false proof of claim as part of a scheme by which the debtor had an accomplice file a false proof of claim was convicted of aiding and abetting a violation of 18 U.S.C. § 152(4), and was later disbarred); *In re Thomas*, 337 B.R. 879, 886 (Bankr. S.D. Tex. 2006) (concluding that "the proof of claim prepared, signed, and filed by Counsel on behalf

specifically been held to apply to proofs of claim," which mandates a pre-filing "inquiry."[100]  In

fact, courts have observed that "[c]ompliance with Bankruptcy Rule 9011 is ***particularly***

***important for proofs of claim*** because a properly filed proof of claim constitutes *prima facie*

evidence of the validity and amount of the claim," and "[t]he Court must therefore be able to rely

on the integrity of the proofs of claim before it."[101]

Moreover, courts have taken a dim view of attorneys who attach pre-signed signature

pages to filings.  In *Rivera*, the court sanctioned (and referred to the chief judge for further

discipline) lawyers who engaged in this practice, concluding that "[n]o reasonable attorney

would consider [forms with pre-signed signatures] to be certifications, nor would any reasonable

attorney engage in the practice of using 'on-file' signature forms."[102]  The court held that the

practice violated Rule 9011 because "the threshold 'factual contention' in each of the ersatz

submissions—that the signatory read and signed the document—[was] flatly untrue (not to

mention without any evidentiary support)."[103]

The pre-filing inquiry requirement is not trivial.  "At a minimum, the reasonable inquiry

standard requires at least some affirmative investigation on the part of the signer," and the

---

of the IRS [was an] intentional false statement[]" because "both the Debtors and Counsel knew that the documents falsely represented the amount that the IRS asserted to be its claim," and referring conduct to the U.S. Attorney.

[100]  *See In re Obasi,* No. 10-10494 (SHL), 2011 WL 6336153, at *7 (Bankr. S.D.N.Y. Dec. 19, 2011); *see also Hannon v. Countrywide Home Loans, Inc. (In re Hannon)*, 421 B.R. 728, 731 (Bankr.M.D.Pa.2009); *In re Thomas*, 337 B.R. 879, 895 (Bankr.S.D.Tex.2006), *aff'd*, 223 Fed. Appx. 310 (5th Cir.2007); *Knox v. Sunstar Acceptance Corp. (In re Knox)*, 237 B.R. 687, 699 (Bankr.N.D.Ill.1999)

[101]  *Obasi*, 2011 WL 6336153 at *7 (emphasis added) (internal quotations and citations omitted).

[102]  *In re Rivera*, 342 B.R. 435, 438, 458, 464 (Bankr. D.N.J. 2006), *aff'd*, No. CIV A 06-4278 KSH, 2007 WL 1946656 (D.N.J. June 29, 2007).

[103]  *Id*. at 458.

"signer must explore readily available avenues of factual inquiry."[104]  Blind reliance on a client's (or an aggregator's) representations is insufficient.  Under Rule 9011, "an attorney must, in her independent professional judgment, make a reasonable effort to determine what facts are likely to be relevant to a particular court filing and to seek those facts from the client."[105]  An attorney "cannot simply settle for the information her client determines in advance."[106]

Nor is this duty to investigate delegable—not even to the signing attorney's associate, and certainly not to a claim aggregation shop churning out claims by the thousand.  In one case, the signing attorney relied on a litigation support firm to "prepare[] proofs of claim, which were then submitted to the firm for review by an attorney at or near the time of filing."[107]  The associate, working "under the general supervision of" the signing attorney, would review the proofs of claim using an internal checklist and file them using the singing attorney's electronic signature.[108]  The court "found that the conduct [at issue] runs afoul of Bankruptcy Rule 9011"[109] because "[t]he person signing, filing, submitting, or advocating a document has a

---

[104]   *Obasi*, 2011 WL 6336153 at *5 (citing *In re KTMA Acquisition Corp.*, 153 B.R. 238, 249 (Bankr. D. Minn. 1993)).

[105]   *In re Taylor*, 655 F.3d 274, 284 (3d Cir. 2011).  *See also In re M.A.S. Realty Corp.*, 326 B.R. 31, 41 (Bankr. D. Mass. 2005) (finding that a lawyer "acted unreasonably under the circumstances" where he filed a proof of claim even though his "efforts [to obtain support and documentation from the claimant] did not yield a single supporting document," which "should have alerted [the attorney] that the proof of claim lacked a reasonable evidentiary basis, which in turn should have made him realize the impropriety of filing the proof of claim itself.").

