# EXHIBIT 1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 20-10343 (LSS) |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Jointly Administered |
| Debtors. | **Hearing Date: Feb. 17, 2021 at 10:00 a.m. (ET)**<br>**Objection Deadline: Feb. 5, 2021 at 4:00 p.m. (ET)** |

## INSURERS' MOTION FOR AN ORDER AUTHORIZING
## RULE 2004 DISCOVERY OF CERTAIN PROOFS OF CLAIM

STAMOULIS & WEINBLATT LLC
800 N. West Street
Third Floor
Wilmington, Delaware  19801

O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036-6537

*Counsel for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America, Ace Insurance Group, Westchester Fire Insurance Company and Westchester Surplus Lines Insurance Company*

---

[1]   The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America ("BSA") (6300) and Delaware Boy Scouts, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Lane, Irving, Texas 75038.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

JURISDICTION AND VENUE ............................................................................... 4

RELIEF REQUESTED............................................................................................. 4

FACTUAL BACKGROUND ................................................................................... 6

      A.      Abused in Scouting and other Coalition lawyers  ran an aggressive, nationwide advertising campaign  and made it easier to file false claims. ................................................................................................................ 6

      B.      Abused in Scouting and Coalition lawyers conceded  that their goal was to maximize the number  of claims so they could control the bankruptcy...................................................................................................... 7

      C.      Plaintiffs' firms used hedge fund money to buy claims  sight-unseen from the businesses that generate them. ......................................... 8

      D.      The Court has already recognized the  potential for improper filings here. ........................................................................................................ 9

      E.      The available evidence shows that attorneys  who signed hundreds of claims in a single day  likely did not even read those claims. .............. 10

      F.      A firm that filed thousands of claims announced  on its website that it would "complete" forms on  behalf of potential claimants who did not opt out. ......................................................................... 12

      G.      Claim-aggregating businesses played a major role in  facilitating the explosion of lawyer-signed claims...................................................... 12

ARGUMENT ........................................................................................................ 16

      POINT I RULE 2004 IS THE APPROPRIATE—AND, INDEED, IDEAL—VEHICLE FOR THE LIMITED, REQUESTED DISCOVERY WHERE THERE ARE OBVIOUS  IRREGULARITIES WITH THE PROOF-OF-CLAIM-FILING PROCESS. ........................................................................................................ 16

      A.      Rule 2004 is broad and the standard  for obtaining discovery is low................................................................................................................ 16

      B.      Mass-tort cases need to be  policed for baseless filings............................ 17

      C.      In light of the evidence here, the need for  Rule 2004 discovery is not a close call. ......................................................................................... 20

      POINT II A LAWYER WHO SIGNS A PROOF OF CLAIM  BECOMES A FACT WITNESS ABOUT THE ASSERTED  ALLEGATIONS AND WAIVES PRIVILEGE. ........................................................................................................ 22

      A.      The law requires a pre-filing  inquiry that is non-delegable. .................... 22

      B.      The ethical rules require  a pre-filing inquiry. .......................................... 26

## TABLE OF CONTENTS
### *(continued)*

**Page(s)**

C.    Signing a proof of claim is an assertion  of personal knowledge of the facts. ................................................................................................... 26

POINT III THE NEED FOR REQUESTED DISCOVERY  FAR OUTWEIGHS ANY POTENTIAL BURDEN. .................................................................................. 28

CERTIFICATION OF COUNSEL ................................................................................. 29

NOTICE ....................................................................................................................... 29

CONCLUSION ............................................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Hannon v. Countrywide Home Loans, Inc. (In re Hannon)*,
    421 B.R. 728 (Bankr.M.D.Pa.2009) ..................................................................... 23

*Hope 7 Monroe St. Ltd. P'ship v. Riaso, LLC (In re Hope 7 Monroe St. Ltd. P'ship)*,
    743 F.3d 867 (D.C. Cir. 2014) .......................................................................... 16

*In re Arkin-Medo, Inc.*,
    44 B.R. 138 (Bankr. S.D.N.Y. 1984) ................................................................. 17

*In re Buick,*
    174 B.R. 299 (Bankr. D. Colo. 1994) ................................................................ 27

*In re Congoleum Corp.*,
    426 F.3d 675 (3d Cir. 2005) ............................................................................ 20

*In re Countrywide Home Loans, Inc.*,
    384 B.R. 373 (Bankr. W.D. Pa. 2008) ............................................................... 16

*In re DeShetler*,
    453 B.R. 295 (Bankr. S.D. Ohio 2011)............................................................... 17

*In re Disciplinary Proceeding Against McGrath*,
    178 Wash. 2d 280 (2013).................................................................................. 22

*In re Garlock Sealing Techs., LLC,*
    504 B.R. 71 (Bankr. W.D.N.C. 2014) ................................................................ 19

*In re Gawker Media LLC*,
    No. 16-11700 (SMB), 2017 WL 2804870 (Bankr. S.D.N.Y. June 28, 2017) ......................... 27

*In re G-I Holdings Corp.*,
    323 B.R. 583 (Bankr. D.N.J. 2005) ................................................................... 19

*In re KTMA Acquisition Corp.*,
    153 B.R. 238 (Bankr. D. Minn. 1993) ................................................................ 24

*In re M.A.S. Realty Corp.,*
    326 B.R. 31 (Bankr. D. Mass. 2005) .................................................................. 24

*In re Michalski,*
    449 B.R. 273 (Bankr. N.D. Ohio 2011)............................................................... 17

*In re Obasi,*
    No. 10-10494 (SHL), 2011 WL 6336153 (Bankr. S.D.N.Y. Dec. 19, 2011 ............... 23, 24, 28

# TABLE OF AUTHORITIES
### *(continued)*

**Page(s)**

*In re Rivera*,
 342 B.R. 435 (Bankr. D.N.J. 2006), aff'd, No. CIV A 06-4278 KSH, 2007 WL 1946656
 (D.N.J. June 29, 2007) ................................................................................................ 23

*In re Rodriguez*,
 No. 10-70606, 2013 WL 2450925 (Bankr. S.D. Tex. June 5, 2013) ................................ 26, 28

*In re Subpoena Duces Tecum*,
 461 B.R. 823 (Bankr. C.D. Cal. 2011) ........................................................................... 18

*In re Sutera*,
 141 B.R. 539 (Bankr. D. Conn. 1992) ............................................................................ 16

*In re Taylor*,
 407 B.R. 618 (Bankr. E.D. Pa. 2009), *rev'd*, No. 09-CV-2479-JF, 2010 WL 624909 (E.D. Pa.
 Feb. 18, 2010), *aff'd in part, vacated in part, rev'd in part*, 655 F.3d 274 (3d Cir. 2011). 25, 26

*In re Taylor*,
 655 F.3d 274 (3d Cir. 2011) ...................................................................................... 24, 25

*In re Thomas*,
 337 B.R. 879 (Bankr. S.D. Tex. 2006) ........................................................................... 22

*In re Thomas*,
 337 B.R. 879 (Bankr.S.D.Tex.2006), *aff'd*, 223 Fed. Appx. 310 (5th Cir.2007) .................... 23

*In re USG Corp.*,
 290 B.R. 223 (Bankr. D. Del. 2003) ............................................................................... 19

*In re Valley Forge Plaza Assocs.*,
 109 B.R. 669 (Bankr. E.D. Pa. 1990) ............................................................................. 16

*In re Washington Mutual, Inc.*,
 408 B.R. 45 (Bankr. D. Del. 2009) ................................................................................ 16

*Knox v. Sunstar Acceptance Corp. (In re Knox)*,
 237 B.R. 687 (Bankr.N.D.Ill.1999) ............................................................................... 23

*Swanson v. Trasino Park-Hudsons, LLC (In re Vission , Inc.)*,
 No. 07-21957, 2008 WL 2230741 (Bankr. E.D. Wis. 2008) .............................................. 26

*Sweetland v. Szadkowski (In re Szadkowski)*,
 198 B.R. 140 (Bankr. D. Md. 1996) ............................................................................... 16

*United States v. Connery*,
 867 F.2d 929 (6th Cir. 1989) ........................................................................................ 22

# TABLE OF AUTHORITIES
### *(continued)*

**Page(s)**

*W.R. Grace & Co*
    475 B.R. 34, 71 (D. Del. 2012) ............................................................................ 18

**Statutes**

18 U.S.C. § 152(4) .................................................................................................... 24

18 U.S.C. § 157 ........................................................................................................ 24

28 U.S.C. § 1334 ...................................................................................................... 4

28 U.S.C. § 1408 ...................................................................................................... 4

28 U.S.C. § 1409 ...................................................................................................... 4

28 U.S.C. § 157 ........................................................................................................ 4

**Other Authorities**

ABA Model Rules of Professional Conduct 3.3 ........................................................ 3

James Lowery, *The Scourge of Over- Naming in Asbestos Litigation: The Costs to Litigants and the Impact on Justice*, Mealey's (Jan. 18, 2018) ...................................... 19

Mark D. Plevin, *The Garlock Estimation Decision: Why Allowing Debtors and Defendants Broad Access to Claimant Materials Could Help Promote the Integrity of the Civil Justice System*, 23 No. 4 J. Bankr. L. & Prac. NL Art. 2 (Aug. 2014) ................................ 19

Nora Freeman Engstrom, *Retaliatory Rico and the Puzzle of Fraudulent Claiming*, 115 Mich. L. Rev. 639 (2017) .............................................................................. 19

S. Todd Brown, *Bankruptcy Trusts, Transparency and the Future of Asbestos Compensation*, 23 Widener L.J. 299 (2013) ........................................................................... 19

**Rules**

Fed. R. Bankr. P. 9011 (b) ...................................................................................... 30

Century and Hartford (together, "Insurers") move for entry of an Order, substantially in the form attached as Exhibit A, authorizing them to serve Rule 2004 discovery on a (i) small group of plaintiffs' counsel who signed many proofs of claim and (ii) third parties that filled in the proofs of claims.[2]

## PRELIMINARY STATEMENT

When BSA filed for bankruptcy, it was a defendant in 275 cases with about 1,400 more possible claims on the horizon. That was after years in the tort system and advertisements by plaintiffs' firms. Yet only a few months after the Court set a bar date, BSA is suddenly inundated with over 95,000 claims. This explosion was not random. A group of for-profit claims aggregators with members of the Coalition of Abused Scouts for Justice ("Coalition") at the forefront engineered an aggressive, nationwide campaign to generate claims that channeled respondents to a website with information that encouraged the presentation of seemingly plausible claims. The stated objective of those behind the Coalition was to generate a supermajority of claims and thus control the bankruptcy, as revealed in an email that the TCC turned over to the U.S. Trustee. And the Coalition did just that.

To accomplish this objective, a handful of Coalition lawyers signed thousands of proofs of claim ("POCs") in the days just before the bar date, and a dozen lawyers each signed hundreds of POCs in one day. Astonishingly, members of the entity that holds itself out as Abused in Scouting—a fictitious firm acting as a front for three separate firms, two of which are one-man shops and the other a nine-lawyer outfit—filed almost 19,000 POCs alone. One of the solo

---

[2]    "Century" refers to Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America, Westchester Fire Insurance Company and Westchester Surplus Lines Insurance Company. "Hartford" refers to Hartford Accident and Indemnity Company, First State Insurance Company and Twin City Fire Insurance Company.

practitioners and a self-proclaimed founder of the Coalition, Timothy Kosnoff, signed some 300 claims in a single day and more than 750 in total—nearly three times the total number of claims BSA faced pre-petition.  But he was not even close to the most prolific mass-signer.  That was Coalition attorney Adam Krause, whose signature was affixed to some 890 POCs in one day and nearly 2,500 in total.  Assuming an eight-hour workday with no breaks, Mr. Krause apparently executed one POC every 32 seconds.

A forensic document expert's analysis shows that in many instances someone photocopied a lawyer's signature page and attached it *en masse* to the POCs.  Some firms had an aggregator submit hundreds of POCs by adding an electronic signature in rapid-fire succession— sometimes only seconds apart—to batches of POCs.  One aggregator submitted hundreds of POCs for one of the firms, all bearing the same signature—but purportedly signed on behalf of different claimants.  Together with other irregularities, this suggests that plaintiffs' lawyers bought claims from aggregators and sent signature pages to them to attach to POCs for filing without the signing lawyer—or any lawyer—ever having seen them.

It is evident that these lawyers conducted no pre-complaint investigation:  Most of the mass-signed POCs lack critical information, are late, duplicates, or have issues with the alleged state or year of abuse.  In fact, it appears that more than three of every four Coalition claims suffer from these facial defects—and that does not even take into account the POCs' merits.  The Motion that Century and Hartford file concurrently with this one seeking discovery from a sample of claimants that this scheme generated, which Insurers incorporate, identifies in more detail examples of fraud and evidence of systemic abuses of this Court's claims process.

