### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |
|  | Re Docket No. 1972 |
|  | **Obj. Deadline: Feb. 5, 2021 at 4:00 p.m.** |
|  | **Hearing Date:  Feb. 17, 2021 at 10:00 a.m.** |

### OBJECTION OF THE COALITION OF ABUSED SCOUTS FOR JUSTICE TO HARTFORD AND CENTURY'S MOTION FOR AN ORDER (I) AUTHORIZING CERTAIN RULE 2004 DISCOVERY, AND (II) GRANTING LEAVE FROM LOCAL RULE 3007-1(f) TO PERMIT THE FILING OF SUBSTANTIVE OMNIBUS OBJECTIONS [D.I. 1972]

The Coalition of Abused Scouts for Justice (the "Coalition"), by its undersigned counsel, hereby submits this Objection (the "Objection") to *Hartford and Century's Motion for an Order (I) Authorizing Certain Rule 2004 Discovery and (II) Granting Leave from Local Rule 3007-1(f) to Permit the Filing of Substantive Omnibus Objections* (the "Motion") [Docket No. 1972]. In support of this Objection, the Coalition respectfully states as follows:

### PRELIMINARY STATEMENT

1.      The Debtors filed for bankruptcy in February 2020—nearly one year ago.  The central issue in these chapter 11 cases is how to resolve the Debtors' liabilities for sexual abuse that occurred nationally and over the course of multiple decades.  Abusers are often drawn to organizations that afford them access to children.  The Debtors are such an organization, but they

---

[1]  The Debtors in these chapter 11 cases, together with the last four digits of Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

are not alone.  Catholic church sexual abuse has commanded headlines in recent years.  But the Catholic dioceses that have filed for bankruptcy are not national organizations.  Extrapolating from the number of abuse victims in local church bankruptcies to a national case like this one, it is not surprising that tens of thousands of abuse victims have now come forward.  The question that all parties should be asking is how do we pursue justice, that is justice for the survivors, here?

2.      The Debtors, Hartford, Century, the Coalition, among other parties, are presently involved in mediation.  This mediation has not yet resulted in a settlement.  The Coalition remains committed to settlement discussions and certainly hopes that the mediation will ultimately be successful in bringing about resolutions that the survivors can support.  Hartford and Century (together, the "Insurers"),[2] however, elected to file the Motion that is now before the Court, raising serious questions among the survivors whether these Insurers are committed to mediating in good faith.  In a move wholly lacking in precedent in the Third Circuit or any other Circuit, the Insurers seek to step into the Debtors' shoes and take discovery on the victims themselves.  The Coalition is certain that it is not lost on this Court that the Debtors themselves have not made this Motion.

3.      The Insurers' approach is not the right approach.  The proposed discovery, which is clearly directed at a potential plan of reorganization, is not necessary to remove an insurmountable obstacle to confirming a plan or resolving the mediation.  The Motion is based on a false narrative that the Insurers are offering a solution to solve a problem in the Debtors' chapter 11 cases.  They are not.  Rather, the Insurers are seeking to create an obstacle.  The Motion serves no legitimate purpose and should be denied in its entirety.

---

[2]    The Insurers' Motion was joined by Agricultural Insurance Company [Docket No. 1979], Travelers Casualty and Surety Company, Inc. (fka Aetna Casualty & Surety Company), St. Paul Surplus Lien Insurance Company and Gulf Insurance Company [Docket No. 2008], and Allianz Global US Insurance Company [Docket No. 2026].

**RESPONSE**

I.    **Proposed Discovery Is Not Necessary to Remove an**
      **Insurmountable Obstacle to Confirming a Plan of Reorganization**

4.    The Insurers argue:  "Unless there is real scrutiny of the claims, plaintiff's counsel

will have created a potentially ***insurmountable obstacle*** to ***confirming a plan of reorganization***

because Hartford, Century and other parties in interest will not be willing to ***fund a plan*** based on

the incredible assumption that there are in excess of 95,000 allowable claims."  Motion at ¶ 2

(emphasis added).  The Insurers go on to assert that they are "prepared to be ***constructive***," but

that it will be "impossible to achieve that goal [of reorganizing] if the ***presumptive starting point***

of negotiations is that … [there are] more than 95,000 [sexual abuse claims]."  *Id.* at ¶ 3 (emphasis

added).  They claim that "[b]efore there can be any real headway in negotiating a ***plan***, the new

claims need to be carefully ***investigated*** and invalid claims need to be ***disallowed***."  *Id.* (emphasis

added).  And the Insurers allege that their discovery is necessary to evaluate the "lawfulness of

any ***cram-down plan*** of reorganization" or "***non-consensual plan*** that seeks to address" the

allowance of abuse claims.  *Id.* at ¶¶ 20, 28 (emphasis added).

5.    The Insurers' proposed discovery is clearly directed at a potential plan and should

be done, if at all, in the context of a plan confirmation proceeding and not under Bankruptcy

Rule 2004.  *See In re Imerys Talc America, Inc.*, Case No. 19-10289 (LSS) (Bankr. D. Del. July 24,

2019) [Docket No. 883, Hr'g Tr. at 89:21-90:9] (denying Johnson & Johnson's request for

Rule 2004 discovery on the basis that it was "classic plan discovery" that "should be done in the

context of a plan").[3]  But even putting this aside, what is amazing is it that every word of what the

Insurers say is wrong.

---

[3]   *See also In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 271 (Bankr. D. Del. 2017) ("<u>Millennium Lab II</u>")
      ("The confirmation process is commenced by the filing of a disclosure statement. . .An objection transforms the
      confirmation hearing into a contested matter."); *Rosbottom v. Schiff*, 589 B.R. 63, 70-71 (Bankr. W.D. La. 2018)

A.    **The Insurers Do Not Have to Fund a Plan and**
      <u>**Claims Do Not Have to Be Investigated Pre-Confirmation**</u>

6.    Hartford and Century do not have to fund a plan.  They are not investors.  They are not lenders.  They are insurers.  They have coverage obligations under the terms of their insurance policies.  If there are 95,000 valid sexual abuse claims, their coverage obligations are what they are under the terms of their respective policies of insurance.  If the Debtors settle abuse claims in good faith or if the Debtors are found liable for sexual abuse claims, Hartford and Century will have to pay in accordance with the terms of their insurance policies.

