**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |
| | Re Docket No. 1974 |

**OBJECTION OF BAILEY COWAN HECKAMAN PLLC TO**
**INSURERS' MOTION FOR AN ORDER AUTHORIZING**
**RULE 2004 DISCOVERY OF CERTAIN PROOFS OF CLAIM [D.I. 1974]**

Bailey Cowan Heckaman PLLC, on behalf of itself and its represented claimants (collectively "BCH") and through its undersigned counsel, hereby submits this Objection (the "Objection") to the *Insurers' Motion for an Order Authorizing Rule 2004 Discovery of Certain Proofs of Claim* (the "Motion") [Docket No. 1974]. In support of this Objection, BCH respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      The Debtors filed for bankruptcy in February 2020—nearly one year ago. The central issue in these chapter 11 cases is how to resolve the Debtors' liabilities for sexual abuse that occurred nationally and over the course of multiple decades. Abusers are often drawn to organizations that afford them access to children. The Debtors are such an organization, but they are not alone. Catholic church sexual abuse has commanded headlines in recent years. But the Catholic dioceses that have filed for bankruptcy are not national organizations. Extrapolating from

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

the number of abuse victims in local church bankruptcies to a national case like this one, it is not surprising that tens of thousands of abuse victims have now come forward.

2.      BCH is affiliated with the Coalition of Abused Scouts for Justice (the "Coalition"). The proposed Rule 2004 discovery against Coalition-affiliated law firms, including BCH (the "Law Firms"), and third-party vendors does nothing to further what should be a primary objective for all concerned—obtaining justice for sexually abused scouts.  Since the Debtors filed for bankruptcy, Hartford and Century (together, the "Insurers")[2] have attacked the professionals involved whenever possible, including the Debtors' counsel and the law firms that represent the vast majority of survivors.  The Motion is a continuation of these attacks and is filled with invective and unsubstantiated allegations of fraud and misconduct. Tellingly, it is directed at a specific subset of Law Firms affiliated with the Coalition.  Nearly every law firm that represents members of the Official Committee of Tort Claimants (the "TCC") filed attorney-signed claim forms, some with a percentage as high as 40.7%, yet ***none*** are the target of the Motion.

3.      Putting aside the wasteful and ugly games being played here, directed at survivors' attorney advocates, the proposed discovery will not make a successful reorganization more likely. In most mass tort bankruptcies, the ultimate claims resolution process most often takes place post-confirmation.  The Insurers, by asking for this process to begin now and for it to include attorney depositions and related discovery, seek delay and to prevent the Debtors from reorganizing on terms that treat sexual abuse victims fairly.  The Motion does not set forth a good faith basis for Rule 2004 discovery against attorneys.  This is not a "close call."  The Motion should be denied in its entirety.

---

[2]      The Insurers' Motion was joined by Agricultural Insurance Company (Docket No. 1979), Travelers Casualty and Surety Company, Inc. (fka Aetna Casualty & Surety Company), St. Paul Surplus Lien Insurance Company and Gulf Insurance Company (Docket No. 2008), and Allianz Global US Insurance Company (Docket No. 2026).

## RESPONSE

**I.**     **There Is No Evidence that BCH Violated Rule 9011 or Committed Fraud.**

4.     The Insurers argue that the Law Firms "conducted no pre-complaint investigation," committed "outright fraud," and violations of "Federal Rules of Bankruptcy Procedure 9011." Motion at 2, 3 & 15. The primary basis offered by the Insurers to support these allegations are the Insurers' statistics regarding the number of claim forms signed by attorneys and when such claims were filed. But there is another supposition that offers a non-fraudulent and frankly more obvious explanation for these statistics.

5.     Proofs of claim were prepared on a rolling basis as BCH was engaged by abuse victims, conducted interviews with abuse victims, and gathered information necessary to complete the claim forms. The claim form for sexual abuse survivors requires information far beyond what is called for in Official Form 410. This form required victims to complete questionnaires regarding the details of their abuse or provide their law firms with the information necessary to complete such questionnaires. The Coalition submits that this was done by design to make it more difficult for abuse victims to file claims in these cases.

6.     After appearing in these cases, the Coalition filed a motion to permit the filing of proofs of claim signed by authorized counsel as permitted under Bankruptcy Rules 3001(b) and 9009(a). *See* Docket Nos. 1388 & 1496. This motion was opposed by the Debtors, the TCC, Hartford and Century, each of whom contended that changing the Bar Date Order to permit authorized counsel to sign claim forms would constitute a material change and produce a result different from what these parties intended. *See* Docket Nos. 1478-1, 1465, 1463 & 1460. This "intent" was not disclosed to the Court when the Bar Date Order was entered. *See* Oct. 14, 2020 Hr'g Tr. 168:22-169:16. The Court overruled these objections and granted the Coalition's attorney signature motion at a hearing held on October 14, 2020. *See* Docket No. 1551.

7.      Notwithstanding the Court's ruling, given the Court's admonitions at the October 14th hearing that the attorneys "ought to think long and hard before they sign that proof of claim form" and stating that it was not good practice, and not something her Honor had ever done as an attorney, the Coalition believes that many firms were reluctant to sign claim forms for fear that the Court would entertain a motion like the one filed by the Insurers.  Oct. 14, 2020 Hr'g Tr. at 165:12-18, 170:5-11.  Law firms with this concern would have sought client signatures whenever possible.  These firms also had attorney-signed claim forms prepared in case the client's signature could not be obtained in time.  These forms would have still been prepared using information obtained from the client.

8.      As the bar date deadline approached, Law Firms were left with a choice:  file the attorney-signed form based on the information gathered to date or file nothing and put the client at risk of being denied compensation for his or her injuries.  This timing is made clear by the Insurers' own Motion.  Of the 15 attorneys the Insurers seek to depose for allegedly signing too many proofs of claim in a day, those proofs of claim were executed in the final week leading up to the bar date.  *See* Motion at 5.  Coalition-affiliated Law Firms filed several thousand claims overall, only a small percentage of which were attorney-signed.  But, as noted, the Insurers have no issue with (and filed no similar motion against) a TCC-affiliated firm filing hundreds of attorney-signed forms—in excess of ***40%***.

