**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,<br><br>    *Debtors.*[1] | Chapter 11<br>Case No. 20-10343 (LSS)<br><br>Jointly Administered<br><br>Re: Docket No. 1974<br><br>**Hearing Date: Feb. 17, 2021 at 10:00 a.m. (ET)** |

**OBJECTION OF ANDREWS & THORNTON, ATTORNEYS AT LAW,
AND ASK LLP TO INSURERS' MOTION FOR AN ORDER AUTHORIZING
RULE 2004 DISCOVERY**

Anthony M. Saccullo (No. 4141)
Mary E. Augustine (No. 4477)
A. M. SACCULLO LEGAL, LLC
27 Crimson King Drive
Bear, Delaware 19701

Lawrence S. Robbins (admitted *pro hac vice*)
William J. Trunk (admitted *pro hac vice*)
Joshua S. Bolian (admitted *pro hac vice*)
John B. Goerlich (admitted *pro hac vice*)
Courtney L. Millian (admitted *pro hac vice*)
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
2000 K Street, N.W., 4th Floor
Washington, DC 20006

*Counsel for Andrews & Thornton, Attorneys at Law
and ASK LLP*

---

[1] The Debtors in these Chapter 11 Cases, together with the last four digits of Debtors' federal tax identification numbers, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

ARGUMENT .................................................................................................................. 4

    I.    THE INSURERS HAVE NOT CARRIED THEIR BURDEN OF ESTABLISHING
        GOOD CAUSE TO TAKE DISCOVERY FROM OPPOSING COUNSEL ..................... 4

        A.    The Insurers Provide No Reason Even To *Speculate* That A&T And ASK
            Abused The Claims Process ................................................................................ 5

        B.    Courts Routinely Exercise Their Discretion To Deny Discovery From
            Opposing Counsel, And Their Reasons For Doing So Apply Here ..................... 8

        C.    The Insurers' Proposed Discovery Is, At Least In Part, Unduly Burdensome
            Or Irrelevant .................................................................................................... 12

    II.    THE INSURERS' RULE 2004 DISCOVERY IS PREMATURE IN ANY EVENT ... 16

RESERVATION OF RIGHTS ......................................................................................... 17

CONCLUSION .............................................................................................................. 17

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re 2435 Plainfield Ave., Inc.*,
223 B.R. 440 (Bankr. D.N.J. 1998), *aff'd*, 213 F.3d 629 (3d Cir. 2000)................................17

*In re Cambridge Analytica LLC*,
600 B.R. 750 (Bankr. S.D.N.Y. 2019)...................................................................................16

*Carlyle Inv. Mgmt. LLC v. Moonmouth Co. S.A.*,
C.A. No. 7841, 2015 WL 778846 (Del. Ch. Feb. 24, 2015)..................................................16

*In re Drexel Burnham Lambert Grp., Inc.*,
123 B.R. 702 (Bankr. S.D.N.Y. 1991)....................................................................................5

*In re Fearn*,
96 B.R. 135 (Bankr. S.D. Ohio 1989)...................................................................................12

*United States ex rel. Fisher v. Homeward Residential, Inc.*,
No. 12-cv-461, 2016 WL 1031154 (E.D. Tex. Mar. 15, 2016) .............................................16

*In re FKF Madison Grp. Owner, LLC*,
No. 10-11867 (KG), 2012 WL 13032955 (Bankr. D. Del. Oct. 12, 2012)...............................8

*In re G-I Holdings, Inc.*,
323 B.R. 583 (Bankr. D.N.J. 2005) .................................................................................11, 16

*In re Garlock Sealing Techs. LLC*,
No. 10-31607 (Bankr. W.D.N.C. Mar. 4, 2011) ...................................................................11

*In re Gawker Media LLC*,
No. 16-11700 (SMB), 2017 WL 2804870 (Bankr. S.D.N.Y. June 28, 2017) ........................11

*Hickman v. Taylor*,
329 U.S. 495 (1947).............................................................................................................10

*In re Int'l Oil Trading Co., LLC*,
548 B.R. 825 (Bankr. S.D. Fla. 2016) ............................................................................14, 15

*Kaplan v. S.A.C. Capital Advisors, L.P.*,
No. 12-cv-9350, 2015 WL 5730101 (S.D.N.Y. Sept. 10, 2015) ...........................................15

*In re Metiom, Inc.*,
318 B.R. 263 (S.D.N.Y. 2004)...............................................................................................5

*In re Millennium Lab Holdings II, LLC*,
562 B.R. 614 (Bankr. D. Del. 2016) ................................................................................5, 7, 8

*Nationwide Mut. Ins. Co. v. Home Ins. Co.*,
   278 F.3d 621 (6th Cir. 2002) ....................................................................................8

*Pamida, Inc. v. E.S. Originals, Inc.*,
   281 F.3d 726 (8th Cir. 2002) ...................................................................................11

*In re Roman Catholic Archbishop of Portland in Or.*,
   339 B.R. 215 (Bankr. D. Or. 2006) .........................................................................16

*Shelton v. Am. Motors Corp.*,
   805 F.2d 1323 (8th Cir. 1986) ..............................................................................8, 9

