# EXHIBIT A

```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3                                      .   Chapter 11
     IN RE:                             .
 4                                      .   Case No. 19-10118 (KJC)
     MAREMONT CORPORATION, et al.,      .
 5                                      .   Courtroom No. 5
                                        .   824 North Market Street
 6                                      .   Wilmington, Delaware 19801
                                        .
 7                      Debtors.        .   March 18, 2019
     . . . . . . . . . . . . . . . . .      1:00 P.M.
 8

 9                   TRANSCRIPT OF OMNIBUS HEARING
               BEFORE THE HONORABLE KEVIN J. CAREY
10                 UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          James Conlan, Esquire
                               Andrew O'Neill, Esquire
13                             Allison Ross Stromberg, Esquire
                               Blair Warner, Esquire
14                             SIDLEY AUSTIN LLP
                               One South Dearborn Street
15                             Chicago, Illinois 60603

16

17

18   Audio Operator:          Electronically Recorded
                               by Dana L. Moore, ECRO
19

20   Transcription Company:    Reliable
                               1007 N. Orange Street
21                             Wilmington, Delaware 19801
                               (302)654-8080
22                             Email:  gmatthews@reliable-co.com

23   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
24

25
```

1   APPEARANCES (Continued):

2   For the Debtors:            Norman Pernick, Esquire
                                J. Kate Stickles, Esquire
3                               COLE SCHOTZ P.C.
                                500 Delaware Avenue, Suite 1410
4                               Wilmington, Delaware 19801

5
    For the U.S. Trustee:       Richard Schepacarter, Esquire
6                               UNITED STATES DEPARTMENT OF JUSTICE
                                OFFICE OF THE UNITED STATES TRUSTEE
7                               844 King Street, Suite 2207
                                Lockbox 35
8                               Wilmington, Delaware 19801

9   For James Patton:           Robert Brady, Esquire
                                Edwin Harron, Esquire
10                              YOUNG CONAWAY STARGATT & TAYLOR LLP
                                Rodney Square
11                              1000 North King Street
                                Wilmington, Delaware 19801
12
    For the Asbestos            Natalie Ramsey, Esquire
13  Committee:                  Robinson & Cole
                                1000 N. West Street, Suite 1200
14                              Wilmington, Delaware 19801

15

16

17

18

19

20

21

22

23

24

25

INDEX

Page

**Confirmation.**  Modified Joint Prepackaged Plan of
Reorganization of Maremont Corporation and Its Debtor
Affiliates Pursuant to Chapter 11 of the Bankruptcy Code
(Filed March 12, 2019) (Docket No. 136)

**No Ruling Given; Hearing will Resume on 3/26/19**

<table>
<tr><td>EXHIBITS:</td><td>ID</td><td>Rec'd</td></tr>
<tr><td>Declaration of Carl D. Anderson, II<br>  In Support of First Day</td><td></td><td>12</td></tr>
<tr><td>Declaration of Carl D. Anderson, II<br>  In Support of Confirmation</td><td></td><td>13</td></tr>
<tr><td>Declaration of Jung W. Song</td><td></td><td>13</td></tr>
<tr><td>Declaration of James L. Patton, Jr.</td><td></td><td>15</td></tr>
<tr><td>Transcript of March 8th, 2019</td><td></td><td>15</td></tr>
</table>

1          (Proceedings commenced at 1:04 p.m.)

2          (Call to order of the court)

3              THE COURT:  Good afternoon, everyone.

4              ALL:  Good afternoon, Your Honor.

5              MR. O'NEILL:  Good afternoon, Your Honor; Andrew

6    O'Neill, Sidley Austin, on behalf of the debtors.  I am

7    joined by my colleagues; John Skakun, Allison Stromberg,

8    Blair Warner, as well as by Norm Pernick and Kate Stickles

9    from Cole Schotz.  We have Mr. Carl Anderson in the courtroom

10   today, Your Honor.  He's chairman of the board and sole

11   officer of Maremont.  Also in the courtroom is J.W. Song from

12   Donlin Recano, the debtors' solicitation and noticing agent.

13             I guess others will make appearances as they come

14   to the microphone.

15             Your Honor, we have one item on the agenda today;

16   confirmation of the plan.  Well, in addition to the approval

17   of the solicitation and our disclosure statement.  We're

18   happy to report that outside of the remaining elements of the

19   U.S. Trustees objection, which you will hear about shortly,

20   we have consensus on this plan and support from the current

21   claimants, the future claimants, and every other party of

22   interest that is engaged with us in this process.

23             THE COURT:  Give me a preview, if you would, of

24   who intends to make what presentation?  Then I would like to

25   know what remains of the U.S. Trustee's objection.

1       MR. O'NEILL:  Very good, Your Honor.  So, the way

2  we thought this would work is my colleague, Ms. Stromberg,

3  was going to fill Your Honor in on what has been settled both

4  from informal comments from parties and also with the U.S.

5  Trustee who we have been working with on some of the plan

6  objections.  I can tell you that the remaining objections

7  from the U.S. Trustee relate to the trust distribution

8  procedures.  Those are the sole remaining objections; the

9  good faith objection and the 524(g) objection about

10 substantial similarity of treatment of future claimants.

11      THE COURT:  Have any of the components of the U.S.

12 Trustee objection been worked out or do they still stand as

13 they did in the filed objection?

14      MR. O'NEILL:  They stand as they did in the

15 objection.

16      THE COURT:  Okay.

17      MR. O'NEILL:  We got to the effective date

18 argument and the exculpation argument, and are in agreement

19 on those objections, but the TDP objection, if you will,

20 remains in toto.

21      So, what we plan to do, Your Honor, as I said, Ms.

22 Stromberg will catch the court up on changes to the plan and

23 the order, and describe those settlements including the

24 recent Fireman's Settlement that occurred on Friday.  Then we

25 will make the record for the day.  We anticipate moving the

1  declarations into evidence and not having direct or cross,

2  but, of course, folks are available in court if Your Honor

3  would like to ask questions.  Then we will go straight to

4  argument and make our case in chief.  I believe the committee

5  and the future's rep will say a few things as well and then

6  Mr. Schepacarter from the U.S. Trustees Office will have his

7  turn to argue as well.

8          THE COURT:  All right.  Mr. Schepacarter, does the

9  U.S. Trustee intend to present any witnesses or other

10  evidence in support of its objection?

11          MR. SCHEPACARTER:  Thank you, Your Honor; for the

12  record Richard Schepacarter for the United States Trustee.

13          No, Your Honor.  As Mr. O'Neill has outlined and

14  laid out for the court that is, sort of, the process upon

15  which we will proceed today.  Thank you.

16          THE COURT:  All right.  Thank you.

17          I did want to take, before you begin, an

18  opportunity to make a few comments and that is while I don't

19  disagree of the fact that there's an opinion by the

20  bankruptcy court in the Garlock case, which on a selected

21  basis has reached some conclusions, I think I do agree that

22  if there's to be some drastic change in the process that

23  maybe that's for another forum or another time; however, I

24  think the U.S. Trustee makes some very good points about

25  putting in provisions that will guard against the possibility

1  that such fraud should occur.  By that I mean it's the

2  multiple claims made by plaintiffs' attorneys on behalf of

3  various claimants in a variety of different trust situations.

4          I don't know any reason why, under the

5  circumstances, if, in fact, it's happened and at least it's

6  happened in some cases, looks to me from the Garlock opinion,

7  that we shouldn't try to guard against it here.  I think at

8  the end of the day, if the evidence is consistent with what

9  the papers have shown, I'm going to ask that you make some

10  adjustments.  The argument that it's a prepack and I

11  shouldn't touch it, and the world will collapse if I don't,

12  will not persuade me.

13          So, with that in mind I had thought about maybe

14  bringing counsel into Chamber's initially, but the parties

15  are so far apart I'm just wondering whether it's just better

16  to make your record and then we'll go from there.  In having

17  said that I'm open to suggestions by any or all of the

18  parties.

19          MR. O'NEILL:  Okay.  Thanks, Your Honor.

20          I think what we'll do, though, is proceed on the

21  basis that we described and then perhaps have conversations

22  based on Your Honor's comments.

23          THE COURT:  It's your party.  Let's get started.

24          MR. O'NEILL:  Sounds good.

25          Okay.  Well, with that I will cede the podium to

1  Ms. Stromberg to run Your Honor through the plan and order

2  changes.

