**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 20-10343 (LSS) |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Jointly Administered |
| Debtors. | **Hearing Date: Feb. 17, 2021 at 10:00 a.m. (ET)**<br>**Objection Deadline: Feb. 5, 2021 at 4:00 p.m. (ET)** |

**INSURERS' REPLY BRIEF IN SUPPORT OF
MOTION FOR AN ORDER AUTHORIZING RULE 2004
DISCOVERY OF CERTAIN PROOFS OF CLAIM
[D.I. 1974, REVISED PUBLIC VERSION D.I. 2022]**

STAMOULIS & WEINBLATT LLC
800 N. West Street
Third Floor
Wilmington, Delaware  19801

O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036-6537

*Counsel for Century Indemnity Company, as
successor to CCI Insurance Company, as
successor to Insurance Company of North
America and Indemnity Insurance Company
of North America, Ace Insurance Group,
Westchester Fire Insurance Company and
Westchester Surplus Lines Insurance
Company*

---

[1]  Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America ("BSA") (6300) and Delaware Boy Scouts, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Lane, Irving, Texas 75038.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................ 1

FACTS ................................................................................................................................. 3

    A.    Objectors do not dispute Insurers' facts and even admit
          that they mass-signed POCs without any pre-filing review....................... 3

    B.    Objectors make unsupported assertions—through
          their lawyers—that are demonstrably false................................................. 5

    C.    Insurers have uncovered more evidence that
          plaintiffs' firms used hedge fund money to buy claims,
          which Coalition founder Timothy Kosnoff concedes. ............................... 7

    D.    Insurers have uncovered more evidence that
          third-party aggregators helped churn out claims. ..................................... 9

    E.    Objectors' unsupported assertions that they filed
          belated amended POCs do not change anything.......................................... 9

    F.    Objectors make evidence-free assertions
          about the vetting they supposedly conducted. .......................................... 10

ARGUMENT ..................................................................................................................... 11

    POINT I

    OBJECTORS DO NOT CONTEST THAT LEGAL AND ETHICAL RULES
    REQUIRE AN ATTORNEY TO CONDUCT A PRE-COMPLAINT INQUIRY. ........................ 11

    POINT II

    RULE 2004 IS BROAD AND INSURERS HAVE
    STANDING TO SEEK DISCOVERY UNDER THAT RULE. ................................................ 12

    POINT III

    FAR FROM BEING PREMATURE, DISCOVERY NOW IS ABSOLUTELY
    NECESSARY IF THERE IS TO BE ANY CHANCE OF CONFIRMING A PLAN. .................... 16

    A.    Now is the time to examine
          abuses in the claims process. ................................................................... 16

    B.    The plaintiffs' lawyers are not immune from discovery,
          having voluntarily assumed the risk of becoming witnesses. .................. 17

CONCLUSION .................................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Safety Indem. Co. v. Vanderveer Estates Holding, LLC (In re Vanderveer Estates Holding, LLC)*,
  328 B.R. 18 (Bankr. E.D.N.Y. 2005) ........................................................................ 13

*Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*,
  321 B.R. 147 (D.N.J. 2005) .................................................................................. 13

*Brandt v. Hongkong & Shanghai Banking Corp. (In re China Fishery Grp. Ltd.)*,
  Nos. 16-11895 (JLG), 16-11914 (JLG), 18-01575-JLG, 2018 Bankr. LEXIS 4063 (Bankr. S.D.N.Y. Dec. 27, 2018) ...................................................................................... 13

*Calloway v. Marvel Enm't Grp.*,
  854 F.2d 1452 (2d Cir. 1988) ............................................................................... 12

*Century Indemnity Co. v. BSA*,
  No. 20-00774 (D. Del.), ECF No. 5 ........................................................................ 14

*Church Mut. Ins. Co. v. Am. Home Assurance Co. (In re Heating Oil Partners, LP)*,
  422 F. App'x 15 (2d Cir. 2011) ............................................................................. 13

*Hannon v. Countrywide Home Loans, Inc. (In re Hannon)*,
  421 B.R. 728 (Bankr.M.D.Pa.2009) ........................................................................ 11

*In re Amatex Corp.*,
  755 F.2d 1034 (3d Cir.1985) ................................................................................ 13

*In re Arkin-Medo, Inc.*,
  44 B.R. 138 (Bankr. S.D.N.Y. 1984) ...................................................................... 15

*In re Black, Davis & Shue Agency, Inc.*,
  460 B.R. 407 (Bankr. M.D. Pa. 2011) .................................................................... 13

*In re Cinderella Clothing Indus., Inc.*,
  93 B.R. 373 (Bankr. E.D. Pa. 1988) ...................................................................... 13

*In re Combustion Eng'g, Inc.*,
  391 F.3d 190 (3d Cir. 2004), *as amended* (Feb. 23, 2005) ...................................... 14

*In re DeShetler*,
  453 B.R. 295 (Bankr. S.D. Ohio 2011) .................................................................. 15

*In re Glob. Indus. Techs., Inc.*,
  645 F.3d 201 (3d Cir. 2011) ............................................................................ 13, 14

**TABLE OF AUTHORITIES**
*(continued)*

**Page(s)**

*In re Int'l Fibercom, Inc.*,
  283 B.R. 290 (Bankr. D. Ariz. 2002).......................................................... 13

*In re Michalski*,
  449 B.R. 273 (Bankr. N.D. Ohio 2011) ...................................................... 15

