1
2
3
4
5
6
7
8

**IN THE UNITED STATES BANKRUPTCY COURT**

9

**FOR THE DISTRICT OF DELAWARE**

10

| | |
|---|---|
| In re: | CHAPTER 11 |
| | |
| | CASE NO. 20-10343 (LSS) |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | |
| | (JOINTLY ADMINISTERED) |
| | |
| Debtors. | |
| | **Date:  February 16, 2021** |

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    **<u>DECLARATION OF LARRY F. STEWART</u>**

2    I, Larry F. Stewart, pursuant to 28 U.S.C. §1746(2), under penalty of perjury, hereby

3    declare as follows:

4    1.    I have personal knowledge of the matters set forth in this declaration and if called

5    to testify at a hearing or trial in this matter I would and could competently testify as follows.

6    2.    I am a forensic scientist and questioned document expert.  I am presently

7    employed as Chief Forensic Scientist and President/Owner of Global Forensic Services, LLC,

8    San Luis Obispo, California.

9    3.    My education includes an Associate of Arts Degree from Florida Technological

10    University Orlando, Florida in 1976, a Bachelor of Science in Forensic Science Degree from the

11    University of Central Florida in 1979, and a Master of Forensic Sciences Degree from Antioch

12    University received in June of 1983.

13    4.    I have received numerous specialized training courses in the forensic sciences

14    from 1976 through the present from such institutions as McCrone Research Institute, Virginia

15    Polytechnic Institute and State University, U.S. Air Force Office of Special Investigations, U.S.

16    Justice Department, F.B.I. Quantico, U.S. Secret Service, Perkin-Elmer Corporation, and various

17    private organizations.

18    5.    My work experience includes Forensic Chemist for the United States Bureau of

19    Alcohol, Tobacco and Firearms; Counterfeit Specialist, Questioned Document Examiner, Senior

20    Document Examiner/National Expert for the United States Secret Service; Chief, Questioned

21    Document Branch and Laboratory Director/Chief Forensic Scientist for the United States Secret

22    Service.

23    6.    I have also been an instructor or guest speaker in forensic science and questioned

24    document examination for numerous groups, schools and agencies, to include the U.S. Secret

25    Service, Rochester Institute of Technology, Antioch School of Law, George Washington

26    University, UCLA, Catholic University, U.S. Department of State, International Law

27    Enforcement Academy, Naval Criminal Investigative Service, California Polytechnic Institute

28    and the U.S. Air Force.

7.     I have testified as an expert witness in state, federal and military courts of law, as well as testified or been deposed in foreign court systems to include Austria, Australia, Canada, Germany, Sri Lanka and Thailand.  I have also testified at The Hague in the Netherlands and three times before the U.S. Congress.

8.     I served the U.S. Government as a forensic scientist for over 25 years and have been in private practice for over 15 years.

9.     I was first Certified as an Examiner of Questioned Documents by the U.S. Secret Service in 1991.  I am proficiency tested for accuracy by the Collaborated Testing Service proficiency.

10.    A true and correct copy of my current curriculum vitae is attached hereto as **Attachment 1**.

11.    A listing of recent-year sworn testimonies follows as **Attachment 2**.

12.    I have been retained as an expert for Century Indemnity Company ("Century") in the above-captioned case to examine the proof of claims ("POCs") submitted by or on behalf of claimants in the Boy Scouts of America bankruptcy case.  Beginning January 6, 2021, I began my own independent examination of the POCs related to this matter.

13.    Additionally, I have reviewed the Declaration of Mr. Erich J. Speckin, dated January 22, 2021 regarding this matter and I am familiar with the contents.

14.    To date, I have examined approximately 10,000 of the POCs in this matter.  My review of the POCs is ongoing and may require further reports or declarations.

15.    **Method of Examination:**

16.    I examined each of the various POCs by viewing them, either with or without the aid of various types of devices.   During the examination, I used various forms of magnification.

17.    This forensic examination of the POCs began from a point of complete neutrality.

18.    Reference was made to the published standards and textbooks outlining worldwide forensic laboratory analysis procedures, as well as to peer reviewed and internationally accepted standards in the field of forensic science.  My education, experience and

the results of the examination procedures described were used to reach my conclusions in this case.

19.    Internationally accepted guidelines were used when performing these examinations to include those set forth by the American Society for Testing and Materials International (ASTM) and the Scientific Working Group for Forensic Document Examination (SWGDOC) and the Federal Bureau of Investigations (See **Attachment 3**).

20.    Treatises relied upon in reaching my conclusions are listed in **Attachment 4**.

21.    Features examined in the POCs may include, but are not limited to: elements of the writing such as alignment; arrangement, formatting, and positioning; connectedness and disconnectedness; cross strokes and dots; direction of strokes; disguise; embellishments; formation; freedom of execution; legibility; line quality; lifts, stops and hesitations of the writing instrument; patching and retouching; slow, drawn quality of the line; unnatural tremor; method of production; pen/brush hold and pen/brush position; overall pressure and patterns of pressure emphasis; proportion; simplification; size; skill; slant or slope; spacing; speed; initial, connecting, and terminal strokes; system; tremor; type of writing; and range of variation.

22.    My conclusions are based on a logical evaluation of the features when examined using the above described, peer-reviewed procedures for methodology, comparison and evaluation.

23.    **Conclusions:**

24.    I am in agreement with the findings outlined in Mr. Speckin's declaration.

25.    So far, I have observed numerous irregularities in thousands of POCs regarding their creation.

26.    I have noted the use of the same digitally reproduced signature page on multiple POCs.

27.    I have noted many POCs with blank text boxes, which should have contained claimant information regarding the incidents.

28.    Multiple formats for checkboxes were found within individual POCs to include font, shape of check mark, type of check mark and size.

29.    I reviewed documents examined by Mr. Speckin and agree that there are instances where the POC document creation date is after the signature date.

30.    Likewise, I have noted numerous instances where it appears that third-party filing services were utilized to file POC's.

31.    I have examined many of the POCs that were created with numerous different type fonts within a single filing.  An example is file 343-66164, which contains the fonts Arial, Helvetica, MS Gothic, MS Mincho, Minion Pro, Nimbus and Times New Roman.

32.    There are examples of POCs that are duplicate claimant names, e.g. files 343-66164, 343-70785 and 343-71285.  Those files each have a creation date and time of 10/27/20 6:08:12 am.  They were submitted by the James Harris Law PLLC firm.  The three files cannot be argued as mistaken duplicates in that the POCs do not have the same number of pages (files 324-66164 and 324-71285 contain 12 pages and file 324-70785 contains 13 pages) and file 324-71285 contains different information from the other two.

33.    Many POC filings contain mis-matched staple holes indicating the various pages were not always attached together.

34.    Many of the POCs contain secured digital text boxes, check boxes and signatures through groups, e.g. Docusign, Vinesign or Adobe.  Often, the area code and/or the IP address associated with the telephone number and/or the computer that submitted the form do not match that of the claimant.

35.    In hundreds of filings, the textual information in the claimant input fields can be changed by whoever opens the form.

36.    There are examples of manipulated confirmation pages, as well.  These are the pages added by Vinesign that contain a unique confirmation number, assigned once the document is completed.  Additionally, there are many examples where the confirmation by Docusign (envelope ID), is compromised.  That envelope ID should be a unique number that is assigned by Docusign once the claimant completes the document.  It should be different for each different Docusigned POC.

37.    For POC filing 324-33948, the document bears a Docusign first page and a Vinesign last page.

38.    Numerous examples exist where the POC is partly digitally created and partly not.

39.    I have only begun my examination of these POCs and to date, I have already found thousands of examples of incorrect forms that should require additional scrutiny, before deeming them authentic.


I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed at _San Luis Obispo_ , California on February _16_, 2021.


Larry F. Stewart

# Attachment 1

## BIOGRAPHY

Larry F. Stewart was born in Asheville, North Carolina.  He has earned an Associate of Arts degree from Florida Technological University in Orlando, a Bachelor of Science in Forensic Science degree from the University of Central Florida, also in Orlando and a Master of Forensic Sciences degree from Antioch University in Yellow Springs, Ohio.  Mr. Stewart has worked for the US Government for over 25 years and in private practice as a business owner for over 13 years.

During his career as a scientist and administrator he has worked on many notable cases involving historical pieces of evidence to include; the Unabomber, the John Wilkes Booth diary, numerous accused Nazi war criminals, e.g. John Demjanjuk, a.k.a. Ivan the Terrible, the reinvestigation of the Dr. Martin Luther King murder, the reinvestigation of the Kennedy assassination/CIA conspiracy theory, the Quedlinburg Treasure, the 1933 Saint-Gaudens Double Eagle gold coin, the Jon Benet Ramsey murder investigation, the 9/11 terrorist attacks, the DC Sniper investigation, the Martha Stewart/Peter Bacanovic case, the 2010 Brazilian presidential election scandal and the Facebook ownership matter.

His efforts have directly assisted the US Government in solving matters concerning multimillion dollar financial crimes investigations, corrupt officials, murders, illegal transfers of nuclear materials, terrorists, counterfeit food and drug products, international border disputes and falsified international treaties.  He has testified as an expert witness in state, federal and military courts of law, as well as testified or been deposed in foreign court systems to include; Austria, Australia, Canada, Germany, Sri Lanka, and Thailand.  He has also testified at The Hague in the Netherlands and three times before the US Congress.  Mr. Stewart held the position of Laboratory Director and Chief Forensic Scientist for the United States Secret Service.  In that role, he managed up to 120 scientists, technicians, and support staff in the areas of questioned document analysis, handwriting, fingerprints, trace evidence, audio and video analysis, photography, toolmarks, computer evidence and counterfeit analysis.  He held not only a higher level of security clearance than Top Secret but also a Diplomatic passport.

In 2005, Mr. Stewart retired from full-time government service and began the independent forensic laboratory and consulting firm known as Stewart Forensic Consultants, LLC and its subsidiary, Global Investigative & Intelligence Services.  In 2017, the two firms combined and became Global Forensic Services, LLC.

**RESUME**

Larry F. Stewart

**Occupation:**

Chief Forensic Scientist and President – Stewart Forensic Consultants, LLC
San Luis Obispo, California

**Education:**

Associate of Arts Degree - Received June 1976
Florida Technological University
Orlando, Florida

Bachelor of Science in Forensic Science Degree - Received August 1979
University of Central Florida
Orlando, Florida

Master of Forensic Sciences Degree - Received June 1983
Antioch University
Yellow Springs, Ohio

**Pertinent Specialized Courses:**

Forensic Microscopy Course - March 1978
McCrone Research Institute
Chicago, Illinois

Atomic Absorption Spectrophotometry - April 1979
Perkin-Elmer Corporation
Gaithersburg, Maryland

Gas Chromatography Course - December 1979
Virginia Polytechnic Institute and State University
Gaithersburg, Maryland

Advanced Gas Chromatography - March 1980
Perkin-Elmer Corporation

Advanced High Pressure Liquid Chromatography Course - January 1981

Virginia Polytechnic Institute and State University
Washington, DC (course location)

Ink and Paper Analysis Seminar - January 1981
U.S. Air Force
Office of Special Investigations
Washington, DC

High Pressure Liquid Chromatography/Mass Spectrometry - July 1981
U.S. Justice Department, F.B.I.
Quantico, Virginia

High Pressure Liquid Chromatography/Computer Operation - March 1984
Perkin-Elmer Corporation
Rockville, Maryland

Questioned Document Course - February 1985
U.S. Secret Service
Washington, DC

Fourier Transform Infrared Spectroscopy Course - June 1986
Nicolet Analytical Instruments
Lanham, Maryland

Scanning Electron Microscopy - September 1994
Philips Electronic Instruments
Mahwah, New Jersey

ASCLD/LAB Inspector Training Course - January 2000
Portland, Oregon

**Work Experience:**
December 1975 through March 1979
Laboratory Technician
University of Central Florida

March 1979 through September 1979

Internship
Bureau of Alcohol, Tobacco and Firearms

September 1979 through July 1982
Forensic Chemist
Bureau of Alcohol, Tobacco and Firearms

