```
1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
2

3                                  .   Chapter 11
    IN RE:                         .
4                                  .   Case No. 20-10343 (LSS)
    BOY SCOUTS OF AMERICA and      .
5   DELAWARE BSA, LLC,             .
                                   .   Courtroom No. 2
6                                  .   824 North Market Street
                                   .   Wilmington, Delaware 19801
7
              Debtors.            .   February 17, 2021
8   . . . . . . . . . . . . . . .  .   10:00 A.M.

9                        TRANSCRIPT OF HEARING
          BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
10                 UNITED STATES BANKRUPTCY JUDGE

11
    APPEARANCES:
12

13  For the Debtor:           Derek C. Abbott, Esquire
                              MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                              1201 North Market Street, 16th Floor
14                            Wilmington, Delaware 19899

15                            - and -

16                            Jessica Lauria, Esquire
                              WHITE & CASE
17                            1221 Avenue of the Americas
                              New York, New York 10020
18
    For First State Insurance
19    Company and Hartford
      Accident and Indemnity
20    Company:                James Ruggeri, Esquire
                              SHIPMAN & GOODWIN LLP
21                            1875 K Street, NW, Suite 600
                              Washington, DC 20003
22

23  Audio Operator:           Brandon McCarthy

24

25
```

```
1   Transcription Company:    Reliable
                              1007 N. Orange Street
2                             Wilmington, Delaware 19801
                              (302)654-8080
3                             Email:  gmatthews@reliable-co.com

4   Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.
5
```

---

```
6


7   TELEPHONIC APPEARANCES (Continued):

8

9   For Century Indemnity:    Tancred Schiavoni, Esquire
                              Brad Elias, Esquire
10                            O'MELVENY
                              7 Times Square
11                            New York, New York 10036

12  For Tort Claimants:       James Stang, Esquire
                              PACHULSKI STANG ZIEHL JONES LLP
13                            919 North Market Street, 17th Floor
                              Wilmington, Delaware 19801
14

15
    For Coalition of the      Eric Goodman, Esquire
16    Abused Scouts for       D. Cameron Moxley, Esquire
      Justice:                BROWN RUDNICK
17                            601 Thirteenth Street, NW
                              Washington, DC 20005
18
    For Andrew Vanarsdale
19    & Timothy Kosnoff:      David Wilks, Esquire
                              WILKS LAW, LLC
20                            Wilmington, Delaware

21  For Napoli Shkolnik:      Brett Bustamante, Esquire
                              NAPOLI SHKOLNIK PLLC
22                            360 Lexington Avenue
                              New York, New York 10017
23

24

25
```

1   TELEPHONIC APPEARANCES (Continued):

2

3   For Hartford Financial:   Philip Anker, Esquire
                              WILMERHALE
                              250 Greenwich Street
4                             New York, New York 10007

5
    For The Church of Jesus   Adam J. Goldberg, Esquire
6     Christ of Latter-Day-   LATHAM & WATKINS LLP
      Saints:                 885 Third Avenue
7                             New York, New York 10022

    For Bailey Cowan
8     Heckaman PLLC:          Connor Bifferato, Esquire
                              THE BIFFERATO FIRM
9                             800 N. King Street
                              Wilmington, Delaware 19801
10

    For James Harris Law:     James Harris, Esquire
11                            JAMES HARRIS LAW, PLLC

12
    For 55101:                Melanie Muhlstock, Esquire
13                            PARKER WAICHMAN LLP
                              59 Maiden Lane, 6th Floor
14                            New York, New York 10038

15  For Slater Slater
      Schulman LLP:           Scott Cousins, Esquire
16                            COUSINS LAW LLC
                              1521 Concord Pike
17                            Wilmington, Delaware

18                            - and -

19
                              Joel Taylor, Esquire
20                            KAGEN CASPERSEN
                              757 3rd Avenue, 20th Floor
21                            New York, New York 10017

22  For Eisenberg Rothweiler
      Winkler, Eisenberg &
23    Jeck, P.C.:             Daniel Hogan, Esquire
                              HOGAN MCDANIEL
24                            1311 Delaware Avenue
                              Wilmington, Delaware 19806
25

1  <u>TELEPHONIC APPEARANCES</u> (Continued):

2

3  For Mark Bern/Partners:    William Sullivan, Esquire
                              SULLIVAN HAZELTINE ALLINSON LLC
4                             919 North Market Street
                              Wilmington, Delaware 19801

5
   For Michael O'Malley:      Walter Gouldsbury, Esquire
6                             CIARDI Gouldsboro ASTIN
                              52 Haddonfield-Berlin Road
7                             Cherry Hill, New Jersey 08034

8  For John Doe 59969:        Carmen Durso, Esquire
                              LAW OFFICE OF CARMEN DURSO
9                             175 Federal Street
                              Boston, Massachusetts 02110
10
   For AIG:                   Susan Gummow, Esquire
11                            FORAN GLENNON PALANDECH PONZI RUDLOFF
                              222 North LaSalle Street
12                            Chicago, Illinois 60601

13
   For Andrews Thornton,
14   ASK LLP:                 Lawrence Robbins, Esquire
                              ROBBINS RUSSELL ENGLERT ORSECK
15                              UNTEREINER SAUBER LLP
                              2000 K Street NW, 4th Floor
16                            Washington, DC 20006

17
   For Junell & Assoc.:       John Thomas, Esquire
18                            HICKS THOMAS LLP
                              700 Louisiana Street
19                            Houston, Texas 77002

20 For D Miller & Assoc.:     Stephanie Levick, Esquire
                              WALDEN MACHT HARAN
21                            250 Vesey Street, 27th Floor
                              New York, New York 10281
22

23

24

25

TELEPHONIC APPEARANCES (Continued):


For Claimants 18867,
  43995, 50263:          Ryan Hicks, Esquire
                      SCHNEIDER WALLACE COTTRELL KONECKY
                      2000 Powell Street, Suite 1400
                      Emeryville, California 94608

For Babin Law:          Joseph Pickens, Esquire
                      TAFT STETTINIUS HOLLISTER
                      94 N. Sandusky Street, Suite 101
                      Delaware, Ohio 43015

1

<u>INDEX</u>

2
3
4
#3) [SEALED] Hartford and Century's Motion for an Order (I) Authorizing Certain Rule 2004 Discovery and (II) Granting Leave from Local Rule 3007-1(f) to Permit the Filing of Substantive Omnibus Objections (D.I. 1971, Filed 1/22/21).

5
6
#4) [SEALED] Insurers' Motion for an Order Authorizing Rule 2004 Discovery of Certain Proofs of Claims (D.I. 1974, Filed 1/22/21).

7
8
9
#5) Insurers' Motion for Entry of an Order Authorizing Filing Under Seal Portions of Certain Documents Relating to Insurers' Motion for an Order Authorizing Rule 2004 Discovery of Certain Proofs of Claim (D.I. 1976, Filed 1/22/21).

10
11
#6) Hartford Accident and Indemnity Company, First State Insurance Company and Twin City Fire Insurance Company's Motion to Compel Abused in Scouting and Kosnoff Law PLLC to Submit Rule 2019 Disclosures (D.I. 2028, Filed 2/3/21).

12
13
14
#7) Century's Motion to Compel Ichor Consulting, LLC to Submit the Disclosures Required by Federal Rule of Bankruptcy Procedure 2019 (D.I. 2029, Filed 2/3/21)

15
16
#8) Century's Motion to Compel Abused In Scouting, Kosnoff Law PLLC, and the Coalition to Submit the Disclosures Required by Federal Rule of Bankruptcy Procedure 2019 (D.I. 2030, Filed 2/3/21).

17
18
19
#9) Motion of Andrews & Thornton, Attorneys at Law and ASK LLP for Entry of an Order Authorizing Filing under Seal of their Objection to Insurers' Rule 2004 Motion (D.I. 2083, Filed 2/5/21).

20
21
22
#10) Motion of the Coalition of Abused Scouts for Justice to File Sur-Reply to Insurers' Reply Brief in Support of Motion for an Order Authorizing Rule 2004 Discovery of Certain Proofs of Claim (D.I. 2196, Filed 2/15/21).

23
24
#11) Timothy D. Kosnoff, Esquire's Motion to Strike Insurers' Reply Brief in Support of Motion for an Order Authorizing Rule 2004 Discovery of Certain Proofs of Claim [D.I. 2180] (D.I. 2204, Filed 2/16/21).

25

#12) Insurers' Motion for Entry of an Order Authorizing
Filing Under Seal Certain Documents Relating to Insurers'
Reply Brief in Support of Motion for an Order Authorizing
Rule 2004 Discovery of Certain Proofs of Claim [D.I. 1974,
Revised Public Version D.I. 2022] (D.I. 2211, Filed 2/16/21).

**Ruling: Matters taken under advisement**

#13) Third Interim Fee Application Hearing. [Exhibit A]

    <u>Debtors' Professionals</u>
    Alvarez & Marsal North America, LLC
    Bates White, LLC
    Haynes and Boone, LLP
    KCIC, LLC
    Morris, Nichols, Arsht & Tunnell LLC
    Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
    PricewaterhouseCoopers LLP
    Quinn Emanuel Urquhart & Sullivan, LLP
    Sidley Austin LLP
    White & Case LLP

    <u>Tort Committee's Counsel</u>
    Pachulski Stang Ziehl & Jones LLP
    Pasich LLP
    Berkeley Research Group, LLC

    <u>Official Committee of Unsecured Creditors</u>
    AlixPartners, LLP
    Kramer Levin Naftalis & Frankel LLP

    <u>Future Claimant's Representatives</u>
    Ankura Consulting Group, LL
    Gilbert, LLP
    James L. Patton, Jr. and Young Conaway Stargatt & Taylor

HARTFORD'S WITNESS(s)

**DENISE NEUMANN MARTIN**

    Direct Examination by Mr. Ruggeri        22

    Cross Examination by Mr. Moxley        29

1        Redirect Examination by Mr. Ruggeri          58

2

3    CENTURY'S WITNESS(s)

4    **PAUL HINTON**

5        Direct Examination by Mr. Elias             150

6        Cross Examination by Mr. Robbins            162

7        Cross Examination by Mr. Sullivan           170

8        Cross Examination by Mr. Taylor             172

9        Cross Examination by Mr. Goodman            180

10       Redirect Examination by Mr. Elias           182

11

12   EXHIBITS                        I.D.    REC'D

13   Declaration of Joshua Weinberg          18

14   Declaration of Todd Mercier             19

15   Declaration of Dr. Denise Neumann Martin    21

16   Declaration of Andrew Kirschenbaum      141

17   Declaration of Sergei Zaslavsky         142

18   Declaration of Paul Hinton              148

19   Declaration of Erich Speckin            149

20

21

22

23

24

25

1      (Proceedings commenced at 10:13 a.m.)

2           THE COURT:  Good morning, counsel, this is Judge

3    Silverstein.  We're here in the Boy Scouts of America case;

4    case number 20-10343.

5           Brandon, can you please remind everyone of the

6    protocol for the hearing.

7           THE CLERK:  Yes, good morning.

8           It is very important that you put your phones on

9    mute when you are not speaking.  When speaking, please do not

10   have your phones on speaker as it creates feedback and

11   background noise which makes it very difficult to hear you

12   clearly.

13          Also, it is important that you state your name

14   each time you speak for an accurate record.  Your cooperation

15   in this matter is appreciated.  Thank you.

16          THE COURT:  Thank you.

17          I'm going to turn this over to debtors' counsel

18   and I'm assuming that I'm going to get an update on where we

19   are and I would like to have that, please.

20          MR. ABBOTT:  Yes, Your Honor.  Thank you.  Derek

21   Abbott from Morris Nichols here with my colleagues from White

22   & Case, counsel for the debtors.

23          Your Honor, before we jump into that, may I make

24   one suggestion regarding the agenda, Your Honor?

25          THE COURT:  Yes.

1          MR. ABBOTT:  The last item on the agenda is

2   interim fee apps.  Your Honor, we have a lot on the court's

3   plate today.  And I know there may be a number of

4   professionals who were on the phone for that.  My hunch, Your

5   Honor, was that you might not get to that today.  But if

6   that's accurate, I wonder if we might just announce that and

7   let those folks be excused so we're not, you know, burning

8   their time and our money.

9          THE COURT:  Yes, thank you, Mr. Abbott.  Your

10  hunch is correct. We are not going to get to that today.

11         So if that's the matter that you are on for, then

12  you are excused.

13         MR. ABBOTT:  Thanks very much, Your Honor.  I will

14  now turn it over to Ms. Boelter for a quick update on status,

15  and then we'll return to the agenda after that.

16         THE COURT:  Thank you.

17         Ms. Boelter.

18         MS. LAURIA:  Thank you, Your Honor and I now --

19  Jessica Lauria, formerly Boelter, with White & Case for the

20  debtors.  I will be brief, Your Honor, because I am cognizant

21  of the fact that you do have a very full agenda this morning.

22         We have not appeared in front of the court since

23  November, that was shortly after our bar date.  And that, I

24  think, is good news in the sense that we've managed to

25  resolve contested issues without the need to appear before

1  the court. And, frankly, it saved the estate quite a bit of

2  money not pulling us altogether.

3          What have we been doing since November?  We have

4  been, Your Honor, engaged in very intense mediations. We now

5  have twenty-two mediation parties which are keeping our three

6  mediators extremely busy.  The mediation sessions at this

7  point are dailies, sometimes several times a day, involving

8  one-on-one with a singular mediation party and the mediator,

9  sometimes a collection of mediation parties and the mediator.

10          We are making very good progress in the

11  mediations.  But we do have a lot of work in front of us

12  still.  That said, Your Honor, as I reported in November, it

13  is still the debtor's intention to emerge from Chapter 11 by

14  the end of summer 2021, so by the end of this upcoming

15  summer.

16          In order to do that, we need to have a disclosure

17  statement hearing late spring.  We're targeting the April

18  timeframe, and I believe Mr. Abbott and his colleagues have

19  been in touch with chambers in terms of understanding Your

20  Honor's schedule and securing those dates.

21          To make that happen, the debtors will need to file

22  an amended plan and disclosure statement, as well as a

23  solicitation procedures motion in the next few weeks. And we

24  look forward to discussing those documents with you in April.

25          So that's where we're at today, Your Honor.  If

1  you have any questions, I'm happy to answer them, but,

2  otherwise, I think we can hand things back over to Mr. Abbott

3  to kick off today's agenda.

4         THE COURT:  Okay.  Thank you.  No, I don't have

5  any questions.  That was helpful.

6         Let me remind everyone who is not speaking to mute

7  your phones.  I am hearing some paper rustling and some

8  background noise.

9         Mr. Abbott.

10         MR. ABBOTT:  Thanks, Your Honor.  My apologies to

11  Ms. Lauria for failing to keep up with the times.

12         Your Honor, items 1 and 2 on the agenda --

13         THE COURT:  And congratulations.

14         MR. ABBOTT:  Indeed, Your Honor.

15         Items 1 and 2 on the agenda, Your Honor, have been

16  submitted under certificate of no objection which brings us

17  to number 3 which is the first matter that I think is going

18  forward, unless the court has questions about 1 or 2?

19         THE COURT:  No, I don't think I have questions

20  about 1 or 2.  I'll take a look at them after the hearing.

21         MR. ABBOTT:  Thank you very much, Your Honor.

22         Number 3 is Century's motion, Your Honor, so I

23  will cede the microphone to Century's counsel.

24         THE COURT:  Thank you.

25         MR. SCHIAVONI:  Your Honor, I believe we have two

1  2004 motion before the court.  They're kind of bookends to

2  each other.  One of them seeks discovery which with respect

3  to the claimants and the other one seeks -- and it also seeks

4  very importantly limited relief from the local rule allowing

5  omnibus objections to be heard.

6          The other motion seeks some very targeted

7  discovery of specific plaintiff's lawyers who signed large

8  numbers of proofs of claim.  This is sort of two ends of the

9  pipe, sort of what on the one end of the process on how the

10  claims were prepared, and on the other end issues about the

11  kinds of claims that came out on the backend.

12          And I would just suggest, Your Honor, that we

13  address, first, the motion for claimant discovery and the

14  corresponding relief from the omnibus to allow omnibus

15  objections to be addressed.  And I would turn that over to

16  Hartford to give the main presentation.

17          I would ask to be heard at the end of that briefly

18  on the omnibus objection issue because it's so important to

19  just address one of the Supreme Court cases that deal with

20  that issue.

21          THE COURT:  Okay.  Now who is going to be taking

22  the lead on this?

23          MR. RUGGERI:  Good morning, Your Honor, James

24  Ruggeri for Hartford.  I will grab the one end of the pipe

25  that Mr. Schiavoni has extended to me.

1    Your Honor, I'd like to start with what we believe
2  is some good news.

3    Through our meet and confer effort in regard to
4  our motion, 2004 motion for leave to serve discovery, we met
5  and conferred with claimants and counsel over the past few
6  weeks. We actually have been able to resolve our differences
7  with ninety-four of the claimants, so those ninety-four
8  claimants have been removed from the list of claimants as to
9  which we've asked the court to grant us relief or permission
10 to serve discovery.

11    And last night, we filed at Docket Number 2224 of
12 filings that shows the amended Exhibit C to our motion which
13 shows 1,304 claimants as to which we have current discovery
14 disputes.

15    Your Honor, now I'd like to turn to the
16 declaration --

17    THE COURT:  Let me ask, Mr. Ruggeri, let me ask
18 what was the general nature of the resolutions that have been
19 reached?

20    MR. RUGGERI:  There was a wide range, Your Honor.
21 Some of the claimants agreed to meet our discovery request.
22 A lot of them did actually and to respond in full to the
23 eleven interrogatories and eight document requests we served.

24    Others, Your Honor, we went through the proof of
25 claim form and they told us they had nothing further to add.

1  And they were in those few open window states, if you will,

2  with regard to the statute of limitation.  And so we said, so

3  long as you're affirming that this is the information that

4  this is the information that you have to support your claim,

5  we will accept that representation.

6         And, again, so long as they weren't in a discovery

7  rule statute of limitation state, which is different than the

8  open window states as the court knows, we were satisfied that

9  the proofs of claim forms and the information support

10  supplied met the obligation that we thought we needed them to

11  meet.  So we were able to resolve those.

12         So it was as bit of a mix bag, Your Honor.  But it

13  did take place over a period of weeks and, as I said, we're

14  pleased that we were able to resolve with regard to ninety-

15  four of the claimants.  None of the claimants, whom we

16  resolved, said this discovery is crazy and you shouldn't have

17  the right to propound it or anything like that. We were able

18  to work through the substance, if you will, of the discovery

19  dispute.

20         And, again, they either said yes, we will

21  supplement what we provided or this is all that we have and

22  we don't have anything more to add and we're not in a

23  discovery rule state.  So that was the nature of the

24  resolution, Judge.

25         THE COURT:  Thank you.

1      MR. RUGGERI:  Your Honor, we submitted three

2  declarations in support of our motion.  I would like to admit

3  them into evidence or move to have them admitted into

4  evidence at this time.

5      The first one was a declaration of Joshua Weinberg

6  and that's found at the docket at Number 1972-5.  Mr.

7  Weinberg offered a declaration that attached to it a number

8  of emails that we received from debtor's counsel. Those

9  exhibits, Your Honor, were filed under seal because they

10  contained claimant specific information.  And we would move

11  the court to admit Mr. Weinberg's declaration into evidence.

12      THE COURT:  Is there any objection?

13     (No verbal response)

14      MR. MOXLEY:  Your Honor, this is Cameron Moxley on

15  behalf of the Coalition of Abused Scouts for Justice from the

16  law firm of Brown Rudnick.

17      Your Honor, it may be appropriate now for us to

18  make this objection, Your Honor, generally.

19      We would ask the court to actually give no weight

20  and to strike the declarations that were filed with the

21  insurer's reply submission.

22      There were no declarations filed, Judge, in

23  connection with the objection, so those declarations were

24  submitted in response to nothing.  And some of them were

25  filed less than twenty-four hours before this hearing began.

1        Judge, we believe the approach that's been taken

2   with respect to these declarations, particularly the late

3   filed ones to the reply submission is a tactic that was

4   designed to not allow for meaningful consideration of

5   testimony and of examination of those witnesses.

6        And we would note that debtor's counsel

7   highlighted for the court at the beginning there is

8   tremendous ongoing constructive work in connection with the

9   mediation that the hope of which (indiscernible) plan.  And

10  (indiscernible) tactics are a distraction.

11       So, Judge, I want to (indiscernible) outset as Mr.

12  Ruggeri noted going to go through the declaration but that's

13  our objection to the declarations that are submitted late in

14  connection with the reply.

15       Thank you, Your Honor.

16       THE COURT:  Okay.  Well, I'll deal with those when

17  I get to those declarations.  But my question is, is there

18  any objection to the entry into evidence of the declaration

19  of Joshua Weinberg that was executed on January 21st of 2021?

20      (No verbal response)

21       THE COURT:  Okay.  I hear none.  It's admitted

22  without objection.

23      (Declaration of Joshua Weinberg, received into

24  evidence)

25       MR. RUGGERI:  Your Honor, the second declaration

1   I'd like to address is the declaration of Todd Mercier.  Mr.

2   Mercier is a vice president of investigations at HUB

3   Engineering or HUB Enterprises, Inc.  That's an investigation

4   firm that we have retained to help us review the proofs of

5   claims themselves.  As I said, he is an assistant vice

6   president there.

7           This declaration also was filed timely and Mr.

8   Mercier, in connection with his deposition, provided the

9   results of his firm's investigation into twenty-one of the

10  claimants, as with the Weinberg exhibits, Your Honor.

11          We filed Mr. Mercier's exhibit under seal because

12  they also disclose and dealt with claimant specific

13  information.

14          We would move the court to admit the Mercier

15  declaration into evidence.

16          THE COURT:  Is there any objection to the entry

17  into evidence of Mr. Mercier's declaration that was executed

18  on January 21st, 2021?

19      (No verbal response)

20          THE COURT:  I hear none.

21          It's admitted without objection.

22      (Declaration of Todd Mercier, received into evidence)

23          THE COURT:  And I didn't ask this question with

24  respect to Mr. Weinberg but I should have, and I'll ask it

25  for both Weinberg and Mercier.  Is there going to be any

1    cross-examination of these witnesses?

2         (No verbal response)

3              THE COURT:  I do not hear a request.  Okay.

4              MR. RUGGERI:  Thank you, Your Honor.

5              Your Honor, that brings us to the declaration of

6    Denise Neumann-Martin which also was timely submitted and can

7    be found at docket at Number 2007-1.  Dr. Martin has a Ph.D.

8    from Harvard University and is a managing director with NERA

9    Economic Consulting which is a firm specializing in the

10   application of economics and statistics.

11             Your Honor, I think there's no doubt that Dr.

12   Martin is an expert.  She is, but that's not why we submitted

13   her declaration in connection with our 2004 motion.

14             We did that to show the court how we identify the

15   1400 claimants on whom we seek to serve discovery.  We're not

16   offering expert opinion testimony from Dr. Martin today on

17   any inferences or extrapolation from that group of 1400

18   claimants.  She doesn't have the data.  We don't have the

19   discovery yet from which she could do that.

20             The Coalition did ask us to make Dr. Martin

21   available for cross-examination. She is on the line but my

22   point today is this really isn't about Dr. Martin today.

23   Today is about our right as creditors and parties in interest

24   to take discovery, Rule 2004 discovery into the debtor's

25   principal liabilities which are the, obviously, the

1  underlying sex abuse claims.

2          I would proceed by, again, offering the

3  declaration of Dr. Martin into evidence and making her

4  available for cross-examination, if there is any.

5          THE COURT:  Is there any objection to the entry

6  into evidence of the declaration of Dr. Martin which was

7  executed on January 22nd, 2021?

8          MR. MOXLEY:  Your Honor, again, it's Cameron

9  Moxley from Brown Rudnick for the Coalition.

10          We have no objection to the admission into

11  evidence. We do request the opportunity today, Judge, to

12  question Dr. Martin.

13          THE COURT:  Very good.  You will have that

14  opportunity.

15          Is there anyone else who is going to want to

16  question Dr. Martin?

17      (No verbal response)

18          THE COURT:  Okay.  I hear no one else.

19          Mr. Ruggeri, in terms of your affirmative case,

20  other than the three declarations, is there any other

21  evidence that you're going to be presenting in support of the

22  motion?

23          MR. RUGGERI:  There's not, Your Honor.

24          THE COURT:  Okay.  Then let's proceed with Dr.

25  Martin's testimony.

1          Mr. Ruggeri, do you have any opening questions or

2   are we right into cross?

3          MR. RUGGERI:  Your Honor, I think that we could

4   ask a couple of questions to acquaint the court with Dr.

5   Martin.  It seems appropriate.  We could start there, Your

6   Honor.

7          THE COURT:  Okay.  Then, Dr. Martin, I need to

8   swear you in.  Can you please raise your right hand?

9              DENISE NEUMANN-MARTIN, WITNESS, SWORN

10          THE WITNESS:  I will.

11          THE COURT:  Please state your full name and spell

12  your last name for the record?

13          THE WITNESS:  Denise Neumann-Martin; M-A-R-T-I-N.

14          THE COURT:  Thank you.

15          Mr. Ruggeri.

16          MR. RUGGERI:  Thank you, Your Honor.

17                     DIRECT EXAMINATION

18  BY MR. RUGGERI:

19  Q    Good morning, Dr. Martin.

20  A    Good morning.

21  Q    I think I found you on the screen.  It's hard to do

22  this by Zoom.  There are lots of faces there.

23          Dr. Martin, where are you currently employed?

24  A    I work for NERA Economic Consulting.  I've been

25  managing director and I've been with the firm for about

1  thirty years now.

2  Q    And would you tell the court a little bit about what

3  NERA does and what you do there as a managing director?

4  A    Sure. We're a firm of about 500 consulting economists

5  in offices around the world.  We apply the tools of

6  statistics and microeconomics to problems that arise in

7  litigation in a bankruptcy.

8  Q    Would you tell the court a little bit about your

9  education background, Dr. Martin?

10  A    Yes, I have a Bachelors Degree in Economics from

11  Wellesley College and a Master's and a Ph.D. in Economics

12  from Harvard University.

13  Q    And how about your education in the area of statistics,

14  specifically.  Can you tell the court a little bit about

15  that?

16  A    Sure.  I followed a number of courses in statistics,

17  both undergraduate and graduate level.  They include topics

18  (indiscernible) speaking such as probability theory and

19  hypothesis testing.  Probability theory tells us likelihood

20  that events are going to occur by chance alone where, you

21  know, (indiscernible) of the coin flip.  If I took a

22  (indiscernible) coin probability theory helps with

23  understanding what's the likelihood I'm going to get exactly

24  five heads.

25        And then hypothesis testing lets us go further than

1  that.  It says, you know, how unlikely I'll receive certain

2  events.  So if I had a no hypothesis, for example, that a

3  coin is fair so it's going to give sustain probability of

4  guessing ahead as in the tail.  It's about the test.  I can

5  slip that coin ten times and if I find I get nine heads, the

6  probability theory and hypothesis testing let me conclude

7  that I can reject the (indiscernible).  That's not a fair

8  coin.  It's disproportionately likely to give (indiscernible)

9  a head rather than a tail.

10      That's just a very basic example but that's the kind of

11  statistics that I have been trained in, in a (indiscernible)

12  deep level.

13  Q    And, again, Dr. Martin, sticking with your background

14  have you ever taught any classes, coursework in the area of

15  statistics?

16  A    Yes, after I completed my statistic training at

17  Harvard, I was a teaching fellow.  There will be a full

18  professor who's teaching the main course and then I taught

19  weekly sections of statistics in one circumstance to Harvard

20  Business School students.

21  Q    And the area of sample (indiscernible) is that an area

22  with which you're familiar, Dr. Martin?

23  A    Sure that's another area that I received training in at

24  both undergraduate and graduate level.  And it's something

25  that I use, techniques that I use routinely in my work at

1  NERA.

2  Q    And in connection with your work in this case, we know

3  that you offered a declaration, correct?

4  A    That's right.

5  Q    And can you tell the court what was your assignment in

6  regard to the declaration?

7  A    Sure.  I had two assignments.  The first was to design

8  and pull a sample of the abused claims that would allow

9  statistical inferences to be made at it's called a

10  subpopulation level.  I was asked to look at six

11  subpopulations.  And then at the level of the population as a

12  whole, so that was one assignment.

13     And another was to generate using a full database of

14  the abuse claims to generate certain statistics that have

15  been requested by counsel.

16  Q    And with regard to the six populations, who provided

17  those subpopulations to you?

18  A    They were provided to me by counsel. They were

19  subpopulations of particular interest to them and they asked

20  me to design a sample that would allow inferences to be made

21  about those subpopulations.  And then they requested about

22  the population altogether.

23  Q    Does the fact that counsel identified those

24  subpopulations, Dr. Martin, effect the integrity of the

25  sample that you drew?

1 A     No, not at all.  It's what's called a stratified sample

2 and it's used in cases when you want to investigate

3 particular subgroups of interest.  Right, you have a

4 particular interest in understanding what the particular

5 characteristic would be in a subpopulation.  And so, you

6 stratify your sample.  You sample within these buckets for

7 strata to make sure you get enough, make sure you get enough

8 observations of each of the subsamples to be able to say

9 something statistically meaningful about those subsamples.

10 Q    Now you drew claims for not only the six subpopulations

11 but for a seventh population too, correct?

12 A    That's right.

13 Q    And what was the seventh subpopulation or population,

14 depending on how you refer to it?

15 A    I would call it all other.  You had the sixth

16 population that counsel asked me to sample from. And then my

17 assignment was to be able to say something also about a

18 population as a whole.  So I needed to sample from the

19 seventh subpopulation, those that are not any of the sixth,

20 to enable me to do that extrapolation.

21 Q    And how many claims did you draw for each of the seven

22 populations?

23 A    I drew two hundred claims within each of the

24 subpopulations.

25 Q    And who arrived at the number two hundred for those

1 subpopulations?

2 A    I did use those accepted statistical formulas. They let

3 us, that we conclude that pulling a sample of two hundred

4 claims from each of the subpopulations would allow me with 95

5 percent confidence to estimate proportion, for example, with

6 a margin of error of plus or minus 7 percent within the -- at

7 that most was my 7 percent was within the subpopulation.  And

8 then to extrapolate up to a population as a whole that would

9 yield a margin of error at most plus or minus 4 percent.

10         THE COURT:  I'm sorry, doctor, I didn't hear that

11 last part.  It would be for the population as a whole, it's

12 what?

13         THE WITNESS:  The margin of error would be plus or

14 minus 4 percent.  I have more observations in the 1400 than I

15 do in the 200, so I put all of it together, I can estimate

16 margin of error that's smaller, estimated an estimate with a

17 smaller margin of error around it.

18 BY MR. RUGGERI:

19 Q    Can you briefly tell the court how you went about

20 drawing the two hundred claims for each of the seven

21 subpopulations and the group that you considered to populate

22 those subpopulations?

23 A    Sure.  And, again, I don't know if they'll let you go

24 through each of the six subpopulations, but maybe that would

25 help the explanation.

1    The first subpopulation was claimants who alleged

2  abuse, at least, one year of abuse in the period from 1971 to

3  1975.  So we identified all those -- again, relying on the

4  omni database which is the database that comes from the proof

5  of claims.  And so, we identified all claims that identified,

6  at least, one year of abuse in that four-year, five-year

7  period.  We sorted them randomly and then we picked the first

8  two hundred, so that was our first subsample was from that,

9  that subpopulation.

10    Then we moved onto the next subpopulation which had no

11  scouting affiliation.  Again, that came right from the new

12  database.  There's a scout affiliation field.  But we looked

13  for cases with that with zero.

14    And we also, though, before pulling that sample, we

15  made sure those there was no scouting affiliation.  We're not

16  also in the first subpopulation.

17    One of the things that's important for extrapolation is

18  that the sample be mutually exclusive.  So I want to make

19  sure there's no overlap between the different subsamples.  So

20  my second subsample was two hundred claims from those who did

21  not indicate any scouting affiliation, that were not also in

22  the first group, and I've seen seventy-one to seventy-five.

23    And then I really just proceeded from there.  You know,

24  we also pulled two hundred in some claimants who provided no

25  indication of identifying their abuser from claimants who did

1  not allege any physical abuse and claimants who did allege

2  any impact associated with the alleged abuse.  And then,

3  finally, from claimants who had sought counseling.

4  Q    Dr. Martin, in your declaration you don't share any

5  inferences or extrapolations that you've made from the sample

6  you designed and drawn.  Why not?

7  A    We haven't gotten there yet, right?  All I've done so

8  far is draw sample, and I've drawn it so that it will enable

9  me to make (indiscernible) inferences at the subpopulation

10  level and the full population level.  But to do that, we have

11  to get the additional discovery data, get the assignment of

12  what we're trying to classify, characterize, and then we'll

13  get estimates.  And then we can extrapolate those estimates

14  to the populations.

15  Q    Thank you, Dr. Martin.

16         MR. RUGGERI:  Your Honor, that's all I have for

17  the direct.

18         THE COURT:  Thank you.

19         Mr. Moxley, cross.

20         MR. MOXLEY:  Thank you, Your Honor.

21                     CROSS-EXAMINATION

22  BY MR. MOXLEY:

23  Q    Good morning, Dr. Martin.

24  A    I'm trying to find you.  Okay.  I got you right here.

25  Q    Can you see me now, doctor?

1   A      I can.  Thank you.

2   Q      Terrific.  Great.

3          Dr. Martin, my name is Cameron Moxley.  I'm from the

4   law firm of Brown Rudnick on behalf of the Coalition of Abuse

5   Scouts for Justice.

6          Dr. Martin, you talked about your curriculum vitae as

7   well that you have a Ph.D. and a master's degree from Harvard

8   in economics and a Bachelors Degree in economics and

9   (indiscernible), correct?

10  A      That's right.

11  Q      Dr. Martin, are you a medical doctor?

12  A      I'm not.

13  Q      Are you a psychologist?

14  A      I'm not.

15  Q      Do you have any degrees in psychology, Dr. Martin?

16  A      I do not.

17  Q      In a professional capacity, have you ever treated a

18  victim of sexual abuse?

19  A      No.

20  Q      In a professional capacity, have you ever counseled a

21  victim of sexual abuse?

22  A      No.

23  Q      Dr. Martin, have you published any articles on sexual

24  abuse?

25  A      I have not.

1 Q      Has anyone assisting you at NERA on this engagement

2 published any articles on sexual abuse?

3 A      No, I don't believe so.

4 Q      Dr. Martin, do you know anyone has published articles

5 on sexual abuse?

6 A      I'm sorry; excuse me?

7 Q      Dr. Martin, the question was do you know anyone who has

8 published articles on sexual abuse?

9 A      I don't think so.

10 Q      Have you read any qualitative studies regarding

11 childhood sexual abuse?

12 A      Yeah, I worked on the case alleging abuse in the

13 Catholic Church and so I may have, at that time, read some

14 studies, although I'm not like following any particular ones

15 sitting here today.

16 Q      Is there any study that you could name that you've read

17 about childhood sexual abuse?

18 A      No.

19 Q      Dr. Martin, can you name any journals that frequently

20 publish articles involving childhood sexual abuse?

21 A      No, not offhand I can't.

22 Q      Dr. Martin, you're aware of the categories of sexual

23 abuse that are identified on the claim forms in this matter,

24 correct?

25 A      Of the physical abuse categories, yes.

1  Q    Okay.  Are you aware, Dr. Martin how the term sexual

2  abuse is defined in literature discussing sexual abuse

3  issues?

4  A    (indiscernible) differently than in the clinical claim

5  forms, no I don't have information about that.

6  Q    Are you familiar with an organization called Child USA?

7  A    I don't believe so, no.

8  Q    Are you familiar, Dr. Martin, with any think tank that

9  studied childhood sexual abuse?

10 A    Again, I may have seen articles from that kind of

11 organization in my work with abuse claims in the Catholic

12 Church but I don't remember a particular one sitting here.

13 Q    Dr. Martin, are you familiar with studies on delay

14 disclosure in the sexual abuse context?

15 A    Not in a professional capacity, no.

16 Q    Okay. Do you know what the -- strike that.

17      Do you know what delay disclosure means in the sexual

18 abuse context?

19 A    Again, my lay understanding would be that disclosures,

20 you know, sometime after the alleged abuse occurred.

21 Q    Do you know if the delayed disclosure is common among

22 sexual abuse survivors?

23 A    Again, I may have seen statistics on that but I'm not

24 surely not using them for the purposes of the affidavit that

25 I have prepared for the court and for purposes of drawing the

1  sample which relies on my expertise as a statistician solely.

2  Q    Are you familiar, Dr. Martin, any estimates of the

3  percentage of child sexual abuse victims is not

4  (indiscernible) that child sexual abuse that they experienced

5  before adulthood?

6  A    I missed a couple of words --

7            MR. RUGGERI:  Objection, Your Honor.

8            Your Honor, beyond the scope in relevance.

9            As I said, we're not talking about inferences and

10  extrapolation today.  We're actually talking about the

11  assignment that she performed.

12           THE COURT:  I'm going to permit the questions.  I

13  think, Mr. Moxley, you're making your point so I don't know

14  how many more questions along these lines you have, but I

15  think it's fair to explore her background relative to sexual

16  abuse, given that that's what the proofs of claim involve.

17           MR. MOXLEY:  And, Judge, I will keep these

18  questions as brief as possible.

19           THE COURT:  Okay.

20  BY MR. MOXLEY:

21  Q    Dr. Martin, the question, just to repeat again, was I

22  think you said you didn't hear me, so let me just ask the

23  question again, if I could.

24           Are you familiar with any estimate of the percentage of

25  child sexual abuse victims who purposely (indiscernible)

1  disclose the child sexual abuse they experienced before

2  adulthood?

3  A     Again, I may have seen those statistics, but I'm not --

4  I don't know them sitting here today and I'm not using that

5  for purposes of preparing the affidavit.  I don't need to use

6  them for purposes of preparing the affidavit.

7  Q     Do you know the average age of a victim of child sexual

8  abuse at the time that victim first reports the abuse?

9  A     I don't.

10  Q     Dr. Martin, do you know the percentage of child sexual

11  abuse that goes unreported altogether based on U.S.

12  Department of Justice data?

13  A     I'm not familiar with that statistic, no.

14  Q     Do you know, Dr. Martin, if most sexual abuse survivors

15  typically disclose the abuse they suffered all at once or

16  overtime?

17  A     Again, I'm not familiar with that.

18  Q     Dr. Martin, when child sexual abuse is detected during

19  the victim's childhood, what the study shows the most likely

20  manner of protection?

21  A     I don't know the answer to that. Again, it's not

22  necessary for the report that I'm submitting to the court

23  here.

24  Q     Dr. Martin, are you aware of whether child sexual abuse

25  experts generally believe that even when reports are delayed

1   or are inconsistent that we should not consider them to be

2   unreliable?

3   A    I'm sorry.  You're a little muffled.

4   Q    Dr. Martin, can you hear me better now?

5   A    Uh-huh.

6   Q    Okay.  Are you aware of whether child sexual abuse

7   experts generally believe that even when reports are delayed

8   or inconsistent, we should not consider them to be

9   unreliable?

10  A    Again, I'm not familiar with that one way or the other.

11  Q    Do you know, Dr. Martin, if child sexual abuse experts

12  generally expect new disclosures of child sexual abuse from

13  senior citizens in light of attitudinal shifts in society

14  over the last two generations?

