IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br>Re: Docket nos. 1972, 1976, 1979, 2007, 2008, 2022, 2026, 2028, 2029, 2030, 2043, 2048, 2048, 2049, 2053, 2054, 2059, 2060, 2061, 2062, 2065, 2066, 2069, 2070, 2074, 2076, 2077, 2078, 2079, 2080, 2080, 2081, 2082, 2083, 2084, 2085, 2087, 2088, 2089, 2090, 2091, 2092, 2095, 2114 |

**RESPONSE OF ABUSE CLAIMANT 242 TO THE OBJECTIONS OF THE COALITION OF ABUSED SCOUTS FOR JUSTICE AND OTHER COUNSEL AND CLAIMANTS TO INSURERS' MOTIONS FOR CERTAIN DISCOVERY, AND JOINDER TO THE MOTIONS OF CERTAIN INSURERS AND TO COMMENTS BY THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS IN THEIR STATEMENT OF INTEREST**

May it please the Court,

1. Each of my four children is registered in a Boy Scouts of America ("BSA") youth program. My wife and I are registered as adult leaders with the BSA. Therefore, I have a fiduciary duty on behalf of my children to ensure that BSA survives and is able to continue its programs for their benefit.

2. My daughter is also a registered youth member with the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and my wife and I are registered as adult leaders with that organization. ▮▮▮▮▮ has a trademark lawsuit against BSA, which was stayed by these proceedings[2] and later referred to mediation. Therefore, I have a fiduciary duty on behalf of my daughter to ensure that ▮▮▮▮▮ is made whole and able to continue its programs for her benefit.

3. I also have deposit accounts and/or lines with credit several of the banks that are creditors to or otherwise do business with the debtors in this case, including JPMorgan Chase Bank and Synchrony Bank.

4. I, my children, spouse and parents are members of the Church of Jesus Christ of Latter-day Saints ("Church" or "LDS Church")[3], which was a chartered organization with the BSA from roughly 1913 until the last day of 2019.

---

1  The Debtors in the chapter 11 cases, together with the last four digits of each Debtors' federal tax identification number, are as follows: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2  See generally *Girl Scouts of the United States of America's Brief in Support of its Motion for Relief from the Automatic Stay to Resume Trademark Action* [D.I. 157]

3  The "Church of Christ" was established on April 6th, 1830. On May 3rd, 1834, it changed its name to "The Church of the Latter Day Saints". On April 26th, 1838, it changed its name again to "The Church of Jesus Christ of Latter-day Saints". As of 2018, it owned many Internet domains, including "lds.org", ".lds", "mormon.org", ".mormon", and "ldschurch.org". On or about May 2019, it changed its primary English-language website to the domain "churchofjesuschrist.org".

5. I am also an abuse claimant in this case. I was a Cub Scout and then a Boy Scout; the abuse I have reported in my claim occurred while I was a Boy Scout.

6. I am not represented by counsel.

**Objection of the Coalition to Insurer's Motion for Law Firm Discovery (D.I.2043)**

7. In its preliminary statement, the Coalition accuses Hartford and Century of "attack[ing] the professionals involved whenever possible, including the Debtors' counsel and the law firms that represent the vast majority of survivors." (Objection at 2) But one purpose of the proposed discovery appears to be to test whether that "vast majority" actually is clients in a *bona fide* attorney-client relationship, as opposed to just a drive-by collection of unvetted and uncommitted leads. Furthermore, it appears that no single firm holds an actual majority of abuse claims, so it is appropriate to test any assertion that some group of firms or other organization holds such a majority.

8. Referring to the abuse claim form, the Coalition suggests that the claim form was structured in a certain way "by design to make it more difficult for abuse victims to file claims in these cases." (Objection at 3) But in fact the TCC and the Debtors worked together to make the claim form understandable to victims, and not overly burdensome. I filled it out myself. It was not particularly difficult.

9. While the various electronic-signing practices apparently used by a number of abuse-claimant attorneys are in fact consistent with a literal interpretation of the Court's rulings and applicable court rules, signing claims that way and expecting no further scrutiny was not consistent with the spirit of the Court's admonition that the attorneys "ought to look long and hard before they sign that claim form". Note that, at this point, Century and Hartford are not actually objecting to any of those claims; they are merely asking for more information about how the claimant's assent to the form of the claim now on file was collected.

**Objection of the Coalition to Insurer's Motion for Random Claimant Discovery (D.I.2048)**

10. The Coalition asserts that "the proposed discovery would itself create an obstacle to plan confirmation." (Objection at 10) It then lays out a timeline suggesting that discovery could still be ongoing in August, and suggesting that the Coalition would react to the discovery by stonewalling mediation. But the 65,400 documents that the requests for production and interrogatories might produce would still be fewer than the 85,000 non-duplicate abuse claims at issue in the case. If a mediation party has time to read all the claims, it has time to read the responses to the interrogatories.

