# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>                  Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>Jointly Administered |

## OFFICIAL TORT CLAIMANTS' COMMITTEE'S CASE STATUS REPORT

The official committee of tort claimants (consisting of survivors of childhood sexual abuse) (the "***Tort Claimants' Committee***"), appointed in the above-captioned cases, hereby files its case status report pursuant to 11 U.S.C. § 1102(b)(3), and respectfully states as follows:

### Introduction

1.    After one year in bankruptcy, the Boy Scouts of America filed a plan of reorganization that does not substantively address the childhood sexual abuse that led to the filing of this case. The plan does not have the support of the Tort Claimants' Committee, the Coalition, or the FCR. It was not the product of negotiation between the Debtors and the Tort Claimants' Committee, or any other party in interest that represents the childhood sexual abuse survivors. Instead, the proposed plan is nothing more than the documentation of a deal among the Debtors prepetition lender and the commercial creditors' committee, whose primary constituency's claims are a very small fraction of the childhood sexual abuse claims. Without meaningful negotiation, the Debtors' plan is the first step on a path to nowhere.

---

[1] The Debtors' federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

2. On March 1, 2021, the Debtors filed the *Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 2293] (the "Plan") and the associated *Disclosure Statement for the Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 2294] (the "Disclosure Statement"). The Debtors scheduled a hearing for the Court to consider approval of the Disclosure Statement on April 15, 2021 and intend to seek confirmation of the Plan on July 26, 2021.

3. There is very little, if anything, that the Tort Claimants' Committee supports in the Plan and Disclosure Statement. While the Debtors, Tort Claimants' Committee, and other constituencies have engaged in numerous discussions during the past year, the Plan was not the product of any meaningful negotiation or collaboration with the Tort Claimants' Committee. At most, the Plan reflects a negotiation among the Debtors, JP Morgan (the Debtors' prepetition lender), and the Official Committee of Unsecured Creditors (the "***UCC***"). The agreement among those parties, as reflected in the statement filed by the Mediators, settles various challenge rights held by the UCC. *See* Docket No. 2292 (the "***Mediators' Report***"). The Mediators' Report, filed moments before the plan, notably and remarkably makes no reference to the same challenge rights held by the Tort Claimants' Committee and the Future Claims Representative ("***FCR***"). Shortly after the filing of the Mediators' Report, the Tort Claimants Committee filed its response to the settlement, i.e. a motion to challenge JP Morgan's secured claim, to which the FCR filed a joinder. *See* Docket Nos. 2297 and 2305.

4. The JP Morgan-UCC settlement can hardly be considered the cornerstone of the Debtors' reorganization strategy. The consideration payable to the trade creditors through the settlement represents a miniscule fraction of the value of the childhood sexual abuse claims. The Debtors' chapter 11 cases were caused by the BSA's history of negligently protecting young boys from sexual predators. It was not caused by the pressure of any trade or other commercial creditors. A plan that effectively ignores survivors is not a promising step.

## Summary of Plan and Disclosure Statement Issues

5. Below is a summary of issues that have not been addressed in the Plan or Disclosure Statement that preclude the confirmation of the Debtors' proposed Plan.

**A.    Claims Against JP Morgan**

6. On March 12, 2021, the Tort Claimants' Committee and the FCR filed the *Joint Motion of the Official Tort Claimants' Committee and Future Claimants' Representative for Entry of an Order Granting Standing and Authorizing the Prosecution of Certain Challenge Claims on Behalf of the Bankruptcy Estates* [Docket No. 2364] (the "***Standing Motion***"). By the Standing Motion and the complaint attached to it, the Tort Claimants' Committee and FCR seek authorization to challenge aspects and certain claims of JP Morgan. As noted above, the Plan does not attempt to resolve these claims in a comprehensive manner that addresses the individual rights of the Tort Claimants' Committee and FCR.

7. For months, the Tort Claimants' Committee beseeched the Debtor, the UCC, and the Mediators to provide a modicum of information about the settlement negotiations that it heard were ongoing between them and JP Morgan. Repeatedly, the Tort Claimants'

Committee was rebuffed. The Tort Claimants' Committee learned about the settlement among the Debtors, JP Morgan, and the UCC by reading the contemporaneously filed Plan and Mediators' Report, a mere eleven days prior to the deadline to file the Standing Motion. Given the amount of time between the filing of the Plan and the March 12, 2021 deadline, and the exclusion of the Tort Claimants Committee and the FCR from any role whatsoever in the negotiations, the Tort Claimants' Committee and FCR were left with no alternative but to file the Standing Motion.

