## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |

**MOTION OF THE FUTURE CLAIMANTS' REPRESENTATIVE, THE OFFICIAL COMMITTEE OF TORT CLAIMANTS, AND THE COALITION OF ABUSED SCOUTS FOR JUSTICE FOR ENTRY OF AN ORDER, PURSUANT TO 11 U.S.C. §§ 105(a) AND 502(c), (I) AUTHORIZING AN ESTIMATION OF CURRENT AND FUTURE ABUSE CLAIMS AND (II) ESTABLISHING PROCEDURES AND SCHEDULE FOR ESTIMATION PROCEEDINGS**

James L. Patton, Jr., the Future Claimants' Representative (the "FCR"), the Official

Committee of Tort Claimants (the "TCC"), and the Coalition of Abused Scouts for Justice (the

"Coalition") (collectively, the "Movants"), by and through their undersigned counsel, hereby

submit this motion (the "Motion") for entry of an order, substantially in the form attached hereto

as **Exhibit A** (the "Proposed Order"),[2] pursuant to sections 105(a) and 502(c) of title 11 of the

United States Code (the "Bankruptcy Code"), (i) authorizing the estimation of the aggregate

amounts[3] of current and future Abuse Claims (defined below) against the Boy Scouts of America

("BSA"), by type of abuse, by local council, by chartered sponsoring organization, and on a

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] To the extent that any party in interest objects to the relief requested in the Proposed Order, the Movants request that such party provide a redline, prior to the objection deadline for this Motion, showing the revisions to the Proposed Order, if any, that would resolve such party's objection.  The Movants intend to meet and confer with objecting parties before the hearing on this Motion to determine if a resolution may be reached.

[3] Estimation of aggregate liability will not determine the liquidated amount of any particular individual claim.  The plan contemplated by the Movants will likely provide that such individual amounts will be determined through trust distribution procedures (the "TDP") or through release of actions into the tort system for adjudication as permitted by the TDP.

year-by-year basis; and (ii) establishing the procedures and schedule for those estimation proceedings.

In support of this Motion, the Movants respectfully represent as follows:

### PRELIMINARY STATEMENT[4]

1.      More than a year ago, the Debtors filed for bankruptcy with the stated objective of providing "consensual, expeditious, [and] global resolution of all claims related to abuse in the BSA's Scouting programs." *See* Dkt. No. 4 at 38. But the plan of reorganization proposed by the Debtors accomplishes none of those things. For that reason, the Debtors' first amended plan of reorganization (Dkt. No. 2293, the "Proposed Plan") has no chance of obtaining the support of sexual abuse survivors. Nor have the parties been successful in negotiating a consensual resolution through mediation. That is because there are two threshold questions—necessary predicates to any confirmed plan—on which the parties fundamentally disagree:

2.      The *first* is the scope and aggregate value of the Abuse Claims. Approximately 84,000 survivors filed proofs of claim before the Bar Date. This number could well be understated; and survivors of such abuse are notoriously reluctant to come forward.[5] But the Debtors (and their insurers) profess to believe just the opposite: that many survivors who filed proofs of claim are simply making it all up. *See* Dkt. No. 1972. The parties likewise disagree as to what constitutes just compensation for abuse survivors.

3.      The *second* is what assets are available to compensate survivors. The Debtors' Proposed Plan contemplates that Abuse Claims will be channeled to and resolved through a trust, which will be funded by the Debtors and other parties, including local councils and chartered

---

[4]  Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meanings ascribed to them in the sections that follow.

[5]  *See* Corky Siemaszko, *Lawyer demands Boy Scouts open up the 'perversion files,'* NBC NEWS, (Apr. 24, 2019), https://www.nbcnews.com/news/us-news/lawyer-demands-boy-scouts-open-perversion-files-n997786.

organizations.  But the Debtors assert that they can make only a limited cash contribution to that trust; the key asset funding the trust will be the Debtors' and local councils' considerable insurance assets.  Because the insurance assets are essential to a full funding of the trust, it would not suffice merely to agree on the Debtors' aggregate liability to the abuse survivors (if the parties could even do that much).  Rather, that aggregate liability, determined using a valuation scale by type of abuse, would then need to be allocated by local council and on a year-by-year and category-of-abuse basis, so that it could be matched to the appropriate insurer(s) and policy(ies).

4.      For a plan to be confirmed in these cases, the parties must find some common ground on these basic questions.  It is plainly impracticable to liquidate some 84,000 Abuse Claims before confirming a plan.  Yet, absent a consensual resolution, a plan simply cannot be confirmed unless and until a value is placed on the Abuse Claims.  The Movants (three groups that collectively represent the interests of all abuse survivors) cannot support the confirmation of a plan unless it provides clear guidance as to how survivors will be paid and adequate consideration is available to satisfy the BSA's aggregate liability.

