```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2
                                         .   Chapter 11
 3    IN RE:                             .
                                         .   Case No. 20-10343 (LSS)
 4    BOY SCOUTS OF AMERICA and          .
      DELAWARE BSA, LLC,                 .
 5                                       .
                                         .
 6    _____Debtors._____  .
      BOY SCOUTS OF AMERICA,             .   Adv. Pro. No. 20-50527
 7                                       .
                       Plaintiff,        .
 8                                       .
          v.                             .   Courtroom No. 2
 9                                       .   824 Market Street
      A.A., et al.,                      .   Wilmington, Delaware 19801
10                                       .
                       Defendants.       .   March 17, 2021
11    . . . . . . . . . . . . . . . . .  .   9:00 A.M.

12              TRANSCRIPT OF TELEPHONIC OMNIBUS HEARING
            BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
13                   UNITED STATES BANKRUPTCY JUDGE

14    APPEARANCES:

15    For the Debtor:          Derek C. Abbott, Esquire
                               Andrew R. Remming, Esquire
16                             Eric W. Moats, Esquire
                               Paige N. Topper, Esquire
17                             MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                               1201 North Market Street, 16th Floor
18                             Wilmington, Delaware 19899

19                             - and -

20
                               Jessica C. Lauria, Esquire
21                             WHITE & CASE LLP
                               1221 Avenue of the Americas
22                             New York, New York 10020

23

24    Audio Operator:          Brandon J. McCarthy

25
```

1   Transcription Company:   Reliable
                             1007 N. Orange Street
2                            Wilmington, Delaware 19801
                             (302)654-8080
3                            Email:  gmatthews@reliable-co.com

4   Proceedings recorded by electronic sound recording; transcript
5   produced by transcription service.

6

7   TELEPHONIC APPEARANCES (Continued):

8   For the Debtors:         Michael C. Andolina, Esquire
                             Matthew E. Linder, Esquire
9                            Laura E. Baccash, Esquire
                             Blair M. Warner, Esquire
10                           WHITE & CASE LLP
                             111 South Wacker Drive
11                           Chicago, Illinois 60606

12  For Century Indemnity:   Tancred Schiavoni, Esquire
                             Brad Elias, Esquire
13                           O'MELVENY
                             7 Times Square
14                           New York, New York 10036

15
    For Tort Claimants:      James Stang, Esquire
16                           PACHULSKI STANG ZIEHL JONES LLP
                             919 North Market Street, 17th Floor
17                           Wilmington, Delaware 19801

18
    For Hartford Financial:  Philip Anker, Esquire
19                           WILMERHALE
                             250 Greenwich Street
20                           New York, New York 10007

21  For Andrews Thornton:    Lawrence Robbins, Esquire
                             ROBBINS RUSSELL ENGLERT ORSECK
22                             UNTEREINER SAUBER LLP
                             2000 K Street NW, 4th Floor
23                           Washington, DC 20006

24

25

```
 1   TELEPHONIC APPEARANCES (Continued):

 2   For the Ad Hoc            Richard Mason, Esquire
     Committee of Local        Joseph Celentino, Esquire
 3   Councils:                 WACHTELL, LIPTON, ROSEN & KATZ
                               51 West 52nd Street
 4                             New York, New York 10019

 5
     For the Committee of      Rachel Ringer, Esquire
 6   Unsecured Creditors:      KRAMER LEVIN NAFTALIS& FRANKEL LLP
                               1177 Avenue of the Americas
 7                             New York, New York 10036

 8   For the FCR:              Edwin Harron, Esquire
                               YOUNG CONAWAY STARGATT & TAYLOR LLP
 9                             1000 N West Street
                               Wilmington, Delaware 19801
10
     For the U.S. Trustee:     David Buchbinder, Esquire
11                             UNITED STATES DEPARTMENT OF JUSTICE
                               OFFICE OF THE UNITED STATES TRUSTEE
12                             844 King Street, Suite 2207
                               Lockbox 35
13                             Wilmington, Delaware 19801

14
     For the Coalition of      David Molton, Esquire
15   Abused Scouts for         BROWN RUDNICK LLP
     Justice:                  7 Times Square
16                             New York, New York 10036

17
     For Abuse Survivors:      Michael Pfau, Esquire
18                             PFAU COCHRAN VERTETIS AMALA
                               403 Columbia Street, Suite 500
19                             Seattle, Washington 98104

20                             - and -

21                             David Klauder, Esquire
                               BIELLI & KLAUDER, LLC
22                             1204 North King Street
                               Wilmington, Delaware 19801
23

24

25
```

1 | MATTERS GOING FORWARD:

2 | 2.  Debtors' Second Omnibus (Substantive) Objection to Certain
3 | (I) Cross-Debtor Duplicate Claims, (II) Substantive Duplicate
Claims, (III) No Liability Claim, (IV) Misclassified Claims,
4 | and (V) Reduce and Allow Claims (Non-Abuse Claims) (D.I. 2020,
Filed 2/3/21)

5 |     **Schedule 1:  Supplemental Revisions Needed**

6 |     **Schedule 2:  Supplemental Revisions Needed**

7 |     **Schedule 3:  Objection Sustained**

8 |     **Schedule 4:  Objection Sustained**

9 |     **Schedule 5:  Objection Sustained**

10 |

11 | MATTERS GOING FORWARD AS A STATUS CONFERENCE:

12 | 6. Amended Chapter 11 Plan of Reorganization for Boy Scouts of
13 | America and Delaware BSA, LLC (D.I. 2293, Filed 3/1/21)

14 | 7.  [SEALED] Hartford and Century's Motion for an Order (I)
Authorizing Certain Rule 2004 Discovery and (II) Granting
15 | Leave from Local Rule 3007-1(f) to Permit the Filing of
Substantive Omnibus Objections (D.I. 1971, Filed 1/22/21)
16 |

17 | 8.  [SEALED] Insurers' Motion for an Order Authorizing Rule
2004 Discovery of Certain Proofs of Claims (D.I. 1974, Filed
18 | 1/22/21)

19 |

20 | ADVERSARY PROCEEDING:

21 | *Boy Scouts of America v. AA, et al.; Adv. Pro. No. 20-50527
(LSS)*

22 | 1. The BSA's Motion to Extend Preliminary Injunction Pursuant
23 | to 11 U.S.C. §§ 105(a) and 362 (D.I. 144, filed 2/22/21)

24 | **Ruling:  Approved/Order Entered**

25 |

1    (Proceedings commenced at 9:09 a.m.)

2          THE COURT:  Good morning.  This is Judge

3  Silverstein.  We're here in the Boy Scouts of America case;

4  Case No. 20-50527.

5          Let me remind everyone to make sure your computers

6  are muted when you are not addressing the court.

7          I will turn it over to Mr. Abbott.

8      (No verbal response)

9          THE COURT:  Can parties hear me?

10          UNIDENTIFIED SPEAKER:  Yes, Your Honor.

11          THE COURT:  Okay.  Thank you.

12          Mr. Abbott?

13          MR. ABBOTT:  Thank you.  Derek Abbott here of

14  Morris Nichols on behalf of the debtors, Your Honor.

15          We have a modestly long agenda today so we will try

16  to get through it quickly, Your Honor.

17          In accordance with the second amended agenda that

18  was filed -- and I want to make sure that Your Honor has it.

19          THE COURT:  I do.

20          MR. ABBOTT:  Thank you, Your Honor.

21          Item one, orders have been entered.  We are good

22  there.

23          Number two, Your Honor, is, I believe, the second

24  omnibus claims objection.  There were certifications filed,

25  but we understand the court may have some questions about the

1 matters raised in that objection.

2          So we're at the court's pleasure.  I believe Mr.

3 Linder will be responding to the court on these issues.  So we

4 are happy to respond as appropriate.

5          THE COURT:  Okay.

6          MR. LINDER:  Good morning, Your Honor.  Matt Linder

7 of White & Case.

8          Can you hear me okay?

9          THE COURT:  Yes.

10          MR. LINDER:  As Mr. Abbott mentioned, the second

11 omnibus substantive claims objection it relates to

12 approximately sixty non-abuse claims.  In particular, we are

13 seeking to expunge certain duplicate claims and no liability

14 claims to reclassify certain claims that were inappropriately

15 asserted as having priority under the bankruptcy code, and to

16 reduce and allow certain claims in revised amounts.

17          Your Honor, we had a few informal comments that we

18 received from counterparties to fund the claimants.  We were

19 able to resolve those without any further filings.  Those were

20 noted in the certification of counsel filed at Docket No.

21 2315.  We did not receive any formal responses, but we're

22 happy to address your questions.

23          THE COURT:  Okay.  Thank you.

24          Yes.  I have reviewed the second omnibus objection

25 and -- I'm sorry, I'm getting feedback.  Am I the only one?

```
1              MS. BATTS:  Your Honor, this is Cacia.  I will go
2    ahead and contact Rob and let him know that you are --
3              THE COURT:  Thank you.
4              MS. BATTS:  You're welcome.
5              THE COURT:  The -- we've reviewed the objections
6    and I have questions with respect to Schedule 1, Schedule 2,
7    and Schedule 3 generally.
8              With respect to Schedule 1 it labels these cross-
9    debtor duplicate claims and by definition if they're cross-
10   debtor they're not duplicative.  Okay.  These persons or
11   entities have asserted a claim against two different debtors,
12   often on the same day.  So it's clear they intended to assert
13   claims against two different debtors.  So they're not
14   duplicative.  So why should I disallow them as duplicative?
15             MR. LINDER:  I'm happy to address that, Your Honor.
16   Delaware BSA is the other debtor in this case, and Delaware
17   BSA is a non-operating company that is not party to other
18   contracts, it's not entered into any guarantees other than
19   being a co-obligor on Boy Scouts of America's prepetition
20   funded indebtedness.
21             Certain of the claims, for example, certain
22   liability, rather, under the Boy Scouts restoration plan which
23   is a prepetition retirement plan.  For example, Delaware BSA
24   has no connection to that plan.  So your comments are well
25   taken in that they are not duplicates asserted at two
```

1  different debtors.  The basis for our objection was that

2  Delaware admits they have no liability on account of these

3  claims.

