**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>　　　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>Jointly Administered<br><br>**Related to Docket No. 2411** |

**THE OFFICIAL COMMITTEE OF TORT CLAIMANTS'**
**OBJECTION TO DEBTORS' THIRD MOTION FOR ENTRY OF AN**
**ORDER EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO FILE**
**A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF**

The Official Committee of Tort Claimants (consisting of survivors of childhood sexual abuse) (the "Tort Claimants' Committee" or the "TCC") appointed in the above-captioned chapter 11 cases of Boy Scouts of America and Delaware BSA, LLC (collectively, the "Debtors") hereby submits its response to *Debtors' Third Motion for Entry of an Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 2411] (the "Motion"), and in support thereof respectfully states as follows:

**Introduction**

1.  More than a year into the chapter 11 cases, the Debtors are unable to propose a confirmable plan. Their plan proposes an inadequate contribution by 253 non-debtor Local Councils and thousands of Chartered Organizations seeking non-consensual third-party releases of 84,000 childhood sexual abuse claims. The non-consensual releases and the channeling of those claims to a trust will effectively discharge the Local Councils and Chartered Organizations over the objection of thousands of men. The time has come to end the Debtors'

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware the BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

plan exclusivity and allow the Tort Claimants' Committee to file its own plan that allows the Debtors to reorganize without a fire-sale intra-family settlement with the Local Councils and Chartered Organizations,

2. The Debtors' bankruptcy cases were caused by decades of childhood sexual abuse that has resulted in 84,000 claims. The Boy Scout's current child protection protocols have been in place since the mid-1990s and the Boy Scouts do not propose revising or updating its child protection protocols even though more than 11,000 of the 84,000 childhood sexual abuse claims arose after the mid-1990s. That the number of claims for some casual and uninformed observers is surprising should not and cannot diminish the sad but undeniable truth that thousands upon thousands of children entrusted to Boy Scout's care were molested, abused, fondled and raped, stealing their precious youth and causing enormous damages in their lives and the lives of their families.

3. The Boy Scouts, Local Councils, and Chartered Organizations simply are not providing adequate compensation. In a settlement offer to the Boy Scouts, the Tort Claimants' Committee estimated the value of the filed claims based on different types of childhood sexual abuse as follows:

| Type of Sexual Abuse | Claim Estimate | Number of Claims | Total Claim Estimate |
|---|---|---|---|
| Penetration | $2,450,000 | 22,898 | $56,100,100,000 |
| Oral Sex | $1,535,000 | 18,689 | $28,687,615,000 |
| Masturbation | $721,000 | 12,567 | $9,060,807,000 |
| Fondling / Groping | $435,000 | 17,431 | $7,582,485,000 |
| Touching Bare Skin | $312,500 | 1,955 | $610,937,500 |
| Over the Clothes | $175,000 | 1,353 | $236,775,000 |
| Non-Touching / Other | $50,000 | 8,758 | $437,900,000 |
| | | **TOTAL** | **$102,716,619,500** |

4.     These claim values are extremely conservative for a number of reasons. First, the claim amounts above yield an average claim value of $811,215, which likely is low. For example, earlier this week, the University of Southern California entered into a settlement for sexual abuse that occurred at the university's student health center from 2009 to 2016. The settlement totals approximately $1.1 billion for 710 survivors yielding an average of $1.2 million per claim per survivor, which is well above the blended average proposed by the Tort Claimants' Committee.

5.     Second, counting each claim as a single act of abuse is an extremely conservative view of the 84,000 claims.  Thousands of proofs of claim allege multiple acts of abuse.  For example, over 5,100 of the claims arose in New York. Under New York law, each instance of abuse gives rise to a separate and distinct claim for damages. *Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 2013 NY Slip Op 3264, 21 N.Y.3d 139, 969 N.Y.S.2d 808, 991 N.E.2d 666. Of the more than 5,100 childhood sexual abuse claims in New York, the proof of claims reflect that there are at least 21,000 separate documented instances of abuse.[2] None of the 5,100 childhood sexual abuse claims are subject to a statute of limitation defense because the Child Victims Act created a statutory window. Accordingly, the New York claims are not and should not be discounted as untimely or "out of statute."[3]

---

[2] The 21,000 estimate caps the instances of abuse at 20 per survivor, which means the total number is substantially higher.

