## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | Jointly Administered |

### OFFICIAL TORT CLAIMANTS' COMMITTEE'S SECOND STATUS REPORT

The Official Committee of Tort Claimants (consisting of survivors of childhood sexual abuse) (the "**Tort Claimants' Committee**"), appointed in the above-captioned cases, hereby files its second case status report, pursuant to 11 U.S.C. § 1102(b)(3), and respectfully states as follows:

### Introduction

1.      On March 1, 2021, the Boy Scouts filed the *Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 2293] (the "**Plan**") and the associated *Disclosure Statement for the Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 2294] (the "**Disclosure Statement**").  The Boy Scouts scheduled a hearing for the Court to consider the approval of the Disclosure Statement on April 29, 2021 and intend to seek confirmation of the Plan on July 26, 2021.

---

[1]  The Debtors' federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

2.      The Plan is not the product of negotiation between the Debtors and the Tort Claimants' Committee, or any other party in interest that represents the childhood sexual abuse survivors. Instead, the Plan is nothing more than the documentation of a deal among the Debtors' prepetition lender and the commercial creditors' committee, whose primary constituency's claims are a very small fraction of the childhood sexual abuse claims. As set forth in the Tort Claimants' Committee's last status conference statement [Docket No. 2388] (the "**First Status Conference Statement**"), the Plan does not substantively address the childhood sexual abuse that led to the filing of these cases. The Plan does not have the support of the Tort Claimants' Committee, the Coalition, or the FCR.

3.      An enormous amount work must be completed before the Boy Scouts can obtain approval of its Disclosure Statement. The Plan cannot proceed without resolving the numerous material disputes that will lay the ground work for a plan of reorganization that is consensual or contested. The parties have been in mediation for months and have yet to reach resolution on some fundamental issues. Discovery in litigation and the adjudication of motions and complaints of at least some of the disputed issues might be the only way to achieve movement toward a consensual plan.[2] Discovery can aid settlement negotiations by providing the facts and transparency necessary for successful resolution of issues, whether by mediation or

---

[2] In the bankruptcy case of the *Roman Catholic Bishop of Great Falls,* Judge Pappas noted the beneficial effect of litigation, "The Court also believes that prosecution of the Avoiding Actions may have a therapeutic effect on the parties' attitudes about the desirability of a negotiated resolution to the issues raised in this case, and perhaps motivate them to consider a consensual plan." *In re Roman Catholic Bishop of Great Falls*, 584 B.R. 335, n. 7 (Bankr. D. Mont. 2018).

otherwise. Judicial resolution of issues, *e.g.*, the Boy Scout's claim that substantially all of its property is beyond the reach of creditors by virtue of donor restrictions or an expansive view of charitable immunity, is critical. This status report will outline those fundamental issues.

## Summary of Issues that Remain Unresolved

4.      Below is a summary of issues that have not been addressed in the Plan or Disclosure Statement that preclude confirmation of the Debtors' Plan and prevent the Boy Scouts from submitting a disclosure statement that contains adequate information as required by section 1125 of the Bankruptcy Code.

**A.      Mediation**

5.      As noted above, the parties have participated in mediation sessions for the past ten months on a variety of topics. From the Tort Claimants' Committee's perspective, nearly all of the mediation sessions have been informational presentations with limited opportunities to pose questions. They have not involved negotiations with the Tort Claimants' Committee. In fact, during last week's mediation in Miami, Florida, the Tort Claimants' Committee was not afforded any opportunity to present its views on the models of the abuse claims and it was "excused" from any meetings on the third and last day of the mediation. Other than the settlement between JPM, UCC, and the Boy Scouts, the mediation has not resulted in the resolution of anything.

