**<u>Exhibit A</u>**

**Reply**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Ref. D.I. 2411, 2506** |
| | **Hearing Date: April 15, 2021 at 10:00 a.m. (ET)** |

**DEBTORS' REPLY IN SUPPORT OF DEBTORS' THIRD MOTION
FOR ENTRY OF AN ORDER EXTENDING THE DEBTORS' EXCLUSIVE
PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF**

Boy Scouts of America (the "BSA") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (together, the "Debtors"), submit this reply in support of their motion [D.I. 2411] (the "Motion")[2] to extend the Exclusive Filing Period and the Exclusive Solicitation Period to August 18, 2021 and October 18, 2021, respectively, and to the objection [D.I. 2506] (the "Objection") to the Motion filed by the Official Committee of Tort Claimants (the "TCC"). In support hereof, the Debtors respectfully state as follows.

**PRELIMINARY STATEMENT**

1.      In its Objection, the TCC makes no attempt to address the legal standard that governs whether the Court should extend the Exclusive Periods: namely, whether the Debtors have established "cause" under section 1121(d) of the Bankruptcy Code. As set forth in the Motion,

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2]    All terms that are capitalized but not otherwise defined herein shall have the meaning ascribed to such terms in the Motion or in the March 1 Plan (as defined below), as applicable.

each factor of this analysis weighs in favor of the requested extensions, including the necessity of sufficient time for the Debtors to continue to negotiate with creditors and insurers, the Debtors' progress in mediated negotiations to date, and the Debtors' having demonstrated reasonable prospects for confirming a viable plan.  Indeed, the TCC has failed to even attempt to rebut any of the Debtors' arguments pertaining to these factors.  Nor could the TCC credibly do so in light of the progress the Debtors continue to make in mediation, which remains extraordinarily active on a daily basis.  As the TCC is presumably aware, the Debtors are involved in ongoing negotiations with important constituencies regarding potential settlements that will promote the global resolution of Scouting-related Abuse Claims.  Rather than addressing the governing legal standard in its Objection, the TCC primarily focuses on whether the Debtors have satisfied the standard for obtaining approval of non-consensual third-party releases of Local Councils and Contributing Chartered Organizations.  These arguments are inapposite and should have no bearing on the Court's ruling on the Motion.

2.      In terms of the issue that is actually before the Court, the TCC argues, in essence, that the Court should terminate the Exclusive Periods because (a) the TCC is dissatisfied with the current dollar amounts of the proposed contributions to the proposed Settlement Trust, and (b) the TCC intends to file its own competing plan of reorganization.  As to the first argument, courts generally reject creditor dissatisfaction as a basis to terminate the Exclusive Periods.  Moreover, based on the TCC's skeletal description of its potential competing plan, the plan would be largely identical to the "BSA Toggle Plan" feature that will be incorporated into the Debtors' forthcoming second amended plan (the "Second Amended Plan").[3]  Although the Debtors remain steadfastly

---

[3]    The Debtors intend to file the Second Amended Plan described herein within the next thirty-six (36) hours unless they reach a resolution as a result of ongoing negotiations with creditors and insurers.  The Debtors reserve their rights to file a plan of reorganization on terms that differ from the terms of the Second Amended Plan described herein.

committed to achieving a global resolution of Abuse Claims under the comprehensive settlement proposed in the amended plan filed on March 1, 2021 [D.I. 2293] (the "March 1 Plan"), the BSA Toggle Plan will afford the Debtors the necessary flexibility to emerge from bankruptcy on their required timeline even if they fail to obtain approval of a global resolution due to lack of creditor support or otherwise.

3.      If the TCC's motivation in seeking to terminate the Exclusive Periods is to propose the plan described in its Objection, then the Debtors will have rendered the Objection moot by filing the Second Amended Plan.  In particular, the BSA Toggle Plan feature of the Second Amended Plan will provide for precisely what the TCC is seeking: the ability for survivors to pursue non-debtor defendants in the tort system.  Apparently unlike the TCC, however, the Debtors believe that these chapter 11 cases present an historic opportunity to deliver equitable and meaningful recoveries to holders of compensable Abuse Claims by channeling all such claims—including claims against the Debtors, Local Councils, Contributing Chartered Organizations, and Settling Insurance Companies—to the Settlement Trust.  The Debtors should be permitted to fully exhaust all avenues for achieving that objective, to the fullest extent permitted under section 1121(d)(2), before survivors are forced to accept the suboptimal outcome that the TCC is advocating: *de minimis* recoveries from the Debtors' limited assets and the right to pursue non-debtor defendants in the tort system—and likely into bankruptcy courts across the country as Local Councils confront a tidal wave of abuse lawsuits.

