UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: | . Chapter 11 |
| | . |
| | . Case No. 20-10343(LSS) |
| BOY SCOUTS OF AMERICA AND | . |
| DELAWARE BSA, LLC, | . |
| | . 824 Market Street |
| | . Wilmington, Delaware 19801 |
| Debtors. | . |
| . . . . . . . . . . . . . . . . | . Monday, April 12, 2021 |

TRANSCRIPT OF VIDEO HEARING
BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES VIA ZOOM:   (On the Record)

| | |
|---|---|
| For the Debtors: | Jessica Lauria, Esq.<br>WHITE & CASE, LLP |
| For the Ad Hoc Committee<br>of Local Councils: | Richard Mason, Esq.<br>WACHTELL, LIPTON, ROSEN & KATZ |
| For the Tort Claimants<br>Committee: | James Stang, Esq.<br>John Lucas, Esq.<br>PACHULSKI, STANG, ZIEHL & JONES |
| For The Hartford: | Phillip Anker, Esq.<br>WILMER, CUTLER, PICKERING, HALE<br> & DORR<br><br>James Ruggeri, Esq.<br>SHIPMAN & GOODWIN |

(Appearances Continued)

| | |
|---|---|
| Audio Operator: | Electronically Recorded<br>by Brandon J. McCarthy, ECRO |
| Transcription Company: | Reliable<br>1007 N. Orange Street<br>Wilmington, Delaware 19801<br>(302)654-8080<br>Email:  gmatthews@reliable-co.com |

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES VIA ZOOM:  (On the Record - Continued)

For the Coalition of
Abused Scouts:                    David Molton, Esq.
                                  BROWN RUDNICK, LLP

For Century Indemnity
Company:                          Tancred Schiavoni, Esq.
                                  O'MELVENY & MYERS, LLP

INDEX

|                               | Page |
| ----------------------------- | ---- |
| STATUS BY MS. LAURIA          | 4    |
| COMMENTS BY MR. STANG         | 15   |
| COMMENTS BY MR. MASON         | 17   |
| COMMENTS BY MR. ANKER         | 19   |
| COMMENTS BY MR. MOLTON        | 22   |
| COMMENTS BY MR. SCHIAVONI     | 25   |
| SCHEDULING                    | 33   |

4

1          (Proceedings commence at 3:04 p.m.)

2          THE COURT:  Okay.  Good afternoon.  This is Judge

3    Silverstein.  We're here in the Boy Scouts of America case,

4    Case Number 20-10343, for a status conference.

5          And I will turn it over to Ms. Lauria --

6          UNIDENTIFIED:  (Indiscernible)

7          THE COURT:  -- and ask all others to please make

8    sure you're muted.

9          MS. LAURIA:  Thank you, Your Honor.  Jessica

10   Lauria, White & Case, for the debtors.

11          Your Honor, with -- in connection with today's

12   status conference, the debtors wanted to address three issues

13   with the Court:

14          First, we wanted to talk through at a very high

15   level where we're at on the mediation and the plan and

16   disclosure statement.

17          Next, we wanted to alert the Court to a motion that

18   the debtors expect to file on Thursday.

19          And then, finally, we wanted to address the time

20   line and, in particular, the time line for the disclosure

21   statement hearing.

22          So, if I could I'm going start with sort of where

23   we're at, again, very high level, not getting into any

24   mediation confidences, with respect to the mediation and talk

25   a little bit about the plan and disclosure statement.

1    Following our last hearing, which I think was March

2    17th, the mediators conducted both virtual mediation and

3    optional, in-person mediation March 30th through April 1st.

4    We did make progress during those sessions.  But as the Court

5    can probably guess due to the lack of a mediation statement,

6    we did not reach a resolution as a result of those sessions.

7    We did, however, have great momentum coming out of

8    those sessions.  And certain of the parties have kept at the

9    mediation, literally with daily mediation sessions, including

10   on the most recent holidays and weekends, since the virtual

11   in-person sessions concluded on April 1.

12   As we always do at these status conferences, we, of

13   course, want to thank the mediators and all of the mediation

14   parties for their efforts.  We specifically want to thank the

15   attorneys representing coalition members for their efforts,

16   they've been working around the clock, as well as the FCR and

17   certain of our insurers.  We appreciate their commitment and,

18   really, everyone's commitment to trying to get this

19   bankruptcy case to a place where we can confirm a plan of

20   reorganization.

21   While we still have very strong momentum, we

22   recognize that there are some parties that we don't have that

23   momentum with that aren't happen with where the mediation

24   stands today.  Candidly, the debtors aren't happy with where

25   the mediation stands today.  We wanted to come before the

1    Court today and announce a global resolute -- excuse me --

2    resolution of the cases.  We're simply not there yet.  But

3    that's not to say, Your Honor, that we've reached an impasse;

4    we haven't.  In our view, we haven't reached an impasse with

5    any of the mediation parties.  We are still negotiating on

6    multiple fronts and we intend to continue to negotiate on all

7    of those fronts.

8         But as I said at the last hearing, we're coming

9    very close to a time where we will call upon Your Honor to

10   start calling balls and strikes when it comes to the

11   disclosure statement and plan.  I think -- and you've seen

12   this in the pleadings before -- if you polled the parties in

13   the case, I think we would agree on one thing, and that is

14   there are some issues that will have to be litigated in

15   connection with the plan.

