## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>             Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered) |

## OPPOSITION OF CERTAIN INSURERS
## TO MOTION OF THE COALITION, TCC AND FCR
## TO ESTIMATE CURRENT AND FUTURE ABUSE CLAIMS

BAYARD, P.A.
Erin R. Fay (No. 5268)
Gregory J. Flasser (No. 6154)
600 North King Street, Suite 400
Wilmington, Delaware 19801
Telephone:  (302) 655-5000
Facsimile:  (302) 658-6395
Email:  efay@bayardlaw.com
       gflasser@bayardlaw.com
  - and -
James P. Ruggeri (admitted *pro hac vice*)
Joshua D. Weinberg (admitted *pro hac vice*)
SHIPMAN & GOODWIN LLP
1875 K Street, NW, Suite 600
Washington, D.C. 20003
Tel:  (202) 469-7750
Fax:  (202) 469-7751
  - and -
Philip D. Anker (admitted *pro hac vice*)
WILMER  CUTLER  PICKERING  HALE  AND
DORR LLP
7 World Trade Center
250 Greenwich Street
New York, N.Y. 10007
Tel:  (212) 230-8890
Fax:  (212) 230-8888

*Attorneys for First State Insurance Company,*
*Hartford Accident and Indemnity Company and*
*Twin City Fire Insurance Company*

*Other Insurer Counsel Listed At End Of Brief*

---

[1]     The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ....................................................................................................................... 4

I.     The Court Should Deny The Motion ................................................................. 4

      A.    There Is No Basis To Estimate The Abuse Claims Under Section 502(c) Of The Bankruptcy Code .................................................................................. 4

      B.    There Is No Other Legitimate Bankruptcy Purpose For An "Estimation" Of The Abuse Claims .......................................................................................... 8

      C.    The Motion Is An Improper Attempt To Prejudice Insurers In State-Court Coverage Litigation ............................................................................... 15

      D.    The "Estimation" Procedures Are Improper ...................................................... 18

CONCLUSION ................................................................................................................... 21

# TABLE OF AUTHORITIES

Page(s)

## CASES

*A.H. Robins Co. v. Piccinin*,
    788 F.2d 994 (4th Cir. 1986) ........................................................................14

*Bittner v. Borne Chem. Co.*,
    691 F.2d 134 (3d Cir. 1982)............................................................................5

*Fuller-Austin Insulation Co. v. Highlands Ins. Co.*,
    135 Cal. Rptr. 3d 716 (Ct. App. 2006) ....................................................16, 17

*In re A.H. Robins Co.*,
    880 F.2d 694 (4th Cir. 1989) ........................................................................11

*In re A.P.I., Inc.*,
    331 B.R. 828 (Bankr. D. Minn. 2005), *aff'd*, 2006 WL 1473004 (D. Minn.
    2006) ............................................................................................................20

*In re Armstrong World Indus., Inc.*,
    348 B.R. 111 (D. Del. 2006)..........................................................9, 10, 11, 20

*In re Bestwall LLC*,
    No. 17-31795 (Bankr. W.D.N.C. Mar. 31, 2021), Dkt. No. 1685 ....................19

*In re Bicoastal Corp.*,
    122 B.R. 771 (Bankr. M.D. Fla. 1990) ...........................................................21

*In re Dow Corning Corp.*,
    211 B.R. 545 (Bankr. E.D. Mich. 1997)................................................ *passim*

*In re Exide Techs.*,
    303 B.R. 48 (Bankr. D. Del. 2003) .................................................................14

*In re Federal-Mogul Glob., Inc.*,
    330 B.R. 133 (D. Del. 2005)...............................................................5, 10, 21

*In re G-I Holdings, Inc.*,
    323 B.R. 583 (Bankr. D.N.J. 2005) ...............................................................10

*In re Garlock Sealing Techs., LLC*,
    504 B.R. 71 (Bankr. W.D.N.C. 2014).......................................................10, 19

*In re Interco Inc.*,
    137 B.R. 993 (Bankr. E.D. Mo. 1992) .............................................................5

*In re Pac. Sunwear of Cal., Inc.*,
    No. 16-10882, 2016 WL 4250681 (Bankr. D. Del. Aug. 8, 2016) ....................5

*In re PG&E Corp.*,
    No. 19-30088-DM (Bankr. N.D. Cal. Mar. 17, 2020), Dkt. No. 6340 .............11

*In re PG&E Corp.*,
    No. 19-30088-DM (Bankr. N.D. Cal. Mar. 17, 2020), Dkt. No. 6353 .............11

*In re PG&E Corp.*,
    No. 3:19-cv-05257-JD (N.D. Cal. June 9, 2020), Dkt. No. 387 ....................14

*In re Roman Catholic Archbishop of Portland in Or.*,
    339 B.R. 215 (Bankr. D. Or. 2006)............................................................14, 21

*In re Specialty Prods. Holding Corp.*,
    No. 10-11780, 2013 WL 2177694 (Bankr. D. Del. May 20, 2013)................10

*In re Stone Hedge Props.*,
    191 B.R. 59 (Bankr. M.D. Pa. 1995) ............................................................5

*In re Tronox Inc.*,
    No. 09-10156-MEW (Bankr. S.D.N.Y Sept. 24, 2010), Dkt. No. 2159..........11

*Kool, Mann, Coffee & Co. v. Coffey*,
    300 F.3d 340 (3d Cir. 2002).....................................................................6, 20

*United States v. Ron Pair Enters., Inc.*,
    489 U.S. 235 (1989)....................................................................................4

## STATUTES

11 U.S.C. § 105......................................................................................1, 9, 10

11 U.S.C. § 502................................................................................... *passim*

11 U.S.C. § 524...........................................................................................10

11 U.S.C. § 1125.........................................................................................11

11 U.S.C. § 1129...........................................................................9, 12, 13, 14, 15

## OTHER AUTHORITIES

Kara Berg, *First of Seven Pleads Guilty to Stealing Money From MSU Fund Set
Up to Aid Nassar Victims*, LANSING ST. J. (Apr. 6, 2021),
    https://www.lansingstatejournal.com/story/news/2021/04/06/msu-larry-
    nassar-healing-fund-fraud-guilty-plea-michigan-state/4748822001/ ...................3

iii

The undersigned insurance carriers (collectively, "**Certain Insurers**"), hereby oppose the *Motion of the Future Claimants' Representative, the Official Committee of Tort Claimants, and the Coalition of Abused Scouts for Justice for Entry of an Order, Pursuant to 11 U.S.C. §§ 105(a) and 502(c), (I) Authorizing an Estimation of Current and Future Abuse Claims and (II) Establishing Procedures and Schedule for Estimation Proceedings*, filed on March 16, 2021 [D.I. 2391] (the "**Motion**").[2]

## PRELIMINARY STATEMENT

1.      The Motion seeks extraordinary relief, contrary to the terms of the Bankruptcy Code, for purposes having nothing to do with the Debtors' reorganization and everything to do with insurance coverage.  Having only recently opposed Hartford's and Century's (and other insurers') requests for discovery into a limited number of Abuse Claims, the FCR, TCC and Coalition ("**Movants**") now contend that the Court should attempt to estimate *every one of those 85,000 or more Abuse Claims* and somehow reach a determination as to what all those claims are worth separately with respect to each policy year.  And they contend that this Court should attempt to estimate Abuse Claims alleged not only against the Debtors, but also all Abuse Claims alleged against hundreds or thousands of non-debtors, including more than 250 local councils and potentially thousands of additional chartered organizations that sponsored individual scout units.

