# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>Hearing Date: April 29, 2021 at 10:00 a.m.<br><br>Re Docket Nos. 2411 & 2506 |

**OBJECTION OF THE COALITION OF
ABUSED SCOUTS FOR JUSTICE AND FUTURE CLAIMANTS'
REPRESENTATIVE TO DEBTORS' THIRD MOTION FOR ENTRY OF
AN ORDER EXTENDING THE DEBTORS' EXCLUSIVE PERIOD TO FILE
A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF [D.I. 2411]**

The Coalition of Abused Scouts for Justice (the "Coalition") and James L. Patton, Jr., the Future Claimants' Representative (the "FCR"), by their undersigned counsel, hereby submit this objection (the "Objection") to *Debtors' Third Motion for Entry of an Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* (the "Motion") [Docket No. 2411] and joinder to the Objection [Docket No. 2506] filed by the Official Committee of Tort Claimants' (the "TCC") to the Motion. In support of this Objection, the Coalition and the FCR respectfully state as follows:

## JOINDER

**A.    The Coalition and the TCC Do Not Support the Global Resolution Plan**

1.    The Debtors have claimed that providing equitable compensation to survivors is a

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

priority. But the Debtors' Plan[2] makes paying every creditor constituency in full or substantially in full a priority *except* for the survivors. The Plan permits the Debtors and Local Councils to retain billions of dollars in real estate for themselves while survivors receive pennies on the dollar.

2. The Coalition and the FCR do not support the Global Resolution Plan, nor does the TCC. If the Court permits the Debtors to solicit votes (which would be a colossal waste of estate assets, further reducing assets available for survivors), the Plan could set a record for both the highest number and highest percentage of tort victims to vote down a chapter 11 plan. The Coalition and the FCR estimate that "no" votes could exceed 95% of holders of Direct Abuse Claims that vote. The Global Resolution Plan is not an option.

B. **The Debtors' Deal with Hartford Is Unconscionable**

3. The TCC estimates that the Debtors have billions of dollars in liability for Direct Abuse Claims. *See* Dkt. No. 2506.[3] The Coalition estimates that there are at least ▓▓▓ Direct Abuse Claims that implicate Hartford's policies and that Hartford's liability for Direct Abuse Claims against the Debtors during its policy periods exceeds ▓▓▓.

4. Yet, the Debtors recently filed a Notice which set forth a settlement with Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company and Navigators Specialty Insurance Company (collectively, "Hartford") for a face amount of $650 million (subject to reductions). *See* Mediators' Report [Dkt. No. 2624] at Ex. A (the "Hartford Settlement Agreement"). This settlement was negotiated in secret between the Debtors and Hartford, without the participation let alone the approval of any of the survivor

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the *Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* ("Plan") [Dkt. No. 2592].

[3] While the FCR has not taken a position on the Debtors' total liability for Direct Abuse Claims, under any circumstance it would exceed by many times the Debtors' estimate.

2

constituencies: the Coalition, the TCC, or the FCR. If Hartford paid $650 million, this settlement would compromise one of the Debtors' most valuable assets for, what the Coalition has determined, is a small percentage— ▮▮▮ —of its actual value.

5. But the Hartford settlement is even worse than this, and it is important for the Court to understand that ***none*** of these survivor constituencies support this "fire sale" settlement by the Debtors. The Hartford Settlement Agreement includes a reduction clause tied to Century Indemnity Company ("Century"), the operation of which makes the Debtors' much publicized $650 million settlement number an illusion, a waste of resources, and an insult to survivors. *Id.* at § II.E (the "Century Clause").

6. Pursuant to the Century Clause, if the Debtors (or the Settlement Trust) execute a settlement with Century for less than $1.3 billion, the Hartford settlement will be reduced, dollar for dollar, by 50% of the difference between $1.3 billion and the amount payable by Century. Thus, for example, if Century settles for $561 million, Hartford's settlement will be reduced by $369.5 million ($1.3 billion *less* $561 million x 50%), making Hartford's settlement worth $280.5 million or, what the Coalition has determined, is a minimal percentage— ▮▮▮ —of the actual value of the Hartford policies.

