## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | § | Chapter 11 |
| | § | |
| BOY SCOUTS OF AMERICA AND | § | Case No. 20-10343 (LSS) |
| DELAWARE BSA, LLC,[1] | § | |
| | § | (Jointly Administered) |
| Debtors. | § | |
| | § | **Related Docket No.: 2364** |

### JPMORGAN CHASE BANK, NATIONAL ASSOCIATION'S OBJECTION TO JOINT MOTION OF THE OFFICIAL TORT CLAIMANTS' COMMITTEE AND FUTURE CLAIMANTS' REPRESENTATIVE FOR ENTRY OF AN ORDER GRANTING STANDING AND AUTHORIZING THE PROSECUTION OF CERTAIN CHALLENGE CLAIMS ON BEHALF OF THE BANKRUPTCY ESTATES

JPMorgan Chase Bank, National Association ("JPM"), by and through its counsel, respectfully submits this objection (this "Objection") to the *Joint Motion of the Official Tort Claimants' Committee and Future Claimants' Representative for Entry of an Order Granting Standing and Authorizing the Prosecution of Certain Challenge Claims on Behalf of the Bankruptcy Estates* [Dkt. No. 2364] (the "Standing Motion"), and its proposed Complaint attached as Exhibit 1 (the "Proposed Complaint"), filed in the above-referenced chapter 11 cases commenced by Boy Scouts of America (the "BSA") and Delaware BSA, LLC (together, the "Debtors"). In support of this Objection, JPM respectfully represents as follows:

### Executive Summary

The Official Tort Claimants' Committee (the "Tort Committee"), and James L. Patton Jr., as Legal Representative for Future Claimants (the "FCR" and together with the Tort Committee,

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

the "Challenge Parties"), through the Proposed Complaint, seek derivative standing to prosecute

certain claims and causes of action against JPM and Arrow WV, Inc. ("Arrow").

Consideration of the Standing Motion at this time is premature.  Because the Debtors'

Second Amended Plan (defined below) provides for the settlement of all claims asserted by the

Challenge Parties in the Proposed Complaint, the Standing Motion should be heard in connection

with confirmation of the Second Amended Plan because if confirmed, the Standing Motion would

be rendered moot.

Should the Court decide to consider the Standing Motion as currently scheduled, it should

be denied for the following reasons, as described in greater detail below:

- First, the Challenge Parties cannot demonstrate that there are "colorable" claims
against JPM.  The conclusory allegations asserted in the Proposed Complaint do
not establish any grounds for derivative standing, and the Challenge Parties'
proposed claims are imprecise and fail to meet the bare-minimum, notice pleading
standard, much less the more stringent standard to obtain derivative standing.
Moreover, the Challenge Parties merely identify certain categories of
unencumbered value of which the Debtors and JPM are already aware, or that JPM
disagrees are unencumbered, and for which the Second Amended Plan already
accounts.  As set forth in greater detail herein, JPM stipulates to the unencumbered
nature of some of the categories of assets discussed in the Standing Motion, which
moots several of the requests set forth in the Proposed Complaint.[2]

- Second, the Standing Motion cannot satisfy the cost-benefit analysis required for
the Court to grant the Challenge Parties' request for derivative standing.  Because
there is little, to no, likelihood of success on the merits of the proposed claims, the
Challenge Parties cannot show that the prosecution of the Proposed Complaint will
afford any meaningful, tangible benefit to the Debtors' estates that justifies the
substantial costs, burdens, and delay that prosecution of the purported claims would
entail.  Indeed, the Challenge Parties are utterly silent on this issue and fail to satisfy
their burden that the pursuit of the proposed claims and causes of action is in the
best interests of the Debtors' estates.

- Third, the Challenge Parties cannot show a crucial prerequisite to derivative
standing, namely that the Debtors, in settlement with the official committee of

---

[2]   For the avoidance of doubt, all references herein to the nature of assets as encumbered or unencumbered are made
as of the Petition Date and without reference to the adequate protection liens granted under the Final Cash Collateral
Order (as defined herein).  Adequate protection liens exist on substantially all of the Debtors' assets, regardless of
whether such assets were unencumbered as of the Petition Date.

unsecured creditors (the "UCC"), abused their discretion in releasing estate claims against JPM under the Second Amended Plan, or that the Debtors' refusal to pursue the claims set forth in the Proposed Complaint is unjustified. The Challenge Parties' purported claims are neither colorable nor likely to succeed on the merits. But even if the Court somehow were to find some modicum of merit in the Proposed Complaint, the Challenge Parties have failed to demonstrate that the Debtors acted unreasonably in deciding not to pursue dubious claims against JPM in light of the benefits provided under the Second Amended Plan.

## Preliminary Statement

1.     The Challenge Parties have not and cannot satisfy their burden to obtain leave to file the Proposed Complaint. While the Challenge Parties correctly recite their burden to show (a) the existence of one or more colorable claims and (b) the Debtors' unreasonable refusal to pursue those claims, the Standing Motion and Proposed Complaint fall well short of establishing either of these two elements. First, the Proposed Complaint fails to meet the relevant pleading requirements such that it could survive a motion to dismiss. Second, the Standing Motion, despite acknowledging that determining whether refusal was unreasonable turns on the outcome of a cost/benefit analysis, offers no such analysis and fails to offer any evidence of unreasonableness. Accordingly, granting the Challenge Parties standing and allowing them to pursue the claims and causes of action set forth in the Proposed Complaint would be pure folly, a further waste of time and resources, and must be denied.

2.     Both the Debtors and the UCC carefully considered the Challenge Parties' proposed litigation alternative and determined that pursuing it was not in the best interests of the Debtors' estates. In the exercise of their reasonable business judgment, the Debtors negotiated with JPM and the UCC at arm's-length pursuant to a court-approved mediation process to avoid protracted and expensive litigation, increase the likelihood of success in these cases, and maximize value for creditors. Nothing in the Proposed Complaint changes that conclusion. Indeed, the central claims of the Proposed Complaint were not ignored by the Debtors or the UCC. Instead, the Debtors and

the UCC carefully considered claims against JPM and others and concluded that pursuing them would lead to no better (and more likely a worse) result for creditors. More importantly, the Challenge Parties should not be permitted to effectively propose their own plan through litigation during the Debtors' exclusivity period, a plan built on a foundation of speculative litigation, as opposed to the Debtors' path of reasonable compromise and settlement embodied in the Second Amended Plan, which is a far better result for the Debtors' estates.

3.      Finally, and perhaps most importantly, the larger context of these cases compels denial of the Standing Motion. The filing of the Standing Motion ultimately is an effort by the Challenge Parties to further delay the Chapter 11 Cases in the hope of extracting "hold-up" value, despite the fact that the value at the centerpiece of the Proposed Complaint (*i.e.*, the value of the Summit), is already being provided to holders of abuse clams under the terms of the Second Amended Plan. For these and other reasons, and as discussed in greater detail herein, the Court should deny the Standing Motion—and permit the Debtors, JPM, the UCC and other stakeholders to proceed with the critical task of successfully reorganizing the estates.

## **Jurisdiction and Venue**

4.      This Court has jurisdiction to consider this Objection pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and JPM confirms their consent, pursuant to Local Rule 9013-1(f), to the entry of a final order or judgment by the Court in connection with this Objection if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith

consistent with Article III of the United States Constitution.  Venue is proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

### A.    The Debtors' Prepetition Indebtedness to JPM and Collateral Grants.

5.    The following is a summary of the BSA's outstanding obligations (collectively, the

"Prepetition Obligations") to JPM:

| Description | Amount[3] | Interest Rate | Maturity |
|---|---|---|---|
| **2019 RCF Agreement** | | | |
| -    2019 Revolver | $0 | L + 125 | March 21, 2021 |
| -    2019 Letters of Credit | $61,542,720 | N/A | N/A |
| **2010 Credit Agreement** | | | |
| -    2010 Revolver | $25,212,317 | L + 125 | March 2, 2020 |
| -    2010 Term Loan | $11,250,000 | L + 100 | March 2, 2022 |
| -    2010 Letters of Credit | $44,299,743 | N/A | N/A |
| **2012 Bond Agreement** | $145,662,101 | 2.94% | March 9, 2022 |
| **2010 Bond Agreement** | $40,137,274 | 3.22% | November 5, 2020 |
| **Total Secured Debt** | **$328,104,155**[4] | | |

6.    Under each of the above-referenced agreements, the BSA is the borrower and JPM

is the sole secured lender or holder, as the case may be.  The Prepetition Obligations are secured

by the same collateral (collectively, the "Prepetition Collateral"), including (i) a first-priority lien

and security interest in the accounts (including certain property arising out of or otherwise relating

to such accounts, but excluding certain amounts payable the source of which is certain donor-

restricted funds), deposit accounts, securities accounts and investment property (each as defined

in Article 9 of the Uniform Commercial Code), and proceeds and products of any or all of the

---

[3]    Includes estimated amounts as of February 18, 2020.  Since the Petition Date, $10,000,000 was drawn on the 2019 Letters of Credit (defined below), resulting in corresponding increases and decreases in the 2019 Revolver (defined below) and the 2019 Letters of Credit, respectively.

[4]    These amounts include contingent, undrawn letters of credit under the 2019 RCF Agreement (defined below) and the 2010 Credit Agreement (defined below) totaling $105,842,463.

foregoing, of the Debtors and Arrow, (ii) a security interest and mortgage in and to (a) that certain parcel of real property owned by the BSA located at 1325 West Walnut Hill Lane, Irving, Texas 75038, together with the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and other improvements now or hereafter located thereon (the "Headquarters") and (b) certain of the BSA's high adventure facilities, including Florida Sea Base ("Sea Base"), Philmont Scout Ranch in New Mexico ("Philmont"), and the Northern Tier high adventure facility in Minnesota ("Northern Tier"), and (iii) a collateral assignment of that certain (a) *Loan Agreement* dated as of June 30, 2010, by and between Arrow, as borrower, and BSA, as lender (the "2010 Intercompany Loan"), as amended by that certain *First Amendment to Loan Agreement and Note* dated as of March 21, 2019 (the "Amended Intercompany Loan"), (b) *Promissory Note* dated as of June 30, 2010, issued by Arrow to the BSA in an original principal amount of $50,000,000 (the "2010 Intercompany Note"), as amended by that certain *Amended and Restated Promissory Note* dated as of March 21, 2019, issued by Arrow to the BSA in an original principal amount of $350,000,000 (the "Amended Intercompany Note"), and (c) *Credit Line Deed of Trust*, dated as of June 30, 2010, made and executed by Arrow, as grantor, to Leslie Miller-Stover, as trustee, for the benefit of the BSA (the "2010 Deed of Trust"), as amended by that certain *First Amendment to Credit Line Deed of Trust*, dated as of March 21, 2019 (the "Amended Deed of Trust"), which grants a security interest and mortgage in and to the Summit Bechtel Reserve in West Virginia (the "Summit" and collectively with Sea Base, Philmont, and Northern Tier, the "HABs"). The agreements summarized above and below (as amended or modified, together with any security, pledge, and guaranty agreements) are referred to herein as the "Prepetition Loan Documents."

i.    *The 2010 Credit Agreement.*

7.    On August 11, 2010, the BSA entered into that certain *Credit Agreement* dated as of August 11, 2010, by and between the BSA, as borrower, and JPM, as lender, as amended by that certain *First Amendment to Credit Agreement* dated as of November 5, 2010, that certain *Second Amendment to Credit Agreement* dated as of November 11, 2011, that certain *Third Amendment to Credit Agreement* dated as of March 9, 2012, that certain *Fourth Amendment to Credit Agreement* dated as of April 25, 2016, that certain *Fifth Amendment to Credit Agreement dated* as of March 2, 2017, that certain *Sixth Amendment to Credit Agreement* dated as of February 15, 2018, and that certain *Seventh Amendment to Credit Agreement*, dated as of March 21, 2019 (the "2010 Credit Agreement").

8.    The 2010 Credit Agreement has two components, a $75,000,000 revolving credit component (the "2010 Revolver") and a $25,000,000 term loan component (the "2010 Term Loan"). The 2010 Credit Agreement also allowed the BSA to request the issuance of letters of credit by JPM (the "2010 Letters of Credit"). The 2010 Revolver matured on March 2, 2020, while the 2010 Term Loan is scheduled to mature on March 2, 2022.

ii.    *The 2010 Bond Agreement.*

9.    On November 5, 2010, the BSA and Arrow entered into that certain *Bond Purchase and Loan Agreement* dated as of November 5, 2010, by and among the County Commission of Fayette County (West Virginia) in its capacity as the issuer (the "Bond Issuer"), JPM, the BSA and Arrow, as amended, restated, supplemented or otherwise modified from time to time (the "2010 Bond Agreement"), pursuant to which the Bond Issuer issued the Series 2010A Bonds in an aggregate principal amount of $50,000,000 and the Series 2010B Bonds in an aggregate principal amount of $50,000,000 (collectively, the "Series 2010 Bonds"), the proceeds of which

were loaned to the BSA.  The loans from the Bond Issuer to the BSA were evidenced by that certain *Promissory Note – 2010A* and that *certain Promissory Note – 2010B*, each executed by the BSA and payable to the order of the Bond Issuer, each in the original principal amount of $50,000,000, and each pledged by the Bond Issuer to JPM to secure the repayment of the Series 2010 Bonds.  On November 5, 2015, the BSA repaid the Series 2010A Bonds in full.

