# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1]<br><br>　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>**Ref. D.I. 2364** |

### DEBTORS' OBJECTION TO JOINT MOTION OF THE OFFICIAL TORT CLAIMANTS' COMMITTEE AND FUTURE CLAIMANTS' REPRESENTATIVE FOR ENTRY OF AN ORDER GRANTING STANDING AND AUTHORIZING THE PROSECUTION OF CERTAIN CHALLENGE CLAIMS ON BEHALF OF THE BANKRUPTCY ESTATES

Boy Scouts of America (the "BSA") and its affiliate Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (together, the "Debtors"), submit this objection to the *Joint Motion of the Official Tort Claimants' Committee and Future Claimants' Representative for Entry of an Order Granting Standing and Authorizing the Prosecution of Certain Challenge Claims on Behalf of the Bankruptcy Estates* [D.I. 2364] (the "Motion"),[2] filed by the Official Tort Claimants' Committee (the "TCC") and James L. Patton Jr., as Legal Representative for Future Claimants (the "FCR," and together with the TCC, "Movants"), and respectfully state as follows:

### PRELIMINARY STATEMENT

The Motion was filed mere weeks after the Debtors filed a proposed amended chapter 11 plan of reorganization, which, as further amended [D.I. 2292] (the "Plan"), will enable them to

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion or the Plan, as applicable.

achieve their restructuring objectives and exit bankruptcy on their required timeline. Rather than focus on preserving and maximizing the value of the Debtors' estates for Movants' constituents, Movants seek standing to further expend the estates' limited resources on prosecuting certain estate causes of action which the Debtors, in their reasonable business judgment, have determined not to pursue. The Motion fails for at least three reasons.

*First*, none of the claims in Movants' proposed complaint (the "Proposed Complaint") are colorable. Movants' attempt to recharacterize the promissory note between Arrow and the BSA (the "Arrow Note") fails on the facts and the law. The Arrow Note is not an equity investment (the applicability of which is questionable, as Arrow is a non-stock entity); rather it is debt issued to memorialize Arrow's obligation to repay the BSA on account of the proceeds of certain bond issuances used to finance the purchase and improvement of the Summit Property. Indeed, a review of the relevant documents—which Movants do not discuss—supports this conclusion. Movants' attempt to avoid the Arrow Note and other unspecified transfers as fraudulent is also misguided, since Movants fail to plead any facts showing that these transfers, certain of which were made as many as 10 years ago, meet the elements of either an actual or constructive fraudulent transfer under the Bankruptcy Code or applicable state law. And Movants' request for a declaratory judgment preserving their rights—which at best seeks an advisory opinion, and at worst seeks to circumvent the Challenge Deadline under the Final Cash Collateral Order—also fails.

*Second*, even if the proposed claims were colorable (and they are not), pursuing them would be a waste of the Debtors' time and resources. The Debtors' have entered into a settlement with the Prepetition Lender and the Official Committee of Unsecured Creditors (the "UCC") that provides for meaningful benefits to the estates and creditors under the Plan. This settlement would, upon the confirmation and consummation of the Plan, resolve the claims sought to be prosecuted

in the Proposed Complaint. Additionally, the Plan already expressly provides value to the Settlement Trust in an amount up to the appraised value of the Prepetition Lender's security interest in the Arrow Note ($42,800,000), to satisfy holders of compensable Abuse Claims. Additionally, there is no assurance that the avoidance actions Movants seek standing to assert would, if successful, actually increase recoveries for unsecured creditors.

**Third**, a movant seeking derivative standing bears the additional burden of undertaking a cost/benefit analysis to show that the benefits of bringing the claims justify the cost to the estate in resources, money and delay. Movants have not even attempted, much less succeeded, to show that they carry this burden. Rather, under these circumstances, where the Motion will serve to distract the Debtors and their key constituents when they are focused on negotiating critical aspects of and confirming the Plan on the Debtors' required timeline, the Motion must fail.

