**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors. | Jointly Administered |
| | **Re: D.I. 2592 and 2594** |

**OBJECTION TO THE ADEQUACY OF DEBTORS' DISCLOSURE STATEMENT
IN SUPPORT OF SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION
AND JOINDER OF THE OBJECTION OF THE TORT CLAIMANTS' COMMITTEE**

**INTRODUCTION**

On April 13, 2021, the Debtors filed a Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America ("BSA") and Delaware BSA, LLC (Dkt. No. 2592) ("the Plan"), and on April 14, 2021, the Debtors filed a Disclosure Statement for the Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC ("the Disclosure Statement") (Dkt. No. 2594).

The Claimants represented by Dumas & Vaughn, LLC (the "D & V Claimants") object to the sufficiency and adequacy of the Disclosure Statement. The D & V Claimants are survivors of childhood sexual abuse who each filed a Sexual Abuse Survivor Proof of Claim.[1] As reflected in their individual proofs of claim, the story of each of these survivors is unique, including how they were sexually abused, how the abuse affected them, and the circumstances that led to the abuse. As a group, their proofs of claim reflect abuse that occurred between approximately 1959 and

---

[1] *See* attached Appendix A, which lists the Sexual Abuse Survivor Proof of Claim numbers for the D & V Claimants and the General Creditor claim number for one woman who was sexually assaulted when she was a young adult working at Philmont Scout Ranch, who filed a claim as a General Creditor, and is also a D & V Claimant.

1

2001, when their ages ranged from approximately eight to 17 years old. The sexual abuse they suffered is representative of the sexual molestation experienced by thousands of children in Scouting and included everything from sexual exploitation, nude photos, forced familial abuse between brothers, and fondling to oral and anal rape.

One Claimant's trial was scheduled to begin jury selection on Friday, February 21, 2020 after being litigated for two years when Debtor filed for bankruptcy just three days before, on Tuesday, February 18, 2020.

Many of the D & V Claimants have claims against non-Debtor entities, including a local council and a charter organization. For example, all 65 have identified claims against various local councils, such as Oregon's Cascade Pacific Council and Oregon Trail Council, Idaho's Mountain West Council and Inland Northwest Council, the Montana Council, California's Long Beach Area Council and Greater Los Angeles Council, Iowa's Hawkeye Council, and the Greater New York Council.

Many have identified claims against charter organizations such as the Church of Jesus Christ of Latter-Day Saints, the Benevolent and Protective Order of the Elks, Church of Christ, Catholic Church, and various local schools.

45 of those 65 have filed or are in the process of filing lawsuits in state court to preserve those claims.

As noted below, many of these non-Debtor entities may have significant assets and their own insurance separate and apart from any insurance maintained by the Debtors. Even without the benefit of discovery, which has been stayed due to the preliminary injunction, some of these claims against non-Debtor entities are strong and compelling.

/ / /

/ / /

/ / /

<u>**Example:**</u>

**Claimants 19491, 17941, 16274, 16268, and 18773's claims against
Oregon's Cascade Pacific Council**

*Brock Claimants*

For example, Claimants 19491, 17941, 16274, 16268, and 18773 ("Brock Claimants") were in Scouting units within the jurisdiction of Oregon's Cascade Pacific Council (CPC), and sexually abused by Assistant Scoutmaster Clyde Brock between 1965 and 1968. Claimants 17941, 16274, and 16268 are brothers, were all abused by Brock (often at the same time), and all filed lawsuits to preserve their state claims prior to Debtor filing for bankruptcy. All Brock Claimants have filed lawsuits against CPC. Brock also abused a fourth brother, who resolved his lawsuit against Debtor and CPC in 2015.

The Brock Claimants' proofs of claim and attached documentation, including deposition testimony, court orders in Claimants' favor, and Brock's Ineligible Volunteer file ("IV File"), indicate that the local council knew that they were in danger of being sexually abused. Prior to and during their abuse, members of the troop committee, including an officer of CPC, knew Brock was taking photographs of nude Scouts, was having boys over to his house and giving them baths, and had pornography laying around for boys to see at his house. That officer testified at a deposition that members of the troop committee were "suspicious" that Brock was molesting boys. Even so, Debtor and CPC did not remove Brock from Scouting and create an IV File on him until spring 1968, after he was accused of molesting *at least 12 boys* in the troop. According to the IV File, members of CPC had admonished Brock at least twice for his inappropriate conduct with boys in the years prior to removing him from Scouting.

Despite these admonitions and suspicions of child molestation, Debtor (on CPC's nomination) awarded Brock the Silver Beaver Award, Debtor's highest volunteer award, in 1966. After Debtor and CPC finally kicked him out in 1968, they allowed Brock to say he resigned due to

health issues and "s[aw] no reason why he shouldn't be recognized at the 50th anniversary celebration" of the CPC. Debtor and CPC did not report him to the police. Three years later, Brock was indicted and convicted for sexually abusing three more boys.

Additionally, members of CPC had submitted information to Debtor to create at least seven IV Files based on reports that volunteers had sexually abused Scouts in the six years prior to the date Brock was kicked out—more than one per year. Debtor likely destroyed CPC IV Files from prior to that time of dead or elderly volunteers when they systematically "cleaned out" the IV Files. These IV Files contain reports of adult volunteers sexually abusing Scouts under similar circumstances to how Brock abused Scouts, including isolating Scouts, taking Scouts to their homes alone, and exposing them to pornography. These IV Files show that the accused volunteers under CPC's jurisdiction had multiple victims, as did Brock. These IV Files show that leaders of CPC had a pattern of allowing accused volunteers to "resign quietly" to avoid hurting Debtor's reputation, instead of alerting the Scouting community, parents, or law enforcement.

### Claimant # 44934

Claimant 44934 was also in a Scouting unit within the jurisdiction of Oregon's Cascade Pacific Council (CPC), and sexually abused by notorious pedophile, Scoutmaster Calvin Malone, in 1974. Claimant's proof of claim and attached documentation, including deposition testimony, court orders, and CPC documents indicate that CPC knew that Claimant and other Scouts were in danger of being sexually abused by Malone. Prior to installing Malone as a Scoutmaster for Troop 75, CPC knew that Malone, as a Scout leader, had sexually abused at least one Scout in California. CPC also knew that Malone was purchasing and supplying alcohol to minor Scouts.

