## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>                         Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>Jointly Administered<br><br>**Hearing Date: May 19, 2021 at 10:00 a.m. (ET)**<br>**Objection Deadline: May 12, 2021 at 4:00 p.m. (ET)** |

### CENTURY'S MOTION TO AMEND THE COURT'S ORDER
### (I) APPROVING PROCEDURES FOR (A) INTERIM COMPENSATION AND
### REIMBURSEMENT OF EXPENSES OF RETAINED PROFESSIONALS AND
### (B) EXPENSE REIMBURSEMENT FOR OFFICIAL COMMITTEE MEMBERS
### AND (II) GRANTING RELATED RELIEF [DKT. NO. 341]

STAMOULIS & WEINBLATT LLC
800 N. West Street
Third Floor
Wilmington, Delaware 19801

O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036-6537

*Counsel for Century Indemnity Company, as
successor to CCI Insurance Company, as
successor to Insurance Company of North
America and Indemnity Insurance Company of
North America*

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Boy Scouts of America (6300) and Delaware Boy Scouts, LLC (4311).

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................1

BACKGROUND ..................................................................................................................2

Under the current Compensation Order, estate professionals are paid 100% of their requested fees every three months.........................................................................2

The Debtors, TCC, UCC, and FCR have all failed to exercise any oversight of fees.............3

The appointment of a fee examiner has not ameliorated the issue of disproportionately high fees in this case. ................................................................3

This massive spending occurred largely in the absence of litigation. ....................................4

A shocking number of professionals are billing at top-of-the-market rates without any regard to the proportionality of the services rendered............................................5

The enormous rates and the incredible number of lawyers are out of sync with other sexual abuse bankruptcies. ..................................................................................7

The TCC and Coalition professionals are generating enormous duplicative costs .................8

The estate has been billed for over $1 million for parties to prepare their fee applications..........................................................................................................9

RELIEF REQUESTED...........................................................................................................9

BASIS FOR RELIEF ..........................................................................................................10

POINT I  THE COURT CAN AND SHOULD AMEND ITS INTERIM COMPENSATION ORDER TO PROVIDE FOR PAYMENT OF THE 20% HOLDBACK ON ATTORNEYS' FEE'S ONLY AT THE END OF THE CASE ........10

A.  Changed circumstances justify amending the Compensation Order under Rule 60(b) of the Federal Rules of Civil Procedure. ..........................................10

B.  An end-of-case fee holdback would enhance the Court's ability to properly assess whether the fees charged are in proportion to the value of the services rendered.............................................................................................10

C.  An end-of-case holdback will allow the Court to assess proportionality in light of the unnecessary and duplicative work for estate professionals generated by the Coalition. ....................................................................................13

POINT II  UPWARDS OF 50% OR MORE OF THE MONEY IN THIS BANKRUPTCY STANDS TO GO TO LAWYERS' FEES......................................................................14

CONCLUSION...................................................................................................................16

**Cases**

*In re ACT Mfg., Inc.*,
281 B.R. 468 (Bankr. D. Mass. 2002) ................................................................. 11, 13

*In re Alumni Hotel*,
203 B.R. 624 (Bankr. E.D. Mich. 1996) ................................................................. 14

*In re Am. Plumbing*,
327 B.R. 273 (Bankr. W.D. Tex. 2005) ................................................................. 14

*In re Bank of New England Corp.*,
134 B.R. 450 (Bankr D. Mass. 1991) *aff'd.*, 142 B.R. 584 (D.Mass.1992) ............................ 11

*In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.*,
104 F.3d 1147 (9th Cir. 1997) ................................................................. 14

*In re Channel Master Holdings, Inc.*,
309 B.R. 855 (Bankr. D. Del. 2004) ................................................................. 11

*In re Child World, Inc.*,
185 B.R. 14 (Bankr. S.D.N.Y. 1995) ................................................................. 11, 13

*In re D.A.K. Indus.*,
66 F.3d 1091 (9th Cir. 1995) ................................................................. 14

*In re D.W.G.K. Restaurants, Inc.*,
84 B.R. 684 (Bankr. S.D. Cal. 1988) ................................................................. 14

*In re Diocese of Camden, New Jersey*,
No. 20-21257 (JNP) (Bankr. D.N.J. March 25, 2021) ................................................................. 2, 12

*In re Engel*,
124 F.3d 567 (3d Cir. 1997) ................................................................. 11

*In re Fleming Cos.*,
304 B.R. 85 (Bankr. D. Del. 2003) ................................................................. 11

