**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BOY SCOUTS OF AMERICA AND | ) | Case No. 20-10343 (LSS) |
| DELAWARE BSA, LLC, | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | Re: D.I. 2293 and 2294 |

**OBJECTION OF CERTAIN CLAIMANT TO THE ADEQUACY OF
DEBTORS' DISCLOSURE STATEMENT
IN SUPPORT OF SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION
AND JOINDER OF OBJECTION OF TORT CLAIMANTS' COMMITTEE**

CLAIMANT NO. 39334 ("Claimant"), by Claimant's counsel, Christopher A. Kreid of

Christopher A. Kreid & Associates, LLC and Raeann Warner of Jacobs & Crumplar, P. A., objects

to the sufficiency and adequacy of the Disclosure Statement for the Second Amended Chapter 11

Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC ("the Disclosure

Statement") (Dkt. No. 2592) filed April 14, 2021, for the following reasons:

**A.  Failure to Disclose the Assets and Liabilities of Each Party Receiving a Release**

1.      Claimant objects to the adequacy of the Disclosure Statement because it fails to

provide sufficient information to make an informed decision on whether to (a) vote to accept or

reject the Plan, which proposes a release of all local councils and may propose a release of

charter organizations, or to (b) raise a "Best Interest of Creditors" objection.

2.      The Disclosure Statement does not provide any property-by-property valuation

of the real or personal property that Debtors intend to transfer to a settlement trust, or any

property-by-property valuation of the real or personal property that it seeks to retain.  The same

is true of Debtors' other assets, including investments.  It is imperative that the Disclosure

Statement provide the liquidation value or fair market value for each such property.

3.      The Disclosure Statement does not include in its liquidation analysis the properties of the local councils.  Under Debtors' governance documents, a local council's property reverts to Debtors if the local council's charter is not renewed.  In a Chapter 7 liquidation of the Debtors, the Chapter 7 trustee presumably would not renew any local council charters.  Since the properties revert to Debtors, the liquidation analysis must include the liquidation value of all real and personal property held by local councils.

4.      The Disclosure Statement and the Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC ("the Plan") (Dkt. 2293) fail to provide any property valuation information for a creditor to determine if any local council is making a substantial contribution that warrants a release and channeling injunction.  Any such valuation must include the liquidation or fair market value of the assets of each local council that will be released, including any justification by a local council for asserting that an asset is unavailable to pay its creditors (e.g., donor restricted), how many childhood sexual abuse claims implicate each local council, and how much each local council is contributing in exchange for a release of such childhood sexual abuse claims.

5.      Based on each local council's publicly available IRS Form 990 statements, the local councils have significant assets, including significant unrestricted assets.  Even the IRS Form 990 statements undervalue the assets if thd local council accounted for its real property using "book value" (e.g., the value it was worth at the time it was acquired) and not its current fair market value.

6.      The Disclosure Statement and the Plan do not provide any property valuation information of any charter organization that will be released, including any justification by a charter organization for asserting that an asset is unavailable to pay creditors (e.g. donor

restricted), how many childhood sexual abuse claims implicate each charter organization, and how much each charter organization is contributing in exchange for a release of such childhood sexual abuse claims.  Like the local councils, many of the charter organizations, such as the Methodist Church, Mormon Church, and Catholic Church have significant property and other financial assets that should be made available to address the injuries of the Claimants.

7.    Claimant cannot make an informed decision to vote to accept or reject the Plan because the Disclosure Statement does not contain any information about the number of claims against each local council or charter organization, or any estimate of the value of such claims. To the extent that sexual abuse claims have not been filed against a local council or charter organization, Debtors should disclose whether they have any indemnification or contribution claims against each local council or charter organization.

8.    Moreover, the Disclosure Statement fails to adequately explain how any contribution by non-Debtor entities, including local councils and charter organizations, will be utilized, including whether their contribution will be used to pay administrative expenses, to pay trust administrative and legal expenses, or to compensate others who do not have a claim against that entity.

