**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors. | Jointly Administered |
| | **Re: D.I. 2592 and 2594** |

**OBJECTION TO THE ADEQUACY OF DEBTORS' DISCLOSURE STATEMENT
IN SUPPORT OF SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION
AND JOINDER OF THE OBJECTION OF THE TORT CLAIMANTS' COMMITTEE**

On April 13, 2021, the Debtors filed a *Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Dkt. No. 2592] (the "Plan"), and on April 14, 2021, the Debtors filed a *Disclosure Statement for the Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Dkt. No. 2594] (the "Disclosure Statement").

Crew Janci LLP represents over 400 victims of sexual abuse in BSA programs who have filed claims in this bankruptcy. Crew Janci LLP's experience with sexual abuse claims against the Boy Scouts (and their local councils and chartering organizations) spans back approximately 15 years. Attorneys Stephen Crew and Peter Janci were part of the Plaintiff's trial team in *Kerry Lewis v. Boy Scouts of America* trial in 2010 in Portland, Oregon. The *Lewis* case involved sexual abuse within a troop sponsored by the Church of the Jesus Christ of Latter-day Saints (also known as the "LDS Church" or "Mormon Church.") In *Lewis*, that plaintiff was abused in the mid-1980s by scout leader Timur Dykes *after* Dykes had been reported to the LDS troop leadership for abuse of one boy, and then admitted to abusing 17 other boys from Troop 719. (When police investigated regarding the one boy who reported, the LDS troop leadership did not inform the detective that there were 16 other victims; accordingly, Dykes was criminally convicted, but placed on probation.) Despite learning

this, the head of the troop (who was also the local Mormon Bishop), did not inform parents or warn scouts about Dykes. As a result of the failure by BSA, the Cascade Pacific Council ("CPC"), and the Mormon Church to warn of a known danger, Kerry Lewis was abused – part of a pattern of national institutional negligence by the Boy Scouts (and, in many cases, the Mormon Church) which resulted in the abuse of thousands of other boys.

The *Lewis* case resulted in $19.9 million jury verdict against BSA and CPC.  (The jury in *Kerry Lewis* also found that the sponsoring organization – the Mormon Church – was 25% at fault for the plaintiff's injuries.)  That verdict against the Boy Scouts included $18.5 million in punitive damages to punish the Boy Scouts for its negligence in responding to a sustained, national problem of adult leaders sexually abusing scouts.  The jury's verdict was largely based on its review of the Boy Scouts' secret internal "Ineligible Volunteer Files" (also referred to by the Scouts as the "IV Files").  (The BSA referred to the category of IV Files covering allegations of child sexual abuse as the "Perversion Files").

The *Lewis* trial resulted in the public release of those Perversion Files created between 1965 and 1985 that had survived destruction.[1]  As a result, starting in 2012 (after appellate processes were exhausted), victims of abuse in Scouting were, for the first time ever, able to look for themselves at BSA's documentation about abuse in Scouting.  Some victims were able, for the first time ever, to look at secret files on their own perpetrators.

Following the *Lewis* verdict and up until the BSA's initiation of the bankruptcy, Crew Janci LLP continued its advocacy for individual victims of sexual abuse in litigation against the Boy Scouts

---

[1] Although BSA began keeping files in 1920, Defendant BSA no longer has any of files from before 1945. BSA has admitted to destroying those files. Boy Scout officials have testified that the IV files were regularly culled to remove the dead and elderly.  Further, in the 1970s, all of the IV files created to that point were reviewed (estimated at over 4,000 files) and "[p]robab1y at least half" of those IV files were destroyed at that time according to deposition testimony by longtime BSA official Paul Ernst.

and local councils around the country.  In total, prior to the initiation of this Chapter 11 proceeding, attorneys from Crew Janci LLP were involved in representing over 150 victims abuse in scouting, including in Oregon, Washington, California, Alaska, Idaho, Arizona, New Mexico, Montana, Texas, Illinois, Wisconsin, Minnesota, Iowa, Ohio, New Hampshire, Vermont, Connecticut, Florida, New York and New Jersey.  Nearly all of those cases involved claims against the related local council of the Boy Scouts; some of those cases also involved concurrent claims against the Sponsoring Organization, including churches, schools, and community organizations.

The Claimants represented by Crew Janci LLP (the "Crew Janci Claimants")[2] are survivors of childhood sexual abuse who each filed a Sexual Abuse Survivor Proof of Claim.  As reflected in their individual proof of claim, the story of each of these survivors is unique, including how they were sexually abused, how the abuse affected them, and the circumstances that led to the abuse.  As a group, their proof of claims reflect abuse that occurred between approximately 1947 and 2018, and that their ages ranged from approximately 6 to 17 years old.  The sexual abuse they suffered includes groping, oral copulation, and penetration.  Some of the abuse was accomplished by conditioning and grooming the victims; some was violent and forcible; all was profoundly damaging.

