**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>Jointly Administered<br><br>Re: D.I. 2592 and 2594 |

**MERSON LAW, PLLC CLAIMANTS' OBJECTION TO THE ADEQUACY OF THE
DEBTORS' DISCLOSURE STATEMENT IN SUPPORT OF THE
SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION AND
JOINDER OF THE OBJECTION OF THE TORT CLAIMANTS' COMMITTEE**

**PRELIMINARY STATEMENT**

1.      On April 13, 2021, the Boy Scouts of America and Delaware BSA, LLC ("the Debtors"), filed a Second Amended Chapter 11 Plan of Reorganization [D.I. 2592] (the "Plan"), and on April 14, 2021, the Debtors filed a Disclosure Statement in support of said Second Amended Chapter 11 Plan of Reorganization [D.I. 2594] (the "Disclosure Statement").

2.      The Merson Law, PLLC Claimants (as identified on Appendix A attached hereto), consists of almost three hundred and thirty (330) survivors of childhood sexual abuse, and by and through undersigned counsel, hereby object to the debtors' Disclosure Statement, as the Debtors filed the Disclosure Statement in support of the grossly inadequate settlement average of approximately $6,000 for child sexual abuse survivors, some of whom have claims that are worth many millions of dollars and fails to provide the adequate information necessary for a creditor to make an informed vote on the Plan.[1]

3.      The Court should not approve the Disclosure Statement.  Approving the Disclosure

---

[1] *See* attached Appendix A, which lists the Sexual Abuse Survivor Proof of Claim numbers of the Merson Law, PLLC Claimants.

Statement would be a gigantic step backward for child sexual abuse survivors by reducing their claims to pennies. The Plan would lead to the worst settlement in the history of all sexual abuse cases. The proposed settlement pales in comparison to similar settlements including the Larry Nasser settlements with Michigan State University ($500 million for 517 claimants) and Harvey Weinstein settlements ($17.2 million for 54 claims).

4.      Indeed, the Boy Scouts of America's Plan includes two plans, the first of which is favored by the Boy Scouts but would lead to an untenable situation for survivors. Specifically, "toggle A" as the Boy Scouts call the first prong, includes a channeling injunction for Local Councils and Chartering and/or Sponsoring Organizations, which means that survivors are not only receiving a pittance for their claims from the Boy Scouts, but also cannot pursue the Local Councils or the Chartering and/or Sponsoring to obtain just compensation. By the Boy Scouts' own admission, the Local Councils and Chartering and/or Sponsoring Organizations are separate entities and as such, should not receive a release for the more than 84,000 claims filed in the bankruptcy. This is only fair since the Boy Scouts plan to contribute so little of their own assets, cash, investments, and property. The Local Councils should not be able to escape their enormous exposure for pennies when they have not even sought bankruptcy protection.

5.      The Disclosure Statement fails to provide any information on the liquidation analysis of the local council properties. Under the Debtors' governance documents, a local council's property reverts to the Debtors if the local council's charter is not renewed. In a Chapter 7 liquidation of the Debtors, the Chapter 7 trustee presumably would not renew any local council charters. Since the properties revert to the Debtors, the liquidation analysis must include the liquidation value of all local council real and personal property.

6.    Further, the Plan fails to provide any property valuation information for a creditor, including the Merson Law, PLLC Claimants, to determine if each Local Council is making a substantial contribution that warrants a release and channeling injunction.  Any such valuation must include the liquidation or fair market value of the Local Council's assets, including any justification by a Council for asserting that an asset is unavailable to pay its creditors (e.g., donor restricted), how many childhood sexual abuse claims implicate the Local Council, and how much the Local Council is contributing for a release of such child sexual abuse claims.

7.    Based on each Local Council's publicly available IRS Form 990 statements, each Local Council has significant assets, including significant unrestricted assets. Moreover, if a Local Council accounted for the Council's real property using "book value" (*e.g.*, the value of the property at the time the Council acquired the property) and not the property's current fair market value, the Council's IRS Form 990 statements likely *undervalue* the Council's total assets given the length of time most of these Councils have existed and the property holdings they have acquired over that time.

8.    The Disclosure Statement and the  Plan do not provide any property valuation information of any Chartering and/or Sponsoring Organization that will be released, including any justification by a Charter and/or Sponsoring Organization for asserting that an asset is unavailable to pay creditors (e.g., donor restricted), how many childhood sexual abuse claims implicate each Chartering and/or Sponsoring Organization, and how much each Chartering and/or Sponsoring Organization is contributing in exchange for a release of such childhood sexual abuse claims. Like the Local Councils, many of the Chartering and/or Sponsoring Organizations, such as the Methodist Church, Mormon Church, and Catholic Church, have significant real property and other assets.

9.      Further, the insurance component of the Disclosure Statement and the Plan also fails. The Boy Scouts of America's claim that the insurance policies are available to provide adequate compensation is hollow and devoid of any value whatsoever. Except for one carrier, the insurers collectively have offered a total of zero dollars ($0) to survivors. Walking away from the more than 84,000 claims and putting the policies into a trust, guarantees survivors nothing but the threat that each claim will take many years to resolve. Like the Boy Scouts, the survivors do not want to wait. The survivors want adequate compensation now and want adequate information to vote. The Boy Scouts should come back to the table and engage in good faith discussions with the survivors to craft a Plan fair for everyone, not just the Boy Scouts. Merson Law, PLLC stands ready, willing, and able to have a discussion at the Debtors' convenience.

