## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Re: D.I. 2592 and 2594** |

## OBJECTION TO THE ADEQUACY OF DEBTORS' DISCLOSURE STATEMENT IN SUPPORT OF SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION AND JOINDER OF THE OBJECTION OF THE TORT CLAIMANTS' COMMITTEE

COME NOW the Tort Claimants represented by Lujan & Wolff LLP ("Lujan Claimants")[1] and object to the adequacy of the Disclosure Statement filed by Debtors Boy Scouts of America and Delaware BSA, LLC (collectively "Debtors") in support of the Second Amended Chapter 11 Plan of Reorganization. On April 13, 2021, Debtors filed a Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (D.I. 2592) ("the Plan"), and on April 14, 2021, Debtors filed a Disclosure Statement for the Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC ("the Disclosure Statement") (D.I. 2594).

Lujan Claimants are survivors of childhood sexual abuse who each filed a Sexual Abuse Survivor Proof of Claim in this case, alleging that the Boy Scouts are liable for such abuse. Each Lujan Claimant was sexually abused on the island of Guam, a United States territory "where America's day begins." The earliest abuse of a Lujan Claimant occurred in 1955, only 11 years after the people of Guam (including indigenous Chamorros, which almost all Lujan Claimants are) were liberated by American Armed Forces from more than 2 ½ years of brutal Japanese occupation

---

[1] See attached Appendix A, which lists the Sexual Abuse Survivor Proof of Claim numbers for Lujan Claimants.

during World War II.[2]  Lujan Claimants were sexually abused about every year thereafter, many suffering through multiple occurrences and in multiple years of abuse, until approximately 1982. After *I Liheslaturan Guahan* enacted in 2016 a law abolishing the civil statute of limitations for actions arising from child sexual abuse, nearly all of Lujan Claimants sued the Boy Scouts of America and its Aloha Council.  In fact, more than One-Fourth (1/4) of the 275 prepetition lawsuits pending against the Boy Scouts of America at the time this jointly administered bankruptcy case was initiated were brought by Lujan Claimants.  A majority of Lujan Claimants were sexually abused by the same perpetrator, admitted serial abuser Father Louis Brouillard, a scoutmaster who was also in charge of the swimming merit badge program in Guam.  Fr. Louis was able to abuse children in Guam for about three decades, from the 1950s to 1980s.  Lujan Claimants estimate that more than 140 adult men and one transgender woman have stepped forward since 2016 to claim they were sexually abused as children by Fr. Louis in connection with the Boy Scouts.  The abuse occurred while the Boy Scouts of America was partnered with the now-defunct Guam Council and Chamorro Council, the Aloha Council, and also while the Boy Scouts of America directly serviced Guam scouting units as the aptly named Direct Service Council from approximately 1956 to 1970. Due at least to the negligence of the Boy Scouts, Lujan Claimants suffered from sexual abuse ranging from forced nudity, touching and fondling/groping of genitals, masturbation, oral sex, and anal penetration.  The chartered organization implicated in the abuse of most, if not all, Lujan Claimants was the local Catholic Church, the Archbishop of Agana[3], who filed for Chapter 11 bankruptcy in the District Court of Guam in January 2019, more than one year before Debtors filed their own Chapter 11 petitions herein, and that Guam bankruptcy case is ongoing and its automatic

---

[2] On December 8, 1941, hours after Pearl Harbor in Hawaii was bombed by Japanese forces, Guam was also bombed and then invaded and occupied by Japan.  Chamorros suffered monstrosities such as rape, beheadings, and massacres, until American Armed Forces landed in Guam on July 21, 1944, to retake the island.
[3] The Archbishop of Agana, a.k.a. the Archdiocese of Agana, filed a timely proof of claim, asserting claims including for contribution and as an insured under Boy Scouts of America insurance policies.

stay remains in effect.  Notably, Guam law provides Lujan Claimants a right of direct action against insurers.

Lujan Claimants object to the Disclosure Statement because it fails to provide adequate information to allow a creditor to make an informed judgment about the Plain and the Plan is inherently or patently unconfirmable.

