## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>**Hearing Date: May 19, 2021 at 10:00 a.m. (ET)**<br><br>**Re: D.I. 2295 & 2726** |

**OBJECTION OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, A UTAH CORPORATION SOLE, TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE DISCLOSURE STATEMENT AND THE FORM AND MANNER OF NOTICE, (II) APPROVING PLAN SOLICITATION AND VOTING PROCEDURES, (III) APPROVING FORMS OF BALLOTS, (IV) APPROVING FORM, MANNER, AND SCOPE OF CONFIRMATION NOTICES, (V) ESTABLISHING CERTAIN DEADLINES IN CONNECTION WITH APPROVAL OF THE DISCLOSURE STATEMENT AND CONFIRMATION OF THE PLAN, AND (VI) GRANTING RELATED RELIEF**

---

[1] The Debtors ("**Debtors**" or "**BSA**") in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300); and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................4

OBJECTION................................................................................................................5

    I.     The Plan Is Patently Unconfirmable .......................................................5

           A.     The Plan Is Patently Unconfirmable Because It Would Impermissibly Modify the Property Rights of Non-Debtor Insureds under BSA's Insurance Policies........................................6

                   i.     The Debtors Cannot Dispense with Rights of Non-Debtor Insureds under the Plan or Otherwise .............................................6

                  ii.     The Church Is an Insured .................................................9

           B.     The Plan Is Patently Unconfirmable Because the Debtors Cannot Demonstrate that the Plan Satisfies the Best Interest Test........................11

           C.     The Plan Is Patently Unconfirmable Because It Fails to Provide Basic Information Regarding the Treatment of Indirect Abuse Claims and May Eradicate BSA's Indemnity Obligations ........................12

    II.    The Disclosure Statement Fails to Provide Adequate Information as Required by Section 1125 of the Bankruptcy Code................................................16

           A.     The Disclosure Statement's Description of the Church's Indemnity Rights Is Inadequate..................................................................16

           B.     The Disclosure Statement Fails to Provide Adequate Information to Demonstrate that the Plan Satisfies the Best Interest Test....................17

           C.     The Disclosure Statement Fails to Provide Adequate Information Regarding the Church's Rights Under the BSA's and Local Councils' Insurance Policies....................................................17

RESERVATION OF RIGHTS ......................................................................................19

CONCLUSION............................................................................................................20

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*In re Am. Capital Equip., LLC,*
  688 F.3d 145 (3d Cir. 2012)..................................................................................5

*In re Archdiocese of St. Paul and Minneapolis,*
  579 B.R. 188 (Bankr. D. Minn. 2017) ...............................................................7, 15

*In re Boy Scouts of Am. and Del. BSA, LLC,*
  No. 20-10343 (LSS) (Bankr. D. Del. Feb. 18, 2020)..................................................9

*In re Burns & Roe Enters.,*
  No. 00-41610RG, 2005 Bankr. LEXIS 3173 (Bankr. D.N.J. Feb. 17, 2005).......................7, 8

*In re Caribbean Petroleum Corp.,*
  566 F. App'x 169 (3d Cir. 2014) ........................................................................14

*In re Dakota Rail, Inc.,*
  104 B.R. 138 (Bankr. D. Minn. 1989) ..................................................................5

*In re Drexel Burnham Lambert Grp. Inc.,*
  148 B.R. 982 (Bankr. S.D.N.Y. 1992)..................................................................14

*In re Flintkote Co.,*
  No. 04-11300 (JKF) (Bankr. D. Del. Nov. 26, 2007) ..............................................8

*In re Forty-Eight Insulations, Inc.,*
  133 B.R. 976 (Bankr. N.D. Ill. 1991) ..................................................................7

*In re Hercules Offshore, Inc.,*
  565 B.R. 732 (Bankr. D. Del. 2016) ..................................................................11

*Mission Prod. Holdings, Inc. v. Tempnology, LLC,*
  139 S. Ct. 1652 (2019)....................................................................................6

*Oneida Motor Freight, Inc. v. United Jersey Bank* (*In re Oneida Motor Freight, Inc.*),
  848 F.2d 414 (3d Cir. 1988)..............................................................................16

*In re Pettibone Corp.,*
  110 B.R. 837 (Bankr. N.D. Ill. 1990) ..................................................................14

