**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors. | Jointly Administered |
| | **Re: D.I. 2592 and 2594** |

**PCVA CLAIMANTS' OBJECTION TO THE ADEQUACY OF DEBTORS'**
**DISCLOSURE STATEMENT IN SUPPORT OF AMENDED CHAPTER 11 PLAN OF**
**REORGANIZATION**

On April 13, 2021, the Debtors filed a Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (Dkt. No. 2592) ("the Plan"), and on April 14, 2021, the Debtors filed a Disclosure Statement for the Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC ("the Disclosure Statement") (Dkt. No. 2594).

The Claimants represented by Pfau Cochran Vertetis Amala PLLC (the "PCVA Claimants")[1] are survivors of childhood sexual abuse who each filed a Sexual Abuse Survivor Proof of Claim. As reflected in their individual proof of claim, the story of each of these survivors is unique, including how they were sexually abused, how the abuse affected them, and the circumstances that led to the abuse. As a group, their proofs of claim reflect abuse that occurred every year from the early 1940s to 2010. The sexual abuse they suffered includes fondling, masturbation, oral copulation, and anal penetration, and many of them report either physical violence or threats of physical violence on them or their loved ones. Declaration of Jason Amala in Support of PCVA Claimants' Objection to the Adequacy of the Debtors' Disclosure Statement in Support of Amended Chapter 11 Plan of Reorganization ("Amala Decl.") at ¶ 4.

---

[1] *See* attached Appendix A, which lists the Sexual Abuse Survivor Proof of Claim numbers for the PCVA Claimants.

## I.      Many PCVA Claimants Have Strong and Compelling Claims Against Non-Debtor Entities

Many of the PCVA Claimants have strong and compelling claims against non-Debtor entities, including a local council and a charter organization.  For example, approximately 236 PCVA Claimants have identified claims against a local council in California, including at least 58 claims against the Greater Los Angeles Area Council, and approximately 143 PCVA Claimants have identified claims against a local council in New York.  Similarly, approximately 88 PCVA Claimants have identified claims against the United Methodist Church, and approximately 48 PCVA Claimants have identified claims against the Church of Jesus Christ of Latter-Day Saints.  As noted below, many of these non-Debtor entities may have significant assets and their own insurance separate and apart from any insurance maintained by the Debtors.  Moreover, even without the benefit of discovery, which has been stayed due to the preliminary injunction, many of the PCVA Claimants already have strong and compelling claims against non-Debtor entities based solely on the bare amount of publicly available information.  Amala Decl., at ¶ 5.

### A.      Exemplar Claims Against Non-Debtor Entities:  Local Councils

The Debtors unquestionably failed to take reasonable steps to protect the PCVA Claimants and other children from the danger of being sexually abused, particularly given their failure to warn Scouts and their parents of that danger despite tracking abusive Scout leaders since the 1920s.  However, in many instances the liability of the Debtors is eclipsed by the liability of a local council who allowed a known or alleged sex predator to serve as a Scout leader in their jurisdiction.  Amala Decl., at ¶ 6.  The following examples are just a *small fraction* of the strong claims that some PCVA Claimants have against a local council.

**Evergreen Council / Mount Baker Council (Washington State)**

The Evergreen Council in Washington State allowed two known sexual predators to work in leadership positions at the Fire Mountain Boy Scout Camp. Amala Decl., at ¶ 7. The Scout leaders, Allen Ewalt ("Ewalt") and Charles Grewe ("Grewe"), sexually abused Claimant No. 72129 at Fire Mountain. Amala Decl., at ¶ 8. The sexual abuse occurred from approximately 1981 to 1982, when Claimant No. 72129 was just 16 to 17 years old, and included Grewe groping Claimant No. 72129's genitals and Ewalt anally penetrating him with an object. Amala Decl., Ex. 1, at 8-9.

At the time Ewalt and Grewe sexually abused Claimant No. 72129, the Fire Mountain Boy Scout Camp was owned and operated by the Evergreen Council, which is now known as the Mount Baker Council. Amala Decl., at ¶ 7. There is no question that the Evergreen Council is liable for the sexual abuse endured by Claimant No. 72129 at the Fire Mountain Boy Scout Camp because there is no question that the Evergreen Council knew that both Ewalt and Grewe were sex offenders who posed a danger to the children at Fire Mountain. Amala Decl., at ¶ 8-9.

In 1980, the Evergreen Council advocated for Ewalt's reinstatement into Scouting even though he had previously been banned from Scouting for sexually abusing multiple Scouts while he was their Scout leader. Amala Dec., Ex. 3, at 18 ("[w]e realize that the error which Mr. Ewalt made occurred in 1964 or 1965, and that many years have passed, since that time"). In fact, Ewalt even confessed to the Evergreen Council that he had sexually abused Scouts in Iowa, characterizing it as a "dumb mistake he made several years ago." *Id.* at 19. Despite knowing that Ewalt had literally molested children in Scouting, and admitted to it, the Evergreen Council allowed him to serve as the Health and Safety Officer (e.g., the camp medic) at Fire Mountain Boy Scout Camp, a position that allowed him to sexually abuse Claimant No. 72129 and many other children. *Id*. Ewalt's sexual abuse of Claimant No. 72129 included Ewalt anally penetrating Claimant No. 72129 with an object under the guise of medical treatment. Amala Decl., Ex. 1, at 9-10.

The liability of the Evergreen Council as to Grewe's abuse of Claimant No. 72129 is equally clear and compelling.  In 1979, the Camp Director at Fire Mountain Boy Scout Camp received a complaint that Grewe had sexually abused a Boy Scout at the camp.  Amala Decl., at ¶ 9.  Just two years later, in 1981, the Evergreen Council received a police report detailing allegations that Grewe had sexually abused multiple minors in a Boy Scout Troop.  *Id*.  Despite the alarming evidence that Grewe was using his position as a Scout leader to molest Boy Scouts, the Evergreen Council allowed him to continue serving as the Aquatics Director at Fire Mountain Boy Scout Camp, a position that allowed him to sexually abuse Claimant No. 72129 and many other children.  *Id*.  Grewe's sexual abuse of Claimant No. 72129 included groping of his genitals.  Amala Decl., Ex. 1, at 9.

The PCVA Claimants do not know how many other Boy Scouts have filed claims for sexual abuse at the Fire Mountain Boy Scout Camp, but at least one other PCVA Claimant was sexually abused at the camp.  Amala Decl., at ¶ 7.  In approximately 1980, Grewe used his position at the camp to sexually abuse Claimant No. 7952.  Amala Decl., Ex. 2, at 8.  Grewe's sexual abuse of Claimant No. 7952 happened after the Camp Director received a complaint that Grewe had sexually abused a Boy Scout at the camp.  Amala Decl., at ¶ 9.  The sexual abuse included Grewe fondling, masturbating, orally copulating, and anally raping Claimant No. 7952, and Grewe forcing Claimant No. 7952 to fondle, masturbate, and orally copulate him.  Amala Decl., Ex. 2, at 9.

