## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>Jointly Administered<br><br>**Re: D.I. 2592 and 2594** |

### OBJECTION TO THE ADEQUACY OF DEBTORS' DISCLOSURE STATEMENT IN SUPPORT OF SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION AND JOINDER OF THE OBJECTION OF THE TORT CLAIMANTS' COMMITTEE

On April 13, 2021, the Debtors filed a Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (Dkt. No. 2592) ("the Plan"), and on April 14, 2021, the Debtors filed a Disclosure Statement for the Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC ("the Disclosure Statement") (Dkt. No. 2594).  The various Abuse Claimants set out in Appendix A[1] are represented by Irwin Zalkin, Esq., Devin Storey, Esq., and Kristian Roggendorf, Esq., of the Zalkin Law Firm, P.C. ("the Zalkin Law Firm Claimants") (Dkt. 2558), and by William Kelleher, Esq., of Gordon Fournaris & Mammarella, P.A.  The Zalkin Law Firm Claimants hereby object to the sufficiency and adequacy of the Disclosure Statement, as well as the Plan itself, for the reasons set out below.

### INTRODUCTION

1.      There is a deeply wicked cynicism in the proffered Amended Plan and Amended Disclosure Statement from debtors Boy Scouts of America and Delaware BSA LLC

---

[1] See attached Appendix A, listing the Sexual Abuse Survivor Proof of Claim numbers for the Zalkin Law Firm Claimants.  Several of these claims represent a further amendment of the original filing, and where possible, the latter claim number is used.

(collectively, "BSA") .  Indeed, BSA's "disclosure" serves more to obscure than to reveal the true price to be paid by the organization for the immeasurable damage it caused to generations of American boys and girls.  BSA's submissions represent a quiet escape hatch for the organization to hide once again from public scrutiny its terrible legacy of decades of child rape and molestation, and once more abandon the scores of thousands of children—now adults—to the vagaries of fate after they have been horribly sexually violated in BSA's programs.  Were BSA's actions not so utterly callous, and the harm suffered by these claimants so terrible, this Plan and Disclosure Statement might be viewed some sort of sick joke.

2.      But as can be seen from the 84,000+ claims filed, the descriptions of the abuse therein, and near century of time covered by those claims, nothing here is even remotely humorous and BSA does not deserve any sort of easy escape from facing accountability for the harm it knowingly allowed to happen.   The BSA knew for decades that the sexual abuse of children was a colossal, pervasive, and continuous problem in scouting going back to the farthest reaches of living memory because BSA kept detailed records of the thousands of abusers, tens of thousands of victims, and .  Indeed, the Zalkin Law Firm Claimants alone were born as long ago as 1937 (Claim No. 107393) and 1939 (Claim No. 77849), all the way through the year 2000 (Claim No. 106168).  The years of abuse stretch from 1949 through 2010, accordingly, representing over *six decades* of child molestation in scouting.  When the weight of the horror inflicted on scores of thousands of children finally started to come to light in the last 25 years, BSA retreated to this court to avoid reckoning with, addressing, or fixing the disaster it created.  With the Plan and Disclosure Statement, BSA is still avoiding its responsibility.  The BSA should not be allowed to throw a fraction of its worth on the table

and scuttle away to leave its victims fighting with each other and BSA's hapless insurers over both BSA's self-created uncertainty and the pittance offered.

I.      **BSA MASSIVELY UNDERVALUES ITS WORTH AND FAILS TO DISCLOSE ITS TRUE ASSETS.**

3.      The inescapable fact of this bankruptcy is that, despite the separate incorporation of the local councils, the BSA is ultimately a unitary entity.  BSA itself controls the very continued existence of its local councils, and if BSA ceased to renew those councils' existence for any reason (including its own liquidation), BSA would own—outright—all of the councils' property.  That is not an opinion or hyperbole; that is a legal truth.

4.      Because of this legal reality, BSA cannot have it both ways.  Either it must disclose all of its local councils' assets and demand from them a binding contribution proportionate to their net assets to obtain releases for the local councils (and disclose the percentage of each councils' net worth being contributed), or BSA should not receive a channeling injunction and cram-down releases on behalf of those local councils.  The blatantly inadequate half-measures proposed by the plan and disclosure statement flatly should not be confirmed.

5.      The basis for claimants' assertion here is founded upon the organic documents of the BSA and its local councils themselves.  Beginning with the local councils, each local council must be incorporated according to the method prescribed in the Charter and Bylaws of the Boy Scouts of America ("BSA Charter and Bylaws").  *E.g.* https://filestore.scouting.org/filestore/pdf/Charter_and_Bylaws_June_2019.pdf, Exhibit 1, Declaration of Kristian Roggendorf, Esq., (hereinafter "Roggendorf Decl.") filed with this

Objection.[2]  These foundational provisions of the BSA require that the local council entities be governed by the BSA Rules:

> Local councils duly chartered by the Boy Scouts of America shall, wherever possible, become incorporated under the laws of their respective states pertaining to nonprofit corporations and pursuant to and consistent with these Bylaws and the Rules and Regulations of the Boy Scouts of America. The National Council may issue a prescribed form for local council articles of incorporation and bylaws, adoption of which shall be a condition of the  issuance or renewal of the charter.

