## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors. | Jointly Administered |
| | **Re: D.I. 2592 and 2594** |

### DECLARATION OF KRISTIAN ROGGENDORF IN SUPPORT OF
### THE ZALKIN LAW FIRM CLAIMANTS' OBJECTON TO
### THE DISCLOSURE PLAN SUBMITTED BY DEBTORS

I, Kristian Roggendorf, hereby state as follows:

1.      I am an attorney duly admitted to practice in the states of Oregon and Colorado, and am authorized to appear before this Court pro hac vice per the Court's order of April 9, 2021. I make this declaration based on my own personal knowledge, I am presenting the following facts on behalf of my clients identified in Appendix A to the Objection fled contemporaneously with this Declaration, and I am competent to testify to the facts asserted herein.

2.      I am employed at the Zalkin Law Firm, P.C. ("the Zalkin Law Firm"), 10590 W Ocean Air Dr. #125, San Diego, CA 92130.  The Zalkin Law Firm represents 144 sexual abuse claimants in the above-captioned matter.

3.      I have been representing survivors of childhood sexual abuse as a lawyer since admitted to the Oregon Bar in October of 2001.  In that capacity, I have been involved in dozens of cases against the Boy Scouts of America, representing primarily men who were sexually harmed as minors during their time in scouting with the firm of O'Donnell Clark & Crew, LLP in Portland, Oregon from 2001 to 2013.  In 2009-10, I was acting as a partner at O'Donnell Clark & Crew, then representing the plaintiffs in the case of *Jack Doe 1 v. Corporation of the*

*Presiding Bishop (and Boy Scouts of America)*, Case No. 0710-11295 (Or. Circ. Apr 23, 2010) (punitive damages verdict).  In the course of preparation of the case for trial, I completed virtually all of the substantive pretrial briefing involving the structure of the Boy Scouts, its interrelation with the local scout Councils, the nature of the relationship between the Scout entities and sponsoring organizations, the control exercised by these entities over volunteer adult scout leaders, and the BSA's decades-long knowledge of child abuse within scouting through its use of the Ineligible Volunteer Files ("Red Flag Files" or "Perversion Files" [BSA's own terms]) that tracked child molesting scout leaders.  That case resulted in a verdict of $19.9 million for one of our plaintiffs in a severed single-plaintiff trial.  During the litigation, our firm originally obtained the Ineligible Volunteer Files later ordered released by the trial court and affirmed by the Oregon Supreme Court.  *Doe v. Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints*, 352 Or. 77, 280 P.3d 377 (2012).

4.     The IV Files produced by the BSA in 2010 consisted of well over a thousand files on individual child abusers in scouting.  The records were admitted by BSA personnel to have been incomplete, as BSA had culled them over the years to remove dead people and those who had been allowed back into scouting despite having a history of sexual molestation of minors.  There were several notable examples of molesters being allowed back into scouting (or never being removed) despite and arrest and even conviction for sexual molestation, and during the *Doe 1* trial, plaintiff's counsel presented several such files to the jury in the punitive damages stage.

5.     In responding to BSA's and Defendant Cascade Pacific Council's motions for summary judgment in the months leading up to the *Doe 1* trial, I reviewed several year's versions of the Scout entities' formation documents (mostly from the 1960s through the 1980s) in detail to respond to their motions.  Based on my best recollection, those corporate formation documents

from Debtor BSA and the Cascade Pacific Council did not vary substantively, if at all, from the pertinent portions of the relevant documents set out as exhibits, below.

6.    Attached as Exhibit 1 to this Declaration is a true and correct copy of Charter and Bylaws of the Boy Scouts of America (2019), located at https://filestore.scouting.org/filestore/pdf/Charter_and_Bylaws_June_2019.pdf

7.    Attached as Exhibit 2 to this Declaration is a true and correct copy of the Rules and Regulations of the Boy Scouts of America (2020), located at https://www.scouting.org/wp-content/uploads/2020/10/Rules_Regulations_Sept20.pdf

8.    Attached as Exhibit 3 to this Declaration is a true and correct copy of the Winnebago Council, BSA, Bylaws (2012), located at http://legacy.winnebagobsa.org/files/d/usr/3/bylaws%20updated%20october%202012.pdf

9.    Attached as Exhibit 4 to this Declaration are a true and correct copies of a various media reports found on the internet at the websites listed in the headers or footers of those articles, on the date listed in the in the header or footer.

10.    Attached as Exhibit 5 to this Declaration is a true and correct copy of the court documentation related to the charging, pleas and conviction of Bruce Kuhn in 1964.

11.    Attached as Exhibit 6 to this Declaration is a true and correct copy of the BSA IV File for Daniel Montoya, a known abuser from southern California, located at https://boyscoutssexualabuse.com/wp-content/uploads/iv_files/bsa_daniel-montoya.pdf

12.    Attached as Exhibit 7 to this Declaration is a true and correct copy of the BSA IV File for Edgard Rincon, a known abuser from southern California, located at

////

////

////

https://boyscoutssexualabuse.com/wp-content/uploads/iv_files/bsa_ed-rincon.pdf

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct to the best of my knowledge, information, and belief.

DATED: May 6, 2021

Kristian Roggendorf, Esq., OSB #013990
**THE ZALKIN LAW FIRM, P.C.**
10590 W Ocean Air Dr. #125
San Diego, CA 92130
Tel:  858-259-3011
Fax:  858-259-3015

# EXHIBIT 1

# CHARTER AND BYLAWS

## OF THE
## BOY SCOUTS
## OF AMERICA



**June 2019**
**©2019 Boy Scouts of America**

# 2019 CHANGES

The Bylaws were revised in 2019 to reflect changes related to the national Executive Board and its committees (Article III). Article IV, Section 4, on honorary positions, was also significantly revised. Below is a list of articles and sections affected.

| | |
|---|---|
| **Article III, Section 4** | **Article IV, Section 2** |
| **Article III, Section 8** | **Article IV, Section 3** |
| **Article IV, Section 1** | **Article IV, Section 4** |

# CONTENTS

**CHARTER  4**

**CONGRESSIONAL REPORT IN SUPPORT OF ACT TO
INCORPORATE BOY SCOUTS OF AMERICA  6**

**BYLAWS  7**

**Article I. General  7**
SECTION 1. Name  7
SECTION 2. Purpose  7
SECTION 3. Seal; Designating Marks  7
SECTION 4. National Service Center  7
SECTION 5. Fiscal Year  7
SECTION 6. Rules and Regulations  7
SECTION 7. Priorities  7

**Article II. The National Council  8**
SECTION 1. General  8
SECTION 2. Members of the National Council  8
SECTION 3. Meetings of the National Council  8

**Article III. The Executive Board  9**
SECTION 1. Powers, Duties, and Interpretation  9
SECTION 2. Membership  9
SECTION 3. Election of Regular Members; Election, Vacancies  9
SECTION 4. Meetings  9
SECTION 5. Electronic Communications  10
SECTION 6. Telecommunication Meetings  10
SECTION 7. National Chair's Council  10
SECTION 8. Committees of the Executive Board  10

**Article IV. Volunteer Leadership, Corporate Officers,
and Honorary Positions  13**
SECTION 1. Volunteer Leadership  13
SECTION 2. Corporate Officers  13
SECTION 3. National Leadership Council and Operations Support
Committees  14
SECTION 4. Honorary Positions  14

**Article V. Regional Organization  14**
SECTION 1. Regions  14
SECTION 2. Regional Committees  15
SECTION 3. Regional Board  15
SECTION 4. Regional Executive Committee  15
SECTION 5. Regional Director  15
SECTION 6. Regional Officers  15
SECTION 7. Regional Standing Committees  16
SECTION 8. Area Committees  16
SECTION 9. Regional Advisory Council  16

**Article VI. Local Councils  16**
SECTION 1. General  16
SECTION 2. Applications  17
SECTION 3. Conditions and Termination  17
SECTION 4. Revocation or Modifications of Charters  17
SECTION 5. Responsibility of the Local Council  17
SECTION 6. Incorporation of Local Councils  17
SECTION 7. Organization and Operation  18

**Article VII. Youth Membership  18**
SECTION 1. General  18
SECTION 2. Membership, Advancement, and Achievement  18

**Article VIII. Adult Leadership  18**
SECTION 1. General  18
SECTION 2. Professional Leadership  18

**Article IX. Policies  19**
SECTION 1. Policies  19

**Article X. Program  19**
SECTION 1. Program Objectives  19

**Article XI. Business  19**
SECTION 1. Finance  19
SECTION 2. Deeds, Contracts, Bonds, etc.  20

**Article XII. Special Situations  20**
SECTION 1. Experimental Programs  20
SECTION 2. Overseas Scouting  20
SECTION 3. Learning for Life  20

**Article XIII. Indemnification  21**
SECTION 1. Indemnification  21

**Article XIV. Waivers and Amendments  21**
SECTION 1. Waivers  21
SECTION 2. Amendment of Bylaws  21

**Index  22**

# CHARTER

### Sixty-Fourth Congress of the

### United States of America

### At the First Session

### Begun and Held at the

### City of Washington

### On Monday, the Sixth Day

### of December

### One Thousand Nine Hundred

### and Fifteen

## AN ACT

**To Incorporate the
Boy Scouts of America and
for Other Purposes**

Section 1.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That Colin H. Livingstone and Ernest P. Bicknell, of Washington, District of Columbia; Benjamin L. Dulaney, of Bristol, Tennessee; Milton A. McRae, of Detroit, Michigan; David Starr Jordan, of Berkeley, California; F. L. Seely, of Asheville, North Carolina; A. Stamford White, of Chicago, Illinois; Daniel Carter Beard, of Flushing, New York; George D. Pratt, of Brooklyn, New York; Charles D. Hart, of Philadelphia, Pennsylvania; Franklin C. Hoyt, Jeremaiah W. Jenks, Charles P. Neill, Frank Presbrey, Edgar M. Robinson, Mortimer L. Schiff, and James E. West, of New York, New York; G. Barrett Rich, Junior, of Buffalo, New York; Robert Garrett, of Baltimore, Maryland; John Sherman Hoyt, of Norwalk, Connecticut; Charles C. Jackson, of Boston, Massachusetts; John H. Nicholson, of Pittsburgh, Pennsylvania; William D. Murray, of Plainfield, New Jersey; and George D. Porter, of Philadelphia, Pennsylvania, their associates and successors, are hereby created a body corporate and politic of the District of Columbia, where its domicile shall be.

Section 2.

That the name of this corporation shall be "Boy Scouts of America," and by that name it shall have perpetual succession, with power to sue and be sued in courts of law and equity within the jurisdiction of the United States; to hold such real and personal estate as shall be necessary for corporate purposes, and to receive real and personal property by gift, devise, or bequest; to adopt a seal, and the same to alter and destroy at pleasure; to have offices and conduct its business and affairs within and without the District of Columbia and in the several States and Territories of the United States; to make and adopt bylaws, rules, and regulations not inconsistent with the law of the United States of America, or any State thereof, and generally to do all such acts and things (including the establishment of regulations for the election of associates and successors) as may be necessary to carry into effect the provisions of this Act and promote the purposes of said corporation.

Section 3.

That the purpose of this corporation shall be to promote, through organization, and cooperation with other agencies, the ability of boys to do things for themselves and others, to train them in Scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred virtues, using the methods which are now in common use by Boy Scouts.

Section 4.

That said corporation may acquire, by way of gift, all the assets of the existing national organization of Boy Scouts, a corporation under the laws of the District of Columbia, and defray and provide for any debts or liabilities to the discharge of which said assets shall be applicable; but said corporation shall have no power to issue certificates of stock or to declare or pay dividends, its object and purposes being solely of a benevolent character and not for pecuniary profit to its members.

SECTION 5.

That the governing body of the said Boy Scouts of America shall consist of an executive board composed of citizens of the United States. The number, qualifications, and terms of office of members of the executive board shall be prescribed by the bylaws. The persons mentioned in the first section of this Act shall constitute the first executive board and shall serve until their successors are elected and have qualified. Vacancies in the executive board shall be filled by a majority vote of the remaining members thereof. The bylaws may prescribe the number of members of the executive board necessary to constitute a quorum of the board, which number may be less than the majority of the whole number of the board. The executive board shall have power to make and to amend the bylaws, and, by two-thirds vote of the whole board at a meeting called for this purpose, may authorize and cause to be executed mortgages and liens upon the property of the corporation. The executive board may, by resolution passed by a majority of the whole board, designate three or more of their number to constitute an executive or governing committee, of which a majority shall constitute a quorum, which committee, to the extent provided in said resolution or in the bylaws of the corporation, shall have and exercise the powers of the executive board in the management of the business affairs of the corporation, and may have power to authorize the seal of the corporation to be affixed to all papers which may require it. The executive board, by the affirmative vote of a majority of the whole board, may appoint any other standing committees, and such standing committees shall have and may exercise such powers as shall be conferred or authorized by the bylaws. With the consent in writing and pursuant to an affirmative vote of a majority of the members of said corporation, the executive board shall have authority to dispose in any manner of the whole property of the corporation.

SECTION 6.

That an annual meeting of the incorporators, their associates and successors, shall be held once in every year after the year of incorporation, at such time and place as shall be prescribed in the bylaws, when the annual reports of the officers and executive board shall be presented and members of the executive board elected for the ensuing year. Special meetings of the corporation may be called upon such notice as may be prescribed in the bylaws. The number of members which shall constitute a quorum at any annual or special meeting shall be prescribed in the bylaws. The members and executive board shall have power to hold their meetings and keep the seal, books, documents, and papers of the corporation within or without the District of Columbia.

SECTION 7.

That said corporation shall have the sole and exclusive right to have and to use, in carrying out its purposes, all emblems and badges, descriptive or designating marks, and words or phrases now or heretofore used by the Boy Scouts of America in carrying out its program, it being distinctly and definitely understood, however, that nothing in this Act shall interfere or conflict with established or vested rights.

SECTION 8.

That on or before the first day of April of each year the said Boy Scouts of America shall make and transmit to Congress a report of its proceedings for the year ending December thirty-first preceding.*

SECTION 9.

That Congress shall have the right to repeal, alter, or amend this Act at any time.

Approved 15 June 1916

WOODROW WILSON

*As amended August 30, 1964, Pub. L. 88-504, 78 Stat. 636.

# CONGRESSIONAL REPORT IN SUPPORT OF ACT TO INCORPORATE BOY SCOUTS OF AMERICA

House Report No. 130, Sixty-Fourth Congress
First Session

February 7, 1916.—Referred to the House Calendar and ordered to be printed.

Mr. Gard, from the Committee on the Judiciary, submitting the following report (to accompany H. R. 755).

The Committee on the Judiciary, to whom was referred the bill (H. R. 755) to incorporate the Boy Scouts of America and to protect its insignia, having carefully considered the same, beg leave to submit the following report with the recommendation that the bill do pass.

The Boy Scout movement is not one seeking to promote a juvenile military system, but is intended to supplement and enlarge established modern educational facilities in activities in the great and healthful out-of-doors where may be the better developed physical strength and endurance, self-reliance, and the powers of initiative and resourcefulness, all for the purpose of establishing through the boys of today the very highest type of American citizenship.

It tends to conserve the moral, intellectual, and physical life of the coming generation, and in its immediate results does much to reduce the problem of juvenile delinquency in the cities. The movement has grown rapidly during the past few years, until it is now organized in practically every community of 4,000 inhabitants and over and in many smaller communities of the United States. During the past two years Boy Scouts have demonstrated the value of the education and training they received as an auxiliary force in the maintenance of public order and in the administration of first-aid and practical assistance in times of great public emergencies. Their services on the occasion of the Ohio floods, at the Gettysburg reunion, in the inaugural ceremonies of President Wilson, and at the recent memorable reunion of the Grand Army of the Republic in Washington attracted Nationwide attention and received general commendation, particularly from the American National Red Cross and the officials of the Federal and State Governments. The importance and magnitude of its work is such as entitle it to recognition and its work and insignia to protection by Federal incorporation.

The Scout scheme is based upon the methods involved in educating the boy. It is a scheme of placing the boy on honor. In addition to requiring him to live up to a standard or code of laws which insure development of character along proper lines, it requires him to study in order to pass certain tests of qualification. The passing of these various tests is recognized by the award of appropriate badges or medals and insignia.

If any boy can secure these badges without meeting the required tests, the badges will soon be meaningless, and one of the leading features of the Scout program will be lost; likewise, with the uniform that designates the Scout. At the present time this is protected by the use of insignia—a seal woven or stamped into the cloth. All of these various badges and insignia are at present protected by the patent laws, but under the patent laws such protection is available for a limited period only. The passing by Congress of this bill will, it is believed, provide the organization with proper protection for its distinctive insignia, the integrity of which is essential to the maintenance of the movement, and protect it from those who are seeking to profit by the good repute and high standing and popularity of the Scout movement by imitating it in name alone.

The identical language of this bill was incorporated in the bill with amendments thereto, known as H.R. 19907, which was reported from the Committee on the Judiciary on February 3, 1915, with a recommendation that it, as so amended, do pass.

# BYLAWS

# ARTICLE I. GENERAL

## NAME

Section 1.

The name of the corporation is Boy Scouts of America. For convenience in these Bylaws the corporation is sometimes referred to as the "Corporation."

## PURPOSE

Section 2.

The purpose of the Corporation is as set forth in the original certificate of incorporation under the laws of the District of Columbia, dated February 8, 1910, and restated in the Act of Incorporation enacted by the Congress of the United States of America on June 15, 1916, as follows: "That the purpose of this Corporation shall be to promote, through organization and cooperation with other agencies, the ability of boys to do things for themselves and others, to train them in Scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred virtues, using the methods which are now in common use by Boy Scouts." In achieving this purpose, emphasis shall be placed upon its educational program and the oaths, promises, and codes of the Scouting program for character development, citizenship training, leadership, and mental and physical fitness.

## SEAL; DESIGNATING MARKS

Section 3.

*Clause 1.* The seal of the Corporation shall be in the form of a circle enclosing the universal badge with the motto "Be Prepared" underneath the badge and the words "Boy Scouts of America" around the circle and shall be used only as authorized.

*Clause 2.* In accordance with provisions of the Charter, the Corporation shall establish and maintain policies to regulate the use of the seal and all other emblems and badges, descriptive and designating marks, and words or phrases associated with or referring to the Boy Scouts of America or any of its affiliates. Such policies may permit the use of the Boy Scouts of America designating marks by third parties as long as such are (i) consistent with the values and purpose of the Corporation, and (ii) pursuant to written agreement between the user and the Corporation. Administration of such policies is the responsibility of the Chief Scout Executive, who may delegate such duties to an officer or employee of the Corporation.

## NATIONAL SERVICE CENTER

Section 4.

The principal office of the Corporation shall be located in the City of Irving, County of Dallas, in the State of Texas, and shall be known as the National Service Center of the Boy Scouts of America.

## FISCAL YEAR

Section 5.

The fiscal year of the Corporation shall be the calendar year.

## RULES AND REGULATIONS

Section 6.

**Establishment**

*Clause 1.* In accordance with the provisions of the Charter, the Executive Committee may establish and amend Rules and Regulations for the further governance and guidance of the Boy Scouts of America including its local councils and affiliates.

**Amendment**

*Clause 2.* The Rules and Regulations and amendments thereto shall normally be adopted by resolution of the Executive Committee.

**Amendment—Reporting Changes to the Executive Board**

*Clause 3.* Any amendment to the Rules and Regulations shall be reported to the members of the Executive Board at its next meeting and unless such amendment is altered or canceled by the Executive Board at such meeting, it will be as effective as if it had been originally adopted by the Executive Board.

## PRIORITIES

Section 7.

**General**

*Clause 1.* These Bylaws shall be consistent with the Charter. The Rules and Regulations shall be consistent with the Charter and the Bylaws. In the event of any conflicts or inconsistencies, the Charter shall govern primarily and the Bylaws secondarily.

**Specifics**

*Clause 2.* All statements contained in official publications of the Boy Scouts of America, its local councils and affiliates, including (but not limited to) handbooks, pamphlets, instructions, magazine articles, bulletins, manuals, and letters, which may, from time to time, be issued for clarification or explanation of official language shall be consistent with the language and intent of the Charter, the Bylaws, and the Rules and Regulations. Any contradictory or inconsistent language is unauthorized and without effect.

# ARTICLE II. THE NATIONAL COUNCIL

**GENERAL**

SECTION 1.

In accordance with the provisions of sections 1 and 2 of the Act of Congress, approved June 15, 1916, entitled "An Act to Incorporate the Boy Scouts of America and for Other Purposes," giving the incorporators therein named the power to provide for the election of their associates and successors, the incorporators, and all persons who were duly elected and qualified as members of the National Council herein provided for their successors duly chosen, shall constitute the corporate membership of the Boy Scouts of America, to be known and designated collectively as the National Council of the Boy Scouts of America.

## MEMBERS OF THE NATIONAL COUNCIL

SECTION 2.

**General**

*Clause 1.* The National Council of the Boy Scouts of America shall consist of elected and ex officio members as provided for in these Bylaws. All members, except honorary members and commissioned professional Scouters, may vote.

**Eligibility Requirements**

*Clause 2.* No person shall be eligible for membership on the National Council who is not a citizen of the United States or has not taken the preliminary legal steps to become a citizen of the United States.

*Clause 3.* A commissioned professional Scouter is ineligible for voting privileges on the National Council.

**The Election and Designation**

*Clause 4.* Members of Executive Board. All persons elected members of the Executive Board shall upon their election become members of the National Council for the term of their election as members of the Executive Board.

*Clause 5.* Members of Regional Executive Committees and Area Commissioners. Persons serving as members of a regional executive committee and area commissioners shall be members of the National Council during their respective terms.

*Clause 6.* Local Council Representatives. The duly elected president and council commissioner of a local council shall, during their terms of office, be members of the National Council. Each local council may, in addition, elect one of its members as a member of the National Council for every 5,000 youth members (Cub Scouts, Boy Scouts, Varsity Scouts, and Venturers), or major portion thereof (2,501 or more), enrolled as of December 31 of the preceding year according to the records of the Corporation. Local councils shall certify as to the election of National Council members so elected and to their terms on forms provided for that purpose.

*Clause 7.* Members at Large. Members at large of the National Council may be elected by the National Council at its annual meeting to serve for 1 year. Persons who become members of national support committees and members of regional committees as defined under article V, section 2 hereof, shall be members at large of the National Council during their respective terms.

*Clause 8.* Honorary Members. Honorary membership in the Boy Scouts of America shall consist of such citizens of the United States as may be elected thereto by the National Council for terms of 1 year in the furtherance of the program of the Boy Scouts of America.

**Credentials of Members**

*Clause 9.* The National Council shall issue certificates of membership and voting credentials to all voting members of the National Council indicating their right to participate and to vote at the annual meeting of the National Council. Votes shall be cast in person at the meeting and not by proxy.

## MEETINGS OF THE NATIONAL COUNCIL

SECTION 3.

**Regular Meetings**

*Clause 1.* General. The National Council shall meet annually inside or outside of the District of Columbia at such time and place as may be determined by the Executive Board, for the purpose of delivering the annual reports of the officers and various committees of the National Council, electing members at large and honorary members of the National Council and regular members of its Executive Board, and transacting such other business as may come before the meeting. The National Chair shall determine what business is appropriate to come before the meeting. The Executive Board may, in its sole discretion, present matters of significance to the movement for a binding referendum vote of the National Council at the annual meeting and any such matter shall be described in the required notice of the annual meeting.

*Clause 2.* Notice. A notice of the annual meeting shall be mailed or sent by electronic mail to each member of the National Council at least 30 days in advance thereof, indicating the time and place of the meeting.

**Special Meetings**

*Clause 3.* Special meetings of the National Council may be called by the Executive Board at any time and shall be called within 90 days upon the request of at least 5% of the members of the National Council (such request specifying the object of such a special meeting) to be held at such place as the National Chair shall determine, provided, however, that a notice of such meeting, indicating the place and object thereof, shall be mailed to each member of the National Council at least 30 days in advance of the meeting. The business of the meeting shall be limited to the matters included in the notice of the meeting.

**Quorum**

*Clause 4.* Five percent of the members of the National Council present in person shall constitute a quorum for all purposes.

**Voting**

*Clause 5.* At any meeting of the National Council, each member present shall be entitled to one vote.

**Guests**

*Clause 6.* Honorary members of the Boy Scouts of America and such other persons as may be specially invited may attend meetings of the National Council but shall have no vote.

# ARTICLE III. THE EXECUTIVE BOARD

### POWERS, DUTIES, AND INTERPRETATION

SECTION 1.

#### Authority of Executive Board

*Clause 1.* The Executive Board shall, in accordance with the provisions of its Charter and these Bylaws, be the governing body of the Corporation, manage its affairs, elect its officers, and be the final reviewing authority with respect to all matters whatsoever which may arise at any level within the Scouting movement, which in its judgment should be reviewed.

#### Interpretation

*Clause 2.* For the purpose of these Bylaws, the phrase "the whole Executive Board" shall mean the number of members on the Executive Board at the time actually holding office and vacancies shall not be included. The Executive Board shall have the following reserved powers that may not be delegated to a committee: amending these Bylaws; changing the mission or purpose of the Corporation; approving nominations to and filling vacancies on the Executive Board and its standing committees; electing officers; approving any merger or dissolution; approving the sale, mortgage, pledge, or transfer of substantially all of the assets of the Corporation; increasing or materially changing the indebtedness of the Corporation beyond any previously authorized level; or authorizing distributions from the Corporation.

### MEMBERSHIP

SECTION 2.

The Executive Board of the Corporation shall consist of:

#### Regular Members

*Clause 1.* Not to exceed 64 regular members who shall be elected at the annual meeting of the Corporation for 1-year terms. The number of board members comprising the Executive Committee shall not be included in the regular member total.

#### Regional Presidents

*Clause 2.* Regional presidents whose terms as members of the Executive Board shall be the same as their respective terms of office as regional presidents. Each regional president who is a regular member of the Executive Board at the time of becoming a regional president shall continue as a regular member of the Executive Board until the end of the term of such, whereupon the individual shall become a regional member provided that at such time the member is still regional president. Nothing herein contained shall prevent a regional member from being elected as a regular member of the Executive Board.

#### Youth Members

*Clause 3.* Those persons who shall be registered youth program participants may be appointed by the National Chair with the approval of the Executive Board to serve for a specified term of up to 1 year. A youth program participant may be reappointed for a second 1-year term. The aggregate number of youth program participants shall at no time exceed five.

#### Special Members

*Clause 4.* The Chairman of the Advisory Council, the President of the National Eagle Scout Association, the Chairman of the Order of the Arrow Committee, a designated representative of the Board of the National Boy Scouts of America Foundation, and the Chairman of Learning for Life shall serve as ex officio voting members of the Executive Board during their 1-year terms. The names of those proposed to serve shall be submitted for consideration and, if accepted, nomination to the national Governance and Nominating Committee and shall thereafter be elected in the same manner as other members of the Executive Board.

#### Immediate Past Chair

*Clause 5.* The Immediate Past National Chair shall be an ex officio voting member of the Executive Board.

### ELECTION OF REGULAR MEMBERS; ELECTION, VACANCIES

SECTION 3.

*Clause 1.* At each annual meeting of the National Council, regular members of the Executive Board shall be elected to serve for a term of 1 year, commencing after the National Annual Meeting, or until their successors have been elected and have qualified.

*Clause 2.* Where vacancies occur, because of resignation or otherwise, of members before the expiration of their term of office, such vacancies may be filled for the unexpired period of the term by nomination by the Governance and Nominating Committee and confirmation by a majority vote of the remaining members of the Executive Board.

### MEETINGS

SECTION 4.

#### Regular Meetings

*Clause 1.* The Executive Board will meet at least three times annually at such times and places as may be designated by the Executive Board, with no more than one meeting during any calendar quarter. One meeting a year shall coincide with the National Council annual meeting.

*Clause 2.* Each Executive Board member must attend a minimum of two board meetings during each term in office. Any vacancy created under this clause may be filled in accordance with the Charter and Bylaws of the Corporation.

#### Special Meetings

*Clause 3.* Special meetings of the Executive Board may be called at any time by the National Chair or by 10 or more members. The call of the meeting shall state the purpose, and no other business not included in the notice of the call shall be transacted.

#### Notice

*Clause 4.* A notice of all Executive Board meetings shall be sent to each member at least 2 weeks in advance of any such meeting.

#### Quorum

*Clause 5.* One-half of the members of the Executive Board, present in person, shall constitute a quorum.

## ELECTRONIC COMMUNICATIONS

SECTION 5.

Electronic communications, records, and signatures may be used in connection with all matters contemplated by these Bylaws except to the extent prohibited by applicable law. Except as may be specifically set forth herein, the parties may use and rely upon electronic communications, records, and signatures for all notices, waivers, consents, undertakings, and other documents, communications, or information of any type sent or received in connection with the matters contemplated by these Bylaws. An electronically transmitted (but not oral) document will be deemed to satisfy any requirement under these Bylaws or applicable law that such document be "written," "in writing," or the like. An electronic signature or electronically transmitted signature by any person on any document (properly authenticated) will be deemed to satisfy any requirement under these Bylaws or applicable law that such document be "signed" or "executed" by such person. An electronic transmittal or communication (but not oral) of a document will constitute delivery of such document. Neither the Corporation nor any member, Executive Board member, or any committee thereof may contest the authorization for, or validity or enforceability of, electronic records and electronic signatures, or the admissibility of copies thereof, under any applicable law relating to whether certain agreements, files, or electronic records are to be in writing or signed by the party to be bound thereby.

## TELECOMMUNICATION MEETINGS

SECTION 6.

The Executive Board or any committee or subcommittee thereof may meet by telecommunication. Action taken at any such meeting shall be recorded and, if required, the record signed by all members participating and filed as the official minutes of such meeting. All notice and quorum requirements shall apply to such meetings provided that the signing of the record of the action taken shall constitute a waiver of notice by persons so signing.

## NATIONAL CHAIR'S COUNCIL

SECTION 7.

*Clause 1.* There shall be a National Chair's Council, composed of members of the Executive Board who, because of their tenure, experience, and particular expertise, would be of assistance to the National Chair of the Corporation in assessing the effectiveness of programs and offering advice and counsel on issues affecting the Scouting movement.

*Clause 2.* There shall be no more than 20 members of the National Chair's Council who shall be appointed by the National Chair each year for 1-year terms and who shall meet from time to time upon request of the National Chair.

*Clause 3.* Members of the National Chair's Council may elect to continue to serve as special members of the Executive Board of the Corporation with full voting privileges, but they will not serve as regular members, as that term is defined in section 2, clause 1 of this article.

## COMMITTEES OF THE EXECUTIVE BOARD

SECTION 8.

**General**

*Clause 1.* The committees of the Executive Board shall consist of an Executive Committee, and other governance standing committees of the Executive Board which shall, though separately structured, have such powers as shall be conferred or authorized by these Bylaws. In addition, the Executive Committee may authorize subcommittees of the standing committees. The National Chair may also appoint ad hoc committees and task forces to handle special assignments. Each member of the Executive Board shall serve on one governance standing committee. Governance standing committee members shall be appointed by the National Chair.

*Clause 2.* Duties and Quorum. The duties and responsibilities of governance committees of the Executive Board shall be prescribed in these Bylaws, in the Rules and Regulations, and/or by approval of the Executive Board. Except as otherwise herein provided, a majority of the members of any standing committee or subcommittee, exclusive of ex officio members, present in person shall constitute a quorum. Once a quorum is present the departure of one or more members shall not invalidate the meeting.

**Executive Committee**

*Clause 3.* Delegation of Authority to Executive Committee. Except for the powers reserved to the Executive Board, the duty and authority to manage the affairs of the Corporation shall be vested in the Executive Committee. The Executive Committee may not take any of the actions specifically reserved to the Executive Board in section 1 of this article. The Executive Committee may authorize the creation and management of affiliated organizations to engage in activities that directly or indirectly support the Corporation's and local councils' ability to achieve the mission of Scouting, provided, however, that any such action shall be reported to the Executive Board at the meeting following any such action.

*Clause 4.* National Key 3. The National Chair, National Commissioner, and Chief Scout Executive shall be known as the National Key 3. The National Key 3 shall be responsible for addressing issues which arise between meetings of the Executive Committee and for addressing such other matters and having such responsibilities as set forth by the Executive Committee. The National Key 3 will report to the Executive Committee on its significant actions at the Executive Committee's meetings.

*Clause 5.* Membership. The Executive Committee shall be comprised of 12 members including: National Chair, National Chair-elect, National Commissioner, Immediate Past National Chair, Standing Committee Chairs, two of which standing committees shall be chaired by the National Chair-elect and Immediate Past Chair, two members-at-large recommended by the National Chair or National Chair-elect and the Chief Scout Executive. The Chief Scout Executive is also a voting member of the Executive Committee. A board member normally will not serve in any office on the Executive Committee for more than four 1-year terms or on the Executive Committee for more than 10 consecutive years.

*Clause 6.* Meetings. Meetings of the Executive Committee may be called at any time by the National Chair and shall be called by the National Chair within 30 days upon the request of three or

more members of the Committee. It shall be the general practice of the Executive Board to meet at least three times annually.

**Governance Standing Committees**

*Clause 7.* The governance standing committees shall be: Audit and Enterprise Risk Management Committee, BSA Mission and Reputation Committee, Development Committee, Diversity Committee, Finance Committee, Governance and Nominating Committee, and Human Resources Committee. The Chair-Elect shall chair the BSA Mission and Reputation Committee.

*Clause 8.* Each member of the Executive Board shall serve as a member of one standing committee. Each Executive Board member must attend a minimum of 50% of the meetings of the governance standing committee that the board member is assigned to during each term of office. The National Chair shall appoint new members of the Executive Board to serve on a committee immediately following their election. Standing committees shall have charters setting forth the committee's authority and responsibilities in accordance with any specific provisions of these Bylaws. Charters shall be approved by the Executive Committee. Governance standing committees shall be supported by one or more staff members assigned by the Chief Scout Executive with the approval of the National Chair.

**Special Requirements for Governance and Nominating Committee**

*Clause 9.* General Duties. The Governance and Nominating Committee shall make nominations at the annual meetings of the National Council for members-at-large and honorary members of the National Council, regular members of the Executive Board, standing committee chairs, chairs of special committees, and the International Commissioner. The Governance and Nominating Committee shall report its nominations for positions on the Executive Committee and others as required at the first meeting following the election of the Executive Board.

*Clause 10.* The Immediate Past National Chair shall serve as the Chair of the Governance and Nominating Committee. No member of the Governance and Nominating Committee shall be eligible for reappointment for more than three consecutive terms. No member of the Governance and Nominating Committee shall be eligible for nomination as a member of the Executive Committee.

*Clause 11.* Submission of Names. The names of possible candidates may be submitted by members of the National Council in writing to the Governance and Nominating Committee for its consideration. The Governance and Nominating Committee will submit nominations:

(a)   To any meeting of the National Council for members at large and honorary members of the National Council and for members of the Executive Board.

(b)   To the Executive Board to fill vacancies in its membership as prescribed in article III, section 3, clause 2.

(c)   To the Executive Board for election of members of the Advisory Council.

(d)   To the Executive Board for honorary officers, and, prior to the annual meeting of the National Council, for members of the Executive Committee, regional presidents, and regional presidents-elect.

*Clause 12.* The Governance and Nominating Committee shall be given full information concerning all such candidates, together with advice from the Chief Scout Executive.

*Clause 13.* The Governance and Nominating Committee shall review and, subject to the Governance and Nominating Committee's approval, accept nominations from the regional nominating committees for regional presidents who shall be elected in the same manner as other members of the Executive Board.

*Clause 14.* A member of the Executive Board whose position has been vacated pursuant to article III, section 3, clause 2 shall be renominated to the Executive Board only with the approval of the Executive Committee.

*Clause 15.* Committee Procedures.

(a)   On request of any member of the Governance and Nominating Committee, voting shall be by written ballot.

(b)   During the actual voting for the selection of members of the Executive Committee and Executive Board, the Governance and Nominating Committee may, on an affirmative vote of the majority of its members, meet in executive session.

**Specific Requirements for Audit and Enterprise Risk Management Committee**

*Clause 16.* The Audit and Enterprise Risk Management Committee shall fulfill the Executive Board's fiduciary responsibilities relating to accounting and financial matters, financial reporting practices, and internal accounting and financial controls. The members shall be knowledgeable on financial and/or risk management matters. The Audit and Enterprise Risk Management Committee shall:

(a)   Recommend independent auditors to the Executive Committee for its selection.

(b)   Recommend to the Executive Board the approval and issuance of the Annual Report of the Treasurer together with the audited financial statements.

(c)   Discuss with the independent auditors the scope of their audit and their fees.

(d)   Discuss with the independent auditors, the internal auditor, and the appropriate administrative officers the Corporation's accounting principles, policies, practices, and reporting policies and practices.

(e)   Discuss with the independent auditors and the internal auditor the results of their audits.

(f)   Discuss with the independent auditors, the internal auditor, and the administrative officers the adequacies of the Corporation's accounting, financial, and operating controls.

(g)   Discuss with the administrative officers, the internal auditor, and the independent auditors any proposed accounting policies which are of sufficient significance to be passed upon by the Executive Board.

(h)   Report to the Executive Board any recommendations and observations with regard to significant financial and accounting matters brought to its attention.

**Special Committees of the Executive Board**

*Clause 17.* (Reserved)

*Clause 18.* A Resolutions Subcommittee of the Governance and Nominating Committee shall review and determine whether any resolution proposed by a member of the National Council is appropriate for discussion at the National Council annual business meeting or whether any such matter should be referred to another committee or dealt with in some other appropriate manner. The Chair of the Governance and Nominating Committee shall appoint members of the Resolutions Subcommittee.

*Clause 19.* The International Committee is a special committee authorized to represent the Corporation in connection with the World Scouting Organization and to support other international initiatives authorized by the Executive Committee. The International Commissioner shall serve as the chair and appoint members of the International Committee.

**Advisory Council**

*Clause 20.* There shall be an Advisory Council to the Executive Board composed of members of the National Council and United States citizens who, because of experience, have a particular expertise that would benefit the national movement and are elected to membership on the Advisory Council by a two-thirds vote of the members of the Executive Board present at any meeting. The Advisory Council shall meet annually.

*Clause 21.* The Chair of the Advisory Council shall be appointed by the National Chair with the approval of a majority of the Executive Board, to serve for a term not exceeding 1 year or until a successor has been appointed and has qualified. The Chair of the Advisory Council shall be an ex officio voting member of the Executive Board.

*Clause 22.* The Advisory Council shall be responsible to the Executive Board, acting in an advisory capacity on matters of major national concern. The Advisory Council also may be requested by the Executive Board to carry out specific projects.

*Clause 23.* Members of the Advisory Council shall receive notice of all such meetings of the Executive Board and be entitled to attend but not to vote.

# ARTICLE IV. VOLUNTEER LEADERSHIP, CORPORATE OFFICERS, AND HONORARY POSITIONS

SECTION 1.

## VOLUNTEER LEADERSHIP

*Clause 1.* The National Chair, National Commissioner, and chairs of governance standing committees shall be elected annually by the Executive Board to serve for 1 year or until their successors have been elected and have qualified. An individual normally will not (a) serve as National Chair for more than two 1-year terms or (b) serve in any other position on the Executive Committee for more than four terms.

