IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>Jointly Administered<br><br>**Re: D.I. 2592 and 2594** |

### OBJECTION TO DEBTOR'S DISCLOSURE STATEMENT: EIGHT QUESTIONS

Boy Scouts of America's Disclosure Statement fails to provide Survivors with the information necessary to cast an informed vote on a BSA plan. BSA seeks broad channeling injunctions for its local councils and charter organizations, but fails to answer at least eight key questions for Survivors:

1. What information should victims know about The Hartford settlement?
2. Does my local council have assets to contribute and, if so, how much?
3. How much is my local council contributing in exchange for its release of liability?
4. Does my charter organization have assets and, if so, how much?
5. How much is my charter organization contributing in exchange for its release of liability?
6. How many claims are there against my local council and charter organization?
7. Does my claim have insurance to cover it and, if so, how much?
8. How is my claim being treated in a distribution procedure?

Hurley McKenna & Mertz, P.C. currently represents approximately 4,000 Survivors that filed valid proofs of claim in this bankruptcy. Hurley McKenna and Mertz, P.C. has been engaged in litigation against the BSA and the Pathway to Adventure Council in Illinois steadily over the last 10 years. We have gone to the appellate court with the Boy Scouts in two separate cases, and before this bankruptcy filing, we settled 18 cases against the BSA and the Pathway to Adventure Council. These settlements did not take place until the eve of each trial, after years of

litigation, an interlocutory appeal, and extensive pretrial discovery including dozens of depositions. That case involved an abuser named Thomas Hacker.

**Local Council Liability**

<u>How Thomas Hacker used the BSA, Local Councils and Charter Organizations to gain access to and molest hundreds of boys.</u>

Thomas Hacker's first arrest for molesting boy scouts was in Marion County, Indiana on July 7, 1961, when he was 25 years old. Despite this arrest, Hacker managed to become a scout leader again in Indianapolis, where on March 30, 1970 he was arrested a second time for assault and battery with intent to gratify sexual desires. Hacker had sexually abused multiple boys in his car. This second arrest led to a wider investigation which revealed that scout leader Hacker had molested at least 51 additional boys in Indianapolis.

In connection with sentencing for the 1970 arrest, Hacker's court-appointed psychiatrist stated: "(Hacker) developed an intense curiosity to view the genitals of pre-puberty boys … This usually occurred in groups and to the recent extent of encouraging masturbation by the boys or demonstrating this himself."

Just over one year later, in October 1971, Hacker crossed the border into Illinois and was arrested and charged with two counts of taking indecent liberties with a child. On June 19, 1976 Hacker was arrested again for battery of a child for throwing a boy to the floor and pulling down his pants. It is important to note that the Northwest Suburban Council of Boy Scouts of America managed to identify and expel Hacker even though he was then calling himself Thomas Edwards (Hacker's middle name).

The BSA national office was notified at least twice in writing that Hacker was a menace to children: once by the Central Indiana Local Council and once by the Northwest Suburban

Council in Illinois. By June 1970 BSA National had acknowledged Hacker's ineligibility to be a scout volunteer.

Nevertheless, by 1980 Hacker managed to volunteer at Troop 1600 chartered by St. Louis de Monfort Catholic Church in Burbank, IL, a suburb of Chicago. While scoutmaster for Troop 1600, Hacker molested at least 36 additional boys. Hacker was arrested for the last time in 1988 and sentenced to 90 years in prison, where he died in 2018. At his deposition, taken at Big Muddy Prison in 2013, Hacker testified: "we're talking lots and lots and lots of kids...in Scouting alone there were more than a hundred." (Hacker deposition excerpt, Ex. A, p. 127). Scouting made molestation easy for Hacker:

> Q. And, so, did that make you think when you went to St. Louis de Montfort that it would be fairly easy to get back into the Scouts?
>
> A. Well I knew it would be. I was positive. I never even gave it a second thought. (Id. p. 139)

BSA charges the local troop committee, the charter organization, and the local council with the responsibility for recruiting and vetting scoutmasters. This duty is outlined in detail in BSA's "Securing a Scoutmaster" document. This requires the charter organization, with the assistance of the Troop Committee and Local Council, to vet and select a scoutmaster. (Ex. B). Neither the Local Council nor St. Louis de Montfort, conducted even basic vetting of Hacker. They did not properly register him as a volunteer, as required by BSA, and certainly did not vet him in any meaningful way.

