## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. 2295** |
| | **Hearing Date: May 19, 2021 at 10:00 a.m. (ET)**<br>**Objection Deadline: May 10, 2021 at 4:00 p.m. (ET)**<br>**(per agreement of Debtors)** |

## THE AIG COMPANIES' OBJECTION TO MOTION FOR APPROVAL
## OF DEBTORS' DISCLOSURE STATEMENT

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

OBJECTION ............................................................................................................................... 3

I.   THE DISCLOSURE STATEMENT DOES NOT CONTAIN ADEQUATE
     INFORMATION REGARDING CONTRIBUTIONS TO THE SETTLEMENT
     TRUST. ............................................................................................................................. 4

     A.   The Disclosure Statement Does Not Contain Adequate Information About
          BSA's Assets .......................................................................................................... 5
     B.   The Disclosure Statement Does Not Contain Adequate Information About the
          Local Council Settlement Contribution and Contributing Chartered
          Organization Settlement Contribution. ................................................................. 6

II.  THE DISCLOSURE STATEMENT DOES NOT CONTAIN ADEQUATE
     INFORMATION REGARDING THE PROPOSED ESTIMATION OF DIRECT
     ABUSE CLAIMS. ............................................................................................................. 8

III. THE DISCLOSURE STATEMENT FAILS TO DISCLOSE THAT THE PLAN IS
     NOT INSURANCE NEUTRAL AND THEREFORE MAY BE
     UNCONFIRMABLE. ....................................................................................................... 10

IV.  THE DISCLOSURE STATEMENT FAILS TO DISCLOSE THAT THE
     EXPEDITED DISTRIBUTION PROCEDURES MAY BE FOUND TO
     CONSTITUTE IMPERMISSIBLE VOTE BUYING AND PROMOTE FRAUD IN
     THE ADMINISTRATION OF THE SETTLEMENT TRUST, AND THEREFORE
     MAY RENDER THE PLAN UNCONFIRMABLE. ........................................................ 14

V.   THE DISCLOSURE STATEMENT DOES NOT CONTAIN ADEQUATE
     INFORMATION ABOUT THE INSURANCE POLICIES. ............................................ 17

     A.   The Disclosure Statement Does Not Contain Adequate Disclosures Regarding
          the Various Insurance Coverage Risks. ................................................................ 17
     B.   The Disclosure Statement Contains Inaccurate and Misleading Information
          About the AIG Policies. ........................................................................................ 21

RESERVATION OF RIGHTS ................................................................................................... 27

CONCLUSION ........................................................................................................................... 27

# TABLE OF AUTHORITIES

Page(s)

CASES

*In re Adelphia Commc'ns Corp.*,
  352 B.R. 592 (Bankr. S.D.N.Y. 2006), *clarified on denial of reconsideration*, 2006 WL
  2927222 (Bankr. S.D.N.Y. Oct. 10, 2006) ............................................................................21

*In re Am. Capital Equipment, LLC*,
  688 F.3d 145 (3d Cir. 2012)......................................................................................................21

*Am. United Mut. Life Ins. Co. v. City of Avon Park, Fla.*,
  311 U.S. 138 (1940)...................................................................................................................14

*Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.)*,
  107 B.R. 856 (E.D. Pa. 1989), *aff'd*, 908 F.2d 961 (3d Cir. 1990).........................................19

*In re Cajun Elec. Power Coop., Inc.*,
  230 B.R. 715 (Bankr. M.D. La. 1999) ......................................................................................11

*Century Indem. Co. v. Aero-Motive Co.*,
  254 F. Supp. 2d 670 (W.D. Mich. 2003) ..................................................................................24

*In re Combustion Engineering, Inc.*,
  391 F.3d 190 (3d Cir. 2004)................................................................................................11, 20

*In re Crippin*,
  877 F.2d 594 (7th Cir. 1989) ....................................................................................................10

*In re Flintkote Co.*,
  486 B.R. 99 (Bankr. D. Del. 2012), *aff'd*, 526 B.R. 515 (D. Del. 2014) ................................11

*Fulton Boiler Works, Inc. v. Am. Motorists Ins. Co.*,
  828 F. Supp. 2d 481 (N.D.N.Y. 2011)......................................................................................23

*Glew v. Cigna Group Ins.*,
  590 F. Supp. 2d 395 (E.D.N.Y. 2008) ......................................................................................23

*In re Glob. Indus. Techs., Inc.*,
  645 F.3d 201 (3d Cir. 2011)................................................................................................11, 13

*Harrow Prods., Inc. v. Liberty Mut. Ins. Co.*,
  64 F.3d 1015 (6th Cir. 1996) ....................................................................................................24

*In re Indianapolis Downs, LLC*,
  486 B.R. 286 (Bankr. D. Del. 2013) ...........................................................................................3

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*Kleenit, Inc. v. Sentry Ins. Co.*,
    486 F. Supp. 2d 121 (D. Mass. 2007) ...................................................23

*Metlife Cap. Corp. v. Westchester Fire Ins. Co.*,
    224 F. Supp. 2d 374 (D.P.R. 2002).....................................................24

*Moody v. Amoco Oil Co.*,
    734 F.2d 1200 (7th Cir. 1984) ............................................................11

*In re Pac. Shores Dev., Inc.*,
    2011 WL 778205 (Bankr. S.D. Cal. Feb. 25, 2011) .............................21

*In re Pittsburgh Corning Corp.*,
    453 B.R. 570 (Bankr. W.D. Pa. 2011) ....................................10, 12, 14

*In re Quigley Co.*,
    437 B.R. 102 (Bankr. S.D.N.Y. 2010) ................................................15

*Rosciti v. Ins. Co. of the State of Pa.*,
    659 F.3d 92 (1st Cir. 2011)..................................................................19

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
    81 F.3d 355 (3d Cir. 1996)....................................................................3

*In re SPM Mfg. Corp.*,
    984 F.2d 1305 (1st Cir. 1993)..............................................................10

*In re Thorpe Insulation Co.*,
    677 F.3d 869 (9th Cir. 2012) .........................................................11, 20

*In re Vandeveer Estates Holding, LLC*,
    328 B.R. 18 (Bankr. E.D.N.Y. 2005)...................................................19

**STATUTES**

11 U.S.C. § 1125(a)(1)..............................................................................3

11 U.S.C. § 1129(a)(3)............................................................................10

**OTHER AUTHORITIES**

*In re Blitz U.S.A., Inc.*,
    Case No. 11-13603 (PJW) (Bankr. D. Del. Nov. 12, 2013) [D.I. 1922] ................................12

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*In re Kaiser Gypsum Co., Inc.*,
  Case No. 16-31602-JCW (Bankr. W.D.N.C.), September 4, 2019 Hr'g Tr. [D.I. 1785] ........16

*In re Maremont Corp.*,
  Case No. 19-10118-KJC (Bankr. D. Del.), March 18, 2019 Hr'g Tr. [D.I. 166] ....................16

*The Perversion Files; List of Confirmed BSA Abusers*, https://abusedinscouting.com/list-of-
  confirmed-bsa-abusers ...........................................................................................................17

National Union Fire Insurance Company of Pittsburgh, Pa., Lexington Insurance Company, Landmark Insurance Company, The Insurance Company of the State of Pennsylvania, and their affiliated entities (collectively referred to herein as the "***AIG Companies***") file this objection (the "***Objection***") to the *Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relied* [D.I. 2295] (the "***Motion***").[2] In support of this Objection, the AIG Companies respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The cornerstone of the Debtors' Plan has been, from the very beginning, the Channeling Injunction and the resolution of Abuse Claims pursuant to the Trust Distribution Procedures. And while the Trust Distribution Procedures and the form of Settlement Trust Agreement were ultimately filed with the *Second Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 2592] on April 13, 2021, the related Disclosure Statement and exhibits continue to lack sufficient information regarding the proposed corpus and mechanics of the Settlement Trust, as well as the risks associated with the Plan.

