## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:* | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | Jointly Administered |
| | **Objection Deadline: May 10, 2021 at 4:00 p.m. (ET)**<br>Hearing Date: May 19, 2021 at 10:00 a.m. (ET) |
| | **RE: Docket No. 2295** |

**OBJECTION OF THE TORT CLAIMANTS' COMMITTEE TO DEBTORS'
MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE DISCLOSURE
STATEMENT AND THE FORM AND MANNER OF NOTICE, (II) APPROVING
PLAN SOLICITATION AND VOTING PROCEDURES, (III) APPROVING
FORMS OF BALLOTS, (IV) APPROVING FORM, MANNER AND SCOPE OF
CONFIRMATION NOTICES, (V) ESTABLISHING CERTAIN DEADLINES IN
CONNECTION WITH APPROVAL OF THE DISCLOSURE STATEMENT
AND CONFIRMATION OF THE PLAN, AND (VI) GRANTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

II. BACKGROUND ............................................................................................... 7

    A.    Formation of the Tort Claimants' Committee ...................................... 7

    B.    The Mediation ....................................................................................... 8

    C.    The Motion............................................................................................ 9

III. THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED  BECAUSE
    IT DOES NOT CONTAIN ADEQUATE INFORMATION TO ENABLE
    SURVIVORS TO VOTE TO ACCEPT OR REJECT THE BOY SCOUTS'
    PLAN ...................................................................................................... 9

    A.    The Disclosure Statement Does Not Contain  Adequate Information
        Regarding the Boy Scouts' Restructuring........................................... 12

        i.    The Disclosure Statement Does Not Contain Adequate
            Information Regarding the Assets Available and Unavailable to
            Pay Survivors ........................................................................... 12

        ii.    The Disclosure Statement Does Not Contain Adequate
            Information Regarding the 84,000 Childhood Sexual Abuse
            Claims ...................................................................................... 21

        iii.    The Disclosure Statement Does Not Contain  Adequate
            Information Regarding the Hartford Settlement ...................... 25

        iv.    The Disclosure Statement Does Not Contain Adequate
            Information Regarding the Treatment of Non-Abuse Claims ................ 28

        v.    The Disclosure Statement Does Not Contain  Adequate
            Information Regarding Insurance Coverage ........................... 29

        vi.    The Disclosure Statement Does Not Contain  Adequate
            Information Regarding the Termination  of Direct Action Rights
            Against Insurance Carriers....................................................... 37

        vii.    The Disclosure Statement Does Not Contain Adequate
            Information Regarding the Pension Plans................................ 38

        viii.    The Disclosure Statement Does Not Contain Adequate
            Information Regarding the Boy Scouts' Operations............................... 41

        ix.    The Disclosure Statement Does Not Contain Adequate
            Information Regarding the Release of Avoidance Actions .................... 42

    B.    The Disclosure Statement Does Not Contain Adequate Information
        Regarding the Local Councils, their Contributions, and the Non-
        Consensual Third Party Releases........................................................ 42

i.      The Disclosure Statement Does Not Contain Adequate
        Information Regarding the Assets and Liabilities of the Local
        Councils .................................................................................. 42

ii.     The Disclosure Statement Does Not Contain Adequate
        Information Regarding Substantial Contributions of the Local
        Councils .................................................................................. 46

iii.    The Disclosure Statement does not Provide Adequate  Information
        on the Local Councils' Insurance Policies ............................... 49

C.      The Disclosure Statement Does Not Contain Adequate Information
        Regarding the Chartered Organizations, their Contributions, and the Non-
        Consensual Third Party Releases ...................................................... 51

i.      The Disclosure Statement is Devoid of Any Information
        Regarding Chartered Organizations ........................................ 51

ii.     The Indirect Abuse Claims Should Be  Paid Along with the Trade
        Creditors ................................................................................. 52

IV. THE PLAN IS PATENTLY UNCONFIRMABLE .............................................. 52

V. THE SOLICITATION PROCEDURES SHOULD NOT BE APPROVED ......................... 56

A.      The Solicitation Deadlines and Recipients of Ballots .......................... 57

i.      Solicitation and Confirmation Deadlines ................................. 57

ii.     Ballots Must be Sent to All Survivors or Their Counsel ......... 57

iii.    Abuse Survivor Plan Solicitation Directive ............................ 59

iv.     Ballots Should Identify the Applicable Local Council ............ 60

v.      The Tort Claimants' Committee Should Be Permitted to Send A
        Cover Letter to Survivors ........................................................ 61

vi.     Deemed Class Acceptance and The Debtors' Discretion Regarding
        Vote Tabulation and Solicitation Procedures Changes Should be
        More Narrow ............................................................................ 61

vii.    Material Plan Amendments  Require a Motion and Notice of
        Hearing ................................................................................... 62

VI. RESERVATION OF RIGHTS .......................................................................... 63

VII. CONCLUSION ......................................................................................... 63

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*C.W. Mining Co. v. Aquila, Inc.*
(*In re C.W. Mining Co.*),
636 F.3d 1257 (10th Cir. 2011) .................................. 44

*Catholic Diocese of Wilmington v. Official Committee of Unsecured Creditors*,
432 B.R. 135 (Bankr. D. Del. 2010) ................................ 14

*City of Farrell v. Sharon Steel Corp.*,
41 F.3d 92 (3d Cir. 1994) .......................................... 14

*Class Five Nev. Claimants v. Dow Corning Corp.*
(*In re Dow Corning Corp.*),
280 F.3d 648 (6th Cir. 2002) ...................................... 55

*Constitution Bank v. Tubbs*,
68 F.3d 685 n. 6 (3d Cir. 1995).................................... 27

*Danning v. Bozek*
(*In re Bullion Reserve of North America*),
836 F.2d 1214 (9th Cir. 1988) .................................... 14

*Eastern Maine Elec. Coop.*,
125 B.R. 329 (Bankr. D. Me. 1991)................................ 52

*Goldberg v. New Jersey Lawyers' Fund for Client Protection*,
932 F.2d 273 (3d Cir. 1991)........................................ 14

*In re 266 Washington Assocs.*,
141 B.R. 275 (Bankr. E.D.N.Y.), *aff'd*, (E.D.N.Y. 1992) .................. 53

*In re A.H. Robbins Co.*,
880 F.2d at 696 ................................................. 54, 55

*In re Allied Gaming Mgmt., Inc.*,
209 B.R. 201 (Bankr. W.D. La. 1997).............................. 53

*In re Am. Capital Equip., LLC*,
688 F.3d 145 (3d Cir. 2012)..................................... 11, 52

*In re Am. Family Enterprises*,
256 B.R. 377 (D.N.J. 2000) ....................................... 47

*In re AOV Indus., Inc.*,
792 F.2d 1140 (D.C. Cir. 1986).................................. 54, 55

*In re Applegate Prop., Ltd.*, 133 B.R. 827 (Bankr. W.D. Tex. 1991)..................... 10

*In re Atlanta West VI*,
91 B.R. 620 (Bankr. N.D. Ga. 1988) .............................. 53

*In re Beyond.com Corp.*,
289 B.R. 138 (Bankr. N.D. Cal. 2003) ............................ 52

*In re Continental Airlines*,
203 F.3d 203 (3rd Cir. 2000)..................................... 47

*In re Crowers McCall Pattern, Inc.*,
   120 B.R. 279 (Bankr. S.D.N.Y. 1990) ................................................................. 18

*In re Ditech Holding Corp.*,
   606 B.R. 544 (Bankr. S.D.N.Y. 2019) ................................................. 17, 18, 43

*In re Drexel Burnham Lambert Group, Inc.*,
   960 F.2d 285 n. 2 (2d Cir. 1992) ................................................................ 47, 54

*In re Felicity Assocs., Inc.*,
   197 B.R. 12 (Bankr. D.R.I. 1996) ........................................................................ 53

*In re Ferretti*,
   128 B.R. 16 (Bankr. D.N.H. 1991) ...................................................................... 10

*In re Flintkote Co.*,
   04-11300 (MFW), 2015 WL 4762580, at *10 (Bankr. D. Del. Aug. 12, 2015) .................. 47

*In re Garcia Avila*,
   *supra*, 296 B.R. 95 (Bankr. S.D.N.Y. 2003) ...................................................... 45

*In re General Teamsters*, 265 F.3d 869 (2001) ........................................................ 16

*In re Graves*,
   609 F.3d 1153 (10th Cir. 2010) ........................................................................... 44

*In re Heron, Burchette, Ruckert & Rothwell*,
   148 B.R. 660 (Bankr. D.D.C 1992) ................................................................ 54, 55

*In re Hoffinger Indus.*,
   321 B.R. 498 (Bankr. E.D. Ark. 2005) ................................................................ 47

*In re HWA Props.*,
   544 B.R. 231 (Bankr. M.D. Fla. 2016) ................................................................ 48

*In re Indianapolis Downs, LLC.*,
   486 B.R. 286 (Bankr. D. Del. 2013) ..................................................................... 47

*In re Jeppson*,
   66 B.R. 269 (Bankr. D. Utah 1986) ...................................................................... 10

*In re M.J.H. Leasing, Inc.*,
   328 B.R. 363 (Bankr. D. Mass. 2005) .................................................................. 48

*In re Mahoney Hawkes, LLP*,
   289 B.R. 285 (Bankr. D. Mass. 2002) .................................................................. 48

*In re Master Mortgage Inv. Fund, Inc.*,
   168 B.R. 930 (W.D. Mo. 1994) ..................................................................... 47, 54

*In re Monroe Well Serv., Inc.*,
   80 B.R. 324 (Bankr. E.D. Pa. 1987) ............................................................. 11, 54

*In re Pecht*,
   57 B.R. 137 (Bankr. E.D. Va. 1986) .................................................................... 52

*In re Phoenix Petroleum Co.*,
   278 B.R. 385 (Bankr. E.D. Pa. 2001) ................................................................... 27

*In re Phoenix Petroleum Co.*, 278 B.R. 385 (Bankr. E.D. Pa. 2001) ......................... 11

*In re Quigley*,
   437 B.R. 102 (Bankr. S.D.N.Y. 2010) ................................................................. 43

*In re Radco Properties, Inc.*,

402 B.R. 666 (Bankr. E.D.N.C. 2009) ........................................................................... 10, 27

*In re Radco Properties, Inc.*, 402 B.R. 666 (Bankr. E.D.N.C. 2009) ......................................... 10

*In re Save Our Springs (S.O.S.) Alliance, Inc.*,
388 B.R. 202 (Bankr. W.D. Tex. 2008) ...................................................................... 16

*In re Specialty Equip. Cos.*,
3 F.3d 1043 (7th Cir. 1993) ......................................................................... 47, 54, 55

*In re Tribune Co.*,
464 B.R. 126 n. 73 (Bankr. D. Del. 2011) ........................................................... 48

*In re U.S. Brass Corp.*,
194 B.R. 420 (Bankr. E.D. Tex. 1996) .................................................................. 11

*In re Wabash Valley Power Association, Inc.*,
77 B.R. 991 (Bankr. IN 1987) .................................................................... 15, 16

*In re Washington Mutual, Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) ..................................................................... 43

*In re Wool Growers Cent. Storage Co.*,
371 B.R. 768 (Bankr. N.D. Tex. 2007) ................................................................ 55

*MacArthur Co. v. Johns-Manville Corp.*,
837 F.2d at 90 .................................................................................... 54, 55

*Matter of Wabash Valley Power Association, Inc.*,
72 F.3d 1305 (7th Cir. 1995) .................................................................... 15

*Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L.*
*(In re R.M.L.)*,
92 F.3d 139 (3d Cir. 1996) ............................................................................ 44

*Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*,
354 B.R. 1 (D.Conn.2006) ..................................................................... 43

*Official Comm. v. Columbia Gas Systems Inc.*
*(In re Columbia Gas Systems Inc.)*,
997 F.2d 1039 (3d Cir. 1993) ........................................................................ 14

*Old Rep. Nat'l Title Ins. Co. v. Tyler*
*(In re Dameron)*,
155 F.3d 718 (4th Cir. 1998) ...................................................................... 14

*Palmdale Hills Prop., LLC v. Lehman Commer. Paper, Inc.*
*(In re Palmdale Hills Prop., LLC)*,
654 F.3d 868 (9th Cir. 2011) .................................................................... 27

*Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf*
*Trailer Corp. Retirement Plan No. 003*
*(In re Fruehauf Trailer Corp.)*,
444 F.3d 203 (3d Cir. 2006) ........................................................................ 44

*Republic Supply v. Shoaf*,
815 F.2d 1046 (5th Cir. 1987) ................................................................. 47, 54

*Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh,*
*PA.*,
2013 NY Slip Op 3264, 21 N.Y.3d 139, 969 N.Y.S.2d 808, 991 N.E.2d 666 .................... 23

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,

81 F.3d 355 (3d Cir. 1996) ................................................................................................. 11

*See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*
*(In re Cybergenics Corp.),*
226 F.3d 237 (3rd Cir. 2000) ............................................................................................. 43

*Spansion,*
426 B.R. at 143 ................................................................................................................ 48

## STATUTES

11 U.S.C. § 1123 .............................................................................................................. 25

11 U.S.C. § 1129 .............................................................................................................. 17

## OTHER AUTHORITIES

7 Collier on Bankruptcy ¶1129.02[7] (Richard Levin & Henry J. Sommer eds.,
16th ed.) ..................................................................................................................... 17, 18

The official committee of survivors of childhood sexual abuse (the "**Tort Claimants'**

**Committee**") hereby objects (the "**Objection**") to the *Motion for Entry of an Order*

*(I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving*

*Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving*

*Form, Manner and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in*

*Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI)*

*Granting Related Relief* [Docket No. 2295] (the "**Motion**").  In support of the Objection, the

Tort Claimants' Committee respectfully represents as follows:

## I.

## INTRODUCTION

1.      The Debtors' Disclosure Statement is deficient for a host of reasons, including,

more notably, that it omits or superficially discusses important financial information and legal

issues necessary for survivors of childhood sexual abuse ("**Survivors**") to make an informed

decision to accept or reject the plan.  One of the most disturbing and glaring defects is that it

minimizes the organization's history of failing to protect children from sexual predators.  The

Boy Scouts displayed this strategy at the first-day hearing when its counsel was fifteen minutes

into her opening presentation before she mentioned sexual abuse and well after her recitation of

the Boy Scout Oath and Law.  Over a year later, the Boy Scouts purposefully continue this

strategy by burying the substantive discussion of the sexual abuse claims in the bowels of the

Disclosure Statement and, again, after a recital of the Boy Scout Oath and Law.  The Disclosure

Statement is the first, and likely only, occasion the Boy Scouts will address all 84,000 childhood sexual abuse Survivors as a group. It should do better.

