**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket Nos. 2295 & 2594** |

**OBJECTION OF THE FUTURE CLAIMANTS' REPRESENTATIVE TO
(A) DISCLOSURE STATEMENT FOR THE SECOND AMENDED CHAPTER 11 PLAN
OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA,
LLC AND (B) DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING
THE DISCLOSURE STATEMENT AND THE FORM AND MANNER OF NOTICE,
(II) APPROVING PLAN SOLICITATION AND VOTING PROCEDURES,
(III) APPROVING FORMS OF BALLOTS, (IV) APPROVING FORM, MANNER, AND
SCOPE OF CONFIRMATION NOTICES, (V) ESTABLISHING CERTAIN DEADLINES
IN CONNECTION WITH APPROVAL OF THE DISCLOSURE STATEMENT AND
<u>CONFIRMATION OF THE PLAN, AND (VI) GRANTING RELATED RELIEF</u>**

James L. Patton, Jr., the Future Claimants' Representative (the "<u>FCR</u>"), hereby submits this objection (the "<u>Objection</u>") to (a) the *Disclosure Statement for the Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 2594] (the "<u>Disclosure Statement</u>") and (b) the *Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief* [Docket No.

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

2295] (the "Disclosure Statement Motion").[2]  In support of this Objection, the FCR states as

follows:

## PRELIMINARY STATEMENT

1.      The Plan does not have the support of the FCR or any other constituency

representing the interests of abuse survivors in these cases, and is unconfirmable as a matter of

law.  The Debtors state in the Disclosure Statement that they "care[] deeply about all victims of

child abuse" and have reiterated on numerous occasions that they intend to equitably compensate

abuse victims.[3]  Nevertheless, just over one year after filing these cases, the Debtors are determined

to cram down a plan of reorganization over innocent victims of sexual abuse that: (1) pays nearly

every other creditor but abuse survivors in full while survivors receive pennies on the dollar;

(2) places the burden of litigating insurance coverage disputes, which could take years to resolve,

on abuse survivors; (3) allows the Debtors and Local Councils to retain billions of dollars in assets;

(4) grants an improper discharge to the Non-Debtor Parties; (5) denies Future Abuse Claimants

due process; and (6) seeks approval of an unconscionable settlement with Hartford for a small

fraction of the Hartford policies' value.

2.      Approval of the Disclosure Statement would be a tremendous waste of the Debtors'

limited resources, because there are significant, gating issues that must be addressed in order for a

confirmable plan of reorganization to be solicited, including whether the Identified Property is

unavailable for distribution to creditors, as the Debtors posit, and the scope and aggregate value of

Abuse Claims.  The outcomes of the Restricted Property Action, and the estimation process set

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Disclosure Statement Motion or Disclosure Statement, as applicable.

[3] Disclosure Statement Art. II.A; *Debtors' Info. Br.* at p. 38 [Docket No. 4].

forth in the Estimation Motion,[4] are essential to determining whether the contributions that will be provided by the Non-Debtor Parties are sufficient to obtain the benefit of the Channeling Injunction, as well as whether the Plan is feasible and satisfies the best interests of creditors test, among other things.  Without understanding the amount of property available to satisfy Abuse Claims, and the magnitude of Abuse Claims, the Debtors cannot possibly satisfy these confirmation standards, particularly over the opposition of the FCR and abuse survivors.

3.      The Debtors recently reiterated that the estates' resources are "limited" and that they need to curtail professional expenses, which are "upwards of $100 million."[5]  But moving forward with solicitation of a patently unconfirmable plan will only worsen the problem and further reduce assets available for distribution to abuse survivors.

## OBJECTION

4.      It is well settled that a disclosure statement cannot be approved if, as a matter of law, the underlying plan is unconfirmable.  *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 153-54 (3d Cir. 2012).  The primary reason to evaluate confirmability at the disclosure statement stage is to "avoid engaging in a wasteful and fruitless exercise of sending the disclosure statement to creditors and soliciting votes on the plan when the plan is unconfirmable on its face.  Such an exercise in futility only serves to further delay a debtor's attempt to reorganize."  *In re Atlanta West VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988); *see also In re Am. Capital Equip.*, 688 F.3d at 154 (stating that "a '[c]ourt [should] not proceed with the time-consuming and expensive

---

[4]  "Estimation Motion" means the *Motion of the Future Claimants' Representative, the Official Committee of Tort Claimants, and the Coalition of Abused Scouts for Justice for Entry of an Order, Pursuant to 11 U.S. C. §§ 105(a) and 502(c), (I) Authorizing an Estimation of Current and Future Abuse Claims and (II) Establishing Procedures and Schedule for Estimation Proceedings* [Docket No. 2391].

