**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors.[1] | (Jointly Administered) |
| | Re Docket No. 2293, 2294, 2295, 2592, 2594 & 2595 |
| | **Obj. Deadline: May 10, 2021 at 4:00 p.m.[2]** |
| | **Hearing Date: May 19, 2021 at 10:00 a.m.** |

**OBJECTION OF THE COALITION OF ABUSED SCOUTS
FOR JUSTICE TO DEBTORS' MOTION FOR ENTRY OF AN ORDER
(I) APPROVING THE DISCLOSURE STATEMENT AND THE FORM
AND MANNER OF NOTICE, (II) APPROVING PLAN SOLICITATION
AND VOTING PROCEDURES, (III) APPROVING FORMS OF BALLOTS,
(IV) APPROVING FORM, MANNER, AND SCOPE OF CONFIRMATION
NOTICES, (V) ESTABLISHING CERTAIN DEADLINES IN CONNECTION
WITH APPROVAL OF THE DISCLOSURE STATEMENT AND CONFIRMATION
OF THE PLAN, AND (VI) GRANTING RELATED RELIEF [D.I. 2295]**

The Coalition of Abused Scouts for Justice (the "Coalition"), by its undersigned counsel, hereby submits this Objection (the "Objection") to Debtors' motion (the "Motion") [Dkt. No. 2295] for entry of an order approving the Disclosure Statement (as amended, the "Disclosure Statement") [Dkt. No. 2594] for the *Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* (the "Plan")[3] [Dkt. No. 2592] and granting related relief. In support of this Objection, the Coalition respectfully states as follows:

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] The Coalition's deadline to object was extended by agreement of the parties to May 10, 2021 at 4:00 p.m.

[3] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Plan.

## PRELIMINARY STATEMENT

1.      The Coalition continues to work hard as a Mediation Party in the Mediation to progress a consensual plan with the Debtors and the other Mediation Parties and believes that a global (or near global) solution to the daunting challenges posed by these cases is desired to bring fair and equitable compensation expeditiously to sexual abuse survivors and remains possible. Nonetheless, the Coalition emphatically states and believes that the Global Resolution Plan, in its current form, is (and remains) dead on arrival.

2.      It is assured that most holders of Direct Abuse Claims will vote to reject the Plan. The Global Resolution Plan, which depends on the Court's approval of nonconsensual third-party releases, cannot be confirmed in the face of such opposition.  In recognition of this outcome, the Debtors proposed an alternative plan—the BSA Toggle Plan—which removes some but not all of the nonconsensual third-party releases and reduces the pool of assets to be contributed to the post-effective date trust established for Direct Abuse Claims.  The BSA Toggle Plan is not only patently unconfirmable but would likely result in the end of Scouting.  The issue before the Court is whether to approve a Disclosure Statement for a toggle of Plans that are both destined for failure and which are whole heartedly condemned by the abuse survivor constituency.  The answer should be "no."

3.      The Disclosure Statement, insofar as it pertains to the Global Resolution Plan, contains inaccurate and misleading information.  The Coalition was prepared to object to the Disclosure Statement as it related to the Debtors' March 1st Plan (*see* Dkt. No. 2293) on the grounds that such plan was patently unconfirmable.  The Debtors have announced that they will abandon the Global Resolution Plan if it is rejected by the survivors—a *fait accompli* given the Debtors' deliberate decision to prioritize their insurers' economic interests over the survivors' right to fair compensation.

4.      But this pivot by the Debtors does not make the Disclosure Statement less objectionable.  Rather, the Disclosure Statement is filled with inaccurate statements designed to create the appearance that the Global Resolution Plan is a good outcome for survivors.  For those represented by counsel affiliated with the Coalition and the Official Committee of Tort Claimants (the "TCC"), this tactic will certainly not work.  But there are many *pro se* survivors who may be misled and to whom adequate and robust disclosure is imperative.  Their interests must be considered in determining whether the Disclosure Statement contains adequate information to inform survivors on whether to accept or reject the proposed Plan(s).

5.      The Disclosure Statement, insofar as it pertains to the BSA Toggle Plan, continues to include insufficient and potentially misleading information regarding the plan terms.  Despite the Debtors' efforts to pivot in the event survivors reject the Global Resolution Plan, the BSA Toggle Plan does not cure the deficiencies in the Debtors' proposed restructuring approach, resulting in an alternative plan that is deeply flawed.  The BSA Toggle Plan, which presumes the existence of at least one rejecting class (*i.e.*, the survivors or the holders of Direct Abuse Claims), engages in unfair discrimination, is not feasible, is not in the best interest of creditors, and contains impermissible third-party releases.  The BSA Toggle Plan may also likely result in the end of Scouting.

6.      These cases do not have to end as a tragedy—the most expensive chapter 11 case involving a charitable organization to date, ending with the liquidation of an American institution. The survivors and those who care about the continuation of Scouting deserve better and there is a way to accomplish the multiple goals of fair compensation to survivors, a process to protect future scouts from abuse, and the continuation of Scouting.  If the Debtors are unwilling or unable to act, then the obvious path forward is to terminate exclusivity to permit the Coalition, the TCC, and the

Future Claims Representative (the "<u>FCR</u>") to move forward with their plan to save Scouting, adopt safeguards to protect against future abuse, and provide fair compensation to survivors of sexual abuse. The Debtors have had their chance. No further estate assets should be wasted on the Debtors' Disclosure Statement and Plan(s). The Motion should be denied.

## BACKGROUND

### I.    General Background

7.    It is well known that childhood sexual abuse is generally unreported during childhood.[4] Abusers are often drawn to organizations that afford them access to children. The Debtors are a national organization that provided such access. The Debtors' own "perversion" or "ineligible volunteer" files include the names of 7,819 **known** scout leaders who allegedly preyed on boys.[5] The abuse alleged against the Debtors and the Local Councils spans many decades and implicates liability that until recently was limited by statutes of limitations which, in many cases, expired before many victims were willing to report their abuse.

8.    Societal views on childhood sexual abuse have changed significantly. In February 2019, New York enacted landmark legislation that suspended the statute of limitations for victims of decades-old child sex abuse. In October 2019, California also enacted legislation that created a three-year window to file sexual abuse claims that were once time barred. Delaware, Georgia, Hawaii, Minnesota, New Jersey, and North Carolina have also implemented similar legislation.

---

[4] *See* Child USA, *Delayed Disclosure: A Factsheet Based on Cutting-Edge Research on Child Sex Abuse*, CHILDUSA.ORG, at 3 (Mar. 2020) available at https://childusa.org/wp-content/uploads/2020/04/Delayed-Disclosure-Factsheet-2020.pdf ("While it may seem intuitive that a survivor would disclose abuse when it happened, data reveals a different reality. In a study of over 1,000 survivors, the average age at the time of reporting child sex abuse was about 52 years.")

