# IN THE UNITED STATES BANKRUPTCY
# COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC, | Case No. 20-10343 (LSS) |
| Debtors. | Jointly Administered |
| | Re: Docket No. 2594 |

### GIRL SCOUTS OF THE UNITED STATES OF AMERICA'S OBJECTION TO DEBTORS' DISCLOSURE STATEMENT FOR THE SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC

Girl Scouts of the United States of America ("Girl Scouts") by and through the undersigned counsel, hereby submits this objection (the "Objection") to the Debtors' *Disclosure Statement For the Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 2594] (the "Disclosure Statement"),[1] filed by the above-captioned debtors, Boy Scouts of America ("Boy Scouts") and Delaware BSA, LLC (together, the "Debtors"), in the above-captioned chapter 11 bankruptcy case. In support of this Objection, Girl Scouts states as follows:

### PRELIMINARY STATEMENT

Girl Scouts objects to the Disclosure Statement and Plan because the Plan provides less favorable treatment to Girl Scouts' claims when compared to all similarly situated Non-Abuse Litigant Claims. In short, Boy Scouts have structured a Plan that purports to treat all non-abuse litigants similarly but in reality singles out and punishes Girl Scouts by providing far worse

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed in the *Second Amended Chapter 11 Plan of Reorganization for Boy Scouts America and Delaware BSA, LLC* [Docket No. 2592] (the "Plan").

4814-9367-1136\8

treatment. This dynamic is not adequately disclosed in the Disclosure Statement and, even if it were, the Plan cannot be confirmed insofar as it affords Girl Scouts' claims disparate treatment.

Girl Scouts trademark litigation against the Boy Scouts is familiar to this Court. The fact that Boy Scouts may be displeased that Girl Scouts is standing up for itself in the face of rampant infringement and confusion cannot form a basis for singling out Girl Scouts for less favorable treatment than every other non-abuse litigation claimant.

## BACKGROUND

### A. Girl Scouts' Claim Against Boy Scouts

1. For over a century, Girl Scouts has established itself as the preeminent, best-known provider of leadership development services for American girls. Girl Scouts is a national, nonprofit organization that was incorporated in 1915 and congressionally chartered under 36 U.S.C. § 80301 on March 16, 1950. It is currently the largest girl-led leadership development organization for girls in the world, with over 2 million current active Girl Scouts, and its iconic GIRL SCOUTS program is both well-known and highly regarded. Founded in 1912 by Juliette Gordon Low in Savannah, Georgia, Girl Scouts promotes, encourages and inspires girls to develop courage, confidence, and character through a variety of activities and practical skills programs.

2. Boy Scouts is a congressionally chartered corporation under 36 U.S.C. § 30901 that was established to provide youth development services and programs for boys. While both Girl Scouts and Boy Scouts are congressionally chartered corporations that offer services to American youth, the two organizations are not associated with one another, and never have been.

3. Prior to the Petition Date, Boy Scouts took actions that infringe upon certain trademarks of the Girl Scouts, which include federally registered marks, common law rights in

each of its federally registered trademarks, as well as in all variations of GIRL SCOUTS that Girl Scouts has used in connection with girls leadership development services and related products or services, and any related trade dress and other designations of source, including "Scout" in the context of services to girls.

4. As a result of Boy Scouts' infringing actions, on November 6, 2018, Girl Scouts filed an action against Boy Scouts in the Southern District of New York, in the case captioned as *Girl Scouts of the U.S. v. Boy Scouts of Am.*, No. 18-10287 (the "Trademark Action"). Through the Trademark Action, Girl Scouts seeks injunctive relief and monetary relief including, but not limited to, direct damages, disgorgement of profits, and attorneys' fees.

**B. The Boy Scouts' Bankruptcy Case**

5. After decades of ignoring and failing to curb a significant child abuse problem, the weight of current and future abuse claims by survivors forced the Debtors to file for bankruptcy protection on February 18, 2020 (the "Petition Date").

