# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re<br><br>BOY SCOUTS OF AMERICA<br>AND DELAWARE BSA, LLC[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>Hearing Date: May 19, 2021 at 10:00 a.m.<br>Objection Deadline: May 10, 2021 at 4:00 p.m. |

**UNITED STATES TRUSTEE'S OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE DISCLOSURE STATEMENT AND THE FORM AND MANNER OF NOTICE, (II) APPROVING PLAN SOLICITATION AND VOTING PROCEDURES, (III) APPROVING FORMS OF BALLOTS, (IV) APPROVING FORM, MANNER, AND SCOPE OF CONFIRMATION NOTICES, (V) ESTABLISHING CERTAIN DEADLINES IN CONNECTION WITH APPROVAL OF THE DISCLOSURE STATEMENT AND CONFIRMATION OF THE PLAN, AND (VI) GRANTING RELATED RELIEF (D.E. 2295)**

Andrew R. Vara, the United States Trustee for Region 3 ("U.S. Trustee"), through his undersigned attorneys, objects to the Disclosure Statement for the Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (the "Disclosure Statement") and the Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief (the "Motion") and states as follows:

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

## PRELIMINARY STATEMENT

1.      As the centerpiece of their Plan,[2] the Debtors have proposed a complex series of releases and injunctions that will channel their tort liability, along with the tort liability of certain non-debtor affiliates and "representatives" (and, depending on the specific version of the Plan confirmed, numerous other non-debtors) to a Settlement Trust that will become the sole source of recovery for persons asserting abuse claims against the Debtors and other Protected Parties. The proposed Channeling Injunction resembles the injunctions that have historically been featured in chapter 11 cases involving product liability claims for which injuries and claims are expected to arise indefinitely into the future. But as the Debtors themselves seem to acknowledge, the use of such an injunction is novel in a case such as this, which involves only past torts with no latency period. *See* Disclosure Statement at 44 n.35.

2.      The legality and enforceability of the Channeling Injunction is ultimately a question for confirmation. But it is the obligation of the Debtors to demonstrate that their Plan is capable of proceeding to confirmation and the Disclosure Statement remains deficient in this regard. Apart from a few passing references to section 105 of the Bankruptcy Code and the Court's equity powers, the Disclosure Statement does not identify any legal authority for the Channeling Injunction, nor does the Disclosure Statement attempt to reconcile this relief with the stringent limitations placed by this Court on non-consensual third-party releases. The United States Trustee reserves judgment on whether the Plan ultimately will be confirmable, but the Disclosure Statement should not be approved until the Debtors have at the very least elucidated the legal argument on which they intend to rely.

---

[2] Defined Terms shall have the same meaning ascribed to them in the Second Amended Plan, Second Amended Disclosure Statement, or the Motion.

2

3. Even assuming that the Debtors can meet this burden, there remain several other deficiencies in the Disclosure Statement which should prevent its approval, notwithstanding its recent amendments. In particular:

- the Disclosure Statement continues to lack critical financial information necessary to allow creditors to meaningfully evaluate their treatment under the Plan, including information regarding the funding of the Settlement Trust;

- the Disclosure Statement lacks clarity about the effect of certain injunctions, making it difficult for creditors to ascertain which causes of action will (or will not) be subject to a release or the Channeling Injunction;

- the Plan proposes an overly broad "exculpation" provision and improperly seeks to effect a non-consensual release of administrative and tax claims;

- the terms of the Settlement Trust impermissibly reward or punish individual creditors based solely on whether they voted to confirm or reject the Plan;

- the Plan and Solicitation Procedures unreasonably impair the ability of creditors to dissent from or "opt out" of certain allegedly consensual releases, which are to be proposed in connection with Plan balloting; and

- the Solicitation Procedures set forth an unreasonably compressed calendar and restrictive balloting procedure that may unfairly disenfranchise many abuse victims and other creditors from participating in the confirmation process.

## JURISDICTION

4. Pursuant to 28 U.S.C. § 586(a)(3), the U.S. Trustee is charged with administrative oversight of the bankruptcy system in this District. Such oversight is part of the U.S. Trustee's overarching responsibility to enforce the laws as written by Congress and interpreted by the courts. *See United States Trustee v. Columbia Gas Systems, Inc. (In re Columbia Gas Systems, Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that the U.S. Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

5. Pursuant to 28 U.S.C. § 586(a)(3)(B), the U.S. Trustee has the duty to monitor plans and disclosure statements filed in Chapter 11 cases and to comment on such plans and disclosure statements.

6. Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on the Plan and Disclosure Statement and the issues raised in this objection.

## PROCEDURAL HISTORY

7. The Debtors filed their petitions on February 18, 2020. The cases have been ordered jointly consolidated for administrative purposes. On March 5, 2020, the U.S. Trustee appointed an Official Committee of Unsecured Creditors ("Creditors' Committee) and a Committee of Tort Claimants ("Tort Claimants' Committee").

8. On April 13, 2021, the Debtors filed the Second Amended Disclosure Statement (D.E. 2594) and Second Amended Plan (D.E. 2592). The Debtors seek approval of the Second Amended Disclosure Statement, with plan solicitation proposed to begin on June 2, 2021, and a Plan Supplement to be filed later, by July 16, 2021, i.e., more than 6 weeks later, and just 14

days before the voting deadline. The Debtors' Plan is now structured as a Toggle Plan. The Global Resolution Plan will create a Settlement Trust to receive funding from the Debtors, Chartered Organizations, Local Councils, and insurance companies, from which distributions shall be made to holders of allowed Direct and Indirect Abuse Claims in accordance with Trust Distribution Procedures. Contributors to the Settlement Trust would benefit from third-party releases and some will also become Protected Parties subject to the Channeling Injunction applicable to Abuse Claims. If the Abuse Claims reject the Plan, the Plan becomes the BSA Toggle Plan. The BSA Toggle Plan provides for contributions to the Settlement Trust from only BSA, including a proposed cash contribution of approximately $115.6 million and BSA's insurance rights. The Chartered Organizations, the Local Councils and their associated insurance rights will be unaffected by the BSA Toggle Plan. Terms may be defined, but much of the necessary content of the Plan is missing; entire exhibits have no content at all.

## ARGUMENT

### I. Applicable Law

9. Section 1125 of the Bankruptcy Code prohibits solicitation of votes on a reorganization plan prior to court approval of a written disclosure statement that contains "adequate information." *See* 11 U.S.C. § 1125(b). "Adequate information" is defined in section 1125 as being:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of debtor's books and records, that would enable a reasonable hypothetical investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan.

11 U.S.C. § 1125(a)(1).

10. The disclosure requirements of section 1125 are "crucial to the effective functioning of the federal bankruptcy system [;] . . . the importance of full and honest disclosure cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (*citing Oneida Motor Freight, Inc. v. United Jersey Bank* (*In re Oneida Motor Freight, Inc.*), 848 F.2d 414 (3d Cir. 1988)).

11. "Adequate information" under § 1125 is "determined by the facts and circumstances of each case." *See Oneida*, 848 F.2d at 417 (citing H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977)). The "adequate information" requirement is designed to help creditors in their negotiations with debtors over proposed plans. *See Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94 (3d Cir. 1988).

## II. Objections to Disclosure Statement

### A. Authority for Channeling Injunction

12. Though styled as a Channeling Injunction, the releases described in Section X.J.3 of the Plan are simply a specialized form of a non-consensual third-party release: nondebtor holders of Abuse Claims will be permanently enjoined from pursuing tort claims against nondebtor Protected Parties, even though their claims are not property of the Debtors' estate and are not claims which the Debtors would have authority to assert or settle. Furthermore, affected abuse victims are given no opportunity to opt out of the Channeling Injunction.

13. The circumstances in which this Court has permitted involuntary third-party releases are rare. *See In re Washington Mutual, Inc.*, 442 B.R. 314, 352 (Bankr. D. Del. 2011) (citing, *inter alia, In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del. 2004) (holding that the "Trustee (and the Court) do not have the power to grant a release of the Noteholders on behalf of third parties," and that such release must be based on consent of the releasing party)); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999) (holding that

6

the release provision had to be modified to permit third parties' release of non-debtors only for those creditors who voted in favor of the plan); *In re Exide Techs.*, 303 B.R. 48, 74 (Bankr. D. Del. 2003) (approving releases which were binding only on those creditors and equity holders who accepted the terms of the plan); *See also In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717, 726-27 (S.D.N.Y. 2019) (noting that "…third party releases are not a merit badge that somebody gets in return for making a positive contribution to a restructuring. They are not a participation trophy, and they are not a gold star for doing a good job. Doing positive things in a restructuring case— even important things— is not enough").

