**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. 2618** |
| | **Hearing Date: May 19, 2021 at 10:00 a.m. (ET)** **Objection Deadline: May 12, 2021 at 4:00 p.m. (ET)** |

**LIMITED OBJECTION OF THE AIG COMPANIES TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) SCHEDULING CERTAIN DATES AND DEADLINES IN CONNECTION WITH CONFIRMATION OF THE DEBTORS' PLAN OF REORGANIZATION, (II) ESTABLISHING CERTAIN PROCEDURES AND, (III) GRANTING RELATED RELIEF**

National Union Fire Insurance Company of Pittsburgh, Pa., Lexington Insurance Company, Landmark Insurance Company, The Insurance Company of the State of Pennsylvania, and their affiliated entities (collectively referred to herein as the "*AIG Companies*") file this limited objection (the "*Limited Objection*") to the *Debtors' Motion for Entry of an Order (I) Scheduling Certain Dates and Deadlines in Connection With Confirmation of the Debtors' Plan of Reorganization, (II) Establishing Certain Procedures and (III) Granting Related Relief*, filed on April 15, 2021 [D.I. 2618] (the "*Motion*")[2] by Boy Scouts of America ("*BSA*") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "*Debtors*"). In support of the Limited Objection, the AIG Companies respectfully represent as follows:

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] Capitalized terms not defined herein have the meanings ascribed to such terms in the Motion.

## PRELIMINARY STATEMENT[3]

1.      While the AIG Companies do not oppose entry of a scheduling order at this
juncture to assist in the creation of a coordinated framework for confirmation, the Debtors'
proposal meaningfully oversteps when it bridges into the concept of claims estimation
procedures. The Debtors' proposed estimation, like the one proposed by the Abuse Claimants
Representatives in their separately filed Estimation Motion, is primarily designed to prejudice
the Debtors' non-settling insurers by attempting to strip them of valuable rights and defenses in
post-confirmation litigation. The Debtors claim that the insurers will not be prejudiced because
of the Insurance Neutrality Provision in the Plan. But "insurance neutrality" is a misnomer: the
Insurance Neutrality Provision is not insurance neutral.

2.      Instead, the Plan expressly provides that principles of *res judicata* and collateral
estoppel will apply in post-confirmation coverage litigation, thereby all but ensuring that future
litigants will seek to use the aggregate "estimation" of Abuse Claim liability against non-settling
insurers post-confirmation. Indeed, the Debtors' proposed aggregate "estimation" is primarily
designed to manufacture an inflated estimate of Abuse Claim liability in order to secure the
Abuse Claimants Representatives' support for the Debtors' Plan. Such aggregate estimation will
then almost certainly be used to attempt to improperly deny non-settling insurers their
contractual rights and available coverage defenses in post-confirmation litigation.

3.      The only rationale the Debtors have provided for an aggregate estimation is that it
is necessary for the Court to approve any settlements the Debtors are able to reach under section
1123(b)(3)(A) of the Bankruptcy Code. But estimation is clearly unnecessary for such approval,

---

[3]      Capitalized terms used but not defined in this preliminary statement have the meanings ascribed to such terms in the remainder of this Limited Objection.

which merely requires the Debtors to satisfy the relatively liberal business judgment standard. Because estimation plainly serves no legitimate purpose and is instead designed to improperly prejudice the insurers in post-confirmation coverage litigation, the Motion should be denied to the extent it requests an aggregate estimation of Abuse Claim liability.

4.      Moreover, given the significant, complicated and diverse set of Abuse Claims in this case, an accurate estimation of Abuse Claim liability is simply not possible and any realistic timeline for an attempt at such an estimation is fundamentally inconsistent with the Debtors' proposed timeline to exit bankruptcy in these Chapter 11 Cases.[4] Any attempt to perform an expedited estimation of the Abuse Claims is destined to be grossly inaccurate and inflated, all to the detriment of the insurers, and in derogation of their due process rights.

## FACTUAL BACKGROUND

5.      On February 18, 2020 (the "***Petition Date***"), BSA was a defendant in 275 cases and estimated that it was aware of approximately 1,400 additional abuse claims that would be filed against it. *See Debtors Informational Brief* [D.I. 4]. On May 26, 2020 the Court entered an order [D.I. 695] establishing a bar date of November 16, 2020. The Motion discloses that the Debtors' estimation expert, Bates White, currently "has information from over 106,000 POC submissions reflecting information from over 82,550 claimants." Motion at ¶ 15. This is nearly 50 times the size of the Debtors' original estimate of total abuse claims, without accounting for a single future claim.

