## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re:* | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | Jointly Administered |
|  | Objection Deadline: May 12, 2021, at 4:00 p.m. (ET) |
|  | Hearing Date: May 19, 2021, at 10:00 a.m. (ET) |
|  | **RE: Docket No. 2618** |

## OBJECTION OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS, THE COALITION OF ABUSED SCOUTS FOR JUSTICE, AND THE FUTURE CLAIMANTS' REPRESENTATIVE TO THE DEBTORS' MOTION FOR ENTRY OF ORDER (I) SCHEDULING CERTAIN DATES AND DEADLINES IN CONNECTION WITH CONFIRMATION OF THE DEBTORS' PLAN OF REORGANIZATION, (II) ESTABLISHING CERTAIN PROTOCOLS, AND (III) GRANTING RELATED RELIEF

The Official Committee of Tort Claimants (the "TCC") and the Coalition of Abused

Scouts for Justice (the "Coalition"), and James L. Patton, Jr., the Future Claimants'

Representative (the "FCR"), by and through their undersigned counsel, hereby object to the

*Motion for Entry of Order (I) Scheduling Certain Dates and Deadlines in Connection With*

*Confirmation of the Debtors' Plan of Reorganization, (II) Establishing Certain Protocols, and*

*(III) Granting Related Relief* [Docket No. 2618] (the "Motion" or "Confirmation Scheduling

Motion"), filed by Boy Scouts of America and Delaware BSA, LLC (the "Boy Scouts" or the

"Debtors"), and in support thereof states as follows:

---

[1] The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

## PRELIMINARY STATEMENT

The Confirmation Scheduling Motion should be rejected.  The Boy Scouts' proposed procedures outlined in the Motion -- and its attempt to undercut the separately pending Estimation Motion [Docket No. 2391] (as such term is defined below) and uniquely benefit insurers (apparently to avoid taking on the parties without whom fair compensation for survivors may be impossible) -- appear designed to further the Boy Scouts' efforts to run away from its legacy of child sexual abuse and to silence those who still suffer from its far-reaching effects.

The Boy Scouts has also seized upon and adulterated a litigation-management mechanism proposed in the Estimation Motion to impose a "Notice of Intent" filing requirement on any party in interest that seeks to participate in the confirmation proceedings, which party may be excluded upon objection for any reason unless the Court affirmatively overrules the objection.  *See* Motion ¶¶ 18–20 at 7-8.  This proposal represents an unfair restriction on participation in the confirmation hearing.

The procedures related to estimation should be determined in connection with the Estimation Motion, not by way of the competing and overlapping Motion proposed by the Boy Scouts.[2]  Such procedures and timeline can only be established once the Boy Scouts has produced necessary information relating to, among other things, settlement and verdict data.  The Boy Scouts' categorical refusal to provide any such data outside of a four-year reachback period makes both estimation and plan confirmation within a reasonable time untenable.

---

[2] The previously scheduled April 29, 2021 hearing regarding the Confirmation Scheduling Motion is now to be heard concurrently with the May 19, 2021 hearing on the Estimation Motion.

Although the survivor groups and the Boy Scouts disagree as to the appropriate forum and context of the claim estimation proceedings,[3] they do agree that estimation of the childhood sexual-abuse claims must be undertaken in connection with the Boy Scouts' chapter 11 cases (the "Chapter 11 Cases").  The Boy Scouts' self-imposed deadline for emergence from bankruptcy by the end of the summer (supported solely by citations to statements on the record made by Boy Scouts' counsel and not supported by the business plan that the Court has never seen),[4] is an insufficient justification to deprive the parties of a workable methodological process and timeline in which such claims are estimated.  The Boy Scouts' attempt by way of the Confirmation Scheduling Motion to preempt the methodology and schedule proposed by the Estimation Motion (which was filed over a month ago and is set for hearing on May 19, 2021) as opposed to working within that as an existing framework and providing the necessary discovery to allow for estimation to occur under any timeline—is inappropriate and serves only to divert the parties' attention from reaching agreement on discovery, methodological and timing issues relating to the admittedly necessary claim-estimation proceedings.

## **INTRODUCTION**

1.      In the Debtors' Informational Brief filed on February 18, 2020, the Boy Scouts acknowledged claims of sexual abuse spanning some eighty years arising from its programs.  *See* Docket No. 4 at 3-4.  Noting systemic failures in protecting children under its care and seemingly

---

[3] *See Motion of the Future Claimants' Representative, the Official Committee of Tort Claimants, and the Coalition of Abused Scouts for Justice for Entry of an Order, Pursuant to 28 U.S.C. § 157(d) and Bankruptcy Rule 5011(a), Withdrawing the Reference of Proceedings Involving the Estimation of Personal Injury Claims* [District Court Docket No. 1] (the "Motion to Withdraw the Reference"), pursuant to which the survivor groups request that the estimation proceedings be conducted in the District Court.

[4] *See* Motion ¶ 13 at 4 (referencing hearing transcripts for statements of counsel for the Boy Scouts regarding Boy Scouts' stated intention to emerge from bankruptcy by the end of summer 2021).

apologizing for allowing predators to infiltrate its organization, the Boy Scouts stated that it "believes victims of abuse" and expressed the "steadfast . . . commitment to provide equitable compensation to victims of abuse in its Scouting programs . . . ." *Id.* at 5.

2.     Now, some fifteen months since making that "commitment," instead of the promised equitable compensation to victims, the Boy Scouts' only achievement has been proposing an amended plan that is not supported by the TCC, the Coalition, or the FCR.  Instead of making good on its apology to tens of thousands of survivors, the Boy Scouts continues to try to minimize and hide the true extent of its legacy of decades of child rape, molestation, and other abuse.

3.     After over a year in bankruptcy, the Boy Scouts intends to disclose sexual abuse settlement data only for settlements arising from and after 2016, despite its awareness and possession of data regarding abuse claims stretching back to 1940:  On May 7, 2021, the Boy Scouts advised the survivors groups of its refusal to provide any information relating to the decades of scouting child molestation claims arising before 2016.

4.     This refusal to provide settlement data does not demonstrate a "steadfast commitment to provided equitable compensation to victims of [the Boy Scouts'] abuse."  Rather, it is nothing more than an affront to the 84,000 survivors:

### Boy Scouts Childhood Sexual Abuse Claims[5]

### Type of Sexual Abuse     Number of Claims

---

[5] The chart is a high-level summary of the childhood sexual-abuse claims asserted against the Boy Scouts in these Chapter 11 Cases.  The summary does not take into account the number of instances of abuse that arise under each claim and the number of different types of abuse that arise under each claim.  A survivor's single proof of claim can include the description of dozens of instances of abuse that include penetration, oral sex, and masturbation but the chart above defaults to only the "highest" or worst single form of abuse.  For example, of the more than 5,100 childhood sexual abuse claims that arose in New York, there are arguably four or five times more claims because under New York law each instance of abuse gives rise to a separate and distinct claim.  *Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins.Co.,* 21 N.Y.3d 139, 969 N.Y.S.2d 808, 991 N.E.2d 666 (2013).

| | |
|---|---|
| Penetration | 22,898 |
| Oral Sex | 18,689 |
| Masturbation | 12,567 |
| Fondling / Groping | 17,431 |
| Touching Bare Skin | 1,955 |
| Over Clothing | 1,353 |
| Non-Touching / Other Abuse | 8,758 |

5.      The number of childhood sexual abuse claims is staggering, but not surprising considering actions by numerous jurisdictions to create statutory windows that eliminated statutes of limitation for such claims (e.g., New York, New Jersey, North Carolina, Arizona, California and Arkansas).

