**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | Jointly Administered |
| | Re:  Dkt. Nos. 2591, 2592, 2594, 2595 |

**CENTURY INDEMNITY COMPANY'S OBJECTIONS TO**
**THE DEBTORS' DISCLOSURE STATEMENT FOR THE**
**SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION**

STAMOULIS & WEINBLATT LLC
800 N. West Street
Third Floor
Wilmington, Delaware  19801

O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036-6537

*Counsel for Century Indemnity Company, as*
*successor to CCI Insurance Company, as successor*
*to Insurance Company of North America and*
*Indemnity Insurance Company of North America*

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are:  Boy Scouts of America (6300) and Delaware Boy Scouts, LLC (4311).

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................. 1

OBJECTION I.  THE APPROVAL HEARING MUST BE POSTPONED BECAUSE THE DISCLOSURE STATEMENT LACKS VITAL INFORMATION ABOUT THE CLAIMS AGAINST THE DEBTORS AND NON-DEBTORS TO BE RELEASED AND IS GROSSLY INCOMPLETE ................................................................. 5

    A.    The Court Should Not Consider the Disclosure Statement Before It Rules on the Pending Rule 2004 Motions And 2019 Motions and the Request for Relief to Allow Omnibus Objections to the POCs. .......... 6

    B.    A Hearing Is Premature Until the Debtors Disclose the Non-Debtor Local Councils and Chartered Organizations Who Ostensibly Are Contributing to the Plan, What They Are Contributing and Their SIR / Deductible Obligation ........................................................................ 8

    C.    Multiple Critical Plan Documents Have Still Not Been Filed, Making a Disclosure Statement Hearing Premature. ............................... 10

OBJECTION II. THE COURT SHOULD NOT APPROVE THE DISCLOSURE STATEMENT BECAUSE IT FAILS TO PROVIDE "ADEQUATE INFORMATION." ......................................................... 12

    A.    The Disclosure Statement Fails to Adequately Describe What BSA Did to Verify the Proofs of Claim. ........................................................... 13

    B.    The Disclosure Statement Fails to Adequately Disclose the Debtors' Available Assets and Expected Liabilities, the Settlement Trust, and Each Third Party Receiving a Release. ................................... 13

    C.    The Disclosure Statement Fails to Adequately Disclose the Necessity and Support for the Broad Releases Granted to Non-Debtors and the Risks Associated with Them. ....................................... 22

    D.    The Disclosure Statement Fails to Adequately Disclose the Necessity and Basis for the Breath of the Channeling Injunction and the Risk Associated with Its Inclusion in the Plan. .......................... 24

    E.    The Disclosure Statement Fails to Disclose Insurance Coverage Risks. ..................................................................................................... 25

    F.    The Disclosure Statement Fails to Disclose How Insurance Proceeds Will Be Utilized or the Risks Associated with It. ................... 27

    G.    The Disclosure Statement Fails to Explain the Terms of the Cooperation Agreement or the Risks Associated with It. ....................... 28

# TABLE OF CONTENTS
(continued)

**Page**

H.    The Disclosure Statement Fails to Confirm that the Debtors Will Assign the First Touch Encounter Agreement to the Settlement Trust and If They Do Not the Risks Associated with Their Action or Inaction. ............................................................................................ 29

I.    The Disclosure Statement Fails to Explain How Either Proposed Plan Will Treat SIRs and the Risks Associated with Failing to Properly Treat SIRs ................................................................................... 31

J.    The Disclosure Statement Fails to Explain the Treatment of Century's Secured Claim. ......................................................... 32

K.    The Disclosure Statement Fails to Explain the Judgment Reduction Clause in The Hartford Settlement or to Quantify its Impact. ................ 33

L.    The Disclosure Statement Fails to Disclose How Privileged Documents and Information Associated with the Defense of Abuse Claims will be Protected Post-Confirmation and the Risks Associated With Waiving Privilege. ....................................................... 34

M.    The Disclosure Statement Fails to Disclose Demands Made by the Coalition for Payments to their Professionals and State Court Counsel, Assurances Given and Impact on Formation of Plan. .............. 35

OBJECTION III. THE COURT CANNOT APPROVE THE DISCLOSURE STATEMENT BECAUSE IT DESCRIBES A PATENTLY UNCONFIRMABLE PLAN ..................................................................... 36

A.    The Proposed Plan Discriminates Against Insurers By Treating Them Far Differently Than Other Unsecured Creditors. ........................ 37

B.    The Proposed Plan Is Not Insurance Neutral. ......................................... 38

C.    The Proposed Plan Deprives Creditors of Statutory Rights .................... 42

D.    The Proposed Plan Was Not Proposed in Good Faith. ........................... 43

E.    The Proposed Plan Improperly Exculpates Multiple Parties .................. 45

RESERVATION OF RIGHTS ............................................................................. 47

CONCLUSION .................................................................................................... 47

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Century Glove, Inc. v. First Am. Bank of N.Y.*,
860 F.2d 94 (3d Cir. 1988) ................................................................. 22

*Hays & Co. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,
885 F.2d 1149 (3d Cir. 1989) ............................................................. 30

*In re Acemla De P.R. Inc.*,
No. 17-02021 ESL, 2019 Bankr. LEXIS 182 (Bankr. D.P.R. Jan. 22, 2019) ........... 7

*In re Am. Capital Equip., LLC*,
688 F.3d 145 (3d Cir. 2012) ........................................................ passim

*In re Armstrong World Indus., Inc.*,
348 B.R. 111 (D. Del. 2006) ............................................................. 37

*In re Bennett Paper Corp.*,
68 B.R. 518 (Bankr. E.D. Mo.1986) ..................................................... 23

*In re Blitz U.S.A., Inc.*,
Case No. 11-13603 (PJW) (Bankr. D. Del. Nov. 12, 2013) ............................. 40

*In re Cajun Elec. Power Coop., Inc.*,
230 B.R. 715 (Bankr. M.D. La. 1999) ................................................... 39

*In re Clamp-All Corp.*,
233 B.R. 198 (Bankr. D. Mass. 1999) .................................................... 5

*In re Combustion Engineering, Inc.*,
391 F.3d 190 (3d Cir. 2004) ........................................................ passim

*In re Cont'l Airlines*,
203 F.3d 203 (3d Cir. 2000) ........................................................ 21, 23

*In re Copy Crafters Quickprint, Inc.*,
92 B.R. 973 (Bankr. N.D.N.Y. 1988) .................................................... 13

*In re Crippin*,
877 F.2d 594 (7th Cir. 1989) ........................................................... 39

*In re Dakota Rail, Inc.*,
104 B.R. 138 (Bankr. D. Minn. 1989) ................................................... 13

*In re Ditech Holding Corp.*,
606 B.R. 544 (S.D.N.Y. 2019) .......................................................... 15

## TABLE OF CONTENTS
### (continued)

Page

*In re Felicity Assocs.*,
    197 B.R. 12 (Bankr. D. R.I. 1996) ........................................................................ 36

*In re Filex, Inc.*,
    116 B.R. 37 (Bankr. S.D.N.Y. 1990) ..................................................................... 36

*In re Flintkote Co.*,
    486 B.R. 99 (Bankr. D. Del. 2012), *aff'd*, 526 B.R. 515 (D. Del. 2014) ................................ 39

*In re Global Indus. Techs., Inc.*,
    645 F.3d 201 (3d Cir. 2011) ......................................................................... 39, 43

*In re Harman*,
    No. 04-17195–WHD, 2006 WL 6591823 (Bankr. N.D. Ga. Oct. 12, 2006) ............................ 29

*In re Kaiser Aluminum Corp.*,
    456 F.3d 328 (3d Cir. 2006) ......................................................................... 43, 45

*In re Kiklis*,
    352 B.R. 355 (Bankr. D. Mass. 2006) ....................................................................... 8

*In re Lehman Bros. Holdings Inc.*,
    435 B.R. 122 (S.D.N.Y. 2010) ............................................................................. 14

*In re Main St. AC, Inc.*,
    234 B.R. 771 (Bankr. N.D. Cal. 1999) ..................................................................... 36

*In re Medley*,
    58 B.R. 255 (Bankr. E.D. Mo. 1986) .................................................................... 5, 13

*In re Metrocraft Pub. Servs., Inc.*,
    39 B.R. 567 (Bankr. N.D. Ga. 1984) ....................................................................... 13

*In re Pettibone Corp.*,
    162 B.R. 791 (Bankr. N.D. Ill. 1994) ..................................................................... 32

*In re Pittsburgh Corning Corp.*,
    453 B.R. 570 (Bankr. W.D. Pa. 2011) .............................................................. 38, 40, 41

*In re RADCO Props., Inc.*,
    402 B.R. 666 (Bankr. E.D.N.C. 2009) ...................................................................... 7

*In re Rosenblum*,
    No. 18-17155-MKN, 2019 Bankr. LEXIS 2278 (Bankr. D. Nev. July 15, 2019) ..................... 7

# TABLE OF CONTENTS
(continued)

Page

*In re Scioto Valley Mortg. Co.*,
88 B.R. 168 (Bankr. S.D. Ohio 1988)................................................................ 12, 13, 15

*In re SPM Mfg. Corp.*,
984 F.2d 1305 (1st Cir. 1993) ........................................................................ 39

*In re Stewart Foods, Inc.*,
64 F.3d 141 (4th Cir. 1995) ........................................................................... 31

*In re Superior Air Parts, Inc.*,
486 B.R. 728 (Bankr. N.D. Tex. 2012).............................................................. 31

*In re Thorpe Insulation Co.*,
677 F.3d 869 (9th Cir. 2012) ....................................................................... 26, 39

*In re Tribune Co.*,
972 F.3d 228 (3d Cir. 2020) ......................................................................... 37

*In re Washington Mut., Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) ................................................................ 23

*In re WL Homes LLC*,
563 B.R. 512 (Bankr. D. Del. 2017) ................................................................ 32

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
337 F.3d 314 (3d Cir. 2003) .......................................................................... 20

*Moody v. Amoco Oil Co.*,
734 F.2d 1200 (7th Cir. 1984) ....................................................................... 39

*Ryan Ops. G.P. v. Santiam-Midwest Lumber Co.*,
81 F.3d 355 (3d Cir. 1996) ........................................................................... 12

*United Artists Theatre Co. v. Walton*,
315 F.3d 217 (3d Cir. 2003) .......................................................................... 21

*Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.)*
293 B.R. 489 (B.A.P. 9th Cir. 2003) ................................................................. 7

**Statutes**

11 U.S.C. § 1109(b) ...................................................................................... 42, 43

11 U.S.C. § 1125(a) .................................................................................. 12, 20, 22

11 U.S.C. § 1126(c) ......................................................................................... 44

**TABLE OF CONTENTS**
(continued)

**Page**

11 U.S.C. § 1129(a)(3)...........................................................................................39, 43

11 U.S.C. § 327(a) ...................................................................................................... 46

**Other Authorities**

Lawrence P. King, *7 Collier on Bankruptcy* (15th Ed. Rev. 2004) ............................ 36

S.R. 95-989, 124 Cong. Rec., 95th Cong. 2d Sess....................................................... 22

Century Indemnity Company ("Century"), as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America, respectfully submits the following objections to the Debtors' proposed Disclosure Statement for the Second Amended Chapter 11 Plan of Reorganization for Boys Scouts of America and Delaware BSA, LLC (the "Disclosure Statement") (the "Proposed Plan").[2]

## PRELIMINARY STATEMENT

The Plan and Disclosure Statement are fundamentally flawed in two key respects:  (i) the Debtors have effectively forfeited defending themselves against flawed and fraudulent claims, creating a moral hazard that has led to a flood of invalid and questionable claims, and (ii) the disclosure of key issues affecting creditors continues to be lacking.  For all their touting of the mediation process, the Debtors have systematically excluded Century from all negotiations over the Trust Distribution Procedures and the plan.  They have met with the TCC and the Coalition without any insurer representation, allowing them to have outsized influence on the formulation of the plan structure and post-bankruptcy claims allowance process.  They now propose paying holders of Abuse Claims $1,500—no questions asked—in a brazen vote-buying scheme that only exacerbates the moral hazards that have infected these cases from the outset.  The outcome of this rigged approach is a Disclosure Statement that is misleading and incomplete and a Plan that cannot be confirmed.  The Court should reject the Disclosure Statement.

A hearing on the Debtors' proposed Disclosure Statement is premature.  The version filed by the Debtors is missing some of its most critical terms—namely, the list of Local Councils and Contributing Chartered Organizations and the Cooperation Agreement—and without these attachments, creditors cannot gain even a basic understanding of who would be released if the

---

[2]    *See* Dkt. No. 2594 (Disclosure Statement); Dkt. No. 2592 (Proposed Plan).  Unless otherwise indicated, docket cites refer to the docket in *In re: Boy Scouts of America*, No. 20-10343 (Bankr. D. Del.), all emphasis is added, and all citations, quotations, and footnotes are omitted.

