## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | Jointly Administered |
| | Re:  Dkt. Nos. 2591, 2592, 2594, 2726, 2726-1, 2726-2 |

## CENTURY INDEMNITY COMPANY'S OBJECTIONS TO THE DEBTORS' SOLICITATION PROCEDURES AND FORM OF BALLOTS

STAMOULIS & WEINBLATT LLC
800 N. West Street
Third Floor
Wilmington, Delaware  19801

O'MELVENY & MYERS LLP
Tancred Schiavoni (*pro hac vice*)
Daniel Shamah (*pro hac vice*)
Times Square Tower
7 Times Square
New York, New York  10036-6537

*Counsel for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America*

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are:  Boy Scouts of America (6300) and Delaware Boy Scouts, LLC (4311).

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

THE PROPOSED PROCEDURES AND THE MANIPULATION TO WHICH THEY
ARE VULNERABLE ............................................................................................... 3

    The Proposed Terms Governing Voting ............................................................. 3

    Claims Generated by For Profit Claim Aggregators.......................................... 4

    The Post-Petition Explosion in Claims Against BSA ........................................ 5

    Effort to Gin Up a Supermajority to Take Control of Bankruptcy .................... 6

    POCs Generated and Signed by Aggregators .................................................... 6

    POCs with Forged and Fictitious Signatures .................................................... 7

    Admissions by Coalition's Founder ................................................................... 8

    Century's Pending Rule 2004 and 2019 Motions .............................................. 9

    Developments Since the February Hearing ...................................................... 10

OBJECTIONS ........................................................................................................ 11

    I.    The Claims Pool Must be Vetted and Invalid Claims Removed Before
        Solicitation Can Commence. ................................................................... 11

        A.    Without Discovery, the Solicitation is Vulnerable to Manipulation........ 12

        B.    The Proposed Solicitation Procedures and Form of Ballots Lack
            Procedural Safeguards ............................................................... 14

        C.    The Proposed $1,500 Payments in Exchange for Votes Exacerbate
            the Problem ................................................................................ 16

    II.    The Solicitation Procedures Improperly Disenfranchise Holders of Abuse
        Claims, and Give Undue Influence to Coalition Law Firms Over the
        Outcome of the Solicitation. ................................................................... 17

        A.    The "Master Ballot Solicitation Method" Will Taint the Voting
            Process ...................................................................................... 18

        B.    The Proposed Self-Certification Procedure Is Unlawful and Will
            Enable Manipulation of Voting ................................................. 19

        C.    Master Ballots Are Untenable In Light of the Rampant Conflicts of
            Interest....................................................................................... 21

    III.    The Proposed Solicitation Procedures Improperly Value Abuse Claims at
        $1.00 for Voting Purposes. ..................................................................... 25

CONCLUSION....................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baron & Budd, P.C. v. Unsecured Asbestos Claimants*,
 321 B.R. 147 (D. N.J. 2005) ............................................................................ 21

*In re Burns and Roe Enters., Inc*., No. 00-41610 (RG) (Bankr. D.N.J. Dec. 7, 2006)...............15

*In re Combustion Eng'g, Inc.*,
 391 F.3d 190 (3d Cir. 2004)...................................................................... 16, 20

*In re Indian Palms Assocs., Ltd.*,
 61 F.3d 197 (3d Cir. 1995)............................................................................ 20

*In re P-R Holding Corp.*,
 147 F.2d 895 (2d Cir. 1945)......................................................................... 16

*In re The Muralo Co.*,
 295 B.R. 512 (Bankr. D. N.J. 2003)............................................................. 20

*Maxus Liquidating Trust v. YPF, S.A. (In re Maxus Energy Corp.)*, 626 B.R. 249, 255 (Bankr. D.
 Del. 2021)……………………………………………………………………………………..21

**Statutes**

11 U.S.C. § 1126(c) .................................................................................... 3, 26

11 U.S.C. § 501(b) ........................................................................................ 14

11 U.S.C. § 501(c) ........................................................................................ 14

11 U.S.C. § 502(a) .............................................................................. 14, 15, 16

**Rules**

Fed. R. Bankr. P. 3005(a) ............................................................................. 15

Fed. R. Bankr. P. 3007................................................................................... 14

Fed. R. Bankr. P. 3018........................................................................ 12, 14, 15, 16

Mod. R. Prof. Conduct 1.7........................................................................ 21, 22

Century Indemnity Company ("Century"), as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America, respectfully submits the following objections to the Debtors' proposed Solicitation Procedures and Form of Ballots for the Second Amended Chapter 11 Plan of Reorganization for Boys Scouts of America and Delaware BSA, LLC (the "Solicitation Procedures") (the "Proposed Plan").[2]

## PRELIMINARY STATEMENT

The Court should reject the Debtors' proposed Solicitation Procedures and Master Ballot Solicitation Method.  As a threshold matter, the Debtors do not disclose what review procedures, if any, they will utilize to identify invalid, duplicative and questionable claims prior to soliciting their votes.  The Court has admitted uncontested evidence of hundreds of improperly submitted Proofs of Claim, revealing that the claims pool is plagued with irregularities.  It is imperative for such a review to be conducted before solicitation.  The Debtors have made no effort to weed out such invalid Abuse Claims, and, if approved, the Solicitation Procedures would inevitably lead to the solicitation of votes from holders of invalid claims, in direct contravention of the Bankruptcy Code.  The Court should not greenlight solicitation unless and until some effort is made to ensure that the voting process will not be irrevocably tainted.

Compounding these infirmities, the Debtors now propose offering each Abuse Claimant—no matter how illegitimate the claim—a $1,500 payment to vote in favor of the

---

[2]    *See* Solicitation Procedures [Dkt. No. 2726-1, Ex. 1] (Apr. 29, 2021); Notice of Revised Solicitation Procedures Order [Dkt. No. 2726] (Apr. 29, 2021); Revised Solicitation Procedures Order [Dkt. No. 2726-1] (Apr. 29, 2021); Disclosure Statement for the Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC, [Dkt. No. 2594] (Apr. 14, 2021) ("Disclosure Statement").  Unless otherwise indicated, docket cites refer to the docket in *In re:  Boy Scouts of America*, No. 20-10343 (Bankr. D. Del.), all emphasis is added, and all citations, quotations, and footnotes are omitted.

Debtors' preferred plan of reorganization, i.e., the Global Resolution Plan.  This is vote buying

of the worst kind.  Holders of legitimate Abuse Claims are unlikely to settle for $1,500.  The

$1,500 payment is thus obviously intended to induce holders of ***illegitimate*** claims to vote in

favor of the Global Resolution Plan—thus providing them with money to which they are not

entitled and providing the Debtors with enough votes to push through a plan that would

otherwise lack sufficient support for confirmation.

