## DECLARATION OF VERONICA STENULSON

I, VERONICA STENULSON, pursuant to 28 U.S.C. § 1746(2), under penalty of perjury, declare that:

1. I was hired by Reciprocity Industries, LLC ("Reciprocity") in or around August 2020 to work in its Montana office. I worked there as an Intake Professional for approximately four or five months until my employment with Reciprocity ended in late November 2020. I am 20 years old. I live in Montana.

2. I learned about a job opening at Reciprocity from friends from middle school and high school. I met with Sara Williams at Reciprocity before being hired as an Intake Professional, and spent one week being trained on Reciprocity's computer systems after I began work. There were no educational requirements for the position.

3. My responsibilities as an Intake Professional included speaking with callers on the telephone and collecting their answers to questions. Depending on a caller's answer to five to seven questions, I would either inform the caller that their claim could not be accepted or would forward their information to a case manager.

4. Reciprocity maintained a website on which scripts for various types of claims were posted. The questions I asked a caller were tailored to the type of claim that was being alleged. For example, if a caller alleged to have been injured by a medication, I would use a set of questions that differed from those I asked of someone who claimed to have been abused.

5. "Abused in Scouting" claims were the most common type that Reciprocity handled while I worked there, but Reciprocity also handled other types of claims such as medication claims, pesticides (Roundup) claims, Abused in Mormonism claims, claims involving a female scouting organization, and claims against the Catholic Church.

6. The next step in the process was the completion, by the caller, of a questionnaire that included approximately 50 questions. The questionnaire asked claimants questions about such things as their prior criminal history, education, and how the abuse affected them.

7. On average, I handled approximately 75 calls per day for the four months that I worked at Reciprocity. I rejected approximately ten prospective claimants out of the approximately 6,000 claimants with whom I spoke. I worked from 1 p.m. until 10 p.m., five days per week.

8. As an employee of Reciprocity I was paid $11 or $12 per hour. I received a weekly bonus of $200 if I signed up twenty claimants. An additional bonus of $100 was paid for every ten claimants that I signed up beyond twenty. No bonus was paid unless at least twenty claimants were signed up. The contract clients signed authorized Reciprocity to keep 40 percent of any amount awarded. Some callers physically signed their contracts, but as it got closer to November 2020, we were only doing electronic signatures. Electronic signatures were also used for incarcerated claimants.

1

*[handwritten margin note: "Jason Hopkins"]*

9. Reciprocity employees were cognizant of how many callers were signed up as claimants by other Reciprocity employees. The staff was split into four competitive teams that were led by Sara Williams, Ambrosia Reaves, and Tim Tilley. The teams had different names. The team I was on was known as "The Cool Ones." Each team was composed of a leader, an intake professional, two case managers, and a cyber-6 person. My team, along with the team that was led by Reaves, were the two highest producing teams in the office. Mike was a case manager on Reaves' team who was known for his ability to sign up claimants. Mike would sometimes get 200 callers to sign in a week.

10. Reciprocity handled approximately 14,000 Boy Scout claims before the window closed for filing claims in November 2020. We would also keep track of numbers. There were white boards everywhere in the office on which numbers of claims were written. I received multiple weekly bonuses for signing up claimants. Bonuses sometimes reached $1,000 over two-week periods when 100 claimants were signed up.

11. Sara Williams, Ambrosia Reaves, and Tim Tilley were the employees who were in charge of the Montana office. Approximately 40 employees worked in Reciprocity's Montana office. None of them were attorneys. I was paid by Reciprocity. The signage in the building in which I worked also said Reciprocity.

12. There were instances where claims were put through for callers who had either changed their mind about pursuing a claim or who were told that they did not qualify. If such a claimant had already signed a Proof of Claim, Mr. Reaves instructed me to leave the claim on file, but to inform the client that their claim had been canceled. I felt bad about misleading callers so I sent emails notifying them that I was unable to rescind their claim at that time, but would continue trying.

13. Callers asked that their claims be rescinded more than we thought they would. I felt bad about misleading callers so I often asked my supervisors to reconsider their decision not to rescind the claims. The typical response I received was that the client was probably going to call back and ask that the claim be reinstated, so it was easier just to leave the claim on file.

14. While I did not tell callers precisely how much money they could be awarded, I was instructed to tell callers that we would not shoot for anything lower than one hundred thousand dollars. I was also told to let claimants know that the Boy Scouts had been selling a lot of its assets in order to generate money that could be used to settle claims.

15. I frequently fielded questions from callers about remaining anonymous. Reciprocity's claimants were told that they could remain anonymous through the entirety of this process.

16. Toward the end of my employment by Reciprocity, employees were told that we could push through Proofs of Claim without the claimants' signatures. The claimants' signatures were electronically affixed to Proofs of Claims by copying their signatures from their contracts and pasting them onto their Proofs of Claims.

17. Sometimes we were told to change the details of a caller's story in order to make their claims seem more viable, but I was not comfortable with that directive. Case managers

2

would say this in order to get more callers signed up. When I informed a case manager that a caller's information did not qualify as a valid claim, the case manager sometimes said, "Oh, I can get them signed, just send them over." When I reminded the case manager that he/I hadn't even looked at the claimant's file yet, the case manager typically responded, "Oh, we'll figure something out." The case managers who employed this practice, included McRae who did this once, Sydney McCleary did it several times, and other case managers altered claimant's narratives as well. One would alter the facts of a caller's experience to get that extra caller signed up so as to get that extra one hundred dollar bonus. When employees got close to the next bonus level (intervals of 10 signings beyond the first 20), they would become more determined to reach that level in order to secure another bonus.

18. Although I was trained to remove duplicate claims from Reciprocity's system, I am aware that for the last four to six weeks of my employment with Reciprocity, team leaders instructed employees to allow duplicate Proofs of Claim to remain active. Team leaders sometimes said, "We'll just give them two claims, that's fine."

19. Telephone calls with Reciprocity were recorded. I believe that callers were made aware of this practice by a recorded message.

20. My employment ended when the time to file Boy Scout claims (the window) ended in November 2020 and Reciprocity no longer needed as many employees.

Pursuant to 28 U.S.C. § 1746(2), I make the foregoing statements under penalty of perjury.

Dated: April 14, 2021

Respectfully submitted,

*[signature]*
VERONICA STENULSON

*I added the names of Jason Hopkins as a team leader on page 2. :)*

*[signature]*
11 May 2021