**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF DAVID L. MCKNIGHT**

I, David L. McKnight, pursuant to 28 U.S.C. § 1746(2), under penalty of perjury, hereby declare as follows:

**I.    BACKGROUND AND QUALIFICATIONS**

1. I am a Senior Associate in the Litigation and Finance Practice of The Brattle Group. Prior to joining the Brattle Group in 2013, I was a Consultant at NERA Economic Consulting where I was employed since 1999. I hold an M.B.A. with Distinction from New York University's Leonard N. Stern School of Business, an M.S. in Mathematics from New York University's Graduate School of Arts and Science, and a B.A. in Mathematics from Vassar College. For over 20 years, I have worked on a number of mass tort cases analyzing claims data, forecasting future claims, and estimating settlement amounts. These cases include:

   - *In re. Purdue Pharma L.P., et al.*, United States Bankruptcy Court Southern District of New York, regarding injuries resulting from addiction to opioids;
   - *In re: Dow Corning Corporation*, United States District Court for the Eastern District of Michigan Southern Division, regarding breast implant personal injury claims;
   - *In re: W.R. Grace & Co., et al*, United States Bankruptcy Court for the District of Delaware, regarding asbestos liabilities;
   - *In re Federal-Mogul Global, Inc., et al.*, regarding asbestos liabilities; and
   - *Ezell Thomas and Owens Corning v. R.J. Reynolds Tobacco Company, et al.*, Circuit Court of Jefferson County, Mississippi, concerning damages arising from asbestos related diseases.

1

2. I have written and presented on issues relating to valuation, tort liability, and bankruptcy, and have submitted expert oral and written testimony in multiple venues including the American Arbitration Association, FINRA, and JAMS. My curriculum vitae, including testimony given over the last four years and publications over the last ten years, is attached as Appendix A.

3. I have been retained by O'Melveny & Myers LLP ("Counsel") on behalf of Century Indemnity Company to opine on the sample of claimants that the Debtors propose be interviewed as part of a claims estimation, and to opine on whether the proposed interviews are likely to provide information that will be helpful in a claims estimation.

4. I am familiar with the Sexual Abuse Survivor Proofs of Claim ("POCs") submitted to the United States Bankruptcy Court for the District of Delaware in this proceeding, *In re Boy Scouts of America and Delaware BSA, LLC*, Case No. 20-10343 (the "BSA Bankruptcy"). I have manually reviewed hundreds of the POCs and have analyzed the digital database of POCs that is maintained by Omni Agent Solutions ("Omni") in its role as the Official Claims Agent.

5. In connection with preparing this Declaration, I have reviewed the following materials:
   - Motion of the Future Claimants' Representative, the Official Committee of Tort Claimants, and the Coalition of Abused Scouts for Justice for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 502(c), (I) Authorizing an Estimation of Current and Future Abuse Claims and (II) Establishing Procedures and Schedule for Estimation Proceedings, March 16, 2021;
   - Century's Opposition to the Coalition, TCC and FCR's Motion to Estimate Current and Future Abuse Claims, April 15, 2021;
   - Debtors' Motion for Entry of Order (I) Scheduling Certain Dates and Deadlines in Connection with Confirmation of the Debtors' Plan of Reorganization, (II) Establishing Certain Protocols, and (III) Granting Related Relied, April 15, 2021; and
   - Letter from Michael C. Andolina to All Mediation Parties, *Re: In re Boy Scouts of America and Delaware BSA, LLC, No. 20-10343 (LSS); Debtors' Proposed Confirmation Scheduling Order*, April 15, 2021.

## II. The Proposed Interviews Are Unlikely to Provide Information That Will Aid in Claims Estimation

### A. The Debtors Do Not Explain How the Proposed Interviews Will Allow Experts to Determine the Aggregate Tort Liability

6. The sample proposed by the Debtors in their letter to the mediation parties, dated April 21, 2021, is unlikely to reveal any information that will be useful in estimating the sexual abuse liabilities claims. The Debtors propose to sample claims along two dimensions: (1) whether the claims are barred by statute of limitations ("SOL"), and (2) the number of times the alleged abuser appears in the POCs. The Debtors identify 10 buckets of claims based on these two dimensions,[1] and are proposing to sample 40 claims from each bucket.[2]

7. Sampling is a statistical procedure whereby a random set of observations is drawn from a population to estimate characteristics of the whole population. Well-designed sampling methodologies will involve defining the population from which the random sample will be drawn, identifying the statistics or characteristics that will be estimated by the random sample, and choosing a targeted range of uncertainty in the estimates. Once the sampling procedure has been designed, the number of observations that need to be sampled in order to assure that the estimates are within the targeted range of uncertainty can be computed. In contrast to this scientific procedure, the Debtors have not defined what information or statistics they hope to estimate from the proposed interviews, and assume without support that a sample of less than 0.5 percent of the claims is large enough to make reliable estimations for the universe of claims.

