## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re:* | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
|  | Jointly Administered |
| Debtors. |  |
|  | Hearing Date: May 19, 2021, at 10:00 a.m. (ET) |
|  | **RE: Docket No. 2391** |

### OMNIBUS REPLY OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS, THE COALITION OF ABUSED SCOUTS FOR JUSTICE, AND THE FUTURE CLAIMANTS' REPRESENTATIVE TO OBJECTIONS TO MOTION OF THE FUTURE CLAIMANTS' REPRESENTATIVE, THE OFFICIAL COMMITTEE OF TORT CLAIMANTS, AND THE COALITION OF ABUSED SCOUTS FOR JUSTICE FOR ENTRY OF AN ORDER, PURSUANT TO 11 U.S.C. §§ 105(a) AND 502(c), (I) AUTHORIZING AN ESTIMATION OF CURRENT AND FUTURE ABUSE CLAIMS AND (II) ESTABLISHING PROCEDURES AND SCHEDULE FOR ESTIMATION PROCEEDINGS

The Official Committee of Tort Claimants (the "TCC") and the Coalition of Abused

Scouts for Justice (the "Coalition"), and James L. Patton, Jr., the Future Claimants'

Representative (the "FCR"), by and through their undersigned counsel, hereby replies to

objections (the "Objections") filed by (i) Boy Scouts of America and Delaware BSA, LLC

(collectively, the "Boy Scouts" or the "Debtors"),[2] (ii) Century Indemnity Company

("Century"),[3] (iii) certain insurance carriers (collectively, the "Certain Insurers"),[4] (iv) the

---

[1]  The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] *Debtors' Objection to the Future Claimants' Representative, the Official Committee of Tort Claimants, and the Coalition of Abused Scouts for Justice's Motion for Entry of an Order, Pursuant to 11 U.S.C. §§ 105(a) and 502(c), (I) Authorizing an Estimation of Current and Future Abuse Claims and (II) Establishing Procedures and Schedule for Estimation Proceedings* [Docket No. 2612] (the "Boy Scouts Objection").

[3] *Century's Opposition to the Coalition, TCC and FCR's Motion to Estimate Current and Future Abuse Claims* [Docket No. 2614] (the "Century Objection").

[4] *Opposition of Certain Insurers to Motion of the Coalition, TCC and FCR to Estimate Current and Future Abuse Claims* [Docket No. 2611] (the "Certain Insurers Objection").

Church of Jesus Christ of Latter-day Saints,[5] joined by the (v) United Methodist Ad Hoc Committee[6] and (vi) Old Republic Insurance Company ("Old Republic")[7] to the *Motion of the Future Claimant's Representative, the Official Committee of Tort Claimants, and the Coalition of Abused Scouts for Justice for Entry of an Order, Pursuant to 11 U.S.C. §§ 105(a) and 502(c), (I) Authorizing an Estimation of Current and Future Abuse Claims and (II) Establishing Procedures and Schedule for Estimation Proceedings* [Docket No. 2391] (the "Motion" or "Estimation Motion"), filed by the TCC, FCR and the Coalition, and in support thereof states as follows:

## **INTRODUCTION**

1.        The parties agree that estimation of abuse claims must be undertaken in connection with the Boy Scouts' cases to move forward with a plan.   The only disagreement is with respect to the forum and context of the estimation proceeding.   The Estimation Motion represents the first step in establishing a mechanism to estimate the liability arising from survivor claims.

2.        The Boy Scouts can offer little resistance to the Motion other than request that estimation only be done *its* way, as proposed in the Plan (and the Confirmation Scheduling Motion to be heard concurrently with the Estimation Motion).  But if the Boy Scouts does get its

---

[5] *Objection of the Church of Jesus Christ of Latter-day Saints, a Utah Corporation Sole, to Motion of the Future Claimants' Representative, the Official Committee of Tort Claimants, and the Coalition of Abused Scouts for Justice for Entry of an Order, Pursuant to 11 U.S.C. §§ 105(a) and 502(c), (I) Authorizing an Estimation of Current and Future Abuse Claims and (II) Establishing Procedures and Schedule for Estimation Proceedings* [Docket No. 2610].
[6] *Joinder of the United Methodist Ad Hoc Committee to the Objection of the Church of Jesus Christ of Latter-day Saints, a Utah Corporation Sole, to Motion of the Future Claimants' Representative, the Official Committee of Tort Claimants, and the Coalition of Abused Scouts for Justice for Entry of an Order, Pursuant to 11 U.S.C. §§ 105(a) and 502(c), (I) Authorizing an Estimation of Current and Future Abuse Claims and (II) Establishing Procedures and Schedule for Estimation Proceedings* [Docket No. 2681.
[7] *Old Republic Insurance Company's Objection to Motion of the FCR, TCC, and Coalition to Estimate Current and Future Abuse Claims and Partial Joinder in the Opposition of Certain Insurers to the Motion* [Docket No. 2613] (the "Old Republic Objection").

way, it will bend over backwards to avoid a true estimation proceeding that determines the values of abuse claims for purposes of distribution or otherwise does anything that may be perceived as threatening to the hold-out parties—the insurers.  *See* Plan § X.M.

