**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND<br>DELAWARE BSA, LLC,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>**Ref. D.I. 2411, 2506, 2577, 2672**<br><br>**Hearing Date: May 19, 2021 at 10:00 a.m. (ET)** |

**DEBTORS' REPLY IN FURTHER SUPPORT OF DEBTORS' THIRD**
**MOTION FOR ENTRY OF AN ORDER EXTENDING THE DEBTORS' EXCLUSIVE**
**PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF**

Boy Scouts of America (the "BSA") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (together, the "Debtors"), submit this reply in further support of their motion [D.I. 2411] (the "Motion")[2] to extend the Exclusive Filing Period and the Exclusive Solicitation Period to August 18, 2021 and October 18, 2021, respectively, and to the objection to the Motion [D.I. 2672] (the "Objection") filed by the Coalition of Abused Scouts for Justice (the "Coalition") and the Future Claimants' Representative (the "FCR"). In support of this reply, the Debtors submit the declaration of Brian Whittman, a Managing Director with Alvarez & Marsal North America, LLC (the "Whittman

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] All terms that are capitalized but not otherwise defined herein shall have the meaning ascribed to such terms in the Motion or in the Plan (as defined below), as applicable.

Footnote continued on next page

Declaration"), which is filed concurrently herewith.  In further support hereof, the Debtors

respectfully state as follows.[3]

## ARGUMENT

I.  **The Debtors Have Carried Their Burden and Demonstrated That Cause Exists to Extend the Exclusive Periods.**

1.       Like the TCC's Objection, the Objection filed by the Coalition and FCR is devoid

of any reference to the legal standard that governs whether the Court should extend the Exclusive

Periods: whether the Debtors have established "cause" under section 1121(d) of the Bankruptcy

Code.  As set forth in the Motion, courts consider the *Dow Corning* factors in considering whether

to grant extensions of the Exclusive Period based on the totality of the circumstances.  *See In re*

*Dow Corning Corp.*, 208 B.R. 661, 664–65 (Bnakr. E.D. Mich. 1997); Motion ¶ 17 (listing factors

and citing cases).  Here, of the nine *Dow Corning* factors, at least seven are uncontroverted.[4]  Under

a generous reading of the Objection, the arguments advanced by the Coalition and FCR appear to

potentially implicate the two remaining factors: (1) whether the debtor has demonstrated

reasonable prospects for filing a viable plan; and (2) whether the debtor is seeking to extend

exclusivity to pressure creditors to accede to the debtor's reorganization demands.  As set forth

below, these factors do not support termination of the Exclusive Periods.  Far from materially

moving these cases forward, termination of the Exclusive Periods would likely reverse the progress

---

[3]    As additional support for this reply, the Debtors incorporate by reference their previously filed reply [D.I. 2577] to the objection [D.I. 2506] (the "TCC's Objection") filed by the Official Committee of Tort Claimants (the "TCC").

[4]    As discussed in the Motion and the Debtors' reply to the TCC's Objection, these uncontroverted factors include the following: (a) the size and complexity of the case; (b) the necessity for sufficient time to permit the debtor to negotiate a chapter 11 plan and prepare adequate information; (c) the existence of good-faith progress toward reorganization; (d) whether the debtor is paying its debts as they become due; (e) whether the debtor has made progress in its negotiations with creditors; (f) the amount of time that has elapsed in the case; and (g) the existence of an unresolved contingency.

Footnote continued on next page

made toward emergence by unwinding the Debtors' settlements with JPM, the Creditors' Committee and Hartford[5] and by accelerating the Debtors' cash burn rate, the combined effect of which would jeopardize the Debtors' opportunity to successfully reorganize altogether.  For the reasons set forth herein, the Objection should be overruled.

> **A.    The Debtors Have Filed a Viable Plan and Have Demonstrated Reasonable Prospects for Confirming the Plan.**

2.    As an initial matter, the Coalition and FCR effectively argue that the hearing on the instant Motion is a *de facto* plan confirmation hearing, requiring the Court, in their view, to determine the propriety of particular plan provisions and whether the plan, as a whole, is confirmable.  This is decidedly not the standard for extending the Exclusive Periods.  Indeed, courts frequently extend the Exclusive Periods in the absence of any plan whatsoever.  Moreover, as discussed in the Debtors' reply to the TCC's Objection, courts do not consider alleged deficiencies in a proposed plan or a lack of creditor support for a plan in determining whether to extend or terminate the Exclusive Periods.  Rather, such objections should be resolved at the plan confirmation stage.  *See, e.g.*, *In re Burns & Roe Enters.*, Case No. 00-41610, 2005 U.S. Dist. LEXIS 26247, at *36–37 (D.N.J. Nov. 3, 2005) (explaining that concerns over a plan's confirmability should be reserved for the plan confirmation hearing); *In re SW Boston Hotel Venture, LLC*, Case No. 10-14534, 2011 Bankr. LEXIS 1726, at *13–14 (Bankr. D. Mass. May 4, 2011) (rejecting a creditor's objection to the debtor's motion to extend exclusivity because its "ability to seek different treatment for its claim . . . is preserved by its opportunity to reject and object to the Debtors' Plan and present evidence at a contested confirmation hearing"); *In re*

---

[5]    As used in this reply, "Hartford" collectively refers to Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company and Navigators Specialty Insurance Company.

