# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>(Jointly Administered)<br><br>Ref. D.I. 2411, 4100 |

## DECLARATION OF BRIAN WHITTMAN
## IN SUPPORT OF DEBTORS' THIRD MOTION FOR ENTRY
## OF AN ORDER EXTENDING THE DEBTORS' EXCLUSIVE PERIODS
## TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF

Brian Whittman, being duly sworn, states the following under penalty of perjury:

1. I am over twenty-one (21) years of age and fully competent to make this declaration in support of the *Debtors' Third Motion for Entry of an Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [D.I. 2411] (the "Motion") and in support of the Debtors' reply (the "Reply"), filed concurrently herewith, to the objection to the Motion filed by the Coalition and the FCR (the "Objection").[2] I am a Managing Director with Alvarez & Marsal North America, LLC ("A&M"), which serves as restructuring advisor to Boy Scouts of America and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession in the above-captioned chapter 11 cases (together, the "Debtors"). As the lead Managing Director at A&M responsible for this engagement since August 2019, I have been

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] All terms that are capitalized but not otherwise defined herein shall have the meaning ascribed to such terms in the Motion or the Reply, as applicable.

involved with many aspects of these chapter 11 cases and in doing so have familiarized myself with a range of matters concerning the Debtors, including those described herein.

2. Except as otherwise stated in this declaration, all facts set forth herein are based on my personal knowledge, materials provided by, or my discussions with, members of the Debtors' management team or information obtained from my personal review of relevant documents. Additionally, the views asserted in this declaration are based upon my experience and knowledge of the Debtors' operations, financial condition, and liquidity.  If called upon to testify, I would competently testify to the facts set forth herein.

## I. The Debtors Remain Committed to Maximizing the Value of the Settlement Trust Through Mediated Negotiations.

3. I participate in frequent discussions with the Court-appointed Mediators, including mediated discussions and negotiations between the Debtors and their legal and economic advisors, on the one hand, and representatives of the Debtors' principal constituents in these cases.  Since the appointment of the Mediators, I have personally participated in hundreds of hours of mediation involving various parties, including the Coalition, the FCR, the TCC, the Ad Hoc Committee, the Debtors' insurers, including Hartford and Century, JPM, the Creditors' Committee, and certain Chartered Organizations.  Additionally, I have spent many more hours interacting with these constituents' representatives outside of the mediation by videoconference, telephone and email. These discussions and negotiations have covered numerous topics, including the evaluation of abuse claims, the values that should be ascribed to such claims, the nature, extent and terms of the Debtors' and Local Councils' historical insurance coverage, the amounts, composition and timing of payment of appropriate contributions from the Debtors, Local Councils, and Chartered Organizations, and the Debtors' business plan and financial projections.

4.     Over the past seven weeks, within the context of the ongoing mediation, the Debtors have discussed numerous detailed proposals and counter-proposals with the Coalition and FCR regarding the terms of the Plan and potential modifications that would render the Plan acceptable to certain survivor constituencies.  The Debtors' efforts to achieve a consensual mediated resolution of these cases has continued unabated notwithstanding the contested nature of the proceedings.  Indeed, the Debtors continued mediated discussions with the Coalition and FCR mere hours after the Objection was filed.

5.     The Debtors and certain of their advisors spent May 4, 5 and 6, 2021 in mediation in New York City with representatives of the Coalition, FCR, TCC, Hartford, Century, and the Ad Hoc Committee of Local Councils.  These meetings were a continuation of the meetings the Debtors held in Miami from March 30 to April 1, 2021.  I attended both the New York and Miami meetings.  Since the May 4–6 mediation, the Debtors have continued to be engaged in extensive and detailed discussions and negotiations with representatives of certain of these parties with a view toward reaching agreement on the terms of a comprehensive settlement of Abuse Claims that would have the support of a critical mass of survivors.  It is my view that notwithstanding the charged rhetoric in the Objection and other pleadings filed in these cases, the Debtors have consistently sought—and intend to continue—to work with their constituents, including the Coalition, FCR, and TCC, with the assistance of the Mediators, to maximize the value of the Settlement Trust from all available sources and to resolve or narrow their disputes.

## II.  Termination of the Exclusive Periods Would Jeopardize the Debtors' Prospects for a Successful Reorganization Due to the Debtors' Limited and Deteriorating Liquidity.

6.     I believe that termination of the Exclusive Periods would jeopardize the Debtors' prospects for a successful reorganization based in substantial part on the Debtors' limited and deteriorating liquidity.  The total amount of restructuring fees paid or accrued by the Debtors in

these cases as of March 31, 2021 was approximately $100 million. By the time the Debtors' confirmation hearing is scheduled to begin on August 30, 2021, even without a competing plan process and the incremental restructuring fees that would accompany that process, the total paid and accrued restructuring fees are expected to exceed $150 million.[3] Every delay in these cases has an attendant cost that reduces the amount of cash available for the Debtors to contribute to the Settlement Trust. As an example, the litigation in these cases since November 2020 and the corresponding delay of the Debtors' confirmation timeline from July 2021 to late August 2021 has reduced the Debtors' cash expected to be contributed to the Settlement Trust by approximately $25 million. Accordingly, I believe that a competing plan process would likely compound the Debtors' deteriorating liquidity by increasing the amount of restructuring fees and extending the length of time within which those fees are incurred due to the inevitable litigation-related delays.

### III. The Hartford Settlement Was Negotiated at Arm's Length and the Settlement Terms Were Carefully Considered by the Debtors.

7. The Hartford settlement is the product of extensive, arm's-length negotiations conducted over a lengthy period between the Debtors and Hartford, with the active assistance of the Mediators. The Debtors believe that the Hartford Settlement is reasonable and in the best interests of the estates and holders of Abuse Claims in large part due to the risks associated with continued coverage litigation with Hartford. Prior to the commencement of these cases, the BSA and Hartford were engaged in litigation over the scope of coverage provided under the Hartford Policies. As set forth in the *Defendants' Special Exceptions, Original Answer and Affirmative Defenses to Plaintiffs' Original Petition* filed by Hartford in the BSA's prepetition coverage action

---

[3] This total would likely be higher if the Debtors had not reached a settlement with the Creditors' Committee and JPM. Based on actual fees incurred and forecast guidance, these parties' respective fees have declined by approximately fifty percent (50%) since the settlement was finalized.

in Texas state court, a true and correct copy of which is attached hereto as **Exhibit A**, Hartford raised a number of defenses in that litigation that I am informed, based on my discussions with the Debtors' insurance coverage counsel, would, if successful, substantially reduce or even eliminate coverage for Abuse Claims.  I am further informed by the Debtors' insurance coverage counsel that Hartford has also contended, outside of litigation, that the BSA's access to certain of its policies is significantly limited, including that the BSA released and extinguished its primary policies for January 1, 1976 to January 1, 1978 through a prepetition settlement; that it has no coverage obligations for Abuse Claims that are barred by the applicable statute of limitations; and that at least one of the Hartford primary policies has an applicable aggregate limit for Abuse Claims.

8.      I disagree with the Coalition and FCR's arguments that the Hartford Settlement was negotiated "in secret."  The Coalition, FCR and Hartford each attended the Miami mediation meetings in person.  The Debtors attended meetings with the Coalition, FCR and Hartford, separately and as a group during that week, and I understand that separate meetings among the Coalition, FCR and Hartford took place without the Debtors in attendance.

*[Remainder of Page Intentionally Left Blank]*

I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: May 16, 2021  
Highland Park, Illinois

ALVAREZ & MARSAL NORTH AMERICA, LLC

*/s/ Brian Whittman*
Brian Whittman
Managing Director