**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 20-10343 (LSS)<br><br>Jointly Administered<br><br>Hearing Date: May 19, 2021 at 10:00 am (ET)<br><br>RE: Docket Nos. 2594, 3526, 3569 |

**STATEMENT OF THE AD HOC COMMITTEE OF LOCAL COUNCILS IN SUPPORT OF AMENDED DISCLOSURE STATEMENT FOR THE SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC**

The Ad Hoc Committee of Local Councils of the Boy Scouts of America (the "Ad Hoc Committee")[2] respectfully submits this statement (the "Statement") in support of the *Amended Disclosure Statement for the Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [Dkt. No. 2594] (the "Disclosure Statement") and states as follows:

**PRELIMINARY STATEMENT**

The cornerstone of the Debtors' second amended plan (the "Plan") that the Disclosure Statement describes is a channeling injunction in favor of, among others, Local

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's U.S. tax identification number are as follows: Boy Scouts of America (6300) and Delaware BSA, LLC (4311). The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

[2] The Ad Hoc Committee consists of eight Local Councils: the Andrew Jackson Council, the Atlanta Area Council, the Crossroads of America Council, the Denver Area Council, the Grand Canyon Council, the Greater New York Councils, the Mid-America Council, and the Minsi Trails Council. For the avoidance of doubt, this Statement is submitted on behalf of the Ad Hoc Committee and not on behalf of any individual member or any Local Council. The undersigned represent only the Ad Hoc Committee and not any of its members individually. The Ad Hoc Committee does not represent (and this Statement should not be construed as a statement on behalf of) any individual Local Council.

Councils in exchange for the Local Council Settlement Contribution[3] which includes: (i) payment from each of 253 Local Councils of an aggregate amount of not less than $425 million, and (ii) assignment by each Local Council of its rights as an insured under certain insurance policies obtained either by the Debtors or by the individual Local Council.

The rights of Local Councils and the Debtors under insurance policies are likely to be the single largest source of recoveries for holders of Abuse Claims. Without the participation of Local Councils, holders of Abuse Claims likely will not have access to *any* Debtor or Local Council insurance proceeds outside of litigation in tort systems in jurisdictions throughout the country. This contribution by Local Councils is critical to any successful resolution of these cases. Additionally, the contemplated financial contribution from Local Councils represents nearly 80% of Scouting's direct financial contributions to support the Debtors' (and Local Councils') objective of equitably compensating holders of Abuse Claims while preserving the Scouting movement in the United States. In short, the proposed extraordinary participation of Local Councils under the Plan represents a singular opportunity for holders of Abuse Claims to obtain substantial compensation promptly.

The Ad Hoc Committee has worked intensively to organize Local Councils' support around achievable contribution goals, and to provide mediation parties with meaningful information about the status of the Ad Hoc Committee's efforts. The Committee's efforts have included identifying a fair allocation of financial contribution responsibility among 253 legally separate non-debtor Local Councils, which face dramatically differing exposure to holders of Abuse Claims, differing litigation risks in their own jurisdictions based on existing statutes of limitations (and differing potential for future changes in the jurisdiction's statute of limitations),

[3] Capitalized terms not defined in this Statement are defined in the Disclosure Statement.

and differing financial capabilities to fund a contribution to the contemplated Trust for the benefit of holders of Abuse Claims (with the bulk of many Local Councils' assets legally restricted and unavailable to fund any contribution).

The Ad Hoc Committee is prepared to undertake further intensive efforts to obtain binding commitments from each of the 253 Local Councils toward the $425 million Local Council financial contribution set out in the Plan. The Ad Hoc Committee believes that this aggregate contribution level is likely achievable (albeit with meaningful difficulty) on a timeline that will permit creditors to assess the results of these efforts prior to any voting deadline.

**STATEMENT IN SUPPORT**

Various objections to the Disclosure Statement assert three primary issues related to Local Councils. *First*, certain parties object to the lack of "binding" commitments from Local Councils. This objection is misplaced, however, in the unique circumstances of these cases. Given the need for a quick emergence from bankruptcy and the time needed to obtain binding commitments from over 250 boards nationwide, it is reasonable to permit the Debtors to begin solicitation of the Plan while the Ad Hoc Committee is engaged in the task of obtaining binding commitments from Local Councils. The Ad Hoc Committee is working with the Debtors to ensure that binding Local Council Contribution commitments are obtained sufficiently in advance of the voting deadline to permit creditors to consider Local Council commitments in assessing whether to vote for or against the Plan.