[106]   *Taylor*, 655 F.3d at 284.

[107]   *Obasi*, 2011 WL 6336153 at *2.

[108]   *Id.*

[109]   The only reason the court did not impose sanctions was that "no evidence has been presented that the UST has complied with the safe harbor provisions by serving a copy of its motion on [the attorney] and his firm before filing it with this Court."  *Id.* at *9.

***nondelegable*** responsibility to the court" and "is ***personally*** responsible for reviewing the document."[110]

In another case, the court chastised an attorney for "sign[ing] a plethora of proofs of claim while reviewing only 10% of them."[111]  The court made clear that "when Borrensen [the lawyer acting as claimant's authorized agent] signed the proof of claim as HSBC's authorized representative without even reviewing it, a line was crossed," and "that Borrensen in signing and presenting a document without any knowledge of its factual basis . . . failed to discharge her duty."[112]  The court sanctioned another lawyer in the case for "fail[ing] to observe her duty to make reasonable inquiry of the two documents she signed" (a stay motion and an answer to a claim objection).[113]  The Third Circuit upheld the sanction, explaining that:

> Rule 11 requires more than a rubber-stamping of the results of an automated process by a person who happens to be a lawyer. Where a lawyer systematically fails to take any responsibility for seeking adequate information from her client, makes representations without any factual basis because they are included in a "form pleading" she has been trained to fill out, and ignores obvious indications that her information may be incorrect, she cannot be said to have made reasonable inquiry.[114]

The conduct here is far more egregious than failing to supervise an associate or even reviewing just 10 percent of the claims.  The attorneys from whom Insurers seek discovery seem to have signed claims indiscriminately or delegated the entire claim preparation process to third-party aggregators that assured the plaintiffs' bar that they would handle "the complete process."

---

[110]  *Id*. at *3, 4, 8 (first emphasis in the original; second emphasis added) (internal quotations and citations omitted).

[111]  *In re Taylor*, 407 B.R. 618, 647 (Bankr. E.D. Pa. 2009), *rev'd*, No. 09-CV-2479-JF, 2010 WL 624909 (E.D. Pa. Feb. 18, 2010), *aff'd in part, vacated in part, rev'd in part*, 655 F.3d 274 (3d Cir. 2011).

[112]  *Id.* at 647.

[113]  *Id*.

[114]  *In re Taylor*, 655 F.3d 274, 288 (3d Cir. 2011).

**B.    The ethical rules require
        a pre-filing inquiry.**

Comment 3 to ABA Model Rule of Professional Conduct 3.3 states that "an assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry."[115]  Here, the POC proclaims in bold letters just above the attorney signature:  "I declare under penalty of perjury that the foregoing statements are true and correct."  There is no way to make that declaration—particularly under penalty of perjury—by giving a photocopy of one's signature for someone else to affix to hundreds of claims.

**C.    Signing a proof of claim is an assertion
        of personal knowledge of the facts.**

The discovery that Century proposes to take should come as no surprise to the lawyers and aggregators to whom it is directed.  In addition to the obligation that Bankruptcy Rule 9011, applicable case law, and the oath that signing a POC imposes, this Court stated at the October 14, 2020 hearing that an attorney signing a claim "might be[come] . . . a fact witness" and "may be subject to a deposition."[116]  The Court had it right because a lawyer who signs a proof of claim "bec[omes] a fact witness as to the allegations contained in the proof of claim," and "this results in waiver of otherwise applicable privileges."[117]  Case law confirms what the POC requires the signing attorney to affirm:  "Signing a proof of claim is an assertion of personal knowledge of

---

[115]  Comment 12 to ABA Model Rule of Professional Conduct 3.3 is also relevant (discussing a lawyer's obligation to preserve the integrity of the adjudicative process).

[116]  Oct. 14, 2020 Hr'g Tr. at 170:2–12.