When the Coalition asked this Court to allow attorneys—rather than claimants—to sign the POCs, its counsel stated that "[a]ll claims . . . will be thoroughly vetted."[3] But the sheer number of attorneys participating in mass signings casts doubt on whether these lawyers kept their promise, let alone complied with the oath they affirmed by signing the POCs or their obligations under Federal Rule of Bankruptcy Procedure 9011, which states that by signing "a petition, pleading, written motion, or other paper, an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, ***formed after an inquiry*** reasonable under the circumstances . . . the allegations and other factual contentions ***have evidentiary support***." ABA Model Rules of Professional Conduct 3.3 imposes similar obligations on lawyers.

The proposed discovery targets a subset of the attorneys who signed POCs that suggest that they engaged in this conduct. The requested discovery will shed light on what—if any— pre-filing inquiry they conducted, exposing efforts to file POCs that this Court should not even consider. That, in turn, will help the parties determine what claims objections to advance. Insurers thus seek Rule 2004 discovery from a subset of 15 plaintiffs' attorneys, each of whom signed more than 500 POCs in total or who signed more than 200 in a single day. Insurers also propose to subpoena Verus Claims Services LLC, Consumer Attorney Marketing Group, Archer Systems, and Stratos Legal, which are claims aggregating businesses that the evidence shows collectively generated thousands of claims.

On September 9, 2020, Debtors' counsel told the Court that he "share[d Century's] and the insurers' concerns of how claims are being generated and, of course, issues relating to State Court ethics," and that he "believe[d] those issues can be resolved, potentially, through 2004

---

[3]    D.I. 1496 ¶ 41.  Unless otherwise noted, docket cites refer to the docket in these bankruptcies.

discovery." The bar date has now passed. The proposed Rule 2004 discovery is essential to police the apparent fraud.

The Court and all parties—except those hoping to profit off fraudulent allegations of sexual abuse—will benefit from getting rid of meritless claims. A plan of reorganization that compensates real victims is impossible without this threshold investigation into abuses in the POCs and the elimination of improper ones. Each baseless claim dilutes the potential recovery for actual victims.

## JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The bases for the relief requested are Section 502 of the Bankruptcy Code, Rules 2004 and 3007 of the Federal Rules of Bankruptcy Procedure, and Local Rules 1001-1, 2004-1 and 3007-1.

## RELIEF REQUESTED

Insurers seek to take limited deposition and document discovery of the following plaintiffs' attorneys, each of whom signed (a) 200 or more POCs in a single day or (b) 500 or more POCs overall. The attorneys are listed on the table below with estimates of their relevant data.[4] As the chart indicates, the mass-signed claims are missing critical information (such as the name of the alleged abuser), are late, duplicates, or have issues with the alleged state or year of abuse. The proposed discovery is attached as Exhibit D.

---

[4]    *See* January 20, 2021 Declaration of Paul Hinton ("Hinton Declaration") tbls. 1, 3.

| Attorney | Firm | Total POCs Signed | POCs Signed in Single Day (Max) | POCs Submitted by Firm | Late, multiple, incomplete, inconsistent age or geography |
|---|---|---|---|---|---|
| Adam W. Krause | Krause & Kinsman | 2,507 | 891 (11/13/20) | 7,217 | 79.0% |
| David H. Stern | Ask LLP | 1,490 | 160 (11/12/20) | 3,613 | 85.0% |
| Joshua B. Schwartz | Abused in Scouting | 1,438 | 314 (11/12/20) | 18,865 | 76.0% |
| Stewart Eisenberg | Abused in Scouting | 963 | 190 (11/13/20) | 18,865 | 76.0% |
| Sean T. Higgins | Andrews & Thornton | 955 | 776 (11/7/20) | 3,104 | 86.3% |
| Deborah Levy | Junell & Associates | 811 | 797 (11/3/20) | 3,189 | 76.8% |
| Timothy Kosnoff | Abused in Scouting | 784 | 304 (11/10/20) | 18,865 | 76.0% |
| Steven Babin Jr. | Babin Law, LLC | 728 | 232 (11/15/20) | 1,201 | 85.2% |
| Rochelle Guiton | D. Miller & Associates | 699 | 267 (11/16/20) | 3,204 | 81.2% |
| Paul J. Napoli | Napoli Law | 672 | 137 (11/10/20) | 1,727 | 89.6% |
| Joseph J. Cappelli | Marc Bern & Partners | 635 | 625 (11/14/20) | 6,120 | 79.9% |
| James Harris | Paglialunga & Harris, PS[5] | 564 | 274 (11/6/20) | 807 | 84.6% |
| Michael S. Werner | Slater Slater Schulman | 466 | 224 (11/10/20) | 15,497 | 74.5% |
| Andrea McGinnis | Bailey Cowan Heckaman | 399 | 397 (11/12/20) | 1,190 | 82.0% |
| Jonathan Schulman | Slater Slater Schulman | 259 | 259 (11/12/20) | 15,497 | 74.5% |

Insurers also seek to issue subpoenas for limited deposition and document discovery directed to the entities listed in Exhibit C. The proposed document discovery for these entities is attached as Exhibit D.

Insurers have narrowly tailored its proposed discovery based on a review of exemplars of the POCs. Insurers are continuing its review, and, depending on its findings, may request additional discovery and the appointment of an examiner to investigate formally the solicitation and filing of POCs.

---

[5] Insurers understand that James Harris may claim that the name of the firm associated with the POCs that he submitted is Jim Harris Law rather than Paglialunga & Harris, PS. Insurers use the name "Paglialunga & Harris, PS" because that is the firm name reflected in the Omni data, but intend that name to be interchangeable with "Jim Harris Law" to the extent Jim Harris Law is the law firm associated with James Harris's POC submissions.

## FACTUAL BACKGROUND

**A.    Abused in Scouting and other Coalition lawyers
ran an aggressive, nationwide advertising campaign
and made it easier to file false claims.**

After the Court issued the bar-date Order, the entities and investors behind the

Coalition (such as Abused in Scouting) conducted advertising in all 50 states.  These

advertisements proclaimed—falsely—that people could submit claims anonymously:  "You're

never going to appear in court, you're never going to have to take a deposition. . . . You can

remain anonymous.  We handle everything."[6]  The advertisements added—also falsely—that

compensation was "ensure[d]."[7]

The Abused in Scouting website included a "Map of Scouting Abuse Locations" that

detailed the "locations by state, troop number, city, and camp name where our client*s* reported

they were abused by BSA leaders."[8]  The website also included a "List of Confirmed BSA

Abusers," allowing visitors to search a roster of allegedly "confirmed" sex abusers, again in all

50 states.[9]  Abused in Scouting also ran ads and produced longer, infomercial-style promotional

videos—many of which could be found on the Abused in Scouting website, social media

accounts, and YouTube.[10]  The ads directed viewers to contact Abused in Scouting and provided

the website and a phone number.

The website supplied all the information anyone would need to manufacture a potentially

passable claim.  As revealed in an email that the TCC turned over to the U.S. Trustee, the stated

---

[6]    August 24, 2020 Declaration of Evan Roberts ("Roberts Decl.") Ex. A-1, D.I. 1145-3.

[7]    *Id.*

[8]    *See* August 26, 2020 Declaration of Janine Panchok-Berry ("Panchok-Berry Decl.") Ex. 4 at 000003, D.I. 1166.

[9]    *See* Panchok-Berry Decl. ¶ 29, D.I. 1165.

[10]    *Id*. ¶¶ 26–28; Roberts Decl. Ex. A-1, A-2.

goal of the Coalition's founder was to generate numerical superiority of POCs to deliver control of the bankruptcy to the Coalition.[11]  And the Coalition appears to have accomplished its goal: Coalition attorneys filed 60% of the over 95,000 claims, many in mass filings in the days just before the bar date.

B.     **Abused in Scouting and Coalition lawyers conceded that their goal was to maximize the number of claims so they could control the bankruptcy.**

Mr. Kosnoff—the self-proclaimed Coalition founder—admitted on June 28, 2020 that his group's "strategy" was to "keep focused on [their] marketing and media efforts going full tilt to Nov[ember]," and "the message" to the Debtors was "[w]e control 80% of the claims[.]  I.e. our coalition controls the case."[12]  Mission accomplished: Mr. Kosnoff and his group now claim to control the case and purport to speak for tens of thousands of claimants before this Court.

Many of the law firms that were recruited to be part of the Coalition have little or no experience in litigating sex abuse cases, including against BSA.  These firms, which specialize in mass filings, joined with two solo-practitioner Coalition founders, Mr. Kosnoff and Andrew Van Arsdale.  Mr. Van Arsdale graduated from law school in 2018, and the address for his firm is a storefront that appears to be a mail drop.[13]  He is the co-owner and founder of a legal marketing firm where he has worked for years and that provides call center, SEO, and other marketing services.[14]

Mr. Kosnoff's website represents that he is retired from the practice of law and lists other services (such as media commentator and mass tort bankruptcy consulting) that he offers.  On his

---

[11]   D.I. 1285-1.

[12]   *Id.*

[13]   Aug. 26 Panchok-Berry Decl. Ex. 6, D.I. 1166.

[14]   *Id.* Ex. 8.

website, Mr. Kosnoff identifies Houston as his business address on his website, but he is not licensed to practice law in Texas, and the listed address is merely a mail drop.[15]  Insurers' attempts to contact Mr. Kosnoff at this address and at the club in Puerto Rico where he docks his boat were unsuccessful.[16]  As reflected in Mr. Kosnoff's June 28 email, he recruited these firms to accumulate as many POCs as possible—as quickly as possible—to ensure his control over the case.

### C.    Plaintiffs' firms used hedge fund money to buy claims sight-unseen from the businesses that generate them.

The money for this effort to run up the claim number came, at least in part, from investment funds.  UCC filings detail the capital invested in generating claims and collateral exchanged in return.[17]  In just one example, Catalur Capital Management, a New York-based hedge fund, has provided financing to firms such as Andrews & Thornton and Slater, Slater & Schulman, securing its investment with recoveries from the BSA litigation.[18]  Mr. Kosnoff alludes to this in his email when he refers to "motherfunders" buying and selling claims.[19]

Investors such as Legal Bay, LLC have also been "actively funding the Boy Scout claims"[20] by advancing money in exchange for "an equity partnership stake" in the claims.[21]

---

[15]  *Id.* Exs. 8, 9, 12, 13.

[16]  D.I. 1417.

[17]  Declaration of Andrew Kirschenbaum ("Kirschenbaum Decl.") Ex. 9, 15, 16.

[18]  *Id*.  Andrews & Thornton name-partner Anne Andrews' license was previously suspended by the California State Bar.  Kirschenbaum Decl. Ex. 7 (http://members.calbar.ca.gov/fal/Licensee/Detail/103280).

[19]  D.I. 1285-1.

[20]  Kirschenbaum Decl. Ex. 10 (https://www.prnewswire.com/news-releases/legal-bay-lawsuit-funding-announces-focus-on-assisting-victims-of-boy-scout-sexual-abuse-cases-301084514.html).

[21]  *Id.* Ex. 11 (https://lawsuitssettlementfunding.com/faq.php#1487467133208-44e2f546-70ff).  Legal Bay's Christopher Janish became CEO of the company after he served several years in prison for orchestrating a $13 million stock manipulation scheme.  *Id.* Ex. 12 (https://www.nytimes.com/2018/01/28/business/metoo-finance-lawsuits-harassment.html); *Id.*  Ex. 13 (https://www.nj.com/business/2008/07/exbroker_sentenced_to_prison_f.html).

After the number of claims dramatically increased, Legal Bay seemed concerned about its investments, stating it was "appalled at the final tally of over 92[,000] claims," and that the "high number of claims is putting a major strain on the settlement amounts awarded to plaintiffs at the culmination of their trials."[22]

### D.    The Court has already recognized the potential for improper filings here.

The Court recognized the risks created by permitting lawyers to sign proofs of claim. While ultimately allowing this practice, the Court noted that it is "ill-advised."[23]  The Court went on to caution that it would be "concern[ed]" if "a thousand claims [are] signed by a particular lawyer," adding that an attorney signing a claim "might be[come] . . . a fact witness" and "may be subject to a deposition."[24]

Those concerns proved to be well-founded.  Many plaintiffs' firms in the Coalition submitted thousands of lawyer-signed claims.  Coalition lawyer Adam Krause alone signed over 2,500 POCs, two other lawyers signed more than 1,400 claims each, and many others signed over 500 each.[25]  A dozen attorneys each signed hundreds of claims in a single day (though not the same day for all these attorneys).[26]

---

[22]    *Id.* Ex. 14 (http://www.prnewswire.com/news-releases/boy-scout-lives-matter-says-legal-bay-lawsuit-funding-as-they-near-100k-sex-abuse-claims-filed-via-bankruptcy-process-301179510.html).

[23]    Oct. 14, 2020 Hr'g Tr. at 190:12–17, D.I. 1520.

[24]    Oct. 14, 2020 Hr'g Tr. at 183:19–22; 170:2–12.

[25]    Hinton Decl. tbl. 1.

[26]    *Id.*

### E.    The available evidence shows that attorneys who signed hundreds of claims in a single day likely did not even read those claims.