7.    Plans are confirmed all the time in mass tort bankruptcies that are not funded by insurers and resolve mass tort claims post-confirmation through a trust.  *See In re PG&E Corp.*, Case No. 19-30088 (DM) (Bankr. N.D. Cal. June 20, 2020) [Docket No. 8053] ("<u>PG&E Confirmation Order</u>"); *In re Insys Therapeutics, Inc.*, Case No. 19-11292 (JTD) (Bankr. D. Del. Jan. 16, 2020) [Docket No. 1115] ("<u>Insys Confirmation Order</u>"); *In re TK Holdings Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) [Docket No. 2120].

8.    In *PG&E* the Bankruptcy Court confirmed a plan that created a trust and approved various trust documents, including claims resolution procedures.  *See* PG&E Confirmation Order at § 6.7.  All tort claims involving the wildfire are channeled to a trust.  *Id.* at § 10.7.  Over 80,000 wildfire claims asserted by individuals and business will be fully liquidated in accordance with the claims resolution procedures without burdening the Bankruptcy Court with a single hearing, a single claim objection, or a single discovery dispute.  None of PG&E's insurers "funded" a cash contribution on the plan effective date for this to occur, nor was it ever contemplated that they would do so.

---

(following *Millennium Lab II* and finding disclosure statement, proposed plan and related hearings are properly considered contested matters under Bankruptcy Rule 9014).  Under Bankruptcy Rule 3020(b), an objection to the confirmation of a chapter 11 plan is a contested matter.  *See* FED. R. BANKR. P. 3020(b).

4

9.     In *Takata*, the Bankruptcy Court approved a multi-step, out-of-court process to resolve over $1 billion of personal injury and wrongful death claims asserted against the debtors.[4] The personal injury claimants submit claim forms and supporting documentation to the trust established under Takata's plan, and the trustee vets and allows or disallows the claims.  *See id.* Neither the claim determination nor the appellate process for channeled claims involves the Bankruptcy Court.  None of Takata's liability insurers participated in "funding" the plan.  Recent case activity shows that the Takata trust is actively exercising the rights assigned to it under Takata's plan to prosecute Takata's recalcitrant insurers for the benefit of victims.[5]  The same fate may await Century and Hartford if they act in bad faith and fail to honor their coverage obligations.

10.     Similar to *Takata*, in *Insys* the Bankruptcy Court approved a plan that channeled all personal injury and wrongful death claims arising from Insys' fentanyl-based drug, Subsys, to a trust called the "Victims Restitution Fund."  *See* Insys Confirmation Order at ¶ 35.  Those claims will be individually liquidated out of court by the claims administrator pursuant to a claims resolution protocol and funded, if at all, by proceeds of insurance policies recovered by the Trust from the Debtors' insurers ***after*** the effective date.   The insurers in *Insys* did not "fund" the plan. The Victims Restitution Fund may be unfunded if it is unable to liquidate insurance proceeds post-confirmation.

11.     If similar procedures are implemented here, sexual abuse claims could be vetted post-confirmation by a trust.  This trust would require all victims to produce evidence sufficient to demonstrate the validity of their claims and to accurately assess the amount of damages.  One goal

---

[4]     *See* Notice of Filing of Fourth Plan Supplement Pursuant to the Fifth Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and Its Affiliated Debtors at Ex. N, *In re TK Holdings, Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Mar. 26, 2018) [Docket No. 2505].

[5]     *See*, *e.g.*, *Eric D. Green, as Trustee of the Takata Airbag Tort Compensation Trust Fund v. Mitsui Sumitomo Insurance Co., Ltd. (In re TK Holdings, Inc.)*, Adv. No. 20-51004-BLS (Bankr. D. Del. Nov. 5, 2020).

would be to eliminate fraudulent claims.  If there are thousands of fraudulent claims, they would be disallowed in accordance with the trust distributions procedures and would never be brought to the Insurers for payment.  The Insurers do not have to "fund" anything for this to occur.

12.     The Insurers have an opportunity here to effectively buy their way out of their contractual liability in exchange for a comprehensive release of liability in the Debtors' bankruptcy.  But nothing requires them to do this.  And nothing requires survivors to vote in favor of a plan that grants the Insurers releases.  Given the Insurers' actions to date, the Coalition's present assumption is that Insurers are not being constructive.  The working assumption is that the Insurers will not fund a plan—*i.e.*, the Insurers' rights will be placed into a trust and pursued by the victims and their agents.  The Insurers' main argument as to why discovery is necessary is, therefore, based on a false premise.

### B.     There Is No "Presumptive Starting Point" for Negotiations

13.     The Insurers asserted that "if the presumptive starting point for negotiations is that … [there are] 95,000 proofs of claim," then "it will be impossible" to achieve a viable plan.  Motion at ¶ 3.  The Insurers chose their words carefully.  The Insurers do not contend that the actual starting point for negotiations in the mediation is that there are 95,000 tort claims.  They clearly do not believe so.  The Insurers demand unprecedented discovery from who are supposed to be anonymous survivors on the basis that there ***may*** be a presumptive starting point for negotiation and such starting point ***could*** be that there are 95,000 valid abuse claims.  But this is speculation.

14.     Further, even assuming *arguendo* that there is a "presumptive starting point," the Insurers offer no explanation as to why the presumptive starting point matters.  Agreements are not reached based on presumptive starting points.  Negotiations are just that: discussions between parties regarding a potential resolution of a dispute.  Insurers have a wealth of information and are

free to negotiate or make an offer based on whatever starting point they deem fit.  The Debtors also have a wealth of information and are also free to negotiate as they see fit.

15.     The Insurers and the Debtors have steadfastly refused to produce information in their possession, custody, and control regarding the value and number of abuse claims in these cases, including historical settlement data.  To date, this is a closely guarded secret which provides the Insurers and the Debtors with, at a minimum, a starting point for negotiations.  If the Insurers and the Debtors want to change the Coalition's view, which does take into account many factors, the obvious starting point is for them to produce information to the Coalition so that the Coalition has a clear understanding of the data driving their views regarding the number of valid abuse claims and the value of such claims.  The Coalition has been seeking this information for some time and without success.