9.      But putting that aside, a reasonable decision under the circumstances was for the attorney to file the attorney-signed claim form, as permitted by the Bankruptcy Rules and this Court's order.  *See* Docket No. 1551; Fed. Rule. Bankr. P. 3001(b); Fed. Rule. Bankr. P. 9009(a). The alternative—miss the bar date and place the client in a position where he or she could be denied compensation—was not a viable option.

10.     The fact that many attorneys—well over 15— when faced with this choice, filed attorney-signed forms—in some instances all at once and in a single day—does not indicate "outright fraud," violations of "Rule 11," a failure to conduct a "pre-complaint investigation," or that lawyers sat at a desk and signed claims "every 32 seconds."  It suggests that attorneys made a proper decision under the circumstances to protect their clients' rights.

11.     Insurers cite their own statistics to create the appearance that the vast majority of claims filed in the Debtors' cases were signed by attorneys without proper vetting.  Motion at 5. But these same statistics show that the vast majority of claims filed by the targeted Law Firms were signed by abuse victims—over ***49,000*** per the Insurers' own Motion—and strongly suggest that attorney-signed forms were filed as a last resort.  *Id.*[3]  The fact that claim forms were signed by attorneys does not prove or ***even indicate*** a lack of diligence or fraud.

12.     As this Court noted during the October 14th hearing pushing back on the Debtors' objection: "But you want me to assume they're not doing their job.  And why should I assume they're not doing their job?  And what does that have to do, in any event, with what the Rule requires and what the Rule says?"  October 14, 2020 Hr'g Tr. 168:5-8.  ***The attorneys, including BCH, did their job***.  And, as a result, several thousand victims will not be denied compensation for their injuries.  This is not a basis for a Rule 2004 investigation.  It shows that the parties that tried to preclude attorney-signed claim forms in the first place were wrong.

## II.     Claim Discovery Is Premature.

13.     The Motion is linked to the Insurers' separate motion seeking Rule 2004 discovery on individual abuse victims.  As a threshold matter, claim objections and claims-related discovery

---

[3]     The top 20 law firms in terms of total claims filed against the Debtors submitted 77,858 claims alleging sexual abuse.  Of this amount 17,024 claims were attorney signed—*i.e.*, approximately 21.8%—and 60,834 were signed by survivors.  Approximately 21.3% of the proofs of claim filed by the targeted Coalition Law Firms (on a collective basis) were attorney signed.

is premature and is not necessary to confirm a plan.

14.     Plans are normally confirmed in mass tort bankruptcies prior to the claims resolution process, with tort claims being individually liquidated post-confirmation in accordance with trust distribution procedures. *See In re PG&E Corp.*, Case No. 19-30088 (DM) (Bankr. N.D. Cal. June 20, 2020) [Docket No. 8053]; *In re Insys Therapeutics, Inc.*, Case No. 19-11292 (JD) (Bankr. D. Del. Jan. 16, 2020) [Docket No. 1115]; *In re TK Holdings Inc.*, Case No. 17-11375 (BS) (Bankr. D. Del. Feb. 21, 2018) [Docket No. 2120].

15.     In *PG&E*, *Insys* and *Takata*, the post-confirmation trusts were not funded by insurers.  There was no pre-confirmation claim litigation against tort victims and hence no discovery related to pre-confirmation claim objections and certainly not any discovery into what are in substance allegations of Rule 2011 violations.  Fraudulent claims, to the extent that there are any, can be vetted post-confirmation and are unlikely to ever be presented to the Insurers for payment.  The entire exercise of conducting discovery on abuse victims and their counsel is premature.

16.     Both Rule 2004 motions really go to the Insurers' own interests in minimizing the number of abuse claims by any means necessary and potential plan confirmation issues and are, therefore, improper on their face. *See In re Imerys Talc America, Inc.*, Case No. 19-10289 (LSS) (Bankr. D. Del. July 24, 2019) (denying Johnson & Johnson's request for Rule 2004 discovery on the basis that the discovery really went to Johnson & Johnson's "own interests in the first instance" as it was "classic plan discovery" that "should be done in the context of a plan"); *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 626-27 (Bankr. D. Del. 2016) ("Rule 2004 is not available to creditors seeking to use this section to deal with their special problems.").

17.     The Insurers cite to several cases to support their assertion that "mass-tort cases need to be policed for baseless filing." Motion at 17. But none of these cases are inconsistent with this Court's rulings in *Imerys* and *Millennium Lab Holdings*. If anything, they support the denial of the Insurers' discovery requests under Rule 2004 because they show that discovery of this nature should take place, if at all, in the context of plan confirmation or a contested matter, like a section 502(c) estimation proceeding, where discovery is permitted under Bankruptcy Rule 3020(b) and/or Bankruptcy Rule 9014.

18.     <u>Silica Products Liability Litigation</u>. The Insurers cite *In re Silica Products Liability Litigation*, 378 F. Supp. 2d 563 (S.D. Tex. 2005) to support their contention that Rule 2004 discovery into the alleged abuses of the claims process is appropriate under Rule 2004. Motion at 18. But, in *Silica*, there was no claims process because it is not a bankruptcy case. This case involves a multidistrict litigation of consolidated state court tort cases where discovery took place in accordance with the Federal Rules of Civil Procedure. It has nothing to do with policing the claims process in bankruptcy or Bankruptcy Rule 2004 for that matter.