*In re Specialty Prods. Holding Corp.*,
   No. BR 10-11779-JKF, 2013 WL 2177694 (Bankr. D. Del. May 20, 2013) ..........16

*Sterne Kessler Goldstein & Fox, PLLC v. Eastman Kodak Co.*,
   276 F.R.D. 376 (D.D.C. 2011)...................................................................................9

*In re Subpoena Issued to Dennis Friedman*,
   350 F.3d 65 (2d Cir. 2003)...........................................................................8, 9, 11

*In re SunEdison, Inc.*,
   562 B.R. 243 (Bankr. S.D.N.Y. 2017) ...............................................................12, 13

*In re Symington*,
   209 B.R. 678 (Bankr. D. Md. 1997) ...................................................................12, 14

*In re Table Talk, Inc.*,
   51 B.R. 143 (Bankr. D. Mass. 1985) .......................................................................14

*Thiessen v. Gen. Elec. Capital Corp.*,
   267 F.3d 1095 (10th Cir. 2001) ..................................................................................8

*In re USG Corp.*,
   290 B.R. 223 (Bankr. D. Del. 2003) .........................................................................11

*V5 Techs. v. Switch, Ltd.*,
   334 F.R.D. 306 (D. Nev. 2019), *aff'd*, No. 17-cv-2349, 2020 WL 1042515 (D.
   Nev. Mar. 3 2020)......................................................................................................15

*In re Valsartan N-Nitrosodimethylamine (NDMA) Contamination Prods. Liab.
   Litig.*,
   405 F. Supp. 3d 612 (D.N.J. 2019) ...........................................................................15

*Viamedia, Inc. v. Comcast Corp.*,
   No. 16-cv-5486, 2017 WL 2834535 (N.D. Ill. June 30, 2017)...............................15

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012) ........................................................................12

*In re Washington Mut., Inc.*,
   408 B.R. 45 (Bankr. D. Del. 2009) ............................................................14

**Statutes and Rules**

11 U.S.C. § 501 ...............................................................................................7

11 U.S.C. § 502 .............................................................................2, 7, 11, 16

Fed. R. Bankr. P. 2004 ............................................................................. *passim*

Fed. R. Bankr. P. 3001 ................................................................................3, 7

Fed. R. Bankr. P. 9009(a) ................................................................................3

Fed. R. Evid. 1004 ...........................................................................................9

**Other Authorities**

Annual Report, https://ar2019.scouting.org/ ..................................................2

*Inside the 'Perversion Files': Tracking Decades of Allegations in the Boy Scouts*,
   Los Angeles Times (Oct. 28, 2012) ............................................................3

## INTRODUCTION

Boy Scouts of America ("BSA") was driven into bankruptcy due in large part to massive legal liabilities stemming from decades of neglect of child abuse in scouting. BSA now professes a desire to reach a consensual resolution with the survivors. But BSA's insurance carriers—the ones chiefly on the hook for BSA's tort liabilities—appear resolved to drag this case out and, in the meantime, to inflict as much pain as possible on abuse survivors and their law firms. To that end, the Insurers[2] filed a motion for sweeping discovery probing all manner of communications between abuse survivors and their attorneys, purportedly to root out claims that the Insurers speculate may be fraudulent. *See* Docket No. 1974 ("Motion" or "Mot.").

The Court should deny the Motion for two separate and independent reasons.

*First*, the Motion fails to show why the requested discovery meets Rule 2004's standards. Discovery under Rule 2004 is not boundless. The Insurers must at the very least demonstrate good cause for the discovery they seek. But, particularly as to Andrews & Thornton, Attorneys at Law ("A&T") and ASK LLP ("ASK"), the Insurers do not come close. Their Motion lumps together more than a dozen law firms and levels scattershot allegations of impropriety—downright fraud, even—against those attorneys who deigned to sign and submit (as this Court expressly permitted, *see* Docket No. 1551) proofs of claim on behalf of clients who could not do so themselves. In the end, the Insurers offer no basis even to *speculate* that A&T or ASK did anything improper. That failing, coupled with the fact that the Motion seeks an array of material that is privileged or irrelevant (or both), warrants denial of the Motion as to A&T and ASK.

---

[2] For the sake of brevity, we refer to Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America; Westchester Fire Insurance Company and Westchester Surplus Lines Insurance Company; Hartford Accident and Indemnity Company; First State Insurance Company; and Twin City Fire Insurance Company—the movants here—collectively as "Insurers."

*Second*, the requested discovery is premature.  The parties are in the thick of mediation attempting to negotiate a plan process.  If those negotiations succeed, as we hope they do, then the sought-after discovery could well be mooted.  Conversely, if negotiations fail, the parties will need to pursue an alternative path to valuing the abuse claims, at least for purposes of voting on and approving a plan.  The likeliest path is an estimation proceeding under 11 U.S.C. § 502(c), where any discovery will be governed not by Rule 2004 but by the more exacting Rules of Civil Procedure.  In either event, allowing the Insurers to undertake a massive discovery campaign that is apt, in due course, to be mooted or superseded would be hopelessly inefficient.