3           THE COURT:  All right.

4           MS. STROMBERG:  Good afternoon, Your Honor;

5  Allison Stromberg from Sidley Austin on behalf of the

6  debtors.

7           We filed plan modifications on March 12th with a

8  memorandum of law in support of confirmation and the proposed

9  findings of fact, conclusions of law and order confirming the

10  plan.  We also filed further revisions to the plan and

11  proposed order yesterday.

12           We have a cumulative redline of the plan as well

13  as a redline of the proposed order that I can provide for

14  you.  May I approach?

15           THE COURT:  Yes.  Do you have an extra set for my

16  law clerk by any chance?

17           MS. STROMBERG:  So, I wasn't going to do a page

18  turn, but rather spend a few moments to walk the court

19  through the main revisions that we made to the plan and the

20  language included in the proposed order that we incorporated

21  to address informal comments that we received from parties as

22  well as the certain issues that were resolved with the United

23  States Trustee.

24           To start, Your Honor may remember that at the

25  first day hearing you had raised two concerns regarding the

1  plan;

2          The first was the provision regarding the

3  retention of exclusive jurisdiction.  We revised the plan to

4  remove the exclusive phrase and that's changes reflected in

5  Article 11(a) of the plan and Paragraph 105 of the proposed

6  order.

7          The second issue Your Honor raised concerned the

8  plan's third-party releases and the extent to which such

9  releases were fully consensual.  We revised the plan to

10  provide for an opt-out mechanism that will allow parties to

11  opt-out of the third-party releases through a notice that

12  will be sent with a notice of the confirmation and effective

13  date.  That opt-out election form is Exhibit 1 to the notice

14  of the effective date, which in turn is Exhibit B to the

15  proposed order.

16          We have also received comments in the plan from

17  certain governmental entities other than the United States

18  Trustee; the Department of Justice, the Environmental

19  Protection Agency in the State of Ohio, and it's State

20  Environmental Agency.  We were able to satisfy these parties

21  with a reservation of rights in favor of the Governmental

22  units that's included in Paragraphs 192 and 193 of the

23  proposed order.  This paragraph is similar to revisions of

24  rights included in other prepackaged plans.  In essence,

25  allows claims and rights of the Governmental units to ride

1  through the plan unaffected with the exception here of any

2  asbestos personal injury claims which are channeled to

3  Asbestos Personal Injury Trust.

4          We received comments from two insurers; Zurich and

5  Fireman's Fund Insurance Company.

6          With respect to Zurich we had discussions with

7  counsel to Zurich regarding the treatment of its settlement

8  agreement under the plan, and Zurich has agreed to the

9  treatment as set forth in Section 4(d)(3) of the plan.  We

10  agreed on language in Paragraph 195 of the proposed order

11  confirming the treatment of Zurich as a settling insurer and

12  the mutual release of potential claims between the debtors

13  and Zurich.

14          With respect to Fireman's Fund we engaged in

15  negotiations with Fireman's Fund regarding the treatment of

16  the existing insurance agreement under the plan and,

17  ultimately, entered into a new agreement settling all issues

18  with respect to the remaining insurance. We filed the

19  settlement agreement along with the corresponding plan

20  changes and proposed confirmation order reflecting Fireman's

21  agreement over the weekend.  The settlement agreement is now

22  Exhibit N to the plan.

23          The settlement provides that Fireman's will pay $8

24  million dollars to the benefit of the trust right after the

25  effective date and the prior agreement with Fireman's, which

1  is a coverage place insurance agreement, will be rejected.

2  Fireman's will be treated as a settling insurer and the

3  parties will grant mutual releases with respect to the

4  policies in the prior agreement.  This agreement is described

5  in Paragraph 194 of the proposed confirmation order and

6  Section 4(d)(1) of the plan.  I also understand that Mr.

7  Harron will speak to the settlement from the perspective of

8  the trust.

9         We did not receive comments or objections from

10  Everest or Mount McKinley, who were the other settling

11  insurers.  Their treatment is provided for in Section 4(d)(2)

12  of the plan and confirmed by Paragraph 196 of the proposed

13  confirmation order.

14         Finally, we were able to resolve two of the

15  objections raised by the United States Trustee with respect

16  to the effective date.  The plan now provides that the

17  effective date will occur within ten business days of the

18  conditions precedent to effectiveness being satisfied.  And

19  with respect to the exculpation provisions we made several

20  revisions to the exculpation in Section 1125(e) protections

21  including revisions to clarify the estate fiduciary is

22  entitled to exculpation and the plan participant is entitled

23  to the protection of Section 1125(e).  And we understand that

24  with these modifications the U.S. Trustee's objection to

25  exculpation provision has been resolved.

1          Unless you have any questions about the recent

2   revisions I can turn the podium back to Mr. O'Neill.

3          THE COURT:  I do not.  Thank you.

4          MS. STROMBERG:  Thank you, Your Honor.

5          MR. O'NEILL:  Okay.  With that, Your Honor, I'd

6   like to start by moving a few declarations into evidence.

7   Then Mr. Harron will do the same for Mr. Patton's

8   declaration.

9          First, we'd like to move in the declaration of Mr.

10  Carl Anderson in support of the first days.  This was entered

11  in on the first day hearing as well, but we rely upon it in

12  our brief as additional evidence on the process.  So, we'd

13  like to re-enter it if you will.

14         THE COURT:  Is there any objection?

15     (No verbal response)

16         THE COURT:  It's admitted without objection.

17     (Declaration of Carl Anderson, admitted into evidence)

18         MR. O'NEILL:  Great.  And I have copies of all of

19  these if Your Honor wants me to bring them up to be marked,

20  but, otherwise, we will just rely on the record.

21         THE COURT:  I think that would be fine.

22         MR. O'NEILL:  Okay.  We also move the declaration

23  of Mr. Anderson in support of confirmation, that is docket

24  139, into evidence.

25         THE COURT:  Is there any objection to the

1  admission of the second Anderson declaration?

2       (No verbal response)

3            THE COURT:  I hear none.  It's admitted without

4  objection.

5       (Declaration of Carl Anderson, admitted into evidence)

6            MR. O'NEILL:  Great.  Thank you.

7            Also, we'd like to move the declaration of J.W.

8  Song into evidence.  That is docket number 12.  That is the

9  voting declaration.

10            THE COURT:  Any objection?

11       (No verbal response)

12            THE COURT:  I hear none.  The Song declaration is

13  admitted without objection.

14       (Declaration of Jung W. Song, admitted into evidence)

15            MR. O'NEILL:  Thank you, Your Honor.

16            We'd also ask that the court take judicial notice

17  of the various affidavits of service and notices that have

18  been filed on the docket.  They're all listed in the agenda.

19  I can list them out by docket number if Your Honor would

20  like.

21            THE COURT:  If they're limited to what's in teh

22  agenda that's not necessary.

23            I will ask if there's any objection to proceeding

24  in that manner.

25       (No verbal response)

1    THE COURT:  I hear none.  So ordered.

2    MR. O'NEILL:  Thank you, Your Honor.

3    Finally, as I noted, we have Mr. Patton in court,

4  the future's representative.  Unless Your Honor has any more

5  questions for me I will let Mr. Harron approach to enter his

6  declaration.

7    THE COURT:  All right.

8    MR. HARRON:  Good afternoon, Judge Carey.  May I

9  please the court; for the record Ed Harron from Young Conaway

10 Stargatt & Taylor.  I am here on behalf of James Patton, the

11 future claimants' representative.

12    I'd like to make a few introductions if I may.

13 Also at counsel table is Ms. Zieg from Young Conaway.

14    MS. ZIEG:  Good afternoon, Your Honor.

15    MR. HARRON:  Mr. Kochenash who is a newer lawyer

16 at Young Conaway.  Ms. Brockman who is with Ankura, the

17 consultant who assisted us with things like the payment

18 percentage.  And to the extent the court has questions we

19 wanted to make sure she was available.

20    By way of housekeeping, Your Honor, I'd note that

21 Mr. Patton submitted a declaration in support of

22 confirmation.  It can be found at docket number 140.  As part

23 of that declaration we incorporated, by reference, the

24 transcript from last week's hearing where Mr. Patton

25 addressed many of his qualifications in his due diligence.

1     If I may, I'd like to move that declaration -- and

2   Mr. Patton, of course, is here for cross examination.  I'd

3   like to move that into evidence along with the March 8th

4   transcript.