*In re Obasi*,
  No. 10-10494 (SHL), 2011 WL 6336153, 2011 Bankr. LEXIS 5011, (Bankr. S.D.N.Y. Dec.
  19, 2011) .................................................................................................. 11, 12

*In re Resyn Corp.*,
  945 F.2d 1279 (3d Cir. 1991) ..................................................................... 18

*In re Rodriguez*,
  No. 10-70606, 2013 WL 2450925 (Bankr. S.D. Tex. June 5, 2013)........................ 17

*In re Subpoena Duces Tecum*,
  461 B.R. 823 (Bankr. C.D. Cal. 2011)...................................................... 2, 15

*In re Summit Corp.*,
  891 F.2d 1 (1st Cir. 1989)........................................................................... 13

*In re Texaco Inc.*,
  79 B.R. 551 (Bankr. S.D.N.Y. 1987)........................................................... 13

*In re Thomas*,
  337 B.R. 879 (Bankr.S.D.Tex.2006), *aff'd*, 223 Fed. Appx. 310 (5th Cir.2007) ..................... 11

*In re Ulmer*,
  363 B.R. 777 (Bankr. D.S.C. 2007).............................................................. 12

*Kennedy v. Skadden, Arps, Slate, Meagher & Flom LLP (In re: Radnor Holdings Corp.)*,
  564 B.R. 467 (D. Del. 2017)........................................................................ 18

*Knox v. Sunstar Acceptance Corp. (In re Knox)*,
  237 B.R. 687 (Bankr.N.D.Ill.1999) ............................................................ 11

*Small v. Neighborhood Hous. Servs. of New Haven, Inc.*,
  589 B.R. 31 (D. Conn. 2018)....................................................................... 13

*Swanson v. Trasino Park-Hudsons, LLC (In re Vission , Inc.)*,
  No. 07-21957, 2008 WL 2230741 (Bankr. E.D. Wis. 2008)............................. 12, 17

**Rules**

Fed. R. Bankr. P. 2004(a) .............................................................................. 13

## PRELIMINARY STATEMENT[2]

In opposing Insurers' motion for discovery from attorneys who mass signed POCs and third-party aggregators the Coalition and various Objecting lawyers filed 13 briefs and related papers totaling 162 pages.  Not one of those pages contains any evidence.  They proffer **no** declarations, **no** affidavits, and **no** expert reports.  The Coalition and other Objectors do not even offer any documentary evidence.  This should tell the Court everything it needs to know about the objections—they are absolutely fact-free.  The mass-signers are lawyers who well know the importance of evidence.  That they offer none is an admission.

In fact, the Coalition and Objectors never outright deny Insurers' evidence.  The Coalition could not deny Requests to Admit that the mass-signers "did not individually sign each of the Claim Forms that bears Coalition Counsel's signature," "did not individually review each of the Claim Forms that bears that Coalition Counsel's signature," and "did not individually investigate the factual contentions in each of the Claim Forms that bears that Coalition Counsel's signature."[3]  They could not even deny that they did not read each POC.[4]

The Coalition actually concedes that the mass-signers conducted no pre-filing inquiries, stating that it "presumes" that the plaintiffs' firms properly investigated the validity of the POCs.  That is a startling statement because not only is it not a denial, but also because it suggests that counsel for the Coalition does not know the answer, or did not try to find out because they did not want to know.[5]

---

[2]    All defined terms have the same meaning as in Insurers' January 22, 2021 opening brief [D.I. 1974, Revised Public Version D.I. 2022].

[3]    Declaration of Andrew Kirschenbaum Ex. 1 (Coalition Response to RFAs 1, 4, 5).

[4]    *Id*. (Coalition Response to RFAs 6).

[5]    Coalition Brief at ¶ 5.

What is more, the Coalition admits that the signatures of its member lawyers were affixed to POCs *en masse*, stating that they "had attorney-signed claim forms prepared in case the client's signature could not be obtained in time."[6]  Counsel for one of the Coalition lawyers (Joseph Cappelli), who signed 635 POCs on a single day with a pre-printed signature page, goes so far as to concede that "if the client did not timely return the signature page, the firm submitted the prepared claim with an attorney signature."[7]  These lawyers simply filed the POCs, ignoring the obvious conclusion that a client who does not affirmatively authorize his or her signature does not want to do so.  Given these admissions, it is hard to imagine that the mass-signing attorneys conducted any pre-filing investigations.  The Court should thus grant the motion based on Insurers' unrebutted evidence.

The law does not permit a shoot-first-ask-questions-later approach.  And neither did the Court when it authorized attorneys to sign POCs on behalf of their clients.  Insurers demonstrate in the opening brief that a lawyer has a legal and ethical obligation to conduct a pre-filing investigation.  Additionally, the POCs that the attorneys signed proclaim in bold letters just above the attorney signature:  "I declare under penalty of perjury that the foregoing statements are true and correct."  None of the briefs opposing Insurers' motion cites any law to the contrary.

The court should also not lose sight of Rule 2004, which is designed to be a pre-litigation discovery tool.  There are many examples where Rule 2004 was used to obtain discovery about the preparation of a claimants' proofs of claim, including documents and records that a claimant provided to counsel before filing.  As one court put it, such an examinations about the validity of proofs of claim "is pretty clearly related to the debtors' liabilities and the amounts to be paid."[8]

---

[6]    Coalition Brief ¶ 7.