July 1982 through June 2005 (retired)
Counterfeit Specialist
Questioned Document Examiner
Lead, Instrumental Analysis Section
Lead, Instrumental and Computer Analysis Section
Senior Document Examiner/National Expert for the United States Secret Service
Chief, Questioned Document Branch
Assistant Laboratory Director
Laboratory Director/Chief Forensic Scientist
United States Secret Service

June 2005 to February 2017
Chief Forensic Scientist and President
Stewart Forensic Consultants, LLC

February 2017 to present
Chief Forensic Scientist and President
Global Forensic Services, LLC

**Instructor:**
Bureau of Alcohol, Tobacco and Firearms
Rockville, Maryland

United States Air Force, Office of Special Investigations
Special Investigator's Course
Washington, DC

United States Secret Service
Washington, DC

Federal Law Enforcement Training Center
Glynco, Georgia

Drug Enforcement Agency
Washington, DC

International Law Enforcement Academy
Budapest, Hungary

Naval Criminal Investigative Service
Washington, DC

Rochester Institute of Technology
Rochester, New York

Cuesta College
San Luis Obispo, California

California Polytechnic University
San Luis Obispo, California

**Guest Speaker:**
Montgomery College
October 1980
Rockville, Maryland

Antioch School of Law
November 1980 and February 1981
Washington, DC

Montgomery College
Ink and Paper Analysis/Instrumental Techniques - February 1982
Rockville, Maryland

DocSec'85
Document Security - May 1985
Washington, DC

George Washington University
Ink and Paper Analysis - February 1986
Washington, DC

Inspector Generals Office - Health and Human Services
Tri-regional Conference - January 1991
Mt. Pocono, Pennsylvania

Bolling Air Force Base
Joint Basic Computer Forensic Workshop - September 1993
Washington, DC

Virginia Military Institute
The Uses of Chemistry and Biology in the Forensic Sciences - April 1994
Lexington, Virginia

UCLA
Forensic Examination of Financial and Identity Documents  - August 1998
American Society of Questioned Document Examiners meeting
Los Angeles, California

Catholic University
Science Under Oath - February 2000
Washington, DC

GATF Conference
Security Printing, Computers and the Forensic Scientist - August 2000
Pittsburgh, PA

Fraud Prevention Workshop
Security Printing  - October 27, 2000
US Department of State
Ft. Lauderdale, Florida

International Association for Identification
Forensic Science and Fraudulent Documents - May 2004

Sacramento, California

Forensic Seminar on Questioned Documents
Czech Republic
Poland
Turkey
Slovenia
Hungary
Mexico

San Luis Obispo Criminal Bar Association
Getting the Most from Forensic Technology in Criminal Investigations - December 13, 2006
San Luis Obispo, California

California Association of Licensed Investigators
Counterfeits Are All Around Us! - February 2, 2007
Palm Springs, California

California Association of Licensed Investigators
Leveling The Playing Field - December 4, 2008
Pismo Beach, California

**Specialized Tours/Training:**
Crane-Weston Paper Mill
Dalton, Massachusetts - July 28, 1982

Philadelphia Mint
Philadelphia, Pennsylvania - July 29, 1982

Bureau of Engraving and Printing
Washington, DC - July 30, 1982

Visa International
San Francisco, California - January 3-6, 1984

Malco Plastics
Garrison Park, Maryland - January 1985

BIS CAP International, Ink Jet Printing Conference
Boston, Massachusetts - September 17-19, 1990

**Achievements:**
Participated as a "referee" in the 1980 Crime Laboratory Proficiency Training Program Forensic Sciences Foundation, Colorado Springs, Colorado

1984 - Successfully obtained, regenerated and operated the world's largest forensic collection of writing inks and watermarks.

Testified in May of 1989 and 1990 before the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce, U. S. House of Representatives.  These matters concerned the investigation of fraud in science.

Certified by the US Secret Service as an accredited Examiner of Questioned Documents, February 1, 1991.

Recipient of the Health and Human Services Inspector General's Integrity Award, 1991.

Appointed Chairman of A.S.T.M. task groups (1991) concerned with developing standards for performing "Writing Ink Comparisons" and "Writing Ink Identifications."

Acted as INTERPOL's representative regarding document related matters concerning the forensic analysis of Ink and Paper.

Appointed as the National Expert in document related matters concerning ink and paper for the US Secret Service.

United States Delegate at the 14th European Meeting on Currency Counterfeiting, The Hague, The Netherlands, October 9-11, 1991 and the First International Conference on Fraudulent Documents, Ottawa, Canada, April 27- May 1, 1992.

United States Delegate at the 6th European Conference for Police and Government Experts, London, United Kingdom, October 2-4, 1996.  Presented a paper on Ink Dating, Relative and Absolute: New Approaches to Old Problems.

Testified on July 22, 1999 before the House Judiciary Committee, Subcommittee on Immigration and Claims, U.S. House of Representatives.  This matter concerned detection and prevention of counterfeit documents.

Classified as an "Inspector" for the American Society of Crime Laboratory Directors.

Elected to the Board of Directors for the American Society of Crime Laboratory Directors, September 14, 2000.

Elected to the Board of Directors for the Document Security Alliance, December,2003.

Appointed as the forensic consultant for the United Nations, tasked with developing and implementing a successful forensic laboratory in Nigeria, Africa, 2007.

Elected to the Board of Directors for The Academy, June 2007.

Certified Forensic Consultant, American College of Forensic Examiners Institute, October 2007.

Appointed as a forensic consultant for the US Department of State, Bureau of International Narcotics and Law Enforcement Affairs in Yerevan, Armenia, January 2008 (ongoing assignment).

Appointed as a forensic consultant for the US Department of State, Bureau of International Narcotics and Law Enforcement Affairs in Tbilisi, Georgia, May 2008.

Elected to the Board of Directors for the American Board of Forensic Examiners, February 2009 to December 2009.

Elected to the Board of Directors for the Education Committee for the American College of Forensic Examiners Institute, July 2012.

**Original Research Publications/Presentations:**
"Detection of Volatile Accelerants in Fire Debris. 1. A Comparative Evaluation... " Richard A. Strobel, Richard A. Tontarski, Larry F. Stewart, Philip Wineman presented at the American Academy of Forensic Sciences, New Orleans, Louisiana, February 1980, and the Mid-Atlantic Association of Forensic Scientists, combined meeting, Louisville, Kentucky, May 1980.

"Artificial Aging of Documents," L.F. Stewart. Published in the Journal of Forensic Sciences, Vol. 27, No. 2, April 1982.

"Ballpoint Ink Age Determination by Volatile Component Comparison," L.F. Stewart, Presented at the American Academy of Forensic Sciences meeting, Orlando, Florida, February 1982, and Mid-Atlantic Association of Forensic Scientists/Northeastem Association of Forensic Scientists joint meeting, Harrisburg, Pennsylvania, April 1982. Published in the Journal of Forensic Sciences, April 1985.

"The Role of the Secret Service in Counterfeit Deterrence," L.F. Stewart.  Presented at the Mid-Atlantic Association of Forensic Scientists meeting, Baltimore, Maryland, April 1983.

"The Forensic Analysis of Printing Inks," Larry F. Stewart.  Presented at the American Society of Questioned Document Examiners, Lake Tahoe, Nevada, September 1983.
"Counterfeit Credit Card Deterrence," Larry F. Stewart.  Presented at the American Society of Questioned Document Examiners/Canadian Society of Forensic Scientists annual meeting, Montreal, Quebec, Canada, September 1985.

"Detection of Counterfeit Currency," Larry F. Stewart. Presented at the International Association of Identification conference, Arlington, Virginia, August 1987.

"Identification of United States Currency Security Fibers by Fourier Transform Infrared Spectroscopy," J.E. Brown and L.F. Stewart.  Presented at the Canadian Society of Forensic Scientists annual meeting, Toronto, Ontario, Canada, October, 1988.

"U.S. Secret Service Ink Identification System," J.W. Hargett, J.E. Brown and L.F. Stewart. Presented at the Canadian Society of Forensic Scientists annual meeting, Toronto, Ontario, Canada, October 1988.

"Use of Enlargement Ratios of Negatives and/or Printing Plates to Characterize Counterfeit Currency," L.F. Stewart, R.L. Outland and J.E. Brown.  Presented at the Canadian Society of Forensic Scientists annual meeting, Toronto, Ontario, Canada, October 1988.

"Current Status of Ink Age Determination," L.F. Stewart and S.L Guertin.  Presented at the Ninth INTERPOL Forensic Science Symposium, INTERPOL Headquarters, Lyon, France, December 12, 1989.  Published in INTERPOL International Criminal Police Review, March-April 1991.

"A.S.T.M. Standard for Writing Ink Comparisons," L.F. Stewart and J.L. Becker
Presented at the Mid-Atlantic Association of Forensic Scientists 1991 meeting, Bethesda,
Maryland, May 31, 1991.

"Standard Guide For Test Methods For Forensic Writing Ink Comparisons," L.F. Stewart (Task
Group Chairman).  Published in the American Society For Testing and Materials (ASTM),
Standard Designation number E-1422-91, November 1991.

"Counterfeit Documents Produced by Color Copier Systems," L.F. Stewart, Presented at
INTERPOL Headquarters, Lyon, France, December 11-19, 1991.

"Sentence Insertions Detected Through Ink, ESDA and Line Width Analysis," S.L. Fortunato and
L.F. Stewart. Published in the Journal of Forensic Sciences, November 1992.

"Status of U.S.S.S. Ink Dating Program," J.W. Hargett and L.F. Stewart.  Presented at the
Humboldt University, Berlin, Germany, April 2, 1993.  Published in Kriminalistik und
Forensische Wissenschaften, No. 82, 1994.

"U.S.S.S. International Ink Library and Bulletin Board System," L.F. Stewart.  Presented at the
Mid-Atlantic Association of Forensic Scientists meeting, Baltimore, Maryland, May 20, 1993.

"Standard Guide For Test Methods For Forensic Writing Ink Identifications," L.F. Stewart (Task
Group Chairman).  Published in the American Society For Testing and Materials (ASTM),
Standard Designation number E-1422, 1995.

"The Government Response to Ink Age Determination," L.F. Stewart, J.L. Becker.  Presented at
the American Academy of Forensic Sciences meeting, Seattle, Washington, February 17, 1995.
Published in the International Criminal Police Review - INTERPOL, Spring 1996.

"Distinguishing Between Relative Ink Age Determination and the Accelerated Aging
Technique," L.F. Stewart and S.L. Fortunato.  Published in the International Journal of Forensic
Document Examiners, January/March 1996.

"Forensic Examination of Financial Crimes Documents," L.F. Stewart and J.W. Hargett.
Presented at the 6th European Conference for Police and Government Document Experts,
London, United Kingdom, October 2-4, 1996 and the GFS Conference, Luzerne, Switzerland,
September 9-12, 1997.

"Unusual Document Examination Approaches and Their Relationship to the Daubert Challenge,"
L.F. Stewart. Presented at the American Board of Forensic Document Examiners meeting, Las
Vegas, NV, June 23, 2002 and the American Society of Questioned Document Examiners
meeting, San Diego, CA, August 14, 2002.

"Forensic Science – Fake Fingerprints?," L.F. Stewart, Published in the Forensic Expert Witness
Association, Fall 2007.

"Leveling The Playing Field," L.F. Stewart. Presented at the California Association of Licensed
Investigators, Central Coast meeting, Pismo Beach, California, December 4, 2008.

"Crime Scene Investigation," L.F. Stewart, on-line course developed for and published by the
American College of Forensic Examiners Institute, January 2009.

"Identity Theft," L.F. Stewart, A-Z Literary Book Publisher, 2009.

"Document Examination," L.F. Stewart, A-Z Literary Book Publisher, 2009.

"Forensic Science – Fake Fingerprints?," L.F. Stewart, Published in the HG Experts Legal
Experts Directory on-line publication, Spring 2010.