15  A    I am not familiar with that one way or the other.

16  Q    And do you know, Dr. Martin, what empirical evidence

17  demonstrates with respect to the likelihood of people to

18  engage in harmful behavior such as criminal activity the

19  person that's sexually abused as a child?

20  A    No, I don't.  And, again, this is not -- that's not my

21  area of expertise.  It's not the area of expertise that I

22  have used to design and pull the sample of these claimants

23  which is a purely statistical exercise in my statistical

24  expertise.

25  Q    Do you consider yourself to be an expert in child

1  sexual abuse claims?

2  A     In the sense that I am able to and have draw a sample

3  of claims in each of these populations that will allow me to

4  make statistical inferences about the proportion of those

5  claimants that satisfy some criteria, for example, in

6  (indiscernible) with statistical precision.

7  Q     Dr. Martin, you recall that last week I had the

8  opportunity to take your deposition, do you recall that?

9  A     Yes.

10  Q     You recall, Dr. Martin, I asked you whether or not if

11  you were to replace on the claim form the different

12  categories of sexual abuse with what is the claimant's

13  favorite color.  And if you were asked to analyze that data

14  would you bring anything different to bear to your analysis.

15  Do you recall I asked you that question?

16  A     I do recall that, yes.

17  Q     And what was your response, if you recall?

18  A     That it's functionally equivalent.  It really doesn't

19  matter what the subject area is.  What the expertise I am

20  bringing is how to draw a sample such that whatever the

21  population that they're already studying it's large enough

22  that I can draw statistically significant inferences about

23  population characteristics.

24  Q     You're not bringing or purporting to bring any

25  expertise of your own with respect to sexual abuse claimants

1  to the statistical analysis by your undertaking, is that

2  right?

3  A    That's right.  Again, it's not necessary for me to, you

4  know, pull the sample and then analyze the information from

5  the sample when we get there and extrapolate up to the

6  population.  Those are really relying on the kinds of

7  statistical techniques that I was talking about when Mr.

8  Ruggeri was asking me questions.

9  Q    Dr. Martin, in your declaration you cited to two

10  specific sources, one of which was the reference manual on

11  scientific evidence.  And specifically, in that manual, the

12  chapter that was entitled, "Reference to (indiscernible)

13  Statistics," is that correct?

14  A    Yes.

15  Q    And we look at that reference guide at your deposition

16  and do you recall that when we looked at that guide at page

17  241 discuss the step of developing statistical model.  And

18  the reference guide discussed the need for the model to

19  "suit" the occasion in order to allow for inferences to be

20  drawn.  Do you recall that?

21  A    I don't recall that specifically, but I'll take your

22  word for it.

23  Q    Well, let's take a look at your deposition transcript

24  which I think you have in front of you.

25          MR. MOXLEY:  And for the record, Your Honor, the

1  transcript is Exhibit 10 to the supplement to objection.

2  BY MR. MOXLEY:

3  Q     Do you have your transcript in front of you from the

4  deposition?

5  A     I do, yes.

6  Q     Okay.  Let's look at page 71 of that transcript.  Are

7  you able to flip there with me?  We don't have the ability

8  today, Dr. Martin, to bring it on the screen.  If you can

9  look at the hard copy in front of you.

10  A     I (indiscernible).  I have a (indiscernible) from

11  (indiscernible).

12  Q     Okay. Great.  Great.

13        Dr. Martin, if you look at page 71 of your transcript,

14  line 17, you'll see there's a question that begins couple of

15  steps down, do you see that?

16  A     Yes.

17  Q     And I asked you a couple of stepdown, there's a bullet

18  for "Developing Statistical Model," and it describes the need

19  for statistical models that "suit the occasion and allow for

20  inferences actually to be drawn from the sample," is that

21  right?  And your answer was, "yes," correct?

22  A     Right, exactly.

23  Q     So you're bringing nothing different to bear here then

24  if you were analyzing the claimant's favorite colors, right?

25  A     The statistical model here is both allows me to

1   estimate a proportion, for example, of each subsample and to

2   estimate that such that I know what the margin of error is

3   around that.  And also, statistical model lets me know that I

4   can extrapolate that out to the population as a whole. And,

5   again, put a margin of error around that so that the model

6   that I'm proposing to use here or that I referenced is a

7   statistical model, right.  And that I aptly have expertise in

8   that area all the time.

9   Q    But areas so just to confront has any subject matter

10  expertise, subject matter expertise in child sexual abuse

11  conformed your work in the case so far?

12  A    No, again, that's not my area of expertise.  My area of

13  expertise is statistics and economics.

14  Q    Now in that reference guide, Dr. Martin, that we looked

15  at, at your deposition, we looked at that guide which stated

16  that cases involving statistical evidence frequently are or

17  should be two expert cases of interlocking testimony with one

18  of those two experts being an expert of the subject matter

19  expertise, correct?

20  A    I remember looking at that, yes.

21  Q    Dr. Martin, are you familiar with using benchmarks in

22  statistical analyses?

23  A    Again, I know we also talked about this at my

24  deposition; yes, I'm aware of that, that can occur.

25  Q    Do you recall that when I first asked you about that at

1  your deposition, your first response was I'm not sure what

2  you mean by that, right?

3  A    I just wanted to make sure we were talking about the

4  same thing, clarifying your question.

5  Q    And, Dr. Martin, after pointing you to the discussion

6  of the importance of using appropriate benchmarks in

7  presenting the results of statistical analyses from the

8  reference guide that you cited in your declaration, you

9  testified at the deposition that using benchmarks was a

10 technique that you had seen used when you compare results

11 generated.  Do you recall that?

12 A    Yes.

13 Q    And as of last week at your deposition, Dr. Martin, you

14 had not yet determined one way or the other whether you would

15 use benchmarks in your analyses here, correct?

16 A    I don't know what the questions are yet, right.  What I

17 was asked to do so far is draw a sample and draw a sample

18 that would allow me to make, again, statistical inferences,

19 draw statistical inference about the subpopulation and the

20 population as a whole with statistical precision.  Now I

21 can't possibly think about benchmarks or any other aspects of

22 the assignment until I know more detail about what that

23 assignment is.

24     What I can do is draw a sample and tell you this sample

25 is big enough that I can reach conclusions about

1  subpopulations and the populations as a whole and do it with

2  a -- and tell the court the margin of error around my

3  estimates.  But until I know what, you know, counsel wants me

4  to estimate I can't possibly go further than that in my

5  explanation.

6  Q    Dr. Martin, counsel, as you testified, selected the

7  first six subcategories that are identified in your

8  declaration, correct?

9  A    Counsel selected those -- they asked me to investigate

10 those, yeah.

11 Q    And who asked you to draw the seven, the seventh

12 category that you drew?

13 A    They didn't ask me to draw that, but the assignment was

14 to be able to say something in a statistical sense about each

15 of those six subpopulations and then also about the

16 population as a whole.  And so, without that seventh subgroup

17 which I determined we should sample, we'd be missing a

18 portion of the population.  So it would not be possible to

19 extrapolate up to the full population.

20 Q    And the only reason, Dr. Martin, that you are analyzing

21 the sixth, the first six subpopulations is because counsel

22 asked you to do that, correct?

23 A    I'm not sure what the only reason -- the only means in

24 that sentence.  Yes, my assignment was to develop a sample

25 that would allow an investigation of those six subpopulations

1  and the population as a whole.

2  Q     Is there any reason other than that counsel asked you

3  to analyze those six subcategories that you picked those

4  subcategories?

5  A     No, again, I didn't pick them.  Counsel picked them.  I

6  was asked just to provide a sample doing that instruction.

7  Q     Dr. Martin, is it customary in your work for the

8  attorney to define the categories of statistical analysis?

9  A     Sure. It can be, right.  With (indiscernible) sampling

10 does is it lets you investigate subpopulations, right.  You

11 have to know what the subpopulation of interests are. And,

12 here, they indicated that the subpopulations were the six

13 that we went through before.

14 Q     Did Hartford counsel explain to you why those six

15 categories were chosen?

16 A     Not in any detail, no.

17 Q     What generally did they tell you?

18        MR. RUGGERI:  Your Honor, that goes beyond the

19 scope of permissible inquiry into conversations between a

20 witness and counsel.

21        MR. MOXLEY:  But, Your Honor -- I'm sorry, Judge.

22        THE COURT:  Go ahead.

23        MR. MOXLEY:  Thank you, Your Honor.

24        Your Honor, Rule 26 and I could point the court to

25 the subsection 26(b)(4)(c)(2) and (3) provide that

1  communications between the party's attorney and an expert

2  witness are only protected except when the communication

3  identifies facts or data the party's attorney provided and

4  that the expert consider in forming the opinions to be

5  expressed; or identify assumptions that the party's attorney

6  provided and the expert relied on in forming the opinion to

7  be expressed.

8           Dr. Martin has unequivocally testified both today

9  and at deposition that the only reason she is analyzing the

10  six subcategories identified in her declaration is because

11  counsel asked her to do that.

12          So I think, Judge, we're entitled to discover what

13  Dr. Martin was told by counsel in connection with the facts

14  or data to be considered in analyzing those six subcategories

15  or what assumptions they asked her to make.

16          MR. RUGGERI:  And, Your Honor, the rule is very

17  careful.  It allows counsel to ask about the assumptions that

18  the expert was requested to make.  It does not allow you to

19  get asked that issue.  That would throw the privilege out the

20  window, Your Honor.

21          Dr. Martin has said what assumptions that she was

22  asked to take into account and the assumptions that she

23  relied on and that's the scope in a permissible inquiry under

24  Rule 26, Your Honor.

25          MR. MOXLEY:  Your Honor, if I may, that is the

1  very question I just asked Dr. Martin there was an objection

2  interposed.

3          My question and I'll rephrase it if counsel would

4  like and if the court would like, but my question to Dr.

5  Martin is simply what did counsel tell Dr. Martin as to

6  assumptions she should make or facts or data she should

7  consider in connection with those six subcategories.  We want

8  to understand what her understanding is from counsel as to

9  why those six subcategories are the ones she should be

10  analyzing.

11          MR. RUGGERI:  Your Honor, I have no objection to

12  the question as rephrased which is different than the one he

13  asked.

14          THE COURT:  Yes, let's go with the rephrased

15  question and why don't you repeat it for Dr. Martin.

16          MR. MOXLEY:  Of course.  Thank you, Your Honor.

17  BY MR. MOXLEY:

18  Q    Dr. Martin, the question is -- strike that.

19       The question, Dr. Martin, is you've testified that the

20  six subcategories are categories that were identified by

21  counsel.  My question is what assumption were you asked to

22  make about those six subcategories and what facts or data did

23  counsel tell you about why they were asking you to analyze

24  those six subcategories?

25          MR. RUGGERI:  The why question, Your Honor, he

1  tagged it onto the end again, that's the problem that he gets

2  invading the privilege, Your Honor.

3           THE COURT:  Let's not ask a compound question,

4  first of all.  Let's just ask her the pieces of it so that we

5  can make sure it's within the bound.

6  BY MR. MOXLEY:

7  Q     Dr. Martin, what assumptions were you asked to make by

8  counsel with respect to the six subcategories that are

9  identified in paragraph five of your declaration?

10 A     No assumption at all.

11 Q     Okay.  What facts were you told by counsel with respect

12 to those six subcategories?

13 A     The only fact I can think of is that 1971 to 1975 is

14 the period of the Hartford coverage insurance lock.

15 Q     Do you recall any other facts that you were told by

16 counsel?

17 A     I don't believe so, no.

18 Q     What data, if any, did counsel provide you with respect

19 to those subcategories that are identified in your

20 declaration?

21 A     I was provided with -- I guess we downloaded the omni

22 database which is, you know, the proof of claims information.

23 And I think I explained earlier about the -- mostly just took

24 -- mostly subcategories are only in that database.  I had a

25 couple of cases.  We had to do additional sort of filtering

1  or refining to parsing to populate to know which claimants

2  fell into each of the subcategories.

3  Q    Dr. Martin, how did you communicate with Hartford's

4  counsel regarding the identification of the six

5  subcategories?

6        MR. RUGGERI:  Objection to form.  I don't

7  understand the question, but to the extent it invades

8  privilege, I object on that ground.

9        MR. MOXLEY:  I'll clarify the question.

10  BY MR. MOXLEY:

11  Q    Dr. Martin, by what method, meaning telephone, email,

12  text messages, other methods, did you utilize in

13  communicating with Hartford's counsel about the six

14  subcategories you were asked to analyze?

15  A    It probably was in both emails at time and phone calls

16  at times.  I certainly, for example, submitted a draft of our

17  -- sample draft of my affidavit which talks about those six

18  subpopulations.  And I would invite (indiscernible) to talk

19  on the phone, yeah.

20  Q    And, Dr. Martin, I believe at your deposition we talked

21  a little bit about the fact that (indiscernible) or assisted

22  in making a document production in connection with this

23  matter, correct?

24  A    Yes.

25  Q    Did you produce any of the emails with counsel about

1  the facts or assumptions that you were provided by counsel

2  with respect to the sixth subcategories that are identified

3  in paragraph five of your declaration?

4  A    Again, there are no -- I was asked not make no

5  assumptions about those.  There wouldn't be any emails or

6  phone calls about assumptions I was asked to make.  The only

7  facts I can think of is the '71 to '75 coverage block.  And I

8  don't believe that would have been the subject of an email

9  either.

10  Q    Dr. Martin, if the insurers get the discovery they seek

11  in the motion, will you be able to tell the court if 96,000

12  sexual abuse claims are valid or not?

13          MR. RUGGERI:  Objection; calls for speculation,

14  Your Honor.  We're not there yet.

15          THE COURT:  Overruled.  Let her answer the

16  question.

17  BY MR. MOXLEY:

18  A    Again, my area of expertise is not in sexual abuse, not

19  particularly, and it would be up to the court to decide, you

20  know, at the end whether claims are valid or not.

21      What I will be able to tell the court is whether these

22  subpopulations or that they share certain characteristics,

23  and I can say that, I can measure that with statistical

24  precision.  I can measure that with, you know, margin of

25  error between 4 and 7 percent.

1    And then, you know, I leave it to counsel and the court

2  to decide whether that means they're valid or invalid.  I

3  don't have any opinion about that.  I have statistical

4  opinion.

5  Q    Dr. Martin, in your declaration at paragraph five, it's

6  for the court's benefit and for the record is, is at Docket

7  Number 1972-6.  Dr. Martin, you state at paragraph five the

8  sample you have drawn, "would be a sufficient size to allow

9  statistically significant inferences to be drawn about

10 population parameters," correct?

11 A    Yes.

12 Q    What is a statistically significant inference?

13 A    The one that's likely to be issued here is I can

14 estimate for each subpopulation what proportion of the

15 population has some characteristic.  And I don't know if

16 those characteristics are going to be yet.  But I can

17 estimate that using the two hundred claim sample.

18    And then suppose I find it 50 percent what statistics

19 lets me tell you is that that's my best estimate of what it

20 is for the population or the subpopulation that 50 percent

21 share that characteristic.  And there's a margin of error

22 around that in the subpopulation of plus or minus 7 percent.

23 So go from 43 percent up to 57 percent.

24    And then -- yeah, so I'm 95 percent confident that if I

25 pulled another two hundred claims, different two hundred, my

1  result would fall in that same band.  My result would fall

2  between 43 percent and 57 percent.  And then when I get to

3  the population as a whole, if I extrapolate up, and I'll

4  develop an estimate for the population as a whole, so that's

5  50 percent.  What I can tell the court is that that's my best

6  estimate.

7       And if I redid the whole exercise again, that would

8  range from 46 percent up to 54 percent.  So I can tell the

9  court what proportions are and how confident I am that I have

10  measured them accurately and what the margin of error is

11  around those.

12  Q    And with respect to what you'll be able to share with

13  the court as you just described it, will that allow the court

14  from reading your explanation of inferences you're able to

15  draw, will that allow the court to determine whether even a

16  single one of these proofs of claim is valid or not?

17  A    Again, I don't know what the --

18            MR. RUGGERI:  Objection to form.  He's asking the

19  witness what the court is going to do with the information

20  and I think that's not appropriate.

21            THE COURT:  Sustained.  The way the question was

22  phrased.

23  BY MR. MOXLEY:

24  A    Dr. Martin, in presenting your statistically

25  significant inferences at the end of your analysis, do you

1  intend to provide opinion as to whether or not any particular

2  proof of claim is valid or not?

3  A    No, first of all, it's not going to my opinion.

4  Generally, I'm not a determiner of validity.  What I am

5  determiner of is which claimant share -- what proportion of

6  claimants share a piece of that characteristic.

7  (indiscernible) looking at any individual claimant saying

8  that claimant has or doesn't have the characteristic.  But

9  it's saying in this population as a whole what proportion of

10 claimants do I expect statistically would share this

11 characteristic and how sure am I that that's the right

12 number.

13 Q    Dr. Martin, just to confirm you don't have, as you sit

14 here today, a statistical model yet, correct?

15 A    I know we spent a long time on this in the deposition

16 and I haven't generated for the court yet an estimate of

17 population parameters because I haven't been asked to do that

18 yet.  We haven't gotten the discovery information yet.  We

19 haven't done any additional analysis yet.

20      What I have done is design the sample so that when that

21 work is done (indiscernible) the kind of extrapolation that I

22 was referencing earlier.

23 Q    Dr. Martin, to try to be as efficient as possible, let

24 me just go through and list what your six subcategories are,

25 just so that we're all talking about the same thing.  These

1  are in paragraph five of your declaration.

2       The six subcategories are: allege abuse in 1971 to

3  1975; no scouting affiliation; no abuser identification; no

4  physical abuse alleged; sought counseling; no impact alleged;

5  is that correct?

6  A     Yeah.

7  Q     Okay.  Is it fair then to say, Dr. Martin, there are

8  potentially six subcategories that you're analyzing where the

9  proof of claim is perceived to be deficient in some way,

10 (indiscernible) identify information of any given category;

11 is that fair?

12 A     Again, I'm not making any assumptions about that.  I

13 don't have any opinion about that.  All I was asked to do is

14 sample from those subcategories.

15 Q     Your seventh category was pulled from a pool of proofs

16 of claim that didn't fall into any of the six subcategories,

17 correct?

18 A     That's right.

19 Q     In your deposition I asked you if you knew what the

20 size of that pool from which that seventh category was drawn.

21 And I can point you to your testimony, but you didn't know

22 specifically what the number was.  I asked you if you would

23 estimate it at tens of thousand and you said you thought it

24 was probably around there.  Do you recall that?

25 A     Yes.

1  Q    Is that still your view that it was probably around

2  tens of thousands of proofs of claim that the two hundred in

3  the seventh category were pulled from?

4  A    Actually, since you asked that question, I went back

5  and looked and it's about 30,000 claims in that seventh

6  category.

7  Q    Dr. Martin, in all of your conversations with counsel,

8  did you have any idea what you are actually going to be

9  analyzing or are you just right now looking at the sample and

10 pulling the sample?

11 A    Just right now looking at the sample and pulling the

12 sample.

13 Q    Dr. Martin, how does including the two hundred claims

14 from that seventh category that don't fall into the first

15 six, how will that effect the way you may develop your

16 statistical model?

17 A    Again, if I were asked to extrapolate up, we could

18 investigate the same population characteristics of

19 (indiscernible), each of the seven subpopulations and then

20 because I have that seventh one, I would be able to compare

21 it, compare with those who share none of this six to ones

22 that do and/or extrapolate up to the population as a whole.

23 But having that seventh bucket lets me say something about

24 those (indiscernible) populations; if I'm asked to do that.

25 Q    As you sit here today, do you know if you will be asked

1  to do that?

2  A    I don't know.

3  Q    Something about the (indiscernible)?

4  A    I don't know.  My assignment was to allow that to be

5  done, so I think may be asked to do that, but I haven't been

6  given any additional information about my assignment other

7  than to design a statistically valid sample.

8  Q    Dr. Martin, there's some overlap among six

9  subcategories meaning that some proofs of claim fall within

10 multiple subcategories, right?

11 A    Yes.

12 Q    And you acknowledged that in paragraph five and six of

13 your declaration, correct?

14 A    Yes.

15 Q    How much overlap is there?  Are you able to determine

16 that?

17 A    Sure.  You can filter the database and, you know, have

18 it see how often its one, for example, allege abuse in the

19 1971, '75 period and no scouting affiliations.

20 Q    You referenced earlier about how you may be able to use

21 that seventh subcategory to extrapolate up about and draw

22 inferences about the total population in the omni database.

23 How would you do that?  Can you explain that?

24 A    It's not may.  I mean if you wanted to extrapolate up

25 to the full population, you would need to use all of the

1  subpopulation.  That's what we're doing.  And (indiscernible)

2  talk you through the formula that is used.

3      First, we're going to get the estimate for each of the

4  subpopulations or whatever characteristic we're interested

5  in.  From that, we can calculate the variance for each of the

6  subpopulations, you know, how tightly we're measuring that,

7  that estimate in the subsample.

8      And then what extrapolation is, is taking those, you

9  know, different sample estimates and variances and putting

10  them together (indiscernible) the population as a whole.

11  That involves adjusting for the weak (ph) of each

12  subpopulation.  So the weak is the number of claims in the

13  subsample, divided by the total population of claims -- I'm

14  sorry; total population.  So the number of claims in the

15  population that's been sampled to have that characteristic

16  divided by the total amount of the claim.  That's the weak

17  and that's a factor that goes into extrapolation.

18      And then also the likelihood of the selection.  So the

19  two hundred, I'm selecting two hundred for each bucket, at

20  each of the strata.  And then you divide that by the total

21  number in the subpopulation as a whole.  So both of those get

22  -- multiplied by the variance and then that allows us to

23  estimate the -- sample estimate and the margin of error

24  around it for the population as a whole.

25  Q    Dr. Martin, do you have any understanding as to why

1  each of the six subcategories that you're analyzing are part

2  of your analysis?

3  A     I think we went through this earlier and I was not

4  given any explanation of the particular buckets.  And I can

5  (indiscernible) that the '71 to '75 wanted -- I know that's a

6  Hartford period so I could understand that being a

7  subcategory.  I don't know the reasons why they elected to --

8  I mean I can speculate, but I wasn't given any information

9  about the reason that they asked for the other five

10  categories.

11  Q     In connection with the analysis that you will undertake

12  and that you (indiscernible), Dr. Martin, have you ever

13  considered talking to a claimant in this case about the abuse

14  they suffered as a child?

15  A     Again, it's not for purposes of selecting statistically

16  representative sample.  I mean that's what I've been asked to

17  do so far.  I've been asked to generate sample that were

18  going to allow me to make inferences about population --

19  about quantitative metrics, right, about population

20  parameters.  But you don't need to talk to anybody,

21  (indiscernible) talk to a claimant to be able to do that.

22  That's just -- it's just statistics.

23  Q     And what about excess of drawing inferences about the

24  population from the sample in connection with that next step,

25  have you ever considered talking to a claimant in this case

1 about the abuse they suffered as a child?

2 A    Again, I haven't been asked to do anything else yet, so

3 I really don't know what the assignment would be and I have

4 to know what that is before I can talk about what I might do

5 or never did.

6 Q    I appreciate that, Dr. Martin.  My question is a little

7 bit different.  My question is have you ever considered --

8 you're the expert undertaking this analysis -- have you ever

9 considered talking to a claimant in this case about the abuse

10 they suffered as a child?

11        MR. RUGGERI:  Your Honor, I object.  Yeah, asked

12 and answered.  We're well beyond the scope.  She said she

13 hasn't been asked to take on any additional assignments.

14        THE COURT:  Sustained.

15        MR. MOXLEY:  If I might just be heard briefly.

16        Your Honor, Dr. Martin has -- Dr. Martin's

17 declaration submitted.  According to the brief that was

18 submitted by the insurers specifically for the purpose of

19 being able to draw statistical inferences from a sample of

20 claimants if they get the discovery they're seeking.

21        My question is to understand if Dr. Martin

22 actually would find it useful to hear from a claimant.  And I

23 think that goes to the heart of whether or not her analysis

24 will provide anything useful to the court.

25        I can rephrase the question if the court would

1  like.

2           THE COURT:  I think it's asked and answered.  She

3  hasn't gotten to the next step yet.

4           MR. MOXLEY:  Thank you, Your Honor.

5  BY MR. MOXLEY:

6  Q    Dr. Martin, in thinking about the statistical analysis

7  that you say in your declaration that you will be able to

8  undertake having drawn these samples, would anything that a

9  claimant in this case might have to say affect your analysis?

10          MR. RUGGERI:  Same objection, Your Honor.  Not

11  there yet.

12          MR. MOXLEY:  Judge, respectfully, the purpose of

13  the declaration, you can look at the brief, was saying that

14  this discovery will allow inferences to be drawn.  I'm asking

15  the expert will the discovery allow her to draw inferences.

16          THE COURT:  Isn't that an argument?  Isn't this

17  part of your argument?

18          MR. MOXLEY:  I apologize, Your Honor.  I was just

19  responding to Mr. Ruggeri's objection stating the basis for

20  the question.

21          THE COURT:  Well, no, I understand that.  But

22  isn't that part of your argument?  I mean I think you're

23  trying to make your argument through your questions but I'm

24  going to sustain the objection.  You can argue what you want

25  to argue with respect to that.

1          MR. MOXLEY:  Thank you, Your Honor.

2          Dr. Martin, thank you very much for your time

3  today.  I have no further questions.

4          THE COURT:  Thank you.

5          Any redirect?

6          MR. RUGGERI:  Your Honor, very briefly.

7                    REDIRECT EXAMINATION

8  BY MR. RUGGERI:

9  Q    Dr. Martin, as a statistician was expertise in the area

10  of sexual abuse claims needed for the assignment that you

11  performed for me?

12  A    No.  It's just purely statistical exercise.

13  Q    And can you elaborate what you mean by that and explain

14  to the court a little bit more why this subject matter

15  expertise was not necessary for the assignment that you

16  performed?

17  A    All I know from the perspective of statistics about a

18  sample to, you know, pull one effectively, one that will

19  allow me to make statistical inferences is information about

20  the size of -- the identity of the subcategories, the size of

21  the subcategories, the level of precision that I want to have

22  attend to the results, the margin of error that I'm willing

23  to tolerate essentially.

24          And then it's -- they're just statistical formulas,

25  right.  You plug the information into the formulas and it

1  spits out an end.  In this case, the end was like a 196.  We

2  rounded it out to two hundred.  It doesn't matter to the

3  formulas whether you're talking about, you know, sexual abuse

4  claims or asbestos claims.  I've done a (indiscernible) where

5  I've used a lot of statistical sampling is asbestos personal

6  injury claim, right.  And I'm not a subject matter expert in

7  asbestos.  You know, I'm not a medical doctor, but I can pull

8  a representative sample of asbestos personal injury claims

9  for additional investigation.

10       And I've done that, you know, throughout the last

11  probably fifteen years in my working there. So it's not about

12  the subject.  It's really about having the expertise in

13  statistics to design the sample properly.

14  Q    You anticipated my next question.

15       MR. RUGGERI:  And that's all I have, Your Honor,

16  for redirect.

17            THE COURT:  Thank you.

18            Thank you, Dr. Martin.  You're excused.

19       (Witness excused)

20            THE WITNESS:  Thank you.

21            THE COURT:  Thank you.

22            Mr. Ruggeri.

23            MR. RUGGERI:  Yes, Your Honor, that completes the

24  evidentiary portion of our presentation.  I think we're at

25  the point of counsel making arguments.

1           THE COURT:  Okay.

2           MR. RUGGERI:  May I proceed?

3           THE COURT:  You may.

4           MR. RUGGERI:  Your Honor, and thank you for the

5    time that you gave us this morning to present the evidentiary

6    record that we sought to present.

7           We have a problem in this case, and I think we all

8    know that there's a problem.  And I think the problem starts

9    with the numbers.

10          Prior to the date the petition was filed on

11   February 18th, 2020, Boy Scouts which was a long-time tort

12   defendant have been named in a grand total of 275 lawsuits,

13   and they told us it was aware of another 1400 claims.  And

14   that was after decades in the tort system.  And that was as

15   of February 18th, 2020.

16          Then, Boy Scouts filed a petition.  It asked the

17   court to set a bar date which the court did.  Now, we have

18   more than 95,000 claims that have been filed.  That, Your

19   Honor, is an unprecedented fifty-five (indiscernible)

20   explosion in claims.  I've never seen anything like it in the

21   context of mass tort bankruptcies, and my experience goes all

22   the way back to the Celotex bankruptcy in the 1990s.

23          Your Honor, bankruptcy is not supposed to be used

24   to increase the debtor's liabilities.  It's supposed to be

25   used to distribute the assets fairly for those liabilities.

1  We don't believe this court can or should ignore the

2  explosion in claims and we don't think this court can or

3  should ignore the circumstances surrounding the explosion of

4  claims.

5          This explosion of claims, Your Honor, and the

6  circumstances surrounding it including the unprecedented

7  attorney advertisements, we believe points squarely in favor

8  of Rule 2004 discovery.  We seek discovery regarding the

9  debtor's liabilities.  That is, no one can dispute, a

10 legitimate goal of Rule 2004 discovery.

11         But Your Honor's opinion in Millennium Lab, you

12 know, the analysis there, when Your Honor was deciding

13 whether to allow the trustee to pursue discovery from banks.

14 You talked about the legitimate purposes of 2004 discovery.

15         We cited Your Honor to In re Subpoena Duces Tecum.

16 This isn't the first time that a party in interest has sought

17 a 2004 discovery into the validity of proofs of claims that

18 have been filed.

19         If the proof of claim process is tainted, Your

20 Honor, it affects the integrity of this entire proceeding.

21 And we shouldn't have to just accept, at this stage, Your

22 Honor, what the claimants say or don't say in support of the

23 proofs of claim.  We should be able, allowed, given time, an

24 opportunity to drill down, drill down deeper for, at least,

25 all we're asking for is about 1.5 percent of the claimants to

1  find out what evidence do they have to support their claim.

2        And I don't know that the court has focused on

3  this issue.  But the majority of states in this country still

4  have discovery rules that apply to time bar issues.

5        The proof of claim form, my recollection, is we

6  ask the court to include some questions that would give us

7  answers to those questions.  That information isn't even

8  provided by the proof of claim form.  We don't have

9  information gleaned or elicited from the proof of claim form

10  that allows us to apply statute of limitations in the

11  majority of discovery rule statute of limitation states.

12  It's not in the proof of claim form.

13        THE COURT:  Let me ask you about that particular,

14  and I want to understand what information you think you're

15  going to get and how it's going to be used.  How it can be

16  used.

17        But on the statute of limitations, for example,

18  isn't that a very facts and circumstances determination based

19  on a particular state law and particular facts?

20        MR. RUGGERI:  You know, Your Honor, it is based on

21  particular facts but we could ask the facts to let us make

22  decisions, frankly, for example, on whether to object to the

23  claim.  If I know facts surrounding the claimant recovery of

24  a repressed memory.  If I have an opportunity to elicit that

25  information, either through document discovery or through the

1  depositions that we seek to take, or if I'm entitled to ask

2  the claimant, okay.  When did you connect your injuries to

3  the alleged sexual abuse?  Those are point question that

4  we're seeking to ask through this discovery and that we would

5  seek to ask through the depositions that seek to take that

6  will enable us to apply and make determinations on whether to

7  assert objections based on statute of limitations for those

8  claimants.  We're in the blind right now really where we're

9  having to make assumptions.

10        THE COURT:  I understand that but since you raised

11  that as the particular issue you want to explore, and you

12  raised it first in your argument, I guess I don't understand

13  that one consistent with how I read the motion which is you

14  want to be able to bring omnibus objections.

15        MR. RUGGERI:  We do.

16        THE COURT:  Explain to me how you would bring an

17  omnibus objection on a statute of limitation issues and how

18  any information you could get through whatever second step

19  Dr. Martin might take relates to that?

20        MR. RUGGERI:  I think we have a little bit of the

21  cart before the horse in terms of whatever step Dr. Martin

22  might take, right.  I have not asked her to analyze the time

23  bar issue.  That would be a legal determination that we could

24  make.

25        I haven't asked her to extrapolate for that issue.

1  The sixth categories you'll recall none of the subpopulations

2  is the time bar question.  Okay.

3              THE COURT:  Okay.

4              MR. RUGGERI:  So we aren't -- with regard to

5  making omnibus objection, it could very well be that we could

6  do it.  We offer, I think her declaration does offer the

7  court the number of states in Florida, in New Mexico, for

8  example, that claims that arise out of those.  That may be an

9  instance where it would have to be claimant by claimant or it

10  may be subject to an omnibus objection.

11             If there's no evidence in support of any discovery

12  rule exception to the applicability of the statute of

13  limitations, I just don't know what facts or information that

14  the claim can rely on.  If the court recalls that the proof

15  of claim forms invites people to make claims even if their

16  time barred.

17             We're trying to get some information for us to

18  distinguish the potentially time barred from the time barred

19  claim.  It may lead to objections that we may file.  I don't

20  know if we would do those objections one by one or through an

21  omnibus.  I don't have the information yet.  I haven't

22  categorized those claimants, Your Honor, to see if they are

23  susceptible to an omnibus objection.  I just don't know at

24  this point because we're still at the frontend of seeking the

25  discovery.

1    THE COURT:  Well isn't that important?  And I ask

2  it because I'd like to make sure I understand what you would

3  intend to use the Rule 2004 discovery for because -- and

4  maybe I've linked it incorrectly to the omnibus objections

5  but I think actually it's linked in the motion to the omnibus

6  objections.

7    And if one of the grounds -- if you can't use

8  information generated from a to be analyzed discovery

9  scenario for an omnibus objection then doesn't that undercut

10  the discovery you're seeking?  Because you're not sitting

11  here saying I'm going to take a deposition of every single

12  96,000 claimants. So there has to be a way to use this and

13  I'm trying to figure out exactly what you want to use it for.

14    MR. RUGGERI:  Your Honor, I think to the extent

15  that we're seeking to reserve the right to ask Dr. Martin to

16  extrapolate to allow us to draw inferences, it does go to the

17  sub-populations that we have asked her to draw the claims

18  for.  So I think that is the answer.

19    The fact is that with regard to a lot of the

20  claimants we believe there is no evidentiary support that

21  they have provided to take advantage of a discovery rule in

22  those states that still apply the statute of limitations.  So

23  we will be looking at that information.  Whether that

24  information is susceptible to extrapolation I don't know

25  sitting here today.  We don't have that information. It may

1   or may not be.

2           To the extent that we could object on the grounds

3   that these claims fall within discovery rule states and none

4   of them supports any evidence in support of a recovery of a

5   repressed memory, or the cause of connection, or, you know,

6   that sort of stuff.  I just don't know.  That is why we're

7   asking these folks to provide support, but the proof of claim

8   form did invite people to file claims even if they were time

9   barred.  So we are trying to wrestle with that issue.

10          Your Honor, I don't know.  The information,

11  depending on how we get it, it may or may not allow us to

12  extrapolate.  It may or may not, you know, invite us to ask

13  the court to allow us to take some additional discovery.  It

14  may or may not allow us to ask the court to make sure that it

15  imposes safeguards along the lines of what Judge Carey,

16  former Judge Carey, did in the Maremont case to protect the

17  recoveries of legitimate claims against the taking away by

18  illegitimate claims.

19          We're not at the point, right now, where we know

20  what we are going to do because we don't have the

21  information.  And it would be premature for me to sit here

22  today and tell you what I am going to be able to do, you

23  know, if we get the information.

24          We're not asking for a lot here.  I mean we are

25  trying to get to the bottom of the liabilities against the

1  debtors on the time table that has been imposed on us

2  pursuant to Rule 2004 which, again, is a legitimate 2004

3  interest that we have.  And I will say that the other point I

4  would make in regard to our discovery request is this isn't,

5  you know, a question of discovery that we're making without

6  any evidentiary support.  We know and the court now knows

7  from the record there are invalid and factually unsupported

8  claims.

9         The record is undisputed.  We attached emails from

10  mothers and brothers who have said the claimants were lying.

11  We attached the HUB Report that identified, you know,

12  claimants who are fraudsters, convicted of fraud crimes, and

13  --

14         THE COURT:  I'm not sure what to do with that, but

15  okay.

16         MR. RUGGERI:  We also had claimants who told us

17  they want to withdraw their claims now that we have

18  identified them as part of the (indiscernible).  Just

19  yesterday, Your Honor, we got an email from Boy Scouts

20  counsel about another claimant who said -- another person who

21  said claimant X is lying, he is trying to ruin the life of

22  the person he has identified as an abuser, and he is trying

23  to steal money from the real victims.

24         So that is the circumstance, the context in which

25  we are before the court asking for leave to take discovery on

1  1.5 percent of the claimants who have made --

2        THE COURT:  I understand that.  So explain to me -

3  - I want to make sure I understand why you think these fixed

4  categories of claims of subgroups that were identified, the

5  sub-populations, what do they tell me?

6        MR. RUGGERI:  At the end, you know -- Your Honor,

7  what I am trying to find out at the end of the day is are we

8  dealing with a lot of invalid claims.  So I am saying, in the

9  first instance, within the Hartford policy periods are we

10  dealing with a lot of invalid claims within that population.

11  Are we seeing something that causes concern?

12        The other categories, Your Honor, are categories

13  that we believe are indicia of needing more information.  We

14  have -- there are 81,000 claimants -- 85,000 claimants who

15  don't identify any affiliation with scouting, okay.  That is

16  the second category.  Well that looks to me like that is a

17  potential problem because, obviously, they need to state a

18  cognizable claim against the Boy Scouts or Local Councils,

19  right, but the Boy Scouts here, this is the debtors, the Boy

20  Scouts.

21        So I can't tell you.  From those, my presumption

22  is they are invalid because they haven't shown any connection

23  between their claim and Boy Scouts.  So that is an example

24  where let us dig a little deeper, let us look at the 200

25  claims, let us see if that is indicative of invalid filings.

1  That is what we are trying to find out.  No abuser

2  identification, okay.

3          There are 6,400 claimants who provide no

4  information about alleged abusers.  Another, that to me is

5  indicia of a presumptively invalid claim and, again, let me

6  take discovery.  Again, 1,400 -- the Coalition says you're

7  wrong, Jim, you're wrong Hartford, that your assumption is

8  incorrect that it is a very small, if any, percentage claims.

9  We don't know, but I think we're entitled to find out.  I

10  mean that is what we're trying to do is we're just trying to

11  get the information to find out.

12          I think, based on my looking at the numbers, a

13  significant percent of the claims are invalid; invalid either

14  because they can't show a connection to Boy Scouts, invalid

15  either because they have no support of their claims, invalid

16  because, as we've seen from the emails we received, people

17  are making it up and they're doing it because they sought as

18  a way to make quick money.

19          Yesterday, Your Honor, I think the court saw we

20  had a claimant submit a letter to the court complaining that

21  a plaintiff's lawyer hadn't shown up at his jail to do a town

22  hall with the inmates on the claimant.  He was complaining

23  because the plaintiff lawyer didn't show up to give him the

24  education on that.  I mean those cause alarms to go off in my

25  head and say, you know what, this is exactly what this 2004

1  discovery is when we're trying to get to the bottom of the

2  liabilities of the debtor.

3           This is the biggest liability that it has.  These

4  are the abuse liabilities and you can't just turn a blind

5  eye, I don't believe we should, when we have, you know,

6  evidence that the proof of claim process in this case may be

7  tainted.  I think we should be allowed to go a little deeper.