11. The Coalition asserts that the Insurers "may be the entities with the most information." (Objection at 11) But the number of claims is inconsistent with the BSA's information at the outset of this case, and presumably with the information that the insurers have as well. The Warren Report discloses that Dr. Warren's team identified fewer than 11,000 victims in the Ineligible Volunteer files, after reviewing the whole period from 1946 to 2016.

12. The Coalition asks whether several motions by Century have been "constructive", implying that they were not. (Objection at 12) But I would have joined many of the cited motions, and in fact I did submit an objection to the Court, on or about August 25th, that effectively joined in part one a motion b the Debtors that Century also joined in one of the cited motions: Docket 1266,

objecting to the Coalition's motions for its Rule 2019 statement to be accepted and to its motion to be deemed a mediation party.

13. The Coalition mischaracterizes the findings of apparent fraud in the Insurers' Motion. The "six examples" (███████████████████████████) are based on communication between people with knowledge of certain plaintiffs and the Debtors. However, the Insurers went on to identify more than twenty claimants, out of what may have been a random sample of 100 claimants, who had criminal history or social media history calling into question the veracity of their claims. If those histories were enough to completely discredit those claimants, and that proportion held true over the entire body of claimants, it would bring the number of claims down to about 68,000... still far more than what some parties may have expected, but leaving more recovery for the victims remaining.

14. The Coalition also objects to the demand for 100 depositions (Objection at 20). But that number strikes me as reasonable, or even low, given the total number of abuse claims. It's only enough to depose half of one of the seven groups of 200 claims each that make up the interrogatory and document production requests.

**Statement of Interest by the Church (D.I. 2049)**

15. The Church states that "if the Insurers' Discovery Motions are granted in whole or in part, then any discovery provided would be relevant to all parties to the ongoing mediation process [...]". I agree. In addition to the Church, the fruits of that discovery should be provided to the TCC, the FCR, the Debtors, the Local Council Committee generally, the implicated Local Councils for each claim, the implicated Chartered Organizations for each claim, to other Insurers, and to GSUSA.

**Objection of Timothy K█████████████**

16. ███████████ touts his "track record of vehement pursuit of justice" (Objection at 8), including "cases against the [LDS Church], the Catholic Church and several other institutions." However, he does not address a couple of troubling circumstances that the Insurers have raised: that he is not licensed to practice law in Texas, where he appears to maintain his business address, and that he represented on his website last summer that he no longer practices law.

**Objection of ███████████████████**

17. ███████████ claims that "[the Insurers'] motion does not identify the categories from which the ███████████ Claimants were randomly selected, ..." (Objection at 4) While perhaps the Insurers' motion could have been more clear on the procedure, I think it's obvious what the rule for selection was, as described in the declaration of ███████████████████████. The claim numbers in question ████████████████████████████████████████████████████████ (████████████████████████ █████ 300-401, including claim 39340, ████ "In No Scouting Affiliation". ██████ 402-601 ██████ claims ██████ "██████ Identified" ██████ ██████████████ ████████ was simply chosen at random from the entire set of claims.

**Objection of ███████████████████████████**

18. Counsel for ███████████████████ and ASK LLP states that "the Insurers' Motion is an undisguised effort to lop off a small fraction of the total abuse claims (1400 in all, a minuscule slice of the whole) which they regard to be most vulnerable to attack." (Objection at 17). On the contrary, the proposed course of discovery aims to gather data that could be used to draw

statistically valid conclusions about the entire body of 85,000 claims, as well as about each of the subgroups from which the remaining groups of 200 claims are taken.

**General Thoughts**

19. If the objecting parties have concerns about the transparency of the random generation of the groups subject to deposition, I would propose the following procedure:
- The Insurers would disclose their list of all claims, in machine-readable format, deduplicated and coded for the various selection criteria ("Allege Abuse in 1971-1975 Period", "No Scouting Affiliation", etc.)
- A new "seed" would be generated from something outside any party's control (such as a winning lottery ticket, or by the Court rolling dice in open court).
- All parties would re-run the algorithm with the new seed, and should all come up with the same set of claims to be subject to random discovery.

20. Several filings have noted that there are roughly 10,000 duplicate abuse claims in the case. While any inflation of the number of claims is unhelpful, I would be curious to learn to what extent that is a result of (a) the claims agent assigning new claim numbers to amended claims, (b) exact copies of the claim being submitted to the claims agent by multiple channels, such as online and mail, or mail and expedited delivery service, and not being immediately reconciled by the claims agent, (c) multiple heirs of the same deceased victim, (d) submissions of a claim by multiple attorneys where the client contacted multiple counsel about the same matter, or (e) other reasons. However, none of the parties appear to have raised that question in prior filings.

Dated: February 10th, 2021
Lansing, Michigan