B.       **Declaratory Judgment Action Regarding Restricted Assets**

8.       At the outset of these cases, the Debtors filed the *Motion for Entry Of an Order (I) Scheduling Certain Deadlines In Connection With Potential Disputes Regarding the Debtors' Identified Property (II) Granting Related Relief, dated February 18, 2020* (the "**Asset Restriction Procedures Motion**") [Docket No. 19]. By the Asset Restriction Procedures Motion, Debtors sought an order of the Court imposing deadlines for the Tort Claimants' Committee, and any other party in interest, to contest Debtors' allegation that certain assets (the "**Identified Property**") are subject to enforceable restrictions under applicable law and/or are otherwise unavailable to satisfy creditor claims, including the claims of the survivors of sex abuse comprising the Tort Claimants' Committee's constituency. The Debtors asserted that the Identified Property has an alleged total value of $1,014,160,463 in restricted and unrestricted assets as of November 30, 2019, and $667,075,374 in value of such assets are restricted and thereby unavailable to satisfy creditor claims.

9. The Tort Claimants' Committee filed an extensive mediation brief regarding the Identified Property and alleged donor restrictions. The Debtors never filed a mediation response to any of the issues raised by the Tort Claimants' Committee.

10. Given the Debtors' deafening silence, the Tort Claimants' Committee commenced an adversary proceeding (Adv. Pro. Case No. 21-50032) (the "*Restricted Property Action*") seeking a declaratory judgment that the Identified Property is not restricted, and that, accordingly, it is available to satisfy creditor claims. In response to the Restricted Property Action, the Debtors filed the Plan offering approximately $115 million of cash or other consideration, which when considering the Identified Property is less than 17% of the property that should be made available to satisfy the claims of creditors. The Debtors and the Tort Claimants' Committee agreed to submit the dispute to the Mediators (of course, the restricted property issue had been a subject of mediation since the inception of the mediation and addressed in detail in the Tort Claimants' Committee brief filed on August 17, 2020, seven months ago). Absent a mediated resolution and in light of the Debtors' proposed Plan that does not propose any compromise of the issues in the Restricted Property Action or the mediation brief, the Tort Claimants' Committee will press forward with the Restricted Property Action.

C.  **Local Councils Participation and Contributions**

11. Nationally, the Boy Scouts is geographically divided into approximately 253 regions. Each region is governed by a "Local Council," which issues charters to sponsoring organizations (the "*Chartered Organizations*") that establish scouting troops. The Local

Councils, along with the Chartered Organizations are implicated in the same 84,000 childhood sexual abuse claims faced by the Debtors.

12. The Debtors' proposed Plan contemplates that 253 Local Councils will be the beneficiaries of a release of all childhood sexual abuse claims and that such claims are channeled to a post-confirmation trust. The Debtors hope that the Local Councils will contribute $300 million in cash and other unspecified property and also assign their respective insurance rights under the insurance policies that might cover certain of the 84,000 childhood sexual abuse claims. There are a host of problems with the Debtors' proposal that make the proposed Plan not only untenable but ultimately unconfirmable.

13. First, the Local Councils have not agreed to contribute anything. Exhibit D of the proposed Plan outlines the Debtors' proposal to get $300 million from the Local Councils. But, according to the Plan, the Local Councils have not committed to making any contribution, much less a substantial contribution, for a release and channeling injunction. The Plan is so nebulous that the Debtors do not intend to update sexual abuse survivors about the Local Councils' willingness to contribute anything until June 1, 2021 (one month after distributing plan solicitation packages). The Tort Claimants' Committee does not understand how the Debtors can solicit acceptance of the proposed Plan that contemplates the release thousands of sexual abuse claims without making a single representation about any monetary commitment from a single Local Council.

14. Second, even if the Local Councils were willing collectively or otherwise to commit $300 million in cash and other property to the settlement, such amount is woefully

inadequate to gain the support of 84,000 sexual abuse survivors or for the Court to grant third-party releases. At the outset of the cases, the Tort Claimants' Committee was provided access to the Debtors' accounting system that includes access to the accounting systems of the Local Councils. The Tort Claimants' Committee also engaged a real property appraiser, as did the Debtors, who are each evaluating hundreds of the real properties owned by the Local Councils. The Tort Claimants' Committee has reviewed and analyzed the membership of each Local Council over time and analyzed the cash and real estate needs of each Local Council (*i.e.*, how much real property is necessary for each Local Council to maintain and provide services to its members). The Tort Claimants' Committee has reviewed substantially all of the assets and liabilities of the Local Councils and determined that they could collectively contribute multiples of the aspirational $300 million amount while at the same time continuing to operate in the ordinary course of business.

15. Third, the Disclosure Statement does not present any financial information about the Local Councils, either collectively or individually. Absent disclosure of the fair market value of the Local Council assets and liabilities, no abuse survivor will be able to determine if the value he will receive under the Plan will satisfy the best interest test under section 1129(a)(7) of the Bankruptcy Code.