5.      The only way to square this circle here is through an estimation proceeding.  *See* 11 U.S.C. § 502(c).[6]  Where the liquidation of individual claims would "unduly delay" the administration of the case, the Bankruptcy Code *requires* the court to estimate the value of those claims.  *See id.* ("There ***shall*** be estimated …") (emphasis added).  Estimation proceedings are

---

[6] The Movants, the Debtors, and the insurers were in mediation for many, many months before three experienced mediators, but have been unable to make progress on these issues.  In light of the Debtors' need to move ahead, as evidenced by their filing the Proposed Plan (Dkt. No. 2293) and scheduling of a hearing on the related Disclosure Statement (Dkt. No. 2294), estimation is the only practical means of moving this reorganization forward.

common in mass-tort bankruptcies precisely because it is infeasible to liquidate thousands of lawsuits before confirming a plan.[7]

6.      Here, estimation will serve four key functions.  ***First***, placing an aggregate value on the Debtors' liability will advance these cases by informing the amount of trust funding needed to satisfy the Abuse Claims and resolve whether any proposed plan meets the legal requirements under the Bankruptcy Code and applicable case law.  Those legal requirements include, *inter alia*, that the consideration received under the plan by each creditor voting against the plan equal or exceed that available in a chapter 7 liquidation (11 U.S.C. § 1129(a)(7)), and that the percentage recovery estimated to be received by abuse claimants not be unfairly dissimilar to the recoveries of other similarly situated, non-priority unsecured creditors (*id.* § 1129(b)(1)).  The output of the estimation also will set a *de facto* cap on BSA's aggregate liability for the estimated claims by defining the maximum amount BSA and beneficiaries of any channeling injunction must make available for distribution under the plan to survivors of childhood sexual abuse before, upon the plan's confirmation, such parties receive permanent protection from these claims.

7.      ***Second***, converting that aggregate value into a year-by-year allocation will provide more transparency into the insurance implications of any plan and permit the Movants to more adequately account for any relevant insurance coverage.  That is critical here.  The Debtors' Proposed Plan contemplates the assignment to a trust of, among other things, BSA's insurance rights.  Those insurance rights are arguably BSA's most valuable asset, without which it may be impossible to afford survivors meaningful recompense.  BSA's insurance coverage

---

[7] *See, e.g.*, *In re Specialty Prods. Holding Corp.*, No. 10-11779-JKF, 2013 WL 2177694, at *1 (Bankr. D. Del. May 20, 2013) (mesothelioma); *In re Fed.-Mogul Glob., Inc.*, 330 B.R. 133, 154 (D. Del. 2005) (asbestos); *In re Roman Catholic Archbishop of Portland in Or.*, 339 B.R. 215, 221 (Bankr. D. Or. 2006) (sexual abuse); *In re PG&E Corp.*, No. 19-30088-DM (Bankr. N.D. Cal. Aug. 21, 2019), Dkt. No. 3648 (wildfires).

portfolio over the relevant decades includes primary and excess policies sold by numerous insurers with varying limits, terms, and conditions. For certain years, certain insurers sold policies providing substantial limits of liability per occurrence, regardless of the number of occurrences, and for other years there may be aggregate limits. By estimating the Abuse Claims on a year-by-year basis, all parties—including the insurers themselves—will be better positioned to evaluate the insurance implications of any plan.

8.      ***Third***, estimation of the Debtors' liabilities, including the extent to which those liabilities are shared (in whole or in part) by any local council or chartered sponsoring organization, will inform the contribution that can and should be expected from any local council and chartered organization that seeks a third-party release. The Debtors' Proposed Plan contemplates a channeling injunction benefiting the 250-plus local councils affiliated with BSA, and possibly other sponsoring organizations as well. The Movants cannot (and do not) support a channeling injunction in favor of those non-debtors unless they can meaningfully evaluate the size of the liability to be extinguished by the injunction. Estimation will so inform the Movants and their constituents.

9.      ***Fourth***, estimation will afford the parties an opportunity to test, with the guidance of the Court, certain insurers' contention that not all proofs of claim are valid. The insurers have sought under Rule 2004 sweeping discovery from more than 1,000 claimants—and more than a dozen law firms—because they hypothesize that large swaths of claims were simply fabricated. The insurers' misplaced Rule 2004 discovery efforts are wasteful and counterproductive, and they will not advance these cases toward confirmation. Estimation will. And, if any proofs of claim turn out to be invalid, the estimation process will account for that.