4         THE COURT:  But that wasn't the basis of your

5  objection.  The basis of your objection is that they're

6  duplicative.

7         MR. LINDER:  We'd be happy, Your Honor, to go back

8  and clarify the objection.  It's really a no liability basis

9  for the objection.  We can substantiate that with a

10 supplemental declaration if you would like.

11        THE COURT:  Okay.  You need to do that and you need

12 to serve that on the claimants.  Then we will take this up

13 again at another hearing.

14        I have similar questions on Schedule 2.

15 Substantive duplicate claims. Some of them appear to be claims

16 against different debtors.  Some of the claims appear to have

17 been purchased, perhaps.  But I don't know if -- I'm not sure

18 that I know the basis of objecting to these claims.  They are

19 not purely duplicative.  In fact, they are different on their

20 face.

21        MR. LINDER:  I think generally, Your Honor, we --

22 rather than being able to address these in a non-substantive

23 fashion on the basis that they're true duplicates and that

24 they are exact matches you are correct, for example, there are

25 a couple of vendor claims that has been filed, on one part, by

1   the actual counterparties and contract, and on one hand, as we

2   noted, by a third-party who may have purchased the claims.

3           We're happy to go back and take a look.  And to the

4   extent that it's not clear in the objection that we filed

5   we're happy to revise it to further substantiate the

6   objections.

7           THE COURT:  Okay.  I think you need to do that and

8   also address, as with the first schedule, the claims that are

9   against different debtors.

10          MR. LINDER:  Understood, Your Honor.

11          THE COURT:  With respect to Schedule 3 I was

12  generally okay with that except I have a question with respect

13  to two of the claims where the reason for disallowance, among

14  other things, is that the debtors do not believe these two

15  invoices are valid.  What does that mean?  You think they made

16  them up?

17          MR. LINDER:  Your Honor, we did take a look in

18  preparation for this hearing.  What that means is that we --

19  the debtors searched its files, its accounts, payable systems,

20  its records, and although it provided services to that

21  counterparty, the invoice that is asserted as to the debtors

22  and the future claim there is no record of those services ever

23  having been provided.

24          THE COURT:  Okay.  So that is a substantive

25  objection that we have no liability for this because we didn't

1   get the services.  Okay.  That one is close enough.  I will

2   accept that.

3            I did not have any questions on Schedules 4 or 5.

4   So I will sustain the objection as to Schedules 3, 4 and 5.

5            Mr. Linder, you will supplement with respect to

6   Schedules 1 and 2.

7            MR. LINDER:  Thank you, Your Honor.  We will

8   bifurcate the order and we will submit the claims under

9   certification of counsel that you are sustaining the

10  objections and then we will do as you requested with respect

11  to the balance of the claims.

12           Thank you very much.

13           THE COURT:  Thank you.

14           MR. ABBOTT:  Thank you, Your Honor.

15           Items three through five on the agenda are the 2019

16  matters that the court previously heard and indicated that it

17  would not be addressing today.

18           So that moves us along to number six on the agenda,

19  Your Honor which is the debtors' plan as to which the court

20  requested a status conference.  I am going to cede the podium

21  to Ms. Lauria who will address the court on that.  I believe

22  there are some others who also, obviously, want to be heard on

23  that issue.

24           Maybe, perhaps, if the court has specific questions

25  that they'd like us to address we can prime the pump so to

1    speak.

2           THE COURT:  Well, I do.  I want to take five

3    minutes because I am getting significant feedback in the

4    courtroom and see if we can get this cleared up.  So let's

5    take five minutes.

6           MR. ABBOTT:  Thank you.

7        (Recess taken at 9:20 a.m.)

8        (Proceedings resumed at 9:33 a.m.)

9           THE COURT:  Okay.  May apologies.  Hopefully we

10   have this fixed.

11          Can you all hear me?

12       (No verbal response)

13          THE COURT:  Okay.

14          MR. ABBOTT:  Yes, Your Honor.

15          THE COURT:  Okay.  Thank you.

16          Let's start with the status conference.  I had

17   requested a status conference to have a discussion about

18   whether there's a realistic timeframe for confirmation or what

19   the realistic timeframe is for confirmation given where we

20   currently are.

21          Debtors have filed a plan.  I have reviewed it.  I

22   noted that the debtors inserted a confirmation date of July

23   26th which was not vetted with Chambers.  And I don't know --

24   and that date, by the way, is not available, but the question

25   I really have is where are we.  I wanted to know whether the

1   debtors were planning estimation procedures, when I can expect

2   TDP's; all of the things one would expect a Judge would have

3   questions about when asked for confirmation dates and when

4   there is currently a disclosure statement hearing scheduled

5   next month.

6          I have seen the flurry of paper.  I have read the

7   flurry of paper.  And I would like to have some discussion.

8   If we were in the courtroom I might have it in Chambers, but

9   we're not.  So we are going to have it on the docket.

10         Ms. Lauria?

11         MR. LAURIA:  Thank you, Your Honor.  Again, for the

12  record, Jessica Lauria, White & Case, on behalf of the Boy

13  Scouts of America.

14         Why don't I start, Your Honor, with where we're at

15  and then turn to the importance of the debtors' timeline, and

16  in particular a summer 2021 confirmation timeline.

17         I am sure Your Honor saw that in addition to the

18  plan and disclosure statement, and solicitation procedures

19  motion we also filed, on behalf of the mediators, the first

20  mediator's report.  I think the fact that they used the term

21  first was no accident.  That was intentional.  And it suggests

22  that there are additional mediator reports to come.

23         In fact, if I could, I want to quote the tail-end

24  of that mediator report which says,

25             "The mediators are confident that the mediation

1  will foster additional constructive discussions between and

2  among the debtors and other mediation parties.  Accordingly,

3  the mediators do not consider the mediation to be closed."

4        That was a mere two weeks ago.  And we agree with

5  the mediators.  In fact, we have had mediation sessions since

6  that mediator report was filed.  And we have also had

7  mediation -- we have a group mediation session scheduled for

8  the end of the month.

9        Now we are, Your Honor, keenly aware that we are

10 not there yet.  We also saw the flurry of pleadings, plan

11 response pleadings, that have been filed to date both by

12 survivor constituencies as well as the insurers.  And like, I

13 think, the sentiments that were expressed in those filings the

14 debtors are also frustrated that we're not there yet.

15       I will say, Your Honor, that we're particularly

16 frustrated that because of the impact of COVID we have been

17 unable to have in-person face to face mediation sessions.

18 It's frustrating, I know, just even from a courtroom

19 experience.  Well that has been extremely frustrating from a

20 mediation experience.  And that has made our bankruptcy

21 mediation, which as you will recall kicked off in the middle

22 of COVID, extraordinarily challenging.  And I don't think that

23 is putting it mildly.

24       We didn't file a responsive pleading to those

25 pleadings.  I am not here today to air our grievances with

1 other mediation parties and what has happened in the

2 mediation.  I think suffice it to say the debtors are

3 committed to continuing to work with the mediation parties.

4 We're working with the mediation -- excuse me, with the

5 mediators on global resolution.

6         As I mentioned, we have sessions scheduled

7 regularly, literally daily, and we believe this is going to

8 culminate in group mediation sessions at the end of March,

9 early April.

10         As you will hear about later today in the hearing

11 we now have consensus around an extension of the preliminary

12 injunction.  That gives us the breathing spell, we think, to

13 continue the mediation.  Your Honor, we know we have a lot of

14 wood to chop.  I don't think it's the entire forest, as some

15 people in this case would have you believe, but we know we

16 have a lot of wood to chop.  We have got a process to resolve

17 that and we need -- from the debtors' perspective we need to

18 let that process play out.

19         In terms of timing I'm going to start with

20 confirmation timing because I know that is where you started.

21 Our apologies, Your Honor, for putting the date in the

22 documents.  From our perspective it is important that we

23 maintain an emergence by the end of summer 2021 for a lot of

24 reasons.  We kick-off recruiting, in earnest, in the fall.

25         The debtors need to put this bankruptcy matter

1  behind them.  We have talked in the past about liquidity

2  concerns, financial concerns with the bankruptcy case.

3  Suffice it to say, the case has cost the debtors tens of

4  millions of dollars, upwards of $100 million.  With the

5  litigious environment that we are finding ourselves, the case

6  is running around $10 million a month from an estate cost

7  perspective.

8       If this litigation, between, frankly, the

9  plaintiffs on the one hand and the insurers on the others with

10  the debtors stuck in the middle, continues to escalate that

11  number is only going to go up.  And we think that that is just

12  entirely inappropriate for a non-profit debtor whose revenue

13  is generated by donations, and children attending, you know,

14  youth serving camps.  We just don't think that is appropriate

15  for the size of this case or the nature of this debtor.  So we

16  are trying to cabin-in those costs also on the timeline.  That

17  is why we are looking at a summer emergence.

18       We would like that hearing to be fully consensual.

19  We have got the mediation set-up, we think, to do that.  We

20  recognize it probably won't and we will probably need multiple

21  days of Your Honor's time.  That doesn't mean we won't have

22  consensus with some parties, but it may be that there are

23  parties, even as we get to the end of the summer, that aren't

24  entirely happy with where we have ended up.  We will see when

25  we get there.

1        In terms of Your Honor specifically asked about

2  estimation.  We understand that last night the TCC, the FCR

3  and, I believe it was joined by the coalition as well, filed a

4  motion to estimate claims.  That is scheduled to be heard, I

5  believe, at the April 15th hearing.

6        As Your Honor noted, that April 15th hearing is

7  currently scheduled as our disclosure statement hearing.  I

8  think given the fact that we have mediation later this month,

9  late this month, into early April holding that date is going

10  to be very difficult for a disclosure statement hearing.  We

11  fully acknowledge that, but we want to stay within the overall

12  timeline.