[3] Similarly there are not statute defenses the thousands and thousands of childhood sexual abuse claims arising in California (over 10,100 claims), Arizona (1,200 claims), New Jersey (2,200), North Carolina (2,000), Montana (235 claims), and Guam (100 claims). In addition, there many other states where the discovery laws routinely permit the enforcement of claims that are by definition out of statute.

DOCS_SF:105319.3 85353/002

6. Third, the summary does not accurately capture the true number of claims because it defaults to the single "worst form of abuse." For example, a childhood sexual abuse claim categorized as a "penetration" claim does not reflect that a substantial number of those survivors were also sexually abused by one or all of the other types of abuse. Once the 84,000 childhood sexually abuse claims are more thoroughly reviewed and analyzed, the total number of claims will reflect that the instances of sexual abuse and the amount of damages are much greater than summarized above.

**The Plan is Patently Unconfirmable and Exclusivity Should be Terminated**

7. On March 1, 2021, the Debtors filed the *Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 2293] (the "Plan") and the associated *Disclosure Statement for the Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 2294] (the "Disclosure Statement"). The Debtors scheduled a hearing for the Court to consider approval of the Disclosure Statement on April 29, 2021 and intend to seek confirmation of the Plan in July, 2021.

8. The proposed consideration under the Plan can be broken into three baskets: (a) cash and non-insurance assets of the Debtors ($115 million), (b) cash and non-insurance assets of the Local Councils ($300 million)[4] and Chartered Organizations ($0), and (c) the assignment to a trust of the Debtors' insurance policies that include Local Councils and Chartered Organizations as additional insureds and the independent insurance policies of the Local Councils.

---

[4] While the Plan provides that the Local Councils will collectively contribute $300 million in cash or other consideration to a trust, the Local Councils have not agreed to contribute such amount. Thus, the Plan as drafted is aspirational at best.

4

9.     For illustration purposes only, if half of the 84,000 claims are disallowed, the consideration proposed by Local Councils and Chartered Organizations still is grossly inadequate. For example, using a blended average of $811,215 per claim and multiplying that amount by 42,000 claims, the total amount of claims is over $34 billion. The Local Councils are proposing to contribute less than 1% of the total damages. No Chartered Organization has offered to pay anything and there is no mechanism under the Plan that outlines a process to evaluate a contribution for purposes of satisfying the legal requirements to receive involuntary third-party releases.

A.     **Local Council and Chartered Organization Contributions Are Inadequate**

10.     Bankruptcy courts in the District of Delaware use the *Master Mortgage* ("*MM*") factors to determine whether third-party non-debtor releases should be allowed. *See, e.g., In re Indianapolis Downs, LLC.* 486 B.R. 286, 303 (Bankr. D. Del. 2013) (citing *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 934 (W.D. Mo. 1994)). The *MM* factors are "neither exclusive nor are they a list of conjunctive requirements." *Id.* The second *MM* factor asks whether the non-debtor has made a substantial contribution of assets to the reorganization. *Id.* This factor requires releases to be "fair" and "given in exchange for reasonable consideration." *In re Continental Airlines*, 203 F.3d 203, 215 (3rd Cir. 2000). The Local Councils and Chartered Organizations have failed to show they will substantially contribute towards the Boy Scout's reorganization to satisfy this factor in their attempt to qualify for a channeling injunction.

11.     Delaware courts have often considered the second *MM* factor in the context of third-party releases for the debtor's directors and officers. In the majority of such cases, the court found that non-financial contributions—such as planning, negotiating, or

5

implementing the reorganization; managing debtor's "complex" operations; or general continued employment—were not sufficient to qualify as a "substantial contribution." *In re Washington Mutual, Inc.,* 442 B.R. 314, 354 (Bankr. D. Del. 2001) (rejecting releases for affiliates due to the lack of evidence regarding "who the affiliates are or why they should be getting a discharge without filing their own bankruptcy cases" and for the directors and officers because their "only 'contribution' was negotiating the plan"); *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (efforts to draft and negotiate plan were not "of the level of the critical financial contribution contemplated" in previous cases); *In re. Exide Techs.*, 303 B.R. 48, 66 (Bankr. D. Del. 2003) (restructuring efforts "did not satisfy the requirement that they contribute 'assets' to the reorganization"); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 606 (Bankr. D. Del. 2001) (individuals were otherwise compensated for their non-financial contributions to the plan).