**B.      The Plan and Disclosure Statement**

6.      There is very little, if anything, that the Tort Claimants' Committee can support in the Plan and Disclosure Statement because there is little, if anything, substantive in it

relating to the sexual abuse claims. As discussed in greater detail below, the Plan reflects the resolution of a dispute among the Boy Scouts, JPM (the Debtors' prepetition lender), and the UCC. The agreement between those parties, as reflected in the statement filed by the Mediators, settles various challenge rights held by the UCC. *See* Docket No. 2292 (the "**Mediators' Report**"). The Mediators' Report, filed moments before the Plan, notably and remarkably makes no reference to the same challenge rights held by the Tort Claimants' Committee and the FCR.

7.      The Plan is premised on granting non-consensual third-party releases for the benefit of 252 Local Councils and thousands of Chartered Organizations. The Local Councils, along with the Chartered Organizations, are implicated in the same 84,000 childhood sexual abuse claims faced by the Debtors. Confirmation of the Plan that includes non-consensual third-party releases is dependent upon each Local Council and each Chartered Organization making a substantial contribution in consideration for the release and the overwhelming approval of the Plan by Survivors.

8.      In Exhibit D of the Plan, the Debtors' state their hope that the Local Councils will contribute cash and property (in an unstated proportion) totaling $300 million, with no guarantee that the Settlement Trust could realize the values ascribed to the property.  Not a single Local Council has committed to making any contribution, much less a substantial contribution, for a release and channeling injunction. The Disclosure Statement, as currently drafted, does not have any financial information about any of the Local Councils that would enable any one the 84,000 survivors to make an informed decision to accept or reject the Plan and have their childhood sexual abuse claims channeled to a trust. It does not disclose the

number and type of childhood sexual abuse claims against each Local Council. It does not value any of the 84,000 childhood sexual abuse claims. It does not disclose the amount each Local Council might contribute. It does not disclose the assets and liabilities of each Local Council for purposes of determining whether or not the best interest test has been satisfied. In simple terms, there is no disclosure and what is set forth in the Disclosure Statement is inadequate.

9.      Even if some or all of the Local Councils committed to contribute $300 million in cash and other property to the settlement trust, such amount is woefully inadequate to gain the support of the 84,000 childhood sexual abuse survivors or for the Court to grant non-consensual third-party releases. The Tort Claimants' Committee has reviewed substantially all of the assets and liabilities of each Local Council utilizing the limited discovery provided by the Local Councils and formal appraisals and broker opinions of value. The Tort Claimants' Committee has determined that the Local Councils could collectively contribute multiples of the aspirational $300 million contribution without endangering their ability to carry on their Scouting mission.

10.     There is no information in the Disclosure Statement about the contributions of Chartered Organizations. While two major religious organizations are mediation parties, they have not filed mediation briefs or attempted to engage the Tort Claimants' Committee in any discussions. At this juncture, the Court cannot approve the adequacy of the Disclosure Statement that contemplates granting non-consensual third-party releases to thousands of Chartered Organizations without a single word about what they might do or even a

mechanism to be eligible for the debtor-like protections afforded under the Plan for thousands of entities that have never appeared in these cases in any substantive manner.

11.      Despite there being no defense to many of 84,000 childhood sexual abuse claims, all of the Boy Scout's insurers (except one) have refused to offer anything to the childhood sex abuse survivors. When you take into consideration the cash and assets proposed by the Boy Scouts (and the Local Councils), those responsible for decades of childhood sexual abuse intend to pay grossly inadequate consideration ($6,000 per claim) and walk away scott free while the childhood sexual abuse survivors are left with an inadequately funded trust that will be required to litigate against the insurance carriers before any meaningful payment to survivors can be made. It is not apparent that the Boy Scouts and Local Councils have made any effort to have the insurers contribute towards the trust despite their claimed purpose of filing chapter 11 to adequately compensate child sexual abuse survivors. Approving the Boy Scout's Plan would re-victimize Survivors all over again resulting in the worst settlement in the history of the Boy Scout's Survivors.