4.      For these reasons and as set forth below, the TCC's Objection falls far short of establishing the extreme or unique circumstances that could warrant termination of the Exclusive Periods and should be overruled.

## ARGUMENT

### I.    The Requested Extensions of the Exclusive Periods Are Warranted under the Circumstances.

5.    The exclusive rights to file and solicit a plan of reorganization are some of the most valuable rights afforded to a debtor in possession under chapter 11, and the Exclusive Periods should not be terminated absent "extreme" or "unique" circumstances.  *In re Pliant Corp.*, Case No. 09-10443 (MFW) (Bankr. D. Del. June 30, 2009), Hr'g Tr. 229:2–5 (hereinafter, "Pliant Transcript") ("The Debtors' right to propose a plan is a very important right in bankruptcy.  It should not be cut off at the knees except in extreme circumstances or in unique circumstances at least."); *see also In re TCI 2 Holdings, LLC*, Case No. 09-13654 (JHW) (Bankr. D.N.J. Sept. 1, 2009), Hr'g Tr. 87:21–25 (Aug. 27, 2009) ("[T]he Debtor's exclusive rights under [section] 1121 to propose a plan during the exclusivity period is certainly important and must be safeguarded."). Because the Exclusive Periods play such a vital role in enabling a debtor to develop a plan that will best serve the interests of the estates and creditors, courts routinely grant extensions of the Exclusive Periods.  This is especially true where a debtor has demonstrated progress toward achieving a confirmable plan of reorganization.  *See, e.g.*, *In re Burns & Roe Enters.*, Case No. 00-41610, 2005 U.S. Dist. LEXIS 26247, at *12 (D.N.J. Nov. 3, 2005) (explaining that courts may extend exclusivity based solely on a finding that progress is being made toward acceptance of the plan); *In re Pine Run Tr., Inc.*, 67 B.R. 432, 435 (Bankr. E.D. Pa. 1986) (granting an extension to exclusivity because the debtor demonstrated substantial progress in negotiations).

6.    Here, the Debtors have continued to make progress in their mediated negotiations with certain survivor representatives and insurers.  Specifically, the Debtors are continuing to engage in extraordinarily active mediated negotiations with the Coalition of Abused Scouts for Justice, the Future Claimants' Representative, and certain insurers regarding a global resolution of

Scouting-related abuse claims, including the terms of potential settlements that would facilitate such a resolution.  With the assistance of the Mediators, the Debtors have had near-continuous discussions for many weeks—and every day since the beginning of the recent in-person and virtual mediation on March 29, 2021—to narrow the gap between their respective positions.  The parties have not reached an impasse in negotiations.  They are continuing to mediate in good faith, and the Debtors believe there are reasonable prospects for the Debtors to win these parties' critical support for settlements that will pave the way for the Debtors to achieve their dual imperatives of equitably compensating survivors and continuing the mission of Scouting.

7.      The Debtors have also demonstrated reasonable prospects for confirming a viable plan of reorganization.  Specifically, the Debtors will soon file the Second Amended Plan, which incorporates two restructuring alternatives: the "Global Resolution Plan," to be implemented if abuse survivor creditors overwhelmingly vote to accept the plan, and the "BSA Toggle Plan," to address the contingency that abuse creditors fail to support the plan or the Court otherwise declines to approve the Global Resolution Plan.  Like the March 1 Plan, the Global Resolution Plan provides that Abuse Claims against the Debtors, Local Councils, Contributing Chartered Organizations, and Settling Insurance Companies will be channeled to the Settlement Trust.  But under the BSA Toggle Plan, only the Debtors and certain related entities (excluding Local Councils and Chartered Organizations) will be released from Abuse Claims.  The BSA Toggle Plan will permit the Debtors to emerge from bankruptcy on their required timeline even if they fail to obtain approval of a global resolution.  Although the BSA Toggle Plan would be a materially worse outcome than the Global Resolution Plan for a multitude of reasons, the Debtors recognize that they must retain the flexibility to confirm a plan of reorganization and emerge from bankruptcy on terms that are entirely within their control, if necessary.  Because the BSA Toggle Plan does not include releases

in favor of non-debtor Local Councils or Chartered Organizations, the Debtors can obtain confirmation of the BSA Toggle Plan without the overwhelming support of survivors.