16        We believe, Your Honor, that the best forum for

17   those issues and the best procedural posture to resolve the

18   open issues through litigation is through plan confirmation

19   in front of this Bankruptcy Court, we think that's the most

20   efficient process for all of the parties.  That has the

21   ability to, not only equitably compensate a few survivors,

22   but also preserve our mission.

23        To that end, Your Honor, unless the stars align

24   tonight and we reach some sort of meaningful resolution with

25   one or more parties this evening, the debtors intend to file

1    tomorrow an amended plan, an amended disclosure statement,

2    trust distribution procedures, and a trust agreement.  I want

3    to outline very briefly the structure that we're

4    contemplating for that plan, in light of where we are in the

5    mediation and the bankruptcy cases, more generally, just to

6    provide context for what, not only you, but all of the

7    parties that are present here today will see in that filing.

8         In short, the plan that we intend to file tomorrow

9    has been designed to continue the momentum that we have in

10   the mediation and with other negotiations, to facilitate a

11   global resolution of these cases, while addressing concerns

12   that we have heard from the TCC and others, and while

13   addressing the BSA's timing needs.

14        In short, Your Honor, what we are going to file

15   tomorrow is what I can best describe as a "toggle plan."  The

16   sort of default or the Plan A version of that is a global

17   resolution plan, very similar to what we have filed in the

18   past.  It provides for local council releases, in exchange

19   for substantial contribution.  It would provide for releases

20   of chartered organizations that have claims exposure that

21   contribute voluntarily to a trust.  It would provide, just

22   like the plan today provides a framework for insurance

23   settlements.

24        This global resolution plan would have an added

25   feature, and that's an estimation of the debtors' abuse

liability.  You've heard a lot about estimation over the last

several weeks, as have we.  We've heard the parties loud and

clear.  We believe there should be an estimation in

connection with confirmation.  We think the settlements that

we are hopeful you will see in the global resolution

component of the plan, we think, in the Court's consideration

of those settlements, the Court would benefit from an

estimation.  We think all parties, candidly, will benefit

from an estimation in that world, so we are going to propose

one.

We think this global resolution plan -- what I kind

of refer to in discussions on our side as the "Plan A plus,

plus, plus" -- is the absolute best plan for BSA.  We think

it's the best plan for the survivors, we think it provides

them with a structured and centralized means to receive

timely compensation and equitable compensation.  We think

it's far preferable to what they would face in the tort

system.  And we also think it continues the mission for BSA

and the local councils.  But that's the global resolution

side of the plan.

As I mentioned, the plan does contain a toggle

feature, so a BSA toggle feature.  If the abuse claimants do

not vote in sufficient numbers to accept that global

resolution plan and Your Honor is, therefore, reluctant to

confirm that global resolution plan, the plan of

1    reorganization would drop the global resolution component.

2    And again, that's the component that requires the plaintiffs'

3    support with the nondebtor releases, including the insurance

4    settlements.  We would drop the global resolution component

5    and we would proceed with a BSA only toggle, a BSA only plan,

6    where BSA could still emerge from bankruptcy.

7         We would save millions of dollars of professional

8    fees.  We would avoid what we think would be wasteful and

9    destructive bankruptcy-related litigation.  We would maintain

10    our time line.  So those are the positives of the BSA toggle.

11         The negatives are it's sub-optimal in our view,

12    worse than sub-optimal for the victims.  We would -- in that

13    world, we wouldn't have the local council contributions, we

14    wouldn't have chartered organization contributions.  We

15    wouldn't have a centralized forum to liquidate and provide

16    timely compensation to creditors.  We would have certainly

17    complications with our insurance, due to the shared insurance

18    features of BSA's insurance program, with the local counsels

19    not being part of the plan.  It would be difficult to

20    contribute certainly the policies to the trust or anything

21    that infringes upon their rights.

22         But that is a sub-optimal plan that's confirmable.

23    We think it's very close to what the TCC was actually

24    suggesting in their pleadings.  We hope that the abuse

25    victims vote in favor of the global resolution plan, and we

1    hope other parties come to that table.  But if not, we have a

2    confirmable plan that will get BSA out of bankruptcy.

3            I should note that the UCC/JPMorgan settlement that

4    was reached in connection with the mediation would be a

5    feature that is present in both plans.  Both plans would

6    provide for that feature.  So that's where we're at with the

7    plan and the mediation.

8            I can turn to estimation, et cetera, if that would

9    be helpful, Your Honor, and then go to time line.  And I'm

10   sure there may be others that wish to be heard, and I'm happy

11   to answer, of course, any questions.

12           So the next piece.  At our last hearing, I believe

13   it was counsel for the FCR mentioned that the TCC, FCR, and

14   coalition would be filing a motion to withdraw the reference,

15   as well as an estimation motion, and they did, in fact, file

16   those motions.  They are scheduled for an objection deadline

17   of the 15th, which I believe is this Thursday.  The debtors

18   will be objecting to both of those motions, both the

19   withdrawal of the reference, as well as the estimation

20   motion.