2.      Although Movants invoke Section 502(c) of the Bankruptcy Code, the "estimation" they seek has no basis in that provision.  The Motion does not ask this Court to estimate any individual "claim"; the proposed "estimation" is not "for purpose of allowance" of any claim; and the Motion does not suggest that any claim must be estimated now to avoid

---

[2]      Capitalized terms not defined herein have the meanings ascribed to such terms in the Motion.

"undu[e] delay [in] the administration of the case." 11 U.S.C. § 502(c).  To the contrary, Movants contend that individual Abuse Claims should be liquidated post-confirmation pursuant to trust distribution procedures without any review by this Court or any other court.  The Motion does not satisfy any, let alone all, of the requirements for an estimation under Section 502(c). For that reason alone, it should be denied.

3.      But the Motion should also be understood for what it is.  Rather than seeking an estimation of one or more individual Abuse Claims for "allowance" under Section 502(c) or any other purpose consistent with bankruptcy law, Movants want this Court to "estimate" the Debtors' aggregate liability and that of the non-debtor local councils and sponsoring organizations precisely in hopes that they never have to prove up in any court the validity of any of the 85,000 or so Abuse Claims, first filed during these bankruptcy cases, that were generated by the massive advertising efforts of for-profit claims aggregators.  Adopting the playbook of plaintiffs' lawyers in other cases who have likewise sought to misuse bankruptcy court "estimations," Movants hope to obtain an "estimation" from this Court that they can later parade before a non-bankruptcy court, unfamiliar with the nuances of bankruptcy law, in subsequent coverage litigation as a supposed adjudication by this Court of the Debtors' liability for Abuse Claims corresponding to particular carriers' insurance coverage.  The Motion thus requests that this Court "estimate" the liability on *an annual basis* so that, in Movants' own words, "the Abuse Claim[s can] to be matched to the appropriate insurer(s) and policy(ies) of the BSA and/or the local councils," thereby supposedly eliminating any "coverage disputes."  Mot. at 16.  Simply put, Movants seek an "estimation" not for bankruptcy purposes at all, but rather for insurance coverage purposes—in particular, to deny the insurers their right under their policies to defend each Abuse Claim on the merits.  For this reason, too, the Motion should be denied.

4.      The entirely one-sided procedures Movants propose provide yet a third reason why this Court should deny the Motion.  Movants propose to force parties that "opt in" to the estimation—on pain of forfeiting any right to have input into the process—to agree to a highly circumscribed discovery process that would afford those parties literally no say in which Abuse Claimants are deposed and in which *all* of the 85,000 Abuse Claims would nevertheless somehow be assessed in less than three months.  Movants' goal is obvious:  to limit discovery to a short list of claimants, of their choosing, in order to tilt the playing field decisively in their favor.  The Motion is not merely contrary to bankruptcy law; it is contrary to any notion of due process.

5.      Of course, there are some legitimate Abuse Claims, and they need to be liquidated and paid.  But the Motion is not designed to separate the good claims from the bad ones, let alone to do so in a manner that respects the legal rights of the carriers and other parties in interest.  It will have precisely the opposite effect, shielding invalid Abuse Claims from scrutiny and preventing insurers asked to pay those claims from ever testing their merits in a court of law on an individualized basis.  As the insurers' Rule 2004 motions demonstrated, many of the newly asserted Abuse Claims in this case were generated through litigation funding and a media blitz, promising limited review and a multi-billion-dollar trust fund.  Such publicity by its nature attracts invalid or inflated claims, as was shown just last week with regard to claims made against the trust established to compensate victims of the Larry Nassar scandal that affected Michigan State and the U.S. Gymnastics program.  *See* Kara Berg, *First of Seven Pleads Guilty to Stealing Money From MSU Fund Set Up to Aid Nassar Victims*, Lansing St. J. (Apr. 6, 2021).[3]  The likelihood of invalid claims is, if anything, even greater here, where claimants have

---

[3]      *Available at*  https://www.lansingstatejournal.com/story/news/2021/04/06/msu-larry-nassar-healing-fund-fraud-guilty-plea-michigan-state/4748822001/

alleged abuse from years or decades ago for the first time following plaintiffs' lawyers' blandishments of six- and seven-figure recoveries from a bankruptcy trust.

6.      If the validity of those Claims is to be assessed in a manner that is potentially going to be binding on any insurers, then the insurers must be afforded real discovery, on a claim-by-claim basis, and a fair process, consistent with their contractual and other legal rights. A procedurally fair estimation process would take many months, if not years.  The Motion should be denied.

## ARGUMENT

### I.    THE COURT SHOULD DENY THE MOTION

#### A.    There Is No Basis To Estimate The Abuse Claims Under Section 502(c) Of The Bankruptcy Code

7.      The Movants base their motion on Section 502(c) of the Bankruptcy Code, claiming that estimation is "mandatory" under that provision.  *See* Mot. at 10-11.  To the contrary, none of Section 502(c)'s requirements for estimation is met here.

8.      Section 502(c) provides:

> There shall be estimated *for purpose of allowance under this section* … any contingent or unliquidated *claim*, the fixing or liquidation of which, as the case may be, would *unduly delay the administration of the case*.

11 U.S.C. § 502(c) (emphasis added).  Like all statutes, the Bankruptcy Code must be construed to mean what its plain language says.  *See, e.g.*, *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (when construing the Bankruptcy Code, "where … the statute's language is plain, the sole function of the courts is to enforce it according to its terms") (internal quotation marks omitted).  Under the plain language of Section 502(c), the Court may estimate a claim only if three requirements are met.

9.      <u>First</u>, Section 502(c) provides for the estimation only of a "contingent or unliquidated *claim*." A Section 502(c) estimation thus must determine the amount of an individual claim or group of related claims, not a debtor's aggregate liability for all mass-tort claims alleged against it. *See, e.g.*, *Bittner v. Borne Chem. Co.*, 691 F.2d 134, 135-137 (3d Cir. 1982) (affirming order estimating the allowed amount of a single unliquidated tort claim). That point is even clearer given the statute's additional requirement that the estimation must be "for purpose of allowance." Claims are not allowed *en masse*, but individually. *See* 11 U.S.C. § 502(b).