C. **As the Debtors Well Know, Century May Lack the Ability to Pay $1.3 Billion**

7. The use of a $561 million Century settlement in the example above is not random. The Century policies at issue were originally issued by Insurance Company of North America and Indemnity Insurance Company of North America (collectively, "INA" and the "INA Policies").

8. In 1995 and 1996, INA Financial Corporation and its subsidiaries (which included INA) underwent a restructuring that moved INA's obligations for certain policyholders into an

3

inactive run-off company that is now called Century Indemnity Company and that allowed a resulting company called INA to continue to actively issue insurance policies.

9. In 1999, ACE Limited acquired INA Financial Corporation and its subsidiaries. In January 2016, ACE Limited acquired Chubb creating a global insurance company that operates under the "Chubb" name. Chubb Limited is the ultimate parent company.

10. As a result of the 1996 and 1999 transactions, it is the Coalition's and the FCR's belief that Chubb (or one of its active insurance subsidiaries) and Century are both responsible for the INA Policies under which the Debtors are insureds. Chubb has sufficient assets to pay the coverage obligations arising under the INA Polies; however, ***Chubb and its active insurance subsidiaries that may be liable for the obligations of the INA Policies have not appeared in the Debtors' bankruptcy***.

11. Century has appeared. The Coalition and the FCR believe that if the documents surrounding the 1996 and 1999 transactions are disclosed, they will support the argument that both Chubb and Century are obligated to cover Abuse Claims. But these documents are a closely guarded secret. Absent an order compelling their disclosure, it is unlikely that Chubb or Century will produce them.

12. This is now a key issue, and one that the Debtors apparently failed to diligence before entering into the Hartford Settlement Agreement. If Century is solely responsible for the INA Policies, Hartford's settlement may not be worth anywhere near $650 million.

13. While Century's finances are opaque, its public filings for the fiscal year ending December 31, 2020 indicate that Century may only have $561 million in available assets unrelated to asbestos and environmental liability—far less than the $1.3 billion referenced in the Century

Clause.[4]  If Century were to settle for the entirety of this $561 million in available assets, Hartford's obligation could be reduced to $280.5 million.

14.     Absent full disclosure by Chubb with information to the contrary, ***$280.5 million***, not the $650 million number that was advertised by the Debtors, should be the presumptive (but still not certain) face value of the Debtors' settlement with Hartford—a number that is far outside the range of reasonableness for a settlement that compromises Hartford's coverage obligations for Abuse Claims.

15.     Complicating matters further, the Century Clause includes a claw back mechanism that requires the Settlement Trust to pay Hartford if the Settlement Trust settles with Century for less than $1.3 billion.  The Settlement Trustee would arguably have to hold a significant portion of the Hartford settlement in reserve while it litigated with Chubb and Century, which litigation could last a decade, especially in light of the leverage that Hartford's settlement gives to Chubb and Century.  Many survivors who are now over 70 years old could be deceased before any meaningful distributions are made under the Debtors' Global Resolution Plan.

### D.     The Debtors Are Trying to Arm the Insurers with Tools to Avoid Paying Survivors Post-Confirmation

16.     Putting aside the Debtors proposed "fire sale" of one of their most valuable assets, the Plan may be even worse for survivors than the Hartford settlement suggests.  The Debtors appear to be working with their insurers to minimize the survivors' recovery and the Insurance Companies' coverage obligations.  This apparent fact follows from the Plan's Insurance Provisions

---

[4] Pages 299-301 of Chubb's Form 10-K for the fiscal year ending December 31, 2020 reflect $227 million available pursuant to an Aggregate Excess of Loss Reinsurance Agreement; $25 million available in Capital Surplus (as required by the 1996 transaction ); and $50 million in current Dividend Retention Fund Balances. Page 52 indicates that Chubb increased reserves by $259 million for abuse claims (which would not be limited to BSA abuse claims or limited to Century's exposure).  The amount of solvent reinsurance available for non-aggregated claims (like abuse claims) also is unclear.  Discovery is necessary for the Coalition to determine the current amount of Century's available assets.

which are inspired by two California decisions that permitted insurers to use the happenstance of their insureds' bankruptcies to avoid their coverage obligations.