      *iii.*     *The 2012 Bond Agreement.*

      10.     On March 9, 2012, the BSA and Arrow entered into that certain *Bond Purchase and Loan Agreement* dated as of March 9, 2012, between the Bond Issuer, JPM, the BSA and Arrow, as amended, restated, supplemented or otherwise modified from time to time (the "2012 Bond Agreement"), pursuant to which the Bond Issuer issued the Series 2012 Bonds (the "Series 2012 Bonds") in an aggregate principal amount not to exceed $175,000,000, the proceeds of which were loaned to the BSA.  The loans from the Bond Issuer to the BSA were evidenced by that certain *Promissory Note – 2012*, executed by the BSA and payable to the order of the Bond Issuer in the principal amount of $175,000,000 and pledged by the Bond Issuer to JPM to secure the repayment of the Series 2012 Bonds.

      *iv.*     *The 2019 RCF Agreement.*

      11.     On March 21, 2019, the BSA entered into that certain *Credit Agreement*, dated as of March 21, 2019, by and between the BSA, as borrower, and JPM, as lender (the "2019 RCF Agreement"), pursuant to which JPM agreed to make revolving loans and other extensions of credit to the BSA.  The 2019 RCF Agreement, which matured on March 21, 2021, is a secured facility with a revolving component (the "2019 Revolver") and a component under which the BSA can

request the issuance of letters of credit by JPM, together in a maximum amount not to exceed $71,500,000 (the "2019 Letters of Credit").

       *v.*      *The Prepetition Security Agreement (2019).*

12.     The BSA's outstanding obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement and the 2019 RCF Agreement are secured *pari passu* by the "Collateral," as defined under that certain *Third Amended and Restated Security Agreement*, dated as of March 21, 2019, by and among the BSA and Arrow, as debtors, JPM, in its capacity as collateral agent, JPM, in its capacity as the lender under each of the 2010 Credit Agreement and the 2019 RCF Agreement, and as holder under each of the 2010 Bond Agreement and the 2012 Bond Agreement (the "Prepetition Security Agreement (2019)"), pursuant to which the BSA and Arrow granted collateral to JPM, which collateral as of such date included a first-priority lien and security interest in their accounts (including certain property arising out of or otherwise relating to such accounts, but excluding certain amounts payable the source of which is certain donor-restricted funds), deposit accounts, securities accounts and investment property (each as defined in Article 9 of the Uniform Commercial Code), and proceeds and products of any or all of the foregoing.

       *vi.*     *The Mortgages, Assignments and Deeds of Trust.*

13.     In addition to the Prepetition Security Agreement (2019), the BSA's outstanding obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement and the 2019 RCF Agreement are secured *pari passu* by: (i) the *Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing*, dated as of March 21, 2019, by and from the BSA, as mortgagor, and JPM, as mortgagee regarding Sea Base (the "Florida Sea Base Mortgage"); (ii) the *Assignment of Agreements, Licenses, Permits and Contracts*, dated as of

March 21, 2019, by and from the BSA, as assignor, and JPM, as assignee regarding Sea Base (the "Florida Sea Base Assignment"); (iii) the *Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing,* dated as of March 21, 2019, by and from the BSA, as assignor, and JPM, as assignee regarding the Headquarters (the "Headquarters Deed of Trust"); (iv) that certain *Assignment of Agreements, Licenses, Permits and Contracts*, dated as of March 21, 2019, by and from the BSA, as assignor, and JPM, as assignee regarding the Headquarters (the "Headquarters Assignment"); (v) that certain *Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing*, dated as of March 21, 2019, by and from the BSA, as mortgagor, and JPM, as mortgagee regarding Northern Tier (the "Northern Tier Mortgage"); (vi) that certain *Assignment of Agreements, Licenses, Permits and Contracts*, dated as of March 21, 2019, by and from the BSA, as assignor, and JPM, as assignee regarding Northern Tier (the "Northern Tier Assignment"); (vii) that certain *Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing*, dated as of March 21, 2019, by and from the BSA, as mortgagor, and JPM, as mortgagee regarding Philmont (the "Philmont Mortgage"); (viii) and that certain *Assignment of Agreements, Licenses, Permits and Contracts*, dated as of March 21, 2019, by and from the BSA, as assignor, and JPM, as assignee regarding Philmont (the "Philmont Assignment").

      vii.    *The Collateral Assignment of the Amended Intercompany Note, the Amended Intercompany Loan and the Amended Deed of Trust.*

      14.    Also on March 21, 2019, the BSA executed the that certain *Collateral Assignment of Promissory Note and Credit Line Deed of Trust*, dated as of March 21, 2019, by and between the BSA, as assignor, and JPM, as lender (the "JPM Arrow Collateral Assignment"), pursuant to which the BSA assigned to JPM, as collateral securing the BSA's outstanding obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement and the 2019

RCF Agreement, its right, title and interest in and to the Amended Intercompany Loan, the Amended Intercompany Note and the Amended Deed of Trust.

       *viii.*    *The Prepetition Security Agreement (2020).*

      15.    On February 3, 2020, the BSA, Delaware BSA, and JPM entered into that certain *Consent and Security Agreement* dated as of February 3, 2020, by and among Delaware BSA, the BSA, JPM, as collateral agent, and JPM, in its capacity as the lender under the 2010 Credit Agreement and the 2019 RCF Agreement, and as holder under the 2010 Bond Agreement and the 2012 Bond Agreement (the "Prepetition Security Agreement (2020)"), pursuant to which Delaware BSA pledged its accounts (including certain property arising out of or otherwise relating to such accounts, but excluding certain amounts payable the source of which is certain donor-restricted funds), deposit accounts, securities accounts and investment property (each as defined in Article 9 of the Uniform Commercial Code), and all proceeds and products of any or all of the foregoing, as security for the Prepetition Obligations.

**B.**    **Arrow and the Summit.**

      16.    Arrow is a non-stock, non-profit corporation organized under the laws of West Virginia that is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code. Arrow was formed in 2009 to acquire and development the Summit in West Virginia. Arrow owns the real property and improvements that comprise the Summit and leases the Summit to the BSA pursuant to a *Shared Services Agreement and Lease of Premises*, dated as of February 13, 2017 (the "Arrow Shared Services Agreement").

      17.    Construction of the Summit was financed by using the proceeds from the Series 2010 Bonds and the Series 2012 Bonds to the BSA from the Bond Issuer.[5] The bonds were

---

[5]    The respective loan documents between the BSA, JPM, and Arrow further demonstrate that the funds provided by JPM to the BSA, which were then advanced to Arrow, were to be treated as loans, not equity. *See, e.g.*, the 2010

ultimately purchased by JPM.  The BSA also provided funding for the construction of the facility, utilizing donations and pledges to the BSA and other BSA financial support, and the BSA provides the necessary services required to operate the Summit pursuant to the Arrow Shared Services Agreement.

18.     On June 30 2010, Arrow, as borrower, and the BSA, as lender, entered into the 2010 Intercompany Loan and Arrow executed the 2010 Intercompany Note.   The 2010 Intercompany Note was secured pursuant to the 2010 Deed of Trust against the Summit.

19.     The 2010 Intercompany Note is entitled "Promissory Note," is in the principal amount of $50,000,000.00 with a 0% Interest Rate, and states that it is a "Demand Note."  It further provides that the "Borrower" is "Arrow WV, Inc." and the "Lender" is "Boy Scouts of America." In the section entitled "Advances," the 2010 Intercompany Note provides that:

> ADVANCES.  This Promissory Note ("Note") evidences a straight (non-revolving) line of credit, which is made pursuant to a line of credit, as provided in that certain Loan Agreement of even date herewith by and between the Lender and Borrower (the "Loan Agreement").  Once the total principal amount of this Note has been advanced by Lender, Borrower is not entitled to any further advances under this Note.  The proceeds of the maximum principal amount evidenced by this Note may be advanced in partial amounts for a period not to exceed sixty months (60) months from the date hereof

In the section entitled "Payment," the 2010 Intercompany Note provides that:

> PAYMENT.  Borrower shall repay the entire principal amount advanced under this Note on or before the 30th day following receipt of a written demand for payment provided by Lender to Borrower.  Written demand shall be deemed received by Borrower three (3) days following Lender sending the written demand by certified letter.  Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

---

Credit Agreement, pg. 10 (provides that "[t]he proceeds of the Notes are to be utilized by the Borrower to finance the cost of the issuance of the Bonds and to make loans and advances to Arrow WV, Inc."); the 2010 Bond Agreement, pg. 33 (references "loans and advances from the Borrower to Arrow WV in an aggregate principal amount not to exceed $150,000,000"); the 2012 Bond Agreement, pg. 33 (references "loans and advances from the Borrower to Arrow WV in an aggregate principal amount not to exceed $500,000,000"); and the 2019 RCF Agreement, pg. 36 (references "loans and advances from the BSA to Arrow made prior to the effective date in an aggregate principal amount not to exceed $500,000,000").

Additionally, in the section entitled "Collateral," the 2010 Intercompany Note provides that:

> COLLATERAL:  This Note is secured in part by a Credit Line Deed of Trust, of even date herewith, executed and delivered by Borrower to Lender, attaching to what is commonly known as the Garden Ground Tract and the underlying mineral interests, which are described in the Special Warranty Deed by Cranberry Group, Inc. to Arrow WV, Inc. recorded in the Clerk of the County Commission of Fayette County and in the Clerk of the County Commission of Raleigh County, the terms, conditions, agreements and restrictions of which shall be deemed to be incorporated herein by reference, as if fully set forth herein, and said documents shall be construed as a whole and considered to be an integral part of the Note.

The 2010 Intercompany Note also requires Arrow to pay to the BSA the reasonable costs of collection, including reasonable attorneys' fees and legal expenses and also contains a jury trial waiver.

20.    The 2010 Intercompany Note was amended and restated on March 21, 2019 in the Amended Intercompany Note (collectively with the 2010 Intercompany Note, the "Intercompany Notes").  The Amended Intercompany Note amended and restated the 2010 Intercompany Note based upon additional loans that the BSA provided to Arrow.  While many of the terms of the Amended Intercompany Note and the 2010 Intercompany Note are identical, there are a few key differences.  First, the Amended Intercompany Note increased the principal amount owed to $350,000,000.00 and provided that the "Maturity Date" was "March 31, 2029."  Consistent therewith, the section entitled "Payment" provides that:

> PAYMENT.  Borrower shall repay the entire principal amount advanced under this Note on or before March 31, 2029.  Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

Second, the section entitled "Collateral" also changed slightly and provides that:

> COLLATERAL:  This Note is secured in part by a Credit Line Deed of Trust dated June 30, 2010, of record in the Office of the Clerk of the County Commission of Fayette County, West Virginia, in

Book 860, at Page 481, as may have been or be amended from time to time, executed and delivered by Borrower to Lender, attaching to what is commonly known as the Garden Ground Tract and the underlying mineral interests, which are described in the Special Warranty Deed by Cranberry Group, Inc. to Arrow WV, Inc. recorded in the Clerk of the County Commission of Fayette County and in the Clerk of the County Commission of Raleigh County, the terms, conditions, agreements and restrictions of which shall be deemed to be incorporated herein by reference, as if fully set forth herein, and said documents shall be construed as a whole and considered to be an integral part of the Note.

21.    The 2010 Deed of Trust was also amended on March 21, 2019, pursuant to the Amended Deed of Trust to secure the Amended Intercompany Note.

**C.    The Bankruptcy Filing and the Final Cash Collateral Order.**

22.    On February 18, 2020 (the "Petition Date"), the Debtors commenced these chapter 11 cases (the "Chapter 11 Cases") by each filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

23.    On March 5, 2020, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the UCC and the Tort Committee.  *See* Dkt. Nos. 141, 142.

24.    On April 24, 2020, the Court appointed the FCR to represent the interests of holders of future claimants.  *See* Dkt. No. 486.

25.    On April 15, 2021, the Court entered the *Final Order (I) Authorizing the Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to the Prepetition Secured Party Pursuant to 11 U.S.C. §§ 105(a), 361, 362, 363, 503, and 507; and (III) Granting Related Relief* [Dkt. No. 433] (the "Final Cash Collateral Order").  The Final Cash Collateral Order contains multiple representations and stipulations by the Debtors (collectively, the "Debtors' Stipulations"), including stipulations regarding the liens granted by the Debtors to JPM with respect to the Prepetition Collateral (as defined in the Final Cash Collateral Order).  *See,*

*e.g.,* ¶¶ D.(v)-(xi), (xiii) of the Final Cash Collateral Order.[6] Specifically, the Final Cash Collateral

Order provides that:

> (viii)   pursuant to and in connection with the Prepetition Loan Documents, each
> Debtor granted to JPM, in its capacity as collateral agent (the "Prepetition Agent",
> and collectively with the Prepetition Secured Lender, the "Prepetition Secured
> Parties"), for the benefit of the Prepetition Secured Parties, continuing, legal, valid,
> binding, properly perfected, enforceable, non-avoidable first priority liens on and
> security interests in (the "Prepetition Liens") all of the "Collateral" (as defined in
> each respective Prepetition Loan Documents) (the "Prepetition Collateral"),[7] which
> Prepetition Liens (a) secure all of the Prepetition Obligations; (b) are not subject to
> any contest, avoidance, recharacterization, subordination (whether equitable,
> contractual or otherwise) (except as expressly set forth in subclause (c) below),
> recovery, reduction, attachment, recoupment, disallowance, impairment, rejection,
> attack, effect, counterclaim, cross-claim, set-off, offset, challenge, defense or any
> other claim (as defined in the Bankruptcy Code) of any kind, cause of action or any
> other challenge of any nature under the Bankruptcy Code or any other applicable
> law or regulation or otherwise; and (c) are and remain senior in priority over any
> and all other liens on and security interests in the Prepetition Collateral, subject
> only to valid, perfected and unavoidable liens on or security interests in the
> Prepetition Collateral that are senior to or pari passu with the Prepetition Liens (a
> "Permitted Encumbrance"); . . .