## ARGUMENT

Because a motion for derivative standing "attempt[s] to usurp the trustee's role as representative of the estate," a creditor seeking derivative standing bears the burden of demonstrating "(1) the existence of a colorable claim; (2) that the trustee unjustifiably refused to pursue the claim, and (3) the permission of the bankruptcy court to pursue the claim." *Sebastian v. Schmitz (In re WorldSpace, Inc.)*, No. 15-25 (GMS), 2016 U.S. Dist. LEXIS 129497, at *29 (D. Del. Sep. 22, 2016). Adding to this high bar, courts have found that derivative standing should be granted only where the likelihood and magnitude of success in prosecuting the claims outweighs the likely cost, disruption, and delay associated with litigation. *In re G-I Holdings, Inc.*, No. 04-3423 (WGB), 2006 U.S. Dist. LEXIS 45510, at *51-52 (D.N.J. June 21, 2006) (reversing grant of derivative standing because bankruptcy court did not consider and weigh "the likelihood of success and the amount that could reasonably be expected to be recovered against the anticipated delay

and expenses to the estate of prosecuting the proposed action"). Movants have not, and cannot, meet this burden.

I. **Movants Have Failed to Show That the Claims They Seek Derivative Standing to Pursue Are "Colorable."**

Courts apply the same standard to determine whether a claim is "colorable" as to determine whether a claim is "plausible" under Rule 12(b)(6). *In re Optim Energy, LLC,* No. 14-10262 (BLS), 2014 Bankr. LEXIS 2155, at *17-18 (Bankr. D. Del. May 13, 2014). Thus, to allege a colorable claim, Movants must assert "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Rather, Movants' "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

A. **Movants Fail to State a Colorable Claim for Recharacterizing the Arrow Note.**

In reviewing claims for recharacterization, the Third Circuit rejects the "multi-factor tests borrowed from non-bankruptcy case law" that Movants rely on (Proposed Complaint ¶ 50), and instead instructs parties to focus on the following "overarching inquiry": (1) what the parties say in their contracts; (2) what they do through their actions; and (3) the economic reality of the surrounding circumstances. *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 456 (3d Cir. 2006); *see also Radnor Holdings Corp. v. Tennenbaum Capital Ptnrs (In re Radnor Holdings Corp.)*, 353 B.R. 820, 838 (Bankr. D. Del. 2006) (explaining the recharacterization inquiry as focusing on the "intent of the parties at the time of the transaction, determined not by . . . applying any specific factor, but through a common sense evaluation of the

4

facts and circumstances surrounding a transaction"). Movants do not address this standard, and cannot meet it.

The evidence demonstrates that the Parties intended the Arrow Note to be debt. The Arrow Note is a "highly-specialized promissory note and mortgage" that demonstrates the parties' intent to create a debt instrument. *See, e.g., Anderson v. Commonwealth Renewable Energy, Inc. (In re Commonwealth Renewable Energy, Inc.)*, 540 B.R. 173, 181-183 (Bankr. W.D. Pa. 2015) (observing that a note's debt classification was substantiated by "[t]he complexity of the documents" that "were carefully crafted by [debtor's] legal counsel to address unique aspects of the transaction"). The Arrow Note is memorialized across more than half a dozen documents, totaling more than 50 pages, which establish and refer to the Arrow Note as debt throughout and make clear that Arrow is a borrower of the proceeds of the BSA's bond issuances in 2010 and 2012. These documents contain covenants of repayment and provide remedies for failure to repay. Furthermore, the Parties' actions demonstrate that they treat the Arrow Note as debt: Arrow reports it as such annually in its Form 990 filings, and the BSA includes it as an intercompany payable on its internal financial statements.[3]

Tellingly, Movants do not cite to, much less offer, any documents or other evidence to support their recharacterization claim. Rather, several of the key facts that Movants purport to rely on are pled "on information and belief." *See, e.g.*, Proposed Complaint ¶ 39 ("Upon information and belief, Arrow has few, if any, assets aside from the Summit Property and no ability to repay the Intercompany Note absent a disposition or refinancing of the Summit Property."). Such conclusory pleading is insufficient to state a colorable claim. *See Donald J. Trump for President,*

---

[3] *See, e.g.*, Arrow WV Inc. Form 990 (2018), Part X, Schedule D – Part X, available at https://www.open990.org/org/270441319/arrow-wv-inc/.