In November 1974, the same year Malone sexually abused Claimant, a fellow Boy Scout reported to CPC's Scout Executive that Malone had molested him in fall 1974. The Scout Executive told the Scout that he would "take care of it." Malone continued to be the Scoutmaster of Troop 75 and have unrestricted access to boys. The Scout reported the abuse again to the Scout

Executive in September 1975, and the Executive again said he would "take care of it." Once again, Malone continued to be the Scoutmaster and no action was taken.

Malone often held drinking parties at his residence and at various Scout camps and lodges throughout Oregon. Malone and other adult Scout leaders for CPC supplied Scouts with alcohol and got them drunk. None of the other Scout leaders (CPC's agents) reported this unlawful activity.

Malone later admitted to molesting at least six or seven boys in Claimant's troop between 1974 and 1976.

Prior to coming to Oregon, Malone joined the Army in 1971, was stationed in Germany, and formed a Boy Scout troop there. The troop had over 100 Scout members, which was an unusually large number and should have put Debtor, the local council, and their agents on notice of a problem. He later admitted molesting at least six or seven boys in that troop. He went on to molest dozens of boys in Scouting in troops he started in Oregon, Montana, and Alabama.

### Example:

### Claimants 39881, 19348, 46398, and 32252's claims against the Montana Council

Claimants 39881, 19348, 46398, and 32252 ("Montana Claimants") were in Scouting units within the jurisdiction of the Montana Council, and sexually abused by various Scout leaders. Each Montana Claimant has claims against Debtor and the Montana Council for negligence and fraud from child sexual abuse by various perpetrators. Claimants 46398 and 32252 filed lawsuits against Debtor and the Montana Council prior to the bankruptcy, and Claimants 19348 and 39881 have filed lawsuits against the Montana Council post-BSA bankruptcy. In previous litigation, Claimants' counsel secured rulings from two separate trial judges, and defeated Debtor's and the Council's attempts to appeal on the same issue, that Debtor and the Council had a duty *as a matter of law* to protect youth members from sexual abuse based on Debtor's and the Council's

development of child protection policies and other safety undertakings. Based on the IV Files

Debtor created, and the Montana Council contributed to, the Montana judges also ruled that it was

foreseeable to Debtor and the Council *as a matter of law* that child abuse would continue to happen

in Scouting if no program improvements were implemented. The Montana Council—not just

Debtor—faces significant liability with these claims. According to information compiled by the

TCC, only 122 Claimants have claims implicating the Montana Council. Based on investigation

and discovery produced in prior litigation, the Council has significant assets and property holdings,

which makes sense given Montana's lush natural landscape, presence of National Parks, and

residents' zeal for outdoor activities.[2]

### Example:

### Claimants 44159 and 47925s's claims against the
### Church of Jesus Christ of Latter-Day Saints

Similarly, Claimant 44159 and 47925s' proofs of claim indicate that their Scouting units

were chartered by the Church of Jesus Christ of Latter-Day Saints ("LDS Church"), and they were

sexually abused by Larren Arnold in Idaho. Their proofs of claim and attached documentation,

including deposition testimony and court rulings from the Idaho federal court, show that the LDS

Church knew that they were in danger of being sexually abused because other Scouts and Scouts'

parents had reported their abuse to Bishops of the LDS Church prior to Arnold's abuse of

Claimants, back to 1964. These reports were made to Bishops for LDS Church Wards that

chartered Scout troops within the jurisdiction of the Ore-Ida Council in Idaho. Arnold abused

Claimant 44159 in 1981 and Claimant 47925 in 1974. Debtor did not create an IV File on Arnold

until 1991, and that IV File documents years of notice about allegations of sexual abuse by Arnold

in Scouting.

---

[2] The Montana Council used to make its Annual Financial Reports available online, on its website. Since Debtor filed for bankruptcy, the Council has removed those reports from its website, so that information is no longer publicly accessible, including to Claimants.

**<u>Example</u>:**

**Idaho Claimants[3]**

D & V's Idaho Claimants were in Scouting units within the jurisdiction of the Mountain West Council and Inland Northwest Council, both of Idaho, and sexually abused by various Scout leaders. To preserve their claims, Claimants have all filed lawsuits against the local councils, and in some cases the charter organizations, for fraud and constructive fraud, in Idaho federal court.

In prior litigation in Idaho federal court, Claimants' counsel, on behalf of 29 plaintiffs, secured numerous rulings from the Idaho District Court's then Chief Justice, repeatedly recognizing and upholding Claimants' constructive fraud and fraud theories, as exemplified by published opinions attached to Claimants' proofs of claim. The plaintiffs argued that Debtor committed fraud and constructive fraud by failing to warn Scouts and their parents about the risk of child sexual abuse in Scouting, a risk Debtor knew of due to the thousands of IV Files pre-dating the plaintiffs' abuse and particular evidence of danger of some of the individual Scout leaders accused in the plaintiffs' litigation. Plaintiffs successfully argued that the statute of limitations for fraud applied and did not begin to run until the plaintiffs gained knowledge of Debtor's hidden knowledge, within three years of filing suit, and thus, their claims were timely. This statute of limitations theory was upheld in a published opinion by the Idaho Supreme Court on certified questions. Plaintiffs survived Debtor's summary judgment challenges on a number of issues, including the statute of limitations. Debtor paid to resolve 27 of the claims and, on behalf of the two remaining plaintiffs, Claimants' counsel litigated their claims against Debtor to within three days of trial, when Debtor settled the claims for a substantial sum that appropriately reflected the degree of liability Debtor faced at trial, including punitive damages.

---

[3]     Claimants 42603, 41710, 44937, 55638, 41808, 44159, 39538, 44333, 46393, 45063, 47925, 42607, and 44804 ("Idaho Claimants").