*In re Senor Snacks*,
2005 Bankr. LEXIS 3295 (Bankr. S.D. Cal. Oct. 27, 2005) ................................................................. 14

*In re Teraforce Technology Corp.*,
347 B.R. 838 (Bankr. N.D. Tex. 2006) ................................................................. 11

*In re XO Communications, Inc.*,
323 B.R. 330 (Bankr. S.D.N.Y. 2005), *aff'd*, 369 B.R. 111 (S.D.N.Y. 2007) ................................................................. 11

*In re: Catholic Diocese of Wilmington, Inc.*,
No. 09-13560 (CSS) (Bankr. D. Del. December 12, 2011) ................................................................. 7

*In re: The Christian Brothers' Institute*,
No. 11-22820 (Bankr. S.D.N.Y. March 24, 2014) ................................................................. 8

*In re: The Diocese of Buffalo*,
    No. 20-10322 (Bankr. W.D.N.Y. Apr. 27, 2021)...........................................................7

*In re: The Roman Catholic Diocese of Rockville Centre, New York*,
    No. 20-12345 (SCC) (Bankr. S.D.N.Y. Apr. 30, 2021)...............................................7

*In re: USA Gymnastics*,
    No. 18-09108-RLM-11 (Bankr. S.D. Ind. Feb. 3, 2021) .........................................7, 8

**Statutes**

11 U.S.C. § 1103..........................................................................................................7, 8

11 U.S.C. § 327............................................................................................................7, 8

11 U.S.C. § 330(a)(1).....................................................................................................11

11 U.S.C. § 330(a)(4).....................................................................................................12

11 U.S.C. § 331.............................................................................................................10

11 U.S.C. § 503.............................................................................................................14

**Regulations**

Fed. R. Bankr. P. 2014................................................................................................7, 8

Century submits this Motion to Amend the Court's Order (I) Approving Procedures for (A) Interim Compensation and Reimbursement of Expenses of Retained Professionals and (B) Expense Reimbursement for Official Committee Members and (II) Granting Related Relief [Dkt. No. 341] ("Motion") and requests an Order, substantially in the form attached hereto as **Exhibit A**, providing that the 20% holdback applicable to monthly fee applications can only be paid after an estate professional files, and the Court approves, a Final Fee Application for that professional's services.

## PRELIMINARY STATEMENT

At the March 17, 2021 hearing, the Debtors told the Court that by the end of summer, the Debtors estimated accrued professional fees would be "around $150 million." Despite the Debtors' statements to the Court about out-of-control fees, none of the estate fiduciaries has moved the Court to take any action to set limits on professional fees, enforce budgets, discount rates, limit duplication of work, or modify the holdback terms.

A staggering number of professionals for each constituency are billing the estate at rates of over $1,000/hour, with several billing at closer to $1,500/hour. When one takes into account that as many as four or five billers representing the same constituency attend the same meetings, it becomes clear that the effective hourly rate can reach as high as $5000 an hour. As explained below, these enormous rates and the incredible number of lawyers billing them are out of sync with other sexual abuse bankruptcies.

The Debtors have touted the administrative cost in this case as a reason to fast-track the next few months. But the run-up in administrative fees has been driven as much by Debtors' professionals: nearly two-thirds of total reimbursements for which professionals seek allowance in the monthly fee applications is for BSA professionals. Meanwhile, a decision to all of the

sudden fast-track the case will curtail the rights of the many parties who have had little substantive involvement in plan formation to this point.

The better, and more equitable route to curb spending would be to convert the end-of-quarter holdback to an end-of-case holdback that will delay payment of the hold back until the Court has the opportunity, at the end of the case, to assess proportionality and reasonableness of the fees charged.

Andrew Vara, United States Trustee for Region 3 recently asked the Bankruptcy Court for the District of New Jersey to convert a quarterly holdback to an end of case holdback in another bankruptcy involving sexual abuse claims, *In re the Diocese of Camden, New Jersey*, to address concerns about disproportionate fee requests and to encourage the parties to reach consensus.[2]

This Court should do the same here.