9.    The inadequacy of the Disclosure Statement is illustrated by the fact that the Debtors state in the Plan that they are "committed" to ensuring the local councils collectively contribute at least $450 million.  This disclosure is illusory because there is no agreement with the local councils to contribute anything to the Plan.  In this regard, the Plan is speculative at best and the Disclosure Statement does nothing to inform abuse survivors whether and when any contribution by the local councils might be realized.  In addition, the Debtors fail to disclose how much each council has available to contribute, how much each council is contributing, and

how the contributions of each council will be utilized, including whether the contributions of a council will be used to compensate abuse survivors who do not have a claim against that council.

10.      Similarly, the Disclosure Statement estimates that under the Global Resolution Plan somewhere between $2.4 billion and $7.1 billion will be available to compensate abuse survivors, but nowhere does the Disclosure Statement explain how the Debtors purport to generate these funds.  On the other hand, the Debtors have *only* agreed to fund $115,000,000 and have "committed to ensuring" the local councils contribute at least $425,000,000.  The Disclosure Statement fails to explain how the Debtors plan to generate an additional $1,860,000,000 to $6,560,000,000.  Even adding the $650,000,000 from the Debtors' proposed settlement with Hartford leaves the Debtors short by $1,210,000,000 from the low end of the amount they claim will be available for abuse survivors.

11.      This lack of basic information makes it impossible for the creditors to determine whether each council is making a substantial contribution, to make an informed decision on whether to vote to accept or reject the Plan, which proposes to release each council, and to make an informed decision on whether to raise a "best interest of creditors" objection because the Plan fails to award them the liquidated value of their claim against all entities they are releasing.

**B.  Failure to Disclose the Specific Entities to Be Released**

12.      Claimant objects to the adequacy of the Disclosure Statement and the accompanying solicitation procedures because they fail to notify all Claimants which local council and/or charter organization is associated with their abuse, whether any such entity will receive a release, and if so, the terms of the release.  If the Plan is designed to provide a release to non-Debtor third parties, such as the local councils and charter organizations, Debtors should identify each local council and charter organization and their relationship to each of the

Claimants.  For example, under the Global Resolution Plan in the Plan, the "Protected Parties" (e.g., those that benefit from a release and channeling injunction) should only include those non-Debtors that make a substantial contribution and receive sufficient support by claimants whose claims will be released and/or the subject of a channeling injunction.

13.    Most of the Claimants, including this Claimant, have legal claims against the Debtor(s), a local council, and a charter organization.  In certain proof of claim forms, Claimants made a good faith effort to identify the local council and/or charter organization that may be liable for the childhood sexual abuse they suffered that is the basis for their claim.  However, Claimants were children when they were sexually abused.  Due to the passage of time and/or the psychological effects of the abuse, many are unsure whether they have identified the correct entities and others were simply too young to recall the correct names today.

14.    For those Claimants and other abuse survivors who do not know this information, the information they need is largely within the purview of Debtor(s) and local councils, which possess the Scouting unit rosters (e.g., Boy Scout Troop rosters and Cub Scout Pack rosters), camp rosters, and adult volunteer rosters.  In prepetition litigation, this disclosure would generally occur through discovery that is currently barred by the preliminary injunction.  Prior to the preliminary injunction, Claimant would normally issue discovery that demanded Debtor(s) and/or the local council to produce the roster(s) for Claimant's Scouting unit and/or camp so Claimant can find his name on the roster and confirm he has identified the correct local council and charter organization for his Scouting unit.

15.     If Claimant's name did not appear on a roster, which may have happened as a result of human error and/or if Claimant joined a Scouting unit during the annual registration process, Claimant could review the roster to see if Claimant recognized the names of other

children or adults on the roster.  If so, Claimant could contact some of the other members of the Scouting unit to see if any had a memory of Claimant being a part of that Scouting unit.  If not, Claimant would work with Debtor(s) and/or the local council to determine whether Claimant identified the wrong Scouting unit and appeared on the roster of a different Scouting unit.  In addition to rosters, Claimant would also ask Debtor(s) and/or local council in discovery to produce the charter for Claimant's Scouting unit so Claimant could confirm the correct charter organization(s) that chartered Claimant's Scouting unit, particularly if Debtor(s) and local council no longer had rosters for the Scouting unit.