In addition to many adult men who were abused as boys over the last 80 years, Crew Janci represents several victims who were sexually abused in the last five years.[3]  Also notable, and contrary to popular understanding, girls have long been allowed to participate in certain types of Scouting units, (including Explorer Posts and Sea Scout Ships) and sexual abuse in Scouting has for decades included female victims.[4] Crew Janci LLP represents a number of women who were sexually

---

[2] *See* attached Appendix A, which lists the Sexual Abuse Survivor Proof of Claim numbers for the Crew Janci Claimants.
[3] See, e.g., Claim #41758, 41766, 55610, and 40554.
[4] See, e.g., Claim #54338 (female Sea Scout abused in 1984-1986 at approximately age 12-13 by the Assistant Scout Leader within the Cascade Pacific Council); Claim #42157 (female Explorer Scout abused in 1985-1987 at approximately age 16-19 by her Explorer Advisor within the Crater Lake Council); Claim #23340 (female Explorer Scout abused in 1990-1994 at approximately age 16-18 by her Senior Explorer Post Advisor within the South Florida Council); Claim #69064 (minor female camp staffer abused in 2011 at approximately age 16 by her adult supervisor –a BSA Camp Employee - while she was working at The Curtis S Reed Scout Reservation within the Twin Rivers

abused as girls in Scouting.  In other words, sexual abuse in Scouting was a largely preventable problem that spanned a century and now impacts men, women, and children.

All of this to say, attorneys from Crew Janci LLP have a unique experience and perspective that informs this objection on behalf of Crew Janci Claimants.  There are a myriad of problematic omissions in the Debtor's proposed disclosure statement.

Many of the Crew Janci LLP's Claimants have claims against non-Debtor entities, including a local council and a charter organization.  For example, the following Crew Janci Claimants have identified claims against the Mormon Church: 32471, 39895, 17370, 40548, 40633, 40687, 53746, 32621, 32711, 65460, 69075, 45781, 20152, 17459, 17471, 23339, 66730, 64336, and 57689. Twenty three (23) Crew Janci Claimants have identified claims against Methodist churches (Claimants 32491, 54344, 62063, 42279, 69040, 71221, 64425, 64472, 63766, 40581, 54352, 69068, 64686, 54366, 45197, 40726, 4484, 29240, 14033, 55460, 14026, 65331, and 63787).  Numerous Crew Janci Claimants have identified claims against the Salvation Army (Claimants 62036, 62035, 62084, 63794, 63850, and 40530), the American Legion (Claimants 17394, 5400, 7904, 7922, 7923, 8784, 17455, and 7913) and dozens of other Crew Janci Claimants were abused in troops sponsored by the Catholic Church, the Episcopal Church, the Lutheran Church, as well as school districts and various other similar organizations. As noted below, many of these non-Debtor entities may have significant assets and their own insurance separate and apart from any insurance maintained by the Debtors.

Even without the benefit of discovery, which has been stayed due to the preliminary injunction, some of these claims against non-Debtor entities are strong and compelling.  For example, twelve (12) Crew Janci Claimants were abused by notorious perpetrator Calvin Malone – three in

---

Council); and Claim # 32702 (female Venture Scout abused as a minor in 2012 by her Assistant Venture Crew Leader within the Central North Carolina Council).

4

the Greater Alabama Council (Claimants 39559, 48070, 39973), five in the Silicon Valley Monterey Bay Council (Claimants 15959, 29204, 15680, 41495, and 41684) and four in Cascade Pacific Council (Claimants 20068, 13964, 41887, and 40670).  Calvin Malone is one of the most prolific pedophile predators in the history of Scouting.  Malone admits to abusing scouts in every troop with which he was involved over more than a decade – including troops in Oregon, Montana, California, Alabama, and Europe.  Malone himself has admitted abusing over 50 children – including 30 scouts; in truth, Malone almost certainly had several hundred victims. As set out in the aforementioned proof of claims, these local councils knew or should have known that these Claimants were in danger of being sexually abused by Malone.

Malone began his career as a Scout Leader in 1970, working as a Summer Camp Staff at Camp Pico Blanco (Silicon Valley Monterey Bay Council) near Big Sur, California. While at Camp Pico Blanco in 1970, Malone was caught sexually abusing a boy scout and giving other boy scouts alcohol. The Boy Scouts' own documents show that Malone was caught and that they opened an IV File on him.   (That file has since been destroyed by the Boy Scouts.)

Following his trouble at Camp Pico Blanco, Malone quickly joined the military and was shipped off to Germany.  While in Germany, the Boy Scouts chose to give Malone another chance – with BSA Troop 114 in Neu Ulm, Germany.  Malone has admitted under oath that he abused numerous boys in that troop over the next couple of years.

Malone arrived in Portland, Oregon in 1974 and was hired by the Cascade Pacific Council as a paid employee called a "District Aide" and entrusted with recruiting boys to Scouting, organizing new troops, planning activities, and acting as a substitute leader in troops around the greater Portland metro area.  Documents from the time of Malone's hiring reveal that the Cascade Pacific Council was aware of the risk that Malone posed.  As an employee and Scoutmaster within the Cascade

Pacific Council, Malone abused more than a dozen boys in under two years.  And, despite multiple reports and notices, Cascade Pacific Council took no action to remove him.

By 1975, BSA and several local councils knew that: (1) Malone had sexually abused a boy and provided alcohol to other boy scouts at Camp Pico Blanco in 1970; (2) Malone had sexually abused several boys and provided alcohol to other boy scouts as a Scout Leader in Portland in 1974 and 1975; and (3) Malone had been prosecuted and convicted of stealing scouting money in Oregon. Still,nothing was done to stop Malone. Malone instead spent the next decade involved in Scouting – and abusing boy scouts – in California, Alabama and Montana.