10.      The Disclosure Statement fails to provide any information regarding how the Local Councils and Chartering and/or Sponsoring Organizations will contribute to a settlement that resolves survivors' claims. The Debtors' Plan and Disclosure Statement not only fails to provide the necessary information, but also requests that this Court grant a release to the non-debtor Local Councils and Chartering and/or Sponsoring Organizations in exchange for contributing an unknown amount, from an unknown source, and without information as to how crucially important insurance policies will be implicated because of said release.

11.      The failure of the Debtors to provide any necessary information in the Disclosure Statement insults a class of creditors, the survivors of childhood sexual abuse, that has already been victimized repeatedly by the Debtors and the Debtors' partners, first in allowing the sexual abuse to occur, and then in refusing to take any responsibility or ownership for allowing said abuse to occur. Perhaps most insulting is that the debtors entered this voluntary Chapter 11 proceeding purportedly to compensate child sexual abuse survivors. *See Debtors' Information Brief* at 5 (D.I.

4) ("The BSA cannot continue to address abuse litigation in the tort system on a case-by-case basis."); *see also id.* ("Under these circumstances, the Debtors have commenced these chapter 11 cases to achieve dual objectives: (a) timely and equitably compensating victims of abuse in Scouting . . . ."). However, the reality is that the Boy Scouts have done nothing to equitably compensate survivors. The Boy Scouts are trying to take advantage of injunctive relief to eliminate exposure and let the child sexual abuse victims fend for themselves. The Boy Scouts Plan revictimizes survivors all over again. The Disclosure Statement should be immediately rejected, and the Boy Scouts should engage with the survivors to come to a Plan in accord with the Boy Scouts' representations to this Court and the world that it wants to "equitably compensate victims.".

12.     The inadequacy of the Disclosure Statement is illustrated by the fact that the Debtors state in the Plan that they are "committed" to ensuring the Local Councils collectively contribute at least $425 million. This disclosure is illusory because there is no agreement with the Local Councils to contribute anything to the Plan. In this regard, the Plan is speculative at best and the Disclosure Statement does nothing to inform abuse survivors whether and when any contribution by the Local Councils might be realized. In addition, the Debtors fail to disclose how much each Council has available to contribute, how much each Council is contributing, and how the contributions of each Council will be utilized, including whether the contributions of a Council will be used to compensate abuse survivors who do not have a claim against that Council.

13.     Similarly, in the Disclosure Statement the Debtors do nothing more than assert that childhood sexual abuse claims will range in value from somewhere between $2.4 billion and $7.1 billion. There is no discussion on how that value is determined. The Debtors project that the recoveries on the childhood sexual abuse claims will range from 8% to 23%, and up to 100% with

the inclusion of available insurance. Under the Plan, the Debtors are the only parties that have offered any consideration ($115 million) for the benefit of the childhood sexual abuse claims. Assuming the childhood sexual claims are valued at $2.4 billion, the $115 million provides a 4.8% recovery, far less than the lower amount asserted by the Debtors. With only $115 million available for sexual abuse survivors, the Disclosure Statement does not describe how recoveries will reach 8%, let alone up to 23% or 100%, when no other consideration has been committed by any other party.

14.    Based on the above reasons, and as more fully explained below, Merson Law, PLLC, on behalf of the more than three hundred (300) claimants the firm represents, respectfully requests that this Court deny approving the debtors' Disclosure Statement, and for such other and further relief as this Court deems just and proper.

## RELEVANT LEGAL STANDARD

15.    "The requirement that a disclosure statement contain[s] adequate information serves to present the parties entitled to vote on the plan with an opportunity to independently evaluate the merits of the proposed plan." *In re East Redley Corp.*, 16 B.R. 429, 429 (Bankr. E.D. PA 1982). The disclosure statement must provide adequate information to enable parties to reach an informed judgment about the plan. *See id.* Absent such information, the court will not approve a disclosure statement. *See id.* The disclosure statement must provide detailed information. *See In re Civitella*, 15 B.R. 206, 208 (Bankr. E.D. PA 1981).

16.    Section 1125(a)(1) of the Bankruptcy Code defines adequate information as:

> Information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would

> enable such a hypothetical investor of the relevant class to make an
> informed judgment about the plan . . . and in determining whether a
> disclosure statement provides adequate information, the court shall
> consider the complexity of the case, *the benefit of additional
> information to creditors and other parties in interest, and the cost
> of providing additional information*[.]

11 U.S.C. § 1125(a)(1) (emphasis added).

17.     The above standard applies to non-debtor third parties as well. The Bankruptcy

Code, specifically Section 524(e), clearly states that the discharge of a debtor, by itself, does not

relieve non-debtors of their liabilities. *See In re Continental Airlines*, 203 F.3d 203, 211 (3d Cir.

2000).   Additionally, "the Bankruptcy Code not explicitly authorize the release and permanent

injunction of claims against non-debtors, except in one instance not applicable here." *Id.*

(referencing asbestos litigation as described in 11 U.S.C. Section 524(g) as the one exception).

Circuits considering nonconsensual, non-debtors releases either reject such releases absolutely, or

accept such releases reluctantly. *See In re Firstenergy Solutions Corp.*, 606 B.R. 720, 734 (Bankr.

N.D. OH 2019) (holding that nonconsensual third-party releases in the debtors' proposed plan

rendered the plan unconfirmable and prevented the court from approving the debtors' disclosure

statement).