A debtor seeking Chapter 11 bankruptcy protection has an affirmative duty under 11 U.S.C. § 1125(b) to provide creditors with a disclosure statement that has "adequate information" to enable a creditor "'to make an informed judgment about the Plan.'"  Krystal Cadillac-Oldsmith GMC Truck, Inc. v. Gen. Motors Corp., 337 F. 3d 314, 321 (3d Cir. 2003) (quoting 11 U.S.C. § 1125(a)(1)).  A debtor must identify and disclose all property of the estate, including all legal and equitable property interests of the debtor.  Krystal Cadillac, 337 F. 3d at 321.  "'[P]reparing and filing a disclosure statement is a critical step in the reorganization of a Chapter 11 debtor.'"  Id. at 322 (quoting Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F. 2d 414, 416 (3d Cir. 1988)).  The Third Circuit has stated that, as creditors and the court rely upon the disclosure statement providing full disclosure, it "'cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of adequate information.'"  Id. (quoting Oneida, 848 F. 2d at 417).

While confirmation issues are ordinarily reserved for the confirmation hearing, the bankruptcy court may consider and resolve at the disclosure stage the issue of whether there is a defect that makes a plan inherently or patently unconfirmable.  In re American Capital Equipment, LLC, 688 F. 3d 145, 153-54 (3d Cir. 2012).  It is within the bankruptcy court's discretion to withhold approval of a disclosure statement if the plan is not confirmable.  Id. at 154.  "A plan is patently unconfirmable where (1) confirmation 'defects [cannot] be overcome by creditor voting results' and (2) those defects 'concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing.'"  Id. at 154-55 (quoting In re

<u>Monroe Well Serv., Inc.</u>, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987)).  The burden of proof is on the debtor to prove that a disclosure statement is adequate, including showing that the plan is confirmable or that defects might be cured or involve disputed material facts.  <u>Id.</u> at 155.

Lujan Claimants object to the adequacy of the Disclosure Statement for the following reasons:

1.    The Disclosure Statement fails to mention claims against Debtors arising in Guam, even though more than 25% of all prepetition lawsuits pending against Debtors and leading up to the bankruptcy filing were brought by survivors of child sexual abuse in Guam, including victims of one of the most prolific child sexual abusers in scouting.

2.    The Disclosure Statement fails to provide sufficient information to support classification of claims in the Plan, including the failure to provide adequate information concerning the similarities and dissimilarities of claims and rights of tort claimant creditors.

3.    The Disclosure Statement fails to explain that some tort claimants have statutory direct action rights against insurers of Boy Scouts policies while most other claimants lack such statutory direct action rights against insurers.  This difference is especially highlighted in Debtors' proposed settlement with Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company, and Navigators Specialty Insurance Company (collectively "Hartford"), which singles out and separately defines "Direct Action Claim" and attempts to release and discharge Hartford of such Direct Action Claims without the consent of direct action claimants, including Lujan Claimants.  The Disclosure Statement fails to explain how the direct action rights of claimants will be protected and how such claimants will fare under the Plan.  Instead, the Disclosure Statement makes a broad statement prohibiting claimants, who are appealing in the tort system the validity or value of their claims as determined by the Settlement Trustee, from naming as a defendant Non-Settling Insurance Companies, if the

4

Plan is confirmed as a Global Resolution Plan.  The Disclosure Statement further states that, if the Plan is confirmed as a Global Resolution Plan, Abuse Claimants shall have no rights against the Non-Settling Insurance Companies.  It is Lujan Claimants' position that no one, including Debtors, the Settlement Trustee, the Litigation Trustee, or the Trust Advisory Committee, should be permitted to dispose of their statutory direct action claims against non-debtor insurers without their full, voluntary, and express individual consent and meaningful participation in negotiations. The Disclosure Statement fails to explain how a Plan can be confirmed that snatches away a claimant's direct action rights against non-debtor, non-settling insurers.  It simply cannot and should not.