*In re Porter Hayden Co.,*
  No. 02-54152, 2006 WL 4667137 (Bankr. D. Md. June 30, 2006).................................13

*In re Quigley Co., Inc.*,
    437 B.R. 102 (Bankr. S.D.N.Y. 2010).................................................................12

*In re Scioto Valley Mortg. Co.*,
    88 B.R. 168 (Bankr. S.D. Ohio 1988)...............................................................16

*In re SoyNut Butter Co.*,
    No. 17 B 14970, 2018 WL 3689549 (Bankr. N.D. Ill. Aug. 1, 2018).....................7

*In re SportStuff, Inc.*,
    430 B.R. 170 (B.A.P. 8th Cir. 2010)....................................................................7

*In re W.R. Grace & Co.*,
    No. 01-01139 (JKF) (Bankr. D. Del. April 22, 2010) .........................................13

## STATUTES

11 U.S.C.
    § 502(e)............................................................................................12, 13, 14, 15
    § 502(e)(1)(B)...............................................................................................13, 14
    § 502(e)(2).........................................................................................................14
    § 502(j)........................................................................................................14, 15
    § 1125(a)(1).................................................................................................5, 16
    § 1129(a)(7)...............................................................................................11, 12
    § 1129(a)(7)(A)..................................................................................................11

## RULES

Fed R. Bankr. P. 7001(2) ....................................................................................8

The Church of Jesus Christ of Latter-day Saints, a Utah corporation sole (the "**Church**") objects (the "**Objection**") to the *Debtors' Motion For Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief* [D.I. 2295, 2726] (the "**Motion**") and the *Disclosure Statement for the Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 2594] (the "**Disclosure Statement**").[2]  In support of its Objection, the Church hereby asserts the following:

## PRELIMINARY STATEMENT

1.     The Debtors' proposed Plan is patently unconfirmable because, among other things, it violates the basic property rights of the Church and other chartered organizations—by attempting to confiscate the Church's and other chartered organizations' rights to insurance proceeds—without their consent.  Even though chartered organizations are insureds under insurance policies procured by the Debtors and Local Councils, the Plan attempts to seize all of the proceeds from those insurance policies, and enjoin all other insureds from enforcing their property rights to the proceeds, while making no effort to provide the Church or other insured parties with *any* rights to insurance proceeds.  Unless the Plan is modified to preserve the property rights of the Church and other insureds (as adjudicated through an adversary proceeding, including potential appeals), the Plan is patently unconfirmable, and it would be futile to approve the Disclosure Statement.

---

[2]    All terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Disclosure Statement or the *Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 2592] (the "**Plan**").

2.      The Disclosure Statement also fails to provide adequate disclosures required by Section 1125 of the Bankruptcy Code.  The Disclosure Statement does not provide adequate information regarding the Church's and other chartered organizations' rights to insurance proceeds and indemnification and does not provide sufficient detail to determine whether the Plan satisfies the best interest test.

3.      Accordingly, the Motion to approve the Disclosure Statement should be denied.

## OBJECTION

### I.      The Plan Is Patently Unconfirmable

4.      Bankruptcy courts have "an obligation not to subject the estate to the expense of soliciting votes and seeking confirmation of [a] plan" where the disclosure statement "on its face relates to a plan that cannot be confirmed." *In re Dakota Rail, Inc*., 104 B.R. 138, 143 (Bankr. D. Minn. 1989).  The Third Circuit has held "that a bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable." *In re Am. Cap. Equip*., LLC, 688 F.3d 145, 154-55 (3d Cir. 2012) (describing a plan as unconfirmable if, among other potential factors, it is forbidden by law, not feasible, or has not been proposed in good faith).

5.      The Disclosure Statement describes a Plan that is patently unconfirmable for three separate and independent reasons.  *First*, the Plan seeks to impermissibly appropriate the rights of non-debtor insured parties under the BSA and Local Councils' insurance policies without the Church's or other insureds' consent or an adversary proceeding.  *Second*, the Plan cannot satisfy the best interest test as to creditors—such as the Church—who would be better situated in a liquidation scenario where the rights of non-debtor insureds under the BSA and Local Council insurance policies would be fully preserved.  *Finally*, the Plan is patently unconfirmable because

5

it may extinguish the BSA's indemnity obligations through the operation of vague and indeterminate trust distribution procedures.