Despite multiple complaints about Grewe, it does not appear the Evergreen Council ever took any steps to prevent him from using his position as a Scout leader to sexually abuse children.  Amala Decl., at ¶ 9.  It was not until 1987, after Grewe had been working at Fire Mountain for almost ten years, that Grewe was arrested and convicted for sexually abusing children as a result of his employment as a school bus driver.  *Id*.  As of the bankruptcy filing, PCVA had represented at least ten Boy Scouts who were sexually abused by Grewe and/or Ewalt at the Fire Mountain Boy Scout Camp.  Amala Decl., at ¶ 10.

Some of the claims of the PCVA Claimants were close to resolving their state court lawsuits when the Debtors filed for bankruptcy. Amala Decl., at ¶ 10. For example, Claimant No. 7952 was pursuing a lawsuit in Washington state court against the Debtors and the Evergreen Council. *Id*. When the Debtors filed for bankruptcy, Claimant No. 7952 had already conducted significant discovery and his case was scheduled for trial on August 3, 2020. *Id*. Claimant No. 7952 would have been ready for trial on that date because of his own discovery and because earlier abuse survivors who sued the Evergreen Council pursued discovery that established its liability for abuse by Ewalt and Grewe. *Id*. For example, those prior claimants deposed Grewe, a Scout leader who worked with Grewe, the former Camp Director of Fire Mountain Scout Camp, and other Scouts who were sexually abused by Grewe. *Id*. During those depositions, Grewe, the Scout leader who worked with Grewe, and the other Scouts who were sexually abused by Grewe all testified that Grewe's sexual abuse of Scouts had been reported to the Camp Director of Fire Mountain Scout Camp as early as 1979. Amala Decl., Ex. 4. Despite the Evergreen Council's clear liability, Claimant No. 7952 lost his trial date because the Debtors filed for bankruptcy. Amala Decl., at ¶ 10.

**Atlantic Area Council / Jersey Shore Council (New Jersey)**

The Atlantic Area Council in New Jersey, now known as the Jersey Shore Council, allowed an alleged sex offender to serve as a Scout leader despite the fact that the Debtors encouraged it not to do so. Amala Decl., at ¶ 11. The Scout leader, George J. Diegelman ("Diegelman"), then used his position as a Scout leader with the Atlantic Area Council to sexually abuse Claimant No. 25282. *Id*. The sexual abuse occurred from approximately 1992 through 1994, when Claimant No. 25282 was just 12 to 14 years old. Amala Decl., Ex. 5, at 9.

Approximately six years *prior* to when he sexually abused Claimant No. 25282, Diegelman was placed in the Debtors' Ineligible Volunteer Files ("IV Files") in response to allegations that he sexually abused youth Scout members. Amala Decl., Ex. 6, at 21. Specifically, Scouts in Diegelman's Scout Troop complained that Diegelman (1) stripped them of their clothes; (2) placed

shaving cream on their genitals; (3) rolled them in sand while they were naked; and (4) exposed his genitals to them. *Id.* After Diegelman appealed, however, the Atlantic Area Council reinstated him on a "probationary" basis. *Id.* at 25. When the Debtors disagreed with the Atlantic Area Council's decision and recommended removing Diegelman from Scouting, the Atlantic Area Council protested, arguing that a suspension will appear as a form of "double jeopardy" and "will bring a lawsuit." *Id.* at 6. (emphasis in original). The Atlantic Area Council ignored the Debtors' concerns and allowed Diegelman to remain as a Scout leader. *Id.* at 5. Diegelman used his position as a Scout leader to begin sexually abusing Claimant No. 25282 approximately six years later. Amala Decl., Ex. 5, at 9. Diegelman's sexual abuse of Claimant No. 25282 occurred at least 25 times and included Diegelman fondling and masturbating Claimant No. 25282. *Id.* at 9-10.

### Piedmont Council (North Carolina)

Like the Evergreen Council and the Atlantic Area Council, the Piedmont Council in North Carolina also allowed a known sexual abuser to serve as a Boy Scout leader. Amala Decl., at ¶ 13. In approximately 1978, the Piedmont Council received a complaint that Scout leader Marcus F. Bumgarner ("Bumgarner") had fondled multiple Scouts at a Scout Camp and threatened to break their penises. Amala Decl., Ex. 8, at 26. Rather than ban Bumgarner from Scouting, the Piedmont Council placed him "on probation" for eighteen months. *Id.* at 19. Just seven months later, during that "probation," Bumgarner used his position as a Scout leader to sexually abuse Claimant No. 35219. Amala Decl., Ex. 7, at 9. Notably, the sexual abuse against Claimant No. 35219 was nearly identical to the sexual abuse that was previously reported to the Piedmont Council – Bumgarner fondled and masturbated Claimant No. 35219 and another Boy Scout during a Scout camping trip. *Id.* at 9-10.

### Theodore Roosevelt Council / Grand Canyon Council (Arizona)

The Theodore Roosevelt Council in Arizona, now known as the Grand Canyon Council, allowed a Scout leader to remain in Scouting despite knowing that he had been charged with five

counts of child molestation in California and was supposed to be banned from Scouting. Amala Decl., Ex. 10, at 9-10. The Scout leader, Henry Falk ("Falk"), then used his position as a Scout leader with the Theodore Roosevelt Council to sexually abuse Claimant No. 4680. Amala Decl., Ex. 9, at 7. The sexual abuse occurred in approximately 1985, when Claimant No. 4680 was 13 to 14 years old, and included Falk fondling Claimant No. 4680, photographing Claimant No. 4680 naked, and forcing Claimant No. 4680 to fondle and masturbate him. *Id*. at 9-11.

In 1983, approximately two years before he sexually abused Claimant No. 4680, Falk was charged with five counts of child molestation in California. Amala Decl., Ex. 10, at 10-12. In response to the criminal charges, the Forty-Niner Council in California wrote to the Debtors and the "Western Region" of local councils, which included the Theodore Roosevelt Council, confirming that Falk would be banned from Scouting. *Id*. at 9. However, despite being banned, the Theodore Roosevelt Council allowed Falk to register as a Scout leader in its jurisdiction and to continue sexually abusing Scouts, including Claimant No. 4680. Amala Decl., at ¶ 16. After Falk was eventually arrested in 1988, a Scout Executive acknowledged the local councils' failure to ban Falk, writing "I think this is the same man we put on the file in 1983." Amala Decl., Ex. 10, at 5.