BSA Charter and Bylaws (2019), page 17-18.  In turn, the BSA's "Rules and Regulations" require that all local council charters and bylaws contain a provision by which all property of the council, upon dissolution, shall revert to the "National Council"—i.e. debtor BSA:

> Any incorporated local council may hold title to real property in its own name provided that in the event of the dissolution of the unit or council or the revocation or lapse of its charter said trustee or trustees will, after satisfying any claims against such unit or council to which such real estate may be subject, convey said property or, if sold, pay the net proceeds of such sale to the Boy Scouts of America, which may hold or use said property or funds for the benefit of Scouting in such locality or elsewhere if there is not suitable opportunity to use said property or funds in such locality. Any incorporated local council holding title to real property in its own name must ensure that its certificate or articles of incorporation expressly provide for the conveyance of such property or the net proceeds from the sale thereof to the Boy Scouts of America in the event of the dissolution of the local council or the revocation or lapse of its charter in a manner consistent with this provision.

BSA Rules and Regulations (2020), page 9, https://www.scouting.org/wp-content/uploads/2020/10/Rules_Regulations_Sept20.pdf, Exhibit 2, Roggendorf Decl.  These Rules control the corporate governance and operation of scouting nationwide and apply to all the local councils by definition under the Bylaws.

---

[2]  Because there has been no discovery in this matter from the Debtor, and because there are only limited BSA corporate-related documents to be found online, counsel is using the best available publicly-sourced documents in this Objection.  Counsel can represent to the Court based on two decades experience in the field of litigation against the BSA, that these corporate documents have not substantively changed significantly over the decades.  *See* Roggendorf Decl., ¶¶ 3, 5.

6.      By way of example, Winnebago Council, BSA, is a local council centered in

Waterloo, Iowa, governing the northeastern part of the state.

https://www.winnebagobsa.org/about-us/.  The Winnebago Council was chosen here because

it is one of the only local councils to post its corporate governance documents online.  *See*

http://legacy.winnebagobsa.org/files/d/usr/3/bylaws%20updated%20october%202012.pdf,

Exhibit 3, Roggendorf Decl.  A brief examination of those local council bylaws uncovers

exactly the provision demanded by the Rules and Regulations:

> The [Winnebago Council] corporation may hold title to real property in its own name as long as its Articles of Incorporation expressly provide for the conveyance of such property or the net proceeds from the sale thereof to the Boy Scouts of America in the event of the dissolution of the corporation or the revocation or termination of its charter. Title to real property acquired for the corporation may also be vested in a bank or trust company in trust for the use of the corporation, where appropriate in accordance with the wishes of the donor, with a provision in the trust deed that in the event of the dissolution of the corporation or the revocation or termination of its charter, the trustee, after satisfying any claims against the corporation to which such property may be subject, will convey said property or pay the net proceeds from a sale of the property to the Boy Scouts of America, which shall hold or use said property or funds for the benefit of Scouting in the locality in which the corporation is located or elsewhere if after a reasonable period there is not suitable opportunity to use said property or funds in said locality.

Winnebago Council Bylaws, page 20-21.  This provision is significant because if BSA were to

dissolve or not renew any council charters, then all—repeat *ALL*—of every local councils'

assets and real estate would revert to the BSA across the country after payments of the local

council debt, which is contemplated to be paid by selling these properties, if necessary. *Id.*

7.      Indeed, there is nothing but BSA's unfettered discretion preventing BSA from

dissolving all of its local councils right now and claiming title to those assets without any legal

restriction, as the reverter required in the deeds does not appear from the Rules to expressly

require any particular deference to donor intent aside from a cursory nod to using said funds

"hold or use said property or funds for the benefit of Scouting in the locality in which the corporation is located"—but only if those funds might be used "locally" within a reasonable time.  The reference to "the wishes of the donor" appears to refer to holding of the assets in trust by a bank or corporate trustee, not any right of reverter to the donor for any of these local council assets (setting aside any rule against perpetuities issues).  If the local councils were all refused a new charter, there would be no scouting activities to fund in virtually any "locality," and BSA would have more than sufficient money—without dissolving *itself* at all—to cover all of its obligations to all of the abuse claimants in this bankruptcy.

8.      The proposed, non-binding, aspirational $450 million supposed by BSA to come from the local councils is not only hypothetical, it is entirely inadequate to represent a substantial portion of the totality of local council assets.  In essence, the local councils are BSA's shell corporations, and their entire assets should be disclosed and considered in the context of BSA's Plan and Disclosure Statement.  Without this knowledge, the Zalkin Law Firm Claimants and all of the claimants in this bankruptcy cannot make an intelligent, informed choice when voting, and this Court cannot determine whether these local councils are making a contribution worthy of the release they are obtaining.  The Zalkin Law Firm Claimants therefore must object to the adequacy of the Disclosure Statement because it fails to provide them with sufficient information to make an informed decision (a) to vote to accept or reject the Plan, which proposes a release of all local councils and may propose a release of charter organizations, and (b) fails to provide enough information for them to raise a "Best Interest of Creditors" objection.

## II.    THE DISCLOSURE STATEMENT WHOLLY FAILS TO ACCOUNT FOR RELATIVE CLAIM VALUES IN STATES LIKE CALIFORNIA AND NEW YORK.

9.      The difficulty with discerning legitimate settlement values in child sexual abuse cases stems from the confidentiality in which so many of these settlements are cloaked.  This is the reason for the Tort Claimant Committee's (TCC's) proposed estimation procedures. Naturally, entities with a long history of abuse and broad geographical reach such as BSA are under no such handicap because they know how much they themselves have paid for settlements, and which specific factors contribute most significantly to different valuations. Based on counsel's own experience in this area, BSA's base values proposed in the Disclosure Statement do not correspond to reasonable values in certain jurisdictions, and the factors that would bring the values closer in line with reality are not set out with enough specificity to ensure proper valuation of any of the Zalkin Law Firm Claimants' individual situations.