### NATIONAL CHAIR

*Clause 2.* The National Chair shall serve as chair of meetings of the National Council, the Executive Board, and the Executive Committee. The National Chair shall be a member ex officio of all committees, other than the Governance and Nominating Committee, and shall perform such duties as are or may be assigned by the Executive Board.

### NATIONAL CHAIR-ELECT

*Clause 3.* The National Chair-elect shall be elected annually and serves as chair of the Corporate Mission and Reputation Committee.

### IMMEDIATE PAST NATIONAL CHAIR

*Clause 4.* The Immediate Past National Chair shall be confirmed annually and serves as chair of the Governance and Nominating Committee.

### GOVERNANCE STANDING COMMITTEE CHAIRS

*Clause 5.* The governance standing committee chairs shall be elected annually. Committee chairs shall chair their assigned committees and perform such additional functions as may be assigned to them by the Executive Committee. The Executive Board may designate one of the governance standing committee chairs to serve as National Chair only during the absence or inability of both the National Chair and the National Chair-elect.

### NATIONAL COMMISSIONER

*Clause 6.* The National Commissioner shall represent the Boy Scouts of America in national affairs, be the chief morale officer of the Boy Scouts of America, and represents the commissioner service team.

### INTERNATIONAL COMMISSIONER

*Clause 7.* The International Commissioner shall represent the Boy Scouts of America in international affairs and shall serve as chair of the International Committee.

SECTION 2.

**Corporate Officers**

*Clause 1.* The officers of the Corporation shall be the following employees:  President, who shall be the Chief Scout Executive and Chief Executive Officer; Treasurer, who shall be the Chief Financial Officer; and Secretary, who shall be the General Counsel.

### CHIEF SCOUT EXECUTIVE

*Clause 2.* The Chief Scout Executive shall be appointed by and shall serve at the pleasure of the Executive Board and shall serve as the chief executive officer of the Corporation. The Chief Scout Executive shall be a voting member of the Executive Committee, Co-Chair of the National Leadership Council, and an ex officio nonvoting member of all other committees except the Governance and Nominating Committee, where the Chief Scout Executive shall serve as staff advisor. The Chief Scout Executive shall not serve after attaining the age of 65 years.

*Clause 3.* The Chief Scout Executive shall have authority over the management and operations of the Corporation, subject to these Bylaws, the Rules and Regulations of the Boy Scouts of America, and to the authority and direction of the Executive Committee.

*Clause 4.* The Chief Scout Executive shall have general authority to execute documents on behalf of the Corporation subject to any limitations prescribed by the Executive Committee or Executive Board. The Chief Scout Executive may delegate, as deemed appropriate, his authority to execute documents to any other staff officer or employee. The Chief Scout Executive, Executive Committee, or Executive Board may require a countersignature or adopt other policies with respect to the execution of documents as may be considered appropriate.

*Clause 5.* The Chief Scout Executive shall prepare an annual plan outlining operational goals and strategies for the Corporation. The plan shall be submitted to the Executive Committee for approval at the National Annual Meeting. The plan shall include the volunteer support committees and reporting structure.

*Clause 6.* The Chief Scout Executive shall submit a written report to the Executive Committee and Executive Board in advance of the regularly scheduled meetings of the Governance Standing Committees, on progress made on the approved annual plan as well as other matters of interest or significant developments. Significant proposed operational or program changes shall be submitted by the Chief Scout Executive to the Executive Committee for approval.

*Clause 7.* The Chief Scout Executive shall prepare an annual report of the Boy Scouts of America for each calendar year and, with the approval of the Executive Board, shall transmit it to Congress, as required by the provisions of the federal Charter, and shall present it to the National Council at the time of its annual meeting.

### CHIEF FINANCIAL OFFICER AND TREASURER

*Clause 8.* The Chief Financial Officer shall serve as Treasurer and shall monitor the financial affairs of the Corporation. The Chief Financial Officer shall utilize a system of internal controls

and shall be responsible for the recording and deposit of all receipts of the Corporation, for the proper disbursements of its cash, and for control over all assets of the Corporation, whether real or personal, tangible or intangible, however acquired. The Chief Financial Officer shall provide periodic financial reports as requested by the Executive Committee, Executive Board, or Finance Standing Committee. The Chief Financial Officer shall prepare a report at the end of each calendar year of the expenses and revenues, together with a statement of assets, liabilities, reserves, and funds of the Corporation as at the end of that calendar year, these statements first having been duly audited by independent public accountants approved by the Executive Committee. The Chief Financial Officer shall serve as staff advisor to the Finance Standing Committee and may serve as the chair of any budget subcommittee or task force.

### SECRETARY

*Clause 9.* The General Counsel shall serve as Secretary of the Corporation and shall see that notices are sent to those elected as members of the National Council and to those appointed as members of the governance standing committees. The General Counsel shall serve as staff advisor for governance matters before the Governance and Nominating Standing Committee.

SECTION 3.

**National Leadership Council and Operations Support Committees**

*Clause 1.* The purpose of the National Leadership Council and its support committees is to provide an appropriate level of volunteer oversight and subject matter expertise to the Chief Scout Executive on matters related to field operations and programs.

The Chief Scout Executive shall submit an operations support committee structure to accompany the proposed annual goals and strategy for approval by the Executive Committee at the National Annual Meeting.

*Clause 2.* The National Leadership Council shall be co-chaired by the Chief Scout Executive and a volunteer Board member proposed by the Chief Scout Executive and confirmed by the National Executive Committee. The Council shall advise the Chief Scout Executive and, when appropriate, make recommendations to the National Executive Committee. Members of the Council shall be the operations support committee chairs and staff advisors. While the Chief Scout Executive is responsible for reporting on operational matters to the governance standing committees, if a majority of the volunteer members of the Council recommends a matter be reported to the Executive Committee, the Chief Scout Executive shall include the matter in his next report.

*Clause 3.* Support committees shall be governed by committee charters setting forth each committee's purpose, authority, annual goals, and action items. Charters shall be approved by the co-chairs. The staff advisor assigned by the Chief Scout Executive shall be responsible for coordinating the efforts of each committee as well as coordination with other committees or staff advisors. Unless specifically set forth in the committee charter, support committees will have no approval authority.

Support committees may be supported by subcommittees and task forces. Those subcommittees and task forces should be focused based upon area of expertise, and members should possess the skill and knowledge necessary to assist in formulating policies, guidelines, program procedures, and related publications.

Support committees should typically meet in person or by telephone or digital conference or the equivalent on a quarterly basis. Agendas and minutes for committee meetings shall be prepared by the staff advisor and submitted as directed by the Chief Scout Executive.

*Clause 4.* Support committee chairs may be members of the Executive Board or the Advisory Council, but not the Executive Committee. Chairs shall be appointed by the Chief Scout Executive subject to the approval of the National Chair. Committee members shall be appointed to 1-year terms based upon staff recommendations in consultation with committee chairs and the approval of the Chief Scout Executive. Committee members shall be considered members of a national support committee and members of the National Council. Chairs should typically serve as chairs no more than 4 consecutive years.

Support committee members may be selected based upon their experience and appropriate expertise in the committee's general area of responsibility. Committee members may include persons with no prior affiliation with Scouting. However, committee members must be registered Scouters during their period of service.

SECTION 4.

**Honorary Positions**

*Clause 1.* With consent, the current President of the United States may be elected to Honorary National President. Such election shall be by the Executive Board upon the recommendation of the Governance and Nominating Committee.

*Clause 2.* A living, former National Chair or National President who no longer renders active service may be elected to an honorary position as "Chair Emeritus." Such election shall be by the Executive Board upon the recommendation of the Governance and Nominating Committee.

*Clause 3.* Those elected to positions under this section are under no obligation to render active service and are not corporate officers or members of the Executive Board in any legal or regulatory sense.

# ARTICLE V. REGIONAL ORGANIZATION

### REGIONS

SECTION 1.

**General**

*Clause 1.* Geographical areas within and without the United States shall be divided into administrative units to be known as regions. The number of such regions, their geographical boundaries, and their designation shall be determined by the Executive Committee.

**Responsibilities**

*Clause 2.* Each region shall have a regional executive committee that is responsible for the achievement of approved goals and for the effective operation of each of its councils. The region is responsible for assessing and improving the performance of each council in the region. The region may issue conditional charters to councils within the region as deemed appropriate. Subject to the approval of the National Key 3, the region may realign councils and their territories

and issue transitional charters. The region is responsible for assuring sufficient qualified volunteer and professional leadership in each area and council. The National Executive Committee retains the authority to take any action otherwise delegated to the regions under this Article.

## REGIONAL COMMITTEES

SECTION 2.

**Organization**

*Clause 1.* Subject to these Bylaws, the Rules and Regulations, and the general control of the Executive Board, each region shall implement national policy and program through a regional committee.

**Membership**

*Clause 2.* Regular Members. The membership of the regional committee shall consist of members of the National Council residing in the region and such additional members as may be elected by the regional committee.

**Meetings**

*Clause 3.* Each regional committee shall meet once a year at such time and place as the regional executive committee or president may direct.

## REGIONAL BOARD

SECTION 3.

**General**

*Clause 1.* The regional board, consisting of the regional executive committee plus not more than 50 regular members at large elected annually by the regional committee, shall be the body of the region that reviews matters regarding the Scouting movement as presented or requested by the regional executive committee. Each member at large must hold some specific committee or other regional assignment.

*Clause 2.* Each regional board member must attend a minimum of one board meeting each calendar year during each term in office. In the event a board member fails to meet this minimum requirement, said board member's position shall be vacated unless the regional executive committee specifically votes to retain the board member as a member of the regional board.

**Youth Members**

*Clause 3.* Youth program participants may be appointed by the regional president with the approval of the regional board to serve as members of the regional board, subject to the following criteria:

(a) The term of appointment shall be for 1 year.

(b) A youth program participant may be reappointed for a second 1-year term.

(c) At no time will the aggregate number of youth members exceed five.

**Meetings**

*Clause 4.* Each regional board shall meet at least annually at such times and places as the regional president may direct for planning of regional events and activities and for meetings of the regional standing committees for training and planning council service.

## REGIONAL EXECUTIVE COMMITTEE

SECTION 4.

**General**

*Clause 1.* The regional executive committee shall consist of the elected officers, including the regional president, regional commissioner, regional vice presidents, the area presidents, and the chairs of the regional standing committees as appointed by the regional president, and the regional director. The regional executive committee shall have and may exercise the authority over all matters to which the region is assigned responsibility. The regional presidents shall provide recommendations and report to the Executive Committee on actions taken in connection with the issuance of conditional charters. Any realignment of council territories and issuance of transitional charters shall be approved in advance by the National Key 3. Any recommendation on charter revocation must be made to the Executive Committee.

**Meetings**

*Clause 2.* Each regional executive committee shall meet twice annually at such times and places as the regional president may direct.

**Authority to Require Council Improvement Plans**

*Clause 3.* The regional executive committee shall have the authority to require councils to adopt improvement plans so as to achieve goals established by the region and aligned with the goals of the Corporation. The improvement plan may be accompanied by a conditional charter.

**Regional Key 3**

*Clause 4.* The regional president, regional commissioner, and regional director shall be known as the regional Key 3. The regional Key 3 shall be responsible for addressing issues which arise between meetings of the regional executive committee and for addressing such other matters and having such responsibilities as set forth by the regional executive committee. The regional Key 3 will report to the regional executive committee on its significant actions at the regional executive committee's meetings.

## REGIONAL DIRECTOR

SECTION 5.

The regional director of field operations shall serve as secretary of the regional committee, the regional board, the executive committee, and the standing committees.

## REGIONAL OFFICERS

SECTION 6.

**Regional President**

*Clause 1.* One member of each regional committee shall annually be elected regional president. Regional presidents shall be nominated and elected in the same manner as other members of the Executive Committee. The regional president shall serve as the chair of the regional committee, regional executive board and as an ex officio member of regional committees, other than the regional nominating committee.

*Clause 2.* One member of the regional committee shall annually be elected regional president-elect, who shall perform such duties as may be assigned by the regional president or regional executive

committee. The regional president-elect shall be elected in the same manner as the regional president. The regional president-elect may designate the regional president-elect to serve as the regional president in connection with regional matters during the regional president's absence or inability to serve.

**Regional Vice President**

*Clause 3.* One or more regional vice presidents may be elected to carry out responsibilities as may be assigned by the regional board.

**Regional Commissioner**

*Clause 4.* The regional commissioner shall be elected annually and shall (a) be an officer of the region; (b) provide support to areas in membership, charter renewal, and training; and (c) support commissioner service.

**Area President**

*Clause 5.* One member from each area of the region shall be elected annually as area president. Area presidents will report directly to the regional president. In the event of a vacancy in an area presidency, the regional president will appoint a successor subject to the approval of the regional executive committee.

**Area Commissioner**

*Clause 6.* Each area commissioner shall be elected annually and shall (a) report to the regional commissioner; (b) provide support to councils in membership, charter renewal, and training; and (c) support commissioner service.

**Elections**

*Clause 7.* Elections shall be by majority vote of those persons voting. On request of 10 members, voting shall be by secret ballot.

### REGIONAL STANDING COMMITTEES

SECTION 7.

**Nominating Committee**

*Clause 1.* Except as otherwise provided, the regional and area officers and commissioners and regional executive committee shall be nominated and elected by a regional nominating committee and election process operating in the same manner as is required for similar national positions.

*Clause 2.* Timing. The nominating committee will be appointed and the chair designated by the regional president at the time of the annual elections or within 30 days following such elections to serve until the next elections.

*Clause 3.* Nominees. Persons to be nominated and elected annually shall include the regional president, regional vice presidents, area presidents, and members of the regional board.

*Clause 4.* Suggestions. At least 120 days prior to the regional elections, members of the regional committee will be invited to submit in writing names of persons to be considered for regional committee membership.

*Clause 5.* Report. The report of the nominating committee will be submitted to all eligible voters in writing at the time of elections.

**Other Regional Committees**

*Clause 6.* Regional standing committees shall reasonably mirror national standing committees applicable to the region and the chairs of those committees may serve as members of the counterpart national committee as requested by the chair of the support committee. The regional executive committee may authorize other regional support committees as may be warranted and select chairs.

### AREA COMMITTEES

SECTION 8.

*Clause 1.* The area executive committee, council presidents, and National Council members from the local councils in the area, shall constitute the area committee. The area executive committee, with the approval of the regional Key 3, may approve the establishment of area committees consistent with the regional committee structure and task forces to address assigned matters on a temporary basis, including providing assistance in the realignment of council territories within the region.

*Clause 2.* The area president, area commissioner, and area director shall be known as the area Key 3. The area Key 3 shall be responsible for addressing issues assigned to them by the regional executive committee.

### REGIONAL ADVISORY COUNCIL

SECTION 9.

*Clause 1.* There shall be an advisory council to the regional board composed of members who because of experience have a particular expertise that would benefit the movement through the region and are elected to membership on the advisory council by a two-thirds vote of the members of the regional board present at any meeting.

*Clause 2.* Members of the advisory council shall be relieved of the obligation of regular attendance at meetings of the regional board, but shall receive notice of all such meetings and be entitled to attend, but not to vote.

# ARTICLE VI. LOCAL COUNCILS

### GENERAL

SECTION 1.

*Clause 1.* Charters. In order to accomplish its purposes and to carry out its programs, the Corporation will charter local councils each with jurisdiction over a prescribed geographical area. All local council charters shall be issued for a period not exceeding 1 year ending June 30 and may be renewed annually upon application, accompanied by reports based upon operations for the preceding calendar year, together with such other evidence as may be required, showing a satisfactory effort to meet the responsibilities of a local council as herein provided. Such charters shall be contingent on such local councils' fulfilling the basic purpose of the Scouting movement within their specified territory in a sustainable manner, in accordance with these Bylaws and the Rules and Regulations of the Corporation.

*Clause 2.* Constructive Trust on Council Properties. All funds raised and property owned by local councils in the name of Scouting shall be subject to and used in accordance with the principles of a constructive trust for the benefit of Scouting as set forth

in the Rules and Regulations of the Corporation. The National Council may request councils to provide information regarding assets, funds, properties, and indebtedness, and councils shall supply such information in a timely manner. Upon termination of a local council charter or dissolution of a council, all rights of management and ownership of local council property shall become vested in the National Council for use in accordance with the Rules and Regulations of the Corporation. Local council articles of incorporation and bylaws shall include or be revised to incorporate this provision at the time of chartering or the next charter renewal.

*Clause 3.* Audits. The National Council shall have the right to audit all records of local councils for compliance with national rules, regulations, and policies. Any report made following an audit shall be shared with the council president, commissioner, and Scout executive. The regional executive committee shall have the right following any audit to take such action as it deems appropriate to correct any deficiencies or violations of any national rules, regulations, policies, or charter agreement.

### APPLICATIONS

SECTION 2.

Applications for new charters shall be accompanied by a copy of the proposed Local Council Articles of Incorporation and Bylaws of the council incorporating terms approved and required by the National Council and evidence showing that it will be for the best interests of the youth of the community and the Scouting movement to have a chartered council and that those who are making the application are in a position to perform the functions of the local council in a manner which would justify the issuance of a charter.

### CONDITIONS AND TERMINATION

SECTION 3.

Charters to local councils shall be issued by the Corporation. The regional executive committee may at any time add such conditions to a local council charter as it may deem appropriate. Subject to the approval of the National Key 3, the regional executive committee may issue a council a transitional charter in advance of the realignment of territory assigned to a local council. The Key 3 will report on any such transitional charter to the Executive Committee as soon thereafter as feasible under the circumstances. The regional executive committee may, with the approval of the Executive Committee, refuse to renew a local council charter in any instance where it deems such action advisable in the interests of Scouting.

### REVOCATION OR MODIFICATIONS OF CHARTERS

SECTION 4.

The Executive Committee may revoke or modify the charter of a local council at any time in its sole discretion when it is believed to be in the best interest of the Scouting movement.

### RESPONSIBILITY OF THE LOCAL COUNCIL

SECTION 5.

*Clause 1.* It shall be the responsibility of each local council to make sure that the general principles of advancement are understood and carried out by the units in the council area.

*Clause 2.* It shall make Scouting training available to all members of chartered organizations and community groups using the Scouting program while maintaining standards in policies, protecting official badges and insignia, and reviewing and making recommendations regarding unit leadership and finances.

*Clause 3.* The local council shall supervise advancement procedures to make sure that they are carried out in such a way as to ensure strict adherence to the requirements and standards as set forth in the Rules and Regulations and the official publications of the Boy Scouts of America. The local council shall organize the necessary unit, district, and council procedures to make sure that youth members have an opportunity to advance and receive recognition promptly. It shall provide training for leaders in the principles and conduct of advancement.

*Clause 4.* No local council Scouter shall have authority to increase or diminish requirements and standards established by the Corporation. A Scouter is an adult who registers with the Boy Scouts of America at the local, area, region, or national level; fulfills the obligations of his or her position; obligates himself or herself to subscribe to the Scout Oath; and agrees to abide by the Rules and Regulations, policies, and other guidelines of the Boy Scouts of America.

*Clause 5.* Every local council shall operate in a sustainable manner as determined by the regional executive committee and measurement standards established by the National Council. Local councils shall adhere to the policies established by the Corporation regarding the use of the seal and all other emblems and badges, descriptive and designating marks, and words or phrases associated with or referring to the Boy Scouts of America, or any of its affiliates. No local council, including employees or Scouting volunteers, may authorize any third party to trade on the goodwill and reputation of the Boy Scouts of America.

*Clause 6.* The powers and responsibilities of local councils shall be controlled by these Bylaws and by the Rules and Regulations.

### INCORPORATION OF LOCAL COUNCILS

SECTION 6.

**General**

*Clause 1.* Local councils duly chartered by the Boy Scouts of America shall, wherever possible, become incorporated under the laws of their respective states pertaining to nonprofit corporations and pursuant to and consistent with these Bylaws and the Rules and Regulations of the Boy Scouts of America. The National Council may issue a prescribed form for local council articles of incorporation and bylaws, adoption of which shall be a condition of the issuance or renewal of the charter.

**Approval of Documents**

*Clause 2.* Proposed corporate articles and bylaws of local councils, and any amendments of such articles or bylaws, shall be submitted to the Corporation's National Service Center for review and approval in advance of adoption. When corporate articles are found to be in proper form, a certificate of approval, with consent to incorporate, for Scouting purposes under the name agreed upon, shall be furnished in behalf of the Boy Scouts of America. This certificate shall be attached to the corporate articles when filed by the local council with the state authorities. Any changes to the bylaws of the local council shall be approved in advance by the National Service Center, and any changes to the requirements for

local council bylaws established by the Executive Committee shall be incorporated into the local council bylaws.

### ORGANIZATION AND OPERATION

SECTION 7.

*Clause 1.* The membership of each local council shall consist of a chartered organization representative from each chartered organization and additional members at large from within the territorial boundaries of the local council, totaling a minimum of 100 adults. When a council is incorporated, its incorporators shall be its initial members. Thereafter its members-at-large shall be elected annually by the council membership.

*Clause 2.* The executive board of each local council shall consist of (a) not fewer than 25 nor more than 50 members elected by the local council from among its active members; plus (b) the officers of the Corporation, including the Scout executive (who shall have no vote); (c) the chairs of the committees of the executive board; (d) the chairs of each district committee, upon being approved by the executive board; and (e) not more than two youth members, who shall be registered members or adult program participants (as defined in Article VII, Section 1) appointed by the council president with the approval of the executive board to serve for a term of 1 year. The executive board shall be the governing body of the council and shall be responsible for its operations and its assets.

*Clause 3.* The executive board annually shall elect its officers of the council, which will consist of a president, one or more vice presidents, a treasurer, and a council commissioner. The officers of the council shall be nominated and elected by a council nominating committee and election process operating in the same manner as is required for similar national positions.

## ARTICLE VII. YOUTH MEMBERSHIP

### GENERAL

SECTION 1.

Those eligible to participate in programs designed for youth and young adults shall collectively be known as "members" or "youth program participants." Participation in programs shall be open to any person who meets the requirements for membership. Program participants who are at least 18 years of age and older and eligible to participate in programs designed for youth shall be referred to as "adult program participants."

### MEMBERSHIP, ADVANCEMENT, AND ACHIEVEMENT

SECTION 2.

Membership in programs, advancement, and achievement of leadership in Scouting is open to all persons who qualify for membership and participation in the program, without regard to race, gender, sexual orientation, gender identity, ethnic background, or religion, and who subscribe to the Declaration of Religious Principle. Advancement and achievement of leadership in Scouting shall be based entirely upon individual merit.

## ARTICLE VIII. ADULT LEADERSHIP

### GENERAL

SECTION 1.

#### Leadership Qualifications

*Clause 1.* General. No person shall be approved as a Scouter or leader unless, in the judgment of the Corporation, that person possesses and demonstrates the moral, educational, and emotional qualities deemed necessary for leadership and satisfies such other qualifications as it may from time to time require.

*Clause 2.* Authority of Region. The Executive Committee and regional Key 3 shall have the right to take action against any Scouter found to have violated any rule, regulation, or policy of the National Council, including expiring the registration of any such Scouter. Any Scouter whose registration is expired shall be deemed to have resigned any appointed or elected office or board position on any council, area, regional, or national executive board or committee. This provision shall not be construed to limit (a) the ability of a local council to request action or (b) the authority of the National Council to take action with respect to any member or adult leader considered unsuitable to serve. The Chief Scout Executive may establish the process for any such action.

*Clause 3.* Positions. The National Council or regional executive committee may limit the registration of any volunteer adult Scouter to such position(s) as it deems to be in the best interests of Scouting and such person shall not be allowed to register in any position other than the designated position(s).

### PROFESSIONAL LEADERSHIP

SECTION 2.

#### General

*Clause 1.* Status. The commissioned status of professional Scouters is separate and distinct from their employment. The commissioning of a Scouter does not in itself entitle a professional to be appointed to or to retain a position. The appointment of an individual to a position in Scouting does not in itself entitle him to receive a commission.

#### Professional Scouters

*Clause 2.* General. A corps of qualified and trained professional Scouters is essential to the success of the whole Scouting movement. To secure and retain such people for service in the national and local councils, their professional status must be clearly defined. Commissioned professionals must be eligible for, apply, and be accepted as a Scouter before they are eligible for commissioning or employment.

*Clause 3.* Commissioning and Decommissioning. The Executive Committee may establish requirements to be met by any person seeking to become or remain a professional Scouter. The Chief Scout Executive is responsible for the commissioning and decommissioning of all professionals and, in the absence of requirements established by the Executive Committee, shall exercise discretion in administering the commissioning and decommissioning process. The Chief Scout Executive shall separately issue commissions to certify qualified professionals to serve as council Scout executives. The Chief Scout Executive may

refuse to certify as qualified or remove the certification of any council Scout executive when, in the sole discretion of the Chief Scout Executive, it is determined that they are no longer qualified to hold that certification. Except for newly employed, pre-commissioned professionals, no person may be employed in a professional capacity by any local council or by the Corporation who does not hold a currently valid commission.

### Employment

*Clause 4.* Rules and Guidelines. The Executive Committee, subject to the provisions of these Bylaws, shall establish rules and regulations covering the employment, training, promotion, tenure, demotion, and retirement or discharge of all professional and other employees of the Corporation and of all professional employees of the local councils.

*Clause 5.* Authority of Chief Scout Executive. The Chief Scout Executive is, subject to these Bylaws, the Rules and Regulations, and the decisions of the Executive Board, authorized to appoint and remove all employees of the Corporation and to direct their work.

# ARTICLE IX. POLICIES

### POLICIES

SECTION 1.

### Declaration of Religious Principle

*Clause 1.* The Boy Scouts of America maintains that no member can grow into the best kind of citizen without recognizing an obligation to God. In the first part of the Scout Oath the member declares, "On my honor I will do my best to do my duty to God and my country and to obey the Scout Law." The recognition of God as the ruling and leading power in the universe and the grateful acknowledgment of His favors and blessings are necessary to the best type of citizenship and are wholesome precepts in the education of the growing members. No matter what the religious faith of the members may be, this fundamental need of good citizenship should be kept before them. The Boy Scouts of America, therefore, recognizes the religious element in the training of the member, but it is absolutely nonsectarian in its attitude toward that religious training. Its policy is that the home and the organization or group with which the member is connected shall give definite attention to religious life.

### Activities

*Clause 2.* The activities of the Boy Scouts of America shall be carried on under conditions which show respect to the convictions of others in matters of custom and religion, as required by the twelfth point of the Scout Law, reading, "Reverent. A Scout is reverent toward God. He is faithful in his religious duties. He respects the beliefs of others."

### Freedom

*Clause 3.* In no case where a unit is connected with a church or other distinctively religious organization shall members of other denominations or faiths be required, because of their membership in the unit, to take part in or observe a religious ceremony distinctly unique to that organization or church. However, no church or religious organization holding a valid charter shall be required to accept as an adult leader any person whose espoused personal beliefs are in conflict with the chartered organization's religious principles.

### Leaders

*Clause 4.* Only persons willing to subscribe to these declarations of principles shall be entitled to certificates of leadership in carrying out the Scouting program.

*Clause 5.* Rules and Regulations approved by the Executive Board or Executive Committee shall be considered no less important to the Corporation merely because they are not specifically set forth in the Bylaws.

# ARTICLE X. PROGRAM

### PROGRAM OBJECTIVES

SECTION 1.

The program shall be one designed to achieve objectives in character development, citizenship training, leadership, and mental and physical fitness.

In its several phases the program shall be adapted to the groups into which program participants are divided and shall be as set forth from time to time in these Bylaws, Rules and Regulations, and other publications of the Corporation.

In all activities, emphasis shall be placed upon practice in daily life of the principles of the Scout Oath. In association with suitable adult leadership, members registered in Scouting will be guided to develop traits of character which are expressed in self-reliance, consideration of and help to others, personal courage, and above all in lives of useful citizenship.

# ARTICLE XI. BUSINESS

### FINANCE

SECTION 1.

### Expenses

*Clause 1.* The necessary expenses of the Corporation shall be met from the receipts from annual registration fees and contributions; from the proceeds from sales of publications and supplies; and from such other sources as may be determined by the Corporation.

### Contributions

*Clause 2.* Contributions shall be solicited in the name of the Boy Scouts of America only through or by the authority of the Corporation, and shall be limited to the National Council or chartered local councils, in accordance with these Bylaws and Rules and Regulations of the Corporation. Youth members shall not be permitted to serve as solicitors of money for chartered organizations, for the local council, for the National Council, for corporate sponsors, or in support of other organizations. Adult leaders and

youth members shall not be permitted to serve as solicitors in support of personal or unit participation in local, national, or international events.

### Fundraising

*Clause 3.* Youth members may sell products as part of an approved fundraising project if (i) the nature of the product is consistent with the values and purpose of the Corporation; (ii) the value of the product is commensurate with the price at which it is offered; and (iii) it is in accordance with the Bylaws and Rules and Regulations of the Corporation. Furthermore, any product that is sold or offered for sale as part of an approved fundraising project and bears any emblems, logos, brands, or other designating marks associated with the Boy Scouts of America must be manufactured by a BSA licensee authorized by the Corporation to use such designating marks in that manner on those specific products. No youth member shall engage in such sales of products for more than 12 total weeks during any one 12-month period.

### Deposit of Funds

*Clause 4.* All funds shall be deposited in such depositories as shall be approved by the Executive Board.

### Custody of Securities

*Clause 5.* The securities of the Corporation shall be deposited in any such deposit vault or vaults or with such bank or banks, trust company or trust companies, or such other depositories, and access thereto shall be provided as may from time to time be determined by the Executive Board. Access to the securities may be had as provided in the Rules and Regulations or by resolution of the Executive Board and not otherwise.

They may be examined or withdrawn by such officer or officers or other employees of the Corporation as may from time to time be designated by the Executive Board. The Executive Board by resolution may authorize any two members of the Executive Board of the Corporation to have access to the securities for the purpose of audit or such other purpose as it may specify in the resolution.

### Checks, Notes, Etc.

*Clause 6.* Except as otherwise provided by law or in these Bylaws, all checks, drafts, notes, bills of exchange, or other orders, instruments, or obligations for the payment of money shall be signed by such officer or officers, employee or employees, or agent or agents of the Corporation as shall be specified by the Executive Board.

#### DEEDS, CONTRACTS, BONDS, ETC.

Section 2.

### Authority to Execute Documents

Except as otherwise provided by law or in these Bylaws, officers of the Corporation shall sign, in the name and on behalf of Corporation, all deeds, bonds, contracts, or mortgages. Provided, however that the execution of such documents relating to the powers reserved to the Executive Board in Article III, Section 1, Clause 2, shall be authorized by the Executive Board, separately and specifically beforehand.

## ARTICLE XII. SPECIAL SITUATIONS

### EXPERIMENTAL PROGRAMS

Section 1.

From time to time the Executive Board may wish to authorize experimental programs to determine how best to achieve the purpose of the Boy Scouts of America under changing conditions. If such experimental programs are in any manner inconsistent with these Bylaws, the programs shall be adopted only in accordance with the procedures established in the Rules and Regulations.

### OVERSEAS SCOUTING

Section 2.

### General

*Clause 1.* To further its objectives of extending membership privileges to citizens of the United States in other parts of the world, the Corporation authorizes the registration of youth members and leaders and the establishment of units in areas lying outside of the jurisdiction of any local council.

### Policy of Cooperation

*Clause 2.* To foster and strengthen the close and friendly relationship that exists between the Boy Scouts of America and other Scout associations, members and leaders of units will work in close harmony with their fellow Scouts and Scouters in the area.

### Services

*Clause 3.* Administration, organization, program, and training services shall be furnished by the International Division of the

Corporation with the cooperation of region, area, or council where such can be utilized.

### Deviations

*Clause 4.* To the extent feasible, the provisions of the Bylaws, Rules and Regulations, and policies of the Corporation relating to its domestic units shall apply to Direct Service units. It is recognized that as the application of certain of these may be impractical, their waiver or modifications will be permitted. Also due to varying conditions, it is recognized that such waiver and modification could result in nonuniform application as between units.

Any deviations will be authorized by the Executive Committee, whose authority may be delegated to a committee or subcommittee. Major deviations of a general nature normally will be set forth in the Rules and Regulations.

#### LEARNING FOR LIFE

Section 3.

*Clause 1.* To further the mission of the Boy Scouts of America to meet and serve the needs of youth and communities, the Corporation authorizes the establishment of an affiliated separate corporation to be known as Learning for Life, to work in cooperation with our nation's schools and businesses.

*Clause 2.* Learning for Life is a nontraditional, nonmembership, educational outreach program that takes place during or after school hours and is not part of the traditional Scouting program.

*Clause 3.* Exploring is Learning for Life's workforce development career program for young men and women who meet the participation requirements.

*Clause 4.* Exploring is based on five areas of emphasis: career opportunities, life skills, citizenship, character education, and leadership experience. Local community organizations initiate an Explorer post by matching their people and program resources to the interests of young people in the community.

*Clause 5.* The program, organization, and administration of and qualifications for participation in Learning for Life shall be established by Learning for Life.

# ARTICLE XIII. INDEMNIFICATION

## INDEMNIFICATION

SECTION 1.

The Corporation shall indemnify any person who was, is, or is threatened to be made a named defendant or respondent in any action, suit, or proceeding, civil or criminal (a "Proceeding"), because such person, or a person of whom such person is the legal representative, (i) is or was a member of the Executive Board, a committee of the Executive Board, a subcommittee of a committee of the Executive Board, or an officer of the Corporation; or (ii) while a member of the Executive Board, a committee of the Executive Board, a subcommittee of the Executive Board, or an officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, agent, or employee of another corporation or organization, to the fullest extent that a nonprofit corporation may grant indemnification to such a person under applicable law, without subjecting the Corporation to any income or excise tax under the Internal Revenue Code of 1986, as amended, or the corresponding provision or provisions of any subsequent United States Internal Revenue law or laws; provided, however, that any right to indemnification from the Corporation under this provision shall not extend to any matter as to which such person shall have engaged in wanton or willful misconduct in the performance or neglect of a duty owed to the Corporation.

Any right to indemnification under this provision shall be a contract right and shall include the right to be paid by the Corporation expenses incurred in defending such Proceeding in advance of its final disposition to the maximum extent permitted under applicable law. Any person who has requested an advancement of expenses under this provision and has not received such advance within 30 days of such request, may thereafter bring suit against the Corporation to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid also the expense of prosecuting such claim. In any such action, the burden of proof shall be on the Corporation to prove the claimant is not entitled to such payment. The rights conferred herein shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, bylaw, vote of the Executive Board or a committee or subcommittee thereof, agreement or otherwise. This provision shall not be deemed to limit any power or exclude any right of the Corporation to provide any additional or other indemnity or right, or to maintain insurance or a similar arrangement for or on behalf of any person. If this provision should be invalid or ineffective in any respect, the validity and effect of this provision in any other respect shall not be affected.

# ARTICLE XIV. WAIVERS AND AMENDMENTS

## WAIVERS

SECTION 1.

Whenever any notice is required by these Bylaws or by any law to be given to any member of the National Council, member of the Executive Board, or any committee or any officer, such notice except as otherwise provided by these Bylaws or by any law may be given personally or by fax or electronic mail addressed to the person at such person's place of business, if any, or (to the extent applicable) at such address as has been given to the Corporation as the home address of the person; or the notice may be given in writing by mail, in a sealed wrapper, postage prepaid, addressed to such person at such address. Any notice given by fax or electronic mail shall be deemed to be given when it shall have been delivered for transmission and any notice given by mail shall be deemed to have been given when it shall have been deposited in a post office, in a regularly maintained letter box, or with a postal carrier. A waiver of any such notice in writing, signed by the person entitled to such notice as required, shall be deemed the equivalent thereof, and the presence at any meeting of any person entitled to notice thereof shall be deemed a waiver of such notice as to such person.

## AMENDMENT OF BYLAWS

SECTION 2.

**Procedures**

*Clause 1.* These Bylaws may be amended at any meeting of the Executive Board by the affirmative vote of a majority of the whole Executive Board; upon the recommendation of the Executive Committee of the Executive Board; or when the proposed amendment has been sent to the members of the Executive Board at least 15 days in advance of the meeting.

**Promulgation**

*Clause 2.* All changes in the Bylaws, when made, shall be announced to the national and local councils in such manner as the Executive Board shall direct.