Hacker's predation of children began again shortly after he volunteered with Troop 1600. His abuse began gradually, with grooming, but eventually escalated to anal penetration and forced group sex. Hacker's victims were limited to prepubescent boys ranging in age from 10-13.

Most of his victims were molested dozens of times and over a period of several years. He manipulated older boys who had matured beyond his appetites to help him groom and initiate new young recruits. Hacker's abuse primarily occurred at camps owned by Pathway to Adventure Council and at events sponsored by the church that chartered Troop 1600.

Hacker was able to abuse boys in Troop 1600 over an eight-year period because the Pathway to Adventure Council failed to implement many of the protocols required by BSA and by common sense. First, it initially failed to register Hacker as an adult volunteer altogether. This prevented BSA from cross-checking his registration with its IV Files. Second, even once Hacker registered with Pathway to Adventure, Pathway failed to take an accurate name in registration, allowing Thomas Hacker to use "Tom" and change his middle initial. Apparently, this also compromised BSA's ability to cross-check his name against their IV Files. Finally, Pathway to Adventure had its own documented history of abuse, with its Chief Scout conceding that he had dealt with 9 or 10 pedophiles in his time at the Council. Despite this, Pathway to Adventure never implemented any youth protection guidelines.

### Statute of limitations defenses depend on the facts of each case.

All of the abuse in the Hacker matter occurred in the 1980s and the cases were filed more than 30 years after the abuse. BSA and Pathway to Adventure took the position that the claims were time barred by Illinois' statute of limitations, which currently allows victims until the age of 38 to file. All victims were older than 38 at the time of filing. BSA and Pathway to Adventure took a hard line on this issue, taking the matter up on interlocutory appeal after losing a Motion for Summary Judgment on the statute of limitations. BSA and Pathway to Adventure lost that appeal. *Doe v. Boy Scouts of America,* 2016 IL App (1st) 152406.

The Appellate Court held that the statute of limitations issue was a question of fact for the jury. The Court recognized the nature of abuse claims generally in support of the conclusion that claimants often do not connect their harm with the misconduct of institutions until much later in life. The Court also noted that the efforts of BSA to instill morals in boys potentially gave rise to a "special relationship" requiring proactive disclosure of liability in cases of abuse.

From that appeal, both BSA and the Council were left with significant liability in future Illinois cases, despite Illinois not being a so-called "window" statute of limitations state.

Current Claims

Pathway to Adventure has at least 1,294 claims against it.[1] Of those claims, 125 are for men under the age of 38. This means that 125 claims in Illinois against Pathway to Adventure remain in statute and none of those claimants need to plead or prove facts to avoid a statute of limitations defense.

The remaining 1,169 claims for men older than 38 have a clear path to avoid a statute of limitations defense under *Doe v. BSA*. The 1,294 claims, including the 125 in-statute claims, are sufficient to easily bankrupt Pathway to Adventure.

## Pathway to Adventure Council Assets

None of our claimants are able to make an informed decision related to any channeling injunction that might be provided to Pathway to Adventure. This is for three reasons: 1) the claimants do not know Pathway to Adventure's assets; 2) the claimants do not know Pathway to Adventure's contribution to the settlement trust; 3) the claimants do not know whether Pathway to Adventure has separate insurance policies covering their claim.