2.      As an initial matter, the Disclosure Statement fails to provide adequate information with respect to the purported Settlement Trust contributions in general, including without limitation adequate information about the Debtors' assets that are available for contribution and

---

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion, the Disclosure Statement, or the Plan, as applicable.

the actual commitments, if any, of each Local Council and Contributing Chartered Organization. The Disclosure Statement also lacks any meaningful discussion about the estimation of Direct Abuse Claims proposed by either the Abuse Claimants Representatives (defined below) or the Debtors themselves, which is compounded by the fact that, contrary to the Debtors' assertions, the Plan is not insurance neutral and Abuse Claimants or the Settlement Trust may attempt to improperly use any estimation of Direct Abuse Claims to bind Non-Settling Insurance Companies in post-confirmation coverage litigation. Before the Court can approve the Disclosure Statement, it should be amended to include more fulsome disclosures regarding the Settlement Trust contributions and the proposed estimation.

3. The Disclosure Statement should also be amended to disclose the various risks to confirmation of the Plan. As noted above, the Disclosure Statement does not disclose the Plan's lack of insurance neutrality, which may render the Plan unconfirmable. The Disclosure Statement also does not disclose the risk that the Court may find the Debtors' proposed "Expedited Distribution" of $1,500 to holders of potentially illegitimate claims (without any mechanisms to protect against fraud) constitutes inappropriate vote-buying and undermines the confirmability of the Plan. Accordingly, the Disclosure Statement must be amended to adequately disclose the risk that the Plan, in its current form, may not be confirmed.

4. In addition, the Disclosure Statement does not contain critical information regarding the Insurance Policies, including an evaluation of the various coverage risks that may reduce available coverage. The Plan and Disclosure Statement also contain inaccurate and misleading information about the AIG Policies (defined below), which brings into question the accuracy and completeness of the Debtors' disclosures regarding the Insurance Policies as a whole. Specifically, the schedules to the Plan list various Alleged Lost Policies that neither the Debtors

nor the AIG Companies have been able to locate and the terms of which the Debtors have failed

to substantiate otherwise. This is a serious issue given that the Plan contemplates that the Insurance

Policies, including the AIG Policies, will be contributed to the Settlement Trust in order to resolve

Abuse Claims. At a minimum, the Disclosure Statement must disclose that the AIG Companies

dispute the existence of the Alleged Lost Policies and inform creditors and other parties in interest

that the outcome of this coverage dispute may reduce the total value of contributions to the

Settlement Trust below what the Disclosure Statement and Plan, in their current form, contemplate.

5.    In short, the Disclosure Statement contains inaccurate, misleading, and/or

inadequate information and does not provide key information that creditors and other parties in

interest need to fully evaluate the merits of the Plan. Accordingly, judicial economy would counsel

against allowing the Debtors to proceed with solicitation of the Plan at this time and the Motion

should, therefore, be denied.

## <u>OBJECTION</u>

6.    Section 1125(b) of the Bankruptcy Code provides that the Court cannot approve

the Disclosure Statement unless it "contain[s] adequate information" about the Plan. The

Bankruptcy Code defines "adequate information" as "information of a kind, and in sufficient

detail, as far as is reasonably practicable in light of the nature and history of the debtor and the

condition of the debtor's books and records . . . that would enable . . . a hypothetical investor of

the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1). Not only

is fulsome disclosure required to enable creditors to make "an informed decision to vote for or

against a proposed plan" (*In re Indianapolis Downs, LLC*, 486 B.R. 286, 293 (Bankr. D. Del.

2013)), it is also "crucial to the effective functioning of the federal bankruptcy system." *Ryan*

*Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996).

7.      Here, the Disclosure Statement falls short of containing adequate information about the Plan in at least the following critical respects: (i) the Disclosure Statement does not contain adequate information about the purported contributions to the Settlement Trust; (ii) the Disclosure Statement does not contain any meaningful discussion about the proposed estimation of Direct Abuse Claims; (iii) the Disclosure Statement fails to disclose that the Plan is not insurance neutral and, therefore, may not be confirmable; (iv) the Disclosure Statement fails to disclose that the Expedited Distribution procedures may render the plan unconfirmable; and (v) the Disclosure Statement contains inadequate information about the Insurance Policies, including inadequate disclosures regarding the various insurance coverage risks and inaccurate and misleading information about the AIG Policies.[3]

## I.    THE DISCLOSURE STATEMENT DOES NOT CONTAIN ADEQUATE INFORMATION REGARDING CONTRIBUTIONS TO THE SETTLEMENT TRUST.

8.      The Disclosure Statement provides that, depending on whether the Plan is confirmed as a Global Resolution Plan or a BSA Toggle Plan, the Settlement Trust will be funded by: (i) a $115.6 million contribution by BSA; (ii) a "substantial contribution" by the Local Councils, "which the Debtors are committed to ensuring is not less than $425,000,000, exclusive of insurance rights"; (iii) "insurance rights of all of the BSA, Local Councils and Contributing Chartered Organizations under insurance policies of the Debtors, Local Councils and Contributing Chartered Organizations";[4] (iv) a "substantial contribution" by certain Contributing Chartered

---

[3]  In addition, several key documents related to the Settlement Trust are still missing. The Debtors have not filed (or even adequately described) the Cooperation Agreement. The lack of disclosure makes it impossible for creditors and the parties who may be bound by the Cooperation Agreement, including Settling Insurance Companies, to determine the rights and duties of each party to the agreement and whether the terms are fair and reasonable. Also missing are the Plan Supplement exhibits identifying the members of the Settlement Trust Advisory Committee and the Settlement Trustee. The filing of the Trust Distribution Procedures is of little comfort in the absence of an independent Settlement Trustee and Settlement Trust Advisory Committee who could be counted on to enforce the requirements of the Trust Distribution Procedures.

[4]  While the Disclosure Statement states that insurance policies of the Contributing Chartered Organizations will be

Organizations; and/or (v) "sum-certain contributions" by certain Settling Insurance Companies.[5] Disclosure Statement § II.C. These generalized statements are not adequate to allow voting creditors and other parties in interest to meaningfully evaluate the sufficiency of the funding of the Settlement Trust. Accordingly, unless and until the Disclosure Statement is amended to provide further disclosures on the contributions, approval of the Disclosure Statement should be denied.

### A.    The Disclosure Statement Does Not Contain Adequate Information About BSA's Assets.

9.    While the Disclosure Statement provides that the BSA Settlement Trust Contributions have a total estimated value of $115.6 million and sets forth a high-level breakdown of the BSA Settlement Trust Contribution, it contains inadequate disclosures regarding the Debtors' assets that make it impossible for creditors and other parties in interest to make informed decisions with respect to the Plan.

10.    For example, the Disclosure Statement provides that BSA will contribute the Warehouse and Distribution Center, "[s]ubject to Leaseback Requirement from the Settlement Trust" (Disclosure Statement § II.C), but it does not disclose whether the $11.5 million valuation set forth in the Disclosure Statement takes into account such Leaseback Requirement.[6] If it does

---

contributed to the Settlement Trust under a Global Resolution Plan, the Plan itself provides that only BSA Insurance Policies and the Local Council Insurance Policies will be contributed to the Settlement Trust.