2.      The Tort Claimants' Committee is made up of nine men who were sexually abused as Boy Scouts.  The committee members are very active. They meet no less than twice a week.  After spending more than 250 hours over the course of more than 185 meetings, they have concluded that the Boy Scouts is either tone deaf or purposely minimizing the childhood sexual abuse claims that led to this chapter 11 case.

3.      After years of suppressing feelings about their childhood sexual abuse, the Boy Scouts' chapter 11 cases have forced the members of the Tort Claimants' Committee and thousands of other Survivors to revisit a dark part of their childhood and question why the Boy Scouts failed to protect them from its very own employees and volunteers.  As the members of the Tort Claimants' Committee waded through the Disclosure Statement, they observed:

> *My perpetrator carried out his child sexual abuse activities on Guam for three decades (1950s to 80s), abusing well over 100 boys who believed that scouting would actually improve their lives and not destroy them.  The Boy Scouts allowed a Scout leader to force young kids to swim naked with him and endure his sexual predation in a remote jungle area of the island where he ran the Boy Scouts' swimming merit badge program.  Over that 30-year period, the Boy Scouts didn't care to ask, "Why does the swimming merit badge program have to be conducted in a remote jungle river rather than at the community swimming pool?" Whether right or wrong, I have carried with me, since that summer in the 1970s, an incredible shame, blaming myself for "allowing" the sexual abuse just to earn Boy Scouts of America merit badges.  I became a person who was easy to anger and who had frequent bouts of rage, ruining my relationships with loved ones and tarnishing my career in the military.  If not for the grace of God, I would have killed myself.  The despair can be terrifying.*

-Wade Paul, Survivor and Fiduciary for all Survivors

*When I was 14 years old, I attended Boy Scouts summer camp in New York. During a camp-wide event, I was injured and taken to the camp director's office where he asked me a number of personal questions and he learned that my mother was a single parent and that we were under a great deal of financial stress. After camp ended, he ingratiated himself with my mother and eventually asked her if I would like to return the next summer as a "counselor in training." That summer he increasingly paid more attention to me and when the summer was over, he made sure that my mother intended to have me come back as a staff member. That next summer, he started touching me inappropriately and made sure I was on overnight duty in the same building as his office. One night in my sleep he viciously attacked me sexually and sodomized me. It occurred again shortly after in the tent where I normally slept and was so violent I thought I was going to lose consciousness and die. The physical pain that I felt was excruciating but paled to the emotional pain, shame, and embarrassment I felt after. I immediately felt dirty, disgusting, and damaged. I did not think that anyone would ever want to be near me again. Although I did not think that anything could make me feel worse, it soon became apparent that other camp staff was aware of what happened to me. Despite that, my abuser was allowed to continue to have access to me without supervision and as such, he continued to torment me.*

-Doug Kennedy, Survivor and Fiduciary for all Survivors

*I was sexually assaulted in 1985 at the age of 15 by a Boy Scout leader while I was attending the 3 day initiation ceremony to become a member of the Order of the Arrow. The Scoutmaster who abused me started as a volunteer in the early 1960's in Georgia, then to Alabama where he was also a Scoutmaster, and then in 1969 back to Georgia. Four years before I met my abuser, he was removed as scoutmaster from the other troop in my hometown because he admitted to molesting Scouts. However, after one year out of scouting he was allowed back in where he assumed Regional Leadership roles, and he soon became President of the Northeast Georgia Council, as well as the Primary Advisor to the Council's Order of the Arrow Lodge. It wasn't until over a decade after my abuse that my abuser was finally investigated. During that investigation, while being questioned, he admitted to molesting "at least 5 or 6 Scouts" while he was the Scoutmaster for Troop 26. However, the District Attorney, without searching for additional victims, decided that*

> *the statute of limitations for criminal prosecution had passed, and quickly and quietly closed the case, allowing the abuser to continue his charade as a model citizen.*

-Robb Lawson, Survivor and fiduciary for all Survivors

> *Knowing that we did not have a father figure in our lives, my scout master befriended my mother and grandmother to make his way into our home life and proceeded to molest and rape me and my younger brother. I was robbed of my youth and as an adult I wasn't able to accomplish much because of the guilt that I carry with me to this day. I attempted suicide multiple times and was placed on a 5150 hold in the hospital. I turned to alcohol and drugs and ended up having two open heart bypass surgeries. This is just a little bit of the damage that the Boy Scouts caused me.*

-George Vega, Survivor and fiduciary for all Survivors

> *My abuser humiliated and abused me by requiring me to do calisthenics naked and blindfolded and also performed a "doctor's physical" on me. The sexual abuse had severe adverse effects on me for my entire life, in personal relationships, and my profession. The damages are incalculable.*

-Richard Halvorson, Survivor and fiduciary for all Survivors

> *The abuse began when I was 11 and continued well into my adolescence, exactly 20 years ago. My parents escaped the violence of 1980s Colombia and settled in Central Falls, Rhode Island. They signed me and my brothers up for the local pack and troop-positive alternatives for young men in their environment. We grew up during the soaring crime of the early and mid-90s and joining the Boy Scouts was meant to help us avoid the pitfalls that others in our community-early parenthood, drug violence, prison-fell into. Our Scoutmaster was respected in our community by parents as a leader. I grew up with many of the boys in our troop who were immigrants growing up with little and straddling cultural fences. The Scoutmaster exploited the vulnerability most of us shared and the credibility he enjoyed with our parents.*

-Jorge Tobon, Survivor and fiduciary for all Survivors

4.     There are approximately 84,000 childhood sexual abuse claims. To date, these

claims have been met with accusations of fraud based on the substantial number of filed claims

when compared to the number of prepetition lawsuits. The Boy Scouts, Local Councils, Chartered Organizations, and their respective insurance carriers self-servingly speculate regarding unproven fraud (to justify the incredibly low values they propose to pay to Survivors) rather than recognizing that a fulsome notice program and real statute of limitations reform is finally forcing them to account for the sordid history of Boy Scouts sexual abuse.

5.      Aside from the use of "Abuse" or "Direct Abuse Claim" as defined terms, there is no substantive discussion of the extent and nature of the childhood sexual abuse depicted in those 84,000 claims: there is no breakdown of the abuse by the categories used in the proofs of claim, no disclosure of these claims against the Local Councils or Chartered Organizations and no timeline of when the abuse occurred to illustrate whether the ballyhooed Boy Scout child protection program actually is effective.

6.      Bankruptcy professionals know that a debtor oftentimes treat a ream of paper as evidence that it is providing "adequate information" under the disclosure statement.  In this instance, the Boy Scouts' message is crystal clear, albeit conveyed by omission:  sexually abused children are a liability on a balance sheet or a claim submitted to an insurance company. The 84,000 survivors of childhood sexual abuse are part of the Boy Scouts' legacy but you would not know that by reading the Boy Scouts' Disclosure Statement.

7.      The Disclosure Statement is hundreds of pages and, distilled to its essence, describes a Plan that channels the childhood sexual abuse claims to a Settlement Trust, discharges Boy Scouts and releases the Boy Scouts' affiliates, Local Councils, and Contributing Chartering Organizations for a small sum relative to the enormous liabilities attributable to

84,000 childhood sexual abuse survivors.  The Plan does not make a single important operational change that would unshackle value for survivors.  For example, all four of the Boy Scouts' High Adventure Facilities are retained (including varying degrees of historical profitability or loss). The Boy Scouts propose to substantially over-fund the pension plan for the benefit of those who failed children, and nothing is done to change the fundraising mindset that ignores any responsibility for childhood sexual abuse claims (failing to simply note in these efforts that a portion of donated funds may be used to compensate Survivors).  Instead, the Plan enables the Boy Scouts, Local Councils, and Chartered Organizations to make a clean get-away from their legacy of broken lives in exchange for a contribution of a relatively small amount of cash, illiquid assets, and a settlement trust with a foreseeable years-long future of insurance coverage litigation.  At the same time, other creditors (who unlike former Boy Scouts are adjudged by the Debtors to be "core" to the Boy Scouts' mission) will be paid substantially in full.

8.      The vast majority of the purported initial funding for the Settlement Trust does not exist.  Other than approximately $115 million comprised of cash and other illiquid assets to be contributed by the Boy Scouts, there is no other description of committed funding by the Local Councils or Chartered Organizations.  Instead, the Boy Scouts is  "committed to ensuring" that the Local Councils will contribute $425 million in cash and other assets but not a single Local Council has agreed to contribute a dollar towards the Plan.  The Local Councils are not even co-proponents of the Plan where they are seeking a non-consensual release of the 84,000 childhood sexual abuse claims.  Assuming the $425 million contribution was in cash (and it is

not), the Boy Scouts' and Local Councils' combined contributions are insufficient to fund a functional trust and make meaningful distributions to Survivors that support the non-debtor discharge of claims.  The Plan belies the Boy Scouts' oft-repeated promise to provide equitable compensation to Survivors.  Instead, it is the "business as usual" premise that compounds the injuries Survivors have already suffered at the hands of the Boy Scouts, the Local Councils, and the Chartered Organizations.  As things stand now, the Tort Claimants' Committee will recommend rejection of the Plan.

9.      As set forth in greater detail herein, the Tort Claimants' Committee objects to approval of the Disclosure and the solicitation and voting procedures described in the Motion because (a) the Disclosure Statement (i) lacks the most basic information necessary for creditors, especially Survivors, to make an informed assessment of the Plan, (ii) the Liquidation Analysis accompanying the Disclosure Statement is fatally flawed, (iii) describes a Plan that is patently unconfirmable and (b) the Plan confirmation procedures, including the proposed balloting and solicitation procedures,  are unfair, deficient and prejudicial to Survivors.

10.     For the reasons set forth herein, the Court should not approve the Disclosure Statement or the proposed solicitation procedures and should deny the Motion.

## II.

## BACKGROUND

### A.    Formation of the Tort Claimants' Committee

11.     On March 5, 2020, the Office of the United States Trustee ("**UST**") appointed the Tort Claimants' Committee, which consists of nine Survivors of childhood sexual abuse (the

"**TCC Members**").  The UST interviewed approximately 50 Survivors and selected the nine

men to serve on the Tort Claimants' Committee as fiduciaries for all abuse Survivors.

**B.    The Mediation**

12.    On the Petition Date, the Debtors filed a motion seeking the appointment of a

mediator to mediate issues related to resolution of childhood sexual abuse claims through a

chapter 11 plan and referring such matters to mediation, which was approved by the Court on

June 9, 2020 [Docket No. 812] (the "**Mediation Order**").  The Mediation Order appointed three

individuals to serve as mediators over the disputes.  On March 1, 2021, the appointed mediators

filed *the First Mediators' Report* [Docket No. 2292] (the "**First Mediator Report**").  In the

First Mediator Report, the mediators announced the JPM/Creditors' Committee Settlement and

stated (erroneously) that the JPM/Creditors' Committee Settlement resolved the Debtors' estates

challenges to JPM's security interests and liens.  On March 2, 2021, the Tort Claimants'

Committee filed a response to the First Mediator Report pointing out that inaccuracy.

13.    On April 16, 2021, the mediators filed the Second Mediator Report [Docket No.

2624] (the "**Second Mediator Report**").  In the Second Mediator Report, the mediators

announced a settlement between the Boy Scouts and one of its primary insurers, Hartford.  After

15 months into the chapter 11 case, this is the only insurance settlement.  The settlement

provides that Hartford will pay the Boy Scouts no more than $650 million, which amount will

be adjusted <u>downward </u>(without any floor) if Century  pays less than $1.3 billion (Century has

not agreed to pay anything, much less an amount even close to $1.3 billion).  Additionally, the

settlement, in effect, requires the release of every Local Council and Chartered Organization that

is an "additional insured" under the Hartford policies although not one of the "additional insureds" have committed to pay a penny to the Settlement Trust.  While $650 million is a lot of money, it is an illusory amount and the Tort Claimants' Committee estimates that Hartford's actual exposure is more than 13 times the proposed settlement amount.  The Hartford settlement does not satisfy Rule 9019 or sale standards under the Bankruptcy Code.

14.     The proposed Hartford settlement is not final and will be objected to by the Tort Claimants' Committee.  For all of the Boy Scouts' recent rose-colored depictions of the Mediation, it has not resolved any disputes over the treatment of childhood sexual abuse claims.

## C.     **The Motion**

15.     On March 2, 2021, the Debtors filed the Motion pursuant to which they seek approval of the adequacy of the Disclosure Statement and the procedures governing the solicitation and tabulation of votes on the Plan.  For all the reasons set forth below, the Tort Claimants' Committee respectfully urges the Court to deny the Motion for the reasons set forth herein and at the hearing on the Motion.

### III.

### THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE IT DOES NOT CONTAIN ADEQUATE INFORMATION TO ENABLE SURVIVORS TO VOTE TO ACCEPT OR REJECT THE BOY SCOUTS' PLAN

16.     The Disclosure Statement, weighing in at approximately two pounds, largely consists of boilerplate recitals of the Plan.  Despite its bulk, it fails to provide the 84,000 survivors of childhood sexual abuse with "adequate information" in numerous material respects.  This objection is broken into four parts:  (a) inadequacy of information regarding the Boy

Scouts, (b) inadequacy of information regarding Local Councils, (c) inadequacy of information regarding Chartered Organizations, and (d) material changes to the proposed solicitation procedures.

17.     A plan proponent has provided "adequate information" to creditors if "hypothetical reasonable investors receive such information as will enable them to evaluate for themselves what impact the information might have on their claims and on the outcome of the case, and to decide for themselves what course of action to take." *In re Applegate Prop., Ltd.*, 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991). "Creditors not only rely on the disclosure statement to form their ideas about what sort of distribution or other assets they will receive but also what risks they will face." *In re Radco Properties, Inc.*, 402 B.R. 666, 682 (Bankr. E.D.N.C. 2009). "As such, the importance of full and honest disclosure is critical and cannot be overstated." *Id.*

18.     For a creditor to fairly evaluate a plan, the court must ensure that a disclosure statement sets forth "all those factors presently known to the Plan proponent to bear upon the success or failure of the proposals contained in the Plan." *See In re Jeppson*, 66 B.R. 269, 292 (Bankr. D. Utah 1986); *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991) (holding that a proper disclosure statement must "clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting their [sic] distribution."). Overall, adequate disclosure "is crucial to the effective functioning of the federal bankruptcy system[;] . . . the importance of full and honest disclosure cannot be

overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996).

19.     Whether a disclosure statement contains "adequate information" should be assessed from the perspective of the claims or interest holders with the ability to vote. *See In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (citing *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 330 (Bankr. E.D. Pa. 1987)).