[5]  *See, e.g.*, Mar. 12, 2021 Hr'g Tr. 46:16-21; *Debtors' Objection to Joint Motion of the Official Tort Claimants' Committee and Future Claimants' Representative for Entry of an Order Granting Standing and Authorizing the Prosecution of Certain Challenge Claims on Behalf of the Bankruptcy Estates* [Docket No. 2733].

27860956.7

proposition of hearings on a disclosure statement and plan when the plan may not be confirmable because it does not comply with [confirmation requirements].'") (citing *In re Kehn Ranch, Inc.*, 41 B.R. 832, 832–33 (Bankr. S.D. 1984)).

5.        In order to be confirmed, a proposed plan must satisfy each of section 1129(a)'s requirements.  *In re Exide Techs.*, 303 B.R. 48, 58 (Bankr. D. Del. 2003); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 598-99 (Bankr. D. Del. 2001).  Failure to satisfy just one of these requirements precludes confirmation of a plan.  11 U.S.C. § 1129(a); *see also In re Calvanese*, 169 B.R. 104, 113-14 (Bankr. E.D. Pa. 1994).

6.        The Plan is patently unconfirmable and violates, at a minimum, sections 1129(a)(1), (7), and 1129(b)(1) of the Bankruptcy Code.  Accordingly, the Court should not approve the Disclosure Statement.

### A.    The Plan Does Not Satisfy Section 1129(a)(1) of the Bankruptcy Code Because It Contains Impermissible Non-Consensual Third-Party Releases.

7.        Section 1129(a)(1) of the Bankruptcy Code provides that a plan may be confirmed only if it "complies with the applicable provisions of [the Bankruptcy Code]."  The Plan contemplates that Abuse Claims will be channeled to the Settlement Trust and enjoins the holders of such claims from taking any action against the "Protected Parties" through the Channeling Injunction and related releases.  Plan Art. X.F, X.J.3.  Under both the Global Resolution Plan and the BSA Toggle Plan, "Protected Parties" includes not only the Debtors, but also certain non-debtor parties (the "Non-Debtor Parties").  Plan Art. I.A.180.  Specifically, the Related Non-Debtor Entities and Settling Insurance Companies[6] are Protected Parties under the Global

---

[6] It is unclear whether the Settling Insurance Companies are Protected Parties under the BSA Toggle Plan.  *Compare* Plan Art. I.A.180(b) ("if the Plan is Confirmed as a BSA Toggle Plan, the following Persons [are Protected Parties]: (i) the Debtors; (ii) Reorganized BSA; (iii) the Related Non-Debtor Entities; *(iv) the Settling Insurance Companies, if any;* and (v) all of such Persons' Representatives") (emphasis added), *with* Plan Article III.B.8 ("for the avoidance of doubt . . . if the Plan is Confirmed as a BSA Toggle Plan, the Protected Parties shall include: (i) the Debtors;

Resolution Plan and BSA Toggle Plan, and the Local Councils and Contributing Chartered Organizations are Protected Parties under the Global Resolution Plan. *Id.* "Protected Parties" also includes the Representatives[7] of the Debtors, including current and former officers, directors, and volunteers, as well as the Representatives of the Related Non-Debtor Entities, Settling Insurance Companies, Local Councils, and Contributing Chartered Organizations, as applicable. *Id.* The non-consensual third-party release of the Non-Debtor Parties included in the Plan does not satisfy the requirements of the Bankruptcy Code, and the Plan therefore does not satisfy section 1129(a)(1).