[5] *See Warren Report*, Dkt. No. 4 at Ex. 2 (discussing findings of study involving the contents of 7,819 Ineligible Volunteer (IV) files generated by the Boy Scouts of America from 1946 to 2016); Corky Siemaszko, *Lawyer demands Boy Scouts open up the 'perversion files,'* NBC NEWS, (Apr. 24, 2019), https://www.nbcnews.com/news/us-news/lawyer-demands-boy-scouts-open-perversion-files-n997786.

Legislation is pending in other states that, if enacted, will revive abuse claims that were once barred affording survivors a long overdue opportunity to seek compensation for their injuries.

9.     These developments exposed the Debtors to liability for abuse claims that were once time barred.  Local Councils and Chartered Organizations who, on a combined basis with the Debtors, own billions of dollars in real estate, also have liability because of these developments.  Liability for abuse claims is not just a problem for the Debtors and their affiliates.  It is also a significant issue for the Debtors' insurers.

10.     Century Indemnity Company ("Century"), an inactive run-off company, may not have the financial ability to honor its coverage obligations for abuse claims.  The Coalition believes that Century's ultimate parent—Chubb—or one or more of Chubb's active insurance subsidiaries are liable for the obligations under the INA policies.  The Coalition, the TCC, and the FCR served discovery on Century regarding this issue on April 23, 2021.  It is the Coalition's understanding that Century will not comply with these requests and is withholding material information on this topic.  The Debtors' apparent failure to properly conduct due diligence and determine the coverage obligations of Chubb and its active insurance subsidiaries is noteworthy.  And, this is exactly the type of information that must be provided in the Disclosure Statement to provide survivors with sufficient information to assess the proposed Plan.

11.     Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company and Navigators Specialty Insurance Company (collectively, "Hartford") may have the financial ability to honor their coverage obligations but could face a downgrade to its credit rating if it is required to do so.  Thousands of abuse claims could translate into billions of dollars in liability in the tort system.  The TCC estimates the total liability here is over $102 billion.  *See* Dkt. No. 2506 at 2.  While the Coalition and the FCR have not yet taken a

position on the full extent of the Debtors' total liability for Direct Abuse Claims, under any circumstance it would exceed by many times the Debtors' estimate.

## II.  **The Bankruptcy Filing**

12.    The Debtors filed for bankruptcy on February 18, 2020 with the stated objective of providing "consensual, expeditious, [and] global resolution of all claims related to abuse in the BSA's Scouting programs." Dkt. No. 4 at 38.  On March 5, 2020, the Office of the United States Trustee appointed the TCC and the Creditors' Committee. *See* Dkt. Nos. 141, 142.  On April 24, 2020, the Court entered an order appointing the FCR. *See* Dkt. No. 486.

13.    On July 24, 2020, the Coalition filed a notice of appearance.  The Coalition comprises over 12,000 survivors who filed claims against the Debtors and signed affirmative consents.  Law firms affiliated with the Coalition represent tens of thousands of the individuals who filed claims alleging sexual abuse.  Together with the firms that represent TCC members, the firms that oppose the Plan represent over 95% of the holders of Direct Abuse Claims—*i.e.*, Class 8.

## III.  **Claims Bar Date**

14.    One of the first motions the Debtors filed was their motion to establish a bar date for Abuse Claims. *See* Dkt. No. 18.  The bar date functions as a statute of limitation in the Debtors' cases and provided survivors with the choice of coming forward or risking being forever barred from receiving compensation on account of their injuries.

15.    On May 26, 2020, the Court entered an order establishing November 16, 2020 as the deadline for survivors to submit a proof of claim. *See* Dkt. Nos. 695, 1331.  The Debtors implemented a robust, nationwide noticing campaign. *See* Dkt. No. 1145 at ¶ 25.  Law firms also implemented their own advertising campaigns.  When the dust settled, approximately 84,000 survivors came forward and filed abuse claims.

16.     The abuse claims range from claims involving anal penetration—claims that the tort system in open states may value at over $10 million if tried before a jury—to claims alleging other forms of abuse.  Survivors carried these injuries for years, if not decades.  The Debtors' liability is substantial.  As a point of comparison, last month the University of Southern California announced that it will pay over $1.1 billion to former patients of a campus gynecologist accused of preying sexually on over 700 patients—roughly $1.5 million per victim.  There are more than 100 times as many survivors in these chapter 11 cases.

## IV.     **Rule 2004 Discovery**

17.     Faced with over 84,000 abuse claims and billions of dollars in potential exposure, the Debtors' insurers needed a strategy.  The Debtors could decide to work with the survivors to develop a plan that provides fair compensation to survivors and permits the Debtors and their affiliates to emerge from bankruptcy with the benefit of a channeling injunction and a process in place to protect future victims.  The only way to accomplish these objectives is to monetize the Debtors' insurance assets.

18.     Hartford and Century (together, the "Insurers") have an incentive to prevent this from ever happening.  The Insurers have alleged—without evidence—that these cases are plagued by false claims.  To further this narrative, the Insurers filed motions under Rule 2004 to obtain discovery from survivors and attorneys who helped them file claims.  *See* Dkt. No. 1972, 1974.  In these motions, the Insurers offered misleading statistics and a paltry six examples of what they claim to be "outright fraud" even though none of their examples proved fraud or indicated that attorneys engaged in improper conduct.  Dkt. No. 1972 at ¶¶ 7-8.

19.     The Insurers failed to disclose to the Court that the Coalition offered them the opportunity to obtain discovery from survivors on a consensual basis, but they declined.  In January

2021, the Insurers asserted during the meet and confer process that they needed additional information from survivors. The Coalition came back with a proposal that would permit interrogatories to be completed by 1,400 survivors and allow for 50 depositions.[6] If the Coalition's proposal had been accepted by the Insurers when offered months ago, this process would be complete by now.

20.     The Insurers rejected this offer and moved forward with the prosecution of their Rule 2004 motions. The Coalition believes that the Insurers were never really interested in reaching an agreement. The Insurers' objective was to come to Court and accuse survivors of lying and law firms of violating Rule 11. The Insurers are trying to create the impression that they are not the primary obstacle preventing a reorganization.

## V.     **Proposed Plan and Disclosure Statement**

21.     The Debtors filed their Plan after the hearing on the Rule 2004 motions. As stated above, the Debtors' Plan embodies two separate plans. The first plan—the Global Resolution Plan—purports to provide the framework for a global resolution of Abuse Claims against the Debtors, Local Councils, Contributing Organizations, and Settling Insurance Companies (including, assumedly, the proposed Debtors' settlement with Hartford). The second plan—the BSA Toggle Plan—is advertised as the alternative if the survivors reject the Global Resolution Plan. The Disclosure Statement states that holders of Direct Abuse Claim could recover as much as "100% of their Claims under the Global Resolution Plan to as little as 1% of this Claims [under the BSA Toggle Plan]." Disclosure Statement at § II.A.