6. On March 10, 2020, Girl Scouts filed its *Motion for Relief from the Automatic Stay to Resume Trademark Action* [Docket No. 157] (the "Lift Stay Motion"), seeking relief from this Court to resume the Trademark Action to (a) adjudicate Girl Scouts' request for post-petition injunctive relief, (b) liquidate and allow the post-petition damages claim, and (c) liquidate and allow the pre-petition damages claim.

7. Unsurprisingly, Boy Scouts opposed the Lift Stay Motion. *See* Docket No. 320. Girl Scouts pressed forward and after a contested hearing before the Bankruptcy Court, the Court made clear that the stay would be lifted; the only question was when. Thereafter, Girl Scouts and Boy Scouts discussed and agreed upon stipulated relief from the automatic stay as set forth in the *Stipulation Granting Limited Relief From the Automatic Stay with Respect to the*

*Trademark Action of Girl Scouts of the United States of America* [Docket No. 477] (the "Stipulation").

8. The Court entered an *Order* approving the Stipulation on April 24, 2020 [Docket No. 485] (the "Stay Relief Order"). Since the entry of the Stay Relief Order, the Trademark Action has proceeded and the claims of the Girl Scouts will be adjudicated and liquidated in the Trademark Action pursuant to the Stay Relief Order.

C. **The Disclosure Statement and Plan**

9. On April 13, 2021, the Debtors filed the Disclosure Statement and the Plan. The Disclosure Statement sets forth the Plan's classification of claims and interests. Of the 10 designated classes, three of the classes include non-abuse unsecured claims, each of which is impaired and entitled to vote:

| Class | Designation | Treatment under Plan | Estimated Amount and Approximate Percentage Recovery |
|---|---|---|---|
| 5 | Convenience Claims | Each holder of an Allowed Convenience Claim shall receive Cash in an amount equal to 100% of such holder's Allowed Convenience Class Claim. | Estimated Amount: $2.3 million – $2.9 million  Estimated Percentage Recovery: 100% |
| 6 | General Unsecured Claims | Each holder of an Allowed General Unsecured Claim (to the extent such Claim is not an Insured Non-Abuse Claim) shall receive, subject to the holder's ability to elect Convenience Class treatment on account of the Allowed General Unsecured Claim, its Pro Rata Share of the Core Value Cash Pool up to the full amount of such Allowed General Unsecured Claim in the manner described in Article VII of the Plan. | Estimated Amount: $26.5 million - $33.5 million  Estimated Percentage Recovery: 75-95% |

4

| 7 | Non-Abuse Litigation Claims | Each holder of an Allowed Non-Abuse Litigation Claim shall, subject to the holder's ability to elect Convenience Class treatment as provided in the following sentence, retain the right to recover up to the amount of such holder's Allowed Non-Abuse Litigation Claim from (i) available Insurance Coverage or the proceeds of any insurance policy of the Debtors, including any Specified Insurance Policy or D&O Liability Insurance Policy, (ii) applicable proceeds of any Insurance Settlement Agreements, and (iii) co-liable non-debtors (if any) or their insurance coverage. Solely to the extent that the holder of an Allowed Non-Abuse Litigation Claim fails to recover in full from the foregoing sources on account of such Allowed Claim after exhausting its remedies in respect thereof, such holder may elect to have the unsatisfied portion of its Allowed Claim treated as an Allowed Convenience Claim and receive cash in an amount equal to the lesser of (a) the amount of the unsatisfied portion of the Allowed Non-Abuse Litigation Claim and (b) $50,000. | Estimated Amount: Undetermined

Estimated Percentage Recovery: 100% |
|---|---|---|---|

Disclosure Statement, 21-22.

## OBJECTIONS

### The Disclosure Statement Does Not Provide Adequate Information

10. Section 1125(b) of the Bankruptcy Code requires debtors to solicit acceptance or rejection of a plan only through a disclosure statement that has been approved by the court as

5

containing "adequate information." 11 U.S.C. § 1125(b). Section 1125(a)(1) defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1).