14. The Disclosure Statement should be amended to explain why the Debtors believe this Court has the authority and jurisdiction to order the involuntary release of the personal claims of creditors—claims the Debtors could not bring—against the Protected Parties and their non-estate assets. *In re Johns-Manville Corp.*, 517 F.3d 52, 66 (2d Cir. 2008), *vacated & remanded on other grounds*, 557 U.S. 137 (2009), *aff'g in part & rev'g in part*, 600 F.3d 135 (2d Cir. 2010) ("a bankruptcy court only has jurisdiction to enjoin third-party non-debtor claims that directly affect the res of the bankruptcy estate.").

### B. Inadequate Disclosure as to Settlement Trust

15. Despite its length, the Disclosure Statement does not contain the most important information for most creditors: what they can expect to receive and when. The Disclosure Statement should include this information, which should be in plain language that ordinary non-lawyer claimants can understand. The Plan and Disclosure Statement fail to adequately disclose funding for the Plan. The Plan creates a Settlement Trust to be funded by various contributions and references Exhibits purporting to identify Local Settlement and Contributing Chartered Organization Settlement Contributions, as well as Local Councils contributing to the Settlement Trust. But none of those entities are identified, and there is no disclosure of the amounts of

funding for each. The Debtors propose to file a report by June 15, 2021, to provide further information, but that report will not be included in the Plan solicitation materials.

16. The Plan also fails to adequately disclose particular assets that will fund the Plan. For example, the BSA Settlement Trust Contribution (I.A.43) includes Artwork (I.A.31), Oil and Gas Interests (I.A.154), and BSA Insurance Policies (I.A.42), but neither the Plan nor the Disclosure Statement discloses values for any of these assets.[3] The Liquidation Analysis attached as Exhibit B to the Disclosure Statement does not show these assets as identified line items.

17. The Disclosure Statement is deficient with respect to financial disclosures generally. Financial information is the kind of information that is most important to a creditor or party in interest's decision to accept or reject the Plan and must be included in any adequate disclosure statement. Exclusive of the Term Sheet, the financial disclosures contained in the Plan and Disclosure Statement consist of the following: Exhibit D to the Plan; the nominal disclosures contained in pages 20-24 of the Disclosure Statement; and Exhibits B (liquidation analysis) and C (future projections) to the Disclosure Statement. Notably, Exhibit D to the Plan is the Local Council Settlement Contribution, which discloses that BSA is committed to raising $425 million from the Local Councils, but there is no disclosure of a single actual commitment to date. Nor is there any discussion as to how BSA will fulfill this commitment. Without adequate information regarding the valuation of these assets, as well as the value of the Plan's releases, creditors cannot evaluate whether the proposed (as-yet-unconfirmed and largely unquantified) contributions by the various Protected Parties are a reasonable or realistic settlement of the claims against these parties.

---

[3] References identified as I.A. followed by a number refers to the corresponding portion of the Plan containing 220 definitions.

18. The Disclosure Statement's lack of adequate financial disclosures is fatal to its approval. Among other things, the financial disclosures should (but do not) show:

- The estimated or actual amount of contribution for each revenue source of the proposed Settlement Trust;

- The identities and amounts to be contributed by each and every proposed Protected Party or Released Party; and

- The likelihood of any Net Unrestricted Cash and Investments greater than $75 million being available for distribution.

19. The information disclosed in response to the first two bullet points is relevant to determining whether the Plan is feasible, whether a proposed Released or Protected Party has contributed or will contribute sufficiently to satisfy the relevant case law standards for obtaining a release or the proposed protection, and whether the Plan satisfies the best interests of creditor test in Bankruptcy Code section 1129(a)(7). The third bullet point is relevant to determine whether this aspect of the proposed BSA Settlement Trust Contribution has any value and, if so, how much.

20. The Second Amended Plan contains the proposed Settlement Trust Agreement and proposed Trust Distribution Procedures as exhibits. The Disclosure Statement does not describe how the Settlement Trustee will be chosen or how a proposed Settlement Trust Advisory Committee will be selected. The Disclosure Statement should address these issues.

21. The Liquidation Analysis in the Disclosure Statement also requires significant revision. The Disclosure Statement appears to presume that because the Debtors are non-profit corporations, they are not required to satisfy the "best interest of creditors" requirement of section 1129(a)(7). The Debtors should explain the legal basis and authority for this contention. Alternatively, the Disclosure Statement should show what would be available for distribution

9

under a liquidation and compare the Liquidation Analysis to the proposed plan to demonstrate how the Plan satisfies the best interests of creditors test. The Liquidation Analysis also fails to account for the insurance rights belonging to BSA that are a part of the BSA Settlement Trust Contribution, and it is unclear if the artwork portfolio is included. It is likewise unclear what assets are included in the Liquidation Analysis line item entitled, "Land, Building and Equipment".