6.      On January 22, 2021, Hartford and Century filed (i) *Hartford and Century's*

---

[4]    In the *Garlock* case, for example, where the Bankruptcy Court for the Western District of North Carolina estimated Garlock's asbestos liabilities, the estimation process spanned almost two years at significant expense to the estate. *See In re Garlock Sealing Techs., LLC*, 504 B.R. 71, 74 (Bankr. W.D.N.C. 2014) (issuing estimation decision over a year and a half after ordering estimation and noting that estimation trial "took place over seventeen trial days and included 29 witnesses and hundreds of exhibits."); *see also In re Bestwall LLC*, No. 17-31795 (Bankr. W.D.N.C. Mar. 31, 2021), Dkt. No. 1685 (approving estimation schedule exceeding one year).

*Motion for an Order (I) Authorizing Certain Rule 2004 Discovery and (II) Granting Leave from Local Rule 3007-1(f) to Permit the Filing of Substantive Omnibus Objections* [D.I. 1972] and (ii) *Insurer's Motion for an Order Authorizing Rule 2004 Discovery of Certain Proofs of Claim* [D.I. 1975] (together, the "***Rule 2004 Motions***"). The Rule 2004 Motions sought specific, targeted discovery of a small subset (approximately 1.5%) of claimants and certain plaintiffs law firms that represent them to determine whether any material portion of the substantial and unexpected increase in claims are not legitimate claims (the "***Rule 2004 Discovery***"). The Debtors did not take a position on the Rule 2004 Motions, but the Rule 2004 Motions were opposed by the Coalition of Abused Scouts for Justice and other representatives of holders of Abuse Claims. *See, e.g.*, [D.I. 2043, 2048, 2069, 2074].

7.      On March 16, 2021, the Future Claimants' Representative, the Official Committee of Tort Claimants and the Coalition of Abused Scouts for Justice (collectively, the "***Abuse Claimants Representatives***") filed the *Motion of the Future Claimants' Representative, the Official Committee of Tort Claimants, and the Coalition of Abused Scouts for Justice for Entry of an Order, Pursuant to 11 U.S.C. §§ 105(a) and 502(c), (I) Authorizing an Estimation of Current and Future Abuse Claims and (II) Establishing Procedures and Schedule for Estimation Proceedings* [D.I. 2391] (the "***Estimation Motion***") which alleges that the total number of abuse claims filed to date "could well be understated." Estimation Motion at ¶ 2. The procedures proposed in the Estimation Motion (the "***Claimants' Estimation Procedures***") provide the Abuse Claimants Representatives with sole authority over selecting a "statistically representative sample of claimants from whom they propose to take discovery" for purposes of the estimation (based on undefined criteria) unless and until the Debtors object to the Movants sample and the Movants and the Debtors are unable to reach agreement on a sample. The Claimants' Estimation

procedures propose completing estimation in under four months.

8.    The Abuse Claimants Representatives also filed a motion to withdraw the reference of the proposed estimation proceedings, asserting that the United Stated District Court for the District of Delaware, rather than the Court, should hear the Estimation Motion and all related discovery. At a hearing on March 17, 2021, the Court explained that "my inclination was to permit certain of the discovery [proposed by the Rule 2004 Motions] to go forward," but that "I'm going to hold off" until "I know whether or not I'm handling the estimation motion," because "all of these issues are intertwined" and that the Court would seek to "coordinate all of this" if the Court were "handling it." Tr. Mar. 17 Hearing at 51-52, 55.

9.    On April 15, 2021, the Debtors filed an objection to the Estimation Motion (the "***Debtors' Estimation Objection***") arguing, *inter alia*, that it is "imperative" that the Debtors emerge from bankruptcy by the end of summer 2021 and the estimation proposed by the Estimation Motion would unduly delay the administration of these Chapter 11 Cases. The Debtors stated:

> now is not the time to spend valuable and limited estate resources embarking upon an overly complex estimation, designed to delay consideration of the Plan, and which even if it could be justified in theory may never be necessary in reality. For the benefit of the Debtors, Reorganized BSA, and the various parties in interest, including the constituencies the Movants represent, the parties' focus should be fixed on finding common ground in Mediation, moving forward with the Debtors' Plan, and making every effort to support prompt emergence from these Chapter 11 Case, consistent with the timeline the Debtors have offered.

Debtors' Estimation Objection at ¶ 40.