6.      The Motion represents only the latest act in the Boy Scouts' on-going campaign to avoid and downplay its responsibilities to survivors on account of sexual-abuse claims.  The Boy Scouts hopes to silence survivors by seeking entry of an order that will bar such survivors' statutory rights to participate in the confirmation process.  Absent compliance with a "Notice of Intent" filing requirement and prevailing against objections "on any grounds" that may be raised by the Boy Scouts and certain other parties, a survivor is silenced.[6]  Such exclusionary tactics are contrary to the most basic due process rights in chapter 11.  *See Official Unsec'd Cred. Comm. v. Michaels* (*In re Marin Motor Oil), 689 F.2d 445, 451-52 (3d Cir. 1982) (section 1109(b)'s mandate should be interpreted as an "unqualified" right to be heard in the case).

---

[6] The Boy Scouts proposes that any party seeking to participate in Plan confirmation proceedings file a Notice of Intent with the Court.  Motion ¶ 18 at 7.  However, the Boy Scouts and other parties participating in Plan confirmation "have the right to object to that Notice **on any grounds** . . . ." *Id.* ¶ 19 at 7 (emphasis added).  If an objection is filed, the party may not participate in proceedings before this Court unless "the Court overrules such objection." *Id.* at 8.

7.      The Boy Scouts' attempt through the Confirmation Scheduling Motion to incorporate estimation proceedings into the confirmation process—although serving as an acknowledgement that estimation is a prerequisite to confirming its Plan—is a transparent attempt to co-opt and limit estimation proceedings and impose an estimation methodology selected by the Boy Scouts through a procedural motion.  The schedule the Boy Scouts proposes "squeezes" fact and expert discovery that will be needed by other parties to estimate abuse claims and attempts to elevate the Boy Scouts' view of the extent of abuse claims as the standard against which other estimations will be judged to the great prejudice of survivors.[7]

8.      The Boy Scouts' procedures propose "time-limited interviews of a stratified sample of individual abuse claimants" that are to be "guided by the Mediators or their designee(s)."  This process presumably facilitates the estimation favored by Bates White—the Boy Scouts' alleged "abuse claims consultant"—and substitutes the judgment of mediators for that of experts who will present to the Court methodologies for the estimation of the thousands of abuse claims asserted against the Boy Scouts.

9.      The Court should not permit the Boy Scouts to utilize the bankruptcy process as another mechanism for sidelining and silencing survivors.

---

[7] Boy Scouts appears to have retained Bates White, LLC, for, among other tasks, the purpose of providing "information about how verdicts do not represent average values of specific sexual abuse cases," perhaps foreshadowing its and the Boy Scouts' biases in excluding relevant sexual abuse data.  *Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Bates White, LLC as Abuse Claims Consultant for the Debtors and Debtors in Possession, Nunc Pro Tunc to the Petition Date* [Docket No. 207], Ex. B (Engagement Letter) ¶ 5 at 2.

## **BACKGROUND**

### A.     **The Commencement of the Chapter 11 Cases**

10.     On February 18, 2020, the Boy Scouts filed petitions for voluntary relief under

chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy

Code").  The Boy Scouts remains in possession of its assets and continues to manage its affairs

as debtors in possession.  No trustee or examiner has been appointed yet in the Chapter 11 Cases.

11.     On March 5, 2020, the Office of the United States Trustee ("UST") appointed the

TCC, which consists of nine survivors of childhood sexual abuse (the "TCC Members").  The

UST interviewed approximately fifty survivors and selected the nine men to serve on the TCC as

fiduciaries for all survivors.  The TCC Members are active participants in the Chapter 11 Cases.

They meet twice a week. The TCC Members have attended nearly all of the mediation sessions

and many of the substantive hearings to date.

12.     On April 24, 2020, the Court entered an order appointing the FCR to represent the

interests of holders of future childhood sexual abuse claims that may be asserted against the

Debtors.  *See* Docket No. 486.

13.     On July 24, 2020, the Coalition filed a notice of appearance in these Chapter 11

Cases pursuant to section 1109(b) of the Bankruptcy Code.  The Coalition comprises more than

12,000 sexual abuse survivors who have submitted proofs of claim against the Boy Scouts and

signed affirmative consents to being a part of the Coalition.

### B.     **The Restricted Property Action**

14.     On January 8, 2021, the TCC commenced an adversary proceeding (Adv. Pro.

Case No. 21-50032) (the "Restricted Property Action") seeking a declaratory judgment that Boy

Scouts assets having an asserted value of $667,075,374 that allegedly are subject to donor

restrictions ("Restricted Assets") are, in fact, not subject to enforceable donor restrictions, and, instead, are available to satisfy creditor claims.

15.     The Boy Scouts filed its answer in the Restricted Property Action on April 23, 2020.  The TCC and the Boy Scouts had their Bankruptcy Rule 7026(f) conference on April 29, 2021.  Initial disclosures pursuant to Bankruptcy Rule 7026(a)(1) are due on May 13, 2021.  The initial scheduling conference is set for May 19, 2021.  JP Morgan Chase Bank has filed an unopposed motion to intervene and the parties are negotiating a stipulation to permit the Official Committee of Unsecured Creditors to intervene as a party.

16.     The TCC served its initial document requests and interrogatories on the Boy Scouts on April 30, 2021. No responses have been served to date.

C.      The Estimation Motion and Discovery

17.     On March 16, 2021, the TCC, FCR and the Coalition filed a *Motion of the Future Claimant's Representative, the Official Committee of Tort Claimants, and the Coalition of Abused Scouts for Justice for Entry of an Order, Pursuant to 11 U.S.C. §§ 105(a) and 502(c), (I) Authorizing an Estimation of Current and Future Abuse Claims and (II) Establishing Procedures and Schedule for Estimation Proceedings* [Docket No. 2391] (the "Estimation Motion"). Through the Estimation Motion, the moving parties seek a Court order authorizing the estimation of the aggregate amounts of current and future abuse claims against the Boy Scouts by type of abuse, by local council, by chartered organization, and on a year-by-year basis in order to match certain claims with one or more insurers and policies, and establishing the procedures and schedule for those estimation proceedings.

18.     The TCC, FCR and Coalition—and the Boy Scouts, by its inclusion of estimation in its Motion—believe that estimation is necessary to determine whether the Debtors' Plan meets the legal requirements under the Bankruptcy Code.