Proposed Plan were approved as a Global Resolution Plan.[3]  If, by contrast, the Proposed Plan were approved as a BSA Toggle Plan, creditors lack any blueprint for determining which claims they would need to pursue in the tort system, how the existing non-debtor cross claims would be handled, and how the various conflicts between the Debtors and the Local Councils and Chartered Organizations would be handled—issues that the yet-to-be-filed Cooperation Agreement must address.  Without these attachments, a hearing on the Disclosure Statement would be a futile exercise.

Should the Court move forward with the hearing, the Debtors' proposed Disclosure Statement should be rejected because it lacks critical information necessary for claimants to make an informed judgment about the Proposed Plan.  Most critically, the Disclosure Statement fails to adequately describe the available assets and expected liabilities of the Debtors, the Settlement Trust, and the unidentified third parties slated to receive releases under the proposed Global Resolution Plan.

As a result, claimants are unable to determine (i) whether the Debtors and those third parties will make sufficient contributions to the Settlement Trust to justify the proposed releases; (ii) the value of the assets that will be available to the Settlement Trust if the proposed Global Resolution Plan is confirmed; (iii) the number of Abuse Claims that the Debtors anticipate will qualify for payment under the Trust Distribution Procedures; and (iv) the likely recovery by any individual Non-Settling Insurer or Abuse Claimant who submits a claim to the Settlement Trust. Absent this basic information, parties are left to guess whether the proposed Global Resolution Plan will be in their best interest or if they would be better off pursuing claims directly against the Local Councils and Chartered Organizations, who remain solvent and have substantial assets.

---

[3]    Capitalized terms not defined herein have the meaning set forth in the Debtors' Disclosure Statement and/or Proposed Plan.

Other deficiencies abound.  The Disclosure Statement contains an impermissibly broad release, encompassing claims having nothing to do with scouting activities, and protecting various non-debtor third parties without explaining why such non-debtor parties are entitled to be released.  This release contravenes well-established precedent and must be stricken.  The proposed Channeling Injunction would also enjoin claims having little or nothing to do with the Boy Scouts, but nowhere does the Disclosure Statement mention this fact.  Further, the Disclosure Statement fails to disclose material risks related to insurance coverage, thereby withholding key information that could profoundly affect potential distributions to Abuse Claimants under the Trust Distribution Procedures.  For example, the Disclosure Statement does not disclose the substantial risk that the proposed assignment of the Debtors' insurance policies to the Settlement Trust would violate those policies' anti-assignment provisions, nor does it mention the numerous aspects of the Proposed Plan on which the Debtors have refused to cooperate with insurers.

The Disclosure Statement also fails to explain how potential insurance proceeds would be utilized by the Settlement Trust, including the possibility that such proceeds would go toward administrative expenses.  What's more, the Disclosure Statement promises that a Cooperation Agreement will govern the terms of cooperation between the Debtors and the Settlement Trust— a relationship critical to the efficient resolution of Abuse Claims—but it fails to include that agreement or even to generally describe its contents.  The Disclosure Statement is also silent on the Debtors' intentions with respect to the First Encounter Agreement, a 1996 agreement that could have significant ramifications for insurance coverage; because the Debtors and—if the Global Resolution Plan is approved, the non-debtors—intend to assign their insurance rights to

the Settlement Trust, the Settlement Trust should similarly be bound by the First Encounter Agreement.

Making matters worse, the Disclosure Statement fails to explain whether self-insured retentions ("SIRs") will be honored or applied under the Proposed Plan, leaving insurers in the dark and leaving creditors with the prospect of absorbing the first $1 million before accessing excess coverage.  Further, the Disclosure Statement offers no explanation of how Century's secured claim would be treated (nor those of other, similarly situated insurers).  Finally, it neglects to explain the impact that the judgment reduction clause in the Hartford Settlement will have on the Debtors and the Settlement Trust.  For each of these reasons, the Disclosure Statement fails to provide "adequate information" for claimants to make an informed decision about the Proposed Plan, and must be rejected under section 1125(b) of the Bankruptcy Code.

The Court should also reject the Disclosure Statement on the ground that it describes a patently unconfirmable plan.  The Third Circuit has repeatedly made clear that courts should reject a disclosure statement if the underlying plan has no hope of confirmation, as is the case here.  Indeed, the Proposed Plan unfairly discriminates against the Debtors' insurers, is not insurance neutral, deprives creditors of their rights, creates perverse incentives that the drafters of the Bankruptcy Code sought to prevent, and oversteps by improperly exculpating the Debtors' attorneys despite the Bankruptcy Court and District Court expressing preserving Century's claims against Sidley Austin.

Unless modified, the Proposed Plan has no hope of confirmation and should not be permitted to move beyond the disclosure statement phase.

**OBJECTION I.**

**THE APPROVAL HEARING MUST BE POSTPONED BECAUSE THE DISCLOSURE STATEMENT LACKS VITAL INFORMATION ABOUT THE CLAIMS AGAINST THE DEBTORS AND NON-DEBTORS TO BE RELEASED AND IS GROSSLY INCOMPLETE.**

Bankruptcy Rule 3017(a) requires at least 28 days' notice for a disclosure statement hearing after a complete disclosure.  By failing to describe any of the problems with the proofs of claim and the pending 2004 and 2019 motions, essential information about the scope and nature of the claims is lacking.  Equally important, BSA has failed to even identify the non-debtors to be released.  Rule 3017(a)'s 28-day-notice requirement has not started to run here because both the Plan and Disclosure Statement are missing vital information.  Per Rule 3017(d)'s Advisory Committee Notes, "Section 1125(c) of the Code requires that *the entire approved disclosure statement* be provided in connection with voting on a plan."  As only an incomplete disclosure statement was filed, the "entire disclosure statement" required by Section 1125(c)  to trigger Rule 3017(a)'s notice has not been met.

Here, a hearing on the Disclosure Statement is premature because the Disclosure Statement lacks material information absent which the Court, as a matter of law, could not order approval.  *In re Medley*, 58 B.R. 255, 256 (Bankr. E.D. Mo. 1986) (holding that a disclosure statement would not be approved where it was a "superficial outline" that did not provide creditors with material information); *see also In re Clamp-All Corp.*, 233 B.R. 198, 206 (Bankr. D. Mass. 1999) ("the hearing on approval of the disclosure statement gives interested parties the opportunity to challenge certain statements or information *contained* in the disclosure statement").

**A.     The Court Should Not Consider the Disclosure Statement Before It Rules on the Pending Rule 2004 Motions And 2019 Motions and the Request for Relief to Allow Omnibus Objections to the POCs.**

A hearing to approve a Disclosure Statement before the Court has ruled on Century's Rule 2004 and 2019 motions and its motion for relief from Local Rule 3007-1(f) is premature. Multiple declarations and dozens of exhibits were admitted into evidence uncontested in support of these motions demonstrating systemic abuse in how the proofs of claim were generated.[4]  This uncontested evidence establishes forged signatures, attorney signatures affixed in mass to proofs of claim by third parties, and the pervasive use of for-profit aggregators in the generation and preparation of the proofs of claim in violation of Federal Rule of Bankruptcy Procedure 3001(c).[5]

While disclosure statements have been approved in circumstances where there are issues with respect to individual claims, in such cases, the debtor and other parties in interest are aware of and have evaluated the scope of the estate's liabilities prior to solicitation.  Not so here.

The Tort Committee and the plaintiff law firms behind it have refused to provide any of the information sought by Century regarding the unexpectedly high number of claims filed against the Debtors.[6]  The Debtors have done nothing to investigate the merits of the proofs of claims or how they were generated, although the number of claims, in the aggregate or 55 times greater than the Debtors anticipated in its first day filing.  This leaves the Debtors with only the anecdotal information and that information is not disclosed in the Disclosure Statement.

---

[4]     *See e.g.*, Feb. 17, 2021 Hr'g Tr. at 16-18, 139-42, 146-48; *see also* Dkt. Nos. 1165 (Declaration of J. Panchok-Berry), 1267 (Declaration of T. Schiavoni), 1972-4 and -5 (Declarations of T. Mercier and J. Weinberg), 1975-1, -3, and -4 (Declarations of A. Kirshenbaum, P. Hinton, and E. Speckin), 2030-02 (Declaration of S. Zaslavsky), 2173 (Declaration of A. Kirschenbaum), 2174 (Supplemental Declaration of P. Hinton), 2175 (Declaration of E. Speckin), 2177 (Declaration of C. Fox).

[5]     *See supra* fn. 4.

[6]     *See, e.g.,* Dkt. Nos. 2043, 2046, 2048, 2053-54, 2059, 2060-62, 2066, 2069, 2074-2108, 2117, 2135, 2142-43, 2184, 2196, 2217

The Disclosure Statement does not—and cannot—account for anywhere near the accurate number and scope of viable abuse claims because this information will not be available until after the Rule 2004 motions are granted, discovery is taken, and omnibus objections are filed. The Disclosure Statement is equally devoid of meaningful information on how meritless and legally invalid claims will be sorted out under the Proposed Plan. The Debtors set out no criteria for disallowing claims or addressing deficiencies. To the contrary, the Debtors offer to pay every claim regardless of their validity in seeking votes in favor of their Plan, without explanation of the potential impact on claim recovery.

Claimants should not be left to guess whether the terms of the Plan are prejudicial to their interests or the degree to which payments on valid claims will be diluted by payments of invalid claims. Providing information on the number and scope of the claims against the estate only after approval of the Disclosure Statement and solicitation is grossly inadequate and prejudicial, especially for a plan of this complexity when there is no substantive disclosure of the criteria to disallow claims. *See In re Rosenblum*, No. 18-17155-MKN, 2019 Bankr. LEXIS 2278, at *16– 17 (Bankr. D. Nev. July 15, 2019) (rejecting disclosure statement because debtor's failure to represent accurately all claims against the estate was "misleading to all other creditors that might be entitled to vote to accept or reject his proposed plan of reorganization") (citing *Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.)*, 293 B.R. 489, 497 (B.A.P. 9th Cir. 2003); *In re Acemla De P.R. Inc.*, No. 17-2021 ESL, 2019 Bankr. LEXIS 182, at *60 (Bankr. D.P.R. Jan. 22, 2019) (rejecting disclosure statement because, among other reasons, the debtor did "not even mention[]" a risk the creditors faced if approved) (citing *In re RADCO Props., Inc.*, 402 B.R. 666, 682 (Bankr. E.D.N.C. 2009) ("Creditors not only rely on the disclosure statement to form their ideas about what sort of distribution or other assets they will receive but also what

risks they will face.")); *In re Kiklis*, 352 B.R. 355, 360 (Bankr. D. Mass. 2006) (sustaining objection because "the Disclosure Statement is insufficient in that it does not provide [a creditor] any information regarding the proposed treatment of that portion of its claim that is unsecured").

Information on the number and scope of claims and the criteria to disallow claims is so critical to the Plan that this information should have been provided when the Disclosure Statement was filed.  As the Plan is missing this core information, the Disclosure Statement cannot lawfully be set for hearing until Rule 2004 discovery is completed and omnibus objections are filed.

**B.      A Hearing Is Premature Until the Debtors Disclose the Non-Debtor Local Councils and Chartered Organizations Who Ostensibly Are Contributing to the Plan, What They Are Contributing and Their SIR / Deductible Obligation.**

The Disclosure Statement fails to identify the non-debtor Local Councils and Chartered Organizations that will contribute to the Plan, despite the Plan contemplating a broad release of these Local Councils and Chartered Organizations if it is approved as a Global Resolution Plan.[7] Neither the Disclosure Statement nor the Proposed Plan disclose what Local Councils have offered to contribute to the Settlement Trust or how much any individual Local Council has offered to pay.[8]  Nor does the Plan and Disclosure Statement identify which, if any, Chartered Organizations will contribute to the Settlement Trust.  Without identification of non-debtor entities that are willing to contribute nd how much, no party in interest can possibly make an informed judgment about the contribution of any particular entity.  It is not even apparent what

---

[7]    *See* Disclosure Statement at 122 [Dkt. No. 2594].
[8]    The Disclosure Statement says that the Debtors "are committed to ensuring" that the Local Councils' aggregate contribution "is not less than $425,000,000," but the Debtors do not identify which Local Councils will contribute to the Settlement Trust or how much.  *See* Disclosure Statement at 14 [Dkt. No. 2594].

total amount will be contributed by these non-Debtors to the Settlement Trust as no amount is attributed to any particular Chartered Organization or to Chartered Organizations in general.[9]

What's more, these non-debtor Local Councils and Chartered Organizations have lodged a host of cross claims against each other and BSA; if the Proposed Plan is approved as a BSA Toggle Plan, the Plan will address their claims against BSA only, leaving claimants to pursue all the Local Councils and Chartered Organizations in the tort system.  The resulting claims will in turn give rise to claims by the non-debtor Local Councils and Charter Organizations against each other and against BSA.[10]  Even under the Global Resolution Plan, there is no resolution for the unidentified non-Contributing Chartered Organizations leaving these non-debtor entities with their claims back against BSA.