The Debtors' proposed Master Ballot Solicitation Method is flawed and should also be

rejected.  Under this approach, the Coalition of Abused Scouts for Justice's ("Coalition") law

firms and others representing Claimants would be permitted to vote on behalf of their clients and

merely self-certify that they are authorized to do so.  In other words, Abuse Claimants

themselves would not receive a Solicitation Package and would not cast ballots on their own

behalf; rather, votes would be cast for them by lawyers who purport to be authorized to cast the

claimants' votes, but need not submit any evidence of such authorization to the Court.  Indeed,

the Solicitation Procedures would permit the lawyers to cast these votes without even asking any

of the claimants whether they want to accept or reject the Proposed Plan.  Following this method

would compound the problems that have already infected this proceeding in connection with

lawyers submitting large volumes of claims seemingly without any claimant approval or even

knowledge.  The huge financial interest that the lawyers hold in the claims given that they assert

entitlement to 40 percent and more of the claimants' recovery only compounds the problem.

Nor should all Abuse Claims be valued at $1.00 for voting purposes.  This equalizing

scheme would dilute the votes of legitimate claim-holders in favor of the law firms responsible

for driving a 55-fold increase in the number of Abuse Claims through potentially improper

conduct.  Further, this one claim, one vote method is designed to avoid Bankruptcy Code section

1126(c)'s requirement that creditors holding "at least two-thirds in amount **and** more than one-half in number of the allowed claims" in the impaired class vote to approve the plan.  11 U.S.C. § 1126(c).  By valuing each Abuse Claim at $1.00, the Solicitation Procedures collapse section 1126(c)'s dual elements—the need to obtain a confirming vote both as to number and amount—into one:  the numerical count.

The Court should not countenance a scheme that so plainly undermines the Bankruptcy Code.

**THE PROPOSED PROCEDURES AND THE**
**MANIPULATION TO WHICH THEY ARE VULNERABLE**

On April 14, 2021, the Debtor filed its Disclosure Statement [ECF No. 2594], and on March 2, 2021, filed its motion seeking, *inter alia*, approval of proposed solicitation, voting, and tabulation procedures (the "Motion").[3]  [ECF No. 2295].  The Motion seeks to establish rules for solicitation and voting that are at variance with the requirements of the Bankruptcy Code and Federal Rules of Bankruptcy.

### The Proposed Terms Governing Voting

The proposed Solicitation Procedures contemplate the use of a Master Ballot by law firms based on the self-certification of the signing lawyer that he or she has authority to submit the ballot on behalf of the listed claimants, even though applicable law requires the submission of evidence establishing the representative's authority to vote on behalf of clients.  In order to vote on behalf of thousands of claimants, the law firm need only *submit an exhibit* listing the claimants who ostensibly support approval of the plan.[4]  And although law firms have the option of using a Direct

---

[3]    The "Motion" means the Debtors' Motion for entry of an order (a) approving disclosure statement; (b) establishing plan solicitation, voting, and tabulation procedures; (c) scheduling a confirmation hearing and deadline for filing objections to plan confirmation; and (d) granting related relief. [ECF. No. 2295].

[4]    *See, e.g.*, Solicitation Procedures, [Dkt. No. 2726-1] at 9.

Solicitation Method, it is obvious they have little incentive to do so.

The proposed procedures virtually ensure that no abuse claimant will actually receive the Plan and Disclosure Statements or cast ballots.[5]  The current claimants' lawyers will completely control voting on the Plan, with no evidence required of the input or involvement by the claimants themselves, or that the claimants were given a copy of the Disclosure Statement.  Nor will there be any effort to limit on whose behalf a ballot is cast as the Proposed Plan promises a bounty of $1,500 for every ballot cast in favor of the Plan regardless of whether the claim has merit.[6]

### Claims Generated by For Profit Claim Aggregators

To understand why the Debtors have structured the voting this way, some background is critical.

This case has drawn the attention of for-profit claim aggregators.[7]  These companies run advertising and social media campaigns that drive traffic to call centers where hourly workers operate out of boiler rooms to generate easy-to-complete proof of claim forms.[8]  The claims are then sold on spec or on contract.[9]

For example, the website for Verus Claims Services LLC ("Verus") describes its procedures in sex-abuse filings:  "Verus will be handling the complete process of the Proof of Claim form, as well as the actual submission to the administrator of the Chapter 11 Proof of

---

[5]  *See* Dkt. No. 2726-1 (explaining that Firms may choose their "preferred method of distribution of the Solicitation Packages").

[6]  *See* Disclosure Statement at 143 [Dkt. No. 2594].

[7]  *See generally* Insurers' Mot. For An Order Authorizing Rule 2004 Discovery of Certain Proofs of Claim at 12–15.

[8]  Declaration of Andrew Kirschenbaum ("Jan. 22, 2021 Kirschenbaum Decl.") Ex. 8. [Dkt. No. 1975-1] (https://www.wsj.com/articles/inside-the-mass-tort-machine-that-powers-thousands-of-roundup-lawsuits-11574700480) (describing how "lead-generation" companies screen respondents to TV and social media ads, after which they either send potential plaintiffs contracts for whatever law firm has hired them, or (for those that work on spec) "sell the leads to law firms," sometimes using brokers).

[9]  *Id.*

Claim process."[10]  The website adds that Verus will "[e]xplain to the victim the Proof of Claim

process," "[r]eview data for quality purposes," and "[u]pload POC form for submission."[11]

To be clear, this is not how the Bankruptcy Code is intended to work.  Rule of

Bankruptcy Procedure 9011 requires that proofs of claim ("POCs") be signed under oath by the

claimant or vetted by an attorney before filing, and disregard for the oath can expose the attorney

signing the POC to sanctions, disciplinary action, and even criminal penalties.[12]  These

submissions render solicitation vulnerable to all kinds of abuses.

### The Post-Petition Explosion in Claims Against BSA

BSA filed for bankruptcy in February of 2020.  After years in the tort system, BSA was

then a defendant in 275 sexual assault cases with about 1,400 more possible claims on the

horizon.[13]  Yet only a few months after the bankruptcy court set a bar date, BSA was inundated

with over 95,000 claims.[14]  This explosion was not random.  For-profit claim-aggregation

businesses engineered an aggressive, nationwide campaign to generate claims.[15]  Some of the

---

[10]   Jan. 22, 2021 Kirschenbaum Decl. Ex. 2.

[11]   *Id.* Ex. 3.