8. The Debtors have not indicated why stratifying the claims by SOL and the number of times the alleged abuser appears in the POCs will aid in claims estimation. Stratified random sampling can be used to improve the statistical power of a sample in populations that consist of two or more homogenous subgroups. In these cases, the populations can be stratified to minimize the variation of the statistics or characteristics of interest within the

---

[1] Letter from Michael C. Andolina to All Mediation Parties, *Re: In re Boy Scouts of America and Delaware BSA, LLC, No. 20-10343 (LSS); Debtors' Proposed Confirmation Scheduling Order*, April 15, 2021, p. 4.
[2] I understand that on a call with the mediation parties counsel for the Debtors stated that the interviews would be: (1) used for purposes of claims estimation; (2) conducted for 40 claimants chosen at random from each of 10 different groups of claims; (3) conducted under oath; and (4) scheduled for one hour, with 20 minutes each given to the claimants' lawyers, the Debtors, and the relevant insurer.

subgroups. The Debtors have not indicated what it intends to learn from the interviews nor why stratifying the claims in the way they propose will aid in claims estimation. The results of the interviews will likely be influenced by factors that are not correlated with the proposed stratification. As a result, there may be little gained by stratifying the random sample as the Debtors propose. In addition, given the different sizes of the stratum sampling 40 claims from each will mean that some subgroups will be sampled at a much lower rate than others.

    **B.**    **The Sampling Approach Specified in the Debtors' Proposal Would Provide Little Useful Information about the Value of the POCs**

9. Each sexual abuse claim involves a unique set of facts and circumstances that could impact the value the claim would receive in the tort system. Factors such as the credibility of the claimant and culpability of the BSA in the alleged abuse can have a huge impact on the value of a tort claim, but are not known for the universe of POCs. As a consequence the value of the claims will have large amounts of variation that cannot be explained by the information that is recorded in the POCs. This creates an issue for the sampling methodology because the required sample size increases when there is more variation within the sampled population. There is no assurance that sampling 400 claims will provide a basis to extrapolate to the universe of 80,000 claims.

10. There are a large number of factors that will affect the value of the claims that are not captured in the proposed sampling strategy. These factors include: (1) the alleged abuse, (2) whether or not the Debtors were or should have been aware of the abuse, (3) whether the claimant has proven scouting involvement, (4) whether there were impacts of the alleged abuse, (5) whether the claimant had other connections to the alleged abuser, (6) whether the claims are missing key information, (7) the state in which the abuse is alleged to have occurred, (8) whether or not the alleged abuse was ever reported to the Debtors or to law enforcement, (9) the age of the claimant at the time of abuse, (10) how long ago the alleged abuse occurred, (11) the number of times the claimant was abused, (12) the number of abusers and whether they were adults or youth, (13) whether the claimant retained counsel and which law firm is representing them, (14) whether there are any forensic issues with the POCs, (15) whether there are inconsistent narratives within the

claims, (16) whether a claimant submitted multiple claims with different law firms, and (17) whether a claim was recruited and processed by a claims aggregator. This list is not exhaustive but demonstrates the extensive number of factors that are important in any valuation and which are not adequately sampled in the Debtors' proposed approach.

11. Other problems with the proposed sampling strategy include:

- Given the large number of factors that affect the value of the sexual abuse claims that are not included in the proposed stratification, the sampled claims are likely to have a very wide range of values, making it difficult to extrapolate from the proposed sample to the universe of POCs.

- There are thousands of potential cohorts of claims (e.g., the unique combinations of the 17 factors above observed in the claims data are very numerous particularly when accounting for the different values each factor can take), making it impossible to interview a statistically significant and representative set of claimants in the timeframe proposed by the Debtors and with the limited scale of the sampling effort proposed.

- Some of the factors that will affect the value of claims are not recorded in the POCs, making it impossible to develop stratum that account for all of the characteristics that affect value.