3.      The Boy Scouts' concerns that estimation that enables parties to group claim amounts by year, type of abuse, local council and chartered sponsoring organization, as requested in the Motion, contradicts the Boy Scouts' heaping praise for the work of its consultant, Bates White LLC, who apparently has worked for months to be able to categorize and manipulate claims data easily.  Finally, the Boy Scouts raises the specter of its self-imposed deadline for emergence from bankruptcy by the end of the summer (supported solely by citations to statements on the record made by Boy Scouts' counsel and not supported by the business plan that the Court has never seen),[8] which is an insufficient justification to deprive the parties of a workable methodological process and timeline in which such claims are estimated.

4.      The insurers and certain other objecting parties offer little in the way of valid criticism of the Motion.  They simply do not want estimation to occur, except maybe the estimation proposed in the Plan that permits insurers to participate, but exempts them from the results.  The Court should overrule the objections, grant the Motion and grant the parties leave to advise the District Court of the disposition of the Motion pending its determination of the Motion to Withdraw the Reference, which will determine the forum in which estimation proceedings will occur.

5.      Approximately 84,000 survivors of child rape, molestation and other sexual abuse arising from the Boy Scouts' scouting programs have filed claims in these cases.  The number of

---

[8] *See* Confirmation Scheduling Motion (as such term is defined below), ¶ 13 at 4 (referencing hearing transcripts for statements of counsel for the Boy Scouts regarding Boy Scouts' stated intention to emerge from bankruptcy by the end of summer 2021).

abuse claims is staggering, but not surprising in light of the Boy Scouts' legacy of child molestation stretching back eight (8) decades and actions by numerous jurisdictions to create statutory windows that eliminated statutes of limitation for such claims (*e.g.*, New York, New Jersey, North Carolina, Arizona, California and Arkansas).

6.      The Boy Scouts have enjoyed the benefits of bankruptcy protection for over a year.  Throughout this period, it has been steadfast in its determination to hide the extent of the sexual abuse in scouting and to ignore the voices of tens of thousands of survivors of scouting childhood sexual abuse.

7.      Most recently, in response to discovery requests propounded by the TCC, FCR and Coalition, the Boy Scouts indicated that it intends to disclose sexual abuse settlement data only for settlements arising from and after 2016, despite its awareness and possession of data regarding abuse claims stretching back to 1940.  On May 7, 2021, the Boy Scouts advised the survivor groups of its refusal to provide any information relating to the decades of scouting child molestation claims arising before 2016.  The Boy Scouts' refusal to provide critical settlement data does not demonstrate a "steadfast … commitment to provide equitable compensation to victims of abuse in its Scouting programs …." *Debtors' Informational Brief* [Docket No. 4]. Rather, it is nothing more than an affront to the 84,000 survivors.  The estimation proceedings contemplated in the Motion will finally provide the Boy Scouts, insurers, the Court, survivors and other parties with the quantifiable extent of the liabilities arising from decades of childhood sexual abuse.

## BACKGROUND

**A.     The Estimation Motion and Discovery**

8.      On March 16, 2021, the TCC, FCR and the Coalition filed the Estimation Motion. Through the Motion, the moving parties seek a Court order authorizing the estimation of the aggregate amounts of current and future abuse claims against the Boy Scouts by type of abuse, by local council, by chartered organization, and on a year-by-year basis to assess the availability of insurance for the claims, and better understand which insurers and policies may apply, and establishing the procedures and schedule for those estimation proceedings.

9.      The estimation process also will set a de facto cap on the Boy Scouts' aggregate liability for the estimated claims by defining the maximum amount Boy Scouts and beneficiaries of any channeling injunction must make available for distribution under a plan to survivors before such parties receive protection from these claims upon confirmation of such plan.

10.      In order to further the estimation process and obtain information regarding the Boy Scouts' settlement and verdict experience in resolving the numerous childhood sexual-abuse claims asserted against them, on April 22, 2021, the TCC, FCR and Coalition served a consolidated set of interrogatories and requests for production on the Boy Scouts in connection with the Estimation Motion [Docket No. 2684] (the "Estimation Discovery").

11.      On May 7, 2021, the Boy Scouts served its *Debtors' Responses and Objections to First Request for the Production of Documents by the Official Committee of Tort Claimants, the Coalition of Abused Scouts for Justice and the Future Claims Representative to Boy Scouts of America and Delaware BSA, LLC, in Connection with Estimation Proceedings* (the "Boy Scouts' Responses to Estimation Request for Production") and *Debtors' Responses and Objections to the Official Committee of Tort Claimants, the Coalition of Abused Scouts for Justice and the Future*

*Claims Representative's First Set of Interrogatories to Boy Scouts of America and Delaware BSA, LLC, in Connection with Estimation Proceedings* (the "Boy Scouts' Responses to Estimation Interrogatories"), in which it flatly refuses to provide any information regarding childhood sexual-abuse claims it acknowledges date back some eighty years and agrees only to "provide responses with regard to the time period from four years prior to the date hereof." Boy Scouts' Responses to Estimation Request for Production ¶ 1 at 7 and 10; Boy Scouts' Responses to Estimation Interrogatories ¶ 1 at 7.

12.    The extent of the Boy Scouts' stonewalling would be laughable were the subject matter less serious than denying justice to survivors of child rape, molestation, and other abuse. For example, Rule 33(d) of the Federal Rules of Civil Procedure, made applicable in bankruptcy proceedings pursuant to Rule 7033 of the Federal Rules of Bankruptcy Procedure, permits a party responding to interrogatories to refer to produced business records as follows:

> (d) OPTION TO PRODUCE BUSINESS RECORDS. If the answer to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing a party's business records (including electronically stored information), and if the burden of deriving or ascertaining the answer will be substantially the same for either party, the responding party may answer by:
>
> (1) specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could; and
>
> (2) giving the interrogating party a reasonable opportunity to examine and audit the records and to make copies, compilations, abstracts, or summaries.