*Interco, Inc.*, 137 B.R. 999, 1001 (Bankr. E.D. Mo. 1992) (finding that while there is no assurance that the debtors' plan could be confirmed, such contentions should be reserved for a confirmation hearing); *In re Lichtin/Wade, LLC.*, 478 B.R. 204, 212 (Bankr. E.D.N.C. 2012) (holding that "[e]vidence that the Debtor's Amended Plan is not confirmable at this point in time is insufficient to show the Debtor has not made good faith progress toward reorganization").

3.      Rather than deciding if the plan is confirmable, the exclusivity analysis asks the Court to determine whether there are reasonable prospects for confirming a viable plan. Here, this factor weighs in favor of the relief requested. In particular, on April 13, 2021, the Debtors filed the *Second Amended Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 2592] (the "Plan").[6] The Plan contains a "toggle" feature, which provides for two viable alternative pathways for the Debtors to emerge from bankruptcy. The alternative that the Debtors ultimately present to the Court for confirmation depends on: (a) whether a sufficient number of survivors vote to accept the Plan; and (b) whether the Court determines that the proposed settlement of Abuse Claims against Local Councils and Contributing Chartered Organizations satisfies applicable legal requirements. *See* Plan Art. I.A.113. If both of these conditions are satisfied, the Debtors will proceed with confirmation of the "Global Resolution Plan." If not, they will confirm the "BSA Toggle Plan." Both of these viable alternatives are described below.

4.      The Global Resolution Plan is the Debtors' preferred alternative because it will achieve the Debtors' dual restructuring objectives of providing equitable and timely compensation to abuse survivors and ensuring that the Debtors' charitable mission will continue. Specifically, the Global Resolution Plan will maximize equitable recoveries for abuse survivors through a

---

[6]    Prior to the hearing on the Motion, the Debtors will be filing proposed amendments to the Plan and related Disclosure Statement to address certain parties' comments or objections and to incorporate the terms of the Hartford Settlement (as defined below).

centralized claims-evaluation process that will eliminate the risk of inconsistent outcomes in the tort system for similarly situated creditors.  It will provide finality for the Debtors, Local Councils, Contributing Chartered Organizations, and Settling Insurance Companies by permanently channeling Abuse Claims to the Settlement Trust with respect to such Protected Parties.  It will also maximize the value of the Debtors' insurance assets by vesting the Settlement Trust with the exclusive right to pursue non-settling insurers on account of Direct Abuse Claims.  The Settlement Trust will, as of the Effective Date, assume exclusive responsibility for processing, liquidating and paying Abuse Claims asserted against the Protected Parties in accordance with the Trust Distribution Procedures.

5.      The Global Resolution Plan currently provides for aggregate contributions to the Settlement Trust of as much as $1.19 billion.  These contributions would be made by the Debtors (approximately $120 million), Local Councils (at least $425 million), and Hartford ($650 million). These amounts are only a floor on the total value of the Settlement Trust.  The Debtors' recent settlement with Hartford (the "Hartford Settlement"),[7] as discussed below, is an important initial building block toward what the Debtors believe will be a substantial aggregate contribution to the Settlement Trust from multiple insurers and Chartered Organizations.  The Debtors therefore believe the Global Resolution Plan is far from "dead," as the Coalition and FCR have concluded. *See* Objection ¶ 33.  In fact, as evidenced by the Hartford Settlement, the framework the Debtors have established for maximizing the value of the Settlement Trust under the Global Resolution Plan is functioning as the Debtors intended.  The Debtors will continue to work tirelessly through mediation to obtain additional contributions that will increase the assets of the Settlement Trust to a level that will attain sufficient survivor support to confirm the Global Resolution Plan.

---

[7] The Hartford Settlement was filed with the Court as Exhibit A to the *Second Mediators' Report* [D.I. 2624].

Ultimately, individual survivors—not their restructuring or state court counsel—will decide whether the Global Resolution Plan is acceptable.

6.      If survivors vote to reject the Plan, or if they accept the Plan in numbers insufficient to warrant approval of non-consensual third-party releases, then the Debtors will pursue confirmation of the Plan under the other alternative pathway to emergence: the "BSA Toggle Plan." Under the BSA Toggle Plan, the only claims that would be channeled to the Settlement Trust are Abuse Claims against the Debtors, Reorganized BSA, the Related Non-Debtor Entities, and their respective representatives.[8]  *See* Plan Art. I.A.180.b.  Abuse Claims would not be channeled to the Settlement Trust as to any Local Councils, Chartered Organizations, or Insurance Companies, as these entities are not Protected Parties under the BSA Toggle Plan.  *See id.* Survivors would therefore be entitled to commence or continue litigation against any Local Council or Chartered Organization in the tort system, and the insurance rights of all such entities would remain in place as if the bankruptcy had never occurred.  This is precisely the same plan formulation that the TCC has proposed in its objection to the Motion:

> The Tort Claimants' Committee intends to file its own plan of reorganization.  To the greatest extent possible, the plan will mirror substantially the Debtor's plan as to treatment of creditors other than Abuse Claimants. As to Abuse Claimants, perhaps the most salient change will be the absence of any non-consensual third party releases for the Local Councils and Chartered Organizations. The plan will allow for releases and a channeling injunction to be negotiated by the Tort Claimants' Committee or the post-confirmation settlement trust but not for the relatively paltry sum offered by the Local Councils.