*Second*, certain objectors request additional disclosure about Local Councils and their finances. The Ad Hoc Committee agrees that the Disclosure Statement should be supplemented to provide Local Council specific financial data, as well as other Local Council

information relevant to assessment of potential recoveries on Abuse Claim from particular Local Councils in the tort system.

*Third*, the Tort Claimants' Committee (the "TCC") objection invokes putative "reversionary" interests of the Debtors in Local Council assets as a basis for further Local Council disclosure. The TCC's discussion of the purported reversionary interest, however, is itself substantially incomplete and misleading. The Ad Hoc Committee concurs that disclosure to creditors concerning the Debtors' putative reversionary interests in Local Council assets may be appropriate, so long as the disclosure adequately describes the limits of the reversionary interests and the likelihood that holders of Abuse Claims will realize few, if any, additional assets from an attempt to invoke the reversionary interests.

*A. The lack of "committed" contributions from Local Councils should not preclude the Debtors from soliciting votes on the Plan.*

The Ad Hoc Committee has spent thousands of hours interacting with Local Councils and assessing their ability to make contributions at various levels, and has gathered (and shared) sufficient information to provide reasonable confidence that the contribution level set forth in the Disclosure Statement will be achieved, albeit with substantial additional effort. The Ad Hoc Committee's continued efforts to secure binding commitments for the Local Council Contribution should not delay the Debtors' dissemination of the Disclosure Statement.

Indeed, this objection – that Local Councils have not yet made binding commitments to contributions that aggregate to $425 million – is really an objection to the feasibility of the Plan, rather than to the adequacy of the Disclosure Statement. Such objections should be heard in connection with Plan confirmation, not in connection with approval of the

Disclosure Statement.[4] The Ad Hoc Committee will work with the Debtors to ensure that binding commitments from Local Councils are in hand prior to the voting deadline.

*B. The Disclosure Statement should include additional, relevant information concerning Local Councils.*

Numerous objections to the Disclosure Statement request that the Debtors provide additional information regarding Local Councils and their assets. Local Councils have throughout these cases provided extensive information to the Debtors' data room, where it has been available to creditor constituencies and other parties in interest. The Ad Hoc Committee specifically agrees that certain additional information regarding Local Councils should be included in the Disclosure Statement. The Ad Hoc Committee is working with the Debtors and other parties and will assist the Debtors in supplementing the disclosure as directed by this Court.

*C. The Disclosure Statement should not include incomplete, misleading or argumentative statements regarding the Debtors' putative reversionary interests in Local Council assets.*

The TCC's Objection argues misleadingly that a hypothetical chapter 7 trustee for the Debtors could revoke or decline to renew Local Council charters and thereby assume management of Local Councils and their properties. The TCC contends that a hypothetical chapter 7 trustee could take this step to dissolve Local Councils and use their net assets to pay Abuse Claims asserted against the Debtors.[5] This incorrect and argumentative position should not be included in the Disclosure Statement. *See* 7 COLLIER ON BANKRUPTCY § 1125.03[4] (16th

---

[4] *See, e.g.*, *Bank of the Ozarks* v. *Coastal Realty Inv., Inc. (In re Coastal Realty Inv., Inc.)*, 2013 WL 214235, at *2 (Bankr. S.D. Ga. 2013) ("[T]he fact that a plan of reorganization is not feasible does not itself bar a disclosure statement's approval. Instead, as long as the disclosure statement adequately provides creditors with enough information to assess the plan, the disclosure statement has fulfilled its purpose. Judgments about whether the plan is feasible based on those assessments are issues reserved for plan confirmation.").

[5] *See, e.g.*, TCC Objection ¶¶ 94-96.

ed.) (a court should not approve a disclosure statement "if the disclosure is inaccurate or 'replete with deficiencies'").

Provisions in the Debtors' Bylaws and Rules & Regulations do speak in terms of a "reversionary interest" in certain assets of Local Councils. However, these provisions clearly do *not* invest a hypothetical chapter 7 trustee with "responsibil[ity] for liquidating [a] Local Council's assets," as the TCC contends,[6] nor do they provide an apparent source of recoveries for holders of Abuse Claims against the National BSA. At most, these provisions *may* provide a *contractual* argument that the Debtors have a *reversionary* interest in Local Council assets, but any such interest is subject to, among other things, contract-law defenses as well as defenses under state franchise and charitable corporation laws. Importantly, as described further below, any such contractual interest – and the defenses thereto – also varies with the terms of the myriad organizational documents of individual Local Councils, as well as with the particular laws of jurisdictions throughout the United States.