[117]  *In re Rodriguez*, No. 10-70606, 2013 WL 2450925, at *4 (Bankr. S.D. Tex. June 5, 2013).

the facts alleged in the proof of claim," and the signing attorney may therefore be questioned

regarding the factual basis for the assertions in the proof of claim.[118]

Indeed, Rule 2004 has been used to obtain discovery from counsel.  Recently, debtor

Gawker Media succeeded in obtaining Rule 2004 discovery pertaining to Peter Thiel's

relationship with attorney Charles Harder who represented plaintiffs in various cases against

Gawker Media that Thiel reportedly funded.[119]  The court rejected the "argument that the Rule

2004 Motion should be denied because Mr. Harder is an attorney."[120]  The court noted that

Harder was "a fact witness whose communications with Thiel do not implicate the concerns that

attend the attorney-client privilege," and that, in any event, "a Rule 2004 examination should not

be denied merely because it may touch on privileged matters."[121]

In short, Rule 2004 is used in the way that Insurers propose to use it here and is

consistent with the Court's preliminary take on this matter.  It is appropriate for probing the

validity of proofs of claim even before any objections are lodged.  And plaintiffs' counsel are

proper targets for such discovery, particularly after they chose to sign proofs of claims, despite

the Court's warning that doing so would subject them to discovery.

---

[118]  *Id.* at *3–4; s*ee also Swanson v. Trasino Park-Hudsons, LLC (In re Vission , Inc.),* No. 07-21957, 2008 WL 2230741, at *4 n.3 (Bankr. E.D. Wis. 2008) ("By signing the affidavit, counsel runs the risk of becoming a fact witness, and any future hope of asserting privilege may disappear.").

[119]  *In re Gawker Media LLC*, No. 16-11700 (SMB), 2017 WL 2804870, at *2, 4 (Bankr. S.D.N.Y. June 28, 2017).

[120]  *Id.* at *6.

[121]  *Id.* at *7 (holding that if "discovery requests implicate a privilege or seek discovery precluded by the settlement agreements, the Court can address those issues as it would in any other litigation").  *See also In re Buick,* 174 B.R. 299, 304 (Bankr. D. Colo. 1994) (attorneys with personal knowledge of relevant matters are "within the scope of persons who may be examined pursuant to Rule 2004").

## POINT III

### THE NEED FOR REQUESTED DISCOVERY
### FAR OUTWEIGHS ANY POTENTIAL BURDEN.

While there is great need for the proposed discovery in light of the dubious claim-filing practices already found by a mere sampling of POCs, the burden is minimal.  Of the hundreds of lawyers filing claims, Insurers seek discovery from only 15.  Insurers selected these lawyers because of the massive filings they made, including signing hundreds of claims in a single day, and the large numbers filed by their firms collectively.  This limited discovery is intended to explore the clear indicia of the likely pervasive claim-churning here.

Not only is the burden slight, but it is also one that the plaintiffs' attorneys voluntarily assumed when they chose to sign the proofs of claim.  The Court cautioned these attorneys to "think long and hard before they sign that proof of claim form" because they may become witnesses.[122]  But they persisted.

The attorneys must comply with Bankruptcy Rule 9011(b)'s requirement that by signing a court filing—such as a proof of claim—an attorney "is certifying, to the best of [his or her] knowledge, information, and belief, formed ***after an inquiry*** reasonable under the circumstances," that the claim has a proper purpose and legal and evidentiary basis.[123]  The rule imposes a personal responsibility to conduct a "reasonable investigation" of the contents of the proof of claim.[124]

"Signing a proof of claim is an assertion of personal knowledge of the facts alleged in the proof of claim," and an attorney signing a proof of claim can be made to "answer . . . questions

---

[122]  Oct. 14, 2020 Hr'g Tr. at 170:8–12.

[123]  Fed. R. Bankr. P. 9011 (b) (emphasis added).

[124]  *See Obasi,* 2011 WL 6336153, at *4.

28

regarding the factual basis for the assertions made in the [form]."[125]  The attorneys here chose to make themselves fact witnesses responsible for answering "questions regarding the factual basis for the assertions made in the" proofs of claim.  Now is the time to answer those questions.

## CERTIFICATION OF COUNSEL

Pursuant to Local Rule 2004-1, before filing this motion, counsel for Insurers met and conferred, or attempted to meet and confer, with the parties as set out in the Declaration of Stamatios Stamoulis filed with this motion.  Those who met and conferred with Insurers' counsel stated that they will oppose Insurers' motion for leave to conduct discovery pursuant to Rule 2004 or refused to say that they would not oppose the motion.

## NOTICE

Notice of this motion was provided to the following parties or their respective counsel: (a) the U.S. Trustee; (b) the Debtors; (c) the Official Committee of Unsecured Creditors; (d) the Official Committee of Tort Claimants; (e) the Future Claims Representative; (f) the Coalition of Abused Scouts for Justice; and (g) any other party that has requested notice pursuant to Bankruptcy Rule 2002.