In addition to the eye-popping numbers, compelling independent evidence suggests rampant disregard for the oath given when signing a POC and the requirement to conduct a pre-complaint investigation (or perhaps worse).  Here are just four available examples:

***Example 1.***  Coalition attorney Deborah Levy (Managing Partner at Junell Associates) signed 797 of her 811 POCs on November 3, 2020.[27]  Yet the "document properties" field for her POCs reveals that the claim documents were created later, several days ***after*** she supposedly signed them.[28]  Ms. Levy—or someone else, such as claims processor Stratos Legal ("Stratos"), which submitted many of Ms. Levy's forms—affixed her electronic signature to the claims before the claim forms were even filled out.[29]  This was no one-woman operation:  It was an assembly line with a team of people working concurrently on affixing Ms. Levy's signature to the claims—a time-stamp analysis shows that five of Ms. Levy's signatures were created within a single 20-second span.[30]  It is improbable that Ms. Levy read the forms she submitted—much less investigated them.

***Example 2.***  Coalition attorney Joseph Cappelli (of Marc J. Bern & Partners) signed 625 of the 635 total POCs he signed on one day—November 14, 2020.[31]  That was just before the bar date.  Experts' analysis shows that all or nearly all of these POCs have an identical pre-printed signature page appended to them.[32]  Someone scanned each claim form with this signature page

---

[27]    *Id.*

[28]    Declaration of Erich Speckin ("Speckin Decl.") ¶ 12.

[29]    *Id.* ¶¶ 13, 20.

[30]    *Id.* ¶ 13.

[31]    Hinton Decl. tbl. 1.

[32]    Speckin Decl. ¶¶ 7–8.

and then submitted them to Omni.  Mr. Cappelli almost certainly did not vet—or even read—the claim forms submitted under his name.

*Example 3.*  Another Coalition member, Jonathan Schulman (of Slater, Slater & Schulman) signed all of his 259 POCs on November 12, 2020, also just before the bar date.[33]  As with Mr. Cappelli's claims, there is an identical pre-printed signature page appended to these POCs.[34]  Someone scanned the POCs with the identical signature pages and submitted them.  It is difficult to imagine that Mr. Schulman had time to carefully review and vet each POC, but did not have two seconds to sign the form.

*Example 4.*  Coalition attorney Paul Napoli (of Napoli Shkolnik PLLC) allegedly signed over 500 POCs in the days leading up to the bar date (between November 9 and November 16, 2020).[35]  Of these, over 400 claim forms were largely blank (*i.e.*, they had one, two, or no words and one, two, or no checkboxes completed in Parts 3, 4, 5, and 6) except for the claimant's and lawyer's name and address.[36]  Even the responses that only required checking a box were blank.  Mr. Napoli did not even bother to sign the forms, instead using the "/s/" symbol.[37]  Mr. Napoli was not the only attorney with blank filings.[38]

---

[33]  Hinton Decl. tbl. 1.

[34]  Speckin Decl. ¶ 10.

[35]  Speckin Decl. ¶ 14.

[36]  *Id.*

[37]  *Id.*

[38]  Hinton Decl. ¶ 13.  Mr. Napoli signed at least 670 of his firm's roughly 1,750 POCs.   He has previously been accused of misconduct by his former law partner.  *See* Affidavit of Marc J. Bern in Support of Defendant's Order to Show Cause ¶¶ 9–10, *Napoli v. Bern*, Sup. Ct. N.Y. Cty., No. 159576/2014, ECF No. 9; June 5, 2015 letter of Clifford S. Robert to Hon. Eileen Bransten, *Napoli v. Bern*, No. 159576/2014 (Sup. Ct. N.Y. Cty.), Dkt. No. 136.

**F.    A firm that filed thousands of claims announced
its website that it would "complete" forms on
behalf of potential claimants who did not opt out.**

Junell & Associates—which filed nearly 3,200 claims—advertised its intent to complete

unfinished forms without input from claimants.  The firm posted a copy of an email sent to

claimants on its website, proclaiming that the firm would "complete a BSA Claim Form on your

behalf so that you do not miss the November 16 deadline for BSA claims.  You will receive a

copy once completed for your files."[39]  The firm expressly states that it will "complete" the form,

not simply submit it, and that it will do so based on nothing more than an intake call:

> Since time is quickly running out to meet the November 16
> deadline, we can complete a Claim Form on your behalf with the
> information you provided over the phone during your first
> consultation with us about this litigation.[40]

The notice also explained that "[t]he Claim Form allows attorneys to sign on behalf of

claimants."[41]  So some portion of the over-3,000 claims submitted by the Junell firm were not

completed by claimants, but rather filled out on behalf of claimants based on a call to an intake

center (unless the person affirmatively opted out), and then signed by an attorney.

**G.    Claim-aggregating businesses played a major role in
facilitating the explosion of lawyer-signed claims.**

Many of the lawyers who signed and submitted hundreds of claims in a single day appear

to have not actually submitted the claims themselves.  Rather, third-party claim-aggregators

completed and submitted thousands of claims on their behalf.  It is not clear what, if any, role the

signing attorney even played in the process.  A claim-aggregator is a for-profit company that

generates claims, typically employing call centers through which traffic is funneled by

---

[39]    Kirschenbaum Decl. Ex. 1 (http://www.junell-law.com/boy-scout-sexual-abuse/claim-form-notice/).

[40]    *Id.*

[41]    *Id.*

advertising and social media.[42]  They either sell the claims they generate or work on contract.  It is a volume business.  Document experts who examined the POCs identified several third-party claim-aggregators that played a key role in churning out dubious claims.

**Verus Claims Services LLC ("Verus").**  Verus's website describes the company's role in the BSA case:  "Verus will be handling the **complete process** of the Proof of Claim form, as well as the actual submission to the administrator of the Chapter 11 Proof of Claim process."[43]  The website adds that Verus "[e]xplain[s] to the victim the Proof of Claim process," "[r]eview[s] data for quality purposes," and "[u]pload[s] POC form for submission."[44]  This full-service offer leaves little or nothing for the lawyer to do, so it is no wonder that Adam Krause, the attorney who signed some 2,500 claims (including 890 in a single day), chose Verus.[45]  Mr. Krause did not even have to bother signing the forms.  A forensic examination revealed that Verus simply pasted a PDF image of his signature on more than 1,900 POCs.[46]  This saved Mr. Krause the effort of even opening a form to place his own digital signature.  At the very least, this practice creates questions about Mr. Krause's and Verus' respective roles in the claim vetting and submission process.

Verus appears to have submitted thousands of claims, more than half of which were submitted less than two weeks before the bar date.[47]  More than a quarter of all these claims had

---

[42]  *See* Kirschenbaum Decl. Ex. 8 (https://www.wsj.com/articles/inside-the-mass-tort-machine-that-powers-thousands-of-roundup-lawsuits-11574700480) (describing how "lead-generation" companies screen respondents to TV and social media ads, after which they either send potential plaintiffs contracts for whatever law firm has hired them, or (for those that work on spec) "sell the leads to law firms," sometimes using brokers).

[43]  Kirschenbaum Decl. Ex. 2.

[44]  Kirschenbaum Decl. Ex. 3.

[45]  Hinton Decl. tbl. 1; Speckin Decl. ¶ 18.

[46]  Speckin Decl. ¶ 18.

[47]  Hinton Decl. tbl. 4.

inconsistencies in the claimant's age at the time of alleged abuse (*i.e.*, either (i) the alleged abuse occurred before a claimant had been born; (ii) the alleged abuse began after the claimant was 22; or (iii) the age range of the scouting designation was inconsistent with the claimant's age at the time of the alleged abuse), alleged abuse in a state where the claimant never lived, were submitted late, or were multiples.[48]  More than two out of three of the forms from Verus were missing at least one critical field.[49]

   ***Consumer Attorney Marketing Group ("CAMG").***  CAMG offered law firms an even broader array of services than Verus, not only handling claim submission, but also creating television and internet ads.  Indeed, CAMG asserts that it has mass torts "down to a science," marketing itself to firms as a "turn-key operation" and a "one-stop shop, with you throughout the process, from running your creative [advertising] through intake, contract processing," and more.[50]  Part of that "science" is apparently maximizing claims, with promises that CAMG's "comprehensive and innovative approach to institutional sex abuse campaigns," including "finely targeted demographics," "data-based campaigns," and even an "exclusive Sex Abuse infomercial," will "optimize [the law firm's] marketing investment."[51]

   Many law firms took CAMG up on its offer.  CAMG appears to have created television ads for Coalition members Napoli Shkolnik PLLC,[52] Babin Law,[53] and Marc J. Bern & Partners,[54] among others, with many ads falsely claiming that "a victim's compensation fund is being set up that may be worth over $1.5 billion dollars."  Some of the firms ran their own ads

---

[48]   Hinton Decl. tbl. 6.  "Multiples" refers to claimants who submitted more than one form

[49]   Hinton Decl. tbl. 5.

[50]   Kirschenbaum Decl. Ex. 4. (https://www.camginc.com/legal-areas/mass-tort/).

[51]   Kirschenbaum Decl. Ex. 5. (https://www.camginc.com/legal-areas/sex-abuse/).

[52]   Kirschenbaum Decl. ¶¶ 18–19.

[53]   *Id.*

[54]   *Id.*

but many included the same graphics that are part of "generic" Boy Scout ads on CAMG's Vimeo homepage.[55]

CAMG's efforts to "optimize" plaintiffs' firms' investment in the BSA bankruptcy did not stop at creating false advertising.  For example, CAMG submitted approximately 400 forms for the Morelli Law Firm, each purportedly signed by a different claimant.[56]  Yet they all bear the same signature.[57]  This goes beyond sloppiness and suggests outright fraud, or at least a complete disregard for checking the veracity of the submitted claims and the oath given in signing them.  Based on the investigation to date, CAMG's fingerprints are on hundreds of claims.  Discovery is urgently needed to determine how 400 purportedly claimant-signed POCs could have been submitted bearing the exact same digital signature, and whether the same level of care was taken to ensure the quality and veracity of other CAMG-submitted claims.

*Archer Systems ("Archer").*  Archer Systems describes itself as a business that processes and administers claims for the plaintiffs' bar.[58]  An Archer Systems employee's name is included in the computer code on the PDF that was submitted to the Court through Omni on more than 900 POCs for Marc Bern & Partners and more than 500 POCs for Junell & Associates.[59]

*Verus, CAMG, and Archer are the tip of an iceberg.*  Other claim-aggregators submitted or processed claims.  Stratos and Your Case Managers were involved in at least 5,200 forms.[60]

---

[55]  *Id.*
[56]  Speckin Decl. ¶ 16, 19
[57]  *Id.*
[58]  Kirschenbaum Decl. Ex. 6 (https://www.archersystems.com/).
[59]  Speckin Decl. ¶ 17.
[60]  Speckin Decl. ¶ 16.

**ARGUMENT**

**POINT I**

**RULE 2004 IS THE APPROPRIATE—AND, INDEED, IDEAL—VEHICLE FOR THE LIMITED, REQUESTED DISCOVERY WHERE THERE ARE OBVIOUS IRREGULARITIES WITH THE PROOF-OF-CLAIM-FILING PROCESS.**

**A.    Rule 2004 is broad and the standard for obtaining discovery is low.**

Rule 2004 provides that "[o]n motion of any party in interest, the court may order the examination of any entity."[61]  Discovery under Rule 2004 "may relate . . . to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge."[62]  Rule 2004 is commonly used for pre-litigation discovery,[63] and permits broader discovery than what is allowed by the Federal Rules of Evidence.[64]

Courts routinely allow parties-in-interest to use Rule 2004 to probe proofs of claim, as Insurers seek to do here.[65]  For example, in *In re Subpoena Duces Tecum*, Rule 2004 was used to obtain discovery from a claimant "about the preparation of [its] proofs of claim," including information about "internal processes and procedures" for filing proofs of claim and "documents,

---

[61]  Fed. R. Bankr. P. 2004(a).

[62]  Fed. R. Bankr. P. 2004(b).

[63]  *See, e.g.*, *Sweetland v. Szadkowski (In re Szadkowski)*, 198 B.R. 140, 141 (Bankr. D. Md. 1996) ("[D]iscovery under [Bankruptcy] Rule 2004 may be properly employed as a prelitigation device.").

[64]  *See In re Washington Mutual, Inc.*, 408 B.R. 45, 49 (Bankr. D. Del. 2009) (Rule 2004 permits "a fishing expedition"); *In re Countrywide Home Loans, Inc.*, 384 B.R. 373, 400 (Bankr. W.D. Pa. 2008) (describing Rule 2004 examination as "broad, unfettered and in the nature of a fishing expedition"); *In re Valley Forge Plaza Assocs.*, 109 B.R. 669, 674 (Bankr. E.D. Pa. 1990) ("The scope of a [Rule] 2004 examination is even broader than that of discovery permitted under the F. R. Civ. P., which themselves contemplate broad, easy access to discovery.").