### C.     The Proposed Discovery Is Not Proper Under Civil Rule 26(b)(1)

16.     This reflects another defect in the Motion, which is that the Insurers' proposed discovery is improper under Rule 26(b)(1) of the Federal Rules of Civil Procedure (the "Civil Rules").  Bankruptcy Rule 2004 encompasses the proportionality rules set forth in Civil Rule 26(b)(1).[6]  Under Civil Rule 26(b)(1), "requested discovery must be '*proportional to the needs of the case*, considering the importance of the issues at stake in the action, the amount in controversy, the *parties' relative access to relevant information*, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.'"  *In re Maxus Energy Corp.*, 617 B.R. 806, 813

---

[6]     *See In re SunEdison, Inc.*, 562 B.R. 243, 250 (Bankr. S.D.N.Y. 2017) (finding that the "spirit of proportionality is consistent with the historic concerns regarding the burden on the producing party and is relevant to the determination of cause"); *see also In re Transmar Commodity Grp. Ltd.*, No. 16-13625-JLG, 2018 WL 4006324, at *4 (Bankr. S.D.N.Y. Aug. 17, 2018) (following *SunEdison* and analyzing the balance of burdens under Rule 2004 in light of the "spirit of the proportionality" underlying amended Civil Rule 26(b)(1)).

(Bankr. D. Del. 2020) (quoting Civil Rule 26(b)(1), made applicable by Bankruptcy Rule 7026) (emphasis added).

17.    If one were to devise a discovery regime here that is consistent with these principles, the starting point would be the identification by all parties of their respective information, where it is located, and the relative cost of obtaining it.  The objective is to obtain relevant information with the least possible cost.  But neither the Coalition nor the Court can evaluate what an appropriate discovery regime should entail so long as the Debtors and the Insurers continue to make important data unavailable to other parties.

18.    The Debtors have files that record instances of sexual abuse alleged against the Boy Scouts that span multiple decades.[7]  The Insurers have significant exposure under their policies and have been the Debtors' insurers of choice for decades.  The Insurers also have volumes of data and information regarding abuse claims in other contexts, including Catholic dioceses bankruptcies.  The data may show that there have been thousands of complaints made and that the number of claimants in these cases is not surprising and, in fact, may understate the number of actual victims.

19.    But the key point under Civil Rule 26(b)(1) is this:  the Insurers should not be permitted to launch an extremely broad and expensive discovery campaign involving thousands of victims of sexual abuse without *first* making information that is readily identifiable and in their possession, custody and control available to other parties.  This is the starting point to determine what, if any, additional discovery is proportional to the needs of these cases.  In this respect, the Insurers are bad actors when it comes to devising a discovery regime that comports with Civil

---

[7]    The Debtors' own "perversion files" apparently include the names of 7,819 *known* scout leaders who allegedly preyed on boys.  *See* Corky Siemaszko, *Lawyer demands Boy Scouts open up the 'perversion files,'* NBC NEWS, (Apr. 24, 2019), https://www.nbcnews.com/news/us-news/lawyer-demands-boy-scouts-open-perversion-files-n997786.  If true, it is not at all surprising that over 95,000 abuse claims were filed in these cases.

Rule 26(b)(1)'s proportionality requirements.  And, a party that has unclean hands should not be rewarded with the right to depose even one abuse victim let alone a hundred.

>        **D.**        **The Proposed Discovery Is Not Necessary to Evaluate the Lawfulness of a Plan**

20.        The Insurers assert that their discovery is justified because it is necessary to evaluate the "lawfulness of any cram-down plan of reorganization."  Motion at ¶¶ 20, 28.  But, if the Debtors find themselves in a cram-down situation vis-à-vis abuse claimants, it would necessarily mean that victims holding over one-third in amount or one-half in number of the abuse claims voted ***against*** plan confirmation.  11 U.S.C. § 1126(c).  If the requisite thresholds in section 1126(c) are met, the class would be an accepting class.  And, section 1129(b)'s cramdown provisions do not apply to an impaired accepting class.[8]

21.        A rejecting class is, by definition, a class where requisite thresholds have not been met.  The Debtors have made it clear that the only plan structure that they believe is viable is one that includes third party releases for non-debtor entities, including their local councils.  *See Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 20] at §§ III.B.8, IV.E, X.D & X.E.  The Coalition submits that the Insurers themselves would never enter into settlement and fund a plan absent releases.  And, under *Millennium Lab II*, this requires a supermajority vote of the abuse victims.  575 B.R. at 272.

---

[8]      *See In re Aegerion Pharm., Inc.*, 605 B.R. 22, 32-33 (Bankr. S.D.N.Y. 2019) ("'Unfair discrimination' and 'fair and equitable' requirements of … section [1129(b)(1)] apply 'with respect to each class of claims or interests that is impaired, and has not accepted, the plan.' … Here, of course, the impaired class in which the former officers and directors have been placed has accepted the plan, so section 1129(b)(1) does not apply."); *In re W.R. Grace & Co.*, 475 B.R. 34, 174-75 (Bankr. D. Del. 2012) ("It is a well-known legal rule in Chapter 11 reorganization litigation that under § 1129(b), a finding that a plan is 'fair and equitable' is required only in the context of a cramdown."  Therefore, "the absolute priority rule" does not come into play unless "an entire class of impaired creditors had voted against confirmation of the plan."); *In re Dow Corning Corp.*, 244 B.R. 678, 693 (Bankr. E.D. Mich. 1999) ("Under § 1129(b), a finding that a plan is 'fair and equitable' is required only in the context of a cramdown").

22.     If the abuse victims vote down the Debtors' plan, there could be no third-party releases as a matter of law.  *See id.*  The requirements for third party releases is a ***higher*** threshold than the threshold for an accepting class under section 1126(c).  It follows that if the ***lower*** threshold set by section 1126(c) is not met, than the ***higher*** threshold would not be met either.

23.     No discovery is necessary to do this math.  The Insurers' assertion that their proposed discovery is necessary to evaluate the lawfulness of a plan under a cram down is not true because the Court would not even reach this issue.  There is a reason why the ***Debtors*** have not joined the Insurers' Motion.  It is ill conceived on its face and serves no legitimate purpose at this time other than for purposes of delay, harassment, and intimidation.