19.     <u>Subpoena Duces Tecum</u>. The Insurers' reliance on *In re Subpoena Duces Tecum*, 461 B.R. 823, 826 (Bankr. C.D. Cal. 2011), is also misplaced. Motion at 18 n. 75. This grant of Rule 2004 discovery is distinguishable because it was a Chapter 13 case in which the United States Trustee sought limited discovery into allegedly fraudulently filed claims. The Bankruptcy Court reasoned that "[t]he UST correctly points out that her "watchdog" role in bankruptcy cases not only justifies allowing the UST to conduct these examinations, but also mandates it." *Id.* at 829-30. The Insurers are in no way a "watchdog" or fiduciary for this bankruptcy. Rather, they are serving their own unique interests and trying to avoid their coverage obligations.

20.    <u>W.R. Grace & Co</u>.  *In re W.R. Grace & Co.*, 475 B.R. 34, 119 (D. Del. 2012), *aff'd sub nom*, 729 F.3d 332 (3d Cir. 2013), and *aff'd*, 532 F. App'x 264 (3d Cir. 2013), and *aff'd*, 729 F.3d 311 (3d Cir. 2013), and *aff'd sub nom.*, 729 F.3d 332 (3d Cir. 2013), cited by the Insurers involved discovery taken in connection with a contested plan confirmation hearing—a contested matter under Bankruptcy Rule 3020(b) wherein parties have the right to discovery under Bankruptcy Rule 9014.

21.    Further, there is no indication—as the Insurers falsely state in their Motion—that the *W.R. Grace* Court ever allowed attorney depositions and questionnaires.  *Compare* Motion at 18; *with W.R. Grace*, 475 B.R. at 119.  The only portion of the District Court's decision in *W.R. Grace* that says anything about depositions appears on page 119 of the Opinion:  "The record indicates that during the ***Confirmation Hearing proceedings***, AMH offered no expert witness of its own to contradict the evidence entered by Grace regarding the Plan's feasibility, despite having ample opportunity to do so.  AMH participated in all of the ***depositions*** of Grace witnesses, and therefore was provided with sufficient notice and information to form its own credible objection at the Hearing."  475 B.R. at 119 (emphasis added).

22.    <u>Estimation Cases</u>.  The remaining cases cited by the Insurers also involved contested matters—namely, discovery that allowed parties to prepare for an estimation hearing under section 502(c) of the Bankruptcy Code.  *Compare* Motion at 19 *with In re Garlock Sealing Techs., LLC*, 504 B.R. 71, 74 (Bankr. W.D.N.C. 2014) ("The parties have engaged in wide ranging discovery in preparation for these estimation proceedings."); *In re USG Corp.*, 290 B.R. 223, 224 (Bankr. D. Del. 2003) ("The salient point of the debtors' proposal is that they would be permitted to challenge the validity of the claims against them in the context of the estimation hearing."); *In re G-I Holdings, Inc.*, 323 B.R. 583, 622-23 (Bankr. D.N.J. 2005) ("This Court agrees that the

estimation proceeding pursuant to § 502(c) of the Code should estimate the asbestos liability of G–I Holdings in the aggregate.").

23.    Further, these cases did not permit discovery against opposing counsel.  In *Garlock*, the court **denied** discovery from counsel, reasoning that "the discovery would be an unprecedented intrusion into attorneys' practices and files."  Order Denying Motion for Production of Information from Counsel Representing Garlock Claimants at 2, *In re Garlock Sealing Techs. LLC*, No. 10-31607 (Bankr. W.D.N.C. Mar. 4, 2011) [Docket No. 1201].  The *Garlock* Court held, in short, that the "records" of "the professionals who represented" "parties to this proceeding" "are protected from this discovery."  *Id.*  In *USG*, the Bankruptcy Court ordered discovery from the claimants—not their counsel—to facilitate the debtors' challenges to claims within an estimation proceeding.  290 B.R. at 227.  And *G-I Holdings* contemplated discovery from claimants to facilitate the debtors' objections within an estimation proceeding.  323 B.R. at 622-23, 625.  The Insurers fail to cite *any* case that is on point and supports the relief sought in the Motion.

**III.    The Insurers Lack Standing to Seek Rule 2004 Discovery.**

24.    Not only is the Motion devoid of legal authority that supports the relief requested, the Insurers themselves lack standing to seek Rule 2004 discovery.

**A.    The Insurers Do Not Have the Same Rights as Debtors.**

25.    Outside of bankruptcy, insurers generally lack the right to participate in litigation between a tort victim and a tortfeasor and seek discovery.  An insurer can qualify as a real party in interest under Civil Rule 17 if the insurer has subrogation rights.  If the tort victim is an **insured** and has insurance that covers the loss, and the insurer pays the tort victim, the insurer steps into the shoes of the victim under the subrogation doctrine and can assert a claim against the tortfeasor to recover amounts paid to the insured.  Here, the sexual abuse victims are not **insureds**.  The

Debtors are the insureds.  The Insurers here cover losses incurred by the tortfeasor and do not have subrogation rights.

26.     The Insurers may have a contractual obligation to cover litigation costs incurred by the Debtors under their policies.  But paying litigation costs would not make the Insurers a proper party defendant with the right to take discovery.  Many states have statutes that bar a plaintiff from suing a defendant's insurer because the plaintiff has no privity of contract with the insurer.

27.     The Insurers may have the right to defend sexual abuse claims under the policies.  This could happen if the Debtors abandoned the defense, which has not occurred, or if the Insurers unequivocally accept their obligation to pay such claims and agree to undertake the defense, which has ***clearly*** not occurred.  Further, in this context, the Insurers would be entitled to certain claims related information but in no event would they be entitled to seek discovery for their own benefit in an effort to avoid their coverage obligations, which is what the Insurers are doing here.

28.     Moreover, an insurer cannot prevent a tortfeasor from settling with the tort victim or force a tortfeasor to litigate with a victim when doing so would be contrary to its business judgment.  The Debtors are ***not*** standing before the Court seeking discovery.  The Insurers are asking this Court to imbue them with the Debtors' rights vis-à-vis abuse claimants so they can wage war against abuse victims and their attorneys.  But the Insurers do not have these rights outside of bankruptcy and there is nothing in the Bankruptcy Code that affords them greater rights due to the mere happenstance of the Debtors' bankruptcy.