## **BACKGROUND**

BSA is the largest scouting organization, and among the largest youth organizations, in the United States.  In 2019, BSA had 2.1 million youth members and nearly 800,000 adult volunteers.[3]

BSA commenced this Chapter 11 proceeding on February 18, 2020.  *See* Docket No. 1.  Its filing was precipitated by the revelation of widespread sexual abuse, spanning decades, perpetrated by BSA employees and volunteers against boys and young men in their care.  *See* Docket No. 4 at 22-23.  BSA confessed that "its efforts to protect youth participants have at times failed some of the very children such efforts were meant to protect."  *Id*. at 4.  "BSA believes victims of abuse," said BSA, and its professed goal of this Chapter 11 case was to achieve a "consensual, expeditious, global resolution of all claims related to abuse in the BSA's Scouting programs."  *Id*. at 5, 38.

On May 26, 2020, the Court granted BSA's motion to set a bar date of November 16, 2020, the deadline by which abuse survivors needed to file proofs of claim.  Docket No. 695.  The Court subsequently ordered that such proofs of claim could be signed and submitted by counsel for abuse

---

[3] *See* BSA 2019 Annual Report, https://ar2019.scouting.org/.

survivors on behalf of their clients, consistent with Bankruptcy Rules 3001(b) and 9009(a) and Official Form 410.  *See* Docket No. 1551.

A&T and ASK are among the law firms that represent abuse survivors.  They worked diligently to identify and vet abuse claims.  Their process began by notifying potential claimants of their rights with truthful, non-misleading advertising, in full compliance with the ethical rules of all fifty states.  Then, when contacted by a claimant, the firms oversaw intake interviews to gather extensive information about the claimants' abuse, with the assistance of mental-health professionals.  Only if the allegations of abuse were credible did the firms agree to represent the claimants.  The firms' lawyers reviewed every single claim that the firms submitted.  And this rigorous process was supported by financing with terms that barred the lender from interfering in any way with the firms' professional judgment.  In short, the firms have complied with all ethical rules, and they have presented the claims truthfully and in good faith.

The scope of child abuse that occurred throughout BSA's organization was enormous. BSA kept files (now widely known as the "perversion files") on some *five thousand people* suspected of child abuse and expelled from BSA from 1947 through 2005.  *See Inside the 'Perversion Files': Tracking Decades of Allegations in the Boy Scouts*, Los Angeles Times (Oct. 28, 2012), https://spreadsheets.latimes.com/boyscouts-cases/.  And that is only what BSA recorded in its files.  The number of abusers is likely much greater.  Indeed, by the bar date, nearly 100,000 proofs of claim had been submitted by abuse survivors.  They allege a spectrum of sexual abuse committed under BSA's watchful eye over the course of decades.  A&T and ASK represent 6,163 of those survivors.

On June 9, 2020, the Court granted BSA's motion to refer the plan negotiation process to mediation before a three-member panel.  Docket No. 812.  Among the parties actively involved in

that mediation are the Insurers—movants here—whose overriding motive is to limit their own exposure.  Not surprisingly, representatives for abuse survivors and the Insurers have publicly disagreed about the value of the sexual abuse claims against BSA.

On January 22, 2021, the Insurers filed motions for sweeping Rule 2004 discovery from more than 1,000 sexual abuse survivors—together with 15 of their attorneys—for the stated purpose of investigating the bona fides of the survivors' allegations and "getting rid of meritless claims."  Mot. at 4.  Among the attorneys targeted by the Insurers are Sean Higgins, a partner at A&T, and David Stern, an attorney at ASK.  *Id*. at 5.  The Insurers' professed rationale for this discovery is that Mr. Higgins and Mr. Stern "signed a large number" of proofs of claim on behalf of their survivor clients.  *See* Hinton Decl. at 3 (Docket No. 1974-4).

## **ARGUMENT**

This Court should deny the Insurers' Motion for two separate and independent reasons: (i) the Insurers do not (and cannot) show good cause for their Rule 2004 request and (ii) such discovery is premature in any event.

## I.    THE INSURERS HAVE NOT CARRIED THEIR BURDEN OF ESTABLISHING GOOD CAUSE TO TAKE DISCOVERY FROM OPPOSING COUNSEL

Broad as it is, Rule 2004 has limits:  A movant must show "good cause."  Rule 2004 is not a license to rummage through the files of opposing counsel, nor is it an invitation to impose burdensome or irrelevant discovery demands on a litigation adversary.  At least as to A&T and ASK, the Insurers do not meet the "good cause" standard.  For that reason alone, the Motion should be denied.

### A.    The Insurers Provide No Reason Even To *Speculate* That A&T And ASK Abused The Claims Process

The Insurers bear the burden to establish "good cause" for Rule 2004 discovery.  But their guilt-by-association innuendo and finger-wagging about the ordinary stuff of mass-tort bankruptcies do not establish good cause as to A&T and ASK.