5          THE COURT:  Is there any objection?

6      (No verbal response)

7          THE COURT:  All right. The declaration is at 140

8   and the transcript is at docket 126.  They are admitted

9   without objection.

10         (Declaration of James Patton, admitted into evidence)

11         (Transcript of March 8th, admitted into evidence)

12         MR. HARRON:  Your Honor, if I could, I'd like to

13  make a, kind of before I do so, brief proffer of Mr. Patton

14  solely in respect of the Fireman's Fund settlement which we

15  recently negotiated.  It was not addressed in his

16  declaration.

17         THE COURT:  Proceed.

18         MR. HARRON:  Your Honor, if Mr. Patton were called

19  to testify he would testify as follows.  Maremont and

20  Fireman's Fund were parties to two insurance policies

21  historically.  Those policies provided coverage for asbestos

22  personal injury claims.  Prior to the bankruptcy case the

23  Fireman's Fund and Maremont had entered into a coverage and

24  place agreement which provided a mechanism to exhaust the

25  remaining indemnity limits and allocated defense costs

1  largely outside of the limits and charged a portion of the

2  defense to the indemnity limits.  The parties had conducted

3  themselves in good faith under that coverage and place

4  agreement for some time up to the petition date.

5        When we filed, Your Honor, the debtor along with

6  the future claimants' rep, with the participation of the

7  committee, reached out to Fireman's Fund and sought to reach

8  a resolution of the coverage and place agreement, and

9  Fireman's Fund's larger obligations under their insurance

10 policies.  We entered into good faith negotiations which

11 resulted in the settlement that's before Your Honor, which

12 has been incorporated into the plan.

13       Your Honor, the negotiations largely focused on to

14 what extent Fireman's Fund should contribute to the trust for

15 defense costs.  The remaining indemnity limits were

16 approximately $7 million dollars.  There was a good faith

17 dispute about the extent to which trust administrative costs

18 would qualify as defense costs under either the policy

19 language or the language of the coverage and place agreement.

20 Also, the coverage and place agreement was silent on the

21 extent to which Fireman's Fund would be entitled to 524(g)

22 should the debtors enter into a Chapter 11 proceeding.

23       To resolve both of those issues we agreed on a

24 settlement which provides for a total of $8 million dollars

25 of funding which will be paid on the effective date of a

1  plan, and for which Fireman's Fund and its affiliated parties

2  will receive a full release from Maremont and also be

3  entitled to the protections of a protected party under the

4  plan, which will allow them to be included in the channeling

5  injunction that we're seeking from this court.

6          Your Honor, I believe that would conclude Mr.

7  Patton's testimony.  It's safe to say that Mr. Patton is of

8  the view that the settlement is fair and reasonable, and

9  furthers the best interest of future claimants.

10          Ms. Davis is in the courtroom on behalf of

11  Fireman's Fund should Your Honor have any questions.

12          THE COURT:  All right.  Let me ask, does anyone

13  wish to cross-examine Mr. Patton?

14      (No verbal response)

15          THE COURT:  I hear no response.

16          MR. HARRON:  Thank you, Your Honor.

17          Your Honor, I'd like to address the court's

18  concerns to the extent possible, but we're operating in a bit

19  of a vacuum because it's not clear to us on this side of the

20  bench exactly which of the Trustee's objections have

21  resignated with Your Honor.  If Your Honor would like to hear

22  from Mr. Patton potentially on the issue of what safeguards

23  the trust has in place to address inconsistent claiming

24  across trusts or other issues we're happy to put Mr. Patton

25  on the stand to attempt to address those issues.

1    THE COURT:  Well, let's do this; I'm assuming that

2  there is no further evidence to be introduced by any party at

3  this point.

4      (No verbal response)

5      THE COURT:  Okay.  So, let me follow along the

6  U.S. Trustee's objection and tell you what my thoughts were.

7  And, of course, they do focus around the trust distribution

8  procedures, and specifically with respect to the issue of

9  transparency.  I have a couple things.

10     One, while I understand why the claims submissions

11 should be, at least initially, confidential, why shouldn't

12 the, as a condition of brining a claim, claimants should do

13 two things: (1) disclose what other claims they've made

14 against other trusts or made a claim and withdrawn it; and

15 (2) offer a release in favor of the trust to share their

16 claim information with other trusts.  What is so bad about

17 that?

18     MR. HARRON:  Well, Your Honor, I have a view on

19 those issues, but it may be more productive if I take a

20 moment and consult with my client and the committee --

21     THE COURT:  Certainly.

22     MR. HARRON:  -- that way I can address them more

23 efficiently.

24     THE COURT:  Okay.

25     MR. HARRON:  Would it make sense to have a fifteen

1 | minute recess?

2 |       THE COURT:  Well, let's go through the rest of my

3 | comments.

4 |       MR. HARRON:  Okay.

5 |       THE COURT:  Why is it important that issues about

6 | who should see what would be resolved only in the Bankruptcy

7 | Court, a Delaware State Court or the United States District

8 | Court for the District of Delaware?  Is that largely a cost-

9 | savings device or are there other reasons for it?

10 |       MR. HARRON:  I can answer that one, Your Honor.

11 | It is a cost-savings device.  It's contemplated that this

12 | will be a Delaware trust.  There are many Delaware 524(g)

13 | trusts and we believe it's most efficient for the trusts to

14 | have these disputes heard in Delaware to the extent possible.

15 | Also, the District Court in Delaware now has some experience

16 | addressing these subpoenas because we've done it before.

17 |       So, that provision is entirely one of efficiency.

18 |       THE COURT:  Okay.  I don't necessarily have so

19 | much of an issue with the Section 5.7(b)(3) provision which

20 | talks about failure to identify debtors' product lines in the

21 | claimants' underlying tort action or to other bankruptcy

22 | trusts.  It says,

23 |       "Does not preclude the claimant from recovering

24 |       from the asbestos trust provided that claimant,

25 |       otherwise, satisfies the medical and exposure

1        requirements."

2            Now, consistent with what I said I'd like to see

3    that disclosure, but if the trustee decides that a failure to

4    disclose isn't relevant and it's the medical and exposure

5    requirements are otherwise satisfied it seems to me that

6    ought to be enough.

7            So, what is the purpose of Section 5.7(a)(2) which

8    says,

9            "Claimants who, otherwise, meet the requirements

10           of the TDP for payment of an asbestos claim shall

11           be paid irrespective of the results in any

12           litigation at any time between the claimant and

13           any other defendant in the tort system."

14           There is a proviso that says,

15           "However, any relevant evidence submitted in the

16           proceeding in the tort system other than any

17           findings of fact, verdict or judgment involving

18           another defendant may be introduced by either the

19           claimant or the asbestos trust."

20           Again, is that, in effect, a cost-saving device so

21   that the trustee is relieved from having to sort through what

22   another court said, and what it meant and what effect it

23   should have or is there some other reason for it?

24           MR. HARRON:  There are at least two reasons, Your

25   Honor.  One is exactly that.  This trust will have relatively

1  modest pay-outs.

2         THE COURT:  And it's a small trust.

3         MR. HARRON:  In negotiating the payment percentage

4  we assumed 15 million of funding for the life of the trust.

5  We have to be efficient to make that work.  So, it's to

6  alleviate the burden on the trust from evaluating that

7  information and in recognition of the fact that the payment

8  to be received by the claimant is only for Maremont's share

9  based on what it was paying, you know, in the tort system to

10  settle its several share of liability and, of course, subject

11  to the payment percentage.  So, it furthers the policy views

12  of a settlement trust with limited administrative funding.

13         As you may note from the discussion we just had

14  about the Fireman's Fund policy the trust is largely trusted

15  with indemnity dollars.  So, every dollar, more or less, that

16  is spent fighting and litigating claims is coming out of

17  money that's designed to pay claims.  So, there is a

18  balancing inherent in the process and the TDP provisions

19  actually say that the trust is to be mindful of how much

20  money is spent litigating claims versus paying sick people.

21  Here we designed the trust to pay the sickest of the

22  claimants 90 percent of the dollars.