[7]    Marc Bern & Partners ¶ 3.

[8]    *In re Subpoena Duces Tecum*, 461 B.R. 823, 826 (Bankr. C.D. Cal. 2011).

2

With no contradictory evidence, Objectors are left to disparage Insurers and express outrage that they have the temerity to question whether claims were filed by for-profit aggregators without any attorney due diligence.  The facts here demonstrate more than enough good cause to allow the requested discovery.  Indeed, in the time since making the motion, Insurers have uncovered even more evidence about abuses in the POC-generating process, including involvement from additional aggregator businesses.

Mass-tort bankruptcies are not an excuse for ignoring Rule 9011 and engaging in conduct that would otherwise be sanctionable.  The evidence that Insurers have developed does not reflect what one objecting brief calls "the ordinary stuff of mass-tort bankruptcies."[9]  The sort of claim churning and un-vetted filing that is now before this Court undermines the integrity of the bankruptcy process.

**FACTS**

**A.    Objectors do not dispute Insurers' facts and even admit that they mass-signed POCs without any pre-filing review.**

Objectors do not dispute Insurers' facts.  Instead, Objectors try to spin the evidence that Insurers have placed before the Court.  They say that the lawyers were just being zealous advocates in protecting their clients' rights by filing POCs without any investigation or apparently even authorization in some cases.  Incredibly, the Coalition admits that its attorneys "had attorney-signed claim forms prepared in case the client's signature could not be obtained in time."[10]

The lawyer for Timothy Kosnoff, the Coalition's erstwhile founding member, also admits that his client filed POCs without any backup evidence.  Mr. Kosnoff only hoped that

---

[9]    A&T ASK Brief at ¶ 5.

[10]    Coalition Brief at ¶ 7.

"upon further investigation" he might find some.[11]  Other Coalition lawyers make similar amazing admissions.

Joseph Cappelli's lawyer admits that his client's pre-printed signature page was affixed to 625 POCs in a single day.  But he asserts that the "firm's practice was to send the final version of each claim to their respective client for signature before filing it, but if the client did not timely return the signature page, the firm submitted the prepared claim with an attorney signature."[12] Leaving aside that a lawyer who takes his legal and ethical obligations seriously would assume the opposite—a client who does not send in a signature does not want to sue—his brief states that of "the 635 claims signed by Mr. Cappelli, 155 were amended following the bar date to include the signature page when it was eventually received from the client."[13]  There is of course no evidence before the Court to validate that factual assertion.  Even taking everything Mr. Cappelli's lawyer asserts as true, 480 POCs still contain only Mr. Cappelli's pre-printed signature.

Not to be outdone, Paul Napoli's lawyer admits that his client did nothing to vet his POCs.  But that is not a problem because he did not have to investigate anything as the blank claims did not assert anything: "signing a Proof of Claim with only the identifying information of the claimant after they represented they were abused while within the BSA, only holds the attorney responsible for the truth or falsity of the identifying information."[14]  In other words, Mr. Napoli had to investigate only that he got the claimant's name right.  It is doubtful whether he did even that because he filed a blank POC on behalf of a deceased claimant.[15]

---

[11]    Kosnoff Brief at ¶ 2.

[12]    Marc Bern & Partners ¶ 3.

[13]    Marc Bern & Partners ¶ 3.

[14]    Napoli Brief at ¶ 35.

[15]    February 11, 2021 Declaration of Charles Fox at ¶ 8.

Mr. Napoli's lawyer also claims that, "of [the] 400 of the 'largely blank' Proof of Claims filed by Napoli, most have since been amended and are now complete and bear the claimants' signatures."[16]  Not so.  Only 93 of the blank POCs have been amended with a claimant signature And Mr. Napoli did not take much care even with the few amendments that he actually made.  Some of the amended POCs are unsigned.[17]  Others have signature pages of claimants slapped on the back of POCs with different type fonts, suggesting that the signature was collected independently of any factual verification.[18]

### B. Objectors make unsupported assertions—through their lawyers—that are demonstrably false.

Objectors briefs read as though they set out facts that contradict Insurers' evidence.  Mr. Kosnoff's lawyer says that his client "did the hard work of assuring himself there was evidentiary support" for each POC that bears his name."[19]  He adds that he "has not utilized a single claim aggregator or any other third parties."[20]  Those statements are not facts because they come from Mr. Kosnoff's lawyer—not any declaration or affidavit from Mr. Kosnoff or anyone else.

Moreover, those statements cannot be reconciled with the evidence.  Forensic analysis shows that Mr. Kosnoff used Your Case Managers, a claim-aggregator Insurers identified in the opening brief.[21]  One thousand and thirty six of Mr. Kosnoff's POCs were submitted to Omni from the email address bsa-kl@yourcasemanagers.com ("KL" stands for Kosnoff Law).[22]

---

[16]   Napoli Brief at ¶ 11.

[17]   February 11, 2021 Declaration of Paul Hinton ("Hinton Decl.") at ¶ 10.

[18]   February 11, 2021 Declaration of Erich Speckin ("Speckin Decl.") at ¶ 17.

[19]   Kosnoff Brief at ¶ 2.

[20]   Kosnoff Brief at ¶ 2.

[21]   Speckin Decl. at ¶ 23.

[22]   Speckin Decl. at ¶ 23.  The number in this sentence includes claimant-signed POCs.