"Forensic Science - The Good and the Bad," L.F. Stewart, Published in the HG Experts Legal
Experts Directory on-line publication, Spring 2010.

"Forensic Science - Erroneous Handwriting Opinions," L.F. Stewart, Published in the HG
Experts Legal Experts Directory on-line publication, Spring 2010.

"Forensic Handwriting Examination - Selecting Your Expert," L.F. Stewart, Published in the HG
Experts Legal Experts Directory on-line publication, Winter 2011.

"Method and System For Detecting Fraudulently Dated Documents- Method For
Measuring Evaporation in Ink in Order to Detect Fraudulently Dated Documents,"
Provisional Patent filed and accepted with the United States Patent and Trademark Office
(Application number 14/811,606, dated 7/28/15).

"Document Related Evidence at the Scene of a Crime," L.F. Stewart, Published in the Forensic Research & Criminology International Journal, April 2017.

"The Process of Forensic Handwriting Examinations," L.F. Stewart, Published in the Forensic Research & Criminology International Journal, April 2017.

"Crime Scene Investigation – Explosives," L.F. Stewart, Published in the Forensic Research & Criminology International Journal, April 2017.

**Professional Affiliations:**
American Academy of Forensic Sciences - Fellow
Canadian Society of Forensic Scientists (past member)
American Society of Crime Laboratory Directors
Document Security Alliance (past member)
Mid-Atlantic Association of Forensic Scientists (past member)
California Association of Licensed Investigators
Forensic Expert Witness Association
American College of Forensic Examiners Institute (past member)
American Chemical Society
Association For Former Intelligence Officers
Business Espionage Controls & Countermeasures Association

**Offices Held:**
Mid Atlantic Association of Forensic Scientists
Secretary/Treasurer
November 1981 to October 1984.

American Society of Crime Laboratory Directors
Board of Directors
September 14, 2000 to September 2003

Document Security Alliance
Board of Directors
December 2003 to November 2004

American Board of Forensic Examiners
Board of Directors

February 2009 to December 2009

The Academy
Board of Directors
June 2007 to present

The American College of Forensic Examiners Institute
Education Committee
July 2012 to November, 2017

Forensic Research & Criminology International Journal
Editorial Board
Honorable Editor
June 2015 to present

**Contact Information:**
Physical Address:
Global Forensic Services, LLC
680 Leff Street
San Luis Obispo, California 93401

Mailing Address:
Global Forensic Services, LLC
793A East Foothill Boulevard, Suite 200
San Luis Obispo, California 93405

Tel/Fax: (805) 595-1333/3333, Cell: (202) 550-6233
Email: contact@global4n6.com
Website: http://www.global4n6.com

# Attachment 2

Larry Stewart

## Testimony Listing

| | | | |
|---|---|---|---|
| 11-03-500 | 2/28/12 | People v. Juan Rios<br>10F03778 (sworn declaration submitted in<br>lieu of testimony) | Sacramento, CA |
| 11-12-200 | 4/17/12 | FL v. Gerald Murray<br>Circuit Court<br>Case No, 92-3708 CFA | Jacksonville, FL |
| 11-07-100 | 7/11/12 | Ceglia v. Zuckerberg<br>& Facebook, INC<br>1:10-cv-00560-RJA | New York, NY |
| 11-12-300 | 7/20/12 | Nancy OH and Suk Ki LEE<br>v. Super Center Concepts<br>Superior Court<br>BC459616 | Los Angeles, CA |
| 12-07-300 | 9/13/12 | Duncan v. Reichhold<br>Cause No. 1122-CC09254 | San Luis Obispo, CA |
| 12-08-400 | 1/25/13 | Wuxi Luoshe Printing<br>and Dyeing Co, et al.<br>v. Anshan Li, et al.<br>Case No. CIV 502381 | San Francisco, CA |
| 12-08-400 | 5/20/13 | Wuxi Luoshe Printing<br>and Dyeing Co, et al.<br>v. Anshan Li, et al.<br>San Mateo Superior Court<br>Case No. CIV 502381 | Redwood City, CA |
| 13-03-300 | 7/25/13 | Jung v. Heebner<br>(Roger Williams Estate)<br>Los Angeles Superior Court<br>Probate Case BP133277 | San Luis Obispo, CA |
| 13-12-600 | 2/3/14 | Gold Glove Productions,<br>LLC v. Handfield, et al.<br>Case No. CV13-07247-DSF (RZx) | Los Angeles, CA |
| 13-03-300 | 6/10/14 | Jung v. Heebner<br>(Roger Williams Estate)<br>Los Angeles Superior Court<br>Probate Case BP133277 | Los Angeles, CA |
| 14-06-200 | 6/19/14 | Yong v. Public Auction<br>Los Angeles Superior Court<br>Department 50 | Los Angeles, CA |
| 14-03-300 | 7/21/14 | Wright v. Albanese, et al.<br>San Luis Obispo Superior Court<br>Case No. 14CVP-0026 | Paso Robles, CA |

Larry Stewart

## Testimony Listing

| | | |
|---|---|---|
| 13-01-400 | 8/13/14 | Hill v Wilke Fleury,et al. San Francisco, CA<br>Sacramento Superior Court<br>Case No. 34-2011-00114402 |
| 14-09-800 | 12/12/14 | Emirat AG v High Point        Milwaukee, WI<br>Printing, LLC, et al.<br>Case No. 2:12-cv-00789 |
| 15-01-100 | 4/10/15 | Estate of Dodson        San Luis Obispo, CA<br>San Luis Obispo Superior Court<br>Department 1 |
| 14-10-500 | 4/15/15 | Charles Liddell, et al.  San Luis Obispo, CA<br>v Cuesta Title Co., et al.<br>Case No. CV 09-0676 |
| 14-10-500 | 6/9-10/15 | Charles Liddell, et al.  San Luis Obispo, CA<br>v Cuesta Title Co., et al.<br>Case No. CV 09-0676<br>San Luis Obispo Superior Court<br>Department 1 |
| 15-04-100 | 8/31/15 | Gibbens v.McCune        San Luis Obispo, CA<br>Case No. 2014CV30743 |
| 15-11-400 | 1/2/16 | Halvorssen v. Utzinger        Hollywood, CA<br>Case No. 30-2014-00712430-CU-FR-CJC<br>Orange County Superior Court<br>Dept. C13 |
| 15-12-200 | 2/4/16 | Ibarra v. Alvarez        Watsonville, CA<br>Telephonic deposition San Luis Obispo, CA |
| 11-12-200 | 2/29/16 | FL v. Gerald Murray        Jacksonville, FL<br>Case No, 92-3708 CFA<br>Telephonic Court testimony from San Luis<br>Obispo, CA |
| 15-12-200 | 3/7/16 | Ibarra v. Alvarez        Santa Cruz, CA<br>Superior Court - Dept. 5<br>CV 181343 |
| 16-03-200 | 5/6/16 | Yee v. Lee        New York City, NY<br>Wei Lu Chiang Estate<br>NY County Civil Court<br>Manhattan |
| 16-03-700 | 5/24/16 | Rodriguez v. Salazar    Woodland Hills, CA<br>Claim Number 55-1X11-109 |
| 14-09-700 | 9/6/16 | Mirzoyan v. Melikyan,    Woodland Hills, CA<br>Natnic, LLC, et al.<br>Los Angeles Superior Court - Dept. 68<br>Case No. BC548436 |

Testimony Listing

```
17-01-200        1/31/17   Hayun v. Reani, et al      Los Angeles, CA
                           Los Angeles Superior Court - Dept. 17
                           Case No. BC539235
                           Related Case No. BC608799

16-10-300        6/20/17   Blizzard Energy Inc. v.      Great Bend, KS
                           Alexdrov, Gitman & Schaefers
                           Barton County District Court
                           Case No. 15-CV55

17-05-400        6/30/17   Man Nguyen v. Lan Diep         San Jose, CA
                           Santa Clara Superior Court
                           Case No. 16-CV-298336

17-03-100        7/7/17    Starr's Building Supply, Inc.   Sacramento, CA
                           v. Lathrop Construction Assoc., Inc, et al.
                           Solano County Superior Court
                           Case No. FCS 045221

17-05-400        8/10/17   Man Nguyen v. Lan Diep         San Jose, CA
                           Santa Clara Superior Court
                           Case No. 16-CV-298336

17-03-400        8/15/17   Delgado v. Franklin      San Luis Obispo, CA
                           San Luis Obispo Superior Court
                           Case No. 16-CV-0218

17-12-400        2/27/18   Lee, et al v Kwan, et al      San Jose, CA
                           Judicial Arbitration Mediation
                           San Jose, CA
                           Master Ref. No. 1110019090

17-12-400        9/26/18   Lee, et al v Kwan, et al      San Jose, CA
                           Judicial Arbitration Mediation
                           San Jose, CA
                           Master Ref. No. 1110019090

18-06-100        9/27/18   CA v. Cole Malone       San Luis Obispo, CA
                           San Luis Obispo Superior Court
                           Case No. 16F-08258-A

18-09-500        4/17/19   Terry Sterling v. Ryan Hart    Santa Cruz, CA
                           Santa Cruz Superior Court
                           Case No. 18CV02100

19-04-200        4/30/19   Aaron Steed v. Erin Steed  San Luis Obispo, CA
                           San Luis Obispo Superior Court
                           Department 12

12-11-300        7/24/19   Rostack v. Sabella, et al.    Los Angeles, CA
                           Los Angeles Superior Court
                           Department 56
                           Case No. BC428298

19-04-600        10/01/19  Grupo Flor, LLC v.             San Jose, CA
```

Larry Stewart

## Testimony Listing

|  |  |  |  |
|---|---|---|---|
|  |  | Moss Landing, et al.<br>Case No. 17CV004079 |  |
| 19-03-100 | 11/4/19 | Domingo Silva v.<br>Lorena Silva<br>Case No. 18FLP-0145 | Paso Robles, CA |
| 19-02-100 | 11/15/19 | 246 Atherton Avenue LLC<br>v. Trans Fluors LLC, et al.<br>San Mateo Sup. Court<br>No. 16CIV02957 | San Jose, CA |
| 19-06-100 | 12/11/19 | The Allen A. Posner Trust<br>Orange Co. Superior Court<br>Case No.<br>30-2015-00820548-PR-TR-CJC | Irvine, CA |
| 19-08-400 | 1/3/20 | Thomas Hardt v. Naomi Hardt<br>Kern Co. Superior Court<br>Case No. S1501FL627880 | Oxnard, CA |
| 19-08-400 | 1/22/20<br>1/23/20 | Thomas Hardt v. Naomi Hardt<br>Kern Co. Superior Court<br>Case No. S1501FL627880 | Los Angeles, CA |
| 18-11-100 | 2/19/20 | Nadine Salas/Carol<br>Joyce Steele (deceased)<br>Del Norte Superior Court (Dept 2) | Crescent City, CA |
| 20-10-100 | 10/30/20 | Masood Khan v. The Greenspan<br>Company, et al.<br>Superior Court County of San Francisco<br>Case No. CGC-19-581129 | San Francisco, CA |

# Attachment 3

**Designation: E 444 – 06**

# Standard Descriptions of Scope of Work Relating to Forensic Document Examiners[1]

This standard is issued under the fixed designation E 444; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ϵ) indicates an editorial change since the last revision or reapproval.

## 1. Scope

1.1 This description covers in general the duties of forensic document examiners, also referred to as questioned document examiners, examiners of questioned documents, document examiners, or document analysts.

## 2. Job Description

2.1 The forensic document examiner makes scientific examinations, comparisons, and analyses of documents in order to: (*1*) establish genuineness or nongenuineness, or to expose forgery, or to reveal alterations, additions, or deletions, (*2*) identify or eliminate persons as the source of handwriting, (*3*) identify or eliminate the source of typewriting or other impression, marks, or relative evidence, and (*4*) write reports or give testimony, when needed, to aid the users of the examiner's services in understanding the examiner's findings.