8           The other point, you know, the claimants, Your

9  Honor, right, these are folks who have interjected themselves

10 into this proceeding.  They didn't have to make claims, but

11 they chose to put in proofs of claim here.  I mean I think

12 legitimately the court said, you know, if you want perfection

13 why not seek discovery for all 95,000.  Well that is not

14 practical, right.  It's not practical to do that.

15          I think what we're trying to do here is ease the

16 burden on the claimants as a whole, on the court, on the

17 parties by saying let us look at 1,400.  Let us see what we

18 see. Let's start there and figure out where it goes.  I will

19 be able to tell from that population --

20          THE COURT:  Okay.  What -- tell me this, this is -

21 - what I am trying to figure out is if what you want is going

22 to get anywhere.  So when I look at the interrogatories what

23 in the interrogatories wasn't in the proof of claim form?

24          MR. RUGGERI:  Your Honor, one, whether -- even if

25 there is a statement in support of a proof of claim, if I ask

 1  for additional information, if I can sit down and talk with

 2  someone -- and I have had experience doing this in a

 3  different arena in the (indiscernible) bankruptcy, this was

 4  years ago, where the court let me sit down and talk with some

 5  claimants and depose the claimants in connection with the

 6  bankruptcy proceeding there.  It was something else.  I mean

 7  it was in the context of abuse where I sat down and talked

 8  with a claimant who said that she would support it with a

 9  diagnosis of a doctor and the first thing I heard from her

10  mouth is I've never seen a doctor, and I was like really.

11          So, I've been through this exercise before.  I

12  think the manner in which these claims were put together

13  these interrogatories are intended to illicit information

14  from people who didn't provide it in the first instance and

15  to give them an opportunity to substantiate the claims from

16  those who did.  Then for a hundred I would have the

17  opportunity to sit down with them, under oath, and ask

18  pointed questions about the information we have about their

19  claims to allow us to make a determination on whether we

20  believe it, you know, valid or invalid.  We submit that we

21  think we are going to see that a lot of these are patently

22  invalid.

23          So the categories are really broken down into

24  three that I am asking for.

25          The first category is the details of the alleged

1  abuse.  You know, tell me information about the acts of

2  abuse, tell me the details of the alleged abuser, tell me the

3  details about the alleged abuser's relationship to scouting.

4        I will tell you, Judge, that when we initially

5  drafted the discovery those questions had to the extent not

6  already provided by your proof of claim form give me all the

7  details about this.  The Coalition, in the course of our meet

8  and confer process, said that would be confusing to the

9  claimants and asked us to strike that preamble; so we did, so

10 we did.  We weren't trying to make make-work, but that was

11 being responsive to the process and the Coalition.

12       The second group of questions, Your Honor, relates

13 to the application of the discovery rule, the

14 interrogatories.  And those go into, you know, the repressed

15 memory beginning at interrogatories five, six, seven, eight

16 and nine; those go to when did you recover your memory, when

17 did you, you know, put your injuries together and realize

18 that those injuries were caused by the abuse.

19       The last two, Your Honor, go to prior claims that

20 the claimants have made against Boy Scouts or Local Councils

21 in prior recoveries which, obviously, goes to the validity of

22 claims that they could be making now.  It's not a small

23 number there, Your Honor.  Its thousands of claims that fall

24 into that bucket too based on our initial paths.

25       The one I missed, Your Honor, is three and four

1   goes to the relationship of the abuser to Scouting and the

2   relationship of the claimant to Scouting.  We talked about

3   that earlier.  Those would be interrogatories three and four.

4          So those are the categories of information.  It's

5   pretty pointed.  It's pretty focused, Your Honor, of the

6   information that we are seeking.  We talked about 100

7   depositions.  That is less then point one percent of all the

8   claimants who have made these claims.  We're just asking the

9   court's permission let us to the 1,400.  Let us identify, you

10  know, 100 of those, up to 100.

11         Mr. Anker, his firm, my firm, Mr. Schiavoni; we're

12  committed to working as fast and as efficiently as we can.  I

13  think with a little bit of cooperation we could complete

14  those depositions by the end of May or possibly early June.

15  It is consistent with a time table that the debtor is seeking

16  to impose on us, Your Honor.

17         Then, you know, I don't know, it probably bears

18  pointing that the court has seen a raft of objections filed

19  in response to the motion.  It didn't see objections from the

20  tort claimants' committee and it didn't see objections from

21  the Boy Scouts.  They said nothing in regard to these

22  motions, but neither one of them stood up and objected.

23         There was an argument about our absence of meet

24  and conferring.  We did meet and confer, Your Honor. I had a

25  team of people spend weeks meeting and conferring with

1  lawyers and claimants.  The TCC told us it couldn't speak for

2  the individual council and invited us to meet and confer with

3  individual council.  We did that.  We met and confer with the

4  pro se claimants with regard to the Coalition.  And I

5  appreciate it.

6          Mr. Goodman sort of cut us off at the path by

7  telling us that, you know, unless discovery were reciprocal

8  on some basis then we were sort of at our end.  So that did,

9  although we offered to meet and confer with anyone who wanted

10  to, that did, sort of, stunt the meet and confer process

11  there.

12          Your Honor, we talked a little bit about Local

13  Rule 3007-1.  I invite Mr. Anker if he has additional words

14  or Mr. Schiavoni to talk about that.  Again, given the nature

15  of the beast that we are wrestling with here I do think it

16  may be that omnibus objections are appropriate.  And we saw

17  in the local rule 150 two times a month, that really doesn't

18  get us to where I think the court wants to get us or where

19  debtor wants to get us on the schedule that it seems to

20  impose.

21          Judge, just wrapping up this case is unprecedented

22  sadly for Your Honor perhaps or maybe you find it fun, but we

23  need this discovery.  I think the court needs this discovery.

24  The legitimate claimants should welcome this discovery.  We

25  want to make sure dollars are paid to those who deserve it.

1  We know there are invalid claims.  It is a purpose that falls

2  right in the sweet spot of Rule 2004 when we're talking about

3  the examination of the debtors' liabilities.  And, you know,

4  for all the reasons we talked about today I would ask the

5  court to grant the motion and allow us to serve the

6  discovery.

7           I would say that with regard to the document

8  requests, Your Honor -- actually, the interrogatories, if you

9  look closely we did have typos in interrogatories nine and

10  eleven.  They cross-reference the wrong numbers.  Nine should

11  cross-reference interrogatory eight.  And eleven should

12  cross-reference interrogatory ten, but we would clean those

13  up before they were served, Your Honor.

14           THE COURT:  And so how am I supposed to use

15  information, and I recognize Dr. Martin hasn't done the

16  second step, but its -- and I guess can't yet.  What I am

17  still having a hard time understanding and what I don't think

18  I got any testimony from Dr. Martin about, and I'm not

19  criticizing that because she hasn't been asked to do anything

20  further, is what -- is she going to be able to make

21  statistically significant inferences about something that's

22  relevant to whether or not a claim is valid --

23           MR. RUGGERI:  Your Honor, I think --

24           THE COURT:  -- and then if she -- okay.  Go ahead.

25           MR. RUGGERI:  I was going to say the answer is

1  yes, but their probably, I think, assuming that the expert

2  statistician is going to be making that qualitative

3  determination and she won't.

4         THE COURT:  That's right.  So I don't have anybody

5  who tells me that what she is going to be able to give me is

6  relevant to whether a particular claimant or group of

7  claimants has been abused.

8         MR. RUGGERI:  I think, Your Honor, what she will

9  be able to tell you is based on the sample, if I accept as

10 true, that 100 of the 200 claimants who fall into that sub-

11 population do not have invalid claims as told to me, my

12 counsel, as the statistician I can extrapolate from there to

13 the entire group of that sub-population; for example, those

14 who don't identify any affiliation with Scouting.

15        That is where the statistics comes into play, but

16 she would not be the one making that qualitative judgment on

17 the validity of that claim.  That may, indeed, be an

18 assumption that she would share with the court that she was

19 asked to assume and explain the specifics around that

20 assumption.  That is the nature of how this exercise would

21 work from a lay person (indiscernible) perspective, but what

22 she was saying is hers is formulaic; statistics is formulaic.

23        So I think there are two reasons:

24        One, I think we would have the right to depose 1.5

25

1  percent of the claimants in a circumstance where we have real

2  questions about the proof of claim process and the, you know,

3  gaining of these claims in support and given the evidentiary

4  record we put in there.  Frankly, I think that warrants

5  investigation by itself independent of any reliant and

6  extrapolation. I think we got to see where we are.

7            All we are asking for is 1.5 percent of the

8  claims.  Then let's figure out what the next steps are.  I

9  think that we're seeking to anticipate where this goes. I

10 don't know where this goes at this point.  All I am asking is

11 please give me the discovery that I believe I am entitled to

12 under the precedent in this jurisdiction.  And on this

13 court's analysis for 1,400, which is a small sub-population,

14 1.5 percent of claimant who elected to participate in this

15 proceeding.

16           We think it is entirely appropriate for this court

17 to make sure that this proceeding is not overrun by abuse of

18 the proof of claim process.  It is my duty to assist the

19 court, if you will, in trying to flesh out the facts.  So I

20 don't think it is right to bootstrap and anticipate where we

21 necessarily have to go to a statistician's testimony.  We are

22 not there yet.  It is just 1.5 percent and point one percent

23 of claimants for deposition; that's it.

24           THE COURT:  Well to make that argument I'm not

25 even sure you needed a statistician.

1        So I am trying to figure out -- I am trying to

2   figure out where we end up because if, in fact, we end up

3   measuring factors that have no correlation, and I'm using

4   that word not in a scientific way, if we end up analyzing

5   factors that don't correlate to presumptively invalid claims

6   then what have we accomplished.

7        MR. RUGGERI:  Your Honor, I think that what you

8   probably looked at, at a minimum, is based on the sample of -

9   - based on the 1,400.  The reason why I presented the

10  declaration of Denise Martin was just to tell Your Honor --

11  explain to Your Honor where this list of 1,400 claimants came

12  from; that was it.  I was -- I said (indiscernible) the sub-

13  populations and she told me what would be adequate numbers to

14  put in those sub-populations to extrapolate if we wanted to.

15  That is how she came up with 200 for each of the stratified

16  sub-populations.  That was the extent of why she was put on

17  the stand today.

18        I have offered to the court, there are thousands

19  and thousands of claims that fall into these different sub-

20  populations. I think it probably doesn't surprise the court

21  to know that I am suspicious where someone says there's not

22  Scouting affiliation.  My working presumption is that that is

23  a presumptively invalid claim and now we're in a situation

24  where, you know, 502 says unless objected to the proof of

25  claim is presumptively valid.  We have gone round and round

1  on that.

2          So I am trying to avoid a situation where I have

3  to object to every one of these claims.  Some of them may be

4  valid.

5          THE COURT:  But wouldn't you actually have to --

6  and maybe I don't need to decide that for today.  The

7  procedure -- the concept that you are using of extrapolating

8  to a group, isn't that more relevant to some kind of group

9  estimation, some sort of global estimation of claims because

10  that is how you would use these to extrapolate, right.  I

11  don't know where we are going in this case. I have nothing in

12  front of me in terms of a plan, or how we're going to vote,

13  or what we're going to do.  So, I don't know where we're

14  going.

15          Just because one person who wasn't or half of the

16  group who says they have no affiliation with Scouting does

17  that mean I get to disallow somebody's claim who also says

18  that where they said, I'm making it up, my brother was a

19  scout and I went to camp so and so with him.  I mean I can't

20  do that.  I don't think I can do that.

21          So that is what I am trying to figure out, what

22  can we accomplish here.

23          MR. RUGGERI:  Your Honor, I think your, sort of,

24  thoughts and statement about you don't know where we're going

25  I don't either.  I don't think an estimation would be proper

1 here. I don't know if that is in the cards for us here, but

2 certainly if one were to ask the court to estimate the

3 liabilities for some purpose then this information will be

4 highly relevant to that, I would imagine.

5        Then the question is with regard to voting.  I

6 mean in many cases we see mass tort claims where each

7 claimant gets a dollar vote.  I don't think it's appropriate

8 if our discovery in these 1,400 claims shows that the proofs

9 of claims are ripe with invalid filings.  I think that would

10 be inappropriate.

11        I don't think, and you're aware, we provided the

12 court with the public tweeting out there about who said what

13 to whom about how they are going to control this.  That is a

14 real concern in this case.  I mean the integrity of this case

15 is at issue.  We have got to get to the bottom of it. I don't

16 think the court can have a working assumption that every one

17 of these claimants presents a claim eligible to vote in light

18 of the circumstances of this case which are well-known not

19 only in this courtroom, but not outside the courtroom.

20        So I think that this case cries out for this

21 discovery and I know the court would like all the questions

22 answered about where it leads us.  I don't think we have all

23 the questions that -- the information or the ability to

24 answer those questions because you and I, you more then I,

25 don't control where this case is going.  All I know is it's a

1  possibility that I'm going to ask the court to estimate.

2  Well there is going to be some sort of vote and do we allow

3  this proceeding to be overtaken, and voted on, and controlled

4  by claimants who I think, if we're entitled to some

5  discovery, may show, you know what, they don't have valid

6  claims.

7          So from the perspective of being able to

8  extrapolate, you heard Dr. Martin, you can extrapolate based

9  on the subgroups.  For what purpose you want to extrapolate,

10 what is the assignment at the end of the day, for what

11 purpose is she being asked that is information that I would

12 have to provide her and an assumption to make, right, to

13 allow that to happen, but I don't think we're there yet, Your

14 Honor.  I don't think we need to be there yet.

15         I think that the request here is, frankly, a

16 pretty small one as to complete it in a matter of a few

17 months.  I mean our meet and confers were successful, you

18 know, when people -- this is not information that is

19 impossible to provide particularly claimants who are

20 participating in this proceeding made the decision to

21 participate in this proceeding.

22         1.5 percent doesn't seem to be a lot to ask from,

23 Your Honor.  I mean that is -- like I said, we probably could

24 have said all 95,000. You probably would have said, okay,

25 this is a short hearing, Mr. Ruggeri.  We are trying to do it

1 | more efficiently.

2 | THE COURT:  Thank you.

3 | Okay.  Let me hear a response.

4 | MR. RUGGERI:  Your Honor, I don't know if Mr.

5 | Schiavoni -- he asked to be heard on this motion too.

6 | THE COURT:  Mr. Schiavoni?

7 | MR. SCHIAVONI:  Your Honor, there is a second

8 | component to this motion; it's the omnibus objection that I

9 | think Mr. Ruggeri was going to have Mr. Anker address that

10 | for him.  I wanted to just address the Supreme Court decision

11 | on that.  So if Mr. Anker wants to be heard I would ask to

12 | pass to him and then just let me address the Supreme Court

13 | decision.

14 | THE COURT:  Okay.  We will pass the ball.

15 | Mr. Anker, do you have anything to add?

16 | MR. ABBOTT:  Your Honor, Derek Abbott.  May I just

17 | interrupt for a moment?

18 | Your Honor, I apologize.  I have received several

19 | requests from folks in the audience about a potential break

20 | for just a few minutes if that is possible.

21 | THE COURT:  Yes.  If we have a request that's

22 | fine.  Let's take ten minutes.

23 | MR. ABBOTT:  Thank you, Your Honor.

24 | THE COURT:  Thank you.  12:10.

25 | (Recess taken at 12:00 p.m.)

1          (Proceedings resumed at 12:10 p.m.)

2          MR. ANKER:  I was about to say good morning, Your

3   Honor, but I think its good afternoon.  For the record Philip

4   Anker, Wilmer Cutler Pickering Hale & Dorr.  We are co-

5   counsel with Mr. Ruggeri's firm for Hartford.

6          I am going to do my darn best to be brief.  I

7   often say that and don't fulfill my promise, but I will do my

8   very, very best. I want to make two points.

9          One is just to try to answer the question you were

10  asking.  And I appreciate that question.  How can one take

11  discovery of a sample of claimants and draw then inferences

12  about others.  And I think the question, Your Honor, may come

13  down to, with respect to claim objections, what one means by

14  an influx.

15         Let me just give a concrete example.  Imagine that

16  we were to take this discovery and conclude that all of those

17  claimants within the sample who did not show any affiliation

18  on their proof of claim form with Scouting they, in fact,

19  didn't have any affiliation with Scouting.  I certainly think

20  that would give us a good faith basis to file an omnibus

21  objection.

22         I am not suggesting, Your Honor, it would give you

23  a basis on an *ex parte* to deny those claims.  The claimants

24  would get notice, the other claimants would object to, and

25  they would have an opportunity to say, well, that might have

1 been true about everyone else in the sample, but it wasn't

2 true about me.

3           As Your Honor knows from business bankruptcy cases

4 omnibus objections are routinely filed without any discovery

5 at all.  A debtor says all the following claimants and

6 asserted claims in our books and records show nothing.  The

7 claimant can come in and say, well, actually you do owe me

8 money.  We could have done that here.  Frankly, we thought

9 the responsible thing to do was to do some discovery first.

10 We thought it was better to ask questions and shoot later,

11 not shoot first and ask questions thereafter.

12           The only other point I would make on that is I

13 don't think the only end game here is mass claim objections

14 all done before confirmation.  As Mr. Ruggeri noted in other

15 cases, including in this district, Judge Carey in Maremont

16 where there have been, on a sample, some showing of invalid

17 claims that has informed the court's judgement when it came

18 to trust distribution procedures, confirmation, what they

19 need to provide.

20           I am about to give an alternative to

21 (indiscernible), Your Honor, but maybe the answer at the end

22 of the day -- imagine we take the sample and it turns out the

23 overwhelming majority of the claims are invalid, maybe there

24 will then be an argument that, you know, Your Honor needs to

25 take a look at these claims even if as is often the case in

1  bankruptcy the claim objection process in court occurs post-

2  confirmation not pre-confirmation.  That is, after all -- I

3  see your smiling, I know it's not something that may thrill

4  you, but it may be what happens here.

5        THE COURT:  Actually, it won't thrill the District

6  Court, I think, is who it won't thrill.

7        MR. ANKER:  I hear you on that as well.  And it

8  may be that it ends up there.

9        Your Honor, I will just end with this and then

10  move to the 3007 issue, it can't be that anyone in this room

11  including people representing valid claimants who don't want

12  to have their clients be diluted for us to put our head in

13  the sands and simply ignore a potential problem.  That isn't

14  the responsible thing for me to do as officer to the court

15  and I know it's not what Your Honor is going to do.

16        On the Rule 3007 point I would just make the basic

17  point we have to be practical here.  We have to deal with the

18  real world.  I hear Ms. Lauria when she says we, BSA, need to

19  get out of bankruptcy by the summer.  That may be right or it

20  may not be right, but I take that point at face value for the

21  moment.  If we are going to be practical here we have to

22  bring on, have relief from those rules and the rules

23  absolutely allow Your Honor to grant that relief in a

24  practical way.

25        Again, I am not asking that we be able to file

1  omnibus objections, Your Honor, without giving any notice to

2  the claimant simply disallows their claim.  They will be able

3  to come into court and put -- you're going to give a due

4  process, but if we going to be practical here we need relief.

5  And as Your Honor knows, in addition to the practical point

6  that that relief is often granted where you have exigent

7  circumstances, the whole Rules Enabling Act starts with the

8  proposition, I think it's really the first section in the

9  statute, that says,

10          "While courts can make rules, and make federal

11  rules, or local rules, those rules cannot abridge the

12  substantive right."

13          Here there is a substantive right to object to

14  claims by parties in interest. If you don't give relief, for

15  all intents and purposes, we're not going to be able to

16  object certainly, certainly before confirmation of a plan.

17  Then the scenario where you said it may not thrill the

18  District Court may become a *fait accompli*.

19          So I would urge the court and I would urge all the

20  parties let's be practical and work for a solution that

21  allows for due process but also allows us to accomplish

22  something that is beneficial.

23          Thank you, Your Honor.

24          THE COURT:  Thank you.

25          Mr. Schiavoni?

1        MR. SCHIAVONI:  Your Honor, just briefly.  I will

2   tell you, Your Honor, I think this may be among the most

3   important decisions that you may in the entire case.  You

4   heard us in the contested hearing about whether or not the

5   bar date order should be entered.  Your Honor, pointedly made

6   the point to me that this is how Congress drafted the statute

7   and that did we want to go back and amend the statute.  We

8   took what came from that, Your Honor's ruling about how the

9   proofs of claim were to be signed.

10        This is, I think, no matter how one looks at it,

11   having mass torts addressed, you know very complicated

12   individual personal industry claims addressed through 502 is

13   putting a square peg in a round hole.  The statute wasn't

14   really meant for this, but I am not making my appeal to

15   Congress now.

16        What I am saying is that Your Honor has told us,

17   in essence, this is not Congress and we should take the rule

18   as drafted.  The rule as drafted allows these are the

19   protections -- like the bad end of it for us, in some

20   respects was, respectfully, the bar date order what came from

21   that, these are the protections that flow from it.  These are

22   the protections that were built into this statutory scheme

23   that we would get an opportunity to object to the claims and

24   that we would be able to use 2004 to collect basic evidence

25   in order to advance those objections.

1        It cannot be that Congress intended 502 to simply

2   turn all of American jurisprudence on its head and deal --

3   and make all claims submitted in a complicated negligence

4   action into strict liability, make them all deemed presumed

5   allowed, make them everything confidential about them and not

6   allow any challenge or inquiry into them.  If that really was

7   what Congress intended if a license just to print money --

8   and I think when we get to the next motion you will see that

9   there are people that think this and that for profit

10  businesses have jumped into to try to take advantage of this

11  and its created a huge problem.

12        On the specifics of this Mr. Anker has it right.

13  He -- your question earlier about would we use this discovery

14  to extrapolate to disallow the claim and, respectfully, as he

15  said that is not really the issue.  What we were looking for

16  with Hartford and -- look, I have to tell you, on the side,

17  it's not so easy always to get along with Phil, and Jim, and

18  everything, but we worked very hard to reach consensus here

19  because what we were looking for was a responsible

20  conservative careful approach to go forward with how to deal

21  with these claims.

22        What you heard Mr. Ruggeri present, his motion, it

23  presents the best thinking of our two companies about just

24  that.  I think we were entitled to, basically, go ahead with

25  objections as is, but we recognize the type of case this is

1  and we wanted to present the court with something that

2  allowed us to, in good faith, look at the claims harder.  We

3  told you during the bar date argument that the questions,

4  respectfully, weren't adequate in our view to set out all the

5  elements of the claims in fifty states.  You know, we had our

6  say.

7          We are now where we are and this is the vehicle

8  for us.  And we think the process that we have set out that

9  we take this narrow discovery of, you know, one percent of

10  the claimant population and that based on the results of that

11  we, Hartford, Century, and others try to make informed

12  decisions about what we have to make a good faith decision

13  about what objections to advance.

14          In some respects that is what we did in the tort

15  system when the claims were defended.  We -- like we weeded

16  out the good claims from the bad claims. That was what the

17  whole thing was about.  And, you know, having some basic

18  information about the claimants was absolutely essential to

19  that.

20          Our people -- when you go back to our claims

21  people, when I go back to them and tell them that something

22  like 80 percent of the claimants don't show an affiliation

23  with Scouting then I check with the Boy Scouts and I don't

24  get a different kind of number from them, and then in the

25  nature of this type of terrible misconduct to have such large

1  numbers of claimants unable to identify the perpetrators.

2           To be clear, there will be claimants who have very

3  sound reasons not to be able to identify their perpetrator,

4  but what everybody is telling us, including our experience

5  from dealing with the claims, is that by its nature these

6  are, sort of, misconduct of a grooming nature where the

7  perpetrators often times got to know the abused.  To have

8  such large numbers of claimants who are unable to identify

9  them it's an issue.  Its developed huge problems on our end

10 on how to deal with this.

11          The notion that what we have come to you with

12 this, sort of, narrow vehicle to try to take discovery on

13 these to get a handle on what is going on because, Your

14 Honor, you have to understand the situation here.  We are not

15 even -- the proofs of claim in the confidentiality order that

16 is put in place we're not able to go out and speak to the

17 claimants informally.  We are not able to speak to their

18 witnesses informally.  We are not able to speak to anybody,

19 really, about them informally. So there is no way to get to

20 the bottom of this without, in some ways, going forward with

21 some basic discovery.

22          When we were before the court on September 9th on

23 the -- and I think then was when this problem was really,

24 sort of, or the problem we perceive about the proofs of claim

25 was manifesting itself with this explosion of claims. I think

1  when we were before you then on the advertising motion and

2  what was being brought out the debtors' counsel told the

3  court that he,

4          "Shared Century's and the insurers concerns" on

5  how the claims are generated, of course, issues related to

6  the State Court ethics."

7          Then he went onto say that he,

8          "Believed that these issues could be resolved

9  potentially through 2004 discovery."

10         Debtors' counsel, I think that was Mr. Andolina,

11  what he was eluding to then was exactly, exactly what we are

12  here for now; a, sort of, targeted discovery that allows us

13  to try to make, together with Hartford, some informed

14  decisions about the nature of the objections we bring and how

15  extensive they bring.

16         The parallel issue, I would just ask you to -- you

17  know, this is part of the second point, but it goes along the

18  same lines as far as dealing with our request, our motion to

19  modify the local rule which, I have to say, is absolutely --

20  like no matter what you do on the discovery this is

21  absolutely essential to us.  It's vital to the case for us is

22  we would respectfully ask you to look at the Supreme Court

23  case Tennessee Student Assistance Corp., v. Hood, 541 US 440,

24  it's a 2004 case and it addresses Section 2075 of the Code.

25         In that case what the Supreme Court held was that

1  allowing the bankruptcy rules "to preclude a party from

2  exercising their statutory rights" under the provision of the

3  bankruptcy code "would give the rules an impermissible

4  effect."  In other words, that was a case where the Supreme

5  Court looked at the application of the rules and was dealing

6  with when a court, in essence, had to override the rules in

7  favor of the statute of the code.  And that, we believe, is

8  exactly the situation you have before you.

9          Normally, to the issue of how to grant relief

10  under the local rules is an issue of, sort of, discretion.  I

11  would suggest to you, Your Honor, in this case it's not

12  discretionary because under the Rules Enabling Act, you heard

13  Mr. Anker refer to, Congress only granted authority to

14  promulgate bankruptcy rules. It did grant that authority, but

15  in doing so, under 28 U.S.C. 278, what Congress did was it

16  mandated that such rules shall not abridge, enlarge, or

17  modify any substantive right.

18          Here, that is exactly what is at issue because

19  here 502 grants the parties a statutory right to object.  As

20  a practical matter here there was no way the parties can

21  meaningfully exercise that right without relief from what

22  Local Rule 3007(1)(f).  There's just too many claims.  If

23  (indiscernible) to be followed is too little time.  We have

24  no -- we lose the substantive right to object at all if we

25  don't have relief from the local rule.

1          Under those circumstances, under what I believe to

2   be Supreme Court authority, it would be, in essence, an abuse

3   of discretion not to grant us authority to modify the rules

4   to allow us to object.  In effect, be robbed of any ability

5   to object to claims here at all.  That would have the

6   catastrophic effect on our clients, but also on the case in

7   general.  It would really just turn the case into a, sort of,

8   machine to manufacture claims and manufacture pay-outs.

9          There would be -- every (indiscernible) our hands

10  are tied three times from Tuesday to even investigate the

11  claims.  The questions are very limited.  They do not address

12  all the elements in the fifty states.  The manner in which

13  they go out you have seen in some of the declarations that

14  are submitted, not even the questions that were presented are

15  filled out.  We received many proofs of claim that are,

16  basically, mostly blank or contain huge gaps of information

17  in them.

18          So the proofs of claim, like if they're just

19  deemed allowed and they don't give us any information, and

20  then everything is deemed confidential it leads to just an

21  absolute sending this case off the rails.

22          So, Your Honor --

23          THE COURT:  I see those blank proofs of claim, but

24  I have also seen, and a couple of objectors submitted the

25  proofs of claim that are fulsomely filled out.  I think under

1 almost any standard would have *prima facie* validity.  Now

2 that doesn't mean that the claim is ultimately allowed.  That

3 means, though, that it has *prima facie* validity and there

4 could be an objection, then the claimant will have the burden

5 of persuasion to show that the claim is valid.

6         So I have seen both of them in the submissions,

7 quite frankly.  That is one of the things I am struggling

8 with in connection with this motion because for some of the

9 objectors who did submit a claim I look at that claim and

10 think, okay.

11         I will tell you this, and I will read the case, I

12 am not familiar with it; although, I don't see how a rule

13 could abridge the code, but the -- or change the code, have

14 the effect of changing the code, but omnibus objections, as a

15 practitioner, I found them difficult and as a judge I find

16 them more difficult, quite frankly.  So it depends on what

17 the omnibus objection is.

18         Quite frankly, we look at every proof of claim in

19 my Chambers, every one.  We're looking for whether or not the

20 claim, I can tell what it is.  It looks *prima* and it gets

21 *prima facie* validity.  Now I don't know.  Everybody tells me

22 these claims are different, right.  That is what I keep

23 hearing, these claims are different.  My proof of claim form

24 that says basis for claim has, you know, a three inch line to

25 put your basis of claim, breach of contract, you know,

1  employee claim, wages.  And I look at that and I say, okay,

2  it's an employee who is owed wages; *prima facie* valid, they

3  signed it, it's under oath.

4       It may or may not ultimately be allowed, but that

5  is what I am trying to get a handle on; what are these

6  objections going to do if they are omnibus, are they truly

7  omnibus in the sense that how I would think of it is that --

8  well, some you are saying matter of law.  Matter of law is

9  actually maybe that can be omnibus in some fashion, but

10  particular facts are always an issue with omnibus claims.

11       So I struggle with omnibus claims because we still

12  have to look at each one of them.  We still have to make a

13  determination on each one of them even if people don't

14  respond.  So I am not sure how that works in this case.  I

15  will read your case.  I don't know. I hear the argument. I

16  don't know what to do, quite frankly.  And I will ask others

17  how I am supposed to address this and get their thoughts to

18  consider.

19       I hear what you are saying.  I don't know what to

20  do with it.

21       MR. SCHIAVONI:  Your Honor, all I can say is,

22  first of all, I appreciate you considering it and in my mind

23  it's always a good thing when a judge is open-minded and

24  thinking about the issues.  So I thank you for that.

25       I would ask you to consider on the issue of how a

1  rule could possible abridge a substantive right.  Here 502

2  gives us a substantive right to object, but if there is

3  95,000 claims and we have more than 150 objections, and the

4  local rule prevents us from filing more than that number of

5  objections, we have lost the substantive right to

6  substantively address the volume of claims we're dealing with

7  here. I think it's that, sort of, straight-forward under the

8  practical effect in this particular case.

9         You know, there are many claims here that, like,

10  idiosyncratically there's an obvious problem with including

11  just the ones that are, in fact, completely blank, okay, that

12  we'd go through 150 all by itself.  So that is one thing I'd

13  ask you to consider.

14         The other is as far as how the evidence carries

15  forward it's that, you know, it's like we're kind of jumping

16  the gun.  Yes, you can evaluate the omnibus objections when

17  you get them and deem them one way or the other, but like us

18  to lose that right without having any ability to inquire

19  about any of the claims at all.

20         I mean I'm not sure if the issue here is the court

21  doesn't think our interrogatories are specific enough.  We

22  thought by making them as general as they were that it was

23  actually better to draw out whether there was additional

24  information.  The pool of deponents we picked was, you know,

25  intended to allow us to, in some way, explore why these

1   issues are the way they are, why it is that so many of them,

2   you know, are deficient in one way or the other.

3          In the real world, in the tort system world these

4   claims they're not dealt with by someone serving a complaint

5   with little information and then paid on that basis.  Almost

6   all of the people in the real world are subject to some sort

7   of, in this particular kind of tort, sit down either

8   deposition or, in many cases, a kind of under oath private

9   kind of, you know, questioning with counsel present because

10  we're dealing here with claims that are difficult to

11  corroborate, you know.  That type of inquiry -- like

12  virtually all the cases that were settled were settled in

13  that manner.

14         Then just the last point I'd make I hear you that

15  you have looked at some of the proofs of claim and you have

16  made some assessments that it looks like a fair claim or what

17  not, but, Your Honor, it's like each of the fifty states have

18  their own body of case law about -- it's like it's easy to

19  look at these claims and immediately collapse them into what

20  would be liability for the perpetrator so that if there is

21  abuse alleged and the perpetrator was -- you know, against

22  the perpetrator was liability.

23         In many, many states there isn't *respondeat*

24  *superior,* you're not automatically liable for any illegal act

25  done by your employee so that the laws vary in the different

1  states about what needs to be brought out in the particular

2  cases both for liability, but also on the statute of

3  limitations.  It's a wide variance.

4        You could easily look at a (indiscernible) proof

5  of claim and say, well, there it is.  Someone says they are a

6  Boy Scout and they're abused by a perpetrator; end of story.

7  It's like you actually have to have like a handle on what the

8  law is in the fifty states on both liability and the statute

9  of limitations.

10       THE COURT:  Well that is fair enough.  And that is

11 why I said I don't know if the claimant is ultimately

12 allowed.  I am looking at it for have they stated a proof of

13 claim for *prima facie* validity which is nothing to do with

14 whether it's ultimately allowed, but I hear you.

15       MR. SCHIAVONI:  Your Honor, cases where -- in

16 these sexual abuse cases the objections have been pursued in

17 some of the diocesan cases.  They're very different because

18 they're just much smaller, but insurers have filed proofs of

19 -- objections to proofs of claim and there's been back and

20 forth.

21       Frankly, that has been extraordinarily helpful in

22 bringing about resolution of the cases.  You know, I can't

23 reveal, obviously, sort of where the mediation is, but, you

24 know, it's not -- you know, we are at a point where this case

25 is not very different from Imerys as between how much

1  progress has been made between, you know, parties that are

2  being asked to fund and otherwise.

3          Now some basic discovery here it's like we face an

4  enormous problem in trying to resolve this case; just

5  enormous.  The gap is just unbelievable because it's a

6  difference between one group of parties thinking that the

7  entire set of claims are all going to be allowed by them, you

8  know, and that there needs to be some actual adjudication of

9  the claims.

10         Cases where they're not abuse cases, but cases

11 where there has been discovery of the claims themselves, you

12 know, W.R. Grace, famously the Garlock case, USG, and G-I

13 Holdings, In Re Silica Products; we put those cases in our

14 briefs.  All of them involve, you know, discovery that was

15 used to, sort of, narrow the parties on the claims

16 themselves.  I would be the first to say that in those cases

17 there weren't proofs of claim.  They're generally not used in

18 a lot of the mass torts, but here they have been used.

19         Thank you, Your Honor.

20         THE COURT:  Thank you.

21         Okay.  Let me hear from the objectors.  I'll start

22 with the Coalition.

23         MR. GOODMAN:  Good afternoon, Your Honor.  Eric

24 Goodman, Brown Rudnick, counsel for the Coalition of Abused

25 Scouts for Justice.

1          Can you hear me okay?

2          THE COURT:  I can.

3          MR. GOODMAN:  Good.  Your Honor, there is a time

4 and a place for everything in a bankruptcy case.  This is not

5 the time and this is not the place for 96,000 personal injury

6 claims to be liquidated.  It may be that a proceeding is

7 commenced shortly seeking estimation under Section 502(c) of

8 the Bankruptcy Code, and given that these are personal injury

9 claims it may be that the District Court will need to be

10 involved.  We are not there yet at this point in time, but

11 that is a possibility.

12          There are five key points that I want to make in

13 response to Century and Hartford's Rule 2004 motion seeking

14 discovery on 1,400 abuse survivors.

15          The first point, that I don't think anyone has

16 even mentioned today, is that the insurers already have

17 robust data.  Hartford and Century have been the debtors'

18 insurers of choice for decades.  Hartford and Century already

19 know about every reported claim for sexual abuse against the

20 debtors.  They already know about every known abuser in the

21 history of Scouting.  And they also have the same information

22 for other institutions with liabilities for sexual abuse.

23          They are insurance companies.  I will say that

24 again, they are here almost acting as if they are the

25 debtors, they are the insurance companies.  Their job is to

1   assess risk.  If you start with a logical assumption that the

2   debtors have complied with their reporting obligations to

3   their insurers it is evident that Century and Hartford

4   already have substantial information.  They won't share any

5   of it.  It is a closely guarded secret.

6           The question I ask, which is a starting point, is

7   why do parties that may have the most data and the most

8   information get to go out and depose over 100 survivors and

9   take discovery on 1,400 individuals.  How is that

10  proportionate to the needs of these cases.

11          The insurers try to brush this aside, but this is

12  really discovery 101.  The proportionality requirements under

13  Civil Rule 26 are every bit as applicable under Bankruptcy

14  Rule 2004.  Good cause cannot exist if the discovery is

15  unduly burdensome or disproportionate to the needs of the

16  case.  And --

17          THE COURT:  Well let me ask you this, Mr. Goodman,

18  why is that the Coalition's argument?  The Coalition isn't

19  providing the discovery.  So why is the proportionality

20  argument the Coalition's argument?

21          MR. GOODMAN:  Your Honor, I think it really has to

22  do with understanding what process, if employed here, would

23  provide the most benefit at the least cost to the estate.

24  And in the interest of wanting to move these cases forward we

25  are interested in, what I would describe as, meaningful

1  discovery; discovery that would get us some place, that would

2  advance the case forward.

3          THE COURT:  So are you offering something?

4          MR. GOODMAN:  Your Honor, during the meet and

5  confer process we attempted to make multiple offers to the

6  other side.  They were all similarly rejected.  In fact, we

7  were in the midst of discussions when they went and filed

8  their motion. It caught us a bit off guard, in fact, but we

9  were amenable to certain limited depositions being taken as

10  long as they were done on a voluntary basis.  And there were

11  discussions about providing additional information regarding

12  the claim forms.  The insurers did not take us up on that

13  offer and they elected to come to court instead.

14          THE COURT:  Okay.  I am just -- I am a little

15  confused and it may be more in connection with the next

16  motion then this one about the Coalition's role.  And since

17  it is not the subject of discovery what it should be

18  advancing here.

19          MR. GOODMAN:  Fair question, Your Honor.  I mean

20  we do represent the collective interests of over 10,000

21  individual abuse victims before the court based on our 2019

22  disclosures.  So it is in that capacity that I am

23  representing the court today.

24          THE COURT:  How many of those 10,000 are in the

25  1,400 that the insurers want to depose, or the 100, I guess,

1  insurers want to depose, or the 1,400 they want to seek

2  discovery from?  Do you know?

3          MR. GOODMAN:  I don't have that number off hand,

4  Your Honor.  So I can't answer that question.

5          THE COURT:  Okay.

6          MR. GOODMAN:  The point I would make is that if

7  you were to envision a discovery process in normal litigation

8  or even in bankruptcy litigation I think that you would want

9  to first identify which parties have the most meaningful

10 information, which parties have the data, and what is the

11 cost of obtaining that.  And if one side is sitting on a

12 mountain of information that is relevant and could be used to

13 answer a lot of questions in this case you start there.  You

14 don't run out and start deposing 100 individual abuse

15 survivors.

16         Again, you will hear this, I think, again in the

17 future, but there is a lot of information that we want.  I

18 will come back and echo Mr. Ruggeri's statement.  When they

19 did approach us we said we were interested in exchanging

20 information, but we wanted it to be reciprocal.  The

21 insurance companies are not interested in a reciprocal

22 process.  And I think that is not how discovery is supposed

23 to work.