16. To be clear, the Tort Claimants' Committee does not seek the liquidation of the Debtors or the Local Councils; it seeks compensation for the 84,000 child sex abuse survivors that satisfies the requirements of the Bankruptcy Code. To that end, the Tort Claimants' Committee has attempted to meet (either inside or outside the mediation context)

with certain of the Local Councils to present the Tort Claimants' Committee's analysis of their financial wherewithal. Those Local Councils (Silicon Valley Monterey Bay, Garden State, Greater New York, and Grand Canyon) have refused to meet and one other (Old North) has remained silent, which the Tort Claimants' Committee interprets as a refusal to meet. Instead, the Local Councils are insisting that the Tort Claimants' Committee meet with the advisors for the Ad Hoc Local Council Committee, which since the outset of the cases has made clear that it does not represent or speak for any of 253 Local Councils. To make things even more confusing, two of the members of the Ad Hoc Local Council Committee (Greater New York and Grand Canyon) have stated they would only consider attending the Tort Claimants Committee's presentation solely in their respective roles as members of an ad hoc committee that has no power to act or negotiate on behalf of the 253 Local Councils.

17.     Fourth, there is no disclosure regarding what each Local Council proposes to contribute in exchange for its release. As noted above, the Local Councils and the Chartered Organizations have liability for the childhood sexual abuse claims. If they want a release and have the claims against them channeled to a trust, they must disclose their respective contributions so that the 84,000 childhood sexual abuse survivors can assess whether or not to accept a plan that contemplates the release of their claims. The number of claims in various jurisdictions is staggering. For example, in California (over 9,300), New York (over 5,200), New Jersey (over 2,220), and Arizona (over 1,200).[2] Assuming the Local Councils each make an

---

[2] It should be noted that the above claim estimates are likely lower than the actual number of claims in each of those respective states.

equal $1,185,770 contribution towards the $300 million contribution, the only two Local Councils in Arizona (Grand Canyon and Catalina) would be contributing approximately 1/10 of 1% of their exposure to childhood sexual abuse claims arising in Arizona that implicate the two Local Councils in that state.

18.     Fifth, the Plan contemplates that the Local Councils will assign to the trust insurance policies under which the Debtors are NOT co-insureds.  Neither the Plan nor the Disclosure Statement describes the means to achieve this transfer of rights, especially in the context of the anti-assignment provisions present in the policies.

### D.     Chartered Organization Participation and Contribution

19.     All of the issues with the Local Councils' participation are same with the Chartered Organizations except there is absolutely no information about what any of the Chartered Organizations might be willing to contribute.  While two major religious organizations are mediation parties, they have not filed any mediation briefs or attempted to engage the Tort Claimants' Committee in any mediation. At this juncture, the Court cannot approve the adequacy of the Disclosure Statement that contemplates granting third-party releases to countless Chartered Organizations without a single of word on what they might do or even a mechanism to be eligible for the protections afforded under the proposed Plan.

### E.     Other Inadequacies of the Plan and Disclosure Statement

20.     There are approximately 101,135 filed sexual abuse proofs of claim (the "***Sexual Abuse Claims***"). Of those Sexual Abuse Claims, the Tort Claimants' Committee estimates that there are approximately 83,807 unique claims if the amended and superseded and

multiple claims filed on account of the same survivor are removed. Article V.M of the Disclosure Statement barely alludes to the fact that there are any childhood sexual abuse claims let alone that there are nearly 84,000 such claims. An extensive amount of information was collected by the Debtors from a heavily negotiated and carefully crafted twelve page proof of claim form that documents the sexual abuse of each survivor, which includes the location(s) of the abuse(s), time(s) of the abuse(s), nature of the abuse(s), name(s) of the perpetrator(s), effects on the survivors' lives, in addition to other information about the childhood sexual abuse claims. The Debtors make little to no disclosure about the magnitude or scope of the claims of their primary creditor constituency and the reason why these cases were filed.

21. More importantly, the Debtors make no attempt to value any of the childhood sexual abuse claims, which is an essential and vital feature of the Disclosure Statement for purposes of feasibility, best interest test, and enabling sexual abuse survivors information that enables them to make reasonable estimates of what they stand to recover on account of their injuries. For example, in Article VI.D of the Disclosure Statement, the Debtors estimate that JP Morgan's recovery will be 100% and that the class of general unsecured commercial and trade claims will receive anywhere from 75% to 90% of their allowed claims. There is no attempt to estimate the total consideration available for or the percentage recovery on account of the childhood sexual abuse claims.