10.     Accordingly, the Movants request entry of the Proposed Order (attached hereto as **Exhibit A**) authorizing the estimation of current and future Abuse Claims for purposes of plan distribution and setting claim distribution reserves.  Such an estimation, using a valuation scale for different types of abuse, will result in a determination of the Debtors' aggregate liability on a year-by-year basis, will shed light on the co-liability of local councils and sponsoring organizations that are seeking releases in the plan, and will resolve the parties' dispute as to the appropriate size of a trust to fairly compensate abuse survivors.  That, in turn, will promote the seasonable confirmation of a plan and distributions to abuse survivors—many of whom suffered this abuse decades ago, and not one of whom should be forced to wait a moment longer than necessary to receive just compensation.

## JURISDICTION AND VENUE

11.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter entails the estimation of "contingent or unliquidated personal injury tort or wrongful death claims," as that term is used in 28 U.S.C. § 157(b)(2)(B), and thus is a non-core proceeding.  Further, 28 U.S.C. § 157(b)(5) provides that personal injury tort claims "shall be tried in the district court in which the bankruptcy case is pending."  The Movants therefore intend to file a separate motion under 28 U.S.C. § 157(d) to withdraw, in whole, the contested matter resulting from the filing of this Motion to the United States District Court in which the Debtors' chapter 11 cases are pending.  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     The statutory and legal predicates for the relief sought herein are sections 105(a) and 502(c) of the Bankruptcy Code.

## BACKGROUND

### A.    The BSA Files For Bankruptcy

13.    The Debtors commenced these chapter 11 cases on February 18, 2020 (the "Petition Date").  These chapter 11 cases are being jointly administered for procedural purposes pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

14.    On March 5, 2020, the Office of the United States Trustee for the District of Delaware appointed the TCC and the Official Committee of Unsecured Creditors pursuant to section 1102 of the Bankruptcy Code.  *See* Dkt. Nos. 141, 142.  The TCC serves as a fiduciary representative for all holders of abuse claims against the BSA.

15.    On April 24, 2020, the Court entered an order appointing the FCR to represent the interests of holders of future Abuse Claims (as defined below) that may be asserted against the Debtors.  *See* Dkt. No. 486.

16.    On July 24, 2020, the Coalition filed a notice of appearance in these chapter 11 cases pursuant to section 1109(b) of the Bankruptcy Code.  The Coalition comprises approximately 12,000 sexual abuse survivors who have submitted proofs of claim against the Debtors and signed affirmative consents to being part of the Coalition.

### B.    Approximately 84,000 Sexual Abuse Survivors Come Forward

17.    Before commencing its bankruptcy case, the BSA was named as a defendant in approximately 275 lawsuits asserting sexual abuse claims against the BSA and affiliated organizations.  *See* Dkt. No. 4 at 32.

18.     On May 26, 2020, the Court entered an order setting November 16, 2020 as the date by which sexual abuse survivors needed to file proofs of claim (the "Bar Date").[8]  The Debtors then implemented a robust and nationwide noticing campaign which included television, radio, print, and internet advertising.  *See* Dkt. No. 1145 ¶ 25.  Approximately 84,000 sexual abuse survivors submitted proofs of claim prior to the Bar Date.

**C.     The Parties Are Unable To Find Common Ground As To The Scope And Value Of The Sexual Abuse Claims**

19.     On the Petition Date, the Debtors filed a motion seeking the appointment of a mediator to help resolve the Abuse Claims through a chapter 11 plan of reorganization.  Dkt. No. 17.  The Court referred these cases to mediation on June 9, 2020.  Dkt. No. 812.

20.     On March 1, 2021, the Debtors filed their Proposed Plan and related Disclosure Statement (Dkt. No. 2294, the "Disclosure Statement").  A hearing regarding approval of the Disclosure Statement is presently scheduled for April 15, 2021.

21.     Among other things, the Proposed Plan provides that both current and future Abuse Claims will be channeled to a trust and processed, liquidated, and paid pursuant to the yet unfiled TDP.  Dkt. No. 2293 arts. IV & X.F.

22.     In pertinent part, the Proposed Plan defines "Abuse" as:

> sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault or battery, rape, pedophilia, ephebophilia, sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation, any other sexual misconduct or injury, contacts or interactions of a sexual nature, including the use of photography, video, or digital media, or other physical abuse or bullying or harassment without regard to whether such physical abuse or bullying is of a sexual nature, between a child and an adult, between a child and another child, or between a non-consenting adult and another adult, in each instance without regard to whether such activity involved explicit force, whether such activity involved genital or other physical contact,

---

[8]  On September 16, 2020, the Court entered an order supplementing the Bar Date Order.  Dkt. No. 1331.

and whether there is or was any associated physical, psychological, or emotional harm to the child or non-consenting adult.