13        So if the date needs to move for the disclosure

14  statement we understand that, but we would ask that it not be

15  moved by much because I think we've got momentum in the

16  mediation right now.  We think we should continue to take

17  advantage of that and see where we are at the end of these

18  sessions that are at the end of the month.

19        THE COURT:  Okay.

20        MR. MASON:  Your Honor, Richard Mason for the ad

21  hoc committee.  I'd be happy to speak for the ad hoc committee

22  if -- I apologize, I didn't mean to interject on Ms. Lauria, I

23  Ms. Lauria is done for the moment.

24        MS. LAURIA:  I am unless Your Honor has any further

25  questions for me.

1            THE COURT:  Not right now.

2            Mr. Mason?

3            MR. MASON:  Yes.  Thank you, Your Honor.  Good

4    morning.  Again, Richard Mason of Wachtell, Lipton, Rosen &

5    Katz for the ad hoc committee of local councils.

6            Just as a very brief reminder, Your Honor, the ad

7    hoc committee consists of eight local councils drawn from

8    across the country.  We are all volunteers as (indiscernible)

9    chair and my firm is pleased to represent the committee *pro

10   bono*.  We reflect a variety of the 253 local councils that

11   deliver the scouting product on the grounds, Your Honor, to

12   over a million youth today.

13           The ad hoc committee, importantly, for purposes of

14   the mediation, consists of councils with higher numbers of

15   claims against them and those with lower numbers, councils in

16   plaintiff friendly states with open windows, and those in

17   states where the statute of limitations has long since expired

18   and is very unlikely to be revived, frankly, including because

19   of state and constitutional provisions, and councils with

20   relatively higher net worth, and those towards the lower end

21   of the financial scale.

22           Despite that variety, Your Honor, we have a common

23   goal to achieve, if we can, a solution that compensates

24   victims of abuse claims and preserves scouting for the young

25   men and women it serves.  We are a mediation party, the ad hoc

1 committee is, and we believe that we have been engaged

2 productively with other mediation parties including the BSA,

3 the coalition and others.

4         Recently we have worked very well with the TCC and

5 the coalition on the proposed extension of the preliminary

6 injunction.  That is a matter that you will hear from my

7 colleague, Mr. Celentino, and others later in the agenda.

8         Your Honor, to be clear, no individual council is a

9 mediation party.  Over the past year the ad hoc committee has

10 been engaged intensively with local councils both to keep them

11 informed about the BSA bankruptcy and particularly recently to

12 see, frankly, what the art of the possible is with regard to

13 local councils aggregate contribution to a global settlement.

14         Now because the numbers are covered by the

15 mediation confidentiality, Your Honor, I am not intending to

16 discuss on the record the amount that we think we can circle

17 from the local councils based on our own analysis and

18 thousands of hours, frankly, we spent with them.  But I just

19 want Your Honor to know that the local councils are fully

20 engaged through the ad hoc committee's efforts to achieve a

21 resolution on a timely basis.

22         I would agree with Ms. Lauria's comments about the

23 need for speed in the matter to achieve a resolution of one as

24 soon as possible and, frankly, we all look forward to the

25 continuing mediation that, from our perspective, has and

1  should be intensifying.

2        I do want to say a brief word, Your Honor, about

3  the TCC's status report if I might.  Frankly, I read it very

4  briefly last night, much like a disclosure statement objection

5  which is for another day.  I guess possibly not next month,

6  but hopefully soon thereafter.  But there is one point that I

7  would like to address that I think is relevant for today and,

8  you know, in mediation.

9        The TCC says that based on its analysis of local

10  council properties, I think all of which have been appraised

11  at this point, the local councils can contribute to

12  "multiples" of the $300 million number that the BSA has

13  identified in the plan that it filed as the local council

14  aggregate settlement contribution.

15        Now we have done our own analysis and we disagree

16  vehemently with the TCC's view of that potential.  We think

17  that the appraisals do not properly account for deed

18  restrictions and conservation easements and other limitations

19  on local council properties across the country.  We have other

20  issues, frankly, with the appraisals.

21        We also think that these types of disputes are

22  exactly why we have mediation with three very able mediators

23  appointed by Your Honor so that we can discuss the issues and

24  avoid litigating them if we can.  So we would invite the TCC

25  to share their analysis with us in mediation.  And if we can

1  find common ground that is fantastic, like we did on the

2  preliminary injunction extension.  And if we don't, at least

3  we will have tried our hardest.  I'm sure they will as well

4  and we will know where we disagree and we can proceed from

5  there.

6        I do just want to mention that the TCC said in its

7  status report that it had reached out to certain individual

8  local councils to discuss the TCC's view about their

9  properties based on the appraisals.  The local councils to

10  whom Mr. Stang reached out to discuss these matters are not

11  mediation parties.  I believe almost all of them have

12  responded, and to the extent that they have they have asked

13  the TCC to work with the ad hoc committee which I would just

14  reiterate we are fully prepared to do.

15        So thank you, Your Honor.  That is all I have for

16  the moment.

17        THE COURT:  Thank you.

18        Let me hear from the tort claimants committee.

19        MR. STANG:  James Stang, Pachulski Stang Ziehl &

20  Jones, for the tort claimants committee.

21        First, Your Honor, we want a consensual resolution

22  of this case.  Survivors and -- well, the (indiscernible)

23  committee has been accused more than once in conversation with

24  other parties that (indiscernible) and the local councils.

25  That simply is not true.  I (indiscernible) the tort claimants

1  committee is not concerned about whether the Boy Scouts
2  (indiscernible) exists post-confirmation.  Their concern is a
3  reasonable compensation (indiscernible).  If the Boy Scouts
4  cannot continue to (indiscernible) post-confirmation so be it.
5  Our goal is to protect our constituencies and get them
6  compensation.  Our goal is always not the liquidation
7  (indiscernible) for the local councils.

8          The issue that Ms. Lauria described was -- we were
9  informed of that on Monday in a phone call with counsel.  We
10 have not received a single notification from the mediators
11 that that mediation has been since scheduled.  No one has
12 asked the tort claimants committee if they were
13 (indiscernible).  No one has discussed with us whether it was
14 safe to travel to Miami for mediation.

15         I have (indiscernible) creditors committee.  I
16 don't know if he's willing to -- he lives in South Florida,
17 whether he is willing to travel to White & Case's offices.  I
18 am not available to White & Case's.  I have several previous
19 (indiscernible) conditions that can be at home.  I have
20 vaccinated and I have asked counsel what precautions they were
21 taking to ensure that it was safe to go their offices.  They
22 said they have (indiscernible) protocol.

23         So COVID issues aside the fact that we have not
24 even consulted (indiscernible) about any availability to go to
25 -- it sounds like counsel hopes that their case

1  (indiscernible).  I think it is just (indiscernible) of what

2  is going on in the mediation process generally.

3          So Mr. Mason's comments about the councils, I

4  think, is a further illustration of where we are.  I don't

5  have to have a settlement (indiscernible) in the context of

6  mediation.  We have analysis of five local councils

7  (indiscernible), their assets, their cash, their investments,

8  their camp utilization, their camp values, the reviewed deed

9  restrictions on thousands of properties.

10          We reached out to the local councils because they

11  are in breach.  There is no invitations to date that we have

12  to have with them about the value of those (indiscernible)

13  which is a huge issue in talking to the parties that are

14  liable.  So we decided to cut through that.

15          The first counsel said we're not interested in

16  talking to you about talking to the local councils.  One of

17  them hasn't even responded to our inquiry.  The debtors said

18  that (indiscernible) not to you individually, but we will talk

19  to you through the local councils.  Two of those local

20  councils are actually members of the ad hoc committee.  So I

21  don't understand what (indiscernible) talk to us through the

22  committee, through the ad hoc committee.

23          Frankly, we'd be willing to talk to all 253

24  (indiscernible) but the information we got was confidential

25  and (indiscernible) unless they all agreed.  So we have been

1  invited to talk to the ad hoc committee, which we intend to

2  do.  Mr. Mason doesn't know that (indiscernible), but it is

3  our intention to do that.

4         That committee has no authority over any of the

5  other local councils.  Mr. Mason has repeatedly said that the

6  committee cannot bind them.  I don't know what communications

7  are going to go forward from that meeting to the rest of the

8  constituents of the ad hoc committee.

9         So the fact that they're not mediation parties,

10  Silicon Valley, Garden State, Grand Canyon, these are local

11  councils, Your Honor, doesn't mean they flock to us.  We are

12  trying to keep our constituents informed of what is going on.

13  We have had three, what I call, (indiscernible) available to

14  all survivors.  We have had (indiscernible).  We have

15  (indiscernible) a couple of thousands of people that

16  downloaded the recordings of those webinars.  We have had town

17  halls (indiscernible) who represent survivors.

18         So they're useful, informing them as to what is

19  going on.  Honestly, I have heard, I don't know the

20  (indiscernible), coming onto those town hall meetings to

21  listen as to what is going on.  So this notion that somehow

22  there's all this communication going on between us and the

23  local councils.  Obviously, we're not (indiscernible) of the

24  mediations at the moment with the BSA.  We have had lots of

25  conversations.  As you can tell from our (indiscernible)

1    progress to where it should be.

2          Issues that we have with plan and disclosure

3    statements or webinar statements (indiscernible) we have too

4    many things to do today (indiscernible).  In a sense

5    (indiscernible) was right, it was kind of a preview of the

6    disclosure statement objection.  It also works with some other

7    issues that have not (indiscernible).  The estimation matter

8    Mr. Patton talked about it.  (Indiscernible) demonstrates how

9    much (indiscernible) and whether (indiscernible) disclosure

10   depends on a lot of the work that the BSA and local councils

11   do.