12. The Plan in its current does not specify the consideration to be paid by each Local Council, which is another factor that weighs against granting non-consensual third-party releases. *See, e.g., In re Hoffinger Indus.,* 321 B.R. 498, 514 (Bankr. E.D. Ark. 2005) (finding that the lack of specificity regarding who or in what proportion the contribution would be paid weighed against granting the releases).

13. In many third-party release cases, the third parties clearly contributed substantial assets to the reorganization. *In re Specialty Equip. Cos*., 3 F.3d 1043,1045 (7th Cir. 1993) (third party creditor extended additional $10 million in credit); *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 288–89 and n. 2 (2d Cir. 1992) (creditor and debtor pooled their rights to collect judgments from the debtor's former officers and director into a $1.3 billion dollar fund); *In re Flintkote Co.*, 04-11300 (MFW), 2015 WL 4762580, at *10 (Bankr. D. Del. Aug. 12, 2015) (releasees contributed $575 million of the $700 million available for releasers);

6

*Republic Supply v. Shoaf,* 815 F.2d 1046, 1048 (5th Cir. 1987) (third party guarantor contributed $850,000 in insurance proceeds to fund the plan); *In re Am. Family Enterprises,* 256 B.R. 377, 408 (D.N.J. 2000) (releasees contributed $70 million to consummate the plan, without their funding creditors would likely receive no recovery). In such cases, the courts typically do not engage in significant analysis of or provide guidelines related to whether those contributions are substantial.

14. Delaware courts have also inquired into the magnitude of the released claims. The *Spansion* court found important to its analysis that "the record does not reflect that there is any pending litigation in this case that would be discontinued by such a release." *Spansion*, 426 B.R. at 143; *see also In re Tribune Co.,* 464 B.R. 126, 188 n. 73 (Bankr. D. Del. 2011).

15. Some courts have also analyzed the releasee's contribution potential in determining whether its contribution was substantial. *See, e.g., In re HWA Props.*, 544 B.R. 231, 241 (Bankr. M.D. Fla. 2016) ("Courts evaluating this factor have found a contribution to be 'substantial' where the contribution consists of most of the assets of the contributing party."); *In re M.J.H. Leasing, Inc.*, 328 B.R. 363, 371 (Bankr. D. Mass. 2005); *In re Mahoney Hawkes, LLP*, 289 B.R. 285, 302 (Bankr. D. Mass. 2002) ("There is no information about whether the contribution is significant in terms of what the partners are able to pay.").

16. This issue arose in the Archdiocese of St. Paul and Minneapolis case when the Archdiocese attempt to cram down a plan on survivors. There the Committee objected to the Debtor's plan on a number of grounds, including the plan's failure to meet any of the *MM* factors. Regarding substantial contribution, the Committee argued that the contribution of approximately $13 million in insurance proceeds on behalf of the parishes did not qualify as a

substantial contribution because it (a) was not the parishes' own assets; (b) was not proportional to the $1.3 billion in assets the Committee believed the releasees had; and (c) did not account for countless other non-parish release recipients. Judge Kressel denied the Debtor's plan due to its overwhelming rejection by the sexual abuse survivors. *In re. Archdiocese of St. Paul and Minneapolis,* Case No. 15-30125, Docket No. 1168, p. 16.

17. Based on the IRS Form 990 statements filed by each Local Council and supplemented by the Tort Claimants' Committee's appraisals of hundreds of Local Council properties, the aggregate value of the Local Councils' assets exceeds $4 billion. The cases above demonstrate the cash and other assets to be contributed under the Plan by the Local Councils and Chartered Organizations are not substantial. The Local Councils, who have not yet committed to contribute the $300 million alluded to in the Plan, are proposed to receive a non-consensual release in exchange for contributing far less than the 1% of the childhood sexual abuse claims that arose under their watch for decades. As noted above, the Local Councils' aggregate assets exceed $4 billion.