12.      On March 18, 2021, the Boy Scouts filed its *Third Motion for Entry of an Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 2411] (the "Exclusivity Motion") seeking an extension of the exclusivity period through and including August 19, 2021. On April 1, 2021, the Tort Claimants' Committee filed its *Objection to the Exclusivity Motion* [Docket No. 2506]. As set forth in greater detail in the Tort Claimants' Committee's objection, the consideration proposed under the Boy Scout's Plan is woefully inadequate (and could never support non-consensual third party

releases) and it is unlikely a super-majority of survivors would ever support the Plan. Because it

is unlikely the Boy Scouts can confirm their Plan, the Tort Claimants' Committee should be

permitted the opportunity to propose its own plan of reorganization.

13.    To the greatest extent possible, a plan proposed by the Tort Claimants'

Committee will mirror the Boy Scout's Plan as to treatment of creditors other than Abuse

Claimants. The alternative plan will allow the Boy Scouts to exit its bankruptcy and operate

under a feasible business plan that fairly allocates value between the survivors and non-abuse

creditors. The Tort Claimants' Committee's plan will not provide releases and a channeling

injunction for Local Councils or Chartered Organizations that offer less than a substantial

contribution given their liability and ability to pay. As the Boy Scouts (per its Plan) expect

survivors to rely on insurance as the primary source of recovery for their claims against the Local

Councils and Chartered Organizations, the Local Councils and Chartered Organizations do not

need a release. They can rely upon the same insurance coverage that survivors are expected to

rely on, which is exactly what Tort Claimants' Committee's plan will provide.

14.    The following sections discuss the other pending contested matters that

preclude consideration of the Disclosure Statement.

**C.    Declaratory Judgment Action Regarding Restricted Assets**

15.    At the outset of these cases, the Boy Scouts filed the *Motion for Entry Of

an Order (I) Scheduling Certain Deadlines In Connection With Potential Disputes Regarding the

Debtors' Identified Property (II) Granting Related Relief, dated February 18, 2020* (the "**Asset

Restriction Procedures Motion**") [Docket No. 19]. By the Asset Restriction Procedures

Motion, the Boy Scouts sought an order of the Court imposing deadlines for the Tort Claimants' Committee, and any other party in interest, to contest the Boy Scout's allegation that certain assets (the "**Identified Property**") are subject to enforceable restrictions under applicable law and/or are otherwise unavailable to satisfy creditor claims, including the claims of the survivors of childhood sexual abuse.[3] The Boy Scouts asserted that the Identified Property has an alleged total value of $1,014,160,463 in restricted and unrestricted assets as of November 30, 2019, and $667,075,374 in value of such assets are subject to donor restrictions ("**Restricted Assets**") and thereby cannot be used to satisfy the claims of the survivors of childhood sex abuse. Alternatively, the Boy Scouts contend that even if they cannot establish donor restrictions, (i) the assets are subject to a charitable trust which can only be used to fulfill the Boy Scouts' charitable mission which does not include paying the survivors of childhood sex abuse; (ii) the Identified Property is core to the Boy Scouts charitable mission and Scouting program and the assets must be preserved for the estates to ensure a successful reorganization: (iii) selling or liquidating the Identified Property would violate the D.C. non-profit Corporations Act; (vi) selling or liquidating the Identified Property is not required as a condition for confirmation; and (v) some of the Identified Property is subject to liens.

16.    The Tort Claimants' Committee contests the Boy Scouts' position with respect to the Identified Property. Resolution of the disputes concerning the Identified Property is required to determine whether over $650 million of real estate and financial assets titled to the

---

[3] It is difficult for the nine members of the Tort Claimants' Committee to square that the Boy Scout's assets are not available for creditor recovery because sexual abuse was not part of the Boy Scout's mission when 84,000 children were sexually abused while participating in that mission.

Boy Scouts are property of the estate available to satisfy creditor claims. The Court's resolution of this dispute is a lynchpin in the confirmation of any plan of reorganization. Among other things, as long as this dispute is unresolved, the Boy Scouts cannot satisfy the Best Interests Test. The Boy Scout's plan must enable each non-consenting creditor to receive as much as the creditor would receive if the Boy Scouts liquidated under chapter 7 of the Bankruptcy Code. The Court cannot confirm a reorganization plan if a non-consenting creditor does not "receive or retain under the plan on account of such claim . . . property of a value, as of the effective date of the plan, that is not less than the amount that such [creditor] would so receive or retain if the debtor were liquidated under chapter 7 of the [Bankruptcy Code] on such date . . . ." 11 U.S.C. § 1129(a)(7).