8.        The BSA Toggle Plan feature of the Second Amended Plan will be similar (if not identical) to the TCC's description of its purported alternative plan of reorganization.  As stated by the TCC, the "most salient change" between the March 1 Plan and the potential TCC plan "will be the absence of any non-consensual third party releases for the Local Councils and Chartered Organizations."  Objection ¶ 20.  Accordingly, under the would-be TCC plan, Local Councils and Chartered Organizations "can use and rely upon the same insurance coverage that Abuse Claimants are left to rely upon for the defense, settlement, and payment of claims."  *Id.* ¶ 21.  In other words, if the Court terminates the Exclusive Periods, survivors would be left to pursue Local Councils and Chartered Organizations in the tort system following the BSA's emergence from bankruptcy. As noted above, the Debtors should be permitted to exhaust all avenues for achieving a global resolution, to the fullest extent permitted under section 1121(d)(2), before abuse survivors are forced to revert to the tort system and likely into bankruptcy courts across the country as Local Councils confront a tidal wave of abuse lawsuits.

## II.    The TCC Has Failed to Show That It Can Propose a Viable Alternative Plan of Reorganization.

9.        In circumstances where courts have terminated the Exclusive Periods, the decision is often based on a creditor's showing that it can present a completely developed plan that has substantial support from the debtor's creditor groups or that the debtor's survival as a going concern is at risk if a plan is not confirmed in the near future.  *See* Pliant Tr. 230:9–24 (terminating exclusivity because the creditors' committee had produced a "fully baked plan" that the committee should be allowed to advance); *In re Sharon Steel Corp.*, 78 B.R. 762, 766 (Bankr. W.D. Pa. 1987) (denying debtor's motion to extend exclusivity where the debtor had not shown progress in

negotiations and there was risk that the debtor would cease operations in the near future).  For example, in *Pliant*, the court terminated the Exclusive Periods because the court had reservations about the viability of the debtor's plan and because the creditors' committee had shown that it was prepared to move forward with a "fully baked plan."  Pliant Tr. 229:13–231:4.  Likewise, in *Sharon Steel*, the court denied the debtor's motion to extend the Exclusive Periods where the debtor had failed to demonstrate that it was making progress in negotiations and where the court concluded that opening up the proceedings to input from creditors would serve to "rescue the debtor from its precarious posture."  *Sharon Steel*, 78 B.R. at 766.

10.     Here, the circumstances warrant the extension—not termination—of the Exclusive Periods.  The Debtors have sufficient liquidity to continue their congressionally chartered non-profit operations and pay their required post-petition debts through the end of their proposed confirmation timeline.  Moreover, there is no indication the TCC or any other creditor or group has a "fully baked plan" that could move forward on the Debtors' required timeline if the Court were to terminate the Exclusive Periods.  The TCC has represented that its plan would, "[t]o the greatest extent possible . . . mirror the Debtor's [sic] plan as to treatment of creditors other than Abuse Claimants," but it has provided no further information other than its intention to eliminate the proposed third-party releases in favor of Local Councils and Contributing Chartered Organizations.[4]

11.     Further exposing the TCC's would-be competing plan as a paper tiger is the unanswered question of how the TCC would propose to treat the claims held by the Debtors' senior secured lender, JPM, and the classes of non-abuse creditors represented by the Creditors'

---

[4]     The TCC has suggested its "extremely conservative" $102 billion estimate of the total value of abuse claims represents an appropriate aggregate contribution to the Settlement Trust.  *See* Objection ¶¶ 3, 4, 20.  Unsurprisingly, the TCC has failed to explain (in its Objection or otherwise) how it would achieve a Settlement Trust value at even a small fraction of that level.

Committee.  The Debtors have reached a settlement with these constituents, as set forth in the term sheet appended to the First Mediators' Report.  The Debtors are not aware of (and the TCC has not suggested) any alternative means for obtaining the votes of these classes in support of a potential TCC plan.  Nor has the TCC explained how it would satisfy the cramdown requirements of section 1129(b) of the Bankruptcy Code with respect to JPM.  For these reasons, among others, a potential TCC plan is far from a "fully baked" alternative to the Second Amended Plan, which critically has the support of two of the three constituencies that will be entitled to vote.  The Court should grant the requested extensions of the Exclusive Periods to afford the Debtors the maximum opportunity permitted under section 1121(d)(2) to garner the support of survivors for their plan of reorganization without the undue interference that would be caused by the filing of competing plans.