21           As I just explained, in our view, the best forum

22   and the best procedural posture for resolution of the

23   litigated issues, including estimation in this case, is you,

24   Your Honor.  It's also in connection with the plan of

25   reorganization itself.  And I understand you're not ruling on

1    either of these matters now.  I just want to give you a heads

2    up of where the debtor is coming out.

3         In our view, if we're in the world of that global

4    resolution that I just described, the District Court will

5    likely need to affirm Your Honor's ruling in any event, which

6    would be premised upon an estimation of the abuse liability.

7    If we are flipped into the world of the BSA toggle plan, we

8    don't think District Court involvement is necessary,

9    including with respect to the estimation.  So we don't think

10   it's necessary to go before the District Court with respect

11   to that estimation.

12        We appreciate the insurers' 2004 motion.  We

13   appreciate the efforts of the TCC, FCR, and coalition to come

14   up with a protocol for estimation.  But we are going to file

15   a confirmation discovery motion that includes the estimation

16   component, we're going to file that also on Thursday, the

17   15th.  As I mentioned, that will apply to plan confirmation.

18   It's going to be very similar, I'm sure, Your Honor, to what

19   you've seen in numerous other cases and concerning, you know

20   litigated confirmation matters.  We will have a protocol

21   that's baked in with respect to the estimation that is

22   designed to get the debtor out of bankruptcy on the time line

23   that we've been discussing.

24        The good news is, on discovery, Your Honor, we're

25   not starting from scratch.  I think you probably know we've

1    provided a lot of information to the creditor parties.  But

2    we do recognize that, in the context of a contested

3    confirmation hearing and a contested estimation proceeding,

4    people are going to need more, and we need a framework to

5    provide them what they need to work through that process.  So

6    we'll be filing that motion, like I said, on the 15th,

7    together with the objections to the other two motions.

8            It's probably -- that's probably a good segue to

9    the timing discussion.  You know, at the risk of sounding

10   like a broken record at the last several hearings, the

11   overall time line is still critically important to the BSA,

12   for all of the reasons that we talked about before.  The fee

13   burn in the case is extraordinary.  We believe that every,

14   you know, additional month takes money out of the trust.  The

15   bankruptcy, I think, jeopardizes the BSA's mission, so we

16   need to get this out of bankruptcy.

17           So we've got two matters that I think are coming up

18   in relatively short order.  We've got the disclosure

19   statement, which currently is scheduled for April 29th.  And

20   I'll come back to the timing of that because I think we

21   understand and have heard from various parties that they

22   would like a little more time on that.  And then we have this

23   discovery protocol motion that I just mentioned.

24           Since we do have time with the Court on April 29th

25   right now, we would ask that we still reserve a few of those

1   hours to get things started on the discovery protocol and the

2   estimation protocol.  We think sooner, rather than later, is

3   best for that.  We want to avoid having parties file before

4   the Court additional 2004 motions and the like.  We think we

5   need a centralized mechanism to deal with the discovery

6   motions.  So we would like to take advantage of the Court's

7   time on April 29th.

8        With respect to the disclosure statement, a couple

9   of things on that.  One, I know the Court is aware of what

10  I'm about to say, but I do feel compelled to address a theme

11  that we've seen in some of the pleadings, which is this

12  notion that, due to lack of support principally from the

13  plaintiff classes, the Court shouldn't hear the disclosure

14  statement or permit the plan to be launched for solicitation.

15  I think it goes without saying there isn't a Bankruptcy Code

16  or Bankruptcy Rule requirement that creditors commit in

17  advance to the support of a plan.  We think it's essential,

18  particularly with the amended plan that I just described,

19  that we put that out as soon as possible.

20       Century did file a motion requesting that the April

21  29th date be adjourned.  While we are -- we disagree with

22  Century's position on 3017(a) and the notion that we couldn't

23  file an amended disclosure statement during the twenty-eight-

24  day period provided for in that rule -- and I should note the

25  disclosure statement that was filed on March 1st, while it

1    didn't contain TDPs and a trust agreement, it was very

2    robust.  It contained a liquidation analysis, as well as the

3    debtors' five-year business plan.

4         But we're sympathetic to Century's view and the

5    views of others.  We understand that the parties may need

6    some additional time to review the filings for tomorrow.  Our

7    next omnibus is scheduled for May 19th.  We would ask that we

8    not go beyond that May 19th date.  We don't think there's any

9    reason to.  Even if you were to adopt Century's reading of

10   Rule 3017(a), that 28 days, assuming we file the documents

11   tomorrow, expires around, I think it's May 11th.  So we can

12   certainly go earlier than that.  But we also know that your

13   docket is extremely full, Your Honor, and so understand if

14   there isn't other available time.

15        So that's where we're at on the three topics,

16   including the time line.  I'm happy to answer any questions,

17   Your Honor, if you have any with respect to those remarks or

18   other matters.

19        THE COURT:  No, I don't have any questions.

20        Let me hear from others who would like to be heard.

21   Mister --

22        MR. MASON:  Your Honor, may I -- oh, sorry.  I

23   didn't mean to interrupt anyone.

24        MR. STANG:  Your Honor, the committee would like to

25   be heard briefly.