10.      <u>Second</u>, the estimation must be "for purpose of allowance under this section." That is, the estimation's purpose must be to determine whether a particular claim is allowed under Section 502 (for distribution or plan voting purposes), and if so, the allowed amount of that claim. *Cf.* 11 U.S.C. § 502(e)(2) (referring to claims "allowed under subsection (a), (b), *or (c)* of this section") (emphasis added); *accord id.* § 502(f)-(i). As this Court has explained, because "section 502(c) … requires that the court estimate [an unliquidated claim] 'for purpose of allowance under this section,'" "estimation under section 502(c) results in allowing a claim for purposes of the entire case, and is no different than a claim allowed under section 502(a) or (b)." *In re Pac. Sunwear of Cal., Inc.*, No. 16-10882, 2016 WL 4250681, at *3 (Bankr. D. Del. Aug. 8, 2016) (Silverstein, J.); *see also In re Federal-Mogul Glob., Inc.*, 330 B.R. 133, 154 (D. Del. 2005) ("Section 502(c) only speaks of estimating claims for the purpose of allowance."); *In re Stone Hedge Props.*, 191 B.R. 59, 63-64 (Bankr. M.D. Pa. 1995) ("estimation … under 11 U.S.C. § 502(c) … appears to confine itself to 'contingent or unliquidated' claims for distribution purposes"); *In re Interco Inc.*, 137 B.R. 993, 998 (Bankr. E.D. Mo. 1992) ("A bankruptcy court is to estimate any contingent or unliquidated claims for the purpose of

5

*allowance* in a bankruptcy case. … An allowed claim … is a claim that may share in the assets of the bankruptcy estate." (emphasis in original; citing Section 502(c))).

11.     Third, Section 502(c) permits the estimation of a contingent or unliquidated claim only if "the fixing or liquidation" of the claim through the normal claims-allowance process under Section 502(a)-(b) of the Bankruptcy Code (or in the tort system) "would unduly delay the administration of the case." *See, e.g.*, *Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 347 n.4, 357 (3d Cir. 2002) (affirming denial of Section 502(c) estimation of creditor's claim because adjudicating the claim's allowance under Section 502(b) would not delay the case). "Something is 'undue' if it is 'unjustifiable.'  Inquiry into whether liquidating the tort claims would be unjust, due to any case delay that may result therefrom, dictates that the Court perform a kind of cost-benefit analysis by considering the time, costs and benefits associated with both estimation and liquidation." *In re Dow Corning Corp.*, 211 B.R. 545, 563 (Bankr. E.D. Mich. 1997) (citation omitted).  When "there is no reason to believe that estimation would result in a faster distribution of proceeds to tort claimants," the court should not order estimation under Section 502(c).  *Id.* at 565.

12.     By Movants' own admission, *none* of those three requirements is met here.  As the Motion states:

> Estimation of aggregate liability will *not* determine the liquidated amount of any particular individual claim.  The plan contemplated by the Movants will likely provide that such individual amounts will be determined through trust distribution procedures (the "TDP") or through release of actions into the tort system for adjudication as permitted by the TDP.

Mot. at 1 n.3 (emphasis added).

13.     Thus, Movants are not asking the Court to estimate the amount of any individual "claim," as Section 502(c) provides, but rather to estimate the Debtors' (and many non-debtors') aggregate liability for tens of thousands of Abuse Claims.  Nor are Movants asking the Court to

estimate any individual Abuse Claim "for purpose of allowance under [Section 502]."  To the contrary, they do not want this Court (or any other) to consider the bona fides of any Abuse Claim; they assert that the allowance and liquidation of individual Abuse Claims should occur entirely outside any judicial scrutiny, pursuant to a separate post-confirmation process governed by trust distribution procedures ("**TDP**") no doubt to be administered by a plaintiff-friendly "trustee."  And Movants' contention that the allowance and liquidation of individual Abuse Claims can occur after confirmation of a plan pursuant to the TDP is a concession that there is no need to liquidate the Abuse Claims now, through an estimation proceeding, to avoid unduly delaying the case.  On the contrary, the Debtors' bankruptcy cases will be unduly delayed if they were paused to conduct an estimation, only to have individual Abuse Claims liquidated after confirmation.

14.     Because the Motion fails to satisfy *any* of the three requirements for estimation, it must be denied.  *Dow Corning* is instructive.  There, as here, the movants argued that an estimation of the debtor's aggregate mass-tort liability was necessary to determine whether a plan was feasible and to help bridge the parties' differences over a plan that faced significant opposition.  *See Dow*, 211 B.R. at 554-556, 562.  But the bankruptcy court denied the estimation motions.  It explained that "bankruptcy law's general rule is to liquidate, not to estimate," and that "[t]here are good reasons to liquidate" rather than "estimate" unliquidated claims because of "the very real concern that the estimates may prove to be inaccurate."  *Id.* at 563.  Thus, estimation is permitted under Section 502(c) only if "the party moving for estimation … show[s] that the normal mode of liquidating the claim would create undue delay in the bankruptcy process."  *Id.* at 573.  The court concluded that the movants had failed to show any "undue" delay because—just as in this case—"individual tort claims would … be liquidated" after "a plan

of reorganization [is] confirmed" pursuant to a "post-confirmation liquidation [process for the] tort claims." *Id.* at 565-566, 574. And the court observed that the notion that an estimation would facilitate consensus around a plan was fanciful: "[N]o matter what answer this Court were to give as its estimate of the value of all tort claims, there is almost no likelihood that the estimate would prove accurate"; "[t]herefore, parties in interest will derive no comfort from the results of a lengthy and complex estimation war." *Id.* at 567.[4] Thus, far from avoiding "undue delay," a lengthy pre-confirmation estimation battle "would only lengthen the time to distribution since funds would not be disbursed until claims are liquidated post-confirmation." *Id.* at 565.

15.     The same is true here. There is simply no basis under Section 502(c) to conduct an "estimation" of the Abuse Claims that does not seek to estimate the amount of any individual "claim" (but, rather, the Debtors' and non-debtors' "aggregate liability"); that is not for the "purpose of allowance" of any particular Abuse Claim; and that is unnecessary to avoid any "undue delay" in the case, given that Movants themselves contemplate that individual Abuse Claims will be liquidated post-confirmation outside the bankruptcy process.

**B.      There Is No Other Legitimate Bankruptcy Purpose For An "Estimation" Of The Abuse Claims**

16.     The proposed "estimation" is not only inconsistent with Section 502(c), but it also fails to serve any proper bankruptcy purpose at all. To be sure, bankruptcy courts have, on occasion, "estimated" a debtor's liabilities in contexts other than claims allowance under Section 502, such as to resolve an objection to confirmation of a plan or to support a settlement. But

---

[4]      The Debtors' own efforts to hazard an estimate of the Abuse Claims, based on several months of work by their consultant, Bates White LLC, has produced only a range with amounts that are billions of dollars apart on the low and high ends. *See Disclosure Statement for the Second Amended Chapter 11 Plan Of Reorganization For Boy Scouts Of America And Delaware BSA, LLC* [D.I. 2594] ("**Disclosure Statement**"), at 23, 60-63. It is far-fetched, to say the least, that an estimation conducted in only a couple of months' time—as Movants' propose—will produce anything definitive.

while those decisions may use the term "estimation," and may sometimes even cite to Section 502(c), they do not involve a true estimation under Section 502(c), which only authorizes estimation of individual claims for the purpose of their allowance.  Rather, estimations of a debtor's aggregate liability are typically done for the limited purpose of determining whether a proposed plan of reorganization meets the Bankruptcy Code's requirements for confirmation (or a settlement meets the business judgment standards or standards of reasonableness under bankruptcy law), without making any binding estimate for purposes of determining the allowed amount of any particular claim, much less any determination that purports to bind any insurer or other third party as to the amount of the debtor's liability in the aggregate (let alone by policy year).