17. Courts, including Circuit and District Courts alike, hold that an insurer may not profit from the bankruptcy of its insured. *See*, *e.g.*, *Matter of Edgeworth*, 993 F.2d 51, 54 (5th Cir. 1993); *UNR Indus., Inc. v. Cont'l Cas. Co.*, 942 F.2d 1101, 1105 (7th Cir. 1991); *In re Jet Fla. Sys., Inc.*, 883 F.2d 970, 975 (11th Cir. 1989); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Porter Hayden Co.*, No. 03-3408, 2012 WL 734176, at *3 (D. Md. Mar. 6, 2012); *ARTRA 542(g) Asbestos Trust v. Fairmont Premier Ins. Co.*, No. 09-cv-458, 2011 WL 4684356, at *2 (N.D. Ill. Sep. 30, 2011).[5] These cases reflect the obvious fact that "it makes no sense to allow an insurer to escape coverage for injuries caused by its insured merely because the insured receives a bankruptcy discharge." *Matter of Edgeworth*, 993 F.2d at 54.

18. One of these cases, *UNR Industries* from the Seventh Circuit, is instructive here. The debtor in *UNR Industries* confirmed a plan that would pay the debtor's tort liability through a plan-created trust. 942 F.2d at 1104. Post-confirmation, the debtor's insurers argued that their coverage obligations were based on the amount the trust was able to pay victims (from the trust's limited assets) and not the victims' actual damages, as determined under a court-approved settlement. *See id.*

19. The Seventh Circuit rejected the insurers' argument. It held that the insurers' obligations were based on the total damages owed by the insured to the victims—*i.e.*, the "merits of their claims"—and not an "arbitrarily discounted amount" paid by the trust on account of such

---

[5] *See also Chapman v. Bituminous Ins. Co. (In re Coho Res., Inc.)*, 345 F.3d 338, 343 (5th Cir. 2003) (stating that it would be "fundamentally wrong" to "allow an insurer to escape coverage for injuries caused by its insured merely because the insured receives a bankruptcy discharge") (citation omitted); *Tucker v. Am. Intern. Grp., Inc.*, 745 F. Supp. 2d 53, 65 (D. Conn. 2010) ("[C]ourts have 'reasoned that the insurance company should not be entitled to gain a benefit that was not intended or in any way computed within the rate charged for its policy.'" (quoting *In re Jet Florida*, 883 F.2d at 975)).

damages. *Id.* at 1005. The Seventh Circuit held that a contrary ruling would confer a "windfall" on the insurers "at the asbestos victims' expense" by permitting the insurers to "profit" from the bankruptcy. *Id.*

20. The District Courts in *Porter Hayden* and *ARTRA* reached the same conclusion, holding that an insured's bankruptcy does not release the insurer from liability and that the covered loss is based on the full measure of the tort victims' damages. *Porter Hayden*, 2012 WL 734176 at *3-4; *ARTRA*, 2011 WL 4684356 at *2.

21. Applied here, this principle means that the Debtors' obligation to pay Abuse survivors—*i.e.*, the full allowed amount of their claims as determined under the Trust Distribution Procedures—would be the "covered loss" for the purpose of determining the insurers' coverage obligations. The "covered loss" should equal the amount of the survivors' allowed claim—no matter whether the trust has enough assets to immediately pay the full amount of the allowed claim.

22. For example, if the Settlement Trust allowed a survivor's claim for $2.45 million, the insurers' obligations would be based on that amount and not on the limited assets initially available to the Settlement Trust to pay claims. This distinction is vital. Without the ability to recover the full $2.45 million from the appropriate insurers, the Settlement Trust could never recover enough assets to satisfy the survivors' actual claims, and the Settlement Trust could never make meaningful distributions to survivors.

23. The Debtors and their insurers know this principle. However, the Plan's Insurance Provisions mimic the provisions in *Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, 135 Cal. App. 4th 958 (Cal. Ct. App. 2006)—a state-court case from California that allowed insurers to escape their coverage obligations through the happenstance of the insured's bankruptcy.

24. In *Fuller-Austin*, after the debtor confirmed a plan that created a trust to pay tort claims, the debtor's insurers argued that their coverage obligations were based on payment percentages used by the trust to make interim distributions based on available assets, and not on the allowed amount of the victims' claims as determined under court-approved trust distribution procedures. *See id.* at 997-1000.