*See* ¶ D.(viii) of the Final Cash Collateral Order.

26.     Moreover, to protect JPM from potential diminution in value of its prepetition

collateral, the cash collateral portion of which has funded the Chapter 11 Cases, the Court granted

to JPM valid, enforceable, unavoidable and fully perfected replacement liens on and security

interests in the Adequate Protection Collateral (as defined in the Final Cash Collateral Order).  *See*

---

[6]    Furthermore, at the time that JPM was granted liens against the real property assets, BSA represented that it
possessed the requisite authority to grant such liens.  BSA's outside counsel further opined that such liens were
properly granted.

[7]    For the avoidance of doubt, the definition of "Prepetition Collateral" shall specifically exclude all (a) amounts
payable in connection with any agreement by a donor, grantor or other Person to donate or otherwise contribute funds
to a Debtor if the use of such funds to be donated is restricted by such Person or applicable state law to a purpose other
than the Project, except to the extent determined by a final order of the Court, or a court of competent jurisdiction, to
not be subject to such restriction (the "Restricted Amounts"), and (b) Excluded Property.  As used in this footnote,
Person, Debtor, Project and Excluded Property have the same meaning ascribed to them in the Prepetition Security
Agreement (2019).

¶ 5.(i) of the Final Cash Collateral Order.  Moreover, to the extent of any diminution in value of its prepetition collateral, JPM was granted super-priority administrative expense claims, junior only to the Carve-Out (as defined in the Final Cash Collateral Order).  *See* ¶ 5.(ii) of the Final Cash Collateral Order.

27.     The Final Cash Collateral Order also set July 3, 2020, as the deadline for the UCC, the Tort Committee, and the FCR to assert a Challenge Proceeding (as defined in the Final Cash Collateral Order) as to the Debtors' Stipulations and the other admissions, agreements and releases contained in the Final Cash Collateral Order in favor of JPM.  *See* Final Cash Collateral Order ¶ 19.(ii).  The Challenge Period was extended eight times by the agreement of JPM through March 12, 2021.  *See* Dkt. Nos. 949, 1175, 1550, 1883, 1945, 1989, 2161 and 2265.

**D.     The Second Amended Plan, the Second Amended Disclosure Statement, and the JPM/UCC Settlement.**

28.     On February 18, 2020, the Debtors filed the *Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Dkt. No. 20] and the *Disclosure Statement for the Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA* [Dkt. No. 21].

29.     On March 1, 2021, the Debtors filed the *First Mediators' Report* [Dkt. No. 2292] (the "First Mediators' Report"), which reported that the Debtors, JPM, and the UCC had reached a settlement (the "JPM/UCC Settlement") and which was further detailed in the term sheet appended to the First Mediators Report.  The JPM/UCC Settlement (i) addresses, among other things, the treatment of non-abuse general unsecured claims, non-abuse litigation claims and JPM's prepetition secured claims under an amended plan of reorganization to be filed by the Debtor; and (ii) also resolves certain alleged, potential claims that the Debtors' estates hold against

JPM and that the UCC could have sought standing to assert on behalf of the Debtors' estates pursuant to the terms and conditions of the Final Cash Collateral Order.

30.     Along with the filing of the First Mediators' Report and the JPM/UCC Settlement, the Debtors filed the *Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Dkt. No. 2293] (the "Amended Plan") and the *Disclosure Statement for the Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Dkt. No. 2294] (the "Amended Disclosure Statement").   The Amended Plan incorporates the terms of the JPM/UCC Settlement and includes a motion to approve the JPM/UCC Settlement under Bankruptcy Rule 9019.  *See* Article V.R. of the Amended Plan.  The Debtors concurrently filed a motion seeking approval of the Amended Disclosure Statement and procedures for soliciting votes on the Amended Plan [Dkt. No. 2295] (the "Solicitation Procedures Motion").

31.     On April 13, 2021, the Debtors filed their *Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Dkt. No. 2592] (the "Second Amended Plan"), and on April 14, 2021, the Debtors filed the *Amended Disclosure Statement for the Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Dkt. No. 2594] (the "Second Amended Disclosure Statement").  The Second Amended Plan incorporates the terms of the JPM/UCC Settlement and includes a motion to approve the JPM/UCC Settlement under Bankruptcy Rule 9019.  *See* Article V.R. of the Amended Plan. Approval of the Second Amended Disclosure Statement is currently set for hearing on May 19, 2021.

E.    **The Challenge Parties' Standing Motion and the Proposed Complaint.**

32.    On March 12, 2021, the Challenge Parties filed the Standing Motion requesting standing to prosecute the following claims and causes of action contained in the Proposed Complaint's prayer for relief:[8]

- **Count 1**: A declaratory judgment that the Amended Intercompany Note should be recharacterized as an equity or capital contribution made by the BSA to Arrow and that JPM has no allowable claim against Arrow and the Summit is free and clear of any lien or security interest of JPM, or, in the alternative, avoiding certain unlisted fraudulent transfers made under the Amended Intercompany Note by the BSA to Arrow;[9]

- **Count 2**: A declaratory judgment that (a) Goods (including Inventory, Equipment and artwork), (b) General Intangibles (including intellectual property and causes of action), (c) Commercial Tort Claims, (d) motor vehicles and watercraft, (e) membership dues payable to or received by the BSA; (f) owned real estate (other than Sea Base, Philmont, and Northern Tier); (g) leased real estate; (h) Money; and (i) any insurance policies (collectively, including any proceeds thereof, the "Unencumbered Assets") are not subject to the liens or security interests granted to JPM, in its capacity as lender, collateral agent, and bondholder;

- **Count 3**: An objection to JPM's claims and liens concerning the Unencumbered Assets;

- **Count 4**: Avoidance of JPM's liens concerning certain unperfected liens and security interests asserted by JPM against (x) Deposit Accounts maintained at any bank other than JPM and (y) any Prepetition Collateral acquired by the Debtors after the Petition Date (collectively, the "Unperfected Assets"); and

- **Count 5**: a declaratory judgment that the Challenge Parties' ability to further challenge the Prepetition Obligations based on the following matters is preserved for all purposes (collectively, the "Reserved Matters"): (a) the allowance of any interest (or default rate interest) paid or accrued under the Prepetition Loan Documents; (b) the accuracy of the calculation of the amount of any principal, interest, fees, costs, or charges paid or accrued under the Prepetition Loan

---

[8]    Capitalized terms in the following section shall have the meaning ascribed to them in the Proposed Complaint unless otherwise defined therein.

[9]    Although not listed in the prayer for relief, the Challenge Parties also assert that Arrow's ownership of the Summit should be avoided and the Summit should be conveyed to the BSA free and clear of any liens or claims of JPM. *See* Proposed Complaint, ¶ 56. Such claim was not plead in the prayer for relief. Further, the claim is not colorable due to the remedy requested by the Challenge Parties. Specifically, the Court cannot order the return of the Summit to the BSA given the uncontroverted fact that the BSA never owned the Summit in the first place.

Documents; (c) the reasonableness pursuant to section 506(b) of the Bankruptcy Code of the amounts of any fees, costs or charges that may be asserted by JPM to the extent provided for under the Prepetition Loan Documents; and (d) any adequate protection or diminution claim that may be asserted by JPM against the Debtors' estates.

## Objection

33.     The Standing Motion should be denied.  As set forth in greater detail below, the Challenge Parties have failed to demonstrate that the claims they seek to pursue on the Debtors' behalf are colorable.[10]    Further, the Challenge Parties have failed to provide any evidence demonstrating that the Debtors' decision not to pursue such claims was unreasonable under the circumstances, especially in light of the benefits that the Debtors' estates obtained under the JPM/UCC Settlement, the terms of which are set forth in the Second Amended Plan.  Moreover, the costs associated with the Challenge Parties bringing the claims and causes of action asserted in the Proposed Complaint are far outweighed by the benefits of confirmation of the proposed Second Amended Plan, and the Challenge Parties have offered no evidence to the contrary.  For the reasons set forth below, the Standing Motion should be denied.

---

[10]     In 2010, the Court of Chancery of Delaware decided *CML V, LLC v. Bax*, 6 A.3d 238 (Del. Ch. 2010), *aff'd*, 28 A.3d 1037 (Del. 2011).  *Bax* addresses the statutory right to commence derivative actions on behalf of limited liability companies.  *Id.* at 239.  Delaware bankruptcy courts have since interpreted the Delaware LLC statute and *Bax* opinion as precluding non-LLC members (*e.g.*, unsecured creditors' committees) from pursuing traditional derivative claims on behalf of an LLC debtor and also from obtaining derivative standing to pursue any claims on behalf of an LLC.  *See, e.g., Off. Comm. of Unsecured Creditors of HH Liquidation, LLC v. Comvest Group Holdings, LLC (In re HH Liquidation, LLC)*, 590 B.R. 211, 284 (Bankr. D. Del. 2018) (holding that committee lacked standing to commence derivative breach of fiduciary duty claims of debtor limited liability company); *see also Dura Automotive Systems, LLC*, Case No. 19-12378 (KBO), Dkt. No. 1115, Transcript of June 9, 2020 hearing, at pgs. 44-50).  The language from the DC Non Profit Act is essentially identical to the language of the Delaware LLC Act, limiting the scope of potential derivative plaintiffs to members and directors, and Delaware courts have analyzed similar state statutes to reach the same result.  *See, e.g., Gavin/Solmonese LLC v. Citadel Energy Partners, LLC (In re Citadel Watford City Disposal Partners, L.P.)*, No. 15-11323 (KJC), 2019 WL 3381734, at *3-5 (Bankr. D. Del. May 2, 2019) (extending holding of *Bax* to North Dakota and Wyoming LLC Act).  Although JPM acknowledges that the Final Cash Collateral Order includes language attempting to circumvent the *Bax* decision's limitation on derivative standing with respect to limited liability companies (Final Cash Collateral Order ¶ 19.(iv)), given that the language in the Final Cash Collateral Order only applies by its terms to limited liability companies, JPM does not believe the language would have any effect on derivative standing under the DC Non Profit Act.  Thus, to the extent the Court finds that the BSA is subject to the DC Non Profit Act, the Court should deny the Standing Motion based upon the application of *Bax*.

34.     While in certain circumstances a court may confer a committee with derivative standing to prosecute certain actions on behalf of a debtor's estate, *see Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003), a committee's right to do so is not unfettered. *See Off. Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.)*, 326 B.R. 532, 543 (W.D. Pa. 2005) ("[T]he ability of creditors' committees to sue derivatively is not without limits."); *see also In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 578 (Bankr. S.D.N.Y. 2016), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016) (denying standing to creditors' committee when committee failed to demonstrate colorable claims for fraudulent transfer, breach of fiduciary duty, and subordination and recharacterization); *Walnut Creek Mining Co. v. Cascade Inv., LLC (In re Optim Energy, LLC)*, 527 B.R. 169, 178 (D. Del. 2015) (upholding denial of standing to large unsecured creditor, when creditor failed to demonstrate colorable claims).   Because the Bankruptcy Code authorizes only the debtor in possession to pursue or settle the estate's legal claims, "the derivative-standing exception to that policy is narrow."  *Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs., LLC)*, 423 F.3d 166, 179-80 (3d Cir. 2005).  This is so, in part, because, unlike a debtor, who is the only fiduciary for all stakeholders, a committee is a fiduciary only for those whom it represents. *Id.* at 180 ("Other parties to a bankruptcy proceeding have interests that differ from those of the estate and thus are not suited to act as the estate's legal representative."); *Advisory Comm. of Major Funding Corp. v. Sommers (In re Advisory Comm. of Major Funding Corp.)*, 109 F.3d 219, 224 (5th Cir. 1997) ("[s]ection 1103 essentially requires the committee to act in the best interest of the creditors it represents."); *Scott v. Nat'l Century Fin. Enters. (In re Balt. Emergency Servs. II, Corp.)*, 432 F.3d 557, 562 (4th Cir. 2005) ("[e]ven if permitted under the Bankruptcy Code,

derivative standing is the exception rather than the rule" and "the interests of a creditor or creditors' committee may not always align with those of the estate.").