*Inc. v. Sec'y Penn.*, 830 F. App'x 377, 387 (3d Cir. 2020) (holding that an allegation beginning with "'[u]pon information and belief' is a lawyerly way of saying that the [plaintiff] does not know that something is a fact but just suspects it or has heard it" and is thus deficient under *Twombly* and *Iqbal*); *Dotson v. Nationwide Credit, Inc.*, 828 F. App'x 150, 154 n.2 (3d Cir. 2020) (holding that an allegation beginning with "'[o]n information and belief' . . . is conclusory and thus not entitled to any presumption of accuracy"); *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 252-53 (3d Cir. 2012) (holding that an allegation "based on 'information and belief' . . . fails to allege sufficient facts to" meet pleading burden). The recharacterization claim thus fails. *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 554 (Bankr. D. Del. 2009) ("Simply alleging, in a conclusory fashion, that the Lenders knew the 'loans' they provided to [the debtor] would be in default at the time the agreements providing for the loans were executed is not enough to state a claim for recharacterization.").

### B. Movants Fail to State a Colorable Claim for Avoidance of the Arrow Note.

Movants argue, in the alternative, that the transfers the BSA has made to Arrow should be avoided as fraudulent. A fraudulent transfer claim requires Movants to identify a "transfer or obligation incurred by [the Debtors] for which [they] received less than a reasonably equivalent value," and to demonstrate that the Debtors either were insolvent at the time of the transfer or became insolvent as a result of it. *In re Fedders N. Am.*, 405 B.R. at 546. Movants have failed to state a colorable claim for fraudulent transfer for at least three reasons.[4]

---

[4] The Proposed Complaint addresses only constructive fraud, and does not allege, much less succeed in showing, that the transfers from the BSA to Arrow were made "with actual intent to hinder, delay, or defraud" creditors. *See In re Fedders N. Am.*, 504 B.R. at 545. Accordingly, the Debtors do not address actual fraud.

6

*First*, the Debtors received reasonably equivalent value for the transfers. The Third Circuit has stated that "a party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.'" *In re Fedders N. Am.*, 405 B.R. at 546 (Bankr. D. Del. 2009) (citation omitted). As Movants acknowledge, in exchange for loaning approximately $350,000,000 to Arrow, the BSA received a security interest in the Summit Property in the form of the Intercompany Deed of Trust. *See* Mot. ¶¶ 24-25. As of year-end 2018, Arrow reported that its land, buildings, and leasehold improvements—the exact property secured by the Intercompany Deed of Trust[5]—had a book value in excess of the amount owed to the Debtors under the *Amended and Restated Promissory Note*. *See* Arrow WV Inc. Form 990 (2018), Schedule D – Part VI, available at https://www.open990.org/org/270441319/arrow-wv-inc/. The funds that the BSA loaned to Arrow were used to develop the Summit Property for the exclusive use of the BSA as a high adventure facility, which the BSA has used since 2014. Although the current fair market value of the property has been appraised at an amount ($42,800,000) less than the amount invested in the facility, that appraised value does not capture the value of the property in its present use to the BSA or at the time the transaction occurred. The Proposed Complaint does not rebut these facts, but rather asserts, in conclusory fashion, that "BSA did not receive fair consideration, or reasonably equivalent value, in exchange for the transfers made to Arrow." Proposed Complaint ¶ 40. Such conclusory pleading cannot state a colorable claim.

*Second*, "[t]here is no question" that the heightened pleading standards of Rule 9(b) "appl[y] to adversary proceedings in bankruptcy which include a claim for relief under §§ 544 or 548, whether it is based upon actual or constructive fraud." *OHC Liquidation Trust v. Nucor Corp. (In re Oakwood Homes Corp.)*, 325 B.R. 696, 698 (Bankr. D. Del. 2005); *see also Sharp Int'l*

---

[5] *Amended and Restated Promissory Note* (Mar. 21, 2019) at 2; *Credit Line Deed of Trust* (June 30, 2010).

7

*Corp. v. State St. Bank & Tr. Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 57 (2d Cir. 2005) (affirming dismissal of fraudulent conveyance claim for failing to meet the heightened pleading standards of Rule 9(b)). Yet the Proposed Complaint does not plead ***any*** facts demonstrating either that the Debtors were insolvent at the time of the transfers or that the transfers caused the Debtors' insolvency. Rather, the Proposed Complaint merely recites the elements of § 548(a)(1)(B) in conclusory fashion. *See, e.g.*, Proposed Complaint ¶ 41 ("The transfers made by BSA to Arrow . . . occurred while BSA was, or caused BSA to be rendered, insolvent, undercapitalized, or unable to pay its debts as they came due"). This is nothing more than the "threadbare recitals of the elements of a cause of action" that *Iqbal* held fail to state a claim. *See Iqbal*, 556 U.S at 678; *see also Crescent Res. Litig. Tr. v. Nexen Pruet, LLC (In re Crescent Res., LLC)*, Nos. 09-11507-CAG, 11-01082- CAG, 2012 Bankr. LEXIS 287, at *25 (Bankr. W.D. Tex. Jan. 23, 2012) (dismissing fraudulent transfer claims that "do no more than mirror the elements of § 548(a)(1)(B)").