According to information compiled by the TCC, 130 Claimants have claims implicating the Mountain West Council and 159 Claimants have claims implicated the Inland Northwest Council. 397 claims originated in Idaho. Both councils, and any affiliated charter organizations like the LDS Church, face significant liability based on the same constructive fraud and fraud theories discussed above—theories that are *not* subject to and constrained by Idaho's non-retroactive statute of limitations for child abuse claims.

### Debtor's Bankruptcy's Interruption of Ongoing Litigation

Some of the claims of the D & V Claimants were close to resolution when the Debtors filed for bankruptcy.

### Example:

### Claimant 17941's February 21, 2020 Trial

For example, Claimant 17941's case was—almost literally—on the eve of trial when Debtor filed for bankruptcy. Claimant 17941 is one of the four brothers who were sexually abused by Clyde Brock, discussed above, in Oregon in the mid-1960s. Claimant filed his case in Oregon in 2018. At that point, he had already been involved in his brother's litigation against Debtor stemming from the same abuse since 2015, including giving a painful and lengthy deposition. Claimant's case is against Debtor and its local council, Cascade Pacific Council, for vicarious liability for child sexual abuse, direct liability for negligence and fraud, and punitive damages. Jury selection was scheduled to begin Friday, February 21, 2020. Debtors filed for bankruptcy on Tuesday, February 18, 2020. Mediation was scheduled for February 22. Claimant's counsel was scheduled to take the deposition of Debtor's Chief Financial Officer, Michael Ashline, on February 25, at Debtor's headquarters in Texas. All of that came to a halt when Debtor filed for bankruptcy.

Claimant's case posed a significant risk to Debtor and its local council. The case was extremely strong, on both liability and damages, and the court had already allowed claims for $45,000,000 in punitive damages against Debtor and $25,000,000 in punitive damages against

CPC. Also, the trial would have been held in the same jurisdiction and venue in which Debtor lost a child sexual abuse case in 2010, and the jury awarded a $19.9 million verdict. One of Claimant's attorneys is one of the trial attorneys from the 2010 case.

**Example:**

**Claimant 16274's Appeal Ready for Imminent Decision on a
Significant Issue of Law**

Additionally, also in Oregon, the Oregon Court of Appeals was set to imminently decide a significant issue of law relating to the liability of organizations for their volunteers' intentional torts in Claimant 16274's case, and likely decide it in Claimant's favor, given the overwhelming authority of existing Oregon case law. The case had been briefed and argued before the Court of Appeals. Due to Debtor's bankruptcy filing, the appeal was stayed, and this important issue remains unresolved. Debtor and other organizations seeking to evade liability under Oregon law now try to use these two outlying trial court rulings as leverage to resolve cases for less than full value because appeal of these rulings has been stayed by Debtor's bankruptcy.

**OBJECTION**

For the above reasons and those that follow, including additional examples and facts of particular cases, the D & V Claimants object to the sufficiency and adequacy of the Disclosure Statement:

**A.     Failure to Disclose the Assets and Liabilities of Each Party Receiving a
Release**

1.      The D & V Claimants object to the adequacy of the Disclosure Statement because it fails to provide them with sufficient information to make an informed decision on whether (a) to vote to accept or reject the Plan, which proposes a release of all local councils and may propose a release of charter organizations, or (b) to raise a "Best Interest of Creditors" objection.

2.      The Disclosure Statement does not provide any property-by-property valuation of the real or personal property that the Debtors intend to transfer to a settlement trust, or any property-by-property valuation of the real or personal property that the Debtors seek to retain. The same is true of the Debtors' other assets, including investments. It is imperative that the Disclosure Statement provide the liquidation value or fair market value for each such property.

### ***Local Councils***

3.      The Disclosure Statement does not include in its liquidation analysis the properties of the local councils. Under the Debtors' governance documents, a local council's property reverts to the Debtors if the local council's charter is not renewed. In a Chapter 7 liquidation of the Debtors, the Chapter 7 trustee presumably would not renew any local council charters. Since the properties revert to the Debtors, the liquidation analysis must include the liquidation value of all local council real and personal property.

4.      The Disclosure Statement and the Plan fail to provide any property valuation information for a creditor, including the D & V Claimants, to determine if each local council is making a substantial contribution that warrants a release and channeling injunction. Any such valuation must include the liquidation or fair market value of the local council's assets, including any justification by a council for asserting that an asset is unavailable to pay its creditors (e.g., donor restricted), how many childhood sexual abuse claims implicate the local council, and how much the local council is contributing in exchange for a release of such childhood sexual abuse claims.

5.      Based on each local council's publicly available IRS Form 990 statements, each local council has significant assets, including significant unrestricted assets. Moreover, if a local council accounted for its real property using "book value" (e.g., the value it was worth at the time it was acquired) and not its current fair market value, its IRS Form 990 statements likely

*undervalue* its total assets given the length of time most of these councils have existed and the property holdings they have acquired over that time.

- For example, the Oregon Cascade Pacific Council ("CPC") faces substantial liability in the Brock Claimants' cases (discussed *supra* at pp. 3-4). Each of them has a filed lawsuit against both Debtor and CPC. As discussed above, CPC faces considerable liability that would reasonably exceed tens of millions of dollars if litigated in the normal course, based on prior Oregon lawsuits. CPC was just as culpable as Debtor in ignoring warning signs and facilitating the abuse of dozens of young boys. If allowed to proceed to trial in Portland, Oregon, there is a high likelihood that Claimants would secure a multi-million-dollar verdict against not just Debtor but also CPC, including punitive damages, which are not dischargeable in bankruptcy. These Claimants cannot make an informed decision regarding whether to release their claims against CPC and reward CPC with a channeling injunction based on the bare information provided for in the Disclosure Statement.

- Additionally, based on non-confidential information produced in discovery in prior litigation, as of 2019, it appears that CPC's net assets totaled $51,019,520, with only $17,272,835 limited by donor restrictions. Its liabilities only totaled $1,273,870. According to information compiled by the Tort Claimants Committee ("TCC"), there are 487 Claimants asserting claims implicating CPC. Given CPC's significant assets and exposure, it is *necessary* that Debtor discloses the information outlined above for Claimants to make informed decisions. CPC must make a *substantial* contribution to the bankruptcy in exchange for a full release of claims and channeling injunction, and Claimants are entitled to know this information.