## BACKGROUND

### *Under the current Compensation Order, estate professionals are paid 100% of their requested fees every three months.*

On April 6, 2020, the Court entered an Order (I) Approving Procedures for (A) Interim Compensation and Reimbursement of Expenses of Retained Professionals and (B) Expense Reimbursement for Official Committee Members and (II) Granting Related Relief [Dkt. No. 341] ("Compensation Order"). Under the Compensation Order, professionals submit monthly fee applications that are subject to a 20% holdback on fees for services rendered.[3] Every three

---

[2]   Objection of the United States Trustee to the First Interim Application of Lowenstein Sandler LLP as Counsel to the Official Committee of Tort Claimant Creditors, *In re Diocese of Camden, New Jersey*, No. 20-21257 (JNP) (Bankr. D.N.J. March 25, 2021) ¶¶ 6, 43 [Dkt. No. 528].

[3]   Dkt. No. 341 ¶ 2(c). Unless otherwise noted, "Dkt. No." refers to the docket in *In re: Boy Scouts of America*, No. 20-10343 (Bankr. D. Del).

months, professionals obtain payment for their full fees and expenses for that period, including the 20% monthly holdback.[4]  Professionals employed by the Debtors, as well as the official Committee of Unsecured Creditors ("UCC"), official Committee of Tort Claimants ("TCC"), the Future Claimants Representative ("FCR") are subject to this Compensation Order.

### *The Debtors, TCC, UCC, and FCR* *have all failed to exercise any oversight of fees.*

At the March 17, 2021 hearing, the Debtors told the Court that "accrued professional fees through the end of February are upwards of $100 million" and that by the end of summer, the Debtors estimated the number would be "around $150 million."[5]  The Court described these numbers as "staggering" and noted that every dollar spent by the estate on professional fees is "a dollar that comes out of some creditor's pocket."[6]

Despite, on one hand, the Debtors' statements to the Court about out-of-control fees and, on the other, the inherent interest of the creditor constituencies in curbing this spending, there has not been a single objection to a fee application in this case.  None of these parties has moved the Court to take any action to set limits on professional fees, enforce budgets, discount rates, limit duplication of work, or modify the holdback terms.

### *The appointment of a fee examiner has not ameliorated* *the issue of disproportionately high fees in this case.*

While the Court appointed a fee examiner on September 18, 2020, the examiner's role is not designed to address whether the fees sought are proportionate to the value of services rendered.  The fee examiner is only empowered to assist the Court in determining whether each

---

[4]   *Id.* ¶ 2(f).
[5]   March 17, 2021 Hr'g Tr. at 46:16–19.
[6]   *Id.* at 49:2–3, 19–21.

fee application technically complies with the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, and the U.S. Trustee's guidelines.[7]

This limited role has resulted in largely *de minimis* cuts to fee applications, which fail to address the larger issue of runaway professional fees. The fee examiner's work has resulted in total fee reductions less than 2% of fees sought in the Interim Fee Applications examined thus far.[8] The fee examiner charged the estate $173,373 (80% of $216,716) to identify $731,176.54 in reductions (and to audit some voluntary reductions), offsetting the net benefit to the estate.[9]

### *This massive spending occurred largely in the absence of litigation.*

Despite the limited litigation involving the estate, nearly 30 professional firms have submitted fee applications billing the estate, with a monthly average of almost 250 individuals billing time on this case.

While the TCC has recently filed a motion to terminate exclusivity and an estimation motion, one of the only contested motions it played an active role in before this was the motion to set a bar date.[10] The UCC and FCR have put in only a small handful of papers between them

---

[7] Dkt. No. 1342.

[8] The examiner's reports to the Court thus far reflect review of only the first, second, and third quarterly interim fee applications, which seek a total of $37,239,549 from the estate. The Fee Examiner has asked parties for a total of $731,176 in reductions. *See* Stamoulis Decl. Exh. 3.

[9] *See* Dkt. No. 2308; Stamoulis Exh. 2. Many of the fee examiner's challenges were directed at time that facially fell outside what could be properly billed to an estate. *See, e.g.*, Dkt. No. 2147 at 6–7 (reducing $5,566.50 in fees incurred "reviewing media articles relating to litigation or related matters against the debtors"); Dkt. No. 1838 at 7 (highlighting $18,270 in double-billing by one professional).

[10] The preliminary injunction motions and motions to extend the preliminary injunction have all been settled by stipulation, without the TCC filing any objections or briefs (other than a short joinder to Debtors' reply to Century's objection to the terms of the Fourth Stipulation). *See* Adv. Pro. No. 20-50527. The TCC initiated an adversary proceeding (Adv. Pro. No. 21-50032) seeking declaratory judgment, but have only filed a complaint and served one set of interrogatories.

in the main bankruptcy, and those that were filed have been "me-too" submissions.[11]  Yet professionals working on behalf of these two constituencies have billed the estate over $11 million combined.[12]  To the extent these constituencies have charged millions of dollars in fees, with their professionals logging significant hours, it has been for time allegedly incurred almost entirely behind closed doors on matters they claim are shielded by privilege.  The size of the UCC's professionals' billings, for example, are out of all proportion to the amount that the UCC's constituents have at issue in the case.