16.    If Claimant was unable to obtain records that confirm Claimant has identified the correct local council and/or charter organization, Claimant would ask Debtor(s) and/or the local council for a "person most knowledgeable" deposition concerning the local council and/or charter organization who was responsible for Claimant's Scouting unit so that Claimant could confirm that Claimant has identified the correct local council and/or charter organization for that Scouting unit.  If Claimant believes he may know the correct local council or charter organization, Claimant would ask for any and all documents that organization has about Claimant's Scouting unit and Claimant would ask the organization for a "person most knowledgeable" deposition to confirm Claimant identified the correct local council and/or charter organization.

17.    Claimant has not been able to pursue the above discovery because the preliminary injunction prohibits Claimant from pursuing any litigation against Debtor(s), local councils, and charter organizations.  Nothing under the Plan provides a mechanism by which Claimant can confirm he has identified the correct local council and/or charter organization before a release is given to those entities.

## C.  Trust Distribution Procedures

18.    Claimant objects to the adequacy of the Disclosure Statement because it fails to explain how their claims will be valued in the trust procedures and what ability they will have to contest the proposed valuation of their claim.

19.    For example, the Plan identifies a number of factors to be used in valuing each claim, but neither the Plan nor the Disclosure Statement discloses how much weight will be assigned to those factors.  Given the current state of negotiations it may not be appropriate to disclose the weight afforded to each factor.  However, if such a valuation system is ultimately included in the Plan, the weight afforded to each factor must be disclosed prior to when votes are solicited for the Plan so that claimants understand how their claim would be valued, can fairly estimate how their claim would be valued, can see how their claim would be valued when compared to other claims, and can decide whether to vote in favor or against the Plan given that valuation system.

20.    The Plan also suggests that the value of a claim might be reduced if the claimant lacks certain information, such as the full name of the Scout leader who abused them, but neither the Plan nor the Disclosure Statement indicates whether the claimant will have an opportunity to pursue discovery so that they can supplement their claim with that missing information.  As noted above, many abuse survivors may not recall the full name of the person who abused them because they were too young to recall the name, but the Debtors, the local councils, and the charter organizations likely possess evidence, such as membership rosters and the "ineligible volunteer files," that could allow abuse survivors to supplement their claim with that information.

## D.  Failure to Disclose Insurance Coverage Risks

21.     Claimant objects to the adequacy of the Disclosure Statement because it fails to explain the likelihood of defeating the insurers' coverage defenses or the insurance companies' ability to pay abuse claims that total billions of dollars.  The Disclosure Statement barely makes a passing note that the insurers have asserted coverage defenses, and Debtor(s) make no effort to evaluate those risks.  Beyond the coverage risks associated with the Debtor(s)' prepetition conduct, Debtors fail to discuss any risk associated with the proposed assignment of all of the insurance of Debtors, the local councils, and participating charter organizations to a trust, including any risk associated with the anti-assignment clauses in such policies.  If the Plan's assignment violates the anti-assignment clauses, the insurance coverage could disappear.

### E.  Failure to Disclose How Insurance Policies Will Be Utilized

22.     Claimant objects to the adequacy of the Disclosure Statement because it fails to explain how the proceeds of any insurance policies assigned to the trust will be utilized. Claimant is entitled to know how the proceeds of any policies will be utilized, including whether the proceeds of a policy that covers a Claimant's claim is being used to pay administrative expenses, to pay trust administrative and legal expenses, or to compensate others who do not have a claim covered under the same policy.