In each council – Cascade Pacific Council, Silicon Valley Monterey Bay Council, Greater Alabama Council, and the Montana Council -- there is evidence that leaders within the council knew or should have known about the grave danger posed by Calvin Malone, but did nothing.  (The inaction of the Boy Scouts and these local councils also meant Malone was free to abuse other children in troubled-youth homes and similar programs in Pennsylvania, Florida, Oregon, and Washington.)

Malone later pleaded guilty to sexual abuse of two different  scouts in Northern California. He was incarcerated in California and then extradited to Oregon to stand trial on eight counts of sodomy and sexual abuse for his earlier crimes.  In 1992, Malone was again convicted of child rape and sexual abuse charges. In 2011, after spending nearly 20 years incarcerated, Malone was adjudicated as a Sexually Violent Predator and was civilly committed at McNeil Island Special Commitment Center, where he remained until he was recently released.

Similarly, as an example, Claimant 57689's proof of claim indicates that his Scouting unit was chartered by Mormon Church and that the charter organization likely knew or should have known that he was in danger of being sexually abused. Claimant 57689 was sexually abused by his Boy Scouts scout leader, Ron Kerlee, in his troop sponsored by the Mormon Church.  Kerlee abused

Claimant on multiple occasions in connection with Scouting activities in the 1980s.  Prior to Claimant's abuse by Kerlee, leaders from the sponsoring organization (the Mormon Church) learned on multiple occasions that Kerlee was suspected of sexually abusing boys; still the Mormon Church did not take action to remove Kerlee from positions of authority over youth.[5]  In fact, unbeknownst to Claimant, his family, or most congregants, in November of 1983, Kerlee was convicted of Sodomy III (a Class C Felony).  Kerlee received a suspended sentence of five years of probation.  Public records show the LDS Church submitted a letter to the court in support of early termination of Kerlee's probation, which Kerlee obtained.

Despite the criminal conviction, the Mormon Church allowed Kerlee to continue to serve in positions of leadership over youth in the Corvallis Stake until the late 1980s (including as a Scout Leader, a youth Seminary Teacher, Sunday School Leader, and youth leader within the LDS Church's youth program). Claimant was abused by Kerlee after this criminal conviction – in connection with the Church-sponsored boy scout troop, but also in many instances in connection with other LDS Church youth programs (like Sunday School and youth seminary) that were unrelated to scouting.  (Kerlee ultimately continued his association with the Mormon Church until 2014, around the same time that the State of Oregon revoked Kerlee's counseling license after finding that Kerlee, then 71 years old, had engaged in sexual contact with young college-aged male clients.)

Claimant has alleged in his independent suit against the LDS Church that the Mormon Church's response to reports of abuse by Ron Kerlee were part of a larger pattern and that, from at

---

[5] For information beyond the Proof of Claim, please see *Hiser v. Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints et al,* US District Court for the District of Oregon Case Number: 6:21-cv-00280-AA; see also "Oregon man sues Mormon church over alleged sexual abuse," https://www.seattletimes.com/seattle-news/northwest/oregon-man-sues-mormon-church-over-alleged-sexual-abuse/ (last accessed 5/4/21).

least the 1960s, the Church "knew that LDS Youth Leader positions across the United States were being used by predatory child molesters to gain access to and victimize children and that LDS Defendants had an institution-wide or systemic child abuse problem."  The lawsuit alleges that the LDS Church "documented this knowledge, including in individual 'Red Flags,' 'annotations' or documents within or related to perpetrators' LDS church membership files[.]"  Based on this information, the Plaintiff alleges that the LDS Church knew about "widespread and repeated occurrence of child molestation by LDS Youth Leaders," and also "the methods by which predatory child molesters used . . . the LDS Youth Program to accomplish their abuse of children." (In response to Claimant's efforts to pursue litigation against the Church for independent abuse suffered in non-scout-related settings, the Mormon Church had BSA add Claimant's case against the Church to the Schedule of "Further Abuse Claims"; this effectively stayed the case a part of this bankruptcy, despite that the suit against the Mormon Church did not name any scouting entity and expressly alleged that the suit "does not seek damages for any other incidents of abuse that occurred within the context of activities affiliated with the Boy Scout troop sponsored by the Corvallis Stake.")

Some of the claims of the Crew Janci LLP Claimants were close to resolution when the Debtors filed for bankruptcy.  For example, Claimants 55610, 41758 and 41766 were all minors at the time that BSA initiated Chapter 11 proceedings.  These Claimants were abused between 2014 and 2017 in their boy scout troop within the Cascade Pacific Council by Scoutmaster Douglas Young. Young was criminally convicted for his abuse of each of these claimants.  Young's abuse of several of these boys was extreme.  For example, Young abused Claimant 41758 over 200 times between approximately 2015 and 2017, including groping the boy's genitals, mutual masturbation, oral copulation, and anal penetration with Young's penis and sex toys. Young also introduced sadomasochism and bondage to this abuse, requiring this victim to wear laced black panties and a

collar while referring to the boy as "The Toy" and the Scoutmaster as the "The Owner." Scoutmaster Young also used his victims in the production of child pornography.

Young's abuse of these boys wasforeseeable.  Years before the abuse, Young was reported multiple times to DHS for allegedly sexually abusing other children. Further, Young regularly posted public blogs online about snuggling and touching children to create a stronger connection with them.

Even as teenage boys, these Claimants found the courage to speak up about what happened to them.  As a result, Young was criminally charged and convicted of sexually abusing these Claimants. Young is now in prison, serving time for his sexual abuse crimes.