18.     Even though the Court in this case is now faced with considering whether to

approve the Disclosure Statement, this Court can still decide on issues of confirmability at the

disclosure stage, because the Debtors' Plan contains such large and insurmountable defects given

the grossly inadequate compensation and, namely the lack of adequate information regarding third-

party, non-debtor releases, that the Debtors' Plan is inherently or patently unconfirmable. *See id.*

at 731.

## THE CLAIMANTS' OBJECTIONS

### A.    Failure to Disclose the Assets and Liabilities of Each Party Receiving a Release

19.    As stated above, Merson Law, PLLC represents more than three hundred (300) victims who suffered childhood sexual abuse at the hands of Boy Scouts of America employees and/or volunteers.

20.    Merson Law, PLLC has extensive experience litigating childhood sexual abuse claims. For example, in 2018, Merson Law, PLLC obtained a $28 million verdict in Westchester County, New York on behalf of a 14-year-old, special needs child who suffered sexual assault and abuse because of the negligence of the Mount Vernon School District. *See Gloria G. v. City School District of the City of Mount Vernon*, INDEX NO. 70026/2012, Sup. Ct. Westchester Cnty. The verdict is the largest child sexual abuse jury verdict in New York State history.

21.    Merson Law, PLLC represents hundreds of clients alleging childhood sexual abuse in state court litigation throughout New York and New Jersey. As such, the firm recognizes the unique aspects of litigating cases premised upon sexual abuse and assault. Currently, the firm has initiated dozens of state court actions against the Boy Scouts, the local councils, and in some cases, the chartering and/or sponsoring organizations, in New Jersey and New York.

22.    Many of the firm's clients have strong claims against the Boy Scouts of America, but also against the non-debtor local councils and chartering and/or sponsoring organizations. Specifically, the New Jersey legislature amended New Jersey Statutes Annotated Section 2A:14-2, raising the age that victims can sue from twenty (20) years old to fifty-five (55) years old. *See* N.J. STAT. ANN. § 2A:14-2a(a)(1) (2021). Additionally, the New Jersey legislature created a two-year window for any victim of childhood sexual abuse, regardless of the victim's current age, to initiate suit against the perpetrator and/or negligent institutions that allowed the abuse to occur.

*See* N.J. STAT. ANN. § 2A:14-2a(b)(1) (2021).

23.    As a result, the Debtors require claimants such as claimant SA-71703 to release his claims against the Local Council and Chartering and/or Sponsoring Organization without any information as to how or why said entities deserve such a release. Claimant SA-71703 suffered horrific sexual abuse over five hundred (500) times, from approximately 1983 to 1986. Richard Lee, a Scoutmaster of Troop 77 in Westfield, New Jersey, would ply claimant with alcohol and/or marihuana, tell claimant scary stories so that claimant would sleep in Lee's tent in full view of the other Troop Leaders and Scoutmasters, then subject claimant SA-71703 to touching, fondling, groping, masturbation, and oral sex. Claimant SA-71703 reported the abuse to his parents, who contacted the Union County District Attorney's Office. Claimant SA-71703's report led to Scoutmaster Lee's arrest.

24.    Claimant SA-71703 has valid claims against not only the Boy Scouts, but also the Patriot's Path Council and Monmouth Council, the two councils overseeing Troop 77 and the multiple Boy Scouts camps throughout New Jersey where the abuse took place. Despite the liability facing the two councils, the Boy Scouts want claimants such as claimant SA-71703 to release these entities, and others, from said liability. In exchange, per the Debtors' Disclosure Statement, claimant SA- is receiving no information about how the two local councils contribute to the settlement, and specifically, to claimant's claim. How can claimant SA-71703 possibly make an informed decision about whether to vote on the Plan without adequate information about how his claim is treated under the Plan? The Boy Scouts ask claimant SA-71703 and the tens of thousands similarly situated claimants to essentially take the Boy Scouts' word for it that the Local Councils are contributing adequately, but offer no information in support of that assurance.

25.    Another New Jersey claimant in a similar position is claimant SA-10735, who has

valid claims against the Northern New Jersey Council and the Brookdale Reformed Church. The Debtors want claimant SA-10735 to release his claims against said parties without any knowledge as to what the non-debtor entities are contributing in exchange for said release. For claimant SA-10735, who suffered sexual abuse at the hands of Scoutmaster Curtis Buttel ("Buttel"), the Disclosure Statement provided by the Debtors is completely unacceptable. Claimant SA-10735 suffered sexual abuse at the hands of Scoutmaster Buttel, a known perpetrator in the Boy Scouts IV Files and who the Scouts allowed back into Scouting after Buttel's removal for sexually abusing children. Scoutmaster Buttel sexually abused claimant SA-10735 at numerous locations, including the Brookdale Reformed Church, which chartered and/or sponsored Troop 4. Thus, claimant SA-10735 has valid claims against the Northern New Jersey Council and the Brookdale Reformed Church.

26.    The Debtors' Disclosure Statement offers no information about how either the Northern New Jersey Council or the Brookdale Reformed Church will contribute to the trust, or to claimant SA-10735's claim in particular. The deficiencies in the Disclosure Statement as to claimant SA-10375's claim sound similar to the deficiencies as to SA-2306's, SA-78410, and SA-61612's claims, just as these deficiencies sound similar as to all claimants, because the Disclosure Statement fails to provide adequate information to any claimant. Thus, the Court cannot approve the Debtors' Disclosure Statement.