4.     The Disclosure Statement represents that "BSA operates Scouting through the Local Councils and the Chartered Organizations," (Disclosure Statement at 41), and fails to disclose that some claimants were sexually abused while involved in or connected with units directly serviced by Boy Scouts of America, calling itself the "Direct Service Council."  Not only do Debtors fail to provide adequate information about the Boy Scouts of America's role and activities while wearing the hat of the Direct Service Council, but they fail to even mention in the Disclosure Statement the Direct Service Council and that the Boy Scouts of America acted as a "local council equal" in directly servicing scouting units, including in Guam.  The Disclosure Statement fails to explain how claimants abused in connection with scouting units directly serviced by the Boy Scouts of America will fare under the Plan.

5.     The Disclosure Statement fails to identify and adequately disclose indirect abuse claims timely filed against Debtors.  The failure to disclose the values of these claims and the holders of these claims prevents Lujan Claimants from making an informed judgment on the Plan, especially since Debtors propose that indirect abuse claimants share in the same settlement trust fund as sexual abuse claimants.  Debtors fail to explain why indirect abuse claimants should

share in the same trust funds allocated for survivors of sexual abuse, when such holders were likely also liable for such abuse.

6.      The Disclosure Statement lacks adequate information about how insurance proceeds will be procured and how and to whom they will distributed.

7.      The Disclosure Statement fails to state whether the Boy Scouts of America or its insurers funded prepetition settlements and whether and which insurers defended the Boy Scouts of America.

8.      The Disclosure Statement fails to disclose the per-person or per-occurrence limits for bodily injury claims of insurance policies acquired by the Boy Scouts of America between 1935 and 1961.

9.      The Disclosure Statement lacks information identifying the "certain Chartered Organizations" who are insured in the Boy Scouts' Comprehensive General Liability (CGL) policies beginning in 1978, (see Disclosure Statement at 42), and whether chartered organizations are insureds under earlier Boy Scouts policies.

10.     The Disclosure Statement lacks adequate information regarding the First Encounter Agreement (FEA) reached in 1996 between BSA and Century.  There is no attempt to explain why the FEA only applies to sexual molestation claims and not to other bodily injury claims.  There is no explanation or discussion regarding whether the FEA can be enforced as to non-parties to the agreement, such as named insureds (e.g., local councils) and additional insureds (e.g., chartered organizations).  The Disclosure Statement lacks adequate information identifying the Insurance Companies who "ascribe to this agreement," and who does not ascribe to this agreement and provide coverage according to the FEA.  (See Disclosure Statement at 42.) The Disclosure Statement fails to explain how and why the FEA with Century would apply to

policies with other insurers.  Further, there is no explanation of how the FEA can be retroactively applied to claims that arose prior to the 1996 FEA.

11.     The Disclosure Statement lacks adequate information about the Insurance Coverage Actions, the coverage defenses asserted, and why Debtors believe the defenses or limitations of insurance coverage are without merit.

12.      The Disclosure Statement lacks any information about Debtors' proposed settlement with Hartford.  There is no explanation of whether the rights of other named insureds and additional insureds are released under the settlement, and, if so, how such a release can be enforceable without the consent of such other insureds.  If the Archbishop of Agana is insured under the Hartford policies, the proposed settlement disposing of and releasing the Archbishop of Agana's interests under the policies would appear to violate the automatic stay in the Guam bankruptcy action.  Similarly, the Disclosure Statement lacks adequate information explaining how the proposed release of Direct Action Claims can be valid without the consent of and without compensation paid directly to claimants with direct action claims, including Lujan Claimants abused or suffering bodily injury during Hartford policy years.

13.     The Disclosure Statement fails to state whether there are local council insurance policies in 1978 or any year thereafter.  The Disclosure Statement fails to state who is insured under the local council insurance policies.

14.     The Disclosure Statement fails to include a proposed ballot which would show how a creditor can vote to accept the Global Resolution Plan or the BSA Toggle Plan. Additionally, the Disclosure Statement lacks adequate information disclosing whether only affected creditors would be able to vote in favor of or against releases or channeling injunctions protecting certain non-debtor third parties, such as particular local councils or chartered organizations.  For example, it is unclear whether only abuse survivors with timely claims

against a local council will be permitted to vote in favor of or against releases or channeling injunctions protecting that local council.

15.     The Disclosure Statement lacks adequate information about claims that are barred or not barred by a statute of limitations, or subject to other defenses.