6.      The collective impact of these terms of the Plan amounts to a brazen attempt to eradicate any ability for the Church and other chartered organizations to collect on their insurance rights and allowable claims against the estates.  Indeed, the Disclosure Statement lays bare the Debtors' view that the amount of "Indirect Abuse Claims" (*i.e.*, claims for indemnity or contribution by the Church and other chartered organizations, whether or not they join in a settlement under the Global Resolution Plan as Protected Parties) should be, incredibly, *zero*.  *See* Disclosure Statement, Art. II.C.8 (emphasis added).

### A.      The Plan Is Patently Unconfirmable Because It Would Impermissibly Modify the Property Rights of Non-Debtor Insureds under BSA's Insurance Policies

#### i.      The Debtors Cannot Dispense with Rights of Non-Debtor Insureds under the Plan or Otherwise

7.      The Plan provides for the wholesale assignment of the BSA's and Local Councils' insurance policies to the Settlement Trust, without any regard to the rights of non-debtor insureds under those policies, and then seeks to have this Court enjoin such insureds from accessing those policies.  *See* Plan, Art. I.124 ("Insurance Assignment"), X.H ("Insurance Entity Injunction").  In other words, the Insurance Assignment and Insurance Entity Injunction are a blatant attempt to divest the equal and independent rights of non-debtor insured parties under the BSA's and Local Councils' insurance policies.

8.      A bankruptcy court does not have jurisdiction over property rights outside of the estate, and accordingly, it does not have jurisdiction over a non-debtors' rights to insurance proceeds.  It is well-established that filing for bankruptcy does not give a debtor greater property rights than it would have had outside of bankruptcy.  *See Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663 (2019) ("The estate cannot possess anything more than

the debtor itself did outside bankruptcy.").  In relation to insurance, where there are multiple insured parties under a policy, "the bankruptcy estate owns only the debtor's interest, not the co-insured's interest." *In re Archdiocese of St. Paul and Minneapolis*, 579 B.R. 188, 202 (Bankr. D. Minn. 2017); *see also In re SportStuff, Inc.*, 430 B.R. 170, 178 n.15 (B.A.P. 8th Cir. 2010) (court citing authority that "[w]hile the bankruptcy court may exercise jurisdiction over (a liability insurance) policy, the interests of the co-insured, a nondebtor, are not property of the estate.  To hold otherwise would allow the court to impair a third party's contract and property rights.") (internal citation omitted).  Thus, the bankruptcy court only has jurisdiction over the Debtors' rights to insurance proceeds.

9.    In turn, a debtor cannot settle its rights under an insurance policy, and consequently settle the "equal and independent" rights of non-debtor insureds, without the consent of each party. *See In re SoyNut Butter Co*., No. 17 B 14970, 2018 WL 3689549, at *4 (Bankr. N.D. Ill. Aug. 1, 2018) (rejecting settlement that would have released rights of non-debtor insured downstream vendors who were "afford[ed] equal and independent rights to seek indemnification and defense" under the policy).  Indeed, courts have denied insurance buyout agreements in bankruptcy based on the objection of non-debtor insureds where the buyout agreement purported to cut off or relieve the insurers' obligations to the non-debtor insured under the policies.  *See, e.g.*, *In re Forty-Eight Insulations, Inc.*, 133 B.R. 973, 976 (Bankr. N.D. Ill. 1991) (concluding that non-debtor insured "has a contract with the insurers that allows it to make claims directly" and rejecting settlement in asbestos bankruptcy that would "extinguish[]" those rights); *In re Burns & Roe Enters.*, No. 00-41610RG, 2005 Bankr. LEXIS 3173, at *17 (Bankr. D.N.J. Feb. 17, 2005) (approving policy buyback between insured and insurer where rights of other non-settling insureds were expressly preserved).  Accordingly, any settlement or sale of coverage under the Debtors' or Local Councils'

policies in which the Church has an interest must expressly preserve the Church's right to the policies or to the settlement or sale proceeds thereof. *See, e.g.*, *In re Flintkote Co.,* No. 04-11300 (JKF) (Bankr. D. Del. Nov. 26, 2007) [D.I. 2845] (policy buyback between insured and insurer expressly preserved right of non-debtor insured to assert claim to the settlement proceeds); *Burns & Roe Enters*., 2005 Bankr. LEXIS 3173 at \*8 (finding that to the extent any person has an interest in the settled policies, such interest will attach to the proceeds of the sale).