**Orange County Council (California)**

Similar to the Theodore Roosevelt Council, the Orange County Council in California also allowed a known sex offender to work closely with Scouts in its jurisdiction. Amala Decl., at ¶ 17. In approximately 1976, the Orange County Council hired Rick Turley ("Turley") as a Program Director at the Lost Valley Scout Camp. Amala Decl., at ¶ 18. However, in 1975, eighteen months before the Orange County Council hired Turley, Turley pled guilty to kidnapping a Boy Scout and was committed to Patton State Hospital as a mentally disordered sex offender. *Id*. Turley's crime was particularly notorious and widely covered by the media because in the commission of the kidnapping, Turley had hijacked a plane in an attempt to take the Scout to Canada. *Id*. Despite this, after Turley was released from Patton State Hospital, the Orange County Council brought him on as

the Program Director at its Boy Scout camp.  *Id*.  Two years later, in 1978, Turley used his position at the Lost Valley Scout Camp to sexually abuse Claimant No. 16263.  Amala Decl., Ex. 11, at 9.  The sexual abuse included Turley fondling, masturbating, and anally raping Claimant No. 16263, and forcing Claimant No. 16263 to fondle and masturbate him.  *Id*. at 9-10

**Greater New York Councils (New York)**

Finally, the Greater New York Councils in New York also allowed a known sex offender to participate in Scouting as a Scout leader.  Amala Decl., at ¶ 19.  In 1964, the Greater New York Councils was notified that its Scout leader, Ernest Morris ("Morris"), was "charged with sodomy on a 12-year-old boy."  Amala Decl., Ex. 13, at 1.  In response, the Greater New York Councils purportedly banned Morris from Scouting.  *Id*. at 8.  However, by the early 1970s, Morris was the registered Scout leader of Troop 288, which was in the jurisdiction of the Greater New York Councils.  *Id*. at 6.  ("Ernest Morris … [was] registered as a Scoutmaster of Troop 288 until March 31, 1976").  From 1973 to 1975, when Claimant No. 25289 was about 11 to 13 years old, he was a registered Scout member of Scout Troop 288 and Morris was his Scout leader.  Amala Decl., Ex. 12, at 5-7.  Morris used his position as Claimant No. 25289's Scout leader to sexually abuse him multiple times.  *Id*. at 9.  The sexual abuse included Morris fondling, masturbating, orally copulating, and anally raping Claimant No. 25289, and Morris forcing Claimant No. 25289 to fondle, masturbate, and orally copulate him.  *Id*. at 9-10.

**B.    Exemplar Claims Against Non-Debtor Entities:  Charter Organizations**

Many charter organizations also failed to take reasonable steps to protect a PCVA Claimant from being sexually abused.  As reflected below, many charter organizations received one or more complaints that a child in Scouting was being sexually abused by a Scout leader, but they failed to take any action against the abuser.  As with the local council examples described above, the following claims are just a few claims of PCVA Claimants that illustrate the liability of charter organizations.  Amala Decl., at ¶ 21.

**Church of Jesus Christ of Latter-Day Saints ("LDS Church")**

A large number of PCVA Claimants have claims against the LDS Church because it frequently ignored complaints that its Scout leaders were sexually abusing children or posed a danger to children in Scouting.  Amala Decl., at ¶ 22.

For example, in 1974, a Mormon member named Robert Gene Metcalf ("Metcalf") was arrested in California for sexually abusing a minor boy.  Five years later, in 1979, Metcalf was arrested in Arizona for anally raping a 13-year-old boy.  As a result of the 1979 conviction, Metcalf was sentenced to six years in prison and was excommunicated from the LDS Church.  After he was released from prison, however, the LDS Church allowed Metcalf to return to the Spring Valley Ward (a local unit of the LDS Church) in Mayer, Arizona, and to serve as a Scout volunteer for one of its Cub Scout Troops.  Amala Decl., at ¶ 22.

Not surprisingly, Metcalf then used his position as a Scout leader to sexually abuse Claimant No. 32543 on a Scout camping trip.  Amala Decl., Ex. 14, at 8.  The sexual abuse occurred in approximately 1987, when Claimant No. 32543 was approximately 9 years old.  *Id*.  Metcalf's sexual abuse of Claimant No. 32543 included Metcalf fondling, masturbating, orally copulating, and digitally penetrating Claimant No. 32543.  *Id*. at 8-10.

**United Methodist Church ("UMC Church")**

Like the LDS Church, many PCVA Claimants have claims against the UMC Church because it ignored complaints or warning signs that its Scout leaders posed a danger to children.  Amala Decl., at ¶ 23.

For example, in approximately 1975, the UMC Church investigated a Scout leader named Philippe Verheyen ("Verheyen") because of complaints that Verheyen "gave alcohol to some Scouts and abused them."  Amala Decl., Ex. 15, at 4.  One of the children Verheyen was sexually abusing was Claimant No. 12940.  Amala Decl., Ex. 16, at 9.  Rather than take any action against Verheyen, or at least remove him from his position as a Scout leader, the UMC Church dropped its investigation

after Verheyen threatened litigation.  Amala Decl., Ex. 15, at 4.  Undeterred, and still a Scout leader, Verheyen continued sexually abusing Claimant No. 12940 for another year.  Amala Decl., Ex. 16, at 9.  Verheyen's sexual abuse of Claimant No. 12940 included Verheyen fondling and masturbating Claimant No. 12940.  *Id*. at 9-11.  Thirteen years later, Verheyen pled guilty to sexually abusing many Scouts in the UMC Church's Scout Troop from the mid-1970s to the late 1980s.  Amala Decl., Ex. 15, at 4.

## II.    PCVA Claimants' Objections to the Debtors' Disclosure Statement

The PCVA Claimants object to the sufficiency and adequacy of the Disclosure Statement for the following reasons:

### A.    Failure to Disclose the Assets and Liabilities of Each Party Receiving a Release

The PCVA Claimants object to the adequacy of the Disclosure Statement because it fails to provide them with sufficient information to make an informed decision on whether (a) to vote to accept or reject the Plan, which proposes a release of all local councils and may propose a release of charter organizations, or (b) to raise a "Best Interest of Creditors" objection.

The Disclosure Statement does not provide any property-by-property valuation of the real or personal property that the Debtors intend to transfer to a settlement trust, or any property-by-property valuation of the real or personal property that the Debtors seek to retain.  The same is true of the Debtors' other assets, including investments.  It is imperative that the Disclosure Statement provide the liquidation value or fair market value for each such property.