10.     In the first instance, the total liability mysteriously arrived at by BSA is off by nearly an order of magnitude even if one only considers the likely value of California cases, leaving the Disclosure Statement inadequate in assessing or accounting for individual claim values.   To wit, there are over 9,300 claims from California alone against BSA in this bankruptcy.  There are over 5,100 claims against BSA from New York.  Of these, the Zalkin Law Firm Claimants account for 73 of those California-based claims, and 16 of the New York claims.  Both of these states are "window" states, meaning there is no statute of limitations impediment to bringing these claims.  In other words, those claims should be valued solely on the merit of the facts of abuse and liability.  As can be seen from a number high-profile public settlements over the last two decades, BSA's Disclosure Statement fails to correspond to California and New York valuations, and likely understates values in other areas as well.

11.     The following publicly available news stories illustrate how the "base" values assigned to the BSA's point matrix for abuse (even assuming the Trust is "fully funded" at the aspirational $4.5 billion, currently slated to come from uncertain and entirely unpredictable sources) are completely out of line with abuse settlement valuations over the past two decades, particularly in California, but elsewhere across the nation as well:

- In March of 2021, the University of Southern California agreed to pay more than $1.1 billion to approximately 700 former patients of a campus gynecologist, or an average of approximately $1.2 million per survivor.

- In 2019, the Diocese of Brooklyn settled with four survivors for $27.5 million after being subjected to sexual abuse by their catechism teacher, amounting to an average of $6.875 million each.

- In 2019, the Archdiocese of Los Angeles agreed to pay a single survivor $8 million in settlement based on a priest who sexually assaulted the victim on approximately 50 occasions.

- In 2018, Michigan State University agreed to a massive $500 million settlement with more than 300 survivors (average $1.67 million each) of Dr. Larry Nassar.  Dr. Nassar was notorious for sexually abusing dozens of young female gymnasts during examinations.  Prior to the USC settlement, the MSU settlement was considered one of the largest in the history of sexual abuse lawsuits against U.S. universities.

- In 2017, Pablo Rosas Joint Unified School District paid $5 million to a single student who at age 16 had been subjected to a sexual relationship by her teacher.

- In 2016, Redlands Unified School District in Redlands, California, settled with three sexual abuse victims who were orally copulated by their teacher for $6 million, or $2

million each on average.

- Also in 2016, LA Unified School District paid an overall $88 million to settle 30 cases of sexual abuse at two schools.  The average settlement was $2.9 million per survivor.

- In 2014 and 2013, Moraga School District in California settled four cases, two for $7 million in 2014 and two for $4.65 million in 2013.

- In 2013, Lido School District in Lodi, California settled a claim with one disabled student who was sexually abused on the school bus for $4.75 million.

- In 2012, the Diocese of Stockton, California, settled a single case for $3.75 million involving a single victim of Fr. Michael Kelly.

- In 2007,  the Diocese of San Diego agreed to pay $198 million to more than 140 survivors after filing for Chapter 11 bankruptcy.  Despite being in bankruptcy, the Diocese paid on average more than $1.4 million per survivor.

- In 2007, the Diocese of Rockville Center in New York agreed to pay two survivors $11,450,000.

- In 2007, the Archdiocese of Los Angeles agreed to pay approximately 500 survivors more than $600 million, or an average of $1.3 million per survivor.

- In 2004, the Diocese of Orange, California agreed to pay approximately 90 survivors approximately $100 million, or an average of $1.1 million per survivor.

- In 1998, the Dallas Catholic Diocese agreed to pay $23,400,000 to eight survivors, which was paid in the form of a substantial contribution from the diocese and its insurer, at an average of $2.925 million per survivor.

*See* Exhibit 4, Roggendorf Decl.  Given these settlements, it is apparent that the average value of sexual abuse claims lies somewhere at least in the $1-2 million range, with more egregious

conduct averaging in the $4-6 million range, especially in more recent times.  Assuming the

16,500 claims in California and New York alone (both "window" states) adhere to such an

average, the minimum amount to cover these states alone ranges from $16 billion to $32 billion,

not counting other window states (New Jersey, North Carolina), or any discovery rule states

(Oregon, Washington, Nevada).  BSA's Disclosure Statement is entirely silent on how it squares

its numbers with this objective reality.

12.     Given the structure and oversight of the local councils by BSA, virtually all of

the Zalkin Law Firm Claimants have claims against non-Debtor entities—either a local council

individually or a local council and a charter organization.  Of the 73 Zalkin Law Firm

Claimants with California claims, a large percentage are clustered in the state's significant

population centers.  For instance, 10 have identified claims against the Orange County

Council, 8 have claims against the Greater Los Angeles Council, and 8 have identified claims

against the San Diego County Council.  These local councils have significant assets, but those

assets are not disclosed, nor is their specific contribution or their contribution exclusively to

claims such as those belonging to these particular Zalkin Law Firm Claimants.  The notion that

sponsoring organizations might potentially be covered by BSA's proposed Plan and forced

releases is even more unclear, lacking even a rough estimate of contributions by these entities.

The Zalkin Law Firm Claimants have claims and filed lawsuits against the Church of Jesus

Christ of Latter Day Saints, various dioceses and orders of the Catholic Church, various

Protestant sects, and numerous civic organizations.  There is nothing remotely concrete in

BSA's Plan or Disclosure Statement concerning these entities, their contributions, or how any

contribution would be enforced.   Thus, there is simply no way to adequately judge whether

the relief offered to any third-party entity is being obtained fairly and for adequate

consideration.