# INDEX

**A**

Access to securities, 20
Activities, policy on, 19
Adult leadership, 18–19
Adult program participants, 18
Advancement, principles of, 17
Advancement standards, 17
Advisory Council, 12
    election to, 12
    meetings of, 12
    members of, 12
Amendment
    Bylaws, 5, 21
    Rules and Regulations, 7
American National Red Cross, 6
Annual meeting, National Council, 5, 8, 9
Annual report to Congress, 5
Approval of documents, 17–18
Area committees, 16
Area executive committee, 16
Assets, 4
Audit and Enterprise Risk
    Management Committee, 11
Audits, 17
Authority of Executive Board, 9
Authority to execute documents, 13, 20

**B**

Badges and insignia, protection of, 6, 17
Bank or banks, 20
Bequest, 4
Bills of exchange, 20
Bonds, 20
Boy Scouts of America
    annual report, 5, 8, 13
    governing body, 5, 9
    handbooks, 7
    membership, 18
    name, 4, 7
    National Service Center, 7
    official publications, 7, 17
    policies, 19
    program, 19
    purpose, 4, 7
    seal, 4, 5, 7, 17
Business, 19–20
Bylaws, amendments to, 5, 21

**C**

Certificate of approval to incorporate, 17
Certificate of stock, 4
Changes in bylaws, 5, 21
Character development, 6, 7, 19
Chartered organization representative, 18
Checks, 20
Chief Financial Officer/Treasurer, 13–14
Chief Scout Executive, 7, 10, 11,
    13, 14, 18–19
Citizenship, 6, 19, 21
Citizenship training, 7, 19
Civil suit, 21
Commissioned leadership, 8, 18
Commissioning, 18
Congress, 4–5, 6, 7, 8, 13
Congressional report, 6
Consistency, 7, 17, 20
Constructive trust, 16
Contracts, 20, 21
Contributions, 19–20
Cooperation with Scout associations, 20
Corporate membership, 8
Corporate Mission and Reputation
    Committee, 11, 13
Corporation property, 5
Council improvement plans,
    authority to require, 15
Council property trust, 16
Courage, 4, 7, 19
Criminal suit, 21
Custody of securities, 20

**D**

Debts, 4
Declaration of religious principle, 18, 19
Decommissioning, 18–19
Deeds, 20
Deposit of funds, 20
Depositories, 20
Deposit vault or vaults, 20
Development Committee, 11
Deviations, 20
Devise, 4
Direct Service units, 20
District of Columbia, 4, 5, 7, 8
Diversity Committee, 11
Dividends, 4
Documents, approval of, 17–18
Documents, authority to execute, 13, 20
Drafts, 20

**E**

Education, 6, 7, 18, 19, 20–21
Election of members of
    Executive Board, 8, 9, 11, 14
Election, regulations for, 4
Electronic communications, 10
Emblems and badges, 7, 17
Employment of professionals, 18, 19
Equity, 4
Executive Board, 5, 9–12
    ad hoc committees, 10
    Advisory Council, 12, 14
    appointment of committee, 10–11
    Audit and Enterprise Risk
        Management Committee, 11
    committees of, 9, 10–12
    Corporate Mission and Reputation
        Committee, 11, 13
    Development Committee, 11
    Diversity Committee, 11
    duties of committees, 10
    election of regular members, 8, 9
    electronic communications, 10
    ex officio members, 9, 10, 12
    Finance Committee, 11
    Governance and Nominating
        Committee, 11, 12, 13, 14
    Human Resources Committee, 11
    International Committee, 12, 13
    interpretation of, 9
    meetings of, 9
    membership, 9
    notice of meetings, 9
    quorum, 10
    regional members, 9
    regional presidents, 9
    regular meetings, 9
    reporting changes to, 7
    special committees, 12
    special meetings, 9
    standing committee chair, 10, 11, 13
    standing committees, 9, 10, 11, 13, 14
    subcommittees, 10, 12, 14, 20, 21
    task forces, 10, 14
    telecommunication meetings, 10
    vacancies, 5, 9, 11
    "whole Executive Board, the," 9, 21
    youth members, 9

Executive Committee, 7, 9, 10–11, 12, 13, 14, 15, 17, 18, 19, 20, 21
  duties of, 10
  meetings, 10–11
  membership, 10
  quorum, 10–11
Expenses of corporation, 19
Experimental programs, 20
Exploring, 21

**F**

Federal charter, 4–5, 13
Finance, 19
Finance Committee, 11
Fiscal year, 7
Fitness, mental and physical, 7, 19
Freedom, religious, 19
Fundraising, 20

**G–H–I–J**

Gift, 4
Governance and Nominating Committee, 9, 11, 12, 13, 14
Governing body, 5, 9, 18
Honor, 6
Honorary officers, 11
Human Resources Committee, 11
Incorporation of local councils, 17–18
Indemnification, 21
Individual merit, 18
Initiative, 6
Insignia, 6, 17
Instruments, 20
Intellectual life, 6
International commissioner, 11, 12, 13
International Committee, 12, 13
International Division, 20
Juvenile delinquency, 6

**K–L**

Key 3, 5
  area, 16
  national, 10, 14, 15, 17
  regional, 15, 16
Leadership, 7, 13, 15, 17, 18–19, 21
Leadership qualifications, 18
Learning for Life, 9, 20–21
Liabilities, 4, 14
Liens, 5
Local councils, 16–18
  application for new charters, 16
  audits of, 17
  charters to, 17
  executive boards, 18

incorporation of, 17
  officers, 18
  operation of, 18
  organization of, 18
  powers of, 17
  responsibilities of, 17

**M**

Medals, 6
Mental fitness, 7, 19
Military system, 6
Moral life, 6
Mortgages, 9, 20
Motto, 7
Movement, Scouting, 6, 8, 9, 10, 12, 15, 16, 17, 19, 20

**N**

Name of the corporation, 4, 7
National commissioner, 10, 13
National Council, 8
  annual meetings, 8
  certificates of membership, 8
  corporate membership, 8
  elected members, 8
  eligibility requirements, 8
  Executive Board members, 8
  ex officio members, 8
  general meetings, 8
  guests, 8
  honorary members, 8
  local council representatives, 8
  meetings, 8
  members, 8
  members at large, 8
  notice of meetings, 8
  quorum, 8
  request for special meeting, 8
  special meetings, 8
  voting, 8
  voting credentials, 8
National Service Center, 7
Notes, 20
Number, governing body, 5

**O–P**

Officers, 13–14
Overseas Scouting, 20
Patent laws, 6
Patriotism, 4, 7
Payment of money, 20
Personal courage, 19
Personal estate, 4
Physical fitness, 7, 19
Policies, 19
President, 13, 14
President-elect, 15–16
Priorities, 7
Professional leadership, 18–19
Professional Scouters, 18–19
Program, 19
Program objectives, 19
Property, 4, 5, 16, 17
Publications, official, 7, 17, 18
Public emergencies, 6
Purpose, 4, 7

**Q**

Qualifications, governing body, 5
Quorum
  annual or special meeting, 9
  Executive Board, 5, 9
  Executive Committee, 10–11
  National Council, 8

**R**

Red Cross, 6
Regional advisory council, 16
Regional board, 15
  meetings, 15
  youth members, 15
Regional committees, 15
  meetings, 15
  organization of, 15
  regular members, 15
Regional director, 15
Regional executive committee, 15
  meetings, 15
  members, 15
Regional officers
  area commissioner, 16
  area president, 16
  elections, 16
  regional commissioner, 16
  regional president, 15–16
  regional vice presidents, 16

Regional organization, 14–16
Regional standing committees, 16
Regions, 14–16
Regulations for election, 4
Religion, policy on, 19
Religious freedom, 19
Report to Congress, 5
Resolutions Subcommittee, 12
Resourcefulness, 6
Responsibilities of regions, 14–15
Revocation of charter, 15, 17
Rules and Regulations, 7, 10, 13, 15, 16, 17, 19, 20

**S**

Scoutcraft, 4, 7
Scouting movement, 6, 8, 9, 10, 12, 15, 16, 17, 18
Scout Oath, 17, 19
Seal, 4, 5, 7, 17
Self-reliance, 4, 6, 7, 19
Signatures for payment, 20
Solicitors of money, 19–20
Special committees, 11, 12
Special meetings, 5, 8, 9
Special situations, 20–21
Standing committees, 5, 9, 10, 11, 13, 14, 15, 16
Support committees, 8, 13, 14, 16
Suit, 21
Supplies, sales of, 19

**T**

Telecommunications, 10
Termination of charters, 17
Term of office, governing body, 9, 11
Tests, 6
Training Scouts, 6
Trust company or companies, 20
Trust, constructive, 16

**U–V–W–Y**

Uniforms, badges, and insignia, 7
Vacancies
    Executive Board, 5, 9, 11
    honorary officers, 11
Varsity Scouting, 8
Vice presidents, 15, 16, 18
Waivers, 10, 20, 21
Wilson, Woodrow, 5
Youth membership, 18
Youth members not to
    solicit money, 19–20
Youth program participants, 9, 15, 18



BOY SCOUTS OF AMERICA
1325 West Walnut Hill Lane
P.O. Box 152079
Irving, Texas 75015-2079
http://www.scouting.org

100-491
June 2019 Printing

# EXHIBIT 2

# RULES AND REGULATIONS
## OF THE
## BOY SCOUTS
## OF AMERICA

### SEPTEMBER 2020



©2020 Boy Scouts of America

100-492
©2020 Boy Scouts of America
September 2020 Revision

# SEPTEMBER 2020 CHANGES

**The term Chief Scout Executive has been changed to Chief Executive Officer throughout the document.**

**Section III, Local Councils, Local Council and Unit Finance**

Deleted provision allowing local councils to charge unit or activity fee or participant surcharge to be applied to national liability insurance program.

**Section V, Individual Registration, Registration of Youth Members and Adult Program Participants**

Deleted sentence prohibiting local councils from charging additional youth membership fee.

**Section V, Individual Registration, Local Council Registration or Program Fees**

Added provision allowing local councils to charge annual registration fee not to exceed national registration fee.

**Section VIII, Commissioned Professional Leadership**

Significant changes were made regarding the employment of professionals in local councils.

# CONTENTS

I.  **Definitions**                                           5

II. **Policies**                                              6
   Code of Conduct                             6
   Cooperation With National Movements         6
   Participation in Public Functions            6
   Scouting Public Display Activities           6
   Commercialism Policy                         6
   Local Council and Unit Fundraising           6
   Advertising Policy                           7
   Policy Concerning Political Questions         7
   Policy Concerning Military Training           7
   Conflict-of-Interest Policy                  7

III. **Local Councils**                                      8
   Local Council Registration and Fees          8
   Council Operations                           8
   Responsibilities of Local Council            8
   District Organization                        8
   Council Program Promotion Outside of Assigned Territory  8
   Local Council and Unit Finance               8
   Real Estate                                  9
   Restricted Funds                             9
   Council or Unit Assets Upon Dissolution      9

IV. **Units and Chartered Organizations**                    10
   General                                      10
   Charters to Organizations                    10
   Charters to Groups of Citizens               10
   Charter Applications, Renewals, and Revocations  10
   Chartered Organizations and Representative   10
   Unit Committees                              10
   Unit Program Leaders                         11
   Unit Designation                             11

V. **Individual Registration**                               12
   Registration of Youth Members and Adult
     Program Participants                    12
   Registration of Adult Leaders                12
   Procedure for Registration                   12
   Qualifications, Applications, Approval, and Removal  12
     Unit Leaders                            12
     District and Council Scouters           12
     Area, Region, and National Scouters     12
     Scouter Training                        12
   Special Types of Registration                12
     Sustaining Members                      12
     Camp Staff                              13
     College Scouter Reserve                 13
     Merit Badge Counselors                  13
     Scouter Reserve                         13
     Retired Professionals                   13
     Special Registration Status             13
   Veteran Award                                13
   Period of Registration                       13
   Transfers                                    13
   Confidentiality and Use of Registration Information  14
   Denial, Expiration, or Revocation of Registration  14
   Local Council Annual Registration or Program Fees  14

VI. **Council Commissioned Leaders**                         15
   Commissioner Service                         15
   Roundtables                                  15

VII. **Programs**                                            16
   Youth Programs                               16
   Youth Leadership Positions                   16
   Advancement                                  16
   General Principle                            16
   Administration                               16
   Advancement Requirements                     16
   Programs and Facilities                      16
   Responsibility for Merit Badges              16
   Activities                                   17
   Anniversary Celebration                      17
   Participant Fees                             17
   *Boys' Life* or *Scout Life* Magazine        17
   Insignia, Uniforms, and Badges               17
   General                                      17
   Official Uniforms                            17
   Use of Uniform                               17
   Special Local Badges and Insignia            17
   Authorization                                17
   Lifesaving and Meritorious Action Awards     18
   Lifesaving Awards                            18
   Meritorious Action Awards                    18
   Applications                                 18
   Awards for Distinguished Service to Youth    18
   Silver Buffalo Award                         18
   Silver Antelope Award                        18
   Silver Beaver Award                          19
   Silver World Award                           19

VIII. **Commissioned Professional Leadership**               20
   General                                      20
   Professional Commissioning                   20
   Decommissioning                              20
   Employment of Professionals                  20
   Rules and Guidelines                         20
   Special Situations                           20
   National Professional Staff                  21
   Local Council Professional Personnel         21
   Other Local Council Staff                    21

IX. **Affiliates**                                           21
   Scouting Affinity Groups                     21

X. **Special Situations**                                    22
   Experimental Programs                        22
   Scouting Outside of Council Territories      22
   World Organization of the Scout Movement     22

XI. **Agreements With Other Organizations**                  22

**Index**                                                    23

# I. DEFINITIONS

**Adult.** Unless otherwise stated, the word "adult" refers to a person 18 years of age or older.

**Adult Program Participant.** An adult program participant is any person 18 years of age or older who registers to participate in a program in which youth members are also eligible to participate; obligates himself or herself to regularly attend the meetings; fulfills a member's obligation to the unit; subscribes to the Scout Oath; and participates in an appropriate program based on the current guidelines of the Boy Scouts of America. Adult program participants are subject to the same guidelines as adult Scouters when required by policies and guidelines.

**Boy Scouts of America.** The Boy Scouts of America means the Boy Scouts of America, National Council.

**Council Scouter.** A council Scouter is an adult volunteer leader serving as a member of the council, a council officer, a board or committee member, or a chartered organization representative.

**District Scouter.** A district Scouter is an adult volunteer leader serving on a district committee or district commissioner's staff.

**Leader.** A leader is an adult Scouter registered in a position of leadership or responsibility at the council, district, or unit level.

**Member.** Unless otherwise stated, a "member" is a youth member and, in context, an adult program participant.

**National Council.** National Council is generally synonymous with the Boy Scouts of America.

**National Service Center.** The National Service Center is the Boy Scouts of America National Council headquarters at Irving, Texas.

**Official Scouting Activity.** An official Scouting activity is an activity consistent with the values, Charter and Bylaws, Rules and Regulations, policies, manuals, and applicable literature of the Boy Scouts of America.

**Scouter.** A Scouter is an adult who registers with the Boy Scouts of America at the local, area, region, or national level; fulfills the obligations of his or her position; obligates himself or herself to subscribe to the Scout Oath; and agrees to abide by the Rules and Regulations, policies, and other guidelines of the Boy Scouts of America.

**Scouter Code of Conduct.** www.scouting.org/health-and-safety/gss/bsa-Scouter-code-of-conduct

**Scouting.** In context, Scouting refers to the collective programs of the Boy Scouts of America.

**Scouts BSA.** In context, Scouts BSA is the program for eligible youth who have completed or are too old for the Cub Scout program.

**Unit Scouter.** A unit Scouter is an adult volunteer leader registered with a unit, except for a chartered organization representative who is considered a council Scouter.

**Youth.** "Youth" generally means a youth member or adult program participant registered in a program.

**Youth Leader.** A youth leader is a youth member or adult program participant occupying a position of responsibility for leadership development purposes as a youth as opposed to an adult leader.

**Youth Member.** A youth member is a youth under 18 years of age who, with the approval of a parent or guardian, becomes a member of a unit; obligates himself or herself to regularly attend the meetings; fulfills a member's obligation to the unit; subscribes to the Scout Oath; and participates in an appropriate program based on the current guidelines of the Boy Scouts of America.

**Youth Programs.** A youth program is any program serving youth members and adult program participants.

# II. POLICIES

## Code of Conduct

Members and Scouters should conduct themselves in accordance with the Scout Oath and Scout Law. Additionally, the Boy Scouts of America may adopt rules or codes of conduct for youth members, adult program participants, and adult leaders, as well as others for specific positions. A code of conduct is enforceable in the same manner as these Rules and Regulations.

## Cooperation With National Movements

With the consent of the local council, members and leaders of the Boy Scouts of America may cooperate with established nonpartisan and nonsectarian national movements for the relief of humanity in undertakings to raise money by giving personal service, provided, however, that this not involve the use of youth members as collectors or solicitors of money.

## Participation in Public Functions

Scouters must, when practicable, cooperate in connection with civic or other public gatherings of a nonpartisan and nonpolitical character in a way that gives youth members an opportunity to render service in harmony with their training instead of merely taking part in parades in their uniforms. Any such participation must be consistent with the principles of the Scouting movement.

## Scouting Public Display Activities

Local councils may approve the sale of tickets for the public display of Scouting activities, such as merit badge shows, circuses, rallies, and demonstrations, when: (a) the nature of the program or function offers a value commensurate with the purchase price of tickets offered for sale, (b) the sale of tickets is not used as an indirect method of defeating the purpose of any other provision of these Rules and Regulations, and (c) the participation of youth members in the sale of tickets for such affairs is confined to their parents, families, and friends and does not involve methods similar to those used in the sale of tags or other general solicitation.

## Commercialism Policy

The National Council has the sole right to authorize the use of insignia, words, phrases, designation marks, pictorial representations, and descriptive remarks relating to the program of the Boy Scouts of America on commercial products, promotional efforts, and/or sale and distribution to members of the Boy Scouts of America and/or the general public. The use of the same by local councils must be only as authorized by the National Service Center.

No Scouter; member, employee, or representative of the Boy Scouts of America; or any local council or unit is authorized to use any logo, insignia, terms in common usage, or descriptive marks relating to Scouting for any commercial purpose without the express written authorization of the National Council for the subject use.

No Scouter; member, employee, or representative of the Boy Scouts of America; or any local council or unit is authorized to enter into a contract or relationship of a commercial character directly involving or obligating the Boy Scouts of America or that uses the seal, emblems, badges, descriptive marks, words, or phrases associated with or referring to the Boy Scouts of America unless duly authorized by the Chief Executive Officer.

A local council may not grant permission to any third party for the use of any logo, insignia, terms in common usage, or descriptive marks relating to Scouting unless that third party is authorized or licensed in writing by the National Council. Any use of a Boy Scouts of America designating mark by a local council must avoid appearing to be an endorsement of any commercial product or venture except in connection with approved corporate sponsorships entered into by the National Council as authorized by the Chief Executive Officer.

The National Council will not engage in direct product sales for fundraising unless conducted in such a manner as to also provide support opportunities for local councils and/or units. Any such activity shall be approved in advance by the National Executive Committee. Provided, however, the Chief Executive Officer may authorize commercial sponsorships and digital media sponsorships in connection with publications and digital media.

## Local Council and Unit Fundraising

Subject to the Bylaws, Rules and Regulations, policies, and guidelines of the Boy Scouts of America, chartered organizations and units may engage in projects to earn money to participate in Scouting, provided that all approved procedures for doing so are followed, including prior approval by the local council. Chartered organizations and units must not allow money-earning projects to be promoted or advertised in a manner that does not clearly indicate the project is for the direct and sole benefit of the Scouting unit. Fundraising projects involving games of chance, lotteries, sale of raffle tickets, or bingo, or which could be construed as a gambling activity and those in the nature of pyramid sales or multilevel marketing are prohibited.

## Advertising Policy

Advertisements for placement in Scouting publications and other media, in addition to meeting the standards in general use by publishers of high-grade periodicals and other advertising media, must:

(a) Relate to a service or product that could reasonably be foreseen to render some service to the audience of the advertisement, or relate in some way to the purposes of the Boy Scouts of America, and

(b) Merit the purchase price of the article or service offered in the advertisement.

No advertisement will use or display any logo, insignia, terms in common usage, or descriptive marks relating to Scouting without conforming to all currently accepted procedures and guidelines as established by the National Council.

## Policy Concerning Political Questions

The Boy Scouts of America must not, through its governing body or through any of its officers, chartered councils, Scouters, or members, involve Scouting in political matters. However, this must not be interpreted to prevent the teaching of ideals of patriotism and good citizenship as required to fulfill the Boy Scouts of America's purpose. Faith-based teachings incorporated into the Scouting program by religious chartered organizations in a manner consistent with the Bylaws are not considered political matters. This policy does not prohibit the Boy Scouts of America from expressing its opinion upon matters of governmental concern when considered in its best interest by the governing body of the Boy Scouts of America.

This policy does not limit the freedom of thought or action of any Scouter or member as an individual in a manner not directly or indirectly implying a connection to Scouting.

## Policy Concerning Military Training

Technical military training and drill must not be included in the Scouting program.

## Conflict-of-Interest Policy

A fundamental principle of ethics is that any person who exercises discretionary authority on behalf of the Boy Scouts of America may not use this authority for his or her own benefit.

It is therefore the basic policy of the Boy Scouts of America that all Executive Board members or members of any committee thereof or officers or employees of the Boy Scouts of America have a duty to be free from the influence of any conflicting interest when they act on behalf of the Boy Scouts of America or represent it in negotiations or advise others in the Boy Scouts of America with respect to dealing with third parties. They are expected to deal with suppliers, customers, contractors, and others having dealings with the Boy Scouts of America on the sole basis of that which is in the best interest of the Boy Scouts of America, without favor or preference to third parties based on personal considerations. To this end, the following is the policy of the Boy Scouts of America:

(a) No member of the Executive Board or member of any committee thereof or officer or employee of the Boy Scouts of America may accept from any person, directly or indirectly, whether by himself or herself or through his or her spouse or a member of his or her family or through any partner or business or professional associate, any gift, favor, service, employment or offer of employment, or any other thing of value that he or she knows or has reason to believe is made or offered to him or her with the intent to influence him or her in the performance of his or her duties as a member of the Executive Board or member of any committee thereof or officer or employee of the Boy Scouts of America.

(b) No member of the Executive Board or member of any committee thereof or officer or employee of the Boy Scouts of America who is a partner, officer, or employee of a partnership, firm, or corporation or who owns or controls, directly or indirectly, more than 10 percent of the stock of such corporation, may represent, appear for, or negotiate on behalf of the Boy Scouts of America in connection with the acquisition or sale by the Boy Scouts of America of any interest in real or tangible or intangible personal property from or to such partnership, firm, or corporation or any purchase of services from or to such partnership, firm, or corporation.

(c) No member of the Executive Board or member of any committee thereof may participate by discussion, voting, or by any other action taken by the Executive Board, or any committee thereof, in the enactment of or defeat of a motion in which that member has an interest as defined in paragraph (b) above. In case any such matter is discussed at any meeting where any Executive Board or committee member who has such an interest is present, the member must promptly disclose that interest in the matter to be voted on to the chairman of the meeting. The member may not vote on the matter and, at the discretion of the disinterested members present, may be required to leave the meeting during the discussion and the voting on the matter.

(d) The Boy Scouts of America may not enter into any transaction with any individual or entity that is a "disqualified person" with respect to the Boy Scouts of America under Section 4958 of the Internal Revenue Code, if such transaction would constitute an "excess benefits transaction" under that same section.

# III. LOCAL COUNCILS

## Local Council Registration and Fees

The requirements set forth in the application for new or renewal charters as well as policies and guidelines must be satisfied in order to maintain the local council in good standing and eligible for a renewal charter. The application must also be accompanied by a statement of compliance with all membership validation requirements and the local council must maintain all membership validation records on file for no less than five years.

An annual registration fee, known as the council charter fee and determined from time to time by the Executive Committee and announced to the field, must be paid by local councils to the National Council upon charter application or renewal application. An annual assessment, known as the national service fee, for which the calculation will be determined from time to time by the Executive Committee and announced to the field, must be paid by the local councils to the National Service Center. This fee will be paid during the 10-month period beginning in February and ending in November.

## Council Operations

Councils must be organized and operated pursuant to the Bylaws, Rules and Regulations, policies, and guidelines of the Boy Scouts of America. Local councils serve as the local representative of the National Council in administering the Scouting program and accepting and processing applications for membership, registration, and unit charters, as well as all other applications for certificates, commissions, awards, and other matters subject to the approval of the National Council. However, local councils are not agents of the National Council and have no authority to bind the Boy Scouts of America or act in a manner inconsistent with the Bylaws, Rules and Regulations, policies, and guidelines of the Boy Scouts of America. Council executive board members must be and remain registered in that position after their election to be eligible to serve.

## Responsibilities of Local Council

It is the duty of the local council to promote the Scouting program through the organization and annual registration of units and their personnel and to provide leadership and support of program activities in such a manner as to ensure compliance with the provisions of the Bylaws, Rules and Regulations, policies, and guidelines of the Boy Scouts of America. Local councils must guard against the use of the official insignia and uniform by persons not registered with or authorized by the Boy Scouts of America and to bring to the attention of the Boy Scouts of America violations of regulations or attempts to commercialize Scouting. Local councils should encourage eligible units and youth to participate in a high-adventure activity or superactivity away from home each year. Local councils must provide the support necessary to ensure opportunities for advancement, awards, and recognition in accordance with the guidelines of the Boy Scouts of America.

## District Organization

For the purpose of unit service and program administration, a local council may be divided geographically or functionally into such districts as the local council executive board may determine. Districts must operate pursuant to the Bylaws, Rules and Regulations, policies, and guidelines of the Boy Scouts of America. Their purpose is to make effective in the territory the policies and programs adopted by the local council, its executive board, and council committees. The administration of Scouting in each district will be exercised by the local council through a district Key 3, committee, and commissioner staff. The district committee, the operating committees of the district, and the district commissioner staff have no legislative authority.

## Council Program Promotion Outside of Assigned Territory

Local councils may not directly or indirectly solicit, advertise, or otherwise use or authorize the use of any logo, insignia, terms in common usage, or descriptive marks of the Boy Scouts of America or status as a chartered affiliate outside of the United States to recruit non-Scouts to local programs. Local councils may publicize the availability of local council programs, including camps, in domestic publications if the facilities are suitable and in compliance with applicable laws, rules, and regulations.

## Local Council and Unit Finance

No unit or local council has the authority to commit the National Council to any financial obligation whatsoever. All money raised by or received for the benefit of a unit or local council and all property acquired by a unit or local council will be deemed to be received or acquired solely for the benefit of Scouting as interpreted by and in accordance with the Bylaws, Rules and Regulations, and policies of the Boy Scouts of America.

Subject to these Rules and Regulations, local councils control the raising and expenditure of all funds for local Scouting work in their jurisdiction. Each chartered local council must render annually to the community in which it is located a duly audited statement of all funds collected and expended and must furnish a copy thereof to the National Service Center.

## Real Estate

Except as hereafter provided with respect to incorporated local councils, the title to all real estate acquired for a unit or local council must be vested in a bank or trust company, in trust for the use of the unit or local council in accordance with the wishes of the donor with the provision that if such property cannot be utilized in such a manner, and title does not revert to the donor, that title or beneficial use of the property must nonetheless be for the benefit of Scouting in the local area.

Any incorporated local council may hold title to real property in its own name provided that in the event of the dissolution of the unit or council or the revocation or lapse of its charter said trustee or trustees will, after satisfying any claims against such unit or council to which such real estate may be subject, convey said property or, if sold, pay the net proceeds of such sale to the Boy Scouts of America, which may hold or use said property or funds for the benefit of Scouting in such locality or elsewhere if there is not suitable opportunity to use said property or funds in such locality. Any incorporated local council holding title to real property in its own name must ensure that its certificate or articles of incorporation expressly provide for the conveyance of such property or the net proceeds from the sale thereof to the Boy Scouts of America in the event of the dissolution of the local council or the revocation or lapse of its charter in a manner consistent with this provision.

## Restricted Funds

Restricted funds received by a unit or local council must in all cases be held (a) in trust by either a corporate trustee for a bank or trust company, the National Boy Scouts of America Foundation, or the Boy Scouts of America Endowment Master Trust; or (b) in the Boy Scouts of America Commingled Endowment Fund LP for the use of the unit or the local council, in accordance with the wishes of the donors, with the provision in the statement of the conditions governing the administering of the funds that in the event of the dissolution of the unit or council or revocation or lapse of its charter said funds will, after any claims against said funds are satisfied, be turned over to the Boy Scouts of America for use by the Boy Scouts of America for the benefit of Scouting in such locality and for the specific purposes for which the fund was granted. If there is no suitable opportunity for the use of said funds in such locality, they may be used elsewhere.

## Council or Unit Assets Upon Dissolution

Consistent with the Bylaws, in the event of the dissolution of a council or the revocation or lapse of its charter, the Executive Committee may, at its option, authorize the National Council to assume charge of the affairs of the council and continue operation pending reorganization or re-establishment of the council or wind up the business of the council. All funds and property in the possession or control of such council must be applied to the payment of the council's obligations. Any surplus funds or property may thereafter be administered as deemed to be in the best interest of Scouting.

In the event of the dissolution of a unit or the revocation or lapse of its charter, unit funds and assets must be used to first satisfy any outstanding unit obligations. Any remaining assets obtained with funds raised in the name of Scouting must be redeployed for Scouting use in the local area. Any assets obtained with funds from the chartered organization or parents of registered members may be redeployed as agreed upon by the chartered organization and local council.

Any property or funds acquired by the National Council upon the dissolution of a Scouting unit or local council will be administered so as to make effective, as far as possible, the intentions and wishes of the donors.

# IV. UNITS AND CHARTERED ORGANIZATIONS

## General

The Boy Scouts of America has the power to grant charters to organizations and groups of individuals that it determines meet the requirements of the Bylaws, Rules and Regulations, policies, and guidelines of the Boy Scouts of America. The Boy Scouts of America has the power to revoke or modify such charters when in its sole judgment such revocation or modification is warranted.

## Charters to Organizations

Charters for new units may be granted upon approval of the application in accordance with the guidelines of the Boy Scouts of America. Prior to approval of any new chartered organization, a review must be made as to the general objectives, purpose, character, intent, and programs of the prospective chartered organization or community group and its compatibility with the aims and purposes of the Boy Scouts of America. The history, length of service, and general reputation of the organization or community group are also factors that should be considered. The application must provide reference to the guidelines adopted by the Boy Scouts of America on the use of the Scouting program by chartered organizations and references to other policies and guidelines on the Scouting program. The charter agreement must obligate the holder to abide by the charter agreement; provide adequate facilities, supervision, and leadership for at least one year; and make an effort to provide youth members with the opportunity for a quality program experience as set forth in the official literature of the Boy Scouts of America. Unit meeting quarters must be periodically inspected to determine their adequacy as well as to ascertain other uses to be made of these or adjoining quarters, for the purpose of considering the compatibility of uses and the general appropriateness of the environment.

## Charters to Groups of Citizens

While the formation of units in connection with existing organizations is preferred, when conditions warrant, a charter may be granted for the formation of a unit independent of any relationship with an existing organization, provided, however, that the applicants are citizens of the United States who subscribe to the principles of the Scout Oath, whose interest is primarily in helping youth through the Scouting program, and who have the resources to provide the necessary leadership, supervision, and facilities. In such cases, the obligations upon the applicants for a charter are the same as those required for organizations.

**Charter Applications, Renewals, and Revocations** Applications for unit charters, new and renewal, must be issued in accordance with the policies and guidelines of the Boy Scouts of America and may be granted only upon the favorable recommendation of the local council. Prior to approving the renewal of unit charters, the council should determine that the unit is offering the Scouting program in accordance with the Rules and Regulations, policies, and guidelines of the Boy Scouts of America.

An annual unit charter fee determined from time to time by the Executive Committee and announced to the field must be paid to the National Council each time a unit registers or reregisters and is in addition to the individual registration fees. No additional unit charter or registration fees must be imposed by a local council

without the prior authorization of the Executive Committee. The expiration of the registration of units will normally be 12 months from the last day of the month in which the original organization of the unit was approved by the local council or, in the case of units not under local council supervision, by the Boy Scouts of America. The rights and privileges of all those units expire with the expiration of the unit registration. In cases where units have been dropped from the records under conditions that they could not avoid, they may have their record of continuous service reestablished by submitting evidence of continued activity and paying registration fees from the date of charter expiration.

## Chartered Organizations and Representative

Chartered organizations must operate the unit in accordance with the Rules and Regulations and charter agreement. Chartered organization representatives are also members of the district committee and voting members of the local council.

## Unit Committees

Each chartered unit of the Boy Scouts of America must be supervised by a unit committee, consisting of three or more qualified adults, 21 years of age or older, selected by the organization with which the unit is connected or, in the case of a unit chartered to a group of individuals, selected from those who make application for the unit charter. The unit must be operated under the guidance of the unit committee, one of whose members must be designated as chairman, in accordance with the Rules and Regulations, policies, and guidelines of the Boy Scouts of America.

## Unit Program Leaders

Two registered adult leaders 21 years of age or over are required at all Scouting activities, including meetings. A registered adult female leader must be present for any activity involving female youth. Notwithstanding the minimum leader requirements, age- and program-appropriate supervision must always be provided.

All adults accompanying a Scouting unit who are present at the activity for 72 total hours or more must be registered as leaders. The 72 hours need not be consecutive.

In Cub Scouting, units may have a separate pack for boys or girls, or separate dens for girls and dens for boys in the same pack. In the case of troops, separate troops for boys and girls are required. Chartered organizations may have "linked troops," which means a chartered organization can have a shared troop committee with separate troops for boys and for girls.

The chartered organization must select and its representative must approve unit leaders. The local council must process unit leader applications submitted on the proper form in accordance with guidelines established by the Boy Scouts of America. All units must be operated in accordance with the applicable policies and guidelines of the Boy Scouts of America.

## Unit Designation

Each unit will be designated by a serial number assigned by the local council. The National Council may establish guidelines by which units are designated and limit the use of such designations as appropriate.

# V. INDIVIDUAL REGISTRATION

### Registration of Youth Members and Adult Program Participants

Youth membership and adult program participation requires the payment of an annual registration fee determined from time to time by the Executive Committee and announced to the field. It is the philosophy of Scouting to welcome all eligible youth, regardless of gender, race, ethnic background, sexual orientation, or gender identification, who are willing to accept Scouting's values and meet any other requirements of membership. Young people of all religious backgrounds are welcome in Scouting, with some participating in units for youths of a particular religion and the greater majority participating in units open to members of various religious backgrounds.

Venturers and Sea Scouts may participate in more than one unit as well as a Scout troop with the payment of one primary registration in a Venturing or Sea Scout unit.

Scouting units are small, intimate groups. In the Scouting programs, units may be made up of even smaller groups which often meet regularly in private homes. As long as they are faithful to Scouting's membership philosophy, set forth above, it is for the units to determine on the basis of considerations such as group size or youth behavior whether to admit or to continue the membership of a youth member.

### Registration of Adult Leaders

The registration fee for Scouters shall include a subscription to *Scouting* magazine. If a Scouter serves in more than one registered capacity, only one registration fee is required.

### Procedure for Registration

All applications must be submitted on the current official form prepared for that purpose and carrying due reference to the requirements and provisions of the Bylaws of the Boy Scouts of America including the Declaration of Religious Principle. A suitable certificate of registration designating the official relationship to the Boy Scouts of America will be provided to all registered members and Scouters.

### Qualifications, Applications, Approval, and Removal

To be eligible for registration, a Scouter must agree to: subscribe to the Scout Oath; fulfill the obligations of his or her position; and perform his or her duties in accordance with the Rules and Regulations, policies, and guidelines of the Boy Scouts of America. The applicant may thereafter be registered by submitting the properly completed official application, approval, and payment of the required fee.

Registration and participation in Scouting is a privilege that may be denied, limited, or terminated when determined to be in the best interest of Scouting. Scouters must abide by the provisions of any applicable code of conduct. A Scouter who has not been designated as ineligible by the National Council, who is removed from a position or whose registration is not renewed by a local council is eligible for service in other positions subject to the required approval for the position.

**Unit Leaders.** Unit leaders must be selected and approved by the chartered organization and are subject to the approval of the local council and the Boy Scouts of America. Unit leaders must be 21 years of age or older when registering, except that assistant Cubmasters, assistant Scoutmasters, assistant den leaders, and assistant Webelos den leaders must be 18 years of age or older. Chartered organizations may remove or refuse to renew the unit registration of unit leaders when the unit committee and chartered organization representative agree that the Scouter's service is no longer desired or required.

**District and Council Scouters.** District and council Scouters must be approved by the local council Scout executive. Council Scout executives may remove or refuse to renew the position registration of a district or council Scouter when the council president and council Scout executive agree that the Scouter's service is no longer desired or required.

**Area, Region, and National Scouters.** Area, region, and National Council Scouters must be approved by the area, region, or national professional responsible for the area of service being provided by the Scouter. The National Council may remove or refuse to renew the registration of such Scouters when it is determined that their service is no longer desired or required.

**Scouter Training.** The Boy Scouts of America may establish training requirements for specified positions and completion of that training may be required prior to registration or renewal.

### Special Types of Registration

**Sustaining Members.** Persons who desire to be identified with the local council through their financial support and influence in the expansion of the council program may be enrolled as sustaining members of local councils.

**Camp Staff.** All persons serving as camp staff at a local council or at a National Council facility must be registered as camp staff members. No additional registration fee is required if the individual is already registered as a youth member, adult program participant, or Scouter. Camp staff includes employees and volunteers. Employees of contractors working at camps are to be registered as camp staff if they will reasonably be expected to have direct interaction with youth, unless an approved alternative procedure is adopted. For contractors working on camp property but not regularly interacting with youth, and those subject to any approved alternative procedure, the following must be the minimum requirements for granting access to camp property: compliance with applicable state laws; maintaining a roster of the name, address, and phone number of all such persons; approved screening or criminal background checks performed on each person; and completion of an approved youth protection training program.

**College Scouter Reserve.** College students who will commit themselves to an informed interest and active participation in the program, whenever possible, may be registered in the College Scouter Reserve.

**Merit Badge Counselors.** Persons who are at least 18 years of age may serve as merit badge counselors in subjects for which they are qualified and must register as such as adult Scouters as provided in this section. A fee for such registration will not be required.

**Scouter Reserve.** Individuals 21 years of age and over may, upon approval of the local council, register in the Scouter Reserve of the Boy Scouts of America by paying the registration fee required of a Scouter. Individuals so registered may serve in the following ways: as faculty members of Cub Scout training courses; assisting in organizing and training in connection with Cub or Scout units, Venturing crews, and Sea Scout ships; as hosts and hostesses; and by helping in finance and public relations campaigns. They may serve as members of fathers' and mothers' clubs, parents' clubs, and auxiliaries of units. Members of the Scouter Reserve may wear the universal badge of Scouting to signify their affiliation.

**Retired Professionals.** Persons who have retired from professional Scouting may be registered on an annual basis with the National Service Center upon the approval of the Chief Executive Officer.

**Special Registration Status.** The Chief Executive Officer may authorize guidelines and policies governing the registration of persons with special needs to accommodate those who are deemed qualified for special registration status outside of the otherwise prescribed program age requirements.

## Veteran Award

After five years of duly registered service in the Boy Scouts of America, individuals may upon application receive the designation of "veteran," provided they agree to live up to their Scouting obligations and to keep local Scouting authorities in the community in which they live informed as to their availability for service. A special badge will be made available to veterans. Such veterans, maintaining an active registered relationship in any capacity, must pay the regular registration fees of their class. Veterans desiring recognition as veterans for periods of time established by the Boy Scouts of America for particular recognition must maintain an active registered relationship for the required number of years, paying their annual registration fees.

## Period of Registration

The expiration of individual registration terms is as follows:

(a) National, regional, and area Scouters. At the end of the period for which they have been duly elected or appointed, unless registered in some other capacity.

(b) Council and district Scouters and those registered in the Scouter Reserve. At the expiration of the council year for which they are issued, unless registered in some other capacity.

(c) Unit Scouters serving in unit capacities only (including chartered organization representatives or group of citizens). At the expiration of the unit charter.

(d) Members. At the expiration of the registration of their respective units.

(e) Lone Cub Scouts and Lone Cub Scout friends and counselors. One year from the date of their last registration.

(f) Lone Scouts and Lone Scout friends and counselors. One year from the date of their last registration.

(g) Registered retired professional Scouters. One year from the date of their last registration.

## Transfers

Individuals (adult leaders or youth members) holding an unexpired registration certificate transferring from unit to council, council to unit, or unit to unit must pay a transfer charge. This charge applies to all transfers during the charter year but does not apply to Tigers becoming Cub Scouts in their affiliated pack.

### Confidentiality and Use of Registration Information

Lists of names, addresses, or other personal information of those currently or formerly registered as members or leaders of the Boy Scouts of America or financial supporters of the Boy Scouts of America and local councils are confidential and must not be used for commercial purposes. This provision does not prohibit the National Council from using affiliate or affinity group information to communicate membership benefits to members thereof in accordance with applicable guidelines or policies.

### Denial, Expiration, or Revocation of Registration

As a private, membership organization, the Boy Scouts of America has the right to set standards of membership and leadership. That right includes the ability to deny, expire, revoke, or otherwise limit or bar registration or affiliation with the Boy Scouts of America or any local council or any other affiliated organization. The general procedure for maintaining those standards is expressed in a publication titled *Procedures for Maintaining Standards of Membership and Leadership;* however, nothing contained therein limits the ability of the Boy Scouts of America to take such action as it may deem appropriate in its sole discretion.

### Local Council Annual Registration or Program Fees

A local council may charge an annual registration or program fee to youth members, adult program participants and Scouters whose primary registration is with the council in an amount not to exceed the amount of the applicable individual registration fee for their position established by the Executive Committee.

# VI. COUNCIL COMMISSIONED LEADERS

## Commissioner Service

All Scouters selected to serve as commissioners must first be approved by the local council commissioner and Scout executive. Commissioners will be issued commissions by the Boy Scouts of America on an annual basis. Commissioned Scouters must be at least 21 years of age.

**Council Commissioner.** The council commissioner is an elected officer of the council who is responsible for the delivery of commissioner service through monthly meetings with district commissioners and commissioner conferences. The council commissioner has the responsibility at the council level to report to the council president and regularly interpret the commissioner function to the council executive board. The council commissioner is responsible for the local council's commitment to on-time reregistration of units. The council commissioner also serves as a council representative to the National Council.