---

[1] There are 39,177 claim forms without a Local Council identified, meaning Pathway to Adventure likely has more claims against it. Summary available:
https://www.pszjlaw.com/assets/htmldocuments/BSA%20Summary%20of%20Sexual%20Abuse%20Claims%20003.pdf

Pathway to Adventure has significant cash and land assets. A publicly available 990 form shows cash, as of the end of 2019, totaling $27,401,939. Additionally, Pathway to Adventure owns a Camp Napowan in Wisconsin – 400 acres, three-and-a-half hours from headquarters in Chicago. It also owns the Owasippe Scout reservation – 4,800 acres, three-and-a-half hours from headquarters. Pathway to Adventure has essentially conceded Owasippe is not a core asset. In 2012, it solicited bids for the property and a member of the Chicago Area Council Board conceded that "We can run a good Boy Scout camp on a few hundred acres. We don't need 5,000."[2]

In addition to two camps, equidistant to Chicago, BSA owns a building and lot in the West Loop neighborhood of Chicago known as the Steve Fossett Center for Scouting. The West Loop is one of the most sought-after areas of real estate development in Chicago. This is in addition to three other offices the same Council maintains in Arlington Heights, Illinois; La Grange, Illinois and Munster, Indiana. It is not clear why a non-profit requires four offices, much less one in a neighborhood with numerous bars and hotels, but few youths.

## Insurance

BSA has repeatedly cited insurance as the source of victims' recovery. While we are hopeful insurance companies will someday contribute to a victims' fund, this is far from certain. Three separate coverage actions remain pending. Further, some victims fall in policy periods with policies that are completely exhausted. For these reasons, it is imperative that victims understand, with some degree of certainty, what BSA, its local councils and its charter organizations are contributing to a fund.

---

[2] https://www.chicagotribune.com/news/ct-xpm-2004-09-05-0409050038-story.html

The Hartford Settlement

Lastly, Hartford settled with BSA for a reported $650 million. The same day it announced this resolution to shareholders, it announced that it would spend an additional $1.0 billion on share buybacks.[3] This is *in addition* to a previously authorized amount of $1.5 billion in share buy backs announced in December of 2020. Victims deserve to know why BSA chose to settle with an insurer with billions of dollars in liability for the paltry sum of $650 million, while that same insurer spent $2.5 billion in cash to inflate its stock price.

## Conclusion

The case before the Court is not a single bankruptcy filed by BSA. Rather, BSA is using this litigation as a vehicle to resolve what are effectively *dozens* of bankruptcies throughout the nation via its proposed channeling injunction. Likely, all of the councils in window states are bankrupt by these claims. Other councils in so-called "discovery" states, like Illinois, are also bankrupt.

While our firm cannot speak for all Survivors, we remain willing to work with BSA and its councils towards a consensual resolution of this bankruptcy. However, the right to transparency for victims is non-negotiable. We will never agree to victimize these men again by pressuring them to accept a settlement without proof that it is fair. Transparency is necessary for healing, and transparency is necessary to resolve this litigation. The Debtor's disclosure statement is not complete and it lacks the facts needed for both victims and the BSA to move on from this horrific chapter.

---

[3] https://s24.q4cdn.com/787643700/files/doc_financials/2021/q1/The-Hartford-Earnings-News-Release-FINAL.pdf

**Joinder to Tort Claimants Committee Anticipated Objection**

Based on the undersigned's participation with the Tort Claimant's Committee as State Court Counsel for one member, we anticipate the TCC filing an objection. We hereby join in that objection.

Dated: May 6, 2021       Respectfully submitted,

/s/ Evan M. Smola
**Hurley McKenna & Mertz, P.C.**
Christopher T. Hurley
Evan Smola, Esquire
20 S. Clark St. Suite 2250
Chicago, IL 60603
Phone: 312.553.4900
Facsimile: 312.553.0964
cthurley@hurley-law.com
esmola@hurley-law.com
*Pro Hac Vice Motion and Local Counsel Affiliation Forthcoming*