[5]  The Disclosure Statement and Plan contain conflicting information on whether Settling Insurance Companies are Protected Parties under the BSA Toggle Plan. On the one hand, the term "Protected Parties" includes Settling Insurance Companies if the Plan is confirmed as either a Global Resolution Plan or a BSA Toggle Plan. *See* Plan § I.A.180. On the other hand, the description of the treatment of Abuse Claims, for example, excludes Settling Insurance Companies as Protected Parties under the BSA Toggle Plan. *See id.* § III.B.10 & 11 ("(b) if the Plan is Confirmed as a BSA Toggle Plan, the Protected Parties shall include: (i) the Debtors; (ii) Reorganized BSA; (iii) the Related Non-Debtor Entities; and (iv) all of such Persons' Representatives"). The Disclosure Statement does not provide any further clarity. Accordingly, the Disclosure Statement and the Plan should be amended to either explain or correct this discrepancy.

[6]  "Leaseback Requirement" means "the requirement that Reorganized BSA be entitled to lease the Warehouse and Distribution Center from the Settlement Trust for fair market value so long as the Settlement Trust holds title to such premises and that any sale or other transfer of the Warehouse and Distribution Center by the Settlement Trust be subject to Reorganized BSA's right to lease such premises from any Person that acquires the Warehouse and Distribution Center from the Settlement Trust (or any subsequent acquirer) for fair market value for a term of not less than ten years, subject to renewal at the option of Reorganized BSA. An agreement reflecting the terms

not, the Disclosure Statement should also disclose that the Leaseback Requirement may significantly reduce the value of the Warehouse and Distribution Center that would be available to satisfy Abuse Claims.

11.      Additionally, the Disclosure Statement provides that certain "Identified Property" that is listed on BSA's balance sheet is not available to satisfy certain claims because it is "legally protected under applicable laws governing charities and other non-profit organizations." Disclosure Statement § III.C.2. Ironically, however, neither the Plan nor the Disclosure Statement specifically identifies any "Identified Property" or provides any other details, such as the value, and the purported restrictions on the use, of each such parcel. Accordingly, creditors and other parties in interest have no way to evaluate the validity of the Debtors' claims and whether BSA's proposed contribution to the Settlement Trust is fair and equitable in light of the value and nature of the Identified Property.

**B.      The Disclosure Statement Does Not Contain Adequate Information About the Local Council Settlement Contribution and Contributing Chartered Organization Settlement Contribution.**

12.      The Global Resolution Plan contemplates that Contributing Chartered Organizations and Local Councils will also be making "substantial contributions" to the Settlement Trust in exchange for Protected Party status and the benefits of the Channeling Injunction. Disclosure Statement § II.C. However, exactly which, if any, Local Councils and Contributing Chartered Organizations have committed to contribute their assets to the Settlement Trust is unclear.[7] And neither the Plan nor the Disclosure Statement includes any information on the specific assets and value of the assets to be contributed to the Settlement Trust by each such entity.

---

of the Leaseback Requirement shall be filed with the Plan Supplement." Plan § I.A.139. Notably, the Debtors have yet to file the Plan Supplement exhibit that reflects the terms of the Leaseback Requirement.

[7]    *See* Disclosure Statement § X.A.13 ("If the Plan is confirmed as a Global Resolution Plan, it contemplates participation by the Local Councils and Contributing Chartered Organizations, . . . . However, there can be no

13.     Under the Plan, "Contributing Chartered Organizations" refers to the "Chartered Organizations listed on Exhibit D hereto" (Plan § I.A.66), and "Contributing Chartered Organization Settlement Contribution" includes "the contributions to the Settlement Trust by the Contributing Chartered Organizations, as set forth in Exhibit C." Plan § I.A.65. However, neither Exhibit C nor Exhibit D is attached to the Plan. Instead, the Plan merely contains exhibit cover sheets that indicate that Exhibit C and Exhibit D are "to be supplemented."

14.     As for the "Local Council Settlement Contribution," the Plan and Disclosure Statement provide that the Debtors are "committed to ensuring that the aggregate value of the Local Council Settlement Contributions is not less than $425,000,000" (*see* Disclosure Statement § II.C; *id.* § V.R; Plan, Exhibit F (Local Council Settlement Contribution)). But neither the Plan nor Disclosure Statement sets forth any concrete value or even an estimate of the assets that any Local Council has actually committed to contribute. Indeed, the Plan tacitly acknowledges that the current version of the Disclosure Statement is woefully deficient in this regard, stating that the Debtors will provide a status update regarding the Local Council Settlement Contribution on or before June 15, 2021. *See* Plan, Exhibit F (Local Council Settlement Contribution) ("The Debtors intend to request the voluntary commitments of Local Councils to make their respective contributions, . . . By no later than June 15, 2021, the Debtors shall file a report . . . concerning the status of the Debtors' efforts to obtain contribution commitments from the Local Councils.").

15.     To make matters worse, unlike the defined term "Contributing Chartered Organizations," "Local Councils" is a blanket term that refers to "collectively, each and every current or former local council of the BSA, including each and every current local council of the

---

assurance that the Local Councils or Contributing Chartered Organizations will agree to make the required contributions or that the level of contributions will be acceptable to other parties in these Chapter 11 Cases or satisfy the requirements for obtaining approval of the Channeling Injunction by the Bankruptcy Court.").

BSA as listed on Exhibit G hereto." *Id.* § I.A.144. Accordingly, the Plan improperly contemplates that all "Local Councils" will be included as a Protected Party under the Global Resolution Plan, whether or not they make a substantial contribution to the Settlement Trust. *See id.* § I.A.180.[8] If it is the intent of the Debtors to afford Protected Party status to Local Councils that make no contribution at all, the Disclosure Statement should clearly state as much, as well as disclose the risk that failure to make a contribution may impair the ability to obtain Protected Party status.

16.     The Disclosure Statement must disclose the nature and extent of the contributions of each Local Council and Contributing Chartered Organization in order for creditors to be able to evaluate the total value of the assets available to fund Abuse Claims and their expected recoveries under the Global Resolution Plan. Moreover, creditors and other parties in interest are entitled to evaluate whether such contributions are sufficient to justify a release. It is impossible to ascertain any of this information from the Disclosure Statement in its current form, and therefore the Motion should be denied.

## II.     THE DISCLOSURE STATEMENT DOES NOT CONTAIN ADEQUATE INFORMATION REGARDING THE PROPOSED ESTIMATION OF DIRECT ABUSE CLAIMS.

17.     The Disclosure Statement does not contain any substantive discussion on the estimation of Direct Abuse Claims proposed by the Future Claimants' Representative, the Tort Claimants' Committee, and the Coalition (the "***Abuse Claimants Representatives***") or the Debtors' own proposed estimation—despite the Debtors' assertions that such estimation is critical to Plan confirmation.

---

[8]   Indeed, it appears that the Debtors contemplate that "former" local councils that may have no assets or no longer are in existence will receive Protected Party status even though they will necessarily not make a contribution.