20.     In determining the adequacy of a disclosure statement, courts look to, *inter alia*, whether the disclosure statement sufficiently addresses the following topics:

- Events which led to the filing of a bankruptcy petition;
- Relationship of the debtor with its affiliates;
- Description of the available assets and their value;
- In this case there should be a description of the unavailable assets; and an explanation for why the assets are unavailable;
- Anticipated future of the company;
- Source of information stated in the disclosure statement;
- Present condition of the debtor while in chapter 11;
- Description and summary of the claims (*i.e.*, type, value, enforceability, defenses) asserted against the debtor;
- Estimated return to creditors
- Comparative return to creditors under a hypothetical chapter 7 liquidation;
- Summary of chapter 11 plan;
- Financial information, valuations, and projections relevant to the creditors' decision to accept or reject the chapter 11 plan;
- Information relevant to the risks posed to creditors under the plan;
- Actual or projected realizable value from recovery of preferential or otherwise avoidable transfers (or justification for the waiver of such claims); and
- Litigation likely to arise in a nonbankruptcy context.

*See In re U.S. Brass Corp.*, 194 B.R. 420, 424-25 (Bankr. E.D. Tex. 1996). The proponent of a disclosure statement bears the ultimate burden of persuasion. *In re Am. Capital Equip., LLC*, 688 F.3d 145, 155 (3d Cir. 2012).

A.    **The Disclosure Statement Does Not Contain
Adequate Information Regarding the Boy Scouts' Restructuring**

i.    **The Disclosure Statement Does Not Contain Adequate Information
Regarding the Assets Available and Unavailable to Pay Survivors**

21.    The Disclosure Statement does not provide an adequate description of the

properties that the Debtors' assert are exempt from creditors' claims and the justification for

such exemption.  The Boy Scouts assert that its property has a  total value of $1,014,160,463 in

restricted and unrestricted assets as of November 30, 2019, and that $667,075,374 in value of

such assets are subject to donor restrictions ("**Restricted Assets**") and thereby cannot be used to

satisfy the claims of the survivors of childhood sex abuse.  Alternatively, the Boy Scouts

contend that even if it cannot establish donor restrictions, (i) its assets are subject to a charitable

trust that can only be used to fulfill the Boy Scouts' charitable mission, which it contends does

not include paying the survivors of childhood sexual abuse; (ii) the property is core to the Boy

Scouts' charitable mission and Scouting program and must be preserved for the estates to ensure

a successful reorganization (notwithstanding the mandatory requirement under the section

1129(a)(7) of the Bankruptcy Code (the "**Best Interests Test**"); (iii) selling or liquidating the

property would violate the D.C. Non-profit Corporations Act; (iv) selling or liquidating the

property is not required as a condition for confirmation (again, in contradiction to the Best

Interests Test); and (v) some of the property is subject to liens.

22.    The Tort Claimants' Committee contests the Boy Scouts' position with respect to

the Restricted Assets and the total availability of the non-Restricted Assets as required under the

Best Interests Test.  Resolution of the disputes concerning the Restricted Assets is required to

determine whether over $650 million of real estate and financial assets titled to the Boy Scouts

are property of the estate available to satisfy creditor claims.  The Court's resolution of this dispute is a prerequisite to the confirmation of any plan of reorganization. Among other things, as long as this dispute is unresolved, the Boy Scouts cannot satisfy the Best Interests Test.  The Boy Scouts' Plan must enable each non-consenting creditor to receive as much as the creditor would receive if the Boy Scouts hypothetically liquidated under chapter 7 of the Bankruptcy Code. 11 U.S.C. § 1129(a)(7).

23.    Because the dispute concerning the Restricted Assets involves a determination of interests in property, it must be resolved in an adversary proceeding rather than in connection with an objection to the Boy Scouts' Plan.  Bankruptcy Rule 7001(2).  On January 8, 2021, the Tort Claimants' Committee commenced an adversary proceeding (Adv. Pro. Case No. 21-50032) (the "**Restricted Property Action**") seeking a declaratory judgment that the Restricted Assets are not subject to enforceable donor restrictions, and is available to satisfy creditor claims. In response to the Restricted Property Action, the Boy Scouts filed the Plan offering approximately $115 million of cash or other consideration for payment of abuse claims, which when considering all of the Boy Scouts' assets, is only 13% of the available assets.  The initial scheduling conference is set for May 19, 2021.  No discovery has been served in the Restricted Property Action nor have the parties made initial disclosures pursuant to Bankruptcy Rule 7026(a)(1).

24.    The Boy Scouts bear a *"double burden of proof"* in claiming that assets titled to it are restricted or held in trust:  (a) to establish the existence of the purported donor restriction or trust and (b) to establish that the funds at issue were segregated from unrestricted/non-trust

funds from the time they were received, or if they were commingled, to trace the funds under the

lowest intermediate balance test.[2]  The Boy Scouts must meet this burden for each and every

donation it contends is subject to a donor restriction or impressed with a trust.

25.      This is a highly fact-intensive exercise.  Expert testimony will be required for

several issues, including the tracing of comingled funds. Accordingly, discovery and the offer of

proof at trial will require significant time and resources of the parties and the Court.  The

resolution of the disputes over what constitutes property of the estate is a *"gating"* issue for the

confirmation of a non-consensual plan by the Boy Scouts.  Therefore, the Restricted Property

Action must be resolved so that the Boy Scouts can adequately describe the assets that are

available to pay creditors under a non-consensual plan considered by the Court.

26.      The Debtors' "Liquidation Analysis" (Exhibit B to the Disclosure Statement)

expressly does not include the liquidation value of Restricted Assets and non-Restricted Assets,

---

[2]  To establish that funds are held in trust, the party claiming the existence of a trust bears the burden of proof on two showings: (1) they must demonstrate the existence and legal source of the alleged trust relationship or restriction by *clear and convincing evidence*; and (2) they must identify the trust fund and, if the trust fund has been commingled with other funds, trace the trust funds.  *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95 (3d Cir. 1994); *see also Goldberg v. New Jersey Lawyers' Fund for Client Protection*, 932 F.2d 273, 280 (3d Cir. 1991) (same); *Old Rep. Nat'l Title Ins. Co. v. Tyler (In re Dameron)*, 155 F.3d 718, 723 (4th Cir. 1998) (party claiming entitlement to a trust must be able to trace its assets into the fund or property that is the subject of the trust); *Danning v. Bozek (In re Bullion Reserve of North America)*, 836 F.2d 1214, 1218 (9th Cir. 1988) (tracing is required under federal bankruptcy law to further the Bankruptcy Code's policy of equal distribution among similarly situated creditors); *Catholic Diocese of Wilmington v. Official Committee of Unsecured Creditors*, 432 B.R. 135,147 (Bankr. D. Del. 2010) (property titled to the debtor is presumptively property of the estate and it is the burden of any purported trust beneficiary to establish otherwise; the law requires parties claiming funds are impressed with a trust to identify the specific funds purported placed in trust either by proving they have been segregated from receipt, or if they have been commingled, to trace the trust funds under the lowest intermediate balance test).  Whereas the first showing is generally a question of state law, the second showing, when it pertains to the distribution of assets from an entity in bankruptcy proceedings, is exclusively a question of federal law. *Catholic Diocese of Wilmington*, 432 B.R. at 147 (Bankr. D. Del. 2010) ; *Goldberg*, 932 F.2d at 280; *see also Official Comm. v. Columbia Gas Systems Inc. (In re Columbia Gas Systems Inc.)*, 997 F.2d 1039, 1063 (3d Cir. 1993) (to protect interests of secured and unsecured creditors, federal law requires that beneficiaries of trust funds bear the burden of identifying and tracing trust property); *Dameron*, 155 F.3d at 723 (tracing is an issue of federal rather than state law).

does not include an inventory of Restricted Assets and non-Restricted Assets, or the value of the

Restricted Assets and non-Restricted Assets.  While not clear, the above deficiencies may result

from the Boy Scouts' view that it is not required to satisfy the Best Interests Test as required by

section 1129(a)(7) of the Bankruptcy Code because a non-profit debtor cannot be forced into a

chapter 7 liquidation without its consent.[3]  *See* Disclosure Statement, p. 170.

27.    The Boy Scouts does not cite authority to support the inapplicability of the Best

Interests Test.  To the best of the Tort Claimants' Committee's knowledge, no court has opined

that a non-profit debtor can confirm a plan of reorganization without satisfying section

1129(a)(7) of the Bankruptcy Code.

28.    Section 1129(a)(7) requires that to confirm a plan, creditors must receive at least

as much as they would receive in a chapter 7 liquidation.  Two circuits have looked at non-profit

chapter 11 debtors and explored applicability of the best interests of creditors test along with the

absolute priority rule provided for by section 1129(b) of the Bankruptcy Code.  In *Matter of*

*Wabash Valley Power Association, Inc.*, 72 F.3d 1305 (7th Cir. 1995), the Seventh Circuit held

that a rural electrical non-profit co-op was not subject to the absolute priority rule because a

non-profit does not exhibit the commercial prerogatives of equity ownership: " . . . the right to

control corporate decision making, the right to share in profits and the rights to share in assets

upon dissolution." 72 F.3d at 1318.[1]  At an earlier stage of the case, the bankruptcy court had

---

[33] The Tort Claimants' Committee uses the term "non-profit" as a synonym for  the Bankruptcy Code's term "non-moneyed."

[1] At an earlier stage of the case, the bankruptcy court had held a valuation hearing to determine:  " . . . whether the plan proposed by Wabash satisfies the requirements of 11 U.S.C. §1129(a)(7)(A)(ii)" (*In re Wabash Valley Power Association, Inc.*, 77 B.R. 991, 992 (Bankr.  IN 1987).  This was not an issue in the 7th Circuit opinion.

held a valuation hearing to determine: " . . . whether the plan proposed by Wabash satisfies the requirements of 11 U.S.C. §1129(a)(7)(A)(ii)" *In re Wabash Valley Power Association, Inc.*, 77 B.R. 991, 992 (Bankr. S.D. Ind. 1987). The applicability of the Best Interests Test was not an issue in the Seventh Circuit opinion.

29.    Several years later, the Ninth Circuit, in *In re General Teamsters*, 265 F.3d 869 (9th Cir. 2001) followed *Wabash*. This case involved an appeal by a creditor from confirmation of the debtor's plan. The creditor contended that the International Union had an equity interest in the Debtor because of escheat provisions in the International's Constitution. The creditor also contended that future dues should be considered assets and therefore the plan failed the Best Interests Test. The Court rejected the notion that future dues would be available for distribution upon liquidation. Since the plan had otherwise proposed to sell or leverage 100% of the value of the debtor's assets, the plan was affirmed. The court found that the Best Interests Test does apply to a non-profit. *Id.* at 873-77. The text of the Disclosure Statement and Liquidation Analysis must be revised to reflect that the Best Interests Test does apply, and then must explain how the Plan satisfies it.

30.    One court has implicitly acknowledged that a non-profit debtor must satisfy the Best Interests Test. *See*, *In re Save Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. 202, 238 (Bankr. W.D. Tex. 2008) ("The Court finds the evidence offered by the Debtor . . . to be credible. [S]uch evidence, considering the unique nature of the Debtor as a non-profit

organization . . . is sufficient proof . . . that the Plan meets the 'best interests test' of

1129(a)(7).").[4]

31.     To confirm the Plan, the Debtors must satisfy the Best Interests Test.  *See*, *In re*

*Ditech Holding Corp.*, 606 B.R. 544 (Bankr. S.D.N.Y. 2019).  "Section 1129(a)(7) is one of the

cornerstones of chapter 11 practice" *Id*. at 606 (internal citations omitted).  To satisfy section

1129(a)(7), the Debtors must show that, with respect to each impaired class of claims,

> (A)     Each holder of a claim or interest of such class –
>
> > (1)     Has accepted the Plan; or
> >
> > (2)     Will receive or retain under the Plan on account of
> >          such claim or interest property of a value, as of the
> >          effective date of the Plan, that is not less than the
> >          amount that such holder would so receive or retain
> >          if the debtor were liquidated under chapter 7 of this
> >          title on such date . . .

11 U.S.C. § 1129(a)(7)(A).

32.     Section 1129(a) of the Bankruptcy Code explicitly directs that the Bankruptcy

Court shall only confirm a plan only if **all** of its requirements are met.  As the plan proponent, a

debtor bears the burden of proof of establishing that each of the requirements has been satisfied.

*In re Ditech Holding Corp.*, 606 B.R. 544, 606 (Bankr. S.D.N.Y. 2019).  Only after each and

every element is proven can the Court confirm a plan.  7 Collier on Bankruptcy ¶1129.02[7]

(Richard Levin & Henry J. Sommer eds., 16th ed.).

---

[4] The plan proposed in *Save Our Springs*, *supra*, though it satisfied the best interests test, was ultimately not
approved because it not was feasible.

33. The Best Interests Test is a cornerstone of chapter 11 reorganizations. The "command of section 1129(a)(7)" is "perhaps the strongest protection creditors have in chapter 11." *Ditech*, 606 B.R. at 607 (citing *In re Crowers McCall Pattern, Inc.*, 120 B.R. 279, 297 (Bankr. S.D.N.Y. 1990). "It is an individual guaranty to each creditor or interest holder that it will receive at least as much in reorganization as it would in liquidation." 7 *Collier on Bankruptcy* ¶1129.02[7] (Richard Levin & Henry J. Sommer eds., 16th ed.). The Bankruptcy Code does not carve out or provide to non-profits an exemption from this cornerstone creditor protection. Yes, it is correct that the Boy Scouts cannot be forced to liquidate; however, it does not follow that it is not subject to the Best Interests Test, which is a hypothetical measure of what non-consenting creditors must receive. The Boy Scouts cannot create such an exemption from whole cloth.

34. The Debtors bear the burden of proving the Plan satisfies the best interests test. *Ditech Holding* at 607. The Disclosure Statement must include information adequate to enable creditors to determine whether their Plan recovery exceeds their expected recovery in a liquidation scenario. As part of that calculation, the Liquidation Analysis must (i) account for the value of a Survivor's claims against the applicable Local Council and Chartered Organization(s) which would not be released under a chapter 7 scenario and (ii) demonstrate that a dissenting Survivor would receive more under the Plan than from (x) a recovery from the Debtors' chapter 7 liquidation **plus** (y) recoveries from the unreleased claims against the Local Councils and Chartered Organizations that are Participating Parties. *See*, *Ditech Holdings* at 614, 621. The Liquidation Analysis does not include this information. In fact, the Disclosure

Statement contains no information about, or analysis of, the claims against, and assets and liabilities of, the Local Councils and Chartering Organizations.