8.      Section 524(e) of the Bankruptcy Code provides that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). In limited circumstances, courts have approved third-party releases of non-debtor entities and channeling injunctions pursuant to section 105(a) of the Bankruptcy Code; however, these courts have emphasized that such releases and injunctions are the exception, not the rule. *See, e.g.*, *In re Wash. Mutual, Inc.*, 442 B.R. 314, 354 (Bankr. D. Del. 2011) (denying confirmation of plan because, among other grounds, non-consensual third-party releases to debtors' officers and directors were impermissible); *Exide Techs.*, 303 B.R. at 74 (denying confirmation of plan because, among other grounds, non-consensual third party releases to debtors' officers and directors were impermissible).

---

(ii) Reorganized BSA; (iii) the Related Non-Debtor Entities; and (iv) all of such Persons' Representatives"). This Objection assumes that the Settling Insurance Companies, if any, are Protected Parties under both the Global Resolution Plan and BSA Toggle Plan.

[7]    "Representatives" means, with respect to any Person, such Person's (a) predecessors, successors, assigns, subsidiaries, and Affiliates, (b) current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, board members, advisory board members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and (c) respective heirs, executors, estates, and nominees, in each case solely in its capacity as such.

27860956.7

9.      Third-party releases and channeling injunctions for the benefit of non-debtor parties are not permissible unless the debtor demonstrates their "fairness, necessity to the reorganization, and specific factual findings to support these conclusions." *In re Lower Bucks Hosp.*, 571 F. App'x. 139, 144 (3d Cir. 2014) (denying third party releases because, among other grounds, there was no indication that the release was exchanged for adequate consideration). In determining the propriety of such releases and injunctions, courts consider whether (a) the non-debtor party made a substantial contribution of assets to the reorganization, (b) the impacted class "overwhelmingly" votes to accept the plan; and (c) the plan provides for payment of all or substantially all of the claims of the class affected by the injunction. *Exide Techs.*, 303 B.R. 71-72 (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999); *see also Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 657-59 (6th Cir. 2002).

10.     This standard is similar to that imposed by section 524(g) of the Bankruptcy Code. In order to channel asbestos claims to a trust, section 524(g) requires: (a) the Bankruptcy Court to appoint a future claimants' representative to act as a fiduciary for future claimants; (b) approval of the plan by a super-majority of current asbestos claimants; and (c) the injunction to be fair and equitable with respect to future claimants in light of the benefits to be provided by the debtor and third parties covered by such injunction. *In re W.R. Grace & Co.*, 729 F.3d 311, 330–31 (3d Cir. 2013); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 237 (3d Cir. 2004). These requirements ensure that the due process interests of future claimants are protected and, at the same time, afford the debtor with an opportunity for a fresh start by channeling such claims to a trust for resolution. *In re W.R. Grace & Co.*, 729 F.3d at 320.

11.     While not directly applicable to these cases, section 524(g) and the policies underlying it are pertinent to the analysis of the Channeling Injunction given that sexual abuse

claims present complexities similar to those raised by asbestos-related claims—namely, both types of claimants may not be aware of their interests and are therefore unable to participate in and protect their interests in a chapter 11 proceeding.  The Third Circuit has held that while the Bankruptcy Court has "broad authority to modify debtor-creditor relationships" as a court of equity, its authority under section 105(a) to craft flexible remedies not expressly authorized by the Bankruptcy Code must be guided by principles of "fairness and justice in the reorganization process" and "effect the result that the Bankruptcy Code was designed to obtain."  *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 235–36 (3d Cir. 2004); *Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003).

12.    The Debtors cannot establish that the Channeling Injunction satisfies the requirements necessary to enjoin Abuse Claims against the Non-Debtor Parties.  First, in order to channel current and future Abuse Claims against the Non-Debtor Parties to the Settlement Trust, the Debtors must obtain the overwhelming vote of current Abuse Claims[8] *and* the consent of the FCR.  Absent the power to block the Channeling Injunction, the FCR would be assigned the task of protecting the due process rights of future Abuse Claims but would not possess any authority with which to do so.  Indeed, for this reason, section 524(g) confers upon a future claimants' representative the power to veto the issuance of a channeling injunction.[9]  The FCR and other

---

[8]  *See In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 133 (3d Cir. 2019) (over 93% of pre-petition lenders had agreed to the releases in a prepetition restructuring agreement); *In re Archdiocese of Saint Paul & Minneapolis*, 578 B.R. 823, 833 (Bankr. D. Minn. 2017) (refusing to approve a third party release where class of abuse claimants overwhelmingly rejected the plan); *In re A.H. Robbins Co.*, 880 F.2d at 698 (94% of tort claimants affected by the injunction voted to accept the plan).