22.     **Global Resolution Plan**. The survivors' likely recovery under the Global Resolution Plan is misleading and not what the Debtors advertise it to be. Under the Global

---

[6] So that Court understands what was offered to the Insurers on a consensual basis, a copy of the Coalitions' last proposal—made during the meet and confer process—is attached hereto as **Exhibit A**.

Resolution Plan, the Debtors and the Local Councils will retain billions of dollars in real estate for themselves. Plan at § X.A. Abuse Claims will be channeled to and resolved by the Settlement Trust pursuant to Trust Distribution Procedures. *Id.* at §§ V.M & X.F.

23. The Global Resolution Plan also imposes involuntary third-party releases for the benefit of the "Protected Parties." *Id.* at § X.F. The "Protected Parties"—defined to include Reorganized BSA, Related Non-Debtor Entities,[7] the Local Councils,[8] the Contributing Chartered Organizations,[9] the Settling Insurance Companies,[10] and their Representatives[11]—will be the beneficiaries of involuntary third-party releases.[12] Under the Plan, if a survivor were to assert an Abuse Claim against a Protected Party in the tort system, the Settlement Trust would be required to indemnify the Protected Party. *Id.* at § IV.I.

24. Under the Plan, former employees and volunteers are not required to contribute anything to obtain the benefits of the Channeling Injunction. Nor are the current or former officers and directors who stand to recover millions of dollars on account of their benefit plans. The Plan and Disclosure Statement contemplate that the Local Councils and Contributing Chartered Organizations will make a financial and/or insurance contribution to the Settlement Trust, but the Disclosure Statement fails to disclose—on an entity by entity basis—what amount will be

---

[7] The Related Non-Debtor Entities, as identified on Exhibit F to the Plan are, Arrow WV, Inc., Atikaki Youth Ventures Inc., Atikokan Youth Ventures Inc., BSA Asset Management, LLC, BSA Endowment Master Trust, Learning for Life, and National Boy Scouts of America Foundation. Plan at § I.A.186, Ex. H.

[8] The Local Councils include over 250 Local Councils identified on Exhibit E to the Plan. Plan at § I.A.144, Ex. G.

[9] The Contributing Chartering Organizations have yet to be identified. Plan at § I.A.66, Ex. D.

[10] The term "Settling Insurance Company" is defined to mean "any Insurance Company that contributes funds, proceeds or other consideration to or for the benefit of the Settlement Trust pursuant to an Insurance Settlement Agreement that is approved by Final Order of the Bankruptcy Court (including the Confirmation Order) and is designated as a Settling Insurance Company in the Confirmation Order or the Affirmation Order." Plan at § I.A.213.

[11] The term "Representative" is defined to include "(a) predecessors, successors, assigns, subsidiaries, and Affiliates, (b) current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, board members, advisory board members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, and (c) respective heirs, executors, estates and nominees[.]" Plan at § I.A.186.

[12] *Id.* at §§ I.A.66, 144, 180, 186, 213, IV.C, IV.I, X.C, X.F, & X.J.

contributed or what assets are available for contribution. Without such disclosure, survivors, and the Court, cannot determine whether the contributions made are sufficient to obtain channeling injunctions and non-debtor releases under applicable Third Circuit law.

25. For the Local Councils, the Debtors state that they "are committed to ensuring" that their contribution is "not less than $425,000,000," but the Debtors offer "no assurance" that the Local Councils will agree to make the required contribution. *See* Disclosure Statement at §§ II.C & X.A15. The Disclosure Statement provides no information regarding the Chartered Organizations' contribution or what an insurer would have to contribute to qualify as a Settling Insurance Company. Based on the Debtors' proposed deal with Hartford, the Debtors have demonstrated that they are willing to compromise their most valuable assets for a minimal percentage of the insurers' actual liability under their policies—a clear violation of their fiduciary duties to creditors.

26. The Global Resolution Plan goes to great lengths to ensure that every creditor constituency is paid in full—or as close to being paid in full as possible—except for the survivors. The Debtors propose to pay Debtor and non-debtor Local Council executives millions of dollars, including executives who oversaw the Debtors' operations during periods when abuse occurred, on account of their non-qualified retirement plan (estimated recovery of ***75-95%***). Plan at §§ I.A.111 & 192, VI.I; Disclosure Statement at §§ II.C.8 & VI.D. Holders of General Unsecured Claims will receive a percentage recovery between ***75-95%***. Disclosure Statement at § II.C.8. JP Morgan will be paid in full (percentage recovery of ***100%***), along with the holders of Allowed Convenience Claims (***100%***) and Non-Abuse Litigation Claims (***100%***). *Id.*

27. But what about the survivors? The Coalition estimates that the survivors could recover ***less than 3%*** of their allowed claim values if the Global Resolution Plan is confirmed.

The Debtors estimate that the BSA Settlement Trust Contribution is worth approximately $115.6 million. If we assume that the Local Council Contribution materializes ($425 million), that will raise the value of the Settlement Trust's assets to approximately $540 million.

28. Given Century's refusal to disclose key information, the actual value of the Hartford Settlement is approximately $280.5 million (not $650 million as the Debtors have vigorously but inaccurately advertised), bringing the total to $820 million. As set forth in the Coalition's objection to the Debtors' motion to extend exclusivity (Dkt. No. 2672), the Debtors have structured their Global Resolution Plan to increase the odds that non-settling insurers may be able to use the Debtors' insolvency to avoid their coverage obligations.[13] If we assume that the Debtors will also cut a fire sale deal with Century, the total amount available to satisfy Direct Abuse Claim could be just over $1 billion. Indeed, the aggregate number may be too generous given the Debtors' proposed settlement with Hartford.

29. The Debtors estimate the value of the Direct Abuse Claims are between $2.4 billion and $7.1 billion. The TCC estimates that the value of the Direct Abuse Claims could exceed $102 billion. *See* Dkt. No. 2506 at 2. The Debtors' valuation is based on an estimate performed by Bates White. The Debtors offer several paragraphs filled with generalizations and qualified statements regarding how Bates White arrived at its value range. Disclosure Statement at § V.N.