11. The fundamental purpose of a disclosure statement "is to give the creditors the information they need to decide whether to accept the plan." *In re Monnier Bros.*, 755 F.2d 1336, 1342 (8th Cir. 1985); *see Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321 (3d Cir. 2003) (noting that a debtor "has an affirmative duty to provide creditors with a disclosure statement containing "adequate information" to "enable a creditor to make 'an informed judgment' about the Plan"); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) (acknowledging that "[t]he importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court" and that, based upon such reliance, "we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information'"); *Gen. Elec. Cred. Corp. v. Nardulli & Sons, Inc.*, 836 F.2d 184, 188 (3d Cir. 1988) (noting that § 1125(a)(1) "requires a debtor . . . to submit a written disclosure statement containing adequate information to allow a reasonable holder to make an informed judgment about the plan").

12. The Disclosure Statement does not provide adequate information for creditors to evaluate the Plan and how to vote on the Plan. Specifically, the Disclosure Statement lacks information necessary to understand the feasibility of the Plan, the basis for the classification and treatment of Girl Scouts' claims when compared to other Non-Abuse Litigation Claims.

4814-9367-1136\8

**Feasibility**

13. "A plan is confirmable only if it is feasible." *In re Am. Capital Equip. LLC*, 688 F.3d 145, 155 (3d Cir. 2012).

14. Unlike the Convenience Claims and the General Unsecured Claims, both of which will receive a cash distribution either directly from the Debtors or from the Core Value Cash Pool, Non-Abuse Litigation Claims are limited to recovery from either (1) available insurance policies or proceeds, (2) proceeds from insurance settlement agreements, if any, or (3) co-liable non-debtors (if any) or their insurance proceeds. If the claimant is unable to recover the full amount of its claim from the aforementioned sources, it may recover upon an Allowed Convenience Claim in the lesser amount of $50,000 or the unsatisfied portion of the claim.

15. Notably, the Disclosure Statement does not include an estimated amount of the Non-Abuse Litigation Claims, nor does it disclose any information related to the referenced insurance policies that would apply to such claims. Based on the Disclosure Statement, Girl Scouts and any other holder of a Non-Abuse Litigation Claim are unable to determine from a reading of the Disclosure Statement: (a) the total amount of potential claims in this class; (b) the insurance policies that apply to such claims and what, if any, limitations exist in their application; (c) the limits of the insurance policies that apply to such claims; or (d) the remaining coverage available under the insurance policies that apply to such claims. This information is essential to determine whether or not there is sufficient insurance coverage to cover the potential claims in this class, especially since the Debtors admit that "the BSA has eroded certain of the Insurance Policies … the BSA has also entered into settlement agreements pertaining to certain policies that may limit the extent of coverage available." Disclosure Statement, 41. Relatedly,

this information is critical to evaluate whether the nominal $50,000 set aside for any unsatisfied portion of the claim is sufficient.

16. The amount of potential claims and available insurance coverage must be provided in order to determine if the Plan is feasible. The Court should not approve the Disclosure Statement until it is amended to include information regarding the existence, extent, and limits of insurance policies applicable to Non-Abuse Litigation Claims, including the Girl Scouts.

## Basis For Classification

17. To confirm a Chapter 11 plan, the Bankruptcy Court must find that the plan complies with each of the requirements set forth in Section 1129(a) of the Bankruptcy Code. One such requirement, Section 1129(a)(1), requires that "[t]he plan complies with the applicable provisions of" Title 11. Section 1129(b)(1) provides that a Chapter 11 plan must, among other requirements, "not discriminate unfairly, and [be] fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. 1129(b)(1).

18. As noted above, Girl Scouts' claims that are being liquidated and allowed in the Trademark Action are classified together with other Non-Abuse Litigation Claims in class 7, and the Disclosure Statement fails to provide adequate information as to how and why such holders are to receive a supposed 100% recovery. Notwithstanding the Disclosure Statement's lack of information on this material issue for class 7 claimants, Girl Scouts understands two points:

   a. insurance policies that cover the claims by the Girl Scouts <u>are not sufficient</u> to cover all of the claims and thus, the recovery for Girl Scouts will be far lower than the Disclosure Statement's 100% projection; and

   b. insurance policies that cover the other Non-Abuse Litigation Claims <u>are sufficient</u> to cover all of such claims and thus, the recovery for all of these other claimants will be at the Disclosure Statement's 100% projection.