### C. Clarification Regarding Scope of Releases and Injunctions

22. The Disclosure Statement must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy Code] alternatives . . . ." *In re Copy Crafters Quickprint, Inc.,* 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988). The Disclosure Statement is deficient because understanding the actual treatment of their claims under the various injunctions proposed in Plan will require creditors to follow a complex and occasionally circular chain of Plan definitions and provisions. This is likely to create confusion and uncertainty as to one of the most important questions facing creditors: the question of which particular rights and liabilities will be channeled to the Settlement Trust, which will be released entirely, and which will pass through the bankruptcy unaffected.

23. The potential for confusion appears to be particularly high regarding the Plan's definition and proposed treatment of "Future Claims." By its terms, the Channeling Injunction applies only to "Abuse Claims," which are defined as "Claims" based on conduct occurring prior to the Petition Date. (I.A.18). "Claims," in turn, are defined as having the definition set forth in section 101(5) of the Bankruptcy Code but are also defined (somewhat circularly) as including "Abuse Claims." (I.A.52). Furthermore, "Abuse Claims" are also defined to include "Future Abuse Claims," (I.A.18, 109), while the releases under the Plan include a release of "all Abuse Claims . . . hereinafter arising." Plan X.J.3. These definitions may create confusion among

creditors, who must evaluate both whether the trust will be funded in amount to pay all Abuse Claims in full as well as the likely treatment of their own claims. For this reason, the Plan should be clarified to explain: (i) whether the Channeling Injunction and Settlement Trust will address any rights or liabilities in addition to those that meet the Bankruptcy Code's statutory definition of a "claim," and if so, the specific rights that will be affected and the basis of the Court's authority to dispose of such rights and liabilities; and (ii) the extent, if any, to which the Channeling Injunction will affect claims based on conduct that occurs or continues after the Petition Date.

24. The Disclosure Statement should also be amended to explain the interplay between the injunctions set forth in sections X.J.3 and X.J.4 of the Plan. Specifically, section X.J.3 ("Releases by Holders of Abuse Claims") is a release of Abuse Claims for the benefit of the Protected Parties who have contributed to the Trust, while section X.J.4 ("Releases by Holders of Claims") appears to be a general release for the benefit of "Released Parties"—a category which appears to be narrower than the Protected Parties, but which also includes several non-debtors such as the Related Non-Debtor Entities, setting insurance companies, and the "Representatives" of various entities. It is unclear whether these releases are intended to overlap, and in particular, whether any Abuse Claims are subject to release or discharge under the general release of section X.J.4. Because, as discussed below, the ability of creditors to opt out of the section X.J.4 release is conditioned on their decision to vote for or against the plan, the effect of these releases should be clarified prior to Plan solicitation.

### D. Releases of Administrative Claims

25. The Disclosure Statement should also be amended to clarify the treatment of administrative expense claimants and priority tax claimants. The Plan's definition of a Releasing Claim Holder (Plan I.A.190) includes "all holders of Administrative Expense Claims or Priority

Tax Claims that do not hold Claims or Interests in any Class and do not timely file with the Bankruptcy Court an objection to the releases set forth in Article X.J.4 by the deadline established to file objections to the Plan . . ." Section 1129(a)(9), however, requires all administrative and priority claims to be paid in full as a condition of confirmation unless a party agrees otherwise. With respect to administrative claims arising under 28 U.S.C. § 1930, applicable to the Court and the Office of the U.S. Trustee, these fees must be paid as a condition of confirmation. Failure to pay these fees is also a ground to dismiss or convert the case pursuant to 11 U.S.C. § 1112. With respect to administrative tax claims, Bankruptcy Code section 503(b)(1)(D) expressly provides that administrative tax claimants "shall not be required to file a request for payment." To the further extent that certain taxes, such as payroll taxes, may impose liability upon responsible persons for failure to pay any such applicable taxes, the provision would conflict with nonbankruptcy law.

26. The proposal requiring that administrative claimants opt out of the third-party releases or be bound to them is also objectionable. As drafted, this provision precludes any non-ordinary course administrative claimant from pursuing a claim against the Debtors or any third-party. Post-petition personal injury claimants and any post-petition abuse claims would arguably be required to opt out or be utterly deprived of their non-bankruptcy rights, including but not limited to applicable statutes of limitation, not only against the BSA, but against all the non-Debtor Protected Parties and their Representatives. The Disclosure Statement should be amended to clarify the treatment of such persons and the statutory authority, if any, for enjoining their claims.