10.    On the same date the Debtors filed the Motion requesting the Court approve a confirmation schedule allowing for confirmation in August 2021. The Motion includes a request to approve the Debtors' preferred method of estimating aggregate Abuse Claim liability, which appears to contain no detail regarding the proposed estimation other than stating:

[t]he Debtors propose time-limited interviews of a stratified sample of individual abuse claimants to be taken in connection with the estimation to be conducted as part of the Confirmation Proceedings. The opportunity to obtain this discovery will support the estimation, including in informing the range of estimated aggregate values of POCs, and in traversing potential explanations for what caused the number of POCs filed to so greatly exceed the amount of cases of which the Debtors were aware prepetition. *See* Disclosure Statement at 60. The Debtors anticipate this process will be guided by the Mediators or their designee(s).

Motion at ¶ 22.

11.     The Motion also contains no details regarding the purposes of estimation, but the

Debtors' Estimation Objection states that:

The [Debtors' proposed] estimation will, among other things, provide a basis for the Bankruptcy Court and the parties to assess the value of the Direct Abuse Claims and whether the settlements proposed in the Plan should be approved under section 1123(b)(3)(A) of the Bankruptcy Code as fair, reasonable, and in the best interests of the estate. At the confirmation hearing, the Debtors will offer evidence in support of the estimation, and other parties will be permitted to submit evidence in support of, or to dispute, the evidence offered by the Debtors. The confirmation order will contain the Bankruptcy Court's findings of facts and conclusions of law with regard to the Debtors' estimated aggregate liability on account of direct Abuse Claims, which findings of fact and conclusions of law shall, by their terms, be subject to insurance neutrality provisions of the Plan and, for the avoidance of doubt, shall not constitute a trial or hearing on the merits or an adjudication or judgment, or accelerate the obligations, if any, of any insurance company under its insurance policies.

Debtors' Estimation Objection at ¶ 19.

12.     The end of the purported insurance neutrality provision in Article X.M of the Plan

(the "***Insurance Neutrality Provision***") expressly provides that it will not prevent any insurer

from being bound by res judicata or collateral estoppel in post-confirmation coverage litigation:

Nothing in this Article X.M is intended or shall be construed to preclude otherwise applicable principles of res judicata or collateral estoppel from being applied against any Insurance Company with respect to any issue that is actually litigated by such Insurance Company as part of its objections, if any, to Confirmation or as part of any contested matter or adversary proceeding filed by such Insurance Company in conjunction with or related to Confirmation. Plan objections that are withdrawn prior to the conclusion of the Confirmation Hearing shall be deemed not to have been actually litigated.

Plan Art. X.M.

**ARGUMENT**

I.      **The Aggregate Claims Estimation Proposed by the Debtors' Motion Serves No Legitimate Purpose and is Merely an Attempt to Expand the Contractual Obligations of the Insurers.**

        A.      **The Debtors' Proposed Estimation Serves No Legitimate Purpose.**

13.      Section 502(c) provides:

> There shall be estimated for purpose of allowance under this section … any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case.

11 U.S.C. § 502(c).

14.      Section 502(c) permits the estimation of a contingent or unliquidated claim only if "the fixing or liquidation" of the claim through the normal claims-allowance process under Section 502(a)-(b) of the Bankruptcy Code (or in the tort system) "would unduly delay the administration of the case." *See, e.g.*, *Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 357 (3d Cir. 2002) (affirming denial of Section 502(c) estimation of creditor's claim because adjudicating the claim's allowance under Section 502(b) would not delay the case).

15.      In the Debtors' Estimation Objection, the Debtors correctly assert that the Abuse Claimants Representatives' proposed estimation serves no legitimate purpose, stating "now is not the time to spend valuable and limited estate resources embarking on an overly complex estimation . . . which even if it could be justified in theory may never be necessary in reality." Debtors' Estimation Objection at ¶ 40. Yet the Debtors have not put forward any legitimate purpose for their own proposed estimation. The only purpose for the estimation the Debtors want to undertake (which does not even appear in the Motion) is that estimation will "provide a basis for the Bankruptcy Court and the parties to assess the value of the Direct Abuse Claims and whether the settlements proposed in the Plan should be approved under section 1123(b)(3)(A) of the

Bankruptcy Code as fair, reasonable, and in the best interests of the estate." Debtors' Estimation Objection at ¶ 19; *see also* Plan Art. V.T.