19.     As articulated in the Estimation Motion, the estimation process also will set a de facto cap on the Boy Scouts' aggregate liability for the estimated claims by defining the maximum amount Boy Scouts' and beneficiaries of any channeling injunction must make available for distribution under a plan to survivors before such parties receive protection from these claims upon confirmation of any such plan.

20.     In order to further the estimation process and obtain information regarding the Boy Scouts' settlement and verdict experience in resolving the numerous childhood sexual-abuse claims asserted against them, on April 22, 2021, the TCC, FCR and Coalition served a consolidated set of interrogatories and requests for production on the Boy Scouts in connection with the Estimation Motion [Docket No. 2684] (the "Estimation Discovery").

21.     On May 7, 2021, the Boy Scouts served its *Debtors' Responses and Objections to First Request for the Production of Documents by the Official Committee of Tort Claimants, the Coalition of Abused Scouts for Justice and the Future Claims Representative to Boy Scouts of America and Delaware BSA, LLC, in Connection with Estimation Proceedings* (the "Boy Scouts' Responses to Estimation Request for Production") and *Debtors' Responses and Objections to the Official Committee of Tort Claimants, the Coalition of Abused Scouts for Justice and the Future Claims Representative's First Set of Interrogatories to Boy Scouts of America and Delaware BSA, LLC, in Connection with Estimation Proceedings* (the "Boy Scouts' Responses to Estimation Interrogatories"), in which it flatly refuses to provide any information regarding childhood sexual-abuse claims it acknowledges date back some eighty years and agrees only to

"provide responses with regard to the time period from four years prior to the date hereof." Boy

Scouts' Responses to Estimation Request for Production ¶ 1 at 7 and 10; Boy Scouts' Responses

to Estimation Interrogatories ¶ 1 at 7.

22.     The extent of the Boy Scouts' stonewalling would be laughable were the subject

matter less serious than denying justice to survivors of child rape, molestation, and other abuse.

For example, Rule 33(d) of the Federal Rules of Civil Procedure, made applicable in bankruptcy

proceedings pursuant to Rule 7033 of the Federal Rules of Bankruptcy Procedure, permits a

party responding to interrogatories to refer to produced business records as follows:

> (d) OPTION TO PRODUCE BUSINESS RECORDS. If the answer to an
> interrogatory may be determined by examining, auditing,
> compiling, abstracting, or summarizing a party's business records
> (including electronically stored information), and if the burden of
> deriving or ascertaining the answer will be substantially the same
> for either party, the responding party may answer by:
>
> (1) specifying the records that must be reviewed, in sufficient
> detail to enable the interrogating party to locate and identify them
> as readily as the responding party could; and
>
> (2) giving the interrogating party a reasonable opportunity to
> examine and audit the records and to make copies, compilations,
> abstracts, or summaries.

Fed. R. Civ. P. 33(d).  Instead of utilizing Rule 33(d) to identify documents in which the survivor

groups might find responses to basic questions regarding the nature and extent of the Boy

Scouts' liabilities arising from decades of scouting childhood rape and other molestation, the

Boy Scouts engages in a series of circular references and denials to ensure that no answers are

provided.

23.     For example, when asked to provide information regarding a verdict rendered in

favor of a sexual abuse claimant, the Boy Scouts, in the Boy Scouts' Responses to Estimation

Interrogatories, objects, refuses to respond substantively and states:  "The Debtors further object

to this Interrogatory as duplicative of Estimation Request No. 2.  Subject to the foregoing

objection, the Debtors refer the Requesting Parties to the Debtors' response to Estimation

Request No. 2."  Boy Scouts' Responses to Estimation Interrogatories at 10-11.  In turn, the Boy

Scouts' response to request for production No. 2 states:  "The Debtors further object to this

request as duplicative of Estimation Interrogatory No. 2."  Boy Scouts' Responses to Estimation

Request for Production at 11.

24.    The Boy Scouts' scheme of referrals and denials continues throughout its

discovery responses in the hope that virtually no information regarding nearly eighty years of

child rape and other molestation will see the light of day and be held to account.  *See, e.g., id.* at

12-20.

**D.    The Plan and Plan Discovery**

25.    On April 13, 2021, the Boy Scouts filed its *Second Amended Chapter 11 Plan of*

*Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 2592] (the

"Plan").[8] The following day, the Boy Scouts filed the *Amended Disclosure Statement for the*

*Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware*

*BSA, LLC* [Docket No. 2594] (the "Disclosure Statement").

26.    The Plan includes a "Global Resolution Plan" that seeks to channel all childhood

sexual-abuse claims against the Boy Scouts, Local Councils, Contributing Chartered

Organizations, and Settling Insurance Companies to a Settlement Trust that will be responsible

for processing, liquidating, and paying such claims in accordance with certain Trust Distribution

Procedures. The Trust Distribution Procedures would implement a process through which abuse

claims will be reviewed and valued by the Settlement Trust based on the nature of the abuse.

---

[8] Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Plan or Motion.

27.    In exchange for making financial or insurance contributions to the Settlement

Trust, Boy Scouts, Local Councils, Contributing Chartered Organizations, and Settling Insurance

Companies would receive the protection of a nonconsensual release of the tens of thousands of

abuse claims, which would then be channeled to the Settlement Trust.

28.    If holders of the childhood sexual-abuse claims as a Class do not vote in favor of

the Plan, the Boy Scouts will seek to impose on survivors its so-called "Toggle Plan," which (a)

does not provide for the resolution of abuse claims against Local Councils and Contributing

Chartered Organizations, (b) does not "channel" abuse claims against the Local Councils and

Contributing Chartered Organizations to the Settlement Trust, (c) provides for Boy Scouts'

assignment of its self-described "few assets"[9] (including interests in its Insurance Policies) to the

Settlement Trust,[10] and (d) allows survivors to pursue their claims against Local Councils and

Chartered Organizations through separate litigation. *See id.* at 7-9.

29.    The Plan contemplates a highly abbreviated estimation process "for purposes of

and in connection with confirmation," Motion ¶ 11 at 4, as described in section V.T. of the Plan,

with special, gratuitous protections for insurers:

> T.    Estimation of Direct Abuse Claims. If the Plan is confirmed
> as a Global Resolution Plan, then **the Bankruptcy Court shall, at
> the Confirmation Hearing, conduct an estimation of the
> Debtors' aggregate liability on account of Direct Abuse Claims
> in accordance with the procedures set forth in the Bankruptcy
> Court's order granting the Confirmation Scheduling Motion.**
> This estimation will, among other things, provide a basis for the
> Bankruptcy Court and the parties to assess the value of the Direct
> Abuse Claims and whether the settlements proposed in the Plan,
> including Insurance Settlement Agreements and the Abuse Claims
> Settlement, should be approved under section 1123(b)(3)(A) of the
> Bankruptcy Code as compromises that are fair, reasonable, and in

---

[9] Disclosure Statement at 12.