Under this structure, the dollar amount of the SIR/deductible obligation that each of the non-debtor Local Councils and Chartering Organizations entities will have or are projected to have under each of the two plan options is important to know.  However, it is not disclosed. Nor is anything disclosed to explain how these obligations between non-debtors will be handled. This information should be disclosed.

It is impossible to assess the extent of these unresolved cross claims, how such claims will be handled (if at all), and by whom, without disclosure of the non-debtor Local Councils and Chartered Organizations that will contribute to the Plan and the amount of their contributions.

---

[9] The Disclosure Statement contains no information on the Contributing Chartered Organizations, and the Debtors do not even propose to identify them until they file plan supplements.  *See* Proposed Plan at 12, § I.A.65-66, Exs. C & D.

[10] *See, e.g., Boy Scouts of America v. A.A.*, Case No. 20-10343 (LLS), Dkt. No. 152 (Century's Joinder in Support of the Unopposed Relief Requested by BSA's Motion to Extend the Preliminary Injunction) (citing to proofs of claims filed by the Church of Jesus Christ of Latter Day Saints ("LDS") and other Chartered Organizations, including POC Nos. 1248, 5261, 5687, 5763, 5970, 5986, 5991, 5830, 7296, 7330, 7781, 12179, 10648, 12716, and 12180.

### C.    Multiple Critical Plan Documents Have Still Not Been Filed, Making a Disclosure Statement Hearing Premature.

A hearing is also premature because the Debtors have not filed a host of Plan documents vital to understanding how claims will be handled with BSA ostensibly protected by the Plan while Local Councils and Chartering Organization remain unprotected.  Article VII.A.18 of the Disclosure Statement provides that the Debtors and the Settlement Trust "shall enter into the Cooperation Agreement on the Effective Date substantially in the form contained in the Plan Supplement."[11] *The Debtors have not yet filed the Plan Supplement.*  Creditors thus have no ability to understand how the Cooperation Agreement will require the Debtors to work with the Settlement Trust in the handling, defense, and prosecution of claims against the Debtors, Local Councils, and Sponsoring Organization.

Without the Cooperation Agreement, it is impossible to assess how the myriad conflicts among the Debtors, Local Councils, and Chartered Organizations will be handled under either the Global Resolution Plan or the Toggle Plan.  The Local Councils and Contributing Chartered Organizations contend that BSA has contractual indemnity obligations and other agreements that obligate BSA to defend and protect them.[12]  Further complicating matters, the Contributing Chartered Organizations claim an interest in the insurance policies held by the Local Councils and the Debtors.[13]  Elsewhere, but nowhere in the Disclosure Statement, the Debtors have acknowledged the gravity of these issues.  Apr. 12, 2021 Hr'g Tr. at 9:16–19 ("We would have certainly complications with our insurance, due to the shared insurance features of BSA's

---

[11]    Disclosure Statement at 140 [Dkt. No. 2594].

[12]    *See, e.g.*, Dkt. No. 3273 (LDS' objection to the Disclosure Statement) (arguing that the Proposed Plan is patently unconfirmable because it "may eradicate BSA's indemnity obligations" and the "Disclosure Statement's description of the Church's indemnity rights is inadequate"); *see also supra* fn. 10.

[13]    *See, e.g.*, Dkt. No. 3273 (LDS' objection to the Disclosure Statement) (arguing that the Proposed Plan and Disclosure Statement fails to provide adequate information regarding the Church's rights under the BSA's and Local Councils' insurance policies); *see also supra* fn. 10.

insurance program"). The Cooperation Agreement is plainly vital to any assessment of the conflicts and competing interests represented by the Proposed Plan, but the Debtors have withheld these critical terms.

In addition, the Disclosure Statement refers repeatedly to the "Settlement Trustee," but fails to identify this individual or how he or she will be selected. And the Proposed Plan merely states that "[t]he initial Settlement Trustee shall be the Person identified in the Plan Supplement,"[14] which the Debtors have yet to file. The Disclosure Statement likewise is silent as to the composition of the Trust Advisory Committee or how it will be selected. The Debtors do not propose to identify these individuals until after the hearing to approve the Disclosure Statement.[15] But these individuals—and how they are to be selected—play a vital role in determining how the conflicts posed by the Local Councils and the Chartering Organizations remaining in the tort system are handled, thus making this information highly material. The Disclosure Statement is grossly incomplete in this respect, further making a hearing premature.

Lastly, attached as Addendum A is a list of other documents that the Debtors do not propose to disclose until the Plan Supplement deadline, including, Amended BSA Bylaws, Assumed Contracts and Unexpired Leases Schedule, Creditor Representative, Directors and Officers of Reorganized BSA, Foundation Loan Agreement, Leaseback Requirement Agreement, Rejected Contracts and Unexpired Leases Schedule, Restated 2010 Bond Documents, Restated 2012 Bond Documents, Restated Credit Facility Documents, and Restated Security Agreement.[16]

---

[14]    Proposed Plan at 50 [Dkt. No. 2592].
[15]    *See, e.g.*, Proposed Plan at vii [Dkt. No. 2592].
[16]    *See* Addendum A; *see also* Proposed Plan at vii [Dkt. No. 2592].

**OBJECTION II.**

**THE COURT SHOULD NOT APPROVE THE DISCLOSURE STATEMENT BECAUSE IT FAILS TO PROVIDE "ADEQUATE INFORMATION."**

Section 1125(b) of the Bankruptcy Code requires that a disclosure statement contain "adequate information," which the Code defines as "information of a kind, and in sufficient detail … that would enable … a hypothetical investor of the relevant class to make an ***informed judgment*** about the plan." *See* 11 U.S.C. § 1125(a). The provision of adequate information in a disclosure statement is a key requirement of the Bankruptcy Code. *See also Ryan Ops. G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) ("the importance of full and honest disclosure cannot be overstated."). "The disclosure statement was intended by Congress to be the primary source of information upon which creditors and shareholders could rely in making an informed judgment about a plan of reorganization." *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170 (Bankr. S.D. Ohio 1988). Plan proponents bear the burden of establishing that the disclosure statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code. *See, e.g., In re Am. Capital Equip., LLC*, 688 F.3d 145, 155 (3d Cir. 2012) ("The debtor has the burden of proving that a disclosure statement is adequate").

Here, the Debtors' Disclosure Statement fails to satisfy the § 1125 standard for multiple reasons and therefore cannot be approved.

The Disclosure Statement Fails to Adequately Describe the Available Assets and Expected Liabilities of the Debtors, the Settlement Trust, and Each Third Party Receiving a Release

**A.    The Disclosure Statement Fails to Adequately Describe What BSA Did to Verify the Proofs of Claim.**

The Disclosure Statement fails to provide any information about what BSA did to verify the Proofs of Claim.   BSA says that Bate White assumed different levels of invalid claims.  But it does disclose what BSA did, if anything, to investigate the claims.

**B.    The Disclosure Statement Fails to Adequately Disclose the Debtors' Available Assets and Expected Liabilities, the Settlement Trust, and Each Third Party Receiving a Release.**

The Disclosure Statement fails to provide adequate information about the Debtors' available assets and expected liabilities, the Settlement Trust, and which third parties would be released under the proposed Global Resolution Plan.  *See In re Scioto Valley Mortg. Co.*, 88 B.R. at 170–71 (holding that a disclosure statement must provide, *inter alia*, (i) a "complete description of available assets and their value," (ii) "[i]nformation regarding claims against the estate," and (iii) "financial information . . . that would be relevant to creditors' determination to accept or reject plan."); *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988) (citing favorably to *Scioto* and its factors); *In re Metrocraft Pub. Servs., Inc.,* 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984) (adopting substantially similar test); *In re Dakota Rail, Inc*., 104 B.R. 138, 142–43 (Bankr. D. Minn. 1989) (same); *see also In re Medley*, 58 B.R. at 256 (holding that a disclosure statement constituting a "superficial outline" that failed to provide creditors with material information could not be approved).

**The Debtors' Assets and Liabilities**.  Although the Disclosure Statement provides that the BSA Settlement Trust Contributions has a total estimated value of $115.6 million,[17] it contains inadequate disclosures concerning the Debtors' assets and liabilities that render the Disclosure Statement wholly deficient.

---

[17]    Disclosure Statement at 14 [Dkt. No. 2594].

**Inadequate Disclosures Concerning the Debtor's Assets.** The Disclosure Statement provides that "certain property listed on the BSA's balance sheet (the 'Identified Property') is legally protected under applicable laws governing charities and other non-profit organizations and, therefore, not available to satisfy certain creditors' Claims."[18] Specifically, the Debtors assert that:

> the Identified Property is not available to satisfy certain Claims against the Debtors for one or more of the following reasons: (i) it is subject to donors' restrictions on use and purpose; (ii) it is core to the BSA's charitable mission and Scouting program; (iii) it is held in an implied charitable trust; (iv) it is part of a charitable trust that can only be used in fulfillment and furtherance of the BSA's charitable mission; (v) selling or liquidating the Identified Property would violate the D.C. Nonprofit Corporation Act; (vi) selling or liquidating the Identified Property contradicts the Bankruptcy Code's treatment of charitable organizations; or (vii) it is otherwise not property of the estate under applicable law.[19]

Yet nowhere in the Disclosure Statement do the Debtors actually identify the Identified Property (thus making the Debtors' chosen nomenclature quite oxymoronic). Nor do the Debtors disclose the value of the Identified Property, how they arrived at that value, or the reason that each specific piece of property is supposedly unavailable to satisfy Abuse Claims against the Debtors. As a result, claimants are unable to assess the validity of the Debtors' position or make an informed judgment as to whether the Debtors' proposed contribution to the Settlement Trust is fair and equitable given the value and nature of the Identified Property. *See, e.g., In re Lehman Bros. Holdings Inc.*, 435 B.R. 122, 134 (S.D.N.Y. 2010) (in determining whether a compromise should be approved, the court must determine whether it is "fair and equitable.").[20]

---

[18]   Disclosure Statement at 35 [Dkt. No. 2594].

[19]   *Id.* at 36.

[20]   The Debtors have also failed to make a showing, in the Disclosure Statement or elsewhere, that the Proposed Plan meets the requirements of section 1129(a)(7) of the Bankruptcy Code (the "Best Interests Test"). That section requires that, to confirm a plan, creditors must receive at least as much as they would in a chapter 7 liquidation. The Debtors bear the burden of satisfying the Best

Claimants are also unable to assess the value of significant assets that the Debtors propose contributing to the Settlement Trust.  For example, the Disclosure Statement lists "Warehouse and Distribution Center" as an asset that the Debtors will contribute, attributing to it a value of $11.5 million.[21]  But this comes with a caveat:  the Warehouse and Distribution Center is "[s]ubject to [a] Leaseback Requirement from the Settlement Trust."[22]  Yet, as of today, the Debtors have not filed the Leaseback Requirement Agreement, and the Proposed Plan contains only a cursory description of it, stating that the Reorganized Debtor must be entitled to lease the property for fair market value and that any sale must be subject to such right to lease.[23]  In other words, the Debtors are offering to contribute an *encumbered* asset but are valuing it in the Disclosure Statement as if it were *unencumbered*.  Without the Leaseback Requirement Agreement, creditors have no way of assessing the Debtors' valuation or discerning how that agreement will affect a sale of the property and the distributions by the Settlement Trust.

**Inadequate Disclosures Concerning Liabilities.**  The Disclosure Statement also fails to disclose sufficient "information regarding claims against the estate."  *In re Scioto Valley Mortg. Co.*, 88 B.R. at 170.  As the Court is aware from the parties' prior submissions, there is strong evidence that many of the more than 96,000 Abuse Claims filed to date are duplicative or otherwise invalid.[24]  The Disclosure Statement seemingly acknowledges this fact, confirming

---

Interests Test.  *In re Ditech Holding Corp.*, 606 B.R. 544, 606–607 (S.D.N.Y. 2019).  Here, they have not met this burden because the Disclosure Statement offers no data or analysis to suggest that creditors would receive at least as much under the Proposed Plan as they would in liquidation.  Moreover, the Debtors have not disclosed, either in the liquidation analysis or the Disclosure Statement, how they intend to satisfy this test.  Considering the Debtors' decision not to disclose the value of the Identified Property, as well as the lack of any analysis on the overall number of legitimate claims against the estate, this deficiency is particularly glaring and renders the Disclosure Statement inadequate.