[12]   *See e.g.*, *In re Disciplinary Proceeding Against McGrath*, 178 Wash. 2d 280, 294 (2013) (disbarring attorney who filed false proofs of claim in his wife's bankruptcy to make her assets seem more encumbered than they really were so as "to mislead and discourage . . . creditors from making claims against the secured property."); *see also* 18 U.S.C. §§ 152(4), 157; *United States v. Connery*, 867 F.2d 929, 932 (6th Cir. 1989) (attorney who "prepared" a false proof of claim as part of a scheme by which the debtor had an accomplice file a false proof of claim was convicted of aiding and abetting a violation of 18 U.S.C. § 152(4), and was later disbarred); *In re Thomas*, 337 B.R. 879, 886 (Bankr. S.D. Tex. 2006) (concluding that "the proof of claim prepared, signed, and filed by Counsel on behalf of the IRS [was an] intentional false statement[]" because "both the Debtors and Counsel knew that the documents falsely represented the amount that the IRS asserted to be its claim," and referring conduct to the U.S. Attorney).

[13]   Debtors' Information Brief at 32 [Dkt. No. 4].

[14]   *See* Jan. 20, 2021 Declaration of Paul Hinton ("Hinton Decl.") ¶ 5 [Dkt. No. 1975-3]; *see also* Jan. 22, 2021 Kirschenbaum Decl. Ex. 14 (http://www.prnewswire.com/news-releases/boy-scout-lives-matter-says-legal-bay-lawsuit-funding-as-they-near-100k-sex-abuse-claims-filed-via-bankruptcy-process-301179510.html) (reporting the announcement of Legal Bay, The Pre-Settlement Funding Company, that the claims tallied over 92,000 as of November 24, 2020).

[15]   *See, e.g.*, Aug. 24, 2020 Declaration of Evan Roberts ("Roberts Decl.") Ex. A-1 [Dkt. No. 1145-3].

claims funneled respondents to a website with the information necessary to submit seemingly plausible claims.[16]

### Effort to Gin Up a Supermajority to Take Control of Bankruptcy

The objective of the group behind this effort was to generate a supermajority of claims in order to take control the bankruptcy, as revealed in an email that the Official Tort Claimants Committee ("TCC") turned over to the United States Trustee.[17]  To accomplish this objective, a handful of Coalition lawyers signed thousands of POCs in the days just before the November 2020 bar date, and a dozen lawyers each signed hundreds of POCs in one day.[18]  Members of the entity that holds itself out as Abused in Scouting—a fictitious entity acting as a front for three separate firms, two of which are one-man shops and the other a nine-lawyer outfit—generated almost 19,000 POCs alone.[19]

One of the solo practitioners and a self-proclaimed founder of the Coalition, Timothy Kosnoff, signed some 300 claims in a single day and more than 750 in total—nearly three times the total number of claims BSA faced pre-petition.[20]  But he was not even close to the most prolific mass-signer.  That was Coalition attorney Adam Krause, whose signature was affixed to some 890 POCs in one day and nearly 2,500 in total.[21]  Assuming an eight-hour workday with no breaks, Mr. Krause apparently executed one POC every 32 seconds.

### POCs Generated and Signed by Aggregators

A forensic document expert's analysis shows that in many instances someone

---

[16]  Jan. 22, 2021 Kirschenbaum Decl. Ex. 1 (http://www.junell-law.com/boy-scout-sexual-abuse/claim-form-notice/)

[17]  Dkt. No. 1285-1.

[18]  *See, e.g.*, Hinton Decl. tbl. 1.

[19]  Hinton Decl. tbl.2.

[20]  *Id.* tbl. 1.

[21]  *Id.* tbls. 1, 2.

photocopied a lawyer's signature page and attached it *en masse* to the POCs.[22]  Some firms had

an aggregator submit hundreds of POCs by adding an electronic signature in rapid-fire

succession—sometimes only seconds apart—to batches of POCs.[23]  One aggregator submitted

hundreds of POCs for one of the firms, all bearing the same signature—but purportedly signed

on behalf of different claimants.[24]  Together with other irregularities, this suggests that plaintiffs'

lawyers bought claims from aggregators and sent signature pages to them to attach to POCs for

filing without the signing lawyer—or any lawyer—ever having seen them.

### POCs with Forged and Fictitious Signatures

Other proofs of claim bear identical signatures, yet purport to be from different claimants.

That is, each signature page has a different claimant name typed in, purports to be signed by the

claimant, but bears the same signature.  For example:



Attached as Exhibit A to the Stamoulis declaration is a demonstrative illustration of this

practice.  The exhibit displays screenshots from the signature pages of seventy-two different

proofs of claim, all of which purport to be signed by the claimant—under penalty of perjury—

and all of which contain the same signature.  In each example, someone has checked the box to

affirm that the claimant is signing.  These are just samples.  Attached as Exhibit B is a list of

close to four hundred proofs of claim, identified by claim number, that bear the same signature.

---

[22]    Jan. 22, 2021 Declaration of Erich Speckin ("Speckin Decl.") ¶ 18 [D.I. No. 1975-4].

[23]    *Id.* ¶ 13.

[24]    *Id.* ¶ 19.

As explained in paragraph 19 of the January 22, 2021 declaration of Erich Speckin[25] and confirmed in paragraph 24 of the declaration of Larry Stewart,[26] a forensic examination of the data associated with these proofs of claim indicates that they were submitted to BSA's claims agent by the same for-profit claims aggregator, CAMG, Inc.[27]  There is little doubt that these lawyers conducted no pre-complaint investigation:  Most of the mass-signed POCs lack critical information, are late, duplicates, or have issues with the alleged state or year of abuse.  In fact, it appears that more than three out of every four Coalition claims suffer from these facial defects— and that does not even take into account the claims' merits.[28]

### Admissions by Coalition's Founder

One of the founders of the Coalition, Mr. Kosnoff, has since acknowledged that the Coalition firms have been "buying inventories of clients" generated by "TV Ad machines" (claim aggregators), funded by "hedge funds."  In his tweets, Mr. Kosnoff admits that the people fronting for these claims "are not real lawyers," have "never represented a victim," and will soon be "moving on to the next mass tort creation."

---

[25]  Speckin Decl. [D.I. No. 1975-4].

[26]  Feb. 16, 2021 Declaration of Larry F. Stewart, ¶ 24 [Dkt. No. 2232].

[27]  Speckin Decl. ¶ 19.

[28]  *See* Hinton Decl. tbl. 3.



Proof of claim forms are poorly suited to complex torts.  The forms typically require little information, are deemed presumptively valid upon filing, and confidentiality restrictions make them difficult to verify.  Investors and mass marketers have realized this and built for-profit businesses whose entire focus is to generate as many claims as possible, with collateral being exchanged in return.[29]

**Century's Pending Rule 2004 and 2019 Motions**

In light of these facts, Century filed motions to allow discovery into abuses in generating claims under Bankruptcy Rule 2004 [Dkt. Nos. 1971, 1974, 2007-1, 2022-1], as well as Century's Rule 2019 motion [Dkt. No. 2030].  At the February 17, 2021 omnibus hearing, the Court admitted into evidence uncontested testimony and exhibits offered by Century.  The claimants and their counsel offered no evidence to contest Century's evidence of widespread abuse in the generation of proofs of claims.