- The interviews may reveal new information important to the value of the claims that is not captured in the POCs. If such new information arises, it will be impossible to extrapolate to the other POCs because that information is not known for the other claims.

- The Debtors do not propose how to identify the number of times an abuser is mentioned in the claims data. Identifying abusers by name alone is inadequate because names are not unique, even within the same state. There are many examples of abusers in the database that have the same name, but based on the location and time of the alleged abuse are clearly not the same people. Many times names are not provided, or nicknames are used. It is a difficult to identify common abusers across all the POCs,

and the Debtors have not proposed how this could be done, even if it were a helpful basis for stratifying the proposed sample.

### III. The Debtors' Proposed Scheduling Order Proposes a Prejudicial and Impractical Estimation Process

#### A. The Proposal Is Prejudicial

12. The goal of a claims estimation process should be to determine the value that the claims would receive if they were brought in the tort system. For the reasons described above, the proposed sampling of claimants is unlikely to provide all of the information that is needed to make this determination. By proceeding with the claims estimation process suggested by the Debtors, experts will not have sufficient information to assess which of the claims would meet the burdens of proof in the tort system, and as a result many claims that would not survive in the tort system may be assigned significant value under the Debtors' proposed estimation. The interviews will not cure the prejudicial effect of allowing aggregate liability estimation for claims filed by over 80,000 claimants with unique individual liability profiles.

13. In the tort system a lengthy discovery process that involves document discovery, depositions of the claimant and other key witnesses, as well as expert analysis is needed to develop the evidence necessary to resolve sexual abuse claims. In lieu of the discovery process, the Debtors propose that a one-hour interview of the claimant will provide all of the information needed to assign a value to that claim and to extrapolate values to thousands of other claims. In fact, by only interviewing the claimant, the Debtors are failing to avail themselves of all of the defenses they would have in the tort system. Unless the claimants somehow contradict themselves or reveal information that weakens or contradicts a given claim, the interviews will only serve to reinforce the claims that are already made on the POC. The Debtors' suggestion that this one-sided process will provide all of the information needed to estimate claim values is prejudicial.

### B. The Schedule Is Impractical

14. The Debtors' proposed scheduling order suggests that claims estimation and Plan Confirmation can be completed by the end of the summer.[3] The schedule of claimant interviews and expert testimony appears to have been set working backward from this target end date, resulting in unreasonably tight turnaround times for expert reports, rebuttal reports, and depositions. The Debtors propose that expert reports can be filed five days after the claimant interviews are completed. This schedule does not provide enough time for experts to summarize the findings from the interviews, extrapolate the findings to the universe of claimants, and develop liability estimates for all POCs. Experts would then have a two-week period to prepare rebuttal reports. Thus assessment and rebuttal analysis of several different estimation procedures would need to be performed during this time. Given the estimation challenges posed by this case, the complexity of the data, and the need to incorporate what was learned from the interviews of sampled claimants, two weeks is an insufficient period of time to complete the work required for experts to reliably inform the Court.

## IV. Conclusion

15. As a result of the defects described above, individually and collectively, the practical effect of the Debtors' proposed sampling approach and Plan Confirmation schedule is to impose a prejudicial estimation process that would produce estimates of aggregate liability that would not – because by design, they could not – adequately account for variations in individualized issues of liability and damages for each of the claimants across the universe of more than 80,000 claims.

Dated: May 12, 2021
_____Maplewood\_, New Jersey

*David McKnight*

_____

David L. McKnight

---

[3] Debtors' Motion for Entry of Order (I) Scheduling Certain Dates and Deadlines in Connection with Confirmation of the Debtors' Plan of Reorganization, (II) Establishing Certain Protocols, and (III) Granting Related Relied, April 15, 2021, par. 21.

# Appendix A - Curriculum Vitae of David L. McKnight

**Mr. David McKnight** has over 20 years of experience in economic consulting, providing expert testimony and consulting services in litigations, regulatory proceedings, tax matters, and arbitrations pertaining to product liability, valuation, bankruptcy, and commercial disputes.

In product liability matters, Mr. McKnight has worked with liability forecasts, insurance coverage, and discounted cash flows. He has forecasted future liabilities for personal injury claims resulting from exposure to asbestos, silicosis, pollution, and various drugs and medical devices; allocated projected losses to available insurance coverage; and estimated the resulting cash flows. He developed models of exposure to asbestos and helped to estimate the future incidence of mesothelioma and other asbestos-related disease. He has also assisted companies in setting liability reserves for financial accounting, and forecasted future claims for bankruptcy trusts.