Fed. R. Civ. P. 33(d). Instead of utilizing Rule 33(d) to identify documents in which the survivor groups might find responses to basic questions regarding the nature and extent of the Boy Scouts' liabilities arising from decades of scouting childhood rape and other molestation, the

Boy Scouts engages in a series of circular references and denials to ensure that no answers are provided.

13.    For example, when asked to provide information regarding a verdict rendered in favor of a sexual abuse claimant, the Boy Scouts, in the Boy Scouts' Responses to Estimation Interrogatories, objects, refuses to respond substantively and states:  "The Debtors further object to this Interrogatory as duplicative of Estimation Request No. 2.  Subject to the foregoing objection, the Debtors refer the Requesting Parties to the Debtors' response to Estimation Request No. 2."  Boy Scouts' Responses to Estimation Interrogatories at 10-11.  In turn, the Boy Scouts' response to request for production No. 2 states:  "The Debtors further object to this request as duplicative of Estimation Interrogatory No. 2."  Boy Scouts' Responses to Estimation Request for Production at 11.

14.    The Boy Scouts' scheme of referrals and denials continues throughout its discovery responses in the hope that virtually no information regarding nearly eighty years of child rape and other molestation will see the light of day and be held to account.  *See, e.g., id.* at 12-20.

**B.    Motion to Withdraw the Reference**

15.    On March 17, 2021, the TCC, Coalition and FCR filed a *Motion of the Future Claimants' Representative, the Official Committee of Tort Claimants, and the Coalition of Abused Scouts for Justice for Entry of an Order, Pursuant to 28 U.S.C. § 157(d) and Bankruptcy Rule 5011(a), Withdrawing the Reference of Proceedings Involving the Estimation of Personal Injury Claims* [Docket No. 2399] (the "Motion to Withdraw the Reference"), requesting that the District Court withdraw the reference of contested matters involving the estimation of current and future personal injury tort claims arising from childhood sexual abuse, pursuant to sections

105(a) and 502(c) of the Bankruptcy Code.  The motion was docketed with the District Court on

March 18, 2021.  The Boy Scouts, Certain Insurers and Century Indemnity Company have filed

papers in opposition to the motion.

16.    The Motion to Withdraw the Reference is based, in part, on 28 U.S.C. §

157(b)(2)(B), which states that a bankruptcy court has jurisdiction over core proceedings "**but

not the … estimation of contingent or unliquidated personal injury tort … claims against

the estate for purposes of distribution in a case under title 11**." 28 U.S.C. § 157(b)(2)(B)

(emphasis added).  The parties contend that the estimation proposed in the Estimation Motion

will be, at least in part, for purposes of distribution because contributions to the trust created by

the Plan will necessarily cap the distributions to holders of abuse claims.

17.    On April 27, 2021, the TCC, FCR and Coalition filed a request for oral argument

regarding the motion.  To date, no hearing date has been scheduled.

**C.    The Plan and Plan Discovery**

18.    On April 13, 2021, the Boy Scouts filed its *Second Amended Chapter 11 Plan of

Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Docket No. 2592] (the

"Plan").[9] The following day, the Boy Scouts filed the *Amended Disclosure Statement for the

Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware

BSA, LLC* [Docket No. 2594] (the "Disclosure Statement").

19.    The Plan includes a "Global Resolution Plan" that seeks to channel all childhood

sexual-abuse claims against the Boy Scouts, Local Councils, Contributing Chartered

Organizations, and Settling Insurance Companies to a Settlement Trust that will be responsible

for processing, liquidating, and paying such claims in accordance with certain Trust Distribution

---

[9] Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Plan or Motion.

Procedures. The Trust Distribution Procedures would implement a process through which abuse claims will be reviewed and valued by the Settlement Trust based on the nature of the abuse.

20.     In exchange for making financial or insurance contributions to the Settlement Trust, Boy Scouts, Local Councils, Contributing Chartered Organizations, and Settling Insurance Companies would receive the protection of a nonconsensual release of the tens of thousands of abuse claims, which would then be channeled to the Settlement Trust.

21.     If holders of the childhood sexual-abuse claims as a Class do not vote in favor of the Plan, the Boy Scouts will seek to impose on survivors its so-called "Toggle Plan," which (a) does not provide for the resolution of abuse claims against Local Councils and Contributing Chartered Organizations, (b) does not "channel" abuse claims against the Local Councils and Contributing Chartered Organizations to the Settlement Trust, (c) provides for Boy Scouts' assignment of its self-described "few assets"[10] (including interests in its Insurance Policies) to the Settlement Trust,[11] and (d) allows survivors to pursue their claims against Local Councils and Chartered Organizations through separate litigation. *See id.* at 7-9.

22.     The Plan contemplates a highly abbreviated estimation process "for purposes of and in connection with confirmation," Motion ¶ 11 at 4, as described in section V.T. of the Plan, with special, gratuitous protections for insurers:

> T.     Estimation of Direct Abuse Claims. If the Plan is confirmed as a Global Resolution Plan, then **the Bankruptcy Court shall, at the Confirmation Hearing, conduct an estimation of the Debtors' aggregate liability on account of Direct Abuse Claims in accordance with the procedures set forth in the Bankruptcy Court's order granting the Confirmation Scheduling Motion.** This estimation will, among other things, provide a basis for the Bankruptcy Court and the parties to assess the value of the Direct

---

[10] Disclosure Statement at 12.