> The Debtors' Plan proposes that substantially all of the compensation will be paid by insurance carriers.  As to Boy Scout's policies, for the most part, Local Councils and Chartered Organizations are additional insureds. Thus, if Boy Scouts and Local Councils want survivors to rely on insurance, the Local Councils and Chartered Organizations do not need a release. They can use and rely upon the same insurance coverage that Abuse Claimants are left to rely upon for the defense, settlement, and

---

[8]     The Debtors intend to delete the reference to Settling Insurance Companies from definition of "Protected Parties" under the BSA Toggle Plan in their proposed amendments to the Plan.

payment of claims – which is what the Tort Claimants' Committee's plan will provide.

TCC's Objection ¶¶ 20–21.  The BSA Toggle Plan is not the Debtors' favored outcome, as it would fail to establish a centralized means of providing compensation to survivors through these chapter 11 cases, lead to inconsistent outcomes in the tort system for similarly situated creditors, prevent the Debtors from entering into settlements with insurers, and precipitate a tidal wave of abuse lawsuits that would overwhelm and likely force a number of Local Councils into bankruptcy. Nevertheless, the BSA Toggle Plan would enable the BSA to provide equitable compensation from the BSA's assets to survivors, stop the extensive depletion of the BSA's assets available to survivors from chapter 11 professional fees, and to continue carrying out its charitable mission.

7.     Both the Global Resolution Plan and the BSA Toggle Plan are viable plans. Although survivor representatives have expressed dissatisfaction with the Global Resolution Plan as it stands today, none of the Coalition, the FCR or the TCC have asserted that the Debtors cannot increase the assets of the Settlement Trust to a level that would attain sufficient support for the Plan.   Nor could they credibly do so, given that the mediation continues to progress, settlement discussions are ongoing, and approximately thirty-five (35) of the Debtors' historical insurers have yet to settle any of their policies.

8.     The Coalition and FCR have promised that they will fight "any plan" that includes the Hartford Settlement, apparently without regard to the ultimate total dollar value of the assets contributed to the Settlement Trust.  *See* Objection ¶ 37.  This is an irresponsible statement to make based on a single insurance settlement that is not even before the Court for approval and as to which the Debtors have not yet provided the Court and parties with the legal and evidentiary basis to support its approval.   The Debtors question whether survivors would be "insult[ed]" by a Settlement Trust with an aggregate value that falls squarely within the Debtors' $2.4 billion to $7.1

billion estimated range of aggregate liabilities for Abuse Claims.  *See id.* ¶ 5.  Because the Global Resolution Plan contemplates this outcome, the Court should not foreclose the Debtors' opportunity to pursue it without the interference that would be caused by a competing plan process, as expressly contemplated by section 1121(d) of the Bankruptcy Code.

9.     Even assuming, *arguendo*, that the Global Resolution Plan is not viable under the present circumstances, the BSA Toggle Plan is a fully formulated alternative plan that can be confirmed if the Global Resolution Plan fails.  Although there remains the potential that certain matters may need to be litigated before emergence, including the TCC's restricted-assets adversary, the Debtors have already obtained the support of JPM and the Creditors' Committee for the Plan, and the treatment of those constituents is the same under the Plan regardless of which alternative is confirmed.  Accordingly, even if holders of Direct Abuse Claims vote to reject the Plan, the Debtors believe they can still confirm the BSA Toggle Plan under the cramdown provisions of section 1129(b) of the Bankruptcy Code given that, among other things,  the BSA Toggle Plan does not include any non-consensual third-party releases.  As noted above, the TCC has signaled that the alternative plan it would propose is essentially identical to the BSA Toggle Plan, including as to the treatment of claimants other than holders of Abuse Claims.  *See* TCC's Objection ¶¶ 20–21.  For these reasons, the BSA Toggle Plan is indisputably viable.  *See Adelphia Commc'ns Corp.*, 352 B.R. 578, 588 (Bankr. S.D.N.Y. 2006) ("This factor requires only that a debtor be able to attain confirmation of at least *some* viable plan, not necessarily the plan currently proposed.").  The "viable plan" factor therefore weighs in favor of granting the Debtors' requested extensions of the Exclusive Periods.

**B.    The Debtors Are Not Seeking to Extend Exclusivity to Pressure Abuse Survivors to Accede to the Debtors' Reorganization Demands.**

10.    Certain of the Coalition and FCR's arguments in support of the Objection could also be construed to suggest that the Debtors are inappropriately seeking to extend the Exclusive Periods to pressure survivors to accede to the Debtors' reorganization demands. *See* S. Rep. No. 989, 95th Cong., 2d Sess. 118 (1978) ("An extension [of the Exclusive Periods] should not be employed as a tactical device to put pressure on parties in interest to yield to a plan they consider unsatisfactory"). Any such suggestion is false, contrary to the manifest weight of the evidence, and defies logic. The Debtors are seeking extensions of the Exclusive Periods to the fullest extent permitted under section 1121(d) of the Bankruptcy Code not to coerce a particular result, but because they need the additional time, without interference from competing plans, to increase the assets of the Settlement Trust to a level that will garner sufficient support for the Plan from abuse survivors. Moreover, the Debtors could not coerce survivors to accept the Global Resolution Plan even if they wished to do so. The Plan must, to be confirmed as the Global Resolution Plan, be acceptable to a supermajority of survivors.