An effort by a hypothetical chapter 7 trustee to rely on these reversionary interests to seize Local Council assets to satisfy claims against the Debtors would inevitably spawn fierce Local Council opposition and litigation, and face insurmountable obstacles, *including*:

- The contractual defense that attempted use of charter revocation or non-renewal to grab Local Council assets would constitute a lack of good faith and fair dealing.
- State franchise law that would bar a chapter 7 trustee of the Debtors from unilateral revocation or non-renewal of a Local Council charter to seize Local Council assets.
- The mandate under the terms of the very documents cited by the TCC that all obligations owed by a Local Council must be satisfied, or provision must be made for their satisfaction (including reserves for contingent claims against the Local Council), before any assets could even possibly revert to the Debtors.

---

[6] *See* TCC Objection ¶ 96.

- The prohibition under state charitable organization laws on use of assets that are "donor restricted" or otherwise "institutional funds" under applicable law to satisfy general obligations of either a Local Council or the Debtors; such assets may only be used for the donor-restricted purposes or other charitable purposes.
- The legal limitation under the terms of the relevant documents that assets that might revert could be used only to advance the Scouting movement in the geographic area where a particular Local Council is incorporated, and are not available to satisfy general claims against the Debtors. On this basis, it is questionable whether *any* Local Council assets at all could *ever* revert to a chapter 7 trustee liquidating the Debtors, who by definition would not use such assets to advance the Scouting movement.[7]

As described further below, the net effect of these obstacles would be to severely limit – if not entirely preclude – any recoveries for holders of Abuse Claims against the National BSA as a result of a hypothetical chapter 7 trustee's attempts to revoke Local Council charters. The Disclosure Statement must not contain statements that would erroneously suggest otherwise to holders of Abuse Claims.

1. <u>Local Council corporate governance documents and legal rules must be considered along with the Debtors' own bylaws, rules and regulations.</u>

Local Councils are legally separate entities from the Debtors, and each has its own articles of incorporation, charters, bylaws, boards, officers, and assets. While the Debtors' charter and bylaws are their own binding corporate governance documents, the Local Councils have their own, separate and non-identical governance documents, which vary in their terms and meaning along with the legal rules applicable to each of the Local Councils in every jurisdiction in the United States.

The relationships between the Debtors and Local Councils are akin to franchisor and franchisees. Courts have previously held that the organizational structure of a charitable

[7] For the avoidance of doubt, nothing in this Statement is intended to waive any rights, claims, defenses and arguments with respect to any attempt to terminate or not renew the charter of any Local Council.

nonprofit organization like the Boy Scouts of America – the Girl Scouts of America – is a franchise.[8] Applying Wisconsin's Fair Dealership Law, the United States Court of Appeals for the Seventh Circuit wrote:

> [T]he national organization (which was founded in 1912 and incorporated in 1950 by Act of Congress, 36 U.S.C. §§ 80301 et seq.) relates to the councils as franchisor to franchisees. It 'charters' (that is, licenses) the local councils, thereby authorizing them to sell cookies and other merchandise under the 'Girl Scout' trademark, which the national organization owns.[9]

Like any other franchisor/franchisee relationship, the Debtors' relationship to the multitude of Local Councils is fundamentally one of contract. As a result, the most that can accurately be said about the Debtors putative reversionary interests is that they form *part of* the contract with Local Councils. Another part of that contract comprises the Local Council charters and bylaws. A court determining the nature and scope of the Debtors' putative reversionary interests in Local Council assets, therefore, would need to assess the provisions of (i) the Debtors' Bylaws, (ii) the Debtors' Rules & Regulations, (iii) each Local Councils' charter, (iv) each Local Council's bylaws, and (v) any parol evidence of the meaning of those documents. Such judicial scrutiny would require over 250 exercises in contract interpretation as well as application of pertinent franchise and nonprofit corporation laws, all under the laws of over 50 jurisdictions.

In short, any assertion that a hypothetical chapter 7 trustee of the Debtors could revoke or decline to renew a Local Council charter and expect to seize the Local Council's assets

---

[8] *See Girl Scouts of Manitou Council, Inc.* v. *Girl Scouts of the United States of Am., Inc.*, 549 F.3d 1079, 1092 (7th Cir. 2008); *see also Girl Scouts of Manitou Council, Inc.* v. *Girl Scouts of the United States of Am., Inc.*, 700 F. Supp. 2d 1055 (E.D. Wis. 2010), *aff'd*, 646 F.3d 983 (7th Cir. 2011).