## CONCLUSION

This Court should enter an order, substantially in the form attached hereto as Exhibit A, allowing Insurers to take written and deposition discovery of counsel identified in Exhibit B and to issue subpoenas to third parties identified in Exhibit C.


*[Remainder of page intentionally left blank]*

---

[125]  *In re Rodriguez*, No. 10-70606, 2013 WL 2450925, at *3, 4. (Bankr. S.D. Tex. June 5, 2013).

Dated:  January 22, 2021

By:   */s/ Erin R. Fay*
     Erin R. Fay (No. 5268)

**Bayard, P.A.**
Gregory J. Flasser (No. 6154)
600 North King Street, Suite 400
Wilmington, Delaware 19801
Telephone:  (302) 655-5000
Email:  efay@bayardlaw.com
       gflasser@bayardlaw.com

**Shipman & Goodwin LLP**
James P. Ruggeri (admitted *pro hac vice*)
Joshua D. Weinberg (admitted *pro hac vice*)
Michele Backus Konigsberg (admitted *pro hac vice*)
1875 K Street, NW, Suite 600
Washington, D.C. 20003
Tel:  (202) 469-7750

**Wilmer Cutler Pickering Hale and Dorr LLP**
Philip D. Anker (*pro hac vice* pending)
7 World Trade Center
250 Greenwich Street
New York, N.Y. 10007
Tel:  (212) 230-8890

**Wilmer Cutler Pickering Hale and Dorr LLP**
Danielle Spinelli (admitted *pro hac vice*)
Joel Millar (*pro hac vice* pending)
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C. 20006
Tel:  (202) 663-6000

*Attorneys for First State Insurance Company,*
*Hartford Accident and Indemnity Company*
*and Twin City Fire Insurance Company*

Respectfully Submitted,

By:   */s/ Stamatios Stamoulis*
     Stamatios Stamoulis (No. 4606)

**Stamoulis & Weinblatt LLC**
800 N. West Street
Third Floor
Wilmington, Delaware 19801
Telephone: (302) 999-1540
Facsimile: (302) 762-1688

**O'Melveny & Myers LLP**
Tancred Schiavoni (admitted *pro hac vice*)
Gary Svirsky (*pro hac vice* pending)
Andrew Kirschenbaum (admitted *pro hac vice*)
Times Square Tower
7 Times Square
New York, New York 10036-6537
Telephone: 212-326-2000

*Counsel for Century Indemnity Company, as*
*successor to CCI Insurance Company, as*
*successor to Insurance Company of North*
*America and Indemnity Insurance Company of*
*North America, Westchester Fire Insurance*
*Company and Westchester Surplus Lines*
*Insurance Company*

**EXHIBIT A**

*Proposed Order*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 20-10343 (LSS) |
| BOY SCOUTS OF AMERICA AND DELAWARE Boy Scouts, LLC,[1] | Jointly Administered |
| Debtors. | |

**[PROPOSED] ORDER GRANTING INSURERS' MOTION FOR
AN ORDER AUTHORIZING CERTAIN RULE 2004 DISCOVERY**

Upon the motion (the "Motion")[2] of Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America, Westchester Fire Insurance Company and Westchester Surplus Lines Insurance Company and Hartford Accident and Indemnity Company, First State Insurance Company and Twin City Fire Insurance Company (together, "Insurers") for entry of an Order granting certain relief requested in the Motion (D.I. _____), it is HEREBY ORDERED THAT:

1.      The Motion is GRANTED.

2.      Insurers are authorized under Bankruptcy Rules 2004 and 9016 to (a) serve the requests for production and interrogatories set forth in Exhibit D to the Motion on the individuals identified in Exhibit B to the Motion (the "Attorney Discovery Requests"); and (b) to take

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware Boy Scouts, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Lane, Irving, Texas 75038.

[2]    All capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Motion.

depositions of the attorneys identified in Exhibit B to the Motion within thirty (30) days of issuance of this Order.

3.      The individuals identified in Exhibit B to the Motion shall have twenty-one (21) days from date of service to object and respond to the Attorney Discovery Requests.

4.      Insurers are authorized under Bankruptcy Rules 2004 and 9016 to issue subpoenas seeking to compel the production of documents and information responsive to the requests set forth in Exhibit E to the entities identified in Exhibit C to the Motion (the "Third Party Discovery Requests"); and to issue subpoenas compelling the testimony on behalf of the entities within twenty-one (21) days of issuance of this Order.