[65]  *In re Sutera*, 141 B.R. 539, 541 (Bankr. D. Conn. 1992) ("It is well settled that a Rule 2004 examination is a proper procedure to inquire into the basis for a filed proof of claim."); *Hope 7 Monroe St. Ltd. P'ship v. Riaso, LLC (In re Hope 7 Monroe St. Ltd. P'ship)*, 743 F.3d 867, 874 (D.C. Cir. 2014) ("Bankruptcy courts have permitted Rule 2004 examinations relating to the validity of a proof of claim.").

records and information provided by [claimant]" to counsel before filing.[66]  The court there found that movant had established good cause for Rule 2004 discovery because the "subject matter of the examinations—the basis for the validity of . . . various proofs of claim—is pretty clearly related to the debtors' liabilities and the amounts to be paid."[67]  And the court ruled that there were good reasons, as here, to suggest "the possible existence of abuse in the proof of claim process."[68]

Similarly, in *In re Michalski*, Rule 2004 was used "to examine [claimant] Wells Fargo as to the liabilities of the Debtors with respect to Wells Fargo and to determine whether the proof of claim is valid or contains objectionable fees."[69]  The court allowed the requested examination, finding that movant "does not have to articulate a basis to dispute the Proof of Claim before exercising his right to conduct a Rule 2004 examination."[70]  The court allowed both written and deposition discovery, finding that "Rule 2004(a) specifically contemplates the in-person examination of an 'entity" and consequently, entitles movant "to conduct an in-person examination of Wells Fargo."[71]

### B.    Mass-tort cases need to be policed for baseless filings.

Identifying and valuing valid claims is a pervasive challenge in mass-tort litigation.  This is particularly the case where, as here, advertisers solicit tens of thousands of claims, the minimal

---

[66]  461 B.R. 823, 826 (Bankr. C.D. Cal. 2011).

[67]  *Id*. at 829.

[68]  *Id*.

[69]  449 B.R. 273, 281 (Bankr. N.D. Ohio 2011).

[70]  *Id*. at 281.

[71]  *Id*. at 283; *see also In re DeShetler*, 453 B.R. 295, 306 (Bankr. S.D. Ohio 2011) ("2004 examination may be used . . . to investigate proofs of claim filed in bankruptcy cases provided that the examination is otherwise appropriate under Rule 2004."); *In re Arkin-Medo, Inc*., 44 B.R. 138, 139-140 (Bankr. S.D.N.Y. 1984) (allowing Rule 2004 examination of the "facts surrounding the signing of the guarantee held by [a creditor], which go directly to the validity of a $1,600,000 claim.").

information available on each claim and the concomitant lack of individual scrutiny of each

claim, invites fraud and abuse.[72]   Discovery is frequently necessary to identify and

evaluate abuses in the claims process, and courts routinely allow such discovery, whether under

Rule 2004 or in other contexts.

    *In re Silica Products Liability Litigation*, a multi-district case about silica injuries, offers

a lesson.[73]   There, discovery uncovered abuse of the claim process.   The court ordered each

plaintiff to submit a "Fact Sheet" detailing "specific information about when, where and how

each Plaintiff alleged he or she was exposed to silica dust" and "medical information concerning

each Plaintiff's silica-related injury."[74]   After discovering that only a handful of doctors

diagnosed more than 9,000 plaintiffs, the court allowed defendants to take the depositions of nine

physicians.   As a result of this discovery, the court concluded that it could "say with confidence"

that only two "of the 10,000 Plaintiffs [were] genuinely injured."[75]

    Similarly, in the *W.R. Grace & Co.* bankruptcy, the court allowed "extensive discovery"

including a detailed questionnaire and the depositions of several plaintiffs' attorneys.[76]   So too in

the *Garlock* bankruptcy, where discovery revealed pervasive abuses by mass-tort plaintiffs that

---

[72]   398 F. Supp. 2d 563 (S.D. Tex. 2005).

[73]   Such examples are not isolated.   As commentators have observed, mass-tort bankruptcies face significant abuse, including by some the same firms that filed claims against BSA.   *See* Nora Freeman Engstrom, *Retaliatory Rico and the Puzzle of Fraudulent Claiming*, 115 Mich. L. Rev. 639, 659–60 (2017) (listing examples). *See also* James Lowery, *The Scourge of Over- Naming in Asbestos Litigation: The Costs to Litigants and the Impact on Justice*, Mealey's (Jan. 18, 2018) (The "over-naming problem has become an epidemic, driving up costs for those entities that simply do not belong as defendants."); S. Todd Brown, *Bankruptcy Trusts, Transparency and the Future of Asbestos Compensation*, 23 Widener L.J. 299 (2013); Mark D. Plevin, *The Garlock Estimation Decision: Why Allowing Debtors and Defendants Broad Access to Claimant Materials Could Help Promote the Integrity of the Civil Justice System*, 23 No. 4 J. Bankr. L. & Prac. NL Art. 2 (Aug. 2014).

[74]   *Id.* at 567.

[75]   *Id.* at 642; *see also In re Subpoena Duces Tecum*, 461 B.R. 823, 826 (Bankr. C.D. Cal. 2011) (permitting discovery where the "concerns stem from a foundation suggesting the possible existence of abuse in the proof of claim process").

[76]   475 B.R. 34, 71 (D. Del. 2012).

made Garlock's historical settlement amounts unfit "as a predictor of [Garlock's] true liability" because they were "infected with the impropriety of some law firms."[77]  The court noted that "[t]he limited discovery allowed by the court demonstrated that almost half of those cases [where Garlock paid recoveries of $250,000 or more] involved misrepresentation of exposure evidence"—*i.e.*, plaintiffs withheld evidence of exposure to asbestos from other sources.[78]  The court decided that it "appear[ed] certain that more extensive discovery would show more extensive abuse," but "the startling pattern of misrepresentation that has been shown is sufficiently persuasive."[79]  While the precise type of abuse (misrepresentation of exposure evidence) may not apply here, that discovery is needed to uncover abuse of process is equally true in this case.

There are other examples.  In the *USG* bankruptcy, the court collected basic information that allowed it to "reject unsubstantiated claims, bogus medical evidence and fanciful theories of causation" and identify claimants who were "truly harmed."[80]  Likewise, in the *G-I Holdings* bankruptcy, the court ordered initial disclosures that allowed the debtor to object to claims it believed were "illegitimate or dispensable as a matter of law."[81]

The enormous financial incentives here create a moral hazard for the plaintiffs' lawyers, lenders, and investors behind the mass-generated claims.  Based on UCC filings, plaintiffs' lawyers alone stand to pocket up to 40 percent of what is paid on a POC.[82]  When one factors in bankruptcy counsel, experts, and expenses, which are in addition to the contingency, half the

---

[77]  *In re Garlock Sealing Techs.*, LLC, 504 B.R. 71, 73, 87 (Bankr. W.D.N.C. 2014).

[78]  *Id.* at 86.

[79]  *Id.*

[80]  *In re USG Corp.*, 290 B.R. 223 (Bankr. D. Del. 2003).

[81]  *In re G-I Holdings Corp.*, 323 B.R. 583, 622–23 (Bankr. D.N.J. 2005).

[82]  Kirschenbaum Decl. Ex. 9.

potential payout—sometimes less—goes to someone other than the claimant.  The Third Circuit has cautioned that bankruptcy courts must be vigilant about these sorts of self-interested incentives in mass-tort cases.[83]

### C.    In light of the evidence here, the need for Rule 2004 discovery is not a close call.

Given the evidence, there is good reason to be concerned about the abuses of the claims process and more than ample reason to allow the requested discovery to proceed.  The numbers speak for themselves—it is impossible for anyone to vet hundreds of claims in a single day or tens of thousands in just a few months.  But the potential misconduct extended well beyond the numbers, including, by way of example, the following:

- Attorneys submitted hundreds of claims by affixing an electronic signature to bundles of claims just seconds apart in assembly-line fashion.[84]

- Other attorneys submitted photocopied pre-signed signature pages attached to hundreds of claims.[85]

- Attorneys relied on aggregators to churn out claims.[86]

- Some attorneys submitted hundreds of claims that contained nothing other than the claimant's and lawyer's respective names and addresses.[87]

- A firm that filed thousands of claims announced that it would "complete" forms on behalf of potential claimants unless they opted out.[88]

Because they were not vetted, the vast majority of the mass-signed POCs reviewed are facially defective.  They are missing critical information, are duplicates, or are barred by the statute of limitations.[89]

---

[83]  *In re Congoleum Corp.*, 426 F.3d 675, 692 (3d Cir. 2005).

[84]  Speckin Decl. ¶¶ 12–13.

[85]  Speckin Decl. ¶¶ 7–8, 10–11.

[86]  Hinton Decl. tbl. 4.

[87]  Hinton Decl. tbl. 1; Speckin Decl. ¶ 14.

[88]  Kirschenbaum Decl. Ex. 1.

[89]  Hinton Decl. tbl. 2, 3.

With the attorneys who engaged in mass signings conducting no pre-filing inquiry, it is not surprising that the following questionable claims can be found in the sample of mass-signed POCs that were reviewed:



The presence of aggregators and funders amplifies the need for scrutiny. These aggregators boast that they will handle the "complete process of the Proof of Claim form."[95] One aggregator advertises that it will "[e]xplain to the victim the Proof of Claim process," "[r]eview data for quality purposes," and "[u]pload POC form for submission."[96] In other words, it will relieve the lawyers who "signed" to POCs from doing anything.

Discovery is necessary here to learn "about the preparation of [the] proofs of claim," including information about "internal processes and procedures" for filing proofs of claim.[97] The proposed discovery will (i) show what, if anything, was done to vet the claims, particularly

---

[90]    *See* Declaration of J. Weinberg ("Weinberg Decl.") Ex. 1.

[91]    *See* Declaration of Todd Mercier ("Mercier Decl.") Ex. 4, 10.

[92]    *See* Weinberg Decl., Ex. 4.

[93]    *See* Mercier Decl. Ex. 1–3.

[94]    *See* Weinberg Decl., Ex. 2.

[95]    Kirschenbaum Decl. Ex. 2.

[96]    Kirschenbaum Decl. Ex. 3.

[97]    461 B.R. 823, 826 (Bankr. C.D. Cal. 2011).

where an attorney signed the form—or allowed his or her signature to be placed on the form apparently without ever seeing it—and represented that he or she undertook a reasonable inquiry to confirm that the factual contentions in the claim have evidentiary support; (ii) uncover evidence that plaintiffs' lawyers bought claims and filed them without ever seeing them; and (iii) reveal additional third parties churning out claims on plaintiff firms' behalf.  The "subject matter of the examinations—the basis for the validity of . . . various proofs of claim—is clearly related to the debtors' liabilities and the amounts to be paid," and, there are good reasons to suggest "the possible existence of abuse in the proof of claim process."[98]  This discovery is essential to uncovering the truth about the suspicious late-breaking explosion of claims.  This discovery will also aid the parties in narrowing and targeting objections to the POCs and the discovery that will accompany the objections.

## POINT II

### A LAWYER WHO SIGNS A PROOF OF CLAIM BECOMES A FACT WITNESS ABOUT THE ASSERTED ALLEGATIONS AND WAIVES PRIVILEGE.

A.    **The law requires a pre-filing inquiry that is non-delegable.**

An attorney undertakes a legal responsibility by affirming the oath above the signature line in a POC.  Disregard for the oath exposes the attorney signing the POC to sanctions, disciplinary action, and even criminal penalties.[99]  In addition, "Bankruptcy Rule 9011 has

---

[98] *Id*. at 829.

[99] *See e.g.*, *In re Disciplinary Proceeding Against McGrath*, 178 Wash. 2d 280, 294 (2013) (disbarring attorney who filed false proofs of claim in his wife's bankruptcy to make her assets seem more encumbered than they really were so as "to mislead and discourage . . . creditors from making claims against the secured property."); *see also* 18 U.S.C. §§ 152(4), 157; *United States v. Connery*, 867 F.2d 929, 932 (6th Cir. 1989) (attorney who "prepared" a false proof of claim as part of a scheme by which the debtor had an accomplice file a false proof of claim was convicted of aiding and abetting a violation of 18 U.S.C. § 152(4), and was later disbarred); *In re Thomas*, 337 B.R. 879, 886 (Bankr. S.D. Tex. 2006) (concluding that "the proof of claim prepared, signed, and filed by Counsel on behalf

specifically been held to apply to proofs of claim," which mandates a pre-filing "inquiry."[100]  In

fact, courts have observed that "[c]ompliance with Bankruptcy Rule 9011 is ***particularly***

***important for proofs of claim*** because a properly filed proof of claim constitutes *prima facie*

evidence of the validity and amount of the claim," and "[t]he Court must therefore be able to rely

on the integrity of the proofs of claim before it."[101]

Moreover, courts have taken a dim view of attorneys who attach pre-signed signature

pages to filings.  In *Rivera*, the court sanctioned (and referred to the chief judge for further

discipline) lawyers who engaged in this practice, concluding that "[n]o reasonable attorney

would consider [forms with pre-signed signatures] to be certifications, nor would any reasonable

attorney engage in the practice of using 'on-file' signature forms."[102]  The court held that the

practice violated Rule 9011 because "the threshold 'factual contention' in each of the ersatz

submissions—that the signatory read and signed the document—[was] flatly untrue (not to

mention without any evidentiary support)."[103]

The pre-filing inquiry requirement is not trivial.  "At a minimum, the reasonable inquiry

standard requires at least some affirmative investigation on the part of the signer," and the

---

of the IRS [was an] intentional false statement[]" because "both the Debtors and Counsel knew that
the documents falsely represented the amount that the IRS asserted to be its claim," and referring
conduct to the U.S. Attorney.