### E.     The Proposed Discovery Would Create an Obstacle to Plan Confirmation

24.     In fact, the proposed discovery would itself create an obstacle to plan confirmation. The Debtors' stated goal is to emerge from bankruptcy in August of 2021.  If the Court grants the Motion on February 17, 2021, the Insurers will need to serve discovery requests on 1,400 abuse victims in accordance with the Bankruptcy Rules and the Civil Rules.  Many victims may not waive personal service.  Once served, parties would have to respond to the interrogatories and requests for production within thirty (30) days.  Motion at ¶ 42.  This may not happen until the end of March or the beginning of April.

25.     Victims would have the right to object to the discovery based on the breadth of the information sought.  If each victim produced only five documents responsive to each request for production, that would result in over 50,000 documents.  Combined with the 15,400 answers to interrogatories, that Insurers would then have to prepare to depose 100 deponents.  Depositions of 100 victims would then take place, presumably in April, May and June, with substantive claim objections filed thereafter.

26.     Survivors who assert abuse claims for personal injury torts could move to withdraw the reference to the District Court. *See* 28 U.S.C. § 157(b)(5). Perhaps even an examiner will get involved if the Insurers get their way. Motion at ¶ 18. The litigation process could take years to complete if each claimant is accorded due process, the right to discovery, and an opportunity to be heard. This is a process that, without any doubt, could not be completed by the end of August 2021, ***nor do the Insurers intend for it to be completed by such date***.

27.     It is unlikely that the Coalition would vote in favor of any plan while this litigation is taking place. The Debtors are seeking to confirm a plan that includes third party releases that cannot be approved unless a supermajority of sexual abuse victims vote in favor of the plan. Even assuming the best possible outcome for the Insurers in their desired war against abuse survivors, the Coalition's members, together with survivors represented by law firms that have clients who are Coalition members, likely have a blocking position. The Insurers are not seeking to remove an obstacle; they want to create one.

28.     The Insurers fear that the Debtors will move forward with a plan that has a chance of obtaining the Coalition's and its members' support and would force the Insurers to honor the terms of their contractual obligations. The discovery sought is an attempt to prevent a consensual reorganization. The Insurers are not offering a solution; they are the problem. There is no amount of information that the Insurers could obtain from abuse victims that would satisfy their demands. This discovery has nothing to do with the Insurers' alleged need for information. They may be the entities with the most information. The Insurers elected to come to Court for a reason. And it has nothing to do with seeking justice for survivors of sexual abuse.

F.    **The Insurers Are Not Being Constructive**

29.    The Insurers assert that they are "prepared to be constructive" and that they "have been participating in the ongoing mediation." Motion at ¶ 3.  Again, the Insurers chose their words carefully.  It is true that the Insurers are participating in mediation.  But whether they are participating in good faith or being constructive are altogether different matters.  Within the confines of the mediation, the Insurers can seek addition information from the Coalition.  But they have chosen to depart the mediation and come before this Court.  Why?

30.    The Coalition is and has always been willing to be constructive.  The abuse survivors that comprise the Coalition deserve nothing less than professionals that will advocate on their behalf with passion and in a professional manner.  But was the Insurers' decision to file a motion that engages in unfounded personal attacks on law firms constructive?  *See* Docket No. 1974.  That answer is clearly an emphatic "no."

31.    Was objecting to a motion to appoint mediators constructive?  *See* Docket Nos. 388, 646, 761, 888.  Was objecting to the Debtors' retention of Sidley Austin LLP and then White & Case LLP constructive?  *See* Docket Nos. 426, 1637.  Was objecting to the bar date motion constructive?  *See* Docket No. 656.  Was objecting to the Coalition's motion to participate in the mediation or for the approval of its Rule 2019 statement constructive?  *See* Docket Nos. 1230, 1266.  Was attempting to disqualify plaintiff firms due to alleged ethical violations in their advertising constructive?  *See* Docket No. 1266.  Was objecting to the Coalition's motion to allow attorney signatures in accordance with the Bankruptcy Rules constructive?  *See* Docket No. 1463.

32.    The Insurers may be *preparing* to be constructive at some unknown point in the future, but they are not here today to be constructive.  They have made this abundantly clear through their actions since the inception of these cases, which actions and conduct speak for

themselves far more loudly and effectively than any objection that the Coalition could ever file with this Court.

## II.    The Remaining Justifications Offered by the Insurers Do Not Justify Relief under Bankruptcy Rule 2004

33.     The remaining justifications offered by the Insurers in their Motion do not justify relief under Bankruptcy Rule 2004.  Bankruptcy Rule 2004 may be broad, but its deployment is always a matter of the Court's discretion.  *See Imerys Talc America*, Case No. 19-10289 (LSS) (Bankr. D. Del. July 24, 2019) [Docket No. 883, Hr'g Tr. at 89:11-12] ("Rule 2004 is discretionary.")[9]

34.     "[Rule 2004] requires a balancing of the competing interests of the parties, weighing the relevance of and necessity of the information sought by examination."  *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 626 (Bankr. D. Del. 2016) (quotation omitted). Courts exercise discretion to deny or limit overbroad, unduly burdensome or harassing Rule 2004 discovery requests.[10]  "Rule 2004 is not available to creditors seeking to use this section to deal with their special problems." *Millennium Lab Holdings II*, 562 B.R. at 626-27.  The burden always remains with the party seeking discovery under Bankruptcy Rule 2004 to demonstrate good cause.[11]

---

[9]    *Accord Transmar Commondity*, 2018 WL 4006324, at *4 ("The decision to grant or deny a request for discovery under Rule 2004 is within the sound discretion of the court."); *In re Mattera*, No. 05-39171, 2007 WL 1813763, at *2 (Bankr. D.N.J. June 13, 2007) ("The permissive language of Rule 2004 connotes a court's discretion in deciding whether to grant a request for a Rule 2004 examination."); *In re Bd. of Dirs. of Hopewell Int'l Ins., Ltd.*, 258 B.R. 580, 587 (Bankr. S.D.N.Y. 2001) ("Rule 2004 provides that the Court 'may' order disclosure thereunder, giving the Court significant discretion.")