**B.     The Insurers Have No Standing to Seek Rule 2004 Discovery.**

29.     Third Circuit case law further proves that the Insurers are not a proper party in interest to seek discovery under Rule 2004.  *In In re Combustion Engineering, Inc.*, 391 F.3d 190, 218 (3d Cir. 2004), the Third Circuit held that the debtor's insurers lacked standing to challenge

an order confirming a chapter 11 plan calling on them to fund an asbestos trust because the plan was insurance neutral.  The Third Circuit opened the door for insurers to appear and be heard in connection with such matters in *In re Global Industries Technologies, Inc.*, 645 F.3d 201, 212 (3d Cir. 2011), where the Circuit held that the debtor's insurers—Hartford and Century—had standing to challenge a plan calling for them to fund an asbestos trust since the plan was not insurance neutral and materially impacted their rights.  Read together, these cases make two points that are relevant here.

30.     First, if the parties do get to plan confirmation and the plan is not insurance neutral, then Hartford and Century will obviously argue that they have standing and the right to object under *Global Industries*.  They will likely seek discovery in connection with such proceeding.  Under Bankruptcy Rule 3020(b), an objection to the confirmation of a chapter 11 plan is a contested matter.  But until then, discovery under Bankruptcy Rule 2004 is inappropriate.  *See Imerys Talc America*, Case No. 19-10289 (LSS) (Bankr. D. Del. July 24, 2019).

31.     Second, the Insurers only have standing to object and be heard on matters that materially impact their rights.  *Global Industries* did not purport to overrule *Combustion Engineering*.  The law remains that a debtor's insurers do not have general standing and a right to be heard on all matters.  What the Insurers are seeking to accomplish here—the free ranging right to conduct discovery and engage in pre-confirmation claim litigation with tort victims and their attorneys—has never been done before and would be inconsistent with the limited role that a debtor's insurer should play in a chapter 11 proceeding.

32.     Finally, if the Insurers contend that they are parties in interest with a right to seek discovery under Rule 2004 as *creditors*, which would be atypical, their status as creditor should be substantiated as a threshold matter.  Hartford asserts "contingent/unliquidated" claims for

"insurance coverage."  Century's asserts "contingent/unliquidated" claims for "liability policy and related agreements."  The addendum Century attached to its claims further alleges that Century may have claims for "contribution."  The Insurers' alleged claims may be subject to disallowance under section 502(e) of the Bankruptcy Code.  If so, they demonstrate nothing more than insurers that lack standing to seek discovery under Rule 2004.

## IV.    The Insurers Have Failed to Establish Good Cause for the Proposed Discovery.

33.    Assuming *arguendo* that the Court is willing to entertain the Insurers' demand for discovery under Rule 2004—and the Court should not do so—the Insurers have failed to demonstrate good cause.  Bankruptcy Rule 2004 may be broad, but it is always a matter of the Court's discretion.  *See Imerys Talc America*, Case No. 19-10289 (LSS) (Bankr. D. Del. July 24, 2019) ("Rule 2004 is discretionary.")[4]

34.    "[Rule 2004] requires a balancing of the competing interests of the parties, weighing the relevance of and necessity of the information sought by examination."  *Millennium Lab Holdings II*, 562 B.R. at 626 (quotation omitted).  Courts exercise discretion to deny or limit overbroad, unduly burdensome or harassing Rule 2004 discovery requests.[5]  "Rule 2004 is not available to creditors seeking to use this section to deal with their special problems."  *Millennium*

---

[4]    *Accord In re Transmar Commodity Grp. Ltd.*, No. 16-13625-JLG, 2018 WL 4006324, at *4 (Bankr. S.D.N.Y. Aug. 17, 2018) ("The decision to grant or deny a request for discovery under Rule 2004 is within the sound discretion of the court."); *In re Mattera*, No. 05-39171, 2007 WL 1813763, at *2 (Bankr. D.N.J. June 13, 2007) ("The permissive language of Rule 2004 connotes a court's discretion in deciding whether to grant a request for a Rule 2004 examination."); *In re Bd. of Dirs. of Hopewell Int'l Ins., Ltd.*, 258 B.R. 580, 587 (Bankr. S.D.N.Y. 2001) ("Rule 2004 provides that the Court 'may' order disclosure thereunder, giving the Court significant discretion.")

[5]    *See In re Mathews*, No. 18-MC-153-LPS, 2018 WL 5024167, at *3 (D. Del. Oct. 17, 2018) (quashing harassing subpoenas under Rule 2004); *In re Washington Mut., Inc.*, 408 B.R. 45, 50 (Bankr. D. Del. 2009) ("There are, however, limits to the use of Rule 2004 examinations. . .[i]t may not be used for 'purposes of abuse or harassment and it cannot stray into matters which are not relevant to the basic inquiry.) (citations omitted); *Mattera*, 2007 WL 1813763, at *2 ("Moreover, the expansive nature of Rule 2004 should not be permitted to exact prejudice or injustice on the subpoenaed party.")

*Lab Holdings II*, 562 B.R. at 626-27.  The burden always remains with the party seeking discovery under Bankruptcy Rule 2004 to demonstrate good cause.[6]

35.     Aside from presenting misleading statistics, the Insurers have failed to present any credible evidence or explanation that would justify Rule 2004 discovery on attorneys.

36.     <u>Attorney Advertising</u>.  The Insurers assert that attorney depositions are necessary because there was an "aggressive, nationwide advertising campaign."  Motion at 6.  Insurers point to attorney advertising as the culprit for the number of abuse claims filed against the Debtors. Motion at 6-7.  But this issue was litigated.  The Debtors moved to preclude attorney advertising and the Coalition objected and argued that the First Amendment protects the attorneys' advertising rights.  *See* Docket Nos. 1190 & 1264.  The Coalition and the Debtors agreed to a consensual resolution of this issue that permitted attorney advertising to continue, which the Court approved. *See* Docket No. 1331.