"The party seeking to conduct a 2004 examination has the burden of showing good cause for the examination which it seeks."  *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 627 (Bankr. D. Del. 2016).  "The burden of showing good cause is an affirmative one in that it is not satisfied merely by a showing that justice would not be impeded by production of the documents." *In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. 702, 712 (Bankr. S.D.N.Y. 1991).  Rather, good cause "[g]enerally" requires the movant to establish that Rule 2004 discovery "is necessary to establish the claim of the party seeking the examination," or that "denial of such request would cause the examiner undue hardship or injustice."  *Millennium Lab*, 562 B.R. at 627 (quoting *In re Metiom, Inc.*, 318 B.R. 263, 268 (S.D.N.Y. 2004)).

The Insurers do not even acknowledge their burden to establish good cause.  They seem to believe that, by tarring their opposing counsel with charges of litigation abuse, they can secure this Court's blessing to rifle through their adversaries' files.  At least as to A&T and ASK, the Insurers offer no lawful basis for that extraordinary request.

For starters, much of the Insurers' "evidence" implicates neither A&T nor ASK.  The Motion is replete with "examples" of assertedly suspicious conduct, implying that the targeted law firms monolithically engaged in that conduct.  But, with one minor exception addressed below (at 7), *none* of the examples concerns A&T and ASK.  *See* Mot. at 6 (Abused in Scouting), 7-8 (Kosnoff; Van Arsdale), 9 (Krause & Kinsman), 10 (Junell), 10-11 (Marc Bern), 11 (Slater, Slater & Schulman; Napoli Shkolnik), 12 (Junell), 13 (Krause & Kinsman), 14 (several others), 20

5

(Junell; Marc Bern; Slater, Slater & Schulman; Napoli Shkolnik), 21 (Abused in Scouting; Slater, Slater & Schulman).   Whatever probative force these broad-brush allegations may otherwise have—and we think they have none—they cannot establish good cause as to A&T and ASK.

When the Insurers finally turn their attention to A&T and ASK in particular, their allegations fall woefully short of "good cause."  The Insurers contend, for example, that many of the proofs of claim submitted by A&T and ASK "are missing critical information (such as the name of the alleged abuser), are late, duplicates, or have issues with the alleged state or year of abuse."  Mot. at 4.  That is plainly wrong in many respects.  By the Insurers' own data, the vast majority of proofs of claim submitted by A&T and ASK contain █████████████████

█████████████████████████████████████████████████████████

████████████████   Hinton Decl. tbl. 2 (Docket No. 1974-4).  ███████████████

█████████████████████████████████████████████████

████████████████   Finally, A&T and ASK's diligent vetting process is ongoing, as shown by the more than 1,300 claim forms (and counting) that ████████████████████

████████

Nor does the fact that A&T and ASK signed numerous proofs of claim justify the discovery that the Insurers seek.  Mass-tort bankruptcies necessarily involve numerous claims.  And, in the circumstances of this case, it is unreasonable to expect that every survivor could sign the claim himself—we are in the middle of a pandemic, and the survivors are having to confront the horrible abuse they suffered, often for the first time in years.  In fact, many of these survivors retained A&T and ASK for the very reason that they wanted assistance in filing their claims for the despicable

---

[4] For example, and in addition to the information about when and where the abuse occurred, by A&T and ASK's tally ███████████████████████████████████████ ████████████

abuses suffered at the hands of BSA.  A&T and ASK were obligated to take every measure to ethically pursue their clients' objectives.  They should not now be criticized for doing what had to be done to protect these survivors.  A&T and ASK committed to this Court that "[a]ll claims . . . will be thoroughly vetted,"[5] and they put mechanisms in place to make good on that commitment, despite the volume of claims.  That many proofs of claim were *signed* on the same day, as the Insurers point out, evinces nothing about when and how the claims were *vetted*.

The remaining "evidence" that the Insurers offer against A&T and ASK is that



Mot. at 21.

Mot. at 20.[6]

With allegations against A&T and ASK as threadbare as these, the Insurers simply have not shown that the requested discovery is "necessary to establish the [Insurers'] claim," or that denial of the discovery would cause "undue hardship."  *See Millennium Lab*, 562 B.R. at 627 (quotation marks omitted).  Probing A&T's and ASK's private communications with clients would shed no useful light on the ultimate issue in these cases: whether and under what circumstances the clients were sexually abused.  The attorneys are not percipient witnesses to those events. Because the Insurers have not established good cause, as they must, their Motion should be denied.

---

[5] *Corrected Omnibus Reply Of The Coalition Of Abused Scouts For Justice To Objections To Motion For Order Permitting Filing Of Proof Of Claim Forms Signed By Authorized Counsel In Accordance With Bankruptcy Code Sections 501 And 502, Bankruptcy Rule 3001, And Official Form 410* ¶ 41 (Docket No. 1496).

[6] That A&T received financing hardly merits comment.  As explained below (at 13-16), financing in and of itself is nothing suspicious, as numerous courts have held in denying discovery about it.

**B.      Courts Routinely Exercise Their Discretion To Deny Discovery From Opposing Counsel, And Their Reasons For Doing So Apply Here**

Even if the Insurers had offered some plausible basis for discovery against A&T and ASK (and they have not), this Court should deny Rule 2004 discovery in the exercise of its discretion. Discovery from opposing counsel prompts work-product and privilege disputes, disrupts the adversarial system, and circumvents the Insurers' duty to locate the proof they need somewhere other than in their adversaries' files.