23         So, that is one of the reasons, Your Honor, its

24  efficiency.  The other is just a recognition of the nature of

25  asbestos litigation.  We touched on this a little bit last

1  week or maybe we didn't.  The cases run together a bit, Your

2  Honor.  These claimants --

3         THE COURT:  Yeah, I know that feeling.

4     (Laughter)

5         MR. HARRON:  These exposures largely occurred

6  thirty and forty years ago.  The claimants are elderly.  In

7  this case you are going to ask a claimant to identify whose

8  brake pad it used when he or she changed their brakes forty

9  years ago or more relevant is whose brakes were you cleaning

10 off the rotor.  It's just -- the proof problem is acute for

11 an asbestos trust; particularly with a product like this.

12 It's very difficult for a claimant to identify the product.

13        Memories and evidence evolves over time.  So, if

14 someone worked at a site where they were installing Owens

15 Corning insulation for twenty years and they filed a claim

16 with Owens Corning, and they said, well, I got sick from

17 Owens Corning it may not be till a few years later that they

18 see a package that has the trade address for Maremont Brakes

19 that they realize, hey, I also changed Maremont brakes.  Who

20 is to say whether or not that memory is accurate and how much

21 of the trust funds should we spend investigating it.

22        That is what happens in the litigation, the file

23 evolves over time, things jog peoples' memories and/or

24 depositions.  They learn of other products to which they were

25 exposed that they may not have known when they were in the

1 prior litigation or sometimes they will be involved in

2 litigation and they will know they worked around pipes, but

3 there is no way for the claimant to know whose insulation was

4 surrounding those pipes.  So --

5       THE COURT:  I also have a feeling that the

6 claimants have a lot of help from lawyers in that respect.

7       MR. HARRON:  Well, I think it's fair to suspect,

8 Your Honor, that the plaintiffs' lawyers don't build their

9 cases in a way to aid the defendants.  The defendants need to

10 ask the right questions when they take the depositions and

11 serve their discovery.

12       THE COURT:  All right.  So, let me just say this;

13 I don't have a problem with the provision that permits a

14 claimant to with draw and then claim again.  That doesn't

15 trouble me, but, again, I do think that when claimants' file

16 they ought to be able to say where else they filed or where

17 they filed and withdrawn claims.

18       With respect to the audit provision I'm a little

19 bit -- well, I will put it this way, the submissions

20 conflict.  The TDP provides that the trust may conduct

21 audits, but the debtor, I think, argued -- the committee

22 argued that it says it must conduct audits; it may, but

23 doesn't have to use a third-party auditor.  So, are the

24 audits mandatory or aren't they?

25       MR. HARRON:  The audits are mandatory.

1              THE COURT: Okay. But on a selected basis, right?

2              MR. HARRON: Random. This trust provides and we

3    expect it will implement two types of audits; random and

4    targeted. It's set forth in the TDP. Random, I think, was

5    the subject of Your Honor's question and the TDP requires for

6    mandatory random audits of both the exposure and the medical

7    evidence.

8              THE COURT: Okay. And that troubled me -- that

9    doesn't trouble me either. So, those were the things that

10   struck me as I looked through the U.S. Trustee's objection

11   and the committee's response to it, as well as Mr. Patton's

12   declaration.

13             So, if you'd like a fifteen minute break now you

14   may have it.

15             MR. HARRON: We would, Your Honor. Thank you.

16             THE COURT: All right. Stand in recess.

17        (Recess taken at 1:32 p.m.)

18        (Proceedings resumed at 1:49 p.m.)

19        (Call to Order of the Court)

20             MR. HARRON: Thank you for that break, Your Honor.

21   We gave the parties some time to consider your questions.

22             Before getting to the headline I'd like to provide

23   a little more context. First, Your Honor, my client wanted

24   to emphasize to the court how seriously we take the issues of

25   fraud, the allegations of fraud, the risk of fraud, but,

1 again --

2        THE COURT: Well, if I didn't think you did I

3 wouldn't have approved Mr. Patton's application in the first

4 place.

5        MR. HARRON: Understood, Your Honor. And it's our

6 view that this trust and other trusts are effective at

7 policing fraud through the audit procedures. All the trusts

8 with which we're involved do implement audits. It is that

9 cost benefit analysis that comes into play when you consider

10 how much information need be provided to the trust and what

11 the trust is going to do wiht it.

12        Mr. O'Neill would confirm that in just the five

13 years leading up to this case the company paid about $43

14 million dollars to address its asbestos liabilities.

15        THE COURT: That was in the papers, I think.

16        MR. HARRON: So, we have structured a trust to go

17 out over the next thirty years using $58 million dollars. Of

18 that $43 million dollars about 32 million was spent on

19 defense. So, 75 percent of every dollar the company spent

20 went to litigate and fight claims and 25 percent went to

21 claimants.

22        So, the trust flips the equation. It's an

23 administrative settlement and I will represent to the court

24 that the trust admin budget for the entire thirty years is

25 $15 million dollars of a corpus just under 60. So, here

1  we're spending 25 percent to administer the trust and 75

2  percent goes to paying sick people.  Again, this trust is

3  structured so 90 percent of the dollars goes to mesothelioma

4  victims.  It's undisputed that asbestos is the only known

5  cause of mesothelioma.

6          Your Honor, if the trust were required to obtain

7  the full exposure history from every claimant it wouldn't be

8  able to afford to process that information and the trustee

9  would be in a position where they feel duty bound to do

10  something with it.

11          THE COURT:  Well, let me explore that for a

12  moment.  A claimant files a claim, but of what does the claim

13  consist?

14          MR. HARRON:  I didn't hear Your Honor.

15          THE COURT:  Of what does a claim consist?

16          MR. HARRON:  There is a claim form that can be

17  found on the internet.  It requires you to generally identify

18  your work history and it requires you to provide evidence of

19  your exposure to Maremont's products.  Generally,

20  particularly in the case of a product that's used at home

21  they would satisfy that exposure through an affidavit.

22  They'd say that I changed my brakes over the last thirty

23  years and I recall going to Sears to pick up Grizzly brakes

24  and I remember seeing the packaging.

25          This trust also pays for occupational claims.  In

1  that case the affidavit would say I worked at a garage for

2  twenty years changing brakes and Grizzly was among the brakes

3  that I used.  They also provide medical evidence usually in

4  the form of a diagnosis and maybe a scan that shows a growth

5  of mesothelioma in linings of -- I think it appears in the

6  linings of the heart or the stomach.

7        THE COURT:  Okay.  So, if a claimant has filed a

8  claim in other asbestos trusts what is the problem with

9  requiring that they give copies of that to this trust as

10 well?  It doesn't require anything more for the trust to do,

11 neither does the requirement that a release be provided.

12       MR. HARRON:  What does Your Honor contemplate the

13 trust would do with that information?

14       THE COURT:  Nothing unless someone asked for it.

15 You see the framework that I think is appropriate under these

16 circumstances is get that information, and if someone in the

17 future shows a right to it, with whatever other protections

18 you've built in, then they have a right to it, but at least

19 it's available.  That is the point.

20       MR. HARRON:  Your Honor, in the --

21       THE COURT:  Let me ask it another way.

22       MR. HARRON:  Yeah.

23       THE COURT:  Would you like a plan confirmed today?

24 Then you got to get to the headline that I want to hear?

25       MR. HARRON:  Okay.  Well, the headline is that in

1 connection with audit we would require, as we normally do,

2 that claimants who are audited provide their full exposure

3 history including their tort system allegations and any

4 filings they made with other trusts.

5 　　　　THE COURT:  I'll give you another fifteen minutes

6 if you need it, but, otherwise, we're done today.

7 　　　　MR. HARRON:  Your Honor, if I may --

8 　　　　THE COURT:  Do you understand what a ruling is,

9 Mr. Harron?  This is only the second time before me, so maybe

10 you didn't understand that.  It's coming and given the U.S.

11 Trustee's objections I think I'm being relatively gentle.

12 　　　　MR. HARRON:  I will take the court's lead and

13 accept the offer of another break.  Thank you.

14 　　　　THE COURT:  Very well.  Stand in recess.

15 　　　　(Recess at 1:55 p.m.)

16 　　(Proceedings resume at 2:10 p.m.)

17 　　　　THE COURT OFFICER:  All rise.

18 　　　　MS. RAMSEY:  Good afternoon, Your Honor.  For the

19 record, Natalie Ramsey, Robinson & Cole for the official

20 committee of asbestos claimants.

21 　　　　Your Honor, we would like to take ten minutes,

22 maybe of Your Honor's time, and explain why we think that a

23 provision that would have the trust collect all other trust

24 information is problematic for this trust, in particular.