The evidence also shows that on November 15, 2020, Mr. Kosnoff's digital signature was executed on POCs in both Palm Springs, California (4 POCs) and Philadelphia, Pennsylvania (19 POCs).[23]  The same happened on November 16, 2020, when his signature was affixed to POCs in Palm Springs (25 POCs), Philadelphia (9 POCs), and Los Angeles.[24]  That Mr. Kosnoff's signatures were apparently executed in different cities across the country at similar times suggests that multiple people were doing that work,[25] which cannot be squared with his lawyer's statement that Mr. Kosnoff "did the hard work."[26]

Likewise, Mr. Kosnoff's digital signatures were created and executed (using Eversign) at a pace strongly suggesting involvement of multiple people.  On November 10, 2020, between 7:01 and 8:00 p.m. PT, his digital signature was created or executed 59 separate times, or roughly once per minute.  The pace was even faster in the last 10 minutes of that period: between 7:51 and 8:00 p.m. PT, his digital signature was created or executed 16 times.[27]  One person cannot create and execute a digital signature once a minute over an entire hour.[28]

The evidence also shows that Mr. Kosnoff—or someone acting for him—appears to have written in the signatures of several claimants (and apparently tried to conceal that fact).[29]  Matching the purported claimant signatures to those individuals' publicly filed documents (like mortgages) shows that they are not even close.  Your Case Managers seemingly made those filings on Mr. Kosnoff's behalf.[30]

---

[23]    Speckin Decl. at ¶ 9.

[24]    Speckin Decl. at ¶¶ 10, 11.

[25]    Speckin Decl. at ¶ 13.

[26]    Kosnoff Brief at ¶ 2.

[27]    Speckin Decl. at ¶ 15.

[28]    Speckin Decl. at ¶ 16.

[29]    Speckin Decl. at ¶ 23–29.

[30]    Speckin Decl. at ¶ 23.

Mr. Kosnoff's lawyer also asserts that his client "spent at least 200,000 hours over the course of years reading and abstracting information."[31]  That means Mr. Kosnoff spent 100 2000-billable-hour years on this work.  That is self-evidently false.

Mr. Napoli's lawyer states that "Insurers falsely claim that Napoli used 'claim-aggregators' to file claims on Napoli's behalf. . . . Napoli did not use any outside service in the act of filing claims."[32]  Here too, the statements are not facts because they come from Mr. Napoli's lawyer and not a witness.  They are also false because further forensic investigation has revealed that Consumer Attorney Marketing Group or CAMG (another claim-aggregator Insurers identified in the opening brief) is linked to some of Mr. Napoli's POCs.[33]

Mr. Napoli also strangely rails at the Insurers for accusing his father Joseph Napoli of impropriety.[34]  But Insurers do not mention Joseph Napoli anywhere in their brief.  So the accusation is hard to understand.

C.      **Insurers have uncovered more evidence that plaintiffs' firms used hedge fund money to buy claims, which Coalition founder Timothy Kosnoff concedes.**

Since filing the opening brief, Mr. Kosnoff confirmed exactly what the evidence shows—namely, certain plaintiffs' lawyers are "buying inventories of clients from TV ad machines, all backed by Wall Street hedge fund money:"[35]

---

[31]    Kosnoff Brief at ¶ 8.

[32]    Napoli Brief at ¶ 6.

[33]    Speckin Decl. at ¶ 18–19.

[34]    Napoli Brief at ¶ 8.

[35]    Sergei Zaslavsky February 3, 2021 Declaration, Exhibit 1.



In Mr. Kosnoff's own words, the people fronting for these claims "are not real lawyers," have "never represented a victim," and will soon be moving "on to their next mass tort creation."[36]

Insurers have also found additional proof of plaintiffs' lawyers buying inventories of claims. While Slater, Slater & Schulman ("Slater"), Andrews & Thornton ("A&T"), and ASK LLP admit to outside funding, they do not tell the whole story.[37]  A UCC statement shows that on September 30, 2020, these firms jointly obtained a loan, secured by the recovery on claims against BSA.[38]  In the six weeks between that loan and the bar date, each firm's filings exploded: ASK had a 124-fold increase, A&T had a 39-fold increase, and Slater had a 9-fold increase.[39]

| Firm | Claims before 9/30/20 | Claims after 9/30/20 |
|---|---|---|
| Ask LLP | 34 | 4,221 |
| Andrews & Thornton | 99 | 3,823 |
| Slater | 1,658 | 14,175 |

---

[36]    Sergei Zaslavsky February 3, 2021 Declaration, Exhibit 1.

[37]    Slater Brief at ¶ 10; A&T and ASK at 3.

[38]    Andrew Kirschenbaum January 22, 2021 Declaration, Exhibit 9.

[39]    Hinton Decl. at ¶ 10.