## 3. General Duties

3.1 Examiners in this field are sometimes known by the term "handwriting experts." Forensic document examination includes expertise in handwriting identification. Handwriting includes cursive or script style writing, handprinting, signatures, numerals, and other written marks or signs. Forensic document examination does not involve the employment of calligraphic or engrossing skills, nor does it involve a study of handwriting in an attempt to create a personality profile or otherwise analyze or judge the writer's personality or character.

3.2 Questions about documents arise in business, finance, civil and criminal trials, or in any matter affected by the integrity of written communications and records.

3.2.1 Typical problems in this field are:

3.2.1.1 the identification of handwriting, typewriting,

3.2.1.2 the identification or elimination of the source of and the output of other mechanical or electronic imaging devices such as printers, copying machines, facsimile equipment, and the like,

3.2.1.3 the identification or elimination of ink, paper, and writing instruments,

3.2.1.4 the establishment of the date, source, history, sequence of preparation, alterations or additions to documents, and relationships of documents.

3.2.2 Other problems are the decipherment and sometimes the restoration, or both, of obscured, deleted, or damaged parts of documents.

3.2.3 The work often includes a study of the information carried by a document for discovery of evidence of spuriousness, identification of persons, or to show significant relationships.

3.2.4 Document examination also includes the recognition and preservation of other relevant physical evidence that may be present on documents.

3.3 Equipment used in forensic document examination includes: microscopes and other optical aids; photographic and other imaging devices, a wide variety of imaging materials adaptable for use with a variety of lighting methods, including those involving radiant energy in the ultraviolet, visible, infrared, and other regions of the electromagnetic spectrum; as well as electrostatic or other devices for the detection, or visualization, or both of indentations and other features present in or on paper or similar substrata. Other analytical instrumentation may be used where appropriate.

3.4 Questions about documents are answered through the application of knowledge, skill, experience, training, or education specific to forensic document examination (usually acquired through 24 or more months of contact training, or apprenticeship, or the equivalent and the study of the recognized texts in the field) as well as from a number of other fields, such as the physical sciences, mathematics, language studies, and the like. The field of interest includes manufacturing processes and the materials that go into the production of documents, as well as the methods, machines, instruments, and human agencies by which the parts of documents are formed or brought together.

3.5 The results of examinations are reported for use by the judiciary, administrative and executive officers, law enforcement agencies, boards, commissions, lawyers, and individuals. These results are often presented in the form of expert testimony, explaining the bases and reasons for the conclusions, which may be illustrated by the use of demonstrative evidence.

---

[1] These descriptions are under the jurisdiction of ASTM Committee E30 on Forensic Sciences and is the direct responsibility of Subcommittee E30.02 on Questioned Documents.

Current edition approved April 1, 2006. Published April 2006. Originally approved in 1972. Last previous edition approved in 1998 as E 444 – 98.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States.

 **E 444 – 06**

*ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.*

*This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.*

*This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org).*

**Designation: E 1658 – 04**

# Standard Terminology for
# Expressing Conclusions of Forensic Document Examiners[1]

This standard is issued under the fixed designation E 1658; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

## 1. Scope

1.1 This terminology is intended to assist forensic document examiners in expressing conclusions based on their examination.

1.2 This terminology is based on the report of a committee of the Questioned Document Section of the American Academy of Forensic Science which was adopted as the recommended guidelines in reports and testimony by the Questioned Document Section of the American Academy of Forensic Science and the American Board of Forensic Document Examiners[2,3].

## 2. Referenced Documents

2.1 *ASTM Standards:* [2]
E 444  Guide for Description of Work of Forensic Document Examiners

## 3. Significance and Use

3.1 Document examiners begin their handwriting examinations from a point of complete neutrality. There are an infinite number of gradations of opinion toward an identification or toward an elimination. It is in those cases wherein the opinion is less than definite that careful attention is especially needed in the choice of language used to convey the weight of the evidence.

3.2 Common sense dictates that we must limit the terminology we use in expressing our degrees of confidence in the evidence to terms that are readily understandable to those who use our services (including investigators, attorneys, judges, and jury members), as well as to other document examiners. We must be careful that the expressions we use in separating the gradations of opinions do not become strongly defined "categories" that will always be used as a matter of convenience; instead, these expressions should be guidelines without sharply defined boundaries.

3.3 When a forensic document examiner chooses to use one of the terms defined below, the listener or reader can assume that this is what the examiner intended the term to mean. To avoid the possibility of misinterpretation of a term where the expert is not present to explain the guidelines in this standard, the appropriate definition(s) could be quoted in or appended to reports.

3.4 The examples are given both in the first person and in third person since both methods of reporting are used by document examiners and since both forms meet the main purpose of the standard, *i. e.,* to suggest terminology that is readily understandable. These examples should not be regarded as the only ways to utilize probability statements in reports and testimony. In following any guidelines, the examiner should always bear in mind that sometimes the examination will lead into paths that cannot be anticipated and that no guidelines can cover exactly.

3.5 Although the material that follows deals with handwriting, forensic document examiners may apply this terminology to other examinations within the scope of their work, as described in Guide E 444, and it may be used by forensic examiners in other areas, as appropriate.

3.6 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

## 4. Terminology

4.1 *Recommended Terms:*

**identification (definite conclusion of identity)**—this is the highest degree of confidence expressed by document examiners in handwriting comparisons. The examiner has no reservations whatever, and although prohibited from using the word "fact," the examiner is certain, based on evidence contained in the handwriting, that the writer of the known material actually wrote the writing in question.

---

[1] This terminology is under the jurisdiction of ASTM Committee E30 on Forensic Sciences and is the direct responsibility of Subcommittee E30.02 on Questioned Documents.

Current edition approved Oct. 1, 2004. Published November 2004. Originally approved in 1995. Last previous edition approved in 1996 as E 1658 – 96.

[2] McAlexander, T. V., Beck, J., and Dick, R., "The Standardization of Handwriting Opinion Terminology," *Journal of Forensic Science*, Vol. 36. No. 2, March 1991, pp. 311–319.

[3] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For *Annual Book of ASTM Standards* volume information, refer to the standard's Document Summary page on the ASTM website.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States.

E 1658 – 04

*Examples*—It has been concluded that John Doe wrote the questioned material, or it is my opinion [or conclusion] that John Doe of the known material wrote the questioned material.

**strong probability (highly probable, very probable)**—the evidence is very persuasive, yet some critical feature or quality is missing so that an *identification* is not in order; however, the examiner is virtually certain that the questioned and known writings were written by the same individual.

*Examples*—There is *strong probability* that the John Doe of the known material wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *very probably* wrote the questioned material.

DISCUSSION—Some examiners doubt the desirability of differentiating between **strong probability** and **probable**, and certainly they may eliminate this terminology. But those examiners who are trying to encompass the entire "gray scale" of degrees of confidence may wish to use this or a similar term.

**probable**—the evidence contained in the handwriting points rather strongly toward the questioned and known writings having been written by the same individual; however, it falls short of the" virtually certain" degree of confidence.

*Examples*—It has been concluded that the John Doe of the known material probably wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *probably* wrote the questioned material.

**indications (evidence to suggest)**—a body of writing has few features which are of significance for handwriting comparison purposes, but those features are in agreement with another body of writing.

*Examples*—There is evidence which *indicates* (or *suggests*) that the John Doe of the known material may have written the questioned material but the evidence falls far short of that necessary to support a definite conclusion.

DISCUSSION—This is a very weak opinion, and a report may be misinterpreted to be an identification by some readers if the report simply states, "The evidence *indicates* that the John Doe of the known material wrote the questioned material." There should always be additional limiting words or phrases (such as "may have" or "but the evidence is far from conclusive") when this opinion is reported, to ensure that the reader understands that the opinion is weak. Some examiners doubt the desirability of reporting an opinion this vague, and certainly they cannot be criticized if they eliminate this terminology. But those examiners who are trying to encompass the entire "gray scale" of degrees of confidence may wish to use this or a similar term.

**no conclusion (totally inconclusive, indeterminable)**—This is the zero point of the confidence scale. It is used when there are significantly limiting factors, such as disguise in the questioned and/or known writing or a lack of comparable writing, and the examiner does not have even a leaning one way or another.

*Examples*—*No conclusion* could be reached as to whether or not the John Doe of the known material wrote the questioned material, or I could not determine whether or not the John Doe of the known material wrote the questioned material.

**indications did not**—this carries the same weight as the indications term that is, it is a very weak opinion.

*Examples*—There is very little significant evidence present in the comparable portions of the questioned and known writings, but that evidence *suggests* that the John Doe of the known material did not write the questioned material, or I found *indications* that the John Doe of the known material did *not* write the questioned material but the evidence is far from conclusive.

See Discussion after **indications**.

**probably did not**—the evidence points rather strongly against the questioned and known writings having been written by the same individual, but, as in the probable range above, the evidence is not quite up to the "virtually certain" range.

*Examples*—It has been concluded that the John Doe of the known material probably did not write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material probably did not write the questioned material.

DISCUSSION—Some examiners prefer to state this opinion: "It is unlikely that the John Doe of the known material wrote the questioned material." There is no strong objection to this, as "unlikely" is merely the Anglo-Saxon equivalent of "improbable".

**strong probability did not**—this carries the same weight as strong probability on the identification side of the scale; that is, the examiner is virtually certain that the questioned and known writings were not written by the same individual.

*Examples*—There is strong probability that the John Doe of the known material did not write the questioned material, or in my opinion (or conclusion or determination) it is highly probable that the John Doe of the known material did not write the questioned material.

DISCUSSION—Certainly those examiners who choose to use "unlikely" in place of "probably did not" may wish to use "highly unlikely" here.

**elimination**—this, like the *definite conclusion of identity*, is the highest degree of confidence expressed by the document examiner in handwriting comparisons. By using this expression the examiner denotes no doubt in his opinion that the questioned and known writings were not written by the same individual.

*Examples*—It has been concluded that the John Doe of the known material did not write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material did not write the questioned material.

DISCUSSION—This is often a very difficult determination to make in handwriting examinations, especially when only requested exemplars are available, and extreme care should be used in arriving at this conclusion.

4.1.1  When the opinion is less than definite, there is usually a necessity for additional comments, consisting of such things as reasons for qualification (if the available evidence allows that determination), suggestions for remedies (if any are known), and any other comments that will shed more light on the report. The report should stand alone with no extra explanations necessary.

E 1658 – 04

4.2 *Deprecated and Discouraged Expressions*:

4.2.1 Several expressions occasionally used by document examiners are troublesome because they may be misinterpreted to imply bias, lack of clarity, or fallaciousness and their use is deprecated. Some of the terms are so blatantly inane (such as "make/no make") that they will not be discussed. The use of others is discouraged because they are incomplete or misused. These expressions include:

**possible/could have**—these terms have no place in expert opinions on handwriting because the examiner's task is to decide to what degree of certainty it can be said that a handwriting sample is by a specific person. If the evidence is so limited or unclear that no definite or qualified opinion can be expressed, then the proper answer is *no conclusion*. To say that the suspect "could have written the material in question" says nothing about probability and is therefore meaningless to the reader or to the court. The examiner should be clear on the different meanings of "possible" and "probable," although they are often used interchangeably in everyday speech.

**consistent with**—there are times when this expression is perfectly appropriate, such as when "evidence consistent with disguise is present" or "evidence consistent with a simulation or tracing is present, but "the known writing is consistent with the questioned writing" has no intelligible meaning.

**could not be identified/cannot identify**—these terms are objectionable not only because they are ambiguous but also because they are biased; they imply that the examiner's task is only to identify the suspect, not to decide whether or not the suspect is the writer. If one of these terms is used, it should always be followed by "or eliminate[d]".

**similarities were noted/differences as well as similarities**—these expressions are meaningless without an explanation as to the extent and significance of the similarities or differences between the known and questioned material. These terms should never be substituted for gradations of opinions.

**cannot be associated/cannot be connected**—these terms are too vague and may be interpreted as reflecting bias as they have no counterpart suggesting that the writer cannot be eliminated either.