24         Second point, Your Honor, of my five points I

25 would like to make I believe that this is premature.  Putting

1  aside the fact that the parties are supposed to be in

2  mediation the insurers' pleadings, I think, make it fairly

3  clear that this is aimed at plan litigation.  The debtors are

4  revising their plan.  We don't know what it's going to look

5  like yet.

6         You heard Ms. Lauria state at the beginning of our

7  proceeding today that the debtors are looking to get a plan

8  and a disclosure statement on file soon and potentially have

9  that before the court in April.  Right now, sitting here

10  today, we don't know if the debtors are willing to propose a

11  plan that will impact the insurers' rights in any way.  We

12  don't know if the insurers will fund anything.  We don't know

13  if Hartford or Century will even need to fund anything.

14  Every indication is that they will not fund a plan no matter

15  what.

16         I take the world as I find it, Your Honor.  We

17  have here two insurance companies that are intent on throwing

18  up a lot of roadblocks in this case.  When this issue was

19  first presented to us we asked a very simple question; what

20  will this accomplish?  How is this helpful?  How will this

21  advance the cases?  I have been asking that same question for

22  two months and I haven't gotten an answer that makes any

23  sense to me at all.

24         If we ever do get to a specific plan that has a

25  chance of being approved by the majority of survivors, let

1  alone the super majority of survivors necessary for third-

2  party releases, what discovery is appropriate in that context

3  will happen, but we are not there yet.  The debtors are not

4  asking for discovery on victims of sexual abuse.  The

5  official committee of tort claimants has not filed a Rule

6  2004 motion seeking discovery from survivors, neither has the

7  FCR or the UCC.  The debtors are not before the court saying

8  that they need this discovery to formulate a plan of

9  reorganization.

10         How can there be good cause to conduct what is

11  classic plan discovery before there is even a plan.  There is

12  no plan yet.  This is entirely premature.

13         Third point, Your Honor, I believe that the

14  prejudice outweighs --

15         THE COURT:  Well I don't hear -- let me ask you,

16  Mr. Goodman, what is the response to the argument that this

17  isn't necessarily for plan purposes, but for objections to

18  claims?

19         MR. GOODMAN:  Well I think as a threshold matter,

20  Your Honor, the insurance companies, I know that this has

21  been discussed and we will continue to discuss it, are not

22  parties in interest within the bankruptcy code definition.

23  They are not creditors in this case.  They filed about the

24  most bare bone claims imaginable. I don't know that it would

25  be considered *prima facie* valid.  We asked them if they would

1  admit that they had coverage obligations.  They refused to

2  admit that.

3        So what we have here are insurance companies that

4  do not fit within the definition of party in interest under

5  1102(b) and they have not acknowledged, in these proceedings,

6  that they actually do have coverage obligations at this

7  point.  Obviously, we think that they do, but as insurers I

8  don't believe that they would have standing to file a claim

9  objection in this case.

10        In fact, the Third Circuit has dealt with this

11  issue on multiple occasions in the context of standing to

12  object to the confirmation of a plan.  And if the plan is

13  insurance neutral and does not impact the insurers' rights in

14  any way I believe under Third Circuit precedent they would

15  not have standing to object to plan confirmation.  If they

16  don't have standing to object to plan confirmation how are

17  they in this case filing substantive claim objections.  This

18  isn't something that they could --

19        THE COURT:  Do you want me to make a decision --

20  you want me to make a decision now?  How do I make a decision

21  now that the insurance companies don't have standing?

22        MR. GOODMAN:  I don't know that the court even

23  needs to get to that question today, Your Honor, because the

24  issue before the court is have they presented good cause

25  under Rule 2004 to go forward with this discovery.  I believe

1 that that is actually a very narrow issue, but I was trying

2 to be responsive to the court's question.

3          You know, my answer is do insurers have the

4 ability to go out and launch hundreds of claim objections

5 against tort victims in cases.  I guess my response to that

6 is show me one case where that has happened before.  In fact,

7 they can't even do this in State Court, Your Honor.  This is

8 not something that an insurer could do in a State Court

9 proceeding is come in and conduct themselves in this way.

10          THE COURT:  I suppose the insurers would say that

11 there would be one claim at a time, not 95,000.

12          MR. GOODMAN:  We'll get there when we get there.

13 I guess my point is we're not there yet.

14          THE COURT:  Okay.  So you want me to -- to you

15 this is premature.  You want me to wait until a plan is

16 filed, we will see what it says, and then if the insurers are

17 entitled to discovery it will start in May.  And you think we

18 will confirm a plan by August?

19          MR. GOODMAN:  I think if discovery is taking place

20 in the context of litigation over a plan you would have a

21 contested matter under 9014. If discovery is taking place in

22 the context of an estimation proceeding under 502(c) you'd

23 have a contested matter.  Then we would have a fair fight.

24 We would go after all of the information that they have.  We

25 would serve them with discovery requests.  They would take

1  the discovery that they are seeking.  It would have meaning.

2  It would have consequence, Your Honor.

3          Right now we are just not there yet.  We don't

4  even know what the litigation in this case is or is not going

5  to involve.  I come back to my point that I believe that that

6  is why this is all very premature.

7          THE COURT:  What about the issue -- maybe you will

8  get to it, but go ahead and make your three more points.

9          MR. GOODMAN:  Thank you, Your Honor.  Keeping

10  track.  Two down, three to go.

11          Third point, Your Honor, I believe the prejudice

12  outweighs the value.  Again, we're not talking here about

13  discovery from the debtors.  We are talking about information

14  that -- we're not talking about information that the debtors

15  have already assembled and have produced to the FCR or

16  someone else in the case.  We are talking about 1,400 abuse

17  victims, 100 depositions, and that is probably just the tip

18  of the iceberg.

19          If the insurers had said they want to then launch

20  substantive claim objections completely free of any

21  restrictions set forth in the local rules the magnitude of

22  this would take months and months which I believe is the

23  point.

24          Based on the testimony that we heard from Mr.

25  Martin, both the deposition and today, it's not clear that

1  the information the insurers are seeking will even be

2  meaningful.  If the insurers were serious about conducting a

3  meaningful study here they would have someone with subject

4  matter expertise involved.  That is what the text books that

5  Dr. Martin cites to say, that if you want to do this the

6  right way you have a subject matter expert and a

7  statistician.  We don't have that here, Your Honor.

8          We have Mr. Ruggeri identifying subcategories.

9  This is completely lawyer driven.  They don't have a

10  statistical model yet and the samples that they have proposed

11  appear, on their face, to be gerrymandered in favor of claims

12  that the insurers have already flagged in their system as

13  somehow deficient.

14          They're starting with the claims that they think

15  are bad and they want to take discovery on those claims.

16  This is not a situation where if they just had the data all

17  of our questions would be magically answered.  And, in fact,

18  I don't even know what a party in this case would say if

19  someone showed up on their doorstep and said I'm objecting to

20  your claim based on a statistical sample.  I don't think that

21  gets us anywhere.

22          Again, I don't believe that this is about

23  interposing discovery or extensive litigation that really

24  advances these cases.  Rather, I think there is a clear

25  danger to permitting Rule 2004 to be used in this way.  If

1  the insurers are successful here this court's decision will

2  be cited for the proposition that discovery in a mass tort

3  bankruptcy can begin with insurance companies going after

4  tort victims before a plan is even proposed.  I cannot locate

5  a single case or anything close to this that has ever been

6  proposed or has ever been permitted.

7          THE COURT:  Well let me ask you -- let me ask you

8  the context here so far you haven't addressed.  Are you going

9  to address the context in which we have claims that start at

10  less than 2,000 prepetition and end up at 95,000 because that

11  is a context in which we are.  You may have different

12  explanations or want to suggest a different explanation, but

13  that is where we are.

14          MR. GOODMAN:  Well, I guess, a couple points that

15  I go back to on that point, Your Honor.

16          The first is if you look at the number of known

17  abusers set forth in news articles in the Boy Scout system

18  the number of known abusers, if you consider the number of

19  victims an abuser will typically have 95,000 is actually not

20  outside the realm of what you would likely expect here.  We

21  are talking about a national organization with, I believe,

22  close to 8 or 9,000 known abusers.  Again, that is just known

23  abusers, Your Honor.

24          If you consider the decades, the decades of abuse

25  in which this, you know, occurred and you also factor in the

1 number of states where the statute of limitations has opened

2 up.  I can also, you know, layer into this, I think, changes

3 in societal views on people disclosing sexual abuse.  If you

4 put all of this together I don't really believe that 95,000

5 is outside the realm of possibility.  In fact, I think the

6 number may actually be significantly higher than that, Your

7 Honor.

8          In terms of the, you know, growth in claims filed

9 its not just Boy Scouts.  Look at Purdue, look at PG&E, look

10 at the claims that had been filed in most mass tort cases;

11 they almost all come into bankruptcy with a couple thousand

12 claims and by the time you're done with a bar date noticing

13 program and a bar date has been set it forces people to make

14 decisions and come forward.

15          So, you know, again the insurers are trying as

16 hard as they can to paint this picture as if something wrong

17 has happened.  You know, yes, something wrong happened.

18 There was sexual abuse on a substantial scale and that is why

19 we are here today.

20          Fourth point, Your Honor, I think this court has

21 actually heard these arguments before.  In Imerys Johnson &

22 Johnson moved for discovery under Rule 2004.  Johnson &

23 Johnson was arguably, I'm sure they would dispute this,

24 obligated to indemnify the debtors.  Given this Johnson &

25 Johnson argued that the TCC and the FCR would eventually seek

1  to recover from them on the talc claims.  Johnson & Johnson

2  claimed that it could be asked to fund a trust for talc

3  claims and that this gave them a key interest at

4  understanding the size of the claim pool and that such issues

5  could arise in the context of a plan. So they demanded

6  discovery under Rule 2004 so they would have adequate time,

7  you know, to process the information.

8         Hartford and Century are making almost the same

9  arguments today.  Hartford and Century say that they have

10 coverage obligations for abuse claims.  Again, we actually

11 asked them to admit this and they refused.  So, technically,

12 Hartford and Century are standing before the court seeking

13 discovery without even admitting that they have coverage

14 obligations.

15        Putting that aside they argue that the TCC, the

16 FCR and the Coalition could ask them to write a check to fund

17 a plan.  That is what they say in their motion.  They are not

18 saying that they would have to write a check, just that they

19 may be asked to.  And they argue that this gives them a keen

20 interest in reducing the size of the claim pool, and this

21 will eventually spill into plan confirmation so they should

22 get discovery under Rule 2004 now.

23        This court denied Johnson & Johnson's Rule 2004

24 motion.  So the question I ask is have Century and Hartford

25 made a stronger showing of good cause as Johnson & Johnson

1  did?  Johnson & Johnson wanted discovery from the debtors.

2  Hartford and Century want discovery from 1,400 abuse victims.

3  Johnson & Johnson had co-liability with the debtors as an

4  indemnitor.  Hartford and Century have co-liability with the

5  debtors as insurers.

6         Johnson & Johnson claimed that they may be asked

7  to fund a plan.  Hartford and Century claimed that they may

8  be asked to fund a plan.  Johnson & Johnson said that they

9  need to understand the size of the claim pool of talc claims.

10  Hartford and Century claimed that they need to understand the

11  size of the pool of abuse claims.  Imerys was still

12  formulating a plan.  The Boy Scouts are still formulating a

13  plan.  Johnson & Johnson already had substantial information

14  as a co-defendant in litigation with the debtors.  Hartford

15  and Century already have substantial information as the

16  insurers for decades and decades.

17         Johnson & Johnson was trying to confirm that the

18  debtors had not shared protected communications.  Hartford

19  and Century are trying to invade the attorney/client

20  privilege of abuse victims.  Johnson & Johnson was seeking

21  information that had already been collected and could have

22  been easily turned over.  Hartford and Century want to go out

23  collect data from 1,400 survivors, have an economist with no

24  subject matter expertise at all analyze it which may or may

25  not amount to anything other than several months of delay in

1   this case.

2          I will add, Your Honor, that your ruling in <u>Imerys</u>

3   was obviously correct.

4          THE COURT:  Obviously.

5          MR. GOODMAN:  Obviously.

6          Fifth and last point, Your Honor, we need to focus

7   on what is at stake here.  As I was preparing for this

8   hearing I kept going back to Claimant No. 2432. He has a name

9   and based on the email that the insurers filed he was abused

10  over sixty years ago.  He may be seventy years old today.

11         Like so many victims, Claimant No. 2432 never

12  sought professional counseling or treatment.  In fact,

13  studies of sexual abuse in America support the proposition

14  that sexual abuse is a grossly underreported crime.  There

15  are many reasons for this failure to disclose, but the

16  predominant one is shame.

17         We don't know if Claimant No. 2432 felt safe

18  enough to tell his parents.  We do know that he mustered the

19  courage to file a proof of claim without the aid of an

20  attorney.  Then came a call from one of Hartford's attorneys

21  requesting a meet and confer over the detailed

22  interrogatories.  He apparently read them and concluded that

23  since he did not seek professional help that he should

24  withdraw his claim.

25         From the way the insurers use this email and talk

1  about the numbers in this case it's almost as if they view

2  this as some kind of victory.  "Rejoice", one less claim we

3  may have to pay.  Your Honor, that is not a victory.  That is

4  sad.  That is just sad.  And it shows, in my view, what the

5  insurers are trying to do in these cases is not appropriate.

6       At a minimum, the rules need to be followed here.

7  After spending years of my life in cases like Takata, PG&E,

8  and now Boy Scouts I don't understand why some parties seem

9  to think that when it comes to tort victims the rules can

10  just be cast aside.

11       There is no good cause here just like there was no

12  good cause in Imerys.  We don't have to check our humanity at

13  the door.  Look at the claims.  Look at the descriptions of

14  the sexual abuse.  Read objections like the one filed by John

15  Doe No. 59969.  The key to moving these cases forward is to

16  not lose sight of what happened.  Look at what happened and

17  what is at stake. These motions should never have been filed,

18  never in this court.  They should have tried to work with us

19  and they chose not to.

20       I have nothing further, Your Honor, unless you

21  have questions for me.

22       THE COURT:  No.  I don't have any questions.

23       Mr. Stang, your hand has been up, I think, for a

24  long time.  I'm not sure that I saw a filing by the tort

25  claimants committee, but I will give you an opportunity to

1  address me if you want to before I go to the individual

2  objectors.

3           MR. STANG:  Thank you, Your Honor.  James Stang

4  for the official tort claimants committee.

5           My hand was up just to let you know that we

6  thought it was the right time that I'd like to say something.

7           THE COURT:  That's fine.

8           MR. STANG:  The tort claimants committee did not

9  file an objection.  The tort claimants committee, of course,

10  does not represent these individual survivors, but we have

11  (indiscernible) overall purposes of this discovery and that

12  it's appropriate.

13           As several of the targets of the discovery, as

14  disclosed by Mr. Ruggeri, responded, had meet and confers.

15  They may not have been timely, but they had their meet and

16  confers, and objections were withdrawn.  People handled their

17  claim discovery as if it was just (indiscernible) discovery.

18           I don't want our silence to be taken as some kind

19  of siding with the carriers.  One should not make that

20  presumption.  What we are -- we're getting back to this

21  actual motion and going back a little bit from the overviews

22  today the discovery request does not ask you to determine

23  that these subgroups are valid subgroups for statistical

24  purposes.  They don't ask you to find that Dr. Martin's 200

25  per category is, in fact, the correct sampling.

1          And if they filed objections, either omnibus or

2   otherwise, and they present some kind of statistical analysis

3   that they think supports their objection every survivor

4   should be able to respond to that without some kind of

5   (indiscernible) being made today if you did approve the Rule

6   2004 exam.  And the TCC, at that point, seeing what the

7   insurers are actually trying to do with this information

8   undoubtedly will be heard or (indiscernible) on whether or

9   not it's appropriate to use the devices to support their

10  objection.

11         So I wanted to try to bring some clarity, at

12  least, to whether Dr. Martin's work is somehow being approved

13  by the court if they were granted the 2004 exam as being

14  something that cannot be questioned down the road.  And I

15  don't think you are saying that.  I don't even think Mr.

16  Ruggeri is saying that.

17         There has been a lot of discussion in cross

18  examination about her qualifications.  I am not sure at this

19  point that is necessary to get into.  If you, in fact, say,

20  hey, I am going to grant this discovery, but I'm not making

21  any finding as to how it is used and the relevance of it at

22  all to an individual claim objection.  If it comes up in an

23  estimation hearing we will take it up then.  Allowing the

24  discovery should not be some kind of blessing that what she's

25  done cannot be revisited or even visited for the first time.

1        Thank you, Your Honor.

2        THE COURT:  Thank you.

3        Okay.  We had a response from the Church of Jesus

4   Christ of Latter-day Saints.  Does their counsel have

5   anything to say?

6        MR. GOLDBERG:  Good afternoon, Your Honor.  Adam

7   Goldberg of Latham & Watkins on behalf of the Church of Jesus

8   Christ of Latter-day Saints.  Thank you for the opportunity

9   to be heard this morning.

10        Your Honor, as stated in our statement on the

11   record we do not have a positon on whether or not relief

12   should be granted on the motion.  We would simply rise to

13   emphasize that if discovery is granted it would be relevant

14   to, particularly, all of the mediation parties in this case

15   and we would request that the church, in particular, be

16   granted access to those discovery materials.

17        THE COURT:  Thank you.

18        MR. GOLDBERG:  Thank you, Your Honor.

19        THE COURT:  Bailey Cowan Heckaman?  Mr. Bifferato,

20   do you have anything to add?

21        MR. BIFFERATO:  Your Honor, I apologize.  This is

22   Connor Bifferato.

23        Nothing to add in addition to counsel from Brown

24   Rudnick's comments.

25        Thank you, Your Honor.

1              THE COURT:  Thank you.

2              James Harris Law, PLLC Law Firm.

3              MR. HARRIS:  This is Jim Harris, Your Honor.

4              Nothing to add from the Coalition's objection.

5              THE COURT:  Thank you.

6              There was a joinder by Eisenberg, Rothweiler,

7  Winkler, et cetera, anything to add?  Mr. Hogan?

8              MR. HOGAN:  Good afternoon, Your Honor.  Daniel

9  Hogan of Hogan McDaniel on behalf of Eisenberg, Rothweiler,

10  Winkler, Eisenberg & Jeck, P.C.

11             Your Honor, I have nothing more to add.  And we

12  will rest on the submissions together with the arguments made

13  by co-counsel, Mr. Goodman.

14             Thank you.

15             THE COURT:  Thank you, Mr. Hogan.

16             The Webster Law Firm filed an objection on behalf

17  of Claimant No. 40573.  Did Mr. Webster have anything to add?

18         (No verbal response)

19             THE COURT:  Okay.  I hear nothing.

20             There was an objection filed by Mr. Swenson of

21  Swenson & Shelley.  Does Mr. Swenson have anything to add on

22  behalf of his clients?

23         (No verbal response)

24             THE COURT:  I hear nothing.

25             There was a joinder filed by Conway Legal, LLC.

1    Mr. Conway and Mr. Kraus [phonetic], do either of you have

2    anything to add?

3           (No verbal response)

4                THE COURT:  I hear nothing.

5                Mr. Conway and Ms. Muhlstock filed an objection on

6    behalf of Claimant No. 55101.  Do either of you have anything

7    to add?

8                MS. MUHLSTOCK:  No, Your Honor.  This is Ms.

9    Muhlstock.  We join in Mr. Goodman's arguments and have

10   nothing further.

11               THE COURT:  Thank you.

12               MS. MUHLSTOCK:  Thank you.

13               THE COURT:  Junell & Associates also filed a

14   joinder.  Mr. Cousins or Mr. Thomas?

15               MR. COUSINS:  Good afternoon, Your Honor.  Scott

16   Cousins on behalf of Junell & Associates.

17               We covered our points in our joinder.  And we

18   thank the court for considering our evidence.

19               THE COURT:  Thank you.

20               There was an objection filed by the law firm of

21   Schneider Wallace Cottrell Konecky on behalf of various

22   claimants.

23               MR. HICKS:  Your Honor, Ryan Hicks here from

24   Schneider Wallace.

25               Can you hear me okay?

1           THE COURT:  Yes.

2           MR. HICKS:  If I may, and I apologize for not

3  being on the Zoom. I am Houston and have been without power a

4  couple of days.  I just have a brief couple of things to add.

5           THE COURT:  Yes.  Please go forward.

6           MR. HICKS:  Your Honor, we have three of these

7  1,400 claimants.  We are not part of the Coalition.  We are

8  not a firm that is the subject of the second motion.  We

9  raised this objection separately as these three proofs of

10 claim were, I believe, as the court characterized some of

11 them earlier, fulsomely filled  out, they were signed by the

12 claimants.

13          Earlier counsel stated something along the lines

14 that this discovery is designed to illicit information from

15 people who didn't provide it and differentiate them from

16 those who did.  We provided information regarding the abuser,

17 the relation to Scouting, information about whether anyone

18 was told of the abuse, discussion of prior claims.

19          So, simply, we are objecting on the basis that

20 this is duplicative and that these claims are

21 (indiscernible), and provide the requested information

22 already.

23          THE COURT:  Thank you.

24          I'll get a response to this after I have gone

25 through all of the objections and we see what else there is.

1          The PCVA Claimants filed an objection.  Mr.
2    Clauder or Mr. Bo [phonetic]?

3          MR. STANG:  Your Honor, this is Mr. Stang.  I
4    believe Mr. Amala [phonetic] of that law firm is on.

5          THE COURT:  Mr. Amala.  Thank you.  Anything
6    further to add?

7          MR. RUGGERI:  Your Honor, that objection was
8    withdrawn.  James Ruggeri for Hartford.

9          THE COURT:  Okay.  I've got another objection by
10   Schneider Wallace Cottrell & Konecky.  I am not sure if it's
11   different claims or not, but I will ask again is there anyone
12   from that firm that wishes to address the court?

13         MR. HICKS:  Your Honor, Ryan Hicks from Schneider
14   Wallace.  Nothing to add on that particular joinder.

15         THE COURT:  Thank you.

16         Napoli Shkolnik filed an opposition.

17         MR. BUSTAMANTE:  Your Honor, this is Brett
18   Bustamante from Napoli Shkolnik.

19         The only thing I think with respect to this motion
20   is we'd just like to point out that the insurers used a
21   series of misrepresentations and *ad hominem* attacks
22   specifically on our firm and other firms.

23         In our opposition we took issue with the fact that
24   the insurers accused Mr. Napoli's father of improperly
25   signing claim forms.  In response the insurers, in their

1  reply, state that Mr. Napoli also (indiscernible) insurers

2  for accusing his father of impropriety, but the insurers do

3  not mention Joseph Napoli anywhere in their brief.  So the

4  accusation is hard to understand.

5          In our opposition we not only cite to the very

6  place where they do that, we also provided them with the

7  exact quote.  We just believe this goes beyond mere

8  negligence because in our citation the fact that we gave them

9  a citation -- they are suggesting that they reviewed the

10  documents and nothing turned up.  So they are directly

11  misrepresenting to the court what they wrote in their own

12  papers.  So we believe that it is just really incumbent on

13  the insurers to explain why it's okay to make such

14  misrepresentations to the court.

15          Additionally, they also accuse Paul Napoli of

16  misconduct.  We pointed out in our opposition that the case

17  that they cited to actually exonerated Paul Napoli.  They did

18  not follow-up in their reply.  So I assume that issue is

19  moot.

20          THE COURT:  Thank you.

21          There's an objection filed by Crew Janci.

22          MR. RUGGERI:  Your Honor, James Ruggeri for

23  Hartford.  That objection has been withdrawn.

24          THE COURT:  Thank you.

25          Mr. Kosnoff?

1          MR. WILKS:  Good afternoon, Your Honor.  David

2   Wilks for Tim Kosnoff.

3          We are content, Your Honor, to rest on the

4   arguments that have been made.

5          Thank you.

6          THE COURT:  Thank you, Mr. Wilks.

7          Babin Law filed an objection.

8          MR. PICKENS:  Good afternoon, Your Honor.  Joe

9   Pickens on behalf of Babin Law.

10          We do not have anything additional and support Mr.

11   Goodman's arguments.

12          Thank you.

13          THE COURT:  Thank you.

14          There was an objection filed by Ms. Liakas from

15   Liakas Law on behalf of multiple claimants.

16       (No verbal response)

17          THE COURT:  I do not hear Ms. Liakas.

18          A joinder filed by Marc J. Bern & Partners.

19          MR. SULLIVAN:  Good afternoon, Your Honor.  Bill

20   Sullivan on behalf of Marc J. Bern & Partners.

21          We filed a joinder to the written objection filed

22   by the Coalition and we also join in the arguments presented

23   to Your Honor today by the Coalition, but we don't have

24   anything further to add.

25          THE COURT:  Thank you, Mr. Sullivan.

1        Merson Law Claimant's joinder, they joined the

2    PCVA Claimant's objections.  Does the Ciardi Firm or Mr.

3    Merson have anything to add?

4        MR. GOULDSBURY:  Your Honor, this is Walter

5    Gouldsbury for Ciardi Ciardi & Astin.

6        We have nothing further to add to the arguments

7    that were made today.

8        THE COURT:  Thank you.

9        MR. STANG:  Your Honor, this is Mr. Stang.

10        I would just like to interject that as to the

11    objections that were withdrawn they were withdrawn pursuant

12    to a meet and confer process that included modifications not

13    withdrawn at the discovery requests.  So I didn't want these

14    two law firms that did withdrawn their objections have

15    clients on the TCC. So I have been in regular contact with

16    them, not to say I am not in contact with others.

17        I didn't want you to come away with the impression

18    that there was simply withdraw of the objection as opposed to

19    a result in the meet and confer process that modified both

20    sides' rights.

21        THE COURT:  I took that from Mr. Ruggeri's intro.

22        MR. STANG:  Thank you, Your Honor.

23        THE COURT:  Thank you.

24        There's a joinder in the Coalition's objection by

25    Porter & Malouf, P.A.  Ms. Harris or Mr. Porter?

1        (No verbal response)

2              THE COURT:  I hear no one.

3              I think I got an objection last night that went to

4    this motion.  I don't see it off hand.

5              If there is anyone else -- I've gone through all

6    the objections I have.  If there is anyone else who is on

7    either the Zoom cast or the phone who would like to be heard?

8              MR. DURSO:  Your Honor, Carmen Durso.

9              THE COURT:  Mr. Durso, I think yours was the

10   objection I saw, yes.

11             MR. DURSO: Yes, Your Honor.  Its John Doe No.

12   5969.  Mr. Goodman has already referenced that objection, but

13   I do want to make a few additional points if I may.

14             THE COURT:  Yes.

15             MR. DURSO:  The process that the insurers have

16   used here, it seems to me, is a result of the 90,000 number.

17   I just want to say to the court that that should not be a

18   significant consideration even though it's an enormously

19   large number in terms of this kind of case.

20             Counsel referred to the statistics that one sees

21   when you read studies about perpetrators indicating that they

22   have, on average, institutional perpetrators have upwards of

23   100 victims.  It was already mentioned to you the 8 or 9,000

24   of perpetrators that have been identified with regard to the

25   Boy Scouts.  You start multiplying those numbers out you come

1  out with victims far in excess of anything that we're talking

2  about in this particular matter.

3         When I started doing this kind of work over thirty

4  years ago the average victim I was seeing was a male in his

5  mid-40's.  That has consistently come done through the years

6  and part of the reason it's come down is because it's become

7  somehow more acceptable for people to talk about these kinds

8  of things.  So my victims are getting younger and younger all

9  the time.

10         The other thing is that when there is well

11  publicized matter like this particular case it gives

12  permission to males who ordinarily would rather die than tell

13  anybody else that another male has touched them sexually.  It

14  gives them permission to say, yeah, it happened to me too and

15  I need to do something about it.  So it's not remarkable that

16  you've got 90,000 people coming forward in this case.

17         The Boy Scouts are the only institution, really,

18  of any size that you see with treating young men throughout

19  the -- treating young boys throughout the country.  The

20  catholic church have all been segmented because the

21  institutional diocese are independent corporations and no one

22  has ever been successful in making the argument that they

23  should be all dealt with as one national organization or that

24  the Vatican should be involved.  So that is the reason why

25  you don't see larger numbers in other cases that have come

1  forward.

2         The idea that the people who come forward are so

3  much less detailed then you would see in other type of tort

4  cases also is not remarkable.  You're talking about boys,

5  young clueless boys who are having what is, arguably, their

6  first sexual experience at the hands of a trusted individual,

7  a very confusing thing that they don't know how to deal with.

8  The male on male part of it makes it clearly something they

9  can't talk about, can't deal with and getting through to the

10  point in their life where they can do that, as I have

11  indicated, is simply just can take them forever.  Some people

12  go to their graves without ever talking about it.

13         So I think the court should not allow itself to be

14  taken in by the idea that because there is a large number of

15  people and because there is vagueness in letters of a lot of

16  these people therefore, automatically it must be something

17  that is fraudulent or, in fact, it's a commonplace to find

18  people who have difficulty coming up with the kind of detail

19  that you would have with any other kind of tort claim.

20         In this particular claim, as has been pointed out,

21  there is no indicia of any kind that this is a fraudulent

22  claim.  I haven't seen the other claims. I have seven claims

23  and I have just one claim of the 1,400.  I can't imagine a

24  claim that would have more detail about the incident and

25  documentation then this particular claim.  There are eighteen

1  pages of documentation from the time period when the claim

2  occurred.  There are official records from the Boy Scouts

3  about the perpetrator.  There is correspondence with the Boy

4  Scouts organization.  There is an indication that parents

5  contacted the Boy Scouts and gave them details about what had

6  happened.  There is a letter from the perpetrator indicating

7  to some degree his admission of his conduct.

8           Why a claim like this would end up picked out by

9  that full proof statistical process of being something that

10  indicates there is widespread fraud I can't imagine.  I'm

11  thinking nobody ever read it, Your Honor, frankly.

12          I did talk to counsel for the insurers and I said,

13  you know, if you have read this  you have got to know that

14  the big thing that is driving you right now for this motion,

15  the fraud simply doesn't apply here.  They said, well, you

16  know, statute of limitations.  I have a great deal of

17  difficulty understanding whatever they might be able to say

18  about that statistical process for rooting out fraud, how

19  that could apply to a statute of limitations situation.

20          There are, actually there's more than fifty

21  states, there is additional jurisdictions where there are

22  statute of limitations.  In most of the jurisdictions there

23  are separate statutes of limitations for perpetrators and for

24  non-perpetrators.  Case law has developed with regard to both

25  of those things.

1        There is a case in the First Circuit that just

2  came down after I filed my objection and if the court gives

3  me permission I will send a copy to you.  Judge Lipez, in the

4  First Circuit, wrote a very interesting decision in which he

5  differentiated between a discovery rule as applied to claim

6  against a perpetrator and a discovery rule as applied as to a

7  non-perpetrator.  He says you don't determine in the same way

8  and statutes of limitations can run differently between one

9  or the other.

10        I say this to you because the point I want to make

11  is that I can't imagine what a statistical study can do to

12  show how statute of limitations issues with regard to any one

13  case can be a predictor of what will happen in any other case

14  particularly with regard to the discovery rule.  The

15  discovery rules determinations are fact based.  You cannot

16  say because I picked out a particular case and I showed that

17  the factual basis there indicates to me that this case might

18  be one we can win it tells you nothing about what would

19  happen in another fact based case.

20        Indeed, I reference in my papers that one of the

21  things that our courts have said, which you look at to

22  determine whether or not there a survivor has made an

23  appropriate determination about an appropriate discovery of

24  the harm which he suffered is that the discovery was

25  triggered by what it calls a watershed event.  Now that is

1    what our courts have said in Massachusetts.  In other states

2    they say very different things.  The state of Washington they

3    look at the mental state of the survivor only.

4            So there is such a variety of ways in which

5    statutes of limitations can be determined, how they can be

6    applied, that looking at a particular case and saying this

7    gives us some information by which we can figure out what we

8    can do with regard to defeating the claims because of the

9    statute of limitations just doesn't work.

10           The last thing that they could possibly do has

11   been determined by a statistical determination.  I listened

12   to the testimony of the young woman who was explaining her

13   process.  I thought about asking her questions, but really I

14   know what the answers are going to be.  She clearly has no

15   legal background.  She does not know how many states have

16   discovery rules.  She does not know how the discovery rules

17   work and how they differ from each other, and how one set of

18   facts can be determined.

19           Now I suppose one of the things that might be

20   asked is well, look, all we really want you to do is to

21   answer a few questions.  The short answer is that that is not

22   really accurate.  What they want to do is to get you to

23   answer a series of questions so that they can then take a

24   deposition and then they can move to dismiss it.  In that

25   process you are going to have to spend a lot of time, money

1  and effort into feeding that.

2          I want to say, respectfully, that I am always

3  willing to engage in that kind of process where opposing

4  counsel has some purpose that will be worthwhile.  The only

5  purpose that would be worthwhile will be to attack my

6  client's particular case and it does not help the court with

7  regard to what happens or should happen in any other case

8  that have statute of limitations issues.

9          THE COURT:  Thank you.

10         Is there anyone else to be heard on this motion?

11         MS. GUMMOW:  Your Honor, this is Susan Gummow.

12         THE COURT:  Ms. Gummow?

13         MS. GUMMOW:  Thank you.  I represent the AIG

14  Company.  We filed a joinder with regard to Century and

15  Hartford's motion.

16         If there is information with regard to invalid or

17  fraudulent claims I think it's important for the debtors to

18  know that, for the court to know that, and for purposes of

19  objecting to claims.

20         With regard to the insurers the policies only pay

21  valid covered claims.  So if there is information regarding

22  invalid or fraudulent claims then that goes to the exposure

23  analysis that is being done by the insurance carriers.  And

24  given that we are currently in the process of mediating these

25  issues I think it's important to have any information with

1  regard to invalid or fraudulent claims sooner rather than

2  later to assist the parties in having beneficial ongoing

3  mediation discussions.

4          That's all I have, Your Honor.

5          THE COURT:  Thank you.

6          I will permit anyone else who has filed a joinder

7  to the insurance companies' position to add any comments they

8  have.

9      (No verbal response)

10          THE COURT:  Okay. I hear no one.

11          Mr. Ruggeri?

12          MR. RUGGERI:  Yes, Your Honor.  Thank you.

13          Well I think we can start off on something that

14  Mr. Goodman and I agree on and that's the standard.  The

15  court agrees on it too because you have written on it.  Have

16  the insurers provided good cause to go forward with

17  discovery.  We have demonstrated that we believe that we

18  have.  We don't dispute the standard.

19          Mr. Goodman accused us of gerrymandering the sub-

20  populations, if you will, because those are the ones that are

21  most likely to draw questionable invalid claims, if you will.

22  Okay.  There are tens of thousands of those.  That is what we

23  are trying to test, Your Honor, is if we draw from those

24  groups are we seeing high percentage of invalid claims

25  filings.  That then would be what one could extrapolate if we

1  did that which would, in turn, enable us to make objections

2  if we feel that appropriate.  And, again, shifting the burden

3  over to the person who is filing the claim.

4        So I think that there is no surprise there and

5  there shouldn't be any surprise there.  That is what we are

6  trying to determine.  One of the things were trying to

7  determine --

8        THE COURT:  Isn't that the question whether the

9  sub-populations that counsel has chosen will give us relevant

10  information with respect to fraud.

11        MR. RUGGERI:  Your Honor, I think -- I wrote it

12  down.  The samples appear gerrymandered for the claims that

13  are defective.  Those words were used by Mr. Goodman.  So I

14  took that as, you know, an indication that he knows why we

15  have identified these sub-populations and articulated those,

16  but I don't deny, Judge, that included in these sub-

17  populations are claims that we believe presumptively are

18  invalid.  That is, sort of, what we are trying to find out

19  through the discovery that we are seeking.

20        So I thought we had joinder on that issue and it

21  would be helpful to the court.  My thought is that's right.

22  That's exactly right.  Your Honor --

23        THE COURT:  How do I know?  How do I know that

24  these six sub-populations correlate to claims that are likely

25  to be fraudulently filed?

1    MR. RUGGERI:  I don't think you know anything more

2  than those are the sub-populations that we designed or

3  requested.  That was the reaction from the Coalition's

4  counsel in response to those sub-populations.  So an

5  indication that those are the sub-populations where one would

6  expect to find problematic claims.  Again, I thought that was

7  helpful that we, sort of, joined that issue.

8    Time and place, trying to go through what Mr.

9  Goodman mentioned, this is the right time and place. I think

10  the court heard Ms. Lauria this morning lay out her schedule,

11  amended plan filed at the end of this month, disclosure

12  statement hearing in April, need to emerge by the end of

13  summer.  This is the time and place for us to take the

14  discovery so, frankly, we get it by May or early June.  We

15  need this information to evaluate the claims for voting

16  purposes and to exercise our right to object to claims as we

17  deem appropriate.

18    Your Honor, Mr. Goodman says we have this

19  information.  We don't have this information.  We don't have

20  anything more about these claims then the proofs of claims

21  that were filed.  We don't have this information.  That is

22  why we are seeking it.  With regard to the historical, the

23  alleged abusers, all we have is information that is publicly

24  available.  We don't have anymore information then he has on

25  those issues, Your Honor.  So it's just wrong to say that.

1          When he says we have turned our back to Hartford

2    and Century turned our backs on these claims that is also

3    wrong.  We have handled these claims in the tort system for

4    decades.  That is what we did before Boy Scouts filed for

5    bankruptcy.  So it is just wrong for him to say that we

6    turned our backs and we're the bad insurance companies who

7    said we're not going to pay claims that are covered by our

8    policy period.  That is not what either one of us has said

9    ever.

10          Standing, Your Honor, I think that the court made

11   it clear that you don't really need to get into the standing

12   issue today.  In fact, Hartford is more than a party in

13   interest.  Were a legitimate creditor.  We actually filed a

14   claim as a creditor based on our indemnity right against Boy

15   Scouts which is partially liquidated.

16          And then in terms of standing, insurers standing,

17   we believe that the lead case is GIT which made it pretty

18   darn clear that when you have a situation where the

19   liabilities that the insurers are going to be asked to cover

20   is increased then there is standing for the insurers to

21   participate in the bankruptcy process.

22          Prejudice, Your Honor, we're asking for 1.5

23   percent of the claimants to give us information that they

24   would have to provide if they were making a claim in the tort

25   system, actually less than that.  But that is what we are

1  asking from them.  They have elected to participate in this

2  proceeding and I don't believe just because the bankruptcy

3  proceeding it immunizes a claimant who has come forward to

4  participate in this proceeding from participating as we need

5  that claimant to participate.

6         Imerys, I don't know that I should tell you about

7  Imerys, Your Honor, but you, obviously better then I,

8  understand the differences between this case and Imerys.  And

9  J&J was demanding debtors to produce all of the materials

10 that they provided to the TCC and the FCR in the course of

11 negotiating the plan.  Your Honor ruled that is not something

12 they were entitled to for a number of reasons including that

13 wasn't legitimate Rule 2004 discovery.  That was plan

14 discovery, not 2004 discovery.

15        We talked about this morning I think that

16 discovery we're seeking today falls right within the

17 wheelhouse of 2004 discovery.  There is no adversary

18 proceeding.  There is no plan.  There is no contested

19 proceeding.  We're in a situation where we're trying to

20 examine the liabilities of the debtor.  The most significant

21 liability of the debtor in this case is sex abuse claims and

22 that falls within the wheelhouse, we believe, of 2004, Your

23 Honor.

24        Thank you for your time, Your Honor.

25        THE COURT:  Thank you.

1          MR. SCHIAVONI:  Your Honor, if I could just add

2    one point to that.  Mr. Ruggeri (indiscernible).