22. The Debtors assert without any support that as a non-profit they are not required to satisfy the best interest test of creditors, which is one of the hallmark requirements of any chapter 11 plan under section 1129(a)(7) of the Bankruptcy Code. See Disclosure Statement,

Art. VIII.D, p. 137 ("Because the Chapter 11 Cases could not be involuntarily converted to a chapter 7 liquidation, the Debtors submit they are not required to satisfy the requirements of section 1129(a)(7) in connection with confirmation of the Plan."). There no legal support for this assertion. Section 1129(a)(7) of the Bankruptcy Code is a hypothetical test designed to ensure non-consenting creditors receive at least as much they would *if* the debtor was liquidated. The best interest test is a measuring device, not an involuntary requirement that the Debtors must be susceptible to being involuntarily liquidated under chapter 7.

23. When a plan proposes the release of non-debtor third parties, as the case with the Local Councils and the Chartered Organizations, the best interest test requires the inclusion of asset values of such non-debtor third parties in the hypothetical, alternative liquidation recovery comparison: "[T]he best interests equation also properly mandates consideration of creditors' comparative recoveries on non-debtor claims, to the extent the plan is treating those non-debtor claims by release." *Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 9 (D. Conn. 2006); *see also* (*In re Ditech Holding Corp.*, 606 B.R. 544, 614 (Bankr. S.D.N.Y. 2019) (same); *In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) ("in a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at lease as well under chapter 11 plan as they would in a chapter 7 liquidation"); *In re Quigley*, 437 B.R. 102 (Bankr. S.D.N.Y. 2010) ("The confirmation of the Fourth Plan and discharge of Pfizer will affect the dissenting Non-Settling Claimants because they would "retain" their right to sue Pfizer if Quigley were liquidated under

chapter 7. As the parties recognize, the critical question is whether I should consider the value of these derivative claims in deciding whether the Fourth Plan is in the "best interest" of the dissenting Non-Settling Claimants. I conclude that I must.").

24. The Disclosure Statement does not include any summary or discussion of creditor recoveries with respect to the Local Councils or the Chartered Organizations, who both stand to benefit from the third-party releases like the ones contemplated in the cases cited above. Contrary to the Debtors' assertions, value distributed to any non-consenting creditor (*i.e.*, one that does not accept the plan) must equal or exceed the aggregate of the hypothetical chapter 7 distribution to that creditor from the Debtors' estates plus the value of that creditor's claims against the Local Councils and Chartered Organizations.

25. The Disclosure Statement's liquidation analysis makes no reference to the value of the Local Councils' assets that would inure to the Debtors if the Boy Scouts are liquidated. Under the documents governing the relationship between the Boy Scouts and the Local Councils, if the Local Councils' annual charters are not renewed, the Local Councils' assets revert to the Boy Scouts. In a hypothetical chapter 7 case, the Boy Scouts would not be renewing charters and the chapter 7 estate would be the beneficiary of the reversionary property interests provided for in the governing documents.

26. The Plan is bereft of the host of documents that will ultimately govern the settlement trust and the process of claims allowance. While some of those documents might be in the bailiwick of the Tort Claimants' Committee, the Debtors did not even submit a draft of a cooperation agreement whereby the settlement trust would have access to important Boy Scouts

documents, e.g. the Ineligible Volunteer files that reportedly identify thousands of sexual predators. Instead, the Debtors propose circulating these critical operational documents a mere fourteen (14) days prior to the proposed voting and objection deadlines under the Plan. The timeline is unworkable, given the number of survivors and that more than 5,000 of them are pro se. Each of them will have enough difficulty wading through hundreds of pages of timely-filed legal documents and then be inundated with even more difficult to review and understand materially important documents in the last two weeks before they are required to vote.

[*Remainder of page intentionally left blank*]

**Conclusion**

27.     Regardless of the rosy picture the Debtors try to portray, there is a substantial amount of work to be done and in many instances much of that work apparently has not yet begun. Given the current state of the proposed Plan and Disclosure Statement and the host of unresolved issues, Debtors cannot reasonably expect approval of their Disclosure Statement less than a month from now.

Dated:  March 16, 2021          PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
James I. Stang (CA Bar No. 94435) (admitted *pro hac vice*)
Robert B. Orgel (CA Bar No. 10187) (admitted *pro hac vice*)
John A. Morris (NY Bar No. 2405397) (admitted *pro hac vice*)
James E. O'Neill (DE Bar No. 4042)
John W. Lucas (CA Bar No.271038) (admitted *pro hac vice*)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
Email:     jstang@pszjlaw.com
           rorgel@pszjlaw.com
           jmorris@pszjlaw.com
           joneill@pszjlaw.com
           jlucas@pszjlaw.com

*Counsel for the Tort Claimants' Committee*