*Id.* art. I.A.17.  An "Abuse Claim" is defined, in turn, as:

> a liquidated or unliquidated Claim against a Protected Party that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively, Abuse that occurred prior to the Petition Date, including any such Claim that seeks monetary damages or other relief, under any theory of law or equity whatsoever, including vicarious liability, *respondeat superior*, conspiracy, fraud, including fraud in the inducement, any negligence-based or employment-based theory, including negligent hiring, selection, supervision, retention or misrepresentation, any other theory based on misrepresentation, concealment, or unfair practice, public or private nuisance, or any other theory, including any theory based on public policy or any act or failure to act by a Protected Party or any other Person for whom any Protected Party is alleged to be responsible.

*Id.* art. I.A.18.

23.    And, pursuant to the Proposed Plan, a "Future Abuse Claim" includes:

> any Direct Abuse Claim against any Protected Party that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively, Abuse that occurred prior to the Petition Date but which, as of the date immediately preceding the Petition Date, was held by a Person who, as of such date,
>
> (a) had not attained eighteen (18) years of age, or
>
> (b) was not aware of such Direct Abuse Claim as a result of "repressed memory," to the extent the concept of repressed memory is recognized by the highest appellate court of the state or territory where the claim arose.

*Id.* art. I.A.106.

24.    The Proposed Plan and Disclosure Statement do not purport to inform holders of Abuse Claims how much they will receive on account of those claims.  That is because the Debtors have no idea.  The lion's share of the proposed trust will comprise rights against the

Debtors' insurance carriers; those carriers, to date, have refused to acknowledge their coverage obligations.[9]

25.    Meanwhile, the parties' mediation efforts have foundered.    The parties fundamentally disagree as to the scope and value of the sexual abuse claims, and by extension the size of the trust necessary to compensate survivors.  Without common ground on those basic issues, it is simply impossible to make headway toward a confirmable plan.

## RELIEF REQUESTED

26.    By this Motion, the Movants request entry of the Proposed Order (i) authorizing estimation of the Debtors' aggregate liability for current and future Abuse Claims, pursuant to section 502(c) of the Bankruptcy Code, in the manner described below; and (ii) establishing the procedures and schedule for those estimation proceedings.

## BASIS FOR RELIEF

### I.    Under The Circumstances Of These Chapter 11 Cases, Estimating The Value Of Sexual Abuse Claims Is Mandatory Under 11 U.S.C. § 502(c)

27.    Estimation is mandatory here.  Section 502(c) of the Bankruptcy Code provides that the court "***shall***" estimate "any contingent or unliquidated" claims against a debtor if the "fixing or liquidation" thereof "would unduly delay the administration of the case."  11 U.S.C. § 502(c) (emphasis added); *see A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1011-12 (4th Cir. 1986) (noting that the "duty of estimation . . . is not a permissive one" where liquidation would unduly delay reorganization); *In re A & B Assocs., L.P.*, No. 17-40185-EJC, 2019 WL 1470892, at *35 (Bankr. S.D. Ga. Mar. 29, 2019) ("[N]umerous bankruptcy courts have held that [e]stimation pursuant to Bankruptcy Code section 502(c) is mandatory where adjudication of the

---

[9] In contrast, the Debtors have offered estimates and specific procedures for the payment of virtually every other class of creditors—including the Debtors' current and former executives, to whom the Debtors propose to pay millions of dollars.  The Proposed Plan additionally contemplates paying all other non-priority, unsecured creditors in full or nearly in full.  Dkt. No. 2294.

claim would unduly delay the administration of the bankruptcy case." (quotation marks omitted)); *In re G-I Holdings, Inc.*, 323 B.R. 583, 599 (Bankr. D.N.J. 2005) ("[The estimation provision] of the Bankruptcy Code is drafted in mandatory terms. That is, any contingent or unliquidated claim 'shall' be estimated so long as the [fixing or liquidation] of the particular claim would 'unduly delay the administration of the case.'" (citing 11 U.S.C. § 502(c)).

28.     That standard is plainly satisfied here. As of this filing, approximately 84,000 unique sexual abuse proofs of claim have been submitted against the Debtors, all or virtually all of which are unliquidated. It could take decades to reduce these claims to judgment in the tort system. This "very real assessment of the enormity of litigation facing" the Debtors "would undoubtedly cause undue delay in the administration of the bankruptcy case and could possibly be the death knell" of a confirmable plan. *See In re G-I Holdings*, 323 B.R.at 599-600; *see also In re John Q. Hammons Fall 2006, LLC*, No. 16-21142, 2017 WL 4638439, at *4 (liquidating "hundreds of claims" would cause undue delay); *In re Interco Inc.*, 137 B.R. 993, 998 (Bankr. E.D. Mo. 1992) (liquidation that would take about three to four years would cause undue delay); *In re MacDonald*, 128 B.R. 161, 165 n.6 (Bankr. W.D. Tex. 1991) (liquidation that would take about two years would cause undue delay).