12         At the end of the day local councils and chartered

13   organizations, (indiscernible) of all liabilities.  I

14   understand the actions with the insurers, the settlements.  I

15   understand there needs to (indiscernible) for them to continue

16   (indiscernible).  The lack of information that is in the

17   disclosure statement that will be provided to the creditors I

18   think there has to be a real change in attitude by councils as

19   to what assets are in the disclosure (indiscernible), what the

20   alternatives are so that they can look at (indiscernible).

21         Your Honor, we will continue working towards a

22   global resolution, but we have a lot of work to do.  We are

23   committed to doing it, but we have got to have partners.

24   Telling us that we have to be in Miami without asking us

25   (indiscernible), who's coming, (indiscernible).

1           Thank you, Your Honor.

2           THE COURT:  Thank you.

3           Let me from the unsecured creditors committee.

4           MR. RINGER:  Good morning, Your Honor.  Rachel

5   Ringer from Kramer Levin on behalf of the creditors committee.

6           Your Honor -- as Your Honor saw from the first

7   mediators report we were able to achieve a resolution for the

8   treatment of our constituency which is embodied in the version

9   of the plan that was filed in early March with the caveat

10  that, you know, given the timing as reflected in that plan and

11  disclosure statement those documents, themselves, we are still

12  in the process of reviewing.

13          In terms of the schedules I generally agree with

14  the comments laid out by Ms. Lauria.  From the committee's

15  perspective, and I think as recognized by, effectively, all

16  the parties in the case, you know, our constituency is small

17  by comparison with the exception of really (indiscernible) for

18  pension claims that are resolved through the plan, and the

19  claims held by our constituency, as I think was referenced in

20  the TCC status report, is not the claims that precipitates the

21  bankruptcy filing.

22          With that in mind we did work very hard with the

23  debtor and with JP Morgan to negotiate a deal for constituency

24  that not only addressed our claims, but allow the organization

25  to take what we view is a critical first step for

1  confirmation.  We do recognize that there are, you know, still

2  a lot of wood to chop.  We are happy to and look forward to

3  continuing to work with the debtors to try and achieve greater

4  consensus around the plan.

5          Key to our agreements and key to the settlements

6  that we reached with the debtor is the continued viability of

7  the organization.  That is important not only for the members

8  of our committee and the members of our constituency, many of

9  whom are going to continue doing business with the

10 organization post-bankruptcy, but also because, as Your Honor

11 has heard a little bit about in prior hearings, the assumption

12 of the pension and the avoiding the items that would trigger a

13 potentially very large claim is important for preserving

14 recoveries to, you know, non-general unsecured creditors and

15 preserving recoveries for all other constituencies in the

16 case.

17         You know, we've always believed our constituency

18 could be an important and constructive building block and we

19 are happy to have reached an agreement but also recognize that

20 we, along with debtors and other parties in the case, still

21 have work to do before confirmation.

22         THE COURT:  Thank you.

23         Let me hear from the FCR.

24         MR. HARRON:  Good morning, Your Honor.  This is Ed

25 Harron for the FCR.

1          Can you hear me okay?

2          THE COURT:  I can.

3          MR. HARRON:  If I may, Your Honor, I'd like to

4    address two things, the plan and the estimation motion that we

5    filed yesterday with the TCC and the coalition.

6          Your Honor, we talked about this in other mass tort

7    cases but its generally the case that a mass tort bankruptcy

8    only concludes when you have some level of consensus between

9    the company and the claimants.  And Imerys is an example of

10   that where we have a consensual plan.

11         Unfortunately, Your Honor, the plan that's on file

12   does not reflect any sort of consensus, and I think it's plain

13   from the TCC's response that it will be a subject of claimant

14   opposition.

15         And, just to be clear, at this moment, I know that

16   we're not (indiscernible), but at this moment the FCR does not

17   support that plan.   And to be frank, Your Honor, we think it

18   ignores the elephant in the room.

19         You know, this case is unique in many ways.  But

20   among the unique facts here is the existence of about 84,000

21   claims that were filed as of the bar date.  And Your Honor has

22   heard in prior hearings that the compensability of those

23   claims, the value of those claims, it will be highly contested

24   by among others, but at least we know the (indiscernible) of

25   issues.

1          But those same considerations which claims are

2   compensable and how much are they worth and that feeds into

3   all the confirmation price areas.  That informs claimants on

4   the votes that form the criteria and values in the TDP.

5          It's necessary for the court to conduct the best

6   interest analysis to compare to the cover available to tort

7   claimants against -- the tort survivors, pardon me -- against,

8   for example, what the commercial claimants are receiving.

9          Also, this case puts at issue third-party releases

10  to the local councils, to the charter organizations, to

11  insurers.  And, of course, the fundamental consideration of

12  the court when evaluating third-party releases is how the

13  consideration compare to the liability.

14         So, to make a long story short, Your Honor, we

15  think the plan is putting the cart before the horse.  And

16  we've discussed with the debtor what we believe to be a more

17  appropriate strategy.  And we discussed this with them before

18  we filed the motion.  But we think the way to advance this

19  case is for a court to determine the magnitude of the

20  liability to the abused claimants. And we're attempting to

21  address that issue via the estimation motion.

22         And Ms. Lauria mentioned that the estimation motion

23  would be up for consideration on the April 15th hearing.

24  That's not our intention, Your Honor.  In fact, we wanted to

25  bring the motion to your attention today.  Mr. Brady set up a

1   chambers this morning, so we have an opportunity to discuss it

2   with you but later this afternoon we plan to file a motion to

3   withdraw the (indiscernible).

4           We believe (indiscernible) 157 -- pardon me 28

5   U.S.C. 157(b)(2)(b), the liquidation of personal injury claims

6   is beyond this court's core jurisdiction.  And because it's

7   our intention, at least, in part, to use the estimation motion

8   of the basis to potentially fix distributions to claimants,

9   again, it falls squarely within 157(b)(2)(b) which said not

10  matters which are among the court's core jurisdiction.

11          So we collectively -- we spent a lot of time

12  consideration which court was best situated to resolve the

13  estimation.  And it's our view, particularly in light of

14  157(b)(2)(b), primarily in light of that statute.  We believe

15  the District Court is probably the appropriate place to

16  litigate the estimation issues.

17          THE COURT:  How does that fit into a timetable that

18  the BSA believes is necessary to make sure we have a

19  continuing Boy Scouts?

20          MR. HARRON:  Well, I don't want to speak out of

21  school, but BSA says it does not fit into their timetable.  We

22  have -- the motion has an expedited schedule and they'll

23  proceed -- we intend to proceed quickly but when we get over

24  to District Court, you know, it will be subject to the court's

25  availability.

1           THE COURT:  Correct.

2           MR. HARRON:  But the BSA timetable we think

3   erroneously assumes that confirmation in the near term is an

4   option.  We don't accept that premise.  We don't think -- we

5   think the current plan is a road to nowhere.  And it may be

6   the case of (indiscernible) BSA funds prosecuting that plan.

7   Maybe that's not in the best interest of the estate.

8           THE COURT:  It may be.  I don't know.  I'm

9   surprised that anyone thinks that the plan that was filed is

10  the plan that's going to be confirmed.

11          So I think you've all been in this game long enough

12  to know that's not the case.  So what my concern is, though,

13  and I don't know what, you know, you file your motion, of

14  course.  I don't know what the District Court will think about

15  the argument you're making with respect to who can determine

16  it.

17          And what concerns me more, quite frankly, is a

18  timeframe with the District Court that has on its plate and

19  coming up with hopefully the relaxation of -- well not

20  hopefully, the relaxation, with possibilities of return to

21  criminal trials, a docket that it has to prioritize.  So that

22  is a concern I have.

23          But parties, of course, are free to file whatever

24  motions they think are appropriate and legally required. But I

25  have that concern of the backlog of criminal docket that --

1  it's my understanding the District Court will need to

2  prioritize.

3          But, you know, I read the motion and I've seen

4  what's been filed, as I said, the flurry of filings.  The

5  parties are free to take the positions they want to take.  I'm

6  not sure if they can take them back at some point.

7          MR. HARRON:  Your Honor, I just want to clarify a

8  few points.

9          One, we seem to be committed to mediation.  And we

10  don't see the estimation path and the mediation path as

11  regionally exclusive.  So it's our hope that the estimation

12  process will bring the parties closer together, rather than

13  further apart.

14          And with the plan and the timing, we do share the

15  concerns about timing.  Certainly, my client has no interest

16  in harming a long-term process of the Boy Scouts.  But it's

17  our view that, as Your Honor noted, the plan that's on file

18  will not be the plan that's confirmed.

19          But when we play it out, we think that any plan

20  that's going to be confirmed ultimately will require an

21  estimation of some sort.  And so, it's our view, that we can

22  proceed with the estimation now and perhaps use that as an

23  opportunity to bring the parties together.  And once that

24  litigation is completed or near completed, then we can move

25  more promptly to a plan process.

1        THE COURT:  Okay.  Thank you.

2        MR. HARRON:  Thank you, Your Honor.

3        MR. MOULTON:  David Moulton.  May I speak for the

4   coalition?

5        THE COURT:  Yes.

6        MR. MOLTON:  Good morning, Judge.  It's David

7   Molton of Brown Rudnick for the Coalition of Abused Scouts for

8   Justice.

9        I want to say a few words.  I'm going to try to be

10  as concise as I can, Your Honor.  I know that a lot of folks

11  have already spoken about things that I was going to say.

12       I know that folks have talked about a lot of wood

13  to chop.  I think that that's a fair statement, but probably

14  an understatement.  I think that that's a forest to chop and I

15  know Mr. Stang has talked about the local council issue and

16  the official tort claimants' issues and efforts in connection

17  with local council.

18       I think also, Judge, one of the, as alluded to

19  earlier, one of the elephants in this room, as Your Honor has

20  seen from the history of this case and our involvement in it,

21  is the insurers.  And what they're going to do, what they're

22  going to bring to this plan.