**B.    There is Insufficient Support from Childhood Sexual Abuse Survivors**

18. In addition to the "substantial contribution requirement, affective creditors must vote overwhelmingly in favor of the plan that contains non-consensual third-party releases. *See, e.g.*, *In re Millennium Lab Holdings II, LLC*, No. 18-3210, 2019 U.S. App. LEXIS 37939, at *8 (3d Cir. Dec. 19, 2019) (over 93% of pre-petition lenders had agreed to the releases in a prepetition restructuring agreement); *In re Archdiocese of Saint Paul & Minneapolis,* 578 B.R. 823, 833 (Bankr. D. Minn. 2017) (refusing to approve third party releases of childhood sexual abuse claims and channeling injunction based solely on overwhelming rejection of the provision by the sex abuse survivors); *In re Specialty Equip. Co.,* 3 F.3d at 1045 (creditors and interest

holders entitled to vote "overwhelmingly" accepted the proposed plan treatment); *In re A.H. Robbins Co.*, 880 F.2d at 698 (94% of tort claimants affected by the injunction voted to accept the plan); *In re AOV Indus., Inc.*, 792 F.2d at 1143 (creditor's overwhelmingly" accepted plan with over 90% of the creditors in each class voting to accept the plan); *In re Heron, Burchette, Ruckert & Rothwell,* 148 Bankr. at (only 1 of 63 creditors and 8 of 93 partners objected to injunction*); In re Johns-Manville Corp.*, 68 B.R. at 621 (plan overwhelmingly accepted).

19. Without overwhelming buy-in from the childhood sexual abuse Survivors (far in excess of the 75% for asbestos cases under section 524(g) of the Bankruptcy Code) and a substantial financial contribution to any settlement by the Local Councils and the Chartered Organizations and a plan that pays substantially all of the estimated value of the Survivors' claims, the Local Councils and the Chartered Organizations will not be able to obtain non-consensual releases from the Survivors or the benefits of a channeling injunction.

**Exclusivity Should Be Terminated For Purpose of
Permitting the Tort Claimants' Committee to Propose a Plan that Permits
the Boy Scout's Reorganization and Relies on Insurance to Compensate Survivors**

20. The Tort Claimants' Committee intends to file its own plan of reorganization. To the greatest extent possible, the plan will mirror substantially the Debtor's plan as to treatment of creditors other than Abuse Claimants. As to Abuse Claimants, perhaps the most salient change will be the absence of any non-consensual third party releases for the Local Councils and Chartered Organizations. The plan will allow for releases and a channeling injunction to be negotiated by the Tort Claimants' Committee or the post-confirmation settlement trust but not for the relatively paltry sum offered by the Local Councils.

21. The Debtors' Plan proposes that substantially all of the compensation will be paid by insurance carriers. As to Boy Scout's policies, for the most part, Local Councils and

9

Chartered Organizations are additional insureds. Thus, if Boy Scouts and Local Councils want survivors to rely on insurance, the Local Councils and Chartered Organizations do not need a release. They can use and rely upon the same insurance coverage that Abuse Claimants are left to rely upon for the defense, settlement, and payment of claims – which is what the Tort Claimants' Committee's plan will provide.

22. <u>Under the Tort Claimants' Committee's plan, the Boy Scouts are afforded the opportunity to pursue their mission. They will be reorganized as an ongoing financially feasible entity within the parameters of the 5-year business plan that they have submitted</u>.

Dated: April 1, 2021

PACHULSKI STANG ZIEHL & JONES LLP

 */s/ James E. O'Neill*
James I. Stang (CA Bar No. 94435)
Robert B. Orgel (CA Bar No. 10187)
John A. Morris (NY Bar No. 2405397)
John W. Lucas (CA Bar No.271038)
James E. O'Neill (DE Bar No. 4042)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899 (Courier 19801)
Telephone: 302-652-4100
Facsimile:  302-652-4400
E-mail:  jstang@pszjlaw.com
    rorgel@pszjlaw.com
    jmorris@pszjlaw.com
    jlucas@pszjlaw.com
    joneill@pszjlaw.com

*Attorneys for the Official Committee of Tort Claimants*