17.     Because the dispute concerning the Identified Property involves a determination of interests in property, it must be resolved in an adversary proceeding rather than in connection with an objection to the Boy Scouts' Plan. Bankruptcy Rule 7001(2). On January 8, 2021, the Tort Claimants' Committee commenced an adversary proceeding (Adv. Pro. Case No. 21-50032) (the "**Restricted Property Action**") seeking a declaratory judgment that the Identified Property is not subject to enforceable donor restrictions, and is available to satisfy creditor claims. In response to the Restricted Property Action, the Boy Scouts filed the Plan offering under $133 million of cash or other consideration for payment of abuse claims and other unsecured creditors, which when considering the Identified Property, is only 13% of the available assets. The initial scheduling conference is set for May 19, 2021. No discovery has

been served nor have the parties made initial disclosures pursuant to Bankruptcy Rule

7026(a)(1).

18.    The Boy Scouts bear a *"double burden of proof"* in claiming that assets

titled to it are restricted or held in trust:  (a) to establish the existence of the purported donor

restriction or trust and (b) to establish that the funds at issue were segregated from

unrestricted/non-trust funds from the time they were received, or if they were commingled, to

trace the funds under the lowest intermediate balance test.[4] The Boy Scouts must meet this

burden for each and every donation they contend is subject to a donor restriction or impressed

with a trust.

19.    This is a highly fact intensive exercise. Expert testimony will be required.

Accordingly, discovery and the offer of proof at trial will require significant time and resources

of the parties and the Court. The resolution of the disputes over what constitutes property of the

---

[4] To establish that funds are held in trust, the party claiming the existence of a trust bears the burden of proof on two showings: (1) they must demonstrate the existence and legal source of the alleged trust relationship or restriction by *clear and convincing evidence*; and (2) they must identify the trust fund and, if the trust fund has been commingled with other funds, trace the trust funds.  *City of Farrell v. Sharon Steel Corp*., 41 F.3d 92, 95 (3d Cir. 1994); *see also Goldberg v. New Jersey Lawyers' Fund for Client Protection*, 932 F.2d 273, 280 (3d Cir. 1991) (same); *Old Rep. Nat'l Title Ins. Co. v. Tyler (In re Dameron)*, 155 F.3d 718, 723 (4th Cir. 1998) (party claiming entitlement to a trust must be able to trace its assets into the fund or property that is the subject of the trust); *Danning v. Bozek (In re Bullion Reserve of North America)*, 836 F.2d 1214, 1218 (9th Cir. 1988) (tracing is required under federal bankruptcy law to further the Bankruptcy Code's policy of equal distribution among similarly situated creditors); *Catholic Diocese of Wilmington v. Official Committee of Unsecured Creditors*, 432 B.R. 135,147 (Bankr. D. Del. 2010) (property titled to the debtor is presumptively property of the estate and it is the burden of any purported trust beneficiary to establish otherwise; the law requires parties claiming funds are impressed with a trust to identify the specific funds purported placed in trust either by proving they have been segregated from receipt, or if they have been commingled, to trace the trust funds under the lowest intermediate balance test). Whereas the first showing is generally a question of state law, the second showing, when it pertains to the distribution of assets from an entity in bankruptcy proceedings, is exclusively a question of federal law.  *Catholic Diocese of Wilmington*, 432 B.R. at 147 (Bankr. D. Del. 2010); *Goldberg*, 932 F.2d at 280; *see also Official Comm. v. Columbia Gas Systems Inc. (In re Columbia Gas Systems Inc.)*, 997 F.2d 1039, 1063 (3d Cir. 1993) (to protect interests of secured and unsecured creditors, federal law requires that beneficiaries of trust funds bear the burden of identifying and tracing trust property); *Dameron*, 155 F.3d at 723 (tracing is an issue of federal rather than state law).

estate is a *"gating"* issue for the confirmation of a non-consensual plan by the Boy Scouts. Therefore, the Restricted Property Adversary Proceeding must be resolved before a non-consensual plan can be considered by the Court.