III.    **The TCC's Dissatisfaction with the Debtors' Plan Is Not a Proper Basis for Terminating the Exclusive Periods; the TCC's Plan Objections Are Premature.**

12.    Courts generally decline to terminate the Exclusive Periods where termination is being urged by a single creditor group on account of its dissatisfaction with the plan.  *See In re Geriatrics Nursing Home*, 187 B.R. 128, 134 (D.N.J. 1995) (holding that "the fact that one creditor constituency is not happy with the debtor's plan" did not constitute cause to terminate the exclusive periods); *In re Spansion, Inc.*, 426 B.R. 114, 140 (Bankr. D. Del. 2010) (noting that "a creditor constituency's unhappiness or dissatisfaction with a debtor's proposed plan, without more, does not constitute cause to end exclusivity and undermine the debtor's chance of obtaining confirmation of its plan during that period").  Instead, when analyzing whether to grant a debtor's request for extensions of the Exclusive Periods, courts examine the factors discussed in the Motion, which focus on, among other things, whether additional time is necessary to allow the debtors to negotiate a plan, the existence of good-faith progress toward reorganization, and whether the

debtors have demonstrated reasonable prospects for filing a viable plan. *See In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 184 (Bankr. D.N.J. 2002) (listing nine relevant factors); Exclusivity Motion ¶ 17 (same).

13.     Nor do courts consider alleged deficiencies in a proposed plan or a lack of creditor support for a plan in determining whether to extend or terminate the Exclusive Periods. Rather, such objections should be resolved at the plan confirmation stage. *See, e.g.*, *In re Burns & Roe Enters.*, 2005 U.S. Dist. LEXIS 26247, at *36–37 (explaining that concerns over a plan's confirmability should be reserved for the plan confirmation hearing); *In re SW Boston Hotel Venture, LLC*, Case No. 10-14534, 2011 Bankr. LEXIS 1726, at *13–14 (Bankr. D. Mass. May 4, 2011) (rejecting a creditor's objection to the debtor's motion to extend exclusivity because its "ability to seek different treatment for its claim . . . is preserved by its opportunity to reject and object to the Debtors' Plan and present evidence at a contested confirmation hearing"); *In re Interco, Inc.*, 137 B.R. 999, 1001 (Bankr. E.D. Mo. 1992) (finding that while there is no assurance that the debtors' plan could be confirmed, such contentions should be reserved for a confirmation hearing); *In re Lichtin/Wade, LLC.*, 478 B.R. 204, 212 (Bankr. E.D.N.C. 2012) (holding that "[e]vidence that the Debtor's Amended Plan is not confirmable at this point in time is insufficient to show the Debtor has not made good faith progress toward reorganization").

14.     Here, the TCC's Objection is principally based on its dissatisfaction with the March 1 Plan, certain alleged deficiencies therein, the perceived likelihood of the Debtors' ability to achieve sufficient support for the plan, and whether the Debtors have satisfied the standard for approval of non-consensual third-party releases. *See* Objection ¶¶ 7–19. These objections should have no bearing on the Court's determination of whether the Debtors have established cause to

extend the Exclusive Periods, and to the extent the TCC's objections pertain to particular terms of the plan, such objections should be heard in connection with confirmation.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court overrule the Objection and enter the Proposed Order, substantially in the form attached to the Motion, granting the relief requested in the Motion and any further relief the Court may deem just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated: April 12, 2021
      Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Eric W. Moats*
_____
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Eric W. Moats (No. 6441)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email:  dabbott@morrisnichols.com
       aremming@morrisnichols.com
       emoats@morrisnichols.com
       ptopper@morrisnichols.com

– and –

**WHITE & CASE LLP**
Jessica C. Lauria (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email:  jessica.lauria@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Email: mandolina@whitecase.com
       mlinder@whitecase.com
       laura.baccash@whitecase.com
       blair.warner@whitecase.com

ATTORNEYS FOR THE DEBTORS AND
DEBTORS IN POSSESSION