1           MR. MASON:  And after the committee, Your Honor,

2     the ad hoc committee of local councils, please.

3           THE COURT:  Thank you.

4           Mr. Stang.

5           UNIDENTIFIED:  (Indiscernible)

6           MR. STANG:  Thank you, Your Honor.

7           I can't comment too much on what Ms. Lauria -- I'm

8     sorry -- on what Ms. Lauria said about this new plan.  We'll

9     see it and we'll review it.

10          Her Toggle B, at least the way she described it,

11    sounds like what we were referencing in our objection to

12    exclusivity, but we'll see.

13          But I would -- I don't want to turn this into a

14    complaint session about what happened in Miami.  But I do

15    want to point out that the committee has been left out of any

16    discussions since Miami.  At Miami, we asked for permission

17    to address -- because that's what you have to do, you have to

18    ask for permission -- to address all parties-in-interest, but

19    BSA in particular, about claims models.  That request was

20    never responded to by the mediators, except we were told on

21    the last day of the mediation that we were excused because

22    apparently nobody wanted to talk to us.

23          And so, if there is a plan to be filed tomorrow

24    that has a claims matrix in it with values, no one has talked

25    to us about those values, other than a presentation by the

1   debtor as to its claims model, which we asked for an ability

2   to respond to in the mediation forum, and we were ignored.

3   So I don't know what this thing is going to look like.  But

4   if the debtors' MO continues, it's going to be that the

5   committee is not a party that it thinks is particularly

6   relevant to the formulation of its Toggle B plan, or, for

7   that matter, maybe its Toggle A plan, and it's unfortunate.

8        But we have not withdrawn from the mediation.  We

9   attended the days that we were told we were wanted there.  We

10  had some discussions with some of the mediation parties, but

11  obviously not all of the ones we wanted to.  And we will

12  continue to participate in an effort to reach a consensual

13  plan.

14       We are having discussions with the debtor regarding

15  our restricted asset adversary proceeding, and it would be

16  great if we could reach a resolution on the BSA contribution

17  around that negotiation.  So I don't want the Court to think

18  that we have withdrawn from the process.  We have not.  We

19  want to be engaged with the debtor, we are engaged with the

20  coalition, we are a joint party in the estimation motion.

21  But the debtor is being very careful about who it's talking

22  to and who it's not talking to.  And on certain material

23  issues, they're not talking to us.  So we look forward to

24  seeing what they file, Your Honor.

25       THE COURT:  Thank you.

1            Mr. Mason.

2            MR. MASON:  Thank you, Your Honor.  Can you hear

3 me?  I just want to make sure the computer is working.

4            THE COURT:  Yes.

5            MR. MASON:  Thank you, Your Honor.  Again, Richard

6 Mason, Wachtell, Lipton, Rosen & Katz for the ad hoc

7 committee of local councils.

8            And Your Honor, just as a brief reminder, the ad

9 hoc committee consists of eight local councils, drawn from

10 across the country.  The members of the ad hoc committee are

11 all volunteers, and my firm is representing the committee pro

12 bono.

13            Prior to the petition date, Your Honor, the BSA

14 asked that I form the ad hoc committee, so that local

15 councils could have an active voice in these proceedings, and

16 we have been very active, Your Honor, both in court and

17 outside.  Outside of court, in particular, we have spent

18 thousands of hours, volunteer hours, amongst ourselves and

19 with the over 250 local councils to try to determine the art

20 of the possible in meeting the twin goals of the BSA case;

21 that is, compensating victims and maintaining the scouting

22 mission.

23            Now, for a global resolution to be achieved, Your

24 Honor, in our view, that means literally thousands of

25 volunteers across the country have to agree.  But we

understand that the principal focus of the mediators and the

mediation parties over the last several weeks has been, as it

should be in our view, I'll just say "elsewhere," without

saying too much.

When it comes time, Your Honor, to negotiate and

finalize the local council contribution, we believe it is

essential that the ad hoc committee be involved, much more

involved than we have recently been asked to be, if a global

resolution is to be achieved, certainly within the time frame

that Ms. Lauria has laid out.

And for our piece, Your Honor, I'll just say the

following:  Based on our work and our extensive interaction

with our fellow local councils -- far more interaction, I

think, candidly, than other parties have had -- we believe

that local councils, in the aggregate, can make and are

prepared to make a substantial contribution of cash,

property, and insurance rights to resolve the BSA case.  But

the amount and other terms, in our view, need to be

realistic, in light of all of the circumstances.

So, Your Honor, I just want to say for the Court

and everyone our sleeves are rolled up and we're ready to

work with the other mediation parties, if they're willing,

particularly if we have a bit more time before the disclosure

statement hearing to achieve a realistic global solution

involving the local councils.  We're here and we hope the

1    other parties are, as well.  Thank you.

2                 THE COURT:  Thank you.

3                 Mr. Anker.

4                 MR. ANKER:  Good afternoon, Your Honor.  Can you

5    hear me okay and the other parties?

6                 THE COURT:  Yes.

7                 MR. ANKER:  Thank you.

8                 Your Honor, let me start out by not complaining

9    about the debtor freezing us out and refusing to negotiate.