17.     For example, in the *Armstrong* asbestos bankruptcy case, the court estimated the debtor's asbestos liability to resolve an objection to confirmation of the debtor's plan by the debtor's commercial creditors.  *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 119-124 (D. Del. 2006).  Those creditors, who had voted to reject the plan, objected under 11 U.S.C. § 1129(b) that it unfairly discriminated against them, and therefore could not be crammed down on them, because, in their view, the plan allocated a disproportionately high share of the estate's assets to the asbestos claimants.  The court denied that objection, concluding that the plan proponents had met their burden to show that the plan's division of assets was fair, by showing that a "reasonable approximation" of the debtor's liability for present and "future" asbestos claims was at least $3.1 billion.  *See id.*  Sections 105(a) and 1129 of the Bankruptcy Code provided the court with authority to make that sort of limited "estimation."  *See* 11 U.S.C. §§ 105(a), 1129.  Indeed, while the court referred to section 502(c), it emphasized that it merely looked to "estimation principles" developed under that provision for guidance.  *Id.* at 122-124.

And it stressed that it was not purporting to make any binding estimation of liability: it "need not choose an exact number for [the debtor's] liability in order to confirm or deny confirmation of the Plan," since a "reasonable prediction" of rough magnitude was sufficient for that purpose, even if that prediction was merely an "approximation," "not [a] search for mathematical precision, nor ultimate certainty." *Id.* at 124, 134, 136.[5]

18.    Here, in contrast, Movants do not identify any legitimate bankruptcy purpose for their proposed "estimation" that withstands scrutiny. Movants claim that they need the Court to estimate the aggregate amount of Abuse Claims so that Abuse Claimants will know how much a trust created under a plan is likely to pay them. Mot. at 12-13. But knowing that would require not just an estimate of the aggregate Abuse Claims against the trust, but also a determination of the amount of the trust's assets, including disputed insurance recoveries (and a host of other things, such as the amount of the claims that fall into the Debtors' and non-debtors' self-insured retentions and uninsured periods). But none of that can be determined except in insurance-coverage litigation. In any event, plans are often confirmed even though creditors do not know

---

[5]    *See also Federal-Mogul*, 330 B.R. at 136-137, 154-155 (estimating present and future asbestos personal-injury claims "for the limited purposes of plan formulation" to resolve dispute over plan's division of assets between asbestos property-damage claimants and asbestos personal-injury claimants); *In re G-I Holdings, Inc.*, 323 B.R. 583, 623-626 (Bankr. D.N.J. 2005) (outlining proposed estimation of present and future asbestos claims to resolve dispute between debtor, which asserted it was solvent if invalid claims were disallowed, and asbestos claimants, who asserted debtor was insolvent and should establish a trust under 11 U.S.C. § 524(g) to pay present and future asbestos claims).

Courts that have undertaken "estimations" have not always clearly distinguished between the estimation of an individual claim under Section 502(c) for the purpose of claims allowance and an "estimation" of aggregate liability made in furtherance of some other bankruptcy purpose. In many cases, the parties did not raise or contest the issue, but simply assumed that Section 502(c) applied. *See, e.g.*, *Federal-Mogul*, 330 B.R. at 154-155 ("undisputed" that estimation under Section 502(c) was required); *In re Specialty Prods. Holding Corp.*, No. 10-11780, 2013 WL 2177694, at *1 (Bankr. D. Del. May 20, 2013) (referencing Section 502(c) in single sentence with no further analysis); *G-I Holdings*, 323 B.R. at 598-599 ("the parties … agree that an estimation of [the debtor's] asbestos liability is required"). In other cases, courts have cited Section 502(c) but recognized that estimations conducted for the limited "purpose of formulating a plan of reorganization" are authorized under separate provisions of the Code. *See, e.g.*, *In re Garlock Sealing Techs., LLC*, 504 B.R. 71, 74, 87 (Bankr. W.D.N.C. 2014) ("[T]he court determined to estimate the aggregate amount of Garlock's asbestos liability for the purpose of formulating a plan of reorganization, pursuant to 11 U.S.C. §§ 502(a) & 105(a)."). And like *Armstrong*, these courts have noted that such "estimations" are not binding determinations of liability, since "an estimation by definition, is an approximation" made "for the limited purposes of plan formulation," and therefore "it is important that we not pretend to have achieved mathematical accuracy." *Federal-Mogul*, 330 B.R. at 154-156.

their likely recoveries.  That can occur because the creditors' claims are largely unliquidated as

of confirmation and the extent to which they will ultimately be allowed is unknown, or because

the value of the assets that will be available to pay claims is unknown—for example, where the

principal estate assets are unliquidated litigation claims against third parties with uncertain

recoveries.[6]  Movants have likewise established no need for the Court to estimate, by policy year,

the Abuse Claims in this case to confirm a plan.

19.     By the same token, Movants have demonstrated no need for the Court to

"estimate" the Abuse Claims to provide "adequate information" about such a plan in a disclosure

statement under 11 U.S.C. § 1125.  "There is no requirement in case law or statute that a

disclosure statement estimate the value of specific unliquidated tort claims."  *In re A.H. Robins

Co.*, 880 F.2d 694, 697 (4th Cir. 1989).  Courts have accordingly approved disclosure statements,

including in the mass-tort context, that did not include any estimate of the mass-tort claims or

claimants' likely recoveries from the trust. [7]

20.     Movants also contend that the Court must estimate the Abuse Claims to resolve

potential objections to confirmation of a plan.  Mot. at 13-15.  But this case is unlike a case such

as *Armstrong*, in which creditors had voted to reject the debtors' plan and objected to its

confirmation.  The Debtors here have not yet solicited votes on any plan, and no objections to

---

[6]     *See, e.g.*, Disclosure Statement Regarding the First Amended Joint Plan of Reorganization of Tronox Incorporated, et al. Pursuant to Chapter 11 of the Bankruptcy Code at 11, *In re Tronox Inc.*, No. 09-10156-MEW (Bankr. S.D.N.Y Sept. 24, 2010), Dkt. No. 2159.

[7]     *See, e.g.*, Order (I) Approving Proposed Disclosure Statement For Debtors' And Shareholder Proponents' Joint Chapter 11 Plan Of Reorganization; (II) Approving Form And Manner Of Notice Of Hearing On Proposed Disclosure Statement; (III) Establishing And Approving Plan Solicitation And Voting Procedures; (IV) Approving Forms Of Ballots, Solicitation Packages, And Related Notices; And (V) Granting Related Relief, *In re PG&E Corp.*, No. 19-30088-DM (Bankr. N.D. Cal. Mar. 17, 2020), Dkt. No. 6340; Disclosure Statement For Debtors' And Shareholder Proponents' Joint Chapter 11 Plan Of Reorganization at 24, *In re PG&E Corp.*, No. 19-30088-DM (Bankr. N.D. Cal. Mar. 17, 2020), Dkt. No. 6353 (disclosing that 83,000 fire-victim claims had been filed, mostly in "unknown" amounts, and that "[a]s a result, it is not currently possible to predict what any specific claimant will be paid or a percentage recovery on such Claim any specific claimant should expect out of the approximately $13.5 billion in total consideration that will be transferred to the Fire Victim Trust under the Plan").

confirmation have been filed.  Indeed, the Court has not yet approved a disclosure statement, much less set deadlines for creditors to vote to accept or reject the plan or file objections to confirmation.  Although Movants suggest that the Abuse Claimants will vote to reject the plan and object to its confirmation, it remains to be seen whether any of that will occur once the newly amended plan that the Debtors filed on April 13, or any further amended plan, is submitted to creditors for consideration.  It is premature, at the very least, to commence now the expensive and time-consuming estimation proceeding Movants seek—in a case that has already cost the estate $100 million in professional fees—to address hypothetical plan-confirmation issues that may never arise.  *See Dow*, 211 B.R. at 572-573 (denying motion to estimate debtor's mass-tort liability, which claimants argued was necessary to resolve their potential objections to the plan, concluding the court "should wait to see whether that occurs before embarking upon a long and complex estimation").