25. The *Fuller-Austin* insurers had an advantage—the plan's insurance provisions purported to not bind the insurers to findings made in the bankruptcy cases, *see id.* at 977, and made "no provision for" any "direct relationship between the amount that [insurers] paid into the trust and the amount that each [tort] victim will receive," *id.* at 999. Based on these plan provisions and after assessing California law and policy, the court held that the insurers' obligation to pay under their policies was the amount the trust paid to asbestos victims based on the trust payment percentage rather than the victims' actual damages. *See id.* at 997-89, 1000.

26. A decade later, after concluding that California law governed and that *Fuller-Austin* therefore controlled, the District Court in *Flintkote Co. v. Aviva PLC* held the same thing upending the recoveries of tort creditors in Flintkote's bankruptcy. 177 F. Supp. 3d 1165, 1178, 1181 (N.D. Cal. 2016). As the *Flintkote* court explained: "[I]f [t]he Trust assign[ed] a claim a nominal value of $184,000 [under the TDP] but the payment percentage is 8% [based on available trust assets], the amount [t]he Trust is obligated to pay the claimant is $14,720." *Id.* at 1168. Had Flintkote never filed for bankruptcy—or if its plan had been defeated—and Flintkote reached a settlement in the tort system for $184,000, the insurers would have been obligated to pay $184,000. The insurers used Flintkote's bankruptcy to reduce a $184,000 coverage obligation to a $14,720 coverage obligation solely on the basis of its insured's limited assets.

27. The effect of rulings in *Flintkote* and *Fuller-Austin* was a bankruptcy windfall for the insurers. *Flintkote* and *Fuller-Austin* were wrongly decided and are distinguishable on several grounds. But, the Debtors are aware of these cases—which is why it is so alarming to see the Debtors willingly include Insurance Provisions in the Plan that mirror *Flintkote* and *Fuller-Austin* and purport to exempt "otherwise applicable principles of *res judicata* or collateral estoppel from being applied against any Insurance Company with respect to any issues that is actually litigated by such Insurance Company." Plan at § X.M.4.

28. The Plan excludes the Insurance Companies from the parties that will be bound by the "Plan, the Plan Documents, and the Confirmation Order." *Id.* at § X.M.2. The Debtors are unwilling for the Insurance Companies to even be bound by "any estimation or valuation of Abuse Claims" wherein they appear, litigate against the Coalition, the FCR, and the TCC and do not prevail. *Id.* The Debtors' proposed Trust Distribution Procedures also appear to obfuscate the direct connection between insurance recoveries and payments to survivors. *See* Trust Distribution Procedures at §§ 6.2, 6.3 & 6.4.

29. Why would the Debtors do this? The Debtors are capitulating to their insurers' demands. If the Trust Distribution Procedures assign an Abuse Claim a value of $2.45 million but the initial payment percentage is 2% (because the trust is not adequately funded), the amount the Settlement Trust would be obligated to pay the Abuse survivor (at least initially) would be $49,000. In the insurers' perfect world, their obligation to pay the Settlement Trust would be pegged at $49,000 for the most horrific acts of rape against children even though this would mean that the Settlement Trust would never have sufficient assets to pay survivors in full or anywhere close to payment in full.

30. The Debtors' insurance assets are the key to confirming a plan. To confirm a plan with nonconsensual third-party releases, the Court must be able to find, as a factual matter, that the Abuse survivors are being paid in full or close thereto. *See In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 272 (Bankr. D. Del. 2017). This means that the Court must assess not only the value of the Abuse Claims, but also the value of the assets being assigned to the Settlement Trust. The only assets that could get the Settlement Trust anywhere close to being able to pay survivors in full are the Debtors' insurance assets.

31. Rather than proposing a plan that effectively monetizes these assets, the Debtors cut an unconscionable deal with Hartford and are proposing a Plan with Insurance Provisions that purport to exempt insurers from otherwise applicable principles of *res judicata* or collateral estoppel to improve the insurers' chances of avoiding their coverage obligations.