35.    In order to confer standing to a committee under Third Circuit precedent, the "Court must find that it has stated a 'colorable' claim that the Debtors have unjustifiably refused to prosecute." *See In re Wash. Mut., Inc.*, 461 B.R. 200, 254 (Bankr. D. Del. 2011), *vacated in part on other grounds*, No. 08-12229, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012) (citing *Cybergenics*, 330 F.3d at 566-67).  "It is the [movant]'s burden in the first instance to demonstrate that it has satisfied [the] prerequisites for derivative standing." *Infinity Invs. Ltd. v. Kingsborough (In re Yes! Ent. Corp.)*, 316 B.R. 141, 145 (D. Del. 2004).  A movant must additionally establish that the claims that it seeks standing to pursue offers a "likely benefit to the estate" such that the Court can "assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce." *In re MIG, Inc.*, No. 09-12118-KG, 2009 WL 8662897, at *2 (Bankr. D. Del Dec. 18, 2009) (quoting *Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 905-06 (2d Cir. 1985)); *see also Eckbold v. Miller (In re Redden)*, No. 04-12335-PJW, 2013 WL 5436368, at *3 (Bankr. D. Del. Sept. 30, 2013) ("Without an argument that granting standing would benefit the bankruptcy estate, derivative standing is necessarily improper."); *In re Centaur, LLC*, No. 10-10799 (KJC), 2010 WL 4624910, at *5 (Bankr. D. Del. Nov. 5, 2010) (courts undertake a "cost/benefit analysis" to determine "whether, in light of the costs of litigation, the claims would likely benefit the estate if pursued."); *Clark*, 326 B.R. at 548 ("Courts generally perform a cost-benefit analysis of the claims to determine whether the creditors' claims have colorable merit and whether, in light of the probable costs of litigation, the claims would likely benefit the estate if pursued.").  Courts have also considered whether the funds being

used by a creditors' committee to litigate would have benefitted the committee's constituency and whether or not other parties would be adversely affected by the expenditure of funds by the creditors' committee. *Id*. at 549.

**A.      The Challenge Parties' Claims Are Not Colorable.**

36.      The Challenge Parties have not established that the claims and causes of action alleged in the Proposed Complaint meet the colorability standard because none possesses the requisite possibility of success, and for that reason alone, the Court should deny the Standing Motion. *See, e.g., In re Optim Energy, LLC*, Case No. 14-10262-BLS, 2014 WL 1924908, at *11 (Bankr. D. Del May 13, 2014) (denying request of creditor for derivative standing when the moving creditor "failed to articulate colorable claims").

37.      As the court in *Optim Energy* recognized, a claim is "colorable" if it would survive the same scrutiny that courts apply to a motion to dismiss for failure to state a claim. *Id*; *see also Claridge Assocs., LLC v. Schepis (In re Pursuit Cap. Mgmt., LLC)*, 595 B.R. 631, 665 (Bankr. D. Del. 2018) ("A claim is colorable if it would survive a motion to dismiss.").  In applying this same scrutiny, this Court need not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. *Morabito v. JH Inc. (In re Consol. Nev. Corp.)*, No. 3:13-BK-51236-GWZ, 2017 WL 6553394, at *8 (9th Cir. B.A.P. Dec. 21, 2017) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).  Importantly, this standard cannot be met where a party presents "threadbare recitals of a cause of action's elements" and supports them with "mere conclusory statements" that "do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2008); *see also Sabine Oil & Gas Corp.*, 547 B.R. at 515 (Court may "engage in some review of disputed facts to determine if there is some factual support for the Committee's allegations") (alterations and

citation omitted); *MIG, Inc.*, 2009 WL 8662897 at *2 (requiring evidence in granting derivative standing including "affidavit and other submission, by evidentiary hearing or otherwise").

38.     Further, unlike in assessing a Rule 12(b)(6) motion to dismiss, "[i]n determining whether a claim is colorable, the court may properly 'engage[ ] in some review of disputed facts'" to determine if there is proper factual support for the allegations, and to determine if the "proposed litigation would be a sensible application of estate resources." *Off. Comm. of Unsecured Creditors v. Sabine Oil & Gas Corp. (In re Sabine Oil & Gas Corp.)*, 562 B.R. 211, 222 (S.D.N.Y. 2016) (quoting *In re Adelphia Commc'ns. Corp.*, 330 B.R. 364, 369 (Bankr. S.D.N.Y. 2005)).  While a mini trial is not required, the bankruptcy court "should assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce." *STN Enters.*, 779 F.2d at 906.

39.     The Challenge Parties have provided no sworn testimony or other admissible evidence with the Standing Motion and the Proposed Complaint, and therefore, the Standing Motion must be denied.

i.     *The Challenge Parties' Claim Regarding Recharacterization of the Amended Intercompany Note is Not Colorable (Count 1).*[11]

40.     Recharacterization is an ***extraordinary*** remedy grounded in the bankruptcy court's equitable authority to insure that substance will not give way to form and that technical

---

[11]   Alternatively, the Challenge Parties have requested the avoidance of certain fraudulent transfers made under the Amended Intercompany Note by the BSA to Arrow.  However, the Challenge Parties fail to specifically identify the payments made by the BSA to Arrow, which is a requirement to establish a fraudulent transfer claim because the Challenge Parties must establish that the Debtors were insolvent on the date of each transfer or became insolvent as a result of each transfer.  Additionally, section 546(e) of the Bankruptcy Code provides a safe harbor exempting from avoidance certain "transfers" made "in connection with a securities contract" to or for the benefit of a "financial institution," however, the Challenge Parties' failure to specifically identify the transfers at issue makes it impossible for JPM to determine whether section 546(e) of the Bankruptcy Code would apply and provide a further defense to the Challenge Parties' alternative claim.  *See, e.g., In re Tribune Co. Fraudulent Conveyance Litig.)*, 946 F.3d 66, 74, 81 (2d Cir. 2019); *Holliday v. K Road Power Mgmt., LLC (In re Boston Generating LLC)*, Adv. Proc. No. 12-01879

considerations will not prevent substantial justice from being done.  *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 454 (3d Cir. 2006); *see also Optim Energy, LLC*, 2014 WL 1924908 at *7 ("Recharacterization of debt as equity is a recognized but challenging cause of action.").  Specifically, recharacterization is focused upon whether a debt actually exists and what is the proper characterization in the first instance of an investment. *SubMicron*, 432 F.3d at 454.  Typically, recharacterization occurs when an equity holder asserts a claim based upon a "loan" made by the equity holder to the debtor company at a time when the debtor company is in such a poor financial condition that lenders would not have made such a loan. *Off. Comm. of Unsecured Creditors of Interstate Cigar Co., Inc. v. Bambu Sales Inc. (In re Interstate Cigar Co., Inc.)*, 182 B.R. 675, 679 (Bankr. E.D.N.Y. 1995).

41.    Moreover, recharacterization typically involves recharacterization of "claims" against the estate from debt to equity.  Here, Arrow is not a debtor in bankruptcy, and JPM is aware of no precedent to support the contention that the Court has jurisdiction to recharacterize claims against Arrow.[12]  For that reason alone, the Challenge Parties' recharacterization claim is not colorable.

42.    Alternatively, if the Challenge Parties' recharacterization claim is ultimately framed as a recharacterization of an asset of the BSA estate versus a claims against the BSA estate, there may at least be a technical argument that the Court has the equitable jurisdiction to adjudicate such a cause of action because the BSA is a debtor.  However, JPM is aware of no precedent where a court has recharacterized an asset of the bankruptcy estate versus a claim against the bankruptcy

---

(RG), 2020 WL 3286207, *25 (Bankr. S.D.N.Y. June 18, 2020).  Failure to identify the transfers is therefore fatal and is yet another reason that even the alternative claim is not colorable.

[12]    The Challenge Parties request that the Court declare that JPM has no claim against Arrow.  *See* Challenge Complaint ¶ 52.  Respectfully, the Court lacks jurisdiction to determine whether a debt exists between two non-debtors.

estate based upon these facts and circumstances, and it is unclear whether such a cause of action

even exists as a matter of law.  In fact, the lack of jurisprudence makes perfect sense because it is

not in the best interests of a creditor to ask the Court to recharacterize an asset of a bankruptcy

estate where such recharacterization would ultimately result in *less* recovery going to the estate

(*i.e.*, characterizing the Amended Intercompany Note as equity would hypothetically result in the

BSA having lower priority in terms of recovery were Arrow to liquidate its assets).  Accordingly,

the Challenge Parties' claim to recharacterize the Amended Intercompany Note is not colorable.

43.    To the extent that the Challenge Parties can even assert a recharacterization claim

from a pure legal perspective, various circuit courts have adopted multi-factored tests borrowed

from nonbankruptcy case law to define the recharacterization inquiry.  *Friedman's Liquidating*

*Trust v. Goldman Sachs Credit Partners, L.P. (In re Friedman's Inc.)*, 452 B.R. 512, 518 (Bankr.

D. Del. 2011).  For example, the Courts of Appeals for the Fourth Circuit and Sixth Circuit have

identified the following eleven factors to determine whether recharacterization is warranted:

> (1) the names given to the instruments, if any, evidencing the indebtedness;
> (2) the presence or absence of a fixed maturity date and schedule of payments;
> (3) the presence or absence of a fixed rate of interests and interest payments;
> (4) the source of repayments;
> (5) the adequacy or inadequacy of capitalization;
> (6) the identity of interest between the creditor and the stockholder;
> (7) the security, if any, for the advances;
> (8) the corporation's ability to obtain financing from outside lending institutions;
> (9) the extent to which the advances were subordinated to the claims of outside creditors;
> (10) the extent to which the advances were used to acquire capital assets;
> (11) the presence or absence of a sinking fund to provide repayments.

*See, e.g., Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 749-50

(6th Cir. 2001) (citing *Roth Steel Tube Co. v. Comm'r of Internal Reve*nue, 800 F.2d 625 (6th Cir.

1986)); *Fairchild Dornier GmbH v. Off. Comm. of Unsecured Creditors (In re Dornier Aviation*

*(N. Am.), Inc.)*, 453 F.3d 225, 233-34 (4th Cir. 2006) (adopting the 11-factor test articulated in

*Autostyle*).  However, the Third Circuit held in *SubMicron*[13] that the multi-factor tests described above ultimately devolve into one overarching inquiry: the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else.  *SubMicron,* 432 F.3d at 455-56.  The Third Circuit further held "[t]hat intent may be inferred from what the parties say in their contracts, from what they do in their actions, and from the economic reality of the surrounding circumstances."  *Id*. at 456. Importantly, the Third Circuit noted in *Submicron* that:

> [n]o mechanistic scorecard suffices.  And none should, for Kabuki outcomes elude difficult fact patterns.  While some cases are easy (e.g., a document titled a "Note" calling for payments of sums certain at fixed intervals with market-rate interest and these obligations are secured and are partly performed, versus a document issued as a certificate indicating a proportional interest in the enterprise to which the certificate relates), others are hard (such as a "Note" with conventional repayment terms yet reflecting an amount proportional to prior equity interests and whose payment terms are ignored).  Which course a court discerns is typically a commonsense conclusion that the party infusing funds does so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes; therefore, the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence, they are equity).  Form is no doubt a factor, but in the end it is no more than an indicator of what the parties actually intended and acted on.

---

[13]    The Intercompany Notes provide that they are governed by West Virginia law.  However, JPM is unaware of any jurisprudence in the Third Circuit where a court has taken into consideration a choice of law provision when ruling on a recharacterization claim.  Rather, courts in the Third Circuit appear to apply federal common law when it comes to addressing recharacterization claims in a bankruptcy case.  *See, e.g.*, *Lipscomb v. Clairvest Equity Partners LP (In re LMI Legacy Holdings, Inc.)*, No. 15-51069, 2017 WL 1508606, at *4-*5, *14 (Bankr. D. Del. April 27, 2017) (while recognizing that choice of law is a factor in connection with certain types of claims, bankruptcy court ultimately applied Third Circuit law in connection with recharacterization claim); *Friedman's Inc.*, 452 B.R. at 518 (applying Third Circuit law); *Off. Comm. of Unsecured Creditors of Moll Indus, Inc. v. Highland Cap. Mgmt. L.P. (In re Moll Indus., Inc.)*, 454 B.R. 574, 581 (Bankr. D. Del. 2011) (applying Third Circuit law); *HH Liquidation, LLC*, 590 B.R. at 289 (applying Third Circuit law); *see also* 93 AMBKRLJ 1, *14, n. 84 (2019) (noting that the Third Circuit follows federal common law test for recharacterization).  *But see Gernsbacher v. Campbell (In re Equip. Equity Holdings)*, 491 B.R. 792, 851 (Bankr. N.D. Tex. 2013) (applying choice of law provision in relevant documents as part of recharacterization analysis as required by the Fifth Circuit's opinion in Lothian Oil);

*Id.  See also Friedman's*, 452 B.R. at 519-20; *Off. Comm. of Unsecured Creditors v. Comvest Group Holdings, LLC (In re HH Liquidation, LLC),* 590 B.R. 211, 289-90 (Bank. D. Del. 2018).[14] Importantly, this analysis applies whether the advance was to a non-profit corporation as opposed to an advance to a for-profit corporation.  *Machne Menachem, Inc. v. Spritzer*, No. 11-1496, 2012 WL 8570, at *2 (3d Cir. Jan. 3, 2012) (unpublished).  Finally, if recharacterization of an investment from debt to equity is warranted, the characterization occurs "ab initio," from the beginning of the investment.  *United States v. State St. Bank & Tr. Co.*, 520 B.R. 29, 74 (Bankr. D. Del. 2014) (citing *Autostyle*, 269 F.3d at 747-48).  Accordingly, the advance does not disappear; instead it becomes equity in the borrowing parties with all the rights and privileges associated with equity.