***Third***, fraudulent transfer claims under section 548 of the Bankruptcy Code are subject to a two-year lookback period. 11 U.S.C. § 548(a)(1); *Miller v. Matco Elec. Corp. (In re NewStarcom Holdings, Inc.)*, 608 B.R. 614, 620 (D. Del. 2019) (citing § 548(a)(1)). Claims asserted under section 544(b) of the Bankruptcy Code, which employ the lookback periods under applicable state law, generally have a four- or six-year lookback period. The 2010 and 2012 bond issuances occurred well outside either of these lookback periods, rendering Movants' fraudulent transfer claims with respect to those transfers time-barred. Moreover, while Movants allege that the Amended Note was signed in March 2019, Movants state that the amendments were intended to document transfers that had already occurred. *See* Proposed Complaint ¶ 37 ("In each fiscal year between 2013 and 2018, the balance exceeded $300 million."). Many, if not all, of these transfers fall outside even the most far-reaching lookback period that could apply under section 544(b). By

8

failing to allege which of these transfers they seek to challenge, Movants fail not only to plead with the requisite specificity, but also to establish that *any* of their proposed claims would not be time-barred.

### C. Movants' Other Proposed Avoidance Actions Fail to State Colorable Claims.

The remainder of Movants' proposed challenge actions are either vague or would otherwise be fruitless. Movants fail to identify which "Unencumbered Assets" they seek to challenge. Rather, they assert that "[i]n the Final Cash Collateral Order, the Debtors stipulated that the Prepetition Lender has liens on or security interests in *some or all* of the Unencumbered Assets." Proposed Complaint ¶¶ 59, 64 (emphasis added). Movants cannot state a colorable claim justifying derivative standing while failing to plead with specificity, or give notice regarding, the actual security interests they seek to challenge.[6]

Movants also seek to challenge the Prepetition Lender's security interest in Deposit Accounts held at other financial institutions. Proposed Complaint ¶ 30. But it is undisputed that, under the Uniform Commercial Code, perfection of deposit accounts requires control, making Movants' proposed challenge action pointless (to the extent the Prepetition Lender even disputes the issue). *See* U.C.C. § 9-314. Similarly, Movants apparently seek to bring a challenge action confirming that the Prepetition Lender's security interests in certain unidentified postpetition proceeds of Prepetition Collateral were cut off as of the Petition Date. Proposed Complaint ¶ 68. In addition to being vague, this count seeks only to affirm what section 552 accomplishes automatically. *See* 11 U.S.C. § 552 ("[P]roperty acquired by the estate or by the debtor after the

---

[6] Worse, Movants define "Unencumbered Assets" by reference to "Prepetition Collateral," which they claim is defined in the Final Cash Collateral Order. *See* Proposed Complaint ¶¶ 26, 29. But "Prepetition Collateral" is not defined anywhere in the Final Cash Collateral Order, making the "Unencumbered Assets" that Movants seek to challenge impossible to decipher.

commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case").

D. **Movants' Request for a Declaration Reserving Their Rights Fails as a Matter of Law**

Movants' request for a declaration reserving their rights also fails for several reasons. ***First***, it is plainly not a derivative claim, as the rights it seeks to reserve belong to Movants, not the Debtors. *See* Proposed Complaint ¶ 72 ("None of the Debtors' various acknowledgments, waivers, and stipulations in the Final Cash Collateral Order . . . should have any impact on any rights, claims, defenses, offsets, or causes of action that Plaintiffs . . . may have against the Prepetition Lender"). ***Second***, Movants' request for a declaration reserving their rights seeks nothing more than an improper advisory opinion. ***Third***, Movants have failed to actually seek to assert the Challenge Claims they wish to preserve on or before the Challenge Deadline, and they are now therefore barred from doing so. *See* Final Cash Collateral Order ¶ 19(ii).