- The Montana Council's exposure is also significant, based on the number of claims, prior plaintiff-friendly court rulings that Debtor had a duty *as a matter of law* to

protect Scouts from sexual abuse, and its substantial assets, as described *supra* at 5-6. Only 122 Claimants have claims implicating the Montana Council, but Claimants have no way of knowing how many of those also have filed lawsuits that were stayed by the bankruptcy, the Council's total assets and liabilities, and the Council's contribution to the bankruptcy.

- Another example is Claimant 14993, a claim arising from abuse in Iowa. Claimant 14993 filed a lawsuit against Debtor and the local council, Hawkeye Area Council, well before Debtor filed for bankruptcy, for negligence, fraud, and vicarious liability. The trial court had denied the defendants' motion to dismiss Claimant's vicarious liability claim, meaning that defendants faced a significant risk of strict liability for the sexual abuse of their volunteer Scout leader. Claimant's abuse was repeated and egregious, and his damages are substantial. Only 53 Claimants have claims implicating the Hawkeye Area Council, but Claimants have no way of knowing how many of those also have filed lawsuits that were stayed by the bankruptcy, the Council's total assets and liabilities, and the Council's contribution to the bankruptcy. Without that information, Claimant 14993 and others cannot make an informed decision regarding whether to release the local council.

- The Idaho councils', including the Mountain West Council's and Inland Northwest Council's, exposure is also significant, based on the number of claims, prior plaintiff-friendly court rulings that Debtor on fraud and constructive fraud, and its substantial assets, as described *supra* at 7-8. Only Idaho's local councils face up to 397 claims, based on information compiled by the TCC that indicates 397 claimants have claims originating from abuse in Idaho. Claimants have no way of knowing how many of those 397 also have filed lawsuits that were stayed by the bankruptcy; how many have identified the correct local councils; how many have timely claims, including

under fraud and constructive fraud theories; the councils' total assets and liabilities; and the councils' contribution to the bankruptcy.

### *Charter Organizations*

6.     The Disclosure Statement and the Plan do not provide any property valuation information of any charter organization that will be released, including any justification by a charter organization for asserting that an asset is unavailable to pay creditors (e.g. donor restricted), how many childhood sexual abuse claims implicate each charter organization, and how much each charter organization is contributing in exchange for a release of such childhood sexual abuse claims.  Like the local councils, many of the charter organizations, such as the Methodist Church, LDS Church, and Catholic Church, have significant real property and other assets.  As it stands, the Disclosure Statement contains <u>no</u> information about charter organizations' assets, liabilities, and contributions to enable Claimants to make informed decisions.  As described above*,* many charter organizations face significant liability for Claimants' sexual abuse—liability that equals or, in some cases, may surpass Debtor's liability.

- For example, Claimants 44159 and 47925 discussed *supra* at 6, were sexually abused by Larren Arnold, a pedophile who was a member of the LDS Church and moved from troop-to-troop in Idaho molesting boys for decades.  They have both filed claims against Debtor, the LDS Church, and the local council.  Under a fraud and constructive fraud theory, previous plaintiffs (also represented by undersigned counsel) litigated claims against Debtor and the LDS Church charter organization for the sexual abuse they suffered.  Plaintiffs' theories of liability were repeatedly recognized and upheld by the Chief Justice of the Idaho District Court, as exemplified by published opinions attached to Claimants' proofs of claim.  The LDS Church paid a substantial amount to resolve many of those plaintiffs' claims.  Similarly, the LDS Church faces significant liability for

13

Claimants 44159 and 47925s' claims. As the Disclosure Statement now exists, Claimants are expected to vote to approve the Plan without any information about whether the LDS Church will make a contribution to the bankruptcy; if it does, how much; how many other filed, pending claims there are against the LDS Church in Idaho; and a summary of the LDS Church's assets and liabilities. Hypothetically, if Claimants vote to approve the plan in its current form, the LDS Church could later contribute $1,000 in exchange for a full release and channeling injunction of Claimants' claims that are worth hundreds of thousands, if not millions, of dollars.

- Another example is Claimant 51733's claim against the Church of Christ charter organization. Claimant 51733 was molested by Scoutmaster Frederick Thomas between 1979 and 1982. His troop was chartered by the West Angeles Church of God in Christ. The abuse occurred at the church and on official Scouting camping trips. Thomas was also a choir volunteer and a minister at the Church. Claimant witnessed him molest numerous other boys in the troop, under the guise of playing a Scout game that required him to "inspect" their bodies. Due to Thomas's multiple leadership roles in the Church, his role as a Scoutmaster, and the frequency of the abuse, it is likely there are many other victims of Thomas's. Based on his leadership roles for the church, and the fact that much of the abuse happened on church premises, if those other victims come forward, the Church of Christ faces substantial exposure, separate and in addition to Debtor's liability. Under the current plan, the Church of Christ could receive a channeling injunction in exchange for a minimal contribution to the Settlement Trust and, should those additional victims come forward in the future, those victims' claims would be barred.

7.      The D & V Claimants cannot make an informed decision to vote to accept or reject the Plan because the Disclosure Statement does not contain any information about the number of claims against each local council or charter organization, or any estimate of the value of such claims.  To the extent that sexual abuse claims have not been filed against a local council or charter organization, the Debtors should disclose whether they have any indemnification or contribution claims against each local council or charter organization.

8.      The Disclosure Statement also fails to adequately explain how any contribution by non-Debtor entities, including local councils and charter organizations, will be utilized, including whether their contribution will be used to pay administrative expenses, to pay trust administrative and legal expenses, or to compensate others who do not have a claim against that entity.

9.      The inadequacy of the Disclosure Statement is illustrated by the fact that the Debtors state in the Plan that they are "committed" to ensuring the local councils collectively contribute at least $425 million.  This disclosure is illusory because there is no agreement with the local councils to contribute anything to the Plan.  In this regard, the Plan is speculative at best and the Disclosure Statement does nothing to inform abuse survivors whether and when any contribution by the local councils might be realized.  In addition, the Debtors fail to disclose how much each council has available to contribute, how much each council is contributing, and how the contributions of each council will be utilized, including whether the contributions of a council will be used to compensate abuse survivors who do not have a claim against that council.