Further examples include insurance counsel for the FCR running up over $1.8 million in fees and expenses without filing a single motion or making an appearance.[13]  Debtors' special counsel, retained to represent the Debtors in trademark litigation with the Girl Scouts of America, has sought allowance of nearly $5 million in monthly applications.[14]

### *A shocking number of professionals are billing at top-of-the-market rates without any regard to the proportionality of the services rendered.*

A staggering number of professionals for each constituency are billing the estate at rates of over $1,000/hour, with several billing at closer to $1,500/hour.  The chart below shows the number of professionals each month billing time to the estate at rates of over $1,000 per hour, based on monthly fee applications:

---

[11]  The litigation involving compliance with Rule 2019, and Rule 2004 discovery was directed at non-estate entities.  The UCC and FCR sat out these motions without filing anything or only filing short joinders.

[12]  Based on the monthly fee applications, the UCC professionals have billed approximately $7.9 million and the FCR $4 million. *See* Stamoulis Decl. Exhs. 2, 3.  These figures represent 100% of the compensation and expenses for which the parties sought allowance in their monthly fee applications and do not reflect any later reduction.

[13]  *See* Stamoulis Decl. Exhs. 2, 3.

[14]  *See id.*

| Billing Period | Professionals billing estate at $1,000/hour or more[15] |
|---|---|
| Feb./Mar.2020 | 32 |
| Apr. 2020 | 27 |
| May 2020 | 30 |
| Jun. 2020 | 32 |
| Jul. 2020 | 36 |
| Aug. 2020 | 33 |
| Sept. 2020 | 35 |
| Oct. 2020 | 30 |
| Nov. 2020 | 29 |
| Dec. 2020 | 31 |
| Jan. 2021 | 33 |
| Feb. 2021 | 26 |

In February 2021, for example, one of BSA's three bankruptcy firms had ***fourteen*** different lawyers billing time at over $1,000 per hour—that is ***half*** of the twenty-nine lawyers from that firm who billed time on this matter in February.[16]  For this firm, such rates are not just limited to senior or lead partners, or even just to partners: in addition to the seven partners all billing time at over $1,000/hour, three counsels and four of the nineteen associates billed at higher than $1,000/hour in February 2021.[17]  All of the remaining fifteen attorneys, including those who were just admitted to practice this year, billed at over $600/hour.[18]

TCC professionals are charging the estate similarly high rates, with eight lawyers from the TCC's lead law firm billing at over $1,000/hour in January 2021, for example.[19]  Even non-lawyer professionals have gotten in on the act, with between three and four professionals at AlixPartners, LLP (the UCC's financial consultant) billing at over $1,000/hour, and a

---

[15]  *See id.*
[16]  Dkt. No. 2627.
[17]  *Id.*
[18]  *Id.*
[19]  Dkt. No. 2433.

professional at Alvarez & Marcel (the Debtors' financial consultant) billing significant time at over $1,000/hour.[20]

> ***The enormous rates and the incredible
> number of lawyers are out of sync with other
> sexual abuse bankruptcies.***

These enormous rates and the incredible number of lawyers billing them are out of sync with other sexual abuse bankruptcies. For example, no professional for the Debtor's lead counsel in the *Wilmington Diocese* case billed more than $1,000/hour—in fact, only one partner for that firm was billing at a rate greater than $675/hour.[21] More recently, in the *Buffalo Diocese* case, no lawyer for the Debtors' lead counsel bills at more than $500/hour.[22]

Nor is this above-market billing limited to Debtors' counsel: Mr. Patton, the Future Claimants' Representative in this case, is billing at a rate of $1,400/hour, which is ***double*** the

---

[20] *E.g.*, Dkt. No. 2404.

[21] *E.g.*, Twenty-Third Monthly and Final Application for Young Conaway Stargatt & Taylor, LLP as Counsel for the Reorganized Debtor for Allowance of Compensation and Reimbursement of Expenses Incurred for the Period September 1, 2011 through September 26, 2011 and the Final Period from October 18, 2009 through September 26, 2011, *In re: Catholic Diocese of Wilmington, Inc.*, No. 09-13560 (CSS) (Bankr. D. Del. December 12, 2011) [Dkt. No. 1803].