23.     For example, if a Claimant has a $1 million childhood sexual abuse claim against the Mormon Church, the Mormon Church presumably has sufficient assets to pay the full value of that claim.  In an insurance buy-back scenario, the insurers and the insured will insist that the insured receives a release of all current and future claims against the insured, otherwise the insured would be without insurance on those claims, would still be responsible for the defense costs on those claims, and would still be at risk for a judgment on those claims.  Claimant is entitled to know whether they will be required to release all of their claims against all insureds

in order to effectuate a buy back of a given policy, and if so, how the proceeds of any such buy back will be utilized.  In the foregoing example, the hypothetical Claimant is entitled to know whether he will be required to release a claim worth $1,000,000 against the Mormon Church to effectuate a "buy back" of a policy that names the Mormon Church as an insured.  Moreover, the hypothetical Claimant is entitled to know whether his share of the sale price of the policy could be a small fraction of the value of his claim against that defendant.

24.     Claimant needs to know this information to determine whether each non-Debtor who is released is making a substantial contribution and whether the "best interests" test is met by that contribution.

**F.  Failure to Disclose the Contribution of Insurers and Their Insureds**

25.     Claimant objects to the adequacy of the Disclosure Statement because it fails to explain what contribution the insurers and their non-Debtor insureds will make in order to receive a release.

26.     As noted above, nearly every Claimant has a legal claim against a local council and a charter organization.  In addition to Debtors, a local council was responsible for all Scouting units in its geographic region, including handling and processing complaints against Scout leaders for allegedly sexually abusing children and ensuring that each Scouting unit abided by policies and procedures to protect children from foreseeable harm.  These local councils, the "eyes and ears" of Debtor(s), were often amongst the parties who neglected to protect the children in their care from foreseeable harm.

27.     In turn, a charter organization was responsible for staffing and supervising the adult volunteers of a Scouting unit, like a Boy Scout Troop or Cub Scout Pack, and were amongst the parties who neglected to protect the child members of a Scouting unit from

foreseeable harm. The leaders of the charter organizations, including the Scout leaders who the charter organization appointed to oversee its Scouting unit(s), were often amongst those to receive complaints that another Scout leader was sexually abusing children in the Scouting unit, or saw the "red flags" or warning signs that another Scout leader was sexually abusing children in the Scouting unit, but neglected to take steps to protect the children from that danger.

28.    Many of the local councils and charter organizations face significant liability, and many have substantial assets that are available to compensate abuse survivors, including Claimants who have valid claims against them.

29.    Claimant objects to the adequacy of the Disclosure Statement because it fails to specify what contribution the local councils and/or charter organizations will have to make to receive a release, including a contribution above and beyond their rights under insurance policies. Claimant needs to know this information to determine whether each entity who is receiving a release, including any local council or charter organization, is making a substantial contribution and whether the "best interests" test is met by that contribution.

### G.  No Disclosure Regarding the Proposed Hartford Settlement Agreement

30.    Claimant objects to the adequacy of the Disclosure Statement because it fails to explain how much each Claimant may receive as a result of the Debtors' proposed settlement with Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company, and Navigators Specialty Insurance Company (collectively "Hartford"), whether each Claimant would be forced to release any of their claims in order to effectuate the settlement, including claims they have against non-Debtor entities, and whether any party, including Hartford and non-Debtor entities, would receive a channeling injunction as a result of the settlement.

31.    The Debtors' proposed settlement with Hartford, which was attached as Exhibit A to the Second Mediators' Report that was filed on April 16, 2021 (Dkt. 2624), is for $650,000,000 and appears to require a release of all current and future claims that may exist under Hartford's policies.  Based on a review of Hartford's policies, it appears that Hartford's policies cover some or all of the claims of approximately 25,000 claimants in this bankruptcy. Pursuant to this analysis, the Debtors' proposed settlement with Hartford equates to an average of only about $26,000 per claimant if the settlement proceeds are shared by the claimants with a claim that is covered by a Hartford policy, and to an average of approximately $7,647 per claimant if the settlement proceeds are shared with 85,000 claimants.

32.    Not only does the Disclosure Statement fail to disclose how the Debtors propose to allocate those settlement funds, but it fails to disclose how much coverage is available under each of the Hartford policies; which claimants have claims under each of the Hartford policies; the number of claims that implicate each policy; the type of claims; and, the value of the claims. Based on the years of the Hartford policies, it appears many of the policies had per occurrence limits of $500,000 with no aggregate limit.  The Disclosure Statement fails to explain why a claimant whose claim triggers a $500,000 insurance policy should vote in favor of a Plan that may result in them receiving an average of $7,647 from a settlement with Hartford.