These Claimants also desired to make sure that their abuse – occurring in the last few years – was an impetus for more change in the current child protection program in Scouting.  Accordingly, Claimant 55610 filed suit against the Boy Scouts of America and Cascade Pacific Council in January of 2018; Claimants 41758 and 41766 filed similar suits in May of 2018.  Thus, at the time of BSA's initiation of Chapter 11 proceedings, these teenage boys had already been through two years of state court litigation and were looking towards the culmination of their cases at trial scheduled for Fall of 2020.  Now, they have been forced into the queue with all other claimants.

The Crew Janci LLP Claimants object to the sufficiency and adequacy of the Disclosure Statement for the following reasons:

**A.      Failure to Disclose the Assets and Liabilities of Each Party Receiving a Release**

1.      The Crew Janci LLP Claimants object to the adequacy of the Disclosure Statement because it fails to provide them with sufficient information to make an informed decision on whether (a) to vote to accept or reject the Plan, which proposes a release of all local councils and may propose a release of charter organizations, or (b) to raise a "Best Interest of Creditors" objection.

2.      The Disclosure Statement does not provide any property-by-property valuation of the real or personal property that the Debtors intend to transfer to a settlement trust, or any property-by-property valuation of the real or personal property that the Debtors seek to retain.  The same is true of the Debtors' other assets, including investments.  It is imperative that the Disclosure Statement provide the liquidation value or fair market value for each such property.

3.      The Disclosure Statement does not include in its liquidation analysis the properties of the local councils.  Under the Debtors' governance documents, a local council's property reverts to the Debtors if the local council's charter is not renewed.  In a Chapter 7 liquidation of the Debtors, the Chapter 7 trustee presumably would not renew any local council charters.  Since the properties revert to the Debtors, the liquidation analysis must include the liquidation value of all local council real and personal property.

4.      The Disclosure Statement and the Plan fail to provide any property valuation information for a creditor, including the Crew Janci LLP Claimants, to determine if each local council is making a substantial contribution that warrants a release and channeling injunction.  Any such valuation must include the liquidation or fair market value of the local council's assets, including any justification by a council for asserting that an asset is unavailable to pay its creditors (e.g., donor restricted), how many childhood sexual abuse claims implicate the local council, and how much the local council is contributing in exchange for a release of such childhood sexual abuse claims.

5.      Based on each local council's publicly available IRS Form 990 statements, each local council has significant assets, including significant unrestricted assets.  Moreover, if a local council accounted for its real property using "book value" (e.g., the value it was worth at the time it was acquired) and not its current fair market value, its IRS Form 990 statements likely

*undervalue* its total assets given the length of time most of these councils have existed and the property holdings they have acquired over that time.

6.       The Disclosure Statement and the Plan do not provide any property valuation information of any charter organization that will be released, including any justification by a charter organization for asserting that an asset is unavailable to pay creditors (e.g. donor restricted), how many childhood sexual abuse claims implicate each charter organization, and how much each charter organization is contributing in exchange for a release of such childhood sexual abuse claims.  Like the local councils, many of the charter organizations, such as the Mormon Church, the Methodist Church, and Catholic Church, have significant real property and other assets.

7.       The Crew Janci LLP Claimants cannot make an informed decision to vote to accept or reject the Plan because the Disclosure Statement does not contain any information about the number of claims against each local council or charter organization, or any estimate of the value of such claims.  To the extent that sexual abuse claims have not been filed against a local council or charter organization, the Debtors should disclose whether they have any indemnification or contribution claims against each local council or charter organization.

8.       The Disclosure Statement also fails to adequately explain how any contribution by non-Debtor entities, including local councils and charter organizations, will be utilized, including whether their contribution will be used to pay administrative expenses, to pay trust administrative and legal expenses, or to compensate others who do not have a claim against that entity.

9.       The inadequacy of the Disclosure Statement is illustrated by the fact that the Debtors state in the Plan that they are "committed" to ensuring the local councils collectively contribute at least $425 million.  This disclosure is illusory because there is no agreement with the local councils to contribute anything to the Plan.  In this regard, the Plan is speculative at best and the Disclosure Statement does nothing to inform abuse survivors whether and when any

contribution by the local councils might be realized.  In addition, the Debtors fail to disclose how much each council has available to contribute, how much each council is contributing, and how the contributions of each council will be utilized, including whether the contributions of a council will be used to compensate abuse survivors who do not have a claim against that council.

10.     Similarly, in the Disclosure Statement the Debtors do nothing more than assert that childhood sexual abuse claims will range in value from somewhere between $2.4 billion and $7.1 billion.  There is no discussion on how that value is determined.  The Debtors project that the recoveries on the childhood sexual abuse claims will range from 8% to 23%, and up to 100% with the inclusion of available insurance.  Under the Plan, the Debtors are the only parties that have offered any consideration ($115 million) for the benefit of the childhood sexual abuse claims. Assuming the childhood sexual claims are valued at $2.4 billion, the $115 million provides a 4.8% recovery, far less than the lower amount asserted by the Debtors. With only $115 million available for sexual abuse survivors, the Disclosure Statement does not describe how recoveries will reach 8%, let alone up to 23% or 100%, when no other consideration has been committed by any other party.