27.    New York claimants face a similar dearth of information, as they too have valid and viable claims under the state's version of the Child Victims Act. For example, claimant SA-61384 suffered sexual abuse at the hands of troop leader Salvatore Filicia shortly after Memorial Day in 1985. Troop Leader Filicia touched, groped, fondled, and/or otherwise molested claimant SA-61384. However, as the Boy Scouts' ineligible volunteer files ("IV files") demonstrate, the

Boy Scouts and the Hiawatha Council (the predecessor to the Longhouse Council which currently oversees this part of New York), knew of the danger posed by Troop Leader Filicia as early as April 5, 1985, when a concerned citizen wrote a letter to an employee of the Hiawatha Council informing the Scouts of Troop Leader Filicia's arrest and conviction for sexual abuse of his stepdaughter only a year prior. Despite said warning, the Boy Scouts and the Local Council allowed Troop Leader Filicia to remain in his position, and claimant SA-61384 suffered sexual abuse as a result.

28.    Another example is claimant SA-2306, who suffered multiple instances of sexual abuse while a member of Troop 87 based in Syracuse, New York from Scoutmaster Robert G. Prior.

29.    Scoutmaster Prior's behavior should come as no surprise to the Boy Scouts or the Longhouse Council, the local council that ran Troop 87. Scoutmaster Prior was a sexual predator that is included in the Boy Scouts' IV files. Unfortunately for claimant SA-2306 and other claimants, the Boy Scouts did nothing to remove Scoutmaster Prior from the organization.

30.    Another such Scout who suffered because of the Boy Scouts and non-debtor entities' negligence is claimant SA-78410. Claimant SA-78410 joined Troop 87 several years after claimant SA-2306. As a member of Troop 87, claimant SA-78410 suffered multiple instances of sexual abuse at the hands of Scoutmaster Prior. Troop 87 met at several locations, including the Church of the Most Holy Rosary and Bishop Ludden High School, two facilities associated with the Diocese of Syracuse, the entity that chartered and/or sponsored Troop 87. As he did with claimant SA-2306, Scoutmaster Prior groped, fondled, touched, and/or otherwise molested the genitals of claimant SA-78410 while driving home from a Scout camping trip. Yet Scoutmaster Prior did not stop there. During a Scout meeting at Bishop Ludden High School, Scoutmaster Prior

called claimant SA-78410 into Prior's office, which he maintained on school grounds. While inside the office, Scoutmaster Prior groped, fondled, touched, and/or otherwise molested claimant's genitals. Scoutmaster Prior then performed oral sex on claimant SA-78410. At the time, claimant SA-78410 was approximately thirteen (13) years old.

31.    Both claimants SA-2306 and SA-78410 have strong, valid claims against not only the Longhouse Council, but also the Diocese of Syracuse and the Diocese's affiliates, the Church of the Most Holy Rosary and Bishop Ludden School. However, the Boy Scouts of America's Disclosure Statement fails to provide either claimant, and the tens of thousands of similarly situated men and women who also suffered abuse, with any information about how the Longhouse Council, the Diocese of Syracuse, and the Diocese's affiliates will contribute to the overall settlement, and each claimant's claim. In exchange for this complete lack of information, the Boy Scouts of America require that claimant SA-2306 and SA-78410 completely release their claims against all entities. The Boy Scouts approach is completely unacceptable.

32.    Analyzing the claims against the Longhouse Council further highlights the deficiencies in the Debtors' Disclosure Statement. Currently, of the approximately 84,000 unique claims filed against the Debtors, one-hundred and forty-eight (148) identify the Longhouse Council as the local council that presided over the troop wherein the sexual abuse occurred. Merson Law, PLLC has six other claimants with claims against the Longhouse Council, for a total of eight claimants against said council. A conservative estimate of the value of Merson Law, PLLC's cases against the Longhouse Council is approximately $12,640,000. If conservatively, the Longhouse Council has $3,000,000 in cash, then claimants need to know how the Longhouse Council purports to resolve their claims. Thus, the claims of Merson Law, PLLC alone effectively place the Longhouse Council into its own bankruptcy. Yet, the Debtors' Plan and accompanying Disclosure

Statement effectively cuts off any potential for these claimants to pursue their claims against the Longhouse Council and prevents the Longhouse Council from having to declare bankruptcy, by providing a release for the council. In exchange, the Debtors offer no information about how the Longhouse Council will contribute to the settlement, specifically regarding the claimants with claims against the council.

33.     Similarly, the chartering and/or sponsoring organizations, such as the Diocese of Syracuse, the Church of the Most Holy Rosary, and Bishop Ludden High School, will obtain a release of liability through the Debtors' Plan and Disclosure Statement. However, the Plan and Disclosure Statement offer no information about what these entities will contribute to the settlement. This is even more important for claimants such as SA-2306 and SA-78410 if the Longhouse Council is unable to fund the amount owed to these victims, and the victims are entitled to know about other sources of compensation, presumably the chartering and/or sponsoring organizations.

34.     For claimants bringing forth claims in states like New York, the above-described information is critically important because these claimants have valid and viable claims against the Debtors and non-debtor entities. On August 14, 2019, the New York State Child Victims Act ("Child Victims Act") went into effect. The Child Victims Act accomplished several goals that rectified an unfair and untenable situation for victims of childhood sexual abuse. *See* Child Victims Act of 2019, Added L.2019, c.11, § 3, eff. Feb. 14, 2019 (holding "New York is one of the worst states in the nation for survivors of child sexual abuse."). First, the Child Victims Act modified the statute of limitations under which plaintiffs can file a lawsuit premised on childhood sexual abuse, raising the age from twenty-three (23) years old to fifty-five (55) years old. *See* N.Y. C.P.L.R. § 208-b. Second, the Child Victims Act created what was originally a one-year look back

window for victims, regardless of age, to initiate suit. *See* N.Y. C.P.L.R. § 214-g. The legislature extended that one-year window to two years in light of the COVID-19 pandemic. The window closes on August 14, 2021.