16.     The Disclosure Statement fails to identify which Local Councils are members of the BSA's "controlled group" and may be jointly and severally liable with BSA on the Pension Benefit Guaranty Corporation's $1,102,200,000 Unfunded Benefit Liability Claim, Termination Premiums Claim including an amount of $51,862,500, and Minimum Funding Contribution Claims.  The Disclosure Statement fails to explain the likelihood of these contingent Claims becoming due upon termination of the Pension Plan and the amount that BSA would likely pay on these Claims.  No contribution claims against Local Councils have been disclosed in the Disclosure Statement.

17.     The Disclosure Statement fails to identify what unknown claimants would qualify as future claimants entitled to compensation under the Plan.  There is also no estimate of the total amount of money that would be set aside or paid for future claimants.

18.     The Disclosure Statement fails to disclose adequate information regarding the appointment of the Settlement Trustee and any successor Settlement Trustee, including the qualifications of such individual(s) who will have, under the Plan, the sole discretion to determine the validity and value of abuse claims and to reconsider such determinations.

19.     The Disclosure Statements fails to explain why excess assets in the Settlement Trust shall be distributed to Reorganized BSA and not to the sexual abuse survivor claimants. This provision in the Disclosure Statement conflicts with another provision stating that, upon termination of the Settlement Trust, the Settlement Trustee will pay all fees and expenses of the

Trust and distribute all remaining assets to a charity chosen by the BSA.  Again, there is no explanation given why remaining assets should not be distributed to abuse claimants.

20.    The Disclosure Statement fails to adequately explain what will happen after the Settlement Trust terminates.

21.    The Disclosure Statements fails to state how much it will cost to administer and maintain the Settlement Trust and Litigation Trust.

22.    The Disclosure Statement fails to adequately disclose the assets and liabilities of Delaware BSA, LLC, and a Financial Projections Analysis separate from the Boy Scouts of America.  Likewise, the Disclosure Statement fails to provide a Financial Projections Analysis of the Boy Scouts of America separate from Delaware BSA, LLC.

23.    The Disclosure Statement lacks adequate information regarding claims against Debtors' estate to allow creditors to have notice and meaningful opportunity to be heard with respect to rights under Federal Rule of Bankruptcy Procedure 3007.

24.    The Disclosure Statement fails to provide adequate information to enable Lujan Claimants to clearly understand and distinguish between the two Plans proposed by Debtors— the Global Resolution Plan and the BSA Toggle Plan which provides no third party releases or channeling injunctions.  Also, it is unclear how many votes to accept the BSA Toggle Plan are required in order for it to be confirmed, as the Disclosure Statement instead alludes to the Toggle Plan being a "default" Plan that may be confirmed if there are insufficient votes to accept the Global Resolution Plan.

Additionally, Lujan Claimants object to the adequacy of the Disclosure Statement for the below reasons:

A.      **Failure to Disclose the Assets and Liabilities of Each Party Receiving a Release**

25.      The Disclosure Statement fails to provide Lujan Claimants with sufficient information to make an informed decision on whether (a) to vote to accept or reject the Plan, which proposes a release of all local councils and may propose a release of chartered organizations, or (b) to raise a "Best Interest of Creditors" objection.

26.      The Disclosure Statement does not provide any property-by-property valuation of the real or personal property that Debtors intend to transfer to a settlement trust, or any property-by-property valuation of the real or personal property that Debtors seek to retain.  The same is true of Debtors' other assets, including investments.  It is imperative that the Disclosure Statement provide the liquidation value or fair market value for each such property.

27.      The Disclosure Statement does not include in its liquidation analysis the properties of the local councils.  Under the Boy Scouts of America's governance documents, a local council's property reverts to it if the local council's charter is not renewed.  In a Chapter 7 liquidation of Debtors, the Chapter 7 trustee presumably would not renew any local council charters.  Since the properties revert to the Boy Scouts of America, the liquidation analysis must include the liquidation value of all local council real and personal property.

28.      As the Boy Scouts of America admits that it is commonly sued along with local councils in lawsuits brought by survivors of child sexual abuse, the Disclosure Statement fails to identify any claims that the Boy Scouts of America may have against the local councils, including any arising from the charters with local councils and any claims for contribution.