10.      Moreover, the Church's right to any settlement or sale proceeds from the BSA policies may only be determined through an adversary proceeding.  *See* Fed. R. of Bank. P. 7001(2) (requiring an adversary proceeding "to determine the validity, priority, or extent of a lien or ***other interest in property***") (emphasis added).  To the extent the insurers and BSA settle or sell the BSA policies without the Church's consent and without a final and non-appealable judgment obtained through an adversary proceeding, the Church would continue to have property rights in coverage from either (1) the insurers under the BSA policies or (2) the proceeds of any settlement or sale, including any such proceeds held in a trust created under a chapter 11 plan.  Either scenario would significantly deplete the value of a settlement or sale for parties other than the Church.  Indeed, the Church will maintain its rights under the BSA policies and will require the insurers to defend and indemnify the Church.  The insurers may not settle solely BSA's claims under the BSA policies if they could face claims exposure from the Church as a non-debtor insured under those same policies.

11.      In a settlement or sale scenario, if any agreement between the BSA and insurers does not involve the Church's consent or the authority of an adversary proceeding, the Church will be entitled to its portion of the settlement or sale proceeds, wherever those proceeds may be held. The Church's rights to these proceeds will deplete the pool of assets available to holders of Direct

Abuse Claims, and distributions of those proceeds must be reserved until the Church's rights are finally adjudicated (including any appeals). The Church is prepared to litigate as fully necessary to preserve its rights to the BSA policies and/or the resulting proceeds of the policies. A value-maximizing outcome, on the other hand, is available for all parties through a plan settlement that includes the Church and other insureds.

### ii.   The Church Is an Insured

12.   There has been a long and well-documented partnership between the BSA and the Church. A review of that history demonstrates that the Church's involvement in scouting activities has always been premised upon the expectation and agreement between both parties that the Church would be protected by the BSA for any injuries or wrongdoing connected to those scouting activities. In other words, it has always been the intent of the BSA that the Church would be covered under BSA's insurance for any claims or losses the Church might face as a result of scouting activities.

13.   Indeed, the BSA's scouting activities have always been conducted through its affiliation with "chartered organizations," such as places of worship, schools, or other community groups. *See In re Boy Scouts of Am. and Del. BSA, LLC*, No. 20-10343 (LSS) (Bankr. D. Del. Feb. 18, 2020) [D.I. 16] at ¶ 19 (the "**First Day Declaration**"). The chartered organizations are the institutions that actually "deliver the Scouting program to the youth of America." First Day Declaration at ¶ 13. Because the chartered organizations are administering the day-to-day Scouting programs, the BSA naturally offers "a series of primary and excess general liability policies" to "all registered volunteer leaders, Local Councils, Chartered Organizations and units on a worldwide basis engaged in official Scouting activities." *Id.* at ¶ 103.

14.   ███████████████████████████████████████████
████████████████████████████████████████████████████████



Indeed, the BSA definitively recognized in its First Day Declaration that the Church had a "105-year relationship as a chartered organization" with the BSA.  *See* First Day Declaration at ¶ 103 n.13.  In addition, the Plan itself provides an opportunity for the Church to join in a settlement under the Plan as a "Contributing Chartered Organization," which the Debtors define as a "civic, faith-based educational or business organization . . . authorized by the BSA to operate, sponsor or otherwise support one or more Scouting units."  *See* Plan, Art. I.51 ("Chartered Organization"), I.66 ("Contributing Chartered Organizations").

15. The Church's requests for comprehensive Local Council policy information have not yet been satisfied, and the Church reserves its rights to seek discovery regarding its insurance rights and the impact that the Plan would have on those rights. The Plan suffers from the same infirmities regarding Local Council and BSA policies because the injunction would extinguish any rights to insurance proceeds from these policies.

16.     Any dispute regarding the extent of the Church's rights to insurance policies can only be adjudicated through an adversary proceeding.  Simply put, the Plan may not dispense with

those rights based on a summary adjudication in connection with the confirmation hearings or otherwise.