The Disclosure Statement does not include in its liquidation analysis the properties of the local councils.  Under the Debtors' governance documents, a local council's property reverts to the Debtors if the local council's charter is not renewed.  In a Chapter 7 liquidation of the Debtors, the Chapter 7 trustee presumably would not renew any local council charters.  Since the properties revert to the Debtors, the liquidation analysis must include the liquidation value of all local council real and personal property.

The Disclosure Statement and the Plan fail to provide any property valuation information for a creditor, including the PCVA Claimants, to determine if each local council is making a substantial contribution that warrants a release and channeling injunction.  Any such valuation must include the liquidation or fair market value of the local council's assets, including any justification by a council for asserting that an asset is unavailable to pay its creditors (e.g., donor restricted), how many childhood sexual abuse claims implicate the local council, and how much the local council is contributing in exchange for a release of such childhood sexual abuse claims.

Based on each local council's publicly available IRS Form 990 statements, each local council has significant assets, including significant unrestricted assets.  Moreover, if a local council accounted for its real property using "book value" (e.g., the value it was worth at the time it was acquired) and not its current fair market value, its IRS Form 990 statements likely *undervalue* its total assets given the length of time most of these councils have existed and the property holdings they have acquired over that time.

The Disclosure Statement and the Plan do not provide any property valuation information of any charter organization that will be released, including any justification by a charter organization for asserting that an asset is unavailable to pay creditors (e.g., donor restricted), how many childhood sexual abuse claims implicate each charter organization, and how much each charter organization is contributing in exchange for a release of such childhood sexual abuse claims.  Like the local councils, many of the charter organizations, such as the Methodist Church, Mormon Church, and Catholic Church, have significant real property and other assets.

The PCVA Claimants cannot make an informed decision to vote to accept or reject the Plan because the Disclosure Statement does not contain any information about the number of claims against each local council or charter organization, or any estimate of the value of such claims.  To the extent that sexual abuse claims have not been filed against a local council or charter

organization, the Debtors should disclose whether they have any indemnification or contribution claims against each local council or charter organization.

The Disclosure Statement also fails to adequately explain how any contribution by non-Debtor entities, including local councils and charter organizations, will be utilized, including whether their contribution will be used to pay administrative expenses, to pay trust administrative and legal expenses, or to compensate others who do not have a claim against that entity.

The inadequacy of the Disclosure Statement is illustrated by the fact that the Debtors state in the Plan that they are "committed" to ensuring the local councils collectively contribute at least $425 million. This disclosure is illusory because there is no agreement with the local councils to contribute anything to the Plan. In this regard, the Plan is speculative at best and the Disclosure Statement does nothing to inform abuse survivors whether and when any contribution by the local councils might be realized. In addition, the Debtors fail to disclose how much each council has available to contribute, how much each council is contributing, and how the contributions of each council will be utilized, including whether the contributions of a council will be used to compensate abuse survivors who do not have a claim against that council.

Similarly, in the Disclosure Statement the Debtors do nothing more than assert that childhood sexual abuse claims will range in value from somewhere between $2.4 billion and $7.1 billion. There is no discussion on how that value is determined. The Debtors project that the recoveries on the childhood sexual abuse claims will range from 8% to 23%, and up to 100% with the inclusion of available insurance. Under the Plan, the Debtors are the only parties that have offered any consideration ($115 million) for the benefit of the childhood sexual abuse claims. Assuming the childhood sexual claims are valued at $2.4 billion, the $115 million provides a 4.8% recovery, far less than the lower amount asserted by the Debtors. With only $115 million available for sexual abuse survivors, the Disclosure Statement does not describe how recoveries will reach

8%, let alone up to 23% or 100%, when no other consideration has been committed by any other party.

This lack of basic information makes it impossible for creditors, including the PCVA Claimants, to determine whether each council is making a substantial contribution, to make an informed decision on whether to vote to accept or reject the Plan, which proposes to release each council, and to make an informed decision on whether to raise a "Best Interest of Creditors" objection because the Plan fails to award them the liquidated value of their claim against all entities they are releasing.

### B.    Failure to Disclose the Specific Entities to Be Released

The PCVA Claimants object to the adequacy of the Disclosure Statement and the accompanying solicitation procedures because they fail to notify creditors, including the PCVA Claimants, which local council and/or charter organization is associated with their abuse, whether any such entity will receive a release, and if so, the terms of the release.  If the Plan is designed to provide a release to non-Debtor third parties, such as the local councils and charter organizations, the Debtors should identify each local council and charter organization and their relationship to each of the creditors, including the PCVA Claimants.  For example, under the Global Resolution Plan in the Plan, the "Protected Parties" (e.g., those that benefit from a release and channeling injunction) should only include those non-Debtors that make a substantial contribution and receive sufficient support by claimants whose claims will be released and/or the subject of a channeling injunction.

Most of the creditors who filed a Sexual Abuse Survivor Proof of Claim form, including the PCVA Claimants, have legal claims against the Debtors, a local council, and a charter organization.  In their proof of claim forms, the PCVA Claimants made a good faith effort to identify the local council(s) and/or charter organization(s) that may be liable for the childhood sexual abuse they suffered that is the basis for their claim.  However, the PCVA Claimants were

children when they were sexually abused.  Due to the passage of time and/or the psychological effects of the abuse, many of them are unsure whether they have identified the correct entities and others were simply too young to recall the correct names today.

For the PCVA Claimants and other abuse survivors who do not know this information, the information they need is largely within the purview of the Debtors and local councils, which possess the Scouting unit rosters (e.g., Boy Scout Troop rosters and Cub Scout Pack rosters), camp rosters, and adult volunteer rosters.  In prepetition litigation, this disclosure would generally occur through discovery that is currently barred by the preliminary injunction.  Prior to the preliminary injunction, the PCVA Claimants would normally issue discovery that demanded the Debtors and/or local council(s) produce the roster(s) for the Claimant's Scouting unit and/or Scout Camp so the Claimant can find their name on the roster and confirm they have identified the correct local council(s) and charter organization(s) for their Scouting unit and/or Scout Camp.

If a Claimant's name did not appear on a roster, which may have happened as a result of human error and/or if the Claimant joined a Scouting unit in-between the annual registration process, the Claimant could review the roster to see if the Claimant recognized the names of the other children or adults on the roster.  If so, the Claimant could contact some of the other members of the Scouting unit to see if they could corroborate that the Claimant was a member of the Scouting unit and/or attended the Scout Camp.  If not, the Claimant would work with the Debtors and/or the local council(s) to determine whether the Claimant identified the wrong Scouting unit and appeared on the roster of a different Scouting unit.  In addition to rosters, the Claimant would also ask the Debtors and/or local council(s) in discovery to produce the charter for the Claimant's Scouting unit so the Claimant could confirm the correct charter organization(s) that chartered the Claimant's Scouting unit, particularly if the Debtors and local council(s) no longer had rosters for the Scouting unit.