13.    Because of the nature of sexual abuse settlements, only the most public cases or

those involving public entities tend to be reported in the media, with entities such as BSA most

often being allowed to hide the amounts they pay in settlement under confidentiality clauses.[3]

Because of the secrecy of past BSA settlements, and the lack of transparency afforded by the

Disclosure Statement with respect to these past settlements by BSA, there is no way for the

Zalkin Law Firm Claimants to discern whether BSA's numbers are reasonable amounts for

settlement, particularly when they are further dependent upon the notion that BSA's

"Settlement Trust" will be fully funded from sources currently not secured.

14.    Due to the unrealistically low values proposed (on a sliding scale, no less), the

patent uncertainty of funding, and the lack of historical justification for the values presented,

BSA has with its Plan and Disclosure Statement merely attempted to extricate itself from its

well-deserved predicament at the direct expense of sexual abuse survivors.  There is no way to

square the proposed values for abuse claims with the "base" values stated in the BSA's matrix,

even assuming full funding at a fraction of the amount needed for just the California claims

alone.  All of the Zalkin Law Firm Claimants would be taking a significant loss on the value of

their claims because of BSA's refusal to secure adequate funding or properly report BSA's

entire corpus of assets.  That is not how bankruptcy is supposed to work.

---

[3]   California barred confidentiality clauses in settlements involving sexual abuse in 2019.

### III. THE DISCLOSURE STATEMENT GIVES THE GREATEST WEIGHT TO FACTORS THAT ARE IRRELEVANT AND INAPPROPRIATE TO CONSIDER AS TO INDIVIDUAL CLAIMANTS.

15.     The matrix of valuation proposed by BSA in the Plan and Disclosure Statement are inadequate because the wrongly-defined "Abuser Profile" is given the greatest weight in multiplying the (already inadequate) "base" value, rather than focusing on the number of times of abuse, what the BSA, its local council(s), or the sponsor knew about the abuser.  The claims asserted by several of the Zalkin Law Firm Claimants involve some known and serial abusers, such as Daniel Montoya[4] and Edgard Rincon,[5] but the discretionary multiplier factors for this "Abuser Profile" category leaves the Zalkin Law Firm Claimants no firm basis on which to vote due to the Disclosure Statement's improper means of determining the danger posed by serial abusers.

16.     Rather than looking objectively at whether a particular predator was known to be a danger based on prior reports or criminal convictions for sexual misconduct, BSA's Plan and Disclosure Statement base the multiplier on whether a particular perpetrator is being accused by other claimants in this proceeding alone.   Limiting such a multiplier effect to only these proceedings is deeply pernicious and absurd.  BSA had numerous predatory serial abusers, that is true.  But for BSA to require other victims to make claims against the same individual—*but only in THIS proceeding*—in order to trigger a multiplier punishes current claimants where other victims brought suit and settled previously.  *Other survivors who have already settled by definition would not be involved in this proceeding*!  Only pure happenstance determines the outcome of the most heavily-weighted factor BSA proposes. Indeed, it is truly wicked for BSA to attempt so blithely to narrow its own liability and that of

---

[4] Roggendorf Decl. Exhibit 6.
[5] Roggendorf Decl. Exhibit 7.

its local councils and the sponsoring organizations where their collective conduct was utterly indefensible.

17.    For instance, Zalkin Law Firm Claimant #47689 was a member of Troop 153 out of Nativity Catholic Church, in Torrance, California.  He was involved in scouting from approximately 1972 through 1975, between the ages of roughly 12 to 15.  In or around 1972 or 1973, Claimant #47689 was sexually molested by his scoutmaster on between 5-8 occasions. The perpetrator, Bruce Kuhn, made #47689 shower with him, and proceeded to sexually grope and masturbate the boy.  The abuse caused #47689 to hate himself, rebel against his mother, and undergo serious life difficulties.  It is a story deeply tragic but all too common in this bankruptcy.  What is uncommon here is that Bruce Kuhn was convicted of felony child molestation in 1964 but allowed—by the Greater Los Angeles Area Council and Nativity Catholic—to serve as scoutmaster despite this prior conviction.  *See* Exhibit 5, Roggendorf Decl. (Kuhn felony documentation).  This was not unheard of in the history of scouting, as a number of the IV files show a lack of removal or readmittance of adult scout leaders who had been caught or reported to be molesting scouts.  *See* Roggendorf Decl., ¶ 4.  Yet under BSA's "points" matrix, the most #47689 could possibly see in recovery is $1.3 million, and that is significantly unlikely because Bruce Kuhn is not in the IV Files that are publicly available, and it is unknown whether any other victims of Kuhn have made claims ***against the BSA in this bankruptcy***.  There are several similar examples of BSA's, the local council's, and/or the sponsoring organizations' allowing these types of individuals to serve as scout leaders in the claims submitted by the Zalkin Law Firm Claimants.  This example is highlighted alone for time and space reasons.

18.     The questions that cannot be answered from BSA's Disclosure Statement include: Should #47689 lose half of the value of his settlement despite the local council and the church placing a previously-convicted felon child molested at the head of claimant's Boy Scout troop?  Should anyone be relegated to a lesser recovery because scores of claims against his abuser might have settled in litigation prior to the bankruptcy?  Indeed, what difference does it make if an abusive scout volunteer has other victims *in this proceeding*?  It makes no difference whatsoever.  BSA's conditioning the largest value multiplier upon the whims of chance is a pointed stick in the eye to the brave and struggling abuse survivors who appear before this Court seeking justice.