**Assistant Council Commissioners.** Each local council may have one or more assistant council commissioners. These individuals are appointed by the council commissioner subject to the approval of the Scout executive and assist, on direction, in the performance of the duties of that office.

**District Commissioner.** A district commissioner is offered for approval by the district nominating committee subject to the approval of the Scout executive. The district commissioner, through a volunteer staff, is responsible for on-time charter renewals, unit service, and monthly roundtables in the district and gives leadership to recruiting, training, and supervision of an effective staff. The district commissioner serves on the council commissioner's staff, reports to the district chairman, and has an advisory relationship with the district operating committees.

**Assistant District Commissioners.** Each district may have one or more assistant district commissioners. These individuals are appointed by the district commissioner subject to the approval of the Scout executive and recruit, train, and supervise unit commissioners or assist in staff operation through functional assignments as directed by the district commissioner.

**Unit Commissioners.** Unit commissioners must be appointed by the district commissioner subject to the approval of the Scout executive and are responsible for the continuity and program capability of assigned units. Unit commissioners provide their assigned units with meaningful service that brings about on-time charter renewal, membership growth, and the delivery of Scouting ideals to youth members. They give guidance in unit operation to unit leaders and interpret council and district activities in terms of unit opportunities.

## Roundtables

Cub and Scout roundtable commissioners are appointed by the district commissioner subject to the approval of the Scout executive and are responsible for monthly roundtables that provide unit program ideas and inspiration to reinforce leaders' commitment to help members grow. Roundtable commissioners must recruit, train, and supervise a permanent roundtable staff.

Roundtable staff members are appointed by the roundtable commissioner subject to the approval of the Scout executive and, under direction, plan and conduct monthly leader roundtables.

# VII. PROGRAMS

## Youth Programs

The youth programs of the Boy Scouts of America are Cub Scouts, Scouts BSA, Venturing, Sea Scouts, and Lone Scout. The eligibility requirements shall be published and available to unit leaders. Changes in the eligibility requirements must be approved by the National Operations Leadership Committee and reported to the National Executive Committee before becoming effective.

## Youth Leadership Positions

Each Scouting unit may have certain key youth leadership positions that involve youth members in leadership training through program management. Positions must be in accordance with guidelines established by the Boy Scouts of America, including:

(a) Junior Assistant Scoutmaster—A 16- to 17-year-old youth appointed by the Scoutmaster, approved by the troop committee, and responsible to the Scoutmaster for tasks assigned.

(b) Senior Patrol Leader—Must be elected by the majority of youth members registered in the troop and must meet the qualifications set by the patrol leaders' council. The senior patrol leader may appoint other youth leaders with the concurrence of the Scoutmaster and presides over the patrol leaders' council.

(c) Venturing Elected Officers—Elected Venturing officers work together to help the crew succeed. Elected officer positions are: president, first vice president, second vice president, secretary, and treasurer.

(d) Sea Scout Elected Officers—Elected Sea Scout officers work together to help the ship succeed. Elected officer positions are: ship boatswain, boatswain's mate/administration, boatswain's mate/program, yeoman, and purser.

## Advancement

### General Principle

Education is the chief function of Scouting and is the basis of the advancement program. A fundamental principle of advancement is that learning is a natural outcome of participation in the Scouting program.

### Administration

All advancement procedures must be administered under conditions that harmonize with the aims and purposes of the Boy Scouts of America.

### Advancement Requirements

Advancement ranks or program recognitions in Scouting programs must be in accordance with published program requirements. Unit activities should be planned to facilitate regular advancement. No additional advancement requirements may be added by a local council or unit. Any change in the advancement requirements in those programs must be approved in advance by the National Operations Leadership Committee.

### Programs and Facilities

Programs and facilities used to provide the Scouting program should be conducted, monitored, and inspected in accordance with the policies and guidelines of the Boy Scouts of America.

### Responsibility for Merit Badges

The responsibility for merit badges rests with the merit badge counselor approved by the local council and district advancement committee. Merit badge counselors must be registered adult leaders of the Boy Scouts of America. The merit badge counselor must prepare and qualify youth members. There is no board of review procedure for merit badges, but public recognition may be given at a unit court of honor or other suitable occasion.

# Activities

## Anniversary Celebration

The anniversary celebration of the Boy Scouts of America takes place annually on February 8, the anniversary of the original day of incorporation of the Boy Scouts of America, and throughout the week (beginning on Sunday) containing this date. This week is known as Scouting Anniversary Week. The National Service Center, with the cooperation of Scouters throughout the country, is to arrange for a nationwide celebration on February 8 and throughout the month of February for the purpose of bringing more definitely to the attention of each community the value of the Scouting program for its work with youth and young adults for the development of character and training for citizenship. The program for the anniversary celebration of the Boy Scouts of America must include a plan whereby every registered youth member is given an opportunity to observe Anniversary Day, February 8, with special ceremonies in which they recommit themselves to the Scout Oath and Scout Law. On this occasion it is the duty of the unit leader and other leaders to bring to the attention of the unit members the extent of the Scouting brotherhood in our own country and throughout the world and impress upon their minds the fact that every member the world over is committed to the same obligation, as stated in the Scout Oath and Scout Law.

## Participant Fees

All national events and activities for which a participant fee is charged must include a surcharge for the national liability insurance program. The National Council may also establish national liability insurance program policies with respect to persons not registered with the Boy Scouts of America who attend national or local Scouting activities or programs on the premises of a national or council facility.

# *Boys' Life or Scout Life* Magazine

The Boy Scouts of America will publish a periodical titled *Boys' Life* or *Scout Life* for all Scouting-age youth, providing wholesome stories and other material of interest and educational value, which will stimulate ambition and help in character development of youth. All stories and material must be in harmony with the principles of Scouting as set forth in the Scout Oath and Scout Law.

# Insignia, Uniforms, and Badges

## General

The intellectual property of the Boy Scouts of America must be made available and used only in accordance with the policies and guidelines of the Boy Scouts of America.

## Official Uniforms

The official uniforms authorized as evidence of official relationship to the Boy Scouts of America are those approved by the Boy Scouts of America from time to time, as illustrated and correctly described in the handbooks, catalogs, and other official guidelines of the Boy Scouts of America. The official uniforms and parts thereof may be issued only as authorized by the Boy Scouts of America and sold either directly by the National Service Center through responsible local merchants designated as local Scouting distributors or through designated local councils. Local Scouting distributors may be appointed and licensed and the licenses revoked only by the National Service Center, but chartered local councils may make recommendations for such actions. Imitation of United States Army, Navy, or Marine Corps uniforms is prohibited, in accordance with the provisions of the organization's Congressional Charter.

## Use of Uniform

The official uniforms are intended primarily for use in connection with official Scouting activities, and their use may be approved by the local council executive board for council events or activities under conditions consistent with the Rules and Regulations of the Boy Scouts of America. No alteration of, or additions to, the official uniforms, as described in the official guidelines or the Rules and Regulations covering the wearing of the uniform and the proper combinations thereof on official occasions, may be authorized by any Scouting official or local council. It is the responsibility of all leaders of the Boy Scouts of America and especially of all commissioned officers and chartered councils to cooperate with the Boy Scouts of America in preventing the use of the official uniforms by those who are not registered and in good standing.

## Special Local Badges and Insignia

Local councils are authorized to adopt special badges and insignia as awards for particular purposes in harmony with national policies and to permit their use upon the official uniform in accordance with the Rules and Regulations, policies, and guidelines of the Boy Scouts of America.

## Authorization

The National Council has the sole and exclusive right to authorize the use of insignia, words, phrases, designation marks, pictorial representation, and descriptive remarks relating to the program of the Boy Scouts of America on commercial products, promotional efforts, and/or sale and distribution to members of the Boy Scouts of America and/or the general public. The use of same by local councils shall be only as authorized and approved by the National Council.

## Lifesaving and Meritorious Action Awards

### Lifesaving Awards

Recognition may be given to a youth member or Scouter where the evidence presented to the local council, in accordance with the applicable guidelines, shows that he or she saved or attempted to save life under circumstances that indicate heroism and risk to self. The reviewing committee will give consideration to resourcefulness and to demonstrated skill in rescue methods. In no case may recognition be given where it appears that the risk involved was merely in the performance of duty or the meeting of an obligation because of responsibility to supervise and give leadership to the persons whose lives were saved. The awards are:

(a) Honor Medal With Crossed Palms. The Honor Medal With Crossed Palms may be awarded in exceptional cases to a youth member or adult leader who has demonstrated unusual heroism and extraordinary skill or resourcefulness in saving or attempting to save life at extreme risk to self.

(b) Honor Medal. The Honor Medal may be awarded to a youth member or adult leader who has demonstrated unusual heroism and skill in saving or attempting to save life at considerable risk to self.

(c) Heroism Award. The Heroism Award may be awarded to a youth member or adult leader who has demonstrated heroism and skill in saving or attempting to save life at minimum personal risk.

### Meritorious Action Awards

Recognition may be given to a youth member or Scouter where the evidence presented to the local council, in accordance with the applicable guidelines, shows that a significant or outstanding act of service, of an exceptional character, was performed. The action taken need not involve attempts of rescue or risk to self but must put into practice Scouting skills or ideals. Recognition may not be given where it appears that the action involved was merely in the performance of duty or the meeting of an obligation. The awards are:

(a) Medal of Merit. The Medal of Merit may be awarded to a youth member or adult leader who has performed an act of service of a rare or exceptional character that reflects an uncommon degree of concern for the well-being of others.

(b) National Certificate of Merit. The National Certificate of Merit may be awarded to a youth member or adult leader who has performed a significant act of service that is deserving of special national recognition.

### Applications

All applications should be processed and approved by the local council upon duly prescribed forms, and it is within the discretion of the local council to determine which type of recognition, if any, will be given. Recipients of these awards must be registered with the Boy Scouts of America at the time the action was performed. Awards are made in the name of the Boy Scouts of America.

## Awards for Distinguished Service to Youth

### Silver Buffalo Award

The Boy Scouts of America may award the Silver Buffalo to citizens of the United States for distinguished service upon the following basis and procedure:

(a) These awards may be made each year.

(b) The award is made on the basis of noteworthy service to youth, of a national or international character, outside of the line of regular duty, either directly to or independent of the Boy Scouts of America.

(c) As evidence of the award there will be presented: a suitable certificate, descriptive of the services rendered, duly authenticated by the Boy Scouts of America, pursuant to the action of the Executive Board; and a miniature silver buffalo, suspended by a red, white, and red ribbon to be worn around the neck.

(d) These awards will be made at the meeting of the National Council or at a major function of the Boy Scouts of America, pursuant to the action of the Executive Board, which action is to be based upon the recommendation to the Executive Board by the National Court of Honor, or by recommendations to the Executive Board by the National Chair and the Chief Executive Officer.

### Silver Antelope Award

The Boy Scouts of America, acting through the National Court of Honor, may award the Silver Antelope for distinguished service to youth upon the following basis and procedure:

(a) This award may be made each year upon the nomination of the regional cabinet. The nomination must be submitted not less than 30 days in advance of the date upon which it is desired to present the award. This award may be made for noteworthy service of exceptional character to youth by registered Cub Scout, Scouts BSA, Venturing, and Sea Scout leaders within the territory under the jurisdiction of a regional cabinet.

(b) As evidence of the award there will be presented: a suitable certificate, duly authenticated by the Boy Scouts of America, pursuant to the action of the National Court of Honor; and a miniature silver antelope suspended by an orange, white, and orange ribbon to be worn around the neck.

(c)  No public announcements are to be made by the region in advance of action of the National Court of Honor with reference to the names presented for consideration.

(d)  These awards are to be presented to the recipients by the region in connection with its annual meeting or other public function, but only after approval of the award by the National Court of Honor.

(e)  Each region is entitled to eight recipients per year.

(f)  Unused allotments for any previous years may not be accumulated or used in any subsequent year.

(g)  The National Court of Honor may, based upon initial recommendation of the Operations Group, award the Silver Antelope to persons in overseas areas.

## Silver Beaver Award

The Boy Scouts of America, acting through the National Court of Honor, may award the Silver Beaver for distinguished service to youth upon the following basis and procedure:

(a)  Each council may process its own annual allotment of Silver Beaver awards and must send a list of Silver Beaver recipients honored each calendar year to the National Court of Honor no later than January 31 of the following year.

(b)  The award is made for noteworthy service of exceptional character to youth by registered Scouters within the territory under the jurisdiction of a local council.

(c)  As evidence of the award there will be presented: a suitable certificate, duly authenticated by the Boy Scouts of America, pursuant to the action of the National Court of Honor; and a miniature silver beaver suspended by a blue, white, and blue ribbon to be worn around the neck.

(d)  No public announcements may be made by the local council in advance of action by the National Court of Honor with reference to names presented for consideration.

(e)  These awards may be made to the recipients by the local council concerned in connection with its annual meeting or other public function.

(f)  Each duly chartered local council is entitled to one nomination. Councils having more than 60 units are entitled to further nominations on the basis of one for each additional 60 units or fraction thereof in their territory, as of December 31 preceding the nomination, according to the records of the National Service Center.

(g)  Councils not using their full allotment in any year may accumulate the unused portion for use in any subsequent year.

In extraordinary cases, the Silver Beaver Award may be made by the National Court of Honor to a Scouter upon the recommendation of the duly constituted Scouting authorities having supervision of one or more units of the Boy Scouts of America located outside of the United States and not under the jurisdiction of a local  council.

## Silver World Award

The Boy Scouts of America through the National Court of Honor, which has delegated the selection of recipients as hereinafter provided, may award the Silver World Award for distinguished service to youth as follows:

(a)  The award may be presented to citizens of any country whose Scout association is a member of the World Scout Conference in recognition of his or her service of exceptional character to the youth of his or her own country or on an international basis.

(b)  The recipient does not have to be a member of a Scout association. United States citizens may receive the Silver World Award for international service to youth, provided they are not registered members of the Boy Scouts of America.

(c)  Approved awards may be presented by an authorized member of the Boy Scouts of America either by a personal visit with the recipient or at an official meeting of a national Scout association, including the Boy Scouts of America.

(d)  Designation of recipients of the Silver World Award, by authority of the International Committee and the Executive Board, is delegated to the following:
i. National Chair of the Boy Scouts of America

ii. Chief Executive Officer

iii. International Commissioner

(e)  Awards may be made at any time on behalf of the International Committee and the Executive Board. The International Committee receives a full report of the Silver World Award designation at each meeting and will maintain accumulative records of awards including support data.

(f)  As evidence of the award there will be presented: a suitable certificate duly authorized by the Boy Scouts of America; and a medal suspended by a red and white ribbon to be worn around the neck when such practice does not conflict with approved uniform policy. The medal will be a circular blue enameled silver medallion upon which will be superimposed meridian lines and stars signifying the global scope of the award. An applied silver universal badge of the Boy Scouts of America will be centered upon the front of the medallion.

# VIII. COMMISSIONED PROFESSIONAL LEADERSHIP

## General

Persons who have met the qualifications and requirements established for professional service in the Boy Scouts of America may be commissioned as professional Scouters by the Chief Executive Officer. The Chief Executive Officer is responsible for the development of such criteria, policies, and procedures necessary to assure the recruitment of professional candidates with the necessary physical, educational, personal, and moral qualifications. They must include at least the following:

(a) A pre-commissioned professional must be age 21 or older at the time they are commissioned and have earned a bachelor's degree from an accredited college or university. Consideration will be given a person with an associate degree with satisfactory evidence of a successful career experience of at least 10 consecutive years in general business, industry, government, or the military, along with at least five years of leadership experience. A person who has completed five consecutive years of successful employment as a district associate may also be considered. A pre-commissioned professional must also meet the qualifications to be a registered Scouter.

(b) The recruit must be, or declare an intention to become, a citizen of the United States of America before being commissioned as a professional Scouter.

## Professional Commissioning

The following procedure provides the basis for the commissioning of persons as professional Scouters:

**Phase I.** A person employed as a pre-commissioned professional must demonstrate to the satisfaction of the local council Scout executive (or, in the case of being employed by the Boy Scouts of America, the Chief Executive Officer) an acceptable willingness to work, a degree of cooperation, a motivation toward career service within Scouting, and an apparent ability to succeed as a professional Scouter. In addition, Phase I pre-course work assigned must be completed prior to attending Phase II position-basic training. In the event he or she does not meet all of these requirements, employment will be terminated by the local council Scout executive (or, as applicable, the Chief Executive Officer).

**Phase II.** The pre-commissioned professional who successfully completes Phase I of the commissioning process must attend the required position-basic training within six months of their date of employment in a position requiring a commission.

The pre-commissioned professional must satisfactorily accomplish those designated assignments in position-basic training; satisfactorily demonstrate the development of necessary techniques; and demonstrate moral and personal fitness as set forth in the Scout Oath and Scout Law and in the Scout Executive's Code. The Boy Scouts of America training and development director or designee will decide whether the pre-commissioned professional has satisfactorily completed position-basic training. Those pre-commissioned professionals who successfully complete position-basic training will receive a certificate to that effect and will be commissioned by the Chief Executive Officer, or designee, as a professional Scouter and will receive documentary evidence of such commission and will thereupon be entered into the official roll of professional Scouters of the Boy Scouts of America.

## Decommissioning

A professional Scouter may be decommissioned when, in the judgment of the Chief Executive Officer or Executive Committee, that person demonstrates that he or she does not possess the moral, educational, or emotional qualities deemed necessary for commissioned professional status, lacks such other commissioned professional qualifications, or fails to obey such requirements as the Boy Scouts of America from time to time may require. A decommissioned professional Scouter is ineligible for re-employment by the Boy Scouts of America or any local council in any capacity.

## Employment of Professionals

### Rules and Guidelines

The Chief Executive Officer may determine the positions that may be held only by commissioned professionals and may establish guidelines for employment, training, promotion, tenure, and demotion of professional and professional-technical employees of the Boy Scouts of America. The applicable guidelines and those pertaining to transfer and retirement must be followed by local councils in the course of their employment of commissioned professionals.

### Special Situations

It is recognized that for the efficient operation of the Boy Scouts of America certain professional and professional-technical staff positions may be held by people selected because of their specialized qualifications. The Chief Executive Officer may, in exceptional instances, waive the education or equivalency requirement for employment as a commissioned professional and grant to such persons commissioned professional or professional-technical status during their term of employment, which will be limited to such professional or professional-technical staff positions.

### National Professional Staff

The Chief Executive Officer, subject to the approval of the Executive Committee, may determine the necessary national organization structure and professional staff requirements.

### Local Council Scout Executive and/or Chief Executive Officer

A local council shall employ a commissioned professional certified to serve as local council Scout executive and/or its chief executive officer having general direction of its administration and supervision over Scouting activities within its jurisdiction. A local council may, if due to exceptional circumstances it is authorized in advance by the Chief Executive Officer and pursuant to guidelines approved by the National Executive Committee, hire a candidate who would not otherwise be eligible for the position. A council Scout executive or chief executive officer shall serve at the pleasure of the local council's executive board subject to the policies, procedures and guidelines of the National Council.

### Other Local Council Staff

Other than newly employed persons not yet commissioned as professional Scouters, a local council may employ individuals for professional positions only in accordance with guidelines approved by the National Executive Committee. Such persons may serve in the local council so long as commissioned as provided herein and during the pleasure of the local council. The duties of such professional personnel are defined by the local council Scout executive with the approval of the local council executive committee. The classification and title of such position must be in accordance with the policies and guidelines of the Boy Scouts of America. Newly employed persons not yet commissioned may be employed as professional Scouters only as provided in these Rules and Regulations and with the preapproval of the National Service Center. The employment period cannot extend for more than five months prior to attending position-basic training.

Excepting approved non-commissioned Scout executives, only commissioned professionals may be employed by local councils or serve in a unit-serving executive position (district executive), a year-round program position, a position supervising other commissioned professional, or the position of council Scout executive.

# IX. AFFILIATES

The Executive Committee may authorize the creation of affiliates to engage in activities that directly or indirectly support the Corporation's and local councils' ability to achieve the mission of Scouting. Except for affinity organizations operated by the Corporation, the authorization may be provided without amendment to the Bylaws or the Rules and Regulations of the Corporation. The Chief Executive Officer shall ensure that the interests of the Corporation are protected insofar as the activities of any such affiliate, regardless of structure, or legal or contractual relationship.

### Scouting Affinity Groups

The Corporation may operate or authorize national or local council affinity groups open to persons who support the mission of the Boy Scouts of America. National affinity groups shall be approved in advance by the Executive Committee. The Chief Executive Officer may authorize the use of the seal, emblems, badges, descriptive marks, words, or phrases associated with or referring to the Boy Scouts of America by local councils subject to such limitations and licensing as deemed necessary or appropriate. The Chief Executive Officer shall oversee the naming, management, and operation of any such national affinity group. Affinity groups may offer benefits to its members or other serve fraternal purposes. The organizational structure and operating practices of any such affinity group must be in harmony with the principles of Scouting.

# X. SPECIAL SITUATIONS

## Experimental Programs

The Chief Executive Officer may authorize the development of experimental or pilot programs to achieve the purpose of the Boy Scouts of America on an expanded basis. Such programs may be inconsistent with or beyond the scope of current corporate governance documents and may include the use of affiliates of the Boy Scouts of America to sponsor such programs as deemed appropriate. The national Key 3 will be notified of proof of concept/pilot programs prior to the development of curriculum or program materials. Only experimental or pilot programs approved by the Chief Executive Officer are authorized for use by local councils.

Experimental programs thereafter showing potential may be further developed and tested through proof of concept/pilot programs on a limited, unpublicized basis. The national Key 3 is to be informed whenever a program is being expanded beyond proof of concept. The scope, duration, and other parameters of proof of concept/pilot programs are to be defined and the program re-evaluated annually. Updates on the progress of the proof of concept/pilot and an assessment upon completion of the proof of concept/pilot must be made by the Chief Executive Officer to the National Operations Leadership Committee.

The National Operations Leadership Committee may determine whether information on proof of concept/pilot programs is to be provided to the Executive Board and may direct the Chief Executive Officer to make such reports and answer questions presented by the Executive Board.

## Scouting Outside of Council Territories

To further its objectives of extending membership privileges to citizens of the United States in other parts of the world, the Boy Scouts of America authorizes the registration of youth members and leaders and the establishment of units in areas lying outside of the jurisdiction of any local council. To foster and strengthen the close and friendly relationship that exists between the Boy Scouts of America and other Scout associations, members, and leaders of such units should work in close harmony with their fellow Scouts and Scouters in the area. Only those eligible for registration in the Boy Scouts of America are eligible to participate in such units.

## World Organization of the Scout Movement

Member associations of the World Organization of the Scout Movement may organize, administer, and service units of their association for dependents of their citizens living temporarily in the United States. Such permission is to be granted upon certification by the National Service Center, under the following conditions:

(a)  The approval to establish a unit will be on an annual  basis  and may be extended upon review of status as reflected in an annual report.

(b)  Registration will be restricted to citizens and dependents of member countries. No registration will be accepted or allowed in the unit from citizens of the United States or any third country.

(c)  The condition of registration will reflect agreements as to the use of Boy Scouts of America's intellectual property. In this instance only would there be a requirement for dual registration.

(d)  There will normally be no registration fee assessed by the Boy Scouts of America for either a unit or an individual member.

(e)  Standards of certification will include membership qualifications, intellectual property, and adherence to the basic policy, program, and methods of the World Organization of the Scout Movement.

# XI. AGREEMENTS WITH OTHER ORGANIZATIONS

Consistent with the mission and values of the Boy Scouts of America to help develop character and leadership in youth, the Boy Scouts of America may enter into agreements with Learning for Life and other youth, veteran, community, and educational organizations with similar missions and values to facilitate service to non-Scouting youth and communities, including for the use of suitable facilities or areas of facilities. Such agreements may not obligate the National Council to enter into or continue any such agreement.

# INDEX

## A

Activities, 17
Adult, 5
Adult program participant, 5
Advancement
    general principles of, 16
    procedures for, 16
    youth programs, 16
Advertising policy, 7
Age requirements
    assistant Cubmaster, 12
    assistant den leader, 12
    assistant Scoutmaster, 12
    assistant Webelos den leader, 12
    commissioned officials, 15
    junior assistant Scoutmaster, 16
    Lone Cub Scout, 16
    merit badge counselors, 13
    professional Scouters, 15
Agreements with other organizations, 22
Anniversary celebration, 17
Assistant
    council commissioner, 15
    Cubmaster, 12
    den leader, 12
    district commissioner, 15
    Scoutmaster, 12
    Webelos den leader, 12
Awards, special
    Heroism Award, 18
    Honor Medal, 18
    Honor Medal With Crossed Palms, 18
    Lifesaving, 18
    Medal of Merit, 18
    Meritorious Action, 18
    National Certificate of Merit, 18
Awards, youth service
    Silver Antelope, 18-19
    Silver Beaver, 19
    Silver Buffalo, 18
    Silver World, 19

## B

Badges, 17
*Boys' Life* Magazine, 17

## C

Charter applications, renewals,
    and revocations, 10
Chartered organization representative, 10
Chartered organizations, 10
Charters
    to group of citizens, 10
    to organizations, 10
Code of Conduct, 5
College Scouter Reserve, 13
Commercial contracts, 6
Commercialism policy, 6
Commissioners, 15
Confidentiality of membership lists, 14
Conflict-of-interest policy, 7

Control of funds
    audited statement, 8
    council obligations, 9
    limitation of authority, 8
    local council control, 8
Cooperation with national movements, 6
Council, *see* local council
Council commissioner, 15
Cub Scout
    advancement, 16
    pack, 11
    registration, 12
    roundtable commissioner, 15
Cubmaster, 12

## D

Declaration of religious principle, 12
Den leader, 12
Denial of registration, 14
Disposition of funds upon termination of
    council or unit, 9
Distinguished service to youth awards
    Silver Antelope, 18-19
    Silver Beaver, 19
    Silver Buffalo, 18
    Silver World, 19

District
    commissioner, 15
    committee, 8
    function of, 8
    organization, 8
    Scouters, 5, 12

## E-F-G-H-I-J-K

Employment of professionals, 20
Experimental programs, 22
Gambling, 6
Insignia, 17
Junior assistant Scoutmaster, 16

## L

Leader, 5
Learning for Life, 22
Lifesaving awards, 18
Local
    badges, 17
    units, 8, 9
Local council
    annual registration fees, 8
    approval of unit applications, 8
    commissioner, 15
    finance, 8
    fundraising, 8
    professional personnel, 20
    program promotion outside of
        assigned territory, 8
    real estate, 9
    responsibilities, 8
    restricted funds, 9
    Scouters, 5, 12

Lone
    Scout, 13, 16
    Scout friend and counselor, 13
    Cub Scout, 13
    Cub Scout friend and counselor, 13

## M

Member, 5
Members, local councils
    approval of, 8
    sustaining, 12
Membership lists, confidentiality of, 14
Membership, term, 13
Merit badge
    counselors, 13
    responsibility for, 16
Meritorious action awards, 18
Military training, policy concerning, 7
Multilevel marketing, 6

## N

National Council, 5
National Court of Honor, 18-19
National movements, cooperation with, 6
National Service Center, 5
Nonpartisan, nonpolitical functions, 6

## O–P

Organization of local units, 8
Pack
    leaders, 11
    organization of, 11
Participant fees, 17
Patrol leaders' council, 16
Pilot programs, 22
Policies concerning
    advertising, 7
    commercialism, 6
    conflict of interest, 7
    cooperation with national movements,
        6
    cooperation with other
        Scout associations, 22
    military training, 7
    participation in public functions, 6
    political questions, 7
    Scouting public display activities, 6
    unit money-earning projects, 6
Political questions, 7
Product sales, 6
Professional Scouters
    commissioning, 20
    decommissioning, 20
    pre-commissioned, 20
    requirements for, 20
Professional-technical positions, 20
Program managers, 16
Public functions, participation in, 6
Pyramid sales, 6

**R**

Registration
    adult leaders, 12
    adult program participants, 12
    camp staff, 13
    college Scouter reserve, 13
    denial or revocation of, 14
    expiration of, 14
    fee, 14
    membership, 12
    merit badge counselors, 13
    period, 13
    procedure for, 12
    qualifications, applications, approval,
      removal, 12
    retired professionals, 13
    Scouter Reserve, 13
    special status, 13
    special types of, 12-13
    sustaining membership, 12
    transfers, 13
    veteran, 13
    youth, 12
Renewals, unit charter, 10
Restricted funds, 9
Retired professional Scouters, 13
Retirement, 20
Roundtables, 15

**S**

Scout
    Law, 6, 17, 20
    Oath, 6, 17, 20
Scouter Reserve, 13
Scouters, 6
    area, regional, national, 12
    Code of Conduct, 6
    council, 5, 12
    district, 5, 12
    registration, 12, 13
    unit, 5, 13

Scouting, 5
    Anniversary Week, 17
    attempts to commercialize, 6
    outside of council territories, 22
    promotion of, 8
    public display activities, 6
    *Scout Life* Magazine, 17
Scoutmaster, 12
Scouts BSA, 5
    advancement, 16
    registration, 12
    roundtable commissioner, 15
Sea Scouts, 16
    elected officers, 16
    registration, 12
Senior patrol leader, 16
Silver Antelope, 18-19
Silver Beaver, 19
Silver Buffalo, 18
Silver World, 19
Special registration status, 13
Superactivity, 8

**T**

Titles of professionals, 21
Training, 12
Troop
    committee, 11
    organization of, 11

**U**

Uniform and insignia
    alteration of, 17
    authorized, 17
    badges and insignia, 17
    distribution of, 17
    integral part of program, 17
    local council protection of, 6-7
    official, 17
    prohibition of imitation, 17
    protection of, 6-7

Uniform and insignia (cont'd)
    restricted sale and use, 17
    special, 17
    use of, 17
Unit
    commissioner, 15
    committee, 10
    Cub Scouters, 11, 13
    designation, 11
    leadership, -11, 12
    money-earning projects, 6
    number, 11
    program leader, 5
    Scouters, 5, 12

**V**

Venturing
    elected officers, 16

    registration, 12
Veteran Award, 13

**W**

Webelos
    den leader, 12
World Organization of the
    Scout Movement, 22

**Y**

Youth, 5
    leader, 5
    programs, 5
Youth members, 5
    Cub Scout, 16
    junior assistant Scoutmaster, 16
    Lone Cub Scout, 16
    Scout, 16
    Sea Scouts, 16
    senior patrol leader, 16
    Venturer, 16

# EXHIBIT 3

# BYLAWS
# WINNEBAGO COUNCIL

## ARTICLE I. NAME

The name of the corporation is Winnebago Council, Inc., Boy Scouts of America, sometimes referred to in these bylaws as the "corporation."

## ARTICLE II. PURPOSE AND RESPONSIBILITIES

### PURPOSE

SECTION 1.

The corporation shall promote, within the territory covered by the charter from time to time granted it by the Boy Scouts of America and in accordance with the Congressional Charter, Bylaws, and Rules and Regulations of the Boy Scouts of America, and the local council charter granted by the Boy Scouts of America, the Scouting program of promoting the ability of boys and young men and women to do things for themselves and others, training them in Scoutcraft, and teaching them patriotism, courage, self-reliance, and kindred virtues, using the methods which are now in common use by the Boy Scouts of America. In achieving this purpose, emphasis shall be placed upon the educational program of the Boy Scouts of America and the oaths, promises, and codes of the Scouting program for character development, citizenship training, and mental and physical fitness.

The corporation shall fulfill the basic purpose of the Scouting movement within its territory, making Scouting training available to all boys and young men and women and serving organizations and community groups using the Scouting program while maintaining standards and policies, protecting official badges and insignia, and providing adequate leadership and finances.

### RESPONSIBILITIES

SECTION 2.

As a council chartered by the Boy Scouts of America, the responsibilities of the corporation shall be as follows:

1

*Clause 1.*  It shall be the duty of the corporation to promote the program of Scouting through the organization and registration annually of units and their personnel; also to approve and provide leadership and supervision of all program activities, within the territory covered by its charter, in such a manner as to ensure compliance with the provisions of the Bylaws of the Boy Scouts of America and the Rules and Regulations thereof.

*Clause 2.*  The corporation shall guard against the use of the official uniform and insignia by persons not officially registered with the Boy Scouts of America and shall bring to the attention of the Boy Scouts of America any violation of regulations not within its power to prevent or any attempt to commercialize the Scouting movement.

*Clause 3.*  The corporation shall, through its Scout executive and other representatives, make the benefits of the Scouting program known to all organizations or community groups having contact with youth and cooperate in the organization of units so that boys and young men and women may have the benefit of the Scouting program.

The corporation shall provide means for assisting chartered organizations in securing and training qualified persons to serve as unit leaders and assistants, unit committee members, and chartered organization representatives. The corporation shall provide facilities and leadership in order that Scouts under its jurisdiction may have the opportunity to have a year-round outdoor program totaling at least 10 days and nights of hiking, overnight camping, camporees, and summer camp experiences, with adequate facilities and supervision.

*Clause 4.*  The corporation shall endeavor to provide facilities and leadership in order that Venturers under its jurisdiction may have the opportunity to participate in at least 5 days and 5 nights of trips and Venturing activities away from home each year.

*Clause 5.*  The corporation shall provide procedures for advancement in order that youth members may meet the various requirements of rank as authorized by the Boy Scouts of America, under such conditions as will reduce to a minimum the necessity of traveling a great distance from home or of interfering with schoolwork or home duties.

*Clause 6.*  The corporation shall endeavor to provide commissioners and other district Scouters to help guide and coach unit Scouters.

*Clause 7.*  The corporation shall cooperate with the Boy Scouts of America in the selection of stores, located within the local council's territory, for appointment as authorized and licensed distributors of official uniforms, literature, and equipment. A sufficient number of stores shall be authorized by the Boy Scouts of America to provide adequate service to the youth and adult members in the territory served by the local council.

# ARTICLE III. MEMBERS OF THE LOCAL COUNCIL

## NUMBER, CLASSES, AND QUALIFICATIONS

SECTION 1.

The corporate membership of the corporation shall be composed of active members and may also include associate members and honorary members; the corporate membership shall be known and designated collectively as the Winnebago Council of the Boy Scouts of America. All active, associate, and honorary members must meet the membership qualifications established by article VI of the corporation's articles of incorporation. The corporation also may enroll Friends of Scouting pursuant to clause 3 of this section. Friends of Scouting shall not be part of the corporate membership of the corporation unless elected as associate members pursuant to clause 2.

### Active Members

*Clause 1.* The active membership of the local council shall consist of chartered organization representatives and members at large. Chartered organization representatives shall represent organizations or community groups operating units. Each organization or community group to which a charter is granted by the Boy Scouts of America to operate one or more recognized Scouting units shall elect or appoint a chartered organization representative, who shall be other than the unit leader or assistant unit leader, as a member of the local council.

Members at large of the local council shall include persons chosen from the various business, civic, educational, labor, professional, social, and religious interests of the communities in the corporation's territory.

The local council shall have not fewer than 100 active members. At all times chartered organization representatives shall constitute a majority of the active membership of the local council.

### Associate Members

*Clause 2.* The active members of the local council may elect as associate members of the local council persons desiring to maintain an active Scouter membership without assignment to active service. Associate members shall have no vote but may wear the uniform and insignia of lay members without office.

### Friends of Scouting

*Clause 3.* The local council may enroll as Friends of Scouting persons desiring to be identified through their financial support and influence in expansion of the corporation's program. Friends of Scouting who satisfy the eligibility requirements may be elected as associate members pursuant to clause 2 of this section. Friends of Scouting shall have no vote.

**Honorary Members**

*Clause 4.*  The active members of the local council may elect as honorary members of the local council persons whose election may further the Scouting program. Honorary members are not elected as members at large and shall have no vote.

## ELECTION AND TERM; VACANCIES

SECTION 2.

**Active Members**

*Clause 1.*  Chartered organization representatives shall become active members of the local council upon their election or appointment by the chartered organization or community group and upon their being registered by the Boy Scouts of America as chartered organization representatives; they shall continue to be active members for such period as such organization or community group shall desire but in any event only during such time as such organization or community group shall continue to hold a charter from the Boy Scouts of America to operate a unit.

All officers, chairs of committees of the board, district chairs, and executive board members *must* first be elected as council members at large, if they are not chartered organization representatives.

Each member at large shall be elected at the annual meeting of the local council by the active members then in office, shall take office immediately following such meeting, and shall hold office until the conclusion of the next succeeding annual meeting of the local council.

**Associate and Honorary Members**

*Clause 2.*  Associate members and honorary members of the local council shall be elected at the annual meeting of the local council by the active members then in office, shall take office immediately following such meeting, and shall hold office until the conclusion of the next succeeding annual meeting of the local council.

**Vacancies in Active Membership**

*Clause 3.*  Any vacancy in the active membership of the local council may be filled by the executive board of the corporation and the member at large so elected shall hold office until the conclusion of the next succeeding annual meeting of the local council.  Nominations to fill vacancies shall be made by the nominating committee.

## MEETINGS; QUORUM; VOTING

S<small>ECTION</small> 3.

### Annual Meeting

*Clause 1.*   The annual meeting of the local council shall be held at such place within the corporation's territory, or on property that is owned or leased by the corporation that is not located within the corporation's territory, and at such time as the executive board of the corporation may determine. The annual meeting of the local council shall be for the purpose of (a) receiving annual reports of the executive board, officers, and various committees, (b) electing members at large, associate and honorary members of the local council, National Council members, regular members of the executive board, and officers of the corporation other than the Scout executive, (c) receiving and approving financial statements showing the financial position of the corporation as of the close of its most recent complete fiscal year and the results of operations during such year, and (d) transacting such other business as may come before the meeting.

### Other Regular Meetings

*Clause 2.*   In addition to the annual meeting, the local council may have such other regular meetings as may be established by resolution of the executive board of the corporation. Each regular meeting shall be held at such place within the corporation's territory, or on property that is owned or leased by the corporation that is not located within the corporation's territory, as the president or the executive board may specify.

### Special Meetings

*Clause 3.*   Special meetings of the local council may be called by the president or the executive board at any time and shall be called within 60 days upon the request in writing of at least one-fifth of the active members of the local council (such request specifying the object of the special meeting). Special meetings shall be held at such place within the corporation's territory, or on property that is owned or leased by the corporation that is not located within the corporation's territory, as the president or executive board may specify except that a special meeting called to consider a proposal to merge or consolidate with one or more corporations which are chartered local councils of the Boy Scouts of America may, to the extent permitted by law, be held in the territory of one of such other corporations if the president or the executive board shall so specify.

### Notice

*Clause 4.*   A written notice of any meeting of the local council, regular or special, shall be provided to each member of the local council who is entitled to attend the meeting at least 20 days or earlier in the case of the annual meeting (see section 4) in advance thereof and shall indicate the time and place of and the business to be transacted at the meeting.

**Quorum**

*Clause 5.*  A quorum for the local council shall be Ten percent of the active members of the council.

**Attendance at Meetings; Voting**

*Clause 6.*  All active, honorary, and associate members of the local council shall be entitled to attend any meeting of the local council. The local council may invite other persons to attend local council meetings but such persons shall have no vote. Each active member of the local council present at a local council meeting shall be entitled to one vote and voting by proxy shall not be permitted.  Nominations for elective offices shall only be made by the nominating committee, and nominations from the floor shall not be permitted.  Except in the case of elections where voting shall be by ballot, voting at a meeting of the local council may be by ballot, voice, or show of hands as the chair of the meeting may rule unless otherwise determined by the members entitled to vote. Unless otherwise required by law, the articles of incorporation or these bylaws, any question presented to a meeting of the local council at which a quorum is present shall be determined by a majority of those actually voting.