18.     The Disclosure Statement provides no information whatsoever on the Abuse Claimants Representatives' proposed estimation, other than that the Estimation Motion was filed and that the Debtors plan to oppose it. *See* Disclosure Statement § IV.M.5. The Abuse Claimants Representatives assert that the estimation is for purposes of distribution and intended to set a *de facto* cap on BSA's liability with respect to the estimated claims, such that the estimation will establish the maximum amount that the BSA and other beneficiaries of the Channeling Injunction must make available for distribution to holders of Abuse Claims. *See* Estimation Motion at 6. There is no disclosure, however, of the impact on confirmation and/or implementation of the Plan if the Estimation Motion is granted and the Court determines that the estimated aggregate value of the Direct Abuse Claims exceeds the proposed contributions to be made to the Settlement Trust. The Disclosure Statement should disclose this risk. The Disclosure Statement should also disclose that various parties oppose the aggressive estimation timeline that the Abuse Claimants Representatives have proposed and that the Court may impose an extended, more realistic timeline, which may be inconsistent with the Debtors' expected timeline for Plan confirmation and emergence from chapter 11.

19.     The disclosures regarding the Debtors' own proposed estimation of their liability on account of Direct Abuse Claims are deficient for the same reasons.[9] Although the Disclosure Statement provides that the estimation will serve as "a basis for the Bankruptcy Court and the parties to assess the value of the Direct Abuse Claims and whether the settlements proposed in the

---

[9]   It is unclear from the Disclosure Statement and Plan whether an estimation of Direct Abuse Claims will be conducted under the BSA Toggle Plan. The Disclosure Statement provides that "[t]he Debtors plan to pursue a non-binding claims estimation from the Bankruptcy Court in connection with the Confirmation proceedings to assist Mediation Parties." Disclosure Statement § V.M.5 (emphasis added). But later on the Disclosure Statement also provides that "*[i]f the Plan is confirmed as a Global Resolution Plan*, then the Bankruptcy Court shall, at the Confirmation Hearing, conduct an estimation of the Debtors' aggregate liability on account of Direct Abuse Claims[.]" *Id.* § VI.H.19 (emphasis added). If the Debtors intend to seek an estimation of Direct Abuse Claims only if the Plan is confirmed as a Global Resolution Plan, the Disclosure Statement must clearly state that intention and also provide an explanation as to why.

Plan . . . should be approved" (Disclosure Statement § VI.H.19), it contains no disclosures regarding the various implications of the proposed estimation. This lack of disclosure is particularly concerning given the significant hole in the insurance neutrality provisions in the Plan described below. Accordingly, there is a real risk that non-settling insurers will be harmed to the extent the Debtors' proposed estimation is intended as an effort to bind the insurers in post-confirmation coverage litigation, notwithstanding the purported insurance neutrality of the Plan. The Disclosure Statement cannot be approved unless and until it discloses this risk and others associated with the proposed estimation or the Plan and Disclosure Statement are amended to eliminate such risk.

### III. THE DISCLOSURE STATEMENT FAILS TO DISCLOSE THAT THE PLAN IS NOT INSURANCE NEUTRAL AND THEREFORE MAY BE UNCONFIRMABLE.

20.     The Disclosure Statement fails to disclose that the Plan may not be confirmable because it could impair insurers' rights under the state-law insurance contracts they have issued to the Debtors and the Local Councils. A chapter 11 plan may not be confirmed if it would give the debtor greater rights under its insurance contracts than it held prepetition. *E.g.*, *In re Pittsburgh Corning Corp.*, 453 B.R. 570, 604–05 (Bankr. W.D. Pa. 2011) (finding a proposed section 524(g) plan "unconfirmable" due to "the lack of clarity regarding insurance neutrality"). The reason for this rule is that a plan is unconfirmable as employing "means forbidden by law" (11 U.S.C. § 1129(a)(3)), if it fails to conform to state-law requirements—including the requirements imposed by contracts validly formed under state law. *See In re SPM Mfg. Corp.*, 984 F.2d 1305, 1311 (1st Cir. 1993) (bankruptcy courts lack authority to enter orders that "expand the contractual obligations of parties"); *In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989) ("[B]ankruptcy courts do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable

terms."); *see also Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984); *In re Cajun Elec. Power Coop., Inc.*, 230 B.R. 715, 737 (Bankr. M.D. La. 1999).

21.     A plan is not insurance neutral unless "all contractual rights and coverage defenses [are] fully preserved." *In re Flintkote Co.*, 486 B.R. 99, 117 (Bankr. D. Del. 2012), *aff'd*, 526 B.R. 515 (D. Del. 2014). The insurance-neutrality inquiry is a practical one, focusing on "the real-world impacts of the plan to see if it increases insurance exposure and likely liabilities of [insurers]." *In re Thorpe Insulation Co.*, 677 F.3d 869, 885 (9th Cir. 2012); *accord In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 212 (3d Cir. 2011) (en banc). In *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004), which has led to a series of decisions requiring insurance neutrality in mass tort bankruptcy cases, the Third Circuit found that the following language in the bankruptcy court's confirmation order was necessary to preserve insurers' rights and defenses under their policies and settlement agreements:

> [N]otwithstanding anything to the contrary in this Order, the Plan or any of the Plan Documents, nothing in this Order, the Plan or any of the Plan documents (including any other provision that purports to be preemptory or supervening), shall in anyway [sic] operate to, or have the effect of, impairing the insurers' legal, equitable or contractual rights, if any, in any respect. The rights of insurers shall be determined under the Subject Insurance Policies or Subject Insurance Settlement Agreements as applicable.

*Id.* at 209.

22.     Since *Combustion Engineering*, courts have only enhanced and expanded the insurance neutrality language required to prevent clever plaintiffs' attorneys from misusing bankruptcy court determinations in later—non-bankruptcy—proceedings. *See Glob. Indus. Techs.*, 645 F.3d at 212-14 (reversing confirmation order and finding that the plan, which included insurance neutrality language that mirrored the language approved in *Combustion Engineering*, was not insurance neutral "in the same sense as was the plan at issue in *Combustion Engineering*"

because "the Plan-triggered explosion of new claims creates an entirely new set of administrative costs, including the investigative burden of finding any meritorious suits in the haystack of potentially fraudulent ones"). For example, in *In re Blitz U.S.A., Inc.* the following language was endorsed by the Court:

> …the Confirmation order . . . shall not have any *res judicata*, collateral estoppel, or other preclusive effect on, or otherwise prejudice, diminish, impair or affect (under principles of waiver, estoppel, or otherwise) any Non-Participating Insurer's legal, equitable or contractual rights or obligations under any Assigned Blitz Insurance Policies . . . [and] shall not constitute an adjudication, judgment, trial, hearing on the merits, finding, conclusion, other determination, or evidence or suggestion of any such determination (a) establishing the liability (in the aggregate or otherwise) or coverage obligation of any Non-Participating Insurers for any Claims.

Case No. 11-13603 (PJW) (Bankr. D. Del. Nov. 12, 2013) [D.I. 1922] at 43-44.[10]

23.    Here, the insurance-specific language in the Plan falls woefully short of the provisions that have been required in other mass tort bankruptcy cases, even including the less robust provisions that were approved in *Combustion Engineering*. Although the Plan here purports to be insurance neutral, it is, in fact, just the opposite in certain circumstances. The Plan provides:

> ***Except as provided in <u>Article X.M.4.</u>***, none of (a) the Bankruptcy Court's or District Court's approval of the Plan or the Plan Documents, (b) the Confirmation Order, the Affirmation Order or any findings or conclusions entered with respect to Confirmation, or (c) any estimation or valuation of Abuse Claims, either individually or in the aggregate (including any agreement as to the valuation of Abuse Claims) in the Chapter 11 Cases shall, with respect to any Insurance Company, constitute or be deemed to constitute a trial or hearing on the merits or an adjudication or judgment, or accelerate the obligations, if any of any Insurance Company under its Insurance Policies.