35.　　In the Disclosure Statement's discussion of its property, the Boy Scouts' assert, without support that "certain property listed on the BSA's balance sheet" is legally exempt from creditors' claims.  The cross-reference to a balance sheet is uninformative as no balance sheet is attached to the Disclosure Statement and the published Boy Scouts' the balance sheets do not have an asset category of Restricted Assets.

36.　　The Boy Scouts refer to its "charitable mission" at least twenty-one times in the Disclosure Statement and rely on its contention that property "core" to its "mission" is unavailable to pay creditors.  The Boy Scouts claim that neither restricted *nor unrestricted* assets can be used to pay creditors because all such assets are impressed with trusts that require that the assets be used exclusively to advance BSA's mission, as its board determines.[5]

37.　　In addition, the Liquidation Analysis is deficient for the following reasons:

- The Liquidation Analysis does not address the liquidation process set forth in the Local Councils' charters and the impact that would have on recoveries in a liquidation scenario.

- As noted above, the Liquidation Analysis fails to provide a valuation for the Artwork, real estate or other assets to be contributed to the Settlement Trust by BSA, despite the fact that the Debtors have fairly recent appraisals for each.

- The Liquidation Analysis also does not describe the basis for assuming that a six month liquidation timeframe is appropriate.

---

[5] BSA apparently does not consider compensating 84,000 people abused while in its care to be part of its charitable mission.

- The Liquidation Analysis does not include recoveries from avoidance actions and proceeds of officer and director insurance policies and there is no justification or discussion of the omission.

- The Liquidation Analysis fails to provide sufficient detail or discussion as to how the estimated recovery percentages were derived.

- A chapter 7 trustee will be obligated to review Direct Abuse Claim values, yet the Liquidation Analysis ignores this reality.  There is no inclusion or discussion of the potential reduction of claims based on statute of limitations defenses, nor any assignment of values based on type of Direct Abuse Claim (as described above in connection with the TDPs).  As a result, the Liquidation Analysis does not accurately reflect a Survivor's potential recovery in a liquidation.

- The Liquidation Analysis provides no basis for the estimate of expenses of a chapter 7 trustee.

38.    The Disclosure Statement is also not adequate because it does not provide a sufficient description and/or basis for the value of the Boy Scouts' contribution to the Settlement Trust.  For example:

- Artwork:  The Boy Scouts should state the appraised value of each piece of artwork on the inventory attached to the Disclosure Statement as Schedule 1, including the appraised values from the 2012 and 2018 appraisals.  The Boy Scouts should provide a hyperlink to the actual appraisals.

- Oil and Gas Interests:  The Boy Scouts should state the annual 2020 royalties received for each oil and gas interest on the inventory attached to the Disclosure Statement as Schedule 4.  The Boy Scouts should describe the basis for the valuation of the oil and gas interests regarding any environmental liability risks associated with ownership of such interests.  The Boy Scouts should include a hyperlink to the third party valuation report referenced in the Liquidation Analysis.

- High Adventure Facilities:  The Boy Scouts should provide the appraised value of each High Adventure Facility and a hyperlink to each appraisal.  In the Disclosure Statement, the values are lumped together in the balance sheet with other assets under "Land, Building and Equipment."

- Other Real Property Disclosure:  The Boy Scouts should provide the terms of the leaseback of its distribution center.  The value of this facility will depend upon the terms of the lease (that makes payments to a trust)

or will be sold whose buyer will value the purchase on the terms of the lease.

ii.    **The Disclosure Statement Does Not Contain Adequate
Information Regarding the 84,000 Childhood Sexual Abuse Claims**

39.    The Disclosure Statement does not contain meaningful information about the 84,000 childhood sexual abuse claims.

40.    Next, the Disclosure Statement does not adequately explain how the consideration available under the Plan provides Survivors a recovery in the range of 8% - 23%. Only the Boy Scouts have committed to fund cash or other consideration under the Plan, in the amount of $115 million.  The projected recovery does not include the expense of operating a settlement  trust for the benefit of the 84,000 childhood sexual abuse Survivors and the Disclosure Statement does not provide any information  regarding such operating expenses. Moreover, even without reducing the recoveries to account for costs of administering and maintaining the trust, the distribution of $115 million results in a recovery of 4.8%, far less than the lowest estimated recoveries of 8% set forth in the Disclosure Statement.  There is no other commitment of cash or other property available to Survivors that could yield as much as 23% of their claims when valued at $7.1 billion.

41.    Article V.M of the Disclosure Statement purports to describe the "Body of Claims" but there is no discussion of the 84,000 childhood sexual abuse claims.  Other than a summary of the events that led to the establishment of the deadline to file claims, there is no substantive discussion regarding the number or type of claims and a range of values of the childhood sexual abuse claims.  The lack of information regarding childhood sexual abuse

claims is remarkable because one of the Boy Scouts' professionals, Bates White, was retained to catalogue and standardize the childhood sexual abuse claims for this purpose.

42.    The Disclosure Statement must describe the childhood sexual abuse claims and evaluate them for purposes of distribution.  The childhood sexual abuse claims are first referenced in the treatment section that is intended to summarize the .claims, the amount of the claims, and the estimated recovery of such claims.  Disclosure Statement, p. 23. While the Disclosure Statement does provide that the gross estimated amount of the childhood sexual abuse claims is between $2.4 billion - $7.1 billion, there is no discussion of how that value is determined.

43.    The below chart is a high-level summary of the childhood sexual abuse claims as reported by the Boy Scouts and used by it, the Local Councils, Chartered Organizations and their insurance companies to determine the number and nature of the childhood sexual abuse claims.  It is an undercount of the childhood sexual abuse claims because it  does not take into account the number of instances of abuse suffered by a Survivor, the number of different types of abuse perpetrated on the Survivor or the fact that Survivors suffer a continuous physical damage over a lifetime.   For example, a survivor's single proof of claim can include the description of dozens of instances of abuse over multiple years that include penetration, oral sex, and masturbation but the Boy Scouts' analysis of the childhood sexual abuse claims defaults to the "highest" or worst form of abuse and disregards the other assaults.  Of the more than 5,100 childhood sexual abuse claims that occurred in New York, there are undoubtedly many  more insurable "occurrences" (an insurance industry  euphemism for the neglect leading to the sexual

abuse of a child) because under New York law each instance of abuse gives rise to a separate and distinct claim. *Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 2013 NY Slip Op 3264, 21 N.Y.3d 139, 969 N.Y.S.2d 808, 991 N.E.2d 666.

| Type of Sexual Abuse | Number of Claims |
|---|---|
| Penetration | 22,898 |
| Oral Sex | 18,689 |
| Masturbation | 12,567 |
| Fondling / Groping | 17,431 |
| Touching Bare Skin | 1,955 |
| Over the Clothes | 1,353 |
| Non-Touching / Other | 8,758 |

44.     At a minimum, the following information should be provided regarding the 84,000 childhood sexual abuse claims:

- The number of unique, non-duplicative claims without the default to the "highest" or worst form of abuse.

- State or jurisdiction the claims arose by abuse category and number.

- The year or years in which the claims arose by abuse category and number.

- Description of the claims by type of abuse.

- The Local Councils and Chartered Organizations implicated in the childhood sexual abuse claims by abuse category and number as adjusted above.

- The extent of the undercount in the foregoing categories resulting from the Boy Scouts' electronic review of the claims that does not reflect information that may be in the proof of claim but not in the "correct" data field, e.g. the date of the abuse is in a narrative but not in the data field for the date of the abuse.

45.     The Disclosure Statement does not provide adequate information regarding the value of the childhood sexual abuse claims. The Boy Scouts ascribe an unexplained value

ranging from $2.4 billion to $7.1 billion.  Without understanding how the Boy Scouts

calculated that value, a Survivor  cannot determine what s/he might receive as a potential

distribution under the Plan.  If a comprehensible range of distributions is not provided, Plan

feasibility cannot be evaluated (*i.e.*, whether the funds remaining after distribution will be

sufficient to enable the settlement trust under the Plan to administer –*e.g.*, value and pay– each

of the 84,000 childhood sexual abuse claims).    Also, if the childhood sexual abuse claims are

not valued in the aggregate, no creditor can evaluate whether the Local Councils and Chartered

Organizations are contributing sufficient consideration under the Plan to receive a non-

consensual third-party release or whether the Hartford settlement is reasonable.

  46.  Because the Boy Scouts have made no legitimate evaluation of the childhood

sexual abuse claims, the Tort Claimants' Committee, Coalition, and FCR (collectively, the

"**Estimation Moving Parties**"), filed a *Motion of the Future Claimants' Representative, the*

*Official Committee of Tort Claimants, and the Coalition of Abused Scouts for Justice for Entry*

*of an Order, Pursuant to 11 U.S.C. §§ 105(a) and 502(c), (I) Authorizing an Estimation of*

*Current and Future Abuse Claims and (II) Establishing Procedures and Schedule for Estimation*

*Proceedings* [Docket No. 2391] (the "**Estimation Motion**"), pursuant to which the Estimation

Moving Parties seek entry of an order (i) authorizing the estimation of the aggregate amounts of

current and future childhood sexual abuse claims against the Boy Scouts by type of abuse, by

Local Council, by Chartered Organization, and on a year-by-year basis; and (ii) establishing the

procedures and schedule for such estimation proceedings.  The Estimation Motion contains a

proposed schedule for fact and expert discovery, motion practice, briefing, and a hearing in advance of consideration of any disclosure statement.

47.      Like the Restricted Property Action, the estimation of the 84,000 childhood sexual abuse claims must be completed before the Court can consider the approval of a Disclosure Statement relating to a non-consensual plan.  Valuing the 84,000 childhood sexual abuse claims is a gating items for the Disclosure Statement and Plan, to enable a meaningful analysis of whether the Plan will meet the Best Interests of Creditors Test and is feasible, and, of paramount importance, whether any proposed contributions by Local Councils or Chartered Organizations are sufficient to warrant the receipt of a non-consensual third party release coupled with a channeling injunction.

### iii.      The Disclosure Statement Does Not Contain
### Adequate Information Regarding the Hartford Settlement

48.      In the Second Mediator Report, the Mediators reported a settlement between the Scouts and Hartford whereby Hartford will "buy back" its policies for  at most $650 million (the "**Settlement Amount**") and a full release of Hartford's obligations to make any payments to anyone on account of the childhood sexual abuse claims under the those policies.

49.      Section 1123(a)(5)(D) of the Bankruptcy Code provides that a Plan *shall* "provide adequate means for the plan's implementation, such as . . . sale of all or any part of the property of the estate . . . " while section 1123(b)(3)(A) provides that a plan *may* "provide for the settlement or adjustment of any claim or interest belonging to the debtor or to the estate . . ." Under the Settlement Agreement, the  Settlement Amount is earmarked for the payment or

defense of Abuse Claims (*see*, Settlement Agreement at § II D) and is thus a means of implementing the Plan.

50.     The Boy Scouts have neither amended the Plan to include the Settlement Agreement nor filed a 9019 Motion.  Similarly, the Disclosure Statement does not identify, disclose, or discuss the Settlement Agreement.  Unless a Survivor had downloaded the Second Mediator Report and thus learned of the Boy Scouts' entry into the Settlement Agreement, he or she would be unaware of its existence.  A Survivor reading the current Disclosure Statement— *the single most important document for a Survivor to make an informed decision whether to accept or reject the Plan*—would be completely unaware of the Settlement Agreement and its impact on available insurance proceeds to pay Survivor claims.

51.     The Boy Scouts apparently intend to solicit the Survivors without disclosing the Settlement Agreement.  This settlement is not an immaterial development.  If approved, it resolves a critical part of the Boy Scouts' insurance program and messages the Boy Scouts' expectation for a fire-sale settlement with Century, another insurer with significant exposure and, with Hartford, represents most of the primary insurance program as well as significant excess coverage.  The Settlement Agreement has the effect of reducing Hartford's insurance exposure  by many *billions* of dollars, in exchange for a relatively paltry $650 million.

52.     The Boy Scouts' failure to amend the Plan and the Disclosure Statement to incorporate and disclose the Settlement Agreement renders approval of the Disclosure Statement impossible.  The Boy Scouts have failed to provide the "full and honest disclosure" that is critically necessary for creditors to evaluate the Plan.  *In re Radco Properties, Inc.*, 402 B.R.

666, 682 (Bankr. E.D.N.C. 2009). Since the adequacy of a disclosure statement should be

assessed from the perspective of the claims or interest holders with the ability to vote, *see In re*

*Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001), the Boy Scouts must

disclose the factual and legal bases for the Settlement Agreement and the impact it would have

on recoveries to Survivors, including Survivors with direct action rights against the Hartford

policies. The Boy Scouts cannot rely on disclosure of the terms of the Settlement Agreement

via the Second Mediator Report (one pleading in a docket of over 3400 entries) which is devoid

of any analysis of the Settlement Agreement's effect on creditors.

53.    The Settlement likely violates the automatic stay of any additional insured under

the applicable policies who also is a debtor in bankruptcy. *See, e.g.*, *Palmdale Hills Prop., LLC*

*v. Lehman Commer. Paper, Inc.* (*In re Palmdale Hills Prop., LLC*), 654 F.3d 868, 875 and 876

(9th Cir. 2011) (actions taken by one debtor in its bankruptcy case that affect the rights of

another debtor in its bankruptcy case violate the automatic stay the latter debtor's bankruptcy

case). Many Chartered Organizations that may be additional insureds under the Boy Scouts'

policies also are debtors in their own bankruptcy cases (*e.g.*, Archbishop of Agana, Diocese of

Buffalo, Diocese of Rochester, Diocese of Rockville Centre, Diocese of Syracuse and

Archdiocese of Santa Fe).

54.    Any action taken in violation of the automatic stay is void *ab initio*. *See*

*Constitution Bank v. Tubbs*, 68 F.3d 685, 692 n. 6 (3d Cir. 1995) ("Generally, judicial actions

and proceedings against the debtor are void ab initio absent relief from the stay."). As the

Settlement Agreement seeks to dispose of the nondebtor-Chartered Organizations' rights under

the Hartford policies,  the Boy Scouts  must obtain stay relief in each of the other bankruptcy

cases.   Any discussion of the Settlement Agreement in the Disclosure Statement must explain

how the Settlement Agreement can be effectuated without stay relief in numerous other pending

bankruptcy cases.

   **iv.**  **The Disclosure Statement Does Not Contain Adequate**
      <u>**Information Regarding the Treatment of Non-Abuse Claims**</u>

   55.  The Disclosure Statement must disclose that non-abuse claims, *e.g.*, personal

injury claims, are given preferential treatment over childhood sexual abuse claims.  The Plan

defines "Specified Insurance Policies" as "any Insurance Policy with inception dates January 1,

2013 to present."  Plan at p.34 (Definition  214). While all other insurance policies' rights are

assigned to the trust under the Plan, "Debtors reserve rights to access limits of liability of the

Specified Insurance Policies to settle or otherwise resolve Insured Non-Abuse Claims.  Further,

the Settlement Trust cannot settle, compromise or otherwise resolve any rights, duties or

obligations under the Specified Insurance Policies without express written consent and approval

of the Debtors, Reorganized Debtors BSA and the Creditors Committee."  Plan at p. 49;

Disclosure Statement at p.138 (Section U 8. Insurance Assignment).