[9]  Although section 524(g), when read in isolation, does not explicitly recite this veto power, sections 524(g) and (h), taken together, condition the enforceability of a channeling injunction upon the future claimants' representative's consent to the confirmation of any plan that contains such an injunction.  *See* 11 U.S.C. § 524(g)(4)(B) (providing that the validity and enforceability of the injunction against future claimants is subject to subsection (h)).  The FCR is not aware of any cases where a court confirmed a section 524(g) plan over the objection of a future claimants' representative.

27860956.7

constituencies in these cases representing the interests of abuse survivors—the Tort Claimants'

Committee and the Coalition—vigorously oppose the Plan.  As a result, the Debtors will not be

able to obtain the requisite support needed from abuse survivors for approval of the non-consensual

release of the Non-Debtor Parties.

13.    Second, neither the Global Resolution Plan nor the BSA Toggle Plan provide for

the payment of substantially all Abuse Claims.  The Disclose Statement provides that abuse

survivors will receive a recovery of just 1-4% plus "insurance rights expected to have limited

value" under the BSA Toggle Plan.  Disclosure Statement Art. II.C.8.  While the Debtors estimate

that holders of Abuse Claims will receive a recovery of 8-23% plus "insurance rights expected to

yield up to 100% recovery" under the Global Resolution Plan, the Debtors do not explain the basis

for their position that insurance rights will provide such a recovery and seemingly ignore the

asserted and potential coverage disputes with insurers regarding such rights, which could take

many years to resolve.  *See id.*  Nor do the Debtors explain how such recovery could be possible

in light of the various Plan provisions that deprive the Settlement Trust of the ability to settle the

coverage at maximum value, including the substantial carveouts to the insurance rights they

propose transferring to the Settlement Trust and the Plan's failure to guarantee that the Settlement

Trust will have access to the documents and information it needs to pursue the coverage.  The

projections are also flawed in that they are based on an initial valuation range of Direct Abuse

Claims by the Debtors' professionals, which the Debtors acknowledge must be refined.  *Id.* Art.

VI.H.19.  As detailed more fully in the Estimation Motion, the FCR agrees that estimation of

Abuse Claims should occur under the circumstances of these cases as it will inform whether the

Plan satisfies the requirements for releasing the Non-Debtor Parties, among other things.

However, estimation must occur prior to solicitation of the Plan to avoid wasting estate resources.

27860956.7

14.    Finally, the Non-Debtor Parties are not making a substantial contribution to the Settlement Trust.  The Plan is completely silent as to what (if any) Plan contributions will be made by the Related Non-Debtor Parties and Contributing Chartered Organizations.  While the Debtors state that they "are committed to ensuring that the aggregate value of the Local Council Settlement Contribution is not less than $425 million," the Local Councils have not committed to providing any contributions.  *Id.* Art. II.C.  Even if the Debtors do obtain a $425 million contribution from the Local Councils, this contribution is not substantial in light of the aggregate value of the Local Councils' assets, which are worth substantially more than $425 million.

15.    Similarly, neither the Plan nor the Disclosure Statement identify any Settling Insurers or Insurance Settlement Agreements.  A report recently filed by the Mediators indicates that the Debtors have reached a settlement (the "Hartford Settlement") with Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company and Navigators Specialty Insurance Company (collectively, "Hartford").  Although the Harford Settlement contemplates a $650 million payment to the Debtors, this payment is illusory given that the agreement includes a reduction clause (the "Century Clause") tied to any settlement that the Debtors or Settlement Trust execute with Century Indemnity Company ("Century") for less than $1.3 billion.  Century's public filings for the fiscal year ending December 31, 2020 indicate that Century may only have $561 million in available assets unrelated to asbestos and environmental liability.[10]  Pursuant to the Century Clause, the Hartford Settlement will be reduced, dollar for dollar, by 50% of the difference between $1.3 billion and any amount paid by Century.