---

[13] Courts, including Circuit and District Courts alike, hold that an insurer may not profit from the bankruptcy of its insured. *See Matter of Edgeworth*, 993 F.2d 51, 54 (5th Cir. 1993); *UNR Indus., Inc. v. Cont'l Cas. Co.*, 942 F.2d 1101, 1105 (7th Cir. 1991); *In re Jet Fla. Sys., Inc.*, 883 F.2d 970, 975 (11th Cir. 1989); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Porter Hayden Co.*, No. 03-3408, 2012 WL 734176, at *3 (D. Md. Mar. 6, 2012); *ARTRA 542(g) Asbestos Trust v. Fairmont Premier Ins. Co.*, No. 09-cv-458, 2011 WL 4684356, at *2 (N.D. Ill. Sep. 30, 2011). Two cases from California—*Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, 135 Cal. App. 4th 958 (Cal. Ct. App. 2006) and *Flintkote Co. v. Aviva PLC*, 177 F. Supp. 3d 1165, 1178, 1181 (N.D. Cal. 2016)—allowed insurers to obtain a windfall from their insureds' bankruptcies. *Flintkote* and *Fuller-Austin* were wrongly decided and are distinguishable. The Debtors have structured their Plan to mirror these cases in certain respects, including by attempting to preclude "otherwise applicable principles of *res judicata* or collateral estoppel from being applied against any Insurance Company with respect to any issues that is actually litigated by such Insurance Company." Plan at § X.M.4.

30.     But the Bates White analysis appears to be deeply flawed and, most notably, is inconsistent with the value ranges for categories of abuse claims set forth in the Debtors' Trust Distribution Procedures.  If one were to use Bates White's data, which is incomplete and fails to consider settlements involving non-Scouting abuse claims, and perform a rational statistical analysis, the value of the Direct Abuse Claims would be a significant multiple of the values set forth in the Disclosure Statement.  The Global Resolution Plan is a bad deal for survivors.  The Debtors are simply trying to hide this fact.

31.     **BSA Toggle Plan**.  Contrary to the Debtors' assertions, the survivors' likely recovery under the BSA Toggle Plan may be superior for many survivors, particularly those with claims against solvent Local Councils and Chartered Organizations.  Under the BSA Toggle Plan, the Debtors and the Local Councils will retain billions of dollars in real estate for themselves.  Plan at § X.A.  Abuse Claims against the Debtors will be channeled to and resolved by the Settlement Trust.  *Id.* at §§ V.M & X.F.

32.     The BSA Toggle Plan continues to impose involuntary third-party releases for the benefit of the "Protected Parties."  *Id.* at § X.F.  The "Protected Parties"—defined to include Reorganized BSA, Related Non-Debtor Entities, and their Representatives—will be the beneficiaries of involuntary third-party releases.  *See* Disclosure Statement at § VI.E.11(ii)b.  Former employees and volunteers are not required to contribute anything to obtain the benefits of the Channeling Injunction.  Nor are the current or former officers and directors who stand to recover millions of dollars on account of their benefit plans.

33.     The BSA Toggle Plan also goes to great lengths to ensure that every creditor constituency is paid in full—or as close to being paid in full as possible—except for the survivors.  The Debtors propose to pay Debtor and non-debtor Local Council executives millions of dollars,

including executives who oversaw the Debtors' operations during periods when abuse occurred, on account of their non-qualified retirement plan (estimated recovery of *75-95%*). Plan at §§ I.A.111 & 192, VI.I; Disclosure Statement at §§ II.C.8 & VI.D. Holders of General Unsecured Claims will receive a percentage recovery between *75-95%*. Disclosure Statement at § II.C.8. JP Morgan will be paid in full (percentage recovery of *100%*), along with the holders of Allowed Convenience Claims (*100%*) and Non-Abuse Litigation Claims (*100%*). *Id.*

34.     But what about the survivors? According to the Disclosure Statement, the "BSA Toggle Plan provides for the resolution of Abuse Claims and other Claims against <u>only</u> the Debtors, thereby reducing the potential recoveries under the Plan for holders of Direct Abuse Claims from as much as 100% of their Claims under the Global Resolution Plan to as little as 1% of their Claims." Disclosure Statement at § II.A.

35.     The Disclosure Statement further provides that under the Global Resolution Plan, the estimated recovery percentage for the holders of Direct Abuse Claims is "8—23% *plus* insurance rights, **expected to yield up to 100% recovery**." *Id.* at § II.C.8 (emphasis in original). In contrast, under the BSA Toggle Plan, the estimated recovery percentage for the holders of Direct Abuse Claims is "1—4% *plus* insurance rights, **expected to have limited value**." *Id.* (same).

36.     Why such a dramatic difference—and in bold font no less? It is not entirely clear, and the "disclosure" is confusing and misleading. The Debtors estimate that the BSA Settlement Trust Contribution would still be worth $115.6 million under the BSA Toggle Plan. But the Local Council Contribution of $425 million would not occur. Neither would there be any contribution from Chartered Organizations.

37.     The Hartford settlement does not become effective unless, among other things, the Confirmation Order provides for a release and channeling injunction for the benefit of the Local

Councils.  Since the Local Councils would not be released, the Hartford settlement would not become effective, bringing the total deduction to $705.5 million relative to the Global Resolution Plan.  The Debtors would still contribute their insurance rights to the Settlement Trust, but the Debtors contend that this would make the "liquidation of the Insurance Policies more difficult" and that "Insurers will not agree to settle piecemeal litigation under the BSA Toggle Plan as opposed to entering into a final global resolution with respect to their policies under the Global Resolution Plan." *Id.* at § II.A.  According to the Debtors, this flips the estimated recovery percentage for the holders of Direct Abuse Claims from "**up to 100% recovery**" to "1—4% *plus* insurance rights, **expected to have limited value**." *Id.*

38.     To call this an exaggeration would be generous.  The Hartford settlement, if approved as part of the Global Resolution Plan, would compromise one of the Debtors' most valuable assets for a small percentage of its actual value and ensure that thousands of survivors ***never*** receive a 100% recovery or anything remotely close thereto.  Nearly every survivor would be better off under a plan that preserves or effectively monetizes the Debtors' insurance assets as opposed to a plan designed to aid the Debtors' insurers in minimizing their coverage obligations to the survivors' detriment.  The Debtors are offering false information to gain affirmative votes by misinforming survivors.

## ARGUMENT

39.     Section 1125(b) of the Bankruptcy Code requires a plan proponent to furnish creditors with "a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information" in order to solicit acceptances or rejections of a proposed chapter 11 plan.  11 U.S.C. § 1125(b).  "Adequate information" is defined in the Bankruptcy Code as:  "Information of a kind, and in sufficient detail, as far as is reasonably practicable in light of

the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan[.]" *Id.* at § 1125(a)(1).