8

19. Although the Disclosure Statement is not complete, Girl Scouts understands that almost all of the Non-Abuse Litigation Claims relate to non-abuse type personal injury and/or other ordinary abuse litigation type claims. Such claims fall under a separate insurance policy or policies compared to those available to the Girl Scouts' claims raised in the Trademark Action. This information must be included in the Disclosure Statement.

20. As the Boy Scouts are aware from the pleadings and discovery in the Trademark Action, Girl Scouts' claim may be divided into three distinct buckets. *See* 15 U.S.C. §1117(a) ("When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office…shall have been established in a civil action arising under this Act, the plaintiff shall be entitled…to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.").

21. First, Girl Scouts has a claim for corrective advertising. This claim relates to money spent by Girl Scouts to implement a marketing strategy to correct the confusion caused in the public by the Boy Scouts' use of "Girl Scouts," "Scouting" and similar terms once they began marketing their boys-only programs to girls. Supporting evidence of Girl Scouts' infringement claims is the rampant confusion, including the fact that the public at times incorrectly thought Girl Scouts and Boy Scouts had merged or that Girl Scouts no longer existed. This is of course not true. Girl Scouts was forced to launch a corrective marketing campaign to combat this confusion created by Boy Scouts' infringing conduct. The claim for corrective advertising is no less than $6,761,833.32.

22. Second, Girl Scouts has a claim for disgorgement of Boy Scouts' profits obtained based on Boy Scouts' infringement of the Girl Scouts Marks. Boy Scouts cannot profit from its willful violation of the Lanham Act, and as such Girl Scouts is entitled to disgorgement of its ill-

9
4814-9367-1136\8

gotten profits. *See id.* Girl Scouts estimates that its claim for disgorgement of profits is no less than $4,998,301.00.

23. Finally, Girl Scouts holds a claim for the costs of the Trademark Action, including reasonable attorneys' fees. *Id.*; 15 U.S.C. 1117(a); *see generally*, *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 909 F.3d 519, 531 (2d Cir. 2018) (awards of attorneys' fees are statutorily allowed under the Lanham act); *Benihana of Tokyo, LLC v. Benihana Inc.*, 771 Fed. Appx. 71, 72 (2d Cir. 2019). Girl Scouts estimates that its claim for attorneys' fees and costs is in excess of $5.8 million and this claim continues to grow as the litigation continues. Furthermore, of this amount, approximately 40% of the claim, plus all of the ongoing increases of this amount, is a postpetition administrative expense claim.

24. Based on the insurance information Girl Scouts has received from the Debtors, it appears that certain portions of Girl Scouts' claims against the Boy Scouts, such as the disgorgement of Boy Scouts' ill-gotten profits, may not be covered by the applicable insurance policies. Additionally, Girl Scouts believes that a substantial amount of the coverage has been – and will continue to be – eroded and diminished by Boy Scouts' counsel in the Trademark Action, whose strategy has been to over-litigate this matter. Indeed, based on information available from the docket, Boy Scouts' counsel's bills in just the past six months are more than twice as much as Girl Scouts' counsel has charged in the Trademark Action. *See* Docket 1125, Schedule 3; Docket 2480, 2.

25. Assuming Girl Scouts' understanding is correct, the exclusion of Girl Scouts' claim for disgorgement of profits alone will reduce Girl Scouts' recovery by at least 30%. Although Girl Scouts' claims for corrective advertising and attorneys' fees are arguably covered by the insurance policies, such coverage has not been stipulated to by the insurance companies,

and the policies have been and continue to be significantly eroded by the fees incurred by the Boy Scouts' counsel in the Trademark Action. Indeed, the coverage may be completely – or at least substantially – extinguished by Boy Scouts' own attorneys' fees.