  **E.** **Exculpation**

27. The Plan includes an overly broad "exculpation" clause that impermissibly seeks to enjoin claims for future misconduct as well as claims against persons who are not fiduciaries

in these cases. Plan section X.K proposes to exculpate parties from conduct taking place not only during the case, but also for "the administration, consummation and implementation of the Plan or the property to be distributed under the Plan, or the management or operation of the Debtors." Future exculpation for acts that have not yet occurred is impermissible. This provision should be revised to apply only to conduct before the Effective Date.

28. The definition of Exculpated Party includes the Creditor Representative, an entity that will not come into existence unless the Plan is confirmed. The Creditor Representative is not an estate fiduciary and should be removed from the definition of Exculpated Parties. The parties being exculpated should be limited to those who served as estate fiduciaries, *i.e.*, the creditors' committee, its members, estate professionals, and the Debtor's directors and officers. *See In re Indianapolis Downs, LLC,* 486 B.R. 286 (Bankr. D. Del. 2013); *Tribune Co.,* 464 B.R. 189; *In re PTL Holdings, LLC*, 2011 WL 5509031 *12 (Bankr. D. Del. Nov. 10, 2011); *Washington Mut.*, 442 B.R. at 350. *See also PWS Holding Corp*, 228 F.3d 224 (3d Cir. 2000).

29. Plan section X.K further proposes that Exculpated Parties "shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the matters referenced in the preceding sentence." This provision should be stricken. This defense is available at common law without having to be included within the exculpation provision. Including this language in the provision tends to elevate a defense into an immunity. Further, to the extent the advice of counsel is unlimited, it should be restricted to written advice.

### F. The "Expedited Distribution" Option Should Be Explained And Should Not Be Conditioned on a Claimant's Plan Vote.

30. Section 3.1 of the Trust provides that if the Plan is confirmed as the Global Resolution Plan, then a Direct Abuse Claimant may elect to receive an Expedited Distribution as follows:

> …if the Plan is confirmed as a Global Resolution Plan, a Direct Abuse Claimant who properly completes a non-duplicative proof of claim and who votes to accept the Plan may elect to resolve his or her Abuse Claim for an Expedited Distribution of $1,500. The Expedited Distribution does not apply if the Plan is confirmed as a BSA Toggle Plan. The Settlement Trust shall make Expedited Distributions to Abuse Claimants who have properly elected to receive the Expedited Distribution on or as soon as practicable after the Effective Date. Abuse Claimants that elect to receive the Expedited Distribution will not have to submit any additional information to the Settlement Trust in order to receive payment of the Expedited Distribution from the Settlement Trust.

Trust Distribution Procedures ¶ 3.1

31. Because the "Expedited Distribution" allows for claimants to be paid without any ability for the Trust to review claims or demand additional documentation, this provision may leave the Trust vulnerable to the payment of meritless or fraudulent claims, which would reduce the funds available to other claimants. The Disclosure Statement should either explain this risk, or otherwise explain the steps that the Trust will take to prevent the allowance and payment of fraudulent claims through the Expedited Distribution option.

32. For purposes of the Disclosure Statement, this provision is also troubling because it appears to offer claimants an improper inducement to vote in favor of the Plan. Abuse Claimants who vote to reject the Plan cannot take advantage of the Expedited Payment option, even though they may be otherwise identically situated to other Abuse Claimants. This provision violates the Bankruptcy Code's requirement that all claims within the same class receive identical treatment, *see* Bankruptcy Code § 1123(a)(4). *See In re New Century TRS Holdings, Inc.,* 407 B.R. 576, 592 (D. Del. 2009) (if claims within the same class are not

14

receiving the same treatment, and the holders of those claims being treated less favorably have not consented to the discrimination, the plan is not confirmable). Furthermore, to the extent that the Expedited Payment option is intended manipulate the vote on the Plan, it is in bad faith and should be excised from the Plan.

### G. Opt Out Provision

33. As noted, the general creditor release in Section X.J.4 is conditioned by an opt out provision that allows some—but not all—affected creditors to withhold their consent to the release. Although the ability to opt out is tied to the creditor's vote on the Plan, as discussed above, because the Plan does not clearly discuss the scope and effect of the Section X.J.4 release, there is a danger that many creditors will waive their right to opt out without understanding the full extent of that release. For this reason, the right of accepting creditors to opt out of releases should not be restricted unless the Disclosure Statement is amended to more clearly advise creditors of the consequences of their vote to accept.