16.     This is no more legitimate than the Abuse Claimants Representatives' proposed purposes for estimation. Indeed, approval of a settlement under section 1123(b)(3)(A) of the Bankruptcy Code requires only that the Debtors satisfy the deferential business judgment rule. *See, e.g., In re Hercules Offshore, Inc.*, 565 B.R. 732, 757 (Bankr. D. Del. 2016) (holding that a proposed settlement under section 1123(b)(3)(A) "must be analyzed under the business judgment rule . . . The Court need only determine that the Debtors exercised sound business judgment in deciding to accept the settlement integral to the proposed plan."); *In re Coram Healthcare Corp.*, 315 B.R. 321, 330-34 (Bankr. D. Del. 2004) (holding that "[t]he standards for approval of a settlement under section 1123 are generally the same as those under Rule 9019" and that "the court should defer to a trustee's judgment so long as there is a legitimate business justification for his action."). The Debtors have provided no explanation why an aggregate claims estimation is necessary for this Court to find that any settlement the Debtors may reach constitutes a sound exercise of the Debtors' business judgment.

17.     *Dow Corning*, a case cited in the Debtors' Estimation Objection, is instructive. *In re Dow Corning Corp.*, 211 B.R. 545 (Bankr. E.D. Mich. 1997). *Dow Corning* also involved dueling estimation motions, one filed by the debtors and one filed by the tort claimants committee. The *Dow Corning* court denied both estimation motions, noting that neither the debtors nor the tort claimant committee showed that cause existed to estimate under section 502(c). The court explained that "bankruptcy law's general rule is to liquidate, not to estimate," and that "[t]here are good reasons to liquidate" rather than "estimate" unliquidated claims because of "the very real concern that the estimates may prove to be inaccurate." *Id.* at 563. Thus,

estimation is permitted under Section 502(c) only if "the party moving for estimation … show[s] that the normal mode of liquidating the claim would create undue delay in the bankruptcy process." *Id.* at 573. The court concluded that the movants had failed to show any "undue" delay because—just as in this case—"individual tort claims would … be liquidated" after "a plan of reorganization is confirmed" pursuant to a "post-confirmation liquidation [process for the] tort claims." *Id.* at 565-566, 574. And the court observed that the notion that an estimation would facilitate consensus around a plan was fanciful: "[N]o matter what answer this Court were to give as its estimate of the value of all tort claims, there is almost no likelihood that the estimate would prove accurate"; "[t]herefore, parties in interest will derive no comfort from the results of a lengthy and complex estimation war." *Id.* at 567. Thus, far from avoiding "undue delay," a lengthy pre-confirmation estimation battle "would only lengthen the time to distribution since funds would not be disbursed until claims are liquidated post-confirmation." *Id.* at 565.

18.    The Debtors' objection to the Estimation Motion stated that "*Dow Corning* is instructive here because now is not the time to spend valuable and limited estate resources embarking upon an overly complex estimation . . . which even if it could be justified in theory may never be necessary in reality." Debtors' Estimation Objection at ¶ 40. For the same reasons, *Dow Corning* is instructive with respect to the Debtors' Motion as well. There is simply no legitimate purpose for the Debtors' proposed estimation and, as in *Dow Corning*, "in order for the process to have any semblance of fairness" it would be "quite lengthy and protracted." *Id.* at 564.

**B.    The Debtors Proposed Estimation is a Transparent Attempt to Expand the Contractual Obligations of the AIG Companies and the Debtors' Other Insurers.**

19.    Just like the Abuse Claimants Representatives' proposed estimation, the Debtors' proposed estimation is an attempt to bind the insurers to pay an aggregate amount for Abuse Claim

liability without judicial scrutiny into any individual Abuse Claim. The Debtors argue that their

proposed Plan is insurance neutral,[5] but a plan is not insurance neutral unless "all contractual rights

and coverage defenses [are] fully preserved." *In re Flintkote Co.*, 486 B.R. 99, 117 (Bankr. D. Del.

2012), *aff'd*, 526 B.R. 515 (D. Del. 2014). The insurance-neutrality inquiry is a practical one,

focusing on "the real-world impacts of the plan to see if it increases insurance exposure and likely

liabilities of [insurers]." *In re Thorpe Insulation Co.*, 677 F.3d 869, 885 (9th Cir. 2012); *accord In

re Global Indus. Techs., Inc.*, 645 F.3d 201, 212 (3d Cir. 2011) (en banc). Moreover, just because

a plan says it is insurance neutral, that does not make it so. Rather, if a plan would "materially alter

the quantum of liability that the insurers would be called upon to absorb," it will not be considered

insurance neutral even if it contains purported insurance neutrality language. *Id. See also In re

Thorpe Insulation*, 677 F.3d at 885 ("Though the plan recites that it is insurance neutral, this

characterization in and of itself does not settle the issue").