[10] The Plan offers approximately $115 million of cash or other consideration for payment of abuse claims which, when considering all of the Boy Scouts' assets, is only 13% of the available assets.

the best interests of the estate with respect to disputed claims, disputed liabilities, and disputed issues. As set forth in the order granting the Confirmation Scheduling Motion, the Debtors shall offer evidence at the Confirmation Hearing in support of the estimation, and other parties shall be permitted to submit evidence in support of, or to dispute, the evidence offered by the Debtors. **The Confirmation Order will contain the Bankruptcy Court's findings of fact and conclusions of law with regard to the Debtors' estimated aggregate liability on account of Direct Abuse Claims, which findings of fact and conclusions of law shall, by their terms, be subject to Article X.M of the Plan and, for the avoidance of doubt, shall not constitute a trial or hearing on the merits or an adjudication or judgment, or accelerate the obligations, if any, of any Insurance Company under its Insurance Policies**.

Plan § V.T. at 59 (emphasis added).  The special exemption that the Boy Scouts proposes to afford insurers will limit any assurance of the value of perhaps the Boy Scouts' principal potential source of recovery for survivors—insurance policies.  Section X.M. of the Plan reiterates these special benefits and exemptions for insurers, making clear that, with limited exceptions:

none of (a) the Bankruptcy Court's or District Court's approval of the Plan or the Plan Documents, (b) the Confirmation Order, the Affirmation Order or any findings or conclusions entered with respect to Confirmation, or (c) **any estimation or valuation of Abuse Claims, either individually or in the aggregate (including any agreement as to the valuation of Abuse Claims) in the Chapter 11 Cases shall, with respect to any Insurance Company, constitute or be deemed to constitute a trial or hearing on the merits or an adjudication or judgment, or accelerate the obligations, if any, of any Insurance Company under its Insurance Policies.**

*Id.* § X.M. at 91 (emphasis added).

30.    On April 26, 2021, the TCC, FCR and Coalition served on the Boy Scouts Interrogatories, Requests for Admission and Requests for Production [Docket No. 2695] (the "Plan Discovery").  To date, the Boy Scouts has not responded to the Plan Discovery.

E.      **The Proposed Hartford Settlement**

31.     On April 16, 2021, the mediators filed the *Second Mediator Report* [Docket No. 2624] (the "Second Mediator Report"). In the Second Mediator Report, the mediators announced a settlement between the Boy Scouts and one of its primary insurers, Hartford (the "Proposed Hartford Settlement").

32.     The Proposed Hartford Settlement provides that Hartford will "buy back" its policies insuring the Boy Scouts for the amount of $650 million (which amount will be adjusted downward if the Boy Scout's other primary insurer Century Indemnity Company ("Century")— pays less than $1.3 billion) and a full release of Hartford's obligations to make any payments to anyone on account of childhood sexual abuse claims under the those policies.  Not only is the amount not fixed, but it is inadequate to satisfy the applicable settlement or sale standards under the Bankruptcy Code and the Bankruptcy Rules.

33.     The agreement memorializing the Proposed Hartford Settlement (the "Hartford Settlement Agreement") states that "the Plan shall incorporate this Agreement and shall constitute a request by the [Boy Scouts] for the Bankruptcy Court to approve the Sale and this Agreement . . . ."  The Hartford Settlement Agreement contemplates that Hartford may request, upon twenty days' notice to the Boy Scouts, that the Boy Scouts file a motion to approve the Proposed Hartford Settlement under Rule 9019 of the Federal Rules of Bankruptcy Procedure (a "9019 Motion").

34.     The TCC estimates that Hartford's actual exposure under the dozens of policies it sold to the Boy Scouts will be more than thirteen times the proposed settlement amount. The TCC, the Coalition and the FCR intend to object to the Proposed Hartford Settlement and oppose any plan of reorganization that incorporates or seeks to effectuate the Proposed Hartford Settlement.

## **ARGUMENT**

**A.      The Motion Continues the Boy Scouts' Campaign to Silence and Hide the Harm Suffered by Survivors**

35.      The Chapter 11 Cases have been pending for approximately fifteen months. During this period of time, although the Boy Scouts has expressed its willingness to share multiple iterations of Bates White's manipulation of the information found in the over 84,000 claims filed in these cases (called "tranches"),[11] the Boy Scouts has indicated its willingness to disclose only approximately four years of information relating to the resolution of childhood sexual-abuse claims and, as discussed above, has refused to disclose any other information regarding nearly eight decades of such abuse.  In doing so, the Boy Scouts has chosen to hide data relating to incidences of child rape, forced oral sex, compelled masturbation, fondling, groping, and other child sexual abuse perpetrated by the Boy Scouts' scouting leaders or otherwise arising from the Boy Scouts' scouting activities which abuses, by its own admission, stretch back to the 1940s.  The procedures outlined in the Motion, including as to estimation that it proposes to have occur within the plan process, do not address the Boy Scouts' failure to provide the key information needed as to abuse values without which neither an estimation nor the Plan can go forward.

36.      The Motion's proposed procedures would pervert the estimation process proposed by the TCC, Coalition and FCR and deny survivors fair access to the Court. The Boy Scouts has seized upon and adulterated a litigation management mechanism proposed in the

---

[11] *See, e.g.*, Motion at 6.

Estimation Motion to impose a Notice of Intent filing requirement on any party in interest that seeks to participate in the confirmation proceedings.  *See* Motion ¶¶ 18–20 at 7-8.  Through the Motion, the Boy Scouts seeks Court sanction of obstacles to participation in confirmation, in stark contrast to the open process contemplated in the Estimation Motion.  *See* Estimation Motion ¶ 39 at 17 ("This process is designed to avoid undue delay while ensuring a transparent process in which all parties may participate . . . [A]ny party in interest that wishes to submit evidence in connection with the estimation hearing shall file a Notice of Estimation Participating Party . . . . **[E]ach party that timely files the Notice of Estimation Participating Party shall be a Participating Party**.") (Emphasis added).  The Boy Scouts and any other party already participating in Plan confirmation proceedings may object to a Notice of Intent "on any grounds" they wish.  Confirmation Scheduling Motion ¶ 19 at 7-8.  The filing of any objection automatically disenfranchises a party from participation unless the objection is overruled by the Court.  *Id.* at 8.

37.    But section 1109(b) of the Bankruptcy Code states that "[a] party in interest, including … a creditor … may raise and **may appear and be heard on any issue in a case under this chapter**."  11 U.S.C. § 1109(b) (emphasis added).[12]  Based on a plain reading of this provision, at a minimum, all creditors of a debtor may appear and be heard on any issue arising in a bankruptcy case.  *See, e.g., Lamie v. U.S. Trustee*, 540 U.S. 526, 533-34 (2004); *United States v. Ron Pair Enters.*, 489 U.S. 235, 241-42 (1989).  The United States Court of Appeals for the Third Circuit, in its analysis of the statutory construction and legislative history of section 1109(b), confirmed that the provision is intended to imbue any creditor with the right to be heard

---

[12] The use of the word "including" in the provision indicates that the list of identified parties is nonexhaustive. 11 U.S.C. § 102(3); *see In re Combustion Eng'g, Inc.*, 391 F.3d 190, 214 n. 21 (3d Cir. 2004).