[21]    Disclosure Statement at 14 [Dkt. No. 2594].

[22]    *Id.* at 14 n.10.

[23]    Proposed Plan at 22 [Dkt. No. 2592].

[24]    *See, e.g.*, Insurers' Mot. For an Order Authorizing Rule 2004 Discovery of Certain Proofs of Claim at 1–4, 9–15 [Dkt. No. 2022-1].

that the Debtors' Abuse Claims consultant, "expects that some portion of submitted Abuse

Claims will … be disallowed for containing insufficient or deficient information."[25]  Yet in the

absence of rulings on Century's Rule 2004 motions and the results of discovery they seek, the

Disclosure Statement provides no assessment of the degree to which the claims are invalid—nor

could it—thus leaving claimants with no way to estimate how many Abuse Claims will

ultimately be allowed under the Trust Distribution Procedures.  Indeed, in response to insurers'

concerns, the Debtors offer no coherent mechanism for filtering out invalid claims:

> [T]he BSA's insurers have questioned the validity of certain of the Abuse Claims
> based on the manner in which large groups of the Abuse Claims were recruited.
> While [the Debtors' Abuse Claims consultant] attempted to account for these
> issues via the implementation of various assumed claim rejection rates, the actual
> rate is not certain."[26]

Based on the information in the Disclosure Statement and absent rulings on Century's

Rule 2004 motions and the discovery they seek regarding information about the total number of

*legitimate* claims against the estate, claimants are unable to make an informed judgment about

the Settlement Trust's likely distributions and cannot cast an informed vote on the Proposed

Plan.

The Disclosure Statement also lacks critical information about *who* will review the Abuse

Claims once they are assigned to the Settlement Trust.  The Disclosure Statement refers

repeatedly to the "Settlement Trustee" but fails to identify this individual or how he or she will

be selected.  And the Proposed Plan merely states that "[t]he initial Settlement Trustee shall be

the Person identified in the Plan Supplement,"[27] which the Debtors have yet to file.  This Court

addressed a similar issue in *Imerys*, where it questioned whether this information should have

been disclosed ahead of voting on the plan.  *See* Case No. 19-10289, Jan. 12, 2021 Hr'g Tr. at

---

[25]    Disclosure Statement at 62 [Dkt. No. 2594].
[26]    *Id.*
[27]    Proposed Plan at 50 [Dkt. No. 2592].

16

196:26–197:1, 200:3–8 (Court asking when the trustee is going to be identified after the U.S.

Trustee lamented that the "Disclosure Statement … still do[es] not tell us who the trustee will

be").  Given the Coalition of Abused Scouts for Justice's ("Coalition") representatives'

involvement in filing of tens of thousands of duplicative and/or invalid Abuse Claims,

empowering them to reconcile those claims would leave the proverbial fox in charge of the

henhouse.  The Debtors must disclose who will be responsible for claims reconciliation so that

creditors can assess whether the reconciliation will be done fairly and objectively.

**The Settlement Trust's Assets and Liabilities Under the Global Resolution Plan**.

The Debtors' Global Resolution Plan contemplates the following contributions to the Settlement

Trust in addition to the approximately $115.6 million in contributions from the Debtors:  (i) a

"substantial contribution" from unidentified Local Councils, which "the Debtors are committed

to ensuring is not less than $425,000,000," (ii) the assignment and transfer of insurance rights,

which could include Insurance Settlement Agreements, and (iii) unidentified "substantial

contributions" from unidentified Chartered Organizations that seek to resolve the Abuse Claims

against them.[28]  These vague and nebulous descriptions of the assets that may be available to the

Settlement Trust post-confirmation, however, do not provide claimants with adequate

information to make an informed decision when voting on the Proposed Plan.  Indeed, claimants

are left to guess *who* might contribute to the Settlement Trust and *how much* they might

contribute—a problem that is compounded by the fact that, as discussed above, the Disclosure

Statement provides no information on the anticipated number of valid Abuse Claims to be

assigned to the Settlement Trust.  The Debtors' failure to disclose this critical information

precludes anyone from assessing the Debtors' estimates of the Abuse Claimants' expected

recovery or formulating their own estimates—***which any reasonable claimant would want to do***

---

[28]     Disclosure Statement at 14 [Dkt. No. 2594].

***before voting on a Proposed Plan that would cut off their right to assert claims against solvent third parties, including the Local Councils and Chartered Organizations.***

For example, while the Disclosure Statement says that the Debtors "are committed to ensuring" that the Local Councils' aggregate contribution "is not less than $425,000,000,"[29] the meaning of that commitment is unclear. It expresses a hope, not a certainty. The Local Councils are not plan sponsors and have made no binding commitment to pay even that amount.[30] Moreover, even if the Disclosure Statement's single sentence could be construed as a binding commitment, nowhere in the Proposed Plan or Disclosure Statement do the Debtors identify which Local Councils have agreed to contribute to the Settlement Trust or how much. Claimants with claims against specific Local Councils thus have no way of determining whether they would be better off seeking a recovery from the Settlement Trust or voting against the Proposed Plan and pursuing a recovery from the Local Councils directly.

The Disclosure Statement likewise contains no information concerning any Contributing Chartered Organizations that would be making contributions to the Settlement Trust. "Contributing Chartered Organization Settlement Contribution" includes "the contributions to the Settlement Trust by the Contributing Chartered Organizations, as set forth in Exhibit C,"[31] and "Contributing Chartered Organizations" refers to the "Chartered Organizations listed on Exhibit D hereto."[32] Yet the Debtors have not attached either Exhibit C or Exhibit D to the

---

[29]     *Id.*

[30]     *See id.* at 184 ("If the Plan is confirmed as a Global Resolution Plan, it contemplates participation by the Local Councils and Contributing Chartered Organizations, including through the Local Council Settlement Contribution and Contributing Organization Settlement Contribution to the Settlement Trust. However, there can be no assurance that the Local Councils or Contributing Chartered Organizations will agree to make the required contributions or that the level of contributions will be acceptable to other parties in these Chapter 11 Cases or satisfy the requirements for obtaining approval of the Channeling Injunction by the Bankruptcy Court.").

[31]     Proposed Plan at 12, § I.A.65.

[32]     *Id.* § I.A.66.

Proposed Plan.  The Proposed Plan merely contains exhibit cover sheets that indicate that Exhibit

A and Exhibit B are "to be supplemented."[33]

The Debtors' attempt to obtain Disclosure Statement approval without disclosing the

value of the Local Councils' and Contributing Chartered Organizations' proposed contributions

to the Settlement Trust is reminiscent of another abuse-related bankruptcy case, *Diocese of

Camden, New Jersey*, currently before the Bankruptcy Court for the District of New Jersey.

There, the debtor's disclosure statement listed 50 parcels of real estate, but the debtor's

liquidation analysis stated that the value of those properties was "to be determined."  Case No.

2020-21257, Mar. 26, 2021 Hr'g Tr., (Bankr. D. N.J.) [Dkt. No. 530].  The court found the

"discussion of Debtor's assets . . . inadequate," reasoning "the present disclosures provide ***no

information of the value*** of those properties or how the value of those properties may affect the

potential distribution if this case were under Chapter 7."  *Id.*  That logic applies with equal force

here, where the Debtors' vague assurance that the Local Councils will make a "substantial

contribution" lacks any detail about the amount of those speculative contributions or how they

will affect the Settlement Trust's potential distributions.  This violates section 1125(b) because a

reasonable claimant voting on the Proposed Plan would want to know whether his potential

recovery is based on a $560 million fund or a different amount—particularly given that more

than 96,000 abuse claims have been filed and the range of potential recoveries is extremely wide.

**The Releasees' Assets and Liabilities**.  The Debtors' Global Resolution Plan

contemplates that unidentified Local Councils and Contributing Chartered Organizations (the

"Releasees") will be released from any and all liability for Abuse Claims in exchange for making

---

[33]    Proposed Plan, Exs. C & D.

"substantial contributions" to the Settlement Trust.[34]  But the Disclosure Statement fails to provide the information necessary for claimants and other parties in interest to evaluate whether each Releasee is making a sufficiently "substantial" contribution to the Settlement Trust to justify granting them a broad release from liability.  Indeed, the Disclosure Statement fails to provide information as to whether each Local Council would have to make any contribution at all before being gifted a release.

To assess the sufficiency of contributions by the Local Councils and Contributing Chartered Organizations, claimants and other parties in interest would need to know (i) the identity of the Releasee, (ii) the scope of the Releasee's potential liability to Abuse Claimants, (iii) the amount of assets available to the Releasee to pay Abuse Claims, (iv) the Releasees' obligation for self-insured retentions and deductibles, and (v) the size of the Releasee's proposed contribution to the Settlement Trust.  Yet the Disclosure Statement provides *none of this information*.  Instead, it offers only a vague assurance that the Settlement Trust will receive "significant value" from the Releasees.[35]  That unsubstantiated assurance does not provide a basis for creditors to "make an informed judgment about the plan."  11 U.S.C. § 1125(a); *see also Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 323 (3d Cir. 2003) (requiring full disclosure of potential claims because "[c]reditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan").

The Debtors' vague assertion that they are committed to obtaining at least $425 million from an unidentified group of Local Councils[36] does not cure this defect.  And it goes without

---

[34]    Disclosure Statement at 14, 122 [Dkt. No. 2594]; *see also* Proposed Plan at 28 [Dkt. No. 2592] (defining Protected Parties).

[35]    Disclosure Statement at 73 [Dkt. No. 2594].

[36]    *Id.* at 14.

saying that the failure to attach the exhibits that contain critical information about the Contributing Chartered Organizations and their purported contributions renders the Plan and Disclosure Statement deficient. Claimants are entitled to know the nature and extent of *each* Local Council's and Contributing Chartered Organization's assets, liabilities, and proposed contribution to the Settlement Trust because that is the only way claimants can ascertain whether a particular Local Council or Contributing Chartered Organization is making a sufficiently large contribution to justify a broad release of the claims against it. That *individualized* determination is a minimum, threshold requirement, since "[t]he Bankruptcy Code does not explicitly authorize the release … of claims against non-debtors," and the few courts that have allowed such releases have done so only in "extraordinary cases." *In re Cont'l Airlines*, 203 F.3d 203, 211–12, 214 (3d Cir. 2000) (holding that "the release and permanent injunction of Plaintiffs' lawsuits [were] legally and factually insupportable" because "[t]he hallmarks of permissible nonconsensual releases—fairness, necessity to the reorganization, and *specific factual findings* to support these conclusions—[were] all absent."); *see also United Artists Theatre Co. v. Walton*, 315 F.3d 217, 227 (3d Cir. 2003) ("Added to these requirements is that the releases 'were given in exchange for *fair consideration*.'"). Without knowing the nature and extent of each Local Council's and Contributing Chartered Organization's liabilities and proposed contribution, Claimants are unable to know whether these "hallmarks"—including fair consideration—are present. At a minimum, the Debtors have the burden of demonstrating that the release of each Local Council and Contributing Chartered Organization is necessary and fair, and they have not provided nearly enough information to even begin this analysis.

\*      \*      \*

In sum, the Disclosure Statement's description of the available assets and expected liabilities of the Debtors, the Settlement Trust, and the Releasees is fraught with wholesale gaps, uncertainty, and speculation, thereby depriving creditors of the chance to make an informed judgment based on adequate information. *See* 11 U.S.C. § 1125(a); *see also Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) (quoting S.R. 95-989, at pp. 121, 95th Cong. 2d Sess., 124 Cong. Rec. (section 1125 "seeks to guarantee a minimum amount of information to the creditor asked for its vote" because "[a] plan is necessarily predicated on knowledge of the assets and liabilities being dealt with and on factually supported expectations as to the future course of the business")). As such, the Disclosure Statement must be rejected as inadequate.

**C.    The Disclosure Statement Fails to Adequately Disclose the Necessity and Support for the Broad Releases Granted to Non-Debtors and the Risks Associated with Them.**

The third-party releases described in the Disclosure Statement are overly broad and subject to challenge and the Disclosure Statement should state that such releases will be the subject of litigation as to whether they render the Proposed Plan unconfirmable. The Disclosure Statement states that, as of the Effective Date:

> [A]ll holders of Abuse Claims shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release each and all of the Protected Parties and their respective property and successors and assigns of and from all Abuse Claims and any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Abuse Claims.[37]

The Proposed Plan defines "Protected Parties" as including "Reorganized BSA," "the Related Non-Debtor Entities," "the Local Councils," and "the Contributing Chartered

---

[37]    Disclosure Statement at 122 [Dkt. 2594].