---

[29]    *See* Jan. 22, 2021 Kirschenbaum Decl. Ex. 9, 15, 16.

The Court carried over Century's Rule 2004 and 2019 motions, and has not yet ruled. Among other things, Century sought relief from Local Rule 3007-1(f) limiting the number of omnibus objections that could be brought so that the POCs could be challenged in an orderly manner after the Rule 2004 discovery was taken.

### Developments Since the February Hearing

As explained in the Statement that Century filed with the Court in March 4 [Dkt. No. 2316], developments since the hearing on Century's 2004 motion further support granting Century 2004 and 2019 motions.

A whistleblower has come to describe how the POCs were generated.[30] The individual worked as an Intake Professional for Reciprocity Industries, LLC ("Reciprocity"), and handled calls concerning claims of abuse in scouting. The whistleblower confirmed that employees were paid $11 or $12 per hour with bonuses paid to hit weekly targets.[31] The organization would "keep track of numbers," using "white boards everywhere in the office on which numbers of claims were written."[32] The tactics described are aggressive, with employees "only doing electronic signatures," and managers telling employees "push through Proofs of Claim without the claimants' signatures."[33] Indeed, claimants' signatures "were electronically affixed to Proofs of Claims by copying their signatures from their contracts and pasting them onto their Proofs of Claims."[34]

When callers changed their mind about pursuing a claim—which happened "more than [employees] thought they would—or were told they did not qualify, employees were instructed

---

[30] *See* Apr. 14, 2021 Declaration of Veronica Stenulson, as Modified May 11, 2021 ("Stenulson Decl.").

[31] Stenulson Decl. ¶¶ 7, 8.

[32] *Id.* ¶ 10.

[33] *Id.* ¶¶ 8, 16.

[34] *Id.* ¶ 16.

"to leave the claim on file, but to inform the client that their claim had been canceled," even though they had not.[35]  At times, employees "were told to change the details of a caller's story in order to make their claims seem more viable."[36]  This individual estimates that, out of the approximately 6,000 claimants with whom she spoke, she rejected *only ten prospective claimants*.[37]

*    *    *

The Debtors' solicitation motion, filed on March 2, 2021, further heightens the need to address this issues raised by the Rule 2004 and 2019 motion prior to solicitation [Dkt. No. 2295].

## OBJECTIONS

### I.    The Claims Pool Must be Vetted and Invalid Claims Removed Before Solicitation Can Commence.

The Debtors' proposed Solicitation Procedures rest on a fundamentally flawed premise: the Debtors appear to see no need to take any steps to weed out any invalid claims prior to soliciting votes.  The Solicitation Procedures do not affirmatively state whether or not the Debtors intend to review these claims.  To the extent the Debtors intend to review Abuse Claims to identify invalid and other deficiencies before soliciting a vote, those review procedures should be disclosed so that the Court, Abuse Claimants, and other parties in interest can evaluate them and object as necessary.  To the extent the Debtors do not intend to conduct such a review, that should be disclosed as well, as this approach would inevitably lead to the Debtors soliciting votes from holders of a large number of invalid claims.  As things currently stand, the Debtors' opaque approach excludes the Court and other parties in interest from any involvement in determining

---

[35]  *Id.* ¶¶ 12, 13.

[36]  *Id.* ¶ 17.

[37]  *Id.* ¶ 7.

11

which Abuse Claims are invalid, and from even knowing if such a review is taking place.

The Bankruptcy Code and Rules do not permit the Debtors to proceed with solicitation under these circumstances absent any form of procedural safeguards or judicial scrutiny. For example, Bankruptcy Code section 502(a) allows any party in interest to object to a proof of claim, and such an objection initiates a judicial process in which the Court determines—based on evidence and argument—whether the person is entitled to vote and, if so, in what amount. Likewise, Bankruptcy Rule 3018 grants *the Court* authority to temporarily allow a claim for voting purposes. The Debtors' proposed Solicitation Procedures aim to dispense with such judicial scrutiny.

### A.    Without Discovery, the Solicitation is Vulnerable to Manipulation

The Court does not have to countenance the Debtors' willful blindness. Before allowing the Debtors to move forward with solicitation, the Court should grant Century's Rule 2004 motions so that there can be some judicial evaluation of the claims, which will ensure that the solicitation process is not tainted. And, given the evidence, there is good reason to be concerned about the abuses of the solicitation process. The numbers speak for themselves—it is impossible for anyone to vet hundreds of claims in a single day or tens of thousands in just a few months. But the potential misconduct extends well beyond the numbers, including, by way of example, the following:

- Attorneys submitted hundreds of claims by affixing an electronic signature to bundles of claims just seconds apart in assembly-line fashion.[38]

- Other attorneys submitted photocopied pre-signed signature pages attached to hundreds of claims.[39]

---

[38]    Speckin Decl. ¶¶ 12–13.

[39]    *Id.* ¶¶ 7–8, 10–11.

- Attorneys relied on aggregators to churn out claims.[40]

- Some attorneys submitted hundreds of claims that contained nothing other than the claimant and lawyer's respective names and addresses.[41]

- A firm that filed thousands of claims announced that it would "complete" forms on behalf of potential claimants unless they opted out.[42]

Because they were not vetted, many of the mass-signed POCs that have been reviewed to date are facially defective. They are missing critical information, are duplicates, or are barred by the statute of limitations.[43]

With the attorneys who engaged in mass signings conducting no pre-filing inquiry, it is no surprise that the following questionable claims can be found in the sample of mass-signed POCs that were reviewed:

- One Abused in Scouting claimant was turned in by his mother, who notified BSA that her son was a scout for only a few weeks and was never molested.[44]

- Another Abused in Scouting attorney filed POCs on behalf of convicted insurance and credit card fraudsters.[45]

- ASK LLP filed a POC alleging abuse by someone who was in college in another state at the time of the alleged abuse.[46]

- Slater Slater Schulman filed a claim on behalf of a convicted tax fraudster.[47]

- The brother of another Slater Slater Schulman claimant came forward to say that his brother was never a scout.[48]

The presence of aggregators and funders amplifies the need for scrutiny. The aggregators

---

[40] Jan. 22, 2021 Declaration of Paul J. Hinton ("Hinton Decl.") tbl. 4 [D.I. No. 2022-1].

[41] Hinton Decl. tbl. 1; Speckin Decl. ¶ 14.

[42] Jan. 22, 2021 Kirschenbaum Decl. Ex. 1 [D.I. No. 1975-1].