In bankruptcy and commercial disputes, Mr. McKnight has valued companies and business opportunities using discounted cash flow analysis, market multiples, and comparable transactions. He has assessed claims of fraudulent conveyance and breach of fiduciary duty in bankruptcy proceedings and litigation. Mr. McKnight has also analyzed complex commercial transactions to compute damages in commercial disputes and assess economic substance in tax matters. He has testified on liability and damages pertaining to a breach of contract claim between a jewelry manufacturer and a management consulting firm, and on the risk and suitability of a complex derivative in a FINRA arbitration.

Mr. McKnight holds an M.S. in Mathematics and an MBA in Finance and Financial Systems & Analytics from New York University.

### EDUCATION
**NEW YORK UNIVERSITY**
Leonard N. Stern School of Business
*Master of Business Administration with Distinction*

Graduate School of Arts and Science
*Master of Science, Mathematics*

**VASSAR COLLEGE**
*Bachelor of Arts with Departmental Honors, Mathematics*

**TESTIMONY**

- Testimony before panel in American Arbitration Association proceedings, Strategic Consulting Alliance, LLC, D/B/A JCG Consulting Group v. S.D.C. Designs, LLC, "Economic Damages Rebuttal Report," December 7, 2016.

- Testimony before a majority-public panel in FINRA arbitration, Ontonimo (OMO) Limited vs. BNP Paribas Securities Corp, concerning the risk and suitability of a Hedge Fund of Funds Option investment product. April 02, 2015.

**EXPERT REPORTS**

- Supplemental Expert report of David McKnight in the matter of Babo International Trade, LLC v. CVS Pharmacy, Inc., JAMS, Case No. 1340018943, on behalf of claimant to estimate damages incurred as a result of breach of contract, December 9, 2020.

- Expert report of David McKnight in the matter of Babo International Trade, LLC v. CVS Pharmacy, Inc., JAMS, Case No. 1340018943, on behalf of claimant to estimate damages incurred as a result of breach of contract, November 20, 2020.

- Expert report of Mark Berkman and David McKnight for the Kentucky Division of Water, July 8, 2020.

**PUBLICATIONS**

- David L. McKnight and Paul J. Hinton, "Tort Liability Costs for Small Businesses," U.S. Chamber Institute for Legal Reform, October, 2020.

- Paul J. Hinton, David L. McKnight, and Lawrence Powel, "Costs and Compensation of the U.S. Tort System," U.S. Chamber Institute for Legal Reform, October, 2018.

- Yvette Austin Smith, David McKnight, and Torben Voetmann, "Delaware Appraisal Case Reaffirms Valuation Premium for S Corporations." Deal Points, Volume XX, Issue 3 Fall 2015.

- David L. McKnight and Paul J. Hinton, "How Costly is the U.S. Tort System? An International Comparison of Liability Costs." U.S. Chamber Institute for Legal Reform, 2013.

- Paul J. Hinton and David L. McKnight, Measuring Improvements in the Tort System. Inside ALEC, American Legislative Exchange Council, 2012.

- Paul J. Hinton and David L. McKnight, "Creating Conditions for Economic Growth: The Role of the Legal Environment." NERA Economic Consulting, October 26, 2011.

## PRESENTATIONS

- David McKnight, Chuck Jones, and Oriana Senatore, "Summit 2020: Future in Focus – Focusing on Small Business Tort Costs." U.S. Chamber Institute for Legal Reform, October 20, 2020.

- Denise M. Clark, David McKnight, and Patrick D. Krivoshia, "Calculating Damages in ERISA Litigation: Practical Guide." The Knowledge Group, March 21, 2019.

- David Berliner, Mark D. Podgainy, David McKnight, and Ryan Wagner, "Corporate Restructuring and Bankruptcy: Trends, Developments, and Opportunities for the Year Ahead for 2017 LIVE Webcast." The Knowledge Congress, December 7, 2017.

- Dirk Van Dyke, David McKnight, and Florin Dorobantu, "Fair Value: Friend or Foe for 2016 LIVE Webcast." The Knowledge Congress, June 28, 2016.

- John Lehman, Linda MacDonald, Rothstein Kass, Raymond Wong, and David McKnight, "Fair Value Measurements and Reporting for 2012 LIVE Webcast." The Knowledge Congress, July 18, 2012.