[11] The Plan offers approximately $115 million of cash or other consideration for payment of abuse claims which, when considering all of the Boy Scouts' assets, is only 13% of the available assets.

Abuse Claims and whether the settlements proposed in the Plan, including Insurance Settlement Agreements and the Abuse Claims Settlement, should be approved under section 1123(b)(3)(A) of the Bankruptcy Code as compromises that are fair, reasonable, and in the best interests of the estate with respect to disputed claims, disputed liabilities, and disputed issues. As set forth in the order granting the Confirmation Scheduling Motion, the Debtors shall offer evidence at the Confirmation Hearing in support of the estimation, and other parties shall be permitted to submit evidence in support of, or to dispute, the evidence offered by the Debtors. **The Confirmation Order will contain the Bankruptcy Court's findings of fact and conclusions of law with regard to the Debtors' estimated aggregate liability on account of Direct Abuse Claims, which findings of fact and conclusions of law shall, by their terms, be subject to Article X.M of the Plan and, for the avoidance of doubt, shall not constitute a trial or hearing on the merits or an adjudication or judgment, or accelerate the obligations, if any, of any Insurance Company under its Insurance Policies.**

Plan § V.T. at 59 (emphasis added).  The special exemption that the Boy Scouts proposes to afford insurers will limit any assurance of the value of perhaps the Boy Scouts' principal potential source of recovery for survivors—insurance policies.  Section X.M. of the Plan reiterates these special benefits and exemptions for insurers, making clear that, with limited exceptions:

none of (a) the Bankruptcy Court's or District Court's approval of the Plan or the Plan Documents, (b) the Confirmation Order, the Affirmation Order or any findings or conclusions entered with respect to Confirmation, or (c) **any estimation or valuation of Abuse Claims, either individually or in the aggregate (including any agreement as to the valuation of Abuse Claims) in the Chapter 11 Cases shall, with respect to any Insurance Company, constitute or be deemed to constitute a trial or hearing on the merits or an adjudication or judgment, or accelerate the obligations, if any, of any Insurance Company under its Insurance Policies.**

*Id.* § X.M. at 91 (emphasis added).

23.     On April 26, 2021, the TCC, FCR and Coalition served on the Boy Scouts Interrogatories, Requests for Admission and Requests for Production [Docket No. 2695] (the "Plan Discovery").  To date, the Boy Scouts has not responded to the Plan Discovery.

**D.      The Confirmation Scheduling Motion**

24.     On April 15, 2021, the Boy Scouts filed the *Debtors' Motion for Entry of Order (I) Scheduling Certain Dates and Deadlines in Connection with Confirmation of the Debtors' Plan of Reorganization, (II) Establishing Certain Protocols, and (III) Granting Related Relief* [Docket No. 2618] (the "Confirmation Scheduling Motion").

25.     As set forth in the *Objection of the Official Committee of Tort Claimants, the Coalition of Abused Scouts for Justice, and the Future Claimants' Representative to the Debtors' Motion for Entry of Order (I) Scheduling Certain Dates and Deadlines in Connection With Confirmation of the Debtors' Plan of Reorganization, (II) Establishing Certain Protocols, and (III) Granting Related Relief* [Docket No. 3816] (the "Objection to Confirmation Scheduling"), filed on May 12, 2021, by the TCC, FCR and Coalition, the Boy Scouts' proposed procedures outlined in the Confirmation Scheduling Motion — and its attempt to undercut the Estimation Motion and uniquely benefit insurers (apparently to avoid taking on the parties without whom fair compensation for survivors may be impossible) — appear designed to further the Boy Scouts' efforts to run away from its legacy of child sexual abuse and to silence those who still suffer from its far-reaching effects.

26.     The Boy Scouts seized upon and adulterated a litigation-management mechanism proposed in the Estimation Motion to impose a "Notice of Intent" filing requirement on any party in interest that seeks to participate in the confirmation proceedings, which party may be

excluded upon objection for any reason unless the Court affirmatively overrules the objection. *See* Confirmation Scheduling Motion ¶¶ 18–20 at 7-8.

27.     In the Confirmation Scheduling Objection, the TCC, FCR and Coalition condemn the Boy Scouts' attempt through the Confirmation Scheduling Motion to incorporate estimation proceedings into the confirmation process—although serving as an acknowledgement that estimation is a prerequisite to confirming its Plan—as a transparent attempt to co-opt and limit estimation proceedings and impose an estimation methodology selected by the Boy Scouts through a procedural motion.  The schedule the Boy Scouts proposes "squeezes" fact and expert discovery that will be needed by other parties to estimate abuse claims and attempts to elevate the Boy Scouts' view of the extent of abuse claims as the standard against which other estimations will be judged to the great prejudice of survivors.[12]  *See id.*  ¶ 7 at 6.

28.     The Boy Scouts' procedures propose "time-limited interviews of a stratified sample of individual abuse claimants" that are to be "guided by the Mediators or their designee(s)."  This process presumably facilitates the estimation favored by Bates White—the Boy Scouts' alleged "abuse claims consultant"—and substitutes the judgment of mediators for that of experts who will present to the Court methodologies for the estimation of the thousands of abuse claims asserted against the Boy Scouts.  *See id.* ¶ 8 at 6.