11.    Importantly, the Debtors' efforts in mediation have transcended abstract discussions. Over the past seven weeks, within the context of the mediation, the Debtors have discussed numerous detailed proposals and counter-proposals with the Coalition and FCR regarding the terms of the Plan and potential modifications that would render the Plan acceptable to certain survivor constituencies. Whittman Decl. ¶ 4. The substance of these proposals is protected by the mediation privilege, but the Court should not believe that the parties have retreated to their respective corners. They have not. The Debtors' efforts to achieve a consensual mediated resolution of these cases has continued unabated notwithstanding the contested nature of the proceedings. Indeed, the Debtors continued mediated discussions with the Coalition and FCR

mere hours after the Objection was filed.  *Id.*  The Debtors spent May 4, 5 and 6 in mediation in New York City with representatives of the Coalition, FCR, TCC, Hartford, Century, and the Ad Hoc Committee of Local Councils.  Since the May 4–6 mediation, the Debtors have continued to be engaged in extensive and detailed discussions and negotiations with representatives of certain of these parties with a view toward reaching agreement on the terms of a comprehensive settlement of Abuse Claims that would have the support of a critical mass of survivors.  Accordingly, notwithstanding the charged rhetoric in the Objection, the Debtors have sought—and intend to continue—to work with their constituents, including the Coalition, FCR, and TCC, with the assistance of the Mediators, to maximize the value of the Settlement Trust from all available sources and to resolve or narrow their disputes.  *Id.* ¶ 5.

12.    The Debtors have recognized from the outset of these cases that any global resolution of Abuse Claims to be implemented through the plan of reorganization requires survivors to vote in sufficient numbers to accept the plan.  For that reason, and because it is the right thing to do in light of the nature of the claims, the Debtors have made extraordinary efforts to work collaboratively with representatives of abuse survivors.  On the Petition Date, the Debtors filed a motion for the appointment of a mediator and the referral of plan-related matters to mediation.[9]  Twenty-six (26) parties are now participating in the mediation, which, as noted above, has been extraordinarily active, particularly during the five months that have followed the claims bar date.  *See Second Mediators' Report* [D.I. 2624], at p. 1 ("The Mediation occurs by videoconference, and meetings are convened frequently (often on a daily basis) between the Mediators and individual Mediation Parties and among the Mediators and groups of Mediation Parties.").  During this time, the Debtors have engaged in hundreds of hours of mediated

---

[9]    *See Debtors' Motion for Entry of an Order (I) Appointing a Judicial Mediator, (II) Referring Certain Matters to Mandatory Mediation, and (III) Granting Related Relief* [D.I. 17].

discussions and negotiations with all of their creditor constituencies, including the Coalition, FCR and TCC, in addition to many more hours of interactions by videoconference, telephone and email outside of the mediation. Whittman Decl. ¶ 3. These discussions and negotiations have covered numerous topics, including the evaluation of Abuse Claims, the values that should be ascribed to such claims, the nature, extent and terms of the Debtors' and Local Councils' historical insurance coverage, the amounts, composition and timing of payment of contributions from the Debtors, Local Councils, and Chartered Organizations, and the Debtors' business plan and financial projections. *Id.*

13.     In addition to generally mischaracterizing the status of discussions among the parties, the Objection contains several specific allegations that the Debtors must address. The Coalition and FCR allege that the Debtors (a) care only about "exiting bankruptcy quickly" at the expense of survivors, (b) are seeking to funnel outsized value to "executives" under the Plan, and (c) are "capitulating to their insurers' demands." *See* Objection ¶¶ 29, 35. Each of these allegations is false.

14.     First, the Debtors' need to exit bankruptcy later in 2021 simply reflects the stark reality of the Debtors' deteriorating liquidity position, as discussed in Section II below and substantiated by the Whittman Declaration. Given that the current schedule will make these cases eighteen (18) months or longer, it is hardly a quick exit from bankruptcy. The Debtors have only a limited period of time to confirm the Plan and emerge from bankruptcy before exhausting their available funds on restructuring fees, further diminishing the potential contribution to the Settlement Trust. Moreover, the TCC insisted the claims bar date be extended by several months from the Debtors' initial proposal and refused to engage in meaningful negotiations with the Debtors until after the claims had been processed following the November 16, 2020 bar date. By

accommodating the TCC, the Debtors essentially forfeited several months of their Exclusive Periods.  Now that the TCC has run down the clock, it wants to terminate the Exclusive Periods.  This should not be countenanced.  Second, the mediated settlement with the Creditors' Committee, the terms of which are incorporated in the Plan, acknowledges that creditors who hold claims incurred in furtherance of the Debtors' charitable mission (including current and former employees who are beneficiaries under the Restoration Plan, together with other General Unsecured Claims and Non-Abuse Litigation Claims) may receive distributions from cash relating to the Debtors' core assets, which are not available for distribution to abuse survivors.  Third, no aspect of the Plan is a "capitulation" to the demands of the Debtors' insurers.  The Court has witnessed the adversarial interactions between the Debtors and their insurers throughout these cases.  The Hartford Settlement was a hard-fought, mediated compromise, which the Debtors will demonstrate at the appropriate time in these chapter 11 cases, and is amply supported by the Debtors business judgment, as explained in Section III below.  Moreover, the Coalition and FCR have fundamentally misrepresented the insurance neutrality provisions of the Plan in the Objection, as explained in Section IV below.