[9] *Girl Scouts of Manitou Council Inc.* v. *Girl Scouts of the United States of Am., Inc.*, 646 F.3d 983, 984 (7th Cir. 2011).

promptly is misleading and erroneous. Such an attempted usurpation and forfeiture of Local Council assets undoubtedly would be hotly contested by Local Councils in nationwide litigation. The Disclosure Statement should not include erroneous statements about the purported rights of a chapter 7 trustee.

2. Charter revocation or non-renewal cannot be used to seize Local Council assets.

Any disclosure concerning attempted revocation or non-renewal of a Local Council charter for the purpose of seizing Local Council assets should disclose that such an attempt would lack contractual foundation and would constitute a lack of good faith and fair dealing toward the Local Council. Section 4 of Article VI of the Debtors' Charter requires that the Debtors' Executive Committee determine that revocation of a Local Council charter would be "in the best interests of the Scouting movement."[10] On its face, this provision does not provide an unfettered right to revoke Local Council charters. Well-established legal principles that impose a duty of good faith and fair dealing on the enforcement of contracts would prevent a chapter 7 trustee from exercising charter revocation powers (or declining to renew a charter) for the naked purpose of grabbing Local Council assets for the Debtors' own purposes.[11]

[10] National BSA Bylaws, Art. VI § 4 ("The Executive Committee may revoke or modify the charter of a local council at any time in its sole discretion when it is believed to be in the best interests of the Scouting movement.").

[11] Local Councils have each invested significant resources in attracting members, collecting dues, remitting funds to the Debtors, and making BSA programs available in their local communities. They did so on the reasonable belief that the Debtors would not arbitrarily revoke their charters to seize their assets. Arbitrary revocation of a Local Council charter, therefore, would also give Local Councils a claim of promissory estoppel under state law.

3. State franchise law constrains the power to revoke Local Council charters.

State franchise law governs the relationship between the Debtors and Local Councils. Most state franchise laws contain provisions barring a franchisor from arbitrarily or unfairly revoking the franchisee's rights to operate. In *Girl Scouts of Manitou Council Inc.*, the Girl Scouts of the United States of America National Organization ("GSUSA") was prohibited from unilaterally changing the territory of its local council under precisely such a law. GSUSA is structured similarly to the BSA: local councils each have their own charters, but are credentialed by the national organization. GSUSA's organizational documents contained broad purported powers to revoke Local Council charters, similar to the powers that the TCC asserts that the Debtors hold here.[12] Despite these facially broad powers to revoke a charter, GSUSA was enjoined from exercising those powers because it had failed to show "good cause" for the charter revocation, even though its governing documents purported to give GSUSA the unilateral right to terminate charters.[13]

---

[12] *See Girl Scouts of Manitou Council Inc.*, 700 F. Supp. 2d at 1059-60 ( "the GSUSA[] is broadly empowered to issue credentials to a given council and revoke such credentials when 'the terms and conditions [of the credentials] or requirements . . . are being violated or when the best interests of Girl Scouting are not being furthered.' GSUSA Const. art. VIII, § 3.").

[13] Order, *Girl Scouts of Manitou Council, Inc.* v. *Girl Scouts of the United States of Am., Inc.*, No. 08-cv-184-JPS (Oct. 12, 2011), ECF No. 208.

> IT IS ORDERED, pursuant to the Wisconsin Fair Dealership Law, that Girl Scouts of the United States of America, including its National Council, National Board, officers, agents and attorneys, is PERMANENTLY ENJOINED from terminating, canceling, failing to renew or substantially changing the competitive circumstances of Girl Scouts of Manitou Council, Inc.'s Charter in furtherance of, or in connection with, GSUSA's Realignment Process.

Any attempt by a hypothetical chapter 7 trustee to take unilateral action to revoke or not renew a Local Council charter will fail in the face of similar franchise laws, in addition to being a violation of the general duty of good faith and fair dealing.

4. Even if a Local Council's charter could be revoked (or not renewed), its assets still would not flow to the Debtors or their creditors.

Even if a hypothetical chapter 7 trustee could revoke a Local Council charter, that trustee would *not* gain access to a Local Council's assets quickly, if ever.

For example, the Model Local Council Articles of Incorporation – to which the TCC refers as one of the bases for the National BSA's purported reversionary interest albeit not by name[14] – provides that a Local Council's assets are irrevocably dedicated to the charitable and educational purposes of the Boy Scouts and that assets may only revert to another Local Council or the Debtors *after* satisfaction of claims (or a provision is made therefor).[15]

Importantly here, the Pension Benefit Guaranty Corporation (the "PBGC") has asserted a contingent claim for more than $1.1 billion against the Debtors.[16] The PBGC can furthermore be expected to assert that its claim against the Debtors is a joint and several obligation of each Local Council.[17] A chapter 7 trustee's ability to access any Local Council's assets through reversionary charter provisions would be substantially impeded by the $1.1 billion

---

[14] *See* TCC Objection ¶ 96 ("[T]he BSA Bylaws provide that the Local Councils' property vests in the BSA *for use in accordance with the Local Councils' governance documents*." (emphasis added)).