5.      The entities identified in Exhibit C to the Motion shall have thirty (30) from date of service to provide objections and responses to the Attorney Discovery Requests.

6.      Nothing contained herein shall prejudice Insurers' rights under Bankruptcy Rule 2004 and other applicable laws to seek further document productions and written and oral examinations in connection with these Chapter 11 Cases.

7.      The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.


Dated _____

                          _____
                                United States Bankruptcy Judge

# EXHIBIT B

***Proposed Attorneys for***
***Written and Deposition Discovery***

| Attorney | Firm |
|---|---|
| Adam W. Krause | Krause & Kinsman |
| David H. Stern | Ask LLP |
| Joshua B. Schwartz | Abused in Scouting |
| Stewart Eisenberg | Abused in Scouting |
| Sean T. Higgins | Andrews & Thornton |
| Deborah Levy | Junell & Associates |
| Timothy Kosnoff | Abused in Scouting |
| Steven Babin Jr. | Babin Law, LLC |
| Rochelle Guiton | D. Miller & Associates |
| Paul J. Napoli | Napoli Law |
| Joseph J. Cappelli | Marc Bern & Partners |
| James Harris | Paglialunga & Harris, PS |
| Michael S. Werner | Slater, Slater & Schulman |
| Andrea McGinnis | Bailey Cowan Heckaman |
| Jonathan Schulman | Slater, Slater & Schulman |

**EXHIBIT C**

*Proposed Third Parties for*
*Written and Deposition Discovery*

| Entity |
|---|
| Verus Claims Services LLC ("Verus") |
| Consumer Attorney Marketing Group ("CAMG") |
| Archer Systems ("Archer") |
| Stratos Legal ("Stratos") |

# EXHIBIT D

*Attorney Discovery Requests*

## DEFINITIONS

1.      "Attorney" means lawyer who indicated in the Claim Form Signature Page (page 12 of the Claim Form) that she or he is the Claimant's attorney.

2.      "Chapter 11 Cases" means the chapter 11 cases filed by the Debtors in the United States Bankruptcy Court for the District of Delaware on February 18, 2020, jointly administered under Case No. 20-10343.

3.      "Claim Form" means the Sexual Abuse Survivor Proof of Claim Form submitted by You or on Your behalf in these Chapter 11 Cases.

4.      "Omni" means Omni Agent Solutions, the debtors' administrative agent in the Chapter 11 Cases.

5.      "You" or "Your" means the person on whom this discovery is served.

## INTERROGATORIES

1.      For each Claim Form submitted to Omni by Your law firm that was signed by an Attorney (to the extent not produced by another attorney at your firm), identify the attorneys in Your Firm who spoke or interacted with the claimants identified on the Claim Form prior to the filing of the Claim Form.

2.      For each Claim Form submitted to Omni by Your law firm that was signed by an Attorney, identify the call centers, claim processors, third-party administrators, claim aggregators, and/or other non-law firm business(es) involved in preparing, completing and/or submitting the Claim Form.

3.      For each Claim Form submitted to Omni by Your law firm that was signed by an Attorney, state, with the associated claim number, the following:

a.    whether the Attorney who signed the Claim Form was authorized in writing to sign the Claim Form on behalf of the claimant;

b.    when the Claim Form was signed;

c.    whether Your law firm or a non-law firm business submitted the Claim to Omni and, if a non-law firm business, its name;

d.    the amount of time You spent investigating the claim and confirming the existence of evidentiary support for the facts set forth in the Claim Form prior to its filing;

e.    list all actions You took to confirm the existence of evidentiary support for the facts set forth in the Claim Form, including the date on which the action was taken and the amount of time the action took to complete;

f.    list all documents You reviewed to confirm the existence of evidentiary support for the facts set forth in the Claim Form; and

## REQUESTS FOR PRODUCTION

1.    For each Claim Form submitted to Omni by Your law firm that was signed by an Attorney, provide any authorization forms or documents authorizing the Attorney who signed the Claim Form to do so.  Identify by claim number which authorization applies to which Claim Form.

2.    For each Claim Form submitted to Omni by or on behalf of Your law firm that was signed by an Attorney, all documents relating to the inquiry You, or anyone working at Your direction, conducted to confirm the existence of evidentiary support for each fact set forth in the Claim Form.  Identify by claim number which document relates to which Claim Form.