[100]  *See In re Obasi,* No. 10-10494 (SHL), 2011 WL 6336153, at *7 (Bankr. S.D.N.Y. Dec. 19, 2011); *see
also Hannon v. Countrywide Home Loans, Inc. (In re Hannon)*, 421 B.R. 728, 731
(Bankr.M.D.Pa.2009); *In re Thomas*, 337 B.R. 879, 895 (Bankr.S.D.Tex.2006), *aff'd*, 223 Fed. Appx.
310 (5th Cir.2007); *Knox v. Sunstar Acceptance Corp. (In re Knox)*, 237 B.R. 687, 699
(Bankr.N.D.Ill.1999)

[101]  *Obasi*, 2011 WL 6336153 at *7 (emphasis added) (internal quotations and citations omitted).

[102]  *In re Rivera*, 342 B.R. 435, 438, 458, 464 (Bankr. D.N.J. 2006), *aff'd*, No. CIV A 06-4278 KSH,
2007 WL 1946656 (D.N.J. June 29, 2007).

[103]  *Id*. at 458.

"signer must explore readily available avenues of factual inquiry."[104]  Blind reliance on a client's (or an aggregator's) representations is insufficient.  Under Rule 9011, "an attorney must, in her independent professional judgment, make a reasonable effort to determine what facts are likely to be relevant to a particular court filing and to seek those facts from the client."[105]  An attorney "cannot simply settle for the information her client determines in advance."[106]

Nor is this duty to investigate delegable—not even to the signing attorney's associate, and certainly not to a claim aggregation shop churning out claims by the thousand.  In one case, the signing attorney relied on a litigation support firm to "prepare[] proofs of claim, which were then submitted to the firm for review by an attorney at or near the time of filing."[107]  The associate, working "under the general supervision of" the signing attorney, would review the proofs of claim using an internal checklist and file them using the singing attorney's electronic signature.[108]  The court "found that the conduct [at issue] runs afoul of Bankruptcy Rule 9011"[109] because "[t]he person signing, filing, submitting, or advocating a document has a

---

[104] *Obasi*, 2011 WL 6336153 at *5 (citing *In re KTMA Acquisition Corp.*, 153 B.R. 238, 249 (Bankr. D. Minn. 1993)).

[105] *In re Taylor*, 655 F.3d 274, 284 (3d Cir. 2011).  *See also In re M.A.S. Realty Corp.,* 326 B.R. 31, 41 (Bankr. D. Mass. 2005) (finding that a lawyer "acted unreasonably under the circumstances" where he filed a proof of claim even though his "efforts [to obtain support and documentation from the claimant] did not yield a single supporting document," which "should have alerted [the attorney] that the proof of claim lacked a reasonable evidentiary basis, which in turn should have made him realize the impropriety of filing the proof of claim itself.").

[106] *Taylor*, 655 F.3d at 284.

[107] *Obasi*, 2011 WL 6336153 at *2.

[108] *Id.*

[109] The only reason the court did not impose sanctions was that "no evidence has been presented that the UST has complied with the safe harbor provisions by serving a copy of its motion on [the attorney] and his firm before filing it with this Court."  *Id.* at *9.

24

*nondelegable* responsibility to the court" and "is ***personally*** responsible for reviewing the document."[110]

In another case, the court chastised an attorney for "sign[ing] a plethora of proofs of claim while reviewing only 10% of them."[111]  The court made clear that "when Borrensen [the lawyer acting as claimant's authorized agent] signed the proof of claim as HSBC's authorized representative without even reviewing it, a line was crossed," and "that Borrensen in signing and presenting a document without any knowledge of its factual basis . . . failed to discharge her duty."[112]  The court sanctioned another lawyer in the case for "fail[ing] to observe her duty to make reasonable inquiry of the two documents she signed" (a stay motion and an answer to a claim objection).[113]  The Third Circuit upheld the sanction, explaining that:

> Rule 11 requires more than a rubber-stamping of the results of an automated process by a person who happens to be a lawyer. Where a lawyer systematically fails to take any responsibility for seeking adequate information from her client, makes representations without any factual basis because they are included in a "form pleading" she has been trained to fill out, and ignores obvious indications that her information may be incorrect, she cannot be said to have made reasonable inquiry.[114]

The conduct here is far more egregious than failing to supervise an associate or even reviewing just 10 percent of the claims.  The attorneys from whom Insurers seek discovery seem to have signed claims indiscriminately or delegated the entire claim preparation process to third-party aggregators that assured the plaintiffs' bar that they would handle "the complete process."

---

[110]  *Id.* at *3, 4, 8 (first emphasis in the original; second emphasis added) (internal quotations and citations omitted).

[111]  *In re Taylor*, 407 B.R. 618, 647 (Bankr. E.D. Pa. 2009), *rev'd*, No. 09-CV-2479-JF, 2010 WL 624909 (E.D. Pa. Feb. 18, 2010), *aff'd in part, vacated in part, rev'd in part*, 655 F.3d 274 (3d Cir. 2011).

[112]  *Id.* at 647.

[113]  *Id.*

[114]  *In re Taylor*, 655 F.3d 274, 288 (3d Cir. 2011).

### B.    The ethical rules require
   ### a pre-filing inquiry.

Comment 3 to ABA Model Rule of Professional Conduct 3.3 states that "an assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry."[115]  Here, the POC proclaims in bold letters just above the attorney signature:  "I declare under penalty of perjury that the foregoing statements are true and correct."  There is no way to make that declaration—particularly under penalty of perjury—by giving a photocopy of one's signature for someone else to affix to hundreds of claims.

### C.    Signing a proof of claim is an assertion
   ### of personal knowledge of the facts.

The discovery that Century proposes to take should come as no surprise to the lawyers and aggregators to whom it is directed.  In addition to the obligation that Bankruptcy Rule 9011, applicable case law, and the oath that signing a POC imposes, this Court stated at the October 14, 2020 hearing that an attorney signing a claim "might be[come] . . . a fact witness" and "may be subject to a deposition."[116]  The Court had it right because a lawyer who signs a proof of claim "bec[omes] a fact witness as to the allegations contained in the proof of claim," and "this results in waiver of otherwise applicable privileges."[117]  Case law confirms what the POC requires the signing attorney to affirm:  "Signing a proof of claim is an assertion of personal knowledge of

---

[115]  Comment 12 to ABA Model Rule of Professional Conduct 3.3 is also relevant (discussing a lawyer's obligation to preserve the integrity of the adjudicative process).

[116]  Oct. 14, 2020 Hr'g Tr. at 170:2–12.

[117]  *In re Rodriguez*, No. 10-70606, 2013 WL 2450925, at *4 (Bankr. S.D. Tex. June 5, 2013).

the facts alleged in the proof of claim," and the signing attorney may therefore be questioned regarding the factual basis for the assertions in the proof of claim.[118]

Indeed, Rule 2004 has been used to obtain discovery from counsel.  Recently, debtor Gawker Media succeeded in obtaining Rule 2004 discovery pertaining to Peter Thiel's relationship with attorney Charles Harder who represented plaintiffs in various cases against Gawker Media that Thiel reportedly funded.[119]  The court rejected the "argument that the Rule 2004 Motion should be denied because Mr. Harder is an attorney."[120]  The court noted that Harder was "a fact witness whose communications with Thiel do not implicate the concerns that attend the attorney-client privilege," and that, in any event, "a Rule 2004 examination should not be denied merely because it may touch on privileged matters."[121]

In short, Rule 2004 is used in the way that Insurers propose to use it here and is consistent with the Court's preliminary take on this matter.  It is appropriate for probing the validity of proofs of claim even before any objections are lodged.  And plaintiffs' counsel are proper targets for such discovery, particularly after they chose to sign proofs of claims, despite the Court's warning that doing so would subject them to discovery.

---

[118]  *Id.* at *3–4; s*ee also Swanson v. Trasino Park-Hudsons, LLC (In re Vission , Inc.),* No. 07-21957, 2008 WL 2230741, at *4 n.3 (Bankr. E.D. Wis. 2008) ("By signing the affidavit, counsel runs the risk of becoming a fact witness, and any future hope of asserting privilege may disappear.").

[119]  *In re Gawker Media LLC*, No. 16-11700 (SMB), 2017 WL 2804870, at *2, 4 (Bankr. S.D.N.Y. June 28, 2017).

[120]  *Id.* at *6.

[121]  *Id.* at *7 (holding that if "discovery requests implicate a privilege or seek discovery precluded by the settlement agreements, the Court can address those issues as it would in any other litigation").  *See also In re Buick,* 174 B.R. 299, 304 (Bankr. D. Colo. 1994) (attorneys with personal knowledge of relevant matters are "within the scope of persons who may be examined pursuant to Rule 2004").

## POINT III

### THE NEED FOR REQUESTED DISCOVERY FAR OUTWEIGHS ANY POTENTIAL BURDEN.

While there is great need for the proposed discovery in light of the dubious claim-filing practices already found by a mere sampling of POCs, the burden is minimal.  Of the hundreds of lawyers filing claims, Insurers seek discovery from only 15.  Insurers selected these lawyers because of the massive filings they made, including signing hundreds of claims in a single day, and the large numbers filed by their firms collectively.  This limited discovery is intended to explore the clear indicia of the likely pervasive claim-churning here.

Not only is the burden slight, but it is also one that the plaintiffs' attorneys voluntarily assumed when they chose to sign the proofs of claim.  The Court cautioned these attorneys to "think long and hard before they sign that proof of claim form" because they may become witnesses.[122]  But they persisted.

The attorneys must comply with Bankruptcy Rule 9011(b)'s requirement that by signing a court filing—such as a proof of claim—an attorney "is certifying, to the best of [his or her] knowledge, information, and belief, formed *after an inquiry* reasonable under the circumstances," that the claim has a proper purpose and legal and evidentiary basis.[123]  The rule imposes a personal responsibility to conduct a "reasonable investigation" of the contents of the proof of claim.[124]

"Signing a proof of claim is an assertion of personal knowledge of the facts alleged in the proof of claim," and an attorney signing a proof of claim can be made to "answer . . . questions

---

[122]  Oct. 14, 2020 Hr'g Tr. at 170:8–12.

[123]  Fed. R. Bankr. P. 9011 (b) (emphasis added).

[124]  *See Obasi*, 2011 WL 6336153, at *4.

regarding the factual basis for the assertions made in the [form]."[125]  The attorneys here chose to make themselves fact witnesses responsible for answering "questions regarding the factual basis for the assertions made in the" proofs of claim.  Now is the time to answer those questions.

## CERTIFICATION OF COUNSEL

Pursuant to Local Rule 2004-1, before filing this motion, counsel for Insurers met and conferred, or attempted to meet and confer, with the parties as set out in the Declaration of Stamatios Stamoulis filed with this motion.  Those who met and conferred with Insurers' counsel stated that they will oppose Insurers' motion for leave to conduct discovery pursuant to Rule 2004 or refused to say that they would not oppose the motion.

## NOTICE

Notice of this motion was provided to the following parties or their respective counsel: (a) the U.S. Trustee; (b) the Debtors; (c) the Official Committee of Unsecured Creditors; (d) the Official Committee of Tort Claimants; (e) the Future Claims Representative; (f) the Coalition of Abused Scouts for Justice; and (g) any other party that has requested notice pursuant to Bankruptcy Rule 2002.

## CONCLUSION

This Court should enter an order, substantially in the form attached hereto as Exhibit A, allowing Insurers to take written and deposition discovery of counsel identified in Exhibit B and to issue subpoenas to third parties identified in Exhibit C.


*[Remainder of page intentionally left blank]*

---

[125]  *In re Rodriguez*, No. 10-70606, 2013 WL 2450925, at *3, 4. (Bankr. S.D. Tex. June 5, 2013).