[10]    *See In re Mathews*, No. 18-MC-153-LPS, 2018 WL 5024167, at *3 (D. Del. Oct. 17, 2018) (quashing harassing subpoenas under Rule 2004); *In re Washington Mut., Inc.*, 408 B.R. 45, 50 (Bankr. D. Del. 2009) ("There are, however, limits to the use of Rule 2004 examinations. . .[i]t may not be used for purposes of abuse or harassment and it cannot stray into matters which are not relevant to the basic inquiry.") (citations omitted); *Mattera*, 2007 WL 1813763, at *2 ("Moreover, the expansive nature of Rule 2004 should not be permitted to exact prejudice or injustice on the subpoenaed party.")

[11]    *See Transmar Commodity*, 2018 WL 4006324, at *4 ("The party seeking discovery under Rule 2004 bears the burden of showing good cause for the examination it seeks."); *Mattera*, 2007 WL 1813763, at *2 ("the party seeking to conduct a Rule 2004 examination bears the burden of showing cause.")

A.      **The Insurers Have Failed to Establish Good Cause for Rule 2004 Discovery**

35.      The Insurers offer several additional justifications in support of the Motion, none of which establish good cause for discovery under Bankruptcy Rule 2004.

36.      Attorney Advertising.   The Insurers assert that discovery from abuse victims is necessary because there was an "aggressive media advertising campaign."  *See* Motion at ¶¶ 5-7. But this issue was litigated.  The Debtors moved to preclude attorney advertising and the Coalition objected and argued that the First Amendment protects the attorneys' advertising rights. *See* Docket Nos. 1190, 1264.  The Coalition and the Debtors agreed to a consensual resolution of this issue that permitted attorney advertising to continue, which the Court approved.  *See* Docket No. 1331.

37.      But putting this aside, there is no evidence that law firm advertisements led to an incredible increase in the number of claims filed.  Bar dates generate claim filings in nearly every chapter 11 case.  The Debtors themselves engaged in a robust noticing nationwide campaign which included television, radio, print, and internet advertising.  *See* Docket No. 1145 at ¶ 25.  In *In re Purdue Pharma, L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), there were very few personal injury claims in the tort system as of the petition date and approximately 120,000 personal injury claims were filed.

38.      The Insurers refuse to consider that the large number of claims is logically attributable to the decades of sexual abuse perpetrated by adults affiliated with Scouting.  Despite lodging salacious attacks on law firms that are dedicated to helping victims of sexual abuse, the Insurers offer a paltry *six* examples of what they claim to be "outright fraud."  *See* Motion at ¶¶ 7-8. And, the Insurers fail to identify any causal link between these six examples and the attorney advertising.  The only email that mentions any advertising at all ***was directed to the Omni Agent***

14

*stating*, "he saw your ads and wanted to make some money." Motion at ¶ 8, Weinberg Decl. Ex. 1. For all the Insurers know, this could be a reference to the Debtors' court-approved notice and advertisements.[12]

39.     The majority of the evidence proffered by the Insurers regarding attorney advertising amounts to classic examples of victim doubting and denial. One email—from Claimant No. 2432—shows the consequence of the Insurers' proposed discovery. *See* Weinberg Decl. Ex. 6 (Jan. 16, 2021 e-mail from Claimant No. 2432 to Michele Backus).

40.     It is important that the Court take note that Claimant No. 2432 is **not represented by counsel**, as he states in this email, so extrapolating his behavior to law firms that engaged in advertising is baseless. **But this email shows something far worse**.

41.     This *pro se* survivor states, in response to the Insurers request for a "meet and confer" to negotiate the scope of the interrogatories, "*I am not represented by counsel, nor can I afford Counsel*." (emphasis added). After reviewing the Insurers' interrogatories he states: "I find that it is highly unlikely that I will be able to recall or answer most of these questions given that it is over 60 years since the incidents occurred and I never sought professional counseling or treatment. Therefore, I decline to undergo any discovery process, and I withdraw my claim."

42.     Contrary to the Insurers' assertions, this does not read as a fraudulent filer trying to cover his tracks, but of an honest and sincere unrepresented survivor who was intimidated, when confronted by Big Law insurance counsel, by the idea of a lengthy discovery process of intimate details of his trauma from decades prior. Scaring survivors so that they withdraw presumptively

---

[12]    Regarding this email (Weinberg Decl. Ex. 1), the Insurers further state that the "claimant's mother e-mailed BSA that her son was not molested." But this presumes that a mother would necessarily know of her son's abuse and/or support his decision to come forward. Prevailing social science research shows that family dynamics can lead to a failure to report abuse. *See, e.g.*, Ramona Alaggia, et al., *Facilitators and Barriers to Child Sexual Abuse (CSA) Disclosures: A Research Update (2000-2016)*, 20 TRAUMA VIOLENCE & ABUSE 260, 277 (2019); R. Alaggia & S. Kirshenbaum, *Speaking the Unspeakable: Exploring the Impact of Family Dynamics on Child Sexual Abuse Disclosures*, 86 FAMILIES IN SOCIETY 227, 229-32 (2005).

valid claims is not good cause; it is disgusting.  If anything, the Insurers' evidence shows the very real harm that this type of discovery may cause to the ability of survivors to come forward and receive the just and equitable compensation they deserve.[13]

43.    <u>Fraudulent Claims</u>.    The Insurers assert that discovery from abuse victims is necessary because individuals may have filed fraudulent claims for sexual abuse.  Motion at ¶¶ 8-9. To the extent that fraudulent claims exist, they can be vetted in accordance with trust distribution procedures post-confirmation.  The Insurers offer no justification as to why this must occur pre-confirmation and in a manner that requires this Court to adjudicate thousands of abuse claims.

44.    The Insurers' "fraud argument" further relies on the false assumptions that all valid sexual assault claims were known to the Debtors prepetition, and that there is a high prevalence of fraudulent claims of sexual assault.  But childhood sexual assault is generally unreported during childhood.[14]  And, the rate of false reporting of sexual assault is very low.[15]  The Insurers ask this Court to presume that most survivors are lying.  Perhaps this Court should start with the assumption that they are telling the truth.