37.     Moreover, there is no evidence that law firm advertisements led to an incredible increase in the number of claims filed.  Bar dates generate claim filings in nearly every chapter 11 case.  The Debtors themselves engaged in a robust nationwide noticing campaign which included television, radio, print, and internet advertising.  In *In re Purdue Pharma, L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), there were very few personal injury claims in the tort system as of the petition date and approximately 120,000 personal injury claims were filed.  The Insurers also refuse to consider that the large number of claims is logically attributable to the decades of sexual abuse perpetrated by adults affiliated with Scouting.[7]

---

[6]     *See Transmar Commodity*, 2018 WL 4006324, at *4 ("The party seeking discovery under Rule 2004 bears the burden of showing good cause for the examination it seeks."); *Mattera*, 2007 WL 1813763, at *2 ("the party seeking to conduct a Rule 2004 examination bears the burden of showing cause.")

[7]     The Debtors' own "perversion files" apparently include the names of 7,819 ***known*** scout leaders who allegedly preyed on boys.  *See Lawyer demands Boy Scouts open up the 'perversion files,'* NBC News, Apr. 24, 2019,

38.    <u>Eve of Bar Date Filings</u>.  The Insurers assert that attorney depositions are necessary because of the number of attorney-signed claim forms that were filed just before the bar date. Motion at 1-4.  But this is consistent with the supposition that attorneys were attempting to obtain client signatures and filed attorney-signed forms before the bar date so that clients would not be denied compensation.  This does not mean or indicate that attorneys did not do their jobs and violated Bankruptcy Rule 9011.  Nor does the fact that proofs of claim were filed on the same day mean that claims were signed "every 32 seconds" and without attorney review or approval. Further, the fact that the Insurers are targeting a select group of Coalition-affiliated Law Firms, and are not proposing to investigate all firms that filed attorney-signed claim forms just before the bar date, suggests that this justification is pretextual.

39.    <u>Use of Electronic Signatures</u>.  The Insurers assert that attorney depositions are justified because attorneys filed claim forms with electronic signatures.  Motion at 11, 20.  But this is permitted under the Local Rules.  *See* Local Rule 9011-4(b).

40.    <u>Photocopies of Signatures</u>.   The Insurers assert that attorney depositions are justified because attorneys used photocopies of signatures.  Motion at 20.  But this is a fairly common practice due to Covid-19—indeed, BCH attorneys and paralegals worked remotely from multiple different locations throughout the claim submission process.  Moreover, this does not prove or even indicate that the attorney whose signature was affixed to the claim form failed to conduct a proper inquiry under the circumstances.  Instead, BCH affixed the attorney signature page *after* information for the claim form had been provided by a claimant, all attempts to reach the claimant to obtain his/her personal signature had failed, the claim forms were reviewed and

---

https://www.nbcnews.com/news/us-news/lawyer-demands-boy-scouts-open-perversion-files-n997786.  If true, it is not at all surprising that over 95,000 abuse claims were filed in these cases.

approved for submission, and an attorney determined that expiration of the impending bar date may likely prevent any recovery for the claimant.

41.    <u>Claims Have Deficiencies / Duplicate Claims Were Filed</u>.  The Insurers assert that attorney depositions are justified because certain claims contain deficiencies and duplicate claims were filed.  Motion at 2, 20.  But this is true in nearly every chapter 11 case, and, as this Court knows, not just in those cases dealing with mass torts.  It is not uncommon for claims to contain deficiencies or for there to be duplicate filings.[8]  It is obviously better to file a claim without complete information than miss the bar date.[9]  Many Law Firms have been filing and will continue to file amended claims that provide additional information and cure deficiencies.  That process is happening now and will continue.

42.    <u>Certain Claimants Have Criminal Records</u>.  The Insurers assert that attorney depositions are justified because certain claimants have criminal records.  Motion at 21.  But having troubles after experiencing abuse is common.  An equally valid supposition is that such troubles in adulthood occurred because these victims were sexually abused as children.[10]

43.    <u>Questionable Claims</u>.  The Insurers assert that attorney depositions are justified because "questionable claims" for sexual abuse may have been filed.  Motion at 21.  Despite

---

[8]    Many of the duplicate filings resulted from problems with the website maintained by the Debtors' claims and noticing agent, Omni Agent Solutions ("Omni"), which were so severe in the week leading up to the bar date that Omni opened a second web portal to handle the traffic.  In fact, even **Hartford** filed duplicate claims against the Debtors.  *See Debtors' First Omnibus (Non-Substantive) Objection to Certain (I) Exact Duplicate Claims, (II) Amended and Superseded Claims, and (III) Incorrect Debtor Claims (Non-Abuse Claims)* [Docket No. 2019].

[9]    As the Supreme Court noted in *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 402 (1990), if a lawyer discovers that his or her client has a potential cause of action only a short time before the statute of limitations will expire, a more cursory inquiry will be tolerated [under Rule 11] than when he or she has ample time to investigate. *Accord Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1279 (3d Cir. 1994) ("[W]e have recognized that a factor in ascertaining the reasonableness of the signer's inquiry is the amount of time available to investigate the facts and law involved. … Accordingly, if a client comes into an attorney's office for an initial consultation concerning a possible case one day before the statute of limitations will run, the attorney might be justified in filing a complaint predicated on an inquiry which would be inadequate if the attorney had more time for investigation.").