1.      Rule 2004 provides that "the court *may* order the examination." Fed. R. Bankr. P. 2004(a) (emphasis added). Thus, "parties do not have an absolute right to Rule 2004 examinations—the granting of a Rule 2004 examination is dependent on the discretion of the court." *Millennium Lab*, 562 B.R. at 626. "The rule requires a balancing of 'the competing interests of the parties, weighing the relevance of and necessity of the information sought by examination.'" *Id.* (quoting *Drexel Burnham Lambert*, 123 B.R. at 712).

2.      Courts routinely exercise their discretion to deny discovery from opposing counsel. *E.g.*, *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 69-70 (2d Cir. 2003) (Sotomayor, J.) ("[T]he federal rules give district courts broad discretion to manage" discovery, and judges "have resisted the idea that lawyers should routinely be subject to broad discovery."). Indeed, in some circuits, depositions of opposing counsel are permitted only when "no other means exist to obtain the information" and "the information [sought] is crucial to the preparation of the case." *Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986).[7]  Even in circuits that do not

---

[7] *See also Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 278 F.3d 621, 628 (6th Cir. 2002) (imposing the same rule); *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1112 (10th Cir. 2001) (same). The Third Circuit has neither adopted nor rejected the *Shelton* rule, and "[c]ourts in this circuit have not consistently" applied it. *In re FKF Madison Grp. Owner, LLC*, No. 10-11867 (KG), 2012 WL 13032955, at *3 (Bankr. D. Del. Oct. 12, 2012).

impose that hurdle, "the practice of seeking discovery from adversary counsel is regarded" with "disfavor." *Friedman*, 350 F.3d at 71. And courts are admonished to "take[] into consideration" factors such as "the need to depose the lawyer, the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation, the risk of encountering privilege and work-product issues, and the extent of discovery already conducted." *Id.* at 72; *accord, e.g.*, *Sterne Kessler Goldstein & Fox, PLLC v. Eastman Kodak Co.*, 276 F.R.D. 376, 382 (D.D.C. 2011).

Courts' widespread and time-honored aversion to allowing discovery from opposing counsel exists for good reasons. "[C]hief among the concerns cited by federal courts[] is that counsel depositions carry the substantial potential of spawning . . . work-product and privilege objections," which puts "burdens on the courts to resolve." *Sterne Kessler*, 276 F.R.D. at 382; *see also, e.g.*, *Shelton*, 805 F.2d at 1327 ("It is not hard to imagine additional pretrial delays to resolve work-product and attorney-client objections."). A second reason to resist discovery from opposing counsel is "its disruptive effect on the adversary system," *Friedman*, 350 F.3d at 70, such as by "chilling the free and truthful exchange of information between attorneys and their clients," *Sterne Kessler*, 276 F.R.D. at 381, and by allowing counsel to glean their opponents' strategy. Finally, there is often no "need to depose the lawyer," *Friedman*, 350 F.3d at 72, as the lawyer is rarely a percipient witness to anything relevant. *Cf.* Fed. R. Evid. 1004 (favoring an original document over other means of proving the document's content).

3.    All the reasons courts deny discovery from opposing counsel apply here. *First*, the Insurers seek evidence that is plainly subject to the attorney-client privilege, the work-product doctrine, or both. For example, the Insurers request "all documents relating to the inquiry" undertaken by the claimants' law firms "to confirm the existence of evidentiary support for each

fact set forth in the Claim." Mot. Ex. D, Request for Production 2. The most important of those documents would, of course, be lawyers' notes on any interviews of their clients—material that is at the heart of the attorney-client privilege and the work-product doctrine. *See Hickman v. Taylor*, 329 U.S. 495, 510 (1947). And the Insurers' efforts to overcome those defenses would embroil this Court in a protracted series of fact-specific disputes across thousands of claims. Such disputes would consume this case.

*Second*, permitting the Insurers' discovery would undermine the adversary process here in at least two important ways. First and foremost, it would stifle advocacy for sexual abuse survivors. As it is, survivors often are reluctant to discuss their cases with their counsel. Giving insurers with every incentive to minimize the survivors' suffering some degree of access to the survivors' discussions with counsel would further chill those discussions. Separately, the Insurers' discovery would undermine the process by frustrating consensual dispute resolution, which is critical to the success of this case. Few things make consensus more difficult than putting one's opposing counsel under oath and grilling them for seven hours apiece.

*Third*, there is no need for discovery from counsel. As explained above (at 7), counsel has no firsthand information about whether and under what circumstances the claimants were sexually abused.

For all these reasons, the Court should exercise its discretion to deny the Insurers' Motion.

4.      The Insurers do not even acknowledge, much less overcome, the pervasive case law squarely rejecting discovery from opposing counsel. And the authority they invoke offers them cold comfort indeed.