25 　　　　THE COURT:  What we're going to do since you

1  haven't convinced me that I'm wrong, I'll hear argument from

2  everyone, then I'm going to rule.  Let me start with the

3  debtor.  It's the debtors' plan, then I'll hear from everyone

4  else.

5            MS. RAMSEY:  Well, Your Honor -- okay.  Will do.

6            MR. O'NEILL:  Your Honor, I walked us through much

7  of the background.  I think Your Honor has it all.  But I do

8  want to just make a few points, from the debtors' point of

9  view on the objection which, among other things, falls into

10  question the good faith of the plan has been proposed.

11            Your Honor, good faith is a factual inquiry.  We

12  think that the record is clear here, that there is a process.

13  It was a good faith negotiation.  The parties all came to

14  agreement on a consensual plan.

15            Again, this is a settlement. It's not perfect from

16  everybody's perspective, but it's a consensual plan that the

17  voting creditors voted in favor of.

18            The U.S. Trustee's objection identifies five or

19  six issues in the TDP that disagrees with and shoehorns those

20  disagreements into a good faith objection.  We don't think

21  that that's appropriate.

22            Again, there's been no showing as Your Honor

23  identified last week that there's been any bad faith, that

24  there's been any untoward behavior, that there's been

25  inequitable conduct.

1          The cases cited by the U.S. Trustee are in

2   opposite.  There's no precedential case here that a court has

3   found that a similar plan has been proposed in bad faith.

4   With that, I'll just jump into the various provisions.

5          Many of the kind of arguments that I had have been

6   addressed already but, again, confidentiality.  As we were

7   reviewing the TDP's, from the debtors' perspective, we

8   understood the trust interest in protecting the identifiable

9   information of the individual claimants.

10          Mr. Patton's persuasive that these claimants just

11  don't want their information available to other parties for

12  various reasons.  We think that this confi provision --

13          THE COURT:  Let me talk about that for a minute

14  because there's a discussion in the submissions that the

15  trustee says, look.  If you filed a tort claim that would be

16  public information.  The response to that is well, we're

17  really setting up a private trust and that's different.

18          We're in court.  It's different than having just a

19  setup of a private trust.  You're acting under the aids of

20  the federal bankruptcy court.  So, I guess, at best, you'd

21  say it's a hybrid.  You may proceed.

22          MR. O'NEILL:  Understood, Your Honor.  I think

23  that the argument is that this is actually a settlement, not

24  just filing a claim in the tort system. And in the tort

25  system, a settlement would be subject to confidentiality

1  provisions.  And that's what is trying to be replicated here

2  with the trust.

3         THE COURT:  Well, but first the claim would be

4  filed publicly, even if the settlement might be kept

5  confidential.

6         MR. O'NEILL:  And I don't want to quibble too much

7  with Your Honor, but in certain instances there are

8  settlements and other warehouse deals where the claims

9  actually never become public.  The company settled them

10 without the parties having to actually file a complaint and

11 become public.

12        THE COURT:  Right, so then you don't ask for court

13 blessing, right.  But once you're in the judicial process,

14 you're in the judicial process.

15        MR. O'NEILL:  Your Honor, just to address a couple

16 of the points that the U.S. Trustee made with respect to the

17 confidentiality.  And to note just because Your Honor seized

18 on it a bit in your opening statement.

19        Garlock TDP, exact same confidentiality provision

20 and, you know, that was a case where there was actual

21 evidence of some fraud among some of the claimants in that

22 case.  This provision is slightly different than some that

23 are out there but that's because it's more comprehensive.  It

24 adds a provision about sharing information with insurers,

25 where necessary.

1       There's also a cost savings provision when there's

2  a bulk discovery request so that the TAC and the FCR can

3  potentially address without having the notice provisions.

4  This just iterates some of what Mr. Harron said.  But, again,

5  as we understand it, these are all cost-saving provisions.

6       Again, from the debtors' perspective when we were

7  being a party to these conversations and negotiations about

8  the TP, our goal, of course, was to protect the interest of

9  our creditors.  And, frankly, you know, get away from the

10 historical precedent that Mr. Harron described as paying 75,

11 85 percent of the dollars to the defense lawyers rather the

12 actual claimants.

13      Procedures that allow that to happen are very

14 attractive to the debtors.  And we felt it was completely

15 good faith to allow those provisions or, you know, to agree

16 to negotiate and accept those provisions given that result.

17      Again, I'm not sure what more I can add about

18 exposure to other products.  The bottom line is the trust is

19 not a proxy for the tort system.  It doesn't defend these

20 claims. That's not its purpose.  Obtaining this information

21 is burdensome.

22      I think what you'll hear from Ms. Ramsey and Mr.

23 Harron, to the extent they argue more, is that there are

24 exponential costs associated with gathering this information,

25 not just acting on it, gathering it.  And then what are the

1  outgrowth, what are the results of gathering that

2  information?  Becoming a target of discovery and subpoenas

3  and having to deal with those.

4        I won't get into the withdrawal and defraud

5  provisions, Your Honor.  Again, this was something on the

6  debtors' side.  We asked the questions.  We wanted to

7  understand it, and the answers, frankly, made sense to us.

8        Cost savings, not having a purpose of the trust be

9  the ding claimants, frankly.  So, you know, and again a lot

10  of the arguments here -- how do I say this.  They're based on

11  this concept of the boogieman, dishonest lawyer, dishonest

12  plaintiff.

13        Frankly, this is an example of an objection that

14  we just didn't understand from that perspective. Again, if

15  somebody is being deposed, if an attorney is asked a

16  question, you can just ask if they ever filed a claim with a

17  trust.  Full stop.  If they then withdrawn it or told it,

18  they still have to answer that question.  If they lie, then

19  they lie.  That's not, again, something from our perspective

20  with this trust that we can control.  So, again, we thought

21  these provisions made sense.

22        The mandatory audit provision, Your Honor I think

23  understood at the end after Mr. Harron's presentation. But to

24  the extent that our paper was unclear, we apologize.  The

25  language is shall.  It's a mandatory provision.  Unlike

1  Garlock, they can actually hire third parties to really clamp

2  down and do these audits.

3       Our understanding, again, these are very

4  expensive.  Yes, you want to weed out corruption.  You want

5  to weed out fraud.  You want the dollars to go to claimants

6  that are legitimate claimants with legitimate claims.  But

7  the cost of doing that, then you potentially deprive some

8  future of getting a recovery at all.

9       And we've talked, Your Honor, a little bit, but I

10 think it bears repeating in the context of the audit

11 provision and what I just said. It's a very small trust.

12 Fifteen million dollars to administer over thirty years.  If

13 that's $30 million dollars because of ramping up various

14 procedures, collecting additional information, storing it,

15 analyzing it, then the recovery percentage goes down

16 dramatically.  That's just the reality here.

17      You know, again, release information.  As we

18 understand it, these are several payments.  This simply isn't

19 applicable to what the trust is doing.  They aren't

20 interested in what the claimant has done with respect to

21 other trusts.  And that's with the exception of the

22 extraordinary claims or claimants that go to arbitration.

23      Finally, we didn't discuss attorney's fees.  I

24 don't think that that's an issue for the court.  You know,

25 obviously, we view this as an intrusion on claimant's ability

1  --

2          THE COURT:  I don't have an issue with that.

3          MR. O'NEILL:  Very good.

4          So, with that, Your Honor, I'll move onto the

5  substantially similar objection which we view as slightly

6  different from the good faith objection.

7          Obviously, we think the plan was proposed in good

8  faith.  All we've done is propose a plan with provisions that

9  have been approved in many many other cases, including after

10 Garlock.  So, we blanch at the idea that this plan wasn't

11 proposed in good faith.

12         With respect to substantially similar treatment, I

13 think FCR counsel and ACC counsel will be in a better

14 position to talk about all the anti-fraud provisions in these

15 documents.  But, suffice to say, that all of the terms and

16 mechanisms in the TDP apply equally to current and future

17 claimants.  We believe it satisfies 524(g) to big (B)(ii)(v)

18 which requires that.

19         Just so sum up, Your Honor, you know, 524(g)

20 specialty provision created by Congress doesn't require any

21 of the requirements that the trustee is trying -- the U.S.

22 Trustee is trying to impose upon this trust. Again, I just

23 said it, but I'll repeat it.  We haven't seen provisions like

24 the U.S. Trustee is suggesting in TDP's before.