It is difficult to believe that that money was used to investigate thousands of new claims in just six weeks before the bar date.  The firms likely just bought them.  After buying these claims the plaintiffs' firms apparently did not vet them, because—as Slater also admits—59 percent of the POCs from its firm are missing the abuser's last name.[40]

### D. Insurers have uncovered more evidence that third-party aggregators helped churn out claims.

In their opening brief, Insurers identified five third-party claim-aggregators that completed and submitted thousands of claims on behalf of the mass-signing lawyers.  Since then, Insurers have found evidence of additional third-party businesses that did everything from caller intake to final submissions (Reciprocity), as well as evidence of additional law firms using the aggregators identified in Insurer's opening brief (such as CAMG).[41]

Reciprocity is particularly interesting because Andrew Van Arsdale, one of the AIS founding members (along with Mr. Kosnoff), owns that aggregator.[42]  The evidence—which is still coming out—shows that more than a dozen firms have used this aggregator.[43]

### E. Objectors' unsupported assertions that they filed belated amended POCs do not change anything.

Some of the Objectors assert without any proof that they filed amended POCs.  Even if that were true, it seemingly happened only after they got caught and only for some claims for which they were called out.  But it does not change the fact that the mass-signing attorneys failed to conduct any pre-filing—not *post*-filing—inquiry.

---

[40]  Slater Brief at ¶ 10.

[41]  Speckin Decl. at ¶¶ 18–19, 20–22.

[42]  August 26, 2020 Declaration of Janine Panchok-Berry, Ex. 8 [D.I. 1166].

[43]  Speckin Decl. at ¶¶ 20–22.

Whatever the reasons for the amendments—and there are no facts before the Court to suggest what those reasons might be—the evidence shows that very few of the mass-signers actually replaced their POCs with claimant-signed documents.  Out of 13,370 attorney-signed POCs that the high-volume signers submitted, they amended only 2,500 to replace them with non-attorney signatures.[44]  So disregarding the substance of changes supposedly made—or the legality of such amendments—some 81 percent remain unchanged.  And the evidence shows that attorney-signed claims are consistently more likely to be incomplete.[45]

### F.    Objectors make evidence-free assertions about the vetting they supposedly conducted.

Objectors' briefs are filled with unsworn statements by lawyers representing the underlying plaintiffs' attorneys contesting Insurers' evidence.  The following is one of the most forceful such statements:  "A&T and ASK committed to this Court that '[a]ll claims . . . will be thoroughly vetted,' and they put mechanisms in place to make good on that commitment, despite the volume of claims."[46]  What "mechanisms" did they put in place?  How did they work?  There are no answers to those questions in any filing.  If there were any mechanisms, they failed—badly.  But these firms are not the only ones making such evidence-free assertions, which they would like the Court to credit over Insurers' unrebutted evidence.

---

[44]    Hinton Decl. Table 1.

[45]    Hinton Decl. Table 3.

[46]    A&T ASK Brief at 7.

# ARGUMENT

## POINT I

### OBJECTORS DO NOT CONTEST THAT LEGAL AND ETHICAL RULES REQUIRE AN ATTORNEY TO CONDUCT A PRE-COMPLAINT INQUIRY.

Insurers demonstrate in their opening brief that "Bankruptcy Rule 9011 has specifically been held to apply to proofs of claim," which mandates a pre-filing "inquiry."[47] "Compliance with Bankruptcy Rule 9011 is *particularly important for proofs of claim* because a properly filed proof of claim constitutes *prima facie* evidence of the validity and amount of the claim," and "[t]he Court must therefore be able to rely on the integrity of the proofs of claim before it."[48] Similarly, Comment 3 to ABA Model Rule of Professional Conduct 3.3 states that "an assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry."[49] The POCs that the attorneys signed drive the point home by proclaiming in bold letters: "I declare under penalty of perjury that the foregoing statements are true and correct."

As with the facts, the Coalition and joining Objectors do not address this declaration or the law that Insurers discuss in their brief. In response, Objectors mention only a bankruptcy law article that apparently criticized one of the cases that Insurers cite. They also draw an irrelevant distinction with another case.[50] The *In re Vision* distinction is off target because that case holds

---

[47]   *See In re Obasi,* No. 10-10494 (SHL), 2011 WL 6336153, at *7 (Bankr. S.D.N.Y. Dec. 19, 2011); *see also Hannon v. Countrywide Home Loans, Inc. (In re Hannon)*, 421 B.R. 728, 731 (Bankr.M.D.Pa.2009); *In re Thomas*, 337 B.R. 879, 895 (Bankr.S.D.Tex.2006), *aff'd*, 223 Fed. Appx. 310 (5th Cir.2007); *Knox v. Sunstar Acceptance Corp. (In re Knox)*, 237 B.R. 687, 699 (Bankr.N.D.Ill.1999)

[48]   *Obasi*, 2011 WL 6336153 at *7 (emphasis added) (internal quotations and citations omitted).

[49]   Comment 12 to ABA Model Rule of Professional Conduct 3.3 is also relevant (discussing a lawyer's obligation to preserve the integrity of the adjudicative process).

[50]   Coalition Brief at ¶ 48.

that an attorney attesting to personal knowledge of facts "is likely to be a necessary witness," and it is irrelevant that the court there considered an attorney affidavit rather than proof of claim.[51]

But there are other cases that stand for the same proposition. The Court in *In re Obasi* held that the attorney's conduct violated Rule 9011 for "failure to review a proof of claim," finding "[t]he attorney in question ***did not review the document and had no intention of doing so prior to filing***. Instead, he ***authorized—in advance***—an associate under his supervision to sign his name to whatever document that associate produced."[52] The Court explained as follows:

> It cannot be that an attorney satisfies his obligation under Bankruptcy Rule 9011 when he conducts no review of the document submitted to the Court. Indeed, some courts have concluded that the fact that the information contained in documents bearing the attorney's signature may have been accurate is not a defense to a Fed. R. Bankr. P. 9011 sanction.[53]

That is as it should be—attorneys have an obligation to conduct basic diligence before they file claims. And there are many cases that stand for that proposition.[54]

## POINT II

### RULE 2004 IS BROAD AND INSURERS HAVE
### STANDING TO SEEK DISCOVERY UNDER THAT RULE.

The Coalition argues that Insurers have no standing because they do not have the same rights as Debtors. But the Coalition does not cite a single case for this argument.[55] Standing is not comparative—whether Insurers have the same rights as Debtors is immaterial. In any event, what matters as far as Debtors are concerned is that they have not objected to this motion.