**no identification**—this expression could be understood to mean anything from a strong probability that the suspect wrote the questioned writing; to a complete elimination. It is not only confusing but also grammatically incorrect when used informally in sentences such as." I no identified the writer" or "I made a no ident in this case."

**inconclusive**—this is commonly used synonymously with no conclusion when the examiner is at the zero point on the scale of confidence. A potential problem is that some people understand this term to mean something short of definite (or conclusive), that is, any degree of probability, and the examiner should be aware of this ambiguity.

**positive identification**—This phrase is inappropriate because it seems to suggest that some identifications are more positive than others.

**[strong] reason to believe**—there are too many definitions of *believe* and *belief* that lack certitude. It is more appropriate to testify to our conclusion (or determination or expert opinion) than to our belief, so why use that term in a report?

**qualified identification**—An *identification* is not qualified. However, opinions may be qualified when the evidence falls short of an *identification* or *elimination*.

*ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.*

*This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.*

*This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org).*



**Designation: E 2290 – 07**

# Standard Guide for
# Examination of Handwritten Items[1]

This standard is issued under the fixed designation E 2290; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

## 1. Scope

1.1 This guide provides procedures that should be used by forensic document examiners (E 444) for examinations and comparisons involving handwritten items and related procedures.

1.2 These procedures are applicable whether the examination and comparison is of questioned and known items or of exclusively questioned items.

1.3 These procedures include evaluation of the sufficiency of the material (questioned, or known, or both) available for examination.

1.4 The particular methods employed in a given case will depend upon the nature of the material available for examination.

1.5 This guide may not cover all aspects of unusual or uncommon examinations of handwritten items.

1.6 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory requirements prior to use.*

## 2. Referenced Documents

2.1 *ASTM Standards:* [2]

E 444 Descriptions of Scope of Work Relating to Forensic Document Examiners

E 1658 Terminology for Expressing Conclusions of Forensic Document Examiners

E 1732 Terminology Relating to Forensic Science

E 2195 Terminology Relating to the Examination of Questioned Documents

## 3. Terminology

3.1 For definitions of terms in this guide, refer to Terminologies E 1732 and E 2195.

3.2 *Definitions:*

3.2.1 *known, n/adj*——of established origin associated with the matter under investigation.                    **E 1732**

3.2.2 *questioned, n/adj*——associated with the matter under investigation about which there is some question, including, but not limited to, whether the questioned and known items have a common origin.                    **E 1732**

3.3 *Definitions of Terms Specific to This Standard:*

3.3.1 *absent character, n*—a character or character combination which is present in one body of writing but is not present (for example, does not have a corresponding character) in another body of writing.

3.3.2 *character, n*—any language symbol (for example, letter, numeral, punctuation mark, or other sign), other symbol, or ornament.

3.3.3 *characteristic, n*—a feature, quality, attribute, or property of writing.

3.3.4 *comparable, n/adj*——pertaining to handwritten items that contain the same type(s) of writing and similar characters, words, and combinations. Contemporaneousness and writing instruments may also be factors.

3.3.5 *distorted writing, n*—writing that does not appear to be, but may be natural. This appearance can be due to either voluntary factors (for example, disguise, simulation) or involuntary factors (for example, physical condition of the writer, writing conditions).

3.3.6 *handwritten item, n*—an item bearing something written by hand (for example, cursive writing, hand printing, signatures).

NOTE 1—As used in this standard "handwriting" and "handwritten" are generic terms. Writing is generally, but not invariably, produced using the hand, and may be the result of some other form of direct manipulation of a writing or marking instrument by an individual.

---
[1] This guide is under the jurisdiction of ASTM Committee E30 on Forensic Sciences and is the direct responsibility of Subcommittee E30.02 on Questioned Documents.

Current edition approved March 15, 2007. Published April 2007. Originally approved in 2003. Last previous edition approved in 2003 as E 2290 – 03.

[2] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For *Annual Book of ASTM Standards* volume information, refer to the standard's Document Summary page on the ASTM website.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States.

E 2290 – 07

3.3.7 *individualizing characteristics*, *n*—marks or properties that serve to uniquely characterize writing.

3.3.7.1 *Discussion*—Both class characteristics (marks or properties that associate individuals as members of a group) and individual characteristics (marks or properties that differentiate the individual members in a group) are individualizing characteristics.

3.3.8 *item*, *n*—an object or quantity of material on which a set of observations can be made.

3.3.9 *natural writing*, *n*—any specimen of writing executed without an attempt to control or alter its usual quality of execution.

3.3.10 *range of variation*, *n*—the accumulation of deviations among repetitions of respective handwriting characteristics that are demonstrated in the writing habits of an individual. (See *variation*, 3.3.15).

3.3.11 *significant difference*, *n*—an individualizing characteristic that is structurally divergent between handwritten items, that is outside the range of variation of the writer, and that cannot be reasonably explained.

3.3.12 *significant similarity*, *n*—an individualizing characteristic in common between two or more handwritten items.

3.3.13 *sufficient quantity*, *n*—that amount of writing required to assess the writer's range of variation, based on the writing examined.

3.3.14 *type of writing*, *n*—refers to hand printing, cursive writing, numerals, symbols, or combinations thereof, and signatures.

3.3.15 *variation*, *n*—those deviations among repetitions of the same handwriting characteristic(s) that are normally demonstrated in the habits of each writer.

3.3.15.1 *Discussion*—Since variation is an integral part of natural writing, no two writings of the same material by the same writer are identical in every detail. Within a writer's range of variation, there are handwriting habits and patterns that are repetitive and similar in nature. These repetitive features give handwriting a distinctive individuality for examination purposes. Variation can be influenced by internal factors such as illness, medication, intentional distortion, etc. and external factors such as writing conditions and writing instrument, etc.

## 4. Significance and Use

4.1 The procedures outlined here are grounded in the generally accepted body of knowledge and experience in the field of forensic document examination. By following these procedures, a forensic document examiner can reliably reach an opinion concerning whether two or more handwritten items were written by the same person(s).

NOTE 2—The phrase "written by the same person(s)" refers to physical generation of the writing, not intellectual ownership of the content.

## 5. Interferences

5.1 Items submitted for examination may have inherent limitations that can interfere with the procedures in this Guide. Limitations should be noted and recorded.

5.2 Limitations can be due to submission of non-original documents, limited quantity or comparability, or condition of the items submitted for examination. Other limitations can come from the quantity or comparability of the writing submitted, and include absent characters, dissimilarities, or limited individualizing characteristics. Such features are taken into account in this guide.

5.3 The results of prior storage, handling, testing, or chemical processing (for example, for latent prints) may interfere with the ability of the examiner to see certain characteristics. Whenever possible, document examinations should be conducted prior to any chemical processing. Items should be handled appropriately to avoid compromising subsequent examinations (for example, with clean cloth gloves).

5.4 Consideration should be given to the possibility that various forms of simulations, imitations, and duplications of handwriting can be generated by computer and other means.

## 6. Equipment and Requirements

6.1 Appropriate light source(s) of sufficient intensity to allow fine detail to be distinguished.

NOTE 3—Natural light, incandescent or fluorescent sources, or fiber optic lighting systems are generally utilized. Transmitted lighting, side lighting, and vertical incident lighting have been found useful in a variety of situations.

6.2 Magnification sufficient to allow fine detail to be distinguished.

6.3 Other apparatus as appropriate.

6.4 Imaging or other equipment for recording observations as required.

6.5 Sufficient time and facilities to complete all applicable procedures.

## 7. Procedure

7.1 All procedures shall be performed when applicable and noted when appropriate. These procedures need not be performed in the order given.

7.2 Examinations, relevant observations, and results shall be documented.

7.3 At various points in these procedures, a determination that a particular feature is not present or that an item is lacking in quality or comparability may indicate that the examiner should discontinue or limit the procedure(s). It is at the discretion of the examiner to discontinue the procedure at that point and report accordingly or to continue with the applicable procedures to the extent possible. The reasons for such a decision shall be documented.

7.4 Determine whether the examination is a comparison of questioned writing to known writing or a comparison of questioned writing to questioned writing.

7.5 Determine whether the questioned writing is original writing. If it is not original writing, request the original.

NOTE 4—Examination of the original questioned writing is preferable.

7.5.1 If the original is not submitted, evaluate the quality of the best available reproduction to determine whether the significant details of the writing have been reproduced with sufficient clarity for comparison purposes and proceed to the extent possible. If the writing has not been reproduced with sufficient clarity for comparison purposes, discontinue these procedures and report accordingly.

2

E 2290 – 07

7.6 Determine whether the questioned writing appears to be distorted. If it appears to be distorted, determine whether it is possible to establish that the apparently distorted writing is natural writing.

7.6.1 If it is not natural writing, or if it is not possible to establish whether the apparently distorted writing is natural writing, determine whether the apparently distorted writing is suitable for comparison and proceed to the extent possible. If the available questioned writing is not suitable for comparison, discontinue these procedures and report accordingly.

7.7 Evaluate the questioned writing for the following:

7.7.1 *Type of Writing*—If there is more than one type of writing within the questioned writing, separate the questioned writing into groups of single types of writing.

7.7.2 *Internal Consistency*—If there are inconsistencies within any one of the groups created in 7.7.1 (for example, suggestive of multiple writers), divide the group(s) into sub-groups, each one of which is consistent.

7.7.3 Determine range of variation of the writing for each group or sub-group of the questioned writing created in 7.7.1 and 7.7.2.

7.7.4 Determine presence or absence of individualizing characteristics.

7.7.5 If the examination is a comparison of exclusively questioned writing, go to 7.12.

7.8 Determine whether the known writing is original writing. If it is not original writing, request the original.

NOTE 5—Examination of the original known writing is preferable.

7.8.1 If the original is not submitted, evaluate the quality of the best available reproduction to determine whether the significant details of the writing have been reproduced with sufficient clarity for comparison purposes and proceed to the extent possible. If the writing has not been reproduced with sufficient clarity for comparison purposes, discontinue these procedures and report accordingly.

7.9 Determine whether the known writing appears to be distorted. If it appears to be distorted, determine whether it is possible to establish that the apparently distorted writing is natural writing.

7.9.1 If it is not natural writing, or if it is not possible to establish whether the apparently distorted writing is natural writing, determine whether the apparently distorted writing is suitable for comparison and proceed to the extent possible. It should be determined whether additional known writing would be of assistance, and if so, it should be requested. If the available known writing is not suitable for comparison, discontinue these procedures and report accordingly.

7.10 Evaluate the known writing for the following:

7.10.1 *Type of Writing*—If there is more than one type of writing within the known writing, separate the known writing into groups of single types of writing.

7.10.2 *Internal Consistency*—If there are unresolved inconsistencies within any of the groups created in 7.10.1 (for example, suggestive of multiple writers), contact the submitter for authentication. If any inconsistencies are not resolved to the examiner's satisfaction, discontinue these procedures for the affected group(s), and report accordingly.

7.10.3 Determine range of variation of the writing for each group of the known writing created in 7.10.1 and 7.10.2.

7.10.4 Determine presence or absence of individualizing characteristics.

7.11 Evaluate the comparability of the bodies of writing (questioned writing to known writing or exclusively questioned writing).

7.11.1 If the bodies of writing are not comparable, discontinue comparison and request comparable known writing, if appropriate.

7.11.1.1 If comparable known writing is made available, return to 7.10. If comparable known writing is not made available, discontinue these procedures and report accordingly.

7.12 Conduct a side-by-side comparison of comparable portions of the bodies of writing.

7.12.1 Determine whether there are differences, absent characters, and similarities.

7.12.2 Evaluate their significance individually and in combination.

7.12.3 Determine if there is a sufficient quantity of writing (questioned writing, or known writing, or both).

7.12.3.1 If writing (questioned writing, or known writing, or both) is not sufficient in quantity for an elimination or an identification, continue the comparison to the extent possible. When appropriate, request more known writing. If more known writing is made available, return to 7.10.

7.12.4 Analyze, compare, and evaluate the individualizing characteristics and other potentially significant features present in the comparable portions of the bodies of writing.