3          The one point I would just like to add is you

4    asked how could you tell that these requests could lead to

5    something.  I do suggest to you the nature of the topics, the

6    subcategories, you know, it's like one is people who on the

7    proofs of claim have no affiliation with Scouting.

8          Another is that they can't identify the abuser.

9    It's like these are not -- it doesn't require a huge amount

10   of inquiry to see that, you know, these are definitely

11   relevant issues that go right to the heart of what anyone

12   would check in evaluating claims here.  The large numbers

13   drive this.

14          Thank you, Your Honor.

15          THE COURT:  Thank you.

16          I did have, earlier in this case, a subject matter

17   expert testify about the bar date.  I recall that.  And it

18   just strikes me that a subject matter expert who would tell

19   me that, in fact, these categories correlate or don't to

20   fraudulently filed claims or likely to would be helpful.

21          I don't know if I need it.  I am going to think

22   about it, but I'm prompted by any objections that question

23   popped into my mind from the beginning.  That is what I have

24   been listening too and, therefore, of course, asking

25   questions about.  I want to give consideration to the

1 responses that I have received as well as the arguments of

2 the objectors, particularly those who say I filled out your

3 form, it's complete, you have my information.

4         I guess maybe in that instance that claimant it

5 would be good to include in the population because it would

6 tend to show if that category means anything that, in fact,

7 it wasn't a fraudulent claim.

8         So we're going to take a break for lunch.  And I

9 also have a three o'clock which I am going to push back to

10 four, first days in another matter.  So let's -- its 1:49,

11 let's recess till 2:30 and we will take up the next motion.

12         Thank you.  We're in recess.

13     (Recess taken at 1:49 p.m.)

14     (Proceedings resumed at 2:32 p.m.)

15         THE COURT:  Thank you.  We're back on the record.

16         MR. ABBOTT:  Thank you, Your Honor.  Derek Abbott,

17 again, Morris Nichols Arsht & Tunnell, here for the debtors.

18         Your Honor, I think we heard a lot of discussion

19 certainly about number four, a little bit about number three

20 which is also the insurers' motion.  It wasn't clear to me

21 that they have said their piece on item three on the docket,

22 Your Honor, which is the relief from the omnibus claims

23 objection, but if so then we're onto number five which is

24 just the insurers motion to seal certain aspects of the 2004

25 motion we did discuss.

1           THE COURT:  I think we're on, and the insurers can

2   correct me if I'm wrong, but I think we're on four.  We heard

3   three.  And four addresses the relief sought against the law

4   firms.  Am I wrong?

5           MR. ABBOTT:  Let me just let the insurers describe

6   that, Your Honor.  I had thought that is what we had just

7   discussed.

8           MR. RUGGERI:  Your Honor, James Ruggeri for

9   Hartford.

10          You are correct.  Mr. Schiavoni is now going to

11  take the other end and talk about that.

12          THE COURT:  Okay.  Agenda Item 4.

13          Mr. Schiavoni?

14      (Recording goes off record)

15          MR. SCHIAVONI:  Yes, Your Honor.

16          THE COURT:  Okay.  So we're on the motion seeking

17  to depose various counsel.

18          MR. SCHIAVONI:  Should I go forward, Your Honor?

19          THE COURT:  Yes.  My understanding is you are

20  taking the lead on this one.

21          MR. SCHIAVONI:  Yes.  I am, Your Honor.  Thank

22  you.

23          If it pleases the court, Your Honor, I'd like to

24  offer into evidence several declarations.

25          The January 22nd, 2021 declaration of Andrew

1  Kirschenbaum.  Its Docket No. 1975 and the exhibits

2  associates with that.

3          THE COURT:  Okay.  Is there any objection to the

4  entry into evidence of the declaration of Mr. Kirschenbaum?

5      (No verbal response)

6          THE COURT:  I don't hear any.  It's admitted

7  without objection.

8      (Declaration of Andrew Kirschenbaum, received into

9  evidence)

10          MR. SCHIAVONI:  Your Honor, I now offer into

11  evidence the declaration of -- he's my colleague, but I will

12  mispronounce his name, I'm certain, Sergei Zaslavsky dated

13  February 3rd, 2021 at Docket 2030 and the exhibits thereto.

14          THE COURT:  I don't remember that one.  Give that

15  to me again.

16          MR. SCHIAVONI:  That's the declaration, Your

17  Honor, with the tweets, the Kosnoff tweets attached to it.

18          THE COURT:  Okay.  Well I did read that.

19          Let me ask if there is any objection to the entry

20  into evidence of -- give me the name again?

21          MR. SCHIAVONI:  Sergei Zaslavsky.

22          THE COURT:  Mr. Zaslavsky's declaration.

23      (No verbal response)

24          THE COURT:  I hear no one.  That is admitted

25  without objection.

1          (Declaration of Sergei Zaslavsky, received into

2    evidence)

3              MR. SCHIAVONI:  Your Honor, I now turn to the

4    declaration of Chuck Fox.  To be clear this was the

5    declaration that was submitted in reply.  It was -- it's

6    specifically responsive to the filing by Mr. Napoli in his

7    opposition, Docket 2090, Paragraph 35 where he says that he

8    is -- he had certain blank proofs of claim he submitted.  He

9    contends he submitted some of those blank claims as filled in

10   and that there was no further work to be done.  Mr. Fox

11   presents the results of a criminal search on the claimants he

12   reviewed.

13             So we offer that -- Mr. Fox's declaration for that

14   purpose.

15             THE COURT:  I was familiar with everything, but I

16   don't have his declaration in front of me.

17             Is there any objection to Mr. Fox's declaration

18   coming into evidence?

19             MR. BUSTAMANTE:  Your Honor, this is Brett

20   Bustamante on behalf of Napoli.

21             I have not received that declaration.  I am

22   unfamiliar.  So I guess I would object to it.  If the court

23   is willing to put that aside or maybe take it for a later

24   hearing, I would certainly be able to take a look at it.

25             Thank you.

1          THE COURT:  Okay.  Well I am not -- when was it

2  filed?

3          MR. SCHIAVONI:  It was filed with our reply brief.

4          MR. Elias, do you happen to have the docket number

5  for it or one of my colleagues.

6          MR. ELIAS:  This is Brad Elias from O'Melveny.

7          I believe its Docket No. 2174.

8          THE COURT:  Well I am not going to admit it over

9  objections that it hasn't been received.  I haven't seen it.

10          MR. MOXLEY:  Your Honor, Cameron Moxley, Brown

11  Rudnick, on behalf of the Coalition again.

12          This is one of those declarations that I have

13  mentioned at the outset of the hearing today, Judge, that we

14  object to the admission of expert reports into evidence that

15  were filed to the reply for the reasons I stated previously.

16  I'd be happy to state those reasons for the record again,

17  Judge, if you would like.  I just want to note the objection

18  to this declaration on the same grounds.

19          MR. SCHIAVONI:  Your Honor, to be clear, Mr. Fox

20  isn't an expert as such.  All he did was run criminal -- he

21  ran a criminal search on Mr. Napoli's opposition brief.  He

22  states that he, sort of, cured the issue of him not having

23  filed blank proofs of claim by filing subsequent proofs of

24  claim.  Mr. Fox simply ran through the ones that he refiled

25  and ran a criminal search on them.  He found a significant

1  number of people who had been convicted of crimes of honesty,

2  you know, identify theft, forgery, that sort of thing.

3           THE COURT:  Okay.  I do have this two volumes that

4  was filed February 11th I think.

5           What am I supposed to do with these?  People who

6  have been convicted of a crime can't have also been abused as

7  a child?

8           MR. SCHIAVONI:  Judge, these aren't ordinary

9  crimes. These are crimes of honesty.  You know, as I said,

10  forgery, identity theft, credit card fraud.  These are fraud

11  crimes.

12           The suggestion that this -- you know, again, we're

13  in a situation here, Your Honor, where we're not able to

14  speak to the claimant, we're not able to speak to any

15  witnesses.  You know, this is what we have, so to speak, to

16  indicate that there are issues about these.  This is not an

17  insignificant number among the ones that were subsequently

18  submitted.

19           So you can give it whatever weight in the contexts

20  of this motion you want, but that is the proffer.

21           THE COURT:  Is Mr. Fox available for cross?

22           MR. SCHIAVONI:  Yes, he is.

23           THE COURT:  Okay.  Let me hear the objection

24  again, Mr. Moxley?

25           MR. MOXLEY:  Yes, Your Honor.  And the

1  availability for cross really doesn't really solve the

2  problem.  The problem with filing these declarations at the

3  eleventh hour with a reply is a tactical one that the

4  insurers engaged in more to limit our ability to study the

5  testimony that is provided in the declaration, to be able to

6  actually prepare meaningfully (indiscernible).

7          These people -- I am surprised to hear that he is

8  (indiscernible) for not, you know, his declaration.  It's not

9  appropriate, Judge, for these declarations to be filed on teh

10 fly when they're not actually in response to any declarations

11 that were filed by objectors.  The insurers (indiscernible)

12 and if they had evidence and testimony to support the motion

13 they should have submitted that evidence with the motion.

14 And it's not appropriate to do so (indiscernible).

15         MR. SCHIAVONI:  Your Honor, there is nothing

16 tactical here.  This is filed in response to an assertion,

17 unsworn assertion by Mr. Napoli in his opposition that he

18 had "cured" some of the proofs of claim by refiling them.

19         So, you know, if we're going to --

20         THE COURT:  How does this relate to the refiled

21 claims?  How does it relate to that specifically?

22         MR. SCHIAVONI:  Mr. Fox, ran criminal searches on

23 the collection of, whatever it was, forty, or fifty, or a

24 hundred of these that were refiled to see whether they were

25 like just obvious facial issues with them and he presents

1  these results.

2      MR. BUSTAMANTE:  Your Honor, if I may.  I also, I

3  think, would add relevance to the objection.  Counsel seems

4  to be making the argument that the proofs of claims were --

5  the proofs of claims were cured by amendment.  Whether the

6  particular claimant has a criminal background is irrelevant

7  to how they were amended.  So it's completely irrelevant to

8  that topic.

9      THE COURT:  Thank you.

10     That is what I am trying to figure out, how does

11 it relate to whether or not the firm subsequently filed an

12 amended proof of claim.  You may not like who filed it or may

13 have an issue with the claim as filed or refiled, but how

14 does that respond to the assertion that the claim has been

15 amended?

16     MR. SCHIAVONI:  Your Honor, this isn't an ordinary

17 situation.  The proofs of claim that were filed were blank.

18 They didn't bear signatures.  They bore an s/Mr. Napoli.

19 Okay.  Then later there is -- not all of the blank ones like

20 this for which there is no explanation of how this came about

21 were amended, some subset were and of those, apparently a

22 significant number of them, come up with, you know, not

23 regular crimes so to speak, but like forgery, identity theft,

24 credit card fraud.

25     You know, you can give it what weight you want,

1  but these are the kinds of things in the overall context that

2  raise concerns.

3          THE COURT:  Okay. I understand in the overall

4  context they may raise concerns for you.  I don't understand

5  how it is responsive to whether a proof of claim was amended

6  or not.  I am not going to admit it.  The parties haven't had

7  a real chance to take a look at it and make any response they

8  may have to it.  I am not going to accept it for purposes of

9  this hearing. It's excluded.

10          MR. SCHIAVONI:  Your Honor, I'd next like to offer

11  --

12          THE COURT:  Excuse me, Mr. Schiavoni, can everyone

13  please make sure that they are muted.  I'm hearing background

14  noise.  Thank you.

15          Mr. Schiavoni?

16          MR. SCHIAVONI:  Your Honor, I'd next like to offer

17  the January 22nd, 2021 declaration of Paul Hinton.

18          THE COURT:  Is there any objection to the

19  declaration of Mr. Hinton, signed January 22nd, 2021?

20      (No verbal response)

21          THE COURT:  I hear none.

22          It's admitted.

23      (Hinton Declaration received in evidence)

24          MR. SCHIAVONI:  Okay.  Your Honor, lastly, I'd

25  like to offer the declaration of Erich Speckin, dated

1  January 22, 2021.

2             THE COURT:  Is there any objection to

3  Mr. Speckin's declaration, signed January 22, 2021, coming

4  into evidence?

5             MR. WILKS:  Yes, Your Honor.  This is David Wilks

6  for Timothy Kosnoff and Kosnoff Law.

7             THE COURT:  Mr. Wilks?

8             MR. WILKS:  Thank you.  We filed a motion to

9  strike the insurer's reply brief, which Mr. Speckin's

10  declaration and 20-some exhibits were accompanied.  The move

11  to strike, I think, lays out, Your Honor, the basis for the

12  objection to Mr. Speckin's declaration.

13             It also, Your Honor, is improper opinion

14  testimony.

15             MR. SCHIAVONI:  Your Honor, he's got the wrong

16  declaration, if I could just help him out.  We're not

17  offering the reply declaration.  Now we're offering the

18  moving declaration.

19             MR. WILKS:  Then I think we'll stop talking, Your

20  Honor.  Thank you.

21             THE COURT:  Okay.  Thank you.

22             Any other objection to the Speckin declaration,

23  signed January 22?

24        (No verbal response)

25             THE COURT:  I hear no one.

1           It's admitted, without objection.

2       (Speckin Declaration received in evidence)

3           MR. SCHIAVONI:  Your Honor, will any of these be

4   subject to cross-examination, so that we can make a

5   determination as to whether we should put them on?

6           THE COURT:  Yes.  Does anyone wish to cross-

7   examine Mr. Kirschenbaum?

8       (No verbal response)

9           THE COURT:  I hear no one.

10          Does anyone wish to cross-examine Mr. Zaslavsky?

11      (No verbal response)

12          THE COURT:  I hear no one.

13          Does anyone wish to cross-examine Mr. Hinton?

14      (No verbal response)

15          THE COURT:  I hear no one.

16          Does anyone wish to cross-examine Mr. Speckin?

17          MR. BUSTAMANTE:  Based on Mr. Schiavoni's

18  representation just now, Your Honor, my answer is no.

19          THE COURT:  Okay.  Then I hear no one.

20          MR. SCHIAVONI:  Your Honor, we would just like to

21  make a very brief presentation with Mr. Hinton of his direct,

22  and if there's cross that follows, it's just to acquaint the

23  Court with his declaration.

24          THE COURT:  Okay.  Mr. Hinton?

25          MR. SCHIAVONI:  And my colleague, Mr. Elias, will,

1  at the pleasure of the Court, put him on.  He's got a pro hac

2  pending, Your Honor.  He's appeared in other Delaware courts.

3  He's my colleague.  I vouch for him.

4          THE COURT:  That would be fine.

5          Mr. Hinton, I need to swear you in.  Can you raise

6  your right hand, please.

7      PAUL HINTON, WITNESS FOR THE INSURER, AFFIRMED.

8          THE WITNESS:  I do.

9          THE COURT:  And will you please state your full

10 name and spell your last name for the record.

11         THE WITNESS:  My name is Paul Hinton, H-i-n-t-o-n.

12         THE COURT:  Thank you.

13         Mr. Elias?

14         MR. ELIAS:  Thank you, Your Honor.  Bradley Elias

15 from O'Melveny & Myers.  I intend to show Mr. Hinton a few

16 tables from his declaration.

17         Would it be easier for the Court to share my

18 screen with those or is it better to just have everyone look

19 at their copy of the tables?

20         THE COURT:  I have my copy.

21         MR. ELIAS:  Okay.

22         THE COURT:  If you can share your screen, that's

23 fine.  I don't know how any of that works.

24         MR. ELIAS:  Okay.  Thank you, Your Honor.

25                     DIRECT EXAMINATION

1  BY MR. ELIAS:

2  Q     Mr. Hinton, who is your current employer?

3  A     The Brattle Group.

4  Q     And what is your current position at Brattle?

5  A     I'm a principal.

6  Q     And what type of work do you do as a principal at The

7  Brattle Group?

8  A     I conduct economic analysis and provide testimony in

9  mass-tort cases, in securities litigation, and in finance

10  cases.

11  Q     And how long have you been doing this type of work?

12  A     I've been doing this work for over 20 years and in the

13  mass-tort area, almost exclusively for a period of 10 years.

14  Q     And can you describe for the Court your educational

15  background.

16  A     Yes, I have an undergraduate degree from Oxford

17  University in the United Kingdom in engineering science and a

18  master's degree from Harvard University's Kennedy School of

19  Government and that degree gave me the opportunity to study

20  statistics, economics, and finance.

21  Q     And how many mass-tort cases have you worked on during

22  your career?

23  A     I've worked on over 40 cases, I would estimate.

24  Q     And what about mass-tort cases, how many of those have

25  you worked on?

1  A     I've conducted claims estimation work that's been

2  relied on in at least five significant mass-tort

3  bankruptcies, including Dow Corning, Armstrong, W.R. Grace,

4  Combustion Engineering, and I can't remember the other ones,

5  but ...

6  Q     And have you provided expert testimony before?

7  A     In the area of mass torts, I provided expert testimony

8  in the Dow Corning trust matter for ING's insurance

9  subsidiary in a fee arrangement, which is a U.K.-based

10 restructuring insurance and runoff.  In a matter called the

11 Harmon v Atlantic Richfield, in a private trust litigation

12 for medical monitoring, and in a chemical company indemnity

13 case, involving Kemira, the chemical company.  Those are the

14 most prominent ones.

15 Q     And do you have any professional experience with or

16 without mass torts, outside of the litigation context?

17 A     Yes, I have had the opportunity to do public policy

18 related research and, in particular, published studies that

19 do empirical analysis of the cost of mass torts and torts and

20 cost in the United States, and was invited on the basis of

21 that research, to provide testimony to Congress to the House

22 Judiciary Committee on two occasions about the impact of U.S.

23 tort litigation on U.S. competitiveness and jobs.

24 Q     Now, turning this case, what has been your role?

25 A     I've been retained by Century Indemnity Company as a

1  claims estimation expert.

2  Q    And have you submitted any, prepared or submitted any

3  declarations in this case?

4  A    Yes, I've submitted two declarations; one on

5  January 22nd and the second on February 11th.

6  Q    I'm going to ask you today only about your first

7  declaration on January 22nd.  Can you please briefly describe

8  the work that's reflected in the declaration.

9           MR. ELIAS:  I don't know if others are hearing the

10  music?

11           THE COURT:  Yes.  Can everyone please check your

12  lines.

13           Operator, can you tell where that's coming from?

14           THE OPERATOR:  Your Honor, I have muted John

15  Thomas' line.  It appears the music was coming from there.

16           THE COURT:  Thank you.  Mr. Elias?

17  BY MR. ELIAS:

18  Q    Mr. Hinton, I'll repeat the question.  I was asking if

19  you could briefly summarize the work that you performed

20  that's reflected in your January 22nd, 2021, declaration.

21  A    Yes, I have been analyzing the claims data for the BSA

22  case that was assembled by Omni and developed certain

23  indicators of claims characteristics, such as their

24  completeness and various other measures that we'll talk

25  about.

1  Q      And just for the record, what is Omni?

2  A      My understanding is that Omni is the claims agent for

3  Boy Scouts of America and so claim forms were submitted to

4  Omni and they processed them to extract the information from

5  them and publish them in a database and made that database

6  available to the parties and to the experts for the parties

7  to (indiscernible) the claims review and analysis.

8  Q      And can you briefly describe how you performed your

9  analysis in this case using the Omni data.

10 A      Yes.  Well, I work with a team at The Brattle Group who

11 work at my direction.  We started with the process of

12 downloading data from the Omni website.  We did that on two

13 occasions, just before each of the declarations I prepared,

14 to make sure we had up-to-date data.  We did some work that's

15 standardized.  Some of the information text yields, there are

16 a lot of text yields that can have typos or misspellings or

17 can just use different syntax, for example, law firms' names.

18 So that had to be standardized.

19       And then we also extracted certain text information

20 from text yields such as key descriptor of the abuse, such as

21 the abuser name and the year of abuse and state of abuse.

22       And, finally, we conducted a random sampling exercise

23 so that we could then manually review a random sample to

24 evaluate the statistical competence level that I could report

25 for the test statistics that I computed in my report to show

1 that they were reliable.

2 Q    Okay.  I'd like to ask you about a few of the specific

3 analyses you did in your report.  I'm going to show you

4 Table 1 in your initial declaration.

5 Can you see that on your screen in front of you, Mr. Hinton?

6 A    I can, thank you.

7 Q    And can you describe the analysis that you've done in

8 Table 1.

9 A    Yes, this table, you'll see lawyers' names in the first

10 column and there are several columns of numbers where I'm

11 reporting the frequency of claims that were signed by

12 particular lawyers.

13 Q    And what was your conclusion after analyzing this data

14 regarding the number of claims signed by attorneys in two

15 weeks prior to the bar date?

16 A    Well, first of all, I identified the lawyers who signed

17 the most claims for the purposes of this table, and I

18 identified lawyers who either filed more than 500 proofs of

19 claim or signed more than 200 on a single day.  And what I

20 discovered is a large number of those claims and attorneys

21 were associated with, the law firms they were associated with

22 and some of them were so admitted with the Abused in Scouting

23 firms, so those are the first firms listed.

24      I see that over 13,000 claims altogether are signed by

25 the top 15 lawyers that are on this table and the lawyers who

1  signed the most claims on a single day signed almost 900

2  claims on a single day and that was Adam Krauss (phonetic).

3  Q    Let's move now to Table 2 in your declaration.  I'll

4  try to make that a little bigger for you.

5       Can you tell us what you did in the analysis depicted

6  on Table 2.

7  A    Yeah, in Table 2, I expanded the list of law firms

8  beyond the list of law firms for the lawyers who signed the

9  (indiscernible) claims to include the other two law firms

10 from the Coalition.  So, this table can now report, I can

11 report on this table, statistics for both, the high-volume

12 signing firms and separately for the Coalition firms, which

13 potentially overlap.

14      And I'm focusing here on indicators that I've developed

15 of claims that have missing key pieces of information of two

16 types; one, information that identifies the claimants and,

17 secondly, information that identifies and describes the

18 nature of the abuse.

19 Q    And just so we're clear, how did you select the firms

20 that were included in this chart in this table?

21 A    Okay.  So, I started with the firms that I identified

22 in my first table, which were identified by starting with the

23 lawyers who signed the largest numbers of claims and then I

24 noted that a large proportion of those claims were attributed

25 to law firms that were in the Coalition.  All but two of the

1  firms in the Coalition were included in that analysis.  So, I

2  added the other two firms which were (indiscernible) at the

3  bottom of Table 2 so that we can now, on this table, report

4  statistics of the Coalition.

5  Q     And can you describe for us the types of information

6  that was missing from the claims that you examined in this

7  table.

8  A     Right.  So, there are two categories.  So, in terms of

9  claimant identification information, I focused on five pieces

10  of information:  the surname, the zip code, the Social

11  Security number, you know, five digits, and the date of

12  birth, month and year.  And if any one of those pieces of

13  information was not provided, then I would flag that as

14  missing key claimant information.

15  Q     And in what respect --

16  A     It's --

17  Q     Keep going, Mr. Hinton.  I'm sorry?

18  A     Yeah, sorry.  I was just going to mention the second

19  category of missing information on this table is, I described

20  as the information about the abuse and, specifically, I

21  identified indicators of the abuse in terms of the when,

22  where, what, and who associated with the abuse.  And if this

23  information was not available for each of those categories, I

24  indicated it in the corresponding column.

25  Q     And what percentage of the claims that you examined in

1  this table were missing key information?

2  A    Well, if you count claims that were missing any

3  information for any one of these indicators, I found that 65

4  percent of claims from the high-volume signing firms, and 65

5  percent is also the number with missing information from the

6  Coalition firms, and that's shown in the last column at the

7  bottom of the table.

8  Q    So, just to break that out, you mentioned high-volume

9  signers and then the Coalition firms.

10      How many claims overall were these firms responsible

11  for?

12  A    So, the high-volume signing firms were the firms where

13  the attorneys signed the most claims, work at law firms that

14  are responsible for 66,000 claims.

15  Q    Okay.  Let's move to your third table.

16      Can you describe for the Court the analysis depicted in

17  Table 3.

18  A    Yes, in Table 3, I now look at the counts of claims for

19  these same law firms that were filed late, after the bar

20  date, where they represented a multiple, meaning there was

21  more than one claim filed for the same claimant or exhibited

22  certain inconsistent information about the age of the

23  claimant or the location of the alleged abuse.

24  Q    You mentioned the inconsistencies with the age.  How

25  did you make that determination?

1  A     Yes, what we noted is that for some claimants, the

2  dates of the alleged abuse occurred when the claimant was not

3  of scouting age, based on the information provided about that

4  scouting activity.

5  Q    And you also have a column here for never lived in the

6  state of alleged abuse.

7        How did you make that determination?

8  A     Well, we did our best to identify the claimant in a

9  commercially available background check database called

10  National Public Data, where we were able to find information

11  about the claimant about their historical locations of

12  residence.  We checked to see if they had ever lived in the

13  state where the alleged abuse occurred.  And when we found

14  that they had never lived in that state, we listed that here.

15  Q    Dismissed the address data that you mentioned a moment

16  ago, did that have information for all of the claims that you

17  looked at?

18  A     No, we were only able to identify inconsistencies for

19  the claims where we were able to obtain historical residence

20  information.  So, we weren't able to do this for every

21  claimant, so there are a lot of claimants for which we don't

22  know the answer to this question.  So, this is potentially an

23  underestimate.

24  Q    So, what percentage of the claims were either missing

25  key information or were late, a multiple claim, or had

1  inconsistencies with regard to age or location?

2  A    Right.  So, combining the results from the previous

3  Table 2 and these results, I report in the last column here

4  that 78 percent of the claims filed by the high-volume

5  signing firms had some sort of deficiency of the types that

6  are listed here.

7       And for the Coalition firms, it's almost the same,

8  77.7, so it rounds to 78 percent, also.

9  Q    Have you been asked for counsel to make any

10 determination as to whether any individual or specific claims

11 were valid?

12 A    No, I haven't been reviewing individual claims.  The

13 whole point of this analysis is to look at proofs of claim,

14 to look at certain indicators or claim characteristics to see

15 whether any are unusual and raise questions about the claims

16 process.

17 Q    And did you look at any other issues associated with

18 the claims?

19 A    I did.  One of the issues I looked at was this question

20 of the frequency with which certain law firms had filed

21 claims that were almost completely blank.

22 Q    So what do you mean by -- how do you define a blank

23 claim?

24 A    Well, a blank claim, I define as essentially lacking

25 all information about alleged abuse.  And there are four

1  sections of the claim form that are focused on capturing that

2  information:  Sections 3, 4, 5, and 6.  And in those

3  sections, there are 120 different fields of information that

4  claimants are asked to provide information on by answering

5  those questions.

6       And I classify a claim as almost completely blank if it

7  only contained two or fewer responses to those 120 questions.

8  Q    And using that methodology, how many blank claims did

9  you find?

10 A    I'm just going to look at the relevant page of my

11 report (indiscernible) memorized it, but I think it's about

12 2500.

13 Q    Okay.  And did those forms come from any specific firms

14 of group of firms?

15 A    Well, it was noteworthy that almost the majority of

16 them came from only three firms, which were the Mark Berman &

17 Partners firm (ph), the Napoli Law Firm, and the Abused in

18 Scouting group.

19 Q    Mr. Hinton, thank you for your time today.

20           MR. ELIAS:  Your Honor, I have no further

21 questions.

22           THE COURT:  Thank you.

23           Does anyone have any cross?

24           MR. ROBBINS:  Yes, Your Honor.  This is Larry

25 Robbins from the firm of Robbins Russell.  I represent the

1  firms of Andrews & Thornton and ASK, LLP, and I wonder if I

2  could just do a brief cross-examination of the witness,

3  please?

4          THE COURT:  Certainly, Mr. Robbins.

5          MR. ROBBINS:  Thank you, Your Honor.

6                    CROSS-EXAMINATION

7  BY MR. ROBBINS:

8  Q     Good afternoon, Mr. Hinton.

9        May I ask you, sir, to turn back to Table 1.  Just so

10 you know what I'm about to do, I'm going to take you through

11 Tables 1, 2, and 3, and I have a couple of questions about

12 each one.

13       So, may I ask you to please put in front of you,

14 Table 1, and tell me when you're there.

15 A     I'm there.

16 Q     All right.  And you have a column in which you gather,

17 in which you report the number of proofs of claim that were

18 signed within two weeks of the bar date; is that correct?

19 A     Yes.

20 Q     And just so we're clear, that column tells us only when

21 the proof of claim was signed, but not anything about when

22 the information contained in the proof of claim was vetted by

23 the signer; is that correct?

24 A     Yeah, that information is just based on the date of

25 signature that's reported in Omni.  It doesn't tell me

1  anything else.

2  Q    So, for example, you would agree with me, Mr. Hinton,

3  that if I were a lawyer submitting one of these claims and I

4  had several rounds of vetting and several rounds of

5  interviews with the claimant and I followed up with the

6  claimants to make sure I was getting as much information as I

7  potentially could so that nobody would impeach the

8  credibility of that claim, and I therefore vetted that claim

9  almost until the bar date was upon us, that would show up,

10  would it not, in your column, indicating when the proofs of

11  claim were signed within the last two weeks, would it not?

12  A    Well, the fact that you had engaged in a lot of vetting

13  prior to that date presumably would show up in some of the

14  indicators that I report, right, in terms of how complete the

15  claims were and whether they were free from inconsistencies

16  as of that date --

17  Q    Yeah, I agree -- I'm sorry, please finish your answer.

18       Are you done?

19  A    I'm finished.

20  Q    All right.  So, let's return to my question.

21       I'm looking at just this column on Table 1 where you

22  list the date of signature and these are the claims that were

23  signed within the two weeks before the bar date, and all I'm

24  asking you is whether the numbers in that column shed any

25  light whatsoever on the extensiveness or timing of the

1  vetting of a given claim by a given law firm, yes or no?

2  A    Well, I think it tells you something about the timing

3  of the vetting, because it wasn't completed until two weeks

4  before the bar date.  But that column is just telling you how

5  many claims were filed at the last minute.  That's all it

6  tells you.

7  Q    Okay.  All right.

8       Let's talk about Table 2.  Table 2, you've gathered

9  what you call "missing information" --

10          THE COURT:  I'm still on this hearing.  I'm just

11  on mute.

12  BY MR. ROBBINS:

13  Q    You gathered missing information for a collection of

14  law firms that you call "high-volume signatories and

15  Coalition law firm members."  I want to ask you about two of

16  those columns.  One of them is missing key claimant ID.

17       Do you see that?

18  A    Yes.

19  Q    And I believe you told us on the direct exam by your

20  counsel that -- well, actually, let me ask you, you tell us,

21  do you not, in paragraph 9 of your declaration on page 4, the

22  things that constitute incomplete information; am I correct?

23  A    Yes.

24  Q    And you also testified, did you not, sir, that if any

25  one of those different categories of information is missing,

1  it goes into the column that you call "missing key claimant

2  ID."

3        Correct or incorrect?

4  A    Yes, the five elements of claimant identification are

5  tested in that column.

6  Q    Yes.  But the point, sir, is if a given proof of claim

7  is missing any of these five, it goes into that column, does

8  it not?

9  A    Yes, it does.

10  Q    So, if a proof of claim is missing, for example, the

11  zip code of the claimant, that shows up in that column of

12  Table 2, does it not?

13  A    Yes.

14  Q    All right.  You also have a column called "missing

15  abuser last name."

16        Correct?

17  A    Yes.

18  Q    And you tell us, do you not, in Footnote 4 on page 4,

19  that you count a given proof of claim as including key

20  information if the last name is identified in the text field

21  of the last name of the abuser, the purported abuser,

22  correct?

23  A    Yes.

24  Q    Which means that if a given claimant, let's say three

25  years after his abuse, if a given survivor can recall only

1  the first name of the scout leader who abused him, that shows

2  up, does it not, in the column called "missing abuser last

3  name."

4      Correct?

5  A    Yes, that's correct.

6  Q    And you don't hold yourself out as any kind of expert

7  in the question whether it is common among survivors of

8  sexual abuse, particularly males, to have forgotten the last

9  name of a scout troop leader.  You don't hold yourself out as

10 that kind of expert, do you?

11 A    No.  Actually, we can just look at those questions by

12 looking across the claims data.  So, I think you're

13 misunderstanding the person's abuse whose data are not to

14 assess the validity of any individual claim; it's to look and

15 see whether particular groups of law firms have unusually

16 high rates of missing information.

17     Whether it's common or not depends, and can be

18 determined, by looking at the other claims.  And so, for

19 example, you can look at claims that were signed by attorneys

20 versus those that were signed by claimants.  So, that would

21 be one way to look at this question to see whether these

22 particular claims look unusual or not, and you don't need to

23 be an expert in sexual abuse to do that analysis.

24 Q    Can we go back to my question, do you fancy yourself an

25 expert on the question whether it is common among abuse

1  survivors to have forgotten the last name of an abuser 30

2  years prior; that's my question.

3       Are you so an expert?

4  A    I'm providing expert testimony that includes

5  information about the frequency of certain pieces of

6  information provided by claimants.  So, you can decide for

7  yourself whether that means I'm an expert of the type that

8  you describe, but I'm representing myself as an expert in

9  claims estimation and analysis, and so I am trying to, in

10  this table, show descriptively, what frequency of these types

11  of deficiencies are in particular groups of claims so the

12  Court can decide whether that warrants asking further

13  questions or not.

14  Q    I see.  So, can I take that as a no to my question, the

15  actual question I asked?

16  A    Well, I'm sorry, I just didn't understand your question

17  fully enough in terms of describing expertise --

18  Q    All right.  Let's move on.  I think I probably made the

19  point.

20       Let's look at Table 3 together.  Tell me when you're

21  there.

22  A    I'm there.

23  Q    And one of your columns is inconsistent age, correct?

24  A    Yes.

25  Q    And to figure out what you mean by inconsistent age,

1  one of the things we should look at is how you define that

2  category in Footnote 13 of you report on page 6; am I

3  correct?

4  A    Yes.

5  Q    And so, if there is a mismatch, for example, between

6  the type of scouting that the claimant purports to have been

7  part of and the age of that particular claimant, that could

8  very well be the kind of inconsistency that would result in

9  showing up in the so-called "inconsistent age" column of

10  Table 3; am I correct?

11  A    I think just to put it simply, you know, all I'm doing

12  is how old were you when the abuse occurred and were you of

13  scouting age, based on the type of scouting activities that

14  you were involved with as a child.

15  Q    Well, let's suppose --

16  A    There are different ages --

17  Q    I'm sorry, go ahead.

18  A    I was just saying, you know, based on, you know, some

19  people were in the Cub Scouts, some people were in the Eagle

20  Scouts and we looked at the information from -- on scouting

21  on the Boy Scouts of America website to determine the age

22  ranges for kids in those different scouting activities, so if

23  you were --

24  Q    I really appreciate that -- sorry, go ahead.

25  A    You know, so I'm just saying --

1  Q      That's exactly what I want to ask you --

2  A      Right.  So, if you were -- if you know that you were

3  abused when you were too old or too young to be a scout, then

4  that raises certain questions.  So, we classified those

5  claims.

6        And that's not to say that some of those claims, if

7  given the opportunity, might be able to clarify that

8  information, but all we're doing here is indicating that that

9  is an inconsistency.  It may be a little bit technical, but

10  it might have useful in this, you know, in the process of

11  identifying proofs of claim where we have additional

12  questions.

13  Q      All right.  Well, let me ask you a concrete example and

14  see, because I appreciate your clarification.  Let me give

15  you this example, Mr. Hinton.

16        Suppose the given survivor fills out a proof of claim

17  and states that he was born in 1952 and that the abuse took

18  place when he was a Boy Scout in 1961 when he was 9 years

19  old.  And he otherwise provides all bells and whistles, every

20  bit of data that you could possibly want, but he calls

21  himself a Boy Scout and not a Cub Scout in 1961 when he was 9

22  years old.

23        My question to you is whether that proof of claim for

24  that claimant, that survivor, would or would not show up in

25  your inconsistent age category, yes or no?

1  A     I think based on Footnote 13, you have to be -- if you

2  were a Boy Scout, you would be age 10 to 18, so that would be

3  an inconsistency, if he -- that particular claimant said they

4  were abused at age 9 as a Boy Scout.

5  Q     So, if -- so, just to be clear, if a claimant is 9

6  years old at the time of the abuse and calls himself in the

7  proof of claim, a Boy Scout and not a Cub Scout, why then, he

8  would show up -- his claim would show up in your column of

9  Table 3 called "inconsistent age."

10        Isn't that true?

11  A     That's right, it's showing up there because it's an

12  inconsistency that deserves a little further investigation.

13        MR. ROBBINS:  All right.  Your Honor, I think I'm

14  through with this witness.  Thank you very much.

15        THE COURT:  Thank you.

16        Any other counsel who wishes to cross-examine?

17        MR. SULLIVAN:  Your Honor, Bill Sullivan.  I have

18  a follow-up question.

19        THE COURT:  Mr. Sullivan?

20                    CROSS-EXAMINATION

21  BY MR. SULLIVAN:

22  Q     Mr. Hinton, staying with the inconsistent table, which

23  is Table 3, would it also be correct that if a Boy Scout who

24  resided in Delaware traveled to Maryland for a camp and was

25  abused at that camp, that that would, nonetheless, show up in

1  your inconsistent information table?

2  A    Well, it depends, whether I was able to get background

3  check information that provided the historical residence

4  information.  But if I were able to do that, that would get

5  flagged, but, again, that doesn't say anything about the

6  validity of that particular claim, right.  All it's doing is

7  saying when we look at particular groups of claims together

8  of particular law firms, is there any reason to expect that

9  there were more, going to be more inconsistencies for one law

10  firm than another or for claims brought by and signed by

11  lawyers versus claims signed by claimants.

12       And when you see these differences or statistically

13  significant differences in these indicators, it can look

14  unusual and raises questions, and that's why we're doing

15  this.  We're not doing it to suggest that there's not an

16  explanation in some of these cases or that individual cases

17  might be cured of inconsistencies, but we're looking at them

18  here as groups.

19  Q    But the answer to my question is, if you were able to

20  determine from historical information that the Boy Scout

21  resided in Delaware and he alleges that he was abused at a

22  camp in Maryland, that would show up as an inconsistency in

23  Table 3, correct?

24  A    Yes, that's true.

25  Q    Thank you.

1          THE COURT:  Thank you.

2          Any other counsel with cross?

3          MR. TAYLOR:  Yes, Your Honor.  Joel Taylor with

4 Kagen Caspersen & Bogart on behalf of Slater Slater &

5 Schulman.

6          THE COURT:  Mr. Taylor?

7                    CROSS-EXAMINATION

8 BY MR. TAYLOR:

9 Q     Mr. Hinton, can you turn to Table 2, please.

10 A     Yes.

11 Q     Here, you performed an analysis of claims filed by the

12 columns that are listed on the left-hand column; is that

13 correct?

14 A     Yes.

15 Q     And have you performed -- are there claims that have

16 been filed by firms, other than those that are in the left-

17 hand column?

18 A     Yes.

19 Q     And did you perform an analysis of this kind with

20 respect to the claims filed by those firms?

21 A     I think we computed these metrics for all claims in the

22 database.  We just haven't reported them here because --

23 Q     Because why?

24 A     Because this analysis was motivated by looking for

25 lawyers who signed the highest volume of individual claims.