29.     In fact, for most of these claims, litigation has not even commenced. Of the relatively few claims presently being litigated, most are stayed in their earliest stages. *See In re Nova Real Estate Inv. Tr.*, 23 B.R. 62, 65 (Bankr. E.D. Va. 1982) (where no trial was yet scheduled in the non-bankruptcy forum, delay would be "undue"); *cf. In re Apex Oil Co.*, 107 B.R. 189, 193 (Bankr. E.D. Mo. 1989) (finding no undue delay in part because "a final disposition" on the underlying claims was "imminent"). To liquidate all these claims would require fact-intensive discovery regarding the circumstances of the underlying abuse, statute-of-

limitations issues, and others.  And this is to say nothing of the *additional* round of litigation that may be necessary to establish the value and viability of the underlying claims in order to determine the insurers' contractual liability.  *See In re Lane*, 68 B.R. 609, 611 (Bankr. D. Haw. 1986) (recognizing that post-trial proceedings also contribute to undue delay).

30.     Importantly, because the Abuse Claims collectively represent "the Debtor's principal creditor"—*i.e.*, sexual abuse survivors—it is "beyond dispute that the resolution of [these] claim[s] 'is a critical juncture for the administration' of the Debtor[s'] case[s].'"  *In re A & B Assocs.*, 2019 WL 1470892, at \*36 (quoting *In re John Q. Hammons*, 2017 WL 4638439, at \*4).  History tells us that, without clarity on the value of these tens of thousands of unliquidated claims, the parties cannot possibly achieve common ground on a confirmable plan.  That informational vacuum threatens a delay that "could be fatal to moving these Chapter 11 cases from the theoretical to the working reorganization they propose to be."  *Id.*

31.     Even if the parties could agree upon the terms of a confirmable plan without estimation, this Court would be unable to confirm any such plan in these cases without first knowing the value of the Abuse Claims.  *See, e.g.*, *In re Rhead*, 179 B.R. 169, 172-73 (Bankr. D. Ariz. 1995) (where a plan is pending and depends on resolution of an unliquidated claim, proceedings other than estimation would cause undue delay); *In re Lane*, 68 B.R. at 611 ("No plan of reorganization can be confirmed so long as [a] claim remains unliquidated and not estimated.").  Take the Debtors' Proposed Plan in particular: it contemplates that Abuse Claims will be channeled to a trust and processed, liquidated, and paid under a TDP (or certain of these claims may also, through a confirmed plan, be released into the tort system for adjudication as permitted by the TDP).  *See* Proposed Plan art. IV.  But what is the value of the assets (including insurance rights) that will go into the trust?  And, more importantly, will those assets be

sufficient to satisfy the Abuse Claims?  Those questions cannot be answered without first estimating the aggregate value of the Abuse Claims.  Also, without the answers to such questions, the Disclosure Statement cannot satisfy the "adequate information" standard required for approval pursuant to section 1125(b) of the Bankruptcy Code.  *See* Disclosure Statement at 11-12 (citing *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, 321 (3d Cir. 2003) ("[A] party seeking chapter 11 bankruptcy protection has an affirmative duty to provide creditors with a disclosure statement containing adequate information to enable a creditor to make an informed judgment about the Plan." (quotation marks omitted)); *see also Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) (stating that section 1125 "seeks to guarantee a minimum amount of information to the creditor asked for its vote"); *Cohen v. TIC Fin. Sys. (In re Ampace Corp.)*, 279 B.R. 145, 157 n.26 (Bankr. D. Del. 2002) ("Section 1125 governs the contents of a disclosure statement and provides that acceptance or rejection of a plan may not be solicited until each holder of a claim or interest receives the plan or a summary thereof, 'and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.'"); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 98 (Bankr. D. Del. 1999) (stating that a disclosure statement "need only contain adequate information for those entitled to vote"); *In re Civitella*, 14 B.R. 151, 152 (Bankr. E.D. Pa. 1981) ("The disclosure statement must contain adequate information in order for it to be approved by the Court.").

32.    Estimation of the Abuse Claims is also critical to determining whether the Proposed Plan (or any other plan) satisfies the Bankruptcy Code's confirmation requirements. 11 U.S.C. § 1129(a)(7), (a)(11), (b)(1); *see, e.g.*, *In re Roman Catholic Archbishop of Portland in Or.*, 339 B.R. at 223 ("Requiring debtor to wait until all claims were liquidated to obtain a

determination of these types of confirmation issues would be an undue delay."); *In re Rhead*, 179 B.R. at 172-73 ("undue delay" standard met where court had to determine whether plan was acceptable to claimants and otherwise satisfied Section 1129); *In re Interco Inc.*, 137 B.R. at 998 (granting estimation because it "would be difficult for this Court to determine the feasibility of a plan until the allowed amount of the [creditor's] claim is determined").