23       So I think we can't respoke it.  Just looking at

24  the Boy Scout proposal and local council's proposal, but also

25  the issue of the insurers.  And I want to address, go right to

1  the heart of what you said about estimation, Judge.  Because

2  what you have in the estimation motion, the two fiduciaries

3  for the survivors, plus the ad hoc committee.

4          The coalition that as Your Honor knows represents a

5  significant amount of those survivors for collective purposes

6  in this bankruptcy case joined together, all of those parties

7  are working extremely hard in the mediation.  I don't think

8  anybody on this in-conference in your courtroom will say that

9  that's not the case.

10          We've all extended hours of good faith efforts

11  working with the debtors, working with the local council,

12  engaging as appropriate and necessary.  And to the extent we

13  can with the insurers through the mediators in order to move

14  this case.

15          At the present time, Judge, the timetable suggested

16  by the estimation is very aggressive. We did that in light of

17  exactly what the debtors concern was and in light of the

18  suggestion and what I knew the question from Your Honor would

19  be.

20          Your Honor said you read it.  We appreciate that,

21  Judge.  Paragraph eleven is the proposed case management

22  ordered.  We narrowed that, that's 111 days' timetable for all

23  of this to get done.  You know assuming that the order is

24  granted and estimation is granted in mid-April, that puts us,

25  you know, within fair game of concluding if that timetable is

1   accepted and abided by.

2          And I know that other folks are going to have their

3   say on that timetable and surely the court hearing this will

4   have its say on that.  But it puts us not beyond or

5   substantially beyond the timetable that Ms. Lauria mentioned.

6   So we tried very hard to do that.

7          Number two, Judge, and I know it's been talked

8   about earlier in earlier hearings in mass tort bankruptcies

9   estimation often is teed up and often it results in incenting

10  and facilitating the mediation and consent, not the opposite.

11         I refer Your Honor to PGE that I know Your Honor

12  heard from before from some of my colleagues where an

13  estimation was teed up in front of the district judge and soon

14  there afterwards, you had a deal between the debtors and the

15  prior victims on value and the amount that would be paid to

16  them in the plan.

17         Just across the hall, the physical hall, at one

18  period of time, an incest, Your Honor, I think it was -- well

19  it's going to be a year and a half, almost two years ago, the

20  debtor teed up an estimation process very early in the

21  program.  And what happened is under the mediation auspices of

22  Judge Carey, mediation happened with that regime be proposed

23  by the debtor which mediation went to a consensual plan.

24         So it's important to understand that from the

25  survivor constituency's perspective, in light of -- and I

1    don't want to get into mediation discussions. That's not

2    appropriate.  I'm not even going to allude were they

3    successful, non-successful progress or non-progress.  But,

4    clearly, the survivor constituencies in light of everything

5    that Your Honor had seen in this case so it's important and

6    necessary to tee this up at this point in time for the reasons

7    that Mr. Harron described.

8          I will say, Your Honor, that you know the coalition

9    agrees with the TCC and the FCR that the plan itself is

10   unconfirmable and will not be voted.  There will be -- I can't

11   say no survivor, but there will be overwhelming survivor

12   opposition and vote no to the plan.

13         There's a lot of issues that I know Mr. Stang stood

14   and raised that 2388 that was filed yesterday, I think it's

15   fair to say that the coalition doesn't have to repeat them or

16   join in them.

17         Just some of the things that weren't said in there,

18   you know, number one, we have great concerns under the present

19   plan.  First of all, it purports to be insurance neutral but

20   yet it gives the insurers enhanced rights such as the ability

21   to avoid direct claim litigation where that litigation is

22   allowed in various states.

23         Further, Judge, in terms of the millennium factors

24   because non-debtor releases here as stated by Ms. Boelter from

25   day one, Ms. Boelter, Ms. Lauria, and Mr. Andolina are

1  absolutely essential to Boy Scouts' surviving, if it's going

2  to emerge from Chapter 11 and survive.

3          A key issue in evaluating whether one of the

4  Millennium, Master Mortgage, Metromedia, whatever you want to

5  call the case law that gives the court the criteria for

6  evaluating non-debtor releases.  Whether the claim effected by

7  the releases are going to be paid in full.  Clearly, the

8  issues there are the value of the claims which is we're

9  dealing with now with the tee up of the estimation, but also

10  the value of the insurance assets.

11          I think it's important to note that no matter what

12  the argument is of the contribution of the local council to

13  the debtors, I think it's undisputed among everybody in this

14  virtual courtroom today, Your Honor, that those assets even if

15  to the maximum requested by the survivor constituencies, the

16  hard assets, you know, will not be even -- will be de minimis

17  in terms of satisfying (indiscernible).

18          So really what is the value of the insurance

19  assets.  And we're really concerned, Judge, that a key issue

20  is what are the obligations of those companies with respect to

21  the proposal made by the debtors in terms of transferring

22  insurance rights under the insurance neutral plan to a trust

23  and one of those issues is, I think, is previewed, I believe,

24  in prior hearings whether the insurers can state that all they

25  owe is the amount that was actually paid into the trust,

1  meaning by the Boy Scouts, or whether their coverage

2  obligation is coextensive with the actual value of the claim.

3       Those are all issues that we believe need to be

4  addressed, one way or other in this case before a plan can be

5  confirmed.  And in that way will give you, Your Honor, the

6  ability to make the Millennium decision to evaluate those

7  criteria based on actual disclosure and ascertain ability of

8  the value of the claim and what is being transferred to the

9  trust to satisfy those claims.

10       So, Your Honor, I think, what we've asked the

11  debtor's counsel nicely and sometimes not so nicely is put off

12  the hearings next month.  There's no reason for all the

13  parties in this room, the talented lawyers in your courtroom

14  to be expending time and resources objecting to a plan that as

15  Your Honor knows won't be the plan that's confirmed and

16  clearly has substantial disqualifications to confirmability

17  now, let alone deficiencies and disclosure.

18       Instead of spending that time and telling us as Ms.

19  Lauria just did, well we think we may have to adjust the

20  schedule, but you know we want to hold it until when?  Until

21  everybody files their objection and the debtor replies and

22  further money is spent on a wasted effort that we all know and

23  then to a plan that cannot be confirmed?

24       No, let's put a hiatus on that, Your Honor, and to

25  use that money to allow Boy Scouts that saves money from the

1  Boy Scouts' estate to be channeled, so to say, into more

2  productive activities over the next month.  Let's get the

3  estimation motion teed up and decided. And, again, there's a

4  case management procedure proposed therein that we think works

5  and addresses all the issues, Your Honor, that have been

6  previewed to Your Honor before regarding this case and the

7  claim.

8          Get it teed up and continue with Judge Carey and

9  Crofton and Tim Gallagher's efforts to bring parties to some

10  common ground.  We're fully behind that, Your Honor.  The

11  coalition has been since day one.  And I'd ask Your Honor, you

12  know, to consider those points in terms of next step.

13          MS. LAURIA:  Your Honor, this is Jessica Lauria.

14  May I just briefly respond to the time line point?  Because I

15  think that was, in fact, the purpose of the status conference.

16          MR. BUCHBINDER:  Excuse me.  This is Dave

17  Buchbinder.  May I be heard briefly on behalf of the U.S.

18  Trustee, Your Honor?

19          THE COURT:  I'd like to hear from all the parties

20  who want to speak.  And then, certainly, Ms. Lauria, I will

21  come back to you.

22          MS. LAURIA:  Thank you, Your Honor.

23          THE COURT:  Mr. Buchbinder.

24          MR. BUCHBINDER:  Thank you, Your Honor.  David

25  Buchbinder on behalf of the United States Trustee.

1          I'd like the Court and the parties to be aware that

2   the U.S. Trustee has provided the debtor with numerous

3   comments regarding the plan, the disclosure statement, and the

4   solicitation procedures motion was also fraught with numerous

5   concerns.  And we do share many of the concerns echoed, not

6   only by the Court, in your initial comments, Your Honor, but

7   in earlier comments, as outlined by the status report filed by

8   the tort claimants committee.  And I would just like the Court

9   to know that at this point in time.

10          Also, as a human being here, it seems that there

11  are two things that are undisputed.  Before this case can go

12  to consensus, we need to know the size of two pots, the size

13  of the claimant pot and the size -- from whatever sources they

14  come from -- of the pot that's available to pay compensation.

15  And what I've heard here this morning, as a human being, is a

16  lot of excuses and reasons why we can't do that now, we can't

17  do this for this reason or that reason.

18          And after acknowledging that these are the two

19  issues, that's where whatever little agreement exists breaks

20  down.  It's incumbent on the parties to roll up their sleeves

21  and sit down and deal with this seriously and realistically

22  because that's what's going to answer the questions, including

23  getting consensus to this case and minimizing, as opposed to

24  exponentially increasing the administrative expenses.  Thank

25  you, Your Honor.

1                THE COURT:  Thank you.

2                MR. ANKER:  Your Honor, this is Mr. Anker.  May I

3    be heard?

4                THE COURT:  Yes, Mr. Anker.

5                MR. ANKER:  Yes, Your Honor.  For the record,

6    Philip Anker from Wilmer, Cutler, Pickering, Hale & Dorr, for

7    Hartford, the Hartford Insurers.

8                Your Honor, I certainly want to echo what Mr.

9    Buchbinder just said, that we all need to roll up our sleeves,

10   and we all need to avoid unnecessary administrative expenses.

11   And Ms. Lauria talked about those expenses.

12               Your Honor may not end up deciding whether there

13   will be an estimation motion in the first instance; it may be

14   the District Court.  But that -- since people have started to

15   politic and try to poison the well, let me briefly respond.  I

16   think Your Honor's instinct that this is a bad aide and an

17   idea that is simply going to lead to more administrative

18   expense is right.

19               Among other things, let's just start with two basic

20   propositions, which are:  One, does the motion have merit?