D.    **Estimation Motion and Withdrawal of Reference**

20.    On March 16, 2021, the Tort Claimants' Committee, Coalition, and FCR (collectively, the "Estimation Moving Parties"), filed a *Motion of the Future Claimants' Representative, the Official Committee of Tort Claimants, and the Coalition of Abused Scouts for Justice for Entry of an Order, Pursuant to 11 U.S.C. §§ 105(a) and 502(c), (I) Authorizing an Estimation of Current and Future Abuse Claims and (II) Establishing Procedures and Schedule for Estimation Proceedings* [Docket No. 2391] (the "**Estimation Motion**"), pursuant to which the Estimation Moving Parties seek entry of an order (i) authorizing the estimation of the aggregate amounts of current and future childhood sexual abuse claims against the Boy Scouts by type of abuse, by Local Council, by Chartered Organization, and on a year-by-year basis; and (ii) establishing the procedures and schedule for such estimation proceedings. The Estimation Motion contains a proposed schedule for fact and expert discovery, motion practice, briefing, and a hearing in advance of consideration of any disclosure statement.

21.    A hearing regarding the Estimation Motion is scheduled to take place on May 19, 2021, at 10:00 a.m. (Eastern Time).  *See* [Docket No. 2475].  Objections to the relief requested in the Estimation Motion must be filed and served by April 15, 2021, at 4:00 p.m. (Eastern Time).

22.     In an effort to solicit comments from other parties in interest and reach consensus regarding the estimation process, the Estimation Moving Parties have indicated their willingness to meet and confer and have requested that parties who have objections to the relief requested in the Estimation Motion provide a redline of the proposed order granting the motion. Estimation Motion fn. 2 at 1.  As of the time of filing of this Status Conference Report, the Estimation Moving Parties have not received any proposed markups of orders regarding the relief requested in the Estimation Motion or proposed alternative procedures to govern the estimation process.  The Tort Claimants' Committee plan to serve discovery requests relating to the Estimation Motion, seeking information regarding childhood sexual abuse claims, their resolution through settlement or verdict, scout rosters, insurance, and other information.[5]

23.     On March 17, 2021, the Estimation Moving Parties filed a *Motion of the Future Claimants' Representative, the Official Committee of Tort Claimants, and the Coalition of Abused Scouts for Justice for Entry of an Order, Pursuant to 28 U.S.C. § 157(d) and Bankruptcy Rule 5011(a), Withdrawing the Reference of Proceedings Involving the Estimation of Personal Injury Claims* [Docket No. 2399] (the "**Withdrawal of Reference Motion**"), seeking to have the reference of proceedings relating to the Estimation Motion withdrawn from the Court and addressed and determined by the United States District Court for the District of Delaware (the "**District Court**").

---

[5] To date, the Boy Scouts has produced only limited information regarding the settlement of abuse claims since 2016.

24.     The Withdrawal of Reference Motion was assigned to Judge Richard G. Andrews and docketed by the District Court on March 18, 2021.  [District Court Docket No. 1]. On March 31, 2021, the Estimation Moving Parties, Century Indemnity Company, First State Insurance Company, Hartford Accident and Indemnity Company and Twin City Fire Insurance Company entered into a stipulation that provides that the objections to the relief requested in the Withdrawal of the Reference Motion must be filed and served by April 15, 2021, and replies thereto must be filed and served by April 22, 2021 [District Court Docket No. 12].  The stipulation was approved by the District Court on April 1, 2021.