10   There have been extensive negotiations.  And I appreciate Ms.

11   Lauria's comment that she appreciates the efforts by, in

12   addition to the coalition and the FCR, several of the

13   insurers.

14                I'm not going to take personal credit, I didn't go

15   to Miami in person, though I did participate by Zoom.  But my

16   colleague Mr. Ruggeri, who is on the line, as well as the

17   head of litigation for Hartford, went down in person and met

18   with the debtor and others.  I think it is fair to say there

19   is progress.  But it's also fair to say there isn't a deal.

20   And I'm not going to comment further and violate any

21   mediation privilege.  But I did want to say people are trying

22   and I'm not here to complain about that process.

23                What I do want to comment briefly about is

24   estimation.  We, too, will be filing an objection come this

25   Thursday, both to the withdrawal of the reference and the

pending current estimation motion.  That motion -- and I
don't know if Your Honor has read it yet -- is rather
remarkable.  What it seeks -- and this is the motion filed by
the FCR, the coalition, and the TCC -- is not an estimation
of any claim in particular for the purpose of allowance under
Section 502, but an estimation of the debtors' aggregate
liability by calendar year, and the policies are by calendar.

This is an obvious effort to try to get an order
out of Your Honor, or the District Court, if not Your Honor,
that the plaintiffs can then parade later in coverage for it
and say ah hah, the aggregate liability by policy year.  So
the Hartford policy years are X, Y, and Z; the Century policy
years are A, B, and C.  We know what the aggregate liability
is, that's been liquidated.  And this isn't the first time
this has been tried in an effort to use Bankruptcy Court
orders that plainly are not liquidations, plainly not
allowance of claims, not for any bankruptcy purpose, for --
but for coverage purposes.

I will say, Your Honor, I haven't seen the debtors'
motion, so I can't say today whether we will object to it or
not.  But if it is an attempt to do something similar, to
strong arm the carriers and deny them their rights to have an
actual adjudication in accordance with their policies of what
claims are valid and not and what liability they have, and
misuse Your Honor's own orders, A, we're not going to let

1  Your Honor be confused about what's being attempted; and, B,

2  we will certainly object to that and protect our rights.

3      I hope that isn't going to -- what is being

4  attempted by the debtor.  It is plainly what is being

5  attempted by the FCR, the coalition, and the TCC.  And we

6  will respond to that both in an objection we will be filing

7  before Your Honor this Thursday to the estimation motion, and

8  an objection to the motion to withdraw the reference to the

9  District Court.  I just wanted to alert you to that.

10      I'll also say one other thing.  To the extent

11  there's been estimation proceedings in mass tort cases, not

12  allowance, the real estimation -- so, for example, for

13  purposes of deciding whether the treatment, for example, of -

14  - whether enough was being contributed by the debtors, so

15  they could treat all claimants as unimpaired.  That was the

16  issue in Garlock.  In similar cases, you have estimation

17  proceedings that went on a year, literally a year or longer.

18      I appreciate, from Ms. Lauria's standpoint, why

19  that is impossible here.  And I'm going to accept that

20  representation at face value.  I certainly take at face value

21  that $100 million in professional fees in a case of a not-

22  for-profit like the Boy Scouts is not viable, and another 100

23  million will be even less viable.

24      And so, if there is an attempt to really get an

25  estimation that is an any way, shape, or form binding or

1    probative, even, for future coverage litigation, we will,

2    regretfully, have to become an obstacle in that because

3    that's not consistent with due process and not consistent

4    with our rights as -- our clients' rights as carriers.  I

5    don't want to do that.  I don't want to do -- say I'm not

6    going to do it lightly because we, too, would like to see

7    this debtor emerge from bankruptcy and reorganize

8    (indiscernible) our clients' rights.

9            And so we'll oppose the existing motion, which is

10   plainly an effort to do that.  And as to what the debtors

11   ultimately file, we will review it in good faith and,

12   hopefully, we won't have to take a similar position.  Thank

13   you, Your Honor.

14           THE COURT:  Thank you.

15           MR. MOLTON:  Your Honor, may I go next?

16           THE COURT:  Who was that?

17           MR. MOLTON:  Your Honor, may I -- it's Mr. Molton,

18   Your Honor, for the coalition.

19           THE COURT:  Yes.  Mr. Molton.

20           MR. MOLTON:  Thank you.

21           First, I want to respond to my friend Mr. Anker.  I

22   had my -- I thought today was April 12th and not May 19th.

23   May 19th is the date for argument on the estimation motion.

24   My friend Mr. Anker has used this opportunity to give us a

25   preview of his argument.  Be advised, Your Honor, I'm not

1   going to do the same.  We're going to just put on the record

2   that we disagree with much of what Mr. Anker, if not all of

3   what he said.

4          And the time will come when we'll put in front of

5   you, Your Honor, the issues as to estimation, none of which

6   are remarkable, none of which will take the time Mr. Anker

7   said, and all of which will move this case to a successful

8   conclusion, we believe, from the coalition, into 2020, along

9   the lines of what the debtor had articulated as their time

10  line.

11         So, in any event, we'll reserve our rights.  And

12  I'm not going to hold Mr. Anker to deduct from his time on

13  the 19th of May, the units he used now, I'll let him do it

14  again, if Your Honor -- if your -- you know, I will not be

15  asking that of Your Honor.