21.     In any event, the Court would not need to "estimate" the aggregate amount of Abuse Claims to resolve any of the potential plan-confirmation objections that Movants identify. An "estimation" is not needed to determine whether the plan is feasible under 11 U.S.C. § 1129(a)(11).  Mot. at 13.  The current plan provides that the Debtors' liability for the Abuse Claims will be channeled to the trust and liquidated under a TDP; that various assets will be contributed to the trust, including cash, property, and potential causes of action against insurers for coverage; and that the Abuse Claims, in whatever amounts those Claims may ultimately be allowed, will be paid a pro rata share of whatever amounts are realized from the trust's assets.[8] The plan includes no provision obligating the Debtors, after confirmation, to contribute any additional funding to the trust.  As long as the Debtors can afford to make their initial (and only)

---

[8]     *See Second Amended Chapter 11 Plan Of Reorganization For Boy Scouts Of America And Delaware BSA, LLC* [D.I. 2592] ("**Plan**"), at Art. III.B.8, Art. Art. IV, V.M & Ex. A (trust distribution procedures).

contribution to the trust, it does not matter how large or small the aggregate Abuse Claims prove to be.  *See Dow*, 211 B.R. at 568-569 (denying estimation of mass-tort claims because estimation was not necessary to determine whether plan was feasible; no matter how large the debtor's liability was, the plan was feasible because debtor had financial ability to make its one-time, capped, contribution to trust).

22.    Nor is it evident that an estimation of the Abuse Claims will be needed to evaluate whether the plan unfairly discriminates against the Abuse Claimants, as compared to other unsecured creditors, under 11 U.S.C. § 1129(b)(1).  Mot. at 4, 13-14.  That issue will never arise if the class of Abuse Claims votes to accept the plan, since the unfair discrimination test applies only to impaired classes that have rejected the plan.  *See* 11 U.S.C. § 1129(b)(1).  And even if the issue arises, the general unsecured claims are relatively small, estimated by the Debtors to total only $26.5 million to $33.5 million, and thus even if some portion of the funds allocated under the plan to pay those claims ($25 million) were re-allocated to the Trust for pro rata distribution among the Abuse Claims, the Abuse Claimants would be unlikely to fare meaningfully better.[9]

23.    An estimation of the Abuse Claims also is not necessary to determine whether the plan satisfies the "best interests of creditors" test.  Mot. at 4, 13, 15.  That issue, too, will arise only if one or more Abuse Claimants vote to reject whatever plan is ultimately submitted to them for acceptance.  *See* 11 U.S.C. § 1129(a)(7)(A).  And in any event, the "best interests" test compares a rejecting creditor's recovery under the plan with its recovery in a hypothetical liquidation of the debtor under chapter 7 of the Bankruptcy Code.  *See id.*  If their validity is assessed fairly, the Abuse Claims—whatever they are—should be the same in both a reorganization and a liquidation.  The only thing that should potentially change is the *assets* that

---

[9]    *See* Disclosure Statement at 22; Plan Art. III.B.6 (treatment of general unsecured claims).

are available to pay those claims under the plan, versus the assets that would be available in a

liquidation.  Thus, any comparison under Section 1129(a)(7) of potential recoveries under a plan

to recoveries in a liquidation will turn on the relative amount of assets that are available under

those two scenarios, not on the amount of the Abuse Claims.

24.    Finally, an estimation of the Abuse Claims against the Debtors is also unlikely to

be necessary to resolve potential objections by Abuse Claimants to a channeling injunction.  This

issue also may not arise, either because the plan on which votes are ultimately solicited does not

contain such a channeling injunction, or because Abuse Claimants accept the plan by the

required vote.  *See In re Exide Techs.*, 303 B.R. 48, 74 (Bankr. D. Del. 2003).  And, even if an

evaluation of the contribution to be made by the local councils or other third parties is required,

that evaluation would not be an estimation under Section 502(c).  Asking the Court to evaluate

the Abuse Claimants' potential state-law claims against *non-debtors* for those non-debtors' own

liability for the Abuse Claims has nothing to do with estimating any creditor's "claim" against

the *debtor* "for purposes of allowance under … section [502]" of the Bankruptcy Code, which is

all that Section 502(c) permits.[10]

25.    In the end, the only thing that Movants' proposed "estimation" would accomplish

is to multiply the expense and length of these bankruptcy cases—precisely the opposite of

---

[10]    Movants' cases are inapposite.  Those cases either (1) concern different issues not presented here, like estimations done to resolve pending plan objections, *see supra* pp.9-10; (2) simply restate the statutory requirements for estimation under Section 502(c); or (3) are otherwise distinguishable.  For example, many of the "estimation" decisions that Movants cite did not, in fact, conduct an estimation at all.  *See, e.g.*, *Order Terminating Estimation Proceedings* at 3-4, *In re PG&E Corp.*, No. 3:19-cv-05257-JD (N.D. Cal. June 9, 2020), Dkt. No. 387 (terminating estimation proceeding without conducting any estimation of mass-tort wildfire claims at all); *In re Roman Catholic Archbishop of Portland in Or.*, 339 B.R. 215, 223-224 (Bankr. D. Or. 2006) (court did not conduct any estimation of mass-tort sexual-abuse claims and deferred consideration of estimation for later proceedings); *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1011-1012 (4th Cir. 1986) (court affirmed order transferring venue of certain tort lawsuits, not an estimation of mass-tort personal-injury claims, and merely noted in dicta, in accordance with Section 502(c)'s plain language, that estimation is appropriate where it is done "for purpose of *allowance* if failure to do so 'would unduly delay the administration of the case'" (emphasis added)).

Section 502(c)'s purpose of avoiding "undue delay."  Movants assert that estimation will facilitate a consensual resolution of these bankruptcy cases, contending that the primary reason mediation has been unsuccessful is that the parties—the Debtors and insurers, on the one hand, and Movants on the other—disagree about the validity and amount of the Abuse Claims.  Mot. ¶¶ 2-3.  They add that estimation will "test … insurers' contention that not all proofs of claim are valid."  *Id.* ¶ 9.  But Movants' proposed estimation procedures are designed to do precisely the opposite.  Among other things, those procedures would limit discovery to a sample of Abuse Claims *selected by Movants*, while the insurers would be denied any right to object or to take discovery from any other claimant.  The result would be an "estimation" of aggregate liability in which no one would have any faith.  The parties would be no closer to consensus.  The "estimation" Movants seek would simply delay these bankruptcy proceedings and add to the more than $100 million in professional fees that the Debtors' estates have incurred in these cases.