32. The insurers obviously do not have the right to appear, litigate, and lose and then pretend that that the whole thing never happened. The Insurance Provisions are an anathema to American jurisprudence, but when combined with the Hartford settlement, they speak a very simple truth about the Debtors' priorities in this case and undermine their public pronouncements of seeking to provide fair and equitable compensation to their victims.

### E.     The Debtors Can Reorganize and Treat Survivors Fairly

33. It is possible for the Debtors to reorganize and for survivors to receive fair compensation. ***These objectives have never been mutually exclusive***. The Coalition and the FCR hoped that the mediation would be successful and result in the Debtors proposing a plan that survivors could support. Given the Hartford settlement, the Global Resolution Plan is dead.

34. The language used in this Objection is as restrained as it can be. What the Court should hear and understand is genuine anger, if not rage, that survivors feel at the Debtors' conduct. Consider how the Debtors' Plan looks through the eyes of someone who was raped as a child.

35. The Debtors have spent over $100 million in professional fees. The Debtors and the Local Councils are proposing to retain billions of dollars in real estate and other assets for themselves. Executives get paid 95% of their claims. The Debtors are trying to compromise insurance assets worth billions for pennies on the dollar—a clear violation of their fiduciary duties to creditors. All the Debtors appear to care about is exiting bankruptcy quickly and getting the Debtors' decades of responsibility for the abuse of children out of the headlines, rather than seeking to compensate victims of wrongs committed on tens of thousands of children.

36. **Enough**. The time has come for a different approach. The Coalition, the FCR, and the TCC are discussing a plan that they would propose to save the Boy Scouts, provide meaningful compensation to survivors, and provide an opportunity for Local Councils and Chartered Organizations to make contributions and become Protected Parties. Help is on the way, but for a competing plan—which would be proposed and supported by the survivor community—to be filed, exclusivity must be terminated. This needs to happen immediately.

37. Even if exclusivity is not terminated now, the Global Resolution Plan is still dead. The Debtors are determined to go forward with their settlement with Hartford. The Coalition and the FCR will fight any plan that includes the Hartford settlement and the Insurance Provisions. The Coalition and the FCR are prepared, together with other survivor constituencies, to take all appropriate actions necessary to defeat the Global Resolution Plan and the BSA Toggle Plan.

38. The question is whether these survivor constituencies can go forward with a plan now or whether they must wait for the votes to be counted and for the Debtors to waste more

money that should be directed to survivors. For the sake of all parties in interest, now is the time to permit the Debtors' largest creditor constituency to move forward with a plan that can be confirmed. It is time to terminate exclusivity.

## CONCLUSION

WHEREFORE, the Coalition and the FCR request that the Court enter an order denying the Motion and granting the Coalition and the FCR such other and further relief as the Court deems just and proper.

Dated: April 22, 2021  
Wilmington, Delaware

MONZACK MERSKY AND BROWDER, P.A.

*/s/ Rachel B. Mersky*  
Rachel B. Mersky (DE No. 2049)  
1201 North Orange Street  
Suite 400  
Wilmington, Delaware 19801  
Telephone:  (302) 656-8162  
Facsimile:  (302) 656-2769  
E-mail:  RMersky@Monlaw.com

-and-

BROWN RUDNICK LLP  
David J. Molton, Esq.  
Eric R. Goodman, Esq. (admitted *pro hac vice*)  
Seven Times Square  
New York, NY 10036  
Telephone: (212) 209-4800  
E-mail: DMolton@BrownRudnick.com  
E-mail: EGoodman@BrownRudnick.com

and

Sunni P. Beville, Esq. (admitted *pro hac vice*)  
Tristan G. Axelrod, Esq. (admitted *pro hac vice*)  
One Financial Center  
Boston, MA 02111  
Telephone: (617) 856-8200  
E-mail: SBeville@BrownRudnick.com  
E-mail: TAxelrod@BrownRudnick.com

*Counsel to the Coalition of Abused Scouts for Justice*

and

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Robert S. Brady*
Robert S. Brady (Bar No. 2847)
Edwin J. Harron (Bar No. 3396)
Sharon M. Zieg (Bar No. 4196)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: rbrady@ycst.com
eharron@ycst.com
szieg@ycst.com

*Counsel to the Future Claimants' Representative*