44.     Here, because the Amended Intercompany Note is an amended and restated version of the 2010 Intercompany Note, analysis of both the 2010 Intercompany Note and the Amended Intercompany Note is appropriate.[15]

45.     First, based upon the characteristics of the 2010 Intercompany Note and the Third Circuit's ruling in *SubMicron*, the lack of interest accrual and the requirement of regular payments notwithstanding, most of the other characteristics of the 2010 Intercompany Note support the argument that the 2010 Intercompany Note is more in the nature of debt and not equity and should thus be characterized as such by the Court.  Specifically, the 2010 Intercompany Note is actually entitled a "Note," requires repayment at a future point in time, and is secured by collateral.  *See*

---

[14]    Despite the Third Circuit's admonishment of "factor tests" in *SubMicron*, bankruptcy courts in the Third Circuit, nonetheless, continue to use factor tests in analyzing recharacterization claims.  *See, e.g., Off. Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Cap. Mgmt,. L.P. (In re Broadstripe, LLC)*, 444 B.R. 51, 95 (Bankr. D. Del. 2010); *Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 572-73 (Bankr. D. Del. 2012); *HH Liquidation, LLC*, 590 B.R. at 292.

[15]    As set forth below, in addition to the fact that the Intercompany Notes themselves evidence an intent that the Intercompany Notes should be treated as debt, not equity, the respective loan documents between the BSA, JPM, and Arrow further demonstrate that the funds provided by JPM to the BSA, which were then advanced to Arrow, were to be treated as loans, not equity.  *See* supra note 5 and accompanying text.

*SubMicron.*, 432 F.3d at 457 (noting that name given to lending documents and evidence that the documents were recorded as secured debt supported lower court's finding that obligations should be characterized as debt versus equity).

46.     Next, based upon the above with respect to the 2010 Intercompany Note, it also appears that most of the characteristics of the Amended Intercompany Note support the argument that the Amended Intercompany Note should be characterized as debt versus equity.   In fact, because the Amended Intercompany Note had an actual maturity date and more precisely defined the collateral that was being provided, there is an even stronger argument that the Amended Intercompany Note should be characterized as debt versus equity when compared to the 2010 Intercompany Note.[16]

47.     Finally, and perhaps most compelling, to the extent the Court grants standing and uses its equitable powers to recharacterize the Amended Intercompany Note as equity (which JPM

---

[16]    As previously noted, bankruptcy courts in the Third Circuit have continued to use various multi-factor tests in analyzing recharacterization claims.  Application of such a multi-factor test should not result in the Amended Intercompany Note being recharacterized.  By way of example, the bankruptcy court in *Autobacs* looked at the following thirteen factors in determining whether recharacterization was appropriate: (a) the names given to the instruments, if any, evidencing the indebtedness; (b) the presence or absence of a fixed maturity date and a schedule of payments; (c) no fixed rate of interest and interest payments; (d) whether repayment depended on success of the business; (e) inadequacy of capitalization; (f) the identity of interests between creditor and stockholder; (g) security, if any, for the advances; (h) ability to obtain financing from outside lending institutions; (i) extent to which the advances were subordinated to the claim of outside creditors; (j) the extent to which the advances were used to acquire capital assets; (k) presence or absence of a sinking fund; (l) presence or absence of voting rights; and (m) other considerations.  *Autobacs Strauss, Inc.*, 473 B.R. at 572-73 (Bankr. D. Del. 2012).  Here, the overwhelming majority of factors (*i.e.*, (a), (b), (g), (h), (i), and (k)) weigh against recharacterization: the name given to the Amended Intercompany Note indicates it was a loan; there is a fixed maturity date; Arrow gave the BSA a security interest in the Summit; Arrow still had the ability to obtain financing from outside lending institutions; there is no evidence that the obligations under the Amended Intercompany Note were subordinated to other creditor claims; and while there was no sinking fund, case law interpreting factor (k) provides that securing the loan with a lien (which occurred here) obviates the need for a sinking fund.  Although factor (c) weighs in favor of recharacterization (*i.e.*, there were no interest payments under the Amended Intercompany Note), the other factors (*i.e.*, factors (d), (e), (f), (j), and (l)) are either inapplicable or there are simply insufficient facts upon which to apply such factor either for or against recharacterization.   Accordingly, even application of a multi-factor test overwhelmingly demonstrates that recharacterization of the Amended Intercompany Note as equity would not be appropriate.

will vigorously contest),[17] JPM will request, by counterclaim, that the Court exercise those same equitable powers and declare that JPM has a perfected lien on such equity based upon the JPM Arrow Collateral Assignment (along with customary protections afforded to a lender with a lien on equity, including taking possession of the share certificates and making sure that any cash distributions are paid to JPM), which would result in JPM being in the exact same place in terms of priority of payment as it is right now.[18]    Specifically, Paragraph 1 of the JPM Arrow Collateral Assignment provides that the BSA unequivocally granted, pledged, transferred, and assigned to JPM, as security for the repayment of the BSA obligations with respect to the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement and the 2019 RCF Agreement, a first priority security interest in all of the BSA's rights, title, and interest to (a) the Amended Intercompany Loan, the Amended Intercompany Note and the Amended Deed of Trust and "all moneys, income, proceeds and benefits attributable thereto," and (b) all proceeds of the foregoing. This language clearly demonstrates that the parties intended for JPM to have a security interest in all of the BSA's rights, title, and interest in the Amended Intercompany Loan, the Amended Intercompany Note and the Amended Deed of Trust, and nothing in the JPM Arrow Collateral Assignment conditions the validity of that security interest on how the Amended Intercompany Note is ultimately characterized.    Therefore, granting standing to the Challenge Parties to pursue any recharacterization claim in connection with the Summit would ultimately be a futile exercise.

---

[17]    Nothing herein shall be deemed to waive or otherwise prejudice any claims or defenses available to JPM should the causes of action in the Proposed Complaint be litigated.    JPM would vigorously contest the disputed issues of fact and law and would assert numerous defenses to counter all asserted claims.    JPM reserves all rights in that regard.

[18]    Moreover, to the extent that JPM is paid in full from collateral other than the Summit, which seems highly unlikely given the significant diminution in value of JPM's collateral since the Petition Date, highlighted by the drop in cash collateral used to fund the Chapter 11 Cases of at least $18 million as of March 31, 2021 (based solely on diminution in cash collateral, and not accounting for accrued but unpaid fees and expenses of estate professionals), the BSA would be subordinate to any creditors of Arrow by virtue of trading its superior secured debt instrument for that of equity.

ii.    *The Challenge Parties' Claims That Certain of the Debtors' Personal Property Assets Are Unencumbered Are Not Colorable (Count 2 and Count 3).*

48.    The Challenge Parties argue in the Standing Motion and the Proposed Complaint that JPM's prepetition collateral package does not include the following assets of the Debtors: (a) Goods (including Inventory, Equipment and artwork); (b) General Intangibles (including intellectual property and causes of action); (c) Commercial Tort Claims; (d) motor vehicles and watercraft; (e) membership dues payable to or received by BSA; (f) owned real estate (other than the three high adventure sites referenced in paragraph 19 of the Proposed Complaint); (g) leased real estate; (h) Money; and (i) any insurance policies (collectively, the "Alleged Unencumbered Assets"). *See* Proposed Complaint, ¶ 29. The Challenge Parties request a declaration that JPM does not have liens on or security interests in the Alleged Unencumbered Assets (Count 2) and object to JPM's liens and claims with respect to the Alleged Unencumbered Assets (Count 3).

49.    For purposes of the Standing Motion, JPM stipulates that the following categories of Alleged Unencumbered Assets were unencumbered as of the Petition Date (collectively, the "Stipulated Assets"):[19]

- Commercial Tort Claims[20]

- Leased real estate (*i.e.*, real estate leased by the BSA from a third party)[21]

---

[19]    Prior to the expiration of the original Challenge Deadline, the Challenge Parties and the UCC presented JPM with a stipulation that extended the Challenge Deadline and included proposed stipulations for the same categories of assets discussed in the Proposed Complaint. JPM informed the parties that while it would agree to a stipulation that extended the Challenge Deadline, the stipulation would not address the Challenge Parties' views on JPM's collateral, which as discussed herein are clearly disputed. After the entry of the stipulation extending the challenge deadline on July 2, 2020 [Dkt. No. 949], counsel for JPM was not contacted again about any proposed stipulations. JPM is willing to consider an appropriate stipulation to address what appears to be largely undisputed categories of assets that comprise JPM's collateral package.

[20]    Although JPM agrees commercial tort claims were unencumbered as of the Petition Date, the Challenge Parties list no commercial tort claims of the Debtors that are unencumbered with specificity. JPM, therefore, reserves all rights with respect to whether any of the causes of action of the Debtors are in fact commercial tort claims.

[21]    The applicable mortgages and deeds of trust grant JPM liens on any leases from the BSA to third parties, and the proceeds/rents the BSA would receive from such leases, provided those leases are associated with the real property

Because JPM stipulates that the Stipulated Assets were unencumbered as of the Petition Date, no justiciable controversy exists as to the Stipulated Assets. Therefore, to the extent the Challenge Parties' claims in Count 2 and 3 include the Stipulated Assets, such claims are not colorable.

50.     Moreover, as discussed below, the Challenge Parties fail to allege colorable declaratory judgment claims with respect to the remaining categories of Alleged Unencumbered Assets set forth in the Proposed Complaint.

51.     <u>Goods (including Inventory, Equipment and artwork)</u>.  Although JPM stipulates that Goods (including Inventory, Equipment and artwork) are not part of JPM's collateral under the Prepetition Security Agreement (2019), JPM does have properly perfected liens on and security interest in Goods (including Inventory, Equipment and artwork) "now owned or hereinafter acquired by [BSA] and now or hereinafter affixed to, placed upon, used in connection with, arising from or related to" the land and improvements at Sea Base, the Headquarters, Northern Tier and Philmont by virtue of the Florida Sea Base Mortgage, the Headquarters Deed of Trust, the Northern Tier Mortgage and the Philmont Mortgage, respectively.  *See* Florida Sea Base Mortgage §1.1; Headquarters Deed of Trust § 1.1; Northern Tier Mortgage § 1.1; Philmont Mortgage § 1.1.

52.     <u>General Intangibles (including intellectual property and causes of action)</u>. JPM has a properly perfected lien in General Intangibles (which would include intellectual property and causes of action) under the Prepetition Security Agreement (2019) to the extent such General Intangibles "evidenc[e], govern[], secur[e], guarantee[], arise[] out of or otherwise relate[] to" Accounts.  *See* Prepetition Security Agreement (2019), § 2.01(b).  Moreover, JPM has properly perfected liens on and security interests in General Intangibles (which would include intellectual

_____

covered by the mortgages and deeds of trust; however, JPM assumes for purposes of this Objection that the reference in the Proposed Complaint is to property leased by the BSA from a third-party and not property leased by the BSA to a third-party.

property and causes of action) "now owned or hereinafter acquired by [BSA] and now or hereinafter affixed to, placed upon, used in connection with, arising from or related to" the land and improvements at Sea Base, the Headquarters, Northern Tier and Philmont by virtue of the Florida Sea Base Mortgage, the Headquarters Deed of Trust, the Northern Tier Mortgage and the Philmont Mortgage, respectively.

53.    <u>Motor vehicles and watercraft</u>.  Although JPM stipulates that motor vehicles and watercraft are not part of JPM's collateral under the Prepetition Security Agreement (2019), JPM does have properly perfected liens on and security interests in personal property, which includes motor vehicles and watercraft, "now owned or hereinafter acquired by [BSA] and now or hereinafter affixed to, placed upon, used in connection with, arising from or related to" the land and improvements at Sea Base, the Headquarters, Northern Tier and Philmont by virtue of the Florida Sea Base Mortgage, the Headquarters Deed of Trust, the Northern Tier Mortgage and the Philmont Mortgage, respectively; provided, however, JPM stipulates that to the extent such motor vehicles and watercraft are required to be perfected by noting its lien on the applicable certificate of title, JPM has not perfected such lien.