II. **The Debtors Have Not Unjustifiably Refused to Pursue the Claims.**

As noted above, to gain derivative standing, Movants must demonstrate not only that their claims are colorable, but that they justify the distraction and drain on estate resources that they will incur. *See In re MIG, Inc.*, Nos. 09-12118(KG), 407, 2009 Bankr. LEXIS 4313, at *5 (Bankr. D. Del. Dec. 18, 2009) (a court weighing derivative standing "should assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce"); *see also Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 569-70 (3d Cir. 2003) (the court acts as gatekeeper in assessing whether pursuit of derivative claims will provide a net benefit to the estate). Notably, Movants have not even attempted to show that they meet this requirement—because they cannot.

As an initial matter, Movants have failed to cite any evidence demonstrating that the Debtors refused to pursue the claims set forth in the Proposed Complaint, much less that their refusal was unjustifiable. The only statement Movants offer in support of this element is the assertion that the Debtors "irrevocably conceded that the Prepetition Lender has liens on, or security interests in, some or all of the Unencumbered Assets and the Unperfected Assets" in the Final Cash Collateral Order. Mot. ¶ 53. But a debtor's waiver of its rights to challenge a creditor's liens and security interests under an order authorizing the debtor's post-petition use of cash collateral is insufficient to demonstrate a debtor's "unjustifiable refusal." *See In re Caesars Entm't Operating Co.*, 561 B.R. 457, 469 (Bankr. N.D. Ill. 2016) ("the Committee has not explained in its motion why the debtors' decision to forego pursuing the claims was unjustified. The Committee has not shown that recovery on the claims is probable or what that recovery might be. Nor has the Committee provided even a rough estimate of how much it might cost to pursue the claims (although the cost would doubtless be considerable)").

Nonetheless, the Debtors would be justified in refusing to bring the claims in the Proposed Complaint because none of them is likely to bring any benefit to the estates.

*First*, the Debtors' refusal to pursue litigation against the Prepetition Lender is justified because the mediated settlement with the Prepetition Lender embodied in the Plan, which was negotiated with and approved by the UCC, obtains the same benefits without the cost and risks associated with litigation. Bankruptcy courts favor compromise to "minimize litigation and expedite the administration of the bankruptcy estate." *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006). Here, among other meaningful benefits to the estates, the settlement embodied in the Plan provides for: (a) a two-year principal holiday under the Restated Debt Documents; (b) the Prepetition Lender's agreement to extend the maturity of the prepetition debt

by 10 years after emergence with a favorably low interest rate under the Restated Debt Documents, allowing the Debtors to make a larger contribution to the Settlement Trust than would otherwise be possible; (c) the consent of the Prepetition Lender to Reorganized BSA's entry into the Foundation Loan, which will enable the Debtors to contribute up to the value of the Prepetition Lender's security interest in the Arrow Note ($42,800,000) to the Settlement Trust; and (d) the agreement of the Prepetition Lender not to seek a diminution-in-value claim if the Plan is confirmed. All of these benefits are provided under the Debtors' settlement with the Prepetition Lender and the UCC without the costs and risks associated with protracted litigation. And, as the Prepetition Lender has argued, if litigation were to commence, the Prepetition Lender would seek a diminution-in-value claim which could result in unencumbered value being used to satisfy the Prepetition Lender's diminution claim rather than unsecured creditors. The Debtors negotiated with the Prepetition Lender and the UCC at arm's length and in good faith pursuant to the Court-approved mediation process to reach a reasonable settlement of disputed issues. Such settlement is within the reasonable business judgment of the Debtors and justifies any refusal to pursue litigation.

*Second*, recharacterizing or otherwise avoiding the Arrow Note would serve no purpose, since holders of abuse claims are already expressly receiving value under the Plan in an amount that corresponds to the Prepetition Lender's security interest in the Arrow Note. Specifically, in the Plan, the "Foundation Loan" provides for a "second-lien term loan lending facility pursuant to which the [National Boy Scouts of America Foundation], as lender, shall make a term loan to Reorganized BSA, as borrower, in the principal amount of $42,800,000, which is equal to the appraised value of the Summit Bechtel Reserve." *See* Plan, Ex. E. Thus, the Plan proposed by the Debtors will enable the Debtors to contribute as much as $42,800,000 of the Debtors' existing

unrestricted cash and investments—the appraised value of the collateral securing the Arrow Note—to the Settlement Trust immediately prior to receiving the proceeds of the Foundation Loan. Importantly, this value flows to the Settlement Trust, and, in turn, to holders of compensable Abuse Claims, regardless of whether the Plan is confirmed as the Global Resolution Plan or the BSA Toggle Plan.