10.      Similarly, in the Disclosure Statement the Debtors do nothing more than assert that childhood sexual abuse claims will range in value from somewhere between $2.4 billion and $7.1 billion.  There is no discussion on how that value is determined.  The Debtors project that the recoveries on the childhood sexual abuse claims will range from 8% to 23%, and up to 100% with the inclusion of available insurance.  Under the Plan, the Debtors are the only parties that

have offered any consideration ($115 million) for the benefit of the childhood sexual abuse claims. Assuming the childhood sexual claims are valued at $2.4 billion, the $115 million provides a 4.8% recovery, far less than the lower amount asserted by the Debtors. With only $115 million available for sexual abuse survivors, the Disclosure Statement does not describe how recoveries will reach 8%, let alone up to 23% or 100%, when no other consideration has been committed by any other party.

11.     This lack of basic information makes it impossible for creditors, including the D & V Claimants, to determine whether each council is making a substantial contribution, to make an informed decision on whether to vote to accept or reject the Plan, which proposes to release each council, and to make an informed decision on whether to raise a "Best Interest of Creditors" objection because the Plan fails to award them the liquidated value of their claim against all entities they are releasing.

### B.     Failure to Disclose the Specific Entities to Be Released

12.     The D & V Claimants object to the adequacy of the Disclosure Statement and the accompanying solicitation procedures because they fail to notify creditors, including the D & V Claimants, which local council and/or charter organization is associated with their abuse, whether any such entity will receive a release, and if so, the terms of the release. If the Plan is designed to provide a release to non-Debtor third parties, such as the local councils and charter organizations, the Debtors should identify each local council and charter organization and their relationship to each of the creditors, including the D & V Claimants. For example, under the Global Resolution Plan in the Plan, the "Protected Parties" (e.g., those that benefit from a release and channeling injunction) should only include those non-Debtors that make a substantial contribution and receive sufficient support by claimants whose claims will be released and/or the subject of a channeling injunction.

13.     Most of the creditors who filed a Sexual Abuse Survivor Proof of Claim form, including the D & V Claimants, have legal claims against the Debtors, a local council, and a charter organization.  In their proof of claim forms, the D & V Claimants made a good faith effort to identify the local council(s) and/or charter organization(s) that may be liable for the childhood sexual abuse they suffered that is the basis for their claim.  However, the D & V Claimants were children when they were sexually abused.  Due to the passage of time and/or the psychological effects of the abuse, many of them are unsure whether they have identified the correct entities and others were simply too young to recall the correct names today.

**As examples:**

- Claimants 45063, 42607, and 44804 believe the charter of their troop and/or pack was an elementary school *or* the local Elks Club, because those locations are where meetings were held.  If the charter organization was the elementary school, Claimants do not know if it was the parent association for that school, the school itself, the school district, or some other local group that merely used the school as a meeting place that actually chartered the troop/pack.

- Claimant 42554 knows that his troop met at a Catholic church located on Washington Avenue in New York, NY, but cannot remember the exact name of the church.  Based on this information, undersigned counsel investigated and worked to identify the correct church but are still unsure if they have identified the correct church as the charter organization.

- Claimant 55506 does not remember the charter of his Cub Scout Pack, due to his young age at the time of the abuse.  He can only remember meeting at the local Boys and Girls Club building, but the Boys and Girls Club historically did not charter Scout troops.

- Likewise, Claimant 24567 started Scouting in Cub Scouts, and does not remember which organization(s) chartered his pack and subsequent troop. He only remembers that pack meetings were held at a local elementary school and troop meetings were held at a local high school. He does not know if the parent organizations, schools, school districts, or other organizations were the actual charter organization(s).

- Claimant 55175 knows that troop meetings were held at St. Martin's-in-the-Fields Episcopal Church in Columbia, SC, but is unsure if that was the charter organization.

- Except for those that have been able to be confirmed by troop rosters (very few), all D & V Claimants' troops that they believe were chartered by elementary schools face the same problem—they are assuming the "elementary school" was the charter organization, but do not know if it was the parent association, the school itself, the school district, or some other local organization merely using the elementary school to hold meetings.

14.     For the D & V Claimants and other abuse survivors who do not know this information, the information they need is largely within the purview of the Debtors and local councils, which possess the Scouting unit rosters (e.g., Boy Scout Troop rosters and Cub Scout Pack rosters), camp rosters, and adult volunteer rosters. In prepetition litigation, this disclosure would generally occur through discovery that is currently barred by the preliminary injunction. Prior to the preliminary injunction, the D & V Claimants would normally issue discovery that demanded the Debtors and/or local council(s) produce the roster(s) for the Claimant's Scouting unit and/or Scout Camp so the Claimant can find their name on the roster and confirm they have identified the correct local council(s) and charter organization(s) for their Scouting unit and/or Scout Camp.

15.     If a Claimant's name did not appear on a roster, which may have happened as a result of human error and/or if the Claimant joined a Scouting unit in-between the annual registration process, the Claimant could review the roster to see if the Claimant recognized the names of the other children or adults on the roster.  If so, the Claimant could contact some of the other members of the Scouting unit to see if they could corroborate that the Claimant was a member of the Scouting unit and/or attended the Scout Camp.  If not, the Claimant would work with the Debtors and/or the local council(s) to determine whether the Claimant identified the wrong Scouting unit and appeared on the roster of a different Scouting unit.  In addition to rosters, the Claimant would also ask the Debtors and/or local council(s) in discovery to produce the charter for the Claimant's Scouting unit so the Claimant could confirm the correct charter organization(s) that chartered the Claimant's Scouting unit, particularly if the Debtors and local council(s) no longer had rosters for the Scouting unit.