[22] *See, E.g.*, Monthly Fee Statement Of Bond, Schoeneck & King, PLLC For Compensation For Services Rendered And Reimbursement Of Expenses As Counsel To The Diocese Of Buffalo, N.Y. For The Period February 1, 2021 Through February 28, 2021, *In re: The Diocese of Buffalo*, No. 20-10322 (Bankr. W.D.N.Y. Apr. 27, 2021) [Dkt. 1025]. Even in recent sex abuse cases, where spending is somewhat higher that in *Wilmington* or *Buffalo*, rates north of $1,000/hour are reserved for seasoned partners. For example, in the *Rockville Diocese* bankruptcy, only a handful of the Debtor's lawyers bill at rates higher than $1,000/hour, and all of those lawyers are partners who have been in practice for over ten years. *See* Notice of Sixth Monthly Fee Statement of Jones Day for Compensation for Services Rendered and Reimbursement of Expenses Incurred as Counsel to the Debtor for the Period from March 1, 2021 through March 31, 2021, *In re: The Roman Catholic Diocese of Rockville Centre, New York*, No. 20-12345 (SCC) (Bankr. S.D.N.Y. Apr. 30, 2021) [Dkt. No. 486]. And a fee application in *USA Gymnastics* showed that only five of the ten partners working for the Debtor billed at over $1,000/hour, with the most senior associate billing at less than $800/hour. *See* Exhibit 1 to Second Interim Application of Jenner & Block LLP as Counsel to USA Gymnastics for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred from April 1, 2020 through November 30, 2020, *In re: USA Gymnastics*, No. 18-09108-RLM-11 (Bankr. S.D. Ind. Feb. 3, 2021) [Dkt. No. 1423-1].

rate of the FCR in another large sex abuse bankruptcy, *USA Gymnastics*,[23] and nearly double the rate of the FCR in *Christian Brothers*.[24]

Many estate professionals, including lawyers for the Debtors, regularly staff calls with multiple attorneys billing at these high rates. For instance, there have been dozens of calls where the Debtors has four partners in attendance and another two to four associates or counsel.[25] As a result, the effective hourly cost to the estate is often two to four or more times $1,000 for a given task. These are just a few examples of many. It is near impossible for the Court to assess the reasonableness or proportionality of any of these fees on a quarterly basis.

### The TCC and Coalition professionals are generating enormous duplicative costs

The Coalition and the state court lawyers associated with it are generating duplicative costs as they jockey over the control of distribution of BSA's assets and to justify substantial contribution awards.

Brown Rudnick and now Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP have appeared for the Coalition. The Coalition insists on separate meetings and calls with the Debtors and then re-meeting all over again with the TCC on the same issues.[26] This has, in

---

[23] *Compare* Dkt. No. 213, *with* Debtor's Motion for Order Appointing Fred C. Caruso as Future Claimants' Representative, *In re: USA Gymnastics*, No. 18-09108-RLM-11 (Bankr. S.D. Ind. May 10, 2019) [Dkt. No. 480].

[24] *See* Notice of Presentment of Application of the Trustee of the Christian Brothers' Institute and the Christian Brothers of Ireland, Inc. Trust to Appoint Alec Ostrow as the Representative for Seattle Future Sexual Abuse Claimants *Nunc Pro Tunc* to February 10, 2014, *In re: The Christian Brothers' Institute*, No. 11-22820 (Bankr. S.D.N.Y. March 24, 2014) [Dkt. No. 684].

[25] For example, the February Monthly Fee Applications from two of the Debtors' six retained law firms reflect two partners from each firm and two additional lawyers from each firm attending the same call on February 5, 2021. *See* Dkt. No. 2627-2 at 67; Dkt. No. 2675-2 at 13–14. Similar attendance at weekly calls recurs throughout the fee applications.

[26] *E.g.*, Dkt. No. 2350-2 at 69 (time billed for Debtor holding separate mediation sessions with Coalition and TCC); Dkt. No. 2433-2 at 40 (time billed for TCC discussing mediation with counsel for Coalition).

various instances, doubled the work for estate professionals meeting with lawyers for the claimants. For example: timesheets from the Debtors' counsel reflect separate, hour-long sessions on the same topic ("plan and settlement issues") with both the TCC and the Coalition (from which insurers were excluded).[27] And on January 29, 2021 the BSA's attorneys billed for separate calls and communications with counsel for the TCC and the Coalition.[28]

The only difference in the makeup of the two committees are the persons who purport to control the claimants.