33.    The Disclosure Statement also fails to disclose the insured(s) under each of the Hartford policies, including whether the Debtors are insureds under each policy or whether the only insured under some policies is a non-Debtor entity, such as a local council.  In turn, the Disclosure Statement fails to explain whether all current and future claims against the insured(s), including non-Debtor entities, will have to be released in order to effectuate the settlement, and

if so, the value of those claims and why a claimant should agree to such a release if the insured

has substantial assets, including other insurance, that should be used to compensate the claimant.

### H.  The Scope of this Bankruptcy Necessitates Transparency Regarding the Handling of Insurance Policies

34.     As it stands, the Plan would provide Claimant an average settlement payment of

$6,000, or less, from Debtor(s) and the local councils, which are partly justified by the

assignment of insurance policies.  The average award could be significantly lower--if non-

existent--after administrative expenses.  Claimant must have sufficient information to evaluate

the risks of the Plan if Claimant is to release multiple non-Debtor entities.  As filed, the

Disclosure Statement falls far short of the Bankruptcy Code's standard for its approval.

### I.  Voting and Solicitation Procedures for Claimants with Multiple Sexual Abuse Survivor Proof of Claims

35.     As the Court is aware, multiple Sexual Abuse Survivor Proof of Claim forms

were filed on behalf of some claimants.  The Claimant objects to the Disclosure Statement and

to the proposed voting and solicitation procedures because they will disenfranchise the votes

of survivors in the event that more than one law firm submits a ballot on behalf of the same

claimant.  Instead, the Debtors' voting and solicitation procedures should require them to verify

whether the law firm who submits a ballot on behalf of a claimant has the authorization to act

on behalf of the claimant in those instances when it matters.  For example, verification is not

necessary if multiple ballots on behalf of the same claimant vote in the same manner.  However,

if the votes conflict and the outcome of the tabulation could be affected, the Debtors must verify

which ballot should be counted by determining which law firm was authorized to submit the

ballot.  As it stands, the Debtors have failed to explain how they intend to solicit and count

votes for such claimants, including how to ensure such claimants do not vote multiple times,

how to determine who can vote on behalf of such claimants, and how to determine which vote to count if inconsistent votes are submitted on behalf of the same claimant.

**J.  Objection to Future and/or Amended Disclosure Statements**

36.    Claimant objects to any future and/or amended disclosure statement by the Debtors that fails to resolve the objections raised in this objection.

**K.  Joinder to the Objection to the Disclosure Statement by the Tort Claimants' Committee**

37.    Claimant joins the objection to the Disclosure Statement filed by the Tort Claimants' Committee.

Dated: May 6, 2021                                     Respectfully submitted,

                                                       JACOBS & CRUMPLAR, P.A.

                                       By: ___*/s/ Raeann Warner*_____
                                                       Raeann Warner
                                                       JACOBS & CRUMPLAR, P.A.
                                                       Attorneys for Claimant
                                                       750 Shipyard Drive, Suite 200
                                                       Wilmington, DE 19801
                                                       302.656.5445


                                                       CHRISTOPHER A. KREID &
                                                           ASSOCIATES, LLC
                                                       Christopher A. Kreid
                                                       CHRISTOPHER A. KREID &
                                                       ASSOCIATES, LLC
                                                       Attorneys for Claimant
                                                       530 Kedzie St.
                                                       Evanston, IL 60202
                                                       847.869.0400
                                                       Bar No. 6194430

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that the foregoing **Objection of Certain Claimant as to the Adequacy of Debtors' Disclosure Statement in Support of Amended Chapter 11 Plan of Reorganization** was electronically filed with the Clerk of Court for the United States Bankruptcy Court, District of Delaware via CM/ECF system on this 6th day of May 2021, and thereby served upon counsel of record.


/s/ *Raeann Warner*
Raeann Warner