11.     This lack of basic information makes it impossible for creditors, including the Crew Janci LLP Claimants, to determine whether each council is making a substantial contribution, to make an informed decision on whether to vote to accept or reject the Plan, which proposes to release each council, and to make an informed decision on whether to raise a "Best Interest of Creditors" objection because the Plan fails to award them the liquidated value of their claim against all entities they are releasing.

B.     **Failure to Disclose the Specific Entities to Be Released**

12.     The Crew Janci LLP Claimants object to the adequacy of the Disclosure Statement and the accompanying solicitation procedures because they fail to notify creditors, including the Crew Janci LLP Claimants, which local council and/or charter organization is associated with their abuse, whether any such entity will receive a release, and if so, the terms of the release.  If the Plan is designed to provide a release to non-Debtor third parties, such as the local councils and charter organizations, the Debtors should identify each local council and charter organization and their relationship to each of the creditors, including the Crew Janci LLP Claimants.  For example, under the Global Resolution Plan in the Plan, the "Protected Parties" (e.g., those that benefit from a release and channeling injunction) should only include those non-Debtors that make a substantial contribution and receive sufficient support by claimants whose claims will be released and/or the subject of a channeling injunction.

13.     Most of the creditors who filed a Sexual Abuse Survivor Proof of Claim form, including the Crew Janci LLP Claimants, have legal claims against the Debtors, a local council, and a charter organization.  In their proof of claim forms, the Crew Janci LLP Claimants made a good faith effort to identify the local council(s) and/or charter organization(s) that may be liable for the childhood sexual abuse they suffered that is the basis for their claim.  However, the Crew Janci LLP Claimants were children when they were sexually abused.  Due to the passage of time and/or the psychological effects of the abuse, many of them are unsure whether they have identified the correct entities and others were simply too young to recall the correct names today.

14.     For the Crew Janci LLP Claimants and other abuse survivors who do not know this information, the information they need is largely within the purview of the Debtors and local councils, which possess the Scouting unit rosters (e.g., Boy Scout Troop rosters and Cub Scout Pack rosters), camp rosters, and adult volunteer rosters.  In prepetition litigation, this disclosure would generally occur through discovery that is currently barred by the preliminary injunction.

Prior to the preliminary injunction, the Crew Janci LLP Claimants would normally issue discovery that demanded the Debtors and/or local council(s) produce the roster(s) for the Claimant's Scouting unit and/or Scout Camp so the Claimant can find their name on the roster and confirm they have identified the correct local council(s) and charter organization(s) for their Scouting unit and/or Scout Camp.

15.     If a Claimant's name did not appear on a roster, which may have happened as a result of human error and/or if the Claimant joined a Scouting unit in-between the annual registration process, the Claimant could review the roster to see if the Claimant recognized the names of the other children or adults on the roster.  If so, the Claimant could contact some of the other members of the Scouting unit to see if they could corroborate that the Claimant was a member of the Scouting unit and/or attended the Scout Camp.  If not, the Claimant would work with the Debtors and/or the local council(s) to determine whether the Claimant identified the wrong Scouting unit and appeared on the roster of a different Scouting unit.  In addition to rosters, the Claimant would also ask the Debtors and/or local council(s) in discovery to produce the charter for the Claimant's Scouting unit so the Claimant could confirm the correct charter organization(s) that chartered the Claimant's Scouting unit, particularly if the Debtors and local council(s) no longer had rosters for the Scouting unit.

16.     If the Claimant was unable to obtain records that confirm the Claimant has identified the correct local council(s) and/or charter organization(s), the Claimant would ask the Debtors and/or the local council(s) for a "person most knowledgeable" deposition about the local council(s) and/or charter organization(s) who were responsible for the Claimant's Scouting unit and/or the Scout Camp the Claimant attended so that the Claimant could confirm that the Claimant has identified the correct local council(s) and/or charter organization(s) for their Scouting unit and/or Scout Camp.  If the Claimant believes they may know the correct local council(s) and/or

charter organization(s), the Claimant would ask for any documents those organizations have about the Claimant's Scouting unit and the Claimant would ask the organizations for a "person most knowledgeable" deposition to confirm the Claimant identified the correct local council(s) and/or charter organization(s).

17.    The Crew Janci LLP Claimants have not been able to pursue the above discovery because the preliminary injunction prohibits the Crew Janci LLP Claimants from pursuing any litigation against the Debtors, local councils, and charter organizations.  Nothing under the Plan provides a mechanism by which a Claimant can confirm the Claimant has identified the correct local council(s) and/or charter organization(s) before a release is given to those entities.

### C.    Trust Distribution Procedures

18.    The Crew Janci LLP Claimants object to the adequacy of the Disclosure Statement because it fails to explain how their claims will be valued in the trust procedures and what ability they will have to contest the proposed valuation of their claim.

19.    For example, the Plan identifies a number of factors to be used in valuing each claim, but neither the Plan nor the Disclosure Statement discloses how much weight will be assigned to those factors.  Given the current state of negotiations it may not be appropriate to disclose the weight afforded to each factor.  However, if such a valuation system is ultimately included in the Plan, the weight afforded to each factor must be disclosed prior to when votes are solicited for the Plan so that claimants understand how their claim would be valued, can fairly estimate how their claim would be valued, can see how their claim would be valued when compared to other claims, and can decide whether to vote in favor or against the Plan given that valuation system.