35.     The legislative changes enacted in New York demonstrate that claimants with claims against the local councils and chartering and/or sponsoring organizations in New York have valid and viable claims. As such, these claimants must know what contributions the liable, non-debtor entities are making to settle the claims. Additionally, claimants SA-2306 and SA-7840 are fortunate in that they at least know the identity of the chartering and/or sponsoring organizations. Many claimants are not so fortunate, in large part because the Debtors and the local councils have refused to provide the troop rosters and other discoverable material that clearly name the chartering and/or sponsoring organizations. Thus, the Debtors ask many claimants, who are not privy to the structure and inner workings of the Debtors' organization, to release claims against entities that the claimant does not even know the identity of.

36.     The lack of information provided by the Debtors becomes even more glaring when examining the case of claimant SA-61612. As a fifteen-year-old member of Troop 319 in Carmichael, California, claimant SA-61612 attended the Boy Scouts of America Jamboree in Washington, D.C. in 1976. While there, claimant SA-61612 met Scoutmaster William Hassenbrock ("Hassenbrock"), who served as a Scout leader for a troop based in Sacramento, California under the auspices of the Mount Diablo Silverado Council, which is now part of the Golden Gate Area Council. At the Jamboree, Scoutmaster Hassenbrock sexually abused claimant SA-61612 by touching, groping, fondling, and/or molesting claimant's genitals, before performing oral sex on claimant. When claimant SA-61612 returned home to California, Scoutmaster Hassenbrock tracked claimant down and continued to sexually abuse claimant for approximately

nine (9) years. Scoutmaster Hassenbrock masturbated, performed oral sex on, and anally penetrated claimant SA-61612. Under the guise of Scouting development and training, Scoutmaster Hassenbrock took claimant SA-61612 on trips throughout the country, including to New York City, where the sexual abuse continued. Claimant SA-61612 reported the abuse to officials within the Church of Jesus Christ of Latter-Day Saints, the chartering and/or sponsoring organization of Troop 319. However, claimant SA-61612's warnings fell on deaf ears as Scoutmaster Hassenbrock continued sexually abusing claimant.

37.     Claimant SA-61612, who initiated a state court action in New York Supreme Court, New York County has valid and viable claims against the Boy Scouts, the Golden Empire Council as the council overseeing Troop 319, the Golden Gate Area Council, and the Church of Jesus Christ of Latter-Day Saints. Yet the Debtors want claimant SA-61612 to release these parties, thereby giving up claimant's valid claims, in exchange for what? The Debtors provide no information as to how claimant SA-61612's claim will be treated, how each of the non-debtor entities will resolve claimant's claim in exchange for the release, and how the multiple insurance policies and assets implicated by the claim will be used to resolve the claim.

38.     The Disclosure Statement provides no information as to the cash, assets, or real estate available for the Golden Empire Council, let alone the Golden Gate Area Council. The Church of Jesus Christ of Latter-Day Saints, one of the largest chartering and/or sponsoring organizations of the Boy Scouts, fares similarly under the Disclosure Statement, with no information provided as to what cash, assets, and/or real estate the organization has made available for survivors, and what amount will be contributed to claimant SA-61612's claim. Despite the lack of information, the Debtors expect claimant SA-61612 to release his claim against all entities, without knowing what assets the non-debtor entities can contribute, and will contribute.

39.     Debtors seeking broad third-party releases for non-debtor entities are becoming increasingly common, and the Debtors in this case are no exception. *See id.* at 737. However, this Court cannot approve the Debtors' Disclosure Statement, because in the Disclosure Statement's current form, the Debtors' Plan of Reorganization is rendered inherently and patently unconfirmable. Without information regarding how the third party, non-debtor entities will contribute to the Plan, what assets the non-debtor entities have, and how the insurance policies and assets will be treated under the Plan, the Disclosure Statement lacks even the barest adequate information to allow claimants, such as those represented by Merson Law, PLLC, to make an informed decision. Therefore, Merson Law, PLLC, on behalf of the hundreds of claimants the firm represents, respectfully requests that this Court not approve the Debtors' Disclosure Statement.

40.     The lack of information regarding Local Council assets and contributions is one of multiple deficiencies in the Disclosure Statement. In addition, the Disclosure Statement and Plan completely lack information regarding the contributions of the insuerers and the non-Debtor insurers.

41.     As noted above, almost every Claimant has a legal claim against a local council and/or a charter organization.  In addition to the Debtors, a local council was responsible for all Scouting units in its geographic region, including handling and processing complaints against Scout leaders for allegedly sexually abusing children and ensuring that each Scouting unit abided by policies and procedures to protect children from foreseeable harm.  These local councils, the "eyes and ears" of the Debtors, were often amongst the parties who neglected to protect the children in their care from foreseeable harm.

42.     In turn, a charter organization was responsible for staffing and supervising the adult volunteers of a Scouting unit, like a Boy Scout Troop or Cub Scout Pack, and were also amongst

the parties who neglected to protect the child members of a Scouting unit from foreseeable harm. The leaders of the charter organization, including the Scout leaders who the charter organization appointed to oversee its Scouting unit(s), were often amongst those to receive complaints that another Scout leader was sexually abusing children in the Scouting unit, or saw the "red flags" or warning signs that another Scout leader was sexually abusing children in the Scouting unit, but neglected to take steps to protect the children from that danger.