29.      The Disclosure Statement and Plan fail to provide any property valuation information for a creditor, including Lujan Claimants, to determine if each local council is making a substantial contribution that warrants a release and channeling injunction.  Any such valuation must include the liquidation or fair market value of the local council's assets, including

10

any justification by a council for asserting that an asset is unavailable to pay its creditors (e.g., donor restricted), how many childhood sexual abuse claims implicate the local council, and how much the local council is contributing in exchange for a release of such childhood sexual abuse claims.

30.     Based on each local council's publicly available IRS Form 990 statements, each local council has significant assets, including significant unrestricted assets.  Moreover, if a local council accounted for its real property using "book value" (e.g., the value it was worth at the time it was acquired) and not its current fair market value, its IRS Form 990 statements likely *undervalue* its total assets given the length of time most of these councils have existed and the property holdings they have acquired over that time.

31.     The Disclosure Statement and Plan do not provide any property valuation information of any chartered organization that will be released, including any justification by a charter organization for asserting that an asset is unavailable to pay creditors (e.g. donor restricted), how many childhood sexual abuse claims implicate each chartered organization, and how much each chartered organization is contributing in exchange for a release of such childhood sexual abuse claims.  Like the local councils, many of the chartered organizations, such as the Methodist Church, Mormon Church, and Catholic Church, have significant real property and other assets.

32.     Lujan Claimants cannot make an informed decision to vote to accept or reject the Plan because the Disclosure Statement does not contain any information about the number of claims against each local council or chartered organization, or any estimate of the value of such claims.  To the extent that sexual abuse claims have not been filed against a local council or charter organization, Debtors should disclose whether they have any indemnification or contribution claims against each local council or charter organization.

33.     The Disclosure Statement also fails to adequately explain how any contribution by non-Debtor entities, including local councils and chartered organizations, will be utilized, including whether their contribution will be used to pay administrative expenses, to pay trust administrative and legal expenses, or to compensate others who do not have a claim against that entity.

34.     The inadequacy of the Disclosure Statement is illustrated by the fact that Debtors state in the Plan that they are "committed" to ensuring the local councils collectively contribute at least $450 million.  This disclosure is illusory because there is no agreement with the local councils to contribute anything to the Plan.  In this regard, the Plan is speculative at best and the Disclosure Statement does nothing to inform abuse survivors whether and when any contribution by the local councils might be realized.  In addition, Debtors fail to disclose how much each council has available to contribute, how much each council is contributing, and how the contributions of each council will be utilized, including whether the contributions of a council will be used to compensate abuse survivors who do not have a claim against that council or who have not asserted timely claims against that council.

35.     Similarly, the Disclosure Statement estimates that under the Global Resolution Plan somewhere between $2.4 billion and $7.1 billion will be available to compensate abuse survivors, but nowhere does the Disclosure Statement explain how Debtors purport to generate these funds.  On the other hand, Debtors have *only* agreed to fund $115,000,000 and have "committed to ensuring" the local councils contribute at least $425,000,000.  The Disclosure Statement fails to explain how Debtors plan to generate an additional $1,860,000,000 to $6,560,000,000.  Even adding the $650,000,000 from Debtors' proposed settlement with Hartford leaves Debtors short by $1,210,000,000 from the low end of the amount they claim will be available for abuse survivors.

36.     This lack of basic information makes it impossible for creditors, including Lujan Claimants, to determine whether each council is making a substantial contribution, to make an informed decision on whether to vote to accept or reject the Plan, which proposes to release each council, and to make an informed decision on whether to raise a "Best Interest of Creditors" objection because the Plan fails to award them the liquidated value of their claim against all entities they are releasing.

### B.     Failure to Disclose the Specific Entities to Be Released

37.     Lujan Claimants object to the adequacy of the Disclosure Statement and the accompanying solicitation procedures because they fail to notify creditors, including Lujan Claimants, which local council and/or chartered organization is associated with their abuse, whether any such entity will receive a release, and if so, the terms of the release.  If the Plan is designed to provide a release to non-Debtor third parties, such as the local councils and chartered organizations, Debtors should identify each local council and chartered organization and their relationship to each of the creditors, including Lujan Claimants.  For example, under the Global Resolution Plan in the Plan, the "Protected Parties" (e.g., those that benefit from a release and channeling injunction) should only include those non-Debtors that make a substantial contribution and receive sufficient support by claimants whose claims will be released and/or the subject of a channeling injunction.