> ### B. The Plan Is Patently Unconfirmable Because the Debtors Cannot Demonstrate that the Plan Satisfies the Best Interest Test

17.    Section 1129(a)(7) of the Bankruptcy Code provides that a bankruptcy court may not confirm a plan unless each holder of an allowed claim or interest in an impaired class either (a) accepts the plan, or (b) will receive or retain property on account of such claim or interest of a value that is not less than the amount that such holder would receive ***or retain***, as of the effective date of the plan, if the debtor were liquidated under chapter 7 of the Bankruptcy Code. *See* 11 U.S.C. § 1129(a)(7)(A) (emphasis added); *In re Hercules Offshore, Inc.*, 565 B.R. 732, 765 (Bankr. D. Del. 2016) (restating the requirements of Section 1129(a)(7)(A)).

18.    The Plan, in its current form, seeks to extinguish the Church's rights under the BSA and Local Council insurance policies in the context of a Global Resolution Plan, which applies the Insurance Entity Injunction and would enjoin the Church from collecting policy proceeds from any Insurance Entity (whether or not it is a settling party). *See* Plan, Art. X.H ("Insurance Entity Injunction"). Furthermore, the entirety of the Church's rights to insurance policies would be assigned to the Settlement Trust, without any carve out to preserve the claims of any non-debtor insureds with respect to Abuse Claims. However, in a hypothetical chapter 7 liquidation, the Insurance Entity Injunction would not apply, and the Church and other insureds would be free to pursue their valuable insurance rights. The Debtors' liquidation analysis excludes "recoveries on BSA's insurance policies" on the basis that "BSA's Insurance Policies are subject to the rights of co-insured, non-debtors" and "obtaining recoveries would likely require significant litigation." *See* Disclosure Statement, Art. IX.D, n.61. There is simply no basis to ignore the fact that, in the

absence of the Insurance Entity Injunction, the Church and other insured parties would retain the right to pursue their claims against the insurers.

19.     Due to the fact that the Church stands to recover greater value in a hypothetical liquidation, the Global Resolution Plan, as a threshold matter, cannot meet the best interests test. When considering approval of a disclosure statement, and whether a proposed plan meets the best interests test under Section 1129(a)(7), courts must consider not only distributions, *i.e.*, the amounts that creditors will receive, but must also consider the value of the property that each dissenting creditor will ***retain*** under the plan and in the hypothetical chapter 7. *See In re Quigley Co.*, 437 B.R. 102, 144-45 (Bankr. S.D.N.Y. 2010). Furthermore, courts have recognized that in conducting such a determination, considerations such as value of derivative claims related to rights otherwise released under a plan must be taken into account to ultimately determine if a plan is in the "best" interest of dissenting creditors. *Id.* The value the Church would retain—namely, the significant value attributable to retaining coverage and related rights under various insurance policies—in a chapter 7 liquidation is greater than what it would receive under the Plan. As a result, the Debtors cannot demonstrate that the Global Resolution Plan satisfies the best interest test with respect to holders of Indirect Abuse Claims who are non-debtor insureds.

**C.     The Plan Is Patently Unconfirmable Because It Fails to Provide Basic Information Regarding the Treatment of Indirect Abuse Claims and May Eradicate BSA's Indemnity Obligations**

20.     The Plan provides that all Indirect Abuse Claims will be assumed, processed, and paid by the Settlement Trust in accordance with the terms and procedures contained in the Settlement Trust Documents. *See* Plan, Art. III.B.9. Specifically, the Trust Distribution Procedures (the "**TDPs**") provide that Indirect Abuse Claims will be treated as presumptively valid and paid if "such Indirect Abuse Claim satisfied the requirements of the Bar Date and is not otherwise disallowed by section 502(e) of the Bankruptcy Code." *See* TDPs, § 8.1. Section 502(e)

of the Bankruptcy Code provides, among other things, that a claim for reimbursement or contribution of an entity that is co-liable with the debtor may be disallowed when such claim is contingent at the time of allowance or disallowance. *See* 11 U.S.C. § 502(e)(1)(B).