If the Claimant was unable to obtain records that confirm the Claimant has identified the correct local council(s) and/or charter organization(s), the Claimant would ask the Debtors and/or the local council(s) for a "person most knowledgeable" deposition about the local council(s) and/or charter organization(s) who were responsible for the Claimant's Scouting unit and/or the Scout Camp the Claimant attended so that the Claimant could confirm that the Claimant has identified the correct local council(s) and/or charter organization(s) for their Scouting unit and/or Scout Camp.  If the Claimant believes they may know the correct local council(s) and/or charter organization(s), the Claimant would ask for any documents those organizations have about the Claimant's Scouting unit and the Claimant would ask the organizations for a "person most knowledgeable" deposition to confirm the Claimant identified the correct local council(s) and/or charter organization(s).

The PCVA Claimants have not been able to pursue the above discovery because the preliminary injunction prohibits the PCVA Claimants from pursuing any litigation against the Debtors, local councils, and charter organizations.  Nothing under the Plan provides a mechanism by which a Claimant can confirm the Claimant has identified the correct local council(s) and/or charter organization(s) before a release is given to those entities.

**C.      Trust Distribution Procedures**

The PCVA Claimants object to the adequacy of the Disclosure Statement because it fails to explain how their claims will be valued in the trust procedures and what ability they will have to contest the proposed valuation of their claim.

For example, the Plan identifies a number of factors to be used in valuing each claim, but neither the Plan nor the Disclosure Statement discloses how much weight will be assigned to those factors.  Given the current state of negotiations it may not be appropriate to disclose the weight afforded to each factor.  However, if such a valuation system is ultimately included in the Plan, the weight afforded to each factor must be disclosed prior to when votes are solicited for the Plan

so that claimants understand how their claim would be valued, can fairly estimate how their claim would be valued, can see how their claim would be valued when compared to other claims, and can decide whether to vote in favor or against the Plan given that valuation system.

The Plan also suggests that the value of a claim might be reduced if the claimant lacks certain information, such as the full name of the Scout leader who abused them, but neither the Plan nor the Disclosure Statement indicates whether the claimant will have an opportunity to pursue discovery so that they can supplement their claim with that missing information. As noted above, many abuse survivors may not recall the full name of the person who abused them because they were too young to recall the name, but the Debtors, the local councils, and the charter organizations likely possess evidence, such as membership rosters and the "ineligible volunteer files," that could allow abuse survivors to supplement their claim with that information.

**D.    Failure to Disclose Insurance Coverage Risks**

The PCVA Claimants object to the adequacy of the Disclosure Statement because it fails to explain the likelihood of defeating the insurers' coverage defenses or the insurance companies' ability to pay abuse claims that total billions of dollars. The Disclosure Statement barely makes a passing note that the insurers have asserted coverage defenses, and the Debtors make no effort to evaluate those risks. Beyond the coverage risks associated with the Debtors' prepetition conduct, the Debtors fail to discuss any risk associated with the proposed assignment of all of the insurance of the Debtors, the local councils, and participating charter organizations to a trust, including any risk associated with the anti-assignment clauses in such policies. If the Plan's assignment violates the anti-assignment clauses, the insurance coverage could evaporate.

**E.    Failure to Disclose How Insurance Policies Will Be Utilized**

The PCVA Claimants object to the adequacy of the Disclosure Statement because it fails to explain how the proceeds of any insurance policies assigned to the trust will be utilized. The PCVA Claimants are entitled to know how the proceeds of any policies will be utilized, including

whether the proceeds of a policy that covers a Claimant's claim is being used to pay administrative expenses, to pay trust administrative and legal expenses, or to compensate others who do not have a claim covered under the same policy.

For example, if a Claimant has a $1 million childhood sexual abuse claim against the Mormon Church, the Mormon Church presumably has sufficient assets to pay the full value of that claim. In an insurance buy-back scenario, the insurers and the insured will insist that the insured receives a release of all current and future claims against the insured, otherwise the insured would be without insurance on those claims, would still be responsible for the defense costs on those claims, and would still be at risk for a judgment on those claims. The PCVA Claimants are entitled to know whether they will be required to release all of their claims against all insureds in order to effectuate a buy back of a given policy, and if so, how the proceeds of any such buy back will be utilized. In the foregoing example, the hypothetical Claimant is entitled to know whether he will be required to release a claim worth $1,000,000 against the Mormon Church to effectuate a "buy back" of a policy that names the Mormon Church as an insured. Moreover, the hypothetical Claimant is entitled to know whether his share of the sale price of the policy could be a small fraction of the value of his claim against that defendant.

The PCVA Claimants need to know this information to determine whether each non-Debtor who is released is making a substantial contribution and whether the "best interests" test is met by that contribution.

### F.      Failure to Disclose the Contribution of Insurers and Their Insureds

The PCVA Claimants object to the adequacy of the Disclosure Statement because it fails to explain what contribution the insurers and their non-Debtor insureds will make in order to receive a release.

As noted above, almost every Claimant has a legal claim against a local council and/or a charter organization. In addition to the Debtors, a local council was responsible for all Scouting

units in its geographic region, including handling and processing complaints against Scout leaders for allegedly sexually abusing children and ensuring that each Scouting unit abided by policies and procedures to protect children from foreseeable harm.  These local councils, the "eyes and ears" of the Debtors, were often amongst the parties who neglected to protect the children in their care from foreseeable harm.

In turn, a charter organization was responsible for staffing and supervising the adult volunteers of a Scouting unit, like a Boy Scout Troop or Cub Scout Pack, and were also amongst the parties who neglected to protect the child members of a Scouting unit from foreseeable harm. The leaders of the charter organization, including the Scout leaders who the charter organization appointed to oversee its Scouting unit(s), were often amongst those to receive complaints that another Scout leader was sexually abusing children in the Scouting unit, or saw the "red flags" or warning signs that another Scout leader was sexually abusing children in the Scouting unit, but neglected to take steps to protect the children from that danger.

Many of the local councils and charter organizations face significant liability, and many have substantial assets that are available to compensate abuse survivors, including the PCVA Claimants who have a claim against them.

The PCVA Claimants object to the adequacy of the Disclosure Statement because it fails to specify what contribution the local councils and/or charter organizations will have to make to receive a release, including a contribution above and beyond their rights under insurance policies. The PCVA Claimants need to know this information to determine whether each entity who is receiving a release, including any local council or charter organization, is making a substantial contribution and whether the "Best Interests" test is met by that contribution.