## IV.     REMAINING OBJECTIONS TO BSA'S DISCLOSURE STATEMENT

The Zalkin Law Firm Claimants object to the sufficiency and adequacy of the Disclosure Statement for the following reasons:

### A.     Failure to Disclose the Assets and Liabilities of Each Party Receiving a Release

19.     The Zalkin Law Firm Claimants object to the adequacy of the Disclosure Statement because it fails to provide them with sufficient information to make an informed decision on whether (a) to vote to accept or reject the Plan, which proposes a release of all local councils and may propose a release of charter organizations, or (b) to raise a "Best Interest of Creditors" objection.

20.     The Disclosure Statement does not provide any property-by-property valuation of the real or personal property that the Debtors intend to transfer to a settlement trust, or any property-by-property valuation of the real or personal property that the Debtors seek to retain.

The same is true of the Debtors' other assets, including investments.  It is imperative that the Disclosure Statement provide the liquidation value or fair market value for each such property.

21.     The Disclosure Statement does not include in its liquidation analysis the properties of the local councils.  Under the Debtors' governance documents, a local council's property reverts to the Debtors if the local council's charter is not renewed.  In a Chapter 7 liquidation of the Debtors, the Chapter 7 trustee presumably would not renew any local council charters.  Since the properties revert to the Debtors, the liquidation analysis must include the liquidation value of all local council real and personal property.

22.     The Disclosure Statement and the Plan fail to provide any property valuation information for a creditor, including the Zalkin Law Firm Claimants, to determine if each local council is making a substantial contribution that warrants a release and channeling injunction.  Any such valuation must include the liquidation or fair market value of the local council's assets, including any justification by a council for asserting that an asset is unavailable to pay its creditors (e.g., donor restricted), how many childhood sexual abuse claims implicate the local council, and how much the local council is contributing in exchange for a release of such childhood sexual abuse claims.

23.     Based on each local council's publicly available IRS Form 990 statements, each local council has significant assets, including significant unrestricted assets.  Moreover, if a local council accounted for its real property using "book value" (e.g., the value it was worth at the time it was acquired) and not its current fair market value, its IRS Form 990 statements likely *undervalue* its total assets given the length of time most of these councils have existed and the property holdings they have acquired over that time.

24.     The Disclosure Statement and the Plan do not provide any property valuation information of any charter organization that will be released, including any justification by a charter organization for asserting that an asset is unavailable to pay creditors (e.g. donor restricted), how many childhood sexual abuse claims implicate each charter organization, and how much each charter organization is contributing in exchange for a release of such childhood sexual abuse claims.  Like the local councils, many of the charter organizations, such as the Methodist Church, Mormon Church, and Catholic Church, have significant real property and other assets.

25.     The Zalkin Law Firm Claimants cannot make an informed decision to vote to accept or reject the Plan because the Disclosure Statement does not contain any information about the number of claims against each local council or charter organization, or any estimate of the value of such claims.  To the extent that sexual abuse claims have not been filed against a local council or charter organization, the Debtors should disclose whether they have any indemnification or contribution claims against each local council or charter organization.

26.     The Disclosure Statement also fails to adequately explain how any contribution by non-Debtor entities, including local councils and charter organizations, will be utilized, including whether their contribution will be used to pay administrative expenses, to pay trust administrative and legal expenses, or to compensate others who do not have a claim against that entity.

27.     The inadequacy of the Disclosure Statement is illustrated by the fact that the Debtors state in the Plan that they are "committed" to ensuring the local councils collectively contribute at least $450 million.  This disclosure is illusory because there is no agreement with the local councils to contribute anything to the Plan.  In this regard, the Plan is speculative at

best and the Disclosure Statement does nothing to inform abuse survivors whether and when any contribution by the local councils might be realized.  In addition, the Debtors fail to disclose how much each council has available to contribute, how much each council is contributing, and how the contributions of each council will be utilized, including whether the contributions of a council will be used to compensate abuse survivors who do not have a claim against that council.

28.     Similarly, the Disclosure Statement estimates that under the Global Resolution Plan somewhere between $2.4 billion and $7.1 billion will be available to compensate abuse survivors, but nowhere does the Disclosure Statement explain how the Debtors purport to generate these funds.  On the other hand, the Debtors have *only* agreed to fund $115,000,000 and have "committed to ensuring" the local councils contribute at least $425,000,000.  The Disclosure Statement fails to explain how the Debtors plan to generate an additional $1,860,000,000 to $6,560,000,000.  Even adding the $650,000,000 from the Debtors' proposed settlement with Hartford leaves the Debtors short by $1,210,000,000 from the low end of the amount they claim will be available for abuse survivors.

29.     This lack of basic information makes it impossible for creditors, including the Zalkin Law Firm Claimants, to determine whether each council is making a substantial contribution, to make an informed decision on whether to vote to accept or reject the Plan, which proposes to release each council, and to make an informed decision on whether to raise a "Best Interest of Creditors" objection because the Plan fails to award them the liquidated value of their claim against all entities they are releasing.

**B.      Failure to Disclose the Specific Entities to Be Released**

30.      The Zalkin Law Firm Claimants object to the adequacy of the Disclosure Statement and the accompanying solicitation procedures because they fail to notify creditors, including the Zalkin Law Firm Claimants, which local council and/or charter organization is associated with their abuse, whether any such entity will receive a release, and if so, the terms of the release.  If the Plan is designed to provide a release to non-Debtor third parties, such as the local councils and charter organizations, the Debtors should identify each local council and charter organization and their relationship to each of the creditors, including the Zalkin Law Firm Claimants.  For example, under the Global Resolution Plan in the Plan, the "Protected Parties" (e.g., those that benefit from a release and channeling injunction) should only include those non-Debtors that make a substantial contribution and receive sufficient support by claimants whose claims will be released and/or the subject of a channeling injunction.