**NOMINATING COMMITTEE OF THE
LOCAL COUNCIL**

SECTION 4.

At least 90 days prior to the annual meeting of the local council, the president shall appoint, with the approval of the executive board, not fewer than three active members of the local council to serve as a nominating committee. Consideration may be given to adding a former council president and the inclusion of one or two persons of the highest community stature who are not active members of the local council.  Nominations for all council elective offices shall be made by the nominating committee.  At the annual meeting of the local council the nominating committee shall nominate persons to be elected as members at large of the local council, associate and honorary members of the local council, regular members of the executive board, National Council members, and officers of the corporation other than the Scout executive. The notice of the annual meeting should be provided between 45 and 60 days prior to the meeting, announcing the membership of the nominating committee so that members of the local council may make recommendations of possible nominees to the committee for its consideration. Recommendations to the committee shall be made in writing at least 30 days prior to the meeting.

In nominating the vice-presidents of the corporation, the nominating committee may, although is not required to, nominate one vice-president to additionally and simultaneously serve as the executive vice-president.  A person elected as the executive vice-president shall serve as the president-elect and may be designated by the President to serve as President during the President's absence or inability to serve, but shall neither have any additional responsibility nor authority beyond that contained in his/her vice-president job description, or as otherwise assigned to him by the President or the Executive Board.  In order to later become Council President, an

executive vice-president must still be nominated and elected at the annual meeting of the local council, as set forth in Article III.

In the case of any council elective office becoming vacant between the annual meetings of the local council, the nominating committee may make recommendations to the executive board of possible nominees to fill such vacant offices. They are to maintain lists of potential candidates and to meet throughout the year to assess those candidates and make nominations when needed.

SECTION 5.

A suggested council election procedure appears in the appendix. (These may be adopted for use by executive board resolution.)

## COMMITTEE ON PROGRAM AND RESOLUTIONS

SECTION 6.

At least 60 days prior to each regular meeting of the local council including the annual meeting, the president may appoint, with the approval of the executive board, not fewer than three nor more than five active members of the local council to serve as a committee on program and resolutions for the next regular local council meeting. The notice of such meeting provided to members of the local council shall announce the membership of this committee and shall invite suggestions from each active member of the local council for the arrangement of the program and resolutions to be considered at the meeting. All suggestions to the committee shall be in writing. The committee shall consider and present to the meeting of the local council or to the appropriate committee of the executive board with recommendations, all suggestions made to it at least 5 days prior to the meeting or which it itself proposes for consideration and action. If a committee on program and resolutions is appointed, no resolution shall be considered at any regular meeting of the local council unless it has first been presented to or proposed by the committee in accordance with this section.

# ARTICLE IV. THE EXECUTIVE BOARD

## POWERS AND FUNCTIONS

SECTION 1.

The executive board shall be the governing body of the corporation and shall manage its affairs. The executive board shall be the local reviewing authority with respect to matters within the Scouting movement which arise in the territory of the corporation.

7

## MEMBERSHIP

SECTION 2.

The executive board of the corporation shall consist of (a) not fewer than 25 nor more than 50 members elected by the local council from among its active members plus, (b) the officers of the corporation including the Scout executive, who shall have no vote, (c) the chairs of the committees of the executive board, (d) the chairs of the several district committees, upon their being approved by the executive board, and (e) not more than two youth members, who shall be registered Boy Scouts or Venturers appointed by the council president with the approval of the executive board to serve for a term of 1 year.

## ELECTION AND TERM; VACANCIES

SECTION 3.

Regular members of the executive board shall be elected at the annual meeting of the local council, shall take office immediately following such meeting, and shall continue in office until the conclusion of the next succeeding annual meeting of the local council and until their respective successors are elected and qualify. Chairs of the committees of the executive board take office as members of the executive board upon their being appointed by the president and approved by the executive board. District chairs take office as members of the executive board upon their being approved by the executive board.

Any vacancy on the executive board of the local council may be filled by the executive board, and the person so elected shall hold office for the unexpired period of the term of office. Nominations to fill vacancies shall be made by the nominating committee.

A member of the executive board may be removed upon 30 days' written notice to the members of the executive board and by an affirmative vote of two-thirds of the entire membership of the board.

## MEETINGS; QUORUM; VOTING

SECTION 4.

The executive board shall meet at such time and place as the executive board may direct and in any event at least four times annually including an organizational meeting as soon as practicable following the annual meeting of the local council. Special meetings of the executive board may be called by the executive committee of the executive board or by the president and shall be called within 30 days upon the written request of at least one-fifth of the members of the executive board (which request shall specify the purpose of such special meeting). A notice of each meeting of the executive board shall be provided to each member at least 5 days in advance of the meeting.

One-third of the members of the executive board shall constitute a quorum for all purposes.

Unless otherwise required by law, the articles of incorporation or these bylaws, all questions presented to a meeting of the executive board at which a quorum is present shall be decided by a majority of those actually voting.

Notwithstanding any provision to the contrary contained herein, any meeting, regular or special, may be held by telephone / speaker phone / video phone / internet conferencing or similar electronic communication equipment so long as all directors can hear one another, and those participating in the meeting receive and vote on the same information.  All such directors participating electronically shall be deemed to be present, in person, at such meeting.

Any regular member of the executive board who fails to attend a minimum of two meetings of the executive board in any one year shall not be eligible for reelection as a regular member of the executive board for the ensuing term, provided, however, that the executive board may excuse absences and any absence so excused shall be counted as a meeting attended.

## ADVISORY COUNCIL

SECTION 5.

There shall be an advisory council to the executive board composed of (a) former members of the executive board who have served on the executive board not less than 5 years and who can no longer attend regular meetings of the board but wish to continue their relationship with the corporation in an advisory or consulting capacity; (b) such other persons who, being unable to devote time to Scouting on a regular basis, wish to serve Scouting upon special assignment.

Both (a) and (b) membership on the advisory council requires a two-thirds vote of the members of the executive board present at any meeting.

Members of the advisory council shall be entitled to receive notice of and to attend all meetings of the executive board, but shall have no vote.

# ARTICLE V. COMMITTEES OF THE EXECUTIVE BOARD

## COMMITTEES; APPOINTMENT

SECTION 1.

There shall be an executive committee consisting of the persons and having the powers specified in section 2 of this article.

In addition, subject to the provisions of section 3 of this article, the executive board shall have committees, each of which shall have such powers and responsibilities as may be fixed by resolution of the executive board in accordance with guidelines and procedures from time to time recommended by the Boy Scouts of America. The committees of the executive board shall be appointed from members of the local council or from persons satisfying the qualifications set forth in article III, sections 1 and 2, annually by the president with the advice and approval of the executive board, at the regular meeting of the executive board next following the annual meeting of the local council. In the event a person, other than the chair of a committee in the district, who is not a member of the local council, is appointed to such a committee, that person may be elected as a member at large of the local council. As provided in section 2 of article IV of these bylaws, the chairs of the committees shall, by reason of their positions as such, be members of the executive board.

All actions of the committees shall be subject to the approval of the executive board.

## EXECUTIVE COMMITTEE

SECTION 2.

The executive committee shall be composed of those persons who are the officers of the corporation, including the Scout executive (who shall have no vote), and may include others appointed by the president.

The executive committee of the executive board shall have and may exercise all the necessary powers of the executive board in the management of the corporation during the intervals between the meetings of the executive board, but in no event shall the executive committee act contrary to action theretofore taken by the executive board. Minutes shall be kept of all executive committee action and reported at the ensuing meeting of the executive board for its approval.

Meetings of the executive committee may be called at any time by the president and shall be called by the president within 30 days upon the request of three or more members of the executive committee. It shall be the general practice of the executive committee to meet in those months in which the executive board does not meet. All meetings of the executive committee shall be held on at least 3 days written notice by fax or electronic mail.  A majority of the voting members of the executive committee shall constitute a quorum.

## COMMITTEES

SECTION 3.

The committees of the executive board shall be responsible for the development and effectiveness of programs and policies of the corporation in accordance with standards and requirements as established by the Boy Scouts of America. The corporation shall have committees of the executive board as may be authorized by the Boy Scouts of America operations manual published for the council's adopted plan of council and district organization.

The committees of the executive board shall be so organized as to provide for the coordination of their work throughout the entire territory of the corporation. The executive board's committees shall be concerned with the development of policy, program, and procedures as approved by the executive board in the interest of the uniform development and extension of Scouting throughout the territory of the corporation.

The committees shall function throughout the year, meeting as often as may be necessary in the judgment of the committee chair, president, or Scout executive.

Committees shall be guided by the program material and manuals made available by the national council of the Boy Scouts of America and shall make recommendations in light of their experience and knowledge of local conditions.

The committees shall perform the tasks organized under the four functions: membership/relationships, finance, program, and unit service. Other committees may be formed to handle special functions.

# ARTICLE VI. OFFICERS AND
# NATIONAL COUNCIL MEMBERS

## OFFICERS; ELECTIONS AND APPOINTMENT

SECTION 1.

The officers of the corporation shall be a president, no more than twelve vice-presidents, a treasurer, a council commissioner, and a Scout executive who shall also fill the office of secretary. The officers, with the exception of the Scout executive, shall be elected from the active membership of the local council at the annual meeting of the local council, shall take office immediately following such meeting, and shall hold office until the conclusion of the next succeeding annual meeting of the local council and until their successors are elected and qualify.

Any vacancies that exist in these offices between annual meetings of the local council may be filled by the executive board. Nominations to fill vacancies shall be made by the nominating committee. The Scout executive shall be appointed by and shall serve during the pleasure of the executive board.

The local council may, upon the nomination of the executive board, create honorary offices and elect persons to fill the offices so created. Honorary officers shall have no duties or vote.

## PRESIDENT

SECTION 2.

The president shall serve as chair of meetings of the local council, the executive board, and the executive committee and shall be a member ex officio of all committees of the executive board and shall perform such other functions as herein provided or as are assigned by the executive board. The president is automatically elected by the National Council to serve as a local council representative during the term of office.

## VICE-PRESIDENTS

SECTION 3.

The vice-presidents shall perform such functions as may be assigned to them by the president. In case of the president's inability or failure to make such designation, the executive board or executive committee may designate one of the vice-presidents to serve during the president's absence or inability to serve.

## TREASURER

SECTION 4.

The treasurer shall be responsible, through methods of internal control, for the recording and deposit of all receipts of the corporation, for the proper disbursement of its cash, and accounting for all property of the corporation, whether real or personal, tangible or intangible, however acquired. The treasurer shall present annually to the executive board a statement of all income and expenses during the prior year, together with a statement of all assets, liabilities, and net assets of the corporation as of the end of that year, these statements first having been duly audited and certified in accordance with generally accepted auditing standards by certified public accountants or other recognized independent public accountants approved by the executive board or executive committee. A copy of such audited annual statements shall be kept available at the office of the corporation for inspection by members of the corporation, and a copy shall be filed with the national council of the Boy Scouts of America. The treasurer shall also present interim period reports as required by the executive board.

No more than two assistant treasurers may be appointed by and shall act during the pleasure of the executive board or executive committee.

The treasurer and assistant treasurers shall be bonded.

## COUNCIL COMMISSIONER

SECTION 5.

The council commissioner is responsible for seeing that the unit-service function is performed.

12

The council commissioner shall:

  (a) Supervise the activities of the commissioner staff and preside at regular meetings of district commissioners.

  (b) Lead efforts to recruit an adequate commissioner staff to provide continuing and effective commissioner service for each unit (a ratio of one commissioner for every three units).

  (c) Provide a year-round training program for commissioners in all districts.  Conduct an annual commissioner conference.

  (d) Assist district nominating committees in selecting district commissioners as needed.

  (e) Maintain the standards of the Boy Scouts of America, uphold national policies, promote good uniforming, and lead efforts to hold regular roundtable programs in the district.

  (f) Be concerned with proper recognition of unit leaders.  Maintain their morale, periodically reporting unit conditions to the executive board.

  (g) Help the district commissioners maintain a good working relationship with their respective district executives.

  (h) Maintain procedures to assure maximum on-time unit charter renewal by district commissioner staffs.

  (i) Work with the council president to secure the help of committees in meeting unit needs.

  The council commissioner must be at least 21 years of age and election is subject to approval and issuance of a commission as council commissioner by the Boy Scouts of America.

  The council commissioner serves as a local council representative to the national council of the Boy Scouts of America during the term of office.


## SCOUT EXECUTIVE

SECTION 6.

  (a) The Scout executive shall be the chief executive officer of the corporation and shall have general direction over the administrative work of the corporation, subject to the authority and direction of the executive board. The Scout executive shall serve as the secretary of the local council, the executive board, its executive committee, all other committees of the executive board, and district committees and shall be a member ex officio of all committees of the executive board but without vote.

The Scout executive may designate one or more representatives to serve as secretaries of district committees and, when necessary, committees of the executive board.

(b) The Scout executive shall be responsible for the administration of the Scouting program within the territory of the corporation and for making effective within such territory the policies and programs of the corporation in accordance with the policies of the Boy Scouts of America as from time to time announced by it.

(c) The Scout executive may execute, on behalf of the corporation, all documents, deeds, or notes duly authorized to be executed and shall be the custodian of the seal of the corporation and may affix the same duly attested to such documents, deeds, or notes as may require it. As to notes and deeds, such countersignatures shall be required as the executive board may direct.

(d) The Scout executive shall assist the treasurer in maintaining the accounting records and the budget system, and shall be responsible for preparing monthly detailed statements of all financial operations including the budget report for the information of the treasurer and the finance committee.

(e) The Scout executive may, with the prior approval of the Executive Board, delegate to any staff officer or employee authority in writing to execute such leases, contracts, and other instruments as may be deemed desirable. Subject to the provisions of these bylaws and the direction of the executive board, the Scout executive shall have the power to appoint and remove all employees of the corporation and to direct their work.

(f) The Scout executive shall see that notices are sent to those elected as members of the local council and the Executive Board and as officers of the corporation and to those appointed as members of committees; and shall cause notices to be sent out of all meetings for which provision is made hereunder and be responsible for the minutes of all meetings of the local council, executive board, and committees of which the Scout executive is secretary.

(g) The Scout executive shall be responsible for the preparation and keeping of such records as will make possible the corporation's application for renewal of its charter. The Scout executive shall submit a report at each meeting of the executive board relative to the work of the corporation and to the status of the Scouting movement throughout the territory of the corporation, inviting attention to matters of particular interest and informing the executive board concerning any problems of which the executive board should be advised, together with recommendations and suggestions for the good of the movement requiring action by the executive board.

(h) The Scout executive shall prepare an annual report covering the activities and achievements of the corporation which, with the approval of the executive board, shall be presented to the annual meeting of the local council, transmitted to the national council of the Boy Scouts of America, and made public to the communities within the territory of the corporation.

(i) The Scout executive appointed by the executive board must be one recommended by the Boy Scouts of America and have been commissioned as Scout Executive by the Boy Scouts of America.

## NATIONAL COUNCIL MEMBERS

SECTION 7.

At its annual meeting, the local council shall elect from its active membership such number of National Council members as the corporation is entitled to under the Bylaws of the Boy Scouts of America to hold office until the conclusion of the next annual meeting of the local council and until their successors are elected and qualify. National Council members shall attend the annual meeting, and any special meetings, of the National Council of the Boy Scouts of America and shall participate in its proceedings and perform such other duties as may be assigned to them by the Executive Board of the corporation or the National Council of the Boy Scouts of America. As liaison officers between this corporation and the National Council they shall:

(a) Present the point of view of the corporation to the National Council in respect to matters of national policy and procedure, and

(b) Interpret to the corporation decisions and policies of the National Council and assist the corporation in its responsibility to make effective and bring about an understanding among local Scouters of such decisions and policies of the National Council.

National Council members shall serve as members of the regional committee and shall attend all regional committee meetings and participate in the proceedings thereof. The duly elected council president and council commissioner are automatically elected to serve as local council representatives to the national council during their terms of office.

In addition to the council president and council commissioner each local council may elect one of its members as a member of the National Council for every 5,000 traditional program youth members (Cub Scouts, Boy Scouts, Varsity Scouts, and Venturers), or major portion (2,501 or more) thereof enrolled as of December 31 of the preceding year.

# ARTICLE VII. COMMISSIONER STAFF AND PROFESSIONAL STAFF

## COMMISSIONER STAFF

SECTION 1.

The commissioner staff may be composed of the council commissioner, one or more assistant council commissioners, district commissioners, assistant district commissioners, roundtable

commissioners, and unit commissioners. Each such Scouter shall be 21 years of age or over to whom the Boy Scouts of America has issued a commission for a respective volunteer post.

The council/district commissioner staff shall be selected as required and in such a manner as is set forth in the commissioner manuals of the Boy Scouts of America for the council's adopted plan of council and district organization, the Rules and Regulations of the Boy Scouts of America, and these bylaws.

Each member of the commissioner staff shall serve as a volunteer and carry out the mission of the position for which commissioned in cooperation with the council's plan for the delivery of its programs to chartered organizations and community groups and in accord with these bylaws, policies, procedures, and the Rules and Regulations of the Boy Scouts of America.

## PROFESSIONAL STAFF

SECTION 2.

The corporation may employ individuals in professional positions who have been recommended by and commissioned as such by the Boy Scouts of America. Such members of the professional staff shall be appointed to office by the executive board upon the recommendation of the Scout executive and shall serve, under the direction and supervision of the Scout executive, at the pleasure of the executive board and the Scout executive.

Duties of members of the professional staff shall be as defined by the Scout executive with the approval of the executive board. They may be designated so as to indicate their respective functions, but all professional titles first shall be approved by the Boy Scouts of America.

# ARTICLE VIII. DISTRICT ORGANIZATION

## DISTRICTS

SECTION 1.

For the purpose of area service and administration, the corporation's territory may be divided geographically into such districts as the executive board from time to time determines, subject to the Rules and Regulations of the Boy Scouts of America. The corporation shall supervise Scouting in each district through the active members of the local council residing within the district and such additional district members as may be elected.

## DISTRICT COMMITTEE

SECTION 2.

The district committee shall be elected annually by the district members to administer the Scouting program within the territory of the district. The district committee and the committees

of the district have no legislative authority, the purpose of the district committee being to make effective within the district policies and programs adopted by the corporation. The district committee consists of chartered organization representatives and council members at large within the district territory plus duly elected district members at large.

## DISTRICT COMMITTEE OFFICERS

SECTION 3.

Each district committee shall elect a chair and vice-chairs, as may be required, and in such a manner as set forth in the official operations manual of the Boy Scouts of America and election procedures approved by the executive board. The district chair shall be nominated for election to the executive board in accordance with article IV, section 2 of these bylaws.

## MEETINGS OF THE DISTRICT COMMITTEE

SECTION 4.

The district committee shall meet monthly at such time and place, preferably within the district, as may be fixed by the committee or its chair. The business transacted at each monthly meeting shall address the four functions of operation (membership/relationships, finance, program, and unit service) and shall be concerned with service to chartered organizations and to units within the district and shall include the receiving of reports from the chairs of various district operating committees, the Scout executive or designee (as secretary of the district committee), and the district commissioner, and such other business as the chair and officers and Scout executive may indicate.

The district committee meeting immediately preceding the annual meeting of the local council should be the annual meeting of the district. At least 90 days prior thereto three to five names of a potential district nominating committee shall be submitted to the council president for approval. The president has the discretion to add or delete names for the nominating committee from the council executive board or the community at large. When approved, the committee shall make nominations for district officers and members at large for election at the annual meeting of the district. At this meeting the officers and district committees shall present reports of the year's activities.

SECTION 5.

A suggested district election procedure appears in the appendix.

## VACANCIES

Section 6.

Any vacancy in district committee officers or district members at large may be filled by the district committee and the person so elected shall hold office until the conclusion of the next

succeeding annual meeting of the district.  Nominations to fill vacancies shall be made by the district nominating committee.

## DISTRICT OPERATING COMMITTEES

SECTION 7.

Each district may have such committees as approved by the executive board and as authorized by the Boy Scouts of America operations manuals. Each district shall be responsible for cooperating in making effective the policies and programs adopted by the executive board and for the performance of the four functions.

The chairs of committees of the district shall be appointed by the district chair with the approval of the district committee. The members of these committees shall be appointed by the district committee, upon the recommendation of the respective committee chair and the district chair.

## DISTRICT COMMISSIONER STAFF

Section 8.

Each district shall have a commissioner staff as set forth in article VII, section 1 of these bylaws and in the commissioner manuals of the Boy Scouts of America.  The district commissioner shall be selected in accordance with article VIII, section 3, clause 6 of the Rules and Regulations of the Boy Scouts of America and the District Election Procedures of the bylaws.

The commissioner staff shall be responsible for advising and coaching unit personnel, on-time unit charter renewals, and monthly roundtables in the district.

# ARTICLE IX. LOCAL UNITS

## APPROVAL OF UNIT CHARTERS

SECTION 1.

The executive board shall review or shall authorize some committee or person to review all applications for new charters or renewal of charters by community or chartered organizations within the corporation's territory and shall forward the recommendation with respect to each such application to the national office of the Boy Scouts of America.

## UNIT DESIGNATION

SECTION 2.

All units within the corporation's territory shall be designated by the name of the community in which the unit is located, by the name of the chartered organization or community group operating the unit, and by a serial number assigned by the corporation.

# ARTICLE X. FINANCES AND PROPERTY

## RAISING FUNDS

SECTION 1.

*Clause 1.* All money raised by or received for the benefit of the corporation or a unit under its jurisdiction and all property acquired by the corporation or such a unit shall be deemed to be received or acquired for the benefit of Scouting as interpreted and promoted by the Boy Scouts of America, in accordance with the Rules and Regulations and procedures from time to time adopted by the Boy Scouts of America.

*Clause 2.* Subject to the Rules and Regulations of the Boy Scouts of America, the corporation shall control the raising and expenditure of all funds for local Scouting work within the territory of the corporation. The necessary expenses of the corporation shall be met by funds secured by solicitation or otherwise in accordance with the Rules and Regulations of the Boy Scouts of America pertaining to the raising of funds for Scouting purposes.

*Clause 3.* Neither the corporation nor any unit under its jurisdiction shall have any authority to bind the Boy Scouts of America to any financial obligation whatever.

## CONTROL OF FUNDS AND PROPERTY

SECTION 2.

**Budget**

*Clause 1.* The executive board shall, preceding the commencement of each fiscal year, consider and adopt a budget of estimated expenditures by the corporation for such fiscal year. No funds shall be expended by the corporation during a fiscal year without the authorization of the executive board or the executive committee for any item not covered by, or in excess of the amount authorized by, the budget for such year.

**General Funds**

*Clause 2.* All funds of this corporation or funds handled on behalf of this corporation or the Boy Scouts of America, from whatever source and for whatever purpose received, shall be deposited to the credit of the corporation in such depositories as shall be approved by the executive board or executive committee. The funds shall be disbursed only upon the authority of the executive board, executive committee or upon the order of officers of the corporation duly authorized by the executive board or executive committee; in any event the signatures of at least two authorized persons shall be required for the disbursal of funds except in the case of checks made payable to the Boy Scouts of America where a single signature will be accepted provided authorization has been accorded by the executive board.

All receipts from registration fees, Boys' Life subscriptions, and any other funds of the Boy Scouts of America which are received by this corporation for transmission to the Boy Scouts of America shall be carefully segregated, through bookkeeping and accounting procedures, as established by the Boy Scouts of America.

All persons having access to any funds (general or special) of the corporation shall be bonded.

**Special Funds**

*Clause 3.* The corporation may create special funds for specific purposes to be used in the interest of the Boy Scouts of America by the corporation or a unit under its jurisdiction. Such special funds may be established by recordation in proper account on the books of the corporation and shall, if required by direction of the executive board or the term of a gift or bequest, be vested in a bank or trust company in trust for the use of the corporation or the unit, with the provision in the statement of the conditions governing the administering of the trust that in the event of the dissolution of the unit or corporation or revocation, termination, or lapse of its charter said trustee will, after satisfying any claims against such fund, turn over to the Boy Scouts of America the balance for use by the Boy Scouts of America for the benefit of Scouting in such locality and for the specific purposes for which the fund was granted. If, after a reasonable period, there is no suitable opportunity for the use of said fund in such locality, it may be used elsewhere.

**Real Estate**

*Clause 4.* The corporation may hold title to real property in its own name as long as its Articles of Incorporation expressly provide for the conveyance of such property or the net proceeds from the sale thereof to the Boy Scouts of America in the event of the dissolution of the corporation or the revocation or termination of its charter. Title to real property acquired for the corporation may also be vested in a bank or trust company in trust for the use of the corporation, where appropriate in accordance with the wishes of the donor, with a provision in the trust deed that in the event of the dissolution of the corporation or the revocation or termination of its charter, the trustee, after satisfying any claims against the corporation to which such property may be subject, will convey said property or pay the net proceeds from a sale of the property to the Boy Scouts of America, which shall hold or use said property or funds for the benefit of Scouting in the locality

in which the corporation is located or elsewhere if after a reasonable period there is not suitable opportunity to use said property or funds in said locality.

Title to all real estate acquired for a unit under the jurisdiction of the corporation shall be vested in (a) the name of the corporation (if the corporation agrees to hold title to property), (b) the operator of such unit (if the operator is a chartered organization or community group), or (c) a bank or trust company, in each case in trust for the use of the unit, where appropriate in accordance with the wishes of the donor, with a provision in the trust deed that in the event of the dissolution of the unit or the revocation, termination, or lapse of its charter, the trustee will, after satisfying any claim against such unit to which such real estate may be subject, hold the property upon the instructions of the corporation or, if so instructed, convey said property or pay the net proceeds from a sale of the property to the corporation, which shall hold or use said property or funds for the benefit of Scouting in the locality in which the unit is located or elsewhere if, after a reasonable period, there is not a suitable opportunity to use said property or funds in such locality.

## Securities

*Clause 5.* The securities of the corporation shall be deposited in any such deposit vault or vaults or with such bank or banks, trust company or trust companies, or such other depositories as may from time to time be designated by the executive board, executive committee, or finance committee. Access to the securities may be had as provided by resolutions of the executive board or executive committee and not otherwise.

## Audit

*Clause 6.* A statement of all income and expenses of the corporation during the fiscal year and a statement of all assets, liabilities, and fund balances of the corporation as at the end of such year shall be duly audited and certified annually in accordance with generally accepted auditing standards, by certified public accountants or other recognized independent public accountants approved by the executive board or executive committee. The corporation shall comply with all applicable legal requirements relating to credits, financial controls, and accounting procedures.

## ADMINISTRATION OF UNIT FUNDS

SECTION 3.

*Clause 1.* At the request of the unit committee of any unit under the jurisdiction of the corporation, the treasurer may hold for such committee funds for the unit. Such funds shall be transferred, in whole or in part, to the custody of the unit or a treasurer of the chartered organization upon duly accredited authority for such transfer.

*Clause 2.* In the event of the dissolution of a unit or the revocation or lapse of its charter, the unit committee shall apply unit funds and property to the payment of unit obligations and shall turn over the surplus, if any, to the corporation. In the case of an organization unit, any funds or equipment which may have been secured as property of the unit shall be held in trust by the

organization or the corporation, as may be agreed upon, pending reorganization of the unit or if this does not occur, such funds and property, by the agreement of those involved, shall be used elsewhere for the promotion of the program of the Boy Scouts of America.

# ARTICLE XI. ADDITIONAL ADMINISTRATIVE MATTERS

## INDEMNIFICATION

SECTION 1.

Any person made a party to any action, suit, or proceeding, civil or criminal, by reason of the fact that such person, his/her testator or intestate, is or was a member of the executive board or committee of the executive board of the corporation, or an officer or National Council member or employee of the corporation, or a director, officer, or employee of any corporation in which he/she served as such at the request of the corporation, or a member of the commissioner staff of the corporation, or a member of a district committee or a district officer under the jurisdiction of the corporation, shall be indemnified by the corporation against the reasonable expenses, (including amounts paid by way of judgment and settlement and including attorney's fees), actually and necessarily incurred by him/her in connection with defense of such action, suit, or proceeding, whether or not such defense shall be successful in whole or in part, or in connection with any appeal therein or any settlement thereof, except in relation to matters as to which it shall be adjudged in such action, suit, or proceeding that such person is liable for negligence or misconduct in the performance of duties. Such indemnification, if afforded, shall not be deemed exclusive of any other rights to which such persons may be entitled apart from this section. This section shall not be deemed to limit any power or exclude any right of the corporation to provide any additional or other indemnity or right for any executive board member, officer, employee, or other person. If this section should be invalid or ineffective in any respect, the validity and effect of the section in any other respect shall not be affected.

## CONTRACTS, CHECKS, DRAFTS, ETC.

SECTION 2.

Except as otherwise provided by law or in these bylaws, such officer or officers, employee or employees, or agent or agents of the corporation as shall be specified by the executive board or executive committee shall sign, in the name and on behalf of the corporation, all deeds, bonds, contracts, mortgages, and other instruments or documents, the execution of which shall be authorized by the executive board or executive committee; and such authority may be general or confined to specific instances.

Except as otherwise provided by law or in these bylaws, all checks, drafts, notes, bonds, bills of exchange, or other orders, instruments, or obligations for the payment of money shall be signed by such officer or officers, employee or employees, or agent or agents of the corporation as shall be specified by the executive board or executive committee.

22

## NOTICES AND WAIVERS

SECTION 3.

   Whenever any notice is required by these bylaws or by any law to be given to any member of the local council, member of the executive board, or any committee or any officer, such notice except as otherwise provided by these bylaws or by any law may be given personally or by fax, or electronic mail addressed to such person at his/her or its place of business, if any, or (to the extent applicable) at such address as has been given to the corporation as the home address of the person; or the notice may be given in writing by mail, in a sealed wrapper, postage prepaid, addressed to such person at such address. Any notice given by fax or electronic mail shall be deemed to have been given when it shall have been delivered for transmission and any notice given by mail shall be deemed to have been given when it shall have been deposited in a post office, in a regularly maintained letter box, or with a postal carrier. A waiver of any such notice in writing, signed by the person entitled to such notice in writing, as required, shall be deemed the equivalent thereof; and the presence at any meeting of any person entitled to notice thereof shall be deemed a waiver of such notice as to such person.

## ACTION WITHOUT A MEETING

SECTION 4.

   Except to the extent otherwise restricted by any applicable law, any action required or permitted to be taken at any meeting of the executive board or any committee thereof may be taken without a meeting if prior to such action a written consent thereto is signed by all members of the executive board or committee and such written consent is filed with the minutes of the proceedings of the executive board or committee.

## FISCAL YEAR

SECTION 5.

   The fiscal year of the corporation shall be the calendar year.

## SEAL

SECTION 6.

   The seal of the corporation shall be in the form of a circle enclosing the universal badge with the motto Be Prepared underneath this badge and the words "Winnebago Council, Inc., Boy Scouts of America," around the circle and shall be used only as authorized.

**AMENDMENT**

SECTION 7.

  These bylaws may be amended at any meeting of the executive board, upon the recommendation of the executive committee of the executive board, or when the proposed amendment has been sent to members of the executive board at least 15 days in advance of the meeting. All amendments to these bylaws must first be approved by the national council of the Boy Scouts of America before being submitted to the executive board for adoption.

Adopted this _____ day of _____, 20_____

_____      _____
          Scout Executive                        Council President

## EXECUTIVE BOARD RESOLUTIONS

RESOLUTION 1. This resolution implements article V, section 3.

## COMMITTEES OF THE EXECUTIVE BOARD

RESOLVED. That the following committees of the executive board shall be appointed:
Fund Raising/Finance, Camping & Outdoor Programs Promotions, Membership, Endowment, Marketing, Strategic Planning, Nominating and Enterprise Risk Management.

Their duties and responsibilities shall be as set forth in the operations manuals and applicable literature of the Boy Scouts of America and the chairs of these committees will automatically become members of the executive board by virtue of their appointment.

RESOLUTION 2. This resolution implements article VI, section 6 (c) and (e).

## AUTHORITY OF SCOUT EXECUTIVE AND
## MEMBERS OF PROFESSIONAL STAFF

RESOLVED, That subject to any limitation imposed by law, the bylaws, or any resolution of the executive board or executive committee, the Scout executive and or the currently serving second senior commissioned professional as appointed by the Scout Executive be and hereby is authorized and empowered, for and on behalf of the corporation and in its name, to deliver, enter into, acknowledge, cancel, and revoke any and all agreements, conveyances, mortgages, powers of attorney, or other instruments which are incident to the carrying on, in the normal course, of the regular affairs of the corporation; and be it further

RESOLVED, That subject to any limitation imposed by law, the bylaws, or any resolution of the executive board or executive committee, the Scout executive, and the treasurer, be and hereby are and each of them hereby is authorized and empowered, for and on behalf of the corporation and in its name, to deliver, execute, acknowledge, and pay any fees connected with any and all applications, reports, returns, or other instruments required by any governmental authority, which are incident to the carrying on, in the normal course, of the regular affairs of the corporation.

RESOLUTION 3. This resolution complements article XI.

## CONFLICT-OF-INTEREST POLICY FOR
## EXECUTIVE BOARD MEMBERS

RESOLVED, That it is the policy of the corporation that all executive board members or members of any committee thereof or officers or employees of the corporation have a duty to be free from the influence of any conflicting interest when they act on behalf of the corporation or represent it in negotiations or advise others in the corporation with respect to dealing with third parties. They are expected to deal with suppliers, customers, contractors, and others having dealings with the corporation on the sole basis of what is in the best interest of the corporation without favor or preference to third parties based on personal considerations. To this end the following rules shall be observed:

1. No member of the executive board or member of any committee thereof or officer or employee of the corporation shall accept from any person, directly or indirectly, whether by himself or herself or through his or her spouse or a member of his or her family or through any partner or business or professional associate, any gift, favor, service, employment or offer of employment or any other thing of value which he or she knows or has reason to believe is made or offered to him or her with the intent to influence him or her in the performance of his or her duties as a member of the executive board or member of any committee thereof or officer or employee of the corporation.

2. No member of the executive board or member of any committee thereof or officer or employee of the corporation who is a partner, officer, or employee of a partnership, firm, or corporation or who owns or controls more than 10 percent of the stock of such corporation, shall represent, appear for, or negotiate on behalf of the corporation in connection with the acquisition or sale by the corporation of any interest in real or tangible or intangible personal property to such partnership, firm, or corporation.

3. No member of the executive board or member of any committee thereof shall participate by discussion, voting, or by any other action taken by the executive board, or any committee thereof, in the enactment of or defeat of a motion which relates to any transaction with any party referred to in paragraph 2 above. In case any such matter is discussed at any meeting where any executive board or committee member who has such an interest is present, he or she shall promptly disclose his or her interest in the matter to be voted on to the chair of the meeting. He or she shall not vote on the matter and at the discretion of the disinterested members present may be required to leave the meeting during the discussion and the voting on the matter.

RESOLUTION 4. This resolution complements article XI.

## CONFLICT-OF-INTEREST POLICY FOR
## COUNCIL EMPLOYEES

RESOLVED, that the following conflict-of-interest policy become the policy of this corporation and be applied to all council employees. It is imperative that employees of the Boy Scouts of America conduct themselves with a degree of honesty and integrity which is beyond reproach or even suspicion.

While it is not possible to anticipate every situation and prescribe a precise rule for each, it is possible to set forth certain basic, general principles to be observed by employees at all times. The essence of this policy is that employees shall always deal with others doing, or seeking to do, business with the Boy Scouts of America or any local council thereof in a manner that excludes all consideration of personal advantage. Accordingly, every employee of the Winnebago Council is subject to the following policy:

**1. Interest in Other Business Organization**

Employees of the Boy Scouts of America or any local council thereof or members of their immediate families shall not have any interest, direct or indirect, in any other business which in any degree conflicts with the employee's primary obligations to the Boy Scouts of America or any local council thereof. In this regard, employees or members of their immediate families should not possess a significant financial interest in any business that does, or seeks to do, business with the Boy Scouts of America or any local council thereof. In addition, employees should not conduct business on behalf of the Boy Scouts of America or any local council thereof with members of their immediate family, or a business organization with which the employees or members of their immediate families have any association which could be construed as significant in terms of potential conflict of interest.

**2. Gifts, Favors, Entertainment and Payments to Employees**

Employees shall not seek or accept any gifts, payments, fees, services, valuable privileges, vacations or pleasure trips, loans (other than conventional loans from lending institutions) or other favors from any person or business organization that does, or seeks to do, business with the Boy Scouts of America or any local council thereof. No employee shall accept anything of value in exchange for referral of parties to any person or business organization that does, or seeks to do, business with the Boy Scouts of America or any local council thereof. In the application of this policy:

(a) Employees may accept common courtesies of nominal value usually associated with accepted business practices for themselves and members of their families.

(b) An especially strict standard is expected with respect to gifts, services or considerations of any kind from suppliers. Entertainment at the expense of suppliers beyond that contemplated by (a) above should not be accepted under any circumstance.

(c) It is never permissible to accept a gift in cash or cash equivalents of any amount.

(d) This policy does not preclude the acceptance of benefits to the local council or the Boy Scouts of America as compared to benefits to an individual employee.

(e) This policy does not preclude the acceptance of courtesies extended to employees of the Boy Scouts of America or any local council thereof in their official capacities, such as gratis hotel rooms for business (but not personal use) in connection with meetings.

(f) This policy will be communicated to persons and organizations doing, or seeking to do, business with the Boy Scouts of America or any local council thereof.

## 3. Confidential Information

Employees shall not, without proper authority, give or release to anyone not an employee, or to another employee who has no need for the information, data or information of a confidential nature concerning the Boy Scouts of America or any local council thereof.

## 4. Gifts, Favors, Entertainment, and Payments by the Boy Scouts of America or Any Local Council Thereof

Gifts, favors, and entertainment may be given others at the expense of the Boy Scouts of America or any local council thereof only if they meet all of the following criteria:

(a) They are consistent with accepted business practices.

(b) They are of sufficiently limited value, and in a form that will not be construed as improper.

(c) They are not in contravention of applicable law and generally accepted ethical standards.

(d) Public disclosure of the facts will not embarrass the Boy Scouts of America or any local council thereof.

## 5. Obligation to Disclose

Any employee who believes that his or her personal actions or interests, or the actions of others, may violate this policy must discuss the matter with the Scout executive. Additional interpretations of this policy and definitions of words and phrases used herein will be made upon request to the Scout executive.

**6. Sanctions**

Any employee whose actions or interests violate this policy is subject to termination on that account alone, if such is determined to be in the best interests of the movement.

It is the responsibility of every employee of the Boy Scouts of America or any local council thereof to be aware of and to observe these standards. Accordingly, each employee is asked to sign and return the accompanying Employee Statement relating to these standards. Employee Statements will be held in complete confidence. The employee statement will be re-executed on a regular basis.

### EMPLOYEE STATEMENT

I certify that I have received a copy of the Council Conflict of Interest Policy, dated July 27, 2012, and that neither I nor any member of my immediate family have any personal economic interest that could be construed as opposed to the best interests of the Boy Scouts of America or any local council thereof or in violation of the stated conflict of interest policy, other than any exceptions listed below.