Plan § X.M.2 (emphasis added). Article X.M.4 of the Plan, in turn, provides:

> Nothing in this Article X.M. is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against any Insurance Company with respect to any issue that is actually litigated by such Insurance Company as part of its objections, if any, to Confirmation or as

---

[10]    *See also Pittsburgh Corning*, 453 B.R at 585 ("nothing in the Confirmation Order or the Plan . . . shall in any way operate to impair, or have the effect of impairing [the insurers'] legal, equitable, or contractual rights, if any, in any respect").

part of any contested matter or adversary proceeding filed by such Insurance Company in conjunction with or related to Confirmation.

*Id.* § X.M.4. In other words, to the extent an Insurance Company objects to confirmation or litigates any issues "in conjunction with or related to Confirmation," the Plan, Confirmation Order, and any other ruling on the litigated issue could be binding or otherwise have a preclusive effect on the Insurance Company in any subsequent litigation. The phrase "in conjunction with or related to Confirmation" is so vague and amorphous that it could be construed as encompassing just about any issue that is raised in these chapter 11 cases. Even though the Plan states that "nothing contained in the Plan, the Plan Documents, or the Confirmation Order, . . . shall in any way operate to, or have the effect of, impairing, altering, . . . decreasing or modifying (a) the rights or obligations of any Insurance Company . . . arising out of or under any Insurance Policy," that is only true if the Insurance Company refrains from objecting to confirmation or otherwise asserting its rights and defenses in these chapter 11 cases. In effect, the Plan forces the insurers into a classic "Catch-22"—they can forego asserting their rights and defenses and risk an unfavorable outcome on a given issue, and rely solely on the Debtors' promise that the Plan will be insurance neutral as to them (which it is not), or they can litigate the issue and risk losing the benefits of the purported insurance neutrality.

24. Neither the Plan nor Disclosure Statement attempts to reconcile the Plan's purported protection of Insurance Companies' rights with what appears to be a restriction on such parties' right to contest confirmation or any issue "in conjunction with or relating to Confirmation." Such an outright impairment of the Insurance Companies' rights under their insurance contracts was expressly prohibited by the Third Circuit in *In re Glob. Indus. Techs., Inc.* 645 F.3d at 204 (holding that "when a federal court gives its approval to a plan that allows a party to put its hands into other people's pockets, the ones with the pockets are entitled to be fully heard

and to have their legitimate objections addressed"). At the very least, the neutrality provisions in the Plan are ambiguous as currently drafted and cannot be approved. *See Pittsburgh Corning*, 453 B.R. at 589 ("Because the purported insurance neutrality provisions . . . are ambiguous as currently drafted, we find that the [Plan] is not insurance neutral.").

25.     Moreover, even if Debtors ultimately agree to remove this offending and inconsistent language, there remains a material risk that—absent further enhancements to the insurance neutrality provisions—plaintiffs' counsel will attempt to submit Bankruptcy Court findings (on claims estimation or otherwise) into evidence in later, non-bankruptcy, coverage proceedings. While such risk cannot be neutralized entirely, it can be reduced by adding significantly stronger insurance neutrality language to the Plan and Confirmation Order. Absent such enhancements, the Plan runs the risk of being deemed unconfirmable.

26.     At a minimum, the Disclosure Statement should be amended to disclose that certain of the Debtors' insurers take the position that the purported insurance neutrality language in the Plan is inadequate and must be amended in order for the Plan to be confirmable. The Disclosure Statement should also inform creditors that the Court may require the Debtors to include more robust language in order for the Plan to ensure insurance neutrality. Without this additional disclosure, the Disclosure Statement cannot be approved as containing adequate information.

**IV.    THE DISCLOSURE STATEMENT FAILS TO DISCLOSE THAT THE EXPEDITED DISTRIBUTION PROCEDURES MAY BE FOUND TO CONSTITUTE IMPERMISSIBLE VOTE BUYING AND PROMOTE FRAUD IN THE ADMINISTRATION OF THE SETTLEMENT TRUST, AND THEREFORE MAY RENDER THE PLAN UNCONFIRMABLE.**

27.     The Disclosure Statement should disclose that the Plan may violate section 1129(a)(3) of the Bankruptcy Code by potentially manipulating the voting process in contravention of the policies and objectives of the Bankruptcy Code. It is black letter law that a transfer of value in exchange for an affirmative vote is impermissible. *See Am. United Mut. Life Ins. Co. v. City of*

*Avon Park, Fla.*, 311 U.S. 138, 147 (1940) ("[I]f a vote is influenced by the expectation of advantage, though without any positive promise, it cannot be considered an honest and unbiased vote.") (internal quotation marks and citation omitted); *see also In re Quigley Co.*, 437 B.R. 102, 126-27 (Bankr. S.D.N.Y. 2010) (finding that the plan was proposed in bad faith because the debtor's non-debtor parent, Pfizer, "bought enough votes" and "wrongfully manipulated the voting process to assure confirmation of the [debtor's] plan, and thereby gain the benefit of the channeling injunction for itself and the other Pfizer Protected Parties"). Here, the proposed blank check payments of $1,500 to any person asserting a Direct Abuse Claim (without any attempt to identify and weed out illegitimate claims) if such person votes in favor of the Plan could be deemed a good faith violation that renders the Plan unconfirmable under section 1129(a)(3) of the Bankruptcy Code.

28.    Specifically, under the Global Resolution Plan, a holder of Direct Abuse Claims may elect to receive an "Expedited Distribution" of $1,500 so long as the holder has timely filed a non-duplicative proof of claim and voted to accept the Plan. *See* Plan § III.B.10. Neither the Plan nor the Trust Distribution Procedures requires the Settlement Trustee to evaluate the validity of the asserted claims. In fact, the Trust Distribution Procedures provide that the "Abuse Claimants that elect to receive the Expedited Distribution ***will not have to submit any additional information*** to the Settlement Trust in order to receive payment of the Expedited Distribution." *See* Trust Distribution Procedures § 3.1. Given the Debtors' representations that holders of Direct Abuse Claims may receive up to a 100% recovery under the Global Resolution Plan (*see* Disclosure Statement § II.C.8), it is difficult to imagine any holder of a legitimate Direct Abuse Claim electing to receive only $1,500 in exchange for a release of the Debtors and other Protected Parties. Instead, the Expedited Distribution will have the effect of enticing holders of illegitimate claims to vote in

favor of the Plan in exchange for value to which they are not entitled, in violation of the Bankruptcy Code. The Disclosure Statement should disclose that the Plan may be unconfirmable if the Court were to find that the Expedited Distribution procedures violate section 1123(a)(3).

29. The Disclosure Statement should also disclose that the Plan may be unconfirmable because neither the Plan nor the Trust Distribution Procedures contains adequate fraud-prevention measures. Courts have required plan proponents to include anti-fraud provisions before proceeding with confirmation or approval of a disclosure statement. *See*, *e.g.*, *In re Kaiser Gypsum Co., Inc.*, Case No. 16-31602-JCW (Bankr. W.D.N.C.), September 4, 2019 Hr'g Tr. [D.I. 1785] at 64-66 ("I don't think . . . a federal court should approve a mechanism and a process that could lead to fraud, particularly in an area where the trusts have been subject to false claims . . . This is one that I'm concerned about of whether the plan, ultimately, is confirmable based on this."); *In re Maremont Corp.*, Case No. 19-10118-KJC (Bankr. D. Del.), March 18, 2019 Hr'g Tr. [D.I. 166] at 6-7 (refusing to confirm plan because it lacked "provisions that will guard against the possibility that [] fraud should occur"). Here, neither the Plan nor the Trust Distribution Procedures sets forth any criteria for evaluating the validity of Direct Abuse Claims held by claimants who elect to receive an Expedited Distribution. In fact, whether or not any evidentiary support has been submitted with the proofs of claim, and without requiring the claimant to provide additional information to receive an Expedited Distribution, the Plan and Trust Distribution Procedures allow a claimant to receive a cash payment so long as he or she has timely filed a non-duplicative proof of claim and voted to accept the Plan. This is far from the anti-fraud mechanisms that courts have required in other mass-tort bankruptcy cases. Accordingly, the Plan may be unconfirmable and the Disclosure Statement should disclose this risk.