   56.  In plain English this means that the Liberty, Old Republic and Evanston primary

insurance policies (and those insurance policies excess to them) are not available to Survivors

with post-2013 claims,  unless Boy Scouts say so.   The Plan thereby  deprives 300 Survivors of

nine years of insurance while contemplating that their compensation largely will be generated

from insurance.  The Disclosure Statement must identify those Survivors of the risky

competition they face for insurance proceeds with the non-abuse claimants and the impact of the

prioritization on their recoveries.

      **v.**      **The Disclosure Statement Does Not Contain**
            **<u>Adequate Information Regarding Insurance Coverage</u>**

57.     The Disclosure Statement fails to adequately describe the Boy Scouts' insurance

program, which includes sufficient limits to cover the 84,000 childhood sexual abuse claims.

This information is critical to Survivors because the Boy Scouts want the 84,000 survivors of

childhood sexual abuse to rely on the insurance program as their main source of recovery.

58.     As set forth in greater detail below, merely listing hundreds of insurance policies

by insurer and year does not enhance the Survivors' ability to assess the potential value of those

insurance policies,  nor does it provide information about the policy limits and the number of

claims arising under each policy.

59.     The Disclosure Statement suggests that the Plan will deliver to the Survivors

substantial insurance-related funds from a multitude of sources.  More specifically, it promises

to include the following as part of the BSA Settlement Trust Contribution: (i) the BSA Insurance

Policies; (ii) the Insurance Coverage; (iii) the Insurance Settlement Agreements; (iv) the

Insurance Actions; and (v) the Insurance Action Recoveries.  Plan, Art I(A)(43).  The value of

those contributions, if any, is not discussed.

60.     The Plan defines Insurance Action Recoveries as "[c]ash derived from and paid

by an Insurance Company pursuant to an Insurance Settlement Agreement, (b) the right to

receive proceeds of Insurance Coverage (including any receivables), and (c) the right to receive

the proceeds or benefits of any Insurance Action."  Plan Article I(A)(123). After more than one

year in bankruptcy, and despite numerous discussions involving the Boy Scouts and their

insurers since, there are presently no Insurance Settlement Agreements (described in the

Disclosure Statement or embodied in the Plan).  Thus, a Survivor will expect that the amount of

"cash derived from and paid by an Insurance Company pursuant to an Insurance Settlement

Agreement presently is $0.00.[6]

61.     The Boy Scouts also propose "contributing" the Insurance Actions.  This, too, is

misleading because a Survivor might believe that the settlement trust is getting something more

than the right to prosecute or defend complicated coverage litigation.   In fact, Boy Scouts is

merely assigning or otherwise transferring  its rights to be embroiled in litigation that has been

pending for years (some initiated by the Boy Scouts' insurers, not the Boy Scouts) and other

litigation not yet filed that will be protracted and expensive.  The currently pending "Insurance

Actions" include:

- A November 2017 action by National Surety Corporation against the Boy Scouts, certain Local Councils, and a number of the Boy Scouts' insurers in the Circuit Court of Cook County, Illinois ("**Illinois Action**").

- A June 2018 action by the Boy Scouts and certain Local Councils against certain of the Boy Scouts' insurers in the District Court of Dallas County, Texas ("**Hartford Action**").

- An August 2018 action by the Boy Scouts and certain Local Councils against certain of the Boy Scouts' insurers in the District Court of Dallas County, Texas ("**INA Action**").

- A May 2020 Adversary Proceeding filed in this Court by the Hartford against the Boy Scouts and a litany of Local Councils and other insurers of the Boy Scouts ("**Adversary Proceeding**").

---

[6] As noted above,  the Mediators filed a notice of a settlement agreement with Hartford, but the settlement is not included in the Plan and is not mentioned in Disclosure Statement.

62.    The Boy Scouts have not provided any estimate of the cost of prosecuting or defending this litigation and the budgetary impact of those costs on the settlement trust.  It also does not provide any information about the potential value of insurance coverage that may stem from these actions should the Debtors or their assignees prevail, or when any such insurance recoveries may be forthcoming.

63.    Perhaps in an effort to make the insurance component of any Settlement Trust Contribution appear more robust, the Boy Scouts propose contributing both the BSA Insurance Policies and the Insurance Coverage.  In reality, as presently defined, they are one and the same. Plan Article I(A)(42), (126).  The Boy Scouts should either amend both definitions so as not to render one superfluous (and, thus, explain the distinction between the contribution of both the BSA Insurance Policies and the Insurance Coverage) or, if they are substantially similar, omit one of these phrases from the Plan completely.

64.    The Disclosure Statement also generally refers to "six decades" of insurance policies that "date back to the 1930s . . . that provide substantial limits of liability in many years."  Disclosure Statement Article III(F).  The Disclosure Statement does not provide any meaningful particulars about these "six decades" of "substantial" coverage.  The Boy Scouts fail to provide information about the potential value of this coverage in total, the per occurrence or other coverage limits in any individual policy or how it calculates the value of an individual policy.  Furthermore, the Boy Scouts omit any discussion of how much of those "substantial limits" are no longer available because of insurer insolvencies, prior settlements, agreements they may have reached with various insurers, their own obligations to fund some of those

settlements, concessions they may have made on key coverage issues (whether warranted or not), whether their actions or failure to act may have compromised any of their rights to recovery, and whether failings in their own document retention policies may have undermined their recovery rights.  The Boy Scouts have a coverage chart depicting its insurance program –it should provide Survivors with a comprehensible copy.

65.     Not all of the Boy Scouts', Local Councils' and Chartered Organizations' insurance carriers are of equal importance to Survivors and the Boy Scouts should provide more in-depth disclosure regarding the carriers with substantial coverage exposure, *e.g.*, Century and Hartford at a minimum.

66.     The Boy Scouts contend that Century sold the Boy Scouts its primary insurance coverage beginning in 1935.  *Id*. Article III(F)(1).  According to the Boy Scouts, the Century policies between 1962 and 1983 "had a per-occurrence limit of $500,000" and "generally only had aggregate limits that pertained to products-competed operations."  *Id.*  Among other things, neither the Plan nor the Disclosure Statement:

- Provides any particulars regarding the coverage from 1935 through 1962.

- Conclusively states that none of the Century coverage from 1962 through 1983 is subject to an applicable aggregate limit.

- Articulates Century's position(s) on any of the Boy Scouts' representations regarding the existence, scope, breadth, terms and/or conditions of any Century policy with a policy period between 1935 and 1983.

- Addresses how much Century can pay, given that Century is in "run-off" status and claims to have limited financial ability to pay.

67.     The Boy Scouts contend that Hartford sold them their primary insurance

coverage from 1971 through 1978.  *Id.*  As with their references to Century, neither the Plan nor

the Disclosure Statement:

- Conclusively states that none of the Harford coverage from 1971 through 1978 is subject to an applicable aggregate limit.

- Articulates Hartford's position(s) on any of the Boy Scouts' representations regarding the existence, scope, breadth, terms and/or conditions of any Hartford policy with a policy period between 1971 and 1978.

- Address the Hartford's contention that there is only one "occurrence" in each policy period (thereby undercutting the Boy Scouts' emphasis on the "no aggregate limit" aspect of these policies).

68.     The Disclosure Statement omits any reference to Hartford coverage between

1981 and 1983.  However, according to Hartford in the Illinois Action:

> On November 29, 2010, First State, Twin City and Boy Scouts of America entered into a Confidential Settlement Agreement and Release ("Settlement Agreement") with respect to the Hartford policies with policy periods between 1981 and 1983. . . The Settlement Agreement governs the rights and responsibilities . . . including the limits of liability and policy periods.  To the extent First State has coverage obligations for the Underlying Lawsuits (as defined in the Complaints) under the [Hartford policies], such obligations are governed by the terms and conditions of the Settlement Agreement.

Hartford Answer and Affirmative Defenses and Counterclaim, First Affirmative Defense.  *See*

*also* [Adv. Pro. Docket No. 1], ¶ 95 (alleging that coverage under the Hartford policies "if any,

is limited and subject to a confidential settlement agreement.").

69.     The Disclosure Statement also fails to disclose that the true value of insurance coverage in these two policy years is undercut by the insolvency of the excess carriers and may be undercut for some creditors due to the fire-sale settlement with Hartford.

70.     The Disclosure Statement also fails to explain the implications of the Hartford settlement for the Hartford coverage sold to the Debtors in 1976 and 1977.  Whatever consideration the Boy Scouts may have received, it is a fraction of the exposure, given the thousands of abuse claims alleged in these two years.  If the Boy Scouts "sold back" those two policies to Hartford, the excess insurers (representing more than $10 million per occurrence coverage in each of these two policy periods) may argue that their polices are not and cannot be triggered because the Hartford polices were not "exhausted."

71.     The Boy Scouts next contend that, beginning in 1983, it began purchasing "towers of insurance" that "included significant limits of liability and excess layers of coverage" to "counterbalance the imposition of aggregate limits." Disclosure Statement at p. 41. As noted, at least one insurer argues that there is only one "occurrence" per policy period.  If that interpretation is correct, none of the excess insurance is implicated as to policies without aggregate limits.  The Boy Scouts should disclose the insurer's position and the impact on the availability of the "towers of insurance."

72.     Even if the Boy Scouts "procured" $50 million in aggregate limits" in 1983 through 1985, the Boy Scouts no longer have "$50 million in aggregate limits" to pay Survivors. Upon information and belief, more than half of the coverage procured by the Boy Scouts during this time period (three years of coverage) has been utilized to pay pre-petition claims or was

coverage sold by a now insolvent insurer.  Also upon information and belief, each year of the

Boy Scouts' coverage during the period from 1990 through at least 2018 has been impaired in

some amount and some policies have been altogether exhausted.  This too should be disclosed.

73.    The Disclosure Statement does not disclose the risks that certain insurers may not

have the ability to pay per policy limits.  For example, there are thousands of claims of abuse

from 1962 through 1971, which are just some of the years in which the Insurance Company of

North America (Century's predecessor) was the primary insurer and during which the policies

appear to have limits of $500,000 per occurrence without an aggregate.  Even assuming there

were only 1,000 claims of abuse in that period (and there are many more), Century's potential

coverage exposure would be $500 million during this limited time period.  This also assumes

that $500,000 per survivor represents adequate compensation.  It does not.  By way of example:

- The University of Southern California recently agreed to pay more than $1.1 billion to approximately 700 former patients of a campus gynecologist, or an average of approximately $1.2 million per survivor.

- In 2007, the Archdiocese of Los Angeles agreed to pay approximately 500 survivors more than $600 million, or an average of $1.3 million per survivor.

- In 2006, the Portland Archdiocese agreed to pay approximately 169 survivors approximately $75 million.

- In 2004, the Diocese of Orange, California agreed to pay approximately 90 survivors approximately $100 million, or an average of $1.1 million per survivor.

- In 2011, the Oregon Province of the Jesuits agreed to pay approximately 500 survivors approximately $166 million.

- In 2007, a New York jury awarded $11.45 million to two survivors against the Diocese of Rockville Centre.

- In 1998, the Dallas Catholic Diocese agreed to pay eight survivors approximately $23.4 million and another three survivors approximately $7.5 million after a jury awarded $119.6 million.

74.     Most of these settlements were paid by insurers, including some of the Boy Scouts' insurers or their affiliates.  Thus, even assuming Century tendered what it may contend to be its policy limits to each survivor of sexual abuse during this time period, it would, when compared to other settlements, still be woefully insufficient.

75.     But Century has not even done that and there are no indications that it intends to. In fact, neither the Plan nor the Disclosure Statement disclose that, according to Century's publicly filed financial statements, Century may assert that the maximum amount it can pay to the survivors of sexual abuse in response to a multi-billion dollar liability is $25 million in excess of undisclosed reserves.  This too should be disclosed.

76.     As the Boy Scouts note, they began purchasing significant excess coverage in increasing amounts beginning in 1983.  By 2013, the Boy Scouts were purchasing more than $200 million in coverage per year.  However, the Plan and Disclosure Statement define all policies incepting on or after January 1, 2013 as Specified Insurance Policies.  Plan Article I(A)(214).  According to the Disclosure Statement, the Boy Scouts purport to reserve their right to use all their post 2013 coverage to indemnify their Insured Non-Abuse Claims and to prevent access to any of this coverage to settle Abuse Claims.  Plan Article VI(I)(7).  The Boy Scouts do so even though there are many claims of abuse in this period that otherwise might not be covered by insurance.  Thus, the more than $1.6 billion in post-2013 coverage is theoretically valueless for the survivors. This too should be disclosed.

vi.     **The Disclosure Statement Does Not Contain**
**Adequate Information Regarding the Termination**
<u>**of Direct Action Rights Against Insurance Carriers**</u>

77.     The Disclosure Statement does not discuss the Plan's impact on  claimants who

have a direct right to sue the insurer of the Boy Scouts, Local Councils, or Chartering

Organizations. Direct action statutes generally provide the insured party, *i.e.*, the Survivor of

childhood sexual abuse, with direct standing to sue an insurer instead of the Boy Scouts as the

insured tortfeasor.  At least eight states grant such relief to Survivors, including the territory of

Guam (Title 22 of the Guam Code Ann. Section 18305), and the states of Arkansas (Ark.

Statutes Ann. Section 66-3240), Wisconsin (Wisc. Stat. Section 632.24) and Louisiana (La. R.S.

22:655(B)(2). [7]

78.     Those survivors have rights that are different from the Survivors in other states

who cannot pursue pre-judgment claims against the Boy Scouts'  insurers.  *See, e.g., Decade's*

*Monthly Income & Appreciation Fund v. Whyte & Hirschboeck, S.C.*, 173 Wis. 2d 655, 675-76,

495 N.W.2d 335, 339 (Wis. 1993) ("The terms and conditions of the direct action statute, Sec.

632.24 Stats., is to be imposed with the same force and effect as if printed in the insurance

contract itself."). The Disclosure Statement never mentions the distinction, and the Plan strips

Survivors of these rights without any description or justification.  Survivors with direct rights of

action against insurers have a property interest in those policies. *See, e.g., Loy v. Bunderson*, 107

Wis. 2d 400, 422, 320 N.W.2d 175, 187 (Wis. 1982) (an injured party acquires an interest in an

insurance policy).  Those rights cannot be seized without the Survivors' consent or adequate

---

[7] There are approximately 900 childhood sexual abuse claims that arose in Arkansas that no longer have any statute
of limitations defense.

protection for their compensation. *In re All-Way Services*, 73 B.R. 556, 565 (Bankr. E.D. Wis.