---

[10]  As set forth in the *Objection of the Coalition of Abused Scouts for Justice and Future Claimants' Representative to Debtors' Third Motion for Entry of an Order Extending the Debtors' Exclusive Period to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 2672], the FCR and Coalition believe that Chubb (or one of its active insurance subsidiaries) may also be liable for these policy obligations and that Chubb has sufficient assets to pay them. However, Chubb has not appeared in the chapter 11 cases, and Century has not produced documents necessary to confirm that Chubb is obligated on these policies.  The FCR reserves all rights regarding Century's and/or Chubb's ability to satisfy at least the $1.3 billion referenced in the Century Clause.

27860956.7

Accordingly, the Hartford Settlement, which was negotiated without the approval or participation of the FCR, Tort Claimants' Committee, or the Coalition, represents a "fire sale" settlement of one of the Debtors' most valuable assets for what is likely just a small portion of the value of the Hartford policies. The Hartford Settlement also includes a claw-back mechanism requiring the Settlement Trust to reimburse Hartford if the Settlement Trust settles with Century for less than $1.3 billion. This arguably would require the Settlement Trust to hold a significant portion of the Hartford Settlement in reserve while it litigated with Century and Chubb, which litigation could last a decade. Many survivors who are now over 70 years old could be deceased before realizing the value of any contributions made by Hartford.

16.     The Debtors' inability to satisfy the requirements applicable to the Channeling Injunction jeopardizes the due process rights of future sexual abuse claimants and renders the Plan unconfirmable as a matter of law. Accordingly, the Disclosure Statement should not be approved.

**B.     The Debtors Cannot Satisfy Section 1129(a)(8) of the Bankruptcy Code or the Cramdown Requirements.**

17.     As discussed above, the FCR's mandate to protect the due process interests of future abuse claimants precludes approval of a plan containing a channeling injunction over the FCR's objection. Nevertheless, even assuming the Plan could be approved without the consent of the FCR, the Debtors do not satisfy the requirements for "cramdown" under the Bankruptcy Code.

18.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims and interests either accept a plan or be unimpaired under the plan. Section 1129(b) provides that if all applicable requirements of section 1129(a) are met—notwithstanding a failure to comply with section 1129(a)(8)—a plan may be confirmed so long as it does not discriminate unfairly and is fair and equitable with respect to each class of claims and interests that is impaired and has not accepted the plan. Although "unfair discrimination" is not defined by the Bankruptcy Code, courts

have held that a "unfair discrimination arises when there is: (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution." *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006).

19.     The Plan unfairly discriminates against current and future sexual abuse survivors. The Debtors commenced these chapter 11 cases with the stated goal of timely and equitably compensating sexual abuse survivors.  Debtors' Info. Br. at 6-7.  Yet, even under the Global Resolution Plan, which the Debtors claim "has been designed to maximize and expedite recoveries to Abuse Victims," the Plan leaves survivors with nothing more than rights to recover an unknown value from a Settlement Trust that will be required to litigate with insurers for years after the Plan's approval.  In the best case scenario, the Debtors estimate that holders of Abuse Claims *might* receive a recovery between 8% and 23% (in addition to any amounts ultimately recovered from insurers), but this recovery is questionable, at best, given that the only committed source of funding for the Global Resolution Plan is the Debtors' contribution (which will be contributed under both the Global Resolution Plan and the BSA Toggle Plan) and the conditional contribution contemplated by the Hartford Settlement (which is illusory as a result of the Century Clause). Under the BSA Toggle Plan, the Debtors expect recoveries on Abuse Claims to range between 1-4%.

20.     The Plan provides more definitive and favorable treatment to every other creditor constituency, regardless of whether the Global Resolution Plan or BSA Toggle Plan is approved, and leaves the Debtors and Local Councils to retain billions of dollars in real property and other

assets.  Specifically, general unsecured creditors (other than Abuse Claims) will receive a recovery of 75-95% of the allowed amount of their claims.  Disclosure Statement Art. II.C.8.  Under the JPM/Creditors' Committee Settlement, JPM will receive at least 100% of the value of its claims. *Id.*  Even worse, the Debtors propose to pay current and former executives millions of dollars, including executives who oversaw the BSA's operations during the periods when a significant amount of abuse occurred.  Nearly every creditor constituency is being paid in full (or close to full) while the innocent victims of childhood sexual abuse are left to fight over a Settlement Trust with limited funding and engage in lengthy, time-consuming litigation with insurers that will not even recognize that they have coverage obligations.