40. The purpose of a disclosure statement is "to inform…claimants, as fully as possible, about the probable financial results of acceptance or rejection of a particular plan."[14] The Third Circuit has emphasized the importance of adequate disclosure, given the reliance creditors and bankruptcy courts place on disclosure statements.[15] A disclosure statement must contain, at a minimum, "adequate information" concerning "all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan."[16]

41. The Third Circuit has recognized that a disclosure statement cannot be approved if the plan to which it relates is not confirmable on its face:

> We find the reasoning of these many courts to be persuasive, and hold that a bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that a later confirmation hearing

---

[14] *In re Stanley Hotel, Inc.*, 13 B.R. 926, 929 (Bankr. D. Colo. 1981); *see also In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170 (Bankr. S.D. Ohio 1988) (Congress intended the disclosure statement "to be the primary source of information upon which creditors and shareholders could rely in making an informed judgment about a plan of reorganization."); *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D. N.H. 1991) (A proposed disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution.")

[15] *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'"); *see also Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) ("[D]isclosure requirements are crucial to the effective functioning of the federal bankruptcy system [because] creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan . . . .")

[16] *See In re Beltrami Enters., Inc.*, 191 B.R. 303, 304 (Bankr. M.D. Pa. 1995) (citation omitted); *see also Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) (stating that section 1125 "seeks to guarantee a minimum amount of information to the creditor asked for its vote"); *Cohen v. TIC Fin. Sys. (In re Ampace Corp.)*, 279 B.R. 145, 157 n.26 (Bankr. D. Del. 2002) ("Section 1125 governs the contents of a disclosure statement and provides that acceptance or rejection of a plan may not be solicited until each holder of a claim or interest receives the plan or a summary thereof, 'and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.'"); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 98 (Bankr. D. Del. 1999) (stating that a disclosure statement "need only contain adequate information for those entitled to vote"); *In re Civitella*, 14 B.R. 151, 152 (Bankr. E.D. Pa. 1981) ("The disclosure statement must contain adequate information in order for it to be approved by the Court.")

would be futile because the plan described by the disclosure statement is patently unconfirmable.

*In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012) (citations and internal quotations omitted).[17]  In such circumstances, a disclosure statement may not be approved, as approving it would impose unnecessary costs and expenses associated with solicitation.[18]  Here, the solicitation of the Plan, in either form, is not worth the cost, particularly given that there are viable alternatives which should be allowed to be presented and voted upon, and when the Debtors' Plan has no support from any Abuse survivor constituency.

## I.     The Global Resolution Plan

42.     The Disclosure Statement, as it pertains to the Global Resolution Plan, contains inaccurate and misleading information, and should not be approved for this reason.  The Disclosure Statement, as it pertains to the Global Resolution Plan, also describes a plan that is patently unconfirmable.  But the Coalition does not believe that it is necessary to set forth its position on this topic since the Global Resolution Plan will be rejected by most survivors who vote.[19]  Notwithstanding, the Debtors should not be permitted to circulate a Disclosure Statement that fails to provide adequate information, and in many instances, fails to provide any disclosure at all, or at best, provides misleading or false information.  For example:

---

[17] *Accord In re Main St. AC, Inc.*, 223 B.R. 771, 775 (Bankr. N.D. Cal. 1999) ("It is now well accepted that a court may disapprove of a disclosure statement. . . if the plan could not possibly be confirmed."); *In re Quigley Company, Inc.*, 377 B.R. 110 (Bankr. S.D.N.Y. 2007); *In re El Comandante Mgmt. Co.*, 359 B.R. 410, 415 (Bankr. D. P.R. 2006); *In re Beyond.com Corp.*, 289 B.R. 138 (Bankr. N.D. Cal. 2003) (collecting cases); *In re Mahoney Hawkes, LLP*, 289 B.R. 285, 294 (Bankr. D. Mass. 2002); *In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001); *In re Silberkraus*, 253 B.R. 890, 899 (Bankr. C.D. Cal. 2000); *In re Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996); *In re Felicity Assocs., Inc.*, 197 B.R. 12, 14 (Bankr. D. R.I. 1996); *In re Market Square Inn, Inc.*, 162 B.R. 64 (Bankr. W.D. Pa. 1994); *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987).

[18] *See In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) (declining to subject estate to expense of soliciting votes for unconfirmable plan); *In re Valrico Square Ltd. P'ship*, 113 B.R. 794, 796 (Bankr. S.D. Fla. 1990) ("Soliciting votes and seeking court approval on a clearly fruitless venture is a waste of the time of the Court and the parties.")

[19] The Coalition does not waive, and expressly reserves, the right to assert objections to the Global Resolution Plan beyond those set forth herein.

43. **Harford Settlement**.  The Debtors fail to disclose that the Hartford settlement compromises one of the Debtors' most valuable assets for a small percentage of its actual value. Given Century's alleged financial issues, the reduction clause that ties the value of the Hartford settlement to any potential settlement with Century may render the Hartford settlement to be worth substantially less than the Debtors have touted and described.  The Debtors apparently failed to conduct proper diligence regarding this issue.  As a result of the claw-back mechanism that requires the Settlement Trust to pay Hartford if the Settlement Trust settles with Century for less than $1.3 billion, there is a risk that the Settlement Trust will have to hold a significant portion of the Hartford settlement in reserve while it litigates with Century and Chubb, which litigation could last many years.  Many survivors could be deceased before any meaningful distributions are made under the Global Resolution Plan.

44. **Insurance Risk**.  The Debtors also fail to disclose that Insurance Companies are not bound by any determinations under the Global Resolution Plan, the Confirmation Order, or the Trust Distribution Procedures except for certain injunctions designed to protect them.  There is a risk that the Insurance Companies will assert—based on the Insurance Provisions the Debtors have proposed—that the Global Resolution Plan effects a partial discharge of their coverage obligations by limiting their liability to distributions made by the Settlement Trust rather than the liquidated value of the Abuse Claims.  If successful, this would severely limit the value of the insurance assets under the Global Resolution Plan and destroy any hope that survivors will receive meaningful recoveries.  Further, the Global Resolution Plan lacks guarantees that the Settlement Trust will even have access to the documents and records it needs to pursue insurance coverage. The Global Resolution Plan reads as something that Hartford and Century drafted to ensure that they pay as little as possible to the detriment of abuse survivors.

45.     **Inaccurate and Misleading Narrative Regarding Recoveries**.  The Disclosure

Statement also contains an inaccurate and misleading narrative regarding how much survivors

stand to recover under the Global Resolution Plan.  On this point, the Coalition objects to the

inclusion of the following statements in the Disclosure Statement, as reflected in the blackline

below:

- The BSA Toggle Plan provides for the resolution of Abuse Claims and other Claims against only the Debtors~~, thereby reducing the potential recoveries under the Plan for the holders of Direct Abuse Claims from as much as 100% of their Claims under the Global Resolution Plan to as little as 1% of their Claims~~. Holders of Direct Abuse Claims must provide a sufficient number of votes in favor of the Plan in order to ensure they will receive the treatment afforded by the Global Resolution Plan and not the treatment provided in the default BSA Toggle Plan. *See* Disclosure Statement at § II.A.