26. Conversely, the other Non-Abuse Litigation Claims will not be subject to the same limitations because they are covered under separate insurance policies and will in fact receive 100% recovery under the Plan in their allowed amounts. Girl Scouts understands that the policies covering these other claims have ample coverage that has no chance of being insufficient, and that the insurance companies for such policies have already accepted coverage for these types of claims. Thus, Girl Scouts is arguably the **only** claimant in the Non-Abuse Litigation Claim class that will not receive 100% of its allowed amounts and indeed will likely receive much less. Therefore, Girl Scouts will receive disparate treatment.

27. Disparate treatment of a particular claim or claims within a single class violates 11 U.S.C. § 1123(a)(4), which states, in relevant part, "a plan shall … provide the same treatment for each claim or interest of a particular class…" *See In re W.R. Grace & Co.* 475 B.R. 34, 124 (Bankr. Del. 2012). Boy Scouts can easily remedy this issue by adjusting the Plan so that if the Girl Scouts' allowed claim as determined by the Trademark Action cannot be fully satisfied by the applicable insurance coverage, then such unsatisfied portion of the claim shall be paid by the reorganized Boy Scouts. This would create a Plan that actually provides for recovery of approximately 100% for Girl Scouts' claim as it proposes for other Non-Abuse Litigation Claims. Given that Boy Scouts believes that there is sufficient insurance coverage or that Girl Scouts' claims are invalid, it should have no issue with this adjustment. Indeed, the estate will not be affected if Boy Scouts' assertions are correct and if they are incorrect, the economic impact is relatively very small.

28. Assuming Girl Scouts' understanding of its unique treatment (on which the Disclosure Statement is silent) is correct, such treatment should be disclosed and explained. Absent a "fix" to have the reorganized Boy Scouts backstop the insurance coverage, the Debtors must provide a reasonable, nondiscriminatory basis for the disparate treatment of Girl Scouts as compared to the other holders of the Non-Abuse Litigation Claims.

29. Unfortunately, Girl Scouts believes there is no reasonable, non-discriminatory basis and thus, the Plan, as to this disparate treatment, cannot be confirmed until it is cured. Simply put, Boy Scouts should be forced to stand behind its position that there is sufficient insurance coverage and/or that Girl Scouts' claim is not valid by agreeing to pay any allowed amount of the Girl Scouts' claim that is not satisfied by insurance proceeds – indeed, they must do so with respect to the postpetition administrative claim portion of Girl Scouts' damages. Only by doing so will the Plan's treatment of the claim of the Girl Scouts equal that of the other Non-Abuse Litigation Claims.

30. The Boy Scouts must adequately disclose the basis for its representation that Non-Abuse Litigation Claims will receive 100% recovery, or otherwise explain the disparate treatment of Girl Scouts under the proposed Plan. The Court should not approve the Disclosure Statement until it is amended to include such information and explanation.

4814-9367-1136\8

| Dated: May 10, 2021 | **DORSEY & WHITNEY (DELAWARE) LLP** |
|---|---|
| | */s/ Eric Lopez Schnabel* |
| | Eric Lopez Schnabel (DE Bar No. 3672) |
| | Alessandra Glorioso (DE Bar No. 5757) |
| | 300 Delaware Avenue, Suite 1010 |
| | Wilmington, Delaware 19801 |
| | Telephone: (302) 425-7171 |
| | Facsimile: (302) 425-7177 |
| | E-mail: schnabel.eric@dorsey.com |
| | glorioso.alessandra@dorsey.com |
| | |
| | -and- |
| | |
| | DORSEY & WHITNEY LLP |
| | |
| | Bruce R. Ewing (*pro hac vice*) |
| | Eric Lopez Schnabel (DE Bar No. 3672) |
| | 51 West 52nd Street |
| | New York, New York 10019 |
| | Telephone: (212) 415-9200 |
| | Facsimile: (212) 953-7201 |
| | E-mail: ewing.bruce@dorsey.com |
| | schnabel.eric@dorsey.com |
| | |
| | ***Counsel to Girl Scouts of the United States of America*** |