34. In other cases, the opt out provisions are deficient because they apply only to creditors who vote against the Plan, and not to other creditors who will be affected by the release but who have no ability to vote or opt out. Thus, the Plan's definition of Releasing Claim Holder (I.A.190) does not permit holders of Claims to opt out if they were presumed to accept the Plan (Priority Claims and Other Secured Claims), nor if they failed to return a ballot. The releases cannot be considered "consensual" with respect to those claimants, and the Plan should not be approved unless those releases are amended to apply only to those creditors who affirmatively assent. *See Zenith*, 241 B.R. at 111 (Bankr. D. Del. 1999).

### H. Scheduling and Balloting Matters

35. The proposed solicitation procedures set the confirmation hearing for the week of August 30, 2021. But this is a month after the proposed voting and confirmation objection

deadline and does not correspond to the Debtors' earlier disclosures that the confirmation hearing would take place in late July or early August. This new date was not disclosed until April 29, 2021. Monday, August 30, is the Monday before Labor Day, and the rest of the week is a week during which many people plan end-of-summer vacations. It is unreasonable to ask more than 80,000 parties in interest, including abuse survivors, to cancel anticipated vacation plans to attend a multi-day trial. The Debtors should move this hearing so that it occurs either earlier in August or after September 12.

36. The proposed solicitation procedures contain dates by which parties, especially parties representing sexual abuse survivors, must inform the Debtors of the decision either to vote indirectly through their counsel or directly on their own. These dates and deadlines appear to have already occurred—before even the (now-adjourned) hearing to consider approval of the solicitation procedures and Disclosure Statement. Further, under this multi-client "master ballot"-type arrangement, the default if a client makes no election is for the attorney to vote on the client's behalf. Instead, the default should be for a claimant to vote his or her claim directly.

37. The Solicitation Procedures Order defines a Disputed Claim to be a claim subject to an objection filed before the proposed Solicitation Date of June 2, other than claims objected to on the basis of "reclassify" or "reduce and allow." The Disclosure Statement should confirm that the Debtor will not be objecting to claims after the Solicitation date and prior to the Voting Deadline. If the Disclosure Statement does not make this confirmation, claimants could be disenfranchised by an interposed objection, because they might be unaware of the Rule 3018 procedures and deadlines that require additional affirmative steps for their vote to be, in essence "re-counted."

38. The Debtors also propose that they be relieved of the requirement to send solicitation packages to all parties entitled to vote and that instead they be permitted to send only a notice containing directions to access the solicitation materials online. This is unacceptable. Federal Rule of Bankruptcy Procedure 3017(d) requires these materials to be mailed: "Except to the extent the Court orders otherwise with respect to one or more unimpaired classes of creditors or equity security holders, the debtor…**shall mail**…" (Emphasis added). The voting classes are all impaired and are entitled to paper copies of the solicitation package (or, at the very least, a flash drive or other media containing complete electronic copies). Many of the sexual abuse survivor claimants (Class 8) are elderly and may not be comfortable with or have easy access to a computer or the internet.

39. The Solicitation Procedures also provide that if there are no votes cast in a voting class, the class will be deemed to have accepted the Plan. This is contrary to Bankruptcy Code section 1126(c), under which a class of claims only accepts a plan if a majority in number and two-thirds in dollar amount of claims of those voting, vote for the Plan. If any impaired class votes to accept the Plan, then any other impaired or rejecting classes are subject to the cramdown provisions of Bankruptcy Code section 1129(b).

## CONCLUSION

40. Neither the Disclosure Statement nor the proposed solicitation procedures should be approved. The deficiencies of the filed Plan are manifest throughout the Disclosure Statement, and the Disclosure Statement does not satisfy the disclosure requirements of section 1125. A simple summary of the plan written in plain English as well as the Trust Distribution Procedures are desperately needed for individuals to help them determine whether to accept or reject the Plan.

**WHEREFORE,** the U.S. Trustee respectfully requests that this Court issue an order denying approval of the Disclosure Statement, denying the Solicitation Procedures Motion, and granting such other relief as this Court deems appropriate, fair, and just.

Dated: May 10, 2021
      Wilmington, Delaware

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**Regions 3 and 9**

By: */s/ David L. Buchbinder*
David L. Buchbinder, Esquire
Hannah M. McCollum, Esq.
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Wilmington, DE 19801
(302) 573-6491
(302) 573-6497 (Fax)
david.l.buchbinder@usdoj.gov