20.     Here, the Insurance Neutrality Provision explicitly provides that nothing shall

prohibit "applicable principles of res judicata or collateral estoppel from being applied against

any Insurance Company . . ." While the Debtors may claim that an insurer can protect itself by

"sitting out" confirmation, in reality the Plan forces the insurers into a classic "Catch-22"—they

can forego asserting their rights and defenses and risk an unfavorable outcome on a given issue

---

[5]    A chapter 11 plan may not be confirmed if it would give the debtor greater rights under its insurance contracts
than it held prepetition. *E.g., In re Pittsburgh Corning Corp.*, 453 B.R. 570, 604–05 (Bankr. W.D. Pa. 2011)
(finding a proposed section 524(g) plan "unconfirmable" due to "the lack of clarity regarding insurance
neutrality"). The reason for this rule is that a plan is unconfirmable as employing "means forbidden by law," 11
U.S.C. § 1129(a)(3), if it fails to conform to state-law requirements—including the requirements imposed by
contracts validly formed under state law. *See In re SPM Mfg. Corp.*, 984 F.2d 1305, 1311 (1st Cir. 1993)
(bankruptcy courts lack authority to enter orders that "expand the contractual obligations of parties"); *In re
Crippin*, 877 F.2d 594, 598 (7th Cir. 1989) ("[B]ankruptcy courts do not have the power to rewrite contracts to
allow debtors to continue to perform on more favorable terms."); *see also Moody v. Amoco Oil Co.*, 734 F.2d
1200, 1213 (7th Cir. 1984); *In re Cajun Elec. Power Coop., Inc.*, 230 B.R. 715, 737 (Bankr. M.D. La. 1999).

(including estimation), and rely solely on the Debtors' promise that the Plan will be insurance neutral as to them, or they can litigate the issue and risk losing the benefits of insurance neutrality.

21.     Even worse, the Debtors' proposed Confirmation Scheduling Order provides that the Participating Parties "shall automatically include, without the need to file a Notice of Intent . . . the Mediation Parties," which include the AIG Companies and a number of other insurers. Motion, Ex. A at ¶ 4. This language appears to mean that every insurer that is a Mediation Party is forced to participate in confirmation as a Participating Party, thereby rendering the Insurance Neutrality Provision meaningless for all such insurers and exposing them to the risk that the Debtors and/or the Abuse Claimants Representatives will argue that every single finding of fact and conclusion of law in the confirmation order, including relating to estimation, is binding on them in future litigation.

22.     Hoping to incentivize the Abuse Claimants Representatives to support the Debtors' Plan and proposed timeline to exit from bankruptcy, the Debtors are following a well-worn playbook in which plaintiffs' lawyers have sought to misuse bankruptcy court "estimations" in subsequent coverage litigation in other courts. *Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, 135 Cal. App. 4th 958 (2006), is a prime example. There, the debtor and asbestos claimants negotiated a Chapter 11 plan that allowed present and future asbestos claims in an aggregate amount determined according to the plan's claim-resolution procedures. *See id.* at 968-970. The plan included purported "insurance neutrality" language, and claimants' counsel represented to the Delaware bankruptcy court at the plan-confirmation hearing that the plan would have no effect on any coverage litigation. But, once the bankruptcy court had confirmed the plan, the plaintiffs reneged on their representation and argued in a subsequent coverage action in California state court that the plan was a "final adjudication that established [the debtor's] liability to asbestos

claimants and therefore obligated [insurers] to pay the full ALV [allowed liquidated value of the asbestos claims] established by the bankruptcy court." *Id.* at 970-972. Remarkably, the state trial court agreed. *Id.* at 972-973. Ultimately, a state appellate court saw through the plaintiffs' tactics and reversed the trial court's judgment. *Id.* at 979-996; *e.g.*, at 991-994 ("While calculating the aggregate value of present and potential future claims is helpful and often necessary in other contexts, no authority exists for utilizing such a valuation to affix an insurer's indemnity obligations. To the contrary, cases addressing the concept of aggregation in the bankruptcy context repeatedly reaffirm its limited scope and purpose. … [A]sbestos claim estimation … is not to determine liability and … does not reflect the amount that will be paid to the asbestos claimants" but instead, "consistent with the limited role of bankruptcy claim estimation," only … assists in formulating a plan of reorganization").