*in unqualified terms.*[13]  *See Marin Motor Oil,* 689 F.2d at 451 (citing S. Rep. No. 989, 95th

Cong., 2nd Sess. 116 (1978)).  The court's view on standing was maintained in its later decision

in *Combustion Engineering* in which it noted that section 1109(b) "has been construed to create a

broad right of participation in Chapter 11 cases."  391 F.3d 190, 214 n. 21 (3d Cir. 2004); *see*

*also In re PWS Holding Corp.*, 228 F.3d 224, 249 (3d Cir. 2000)(section 1109(b) "confers broad

standing at the trial level").  Additionally, section 1128(b) of the Bankruptcy Code states

unequivocally that "[a] party in interest may object to confirmation of a plan."  11 U.S.C. §

1128(b).[14]

38.     Thousands of the survivors of the Boy Scouts' legacy of child sexual abuse have

appeared pro se in these Chapter 11 Cases.  There are many survivors who have counsel but not

necessarily bankruptcy counsel. These survivors are creditors of the Boy Scouts.  The Boy

Scouts offers no basis for imposing additional requirements to participate in confirmation

proceedings in derogation of sections 1109(b) and 1128(b) of the Bankruptcy Code and the

expansive view towards standing adopted in this Circuit.

39.     The Court should not reward the Boy Scouts' efforts to erect "barriers to entry" to

these proceedings by creating restrictions on participation, which are nothing more than an

administrative hurdle intended to limit the number of objections filed to the plan and

confirmation process and to silence the voices of survivors.

---

[13] The term "creditor" is defined in Bankruptcy Code section 101(10)(A) as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor."  The term "claim" is defined by section 101(5)(A) as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, **disputed**, undisputed, legal, equitable, secured, or unsecured[.]"  11 U.S.C. § 101(10)(A) (emphasis added).
[14] The term "party in interest" is conceptualized broadly as "anyone who has a legally protected interest that could be affected by a bankruptcy proceeding."  *In re James Wilson Assoc.*, 965 F.2d 160, 169 (7th Cir. 1992).

**B.      The Boy Scouts Seeks to Preempt the Estimation Motion**

40.      As described above and as tacitly conceded by the Boy Scouts by the relief

requested in the Motion, estimation is a prerequisite to addressing confirmation requirements,

*e.g.* 11 U.S.C. § 1129(a)(7), (11), 1129(b)(1), including the reasonableness of settlements and the

propriety of any releases proposed as part of the Plan.[15]  Estimation may also be needed to

determine the propriety of the Proposed Hartford Settlement, disclosed after the Estimation

Motion was filed.

41.      The watered-down and hurried estimation proposed by the Boy Scouts, while

serving to needlessly deny survivors participation rights, is expressly designed to uniquely

benefit insurers by exempting only them from any preclusive effects that might otherwise result

from the findings and rulings associated with the estimation or Plan.  The Plan, which would

fully bind survivors in limiting their recourse for their claims, makes clear that the Boy Scouts'

favored estimation process would not impact whatsoever insurance companies and their

policies—policies which represent the principal source of payment to survivors.  *See* Plan §

X.M.

42.      To the extent that an estimation process might have preclusive effect as to

coverage litigation, any resulting shortening of such likely postconfirmation litigation that

otherwise could "unduly delay the administration of the case" should be welcomed.  11 U.S.C. §

502(c); *see* Fed. R. Bankr. P. 3022 (court should consider "whether all motions, contested

---

[15] *See* Estimation Motion ¶¶ 30-36 at 12-16; Plan § V.T. ("This estimation will, among other things, provide a basis for the Bankruptcy Court and the parties to assess the value of the Direct Abuse Claims and whether the settlements proposed in the Plan, including Insurance Settlement Agreements and the Abuse Claims Settlement, should be approved under section 1123(b)(3)(A) of the Bankruptcy Code as compromises that are fair, reasonable, and in the best interests of the estate with respect to disputed claims, disputed liabilities, and disputed issues.").

matters, and adversary proceedings have been finally resolved" before closing case; advisory committee note to 1991 Amendment).

43.     The Boy Scouts offers little meaningful criticism of the estimation proposed by the survivor groups in its objection to the Estimation Motion.  The Boy Scouts' objection boils down to (a) its empty assertion that its proposed estimation is better because it takes place as part of Plan confirmation; (b) its belief that this Court can estimate personal injury claims; (c) an apparent misunderstanding about categorizing estimated claims into separate fields (*e.g.*, type of sexual abuse suffered, year, etc.), something that can be easily drawn from information set forth on filed Proofs of Claim; and (d) its insistence that the estimation proposed in the Estimation Motion would risk delaying its emergence from chapter 11 by its arbitrary "deadline."[16]

44.     First, the use of estimation proceedings "as part of" Plan confirmation, rather than a prerequisite for confirmation (as outlined in the Estimation Motion) is a "distinction without a difference."  The Boy Scouts concedes that estimation is necessary for the resolution of these Chapter 11 Cases and incorporate estimation into its Motion. As discussed in the TCC's objection to the *Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief* [Docket No. 2295],

---

[16] *See Debtors' Objection to the Future Claimants' Representative, the Official Committee of Tort Claimants, and the Coalition of Abused Scouts for Justice's Motion for Entry of an Order, Pursuant to 11 U.S.C. § 105(a) and 502(c), (I) Authorizing an Estimation of Current and Future Abuse Claims and (II) Establishing Procedures and Schedule for Estimation Proceedings* [Docket No. 2612] (the "Boy Scouts' Objection to Estimation Motion") ¶ 7 at 4; ¶ 20 at 9-10; ¶ 26 at 12; ¶ 31 at 14; ¶ 32 at 15; ¶ 35-36 at 15-16.

for these cases to move towards Plan confirmation, the childhood sexual-abuse claims must be valued. *See* Docket No. 3526.

45.     The Boy Scouts has not undertaken any valuation of the 84,000 childhood sexual abuse claims. (Yet, in its Disclosure Statement, the Boy Scouts nonetheless, without explanation, ascribes a range in values to abuse claims from $2.4 billion to $7.1 billion.)  Without valuing the abuse claims, neither the Court nor survivors can ascertain what the survivors might receive under the Plan—which is perhaps the most fundamental information every creditor wants to know before voting on a plan.  Moreover, if a reasonable range of distributions is not provided, there will be no measure against which to consider a "best interests of creditors" challenge. Also, if the abuse claims are not valued, neither the Court nor survivors can evaluate if an insurer, local council, or chartered organization is contributing sufficient consideration to justify the nonconsensual third-party releases it requires be granted, and whether it is appropriate to have tens of thousands of abuse claims channeled to a trust.

46.     Because the Boy Scouts has made no legitimate attempt to evaluate the childhood sexual-abuse claims, the survivor groups filed the Estimation Motion, which contains its own proposed schedule for fact and expert discovery, motion practice, briefing, and a hearing in advance of consideration of any disclosure statement.  The estimation of the 84,000 childhood sexual abuse claims must be completed before the Court can commence a nonconsensual confirmation hearing.  The value of the 84,000 abuse claims is a gating item under the Debtors' Disclosure Statement and Plan.