Organizations."[38]  The scope of the third-party releases likely sweeps in claims that have nothing

to do with the Debtors because they broadly releases all Abuse Claims, defined to encompass

anything concerning Abuse.[39]

Debtors also fail to disclose that the release's inclusion of myriad non-debtor entities—

including entities that do not even exist yet, such as Reorganized BSA—is likely unlawful.  *See*

*In re Bennett Paper Corp.*, 68 B.R. 518, 520 (Bankr. E.D. Mo.1986) (disapproving disclosure

statement for failure to inform creditors that non-debtor release provision is impermissible).

Indeed, courts in this Circuit have consistently held that, absent extraordinary circumstances, a

release of causes of action against non-debtor third parties pursuant to a chapter 11 plan violates

Bankruptcy Code section 524(e).  *See In re Continental Airlines*, 203 F.3d at 211–218 (collecting

cases); *see also In re Washington Mut., Inc.*, 442 B.R. 314, 348 (Bankr. D. Del. 2011)

(explaining that post-confirmation entities "have done nothing yet for which they need a release"

and will not come into existence until after confirmation).  The Debtors must disclose that this

feature will likely render the Proposed Plan unconfirmable.

Further, the release includes the *attorneys* of such Protected Parties, providing no opt-out

mechanism for Century if Century votes to confirm.[40]  This feature is untenable, a fact that is not

addressed by the Disclosure Statement.  As explained below, Century has claims against Sidley

Austin LLP related to its pre-bankruptcy representation of the BSA.  These claims are currently

the subject of arbitration and an appeal, but if Century were to vote to confirm the Proposed

Plan, it would have no way of preserving its position against Sidley.  Indeed, the proposed ballot

language for Class 9 Indirect Abuse Claims provides:

---

[38]    Proposed Plan at 28 [Dkt. No. 2592] (listing the Protected Parties under the Global Resolution Plan,
        which is the plan preferred by the Debtors).
[39]    *See id.* at 4.
[40]    Proposed Plan at 28 [Dkt. No. 2592].

> As a holder of an Impaired Claim under the Plan, you are deemed to provide the releases contained in Article X.J.4 of the Plan … if you vote to accept the Plan, do not vote to accept or reject the Plan, or reject the Plan but do not opt out of the release provision in the Plan.[41]

In other words, Century would have no method of voting to accept the Proposed Plan *while* preserving its claims against Sidley, since the release would include Sidley. This dynamic is untenable, and the Disclosure Statement must acknowledge this deficiency. At minimum, the proposed ballot language and Disclosure Statement must be amended so that Century is not forced to decide between voting to accept the Proposed Plan and opting to preserve its claims against Sidley.

> D.    **The Disclosure Statement Fails to Adequately Disclose the Necessity and Basis for the Breath of the Channeling Injunction and the Risk Associated with Its Inclusion in the Plan.**

The Disclose Statement also fails to disclose the necessity and basis for the Proposed Plan's Channeling Injunction and whether its inclusion in the Proposed Plan could render the Proposed Plan unconfirmable. Article X.F of the Proposed Plan provides:

> On and after the Effective Date, all Persons that have held or asserted, currently hold or assert, or that may in the future hold or assert, any Abuse Claim against the Protected Parties, or any of them, shall be permanently and forever stayed, restrained and enjoined from taking any action for the purpose of directly, indirectly, or derivatively collecting, recovering, or receiving payment, satisfaction, or recovery from any Protected Party with respect to any such Abuse Claim other than from the Settlement Trust.[42]

A plain reading of this language indicates that it likely enjoins claims that have nothing to do with scouting activities. The Disclosure Statement must be modified to advise claimants that (i) claims having no connection to the Boy Scouts may be enjoined under the Proposed Plan, and (ii) explain how the Settlement Trust will review Abuse Claims to ensure that only claims that are directly connected to scouting activities are validated.

---

[41]    Form of Ballot for Class 9 Indirect Abuse Claims [Dkt. 2726-2], Ex. 2-7, at 3.
[42]    Proposed Plan at 83 [Dkt. No. 2592].

Nor does the Disclosure Statement explain whether the Channeling Injunction is intended to limit cross claims and claims for contribution and equable apportionment among insurers and if so how

### E.    The Disclosure Statement Fails to Disclose Insurance Coverage Risks.

The Disclosure Statement should also be denied because it fails to adequately explain the risks related to the insurers' coverage defenses and the potential impact of those coverage defenses on any recoveries.  Although the Disclosure Statement mentions that the insurers have asserted coverage defenses, it neglects to evaluate those risks, instead stating, in conclusory terms, the Debtors' apparent belief that "such defenses … are without merit."[43]

Apart from the coverage risks associated with the Debtors' prepetition conduct, the Debtors include no discussion of the risk associated with the proposed assignment of all the insurance rights of the Debtors, the Local Councils, and the Contributing Chartered Organizations to a trust, including the risk related to the enforcement of anti-assignment clauses and the violation of provisions vesting insurers with the right to control the settlement of claims in many of those policies.  Indeed, the Proposed Plan's assignment violates the anti-assignment clauses in the insurance policies, which would eliminate the Settlement Trust's ability to obtain coverage under the applicable insurance policies.  And although the Debtors might argue that such clauses are preempted, it is unclear that federal preemption of anti-assignment provisions in a debtor's insurance contracts applies outside the context of Bankruptcy Code section 524, which only applies to asbestos claims.  *Cf. In re Thorpe Insulation Co.*, 677 F.3d 869, 883 (9th Cir. 2012) (holding that "the anti-assignment provisions contained in the contracts … stand as an obstacle to completion of a successful § 524(g) plan, and therefore are preempted by federal bankruptcy law").

---

[43]    Disclosure Statement at 43 [Dkt. No. 2594].

But even if federal preemption applies to debtor contracts outside the section 524(g) context, the Third Circuit has held that preemption does not apply equally to *non-debtors* such as the Local Councils and Sponsoring Organizations. *See In re Combustion Engineering, Inc.*, 391 F.3d 190, 219 (3d Cir. 2004) ("To the extent the subject insurance policies are jointly held by [the debtor] and a non-debtor, … the § 541 preemption of anti-assignment provisions applies only to [the debtor's] interest in the shared policies."). The Disclosure Statement must explain these risks so that creditors may consider the coverage risks and the likelihood of a reduction in available coverage when evaluating the Proposed Plan. *See In re Am. Capital Equipment, LLC*, 688 F.3d 145, 156 (3d Cir. 2012) ("A plan will not be feasible if its success hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely.").

The Disclosure Statement fails to acknowledge that the Debtors have declined to cooperate with insurers on essentially all aspects of the Proposed Plan, thereby introducing additional uncertainty concerning insurance coverage. Such aspects include the Debtors' volunteering of liability,[44] the inclusion of an "Expedited Distribution" option for claims that will undergo no scrutiny,[45] and the establishment of TDPs with a claims matrix that would allow payment of claims that are barred under the applicable statute of limitations or as a result of failure to timely file a proof of claim, without insurer approval.[46] Each of these steps, taken unilaterally by the Debtors, introduces risk that a significant number of Abuse Claims will not be insured.

---

[44]    *See id.* at 60–63.
[45]    *See id.* at 143.
[46]    *See id.* at 146 (explaining that the Settlement Trustee "shall have discretion" to "find that [a] Submitted Claim is valid despite" the Abuse Claimant filing a defective Proof of Claim or filing the Proof of Claim "after the Bar Date and/or application of relevant statutes of limitation, repose, or other applicable law," as long as " the evidence … is strong enough").

Nor is there any discussions of consent to settle and voluntary settlement clauses in the policies and the risks associated with BSA having ignored them.  BSA also says nothing about the risks associated decisions by BSA and Haines & Boones' that are the subject of Count I of the adversary proceeding complaint by Hartford.

There is no discussion whatsoever of the risks posed by BSA having engaged Sidley Austin knowing that they represented Century, keeping the nature of the engagement from Century and simulteously serving discovery on Century for information that was the subject of the Sidley Austin engagement.

Perhaps most striking, there is no disclosure of the risks posed by the Toggle Plan on the continued availability of coverage given BSA's unilateral abandonment of the defense and election to no longer maintain underlying coverage.

Accordingly, without any discussion of these substantial risks, the Disclosure Statement must be rejected.

**F.    The Disclosure Statement Fails to Disclose How Insurance Proceeds Will Be Utilized or the Risks Associated with It.**

The Court should not approve the Disclosure Statement because it provides no detail as to how the proceeds of any insurance policies assigned to the Settlement Trust would be utilized.

For instance, claimants and other interested parties are entitled to know whether insurance proceeds would go toward compensating other claimants who do not have a claim covered under the same policy, such as claims based on abuse that allegedly occurred outside the applicable coverage period.  Alternatively, if the proceeds will be applied toward claims falling outside the coverage period—this information would almost certainly affect how claimants vote, since they have competing interests.

An additional consideration is whether the insurance proceeds of a policy covering a claim would be used to pay administrative expenses, as well as trust and legal expenses.  The Debtors must disclose this information in order for claimants and other interested parties to make an informed judgment as to the actual amount of proceeds potentially available to pay claims.

### G.    The Disclosure Statement Fails to Explain the Terms of the Cooperation Agreement or the Risks Associated with It.

The Disclosure Statement also lacks adequate information because it provides no insight into how the Debtors—and potentially non-debtor third parties—will be obliged to cooperate with the Settlement Trust.

Article VII.A.18 of the Disclosure Statement provides that the Debtors and the Settlement Trust "shall enter into the Cooperation Agreement on the Effective Date substantially in the form contained in the Plan Supplement."[47]  The Debtors *have not yet filed* the Plan Supplement, and the Disclosure Statement does not offer even a barebones description of any of the material terms of the Cooperation Agreement.  Consequently, creditors are left to guess how the cooperation between the Debtors and the Settlement Trust will be governed.  This information is critical because it directly impacts how Abuse Claims will be resolved by the Settlement Trust.

Should the Cooperation Agreement prescribe vague guidelines, for example, such provisions could enable the Debtors to shirk their obligations to promptly provide information, thereby undermining claimants' ability to resolve their Abuse Claims expeditiously with the Settlement Trust.  Another possibility that creditors cannot discount is that the Debtors might commit inadequate resources to fulfill their cooperation obligations; without the agreement, governance requirements are unknown.  Perhaps most importantly, the absence of the Cooperation Agreement leaves creditors to guess what relief might be available if the Debtors

---

[47]    *Id.* at 140.

ultimately fail to cooperate—a scenario creditors must consider.  *See, e.g.*, *In re Harman*, No. 04-17195–WHD, 2006 WL 6591823, at *7 (Bankr. N.D. Ga. Oct. 12, 2006) (sanctioning the debtor for its "bad faith" "attempts to undermine the Trustee's ability [to administer the estate]").

The Disclosure Statement's assurance that the Cooperation Agreement "shall provide for certain documents, books and records of the Debtors" does not cure this defect.[48]  Creditors must know the *extent* to which the Debtors must provide access to internal documents and records, including what records are available and for what years.  Moreover, in the event the Proposed Plan is confirmed as a Global Resolution Plan, the Local Councils and Contributing Chartered Organizations will also have cooperation obligations.  As things stand now, however, what obligations these non-debtor third parties will have is completely unknown.

It is not clear, for instance, whether the Debtors will be required to coordinate between the Settlement Trust and these third parties or how they will do this given conflicts.  Nor is it clear who from the Local Councils and Contributing Chartered Organizations will be tasked with overseeing such cooperation.  And given the claims asserted against these non-debtors, creditors should have some notion of what to expect from these entities when they attempt to resolve their claims through the Settlement Trust.

## H.    The Disclosure Statement Fails to Confirm that the Debtors Will Assign the First Touch Encounter Agreement to the Settlement Trust and If They Do Not the Risks Associated with Their Action or Inaction.

Compounding the Disclosure Statement's inadequacies is its failure to indicate the Debtors' intentions with respect to the First Encounter Agreement.  As the Disclosure Statement explains, BSA and Century entered the First Encounter Agreement in 1996 in an effort to minimize disputes about insurance coverage.[49]  In particular, the First Encounter Agreement

---

[48]    *Id.*

[49]    *See id.* at 42.

clarified the date of occurrence to be used for sexual molestation claims by stating that only the policy in effect when a claimant was first abused would provide coverage for that claimant's claims.[50]  The Disclosure Statement provides no explanation, however, of how confirmation of the Proposed Plan and the assignment of insurance rights and proceeds to the Settlement Trust would impact this agreement.

The Debtors must affirmatively state whether the Settlement Trust will be bound by the First Encounter Agreement.  Under the Proposed Plan, BSA and, if the Global Resolution Plan is confirmed, the Local Councils and Contributing Chartered Organizations intend to assign their insurance rights to the Settlement Trust.[51]  Because the First Encounter Agreement is not an executory contract (as it does not contain material unperformed obligations by both parties), it is binding on the Debtors and they cannot use the bankruptcy to rid themselves of its obligations. *See Hays & Co. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1154 (3d Cir. 1989); *In re Stewart Foods, Inc.*, 64 F.3d 141, 144 (4th Cir. 1995); *In re Superior Air Parts, Inc.*, 486 B.R. 728, 738 (Bankr. N.D. Tex. 2012).