[43] Hinton Decl. tbl. 2, 3.

[44] *See* Jan. 21, 2021 Declaration of J. Weinberg ("Weinberg Decl.") Ex. 1 [D.I. No. 2007-1].

[45] *See* Jan. 21, 2021 Declaration of Todd Mercier ("Mercier Decl.") Ex. 4, 10 [D.I. No. 2007-1].

[46] *See* Weinberg Decl., Ex. 4.

[47] *See* Mercier Decl. Ex. 1–3.

[48] *See* Weinberg Decl., Ex. 2.

boast that they will handle the "complete process of the Proof of Claim form."[49]  One aggregator advertises that it will "[e]xplain to the victim the Proof of Claim process," "[r]eview data for quality purposes," and "[u]pload POC form for submission."[50]  In short, it will relieve the lawyers who "signed" POCs from doing anything.

### B.    The Proposed Solicitation Procedures and Form of Ballots Lack Procedural Safeguards

The proposed ballot the Debtors seek to use allows anyone to claim to be a claimant's authorized agent to cast a vote on the claimant's behalf.[51]  The proposed ballot the Debtor seeks to use allows anyone to claim to be a claimant's authorized agent to cast a vote on the claimant's behalf.  The Debtor's proposed procedures require no showing that counsel is authorized to casts votes on the claimants' behalf, and does not require that any counsel must comply with Rule 2019 before signing a ballot.

This lack of procedure entirely excludes the Court and other parties in interest from the process of evaluating a claimant's assertion that he or she has a claim and is therefore entitled to vote.  The Bankruptcy Code and Rules do not allow claimants (or their counsel) to make this determination on their own, without scrutiny from the Court, and without any opportunity for other parties in interest to object to the claim.  Instead, under § 502(a), any party in interest may object to a proof of claim.  Such an objection initiates a judicial process in which the Court will determine, on the basis of evidence and argument, whether the person should be permitted to vote and, if so, in what amount.[52]

---

[49]  Jan. 22, 2021 Kirschenbaum Decl. Ex. 2.

[50]  Jan. 22, 2021 Kirschenbaum Decl. Ex. 3.

[51]  Solicitation Procedures at 7 [Dkt. No. 2726-1, Ex. 1].

[52]  *See* 11 U.S.C. § 502(a); Fed. R. Bankr. P. 3007, 3018.  Similarly, if the debtor has scheduled a particular creditor's claim as undisputed and liquidated, any other party in interest who disagrees with the debtor's scheduling of a claim and who may be liable with the debtor for the claim may file a proof of claim on the claimant's behalf and then object to it.  *See* 11 U.S.C. § 501(b), (c); 11 U.S.C. §

The procedures proposed by Debtor dispense with any such judicial scrutiny by permitting claimants, their lawyers, and the Debtor essentially to self-adjudicate the validity of their clients claim and self-determine their entitlement to vote.[53]

The necessity of judicial scrutiny in this context is underscored by revelations of what has gone wrong in other mass tort cases where ballots signed by counsel were used.  For example, in the *Burns & Roe* bankruptcy it was discovered that large numbers of tort claimants submitted ballots even though (i) they had settled their claims with debtor pre-petition, and had been paid, or (ii) they had dismissed their claims pre-petition, with prejudice, pursuant to a stipulation that they had no evidence of exposure to asbestos for which Burns & Roe might have legal responsibility.[54]

The procedures proposed in the Motion cannot be reconciled with requirements of the Code and Rules—particularly Rule 3018, which confers on the Court, not the claimants themselves or their lawyers, the authority to determine which claims are valid for voting purposes.  The Court should not approve a set of procedures that essentially permit counsel to self-determine—without judicial oversight or involvement—the validity of a claim for voting purposes.  Before an abuse claimant can be permitted to vote, therefore, he or she must file a

---

502(a); Fed. R. Bankr. P. 3005(a).

[53] *See* Motion ¶ 33.

[54] *See In re Burns and Roe Enters., Inc.*, No. 00-41610 (RG) (Bankr. D.N.J. Dec. 7, 2006), Dkt. No. 1884 at ¶ 2, Certification of Deirdre Woulfe Pacheco, Esq. (acknowledging that up to 547 clients of her law firm whose claims against debtor had been settled or dismissed with prejudice pre-petition had nevertheless submitted ballots voting on the debtor's plan); Declaration of Arthur Luxenberg, Dkt. No. 1913, *In re Burns and Roe Enters., Inc.*, No. 00-41610 (RG) (Bankr. D.N.J. Jan. 8, 2007) (acknowledging, after a court-directed review of his firm's records, that additional ballots had been erroneously cast by clients of his firm who had dismissed their suits against debtor pre-petition); Certification of Jake W. Harrell, Dkt. No. 1880, Exh. 1 at 15 and 16, *In re Burns and Roe Enters.*, Inc., No. 00-41610 (RG) (Bankr. D.N.J. Dec. 5, 2006) (attaching a stipulation, signed by a claimant who submitted a ballot voting on the Burns & Roe plan, in which the claimant had dismissed her claim against debtor pre-petition, with prejudice, based on an acknowledgement that, *inter alia*, the claimant had "no evidence of identification of products containing asbestos manufactured, distributed, used, or sold by defendant BURNS AND ROE ENTERPRISES, INC. to which the Plaintiffs were exposed").

proof of claim, parties in interest must have the chance to object to the proof of claim, the Court must issue an appropriate order under Rule 3018 temporarily allowing the claim, and all ballots must be supported by adequate proof of the claim being voted.

### C.    The Proposed $1,500 Payments in Exchange for Votes Exacerbate the Problem

As if this were not bad enough, the Debtors also propose offering each Abuse Claimant a $1,500 payment to vote in favor of the Debtors' preferred plan of reorganization, i.e., the Global Resolution Plan—*without any scrutiny of the claim whatsoever.*[55]  This, too, violates Bankruptcy Code section 502(a) because no party will have an opportunity to object to those payments, which could divert tens of millions of dollars to holders of facially invalid Abuse Claims. Moreover, the $1,500 payments violate Bankruptcy Code section 1129(a)(3)'s requirement of good faith because the Debtors are buying votes, which will inevitably lead to discrimination in favor of those accepting the payments.  *See In re P-R Holding Corp.*, 147 F.2d 895, 897 (2d Cir. 1945) (explaining that it is "certainly … bad faith when [the purchase of claims by the plan proponent] results in discrimination in favor of the creditors selling their interests.").  While holders of legitimate Abuse Claims have no reason to settle for $1,500 payment, the $1,500 payment will induce holders of illegitimate claims to vote in favor of the Global Resolution Plan. It is a win-win for the Debtors and these claimants:  The claimants receive money to which they are plainly *not entitled*, and the Debtors gain enough votes to push through a plan that would otherwise lack majority support.  The Court should not countenance such egregious conduct.