**E.     The Proposed Hartford Settlement**

29.     On April 16, 2021, the mediators filed the *Second Mediator Report* [Docket No. 2624] (the "Second Mediator Report").  In the Second Mediator Report, the mediators

---

[12] Boy Scouts appears to have retained Bates White for, among other tasks, the purpose of providing "information about how verdicts do not represent average values of specific sexual abuse cases," perhaps foreshadowing its and the Boy Scouts' biases in excluding relevant sexual abuse data.  *Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Bates White, LLC as Abuse Claims Consultant for the Debtors and Debtors in Possession, Nunc Pro Tunc to the Petition Date* [Docket No. 207], Ex. B (Engagement Letter) ¶ 5 at 2.

announced a settlement between the Boy Scouts and one of its primary insurers, Hartford (the "Proposed Hartford Settlement").

30.     The Proposed Hartford Settlement provides that Hartford will "buy back" its policies insuring the Boy Scouts for the amount of $650 million (which amount will be adjusted downward if the Boy Scout's other primary insurer, Century Indemnity Company ("Century"), pays less than $1.3 billion) and a full release of Hartford's obligations to make any payments to anyone on account of childhood sexual abuse claims under the those policies.  Not only is the amount not fixed, but it is inadequate to satisfy the applicable settlement or sale standards under the Bankruptcy Code and the Bankruptcy Rules.

31.     The agreement memorializing the Proposed Hartford Settlement (the "Hartford Settlement Agreement") states that "the Plan shall incorporate this Agreement and shall constitute a request by the [Boy Scouts] for the Bankruptcy Court to approve the Sale and this Agreement . . . ."  The Hartford Settlement Agreement contemplates that Hartford may request, upon twenty days' notice to the Boy Scouts, that the Boy Scouts file a motion to approve the Proposed Hartford Settlement under Rule 9019 of the Federal Rules of Bankruptcy Procedure.

32.     The TCC estimates that Hartford's actual exposure under the dozens of policies it sold to the Boy Scouts will be more than thirteen times the proposed settlement amount. The TCC, the Coalition and the FCR intend to object to the Proposed Hartford Settlement and oppose any plan of reorganization that incorporates or seeks to effectuate the Proposed Hartford Settlement.

## ARGUMENT

**A.    The TCC, FCR, Coalition and Boy Scouts Agree That Estimation is a Prerequisite for Plan Confirmation**

33.    The TCC, FCR and Coalition—and the Boy Scouts, by its inclusion of estimation in its Confirmation Scheduling Motion—believe that estimation is a prerequisite to addressing confirmation requirements, *e.g.* 11 U.S.C. §§ 1129(a)(7), (11), 1129(b)(1), including the reasonableness of settlements and the propriety of any releases proposed as part of the Plan.[13]

34.    For example, section V.T. of the Plan concedes that

> estimation will, among other things, provide a basis for the Bankruptcy Court and the parties to assess the value of the Direct Abuse Claims and whether the settlements proposed in the Plan, including Insurance Settlement Agreements and the Abuse Claims Settlement, should be approved under section 1123(b)(3)(A) of the Bankruptcy Code as compromises that are fair, reasonable, and in the best interests of the estate with respect to disputed claims, disputed liabilities, and disputed issues.

Plan § V.T.

35.    As articulated in the Estimation Motion, the estimation process also will set a de facto cap on the Boy Scouts' aggregate liability for the estimated claims by defining the maximum amount Boy Scouts' and beneficiaries of any Plan channeling injunction must make available for distribution under a plan to survivors before such parties receive protection from these claims upon confirmation of any such plan.

36.    The Boy Scouts has not undertaken any valuation of the 84,000 childhood sexual abuse claims. Yet, in its Disclosure Statement, the Boy Scouts nonetheless, without explanation, ascribes a range in values to abuse claims from $2.4 billion to $7.1 billion.  Without valuing the abuse claims, neither the Court nor survivors can ascertain what the survivors might receive

---

[13] *See* Estimation Motion ¶¶ 30-36 at 12-16.

under the Plan—which is perhaps the most fundamental information every creditor wants to know before voting on a plan.  If a reasonable range of distributions is not provided, there will be no measure against which to consider a "best interests of creditors" challenge.  Also, if the abuse claims are not valued, neither the Court nor survivors can evaluate if an insurer, local council, or chartered organization is contributing sufficient consideration to justify the nonconsensual third-party releases it requires be granted, and whether it is appropriate to have tens of thousands of abuse claims channeled to a trust.  Estimation may also be needed to determine the propriety of the Proposed Hartford Settlement, which was disclosed after the Estimation Motion was filed.

37.    Because the Boy Scouts has made no legitimate attempt to evaluate the childhood sexual-abuse claims, the survivor groups filed the Estimation Motion, which contains its own proposed schedule for fact and expert discovery, motion practice, briefing, and a hearing in advance of consideration of any disclosure statement.  The estimation of the 84,000 childhood sexual abuse claims must be completed before the Court can commence a nonconsensual confirmation hearing.  The value of the 84,000 abuse claims is a gating item under the Debtors' Disclosure Statement and Plan.