15.    The Debtors' request to extend the Exclusive Periods is not an attempt to hold survivors hostage to the Plan in the face of a viable alternative.  The Court has not been presented with any realistic alternative plan proposed by survivors.  *See In re Pliant Corp.*, Case No. 09-10443 (MFW) (Bankr. D. Del. June 30, 2009), Hr'g Tr. 229:2–5 (terminating exclusivity because the creditors' committee had produced a "fully baked plan" that the committee should be allowed to advance).  To the contrary, as referenced above, the TCC has stated that it would support a plan that will "mirror substantially" the terms of the Global Resolution Plan except for removing non-consensual third-party releases for Local Councils and Chartered Organizations.  *See* TCC's

Objection ¶¶ 20–22.  Given that this is precisely what the BSA Toggle Plan provides for, the TCC's Objection should be considered moot.  The Coalition and FCR, for their part, are "discussing" a competing plan that would "save the Boy Scouts, provide meaningful compensation to survivors, and provide an opportunity for Local Councils and Chartered Organizations to make contributions and become Protected Parties."  Objection ¶ 36.  This theoretical plan, which would somehow— by unspecified means—yield greater recoveries for survivors, is pure fiction.

16.     Even if the Coalition and FCR filed a competing plan today that purported to offer superior recoveries to creditors, the issue at hand is whether the debtor has been diligent in its attempts to reorganize, not whether "some other plan may exist which provides greater recovery." *See In re Express One Int'l, Inc.*, 194 B.R. 98, 101 (Bankr. E.D. Tex. 1996) (granting extension of exclusivity notwithstanding creditor's proposal of a competing plan that purported to yield superior recoveries for creditors).  The Debtors are continuing to diligently prosecute the Plan, which, as explained above, is viable without regard to whether survivors vote in sufficient numbers to attain approval of the Global Resolution Plan.  This factor, too, weighs in favor of granting the Debtors' requested extensions of the Exclusive Periods.

## II.    Termination of the Exclusive Periods Would Not Move These Cases Forward and Could Jeopardize the Debtors' Opportunity to Successfully Reorganize.

17.     In addition to the specific factors enumerated in *Dow Corning*, courts "draw back from the narrow focus on individual factors and scan the big picture."  *Dow Corning*, 208 B.R. at 669.  The "primary consideration" in determining whether to terminate the Exclusive Periods is whether termination "will move the case forward."  *See Dow Corning*, 208 B.R. at 670; *Adelphia*, 352 B.R. at 590.  As articulated by Judge Gerber in *Adelphia*, this test examines "whether terminating exclusivity would move the case forward materially, to a degree that wouldn't otherwise be the case."  *Adelphia*, 352 B.R. at 590.  Here, termination of exclusivity is more likely

to threaten or unwind integral components of the Debtors' pathway to emergence than to materially move the cases forward.  As in *Adelphia*, "[a] competing plans battle now" between or among the Debtors, the Coalition/FCR, and the TCC, "might well jeopardize current fragile agreements between various stakeholders, re-ignite intercreditor disputes, and push this process back to square one."  *Id.*  In terms of time, money, and momentum, the Debtors cannot afford to squander the important progress they have made to date.  Indeed, termination of exclusivity would accelerate the Debtors' cash burn on account of restructuring fees to a degree that could easily jeopardize the Debtors' opportunity to reorganize altogether.

18.     The Plan is predicated on several heavily negotiated and carefully constructed settlements, and it contains a framework for settlements with additional parties to follow.  Much as the Coalition, FCR and TCC have sought to minimize the importance of the Debtors' settlements with JPM and the Creditors' Committee, these settlements are integral to the Debtors' ability to successfully reorganize.  The balance of JPM's funded debt in these cases is $232 million, plus $96 million of outstanding letters of credit.  *See* Plan Art. III.B.  If one or more competing creditor-sponsored plans are filed, there is no assurance that JPM would accept such a proposal, and none of the Coalition, FCR or the TCC have attempted to explain how they would either gain the support of JPM for their alternative proposal or satisfy the cramdown requirements of section 1129(b) with respect to JPM.  Moreover, the PBGC, which is a member of the Creditors' Committee, has filed a proof of claim against the Debtors in the amount of approximately $1.1 billion on account of its contingent claim that arising from the potential termination of the Pension Plan.  The Coalition and FCR suggest that the treatment of non-abuse creditors under the Plan is unacceptable, but they are silent on how they would gain the support of the PBGC (or any other unsecured non-abuse

creditor) for their proposal.  These issues would likely prove to be formidable obstacles for any creditor-sponsored restructuring proposal.

19.     The Coalition and FCR have also sharply criticized the terms of the Hartford Settlement, including the settlement amount of $650 million and the provision that would reduce such amount to the extent the Debtors settle with Century at an amount less than $1.3 billion. Again, however, the Coalition and FCR have expressed their intent to unwind an integral component of the Debtors' restructuring without attempting to explain how they would be able to propose a better deal.  Indeed, based on the Objection, the only action the Coalition and FCR are prepared to take is to "fight" and "defeat" the Hartford Settlement and the Plan.  *See* Objection ¶ 37.  This is not a strategy at all, much less a strategy to move the cases forward.  It is merely a blueprint to "push this process back to square one" by driving insurers away from the bargaining table.  *See Adelphia*, 352 B.R. at 590.