[15] *See* Model Local Council Articles of Incorporation Art. X.

[16] *See* Claims Docket, Claim No. 1162 (filed Oct. 29, 2020).

[17] *See id.* ¶ 7 ("Upon termination of the Pension Plan, its contributing sponsor and each member of the contributing sponsor's controlled group become jointly and severally liable to PBGC for the total amount of the Pension Plan's unfunded benefit liabilities.") *See* 29 U.S.C. § 1362(a), (b); *id.* § 1301(a)(18). For the avoidance of doubt, the Ad Hoc Committee does not concede that Local Councils are jointly and severally liable to the PBGC. However, this issue would need to be resolved in connection with any attempted reversion of Local Council assets to the Debtors.

PBGC claim, which no Local Council has sufficient assets to meet. Until the risks associated with the PBGC claim are fully resolved in litigation, all Local Councils would be obligated to reserve their assets for the benefit of the PBGC, among other creditors.

And, even if any assets did revert to the Debtors from a Local Council after payment of any PBGC claim, a chapter 7 trustee would be limited in the use of those assets, as they could only be used to further the charitable and educational mission of the Boy Scouts.

Moreover, every Local Council is also subject to the nonprofit laws of its state of incorporation. State nonprofit laws often prohibit significant transfers by a nonprofit organization without the approval of the state's attorney general.[18] In such jurisdictions, state attorneys general would be required to approve the transfer of any assets before such assets could flow to the Debtors through exercise of a reversionary interest.

Finally, any real property or restricted funds that might revert to the Debtors would have to be used, in the first instance, in the locality of the Local Council from which the assets reverted.[19] Similarly, any assets that did revert would be required to be used "in the best interests of Scouting" and in accordance with "the intent and wishes of the donor."[20] Using a putative reversionary interest to seize Local Council assets to pay general claims against the Debtors would clash with these provisions and limitations.

* * *

[18] *See, e.g.*, *Cuomo* v. *Daniels*, 906 N.Y.S. 2d 771, 771 (Sup. Ct. 2009) ("conveyance of all or substantially all of the property of a not-for-profit corporation without approval of the corporate directors or the court, *and without notice to the Attorney General* is *void ab initio*"); *St. Andrey Bulgarian E. Orthodox Cathedral Church, Inc.* v. *Bosakov*, 272 A.D.2d 55, 56 (N.Y. 2000) (transfer of property between churches was void because state attorney general did not consent).

[19] *See* National BSA Rules & Regulations Art. III.

[20] *See id*.

In short, while the Ad Hoc Committee does not oppose including language in the Disclosure Statement that references the Debtors' putative reversionary interests, any such statements should realistically describe the difficulties and uncertainties of using these provisions to obtain assets from Local Councils for the benefit of holders of Abuse Claims.

**CONCLUSION**

The Ad Hoc Committee supports the prompt approval of the Disclosure Statement. It will work with the Debtors to propose appropriate additional information concerning Local Councils and their assets. To the extent that the Court directs the inclusion of any language concerning the putative reversionary interests, the Ad Hoc Committee requests that such description be appropriately tempered by the reality of the difficulties and uncertainties of using these provisions to realize assets for the benefit of the Debtors' creditors. And, while binding commitments have not yet been obtained from Local Councils, the Ad Hoc Committee submits that this is properly an issue to be addressed at Plan confirmation, even as the Ad Hoc Committee will work with the Debtors to ensure that binding commitments are obtained prior to the voting deadline on the Plan and promptly reported to creditors.

Dated: May 16, 2021
Wilmington, Delaware

DLA PIPER, LLP (US)

/s/ *R. Craig Martin*
R. Craig Martin (No. 5032)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801-1147
Telephone: (302) 468-5655
Facsimile: (302) 778-7834
Email: craig.martin@dlapiper.com

WACHTELL, LIPTON, ROSEN & KATZ

/s/ *Richard G. Mason*
Richard G. Mason (admitted *pro hac vice*)
Douglas K. Mayer (admitted *pro hac vice*)
Joseph C. Celentino (admitted *pro hac vice*)
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000
Email: RGMason@wlrk.com
DKMayer@wlrk.com
JCCelentino@wlrk.com

*Attorneys for the Ad Hoc Committee of Local Councils of the Boy Scouts of America*