3.      All contracts or agreements (whether formal or informal) entered into by You or Your law firm in connection with soliciting, acquiring access to, interacting with, executing signatures, or vetting claimants or potential claimants in the Chapter 11 Cases.

4.      For each Claim Form submitted to Omni by Your law firm that was signed by an Attorney,  all documents reflecting communications with third party vendors pertaining to soliciting,  processing, vetting, and filing Claim Forms.

5.      For each Claim Form submitted to Omni by Your law firm, the original PDF of the Claim Form created at your firm and transmitted to Omni, in native format, including all associated metadata.

6.      For each Claim Form submitted to Omni by Your law firm where You signed a standalone signature page (page 12 of the Claim Form) rather than the signature page that was part of the document containing the complete Claim Form, (a) the original file containing the signed signature page (page 12 of the Claim Form), in native format, including all associated metadata; and (b) the original file containing the completed Claim Form that was filled in without Your signature in native format, including all associated metadata

7.      For each document responsive to the above request, identify by claim number with which Claim Forms each signed standalone signature page was used.

8.      All documents reflecting communications between You (or Your law firm) and any non-law firm business pertaining to ownership of or financial interest in claims in the Chapter 11 Cases, including but not limited to any marketing of claims in Chapter 11 cases or any financial interest therein, any offers to sell or transfer claims in the Chapter 11 Cases, and communications pertaining to financing secured by an interest in any potential recovery on the claims in the Chapter 11 Cases.

**EXHIBIT E**

*Third Party Discovery Requests*

**DEFINITIONS**

1.      "Attorney" means lawyer who indicated the in Claim Form Signature Page (page 12 of the Claim Form) that she or he is the Claimant's attorney.

2.      "Chapter 11 Cases" means the chapter 11 cases filed by the Debtors in the United States Bankruptcy Court for the District of Delaware on February 18, 2020, jointly administered under Case No. 20-10343.

3.      "Claim Form" means the Sexual Abuse Survivor Proof of Claim Form submitted by You or on Your behalf in these Chapter 11 Cases.

4.      "Omni" means Omni Agent Solutions, the debtors' administrative agent in the Chapter 11 Cases.

5.      "You" or "Your" means [NAME OF COMPANY].

**REQUESTS FOR PRODUCTION**

1.      For each Claim Form submitted by You to Omni in the Chapter 11 Cases, the original PDF of the Claim Form that was transmitted to Omni, in native format, including all associated metadata.

2.      For each Claim Form which you submitted or for which you provided services (a) the original file containing the signature placed on the signature page (page 12 of the Claim Form), in native format, including all associated metadata; and (b) the original file containing the completed Claim Form that was filled in without the signature, in native format, including all associated metadata.  Identify by claim number with which Claim Forms each signed standalone signature page was used.

3.      Documents sufficient to show the names and email addresses associated with all accounts which you used to submit Claim Forms to Omni.

4.       All documents reflecting any contracts or agreements You had with any law firm, person, or any other party pertaining to any services performed by You in relation to the Chapter 11 Cases, including but not limited to soliciting, acquiring access to, interacting with, executing signatures, vetting, or filing Claim Forms for claimants or potential claimants in the Chapter 11 Cases.

5.       All documents that provide instructions or describe processes and procedures to be followed in providing services pertaining to the Chapter 11 cases, including but not limited to soliciting, acquiring access to, interacting with, executing signatures, vetting, or filing Claim Forms for claimants or potential claimants in the Chapter 11 Cases.

6.       All documents reflecting communications relating to obtaining Attorney signatures for all Claims Forms submitted by You that were signed by an Attorney.

7.       For all Claim Forms that you submitted or for which you provided any services, and that were signed by an Attorney, all documents or communications reflecting or pertaining to the Claim Forms.

8.       Documents sufficient to show the (a) names of Your employees or members of other organizations who performed any work relating to the Chapter 11 cases and (b) the nature of the work performed by each employee of Your firm or third-party employee.  (c) For each responsive document to (a) and (b) identify the Claim Forms (by claim number) and each employee of Your firm or third-party employee who performed work.

9.       All documents reflecting communications between You and any law firm or other entity pertaining to ownership of or financial interest in claims in Chapter 11 Cases, including but not limited to any marketing of claims in Chapter 11 cases or any financial interest therein,

any offers to sell or transfer claims in the Chapter 11 Cases, and communications pertaining to financing secured by an interest in any potential recovery on the claims in the Chapter 11 Cases.