Dated:  January 22, 2021

By:  */s/ Erin R. Fay*
    Erin R. Fay (No. 5268)

**Bayard, P.A.**
Gregory J. Flasser (No. 6154)
600 North King Street, Suite 400
Wilmington, Delaware 19801
Telephone:  (302) 655-5000
Email:  efay@bayardlaw.com
        gflasser@bayardlaw.com

**Shipman & Goodwin LLP**
James P. Ruggeri (admitted *pro hac vice*)
Joshua D. Weinberg (admitted *pro hac vice*)
Michele Backus Konigsberg (admitted *pro hac vice*)
1875 K Street, NW, Suite 600
Washington, D.C. 20003
Tel:  (202) 469-7750

**Wilmer Cutler Pickering Hale and Dorr LLP**
Philip D. Anker (*pro hac vice* pending)
7 World Trade Center
250 Greenwich Street
New York, N.Y. 10007
Tel:  (212) 230-8890

**Wilmer Cutler Pickering Hale and Dorr LLP**
Danielle Spinelli (admitted *pro hac vice*)
Joel Millar (*pro hac vice* pending)
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C. 20006
Tel:  (202) 663-6000

*Attorneys for First State Insurance Company,
Hartford Accident and Indemnity Company
and Twin City Fire Insurance Company*

Respectfully Submitted,

By:  */s/ Stamatios Stamoulis*
    Stamatios Stamoulis (No. 4606)

**Stamoulis & Weinblatt LLC**
800 N. West Street
Third Floor
Wilmington, Delaware 19801
Telephone: (302) 999-1540
Facsimile: (302) 762-1688

**O'Melveny & Myers LLP**
Tancred Schiavoni (admitted *pro hac vice*)
Gary Svirsky (*pro hac vice* pending)
Andrew Kirschenbaum (admitted *pro hac vice*)
Times Square Tower
7 Times Square
New York, New York 10036-6537
Telephone: 212-326-2000

*Counsel for Century Indemnity Company, as
successor to CCI Insurance Company, as
successor to Insurance Company of North
America and Indemnity Insurance Company of
North America, Westchester Fire Insurance
Company and Westchester Surplus Lines
Insurance Company*

30

EXHIBIT 2

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |

### DECLARATION OF PAUL J. HINTON

I, Paul J. Hinton, pursuant to 28 U.S.C. § 1746(2), under penalty of perjury, hereby declare as follows:

## I.    BACKGROUND AND QUALIFICATIONS

1.    I am Principal of The Brattle Group in New York City.  Prior to joining The Brattle Group in 2013, I was a Vice President at NERA Economic Consulting, where I was employed since 1994.  I earned a B.A. in Engineering Science in 1988 from New College, Oxford University, and a Masters in Public Policy in 1994 from the John F. Kennedy School of Government at Harvard University where my studies included economics, statistics and finance.  My practice and professional experience in economic consulting has focused to a significant extent on the forecasting of mass torts claims and analysis of mass torts risk exposures.

2.    More specifically, for over 10 years, I have developed claims liability analyses to assist corporate risk managers and/or in the context of mass litigation, settlements, bankruptcy proceedings and legislative reform initiatives.  These analyses have formed a basis of expert opinion and testimony in five bankruptcy confirmation proceedings.  I have testified on funding adequacy for a proposed program to monitor the development of possible future personal injuries due to ground water contamination.  I have also testified before Congress on the costs of the liability system.  These assignments have involved analysis of product liability claims related to future personal injuries allegedly caused by asbestos, tobacco, manganese, crude oil, pharmaceutical products, and medical devices, in addition to property damage allegedly caused by product defects in automobile tires and building defects.

3.     I have testified previously as an expert witness in matters of economics and finance, specifically including quantification of liabilities in product liability mass torts. My curriculum vitae including testimony given over the last four years and publications over the last ten years is attached at Appendix A hereto.

4.     I have been retained by O'Melveny & Myers LLP ("Counsel") on behalf of Century Indemnity Company to analyze the Sexual Abuse Survivor Proofs of Claim ("POCs") submitted to the United States Bankruptcy Court for the District of Delaware in the proceeding *In re Boy Scouts of America and Delaware BSA, LLC*, Case No. 20-10343 (the "BSA Bankruptcy"). In particular, I have been asked to (1) identify attorneys that were the signatories on the highest volume of POCs, and (2) determine whether the POCs filed by these attorneys' law firms, as well as other groups of POCs, had certain characteristics described below.

## II.   MATERIALS RELIED UPON

5.     In its role as the Official Claims Agent, Omni Agent Solutions ("Omni") has compiled a database of all of the POCs submitted in the BSA Bankruptcy. My analysis is based on the database of POCs downloaded from Omni's website as of January 4, 2021 (the "Omni Database").[1] The Omni Database contains data on 96,364 POCs and includes, among other things, the following information:

- the name of the claimant;
- the claimant's social security number and date of birth;
- the name of the law firm and attorney – if any – representing the claimant in the BSA Bankruptcy;
- the date the POC was signed and the date it was received by Omni;
- the email address associated with the POC submission; and
- a description of the alleged sexual abuse, including details such as when and where the abuse occurred and the name of the alleged abuser.

6.     Working at my direction, a team at the Brattle Group has standardized the names of the law firms and attorneys in the Omni Database. The standardization procedure included

---

[1]   The database of POCs was downloaded from https://bsa.omniagentsolutions.com/ using the search tool and export option.

correcting typos and standardizing names to allow POCs from the same law firm or attorney to be listed identically, grouped together, and counted.

## III.   CERTAIN ATTORNEYS SIGNED A LARGE NUMBER OF POCS

7.     I have identified attorneys who signed a large number of POCs that were recorded in the Omni Database.  I define high-volume attorney signatories to be attorneys who signed more than 500 POCs in total, or who signed more than 200 POCs on a single day.  Based on this definition, I identified the 15 such attorneys listed in Table 1 below.[2]

**Table 1: Attorneys Who Signed More Than 500 POCs, or Signed More Than 200 POCs in a Single Day**

| Signed Name | Law Firm | Total POCs Signed | POCs Signed within Two Weeks of Bar Date | Highest Number of Claims Signed on a Single Day | |
| --- | --- | --- | --- | --- | --- |
| | | | | Date | POCs |
| ADAM W. KRAUSE | Krause & Kinsman | 2,507 | 2,033 | 11/13/2020 | 891 |
| DAVID H. STERN | Ask LLP | 1,490 | 686 | 11/12/2020 | 160 |
| JOSHUA B. SCHWARTZ | Abused in Scouting | 1,438 | 1,432 | 11/12/2020 | 314 |
| STEWART J. EISENBERG | Abused in Scouting | 963 | 959 | 11/13/2020 | 190 |
| SEAN T. HIGGINS | Andrews & Thornton | 955 | 951 | 11/7/2020 | 776 |
| DEBORAH LEVY | Junell Associates | 811 | 806 | 11/3/2020 | 797 |
| TIMOTHY D. KOSNOFF | Abused in Scouting | 784 | 779 | 11/10/2020 | 304 |
| STEVEN C. BABIN JR. | Babin Law, LLC | 728 | 725 | 11/15/2020 | 232 |
| ROCHELLE GUITON | D. Miller & Associates | 699 | 689 | 11/16/2020 | 267 |
| PAUL J. NAPOLI | Napoli Law | 672 | 331 | 11/10/2020 | 137 |
| JOSEPH J. CAPPELLI | Marc J. Bern & Partners, LLP | 635 | 630 | 11/14/2020 | 625 |
| JAMES HARRIS | Paglialunga & Harris, PS | 564 | 559 | 11/6/2020 | 274 |
| MICHAEL S. WERNER | Slater, Slater & Schulman | 466 | 461 | 11/10/2020 | 224 |
| ANDREA MCGINNIS | Bailey Cowan Heckaman | 399 | 397 | 11/12/2020 | 397 |
| JONATHAN E. SCHULMAN | Slater, Slater & Schulman | 259 | 259 | 11/12/2020 | 259 |
| **Total** | | **13,370** | **11,697** | | **5,847** |

---

[2]   Abused in Scouting includes the following constituent law firms: Eisenberg Rothweiler, Kosnoff Law, and AVA Law Group.  Rule 2019 statement, Dkt. No. 1429-1 Ex. A-3.  Abused in Scouting also includes Zuckerman Spaeder LLP when it is named along with one of the other constituent law firms listed above.

8.    As shown in Table 1, these 15 attorneys signed a total of 13,370 POCs, and 11,697 of those were signed within two weeks of the Abuse Claims Bar Date which was November 16, 2020. Many of these POCs were signed on a single day.

9.    I analyzed characteristics for the POCs filed by law firms associated with the high-volume signers identified in Table 1, including whether the POCs are incomplete.[3]  For the purposes of this analysis, I define POCs to be incomplete if they lacked certain key elements of identifying information about the claimant or the alleged abuse.   The key elements of identifying information about the claimant are: surname, zip code, last four digits of social security number, and month and year of birth.   The key elements of information about the alleged abuse are:  who abused the claimant;[4]  what abuse occurred;[5]  when the abuse occurred;[6]  and where the abuse occurred.[7]

10.    The number of POCs that lacked these key elements of information are reported for each of the law firms that are associated with a high-volume signatory in Table 2 below.  65.4 percent of the POCs submitted by the high-volume law firms were missing at least one key element of information (were "incomplete").

11.    Eight of the twelve law firms with high-volume signatories are members of a coalition of law firms that claim to represent a substantial number of the claimants who filed POCs in the BSA Bankruptcy (the "Coalition").[8]   The only law firms that are members of the Coalition that did not have high-volume signatories are Reich & Binstock and Motley Rice

---

[3]    For the purposes of this analysis, I use the term "incomplete" to refer to POCs that lack certain information about the claimed abuse (as defined in the main text of the declaration), but of course, a POC may also be incomplete for many additional reasons that are not captured in this analysis.

[4]    POCs were counted as including key information about who abused the claimants if the last name of the abuser was identified in the text field describing the abuser.

[5]    POCs were counted as including key information about what abuse occurred if the POC indicated one of the six specified types of abuse listed on the claim or if the text field describing the abuse was filled.

[6]    POCs were counted as including key information about when the abuse occurred if the text field describing the date of abuse was filled.

[7]    POCs were counted as including key information about where the abuse occurred if the text field describing where the abuse occurred was filled.

[8]    The Coalition's most recent Rule 2019 statement, filed with the Court, lists the following firms as members: (i) Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C., (ii) Andrews & Thornton, (iii) ASK LLP, (iv) Slater Slater Schulman LLP, (v) Motley Rice LLC, (vi) Napoli Shkolnik PLLC, (vii) Marc J. Bern & Partners LLP, (viii) Junell & Associates, PLLC, (ix) Reich & Binstock LLP, and (x) Krause & Kinsman Law Firm.  Because the Coalition's filings reflect that clients are retained by Eisenberg Rothweiler as part of Abused in Scouting, Abused in Scouting is listed along with the Coalition.

LLC. For the ten Coalition law firms, 65.0 percent of the POCs they submitted were incomplete.

**Table 2: POCs Filed By Law Firms with High-Volume Attorney Signatories and Coalition Law Firms That Are Missing Certain Elements of Information**

| Law Firm | High Volume? | Coalition? | Total POCs | Missing Key Claimant ID | Missing Abuser Last Name | Missing When Abuse Occurred | Missing Where Abuse Occurred | Missing What Abuse Occurred | % Missing One or More Pieces of Information |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **Number of POCs Missing Information** | | | |
| Abused in Scouting | yes | yes | 18,865 | 3,769 | 9,457 | 950 | 602 | 308 | 60.0% |
| Slater, Slater & Schulman | yes | yes | 15,497 | 1,541 | 8,668 | 33 | 50 | 89 | 59.2% |
| Krause & Kinsman | yes | yes | 7,217 | 736 | 4,774 | 917 | 444 | 34 | 69.2% |
| Marc J. Bern & Partners, LLP | yes | yes | 6,120 | 2,371 | 3,881 | 1,312 | 1,338 | 2,193 | 72.2% |
| Ask LLP | yes | yes | 3,613 | 1,603 | 2,264 | 4 | 32 | 2 | 77.4% |
| D. Miller & Associates | yes | | 3,204 | 98 | 2,063 | 28 | 63 | 5 | 66.4% |
| Junell Associates | yes | yes | 3,189 | 259 | 2,059 | 54 | 47 | 45 | 67.1% |
| Andrews & Thornton | yes | yes | 3,104 | 1,374 | 1,975 | 115 | 121 | 5 | 78.4% |
| Napoli Law | yes | yes | 1,727 | 330 | 1,294 | 568 | 530 | 522 | 78.9% |
| Babin Law, LLC | yes | | 1,201 | 71 | 845 | 12 | 8 | 2 | 71.8% |
| Bailey Cowan Heckaman | yes | | 1,190 | 75 | 808 | 103 | 41 | 4 | 70.3% |
| Paglialunga & Harris, PS | yes | | 807 | 157 | 475 | 41 | 44 | 29 | 67.8% |
| **High Volume Total** | | | **65,734** | **12,384** | **38,563** | **4,137** | **3,320** | **3,238** | **65.4%** |
| Reich & Binstock | | yes | 411 | 41 | 231 | 12 | 11 | 1 | 61.1% |
| Motley Rice, LLC | | yes | 325 | 4 | 130 | - | - | - | 41.2% |
| **Coalition Total** | | | **60,068** | **12,028** | **34,733** | **3,965** | **3,175** | **3,199** | **65.0%** |

12. The name of the abuser was extracted from text fields on the Omni claims forms, and this process involved some human judgement. In addition, some POCs included answers to the questions about the abuse that were not informative.[9] Consequently, I tested the accuracy of the methodology used to identify claims that were incomplete (i.e., missing one of more pieces of information) by checking a random sample of one thousand claims by manual review. The manual review shows the claims were correctly identified as being incomplete more than 95 percent of the time.[10]

13. In addition to many of the POCs being incomplete, I identified 2,489 POCs that were almost entirely blank except for the name and identification of the claimant. I define a POC to be "nearly blank" if in Parts 3, 4, 5 and 6 of the form there are two or fewer words and two or fewer of the boxes on the form were checked. The nearly blank forms were mostly submitted

---

[9]   For example, claimants may have answered that they do not remember or do not recall details about the alleged abuse.