45.    <u>Attorney Signed Claim Forms</u>.    The Insurers assert that discovery from abuse victims is necessary because attorneys signed claim forms and hundreds of such forms were filed

---

[13]    The Coalition requests that any Order entered in respect of the Motion provide that Claim No. 2432, to the extent withdrawn, be deemed reinstated as if no withdrawal occurred.

[14]    *See* Child USA, *Delayed Disclosure: A Factsheet Based on Cutting-Edge Research on Child Sex Abuse*, CHILDUSA.ORG, at 3 (Mar. 2020) available at https://childusa.org/wp-content/uploads/2020/04/Delayed-Disclosure-Factsheet-2020.pdf ("While it may seem intuitive that a survivor would disclose abuse when it happened, data reveals a different reality.  In a study of over 1,000 survivors, the average age at the time of reporting child sex abuse was about 52 years.")

[15]    *See* David Lisak, et al., *False Allegations of Sexual Assault:  An Analysis of Ten Years of Reported Cases*, 16 VIOLENCE AGAINST WOMEN 1318, 1329 (2010) ("Of the 136 cases of sexual assault 8 (5.9%) were coded as false reports"); *see also* Ann-Christin Cederborg et al., *Delay of Disclosure, Minimization, and Denial of Abuse When the Evidence Is Unambiguous:  A Multivictim Case* (May 1, 2004) available at https://journals.sagepub.com/doi/10.1177/ 1077559504264263 ("Even when reports are delayed or inconsistent, furthermore, we should not consider them to be unreliable. … [C]hildren who have been threatened with reprisals by a manipulative perpetrator and fear their parents will not be supportive must be reassured that they will be protected if they do disclose what has happened to them.")

in a single day.  Motion at ¶¶ 10, 15.  But the Bankruptcy Rules permit attorneys to sign proofs of claim.  *See* FED. R. BANKR. P. 3001(b), 9009(a).  As does this Court's own Order.  *See* Docket No. 1551.  The fact that hundreds of attorney-signed forms were filed in a single day suggests that many firms filed attorney-signed claim forms to protect their clients' right to receive a distribution. The Insurers' numbers and statistics do not indicate any improper conduct or that claims were filed without proper attorney review.

46.    <u>Certain Claimants Have Criminal Records</u>.  The Insurers assert that discovery from abuse victims is necessary because certain claimants have criminal records.  Motion at ¶ 9.  But having troubles after experiencing abuse is common.  An equally valid supposition is that such troubles in adulthood occurred because these victims were sexually abused as children.[16]

47.    <u>Abuse Impact Description</u>.  The Insurers assert that discovery from abuse victims is necessary because ***eleven*** proofs of claim use the following language to describe the abuse: "████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████."  But this description is consistent with the claimant having been abused as a child.  Statements like these should compel all professionals involved in these cases to be constructive given what is at stake here.

48.    <u>Claims Have Deficiencies / Duplicate Claims Were Filed</u>.  The Insurers assert that discovery from abuse victims is necessary because certain claims contain deficiencies and duplicate claims were filed.  Motion at ¶¶ 12, 15.  But this is true in nearly every chapter 11 case, and, as this Court knows, not just in those cases dealing with mass torts.  It is not uncommon for

---

[16]    Research indicates there is a correlation between childhood sexual abuse and higher rates of criminal activity. *See, e.g.*, Mirko Bagaric, et al., *Trauma and Sentencing: The Case for Mitigating Penalty for Childhood Physical and Sexual Abuse*, 30 STANFORD L. & POLICY REV. 1, 28-33 (2019).

claims to contain deficiencies or for there to be duplicate filings.[17]  It is obviously better to file a claim without complete information than miss the bar date.  Many law firms have been and will continue to file amended claims that provide additional information and cure deficiencies.  That process is happening now and will continue.

49.    <u>Time Barred Claims</u>.  The Insurers assert that discovery from abuse victims is necessary because certain claims appear to be time-barred on their face.  Motion at ¶¶ 15, 35-37.  But this Court's bar date order specially provides:  "For the avoidance of doubt, even if the Sexual Abuse Claim is time-barred under applicable statute of limitations, each Sexual Abuse Survivor is required to file a Sexual Abuse Survivor Proof of Claim in order to preserve the right to pursue a Sexual Abuse Claim."  Docket No. 695 at ¶ 4(h) (emphasis removed).  How could this be grounds for a Rule 2004 examination given this Court's clear instructions?

50.    <u>Claims Already Paid</u>.  The Insurers assert that discovery from abuse victims is necessary because approximately ***130 claimants*** (out of over 95,000 filed claims) may have already received some form of payment.  Motion at ¶ 15.  But this does not mean that all of these claimants have been paid in full for their injuries.  Nor is this a basis to seek discovery on over one thousand sexual abuse victims, the vast majority of whom have not received any compensation for abuse that occurred decades ago.

51.    <u>Ability to Extrapolate</u>.  The Insurers assert that if they are permitted to pursue Rule 2004 discovery against 1,400 victims, they will be able to extrapolate from the results and conform conclusions regarding the entire claim population.  Motion at ¶¶ 39-40.  The Insurers do

---

[17]    Many of the duplicate filings resulted from problems with the website maintained by the Debtors' claims and noticing agent, Omni Agent Solutions ("<u>Omni</u>"), which were so severe in the week leading up to the bar date that Omni opened a second web portal to handle the traffic.  In fact, even ***Hartford*** filed duplicate claims against the Debtors.  *See Debtors' First Omnibus (Non-Substantive) Objection to Certain (I) Exact Duplicate Claims, (II) Amended and Superseded Claims, and (III) Incorrect Debtor Claims (Non-Abuse Claims)* [Docket No. 2019].

not provide any explanation as to how this is possible. The Coalition served the Insurers with discovery and have noticed their economist for deposition. The Coalition reserves the right to supplement its Objection based on the Insurers' discovery responses, or failure to respond.

52.     None of the Insurers' assertions, standing alone or together, amount to good cause under Rule 2004. When balancing the Insurers' need for the requested information and their history of harassing survivors and wasting estate resources against the impact that their discovery would have on sexual abuse survivors who would be ***forced*** to recount their abuse in detail in depositions and written responses to interrogatories, it is clear that the Motion should be denied.