[10]    Research indicates there is a correlation between childhood sexual abuse and higher rates of criminal activity. *See, e.g.*, Mirko Bagaric, et al., *Trauma and Sentencing: The Case for Mitigating Penalty for Childhood Physical and Sexual Abuse*, 30 STANFORD L. & POLICY REV. 1, 28-33 (2019).

lodging salacious attacks on law firms that are dedicated to helping victims of sexual abuse, the Insurers offer a paltry *five* examples of what they claim to be "questionable claims." **Two** examples have nothing to do with the claims but rely solely on the fact that the claimant was convicted of an unrelated crime. **Two** other examples are based on assertions made by family members, which presume that a mother or brother would necessarily be aware of the abuse.[11] The *final* example is based on an email from the alleged abuser. None of these examples prove fraud or indicate that any attorneys failed to conduct a proper pre-filing inquiry.

44. <u>"Explosion of Claims" Filed Just Before the Bar Date</u>. The Insurers assert that attorney depositions are justified because there was an "explosion of claims" filed just before the bar date. Motion at 22. But this happens in most chapter 11 cases, including mass tort cases. Most trade creditors file their claims in the week before the bar date. The fact that the same would be true for survivors of sexual abuse is hardly surprising or a basis to justify a Rule 2004 exam.[12] Moreover, the fact that claims were filed just before the bar date does not mean or indicate that a factual investigation of the claims did not occur before the bar date.

45. <u>Litigation Funding</u>. The Insurers assert that attorney depositions are justified because some Law Firms may have litigation funding. Motion at 8-9. But it is becoming

---

[11] Prevailing social science research shows that family dynamics can lead to a failure to report abuse. *See, e.g.*, Ramona Alaggia, et al., *Facilitators and Barriers to Child Sexual Abuse (CSA) Disclosures: A Research Update (2000-2016)*, 20 TRAUMA VIOLENCE & ABUSE 260, 277 (2019); R. Alaggia & S. Kirshenbaum, *Speaking the Unspeakable: Exploring the Impact of Family Dynamics on Child Sexual Abuse Disclosures*, 86 FAMILIES IN SOCIETY 227, 229-32 (2005). Fear, shame, embarrassment, and lack of family support are factors that inhibit disclosure of abuse. *See* Child USA, *Delayed Disclosure: A Factsheet Based on Cutting-Edge Research on Child Sex Abuse*, ChildUSA.org, at 4 (Mar. 2020) available at *https://childusa.org/wp-content/uploads/2020/04/Delayed-Disclosure-Factsheet-2020.pdf*

[12] As the Court noted at the October 16, 2020 hearing: "I can think of any number of reasons that there might be an explosion of claims against debtors: The very filing of the bankruptcy, itself; the imposition of the claims bar date; the lifting of the statute of limitations for sexual abuse victims in multiple states; a changed environment in the last couple of years with respect to coming forward on sexual abuse claims, that is, a less-stigmatizing environment; and, yes, the national advertising blitz by multiple law firms over the last six months directed specifically to the abuse victims, with that national advertising made by many of the State Court counsel." Oct. 16, 2020 Hr'g Tr. at 10:2-12.

increasingly commonplace for attorneys to allow litigation funders to pay upfront costs of legal fees. This proper arrangement allows attorneys to represent clients who could not otherwise afford representation by covering certain upfront costs. The funders are then compensated out of the portion of money that the attorneys, not the claimants, are paid for the case. There is nothing about the existence of litigation funding that indicates that attorneys committed fraud.

46.     The overarching reality is that the Insurers are angry that a substantial number of survivors did not miss the bar date and want to focus blame on the Law Firms for this fact. But the Law Firms did not sexually abuse children. They are the survivors' advocates and are trying to help. The Debtors made the decision to file for bankruptcy and to attempt to use bankruptcy to resolve their liabilities arising from decades of sexual abuse on a national scale. In an obvious effort to avoid their coverage obligations by continuing to delay the Debtors' reorganization, the Insurers are attempting to intimidate the Law Firms and their attorneys that have the audacity to assist survivors of sexual abuse. This needs to stop.

## V.    Signing a Proof of Claim Does Not Constitute a Privilege Waiver or Make an Attorney a Fact Witness.

47.     Insurers argue that signing a claim form constitutes a privilege waiver and transforms an attorney into a fact witness. Motion at 22, 26-27. The Insurers cite two unpublished cases in support of this argument—*Swanson v. Trasino Park-Hudsons, LLC (In re Vission, Inc.)*, No. 07-21957, 2008 WL 2230741, at *4 n.3 (Bankr. E.D. Wis. May 28, 2008), and *In re Rodriguez*, No. 10-70606, 2013 WL 2450925, at *4 (Bankr. S.D. Tex. June 5, 2013).

48.     *In re Vission* involved a motion to strike an attorney affidavit filed in connection with a motion to dismiss. The *Vission* Court stated in a footnote that "[a]n attorney should be wary of signing an affidavit because counsel generally should not act as an advocate at a trial in which he or she is likely to be a necessary witness." 2008 WL 2230741, at *4 n.3. This case did not

involve a proof of claim and is inapposite.  *In re Rodriguez* has been criticized as an unsound application of the Bankruptcy Rules governing proofs of claim.[13]

49.    Bankruptcy Rule 3001 sets forth the requirements governing proofs of claim. *See* Fed. R. Bankr. P. 3001.  Among its requirements, Bankruptcy Rule 3001 permits claims to be executed by the "creditor or the creditor's authorized agent."  *Id.* at 3001(b).  In accordance with Bankruptcy Rule 3001(b), Part 3 of Official Form 410 (the proof of claim form) includes an area where a party completing a proof of claim must denote whether he or she is, among others, "the creditor's attorney or authorized agent."

50.    Part 3 of Official Form 410 contain the following statements:  "I have examined the information in this Proof of Claim and have a ***reasonable*** belief that the information is true and correct.  I declare under penalty of perjury that the ***foregoing*** is true and correct."  (Emphasis added.)  Bankruptcy Rule 9011, which applies to proofs of claim, ***mirrors*** this requirement.

51.    When an attorney signs a claim form, the attorney is affirming that to the best of the attorney's "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" that the "factual contentions have evidentiary support" or "are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery."  Fed. R. Bankr. P. 9011.  This what Bankruptcy Rule 9011 requires.  But such diligence does ***not*** make the attorney a necessary witness to the underlying facts.