The Insurers' contention that "Rule 2004 has been used to obtain discovery from counsel," Mot. at 27, is wordplay. In their sole example, the target of discovery was indeed an attorney—

but *not in the case where the discovery was sought*.  Instead, the attorney had represented plaintiffs in long-completed litigation against the debtors.  *In re Gawker Media LLC*, No. 16-11700 (SMB), 2017 WL 2804870, at *7 (Bankr. S.D.N.Y. June 28, 2017).    Thus, although the court acknowledged the serious "concerns that informed the *Friedman* decision" discussed above, it concluded that they were "not present [t]here."  *Id.*; *see also Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726, 730 (8th Cir. 2002) (rule against discovery from counsel "applies only to the instant case, not to [a] concluded case").  This case is not like *Gawker*—the Insurers are seeking discovery not from lawyers involved in closed cases but from the lawyers *actively involved in the bankruptcy itself*.

The Insurers insist that "courts routinely allow" discovery "to identify and evaluate abuses in the claims process."  Mot. at 18.  But the cases they cite for this proposition did not entail discovery from lawyers at all.  In *In re USG Corp.*, 290 B.R. 223, 227 (Bankr. D. Del. 2003), the court ordered discovery from the claimants—not their counsel—to facilitate the debtors' challenges to the claims within an estimation proceeding under 11 U.S.C. § 502(c).  Similarly, *In re G-I Holdings, Inc.*, 323 B.R. 583, 622-23, 625 (Bankr. D.N.J. 2005), contemplated discovery from claimants to facilitate the debtors' objections within an estimation proceeding.  Neither case allowed discovery against opposing counsel, and neither involved a proceeding (as here) outside the context of an estimation.

In yet another case cited by the Insurers, the court actually *denied* discovery from counsel under Rule 2004.    It reasoned that "the discovery would be an unprecedented intrusion into attorneys' practices and files."  Order Denying Motion for Production of Information from Counsel Representing Garlock Claimants at 2, *In re Garlock Sealing Techs. LLC*, No. 10-31607 (Bankr. W.D.N.C. Mar. 4, 2011) (Docket No. 1201).  The court held, in short, that the "records" of "the

professionals who represented" "parties to this proceeding" "are protected from this discovery."

*Id.*[8]

### C.    The Insurers' Proposed Discovery Is, At Least In Part, Unduly Burdensome Or Irrelevant

1.    In addition to being both baseless (at least against A&T and ASK) and intrusive, much of the requested discovery would also be unduly burdensome.   Although Rule 2004 discovery is "very broad," "[t]he examination should not be so broad as to be more disruptive and costly to the party sought to be examined than beneficial to the party seeking discovery."  *In re SunEdison, Inc.*, 562 B.R. 243, 249 (Bankr. S.D.N.Y. 2017) (quoting *In re Fearn*, 96 B.R. 135, 138 (Bankr. S.D. Ohio 1989)).   The rule's application should be "consistent with the historic concerns regarding the burden on the producing party."  *Id.* at 250; *see also, e.g.*, *In re Symington*, 209 B.R. 678, 687 (Bankr. D. Md. 1997) (rule does not allow "overly-broad, oppressive or unfair inquiries").

Several of the Insurers' proposed interrogatories exceed these boundaries.   At the outset, the Insurers misdirect the eye by professing to seek discovery from "only 15" lawyers.  Mot. at 28. That is just not so.  Each of the proposed interrogatories asks for information about "each Claim Form submitted . . . by *Your law firm* that was signed by *an Attorney*."  Mot. Ex. D, p. 1 (emphasis added).  In no way are those questions confined to "only 15" lawyers; rather, those eight questions address *thousands* of claims signed by many more than the fifteen named lawyers.

That would be bad enough if the questions were subject to generic answers readily available in each claim's file.   But some of the proposed interrogatories do not permit such

---

[8] The Insurers assert that the court in *In re W.R. Grace & Co.*, 475 B.R. 34, 71 (D. Del. 2012), allowed "the depositions of several plaintiffs' attorneys."  Mot. at 18.  The decision that the Insurers cite says nothing about that.

straightforward responses.  Instead, they ask the firms to identify *each* attorney who spoke with *each* claimant, *each* outside vendor involved in preparing or submitting *each* claim, *everything* the targeted lawyer did to confirm *each* claim's veracity, and how long that all took *per claim*.  *Id.* Interrogatories 1, 2, 3.d-f.  That information might not have been recorded on a claim-by-claim basis and so would need to be created from recollection.  Such a process would put an enormous strain on A&T and ASK while doing next to nothing to illuminate the merits of the underlying claims.

One of the Insurers' proposed document requests is at least as burdensome.  It requests— again, "[f]or each Claim Form submitted . . . by or on behalf of Your law firm that was signed by an Attorney"—"all documents relating to the inquiry" into the claim's veracity.  Mot. Ex. D, Request for Production 2.  This request, like the offending interrogatories, concerns documentation that might not currently exist for thousands of claims.  What is more, its broad-as-possible scope ("all," "relating to") does not "place[] reasonable limits on the sources or types of information that [A&T and ASK] must search for and retrieve."  *See SunEdison*, 562 B.R. at 251; *see also id.* at 252 (requests at issue "generally ask[ed] for 'all documents and communications' that 'relate to' the subject matter").  Thus, A&T and ASK would have to search numerous electronic sources and hard-copy files for responsive documents.  Whatever relevance these documents might have is vastly outweighed by the burden of collecting, reviewing, and matching them to claims.