25         From our perspective that created a viable and an

1   accepted TDP that would work in conjunction with our plan,

2   specially given the small corpus, the small size of the

3   trust.

4          We haven't heard any evidence today, Your Honor,

5   that, frankly, any of the proposed provisions from the U.S.

6   Trustee would create more fraud, create any fraud, change the

7   amount of fraud from a rounding error to something greater.

8   We haven't heard what disclosure or releases, how that would

9   practically impact the trust.

10         But we do know from the past and from these

11  provisions, operating in various trusts, that they do help

12  the trust save money.  And that's a goal that is significant

13  in this case, given the size of the trust.

14         Your Honor, I won't go through our affirmative

15  plan argument, unless Your Honor would like to discuss any of

16  that.

17         THE COURT:  I've read the submissions.

18         MR. O'NEILL:  Very good.  And I was going to say

19  based on the length of our brief, we addressed everything and

20  more so.  So, I'm glad to hear that.

21         So, in closing, Your Honor, I just say this plan,

22  we believe, is confirmable in every respect and we understand

23  and hear Your Honor's concern with some of the TDP

24  provisions, but we ask that Your Honor confirm it, not hold

25  it hostage or otherwise require things that, you know, our

1  colleagues across the aisle are unwilling to do for the

2  debtors' sake and for the creditor's sake.

3       Unless Your Honor has any questions, I'll cede the

4  podium to the next.

5       THE COURT:  No.  I'll hear next from the trustee.

6       MR. O'NEILL:  Okay.

7       MR. SCHEPACARTER:  Thank you, Your Honor. Richard

8  Schepacarter for the United States Trustee.

9       Let me just address some of the specific issues

10  that have been raised, some of the specific objections.

11       With respect to the Section 6.5 of the Trust

12  Distribution Procedures, it basically makes that all

13  submissions to the trust, by the claimant, are going to be

14  treated as confidential as part of settlement discussions,

15  subject to all applicable privileges, and that the trust is

16  going to protect those submissions.

17       THE COURT:  I don't have a problem with that part.

18       MR. SCHEPACARTER:  Okay.  Let me skip to another

19  section.

20       THE COURT:  And yes, they make it hard to get at

21  the information.  I agree.

22       MR. SCHEPACARTER:  Understood.  That same section

23  also, the TDP also appears, designed to impede future

24  discovery of trust claims even in cases in which the trust is

25  not a party.

1  I think what they basically want to do is -- with

2 respect to the releases -- well, let's get into the releases

3 because I know Your Honor is interested in that.

4  Having the claimants authorized to release

5 information to the trust can only assist the trust in its

6 efforts of claims administration with really no burden put

7 upon the claimants.  They would have to submit this

8 information in any regard.

9  In fact, the provision such as that can only

10 protect the trust especially the unknown future claimants and

11 can allow the trust to verify information provided in

12 connection with claims and assist with audits and to act as

13 another protection and deterrent with respect to fraud.

14  With respect to the audits, I think our objection

15 with respect to the audits hammers upon the fact that the

16 audits are not -- although, they're mandatory, they're sort

17 of an internal mandatory audit and there's no mandatory

18 requirement that the audits be made by independent third

19 parties, which are more reliable, of course, because they're

20 audits of the people who are actually doing the internal

21 auditing as a third party who could verify the information,

22 that is --

23  THE COURT:  Okay.  So, let me just give you my

24 view on that.  I am sensitive to the point that I don't think

25 is in dispute here is that there's a small trust involved.

1   And that it's legitimate aim of all the stakeholders to make

2   administering the trust as cost effective as possible.  And I

3   do, as I said earlier, have confidence that the FCR and those

4   involved with administering the trust will act appropriately.

5   And should there be something they think is worthy of audit,

6   that they can undertake that on their own.  And, if

7   necessary, at their option bring in a third party.  But under

8   the circumstances, I'm not inclined to require that a third

9   party be brought in.

10          MR. SCHEPACARTER:  Okay.  I understand, Your

11  Honor.

12          With respect to the sort of the information that I

13  think that Your Honor has been discussing, basically the

14  other information of other claims made with respect to other

15  trusts, not having that information sort of belies the

16  ability of the trust to verify that information from other

17  trusts.

18          For example, if someone who may be changing their

19  breaks may have worked at shipyard or something along those

20  lines where we know that they've been exposed to ample

21  asbestos and that they've made submissions to other trusts.

22  I think that that information is important.  And that's one

23  of the reasons why we made or objection is to get away from

24  the Garlock problem which is that the information is not

25  readily available to all the other parties.

1        THE COURT:  Well, listen, I understand, at least,

2   one of the concerns, and that is that well if they have the

3   information, which I think they should, if they have the

4   information, number one, does that create an obligation, a

5   duty, to do something about it?

6        I don't think that the trust should be required,

7   okay, to follow up on the information if in the trustee's

8   discretion there's no need to.  And, secondly, again I'll

9   repeat, I think the information ought to be available.  But

10  under the circumstances that are proposed in the provisions,

11  and it will be left to a later day whether anyone's able to

12  make a case for a legitimate need to get it.  And I

13  understand there may be some costs involved with that too.

14       MR. SCHEPACARTER:  But I think it's important to

15  note that these trusts are in the framework of information

16  which is not readily available but, at the same time, it's in

17  the framework that was the issue that was developed,

18  acknowledged, recognized in the Garlock case which is that

19  there are some gamesmanship that's done with respect to the

20  claims.

21       And to have the transparency with respect to the

22  trust so that the information is transparent and that, for

23  example, I know that there's an issue with respect to

24  withdraw of claims and deferral of claims.  Garlock says

25  basically if you withdrew a claim, like a baseball game once

1  you're out, you're out.  You can defer the claim, but I think

2  that that's --

3          THE COURT:  Well, we're not into a baseball park,

4  Mr. Schepacarter.

5          MR. SCHEPACARTER:  Couple of weeks.

6          But I think it's incumbent upon he trust to be

7  able to be transparent enough to get away from the issue of

8  that those claimants that are going to be paid now will not -

9  - so that the trust ensures that -- and you'll hear other

10 provisions -- but I think it's important that with respect to

11 the objections that our office has set forth in the written

12 submissions, that information be made not hidden, so to

13 speak, in the settlement that it is able to be able to be

14 assessed by the trust, as well as -- so that those claimants

15 that come in will be giving the right information so that

16 when the future claimants that come along, who we don't even

17 know who they are, will be protected.

18         I mean this is -- there's no question that this is

19 a limited small trust and everybody has acknowledged that.

20 So, it's even more incumbent upon the parties to protect

21 those claimants if this is a thirty year trust that are

22 twenty years down the road that when those claimants come in

23 that there are sufficient funds, that the funds haven't been

24 depleted by the other parties because of the inability of the

25 trust for cost-cutting measures they have decided to sort of

1  take some of these claims without really being able to know

2  exactly what the other information is.

3        THE COURT:  Well, but you understand the argument

4  is, look if we took the time to do that, it just would defeat

5  the whole purpose of the trust to get as much as we can to

6  the claimants.

7        MR. SCHEPACARTER:  And I think that that's, to a

8  large extent, everybody's goal is to make sure that all the

9  claimants get the money.  But there's all the claimants --

10  everybody's in the game for the thirty years.  It's not just

11  the people in the beginning of the game that get everything.

12  And then when the people at the end of the line come in, you

13  know, there's nothing left.

14        And I think that, to address another issue before

15  I forget.  With respect to the confidentiality, I think that

16  there could be safeguards, and we mention in our papers.  But

17  there could be safeguards not unlike with Judge Stark alluded

18  to or ordered in his Garlock sealing product opinion a few

19  yeas ago that basically said, you know, we can protect the

20  personal information of claimants so that.

21        I know there's been, at least, argument or, at

22  least, allusions that have been to the point that we don't

23  want these persons, these claimant's information out there.

24  Their personal information, yes.  When they file a tort

25  claim, that complaint is filed and all that information is

1  public. There may be some personal information and there's

2  safeguards that can be enacted to protect all that.

3          THE COURT: So, there's no misunderstanding. I'm

4  not suggesting the information that I think should be

5  collected be publicly available.

6          MR. SCHEPACARTER: Understood. Understood.

7          So, did Your Honor want to hear anything more or?

8          THE COURT: Only if you think I should.

9          MR. SCHEPACARTER: Well, I don't know. I have a

10 lot to say.

11         THE COURT: I read your submission. I think you

12 might have gathered that by now.