---

[51] *Swanson v. Trasino Park-Hudsons, LLC (In re Vision, Inc.)*, No. 07-21957, 2008 WL 2230741, at *4 n.3 (Bankr. E.D. Wis. May 28, 2008).

[52] No. 10-10494 (SHL), 2011 Bankr. LEXIS 5011, at *34 (Bankr. S.D.N.Y. Dec. 19, 2011) (emphasis added) (internal citations and quotations omitted).

[53] *Id.*

[54] *In re Ulmer*, 363 B.R. 777, 782 (Bankr. D.S.C. 2007); *see also Calloway v. Marvel Enm't Grp.*, 854 F.2d 1452, 1470 (2d Cir. 1988).

[55] Coalition Brief at ¶¶ 25–28.

Rule 2004 expressly states that it applies to "any party in interest."[56]  And the Third

Circuit broadly defines "party in interest" as "anyone who has a legally protected interest that

could be affected by a bankruptcy proceeding."[57]  As parties in interest, Insurers have standing to

seek discovery in bankruptcy proceedings that threaten to increase their liability.  Courts have

routinely authorized parties other than the debtor or trustee to take Rule 2004 discovery.[58]  This

includes insurers.[59]

Moreover, Insurers have standing to object to the POCs under Section 502(a), which

expressly refers to "parties in interest," not just creditors.  Courts in the Third Circuit hold that

insurers have standing to challenge proofs of claim.[60]  This Court also stated that if parties in

---

[56]  Fed. R. Bankr. P. 2004(a).

[57]  *In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 210 (3d Cir. 2011) (internal quotations omitted); *see also In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir.1985) (a "party in interest" is any party with "a sufficient stake in the proceeding so as to require representation").

[58]  *See*, *e.g.*, *In re Summit Corp.*, 891 F.2d 1, 5 (1st Cir. 1989) (prospective bidder of debtor's assets); *Small v. Neighborhood Hous. Servs. of New Haven, Inc*., 589 B.R. 31, 34 (D. Conn. 2018) (creditor); *In re Int'l Fibercom, Inc.*, 283 B.R. 290, 294 (Bankr. D. Ariz. 2002) (insurance company); *In re Cinderella Clothing Indus., Inc.*, 93 B.R. 373, 378-379 (Bankr. E.D. Pa. 1988) (creditor); *In re Texaco Inc.*, 79 B.R. 551, 552 (Bankr. S.D.N.Y. 1987) (creditor).

[59]  *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm*., 321 B.R. 147, 158 (D.N.J. 2005) ("[P]arties with potential responsibility to pay claims against debtors regularly have standing to participate in bankruptcy cases."); *Am. Safety Indem. Co. v. Vanderveer Estates Holding, LLC (In re Vanderveer Estates Holding, LLC)*, 328 B.R. 18, 29 (Bankr. E.D.N.Y. 2005) (explaining that debtor's insurer was permitted to seek "discovery pursuant to Bankruptcy Rule 2004 at any time after commencement of the bankruptcy case"); *In re Int'l Fibercom*, 283 B.R. 290, 294 (Bankr. D. Ariz. 2002) (granting insurance company's motion for discovery under Rule 2004 with respect to the debtor's liabilities, among other things); *Brandt v. Hongkong & Shanghai Banking Corp. (In re China Fishery Grp. Ltd.)*, Nos. 16-11895 (JLG), 16-11914 (JLG), 18-01575-JLG, 2018 Bankr. LEXIS 4063, at *11–12 (Bankr. S.D.N.Y. Dec. 27, 2018) ("[A] party will qualify as a 'party in interest' under section 1109 when it has a direct financial stake in the proceeding in which it seeks to be heard.") (citing *Church Mut. Ins. Co. v. Am. Home Assurance Co. (In re Heating Oil Partners, LP)*, 422 F. App'x 15, 17 (2d Cir. 2011) (finding that debtor's insurer was a party-in-interest with standing to seek a declaratory judgment)).

[60]  *In re Black, Davis & Shue Agency, Inc.*, 460 B.R. 407, 413–15 (Bankr. M.D. Pa. 2011) (finding standing for insurer to challenge proofs of claim where "proceeds of the insurance policy would be the primary source for the payment" of the claims in question and the insurer had "an interest in the litigation separate from Debtor's interest that could be affected by the outcome and supports separate representation").

interest believed that proofs of claim filed in response to the bar date were objectionable, they should file objections to the claims, because otherwise the claims would be deemed allowed under section 502.[61]  Likewise, Debtors have acknowledged this, stating that "[w]hatever claims are submitted using the Claim Form approved in the Bar Date Order remain subject to objection."[62]

In *Global Industries*, which the Coalition and some Objectors cite, the Third Circuit held that where "the Plan's promise of an APG Silica Trust appears to have staggeringly increased—by more than 27 times—the pre-petition exposure. . . . it cannot fairly be said that the GIT plan is 'insurance neutral' in the same sense as was the plan at issue in *Combustion Engineering*."[63] That reasoning applies here.  Nothing in *Global Industries* limits Insurers' standing only to situations where a plan is not insurance neutral or, indeed, to plan-related matters only.