NOTE 6—Among the features to be considered are elements of the writing such as abbreviation; alignment; arrangement, formatting, and positioning; capitalization; connectedness and disconnectedness; cross strokes and dots, diacritics and punctuation; direction of strokes; disguise; embellishments; formation; freedom of execution; handedness; legibility; line quality; method of production; pen hold and pen position; overall pressure and patterns of pressure emphasis; proportion; simplification; size; skill; slant or slope; spacing; speed; initial, connecting, and terminal strokes; system; tremor; type of writing; and range of variation.

Other features such as lifts, stops and hesitations of the writing instrument; patching and retouching; slow, drawn quality of the line; unnatural tremor; and guide lines of various forms should be evaluated when present.

Potential limiting factors such as age; illness or injury; medication, drugs or alcohol (intoxication or withdrawal); awkward writing position; cold or heat; fatigue; haste or carelessness; nervousness; nature of the document, use of the unaccustomed hand; deliberate attempt at disguise or auto-forgery should be considered.

For further details, see the referenced texts.

7.12.5 Evaluate the similarities, differences, and limitations. Determine their significance individually and in combination.

7.13 Form a conclusion based on results of the above analyses, comparisons, and evaluations.

## 8. Reporting Conclusions

8.1 The conclusion(s) or opinion(s) resulting from the procedures in this Guide may be reached once sufficient examinations have been conducted.

8.2 The bases and reasons for the conclusion(s), opinion(s), or finding(s) should appear in the examiner's documentation and may also appear in the report.

 E 2290 – 07

8.3 Refer to Terminology E 1658 for reporting conclusion(s) or opinion(s).

**9. Keywords**

9.1 forensic sciences; handwriting; questioned documents

**REFERENCES**

(**1**) Conway, J. V. P., *Evidential Documents*, Springfield, IL, Charles C. Thomas, 1959.

(**2**) Harrison, W. R., *Suspect Documents*, London, Sweet and Maxwell, 1958 and 1966.

(**3**) Hilton, O., *Scientific Examination of Questioned Documents*, New York, Elsevier, 1982.

(**4**) Huber, R. A. and Headrick, A. M., *Handwriting Identification: Facts and Fundamentals*, Boca Raton, FL, CRC Press, 1999.

(**5**) Osborn, A. S., *Questioned Documents*, 2d ed., Albany, NY, Boyd Printing Co., 1929.

*ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.*

*This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.*

*This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org).*

**SWGDOC Standard for Examination of Handwritten Items**

1. Scope

1.1 This standard provides procedures that should be used by forensic document examiners (SWGDOC Standard for Scope of Work of Forensic Document Examiners) for examinations and comparisons involving handwritten items and related procedures.

1.2 These procedures are applicable whether the examination and comparison is of questioned and known items or of exclusively questioned items.

1.3 These procedures include evaluation of the sufficiency of the material (questioned, or known, or both) available for examination.

1.4 The particular methods employed in a given case will depend upon the nature of the material available for examination.

1.5 This standard may not cover all aspects of unusual or uncommon examinations of handwritten items.

1.6 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory requirements prior to use.*

2. Referenced Documents

2.1 *Standards:*

ASTM E1732 Terminology Relating to Forensic Science

SWGDOC Standard for Scope of Work of Forensic Document Examiners

SWGDOC Terminology for Expressing Conclusions of Forensic Document Examiners

SWGDOC Terminology Relating to the Examination of Questioned Documents

3. Terminology

3.1 For definitions of terms in this standard, refer to Terminologies E1732 and SWGDOC Terminology Relating to the Examination of Questioned Documents.

3.2 *Definitions:*

3.2.1 *known, n/adj*——of established origin associated with the matter under investigation. E1732

3.2.2 *questioned, n/adj*——associated with the matter under investigation about which there is some question, including, but not limited to, whether the questioned and known items have a common origin. E1732

3.3 *Definitions of Terms Specific to This Standard:*

3.3.1 *absent character*, *n*—a character or character combination which is present in one body of writing but is not present (for example, does not have a corresponding character) in another body of writing.

3.3.2 *character*, *n*—any language symbol (for example, letter, numeral, punctuation mark, or other sign), other symbol, or ornament.

3.3.3 *characteristic*, *n*—a feature, quality, attribute, or property of writing.

3.3.4 *comparable, n/adj*——pertaining to handwritten items that contain the same type(s) of writing and similar characters, words, and combinations. Contemporaneousness and writing instruments may also be factors.

3.3.5 *distorted writing*, *n*—writing that does not appear to be, but may be natural. This appearance can be due to either voluntary factors (for example, disguise, simulation) or involuntary factors (for example, physical condition of the writer, writing conditions).

3.3.6 *handwritten item*, *n*—an item bearing something written by hand (for example, cursive writing, hand printing, signatures).

NOTE 1—As used in this standard "handwriting" and "handwritten" are generic terms. Writing is generally, but not invariably, produced using the hand, and may be the result of some other form of direct manipulation of a writing or marking instrument by an individual.

3.3.7 *individualizing characteristics*, *n*—marks or properties that serve to uniquely characterize writing.

3.3.7.1 *Discussion*—Both class characteristics (marks or properties that associate individuals as members of a group) and individual characteristics (marks or properties that differentiate the individual members in a group) are individualizing characteristics.

3.3.8 *item*, *n*—an object or quantity of material on which a set of observations can be made.

3.3.9 *natural writing*, *n*—any specimen of writing executed without an attempt to control or alter its usual quality of execution.

3.3.10 *range of variation*, *n*—the accumulation of deviations among repetitions of respective handwriting characteristics that are demonstrated in the writing habits of an individual. (See *variation*, 3.3.15).

3.3.11 *significant difference*, *n*—an individualizing characteristic that is structurally divergent between handwritten items, that is outside the range of variation of the writer, and that cannot be reasonably explained.

3.3.12 *significant similarity*, *n*—an individualizing characteristic in common between two or more handwritten items.

3.3.13 *sufficient quantity*, *n*—that amount of writing required to assess the writer's range of variation, based on the writing examined.

3.3.14 *type of writing*, *n*—refers to hand printing, cursive writing, numerals, symbols, or combinations thereof, and signatures.

3.3.15 *variation*, *n*—those deviations among repetitions of the same handwriting characteristic(s) that are normally demonstrated in the habits of each writer.

*Discussion*—Since variation is an integral part of natural writing, no two writings of the same material by the same writer are identical in every detail. Within a writer's range of variation, there are handwriting habits and patterns that are repetitive and similar in nature. These repetitive features give handwriting a distinctive individuality for examination purposes. Variation can be influenced by internal factors such as illness, medication, intentional distortion, etc. and external factors such as writing conditions and writing instrument, etc.

4. Significance and Use

4.1 The procedures outlined here are grounded in the generally accepted body of knowledge and experience in the field of forensic document examination. By following these procedures, a forensic document examiner can reliably reach an opinion concerning whether two or more handwritten items were written by the same person(s).

NOTE 2—The phrase "written by the same person(s)" refers to physical generation of the writing, not to intellectual ownership of the content.

5. Interferences

5.1 Items submitted for examination may have inherent limitations that can interfere with the procedures in this Standard. Limitations should be noted and recorded.

5.2 Limitations can be due to submission of non-original documents, limited quantity or comparability, or condition of the items submitted for examination. Other limitations can come from the quantity or comparability of the writing submitted, and include absent characters, dissimilarities, or limited individualizing characteristics. Such features are taken into account in this standard.

5.3 The results of prior storage, handling, testing, or chemical processing (for example, for latent prints) may interfere with the ability of the examiner to see certain characteristics. Whenever possible, document examinations should be conducted prior to any chemical processing. Items should be handled appropriately to avoid compromising subsequent examinations (for example, with clean cloth gloves).

5.4 Consideration should be given to the possibility that various forms of simulations, imitations, and duplications of handwriting can be generated by computer and other means.

6. Equipment and Requirements

6.1 Appropriate light source(s) of sufficient intensity to allow fine detail to be distinguished.

NOTE 3—Natural light, incandescent or fluorescent sources, or fiber optic lighting systems are generally utilized. Transmitted lighting, side lighting, and vertical incident lighting have been found useful in a variety of situations.

6.2 Magnification sufficient to allow fine detail to be distinguished.

6.3 Other apparatus as appropriate.

6.4 Imaging or other equipment for recording observations as required.

6.6 Sufficient time and facilities to complete all applicable procedures.

7. Procedure

7.1 All procedures shall be performed when applicable and noted when appropriate. These procedures need not be performed in the order given.

7.2 Examinations, relevant observations, and results shall be documented.

7.3 At various points in these procedures, a determination that a particular feature is not present or that an item is lacking in quality or comparability may indicate that the examiner should discontinue or limit the procedure(s). It is at the discretion of the examiner to discontinue the procedure at that point and report accordingly or to continue with the applicable procedures to the extent possible. The reasons for such a decision shall be documented.

7.4 Determine whether the examination is a comparison of questioned writing to known writing or a comparison of questioned writing to questioned writing.

7.5 Determine whether the questioned writing is original writing. If it is not original writing, request the original.

NOTE 4—Examination of the original questioned writing is preferable.

7.5.1 If the original is not submitted, evaluate the quality of the best available reproduction to determine whether the significant details of the writing have been reproduced with sufficient clarity for comparison purposes and proceed to the extent possible. If the writing has not been reproduced with sufficient clarity for comparison purposes, discontinue these procedures and report accordingly.

7.6 Determine whether the questioned writing appears to be distorted. If it appears to be distorted, determine whether it is possible to establish that the apparently distorted writing is natural writing.

7.6.1 If it is not natural writing, or if it is not possible to establish whether the apparently distorted writing is natural writing, determine whether the apparently distorted writing is suitable for comparison and proceed to the extent possible. If the available questioned writing is not suitable for comparison, discontinue these procedures and report accordingly.

7.7 Evaluate the questioned writing for the following:

7.7.1 *Type of Writing*—If there is more than one type of writing within the questioned writing, separate the questioned writing into groups of single types of writing.

7.7.2 *Internal Consistency*—If there are inconsistencies within any one of the groups created in 7.7.1 (for example, suggestive of multiple writers), divide the group(s) into subgroups, each one of which is consistent.

7.7.3 Determine range of variation of the writing for each group or sub-group of the questioned writing created in 7.7.1 and 7.7.2.

7.7.4 Determine presence or absence of individualizing characteristics.

7.7.5 If the examination is a comparison of exclusively questioned writing, go to 7.12.

7.8 Determine whether the known writing is original writing. If it is not original writing, request the original.

NOTE 5—Examination of the original known writing is preferable.

7.8.1 If the original is not submitted, evaluate the quality of the best available reproduction to determine whether the significant details of the writing have been reproduced with sufficient clarity for comparison purposes and proceed to the extent possible. If the writing has not been reproduced with sufficient clarity for comparison purposes, discontinue these procedures and report accordingly.

7.9 Determine whether the known writing appears to be distorted. If it appears to be distorted, determine whether it is possible to establish that the apparently distorted writing is natural writing.

7.9.1 If it is not natural writing, or if it is not possible to establish whether the apparently distorted writing is natural writing, determine whether the apparently distorted writing is suitable for comparison and proceed to the extent possible. It should be determined whether additional known writing would be of assistance, and if so, it should be requested. If the available known writing is not suitable for comparison, discontinue these procedures and report accordingly.

7.10 Evaluate the known writing for the following:

7.10.1 *Type of Writing*—If there is more than one type of writing within the known writing, separate the known writing into groups of single types of writing.

7.10.2 *Internal Consistency*—If there are unresolved inconsistencies within any of the groups created in 7.10.1 (for example, suggestive of multiple writers), contact the submitter for authentication. If any inconsistencies are not resolved to the examiner's satisfaction, discontinue these procedures for the affected group(s), and report accordingly.

7.10.3 Determine range of variation of the writing for each group of the known writing created in 7.10.1 and 7.10.2.

7.10.4 Determine presence or absence of individualizing characteristics.

7.11 Evaluate the comparability of the bodies of writing (questioned writing to known writing or exclusively questioned writing).