1  Q    Okay.  And so, let me just -- we'll look at the right-

2  hand column there and there are conclusions there that as to

3  the claims filed by those that you identified in the left-

4  hand column, 65 percent are missing some element of

5  information; is that correct?

6  A    Yes.

7  Q    And do you present anywhere in your analysis, the

8  percentage of the claims filed by other law firms that are

9  missing this information?

10 A    In my second declaration, what I do to make a

11 comparison is compare claims that were filed and signed by

12 attorneys versus those that were signed by claimants, but I

13 do that --

14 Q    I understand that.  That's not my question, right.

15     My question is, did you perform an analysis of the

16 frequency with which there was information missing from

17 claims that are filed by law firms, other than those that are

18 listed in the left-hand column?

19 A    I have done that analysis, it's just not recorded here

20 for the reason that I described.

21 Q    Right.  So, it may well be, and we don't know because

22 you haven't submitted the information, that those claims that

23 were submitted by firms other than those in the left-hand

24 column, in fact, report a higher frequency of missing

25 information; isn't that correct?

1  A     Well, no, in fact, they have a lower frequency of

2  missing information, because I have done that work and I have

3  looked at that question, and I don't --

4  Q     But you don't report that in our --

5  A     It wouldn't be wise to do that.

6  Q     You don't have that in your report, do you, Mr. Hinton?

7  A     It's not included in the report because I think 65

8  percent speaks for itself; that's a pretty high number.

9  Q     But for all we know, the other firms may have an 85

10 percent missing information rate; isn't that correct?

11 A     Well, I think you have access to the Omni data, as

12 well, so I certainly hope you don't know that, because that

13 would be wrong, in fact, (indiscernible) what we think is

14 true.

15 Q     Am I correct that you have chosen not to share with the

16 Court, the results of your analysis as to the rate of

17 incomplete information contained in claims filed by firms,

18 other than those in the left-hand side; isn't that correct?

19 A     It's true that those additional numbers for the other

20 firms is not reported here.

21 Q     Okay.  Now, can we please turn to Table 3.

22       The same is true of Table 3, isn't it, Mr. Hinton?

23 Isn't it the case that you have chosen not to report to the

24 Court the frequency with which there is so-called

25 inconsistent information in claims that are filed by law

1  firms, other than those in the left-hand column.

2  A    Well, I just want to -- I don't really agree with the

3  phrasing of the question, because you have articulated that

4  it's something that I've chosen to do.

5       I was charged with a particular scope of work, with

6  regard to this declaration, which was very narrow and related

7  to identifying, as narrowly as possible, which of the law

8  firms that show with the indicators I've developed, unusual

9  frequency of claimant characteristics that warrant further

10 inquiry or raise questions.

11 Q    Well --

12 A    Yeah, I could have added more law firms, but I was

13 asked to just for focus on those law firms that had attorneys

14 who filed the most claims and that was the starting point and

15 so, it was my mandate.  It doesn't like I chose not to give

16 you information that would be useful to the Court.  I was

17 narrowly focused in my inquiry for this particular

18 declaration.

19 Q    Okay.  So, you report that 78.4 percent of the claims

20 filed by the firms in the left-hand column had inconsistent

21 information of some sort, correct?

22 A    That's correct, yes.

23 Q    And you have been mandated to not share with us the

24 rate of inconsistencies that may appear in claims filed by

25 law firms other than those in the left-hand column; isn't

1  that correct?

2  A    I think that's really a mischaracterization of how I

3  was given my mandate.  And I've already told you that

4  actually the rates are actually relatively lower for the

5  other firms and the *pro ses* in general.

6  Q    But you have chosen, or you have been mandated not to

7  share that information with the Court, correct?

8  A    As I said, I was asked to start by looking at the

9  lawyers who signed the most claims and that was the starting

10  point for my analysis.  We then looked at all the claims that

11  were filed by those law firms.

12  Q    Okay.  But based on the information that you have

13  chosen or mandated to share with us, we and the Court, have

14  no way of knowing whether or not those claims filed by those

15  listed, the firms listed in the left-hand column are any more

16  or less likely to have missing elements of information or

17  inconsistent information than those claims filed by firms

18  that are not on that list; isn't that true?

19  A    No, absolutely not.

20       Everybody, all the experts, all the parties have access

21  to the same Omni data.  This declaration was filed almost a

22  month ago.  All the parties have claims analysis experts who

23  are able to access these data and look at them.  So, I can

24  only infer that you have looked at this and you've seen that

25  the numbers aren't actually supportive, and you're not -- you

1  haven't decided to reference that or cross me on that.

2  Q    Okay.  But let me just repeat my question, which is

3  based on the information that you have chosen to give to the

4  Court or that you have been mandated to the Court, there is

5  no way for us to know whether or not the rate of

6  inconsistency or rate of missing information is any higher or

7  lower for the firms listed in the left-hand column than it is

8  for those that you have chosen not to present information

9  for; isn't that correct?

10  A    I disagree with your characterization that there's no

11  way that you can find that information; that's just not true.

12  Q    That was not my question.  My question was, based on

13  the information that you chose or were mandate to furnish,

14  there is no way to know; isn't that correct?

15  A    Well, yes, I guess if you're just referring to the work

16  I've done.

17      My understanding is that all the parties have experts

18  who are doing work and can answer whatever questions they

19  have about the claims data.

20  Q    Okay.  Thank you.

21      Another set of questions related to Tables 2 and 3.  Am

22  I correct that as to both Tables 2 and 3, the analysis that

23  you have performed relates to all claims that were filed by

24  the firms in the left-hand columns and not just those claims

25  that were signed by attorneys?

1  A    Yes, in columns 2 and 3, they include all the claims

2  that were filed as of the date that we downloaded the data

3  from Omni, which was January 4th for the purposes of this

4  table --

5  Q    And so, Tables 2 and 3 contained in your declaration

6  tell us nothing about whether or not the claims that were

7  signed by attorneys are any more or less likely to contain

8  missing information or inconsistent information than those

9  claims that were signed by claimants themselves; isn't that

10 correct?

11 A    I did that analysis in my second declaration.

12 Q    Right.  I'm asking you about your first declaration.

13 The information contained in Tables 2 and 3 tell us nothing

14 about the rate at which there are inconsistencies or missing

15 information contained in those claims that are filed by

16 attorneys, as opposed to those claims filed by someone, other

17 than an attorney; isn't that correct?

18 A    Yeah, these two tables report those numbers together,

19 so you're seeing the average.

20 Q    Right.  So, when you see, for example, in Table 2 that

21 65 percent of the claims are missing information, we don't

22 know if that means 80 percent of the claims filed by non-

23 attorneys are missing that information and only 20 percent of

24 the claims filed by attorneys are missing that information,

25 we don't know, right?

1  A    Well, not by looking at that table, but you can find

2  that answer by looking at my second declaration.

3  Q    Okay.  So, just finalizing on your first declaration,

4  the information contained in there doesn't really give us any

5  insight into whether those claims filed by attorneys are any

6  more or less reliable than those filed by non-attorneys,

7  correct?

8            UNIDENTIFIED:  Your Honor, we would like to offer

9  the second declaration.  He's opened the door for us to offer

10  the second declaration.  We would like to offer it.

11            THE COURT:  I don't think he's opened the door for

12  the second declaration.  I don't know who's speaking.  I

13  don't think counsel did.

14            Overruled.

15  BY MR. TAYLOR:

16  Q    So, can you please answer the question, Mr. Hinton.

17  A    I'm sorry, you had just wanted me to confirm that

18  Tables 2 and 3 don't look at the question of the frequency of

19  missing information or attorney-filed claims versus claimant-

20  filed claims.

21       Yes, that's correct, I don't address that question in

22  the first declaration.

23  Q    Right.  So, it could well be that the attorney-signed

24  claims are more reliable in that they contain fewer

25  inconsistencies and less missing information than those

1  claims that are filed by claimants; isn't that correct?

2  A    Well, no, that's not true.  The opposite is true.

3  Q    Well, that's not contained in your declaration,

4  correct?  You did not do that analysis.

5  A    That's right.  Not in the first declaration, that's

6  correct.

7         MR. TAYLOR:  Okay.  Your Honor, I would like to

8  reserve the opportunity to cross-examine Mr. Hinton with

9  respect to his second declaration if it is moved into

10 evidence, otherwise, I have no other questions for him.

11         THE COURT:  Yes, that's reserved.  It has not been

12 moved into evidence yet.

13         Any other cross-examination?

14         MR. GOODMAN:  Your Honor, this is Eric Goodman.

15         Can you hear me?

16         THE COURT:  Yes, Mr. Goodman?

17         MR. GOODMAN:  Thank you.  I just have four

18 questions for the witness.

19                    CROSS-EXAMINATION

20 BY MR. GOODMAN:

21 Q    And, again, Eric Goodman, counsel for the Coalition for

22 Abused Scouts for Justice.

23         Are you aware that 47 -- sorry, let's try that again --

24 are you aware that 40.7 percent of the claims filed by the

25 law firm Jeff Anderson & Associates, were attorney-signed?

1   A     (No verbal response.)

2            THE COURT:  Okay.  I've lost volume.

3            THE WITNESS:  Oh, I'm sorry, I think I put myself

4   on mute.

5            I don't recall exactly what the fraction was for

6   that particular law firm, I'm sorry.

7   BY MR. GOODMAN:

8   Q     Okay.  But you would agree with me that that law firm

9   does not appear in any of your tables?

10  A     Any of the tables in the first declaration, that's

11  right.

12  Q     Okay.  Another question.

13        Are you aware that the law firm Hurley McKenna & Mertz

14  filed other 4,000 proofs of claim in these cases?

15  A     Again, I looked at -- I summarized all the claims by

16  law firm, but I don't recall -- I don't remember all the

17  numbers for every law firm, so I apologize.

18  Q     Okay.  You would agree with me that the law firm Hurley

19  McKenna & Mertz does not appear in any of the tables in your

20  first declaration?

21  A     That's true.

22            MR. GOODMAN:  No further questions.

23            THE COURT:  Thank you.

24            Any other questions?

25        (No verbal response)

1          THE COURT:  Okay.  Redirect.

2                    REDIRECT EXAMINATION

3  BY MR. ELIAS:

4  Q    Mr. Hinton, I just have one or two questions for you.

5          Do you recall earlier you were asked about the

6  designation of claimants as to whether they participated in

7  Boy Scouts, Cub Scouts, or Explorer Scouts, do you recall

8  that line of questioning?

9  A    Yes.

10 Q    And do you know on the claim forms whether claimants

11 are asked to provide that information in a free-form text box

12 or whether they're asked to check the box for the appropriate

13 scouting organization?

14 A    I believe they have the opportunity to provide the

15 information both ways, but that's my recollection.

16 Q    And do you recall seeing checkboxes with the scouting

17 organization names on them?

18 A    Yes, I recall seeing them.

19 Q    So, if a claimant was checking the box for the Boy

20 Scouts, in your analysis, you would assume they were a Boy

21 Scout and not a Cub Scout, given the choice they made when

22 they filled out the form.

23          Do I understand that correctly?

24 A    Yes.

25               MR. ELIAS:  I have nothing further, Your Honor.

1          THE COURT:  Okay.  Thank you.

2          Mr. Hinton, thank you for your testimony.  You're

3   excused.

4          THE WITNESS:  Thank you.

5      (Witness excused)

6          MR. SCHIAVONI:  Your Honor, I think we can go to

7   argument now with the --

8          THE COURT:  Let me ask before we do that if any of

9   the objectors have any evidence that they're going to be

10  presenting?

11      (No verbal response)

12         THE COURT:  Okay.  I hear no one.

13         Argument, Mr. Schiavoni.

14         MR. SCHIAVONI:  Thank you, Your Honor.

15         Rule 9011 applies to proofs of claim.  It embeds

16  in it the proof of claim, the oath that's there to affirm the

17  contents of the proof of claim.  It's an essential part of

18  the, in essence, statutory scheme here for 502.  That 502 may

19  create a presumption of validity if the questions posed in a

20  proof of claim go through all the elements, but if it does,

21  the protections built into the statute include the

22  verification of the contents of the proof of claim.  It's an

23  essential element of that statutory scheme.

24         The cases that have looked at 9011 make that

25  really clear.  And, Your Honor, you know, there's always one

1  or two cases in every case that, you know, every motion you

2  want to sort of like to refer the Court to, but In re Obasi,

3  which is a Southern District of New York case, Westlaw

4  6336153 is one of those cases.  It's a case that talks about

5  the 9011 requirement, the context of proofs of claim, and,

6  you know, critically it says in compliance with 9011 is

7  particularly important for proofs of claim because a properly

8  filed proof of claim may constitute *prima facie* evidence of

9  validity.  And because of that, it's essential that the Court

10 know that there's integrity in the proof of claim process

11 itself.  It's a key protection.

12        We cite in our moving papers, the cases that apply

13 the 9011 requirement and talk about what has to do done and

14 why it's important.  We cite in Obasi itself, it makes

15 crystal clear that that's an obligation that when a lawyer

16 signs, right, that when a lawyer signs a proof of claim, that

17 that's a nondelegable obligation, that the person signing,

18 who's giving the oath, has to verify that the oath is correct

19 and has to do it in the context of the actual proof of claim.

20        The other point we make in our brief in citing

21 cases, In re Rivera, 342 B.R. 435, is that you may not, you

22 cannot comply with 9011 by attaching pre-signed signature

23 pages.  This is not the first case where this has happened.

24 Other bankruptcy courts have looked at this and said, you

25 cannot do this.

1          And the reason is sort of clear that if you're

2  pre-signing signature pages and giving them to someone else

3  to attach, you're not complying with the fundamental elements

4  of 9011 which require that you personally vet the contents of

5  the proof of claim.  In re Rivera talks specifically about

6  that, and that decisions we cite some other cases that talk

7  about other instances in the bankruptcy context where people

8  have tried to, basically, either pre-print signature pages or

9  give signature pages to other people.

10          THE COURT:  Let me ask you a question --

11          MR. SCHIAVONI:  Yes?

12          THE COURT:  -- let me ask you a question on

13  Rivera, because I spent a lot of time in Judge Lane's opinion

14  in Obasi, which was in the context of a sanctions motion.

15          What's the context of Rivera?

16          MR. SCHIAVONI:  Rivera deals with certifications

17  of -- it's a certification of compliance.  I forget exactly

18  with what, but it's something that has to be signed.  It's

19  the same context of a lawyer signing.

20          And in this particular case, the signatures have

21  been -- it's like they were pre-done, the certifications, and

22  given to others to attach.

23          THE COURT:  Okay.  Because Judge Lane does not

24  disallow the proofs of claim because of the attorney's

25  impropriety in Obasi, right?

1    MR. SCHIAVONI:  Your Honor, the procedural context

2 of that case was a little complicated.  There was an issue

3 about the trustee being involved and whatnot, as I recall,

4 but definitely, in Obasi, the Court definitely held that you

5 cannot delegate the signing of the proof of claim.  It was --

6    THE COURT:  Yes.

7    MR. SCHIAVONI:  It was a sanctions case.

8    THE COURT:  Uh-huh.

9    MR. SCHIAVONI:  I don't think the exact issue of

10 the proof of claim is even before the Court, and the Court

11 ended up dealing with the sanctions issue in the context of

12 sanctions.  But I don't think the Court ruled anything about

13 the propriety of the proof of claim without the signature

14 attached, without the appropriate signature.

15    THE COURT:  Well, he did note that the defect had

16 been, that the firm had taken steps to remedy the defect and

17 had amended the proof of claim to include the electronic

18 signature of the attorney who actually did the review, as

19 opposed to the attorney who had signed the proof of claim.

20    So, clearly, Obasi is right on point on what your

21 obligations are, with respect to a proof of claim and how to

22 sign it.  So, I do want to hear in your presentation what it

23 is that you want to do with the -- I want to hear the

24 purpose, I want to hear the purpose of the discovery you want

25 from the law firms.

1          MR. SCHIAVONI:  All right.  Your Honor, here's the

2    thing here.  This is not -- we're not asking here to

3    disallow.  This is not a disallowance motion.  We're not

4    seeking that as a remedy now to disallow the claims.  We're

5    also not seeking sanctions in connection with this motion.

6    That's not what the motion is.

7          The motion is -- you know, at the very beginning,

8    I sort of introduced these two motions as sort of the two

9    ends of the pipe --

10          THE COURT:  Uh-huh.

11          MR. SCHIAVONI:  -- you know, one being the kinds

12    of claims that were coming out and the other, the process

13    that generated the claims.  And just one minute of background

14    before I can get into, like, you know, the purpose, but it's

15    like getting the notion of how the claims were prepared, the

16    process of the claims.  502 builds into that some assurance

17    of reliability of the process.

18          And one of the elements of that is having the

19    claims vetted and having someone personally attest to the

20    claim.  There was at least, at a minimum, a sufficient

21    concern in Obasi about the situation that some remedy was

22    done after the fact.

23          Here, it's like where the evidence takes us from

24    here and, critically, the testimony we put forward who

25    reviewed the actual signatures on the proofs of claim, they

1  don't just show that signatures were pre-signed and given to

2  others.  They show, critically, further, that the signatures

3  were given to third parties.  They were given to claims

4  aggregators, for-profit shops that do this work, and that the

5  role of interviewing the claimant and vetting the claimant

6  was delegated not to one's associate, but to these claims

7  aggregator firms.

8         All of the exhibits that are cited, all of the

9  factual assertions cited in our brief about those claims

10  aggregator firms, they've all come in now uncontested.

11  They're all attached to exhibits from Mr. Kirschenbaum's

12  declaration and Sergi's (phonetic) declaration, and they all

13  show, not just a failure of lawyers not just that the

14  signature pages have been passed to others, but they have

15  been passed to third parties who aren't even lawyers.

16         And, further, it's like we have also put in

17  evidence of indications that the claims are bought and sold.

18  Among that evidence, Your Honor, is a tweet from Mr. Kosnoff

19  himself after this motion was filed, which talks about

20  inventories of claimants being bought and sold.  He talks

21  about them being acquired from, quote, TV advertisers.  This

22  is direct reference and there was nobody better placed to

23  know how this was done than the man behind it, the man who

24  founded the Coalition.  And that concern goes to how -- goes

25  to the process, the process by which these proofs of claim

1  were generated and whether or not they were really vetted.

2          The discovery we've asked for, the purpose of it

3  isn't really to sanction people, per se, or at least,

4  initially, to disallow the claims, but the purpose of it is

5  to identify the breadth and scope to which the claim, like

6  the actual claim process was delegated out to non-lawyers,

7  third parties, in violation of 9011, so that we all, in

8  connection with Obasi, can make an evaluation about the

9  integrity of the proofs of claim as a general matter, the

10  extent to which this was done, and, frankly, to confirm, to

11  be confirmatory about exactly how many it was done in

12  connection with it.

13          The evidence that we've offered, it gets us enough

14  of the way along to show that this sort of thing was done.

15  We walked through in our brief four different examples of

16  collections of these mass-signed declarations that are all

17  supported by the uncontested declaration that's now in

18  evidence of the gentleman that reviewed the actual signature

19  pages, the metadata embedded in those signature pages, and

20  the verification sheets attached to them that show that

21  signature pages were generated and attached to proofs of

22  claim before the proofs of claim, like the signature page

23  was -- one of the examples that's on page -- this shows up in

24  our moving brief on page 10 through 12, is an example that

25  was called out that specifically walked through in the

1  declarations, where signatures were generated before the
2  proofs of claim were created and essentially attached after
3  the fact.

4         And then the same sets of these proofs of claim,
5  gets a trace through the metadata and the other electronic
6  data associated with them to the third-party claims
7  aggregators who were the ones who were actually submitting
8  the proofs of claim.

9         This is a failure in the process.  In is exactly
10 what those 9011 cases talk about that the process was
11 supposed to have lawyers vetting the claims and that's all
12 indications that that's absolutely not what happened here.
13 But we're not asking -- again, we're not asking for sanctions
14 on this right now.  We're not asking for anything else,
15 except we're asking for some very targeted discovery directed
16 at establishing the full extent to which this happened, so we
17 can focus on those groups of claims for further question and
18 study.

19        And, again, talking about the overall process that
20 Hartford and Century have tried to come forward here with to
21 be constructive, to give some sense of where there are issues
22 with these proofs of claim.  This is one of them.  This is an
23 effort.  We didn't jump the gun.  We didn't move for
24 sanctions.  We didn't try to take -- you know, we didn't rush
25 out and immediately file objections on these.  We'd like a

1  better understanding of the breadth to which this happened.

2           And, Your Honor, just to bring you back to when we

3  all faced -- you know, remember what happened.  The TCC here,

4  which has the fiduciary duty to all the claimants, they

5  signed off on, and a bar date order was entered that required

6  the claimants to actually sign and to use real signatures.

7           It was the Coalition that came in and asked that

8  that be changed.  We had argument on that, and Your Honor

9  decided to grant that motion.

10          But, importantly, I think some of the concerns

11 that we raised then about what might happen, you know, I

12 think Your Honor took some of those things to heart.  And the

13 Court, in connection with that, if you remember, you know,

14 you recognized the risk created by permitting lawyers to sign

15 the proofs of claim, the Court noted, quote, that it was ill-

16 advised for lawyers to sign proofs of claim -- this was at

17 the October 14th, 2020, hearing; it's pages 190 to 12 --

18 lines 12 through 17 -- it's on the docket as 1520.

19          And, you know, obviously the Court is free to --

20 I'm not quoting Your Honor back as if you're authority to

21 yourself; that's not the point.  I want to make a different

22 point here, and that point is, really, that the claimants,

23 the plaintiffs' lawyers here were completely forewarned not

24 to do this.

25          The Court went on to tell them at that hearing on

1  October 14 that it was, quote -- that the Court would be,

2  quote, concerned, closed quote, if, quote, a thousand claims

3  are signed by a particular lawyer.  And Your Honor went on to

4  add that an attorney signing a claim, quote, might have to

5  give a -- to become a fact witness and may be subject to

6  deposition.  That's on page 183, line 9 through 22, of that

7  October 14 deposition.

8          And despite this, this is exactly happened.  This

9  is exactly happened.  And the reason is, if you look at these

10 firms, many of them are fairly small.  It's almost

11 implausible that they could have generated this volume of

12 claims on their own.  It's like, we've submitted to you, and

13 it's in the exhibits that are attached to these declarations,

14 that have quoted in the fact section of the moving brief,

15 from these aggregator firms that, you know, the sections

16 where they talk about in their own marketing that, we will

17 take care of everything for you.  We will run the process.

18 We will submit the claim.  We will speak to the people.  And

19 there's every reason to believe, based on what we've

20 submitted, that that's exactly what happened here and that,

21 in many ways, is how this mass-tort process has changed.

22          You heard someone in the prior argument this

23 morning talk about the three prior cases they have worked on.

24 They were Takata and two other cases that had nothing to do

25 with sexual abuse.  We put in the fact section that it's

1  clear that many of the lawyers that came in to the, you know,

2  and are now part of the Coalition, and, critically, not all

3  of them, to be clear, but many of them were firms that have

4  no connection with sexual abuse cases, have no history in it

5  at all.  That their history, their commonality is that

6  they're filing proofs of claim in one after the other mass-

7  tort bankruptcy.  The only commonality of it is they're mass-

8  tort bankruptcies.  The claims are all being generated out of

9  this, this central, like, these central, you know, claims

10  aggregators.

11         The point here is that without the protections of

12  9011, there's not the same assurance that the claims are

13  valid.  Just like in Obasi, the Court said, look, once they

14  got hold of the facts on that, and, again, it's not -- that

15  case is not really one where they took at issue directly the

16  proof of claim.  They were dealing with the sanction motion.

17  But the Court looked at that and said, Yes, and there was

18  some mention of, yes, it was the follow-up on that.

19         That's what we're, like, what we're trying to do

20  is just that.  This process of you know -- it's like you've

21  seen the evidence in the examples in the moving brief.  It's

22  uncontested.  The targets here of this motion very easily

23  could have put in one-paragraph declarations saying, yes,

24  just like the gentleman did on cross with Mr. Hinton that,

25  like, yes, we thoroughly reviewed these in the months prior

1  to the filing and then we filed them.

2          That's not what they did.  To be clear, that's not

3  what they did.  There's not an affidavit from a single one of

4  them here that in any way contests any of the evidence that

5  is now uncontested in the record which points entirely in a

6  different direction, where when you get into the metadata,

7  you have signature pages coming in and being submitted

8  seconds after each other in series and machines on file that

9  could only be done, the only plausible explanation for this

10 is that it's being done out of an aggregator, submitting

11 large numbers of claims all at once.

12          That's not a good process.  That's not a process

13 that 9011 has in mind.  That's a process that generates

14 claims that are not of the same quality.  That's a process

15 that generates suspect claims.

16          And, yes, you can cross Mr. Hinton about, you

17 know, maybe this or that is driving the high number of

18 disparities, but the disparity on these, on the Coalition

19 claims is very, very significant and there's significant

20 oddities among those claims, including just -- I mean, some

21 of them are almost hard with a straight face, to explain.

22          You know, in example four in our brief for the

23 Paul Napoli firm, and, by the way, the whole thing about,

24 like, mentioning some complaint about mentioning the father

25 instead of the son, it's not in this motion.  If it was a

1  typo in the other brief, apologies to the Napoli family.  I'm

2  completely unaware of that, but it's not in this motion,

3  because we pointed out that Paul Napoli, he allegedly signed

4  over 500 proofs of claim in the days leading up to the bar

5  date.  Four hundred of those proofs of claim were essentially

6  blank, blank with just a similar symbol at the bottom of it.

7  This is not a sign of a normal process.  There is something

8  wrong.

9          We pointed Your Honor also in the brief, and it's

10 uncontested to the Junelle (phonetic) firm, which actually

11 publicly published that they, the firm, was going to, quote,

12 have their proofs of claim completed and filed without the

13 claimants, even getting back to them, that they created like

14 a negative opt-out, that if you wrote them, unless you wrote

15 them, they would finish your form and file it.

16          This is not a reliable process.  It's a process

17 that causes great -- it's a suspect process.  It's in

18 violation of 9011, to start with, and it's entirely

19 legitimate for us to say that the evidence we've offered is

20 enough to say, please give us, you know, a few depositions of

21 these folks.

22          If Your Honor, you know, thinks 15 is too large a

23 number, so be it.  You could cut it in half.  You could just

24 pick the ones who have the most numbers of claims.  But

25 getting a handle on, and a sense before the Court of how the

1   claims were actually prepared, it goes right to the -- like,

2   can you rely on the integrity of this process.

3           And that's really a key issue here, how these

4   claims were prepared.  All of those examples are uncontested.

5   We attach, again, you know, four of the different --

6   (indiscernible) embedded in the proofs of claim, you know,

7   the verification stuff, information showing that they come in

8   from (indiscernible) Consumer Attorney Marketing, a firm

9   called Archer, a case called case management.  Actually, they

10  tout that they take over your management of your claims.

11          This is wrong.  It's a classic reason for Rule

12  2004 discovery, and we cite In re Subpoena Duces Tecum as a

13  2004 case where the Court actually talked about how the

14  process on which the proofs of claim were being prepared was

15  a legitimate form of question for 2004.

16          Here, I'd be the first to tell you, Your Honor,

17  this is sort of a unique process.  This is unique.  I will

18  tell you that.

19          The shadowy role that these claims aggregators

20  have played has not been one that's really been inquired

21  about.  Everyone thought the plaintiffs' firms just made, you

22  know, ran some ads and they, themselves, did the interviews.

23  The notion that this whole process is one that third-party

24  investors, working together with claimants, is running is one

25  that only raises concern about this process, because, look,

1  like, we (indiscernible) one of these firms, one of the

2  funders for this is a Wall Street hedge fund which is known

3  for, you know, distressed investing.

4         You know, I have clients that do -- that are

5  distressed-investing hedge funds.  We all know that they're

6  very, very aggressive, and they know how this process works.

7  Fill out 15 questions, file the form, it's presumptively

8  approved, everything is confidential about it, we're going to

9  make it incredibly hard to attack it.

10         And by the way, it's like Your Honor has seen the

11  retention agreements in connection with the 2019s.  I thought

12  it was important that you saw those and saw how the

13  retentions were set up.  I'm not going to disclose what the

14  fee percentages there were.  I don't have to, because in the

15  UCCs filed by the funders, they tout the fact that they're

16  taking -- in the UCCs, they're in evidence, but, you know,

17  uncontested, as part of this brief -- that they're going to

18  take 40 percent of the claim.  When you add on top of that

19  the coalition's rates, you know, the charges of the

20  Coalition, half the money goes out the door to the people who

21  have generated the claims and own the claims.  It's a process

22  that is problematic.

23         But at the end of the day, the thing that is most

24  convincing here is -- Mr. Stamoulis, could you bring up Mr.

25  Kosnoff's tweet for a second.

1           MR. STAMOULIS:  Your Honor, I'm going to share my

2   screen.  This is Stam Stamoulis.

3           THE COURT:  Okay.

4           MR. SCHIAVONI:  I (indiscernible) before Your

5   Honor --

6           MR. STAMOULIS:  Go ahead.

7           MR. SCHIAVONI:  The screen-sharing is disabled in

8   my -- as my participant's view -- okay.  Well, there we go.

9   I was going to make a joke about how I'm no more

10  sophisticated than Your Honor in using the screen-sharing,

11  but I guess I proved it even better.

12          But the tweet that we're relying upon or that we

13  offer, it's like, I got it, it's a tweet, but it tells it

14  all, because, you know, Mr. Kosnoff talks in there about

15  inventories of claims being bought from TV advertisers.  He

16  talks about how the lawyers handling those claims, he talks

17  about them in derogatory terms, and it's probably unfair, but

18  the gist of it is that they're just moving from one of these

19  cases to another, but they're not professional at handling

20  sexual abuse cases.

21          And I have no doubt that there are lawyers on this

22  phone -- we heard one earlier -- who has spent his career on

23  this sort of work and, if anything, it's people like that

24  gentleman who are, and their clients, who are the ones who

25  are potentially victimized by this, because bringing in this

1  sort of mass numbers of claims, if we're not able to inquire

2  about them and look into it, you know, it does hurt the

3  claimant.  It hurts those claimants with meritorious claims.

4          The integrity of the process is important.  And

5  I've got it.  It's like, you know, Greeks bearing gifts,

6  hearing it coming from me, but it's true, nonetheless, it's a

7  true fact about this, that having the unreliability of the

8  proofs of claim is a real problem.

9          So, Your Honor, I'd ask you, respectfully, to give

10 this some serious thought.  I continue to think that these

11 two motions are, to some extent, the most important motions

12 you'll hear on the case, because if we're just simply, our

13 hands are tied behind our back and, you know, we're

14 blindfolded and our ears are stuffed and we're just told, you

15 know, here's 95,000 claims that were done through an

16 aggregator, mass-tort process system, and no matter what it

17 is, you have to take them all and let the tort claimants

18 generate the values, it's like it becomes an impossibility to

19 deal with the situation.  It becomes one that can only be

20 resolved fundamentally by the Circuit, and it's like one that

21 will just buy tremendous amounts of litigation.

22          Letting us have some ability to, like, get into

23 this -- and this is not, you know, to be clear, like the

24 folks that we have asked for this discovery from, cut the

25 number in half if you think, focus on some of the ones that

1  we offered the most compelling evidence in that group, but

2  these are people at the end of the day that, respectfully,

3  you warned in very clear terms that if you sign, you may be

4  deposed.  And the case law supports that.  We offered those

5  cases, and it makes clear that if you sign, you know -- and

6  that's not something -- like, to honest I've had a couple of

7  clients call me at the last minute and tell me to sign and,

8  you know, I don't like to turn away business, but, you know,

9  I said, I'm not going to do it.

10          I did it once when it was just a bond, you know,

11  it was like I was just attaching a bond, but to submit, you

12  know, after the Court has told you to submit 2,000 claims in

13  your own name or to submit hundreds and hundreds on a given

14  day when the Court has warned you that if you do that, you

15  may be deposed, all notions of proportionality and prejudice,

16  I think genuinely go out the window.  It's like these folks

17  happen to have an obligation to step forward, and in a

18  deposition, they'd be asked, basically, the fundamental

19  questions of, is that really true what you heard before?

20  Were you really vetting these over the last three weeks?  Or,

21  you know, is what's in the metadata the story, that, in fact,

22  you signed this, sent your signature page to Verus, and Verus

23  handled the whole process, just like they tout in their

24  advertisements.

25          And that's something that we don't have,

1  necessarily, the metadata from all of the claims, so we can't

2  build this out, but getting into this process a little bit,

3  we could isolate the broader group here.

4         And, by the way, there's one other element to it.

5  You know, there was a key part of the proof of claim where

6  there was an issue about should we have verifications for the

7  claimant signatures, all right.  And most of the claimant

8  signatures here are electronic; they're not handwritten.  And

9  of the electronic ones, some had verifications, but many

10  don't, because that ended up being something that wasn't

11  required.

12         But the indication that they were using the

13  aggregators and what we have already, it looks like the

14  signatures, many of them were attached by the aggregators and

15  not separately by the claimants.

16         But we need discovery.  We need the ability to get

17  a little discovery on this to really kind of confirm that,

18  and make an issue about, and see whether there's an issue

19  about how many that happened to.  And, again, that's not just

20  important to us, that's important to the claimants at the end

21  of the day, those with meritorious claims.

22         And, yes, you know, the TCC has not opposed this.

23  There are -- by no means is Mr. Stang in any way working with

24  us or Mr. Stang like insurers or anything like that.  I'll be

25  the first to show up at Mr. Stang, you know, valedictorian to

1  give him that, like, he is against insurers and whatnot.

2         But the bottom line is, I think, and, you know,

3  they have not opposed this, because it's not -- it's

4  discovery that isn't anti-claimant; it's discovery that could

5  be beneficial to the claimants with meritorious claims.

6         Thank you, Your Honor.  Sorry I got a little

7  passionate about it.

8         THE COURT:  Okay.  Thank you.

9         It's 4:20 and I need to take the hearing in my

10 other matter, so we're going to do that.  We're going to

11 adjourn until 5:00 and then I'm going to hear the response,

12 the objectors' arguments.  We're not getting to the Rule 2019

13 today.  That's just not going to happen, but I want to close

14 the argument on this particular motion.

15         So, we're adjourned until -- we're in recess until

16 five o'clock.

17     (Recess taken at 4:17 p.m.)

18     (Proceedings resumed at 5:08 p.m.)

19         THE COURT:  Thank you, this is Judge Silverstein.

20         We're back on the record in Boy Scouts.

21         Mr. Schiavoni has finished his argument.

22         Is there any other party in support who wants to

23 speak before I go to the objectors?

24         MR. RUGGERI:  Your Honor, James Ruggeri for

25 Hartford, very briefly, just to make a couple of points, Your

1  Honor.

2           We join in full in Mr. Schiavoni's comments this

3  afternoon.  His motion is well-supported by evidence, and

4  we'd just note, again, that the Coalition or the objectors, I

5  should say, could have offered competing evidence.  They

6  didn't.  The objectors could have cross-examined Mr. Speckin

7  this afternoon about his declaration and all of the

8  irregularities that he found with regard to the signatures on

9  the proof of claim forms.  He didn't.

10          On cross-examination of Mr. Hinton, the only

11  witness they chose to cross, all it really showed is that his

12  claim count would have someone who lived in one state and

13  camped in an adjacent state and those instances, no doubt,

14  are few and far between, but more importantly, that point

15  doesn't do anything to undermine the credibility of his work

16  in this case.  I mean, again, this afternoon, the objectors

17  are going to be left not with evidence, but with argument of

18  counsel.

19          These motions, this motion, as the other one, in

20  our view, they're about integrity and they're important, Your

21  Honor.  And thank you for your time today.

22          THE COURT:  Thank you.

23          Okay.  Let's hear from the objectors.

24          MR. GOODMAN:  Good afternoon, Your Honor.

25          Eric Goodman, Brown Rudnick, counsel for the

1  Coalition of Abused Scouts for Justice.

2             Just two matters before I get into argument on the

3  2004 motion, themselves, or the 2004 motion, directed at

4  attorneys.  The first is we did have some discussions

5  regarding an order, a lineup, if you will, in terms of who

6  wants to talk and when.  I will note, and if the Court will

7  agree with this, we would certainly appreciate it, although,

8  the Court is obviously free to call on anyone she wants and

9  at any time.

10            But after I am done speaking, I would like to turn

11  the virtual podium over to Mr. Robbins, who represents

12  Andrews Thornton and ASK.  And then following Mr. Robbins

13  would be Mr. Taylor, who represents Slater Slater & Schulman.

14  Following Mr. Taylor would be Mr. David Wilks, who represents

15  Mr. Kosnoff, and following Mr. Wilks would be Mr. Hogan, who

16  represents the Eisenberg firm.  There may be others who want

17  to speak after Mr. Hogan, but those are the initial lineup,

18  if you will.

19            The second matter before I get into argument, a

20  matter was brought to my attention at lunch that I wanted to

21  address.  Apparently, the insurers made a representation that

22  there were some 80,000 claims filed in this case that are

23  deficient because the victims did not allege an affiliation

24  with scouting.

25            Apparently, that is factually not true.  There are

1  claims where the survivors did not check the box in

2  Part 3(e)(a) of the claim form, indicating an affiliation

3  with scouting, but, instead, included a detailed narrative,

4  explaining their affiliation with scouting, instead.

5          Since the insurers evidently, have not reviewed

6  all of the claim forms, or at least the vast majority of the

7  claim forms submitted by survivors, they kept asserting that

8  some 80,000 claimants have no affiliation with scouting.

9  Again, we believe that that is factually not true, and I was,

10  specifically, asked to bring that to the Court's attention

11  before beginning argument.

12          So, with those two points --

13          THE COURT:  Okay.  I will -- your lineup is fine,

14  and I would ask everyone to please check your phones.  I'm

15  getting some feedback.  Make sure you're muted.

16          MR. GOODMAN:  Okay.  Thank you, Your Honor.

17          So, there are three key points this time that I

18  would like to make in response to Century and Hartford's Rule

19  2004 motion, seeking discovery on attorneys, Your Honor.  The

20  first is, this is not about the survivors, nor is it about

21  their claims; this is about the law firms.

22          And I thought that Century and Hartford's reply

23  brief was very clear on this point.  According to Century and

24  Hartford, the discovery they're seeking from the law firms

25  is, and I quote, not material, or material, not because the

1  Plaintiffs' lawyers may have knowledge of the underlying

2  abuse, but to determine whether they conducted any pre-filing

3  investigation.

4          I agree with the insurers' own characterization of

5  their motion.  The Plaintiffs' lawyers have no personal

6  knowledge of the underlying abuse.  When they signed the

7  claim forms, they did not travel back in time and witness

8  abuse that occurred decades ago.

9          The attorneys are not fact witnesses, as to the

10 allegations contained in the proofs of claim.  Seeking

11 discovery from the law firms is not about the survivors.

12 This is about the insurers' ongoing war against law firms

13 that seek to help tort victims and it goes beyond this case.

14         The insurers are seeking discovery and aid of a

15 sanctions motion, which itself is improper, but more

16 importantly, it's not about the survivors or their claims,

17 and, therefore, it's not about the debtors' liabilities,

18 which takes this out of Bankruptcy Rule 2004 entirely.