33.     For example, estimation will allow the Court to evaluate whether the plan is fair and equitable with respect to the treatment of Abuse Claims as compared to other general unsecured claims. *Accord In re Armstrong World Indus., Inc.*, 348 B.R. 111, 124 (D. Del. 2006) (using estimation to determine whether a plan favored one class of unsecured creditors over another); *In re Rhead*, 179 B.R. at 172-73 (estimation warranted where court had to determine whether plan was acceptable to claimants and otherwise satisfied Section 1129); *In re Interco*, 137 B.R. at 998 (estimation warranted because it "would be difficult for this Court to determine the feasibility of a plan until the allowed amount of the [creditor's] claim is determined").

34.     Further, because the Debtors are proposing a plan that includes involuntary third-party releases and purports to bind abuse survivors (including future claimants),[10] the Court will be required at plan confirmation to consider whether the Debtors' plan provides for the payment of all or substantially all of the Abuse Claims. *See In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 272 (Bankr. D. Del. 2017). The Court cannot possibly make that judgment without knowing the value of Abuse Claims, as well as the responsibility of any third parties seeking a release from them. *See, e.g.*, *In re Eagle-Picher Indus., Inc.*, 189 B.R. 681, 682 (Bankr. S.D. Ohio 1995), *as amended* (Dec. 14, 1995) (estimating "present and future asbestos-related personal injury claims in the aggregate" "so that a proper allocation of plan funding assets can be

---

[10] *See* Proposed Plan art. III.B.8, IV.E, X.D & X.E.

made as between the unsecured creditors and the PI Trust created by the plan").  Nor could a channeling injunction of the sort proposed by the Debtors be permitted absent overwhelming support from the relevant creditors (here, the abuse survivors).[11]  And abuse survivors cannot meaningfully evaluate (much less support) a channeling injunction when they have no way of knowing the value of the claims it purports to extinguish.

35.    In addition, when a plan proposes the release of non-debtors, Bankruptcy Code section 1129(a)(7) requires the court to include the value of those released claims in its hypothetical, alternative recovery comparison.  *See Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 9 (D. Conn. 2006) ("[T]he best interests equation also properly mandates consideration of creditors' comparative recoveries on non-debtor claims, to the extent the plan is treating those non-debtor claims by release."); *see also In re Ditech Holding Corp.*, 606 B.R. 544, 614 (Bankr. S.D.N.Y. 2019) (same); *In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) ("[I]n a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at lease as well under chapter 11 plan as they would in a chapter 7 liquidation."); *In re Quigley*, 437 B.R. 102 (Bankr. S.D.N.Y. 2010) (same).  Estimation of the BSA's aggregate liability for Abuse Claims—using a valuation scale

---

[11] *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 934-35 (W.D. Mo. 1994) (factors for approval of channeling injunction include that the impacted class has "overwhelmingly" (over 90%) voted to accept the proposed plan treatment); *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) ("Nondebtor releases may also be tolerated if the affected creditors consent."); *see also In re Millennium Lab Holdings II, LLC*, No. 18-3210, 2019 U.S. App. LEXIS 37939, at *8 (3d Cir. Dec. 19, 2019) (over 93% of pre-petition lenders had agreed to the releases in a prepetition restructuring agreement); *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1045 (7th Cir. 1993) (creditors and interest holders entitled to vote "overwhelmingly" accepted the proposed plan treatment); *In re A.H. Robins Co.*, 880 F.2d 694, 698 (4th Cir. 1989) (94% of tort claimants affected by the injunction voted to accept the plan); *In re AOV Indus., Inc.*, 792 F.2d 1140, 1143 (D.C. Cir. 1986) (creditors "overwhelmingly" accepted plan with over 90% of the creditors in each class voting to accept); *In re Archdiocese of Saint Paul & Minneapolis*, 578 B.R. 823, 833 (Bankr. D. Minn. 2017) (refusing to approve third-party releases and channeling injunction based solely on overwhelming rejection of the provision by the sex abuse victims); *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 664 (Bankr. D.D.C. 1992) (only 1 of 63 creditors and 8 of 93 partners objected to injunction); *In re Johns-Manville Corp.*, 68 B.R. 618, 621 (Bankr. S.D.N.Y. 1986) (plan overwhelmingly accepted).

by type of abuse, on a year-by-year basis, and identifying applicable local councils and chartered, sponsoring organizations—is necessary to allow for that comparative exercise.