21   And two, can Your Honor decide it?  Your Honor, under 157,

22   cannot liquidate for distribution purposes an unliquidated

23   personal injury claim.  The most significant part of the

24   motion that has been in front of you that was filed is

25   Footnote 3.  Footnote 3 reads, quote:

1          "Estimation of aggregate liability will not

2     determine the liquidating amount of any particular individual

3     claim.  The plan contemplated that the movants will likely

4     provide that such individual amounts will be determined

5     through trust distribution procedures, the TDP, or through

6     release of actions in the tort system through adjudication, as

7     permitted by the TDP."

8          That means, first, Your Honor can resolve the

9     motion; and second, the motion is directly contrary to 502(c),

10    the Bankruptcy Code provision on estimation, which says -- if

11    I can call it up quickly and I apologize, Your Honor:

12         "There shall be estimated, for purpose of allowance

13    under this section, any contingent or unliquidated claim" --

14    singular -- "the fixing or liquidation of which, as the case

15    may be, would unduly delay the administration of the case."

16         Yes, there are procedures for valuing that are done

17    in connection with a plan; for valuing assets of an estate and

18    liabilities of an estate.  But what is being proposed here

19    with respect to estimation flies in the face of the words of

20    the statute.  And the proposition that Your Honor can't

21    consider it flies in the face of the words of the

22    jurisdictional statute 28 U.S.C. 157.  We will make those

23    arguments.

24         But this -- let's ask the real question, what is

25    going on and why it's going on.  What's going on -- and Mr.

1    Moulton, with all due respect -- and I've known him for a long

2    time -- is being -- and he smiles, and I think he acknowledges

3    that I know him -- is cute, is being cute.  What really is

4    being sought here is some sort of adjudication by someone of

5    aggregate liability, so that, then, when it comes to coverage

6    litigation, someone can say, ah hah, that's already been

7    determined.

8              If we want insurance neutrality here, I agree with

9    Mr. Moulton, the current plan is not insurance-neutral.  It

10   denies carriers rights, doesn't grant them rights.  One of our

11   rights is to defend every claim in the tort system, if we want

12   to; and, if not, if not, that is a breach of the policy, and

13   it provides for defense to coverage.  If there's going to be

14   insurance-neutrality here, there needs to be language that

15   either honors our rights or gives us all defenses to coverage

16   that that creates and doesn't have anything that this Court

17   does or the District Court does affect that ultimate coverage

18   decision.

19             Having said all of that, I want to come back to and

20   actually echo something that Your Honor said and Ms. Lauria

21   said.  This case has led to enormous expense and a lack of

22   consensus.  There is an ongoing mediation.  I am not going to

23   breach the mediation privilege, either.  But I think Ms.

24   Lauria would attest that our client has been constructive and

25   helpful, and we are trying to see if we can get to something

1    that ultimately makes sense, given the extraordinary -- and I

2    know Mr. Moulton likes to stay away from this.  But going from

3    275 filed claims in the tort system to 86,000 is staggering

4    and tells you something is -- I'm trying to remember what the

5    Shakespeare expression was, something is amiss in Denmark, or

6    whatever that expression was.

7              Something doesn't smell right, and that has to be

8    dealt with, but this estimation process is not the way to do

9    it.  It simply is inconsistent with the Code and with the

10   jurisdictional statute.  Thank you, Your Honor.

11             THE COURT:  Thank you.

12             MR. ROBBINS:  Your Honor, I wonder if I could --

13   this is Larry Robbins.  Our firm is litigation counsel to the

14   coalition in connection with the estimation.

15             I had thought that all we were appropriately

16   supposed to do today was to call the fact of the estimation

17   motion to the Court's attention.  Mr. Anker has just given

18   what I assume is the first half of his oral argument on the

19   merits.  I don't propose to engage on it.  But I also don't

20   want the moment to pass with the suggestion that we believe

21   that that substantive opposition has any merit.  We don't.

22             And when Mr. Anker and his co-counsel put those

23   arguments in writing, in due course -- which is how motions

24   are supposed to be handled -- we will respond.  And we are

25   confident that whatever court resolves the threshold question

1   of whether there should be an estimation will conclude that

2   it's appropriate and that the time line that we proposed is

3   fully consistent with the debtors' goal of getting a plan

4   confirmed in a timely manner.

5            Unless the Court is asking for argument on the

6   merits today, I'm going to stop here because I don't think an

7   oral argument of the sort Mr. Anker just gave is warranted.

8            THE COURT:  Thank you, Mr. Robbins.

9            Anyone else before I go back to mister -- to Ms.

10  Lauria?

11           MR. MOULTON:  Judge, it's Mr. Moulton again.  I

12  just want to tell Mr. Anker that the last time I was called

13  "cute" was in high school, so thank you.

14           MS. LAURIA:  Thank you, Your Honor.  And I think

15  we're getting --

16           MR. SCHIAVONI:  (Indiscernible) I'm sorry, I had

17  mute on.  Your Honor, this is Tanc Schiavoni for Century.  May

18  I be heard for just a moment before Ms. Lauria?

19           THE COURT:  What hearing would be complete if I

20  didn't hear from you?

21           MR. SCHIAVONI:  I -- and Your Honor, what I'm going

22  to say is really -- I really want to talk about estimation,

23  but I'm not going to.  Okay?  I just want to say something

24  very brief, that I think will be noteworthy, and that is:

25           I have had many disagreements with Ms. Lauria.  I

1   don't necessarily agree with a lot of the things in the plan.

2   But I think you should give her some more time and a chance.

3   We're willing to work with her, and I think she can be very

4   creative.  So I would give her a little bit more string to run

5   out here, and that's me saying positive things about Ms.

6   Lauria and the Boy Scouts.  So let me end on that note and

7   thank you for hearing me.

8              THE COURT:  Thank you.

9              Anyone else?

10      (No verbal response)

11             THE COURT:  Ms. Lauria.

12             MS. LAURIA:  Thank you, Your Honor.  Jessica

13  Lauria, White & Case, on behalf of Boy Scouts of America.

14             While Mr. Schiavoni deprived me of the joke I was

15  going to make about my boxing helmet, as you can see, with my

16  big puffy earphones today, because that was an unusual

17  occurrence.  But I do wear these things for a reason.  And as

18  you can see, we're a little bit stuck in between our plaintiff

19  colleagues -- who we agree with all of the remarks that were

20  made, it is our desire to equitably compensate victims -- and

21  our insurers.

22             But without delving into the merits of the plan or

23  the estimation, I do think we need to return to the time line

24  because that, I think, is where you started, Your Honor.

25             On the estimation, we share Your Honor's concern

1  about the District Court's calendar and the time line that the

2  District Court would be able to accommodate.  But even if this

3  were in front of Your Honor, I should note that the hundred-

4  and-eleven-day time line that was proposed in the estimation

5  conveniently expires right at the debtors' statutory

6  exclusivity period.

7         And as I read the motion, it suggested that the

8  bankruptcy cases should hold tight while the estimation work

9  proceeds -- with that hearing at some point in mid-August,

10  again, when our statutory exclusivity expires -- so that,

11  apparently, the other parties can deprive the debtors of their

12  time in Chapter 11 and their attempts to reach a consensual

13  deal.  We don't think that's appropriate and we don't think

14  that should guide the Court today in determining what our time

15  line is for confirmation.

16         As I said, Your Honor, and just to put a finer

17  point on it, accrued professional fees through the end of

18  February are upwards of $100 million.  By the time we get to

19  August, we're estimating they'll be around $150 million.

20  That's just -- that's not right for a nonprofit case.  And we

21  are trying to reign that in with the mediation process.

22         With respect to Mr. Moulton's point on moving the

23  disclosure statement hearing, Your Honor, we understand that

24  if we need to move that to accommodate parties, but as I said

25  earlier, only by a bit.  We are getting to the point in this

1   case -- and certainly, I think we will be there by the end of

2   April, that we're going to need the Court to start calling

3   balls and strikes on disputed issues.  And those disputed

4   issues go beyond 2004 requests and 2019 motions.  We have

5   pretty serious issues that we'll need to bring before the

6   Court at the appropriate time on an appropriate briefing

7   schedule.  So, in our view, pushing the disclosure statement

8   hearing off indefinitely or to a date past the 111 days or

9   well into the future is just not right for this particular

10  case.

11          So, again, if the Court is inclined to move that

12  date, we would say only move it by a very little bit because

13  we do believe we need to come in front of the Court,

14  potentially in the near term -- let's see how the mediation

15  goes through the month of March -- to call some balls and

16  strikes for us.

17          THE COURT:  When you say "a little bit," what are

18  you thinking?

19          MS. LAURIA:  You know, I would say two weeks, two

20  to four weeks.  I know we have an omnibus mid-May, I think

21  it's May 15th, if I'm not mistaken, or thereabouts.

22      (Pause in proceedings)

23          THE COURT:  May 19th.

24          Well, thank you for all of the input.  As I said, I

25  have read what's been filed, the flurry of papers noted, the

1  adversary proceeding that's been filed, obviously the

2  estimation motion.  Sometimes I think I am not the audience

3  for some of these filings because I can read a mediator's

4  report and understand exactly what it meant.  But the -- and I

5  -- so if parties perceive that their filings are helpful for

6  some reason, of course you can file what you want.  But again,

7  I don't always think I'm the intended audience.

8         The concern I have with going forward with the

9  disclosure statement at this point is because I don't see some

10  very necessary information and documents, quite frankly, that

11  I would want to see at a disclosure statement, including the

12  TDPs.  Those who are involved in Imerys with me know that I

13  did not send out that disclosure statement until we had TDPs.

14  They can be negotiated or they can not be negotiated.  But

15  there's -- but I think -- and think this plan has that gap in

16  it, where parties don't know what, in fact, the treatment is

17  going to be.

18         So, for very practical reasons, I think it's

19  difficult, perhaps, to go forward with that hearing in mid-

20  April.  On the other hand, I hesitate to move it because

21  deadlines usually focus people and things get achieved.  What

22  I think, here, perhaps can focus people are the mediation

23  sessions that are to take place later this month.