25.     Like the Restricted Property Action, the estimation of the 84,000 childhood sexual abuse claims must be completed before the Court can consider a non-consensual confirmation hearing of the Boy Scout's Plan. The value of the 84,000 childhood sexual abuse claims are a gating items under the Plan, which include the Best Interests of Creditors Test, feasibility, and of paramount importance, the substantial contribution that each Local Council and Chartered Organization must make in consideration of receiving a non-consensual third party release and having the claims against them channeled to a settlement trust.

**E.     TCC Standing Motion and Challenge Claims Against JP Morgan**

26.     On March 12, 2021, the Tort Claimants' Committee and the Future Claimants' Representative ("FCR") filed the *Joint Motion of the Official Tort Claimants' Committee and Future Claimants' Representative for Entry of an Order Granting Standing and Authorizing the Prosecution of Certain Challenge Claims on Behalf of the Bankruptcy Estates* [Docket No. 2364] (the "Standing Motion"). The Standing Motion seeks standing for the Tort

Claimants' Committee and the FCR to file a complaint against JP Morgan Chase Bank, N.A. ("JPM"), the Boy Scouts, and Arrow WV, Inc. relating to various challenge issues. The Standing Motion was originally scheduled for hearing on April 15, 2021 with an objection deadline of March 26, 2021. The TCC and FCR agreed to adjourn the hearing and objection deadline on the Standing Motion. Pursuant to the re-notice of Standing Motion [Docket No. 2445], filed on March 24, 2021, any responses or objections to the Standing Motion are due no later than April 29, 2021 at 4:00 p.m. (Eastern Time). The Standing Motion is currently scheduled for hearing on May 19, 2021 at 10:00 a.m. (Eastern Time).

27.    The Tort Claimants' Committee and FCR were forced to file the Standing Motion because they were not included in any part of the resolution of the UCC's challenge rights regarding JPM's asserted liens. The Tort Claimants' Committee requested meetings, updates, and inclusion in the settlement process among those parties but was excluded.

28.    The Tort Claimants' Committee cannot see how the settlement advanced anything since it did not include the same challenge rights held by the Tort Claimants' Committee and the FCR. The consideration payable to the trade creditors through the settlement represents a miniscule fraction of the value of the childhood sexual abuse claims. The Boy Scout's chapter 11 cases were caused by decades of negligently protecting young boys from sexual predators. It was not caused by the pressure of any trade or other commercial creditors. The Plan effectively ignores survivors and any settlement with JPM that does not take into consideration the Tort Claimants' Committee and the FCR challenge rights with respect to JPM is not really a settlement at all.

## F.    Insurance Coverage and Insurer Participation/Contribution

29.    Beginning no later than 1950 and through 2019, the Boy Scouts continually bought primary, umbrella, and excess general liability insurance policies to defend lawsuits and indemnify judgments and settlements arising from claims for injuries sustained by third parties, including the survivors of childhood sexual assault.

30.    All the Boy Scout's insurance until 1985 was sold on a per "occurrence" basis without an aggregate limit (that is, without a cap on what the insurers agreed to pay if there were multiple victims of sexual abuse and multiple acts of abuse). After 1985, the Boy Scouts bought significant insurance coverage, in many years exceeding $200 million per year.

31.    There is ample precedent by which the "value" of the more than 84,000 claims can be measured:

- Earlier this month, the University of Southern California agreed to pay more than $1.1 billion to approximately 700 former patients of a campus gynecologist, or an average of approximately $1.2 million per survivor.

- Michigan State University agreed to a massive $500 million settlement with more than 300 survivors of Dr. Larry Nassar. Dr. Nassar is notoriously known for sexually abusing dozens of young female gymnasts. This settlement is considered one of the largest in the history of sexual abuse lawsuits against U.S. universities.

- In 2007, the Archdiocese of Los Angeles agreed to pay approximately 500 survivors more than $600 million, or an average of $1.3 million per survivor.

- In 2007, the Diocese of Rockville Center in New York agreed to pay two survivors $11,450,000.

- In 2004, the Diocese of Orange, California agreed to pay approximately 90 survivors approximately $100 million, or an average of $1.1 million per survivor.