16         In any event, Judge, I do want to say a few things

17  about what Ms. Lauria said because I think there were some

18  points that we should be cognizant of, is that parties are

19  working hard with the debtor and other mediation parties, in

20  the context of a mediated resolution of what is a very, very

21  complicated case, a challenging case, as Your Honor knows.

22         Yes, it's true that no agreements were reached at

23  Miami, that we can report to you today.  But the parties are

24  talking, phone lines are open, calls are being responded to.

25  And even as late as within the last hour, Your Honor, the

1  coalition has been hard at work in dealing with mediation

2  issues with respect to the parties, you know, the mediation

3  parties.  And we look forward to putting rubber to road, so

4  to say, on that, and seeing if they can bear fruit.

5          I don't want to go any further than that.  But

6  nobody should take away from this status conference that

7  Miami happened, and then it was over.  No, Miami was a

8  beginning that set -- you know, that the parties were able to

9  understand each other's positions.  And it has served for a

10  basis for continual discussions and serious, serious

11  negotiation.

12          I do want to say, Judge, that the coalition had its

13  mediation delegation on the ground in Miami, meeting with

14  various mediation parties that were there, you know,

15  including the debtor and insurers.  And we had folks on, you

16  know, digital, as well, participating.  It was a challenging

17  endeavor to do this in the way that it was done.  But I

18  think, all in all, looking back at it, it was successful in

19  allowing the parties to articulate their positions,

20  understand each other's positions, and set the groundwork for

21  further discussions.

22          So, in any event, Your Honor, that's what I would

23  like to say.  And if Your Honor has no more questions, I'll

24  leave it at that.

25          THE COURT:  Thank you.

1          Who would -- who else would like to be heard?

2          MR. SCHIAVONI:  Century, Your Honor.

3          THE COURT:  Yes.

4          MR. SCHIAVONI:  If you --

5          THE COURT:  Before that, please, everyone check

6    your audio to make sure you're muted.  I'm getting some

7    background.

8          Mr. Schiavoni.

9          MR. SCHIAVONI:  Thank you, Your Honor.  Tanc

10   Schiavoni for Century Indemnity.

11         Your Honor, I flew to Miami, I was there the whole

12   week.  I stayed a few days to -- I basically traveled on a

13   safer route back.  My client was available.  The actual

14   reality on the ground was that Century was excluded from all

15   meetings with -- between the Boy Scouts and the coalition,

16   save for an opening meeting.  That's true with respect to, I

17   believe, essentially all of the other insurers, except for

18   Hartford.  There were meetings throughout the session between

19   Hartford and the Boy Scouts and the coalition.  But by and

20   large, the other insurers -- or not "by and large."  The

21   other insurers were -- had one discussion or two with one of

22   the mediators, but were not -- were excluded from all of the

23   discussions between the Boy Scouts and the coalition.

24         We are hopeful that things will go in a positive

25   direction here, and we still are -- you know, hold out an

olive branch to engage.  But you know, to be clear here, you know, what had happened is the debtor is engaging with an ad hoc committee that isn't bound by fiduciary duties, which has made multiple threats, as we set out in the 2019 motions we filed.  These are very challenging discussions, what's gone on here.

We're very concerned that we face an enormous moral hazard in how this case reaches a landing.  In essence, we are, at this point, almost completely in the dark as to what the debtor is doing.  I mean, what I just heard from Ms. Lauria is all complete news to us.  I had no idea that this is where they are.  It may be a positive; it may be a negative.  Anything new, in my mind, is potentially a positive.  I'm looking at the glass half full.  You know, we've gotten -- we've written them saying -- you know, giving them our phone number to call us.  We're, you know, anxious to work with them over the next couple of days.

But the bottom line here is that we face a genuine enormous moral hazard, which we're very familiar with how that went down in Imerys.  We do think -- we're not seeking delay for the purpose of delay.  But under 3017, we ought to have the basic 28 days to, you know, examine the disclosure statement and engage on it.  And that's -- you know, our substantive rights in that regard shouldn't be trampled because of the spending.

1              There has been enormous spending here.  But Your

2    Honor, the spending is being talked about as if it's almost

3    like an act of God, you know, a drought that's occurred or

4    something that no one has had any control over.  The debtor

5    is in significant control over this spending.  There has not

6    been open-ended litigation in this case.  It is true that

7    Century has brought several motions, but they've been

8    brought, not against the debtor or the TCC; they've been

9    brought against the coalition, which is not an estate

10   professional and doesn't bill the estate.  The T -- honestly,

11   both the TCC and the debtor really sat aside on those

12   motions, so we can't be blamed for this spending.  The

13   spending has largely occurred in the context of essentially

14   no contested litigation going on.

15             The debtor has huge control over this.  We've urged

16   them to do things like enhance the budgets they have.  We've

17   urged them to do things like the U.S. Trustee, Mr. Vara, has

18   put in place in another abuse case in the last several weeks,

19   in the District of New Jersey, he's imposed a case-ending

20   holdback instead of 20 percent, so that the estate

21   professionals are -- have a holdback until the end of case.