### C.    The Motion Is An Improper Attempt To Prejudice Insurers In State-Court Coverage Litigation

26.    That Movants are unable to identify any legitimate bankruptcy purpose for the "estimation" they request is not surprising.  Movants do not seek an estimation for the purpose of allowance under Section 502(c) or for any plan-confirmation purpose under Section 1129.  Rather, Movants' actual objective is to obtain an order that they will then parade in state court in subsequent insurance-coverage litigation as a supposed adjudication by this Court of the Debtors' aggregate liability and that of the non-debtor local councils and sponsoring organizations, by policy year, for the Abuse Claims—even though no court will have vetted the validity of a single Abuse Claim.

27.    Movants are following a well-worn playbook in which plaintiffs' lawyers have sought to misuse bankruptcy court "estimations" in subsequent coverage litigation in other

courts. *Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, 135 Cal. Rptr. 3d 716 (Ct. App. 2006), is a prime example. There, the debtor and asbestos claimants negotiated a Chapter 11 plan that allowed present and future asbestos claims in an aggregate amount determined according to the plan's claim-resolution procedures. *See id.* at 722-724. The plan included purported "insurance neutrality" language, and claimants' counsel represented to the Delaware bankruptcy court at the plan-confirmation hearing that the plan would have no effect on any coverage litigation. But, once the bankruptcy court had confirmed the plan, the plaintiffs reneged on their representation and argued in a subsequent coverage action in California state court that the plan was a "final adjudication that established [the debtor's] liability to asbestos claimants and therefore obligated [insurers] to pay the full ALV [allowed liquidated value of the asbestos claims] established by the bankruptcy court." *Id.* at 726. Remarkably, the state trial court agreed. *Id.* at 726-727. Fortunately, a state appellate court saw through the plaintiffs' tactics and reversed the trial court's judgment. *Id.* at 731-746. The court explained: "While calculating the aggregate value of present and potential future claims is helpful and often necessary in other contexts, no authority exists for utilizing such a valuation to affix an insurer's indemnity obligations. To the contrary, cases addressing the concept of aggregation in the bankruptcy context repeatedly reaffirm its limited scope and purpose. … [A]sbestos claim estimation … is not to determine liability and … does not reflect the amount that will be paid to the asbestos claimants" but instead, "consistent with the limited role of bankruptcy claim estimation," only … assists in formulating a reorganization plan." *Id.* at 742-744.

28.     It is clear that Movants are seeking to follow the same script here, hoping that they can misuse an "estimation" to avoid the need ever to prove the validity of any Abuse Claim and to prejudice insurers in state-court coverage litigation, as in *Fuller-Austin*. That is the reason

Movants are requesting an estimation of the Debtors' aggregate liability *by year*. Mot. at 16. Because different insurers issued policies for different years in which the Boy Scouts operated, Movants want an estimate of the Boy Scouts' total liability by year to try to use that estimate in subsequent coverage litigation against particular carriers that issued policies for that year. Indeed, Movants admit as much, asserting that "a year-by-year estimation—of the sort we propose—will permit the Abuse Claim liability to be matched to the appropriate insurer(s) and policy(ies) of the BSA and/or the local councils," which will purportedly "resolv[e] ancillary disputes with and among the insurers about who is liable for what" and "solv[e] for such coverage disputes." Mot. at 16. Such an estimate by year would be wholly unnecessary if Movants' real objective were to assess the allowability of any Abuse Claim, to determine whether a plan was feasible, or any other legitimate bankruptcy purpose.

29.     That Movants invoke Section 502(c), a provision focused on the "allowance" of creditor claims in bankruptcy, as the basis for their Motion is rich with irony. Movants do not want to allow this Court, or any other, to consider whether any of the 85,000 Abuse Claims, first filed after for-profit claims aggregators engaged in their massive advertising effort in these bankruptcy cases, are valid. Instead, they want this Court to "estimate" the Boy Scout's aggregate liability in the hope that such an "estimation" will *prevent* any court from ever scrutinizing the allowability of any individual Abuse Claim.

30.     In short, Movants seek an estimation that not only fails to satisfy any of Section 502(c)'s requirements but is at war with its statutory purpose, serves no other legitimate bankruptcy objective, and, instead, is designed to prejudice the insurers in future, state-law coverage litigation by preventing any court from scrutinizing any Abuse Claim. The Motion should be denied.

### D.    The "Estimation" Procedures Are Improper

31.    Even if the Motion had any merit, the proposed "estimation" procedures would need to be substantially revised.  There is no semblance of fairness or due process in what is proposed.

32.    For example, the proposed procedures would require parties in interest either to agree to be bound as a "party" to the proceeding or be barred from presenting any evidence. Mot. Ex. A (Proposed Order) ¶ 3(a) & Ex. B.  That is a transparent attempt to set up an argument by Movants in subsequent coverage litigation that the insurers were parties to the "estimation" and therefore should be bound by this Court's supposed adjudication of the Debtors' liability. The proposed procedures also would require the insurers to produce information showing all amounts paid to settle or satisfy sexual-abuse claims.  *Id.* Ex. A (Proposed Order) ¶ 3(c).  Those settlements are subject to confidentiality agreements and have little relevance—historical settlements of different claims in the past say nothing about the validity or amount of the claims that are currently alleged against the Boy Scouts—and would serve only to skew purported claim values upwards, since thoroughly vetted, more meritorious claims are often settled while less meritorious ones are typically dismissed without payment or settled for a nominal amount.[11] Worse, the "estimation" procedures would limit discovery solely to a purportedly "representative sample of claimants" cherry-picked by the Movants, while the insurers would be denied any right to object to Movants' sample or to propose their own sample.  *Id.* ¶ 3(d).  And, under Movants' proposed procedures, all fact and expert discovery would be completed in barely two

---

[11]    The least meritorious claims may not have been asserted at all outside of these Chapter 11 Cases, which have combined (i) a massive advertising effort by plaintiffs' counsel and (ii) the suggestion by plaintiffs' counsel that every Abuse Claim will be liquidated without any judicial scrutiny thereof pursuant to a TDP.

months, with all trial motions, motions in limine and the like completed within a few weeks after that. *Id.* ¶ 3(d)-(j).

33.     All of these procedures are plainly designed to rig the "estimation" proceeding against the insurers.  Discovery is limited to a sample of claimants hand-picked by the Movants to generate a predetermined result.  The procedures do not allow other parties in interest, including the insurers, to object to the Movants' sample or to propose their own sample of claimants.  Similarly, the estimation motion is rife with improper provisions, including the requirements that the insurers file notices as "participating parties" that Movants can tout in coverage court as the insurers' supposed agreement to be "bound" by the estimation and that the insurers produce confidential and irrelevant information on historical settlements.  And, if there is to be a comprehensive estimation, there needs to be real due process with a realistic time frame, not the truncated process and schedule that Movants propose.  *See Dow*, 211 B.R. at 563 ("[R]egardless of the estimation method selected, for the process to have any semblance of fairness it will necessarily involve hearings that would be quite lengthy and protracted. … Considering the magnitude of the claims involved and the absolute importance of rendering a fair and accurate decision, the Court cannot countenance a valuation procedure that would place artificial time constraints on the parties' ability to properly present their cases."); *Garlock*, 504 B.R. at 74 (issuing estimation decision more than a year and a half after ordering estimation and noting the proceeding took 17 trial days); Case Management Order for Estimation of the Debtor's Liability for Mesothelioma Claims, *In re Bestwall LLC*, No. 17-31795 (Bankr. W.D.N.C. Mar. 31, 2021), Dkt. No. 1685 (estimation schedule exceeding one year).