54.    <u>Membership dues payable to or received by BSA</u>.  Membership dues payable to or received by the BSA are collateral of JPM because they are Accounts covered by the Prepetition Security Agreement (2019).[22]  Pursuant to the Prepetition Security Agreement (2019), the BSA and Arrow granted JPM a first-priority lien and security interest in all Accounts (including certain

---

[22]    JPM perfected its security interest in Accounts by virtue of the following UCC filings: UCC-1 with initial filing number #2018101747, filed and recorded with the Recorder of Deeds of the District of Columbia, as amended by that certain UCC-3 amendment with filing number #2019029601, filed and recorded on March 22, 2019 with the Recorder of Deeds of the District of Columbia.

property arising out of or otherwise relating to such Accounts)[23] and all proceeds and products of any or all of the foregoing.  *See* Prepetition Security Agreement (2019), §§ 2.01(a), (b) and (f). Accounts is defined as "all 'accounts', as defined in Article 9 of the [Uniform Commercial Code as in effect in the State of Texas from time to time] and all 'payment intangibles', as defined in Article 9 of the [Uniform Commercial Code as in effect in the State of Texas from time to time]." *Id*. at § 1.01.[24]  The Uniform Commercial Code as in effect in the State of Texas defines "Account" as:

> [A] right to payment of a monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (ii) for services rendered or to be rendered, (iii) for a policy of insurance issued or to be issued, (iv) for a secondary obligation incurred or to be incurred, (v) for energy provided or to be provided, (vi) for the use or hire of a vessel under a charter or other contract, (vii) arising out of the use of a credit or charge card or information contained on or for use with the card, or (viii) as winnings in a lottery or other game of chance operated or sponsored by a state, governmental unit of a state, or person licensed or authorized to operate the game by a state or governmental unit of a state.

TEX. BUS. & COMM. CODE ANN § 9.102(a)(2).  "Payment intangible" is defined as "a general intangible under which the account debtor's principal obligation is a monetary obligation."  *See* TEX. BUS. & COMM. CODE ANN § 9.102(a)(62).[25]

---

[23]    The Prepetition Security Agreement (2019) provides that the collateral also includes all of the following evidencing, governing, securing, guaranteeing, arising out of or otherwise relating to any Accounts: (i) all documents; (ii) general intangibles; (iii) instruments; (iv) letter of credit rights; (v) supporting obligations; (vi) chattel paper; (vii) any and all books and records, in whatever form, or medium including electronic media, that at any time evidence or contain information relating to any of the foregoing or interests in the foregoing or are otherwise necessary or helpful in the collection thereof or realization thereon; and (viii) all substitutions and replacements of, any and all of the foregoing[.]  *See* Prepetition Security Agreement (2019), § 2.01(b).

[24]    "Accounts shall specifically include, without limitation, all amounts payable in connection with any agreement by a donor, grantor or other Persons to donate or otherwise contribute funds to a Debtor for the Project. Accounts shall specifically exclude however all amounts payable in connection with any agreement by a donor, grantor or other Person to donate or otherwise contribute funds to a Debtor if the use of such funds to be donated is restricted by such Person or applicable state law to a purpose other than the Project." *Id*. at § 1.01.

[25]    General Intangible is defined as "any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit

55.     The majority of Scouting memberships expire at year-end.  On January 1 of the following year, Scouts that decide to remain in the troop can renew their membership for that year. Membership dues payable to or received by the BSA are then collected from members by individual units and then submitted to the local council, and then those dues are swept into the BSA's primary concentration account at JPM after the local councils report the membership information for Scouts that remained in the troop as of January 1 and the deposit amounts are verified by the BSA.  The amounts ultimately collected from members by the local councils via remittance by Scouting units are immediately payable to the BSA.  As of the Petition Date, approximately $39 million in dues were payable to the BSA from local councils for 2020 member renewals evidenced by troop rosters delivered by the local councils.  Because membership dues payable to the BSA are accounts receivable, and within the scope of the definition of Accounts in the Prepetition Security Agreement (2019), JPM has a lien on membership dues pursuant to the Prepetition Security Agreement (2019).

56.     <u>Owned real estate (other than the three high adventure sites referenced in paragraph 19 of the Proposed Complaint)</u>.  The Challenge Parties' request for declaratory relief that JPM only has a lien in the three high adventure sites referenced in paragraph 19 of the Proposed Complaint (*i.e.*, Sea Base, Northern Tier and Philmont) is not correct because JPM also has a perfected lien on and security interest in the Headquarters by virtue of the Headquarters Deed of Trust.[26]  In addition to JPM's direct mortgages on Sea Base, Northern Tier, Philmont, and the

---

rights, letters of credit, money, and oil, gas, or other minerals before extraction.  The term includes payment intangibles and software."  *See* TEX. BUS. & COMM. CODE ANN § 9.102(a)(42).

[26]     Presumably the request for a declaratory judgment is an error since the Challenge Parties admit that JPM has a lien on the Headquarters.  *See* Proposed Complaint ¶ 27.

Headquarters, JPM also has a perfected collateral assignment of the BSA's mortgage on the Summit by virtue of the JPM Arrow Collateral Assignment.

57.    <u>Money</u>.  It is not clear from the Standing Motion or the Proposed Complaint what the Challenge Parties refer to by the use of the term "Money."  The vague reference to "Money" does not meet the exacting pleading standard required to establish that JPM does not have a perfected lien on Money.  As such, the Challenge Parties' request for declaratory relief as to Money should be denied.  To the extent the Challenge Parties are referring to cash, this request should also be denied because JPM does have a perfected lien on cash to the extent the cash is the identifiable proceeds of JPM's collateral or is held in an account at JPM.  Pursuant to the Prepetition Security Agreement (2019), JPM has properly perfected liens on and security interests in (a) all Accounts; (b) all Investment Property; (c) all Deposit Accounts; (d) all Securities Accounts; and (e) all proceeds and products of any or all of the foregoing.  *See* Prepetition Security Agreement (2019), § 2.01.  Similarly, each of the Florida Sea Base Mortgage, the Headquarters Deed of Trust, the Northern Tier Mortgage and the Philmont Mortgage contain liens on and security interests in various types of real and personal property, including "all accessions, replacements and substitutions for any of the foregoing and all proceeds thereof[.]"  Section 9.315(1)(b) of the Uniform Commercial Code provides that "a security interest attaches to any identifiable proceeds of collateral."  *See* TEX. BUS. & COMM. CODE ANN § 9.315(a)(2).[27] Furthermore, proceeds that are commingled with other property are still identifiable "to the extent that the secured party identifies the proceeds by a method of tracing, including application of

---

[27]    The security agreements are governed by the following applicable law: (i) the Prepetition Security Agreement (2019) (Texas); (ii) the Florida Sea Base Mortgage (Texas and Florida); (iii) the Headquarters Deed of Trust (Texas); (iv) the Northern Tier Mortgage (Texas and Minnesota); and (v) the Philmont Mortgage (Texas and New Mexico). Texas, Florida, Minnesota and New Mexico have each adopted the relevant provisions of Article 9 of the Uniform Commercial Code in substantially similar form.  Accordingly, all statutory references in this section are to the Uniform Commercial Code, as in effect in the State of Texas.

equitable principles." *See* TEX. BUS. & COMM. CODE ANN § 9.315(b)(2).  To the extent any Money (*i.e.*, cash) referenced in Counts 2 and 3 of the Proposed Complaint is the identifiable proceeds of JPM's collateral, or held in an account at JPM,[28] JPM has a perfected lien on such Money.

58.    <u>Any insurance policies</u>.  Again, pursuant to the Prepetition Security Agreement (2019), JPM has properly perfected liens on and security interests in (a) all Accounts; (b) all Investment Property; (c) all Deposit Accounts; (d) all Securities Accounts; and (e) all proceeds and products of any or all of the foregoing.  Prepetition Security Agreement (2019), § 2.01.  To the extent any insurance policies have proceeds, JPM has a security interest in them as well.  Moreover, certain of the Debtors' insurance policies and proceeds therefrom may have been encumbered as of the Petition Date under state law by virtue of the Debtors' endorsement of such policies in favor of JPM or by virtue of JPM being loss payees under such policies.  Finally, JPM has properly perfected liens on and security interest in "[a]ll insurance policies, unearned premiums therefor and proceeds from such policies" covering any of the BSA's personal and real property described in the Florida Sea Base Mortgage, the Headquarters Deed of Trust, the Northern Tier Mortgage and the Philmont Mortgage.

iii.    *The Challenge Parties' Claims That Certain of the Debtors' Personal Property Assets Are Unperfected Are Not Colorable (Count 4).*

59.    The Challenge Parties argue in the Standing Motion and the Proposed Complaint that JPM does not have perfected or otherwise enforceable security interests in the following assets of the Debtors: (a) Deposit Accounts maintained at any bank other than JPM and (b) any Prepetition Collateral acquired by the Debtors after the Petition Date (the "<u>Alleged Unperfected</u>

---

[28]    *See* TEX. BUS. & COMM. CODE ANN § 9.313(a).

Assets"). *See* Proposed Complaint, ¶ 30. The Challenge Parties request in Count 4 that the Court avoid JPM's liens concerning the Alleged Unperfected Assets. As set forth below, the Challenge Parties' claims in Count 4 are not colorable and should be dismissed.

60. <u>Deposit Accounts maintained at any bank other than JPM</u>. As set forth above with respect to the Challenge Parties' claims in Counts 2 and 3 that JPM does not have a lien on "Money," JPM does have perfected liens on cash to the extent such cash is the identifiable proceeds of JPM's collateral <u>or</u> is held in an account at JPM. *See* TEX. BUS. & COMM. CODE ANN § 9.315(a)(2) & TEX. BUS. & COMM. CODE ANN § 9.315(b)(2). As such, just because the identifiable proceeds of JPM's collateral are not in a JPM account does not mean that JPM does not have a lien on the cash held in the non-JPM account. Accordingly, to the extent there are Deposit Accounts maintained at any bank other than JPM, JPM will have a lien on the cash held in those Deposit Accounts to the extent such cash is the identifiable proceeds of JPM's collateral.[29]

61. <u>Prepetition Collateral acquired by the Debtors after the Petition Date</u>. Pursuant to section 552(a) of the Bankruptcy Code, "[e]xcept as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a). In turn, section 552(b)(1) of the Bankruptcy Code provides that if the prepetition security interest "extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case[.]" 11 U.S.C. § 552(b)(1).[30] As

---

[29] Upon information and belief, the amount of cash in non-JPM Deposit Accounts is approximately $2.9 million.

[30] Section 552(b)(2) of the Bankruptcy Code provides that if the prepetition security interest "extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property or the fees,

discussed above, the Prepetition Security Agreement (2019) and the applicable mortgages and deed of trust included liens on and security interests in proceeds. Accordingly, to the extent the Challenge Parties are seeking a comfort order about the self-effectuating provisions of section 552 of the Bankruptcy Code, such a ruling is unnecessary. To the extent the Challenge Parties are seeking to avoid the provisions of section 552(b)(1) of the Bankruptcy Code, such a request is impermissible given that the Final Cash Collateral Order includes a waiver of the "equities of the case" exception under section 552(b) of the Bankruptcy Code. *See* Final Cash Collateral Order ¶ 16. Finally, as discussed above, to protect JPM, who effectively has funded these cases for 14 months through the use of its cash collateral, from potential diminution in value of its prepetition collateral, the Court granted to JPM valid, enforceable, unavoidable and fully perfected replacement liens on and security interests in the Adequate Protection Collateral (as defined in the Final Cash Collateral Order). *See* ¶ 5.(i) of the Final Cash Collateral Order. The Adequate Protection Collateral (as defined in the Final Cash Collateral Order) includes Prepetition Collateral acquired by the Debtors after the Petition Date.

> iv. *The Challenge Parties' Claims Regarding the Reserved Matters Are Not Colorable (Count 5).*

62. The Challenge Parties contend that they should be given a reservation of rights with respect to the following matters: (a) the allowance of any interest (or default rate interest) paid or accrued under the Prepetition Loan Documents; (b) the accuracy of the calculation of the amount of any principal, interest, fees, costs, or charges paid or accrued under the Prepetition Loan Documents; (c) the reasonableness pursuant to section 506(b) of the Bankruptcy Code of the

---

charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties, then such security interest extends to such rents and such fees, charges, accounts, or other payments acquired by the estate after the commencement of the case[.]" JPM has filed assignments of leases and rents for Sea Base, Northern Tier, Philmont, and the Headquarters. *See* Florida Sea Base Assignment, Headquarters Assignment, Northern Tier Assignment and Philmont Assignment.

amounts of any fees, costs or charges that may be asserted by JPM to the extent provided for under the Prepetition Loan Documents; and (d) any adequate protection or diminution claim that may be asserted by JPM against the Debtors' estates.  *See* Proposed Complaint, ¶ 45.  The Challenge Parties' requests in Count 5 are either already reserved under the Final Cash Collateral Order or should be denied.

63.    The allowance of any interest (or default rate interest) paid or accrued under the Prepetition Loan Documents.  The Final Cash Collateral Order provides that the "Debtors shall pay to the Prepetition Agent for the benefit of the Prepetition Secured Lender all accrued and unpaid interest (including, for the avoidance of doubt, interest accruing and becoming due after the Petition Date) at the non default rates and consistent with the ordinary course interest payment dates set forth in each respective Prepetition Loan Document[.]"  *See* Final Cash Collateral Order ¶ 5.(iii).  The Final Cash Collateral Order further provides that "in the event of a successful Challenge Proceeding or a determination by final order that the Prepetition Secured Parties are undersecured in the Prepetition Collateral,[31] all rights of the Debtors, the Creditors' Committee, the Tort Committee and the FCR to seek recharacterization, disgorgement, or refund of any amounts paid to the Prepetition Agent to or for the benefit of the Prepetition Secured Parties (including the Adequate Protection Payments) are fully and expressly preserved."  *See* Final Cash Collateral Order ¶ 17.[32]  Accordingly, the Challenge Parties' right to challenge the payment of interest to JPM is already preserved to the extent JPM is found to be undersecured.