*Third*, Movants assume, without justification, that avoiding the Prepetition Lender's liens must redound to the benefit of unsecured creditors' recoveries. Not so. Rather, the incremental value that would be generated from avoiding the Prepetition Lender's liens could be retained by the Debtors for general corporate purposes and ultimately flow to the Reorganized BSA. Movants cite nothing that would demonstrate otherwise.

*Fourth*, the Prepetition Lender could have a significant claim for post-petition diminution in value of its collateral. Thus, any avoidance action focused on the miscellaneous security interests identified in the Proposed Complaint would likely be fruitless, as it would, if successful, avoid security interests in property that could be subject to the Prepetition Lender's replacement liens granted under the Final Cash Collateral Order.

Further, as discussed above, Movants have not demonstrated, and cannot demonstrate, that the potential benefits to creditors from filing and prosecuting the Proposed Complaint (which, as shown above, are minimal at best) outweigh the attendant expense, delay, and distraction. This factor is especially important given that the Debtors have proposed the Plan, which will allow them to exit bankruptcy on their required timeline to the benefit of all stakeholders. The Debtors and their key creditor constituencies must be able to focus on further negotiating the terms of the Plan and pursuing confirmation without the distraction of litigation.

Apparently recognizing the deficiencies in the Proposed Complaint, Movants try to salvage the Motion by noting repeatedly that the Proposed Complaint may later be amended. *See* Mot. ¶¶ 40, 41, 58. This has things backwards: it is Movants' burden to demonstrate that they have put forth colorable claims, not to promise that they may one day amend the Proposed Complaint to the point of viability. In fact, by relying on the possibility of amendment, Movants tacitly acknowledge that the Debtors are not unreasonable in refusing to prosecute the Proposed Complaint in its current form. Moreover, because Movants seek to bring Challenge Claims after the Challenge Deadline, their claims are time-barred, and amendment would be futile. Indeed, for the Court to recognize Movants' right to amend their claims would effectively allow Movants to impose a unilateral and unauthorized extension of the Challenge Period.

## **CONCLUSION**

For the reasons set forth above, the Debtors request that the Court deny the Motion and grant any other relief as may be just and proper.

| | |
|---|---|
| Dated:  April 29, 2021<br>　　　　  Wilmington, Delaware | **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**<br><br>*/s/ Eric W. Moats*<br>Derek C. Abbott (No. 3376)<br>Andrew R. Remming (No. 5120)<br>Eric W. Moats (No. 6441)<br>Paige N. Topper (No. 6470)<br>1201 North Market Street, 16th Floor<br>P.O. Box 1347<br>Wilmington, Delaware 19899-1347<br>Telephone:  (302) 658-9200<br>Email:  dabbott@morrisnichols.com<br>　　　　  aremming@morrisnichols.com<br>　　　　  emoats@morrisnichols.com<br>　　　　  ptopper@morrisnichols.com<br><br>– and –<br><br>**WHITE & CASE LLP**<br>Jessica C. Lauria (admitted *pro hac vice*)<br>1221 Avenue of the Americas<br>New York, New York 10020<br>Telephone: (212) 819-8200<br>Email: jessica.lauria@whitecase.com<br><br>– and –<br><br>**WHITE & CASE LLP**<br>Michael C. Andolina (admitted *pro hac vice*)<br>Matthew E. Linder (admitted *pro hac vice*)<br>Laura E. Baccash (admitted *pro hac vice*)<br>Blair M. Warner (admitted *pro hac vice*)<br>111 South Wacker Drive<br>Chicago, Illinois 60606<br>Telephone: (312) 881-5400<br>Email: mandolina@whitecase.com<br>　　　　  mlinder@whitecase.com<br>　　　　  laura.baccash@whitecase.com<br>　　　　  blair.warner@whitecase.com<br><br>ATTORNEYS FOR THE DEBTORS AND DEBTORS IN POSSESSION |