16.     If the Claimant was unable to obtain records that confirm the Claimant has identified the correct local council(s) and/or charter organization(s), the Claimant would ask the Debtors and/or the local council(s) for a "person most knowledgeable" deposition about the local council(s) and/or charter organization(s) who were responsible for the Claimant's Scouting unit and/or the Scout Camp the Claimant attended so that the Claimant could confirm that the Claimant has identified the correct local council(s) and/or charter organization(s) for their Scouting unit and/or Scout Camp.  If the Claimant believes they may know the correct local council(s) and/or charter organization(s), the Claimant would ask for any documents those organizations have about the Claimant's Scouting unit and the Claimant would ask the organizations for a "person most knowledgeable" deposition to confirm the Claimant identified the correct local council(s) and/or charter organization(s).

17.     The D & V Claimants have not been able to pursue the above discovery because the preliminary injunction prohibits the D & V Claimants from pursuing any litigation against

the Debtors, local councils, and charter organizations.  Nothing under the Plan provides a mechanism by which a Claimant can confirm the Claimant has identified the correct local council(s) and/or charter organization(s) before a release is given to those entities.

18.     For example, one effect of this means that if a Claimant has failed to identify a local council or the correct local council or charter organization, and the statute of limitations expires for Claimant's claim prior to the resolution of the bankruptcy or prior to Claimant realizing he identified the wrong council, the Claimant could be forever barred from bringing a valid claim against the local council following the bankruptcy.  If that local council or charter organization had considerable culpability, the Claimant could very well risk not being fully and equitably compensated for his claim.

C.     **Trust Distribution Procedures**

19.     The D & V Claimants object to the adequacy of the Disclosure Statement because it fails to explain how their claims will be valued in the trust procedures and what ability they will have to contest the proposed valuation of their claim.

20.     For example, the Plan identifies a number of factors to be used in valuing each claim, but neither the Plan nor the Disclosure Statement discloses how much weight will be assigned to those factors.  Given the current state of negotiations it may not be appropriate to disclose the weight afforded to each factor.  However, if such a valuation system is ultimately included in the Plan, the weight afforded to each factor must be disclosed prior to when votes are solicited for the Plan so that claimants understand how their claim would be valued, can fairly estimate how their claim would be valued, can see how their claim would be valued when compared to other claims, and can decide whether to vote in favor or against the Plan given that valuation system.

21.     The Plan also suggests that the value of a claim might be reduced if the claimant lacks certain information, such as the full name of the Scout leader who abused them, but neither

the Plan nor the Disclosure Statement indicates whether the claimant will have an opportunity to pursue discovery so that they can supplement their claim with that missing information. As noted above, many abuse survivors may not recall the full name of the person who abused them because they were too young to recall the name, but the Debtors, the local councils, and the charter organizations likely possess evidence, such as membership rosters and the "Ineligible Volunteer files," that could allow abuse survivors to supplement their claim with that information.

**As examples:**

- Claimant 46721 is 74 years old. He remembers his abuser as "Mr. Carlson" because his abuser was the father of a fellow Scout member with the last name Carlson. As a child, he did not know Mr. Carlson's first name or his exact role in the troop.

- Claimant 42554 was sexually abused five to six times by a Scout leader named "Bernie" when he was approximately eleven years old. He does not know the last name of Bernie.

- Claimant 55506 was only nine years old when his abuse started. He does not remember the name of the Scout leader who abused him.

- Claimant 55175 was violently attacked, including attempted anal rape, by at least three other Scouts in his Scout troop during a camping trip. It was dark, at night, and he could not identify all of his attackers, and no longer remembers their names.

- Claimant 46393 was abused by Scout Leader Robert Elliott, a repeat perpetrator in Scouting, on whom Debtor created an IV File. Elliott introduced Claimant to his friend, "Dr. Larry," who also abused Claimant. Claimant only knew the man as "Dr. Larry."

22. The Plan also provides for a number of valuation procedures that are poorly defined, such as what constitutes a "BSA sponsored event;" what constitutes "prior notice" of an

abuser to Debtor and related entities; whether "other Abuse Claimants" who accused the abuser includes individuals who previously resolved a claim against Debtor for abuse by the same perpetrator and individuals who have been identified, such as in an IV File, but not made a claim; what constitutes a "typical level of abuse-related distress;" and a host of other factors. Even with the current lack of specificity and deficiencies, Debtor's valuation procedures seem grossly weighted in favor of Debtor, without reflecting the reality of the facts of most of the abuse that occurred in Scouting.

23.     The valuation procedures in the Plan fail to account for Claimants who had previously made a claim for compensation or filed a lawsuit against Debtor prior to the bankruptcy, and what those Claimants had to endure as part of Debtor's and its local council's general "scorched-earth" litigation tactics. Claimants' pre-bankruptcy litigation procedures affect Debtor's, its local councils', and charter organizations' exposure; these pre-bankruptcy claims certainly contributed to Debtor's decision to file bankruptcy; and Claimants' and their families' experiences litigating against Debtor and its related entities have greatly exacerbated Claimants' emotional distress from the abuse.

### D.     Failure to Disclose Insurance Coverage Risks

24.     The D & V Claimants object to the adequacy of the Disclosure Statement because it fails to explain the likelihood of defeating the insurers' coverage defenses or the insurance companies' ability to pay abuse claims that total billions of dollars. The Disclosure Statement barely makes a passing note that the insurers have asserted coverage defenses, and the Debtors make no effort to evaluate those risks. Beyond the coverage risks associated with the Debtors' prepetition conduct, the Debtors fail to discuss any risk associated with the proposed assignment of all of the insurance of the Debtors, the local councils, and participating charter organizations to a trust, including any risk associated with the anti-assignment clauses in such policies. If the Plan's assignment violates the anti-assignment clauses, the insurance coverage could evaporate.

In "normal" pretrial litigation, Debtor and associated parties would be required to produce insurance policies and coverage documents in discovery, to allow plaintiffs to evaluate the amount of insurance coverage available, coverage defenses, and the likelihood of success on those defenses. No such information has been provided to Claimants, on a claimant-by-claimant basis, here. This lack of information is extremely problematic. For example, for the Brock Claimants, discussed *supra* at 3-4, whose claims arose in the mid-1960s, and many other Claimants' claims that arose prior to the 1980s, there was most likely no coverage exclusion for sexual abuse claims, as there typically is under insurance policies today. If Debtor is raising a "sexual abuse exclusion" defense to, for example, claims arising in the 1960s, then that defense is likely without merit. Claimants are being asked to blindly make the same risk evaluations in the bankruptcy that they would have to make in regular litigation, without the benefit of any of the information they would normally have access to—out of the discovery principles of fairness and transparency—in litigation.