### *The estate has been billed for over $1 million for parties to prepare their fee applications.*

The excessive duplication is generating absurd results. With nearly thirty firms preparing monthly and quarterly fee applications, enormous hours are being consumed simply generating the applications to collect this money. The fee applications appear to seek allowance of over almost $1.4 million for the preparation of those documents alone.[29]

### RELIEF REQUESTED

By this Motion, Century requests that the Court modify its Compensation Order for all estate professionals to provide that the 20% holdback be paid from the estate only after consideration and approval of a Final Fee Application.

---

[27] Dkt. No. 2350-2 at 69.
[28] Dkt. No. 2350-2 at 58.
[29] Stamoulis Decl. Exhs. 2, 3.

**BASIS FOR RELIEF**

**POINT I**

**THE COURT CAN AND SHOULD AMEND ITS INTERIM
COMPENSATION ORDER TO PROVIDE FOR PAYMENT OF THE 20% HOLDBACK
ON ATTORNEYS' FEE'S ONLY AT THE END OF THE CASE**

**A.    Changed circumstances justify amending the Compensation Order under Rule
60(b) of the Federal Rules of Civil Procedure.**

Under Rule 60(b) of the Federal Rules of Civil Procedure, made applicable in bankruptcy

under Rule 9024, the Court may grant relief from judgments where the moving party can show

changed circumstances.  The Compensation Order was entered on April 6, 2020.  The raw

numbers bear out a situation that the Court could not have envisioned when it signed this order.

The "staggering" fees in this matter indicate as much.[30]

If the amount of professional fees charged to the estate is not sufficient evidence of

changed circumstances, one can point to the fact that the Debtors have, since the Compensation

Order was entered, sought the retention of special counsel, and that firm has documented nearly

$5 million in fees and expenses in the course of eight months.[31]  The TCC has also hired an

additional law firm that has sought roughly $1.5 million from the estate.[32]  And the Coalition,

which was not formed until months after the Court signed the Compensation Order, has retained

two law firms to represent it.

**B.    An end-of-case fee holdback would enhance the Court's
ability to properly assess whether the fees charged are in proportion
to the value of the services rendered.**

Though 11 U.S.C. § 331 permits interim compensation of fee and expense awards, Courts

impose a "holdback" of some portion of interim compensation as a routine matter in making

---

[30]    *Id.* at 49:2–3, 19–21.

[31]    Stamoulis Decl. Exhs. 2, 3.

[32]    *Id.*

10

interim fee allowances.  *See, e.g.*, *In re Teraforce Technology Corp.*, 347 B.R. 838, 844 (Bankr.

N.D. Tex. 2006); *In re XO Communications, Inc.*, 323 B.R. 330, 333 (Bankr. S.D.N.Y. 2005),

*aff'd*, 369 B.R. 111 (S.D.N.Y. 2007).  The Court must assess whether the compensation sough

represents "reasonable compensation for actual, necessary services rendered" or "actual,

necessary expenses."  11 U.S.C. §§ 330(a)(1), 331.  The professional seeking compensation

bears the burden to demonstrate that the services meet these requirements, *see In re Engel*, 124

F.3d 567, 572–73 (3d Cir. 1997), and courts apply a two-tiered test: (1) "the court must be

satisfied that the professionals performed actual and necessary services," and (2) "the court must

assess a reasonable value for those services."  *In re Channel Master Holdings, Inc.*, 309 B.R.

855, 861 (Bankr. D. Del. 2004); *see also In re Fleming Cos.*, 304 B.R. 85, 90 (Bankr. D. Del.

2003).

   A holdback of compensation to the ***conclusion*** of the case is appropriate "to moderate

potentially excessive interim allowances and to offer an incentive for timely resolution of the

case," *In re Child World, Inc.*, 185 B.R. 14, 18 (Bankr. S.D.N.Y. 1995) or where the Court may

face difficulty in determining whether services were actual and necessary when reviewing

interim applications.  *In re Bank of New England Corp.*, 134 B.R. 450, 458–59 (Bankr D. Mass.

1991) *aff'd.*, 142 B.R. 584 (D.Mass.1992).  As the outcome of larger cases, in particular, may not

be known until the conclusion of the case, a holdback can be employed to ensure that all

professional fees disbursed are reasonable, as required by the bankruptcy code.  *See In re ACT

Mfg., Inc.*, 281 B.R. 468, 480 (Bankr. D. Mass. 2002).