20.    The Plan also suggests that the value of a claim might be reduced if the claimant lacks certain information, such as the full name of the Scout leader who abused them, but neither

the Plan nor the Disclosure Statement indicates whether the claimant will have an opportunity to pursue discovery so that they can supplement their claim with that missing information. As noted above, many abuse survivors may not recall the full name of the person who abused them because they were too young to recall the name, but the Debtors, the local councils, and the charter organizations likely possess evidence, such as membership rosters and the "ineligible volunteer files," that could allow abuse survivors to supplement their claim with that information.

### D.    Failure to Disclose Insurance Coverage Risks

21.    The Crew Janci LLP Claimants object to the adequacy of the Disclosure Statement because it fails to explain the likelihood of defeating the insurers' coverage defenses or the insurance companies' ability to pay abuse claims that total billions of dollars. The Disclosure Statement barely makes a passing note that the insurers have asserted coverage defenses, and the Debtors make no effort to evaluate those risks. Beyond the coverage risks associated with the Debtors' prepetition conduct, the Debtors fail to discuss any risk associated with the proposed assignment of all of the insurance of the Debtors, the local councils, and participating charter organizations to a trust, including any risk associated with the anti-assignment clauses in such policies. If the Plan's assignment violates the anti-assignment clauses, the insurance coverage could evaporate.

### E.    Failure to Disclose How Insurance Policies Will Be Utilized

22.    The Crew Janci LLP Claimants object to the adequacy of the Disclosure Statement because it fails to explain how the proceeds of any insurance policies assigned to the trust will be utilized. The Crew Janci LLP Claimants are entitled to know how the proceeds of any policies will be utilized, including whether the proceeds of a policy that covers a Claimant's claim is being used to pay administrative expenses, to pay trust administrative and legal expenses, or to compensate others who do not have a claim covered under the same policy.

23.     For example, if a Claimant has a $1 million childhood sexual abuse claim against the Mormon Church, the Mormon Church presumably has sufficient assets to pay the full value of that claim.  In an insurance buy-back scenario, the insurers and the insured will insist that the insured receives a release of all current and future claims against the insured, otherwise the insured would be without insurance on those claims, would still be responsible for the defense costs on those claims, and would still be at risk for a judgment on those claims.  The Crew Janci LLP Claimants are entitled to know whether they will be required to release all of their claims against all insureds in order to effectuate a buy back of a given policy, and if so, how the proceeds of any such buy back will be utilized.  In the foregoing example, the hypothetical Claimant is entitled to know whether he will be required to release a claim worth $1,000,000 against the Mormon Church to effectuate a "buy back" of a policy that names the Mormon Church as an insured.  Moreover, the hypothetical Claimant is entitled to know whether his share of the sale price of the policy could be a small fraction of the value of his claim against that defendant.

24.     The Crew Janci LLP Claimants need to know this information to determine whether each non-Debtor who is released is making a substantial contribution and whether the "best interests" test is met by that contribution.

**F.     Failure to Disclose the Contribution of Insurers and Their Insureds**

25.     The Crew Janci LLP Claimants object to the adequacy of the Disclosure Statement because it fails to explain what contribution the insurers and their non-Debtor insureds will make in order to receive a release.

26.     As noted above, almost every Claimant has a legal claim against a local council and/or a charter organization.  In addition to the Debtors, a local council was responsible for all Scouting units in its geographic region, including handling and processing complaints against Scout leaders for allegedly sexually abusing children and ensuring that each Scouting unit abided

by policies and procedures to protect children from foreseeable harm.  These local councils, the "eyes and ears" of the Debtors, were often amongst the parties who neglected to protect the children in their care from foreseeable harm.

27.    In turn, a charter organization was responsible for staffing and supervising the adult volunteers of a Scouting unit, like a Boy Scout Troop or Cub Scout Pack, and were also amongst the parties who neglected to protect the child members of a Scouting unit from foreseeable harm. The leaders of the charter organization, including the Scout leaders who the charter organization appointed to oversee its Scouting unit(s), were often amongst those to receive complaints that another Scout leader was sexually abusing children in the Scouting unit, or saw the "red flags" or warning signs that another Scout leader was sexually abusing children in the Scouting unit, but neglected to take steps to protect the children from that danger.

28.    Many of the local councils and charter organizations face significant liability, and many have substantial assets that are available to compensate abuse survivors, including the Crew Janci LLP Claimants who have a claim against them.

29.    The Crew Janci LLP Claimants object to the adequacy of the Disclosure Statement because it fails to specify what contribution the local councils and/or charter organizations will have to make to receive a release, including a contribution above and beyond their rights under insurance policies.  The Crew Janci LLP Claimants need to know this information to determine whether each entity who is receiving a release, including any local council or charter organization, is making a substantial contribution and whether the "Best Interests" test is met by that contribution.

## G.    No Disclosure Regarding the Proposed Hartford Settlement Agreement

30.    The Crew Janci LLP Claimants object to the adequacy of the Disclosure Statement because it fails to explain how much each Claimant may receive as a result of the Debtors'

proposed settlement with Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company, and Navigators Specialty Insurance Company (collectively "Hartford"), whether each Claimant would be forced to release any of their claims in order to effectuate the settlement, including claims they have against non-Debtor entities, and whether any party, including Hartford and non-Debtor entities, would receive a channeling injunction as a result of the settlement.