43.    Many of the local councils and charter organizations face significant liability, and many have substantial assets that are available to compensate abuse survivors, including the Merson Law, PLLC Claimants who have a claim against them.

44.    The Merson Law, PLLC Claimants object to the adequacy of the Disclosure Statement because the Disclosure Statement fails to specify what contribution the Local Councils and Chartering and/or Sponsoring Organizations will have to make to receive a release, including a contribution above and beyond their rights under insurance policies. The Merson Law, PLLC Claimants need to know this information to determine whether each entity who is receiving a release, including any Local Council or Chartering and/or Sponsoring Organization, is making a substantial contribution and whether the "Best Interests" test is met by that contribution.

**B.    Failure to Disclose the Specific Entities to Be Released**

45.    The Merson Law, PLLC Claimants object to the adequacy of the Disclosure Statement and the accompanying solicitation procedures because they fail to notify creditors, including the Merson Law, PLLC Claimants, which Local Council and Chartering and/or Sponsoring Organization is associated with their abuse, whether any such entity will receive a release, and if so, the terms of the release. If the Plan is designed to provide a release to non-Debtor third parties, such as the local councils and charter organizations, the Debtors should identify each

local council and charter organization and their relationship to each of the creditors, including the Merson Law, PLLC Claimants. For example, under the Global Resolution Plan in the Plan, the "Protected Parties" (e.g., those that benefit from a release and channeling injunction) should only include those non-Debtors that make a substantial contribution and receive sufficient support by claimants whose claims will be released and/or the subject of a channeling injunction.

46.    Most of the creditors who filed a Sexual Abuse Survivor Proof of Claim form, including the Merson Law, PLLC Claimants, have legal claims against the Debtors, a local council, and a charter organization. In their proof of claim forms, the Merson Law, PLLC Claimants made a good faith effort to identify the local council(s) and/or charter organization(s) that may be liable for the childhood sexual abuse they suffered that is the basis for their claim. However, the Merson Law, PLLC Claimants were children when they were sexually abused. Due to the passage of time and/or the psychological effects of the abuse, many of them are unsure whether they have identified the correct entities and others were simply too young to recall the correct names today.

47.    For the Merson Law, PLLC Claimants and other abuse survivors who do not know this information, the information they need is largely within the purview of the Debtors and local councils, which possess the Scouting unit rosters (e.g., Boy Scout Troop rosters and Cub Scout Pack rosters), camp rosters, and adult volunteer rosters. In prepetition litigation, this disclosure would generally occur through discovery that is currently barred by the preliminary injunction. Prior to the preliminary injunction, the Merson Law, PLLC Claimants would normally issue discovery that demanded the Debtors and/or local council(s) produce the roster(s) for the Claimant's Scouting unit and/or Scout Camp so the Claimant can find their name on the roster and confirm they have identified the correct local council(s) and charter organization(s) for their Scouting unit and/or Scout Camp.

48.     If a Claimant's name did not appear on a roster, which may have happened as a result of human error and/or if the Claimant joined a Scouting unit in-between the annual registration process, the Claimant could review the roster to see if the Claimant recognized the names of the other children or adults on the roster.  If so, the Claimant could contact some of the other members of the Scouting unit to see if they could corroborate that the Claimant was a member of the Scouting unit and/or attended the Scout Camp.  If not, the Claimant would work with the Debtors and/or the local council(s) to determine whether the Claimant identified the wrong Scouting unit and appeared on the roster of a different Scouting unit.  In addition to rosters, the Claimant would also ask the Debtors and/or local council(s) in discovery to produce the charter for the Claimant's Scouting unit so the Claimant could confirm the correct charter organization(s) that chartered the Claimant's Scouting unit, particularly if the Debtors and local council(s) no longer had rosters for the Scouting unit.

49.     If the Claimant was unable to obtain records that confirm the Claimant has identified the correct local council(s) and/or charter organization(s), the Claimant would ask the Debtors and/or the local council(s) for a "person most knowledgeable" deposition about the local council(s) and/or charter organization(s) who were responsible for the Claimant's Scouting unit and/or the Scout Camp the Claimant attended so that the Claimant could confirm that the Claimant has identified the correct local council(s) and/or charter organization(s) for their Scouting unit and/or Scout Camp.  If the Claimant believes they may know the correct local council(s) and/or charter organization(s), the Claimant would ask for any documents those organizations have about the Claimant's Scouting unit and the Claimant would ask the organizations for a "person most knowledgeable" deposition to confirm the Claimant identified the correct local council(s) and/or charter organization(s).

50.    The Merson Law, PLLC Claimants have not been able to pursue the above discovery because the preliminary injunction prohibits the Merson Law, PLLC Claimants from pursuing any litigation against the Debtors, local councils, and charter organizations. Nothing under the Plan provides a mechanism by which a Claimant can confirm the Claimant has identified the correct local council(s) and/or charter organization(s) before a release is given to those entities.

C.    **Trust Distribution Procedures**

51.    The Merson Law, PLLC Claimants object to the adequacy of the Disclosure Statement because the Disclosure Statement fails to explain how their claims will be valued in the trust procedures and what ability they will have to contest the proposed valuation of their claim.