38.     Most of Lujan Claimants have asserted legal claims not only against Debtors, but also a local council and a chartered organization.  In their proof of claim forms, Lujan Claimants made a good faith effort to identify the local council(s) and/or chartered organization(s) that may be liable for the childhood sexual abuse they suffered that is the basis for their claim.  However, Lujan Claimants were children when they were sexually abused.  Due to the passage of time

and/or the psychological effects of the abuse, some of them are unsure whether they have identified the correct entities and others were simply too young to recall the correct names today.

39.     For Lujan Claimants and other abuse survivors who do not know this information, the information they need is largely within the purview of Debtors and local councils, which possess the Scouting unit rosters (e.g., Boy Scout Troop rosters), camp rosters, and adult volunteer rosters.   In prepetition litigation, this disclosure would generally occur through discovery that is currently barred by the preliminary injunction in the related adversary proceeding.   Without the preliminary injunction, Lujan Claimants would normally issue discovery that demanded the Boy Scouts of America and/or local council(s) produce the roster(s) for the Claimant's Scouting unit and/or Scout Camp so the Claimant can find his name on the roster and learn or confirm the correct chartered organization(s) for his Scouting unit and/or Scout Camp.

40.     If a Claimant's name did not appear on a roster, which may have happened for various reasons including but not limited to human error, the Claimant joining a Scouting unit in between the annual registration process, the abuse occurring while the Claimant was being recruited to join the Boy Scouts, or the Claimant was abused while not officially a scout but while he was permitted to participate in scouting activities or events, the Claimant could review the scout and adult rosters to see if the Claimant recognized the names of the other children or adults on the rosters.   If so, the Claimant could contact some of the other members of the Scouting unit to see if they could corroborate that the Claimant was a member of the Scouting unit and/or attended the Scout Camp.   If not, the Claimant would work with Debtors and/or the local council(s) to determine whether the Claimant identified the wrong Scouting unit and appeared on the roster of a different Scouting unit.   In addition to rosters, the Claimant would also ask Debtors and/or local council(s) in discovery to produce the charter for the relevant

14

Scouting unit so the Claimant could confirm the correct chartered organization(s) that chartered the unit, particularly if Debtors and local council(s) no longer had rosters for the Scouting unit.

41.    If the Claimant was unable to obtain records that confirm the Claimant has identified the correct local council(s) and/or chartered organization(s), the Claimant would ask Debtors and/or the local council(s) for a "person most knowledgeable" deposition about the local council(s) and/or chartered organization(s) who were responsible for the Claimant's Scouting unit and/or the Scout Camp the Claimant attended so that the Claimant could confirm that the Claimant has identified the correct local council(s) and/or charter organization(s) for their Scouting unit and/or Scout Camp.  If the Claimant believes they may know the correct local council(s) and/or charter organization(s), the Claimant would ask for any documents those organizations have about the Claimant's Scouting unit and the Claimant would ask the organizations for a "person most knowledgeable" deposition to confirm the Claimant identified the correct local council(s) and/or charter organization(s).

42.    Lujan Claimants have not been able to fully pursue or pursue at all the above discovery because the preliminary injunction prohibits Lujan Claimants from litigating against the local council and alleged chartered organizations.  Nothing under the Plan provides a mechanism by which a claimant can confirm the claimant has identified the correct local council(s) and/or chartered organization(s) before a release is given to those entities.

## C.    Trust Distribution Procedures

43.    The Disclosure Statement and Plan fails to provide a copy of the Settlement Trust Agreement and Trust Distribution.  Without it, Lujan Claimants are unable to make an informed decision whether to support or reject the Plan.