21.     Neither the Plan nor the Disclosure Statement provide ***any*** explanation as to the intended effect of this provision on holders of Indirect Abuse Claims, nor how the Settlement Trustee will construe this provision in processing and liquidating such claims. The Church has filed proofs of claim in compliance with the Bar Date Order for, among other things, indemnification and/or contribution arising from costs that may be incurred in defending scouting-related abuse claims asserted against the Church in the future, and the payment of any amount to resolve such claims. *See* Claim Nos. 1248, 12530.[3] While a portion of the Church's claims are ***presently*** contingent, it is only a matter of time before they become liquidated and non-contingent claims as the Church is forced to defend itself in the tort system (subject to the Church's rights to insurance and indemnification).

22.     The Debtors cannot maintain that Indirect Abuse Claims will be channeled to the trust if only to be "cut off" by the operation of vague and indeterminate procedures.[4] Indeed, any attempt to disallow the claims of indemnitees and co-liable parties would be extremely

---

[3]     In addition, the Church has asserted significant liquidated and non-contingent claims for reimbursement and/or contribution relating to the payment of costs to defend and resolve scouting-related abuse claims. For the avoidance of doubt, the description of the Church's claims contained in this Objection are fully qualified by the Church's actual proofs of claim. *See* Claim Nos. 1248, 12530.

[4]     Notably, in certain other cases where indirect claims are channeled to a trust under a plan of reorganization, the TDPs contain an express provision exempting indirect claims from the scope of section 502(e). Indeed, if the Debtors intend to channel indirect claims to the Settlement Trust for liquidation and payment, then they would have included a similar provision with respect to Indirect Abuse Claims. *See, e.g.*, *In re W.R. Grace & Co.*, No. 01-01139 (JKF) (Bankr. D. Del. Apr. 22, 2010) [D.I. 24657-7] (trust distribution procedures provide "[f]or the purposes of determining the validity, acceptability and enforceability of Indirect PI Trust Claims pursuant to this section, section 502(e) of the Bankruptcy Code shall not be applied to Indirect PI Trust Claims"); *In re Porter Hayden Co.*, No. 02-54152, 2006 WL 4667137, at *6 (Bankr. D. Md. June 30, 2006) (confirmation order provided "[p]ursuant to Section 502(e)(1)(B) of the Bankruptcy Code, all contingent contribution, reimbursement or subrogation Claims other than (a) Indirect Asbestos Bodily Injury Claims . . . are hereby disallowed").

problematic, as the Plan contains a separate provision that would deprive claimants of the right to seek reconsideration of disallowed claims under section 502(j).  *See* Plan, Art. VIII.H ("If the Bankruptcy Court Disallows a Claim for reimbursement or contribution pursuant to section 502(e)(1)(B) of the Bankruptcy Code . . . such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code.").  In other words, the Plan and TDPs would potentially allow the Debtors to use section 502(e) to disallow the claims of indemnitees on the basis that such claims are contingent, only to then deny claimants the ability to seek reconsideration of such claims *after* they have been liquidated.  This is perhaps why the Disclosure Statement provides that recoveries to holders of Indirect Abuse Claims is estimated at an amount of *zero dollars* under either the Global Resolution Plan or the BSA Toggle Plan.  *See* Disclosure Statement, Art. II.C.8 (emphasis added).

23.     Contrary to the proposed Plan and TDPs, courts have recognized that contingent or unliquidated claims based on contribution, reimbursement or otherwise that might initially be subject to disallowance under section 502(e)(1)(B) may become fixed, allowable, and entitled to distribution from estate assets when they mature.  *See, e.g.*, *In re Caribbean Petroleum Corp.*, 566 F. App'x 169, 175 (3d Cir. 2014) (noting that the Bankruptcy Court's order expressly provided for the right of a claimant that held "contingent claims" that were disallowed in the early stages of a trust's administration of claims under a confirmed plan "to move for reconsideration under 11 U.S.C. § 502(j), thereby preserving further procedural rights for [the claimant] should its claims become ascertainable at some point in the future"); *In re Pettibone Corp.*, 110 B.R. 837, 848 (Bankr. N.D. Ill. 1990) (court allowed late-filed contingent claims post-confirmation and held that "[a]t such time if any as such claims cease to be contingent, then Movants under § 502(e)(2) will then be deemed to have filed timely pre-petition claims for reimbursement"); *In re Drexel*

*Burnham Lambert Grp. Inc.*, 148 B.R. 982, 991 (Bankr. S.D.N.Y. 1992) (disallowing certain contingent claims while noting that claimants' rights to have disallowed claims reconsidered at a later time were expressly preserved under section 502(j)).