### G.    No Disclosure Regarding the Proposed Hartford Settlement Agreement

The PCVA Claimants object to the adequacy of the Disclosure Statement because it fails to explain how much each Claimant may receive as a result of the Debtors' proposed settlement with Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company, and Navigators Specialty Insurance Company (collectively "Hartford"), whether each Claimant would be forced to release any of their claims in order to effectuate the settlement, including claims they have against non-Debtor entities, and whether any party, including Hartford and non-Debtor entities, would receive a channeling injunction as a result of the settlement.

The Debtors' proposed settlement with Hartford, which was attached as Exhibit A to the Second Mediators' Report that was filed on April 16, 2021 (Dkt. 2624), is for $650,000,000 and appears to require a release of all current and future claims that may exist under Hartford's policies. Based on a review of Hartford's policies, it appears that Hartford's policies cover some or all of the claims of approximately 25,000 claimants in this bankruptcy.  Pursuant to this analysis, the Debtors' proposed settlement with Hartford equates to an average of only about $26,000 per claimant if the settlement proceeds are shared by the claimants with a claim that is covered by a Hartford policy, and to an average of approximately $7,647 per claimant if the settlement proceeds are shared with 85,000 claimants.

Not only does the Disclosure Statement fail to disclose how the Debtors propose to allocate those settlement funds, but it fails to disclose how much coverage is available under each of the Hartford policies; which claimants have claims under each of the Hartford policies; the number of claims that implicate each policy; the type of claims; and, the value of the claims.  Based on the years of the Hartford policies, it appears many of the policies had per occurrence limits of $500,000 with no aggregate limit.  The Disclosure Statement fails to explain why a claimant whose claim

triggers a $500,000 insurance policy should vote in favor of a Plan that may result in them receiving an average of $7,647 from a settlement with Hartford.

The Disclosure Statement also fails to disclose the insured(s) under each of the Hartford policies, including whether the Debtors are insureds under each policy or whether the only insured under some policies is a non-Debtor entity, such as a local council.  In turn, the Disclosure Statement fails to explain whether all current and future claims against the insured(s), including non-Debtor entities, will have to be released in order to effectuate the settlement, and if so, the value of those claims and why a claimant should agree to such a release if the insured has substantial assets, including other insurance, that should be used to compensate the claimant.

## H.    The Scope of this Bankruptcy Necessitates Transparency Regarding the Handling of Insurance Policies

As it stands, the Plan would provide each Claimant an average of $6,000, or less, from the Debtors and the local councils, which they partly justify by the assignment of insurance policies. The average award could be significantly lower, if non-existent, after administrative expenses. The PCVA Claimants must have sufficient information to evaluate the risks of the Plan if the PCVA Claimants are to release multiple non-Debtor entities.  As filed, the Disclosure Statement falls far short of the Bankruptcy Code's standard for its approval.

## I.    Voting and Solicitation Procedures for Claimants with Multiple Sexual Abuse Survivor Proof of Claims

As the Court is aware, multiple Sexual Abuse Survivor Proof of Claim forms were filed on behalf of some claimants.  The PCVA Claimants object to the Disclosure Statement and to the proposed voting and solicitation procedures because they will disenfranchise the votes of survivors in the event that more than one law firm submits a ballot on behalf of the same claimant.  Instead, the Debtors' voting and solicitation procedures should require them to verify whether the law firm who submits a ballot on behalf of a claimant has the authorization to act on behalf of the claimant in those instances when it matters.  For example, verification is not necessary if multiple ballots

on behalf of the same claimant vote in the same manner. However, if the votes conflict and the outcome of the tabulation could be affected, the Debtors must verify which ballot should be counted by determining which law firm was authorized to submit the ballot. As it stands, the Debtors have failed to explain how they intend to solicit and count votes for such claimants, including how to ensure such claimants do not vote multiple times, how to determine who can vote on behalf of such claimants, and how to determine which vote to count if inconsistent votes are submitted on behalf of the same claimant.

**J.      Objection to Future and/or Amended Disclosure Statements**

The PCVA Claimants object to any future and/or amended disclosure statement by the Debtors that fails to resolve the objections raised in this objection.

**K.      Joinder to the Objection to the Disclosure Statement by the Tort Claimants' Committee**

The PCVA Claimants join the objection to the Disclosure Statement filed by the Tort Claimants' Committee.

Respectfully submitted,

**BIELLI & KLAUDER, LLC**

Dated: May 6, 2021                                    /s/ David M. Klauder
       Wilmington, Delaware                     David M. Klauder, Esquire (No. 5769)
                                                             1204 N. King Street
                                                             Wilmington, DE 19801
                                                             Phone: (302) 803-4600
                                                             Fax: (302) 397-2557
                                                             Email: dklauder@bk-legal.com


                                                             and

                                                             **PFAU COCHRAN VERTETIS AMALA PLLC**
                                                             Michael T. Pfau, Esquire
                                                             Jason P. Amala, Esquire
                                                             Vincent T. Nappo, Esquire
                                                             403 Columbia Street, Suite 500
                                                             Seattle, WA 98104
                                                             Phone: (206) 451-8260

Facsimile: (206) 623-3624
michael@pcvalaw.com
jason@pcvalaw.com
vnappo@pcvalaw.com

*Counsel to the PCVA Claimants*

# APPENDIX A

The foregoing Objection to the Adequacy of Debtors' Disclosure Statement in Support of Amended Chapter 11 Plan of Reorganization was filed by the following creditors who each filed a Sexual Abuse Survivor Proof of Claim and are represented by Pfau Cochran Vertetis Amala PLLC (the "PCVA Claimants").  The numbers below are the claim numbers for each creditor's Sexual Abuse Survivor Proof of Claim.