31.      Most of the creditors who filed a Sexual Abuse Survivor Proof of Claim form, including the Zalkin Law Firm Claimants, have legal claims against the Debtors, a local council, and a charter organization.  In their proof of claim forms, the Zalkin Law Firm Claimants made a good faith effort to identify the local council(s) and/or charter organization(s) that may be liable for the childhood sexual abuse they suffered that is the basis for their claim.  However, the Zalkin Law Firm Claimants were children when they were sexually abused.  Due to the passage of time and/or the psychological effects of the abuse, many of them are unsure whether they have identified the correct entities and others were simply too young to recall the correct names today.

32.      For the Zalkin Law Firm Claimants and other abuse survivors who do not know this information, the information they need is largely within the purview of the Debtors and

local councils, which possess the Scouting unit rosters (e.g., Boy Scout Troop rosters and Cub Scout Pack rosters), camp rosters, and adult volunteer rosters.  In prepetition litigation, this disclosure would generally occur through discovery that is currently barred by the preliminary injunction.  Prior to the preliminary injunction, the Zalkin Law Firm Claimants would normally issue discovery that demanded the Debtors and/or local council(s) produce the roster(s) for the Claimant's Scouting unit and/or Scout Camp so the Claimant can find their name on the roster and confirm they have identified the correct local council(s) and charter organization(s) for their Scouting unit and/or Scout Camp.

33.    If a Claimant's name did not appear on a roster, which may have happened as a result of human error and/or if the Claimant joined a Scouting unit in-between the annual registration process, the Claimant could review the roster to see if the Claimant recognized the names of the other children or adults on the roster.  If so, the Claimant could contact some of the other members of the Scouting unit to see if they could corroborate that the Claimant was a member of the Scouting unit and/or attended the Scout Camp.  If not, the Claimant would work with the Debtors and/or the local council(s) to determine whether the Claimant identified the wrong Scouting unit and appeared on the roster of a different Scouting unit.  In addition to rosters, the Claimant would also ask the Debtors and/or local council(s) in discovery to produce the charter for the Claimant's Scouting unit so the Claimant could confirm the correct charter organization(s) that chartered the Claimant's Scouting unit, particularly if the Debtors and local council(s) no longer had rosters for the Scouting unit.

34.    If the Claimant was unable to obtain records that confirm the Claimant has identified the correct local council(s) and/or charter organization(s), the Claimant would ask the Debtors and/or the local council(s) for a "person most knowledgeable" deposition about the

local council(s) and/or charter organization(s) who were responsible for the Claimant's

Scouting unit and/or the Scout Camp the Claimant attended so that the Claimant could confirm

that the Claimant has identified the correct local council(s) and/or charter organization(s) for

their Scouting unit and/or Scout Camp.  If the Claimant believes they may know the correct

local council(s) and/or charter organization(s), the Claimant would ask for any documents

those organizations have about the Claimant's Scouting unit and the Claimant would ask the

organizations for a "person most knowledgeable" deposition to confirm the Claimant identified

the correct local council(s) and/or charter organization(s).

35.     The Zalkin Law Firm Claimants have not been able to pursue the above

discovery because the preliminary injunction prohibits the Zalkin Law Firm Claimants from

pursuing any litigation against the Debtors, local councils, and charter organizations.  Nothing

under the Plan provides a mechanism by which a Claimant can confirm the Claimant has

identified the correct local council(s) and/or charter organization(s) before a release is given to

those entities.

## C.     Trust Distribution Procedures

36.     The Zalkin Law Firm Claimants object to the adequacy of the Disclosure

Statement because it fails to explain how their claims will be valued in the trust procedures

and what ability they will have to contest the proposed valuation of their claim.

37.     For example, the Plan identifies a number of factors to be used in valuing each

claim, but neither the Plan nor the Disclosure Statement discloses how much weight will be

assigned to those factors.  Given the current state of negotiations it may not be appropriate to

disclose the weight afforded to each factor.  However, if such a valuation system is ultimately

included in the Plan, the weight afforded to each factor must be disclosed prior to when votes

are solicited for the Plan so that claimants understand how their claim would be valued, can fairly estimate how their claim would be valued, can see how their claim would be valued when compared to other claims, and can decide whether to vote in favor or against the Plan given that valuation system.

38.     The Plan also suggests that the value of a claim might be reduced if the claimant lacks certain information, such as the full name of the Scout leader who abused them, but neither the Plan nor the Disclosure Statement indicates whether the claimant will have an opportunity to pursue discovery so that they can supplement their claim with that missing information.  As noted above, many abuse survivors may not recall the full name of the person who abused them because they were too young to recall the name, but the Debtors, the local councils, and the charter organizations likely possess evidence, such as membership rosters and the "ineligible volunteer files," that could allow abuse survivors to supplement their claim with that information.

**D.      Failure to Disclose Insurance Coverage Risks**

39.     The Zalkin Law Firm Claimants object to the adequacy of the Disclosure Statement because it fails to explain the likelihood of defeating the insurers' coverage defenses or the insurance companies' ability to pay abuse claims that total billions of dollars.  The Disclosure Statement barely makes a passing note that the insurers have asserted coverage defenses, and the Debtors make no effort to evaluate those risks.  Beyond the coverage risks associated with the Debtors' prepetition conduct, the Debtors fail to discuss any risk associated with the proposed assignment of all of the insurance of the Debtors, the local councils, and participating charter organizations to a trust, including any risk associated with the anti-

assignment clauses in such policies.  If the Plan's assignment violates the anti-assignment

clauses, the insurance coverage could evaporate.