(Give full details below or on a separate sheet, if appropriate, concerning any outside interests that you believe require or may require the approval of the Scout executive. If none, please so state).

Signature of Employee: _____ Date: _____

# THE LOCAL COUNCIL ANNUAL MEETING

The annual meeting of the local council shall be held at such place . . . and at such time as the executive board of the corporation may determine. The annual meeting of the local council shall be for the purpose of:

a.   Receiving annual reports of the executive board, officers, and various committees,

b.   Electing members at large, associate and honorary members of the local council,  regular members of the executive board, officers of the corporation other than the Scout executive, and National Council members.

c.   Receiving and approving financial statements showing the financial position of the corporation as of the close of its most recent complete fiscal year and the results of operations during such year, and

d.   Transacting such other business as may come before the meeting.

The following guidelines shall be observed:

1.   The proposed agenda, notice, and election procedures should be reviewed in conference by the council president, Scout executive, and area director well in advance of the meeting (i.e., prior to the board meeting which is 3 months before the annual meeting).

2.   The council president must give careful attention to the appointment of both the nominating committee and the committee on program and resolutions within the time specified in the bylaws. It would be well for the council president to appoint a volunteer Scouter knowledgeable in the BSA election procedures, as well as the applicable nonprofit corporation state law requirements, to serve as parliamentarian and also election judge(s). These appointments should be published with sufficient advance notice to give voting members the opportunity to send in written recommendations.

3.   Notice of the annual meeting must be given in writing a minimum number of days in advance of the meeting, as specified in the bylaws of the council.

4.   A list of the names of presently registered chartered organization representatives in the council and the name of the organization which each represents shall be developed. The list should indicate anticipated attendance at the annual meeting. Chartered organization representatives must constitute a majority of the active membership of the local council at all times.

5.   Local council bylaws should stipulate the quorum requirements. The National Council recommends that a quorum for the local council conform to the laws of the state in which the council is incorporated. When this is not stated, 5 percent or 10 percent or 15 percent of the total voting membership shall be required.

6.  Voting delegates and nonvoting delegates should be properly identified at the annual meeting with easily recognizable and distinctive name tags. All voting delegates should register as they arrive.

7.  The council president may desire to call upon the parliamentarian to explain the election procedures before turning the meeting over to the nominating committee chair to present the nominating committee report and conduct the elections. Copies of the election procedures and council bylaws should be on hand for ready reference. The election procedure should be dignified and be carried out in a businesslike manner. Nominations from the floor are not permitted.

8.  It is strongly recommended that all officers and members of the executive board be contacted personally (and proposed members at large of the council written to) informing them of the intention of the nominating committee to place their name in nomination for election at the council's annual meeting unless they inform the chair of the nominating committee otherwise. This is not only a courtesy, but strengthens the position of the nominating committee's final recommendations.

9.  A strategy meeting should be held no more than 10 days (preferably within 24 hours) in advance of the annual meeting, at which the council president, Scout executive, parliamentarian, nominating committee chair (and where possible the regional and/or area representative) are present to review the agenda and to discuss the possibility of problems arising.

10. In the event that problems or divisive matters are anticipated at the meeting, it is appropriate to determine whether or not it is proper to raise such items at the meeting under the council's bylaws. If so, it will be necessary to devise strategy to cope with each matter. It may be appropriate to contact all voting members to give them additional information and to assess the voting position of each.

11. Efforts should be taken to ensure that all volunteer Scouters, especially those from the districts, are well informed. It may be useful to suggest to district Scouters that they have direct representation on the executive board through their district chair and thus may have their views represented in this manner.

12. The National Council of the Boy Scouts of America may be called upon by the executive board of a local council for assistance in these matters; such as conducting special audits in such areas as personnel, membership, or fiscal stewardship.

# COUNCIL ELECTION PROCEDURES

**Purpose**

To elect council members at large, associate and honorary members of the local council, regular members of the executive board, officers of the corporation other than the Scout executive and local council representatives to the National Council.

**Those eligible to vote**

1. Registered chartered organization representatives currently officially representing chartered organizations within the council's geographical boundaries.

2. Registered, duly elected council members at large.

**Time of elections**

The date, time, and place of the annual business meeting of the local council is specified by the executive board of the corporation as prescribed by the council's bylaws.

**Process**

1. At least 90 days prior to the date set for the annual business meeting of the local council the president shall appoint a nominating committee, subject to board approval, of not fewer than three active council members. Consideration may be given to adding a former council president and the inclusion of one or two persons of the highest community stature who are not active members of the local council.

2. The members of the nominating committee will be identified to members of the council between 60 and 45 days prior to the annual council business meeting so that names may be given to them for consideration.

3. Suggested nominees from registered members of the local council are to be considered if they are received in writing no less than 30 days prior to the annual business meeting. Those who offer names to the nominating committee should supply some background information but should not have secured the permission of the person to be nominated or whether they will serve if elected.

4. The nominating committee will meet with the Scout executive, serving as the secretary and having no vote, for the purpose of selecting a slate of nominees for election.

5. Nominations received in writing within the allowable time from members of the local council not on the nominating committee are given serious consideration. Each such nomination should be acknowledged with a brief letter of thanks and the assurance that the candidate will be considered.

6.  To provide a fair and orderly nominating process, nominations will not be accepted from the floor at the time of election.  This procedure also permits sufficient time to consider in advance all aspects of a nominee's suitability to serve.

7.  The nominating committee will select a slate consisting of a single candidate for each council officer position and no more than the legally allowable number of persons for each of the following categories: executive board members, council members at large, associate and honorary members, local council representatives to the National Council; however, the committee may elect not to completely fill the associate and honorary member categories.

    The nominating committee will then ensure that sufficient copies of the ballot are printed and that one is provided to each official voting member present at the local council annual business meeting. The order of listing on the ballot is as follows:

    | Voting members | Non-Voting members |
    | --- | --- |
    | Council members at large | Associate and honorary members |
    | Executive board members | Advisory council members |
    | Council officers (except Scout executive) | |
    | Local council representatives to the National Council | |

8.  Following the elections it is important to notify those elected, to congratulate each, and to register those not already registered as active members of the Boy Scouts of America.

**Details and Contingencies**

1.  Newly elected officers and local council members at large take office immediately following the annual business meeting.

2.  Should any portion of the nominating committee's report be rejected, this portion would be reintroduced, with or without changes, for consideration at an adjourned or special or postponed meeting to be held no more than 60 days after the annual business meeting. This would permit write-in nominations to be submitted and studied by the nominating committee.

    Formal notice of the rescheduled meeting, stating the purpose, etc., should be sent to eligible voters. The nominating committee should, at the rescheduled meeting, be called upon by the president to proceed with that portion (or portions) of the election that was not completed. It is hoped that nominating committee members will discover the reasons for the failure of acceptance of the slate and attempt to deal with them prior to one rescheduled meeting.

3.  In the event that a resolution is still not obtained, the process described in "2" above will be followed once more. Failing resolution the second time, the president may (a) elect to entertain a motion to follow the process in "2" above once again, or (b) dismiss the present nominating committee and appoint a new one which will meet and draw up a slate to be presented according to the guidelines above.

33

4. Since officers, regular members of the executive board, and council members at large take office immediately following the local council annual business meeting (local council Bylaws, Article III, Section 2, Clause 1 and Article IV, Section 3) they will assume office as soon as the local council annual business meeting is adjourned.

5. Voting should be done by ballot. The nominating committee's slate, having been printed and distributed to eligible voters at the meeting, may be used as an official ballot should there be the need.

   The chair of the nominating committee may "move the acceptance of the category under consideration and instruct the secretary to cast a unanimous ballot for the proposed nominees." If this motion is carried, there is no need to collect the printed ballots.

   If the "unanimous ballot" motion is defeated then the president immediately will appoint tellers from among the active, registered members present to collect and tally the ballots. It may be helpful to have eligible voters sign their names so that their eligibility can be checked.

# DISTRICT ELECTION PROCEDURES

**Purpose**

To elect district officers and district members at large.

**Those eligible to vote**

1. Chartered organization representatives registered and currently representing chartered organizations within the district's geographical boundaries. (see "chartered organization representative" below.)

2. Registered district members at large duly elected at the last annual district committee meeting or during the interim at a regular, duly called district committee meeting.

3. Registered council members at large residing in the district.

**Time**

The district committee meeting immediately preceding the council annual meeting should be the district annual meeting.

**Process**

1. Ninety days prior to the district annual meeting, the district chair will submit suggestions for members of the nominating committee to the council president for approval. This committee should consist of three to five members. The president has the discretion to add

or delete names for the nominating committee from the council executive board or the community at large. It is recommended that the council president appoint a member of the council executive board to serve on this committee.  In the event of a vacancy in the office of district commissioner, the president may ask the council commissioner to serve on the nominating committee.

2. When approval is received from the council president the nominating committee will meet with the district executive as adviser to form the slate comprised of nominees for district chair, one or more vice-chairs, and district members at large, plus a nominee to be submitted by the district chair for council executive board approval to serve as district commissioner.

3. The nominating committee not only will agree on the slate but also will secure the nominees' permission to stand for election and to serve if elected.

4. The members of the nominating committee will be identified to the district members of the local council between 60 and 30 days prior to the annual district committee meeting so that suggestions may be given to them for consideration. (This information may be included in one formal notice of the annual meeting.)

5. Suggestions may be made in writing to the nominating committee for inclusion in its report providing the nominees thus entered are received by the nominating committee at least 2 weeks prior to the annual meeting of the district. If accepted by the nominating committee, the candidate will be contacted by the nominating committee and permission received from the person to stand for election and to serve.

6. To provide a fair and orderly nominating process, nominations will not be accepted from the floor at the time of election.  This procedure also permits sufficient time to consider in advance all aspects of a nominee's suitability to serve.

7. At the district annual meeting the district chair will call upon the chair of the nominating committee for the committee's report and "turn over the chair to conduct the elections."

    a. The chair of the nominating committee will present first the committee's nominees for district members at large; call for a motion, second, and vote.

    b. The chair of the nominating committee then will present the committee's nominees for district chair and vice-chairs; call for a motion, second, and vote.

    c. The district commissioner is to be an elected member at large but is offered for appointment and approval as district commissioner by the council executive board through the report of the district nominating committee and with the concurrence of the Scout executive. The district commissioner is not elected at the district annual meeting.

    d. Vote of the majority of the members present at the district meeting is required for election.

**Details and Contingencies**

1.  Newly elected officers and members at large take office immediately following the district business meeting.

2.  If any portion of the nominating committee's report is rejected, this portion must be reintroduced at a special or adjourned or recessed meeting of the district committee to be held within 30 days of the present meeting. Formal notice of this meeting must be sent to eligible voters immediately so that it is received at least 2 weeks prior to the meeting. Additional names may be submitted to the nominating committee during that period. The nominating committee will, at the next meeting, proceed with the portion of the election that failed passage. It is hoped that the nominating committee members will discover the reasons for the failure of acceptance and attempt to deal with them.

3.  In the event that a resolution is still not obtained, then the matter will be referred to the council president and/or executive board for final resolution.

4.  Because members at large take office immediately following the district business meeting, they and the chartered organization representatives are eligible to vote at postponed elections if they were elected and the officers' slate was not accepted.

5.  Voting may be done by ballot but voice or hand votes are acceptable since a district is a non-policymaking body. If ballots are used, the secretary should be instructed to collect ballots only from those eligible to vote, marked with the name of eligible voters and counted by clerks appointed by the chair of the nominating committee. A motion to cast a unanimous ballot for the proposed candidates is acceptable.

**Chartered Organization Representative**

1.  The chartered organization representative is automatically a voting member of the council and the district upon the selection or appointment by the community organization and when registered as a member of the Boy Scouts of America. The individual is to be registered during the time that the chartered organization designates this person as chartered organization representative and shall have one vote.

2.  Primary responsibilities are (1) help units to be successful and (2) serve as liaison between the chartered organization and Scouting.

3.  The chartered organization representative is encouraged to become an active, participating member of one of the district's committees.

# EXHIBIT 4

5/6/2021    USC's $1.1-billion payout: Here is who gets the settlements and other details - Los Angeles Times

CALIFORNIA

# USC's $1.1-billion payout: Here is who gets the settlements and other details



Attorney John Manly speaks Thursday during a press conference on the historic settlement with USC over sexual misconduct by former campus gynecologist Dr. George Tyndall.  (Dania Maxwell / Los Angeles Times)

By MATT HAMILTON, HARRIET RYAN

MARCH 25, 2021 6 PM PT



---

     Los Angeles Times     LOG IN   

A West Coast Perspective     $1/8 week

Case 2:40343-USS-Doc-3276-1-Filed-05/06/21-Page-96-of-170

SUBSCRIBE

sexual abuse settlement in American higher education.

USC has made a series of legal settlements with former patients of Tyndall, and the largest of those — for $852 million — was announced Thursday.

This settlement far exceeds the scale and cost of other sex abuse scandals, including those that roiled the Archdiocese of L.A., Michigan State University and Penn State, and will result in hundreds of women receiving money from their alma mater.

Here are the basic facts:

## The settlements

- A final group of 710 women suing the university in Los Angeles Superior Court settled their claims Thursday for $852 million.
- USC previously agreed to pay thousands of other alumnae and students $215 million in 2018 as part of a class action settlement reached in federal court. USC also agreed to pay up to $25 million in legal fees in this case, putting the total cost at about $240 million.
- Women who were part of Thursday's settlement in state court had to explicitly opt out of the 2018 federal class action settlement.
- A group of about 50 other women with individual state court cases were previously settled for an amount that has not been made public.

## Years of legal battles

- The sole full-time gynecologist at the student health clinic from 1989 until 2016, Tyndall was accused of preying on a generation of USC women.
- After The Times exposed the years of misconduct accusations against Tyndall in 2018, USC was sued by hundreds of former female students who accused the

**A West Coast Perspective**

**$1/8 weeks**

✕

SUBSCRIBE

- The university hired at least three top law firms to defe                patients' lawsuits in federal court, including Gibson, Dunn & Crutcher and Fraser Watson Crouch. The cost of USC's legal defense is separate from the settlements and ran into the tens of millions of dollars, according to the university's general counsel.

- From 2018 until this spring, USC's lawyers have repeatedly sparred with lawyers representing the hundreds of former Tyndall patients. The women's attorneys had dozens of USC administrators and employees sit for questioning under oath, including former provost Michael Quick, former general counsel Todd Dickey and nurses and student clinic staff.

- Tyndall was also questioned under oath but he repeatedly invoked his 5th Amendment right against self-incrimination. Tyndall has been charged with multiple counts of sexual assault by Los Angeles County prosecutors and is awaiting trial.

- Former USC President C.L. Max Nikias was scheduled to be questioned during a deposition this winter, but it was postponed amid settlement negotiations and ultimately never took place.

## The payouts

- The 710 women who were part of Thursday's settlement will receive an average payment of $1.2 million, although the exact distribution of the money was expected to vary by individual allegations and ultimately be determined by a retired judge in coming months. Lawyers for the women expected some would receive in the middle to low six figures, while other women could receive more than $2 million, depending on the severity of their claims.

- USC will pay the settlement over two years. The first payment will be in August 2021, and the second will occur in August 2022.

- T             f  th                           USC     ill   l

**A West Coast Perspective**

$1/8 weeks

✕

SUBSCRIBE

- No philanthropic gifts, endowments funds, or tuition w
  settlement, according to USC.
- The thousands of former patients who are part of the class action settlement have already received a minimum payment of $2,500. Some patients were eligible for higher awards — up to $250,000 — depending on what they experienced. Those former patients have begun this month to receive notice of how much they were awarded.

RELATED

[The Times' investigation of George Tyndall, former USC gynecologist accused of sexually abusing students](#)

[A USC doctor was accused of bad behavior with young women for years. The university let him continue treating students](#)

CALIFORNIA



**The perils of parenting through a pandemic**

What's going on with school? What do kids need? Get 8 to 3, a newsletter dedicated to the questions that keep California families up at night.

> Enter email address

SIGN ME UP

A West Coast Perspective

$1/8 weeks

Serrano's lap. When she left for the day, he would be the only adult in the office with the boys, Justice Baily-Schiffman wrote.

Despite Mr. Serrano's position as a religious educator — with Mr. Serrano at the church nearly every day between 1997 and 2009, volunteering at the summer camp, and getting keys to the church and rectory — no records were kept regarding him or his employment history at the church, the judge wrote.

With the case set for trial, the Diocese of Brooklyn agreed to settle. But in a statement released on Tuesday, the diocese still seemed to minimize its role in allowing the abuse.

"The diocese and another defendant have settled these lawsuits brought by the four claimants who were sexually abused by Angelo Serrano at his private apartment many years ago," the statement said. "Mr. Serrano was a volunteer worker at a local parish; he was not clergy or an employee of the diocese or parish."

The statement added that for three of the claimants, "another defendant" would be contributing "a significant portion of the settlement." A spokeswoman for the diocese said that the Dorothy Bennett Mercy Center, a local after-school program based next to the church in Clinton Hill, had agreed to pay about one-third of the total settlement.

The spokeswoman, Adriana Rodriguez, did not address whether Father Shannon and Father Lynch were punished for failing to report signs of abuse.

In all, each of the four victims will receive $6,875,000, the lawyers said, sharing an email with the diocese's lawyer confirming the settlement amount. The note indicated that the diocese would confer with its insurers regarding how the settlement would be paid.

The largest previous individual settlement to an abuse victim in the Catholic Church is believed to be in 2007, when two victims of a lay music minister in the Rockville Centre diocese collected a total of $11,450,000, or $5.725 million each, according to BishopAccountability.org, which tracks clergy sexual abuse cases. The lawyers for the Brooklyn victims said they believed this was a record settlement to individuals for sex abuse in the Catholic Church in this country.

The victims, who are now between the ages of 19 and 21, have requested that their identities be withheld.

"These were boys who were abused in second grade through sixth grade, for years for some of them," said Ben Rubinowitz, another lawyer for the victims. "The egregious nature of the conduct is the reason that the church paid what they did."

The Brooklyn diocese, which includes Queens, is already in the process of settling hundreds of older abuse cases where the victims can no longer sue because of the statute of limitations.

Like many dioceses, the Brooklyn diocese has confronted waves of parish mergers and closures as the number of parishioners has shrunk. St. Lucy's-St. Patrick's parish was itself the result of a merger of parishes in the 1970s because of dwindling attendance. In 2010, the diocese announced that the church would be shuttered in another wave of parish closings.

In a lengthy article by The New York Times about the struggling parish published in 2004, Mr. Serrano appears as a "raspy-voiced pastoral assistant" who took phone calls, promising one woman he would help her find her lease so she could avoid eviction. He calmly counseled another caller who was in a psychiatric ward, feeling desperate.

"Suicide is not an option," he told her, dropping his gruff demeanor. "Pray to St. Jude, the patron of the impossible."

"Mr. Serrano can identify with her," the story reported then, five years before his arrest. "He has struggled with depression. So far, he is winning. But, he admitted, this year would be hard. Very hard. He was talking about spending Christmas alone this year."

Archdiocese Of Los Angeles Agrees To $8 Million Settlement In Sex Abuse Case | WUSF News



HOURLY NEWS
LISTEN LIVE
PLAYLIST

   

DONATE

NATIONAL

# Archdiocese Of Los Angeles Agrees To $8 Million Settlement In Sex Abuse Case

April 17, 2019 · 6:58 AM ET

FRANCESCA PARIS



The Archdiocese of Los Angeles has agreed to pay $8 million to a teenager who was sexually abused by a teacher when she was 15 years old. Pictured here, the Cathedral of Our Lady of the Angels, the headquarters for the archdiocese, in 2013.

*Damian Dovarganes/AP*

The Roman Catholic Archdiocese of Los Angeles has agreed to pay $8 million to a teenager who was sexually abused and kidnapped by a teacher at her Catholic high school.

The teenager's attorney, David Ring, said that the settlement — finalized by a court last week — is the largest that the Archdiocese of Los Angeles has ever paid to a single victim, The Associated Press reports. Over the past 15 years, the archdiocese has paid more than $740 million in sexual abuse settlements.

Juan Ivan Barajas, then-athletic director and health teacher at San Gabriel Mission High School in San Gabriel, Calif., repeatedly sexually abused the student when she was 15 years old, according to a lawsuit filed in 2017. Barajas then kidnapped her and took her to Las Vegas, according to court documents reported by The Los Angeles Times.



**WORLD**

After Years Of Abuse By Priests, #NunsToo Are Speaking Out

Barajas was arrested in Nevada and is currently serving a six-year prison sentence after pleading guilty to felony statutory sexual seduction, the AP reports.

"The Archdiocese recognizes that there was serious harm done to the life of the victim-survivor," the archdiocese said in a statement. "We hope that the settlement will allow her to heal and move forward with her education and lifetime goals. The Archdiocese apologizes for the impact that this caused in her life."

The abuse – which reportedly began in April 2016 – followed repeated allegations of misconduct from others regarding Barajas, according to the *Times*. Several reports from 2015 detailed suspicious behavior by the athletic director around students at the all-girls school, including allegedly taking a girl into his office alone on more than 50 occasions.

"The warning signs here were crystal clear," Ring told the *Times*. "The complaints about Barajas were unambiguous, and yet nothing was done."

NATIONAL

For The Catholic Church, A Year Of Unending Clergy Abuse Revelations

Adrian Marquez Alarcon, a spokeswoman for the archdiocese, told the *Times* that the matter was investigated at the time and that no evidence was found of sexual misconduct. According to records in the case, Barajas received a warning from the archdiocese for being alone with a minor.

The Archdiocese of Los Angeles had previously been part of the largest settlement to date in a clergy sex abuse case, when it agreed to pay $660 million to 508 victims in 2007.

roman catholic church　　los angeles

# More Stories From NPR

TECHNOLOGY
**Want To Send A Mean Tweet? Twitter's New Feature Wants You To Think Again**

HEALTH
**Oregon Public Health Workers Race To Vaccinate 'Extreme Risk' Counties**

POLITICS
**Bill To Combat Sexual Assault In Military Finally Has Votes To Pass, Senators Say**

ENVIRONMENT
**Deepening Drought Holds 'Ominous' Signs For Wildfire Threat In The West**

HEALTH
**Some Question Whether Hospital Visitation Bans During Pandemic Were Too Strict**

BUSINESS
**Google Adapts To Long-Term Telework, Offers Employees Hybrid Workweek**

Michigan State reaches $500M settlement with Larry Nassar victims – Orange County Register

SPORTS > COLLEGE SPORTS

# Michigan State reaches $500M settlement with Larry Nassar victims



Michigan State agreed to a $500 million settlement with more than 300 victims of sports doctor Larry Nassar in the worst sex-abuse case in sports history. (Cory Morse/The Grand Rapids Press via AP)

By **SCOTT M. REID** | sreid@scng.com | Orange County Register
PUBLISHED: May 16, 2018 at 9:21 a.m. | UPDATED: May 16, 2018 at 5:15 p.m.

Michigan State University has reached $500 million settlement with more than 300 women who alleged they were sexually abused by former U.S. Olympic and USA Gymnastics team physician Larry Nassar, a longtime member of the Michigan State sports medicine clinic.



Under terms of the agreement agreed on in principle by Michigan State's board of trustees Tuesday night, $425 million will be paid to 332 known survivors of Nassar's sexual abuse. An additional $75 million will be placed in a trust fund for future claimants alleging sexual abuse by Nassar.

There are no confidentiality or non-disclosure agreements attached to the settlement.

USA Gymnasts, the U.S. Olympic Committee, three former USA Gymnastics executives and former U.S. Olympic and national team directors Martha and Bela Karolyi still face dozens of lawsuits filed by more than 150 survivors of Nassar's sexual abuse.

"This historic settlement came about through the bravery of more than 300 women and girls who had the courage to stand up and refuse to be silenced," said John Manly, the Irvine attorney for many of the survivors. "We appreciate the diligent efforts of Mick Grewal and the survivors' attorneys across the nation who worked to obtain this measure of justice and healing. We also thank the mediator and all who participated in crafting this settlement. It is the sincere hope of all of the survivors that the legacy of this settlement will be far-reaching institutional reform that will end the threat of sexual assault in sports, schools and throughout our society."

Michigan State conducted two investigations of Nassar between early 2014 and July 2015 after receiving complaints that he improperly touched a patient while performing a procedure at the Michigan State sports medicine clinic. A local prosecutor declined to file criminal charges against Nassar, who was allowed to continue working at the clinic. Michigan State officials never contacted USA Gymnastics about the allegations against Nassar.

Former gymnast Rachael Denhollander said Michigan State officials discounted and ridiculed her when she first told them in 2016 she was abused by Nassar.

"Michigan State is pleased that we have been able to agree in principle on a settlement that is fair to the survivors of Nassar's crimes," said Robert Young, special counsel to MSU, said in a statement. "We appreciate the hard work both sides put into the mediation, and the efforts of the mediator, which achieved a result that is responsible and equitable."



The club coach of U.S. national team gymnast Maggie Nichols informed USA Gymnastics officials in June 2015 of her concerns that Nassar had sexually abused Nichols under the guise of performing a medical procedure at training camp at the Karolyi Ranch in Texas. Nassar was allowed to retire as U.S. national team physician under false pretenses by USA Gymnastics officials in September 2015, keeping the allegations of his sexual abuse from the public for another year.

Olympic gold medalist McKayla Maroney confirmed to USA Gymnastics officials in July 2015 that she had been repeatedly sexually assaulted by Nassar while competing for Team USA at the Olympic Games and World Championships, as well as during training camps at the Karolyi Ranch. USA Gymnastics chief executive Steve Penny and other USA Gymnastics officials and board members did not share Maroney's statements or other allegations with Michigan State officials.

In the two-year window when Michigan State and USA Gymnastics, unbeknownst to each other, conducted investigations of Nassar to the time his abuse became public in September 2016, at least 25 young women, and possibly more than 100, were sexually assaulted by Nassar at the Michigan State clinic, according to court documents.

Newsroom Guidelines
News Tips
Contact Us
Report an Error

 **The Trust Project**

## Scott M. Reid | Reporter

Scott M. Reid is a sports enterprise/investigative reporter for the Orange County Register. He also covers Olympic and international sports as well as the Los Angeles' bid to host the 2024 Olympic Games. His work for the Register has led to investigations by the International Olympic Committee, the U.S. Department of Education, the California Legislature, and the national governing bodies for gymnastics and swimming. Reid's 2011 reporting on wide spread sexual abuse within USA Gymnastics and the governing body's failure to effectively address it led to Don Peters, coach of the 1984 record-setting Olympic team, being banned from the sport for life. His reporting also prompted USA Gymnastics to adopt new guidelines and policies dealing with sexual abuse. Reid's 2012 and 2013 reporting on sexual abuse within USA Swimming led to the banishment of two top level coaches. Reid has won 11



  

**Home    Uncovered SLO    Daily Briefs    Discovered    Sales and Deals    Opinion    Eye on the Coast    Login**
**Weather    Subscribe    Advertise    Employment    Search    Tips    Store**

# Paso Robles teacher sex case prompts $5 million settlement

January 31, 2017



Jeremy Monn

A Paso Robles teen who had a sexual relationship with her former high school teacher will receive a $5 million settlement. The Paso Robles Joint Unified School District will be on the hook for $1 million, while a Central Valley district must pay $4 million. [Union Democrat]

During the 2013-2014 school year, the teen was 16 years old when she had a sexual relationship with Jeremy Monn, now 33. Monn was the student's agriculture teacher at the time.

Monn is currently serving a prison sentence at Golden State Modified Community Correctional Facility in Kern County.

Prior to working at Paso Robles High School, Monn had a sexual relationship in 2013 with a 15-year-old student at Don Pedro High School in Tuolumne County. At the time, Monn was teaching at Don Pedro High School and living in Merced.

The Paso Robles teen's lawsuit alleged the Big Oak Flat-Groveland Unified School District did not investigate Monn's behavior after hearing rumors of his relationship with a student. Rather, Dave Urquhart, the superintendent of the Central Valley school district, promised Monn a favorable recommendation if the teacher found a job elsewhere.

The Central Valley district then informed the Paso Robles district that Monn was a model teacher of high moral character, according to the lawsuit.

San Luis Obispo County prosecutors said Monn then groomed the Paso Robles student for sex by giving her gifts and compliments. In July 2015, Monn received a combined sentence of six years and four months for his sexual relationships with the underage students in Paso Robles and the Central Valley.

At Monn's sentencing hearing, the mother of the Paso Robles teen said her daughter graduated high school with a 4.0 GPA, but she no longer planned to go away for college.

Los Angeles attorney David M. Ring, who represented the Paso Robles teen, announced the settlement on Monday. Ring said the Big Oak Flat-Groveland superintendent and other district officials provided "glowing recommendations" for Monn prior to him going to work in Paso Robles.

Urquhart, who has remained the Big Oak Flat-Groveland superintendent, said the district's self-insurance program and the plaintiff's attorney handled the settlement.

Ilan Funke-Bilu, who had defended Monn, previously said his client was suffering from personal issues and was motivated by depression when he had sex with both students. Monn could be eligible for release after serving just three years and two months in prison.

**Sponsored Links**



Natural revitalizing hot springs
Avila Beach's secret hideaway

**Sponsored Links**



**Search Cal Coast News.Com**

Custom Search

Search

**Sponsored Links**



**Recent And Most Commented**

- Recent topics
- Most viewed
- Most commented

- **Sponsored Links**



SUGGESTED NEWS

mgid

Case 20-10343-LSS    Doc 3276-1    Filed 05/06/21    Page 107 of 170

# Student who fathered teacher's baby receives $6-million abuse settlement from Redlands schools



Former Citrus Valley High School teacher Laura Whitehurst, awaiting a hearing in Superior Court in San Bernardino, pleaded guilty to sex acts with three boys. (Kurt Miller / Associated Press)

By **Richard Winton**

AUGUST 19, 2016, 4:25 PM

**A** former student who fathered a child with a onetime Redlands schoolteacher convicted of having sex with him and two other students will receive a $6-million settlement from the school district, officials said Friday.

Vince Finaldi, an attorney for the former high school student, said the egregious conduct of Redlands Unified School administrators in the case warranted what may be one of the largest single-victim sex abuse settlements by a public agency.

**Support Quality Journalism**
Subscribe for only 99¢

**START NOW ›**

Case 20-10343-LSS    Doc 3976-1    Filed 05/06/21    Page 108 of 170

"The size of this settlement represents the gravity of the damage done to this young victim and his family and it also highlights the extreme malfeasance and neglect by school officials who turned a blind eye to the criminal conduct of a teacher and failed to protect a student," Finaldi said.

Laura Whitehurst, 29, was arrested in July 2013 and charged with 41 felony counts of unlawful sex acts that could have meant up to 29 years in prison. She pleaded guilty to four counts of unlawful sexual intercourse and two counts of oral copulation with a person under 18 involving three boys while teaching at Citrus Valley and Redlands high schools.

As part of a plea bargain, she was sentenced to a year in jail and released after six months. She remains on probation and is required to register as a sex offender. She shares custody of the child with the former student, who is now 21, according to his attorneys.

In the lawsuit, attorneys for the former student alleged that school officials knew of his relationship with Whitehurst and failed to warn his family. The suit also claimed that a teaching colleague of Whitehurst's was aware of the relationship and that school officials even questioned Whitehurst and the student when she became pregnant.

School district officials said they were admitting no wrongdoing by settling the lawsuit and blamed Whitehurst alone.

District spokesman Tom DeLapp said the district is "not pleased with this outcome" but settled "this tragic case once and for all so we can move forward."

"We felt there could be serious damage to the reputation of a very fine school district if the plaintiff's lawyers were allowed to drag the district and its employees through the mud all over again," DeLapp said. "In the long run, $6 million is high, but it could have been much higher if this had been left to an empathetic jury in another city looking past the facts to find a financial scapegoat for the unprofessional, criminal actions of one individual."

## ❝

# There was a picture of her in the birthing suite circulated to people at the school with the boy.

— John Manly, attorney for the victim

Support Quality Journalism
Subscribe for only 99¢

The former student who fathered Whitehurst's baby said the relationship started in 2012 when he was 16 and lasted nearly a year. He told authorities Whitehurst began driving him home from school

functions and spending long hours with him. On a trip to Disneyland, she grabbed his hand and told him she wanted to kiss him. Shortly after the trip, she and the boy began having repeated sexual intercourse at her apartment. Whitehurst gave birth to their child in June 2013, with the boy in attendance.

He said Whitehurst gave him alcohol and told him it was a "miracle pregnancy" because she did not believe she could get pregnant. She even gave him a Bible on his 17th birthday and would take him to church, he said.

In asking a judge to reject the plea bargain with prosecutors in 2013, the student said, "Physically, I feel sick to my stomach thinking about the manipulation I was subjected to."

John Manly, another attorney for the former student, said district employees failed to report the abuse to authorities as required by state law.

"There was a picture of her in the birthing suite circulated to people at the school with the boy," Manly said." The principal wrote an email about the photo."

According to a Redlands police search warrant served shortly after Whitehurst's arrest, the school district began investigating the accusations but "failed to report suspected child abuse as mandated" to police or social workers until six weeks later on July 1, 2013.

Supt. Lori Rhodes has said the district received the first credible information about a possible relationship on July 1, when the teen's mother reported it to school officials, who then immediately called the police. Rhodes said that the pair in May had denied the relationship and provided plausible explanations for their association.

School officials insist that the only wrongdoing was by Whitehurst. No one in the district was charged with any offense.

"Ms. Whitehurst made a conscious effort to deceive and circumvent the standards and policies she was trained to uphold," DeLapp said.

The settlement follows a $505,000 payout in an alleged sexual abuse case involving a teacher and student in 2013. The district also faces a legal claim from a 16-year-old alleged victim of a math teacher recently charged with sexually abusing her.

**richard.winton@latimes.com**

**Support Quality Journalism**
Twitter: @lacrimes¢

**START NOW ›**

Thanks for checking out our new design, please let us know if you have feedback

DNAinfo has closed.

Click here to read a message from our Founder and CEO

Search   | Go |

# LAUSD To Pay $88 Million In 30-Student Sexual Abuse Settlement

by Matt Tinoco in News on May 17, 2016 9:30 am

552
Like
Share

The Los Angeles Unified School District (LAUSD) will pay a total of $88 million to settle 30 cases of sexual abuse at two elementary school campuses, where questions about specific teachers' behavior had been repeatedly raised and ignored by district officials, according to the Los Angeles Times.

Monday's announcement centers upon abuses at a pair of LAUSD elementary schools. The settlement addresses 18 instances of teacher-student abuse at De La Torre Elementary in Wilmington, and 12 cases at Telfair Avenue Elementary in Pacoima, according to the City News Service. Aside from the abuse, this settlement stems directly from allegations that the district was aware that the involved teachers were potentially abusive, but failed to act on that knowledge.

This settlement represents the second largest in the district's history. Back in 2014, LAUSD paid nearly $140 million to the families of children abused by Mark Berndt, a teacher at Miramonte Elementary School in South Los Angeles. Berndt photographed students bound and gagged, covered in cockroaches, and being spoon-fed what trial prosecutors alleged was Berndt's semen.

Berndt's trial and conviction occurred while allegations of abuse at Telfair and De La Torre Elementary schools were under investigation.

At Telfair, teacher Paul Chapel III was first accused of lewd acts against third grade students back in 2012. An internal investigation substantiated the claim, and Chapel was found to have abused a dozen students at Telfar, including touching and kissing his students' genitals.

But questions about Chapel's behavior existed before his employment at Telfair Elementary. Chapel was dismissed by a private school before he was hired by LAUSD. There, he was accused of sexually abusing a male student. Though Chapel was not convicted, LAUSD never opted to conduct their own

investigation on Chapel. This is despite several teachers who raised flags about Chapel's questionable behavior, like keeping children on his lap, trying to take them on unauthorized field trips, and shutting his classroom door with students inside during lunch and recess.

At De La Torre Elementary, Robert Pimentel was subjected to district scrutiny for more than a decade before he was convicted of sexually assaulting four girls. In 2002, former De La Torre principal Irene Hinojosa questioned Pimentel about allegations that he slapped young girls' buttocks and touched their calves. Pimentel confessed to the behavior, but blamed it on medication that increased his sex hormones. He continued teaching.

He also continued to teach even after De La Torre's principal received a search warrant asking for Pimentel's personnel files relating to an investigation that he abused a minor related to him. More complaints against Pimentel began surfacing in 2009, when a social worker filed a report documenting misconduct. Still, the district failed to open an investigation. Pimental wouldn't leave the school until 2012 after a student told her mother he had inappropriately touched her.

This fact is crucial to the claims of negligence levied against LAUSD in this latest settlement. Liability is established not by the abusive acts themselves, but whether or not the district was aware that abuse could potentially occur. The settlement indicates that in the cases of both Pimentel and Chapel, the district was accordingly aware.

Chapel is currently serving a 25-year sentence in prison after pleading no contest to 12 counts of abuse. Pimentel is serving 12 years after pleading no contest to four.

Contact the author of this article or email tips@laist.com with further questions, comments or tips.

- twitter
- facebook
- reddit
- print

- lausd
- paul chapel
- robert pimentel
- sexual assault
-

News

# East Bay school district agrees to pay largest ever per student molestation settlement

By **MATTHIAS GAFNI** | mgafni@bayareanewsgroup.com | Bay Area News Group
June 17, 2014 at 11:50 am

MORAGA — Seeking closure for a scandal that devastated a school community, the Moraga School District has agreed to pay $14 million to two women suing them over a teacher's sex abuse, in what is apparently the nation's largest molestation settlement per student.

The hefty settlement — two other victims received $4.65 million last year — is the price of the district's utter failure to investigate and report allegations of biology teacher Daniel Witters' behavior to authorities in the 1990s. Newly uncovered documents show more officials knew about those allegations than has previously been disclosed, and three were secretly reprimanded while the district assured the community administrators acted appropriately.

Case 20-10343-LSS   Doc 3276-1   Filed 05/06/21   Page 113 of 170

Not until this newspaper, with the help of victim Kristen Cunnane, reported on the officials' misdeeds in 2012 did the cover-up start to crumble. The other three victims have not gone public, but they and the district's critics have said Witters' abuse could have been stopped early on had the initial reports been taken seriously.

Current Superintendent Bruce Burns, who has worked to change the abuse reporting culture in the district, apologized for those missteps Tuesday.

"They were innocent victims, abused at a young age by someone in a position of trust," he said. "The betrayal of that trust caused real and lasting suffering. It is our hope that this settlement will allow these women to continue to heal and help them and their families move forward. It also allows our district to continue the work we have begun to improve student safeguards and be worthy of the trust parents place in us."

In a statement, the two victims said they are relieved at the settlement but "we remain appalled at the callous and reprehensible behavior of all the school officials and administrators involved. We will probably never understand how or why they chose to ignore and cover up the repeated warnings they received. It is devastating that all this could and should have been prevented had any one of them chosen to act."

The women's attorney David Ring, who specializes in school abuse cases, said the settlement was the largest ever of its kind, with each of the two victims receiving $7 million.

The payments will not affect the district's general fund as its insurance company from the 1990s will foot the bill, Burns said.

All four victims — including Cunnane, assistant head coach for Cal's women's swim team who received $2.85 million last year — named retired Principal Bill Walters, retired Assistant Principal Paul Simonin and retired Superintendent John Cooley as failing to report student reports of Witters' sexual abuse, thus allowing them to be victimized by the science teacher.