## V.    THE DISCLOSURE STATEMENT DOES NOT CONTAIN ADEQUATE INFORMATION ABOUT THE INSURANCE POLICIES.

### A.    The Disclosure Statement Does Not Contain Adequate Disclosures Regarding the Various Insurance Coverage Risks.

30.    The Disclosure Statement does not adequately disclose the various insurance coverage risks that may substantially reduce the amount of coverage available under the Insurance Policies. Although the Disclosure Statement briefly mentions that, absent an agreement with the Insurance Companies, "there is a risk that the Settlement Trust may not realize contributions from Insurance Companies, or that the Settlement Trust's efforts to realize recoveries on account of the Insurance Coverage will be the subject of litigation that is expensive and time-consuming" (Disclosure Statement § X.A.21), it contains no evaluation whatsoever of such risk.

31.    The Disclosure Statement should disclose that the AIG Companies and other Insurance Companies have meritorious coverage defenses that may substantially reduce the amount of available coverage and that coverage will be subject to expensive and time-consuming litigation in which any Non-Settling Insurance Companies could raise significant coverage defenses, such as exhaustion of underlying limits, applicability of various exclusions, applicability of "expected or intended" language in the definitions of "occurrence," and the Debtors' compliance with policy conditions and requirements.[11] In addition to further disclosure regarding

---

[11]   For example, and without limitation, the Coalition, which purports to represent thousands of Abuse Claimants, has credibly alleged that there is considerable evidence that the Debtors knew of rampant sexual abuse in their organization for many years and did nothing to stop it. The Coalition's own website explains this as follows:

> In 2010, a landmark case against the Boy Scouts of America triggered the release of over 20,000 secret documents stowed away by the BSA. These records, now referred to as "the perversion files," detailed the names and incidents of over 1,000 volunteers in the BSA banned for child abuse. These names never made it to the public eye, and the BSA consistently failed to report incidents of child abuse in the Scouts to the police or parents. For over 100 years the BSA kept these records away from the public eye….

*The Perversion Files; List of Confirmed BSA Abusers*, https://abusedinscouting.com/list-of-confirmed-bsa-abusers (last visited May 6, 2021). The Disclosure Statement must disclose that such documents and allegations exist, and must further disclose that if insurers are able to prove that the Coalition's allegations are correct, such

such insurer defenses which may be applicable here, the Debtors should describe the risks associated with (a) their proposed treatment of self-insured retentions ("***SIRs***") and allocation of deductibles and (b) their attempts to transfer policy coverage to the Settlement Trust in the face of clear anti-assignment provisions.

> ### i. The Disclosure Statement fails to provide adequate information regarding SIRs, deductibles, and related coverage issues.

32.    The Plan and Disclosure Statement make little mention of the existence of SIRs, deductibles, or other underlying obligations, which must be satisfied before excess coverage can be accessed, other than the following:

> The Settlement Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred on or after the Effective Date arising from, relating to, or associated with any legal action or other proceeding which is the subject of Article IV.P of the Plan and shall pay Indirect Abuse Claims, in accordance with the Trust Distribution Procedures, that may arise from deductibles, self-insured retentions, retrospective premium adjustments, or other charges.

Disclosure Statement § VII.A.22.

33.    Notably, the Disclosure Statement is devoid of any discussion regarding the funding of the SIRs, the allocation of deductibles as between primary and excess insurers, and the potential impact of these issues on recoveries. As drafted, it is unclear who the Debtors believe should bear the burden of any applicable SIR or deductible that is not funded by the Debtors—the insurers or the Abuse Claimants. If it is the insurers, they would need to submit corresponding Indirect Abuse Claims, which are projected to receive a 0% recovery under the Plan. Absent clear disclosure regarding the Debtors' intent with respect to SIRs and deductibles, it is impossible for creditors, insurers, and other parties in interest to make informed decisions with respect to the Plan.

---

evidence may serve as a complete defense to coverage under the insurance policies, meaning that there would be little or no insurance proceeds available to the Abuse Claimants.

34.     In addition to clarifying their intent with respect to funding of the SIRs and deductibles in the Disclosure Statement, the Debtors should disclose that insurance coverage (and ultimate recoveries by holders of Direct Abuse Claims) could be significantly undermined based on the coverage issues related to the non-payment of SIRs and deductibles. For example, to the extent the Debtors require insurers to drop down and satisfy any gaps in coverage due to the Debtors' failure to directly satisfy SIRs, the Disclosure Statement should disclose that such a requirement is contrary to applicable law and may render the Plan unconfirmable. While courts sometimes recognize that a debtor may be unable to satisfy their required SIRs, and in those instances do not expressly require payment of those obligations in order to trigger insurance coverage, such courts typically provide that insurers are required to fund <u>only</u> the amount of valid claims in excess of the underlying SIR. *See, e.g.*, *Rosciti v. Ins. Co. of the State of Pa.*, 659 F.3d 92, 97, 100 (1st Cir. 2011); *In re Vandeveer Estates Holding, LLC*, 328 B.R. 18, 21 (Bankr. E.D.N.Y. 2005); *Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.)*, 107 B.R. 856 (E.D. Pa. 1989), *aff'd*, 908 F.2d 961 (3d Cir. 1990).

35.     Similarly, the Disclosure Statement should disclose the coverage risks associated with any disputes concerning the allocation of deductibles or payment by the Debtor or the applicable primary insurer. As the failure of a primary insurer to cover required deductibles invalidates excess coverage obligations, the Debtors should include a risk factor indicating that the failure of any primary insurer to cover certain Abuse Claims and policy years on the basis that such primary policy is merely a "fronting policy" or otherwise may be disputed by applicable excess insurers—and in the event of a successful challenge, any excess insurance may be invalidated, thereby reducing available coverage.

ii.     **The Disclosure Statement fails to provide adequate information concerning the effects of anti-assignment provisions in the Insurance Policies.**

36.     The Disclosure Statement should also disclose that the Insurance Assignment[12] may violate any anti-assignment provisions in those policies, resulting in a diminished corpus of the Settlement Trust. As an initial matter, it is unclear whether federal preemption of anti-assignment provisions in a debtor's insurance contracts can or should apply in any context other than that where section 524(g) of the Bankruptcy Code is applicable. The cases in which courts have permitted such preemption involve section 524(g), which provides a strong statutory basis for overriding anti-assignment clauses. *See*, *e.g.*, *Thorpe Insulation*, 677 F.3d at 883 (holding that "the anti-assignment provisions contained in the contracts between Appellants and Appellees stand as an obstacle to completion of a successful § 524(g) plan, and therefore are preempted by federal bankruptcy law"). Section 524(g) of the Bankruptcy Code, which only applies to asbestos claims, is not applicable in this case.