1987).

### vii.    The Disclosure Statement Does Not Contain Adequate Information Regarding the Pension Plans

79.    The Disclosure Statement does not provide any meaningful information

regarding the Boy Scouts' pension obligations other than describing a standard separation of the

Settlement Trust from the Pension Plan: "The Settlement Trust shall not have any liability to any

Person on account of the Pension Plan, including liability as a member of a "Controlled Group"

as defined in 29 U.S.C. § 1301(a)(14)(A) or on any other basis whatsoever."

80.    The Disclosure Statement should disclose that the Boy Scouts' Retirement Plan

(the "Retirement Plan") is currently overfunded – about $86 million overfunded as of February

1, 2021, according to Willis Towers Watson (the Retirement Plan's Enrolled Actuary). The

primary drivers of the overfunded position are:

- Better than expected historical investment returns.

- Conservative funding of the Retirement Plan, including a voluntary $60 million contribution made by the Boy Scouts in two instalments (April and May of 2019).

- The full freezing of the Retirement Plan effective August of 2020, which eliminated any future accruals of benefits under the Retirement Plan.

81.    The Retirement Plan liabilities are currently discounted at the gross expected rate

of return on assets (6.5%). Based on the Enrolled Actuary's best estimate of future plan

experience (as certified annually in the Schedule SB of Form 5500, filed with the IRS), **no**

**future** contributions are expected to be required. If, in the aggregate, actuarial assumptions are

met going forward, the plan's overfunding is expected to grow modestly over time from the current level of ~$86 million.

82.　The Boy Scouts have implemented a new Retirement Contribution Policy for itself and the Local Councils, set at 12% of payroll effective February 1, 2021.  After paying for administrative expenses and the matching contribution in the 401(k) plan, the Boy Scouts intend to contribute the residual amount into the Retirement Plan, which is estimated be more than  $25 million annually from the Boy Scouts and Local Councils. If this approach is followed, the Retirement Plan overfunding is expected to grow to $264 million by 2026 and $500 million by 2031, per Willis Towers Watson, the Boy Scouts' own Enrolled Actuary.  The overfunding cannot be used for any purpose other than paying retirement benefits, PBGC premiums and certain Plan-related administrative expenses.

83.　The liquidation analysis further provides that "[u]nder a chapter 7 liquidation, moreover, it is likely that the BSA's defined benefit pension plan would be terminated and the Pension Benefit Guarantee Corporation (the "PBGC") would pursue its Claim of approximately $1.1 billion against all members of the controlled group, which are jointly and severally liable for such amounts and include the Related Non-Debtor Entities. The Boy Scouts expect that under section 4068(a) of ERISA, the PBGC would successfully assert a lien arising as of the termination date against each member of the controlled group in an amount not to exceed 30% of the "collective net worth" of all members of the controlled group combined.

84.　However, for any member of the controlled group that has filed for bankruptcy prior to the termination, the automatic stay will generally prevent perfection of any lien under

ERISA. The PBGC's claim could therefore be asserted jointly and severally against each member of the controlled group in the full amount of the approximately $1.1 billion claim, provided that the PBGC's claim, to the extent not secured by a lien under ERISA, would likely be treated as a general unsecured claim. The Liquidation Analysis assumes that the lien on Related Non-Debtor Entity assets would represent 30% of Liquidation Proceeds remaining for the Boy Scouts and Related Non-Debtor Entities combined after wind down costs and secured debt, if any.

85.    Under a chapter 7 liquidation, it is extremely unlikely that the Boy Scouts' Retirement Plan would be terminated because there is no reason to do so. As described above, the Retirement Plan is fully funded on an ongoing basis, it has no current contribution requirements, and there is potentially a large body of sponsors (the Local Councils) who could assume the Retirement Plan in the Boy Scouts' absence. The Tort Claimants' Committee is not aware of any precedent for the PBGC involuntarily terminating a plan under such circumstances.

86.    In sum, the Boy Scouts are attempting to use the pension as a way to shield cash that can otherwise be used to pay the claims of childhood sexual abuse survivors. Over the next five years, the Boy Scouts project that more than $25 million will be contributed each year for the next five years towards the Retirement Plan when any such contribution is wholly unnecessary. The Disclosure Statement and the Liquidation analysis fail to adequately disclose the foregoing.

### viii.    The Disclosure Statement Does Not Contain Adequate Information Regarding the Boy Scouts' Operations

87.    The Disclosure Statement fails to address declining membership trends and the impact thereof on the Boy Scouts' on-going operational needs.  Given that membership in the Boy Scouts ends on December 31st for each calendar year, the Boy Scouts should disclose the current 2021 membership numbers so that parties can compare the actual results to the projections on which the Plan is premised. If the projections vary significantly from the actuals, the Boy Scouts should pay much more to the Settlement Trust than it currently is offering.  To the extent the Plan relies on the continued existence of the Boy Scouts to fund the Settlement Trust, the Plan may not be feasible and Survivors need the information necessary to make that assessment.

88.    Relatedly, the Disclosure Statement does not provide an analysis of the Boy Scouts' on-going need (or lack thereof) for camps in light of declining membership, underutilization of camps and overcapacity.

89.    The Disclosure Statement does not adequately describe or detail either the whole number or the percentage of Scouts who actually attend the high adventure facilities.  Nor does it detail the revenues generated by the high adventure facilities.  As noted above, the Disclosure Statement also fails to identify the appraised value for each of the high adventure facilities.  The Disclosure Statement does not address the impact a sale of the high adventure facilities could have on (i) Boy Scouts' on-going operations or (ii) potential recoveries under the Plan.

### ix.    The Disclosure Statement Does Not Contain Adequate Information Regarding the Release of Avoidance Actions

90.    Article VI.P provides that the Boy Scouts are releasing all of the "Avoidance Actions" in exchange for good and valuable consideration.  There is no discussion in the Disclosure Statement regarding the number, type, and potential value of the claims defined by the "Avoidance Actions" or any defenses that the potential defendants might have.  The Boy Scouts must disclose the potential value of the claims being released, summary of any defenses, and the value the beneficiaries of such claims are otherwise receiving.

### B.    The Disclosure Statement Does Not Contain Adequate Information Regarding the Local Councils, their Contributions, and the Non-Consensual Third Party Releases

91.    The Disclosure Statement fails to provide basic information about the 84,000 childhood sexual abuse claims that implicate the Local Councils, the assets and liabilities of the Local Councils, and the substantial Contribution that each Local Council must make to receive a non-consensual third-party release and channeling injunction.

### i.    The Disclosure Statement Does Not Contain Adequate Information Regarding the Assets and Liabilities of the Local Councils

92.    An accurate description of the Local Councils' assets and liabilities is essential for Survivors to understand whether the Plan satisfies the "Best Interests Test."  Local Councils' asset values must be included in the required comparison due to the non-consensual releases afforded to the Local Councils under the Plan.  Each Survivor has a claim against the Boy Scouts, a Local Council, a Chartered Organization, and the perpetrator(s).  The required comparison is between Plan distributions to "the amount that such [creditor] would so receive or retain if the debtor were liquidated under chapter 7 of the [Bankruptcy Code] on such date."  In

a hypothetical chapter 7 liquidation, the Local Councils would not get a release.  Thus, when the Plan proposes the release of non-debtor third parties, the Best Interests Test requires the inclusion of assets values of such non-debtor third parties in the hypothetical, alternative liquidation recovery comparison.  "[T]he best interests equation also properly mandates consideration of creditors' comparative recoveries on non-debtor claims, to the extent the Plan is treating those non-debtor claims by release."[8]

93.    As discussed above with respect to the Boy Scouts, the value distributed to any non-consenting creditor (*e.g.*, that does not accept the Plan) must equal or exceed the aggregate of the hypothetical chapter 7 distribution to that creditor from the Boy Scouts' estate <u>plus</u> the value of that creditor's claims against the Local Councils. Section 1129(a)(7) of the Bankruptcy Code mandating this comparison does not limit it to the distribution of "property of the estate" to be received from the trustee in the chapter 7 proceeding, and the absence of that term cannot be assumed to be inconsequential. [9]  As each Survivor's claim is released under the Plan, the Disclosure Statement must contain financial information as to each Local Council so that the Survivor can determine if the Plan satisfies the Best Interests Test.

---

[8] *Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 9 (D.Conn.2006); *see also* (*In re Ditech Holding Corp.*, 606 B.R. 544, 614 (Bankr. S.D.N.Y. 2019)(same); *In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) ("in a case where claims are being released under the chapter 11 Plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at lease as well under chapter 11 Plan as they would in a chapter 7 liquidation"); *In re Quigley*, 437 B.R. 102 (Bankr. S.D.N.Y. 2010) ("The confirmation of the Fourth Plan and discharge of Pfizer will affect the dissenting Non-Settling Claimants because they would "retain" their right to sue Pfizer if Quigley were liquidated under chapter 7.  As the parties recognize, the critical question is whether I should consider the value of these derivative claims in deciding whether the Fourth Plan is in the "best interest" of the dissenting Non-Settling Claimants. I conclude that I must.").

[9] *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 246 (3d Cir. 2000) (in holding that a sale confined to debtor's "assets" did not include fraudulent transfer claims, the court explains that "'Cybergenics' assets' and 'property of the estate' have different meanings, evidenced in part by the numerous provisions in the Bankruptcy Code that distinguish between property of the estate and property of the debtor, or refer to one but not the other").

94.     The Local Councils' asset values must be included among the assets in the liquidation analysis for another independent reason.  In a hypothetical chapter 7 case, a trustee would refrain from renewing a Local Council charter.  The Boy Scouts' bylaws and the charters and bylaws of the Local Councils provide that if the charters are not renewed, the Local Councils' assets are under the management of the Boy Scouts and revert to the Boy Scouts for specified purposes after payment or provision for claims against such Local Councils. Contingent, reversionary interests are property of the estate.[10]  The Boy Scouts' reversionary interest in the net value of the Local Councils' assets is property of the BSA estate and must be taken into consideration for purposes of the Best Interests Test.

95.     The Boy Scouts have the right to refrain from renewing a Local Council charter as Local Council charters are issued for a period not exceeding one year ending June 30.[11]  The BSA Charter does not have any express limits on the Boy Scouts' right to refrain from renewing the charters.  A chapter 7 trustee can exercise the Boy Scouts' power to refrain from renewing a Local Council's charter.[12]  In a hypothetical chapter 7 liquidation of the Boy Scouts, the chapter 7 trustee would exercise the Boy Scouts' authority to refrain from renewing the charters because (i) she will not be authorized to operate the Boy Scouts' business absent Court approval; and (ii)

---

[10]  *In re Graves*, 609 F.3d 1153 (10th Cir. 2010). The Third Circuit has held that a potential future recoupment of the surplus from a debtor's pension plan (*i.e.*, something that might or might not exist) is property of the estate and its transfer subject to recovery.  *Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp. Retirement Plan No. 003* (*In re Fruehauf Trailer Corp.*), 444 F.3d 203, 211 (3d Cir. 2006).  It is also well established that "the mere opportunity to receive an economic benefit in the future" is property with value under the Bankruptcy Code.  *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L.* (*In re R.M.L.*), 92 F.3d 139, 148 (3d Cir. 1996).

[11]  BSA Bylaws, Art. VI, Sec. 1.

[12]  *C.W. Mining Co. v. Aquila, Inc. (In re C.W. Mining Co.)*, 636 F.3d 1257 (10th Cir. 2011)(Bankruptcy trustee assumes control of the debtor's business and succeeds to rights of the board of directors).

her fiduciary duties will require her to maximize the Debtors' estates.  Even if a trustee could obtain approval to continue operations, it would be for a limited time, ultimately resulting in the termination of the charter and the reversion of the net value of Local Councils assets' to the BSA estate.[13]

96.    Once the chapter 7 trustee refrains from renewing the Local Councils' charters, the BSA Bylaws provide that the Local Councils' property vests in the BSA for use in accordance with the Local Councils' governance documents.  Those governance documents provide that creditors' claims must be paid before Local Council property reverts to the BSA estate.  The hypothetical BSA chapter 7 trustee would be responsible for liquidating the Local Councils' assets and for paying each of the Local Council's creditors from the respective Local Councils' assets.  Thus, based on, *inter alia*, the right of BSA not to renew Local Councils' charters, the obligation of Local Councils to pay their creditors, and BSA's reversionary interest in any remaining Local Councils' assets, the Best Interests Test will result in comparing the value of distributions under the Plan, on the one hand, to (a) the distributable value of Local Council assets to Survivors who have claims against a particular Local Council plus (b) the BSA assets (including any net value of the Local Council assets after payment of claims).

97.    The Tort Claimants' Committee proposes the following Disclosure Statement amendments to remedy this inadequacy of the Disclosure Statement:

- Include (i) a hyperlink to a site containing the Tort Claimants' Committee's analysis of each Local Council's assets and liabilities, and

---

[13]  *In re Garcia Avila, supra*, 296 B.R. 95, 113 (Bankr. S.D.N.Y. 2003)("In a hypothetical chapter 7 liquidation under the Bankruptcy Code, however, a trustee would liquidate those shares (shares in operating subsidiaries) and distribute their value to the debtor's creditors").

(ii) an appendix to the Disclosure Statement or a hyperlink to a virtual appendix that shows a breakdown of childhood sexual abuse claims by (x) type of Direct Abuse Claim/severity, (y) the year of each childhood sexual abuse claim, and (z) the geographic area/Local Council associated with each childhood sexual abuse claim.[14]

- Provide Survivors with a breakdown of individual Local Councils' contributions to the Settlement Trust.  The aggregate Local Council contribution (whatever the amount) is meaningless to a Survivor from a "Best Interests Test" standpoint because the Survivor cannot compare the liquidation values to the amount the Survivor would receive under the Plan.

98.     In its current form, the Disclosure Statement does not contain any of this information.  As a result, it is impossible for any Survivor to make an informed decision to vote to accept or reject the Plan that is designed to forever terminate the rights of all Survivors against the Local Councils for decades of childhood sexual abuse.

### ii.     The Disclosure Statement Does Not Contain Adequate Information Regarding Substantial Contributions of the Local Councils

99.     Under the Plan, the Local Councils have not committed to contribute anything to the trust in consideration of the non-consensual third-party release they are slated to receive. Instead, the Boy Scouts are committed to trying to get the Local Councils to collectively contribute $425 million, which is facially inadequate given the sheer number of claims that have value in the tens of billions.  The Boy Scouts do not contemplate providing the contribution by the Local Councils in the Disclosure Statement.  Instead, the Boy Scouts propose that the disclosure would be made in June, as part of a plan supplement, approximately a month and half after the approval of the Disclosure Statement.