21.    In addition, the Plan permits the insurers to seek to reduce their contracted-for liability for Abuse Claims notwithstanding that the Debtors' insurance assets are extremely valuable and critical to ensuring that abuse survivors are equitably compensated.  Among other things, the Plan omits Insurance Companies from the parties bound by the Plan and Confirmation Order, purports to exempt "otherwise applicable principles of res judicata or collateral estoppel from being applied against any Insurance Company with respect to any issue that is actually litigated by such Insurance Company[,]" and provides that Insurance Companies will not be bound by "any estimation or valuation of Abuse Claims" even if they appear, litigate, and are unsuccessful.  Plan at Art. X.M.  These provisions fly in the face of well-established case law holding that an insurer may not profit from the bankruptcy of its insured.[11]  Presumably, the Debtors included the foregoing provisions so that the Plan would be "insurance neutral" in hopes

---

[11]  *See, e.g.*, *In re Edgeworth*, 993 F.2d 51, 54 (5th Cir. 1993) ("[I]t makes no sense to allow an insurer to escape coverage for injuries caused by its insured merely because the insured receives a bankruptcy discharge."); *UNR Indus., Inc. v. Cont'l Cas. Co.*, 942 F.2d 1101, 1105 (7th Cir. 1991) (holding that allowing insurers to profit from the insured's bankruptcy would confer a windfall at asbestos victims' expense); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Porter Hayden Co.*, 2012 WL 734176, at *4 (D. Md. Mar. 6, 2012) ("The Bankruptcy Code is not intended to enable insurers to evade their indemnity obligations.").

27860956.7

of reducing or eliminating objections to the Plan from their insurers.  But prioritizing insurance neutrality at the expense of abuse survivors is misplaced—a plan cannot be confirmed over the objection of the FCR and abuse survivors, as discussed above, but can be confirmed over the objection of insurers.  *See e.g.*, *In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355, 357 (3d Cir. 2012) (affirming the confirmation of a plan over insurers' objection to certain anti-assignment provisions included in the plan).

22.     The Plan shifts material risks onto just one category of general unsecured claims: claims held by at least 84,000 (and likely more) innocent victims of childhood sexual abuse.  Under these circumstances, the Plan unfairly discriminates against holders of Abuse Claims and cannot be confirmed.  *See, e.g.*, *In re Sentry Operating Co. of Tex., Inc.,* 264 B.R. 850, 863-65 (Bankr. S.D. Tex. 2001) (finding unfair discrimination where plan provides a 100% recovery to one class of unsecured creditors and 1% recovery to another class of unsecured creditors); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 231 (Bankr. D.N.J. 2000) (collecting cases where a 50% disparity constituted "grossly disparate treatment" among classes, rising to unfair discrimination); *In re Barney & Carey Co.*, 170 B.R. 17, 25-26 (Bankr. D. Mass. 1994) (denying confirmation and finding unfair discrimination where a plan provided for a 100% recovery for deficiency claims and only a 15% recover for general unsecured claims).

### C.     The Debtors Cannot Satisfy the Best Interests Test.

23.     Section 1129(a)(7) of the Bankruptcy Code requires that a plan of reorganization be in the best interests of creditors.  Under section 1129(a)(7)'s "best interests test," with respect to each impaired class of claims, each holder of a claim must either accept the plan or receive or retain under the plan property having a present value, as of the effective date of the plan, not less

than the amount such holder would receive or retain in a hypothetical liquidation scenario.  11 U.S.C. § 1129(a)(7).