- To continue the BSA's long tradition of Scouting, and maximize distributions to holders of Direct Abuse Claims, the Debtors seek approval of a plan of reorganization under chapter 11 of the Bankruptcy Code that provides a framework for a global resolution, which, if confirmed and consummated, will allow the Debtors, as Reorganized BSA, to emerge from bankruptcy, having fulfilled their ~~dual~~ restructuring goal~~s~~ of ~~(a) providing an equitable, streamlined, and certain process by which survivors of Abuse (the "Abuse Survivors") may obtain compensation for Abuse and (b)~~ ensuring that Reorganized BSA has the ability to continue its vital charitable mission. *Id.*

- These contributions to the Settlement Trust, along with the BSA's contributions, will be used to fund ~~significant~~ recoveries for holders of compensable Direct Abuse Claims in accordance with the terms of the Trust Distribution Procedures. *Id.*

- ~~As detailed further herein, the distributions to holders of Direct Abuse Claims are substantially greater under the Global Resolution Plan.  In order to ensure holders of Direct Abuse Claims receive this greater recovery, holders of Direct Abuse Claims as a Class must provide a sufficient number of votes in favor of the Plan~~. *Id.*

- Confirmation of the BSA Toggle Plan, as opposed to the Global Resolution Plan, forces Abuse Survivors to seek compensation on account of their Claims against Local Councils and Chartered Organizations by filing independent lawsuits in the tort system against such entities.  This ~~will necessarily~~ <u>may</u> entail lengthy, complicated litigation.  ~~Unlike the current Chapter 11 Cases, where Abuse Survivors will receive equitable, consistent treatment through one, consolidated process,~~ <u>I</u>f the Plan defaults to the BSA Toggle Plan, Abuse Survivors ~~will be~~ <u>could end up</u> competing for judgments and settlements against

18

Local Councils and Chartered Organizations in multiple venues, resulting in a "rush to the courthouse." ~~Moreover, the delays and uncertainties inherent in such a scenario, as well as the more limited contributions that will be made to the Settlement Trust in these Chapter 11 Cases, will likely produce inferior outcomes and recoveries for Abuse Survivors than would be achieved under the Global Resolution Plan~~. *Id.*

- Indeed, without the ability of the Local Councils and Contributing Chartered Organizations to contribute assets to the Settlement Trust, the Settlement Trust will necessarily have ~~substantially~~ fewer assets to distribute to Abuse Survivors. Additionally, under the BSA Toggle Plan, the BSA is only assigning its own rights and interests to the Insurance Policies to the Settlement Trust, thereby making ~~liquidation of the Insurance Policies~~ **global settlements with the Insurers** more difficult. ~~Additionally, Insurers will not agree to settle piecemeal litigation under the BSA Toggle Plan as opposed to entering into a final global resolution with respect to their policies under the Global Resolution Plan~~. *Id.*

- As a result, **the Debtors are encouraging** holders of Direct Abuse Claims ~~are strongly encouraged~~ to vote in favor of the Plan in order to ensure that the Plan does not default to the BSA Toggle Plan. *Id.*

- While the Debtors believe that either of these scenarios would accomplish the Debtors' goals to some extent, the Debtors submit that the Global Resolution Plan better realizes these goals and offers a far more favorable treatment to holders of Abuse Claims. **The Coalition disagrees and does not believe that the Global Resolution Plan will timely or equitably compensate survivors of Abuse in Scouting**. *Id.* at § II.C.

- While the BSA Toggle Plan similarly provides a mechanism to channel the Abuse Claims to the Settlement Trust, it only channels Abuse Claims asserted against the BSA. As a result, the contributions to be made by the Local Councils and Contributing Chartered Organizations, including the ability to access substantial insurance assets, will not be made, and the holders of Abuse Claims will receive only a *de minimis* recovery from the Debtors' few assets and potential and uncertain value of BSA's rights to insurance policies. **The Coalition submits that the Global Resolution Plan would also provide a *de minimis* recovery to holders of Abuse Claims and the Debtors could, but have decided not to, propose a Plan that does provide meaningful compensation to holders of Abuse Claims.** *Id.*

- Holders of Class 8 Abuse Claims must provide a sufficient number of votes in favor of the Plan to receive the ~~substantial~~ recoveries provided for under the Global Resolution Plan. *Id.*

- And for holders of Direct Abuse Claims under Class 8, the ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation of the Plan as a Global Resolution Plan or BSA Toggle Plan. ~~If the Plan is confirmed as a Global Resolution Plan, holders of Direct Abuse Claims~~

will receive much more significant distributions that would otherwise receive under the BSA Toggle Plan. *Id.* at § II.C.8.

- **Under the Global Resolution Plan**:  Estimated Percentage Recovery: ~~8 – 23%~~ **1 – 4%** plus insurance rights~~, expected to yield up to 100% recovery~~. *Id.*

- **Under the BSA Toggle Plan**:  Estimated Percentage Recovery: 1 – 4% plus insurance rights~~, expected to have limited value~~. *Id.*

- Estimated Amount:  **N/A**.  ~~$2.4 billion – $7.1 billion~~.  **Under the Global Resolution Plan**: Estimated Percentage Recovery: ~~8 – 23%~~ **1 – 4%** plus insurance rights~~, expected to yield up to 100% recovery~~. *Id.* at § IX.D.

- **Under the BSA Toggle Plan**:  Estimated Percentage Recovery: 1 – 4% plus insurance rights~~, expected to have limited value~~. *Id.*

- **Estimated Recovery in Chapter 7**.  Estimated Amount:  **N/A**.  ~~$2.4 billion – $7.1 billion~~.  Estimated Percentage Recovery:  **N/A**.  ~~0.0% – 0.2%~~

- If confirmed and consummated, the Plan **may** ~~will~~ accomplish **the BSA's objective of ensuring** ~~two core objectives:  (a) provide an equitable, streamlined, and certain process by which Abuse Survivors may obtain compensation for their Abuse Claims and (b) ensure~~ that the BSA has the ability to continue its vital charitable mission. *Id.* at § X.A.1.