23.    The Debtors appear to be following the *Fuller-Austin* playbook here, down to representing in the Debtors' Estimation Objection that the Insurance Neutrality Provision will prevent their estimation from having preclusive effect in post-confirmation coverage litigation, despite the fact that this provision ensures the opposite is true: if this Court approves the Debtors' proposed estimation, the Insurance Neutrality Provision—as drafted—all but ensures that the rights of every non-settling insurer will be severely prejudiced.

24.    The risk to insurers is not hypothetical. Like the Claimants' Estimation Procedures, what little detail the Debtors have provided regarding their proposed estimation procedures appears to show that the Debtors' estimation will involve absolutely no discovery into the legitimacy of the underlying Abuse Claims, which should be a pre-requisite to any claims estimation. If an aggregate estimation occurs without real discovery, of the type requested in the Rule 2004 Motions, into the legitimacy of the 104,000 submissions by 82,550 separate alleged

claimants, it would be impossible to determine whether such estimation significantly inflated aggregate Abuse Claim liability. That, combined with the significant defects in the Insurance Neutrality Provision in the Plan, ensures that the Debtors' proposed estimation will significantly harm the non-settling insurers.

25.      The Debtors' proposed estimation is designed to give the Abuse Claimants Representatives what they want—an inflated aggregate claims estimation, not supported by facts developed during discovery—in exchange for what the Debtors want—approval of a plan on the Debtors' preferred timeline with a channeling injunction that shields them from the effects of such estimation. Accordingly, the Motion should be denied to the extent it requests an estimation.

## II.      If the Court Orders Estimation, Confirmation Cannot Occur on the Debtors' Proposed Timeline and Additional Discovery Is Needed.

26.      Even if the Court disagrees with the AIG Companies and is inclined to approve an aggregate estimation at this time, it is unclear what exactly the Debtors are asking the Court to approve. In addition to failing to include any explanation of why estimation is justified under these circumstances, the Motion includes almost no details about the procedures that will govern their proposed estimation. All that is disclosed in the Motion is that (i) the Debtors propose to complete their estimation on an even faster timeline than the Abuse Claimants Representatives' unrealistic timeline for their own proposed estimation (a timeline criticized by the Debtors), (ii) the Debtors will have apparently sole control over selecting the sample of claims used for the proposed estimation, and (iii) the aggregate estimation appears to involve no scrutiny into whether any of the 82,550 separate alleged claimants hold valid claims.

27.      Amazingly, the only details the Debtors' Motion includes regarding the discovery into the underlying Abuse Claims that will be involved in the Debtors' estimation is the following:

> **Discovery from Sample of Claimants**. The Debtors propose time-limited interviews of a stratified sample of individual abuse claimants to be taken in connection with the estimation to be conducted as part of the Confirmation Proceedings. The opportunity to obtain this discovery will support the estimation, including in informing the range of estimated aggregate values of POCs, and in traversing potential explanations for what caused the number of POCs filed to so greatly exceed the amount of cases of which the Debtors were aware prepetition. See Disclosure Statement at 60. The Debtors anticipate this process will be guided by the Mediators or their designee(s).

Motion at ¶ 22.

28.     Based on this, it appears that the only discovery the Debtors contemplate is necessary to determine "what caused the number of POCs filed to so greatly exceed the amount of cases of which the Debtors were aware prepetition" are "time-limited interviews" on an as yet unidentified "stratified sample of individual abuse claimants," where the Debtors appear to retain sole control in choosing which and how many claims are included in the sample.[6] This is obviously insufficient to determine whether the Debtors' estimate of the number of Abuse Claims was off by nearly *fiftyfold* (1,700 expected claims compared to the 82,550 that have been filed) before even accounting for any future claims.

29.     Any realistic estimation of aggregate Abuse Claim liability would require, as a threshold matter, an inquiry into the underlying Abuse Claims of the type requested in the Rule 2004 Discovery so all parties can have confidence that the aggregate claims estimation the Debtors request is not improperly inflated by invalid claims. The Court already recognized this over a month ago at a hearing on March 17 when the Court stated "my inclination was to permit certain of the discovery [proposed by the Rule 2004 Motions] to go forward," and that the Rule 2004 Discovery was "intertwined" with an aggregate estimation of Abuse Claim liability. Tr. Mar. 17 Hearing at 51-52, 55. But such discovery will take time.

---

[6]     Additionally, the AIG Companies do not believe it is necessary or appropriate for the Mediators to oversee the discovery process. The process can and should be handled between the Participating Parties without Mediator supervision. Any disagreements should be resolved by the Court.