47.     The Boy Scouts' version of estimation described in the Motion and Plan is critically different from that proposed in the Estimation Motion. The Boy Scouts has crafted the estimation proposed in the Motion to be toothless. It seeks to avoid determining the values of

childhood sexual abuse claims for purposes of distribution and to avoid doing anything that might be perceived as threatening to the hold-out parties—the insurers—who control the Boy Scouts' most valuable assets.  *See* Plan § X.M.

48.    In contrast, the goal of the Estimation Motion is to derive a valuation of the childhood sexual-abuse claims that will dictate the maximum amount that the Boy Scouts (together with its insurers and any other parties seeking a release under the Plan) must make available for distribution to abuse claimants. The size of that trust will be determined (and capped) by the estimated value of the Boy Scouts' childhood sexual-abuse claims.  The preclusive effects of the Court's findings and rulings in connection with the estimation will be whatever applicable law provides as determined in any applicable later matter.

49.    The Boy Scouts has mischaracterized the estimation proposed in the Estimation Motion as a "core proceeding."  To the contrary, the estimation of abuse claims is noncore because it seeks "estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution." 28 U.S.C. § 157(b)(2)(B). The purpose of the Estimation Motion is to facilitate "distribution."  *See In re Roman Catholic Archbishop of Portland* ("*Portland*"), 339 B.R. 215, 220 (Bankr. D. Or. 2006) ("plan provid[ing] that the estimation will provide a cap on the amount of money that will be made available to pay the tort claims . . . . effectively limits the amount that will be distributed, thereby causing the estimation of the claims to be for distribution purposes").

50.    The Boy Scouts falsely claims that categorizing estimated claims by "type of abuse, by local council, by chartered organization, and on a year-by-year basis," as requested in the Estimation Motion, will be a monumental and time-consuming task.  *See* Boy Scouts' Objection to Estimation Motion ¶¶ 34-36 at 15-16.  First, as to why it would be important to

associate the Boy Scouts' liability for childhood sexual abuse claims with particular years of abuse or associated local councils or chartered organizations, the Plan includes a possible channeling injunction to the proposed settlement trust of the liability of others for childhood sexual abuse claims.  Determining the amount of the Boy Scouts' liability associated with these parties is an important step in reaching and having the Court approve settlements with them, thereby adding them as Protected Parties under the Plan, and in evaluating those proposed settlements in light of what a claimant might receive in a 'best interests' test analysis.

51.    As to the concerns with the burden of the task, the Boy Scouts' concerns are either disingenuous or the result of confusion.  In the Motion, the Boy Scouts trumpets the accomplishments of Bates White, which has "provided all parties with a common analytical database reflecting information in the [proof of claim] submissions, *allowing the parties to sort and manipulate data across a range of dozens of categories including:  abuse allegation, dates of abuse, abuser, Local Council and other categories*."  Motion ¶ 15 at 6 (emphasis added). Presumably, the database touted by the Boy Scouts—purportedly refined by Bates White over multiple "tranches" or a similar one from experts retained by the survivor groups—should readily be able to be organized by various categories or include additional categories without much difficulty.

52.    Finally, while the estimation procedure proposed by the survivor groups is not materially longer in duration than the timetable proposed by the Boy Scouts, the Boys Scouts' schedule does not provide sufficient time for discovery or the expert report process to unfold in a reasonable manner.  Due to the Boy Scouts' refusal to provide critical discovery regarding settlement and verdict data beyond a truncated and arbitrary four-year reachback period, the Boy Scouts' proposed timetable is unrealistic.

53.     Moreover, in light of glaring inadequacies with the Boy Scouts' Disclosure Statement and the Boy Scouts' recent flat-out refusal to provide necessary and critical discovery relating to, among other things, settlement and verdict data, the Disclosure Statement is not in any position to be approved by the Court in the near term such that the Boy Scouts itself could not meet its own proposed deadlines.

54.     Although the insurers—perhaps fearful of the liability that will be imposed on them by way of the estimation sought by the survivor groups—and certain others object to the Estimation Motion, such parties offer little in the way of valid criticism of Estimation Motion—they simply do not want estimation to occur.  For example, Century falsely asserts that the *Portland* court "squarely rejected" the estimation of aggregate sexual abuse cases. *Century's Opposition to the Coalition, TCC and FCR's Motion to Estimate Current and Future Abuse Claims* [Docket No. 2614] (the "Century Objection to Estimation Motion") ¶ 2 at 2; ¶¶ 9-10 at 4.

55.     Instead, the court found that an estimation of such claims for purposes of distribution would have to be addressed by the district court:

> Debtor is correct that the distribution to all of the tort claimants will be based on actual liquidated amounts, not on the estimated amounts. However, debtor's proposed plan provides that the estimation will provide a cap on the amount of money that will be made available to pay the tort claims. This effectively limits the amount that will be distributed, thereby causing the estimation of the claims to be for distribution purposes, not merely for voting and confirmation purposes.
>
> . . . .
>
> [The debtor] wants this court to estimate in the aggregate the amounts of the present child sex abuse claims, for the purported purpose of confirmation and voting. In fact, it intends to use the estimation, along with estimation of other present tort claims, to put an upper limit on the amount it will pay on all of the tort claims, while discharging any actual liability in excess of the estimated amount. This court does not have jurisdiction to estimate

personal injury tort claims for purposes of distribution, which is in effect what debtor asks this court to do.

. . . .

**Because I conclude that the estimation debtor seeks is at least in part for the purpose of distribution, I cannot make that estimation. If debtor decides that it wants to proceed with a plan of reorganization that depends on an aggregate estimation of present child sex abuse claims for purposes of capping the fund from which tort claims will be paid, I will at the appropriate time prepare a report and recommendation to the district court.**

*Portland*, 339 B.R. at 220-21 (emphasis added).

56.    Century, a group of other insurers (the "Certain Insurers"), and the Church of Jesus Christ of Latter-day Saints (the "LDS") also accuse the survivor groups of seeking to estimate nondebtor claims.[17]  But, as Century quotes in its objection, the estimation of sexual-abuse claims against the Boy Scouts necessarily will "include[e] the extent to which those liabilities are shared [] by any local council or chartered sponsoring organization [and] will inform the contribution that can and should be expected from local council and chartered organization."  Estimation Motion at 5 (cited in Century Objection to Estimation Motion ¶ 30 at 11).  That nondebtors may be coliable on an estimated claim and are claiming coverage under the Boy Scouts' insurance policies does not render the estimation of such claim somehow improper or unprecedented.