The Debtors agreed that the First Encounter Agreement would also be binding on the Debtors' assigns "with respect to the standard for determining when an occurrence takes place for a Sexual Molestation Claim or how to allocate defense and indemnity costs relating thereto." Thus, if policies are assigned, the First Encounter Agreement would have to be assigned to the Settlement Trust also to ensure that Century (and other insurers ascribed to it) get the benefit of their bargain.  And if for some reason BSA does not intend to honor the agreement, such intentions must be disclosed, along with the related ramifications for insurance coverage.

---

[50]    *Id.*  The Disclosure Statement also says that the Debtors and other insurers, besides Century, are bound by the First Encounter Agreement.  *See id.* ("several of the BSA's other Insurance Companies ascribe to this agreement and provide coverage according to the first alleged year the Abuse occurred.").

[51]    Proposed Plan at 20 [Dkt. No. 2592]; *see also* Disclosure Statement at 137–38 [Dkt. No. 2594].

This information is critical to allow creditors to make an informed judgment, particularly given the Debtors' repeated assurances that they will contribute "substantial insurance assets" to the Settlement Trust.[52]

**I.      The Disclosure Statement Fails to Explain How Either Proposed Plan Will Treat SIRs and the Risks Associated with Failing to Properly Treat SIRs.**

The Court should also reject the Disclosure Statement because it lacks any coherent explanation of how either Proposed Plan will treat deductibles and self-insured retentions ("SIRs").

The Debtors' insurance policies with Century require that the "Named Insured" must pay the first $1 million per occurrence, and the "Named Insured" includes BSA and "Local Councils." If the Named Insured does not pay, Century may be required to pay, and Century then has a right of reimbursement from the Named Insured. But the Disclosure Statement fails to explain how such SIRs will be handled under either Proposed Plan. Article VII.A.22 of the Disclosure Statement implies that SIRs become Indirect Abuse Claims, stating that "[t]he Settlement Trust … shall pay Indirect Abuse Claims, in accordance with the Trust Distribution Procedures, that may arise from deductibles, *self-insured retentions*, retrospective premium adjustments, or other charges."[53] Article IV.4.5 of the proposed Trust Distribution Procedures says, "[f]or Insured Claims that a Non-Settling Insurance Company agrees to cover … the Non-Settling Insurance Company shall reimburse the Settlement Trust the full amount of the Proposed Claim Valuation (*less any applicable deductible*) for such claim within 30 days of such claim becoming a Settled Claim."[54]

---

[52]     Disclosure Statement at 12 [Dkt. No. 2594].
[53]     *Id.* at 141.
[54]     Trust Distribution Procedures at 9 [Ex. A, Dkt. No. 2592].

These piecemeal explanations are utterly inadequate.  If the Debtors intend to transform the applicable SIRs into Indirect Abuse Claims to be paid by the Settlement Trust, they must clearly explain this decision and the perils of proceeding in this way, particularly in light of the case law from this Circuit condemning such an outcome.  *See, e.g.*, *In re WL Homes LLC*, 563 B.R. 512, 518 (Bankr. D. Del. 2017) (holding that insurer was entitled to reimbursement of amounts due under the SIR because it "would be inequitable [to] allow the Debtor to enjoy the benefits of the Policy without meeting its obligations under that Policy").  Further, if the Proposed Plan forces creditors to foot the bill for the first $1 million on Insured Claims, *see In re Pettibone Corp.*, 162 B.R. 791, 802 (Bankr. N.D. Ill. 1994) (explaining that, under the plan, "the burden of unused SIR for each policy year is in effect shared pro rata among recovering claimants through deductions from their settlements or judgments"), the Disclosure Statement must state this intent expressly.

The Disclosure Statement should also explain whether the Proposed Plan permits Century to pursue its SIR claims against the Local Councils and Chartering Organizations and, if not, what the basis is for blocking such claims.  How the SIRs will be handled—a feature that will directly impact distributions made by the Settlement Trust—goes unexplained.  Accordingly, the Disclosure Statement lacks adequate information.

**J.**     **The Disclosure Statement Fails to Explain the Treatment of Century's Secured Claim.**

The Disclosure Statement also lacks any explanation of how Century's secured claim against the Debtors will be treated.

Like other insurers, certain of Century's policies are "fronting" policies.[55]  Under these policies, the Debtors' repayment obligations to Century are secured by at least one letter of credit issued by JPMorgan Chase Bank in the current amount of $3,812,060.  Century filed proofs of claim preserving this claim November 14, 2020.

It appears that Century's secured claim should be classified as a Class 2 "Other Secured Claim," an unimpaired class that the Debtors propose either paying in cash in full on the Effective Date, reinstating, or returning the collateral securing the claim in full satisfaction of the claim.[56]  But the Plan and Disclosure Statement do not confirm that treatment, nor does the Disclosure Statement explain whether the Century letter of credit will be one that the Debtors assume will be drawn on the Effective Date.[57]

The Disclosure Statement must be amended to explain how the Debtors intend to treat the letters of credit issued to Century and other similarly situated insurers.

K.      **The Disclosure Statement Fails to Explain the Judgment Reduction Clause in The Hartford Settlement or to Quantify its Impact.**

The Debtors' Settlement Agreement with Hartford contains a judgment reduction clause to reduce any claim against Hartford for contribution, subrogation, indemnification, or other similar claim.  Specifically, it provides:

> In the event that any other such Person obtains a final and non-appealable judicial determination or binding arbitration award that it is entitled to obtain a sum certain from Hartford as a result of a Claim for contribution, subrogation, indemnification or other similar Claim against Hartford for Hartford's alleged share or equitable share, or to enforce subrogation rights, if any, of the defense and/or indemnity obligation of Hartford for any Claims released pursuant to [the Settlement] Agreement, the BSA, the Estate, or their assignees, successors or any other Person formed to assume the BSA's liability for Abuse Claims, including the Settlement Trust, as applicable, shall voluntarily reduce its judgment or Claim

---

[55]    *See* The BSA's Opening Brief in Support of Motion for a Preliminary Injunction Pursuant to Sections 105(a) and 362 of the Bankruptcy Code, Case. No. 20-50527 [Dkt. No. 7], at 12.

[56]    Disclosure Statement at 78 [Dkt. No. 2594].

[57]    *See generally* Disclosure Statement, Exhibit B.

against, or settlement with, such other Person to the extent necessary to eliminate such contribution, subrogation or indemnification Claims against Hartford.[58]

The Disclosure Statement must, at a minimum, explain the impact of the judgment reduction clause on the Debtors and the Settlement Trust.  This explanation is particularly important, given that Hartford wrote more policies to the Debtors and Local Councils than any other insurers.

To what extent will the judgment reduction clause serve to reduce the obligation of other insurers of BSA because of cross claims and contribution claim between BSA and the Local Councils and Chartering Organizations?  With Hartford having issued over 2,400 policies to the Local Councils and BSA, the monetary impact of this clause on the other policies should be disclosed and quantified.

Each of BSA's excess carriers have cross claims for contribution against the Local Councils so the availability of the judgment reduction clause serves to reduce the value of the coverage for those claims.  Consequently, the Debtors must acknowledge the likelihood that other insurers will claim reduction based on contribution and cross claims relating to the Hartford policies issued to the Local Councils and estimate the impact of these claims on potential recoveries.

Absent these explanations, the Disclosure Statement is inadequate and must be rejected.

L.    **The Disclosure Statement Fails to Disclose How Privileged Documents and Information Associated with the Defense of Abuse Claims will be Protected Post-Confirmation and the Risks Associated With Waiving Privilege.**

Under the Toggle Plan, litigation of abuse claims may resume in the tort system against the Local Councils and Chartered Organization.  The Cooperation Agreement has not been provided.  Nowhere in the Disclosure Statement does BSA explain whether documents and information associated with the underlying defense of claims will remain privileged and, if so,

---

[58]    *See* Hartford Settlement Agreement [Dkt. No. 2624].

how privilege will be protected.  If BSA intends to abandon privilege or transfer privileged documents and information to the Settlement Trust, BSA should disclose that now and explain the risks associated with it doing so. Alternatively, if BSA contemplates that privilege will be protected, BSA needs to disclose that and explain how privilege will be protected and who will control BSA's rights with respect to privilege post-petition.

> **M.** **The Disclosure Statement Fails to Disclose Demands Made by the Coalition for Payments to their Professionals and State Court Counsel, Assurances Given and Impact on Formation of Plan.**

The Disclosure Statement lacks any disclosure of whether and the extent to which demands were made by the Coalition for payments to their professionals and State Court counsel characterized as substantial contribution awards or otherwise in connection with the Coalition support for BSA's Global Resolution Plan.  Nor is there disclosure as to whether BSA has given or been asked to give assurances of support for such payments.  The Disclosure Statement lacks adequate information in this regard.

**OBJECTION III.**

**THE COURT CANNOT APPROVE THE DISCLOSURE STATEMENT BECAUSE
IT DESCRIBES A PATENTLY UNCONFIRMABLE PLAN.**

This Court should also deny the Disclosure Statement because the Proposed Plan is

patently unconfirmable.  The Third Circuit held in *In re American Capital Equipment, LLC*, 688

F.3d 145 (3d Cir. 2012) ("*Skinner II*"), "that a bankruptcy court may address the issue of plan

confirmation where it is obvious at the disclosure statement stage that a later confirmation

hearing would be futile because the plan described by the disclosure statement is patently

unconfirmable."  *Id.* at 154; *see also In re Main St. AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D.

Cal. 1999) ("It is now well accepted that a court may disapprove of a disclosure statement ... if

the plan could not possibly be confirmed."); *In re Felicity Assocs.*, 197 B.R. 12, 14 (Bankr. D.

R.I. 1996) (same); *In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990) (same); Lawrence P.

King, *7 Collier on Bankruptcy* ¶ 1125.03[5] (15th Ed. Rev. 2004) ("most courts will not approve

a disclosure statement if the underlying plan is clearly unconfirmable on its face").  "A plan is

patently unconfirmable where (1) confirmation defects cannot be overcome by creditor voting

results and (2) those defects concern matters upon which all material facts are not in dispute or

have been fully developed at the disclosure statement hearing."  *Skinner II*, 688 F.3d at 154–55.

Here, the Proposed Plan is patently unconfirmable for a host of reasons including without

limitation, because it (i) discriminates against insurers by treating them differently than other

unsecured creditors; (ii) is not insurance neutral; (iii) deprives creditors of statutorily protected

rights; (iv) is not proposed in good faith, and (v) improperly exculpates non-debtors, like

attorneys for Sidley Austin LLP/White & Case LLP, notwithstanding that their retention by the

Debtors violated the Bankruptcy Code and could lead to the disgorgement of fees, and others who have engineered a plan that is not being proposed in good faith.[59]

A.    **The Proposed Plan Discriminates Against Insurers By Treating Them Far Differently Than Other Unsecured Creditors.**

Although a Chapter 11 plan may treat similarly situated classes differently, a dissenting class must generally receive "relative value equal to the value given to all other similarly situated classes." *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006). In *In re Tribune Co.*, 972 F.3d 228, 241–45 (3d Cir. 2020), the Third Circuit adopted a rebuttable presumption of unfair discrimination where there is (i) a dissenting class; (ii) another class of the same priority; and (iii) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments) or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

Here, the Proposed Plan unfairly discriminates against insurers by providing them with a substantially lower percentage recovery than similarly situated unsecured creditors. Under Section 7.3 of the Trust Distribution Procedures, any Non-Settling Insurance Company that is owed a deductible from the Settlement Trust is deemed to hold an Indirect Abuse Claim.[60] Indirect Abuse Claims are categorized as Class 9 claims in the Proposed Plan,[61] and holders of such claims are projected in the Disclosure Statement to recover *$0*, with an estimated

---

[59]    To be clear, the Proposed Plan, as currently drafted, is likely unconfirmable for a host of other reasons, including because the Debtors will not be able to "cram down" holders of Class 8 Abuse Claims, whose representatives in the Coalition and the TCC are stridently opposed to confirmation (*see, e.g.*, Dkt. No. 2672 at 10; Dkt. No. 2506 at 1–2), under Bankruptcy Code section 1129(b). Century is limiting its objections to those defects that cannot be remedied by creditor vote.

[60]    Trust Distribution Procedures at 22 [Ex. A, Dkt. No. 2592].