It was for similar reasons that the Third Circuit in *In re Combustion Engineering* remanded the case to the lower court to determine, *inter alia*, whether the debtor's scheme of

---

[55]    *See* Trust Distribution Procedures at 3 [Dkt. No. 2952, Ex. A].

reaching pre-petition side-agreements with a privileged group of claimants violated Bankruptcy Code section 1129(a)(3)'s good faith requirement. 391 F.3d 190, 244–47 (3d Cir. 2004). The "consequence" of this pre-petition side-arrangement was that this group of claimants "represented a voting majority despite holding, in many cases, only slightly impaired 'stub claims.'" *Id.* at 244. Accordingly, the court observed that "the monitoring function of § 1129(a)(10)"—which requires that at least one class of impaired claims must accept the plan— "may have been significantly weakened," enabling manipulation of the voting process. *Id.* at 243 ("The chief concern with such conduct is that it potentially allows a debtor to manipulate the Chapter 11 confirmation process by engineering literal compliance with the Code while avoiding opposition to reorganization by truly impaired creditors.").

So too here. By offering holders of Abuse Claims $1,500 to vote in favor of the Global Resolution Plan, the Debtors hope to leverage the favorable votes of the many holders of illegitimate claims, thereby creating a voting majority and overpowering the opposition voiced by holders of legitimate claims of higher value. And while this maneuver would engineer literal compliance with the code, it betrays the Debtors' true intention—to ram through a plan that is not proposed in good faith by manipulating the voting process. The Court should preclude the use of such tactics.

## II.    The Solicitation Procedures Improperly Disenfranchise Holders of Abuse Claims, and Give Undue Influence to Coalition Law Firms Over the Outcome of the Solicitation.

The Court should also reject the Solicitation Procedures because they contain three features that are designed to give undue control over the vote process to claimant law firms that have already filed tens of thousands of improper claims: (i) they permit law firms to use the "Master Ballot Solicitation Method," a process that will invite abuse and taint the solicitation process; (ii) they permit law firms to merely self-certify that they have authority to submit ballots

on behalf of their clients, even though applicable law does not permit this shortcut and requires the submission of evidence of such authorization; and (iii) they empower law firms who are laboring under untenable conflicts of interest that preclude them from fairly representing the interests of each of their clients.

### A.    The Use of Master Ballots Will Taint the Voting Process

First, the Court should not permit the Debtors to allow law firms to use the "Master Ballot Solicitation Method."[56]  Under this method, the Debtors will reach out to individual law firms—not individual claimants—and provide those law firms with the one Solicitation Package and Ballot, and then submit a single Master Ballot on which the firm will present the votes of all its clients and certify that it has authority to vote on their behalf.[57]  If this approach were adopted, tens of thousands of claimants would be voting on the plan without ever having seen a copy of the Proposed Plan or Disclosure Statement.  Leaving control of the vote in the hands of these law firms is particularly problematic here, where the Coalition law firms filed vast numbers of Abuse Claims in a short period of time, all in an effort to gain control over the class.  Indeed, some Coalition lawyers signed hundreds of claims in a single day, while others affixed their clients' signatures to claim forms that those clients had never seen or approved.[58]

The sheer volume of claims—with some Coalition firms purporting to represent thousands of Abuse Claimants—invites abuse because it is simply not plausible that those firms are going to have sufficient time to contact each of their clients individually, have a meaningful

---

[56]  *See* Disclosure Statement at 163 [Dkt. No. 2594] (explaining that each firm may "voluntarily select[] its preferred method for the Solicitation Agent to solicit votes on the Plan from its clients"); *see also* Revised Solicitation Procedures Order ¶¶ 27–28 [Dkt. No. 2726-1].

[57]  Alternatively, a Firm may choose the "Direct Solicitation Method," which allows the Firm to direct the Solicitation Agent to send solicitation materials directly to each holder of an Abuse Claim, and these claimants then vote individually.

[58]  *See* Insurers' Mot. For An Order Authorizing Rule 2004 Discovery of Certain Proofs of Claim at 10–11 [Dkt. No. 1975] (Jan. 22, 2021).

conversation with them about the Disclosure Statement, and record their vote on a Master Ballot. The far more likely outcome is that the Coalition firms will announce to their clients how the firm intends to vote on their behalf unless they choose to opt out. That approach would render the outcome of the vote a foregone conclusion and taint the entire voting process. The only way to ensure that individual Abuse Claimants have a meaningful opportunity to evaluate the Disclosure Statement and Proposed Plan is to permit them to vote individually unless they affirmatively choose to vote as part of a Master Ballot.[59]

### B. The Proposed Self-Certification Procedure Is Unlawful and Will Enable Manipulation of Voting

Second, allowing each law firm to self-certify that it has authority to vote on behalf of its clients only after submitting their votes—and without any prior review by the Debtors or the Court—will further taint the solicitation and voting process. Under the proposed Solicitation Procedures, each firm utilizing the Master Ballot Solicitation Method must certify that (a) the firm "shall collect and record the votes of its Abuse Survivor Clients through customary and accepted practices," or (b) the firm has authority to vote under applicable law.[60] But requiring only a conclusory certification of each firm's customary practices or its authority to vote on behalf of its clients invites abuse and would vitiate Bankruptcy Rule 2019's requirement that persons acting on behalf of multiple claimants file with the Court the instrument granting them the claimed authority.[61]

---

[59] That a claimant's Proof of Claim form might "indicate that communications regarding such claim may be directed to such client's Firm" does not solve this problem. *See* Solicitation Procedures at 7 [Dkt. No. 2726-2]. Claimants likely did not intend to forego their right to receive a Solicitation Package when they authorized their law firm to receive communications on their behalf (assuming they provided such authority). Claimants must have a meaningful opportunity to consider the Disclosure Statement and Proposed Plan, and the Master Ballot Solicitation Method would deprive them of this chance.

[60] Disclosure Statement at 163 [Dkt. No. 2594].

[61] The Court should not allow the Coalition law firms to rely on their retention agreements as

Bankruptcy Rule 2019(b) provides that a verified statement "*shall* be filed," thus imposing a mandatory requirement.  *See In re Indian Palms Assocs., Ltd.*, 61 F.3d 197, 208 (3d Cir. 1995) (use of the term "shall" imposes a requirement of mandatory, as opposed to discretionary, compliance); *In re The Muralo Co.*, 295 B.R. 512, 524 & n.10 (Bankr. D. N.J. 2003) (holding that "Rule 2019(a) requires entities, including counsel, who would represent in a chapter 11 case more than one creditor, to file a verified statement listing those creditors" and "explaining the circumstances of their agency").