**B.    The Estimation Proposed in the Plan is Designed to Benefit Insurers**

38.    The Boy Scouts' version of estimation described in the Confirmation Scheduling Motion and Plan is critically different from that proposed in the Estimation Motion.  The Boy Scouts has crafted the estimation proposed in the Plan to be toothless.  The watered-down and hurried estimation proposed by the Boy Scouts is expressly designed to uniquely benefit insurers by exempting only them from any preclusive effects that might otherwise result from the findings and rulings associated with the estimation or Plan.  The Plan, which would fully bind survivors in limiting their recourse for their claims, makes clear that the Boy Scouts' favored

estimation process would not impact whatsoever insurance companies and their policies—

policies which represent the principal source of payment to survivors.  *See* Plan § X.M.

39.     By contrast, the estimation proposed in the Estimation Motion is not deliberately

hamstrung by such restrictions.  The goal of the Estimation Motion is to derive a valuation of the

abuse claims that will dictate the maximum amount that the Boy Scouts (together with its

insurers and any other parties seeking a release under the Plan) must make available for

distribution to abuse claimants. The size of that trust will be determined (and capped) by the

estimated value of the Boy Scouts' childhood sexual-abuse claims.  The preclusive effects of the

Court's findings and rulings in connection with the estimation will be whatever applicable law

provides as determined in any applicable later matter.

40.     To the extent that an estimation process might have preclusive effect as to

coverage litigation, any resulting shortening of such likely postconfirmation litigation that

otherwise could "unduly delay the administration of the case" should be welcomed.  11 U.S.C. §

502(c); *see* Fed. R. Bankr. P. 3022 (court should consider "whether all motions, contested

matters, and adversary proceedings have been finally resolved" before closing case; advisory

committee note to 1991 Amendment).  No party should have the right to appear, litigate and

pretend the proceeding never occurred if the outcome is unfavorable — *e.g.*, the very special

treatment the insurers demand and to which the Debtors appear willing to acquiesce.

## C.     The Boy Scouts Do Not (and Cannot) Offer Much Substantive Criticism of Estimation, A Process It Also Favors

41.     The Boy Scouts offers little meaningful criticism of the estimation proposed by

the survivor groups in its objection to the Estimation Motion.  The Boy Scouts' objection boils

down to (a) its empty assertion that its proposed estimation is better because it takes place as part

of Plan confirmation; (b) its belief that this Court can estimate personal injury claims; (c) an

apparent misunderstanding about categorizing estimated claims into separate fields (*e.g.*, type of sexual abuse suffered, year, etc.), something that can be easily drawn from information set forth on filed Proofs of Claim; and (d) its insistence that the estimation proposed in the Estimation Motion would risk delaying its emergence from chapter 11 by its arbitrary "deadline."[14]

42.     First, the use of estimation proceedings "as part of" Plan confirmation, rather than a prerequisite for confirmation (as outlined in the Estimation Motion) is a "distinction without a difference."  The Boy Scouts concedes that estimation is necessary for the resolution of these Chapter 11 Cases and incorporates estimation into its Plan. As discussed in the TCC's objection to the *Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief* [Docket No. 2295], for these cases to move towards Plan confirmation, the childhood sexual-abuse claims must be valued. *See* Docket No. 3526.

43.     Second, the Boy Scouts has mischaracterized the estimation proposed in the Estimation Motion as a "core proceeding."  To the contrary, the estimation of abuse claims is noncore because it seeks "estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution." 28 U.S.C. § 157(b)(2)(B). The purpose of the Estimation Motion is to facilitate "distribution."  *See In re Roman Catholic Archbishop of Portland* ("*Portland*"), 339 B.R. 215, 220 (Bankr. D. Or. 2006) ("plan provid[ing] that the estimation will provide a cap on the amount of money that will be made available to pay

---

[14] *See* Boy Scouts Objection ¶ 7 at 4; ¶ 20 at 9-10; ¶ 26 at 12; ¶ 31 at 14; ¶ 32 at 15; ¶ 35-36 at 15-16.

the tort claims . . . . effectively limits the amount that will be distributed, thereby causing the estimation of the claims to be for distribution purposes").

44.     Third, the Boy Scouts contends that categorizing estimated claims by "type of abuse, by local council, by chartered organization, and on a year-by-year basis," as requested in the Estimation Motion, will be a monumental and time-consuming task.  *See* Boy Scouts' Objection to Estimation Motion ¶¶ 34-36 at 15-16.  First, as to why it would be important to associate the Boy Scouts' liability for childhood sexual abuse claims with particular years of abuse or associated local councils or chartered organizations, the Plan includes a possible channeling injunction to the proposed settlement trust of the liability of others for childhood sexual abuse claims.  Determining the amount of the Boy Scouts' liability associated with these parties is an important step in reaching and having the Court approve settlements with them, thereby adding them as Protected Parties under the Plan, and in evaluating those proposed settlements in light of what a claimant might receive in a "best interests" test analysis.

45.     As to the concerns with the burden of the task, the Boy Scouts' concerns are either disingenuous or the result of confusion.  In its Confirmation Scheduling Motion, the Boy Scouts trumpets the accomplishments of Bates White, which has "provided all parties with a common analytical database reflecting information in the [proof of claim] submissions, *allowing the parties to sort and manipulate data across a range of dozens of categories including:  abuse allegation, dates of abuse, abuser, Local Council and other categories*."  Confirmation Scheduling Motion ¶ 15 at 6 (emphasis added).  Presumably, the database touted by the Boy Scouts—purportedly refined by Bates White over multiple "tranches" or a similar one from experts retained by the survivor groups—should readily be able to be organized by various categories or include additional categories without much difficulty.