20.     If the Exclusive Periods are terminated, a competing plan process would also increase the volume of time-consuming and expensive discovery, motion practice and other litigation in the cases, thereby accelerating the Debtors' unsustainable cash burn rate and truncating the time period within which they can confirm the Plan.  As the Court and parties are aware, the Debtors are obligated to pay the reasonable fees and expenses of two official committees, the FCR, and JPM.  By entering into arm's-length settlements with the Creditors' Committee and JPM, the Debtors have avoided litigation with those parties and the professional fees that would accompany such litigation.  Based on actual fees incurred and forecast guidance, the Creditors' Committee's and JPM's respective fees have declined by approximately fifty percent (50%) since the settlement was finalized.  Whittman Decl. ¶ 6 n.3.  Nonetheless, the total amount of restructuring fees paid or accrued by the Debtors in these cases as of March 31, 2021

was approximately $100 million. *See* Whittman Decl. ¶ 6. As the Debtors have repeatedly emphasized, a non-profit organization cannot simultaneously linger in bankruptcy and effectively carry out its charitable mission, let alone continue to indefinitely incur this fee burden. The Debtors' cases will have been pending for more than eighteen (18) months by the time the Confirmation Hearing is scheduled to begin on August 30, 2021. By that time, even without a competing plan process and the incremental restructuring fees that would accompany that process, the total paid and accrued restructuring fees are expected to exceed $150 million. The Debtors cannot sustain this level of restructuring fees. Critically, as the Court has observed, every incremental dollar of professional fees at this stage decreases the amount of the Debtors' cash contribution to the Settlement Trust. *See* Hr'g Tr. 49:19–21 (Mar. 17, 2021) (observing that "every dollar to professional fees is a dollar that comes out of some creditor's pocket"). Every delay in these cases has an attendant cost that reduces the amount of cash available for the Debtors to contribute to the Settlement Trust. As an example, the litigation in these cases since November 2020 and the corresponding delay of the Debtors' confirmation timeline from July 2021 to late August 2021 has reduced the Debtors' cash expected to be contributed to the Settlement Trust by approximately $25 million. Accordingly, a competing plan process would likely compound the Debtors' deteriorating liquidity by increasing the amount of restructuring fees and extending the length of time within which those fees are incurred due to the inevitable litigation-related delays. *Id.*

21. In sum, the "big picture" of these cases militates in favor of extending the Exclusive Periods as requested, to the fullest extent permitted by section 1121(d) of the Bankruptcy Code. The Debtors are mere days away from the hearing to consider approval of the disclosure statement for the Plan, and the Plan represents the parties' best—and perhaps only—chance of achieving a

global resolution of Abuse Claims.  Survivor representatives have made clear they will not accept the Global Resolution Plan as it is currently constructed.  The Debtors are also not yet satisfied with the level of assets currently proposed to be contributed to the Settlement Trust.  But the Debtors have demonstrated that they are continuing to engage in good-faith negotiations with all of their constituents and are committed to increasing the value of the Settlement Trust in advance of the Confirmation Hearing.  Nevertheless, if the Debtors fail to attain overwhelming support from survivors for the Plan, then they will confirm the BSA Toggle Plan and survivors will retain all of their rights against Local Councils, Chartered Organizations and Insurance Companies.  Only an extension of the Exclusive Periods can materially move these cases forward.  For that reason, the Objection should be overruled.

### III.    The Hartford Settlement Is Not a Basis to Terminate the Exclusive Periods.

22.    The Hartford Settlement is not presently before the Court, nor is it relevant to the Court's analysis of whether the Exclusive Periods should be extended or terminated.  The Hartford Settlement is expressly subject to Court approval, either under the Plan or upon a motion of the Debtors.  Hartford Settlement § I.A.3.  As noted above, the hearing to consider confirmation of the Plan is not scheduled to begin for more than three months, and the Debtors have not filed a motion to approve the Hartford Settlement.  Moreover, the Hartford Settlement provides that it only applies under the Global Resolution Plan and not the BSA Toggle Plan.  *See* Hartford Settlement § III.I.  Therefore, if survivors reject the Plan, the Hartford Settlement falls away.  Even so, the Objection alleges that: (a) the settlement is a breach of the Debtors' fiduciary duties; (b)  the settlement, including the settlement amount of $650 million, is "unconscionable," a "fire sale," and "an illusion, a waste of resources, and an insult to survivors"; (c) the Debtors "apparently failed to diligence" the financial wherewithal of Century before agreeing to the most-favored nation provision of the Hartford Settlement; (d) and the Hartford Settlement was negotiated "in

secret" between the Debtors and Hartford without the participation of survivor representatives. *See* Objection ¶¶ 4, 5, 12, 16, 31, 35. Although none of these allegations should bear upon the Court's decision on the Motion, each such allegation is false, the Debtors must respond to correct the record.

23.     The first and most serious allegation—that the settlement is a breach of the Debtors' fiduciary duties—is perhaps the most easily dispatched. In determining whether to approve a settlement, bankruptcy courts generally give deference to a debtor's business judgment, subject to the requirement that the compromise be fair, reasonable and in the best interests of the estate. *Key3Media Grp., Inc. v. Pulver.com, Inc. (In re Key3Media Grp., Inc.)*, 336 B.R. 87, 92–93 (Bankr. D. Del. 2005). Compromises are favored in bankruptcy because they minimize the costs of litigation and further the expeditious administration of the estate. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).

24.     The Debtors believe that the Hartford Insurance Settlement Agreement is fair, reasonable, and in the best interests of the estates and holders of Abuse Claims, which they intend to demonstrate at the appropriate time in these chapter 11 cases. Hartford issued primary and certain umbrella policies to the BSA for the period from September 21, 1971 to January 1, 1978. Prior to the Petition Date, the BSA and Hartford were engaged in litigation over the scope of coverage provided under the Hartford Policies. In that litigation, Hartford raised a number of defenses that, if successful, would substantially reduce or even eliminate coverage for the Abuse Claims, including that the BSA has breached conditions to coverage; that the Abuse Claims arise out of a single occurrence under applicable law, which Hartford believes is New Jersey law under its primary policies; and that the BSA and the Local Councils expected or intended the injuries for which they seek coverage. *See* Whittman Decl. ¶ 7 & Ex. A. Hartford has also contended, outside

of litigation, that the BSA's access to certain of its policies is significantly limited, including that the BSA released and extinguished its primary policies for January 1, 1976 to January 1, 1978 through a prepetition settlement; that it has no coverage obligations for Abuse Claims that are barred by the applicable statute of limitations; and that at least one of the Hartford primary policies has an applicable aggregate limit for Abuse Claims.  *Id.*