[10]  Of the randomly sampled claims, 565 were classified as incomplete. Based on manual review, 543 of those claims were correctly coded. This implies an error rate of 3.9 percent with a 95 percent confidence interval of 2.6 to 5.8 percent. Of the randomly sampled claims, 435 were classified as complete. Based on manual review, 403 of those claims were correctly coded. This implies an error rate of 7.4 percent with a 95 percent confidence interval of 5.3 to 10.2 percent.

by three law firms that are both members of the Coalition and are associated with high-volume signatories.  The firms that submitted a large quantity of nearly blank forms are: Marc J. Bern & Partners, LLP, which submitted 1,111 nearly blank forms; Napoli Law, which submitted 410 nearly blank forms; and Abused in Scouting, which submitted 167 nearly blank forms.  In addition, there were 748 nearly blank forms submitted by claimants that did not name a law firm on their POC ("Pro Se").

14.   Many of the law firms associated with high-volume signatories not only submitted POCs that were incomplete but also submitted POCs that:

- were filed after the bar date ("late");[11]
- were filed by a claimant who also filed other POCs ("multiples");[12]
- alleged a year of abuse when the claimant was not of scouting age;[13] or
- alleged abuse in a state in which the claimant never resided.[14]

15.   The percent of claims filed by high-volume and Coalition law firms with these characteristics is reported in Table 3.  For the twelve law firms with high-volume signatories, 38.7 percent of the POCs they submitted had at least one of these characteristics, and 37.8 percent of the POCs submitted by just the Coalition law firms had at least one of these characteristics.  In addition, 78.4 percent of the POCs submitted by high-volume law firms and 77.7 percent of

---

[11]   Late POCs are those submitted after November 16, 2020, the Abuse Claims Bar Date.

[12]   POCs filed for the same claimant are defined as those with the same month and year of birth, last four digits of social security number, and zip code.  Year and month of birth are only used if they are not missing and before January 1, 2020.  Last four digits of social security numbers are only used if they are not missing or 0.  Zip codes are only used if they are not missing, and are five digit zip codes, Canadian zip codes, or six digit zip codes.  Five digit zip codes must be greater than or equal to 00506 and less than or equal to 99950.

[13]   Invalid scouting ages are identified if (1) alleged abuse occurred before a claimant was born; (2) alleged abuse begins after the claimant is 22; or (3) the age range of the scouting designation is inconsistent with the age of the claimant at the time of the alleged abuse.  The ages for participation in the different scouting programs are: (i) Cub Scouts 6 – 11, (ii) Exploring Scouts 10 – 14, (iii) Boy Scouts 10 – 18, (iv) Sea Scouts 14 – 21, and (v) Venturing Scouts 14 – 21 (source: www.scouting.org/about/faq/question1).  For many POCs the age of the claimant or the year of the alleged abuse are not known at this time, and so I do not determine whether the claimant was not of scouting age at the time of the alleged abuse.

[14]   Historical states of residence for the claimants were pulled from the National Public Data ("NPD") background check database and compared to the states in which the abuse is alleged to have occurred.  Background checks were run on claimants using their name, month and year of birth, and state of residence.  The background checks returned names, social security numbers, dates of birth, and a list of all past known addresses.  I verified that the claimant was the correct person in the NPD database by matching the name, last four digits of the social security number, and year and month of birth.  For all claimants where background check data were verified, I tested to see whether the claimant had ever lived in the state(s) where the abuse is alleged to have occurred.  Many POCs do not report the state in which the alleged abuse occurred.  While state of abuse may be stated or inferred from information provided elsewhere in the POC or in attachments, at this time, I do not determine whether these POCs allege abuse that occurred in a state in which the claimant never resided.

the POCs submitted by just the Coalition law firms were either incomplete (as reported in Table 2) or had at least one of these characteristics.

**Table 3: POCs Filed By Law Firms with High-Volume Attorney Signatories and Coalition Law Firms That Are Late, Multiple, or Have Inconsistent Ages or States of Alleged Abuse**

| Law Firm | High Volume? | Coalition? | Total POCs | Number of POCs | | | | % Late, Multiple, Inconsistent Age, or Never Lived in Abuse State | % Late, Multiple, Inconsistent Age, Never Lived in Abuse State, or Missing Information |
| | | | | Late | Multiple | Inconsistent Age | Never Lived in State of Alleged Abuse | | |
|---|---|---|---|---|---|---|---|---|---|
| Abused in Scouting | yes | yes | 18,865 | 113 | 3,417 | 4,921 | 1,302 | 44.9% | 76.0% |
| Slater, Slater & Schulman | yes | yes | 15,497 | 195 | 3,197 | 1,946 | 971 | 35.5% | 74.5% |
| Krause & Kinsman | yes | yes | 7,217 | 16 | 1,347 | 591 | 394 | 29.7% | 79.0% |
| Marc J. Bern & Partners, LLP | yes | yes | 6,120 | 7 | 549 | 1,226 | 303 | 31.5% | 79.9% |
| Ask LLP | yes | yes | 3,613 | 6 | 391 | 702 | 122 | 31.0% | 85.0% |
| D. Miller & Associates | yes | | 3,204 | 97 | 996 | 426 | 191 | 45.3% | 81.2% |
| Junell Associates | yes | yes | 3,189 | 20 | 555 | 461 | 168 | 32.8% | 76.8% |
| Andrews & Thornton | yes | yes | 3,104 | 43 | 319 | 1,206 | 170 | 51.1% | 86.3% |
| Napoli Law | yes | yes | 1,727 | 97 | 590 | 150 | 60 | 42.7% | 89.6% |
| Babin Law, LLC | yes | | 1,201 | 4 | 320 | 251 | 58 | 46.0% | 85.2% |
| Bailey Cowan Heckaman | yes | | 1,190 | 4 | 338 | 140 | 88 | 41.3% | 82.0% |
| Paglialunga & Harris, PS | yes | | 807 | 32 | 270 | 90 | 40 | 47.3% | 84.6% |
| **High Volume Total** | | | **65,734** | **634** | **12,289** | **12,110** | **3,867** | **38.7%** | **78.4%** |
| Reich & Binstock | | yes | 411 | 0 | 51 | 64 | 21 | 30.4% | 71.8% |
| Motley Rice, LLC | | yes | 325 | 0 | 6 | 18 | 29 | 16.3% | 50.8% |
| **Coalition Total** | | | **60,068** | **497** | **10,422** | **11,285** | **3,540** | **37.8%** | **77.7%** |

16. The metrics reported above do not account for whether the claimed abuse occurred recently enough to fall within with relevant statute of limitations for the state in which the abuse occurred. I have not determined which POCs were filed outside the relevant statutes of limitation, which would involve applying a state-by-state time limitation. However, the likely materiality of doing so can be assessed by determining the proportion of POCs that alleged abuse occurring more than ten or twenty years ago (based on stated year of abuse). 85.8 percent of POCs filed by high-volume law firms that are complete and do not have any of the characteristics listed in Table 3 allege abuse that occurred more than 10 years ago, and 83.3 percent allege abuse that occurred more than 20 years ago.[15]

---

[15] Many POCs do not report the specific years in which the alleged abuse occurred. While this information may be available elsewhere in the POC or in attachments, at this time, I do not determine whether these POCs allege abuse that occurred more than 10 or 20 years ago.

## IV. THIRD-PARTY ENTITIES SUBMITTED A LARGE NUMBER OF POCS

17.  A material proportion of the POCs were submitted to Omni by third-party entities. These claims are identified by the email address from which the claims were submitted to Omni.[16] Based on this analysis, I identified 11,597 POCs that are known to have been submitted by the four third-party entities listed in Table 4 below. These four firms, as well as other third-party entities, could have submitted additional POCs that I could not identify because the submitter could have used an unrecognized email address.

### Table 4: POCs Known to Have Been Submitted by Third-Party Entities

| Third-Party Entity | Total POCs | POCs Signed within Two Weeks of Bar Date | Highest Number of Claims Signed on a Single Day | |
| | | | Date | POCs |
| --- | --- | --- | --- | --- |
| Verus LLC | 5,973 | 3,269 | 11/13/2020 | 1,136 |
| Stratos Legal | 2,953 | 1,047 | 11/3/2020 | 669 |
| Your Case Managers | 2,199 | 957 | 11/10/2020 | 365 |
| Consumer Attorney Marketing Group | 472 | 307 | 11/12/2020 | 60 |
| **Total** | **11,597** | **5,580** | | **2,230** |

18.  The number of POCs that were submitted to Omni by third-party entities that were either missing key claimant identification or missing information about the alleged abuse are reported in Table 5.

---

[16]  I identify Verus LLC claims as those that were submitted from the email domain verusllc.com; Stratos Legal claims as those that were submitted from the email domain smedreview.com; Consumer Attorney Marketing Group claims as those that were submitted from the email domain camginc.com; and Your Case Managers claims as those that were submitted from three email domains: yourcasemanager.com, yourcasemanagers.com, and yourcaseworks.com.

**Table 5: POCs Submitted by Third-Party Entities That Are Missing Certain Elements of Information**

| Third-Party Entity | Total POCs | Number of POCs Missing Information | | | | | % Missing One or More Pieces of Information |
|---|---|---|---|---|---|---|---|
| | | Missing Key Claimant ID | Missing Abuser Last Name | Missing When Abuse Occurred | Missing Where Abuse Occurred | Missing What Abuse Occurred | |
| Verus LLC | 5,973 | 596 | 3,875 | 925 | 446 | 40 | 68.2% |
| Stratos Legal | 2,953 | 230 | 1,896 | 51 | 43 | 37 | 66.6% |
| Your Case Managers | 2,199 | 535 | 1,426 | 144 | 41 | 34 | 72.9% |
| Consumer Attorney Marketing Group | 472 | 53 | 271 | 8 | 8 | 5 | 62.5% |
| **Total** | **11,597** | **1,414** | **7,468** | **1,128** | **538** | **116** | **68.5%** |

19.     The number of POCs submitted to Omni by third-party entities that are late, multiple, have inconsistent scouting age, or where the claimant never lived in the state of alleged abuse are listed in Table 6.

**Table 6: POCs Submitted by Third-Party Entities That Are Late, Multiple, or Have Inconsistent Ages or States of Alleged Abuse**

| Third-Party Entity | Total POCs | Number of POCs | | | | % Late, Multiple, Inconsistent Age, or Never Lived in Abuse State | % Late, Multiple, Inconsistent Age, Never Lived in Abuse State, or Missing Information |
|---|---|---|---|---|---|---|---|
| | | Late | Multiple | Inconsistent Age | Never Lived in State of Alleged Abuse | | |
| Verus LLC | 5,973 | 9 | 1,086 | 307 | 325 | 27.0% | 77.8% |
| Stratos Legal | 2,953 | 6 | 412 | 405 | 157 | 29.5% | 75.3% |
| Your Case Managers | 2,199 | 4 | 250 | 356 | 119 | 30.1% | 79.8% |
| Consumer Attorney Marketing Group | 472 | 35 | 29 | 76 | 30 | 31.6% | 72.0% |
| **Total** | **11,597** | **54** | **1,777** | **1,144** | **631** | **28.4%** | **77.3%** |

20.     78.7 percent of POCs submitted by third-party entities that are complete and do not have any of the characteristics listed in Table 6 allege abuse that occurred more than 10 years ago, and 75.8 percent allege abuse that occurred more than 20 years ago.

21.     Additionally 1,424 POCs identify Robyn LeGris as the author of the PDF that was submitted to Omni.  Robyn LeGris is employed at ARCHER Systems according to her LinkedIn page.[17] The characteristics of these POCs are reported in Appendix B.

---

[17]   https://www.linkedin.com/in/rlegris/.

## V.    CONCLUSION

22.    My analysis is ongoing, and represents the best information I have as of the date of this declaration.  I may revise the analysis described above as my work continues.

Dated: January 22, 2021
      Alta, Utah

_____

Paul J.  Hinton

**Appendix A – Curriculum Vitae of Paul J. Hinton**

Mr. Hinton received his BA in engineering science from Oxford University in the UK and his MA in public policy from the John F. Kennedy School of Government at Harvard University, where his studies included economics, statistics and finance.

## EXPERT TESTIMONY

- Deposition testimony. *In re. The Financial Oversight and Management Board of Puerto Rico, et al., Debtors, PROMESA Title III*, Case No. 3:17-bk-03283 (LTS), August 2020.

- Deposition testimony. *Atlantica Holdings, Inc. et al v. BTA Bank JSC*, SDNY, 1:13-cv-05790, April 2019.

- Trial testimony. *Lantau Holdings Ltd., v. General Pacific Group Ltd., and SVK Capital Management, Ltd*, Supreme Court of New York State, Index No. 650085/2017, Hon. Barry Ostrager, October 2018.

- Deposition testimony. *Lantau Holdings Ltd., v. General Pacific Group Ltd., and SVK Capital Management, Ltd*, Supreme Court of New York State, Index No. 650085/2017, June 2018.

- Trial testimony. *U.S. v. David Bergstein*, case number 1:16-cr-00746, before Judge Geoffrey S. Berman, in the U.S. District Court for the Southern District of New York, February 2018.