### B.     The Proposed Discovery Requests Are Overly Broad and Unduly Burdensome

53.     Assuming, *arguendo*, that the Court, in its discretion, elects to open the door to plan discovery and claim litigation now, the Insurers' proposed discovery requests are overbroad, unduly burdensome, and disproportionate to the needs of these cases. If discovery is permitted, each abuse victim should have the right to object under the Civil Rules.

54.     The Insurers assert that their discovery requests are "narrowly tailored." Motion at ¶ 40. But even putting aside the number of claimants swept up in their discovery scheme—11 interrogatories and 8 requests for production for each of the 1,400 claimants results in over 28,000 unique discovery requests—the interrogatories and requests for productions are overbroad and lacking requisite temporal and substantive specificity. For example, Request for Production #2 requests "[a]ll documents, recordings or electronic materials constituting or reflecting any communications that You had with any other person relating to the Sexual Abuse." *See* Docket No. 1972-2. Requests like this guarantee that there will be a lengthy response and objection process.

55.     The Insurers include a plan for this contingency.   In their Proposed Order, the Insurers request permission to file an omnibus motion to compel to address any unresolved objections to their discovery.  Motion at Ex. A, ¶ 5.  Tellingly, a motion to compel of this nature is *not even mentioned anywhere in the Motion itself*.  The Coalition is unable to locate any instance where a Bankruptcy Court has permitted discovery objections to be resolved in this manner.

56.     Finally, the Insurers demand for 100 depositions goes well beyond what is ordinarily permitted under Civil Rule 30(a)(2)(A)(i), which limits each party to 10 depositions. The blanket demand for carte blanche authority to conduct 100 depositions prior to identifying with any level of specificity which 100 deponents will be selected from the 1,400 served with interrogatories is not a ripe request for this Court's review.  To justify such a request for additional depositions over the 10 deposition limit the party "is required to specify the individuals it wishes to depose and make a 'particularized showing' of the reasons the additional depositions are needed." *Maxus Energy*, 617 B.R. at 813.  The Motion contains no such showing.

## III.     The Insurers Should Not be Permitted to File Claim Objections

57.     The Insurers also seek relief from Local Rule 3007 to permit the filing of omnibus claim objections.  But insurers should not have the right to file claim objections, or even seek discovery under Bankruptcy Rule 2004.

### A.     The Insurers Do Not Have the Same Rights as the Debtors

58.     Outside of bankruptcy, insurers generally lack the right to participate in litigation between a tort victim and a tortfeasor and seek discovery.  An insurer can qualify as a real party in interest under Civil Rule 17 if the insurer has subrogation rights.  If the tort victim is an *insured* and has insurance that covers the loss, and the insurer pays the tort victim, the insurer steps into

the shoes of the victim under the subrogation doctrine and can assert a claim against the tortfeasor to recover amounts paid to the insured. Here, the sexual abuse victims are not *insureds*. The Debtors are the insureds. The Insurers here cover losses incurred by the tortfeasor and do not have subrogation rights.

59.     The Insurers may have a contractual obligation to cover litigation costs incurred by the Debtors under their policies. But paying litigation costs would not make the Insurers a proper party defendant with the right to take discovery. Many states have statutes that bar a plaintiff from suing a defendant's insurer because the plaintiff has no privity of contract with the insurer.

60.     The Insurers may have the right to defend sexual abuse claims under the policies. This could happen if the Debtors abandoned the defense, which has not occurred, or if the Insurers unequivocally accept their obligation to pay such claims and agree to undertake the defense, which has *clearly* not occurred. Further, in this context, the Insurers would be entitled to certain claims related information but in no event would they be entitled to seek discovery for their own benefit in an effort to avoid their coverage obligations, which is what the Insurers are doing here.

61.     Moreover, an insurer cannot prevent a tortfeasor from settling with the tort victim or force a tortfeasor to litigate with a victim when doing so would be contrary to its business judgment. Significantly, the Debtors are *not* standing before the Court seeking discovery. The Insurers are asking this Court to imbue them with the Debtors' rights vis-à-vis abuse claimants so they can wage war against abuse victims and their attorneys.

62.     But the Insurers do not have these rights outside of bankruptcy and there is nothing in the Bankruptcy Code that affords them greater rights due to the mere happenstance of the Debtors' bankruptcy. Even if the Insurers somehow qualify as a "party in interest" (which the Coalition does not accept or concede), the orderly administration of the Debtors' estates demands

that they not be permitted to file claim objections, and certainly not on the scale proposed by the Insurers. *See* FED. R. BANKR. P. 3007, Notes of Advisory Committee on Rules (1983) ("While the debtor's other creditors may make objections to the allowance of a claim, ***the demands of orderly and expeditious administration have led to a recognition that the right to object is generally exercised by the trustee***.") (emphasis added).

**B**       **The Insurers Lack Standing to Lodge Substantive Claim Objections**

63.      Third Circuit case law further proves that the Insurers are not a proper party in interest to file claim objections or seek discovery from tort victims.   In *In re Combustion Engineering, Inc.*, 391 F.3d 190, 218 (3d Cir. 2004), the Third Circuit held that the debtor's insurers lacked standing to challenge an order confirming a chapter 11 plan calling on them to fund an asbestos trust because the plan was insurance neutral.  The Third Circuit opened the door for insurers to appear and be heard in connection with such matters in *In re Global Industries Technologies, Inc.*, 645 F.3d 201, 212 (3d Cir. 2011), where the Circuit held that the debtor's insurers—Hartford and Century—had standing to challenge a plan calling for them to fund an asbestos trust since the plan was not insurance neutral and materially impacted their rights.  Read together, these cases make two points that are relevant here.

64.      First, if the parties do get to plan confirmation and the plan is not insurance neutral, then Hartford and Century will obviously argue that they have standing and the right to object under *Global Industries*.  They will likely seek discovery in connection with such proceeding. Under Bankruptcy Rule 3020(b), an objection to the confirmation of a chapter 11 plan is a contested matter.  But until then, discovery under Bankruptcy Rule 2004 is inappropriate. *See Imerys Talc America*, Case No. 19-10289 (LSS) (Bankr. D. Del. July 24, 2019) [Docket No. 883, Hr'g Tr. at 89:9-91:21].