52.    Consider, for example, an attorney that represents a trade creditor.  Once a bar date is set, the creditor may consult with an attorney regarding the preparation of the claim form.  The attorney obviously has no personal knowledge of any facts germane to the account.  At counsel's request, the creditor may assemble purchase orders, invoices, bills of lading and an account history,

---

[13]    *See* Jonathan W. Young & Dana G. Hefter, *The Involuntary Witness; Privilege and Waiver Issues Raised by Rodriguez*, 33-Aug. Am. Bankr. Inst. J. 38 (2014).

and arrive at a net balance that is owed to the creditor.  After reviewing these documents and discussing them with his or her client, the attorney finalizes, signs, and files the proof of claim.

53.     The preparation of a tort claim is similar.  Once a bar date is set, the tort victim may consult with an attorney regarding the preparation of the claim form.  The attorney obviously has no personal knowledge regarding any facts germane to the tort itself.  At the counsel's request, the victim may assemble documents or complete a questionnaire or provide information for the attorney's inclusion therein.  Few tort victims can assign dollar amounts to their injuries, which may be the subject of expert testimony.  After reviewing the case file or having discussions with the client, the attorney finalizes, signs, and files the proof of claim.

54.     In performing these actions, an attorney does not become a witness.  In the case of the trade creditor, the attorney has no personal knowledge of the purchase orders, invoices, bills of lading or account history, and he or she does not participate in the underlying transactions.  In the case of the tort creditor, the attorney has no personal knowledge of the tort itself.

55.     The attorney did not witness the sexual abuse, which may have occurred decades ago, or perform a medical assessment of the injuries.  In both instances, the attorney may have a role in reviewing documents and completing the claim form using the information provided by the client, but such actions do not make the attorney a fact witness with personal knowledge.  Rather, such actions make the attorney an *attorney* preparing to litigate the underlying issues.

*56.*     There may be situations where the attorney's personal knowledge of the claim preparation process is relevant.  Examples offered in the American Bankruptcy Institute Journal include when "the client challenge[s] the attorney's authorization to act on its behalf, or [when] the attorney [is] seeking to recover his fees."  33 Aug. Am. Bankr. Inst. J. 38.  In those cases "it might be fair to question the attorney about work on the proof of claim, but these are the exceptions

that prove the rule," which is that "[i]n the substantial majority of cases, attorney's function in a purely representative capacity, and work in that capacity does ***not***, by itself, transform the attorney into a ***percipient*** witness." *Id.* (emphasis added).

57.     Bankruptcy Rule 9011 reinforces this view.  Courts have held that Bankruptcy Rule 9011, which contemplates the execution of documents by an attorney, applies to proofs of claim.  *See*, *e.g.*, *Hannon v. Countrywide Home Loans, Inc. (In re Hannon)*, 421 B.R. 728, 731 (Bankr. M.D. Pa. 2009).  Thus, it is acceptable for an attorney to sign a client's proof of claim under Bankruptcy Rule 9011.  This obviously does not require that an attorney be a fact witness or disclose privilege communications.  The 1983 Advisory Committee Note to Rule 11 provides: "The rule does ***not*** require a party or an attorney to disclose ***privileged communications*** or work product in order to show that the signing of the pleading, motion, or other paper is substantially justified." (emphasis added).[14]  Bankruptcy Rule 9011, which tracks, Rule 11, is no different.[15]

58.     The fact that a properly filed proof of claim is "prima facie evidence of the validity and amount of the claim"—a point seized on by the *Rodriguez* Court—does not change the analysis.  Fed. R. Bankr. P. 3001(f).  Both Rule 3001 and Official Form 410 acknowledge the permissibility of filing by a creditor's agent, and an attorney is just that.

---

[14]     *Accord Vista Mfg., Inc. v. Trac-4, Inc.*, 131 F.R.D. 134, 137 (N.D. Ind. 1990) ("Rule 11 was not intended to be a discovery device. … A plaintiff should not be required to lay bare its case, or reveal its work-product, simply because a Rule 11 motion is lodged against it.")

[15]     The attorney client privilege applies to communications made for the "for the purpose of obtaining or providing legal advice."  *Cottillion v. United Ref. Co.*, 279 F.R.D. 290, 299 (W.D. Pa. 2011).  Matters alleged in a proof of claim form do not qualify as a privileged communication any more than matters alleged in a complaint filed in a civil action.  Further, the "attorney-client privilege belongs to the client" and cannot be waived by an attorney without the client's consent.  *Martin Marietta Materials, Inc. v. Bedford Reinforced Plastics, Inc.*, 227 F.R.D. 382, 390 (W.D. Pa. 2005).  When an attorney is authorized to act for the client, the attorney can, within the scope of that authority, waive the privilege.  *U.S. v. Mierzwicki*, 500 F. Supp. 1331, 1334 (D. Md. 1980) ("Although the attorney-client privilege is personal to the client, it may be waived by counsel acting with the authority of the client.")  If a claim form or a complaint were to disclose privileged communications, it would make no difference whether it was signed by the client or an authorized agent.  It follows that there is no logical basis to conclude that a claim form or complaint signed by an attorney or an attorney acting as an authorized agent effectuates a privilege waiver where the same claim form or complaint, if signed by the client instead, does not effectuate a waiver.  In either case, the analysis would not turn on who signed the claim form or complaint, but on what was disclosed.

59.    Such a procedure is permissible given the language and structure of Official Form 410 and the relevant legislative history.  The Advisory Committee Notes for the 2011 Amendment to Official Form 410 provides that "[w]hen a servicing agent files a proof of claim on behalf of a creditor, the individual completing the form must provide his or her own name, as well as the name of the company that is the servicing agent."  Moreover, the Committee explained that Part 3 was "revised to include a declaration that is intended to impress upon the filer the duty of care that must be exercised in filing a proof of claim," which is that the filer have a "reasonable belief that the information is true and correct."