2.     The Insurers also seek documents related to financing agreements.  Specifically, the Insurers seek "[a]ll documents reflecting communications between [counsel] and any non-law firm business pertaining to ownership of or financial interest in claims in the Chapter 11 Cases, including but not limited to any marketing of claims . . . , any offers to sell or transfer claims . . . , and communications pertaining to financing secured by an interest in any potential recovery on

13

the claims." Mot. Ex. D, Request for Production 8. This request is clearly improper—it seeks information that is both irrelevant and privileged.

*Relevance*. Although discovery under Rule 2004 takes place outside of an identifiable dispute, the rule nonetheless requires that the discovery be relevant. Discovery "cannot stray into matters which are not relevant to the basic inquiry." *In re Washington Mut., Inc.*, 408 B.R. 45, 50 (Bankr. D. Del. 2009) (quoting *In re Table Talk, Inc.*, 51 B.R. 143, 145 (Bankr. D. Mass. 1985)). "[A] Rule 2004 examination must be both relevant and reasonable," and courts may "limit the normally broad inquiry under Rule 2004" to prevent "inquiries into topics that are irrelevant to a review of the conduct and assets of debtors." *Symington*, 209 B.R. at 684, 687.

The Insurers' requested financing discovery is not relevant. First of all, the involvement of lenders is public. One can see that from the Insurers' brief, which cites repeatedly to public sources—including "UCC filings" *in this case*—to show that lenders have worked with Coalition firms. Mot. at 8-9; Kirschenbaum Decl. Exs. 9, 15, 16 (Docket No. 1974-2). So there is no great mystery that lenders are partly financing the litigation. Nor is there any great mystery as to their motivations. Lenders lend money (like most of us) to make money. Their involvement "is not, in and of itself, indicative of an improper motivation." *In re Int'l Oil Trading Co., LLC*, 548 B.R. 825, 838 (Bankr. S.D. Fla. 2016).

The Insurers do not offer an argument for relevance beyond those basic, and public, facts. All they say is that one hedge fund "provided financing" to two Coalition firms and that a second investor "actively fund[ed] the Boy Scout claims by advancing money in exchange for an equity partnership stake in the claims." Mot. at 8-9 (quotation marks omitted). That's it for facts. As for legal argument, the Insurers are terser still. They note at one point that "[t]he presence of aggregators and funders amplifies the need for scrutiny." Mot. at 21. They follow that point with

14

two sentences about aggregators and nothing about funders. *Id.* There is *nothing else at all* about lenders in the entirety of Insurers' argument. It is impossible to understand why discovery into lenders is "relevant to the case," Fed. R. Bankr. P. 2004(b), when the Insurers themselves cannot articulate a legal basis for such palpably irrelevant discovery.[9]

*Work product.* The financing documents requested are also protected by the work-product doctrine. That doctrine protects documents that contain the "mental impressions, conclusions, opinions, or legal theories" of an attorney that were prepared in anticipation of litigation. *Int'l Oil*, 548 B.R. at 835 (quotation marks omitted). That describes the documents sought here, which, it stands to reason, would feature attorneys from A&T and ASK communicating with lenders about whether and why they might fund the case. It is reasonable to suppose that the attorneys would have shared their thoughts and mental impressions of the strength or weakness of claims when seeking funding. As the *International Oil* court pointed out, "[t]hese are communications between a client, the client's attorney, and a litigation funder whose participation depends on assessments of the merits of litigation." *Id.* at 836; *see also, e.g., Viamedia, Inc. v. Comcast Corp.*, No.

---

[9] Although Rule 2004 imposes less stringent standards on discovery than do the Federal Rules of Civil Procedure, courts assessing discovery requests into financing under those Rules nearly universally reject them unless there is some suggestion that lenders are playing some untoward role. *See, e.g., In re Valsartan N-Nitrosodimethylamine (NDMA) Contamination Prods. Liab. Litig.*, 405 F. Supp. 3d 612, 615-16 (D.N.J. 2019) (denying defendants' request for financing discovery in multidistrict mass tort litigation due to absence of good cause such as "a sufficient showing that a non-party is making ultimate litigation or settlement decisions, the interests of plaintiffs or the class are sacrificed or are not being protected, or conflicts of interest exist"); *V5 Techs. v. Switch, Ltd.*, 334 F.R.D. 306, 312 (D. Nev. 2019) ("Discovery into litigation funding is appropriate when there is a sufficient factual showing of 'something untoward' occurring in the case . . . . Mere speculation by the party seeking this discovery will not suffice."), *aff'd*, No. 17-cv-2349, 2020 WL 1042515 (D. Nev. Mar. 3 2020); *Kaplan v. S.A.C. Capital Advisors, L.P.*, No. 12-cv-9350, 2015 WL 5730101, at *5 (S.D.N.Y. Sept. 10, 2015) (rejecting as speculative defendants' arguments that third-party financing could affect strategic decisions made on behalf of the class, cause counsel's interest to diverge from class members, or result in intraclass conflicts). The Insurers have not attempted such a showing here.