13         MR. SCHEPACARTER: Yeah. I mean I can't sort of -

14 - I know the party's kind of want to make, you know, the

15 Garlock opinion sort of an outlier to a certain extent, but

16 it's sort of one off of some sort. But I think it's

17 important to notice that in the Garlock case, there were 15

18 cases and the make a point that only 15 cases. But out of

19 the 15 that were assessed, it was a 100 percent that they

20 found fraud.

21         THE COURT: Look, the way I -- here's how I weigh

22 that information or evidence, if you want to call it evidence

23 and that is, it demonstrates that something can happen.

24         MR. SCHEPACARTER: Well, I would say that I mean

25 my argument would be and my point would be that it has

1  happened and it happens a lot; at least, <u>Garlock</u> said in the

2  15 cases that they found, it happened in all of those cases.

3       And there was other evidence and testimony in that

4  case that basically there were other incidences that were

5  testified to or, at least, alluded to by counsel that talked

6  about some of the defense counsel that talked about other

7  instances of like 161 cases where they paid, you know, a

8  quarter of a million dollars on some of this limited

9  discovery exposure.

10      So, I think that that's, again, I think it's -- I

11  know everybody says they kind of harp on the fact that we say

12  it's a game changer, but it is.  It changed the landscape of

13  the asbestos litigation trust and as a host of bankruptcy

14  cases.

15      Let me see if there's anything else.

16      I think Your Honor has basically talked about the

17  confidentiality provisions and the withdrawal and deferral of

18  claims I think Your Honor has already indicated that.  So if

19  Your Honor has anymore questions after you hear from the

20  trust and, I guess, the future claims representative counsel,

21  I'm happy to answer those questions.

22          THE COURT:  All right, thank you.

23          MR. SCHEPACARTER:  Thank you, Your Honor.

24          THE COURT:  I'll hear from the committee.

25          MS. RAMSEY:  Thank you, Your Honor.  Again,

1  Natalie Ramsey for the official committee of asbestos

2  claimants.

3          Your Honor, I'm trying to address specifically

4  what the court has asked and suggested and not engage in a

5  broader argument because I think that the court knows exactly

6  where our position is.

7          For the record, I think the court is in line with

8  the committee in terms of the <u>Garlock</u> decision.  I think that

9  our position is that it illustrates the possibility that

10  there could be claims paid that should not be paid.  And we

11  acknowledge that that is a potential.

12          We have all kinds of safeguards in this trust that

13  are designed to avoid that.  The audit is one.  Section

14  5.7(b)(1) which provides for submission and review by the

15  trust, provides specifically that, and I quote:

16              "The asbestos trust can also require submission of

17              other or additional evidence of exposure when it

18              deems necessary."

19          This is a trust that is small, as the court has

20  said.  This is a trust that is 90 percent allocated to

21  occupationally exposed claims and occupational exposure is

22  defined as professional oil mechanics who were allegedly

23  exposed to the debtor product lines while working as

24  professional mechanics in the automotive industry.  It

25  requires a specified length of time for that exposure.

1　　　　　This is a trust that is set up to pay a several

2　liability.  So, this trust is based on what the debtor was

3　paying in the tort system.  It is based on the values that

4　were assigned or based on the values that were being paid in

5　the tort system.  This is primarily a mesothelioma trust.

6　　　　　The only significant value claims are the

7　mesothelioma claims for occupationally exposed.  It's

8　$111,000 for mesothelioma claims that result from Shade Tree

9　exposure, casual exposure.  It's a $12,100 dollar claim.

10　　　　　There's a payment percentage that is established

11　that was hotly negotiated in this case.  And several times

12　threatened the ultimate resolution here.  And that is based

13　on a negotiation between the current claims and the future

14　claims based upon the anticipated number of claims that are

15　going to be paid in the trust.  That payment percentage is

16　set at 29.1 percent.

17　　　　　That payment percentage was ultimately reached by

18　an agreement that the parties would do everything they could

19　to cap administrative costs of this trust at $15 million

20　dollars. This would be an extraordinary savings for this

21　trust over other trusts.

22　　　　　Typically, a trust this size would end up with

23　administrative expenses of $20 million or more.  So, this

24　trust has to operate extremely, efficiently in order to hold

25　that payment percentage.  So, you're looking at a

1  mesothelioma claim who is occupationally exposed receiving

2  something like $31,000 dollars out of this trust as a claim,

3  unless they're able to prove some sort of extraordinary

4  status.  There's a maximum annual payment that is set by the

5  trust, reserve the funds to ensure that there's not a

6  significant run on the trust.

7          What the court has proposed is one way, and we

8  understand what the court is, as I understand it, concerned

9  with is what the trust knows about the claim.  Is there

10 something out there that would affect whether or not the

11 trust paid a claim if it only knew that information.  And,

12 therefore, more information is better.

13         We have two concerns with that.  Number one, it

14 puts the trust and the trustees in a very difficult position

15 if they have that kind of information and somebody doesn't

16 look at it.  Because if somebody comes back later and says

17 you paid this claim and you had the information right there

18 that demonstrated that you shouldn't have paid it, the

19 trustees are in an untenable position.  So, that information,

20 we believe, would have to be reviewed by the trust in the

21 exercise of its fiduciary duty and that's a cost.

22         The other thing that we're concerned about is that

23 by becoming and repository for that information, the trust is

24 going to be responding to multiple claims for that

25 information.  But other defendants in the tort system who are

1  going to be seeking that information for their own purposes

2  and that is going to be another cost.

3          Responding to all of those subpoenas, responding

4  to all of those requests, the legal fees are going to quickly

5  rise.  Those two things threaten the $15 million dollar

6  administered budget that we have tried to set for this trust.

7  And if that were to happen, that requires re-negotiation of

8  the payment percentage, and it drives it down because the

9  costs go up.  And that results in a re-negotiation of the

10  trust and probably a re-solicitation. And that threatens this

11  case.

12          We understand the court's concern.  It is not the

13  intention of this trust to pay any fraudulent claims. And we

14  have done what we can to try to ensure that the particular

15  proof requirements in this, which are pretty specific because

16  there's one line of products really we're paying -- Grizzly

17  Brakes.

18          Now with respect to Shade Tree claims and Sears,

19  you know what Sears sold, there are a lot of individuals who

20  probably worked with those.  Could you have somebody who said

21  I worked as a Shade Tree mechanic and I swear that I was

22  exposed to Grizzly, yes.  Would it matter to us?  Would it

23  matter to this trust or the trust to know that someone also

24  had amphibole exposure?  The answer is no.

25          In the tort system with respect to mesothelioma

1   claims, generally it is accepted that any exposure could have

2   caused the disease.  And so, if this defendant would have had

3   to pay its several share in the tort system, along with the

4   amphibole exposure, probably paying a much greater portion of

5   that claimant's injury, those two defendants would be liable,

6   both of them, to the claimant. And that's what this trust

7   tries to realize.

8         So, while we appreciate the court's concern, we

9   believe that this trust is set up as best as it can given the

10   nature of the product, given the size of the trust to try to

11   maximize payments to the claimants.  And we are concerned

12   that if the trust becomes more like a defendant in the tort

13   system that what you're going to see is the same dynamic, the

14   same proportion of the money that's available going to

15   defense and to claimants.

16         And the analysis that we would argue is if there

17   has to be -- if there are few claims that get paid that

18   shouldn't have been paid, we think that that's going to be a

19   limited number if it happens.  And the costs associated with

20   that is much less than the cost that would be associated with

21   trying to second guess --

22         THE COURT:  And I understand that as a business

23   proposition and, frankly, have no trouble with it.  But

24   you're in a federal bankruptcy court okay.  And there's an

25   overlay here that the terms, as I see them, don't fit with.

1   And I take as true all of the economic considerations that

2   you've just described.  I don't know what to say more than

3   that.

4           MS. RAMSEY:  Thank you, Your Honor.

5           THE COURT:  Mr. Harron, I'll give you the last

6   word, if you like it, but make it short.

7           MR. HARRON:  Thank you again, Your Honor.  I

8   appreciate the court's time.

9           I will endeavor to be brief.  I understand the

10  court's concerns.

11          The system that the court may be envisioning where

12  the trust requires a full exposure history.  As Ms. Ramsey

13  said, it would be expensive, not for the claimants to submit

14  the data but, inevitably, this would cause this trust to have

15  more information from its claimants than any other trust and

16  we'd become the focal point for discovery from every

17  defendant remaining in the tort system.