The Coalition cites *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 218 (3d Cir. 2004), *as amended* (Feb. 23, 2005), to argue that Insurers have no standing to contest a neutral plan of reorganization.  But there is no plan yet that Debtors have asked the Court to confirm and no neutrality language to consider.  Nor does *Combustion Engineering* stand for the proposition that insurers lack standing on all issues where a plan is neutral.  Not one word in *Combustion Engineering* speaks to Rule 2004 or the right to obtain discovery before plan confirmation.

The Coalition's effort to distinguish *In re Subpoena Duces Tecum* is no better.  There, the court allowed discovery "about the preparation of [the] proofs of claim," including information about "internal processes and procedures" for filing proofs of claim and "documents, records and

---

[61]   May 18, 2020 Hr'g Tr. at 70 [D.I. 675].

[62]   *Century Indemnity Co. v. BSA*, No. 20-00774 (D. Del.), ECF No. 5.

[63]   345 F.3d 201, 211 (3d Cir. 2011).

information provided by [claimant]" to counsel before filing.[64]  The court held there that was good cause for Rule 2004 discovery because the "subject matter of the examinations—the basis for the validity of . . . various proofs of claim—is pretty clearly related to the debtors' liabilities and the amounts to be paid."[65]  That *Subpoena Duces Tecum* was a Chapter 13 case or that the U.S. Trustee sought the discovery is an irrelevant distinction that the Coalition and some Objectors raise.  The point is that the court authorized discovery to investigate "the possible existence of abuse in the proof of claim process."[66]  That is exactly the issue here.

And in responding to Insurers' motion, no Objector even tries to distinguish *In re Michalski*, where Rule 2004 was used to examine "whether the proof of claim is valid."[67]  The court allowed the requested discovery, finding that movant "does not have to articulate a basis to dispute the Proof of Claim before exercising his right to conduct a Rule 2004 examination."[68]  Among other things, the court authorized depositions.[69]

---

[64]    461 B.R. 823, 826 (Bankr. C.D. Cal. 2011).

[65]    *Id*. at 829.

[66]    *Id*.

[67]    449 B.R. 273, 281 (Bankr. N.D. Ohio 2011).  The PCVA objection in response to Hartford and Century's parallel motion [D.I. 1972] tries to distinguish this case by pointing out that the party requesting the Rule 2004 examinations was the U.S. Trustee.  That supposed distinction fails for the same reasons as the attempt to distinguish *Subpoena Duces Tecum*.

[68]    *In re Michalski*, at 281.

[69]    *Id*. at 283; *see also In re DeShetler*, 453 B.R. 295, 306 (Bankr. S.D. Ohio 2011) ("2004 examination may be used . . . to investigate proofs of claim filed in bankruptcy cases provided that the examination is otherwise appropriate under Rule 2004."); *In re Arkin-Medo, Inc*., 44 B.R. 138, 139–140 (Bankr. S.D.N.Y. 1984) (allowing Rule 2004 examination of the "facts surrounding the signing of the guarantee held by [a creditor], which go directly to the validity of a $1,600,000 claim.").

## POINT III

### FAR FROM BEING PREMATURE, DISCOVERY NOW IS ABSOLUTELY NECESSARY IF THERE IS TO BE ANY CHANCE OF CONFIRMING A PLAN.

**A.    Now is the time to examine abuses in the claims process.**

The Coalition contends that discovery is premature, arguing that "[p]lans are normally confirmed in mass tort bankruptcies prior to the claims resolution process, with tort claims being individually liquidated post-confirmation in accordance with trust distribution procedures."[70] But, none of the three case the Coalition cites holds that a party is not entitled to obtain claim discovery before a plan is confirmed. And in none did the court set a bar date that led to a lawyer-generated claims explosion.

The argument that Insurers' discovery should be deferred until post-confirmation gets it exactly backwards. Not only would discovery now not derail the plan confirmation process, as the Coalition argues, but it would be impossible to solicit, let alone confirm, a plan without a realistic sense about the universe of claims.[71] The notion that there are 95,000 claims here is based on a claims-generation campaign that churned out POCs that this Court should not even consider, much less get bogged down in "individually liquidat[ing]," which could well take years.[72] Nor can the parties hope to conduct a mediation that has any chance of success without having some realistic sense about the number of POCs.

It is also disingenuous for the Coalition to argue that POC-related discovery is premature because plaintiffs' lawyers can later be expected to argue that the POCs are presumptively valid. While the Court need not resolve that issue now, plaintiffs' lawyers are trying to whipsaw

---

[70]    Coalition Brief at ¶ 11.

[71]    Coalition Brief at ¶ 63.

[72]    Coalition Brief at ¶ 14.

Insurers by denying them discovery today, only to claim later that Insurers have no evidence to challenge allegedly *prima facie* valid POCs.