7.11.1 If the bodies of writing are not comparable, discontinue comparison and request comparable known writing, if appropriate.

7.11.1.1 If comparable known writing is made available, return to 7.10. If comparable known writing is not made available, discontinue these procedures and report accordingly.

7.12 Conduct a side-by-side comparison of comparable portions of the bodies of writing.

7.12.1 Determine whether there are differences, absent characters, and similarities.

7.12.2 Evaluate their significance individually and in combination.

7.12.3 Determine if there is a sufficient quantity of writing (questioned writing, or known writing, or both).

7.12.3.1 If writing (questioned writing, or known writing, or both) is not sufficient in quantity for an elimination or an identification, continue the comparison to the extent possible. When appropriate, request more known writing. If more known writing is made available, return to 7.10.

7.12.4 Analyze, compare, and evaluate the individualizing characteristics and other potentially significant features present in the comparable portions of the bodies of writing.

NOTE 6—Among the features to be considered are elements of the writing such as abbreviation; alignment; arrangement, formatting, and positioning; capitalization; connectedness and disconnectedness; cross strokes and dots, diacritics and punctuation; direction of strokes; disguise; embellishments; formation; freedom of execution; handedness; legibility; line quality; method of production; pen hold and pen position; overall pressure and patterns of pressure emphasis; proportion; simplification; size; skill; slant or slope; spacing; speed; initial, connecting, and terminal strokes; system; tremor; type of writing; and range of variation.

Other features such as lifts, stops and hesitations of the writing instrument; patching and retouching; slow, drawn quality of the line; unnatural tremor; and standard lines of various forms should be evaluated when present.

Potential limiting factors such as age; illness or injury; medication, drugs or alcohol (intoxication or withdrawal); awkward writing position; cold or heat; fatigue; haste or carelessness; nervousness; nature of the document, use of the unaccustomed hand; deliberate attempt at disguise or auto-forgery should be considered.

For further details, see the referenced texts.

7.12.5 Evaluate the similarities, differences, and limitations. Determine their significance individually and in combination.

7.13 Form a conclusion based on results of the above analyses, comparisons, and evaluations.

8. Reporting Conclusions

SWGDOC Standard for Examination of Handwritten Items

8.1 The conclusion(s) or opinion(s) resulting from the procedures in this standard may be reached once sufficient examinations have been conducted. The number and nature of the necessary examinations is dependent on the question at hand.

8.2 The bases and reasons for the conclusion(s), or opinion(s), should be included in the examiner's documentation and may appear in the report.

8.3 Refer to SWGDOC Terminology for Expressing Conclusions of Forensic Document Examiners for reporting conclusion(s) or opinion(s).

**9. Keywords**

9.1 forensic sciences; handwriting; questioned documents

REFERENCES

(**1**) Conway, J.V.P., *Evidential Documents*, Springfield, IL, Charles C. Thomas, 1959.

(**2**) Harrison, W.R., *Suspect Documents*, London, Sweet and Maxwell, 1958 and 1966.

(**3**) Hilton, O., *Scientific Examination of Questioned Documents*, New York, Elsevier, 1982.

(**4**) Huber, R.A., and Headrick, A.M., *Handwriting Identification: Facts and Fundamentals*, Boca Raton, FL, CRC Press, 1999.

(**5**) Osborn, A.S., *Questioned Documents*, 2d ed., Albany, NY, Boyd Printing Co., 1929.

SWGDOC **Standard for Scope of Work of Forensic Document Examiners**
**1. Scope**
1.1 This standard describes, in general, the duties of forensic document examiners, also referred to as questioned document examiners, examiners of questioned documents, document examiners, or document analysts.
1.2 This document can provide guidance to anyone encountering matters involving forensic document examination.
**2. Referenced Documents**
2.1 *Standards:*
SWGDOC Standard for Minimum Training Requirements for Forensic Document Examiners
**3. Job Description**
3.1 The forensic document examiner makes scientific examinations, comparisons, and analyses of documents in order to: (*1*) establish genuineness or nongenuineness, or to expose forgery, or to reveal alterations, additions, or deletions, (*2*) identify or eliminate persons as the source of handwriting, (*3*) identify or eliminate the source of typewriting or other impression, marks, or relative evidence, and (*4*) write reports or give testimony, when needed, to aid the users of the examiner's services in understanding the examiner's findings.
**4. General Duties**
4.1 Examiners in this field are sometimes known by the term "handwriting experts." Forensic document examination includes expertise in handwriting identification. Handwriting includes cursive or script style writing, handprinting, signatures, numerals, and other written marks or signs. Forensic document examination does not involve the employment of calligraphic or engrossing skills, nor does it involve a study of handwriting in an attempt to create a personality profile or otherwise analyze or judge the writer's personality or character.
4.2 Questions about documents arise in business, finance, civil and criminal trials, or in any matter affected by the integrity of written communications and records.
4.2.1 Typical problems in this field are:
4.2.1.1 The identification of handwriting and typewriting.
4.2.1.2 The identification or elimination of the source of and the output of other mechanical or electronic imaging devices such as printers, copying machines, facsimile equipment, and the like.
4.2.1.3 The identification or elimination of ink, paper, and writing instruments.
4.2.1.4 The establishment of the date, source, history, sequence of preparation, alterations or additions to documents, and relationships of documents.
4.2.2 Other problems are the decipherment and sometimes the restoration, or both, of obscured, deleted, or damaged parts of documents.
4.2.3 The work often includes a study of the information carried by a document for discovery of evidence of spuriousness, identification of persons, or to show significant relationships.
4.2.4 Document examination also includes the recognition and preservation of other relevant physical evidence that may be present on documents.
4.3 Equipment used in forensic document examination includes: microscopes and other optical aids; photographic and other imaging devices, a wide variety of imaging materials adaptable for use with a variety of lighting methods, including those involving radiant energy in the ultraviolet, visible, infrared, and other regions of the electromagnetic spectrum; as well as electrostatic or other devices for the detection, or visualization, or both of indentations and other features present in or on paper or similar substrata. Other analytical instrumentation may be used where appropriate.
4.4 Questions about documents are answered through the application of knowledge, skill, experience, training, (SWGDOC Standard for Minimum Training Requirements for Forensic Document Examiners), or education specific to forensic document examination as well as from a number of other fields, such as the physical sciences, mathematics, language studies, and the like. The field of interest includes manufacturing processes and the materials that go into the production of documents, as well as the methods, machines, instruments, and human agencies by which the parts of documents are formed or brought together.
4.5 The results of examinations are reported for use by the judiciary, administrative and executive officers, law enforcement
agencies, boards, commissions, lawyers, and individuals. These results are often presented in the form of expert testimony, explaining the bases and reasons for the conclusions, which may be illustrated by the use of demonstrative evidence.

**SWGDOC Terminology for Expressing Conclusions of Forensic Document Examiners**

1. Scope

1.1 This terminology is intended to assist forensic document examiners in expressing conclusions or opinions based on their examinations.

1.2 The terms in this terminology are based on the report of a committee of the Questioned Document Section of the American Academy of Forensic Science that was adopted as the recommended standardlines in reports and testimony by the Questioned Document Section of the American Academy of Forensic Science and the American Board of Forensic Document Examiners.[2]

[2] McAlexander T.V., Beck, J., and Dick, R., "The Standardization of Handwriting Opinion Terminology," *Journal of Forensic Science*, Vol 36, No. 2, March 1991, pp. 311–319.

2. Referenced Documents

2.1 *Standards*

SWGDOC Standard for Scope of Work of Forensic Document Examiners

3. Significance and Use

3.1 Document examiners begin examinations from a point of neutrality. There are an infinite number of gradations of opinion toward an identification or toward an elimination. It is in those cases wherein the opinion is less than definite that careful attention is especially needed in the choice of language used to convey the weight of the evidence.

3.2 Common sense dictates that we must limit the terminology we use in expressing our degrees of confidence in the evidence to terms that are readily understandable to those who use our services (including investigators, attorneys, judges, and jury members), as well as to other document examiners. The expressions used to differentiate the gradations of opinions should not be considered as strongly defined "categories". These expressions should be standardlines without sharply defined boundaries.

3.3 When a forensic document examiner chooses to use one of the terms defined below, the listener or reader can assume that this is what the examiner intended the term to mean. To avoid the possibility of misinterpretation of a term where the expert is not present to explain the standardlines in this standard, the appropriate definition(s) could be quoted in or appended to reports.

3.4 The examples are given both in the first person and in third person since both methods of reporting are used by document examiners and since both forms meet the main purpose of the standard, that is, to suggest terminology that is readily understandable. These examples should not be regarded as the only ways to utilize probability statements in reports and testimony. In following any standardlines, the examiner should always bear in mind that sometimes the examination will lead into paths that cannot be anticipated and that no standardlines can cover exactly.

3.5 Although the material that follows deals with handwriting, forensic document examiners may apply this terminology to other examinations within the scope of their work, as described in SWGDOC Standard for Scope of Work of Forensic Document Examiners, and it may be used by forensic examiners in other areas, as appropriate.

3.6 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

Terminology

4.1 *Recommended Terms:*

identification (definite conclusion of identity)—this is the highest degree of confidence expressed by document examiners in handwriting comparisons. The examiner has no reservations whatever, and although prohibited from using the word "fact," the examiner is certain, based on evidence contained in the handwriting, that the writer of the known material actually wrote the writing in question.

*Examples*—It has been concluded that John Doe wrote the questioned material, or it is my opinion [or conclusion] that John Doe of the known material wrote the questioned material.

strong probability (highly probable, very probable)—the evidence is very persuasive, yet some critical feature or quality is missing so that an *identification* is not in order; however, the examiner is virtually certain that the questioned and known writings were written by the same individual.

*Examples*—There is *strong probability* that the John Doe of the known material wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *very probably* wrote the questioned material.

DISCUSSION—Some examiners doubt the desirability of differentiating between strong probability and probable, and certainly they may eliminate this terminology. But those examiners who are trying to encompass the entire "gray scale" of degrees of confidence may wish to use this or a similar term.

probable—the evidence contained in the handwriting points rather strongly toward the questioned and known writings having been written by the same individual; but it falls short of the" virtually certain" degree of confidence.

*Examples*—It has been concluded that the John Doe of the known material probably wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *probably* wrote the questioned material.

indications (evidence to suggest)—a body of writing has few features which are of significance for handwriting comparison purposes, but those features are in agreement with another body of writing.

*Examples*—There is evidence which *indicates* (or *suggests*) that the John Doe of the known material may have written the questioned material but the evidence falls far short of that necessary to support a definite conclusion.

DISCUSSION—This is a very weak opinion, and a report may be misinterpreted to be an identification by some readers if the report simply states, "The evidence *indicates* that the John Doe of the known material wrote the questioned material." There should always be additional limiting words or phrases (such as "may have" or "but the evidence is far from conclusive") when this opinion is reported, to ensure that the reader understands that the opinion is weak. Some examiners doubt the desirability of reporting an opinion this vague, and certainly they cannot be criticized if they eliminate this terminology. But those examiners who are trying to encompass the entire "gray scale" of degrees of confidence may wish to use this or a similar term.

no conclusion (totally inconclusive, indeterminable)—This is the zero point of the confidence scale. It is used when there are significantly limiting factors, such as disguise in the questioned and/or known writing or a lack of comparable writing, and the examiner does not have even a leaning one way or another. *Examples—No conclusion* could be reached as to whether or not the John Doe of the known material wrote the questioned material, or I could not determine whether or not the John Doe of the known material wrote the questioned material.

indications did not—this carries the same weight as the indications term that is, it is a very weak opinion.

*Examples*—There is very little significant evidence present in the comparable portions of the questioned and known writings, but that evidence suggest*s* that the John Doe of the known material did not write the questioned material, or I found indication*s* that the John Doe of the known material did no*t* write the questioned material but the evidence is far from conclusive.