19         Bankruptcy Rule 2004 has never been used for this

20 purpose.  In the history of bankruptcy, no court has ever

21 granted a Rule 2004 motion like this one.  The Obasi case,

22 which was discussed --

23         THE COURT:  I'm sorry, in the history of

24 bankruptcy, no court has ever granted a Rule 2004 motion like

25 this one?

1          I don't know whether they have or they haven't,

2    but let me ask you a question --

3          MR. GOODMAN:  We haven't located anything close to

4    it, Your Honor.  Obasi involved a Rule 11 motion and

5    Subpoena Duces Tecum involved a nationwide review of claims

6    by mortgage servicers conducted by the United States Trustee.

7          Again, we haven't found, and no case has been

8    cited, where anything like this has been done before.  And

9    the reason, I think, for that is it doesn't fall within the

10   scope of Rule 2004, which is --

11         THE COURT:  Okay.  So, what would be the remedy or

12   what would be the appropriate way to investigate process

13   issues?

14         MR. GOODMAN:  So, I think we would look at

15   Rule 9011, Your Honor, as that deals with the specific issue.

16   And I think the starting point would be that if a party

17   identifies a claim in this case that they believe has not

18   been asserted and doesn't, you know, contain appropriate

19   information, that they could send a letter; in fact, that's

20   what Rule 9011 requires before a party should come before the

21   Court on a motion for sanctions.

22         I think that the Bankruptcy Rules, themselves, set

23   in place a process by which these types of challenges can

24   occur and it's not about free-range discovery under Rule

25   2004, because, again, whether the attorney did his job or not

1   is not something that is related to the validity of the

2   claim, which is, again, what takes you out of Rule 2004

3   entirely.

4           The debtors, again, are not seeking this relief.

5   From our perspective, Century is seeking to use Rule 2004

6   here to further its own personal agenda, and that's not an

7   appropriate use of the bankruptcy statute.

8           Second point, Your Honor, there's no evidence of

9   fraud.  I'm going to say that again:  There's no evidence of

10  fraud.

11          Let's go through it.  One, attorney advertising

12  happened.  The debtors, themselves, engaged in a robust

13  nationwide noticing campaign.  That's not fraud.

14          A     lot of claims were filed on the eve of a bar

15  date.  That happens in every bankruptcy case.  That's not

16  fraud.

17          People used electronic signatures.  So did the

18  insurers on the pleadings they file in this case.  That's not

19  fraud.

20          Lawyers used photocopies of signatures.  I'm sure

21  The Center for Disease Control appreciates that.  That's not

22  fraud.

23          Duplicate claims were filed; in fact, Hartford

24  apparently filed duplicate claims in this case, and I will

25  say, probably not fraud.

1        Claims have deficiencies; again, not uncommon in

2    mass-tort bankruptcies.

3        If the Court wants to see a truly bare-boned proof

4    of claim, one that lacks almost any description or detail at

5    all, you should look at the claims filed by Hartford or

6    Century.  I still can't figure out how they have claims in

7    these cases, but not fraud.

8        Attorneys signed claim forms.  This is permitted

9    by the Bankruptcy Rules.  This was already litigated, not

10   fraud.

11       Abuse victims have criminal records.  Yes, they

12   do, because they were abused as children.  Also, not fraud.

13       Family members doubt that their sons or siblings

14   were abused.  That's actually fairly consistent with social

15   science and heartbreaking in many ways, but also not fraud.

16       People who have been named as abusers have denied

17   such accusations.  Also, not surprising, also does not prove

18   fraud on behalf of any of the attorneys.

19       There was a, quote, explosion of claims before the

20   bar date.  Yes, we know that.  Look at Purdue.  Look at PG&E.

21   Look at Takata.

22       Attorneys have litigation funding; again, not

23   fraud.

24       Your Honor, the insurers are employing a logical

25   fallacy, known as proof by assertion.  If they repeat a

1  statement enough times, regardless of contradiction or lack
2  of evidence, they're hoping that this Court and others will
3  believe that it is true.  It is called a logical fallacy for
4  a reason, Your Honor.  Simply shouting fraud over and over
5  again does not make it so.
6          Third point, Your Honor.  This motion has not been
7  filed for a proper purpose, and I feel obligated to say that
8  because I am not the attorney that's being personally
9  attacked here.
10          I did not sign any claim forms.  I did not
11  directly represent any abuse victims.  I am counsel for an ad
12  hoc group.  I did not counsel any survivors on how to
13  describe being raped as a teenager on a claim form, but many
14  attorneys who are under attack in this courtroom have.  They
15  have been on those calls.  They have heard the stories and
16  none of them seem remotely surprised by the number of abuse
17  claims filed in these cases.
18          Again, a national organization like the Boy
19  Scouts, decades of known abuse, thousands of known abusers.
20  I checked over the lunch break and the number of known
21  abusers, according to news articles is 7,819, and that's just
22  the ones that are known.  Are the insurers really shocked at
23  how many claims were filed?
24          These lawyers are being targeted, Your Honor.
25  First, I would submit that they're being targeted because

1  they're part of the Coalition.  The insurers understand the

2  collective votes that we represent and it's terrifying to

3  them and they need a way to attack the firms.

4          When Mr. Hinton testified, I asked him a few

5  questions.  I asked him about two law firms; first, Jeff

6  Anderson & Associates.  40.7 percent of the claims his firm

7  filed were attorney-signed.  The second firm was Hurley

8  McKenna & Mertz.  That firm filed 4,065 claims, putting them

9  in the top five overall.  Both firms are completely absent

10 from any of Mr. Hinton's charts.  Both firms represent

11 members of the TCC.

12         I'm not suggesting that Century is working with

13 the TCC.  I just wanted to be clear that this is a job that

14 is targeting firms that are part of the Coalition.

15         The second reason they're being targeted --

16 because they are on the front lines.  Yes.  They signed claim

17 forms for their clients because they believed it was the

18 right thing to do, and we should all wish for that kind of

19 courage and dedication.  If it means that one survivor of

20 sexual abuse gets compensated, it was worth it.

21         And the insurers have the audacity to come before

22 the Court and accuse lawyers of, quote, outright fraud and

23 Rule 11 violations.  Based on what?  Advertising?  Electronic

24 signatures?  Duplicate forms?  A surge in filings before the

25 bar date?

1          Your Honor, this has to stop.  Insurers should not

2    be allowed to threaten State Court counsel when there's no

3    evidence.  This is not how attorneys should be treated.  This

4    is not how anyone should be treated.  There are a number of

5    complex problems that must be solved for survivors to be

6    fairly compensated and for the Boy Scouts to survive.

7          We are trying to be constructive.  Every day I

8    wake up trying to solve the real problems in these cases.

9    Having to spend weeks responding to motions like these when

10   the parties are in mediation, does nothing to advance these

11   cases.  It is incredibly expensive.  When you look at the

12   agenda for today, it is driven entirely by Century and

13   Hartford.  I mean, consider how much time has been spent

14   dealing with their motions and objections.  This is all being

15   driven by insurers, not creditors, that won't even admit that

16   they have coverage obligations.

17         At some point, the gamesmanship needs to stop.

18   It's causing real harm.  Thank you, Your Honor.

19         THE COURT:  So, let me ask you, why did the

20   Coalition feel the need to file something, when they are not

21   the subject of the motion?

22         MR. GOODMAN:  That is a fair point, Your Honor.  I

23   believe that the attorneys that represent State Court counsel

24   are probably going to have a lot more to say on these

25   specific issues.  The reason why the Coalition filed an

1   objection is, one, because we thought that it was an improper

2   use of Bankruptcy Rule 2004 and, most importantly, we think

3   that it is serving as a massive distractions in these cases.

4   We do not want to see this kind of discovery go forward

5   because we are trying to find a constructive solution.

6           THE COURT:  I guess I understand that, but you

7   also make factual assertions or representations in your

8   filings, which I assume you have no knowledge of, so I was a

9   little surprised to see the filing.  This isn't directed at

10  you.  You don't represent these law firms.  You don't even

11  represent the underlying claimants.  But you're spending time

12  and effort on what you think is a distraction from your other

13  efforts.  That's why I ask.

14          You don't know.  You do not know what these law

15  firms did or did not do.  The Coalition don't, right?

16          MR. GOODMAN:  I will answer your question

17  directly, and you're correct.  I do not have any personal

18  knowledge.

19          THE COURT:  So, how can you tell me what they did

20  or did not do?

21          MR. GOODMAN:  I cannot.  I can simply look at the

22  data that the insurers have given to you, and to me, it's

23  meaningless.

24          THE COURT:  That's a different argument.  Okay.

25          MR. GOODMAN:  With that, I will cede the podium to

1   Mr. Robbins, Your Honor.

2            THE COURT:  Mr. Robbins?

3            MR. ROBBINS:  Thank you, Your Honor.  Again, this

4   is, for the record, this is Larry Robbins for two firms:

5   Andrews & Thornton and ASK, LLP.

6            I want to join in the arguments Mr. Goodman made

7   on behalf of the Coalition as a whole, but, Your Honor, with

8   respect to the two firms that I represent today, the 2004

9   discovery that's requested by the insurers is especially

10  unwarranted, and I say that for four reasons.

11           First, to our knowledge, Rule 2004 discovery has

12  never been used to take discovery from opposing counsel in

13  the very case, itself.  Now, the Court posed a question to my

14  co-counsel a moment ago:  Can you really say that in the

15  entire history of the Bankruptcy Code, there's never been

16  such a motion?

17           If there is, Your Honor, I can't find it, and more

18  importantly, neither have the insurers.  Now, they did tell

19  you on page 27 of their opening brief, they told you -- they

20  included the following sentence, quote, indeed, they said,

21  Rule 2004 has been used to obtain discovery from counsel.

22           With all respect, that truly misdirects the eye,

23  because what they didn't tell you is that in the only two

24  cases they've cited, the discovery was against lawyers from

25  closed cases, not from the opposing counsel in the two cases

1  before the Court.  In the _Gawker_ case, the first one they

2  cite, the only one they cite in text, that was a closed case

3  in which the debtor was taking discovery from a lawyer who

4  had represented a third-party funder; in other words, not --

5  it was Mr. Peter Thiel in the famous _Gawker_ case, who was

6  behind-the-scenes, funding the Plaintiffs' counsel and debtor

7  brought that 2004 motion to get discovery in a closed case.

8         The same is true in the second, and only the

9  second -- they only cite two cases.  It's true in the other

10  case, as well, which is cited in the so-called Bewitt

11  (phonetic) case, cited in Footnote 121 of their opening

12  motion.  In that instance, the discovery was taken from a

13  lawyer who was basically a business partner in the pre-

14  bankruptcy transactions conducted by the debtor.

15         So, to put it squarely, we are unaware of any

16  reported case in which 2004 discovery has been used as the

17  insurers propose to use it here, to take discovery from their

18  actual litigation opponents.  It's never happened and their

19  claim that there are two such instances, which they make at

20  page 27 of their brief is simply untrue.

21         Now, is there a case out there that nobody can

22  find?

23         Obviously, I can't swear to you, Your Honor, that

24  somebody couldn't come up with one, but everybody has had a

25  lot of good reasons to try to find it and nobody has given it

1   to you, and they've given you know good reason to be the

2   first judge to order it against a counsel in the very case

3   itself.

4           Point number two, they told you, Mr. -- counsel

5   for the insurers did, as Mr. Goodman explained in the last

6   sentence of their reply brief, and, actually, in the very

7   first sentence in Mr. Schiavoni's argument today, he made

8   clear that the purpose of the discovery they're seeking, the

9   purpose for this 2004 discovery is to support a potential

10  9011 claim for sanctions.  He said he's not actually seeking

11  sanctions right now, but he's looking for the predicate.  He

12  wants to know, as he put it, what went on, how were the

13  claims prepared, how we they vetted.

14          Under Rule 11, where the case law tells us, it's

15  supposed to be a benchmark for the application of Rule 9011,

16  as well, the advisory committee notes are emphatic.  They

17  state that the Court must, to the extent possible, limit the

18  scope of sanctions proceedings to the record, thus discovery

19  should be conducted only in extraordinary circumstances.

20          It is therefore not surprising that there is no

21  reported 2004 case that we've been able to find in which

22  discovery was permitted for the purpose of predicating these

23  sanctions motions.  We've never seen one.  The other side

24  doesn't cite one.

25          Now, they do cite cases.  To be clear, Your Honor,

1  they do cite cases in which 2004 has been used for discovery

2  into the *bona fides* of claims, but they cite not a single

3  case in which 2004 discovery was used to investigate the *bona*

4  *fides* of the lawyers, themselves.

5          We are aware of no such case and the advisory

6  committee notes to Rule 11 tell us that only in the most

7  extraordinary circumstance should it be granted, and we've

8  never seen one, and they've never cited one.  So, for that

9  second reason, this Court oughtn't to be the first to do so.

10          Now, if you were ever going to be the first to do

11  so, Your Honor, it ought to be in a case where there's

12  abundant good cause and that brings me to the third point.

13  At least with respect to the two firms I represent, there is

14  nothing remotely close to good cause.  The allegations don't

15  come close to meeting the Millennium standard that this Court

16  articulated.

17          Let's be clear about what the insurers say about

18  Andrews & Thornton and ASK, in particular.  I urge the Court

19  to look closely at Tables 2 and 3, and I don't want to

20  restate the points that I hope came clear in my cross-

21  examination of Mr. Hinton, because the data reflected in

22  Tables 2 and 3 to the Hinton declaration call to mind, Your

23  Honor, the adage usually attributed to Mark Twain, that,

24  "There are three kinds of lies:  lies, damned lies, and

25  statistics."

1          This is an example of the third kind of lie.

2    Let's start with Table 2.  Table 2 asked this Court to infer

3    that the proofs of claim filed by A&T and ASK were missing

4    all sorts of important information and, therefore, must have

5    been filed without proper vetting.  That, Your Honor, is an

6    utter canard.

7          Here's what Table 2 actually shows.  For, ASK, it

8    shows that of the 3613 proofs of claim listed, 99.9 percent

9    listed the date of the abuse, 99.1 percent listed the

10   location of the abuse, 99.9 percent listed the nature of the

11   abuse.

12         For A&T, of the 3104 proofs of claim listed, 96

13   percent listed the date, 96 listed the location, 99.9 listed

14   the nature of the abuse.

15         The balance Table 2 is equally misleading, I

16   suggest.  Take the category called "missing key claimant ID."

17   That certainly sounds ominous, but as the Court will recall

18   from my cross-examination of Mr. Hinton, it turns out that

19   all you have to do to get into that column, Your Honor, is to

20   omit the claimant's zip code.  And even under that rather

21   exacting standard, ASK and A&T filed quote, unquote, complete

22   proofs of claim 56 percent of the time.

23         How about the final category on Table 2, "missing

24   abuser's last name."  I asked Mr. Hinton about that and, you

25   know, in all fairness, I didn't expect him to profess any

1  expertise in this field, but I would suggest to Your Honor

2  that it is a scarcely surprising that survivors of BSA

3  predation can now only recall the first names of their

4  abusers.

5          Does that, does the failure after all this time,

6  to remember the last name of their scoutmaster, as well,

7  remotely suggest that these law firms, the two that I

8  represent, or for that matter, any of them, have somehow

9  failed to discharge their ethical duties?  Could that

10  possibly be a basis for being the first court, to our

11  knowledge, ever to permit 2004 discovery into the ethical

12  conduct of lawyers in the very case, itself?

13          How about Table 3?  Table 3 supposedly shows you

14  that a significant percentage of high-volume filers made

15  mistakes in the claims they filed.  Unfortunately, this is

16  yet another illustration of the Mark Twain principle at work.

17  For ASK, 99.9 percent of the claims were timely, 90 percent

18  weren't duplicates, 97 percent of the claimants lived in the

19  state of the alleged abuse.

20          For A&T, 87 percent were timely, 90 percent

21  weren't duplicates, 95 percent lived in the state where the

22  abuse took place.

23          But the insurers, like Inspector Javert, are bound

24  and determined to find some kind of impropriety.  For

25  example, they pounce on a category called "inconsistent

1   ages," but as the Court will recall from my cross-examination

2   of Mr. Hinton this afternoon, it turns out that when you look

3   at Footnote 13 of the Hinton declaration, inconsistent ages

4   could simply be when a 9-year-old abuse survivor checks off

5   "Boy Scout," instead of "Cub Scout" on the form.  And even

6   then, under that cherry-picked standard, ASK got the ages

7   right 81 percent of the time, while A&T got it right 61

8   percent of the time.

9           The notion that data this paltry could launch a

10  Rule 11, a Rule 2004 foray to rummage through opposing

11  counsel's files is absurd, I respectfully suggest.

12          So, what's left over to show good cause in this

13  case?  What else do they have?

14          Well, they say that some firms received funding

15  from a hedge fund on Wall Street, no less.  I'd suggest that

16  there are a fair number of big law firms that are represented

17  on today's call that gets funding from banks, too, for their

18  operations.  I'd suggest that some of them use marketers, as

19  well.  I would suggest that some of them use outside vendors

20  or use contract lawyers.

21          This isn't a specialty of Plaintiffs' law firms;

22  it's endemic to the entire profession.  There's nothing

23  unique or much less suspect as grounds for launching this

24  kind of rummaging through files.

25          They also say in their reply brief that in the six

1  weeks between the receipt of the financing and the bar date,

2  the two firms filed many more claims than they filed in the

3  six weeks before the financing.  But all that shows, Your

4  Honor, is a basic fact about human nature.  Busy people tend

5  to finish things close to the due date.  If anything, this

6  completely anodyne fact suggests only that the two firms I

7  represent continue to vet claims up through the bar date and

8  only then made the filing.

9          And I want to actually return to a question you

10 posed to my co-counsel.  You asked, well, gosh, if this isn't

11 the right way to do it.  If this isn't an appropriate use of

12 2004, what actually is the right way to investigate claims

13 that the process was abused or that lawyers have failed to

14 discharge their ethical duties?

15         And there was an answer to that.  It's an answer

16 prescribed by the rule itself.  Rule 9011 and Rule 11 tells

17 us what the process should look like, and it tells us in the

18 advisory notes that only in extraordinary circumstances shall

19 that process, shall the existing record be supplemented by

20 the launching of discovery.  This is not even remotely such

21 an extraordinary case.

22         Finally, the only other piece of so-called good

23 cause evidence that they have as to my two firms are that the

24 firms signed numerous claims on a given day.  Again, that's

25 just beside the point.  The question is not when did these

1   claims get signed?  The question is, did they get vetted?

2           And the fact that they may have been signed on a

3   given day, as the due date, the bar date was fast

4   approaching, sheds absolutely no useful light on when the

5   claims were vetted for their sufficiency and the lawyers'

6   ethical obligations under 9011.  It's completely without

7   probative force, much less the compelling probative force it

8   would have to have to allow, to permit this kind of rummaging

9   through opposing counsel's files.

10          In any event, and this is the last substantive

11  point I want to make before just quickly addressing three or

12  four quick things that Mr. Schiavoni said in his argument,

13  even if there were good cause, even if this weren't an

14  untethered use of Rule 2004, even if it were permissible to

15  rummage through opposing counsel's files in a way that, to my

16  knowledge, is unprecedented in reported cases, even if all of

17  that were true, it would be premature to do it now.

18          Mediation is ongoing, as other counsel had pointed

19  out, and if mediation fails, it's quite likely that the

20  plaintiffs will launch an --

21          Somebody's on the phone.

22          THE COURT:  Somebody has another conversation

23  going.  Please check your phones.

24          MR. ROBBINS:  Thank you, Your Honor.

25          THE COURT:  Mr. Robbins?

1          MR. ROBBINS:  Thank you, Your Honor.

2          And if mediation fails, there's a likelihood that

3  the plaintiffs will seek a 502(c) adversary estimation

4  proceeding.  As this Court pointed out in Millennium, once

5  that happens, 2004 relief is no longer available.

6          Now, in our brief, Your Honor, we explained the

7  large swaths of this requested discovery is burdensome and

8  would infringe on privileges and work product, but because it

9  is so plainly -- Rule 2004 is so plainly unwarranted, as a

10 matter of law, I don't think there's any occasion for this

11 Court to wade into the particulars of the discovery requests

12 because they're simply not entitled to it.

13         I'm going to close with four quick points about

14 things that Mr. Schiavoni said that need correction.  He

15 pointed Your Honor to a series of tweets from Mr. Kosnoff and

16 he said in his argument -- I wrote this down -- quote, it

17 tells it all, end quote.

18         And point of fact, it tells us nothing, because

19 the tweets of one individual lawyer cannot be admitted for

20 the truth of the matter asserted against the other lawyers

21 involved in this case under Rule 801(b)(2).  It simply -- if

22 a party admission is admitted, as this Court well knows, only

23 against the party itself, not against everyone else.  So, it

24 tells us literally nothing about the conduct and *bona fides*

25 of anybody else.

1      Second, Mr. Schiavoni said that 40 percent of the

2 total funding is going to the funders.  That is untrue.  As

3 even a glance at the relevant documents will reveal, it is

4 simply not true.

5      A    third point, and, actually, I'm going to

6 close with this, Mr. Schiavoni, at some point, said to the

7 Court, in substance, look, if you don't want to give us

8 everything we want, give us half.  Give us 7 out of 15 or 8

9 out of 15.

10      I say this with all respect to opposing counsel,

11 when you are seeking the extraordinary remedy of asking to

12 look through the processes and files kept by your opposing

13 counsel, that is not a moment for such cavalier argument.

14 What Mr. Schiavoni is asking this Court to do is not only

15 unprecedented, to our knowledge; it is deadly serious.  It is

16 not a joking matter to rummage through opposing counsel's

17 files, and it is not an occasion for saying, well, gosh, if

18 you don't give us 15, give us 7 or 8.

19      No.  The right answer, Your Honor, is to stick to

20 the plain text of Rule 2004, the advisory committee notes to

21 Rule 11, and not to undercut the nature of the adversary

22 system, itself, along with its attendant privileges and work

23 product protections, and allow a motion, whose evident

24 purpose is to disable that adversary process from finally

25 uncovering the truth.

1          And with that, Your Honor, I yield the floor and

2   thank the Court for its time.

3          THE COURT:  Thank you, Mr. Robbins.

4          Let me ask you a question, and I don't know if

5   this applies to your two firms -- I don't recall -- to the

6   two firms you represent.  Part of the request is to have Rule

7   2004 discovery into Verus Claims Services, Consumer Attorney

8   Marketing Group, Archer Systems, and Stratus Legal.

9          As I said, I don't know if the two firms you

10  represent have a relationship with those entities or not, but

11  I would like your thoughts -- if they are -- I would like

12  your thought with respect to that particular aspect of the

13  request.

14         MR. ROBBINS:  Well, I may not be the right person

15  to answer it, because to my knowledge, we have no such

16  relationship --

17         THE COURT:  Okay.

18         MR. ROBBINS:  -- but since I have the privilege of

19  the lectern for just a moment, I will say that if we had some

20  relationship, which I believe we don't, it would be no more

21  relevant to the question before the Court.

22         Whether a particular law firm uses outside vendors

23  to assist in the marketing process or the advertising process

24  is, it seems to me, a matter of utter irrelevance.  If every

25  law firm representing the insurers in this case -- and let me

1  say, I'm rarely in a case where -- I'm not a mass-tort

2  lawyer.  I'm not a personal injury lawyer.  I don't pretend

3  to know the ins and outs of that profession.  I spend most of

4  my time dealing with law firms that are today, in front of

5  you, representing insurance companies.

6           And I can tell you this, there's not a one of them

7  that doesn't use outside vendors, that doesn't use marketers,

8  that doesn't make some kind of advertising, and the

9  suggestion that somehow these law firms, on behalf of

10 individual claimants and survivors are doing something that

11 is unique or endemic only to the Plaintiffs' side of the

12 caption is a canard.

13          But the short answer to your question is, as far

14 as I know, we have no involvement with those particular

15 entities.

16          THE COURT:  Thank you.

17          MR. ROBBINS:  Thank you, Your Honor.

18          MR. SCHIAVONI:  Your Honor, if I may, their

19 involvement is set out on page 13 of our brief.  There's

20 specifically, the signature pages were sent to Verus.  It's

21 in paragraph 18 of Mr. Speckin's declaration, which is in

22 evidence.

23          THE COURT:  Okay.  Let me hear from Mr. Taylor.

24          MR. TAYLOR:  Good afternoon, Your Honor.

25          Can you hear me okay?  I'm on speakerphone.  I can

1   put you on --

2            THE COURT:  Yes.

3            MR. TAYLOR:  So, I will try to be brief, because I

4   think Mr. Goodman has done a very good job of explaining many

5   of these issues already.

6            I'm counsel to Slater Slater & Schulman and speak

7   only to address whether or not good cause has been shown with

8   respect to that firm, to serve discovery on that firm.

9            There are only three allegations made by insurers

10  with respect to the Slater firm; one, which I think has

11  already been generally addressed, both by Mr. Mr. Goodman and

12  Mr. Robbins, is that there are two attorneys at the Slater

13  firm who signed claim forms, more than 200 claim forms, and,

14  secondly, which was addressed by Mr. Robbins, is that the

15  Slater firm was also a party to this lending agreement that

16  provided litigation financing.  And I think the proper

17  explanations of those two things have already been provided

18  and I won't repeat that.

19           The third factor that the insurers point to is the

20  information contained in the Hinton declaration, which I

21  cross-examined him about, that there are certain claims that

22  were filed that were either incomplete or contained other

23  characteristics that Mr. Hinton suggested may sort of reflect

24  on the reliability of those claims.

25           And that, to me, is really the meat of what it is

1  that is being argued.  The rest of these, you know, sort of

2  accusations of impropriety are sort of atmospheric or window

3  dressing, whether or not the claims that are filed have any

4  kind of demonstrable infirmity in a manner that other claims

5  don't.

6          And that was the purpose of my cross-examination

7  of Mr. Hinton that the two principle sources of information

8  that he's providing is Table 2 and Table 3 of his opening

9  declaration is, you know, in Table 2 where he reaches a

10 conclusion that 65 percent of the claims filed by the firms

11 that are listed have some element of information that's

12 missing, but he doesn't furnish you, doesn't furnish the

13 Court, doesn't furnish us any information as to sort of a

14 control group, right.  He doesn't look at the other firms to

15 figure out the percentage of those claims filed by those

16 firms that have any missing information.

17         So, when he says that 65 percent are missing

18 information it may well be that the claims filed by other

19 firms have 80 percent of those claims are missing information

20 and, in fact, the firms that he is targeting, that the

21 insurers are targeting, have more complete claims than others

22 and they elected not to furnish the Court with that

23 information.

24         The same is true of Table 3, where there is

25 information that they say is -- and I don't know what the

1  purpose of this is -- they call them "indicators of

2  characteristics," which is meaningless to me, but I assume

3  that these categories that they identified are in some manner

4  that they think they reflect a lack of *prima facie* validity

5  of the claims.  And, again, there's no comparison of the

6  claims that are submitted by the firms that they're targeting

7  for discovery to those for claims that are filed by firms if

8  they're not the subject of discovery.  There's no control

9  group, right.

10         So, they say that 78 percent of the claims as a

11  group, 78 percent of the claims have, you know, the

12  inconsistent information or one of these other

13  characteristics, but it may well be that the claims by firms

14  that are not the target of this discovery is of a much higher

15  percentage, right.  It may well be that this group, in fact,

16  has more reliable claims being filed.  So, that's one point.

17         The second point is that none of this information

18  is distinguishing between claims that are filed by attorneys

19  and claims that are being filed by the claimants.  So, these

20  are just aggregate numbers.  So, in the case of Slater, which

21  filed 15,497 claims, there's a conclusion that 74.5 percent

22  of them -- this is in Table 3 -- has one of these

23  characteristics, but we don't know whether or not those

24  characteristics are more prevalent in attorney-signed claims

25  or non attorney-signed claims.  It could very well be that

1  the attorney-signed claims are less likely to have these

2  characteristics than are the non attorney-signed claims.  It

3  may be that the attorney-signed claims, to the extent that

4  these are indicators of the prospective validity of the

5  claims, it may well be that the claims being filed by the

6  attorneys have greater indication of validity.  And we don't

7  know, because they elected not to provide that information to

8  the Court.

9         And, in fact, Mr. Hinton did file a supplemental

10  declaration addressing that issue, trying to identify as to

11  each firm, the probability that a claim is going to missing

12  information or other characteristics that those that are

13  attorney-signed and those that are not attorney-signed, and

14  they chose not to move that into evidence for reasons I don't

15  understand.

16         I do, I certainly do with respect to Slater,

17  because what it shows is, in fact, that it is the percentage

18  of the claims that are being filed by the attorneys are less

19  likely to have these characteristics than those claims that

20  are filed by the -- that are not filed by the attorneys,

21  right.

22         And you can look at this in the supplemental

23  declaration of Mr. Hinton, right.  There are one, two, three,

24  four -- four characteristics --

25         MR. SCHIAVONI:  Your Honor, I'm going to object.

1          To the extent counsel wants to talk about the

2   supplemental declaration, we would like to offer it into

3   evidence.  We're not hiding from it.  We would like it in

4   evidence.

5          So, please, he's opened the door.  We'd ask that

6   it be admitted into evidence or he stop trying to sort of

7   cherry-pick things from it and cite them, you know,

8   improperly.  But we would like it in evidence.

9          THE COURT:  Let's have argument about what's in

10  evidence.

11         MR. TAYLOR:  I would -- I think had they moved it

12  into evidence when Mr. Hinton was available for deposition, I

13  think he'd have a better basis, but they chose not to do so

14  at that point.

15         THE COURT:  Yes, you're correct.  It's not in

16  evidence, so I'm not going to consider it.

17         MR. TAYLOR:  So, am I not to speak to it?

18         THE COURT:  It's not in evidence.

19         MR. TAYLOR:  Well, I will represent to you, if you

20  look at the factors that they say, there's incomplete

21  information or that the information somehow has other

22  characteristics with respect to --

23         MR. SCHIAVONI:  Objection.

24         MR. TAYLOR:  -- with respect to the Slater firm --

25         I hear your objection and I'll speak, and the

1  judge can decide if she wants to hear it or not.

2          With respect to the Slater firm, it is more likely

3  that a claim that's not filed by an attorney has these

4  characteristics than a claim that is filed by a Slater

5  attorney.  And as to those where there is statistical

6  significance, as found by Mr. Hinton, there is not a single

7  one of these characteristics that is more likely to appear in

8  an attorney-signed claim.

9          Those two that have some statistical significance,

10 according to Mr. Hinton, as to both of those, the attorney-

11 signed claims are less likely to have those characteristics

12 than the non attorney-signed claims, right.

13         It is a complete contradiction of the insurers'

14 thesis that somehow these attorney-signed claims are less

15 reliable or some indicator of fraud; in fact, by their very

16 own roster of characteristics, the attorney-signed claims are

17 more likely to be reliable.

18         The only exception to that is what they refer to

19 as incomplete, and incomplete, there are more incomplete

20 attorney-signed claims than there are non attorney-signed

21 claims, which makes a lot of sense for the reasons that

22 Mr. Robbins talked about, is that these are being signed

23 shortly before the bar date, before they have all the

24 information.

25         And if you look at -- and this is the same

1 exercise that Mr. Robbins went through -- if you look -- and

2 this is back to Mr. Hinton's original declaration, right --

3 if you're not interested in hearing anything about the

4 supplemental declaration, because they chose not to move it

5 into evidence -- this is going back to his original

6 declaration, right.

7        MR. SCHIAVONI:  We'd like it in evidence.

8        THE COURT:  Go ahead.

9        MR. TAYLOR:  So, this is something that is

10 certainly in evidence, right, and if you look at the numbers

11 here, it is very similar to what was the case of ASK and of

12 Andrews & Thornton, that the vast, vast majority of these

13 claims contain all of the information, the vast of it.  The

14 only exception to that is the category of "missing abuser

15 last name."  There's 8,668 of those, right.

16        If you remove that, just that one category, only

17 11 percent of the claims that are filed by Slater Slater &

18 Schulman, are missing any information, right.  And for the

19 reasons Mr. Robbins and others have talked about, it is

20 unsurprising that somebody now doesn't remember the name of

21 the scout leader that molested them when they were a child.

22        So, what it comes down to is the entire basis on

23 which the insurers are seeking discovery from the Slater firm

24 is an inflated number of supposedly incomplete claim forms

25 based on the fact that they don't have last names, right.

1  That's the extent of it.

2          Every other indicator that they have of whether or

3  not a claim form is complete or has other characteristics is

4  demonstrable that the attorney, by their own evidence, if the

5  attorney-signed claim forms have fewer of those

6  characteristics.

7          So, that's what I have to say about that.  I think

8  the Mark Twain quote is an appropriate one.  If you actually

9  look at the numbers, you'll see that a case has not been made

10 that the attorney-signed claim forms are in any way less

11 reliable than non attorney-signed claim forms.

12         THE COURT:  Okay.  So, your point is on this

13 Table 2, if I'm understanding it right, is that if you look

14 at these claim forms included information almost all the time

15 of when the abuse occurred, where the abuse occurred, and

16 what abuse occurred?

17         MR. TAYLOR:  Yes.  For example, if there are

18 15,492 claims are filed, only 33 of which were missing

19 information about when the abuse occurred, only 50 of which

20 were missing information about where the abuse occurred, and

21 only 89 of which were missing information about what abuse

22 occurred.  That's pretty extraordinary, right.

23         So, they are trying to inflate the number of

24 supposedly incomplete claim forms by including these two

25 categories.  And Mr. Robbins also talked about missing abuser

1  last name and missing key claimant information, and it's

2  particularly that "missing abuser last name" category, which

3  in the case of Slater, it's 8,668 that don't have a last

4  name, but that certainly shouldn't be a basis, in and of

5  itself, as Mr. Robbins said, to rummage through the files of

6  your adversary law firm, right, because it's natural that

7  many of these claimants aren't going to know the last name of

8  the people who abused them, right.  These are 5-year-old

9  children who were abused by a scout leader who, you know, 20

10 years later, can't remember the scout leader's last name, if

11 they ever knew it.

12           THE COURT:  Okay.  Well, not now, but, Mr.

13 Schiavoni, when it's your turn, you can tell me why it is

14 that the missing abuser last name column doesn't dominate how

15 this chart comes out.

16           Okay.  Anything further, Mr. Taylor?

17           MR. TAYLOR:  No, Your Honor.

18           THE COURT:  Thank you.

19           Mr. Wilks?

20           MR. WILKS:  Thank you, Your Honor, and good

21 evening, everyone.  And I'll join everybody else in thanking

22 you for so much time today.  Your patience is truly

23 incredible.  But if it were earlier in the day, you know,

24 Your Honor, I would have a lot to say, but I know Your Honor

25 reads all the submissions, you know I've written a lot on

1  this motion, and I know what time it is.  So I'm going to be

2  just hitting some high points here.

3       I also don't probably need very much time because

4  it feels like the insurers have kind of gone full circle here

5  when it comes to my client, Tim Kosnoff.

6       The original motion that they filed was really

7  bare bones when it comes to Mr. Kosnoff.  They talked about

8  the email that we talked about last fall that he had written

9  about some folks in this case.  It should never have gotten

10  public anyway because that was a privileged communication,

11  but that we can kind of take that aside, it doesn't really

12  expose him to 2004 discovery.  Your Honor already held last

13  fall that it doesn't expose him to discovery on the issues

14  before the Court then and this one is really no different,

15  this was even more attenuated.

16       And then they cite the two statistical points

17  that, gosh, there's an awful lot of attorney-signed proofs of

18  claim and, gosh, there's an awful lot of him close to the bar

19  date.  Well, those two things go together, of course, because

20  the attorneys' signatures are required because this is -- you

21  know, we've heard it before today, this is a deadline that

22  had to be met and an attorney who would blow the deadline for

23  a client like this is an attorney with a problem, a much

24  bigger problem than facing a deposition in a 2004

25  examination, which is entirely extraordinary.

1        But the irony not lost on me, I don't know if

2   anybody else picked up on it, is that Mr. Schiavoni even

3   wants discovery from Mr. Kosnoff because the tweet that he's

4   kind of showing Your Honor and keeps talking about has

5   nothing whatever to do with Mr. Kosnoff's practices or

6   anybody that he's associated with.  It's -- Mr. Kosnoff is

7   only one man's view of what other nameless, faceless

8   attorneys might be doing in his view, it has nothing to do

9   whatever with --

10       THE COURT:  I don't know that I buy that.  I don't

11  know that I buy that when he's referring in a tweet to his

12  clients, he's talking about a case; I don't know that I

13  believe that the tweet means nothing.  I don't know what I do

14  with it, but I don't know that I believe that it's not in his

15  lawyer capacity and representing his clients when -- I don't

16  have it right in front of me, but I think that's what he

17  talks about.

18       MR. WILKS:  Oh, it's about this case.  Make no

19  mistake, Your Honor, it's about this case, but he's not

20  talking about, hey, guess what, I have a bunch of fraudulent

21  claims.  Guess what, I use hedge funds.  Guess what, I use

22  third party aggregators in marketing firms.  That wasn't

23  self-referential, he was -- those were his own views of what

24  other people, in his view, he suspects might be doing, which

25  sounds an awful lot like what Mr. Schiavoni is talking about.

1   They're both criticizing the same thing.

2           Our submissions are very clear.  We answered the

3   accusations that are set forth in the original motion papers.

4   There's no evidence now supporting or even submitted on any

5   of these new allegations that came in, you know, in the

6   reply, which I don't have to talk about now, I don't think,

7   because Your Honor isn't going to consider the Speckin

8   declaration or anything attached to that.

9           But the fact of the matter is, the record before

10  Your Honor is Mr. Kosnoff is probably the most experienced

11  child sex abuse advocate in the country, although hearing

12  from Carmen Durso today was enlightening too.  I mean, these

13  are two old warhorses in this practice area, no one else

14  holds a candle to either of them.

15          THE COURT:  Do I have any evidence -- do I have

16  any evidence at all about Mr. Kosnoff?  What evidence do I

17  have?

18          MR. WILKS:  Your Honor, first of all, we're not

19  obligated to put forth the evidence.  And it's interesting to

20  hear Mr. Schiavoni talk about that because he suggests we

21  should put in evidence, we should provide the evidence that

22  he is asking for in a 2004 exam.  In order to avoid a 2004

23  exam, we should put in the 2000 -- the information that he's

24  asking for.

25          THE COURT:  That's a different argument, that's a

1  different argument, but you told me I had evidence.  So I

2  want to know what evidence I have.  I don't think I have any

3  evidence in front of me about Mr. Kosnoff or his practice.  I

4  have representations from counsel, but I don't have any

5  evidence.

6          MR. WILKS:  You're right, Your Honor.  You have my

7  representation, that's exactly right, and I, as an officer of

8  the court, take that very seriously, as everyone else on this

9  call does.  But what you -- well, let's look at the flipside.

10 What evidence do you have that Mr. Kosnoff uses hedge funds?

11 None.  What evidence is there that Mr. Kosnoff uses any of

12 the three third party aggregators that Your Honor named?

13 None, not -- there's no evidence.

14         THE COURT:  Does he or doesn't he?

15         MR. WILKS:  He does not, Your Honor, and that's an

16 attorney representation.  He does not use those three -- he

17 doesn't use third party aggregators.

18         MR. SCHIAVONI:  Objection.  You can't -- that

19 statement can't be made consistent with the duty of candor,

20 it's just not true.

21         MR. WILKS:  It is true.

22         THE COURT:  Mr. Schiavoni, this is Mr. Wilks'

23 argument.

24         MR. WILKS:  Yes.

25         THE COURT:  Is it aggregator by another name or

1    what is it?  How did he sign so many claims?