36.     Estimation also will inform the parties of key information relevant to the value of the insurance rights proposed to be contributed to the trust.  In particular, a year-by-year estimation—of the sort we propose—will permit the Abuse Claim liability to be matched to the appropriate insurer(s) and policy(ies) of the BSA and/or the local councils.  That is crucial here, given that the incidents of sexual abuse span many decades and implicate at least 79 different insurance carriers and nearly 500 different policies sold to BSA, and hundreds more policies sold to local councils, which have disparate terms and policy limits.  Moreover, such estimation may have the prudential benefit of simultaneously resolving ancillary disputes with and among the insurers about who is liable for what.  By anticipating and solving for such coverage disputes, the estimation could pretermit years of collateral, piecemeal, and potentially inconsistent litigation that would otherwise defeat the Debtors' objective of a "streamlined[] and certain process by which [a]buse [s]urvivors may obtain compensation."  Disclosure Statement at 6; *see also In re Interco*, 137 B.R. at 998 (noting that estimation "would prevent piecemeal litigation which would seriously threaten or jeopardize a debtor's ability to reorganize") (quotation marks omitted)); *In re Frontier Airlines*, 137 B.R. 811, 814 (D. Colo. 1992) (affirming a bankruptcy court's decision that a "risk of inconsistency that could result from an individualized litigation process" supported estimation); *see also In re Fed.-Mogul Glob.*, 330 B.R. at 154 ("Estimation helps the court avoid the need to await the resolution of outside lawsuits to determine issues of liability or amount owed by means of anticipating and estimating the likely outcome of these

actions.") (quotation marks omitted); *In re Adelphia Bus. Sols., Inc.*, 341 B.R. 415, 422 (Bankr. S.D.N.Y. 2003).[12]

37.     To be clear, the Movants are prepared to continue mediation discussions in good faith with the Debtors and other constituencies to try to find common ground as to the scope and value of the Abuse Claims.  But there is no certainty that those discussions will bear fruit.  Thus, to enable the earliest possible confirmation of a chapter 11 plan, it is crucial to begin estimation now.

## II.     The Court Should Approve the Proposed Estimation Schedule

38.     Courts in this District and others have adopted claims estimation procedures in the course of granting estimation orders.  *See, e.g.*, *In re CMTSU Liquidation, Inc. (f/k/a CIBER, Inc.)*, Case No. 17-10772 (BLS) (Bankr. D. Del. Sep. 29, 2017) (approving claims estimation procedures); *In re VeraSun Energy Corp.*, Case No. 08-12606 (BLS) (Bankr. D. Del. Nov. 19, 2009) (approving expedited claims estimation procedures); *In re Motors Liquidation Co.*, Case No. 09-50026 (REG) (Bankr. S.D.N.Y. Dec. 15, 2010) (authorizing a schedule for estimation proceedings).

39.     The Movants propose the following schedule for fact and expert discovery, motion practice, briefing, and a hearing in advance of consideration of any disclosure statement. This process is designed to avoid undue delay while ensuring a transparent process in which all parties may participate:

    a.     Within 7 days after entry of the Order granting this Motion, any party in interest that wishes to submit evidence in connection with the estimation hearing shall file a Notice of Estimation Participating Party, in the form attached hereto as Exhibit B.  The Movants

---

[12] We expect that any remaining disputes as between the Debtors and its insurers regarding coverage issues could be resolved through a declaratory judgment action, which could proceed in parallel with the estimation proceeding.

and each party that timely files the Notice of Estimation Participating Party shall be a

Participating Party. Any party in interest other than the Movants that fails to timely file a

Notice of Estimation Participating Party within such time period shall be barred from

submitting evidence in connection with the estimation hearing, provided, however, that nothing

in the Order granting this Motion shall limit or restrict the rights of any party in interest to

defend or respond to discovery requests, including, without limitation, defending or objecting to

the taking of depositions and responding to subpoenas, all of which are expressly reserved.

b.      Any party that timely files a Notice of Estimation Participating Party shall

be deemed to have assented to and shall be bound by the Order Approving Confidentiality and

Protective Order (Dkt. No. 799) (the "Protective Order") (to which each of Movants already is

bound). Each party in interest that files a Notice of Estimation Participating Party shall include

a statement indicating that such party has reviewed the Protective Order and agrees to comply

with it in all respects.

c.      Within 10 days after entry of the Order granting this Motion, the Debtors,

their insurance carriers, and all local councils and chartered, sponsoring organizations that

become Participating Parties shall produce to the other Participating Parties information in their

possession, if any, sufficient to show all amounts paid to settle or otherwise satisfy claims

alleging sexual abuse.

d.      Within 14 days after entry of the Order granting this Motion, the Movants

shall propose a statistically representative sample of claimants from whom they propose to take

discovery, together with the bases and justifications supporting such sample size and

selection. Within 7 days thereafter, the Debtors may object to that sample and/or propose their

own sample. If the Movants and the Debtors cannot agree on a representative sample, which

they shall attempt to do in good faith, then the matter will be resolved—and a sample chosen—by the Court following an evidentiary hearing at which the parties' respective experts will testify and be subject to cross examination.