24         And whether attending in person or attending via

25  Zoom, I expect everybody to be there, who the mediators

1  request be there.  I don't want to hear that someone decided

2  it was inconvenient or they couldn't show.  We're $100 million

3  into fees in this case, I think that is a staggering number,

4  and progress needs to be made.  Victims need to be compensated

5  appropriately and the Boy Scouts' mission needs to continue.

6  And that's evident from -- everyone that I see here has voiced

7  that view.

8          And I will say that some of the letters that I've

9  received from individual -- individuals who are abuse

10  survivors, or who say they are abuse survivors -- and they get

11  docketed -- also share that view, which I find quite

12  heartening and somewhat amazing sometimes; that those

13  survivors, some of them, are still involved in scouts, their

14  kids are involved in scouts, and they see a role for scouts

15  going forward.  Boy Scouts, I should be specific.

16          So I think that goal needs to be paramount, and I

17  think it affects the mediation.  It affects the timing of

18  disclosure statement and confirmation.  It affects how much

19  this is going to cost.  And quite frankly, every dollar to

20  professional fees is a dollar that comes out of some

21  creditor's pocket.

22          So I'm going to move the disclosure statement

23  hearing to April 29th and 30th.  And I will look for any

24  further mediation reports that the mediators find appropriate

25  to file after further mediation sessions.  And we'll have a

1  further status report or hearing on April 12th.

2           MR. ABBOTT:  Your Honor, Derek Abbott for the

3  debtors.  I assume we can just work with chambers to tighten

4  up specific timing for that and get notice --

5           THE COURT:  Yeah, I'm looking in the afternoon.

6  And if that doesn't work for parties, generally, we can do it

7  on the 13th.  My thought is to try to get in a status before

8  objections are due to disclosure statement, recognizing that

9  some people may still have to work on it notwithstanding, but

10  people seem to have a jump on it.  And I want it sufficiently

11  after the sessions with the mediator, so that discussions can

12  continue, as they often do after the mediation, and we can see

13  if -- what kind of consensus, if any, is reached on overall

14  issues or discrete issues.  But I'm generally available the

15  afternoon of the 12th and 13th, and I don't have a preference,

16  but that's my thinking.

17          MR. ABBOTT:  (Indiscernible)

18          THE COURT:  Thank you.

19          MR. BUCHBINDER:  Your Honor, Dave Buchbinder for

20  the record.

21          I take it that the objection deadlines will be

22  extended accordingly?

23          THE COURT:  Yes, they need to be extended

24  accordingly.

25          MR. BUCHBINDER:  Thank you, Your Honor.

1          THE COURT:  Thank you.

2          Okay.  What's next?

3          MR. ABBOTT:  Yes.  Your Honor, the next matters on

4    the agenda are related, Items 7 and 8.  I believe the Court

5    requested status on the 2004 motion filed by the insurers.

6    I'm suspecting the Court may have questions.  But I'll cede

7    the podium, obviously, to the insurers' counsel.

8          THE COURT:  Okay.  Well, here's my thoughts.  I had

9    been working on ruling on these motions when the flurry of

10   paper came in.  And quite frankly, I had waited to see what

11   the plan was going to look like before I ruled on these

12   motions.  And now I think we've somewhat eclipsed them, in

13   that, if this estimation motion goes forward, then I see no

14   reason why that discovery shouldn't go forward as part of that

15   process.  I may not be the person who is presiding over that

16   process or making that decision.

17          But I considered this, the requested discovery --

18   and I should qualify that by saying that certain of the

19   discovery could go forward, was my thinking -- would be or

20   could be relevant to estimation and could be relevant to the

21   TDPs, more so than objections to claims because, at least

22   under this plan, as filed, the survivor proofs of claim are

23   expunged from the docket.  I'm not making a comment on whether

24   or not that's appropriate, but that's what this plan says with

25   respect to those proofs of claim form -- forms and said that

1  those claims will be -- I forget exact language, but the

2  claims will be resolved exclusively in accordance with the

3  TDPs, which we've already discussed that we don't have yet.

4          So my inclination was to permit certain of the

5  discovery to go forward, but I think it needs to be racked

6  into where we are now.  So I'm going to hold off, again, and

7  let's see where it goes.  But I think certain of this

8  discovery is appropriate.  And quite frankly, I see in the

9  estimation motion the movants wanting to do similar, if not

10  the same type of discovery, which they opposed -- well, the

11  coalition opposed two weeks ago, so I think it needs to be

12  racked into that.  So I'm not going to rule separately on it

13  at this point.

14          MR. MOULTON:  Judge, can I add one point, just for

15  clarification, if Your Honor lets me?

16          THE COURT:  Mr. Moulton.

17          MR. MOULTON:  Yeah.  I don't think we oppose,

18  Judge.  I think we opposed the 2004 process, which was a

19  unilateral process, I think, at the hearing.  We suggested

20  that we were willing to engage in a reciprocal process or come

21  to an agreement as to a process.

22          And I do note, Your Honor -- and Your Honor is

23  correct that that sort of process that was suggested by the

24  first motion, which would -- what I call the "claims motion,"

25  that I think Your Honor is probably referring to --

1          THE COURT:  Uh-huh.

2          MR. MOULTON:  -- is, in fact, covered by 11(d) of

3   the estimation, but it endeavors a cooperative, collaborative

4   regime.  And if that -- a cooperative and reciprocal regime.

5   And if that regime is unable to be agreed to, then the

6   presiding court will decide it.

7          So I do want to say I don't think -- I don't

8   necessarily think it's an accurate characterization that we

9   were opposed to it.  I think the survivors have their claims.

10  I think our estimation motion with the TCC and the FCR shows

11  that we believe in our claims.  It's interesting, I know,

12  again, referring to my friend Mr. Anker's "cute" reference,

13  but it's almost too cute by half that the very issue that

14  we've been hearing since day one of our emergence in this

15  case, now we put it on, teed it up.  Apparently, they're not

16  in favor of it, so that's an interesting thing.

17         But the estimation process and the proposed

18  discovery regime in it does cover that.  And it would be my

19  suggestion, Judge, that that be left to the Judge who's

20  administering that to work within -- with the parties and come

21  up with a doable plan and regime.  That would be my only

22  point, Your Honor.

23         Otherwise, you know, clearly, with respect to the

24  second motion, what I call the "attorney discovery motion," we

25  just stand on our -- you know, I'm not going to repeat what

1  was said at length a month ago.  And the claims -- I note Your

2  Honor's points on claims objection, which we still stand on

3  our arguments.  Thank you, Judge.

4          MR. SCHIAVONI:  Your Honor, Tanc Schiavoni for

5  Century.

6          We do have -- it could have been lost in the

7  motion, but we do have the request for relief under 3007-1(f).

8  And I'm not -- and Your Honor will obviously rule whenever you

9  choose to.  But I just would ask that -- you know, I think a

10  ruling on that could be decoupled from the other issues.  If

11  you some -- if you decided you want to deal with this -- the

12  discovery collectively, you know, I defer to the Court's

13  decisions about how to administer matters.  But 3007 is a sort

14  of separate issue, and it is sort of tied to solicitation

15  here, about whether -- you know, what claims should vote, what

16  claims should not.

17          We put before the Court specific uncontested

18  evidence of proofs of claim bearing signatures, the same

19  signature for multiple different names of claimants and other

20  such things that are very problematic.  We look forward to the

21  U.S. Trustee weighing in on these issues, as they examine the

22  evidence.  But we think the 3007 relief is a separate issue

23  that we'd ask Your Honor to take into consideration and

24  consider ruling on.  Thank you, Your Honor.

25          THE COURT:  Thank you.

1     My thought was that I was going to consider the

2  Rule 3007 issue after I saw what discovery yielded.  But I'll

3  make a decision on that when I see whether or not I'm going to

4  be handling the estimation motion and -- because I think I

5  need to see what's happening there.  I may decide -- if I'm

6  not handling it, so that I cannot coordinate all of this, then

7  I may rule separately on the Rule 3007 request.

8     I do think, to some extent, all of these issues are

9  intertwined.  And the estimation, for example, the discovery

10 you want with respect to the -- or from the attorneys, the

11 individual attorneys and the aggregaters may be appropriate

12 discovery in the estimation motion context.  And so I'm -- but

13 since I may not be handling that, I'm not going to rule on it

14 for now.  And I will consider whether I rule on the 3007

15 separately, once I know whether or not I'm handling the

16 estimation motion.

17     MR. SCHIAVONI:  Your Honor, we -- if you recall, we

18 took an appeal on the bar date order that's before Judge

19 Andrews.

20     THE COURT:  Ah.

21     MR. SCHIAVONI:  One of the issues there was -- so I

22 just -- so, if you remember that, one of the issues there was

23 sort of how the form questions -- the adequacy of the

24 questions, what would happen.  It's a -- you know, it's as if

25 a prophet wrote that email -- that brief.  It foretells what

1  might go wrong.  And I'm not -- no -- and Your Honor, I mean

2  no criticism, obviously, to the Court.  It's like, you know, I

3  think we were all faced, at that time, not -- you know, with

4  some novel issues.

5         But Judge Andrews does have before him an appeal

6  that asks him to -- that, because of -- you know, the

7  substance of the appeal is the claim shouldn't be granted

8  presumptive validity.  Okay?  So that is before him.

9         Now just one thing to close on:  It's still before

10  him.  I'm not sure how many months have gone by.  But you

11  know, perhaps -- Mr. Moulton would be very happy if like he

12  gets to the estimation after he gets out that appeal for six

13  months.  Okay?