- In 1998, the Dallas Catholic Diocese agreed to pay $23,400,000 to eight survivors, which was paid in the form of a substantial contribution from the diocese and its insurer.

Most of these settlements were paid by insurers, including some of the Boy Scouts' insurers or their affiliates.[6]

32.      In contrast, the Boy Scouts do not have an agreement with any of its insurers to pay a penny here towards the resolution of claims by the childhood sexual abuse survivors. None of the Boy Scout's insurers have explained why the survivors of childhood sexual abuse here should receive less than the survivors in the cases cited above. None of the Boy Scout's insurers have explained their failure to make any contribution whatsoever to a settlement.

33.      Any settlement among the applicable insurance carriers of 84,000 childhood sexual abuse claims that is on par with the settlements described above would certainly result in a "large" number. The Boy Scout's negligence for such a long period of time is not an excuse to provide less compensation than the survivors of sexual abuse deserve. Indeed, even the Boy Scouts profess that the survivors should be equitably compensated:

> The Boy Scouts of America believes our organization has a social and moral responsibility to equitably compensate all victims who were abused during their time in Scouting.[7]

34.      The fact that so many children were abused for so long is what warrants a "large" number. In fact, even if there were "only" 45,000 survivors, even if each survivor were abused "only" once, and even if each survivor were to receive even half of the settlement payments in the above examples, the Boy Scout's liability (and thus that of their insurers) still

---

[6] There are at least 9,346 claims identifying California (where the Debtors and Local Councils do not have a statute of limitations defense) as the situs of the abuse.
[7] https://www.bsarestructuring.org/.

exceeds, at the low end, $45 billion. But there are not "only" 45,000 survivors and most survivors were abused multiple times.

35.     The fact that an insurance contribution is "large" is not the standard by which an insurer's contractual obligations are measured. An insurer is obligated to fund a reasonable settlement within policy limits. As demonstrated by the precedent cited above, a "large" number is also a reasonable one. It is also within policy limits. Under theories that many courts long have recognized and approved, there is more than $100 billion (and perhaps more than $400 billion) in available insurance.[8]  Thus far, neither the Boy Scouts nor their insurers (nor the insurers of the Local Councils) have accepted the invitation to offer a different view.

*[Remainder of page intentionally left blank]*

---

[8] This is because many of the insurance policies have no aggregate limits, meaning that the insurer is obligated to pay for each "occurrence"—whether that be each survivor under the law of some states or each act of abuse under the law of other states.

## Conclusion

36.    There is a substantial amount of work to be done. Given the current state
of the Plan and Disclosure Statement and the host of unresolved issues, the Boy Scouts cannot
reasonably expect approval of their Disclosure Statement less than three weeks from now.

Dated:  April 9, 2021          PACHULSKI STANG ZIEHL & JONES LLP

/s/ James E. O'Neill
James I. Stang (CA Bar No. 94435) (admitted *pro hac vice*)
Robert B. Orgel (CA Bar No. 10187) (admitted *pro hac vice*)
Iain A.W. Nasatir (CA Bar No. 148977) (admitted *pro hac vice*)
James E. O'Neill (DE Bar No. 4042)
John W. Lucas (CA Bar No.271038) (admitted *pro hac vice*)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Tele/Fax: (302) 652-4100 / (302) 652-4400
Email:          jstang@pszjlaw.com
                rorgel@pszjlaw.com
                inasatir@pszjlaw.com
                joneill@pszjlaw.com
                jlucas@pszjlaw.com

          -and-

PASICH LLP

Kirk Pasich (CA Bar No. 94242)
10880 Wilshire Boulevard, Suite 2000
Los Angeles, California 90024
Telephone:  (424) 313-7850
KPasich@PasichLLP.com

          -and-
Jeffrey L. Schulman (NY Bar No. 3903697)
757 Third Avenue, 20th Floor
New York, New York 10017
Telephone: (212) 686-5000
JSchulman@PasichLLP.com

*Counsel for the Tort Claimants' Committee*