22   We continue to think that actually would be a very productive

23   suggestion here, and encouraging everyone to really focus on

24   getting the case done.  But yes, I got it, that even that

25   suggestion coming from me sounds like, you know, a Trojan

1    Horse, Greeks bearing gifts, et cetera.  But it's,

2    nonetheless, a good idea.

3         But the main point here is our substantive rights

4    to deal with this disclosure statement should not be trampled

5    because of the spending, which we have no control over,

6    frankly, at all.  This is a huge -- it's like this case poses

7    tremendous threats to these -- you know, my client is a

8    runoff, it has limited assets.  You know, you've seen the

9    papers that have been put in.  It's like they're

10   (indiscernible) it's like we need our rights under 3017.

11   That's the second point I'd like to make.

12        The third point, Your Honor, is we do have two

13   motions before you.  And I just want to just explain to you

14   why they actually are important to be decided.  The 2019

15   motion, it's a supplemental motion that -- look, I'm the

16   first to say that I think, when we brought the 2019 motions

17   before Your Honor, you might have been wondering what is this

18   all about, is this a waste of time.  But I think as you've

19   seen how the case has evolved, how the negotiations are

20   taking place and how the subgroups have evolved, identifying

21   the subgroups and whether we really have a controlling vote

22   is actually very important.  And what's been driving them is

23   very, very important to resolving this case.  And we think

24   your rulings on the 2019, so far, have been helpful.

25        What we have on the supplemental motion we have

before you on 2019, it deals with a very fundamental problem

we have.  The coalition, the biggest block of votes within

the coalition is by an entity calling itself "AIS," Abused in

Scouting.  It's sort of -- we've previously argued this to

you.  It's sort of presenting itself as a conglomerate

organization when it's really sort of three firms working

together.

But we have one of the -- one of the co-lawyers who

co-share those claimants is regularly publishing statements

about liquidating the Boy Scouts.  We've included some of

those statements in the 2019 that he publishes on the web.

And they go out to like a list of other plaintiffs' lawyers

and other claimants.  Meanwhile, you know, the negotiations

for the coalition are being led at the very same time by his

co-counsel, who shares the same exact clients, who is

purporting to run the negotiations in the -- in Miami and

elsewhere.  Okay?

It's important for all the parties to know does the

coalition, in fact, have a majority vote.  You know, is AIS

acting as one entity, or is there an issue here because the

two -- you know, is this some sort of negotiating ploy,

having one co-counsel say he's liquidating the Boy Scouts,

and the other saying he's negotiating to a resolution, or is

there a genuine conflict between the two counsel?  That 2019

motion is important for that reason.  It goes to who the

1    parties are dealing with and whether they think there

2    actually could be a deal with them.

3         But we would ask you to consider looking at those

4    motions.  I don't think Your Honor needs to schedule further

5    argument on them, or at least we'd be prepared to waive

6    argument, if it (indiscernible) decision.

7         The other motions before Your Honor are Century's

8    2004 motions that go to how the claims were generated.  And I

9    got it, but there's a huge temptation to sort of put this off

10   and put off decision on it until somehow discovery comes

11   along.  But you can see what's happening.  It's like there's

12   a proposal now that like we should wait for all discovery

13   until right at the end, right before confirmation, and even

14   defer this discussion until after estimation.

15        The fact of the matter is the 2004 discovery is

16   threshold discovery that was supposed to put us in a position

17   to file omnibus objections before solicitation.  So deferring

18   -- if there's a rush to move this forward, I would just

19   suggest that that rush mandates or -- maybe that's too harsh

20   of a word, I apologize -- it, you know, encourages,

21   incentivizes a ruling on the 2004 motion sooner, rather than

22   later.

23        And we do think those motions are extremely

24   meritorious.  We don't think solicitation can go forward when

25   there's hundreds of proofs of claim that they're, you know,

1  basically, you know, forged signatures, we've submitted, and

2  other like very serious problems about them.  So we would ask

3  that that motion not be held up as part of some package on

4  estimation, but that it be dealt with, you know, as soon as

5  Your Honor can issue a decision on it.

6          And just last, Your Honor, I don't -- I'm not

7  intending to get into arguments about estimations.  But you

8  know, to be clear, this is sort of being marshaled as some

9  sort of weapon.  If you were to -- if you were to grant an

10  estimation motion, you will be the first judge in the United

11  States of America to estimate sexual abuse claims.  The only

12  other judge that's looked at this, it's the only other

13  citation in the TCC's brief, when you read the decision, was

14  horrified at the notion of the complex and bizarre issues it

15  would get involved in.

16          The other thing about it that no one has even

17  mentioned is that this is an estimation motion, not just of

18  the Boy Scouts liability, it's an estimation of nondebtor

19  liability.  In other words, they're going to ask -- are

20  asking that you estimate the liability of the local councils

21  and of the sponsoring organizations.  To be clear, there's

22  over 5,000 sponsoring organizations and 253 local council

23  entities.

24          We don't think, as a matter of law, the estimation

25  procedures ever could be used to estimate nondebtor

1    liabilities, and we think it's dead on arrival for that

2    reason, all by itself.  But we also don't think it's actually

3    possible to estimate, you know, by putting on some

4    statistician, the different liabilities based on 5,000

5    different sponsoring organizations, all with their own kind

6    of unique and peculiar facts involving each of those

7    institutions.