34.     Finally, any order must include provisions making clear that any "estimation" of the Debtor's aggregate liability for the Abuse Claims is not a finding or adjudication by the

Court of the Debtors' liability for any individual Abuse Claim and that the so-called "estimate"

is not "binding" on any insurer or a determination of any issue bearing on any insurer's coverage

liability.[12]  An "estimation" of the Debtors' "aggregate liability" for Abuse Claims, which does

not vet a single individual Abuse Claim, could not determine any issue of insurance coverage.

Hartford's policies, for example, generally obligate it to indemnify the insured only for specific

claims that the insured "shall become legally obligated to pay," not to indemnify the insured for

an "estimation" of "aggregate liability" untethered to any individual Abuse Claim.[13]  An

aggregate-liability estimation, even if broken down by year, would say nothing about whether or

when a particular claimant was abused or the amount the claimant is entitled to recover on

account of his claim, critical information needed to apply the terms of each insurer's insurance

policy.

35.     Such an "estimation" would certainly not be an "adjudication" of the Debtors'

liability for any individual Abuse Claim.  *See, e.g.*, *Kool, Mann, Coffee*, 300 F.3d at 348 ("an

Estimation Hearing has no legal effect other than establishing the approximate amount of the

claim that will be recognized in a reorganization"); *Armstrong*, 348 B.R. at 124, 134, 136

(aggregate-liability estimation is merely an "approximation" and "prediction of the amount of

liability [the debtor] will face," "not [a] search for mathematical precision, nor ultimate

certainty"); *Federal-Mogul*, 330 B.R. at 154-156 ("an estimation by definition, is an

approximation," made "for the limited purposes of plan formulation"; "it is important that we not

---

[12]     *See In re A.P.I., Inc.*, 331 B.R. 828, 846-47 (Bankr. D. Minn. 2005), *aff'd*, 2006 WL 1473004 (D. Minn. 2006) (holding that, at the plan confirmation stage, "at bare minimum this Court has the power to deny preclusive effect to the ostensible determinations that are to be made" by post-confirmation trust of asbestos claims "via the estimation of claims").

[13]     *See* Complaint ¶¶ 91-97, *Hartford Accident and Indemnity Co. v. Boy Scouts of Am.*, Adv. Proc. No. 20-50601-LSS, D.I. 1 (Bankr. D. Del. May 15, 2020).  Other insurers' policies are similar.  For example, many of AIG's policies contain comparable language, obliging AIG to indemnify the insured for "the ultimate net loss excess of the retained limit as hereinafter defined, which the Insured shall become legally obligated to pay as damages by reason of the liability imposed upon the Insured by law…."

pretend to have achieved mathematical accuracy"); *Roman Catholic Archbishop*, 339 B.R. at 224 (concluding estimation for plan-confirmation purposes can use "less exacting" methodologies because the "consequences" of "an erroneous estimation is much less serious"); *Dow*, 211 B.R. at 562-563 & n.16 (noting "very real concern that the estimates may prove to be inaccurate" and that the use of aggregate-liability estimations in the mass-tort context "rests on the shaky foundation that judges can accurately estimate the results of a series of extremely speculative problems"); *In re Bicoastal Corp.*, 122 B.R. 771, 774-775 (Bankr. M.D. Fla. 1990) ("[O]ne must draw a distinction between the estimation process of a claim and the adjudication process of the same.  There is no question that the estimation of claims in bankruptcy does not establish a binding legal determination of the ultimate validity of a claim nor a binding determination of any issues.").

## **CONCLUSION**

Certain Insurers respectfully request that the Court deny the Motion and enter such other relief as the Court deems proper.

BAYARD, P.A.

/s/ Erin R. Fay
Erin R. Fay (No. 5268)
Gregory J. Flasser (No. 6154)
600 North King Street, Suite 400
Wilmington, Delaware 19801
Telephone:  (302) 655-5000
Facsimile:  (302) 658-6395
Email:  efay@bayardlaw.com
           gflasser@bayardlaw.com

- and -

James P. Ruggeri (admitted *pro hac vice*)
Joshua D. Weinberg (admitted *pro hac vice*)
SHIPMAN & GOODWIN LLP
1875 K Street, NW, Suite 600
Washington, D.C. 20003
Tel:  (202) 469-7750
Fax:  (202) 469-7751

- and -

Philip D. Anker (admitted *pro hac vice*)
WILMER CUTLER PICKERING HALE AND
DORR LLP
7 World Trade Center
250 Greenwich Street
New York, N.Y. 10007
Tel:  (212) 230-8890
Fax:  (212) 230-8888

Danielle Spinelli (admitted *pro hac vice*)
Joel Millar (admitted *pro hac vice*)
WILMER CUTLER PICKERING HALE AND
DORR LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C.  20006
Tel:  (202) 663-6000
Fax:  (202) 663-6363

*Attorneys for First State Insurance Company,
Hartford Accident and Indemnity Company and
Twin City Fire Insurance Company*

CHOATE, HALL & STEWART, LLP
Douglas R. Gooding (admitted *pro hac vice*)
Jonathan D. Marshall (admitted
*pro hac vice*)
Two International Place
Boston, MA 02110
Telephone: (617) 248-5000
dgooding@choate.com
jmarshall@choate.com

-and-

Kim V. Marrkand (admitted *pro hac vice*)
Laura Bange Stephens (admitted *pro hac vice*)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
AND POPEO PC
One Financial Center
Boston, MA 0211
Telephone: (617) 542-6000
kmarrkand@mintz.com
lbstephens@mintz.com

*Counsel to Liberty Mutual Insurance Company*

REGER RIZZO & DARNALL LLP
Louis J. Rizzo, Jr., Esquire (#3374)
1521 Concord Pike, Suite 305
Brandywine Plaza West
Wilmington, DE 19803
(302) 477-7100
Email:  lrizzo@regerlaw.com

*Attorney for Defendants, Travelers Casualty
and Surety Company, Inc. (f/k/a Aetna Casualty
& Surety Company), St. Paul Surplus Lines
Insurance Company and Gulf Insurance
Company*

SMITH, KATZENSTEIN & JENKINS LLP
Kathleen M. Miller (No. 2898)
1000 West Street, Suite 501
P.O. Box 410
Wilmington, DE 19899
Telephone: (302) 652-8400
kmiller@skjlaw.com

WILEY REIN LLP
Gary P. Seligman (admitted pro hac vice)
Ashley L. Criss (admitted pro hac vice)
1776 K Street NW
Washington, DC 20006
gseligman@wiley.law
acriss@wiley.law

*Attorneys for General Star Indemnity Company*

Robert D. Cecil, Jr.  (No. 5317)
TYBOUT, REDFEARN & PELL
P.O. Box 2092
Wilmington, Delaware  19899-2092
Phone:  (302) 658-6901
Fax:      (302) 658-4018
E-mail:  rcecil@trplaw.com

Mark D. Plevin (admitted pro hac vice)
CROWELL & MORING LLP
Three Embarcadero Center, 26th Floor
San Francisco, California  94111
Phone:  (415) 986-2800
Fax:      (415) 986-2827
E-mail:  mplevin@crowell.com