---

[31]    The Challenge Period did not limit the ability to challenge "the value of the Prepetition Collateral at the Petition Date and whether the Prepetition Obligations are fully secured within the meaning of Section 506 of the Bankruptcy Code[.]"  *See* Final Cash Collateral Order ¶ 19.(iii).

[32]    Pursuant to the Final Cash Collateral Order, the term "Adequate Protection Payments" includes interest paid to JPM (¶ 5.(iii)) and fees and expenses of legal counsel, financial advisors and other consultants (¶ 5.(iv)).

64.     <u>The accuracy of the calculation of the amount of any principal, interest, fees, costs, or charges paid or accrued under the Prepetition Loan Documents</u>.  The Final Cash Collateral Order provides that the "Debtors' Stipulations shall be deemed to constitute a timely filed proof of claim for the Prepetition Agent and the Prepetition Secured Lender upon approval of this Final Order, and the Prepetition Agent and the Prepetition Secured Lender shall be treated under section 502(a) of the Bankruptcy Code as if they filed a proof of claim."  *See* Final Cash Collateral Order ¶ 30.  Included in the Debtors' Stipulations are the principal amounts due under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement and the 2019 RCF Agreement as of the Petition Date.  *See* Final Cash Collateral Order ¶ D.(v).  Although the Proposed Complaint provides that it "constitutes an objection, pursuant to section 502 of title 11 of the U.S. Code . . . to the liens and claims asserted by the Prepetition Lender against the Debtors[,]" nowhere in the Proposed Complaint do the Challenge Parties actually allege that any principal, interest, fees, costs, or charges paid or accrued under the Prepetition Loan Documents are incorrect, relying instead on improper conclusory statements.  Accordingly, such request should be denied except to the extent JPM is determined to be undersecured, in which case the reservation of rights set forth in Paragraph 17 of the Final Cash Collateral Order would apply.

65.     <u>The reasonableness of the amounts of any fees, costs or charges that may be asserted by the Prepetition Lender</u>.  The Final Cash Collateral Order provides that "the Prepetition Agent shall receive from the Debtors, for the benefit of the Prepetition Secured Lender, current cash payments of all reasonable and documented prepetition and postpetition fees and expenses payable to the Prepetition Secured Parties under the Prepetition Loan Documents, including, but not limited to, the reasonable and documented prepetition and postpetition fees and disbursements of legal counsel, financial advisors and other consultants (the "<u>Adequate Protection Fees and</u>

Expenses”).”  *See* Final Cash Collateral Order ¶ 5.(iv).  The Final Cash Collateral Order further provides that “[p]ayment of all such Adequate Protection Fees and Expenses shall not be subject to allowance by the Court” but subject to a ten business day objection period.  *Id*.  To date, no objections have been filed to any of the Adequate Protection Fees and Expenses submitted by JPM and it is JPM’s position that such fees and expenses are not subject to challenge, except to the extent JPM is determined to be undersecured, in which case the reservation of rights set forth in Paragraph 17 of the Final Cash Collateral Order would apply.

66.    <u>Any adequate protection or diminution claim that may be asserted by the Prepetition Lender against the Debtors’ estates</u>.  This request is not ripe as, to date, JPM has not asserted any adequate protection or diminution claim against the Debtors’ estates at this time. Should JPM assert such claim in the future, the Challenge Parties can respond to such a request as the Final Cash Collateral Order provides that the “Creditors’ Committee, the Tort Committee and the FCR reserve all rights to challenge any assertion of any diminution in value of the Prepetition Funds or the Encumbered Postpetition Funds or any other claim for any alleged diminution in value.”  *See* Final Cash Collateral Order ¶ 2.(ii).

**B.    The Debtors’ Refusal to Litigate the Alleged Claims is Entirely Justified.**

67.    While the Challenge Parties appear to suggest that the Debtors’ waiver of their ability to pursue the proposed causes of action under the Final Cash Collateral Order demonstrates refusal to bring such claims, they fail to address whether that waiver constitutes an “unjustified refusal.”  Taking into account both the costs and benefits of the Challenge Parties’ alleged claims— including the insurmountable deficiencies identified above—the Debtors properly exercised their business judgment not to pursue such claims in the first instance and to settle them with the UCC in the context of the Second Amended Plan.  Thus, the Challenge Parties have not, and cannot,

satisfy their burden to show that the Debtors' determination that the claims were not worth the time and expense to pursue was unjustified, or indeed that any of the alleged claims warrant further attention, particularly in the face of the value maximizing settlement set forth in the Second Amended Plan.

68.    Courts refer to the requirement that a derivative plaintiff show the debtor's decision to not bring claims was unjustified as the "critical inquiry." *PW Enters., Inc. v. N.D. Racing Comm., et al. (In re Racing Servs., Inc.)*, 540 F.3d 892, 900 (8th Cir. 2008) ("[W]e agree with our sister circuits that the ***critical inquiry*** is whether the trustee (or debtor-in-possession) abused its discretion by ***unjustifiably*** refusing to pursue the creditor's proposed claims." (emphases added)). As the Eighth Circuit Court of Appeals explained, the movant must do more than simply allege that the debtor's decision was unjustifiable—it must provide specific reasons for its belief. *Id.* ("To satisfy its burden, the creditor, at a minimum, must provide the bankruptcy court with specific reasons why it believes the trustee's refusal is unjustified. A creditor thus does not meet its burden with a naked assertion that 'the trustee's refusal is unjustified.'"). Otherwise, derivative actions in bankruptcy cases would become the norm. *Id.* (noting that the "unjustifiable refusal" element helps "to prevent derivative adversary proceedings from becoming the norm in bankruptcy"). "If presented with nothing more than [naked assertions], the bankruptcy court may properly deny a creditor's motion without explanation." *Id.*

69.    "The party seeking derivative standing bears the burden of establishing, by competent evidence, that . . . the trustee unjustifiably refused to bring suit[.]" *In re Copperfield Investments, LLC*, 421 B.R. 604, 609 (Bankr. E.D.N.Y. 2010); *see also Racing Servs., Inc.*, 540 F.3d at 900 ("The creditor, not the bankruptcy court, has the onus of establishing the trustee unjustifiably refuses to bring the creditor's claim."). The Challenge Parties must present sufficient

evidence showing that the Debtors' inactivity on the claims is unjustifiable or abusive of their discretion. *See, e.g., STN Enters.*, 779 F.2d at 905 ("[i]f the committee presents a colorable claim . . . the court must also examine, on affidavit and other submission, by evidentiary hearing or otherwise, whether an action asserting such claim(s) is likely to benefit the reorganization estate.") (internal citation omitted); *MIG, Inc.*, 2009 WL 8662897 at *2 (requiring evidence in granting derivative standing including "affidavit and other submission, by evidentiary hearing or otherwise").

70.    Determining whether refusal was justified requires an analysis of the costs and benefits of pursuing the proposed claims. *See, e.g., In re Archdiocese of Milwaukee*, 483 B.R. 855, 869-71 (Bankr. E.D. Wis. 2012) (finding cost-benefit analysis weighed against granting derivative standing when already-conducted discovery led to little evidence of liability and more discovery leading to trial would cause substantial expense).   To satisfy their burden on standing, the Challenge Parties, "at a minimum," must provide the Court with "***specific*** reasons why it believes the [Debtors'] refusal is unjustified" and that burden is not met "with a naked assertion that [] refusal is unjustified."   *Racing Servs., Inc.*, 540 F.3d at 900 (emphasis in original); *Unsecured Creditors' Comm. v. Farmers Sav. Bank (In re Toledo Equip. Co.)*, 35 B.R. 315, 320 (Bankr. N.D. Ohio 1983) (an application for standing must show "the creditor's committee's grounds for contending that the debtor-in-possession's inactivity on the claim is unjustifiable or abusive of their discretion").   The Challenge Parties have failed to satisfy this essential and fundamental burden to establish that Debtors' refusal to litigate the claims set forth in the Proposed Complaint was unjustifiable.

     *i.     Refusal is Justified Because the Challenge Parties Cannot Demonstrate That the Debtors Abused Their Discretion By Settling the Claims Under the Second Amended Plan.*

71.     Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 authorize the Court to approve settlements of claims.  Section 105(a) of the Bankruptcy Code provides, in relevant part, that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  In addition, Bankruptcy Rule 9019 provides that, upon notice and a hearing, the Court "may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).

72.     Settlements and compromises are favored in bankruptcy proceedings as a means of "minimiz[ing] litigation and expedit[ing] the administration of a bankruptcy estate."  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *see also In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006).  The Court should exercise its discretion to approve a settlement or compromise where it is "fair, reasonable, and in the interest of the estate."  *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997).  The Court need only "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonable."  *In re W.R. Grace & Co.*, 475 B.R. 34, 78 (D. Del. 2012).  In determining whether a settlement or compromise should be approved, courts consider a number of factors, including "(1) the probability of success in the litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors.  *Martin*, 91 F.3d at 393.

73.     Here, the Debtors, acting as estate fiduciaries on behalf of all stakeholders and in the exercise of their reasonable business judgment, determined that the mediated settlement with JPM embodied in the Second Amended Plan, which was negotiated and approved by the UCC,

was a value-maximizing alternative to questionable litigation. As set forth in the Amended Disclosure Statement, the settlement with JPM and the UCC provides the following substantial benefits (to which the Challenge Parties have provided no evidence to the contrary):[33]

- Preserves the BSA as a going concern and its charitable mission;

- Eliminates substantial litigation fees and expenses;

- Extends the maturity of JPM's prepetition indebtedness by 10 years under the Restated Debt and Security Documents with favorably low interest rates, including a two (2) year moratorium on principal, which allows the Debtors to increase their contributions to the Settlement Trust;

- Permits the Debtors to enter into the Foundation Loan, which enables the Debtors to contribute to the Settlement Trust an amount of cash up to the value of the Summit ($42.8 million), which secures the Amended Intercompany Note that was collaterally assigned to JPM pursuant to the JPM Arrow Collateral Assignment;

- Provided the Second Amended Plan is confirmed, JPM will not seek a diminution in value claim; and

- Provided the Second Amended Plan is confirmed, JPM will not object to the Net Unrestricted Cash and Investments, the Scouting University (valued at $1.8 million), the Artwork (valued at $60 million), the Oil and Gas Interests (valued at $7.6 million), and the Distribution Center (valued at $11.5 million) being contributed to the Settlement Trust.

---

[33]  Capitalized terms in the following section shall have the meaning ascribed to them in the Second Amended Plan unless otherwise defined therein.

74.     Moreover, the primary claim in the Proposed Complaint is a claim to recharacterize the Amended Intercompany Note as equity in an attempt to obtain the value of the Summit for the benefit of abuse claimants.  *See* ¶ 16 of the Proposed Complaint ("Unless these transfers or the proper ownership of the Summit are remedies, the value thereof will be outside the reach of BSA's tort claimants").  However, the Second Amended Plan already provides the value of the Summit to the Settlement Trust (as a component of Net Unrestricted Cash and Investments) by virtue of the Foundation Note in the amount $42.5 million, the same value as the Summit.  Accordingly, the value the Challenge Parties seek to gain through the Proposed Complaint is already provided for under the Second Amended Plan without the need to litigate.[34]  Indeed, if the Court confirms the Second Amended Plan, the Debtors and the UCC will have obtained what the Challenge Parties seek standing to pursue, all without the attendant risks of complex and protracted litigation that would be costly to the Debtors' estates.  The Chapter 11 Cases are now in their fourteenth month and, given the number of estate professionals, extraordinarily expensive.  Prosecution of the Proposed Complaint would only increase the amount of estate assets being used to fund professional fees rather than distributions to creditors in the Chapter 11 Cases.  Moreover, these increased administrative claims will have a higher payment priority than general unsecured claims and would be owed by each of the Debtors jointly and severally.  Accordingly, even if the claims asserted under the Proposed Complaint could somehow generate additional value, such value would inevitably be consumed by the substantially increased costs imposed as a result of the

---

[34]     The Tort Committee's own admission that it "intends to file its own plan of reorganization" and that "[t]o the greatest extent possible, the plan will mirror substantially the Debtor's plan as to treatment of creditors other than Abuse Claimants" undermines any justification for prosecuting the Proposed Complaint.  *See* Dkt. No. 2506, ¶ 20. Given that the Tort Committee's proposed plan's treatment of JPM will be substantially similar to the Second Amended Plan, which includes the JPM/UCC Settlement, there is absolutely no benefit to the Debtors' estates for the Challenge Parties to pursue the claims set forth in the Proposed Complaint.  Rather, the Standing Motion and the Proposed Complaint appear to be nothing more than a litigation tactic that has resulted in the Debtors and JPM further depleting already limited resources to respond to the Challenge Parties' request for standing.

litigation requested by the Challenge Parties.  As such, the Challenge Parties cannot satisfy their burden of showing that the cost benefit analysis weighs in favor of granting standing.