**E.      Failure to Disclose How Insurance Policies Will Be Utilized**

25.      The D & V Claimants object to the adequacy of the Disclosure Statement because it fails to explain how the proceeds of any insurance policies assigned to the trust will be utilized. The D & V Claimants are entitled to know how the proceeds of any policies will be utilized, including whether the proceeds of a policy that covers a Claimant's claim is being used to pay administrative expenses, to pay trust administrative and legal expenses, or to compensate others who do not have a claim covered under the same policy.

26.      For example, if a Claimant has a $1 million childhood sexual abuse claim against the Mormon Church, the Mormon Church presumably has sufficient assets to pay the full value of that claim. In an insurance buy-back scenario, the insurers and the insured will insist that the insured receives a release of all current and future claims against the insured, otherwise the insured would be without insurance on those claims, would still be responsible for the defense

costs on those claims, and would still be at risk for a judgment on those claims. The D & V Claimants are entitled to know whether they will be required to release all of their claims against all insureds in order to effectuate a buy back of a given policy, and if so, how the proceeds of any such buy back will be utilized. In the foregoing example, the hypothetical Claimant is entitled to know whether he will be required to release a claim worth $1,000,000 against the Mormon Church to effectuate a "buy back" of a policy that names the Mormon Church as an insured. Moreover, the hypothetical Claimant is entitled to know whether his share of the sale price of the policy could be a small fraction of the value of his claim against that defendant.

27. The D & V Claimants need to know this information to determine whether each non-Debtor who is released is making a substantial contribution and whether the "best interests" test is met by that contribution.

**F.      Failure to Disclose the Contribution of Insurers and Their Insureds**

28. The D & V Claimants object to the adequacy of the Disclosure Statement because it fails to explain what contribution the insurers and their non-Debtor insureds will make in order to receive a release.

29. As described above, almost every Claimant has a legal claim against a local council and/or a charter organization. In addition to the Debtors, a local council was responsible for all Scouting units in its geographic region, including handling and processing complaints against Scout leaders for allegedly sexually abusing children and ensuring that each Scouting unit abided by policies and procedures to protect children from foreseeable harm. These local councils, the "eyes and ears" of the Debtors, were often amongst the parties who neglected to protect the children in their care from foreseeable harm.

30. In turn, a charter organization was responsible for staffing and supervising the adult volunteers of a Scouting unit, like a Boy Scout Troop or Cub Scout Pack, and were also amongst the parties who neglected to protect the child members of a Scouting unit from

foreseeable harm. The leaders of the charter organization, including the Scout leaders who the charter organization appointed to oversee its Scouting unit(s), were often amongst those to receive complaints that another Scout leader was sexually abusing children in the Scouting unit, or saw the "red flags" or warning signs that another Scout leader was sexually abusing children in the Scouting unit, but neglected to take steps to protect the children from that danger.

31.     Many of the local councils and charter organizations face significant liability, and many have substantial assets that are available to compensate abuse survivors, including the D & V Claimants who have a claim against them, as described above.

32.     The D & V Claimants object to the adequacy of the Disclosure Statement because it fails to specify what contribution the local councils and/or charter organizations will have to make to receive a release, including a contribution above and beyond their rights under insurance policies. The D & V Claimants need to know this information to determine whether each entity who is receiving a release, including any local council or charter organization, is making a substantial contribution and whether the "Best Interests" test is met by that contribution.

33.     The non-Debtor entities are asking for extraordinary relief: releases of *all* claims and blocking any future efforts at recovery by abuse survivors. In normal litigation, rules and procedure exist to protect the rights of all parties and to ensure, as much as possible, that all parties have access to the same basic set of information to allow them to fully and fairly evaluate their relative strengths and weaknesses of their cases. Without such protections, our system fails to uphold due process and fails to function as it should. Here, the dearth of information offered to Claimants is extraordinary. They would have access to a tiny fraction of the information they would normally have access to in pretrial litigation yet are being called upon to sacrifice significant rights and make the same types of decisions they would in regular litigation. Hypothetically, a local council could contribute $1,000, and receive a full release of a multi-million-dollar legal claim.

**G.      No Disclosure Regarding the Proposed Hartford Settlement Agreement**

34.      The D & V Claimants object to the adequacy of the Disclosure Statement because it fails to explain how much each Claimant may receive as a result of the Debtors' proposed settlement with Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company, and Navigators Specialty Insurance Company (collectively "Hartford"), whether each Claimant would be forced to release any of their claims in order to effectuate the settlement, including claims they have against non-Debtor entities, and whether any party, including Hartford and non-Debtor entities, would receive a channeling injunction as a result of the settlement.

35.      The Debtors' proposed settlement with Hartford, which was attached as Exhibit A to the Second Mediators' Report that was filed on April 16, 2021 (Dkt. 2624), is for $650,000,000 and appears to require a release of all current and future claims that may exist under Hartford's policies.  Based on a review of Hartford's policies, it appears that Hartford's policies cover some or all of the claims of approximately 25,000 claimants in this bankruptcy. Pursuant to this analysis, the Debtors' proposed settlement with Hartford equates to an average of only about $26,000 per claimant if the settlement proceeds are shared by the claimants with a claim that is covered by a Hartford policy, and to an average of approximately $7,647 per claimant if the settlement proceeds are shared with 85,000 claimants.

36.      The proposed settlement covers Hartford policies from 1971 to 1989, and 2012-2014.  Approximately 32 of D & V's 65 Claimants (*50 percent*) were abused during those years and need this information about Hartford in order to make an informed decision.  Even those D & V Claimants who were abused in other years need this information if Hartford money is going to be shared in a general fund.