   Andrew Vara, United States Trustee for Region 3 ("UST") recently asked the Bankruptcy

Court for the District of New Jersey to convert a quarterly holdback to an end of case holdback

in another bankruptcy involving sexual abuse claims.[33]  In *In re the Diocese of Camden, New Jersey,* the official trade creditors' committee requested an end-of-case holdback to address concerns about disproportionate fee request, given the size of the case and the Debtor's assets.[34] The UST agreed and pointed to the prospect that parties might continue to run up large fees as grounds to recommend that "the Court impose a twenty percent (20%) holdback on all professionals' fees in this case to be paid only after final fee applications are granted by the Court."[35]

Over one year into BSA's bankruptcy, the professionals paid by the estate continue to run up staggering fees.[36]  In monthly fee applications, professionals working on behalf of the TCC have billed the estate for over $10M.[37]  Other professionals, like the Unsecured Creditors Committee and the Future Claimants Representative, are likewise billing out large amounts, having sought allowance of approximately $7.9 million and $4 million in monthly fees and expenses, respectively.[38]  And the Debtors' professionals have sought allowance of over $41 million in their monthly fee applications.[39]

For all of this spending, there is little consensus or real progress in the case, and it remains unclear whether the sort of resolution that could even justify the massive estate spending is feasible here.  The TCC, Coalition and FCR have all challenged the Debtors' exclusivity,

---

[33]  *See* Objection of the United States Trustee to the First Interim Application of Lowenstein Sandler LLP as Counsel to the Official Committee of Tort Claimant Creditors, *In re Diocese of Camden, New Jersey*, No. 20-21257 (JNP) (Bankr. D.N.J. March 25, 2021) ¶¶ 4–5 [Dkt. No. 528].

[34]  *Id.*

[35]  *Id.* ¶¶ 6, 43.

[36]  Dkt. No. 2672 ¶ 35.

[37]  *See* Stamoulis Decl. Exhs. 2, 3.

[38]  *Id.*

[39]  *Id.*

raising the specter that the case may go forward with two (or even three) reorganization plans on the table.[40]

Separately, the insurers' Rule 2004 discovery motions also remain pending, and there has been no discovery into the nearly 100,000 abuse proofs of claim filed in this case. In short, there is little, if any, certainty with regard to a resolution in this case, and in the meantime professional fees are likely to accelerate.

In such an environment, it is impossible for the Court to truly assess whether the services rendered by the ***many*** professionals are necessary or ultimately beneficial to the estate in this case. *See In re ACT Mfg., Inc.*, 281 B.R. at 480; *In re Child World*, 185 B.R. at 18 (Bankr. S.D.N.Y. 1995) (holdbacks, while not mandated by statute, are commonly used by courts to moderate potentially excessive interim allowances and to offer an incentive for timely resolution of the case). Such a determination will be particularly difficult given the closed-door nature of the past six months, with parties asserting confidentiality over what they have been doing behind closed doors.

**C.    An end-of-case holdback will allow the Court to assess proportionality in light of the unnecessary and duplicative work for estate professionals generated by the Coalition.**

A significant portion of the estate professional fees in this case have been driven by competition between competing groups of claimant lawyers. The resulting duplicative meetings with estate professionals further contributed to mounting professional fees. The Debtors' plan has satisfied neither tort claimant constituency, and the lack of progress in the case remains completely disproportionate to the exorbitant professional fees the parties are seeking. The

---

[40]    Dkt. Nos. 2506, 2672.

13

Coalition's latest filing leaves the impression that the parties are back to square one,[41] with none of the many (costly) hours of dual-track, closed-door negotiations resulting in a plan that is a starting point for negotiations with any tort claimant constituency.

An end-of-case holdback will give time for the Court to assess the extent to which a group's role contributed negatively to the process. Moreover, such a holdback will allow the Court to assess estate fees alongside the multiple demands that will be made for substantial contribution awards under section 11 U.S.C. § 503. Of course, section 503 places a heavy burden on applicants,[42] and the party seeking such an award must show more than mere participation in negotiation and settlement of claims.[43]

## POINT II

### UPWARDS OF 50% OR MORE OF THE MONEY IN THIS BANKRUPTCY STANDS TO GO TO LAWYERS' FEES

If nothing is done to curb the professional fees in this case, lawyers for claimants, rather than their clients, stand to get the bulk of the money in this case. The die is loaded in favor of the lawyers already, as many of the state court counsel representing tort claimants here have

---

[41] Dkt. No. 2672 ¶¶ 34–37.