31.    The Debtors' proposed settlement with Hartford, which was attached as Exhibit A to the Second Mediators' Report that was filed on April 16, 2021 (Dkt. 2624), is for $650,000,000 and appears to require a release of all current and future claims that may exist under Hartford's policies.  Based on a review of Hartford's policies, it appears that Hartford's policies cover some or all of the claims of approximately 25,000 claimants in this bankruptcy.  Pursuant to this analysis, the Debtors' proposed settlement with Hartford equates to an average of only about $26,000 per claimant if the settlement proceeds are shared by the claimants with a claim that is covered by a Hartford policy, and to an average of approximately $7,647 per claimant if the settlement proceeds are shared with 85,000 claimants.

32.    Not only does the Disclosure Statement fail to disclose how the Debtors propose to allocate those settlement funds, but it fails to disclose how much coverage is available under each of the Hartford policies; which claimants have claims under each of the Hartford policies; the number of claims that implicate each policy; the type of claims; and, the value of the claims.  Based on the years of the Hartford policies, it appears many of the policies had per occurrence limits of $500,000 with no aggregate limit.  The Disclosure Statement fails to explain why a claimant whose claim triggers a $500,000 insurance policy should vote in favor of a Plan that may result in them receiving an average of $7,647 from a settlement with Hartford.

33.     The Disclosure Statement also fails to disclose the insured(s) under each of the Hartford policies, including whether the Debtors are insureds under each policy or whether the only insured under some policies is a non-Debtor entity, such as a local council.  In turn, the Disclosure Statement fails to explain whether all current and future claims against the insured(s), including non-Debtor entities, will have to be released in order to effectuate the settlement, and if so, the value of those claims and why a claimant should agree to such a release if the insured has substantial assets, including other insurance, that should be used to compensate the claimant.

**H.     The Scope of this Bankruptcy Necessitates Transparency Regarding the Handling of Insurance Policies**

34.     As it stands, the Plan would provide each Claimant an average of $6,000, or less, from the Debtors and the local councils, which they partly justify by the assignment of insurance policies.  The average award could be significantly lower, if non-existent, after administrative expenses.  The Crew Janci LLP Claimants must have sufficient information to evaluate the risks of the Plan if the Crew Janci LLP Claimants are to release multiple non-Debtor entities.  As filed, the Disclosure Statement falls far short of the Bankruptcy Code's standard for its approval.

**I.     Voting and Solicitation Procedures for Claimants with Multiple Sexual Abuse Survivor Proof of Claims**

35.     As the Court is aware, multiple Sexual Abuse Survivor Proof of Claim forms were filed on behalf of some claimants.  The Crew Janci LLP Claimants object to the Disclosure Statement and to the proposed voting and solicitation procedures because they will disenfranchise the votes of survivors in the event that more than one law firm submits a ballot on behalf of the same claimant.  Instead, the Debtors' voting and solicitation procedures should require them to verify whether the law firm who submits a ballot on behalf of a claimant has the authorization to

act on behalf of the claimant in those instances when it matters.  For example, verification is not necessary if multiple ballots on behalf of the same claimant vote in the same manner.  However, if the votes conflict and the outcome of the tabulation could be affected, the Debtors must verify which ballot should be counted by determining which law firm was authorized to submit the ballot. As it stands, the Debtors have failed to explain how they intend to solicit and count votes for such claimants, including how to ensure such claimants do not vote multiple times, how to determine who can vote on behalf of such claimants, and how to determine which vote to count if inconsistent votes are submitted on behalf of the same claimant.

### J.    Objection to Future and/or Amended Disclosure Statements

36.    The Crew Janci LLP Claimants object to any future and/or amended disclosure statement by the Debtors that fails to resolve the objections raised in this objection.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

### K.    Joinder to the Objection to the Disclosure Statement by the Tort Claimants' Committee

37.    The Crew Janci LLP Claimants join the objection to the Disclosure Statement filed by the Tort Claimants' Committee.

Dated: May 6, 2021                    Respectfully submitted,

**KLEHR HARRISON HARVEY**
**BRANZBURG LLP**

*/s/ Sally E. Veghte*
Sally E. Veghte (DE Bar No. 4762)

919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:  (302) 552-5503
Email:  sveghte@klehr.com

-And-

Morton Branzburg, Esquire
**KLEHR HARRISON HARVEY
BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:     (215) 569-2700
Email:  mbranzburg@klehr.com

-And-

Peter B. Janci, Esquire
*Admitted Pro Hac Vice*
**CREW JANCI LLP**
1200 NW Naito Parkway, Suite 500
Portland, Oregon 97209
Telephone: (503) 306-0224
Email:  peter@crewjanci.com

*Attorneys for the Crew Janci Claimants*

# APPENDIX A

The foregoing Objection to the Adequacy of Debtors' Disclosure Statement in Support of Second Amended Chapter 11 Plan of Reorganization and Joinder of the Objection of the Tort Claimants' Committee was filed by the following creditors who each filed a Sexual Abuse Survivor Proof of Claim and are represented by Crew Janci LLP.  The numbers below are the claim numbers for each creditor's Sexual Abuse Survivor Proof of Claim.