52.    For example, the Plan identifies several factors to be used in valuing each claim, but neither the Plan nor the Disclosure Statement discloses how much weight will be assigned to those factors. Given the current state of negotiations it may not be appropriate to disclose the weight afforded to each factor. However, if such a valuation system is ultimately included in the Plan, the weight afforded to each factor must be disclosed prior to when votes are solicited for the Plan so that claimants understand how their claim would be valued, can fairly estimate how their claim would be valued, can see how their claim would be valued when compared to other claims, and can decide whether to vote in favor or against the Plan given that valuation system.

53.    The Plan also suggests that the value of a claim might be reduced if the claimant lacks certain information, such as the full name of the Scout leader who abused them, but neither the Plan nor the Disclosure Statement indicates whether the claimant will have an opportunity to pursue discovery so that they can supplement their claim with that missing information. As noted above, many abuse survivors may not recall the full name of the person who abused them because they were too young to recall the name, but the Debtors, the local councils, and the charter

organizations likely possess evidence, such as membership rosters and the "ineligible volunteer files," that could allow abuse survivors to supplement their claim with that information.

### D.      Failure to Disclose Insurance Coverage Risks

54.      The Merson Law, PLLC Claimants object to the adequacy of the Disclosure Statement because the Disclosure Statement fails to explain the likelihood of defeating the insurers' coverage defenses or the insurance companies' ability to pay abuse claims that total billions of dollars. The Disclosure Statement barely makes a passing note that the insurers have asserted coverage defenses, and the Debtors make no effort to evaluate those risks. Beyond the coverage risks associated with the Debtors' prepetition conduct, the Debtors fail to discuss any risk associated with the proposed assignment of all the insurance of the Debtors, the local councils, and participating charter organizations to a trust, including any risk associated with the anti-assignment clauses in such policies.  If the Plan's assignment violates the anti-assignment clauses, the insurance coverage could evaporate.

### E.      Failure to Disclose How Insurance Policies Will Be Utilized

55.      The Merson Law, PLLC Claimants object to the adequacy of the Disclosure Statement because it fails to explain how the proceeds of any insurance policies assigned to the trust will be utilized.  The Merson Law, PLLC Claimants are entitled to know how the proceeds of any policies will be utilized, including whether the proceeds of a policy that covers a Claimant's claim is being used to pay administrative expenses, to pay trust administrative and legal expenses, or to compensate others who do not have a claim covered under the same policy.

56.      For example, if a Claimant has a $1 million childhood sexual abuse claim against the Mormon Church, the Mormon Church presumably has sufficient assets to pay the full value of that claim.  In an insurance buy-back scenario, the insurers and the insured will insist that the

insured receives a release of all current and future claims against the insured, otherwise the insured would be without insurance on those claims, would still be responsible for the defense costs on those claims, and would still be at risk for a judgment on those claims. The Merson Law, PLLC Claimants are entitled to know whether they will be required to release all their claims against all insureds in order to effectuate a buy back of a given policy, and if so, how the proceeds of any such buy back will be utilized. In the foregoing example, the hypothetical Claimant is entitled to know whether he will be required to release a claim worth $1,000,000 against the Mormon Church to effectuate a "buy back" of a policy that names the Mormon Church as an insured. Moreover, the hypothetical Claimant is entitled to know whether his share of the sale price of the policy could be a small fraction of the value of his claim against that defendant.

57.    The Merson Law, PLLC Claimants need to know this information to determine whether each non-Debtor who is released is making a substantial contribution and whether the "best interests" test is met by that contribution.

**F.    Failure to Disclose the Contribution of Insurers and Their Insureds**

58.    The Merson Law, PLLC Claimants object to the adequacy of the Disclosure Statement because it fails to explain what contribution the insurers and their non-Debtor insureds will make in order to receive a release.

59.    As noted above, almost every Claimant has a legal claim against a local council and/or a charter organization. In addition to the Debtors, a local council was responsible for all Scouting units in its geographic region, including handling and processing complaints against Scout leaders for allegedly sexually abusing children and ensuring that each Scouting unit abided by policies and procedures to protect children from foreseeable harm. These local councils, the

"eyes and ears" of the Debtors, were often amongst the parties who neglected to protect the children in their care from foreseeable harm.

60.    In turn, a charter organization was responsible for staffing and supervising the adult volunteers of a Scouting unit, like a Boy Scout Troop or Cub Scout Pack, and were also amongst the parties who neglected to protect the child members of a Scouting unit from foreseeable harm. The leaders of the charter organization, including the Scout leaders who the charter organization appointed to oversee its Scouting unit(s), were often amongst those to receive complaints that another Scout leader was sexually abusing children in the Scouting unit, or saw the "red flags" or warning signs that another Scout leader was sexually abusing children in the Scouting unit, but neglected to take steps to protect the children from that danger.

61.    Many of the local councils and charter organizations face significant liability, and many have substantial assets that are available to compensate abuse survivors, including the Merson Law, PLLC Claimants who have a claim against them.

62.    The Merson Law, PLLC Claimants object to the adequacy of the Disclosure Statement because it fails to specify what contribution the local councils and/or charter organizations will have to make to receive a release, including a contribution above and beyond their rights under insurance policies.  The Merson Law, PLLC Claimants need to know this information to determine whether each entity who is receiving a release, including any local council or charter organization, is making a substantial contribution and whether the "Best Interests" test is met by that contribution.