44.    The Disclosure Statement fails to explain how sexual abuse claims will be valued in or out of the trust procedures and what ability claimants will have to contest the proposed

valuation of their claim.    For example, the Plan identifies a number of factors to be used in valuing each claim, but neither the Plan nor the Disclosure Statement discloses how much weight will be assigned to those factors.    Given the current state of negotiations it may not be appropriate to disclose the weight afforded to each factor.    However, if such a valuation system is ultimately included in the Plan, the weight afforded to each factor must be disclosed prior to when votes are solicited for the Plan so that claimants understand how their claim would be valued, can fairly estimate how their claim would be valued, can see how their claim would be valued when compared to other claims, and can decide whether to vote in favor or against the Plan given that valuation system.

45.    The Disclosure Statement lacks adequate information about how the Trust will be administered and by whom, and how funds will be invested.

### D.    Failure to Disclose Insurance Coverage Risks

46.    The Disclosure Statement fails to explain the likelihood of defeating the insurers' coverage defenses or the likelihood of insurance companies paying on abuse claims that total billions of dollars.    The Disclosure Statement barely makes a passing note that the insurers have asserted coverage defenses, and Debtors make no effort to evaluate those risks.    Beyond the coverage risks associated with Debtors' prepetition conduct, Debtors fail to discuss any risk associated with the proposed assignment of all of the insurance of Debtors, the local councils, and participating chartered organizations to a trust, including any risk associated with anti-assignment clauses in such policies.

### E.    Failure to Disclose How Insurance Policies Will Be Utilized

47.    The Disclosure Statement fails to explain how the proceeds of any insurance policies assigned to the trust will be utilized.    Lujan Claimants are entitled to know how the proceeds of any policies will be utilized, including whether the proceeds of a policy that covers a

Claimant's claim is being used to pay administrative expenses, to pay trust administrative and legal expenses, or to compensate others who do not have a claim covered under the same policy.

48.    For example, if a claimant has a $1 million childhood sexual abuse claim against the Mormon Church, the Mormon Church presumably has sufficient assets to pay the full value of that claim.  In an insurance buy-back scenario, the insurers and the insured will insist that the insured receives a release of all current and future claims against the insured, otherwise the insured would be without insurance on those claims, would still be responsible for the defense costs on those claims, and would still be at risk for a judgment on those claims.  Lujan Claimants are entitled to know whether they will be required to release all of their claims against all insureds in order to effectuate a buy back of a given policy, and if so, how the proceeds of any such buy back will be utilized.  In the foregoing example, the hypothetical claimant is entitled to know whether he will be required to release a claim worth $1,000,000 against the Mormon Church to effectuate a "buy back" of a policy that names the Mormon Church as an insured.  Moreover, the hypothetical claimant is entitled to know whether his share of the sale price of the policy could be a small fraction of the value of his claim against that defendant.

49.    Lujan Claimants need to know this information to determine whether each non-Debtor who is released is making a substantial contribution and whether the "best interests" test is met by that contribution.

### F.    Failure to Disclose the Contribution of Insurers and Their Insureds

50.    The Disclosure Statement fails to explain what contribution the insurers and their non-Debtor insureds will make in order to receive a release.  The Disclosure Statement fails to specify what contribution the local councils and/or chartered organizations will have to make to receive a release, including a contribution above and beyond their rights under insurance policies.  Lujan Claimants need to know this information to determine whether each entity who

17

is receiving a release, including any local council or chartered organization, is making a substantial contribution and whether the "Best Interests" test is met by that contribution.

### G.    No Disclosure Regarding the Proposed Hartford Settlement Agreement

51.    Lujan Claimants object to the adequacy of the Disclosure Statement because it fails to explain how much each claimant may receive as a result of Debtors' proposed settlement with Hartford, whether each claimant would be forced to release any of their claims in order to effectuate the settlement, including claims they have against non-Debtor entities, and whether any party, including Hartford and non-Debtor entities, would receive a channeling injunction as a result of the settlement.

52.    Debtors' proposed settlement with Hartford, which was attached as Exhibit A to the Second Mediators' Report that was filed on April 16, 2021 (D.I. 2624), is for $650,000,000 and appears to require a release of all current and future claims that may exist under Hartford's policies.  Based on a review of Hartford's policies, it appears that Hartford's policies cover some or all of the claims of approximately 25,000 claimants in this bankruptcy.  Pursuant to this analysis, Debtors' proposed settlement with Hartford equates to an average of only about $26,000 per claimant if the settlement proceeds are shared by the claimants with a claim that is covered by a Hartford policy, and to an average of approximately $7,647 per claimant if the settlement proceeds are shared with 85,000 claimants.