24.     The Court should not permit solicitation of a Plan that seeks to extinguish the rights of indirect claimants based merely on ***timing*** while also depriving claimants of any recourse after such claims have been fully liquidated and matured.   Instead, all channeled claims should be processed and paid at the time such claims are asserted against the Settlement Trust as liquidated, non-contingent claims.   The Plan and TDPs must clarify ***how*** section 502(e) will operate in the context of the post-confirmation Settlement Trust, and whether the rights of claimants to assert Indirect Abuse Claims as they become liquidated in the tort system will be preserved.   Any attempt to disallow the claims of indemnitees and co-liable parties without preserving their rights to seek recourse against the Settlement Trust or otherwise seek reconsideration of prematurely disallowed claims renders the plan patently unconfirmable.   *See Archdiocese of St. Paul*, 579 B.R. at 197 (denying confirmation of creditors' plan on the basis that it sought to prematurely disallow and discharge contingent claims for indemnification and contribution, finding that "if the tort creditors sue the parishes for the sexual abuse claims and are successful, the parishes' claims against the debtor will mature and the parishes will have the right to have their contribution claims allowed").

25.     Thus, the Court should not permit solicitation of a Plan with vague provisions requiring claimants to speculate as to how their claims will be treated—and certainly not allow solicitation on a Plan that seeks to potentially extinguish the rights of indirect claimants through backdoor procedures.

II.     **The Disclosure Statement Fails to Provide Adequate Information as Required by Section 1125 of the Bankruptcy Code**

26.     The purpose of a disclosure statement is "to inform equity holders and claimants, as fully as possible, about the probable financial results of acceptance or rejection of a particular plan." *See In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170 (Bankr. S.D. Ohio 1988).  The Third Circuit has emphasized the importance of adequate disclosure, given the reliance creditors and bankruptcy courts place on disclosure statements.  *See, e.g.*, *Oneida Motor Freight, Inc. v. United Jersey Bank* (*In re Oneida Motor Freight, Inc.*), 848 F.2d 414, 417 (3d Cir. 1988) ("[W]e cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'").  "[A]dequate information" is defined as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan."  11 U.S.C. § 1125(a)(1).  Whether a disclosure statement provides "adequate information will be determined by the facts and circumstances of each case."  *Oneida Motor Freight*, 848 F.2d at 417.

A.     **The Disclosure Statement's Description of the Church's Indemnity Rights Is Inadequate**

27.     The Disclosure Statement neglects to discuss the full extent of the BSA's contractual and state law obligations to indemnify and hold harmless the Church (and potentially other chartered organizations) for costs incurred in defending and resolving any scouting-related abuse claims that may be asserted against such organizations in the tort system.  The Church's contractual and state law claims are the product of a long and well-documented partnership between the BSA and the Church, which, as noted, has always been premised upon the expectation and agreement between both parties that the Church would be protected by the BSA for any injuries or wrongdoing connected to the Church's sponsorship of scouting activities.  Indeed, the Church

16

and other sponsoring organizations will likely have significant claims against the Settlement Trust for indemnification and/or contribution as they are forced to defend themselves for scouting-related claims in the tort system. Yet, the Disclosure Statement includes an estimate that Indirect Abuse Claims will be allowed in the amount of ***zero dollars***, despite the fact that they are likely to materially affect recoveries to holders of Direct Abuse Claims. *See* Disclosure Statement, Art. II.C.8. The Disclosure Statement should not be approved without basic information regarding the extent of indirect claims that will be assumed by the Settlement Trust, and the impact these claims could have on the availability of distributable assets to holders of Direct Abuse Claims.