| | | | | | |
|---|---|---|---|---|---|
| 3412 | 10232 | 17327 | 28206 | 40176 | 53416 |
| 3468 | 10235 | 17334 | 28210 | 40177 | 53447 |
| 3470 | 10242 | 17335 | 28212 | 40188 | 53466 |
| 3480 | 10243 | 17336 | 28216 | 40392 | 53467 |
| 3508 | 10246 | 17337 | 28223 | 40410 | 53468 |
| 3514 | 10259 | 17343 | 28233 | 40412 | 53472 |
| 3516 | 10260 | 17346 | 28241 | 40428 | 53474 |
| 3518 | 10261 | 17347 | 28245 | 40448 | 53487 |
| 3548 | 10269 | 17348 | 28247 | 40467 | 53489 |
| 3550 | 10368 | 17349 | 28248 | 40480 | 53522 |
| 3552 | 10374 | 17350 | 28262 | 40481 | 53530 |
| 3556 | 10508 | 17351 | 28265 | 40496 | 53533 |
| 3626 | 10992 | 17352 | 28267 | 40498 | 53557 |
| 3628 | 10993 | 17353 | 28270 | 40521 | 53558 |
| 3630 | 11017 | 17356 | 28272 | 40526 | 53565 |
| 3632 | 11023 | 17357 | 28273 | 40529 | 53578 |
| 3634 | 11029 | 17359 | 28276 | 40532 | 53581 |
| 3636 | 11031 | 17931 | 28279 | 40545 | 56184 |
| 3637 | 11034 | 18782 | 28280 | 40577 | 56189 |
| 3638 | 11035 | 18787 | 28283 | 40590 | 56214 |
| 3640 | 11042 | 18788 | 28285 | 40591 | 56216 |
| 3642 | 11043 | 18820 | 28291 | 40592 | 56492 |
| 3644 | 11055 | 18826 | 28296 | 40599 | 56514 |
| 3646 | 11061 | 20615 | 28300 | 40606 | 56547 |
| 3648 | 11068 | 20624 | 28303 | 40610 | 56598 |
| 3652 | 11071 | 20647 | 28305 | 40617 | 56600 |
| 3654 | 11075 | 20659 | 28314 | 40621 | 56666 |
| 3656 | 11076 | 20667 | 28315 | 40622 | 56681 |
| 3658 | 11077 | 20682 | 28319 | 40624 | 56684 |
| 3663 | 11080 | 20685 | 28323 | 40631 | 56685 |
| 3665 | 11088 | 20708 | 28333 | 40632 | 56696 |
| 3669 | 11093 | 20714 | 28335 | 40634 | 56697 |
| 3675 | 11101 | 20725 | 28343 | 40636 | 56760 |
| 3677 | 11103 | 20747 | 28345 | 42259 | 56789 |
| 3681 | 11104 | 20760 | 28351 | 42311 | 56805 |

| | | | | | |
|---|---|---|---|---|---|
| 3683 | 11105 | 20768 | 29580 | 42329 | 56810 |
| 3685 | 11106 | 20770 | 29581 | 42336 | 56833 |
| 3689 | 11109 | 20779 | 29583 | 42355 | 57456 |
| 3691 | 11117 | 20781 | 29586 | 42363 | 57630 |
| 3693 | 11119 | 20782 | 29587 | 42368 | 57639 |
| 3701 | 11120 | 20784 | 29588 | 42552 | 57642 |
| 3943 | 11122 | 20790 | 29592 | 42556 | 60302 |
| 3944 | 11123 | 20812 | 29594 | 42565 | 60369 |
| 3945 | 11127 | 20825 | 29596 | 42568 | 60443 |
| 3946 | 11184 | 20839 | 29597 | 42576 | 60615 |
| 3947 | 12814 | 20850 | 29600 | 42589 | 60751 |
| 3948 | 12818 | 20863 | 29603 | 42592 | 60816 |
| 3949 | 12819 | 20872 | 29606 | 42599 | 60923 |
| 3950 | 12821 | 20876 | 29613 | 42606 | 61276 |
| 3951 | 12823 | 20879 | 31921 | 42608 | 61690 |
| 3952 | 12824 | 20882 | 31927 | 42609 | 61800 |
| 3953 | 12829 | 20892 | 31930 | 42615 | 61811 |
| 3954 | 12861 | 20916 | 31961 | 42625 | 61834 |
| 3955 | 12882 | 20939 | 31976 | 42634 | 61957 |
| 3956 | 12883 | 20940 | 31988 | 42635 | 61977 |
| 3957 | 12895 | 20968 | 32052 | 42637 | 61978 |
| 3958 | 12896 | 20973 | 32061 | 42640 | 62111 |
| 3959 | 12912 | 20980 | 32071 | 42647 | 62125 |
| 4331 | 12918 | 21002 | 32114 | 42650 | 62183 |
| 4332 | 12923 | 21010 | 32136 | 42679 | 63267 |
| 4333 | 12929 | 21018 | 32140 | 42680 | 63346 |
| 4335 | 12937 | 21039 | 32141 | 42689 | 63359 |
| 4341 | 12940 | 21046 | 32158 | 42697 | 63436 |
| 4343 | 12942 | 21053 | 32160 | 42702 | 63438 |
| 4344 | 12947 | 21056 | 32163 | 42705 | 63532 |
| 4347 | 12952 | 21149 | 32164 | 42706 | 63571 |
| 4348 | 12957 | 21161 | 32165 | 42707 | 63591 |
| 4352 | 12962 | 21174 | 32206 | 42709 | 63645 |
| 4353 | 12963 | 21202 | 32223 | 42723 | 63670 |
| 4354 | 12968 | 21212 | 32230 | 42725 | 63701 |
| 4422 | 12969 | 21227 | 32255 | 42736 | 63751 |
| 4423 | 12970 | 21272 | 32270 | 42738 | 63771 |
| 4469 | 12989 | 21279 | 32290 | 42744 | 63780 |
| 4480 | 12991 | 21287 | 32307 | 42746 | 63791 |
| 4483 | 12992 | 21311 | 32336 | 42756 | 63868 |
| 4520 | 12993 | 21316 | 32344 | 42761 | 63914 |
| 4529 | 13003 | 21324 | 32353 | 42768 | 63921 |
| 4533 | 13451 | 21344 | 32384 | 42792 | 63970 |