### E.    Failure to Disclose How Insurance Policies Will Be Utilized

40.    The Zalkin Law Firm Claimants object to the adequacy of the Disclosure

Statement because it fails to explain how the proceeds of any insurance policies assigned to

the trust will be utilized.  The Zalkin Law Firm Claimants are entitled to know how the

proceeds of any policies will be utilized, including whether the proceeds of a policy that

covers a Claimant's claim is being used to pay administrative expenses, to pay trust

administrative and legal expenses, or to compensate others who do not have a claim covered

under the same policy.

41.    For example, if a Claimant has a $1 million childhood sexual abuse claim

against the Mormon Church, the Mormon Church presumably has sufficient assets to pay the

full value of that claim.  In an insurance buy-back scenario, the insurers and the insured will

insist that the insured receives a release of all current and future claims against the insured,

otherwise the insured would be without insurance on those claims, would still be responsible

for the defense costs on those claims, and would still be at risk for a judgment on those claims.

The Zalkin Law Firm Claimants are entitled to know whether they will be required to release

all of their claims against all insureds in order to effectuate a buy back of a given policy, and if

so, how the proceeds of any such buy back will be utilized.  In the foregoing example, the

hypothetical Claimant is entitled to know whether he will be required to release a claim worth

$1,000,000 against the Mormon Church to effectuate a "buy back" of a policy that names the

Mormon Church as an insured.  Moreover, the hypothetical Claimant is entitled to know

whether his share of the sale price of the policy could be a small fraction of the value of his claim against that defendant.

42.    The Zalkin Law Firm Claimants need to know this information to determine whether each non-Debtor who is released is making a substantial contribution and whether the "best interests" test is met by that contribution.

### F.    Failure to Disclose the Contribution of Insurers and Their Insureds

43.    The Zalkin Law Firm Claimants object to the adequacy of the Disclosure Statement because it fails to explain what contribution the insurers and their non-Debtor insureds will make in order to receive a release.

44.    As noted above, almost every Claimant has a legal claim against a local council and/or a charter organization.  In addition to the Debtors, a local council was responsible for all Scouting units in its geographic region, including handling and processing complaints against Scout leaders for allegedly sexually abusing children and ensuring that each Scouting unit abided by policies and procedures to protect children from foreseeable harm.  These local councils, the "eyes and ears" of the Debtors, were often amongst the parties who neglected to protect the children in their care from foreseeable harm.

45.    In turn, a charter organization was responsible for staffing and supervising the adult volunteers of a Scouting unit, like a Boy Scout Troop or Cub Scout Pack, and were also amongst the parties who neglected to protect the child members of a Scouting unit from foreseeable harm.  The leaders of the charter organization, including the Scout leaders who the charter organization appointed to oversee its Scouting unit(s), were often amongst those to receive complaints that another Scout leader was sexually abusing children in the Scouting unit, or saw the "red flags" or warning signs that another Scout leader was sexually abusing

children in the Scouting unit, but neglected to take steps to protect the children from that danger.

46.    Many of the local councils and charter organizations face significant liability, and many have substantial assets that are available to compensate abuse survivors, including the Zalkin Law Firm Claimants who have a claim against them.

47.    The Zalkin Law Firm Claimants object to the adequacy of the Disclosure Statement because it fails to specify what contribution the local councils and/or charter organizations will have to make to receive a release, including a contribution above and beyond their rights under insurance policies.  The Zalkin Law Firm Claimants need to know this information to determine whether each entity who is receiving a release, including any local council or charter organization, is making a substantial contribution and whether the "Best Interests" test is met by that contribution.

**G.    No Disclosure Regarding the Proposed Hartford Settlement Agreement**

48.    The Zalkin Law Firm Claimants object to the adequacy of the Disclosure Statement because it fails to explain how much each Claimant may receive as a result of the Debtors' proposed settlement with Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company, and Navigators Specialty Insurance Company (collectively "Hartford"), whether each Claimant would be forced to release any of their claims in order to effectuate the settlement, including claims they have against non-Debtor entities, and whether any party, including Hartford and non-Debtor entities, would receive a channeling injunction as a result of the settlement.

49.    The Debtors' proposed settlement with Hartford, which was attached as Exhibit A to the Second Mediators' Report that was filed on April 16, 2021 (Dkt. 2624), is for

$650,000,000 and appears to require a release of all current and future claims that may exist

under Hartford's policies.  Based on a review of Hartford's policies, it appears that Hartford's

policies cover some or all of the claims of approximately 25,000 claimants in this bankruptcy.

Pursuant to this analysis, the Debtors' proposed settlement with Hartford equates to an average

of only about $26,000 per claimant if the settlement proceeds are shared by the claimants with

a claim that is covered by a Hartford policy, and to an average of approximately $7,647 per

claimant if the settlement proceeds are shared with 85,000 claimants.

50.     Not only does the Disclosure Statement fail to disclose how the Debtors

propose to allocate those settlement funds, but it fails to disclose how much coverage is

available under each of the Hartford policies; which claimants have claims under each of the

Hartford policies; the number of claims that implicate each policy; the type of claims; and, the

value of the claims.  Based on the years of the Hartford policies, it appears many of the

policies had per occurrence limits of $500,000 with no aggregate limit.  The Disclosure

Statement fails to explain why a claimant whose claim triggers a $500,000 insurance policy

should vote in favor of a Plan that may result in them receiving an average of $7,647 from a

settlement with Hartford.

51.     The Disclosure Statement also fails to disclose the insured(s) under each of the

Hartford policies, including whether the Debtors are insureds under each policy or whether the

only insured under some policies is a non-Debtor entity, such as a local council.  In turn, the

Disclosure Statement fails to explain whether all current and future claims against the

insured(s), including non-Debtor entities, will have to be released in order to effectuate the

settlement, and if so, the value of those claims and why a claimant should agree to such a

release if the insured has substantial assets, including other insurance, that should be used to compensate the claimant.