Ultimately, as complaints against Witters mounted, he was placed on leave from Joaquin Moraga Intermediate School in 1996 and drove his car off a cliff days later.

While the criminal case stalled with his suicide, the community was clamoring for answers after hearing rumors of earlier complaints against Witters.

At the time, district officials assuaged angry parents by telling them Witters had no earlier reports of sexual abuse. New information obtained by this newspaper make clear it was a lie.

In 1994, a female student wrote a letter describing in detail sexual abuse at the hands of Witters dating back four years earlier; district internal documents show Walters, Simonin and Cooley all knew about the letter but no one reported it to police. In fact, Ring said, the girl called the school office a week after sending the letter to make sure Walters received it and was told he was "busy."

Further reports of sexual abuse in 1995 were also ignored.

State law requires school employees to immediately report any suspicions of child abuse to authorities.

After Witters' death, the school district stonewalled Moraga police. It reached a point where the then-chief of police personally appeared on campus to force them to comply, Ring said.

In the immediate wake of the scandal, school officials never explained the lapses, instead telling parents in a letter they were making "minor revisions" to policies and procedures on sexual harassment, processing citizens' complaints, district office records and personnel files.

But documents newly obtained by this newspaper show the school board took some action, secretly reprimanding all three administrators about seven months after Witters' suicide.

Walters' letter stressed he failed his "legal duty to report all reasonable suspicion of child abuse to the police."

Walters was the only one to respond to his reprimand, writing a letter that acknowledged even more employees knew of the original sex abuse allegations in 1994.

"Upon receipt of the letter received in June 1994, I made the superintendent aware of the content and followed his directions to follow-up with Mr. Witters," he wrote. "Three of the Joaquin Moraga Intermediate School staff members were aware of my conversations with the superintendent. Thus, I did feel that I had reported the incident to my superior."

Despite the reprimands, all three kept their jobs and Walters was given a two-year contract through which his salary nearly doubled from $36,000 to $63,000 per year.

Case 20-10343-LSS   Doc 3276-1   Filed 05/06/21   Page 115 of 170

All three left the district, but Walters returned to serve as principal at an elementary school. He announced his resignation in March 2012, days after this newspaper was told it would receive internal district documents on the case.

Contact Matthias Gafni at 925-952-5026. Follow him at Twitter.com/mgafni.

SPONSORED CONTENT

## Homeless House Calls: Bringing Health to the St

By Adventist Health

The homeless are in dire need of healthcare. But they also need respect. An inspiring story of

**Matthias Gafni** Matthias Gafni is an award-winning investigative reporter for the Bay Area News Group. He has reported and edited for Bay Area newspapers since he graduated from UC Davis, covering courts, crime, environment, science, child abuse, education, county and city government, and corruption. A Bay Area native, he cherishes his Warriors, Giants and 49ers. Send tips to 925-952-5026 or mgafni@bayareanewsgroup.com.

🐦 Follow Matthias Gafni @mgafni

## SUBSCRIBE TODAY!
ALL ACCESS DIGITAL OFFER FOR JUST 99 CENTS!

News

# Record settlement for mentally disabled girl sexually abused on Lodi school bus

By **MATTHIAS GAFNI** | mgafni@bayareanewsgroup.com | Bay Area News Group
March 5, 2013 at 10:21 am

Lawyers on behalf of a 10-year-old special needs child sexually assaulted on a school bus by her driver reached a record $4.75 million settlement Tuesday with Lodi Unified School District.

The 2010 assault was captured by video camera on the school bus. The girl, 8 at the time of the assault, had the mental capacity of a 5-year-old. She was alone on the bus with driver Richard Evans, now 61, in 2010 while on her way to elementary school.

Evans was convicted and sentenced to 25 years in prison. Before his hire, Evans had been convicted of having sex with a prostitute while driving a potato chip delivery truck.

The child's attorney hopes the settlement will force school districts to better check bus drivers' backgrounds, and that it will prompt a state investigation.

"This settlement provides some small measure of justice for a little girl who suffered horrible abuse at the hand of a school bus driver who should never have been hired," said John Manly, the victim's attorney. "It also sends a clear message to every school district in California — protect our children from dangerous predators or suffer the consequences."

The Lodi school district released a statement Tuesday on behalf of Superintendent Cathy Washer: "Lodi Unified School District is pleased that Nor Cal Relief and the plaintiffs in this case have reached a settlement that will provide resources for the family of the student that was harmed.... The district regards this situation very seriously. The health and safety of our students is the highest priority for Lodi Unified School District. We understand how important this is to the parents of our community who entrust their children to us each day."

Nor Cal Relief is an insurance pool funded by 330 member public school districts, she explained.

On Feb. 27, a San Joaquin County Superior Court jury found Lodi Unified negligent in hiring Evans and 90 percent liable. The case was nearing the second phase of awarding damages when the district decided to settle for $4.75 million, the largest pre-verdict settlement against a California school district in history, Manly said. Last month, the Lodi school board turned down a settlement for $500,000 less, Manly added.

"Her life is destroyed, she never will be OK and that's why the number is so high," Manly said. "The jury was also able to see and hear the horror the victim went through on the video."

During trial, Manly said that had the district checked Evans' references, former co-workers would have said on-duty sexual activity was a common occurrence for him.

The girls' attorneys are calling for a state investigation into the hiring standards of nonclassified school employees, particularly bus drivers who need to be approved by the DMV and CHP.

"Despite his criminal conviction for lewd conduct while on the job as a professional driver he was eligible to drive a school bus," Manly said.

Contact Matthias Gafni at 925-952-5026. Follow him at Twitter.com/mgafni.

SPONSORED CONTENT

- ◦ Classifieds
- ◦ Jobs
- ◦ Legal Notices
- ◦ Local Guide
- ◦ Real Estate
- ◦ Special Sections
- ◦ Today's Ads                        • #
- ◦ Video Ads
- ◦ Weekly Ads
- • Tools
  - ◦ Advertise With Us          ◦
  - ◦ Archives                         • Twitter
  - ◦ Contact Us                      •
  - ◦ Electronic Edition            • Reddit
  - ◦ Missed paper                  • Pinterest
  - ◦ Online customer service   • 0 Comments
  - ◦ Privacy Policy                 • ...
  - ◦ Reprints                              ◦ Email
  - ◦ Submit calendar event          ◦ Print
  - ◦ Vacation hold                       ◦ Tumblr
  - ◦ Newsletter Signup                ◦ LinkedIn
                                                  ◦ StumbleUpon

- • Home â†'
- • Education

# Pajaro Valley school district pays $3 million to settle child sex abuse lawsuit

By

By Donna Jones

Santa Cruz Sentinel

Posted: 01/10/14, 12:01 AM PST |

0 Comments

WATSONVILLE -- Pajaro Valley Unified School District will pay $3 million to settle a lawsuit brought by the family of a child molested by a former teacher at Aptos Junior High School.

Steven Jay Sande, 64, is serving a 17-year sentence in state prison after pleading guilty in 2011 to 19 felonies, including 12 sexual abuse charges involving the then-13-year-old girl, as well as seven charges of child pornography and using a computer to facilitate the crimes.

"No amount of money can ever put that girl back to where she was before she met Mr. Sande. No amount of money can compensate that family for what they went through," said lawyer David Ring of the Los Angeles firm, Taylor and Ring.

But Ring said the settlement kept the girl from having to testify in open court, and the district from having to pay out a potentially higher award.

"I don't know of any school district or business that would agree to $3 million unless they know they're going to get whacked in court," he said.

The lawsuit, filed in 2011 by the girl's parents, details how Sande "groomed" his victim during the 2009-10 school year, when she was a student in his math class. He shared personal information with her, then romantic sentiments and finally sex talk and pornographic images via texts before committing acts of intercourse and oral copulation against her will.

According to the lawsuit, the girl was coerced into remaining silent by expressed and implied threats. During a sentencing hearing, the victim's family said Sande warned the girl he might kill himself if she told anyone what was happening. Sande's crimes only came to light in July 2010, when the girl's parents discovered she had been meeting with the teacher during the summer.

But the plaintiffs, who were not named to protect the girl's identity, said school officials should have known and taken action sooner since other parents and at least one teacher previously had expressed concerns about inappropriate behavior by Sande. Their concerns were not taken seriously, plaintiffs said.

According to the lawsuit, Sande earned the trust of students by speaking favorably about marijuana use, and rewarding correct answers with cash. He also allowed girls to sit on his lap, gave them his cellphone number, and, in at two other cases, made inappropriate calls or texts.

Sande's actions caused "severe emotional distress and physical and psychological injuries" to the girl, as well as economic harm, plaintiffs said. They sought compensatory and punitive damages.

The girl's parents incurred medical and therapy bills, and were forced to put their home up for sale in a depressed market so they could leave the area and enroll their daughter in a new school, the lawsuit says.

District officials' failure to properly supervise and investigate Sande enabled him to abuse the girl, plaintiffs said.

Brett McFadden, Pajaro Valley's chief business officer, called the settlement "extraordinary, the largest I've seen in my career."

The district had argued the teacher had due process protections that officials were bound by law to follow. Still, McFadden said the district has improved its training of principals regarding the law.

"You can't have a case like this and it not affect how you look at things," McFadden said.

Insurance will cover the district's settlement costs.

Follow Sentinel reporter Donna Jones at Twitter.com/DonnaJonesscs

Home   News   I-Team   Weather   Entertainment
U.S. & World   California News   Sports   NFL in LA   Health   Tech   Weird   Weather   NewsConference          71°   Connect



# LAUSD Agrees to $5 Million Settlement in Molestation Lawsuit

The agreement could be one of the largest the district has ever agreed to in a civil settlement if finalized.

By John Cadiz Klemack and Kelly Goff



The LA Unified School District will pay $5 million to settle the lawsuit in child abuse cases. John Cadiz Klemack reports from Pacoima for the NBC4 News at 6 p.m. on Wednesday, June 11, 2014. (Published Wednesday, June 11, 2014)






**LA Unified School District Will Pay $5 Million Settlement**

Watch: Police Pursue U-Haul Driver Into Produce Market

Hollywood Sex Abuse: How Scandals are Derailing Productions

LiAngelo Ball Linked to China Shoplifting Case



## TRENDING STORIES

 3 Killed in Shooting Near Northern California Elementary School

 [VIDEO] Sex, Drugs and the Public Library

 [VIDEO] UCLA Basketball Players Detained in China Are Headed Home

 Woman Dies from Burns Suffered in Gasoline Attack: Family

 [VIDEO] Boy's Torture-Murder Trial: 'There is Evil in This Room'

Two girls molested by a teacher at a Pacoima elementary school have reached a $5 million settlement with the Los Angeles Unified School District, attorneys said Wednesday.

The agreement could be one of the largest the district has ever agreed to in a civil settlement if finalized.

Details of the agreement have not been disclosed, but the two former Telfair Elementary School students will divide the settlement, which came on the day the case was set to go to trial.

"It was not easy, it was a very hard-fought case and it resolved as you saw on the doorstep of trial," said Tom Cifarelli, attorney for the plaintiffs

## WEATHER FORECAST

Los Angeles, CA

71° Clear
Feels Like 71°



  Radar      Forecast      Maps  

## WHAT DO YOU THINK?

Does it matter that Ben Simmons, the NBA's top pick, doesn't have the best outside shot?



NEWSLETTERS

Receive the latest local updates in your inbox
Email

Email                                    Sign up

Privacy policy | More Newsletters

LAUSD has agreed to pay $5 million in a settlement with two girls who were molested by a teacher at Telfair Elementary School. John Cadiz Klemack reports live on the NBC4 News at Noon June 11, 2014. (Published Wednesday, June 11, 2014.)



• **Watch: Cover-Up Allegations Mount Against LAUSD**

Former third-grade teacher Paul Chapel was sentenced in 2012 to 25 years in prison for molesting 13 former students in 2010 and 2011.

The civil lawsuit alleged Chapel molested the girls, who were 8 years old at the time, during school hours and that LAUSD failed to protect them, even though it knew about previous allegations against Chapel and had moved him to Telfair from a Chatsworth school because of those accusations.

• **Download: Download the NBCLA Mobile App**

"I certainly think based on this case, LA Unified is taking these matters very seriously and prepared to address them and resolve them appropriately," Cifarelli said

The lawsuit is one of several similar complaints LAUSD is facing.

Dave Holmquist, general counsel for the district, released this statement following the announcement of the settlement:

"Student safety has been and will always be a top priority. Everyday District employees work hard to ensure the safest learning environment possible for all students. In 2011, when our dedicated employees learned of allegations of the former teacher's inappropriate conduct, they, consistent with their training, immediately contacted law enforcement and, consistent with our policies, the teacher was removed from the school site and eventually fired.

"Unfortunately, plaintiffs suffered harm before the teacher's activities were uncovered. For this reason and in an effort to shield the young children from a long and emotional trial, we are finalizing settlements which we are confident will provide for the future health and educational needs of the students involved.

"We know that our work to protect students is never done. While this teacher's dismissal is a prime example of the school district's aggressive stance on housing and terminating teachers for their misconduct, we continue to improve our processes with the goal of identifying and ridding the system of the predators entirely. This will not be easy, but I am confident this goal will be achieved."

"Over the last few years, we have adopted new policies that are at work each day to ensure our students have a safe environment in which to learn and grow. These efforts have included our mandatory 72 hour notification policy; statewide leadership on legislative reform to streamline the dismissal of teachers accused of misconduct; development of a centralized data warehouse for all records and files

related to misconduct; and the creation of a specialized team to investigate allegations of serious misconduct."

The LAUSD is insured for liability coverage of child abuse cases. However, the district is currently in litigation with its insurance providers following the more than 60 settlements in the Miramonte cases last year.

District officials said Wednesday its premiums are paid and they are hopeful the insurance carriers will take care of their responsibilities. However, settlements and judgements are paid for out of the district's general fund, which is part of its $6 billion operating budget.

Published at 11:56 AM PDT on Jun 11, 2014 | Updated at 9:41 PM PDT on Jun 11, 2014

**Follow NBCLA for the latest LA news, events and entertainment:iPhone/iPad App | Facebook| Twitter | Google+ | Instagram | RSS | Email Alerts**

## You May Like

Promoted Links by Taboola

Handicap Higher Than 10? This Is The Driver For You
GX7 Golf

Homeowners Born Before 1985 Get A Huge Surprise
The Better Finance

Rest Easy With Nonstop Threat Detection
Microsoft

Flora Stevens Recognized Her Own Photo, But Can't Account for 42 Years

Safety Group Unveils 2017 'Most Dangerous' Toys List

Woman: Botched Eyelash Extension Job in Maryland Glued My Eyes Shut

SPONSORED LINKS

- This $199 Golf Driver is Changing the Game For Amateurs (GX7 Golf)
- [Doctor] "How To Get Rid of Lip Wrinkles & Vertical Lines" (Younger Lips)
- San Diego women are shedding pounds drinking this detox. (Skinnyfit Tea)
- Enter for a Chance at $2.6 MM + $5K A Week For Life - Exp... (Publishers Clearing House)
- Two Savings Accounts That Pay 10x What Your Bank Pay... (MyFinance Bank Referrals)

MORE FROM NBC Los Angeles

- Penn State Frat Death: New Charges After Deleted Video Recovered
- Marine Corps Veteran Killed by Hit-and-Run Driver at Gas Station
- Legionnaires' Disease Found Among Disneyland Visitors
- Defendant Faints Following Guilty Verdict in Carlsbad Murder For Hire Ca...
- Video Shows Floor Collapse During Party at Texas Apt

WATCH LIVE  Today With Kathie Lee & Hoda
Suzanne Somers and Alan Hamel; Gene Simmons; wine...

Subscriber Services  Subscriptions  E-edition  Classifieds  About Us  Contact Us  Site Map                                    November 14, 2017

Archives/Advanced Search

54°                    GO
Broken Clouds

News   Business   Features   Showtime   Newsy Neighbors   Obits   Opinion   Religion   Sports        Print Ads   Real Estate   Jobs   Classifieds

Life&Leisure   Want to reach more people   Life & Leisure is all new and improved!   Welcome to the site!
                Want local content & events   Monthly publication! Great Content! Improved circulation!   Login or Signup below.
                                              Life & Leisure Magazine!!
                Call your Lodi News-Sentinel Advertising Representative to reserve your space in the next edition! 209-369-2761   Login | Signup

**Welcome to Lodi News-Sentinel** We hope you enjoy this story that was shared with you.

**9  Remaining**

Compare rates and SAAAAAAAAVE . .

PROGRESSIVE   COMPANY A
$$$           $$$
COMPANY B     COMPANY C
$$$           $$$

Zip Code

Get a Quote

Home › News

# Stockton Diocese will pay $3.75 million to settle with plaintiff in Father Michael Kelly case

Story   Image (3)                                    Print   Font Size:

[Previous] [Next]



Posted: Friday, April 20, 2012 10:39 am

**By Katie Nelson/News-Sentinel Staff Writer**

The Diocese of Stockton is paying $3.75 million to settle a civil sex abuse case involving Father Michael Kelly, who fled to Ireland last week, it was announced Friday.

Also on Friday, the plaintiff, Bay Area resident Travis Trotter, came forward at a press conference at the Waterfront Hotel in Stockton to discuss the case. His identity had previously been protected by court order, as he is a victim of sex abuse.

**Katie Nelson/News-Sentinel**

Travis Trotter addresses jurors from his civil trial, family members and others at the Waterfront Hotel in Stockton on Friday, April 20, 2012. Trotter formally identified himself as the plaintiff of the civil trial against the Diocese of Stockton and Father Michael Kelly at a press conference at the hotel.

The diocese will pay Trotter and his attorneys $3.75 million, with $2 million of that amount being paid by the diocese's insurance carriers.

   Buy this photo

As a result of this agreement, Trotter has agreed to dismiss his lawsuit and not seek any further legal action against the diocese or Kelly.

Trotter said he believes he would not have been able to come forward and identify himself as a victim of sexual abuse when his lawyers' investigation for the civil trial initially began over 4 1/2 years ago.

However, he said coming forward and identifying himself Friday was empowering, providing closure not only for him but perhaps blazing a path for other victims to come forward.

Trotter sat with jurors prior to the press conference, sipping drinks and talking about the case. He reiterated his gratitude to the jury for their work, saying while he had not been able to speak with anyone until Friday, he felt he had an emotional connection to each juror.



CALL FOR ENTRIES

—[DEADLINE]—
NOVEMBER 15
ENTRY FORMS & INFORMATION AT
WINEJUDGING.COM

2018 San Francisco Chronicle
WINE COMPETITION
THE LARGEST COMPETITION OF AMERICAN WINES

**Most Read**

Stories

**Two injured in single vehicle crash in Lodi**

**Man arrested on suspicion of sexual offenses at Lodi Unified schools**

**Woodbridge homes tagged with hate symbols**

**Liberty Ranch students lobby Galt City Council to make walking path safer**

**Signing Day: Lodi players ink with D-1 colleges**

## Poll

**Which local holiday display is your favorite?**

Total Votes:                    111

"Maybe it was a good thing (the case) took so long," he said at the press conference. "Because now I am strong. I could not have done this when I was a child. I was insecure, I needed attention. And I felt a lot of shame and carried it with me for a long time."

Trotter's attorney, John Manly, stood by him throughout Trotter's address to jurors, his wife and children, and others.

Manly called Trotter a "hero," and his trial a "crucible."

Trotter served in the U.S. Air Force, working his way up to the rank of major. However, the emotional damage caused him to leave the Air Force with an honorable discharge.

Trotter then went on to become a pilot for Southwest Airlines, but eventually lost his job because medication he was prescribed to combat his depression was not allowed to be used on the job, per corporate policy.

"(The defense) tried everything to run him over," Manly said, "and this was a close case. But at the end of the day, we won because Travis told the truth."

Trotter said he recovered memories of the sexual abuse only after the statute of limitations had expired, so he sued in civil court.

The trial lasted nearly two months before a jury found Kelly liable for sexual assault and abuse April 6. The jury deliberated for 4 1/2 hours hours before reaching a decision.

Within hours of the jury's decision, the diocese removed Kelly from his position with St. Joachim Catholic Church in Lockeford.

Kelly fled to Ireland last week, stating his health was in serious decline and that he wanted to be with his family.

According to Bishop Stephen Blaire, Kelly told him in an email that he did not plan on returning to the United States, despite Blaire's urging him to do so.

Despite the trial's decision, many members of St. Joachim's Catholic Church still support the priest who led them for the past eight years.

Ralph Saxton of Modesto called the trial's conclusion "ludicrous."

Saxton worked with Kelly in the Modesto Youth Soccer league for several years and said he never heard a mention of inappropriate conduct.

"I had people talking to me all the time about their kids. Out of all those thousands of children, not a whisper ever came up," he said. "Somebody, some parent, something would have come up and they would have told me, 'We've got to meet, we've got a little problem here.'"

Jerry Ball of Stockton has known Kelly for 30 years and was married by him in a home ceremony, though he and his wife are not Catholic.

He does not believe the plaintiff's story, despite the court's decision.

"I question his motives. I firmly believe he's not telling the truth. He's caught up in 'Where's the money from the Catholic Church?' and using Father Kelly as a conduit to get the money. That's a very bad feeling to have, I know, but I am as certain as I'm living that (Kelly) didn't do this," he said.

Joey Piscitelli, Northern California's regional director for the Survivors Network of those Abused by Priests, said reactions of emphatic support are common among parishioners whose priests have been found liable of sexual assault.

"The faithful get so attached and trusting, the horror is too much for them to take. Even after (the suspect) is guilty or convicted, they still don't believe it," he said.

○  The light and music extravaganza at 80 N. Lower Sacramento Road

○  The light display and drive-through nativity scene at Zion Reformed Church, 105 S. Ham Lane

○  The decorated Christmas tree at Lodi's City Hall

○  The decorated Lodi Arch in Downtown Lodi

Vote                              View Results

## New Classifieds Ads

Notice
**NOTICE TO OUR READERS The Pub**
NOTICE TO OURREADERS Read more

Lost
**HAVE YOU LOST A PET? If you ha**
HAVE YOU LOST A PET? Read more

Notice
**CASE NO. CV-UNC-2017-11479 ORD**
CASE NO. CV-UNC-2017-11479ORDER TO SHOW CAUSEFOR CHANGE O... Read more

Notice
**CASE NUMBER STK-PR-EST-2017-11**
CASE NUMBER STK-PR-EST-2017-1176NOTICE OF PETITION TOADMI... Read more

Notice
**CNS-3064043**
FICTITIOUS BUSINESS NAME STATEMENTFile No. 2017-117295 Read more

Notice
**CNS-3069398**
FICTITIOUS BUSINESS NAME STATEMENTFile No. 2017-123962 Read more

Notice
**DOC# 2017-112112 FICTITIOUS B**
DOC# 2017-112112FICTITIOUS BUSINESSNAME STATEMENT Read more

Notice
**DOC# 2017-118730 FICTITIOUS B**
DOC# 2017-118730FICTITIOUS BUSINESSNAME STATEMENTThe foll... Read more

## Twitter

The settlement puts an end to litigation that began more than 4 1/2 years ago, a press release by the diocese stated Friday.

Of the $3.75 million to be paid to Trotter and his attorneys, $2 million will come from liability insurance, said Sister Terry Davis of the Diocese of Stockton.

The remaining $1.75 million will come from the diocese's reserves, according to Blaire. The reserves have been depleted over the years, Blaire said, so coming up with the money needed in the settlement will be difficult.

However, Blaire said he is at peace with the way the case has transpired, saying that while he believed Father Kelly to be innocent, every person deserves their day in court.

Davis said the future of the diocese remains bright despite the jury's ruling.

"Not to be too pious about it, but we are people of faith," she said. "We will move forward with this, and we will learn from it. Because that is what is important."

*Reporter Sara Jane Pohlman contributed to this story.*

*Contact reporter Katie Nelson at katien@lodinews.com.*

**More Coverage**

- Survivors Network of those Abused by Priests applauds Michael Kelly settlement

**More about** *Roman Catholic Diocese Of Stockton*

- **ARTICLE:** Nevada judge to act as mediator in Stockton Diocese bankruptcy
- **ARTICLE:** Stockton Diocese answers questions about bankruptcy
- **ARTICLE:** Catholic Diocese of Stockton to declare bankruptcy
- **ARTICLE:** Stockton Catholic Diocese closer to bankruptcy filing; no decision made yet
- **ARTICLE:** Stockton Diocese settles Oliver O'Grady lawsuit for $1.75 million

**More about** *Michael Kelly*

- **ARTICLE:** Former Lockeford priest Michael Kelly could face 14 years in prison
- **ARTICLE:** Calaveras County Grand Jury indicts Michael Kelly
- **ARTICLE:** Catholic Diocese of Stockton to declare bankruptcy
- **ARTICLE:** Stockton Catholic Diocese closer to bankruptcy filing; no decision made yet
- **ARTICLE:** Stockton Bishop Stephen Blaire: Lawsuits have cost diocese $15 million

**More about** *Sexual Abuse*

- **ARTICLE:** Family of student abused by older teen file claim against Lodi Unified School District
- **ARTICLE:** Catholic Diocese of Stockton to declare bankruptcy
- **ARTICLE:** Stockton Diocese settles Oliver O'Grady lawsuit for $1.75 million
- **ARTICLE:** Father Michael Kelly denies clergy abuse allegations
- **ARTICLE:** Second clergy abuse lawsuit filed against Father Michael Kelly

Print

Posted in News on Friday, April 20, 2012 10:39 am. | Tags:    Roman Catholic Diocese Of Stockton,    Michael Kelly,    Sexual Abuse,    Roman Catholic Church Sex Abuse Scandal

Report an error in this story

Sponsored Content

Recommended by

**Lodinews**

A Twitter list by @lodinews



NWS Sacramento
@NWSSacramento

Significant impacts on mountain travel Wednesday-Thursday due to #snow. Potential for near zero visibilities at times. Avoid travel if possible! #cawx



2h

Lodi News-Sentinel
@lodinews

Embed                    View on Twitter

## Mailing List

Subscribe to a mailing list to have daily news sent directly to your inbox.

**Breaking News**
Would you like to receive breaking news alerts? **Sign up now!**

**News Updates**
Would you like to receive our daily news headlines? **Sign up now!**

**Sports Updates**
Would you like to receive our daily sports headlines? **Sign up now!**

Manage Your Lists

▶ **TAKE A LOOK**

- **Rate President Donald Trump on His Job Performance**
- **Amazon or Walmart? Some Retailers Are Choosing Alliances**
- **Sessions: I Never Lied Under Oath to Congress**
- **4th Person Shot Dead in Tampa Neighborhood**
- **Goldman Sachs Said to Drop Stake in Weinstein Co. Down to Zero**
- **Poll: 60% Of Voters Say Moore Should Quit Ala. Senate Race**



This copy is for your personal non-commercial use only. To order presentation-ready copies of Toronto Star content for distribution to colleagues, clients or customers, or inquire about permissions/licensing, please go to: www.TorontoStarReprints.com

**NEWS**

# San Diego diocese to pay $198M in sex cases

⚠ Fri., Sept. 7, 2007    |    🕐 2 min. read

SAN DIEGO – The Roman Catholic Diocese of San Diego said Friday it has agreed to pay $198.1 million to settle 144 claims of sexual abuse by clergy, the second-largest payment by a diocese.

The agreement caps more than four years of negotiations in state and federal courts.

Earlier this year, the diocese abruptly filed for bankruptcy protection just hours before trial was scheduled to begin on 42 lawsuits alleging sexual abuse. Bankruptcy could shield the diocese's assets, but a judge recently threatened to throw out the bankruptcy case if church officials didn't reach an agreement with the plaintiffs.

The San Diego diocese initially offered about $95 million to settle the claims. The victims were seeking about $200 million.

"The diocese has always been committed to resolving this litigation in a way that fairly compensates these victims of abuse and would still preserve the ongoing ministries and programs of the church," Bishop Robert Brom said in a press release Friday.

"We pray that this settlement will bring some closure and healing to the years of suffering experienced by these victims."

In the largest payment yet in the scandal, the Los Angeles Archdiocese settled 508 cases for $660 million in July, two days before jury selection was scheduled to begin in the first of 15 trials involving 172 abuse claimants there.

The Diocese of Orange agreed in 2004 to settle 90 claims for $100 million after a judge promised to set trial dates and begin the discovery process if settlement talks collapsed. Bishop Tod D. Brown later said he couldn't risk a trial in a state where a jury once awarded $30 million to two people who claimed they were sexually abused by clergy.

The Diocese of San Diego, with nearly 1 million Catholics and holdings throughout San Diego County, is by far the largest and wealthiest of the five U.S. dioceses to have filed for Chapter 11 bankruptcy protection under the shadow of civil claims over sexual abuse.

Dioceses in Spokane, Wash., Portland, Ore., and Tucson, Ariz., have already emerged from Chapter 11 bankruptcy protection. The Davenport, Iowa, diocese, which faces claims from more than 150 people, is still in proceedings.

**More from The Star & Partners**

Copyright owned or licensed by Toronto Star Newspapers Limited. All rights reserved. Republication or distribution of this content is expressly prohibited without the prior written consent of Toronto Star Newspapers Limited and/or its licensors. To order copies of Toronto Star articles, please go to: www.TorontoStarReprints.com

**CNN.com**

International Edition | N Netscape

Member Center: **Sign In** | **Register**

MAKE CNN.com YOUR HOME PAGE

**SEARCH**  ● The Web  ○ CNN.com  [        ]  Search

- Home Page
- World
- U.S.
- Weather
- Business
- Sports
- Politics
- Law
- Technology
- Science & Space
- Health
- Entertainment
- Travel
- Education
- Special Reports
- Autos

SERVICES
- Video
- E-mail Newsletters
- Your E-mail Alerts
- RSS
- CNNtoGO
- TV Commercials
- Contact Us

SEARCH

Web ● CNN.com ○

[        ]  Search

# LAW CENTER

## California diocese settles clergy sexual abuse cases

### Sources say payout will be largest in scandal's history

From Drew Griffin
CNN

Friday, December 3, 2004 Posted: 9:19 PM EST (0219 GMT)

**LOS ANGELES, California (CNN) -- The Diocese of Orange in Southern California will pay 87 victims of clergy sexual abuse about $100 million, the largest payout so far in the Catholic Church's abuse scandal, multiple sources told CNN.**

Details are subject to a gag order for at least seven days. A settlement of $100 million would substantially eclipse the $85 million settlement reached between the Archdiocese of Boston and abuse victims there last year.

The settlement was announced Thursday night outside a Los Angeles courtroom, where some abuse victims looked on in tears as Bishop Tod Brown apologized on behalf of the church.

"I intend to write a letter to each victim personally seeking forgiveness and reconciliation," Brown said.

"And let me once again extend on behalf of the Diocese of Orange, and myself, a sincere apology and request heartfelt hope for reconciliation and healing."

Brown said the settlement was "both fair and compassionate" and would allow the church to compensate victims "in a way that allows our church to continue its ministry of service to the entire community."

According to the statement announcing the settlement, exact terms are still being worked out, including the amount to be paid out to each victim.

After Brown spoke, some of the victims -- people who were molested by 43 Catholic priests, nuns, teachers, even a choir director -- hugged and thanked the bishop for acknowledging their pain.

"For once, them coming in tonight and settling these cases and apologizing. ... I mean, I couldn't stop crying," said David Guerrero, a victim.

"I think it reflects the point that all these people ever wanted was to be believed, and tonight what you have is a demonstration, a concrete demonstration by him [Brown],



**Lawyers.com℠**

Area of Practice
City:
State  Search

story.church.settlement.hug.jpg

**Bishop Tod Brown, left, hugs a man Thursday at news conference announcing settlement.**

RELATED
- U.S. bishops OK abuse reforms
- L.A. Archdiocese ordered to provide documents
- Portland Archdiocese declares bankruptcy

YOUR E-MAIL ALERTS
○ Catholic Church
○ Sexual Abuse

Activate or CREATE YOUR OWN

Manage alerts | What is this?

that it did happen, and he's sorry," said victims' attorney John Manly.

Another victim, Joelle Casteix, said the money is secondary. She said the court documents detailing the abuse that will be released are most important aspect of the settlement.

"People tend to think that perhaps things aren't as bad as it's portrayed in the press," she said.

"But the truth is, it's a hundred times worse than anyone ever imagined. And when those documents get out it will be a very great day for survivors and a very interesting day for the Catholic Church."

"No amount of money will replace their lost childhood and teenage years," said Ray Boucher, lead attorney for the victims.

"But this settlement will give them all the ability and opportunity to conclude their claims and help them to move forward with their lives."

With a settlement reached for victims in suburban Orange County, the focus of the scandal in Southern California is expected to shift to the Archdiocese of Los Angeles.

The archdiocese faces nearly 500 claims of abuse involving more than 200 priests and church officials.

"Los Angeles has a far bigger problem that Boston ever had," said Richard Sipe, a clergy abuse expert and former priest.

"The breadth and depth of the sexual activity and corruption in L.A. is unequaled by any other archdiocese in this country."

The Los Angeles Archdiocese is also the subject of a grand jury investigation. District Attorney Steve Cooley has vowed to stop at nothing to find out whether a conspiracy existed to hide abusive priests.

**Story Tools**

[Subscribe to Time for $1.99](#)



**LAW CENTER** · LAW NEWS ▶

CNN/Money: [Ex-Tyco CEO found guilty](#)

• [Killen ordered attack on civil rights worker, jury hears](#)
• [Father convicted of murdering 9 of his children](#)
• [Gov. Bush: Prosecutor taking up Schiavo inquiry](#)

**TOP STORIES** · CNN.com HOME PAGE ▶

CNN/Money: [Security alert issued for 40 million credit cards](#)

• [Bin Laden deputy sends message](#)
• [U.S. House votes to keep U.N. dues](#)
• [Iran poll to go to run-off](#)

**International Edition**   Languages ▾   **CNN TV**   **CNN International**   **Headline News**   **Transcripts**   **Advertise With Us**   **About Us**

SEARCH   The Web ◉   CNN.com ○   [          ]   Search

© 2005 Cable News Network LP, LLLP.
A Time Warner Company. All Rights Reserved.
[Terms](#) under which this service is provided to you.
Read our [privacy guidelines](#). [Contact us](#).

All external sites will open in a new browser.
CNN.com does not endorse external sites.

Denotes premium content.

XML   Add [RSS headlines](#).

# EXHIBIT 5

IN THE MUNICIPAL COURT OF      SOUTH BAY      **JUDICIAL DISTRICT**
COUNTY OF LOS ANGELES, STATE OF CALIFORNIA

SBF 4364

THE PEOPLE OF THE STATE OF CALIFORNIA,
                                                    Plaintiff,

                          v.

**COMPLAINT**
**FELONY**        BRUCE KUHN

                                                    Defendant.

M. C. No.  **F 4424**

Filed ...........................................
Clerk of the above entitled Court, County
of Los Angeles, State of California.

By ...........................................
                                    Deputy Clerk

S. C. No. **291918**

Personally appeared before me this **30th** day of **June, 1964**
          **D. A. Cole**
of the County of Los Angeles who, being first duly sworn on oath, upon information and belief complains
and says:

    That on or about the **8th** day of **May, 1964** , at and in the County
of Los Angeles, State of California, the crime of **VIOLATION OF SECTION 288,**
Penal Code of California, a felony, was committed by

          **BRUCE KUHN**

**FILED**

JUL 2 3 1964

who, at the time and place last aforesaid, did willfully, unlawfully, feloniously and lewdly commit a

WILLIAM G. SHARP, County Clerk

lewd and lascivious act upon and with the body and certain parts and members of the said

By R. E. MASIELLO, Deputy

▮▮▮▮▮▮▮▮▮▮▮

a child under the age of fourteen years, with the intent of arousing, appealing to and gratifying the lust,

passions and sexual desires of the said defendant and the said child.

7-14-64

Subpoena Requested

7-24-64

    Said complainant therefore prays that a warrant may be issued for the arrest of said defendant
who may then be dealt with according to law.

                                    X

Subscribed and sworn to before me on

                                    X

                                                    Judge of the above entitled Court

Issued by WILLIAM B. McKESSON, District Attorney          Bail Recommended
By

                          Deputy                          $

JUL 6 1964   Bail Bond # 241082-08  **WITNESSES**

In sum of ............ **$3,300.00**

posted by ........ Nat'l Auto & Cas.

for appearance ........ 7-6-64

Rec. No. ...........................

Subpoena Requested

7-6-64

8 H 7-14-64

LASC

JUN 30 1964

WARRANT ISSUED WITH
BAIL THEREON SET IN
THE SUM OF **3 30 0**

This bail includes a penalty assessment as provided
under Section 42095 VC of $.............
or under Section 13521 PC of $ **300.00**

JUL 6 1964
Warrant Recalled

JUL 7 1964
Warrant Filed

## COUNT II

For a further and separate cause of complaint, being a different offense of the same class of crimes and offenses as the charge set forth in **Count I** hereof, complainant further complains and says:

That on or about the **8th** day of **May, 1964** , at and in the County of Los Angeles, State of California, the crime of **VIOLATION OF SECTION 288a,** PENAL CODE , a felony, was committed by **BRUCE KUHN**

who, at the time and place last aforesaid, did willfully, unlawfully and feloniously participate in the act of copulating the sexual organ, to wit the penis, of him, the said **Anthony Ray Dopp,**

with the mouth of **BRUCE KUHN, and that at the time of the commission of the said offense, the said ████████████ was under the age of fourteen years, to wit, of the age of nine years, and the defendant, BRUCE KUHN, was more than ten years older than the said ████████████**

Said complainant therefore prays that a warrant may be issued for the arrest of the defendant who may then be dealt with according to law.

Subscribed and sworn to before me on

------------------------------------------------

------------------------------------------------
                                          Judge of the above entitled Court

X

Issued by WILLIAM B. McKESSON, District Attorney                    Bail recommended
By

X   Deputy                              $

### WITNESSES

X

X

X

X

## COUNT III

For a further and separate cause of complaint, being a different offense of the same class of crimes and offenses as the charge S set forth in **all of the preceding counts** hereof, complainant further complains and says:

That on or about the **25th** day of **April, 1964**                  , at and in the County of Los Angeles, State of California, the crime of **VIOLATION OF SECTION 288,** Penal Code , a felony, was committed by

### BRUCE KUHN

who, at the time and place last aforesaid, did willfully, unlawfully, feloniously and lewdly commit a lewd and lascivious act upon and with the body and certain parts and members thereof of

████████████████

a child under the age of fourteen years, with the intent of arousing, appealing to and gratifying the lust, passions and sexual desires of the said defendant and the said child.

Said complainant therefore prays that a warrant may be issued for the arrest of said defendant who may then be dealt with according to law.

Subscribed and sworn to before me on

*W. A. Cole, Sgt.,*

*Otto B. Willett*

June 30, 1964 mi                                    Judge of the above entitled Court

Issued by WILLIAM B. McKESSON, District Attorney                    Bail Recommended

By  *P. de Dubovay*

P. de DUBOVAY            Deputy                    $ 3,000.00

### WITNESSES

D. A. Cole. LASO. Lennox Juv.

████████████████████████████████

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

### MINUTES

Department No. __SOUTH E__

AUG 7 1964 _____ 19____ Present Hon. __MAURICE C SPARLING__ Judge

THE PEOPLE OF THE STATE OF CALIFORNIA,        vs

BRUCE KUHN                                      291918

Deputy District Attorney D Fitts and the Defendant with counsel,

E Hicks, present. Arraigned. Pleads "Not Guilty." Trial is set

for September 25, 1964 at 9 A. M. Defendant remains on bail.