37.     Even if the concepts of federal preemption were to apply to debtor contracts outside of the section 524(g) context, the Third Circuit has held that preemption does not apply as to non-debtors. *See Combustion Engineering*, 391 F.3d at 218-19 ("To the extent the subject insurance policies are jointly held by [the debtor] and a non-debtor, . . . the § 541 preemption of anti-assignment provisions applies only to [the debtor's] interest in the shared policies. Accordingly, the London Market Insurers have appellate standing to challenge any assignment of policy

---

[12] "Insurance Assignment" refers to "the assignment and transfer to the Settlement Trust of (a) the Insurance Actions, (b) the Insurance Action Recoveries, (c) the Insurance Settlement Agreements, (d) the Insurance Coverage, and (e) all other rights or obligations under or with respect to the Insurance Policies (but not the policies themselves); provided, however, that if the Plan is Confirmed as a BSA Toggle Plan, such assignment and transfer will be limited to the rights and obligations of the Debtors and the Related Non-Debtor Entities, and all such Persons' Representatives. The Insurance Assignment does not include any rights or obligations under or with respect to any Insurance Policies that are the subject of an Insurance Settlement Agreement." Plan § I.A.124.

proceeds that violated anti-assignment provisions in the excess and primary policies held by non-debtors[.]").[13]

38.    These risks should be highlighted in the Disclosure Statement to enable creditors and other parties in interest to take into account the full extent of the coverage risks and the probability of a reduction in available coverage when evaluating the Plan. *See In re Am. Capital Equipment, LLC*, 688 F.3d 145, 156 (3d Cir. 2012) ("A plan will not be feasible if its success hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely."). Absent these additional disclosures, the Disclosure Statement is wholly deficient and should not be approved.

**B.    The Disclosure Statement Contains Inaccurate and Misleading Information About the AIG Policies.**

39.    The Disclosure Statement should not be approved because both the Plan and the Disclosure Statement contain inaccurate and misleading information about the insurance policies alleged to have been issued by the AIG Companies (the "***AIG Policies***"). Courts generally will not approve disclosure statements that contain statements that are "false, misleading, or defamatory." *In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006), *clarified on denial of reconsideration*, 2006 WL 2927222 (Bankr. S.D.N.Y. Oct. 10, 2006); *see also In re Pac. Shores Dev., Inc.*, 2011 WL 778205, at *6 (Bankr. S.D. Cal. Feb. 25, 2011) (denying approval of disclosure statement that contained "inaccurate and misleading statements").

40.    Here, the schedules to the Plan reflect incorrect, misleading, and unsubstantiated information about the AIG Policies, a matter that directly bears on the accuracy and completeness

---

[13]    As it relates to the Alleged Lost Policies (defined below), there is zero evidence that the Debtors are named insureds or additional insureds under such Alleged Lost Policies. As a result, even if the Debtors can demonstrate that the Alleged Lost Policies exist and provide coverage, the Debtors will not be able to assign these policies to the Settlement Trust. At the very least, this risk must be disclosed.

of the Debtors' disclosures about the Insurance Policies, including the AIG Policies, that are to be contributed to the Settlement Trust in exchange for a channeling order and injunction and third-party releases. *See* Disclosure Statement § II.A ("The first plan of reorganization is a 'Global Resolution Plan,' which provides the framework for global resolution of Abuse Claims against the Debtors, Local Councils, Contributing Chartered Organizations, and Settling Insurance Companies, in exchange for contributions by such parties . . . including the contribution of substantial insurance assets."); *id.* § V.R ("Under the Global Resolution Plan, in exchange for the Local Council Settlement Contribution[14] . . . which the Debtors believe will provide significant value to the Settlement Trust to fund Abuse Claims, the Local Councils . . . will be granted third-party releases and Abuse Claims against the Local Councils . . . will be channeled to the Settlement Trust[.]").

41.    Specifically, the Disclosure Statement provides a list of various Local Council Insurance Policies for which the AIG Companies are purported carriers (see Schedule 3 to the Plan), but it fails to adequately disclose that the AIG Companies dispute the existence of the vast majority of these policies and further dispute that they have any coverage obligations for any such alleged policies. Moreover, the Disclosure Statement fails to address the risk that lack of such coverage presents for recoveries under the Global Resolution Plan.[15]

---

[14]    "Local Council Settlement Contributions" includes "to the maximum extent permitted under applicable law, any and all of the Local Councils' rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to: (i) the Local Council Insurance Policies (subject to Article IV.D.3 and Article IV.D.4 with respect to Insured Non-Abuse Claims), the Insurance Coverage, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof; (ii) the Insurance Actions; and (iii) the Insurance Action Recoveries; . . ." Plan § I.A.143.

[15]    In addition, the Disclosure Statement fails to accurately list the AIG Policies that the AIG Companies actually believe to exist and bind the relevant AIG Company to coverage. In Schedule 2 to the Plan, which sets forth a list of BSA Insurance Policies, the Landmark Insurance Company policy (No. FE4002136) is listed twice but should only be listed once with the effective dates of December 31, 1984 to March 1, 1986. *See* Plan, Schedule 2 (BSA Insurance Policies) at 3. In addition, the policy number for the Lexington Insurance Company policy for effective

### i.       The New Hampshire Policies

42.      The Disclosure Statement identifies approximately 300 Local Council Insurance Policies that were allegedly issued by New Hampshire Insurance Company ("***New Hampshire***"). In so doing, the Debtors misrepresent the existence of these policies and fail to disclose that the AIG Companies dispute that the vast majority of these policies were ever issued and that New Hampshire is required to provide any insurance coverage under them. Indeed, the Debtors know, but do not disclose, that only three of the policies—Verdugo Hills (1968–71), Calvin Coolidge (1963–64), and Bay Area (1977–78)—have been produced by the Debtors, and neither the Debtors nor the AIG Companies have been able to locate documents showing that the remaining policies exist or that they impose coverage obligations on the AIG Companies. For these remaining hundreds of policies (the "***Alleged Lost New Hampshire Policies***"), the Debtors have produced only a scattering of secondary documents, ranging from lists apparently compiled by an insurance broker to alleged declaration pages to mere notes pulled from Local Councils' internal records.

43.      These secondary documents alone are insufficient to demonstrate the existence of the Alleged Lost New Hampshire Policies or coverage thereunder, and the Disclosure Statement must disclose this risk. To prove coverage under a lost policy through secondary evidence, the insured must prove—typically by a preponderance of evidence—both the existence of the policy <u>and</u> the terms sufficient to show coverage of the asserted claim. *See, e.g.*, *Fulton Boiler Works, Inc. v. Am. Motorists Ins. Co.*, 828 F. Supp. 2d 481, 490 (N.D.N.Y. 2011); *Kleenit, Inc. v. Sentry Ins. Co.*, 486 F. Supp. 2d 121 (D. Mass. 2007); *Glew v. Cigna Group Ins.*, 590 F. Supp. 2d 395, 411 (E.D.N.Y. 2008). The documents that the Debtors have produced to the AIG Companies do

---

dates March 1, 2007 to March 1, 2008 is shown as "51134," when, in fact, the policy number is "501134." *See id.* at 8. Unless and until the Debtors amend Schedule 2 to reflect the correct information or supplement the Disclosure Statement to explain the discrepancies, the Disclosure Statement cannot be approved as containing adequate disclosures about these policies.

not contain policy terms for most Local Councils for most years, and therefore cannot be deemed sufficient to show coverage for any abuse claim that potentially falls within the policy period asserted by the Debtors for any of the Alleged Lost New Hampshire Policies.