---

[14] An exemplar of the Tort Claimants' Committee's analysis for a Local Council  is attached as **Exhibit A**.  An analysis is available for each Local Council.

100.    Bankruptcy courts in the District of Delaware use the *Master Mortgage* ("**_MM_**") factors to determine whether third-party non-debtor releases should be allowed.[15]  The *MM* factors are "neither exclusive nor are they a list of conjunctive requirements."[16]  The second *MM* factor asks whether the non-debtor has made a substantial contribution of assets to the reorganization.  This factor requires releases to be "fair" and "given in exchange for reasonable consideration."[17]  The Local Councils have failed to show they will substantially contribute towards the Boy Scouts' reorganization to satisfy this factor in their attempt to qualify for a channeling injunction.

101.    The Plan in its current does not specify the consideration to be paid by each Local Council, which is another factor that weighs against granting non-consensual third-party releases.[18]  In many third-party release cases, the third parties clearly contributed substantial assets to the reorganization.[19]  In such cases, the courts typically do not engage in significant analysis of or provide guidelines related to whether those contributions are substantial.

---

[15]  *See, e.g., In re Indianapolis Downs, LLC.*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) (citing *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 934 (W.D. Mo. 1994)).

[16]  *Id.*

[17]  *In re Continental Airlines*, 203 F.3d 203, 215 (3rd Cir. 2000).

[18]  *See, e.g., In re Hoffinger Indus.,* 321 B.R. 498, 514 (Bankr. E.D. Ark. 2005) (finding that the lack of specificity regarding who or in what proportion the contribution would be paid weighed against granting the releases).

[19]  *In re Specialty Equip. Cos.*, 3 F.3d 1043,1045 (7th Cir. 1993) (third party creditor extended additional $10 million in credit); *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 288-89 and n. 2 (2d Cir. 1992) (creditor and debtor pooled their rights to collect judgments from the debtor's former officers and director into a $1.3 billion dollar fund); *In re Flintkote Co.*, 04-11300 (MFW), 2015 WL 4762580, at *10 (Bankr. D. Del. Aug. 12, 2015) (releasees contributed $575 million of the $700 million available for releasers); *Republic Supply v. Shoaf,* 815 F.2d 1046, 1048 (5th Cir. 1987)(third party guarantor contributed $850,000 in insurance proceeds to fund the plan); *In re Am. Family Enterprises,* 256 B.R. 377, 408 (D.N.J. 2000) (releasees contributed $70 million to consummate the plan, without their funding creditors would likely receive no recovery).

102.    Delaware courts have also inquired into the magnitude of the released claims. The *Spansion* court found important to its analysis that "the record does not reflect that there is any pending litigation in this case that would be discontinued by such a release."[20]  Some courts have also analyzed the releasee's contribution potential in determining whether its contribution was substantial.[21]

103.    Based on the IRS Form 990 statements filed by each Local Council (and related foundations, trusts, etc.) and supplemented by the Tort Claimants' Committee's appraisals of hundreds of Local Council properties, the aggregate value of the Local Councils' assets exceeds $4 billion.  The cash and other assets to be contributed under the Plan by the Local Councils are not substantial relative to either their liability or assets.  The Local Councils, who have not yet committed to contribute the $425 million alluded to in the Plan, are proposed to receive a non-consensual release in exchange for contributing far less than the 1% of the childhood sexual abuse claims that arose under their watch for decades.

104.    The Disclosure Statement should include a statement of the amount that each Local Council would contribute, the formula for allocating the global contribution to each Local Council, the percentage of the value of the abuse claims against each Local Council that is paid by the proposed contribution and the percentage of value of the abuse claims against each Local Council that would be paid if the Local Council is liquidated.

---

[20] *Spansion*, 426 B.R. at 143; *see also In re Tribune Co.,* 464 B.R. 126, 188 n. 73 (Bankr. D. Del. 2011).

[21] *See, e.g., In re HWA Props.*, 544 B.R. 231, 241 (Bankr. M.D. Fla. 2016) ("Courts evaluating this factor have found a contribution to be 'substantial' where the contribution consists of most of the assets of the contributing party."); *In re M.J.H. Leasing, Inc.*, 328 B.R. 363, 371 (Bankr. D. Mass. 2005); *In re Mahoney Hawkes, LLP*, 289 B.R. 285, 302 (Bankr. D. Mass. 2002) ("There is no information about whether the contribution is significant in terms of what the partners are able to pay.").

### iii.    The Disclosure Statement does not Provide Adequate Information on the Local Councils' Insurance Policies

105.    The Boy Scouts also purport to include as part of the Local Council Settlement Contribution: (i) the Local Council Insurance Policies; (ii) the Insurance Coverage; (iii) the Insurance Settlement Agreements; (iv) the Insurance Actions; and (v) the Insurance Action Recoveries.  Disclosure Statement Article VI(H)(17)(1)(a)(iii); Plan Article V(R)(1)(a).  The Disclosure Statement fails to provide adequate information with respect to these assets for the same reasons discussed above concerning the Boy Scouts' policies.  There are no Insurance Action Recoveries or Insurance Settlement Agreements and the Boy Scouts provides no information on how long it will take for the Insurance Actions to be monetized or at what cost.

106.    The Boy Scouts provides a purported list of what it refers to as the Local Council Insurance Policies.  Plan, Schedule 3.  At first glance, it is seemingly an impressive list and suggests an extensive amount of potentially available Local Council insurance coverage.  But that is not necessarily so.  For example, thousands of the entries on Schedule 3 are repetitive references to policies sold to the Boy Scouts with respect to which Local Councils may be additional insureds (and thus, arguably provide no additional limits of liability).  This may explain why the Boy Scouts omitted any representation as to the additional value of any of these policies, individually or collectively, beyond the value attributed to the Boy Scouts alone.

| **BSA Policy on Schedule 3** | **Policy Period** | **Number of Local Councils to Which the Policy is Attributed[22]** |
|---|---|---|
| Hartford Primary Policy No. 10CA43303 | 1/1/72 to 1/1/74 | 499 |
| Hartford Excess Policy No. 10HUA43302 | 1/1/72 to 1/1/74 | 501 |
| Hartford Primary Policy No 10CA43329 | 1/1/74 to 1/1/75 | 252 |
| Hartford Excess Policy No 10HUA43331 | 1/1/74 to 1/1/75 | 253 |
| Hartford Primary Policy No 10CA43342E | 1/1/75 to 1/1/76 | 434 |
| Hartford Primary Policy No 10CA43349E | 1/1/76 to 1/1/77 | 429 |

107.    By way of further example, upon information and belief, certain insurers also sold policies to be shared by numerous Local Councils.  American Re Insurance Company purportedly sold local councils policy number M1027493 with policy periods from January 1, 1976, to January 1, 1978, with an aggregate limit of liability.  However, that policy is separately referenced 854 times on Schedule 3.  *Id.*  The Boy Scouts also include references on their Schedule 3 to policies sold by insurers in liquidation.  *See, e.g.*, Commercial Union Insurance Company (13 individual references).

108.    Finally, Century is identified as having sold hundreds of Local Council policies without aggregate limits in years during which numerous individuals allege to have been abused.  *Id.*  Its potential liability, both to the Boy Scouts and to the Local Councils, is potentially massive.  For reasons discussed below, however, it may claim an inability to pay only a scintilla of what it owes.

---

[22]  This includes the additional reference to this same policy on Schedule 2 which purportedly enumerates the Boy Scouts' policies.

109. In addition to the above issues, there is no disclosure regarding the risk associated with the potential assignment of the Local Councils' insurance policies to the trust because the Local Councils are not debtors in the chapter 11 cases. As such, their policies are not property of the estate and they, as non-debtors, do not enjoy the benefits of assigning the policies in contravention of the anti-assignment provisions that each and every policy provides. There is no disclosure that any of the insurance carriers will consent to the Local Councils' assignment of their policies to the trust. Therefore, Survivors should be informed of the risks that the Settlement Trust can access the Local Councils' insurance policies as a means of recovery on account of the 84,000 childhood sexual abuse claims.

**C.  The Disclosure Statement Does Not Contain Adequate Information Regarding the Chartered Organizations, their <u>Contributions, and the Non-Consensual Third Party Releases</u>**

**i.  The Disclosure Statement is Devoid of Any <u>Information Regarding Chartered Organizations</u>**

110. The Disclosure Statement completely fails to provide any information regarding the Chartered Organizations, the number or nature of the claims against each of them (or even the major ones) and their participation under the Plan as beneficiaries of the non-consensual third-party releases and a channeling injunction. No Chartered Organization is a "Contributing Chartered Organization." There is no description of a mechanism for a Chartered Organizations to become eligible to receive a non-consensual third-party release of claims or channeling injunction. The Disclosure Statement cannot be approved as it provides no information whatsoever about the Chartered Organizations.

ii.     **The Indirect Abuse Claims Should Be
        Paid Along with the Trade Creditors**

111.    The Disclosure Statement fails to explain why Indirect Abuse Claims are to be

paid from the Settlement Trust rather than being classified and treated as General Unsecured

Claims.  First, we are in a "looking glass world"  to have the parties that are co-liable for the

childhood sexual abuse to share in the assets that are devoted to pay the Survivors that suffered

the abuse.  Additionally, there is no information in the Disclosure Statement explaining why the

Boy Scouts are required to indemnify the Chartered Organizations for the childhood sexual

abuse claims for which they are liable.

## IV.

## <u>THE PLAN IS PATENTLY UNCONFIRMABLE</u>

112.    "If the Court can determine from a reading of the Plan that it does not comply

with § 1129 of the Bankruptcy Code, then it is incumbent upon the Court to decline approval of

the disclosure statement and prevent diminution of the estate." *In re Pecht*, 57 B.R. 137, 139

(Bankr. E.D. Va. 1986).  A disclosure statement for a facially defective Plan cannot be approved

as containing "adequate information" within the meaning of section 1125 of the Bankruptcy

Code.  *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 148 (3d Cir. 2012) (bankruptcy court

can determine at the disclosure statement stage that a chapter 11 Plan is unconfirmable); *see also

Eastern Maine Elec. Coop.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991) ("If the disclosure

statement describes a Plan that is so 'fatally flawed' that confirmation is 'impossible,' the court

should exercise its discretion to refuse to consider the adequacy of disclosures."); *In re

Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003); *In re Allied Gaming Mgmt.*,

*Inc.*, 209 B.R. 201, 202 (Bankr. W.D. La. 1997) ("notwithstanding adequate disclosure of information required by section 1125(b), a disclosure statement should not be approved if the Plan, as a matter of law, cannot be confirmed."); *In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y.), *aff'd*, (E.D.N.Y. 1992) ("A disclosure statement will not be approved where, as here, it describes a Plan which is fatally flawed and thus incapable of confirmation."); *In re Felicity Assocs., Inc.*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996) (analysis of such issues at this stage of the confirmation process has become a "standard Chapter 11 practice").

113.    Evaluating confirmability at the disclosure statement stage avoids "engaging in a wasteful and fruitless exercise of sending the disclosure statement to creditors and soliciting votes on the Plan when the Plan is unconfirmable on its face.  Such an exercise in futility only serves to further delay a debtor's attempts to reorganize."  *In re Atlanta West VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988).

114.    Here, the Plan contains inappropriate blanket direct and third-party releases of, among others, the Debtors' current and former officers and directors devoid of any discussion of (i) what claims (and the value thereof) are being proposed to be released by the Debtors through the Debtors' release of the Released Parties and (ii) what value and consideration, if any, is being provided by the Released Parties to justify the releases in favor of the Released Parties. The Local Councils and Contributing Chartered Organizations will be released with Direct Abuse Claims against them being channeled to the Settlement Trust with no determination that the contributions made justify such releases.

115.    Although the Third Circuit permits third party releases, the bankruptcy courts in

Delaware have allowed non-consensual, non-debtor releases only if certain factors are satisfied.

In the seminal case of *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 934 (W.D. Mo.

1994), the court identified the factors that are now used by most courts, including the Delaware

Bankruptcy Court:  (1) identity of interest between the debtor and the third-party, usually an

indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the

debtor or will deplete assets of the estate; (2) the non-debtor has made a substantial contribution

of assets to reorganization;[23] (3) the release is necessary to the reorganization and without it

there is little likelihood of reorganization;[24] (4) a substantial majority of the creditors agree to

the injunction, specifically, the impacted class, or classes, has "overwhelmingly" (over 90%)

voted to accept the Plan treatment;[25] and (5) the Plan provides a mechanism for the payment of

all, or substantially all, of the claims of the class or classes affected by the injunction[26].

---

[23]  *In re Specialty Equip. Cos.*, 3 F.3d 1043,1045 (7th Cir. 1993)(third party creditor extended additional $10 million in credit); *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 288-89 and n. 2 (2d Cir. 1992)(creditor and debtor pooled their rights to collect judgments from the debtor's former officers and director into a $1.3 billion dollar fund); *In re A.H. Robbins Co.*, 880 F.2d at 696 (third party insurer contributed assets to a claimant fund); *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d at 90 (third party insurer contributed $770 million to a claimant fund); *Republic Supply v. Shoaf*, 815 F.2d 1046, 1048 (5th Cir. 1987) (third party guarantor contributed $850,000 in insurance proceeds to fund the Plan); *In re AOV Indus., Inc.*, 792 F.2d 1140, 1142 (D.C. Cir. 1986) (creditor released $51 million in claims and contributed an additional $4.5 million); *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 665-66 (Bankr. D.D.C 1992) (Plan funded exclusively by contributions of non-debtors); *In re Monroe Well Serv., Inc.*, 80 B.R. 324 (Bankr. E.D. Pa. 1987) (largest creditor contributed $6.45 million and other creditors paid additional $1.2 million to fund Plan).

[24]  *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d at 289(no reorganization without principal creditor settlement, including injunction); *In re A.H. Robbins Co.*, 880 F.2d at 702 (injunction essential to reorganization); *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d at 90 (injunction the "cornerstone" of the proposed Plan); *In re Heron, Burchette, Ruckert & Rothwell,* 148 Bankr. at 667 (injunction the "sine qua non" of the Plan); *In re Ionosphere Clubs, Inc.*, 124 B.R. 635, 642 (S.D.N.Y. 1991) (injunction necessary for successful reorganization); *In re Johns-Manville Corp.*, 68 B.R. 618, 625 (Bankr. S.D.N.Y. 1986) (no meaningful reorganization unless Plan protects the equitable rights of parties in interest); *In re MacDonald Assocs., Inc.,* 54 B.R. 865, 870 (Bankr. D. R.I. 1985) debtor unable to reorganize without injunction).