24.     As a threshold matter, the Debtors boldly assert that they are not required to satisfy the best interests test because the chapter 11 cases cannot be involuntarily converted to chapter 7. Disclosure Statement Art. IX.D, Ex. B ¶ 1.  This interpretation of the best interests test is belied by the clear and unambiguous language of the Bankruptcy Code, which provides that the court shall *only* confirm a plan that impairs classes of claims or interests *if* the plan satisfies the best interests test.  11 U.S.C. § 1129(a)(7).  Indeed, numerous courts have required that plans proposed by non-profit debtors satisfy the best interests of creditors test.  *See, e.g.*, *S. Pac. Transp. Co. v. Voluntary Purchasing Grps., Inc.*, 252 B.R. 373, 390–92 (E.D. Tex. 2000) (reversing an order approving a non-profit debtor's plan where there was insufficient evidentiary basis to determine that the plan satisfied the best interests test); *In re Gen. Teamsters, Warehousemen & Helpers Union Loc.*, 890, 225 B.R. 719, 737 (Bankr. N.D. Cal. 1998) (holding that the best interests test must be applied to the debtor's plan and that "[c]hapter 11 makes no exceptions for [non-profit debtors] in the plan confirmation standards"); *In re Mandalay Shores Co-op. Hous. Ass'n, Inc.*, 53 B.R. 609, 615 (Bankr. M.D. Fla. 1985) (applying best interests of creditors test to a non-profit debtor's plan).

25.     Again, estimation of Abuse Claims as proposed in the Estimation Motion is critical to the analysis of this confirmation standard.  The Debtors cannot establish that the best interests test is satisfied without knowing the magnitude of Abuse Claims.  In addition, as noted in the Disclosure Statement, the Debtors claim that a significant portion of their assets, the Identified Property, is subject to donor or other restrictions.  Disclosure Statement Art. III.C.2.  While the Debtors indicate that the value of the Identified Property is in excess of $1 billion, they believe

nearly $670 million in such assets are unavailable for abuse survivors as a result of donor restrictions. *Id.* Art. V.Q.2. The Tort Claimants' Committee filed the Restricted Property Action seeking a determination that the Identified Property is not subject to enforceable donor restrictions and is fully available to satisfy creditor claims. The Restricted Property Action raises threshold issues regarding the scope of assets available to satisfy Abuse Claims, and the Debtors cannot satisfy the best interests test until this dispute is resolved.

26.    Finally, the Debtors' Liquidation Analysis suffers from a number of fatal deficiencies. When a plan proposes the release of non-debtor third parties, the best interests test requires the inclusion of the value of those released claims in the hypothetical, alternative recovery comparison. *See In re Wash. Mut., Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) ("[I]n a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at least as well under chapter 11 plan as they would in a chapter 7 liquidation."). The Liquidation Analysis does not take the value of released claims against the Local Councils and Chartered Organizations into consideration. Disclosure Statement Ex. B. As noted in the Estimation Motion, estimation of the Debtors' aggregate liability for Abuse Claims is necessary to allow for this comparative exercise here. In addition, the documents governing the Local Councils' annual charters provide that their assets revert to the Debtors in the event such charters are not renewed. Thus, the value of the Local Councils' assets must be disclosed and factored into the hypothetical liquidation test of section 1129(a)(7) given that such charters would not be renewed in the context of a liquidation, regardless of whether the Debtors proceed with the Global Resolution Plan or the BSA Toggle Plan.

* * *

27860956.7

27.     For the reasons stated above, both the Global Resolution Plan and BSA Toggle Plan are patently unconfirmable.  Allowing the Debtors to solicit the Plan would be an enormous waste of the Debtors' resources and would further reduce the assets available to satisfy Abuse Claims. Accordingly, the FCR respectfully requests that the Bankruptcy Court deny approval of the Disclosure Statement.

## RESERVATION OF RIGHTS

28.     The FCR expressly reserves all rights to: (a) supplement and amend this Objection at or prior to the hearing on the Disclosure Statement and Disclosure Statement Motion, (b) join in any objections to the Disclosure Statement or Disclosure Statement Motion made by other parties in interest to the extent not inconsistent herewith, and (c) object to the Plan with respect to any and all issues.

## CONCLUSION

WHEREFORE, for the reasons stated above, the FCR respectfully requests that the Court: (i) sustain this Objection; (ii) disapprove the Disclosure Statement; and (iii) grant such other and further relief as justice may require.

Dated: May 10, 2021            YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Robert S. Brady*
Robert S. Brady (No. 2847)
Edwin J. Harron (No. 3396)
Sharon M. Zieg (No. 4196)
Rodney Square, 1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Emails:  rbrady@ycst.com
              eharron@ycst.com
              szieg@ycst.com

*Counsel to the Future Claimants' Representative*

27860956.7