- If the Plan cannot be Confirmed, or if the Bankruptcy Court otherwise finds that conditions necessary for Confirmation cannot be met, the Debtors may be required to liquidate and/or voluntarily convert these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. In this event, ~~neither of~~ the Debtors' core objectives would <u>not</u> be accomplished. ~~Abuse Survivors would not have a certain, streamlined way to recover on account of their Claims, and~~ **T**here would be a material risk that the BSA's mission could not continue to be carried out. *Id.*

- The best mechanism for the Debtors to achieve ~~these two core~~ **their** objectives is Confirmation of a plan of reorganization as a Global Resolution Plan that provides for substantial contributions by Local Councils, by Contributing Chartered Organizations, and by Settling Insurance Companies (if any) to the Settlement Trust in exchange for the protection of the Channeling Injunction and Releases under the Plan. *Id.*

- [The Global Resolution Plan] provides an ~~equitable, streamlined, and certain~~ process by which (a) Abuse Survivors may obtain compensation for their Abuse Claims from the BSA, Local Councils, Contributing Chartered Organizations and

Settling Insurance Company and (b) ensures that the BSA has the ability to continue its vital charitable mission. *Id.* at § X.A.2.

- The contributions from the Local Councils, Contributing Chartered Organizations and Settling Insurance Companies to the Settlement Trust, along with BSA's contributions, will be used to fund ~~significant~~ recoveries for holders of compensable Direct Abuse Claims in accordance with the terms of the Trust Distribution Procedures. *Id.*

- ~~**Recoveries to holders of Direct Abuse Claims are substantially greater under the Global Resolution Plan**~~. In order to ensure holders of Direct Abuse Claims receive this ~~greater~~ recovery, holders of Direct Abuse Claims as a Class must vote in favor of the Plan in a sufficient number to confirm the Plan. *Id.*

- Confirmation of the BSA Toggle Plan, as opposed to the Global Resolution Plan, forces Abuse Survivors to seek compensation on account of their Claims against Local Councils and Chartered Organizations by filing independent **lawsuits** in the tort system against such entities. This ~~will necessarily~~ **may** entail lengthy, complicated litigation. Abuse Survivors ~~will be~~ **could end up** competing for judgments and settlements against Local Councils and Chartered Organization in multiple venues, resulting in a "rush to the courthouse." ~~**Moreover, the delays and uncertainties inherent in such a scenario, as well as the more limited contributions that will be made to the Settlement Trust in these Chapter 11 Cases, will likely produce inferior outcomes and recoveries for Abuse Survivors than would be achieved under the Global Resolution Plan**~~. *Id.*

- As a result, **the Debtors are encouraging** holders of Direct Abuse Claims ~~are strongly encouraged~~ to vote in favor of the Plan in order to ensure that the Plan does not default to the BSA Toggle Plan. *Id.*

46.    In addition, the solicitation materials should include a letter from the Coalition (attached as **Exhibit B**) recommending that survivors vote to reject the Plan. Contrary to the inaccurate and misleading narrative presented by the Debtors in the Disclosure Statement, the Global Resolution Plan is a bad deal for survivors. The survivors, particularly those who are unrepresented by counsel, should be informed of the Coalition's position, along with the Debtors' position on this issue.

## II.    The BSA Toggle Plan

47.    The Disclosure Statement presents a bleak picture of what the BSA Toggle Plan could mean for survivors and the future of Scouting. The Disclosure Statement is less misleading

in this respect. The Disclosure Statement, as it pertains to the BSA Toggle Plan, should not be approved for another reason: it describes a plan that is patently unconfirmable.

48.     The BSA Toggle Plan is unconfirmable for at least five reasons.[20] *First*, the involuntary third-party releases cannot be approved because the Debtors cannot satisfy the *Millennium Lab* factors. *Second*, the BSA Toggle Plan discriminates unfairly and is not fair and equitable with respect to survivors. *Third*, the Debtors have not shown that they can satisfy the best interests of creditors test. *Fourth*, the BSA Toggle Plan is not feasible. *Fifth*, the BSA Toggle Plan was not proposed in good faith.

### A.     Involuntary Third-Party Releases Cannot Be Approved

49.     While the BSA Toggle Plan includes fewer Protected Parties, it still seeks the approval of non-consensual third-party releases. For the Court to approval non-consensual third-party releases, the non-debtor beneficiary must make a "substantial contribution," the class of impacted creditors must vote "overwhelmingly" to accept the plan, and the plan must provide for the payment "of all or substantially all" of the affected claims. *See In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 271 (Bankr. D. Del. 2017) (citing *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)).

50.     The BSA Toggle Plan fails each factor. The Related Non-Debtor Entities, their Representatives, and the Reorganized BSA's Representatives are not making **any** contribution, certainly not a substantial contribution sufficient to justify a non-consensual third-party release. The BSA Toggle Plan presumes that the overwhelmingly majority of survivors have not voted to accept the Plan. And, as the Disclosure Statements states, the holders of Direct Abuse Claims will not be paid in full (or even close to paid in full) under the BSA Toggle Plan. As a result, the

---

[20] The Coalition does not waive, and expressly reserves, the right to assert other and further objections to the BSA Toggle Plan beyond those set forth herein.

Coalition assets that no non-consensual releases can be approved in connection with the BSA Toggle Plan.

**B.**      **The Plan Discriminates Unfairly and Is Not Fair and Equitable**

51.      The BSA Toggle Plan also discriminates unfairly against survivors and violates section 1129(b)(1) of the Bankruptcy Code. The BSA Toggle Plan presumes that Class 8 has rejected the Plan. This means that the BSA Toggle Plan must satisfy the cramdown requirements set forth in section 1129(b) of the Bankruptcy Code.

52.      The difference between recovery percentages set forth in the Disclosure Statement for survivors claims and holders of General Unsecured Claims is extreme—less than 1% versus 75-95% / 100%. This is unfair discrimination and renders the BSA Toggle Plan unconfirmable. The fact that the Debtors are prioritizing the recoveries of executives of non-debtor entities over survivors speaks volumes.

**C.**      **The Best Interest of Creditors Test**

53.      The BSA Toggle Plan appears to be worse for survivors than liquidation under chapter 7, which means that the Plan also violates the "best interest of creditors test" set forth in section 1129(a)(7) of the Bankruptcy Code. In liquidation, the Debtors cannot argue that they must retain certain assets to continue their mission. Properties that the Debtors seek to retain may have more value to survivors in liquidation than in the context of a reorganization.

54.      Further, although courts, including Circuit and District Courts alike, hold that an insurer may not profit from the bankruptcy of its insured,[21] some insurers have used the confirmation of an insured's chapter 11 plan to escape their coverage obligations.[22] The Debtors

---

[21] *See, e.g., Edgeworth*, 993 F.2d at 54; *UNR Indus.*, 942 F.2d at 1105; *Jet Fla.*, 883 F.2d at 975; *Porter Hayden*, 2012 WL 734176, at *3; *ARTRA*, 2011 WL 4684356, at *2.