30.    Indeed, as the *Dow Corning* court stated:

there is no guarantee that estimation would in fact move matters along significantly faster. To begin with, regardless of the estimation method selected, for the process to have any semblance of fairness it will necessarily involve hearings that would be quite lengthy and protracted. After all, the extremely contentious issues surrounding the tort claims are highly complex and their resolution will require the presentation of many witnesses, many pieces of evidence and extensive oral argument. Abbreviating the time parties have to present their cases at an estimation hearing would, in the Court's opinion, be ill-advised. Considering the magnitude of the claims involved and the absolute importance of rendering a fair and accurate decision, the Court cannot countenance a valuation procedure that would place artificial time constraints on the parties' ability to properly present their cases. And after completion of the estimation hearings, the Court would undoubtedly require considerable time to sift through and reflect upon the massive amount of evidence presented before issuing its ruling.

. . .

Moreover, dissatisfaction with an estimation of the total value of tort claims could, as in *Bittner*, 691 F.2d at 132, result in an appeal, occasioning further time delay.

*Dow Corning* 211 B.R. at 563-65. Having failed to support the Rule 2004 Discovery when it was proposed over three months ago, the Debtors have forfeited the opportunity to both exit from bankruptcy in summer 2021 and obtain an aggregate claims estimation prior to doing so.[7]

31.    In short, in order for the Debtors' proposed estimation to have "any semblance of fairness," the Rule 2004 Discovery needs to proceed ***before*** the Debtors' undisclosed "stratified sample of individual abuse claimants" is selected.[8] Once the Rule 2004 Discovery is completed,

---

[7]    The Debtors make much of the fact that the Debtors and the other Mediation Parties have already exchanged a significant amount of discovery, providing examples of information provided between the parties primarily related to the assets of BSA and the Local Councils. *See* Motion at ¶ 14. Conspicuously absent is any discovery from Abuse Claimants and their counsel that will be necessary for any estimation proceeding. While the Motion states that Bates White has compiled a database based on 106,000 POC submissions from holders of alleged Abuse Claims which has been shared with the Mediation Parties, *see* Motion at ¶ 15, there has been little, if any, discovery into the nature and validity of such claims.

[8]    The Motion appears to claim that the "time-limited interviews" of the Debtors' sample of abuse claimants will be sufficient to "travers[e] potential explanations for what caused the number of POCs filed to so greatly exceed the amount of cases of which the Debtors were aware prepetition." Motion at ¶ 22. The AIG Companies respectfully disagree and do not believe that time-limited interviews alone will provide any ability to determine if any significant number of Abuse Claims are not legitimate claims.

each of the Abuse Claimants Representatives, the Debtors and the insurers should have time to review the materials produced before the stratified sample of individual abuse claimants is selected. Without the Rule 2004 Discovery, it will be impossible to determine whether the different groups, or strata, that are used to create the stratified sample are representative of legitimate Abuse Claims that the estate is obligated to pay. Accordingly, without the Rule 2004 Discovery, it appears the Debtors' estimation will be based on what the AIG Companies believe is a false premise: that substantially all of the 82,550 separate alleged abuse claimants hold valid Abuse Claims, resulting in an estimation that significantly inflates Abuse Claim liability.

32.     In addition, if the Court does approve estimation, the Debtors should not be given carte blanche to develop their own estimation procedures which would result in sacrificing accuracy for speed to allow them to exit bankruptcy this summer. Accordingly, the AIG Companies respectfully submit that the consent of other parties in interest (including the Debtors' insurers) and/or Court review of the procedures that will govern estimation should be required before the estimation process begins. Further, at a minimum, any estimation needs to include the following to safeguard against an inflated estimate of Abuse Claim liability:

- **Timing and Transparency Regarding Selection of Sample of Abuse Claimants Following Rule 2004 Discovery:** The selection of a stratified sample should not occur until at least 30 days after the Rule 2004 Discovery is completed to provide all parties in interest sufficient time to review the results thereof and determine whether it appears that any material portion of the 82,550 individual claimants do not hold valid Abuse Claims. Further, the selection of the sample needs to be subject to a transparent, Court supervised process that allows the Debtors' insurers the ability to have input into the selection, thereby providing all parties with confidence that key variables that will drive the value of Abuse Claims are appropriately accounted for.

- **Depositions of the Sample of Abuse Claimants:** "[T]ime-limited interviews" of an unspecified length of the sample of claimants, which would not be under oath, are not sufficient to arrive at a reasonable estimation. Each such claimant should participate in a sworn deposition that provides insurers with a meaningful amount of time to ask questions about the claimants' alleged Abuse Claim, including whether such claim is subject to any defenses.