---

[17] *See* Century Objection to Estimation Motion ¶¶ 26-30 at 10-11; *Opposition of Certain Insurers to Motion of the Coalition, TCC and FCR to Estimate Current and Future Abuse Claims* [Docket No. 2611] (the "Other Insurers' Objection to Estimation Motion") ¶ 13 at 6-7; *Objection of the Church of Jesus Christ of Latter-day Saints, a Utah Corporation Sole, to Motion of the Future Claimants' Representative, the Official Committee of Tort Claimants, and the Coalition of Abused Scouts for Justice for Entry of an Order, Pursuant to 11 U.S.C. §§ 105(a) and 502(c), (I) Authorizing an Estimation of Current and Future Abuse Claims and (II) Establishing Procedures and Schedule for Estimation Proceedings* [Docket No. 2610] ¶ 1 at 1, ¶¶ 5-6 at 2-3.  The United Methodist Ad Hoc Committee filed a joinder [Docket No. 2681] to the LDS's objection to the Estimation Motion.

57.     In connection with the Estimation Motion, Century, Certain Insurers and Old Republic Insurance Company suggest that estimation may permissibly involve only a determination of a "an individual claim or group of related claims" but not more than one unrelated claim, thus apparently challenging both the estimation proposed by the Estimation Motion and the estimation proposed by the Debtors.[18]  This argument against estimation of claims in the aggregate is frivolous.  *See, e.g.*, 11 U.S.C. § 102(7) ("[T]he singular includes the plural."); *In re North Am. Health Care, Inc.*, 544 B.R. 684, 689 (Bankr. C.D. Cal. 2016) ("Unliquidated claims can be estimated individually or in the aggregate."); *In re Armstrong World Indus.*, 348 B.R. 111, 136 (D. Del. 2006); *In re Federal-Mogul Global, Inc.*, 330 B.R. 133, 164 (D. Del. 2005); *Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 725 (D. Del. 2005); *In re Specialty Prods. Holding Corp.*, 2013 Bankr. LEXIS 2051 (Bankr. D. Del. May 20, 2013).

## C.      Due to the Boy Scouts' Continuing Refusal to Disclose Information Regarding the Disposition of Nearly 80 Years of Claims Arising From Child Rape and Other Molestation, the Debtors' Proposed Estimation and Confirmation Timeline Is Completely Unrealistic

58.     The procedures related to estimation should be determined in connection with the Estimation Motion, not by way of the competing and overlapping Motion proposed by the Boy Scouts.[19]  Such procedures and timeline, however, can only be established once the Boy Scouts has produced the necessary discovery relating to, among other things, settlement and verdict

---

[18] Century Objection to Estimation Motion ¶ 13-14 at 5-6, ¶ 15 at 8; *see* Other Insurers' Objection to Estimation Motion ¶ 9 at 5; *Old Republic Insurance Company's Objection to Motion of the FCR, TCC, and Coalition to Estimate Current and Future Abuse Claims and Partial Joinder in the Opposition of Certain Insurers to the Motion* [Docket No. 2613] ¶ 3 at 2.

[19] The previously scheduled April 29, 2021 hearing regarding the Confirmation Scheduling Motion is now to be heard concurrently with the May 19, 2021 hearing on the Estimation Motion.

data.  The Boy Scouts' categorical refusal to provide any such data outside of a four-year reachback period makes it impossible to formulate any workable schedule.

59.    In fact, until the Boy Scouts' recent refusal to disclose any information regarding nearly eight decades of abuse, the survivor groups' and the Boy Scouts' proposed timelines in which to conduct the estimation proceedings were not materially at odds in terms of total timing. Both propose a total timeline that is within approximately two weeks of the other—with the survivor groups proposing an approximate 111-day timeline following approval of the Estimation Motion and the Boy Scouts proposing an approximately 96-day timeline.[20]  The Boy Scouts and the survivor groups, therefore, were proposing similar total timing for the conduct of the estimation process—with an estimation determination following the conclusion of this process to be scheduled by the Court presiding over the estimation proceedings.

60.    Within this broader rubric, however, the Boy Scouts' proposed methodology and schedule in the Confirmation Scheduling Motion is unworkable in certain material respects and does not provide the parties with sufficient time or ability to engage in a fulsome fact and expert discovery, preparation of initial and rebuttal expert reports, briefing, and preparation for the estimation hearing.  Most importantly, given the Boy Scouts' (and its insurers') decision to stonewall survivors, the determination of any estimation or confirmation scheduled must await this Court's resolution of this critical disclosure issue.

---

[20] The hearings regarding the Estimation Motion, the Confirmation Scheduling Motion, and approval of the Disclosure Statement are currently scheduled for May 19, 2021.  The survivor groups object to the Boy Scouts' request that the estimation proceedings be conducted following approval of the Disclosure Statement in connection with Plan confirmation.  To the contrary, the estimation proceedings are properly conducted in the District Court, as requested by the Motion to Withdraw the Reference, in advance of approval of the Disclosure Statement.

**D.      Through the Motion, the Boy Scouts Also Seeks to Hijack the Restricted Property Action**

61.      Through the Restricted Property Action, the TCC contests the Boy Scouts' position that most of its assets are unavailable to satisfy abuse claims due to charitable restrictions.  Resolution of the disputes concerning the Restricted Assets is required to determine whether over $650 million of real estate and financial assets titled to the Boy Scouts are property of the estate available to satisfy abuse claims.[21]

62.      The Court's resolution of this dispute is a prerequisite to the confirmation of the Debtors' plan. Among other things, as long as this dispute is unresolved, the Boy Scouts cannot satisfy Bankruptcy Code section 1129(a)(7).  Recognizing that resolution of the Restricted Property Action is a gating issue to confirmation of the Plan, the Boy Scouts has informed the TCC that it intends to have the issues raised by the Restricted Property Action determined on the schedule set forth in the Confirmation Scheduling Motion. This is prejudicial to the TCC and unrealistic.

63.      As explained in detail by Judge Sontchi in the *Catholic Diocese* decisions, the party advancing the existence of a trust (here, the Boy Scouts) bears a *"double burden of proof"* in claiming that financial assets titled to it are restricted or held in trust:  (a) to establish the existence of the purported donor restriction or trust and (b) to establish that the funds at issue were segregated from unrestricted/non-trust funds from the time they were received or, if they were commingled, to trace the funds under the lowest-intermediate-balance test.[22]  *Official*

---

[21] Because the dispute concerning the Restricted Assets involves a determination of interests in property, it must be resolved in an adversary proceeding rather than in connection with an objection to the Boy Scouts' Plan.  Fed. R. Bankr. P. 7001(2).