[61]    Proposed Plan at 40 [Dkt. No. 2592].

percentage recovery of "N/A," which might as well say 0%.[62]  By contrast, General Unsecured

Claims in Class 6 are projected to recover **75–95%**, while holders of Direct Abuse Claims are

projected to recover **8–23%**, or up to 100% with insurance rights.[63]  There is simply no

justification for providing holders of Indirect Abuse Claims, including the Non-Settling Insurers,

with a 0% recovery on their unsecured claims while providing other classes of unsecured

creditors a recovery of up to 100%.  Indeed, it is hard to imagine a more blatant case of unfair

discrimination.  And, given this wildly disparate treatment, holders of Indirect Abuse Claims are

overwhelmingly likely to vote against confirmation, thereby satisfying the requirement of a

dissenting class.  Accordingly, unless the Debtors make a showing to overcome the presumption

of unfair discrimination based on the materially lower percentage recovery for the class of

Indirect Abuse Claims,[64] the disparate treatment is inconsistent with the objectives and purposes

of the Bankruptcy Code and the Proposed Plan cannot be confirmed to the extent Class 9 votes to

reject the Proposed Plan.

### B.    The Proposed Plan Is Not Insurance Neutral.

The Proposed Plan is patently unconfirmable because it impairs insurers' rights under the

state-law insurance contracts they have issued to the Debtors and the Local Councils.  A chapter

11 plan may not be confirmed if it would give the debtor greater rights under its insurance

contracts than it held prepetition.  *E.g.*, *In re Pittsburgh Corning Corp.*, 453 B.R. 570, 604–05

(Bankr. W.D. Pa. 2011) (finding a proposed section 524(g) plan "unconfirmable" due to "the

lack of clarity regarding insurance neutrality").  The reason for this rule is that a plan is

---

[62]    Disclosure Statement at 24 [Dkt. No. 2594].

[63]    *Id.* at 23.

[64]    *See In re Trib. Co.*, 972 F.3d at 241 (establishing that the presumption of unfair discrimination may
be overcome only if the court finds that "a lower recovery for the dissenting class is consistent with
the results that would obtain outside of bankruptcy, or that a greater recovery for the other class is
offset by contributions from that class to the reorganization").

unconfirmable as employing "means forbidden by law," 11 U.S.C. § 1129(a)(3), if it fails to conform to state-law requirements—including the requirements imposed by contracts validly formed under state law. *See In re SPM Mfg. Corp.*, 984 F.2d 1305, 1311 (1st Cir. 1993) (bankruptcy courts lack authority to enter orders that "expand the contractual obligations of parties"); *In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989) ("[B]ankruptcy courts do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable terms."); *see also Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984); *In re Cajun Elec. Power Coop., Inc.*, 230 B.R. 715, 737 (Bankr. M.D. La. 1999).

A plan is not insurance neutral unless "all contractual rights and coverage defenses [are] fully preserved." *In re Flintkote Co.*, 486 B.R. 99, 117 (Bankr. D. Del. 2012), *aff'd*, 526 B.R. 515 (D. Del. 2014). The insurance-neutrality inquiry is a practical one, focusing on "the real-world impacts of the plan to see if it increases insurance exposure and likely liabilities of [insurers]." *In re Thorpe Insulation Co.*, 677 F.3d 869, 885 (9th Cir. 2012); *accord In re Global Indus. Techs., Inc.*, 645 F.3d 201, 212 (3d Cir. 2011) (en banc). The seminal case on insurance neutrality is *In re Combustion Eng'g*, 391 F.3d 190, in which the Third Circuit found that the following language in the Bankruptcy Court's confirmation order fully preserved insurers' rights and defenses under their policies and settlement agreements:

> [N]otwithstanding anything to the contrary in this Order, the Plan or any of the Plan Documents, nothing in this Order, the Plan or any of the Plan documents (including any other provision that purports to be preemptory or supervening), shall in anyway [sic] operate to, or have the effect of, impairing the insurers' legal, equitable or contractual rights, if any, in any respect. The rights of insurers shall be determined under the Subject Insurance Policies or Subject Insurance Settlement Agreements as applicable.

*Id.* at 211–12.  The court held that "this language broadly preserves insurers' pre-petition rights under the subject insurance policies" and, as a result, that the plan did not "diminish the rights of insurers or increase their burdens under the subject insurance policies."  *Id.* at 217.[65]

Here, although the Proposed Plan purports to be insurance neutral, it is, in fact, just the opposite for certain Insurance Companies. It provides:

> ***Except as provided in Article X.M.4.***, none of (a) the Bankruptcy Court's or District Court's approval of the Plan or the Plan Documents, (b) the Confirmation Order, the Affirmation Order or any findings or conclusions entered with respect to Confirmation, or (c) any estimation or valuation of Abuse Claims, either individually or in the aggregate (including any agreement as to the valuation of Abuse Claims) in the Chapter 11 Cases shall, with respect to any Insurance Company, constitute or be deemed to constitute a trial or hearing on the merits or an adjudication or judgment, or accelerate the obligations, if any of any Insurance Company under its Insurance Policies.[66]

Article X.M.4 of the Proposed Plan, in turn, provides:

> Nothing in this Article X.M. is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against any Insurance Company with respect to any issue that is actually litigated by such Insurance Company as part of its objections, if any, to Confirmation or as part of any contested matter or adversary proceeding filed by such Insurance Company in conjunction with or related to Confirmation.[67]

*Id.* § X.M.4.  In other words, to the extent an Insurance Company objects to confirmation or litigates any issues "in conjunction with or related to Confirmation," the Proposed Plan, Confirmation Order, and any other ruling on the litigated issue could be binding or otherwise

---

[65]    *See also In re Pittsburgh Corning Corp.*, 453 B.R. 570, 585 (Bankr. W.D. Pa. 2011) ("nothing in the Confirmation Order or the Plan . . . shall in any way operate to impair, or have the effect of impairing [the insurers'] legal, equitable, or contractual rights, if any, in any respect"); *In re Blitz U.S.A., Inc.*, Case No. 11-13603 (PJW) (Bankr. D. Del. Nov. 12, 2013) [D.I. 1922] at 47 ("the Confirmation order . . . shall not have any *res judicata*, collateral estoppel, or other preclusive effect on, or otherwise prejudice, diminish, impair or affect (under principles of waiver, estoppel, or otherwise) any Non-Participating Insurer's legal, equitable or contractual rights or obligations under any Assigned Blitz Insurance Policies . . . [and] shall not constitute an adjudication, judgment, trial, hearing on the merits, finding, conclusion, other determination, or evidence or suggestion of any such determination (a) establishing the liability (in the aggregate or otherwise) or coverage obligation of any Non-Participating Insurers for any Claims").

[66]    Proposed Plan, Article X.M.2, at 91 [Dkt. No. 2592].

[67]    *Id.* Article X.M.4, at 92.

have a preclusive effect on the Insurance Company in any subsequent litigation.  The phrase "in

conjunction with or related to Confirmation" is so vague and amorphous that it could be

construed as encompassing just about any issue that is raised in these chapter 11 cases.  Even

though the Proposed Plan states that "nothing contained in the Plan, the Plan Documents, or the

Confirmation Order, . . . shall in any way operate to, or have the effect of, impairing, altering, . . .

decreasing or modifying (a) the rights or obligations of any Insurance Company . . . arising out

of or under any Insurance Policy," that is only true if the Insurance Company refrains from

objecting to confirmation or otherwise asserting its rights and defenses in these chapter 11 cases.

In effect, the Proposed Plan forces the insurers into a classic "Catch-22"—they can forego

asserting their rights and defenses, risk an unfavorable outcome on a given issue, and rely solely

on the Debtors' promise that the Proposed Plan will be insurance neutral as to them, or they can

litigate the issue and risk losing the benefits of insurance neutrality.

Neither the Proposed Plan nor the Disclosure Statement attempts to reconcile the

Proposed Plan's purported protection of Insurance Companies' rights with what appears to be a

restriction on such parties' right to contest confirmation or any issue "in conjunction with or

relating to Confirmation."  If this is not an outright impairment of the Insurance Companies'

rights under their insurance contracts, at the very least, the neutrality provisions in the Proposed

Plan are ambiguous as currently drafted and cannot be approved.  *See Pittsburgh Corning*, 453

B.R. at 589 ("Because the purported insurance neutrality provisions . . . are ambiguous as

currently drafted, we find that the [Plan] is not insurance neutral.").[68]

---

[68]    Similarly, the Plan is not insurance neutral because it seeks to have the Bankruptcy Court retain
jurisdiction on, *inter alia*, Insurance Actions and actions to enforce any Insurance Policy,
notwithstanding the forum selection clauses in the applicable insurance policies.  *See* Disclosure
Statement, Article VI.T, at 126, 128 [Dkt. No. 2594].  The Debtors cannot vitiate the venue rights
granted by these policies by inserting a retention provision in the Plan.  This provision is likely

At a minimum, the Disclosure Statement should be amended to disclose that certain of the Debtors' insurers take the position that purported insurance neutrality language in the Proposed Plan is inadequate.  The Disclosure Statement should also inform creditors that the Court, or a court on appeal, may require the Debtors to include more robust language in order for the Proposed Plan to actually be insurance neutral.  Without this additional disclosure, the Disclosure Statement cannot be approved as containing adequate information.

### C.    The Proposed Plan Deprives Creditors of Statutory Rights.

The Debtors' Proposed Plan is patently unconfirmable because it appears to transfer the exclusive right to object to proofs of claim to the Settlement Trust, thereby depriving creditors and other parties in interest from asserting claim objections.  Article IV(C)(2) of the Proposed Plan states that "the Settlement Trust shall have control over the Settlement Trust Causes of Action and the Insurance Actions," and "shall thereby become the estate representative . . . with the exclusive right to enforce each of the Settlement Trust Causes of Action and the Insurance Actions."[69]  The Proposed Plan defines the term "Settlement Trust Causes of Action" as including "Estate Causes of Action," which the Proposed Plan defines as "any and all Causes of Action owned, held, or capable of being asserted by or on behalf of either Debtor or its Estate" relating to matters that include defenses under Bankruptcy Code section 502.[70]

This language could be construed as divesting creditors of their statutory right to object to proofs of claims, since it encompasses "any and all" claims "capable of being asserted" "on behalf of" the Debtor.  But Bankruptcy Code section 1109(b) provides that "parties in interest" have the right to "appear and be heard on any issue" in a Chapter 11 bankruptcy case.  11 U.S.C.

---

unlawful, and the Disclosure Statement must acknowledge that its inclusion likely makes the Plan unconfirmable.

[69]    Proposed Plan at 48 [Dkt. No. 2592].

[70]    *Id.* at 16, 33.

§ 1109(b); *see also Global Indus. Tech., Inc.*, 645 F.3d at 210 (explaining that section 1109(b) "has been construed to create a broad right of participation in Chapter 11 cases").  And Bankruptcy Code section 502(a) expressly preserves the rights of "parties of interest" to object to proofs of claim.  Accordingly, to the extent the Proposed Plan seeks to vest the Settlement Trust with the *exclusive* right to object to proofs of claim, it is not confirmable.

This defect cannot be cured by creditor voting, as it would seemingly strip interested parties of their right to lodge objections, thereby setting them up to vote on a plan about which they had no say.  *Skinner II*, 688 F.3d at 154–55.  Consequently, the Proposed Plan is patently unconfirmable as proposed, and the Court should reject the Disclosure Statement.  In any event, the Court should, at a minimum, require language clarifying that all interested parties shall maintain their right to object to proofs of claim.

### D.    The Proposed Plan Was Not Proposed in Good Faith.

The Proposed Plan is also patently unconfirmable because it creates perverse incentives that undermine the purposes of the Bankruptcy Code.

The Debtors excluded Century from all the meetings, discussions and communications held with the claimant representatives concerning the formulation of a plan,  Under section 1129(a)(3), a plan is confirmable only if it is proposed in good faith.  In assessing whether a plan is proposed in good faith, courts examine "the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Combustion Eng'g*, 391 F.3d at 247.  Purposes of the Bankruptcy Code include "discouraging debtor misconduct" and "achieving fundamental fairness and justice." *Skinner II*, 688 F.3d at 157; *In re Kaiser Aluminum Corp.*, 456 F.3d 328, 339–43 (3d Cir. 2006).  Moreover, the "question of whether a … petition is filed in good faith is a judicial doctrine," which considers

"the motivation for proceeding in bankruptcy … and … requires an examination of all of the facts and circumstances." *Skinner II*, 688 F.3d at 157.

In *Skinner II*, the court found that the plan was proposed in bad faith where it "set[] up a system in which [the debtor] would be financially incentivized to sabotage its own defense." *Id.* at 158. Such was the case because the debtor had no assets to distribute, and, under the proposed plan, the only way for creditors to be paid was if asbestos litigants won settlements against the debtor and paid the plan's surcharge. *Id.* at 158–59. That process, however, required the debtor to defend against the litigants' claims, notwithstanding that it could only pay its creditors if the asbestos litigants prevailed. *Id.* Consequently, the debtor would be "required to cooperate in its defense, but [would] be incentivized to do otherwise." *Id.* at 159.