To comply with Bankruptcy Rule 2019, the Court should thus require that persons or law firms purporting to act on behalf of multiple claimants file *evidence* of their authority as a matter of course.  Specifically, the Court should only permit representative voting if the lawyer claiming authority submits a power of attorney establishing that he or she has been specifically authorized to vote on the client's behalf on *this* particular Proposed Plan.  *See, e.g.*, *Combustion Eng'g*, 391 F.3d at 245 n.66 (explaining that "[w]here the voting process is managed almost entirely by proxy, it is reasonable to require a valid power of attorney for each ballot to ensure claimants are properly informed about the plan and that their votes are valid.").  As the court explained in *In re Congoleum Corp.*:

> I want to emphasize, the power of attorney must be bankruptcy specific.  If it merely refers to the personal injury case, it is not enough.  Authority to take action on a client's behalf in a personal injury case is not sufficient to give authority to vote on that client's behalf in the bankruptcy case.[62]

---

certification of their authority to vote on behalf of their clients, since the agreements do not grant a proxy with respect to voting.  Accordingly, even if the Court were to accept certifications of voting authority, these agreements cannot satisfy the requirement.

[62] July 26, 2004 Hr'g Tr. at 52–53, *In re Congoleum Corp.*, No. 03-51524 (Bankr. D. N.J. July 26, 2004) [Dkt. No. 1090]; *see also* Dec. 30, 2004 Hr'g Tr. at 57, *In re Congoleum Corp.*, No. 03-51524 (Bankr. D.N.J. Dec. 30, 2004) [Dkt. No. 1861] (holding that a "certification in the master ballots doesn't really solve the problem" and therefore "a bankruptcy specific power-of-attorney is something that must be strictly complied with here").

The need for evidence—and not a mere certification—is particularly acute because this Court is the sole arbiter of the legal sufficiency of an attorney's authority to submit a ballot on behalf of a client, and a record must exist from which the Court can make such a determination. Indeed, once counsel have filed the requisite powers of attorney under Bankruptcy Rule 2019, the Court should allow parties in interest to object, if appropriate, to any authorizations that may be insufficient. This process would ensure that claimants have specifically authorized their counsel to vote in a particular manner on the *specific* plan under consideration, and the Court can therefore be confident that the votes on the Proposed Plan reflect the interests and intentions of the actual claimants, rather than their counsel. *See, e.g.*, *Baron & Budd, P.C. v. Unsecured Asbestos Claimants*, 321 B.R. 147, 165 (D. N.J. 2005) ("Regulation of professional responsibility with respect to creditors' or debtors' counsel, moreover, is squarely within the purview of the bankruptcy court regardless of whether third party, non-debtors are involved.").[63]

### C.  The Engagement Agreements for Coalition Firms Preclude the Use of Master Ballots

Third, use of the "Master Ballot Solicitation Method" is also untenable because the Coalition law firms are laboring under clear conflicts of interest among their clients and lack authority to use master ballots. Under the Model Rules of Professional Conduct, attorneys must obtain "informed consent, confirmed in writing, when a concurrent conflict of interest exists." Mod. R. Prof. Conduct 1.7. *See* Local Rule 9010-1(f) (Model Rules apply to all attorneys practicing in Delaware bankruptcy court); *Maxus Liquidating Trust v. YPF, S.A. (In re Maxus Energy Corp.)*, 626 B.R. 249, 255 (Bankr. D. Del. 2021) (Model Rules of Professional Conduct apply to bankruptcy actions in Delaware).

---

[63]  Likewise, if a claimant is deceased, the person submitting the ballot for such a claim should provide evidence that they are the duly appointed agent for the estate of the deceased claimant.

Informed consent requires that "each affected client be aware of the relevant circumstances of the material and reasonably foreseeable ways that the conflict could have adverse effects on the interests of the client." Mod. R. Prof. Conduct 1.7, Comment 18. "When representation of multiple clients in a single matter is undertaken, the information must include the implications of the common representation, including possible effects on loyalty, confidentiality and the attorney-client privilege and the advantages and risks involved." *Id.*

Here, the Coalition law firms have at least two definite conflicts among their clients. First, as in every mass tort class, claimants have varying interests. Some claims may prove meritorious, whereas others will prove less valuable or, in some cases, invalid. Some claims will be barred by the applicable statutes of limitations, whereas others are not time-barred. And the law firm voting via a master ballot—as proposed and described above—cannot give different advice to the different groups of claimants it represents. Accordingly, a conflict exists purely as a result of the Coalition clients' varying positions with respect to the bankruptcy.

The retention agreement for AIS and many of the other Coalition firms do not contain the affirmative disclosures necessary for a waiver of the conflicts that flow from a joint representation or a waiver:

- The AIS law firms' single-page "Professional Employment Agreement" fails to even mention conflicts of interest.[64]

- Likewise, Slater Slater Schulman "Retainer Agreement" offers no mention of conflicts of interest.[65]

---

[64]   *See* Dkt. No. 1997-3 at 15; *see also* Oct. 13, 2020 Declaration of Nancy Moore [Dkt. No. 1499-2] ¶ 19.

[65]   *See* Dkt. No. 1997-3 at 2–5; *see also* Oct. 13, 2020 Declaration of Nancy Moore [Dkt. No. 1499-2] ¶ 19.

- Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, P.A.'s "Attorney-Client Employment Agreement" is silent regarding conflicts of interest.[66]

- Reich & Binstock, LLP and Shapiro Legal Group, PLLC's "Power of Attorney and Employment Agreement: Boy Scouts of America Abuse Litigation" makes passing reference to "common costs" but does not disclose or detail conflicts of interest.[67]

- Marc J. Bern & Partners "Contingent Fee Agreement" omits mention of conflicts of interest.[68]

- Motley Rice, LLC, Berger Montague PC, and Nye, Stirling, Hale & Miller, LLP's "Attorney Representation - Contingency Agreement" likewise says nothing about conflicts.[69]

- Mitchell A. Toups, Ltd.'s "Power of Attorney/Contract to Hire Attorneys" mentions the potential for joint representation but only in the context of apportionment of expenses.[70]

- Neither Colter Legal's "Contingency Fee Retainer Agreement" nor the cover letter mentions potential conflicts of interest.[71]

- Christina Pendleton & Associates, PLLC's "Attorney Contingent Fee Retaining/Employment Agreement" fails to disclose or discuss conflicts of interest.[72]

- Forman Law Offices, P.A.'s "Attorney-Client Employment Agreement" details the firm's "Common Benefits Charges" policy for group representations, but does not discuss the conflicts potentially stemming from such representations.[73]

- Danziger & De Llano, LLP's "Attorney Employment Agreement" makes no mention of conflicts of interest.[74]

---

[66] *See* Dkt. No. 1997-3 at 10–14.