46.     Finally, while the estimation procedure proposed by the survivor groups is not materially longer in duration than the timetable proposed by the Boy Scouts, the Boys Scouts' schedule does not provide sufficient time for discovery or the expert report process to unfold in a reasonable manner.  Due to the Boy Scouts' refusal to provide critical discovery regarding settlement and verdict data beyond a truncated and arbitrary four-year reachback period, the Boy Scouts' proposed timetable is unrealistic.

47.     Indeed, an abbreviated discovery schedule at this juncture is at odds with this Court's rulings in other matters in which the rights of parties in interest to obtain relevant information has been protected.  For example, in the *Imerys Talc America* case, the Court stated:

> I'm going to permit time for discovery to take place . . . . So, we're going to get documents. We're going to have production. We'll set a schedule. We'll set a schedule for confirmation . . . . [W]e're going to permit appropriate time for discovery. And if people want the full time for responding to discovery, that factors into how quickly we can proceed, and there's nothing wrong with that; it gets factored into the timeline.

And:

> [W]e're going to have time for discovery. We're going to have time for depositions. And we're going to have time for expert reports. And it doesn't all need to be jammed into a truncated time period.

*In re Imerys Talc America, Inc., et al.* (Case No. 19- 10289 (LSS) (Bankr. D. Del.)), 01/12/21 Hr'g Tr. at 186–87, 235–36.

48.     Moreover, in light of glaring inadequacies with the Boy Scouts' Disclosure Statement and the Boy Scouts' recent flat-out refusal to provide necessary and critical discovery relating to, among other things, settlement and verdict data, the Disclosure Statement is not in

any position to be approved by the Court in the near term such that the Boy Scouts itself could not meet its own proposed deadlines.

**D.     The Insurers, Fearful of the Liability That May Be Imposed on Them by Estimation, Offer No Basis to Deny the Motion**

49.     Although the insurers—perhaps fearful of the liability that will be imposed on them by way of the estimation sought by the survivor groups—and certain others object to the Estimation Motion, such parties offer little in the way of valid criticism of the Estimation Motion.  They simply do not want estimation to occur, except maybe the estimation proposed in the Debtors' Plan that specifically exempts insurers from any impact, as discussed above.

50.     For example, Century Indemnity Company ("Century") falsely asserts that the *Portland* court "squarely rejected" the estimation of aggregate sexual abuse cases. Century Objection ¶ 2 at 2; ¶¶ 9-10 at 4.

51.     Instead, the court found that an estimation of such claims for purposes of distribution would have to be addressed by the district court:

> Debtor is correct that the distribution to all of the tort claimants will be based on actual liquidated amounts, not on the estimated amounts. However, debtor's proposed plan provides that the estimation will provide a cap on the amount of money that will be made available to pay the tort claims. This effectively limits the amount that will be distributed, thereby causing the estimation of the claims to be for distribution purposes, not merely for voting and confirmation purposes.
>
> . . . .
>
> [The debtor] wants this court to estimate in the aggregate the amounts of the present child sex abuse claims, for the purported purpose of confirmation and voting. In fact, it intends to use the estimation, along with estimation of other present tort claims, to put an upper limit on the amount it will pay on all of the tort claims, while discharging any actual liability in excess of the estimated amount. This court does not have jurisdiction to estimate

personal injury tort claims for purposes of distribution, which is in effect what debtor asks this court to do.

. . . .

**Because I conclude that the estimation debtor seeks is at least in part for the purpose of distribution, I cannot make that estimation. If debtor decides that it wants to proceed with a plan of reorganization that depends on an aggregate estimation of present child sex abuse claims for purposes of capping the fund from which tort claims will be paid, I will at the appropriate time prepare a report and recommendation to the district court.**

*Portland*, 339 B.R. at 220-21 (emphasis added).

52.     Century, Certain Insurers, and the Church of Jesus Christ of Latter-day Saints also accuse the survivor groups of seeking to estimate nondebtor claims.[15] But, as Century quotes in its objection, the estimation of sexual-abuse claims against the Boy Scouts necessarily will "include[e] the extent to which those liabilities are shared [] by any local council or chartered sponsoring organization [and] will inform the contribution that can and should be expected from local council and chartered organization." Estimation Motion at 5 (cited in Century Objection ¶ 30 at 11). That nondebtors may be co-liable on an estimated claim and are claiming coverage under the Boy Scouts' insurance policies does not render the estimation of such claim somehow improper or unprecedented.

53.     In connection with the Estimation Motion, Century, Certain Insurers and Old Republic suggest that estimation may permissibly involve only a determination of a "an individual claim or group of related claims" but not more than one unrelated claim, thus apparently challenging both the estimation proposed by the Estimation Motion and the

---

[15] *See* Century Objection ¶¶ 26-30 at 10-11; Certain Insurers Objection ¶ 13 at 6-7; *Objection of the Church of Jesus Christ of Latter-day Saints, a Utah Corporation Sole, to Motion of the Future Claimants' Representative, the Official Committee of Tort Claimants, and the Coalition of Abused Scouts for Justice for Entry of an Order, Pursuant to 11 U.S.C. §§ 105(a) and 502(c), (I) Authorizing an Estimation of Current and Future Abuse Claims and (II) Establishing Procedures and Schedule for Estimation Proceedings* [Docket No. 2610] ¶ 1 at 1, ¶¶ 5-6 at 2-3.

estimation proposed by the Debtors.[16]  This argument against estimation of claims in the

aggregate is frivolous.  *See, e.g.*, 11 U.S.C. § 102(7) ("[T]he singular includes the plural."); *In re*

*North Am. Health Care, Inc.*, 544 B.R. 684, 689 (Bankr. C.D. Cal. 2016) ("Unliquidated claims

can be estimated individually or in the aggregate."); *In re Armstrong World Indus.*, 348 B.R.