25.    While the Debtors dispute many, if not all, of those contentions, there can be no doubt that continuing to litigate against Hartford would not only drain the Debtors' limited resources but also create a substantial risk that Hartford would ultimately pay significantly less toward Abuse Claims than it will under the Hartford settlement—and some risk that Hartford would pay nothing.  The resolution of the coverage dispute reflected in the Hartford settlement is the product of extensive, arm's-length negotiations conducted over a lengthy period between the Debtors and Hartford, with the active assistance of the Mediators.  Whittman Decl. ¶ 7.  As the Debtors will demonstrate when the Debtors present the Hartford Settlement for the Court's approval, it represents a good-faith settlement and compromise of complex disputes and will avoid the costs, risks, uncertainty, and delay associated with protracted litigation, while providing a very substantial payment on account of Abuse Claims.

26.    The Coalition and FCR express great concern that a payment-reduction provision of the Hartford Settlement would inevitably result in a significant reduction of the $650 million settlement amount.  The provision in question provides that if the Debtors or the Settlement Trust enter into a settlement of Century's policies for less than $1.3 billion, then Hartford's $650 million settlement amount shall be reduced by 50% of the difference between $1.3 billion and any lower Century settlement amount.  *See* Hartford Settlement § II.E.  Again, the Debtors' views on the appropriateness of this provision will be addressed at a hearing to approve the Hartford Settlement.

The presence of a most favored nation provision in a single settlement agreement that is not currently before the Court is not a basis to terminate the Debtors' exclusivity.

27.    Finally, the Coalition and FCR's arguments that the Hartford Settlement was a backroom deal, negotiated "in secret" and without those constituencies' participation is misleading at best.  The Coalition, the FCR and Hartford each attended the March 30–April 1 mediation that took place in Miami.  Whittman Decl. ¶ 8.  The Debtors attended meetings with the Coalition, FCR and Hartford separately and as a group during that week and are aware of separate meetings among the Coalition, FCR and Hartford that the Debtors did not attend.  For those reasons, the Hartford Settlement was not the result of any "secret" negotiations.

## IV.    The Coalition and FCR Misrepresent the Insurance Neutrality Provisions of the Plan, Which Are Consistent with Established Third Circuit Precedent.

28.    Like the reasonableness of the Hartford Settlement, the propriety of the Plan's insurance provisions should have no bearing on the Court's decision to extend the Exclusive Periods.  *See*, *e.g.*, *In re Burns & Roe Enters.*, 2005 U.S. Dist. LEXIS 26247, at *36–37 (explaining that concerns over a plan's confirmability should be reserved for the plan confirmation hearing).  Undeterred, the Coalition and FCR devote the majority of the Objection to arguing that the Plan's "insurance neutrality" provisions, which are consistent with established Third Circuit precedent, somehow indicate that the Debtors "appear to be working with their insurers to minimize the survivors recovery and the Insurance Companies' obligations" and that the Debtors "are capitulating to their insurers' demands."  *See* Objection ¶¶ 16, 29.  These arguments are disingenuous and based on incorrect or misleading interpretations of straightforward provisions of the Plan.

29.    Contrary to the Coalition and FCR's assertions, the "insurance neutrality" provisions of Article X.M of the Plan are customary and intended to ensure—consistent with

applicable Third Circuit precedent—that the Debtors can assign their valuable insurance rights to the Settlement Trust on the Effective Date without becoming mired in time-consuming and expensive litigation with their insurers.  Nothing in these neutrality provisions is intended to provide the Insurance Companies with a better outcome than that which insurers are customarily afforded in other similarly situated mass tort cases, or otherwise impair the ability of survivors to receive the full recoveries to which they are entitled under to the Trust Distribution Procedures.

30.    Indeed, the "insurance neutrality" provisions of the Plan do little more than expressly preserve the prepetition rights and defenses of Non-Settling Insurance Companies under their policies and applicable law by providing that nothing in the Plan and related documents "shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (a) the rights or obligations of any Insurance Company or (b) any rights or obligations of the Debtors arising out of or under any Insurance Policy."  Plan Art. X.M.1.  Under this provision, the Plan effectively returns the Insurance Companies to their prepetition position, which is consistent with the manner in which many debtors in mass-tort bankruptcies have addressed this issue.

31.    It is well established that, for a plan to be "insurance neutral," it must affirm the prepetition contractual obligations of the insurer without impairing the rights of the insurer or increasing its burden.  *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 202 (3d Cir. 2004) (describing "neutrality" provision as "protect[ing] the debtor's and insurers' pre-petition rights under certain insurance policies"); *Mt. McKinley Ins. Co. v. Pittsburgh Corning Corp.*, 518 B.R. 307, 329 (W.D. Pa. 2014) (explaining that plan was insurance neutral where it "did not dramatically increase the 'quantum of liability,' harm [the insurer's] contractual rights, or increase its administrative burdens"); *see also In re Glob. Indus. Techs.*, 645 F.3d 201, 212 (3d Cir. 2011)