## PUBLICATIONS

- Research study on small business tort costs commissioned by US Chamber Institute for Legal Reform, September 2020.

- Research study on "Costs and Compensation of the U.S. Tort System," commissioned by US Chamber Institute for Legal Reform, October 2018.

- "The Johnson Conviction and Fallout for Forex Market," with Andrew Newman and George Oldfield, Law360, December 6, 2017.

- "The Focus on Event Studies in Class Certification," with Torben Voetmann and Matthew Aharonian, Law360, December 22, 2015.

**Appendix A – Curriculum Vitae of Paul J. Hinton**

- "Making the Most of Document Analytics," with Rand Ghayad, Mark Sarro, Michael Cragg, and David Cohen, Law360, December 1, 2015.

- "D.C. Circuit Clarifies that SEC Need Not Show Market Impact in Manipulation Cases," with Shaun Ledgerwood, ABA Litigation Section, Securities Litigation Journal, December 9, 2015.

- "Equity Market Microstructure and the Challenge of Regulating HFT," with Michael Cragg, Financier Worldwide, January 2015.

- "FSA Calendar Year-End Update 2012," with Robert Patton, and Zachary Slabotsky, NERA Report, January 2, 2013.

- "Trends in Regulatory Enforcement in UK Financial Markets: Fiscal Year 2011/12" with Robert Patton, NERA Report, June 26, 2012.

- "Trends in FDIC Professional Liability Litigation" with Zachary Slabotsky, NERA Report, May 31, 2012.

- "A Model For Olympus Shareholder Litigation" with Makoto Ikeya. Securities Law360, Expert Analysis, January 05, 2012.

- "Trends in Regulatory Enforcement in UK Financial Markets" with Robert Patton, Marsh ProBroker, November, 2011.

- "Trends in Regulatory Enforcement in UK Financial Markets," with Robert Patton, NERA Paper, July 11, 2011.

- "Is Mortgage Underwriting to Blame for Subprime Losses? Disentangling the effects of poor underwriting from the economic downturn," with Ethan Cohen-Cole, NERA Paper, February 17, 2011.

**Appendix B – POCs Where Robyn LeGris Is Identified as the Author of the PDF That Was Submitted to Omni**

23. In this appendix, I provide metrics aggregating the POCs known to have been submitted by third-party entities Verus LLCs, Stratos Legal, Your Case Managers, and Consumer Attorney Marketing Group, and the POCs that have Robyn LeGris identified as the author in the metadata of the PDF that was submitted to Omni.[18]

**Table B-1: POCs Where Robyn LeGris Is Identified as the Author of the PDF That Are Missing Certain Elements of Information**

| | | Number of POCs Missing Information | | | | | % Missing One or More Pieces of Information |
|---|---|---|---|---|---|---|---|
| | Total POCs | Missing Key Claimant ID | Missing Abuser Last Name | Missing When Abuse Occurred | Missing Where Abuse Occurred | Missing What Abuse Occurred | |
| ARCHER (Robyn LeGris) | 1,424 | 1,034 | 949 | 80 | 101 | 904 | 91.9% |
| Submitted by Third-Party Entities | 11,597 | 1,414 | 7,468 | 1,128 | 538 | 116 | 68.5% |
| **Total** | **12,585** | **2,319** | **8,100** | **1,202** | **627** | **1,017** | **70.7%** |

**Table B-2: POCs Where Robyn LeGris Is Identified as the Author of the PDF That Are Late, Multiple, or Have Inconsistent Ages or States of Alleged Abuse**

| | | Number of POCs | | | | % Late, Multiple, Inconsistent Age, or Never Lived in Abuse State | % Late, Multiple, Inconsistent Age, Never Lived in Abuse State, or Missing Information |
|---|---|---|---|---|---|---|---|
| | Total POCs | Late | Multiple | Inconsistent Age | Never Lived in State of Alleged Abuse | | |
| ARCHER (Robyn LeGris) | 1,424 | 2 | 183 | 851 | 50 | 70.3% | 97.2% |
| Submitted by Third-Party Entities | 11,597 | 54 | 1,777 | 1,144 | 631 | 28.4% | 77.3% |
| **Total** | **12,585** | **55** | **1,834** | **1,858** | **668** | **32.2%** | **79.1%** |

---

[18] Some POCs were both submitted by a third-party entity and identified Robyn LeGris at the author of the PDF that was submitted to Omni. Accordingly, the totals reported in the tables below do not equal the sum of the number of POCs submitted by third-party entities and the number of POCs where Robyn LeGris is identified as the author of the PDF.

# EXHIBIT 3

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |

### DECLARATION OF ERICH J. SPECKIN

I, Erich J. Speckin, pursuant to 28 U.S.C. § 1746(2), under penalty of perjury, hereby declare as follows

1.      I am a forensic document analyst and ink-dating specialist.  I am the President of Speckin Forensic Laboratories, a position I have held since 1999.  I have performed forensic examination in over 4,000 cases, and have presented expert testimony in 37 different states and 11 different countries.  A substantial portion of my examinations involves the analysis of handwriting, including signatures.  I have been proficiency-tested by Collaborative Testing Services, the agency that administers tests for government forensic laboratories, every year since 2009.  The majority of these tests deal with handwriting and signatures, and some of these tests pertain to machine-copied documents and photocopy damage patterns.  I have passed every test.

2.      I am frequently invited to speak on the subject of document forensics by various societies of forensic scientists and document examiners.  I have published numerous articles and papers on forensic examination, and have authored a chapter in The Encyclopedia of Crime and Punishment pertaining to documents and handwriting.  I am a member of the Midwestern Association of Forensic Scientists and the American Society of Testing and Materials (ASTM International).

3.      I have been retained by Century Indemnity Company ("Century") in the above-captioned case to examine the handwriting and signatures on the proofs of claim ("POCs") submitted by claimants in the Boy Scouts of America bankruptcy.

4.      I have examined POCs submitted in the above-captioned case.  As part of my examination, in this or any other case, I take into account all relevant aspects of the document, including but not limited to handwriting analysis and comparison, font, printer type, scanner type, damage patterns from optical reproductions (copies), staple holes, metadata that is present in electronic records, and any other information that can assist in the examination.

5.      My review of the POCs submitted in this matter is ongoing, and I may supplement my analysis based on subsequent review and investigation.

6.      I have observed several irregularities that, at the very least, raise questions about the provenance and authorship of certain categories of POCs.

7.      **The use of the same photocopied signature page on multiple forms.**  Hundreds of POCs, all filed by Joseph J. Cappelli of Marc Bern & Partners, contain the exact same signature page.  The exact same signature page appears on all or nearly all of the over-600 POCs Cappelli purportedly signed on November 14, 2020.  The signature on the different forms is exactly the same, including the form, shape, and size of the signature, as well as the same photocopy damage pattern on each page.

8.      Just as revealingly, the intersection of the signature with the typewritten text is in exactly the same location on each signature.  There is no evidence on the face of the document that it is a digital signature.  One would not see such an exact match in the signatures (and the locations of the signatures) across different forms if the signer had individually signed each form.  No one signs his or her name exactly the same way twice, and no one places his or her

2

signature on the exact same spot (including intersections with surrounding text) each time he or she signs.

9.      Additionally, many of the POCs bearing Cappelli's signature were nearly blank, with very little information provided in the form.  Over 200 POCs provided no information at all in Parts 3 (Background Information for Sexual Abuse Survivor), 4 (Nature of the Sexual Abuse), 5 (Impact of Sexual Abuse), and 6 (Additional Information) of the claim form.

10.     The forms purportedly signed by Jonathan Schulman of Slater, Slater & Schulman follow the same pattern—*i.e.*, the signature pages are photocopies.  Schulman purportedly signed over 250 POCs, and all or nearly all have a photocopy of the exact same signature page appended to them.  I can determine that they are photocopies of the same signature page based on identical photocopier damage patterns across the different forms.

11.     The same issue (affixing of photocopied signature pages) applies to POCs purportedly signed by Andrea McGinnis (of Bailey, Cowan & Heckaman), and Christopher Tuck (of Weller, Green, Toups, & Terrell).  There may well be others who follow this pattern.

12.     **POCs with document creation date that is after the signature date.**  All or nearly all of the POCs signed and filed by (or on behalf of) Deborah Levy, an attorney with Junell & Associates who signed many hundreds of POCs in a single day, have a document creation date that is after the signature date.  I reviewed approximately 750 POCs bearing Levy's signature that had a signature date of November 3, 2020.  The "document created" date in the document properties box for these POCs is several days later, such as November 10, 2020 or November 12, 2020.

13.     I analyzed the time stamps for the document creation time in the metadata for the November 3 signatures.  The time stamps are clustered closely together: *e.g.*, five Levy signatures were generated within 20 seconds.  No one person can sign forms that fast, even

digitally.  This suggests that multiple people were working concurrently on placing Deborah Levy's signature on POCs.

14.    **Blank or nearly-blank POCs.**  Paul Napoli of Napoli Shkolnik PLLC purportedly signed approximately 550 forms between November 9, 2020 and the November 16, 2020 bar date[1] (with approximately 20 forms submitted after the bar date).  Over 400 were nearly blank—*i.e.*, little or no writing in Parts 3 (Background Information for Sexual Abuse Survivor), 4 (Nature of the Sexual Abuse), 5 (Impact of Sexual Abuse), and 6 (Additional Information).[2]  These blank forms did not even bear Napoli's actual signature, but merely the "/s/" symbol.

15.    **Third-party entities such as Verus Claims Services LLC ("Verus") submitted thousands of POCs.**  Verus is a business that describes itself as an "innovative litigation support services firm serving mass tort lawyers nationally."[3]  Verus appears to have submitted approximately 6,000 POCs (and possibly more) in this case.  I can identify POCs submitted by Verus based on data provided by the Official Claims Agent, Omni Agent Solutions ("Omni").  Omni identifies the email address associated with each submitted claim.  If the email address has "verusllc.com" as the domain name, that suggests that the claim was submitted by Verus.  Of course, it is possible for someone at an entity such as Verus to create an Omni account without using an email address that identifies the name of the entity.  That is why I am only able to identify the lower bound for the number of POCs that were submitted by Verus or other third-party entities.

---

[1] To determine the signature date, I examined both the Date field in the POC and the date in the metadata.

[2] When I say "little or no writing," I mean that the forms had two or fewer words and two or fewer checkboxes checked across Parts 3, 4, 5, and 6.

[3] https://verusllc.com/about-us/.

16.     Using the process described above, I was able to determine that nearly 500 POCs were submitted through Consumer Attorney Marketing Group ("CAMG") (the submitter email addresses had "camginc.com" as the domain name); nearly 3,000 POCs were submitted through Stratos Legal (the submitter email had "smedreview.com" in the domain name);[4] and approximately 2,200 POCs were submitted through Your Case Managers (the submitter email addresses had yourcasemanagers.com in the domain name).

17.     I was also able to determine that Robyn LeGris was listed as the "author" in PDF metadata in over 1,400 POCS, including over 900 for Marc Bern & Partners and over 500 for Junell & Associates.  Robyn LeGris appears to work as a Pre-Litigation Support Lead at Archer Systems.[5]  Over 430 of the POCs listing Robyn LeGris as the author appear to have been submitted by another third-party entity, Stratos Legal.[6]

18.     **Verus appended attorney signatures to POC forms.**  Adam Krause's (of Krause & Kinsman) signature appears on approximately 2,500 POCs submitted in this case, and over 1,900 of them were submitted by Verus.  I examined Krause's signature on Verus-submitted forms.  It appears that someone cut and pasted the PDF of the signature into the form.  Krause's signature in Verus-submitted POCs is extended across the entire page.  Other forms submitted by Verus for other attorneys in this matter had the same signature distortion.  This suggests that this signature distortion is unique to Verus.  Krause's signature in POCs that were not submitted by Verus did not have this distortion.

19.     **CAMG submitted forms purporting to be signed by different claimants that had the exact same signature.**  CAMG submitted approximately 400 POCs for the Morelli Law

---

[4] Smedreview.com is a domain name associated with Stratos Legal.  *See* https://www.whois.com/whois/smedreview.com.

[5] https://www.linkedin.com/in/rlegris/.

[6] The submitter email address had smedreview.com in the domain name.

Firm.  Each POC is purported to be signed by a different claimant (*i.e.*, each signature page has a different claimant name typed under the signature).  Each POC bears an identical, digitally generated signature.

20.     **Stratos Legal submitted over 2,900 of Deborah Levy's POCs, including over 550 POCs bearing Levy's signature.**  I base this on Omni submission data, which indicates that the submitter email addresses for these POCs have "smedreview.com" as the domain name.  As stated in Paragraph 11 above, the time stamps for the document creation time in the metadata for the Levy signatures are clustered very closely together (with some signatures a mere two or three seconds apart), suggesting that multiple people were concurrently working on placing the same Levy signature on the POCs.

21.     I respectfully reserve the right to amend, modify, or supplement this Declaration in response to, or as a result of, the filing of any submission in connection with this case, any discovery being conducted in connection therewith, or further analysis of the POCs.

Dated:    January 22, 2021
          Carter, South Dakota

                                                    _____
                                                    Erich J. Speckin