65.    <u>Second</u>, the Insurers only have standing to object and be heard on matters that materially impact their rights.   *Global Industries* did not purport to overrule *Combustion Engineering*.  The law remains that a debtor's insurers do not have general standing and a right to be heard on all matters.  What the Insurers are seeking to accomplish here—the free ranging right to conduct discovery and engage in pre-confirmation claim litigation with tort victims—has never been done before and would be inconsistent with the limited role that a debtor's insurer should play in a chapter 11 proceeding.

66.    Finally, if the Insurers contend that they are parties in interest with a general right to be heard as *creditors*, which would be atypical, their status as creditor should be substantiated as a threshold matter.  Hartford asserts "contingent/unliquidated" claims for "insurance coverage."  *See* Claim No. 8191.  Century's asserts "contingent/unliquidated" claims for "liability policy and related agreements."  *See* Claim No. 856.  The addendum Century attached to its claims further alleges that Century may have claims for "contribution."  *Id.*  The Insurers' alleged claims may be subject to disallowance under section 502(e) of the Bankruptcy Code.  If so, they demonstrate nothing more than insurers that lack standing.

### B.    No Basis to Grant Relief from Local Rule 3007-1(f)

67.    Assuming *arguendo* that the Insurers have the right to file claim objections, the Insurers fail to show why the Court should amend the Local Rules to permit a less stringent process for lodging substantive objections en masse against tens of thousands of sexual abuse claimants.

68.    Local Rule 3007-1 does not limit non-substantive omnibus claim objections.  If there are, in fact, 11,676 duplicate claims, as the Insurers assert, the Debtors can file an omnibus objection as to these claims.  Motion at ¶ 30; *see* Local Rule 3007-1(d)(i).  The remaining categories of allegedly objectionable grounds asserted by the Insurers are substantive issues—

*i.e.*, time barred, already compensated, omitted necessary facts, allegedly fraudulent—cannot be summarily objected to and disallowed.

69.     The requirements relating to substantive objections are set forth in Local Rule 3007-1(f).  First, the Insurers seek relief from Local Rules 3007-1(f)(i) and (f)(ii), which limit the Insurers to submit no more than 150 claims in their omnibus objection and limits the Insurers to file no more than two such omnibus objections per month.  *See* Motion at ¶¶ 48-50.  By seeking relief from both Local Rules, the Insurers hope to create a procedure which would allow them to file an unlimited number of substantive claim objections at an undetermined frequency.  The Insurers fail to cite any case where this has happened before.

70.     Second, the Insurers seek relief from Local Rules 3007-1(f)(iii), which requires the objector to include all substantive objections to a claim in a substantive claim objection.  *See* Motion at ¶ 51-53.  By seeking relief from this Local Rule, the Insurers hope to create a procedure which would allow the Insurers two, three, or even four bites at the apple—for any substantive claim objection that fails on the Insurers' first attempt, the Insurer may continue to reallege new substantive bases for objection until one sticks.  The Insurers also fail to cite any case where this has happened before.  The Insurers also ignore Local Rule 3007-1(f)(v), which states that the Court will not consider any substantive objection to personal injury claims that would be in violation of 28 U.S.C. § 157(b)(2)(B).[18]

71.     The Insurers clearly intend to file omnibus objections against tens of thousands presumptively valid claims stating that the claims are disallowable without sufficient justification or proof.  But Bankruptcy Rule 3007 and Local Rule 3007-1 were designed to prevent such

---

[18]    *See* 11 U.S.C. § 157(b)(5) ("The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending.")

wholesale objections and this Court should not negate those protections to benefit the Insures at the expense of the sexual abuse survivors' right to due process.

72.     The cases cited by the Insurers mandate no other result.  In *In re Energy Future Holdings Corp.* (Bankr. D. Del. July 9, 2015) (No. 14-10979 (CSS)), the Bankruptcy Court allowed the limited waiver of ***only*** Local Rule 3007-1(f)(ii) and permitted the Debtors to file more than two omnibus objections per month, after "having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest[.]"

73.     Both the *In re PES Holdings, LLC* Court and the *In re TK Holdings* Court granted a limited waiver of Local Rule 3007-1(f)(ii) and allowed for the filing of up to four omnibus objections per month of no more than 150 claims.  *See In re PES Holdings*, LLC, Case No. 19-11626 (KG) (Bankr. D. Del. Dec. 9, 2019); *In re TK Holdings Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Aug. 27, 2018).  In *TK Holdings*, this relief was granted post-confirmation in response to a motion filed by the Trustee.

74.     The Insurers have not and cannot cite any case in which the Court has granted anything close to the near complete exemption from Local Rule 3007-1 sought here.  If this Court is going to become the forum in which thousands of sexual abuse claims are adjudicated, it is important that each victim be accorded the same rights as other creditors in Delaware and that the Insurers comply with the same rules as would be applicable to the Debtors.

## **CONCLUSION**

WHEREFORE, the Coalition requests that the Court enter and order denying the Motion and granting the Coalition such other and further relief as the Court deems just and proper.

Dated: February 5, 2021
Wilmington, Delaware

MONZACK MERSKY AND
BROWDER, P.A.

*/s/ Rachel B. Mersky*
Rachel B. Mersky (DE No. 2049)
1201 North Orange Street
Suite 400
Wilmington, Delaware 19801
Telephone:      (302) 656-8162
Facsimile:      (302) 656-2769
E-mail:          RMersky@Monlaw.com

-and-

BROWN RUDNICK LLP
David J. Molton, Esq.
Eric R. Goodman, Esq. (admitted *pro hac vice*)
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
E-mail: DMolton@BrownRudnick.com
E-mail: EGoodman@BrownRudnick.com

and

Sunni P. Beville, Esq. (admitted *pro hac vice*)
Tristan G. Axelrod, Esq. (admitted *pro hac vice*)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
E-mail: SBeville@BrownRudnick.com
E-mail: TAxelrod@BrownRudnick.com

*Counsel to the Coalition of Abused Scouts for Justice*