60.    Nothing in Official Form 410 or the Advisory Committee Notes imputes personal knowledge to the filer when there is no basis for that knowledge.  By ruling to the contrary, the *Rodriguez* Court made an inferential leap that is unsupported by any other case law, rule or statute.  2013 WL 2450925, at *4 ("By signing the proof of claim, Womble [the attorney] became a fact witness as to the allegations contained in the proof of claim.").  The Coalition has been unable to locate a single case that has followed *Rodriguez* on this issue.

61.    Finally, due consideration should be given to the strong presumption under federal law against calling an attorney as a witness, particularly with respect to depositions of opposing counsel.  To conduct a deposition of opposing counsel the party seeking the deposition would need to meet the heightened *Shelton* rule showing.  The *Shelton* rule requires the requesting party to prove:  (1) no other means exist to obtain the information sought through the deposition than to depose opposing counsel; (2) the information sought is relevant and not privileged; and (3) the information is crucial to the preparation of the case.[16]  Federal courts disfavor calling attorneys as

---

[16]    *See In re FKF Madison Grp. Owner, LLC*, No. 10-11867 (KG), 2012 WL 13032955, at *3 (Bankr. D. Del. Oct. 12, 2012) (quoting *Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986)); *Allergan Inc. v. Pharmacia Corp.*, No. CIV.A.01-141-SLR, 2002 WL 1268047, at *1 (D. Del. May 17, 2002) (granting protective order to

a witness.  In most instances, other witnesses will have more direct knowledge of the subject matter.  When called as a witness, an attorney will have to assure his or her compliance with rules of professional responsibility.  Given this, it is appropriate to avoid, whenever possible, putting attorneys in a position of being both counselor and witness.[17]

## VI.   The Insurers' Request for Discovery Is Designed to Prevent a Reorganization.

62.    The Insurers assert that their need for Rule 2004 discovery against attorneys "is not a close call," that such need "far outweighs any potential burden" and that a plan of reorganization is "impossible" without an investigation.  Motion at 4, 20 & 28.  But the opposite is true.  The Insurers' game here to prevent a plan that treats abuse victims fairly from being confirmed.

63.    The Debtors want to exit bankruptcy by August 2021.  The Rule 2004 discovery regime and claim litigation that the Insurers want this Court to bless would derail the plan confirmation process.  As noted above, in nearly all mass tort cases, the individual claims allowance process occurs after plan confirmation.  Opening the door for this to commence now may mean that the plan confirmation process must be placed on hold.  This apparently is the Insurers' goal.

64.    If the Court grants the Insurers' Rule 2004 motion seeking discovery on victims on February 17, 2021, the Insurers will need to serve discovery requests on 1,400 abuse victims in accordance with the Bankruptcy Rules and the Civil Rules.  Many victims may not waive personal service.  Once served, parties would have to respond to the interrogatories and requests for

---

prevent deposition of opposing counsel because the Court concluded "that plaintiffs have not met their burden to demonstrate a compelling need for the requested discovery" under the *Shelton* rule).

[17]  *See, e.g., Ricoh Co. v. Oki Data Corp.*, No. CA 09-694-SLR, 2011 WL 3563142, at *2 (D. Del. Aug. 15, 2011) (applying the *Shelton* rule and reasoning "this court recognizes that deposing opposing counsel is not an absolute right, but instead an exception for which a basis must be established."); *Smith ex rel. Smith v. U.S.*, 193 F.R.D. 201, 216 (D. Del. 2000) (applying *Shelton* rule and denying deposition of attorneys that investigated administrative claims).

production within thirty (30) days.  This may not happen until the end of March or the beginning of April.  Victims would have the right to object to the discovery based on the breadth of the information sought.  If each victim produced only five documents responsive to each request for production, that would result in over 50,000 documents.  Combined with the 15,400 answers to interrogatories, that Insurers would have then have to prepare to depose 100 deponents.  Depositions of one hundred victims would then take place, presumably in April, May and June, with substantive claim objections filed being thereafter.

65.     Discovery on attorneys and subpoenas on third party vendors could also take months as issues concerning privilege and disputes over subpoenas are litigated.  If the Debtors attempt to move forward with plan confirmation during such discovery, they will likely face stiff opposition from abuse victims, along with their attorneys, who are being attacked by the Insurers.  This may mean that the Debtors will not be able to confirm a plan that includes third party releases in August 2021, if at all.

66.     These cases are at an important juncture.  The Insurers appetite for discovery and claim litigation will not be satiated with even limited discovery.  The history of this case has proven as much.  If the Insurers are permitted to effectively step into the Debtors shoes and launch a war against the victims and their attorneys, the most likely casualty will be the Boy Scouts of America.

## CONCLUSION

WHEREFORE, Bailey Cowan Heckaman PLLC, on behalf of itself and its represented claimants, through its undersigned counsel, requests that the Court enter and order denying the Motion and granting BCH such other and further relief as the Court deems just and proper.

Dated: February 5, 2021                         Respectfully submitted,
                                                */s/ Ian Connor Bifferato*
                                                Ian Connor Bifferato (#3273)
                                                THE BIFFERATO FIRM, P.A.

1007 N. Orange Street, 4th Floor
Wilmington, DE 19801
Tel.: (302) 225-7600
E-mail: cbifferato@tbf.legal

*Attorney for Bailey Cowan Heckaman*
*PLLC, on behalf of its represented claimants*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 5th day of February, 2021, the foregoing *Objection Of Bailey Cowan Heckaman PLLC to Insurers' Motion for an Order Authorizing Rule 2004 Discovery of Certain Proofs Of Claim [D.I. 1974]* was served on any and all parties who have requested electronic notice through the Court's CM/ECF system in compliance with the Federal Rules of Bankruptcy Procedure and the Court's Local Rules.

*/s/ Ian Connor Bifferato*
Ian Connor Bifferato (#3273)