16-cv-5486, 2017 WL 2834535, at *3 (N.D. Ill. June 30, 2017); *United States ex rel. Fisher v. Homeward Residential, Inc.*, No. 12-cv-461, 2016 WL 1031154, at *6 (E.D. Tex. Mar. 15, 2016); *Carlyle Inv. Mgmt. LLC v. Moonmouth Co. S.A.*, C.A. No. 7841, 2015 WL 778846, at *8-9 (Del. Ch. Feb. 24, 2015). And there is no doubt that the communications were prepared in anticipation of litigation; that is why it is called litigation finance.

## II.    THE INSURERS' RULE 2004 DISCOVERY IS PREMATURE IN ANY EVENT

Even were discovery from A&T and ASK an appropriate subject of a Rule 2004 request—and it is not—the Insurers' Rule 2004 request is premature. The parties have been working tirelessly in mediation to negotiate a path forward for BSA and abuse survivors. (The instant frolic and detour is unproductive to those efforts, to say the least.) We are hopeful that the parties can negotiate a plan and distribution process that obviates the need for wasteful and inefficient discovery from thousands of abuse survivors, much less their counsel.

If a negotiated plan proves out of reach, however, then the parties will need to undertake an alternative process to value the abuse claims for purposes of plan voting and confirmation. The likeliest candidate is an estimation proceeding under 11 U.S.C. § 502(c). Estimation is a tried and true method for valuing mass tort claims that cannot feasibly be liquidated prior to confirmation. *See G-I Holdings*, 323 B.R. at 600-01 (noting "it would take years, actually lifetimes, before these [asbestos] claims would be liquidated" failing an estimation); *In re Specialty Prods. Holding Corp.*, No. BR 10-11779-JKF, 2013 WL 2177694, at *1 (Bankr. D. Del. May 20, 2013) (mesothelioma claims); *In re Roman Catholic Archbishop of Portland in Or.*, 339 B.R. 215, 221 (Bankr. D. Or. 2006) (sexual abuse claims). And, once an estimation proceeding is commenced, the Insurers' Rule 2004 discovery requests will be superseded by the Federal Rules of Civil Procedure. *See In re Cambridge Analytica LLC*, 600 B.R. 750, 752 (Bankr. S.D.N.Y. 2019) ("[T]here is a well-recognized rule that once an adversary proceeding or contested matter is

16

commenced, discovery should be pursued under the applicable Federal Rules of Civil Procedure, and not Rule 2004."); *In re 2435 Plainfield Ave., Inc.*, 223 B.R. 440, 455-56 (Bankr. D.N.J. 1998) (collecting cases), *aff'd*, 213 F.3d 629 (3d Cir. 2000).

Nor would the Insurers' discovery requests serve any useful purpose in the meantime. All parties appear to agree that it will be practically impossible to confirm a plan until the parties can come to a common understanding as to the aggregate value of the abuse claims. The Insurers' proposed discovery will not advance that effort. On the contrary, the Insurers' Motion is an undisguised effort to lop off a small fraction of the total abuse claims (1400 in all, a minuscule slice of the whole) which they regard to be most vulnerable to attack.[10] We respectfully submit that spending months and millions of dollars on discovery in order (the Insurers hope) to whittle the universe of claims by roughly one percent is not a productive path forward.

## **RESERVATION OF RIGHTS**

A&T and ASK reserve all rights to object on any permissible ground to, and to seek appropriate relief regarding, any discovery requests that are served.

## **CONCLUSION**

The Insurers' Motion for Rule 2004 discovery should be denied as to A&T and ASK.

---

[10] The methodology used by the Insurers and their expert to identify the "random sample" of abuse claims (roughly 1% of the total) they propose to dissect is telling: Their expert identified six "sub-categories" of claims, virtually all of which comprise claims that the Insurers regard as the most vulnerable to attack ("No Scouting Affiliation," "No Abuser Identification," "No Impact Alleged," etc.), and then "randomly" selected claims from only *those* categories to derive the 1,400-claim sample. *See* Docket No. 1972-6 (Martin Decl.) at 2-3. Whatever this exercise is, it is not a "random" sample of the full universe of abuse claims in any sense of that word.

Dated:  February 5, 2021

Respectfully submitted,

/s/ Mary E. Augustine
Anthony M. Saccullo (No. 4141)
Mary E. Augustine (No. 4477)
A. M. SACCULLO LEGAL, LLC
27 Crimson King Drive
Bear, Delaware 19701
Telephone: (302) 836-8877
Facsimile: (302) 836-8787
Email: meg@saccullolegal.com

Lawrence S. Robbins (admitted *pro hac vice*)
William J. Trunk (admitted *pro hac vice*)
Joshua S. Bolian (admitted *pro hac vice*)
John B. Goerlich (admitted *pro hac vice*)
Courtney L. Millian (admitted *pro hac vice*)
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
2000 K Street, N.W., 4th Floor
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
Email: lrobbins@robbinsrussell.com

*Counsel for Andrews & Thornton, Attorneys at Law and ASK LLP*

18