18          That litigation would be expensive.  We would have

19  to account for in the budget.  It would drive the payment

20  percentage down.  And we'd have to resolicit.  And then we'd

21  be faced with a situation of whether we could even get the

22  affirmative vote of 75 percent of the claimants.

23          At the current payment percentage of 29.1 percent,

24  the most mesothelioma claimant could receive in this trust is

25  about $30,000 dollars.

1      THE COURT:  Okay.  I just heard all this from Ms.
2  Ramsey.  Saying again doesn't make it any better.

3      MR. HARRON:  The point that I'd like to drive
4  home, Your Honor, is that this -- if this plan fails, it will
5  actually be the future claimants who suffer.  The argument
6  from the trustee is that fraud is harming future claimants.
7  Causing this prepack to fail will occasion much more harm on
8  future claimants.

9      This company was paying $9 million dollars a year.
10  So just apply that to the $58 million in funding we have and
11  it's, you know, six or seven more years in the tort system.
12  Most of that money goes to defense costs.  But, keep in mind,
13  $28 million is for Meritor, the parent, for return of a
14  dividend.  It's unclear whether that money would be available
15  to claimants in any event, outside of this case.

16      So in seven years at the current burn rate, even
17  if Meritor contributes the full $28 million they're prepared
18  to contribute here, the pot is empty.  Future claimants
19  recover nothing.

20      Your Honor, the information that you've described
21  is available to the trust in audit.  It serves two purposes.
22  It allows the trust to evaluate the credibility of the claim,
23  but it also serves as a deterrent because claimants know if
24  there's selective fraud, they'll have to provide that
25  information.

 1              I think the court itself has conceded that

 2   gathering all the information from each claimant serves no

 3   purpose for the trust itself.  You said the trustee doesn't

 4   even have to look at it.  And, Your Honor, we'd submit that

 5   the 524(g) trust is not intended by Congress and not intended

 6   by the claimants to serve the interest of parties outside of

 7   the trust; certainly, not intended to serve the interest of

 8   claimants, Your Honor.

 9              THE COURT:  But the barrier that in the procedures

10   you've guilt to access to this information I'm prepared to

11   approve and it's a pretty high wall that you've built.

12              MR. HARRON:  Your Honor, it will be litigated

13   repeatedly.  And we will face subpoenas.  We have experience

14   with that in other trusts, in other bankruptcy cases, and you

15   know, Your Honor, those things become expensive.

16              A couple other things that Your Honor has said

17   that because it's a trust, it's subject to some amount of

18   judicial oversight.

19              I would note --

20              THE COURT:  No, it's not because it's a trust.

21   It's because it's a trust here that's subject to some

22   judicial oversight.

23              You know in the U.S. a bankruptcy proceeding by

24   its nature is judicial.  You can argue whether it shouldn't

25   be, maybe just administrative, but it's judicial.

1    MR. HARRON:  I understand, Your Honor, but when a

2  company is reorganized generally, other than a retention of

3  jurisdiction, the court plays no oversight role.

4    THE COURT:  Happily not.

5    MR. HARRON:  Why should it be that claimants who

6  are prepared to accept less, the current claimants who voted

7  on this are going to get less than the ones in the front of

8  the line in the tort system.  But they're going to have to

9  give up more rights, while the process you envision provides

10  additional rights to defendants in the tort system who

11  haven't contributed a dime to the trust.

12    And Maremont and Fireman's Fund get to go about

13  their business, but claimants have to give more, provide more

14  information to receive less money.  It's a different standard

15  you'd be opposing on this trust than you're imposing on the

16  reorganized company.

17    THE COURT:  Yes, but this is -- the asbestos trust

18  are unique animals under the Bankruptcy Code.

19    MR. HARRON:  Well, there is a specific provision

20  in the Bankruptcy Code, but that provision doesn't address --

21    THE COURT:  It was created for this unique

22  purpose.

23    MR. HARRON:  Correct, Your Honor, and numerous

24  courts have approved these provisions under 524(g) --

25    THE COURT:  I understand.

1        MR. HARRON:  -- including the Third Circuit in

2  Federal Mogul and W.R. Grace.

3        THE COURT:  I understand.

4        MR. HARRON:  The whole trustee argument is based

5  on multiple false premises.  Their argument starts with the

6  fact that fraud causes the payment percentage to go down.

7  They provide no evidence to support that fact.

8        524(g) exists by its terms to account for the fact

9  that the amount of future liability is unknowable.  524(g)

10  requires periodic review of the payment percentage in

11  recognition of the fact that the payment percentage may go

12  down if more claims come in.

13        THE COURT:  Okay.  So, we're treading old ground,

14  at this point.  Look, I commend you for your passion, but I

15  think I've heard all the arguments that are to be made.

16        MR. HARRON:  Your Honor, just one more point and I

17  know I'm risking the court's patience.

18        The Garlock TDP has the same confidentiality

19  provision that we have here, even after hearing about the

20  Garlock litigation which was regarded tort claims not trust

21  claims.

22        Like this TDP for expedited review, Garlock only

23  requires exposure to Garlock products, but this TDP is the

24  same in the Garlock's TDP that if you file an extraordinary

25  claim; in other words, you've primarily been made sick

1  because of Maremont products and that case your entire

2  exposure history is subject to the trust review.

3           So, to that extent, when claimants are seeking to

4  recover for a greater percentage of their injury, the trust

5  gets more information. But, again, Your Honor, we've tried

6  to balance the fraud and the need for a full exposure record

7  against the cost of administration and the fact that

8  requiring the trust to gather all of this data will make it a

9  target of unlimited discovery.

10          Thank you, Your Honor.

11          THE COURT: All right. So, I think sometimes --

12  well, I'll hold that comment. I'll just say this.

13          I'm not prepared to confirm this plan in its

14  present form, and I think I've made that clear already. So,

15  what I'm prepared to do, however, is to bring you back

16  tomorrow, I'll say one o'clock also, to give you the

17  opportunity to try to work with the U.S. Trustee to address

18  the concern that I've been made.

19          So, that I'm clear, I'm prepared to overrule all

20  of the other objections that have been raised by the U.S.

21  Trustee for basically for the reasons the parties on the

22  other side have argued. But you need to address my concern

23  or this plan is not going to get approved.

24          I understand your concerns and I am not unmindful

25  of them, but there we are. Are there any questions?

1              THE COURT:  Are there any questions?

2              MR. O'NEILL:  I think we understand, Your Honor.

3    Could we have five minutes, maybe, to talk about schedules?

4    I gather Your Honor has given us tomorrow at one p.m. for our

5    benefit, but there may be some limitations there and just

6    talk through that for a moment.

7              THE COURT:  Certainly.

8              MR. O'NEILL:  Okay.  Thank you.

9              THE COURT:  All right.  We'll take a brief break.

10         (Recess taken at 2:53 p.m.)

11         (Proceedings resumed at 3:07 p.m.)

12         (Call to Order of the Court)

13             THE COURT:  All right.  For the record we met

14   briefly in Chambers to discuss whether there might be some

15   basis to satisfy my concerns and the parties, I think, are

16   going to get in discussion on that.  They've asked to come

17   back next Tuesday.

18             So, I have a noon time commitment in Philadelphia,

19   but I'll come back for that if necessary.  How about three

20   o'clock next Tuesday, does that suit?

21             ALL:  Yes, Your Honor.

22             THE COURT:  All right.  So, we'll leave the record

23   open till next Tuesday at three.  And, hopefully, at that

24   point the parties will be able to have come to some way of

25   addressing my concerns.

1    Is there anything else we need to talk about

2  before we adjourn?

3    MR. O'NEILL:  No, Your Honor.

4    THE COURT:  Thank you all very much.  That

5  concludes this hearing.  Court will stand adjourned.

6    ALL:  Thank you, Your Honor.

7    THE COURT:  And, Mr. Schepacarter, don't get

8  greedy, okay.

9    (Laughter)

10    (Proceedings concluded at 3:09 p.m.)

11

12

13                    CERTIFICATE

14

15  We certify that the foregoing is a correct transcript from

16  the electronic sound recording of the proceedings in the

17  above-entitled matter.

18

19
   /s/Mary Zajaczkowski                    March 19, 2019
20  Mary Zajaczkowski, CET**D-531

21

22

23

24

25