### B. The plaintiffs' lawyers are not immune from discovery, having voluntarily assumed the risk of becoming witnesses.

This Court stated at the October 14, 2020 hearing that an attorney signing a claim "might be[come] . . . a fact witness" and "may be subject to a deposition."[73]  That observation is on all fours with authority holding that a lawyer who signs a proof of claim "bec[omes] a fact witness as to the allegations contained in the proof of claim," and "this results in waiver of otherwise applicable privileges."[74]  The Coalition and Objectors twist themselves into knots about Rule 9011, but they do not contest that "[s]igning a proof of claim is an assertion of personal knowledge of the facts alleged in the proof of claim," thus making the signing attorney a possible witness regarding the factual basis for the assertions in the proof of claim.[75]

The Coalition's lengthy discussion about how the requested discovery would implicate privileged material does not cite a single case holding that discovery is inappropriate here.[76]  Other than case law standing for the generic proposition that attorney depositions are disfavored absent unique circumstances, the Coalition oddly cites *Garlock*, which strongly support an investigation into the misconduct here.[77]  The Coalition and Objectors also ignore this Court's

---

[73]    Oct. 14, 2020 Hr'g Tr. at 170:2–12.

[74]    *In re Rodriguez*, No. 10-70606, 2013 WL 2450925, at *4 (Bankr. S.D. Tex. June 5, 2013).

[75]    *Id.* at *3–4; *see also Swanson v. Trasino Park-Hudsons, LLC (In re Vission , Inc.),* No. 07-21957, 2008 WL 2230741, at *4 n.3 (Bankr. E.D. Wis. 2008) ("By signing the affidavit, counsel runs the risk of becoming a fact witness, and any future hope of asserting privilege may disappear.").

[76]    Coalition Brief at ¶¶ 47–61.

[77]    *See* Insurers Opening Brief [D.I. 1974] at 18–19.

ruling, which is now the law of the case.[78]  By signing the POCs here, plaintiffs' counsel voluntarily took on the risk of becoming fact witnesses.

Finally, Objectors argue that attorneys here should not become fact witnesses—despite the Court's warning and case law—because their testimony is irrelevant.  The Coalition and Objectors contend that these lawyers did not witnesses the alleged underlying abuse.  Obviously, that is not why Insurers wish to depose the attorneys who concede that they mass-signed POCs.  The discovery is material not because the plaintiffs' lawyers may have knowledge of the underlying abuse, but to determine whether they conducted any pre-filing investigation, as they were required.[79]

## CONCLUSION

This Court should enter an order, substantially in the form attached to the opening brief as Exhibit A, allowing Insurers to take written and deposition discovery of counsel identified in Exhibit B and to issue subpoenas to third parties identified in Exhibit C.

---

[78]  *Kennedy v. Skadden, Arps, Slate, Meagher & Flom LLP (In re: Radnor Holdings Corp.)*, 564 B.R. 467, 482 (D. Del. 2017) (the law of the case "doctrine mandates that 'when a court decides a rule of law, that rule of law should continue to govern the same issues in subsequent stages in the litigation.'") (quoting *In re Resyn Corp.*, 945 F.2d 1279, 1281 (3d Cir. 1991)).

[79]  The Insurers incorporate the arguments in the February 11, 2021 reply Hartford and Century brief in support of the motion seeking discovery from claimants.

Dated:  February 11, 2021

By:   */s/ Erin R. Fay*
     Erin R. Fay (No. 5268)

**Bayard, P.A.**
Gregory J. Flasser (No. 6154)
600 North King Street, Suite 400
Wilmington, Delaware 19801
Telephone:  (302) 655-5000
Email:  efay@bayardlaw.com
       gflasser@bayardlaw.com

**Shipman & Goodwin LLP**
James P. Ruggeri (admitted *pro hac vice*)
Joshua D. Weinberg (admitted *pro hac vice*)
Michele Backus Konigsberg (admitted *pro hac vice*)
1875 K Street, NW, Suite 600
Washington, D.C. 20003
Tel:  (202) 469-7750

**Wilmer Cutler Pickering Hale and Dorr LLP**
Philip D. Anker (*pro hac vice* pending)
7 World Trade Center
250 Greenwich Street
New York, N.Y. 10007
Tel:  (212) 230-8890

**Wilmer Cutler Pickering Hale and Dorr LLP**
Danielle Spinelli (admitted *pro hac vice*)
Joel Millar (*pro hac vice* pending)
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C. 20006
Tel:  (202) 663-6000

*Attorneys for First State Insurance Company,*
*Hartford Accident and Indemnity Company*
*and Twin City Fire Insurance Company*

Respectfully Submitted,

By:   */s/ Stamatios Stamoulis*
     Stamatios Stamoulis (No. 4606)

**Stamoulis & Weinblatt LLC**
800 N. West Street
Third Floor
Wilmington, Delaware 19801
Telephone: (302) 999-1540
Facsimile: (302) 762-1688

**O'Melveny & Myers LLP**
Tancred Schiavoni (admitted *pro hac vice*)
Gary Svirsky (*pro hac vice* pending)
Andrew Kirschenbaum (admitted *pro hac vice*)
Times Square Tower
7 Times Square
New York, New York 10036-6537
Telephone: 212-326-2000

*Counsel for Century Indemnity Company, as*
*successor to CCI Insurance Company, as*
*successor to Insurance Company of North*
*America and Indemnity Insurance Company of*
*North America, Westchester Fire Insurance*
*Company and Westchester Surplus Lines*
*Insurance Company*