See Discussion after indications.

probably did not—the evidence points rather strongly against the questioned and known writings having been written by

the same individual, but, as in the probable range above, the evidence is not quite up to the "virtually certain" range.

*Examples*—It has been concluded that the John Doe of the known material probably did not write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material probably did not write the questioned material.

DISCUSSION—Some examiners prefer to state this opinion: "It is unlikely that the John Doe of the known material wrote the questioned material." There is no strong objection to this, as "unlikely" is merely the Anglo-Saxon equivalent of "improbable".

strong probability did not—this carries the same weight as strong probability on the identification side of the scale; that is, the examiner is virtually certain that the questioned and known writings were not written by the same individual.

*Examples*—There is strong probability that the John Doe of the known material did not write the questioned material, or in my opinion (or conclusion or determination) it is highly probable that the John Doe of the known material did not write the questioned material.

DISCUSSION—Certainly those examiners who choose to use "unlikely" in place of "probably did not" may wish to use "highly unlikely" here.

elimination—this, like the *definite conclusion of identity*, is the highest degree of confidence expressed by the document examiner in handwriting comparisons. By using this expression the examiner denotes no doubt in his opinion that the questioned and known writings were not written by the same individual.

*Examples*—It has been concluded that the John Doe of the known material did not write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material did not write the questioned material.

DISCUSSION—This is often a very difficult determination to make in handwriting examinations, especially when only requested exemplars are available, and extreme care should be used in arriving at this conclusion.

4.1.1 When the opinion is less than definite, there is usually a necessity for additional comments, consisting of such things as reasons for qualification (if the available evidence allows that determination), suggestions for remedies (if any are known), and any other comments that will shed more light on the report. The report should stand alone with no extra explanations necessary.

4.2 *Deprecated and Discouraged Expressions*:

4.2.1 Several expressions occasionally used by document examiners are troublesome because they may be misinterpreted to imply bias, lack of clarity, or fallaciousness and their use is deprecated. Some of the terms are so blatantly inane (such as "make/no make") that they will not be discussed. The use of others is discouraged because they are incomplete or misused. These expressions include:

possible/could have—these terms have no place in expert opinions on handwriting because the examiner's task is to decide to what degree of certainty it can be said that a handwriting sample is by a specific person. If the evidence is so limited or unclear that no definite or qualified opinion can be expressed, then the proper answer is *no conclusion*. To say that the suspect "could have written the material in question" says nothing about probability and is therefore

meaningless to the reader or to the court. The examiner should be clear on the different meanings of "possible" and "probable," although they are often used interchangeably in everyday speech.

consistent with—there are times when this expression is perfectly appropriate, such as when "evidence consistent with disguise is present" or "evidence consistent with a simulation or tracing is present, but "the known writing is consistent with the questioned writing" has no intelligible meaning.

could not be identified/cannot identify—these terms are objectionable not only because they are ambiguous but also because they are biased; they imply that the examiner's task is only to identify the suspect, not to decide whether or not the suspect is the writer. If one of these terms is used, it should always be followed by "or eliminate[d]".

similarities were noted/differences as well as similarities— these expressions are meaningless without an explanation as to the extent and significance of the similarities or differences between the known and questioned material. These terms should never be substituted for gradations of opinions.

cannot be associated/cannot be connected—these terms are too vague and may be interpreted as reflecting bias as they have no counterpart suggesting that the writer cannot be eliminated either.

no identification—this expression could be understood to mean anything from a strong probability that the suspect wrote the questioned writing; to a complete elimination. It is not only confusing but also grammatically incorrect when used informally in sentences such as." I no identified the writer" or "I made a no ident in this case."

inconclusive—this is commonly used synonymously with no conclusion when the examiner is at the zero point on the scale of confidence. A potential problem is that some people understand this term to mean something short of definite (or conclusive), that is, any degree of probability, and the examiner should be aware of this ambiguity.

positive identification—This phrase is inappropriate because it seems to suggest that some identifications are more positive than others.

[strong] reason to believe—there are too many definitions of *believe* and *belief* that lack certitude. It is more appropriate to testify to our conclusion (or determination or expert opinion) than to our belief, so why use that term in a report?

qualified identification—An *identification* is not qualified. However, opinions may be qualified when the evidence falls short of an *identification* or *elimination*.

**SWGDOC Terminology Relating to the Examination of Questioned Documents**

1. Scope

1.1 This terminology standard includes terms that relate to the examination performed by forensic document examiners.

NOTE 1—The terms in the Terminology Section refer to typical copybook styles of writing and do not account for exceptional forms.

2. Referenced Documents

2.1 *Standards*

SWGDOC Standard for Scope of Work of Forensic Document Examiners

3. Terminology

apex, *n*—the uppermost point of a character. ascender, *n*—a stroke that rises above the height of the body of the letter formation.

assisted hand signature, *n*—a signature executed by a writer while the writer's hand, arm, or writing instrument is steadied or stabilized by another.

awkward hand, *n*—see unaccustomed hand. baseline , *n*—the ruled or imaginary line upon which writing or typewriting appears to rest.

character, *n*—any language symbol (for example, letter, numeral, punctuation mark, or other sign), other symbol or ornament.

connecting stroke, *n*—a line joining two adjacent characters.

cross stroke, *n*—a stroke that crosses another portion of the character and is not attached at either end. (For example, the horizontal stroke of the "t") (cf. crossbar).

crossbar, *n*—a stroke that intersects other portions of the character at both ends. (cf. arm and cross stroke).

cursive, *n*—a type of writing in which the letters are joined and the writing instrument is not lifted after most strokes.

descender, *n*—a stroke that extends below the baseline of the body of the letter formation

drag stroke, *n*—a stroke resulting from incomplete lifting of the pen.

standardd signature, *n*—a signature executed by a writer while a writer's hand arm, or writing instrument is influenced or controlled by another.

hand printing, *n*—a style of writing in which the letters are not joined and the writing instrument is lifted after most strokes.

hesitation, *n*—a pause in the writing without the instrument being lifted.

individualizing characteristic, *n*—marks or properties that serve to individualize writing.

indentations, *n*—latent or visible impressions in paper or other media.

line quality, *n*—the sum total of the attributes of the writing movement (for example, speed, pressure, and skill).

loop, *n*—a formation that curves and crosses itself.

manuscript, *n*—see handprinting.

model signature, *n*—a signature that is used as a prototype for a simulation or copy, by manual electronic or other means.

patching, *n*—retouching a portion of a written stroke.

pen lift, *n*—an interruption in a stroke caused by removing the writing document from the writing surface.

pen position, *n*—the relationship between the writing instrument and the writing surface.

pen pressure, *n*—the force with which the writing instrument contacts the paper.

retrace, *n*—a stroke written back over the preceding stroke in the reverse direction.

unaccustomed hand, *n*—the opposite hand (or other body part) from that normally used for writing.



Home • About Us • Laboratory Services • Forensic Science Communications • Back Issues • April 2000 • Guidelines for Forensic Document Examination, Part 5, by...

April 2000 - Volume 2 - Number 2

**FSC Links**

- Table of Contents
- Meetings and Conferences
- Editors
- Back Issues

- About FSC
- Instructions for Authors
- Search

- FBI Laboratory

- Current Issue

## *Guidelines for Forensic Document Examination*

**Part 5**

**Scientific Working Group for Forensic Document Examination (SWGDOC)**

**Revised January 2000**

*Read about …*

**Introduction**

**Guidelines:**

   **Examination of Handwritten Items**

   **Examination of Exclusively Questioned Handwritten Items**

   **Examination of Nonoriginal Handwritten Items**

   **Examination of Handwritten Items Having a Distorted Appearance**

   **Safe Handling of Contaminated Document Evidence and the Preservation of Associated Trace Evidence**

      **Discussion of the Guideline for the Safe Handling of Contaminated Document Evidence and the Preservation of Associated Trace Evidence**

   **Quality Assurance and Proficiency Testing**

**Comments**

**Acknowledgments**

## Guideline for the Examination of Handwritten Items Having a Distorted Appearance

**1. Purpose**

To determine whether or not handwritten items, one or more having a distorted appearance, are suitable for comparison.

**2. Introduction**

**2.1.** This Guideline will be used as a continuation of the **Guideline for the Examination of Handwritten Items**, the **Guideline for the Examination of Nonoriginal Handwritten Items**, and the **Guideline for the Examination of Exclusively Questioned Handwritten Items**.

**2.2.** Terms defined in the glossary are in italics when they first appear in the Guideline.

**2.3.** A flowchart for this Guideline is in Appendix D.

**3. Requirements**

That the forensic document examiner will have the following available:

**3.1.** A light source of sufficient intensity to distinguish fine detail.

**3.2.** An optical instrument capable of sufficient magnification to distinguish fine detail.

**3.2.** An optical instrument capable of sufficient magnification to distinguish line detail.

**3.3.** Sufficient time to complete the procedures of this Guideline.

*Back to the index*

**4. Procedures**

**4.1.** Evaluate the apparent distortion in the writing. If appropriate, a comparison to other available writing may be made.

**4.2.** Determine whether or not it is possible to establish that the apparently distorted writing is *natural writing*.

> **4.2.1.** If it is possible, and
>
> > **4.2.1.1.** It is natural writing, return to the referring Guideline, or
> >
> > **4.2.1.2.** It is not natural writing, proceed to **Section 4.3** in this Guideline, and continue.
>
> **4.2.2.** If it is not possible, continue with this procedure.

**4.3.** Determine whether the apparently distorted writing is suitable for comparison. If it is, return to the referring Guideline. If it is not, continue with this Guideline.

**4.4.** Determine whether additional known writing would be of assistance.

> **4.4.1.** If it would, request additional known writing.
>
> > **4.4.1.1.** If additional known writing is received, return to the referring Guideline and continue.
> >
> > **4.4.1.2.** If additional known writing is not received, go to **No Conclusion**, **Section 5.5** of the referring Guideline.
>
> **4.4.2.** If not of assistance, go to **No Conclusion**, **Section 5.5** of the referring Guideline.

*Back to the index*

**5. Glossary**

*Natural Writing*: Any specimen of writing without an attempt to control or alter its usual quality of execution.

**Appendix D**

The flowchart for the **Guideline for the Examination of Handwritten Items Having a Distorted Appearance**.

**Comments**

Comments and questions concerning the **Guideline for the Examination of Handwritten Items Having a Distorted Appearance** may be forwarded to Susan Morton at magnolia@worldspy.net.

Readers may also respond via a document comments form.

*Back to the index*

*Continue Guidelines*

Close

# Attachment 4

Larry F. Stewart

**Questioned Document Examination Relied Upon Treatise:**

1. "Questioned Documents," Albert S. Osborn, Boyd Printing Company, 1943.

2. "Evidential Documents," James V. P. Conway, Charles C. Thomas Publisher, 1972.

3. "Questioned Documents," Albert S. Osborn, Patterson Smith, Second Edition, 1978.

4. "Scientific Examination of Questioned Documents," Ordway Hilton, Elsevier, 1982.

5. "FBI Handbook of Forensic Science," FBI Laboratory publication, 2007.

6. "Document Examination," Larry F. Stewart, A-Z Literary Book Publisher, 2009.

7. Heckeroth, et al. "Features of Digitally Captured Signatures vs. Pen and Paper Signatures: Similar or Completely Different?" Forensic Science International, November, 2020.

8. Flynn, "Conducting a Forensic Examination of Electronically Captured Signatures," J. Am. Soc. Questioned Doc. Exam., 15(1) (2012), 3-10.


**ASTM and SWGDOC Standards:**

1. Standard Guide for Examination of Altered Documents E2331-04

2. Standard Descriptions of Scope of Work Relating to Forensic Document Examiners E444-06

3. Standard Terminology for Expressing Conclusions of Forensic Document Examiners E1658-04

4. Standard Guide for Examination of Handwritten Items E2290-07

5. Standard Guide for Minimum Training Requirements for Forensic Document Examiners E2388-05

6. Plus all associated SWGDOC standards (These are standards that incorporate the ASTM standards and continue providing support after disbanding E30.02).