2          MR. WILKS:  Well, first of all, as I said, he's a

3    warhorse.  He has been on the New York Times; he's been on

4    the Canadian version of 60 Minutes.  His name is out there

5    and has been for 25 years handling these kinds of cases.

6          He's also associated with other lawyers who have

7    proprietary software and proprietary methods.  I mean, a lot

8    of that is work product, Your Honor.  Nobody has really

9    talked about the work product doctrine today.  I mean, the

10   work product and privilege issues here are rampant.

11          But, you know, for Mr. Schiavoni to get upset and

12   suggest that Mr. -- there's any evidence that Mr. Kosnoff

13   uses those three organizations that Your Honor asked someone

14   else about, there is no evidence at all.  You know why?

15   Because he doesn't.  And he doesn't take hedge fund money.

16   There is absolutely no suggestion that each proof of claim

17   filed with the Kosnoff name on it had attorney consideration

18   involved in the process before they were signed, that's the

19   way it was done and there's not a shred of evidence to the

20   contrary.

21          It's not our burden to come forward and show the

22   insurance companies and everybody else exactly what our

23   methods are.  That's proprietary, it's work product.  In

24   order for that to be required they'd have to come up with

25   something other than plain, bald accusation, which is all

1 this is.  He wrote an email last fall criticizing folks who

2 are taking a different tack in this case, those arguments are

3 going to be hashed out someday in this case, I imagine.  That

4 has nothing whatever to do with what we're talking about

5 today.  He also has the two statistics that are in these

6 charts.  I'm not going to slice through them at all.

7 What's important is, how did he get to where he

8 got to?  Is there any evidence at all (inaudible) proofs of

9 claim that he -- that came through for his claimants, are any

10 of them fraudulent?  Was there ever -- is there any evidence

11 at all that there's no homework done behind it, that there's

12 no attorney work done behind it?  Absolutely none.  There are

13 trained professionals, there are trained nurses, there are

14 forensic nurses, there are professionals, there are lawyers,

15 there's a big team of people all behind each one of these

16 proofs of claim and we lay that out in our papers.

17 So I don't think it's my burden to come forward

18 with that evidence, it's not our burden to put forth a

19 declaration or an affidavit, which is exactly the ultimate

20 relief that the motion seeks.  It's not our obligation to

21 give them what they seek in order to beat the motion.  On the

22 flipside, there is absolutely nothing that suggests that any

23 of the Kosnoff proofs of claim are anything other than bona

24 fide claims that pass muster.

25 I don't have to address all the accusations in Mr.

1  Speckin's declaration of course.  If there's anything that

2  Your Honor is particularly, you know, worried about of the

3  three things that are in the original, I'm happy to discuss

4  them.  But the motion, Your Honor, is improper, it asks for

5  extraordinary, extraordinary relief.

6         In a regular case, if a defense lawyer hired by an

7  insurance company or anybody else suspects that a complaint

8  filed and signed, by the way, by an attorney is unworthy of

9  Rule 11, you don't -- the relief is not to depose that

10 lawyer.  The relief is to take discovery in the case and let

11 the case follow its course, unless there are other purposes

12 here behind the motion.  Is it an attempt to run out the

13 clock?  Is it an attempt to disturb the debtors' hoped-for

14 plan confirmation?  I don't know, but if that's the design,

15 this is probably a decent way to go about it because, if

16 we're going to go through discovery of lawyers, the

17 privilege, the work product, the scope questions, we're going

18 to be back in front of Your Honor quite a lot and I don't

19 think that's lost on the insurers.

20        So, unless Your Honor has any questions, I've

21 talked more than I intended to.  Thanks very much.

22        THE COURT:  Thank you.

23        Mr. Hogan?

24        MR. HOGAN:  Thank you, Your Honor.  Good

25 afternoon, Daniel Hogan of Hogan McDaniel on behalf of

1  Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C.

2           Your Honor, I don't stand to repeat most of what

3  you've heard today because you've heard a lot.  I would and

4  always like to focus on the big picture here, Your Honor, and

5  I really hope that the Court doesn't lose sight of the fact

6  that this case and where this case is, this 2004 discovery is

7  largely premature and specious, at best.  The Eisenberg firm

8  has been subject to discovery as a product of these motions,

9  Your Honor, I'm not sure you're aware of that, but we were

10 served with discovery requests, interrogatories, requests for

11 production and requests for admissions relative to these

12 motions and, as a product of that, we have answered some of

13 the questions that the insurance companies are looking for

14 from these other firms.  And I can tell you unequivocally

15 that Eisenberg has denied each of the allegations that were

16 brought forth in the requests for admissions and these

17 requests for admissions largely mirror the requests that

18 they're looking for in this 2004 motion.  And so it was a

19 little strange for us, honestly, to have to answer discovery

20 about relief that they were requesting in the motion that the

21 discovery was predicated upon.

22           Nevertheless, we responded to the requests for

23 admission, Your Honor, and we denied each of the allegations.

24 Allegations such as whether signatures were photocopied and

25 affixed to claim forms, whether we used -- whether we

1  submitted claim forms without the claim form having been

2  completed, whether AIS counsel did not individually

3  investigate the factual contentions in each claim form,

4  whether AIS counsel did not individually review each claim

5  form that bears the signature.

6         And so from our perspective, Your Honor, this

7  entire process is somewhat backwards, and it's our

8  perspective that this discovery is inappropriate,

9  particularly at this juncture.  The Eisenberg firm had a

10  significant vetting process that it undertook with regard to

11  each proof of claim that was filed.  In fact --

12         MR. SCHIAVONI:  Objection.  There's no evidence in

13  on this issue.

14         THE COURT:  It's argument.  Go ahead, Mr. Hogan.

15         MR. HOGAN:  Thank you, Your Honor.

16         In fact, there is -- there's a number of proofs of

17  claims, in excess of 1500 proofs of claims that have been

18  amended post bar date by the Eisenberg firm to in fact

19  replace the signatures of the individual lawyers who reviewed

20  those proofs of claim with the signatures of the claimant,

21  and I think that speaks to the nature of the vetting and also

22  to the nature of the bar date and the fact that these claims

23  were filed at the last moment largely because that's how

24  deadlines work, Your Honor.

25         With relation to the tweets, Your Honor, the

1  tweets really are a sideshow.  The tweets were made by Mr.

2  Kosnoff, the tweets weren't made by Abused in Scouting, they

3  weren't re-tweeted by Abused in Scouting, they weren't re-

4  tweeted by the Eisenberg law firm.  They are just merely a

5  sideshow; they're a predicate upon which the insurance

6  companies are seeking to have this Court inject itself into

7  these proofs of claims unnecessarily.

8           And so from our perspective, Your Honor, these

9  motions are inappropriate and should be denied.

10          Do you have any questions for me, Your Honor?

11          THE COURT:  Thank you.

12          Any other objectors?  I think that was the end of

13  the lineup, but I'd like to hear from anyone else.

14          MR. THOMAS:  Your Honor, this is John Thomas from

15  Houston, Texas, representing the Junell & Associates firm.

16          THE COURT:  Mr. Thomas.

17          MR. THOMAS:  Yes, Your Honor.  My apologies for

18  not being on camera today.  In Houston, we're largely without

19  power and all without water, so my apologies.  I will be

20  brief.

21          I want to respond specifically because Counsel

22  addressed Junell & Associates in its comments, and I got the

23  distinct impression that Counsel was trying to suggest that

24  there was some funny busy or fraud going on in the

25  communications with clients regarding opt-outs.  The

1  communication that Counsel was referring to is contained at

2  Exhibit 1 to the Kirschenbaum document contained in their

3  2004 motions.  That communication is one that was done by

4  email and text at the end of a lengthy process to evaluate

5  and file claims on behalf of numerous claimants in this case.

6  And I'll direct the Court's attention -- unfortunately, I

7  can't share my screen, Your Honor, but in that communication,

8  which was sent to clients, paragraph 1 states that "Our

9  firm," which is Junell & Associates, "has a signed contract

10 with you to participate in the BSA litigation and, as your

11 attorneys, we are obligated to act as fiduciaries on your

12 behalf in this matter."

13         It goes on to say that the power-of-contract form

14 with our firm that you signed is an obligation that we take

15 extremely seriously with respect to both professional

16 responsibility and the law, and we aim to make certain that

17 all of our BSA clients meet the November 16th deadline.

18         Your Honor, this communication was done three days

19 before the deadline to clients who had not signed their

20 forms, and it reflected the communication with regard to

21 putting the clients on notice that time was running out and

22 that we can complete the claim form with the information you

23 provided over the phone during your first consultation with

24 us about the litigation.  And we advised clients -- Junell &

25 Associates advised clients that, unless they told us not to,

1  we were going to go forward and do the job that we were

2  hired, which is to file a claim.

3           And, Your Honor, the claim form, which was a

4  process of negotiation and vetting with the Court, contained

5  a statement that "I have examined the information in the

6  Sexual Abuse Survivor proof of claim and have a reasonable

7  belief that the information is true and correct," and this

8  Court permitted attorneys to make that representation, if

9  needed, on behalf of its clients who it provided the

10 information that was used to fill out this 12-page, multi-

11 question claim form.

12          And, Your Honor, I was not at the October 14th

13 hearing, but I do recall Your Honor making a comment with

14 regard to why would I believe that the attorneys did not do

15 their job?  Your Honor, we did not put into the record the

16 specific discovery that was requested by the insurers in

17 response to this motion because there is nothing that they

18 have to suggest that my clients, Junell & Associates, didn't

19 discharge their duties and their ethical obligations to the

20 client and to this Court in filing the claim forms that

21 they've submitted to the Court.

22          And, Your Honor, I don't have the statistics handy

23 at this time and can sure provide them, but there are

24 numerous claim forms that have been submitted post bar date

25 with the clients' signatures.

 1          And so, Your Honor, we do object to the discovery

 2   for the reasons stated previously and for the reasons stated

 3   in my comments.  I simply wanted to address Counsel's

 4   comments because it suggested some kind of funny business or

 5   fraud in connection with these claims submitted by Junell &

 6   Associates.

 7          Thank you.

 8          THE COURT:  Very well.

 9          MR. SULLIVAN:  Your Honor, I think you said me,

10   but I didn't hear, is that right?

11          THE COURT:  I didn't hear anyone.  Who is

12   speaking?

13          MR. SULLIVAN:  Oh, I'm sorry, Bill Sullivan.

14          THE COURT:  Mr. Sullivan.

15          MR. SULLIVAN:  Your Honor, for the record, Bill

16   Sullivan on behalf of Mark Bern and Partners.

17          Your Honor, from our perspective, the focus on the

18   colloquy that Your Honor had last October is a discussion in

19   the abstract.  At best, it may have been a warning for

20   counsel not to substitute convenience for best practices, but

21   I don't read it to be an invitation to demand discovery if an

22   attorney signs a claim form, which is a permitted practice.

23   And I think we can leave that behind because now we also have

24   the benefit of hindsight.

25          The principal point I'd like to make, Your Honor,

1  is that the broad-brush approach here is not appropriate to

2  meet the for cause standard that applies to the Rule 2004

3  examination that they're requesting.  The insurers' requested

4  discovery doesn't go to all of the claims signed by

5  attorneys, it doesn't go to all of the attorneys who signed

6  claims, it appears and based on the Hinton testimony that

7  it's only directed at attorneys who signed claims at or near

8  the bar date.  And I think that shows that it's really the

9  spike of activity near the bar date that is the insurers'

10  concern, but I don't think that's an unexpected occurrence.

11  It may have been that because the bar date process was

12  extended in this case that people thought it would be

13  otherwise, but human nature is what it is and attorneys

14  respond to deadlines, and they also try to get their clients

15  to do the same.

16            Your Honor, the reality is is that a signature on

17  the proof of claim is the last act before it's filed.  And so

18  whether it's signed by an attorney or not or whether it was

19  filed two days before the bar date or two months before the

20  bar date, none of that is proof of a lack of vetting of the

21  proof of claim.  I think Mr. Robbins' questions of Mr. Hinton

22  brought that out.  And so the discovery that is being sought

23  on a broad basis from a large number of law firms isn't

24  really appropriately targeted and there isn't cause for Your

25  Honor to grant it.

1          Your Honor, I think the parties recognize that

2     Rule 11 applies to proofs of claim; I don't think any party

3     has disputed that.

4          Your Honor, with respect to attorney discovery, we

5     also pointed out that the Shelton rule applies and that, you

6     know, in order to get it, there are three standards that

7     should be met, and that is no other means exist to obtain it,

8     the information that's sought is relevant and not privileged,

9     and the information is crucial to the preparation of the

10    case.  I don't think that standard has been met either.

11         Your Honor, we referred to a Law Journal article

12    by Young and Hefter (ph) from 2014 in our response, but --

13    and I think it echoes your comments about the Obasi case --

14    and that is Rule 11 does -- Rule 9011 does apply to proofs of

15    claim, but the signing of a proof of claim by an attorney

16    does not and should not automatically turn the attorney into

17    a fact witness.

18         And, Your Honor, respectfully, the grounds to

19    obtain this discovery have not been met and we ask that Your

20    Honor overrule the motion.

21         THE COURT:  Thank you.

22         Is there anyone else?

23         MR. HARRIS:  Your Honor, Jim Harris with the James

24    Harris Law Firm.  Can you hear me okay?  Your Honor, can you

25    hear me?

1          THE COURT:  Yes, I can --

2          MR. HARRIS:  Okay.

3          THE COURT:  -- and go ahead.

4          MR. HARRIS:  All right.  Thank you, Your Honor.

5          The general points that have been made so far, I

6   won't go over those again, they've been made and I would join

7   in them.  I would just say, with respect to each individual

8   attorney that's been targeted here, I ask the Court to just

9   make sure that they've met their heavy burden with respect to

10  each attorney.  There's been a general tendency to try to

11  paint everyone with the same brush.  In the case of my law

12  firm, I don't believe that they've met their burden.  They've

13  not shown good cause.

14          It seems that their complaint is with the number

15  of claim forms that were signed by myself and I don't think

16  that's probative, it's just -- it's part of this innuendo

17  that there must be some sort of fraud going on.  And my

18  understanding is the rule allowed attorneys to sign, Your

19  Honor allowed attorneys to sign, and so the number of times

20  that a lawyer did what you said they could do and what the

21  rules say they could do can't be probative.  It's not

22  evidence of fraud; it's just evidence that they're following

23  the rules and they're following your order and doing what you

24  allowed them to do.

25          So I think they need to show something more

 1  because they start rummaging through clients' files and

 2  privileged materials and, in my case, I don't think they've

 3  met that burden.

 4          Thank you, Your Honor.

 5          THE COURT:  Thank you.

 6          MR. PICKENS:  Your Honor, this is Joe Pickens,

 7  Taft, Stettinius & Hollister on behalf of Babin Law.

 8          I'll be brief.  We agree with and we echo the

 9  arguments that were made by Mr. Goodman and Mr. Robbins and

10  the other objectors, I won't rehash those here, and we have

11  nothing more to add.  Thank you.

12          THE COURT:  Thank you.  Anyone else?

13      (No verbal response)

14          THE COURT:  Okay, I hear no one else.  Mr.

15  Schiavoni?

16          MR. BUSTAMANTE:  Your Honor, Brett Bustamante on

17  behalf of Napoli Law.

18          THE COURT:  Yes --

19          MR. BUSTAMANTE:  Can you hear me?

20          THE COURT:  -- Mr. Bustamante.

21          MR. BUSTAMANTE:  Again, we'd like to join in the

22  concerns of our colleagues.  We believe there's no good cause

23  for discovery, specifically from Napoli.  Just a couple of

24  points that I'll try and keep as brief as possible for Your

25  Honor.

1          First, there's been no attempt to meet and confer

2     specifically with me.  I appeared before this Court three

3     times and I'm counsel of record on every case.  So, you know,

4     the fact that they haven't met and conferred with me on the

5     motion kind of shows that it's more about harassing our law

6     firm than it is about actually solving issues in the

7     litigation.

8          And to that point, if they honestly believed there

9     were deficiencies of any kind, why not give us a list of some

10    kind?  Why not tell us what those deficiencies are?

11         Just first to very quickly deal with the

12    conspiracy theory.  Napoli has been lumped in with other law

13    firms.  Obviously, we don't think any of those law firms have

14    done anything wrong either.  But just very quickly, the

15    insurers have not established any evidence that we have any

16    connection to Tim Kosnoff, which we don't, there's no

17    evidence that we coordinated any of our filings or advertised

18    any with other members of the coalition.

19         They also make the claim that we used claim

20    aggregators to file cases and they pushed this point in their

21    reply.  They claimed that they have evidence that -- some

22    type of forensic evidence that we used claim aggregators to

23    actually file claims, and they cite to paragraph 18 and 19 of

24    the Speckin declaration.  If you look at that citation, that

25    simply doesn't refer to Napoli.  So the citation is a

1  misrepresentation on their part.  And, again, there's just no

2  outright fraud on behalf of Napoli.

3          As far as the one other argument I wanted to bring

4  to the Court's attention, they initially claimed in their

5  opening motion that we filed 1700 cases and a large amount of

6  them had no attorney signature and -- or had an attorney's

7  signature and were largely blank.  This was a direct and very

8  intentional misrepresentation.  It omitted the fact that

9  there were amendments made by Napoli.  Our opposition pointed

10 out that we only have 1300 cases, about 1300 cases, so we

11 can't possibly have 1700 cases on file, there has to be a

12 large amount of amendments there.

13         In their reply, the insurers capitulate to that to

14 some extent.  They claim that there's 93 amendments that we

15 did, we claim there are far more.  Just for Your Honor I

16 could represent that we mark 690 cases to be amended, we

17 believe that we've amended 391 of them and we have 299 left,

18 which we intend to do that and we are doing so through even

19 today.

20         Regardless, their capitulation shows that there's

21 essentially no fraud taking place by the Napoli firm.  If

22 we're able to amend the cases and they now bear an

23 attorney/client signature, regardless of their number or not,

24 there simply can't be fraud unless we've made up the names of

25 the claimants as well and their signatures as well, which I

1 think would be a very bold claim and I don't think the

2 insurers have made that claim.

3          And just to very quickly address -- if Your Honor

4 has any questions, I don't want to cut you off.  I'm sorry.

5          To address some of the other arguments, there was

6 an argument made about fonts, that certain claim forms have

7 different fonts on the signature page.  Just in dealing with

8 the clients myself, I know that sending out a proof of claim

9 and getting it back, they sometimes sign it independently of

10 us filling -- of completing it over the phone with them or

11 they may use a different software program when signing the

12 proof of claim.  So that certainly is no evidence of fraud in

13 itself.

14          There was a point made about sharing contingency

15 fees.  I think that largely got glossed over, but I can

16 assure you our law firm, but certainly any law firm that

17 works with contingency fees is not sharing those contingency

18 fees, it's an illegal practice.

19          And I echo the concerns brought up before about

20 evidence, you know, it's not our burden to show that we are

21 not part of some made-up fraud.

22          And then just finally, Mr. Schiavoni addressed the

23 issue of naming Joseph Napoli, our senior partner's father,

24 in their briefing.  He claims now that it's a typo, but in

25 their papers they again said Mr. Napoli also (indiscernible)

1    the insurers, they're accusing his father, Joseph Napoli, of

2    impropriety, but the insurers do not mention Joseph Napoli

3    anywhere in their brief.  So the accusation is hard to

4    understand.

5         Mr. Schiavoni's name is on the signature block of

6    that briefing.  So, technically, he's the only person who

7    signed it and violated Rule 9011 so far.

8         With that, if Your Honor has any questions?

9         THE COURT:  Thank you.

10         MR. BUSTAMANTE:  Thank you.

11         THE COURT:  Anyone else?

12         MS. LEVICK:  Hi, this is Stephanie Levick on

13    behalf of D. Miller and Associates.  I just want to echo and

14    join in all the arguments made by Mr. Goodman and our other

15    colleagues, which I won't repeat given that it's already

16    6:30.

17         I just wanted to add that we don't believe that

18    the insurers have demonstrated good cause to take discovery,

19    specifically from our client, D. Miller, and note only that

20    the insurers' papers make no specific allegations regarding

21    D. Miller beyond their argument that somehow the volume of

22    attorney-signed claim forms or forms submitted close to the

23    bar date are somehow inherently suspicious.

24         That's all I had.  Thank you.

25         THE COURT:  Thank you.

1          Anyone else?

2       (No verbal response)

3          THE COURT:  Mr. Schiavoni?

4          MR. SCHIAVONI:  The reason why, Your Honor, I feel

5   a little like Custer going to Little Big Horn by myself, but

6   sometimes, you know, just one man in the wilderness is right

7   and, this one, we're right on; this is not a close call.

8          The arguments you've heard, almost all of them are

9   straw man arguments.  This is not a motion to seek discovery

10  for sanctions.  I don't know how anyone could perceive that

11  somehow that would be in our advantage.  This is a motion to

12  seek discovery in furtherance of what 502 objections should

13  be filed.  We were explicit about it.  The two motions that

14  we filed are both unified, they are both tied to the omnibus

15  objection motion.  We've made that very, very clear.  I

16  understand why there's concern here about sanctions by some

17  of these folks, but that is not what we're seeking discovery

18  about.

19          Two, this is not a motion where we have the

20  obligation to prove fraud, nor is it even really an element

21  of the motion that we have to show fraud or that we are

22  showing fraud, or whatnot.  We've made a specific showing

23  here through the evidence that was uncontested, the exhibits

24  that are in, the forensic document examiner declaration

25  that's in that none of these folks really wanted to talk

1  about, but the illustration of that is almost best made by

2  you heard from Mr. Krause's lawyer -- I forget his name, he's

3  a very eloquent fellow -- but here's what's in the

4  declaration and in the brief, and the brief is all summed up

5  on page 13 and tied to the declarations, but Adam Krause

6  signed -- or his signature is affixed to 890 proofs of claim

7  in one day, overall it's affixed to 2500 proofs of claim.

8  Assuming an eight-hour day, you know, we say this in our

9  papers, he'd have to be affixing it every 32 seconds to get

10 that 890 that day.

11       But what's important about it -- and this is

12 what's been missed in all the arguments you've heard -- is

13 they've all sort of selected out individual pieces and not

14 tied them together, but they're tied together in the moving

15 brief and they're tied together in the declarations, and that

16 is we went a step further.  It's not just that 890 proofs of

17 claim went in one day and that carries with it some real

18 oddities about what was happening, they got -- the forensic

19 document examiner got into those individual documents and

20 what he found inside of them was he found that the signature

21 was -- that this affixed signature was pasted as part of a

22 PDF image onto the proofs of claim of over 1900 proofs of

23 claim.

24       What else did he find?  And it's in his

25 declaration, you know, paragraph 18, he found that those were

1  all submitted by this firm Verus.

2         What was the other thing that we put in as

3  evidence that ties this together?  We put in -- and it's

4  cited and quoted on page 13 -- we put in in the Kirkland

5  declaration, Exhibits 2 and 3, we put in documents that we

6  got from Verus.  Verus actually couched what they're doing on

7  the Boy Scouts and this is what they say:  "Verus will be

8  handling the complete process of the proofs of claim forms,

9  as well as the actual submission of the claims to the Chapter

10  11 proof of claims submission."  The complete process.  Even

11  when 90 signatures get imaged, they get given to a third

12  party aggregator, they get affixed to 1900 proofs of claim,

13  and they all get submitted.

14         You know, we don't have a videotape of Mr. Krause,

15  what he was doing in the weeks before, but there's enough

16  evidence there to warrant the discovery we've asked for

17  because what it indicates is that these proofs of claim were

18  done exactly what Verus says, that they will be handling the

19  complete process of the proofs of claim.

20         And we heard, we heard Mr. Krause's lawyer get up

21  -- and I'm going to be clear, Mr. Krause's lawyer sounded to

22  me like a very eloquent fellow, I don't know, and I 100

23  percent believe that he believed everything he said because

24  he did condition it saying this isn't his area of practice,

25  okay?  But he actually got up and said we don't use Verus,

1  despite the fact that that's the evidence, that's the

2  evidence here.  There's not an affidavit from Krause denying

3  this, there's no -- none of the evidence submitted on it was

4  contested.  Mr. Kosnoff, the linkup is the same.

5          You don't even have to take Mr. Speckin's reply

6  declaration, who was replying just to the submission that Mr.

7  Kosnoff made.  In Mr. Kosnoff's own opposition papers he

8  says, well, like somehow if we weren't -- we weren't using --

9  and this is in his surreply -- we weren't using these other

10  aggregators, we somehow used reciprocity.  Well, if you try

11  to go on the website for reciprocity, it's an aggregator.

12  It's owned by Mr. Van Arsdale.  I think he refers to that

13  actually in his reply paper.

14          And, okay, we didn't put on the reply declaration

15  of Mr. Speckin because -- like all the hoot and hollering

16  about somehow that's -- you know, it would be ambushing the

17  poor Mr. Kosnoff, but my goodness, we'd have to be ostriches

18  with our heads in the sand not to know that what's in there

19  is actually evidence that Mr. Kosnoff is using reciprocity to

20  submit his claims and that's -- which is something he's

21  admitted himself, and they're the ones -- it's a call center,

22  it's a call center, it's not a marketing firm, they're the

23  ones who actually spoke to the people.  How do we know that?

24  Mr. Kosnoff is a solo practitioner, how on earth could he

25  generate these numbers?  And we can go through each one of

1  these.

2         To hear Mr. Napoli get up and now Mr. Napoli is

3  suggesting maybe sanctions are appropriate against me.  To be

4  clear, in this motion, in the motion about the claimants'

5  signatures, we do not refer to his father.  Apparently, in

6  the motion that Mr. Ruggeri argued, it may be they have the

7  name wrong, in which case -- and I acknowledge my name is on

8  that, in which case I acknowledge it's a typo and it

9  shouldn't have been there.  Okay?  So no insult intended to

10  Mr. Napoli's father.  But the reality is what matches, the

11  Napoli firm submitted hundreds of claims that were blank that

12  just had S slashes on them.

13         You can't fathom how any of this is even close to

14  consistent with what the statutory scheme envisioned with

15  regard to the importance of having a lawyer vet the claims.

16  You know, not somebody who the week before was working at a

17  pizza delivery company and for 15 bucks an hour is on the

18  call center phone, filling out proofs of claim and maybe

19  getting a bonus to submit them for it.  It's like, no, an

20  actual member of the bar actually sitting down with people

21  and making sure that the claims were -- are in fact should be

22  submitted.

23         And that gets to another point.  I want to answer

24  Your Honor's question about the Hinton declaration.  It gets

25  to what is really off the rails about this kind of case.

1  Your Honor, you easily could miss the big picture by sort of

2  focusing on is the proof of claim, are the 15 questions

3  perfectly filled out?  This type of mass tort is very

4  different from some of these other latent injury one, at

5  least like in the asbestos or some of these others, talc, but

6  fundamentally the claims turn on some very objective

7  evidence.  You've heard some of it in Imerys.  Do you have

8  ovarian cancer?  Do you have lung cancer?  Do you have

9  another cancer?  At the end of day there's to be debate about

10  like what proof they've done on that, but there's some tie-

11  down on what the proof is.  These kind of claims are very

12  different.

13            You did hear from a gentleman who I give great

14  credit to from Massachusetts who said he's got attached to

15  his declaration, it's in his proof of claim, 15 or 20 pages

16  of exhibits.  I have not seen a single proof of claim like

17  that.  I'm happy to sit down with him and his proof of claim

18  and try to resolve that with Mr. Ruggeri, but that, my

19  goodness, is the absolute oddity here.  It's like here all

20  you've got to do is answer the 15 questions.  And the

21  suggestion that perfectly filling out the 15 questions leads

22  to like, okay, pay $2 million is absolutely not how any of

23  these claims are normally handled in any way because the

24  credibility of the claimant and the collaboration that one

25  can get through a sworn exchange with the claimant is

1  absolutely critical to verifying the claims.  To simply hand

2  them out and say, did you fill in the questions perfectly,

3  you know, it's like that's -- that doesn't get there.  It's

4  like that's almost as much of the problem as anything else.

5           So the notion that they're perfectly filled out --

6           THE COURT:  How does that relate to what you're

7  looking for here?  You're really arguing then that there

8  needs to be a different focus -- and I haven't even seen a

9  focus yet -- on who a trustee might be, what the trust

10 distribution procedures might look like, what will be

11 acceptable documentation to support a claim, isn't that

12 really what you're getting to with this?

13          MR. SCHIAVONI:  So, admittedly, Judge, you are

14 sort of reaching forward -- and maybe I am a little bit too,

15 because you will hear argument from us about that at some

16 point perhaps because that is an issue, that's a problem

17 here, okay?  But to suggest that the purpose of today -- and

18 I want to come back to answering a Hinton question and also

19 like dealing directly with how this would be helpful, this

20 discovery -- it's like to suggest that like, well, like maybe

21 if they're perfectly filled out, everything is, you know,

22 copacetic, it's not really the case.  That's not really the

23 situation because think what we have, think what we have.  We

24 have a non-member of the bar hired by a for-profit company

25 called Verus saying we will be handling the complete process,

1 | the complete process.  Okay?  It's like they could be trained
2 | to perfectly, you know, fill out the form, but it's like we
3 | need to know that to know how to -- how to -- in essence,
4 | where there are problems here and where there aren't.

5 | The discovery we've sought, it is specific.  It's
6 | like we would like to speak to -- and some of these folks
7 | like Mr. Krause who submitted hundreds and hundreds of claims
8 | on a given day and who are linked to what appear to be just
9 | giving it to Verus and we would like the subpoena to Verus to
10 | show how -- what was the process here that generated these
11 | things.  Because I think 9011 and I think the statutory
12 | system, like the scheme was intended that, as members of the
13 | bar, we're kind of bound by ethics rules and procedures about
14 | how we would go about preparing a proof of claim and how we
15 | would vet someone when they come in the door, not even go
16 | into someone who's a for-profit entity.  It's like it's a
17 | totally different, Wild West entity.  It's like we ought to
18 | know what proofs of claim come out of there and the process
19 | for -- and if we're all wrong about it, so be it, but letting
20 | us have some discovery on this when there's this kind of
21 | evidence, it's like I think this is the kind of thing that
22 | actually really would concern the circuit if they see 96,000
23 | claims coming down valued at millions of dollars, every one
24 | of them, it's like it's a process off the rails to not let us
25 | even look under the hood and see what is going on with these

1    folks.

2         And, again, you know, I picked Krause out.  I

3    could go on through each one of these.  I'd ask you to look

4    at the Speckin declaration.  And, yes, the proof is sort of

5    different for each one of them and for some it's not as

6    complete as the others, but it's there and it's linked

7    together about how these entities were involved and how they

8    were generating claims.  And the importance of it, yes, is

9    9011 was a substantive protection.

10        And the discovery we want, it's not to sanction

11   people, that's not the point.  The point is what is the scope

12   and extent of this?  And where were these claims emanating

13   from and what commonality could we then draw from them, so we

14   could make some assessment about what to deal with the proofs

15   of claim objections as a general matter and how to deal with

16   the claims.  And that's a very valid point in using 2004.

17        I disagree about the case law and somehow this is

18   the first time ever that 2004 has been used to look at the

19   process of proofs of claim being produced.  But you know

20   what?  If they want to say it's the first time, tell me

21   another case, another case in this district where somebody

22   submitted 890 proofs of claim, they signed them, and then

23   their signature turned out to be affixed to a PDF coming from

24   a third party entity.  It's like there's a first time for

25   everything and this might be it, if that's really the view,

1  but it's like that -- you know, that is really a process

2  that's off the rails and it's something that merits some

3  targeted discovery.

4          And, you know, what we've asked for here is not --

5  you know, it's not really that much.  Okay?  And the notion

6  that, you know, these folks saying, oh, yeah, it's like, you

7  know, we didn't do anything, they're not really 100-percent

8  upfront about the evidence that's out there.  There's a

9  reason why they didn't put declarations in, they can't.  It's

10  like a lot of what we've heard is utterly inconsistent with

11  what's actually happened.

12          And, you know, I'd just like to wrap up on two

13  points.  Your Honor, I went back and I looked at the Riviera

14  case -- I don't know if I've pronounced it right -- Rivera

15  case -- and it's worth a read what the court there said about

16  the use of, you know, pre-signed certifications in that case

17  and they were used, they were being attached to stay motions.

18  And what the Riviera court that this District of New Jersey

19  talks about is that, quote, "no reasonable attorney would

20  consider" -- and then a, you know, bracket -- "forms with

21  pre-signed signatures to be certifications, nor would any

22  reasonable lawyer engage in the practice of using un-signed

23  signature forms."

24          The case goes on and on about the judge talking

25  about the practice is in violation of 9011 because writings

1  were presented for, you know, an improper purpose.  They had

2  the court believe that they were certifications.  Moreover,

3  the threshold factual contention in each one of these

4  submissions was that the signatory read and signed is flatly

5  untrue.  That's the situation here.

6            But we're not seeking this discovery to sanction

7  these people.  Okay?  You know, it's sort of a distraction to

8  what's really important to us and that is how big a problem

9  is this.  Because, yes, we thought and I think the Court

10  thought when it was getting the signatures on it that it was

11  getting someone verifying that they read this and they

12  thought about it before they submitted it.  It's one of the

13  reasons, by the way, in the tort system that we ended up in

14  the filing with 275 claims because the lawyers had to make

15  actual, real decisions before they took on claims.  They

16  weren't having a third party just saying, well, you know, for

17  every one of these we will fill out, we're going to sell it

18  to you for X dollar amount and you're going to be able to

19  then turn around and turn it for another dollar amount.  It's

20  a totally different process.

21            But, you know, Judge, a point I'll end on is the

22  one other quote from the hearing, you know, on October 14th

23  that you told the parties -- and, again, you're obviously

24  free to rule any way you want about this, I'm not quoting you

25  -- I'm not quoting back to you -- but what you warned the

1  parties was, quote, "Think long and hard before you sign a

2  proof of claim form because you may become a witness."

3          These folks were definitely, like they were

4  warned, but they -- you know, they went ahead and did it

5  anyway.  Asking Mr. Krause to sit for a deposition to

6  explain, you know, what happened here is just -- it would be

7  very productive and it would not lead to a huge distraction.

8          Thank you, Your Honor.

9          THE COURT:  Thank you.  Okay.

10          MR. SCHIAVONI:  Oh, I did -- if you want to hear

11  about Hinton, I'm sorry to miss that, but I'm happy to answer

12  that question.  Hold on, let me just --

13          THE COURT:  You did answer the question.  If I

14  eliminate the abuser last name column from Table 2, does it

15  look that bad?

16          MR. SCHIAVONI:  Okay.  So, Judge, first of all, if

17  you set aside the missing abuser last name, there's still

18  tens of thousands of proofs of claim among the 66,000 that

19  were submitted by these high-volume-signing firms with other

20  infirmities that are flagged by Mr. Hinton in Tables 2 and 3.

21  So just simply sort of putting that aside, it doesn't really

22  -- it's like there's still a very significant issue with the

23  other things made in Tables 2 and 3.

24          The other point is that like I've got it that some

25  victims may not remember their abuser's name, we're not

1  saying otherwise.  It's like that easily -- that could

2  happen.  Okay?  But what we're saying is to have almost 60

3  percent of the proofs of claim in this kind of case missing

4  that kind of information, it is noteworthy, it is something,

5  it is noteworthy and it does go into the analysis here.

6           THE COURT:  Doesn't it matter if the rest of the

7  proof of claim form is very specific?  It has a troop number,

8  it has a date, it has -- so that you could figure it out by

9  the first name?

10          MR. SCHIAVONI:  Again, Judge, in any one case

11 that's -- I hear you, I completely hear that, you know, but

12 in this large -- it's the overall percentage of it in the

13 context of this kind of matter.  Okay?  Where there's -- like

14 the allegation is long-term grooming, et cetera.

15          And, look, I already can hear it, so, you know,

16 the objectors need not put on an argument about it.  I can

17 tell you they'll say, oh, well, there's a million

18 psychologists who could explain it away in any one case, and

19 that may be the case, but the overall number is significant,

20 60 percent.

21          THE COURT:  Okay.  This is the flipside, these

22 deficiencies are the flipside of what you just postulated

23 that you could hire a whole bunch of people who know how to

24 fill out the form perfectly even though there are no valid

25 claims.  So this is sort of the flipside of that.  Either

1  they fill it out perfectly or there are deficiencies.

2          MR. SCHIAVONI:  Judge, that's -- look, I hear you

3  on that and actually (indiscernible) and I have sort of

4  looked at both.  It's like one set of ones to look at were

5  almost the ones that -- and, by the way, like I think they

6  were the ones, some of the ones that HUD pulled, they were

7  the ones, they were absolutely perfect, and that's -- they

8  drew a lot of -- a lot of those turned out to be problematic

9  for reasons -- for reasons that we will put on at some point,

10  but they pulled a small sample of those and, yeah, it's like

11  it was the oddity of sort of the perfect submission.

12          THE COURT:  They're too good, they're too good --

13          MR. SCHIAVONI:  Too good.

14          THE COURT:  -- they can't be right.

15          MR. SCHIAVONI:  But, Judge, here's the thing.

16  We're not here today to prove fraud.  I have -- and to be

17  100-percent clear, we haven't accused anybody of fraud.

18  Hartford and Century have tried to be careful, cautious;

19  we've tried to come up with a process that gives us a good

20  faith basis to look at this.  Okay?

21          And no one has -- look, I will be the first to say

22  that I think it was wrong for -- it's wrong to the extent a

23  lawyer photocopied a signature and attached it, I don't take

24  it you've just excused that, but it's -- but we haven't

25  accused any claimant of fraud, we haven't accused any lawyer

1  of fraud at this point.  We're looking to try to identify and

2  get a handle on these claims and this is -- what we've come

3  up with is a legitimate, good faith effort to try to do that

4  and, you know, without objecting to every single claim, it's

5  a good faith effort to try to address the issue.

6          THE COURT:  Thank you.

7          Okay, it's 7 o'clock.  I don't know what else is

8  on the agenda.  I don't recall, other than the Rule 2019

9  motion, which we're not going to get to tonight.  Is there

10 anything else that I have to address tonight?

11         MR. ABBOTT:  Your Honor, it's Derek Abbott.  There

12 were a handful of sealing motions, as well as a motion

13 requesting the ability to file a surreply, but the 2019 is

14 the only thing -- and there's a motion to strike by Mr.

15 Kosnoff, but I would suggest, Your Honor, that the 2019 is

16 the only other thing of real substance or import tonight that

17 remain on the agenda.

18         THE COURT:  Okay.  We'll find a time for that -- I

19 don't know when that will be, but we'll find a time for that

20 and I'll take these matters under advisement.

21         Thank you.

22         COUNSEL:  Thank you, Your Honor.

23         THE COURT:  Thanks for the day, guys, and I will

24 be -- and we're adjourned.

25         COUNSEL:  Thank you, Your Honor.

1        (Proceedings adjourned at 6:59 p.m.)

2

3

4                          CERTIFICATE

5

6        I certify that the foregoing is a correct transcript

7    from the electronic sound recording of the proceedings in the

8    above-entitled matter.

9
     /s/Mary Zajaczkowski              February 19, 2021
10   Mary Zajaczkowski, CET**D-531

11
     /s/William J. Garling             February 19, 2021
12   William J. Garling, CE/T 543

13
     /s/ Tracey Williams               February 19, 2021
14
15   Tracey Williams, CET-914

16

17

18

19

20

21

22

23

24

25