   e. Within 56 days after entry of the Order granting this Motion, all fact discovery, including all fact depositions, shall be completed.  Fact discovery shall be limited to those claimants identified on any Participating Party's notice of claimant sample.

   f. Within 66 days after entry of the Order granting this Motion, each Participating Party may serve on all other Participating Parties its expert reports, along with all documents considered or relied upon by the experts authoring those reports.

   g. Within 76 days after entry of the Order granting this Motion, each Participating Party may serve on all other Participating Parties its rebuttal expert reports, along with all documents considered or relied upon by the experts authoring those reports (to the extent not previously produced).

   h. Within 90 days after entry of the Order granting this Motion, all expert discovery, including all expert depositions, shall be completed.

   i. Within 111 days after entry of the Order granting this Motion, each Participating Party shall file its proposed estimation order, trial brief, motions in limine (if any), and motions to preclude expert testimony (if any).  No dispositive motions shall be permitted.

   j. The estimation hearing will commence on a date to be set by the Court.

  40. Although the proposed estimation will take some time, albeit subject to the aggressive schedule proposed above, estimation is necessary here—and there is no feasible alternative.  Liquidating the Abuse Claims before confirmation is infeasible.  Yet, the Debtors cannot emerge from bankruptcy until they are in a position to provide adequate disclosure, prove

that their plan is fair and equitable, and obtain an affirmative vote from holders of Abuse Claims, none of which can happen until abuse survivors can determine whether they are being fairly compensated under any plan.  And leaving the Abuse Claims to be liquidated post-confirmation is not tenable.  Miring survivors in years of disputes with insurance carriers, intent on shirking their coverage obligations, would only delay further the justice which the survivors have long been denied.

## NOTICE

41.    Notice of this Motion will be provided to the following parties: (a) the Debtors; (b) the U.S. Trustee; (c) counsel to the Official Committee of Unsecured Creditors; (d) counsel to the Ad Hoc Committee of Local Councils; (e) counsel to JPMorgan Chase Bank National Association; (f) the County Commission of Fayette County (West Virginia), as issuer of those certain Commercial Development Revenue Bonds (Arrow WV Project), Series 2010A, 2010B and 2012; and (g) any other party that has requested notice pursuant to Bankruptcy Rule 2002. The Movants submit that, in light of the nature of the relief requested herein, no other or further notice need be given.

## CONCLUSION

WHEREFORE, the Movants respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  March 16, 2021
Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Robert S. Brady*
Robert S. Brady (Bar No. 2847)
Edwin J. Harron (Bar No. 3396)
Sharon M. Zieg (Bar No. 4196)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:  rbrady@ycst.com
         eharron@ycst.com
         szieg@ycst.com

*Counsel to the Future Claimants' Representative*

– and –

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
James I. Stang (CA Bar No. 94435)
Iain A.W. Nasatir (CA Bar No. 148977)
John A. Morris (NY Bar No. 2405397)
James E. O'Neill (DE Bar No. 4042)
John W. Lucas (CA Bar No.271038)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email:  jstang@pszjlaw.com
         inasatir@pszjlaw.com
         jmorris@pszjlaw.com
         joneill@pszjlaw.com
         jlucas@pszjlaw.com

*Counsel for the Tort Claimants' Committee*

– and –

MONZACK MERSKY AND BROWDER, P.A.

*/s/ Rachel B. Mersky*
Rachel B. Mersky (DE No. 2049)
1201 North Orange Street, Suite 400
Wilmington, Delaware 19801
Telephone:  (302) 656-8162
Facsimile:  (302) 656-2769
E-mail:  rmersky@monlaw.com

– and –

BROWN RUDNICK LLP
David J. Molton, Esq.
Eric R. Goodman, Esq.
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Email: dmolton@brownrudnick.com
Email: egoodman@brownrudnick.com

– and –

Sunni P. Beville, Esq.
Tristan G. Axelrod, Esq.
One Financial Center
Boston, MA 02111
Telephone:  (617) 856-8200
Email: sbeville@brownrudnick.com
Email: taxelrod@brownrudnick.com

– and –

ROBBINS, RUSSELL, ENGLERT, ORSECK,
  UNTEREINER & SAUBER LLP
Lawrence S. Robbins*
Ariel N. Lavinbuk*
William J. Trunk*
Joshua S. Bolian*
2000 K Street NW, 4th Floor
Washington, DC 20006
Telephone:  202-775-4500
Email:  lrobbins@robbinsrussell.com
          alavinbuk@robbinsrussell.com
          wtrunk@robbinsrussell.com
          jbolian@robbinsrussell.com
* (motion to appear *pro hac vice* forthcoming)

*Counsel to the Coalition of Abused Scouts for Justice*