14         THE COURT:  Well, my --

15         MR. SCHIAVONI:  I mean --

16         THE COURT:  My guess is --

17         MR. SCHIAVONI:  -- it's like -- it's illustrative

18  of the case --

19         THE COURT:  My guess is, if the District Court

20  takes this, you're going to be in front of Judge Andrews, so

21  you'll be able to address him on multiple issues.  I could be

22  wrong, but that's generally how it happens.  So -- and I --

23  has he had argument on that yet?

24         MR. SCHIAVONI:  No, Your Honor, he hasn't.

25         THE COURT:  Okay.  Well, I will consider this.  I -

1 | - as I said, I was going to sequence it a little differently,

2 | but I will rethink whether I need to -- how I should sequence

3 | it, once I know what I'm handling and what I'm not handling

4 | and we see --

5 |          MR. SCHIAVONI:  Thank you, Your Honor.

6 |          THE COURT:  I'd like to see if the mediation

7 | results in something that could somehow meet this issue, as

8 | well, or address this issue, as well.  So we'll see.  Okay.

9 | Thank you, everyone.

10 |          What is next?

11 |          MR. ABBOTT:  Thank you, Your Honor.

12 |          The next item on the agenda is the debtors' motion

13 | for preliminary injunction.  I believe that matter has been

14 | resolved, but I'll cede the mic to Mr. Andolina, Your Honor,

15 | who will (indiscernible)

16 |          THE COURT:  Mr. Andolina.

17 |          MR. ANDOLINA:  Good morning, Your Honor.  Michael

18 | Andolina, White & Case, on behalf of the Boy Scouts of

19 | America.

20 |          Yes, Your Honor.  As Ms. Lauria previewed and Mr.

21 | Abbott just stated, some continued good news and momentum to

22 | report.  Your Honor, we filed a motion to extend the

23 | preliminary injunction on February 19th.  Prior to the

24 | objection deadline on that motion, we engaged in extensive

25 | mediated negotiations with the UCC, the TCC, the coalition,

1  the FCR, and the ad hoc committee of local councils.  And Your

2  Honor, the parties were able to finalize a stipulation and

3  proposed order that was filed at Docket 151.

4         That stipulation was served on all parties in the

5  adversary on March 8th.  There were no objections by any

6  plaintiff to either our motion or to that stipulation.  As

7  Your Honor is aware, Century had filed a limited objection to

8  the stipulation.  We greatly appreciate the conversations we

9  had over the last several days, in particular with Mr.

10  Schiavoni, Mr. Lucas, and Mr. Celentino, assisted by Mediator

11  Tim Gallagher.  And we were able to resolve Century's limited

12  objection.

13         Your Honor, we provided a blackline version of the

14  proposed order to the Court.  I don't know if Your Honor has

15  had an opportunity to review that.  We can -- I can either

16  read the language or we can submit that to Your Honor, you

17  know, through a filing.  But all the parties to the

18  stipulation -- the TCC, the UCC, the insurers and the ad hoc -

19  - have signed off on that additional language to the proposed

20  order.  And we would ask that the Court enter the order and

21  stipulation as soon as the Court has an opportunity to review

22  that proposed language.

23         THE COURT:  It was just handed to me.  Let me see.

24  Okay.  It looks fine.

25         Does anyone else wish to be heard?

1        MR. STANG:  Your Honor, this is Mr. Stang.  I'd
2  like to make a comment, please.

3        THE COURT:  Yes.

4        MR. STANG:  Your Honor, while it's good news --
5  good that we're not having a preliminary injunction trial
6  today, the real good news will be if (indiscernible) satisfied
7  the conditions for the extension of their preliminary
8  injunction.  And this (indiscernible) this an agreement
9  between the TCC and the (indiscernible) and the counsels have
10  been told (indiscernible) eligible for the extension of the
11  injunction, this is what you have to do (indiscernible)
12  production of documents.

13        And we've talked about (indiscernible) before, they
14  are critically important to our survivors, to our
15  (indiscernible) organizations (indiscernible) liable for the
16  abuse they suffered and may be channeled parties or
17  participating parties under the proposed plan.  So we keep our
18  fingers crossed.

19        We've been through this (indiscernible) before,
20  local counsel producing information.  And (indiscernible) they
21  have -- they did supply information (indiscernible)
22  disclosures, but there was a response.  So we're hoping that,
23  through (indiscernible) the debtor (indiscernible) can
24  (indiscernible) counsel to make those searches (indiscernible)
25  rosters under the conditions specified in the stipulation.

1           Your Honor, Mr. Pfau, who represents abuse

2   survivors, filed a joinder to the (indiscernible) response, I

3   should say, to the preliminary injunction (indiscernible) like

4   to make a comment to the Court.

5           THE COURT:  Okay.

6           MR. PFAU:  Your Honor, this is Michael Pfau.  Can

7   you hear me clearly?

8           THE COURT:  I can hear you, yes.

9           MR. PFAU:  Okay.  My apologies.  I'm traveling, so

10  I had to appear via iPhone.  But if you can hear me and see

11  me, great.

12          I filed a joinder -- I represent a number of abuse

13  survivors across the country, and I filed a joinder and am

14  appearing in conjunction with David Klauder, a Delaware

15  bankruptcy attorney.  We filed that joinder, we thought it was

16  important because we wanted to raise an issue with you that we

17  think is critically important.  We styled our joinder a

18  cautious joinder, not an enthusiastic joinder, and it's

19  cautious because we have been seeking the troop rosters for a

20  long time.  Don't need to get into that now because we have

21  agreement, or at least agreement on a protocol that will allow

22  us to obtain those rosters.

23          The rosters may not be as important for the

24  bankruptcy lawyers and bankruptcy professionals, but they are

25  of critical importance to those of us who are representing

1 survivors in this case.  And you know, why are the rosters so

2 important?  The rosters allow the survivors to identify the

3 local council in the sponsoring organization.  Not many, but

4 some of my clients have not been able to identify the

5 sponsoring organization that sponsored the troop when they

6 were children.

7            I have been told that there are tens of thousands

8 of claimants who have not identified a sponsoring

9 organization.  Now this is important because the injunction

10 does not toll the statute of limitations for the lawyers that

11 are practicing in State Court, and it doesn't allow for

12 discovery.

13            And the reason I wanted to speak, Your Honor, on my

14 client's behalf, and I think on behalf of many of the tort

15 lawyers representing abuse survivors was a timing issue.

16 There are three states who have passed limbo legislation, New

17 Jersey, New York, and North Carolina, where those windows are

18 going to be closing this year.  We need to be able to

19 identify, in order to preserve the statute of limitations,

20 those sponsoring organizations, and we need the troop rosters.

21            I'm glad we've reached a point where we have a

22 protocol in place to obtain that discovery.  But we thought it

23 was important, Your Honor, to raise this issue.  It's of

24 critical important to us, to put it on your radar.  Hopefully,

25 we'll not be back asking for any relief in this regard.  But

1  we thought it was important to join, important to state our

2  piece, and like I said, put this on your radar.  So thank you.

3            THE COURT:  Thank you.

4            Is there anyone else who wishes to be heard?

5            MR. CELENTINO:  Your Honor, this is Joe Celentino

6  of Wachtell, Lipton, Rosen & Katz, for the ad hoc committee.

7  May I be heard?

8            THE COURT:  Yes.  Can I remind everyone else,

9  please mute your microphones?  Thank you.

10           Mr. Celentino.

11           MR. CELENTINO:  Good morning.  I'll be brief, Your

12  Honor.

13           As you have no doubt just heard, this -- we support

14  the preliminary injunction stipulation that Your Honor is

15  being asked to enter, and we hope that you will.  As you can

16  tell from the comments that were made just now, the injunction

17  stipulation is a compromise, and it's a compromise that we

18  support because it's one that will let the parties focus on

19  mediation, which, as Your Honor heard this morning, is

20  critical, given where we are in the case right now.  It is

21  critical that we can get to a global resolution in the short

22  time frame that we have here.

23           We believe this stipulation will help move these

24  cases forward to a positive conclusion, which is in everyone

25  interests -- everyone's interests here.  And we hope that Your

1   Honor will enter the stipulation this morning.  And we will

2   continue, the ad hoc committee will continue to work to move

3   these places -- these cases to a global resolution.  Thank

4   you, Your Honor.

5            THE COURT:  Thank you.

6            Anyone else?

7        (No verbal response)

8            THE COURT:  Okay.  Well, I have reviewed the

9   revised form of order and I will enter it as consensual and

10  recognize that it is a compromise that the parties who

11  negotiated it have reached.  I do not have any plaintiff in

12  the underlying litigation in front of me objecting to any

13  further extension of the preliminary injunction, and so I will

14  grant it.  I will address whatever subsequently occurs with

15  respect to the compromise, as and when it's brought in front

16  of me.  So that will be signed.

17           MR. ABBOTT:  Thank you, Your Honor.

18           THE COURT:  Anything further?

19           MR. ABBOTT:  Thank you, Your Honor.  Your Honor,

20  Derek Abbott again for -- on behalf of the debtors.  No, that

21  completes the agenda.  We appreciate the Court's time and

22  guidance today.

23           THE COURT:  Thank you.  And I encourage everyone to

24  make good use of the mediators and the mediation session that

25  was coming up.  If I were channeling Judge Fitzgerald -- who

1  many of you have been in front of on mass tort cases -- I

2  would say bring your toothbrushes and be prepared to come to a

3  resolution.  We're adjourned.

4            UNIDENTIFIED:  Happy St. Patrick's Day, everyone.

5            UNIDENTIFIED:  Thanks, David.  Nice hat.

6            UNIDENTIFIED:  Thank you, everybody.  Thank you,

7  Judge.

8            UNIDENTIFIED:  Thank you, Your Honor.

9        (Proceedings concluded at 11:05 a.m.)

10

11

12

13

14                          CERTIFICATE

15

16      I certify that the foregoing is a correct transcript

17  from the electronic sound recording of the proceedings in the

18  above-entitled matter.

19
   /s/Mary Zajaczkowski              March 17, 2021
20  Mary Zajaczkowski, CET**D-531

21

22

23

24

25