8            And the same goes true with (indiscernible) local

9    councils.  Obviously, that kind of discovery would take

10   months, it would be -- it is -- I -- you know, in just the

11   most concise word possible, this estimation is an appeal

12   magnet.  It will -- it's like, you know, to the extent there

13   were efforts to do this for an entirely different reason, in

14   W.R. Grace, in Owens Corning, it generated so many different

15   appeal issues.  It was like an appellate lawyer's dream.

16   This will be a disaster to go this route (indiscernible) so,

17   Your Honor, we think that's a reason -- the only reason I

18   bring that up is the 2004 and the 2019 discovery rulings

19   shouldn't wait for that to happen.  It should go forward now.

20           And again, to just sum up on a happy note, it's

21   like, you know, we're prepared to engage if anybody reaches

22   out to us.  But right now, quite bizarrely, I'm with Mr.

23   Stang, and both of us are in the dark on sort of where the

24   debtor is, Your Honor.  So thank you.  Thank you very much

25   for listening.

1          THE COURT:  Thank you.

2          Is there anyone else who would like to be heard?

3     (No verbal response)

4          THE COURT:  Okay.  Well, I've received a request to

5     push the disclosure statement hearing, and it makes sense

6     because the debtors are going to be making new filings.  So

7     we're going to let the debtor make the new filings, and we'll

8     all see what they are.  And we will move the disclosure

9     statement hearing to May 19th.  And we'll move the objection

10     to the disclosure statement hearing accordingly, objections

11     to the disclosure statement.

12          MR. SCHIAVONI:  And Your Honor, does that include

13     the solicitation procedures, too?  I think they're part of

14     the same motion, so --

15          THE COURT:  Yes, that's going to include --

16          MR. SCHIAVONI:  -- they both --

17          THE COURT:  -- anything related to the disclosure

18     statement and solicitation procedures.  And that should give

19     people plenty of time to take a look at what the debtor is

20     going to file on Thursday.

21          MR. LUCAS:  Your Honor --

22          THE COURT:  And we'll --

23          MR. LUCAS:  -- this is John Lucas.

24          THE COURT:  We'll go from there.

25          Mr. Lucas.

1          MR. LUCAS:  Yeah, I'm sorry, Your Honor.  I'm just

2    not clear when the objection deadline is now.  Can maybe Ms.

3    Lauria or somebody clarify that for us?

4          THE COURT:  What do we usually --

5          MS. LAURIA:  This is Jessica --

6          THE COURT:  -- do with --

7          MS. LAURIA:  -- Lauria.

8          THE COURT:  Yeah.

9          MS. LAURIA:  Yeah.  I apologize, Your Honor.  I

10   don't know the current time line in front of me, and I can't

11   recall if that objection deadline was scheduled 7 or 14 days

12   in advance of the hearing.  We would, as Your Honor just

13   suggested, utilize the exact same timing that is currently in

14   place, whether it's 7 or 14 days, and notice it out

15   accordingly.

16         THE COURT:  Yes.  It will get re-noticed.

17         MR. LUCAS:  (Indiscernible) thank you.

18         UNIDENTIFIED:  (Indiscernible)

19         THE COURT:  I'm hearing somebody's discussion.

20      (Pause)

21         THE COURT:  Okay.  What is left, if anything, for

22   Thursday?

23         MS. LAURIA:  Your Honor, the hearing this Thursday

24   is the hearing with respect to the debtors' exclusivity

25   motion.  One objection has been filed, which was the

1    objection of the TCC.  Obviously, they have not seen the

2    documentation that we just described, so I'm sure they're

3    unable to represent if they're going to continue with that

4    objection.  But we would be prepared to go forward with that

5    on Thursday.

6              THE COURT:  Okay.  Okay.  Well, I appreciate the

7    status.  I appreciate all parties' efforts to continue

8    discussions.  I'm hearing that some parties were more

9    involved than other parties with respect to the mediation, or

10   at least -- and some parties feel they weren't fully utilized

11   at the mediation.

12             I would, of course, encourage all parties to talk

13   to all other parties, to see what can be resolved.  But I'm

14   heartened to hear that the parties -- some of the mediation

15   parties are still having discussions post the March mediation

16   down in Miami.  And I would expect that those communications

17   would continue.  Any momentum that was generated by the

18   mediation is welcome, and I would hope that that momentum

19   could continue and could broaden to include parties who feel

20   they were not fully utilized during the mediation.

21             Anything else?

22             MS. LAURIA:  Not from your -- the debtor, Your

23   Honor.  Thank you for your time today.

24             THE COURT:  Okay.  Thank you, everyone.  We're

25   adjourned.

1          COUNSEL:  Thank you, Your Honor.  Thank you, Your

2     Honor.

3          (Proceedings concluded at 3:55 p.m.)

4                              *****

1                    <u>CERTIFICATION</u>

2          I certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of my

5    knowledge and ability.

6

7

8

9

10   _____     April 12, 2021

11   Coleen Rand, AAERT Cert. No. 341

12   Certified Court Transcriptionist

13   For Reliable