Tacie H. Yoon  (admitted pro hac vice)
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C.  20004
Phone:  (202) 624-2500
Fax:      (202) 628-5116
Email:  tyoon@crowell.com

*Attorneys for American Zurich Insurance
Company, American Guarantee and Liability
Insurance Company, and Steadfast Insurance
Company*

FINEMAN KREKSTEIN & HARRIS PC
Deirdre M. Richards (DE Bar No. 4191)
1300 N. King Street
Wilmington, DE 19801
Telephone:      (302) 538-8331
Facsimile:      (302) 394-9228
Email: drichards@finemanlawfirm.com

-and-

FORAN GLENNON PALANDECH PONZI &
RUDLOFF P.C.
Susan N.K. Gummow (admitted pro hac vice)
222 N. LaSalle St., Suite 1400
Chicago, Illinois 60601
Telephone:    (312) 863-5000
Facsimile:    (312) 863-5009
Email: sgummow@fgppr.com

-and-

GIBSON, DUNN & CRUTCHER LLP
Michael A. Rosenthal (admitted pro hac vice)
James Hallowell (admitted pro hac vice)
Keith R. Martorana (admitted pro hac vice)
200 Park Avenue
New York, New York 10166
Telephone:    (212) 351-4000
Facsimile:    (212) 351-4035
Email: mrosenthal@gibsondunn.com
          jhallowell@gibsondunn.com
          kmartorana@gibsondunn.com

-and-

GIBSON, DUNN & CRUTCHER LLP
Matthew G. Bouslog (admitted pro hac vice)
3161 Michelson Drive
Irvine, California 92612
Telephone:    (949) 451-3800
Facsimile:    (949) 451-4220
Email: mbouslog@gibsondunn.com

*Attorneys for the AIG Companies*

Michael J. Joyce (No. 4563)
The Law Offices of Joyce, LLC
1225 King Street, Suite 800
Wilmington, DE 19801
 (302)-388-1944
mjoyce@mjlawoffices.com

-and-

25

Kevin T. Coughlin (Admitted *Pro Hac Vice*)
Lorraine M. Armenti (Admitted *Pro Hac Vice*)
Michael E. Hrinewski (Admitted *Pro Hac Vice*)
Coughlin, Midlige & Garland, LLP
350 Mount Kemble Ave.
PO Box 1917
Morristown, NJ 07962
973-267-0058 (Telephone)
973-267-6442 (Facsimile)
larmenti@CMG.law

*Attorneys for Arrowood Indemnity Company,*
*formerly known as Royal Indemnity Company*

TROUTMAN PEPPER HAMILTON SANDERS LLP
David M. Fournier (DE No. 2812)
Marcy J. McLaughlin Smith (DE No. 6184)
Hercules Plaza
1313 Market Street
Suite 5100
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone:      302.777.6500
Facsimile:      302.421.8390

-and-

Harris B. Winsberg (admitted *pro hac vice*)
Matthew G. Roberts (admitted *pro hac vice*)
Bank of America Plaza
600 Peachtree Street NE
Suite 3000
Atlanta, GA  30308-2216
Telephone:      404.885.3000
Facsimile:      404.885.3900

-and-

NICOLAIDES FINK THORPE MICHAELIDES
SULLIVAN LLP
Matthew S. Sorem (admitted *pro hac vice*)
10 S. Wacker Dr.
21st Floor
Chicago, IL 60606
Telephone:      312.585.1433
Facsimile:      312.585.1401

-and-

MCDERMOTT WILL & EMERY LLP
Margaret H. Warner (admitted *pro hac vice*)
Ryan S. Smethurst (admitted *pro hac vice*)
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001-1531
Telephone:     202.756.8228
Facsimile:     202.756.8087

*Attorneys for Allianz Global Risks US*
*Insurance Company*

TROUTMAN PEPPER HAMILTON SANDERS LLP
David M. Fournier (DE No. 2812)
Marcy J. McLaughlin Smith (DE No. 6184)
Hercules Plaza
1313 Market Street
Suite 5100
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone:     404.885.3000
Facsimile:     404.885.3900

-and-

Harris B. Winsberg (admitted *pro hac vice*)
Matthew G. Roberts (admitted *pro hac vice*)
Bank of America Plaza
600 Peachtree Street NE
Suite 3000
Atlanta, GA  30308-2216
Telephone:     404.885.3000
Facsimile:     404.885.3900

-and-

BRADLEY RILEY JACOBS PC
Todd C. Jacobs (admitted *pro hac vice*)
John E. Bucheit (admitted *pro hac vice*)
500 West Madison Street
Suite 1000
Chicago, IL 60661
Telephone:    312.281.0295

*Attorneys for National Surety Corporation and Interstate Fire & Casualty Company*

BODELL BOVÉ, LLC
Bruce W. McCullough  (No.  3112)
1225 N. King Street, Suite 1000
P.O. Box 397
Wilmington, DE 19899-0397
Telephone: (302) 655-6749,
Facsimile: (302) 655-6827
Email: bmccullough@bodellbove.com

- and -

CLYDE & CO US LLP
Bruce D. Celebrezze (pro hac vice)
Four Embarcadero Center, Suite 1350
San Francisco, CA 94111
Telephone:  (415) 365-9800
Facsimile:  (415) 365-9801
Email:    bruce.celebrezze@clydeco.us

Konrad R. Krebs (pro hac vice)
200 Campus Drive, Suite 300
Florham Park, NJ 07932
Telephone:  (973) 210-6700
Facsimile:  (973) 210-6701
Email:    konrad.krebs@clydeco.us

- and -

DAVID CHRISTIAN ATTORNEYS LLC
David Christian (pro hac vice)
105 W. Madison St., Suite 1400
Chicago, IL 60602
Telephone: (862) 362-8605
Email: dchristian@dca.law

*Attorneys for Agricultural Insurance Company,
Agricultural Excess and Surplus Insurance
Company, and Great American E&S Insurance
Company*

Matthew G. Summers (DE No. 5533)
Chantelle D. McClamb (DE No. 5978)
BALLARD SPAHR LLP
919 N. Market Street, 11th Floor
Wilmington, Delaware 19801-3034
Telephone: (302) 252-4428
Facsimile: (302) 252-4466
E-mail: summersm@ballardspahr.com
        mcclambc@ballardpshar.com

-and-

Harry Lee*
John O'Connor*
Brett Grindrod*
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC 20036
Telephone: (202) 429-8078
Facsimile: (202) 429-3902
E-mail:  hlee@steptoe.com
        joconnor@steptoe.com
        bgrindrod@steptoe.com
(*Admitted pro hac vice)

*Attorneys for Clarendon America Insurance
Company*

Goldstein & McClintock LLLP
Maria Aprile Sawczuk (DE #3320)
501 Silverside Road
Wilmington, DE 19809
302-444-6710
marias@goldmclaw.com

-and-

Laura McNally
Emily Stone
Loeb & Loeb LLP
321 N. Clark Street, Suite 2300
Chicago, IL 60654
312-464-3155
lmcnally@loeb.com
estone@loeb.com

*Attorneys for The Continental Insurance*
*Company and Columbia Casualty Company*