75.    Moreover, under the compromise set forth in the Second Amended Plan, JPM agreed to waive any diminution in value claim if the Second Amended Plan is confirmed.  If the Court granted JPM a diminution in value claim (which JPM would pursue if the Second Amended Plan is not confirmed), any unencumbered value (*e.g.*, the value of Summit if the Challenge Parties were granted standing and were successful in their claim to recharacterize the Amended Intercompany Note) would first go to pay JPM's diminution in value claim, with any residual likely going to pay non-super priority administrative claims rather than unsecured creditors, including abuse claimants.

      *ii.*    *Refusal is Justified as the Costs for Litigating Such Claims Will Not Benefit the Estate.*

76.    In deciding whether the Debtors unjustifiably refused to bring suit so as to confer standing on the Challenge Parties, the court must determine whether an action asserting such claim(s) is likely to benefit the estate.  *Sabine Oil & Gas Corp.,* 547 B.R. at 516 (citing *STN Enters.,* 779 F.2d at 905).  The court should weigh the "probability of success and financial recovery," as well as the anticipated costs of litigation, as part of a cost/benefit analysis to determine whether the prosecution of claims is likely to benefit the debtor's estate.  *Sabine Oil & Gas Corp.*, 547 B.R. at 516. (citing *Official Comm. of Unsecured Creditors of Am.'s Hobby Ctr., Inc. v. Hudson United Bank (In re America's Hobby Ctr., Inc.)*, 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998)).  The court must assure itself (a) "that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that initiation and continuation of litigation will likely produce," (b) that the claims, if proven, will provide a basis for recovery;

and (c) that the proposed litigation will not be a "hopeless fling." *Sabine Oil & Gas Corp.*, 547 B.R. at 516 (citing *Adelphia Commc'ns. Corp.*, 330 B.R. at 386).

77.     Were the Court to grant derivative standing and permit the Challenge Parties to prosecute the Proposed Complaint, one certain result would be the expenditure of a sizable amount of estate resources in such litigation.  The Challenge Parties provide no evidence of the anticipated costs of litigating the Proposed Complaint, leaving the Court to speculate as to the actual net effect that the Challenge Parties' pursuit of their claims and causes of action would have on the estates. *See In re Catholic Bishop of N. Alaska*, No. F08–00110, 2009 WL 8412174, at *6 (Bankr. D. Alaska Sept. 11, 2009) (holding that because "[t]he [Committee] has provided no estimate as to the costs for recovery . . . [i]t is impossible for the court to make a cost-benefit analysis under such circumstances").

78.     In fact, the Challenge Parties fail to acknowledge any downside whatsoever to the Court granting standing, putting these cases squarely down a litigation path.  But one thing is not subject to dispute—the Debtors would bear the entire cost of any litigation on behalf of the Debtors' estates, JPM (pursuant to the Final Cash Collateral Order), the UCC, and the Challenge Parties.  The type of litigation outlined in the Proposed Complaint is exceedingly expensive. Specifically, it would entail months of fact discovery, expert testimony, as well as a lengthy trial. It follows that the resulting administrative costs associated with this litigation strategy would only serve to hurt all stakeholders and would needlessly delay and likely jeopardize the Debtors' confirmation process for the Second Amended Plan (and the substantial benefits to the Debtors' estates provided therein) in favor of a speculative and value-destructive litigation strategy without a path to emergence—all while the Challenge Parties admit that their version of the restructuring process would provide substantially similar treatment to JPM.  The Challenge Parties have quite

literally provided no advantage to the litigation path set out in their Proposed Complaint.  *See* Dkt. No. 2506, ¶ 20.  In sum, the cost-benefit analysis strongly favors denying the Standing Motion.

iii.     *Refusal is Justified Because the Alleged Claims Are Not Likely to Succeed.*

79.     As discussed above, the Challenge Parties' alleged claims are significantly, if not fatally, flawed, and the Challenge Parties would have a negligible likelihood of success were they allowed to proceed.  The Challenge Parties assert that their alleged claims have the potential to "preserve substantial assets for the benefit of the estate . . . [and] tort claimants."  *See* Standing Motion, ¶¶ 54-55.  But conclusory statements like this do not equate to the evidentiary showing required to establish the probabilities of actual legal success and financial recovery as this Court requires.  *MIG, Inc.*, 2009 WL 8662897, at *2 (requiring evidence in granting derivative standing including "affidavit and other submission, by evidentiary hearing or otherwise").

80.     Given that the value of the Summit is already being contributed to the Settlement Trust, in addition to the deficiencies addressed herein, prosecution of any of the Challenge Parties' proposed claims and causes of action would serve only to diminish value that could be distributed to existing creditors.  As a result, the estates are clearly better off with the settlement embodied in the Second Amended Plan rather than being mired in endless litigation with no path to exit.  As explained herein, the Challenge Parties' theories fail on the law and the facts.  Thus, standing should be denied in light of the significant costs and lack of corresponding benefits to the estates.  *See Sabine Oil & Gas Corp.*, 547 B.R. at 516; *In re Caesars Ent. Operating Co., Inc.*, 561 B.R. 457, 469 (Bankr. N.D. Ill. 2016).

**C.**     **To the Extent the Challenge Parties Are Requesting Exclusive Authority to Pursue the Claims and Causes of Action in the Proposed Complaint, Such Request Should Be Denied.**

81.     The Challenge Parties have requested "standing to pursue, prosecute, ***and resolve***, on behalf of the Debtors' estates" the claims and causes of action set forth in the Proposed Complaint.  *See* Standing Motion ¶ 1 (emphasis added).  If inclined to entertain the Challenge Parties' requests at all, the Court should reject any request (to the extent that is what is being requested) by the Challenge Parties for ***exclusive*** authority to pursue and settle the alleged claims.

82.     The Court should instead recognize the Debtors' statutory authority to settle causes of action in the best interests of the estates, as the sole fiduciary for all stakeholders.  *Compare In re Tex. Standard Oil Co.*, No. 08–34031, 2008 WL 5479114, at 8* (Bankr. S.D. Tex. Nov. 12, 2008) ("Because the Debtor is in bankruptcy, it has fiduciary duties to its creditors to maximize the value of its bankruptcy estate."); *Smart World Techs., LLC*, 423 F.3d at 175 n.12 (explaining that a creditors' committee "owes a fiduciary duty to the class it represents, but not to the debtor, other classes of creditors, or the estate").  Any settlement authority on behalf of the Challenge Parties—let alone exclusive settlement authority—lacks merit where, as here, the Challenge Parties are only one constituency of many, which the Challenge Parties readily admit.  *See Centaur, LLC*, 2010 WL 4624910 at *7 ("A grant of derivative standing does not strip a debtor of ownership of the Claims and, accordingly, the Debtors continue to have the right, subject to Court approval, to settle the Claims."); *In re Exide Techs.*, 303 B.R. 48, 67 (Bankr. D. Del. 2003) (rejecting the committee's argument that the debtors lacked authority to settle claims against the estate through plan confirmation, stating that "[a]fter examination of the plain language of § 1123(b)(3)(A) and upon review of the relevant decisional law on the issue, I conclude that § 1123(b)(3)(A) authorizes the Debtor to propose a settlement of the Creditors Committee's Adversary Proceeding in its

plan."). Indeed, granting the Challenge Parties exclusive settlement authority would distort settlement dynamics. The Challenge Parties have fiduciary duties only to abuse claimants and may therefore have an incentive to imperil the overall going concern value of the Debtors' estates in an attempt to swing for the fences and "hit a home run" for their constituencies. The Debtors, by contrast, have a fiduciary duty to maximize the value of their estates for all parties in interest in the Chapter 11 Cases.

83.    To the extent the Challenge Parties are requesting that the Debtors should not maintain the exclusive authority to propose a settlement of the claims for a review by creditors and approval of this Court (which the Debtors have done in the Second Amended Plan), the Challenge Parties request would override three important provisions of the Bankruptcy Code and the Bankruptcy Rules: (a) Bankruptcy Rule 9019(a), which permits a debtor to propose a settlement or compromise;[35] (b) section 1123(b) of the Bankruptcy Code, which allows a plan proponent to include a proposed settlement of claims belonging to the debtors;[36] and (c) section 1109(b) of the Bankruptcy Code, which allows the debtor to raise and be heard on "any issue in a case under

---

[35]    Bankruptcy Rule 9019(a) provides, in pertinent part, that "[o]n motion by the trustee and after notice a hearing, the court may approve a compromise or settlement." *See* Fed. R. Bankr. P. 9019(a) (emphasis added). Accordingly, the trustee or debtor in possession has the express—and exclusive—right to settle claims in a chapter 11 case. The Supreme Court has held that authority granted by the Bankruptcy Code solely to a trustee is limited, by its terms, to a trustee or a debtor in possession. *See Hartford Underwriters Ins. Co. v. Union Planters Bank N.A.*, 530 U.S. 1, 6 (2000) (holding that individual creditors cannot employ the power of "the trustee" to surcharge a secured creditor under section 506(c) of the Bankruptcy Code).

[36]    Section 1123 of the Bankruptcy Code provides that "a plan may . . . provide for the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A) (emphasis added). Numerous courts have recognized that this settlement right is limited, by the plain language of the statute, to the plan proponent. *See, e.g., In re Allegheny Int'l, Inc.*, 118 B.R. 282, 312 (Bankr. W.D. Pa. 1990) (approving settlement of claims over equity committee's objection, even where committee could have derivatively pursued claims, holding that "the court believes this is a derivative action being brought by the committee on behalf of the debtor. This court by confirming the debtor's plan and agreeing to this settlement binds the [equity committee].").

[chapter 11]."[37]  Any request for exclusive settlement authority is therefore directly contrary to the plain language of the Bankruptcy Code and the Bankruptcy Rules and should be rejected.

84.    Granting the Challenge Parties the exclusive authority to settle claims would also undermine many aspects of the Debtors' restructuring, including their exclusive right to propose and solicit votes for the Second Amended Plan that already addresses the alleged claims.  Indeed, granting the Challenge Parties exclusive settlement authority would also have the effect of giving the Challenge Parties improper veto authority over any plan in these chapter 11 cases (including the Second Amended Plan), as no plan (whether proposed by the Debtors or otherwise) would be able to compromise the claims in the Proposed Complaint without the Challenge Parties' consent. The Debtors' retention of settlement authority, however, will not undermine the Challenge Parties' ability to have a say on the resolution of the claims.  Indeed, the settlement by the Debtors and the UCC embodied in the Second Amended Plan must be approved by the Court before it takes effect. *See* 11 U.S.C. § 1123(b); Fed. R. Bankr. P. 9019(a).  The fact that the Challenge Parties are displeased with the proposed settlement in the Second Amended Plan offers no grounds for avoiding the default rule of a debtor's exclusive authority to settle.  *See In re Adelphia Commc'ns. Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006).

85.    For these reasons, even if the Court grants the Standing Motion, the order should expressly preserve the Debtors' inherent authority to settle the causes of action in the Proposed Complaint, including through a plan of reorganization such as the Second Amended Plan (which, as has been mentioned, does in fact settle those causes of action), consistent with Rule 9019 and

---

[37]    The Debtors' retention of settlement authority will not undermine the Challenge Parties' ability to have a say on the proposed resolution of the claims and the opportunity to object or be heard at confirmation of the Second Amended Plan.  This result squares perfectly with section 1109(b) of the Bankruptcy Code, which provides that certain parties, including a debtor, "may raise and may appear and be heard on any issue in a case under" chapter 11.  11 U.S.C. § 1109(b).

section 1123(b)(2)(A) of the Bankruptcy Code, and any request by the Challenge Parties for exclusive authority to compromise or settle such causes of action should be denied.

## **Notice**

86.     Notice of this Objection will be provided to (i) the U.S. Trustee; (ii) counsel to the Debtors (iii) counsel to the UCC; (iv) counsel to the Tort Committee; (v) counsel to the proposed FCR; (vi) counsel to the Ad Hoc Committee of Local Councils, (vii) the County Commission of Fayette County (West Virginia), as issuer of those certain Commercial Development Revenue Bonds (Arrow WV Project), Series 2010A, 2010B and 2012; and (viii) any party that has requested notice pursuant to Bankruptcy Rule 2002.  JPM submits that, in light of the nature of the relief requested, no other or further notice need be given.

### Conclusion

WHEREFORE, JPM respectfully requests that this Court (a) enter an order denying the

Standing Motion; and (b) for any additional relief as this Court deems just and proper.

Dated:  April 29, 2021
       Wilmington, Delaware

**WOMBLE BOND DICKINSON (US) LLP**

*/s/ Morgan L. Patterson*
Matthew P. Ward (DE Bar No. 4471)
Morgan L. Patterson (DE Bar No. 5388)
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone:  (302) 252-4320
Facsimile:  (302) 252-4330
Email:  matthew.ward@wbd-us.com
      morgan.patterson@wbd-us.com

-and-

**NORTON ROSE FULBRIGHT US LLP**
Louis R. Strubeck, Jr. (admitted *pro hac vice*)
Kristian W. Gluck (admitted *pro hac vice*)
Laura Smith (admitted *pro hac vice*)
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201
Telephone: (214) 855-8000
Facsimile: (214) 855-8200
Email:  louis.strubeck@nortonrosefulbright.com
      kristian.gluck@nortonrosefulbright.com
      laura.smith@nortonrosefulbright.com

*Counsel to JPMorgan Chase Bank, National Association*