37.      Not only does the Disclosure Statement fail to disclose how the Debtors propose to allocate those settlement funds, but it fails to disclose how much coverage is available under

each of the Hartford policies; which claimants have claims under each of the Hartford policies; the number of claims that implicate each policy; the type of claims; and the value of the claims. Based on the years of the Hartford policies, it appears many of the policies had per occurrence limits of $500,000 with no aggregate limit. The Disclosure Statement fails to explain why a claimant whose claim triggers a $500,000 insurance policy should vote in favor of a Plan that may result in them receiving an average of $7,647 from a settlement with Hartford.

38.     The Disclosure Statement also fails to disclose the insured(s) under each of the Hartford policies, including whether the Debtors are insureds under each policy or whether the only insured under some policies is a non-Debtor entity, such as a local council. In turn, the Disclosure Statement fails to explain whether all current and future claims against the insured(s), including non-Debtor entities, will have to be released in order to effectuate the settlement, and if so, the value of those claims and why a claimant should agree to such a release if the insured has substantial assets, including other insurance, that should be used to compensate the claimant.

**H.     The Scope of this Bankruptcy Necessitates Transparency Regarding the Handling of Insurance Policies**

39.     As it stands, the Plan would provide each Claimant an average of $6,000, or less, from the Debtors and the local councils, which they partly justify by the assignment of insurance policies. The average award could be significantly lower, if non-existent, after administrative expenses. The D & V Claimants must have sufficient information to evaluate the risks of the Plan if the D & V Claimants are to release multiple non-Debtor entities. As filed, the Disclosure Statement falls far short of the Bankruptcy Code's standard for its approval.

**I.     Voting and Solicitation Procedures for Claimants with Multiple Sexual Abuse Survivor Proof of Claims**

40.     As the Court is aware, multiple Sexual Abuse Survivor Proof of Claim forms were filed on behalf of some claimants. The D & V Claimants object to the Disclosure Statement and to the proposed voting and solicitation procedures because they will

27

disenfranchise the votes of survivors in the event that more than one law firm submits a ballot on behalf of the same claimant. Instead, the Debtors' voting and solicitation procedures should require them to verify whether the law firm who submits a ballot on behalf of a claimant has the authorization to act on behalf of the claimant in those instances when it matters. For example, verification is not necessary if multiple ballots on behalf of the same claimant vote in the same manner. However, if the votes conflict and the outcome of the tabulation could be affected, the Debtors must verify which ballot should be counted by determining which law firm was authorized to submit the ballot. As it stands, the Debtors have failed to explain how they intend to solicit and count votes for such claimants, including how to ensure such claimants do not vote multiple times, how to determine who can vote on behalf of such claimants, and how to determine which vote to count if inconsistent votes are submitted on behalf of the same claimant.

41.     The Disclosure Statement's description of the implications of the "BSA Toggle Plan" employs inappropriate, heavily weighted, and fear-mongering language in an attempt to "bully" and scare Claimants into voting for Debtor's Global Resolution Plan. Debtor's description of the "BSA Toggle Plan" implies to Claimants that they have no real choice in voting for the Global Resolution Plan because, if they do not approve the Plan, the Toggle Plan will leave them with nothing to compensate them for their claims. Debtor's description is entirely inappropriate and is only designed to bully Claimants into approving Debtor's Global Resolution Plan, regardless of its deficiencies.

### J.     Objection to Future and/or Amended Disclosure Statements

42.     The D & V Claimants object to any future and/or amended disclosure statement by the Debtors that fails to resolve the objections raised in this objection.

/ / /

/ / /

/ / /

28

**K.** **Joinder to the Objection to the Disclosure Statement by the Tort Claimants'**
     **Committee**

43.     The D & V Claimants join the objection to the Disclosure Statement filed by the

Tort Claimants' Committee.


                                        **BIELLI & KLAUDER, LLC**

Dated: May 5, 2021                      */s/ David M. Klauder*
       Wilmington, Delaware             David M. Klauder, Esquire (No. 5769)
                                        1204 N. King Street
                                        Wilmington, DE 19801
                                        Phone: (302) 803-4600
                                        Fax: (302) 397-2557
                                        Email: dklauder@bk-legal.com

                                        - and -

                                        **DUMAS & VAUGHN, LLC**

                                        Ashley L. Vaughn, Esq., a*dmitted pro hac vice*
                                        3835 NE Hancock St., Ste. GL-B
                                        Portland, OR 97212
                                        Phone: 503-616-5007
                                        Fax: 503-616-5007
                                        Email: ashley@dumasandvaughn.com

                                        *Counsel to the D & V Claimants*

# APPENDIX A

The foregoing Objection to the Adequacy of Debtors' Disclosure Statement in Support of Amended Chapter 11 Plan of Reorganization was filed by the following creditors who each filed a Sexual Abuse Survivor Proof of Claim and are represented by Dumas & Vaughn, LLC. The numbers below are the claim numbers for each creditor's Sexual Abuse Survivor Proof of Claim.[4]

| | | | | |
|---|---|---|---|---|
| 58703/105815 | 34947/105106 | 44207/105070 | 16268/104761 | |
| 58685/105816 | 34531/105107 | 47925/105064 | 18773 | |
| 78021/105814 | 51733 | 46721 | 18838 | |
| 54709 | 24486/105017 | 42607/105065 | 24567/104769 | |
| 40260/105108 | 18072 | 44804/105072 | 41448 | |
| 41100/105809 | 40722 | 14993/104762 | 55506/104767 | |
| 39519/105016 | 42603 | 24322 | 21530 | |
| 45084/105063 | 41710/105069 | 51220 | 26054 | |
| 71146/90485 | 44937 | 39881/104772 | 55960/104771 | |
| 29655 | 44934 | 19348/104766 | 55175 | |
| 37264/105810 | 55638/105066 | 46398 | | |
| 48079 | 41808/105073 | 32252/104770 | | |
| 44156/105020 | 44159 | 40184/110048 | | |
| 41149/105813 | 39538 | 64492/105945 | | |
| 44153/105022 | 44222 | 42554/105071 | | |
| 42623/105811 | 56947 | 19491/104765 | | |
| 51644/51702 | 46393/105068 | 17941 | | |
| 52861 | 45063 | 16274/104768 | | |

---

[4] The second numbers listed in each cell, following the slash, are the numbers assigned to each Claimant's amended Proof of Claim, where applicable.