[42] *See In re D.W.G.K. Restaurants, Inc.*, 84 B.R. 684, 689 (Bankr. S.D. Cal. 1988) ("The movant bears a heavy burden in requesting compensation under § 503(b)."); *In re Senor Snacks*, 2005 Bankr. LEXIS 3295, at *4 (Bankr. S.D. Cal. Oct. 27, 2005) (construing the Bankruptcy Code's substantial contribution provisions narrowly, noting that "any uncertainty as to the benefit of a service performed must be decided . . . against the applicant."); *In re D.A.K. Indus.*, 66 F.3d 1091, 1094 n.3 (9th Cir. 1995) (construing § 503 narrowly because "the narrow construction of administrative expenses insures that payments out of the estate are kept to a minimum."); *In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.*, 104 F.3d 1147, 1148 (9th Cir. 1997) ("the Bankruptcy Code and its Rules require extensive documentation for compensation.").

[43] *See, e.g.*, *In re Alumni Hotel*, 203 B.R. 624, 632-33 (Bankr. E.D. Mich. 1996) (rejecting a substantial contribution claim where the principal contribution was negotiation, because otherwise "all parties to [the] settlement might well argue that they, too, made a 'substantial contribution' by agreeing to compromise their claims"); *In re Am. Plumbing*, 327 B.R. 273, 291 (Bankr. W.D. Tex. 2005) (noting that negotiation does not alone constitute a substantial contribution because "[n]egotiation and settlement, by its nature, is not a unilateral action").

signed up claimants to agreements that give their lawyers a 40% interest in each claim.[44]  These

enormous contingency fees are themselves problematic, as in many cases lawyers have limited

their representation to the bankruptcy only.[45]  This is in a case where there is an official

committee paying its professionals top dollar to represent the interests of tort claimants, and an

ad hoc committee, which has likewise retained and paid two law firms to represent the claimants'

interest.

Those contingency fees, plus the millions of dollars professionals for the TCC are billing

the estate for and the prospect that Coalition counsel will seek direct payment in the form of a

substantial contribution award, significantly reduce the pool of funds available to claimants.

Simple math shows how a large chunk of the money put up by the estate will be

consumed by attorneys if nothing is done to curb fees in this case.  Under the Debtors' current

proposed global resolution plan, the Debtor would themselves contribute approximately $115.6

million to fund a trust, with a projected "substantial contribution" from unidentified Local

Councils in the amount of $425 million.[46]  The Debtors have estimated the estate will be billed

$150 million by estate professionals by the end of August.[47]  Brown Rudnick may seek a

substantial-contribution payment of up to $20 million, leaving the State Court lawyers to seek

individual awards.

Assuming a 40% contingency recovery by state court lawyers on money paid from the

trust, contingency fees alone work out to $216 million of the roughly $540 million trust

---

[44]  *See, e.g.*, Exhibit 9 to the January 22, 2021 Declaration of Andrew Kirschenbaum, Dkt. No. 1975-1 (UCC financing statement reflecting a financing arrangement between a secured financing party and Andrews & Thornton, filed on October 6, 2020).

[45]  *See* Dkt. No. 1997-3.

[46]  Dkt. No. 2594 at 14.

[47]  March 17, 2021 Hr'g Tr. at 46:16–19.

contribution quantified in the Debtors' current Disclosure Statement. The combined total projections represents approximately $386 million of that $540 million.

*    *    *

The Court can and should act to curb the out-of-control professional fees in this case. Amending the holdback provision of the compensation order would force parties to take a more critical eye to their billing and ensure that what they are asking the estate to pay is in fact reasonable and proportional to the outcomes that can be achieved. This amendment to the compensation order, rather than fast-tracking the end of the case, will encourage efficient disbursement of estate resources without cutting off the rights of parties to properly vet plan proposals.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, Century respectfully requests that the Court grant the relief requested herein and enter the Proposed Order amending the Compensation Order.

Dated: May 5, 2021

Respectfully Submitted,

By:   */s/* Stamatios Stamoulis
          Stamatios Stamoulis (#4606)
STAMOULIS & WEINBLATT LLC
800 N. West Street
Third Floor
Wilmington, Delaware  19801
Telephone:   302 999 1540
Facsimile:    302 762 1688

O'MELVENY & MYERS LLP
Tancred Schiavoni (*pro hac vice*)
Times Square Tower
7 Times Square
New York, New York  10036-6537
Telephone:   212 326 2000
Facsimile:    212 326 2061

*Counsel for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America*