| | | | | |
|---|---|---|---|---|
| 14012 | 44261 | 40278 | 40633 | 15959 |
| 40719 | 40375 | 71131<br>71189<br>amended claim:<br>96094 | 63807 | 67109 |
| 20068 | 7909 | 28445<br>amended claim:<br>96734 | 32636 | 32670 |
| 39529 | 40581 | 28436 | 32622 | 32688 |
| 32471 | 40586 | 42167 | 42515 | 65358<br>amended claims:<br>103205<br>105676 |
| 22842 | 54352 | 20080 | 54377 | 40791 |
| 45768 | 39962 | 32605 | 17459 | 65301 |
| 20073 | 66146 | 54375 | 32621 | 40795 |
| 62069<br>amended claim:<br>103535 | 17372 | 17370 | 17379 | 13964 |
| 40744 | 40015 | 20081 | 20138 | 40797 |
| 32491 | 63711 | 40305 | 63957 | 66730 |
| 73478 | 62684 | 17449 | 65655 | 48115 |
| 23335 | 17428 | 40322 | 40655 | 41882 |
| 48092 | 39992 | 17458 | 40654 | 33949 |
| 40727 | 23339 | 63831 | 32627 | 42157 |
| 45777 | 43613 | 32614 | 42307 | 7924 |
| 39559 | 22156 | 7906 | 40683 | 8805 |
| 14775 | 45784 | 7915 | 40670 | 17405 |
| 39575 | 40009 | 71315 | 40687 | 13115 |
| 54344 | 69075 | 69200 | 64716 | 17460 |
| 42575 | 17387 | 40587 | 29197 | 7923 |
| 55610 | 40065 | 40327 | 63810 | 8784 |
| 23337 | 40045 | 40382 | 17367 | 41428 |
| 62036 | 32536 | 52103 | 40706 | 48068 |
| 22154 | 15680 | 40432 | 28862 | 41466 |
| 14044 | 40067 | 7914 | 45749 | 41887 |
| 54338 | 28453<br>amended claim:<br>96072 | 17403 | 45750 | 41495 |
| 42591 | 40578 | 53746 | 45753 | 54063 |
| 39619 | 40092 | 45787 | 40714 | 63850 |
| 38232 | 40135 | 52369 | 40724 | 29240 |

| | | | | |
|---|---|---|---|---|
| 32496 | 40110 | 50973 | 55366 | 65331 |
| 54356 | 17394 | 45197 | 40726 | 41483 |
| 7898 | 54348 | 40582 | 17456 | 41564 |
| 42023 | 42595 | 42119 | 14060 | 66784 |
| 7899 | 64598 | 40446 | 20127 | 55402 |
| 71173 | 17432 | 62173 | 63858 | 28857 |
| 39630 | 29083 amended claim: 96073 | 64668 | 73475 | 14033 |
| 39664 | 36392 | 40469 | 45780 | 48110 |
| 45778 | 40128 | 40485 | 40728 | 23341 |
| 14052 | 65451 | 40489 | 45783 | 65390 |
| 32505 | 44281 | 69064 | 7921 | 32702 |
| 12828 | 42601 | 14785 | 45786 | 28870 |
| 23334 | 40162 | 52970 | 45785 | 40603 |
| 62063 | 48167 | 52693 | 40745 | 55460 |
| 39828 | 17427 | 44746 | 45782 | 45767 |
| 7911 | 28430 | 33968 40515 | 63841 | 17471 |
| 62075 | 20083 | 13934 | 41406 | 17465 |
| 28417 | 17443 | 48101 | 32673 | 41654 |
| 38233 | 49388 | 20102 | 19427 amended claim: 66235 | 41682 |
| 64336 | 17407 | 71262 | 66112 | 20145 |
| 42279 | 5400 | 40530 | 7919 | 32725 |
| 62035 | 45762 | 40543 | 20137 | 14026 |
| 45779 | 54358 | 47445 | 65239 | 65421 |
| 69040 | 63794 | 14050 | 20148 | 20151 |
| 39835 | 40165 | 40534 | 7920 | 45788 |
| 71221 | 54370 | 45183 | 55333 | 69200 |
| 62084 amended claim: 103544 | 63787 | 40533 | 40583 | 32711 |
| 55614 | 32576 | 40554 | 40755 | 41684 |
| 17419 | 54365 | 14023 | 49441 | 44337 |
| 39824 | 17433 | 17404 | 67128 | 32705 |
| 32499 | 40192 | 48166 | 20147 | 85035 |
| 64425 | 63956 | 40548 | 52060 | 63902 |
| 64472 | 40193 | 53046 | 17462 | 55410 |
| 39888 | 69068 | 40584 | 40775 | 17468 |
| 39852 | 45781 | 43633 | 45230 | 12826 |
| 64461 | 40211 | 40600 | 14016 | 7925 |
| 56138 | 54374 | 28841 | 23340 | 32738 |
| 17423 | 15458 | 20120 | 11349 | 49376 |
| 52110 52102 | 40267 | 40602 | 65251 | 32727 |
| 48070 | 17436 | 59063 | 65255 | 28875 |
| 39861 | 64532 | 32599 | 40764 | 40594 |
| 14058 | 7904 | 40579 | 4484 | 32759 |
| 63766 | 17450 | 40612 | 40758 | 15375 |
| 32521 | 57689 | 64882 | 65309 | 20152 |

| 45773 | 64686 | 40644 | 95549 | 66170 |
|-------|-------|-------|-------|-------|
| 39895 | 54366 | 32593 | 17464 | 55497 |
| 29204 | 42597 | 7913 | 40783 | 41711 41716 |
| 45772 | 32585 | 7922 | 32658 | 41758 |
| 45775 | 17452 | 17455 | 44323 | 41766 |
| 39899 | 32587 | 64645 | 40777 | 41816 |
| 39973 | | | 45191 | 65460 |