### G.    No Disclosure Regarding the Proposed Hartford Settlement Agreement

63.    The Merson Law, PLLC Claimants object to the adequacy of the Disclosure Statement because it fails to explain how much each Claimant may receive as a result of the

Debtors' proposed settlement with Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company, and Navigators Specialty Insurance Company (collectively "Hartford"), whether each Claimant would be forced to release any of their claims in order to effectuate the settlement, including claims they have against non-Debtor entities, and whether any party, including Hartford and non-Debtor entities, would receive a channeling injunction as a result of the settlement.

64.     The Debtors' proposed settlement with Hartford, which was attached as Exhibit A to the Second Mediators' Report that was filed on April 16, 2021 (D.I. 2624), is for $650,000,000 and appears to require a release of all current and future claims that may exist under Hartford's policies. Based on a review of Hartford's policies, it appears that Hartford's policies cover some or all of the claims of approximately 25,000 claimants in this bankruptcy. Pursuant to this analysis, the Debtors' proposed settlement with Hartford equates to an average of only about $26,000 per claimant if the settlement proceeds are shared by the claimants with a claim that is covered by a Hartford policy, and to an average of approximately $7,647 per claimant if the settlement proceeds are shared with 85,000 claimants.

65.     Not only does the Disclosure Statement fail to disclose how the Debtors propose to allocate those settlement funds, but it fails to disclose how much coverage is available under each of the Hartford policies; which claimants have claims under each of the Hartford policies; the number of claims that implicate each policy; the type of claims; and the value of the claims. Based on the years of the Hartford policies, it appears many of the policies had per occurrence limits of $500,000 with no aggregate limit. The Disclosure Statement fails to explain why a claimant whose claim triggers a $500,000 insurance policy should vote in favor of a Plan that may result in them receiving an average of $7,647 from a settlement with Hartford.

66.    The Disclosure Statement also fails to disclose the insured(s) under each of the Hartford policies, including whether the Debtors are insureds under each policy or whether the only insured under some policies is a non-Debtor entity, such as a local council.  In turn, the Disclosure Statement fails to explain whether all current and future claims against the insured(s), including non-Debtor entities, will have to be released to effectuate the settlement, and if so, the value of those claims and why a claimant should agree to such a release if the insured has substantial assets, including other insurance, that should be used to compensate the claimant.

**H.    The Scope of this Bankruptcy Necessitates Transparency Regarding the Handling of Insurance Policies**

67.    As it stands, the Plan would provide each Claimant an average of $6,000, or less, from the Debtors and the local councils, which they partly justify by the assignment of insurance policies.  The average award could be significantly lower, if non-existent, after administrative expenses.  The Merson Law, PLLC Claimants must have sufficient information to evaluate the risks of the Plan if the Merson Law, PLLC Claimants are to release multiple non-Debtor entities. As filed, the Disclosure Statement falls far short of the Bankruptcy Code's standard for its approval.

**I.    Voting and Solicitation Procedures for Claimants with Multiple Sexual Abuse Survivor Proof of Claims**

68.    As the Court is aware, multiple Sexual Abuse Survivor Proof of Claim forms were filed on behalf of some claimants. The Merson Law, PLLC Claimants object to the Disclosure Statement and to the proposed voting and solicitation procedures because they will disenfranchise the votes of survivors if more than one law firm submits a ballot on behalf of the same claimant. Instead, the Debtors' voting and solicitation procedures should require them to verify whether the law firm who submits a ballot on behalf of a claimant has the authorization to act on behalf of the

claimant in those instances when it matters.  For example, verification is not necessary if multiple ballots on behalf of the same claimant vote in the same manner.  However, if the votes conflict and the outcome of the tabulation could be affected, the Debtors must verify which ballot should be counted by determining which law firm was authorized to submit the ballot.  As it stands, the Debtors have failed to explain how they intend to solicit and count votes for such claimants, including how to ensure such claimants do not vote multiple times, how to determine who can vote on behalf of such claimants, and how to determine which vote to count if inconsistent votes are submitted on behalf of the same claimant.

> **J.      Objection to Future and/or Amended Disclosure Statements**

69.      The Merson Law, PLLC Claimants object to any future and/or amended disclosure statement by the Debtors that fails to resolve the objections raised in this objection.

> **K.      Joinder to the Objection to the Disclosure Statement by the Tort Claimants' Committee**

70.      Finally, the Merson Law, PLLC Claimants join the objection to the Disclosure Statement filed by the Tort Claimants' Committee.

**CONCLUSION**

WHEREFORE, based on the foregoing and the objections raised by the Tort Claimants Committee, the Merson Law, PLLC Claimants respectfully request that this Court not approve the Debtors' Disclosure Statement, and for such other and further relief as this Court deems just and proper.

Dated:  May 6, 2021
         Wilmington, Delaware

Respectfully submitted,

**CIARDI CIARDI & ASTIN**

*/s/ Daniel K.  Astin*
Daniel K. Astin (No. 4068)
1204 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 658-1100
Facsimile:  (302) 658-1300
E-mail:  dastin@ciardilaw.com

-and-

Albert A. Ciardi, III, Esquire Walter W.
Gouldsbury III, Esquire
(*Admitted Pro Hac Vice*)
CIARDI CIARDI & ASTIN
1905 Spruce Street
Philadelphia, PA 19103
Telephone: (215) 557-3550
Facsimile: (215) 557-3551
aciardi@ciardilaw.com
wgouldsbury@ciardilaw.com

-and-

Jordan K. Merson, Esquire
Matthew G. Merson, Esquire
(*Pro hac vice forthcoming*)
950 Third Avenue, 18th Floor
New York, New york 10155
Telephone: (212) 603-9100
jmerson@mersonlaw.com
mmerson@mersonlaw.com