53.    Not only does the Disclosure Statement fail to disclose how Debtors propose to allocate those settlement funds, but it fails to disclose how much coverage is available under each of the Hartford policies; which claimants have claims under each of the Hartford policies; the number of claims that implicate each policy; the type of claims; and, the value of the claims. Based on the years of the Hartford policies, it appears many of the policies had per occurrence limits of $500,000 with no aggregate limit.  The Disclosure Statement fails to explain why a

claimant whose claim triggers a $500,000 insurance policy should vote in favor of a Plan that may result in them receiving an average of $7,647 from a settlement with Hartford.

54.     The Disclosure Statement also fails to disclose the insured(s) under each of the Hartford policies, including whether Debtors are insureds under each policy or whether the only insured under some policies is a non-Debtor entity, such as a local council.   In turn, the Disclosure Statement fails to explain whether all current and future claims against the insured(s), including non-Debtor entities, will have to be released in order to effectuate the settlement, and if so, the value of those claims and why a claimant should agree to such a release if the insured has substantial assets, including other insurance, that should be used to compensate the claimant.

### H.     The Scope of this Bankruptcy Necessitates Transparency Regarding the Handling of Insurance Policies

55.     As it stands, the Plan would provide each claimant an average of $6,000, or less, from Debtors and the local councils, which they partly justify by the assignment of insurance policies.   The average award could be significantly lower, if non-existent, after administrative expenses.   Lujan Claimants must have sufficient information to evaluate the risks of the Plan if the they are to release multiple non-Debtor entities.   As filed, the Disclosure Statement falls far short of the Bankruptcy Code's standard for its approval.

### I.     Voting and Solicitation Procedures for Claimants with Multiple Sexual Abuse Survivor Proof of Claims

56.     As the Court is aware, multiple Sexual Abuse Survivor Proof of Claim forms were filed on behalf of some claimants.   Lujan Claimants object to the Disclosure Statement and to the proposed voting and solicitation procedures because they will disenfranchise the votes of survivors in the event that more than one law firm submits a ballot on behalf of the same claimant.   Instead, Debtors' voting and solicitation procedures should require them to verify whether the law firm who submits a ballot on behalf of a claimant has the authorization to act on

behalf of the claimant in those instances when it matters.  For example, verification is not

necessary if multiple ballots on behalf of the same claimant vote in the same manner.  However,

if the votes conflict and the outcome of the tabulation could be affected, Debtors must verify

which ballot should be counted by determining which law firm was authorized to submit the

ballot.  As it stands, Debtors have failed to explain how they intend to solicit and count votes for

such claimants, including how to ensure such claimants do not vote multiple times, how to

determine who can vote on behalf of such claimants, and how to determine which vote to count

if inconsistent votes are submitted on behalf of the same claimant.

J.      **Objection to Future and/or Amended Disclosure Statements**

57.    Lujan Claimants object to any future and/or amended disclosure statement by

Debtors that fails to resolve the objections raised in this objection.

K.      **Joinder to the Objection to the Disclosure Statement by the Tort Claimants'
Committee**

58.    Lujan Claimants join the objection to the Disclosure Statement filed by the Tort

Claimants' Committee.

Dated: May 6, 2021.                          Respectfully submitted,

 /s/ Christopher D. Loizides (No. 3968)
Loizides, PA
1225 North King Street, Suite 800
Wilmington, DE 19801
Phone: 302.654.0248
Email: Loizides@loizides.com

and

LUJAN & WOLFF LLP

 /s/ Delia Lujan Wolff
Delia Lujan Wolff (motion for admission pro
hac vice pending)
Suite 300, DNA Bldg.
238 Archbishop Flores St.
Hagatna, Guam 96910

20

Phone: (671) 477-8064/5
Facsimile: (671) 477-5297
Email:  dslwolff@lawguam.com

*Attorneys for Lujan Claimants*