**B.      The Disclosure Statement Fails to Provide Adequate Information to Demonstrate that the Plan Satisfies the Best Interest Test**

28.      The Disclosure Statement fails to disclose the risk that the Plan would not satisfy the "best interest" test with respect to holders of Indirect Abuse Claims. The Plan seeks to extinguish the valuable rights of chartered organizations as named and/or co-insureds with respect to Abuse Claims under the Debtors' insurance policies. *See* Plan, Art. X.H ("Insurance Entity Injunction"). In a chapter 7 liquidation, however, chartered organizations would retain the right to exercise their rights under the insurance policies and thus stand to recover significantly greater value than under the current Plan. Unsurprisingly, the liquidation analysis does not take into consideration the chartered organizations' rights under the insurance policies, and there is no discussion of the best interests test in Article X of the Disclosure Statement.

**C.      The Disclosure Statement Fails to Provide Adequate Information Regarding the Church's Rights Under the BSA's and Local Councils' Insurance Policies**

29.      The Disclosure Statement does not accurately reflect the terms and coverage limits of policies issued to the BSA and Local Councils, the rights to insurance coverage held by the Church (and other chartered organizations), and the proper interpretation of the "occurrence" trigger as it relates to the Church and other chartered organizations.

17

30.    The Disclosure Statement does not adequately describe the BSA insurance portfolio. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████    ███████████████████████████████████████████

███████████████    ████████████████████████████████████████

████████████████████████████████████████    ████████████████

███████████████████████████████████████████████████████

████████████████████████████████    However, Hartford Accident and Indemnity Company ("**Hartford**") has not produced its policies in full.  The Church will issue discovery to determine the full scope of coverage provided by Hartford policies and litigate this issue as necessary.

31.    ████████████████████████████████████████████████████

█████████████████████████████████████    ███████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████ The Church will issue discovery to determine the full scope of coverage provided by Hartford policies and litigate this issue as necessary.  ████████████████

████████████████████████████████████████████████

████████████████████████

32.      Finally, the Disclosure Statement states that the First Encounter Agreement ("**FEA**") governs policies issued by "several of the BSA's [] Insurance Companies[.]"  *See* Disclosure Statement, Art. VIII.F.3.  This is patently incorrect and a blatant attempt to manipulate the terms of the coverage available to the Church and other chartered organizations.  ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████  ██████████████████████████████

██████████ The BSA and Century cannot amend the terms of coverage as to other insureds for policies issued by Century, and other insurers certainly cannot unilaterally decide to "ascribe to [the FEA] and provide coverage according to [its terms]."  *Id.*  Thus, the FEA does not—and cannot—apply to the Church or other chartered organizations.

## **RESERVATION OF RIGHTS**

33.      The Church reserves all rights, claims, defenses, and remedies, including, without limitation, to supplement and amend this Objection, to raise further and other objections, to introduce evidence prior to or at any hearing regarding the Disclosure Statement in the event the Church's objections are not resolved prior to such hearing, to seek to introduce documents or other relevant information in support of the positions set forth in this Objection, and to raise any and all objections to confirmation of the Plan.

## **CONCLUSION**

34.     For the reasons stated herein, the Court should reject the Disclosure Statement for failing to provide creditors with adequate information, or in the alternative, rule that the Disclosure Statement provides for a patently unconfirmable Plan on which votes should not be solicited and, in each instance, grant such other relief as may be just and proper.

Dated: May 6, 2021
      Wilmington, Delaware

_\_\_/s/ Michael J. Merchant_____

**RICHARDS, LAYTON & FINGER, P.A.**
Michael J. Merchant (No. 3854)
One Rodney Square
920 North King Street
Wilmington, DE  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
E-mail:  merchant@rlf.com

- and -

**LATHAM & WATKINS LLP**

Jeffrey E. Bjork (admitted *pro hac vice*)
Deniz A. Irgi (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763
E-mail:  jeff.bjork@lw.com
          deniz.irgi@lw.com

- and -

Adam J. Goldberg (admitted *pro hac vice*)
Robert J. Malionek (admitted *pro hac vice*)
Madeleine C. Parish (admitted *pro hac vice*)
Benjamin A. Dozier (admitted *pro hac vice*)
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020-1401
Telephone: (212) 906-1200
E-mail: adam.goldberg@lw.com
         robert.malionek@lw.com

madeleine.parish@lw.com
benjamin.butzin-dozier@lw.com

*Counsel to The Church of Jesus Christ of Latter-day Saints, a Utah corporation sole*