| | | | | | |
|---|---|---|---|---|---|
| 4538 | 14017 | 21355 | 32389 | 42796 | 64018 |
| 4545 | 14024 | 21357 | 32392 | 42817 | 64038 |
| 4547 | 14025 | 21361 | 32403 | 42819 | 64069 |
| 4554 | 14028 | 21368 | 32404 | 44476 | 64080 |
| 4558 | 14031 | 21382 | 32412 | 44511 | 64137 |
| 4680 | 14032 | 21586 | 32427 | 44512 | 64184 |
| 4684 | 14035 | 21607 | 32430 | 44518 | 64211 |
| 4687 | 14036 | 21720 | 32431 | 44550 | 64213 |
| 4688 | 14038 | 22410 | 32432 | 44573 | 64279 |
| 4689 | 14039 | 22414 | 32434 | 44610 | 64324 |
| 4690 | 14041 | 22433 | 32436 | 44614 | 65698 |
| 4691 | 14042 | 22446 | 32442 | 44654 | 65699 |
| 4692 | 15183 | 22459 | 32443 | 44700 | 65706 |
| 4693 | 15193 | 22463 | 32453 | 44730 | 65767 |
| 4694 | 15198 | 22494 | 32461 | 44844 | 65804 |
| 4698 | 15202 | 22507 | 32468 | 44857 | 65806 |
| 4699 | 15205 | 22508 | 32479 | 44873 | 65873 |
| 4700 | 15206 | 22518 | 32481 | 44884 | 66078 |
| 4702 | 15207 | 25251 | 32492 | 44914 | 70221 |
| 4706 | 15213 | 25252 | 32510 | 44946 | 70284 |
| 4707 | 15215 | 25253 | 32515 | 44998 | 70689 |
| 4710 | 15216 | 25254 | 32528 | 45006 | 70776 |
| 4712 | 15219 | 25256 | 32529 | 45044 | 70873 |
| 4715 | 15220 | 25257 | 32543 | 45058 | 70880 |
| 4716 | 15221 | 25258 | 32559 | 45064 | 71140 |
| 4723 | 15223 | 25259 | 35156 | 45082 | 71157 |
| 4724 | 15224 | 25261 | 35157 | 45087 | 71170 |
| 6363 | 15230 | 25262 | 35163 | 45088 | 71258 |
| 6365 | 15332 | 25264 | 35165 | 45092 | 71261 |
| 6366 | 15333 | 25265 | 35169 | 45095 | 71311 |
| 6367 | 15342 | 25266 | 35170 | 45103 | 71350 |
| 6368 | 15345 | 25267 | 35171 | 45109 | 71409 |
| 6369 | 15461 | 25269 | 35180 | 47687 | 71414 |
| 6370 | 15505 | 25270 | 35187 | 47729 | 71490 |
| 6376 | 15619 | 25271 | 35192 | 47745 | 71568 |
| 6380 | 15627 | 25272 | 35195 | 48013 | 71579 |
| 6381 | 15631 | 25275 | 35212 | 48028 | 71654 |
| 6382 | 15638 | 25276 | 35219 | 48035 | 71786 |
| 6383 | 15643 | 25277 | 35233 | 48057 | 71822 |
| 6384 | 15646 | 25278 | 35266 | 48059 | 71824 |
| 6394 | 15647 | 25279 | 36476 | 48060 | 71886 |
| 6397 | 15655 | 25281 | 36480 | 48087 | 71904 |
| 6398 | 15677 | 25283 | 36484 | 48089 | 71909 |

| | | | | | |
|---|---|---|---|---|---|
| 6399 | 15681 | 25284 | 36494 | 48093 | 71985 |
| 6400 | 15682 | 25285 | 36495 | 48094 | 72008 |
| 6401 | 15683 | 25286 | 36501 | 48099 | 72035 |
| 6402 | 15685 | 25287 | 36515 | 48104 | 72076 |
| 6403 | 15686 | 25288 | 36521 | 48107 | 72106 |
| 6406 | 15735 | 25289 | 38009 | 48113 | 72111 |
| 6408 | 15740 | 25290 | 38081 | 48427 | 72129 |
| 7930 | 15742 | 25291 | 38083 | 48441 | 72142 |
| 7931 | 15746 | 25292 | 38089 | 48446 | 72145 |
| 7933 | 15747 | 25293 | 38107 | 48451 | 72177 |
| 7934 | 15749 | 25294 | 38131 | 48454 | 72192 |
| 7937 | 15750 | 25295 | 38133 | 48467 | 72233 |
| 7938 | 15753 | 25296 | 38139 | 48480 | 72312 |
| 7940 | 15759 | 25297 | 38154 | 48490 | 72365 |
| 7943 | 16244 | 25298 | 38172 | 48491 | 72390 |
| 7944 | 16245 | 25300 | 38173 | 48492 | 76263 |
| 7945 | 16246 | 25304 | 38280 | 48498 | 76284 |
| 7952 | 16247 | 25305 | 38281 | 48500 | 76330 |
| 7957 | 16248 | 25306 | 38282 | 48501 | 76377 |
| 7963 | 16249 | 25307 | 38296 | 48505 | 76632 |
| 7964 | 16250 | 25308 | 38311 | 48506 | 76708 |
| 7968 | 16251 | 25309 | 38319 | 48514 | 82969 |
| 7972 | 16252 | 25311 | 38325 | 48520 | 83136 |
| 7975 | 16254 | 27884 | 38340 | 48522 | 83195 |
| 7981 | 16255 | 27914 | 38341 | 48524 | 84975 |
| 7989 | 16256 | 27954 | 38345 | 48528 | 85019 |
| 7993 | 16258 | 27955 | 38346 | 48532 | 85034 |
| 8001 | 16259 | 27963 | 38352 | 48537 | 85142 |
| 8003 | 16261 | 27972 | 38361 | 48539 | 85171 |
| 8005 | 16262 | 27974 | 38364 | 52929 | 85291 |
| 8008 | 16263 | 28003 | 38365 | 52940 | 89625 |
| 8012 | 16264 | 28007 | 38381 | 52946 | 89784 |
| 8013 | 16265 | 28065 | 38389 | 52949 | 89830 |
| 8595 | 16266 | 28070 | 38394 | 52960 | 89904 |
| 9153 | 16267 | 28071 | 38404 | 52969 | 90742 |
| 9162 | 16269 | 28078 | 38408 | 53104 | 90828 |
| 9193 | 16270 | 28080 | 38417 | 53128 | 90873 |
| 9228 | 16271 | 28083 | 38423 | 53153 | 90942 |
| 9229 | 16272 | 28089 | 38432 | 53172 | 90991 |
| 9230 | 16273 | 28091 | 38434 | 53191 | 91123 |
| 9231 | 16275 | 28093 | 38436 | 53208 | 91134 |
| 9235 | 16276 | 28098 | 38444 | 53213 | 91280 |
| 9237 | 16278 | 28099 | 38455 | 53230 | 91293 |

| | | | | | |
|---|---|---|---|---|---|
| 9240 | 16279 | 28101 | 38474 | 53287 | 91411 |
| 9272 | 17291 | 28126 | 40105 | 53303 | 91427 |
| 9276 | 17295 | 28128 | 40106 | 53315 | 91699 |
| 9278 | 17297 | 28136 | 40116 | 53328 | 91894 |
| 9324 | 17299 | 28139 | 40133 | 53337 | 92118 |
| 9331 | 17309 | 28151 | 40134 | 53360 | 92640 |
| 9361 | 17310 | 28159 | 40142 | 53374 | 93558 |
| 9363 | 17318 | 28170 | 40154 | 53389 | 93736 |
| 10227 | 17321 | 28175 | 40156 | 53392 | 93990 |
| 10231 | 17325 | 28187 | 40163 | 53412 | 104710 |