### H.     The Scope of this Bankruptcy Necessitates Transparency Regarding the Handling of Insurance Policies

52.     As it stands, the Plan would provide each Claimant an average of $6,000, or less, from the Debtors and the local councils, which they partly justify by the assignment of insurance policies.  The average award could be significantly lower, if non-existent, after administrative expenses.  The Zalkin Law Firm Claimants must have sufficient information to evaluate the risks of the Plan if the Zalkin Law Firm Claimants are to release multiple non-Debtor entities.  As filed, the Disclosure Statement falls far short of the Bankruptcy Code's standard for its approval.

### I.      Voting and Solicitation Procedures for Claimants with Multiple Sexual Abuse Survivor Proof of Claims

53.     As the Court is aware, multiple Sexual Abuse Survivor Proof of Claim forms were filed on behalf of some claimants.  The Zalkin Law Firm Claimants object to the Disclosure Statement and to the proposed voting and solicitation procedures because they will disenfranchise the votes of survivors in the event that more than one law firm submits a ballot on behalf of the same claimant.  Instead, the Debtors' voting and solicitation procedures should require them to verify whether the law firm who submits a ballot on behalf of a claimant has the authorization to act on behalf of the claimant in those instances when it matters.  For example, verification is not necessary if multiple ballots on behalf of the same claimant vote in the same manner.  However, if the votes conflict and the outcome of the tabulation could be affected, the Debtors must verify which ballot should be counted by determining which law firm was authorized to submit the ballot.  As it stands, the Debtors

have failed to explain how they intend to solicit and count votes for such claimants, including how to ensure such claimants do not vote multiple times, how to determine who can vote on behalf of such claimants, and how to determine which vote to count if inconsistent votes are submitted on behalf of the same claimant.

**J.      Objection to Future and/or Amended Disclosure Statements**

54.      The Zalkin Law Firm Claimants object to any future and/or amended disclosure statement by the Debtors that fails to resolve the objections raised in this objection.

**K.      Joinder to the Objection to the Disclosure Statement by the Tort Claimants' Committee**

55.      The Zalkin Law Firm Claimants join the objection to the Disclosure Statement filed by the Tort Claimants' Committee.

DATED: May 6, 2021            */s/ William M. Kelleher*
                             William M. Kelleher, Esq. (DE. Bar No. 3961)
                             **GORDON FOURNARIS & MAMMARELLA, P.A.**
                             1925 Lovering Avenue
                             Wilmington, DE 19806
                             Tel: 302-652-2900
                             Fax: 302-652-1142 (telefax)
                             BKelleher@gfmlaw.com

                             and

                             Irwin Zalkin, Esq. (Admitted Pro Hac Vice)
                             Devin Storey, Esq. (Admitted Pro Hac Vice)
                             Kristian Roggendorf, Esq. (Admitted Pro Hac Vice)
                             **THE ZALKIN LAW FIRM, P.C.**
                             10590 W Ocean Air Dr. #125
                             San Diego, CA 92130
                             Tel:  858-259-3011
                             Fax:  858-259-3015

# APPENDIX A

The "Zalkin Law Firm Claimants" consist of the following claimants represented by either the Zalkin Law Firm, P.C., exclusively, or by the Zalkin Law Firm, P.C., jointly with the law firm of Dumas & Vaughn, LLP, Portland, OR (joint representation indicated with "*"), or those represented jointly with the firm of Potter Hardy, LLP, of San Diego, CA (joint representation designated with a "#"). These claimants are identified by the claim number provided in their initial claim filing or the latest amended claim number on file, as appropriate:

SA37970; SA43527; SA43531; SA43537; SA44968; SA44970; SA46081; SA46090; SA47689; SA54709; SA54721; SA54807; SA58626; SA58646; SA58657; SA58674; SA58680; SA58700; SA58743; SA63163; SA63165; SA63175; SA63188; SA63190; SA63201; SA63208; SA63220; SA67605; SA67612; SA67614; SA67630; SA67633; SA67637; SA67660; SA67671; SA67687; SA77282; SA77319; SA77322; SA77364; SA77391; SA77397; SA77425; SA77438; SA77572; SA77585; SA81313; SA77619; SA77676; SA77749; SA77783; SA77789; SA77849; SA77911; SA77922; SA77927; SA78074; SA78117; SA78168; SA78190; SA78250; SA78329; SA78384; SA78390; SA78424; SA78482; SA78618; SA78622; SA84481; SA84496; SA84562; SA84965; SA88613; SA89201; SA89203; SA90197; SA90247; SA90282; SA90399; SA90468; SA90728; SA90739; SA90799; SA91547; SA93305; SA93523; SA97419; SA97420; SA97421; SA97423; SA97424; SA97426; SA97429; SA97430; SA97431; SA104530; SA104562; SA105075; SA105807; SA105822; SA105826; SA105875; SA105886; SA105891; SA105896; SA105919; SA105928; SA106168; SA106521; SA107360; SA107363; SA107390; SA107392; SA107393; SA107394; SA107396; SA107399; SA107401; SA107419; SA18072*; SA29655*; SA34531*; SA34947*; SA40260*; SA40722*; SA48079*; SA51702*; SA51733*; SA52861*; SA90485*; SA105016*; SA105017*; SA105020*; SA105022*; SA105063*; SA105809*; SA105810*; SA105811*; SA105813*; SA105814*; SA105815*; SA105816*; SA74196#; SA106523#