THIS MINUTE ORDER WAS

## ENTERED

AUG 1 2 1964

WILLIAM G. SHARP, COUNTY CLERK
AND CLERK OF THE SUPERIOR COURT

C. A. Potts

PROB. ____ AUD. ____ DMV ____
LAPD ____ CSHR. ____ CYA ____
CC.J. ____ JUV. ____ C. CLK. ____
SHER. ____ PSYC. ____ MISC. ____

MINUTES

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

### MINUTES

Department No. **SOUTH E**

**SEP 25 1964**     19___    Present Hon. **JOE RAYCRAFT**    Judge

THE PEOPLE OF THE STATE OF CALIFORNIA    vs

BRUCE KUHN                 291918

Cause is called for trial. Deputy District Attorney D Fitts and the
Defendant with counsel E Ricks, present. Defendant withdraws "Not
Guilty" plea to Count. Rearraigned on Count 2. Pleads "Guilty" to
Count 2. Waives time. A Probation Report is ordered. Further
proceedings continued to October 23, 1964 at 9 A M. Defendant remains
on bail.

THIS MINUTE ORDER WAS

ENTERED

SEP 3 0 1964

BY LEVI G. SHARP, COUNTY CLERK
AND CLERK OF THE SUPERIOR COURT

C. A. Blackwell

PROB. ___ / ___ AUD. ___ DMV ___
LAPD ___ / ___ CSHR. ___ CYA ___
CO.J. ___ JUV. ___ C. CLK. ___
SHER. ___ PSYC. ___ MISC. ___

MINUTES

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
### FOR THE COUNTY OF LOS ANGELES

## MINUTES

Department No. **SOUTH E**

OCT 26 1964 _____ 19 ____ Present Hon. **MAURICE C SPARLING** Judge

THE PEOPLE OF THE STATE OF CALIFORNIA,          vs

BRUCE KUHN                                291918

Deputy District Attorney D Fitts and the Defendant with counsel,
E Hicks, present. Doctors Nielsen and Abe are appointed to
examine defendant under Section 5504 Welfare and Institutions Code
and proceedings are continued to November 16, 1964 at 9 A. M. Defen-
dant remains on bail.

THIS MINUTE ORDER WAS

ENTERED

OCT 29 1964

WILLIAM G. SHARP, COUNTY CLERK
AND CLERK OF THE SUPERIOR COURT

| | | |
|---|---|---|
| PROB. | AUD. | DMV |
| LAPD | CSHR. | CYA |
| CO.J. | JUV. | C. CLK. |
| SHER. | PSYC. | MISC. |

MINUTES

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

### MINUTES

Department No. __SOUTH E__

**NOV 4 1964**

_____ 19__   Present Hon. __MAURICE C SPARLING__ Judge

THE PEOPLE OF THE STATE OF CALIFORNIA,   vs

BRUCE KUHN                                 291918

Doctor _____ J M Nielsen _____ whose address is

__727 West Seventh Street, Los Angeles, California__ ,

having been appointed to examine this defendant under Section __5504 Welfare and__

__Institutions Code__ on __October 26, 1964__, and having rendered that service on

__November 2, 1964__, it is ordered that a warrant be drawn by the Auditor on the Treasurer

for the sum of $__40.00__, which is hereby found to be a reasonable fee for such service.

THE PEOPLE OF THE STATE OF CALIFORNIA,   vs

Doctor _____ whose address is

_____ ,

having been appointed to examine this defendant under Section _____

_____ on _____, and having rendered that service on

_____, it is ordered that a warrant be drawn by the Auditor on the Treasurer

for the sum of $_____, which is hereby found to be a reasonable fee for such service.

| PROB. | AUD. | / | DMV | |
|-------|------|---|-----|--|
| LAPD  | CSHR. | | CYA | |
| CO.J. | JUV. | | C. CLK. | |
| SHER. | PSYC. | | MISC. | / |

This minute order was entered

NOV 10 1964

WILLIAM G SHARP, COUNTY CLERK
C A RHETTA DEPUTY

1996

MINUTES — PAYMENT OF DOCTORS

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

## MINUTES

Department No. __SOUTH E__

__NOV 12 1964_____ 19____ Present Hon. __MAURICE C SPARLING__ Judge

THE PEOPLE OF THE STATE OF CALIFORNIA,   vs

BRUCE KUHN                                    291918

Doctor ___George Y Abe_____, whose address is

___Metropolitan State Hospital, Norwalk, California___,

having been appointed to examine this defendant under Section __5504 Welfare and__

__Institutions Code__ on __October 26, 1964__, and having rendered that service on

__November 9, 1964__, it is ordered that a warrant be drawn by the Auditor on the Treasurer

for the sum of $ __40.__, which is hereby found to be a reasonable fee for such service.


THE PEOPLE OF THE STATE OF CALIFORNIA,   vs


Doctor _____, whose address is

_____,

having been appointed to examine this defendant under Section _____

_____ on _____, and having rendered that service on

_____, it is ordered that a warrant be drawn by the Auditor on the Treasurer

for the sum of $_____, which is hereby found to be a reasonable fee for such service.


PROB._____ AUD._____ DMV _____
LAPD _____ CSHR._____ CYA _____
CO. J._____ JUV._____ C. CLK._____
SHER._____ PSYC._____ MISC._____

5039

This minute order was entered

NOV 19 1964

C. A. RHETTS DEPUTY

MINUTES — PAYMENT OF DOCTORS

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
### FOR THE COUNTY OF LOS ANGELES

### MINUTES

Department No. __SOUTH E__

NOV 16 1964    19____    Present Hon. __MAURICE C SPARLING__ Judge

THE PEOPLE OF THE STATE OF CALIFORNIA,    vs

BRUCE KUHN    291918

Deputy District Attorney D Fitts and the Defendant with counsel,

E Ricks, present. On defendant's motion proceedings are continued

to November 30, 1964 at 9 A M. Remain on bail.

ENTERED

NOV 23 1964

PROB.____    AUD.____    DMV____
LAPD____    CSHR.____    CYA____
CO.J.____    JUV.____    S. CLK.____
SHER.____    PSYC.____    MISC.____

MINUTES

# EXHIBIT 6

REGISTRATION, SUBSCRIPTION AND STATISTICAL SERVICE          APPENDIX A

BOY SCOUTS OF AMERICA

DATE _____ December 31, 1986 _____

FULL NAME ___ Daniel Montoya ___

SOCIAL SECURITY NUMBER _____

(No initials if you can possibly get full name)

ADDRESS ___ ▮▮▮▮▮▮▮ Long Beach, California ___

CITY ___ Long Beach ___ STATE ___ California ___ ZIP CODE 90804

DATE OF BIRTH _10-20-59_ (This is important and should be exact)

APPROXIMATE AGE ___ 26 ___ (To be used ONLY when date of birth is not known)

RELIGION ___ Mormon ___ NATIONALITY ___ Hispanic ___

OCCUPATION ___ Delta Elevator Company, Paramount, California ___

EDUCATION _AA DEGREE_ ☒

WEIGHT _130_ HEIGHT _5' 11"_ RACE _WHITE_

COLOR OF HAIR _Light Brown_ COLOR OF EYES _____

OUTSTANDING CHARACTERISTICS OR INTERESTS _Honest Likes Young People_

MARRIED OR SINGLE _Single_ CHILDREN _None_

NAME OF SPOUSE _n/a_

(Number, ages, and names, if possible)

SCOUTING CONNECTIONS:

| UNIT # | CITY | STATE | POSITION | DATE REGISTERED | DATE RESIGNED |
|--------|------|-------|----------|-----------------|---------------|
| 121 Troop | Long Beach | CA | SA | 1/86 | |

SPECIAL RECOGNITION ___ None ___

SUSPENDED OR DENIED REGISTRATION FOR FOLLOWING REASONS:

Charged and arrested for fondling (child molestation). _Please note that Montoya is charged with fondling. No charge has ever been made involving any violent act. He is a meek timid young man._

SPECIFY THE FACTS WHICH LEAD YOU TO RECOMMEND DENIAL OF REGISTRATION AND LIST ATTACHED SUPPORTING DOCUMENTS (STATE ONLY KNOWN FACTS, NOT RUMOR, CONJECTURE OR SPECULATION):

Newspaper article attached.

F. STARON       NOTED

JAN 9 1987      FEB 2 9 '88

JOSEPH L. ANGLIM

Signed _Kurt S. Weaver_
SCOUT EXECUTIVE

Council ___ Long Beach Area Council ___

RS-509
4/14/83-nah

March 2, 1988


Mr. Kurt S. Weaver
Scout Executive
Long Beach Area Council, No. 32

PERSONAL AND CONFIDENTIAL

SUBJECT:  Daniel Montoya

Dear Kurt:

Thank you for the detailed information sent concerning the above Scouter.
This case has been reviewed with our attorney and is now on our permanent
Confidential File.

Sincerely,



Paul Ernst, Director
Registration Service

PE/eak

cc:  Western Region

READY TO FILE
MAR 0 2 1988
ERIN O'RILEY

CONF013995

January 19, 1983


Mr. Kurt S. Weaver
Scout Executive
Long Beach Area Council, No. 32

PERSONAL & CONFIDENTIAL                    SUBJECT:  Daniel Montoya

Dear Kurt:

I am sorry to keep bothering you concerning the above-named individual, but we
still have not heard from you with any response in over a year.  We have writ-
ten several times related to the individual and must have the final outcome of
the legal action which took place.  This will then close our file and give us
all the documentation necessary for refusing registration should he attempt it
in some other location.

We really feel we must protect the youth and do not feel that Mr. Montoya
should ever be a leader with the organization.

Let us know if we may be of help in any other way.

Sincerely,



Paul Ernst, Director
Registration Service

eak

cc:  Western Region

READY TO FILE
JAN 19 1983
ERIN O'RILEY

CONF013996

Cub Scout, Scout, and Explorer Programs

LONG BEACH AREA COUNCIL,
BOY SCOUTS OF AMERICA #32

SCOUTING/USA

January 29, 1988

Paul Ernst, Director
Registration Service
National Office
Boy Scouts of America
▒▒▒▒▒▒▒▒▒▒▒▒▒▒
Irving, Texas 75038-3096

Dear Paul:

You are certainly no bother when it comes to the protection of youth
in our program, you merely share our concerns. Our records indicate
we have forwarded the newspaper article concerning the probation of
DANIEL MONTOYA. Sorry if it didn't make it to your office. We have
enclosed a copy of the article to be included in your file.

Paul, if you need additional information, please do not hesitate to
contact us.

Sincerely,

KURT S. WEAVER
Scout Executive
:m

CONF013997

LONG BEACH PRESS TELEGRAM
Thursday, May 21, 1987

# Molester gets 3 years' probation

A former Mormon missionary and Boy Scout leader who pleaded guilty last year to molesting two boys has been ordered to spend one year in a residential behavioral treatment program.

Daniel Montoya, 27, was sentenced to eight years in prison by Long Beach Superior Court Judge Sheila Pokras, who suspended the sentence in lieu of three years' probation and the in-patient treatment, court records show.

He also was ordered to participate in psychotherapy sessions at least once a week for two years by Pokras, who handed down the sentence earlier this month.

Montoya pleaded guilty to two of nine sex counts last November in a pretrial agreement with the district attorney's office. Under the agreement, the remaining seven counts would be dropped at the time of sentencing.

Originally, he was charged with molesting three boys, ages 9, 11 and 12 last summer. The boys were members of Montoya's church, the Church of Jesus Christ of Latter-day Saints on Elm Street, Long Beach.

He allegedly admitted to police that he fondled the boys.



... class president, said he believes the more intelligent kids already knew a good deal of the information Pazelogs provided. But he discounts a concern of some of the parents, that knowledge of sex protections, no matter how detailed, could be misconstrued.

For example, one girl he said asked if AIDS could be acquired by stepping in a patient's spit. "That's just ridiculous," said Jorge.

Jorge said there really is a degree of fear about the disease. "It scares the students. I think it makes the

October 23, 1987

Kurt S. Weaver
Scout Executive
Long Beach Area Council, No. 32

PERSONAL & CONFIDENTIAL          SUBJECT: Daniel Montoya

Dear Kurt:

We appreciate the information you sent us earlier this year concerning the above named individual. We need the outcome of the legal action so we can complete our file. This is important if we are to protect the youth of America.

Please give us a newspaper clipping or a copy of the court record which would indicate the convicting and sentencing, if these took place.

Thanks for your help.

Sincerely,

Paul Ernst, Director
Registration Service

mdw

cc: Western Region

CONF013999

December 7, 1987

Mr. Kurt S. Weaver
Scout Executive
Long Beach Area Council, No. 32

PERSONAL & CONFIDENTIAL                SUBJECT:  Daniel Montoya

Dear Kurt:

We have written several times concerning the above named individual.  We
really must have the outcome of the legal action against Mr. Montoya.  We
understand that he was charged with fondling in late 1986.

It is important that we close our file and have all the information necessary
to refuse registration to Mr. Montoya if he should attempt it in another
location.

If you need any help or wish to discuss this, please don't hesitate to contact
me.

Sincerely,



Paul Ernst, Director
Registration Service

mdw

cc:  Western Region

READY TO FILE
DEC 0 8 1987
ERIN O'RILEY

CONF014000

July 27, 1987


Mr. Kurt S. Weaver
Scout Executive
Long Beach Area Council, No. 32

PERSONAL & CONFIDENTIAL                    SUBJECT: Daniel Montoya

Dear Kurt:

We received information earlier this year concerning the above named
individual. We appreciate the confidential record sheet and the newspaper
clipping indicating that he had been charged with fondling.

We would like the outcome of any legal action which took place so we can
complete our file. Please send us a copy of newspaper clippings or court
records which would substantiate our refusal of registration anywhere it might
be attempted.

Thanks for your help in protecting the youth of America.

Sincerely,



Paul Ernst, Director
Registration & Subscription Service

mdw

cc: Western Region

READY TO FILE

JUL 28 1987

ERIN O'RILEY.

January 20, 1987

Mr. Kurt S. Weaver
Scout Executive
Long Beach Area Council, No. 32

PERSONAL & CONFIDENTIAL                          SUBJECT:  Daniel Montoya

Dear Kurt:

Thank you very much for sending us the Confidential Record Sheet for the above-named individual. This is most helpful to us, and will enable us to identify Mr. Montoya should he try to register at some other time.

We would like to have the final outcome of the legal action whenever this is completed. If he is sentenced, we would like to have the sentencing so that we know what has occurred and have a complete file for anyone who uses it in the future.

Thanks again for your help in protecting the youth of America.

Sincerely,

Paul Ernst, Director
Registration, Subscription &
Statistical Service

PE/cre

cc:  Western Region

READY FOR FILE

JAN 20 1987

CONF014002



**SCOUTING/USA**

National Office
**BOY SCOUTS OF AMERICA**

December 15, 1986

Mr. Kurt S. Weaver
Scout Executive
Long Beach Area Council, No. 32

PERSONAL & CONFIDENTIAL                    SUBJECT:  Daniel Montoya

Dear Kurt:

Earlier in the year, we received correspondence which you had sent to Mr.
David Park concerning the above-named individual. At that time, we wrote to
you asking for a Confidential Record Sheet so that we could identify Mr.
Montoya should he attempt to register in some other location.

We are again enclosing a Confidential Record Sheet which we would like to have
completed so that we are able to identify Mr. Montoya. Please give us all the
personal information you can related to this matter.

We would also like to know of any further legal action which may have taken
place by this time. If there has been a trial, we need the outcome and any
sentencing which may have occurred.

Thanks for your help in completing this file so that registration may be
refused.

Sincerely,

Paul Ernst, Director
Registration, Subscription &
Statistical Service

PE/cre

Enclosure

cc:  Western Region

December 15, 1986

Mr. Kurt S. Weaver
Scout Executive
Long Beach Area Council, No. 32

PERSONAL & CONFIDENTIAL                              SUBJECT:  Daniel Montoya

Dear Kurt:

Earlier in the year, we received correspondence which you had sent to Mr.
David Park concerning the above-named individual.  At that time, we wrote to
you asking for a Confidential Record Sheet so that we could identify Mr.
Montoya should he attempt to register in some other location.

We are again enclosing a Confidential Record Sheet which we would like to have
completed so that we are able to identify Mr. Montoya.  Please give us all the
personal information you can related to this matter.

We would also like to know of any further legal action which may have taken
place by this time.  If there has been a trial, we need the outcome and any
sentencing which may have occurred.

Thanks for your help in completing this file so that registration may be
refused.

Sincerely,

Paul Ernst, Director
Registration, Subscription &
Statistical Service

PE/cre

Enclosure

cc:  Western Region

READY FOR FILE

DEC 1 5 1986

SHIRLEY BAKER

September 30, 1986


Mr. Kurt S. Weaver
Scout Executive
Long Beach Area Council, No. 32

PERSONAL & CONFIDENTIAL                    SUBJECT:  Daniel Montoya

Dear Kurt:

Thank you for your letter of September 17, to Mr. David Park, concerning the
above-named individual.  This information is certainly most helpful and will
enable us to establish a file for refusal of future registration attempts.

We are enclosing a Confidential Record Sheet which we would like to have
completed so that we will be able to identify Mr. Montoya should he try to
register in some other location.

We would also ask that you delete Mr. Montoya from your registration records.
You are an "on-line" council and the deletion in your council office would
also delete him from the national registration records.

Please keep us informed as further legal action takes place.  This will be
most important to us in having a complete case and enough information for
refusal of registration attempts anywhere in the country.

Thank you again for your help in protecting the youth of America.

Sincerely,




Paul Ernst, Director
Registration, Subscription &
Statistical Service

eak

Encl.

cc:  Western Region

READY FOR FILE

SEP 30 1986

SHIRLEY MARTIN

CONF014005

Cub Scout, Scout, and Explorer Programs

LONG BEACH AREA COUNCIL,
BOY SCOUTS OF AMERICA W-32

SCOUTING/USA

September 17, 1986

Mr. David Park
Legal Council
National Council
Boy Scouts of America

Irving, Texas 75038-3096

Dear David:

Please be advised that DANIEL MONTOYA, ▮▮▮▮▮ Long Beach 90807,
has been charged and arrested for fondling (child molestation).  Bail
has been set at $5000.  He is currently registered as Assistant Scout-
master, Troop 121 sponsored by Church of Jesus Christ of the Latter Day
Saints (Mormon).

Respectfully,

KURT S. WEAVER
Scout Executive
KSW:mr

CONF014006

Cub Scout, Scout, and Explorer Programs

LONG BEACH AREA COUNCIL,
BOY SCOUTS OF AMERICA #32

SCOUTING/USA

September 17, 1986

Mr. Daniel Montoya
Long Beach, CA 90807

Dear Mr. Montoya:

Please be advised as of this date, September 17, 1986, you are
suspended from all Scouting activities in the Long Beach Area
Council, Boy Scouts of America, until such time you are exonerated
from current litigation.

Respectfully,


KURT S. WEAVER
Scout Executive
:mr

A MEMBER AGENCY OF UNITED WAY

CONF014007

# 'Boy Scout troop' leader arrested on charge of molesting boy

## Accused of fondling three boys, police say

**By Helen Guthrie Smith**
Staff writer

Long Beach police have arrested a 28-year-old Mormon church Boy Scout leader, who is accused of fondling three boys.

Daniel Montoya, leader of a "570" troop of boys aged 11 and 12, was arrested at 5 p.m. Tuesday at his home, at 3520 Fallbrook Ave., and booked on charges of lewd and lascivious acts with a child under 14, according to Detective Mike Stovall of the police department's Sexually Exploited Children's Unit.

Police are expected to ask the district attorney's office today to file molestation charges against Montoya.

Montoya was being held Tuesday on $5,000 bail.

Stovall said the alleged victims are aged 12, 11 and 9.

He said the oldest boy was 11 when he was allegedly molested July 30 outside an A & W Root Beer stand at Cedar Avenue and

Pacific Coast Highway.

He said the boy had just ordered some food about 3 p.m. time, but has since taken a job at when a man approached him and "tried to befriend him."

Stovall said the boy told police the man fondled him, then gave him a slip of paper with his name, address and phone number on it. The boy said the man told him "maybe we can be pals and maybe get together and go to the beach."

Stovall said the boy took the slip of paper home and showed it to his mother, who called police.

Montoya, he said, was working at a nearby furniture store at the far, the accusations by the boy have been limited to fondling Delta Elevator Co. in Paramount.

He said the incident was being investigated when a social worker from the Church of Jesus Christ of Latter-day Saints, at 3701 Elm St., notified police that "there might possibly be some sexual molestation going on with Daniel and some of the boys in his troop."

"We interviewed those boys and found they were accusing

him of molesting them on prior occasions," he said, adding, "So only."

Stovall said the alleged incidents with the other two boys took place "within the last two months."

He said one of the boys was in Montoya's troop and the other was a Cub Scout who "was included in a lot of the activities with Montoya's Boy Scout troop.

He said "these three are the only ones we know of."

CONF014008

# EXHIBIT 7

## BOY SCOUTS OF AMERICA

DATE _April 23, 1990_

FULL NAME _____Ed Rincon_____
(No initials if you can possibly get full name)

ADDRESS ███████████

CITY _Garden Grove_          STATE __CA__          ZIP CODE __92640__

DATE OF BIRTH_____ (This is important and should be exact)

APPROXIMATE AGE ___40___ (To be used ONLY when date of birth is not known)

RELIGION_____ NATIONALITY _Hispanic_

OCCUPATION _So Calif Gas Co._

EDUCATION_____

WEIGHT_____ COLOR_____ HEIGHT_____

COLOR OF HAIR_____ COLOR OF EYES_____

OUTSTANDING CHARACTERISTICS OR INTERESTS_____

MARRIED OR SINGLE _Single_     CHILDREN _None_
(Number, ages, and names, if possible)

WIFE'S NAME_____

SCOUTING CONNECTIONS:

| UNIT # | CITY | STATE | OFFICE | DATE REGISTERED | DATE RESIGNED |
|--------|------|-------|--------|-----------------|---------------|
| 75 | Garden Grove | Ca | Asst Scoutmaster | 2/83 | |

SPECIAL RECOGNITION _Vigil Honor Member_

RECOMMENDED FOR CONFIDENTIAL FILE FOR FOLLOWING REASONS:

| | |
|---|---|
| ☐ CONVICTION OF CRIMINAL CONDUCT | ☑ SUBSTANTIATED REPORTS |
| ☐ OFFICIAL CHARGES OF CRIMINAL CONDUCT (REVIEW) | ☐ UNSUBSTANTIATED REPORTS |

SPECIFY THE FACTS WHICH LEAD YOU TO RECOMMEND INDIVIDUAL FOR CONFIDENTIAL FILE
AND LIST SUPPORTING DOCUMENTS:

**NOTED**

FIDENTIAL     AUG 23 1990

JUL 2 1990     JOSEPH L ANGLIM

F. STARON

Signed _____
SCOUT EXECUTIVE

Council _____

CONF018836

August 24, 1990

Mr. A. Buford Hill
Scout Executive
Orange County Council, No. 39

PERSONAL AND CONFIDENTIAL        SUBJECT:   ED RINCON

Dear Buford:

Thank you for the detailed information sent concerning the above Scouter.
This case has been reviewed with our attorney and is now on our permanent
Ineligible Volunteer File.

Sincerely,

Paul Ernst, Director
Registration Service

eko

cc:  Western Region

READY TO FILE

AUG 24 1990

ERIN O'RILEY

CONF018837

4/20/90

Chloe
Clinton F----
June 6/29/90 am

At approx 11:45 am 4/20 Jeff Hotchkin informed me of a possible Child Molestation situation in Troop 75 — Jim McCleod is the Scout Master and he told Jeff about Ed Rincon an asst. S.M. for the troop who allegedly touched ▮▮▮▮▮ in his "private parts" at a swimming merit badge class at the YMCA. 2 weeks ago. The boy told a teacher at school, this Teacher told the parents. this boys father told Jim at the Troop Meeting last night.

Jim McCleod works at our office. I asked Jim to write me an account of this accusation which I now have. Jim says there is another swim class tonight. Jim + Don Thorpe (the CC) will meet with Ed and inform him that he is to discontinue any activities with the troop until this matter is cleared up. They are to direct Ed to contact me Monday. I told Jim not to divulge the name of the boy. I took this immediate action because I do not want Ed to show up at the swim class tonight. Not able to reach ▮▮▮▮▮

4/22/90 (SUNDAY) Jim Mc called me at home to tell me that he and the CC Talked to Ed about the accusation. he seemed devastated and said he would no longer participate in any Troop activities. Jim says he believes he is innocent

CONF018838

4/23/90

Ed Rincon called 8:42 am says he wants to come in and talk to me. I set an appt for 4:00pm today. Nothing was discussed on the telephone. Tried to reach ████████ yet tried this morning — no answer.

4/23/90 ████ 9:18 AM Talked to Richard Paulson @ Region and related History of case so far — he said "I think you've handled it perfectly so far." "Prepare the letter and give it to him when he comes in." "As far as reporting you are not obligated to report to authorities, but usually a good idea.", "in this case... you may not want to do more than the letter." "light accusation" "child not harmed" "no witnesses", ... parents not willing to report." "Best thing is just to ask the Ed to step aside."

4/25...

Met with Ed Rincon 4pm 4/23 — he said he was innocent — can't imagine why any boy would say such a thing — he was in shower area for a few minutes alone with ████████ and a smaller ████████ boy ... "to hurry the boys along." He says he will not return to troop activity because he doesn't want the "stress" — but he would like his name cleared. I told him about the BSA policy regarding these matters and the appeal process. I said after I talked to the boy, I probably would be sending him a letter of suspension. In the meantime he was not to have anything to do with the Troop.

CONF018839

4/25-

    Met with ███████ and ███████
at 7:00 pm at their home. I had Don Thorp
(cc) meet me there and he was present
throughout the meeting which lasted apprx 1 hr.
I asked ████ to describe the incident. He said
on Friday 4/13. he went to the YMCA with the
Troop to register on the swimming meet Body.
After swimming and while in the shower he
said "Mr Ed" got close to him and touched
his rear end. "no one saw because it happened
so fast" in a second time Mr Ed reached
down and grabbed his private parts and
said something like ... "let's go". ████████
says it was not a "brush up" or an
"accident" but very deliberate. He told
several of his friends immediately afterward but
he never told his parents because he was
"afraid". The next week was vacation. On
April 16 Monday @ about 9:30 AM it was
still bothering him so he wrote a note
to his teacher about it. She told the
mother the following Thursday at parent teacher
conferences. The mother told the father / father
reported to Jim McCleod..

over

█████ also reported that "2 or 3 weeks before" this incident, "Mr Ed" asked him if he would like to help wax his car — ████ agreed — he went to "Mr Ed's" - no other boys were present — after cleaning the car — he asked ████ ████ if he would like to come inside — showed him some troop albums, they played video games and, at one point, "Mr Ed got "real close" and tried to "wrestle around" with him a little — ████ says nothing else happened that day — when ████ found out later in the day that ████ was ner at "Mr Ed's" alone he showed him and told him to "get home".

The boy appears to have his "story" "straight" and I feel that there is something to his story. I believe he is probably telling the truth.

Throughout the interview ████ kept saying he was "going to get" "Mr. Ed" and other threatening remarks. Both Don and I tried to discourage that and we both encouraged him to report the incident to the authorities. I explained "Mr Ed" was already suspended from Boy Scout activity.

CONF018841

4/25  11:15  A.M.   Reported alleged child
abuse  and  threats by ██████████ to
Child Abuse Registry ████████████. "Kas"
took this report and said she would also notify
G.G.P.D  about threats —

Edgard M. Rincon
Garden Grove, Ca. 92640
June 17, 1990

Richard Harrington
Western Region
Boy Scouts of America

Dear Mr Harrington:

I have recently been the victim of a vicious accusation by a boy from Troop 75 of Garden Grove, where I have been an adult leader for about 17 years. Based solely on this boy's word, my registration in the BSA was cancelled as of April 29, 1990, and I was given sixty days to appeal. This is my response.

I joined Scouting when I was 12. As a scout, I earned the highest rank the country where I was born had to offer. I went from patrol Quartermaster to troop Scoutmaster. I worked hard, always emphasizing Scout Spirit and adherence to the Scout Oath and Law. This approach, combined with the idea of making all the activities fun for everybody allowed me to accomplish a lot. My reputation as a scout and as a leader grew so much that to this day when I arrive in the old country a delegation of uniformed scouts always comes to the airport to greet me.

In the United States I have been volunteering my services to the same District (El Capitan) for over 20 years. As a Scoutmaster in Troop 90 I turned a weak, declining troop into one of the best two units in the District. The other was Troop 75, where I was also volunteering as an Assistant Scoutmaster. I worked for Troop 90 for many years, and received nothing but awards and praise from the boys, the parents and the BSA. Under my direction, the troop earned the National Camping Award every year, was always one of the top troops at the Camporee and was given the President's Honor Unit Award, among other awards. My backpacking program was so succesful that other units would request my services in organizing theirs. We would go to the Colorado river every year in fiberglass canoes of our own making, and never missed a Summercamp. In fact,

1

CONF018843

my troop had at the very least one outing a month. I was given the Woodbadge beads in 1975, the Scouter's Training Award, the Scout-master's Key, the National President's Leader of Distinction Award, the District's Award of Merit, and lots of certificates of appre-ciation and recognition from the troops, the BSA and the boys them-selves. During all this time, I was also an Assistant Scoutmaster in Troop 75, and everyone there at the time can attest to my inte-grity.

I..was elected to the Order of the Arrow and, after leaving the Scoutmastership of Troop 90 to a former Eagle Scout I dedicated myself to reviving the local Chapter, which was at the lowest possible level of morale, organization and membership. When I became Chapter Advisor I made Scout Spirit our first priority, and all our activities became well organized, instructive and fun. The Chapter was given the Chapter of the Year award several times. Seasoned Scouters would come forward to tell me that our Fellow-ship was the finest, most inspiring experience they ever had in Scouting. I still get stopped by former arrowmen who want to pump my left hand and thank me for the experiences and memories I helped to provide for them. I received the Wixiscan award, was voted Arrowman of the Year and was given the Vigil Honor.

As sometimes happens to very active volunteers, I began to feel a little burned out. I became less active in the Order of the Arrow, but remained as an adult leader in Troop 75. I also put on my backpacking program for Troop 174, and remained there as an Assistant Scoutmaster for several years. There, as every-where, my efforts were appreciated by all.

At about this time, I developed ulcers, due primarily to job related stress. I dropped out of Troop 174, but, again, maintained my membership with Troop 75. I wasn't very active there, but I helped with training, merit badges, Summercamps and other activities, including, now and then, Friday night swims. Last year my ulcers put me in the hospital, and early this year I had to undergo mayor surgery for the ulcers as well as for my gallbladder.

2

CONF018844

and asked me to talk to those boys, so I drove my car to catch up
with them. There were two sets of brothers: the first had several
members and were lead by the oldest, a very tall and responsible
young man. The other set were younger, the ███████ brothers, and
they said that they were spending the night with the others. I
told them that they had upset the Scoutmaster by walking away, at
night, without his permission, that the Scouts were responsible for
them at that time, and that their parents would not know where they
were. I also questioned them rather sternly about whether or not
the ███████ already had permission to spend the night away from
home. They hadn't. I let them know that I wasn't pleased. But
since they all live nearby, and I couldn't put them all in my car,
I let the matter drop and they walked home. However, I called the
Scoutmaster as soon as I got home and informed him on what had
happened. I thought that was the end of a rather typical Friday
night troop swim. I had no idea of the trouble that was brewing.

Before that night, I have had thousands of
opportunities to molest scouts if that was my bent. I have earned
hundreds of backpacking and camping awards, representing perhaps
thousands of days and nights spent in very close contact with scouts,
in situations where it would have been easy to do something as has
been suggested. Do you really believe that a pervert would not have
taken advantage, through more than 20 years, of the easy and safe
opportunities presented to him in a lifetime of Scouting, and,
instead, would choose to attack a rather sullen, unattractive, imma-
ture young boy in a situation where not only he couldn't physically
take his action to any twisted conclusion, but put himself in great
danger of being caught in the act by the many boys and adults in the
immediate area at the time?

I consider myself a good citizen and a law abi-
ding man. I have lived in the same place for 17 years and no one
has ever had any complaints in my neighbourhood. I have worked for
the same company for 23 years, again with no complaints whatsoever.
I don't smoke and only drink an occasional glass of champagne. My
police record is absolutely clean, and the only time I've ever been
in the presence of a judge was when I fought an unfair traffic
ticket, and I won the case.

4

CONF018845

I wasn't told by the BSA which boy accused me, but I have reason to believe it was ███████████ ██ was one of the stragglers at the showers, one of the boys who were walking home, and didn't have permission to spend the night away from home. I might have been overly stern that night, and he could have been upset by my words. However, that is hard to believe, because I had gone out of my way to help this particular boy. He had told me that he couldn't go to the Colorado river because of money. I told him to do odd jobs for his neighbors. He said he couldn't get any work, that he had tried, and his brother had the available paper route. I told him to offer to wash and wax cars, or mow lawns. He said that nobody wanted to give him any work. I told him he could wax my car, since it needed it and I couldn't do it myself because of my surgery. He came over the Saturday before the night of the alleged incident. He waxed my car, we went for a coke at MacDonalds and returned to my apartment. Just then his dad called him. I gave the $10 dollars I had offered him beforehand (he did a good job), asked him to deposit the money in his camping account with the troop treasurer (apparently he never did), and he went home. I didn't see him again until the next Friday, when the incident supposedly happened.

If ████ had wanted to punish me, or get even with me for something, he could have accused me of having attempted anything at my apartment when he was alone with me, although the doors were wide open and the sliding glass door to the balcony was also open all this time, so we really didn't have any privacy. Perhaps he was subconsciously pleading for help or searching for attention. I know that adolescence is not an easy stage for a boy, specially today, and during this time of confusing thoughts and feelings reason sometimes looses out to unfounded fears and misinterpreted facts. I can't blame his father for being so angry, but I have had to take his threats very seriously.

I can understand the BSA's position, and its attempt at avoiding liability, but I can't help feeling that, after

5

CONF018846

all these years of loyal service to Scouting, the BSA has not been very supportive of me. In fact, it seems that, without a shred of evidence, the BSA has set itself up as judge and jury, pronounced a veredict of guilty, and punished me by kicking me out of the organization. I have been denied the right to know the exact nature of the charges, and, officially, I don't even know who my accuser is. Even in the most barbaric nation this treatment would be considered most unfair, if not ilegal.

So far, I have suffered in silence in order to protect the troop and Scouting from scandal. Apparently gossip has been minimal.

I want to make it clear that I want the BSA to reinstate my membership. I do not intend to continue as an active member of the BSA, because now I see clearly the grave danger that every scout volunteer is in today, and I would not put myself again through what I have gone through in the past two months for anything in the world. The stress can quite literally kill me. Besides, in our society an accusation such as this is tantamount to being guilty, and the parents would never feel confident with me, or I comfortable with them. However, I will not allow my Scouting career, which has brought me honor and self-fulfillment, and which also brought an exciting, inspiring Scouting program to literally thousands of boys, to end in dishonor and rejection.

If necessary, I will solicit testimonials of my moral character from every scout, scouter and parent that I ever came in contact with. This may force this issue into the open, and it may get ugly, but I will fight this ridiculous, unfounded rumor at every level of Scouting and, failing that, through every avenue of the judicial system. I will not stop until my name is officially cleared. I am a rather quiet, unassuming man, but I will not let my honor be destroyed. I may not have much, and I may not have accomplished a great deal during my life, but I want to go to my grave not as a pervert, but with the satisfaction that I have done my part in helping the youth of our world. Do not take that away from me.

Yours in Scouting,

*Edgard L. Rins*

6

CONF018847

CONF018848

READY FOR FILE

June 18, 1990

JUN 21 1990

A. GRAVES

Mr. Ted Cox
Director of Field Service
Orange County Council, No. 39

PERSONAL AND CONFIDENTIAL          SUBJECT: ED RINCON

Dear Ted:

I received a copy of the letter which you sent to Mr. Rincon
suspending his registration. We have no other material in our file at
this time.

I am enclosing an Ineligible Volunteer Record Sheet which I would like
to have completed, so we can identify Mr. Rincon. Please give us as
much information as you have available.

We would also like to have some substantiation of the reasons for your
action. Please give us newspaper clippings, court records, or
statements from individuals which would substantiate this.

Thanks for your help.

Sincerely,


Paul Ernst, Director
Registration Service

ag

Enclosure

cc: Western Region
    A. Buford Hill, Council No. 39

CONF018849

BOY SCOUTS OF AMERICA
ORANGE COUNTY COUNCIL, INC.

3590 Harbor Gateway North
Costa Mesa. California 92626-1425

*Cc 39*
*Soo75 - 00-.49*

April 23, 1990

Ed Rincon ▮▮▮▮▮▮▮▮▮▮
Garden Grove, CA 92640

Dear Ed:

After careful review, we have decided that your registration with the Boy
Scouts of America should be denied. We are therefore compelled to request
that you sever any relations that you may have with the Boy Scouts of America.
A refund of your registration fee is enclosed.

You should understand that Boy Scouts of America membership registration is a
privilege and is not automatically granted to everyone who applies. We
reserve the right to refuse registration whenever there is a concern that an
individual may not meet the high standards of membership which the Boy Scouts
of America seeks to provide for American youth.

If you wish to have this decision reviewed by a Boy Scouts of America regional
review committee, please write to the regional director within 60 days of the
date of this letter, explaining your version of the facts supporting your
claim that your registration as a Boy Scouts of America member should be
reinstated. The procedures for a review of this decision are attached.

Sincerely yours,

Ted Cox
Director of Field Service

TC/kv

cc:  Richard Harrington
     Western Region, BSA

     Paul Ernst, Director
     Registration Service

CONF018850

MS08

MEMBERSHIP SUPPORT SYSTEM

MEMBER DELETE

06/29/90
12:45:23

CNCL 039   PRG/UNIT S0075   SEQ. 001149
FIRST: ED                                LAST : RINCON
ADDR1: ███████████████       ADDR2: GARDEN GROVE                    CA
ADDR3:                       ADDR4:                                 ZIP: 92640
REG STATUS: R   ENROLL: 0283  BIRTH: 0000  SEX: M   AGENCY: N   ADULT/YOUTH: A
POSITION: SA    FINDERCODE: 53  PHONE: ██████████   BULK:        MAG-STATUS:
REN DAT: 0191
TRANSFER FROM = CNCL.:

                                    PGM/UNIT:              SEQ:              TRANSFER DATE:

                                          MAGAZINES

---SOURCE---    PRICE    SUB   STRT  ---COPIES---   ISSUES TO GO AREAR   LAST LABEL EXP
TYPE  CNCL  P/UNIT  CODE  TRM  DATE  FIRST LAST  ORIG  TOTAL  COUNT  PRINTED    DAT
 S     ---     N     06   0390  0390  0590   04    004    00     2403    0191
 -     ---   -------  --   ---- ----- -----  ----   ---    --      ----    ----
 -     ---   -------  --   ---- ----- -----  ----   ---    --      ----    ----
 -     ---   -------  --   ---- ----- -----  ----   ---    --      ----    ----

                         PF2>DELETE    PF12>MENU   CLR>END

MEMBER DELETED FROM DATABASE SUCCESSFULLY