44.     BSA has suggested that the similarities among documents produced by various Local Councils indicates that the AIG Companies purportedly operated one or more Local Council insurance "programs." However, while this may be BSA's argument, it is nothing more than BSA's asserted legal position. Yet, the Disclosure Statement presents as a purported fact that "from 1975 to 1976, the New Hampshire Insurance Company . . . created an insurance program through a broker, R.F. Lyons, that issued a significant number of AIG Insurance Policies to Local Councils." Disclosure Statement § III.F.2. The Disclosure Statement must be amended to correct this misstatement. In any event, evidence of an insurance "program" alone is not sufficient for purposes of proving policy terms. *See Metlife Cap. Corp. v. Westchester Fire Ins. Co.*, 224 F. Supp. 2d 374, 384 (D.P.R. 2002) ("[Th]e mention of a policy number in another document is insufficient to establish either the existence or the terms of insurance coverage."); *Century Indem. Co. v. Aero-Motive Co.*, 254 F. Supp. 2d 670, 680 (W.D. Mich. 2003) ("While a copy or a reasonable facsimile of the policy is not an absolute requirement for an insured to establish coverage, an insured cannot meet its burden merely by 'rely[ing] on some contemporaneous version of the policy that it has secured from [the insurer or] other parties . . . absent some clear link, such as there being only one version of the policy, direct testimony linking the sample policy to the one issued, or solely cosmetic differences between versions.'" (quoting *Harrow Prods., Inc. v. Liberty Mut. Ins. Co.*, 64 F.3d 1015, 1021 (6th Cir. 1996)).

### ii.     The National Union Policies

45.     The Disclosure Statement identifies approximately 800 Local Council Insurance Policies that were allegedly issued by National Union Fire Insurance Company of Pittsburgh, PA

("**National Union**"). As with the policies identified as allegedly being issued by New Hampshire, the Debtors again misrepresent the existence of these policies and fail to disclose that the AIG Companies dispute that the vast majority of these policies were ever issued and that National Union is required to provide any insurance coverage under them. While the Debtors have produced what appears to be three purported "master" forms that contain endorsements listing over 400 Local Councils as "Named Insured" and individual policy numbers next to each listed Local Council, the Debtors fail to disclose that (i) the Debtors and National Union have been able to locate alleged policy documents for *only three* of the over 400 Local Councils and even these documents are incomplete, and (ii) each of the purported "master" forms expressly states that it "does not afford any liability" and is instead "solely for purposes of Premium Computation."

46.     And the incomplete policy documents that the Debtors have produced – a single declaration page for each of two Local Councils (Mount Diablo, No. BE1216960 (1976-77) and Fairfield County, No. BE1219921 (1977-78)) – do not demonstrate that the other Local Councils listed in the endorsements were actually issued individual policies (the policies purportedly issued to such Local Councils, the "***Alleged Lost National Union Policies***" and, together with the Alleged Lost New Hampshire Policies, the "***Alleged Lost Policies***"). Nor have the Debtors produced any documents for any of the Alleged Lost National Union Polices that show the coverage terms of the Alleged Lost National Union Policies.

47.     The AIG Companies dispute they have any coverage obligations under the Alleged Lost Policies, and neither the Plan nor the Disclosure Statement can contain adequate information about such alleged policies unless and until the Debtors disclose the significant risk (and the associated recovery implications) of the Debtors' inability to meet their burden of proving both the existence and the material terms of such alleged policies.

### iii.    Required Disclosures

48.    The Disclosure Statement improperly states as fact that the Alleged Lost Policies exist and provide coverage to the Local Councils. While this is the Debtors' argument, the Debtors know that the AIG Companies disagree, and a Disclosure Statement should not misrepresent the Debtor's contested legal position as fact. The Disclosure Statement must be amended to make this clear. Moreover, the Disclosure Statement must disclose that the AIG Companies dispute the existence of the Alleged Lost Policies and do not believe there is sufficient evidence to demonstrate the Alleged Lost Policies bind the AIG Companies to provide coverage.

49.    But the disclosure regarding the Alleged Lost Policies cannot stop there. The validity of the Alleged Lost Policies is critical to the Local Council Settlement Contribution and, in turn, the Debtors' ability to resolve Abuse Claims. *See* Plan § I.A.143 (defining "Local Council Settlement Contribution" to include "any and all of the Local Councils' rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, . . . arising under or attributable to: (i) the Local Council Insurance Policies"). The Plan provides that, under the Global Resolution Plan, the Debtors "are committed to ensuring that the aggregate value of the Local Council Settlement Contribution is not less than $425,000,000." Disclosure Statement § V.R. Yet, the dispute surrounding the Alleged Lost Policies calls into question any disclosure that the Local Council Settlement Contribution will be not less than $425,000,000. The risks associated with the Alleged Lost Policies not being available as part of the Local Council Settlement Contribution is clearly information that must be disclosed as part of the Debtors' obligation to provide adequate information.

50.    At a minimum, the Disclosure Statement should disclose the following regarding the Alleged Lost Policies: (i) neither the Debtors nor the AIG Companies has been able to locate full and complete copies of the Alleged Lost Policies or conclusive evidence of their existence and

binding nature and that, as a result, there are serious evidentiary issues with respect to the Alleged Lost Policies; (ii) the AIG Companies' position that the Alleged Lost Policies do not exist or bind the AIG Companies; (iii) the outcome of this coverage dispute may reduce the value of the Local Council Settlement Contribution well below $425,000,000; and (iv) the risks to the Plan's confirmability and implementation, and recoveries on Abuse Claims, if the Alleged Lost Policies cannot be enforced, in whole or in part. Absent such disclosure, the Disclosure Statement is deficient and the Motion should be denied.

## RESERVATION OF RIGHTS

51.     The AIG Companies reserve all of their rights to object to confirmation of the Plan, whether or not the bases for such objection are expressly referred to herein. Further, the AIG Companies reserve the right to join in any argument or objection made by any other parties relating to the adequacy of the Disclosure Statement and confirmability of the Plan. Moreover, nothing contained herein shall be deemed an admission by the AIG Companies as to the existence of or coverage under any insurance policies alleged to have been issued by the AIG Companies.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the AIG Companies respectfully request that the Court (i) deny the Motion and approval of the Disclosure Statement and (ii) grant such other and further relief as the Court deems just and proper.

Dated:  May 10, 2021
        Wilmington, Delaware

Respectfully submitted,

By: */s/ Deirdre M, Richards*

**FINEMAN KREKSTEIN & HARRIS PC**
Deirdre M. Richards (DE Bar No. 4191)
1300 N. King Street
Wilmington, DE 19801
Telephone:     (302) 538-8331
Facsimile:     (302) 394-9228
Email: drichards@finemanlawfirm.com

-and-

**FORAN GLENNON PALANDECH PONZI &
RUDLOFF P.C.**
Susan N.K. Gummow (admitted *pro hac vice*)
222 N. LaSalle St., Suite 1400
Chicago, Illinois 60601
Telephone:     (312) 863-5000
Facsimile:     (312) 863-5009
Email: sgummow@fgppr.com

-and-

**GIBSON, DUNN & CRUTCHER LLP**
Michael A. Rosenthal (admitted *pro hac vice*)
James Hallowell (admitted *pro hac vice*)
Keith R. Martorana (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone:     (212) 351-4000
Facsimile:     (212) 351-4035
Email: mrosenthal@gibsondunn.com
 jhallowell@gibsondunn.com
 kmartorana@gibsondunn.com

-and-

**GIBSON, DUNN & CRUTCHER LLP**
Matthew G. Bouslog (admitted *pro hac vice*)
3161 Michelson Drive
Irvine, California 92612
Telephone:     (949) 451-3800
Facsimile:     (949) 451-4220
Email: mbouslog@gibsondunn.com

*Attorneys for the AIG Companies*