[25]  *In re Millennium Lab Holdings II, LLC*, No. 18-3210, 2019 U.S. APP. LEXIS 37939, at *8 (3d Cir. Dec. 19, 2019) (over 93% of pre-petition lenders had agreed to the releases in a prepetition restructuring agreement); *In re Archdiocese of Saint Paul & Minneapolis*, 578 B.R. 823, 833 (Bankr. D. Minn. 2017) (refusing to approve third

116.    Therefore, without (a) overwhelming support from the Survivors (in the 90% range) (b) a demonstrated substantial financial contribution to the Settlement Trust by the applicable Local Councils and Contributing Chartered Organizations (as the proposed beneficiaries of the channeling injunction) based on pending childhood sexual abuse claims and the assets available to pay such Claims, and (c)  a Plan that pays substantially all of the estimated value of the Survivors' claims, the Local Councils and Contributing Chartered Organizations cannot obtain non-consensual releases from Survivors or the benefits of the channeling injunction.   Based on the publicly stated positions of the Tort Claimants' Committee and the Coalition, more than 90% of the Survivors will vote to reject the Plan.  The Tort Claimants' Committee cannot fathom that the Boy Scouts could confirm the Plan over the opposition of the Survivors' fiduciary representative and the near unanimous opposition of the Survivor constituency.   This opposition has nothing to do with emotion.  Rather, the Disclosure Statement clearly shows that the Boy Scouts and the Local Councils are not paying anything close to their "ability to pay", that Hartford is grossly underpaying on its exposure and that

---

party releases and channeling injunction based solely on overwhelming rejection of the provision by the sex abuse victims); *In re Specialty Equip. Co.,* 3 F.3d at 1045 (creditors and interest holders entitled to vote "overwhelmingly" accepted the proposed Plan treatment); *In re A.H. Robbins Co.,* 880 F.2d at 698 (94% of tort claimants affected by the injunction voted to accept the Plan); *In re AOV Indus., Inc.,* 792 F.2d at 1143 (creditors "overwhelmingly" accepted Plan with over 90% of the creditors in each class voting to accept); *In re Heron, Burchette, Ruckert & Rothwell,* 148 Bankr. at 664 (only 1 of 63 creditors and 8 of 93 partners objected to injunction*); In re Johns-Manville Corp.,* 68 B.R. at 621 (Plan overwhelmingly accepted).

[26]  *See, e.g., Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.),* 280 F.3d 648, 659 (6th Cir. 2002) ("in order for the Plan to be approved under the 'unusual circumstances' test, it must ensure an opportunity for those claimants who choose not to settle to recover in full, and this determination must be supported by particularized factual findings."); *In re Specialty Equip. Co.,* 3 F.3d 1043, 1044-45 (7th Cir. 1993) (consensual releases with unsecured claims paid in full and bondholders received 96% of common stock ); *In re A.H. Robbins Co.,* 880 F.2d 694, 697 (4th Cir. 1989) (Plan approval contingent on finding that there is enough funding to pay all claims in full); *In re Wool Growers Cent. Storage Co.,* 371 B.R. 768, 777 (Bankr. N.D. Tex. 2007) ("As for the fifth factor, most courts have held that full payment is necessary."); *see also id.* at 777-78 (holding that fifth factor not satisfied where "the [nonconsenting creditors], if forced to accept the Plan with the proposed release, will recover, at best, sixty to seventy percent of their claims").

Survivors will not receive anywhere near the estimated value of their childhood sexual abuse claims.

117.    While the universe of proposed Released Parties and Protected Parties is vast, the definition of Released Parties inexplicably excludes the Tort Claimants' Committee and related parties from a standard provision.  There is no basis for the hostile discriminatory treatment.

118.    The Disclosure Statement describes a Plan that cannot be confirmed.  As the Debtor constantly reminds everyone, every dollar spent on administrative expenses is a dollar less for Survivors.  The  Court should not subject the Survivors to the expense of the Boy Scouts soliciting votes on a patently unconfirmable Plan, nor should it require Survivors to wade through nearly 600 pages and relive their traumas, for a plan that cannot be confirmed.

## V.

## <u>THE SOLICITATION PROCEDURES SHOULD NOT BE APPROVED</u>

119.    Although bankruptcy courts frequently authorize the use of "master ballots" in connection with the voting as to securities indirectly held through street names, use of the master ballot process for other claims is more limited –primarily in asbestos cases.  Under the typical master ballot process for tort claims, lawyers for tort claimants vote their clients' claims to accept or reject a Plan on a master ballot that aggregates and tallies all of the votes of the attorneys' clients.  The lawyer signs the master ballot on behalf of his or her clients/claimants. A lawyer may or may not be required to provide evidence of his/her authority to vote the creditor's claim.

120. Notwithstanding the trending use of master ballots, the procedures proposed here are fatally flawed because they are not designed to ensure that each and every vote of a Survivor is counted. If the solicitation procedures are adopted, they almost certainly will result in Survivors either being deprived of the opportunity to vote or, if the Survivor does vote, he/she risks having multiple votes cast on his/her behalf by law firms that could ultimately render his/her vote invalid or not counted at all.

A.    **The Solicitation Deadlines and Recipients of Ballots**

i.    **Solicitation and Confirmation Deadlines**

121. The solicitation and confirmation timeline outlined in the Motion no longer applies because the hearing on the Motion and approval of the Disclosure Statement was moved from April 15, 2021 to April 29, 2021 and then to May 19, 2021. If and when the Disclosure Statement and the procedures for soliciting ballots are approved, Survivors, or their counsel, should have no less than 60 days to consider whether to accept or reject the Plan. Similarly, all the deadlines and other milestones must be extended accordingly, which includes the solicitation deadline and record date.

ii.    **Ballots Must be Sent to All Survivors or Their Counsel**

122. As the Boy Scouts acknowledge in paragraph 46 of the Motion, holders of allowed claims are entitled to vote. 11 U.S.C. § 1126(a). No party in interest has filed an objection to any of the childhood sexual abuse claims. Accordingly, absent an objection, all such claims should receive a ballot and be entitled to vote on the Plan.

123.    However, under the proposed solicitation procedures, the Boy Scouts will only solicit the holder of a claim, or his/her counsel, that was filed most recently.  *See* Solicitation Procedures, IV.A.3.  For example, if a claim was filed on behalf of John Doe 1 on November 1, 2020, by Law Firm A and another claim was filed a claim on behalf of John Doe 1 on November 8, 2020 by Law Firm B, the Boy Scouts will not send a ballot to Law Firm A on behalf of John Doe 1 but only to Law Firm B.  The foregoing is problematic for several reasons.

124.    The Boy Scouts have not and will not conduct any claims reconciliation prior to solicitation.  Ordinarily, it is common for a debtor to file administrative objections for the purpose of cleaning up the claim register.  While the administrative objections generally address amended and superseded claims (or claims filed against the wrong debtor), administrative objections would be far more helpful here because frequently more than one law firm filed a claim on behalf of the same Survivor.

125.    Counsel to the Torts Claimants' Committee is aware of numerous instances in which the earlier filed claim is the operative claim because the survivor has no record of ever signing an engagement otherwise authorizing another law firm to file a claim on his or her behalf.  Thus, if the Boy Scouts sends ballots only to the last claim filed, it will in many instances send ballots to law firms that are not authorized to act on behalf of the survivor.  Unless an objection is filed, the Boy Scouts must send ballots to (a) every counsel that filed the claim on behalf of the survivor and (b) to the survivor to the extent that the survivor filed a claim on behalf of himself or herself.

### iii.    **Abuse Survivor Plan Solicitation Directive**

126.    The Solicitation Procedures contemplate that the Boy Scouts will send a notice

(the "**Attorney Solicitation Directive**") to the survivors' counsel of record to determine

whether (a) that counsel will vote on behalf of the survivor (and any of the other survivors that

are clients of such counsel) by way of a master ballot or (b) directly to the survivor that filed a

proof of claim.  Prior to sending the Attorney Solicitation Directive, the Tort Claimants'

Committee and the Coalition worked with the Boy Scouts on how it should be revised to reflect

the desires of Survivors to have their counsel act on their behalf.

127.    In addition, the Debtors' proposed procedures disenfranchise and disempower

Survivors, many of whom look forward to casting their votes and view it as an important and

cathartic step.  If a Survivor chooses, he/she can authorize his/her attorney to include his/her

vote in a master ballot.  But Survivors, not the Firms, should make that initial decision.

Moreover, each abuse proof of claim contained a direction from the Survivor telling the Debtors

whether they should contact the Survivor or the Survivor's attorney.  This direction should take

precedence.

128.    Paragraph IV.F.3 of the Solicitation Procedures provides that if more than one

master ballot is received on behalf of the same Survivor from more than one law firm, that the

Boy Scouts will provide ten days' notice to the respective firms to determine which firm

controls the Survivor's vote.  In the event the issue is not resolved within ten days, such votes

will not be tabulated.

129.    Instead, if the votes on master ballots from the multiple law firms are the same

(*i.e.*, both or all vote to accept), then the Boy Scouts should simply count Survivor's vote one

time and there is no reason to sort out which law firm controlled the vote of the Survivor.  If the votes on master ballots from multiple laws firms conflict (*i.e.*, one votes to accept and other to reject), then the Boy Scouts should require the applicable law firms to produce an engagement letter that shows it was authorized to act on behalf of the Survivor but only to the extent the conflicting vote might change the outcome of the acceptance or rejection of the plan.

130.    Under the Solicitation Procedures, the deadline to submit votes is July 30, 2021, and the Boy Scouts propose to file a ballot report on August 16, 2021.  The above procedures should permit the parties 14 days before the conflicting votes are not counted, not ten days.  The timeline above shows there is sufficient time for the Boy Scouts to ensure that all votes are counted and submitted by the authorized representative.

### iv.    Ballots Should Identify the Applicable Local Council

131.    A Survivor needs to know the Local Council he or she is being asked to release by voting to accept the Plan and that information should be included on the ballot.   Over 30,000 Survivors do not remember the name of their troop or pack's Local Council, not surprising given their age when they were Scouts and the passage of time.   For the entirety of this Case, the Tort Claimants' Committee has sought production of troop and volunteer rosters from the Boy Scouts and the Local Councils that have such information.  Production has been fitful and roster production that has been made was premised on the Survivor remembering (assuming he even knew)  the name of the Local Council.  In most cases, the Boy Scouts knows where the abuse occurred and it should research the names of the Local Councils that are being released from the abuse claims.

### v.    The Tort Claimants' Committee Should Be Permitted to Send A Cover Letter to Survivors

132.    By the Motion, the Debtors seek authority to transmit to creditors a Cover Letter urging them to accept the Plan.  Other parties are not authorized to communicate to creditors unless a party becomes a co-proponent of the Plan and will also be urging support.  The Tort Claimants' Committee should be authorized to transmit its own Cover Letter to Survivors as part of the solicitation materials communicating its recommendation regarding the Plan. Given that the Tort Claimants' Committee is an official committee that represents the interests of all childhood sexual abuse Survivors (which is the reason this bankruptcy case was filed), it too should have a voice regarding the acceptance or rejection of the Boy Scouts' Plan.  The Boy Scouts efforts to deflect attention away from Survivors again is evidenced in this one-sided solicitation procedure.

### vi.    Deemed Class Acceptance and The Debtors' Discretion Regarding Vote Tabulation and Solicitation Procedures Changes Should be More Narrow

133.    Paragraph V.B.10 of the Solicitation Procedures will authorize the Boy Scouts to stipulate with the holders of claims regarding the amount of such claim for voting purposes.  To the extent any such stipulation involves an agreement with a holder of a childhood sexual abuse claim, the Boy Scouts should obtain the consent of the Tort Claimants' Committee or provide notice and an opportunity for a hearing.

134.    Paragraph V.D.8 of the Solicitation Procedures permits the Boy Scouts to authorize the withdrawal or modification of a ballot after the voting deadline.  Before the Boy Scouts authorizes the withdrawal or modification of a ballot of a Survivor or a master ballot

after the voting deadline, the Boy Scouts should obtain the consent of the Tort Claimants'

Committee or provide notice and opportunity for a hearing.

135.    Paragraph V.D.13 of the Solicitation Procedures permits the Boy Scouts to waive

any defects with respect to a Ballot.  Any such waiver must be subject to the consent of the Tort

Claimants' Committee to the extent such ballot was submitted by a Survivor or his/her counsel

or provide notice and opportunity for a hearing.

136.    Paragraph V.D.16 of the Solicitation Procedures provide that if a class under the

Plan does not receive any votes to accept or reject, then that class will be deemed to have

accepted the Plan.  This procedure is contrary to the section 1126 of the Bankruptcy Code and

the absence of any ballot for or against the Plan cannot be deemed to accept the Plan.  Creditors

must submit ballots and vote before a class regarded as having accepted the Plan.

137.    Paragraph V.D.20(b) of the Solicitation Procedures permit the Boy Scouts to

grant extensions of time to submit a ballot.  If the extension relates to a childhood sexual abuse

claim, then the Boy Scouts must obtain the consent of the Tort Claimants' Committee.

### vii.    Material Plan Amendments Require a Motion and Notice of Hearing

138.    Paragraph V.D.11 contemplates that the Boy Scouts may amend the plan and

distribute amended solicitation materials.  Any such material plan amendments must be made

pursuant to section 1127 of the Bankruptcy Code after notice and hearing with any changes to

the Plan or solicitation materials approved by the Court prior to their distribution.

# VI.

## RESERVATION OF RIGHTS

The Tort Claimants' Committee reserves all rights with respect to the foregoing and reserves the right to raise any other and additional objections prior to or at the hearing on the Motion or any further iterations to the Plan and Disclosure Statement.

# VII.

## CONCLUSION

For all of the foregoing reasons, the Tort Claimants' Committee respectfully requests that the Court deny the Motion.

Date: May 10, 2021

**THE OFFICIAL COMMITTEE OF TORT CLAIMANTS**

*/s/ James E. O'Neill*
James I. Stang (CA Bar No. 94435)
John A. Morris (NY Bar No. 2405397)
Iain A.W. Nasatir (CA Bar No. 148977)
James E. O'Neill (DE Bar No. 4042)
John W. Lucas (CA Bar No. 271038)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899 (Courier 19801)
Telephone: 302-652-4100
Facsimile: 302-652-4400
Email: jstang@pszjlaw.com
        jmorris@pszjlaw.com
        inasatir@pszjlaw.com
        joneill@pszjlaw.com
        jlucas@pszjlaw.com

*Counsel for the Tort Claimants' Committee*