[22] *See, e.g., Flintkote*, 177 F. Supp. 3d at 1178, 1181; *Fuller-Austin*, 135 Cal. App. 4th 958.

here appear all too eager to assist their insurers in achieving this result to the detriment of the survivors. *See* Plan at § X.M. Presently, liquidation under chapter 7 is better for all survivors than the confirmation of a chapter 11 plan that have the effect of releasing billions of dollars of coverage obligations for Abuse Claims. The Coalition implores the Court to take this into account.[23] For the Court to conclude that the Plan (in any form) satisfies the best interest of creditors test, the Court would have to first find that the Plan does not lead to the result that occurred in *Flintkote* or *Fuller-Austin*.

### D. BSA Toggle Plan Is Not Feasible

55. Section 1129(a)(11) of the Bankruptcy Code requires that the Court determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." This feasibility requirement does not require that substantial consummation of the plan be "guaranteed;" rather, "the plan proponent must demonstrate that there is a reasonable assurance of compliance with plan terms." *In re Frascelle Enters., Inc.*, 360 B.R. 435, 453 (Bankr. E.D. Pa. 2007) (citations omitted).

56. The BSA Toggle Plan is not feasible. ***First***, the Settlement Trust is not adequately capitalized and will not be able to liquidate the Direct Abuse Claims as a result. Under the BSA Toggle Plan, the Settlement Trust would have $34.7 million in cash on the Effective Date to

---

[23] *See Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 9 (D. Conn. 2006) (section 1129(a)(7) inquiry requires bankruptcy court to consider on remand whether creditor would be less secured under plan that provided for releases of non-debtor guarantors than it would in a chapter 7 liquidation where it would continue to receive the benefit of the guarantees); *In re Washington Mutual, Inc.*, 442 B.R. 314, 359-60 (Bankr. D. Del. 2011) ("In a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at least as well under the chapter 11 plan as they would in a chapter 7 liquidation."); *In re Quigley*, 437 B.R. 102, 146 (Bankr. S.D.N.Y. 2010) ("The confirmation of the … Plan and discharge of Pfizer will affect the dissenting Non-Settling Claimants because they would 'retain' their right to sue Pfizer if Quigley were liquidated under chapter 7. As the parties recognize, the … question is whether I should consider the value of these … claims in deciding whether the Fourth Plan is in the 'best interest' of the dissenting Non-Settling Claimants. I conclude that I must.")

liquidate trust assets, implement the provision of the trust documents, and pursue litigation against recalcitrant insurers. This is inadequate to fund litigation against insurers and pay for Settlement Trust operations. Under the BSA Toggle Plan, the Settlement Trust is designed to fail; the Debtors cannot show that there is a reasonable assurance of compliance with the Plan terms.

57. **Second**, the Debtors are destined to fail under the BSA Toggle Plan. The Debtors' ability to continue their operations is dependent on the Local Councils. As the Debtors' acknowledge, many of the Local Councils may not be able to operate if they are not Protected Parties. *See* Disclosure Statement at § X.A.19. The BSA Toggle Plan sets the stage for a subsequent liquidation and the end of Scouting.

### E. The Plan Was Not Proposed in Good Faith

58. Finally, the Plan was not proposed in good faith as required by section 1129(a)(3) of the Bankruptcy Code.[24] Although this is typically a confirmation objection,[25] the Coalition believes that the Court should take the totality of the issues relating to the Plan and Disclosure Statement into account before permitting the costly solicitation of votes on the Plan.

59. Transparency and disclosure are supposed to be hallmarks of the chapter 11 process. Here the Debtors are seeking to solicit votes based on a Disclosure Statement that includes inaccurate and misleading information regarding the aggregate value of abuse claims and the survivors' expected recovery. Century will not produce information necessary to understand

---

[24] Section 1129(a)(3) of the Bankruptcy Code demands that a plan must be "proposed in good faith and not by any means forbidden by law." Although the Bankruptcy Code does not define "good faith" in the context of section 1129(a)(3), the Third Circuit has explained that "[f]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 247 (3d Cir. 2004). The good faith requirement also has been construed to require a showing that the debtors proposed the plan with "honesty and good intentions" and with a basis for believing that the reorganization plan can be affected. *Kane v. Johns-Manville Corp. (In re Johns-Mansville)*, 843 F.2d 636, 649 (2d Cir. 1988).

[25] The burden to prove good faith is on the debtors. *See In re Silberkraus*, 253 B.R. 890, 902 (Bankr. C.D. Cal. 2000), *aff'd sub nom.*, *Dressler v. Seely Co. (In re Silberkraus)*, 336 F.3d 864 (9th Cir. 2003).

the true value of the Hartford settlement as well as the value of the INA policies.  The Debtors and their insurers are trying to keep survivors in the dark.  The Debtors have failed to propose the plan with honesty and good intentions.  This is unfortunate because the Debtors can reorganize.

60.     The Debtors could propose a plan that provides fair compensation for survivors.  The Debtor are unwilling to do so.  The Coalition, the TCC, and the FCR are prepared to file a joint plan to save Scouting and provide safeguards to prevent future abuse.  The Coalition sincerely hopes that the Debtors will adopt a different approach but, for now, the parties standing in the way of a successful reorganization are the Debtors and their insurers.  For the sake of Scouting, fairness, and equity, this must end.  The path forward is clear.  The Coalition respectfully asserts that the Court should deny the Motion, terminate exclusivity, and permit the Coalition, the TCC, and the FCR to move forward with a plan that has the survivors' support and can be confirmed by this Court.

## CONCLUSION

WHEREFORE, the Coalition requests that the Court enter an order denying the Motion, rejecting the Disclosure Statement for failing to provide survivors with adequate information, and granting the Coalition such other and further relief as the Court deems just and proper.

Dated: May 10, 2021                              MONZACK MERSKY AND BROWDER, P.A.
Wilmington, Delaware

                                                 */s/ Rachel B. Mersky*
                                                 Rachel B. Mersky (DE No. 2049)
                                                 1201 North Orange Street
                                                 Suite 400
                                                 Wilmington, Delaware 19801
                                                 Telephone:     (302) 656-8162
                                                 Facsimile:     (302) 656-2769
                                                 E-mail:        RMersky@Monlaw.com

                                                      -and-

BROWN RUDNICK LLP
David J. Molton, Esq.
Eric R. Goodman, Esq. (admitted *pro hac vice*)
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
E-mail: DMolton@BrownRudnick.com
E-mail: EGoodman@BrownRudnick.com

and

Sunni P. Beville, Esq. (admitted *pro hac vice*)
Tristan G. Axelrod, Esq. (admitted *pro hac vice*)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
E-mail: SBeville@BrownRudnick.com
E-mail: TAxelrod@BrownRudnick.com

*Co-counsel to the Coalition of Abused Scouts for Justice*