- **Expert Reports:** Following the completion of interviews with claimants, all parties

participating in the estimation should have at least 21 days to prepare their expert report following the completion of depositions from the sample of individual abuse claimants.

- **Estimation Trial:** Parties should be provided sufficient time at an estimation trial in order to question any other party's expert witness.

III.    **If the Court Orders Estimation, the Estimation Procedures Need to Adequately Protect the Insurers From Any Preclusive Effect of Estimation.**

33.    In light of the severe prejudice any non-settling insurer would suffer from an inaccurate and expedited claims estimation, if the Court is inclined to grant estimation, the AIG Companies respectfully request that the Court condition the approval of any estimation on both (a) a clear limitation that such estimation would be used only in consideration of a plan in these Chapter 11 Cases, and (b) an express prohibition on the results of the estimation being offered into evidence in any other proceeding. The possibility that the Debtors or Abuse Claimants Representatives might later argue in coverage litigation that any such estimation should be granted res judicata or collateral effect must be completely foreclosed. *See In re A.P.I., Inc.*, 331 B.R. 828, 846-47 (Bankr. D. Minn. 2005), *aff'd* 2006 WL 1473004 (D. Minn. 2006) (holding that, at the plan confirmation stage, "at bare minimum this Court has the power to deny preclusive effect to the ostensible determinations that are to be made" by post-confirmation asbestos trust "via the estimation or claims").

IV.    **The Debtors Proposed Confirmation Schedule Does Not Provide Sufficient Time to Allow For Discovery Unrelated to Estimation.**

34.    Although the AIG Companies' primary concern is the Debtors' inappropriate proposed estimation, the Motion also asks the Court to approve an expedited confirmation schedule that does not provide sufficient time for discovery to be completed prior to the confirmation hearing even assuming that there is no estimation performed in connection with confirmation. Among other deficiencies the Motion's proposed confirmation schedule does not provide enough time to resolve discovery disputes, prepare expert reports, and allow parties in

interest sufficient time to adequately review documents that are produced. Accordingly, assuming the Court denies the Debtors' estimation, the AIG Companies request that the Court require that the Debtors' proposed confirmation schedule be extended to allow all parties sufficient time to complete the discovery that is necessary before a confirmation hearing on the Debtors' Plan can be held.

## RESERVATION OF RIGHTS

35.     The AIG Companies reserve the right to amend or supplement this Limited Objection, seek discovery with respect to this Limited Objection, introduce evidence supporting this Limited Objection at any hearing to consider same, and seek any alternative or incremental relief. Further, the AIG Companies reserve the right to join in any argument or objection made by any other parties relating to the Motion.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the AIG Companies respectfully request that the Court deny the portion of the Motion that requests the Court approve an estimation in connection with confirmation, and grant such other and further relief as the Court deems just and proper.

Dated: May 12, 2021                         Respectfully submitted,
        Wilmington, Delaware

By: */s/ Deirdre M. Richards*
_____

**FINEMAN KREKSTEIN & HARRIS PC**
Deirdre M. Richards (DE Bar No. 4191)
1300 N. King Street
Wilmington, DE 19801
Telephone:     (302) 538-8331
Facsimile:     (302) 394-9228
Email:   drichards@finemanlawfirm.com

-and-

**FORAN GLENNON PALANDECH PONZI &**
**RUDLOFF P.C.**
Susan N.K. Gummow (admitted *pro hac vice*)
222 N. LaSalle St., Suite 1400
Chicago, Illinois 60601
Telephone:     (312) 863-5000
Facsimile:     (312) 863-5009
Email: sgummow@fgppr.com

-and-

**GIBSON, DUNN & CRUTCHER LLP**
Michael A. Rosenthal (admitted *pro hac vice*)
James Hallowell (admitted *pro hac vice*)
Keith R. Martorana (admitted pro hac vice)
200 Park Avenue
New York, New York 10166
Telephone:     (212) 351-4000
Facsimile:     (212) 351-4035
Email: mrosenthal@gibsondunn.com
        jhallowell@gibsondunn.com

-and-

**GIBSON, DUNN & CRUTCHER LLP**
Matthew G. Bouslog (admitted *pro hac vice*)
3161 Michelson Drive
Irvine, California 92612
Telephone:     (949) 451-3800
Facsimile:     (949) 451-4220

Email: mbouslog@gibsondunn.com

*Attorneys for the AIG Companies*