[22] To establish that funds are held in trust, the party claiming the existence of a trust bears the burden of proof on two showings: (1) they must demonstrate the existence and legal source of the alleged trust relationship or restriction by *clear and convincing evidence* and (2) they must identify the trust fund and, if the trust fund has been commingled with other funds, trace the trust funds.  *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95 (3d Cir. 1994); *see also Goldberg v. New Jersey Lawyers' Fund for Client Protection*, 932 F.2d 273, 280 (3d Cir. 1991)

*Comm. v. Catholic Diocese (In re Catholic Diocese)*, 432 B.R. 135, 147 (Bankr. D. Del. 2010)

("The [account] is held solely in the name of the Debtor. As such the account and its funds are

property of the estate" under section 541(a) of the Bankruptcy Code").  Property titled to the

debtor is presumptively property of the estate and it is the burden of any purported trust

beneficiary to establish otherwise; the law requires parties claiming funds are impressed with a

trust to identify the specific funds purportedly placed in trust either by proving they have been

segregated from receipt or, if they have been commingled, to trace the trust funds under the

lowest-intermediate-balance test); *Catholic Diocese v. Official Comm. (In re Catholic Diocese),*

437 B.R. 488, 492 n.19 (Bankr. D. Del. 2010) ("It is the defendants' burden not the Committee's

to prove that funds in the Debtor's custody and control are not property of the estate.  This

includes proving that the funds were not commingled. They failed to meet that burden"). The

Boy Scouts must meet this double burden for each and every donation it contends is subject to a

donor restriction or impressed with a trust.[23]

---

(same); *Old Rep. Nat'l Title Ins. Co. v. Tyler (In re Dameron)*, 155 F.3d 718, 723 (4th Cir. 1998) (party claiming entitlement to a trust must be able to trace its assets into the fund or property that is the subject of the trust); *Danning v. Bozek (In re Bullion Reserve of North Am.)*, 836 F.2d 1214, 1218 (9th Cir. 1988) (tracing is required under federal bankruptcy law to further the Bankruptcy Code's policy of equal distribution among similarly situated creditors);. Whereas the first showing is generally a question of state law, the second showing, when it pertains to the distribution of assets from an entity in bankruptcy proceedings, is exclusively a question of federal law. *Goldberg*, 932 F.2d at 280; *see also Official Comm. v. Columbia Gas Sys. Inc. (In re Columbia Gas Sys. Inc.)*, 997 F.2d 1039, 1063 (3d Cir. 1993) (to protect interests of secured and unsecured creditors, federal law requires that beneficiaries of trust funds bear the burden of identifying and tracing trust property); *Dameron*, 155 F.3d at 723 (tracing is an issue of federal rather than state law).

[23] The analyses (and the Boy Scouts' burdens) are the same whether it contends the assets are donor restricted or held in trust. The Restatement (Third) of Trusts continues the approach in the Restatement (Second) of Trusts that a restricted gift to a corporate charity creates a trust. A comment in the Restatement (Third) of Trusts declares:

> An outright devisee or donation to a nonproprietary hospital or university or other charitable institution, expressly or impliedly to be used for its general purposes, is charitable but does not create a trust as that term is used in this Restatement. A disposition to such an institution for a specific purpose, however, such as to support medical research, perhaps on a particular disease, or to establish a scholarship fund in a certain field of study, creates a charitable trust of which the institution is the trustee for purposes of the terminology and rules of this Restatement.

Restatement 3d of Trusts § 28 (2012).

64.      In an effort to streamline the Restricted Property Action, the TCC has made repeated requests that the Boy Scouts inform it whether it intends to offer evidence at trial to meet its double burdens of proof or if it intends to attempt to convince the Court that Judge Sontchi's opinions should not be followed.  If the former, the TCC has requested the prompt production of the evidence that the Boy Scouts will rely on at trial to meet its burdens of proof. If the latter, the matter may be disposed of by summary judgment. To date, the Boy Scouts has refused to do either.

65.      This refusal, combined with the Boy Scouts attempt through the Confirmation Scheduling Motion, to force an unrealistically compressed schedule upon the TCC, is unfair and inappropriate.   As with the estimation proceedings, the schedule proposed by the Boy Scouts "squeezes" fact and expert discovery into a time frame that will not be possible to accomplish.[24] If the Boy Scouts is to meet its double burden of proof for the multiple accounts and hundreds of millions of dollars it contends are not property of the estate, vast amounts of proof and discovery will be required.  Expert analysis and testimony will be required for several issues, including analysis of any proposed tracing analysis of comingled funds by the Boy Scouts and the supporting financial records.  Accordingly, discovery and the offer of proof at trial will require far more time and resources of the parties then is contemplated by the Confirmation Scheduling Motion.

---

[24] In compliance with Delaware local rule 7016-2, the Tort Claimants' Committee will be filing a proposed scheduling order for the Restricted Property Action on May 14, 2021 which set forth a realistic proposed schedule which provides sufficient time for fact discovery, the expert report process and summary judgment motions to occur in a prompt, reasonable and fair time frame.  Bankr. D. Del. 7016-2.

## <u>CONCLUSION</u>

For all the foregoing reasons, the undersigned survivor groups respectfully request that

the Court enter its order denying the Confirmation Scheduling Motion and granting the survivor

groups such other and further relief as may be necessary or appropriate under the circumstances.

Date: May 12, 2021

**THE OFFICIAL COMMITTEE OF TORT CLAIMANTS**

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
James I. Stang (CA Bar No. 94435)
Malhar S. Pagay (CA Bar No. 189289)
James E. O'Neill (DE Bar No. 4042)
John W. Lucas (CA Bar No. 271038)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899 (Courier 19801)
Telephone: 302-652-4100
Facsimile: 302-652-4400
Email: jstang@pszjlaw.com
       mpagay@pszjlaw.com
       joneill@pszjlaw.com
       jlucas@pszjlaw.com

*Counsel for the Tort Claimants' Committee*

**COALITION OF ABUSED SCOUTS FOR JUSTICE**

MONZACK MERSKY BROWDER AND HOCHMAN, P.A.


*/s/ Rachel B. Mersky*
Rachel B. Mersky (DE No. 2049)
1201 North Orange Street, Suite 400
Wilmington, Delaware 19801
Telephone:  (302) 656-8162
Facsimile:  (302) 656-2769
E-mail:  rmersky@monlaw.com

– and –

BROWN RUDNICK LLP
David J. Molton, Esq.
Eric R. Goodman, Esq.
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Email: dmolton@brownrudnick.com
Email: egoodman@brownrudnick.com

– and –

Sunni P. Beville, Esq.
Tristan G. Axelrod, Esq.
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Email: sbeville@brownrudnick.com
Email: taxelrod@brownrudnick.com

– and –

ROBBINS, RUSSELL, ENGLERT, ORSECK, &
 UNTEREINER LLP
Lawrence S. Robbins
Ariel N. Lavinbuk
William J. Trunk
Joshua S. Bolian
2000 K Street NW, 4th Floor
Washington, DC 20006
Telephone: 202-775-4500
Email: lrobbins@robbinsrussell.com
 alavinbuk@robbinsrussell.com
 wtrunk@robbinsrussell.com
 jbolian@robbinsrussell.com

*Co-Counsel to the Coalition of Abused Scouts for
Justice*


**FUTURE CLAIMANTS' REPRESENTATIVE**

YOUNG CONAWAY STARGATT & TAYLOR,
LLP

*/s/ Robert S. Brady*
Robert S. Brady (Bar No. 2847)
Edwin J. Harron (Bar No. 3396)
Sharon M. Zieg (Bar No. 4196)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: rbrady@ycst.com
eharron@ycst.com
szieg@ycst.com

*Counsel to the Future Claimants' Representative*