Here, similar flaws exists. The Debtors have made it abundantly clear that their priority is to emerge from bankruptcy in short order. *See, e.g.*, Mar. 17, 2021 Hr'g Tr. at 11:21–23 (Court noting that "the debtors inserted a confirmation of ***July 26th*** which was not vetted with Chambers"). Moreover, the Debtors have seemingly formed a mutually beneficial agreement with the Coalition law firms—over the objection of the TCC—to ram through an incomplete plan on a compressed timeline (*see id.* at 29, 33 (the Coalition, TCC, and FCR admitting that their proposed timeline is "very aggressive" and ultimately "will be subject to the court's availability")), likely because the Debtors seek votes on account of invalid claims to meet the numerosity requirement for confirmation. *See* 11 U.S.C. § 1126(c).

The Debtors' latest proposal offering each Abuse Claimant a $1,500 payment to vote in favor of the Debtors' preferred plan of reorganization—*without any scrutiny of the claim whatsoever*—only underscores the Debtors' attempt to capitalize on the votes of illegitimate

claimants.[71]  Thus, rather than seeking to ensure that claimants obtain a fair result consistent with

the Bankruptcy Code and in conflict with what should be the Debtors' desire to ensure that only

valid claims are allowed (and, therefore, permitted to vote on the Proposed Plan), the Debtors

wish to manipulate the voting to fast-forward the process, effectively self-sabotaging these

proceedings.

This "inherent conflict of interest" renders the Proposed Plan patently unconfirmable.

*Skinner II*, 688 F.3d at 160.  This defect is not curable by creditor voting, since the defect itself

spurs illegitimate voting designed to sabotage the integrity of these proceedings.  To conclude

otherwise would undermine the Bankruptcy Code's goals of "discouraging debtor misconduct"

and "achieving fundamental fairness and justice," since the Debtors aim to escape Chapter 11 in

short order by short-circuiting the proceedings—a result that will *obstruct* "fairness and justice."

*Skinner II*, 688 F.3d at 157; *Kaiser Aluminum Corp.*, 456 F.3d at 339–43.  And the Proposed

Plan's lack of good faith does not concern a question of material fact; rather, it concerns "the

plan itself" and the Debtors' "motivation" for proceeding in this manner.  *In re Combustion*

*Eng'g*, 391 F.3d at 247; *Skinner II*, 688 F.3d at 157.  Accordingly, the Proposed Plan is

unconfirmable and the Court should therefore deny the Disclosure Statement.

E.    **The Proposed Plan Improperly Exculpates Multiple Parties**

Finally, the Proposed Plan is patently unconfirmable because it improperly exculpates the

Debtors' attorneys who were with Sidley Austin LLP and now are with White & Case LLP.

Article VI, Section O of the Disclosure Statement provides:

> From and after the Effective Date, none of the Exculpated Parties shall have or
> incur any liability to, or be subject to any right of action by, any Person for any
> act, omission, transaction, event, or other circumstances in connection with,
> relating to or arising out of the Chapter 11 Cases, the negotiation of the Plan

---

[71]    This component of the Debtors' Proposed Plan is discussed in greater detail in Century's Objections
to the Debtors' Solicitation Procedures and Form of Ballots.

Documents, the Releases and Injunctions, the pursuit of Confirmation of the Plan, the administration, consummation and implementation of the Plan or the property to be Distributed under the Plan.[72]

The Proposed Plan defines "Exculpated Parties" to include not only the Debtors but also all of the Debtors' *attorneys*.[73]  Accordingly, the Disclosure Statement would exculpate the Debtors' attorneys "for any act" or "omission … arising out of … the pursuit of Confirmation of the Plan."

The breadth of the exculpation here is improper in light of the very real prospect—of which the Debtors and their counsel are aware—that the Debtors' counsel will be required to disgorge fees collected in this case.  As this Court will recall, Sidley took the Debtors on as a client while it still represented Century, and thus had a direct conflict of interest precluding its representation under section 327 of the Bankruptcy Code.  Section 327 authorizes debtors in Chapter 11 proceedings to retain only attorneys who "do not hold or represent an interest adverse to the estate," and who are "disinterested."  11 U.S.C. § 327(a).  Because Sidley's retention application sought authorization to represent the Debtors *nunc pro tunc* to February 18, 2020, which this Court granted, and Sidley continued to represent Century until *after the petition date*, Sidley "represent[ed] an interest adverse" to the Debtors in violation of Section 327.

And although this Court granted the Debtors' application to retain Sidley,[74] that ruling is being appealed.[75]  Should Century prevail on appeal, the Debtors' attorneys would likely have to disgorge all fees collected under their representation of the Debtors.  The Debtors cannot moot Century's legitimate appeal by simply inserting an overbroad exculpation provision in the Proposed Plan.  At a minimum, the Century appeal should be carved out of the exculpation

---

[72]  Disclosure Statement at 123 [Dkt. No. 2594].
[73]  *See* Proposed Plan at 16 [Dkt. No. 2592].
[74]  *See* Bench Ruling, Dkt. No. 755 at 5–6.
[75]  *See* D. Ct. Del. Case No. 20-00798.

46

provision.  Unless it is modified to address the foregoing issue, the Proposed Plan is patently unconfirmable and should be rejected at the Disclosure Statement phase.

### RESERVATION OF RIGHTS

The Proposed Plan contains numerous other defects that likely render it unconfirmable, including but not limited to:  (i) improperly depriving Century of its setoff rights, (ii) illegally impairing Century's and the Debtors' removal rights, (iii) prejudicing Century's right to settle or defend claims post-confirmation, and (iv) granting the Debtors a discharge injunction and the equivalent of protection under Bankruptcy Code sections 524(g) and 1141(d) without complying with those provisions.  Century expressly reserves all objections to confirmation of the Proposed Plan.  Century also expressly reserves all objections to approval of the Disclosure Statement.

### CONCLUSION

For the foregoing reason, the Court should decline to approve the Debtor's proposed Disclosure Statement.

Dated:  May 12, 2021[76]

                                Respectfully Submitted,

                                By:    /s/Stamatios Stamoulis_____
                                     Stamatios Stamoulis (No. 4606)

                                STAMOULIS & WEINBLATT LLC
                                800 N. West Street
                                Third Floor
                                Wilmington, Delaware  19801
                                Telephone: (302) 999-1540
                                Facsimile: (302) 762-1688

                                O'MELVENY & MYERS LLP
                                Tancred Schiavoni (*pro hac vice*)
                                Daniel Shamah (*pro hac vice* forthcoming)
                                Times Square Tower
                                7 Times Square
                                New York, New York  10036-6537
                                Telephone: 212-326-2000

                                *Counsel for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America*

---

[76] Century received an extension of time from the Debtors' counsel, until the end of the day on May 12, 2021, to file these objections.

## Plan Documents That Have Not Yet Been Provided

The Plan includes the following exhibits: (a) the Trust Distribution Procedures; (b) the Settlement Trust Agreement; (c) the Contributing Chartered Organization Settlement Contribution; (d) the list of Contributing Chartered Organizations; (e) the Foundation Loan Facility Term Sheet; (f) the Local Council Settlement Contribution; (g) the list of Local Councils; and (h) the list of Related Non-Debtor Entities.

The following exhibits were excluded or incomplete.

(a)     Contributing Chartered Organization Settlement Contribution – BSA has not provided the Contributing Chartered Organization Settlement Contribution. This exhibit purportedly will be supplemented in a later version of the Plan. It is supposed to provide a summary of the Contributing Chartered Organizations' contribution to the Settlement Trust.

(b)     Contributing Chartered Organizations – BSA has not provided the list of Contributing Chartered Organizations. This exhibit is supposed to be supplemented in a later version of the Plan.

(c)     Local Council Settlement Contribution – BSA included a note regarding the Local Council Settlement Contribution with the latest draft of the Plan but there is no firm commitment. BSA states that it is committed to ensuring that the aggregate value of the Local Council Settlement Contribution under the Global Resolution Plan is not less than $425M, exclusive of insurance rights proposed to be contributed to the Settlement Trust. By no later than June 15, 2021, BSA is supposed to file a report concerning the status of BSA's efforts to obtain the contribution commitments from the Local Councils.

Additionally, BSA is supposed to file a Plan Supplement no later than 14 days before the Voting Deadline, which based on the proposed confirmation schedule would be no later than July 16, 2021. None of the Plan Supplement documents have been filed yet. The Plan Supplement documents include:

(a)     Amended BSA Bylaws – The Plan Supplement will include the amended and restated bylaws of the BSA.

(b)     Assumed Contracts and Unexpired Leases Schedule – BSA will include a schedule of Executory Contracts or Unexpired Leases to be assumed by the BSA under the Plan and the Cure Amount for each such Executory Contract or Unexpired Lease.

(c)     Cooperation Agreement – The Plan Supplement will include the Cooperation Agreement, among BSA and the Settlement Trust and including, solely if the Plan is confirmed as a Global Resolution Plan, the Local Councils, the Settling Insurance Companies, and the Contributing Chartered Organizations. The Contribution Agreement will provide for certain documents, books and records of the Debtors (including all portions of the Volunteer Screening Database relating

to allegations of Abuse set forth in Proofs of Claim), and, if the Plan is confirmed as a Global Resolution Plan, the Local Councils, and Contributing Chartered Organizations, to be shared with the Settlement Trust.

(d)     Creditor Representative – BSA will identify the Creditor Representative in the Plan Supplement.  The Creditor Representative is responsible for assisting Reorganized BSA and its professionals in their efforts to efficiently reconcile Convenience Claims, General Unsecured Claims, and Non-Abuse Litigation Claims.

(e)     Directors and Officers of Reorganized BSA – If there are any changes in Reorganized BSA's directors and officers, BSA will identify such changes in the Plan Supplement.

(f)     Foundation Loan Agreement – The form of the credit agreement governing the Foundation Loan will be included in the Plan Supplement.  The material terms of the Foundation Loan are attached as an exhibit to the Plan.

(g)     Leaseback Requirement Agreement – The Plan requires that Reorganized BSA be entitled to lease the Warehouse and Distribution Center from the Settlement Trust for fair market value so long as the Settlement Trust holds title to such premises. Any sale or other transfer of the Warehouse and Distribution Center by the Settlement Trust will be subject to Reorganized BSA's right to lease such premises from any Person that acquires the Warehouse and Distribution Center from the Settlement Trust (or any subsequent acquirer) for fair market value for a term of not less than ten years, subject to renewal at the option of Reorganized BSA.  An agreement reflecting the terms of this requirement will be included in the Plan Supplement.

(h)     Rejected Contracts and Unexpired Leases Schedule – BSA will include a schedule of Executory Contracts or Unexpired Leases to be rejected by the BSA under the Plan.

(i)     Restated 2010 Bond Documents – In connection with the JPMorgan settlement, BSA, JPMorgan, and Arrow agree to enter into amended and restated debt documents on the Effective Date in principal amounts equal to the amounts of unpaid principal and accrued interest and fees as of the Effective Date and containing substantially the same terms as the prepetition debt documents, subject to a few modifications.  The form of the restated 2010 Bond Documents will be included in the Plan Supplement.

(j)     Restated 2012 Bond Documents – The Plan Supplement will include the form of the restated 2012 Bond Documents, including a restated revenue bond, bond purchase agreement, promissory note, security agreement, and all documentation executed and delivered in connection therewith.

(k)     Restated Credit Facility Documents – The Plan Supplement will include the form of the revolving credit facility documents.

**Addendum A**

(l)     Restated Security Agreement – The Plan Supplement will include the form of the restated security agreement, pursuant to which Reorganized BSA shall grant blanket first-priority liens on and security interests in all of Reorganized BSA's assets, including but not limited to all collateral secured by the Prepetition Security Documents (2019), to JPM to secure Reorganized BSA's and Arrow's obligations under the Restated 2010 Bond Documents, the Restated 2012 Bond Documents and the Restated Credit Facility Documents.

(m)    Initial members of the Settlement Trust Advisory Committee – The Settlement Trust Advisory Committee is the committee appointed and serving in accordance with the Plan and the Settlement Trust Agreement, which shall have the powers, duties and obligations set forth in the Settlement Trust Agreement.  In the Plan Supplement, BSA will identify the initial members of Settlement Trust Advisory Committee.

(n)     Initial Settlement Trustee – The Settlement Trustee is the individual appointed to serve as trustee of the Settlement Trust pursuant to the terms of the Plan and the Settlement Trust Agreement.  BSA will identify the initial Settlement Trustee in the Plan Supplement.