[67] *Id.* at 19–21.

[68] *Id.* at 22.

[69] *Id.* at 32–40.

[70] *Id.* at 41–45.

[71] *Id.* at 46–47.

[72] *Id.* at 48–49.

[73] *Id.* at 50–56.

[74] *Id.* at 57.

- Swenson & Shelley's "Attorney Contingency Fee Agreement" is similarly silent on conflicts.[75]

- Brooke F. Cohen Law's "Boy Scouts of America Continent Fee Agreement" says nothing about potential conflicts among multiple Boy Scouts claimant clients.[76]

- Linville Johnson and Pahlke Law Group's "Attorney Contingency Fee Agreement" does not disclose potential conflicts of interest.[77]

- Finally, NS PR Law Services LLC d/b/a Napoli Shkolnik's "BSSA Retainer Agreement" likewise fails to even mention conflicts of interest.[78]

Hence, these engagements simply do not allow for the use of a master ballot, as the Coalition attorneys are violating their obligations under the rules. As explained by Professor Moore in her October 7, 2020 declaration, the failure to acknowledge or adequately disclose the conflict-of-interest risks associated with a joint representation violates Model Rule 1.7. Oct. 13, 2020 Declaration of Nancy Moore [Dkt. No. 1499-2] ¶ 19. Comment [18] to Rule 1.7 explains that in the context of a conflict of interest under that rule, "[i]nformed consent requires that each affected client be aware of the relevant circumstances and of the material and reasonably foreseeable ways that the conflict could have adverse effects on the interests of that client." Oct. 13, 2020 Declaration of Nancy Moore [Dkt. No. 1499-2] ¶ 19.

Second, the Coalition's retention agreements with its approximately 60,000 clients do not require those clients to pay the fees for Brown Rudnick LLP, the law firm representing the Coalition. Rather, a subset of approximately 10,000 of the Coalition's clients affirmatively elected to join the Coalition, thereby taking on the obligation for Brown Rudnick's fees. This dynamic is problematic because Brown Rudnick is jockeying to apply for reimbursement of their

---

[75]    *Id.* at 62–63.

[76]    *Id.* at 64–68.

[77]    *Id.* at 83–84.

[78]    *Id.* at 90.

fees with whatever plan is confirmed.  This arrangement may work for the 10,000 or so claimants whose obligation to pay Brown Rudnick's fees are discharged under the Proposed Plan, but not for the Coalition's remaining 50,000 clients.  A second conflict thus exists between the Coalition clients.[79]

The Court therefore cannot permit the Coalition firms to submit ballots on a Master Ballot.

### III.    The Proposed Solicitation Procedures Improperly Value Abuse Claims at $1.00 for Voting Purposes.

The Court should also deny the Solicitation Procedures because they improperly value all Abuse Claims at $1.00 for voting purposes,[80] despite substantial evidence that many claims could be deficient and/or illegitimate as a result of potentially improper conduct by law firms and attorneys, claims aggregators, and claimants.

Certain Insurers, including Century, moved over two months ago under Rule 2004 for discovery into the methods used to recruit these Abuse Claims.  During the March 17, 2021 hearing, this Court stated that its "inclination was to permit certain of the [Rule 2004] discovery" and that "certain of this discovery is appropriate," but held off on ruling.  Mar. 17, 2021 Hr'g Tr. at 51:8-52:13.

In light of the evidence on how the POCs were generated, this approach is inappropriate. First, under the circumstances, it will dilute the votes of those in the Class holding legitimate

---

[79]    *See, e.g.*, *id.* ¶ 20 (explaining that "[t]he Brown Rudnick Engagement Agreement provides that Brown Rudnick will charge its 'Standard Hourly Fees,'" and that, because the Agreement is "silent on whether and how the Six Law Firms will pass along the cost of Brown Rudnick's fees and expenses to the individual Law Firm Clients," it is "possible that these firms will characterize Brown Rudnick's hourly fees and expenses as 'expenses associated with the prosecution of client's claim' under paragraph 8, which the attorneys would advance and then 'be payable out of the Client's share of any recovery and will not affect the contingency rate or fees due to the Firms.'").

[80]    *See, e.g.*, Revised Solicitation Procedures Order ¶ 25 [Dkt. No. 2726-1].

claims.  Second, the $1.00 per vote scheme effectively "writes out" the requirements of Bankruptcy Code section 1126(c), which provides that a class of claims accepts a plan only "if such plan has been accepted by creditors … that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class" who have voted on such plan.  11 U.S.C. § 1126(c).  By valuing each Abuse Claim at $1.00, the Solicitation Procedures collapse section 1126(c)'s dual elements—the need to obtain a confirming vote both as to **number** and **amount**—into one:  the numerical count.

In this case, the claim values will vary widely in range, due to (i) the likelihood that many of the filed claims will prove worthless and/or invalid and/or time barred, and (ii) the vast disparities in the alleged severity of abuse and the alleged impact on the victims who hold legitimate claims.  Thus, it is entirely possible that despite section 1126(c)'s two-thirds requirement in dollar amount *not* being met, the law firms representing holders of likely deficient and/or invalid claims would push the votes over the 50% threshold.  Such an outcome would be highly inequitable and, under the proposed Solicitation Procedures, the Court will have no way of assessing whether such dubious maneuvering is actually taking place.

Accordingly, the Court should reject the Debtors' attempt to value all Abuse Claims at $1.00 for voting purposes.

## CONCLUSION

For the foregoing reasons, the Court should reject the Debtors' proposed Solicitation Procedures and Form of Ballots.  The Court should grant Century's Rule 2004 Motion, and allow discovery to proceed.  Only then should the Court permit solicitation to proceed, and it should require that claimants be individually solicited absent evidence of a case-specific grant of authority to the attorney to vote on the client's behalf, and an effective retention agreement containing a joint retention waiver.

Dated:  May 12, 2021[81]

Respectfully Submitted,

By:    */s/ Stamatios Stamoulis*
          Stamatios Stamoulis (#4606)

STAMOULIS & WEINBLATT LLC
800 N. West Street
Third Floor
Wilmington, Delaware  19801
Telephone:     302 999 1540
Facsimile:     302 762 1688

O'MELVENY & MYERS LLP
Tancred Schiavoni (*pro hac vice*)
Daniel Shamah (*pro hac vice* forthcoming)
Times Square Tower
7 Times Square
New York, New York  10036-6537
Telephone:     212 326 2000
Facsimile:     212 326 2061

*Counsel for Century Indemnity Company, as
successor to CCI Insurance Company, as
successor to Insurance Company of North
America and Indemnity Insurance Company of
North America*

---

[81] Century received an extension of time from the Debtors' counsel, until the end of the day on May 12, 2021, to file these objections.