111, 136 (D. Del. 2006); *In re Federal-Mogul Global, Inc.*, 330 B.R. 133, 164 (D. Del. 2005);

*Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 725 (D. Del. 2005); *In re Specialty*

*Prods. Holding Corp.*, 2013 Bankr. LEXIS 2051 (Bankr. D. Del. May 20, 2013).  A court readily

may estimate one or more claims as needed.

54.     Finally, estimation may result in something that the insurers fear more than

anything else—a settlement. The estimation of tort claims on an aggregate basis, as ordered in

recent mass tort bankruptcy proceedings, has led to settlements and consensual plans of

reorganization. *See*, *e.g.*, *In re PG&E Corp.*, No. 19 30088-DM (Bankr. N.D. Cal. Aug. 21,

2019) (recommendation for district court to withdraw the reference of section 502(c) proceeding

involving estimation of debtors' aggregate liability for tort claims).

55.     And, a plan settlement involving the Debtors' tort liability could imperil the

insurers to the tune of billions of dollars in coverage obligations that, if honored, would make it

possible to provide meaningful compensation to survivors. *See*, *e.g.*, *UNR Indus., Inc. v. Cont'l*

*Cas. Co.*, 942 F.2d 1101, 1108 (7th Cir. 1991) (holding order confirming chapter 11 plan of

reorganization that included a settlement of asbestos claims was a "judgment" or "settlement"

against the debtor that triggered excess insurer's coverage obligations).  The answer to the

question of whether an insurer can be bound by the *res judicata* or collateral estoppel effect of a

plan confirmation order is plainly "yes." This is what otherwise applicable principles of *res*

---

[16] Century Objection ¶ 13-14 at 5-6, ¶ 15 at 8; *see* Certain Insurers Objection ¶ 9 at 5; Old Republic Objection ¶ 3 at 2.

*judicata* or collateral estoppel mandate. Avoiding this outcome has and will always be the insurers' primary objective here. Estimation is not the problem; it may be the solution.

## CONCLUSION

For all the foregoing reasons, the survivor groups respectfully request that the Court enter its order (i) granting the Estimation Motion with leave for the parties to advise the District Court of the disposition of the motion in connection with the District Court's determination of the pending Motion to Withdraw the Reference; and (ii) granting the undersigned survivor groups such other and further relief as may be necessary or appropriate under the circumstances.

Date: May 14, 2021

**THE OFFICIAL COMMITTEE OF TORT CLAIMANTS**

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
James I. Stang (CA Bar No. 94435)
Malhar S. Pagay (CA Bar No. 189289)
James E. O'Neill (DE Bar No. 4042)
John W. Lucas (CA Bar No. 271038)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE  19899 (Courier 19801)
Telephone: 302-652-4100
Facsimile: 302-652-4400
Email: jstang@pszjlaw.com
        mpagay@pszjlaw.com
        joneill@pszjlaw.com
        jlucas@pszjlaw.com

*Counsel for the Tort Claimants' Committee*

**COALITION OF ABUSED SCOUTS FOR JUSTICE**

MONZACK MERSKY & BROWDER, P.A.

*/s/ Rachel B. Mersky*
Rachel B. Mersky (DE No. 2049)
1201 North Orange Street, Suite 400
Wilmington, Delaware 19801
Telephone:  (302) 656-8162
Facsimile:  (302) 656-2769
E-mail:  rmersky@monlaw.com

– and –

BROWN RUDNICK LLP
David J. Molton, Esq.
Eric R. Goodman, Esq.
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Email: dmolton@brownrudnick.com
Email: egoodman@brownrudnick.com

– and –

Sunni P. Beville, Esq.
Tristan G. Axelrod, Esq.
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Email: sbeville@brownrudnick.com
Email: taxelrod@brownrudnick.com

– and –

ROBBINS, RUSSELL, ENGLERT, ORSECK, &
 UNTEREINER LLP
Lawrence S. Robbins
Ariel N. Lavinbuk
William J. Trunk
Joshua S. Bolian
2000 K Street NW, 4th Floor
Washington, DC 20006
Telephone: 202-775-4500
Email: lrobbins@robbinsrussell.com
 alavinbuk@robbinsrussell.com
 wtrunk@robbinsrussell.com
 jbolian@robbinsrussell.com

*Co-Counsel to the Coalition of Abused Scouts for Justice*

**FUTURE CLAIMANTS' REPRESENTATIVE**

YOUNG CONAWAY STARGATT & TAYLOR,
LLP

*/s/ Robert S. Brady*
Robert S. Brady (Bar No. 2847)
Edwin J. Harron (Bar No. 3396)
Sharon M. Zieg (Bar No. 4196)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: rbrady@ycst.com
eharron@ycst.com
szieg@ycst.com

*Counsel to the Future Claimants' Representative*