("'Insurance neutrality' is a meaningful concept where, as in *Combustion Engineering*, a plan does not materially alter the quantum of liability that the insurers would be called to absorb."); *In re Pittsburgh Corning Corp.*, 453 B.R. 570, 584 (Bankr. W.D. Pa. 2011) ("A plan is considered to be insurance neutral if it neither increases an insurer's pre-petition obligations nor impairs its pre-petition contractual rights under the subject insurance policies.").  Similar neutrality language has been approved in numerous other mass tort bankruptcy cases.[10]

32.    The Coalition and FCR also misrepresent certain of the neutrality provisions of the Plan itself in an apparent attempt to argue that the Debtors' proposed insurance neutrality provisions are meaningfully different than those included in other mass tort plans.  They are not.  For example, the Coalition states that the Plan would give Insurance Companies a "windfall" because the Plan "purport[s] to exempt 'otherwise applicable principles of res judicata or collateral estoppel from being applied against any Insurance Company with respect to any issues that is

---

[10]    *See, e.g.*, *Combustion Engineering*, 391 F.3d at 209, 216 (finding that substantially similar language "broadly preserves insurers' pre-petition rights under the subject insurance policies"); *see also In re PG&E Corp.*, Case No. 19-30088 (Bankr. N.D. Cal. June 20, 2020) [D.I. 8053] (confirming chapter 11 mass tort plan addressing personal injury and other claims arising from wildfires, with confirmation order containing insurance neutrality provision); *In re Sepco Corp.*, Case No. 16-50058 (Bankr. N.D. Ohio Mar. 24, 2020) [D.I. 732] (confirming chapter 11 mass tort plan addressing asbestos liabilities with insurance neutrality plan provisions); *In re Insys Therapeutics, Inc.*, Case No. 19-11292 (KG) (Bankr. D. Del. Jan. 16, 2020) [D.I. 1115] (confirming chapter 11 mass tort plan addressing opioid liabilities with insurance neutrality plan provisions); *In re TK Holdings Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) [D.I. 2120] (confirming chapter 11 mass tort plan addressing personal injury and wrongful death claims arising from defective airbag inflators with insurance neutrality plan provisions); *In re Garlock Sealing Techs. LLC*, Case No. 10-31607 (Bankr. W.D.N.C. May 24, 2017) [D.I. 5972] (confirming chapter 11 mass tort plan addressing asbestos liabilities with insurance neutrality plan provisions); *In re Blitz U.S.A., Inc.*, Case No. 11-13603 (PJW) (Bankr. D. Del. Jan. 30, 2014) [D.I. 2152] (confirming chapter 11 mass tort plan addressing tort claims arising out of gas transportation carriers with insurance neutrality plan provisions); *In re Roman Catholic Bishop of Stockton*, Case No. 14-20371 (Bankr. E.D. Cal. Jan. 13, 2017) [D.I. 843] (confirming chapter 11 mass tort plan addressing sexual abuse liabilities with insurance neutrality plan provisions); *In re Roman Catholic Church of the Diocese of Gallup*, Case No. 13-13676 (Bankr. D.N.M. June 23, 2016) [D.I. 591] (same).

actually litigated by such Insurance Company.'" *See* Objection ¶ 27 (citing Plan Art. X.M.4). But

the Coalition and FCR fail to quote the full provision, which states as follows:

> ***Nothing in this Article X.M is intended or shall be construed to preclude*** otherwise applicable principles of res judicata or collateral estoppel from being applied against any Insurance Company with respect to any issues that is actually litigated by such Insurance Company.

Plan Art. X.M.4 (emphasis added).

33.     In other words, if an insurer objects to confirmation of the Plan on the basis that,

for example, the Plan was not proposed in good faith, the Insurance Company will be precluded

from raising that argument in post-emergence coverage litigation, as it was already adjudicated in

the chapter 11 cases. This is a favorable provision for Abuse Survivors. Insurance Companies do

not get to "appear, litigate, and lose and then present that the whole thing never happened," as the

Coalition and FCR baselessly contend in their Objection. *See* Objection ¶ 32.

34.     As to Article X.M.2 of the Plan, the Coalition and FCR state that the Plan purports

to exclude Insurance Companies from the parties that will be bound by the Plan, the Plan

Documents, and the Confirmation Order. *See* Objection ¶ 28. Not so. The Plan provides that,

except as provided in Article X.M.4 (the *res judicata* provision discussed above), none of the Plan

Documents or any estimation or valuation of Abuse Claims shall "constitute or be deemed to

constitute a trial or hearing on the merits or an adjudication or judgment, or accelerate the

obligations, if any, of any Insurance Company under its Insurance Policies." *See* Plan Art. X.M.2.

As discussed above, this type of provision is frequently included in mass tort chapter 11 plans and

simply affirms the prepetition rights and obligations of the insurers without affecting or increasing

the insurers' burden.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court overrule the Objection and enter the Proposed Order, substantially in the form attached to the Motion, granting the relief requested in the Motion and any further relief the Court may deem just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated: May 16, 2021
       Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Eric W. Moats*

Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Eric W. Moats (No. 6441)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email:  dabbott@morrisnichols.com
      aremming@morrisnichols.com
      emoats@morrisnichols.com
      ptopper@morrisnichols.com

– and –

**WHITE & CASE LLP**
Jessica C. Lauria (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email:  jessica.lauria@whitecase.com

– and –

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Email: mandolina@whitecase.com
      mlinder@whitecase.com
      laura.baccash@whitecase.com
      blair.warner@whitecase.com

ATTORNEYS FOR THE DEBTORS AND
DEBTORS IN POSSESSION