**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |
| | **Ref. D.I. 2295, 2726, Ex. A**<br>**Hearing Date: May 19, 2021 at 10:00 a.m. (ET)** |

**DEBTORS' OMNIBUS REPLY IN SUPPORT OF
DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE
DISCLOSURE STATEMENT AND THE FORM AND MANNER OF NOTICE,
(II) APPROVING PLAN SOLICITATION AND VOTING PROCEDURES,
(III) APPROVING FORMS OF BALLOTS, (IV) APPROVING FORM, MANNER, AND
SCOPE OF CONFIRMATION NOTICES, (V) ESTABLISHING CERTAIN DEADLINES
IN CONNECTION WITH APPROVAL OF THE DISCLOSURE STATEMENT AND
<u>CONFIRMATION OF THE PLAN, AND (VI) GRANTING RELATED RELIEF</u>**

---

[1]  The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Boy Scouts of America (6300) and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

REPLY .............................................................................................................................. 8

I.   THE DISCLOSURE STATEMENT SHOULD BE APPROVED BECAUSE IT SATISFIES THE
     APPLICABLE STANDARDS  UNDER SECTION 1125 OF THE BANKRUPTCY CODE .................. 8

     A.   The Disclosure Statement Provides Adequate Information As Required By Section
          1125 of the Bankruptcy Code .................................................................................. 9

          1.   The Disclosure Statement Adequately Describes the Hartford Insurance
               Settlement Agreement. ............................................................................. 10

          2.   The Disclosure Statement Provides Adequate Information Concerning the
               Assets and Liabilities of the Local Councils. ............................................ 11

          3.   The Disclosure Statement Adequately Describes the Debtors' Insurance
               Policies and the Disputes Surrounding such Policies. ............................... 11

     B.   The Confirmation Objections Are Premature and Meritless ............................... 12

          1.   The Unfair Discrimination Objection Is a Premature Confirmation
               Objection and Without Merit. .................................................................... 14

          2.   The GSUSA's Disparate Treatment Objection Is a Premature
               Confirmation Objection and Without Merit. .............................................. 18

          3.   The Tort Claimants' Committee's Objection to the Hartford Insurance
               Settlement Agreement Is a Premature Confirmation Objection and
               Without Merit. ........................................................................................... 20

          4.   The Objections Regarding Feasibility Are Premature Confirmation
               Objections and Without Merit. ................................................................... 21

          5.   Objections Regarding Good Faith Are Unripe and Have Been Rendered
               Moot. .......................................................................................................... 23

          6.   While the Global Resolution Plan TDP Provides Robust Anti-Fraud
               Protections, They Do Not Make Economic Sense for Purposes of the
               Expedited Distributions. ............................................................................ 25

          7.   The Plan Does Not Impermissibly Modify the Church's Rights to
               Insurance Proceeds and Provides for Appropriate Treatment of Indirect
               Abuse Claims. ............................................................................................ 26

II.  THE BEST INTEREST TEST IS NOT RELEVANT AT THE DISCLOSURE STATEMENT STAGE .... 30

     A.   Even if the Best Interest Test Applied (and It Does Not), the Disclosure Statement
          Contains Sufficient Information For Creditors to Evaluate Whether the Plan
          Meets It. ................................................................................................................ 32

          1.   The Disclosure Statement Provides Sufficient Information to Satisfy
               Disclosure Requirements Regarding the Best Interest Test. ...................... 32

          2.   The Disclosure Statement Does Not Need to Include Assets, Contributions
               and Released Claims in Respect of Each Local Council. ......................... 33

3.      The Liquidation Analysis Adequately Includes the Debtors' Assets. ...... 34

4.      The Plan Is Insurance Neutral. ................................................................. 36

5.      The Channeling Injunction and Related Non-Consensual Third-Party Releases Do Not Render the Plan Patently Unconfirmable. ..................... 40

6.      Century's 502(a) Objection Has Been Repeatedly Rejected by Bankruptcy Courts as Meritless. ................................................................................. 42

7.      The Third-Party Consensual Releases Are Consistent with Applicable Law. ........................................................................................................... 44

B.      *The Solicitation Procedure Objections and Other Procedural Objections Are Meritless or Have Been Addressed* ........................................................................ 46

1.      Century's Objection That All Claims Information Must Be Provided in the Disclosure Statement Contradicts Bankruptcy Law and Practice. ............ 46

2.      The Debtors' Procedures with Respect to the Solicitation Directive Appropriately Incorporate the Instructions of Abuse Survivors on their Proofs of Claim. ...................................................................................... 47

3.      It Is Not Relevant or Feasible for the Debtors to Identify a Local Council on Each Ballot. ......................................................................................... 48

4.      The Debtors Are Willing to Work with the Tort Claimants' Committee and the Coalition on Inserts to the Cover Letter for the Solicitation Package. ..................................................................................................... 49

5.      The Procedures Related to Claim Objections Filed After the Solicitation Date Do Not Disenfranchise Claimants. .................................................... 50

6.      The Use of Modern Forms of Distribution of the Solicitation Packages Is an Appropriate and Efficient Use of Estate Resources Given the Number of Claimants in the Voting Classes and Costs of Mailing ....................... 51

7.      The Debtors Are Not Required to Weed Out Abuse Claims Prior to Soliciting Votes on the Plan. ..................................................................... 53

8.      The Debtors' Master Ballot Procedures Are Sufficient, and the Court Does Not Need to Require Counsel to Comply with Bankruptcy Rule 2019 Prior to Recording Abuse Survivor Clients' Votes on a Master Ballot. ............ 55

9.      The Master Ballot and Related Procedures Do Not Improperly Disenfranchise Abuse Claims Holders and Do Not Give Undue Influence to the Coalition Law Firms. ...................................................... 57

10.     The Certification on the Master Ballot Does Not Invite Manipulation of Voting. ...................................................................................................... 58

11.     The Solicitation Procedures Do Not Give Undue Influence to Coalition Law Firms, and Coalition Firms Are Not Precluded from the Use of Master Ballots. ......................................................................................... 59

12.     The Temporary Allowance of Abuse Claims at $1.00 Solely for Voting Purposes Is Proper. ................................................................................... 60

*CONCLUSION* ............................................................................................................. *61*

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Azar v. THGH Liquidating LLC (In re THGH Liquidating LLC)*,
Case No. 19-11689, 2020 U.S. Dist. LEXIS 164740 (D. Del. 2020) .....................................24

*Blocker v. State*,
718 S.W.2d 409 (Tex. App. 1986).........................................................................................36

*Hargreaves v. Nuverra Envtl. Sols., Inc. (In re Nuverra Envtl. Sols., Inc.)*,
590 B.R. 75 (D. Del. 2018)...................................................................................................15

*In re 24 Hour Fitness Worldwide, Inc.*,
Case No. 20-11558 (Bankr. D. Del. 2020) .............................................................................48

*In re A.H. Robbins*,
Co., 88 B.R. 742 (E.D. Va. 1988).............................................................................26, 47, 61

*In re Abeinsa Holding, Inc.*,
562 B.R. 265 (Bankr. D. Del. 2016) .......................................................................................32

*In re Abengoa Bioenergy Biomass of Kan.*,
LLC, Case No. 16-10446, 2018 Bankr. LEXIS 1361 (Bankr. D. Kan. 2018).........................43

*In re ACandS, Inc.*,
311 B.R. 36 (Bankr. D. Del. 2004) .........................................................................................43

*In re Acemla De P.R. Inc.*,
No. 17-2021 ESL, 2019 Bankr. LEXIS 182 (Bankr. D.P.R. 2019).........................................47

*In re AgFeed USA, LLC*,
No. 13-11761, 2015 Bankr. LEXIS 1403 ...............................................................................54

*In re Am. Capital Equip., LLC*,
688 F.3d 145 (3d Cir. 2012)..........................................................................................13, 42

*In re Armstrong World Indus., Inc.*,
348 B.R. 111 (D. Del. 2006).........................................................................................15, 16

*In re Barnes*,
309 B.R. 888 (Bankr. N.D. Tex. 2004)...................................................................................24

*In re Borders Grp., Inc.*,
Case No. 11-10614 (Bankr. S.D.N.Y. 2011) ..........................................................................53

*In re Burns & Roe Enters.*,
   Case No. 00-41610RG, 2005 Bankr. LEXIS 3173 (Bankr. D.N.J. 2005) ..............................29

*In re Catholic Diocese of Wilmington*,
   Case No. 09-13560 (Bankr. D. Del. 2009) .......................................................................44, 62

*In re Century 21 Dep't Stores, LLC*,
   Case No. 20-12097 (SCC) (Bankr. S.D.N.Y. 2021) ...............................................................51

*In re Chaparral Energy Inc.*,
   Case No. 20-11947 (MFW) (Bankr. D. Del. 2020) ...............................................................46

*In re Colin*,
   44 B.R. 806 (Bankr. S.D.N.Y. 1984)......................................................................................31

*In re Combustion Eng'g*,
   391 F. 3d 190 (3d Cir. 2004)...........................................................................................36, 38

*In re Congoleum Corp.*,
   No. 03-51524, 2008 Bankr. LEXIS 2375 (Bankr. D.N.J. 2008) ............................................43

*In re The Christy Refractories*,
   Case No. 08-48541 (Bankr. E.D. Miss. 2009) .......................................................................44

*In re Dakota Rail, Inc.*,
   104 B.R. 138 (Bankr. D. Minn. 1989) ...................................................................................13

*In re DeSardi*,
   340 B.R. 790 (Bankr. S.D. Tex. 2006) ..................................................................................54

*In re Ditech Holding Corp.*,
   606 B.R. 544 (Bankr. S.D.N.Y. 2019) ...................................................................................32

*In re Diversified Invests. Fund XVII*,
   91 B.R. 559 (Bankr. C.D. Cal. 1988).....................................................................................32

*In re Draw Another Circle, LLC*,
   Case No. 16-11452 (KJC) (Bankr. D. Del. 2016)...................................................................53

*In re Dune Energy, Inc.*,
   Case No. 15-10336 (Bankr. W.D. Tex. 2015) .......................................................................53

*In re Duro Dyne Nat'l Corp.*,
   No. 18-27963 (MBK) (Bankr. D.N.J. 2018)...........................................................................30

*In re Extraction Oil & Gas, Inc.*,
   Case No. 20-11548 (CSS) (Bankr. D. Del. 2020)...................................................................51

*In re Flintkote Co.*,
    Case No. 04-11300 (JKF) (Bankr. D. Del. 2008) .............................................................30, 33

*In re Flintkote Co.*,
    486 B.R. 99 (Bankr. D. Del. 2012) ........................................................................................21

*In re Forty-Eight Insulations, Inc.*,
    133 B.R. 973 (Bankr. N.D. Ill. 1991) ...................................................................................27

*In re Forty-Eight Insulations, Inc.*,
    149 B.R. 860 (N.D. Ill. 1992) ..............................................................................................29

*In re Global Industrial Technologies*,
    645 F.3d 201 (3d Cir. 2011)...................................................................................................39

*In re Grace Christian Ministries, Inc.*,
    287 B.R. 352 (Bankr. W.D. Pa. 2002) ..................................................................................31

*In re GUE Liquidation Cos., Inc.*,
    No. 19-11240 (LSS) (Bankr. D. Del. Oct. 23, 2019)..............................................................45

*In re Hereford Biofuels, L.P.*,
    466 B.R. 841 (Bankr. N.D. Tex. 2012)..................................................................................28

*In re Hertz Corp.*,
    Case No. 20-11218 (MFW) (Bankr. D. Del. Apr. 22, 2021)...................................................51

*In re Imerys Talc Am., Inc.*,
    Case No. 19-10289 (Bankr. D. Del. 2019) ...............................................................30, 33, 56

*In re Insys*,
    19-11292 (Bankr. D. Del. 2019) ....................................................................................48, 56

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986)....................................................................................70

*In re Kaiser Gypsum Co., Inc.*,
    No. 16-31602 (Bankr. W.D.N.C.).........................................................................................25

*In re Kiklis*,
    352 B.R. 355 (Bankr. D. Mass. 2006) ..................................................................................56

*In re L.A. Cty. Pioneer Soc'y*,
    257 P.2d 1 (Cal. 1953) ..........................................................................................................39

*In re Lloyd E. Mitchell, Inc.*,
    373 B.R. 416 (Bankr. D. Md. 2007) .....................................................................................65

*In re Magnum Constr. Mgmt., LLC,*
   No. 19-12821 (Bankr. D. Del. 2019) ...................................................35

*In re Majestic Star Casino, LLC,*
   716 F.3d 736 (3d Cir. 2013)................................................................37

*In re Mandalay Shores Co-op. Hous. Ass'n, Inc.,*
   53 B.R. 609 (Bankr. M.D. Fla. 1985) .................................................33

*In re Maremont Corp.,*
   601 B.R. 1 (Bankr. D. Del. 2019) .......................................................25

*In re Melinta Therapeutics, Inc.,*
   Case No. 19-12748 (LSS) (Bankr. D. Del. 2020)................................59

*In re Mem'l Med. Ctr., Inc.,*
   337 B.R. 388 (Bankr. N.M. 2005) .......................................................32

*In re Milbourne,*
   557 B.R. 376 (Bankr. E.D. Pa. 2016) .................................................63

*In re Millennium Lab Holdings II, LLC,*
   575 B.R. 252 (Bankr. D. Del. 2017) ...................................................49

*In re Millennium Lab Holdings II, LLC,*
   945 F.3d 126 (3d Cir. 2019)................................................................53

*In re Monroe Well Serv. Inc.,*
   80 B.R. 324 (Bankr. E.D. Pa. 1987) ..............................................7, 30

*In re Parkview Hosp.,*
   211 B.R. 616 ........................................................................................39

*In re Phoenix Petroleum Co.,*
   278 B.R. 385 (Bankr. E.D. Pa. 2001) ...................................................9

*In re Pittsburgh Corning Corp.,*
   417 B.R. 289 (Bankr. W.D. Pa. 2006) ...............................................40

*In re Price Funeral Home, Inc.,*
   No. 08-04816-8-ATS, 2008 Bankr. LEXIS 3462 (Bankr. E.D.N.C. 2008)..............................8

*In re Prussia Assocs.,*
   322 B.R. 572 (Bankr. E.D. Pa. 2005) .................................................21

*In re Quigley Co.,*
   377 B.R. 110 (Bankr. S.D.N.Y. 2007) ................................................12

*In re Quigley Co.*,
    437 B.R. 102 (Bankr. S.D.N.Y. 2010) ...........................................................36, 65

*In re Resorts Int'l*,
    145 B.R. 412 (Bankr. D.N.J. 1990) ......................................................................18

*In re Rochem, Ltd.*,
    58 B.R. 641 (Bankr. D.N.J. 1985) ........................................................................16

*In re Rosenblum*,
    No. 18-17155-MKN, 2019 Bankr. LEXIS 2278 (Bankr. D. Nev. 2019)................56

*In re Save Our Springs (S.O.S.) Alliance, Inc.*,
    388 B.R. 202 (Bankr. W.D. Tex. 2008)...........................................................31, 38

*In re Scioto Valley Mortg. Co.*,
    88 B.R. 168 (Bankr. S.D Ohio 1988).....................................................................9

*In re SoyNut Butter Co.*,
    Case No. 17 B 14970, 2018 Bankr. LEXIS 2300 (Bankr. N.D. Ill. 2018) ........27, 29

*In re Stanley Hotel, Inc.*,
    13 B.R. 926 (Bankr. D. Colo. 1981) ......................................................................6

*In re Tribune Co.*,
    972 F.3d 228 (3d Cir. 2020)...........................................................................14, 15

*In re Tynan*,
    773 F.2d 177 (7th Cir. 1985) ...............................................................................37

*In re U.S. Brass Corp.*,
    194 B.R. 420 (Bankr. E.D. Tex. 1996) ................................................................13

*In re W. Asbestos Co.*,
    313 B.R. 832 (Bankr. N.D. Cal. 2003) ................................................................51

*In re W.P. Hickman*,
    2012 Bankr. LEXIS 3301 ....................................................................................34

*In re W.R. Grace & Co.*,
    468 B.R. 81 (D. Del. 2012)..................................................................................18

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012)..................................................................................21

*In re W.R. Grace & Co.*,
    729 F.3d 311 (3d Cir. 2013)...........................................................................18, 19

*In re Wabash Valley Power Ass'n*,
   77 B.R. 991 (Bankr. S.D. Ind. 1987) ...................................................................33

*In re Wash. Mut., Inc.*,
   442 B.R. 314 (Bankr. D. Del. 2011) ..............................................................36, 49

*In re WR Grace & Co.*,
   729 F.3d 332 (3d Cir. 2013)..............................................................................24

*Kane v. Johns-Manville Corp.*,
   843 F.2d 636 (2d Cir. 1988)........................................................................21, 54

*MacArthur Co. v. Johns-Manville Corp.*,
   837 F.2d 89 (2d Cir. 1988)................................................................................28

*McCord v. Sofer (In re Sofer)*,
   507 B.R. 444 (Bankr. E.D.N.Y. 2014)...............................................................20

*Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*,
   354 B.R. 1 (D. Conn. 2006) ..............................................................................36

*In re Molycorp, Inc.*,
   Case No. 15-11357 (CSS) (Bankr. D. Del. 2016)...............................................54

*In re Oldco, LLC*,
   Case No. 17-30140 (Bankr. W.D.N.C. 2017) .....................................................51

*In re PG&E Corp.*,
   Case No. 19-30088 (DM) (Bankr. N.D. Cal. 2020).................................62, 65, 70

*In re Remington Outdoor Co.*,
   Case No. 20-81688 (Bankr. N.D. Ala. 2020)......................................................51

*In re Roman Catholic Bishop of Great Falls*,
   Case No. 17-60271 (Bankr. D. Mont. 2018)........................................................70

*In re Signal Int'l, Inc.*,
   Case No. 15-11498 (Bankr. D. Del. 2015) .........................................................35

*In re Southland Royalty Co.*,
   Case No, 20-10158 (KBO) (Bankr. D. Del. 2021) ..............................................59

*In re Specialty Prods. Holding Corp.*,
   Case No. 10-11780 (PJW) (Bankr. D. Del. 2014) ..............................................34

*In re Specialty Prods. Holding Corp.*,
   No. 10-11780 (PJW) (Bankr. D. Del. 2014) .......................................................30

*In re TK Holdings, Inc.*,
    Case No. 17-11375 (BLS) (Bankr. D. Del. 2018) ......................................................53, 62, 70

*In re United Gilsonite Labs.*,
    Case No. 5:11-bk-02032 (RNO) (Bankr. M.D. Pa. 2014) ......................................................34

*In re W.P. Hickman Sys., Inc.*,
    No. ADV 10-2289JAD, 2012 Bankr. LEXIS (Bankr. W.D. Pa. 2012) ...............................30

*In re Yarway Corp.*,
    No. 13-11025 (BLS) (Bankr. D. Del. 2015) ..........................................................................30

*In re Z Gallerie, LLC*,
    Case No. 19-10488 (LSS) (Bankr. D. Del. 2019) ..................................................................54

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
    848 F.2d 414 (3d Cir. 1988).....................................................................................................8

*S. Pac. Transp. Co. v. Voluntary Purchasing Grps., Inc.*,
    252 B.R. 373 (E.D. Tex. 2000) ..............................................................................................33

## FEDERAL STATUTES

11 U.S.C. § 541(d) ........................................................................................................................38

11 U.S.C. § 303 ..............................................................................................................................32

11 U.S.C. § 1112(c) .......................................................................................................................32

11 U.S.C. § 1125(a)(1)...........................................................................................................6, 8, 9

11 U.S.C. § 1129(a)(3)...................................................................................................................25

11 U.S.C. § 1129(a)(7)(A) .......................................................................................................31, 33

## FEDERAL RULES

Fed. R. Bankr. P. 2004....................................................................................................................64

Fed. R. Bankr. P. 2019.................................................................................................64, 66, 67, 68

Fed. R. Bankr. P. 3001....................................................................................................................63

Fed. R. Bankr. P. 3018....................................................................................................................63

Fed. R. Bankr. P. 9010....................................................................................................................65

Boy Scouts of America (the "BSA") and Delaware BSA, LLC, the non-profit corporations that are debtors and debtors in possession (together, the "Debtors") in the above-captioned chapter 11 cases, hereby submit this omnibus reply (this "Reply") to the objections, joinders, and reservations of rights (collectively, the "Objections") filed by the parties listed on **Exhibit A** hereto (collectively, the "Objectors") with respect to the *Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief* [D.I. 2295] (the "Motion"),[2] which requests, among other things, entry of an order (as amended on April 28, 2021, and as may be further amended, the "Solicitation Procedures Order") approving the Disclosure Statement and the Solicitation Procedures.  In support of this Reply and in further support of the approval of the Disclosure Statement and the Solicitation Procedures, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      On February 18, 2020, the Debtors commenced these chapter 11 cases to achieve their dual restructuring objectives of providing equitable and timely compensation to abuse survivors and ensuring that the Debtors' congressionally chartered charitable mission will continue for future generations of American youth.  The Court established November 16, 2020 as the bar date for filing abuse proofs of claim against the Debtors.  As of the bar date,

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion, the *Disclosure Statement for the Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 2594] (as may subsequently be amended or modified, the "Disclosure Statement"), or the *Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* [D.I. 2592] (as may subsequently be amended or modified, the "Plan"), as applicable, or as the context otherwise requires.

approximately 82,500 unique abuse proofs of claim had been filed.  Moreover, as the Court is aware, since May 3, 2021, more than 550 letters have been filed by Abuse Survivors describing, among other things, the abuse they have recounted in their proofs of claim and their desire to have this matter resolved quickly.  The BSA appreciates survivors sharing their perspectives and experiences, and would like to acknowledge the courage of each survivor in sharing their story. As an organization dedicated to improving the lives of young people, the Debtors are devastated by the pain and suffering many of these claimants have described as youths in Scouting programs.  The Debtors understand that no monetary compensation can heal the anguish caused or restore the lives shattered by abuse, as recounted in the proofs of claim.  Nevertheless, the BSA believes that it is of paramount importance to continue to work to give the Abuse Survivors the closure they desire by maximizing the value of the Settlement Trust under the Plan.  The approval of the Disclosure Statement and Solicitation Procedures is a critical milestone toward fulfilling the Debtors' financial and moral responsibility to compensate survivors.

2.    The Debtors filed the Plan on April 13, 2021.  The Plan, which is presently supported by the Creditors' Committee, JPM, and Hartford, contains a "toggle" feature, which provides for two alternative pathways for the Debtors to emerge from bankruptcy.  The alternative that the Debtors ultimately present to the Court for confirmation depends on: (a) whether a sufficient number of survivors vote to accept the Plan; and (b) whether the Court determines that the proposed settlement of Abuse Claims against Local Councils and Contributing Chartered Organizations satisfies applicable legal requirements.  If both of these conditions are satisfied, the Debtors will proceed with confirmation of the "Global Resolution Plan."  If not, they will confirm the "BSA Toggle Plan."

3.      The Global Resolution Plan is the Debtors' preferred alternative because it will achieve the Debtors' dual restructuring objectives.  Specifically, the Global Resolution Plan will maximize equitable recoveries for abuse survivors through a centralized claims-evaluation process that will eliminate the risk of inconsistent outcomes in the tort system for similarly situated creditors.  It will provide finality for the Debtors, Local Councils, Contributing Chartered Organizations, and Settling Insurance Companies by permanently channeling Abuse Claims to the Settlement Trust with respect to such Protected Parties.  It will also maximize the value of the Debtors' insurance assets by vesting the Settlement Trust with the exclusive right to pursue non-settling insurers on account of Direct Abuse Claims.  The Settlement Trust will, as of the Effective Date, assume exclusive responsibility for processing, liquidating and paying Abuse Claims asserted against the Protected Parties in accordance with the Trust Distribution Procedures.

4.      The Global Resolution Plan currently provides for aggregate contributions to the Settlement Trust of as much as $1.19 billion.   These contributions would be made by the Debtors (approximately $120 million), Local Councils (at least $425 million), and Hartford ($650 million).  These amounts are only a floor on the total value of the Settlement Trust.  The recent Hartford Insurance Settlement Agreement is an important initial building block toward what the Debtors believe will be a substantial aggregate contribution to the Settlement Trust from multiple insurers and Chartered Organizations.  The Debtors will continue to work tirelessly through mediation to obtain additional contributions that will increase the assets of the Settlement Trust to a level that will attain sufficient survivor support to confirm the Global Resolution Plan.  Ultimately, individual survivors will decide whether the Global Resolution Plan is acceptable.

5.      If survivors vote to reject the Plan, or if they accept the Plan in numbers insufficient to warrant approval of non-consensual third-party releases, then the Debtors will pursue confirmation of the Plan under the other alternative pathway to emergence: the "BSA Toggle Plan."  Under the BSA Toggle Plan, the only claims that would be channeled to the Settlement Trust are Abuse Claims against the Debtors, Reorganized BSA, the Related Non-Debtor Entities, and their respective representatives.  Abuse Claims would not be channeled to the Settlement Trust as to any Local Councils, Chartered Organizations, or Insurance Companies, as these entities are not Protected Parties under the BSA Toggle Plan.  Survivors would therefore be entitled to commence or continue litigation against any Local Council or Chartered Organization in the tort system, and the insurance rights of all such entities would remain in place as if the bankruptcy had never occurred.  This is not the Debtors' favored outcome, as it would fail to establish a centralized means of providing equitable compensation to survivors through these chapter 11 cases, lead to inconsistent outcomes in the tort system for similarly situated creditors, devalue the Debtors' insurance assets, and precipitate a tidal wave of abuse lawsuits that would overwhelm and likely force a number of Local Councils into bankruptcy.  Nevertheless, the BSA Toggle Plan would enable the BSA to emerge from bankruptcy on its required timeline with the ability to continue carrying out its charitable mission free from the specter of prepetition Abuse Claims against the national organization.

6.      The Debtors have recognized from the outset of these cases that any global resolution of Abuse Claims to be implemented through the plan of reorganization requires survivors to vote in sufficient numbers to accept the plan.  Accordingly, the Debtors have made extraordinary efforts to work collaboratively with representatives of abuse survivors.  Twenty-six (26) parties are now participating in the Court-sanctioned mediation, which has been

extraordinarily active, particularly during the five months that have followed the claims bar date. In particular, over the past seven weeks, within the context of the mediation (including two weeks of in-person meetings in Miami and New York), the Debtors have discussed numerous detailed proposals and counter-proposals with the Coalition and FCR regarding the terms of the Plan and potential modifications that would render the Plan acceptable to certain survivor constituencies.

7.      Although the Debtors have not reached agreement with the Coalition, FCR or Tort Claimants' Committee, the Debtors are committed to continuing to work with these constituents and others, including the Insurance Companies and the Ad Hoc Committee of Local Councils, with the assistance of the Mediators, to maximize the value of the Settlement Trust from all available sources.  Ultimately, the Debtors believe they can increase the assets of the Settlement Trust to a level that will garner sufficient support for the Plan from abuse survivors.

8.      In the meantime, it remains critical that the Debtors continue to move their plan process forward, and expeditiously.  The Debtors must continue to build upon the settlement structure embodied in the Plan and emerge from chapter 11 on their required timeline.  As the Court is aware, the total amount of restructuring fees paid or accrued by the Debtors in these cases as of March 31, 2021 was approximately $100 million, and the run rate of estate professional fees remains approximately $10 million per month.  Every dollar spent on restructuring fees is a dollar that could otherwise be contributed to the Settlement Trust for the benefit of abuse survivors.  The Debtors therefore remain focused on emerging from chapter 11 as soon as September 2021.

9.      As set forth on **Exhibit A**, numerous Objections have been filed relating to the adequacy of the Disclosure Statement and the propriety of the Solicitation Procedures.  Attached

hereto as **Exhibit B** is a chart (the "Objection Response Chart") that lists the Objections and the Debtors' responses thereto.[3]    The Objections primarily fall into one of three categories: (a) objections as to the adequacy of the information contained in the Plan and Disclosure Statement; (b) objections raising issues with respect to the confirmability of the Plan; and (c) objections to procedural or solicitation matters.

10.    Pursuant to section 1125 of the Bankruptcy Code, the question at hand is whether the Disclosure Statement enables a "hypothetical investor typical of the holders of claims or interest in the case" to cast an informed vote on the Plan.  11 U.S.C. § 1125(a)(1).  In this inquiry, the Court is not required to consider specialized issues that a particular creditor may wish to raise with respect to a plan of reorganization, nor must a debtor to explain why its plan of reorganization is superior to other, hypothetical plans.  *See* 11 U.S.C. § 1125(a)(1) ("[A]dequate information need not include such information about any other possible or proposed plan . . . .").  Moreover, this determination does not require a plan proponent to clutter its disclosure statement with endless responses to the myriad discovery requests.  *See, e.g.*, *In re Stanley Hotel, Inc.*, 13 B.R. 926, 933–34 (Bankr. D. Colo. 1981) ("[C]ompounding a disclosure statement for the sake of a lawyer's notion of completeness, or because some additional information might enhance one's understanding, may not always be necessary or desirable, and the length of a document should not be the test of its effectiveness.").

11.    The Debtors have worked diligently to attempt to address, to the extent practicable and appropriate, any Objections with respect to the adequacy of the Disclosure Statement or the Solicitation Procedures.  Accordingly, the Debtors will shortly file proposed amended versions of the Plan and the Disclosure Statement, which will incorporate responsive

---

[3]    Any Objection not addressed in the body of this Reply is addressed in the Objection Responses Chart.

disclosures or supplemental provisions, as applicable.  As detailed in the Objection Response Chart, the Debtors have addressed the Objections that relate to the adequacy of disclosure by including certain additional language in the Disclosure Statement or the Plan—even where the Debtors believe that the requested disclosure extends beyond the scope of "adequate disclosure" per section 1125.  Prior to the hearing, the Debtors will continue to work toward consensual resolution of all remaining disclosure-related Objections.  **To this end, the Debtors invite parties to submit to Debtors' counsel by May 18, 2021 at 12:00 p.m. (ET) any additional disclosures that they wish the Debtors to include in the Disclosure Statement, and the Debtors will consider whether the Disclosure Statement should include such additional information**.

12.     Most of the remaining Objections raise confirmation issues that should not be considered at the Disclosure Statement stage.  These Objections assert that the Plan is "patently unconfirmable"—a high standard that none of the Objections have met.  *See In re Monroe Well Serv. Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987) (observing that the "patently unconfirmable" standard as requiring an objecting party to demonstrate that the Plan, on its face, "cannot plausibly be confirmed.").  Challenges regarding the feasibility of the Plan, whether the Plan has been proposed in good faith, whether the Plan satisfies the best interests test, and the permissible scope of the releases contemplated by a plan, among other issues, are properly addressed in the context of confirmation—after solicitation of creditors—and not in the context of disclosure.  As demonstrated below and in the Objection Response Chart, the confirmation-related Objections are just that—premature objections to confirmation that should not preclude the Court's approval of the Disclosure Statement and should appropriately be deferred until the Confirmation Hearing as none rise to the level of rendering the Plan "patently unconfirmable."

13.     Accordingly, the Debtors respectfully request that the Court overrule the Objections and enter the proposed order approving the Disclosure Statement and authorizing the Debtors to solicit votes to accept or reject the Plan.

## REPLY

**I.     The Disclosure Statement Should be Approved Because It Satisfies the Applicable Standards  Under Section 1125 of the Bankruptcy Code**

14.     Pursuant to section 1125 of the Bankruptcy Code, the proponent of a chapter 11 plan must provide holders of impaired claims and interests entitled to vote on a plan with "adequate information" regarding the plan.  *See* 11 U.S.C. § 1125(a)(1). Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . . .

15.     The determination of whether a disclosure statement contains adequate information focuses on the facts and circumstances of each case.  *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) (citing H.R. Rep. No. 595, 97th Cong., 1st Sess. 266 (1977)) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case.").

16.     Even where "a disclosure statement could have included more information, . . . a disclosure statement need not be perfect and may be approved if the information is reasonable in the circumstances."  *In re Price Funeral Home, Inc.*, No. 08-04816-8-ATS, 2008 Bankr. LEXIS 3462, at *5 (Bankr. E.D.N.C. Dec. 12, 2008).

17.     In its section 1125 inquiry, the Court need not consider specialized issues that a particular creditor may wish to raise with respect to a plan, nor is a debtor required to explain why its chapter 11 plan is superior to other, hypothetical plans.  *See* 11 U.S.C. § 1125(a)(1) ("[A]dequate information need not include such information about any other possible or proposed plan[.]").  Further, the "adequate information" standard does not require that a disclosure statement include information about every aspect of a debtor's business, its proposed plan, or claims asserted against the debtor.  Rather, as expressed in the statute, "adequate information" is limited to "information of a kind, and in sufficient detail, as far as is reasonably practicable . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan." *Id.*

### A.     The Disclosure Statement Provides Adequate Information As Required By Section 1125 of the Bankruptcy Code

18.     Courts have identified categories of information that generally should be included in a disclosure statement, while acknowledging that certain categories of information that are necessary in one case may be omitted in another.  *See In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170-71 (Bankr. S.D. Ohio 1988).  The Disclosure Statement contains adequate information in each of those categories:

- The Debtors' corporate history and structure, business operations, and prepetition capital structure and indebtedness (Article III);

- Events leading up to the Chapter 11 Cases, including the Debtors' pre-bankruptcy restructuring negotiations and significant events in the Chapter 11 Cases (Article IV);

- The classification and treatment of Claims and Interests under the Plan, including which Classes are entitled to vote and how to vote on the Plan (Article VI.C-E);

- Releases contemplated by the Plan that are integral to the Restructuring Transactions and overall settlement of Claims pursuant to the Plan (Article VI.O);

- Certain important effects of Confirmation of the Plan (Article X);

- Certain U.S. federal income tax consequences of the Plan (Article XI);

- Certain risk factors that Holders of Claims should consider before voting to accept or reject the Plan and information regarding alternatives to Confirmation of the Plan (Article X); and

- The requirements for Confirmation of the Plan (Article IX).

19.    Notably, the Debtors believe that the unresolved Objections fail to identify ***any*** category of information required by case law or statute that the Debtors have failed to disclose—because there is none. Indeed, the majority of the unresolved Objections are self-serving requests for unnecessary disclosure or tactics to delay the confirmation of these cases in the face of Abuse Claimants who deserve to be compensated for the harm they have experienced.

### 1.    The Disclosure Statement Adequately Describes the Hartford Insurance Settlement Agreement.

20.    Certain Objections to the Disclosure Statement assert that it does not contain sufficient information regarding the Hartford Insurance Settlement Agreement. [*See* D.I. 2739, 3284, 3526, 3565, 3569, 3285, 3856].  However, this has been addressed through the additional disclosures in the *Proposed Amendments to Disclosure Statement for the Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* (the "Proposed Disclosure Statement Amendments") which is being filed concurrently herewith and which comprehensively describe the Hartford Insurance Settlement Agreement and its terms, including Hartford's commitment, subject to certain terms and conditions, to make a contribution of up to $650 million to the Settlement Trust for the payment of Abuse Claims.  *See* Art. V.R.2. The disclosures also address the factors that influenced the Debtors' determination to enter into the Hartford Insurance Settlement.  *Id.*

2.     **The Disclosure Statement Provides Adequate Information Concerning the Assets and Liabilities of the Local Councils.**

21.     Certain Objections assert that the Disclosure Statement does not contain sufficient information regarding the assets and liabilities of the Local Councils, who would become Protected Parties under the Global Resolution Plan, subject to the requirement that Local Councils make the Local Council Settlement Contribution to the Settlement Trust in the amount of at least $425 million. *See, e.g.*, D.I. 2449, 2497, 2500, 2580, 2586, 2642, 2741, 2960, 3276, 3256, 3523, 3565, 3856.[4]  However, this has been addressed through the additional disclosures. Specifically, the Debtors are including an aggregate summary of the Local Councils' assets and liabilities in the Proposed Disclosure Statement Amendments, and balance sheets for each of the Local Council are attached to the Liquidation Analysis as Exhibit 1.  Additionally, the values of the real property held by the Local Councils are disclosed in Exhibit 2 of the Liquidation Analysis.  The overwhelming majority of these values are based on desktop broker opinions of value prepared by real estate consultants retained by the Debtors or the Tort Claimants' Committee, as indicated on Exhibit 2.  Moreover, the Debtors have also disclosed on Exhibit 2 whether, based upon the Local Councils' records and the Debtors' review of such records, the real properties are subject to enforceable restrictions on the sale or other disposition of such properties.

3.     **The Disclosure Statement Adequately Describes the Debtors' Insurance Policies and the Disputes Surrounding such Policies.**

22.     Certain of the Objectors assert that the Disclosure Statement does not contain sufficient information regarding the Insurance Policies and, in certain instances, disputes with

---

[4]     This list is not exhaustive. Please refer to Exhibit B, the Objection Responses Chart, for the Objections and the Debtors' responses thereto.

respect to the Insurance Policies. See, e.g., D.I. 2449, 2960, 3263, 3273, 3478, 3526, 3523, 3549, 3856, 3579.[5]

23.     The Disclosure Statement describes, at length, the structure and history of the Debtors' Insurance Policies and the nature of the Debtors' historical insurance program.  The Disclosure Statement contains, among other things, known information about the Insurance Policies, the historical background of coverage in place from the 1930s to the Petition Date, deductibles, per-occurrence limits, aggregate limits, excess coverage, exhaustion of coverage, discovery concerning the policies issued prior to 1978, the First Encounter Agreement, and descriptions of disputes between the Debtors and certain Insurance Companies and among certain Insurance Companies with respect to obligations under certain Insurance Policies.  Discl. Stmt. Art. III.F; *see also* Art.X.A.22.

24.     Additionally, the Disclosure Statement describes how the Debtors' rights and obligations under the Insurance Policies, along with other assets as described in the Plan and Disclosure Statement, will be transferred to the Settlement Trust, which will have the exclusive responsibility for the liquidation and payment of Abuse Claims.  Discl. Stmt. Art. VI.A.3.

### B.     The Confirmation Objections Are Premature and Meritless

25.     Various Objectors assert that the Disclosure Statement cannot be approved because the Plan is "patently unconfirmable."  *See generally* D.I. 3263, 3526, 3565, 3569. Bankruptcy courts generally do not hear confirmation disputes at disclosure statement hearings because those hearings lack the evidentiary record necessary to determine confirmation issues. *See, e.g.*, *In re Broad Assocs. Ltd. P'ship*, No. 5-89-01070, 1989 Bankr. LEXIS 2248, at *7

---

[5]     This list is not exhaustive.  Please refer to Exhibit B, the Objection Responses Chart, for the Objections and the Debtors' responses thereto.

(Bankr. D. Conn. Dec. 29, 1989) ("care must be taken to ensure that the hearing on the disclosure statement does not turn into a confirmation hearing"); *see also In re Quigley Co.*, 377 B.R. 110, 119 (Bankr. S.D.N.Y. 2007) (approving the debtor's disclosure statement despite finding that questions existed regarding good faith, improper voter manipulation, and voter designation because such questions were "confirmation issues that require an evidentiary hearing"). For this reason, "[o]nly where the disclosure statement *on its face* relates to a plan that cannot be confirmed" is it appropriate to dismiss a proposed plan prior to the solicitation of votes; "otherwise, confirmation issues are left for later consideration." *In re Dakota Rail, Inc.*, 104 B.R. 138, 143 (Bankr. D. Minn. 1989) (emphasis in original).

26.    Courts in the Third Circuit find plans to be "patently unconfirmable" only "where (1) confirmation defects [cannot] be overcome by creditor voting results and (2) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing." *In re Am. Capital Equip., LLC*, 688 F.3d 145, 154–55 (3d Cir. 2012). A party raising this objection bears the burden of proving, as a matter of law, that the plan "is so fatally flawed that confirmation is impossible." *In re U.S. Brass Corp.*, 194 B.R. 420, 428 (Bankr. E.D. Tex. 1996). Moreover, "patently unconfirmable" objections require that there be no disagreement about the material facts at issue or that all such facts have been fully developed. *See In re Am. Cap. Equip., LLC*, 688 F.3d at 155 (internal quotations omitted). The Objectors fail to meet this high bar.[6]

---

[6] Century's claim that the exculpation provision renders the Plan patently unconfirmable lacks merit as that is clearly a confirmation issue. Therefore, this is addressed in the Objection Responses Chart. Likewise, the Lujan Claimaints dispute a provision of the TDP, which is a confirmation issue and does not make the Plan patently unconfirmable.

### 1.    The Unfair Discrimination Objection Is a Premature Confirmation Objection and Without Merit.

27.    The Future Claimants' Representative asserts that the Plan is "patently uncomfirmable" because it unfairly discriminates against current and future sexual abuse survivors by providing Class 8 (Direct Abuse Claims) with 8%-23% recovery, while providing Class 6, General Unsecured Claims, with 75% - 95% recovery.  [D.I. 3565] at 11.  Likewise, the Coalition asserts that the BSA Toggle Plan discriminates unfairly against Direct Abuse Claims by providing such claims with less than 1% recovery, as opposed to 75-95% recovery for General Unsecured Claims.  [D.I. 3569], at 23.  This objection fails for several reasons.[7]

28.    As an initial matter, this objection is premature at the disclosure statement stage. The distributions that the Future Claimants' Representative and Coalition complain of will only be triggered if (a) Class 8 rejects the Plan or (b) if the Court concludes that (i) the Plan has not been accepted by a sufficient number of holders of Direct Abuse Claims that have voted to accept or reject the Plan, or (ii) the provisions of the Plan applicable to the Abuse Claims Settlement have failed to satisfy applicable requirements for approval under the Bankruptcy Code or Bankruptcy Rules.  None of these contingencies has occurred and, indeed they could occur only after solicitation (*i.e.*, after approval of the Disclosure Statement).

29.    Even if the Court were to consider this premature objection on the merits (which it should not), it is wrong as a matter of law.  The Bankruptcy Code does not prohibit all discrimination between similarly situated classes, only discrimination that is "unfair" to a dissenting class that is being "crammed down" pursuant to section 1129(b)(1).  *See In re Tribune Co.*, 972 F.3d 228, 242 (3d Cir. 2020) (explaining that "unfair discrimination applies only to

---

[7]    In addition to the errors detailed below, the Coalition misstates the terms of the BSA Toggle Plan, which contemplates a *minimum* 1% recovery, plus insurance rights, for Direct Abuse Claims.  *See* Disclosure Statement Article IX(D); *see also* Disclosure Statement Article II.C.

classes of creditors (not the individual creditors that comprise them), and then only to classes that dissent.").  Although the Bankruptcy Code does not define "unfair discrimination," courts have developed several tests "to determine what unfairness means and, in some of those tests, whether, if a presumption of unfairness exists, it can be rebutted." *Id.* at 240.

30.     The Future Claimants' Representative cites the Markell Test, which asks whether "'there is: (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.'" [D.I. 3565] at 11 (citing I*n re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006)).  The Future Claimants' Representative omits, however, that the foregoing test only creates a rebuttable presumption of unfair discrimination, which the Debtors may overcome if the court finds that (i) a lower recovery for the dissenting class is consistent with the results that would obtain outside of bankruptcy, (ii) a greater recovery for the other class is offset by contributions from that class to the reorganization or (iii) the risks are allocated in a manner consistent with the prebankruptcy expectations of the parties.  *In re Tribune Co.*, 972 F.3d at 241 (quoting Bruce A. Markell, A New Perspective on Unfair Discrimination in Chapter 11, 72 Am. Bankr. L.J. 227–28 (1998)).[8]

31.     The Debtors believe, and will prove at confirmation, that there is a reasonable basis for treating the Direct Abuse Claims and General Unsecured Claims differently, and that confirmation and consummation of a plan would not be possible without such disparate

---

[8]    This list is not exhaustive, and bankruptcy courts may find that a debtor has successfully rebutted a presumption of unfair discrimination on other grounds.  *Hargreaves v. Nuverra Envtl. Sols., Inc. (In re Nuverra Envtl. Sols., Inc.)*, 590 B.R. 75, 92 (D. Del. 2018).

treatment, thus vitiating any claim of unfair discrimination. *In re Armstrong World Indus., Inc.*, 348 B.R. at 121. However, even if the disparity in recovery percentages between Class 6 and Class 8 creates a presumption of unfair discrimination (which it does not), the Debtors can rebut such a presumption under all three of the grounds set forth in *Tribune*.

32.     First, outside of bankruptcy, the Direct Abuse Claims would yield a significantly lower recovery overall than would General Unsecured Claims. While holders of General Unsecured Claims would likely receive payment of their claims in the ordinary course of business, Direct Abuse Claims are, by their nature, contingent unliquidated tort claims subject to significant litigation risk. Further, without the efficient mechanism to settle Direct Abuse Claims provided for in the Plan, many Class 8 claimants would never have pursued their claims in the first instance, and would lack a practical method for doing so in the future, thus providing zero recovery for many Direct Abuse Claims outside of bankruptcy. *See, e.g.*, *In re Rochem, Ltd.*, 58 B.R. 641, 643 (Bankr. D.N.J. 1985) (finding that a plan providing a class consisting of "an unliquidated and disputed tort claim" with less than 1% recovery, while providing a class of "undisputed claims" of general trade creditors with 50% recovery, was not unfairly discriminatory because such discriminatory treatment "rests in the basis of their claim.").

33.     Second, although, as noted above, many Class 8 claimants would not have expected any recovery pre-bankruptcy, the same is not true for the Debtors' general unsecured creditors, many of whom expected full payment in the ordinary course of business. Accordingly, the recovery provided to these two classes aligns with the risks that each reasonably expected.

34.     Third, many of the Debtors' unsecured creditors play a crucial role in their operations, and the success of the Debtors' reorganization depends in part on the continued future performance of those creditors. Upon confirmation of the Plan, the Creditors' Committee,

which represents the interests of General Unsecured Claims as a whole, will have indisputably played a crucial role in the success of the Debtors' reorganization. Moreover, many individual holders of General Unsecured Claims have continued to provide goods or services to the Debtors during the pendency of these cases, thereby allowing the Debtors to continue to carry out their charitable mission and, in turn, promoting a successful reorganization. The viability of the Debtors as a going concern post-emergence depends in part on the continued future performance of those creditors.

35.    Although, as noted above, many Class 8 claimants would not have expected any recovery outside of bankruptcy, the same is not true for holders of General Unsecured Claims, which could have reasonably expected full payment in the ordinary course of business based on the terms of their agreements with the Debtors and the Debtors' historical performance,. Accordingly, the recovery provided to these two classes aligns with the risks that each reasonably expected.

36.    Moreover, as acknowledged in the JPM / Creditors' Committee Term Sheet and the Plan, General Unsecured Claims are held by creditors who are core to the Debtors' charitable mission or creditors whose Claims, if Allowed, were incurred in furtherance of the Debtors' charitable mission. As a charitable non-profit, the Debtors own certain assets the sale or other disposition of which would eviscerate the Debtors' ability to continue their charitable mission. Accordingly, payments by Reorganized BSA under the Plan on account of such Allowed Claims will be made from cash relating to Reorganized BSA's core assets. This alignment of core assets with core creditors is unique to certain Classes of Claims under the Plan. Neither Abuse Claims nor Indirect Abuse Claims arose in furtherance of the Debtors' charitable mission and, for that reason, such claims cannot be satisfied with the Debtors' core assets or the proceeds thereof.

2. **The GSUSA's Disparate Treatment Objection Is a Premature Confirmation Objection and Without Merit.**

37.     The Girl Scouts of the United States of America ("GSUSA") assert that they are receiving disparate treatment under the Plan, in contravention of section 1123(a)(4), as the other Non-Abuse Litigation Claims (Class 7) will purportedly receive 100% recovery on their claims, while the Girl Scouts will purportedly receive less than 100%. [D.I. 3579] at ¶¶ 26-27.

38.     As an initial matter, on its face, GSUSA's objection is properly raised only in the context of plan confirmation, not disclosure statement approval, as it relies on section 1123(a)— the section of the Bankruptcy Code that sets forth the required contents of a plan (not a disclosure statement).   But even if the Court were inclined to consider GSUSA's untimely objection at this stage (which it should not), the objection fails on the merits, as the Plan's treatment of GSUSA's claim is fair and equal to that of other Non-Abuse Litigation Claims.

39.     Section 1123(a)(4) "without question" does not require that all claimants within a class recover the same amount; rather, "[w]hat matters . . . is . . . that they have equal opportunity to recover on their claims."  *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013). Additionally, class members with "stronger claims, or stronger defenses, than others . . . may be classified together so long as their claims are substantially similar and their treatment is approximately equal."  *In re Resorts Int'l*, 145 B.R. 412, 448 (Bankr. D.N.J. 1990).  The Plan meets these requirements.

40.     Nothing in the Plan's treatment of GSUSA's claim indicates that GSUSA was "earmarked for disparate treatment within Class [7]."  *In re W.R. Grace & Co.*, 468 B.R. 81, 170–71 (D. Del. 2012).  Nor has GSUSA proffered any evidence of such intent on the part of the Debtors.  Rather, the Plan provides the same opportunity for recovery to the GSUSA as every other member of Class 7: they may elect Convenience Class treatment or "retain the right to

18

recover up to the amount of such holder's Allowed Non-Abuse Litigation Claim from (i) available Insurance Coverage or the proceeds of any insurance policy of the Debtors, including any Specified Insurance Policy or D&O Liability Insurance Policy, (ii) applicable proceeds of any Insurance Settlement Agreements, and (iii) co-liable non-debtors (if any) or their insurance coverage." Plan Art. III.B.9.

41.     GSUSA does not dispute these facts; rather, GSUSA argues that the insurance available to it will yield a smaller recovery than the insurance available to other claimants in their class. *See* [D.I. 3579] at ¶¶ 18-28 ("insurance policies that cover the claims by the Girl Scouts are not sufficient to cover all of the claims," while "insurance policies that cover the other Non-Abuse Litigation Claims are sufficient to cover all of such claims."). That is not disparate treatment. Rather, the Plan affords every member of Class 7—including GSUSA—the same opportunity to recover the full amount of their allowed claim against any insurance coverage *available to such claimant*. Plan Art. III.B.9. That treatment comports with Section 1123(a)(4), which allows debtors to group together claims with access to different or superior sources of recovery—such as, for example, litigation claims that will receive disparate money judgments. *In re W.R. Grace & Co.*, 729 F.3d at 327. Similarly, Non-Abuse Litigation Claims are all able to retain their right to receive whatever amount is provided by their available insurance coverage. *See* Disclosure Statement, Article VI.D; *see also* Disclosure Statement, Article II.C.3.

42.     GSUSA's Objection is particularly remarkable because it is a member of the Creditors' Committee, which bargained extensively with the Debtors, at arm's length and in good faith, for the highly negotiated treatment memorialized in the Plan. These hard-fought negotiations played out over the course of more than two months. The Creditors' Committee represented to the Debtors that its committee members—including GSUSA, which has asserted

Non-Abuse Litigation Claims—were satisfied that the Debtors' insurance assets would be sufficient to satisfy anticipated Allowed Non-Abuse Litigation Claims.  Now, more than *two months* after the Debtors entered into the JPM / Creditors' Committee settlement, GSUSA has suddenly reversed course and objected to the fundamental terms of the deal it participated in negotiating.  GSUSA's objection smacks of improper litigation tactics and, for that reason and the reasons discussed above, should not be countenanced.

### 3.    The Tort Claimants' Committee's Objection to the Hartford Insurance Settlement Agreement Is a Premature Confirmation Objection and Without Merit.

43.    The Tort Claimants' Committee attacks the Plan by arguing that the Debtors' entry into the Hartford Insurance Settlement Agreement "likely violates the automatic stay of any additional insured . . . [because] [m]any Chartered Organizations that may be additionally insured under the Boy Scouts' policies also are debtors in their own bankruptcy cases" [TCC Objection, ¶ 53].  As a gating matter, the Tort Claimants' Committee lacks standing to object to the Hartford Settlement as a purported violation of the automatic stay in another unrelated chapter 11 proceeding.  *See, e.g.*, *McCord v. Sofer (In re Sofer)*, 507 B.R. 444, 449 (Bankr. E.D.N.Y. 2014) ("[I]n order to have standing to seek contempt for violation of the stay, 'the creditor must assert a claim for his own direct injury and not a claim that belongs to the estate . . . If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim.'"). (quoting *In re Ampal-Am. Isr. Corp.*, 502 B.R. 361, 371 (Bankr. S.D.N.Y. 2013)).  Furthermore, as discussed in section I.A.1, *supra*, the additional disclosures with respect to the Hartford Settlement provide adequate information regarding the settlement.  The effectiveness of the Hartford Insurance Settlement Agreement is expressly conditioned upon entry of an order of the Court, which may be the Confirmation Order, approving the agreement.  Although Hartford may

elect to cause the Debtors to seek approval of the agreement by motion under section 363 of the

Bankruptcy Code, they have not done so.    Accordingly, because the Hartford Insurance

Settlement Agreement has been disclosed and will not be presented to the Court for approval

until some later date, which may be the Confirmation Hearing, any remaining objections should

be rejected as premature at the disclosure statement stage.

> ### 4.    The Objections Regarding Feasibility Are Premature Confirmation Objections and Without Merit.

44.    Certain objectors, including the Coalition and the Tort Claimants' Committee

assert that the Plan may not be feasible, and thus cannot satisfy section 1129(a)(11) of the

Bankruptcy Code.   *See* D.I. 3569, 3526.   In addition to being premature in the context of a

disclosure statement (as demonstrated by the Objections' reliance on section 1129), this

objection is without merit.

45.    The purpose of the feasibility test is to protect against far-fetched visionary or

speculative plans.  *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 298 (Bankr. D. Del. 2013).

As such, feasibility does not require a debtor to guarantee success.  *See Kane v. Johns-Manville

Corp*., 843 F.2d 636, 649 (2d Cir. 1988); *In re Flintkote Co*., 486 B.R. 99, 139 (Bankr. D. Del.

2012); *In re W.R. Grace & Co.,* 475 B.R. 34, 115 (D. Del. 2012) ("In making this [feasibility]

finding, the bankruptcy court need not require a guarantee of success, but rather only must find

that the plan presents a workable scheme of organization and operation from which there may be

reasonable expectation of success." (citation omitted)).   Rather, feasibility requires the debtor to

provide only a reasonable assurance of success (*Kane*, 843 F.2d at 649; *Flintkote Co.*, 486 B.R.

at 139; *W.R. Grace & Co*., 475 B.R. at 115), to a relatively low standard of proof.  *See e.g., In re

Prussia Assocs*., 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) ("[t]he Code does not require the

debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy

§ 1129(a)(11) so long as adequate evidence supports a finding of feasibility") (internal quotation marks omitted).  The Plan far surpasses this low threshold.

46.     The Coalition argues that the BSA Toggle Plan is not feasible because (1) the Settlement Trust is not adequately capitalized and, consequently, will not be able to liquidate the Direct Abuse Claims and (2) the Debtors' ability to continue their operations depends on Local Councils, which may not be able to operate if they are not Protected Parties.  D.I. 3569 ¶¶ 55–57. The Tort Claimants' Committee also argues that, to the extent the Plan relies on the continued existence of the BSA to fund the Settlement Trust, the Plan may not be feasible given the declining membership trends and their impact on the BSA's ongoing operational needs.  D.I. 3526 ¶ 87.

47.     The Debtors will satisfy the necessary standard at the confirmation hearing that the Plan is feasible and will not likely be followed by a need for further financial restructuring. Nevertheless, the feasibility requirement is satisfied with respect to both the Settlement Plan and the BSA Toggle Plan.  The Debtors, with the assistance of their advisors, have prepared projections for the calendar years 2021 through 2025, including management's related assumptions.  *See* Amended Disclosure Statement, D.I. 2594, Ex. C (the "Financial Projections").  As reflected in the Debtors' Financial Projections, the Debtors anticipate that they will timely meet all of their collective obligations and will be financially viable after Confirmation of the Plan.  Accordingly, the Debtors believe that Confirmation is not likely to be followed by liquidation or the need for further reorganization.  In addition, the Debtors will show at confirmation that the Settlement Trust is adequately funded to liquidate Abuse Claims and pay its legal and administrative costs as set forth in the Trust Distribution Procedures.

### 5.  Objections Regarding Good Faith Are Unripe and Have Been Rendered Moot.

48.     The Debtor's good faith in proposing the Plan is a factual matter to be addressed at the confirmation hearing, and the objections alleging bad faith should be overruled as premature.  Nonetheless, in the interest of resolving these objections, the Debtors have made certain modifications to the Plan, including the terms governing the expedited payment option for Abuse Claims under the Global Settlement Plan.  As modified, the Plan now provides that the election by a holder of a Direct Abuse Claim to the Expedited Distribution—a one-time Cash payment from the Settlement Trust in the amount of $1,500, conditioned upon Confirmation of the Plan as a Global Settlement Plan—is no longer linked to the requirement that such holder vote in favor of the Plan.  Plan, Article III.B; *see also* Plan, Exhibit A-1 for the Global Resolution Plan TDP and Plan, Exhibit A-2 for the BSA Toggle Plan TDP.

49.     In light of this change, the majority of good faith objections to the Plan are now moot, including (i) the U.S. Trustee's arguments that to the extent the expedited payment option is intended to manipulate the vote on the Plan, it is proposed in bad faith and should be excised from the Plan (D.I. 3581 at ¶ 32), (ii) the argument by Century[9] that the Plan was not proposed in good faith because the Debtors wish to manipulate the voting to fast-forward the chapter 11 process (D.I. 3856 at II.D), and (iii) the argument by the AIG Companies[10] that the $1,500 payments to any person asserting a direct abuse claim and voting in favor of the Plan, without an

---

[9]   Century Indemnity Company ("Century"), as successor to CCI Insurance Company, as successor to Insurance Company of North America and Indemnity Insurance Company of North America.

[10]   National Union Fire Insurance Company of Pittsburgh, Pa., Lexington Insurance Company, Landmark Insurance Company, The Insurance Company of the State of Pennsylvania, and their affiliated entities (collectively referred to herein as the "AIG Companies").

attempt to identify illegitimate claims, "could be deemed a good faith violation."[11]  (D.I. 3523 ¶ 27.)

50.    Indeed, the only remaining objection based on good faith is the Coalition's assertion that the BSA Toggle Plan is not proposed in good faith because, among other things, the "Debtors are seeking to solicit votes based on a Disclosure Statement that includes inaccurate and misleading information regarding the aggregate value of abuse claims and the survivors' expected recovery."  (D.I. 3569 ¶¶ 58-60).  As discussed above, the Disclosure Statement contains a lengthy discussion of the Abuse Claims and the Debtors' estimate of the value of such claims.  Discl. Stmt. Art. V.N.  Moreover, the Debtors have revised the Disclosure Statement to make clear that certain creditor constituencies, such as the Coalition, believe that the aggregate value of all abuse claims is higher than the Debtors' current estimate of $2.4-$7.1 billion.  Discl. Stmt. Art. V.N.  The Coalition's disagreement on this calculation is not a valid basis for challenging the Debtors' good faith.  *See In re WR Grace & Co.*, 729 F.3d 332, 347 (3d Cir. 2013) ("[We] note that a creditor's disagreement about the handling of its claim does not that necessarily evince bad faith by the [p]lan's proponents."); *see also In re Barnes*, 309 B.R. 888, 893 (Bankr. N.D. Tex. 2004) ("[T]he fact that a plan proposed by a debtor is not the one that the creditors would have proposed does not make the plan one that has not been filed in good faith.").[12]

---

[11]    The UST's argument that the expedited payment option unfairly discriminates against Abuse Claimants who do not vote in favor of the Plan is now also moot.  *See* UST Obj. ¶ 32.

[12]    Moreover, the Coalition's conclusory assertion that the Plan was not proposed in good faith is unsupported and meritless.  The negotiations between the Debtors and the Coalition, among others, were conducted in good faith and at arm's length.  Indeed, since June 9, 2020, those negotiations have been generally overseen by Court-appointed mediators. *See* Order Appointing Mediators, D.I. 812.  The Coalition has not cited any evidence to rebut this record of the Debtors' good-faith engagement  To the contrary, the record regarding the development of the Debtors' Plan demonstrates that the Debtors have been honest and transparent.  *See Azar v. THGH Liquidating LLC (In re THGH Liquidating LLC)*, Case No. 19-11689, 2020 U.S. Dist. LEXIS 164740, *22-23 (D. Del. Sept. 9, 2020) (finding no error in the bankruptcy court's determination that the plan was proposed in

### 6.    While the Global Resolution Plan TDP Provides Robust Anti-Fraud Protections, They Do Not Make Economic Sense for Purposes of the Expedited Distributions.

51.    AIG and the U.S. Trustee assert that the Disclosure Statement fails to disclose that the Expedited Distribution procedures do not guard against meritless and fraudulent claims, which may entice holders of illegitimate claims to vote in favor of the Plan and make the Plan unconfirmable.  AIG Obj. ¶¶ 28-29; UST Obj. ¶ 31.[13]  As a preliminary matter, concerns with the TDP's anti-fraud provisions are confirmation objections and are therefore premature.[14]  But even if these objections were ripe (and they are not), they lack merit.

52.    The Global Settlement Plan TDP contains robust anti-fraud procedures to ensure that claims submitted by Abuse Claimants are properly reviewed and evaluated.  In particular, the Global Settlement Plan TDP calls for the Settlement Trustee to "evaluate each Trust Claim Submission individually" to determine its validity.  Global Settlement Plan TDP ¶ 4.2.  If the Settlement Trustee finds that the evidence submitted by the Abuse Claimant in a Trust Claim Submission does not support a viable tort claim against a Protected Party, the Settlement Trustee

---

good faith where "uncontroverted evidence attests that the Plan was proposed with the honest intention of maximizing value for the Debtors, their estates and their creditors").  *see also In re Maremont Corp.*, 601 B.R. 1, 20 (Bankr. D. Del. 2019) (finding good faith pursuant to 11 U.S.C. §1129(a)(3) where "[t]he record demonstrates that the Debtors engaged in extensive good-faith, arm's length negotiations with [the debtors' parent], the Ad Hoc Committee, and the prepetition Future claimants' Representative, which led to the Plan's formulation.").

[13]    Reiterating its concerns that a number of Abuse Claims filed are invalid, Liberty Mutual also asserted that the Disclosure Statement does not disclose that the election to receive the Expedited Distribution does not impact any Insurance Company under any scenario.  Liberty Mutual ¶ 7.

[14]    AIG cites two hearing transcripts to argue that courts require plan proponents to include adequate anti-fraud provisions before proceeding with confirmation or approval of a disclosure statement.  Yet the two cases are inapposite.  *In re Maremont Corp.*, No. 19-10118 (KJC) (Bankr. D. Del.) was a prepackaged reorganization in which the debtors simultaneously sought approval of the disclosure statement with confirmation of the plan.  And while the *Kaiser Gypsum* court expressed concern about "approv[ing] a mechanism and a process that could lead to fraud," the court correctly concluded in the disclosure statement hearing that that issue should be resolved at confirmation.  *In re Kaiser Gypsum Co., Inc.*, No. 16-31602 (Bankr. W.D.N.C.) [D.I. 1785] Sept. 9, 2019 Hr'g Tr. 66:7-66:13 ("[The court is] concerned about this issue and whether the plan could be confirmed without something more . . . . But [the court is] going to hold that until we get to confirmation.").  This Court should do the same.

"shall make a determination that the Submitted Abuse Claim is invalid and provide written notice of its determination to the relevant Abuse Claimant."  Global Settlement Plan TDP § 4.3  Abuse Claimants may then seek reconsideration of the Settlement Trustee's determination, after which the Settlement Trustee will either grant or deny the Reconsideration Request.  Global Settlement Plan TDP § 4.6  If granted, the Settlement Trustee will then reconsider the Submitted Abuse Claim, including all new information provided by the Abuse Claimant in the Reconsideration Request and any additional Trustee Interview.  *Id.*  If denied, the Settlement Trustee's earlier determination as to validity stands.  *Id.*

53.    The expense of undertaking this multi-step process of evaluating, validating and potentially reconsidering every Direct Abuse Claim would cost substantially more than the $1,500 that a holder of such claims would receive from electing an Expedited Distribution.  Additionally, the sheer number of Abuse Claims, 82,500, presents an enormous expense in the review phase alone.  Indeed, far from diminishing estate resources, the Expedited Distributions preserve the Debtors' estates, including for holders of Abuse Claims who do not elect to participate in the Expedited Distribution.  Similar provisions have been allowed. *In re A.H. Robbins*, Co., 88 B.R. 742 (E.D. Va. 1988) (establishing two trusts in products liability mass-tort cases whereby claimants could elect either to receive a pre-determined, lump-sum payment by submitting an affidavit of injury without any other investigation of the claim, or submit their claim to more extensive review to receive large distribution from the trust).

       **7.**    **The Plan Does Not Impermissibly Modify the Church's Rights to Insurance Proceeds and Provides for Appropriate Treatment of Indirect Abuse Claims.**

54.    The Church of Jesus Christ of Latter-Day Saints (the "<u>Church</u>") (as joined by certain other chartered organizations) argues that the Plan is unconfirmable because it (a) impermissibly seeks to appropriate the rights of non-debtor insured parties under the BSA

and Local Councils' insurance policies without the Church's consent or an adversary proceeding, and (b) may extinguish the BSA's indemnity obligations through the operation of vague and indeterminate trust distribution procedures. (D.I. 3263.)  This Objection is premature and is without merit.

55.    Contrary to the Church's assertion that the Insurance Assignment (Plan § I.124) and Insurance Entity Injunction (Plan § X.H) divest the rights of non-debtor insured parties under the BSA's and Local Councils' insurance policies, the Plan adequately protects the rights of the non-debtor insureds to the proceeds of such policies in the Settlement Trust—consistent with well-established mass tort bankruptcy case law on this subject.  In the TDPs, third parties with a potential interest in insurance policies assigned to the Settlement Trust may assert an Indirect Abuse Claim, once ripened under the requirements of the TDP, against the proceeds of such policies in the Settlement Trust.  As such, these (speculative and limited) rights are adequately protected.

56.    The Church cites two bankruptcy cases from the Northern District of Illinois to support the argument that a debtor must obtain the consent of each non-debtor insured in order to settle its rights under a policy: *In re SoyNut Butter Co.*, Case No. 17 B 14970, 2018 Bankr. LEXIS 2300, at *15–19 (Bankr. N.D. Ill. Aug. 1, 2018), and *In re Forty-Eight Insulations, Inc.*, 133 B.R. 973, 976 (Bankr. N.D. Ill. 1991)).  But the cases cited by the Church reflect only one extreme of an unsettled area of law where cases have fallen on a continuum.  More important, the Church fails to mention the pivotal mass tort case on this issue because it vitiates the Church's claims.

57.    In *Johns-Manville*, the debtor sought approval of various insurance settlements, whereby the insurers agreed to contribute proceeds to the asbestos trust in exchange for a release

from obligations under the policies and an injunction protecting the insurers from related claims. *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 90-91 (2d Cir. 1988).  As the court recognized, the proposed settlements and related injunctions formed the cornerstone of the debtor's plan of reorganization.  *Id.* at 90, 94.  A distributor of the debtor's asbestos products, who claimed to be a co-insured under the debtor's liability insurance policies, objected to the proposed injunction and challenged the bankruptcy court's jurisdiction over the debtor's insurance policies.  *Id.* at 90.  The bankruptcy court overruled the objection, and the distributor appealed to the Second Circuit.

58.    The Second Circuit affirmed, in a decision that repudiated the exact arguments the Church makes here.  First, contrary to the Church's position, the Second Circuit rejected the argument that the bankruptcy court did not have jurisdiction over the insurance policies at issue. *Id.* at 90, 92–93.  Rather, the court found that the insureds' rights under the policies were based on the conduct of the debtor, and the debtor's status as the primary insured and purchaser of the policies was significant.  *Id.*  Second, the court held that the bankruptcy court could properly approve the proposed settlements and channel any claims to the proceeds of the policies to the settlement trust pursuant to section 105(a) of the Bankruptcy Code as well as section 363(f).  *Id.* at 93–94.  The insurance settlement and injunction were essential to the reorganization, and thus fell "well within the bankruptcy court's powers" to ensure that "substance will not give way to form."  *Id.*

59.    Courts in other mass tort cases have upheld a debtor's free and clear sale of policies under section 363(f) of the Bankruptcy Code.  *See*, *e.g.*, *In re Hereford Biofuels, L.P.*, 466 B.R. 841, 858-59 (Bankr. N.D. Tex. 2012) (holding that a debtor's sale of its insurance policy rights over the objection of a co-insured was authorized, as the proceeds on any claim

adjusted under the policy would properly have gone to the debtor even if the co-insured could assert a legitimate claim to the proceeds); *In re Burns & Roe Enters.*, Case No. 00-41610RG, 2005 Bankr. LEXIS 3173, at *34 (Bankr. D.N.J. 2005) (order approving settlement involving sale of debtors' interests in tort claims insurance policies in mass tort case with corresponding channeling injunction, where certain third party interests in the policies would attach to the proceeds of the sale).

60.     By contrast, the cases cited by the Church in support of its position are inapt.  In *SoyNut Butter*, a debtor with mass tort liability sought to establish a trust in a chapter 7 liquidation proceeding, not a reorganization case.  *SoyNut Butter*, 2018 Bankr. LEXIS at *21. Similarly, in *Forty-Eight Insulations*, a liquidating chapter 11 debtor sought to use proceeds from an insurance settlement to fund a liquidating chapter 11 plan under which all of the debtor's assets would be distributed to asbestos tort claimants.  *In re Forty-Eight Insulations, Inc.*, 149 B.R. 860, 862 (N.D. Ill. 1992).  Notably, the case did not involve a mass tort reorganization, and the debtor's non-debtor parent company whose third party rights the debtor sought to enjoin against the settling insurer, was in fact the purchaser and named insured under the policies that paid the premiums.  *Id.* at 863.

61.     The Church makes two further objections, both of which lack merit.  The Church argues that is right to any settlement or sale proceeds must be determined through an adversary proceeding.  This is a procedural point that is irrelevant to the question of whether the Plan is confirmable, let alone the standard for approval of the Disclosure Statement, and is also premature.  Additionally, the Church asserts that the Debtors may extinguish the BSA's indemnity obligations through the operation of vague and indeterminate trust distribution procedures.  The Debtors submit that this Objection is not only premature but moot based on the

Debtors' filing of the revised Plan and TDPs, which delete the section of the Plan to which the Church objects, and add language expressly recognizing the right of a holder of an Indirect Abuse Claim to "seek reconsideration under section 502(j) of the Bankruptcy Code."  *See* Global Resolution Plan TDP § 8.1, BSA Toggle Plan TDP § 9.1.   Moreover, and contrary to the Church's position, the TDP is clear that Indirect Abuse Claims shall be treated as valid, if certain circumstances are met and unless otherwise disallowed by section 502(e) or 509(c) of the Bankruptcy Code, subject to the right of the holder to seek reconsideration under section 502(j). This comports with comparable trust distribution procedures.[15]

## II.    The Best Interest Test Is Not Relevant at the Disclosure Statement Stage

62.    Whether the "best interests" test would apply to a given creditor is not determined until the voting process has completed—something that must occur after the Disclosure Statement is approved and solicitation has occurred.  For this reason, courts have routinely held that objections that the debtors did not satisfy the best interest test are confirmation objections that are not ripe for consideration at the Disclosure Statement Hearing.  *See In re W.P. Hickman Sys., Inc.*, No. ADV 10-2289JAD, 2012 Bankr. LEXIS, at *17 (Bankr. W.D. Pa. July 13, 2012) ("[T]he basis for an objection to a disclosure statement and its liquidation analysis would be that it contained inadequate information, not that the liquidation analysis was inaccurate"); *In re Monroe Well Serv.,* 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987) (holding that objections regarding that the plan was not for the best interest of creditors were not up to be decided in approving a disclosure statement) ("Virtually all of the objections raised cannot be considered at this juncture

---

[15] *See, e.g. In re Imerys Talc Am., Inc.*, No. 19-10289 (LSS) (Bankr. D. Del. Jan. 27, 2021) [D.I. 2852-1]; *In re Specialty Prods. Holding Corp.*, No. 10-11780 (PJW) (Bankr. D. Del. Oct. 21, 2014) [D.I. 5117-3]; *In re Yarway Corp.*, No. 13-11025 (BLS) (Bankr. D. Del. Jan. 27, 2015) [D.I. 859-3]; *In re Duro Dyne Nat'l Corp.*, No. 18-27963 (MBK) (Bankr. D.N.J. Nov. 20, 2018) [D.I. 1295-4]; In re Flintkote Co., No. 04-11300 (JKF) (Bankr. D. Del. Feb. 9, 2015) [D.I. 8709].

in the case . . . there is no need at this point to address the absolute priority rule or the best interest of creditors test, other than to hold that these concepts are properly explained in the disclosure statement."); *In re Colin*, 44 B.R. 806, 809 (Bankr. S.D.N.Y. 1984) (holding that "since the 'best interests of creditors test' of § 1129(a)(7) only becomes applicable upon the casting of a negative vote against the plan, the committee's argument is premature even if this Court could accept its questionable statutory interpretation."). That in itself disposes of the objections to the Debtors' Disclosure Statement based on the best interest test.

63. A number of Objections have taken issue with the Debtors' reservation of rights in the Disclosure Statement that the best interest test under 11 U.S.C. § 1129(a)(7)(A) does not apply to non-profit debtors, such as the Debtors. Although this legal issue is not before the Court today (and won't be until the Confirmation Hearing), the Debtors believe it was important to put voting creditors on notice that they will take the position at Confirmation that the best interests test does not apply for the reasons stated in the Disclosure Statement. The Debtors understand that the objecting parties dispute the Debtors' legal position in this regard and, if such parties prevail, in the alternative, the Debtors will be prepared to demonstrate at the Confirmation Hearing that the best interest test has been satisfied.[16]      .

---

[16] The Bankruptcy Code bars the involuntary conversion of a non-profit corporation's chapter 11 case to chapter 7. 11 U.S.C. § 1112(c). *In re Grace Christian Ministries, Inc.*, 287 B.R. 352, 355 (Bankr. W.D. Pa. 2002) ("A corporation . . . may not be an involuntary chapter 7 or 11 debtor if it is a not-for-profit corporation."). Likewise, Congress prohibited an involuntary bankruptcy proceeding from being commenced against a non-profit corporation. 11 U.S.C. § 303. H.R. Rep. No. 95-595, at 322 (1977) ("Section 303 governs the commencement of involuntary cases under title 11 . . . Eleemosynary institutions, such as churches, schools, and charitable organizations and foundations, likewise are exempt from involuntary bankruptcy."); *In re Mem'l Med. Ctr., Inc.*, 337 B.R. 388, 390 (Bankr. N.M. 2005) ("Courts interpreting this section consistently conclude that non-profit organizations are not subject to involuntary proceedings."). The distinctions that the Bankruptcy Code makes with respect to non-profit debtors turns a hypothetical liquidation into a virtual impossibility. The Tort Claimants' Committee and Future Claimants' Representative do not cite a single authority to support the argument that non-profit debtors must satisfy the best interest test. Rather, these parties cite cases involving for-profit debtors, non-profit debtors who chose to submit a liquidation analysis (even though they were not required to do so), and debtors whose plans were rejected for reasons other than failure to submit a liquidation analysis. *In re Ditech Holding Corp.*, 606 B.R. 544, 553 (Bankr. S.D.N.Y. 2019) (discussing the liquidation analysis for a for-profit corporation); *S. Pac. Transp. Co. v.*

### A.    Even if the Best Interest Test Applied (and It Does Not), the Disclosure Statement Contains Sufficient Information For Creditors to Evaluate Whether the Plan Meets It.

64.    Various parties object that the Disclosure Statement does not contain sufficient information to evaluate whether the best interest test is satisfied.  UST's Obj. ¶¶ 18, 19, 21; Future Claimants' Representative Obj. ¶ 26; Tort Claimants' Committee Obj. ¶¶ 35-38. Assuming, *arguendo*, that the best interest test applies here, the Debtors' liquidation analysis is sufficient for purposes of disclosure and, in any event, has been amended in ways that make many of these objections moot.

### 1.    The Disclosure Statement Provides Sufficient Information to Satisfy Disclosure Requirements Regarding the Best Interest Test.

65.    As noted above, the best interest test does not apply at the disclosure statement stage.  Rather, the debtor should provide a liquidation analysis that allows creditors to compare what they will receive from a chapter 11 plan against a hypothetical recovery from a chapter 7 liquidation.  *See In re Abeinsa Holding, Inc.*, 562 B.R. 265, 275 (Bankr. D. Del. 2016); *In re Diversified Invests. Fund XVII*, 91 B.R. 559, 561 (Bankr. C.D. Cal. 1988) ("[T]he disclosure statement must contain a liquidation analysis which compares the proposed plan of reorganization with a Chapter 7 liquidation.").  In other words, at the disclosure statement phase, courts focus on whether a liquidation analysis has been performed rather than on the conclusions of that analysis.  *See In re W.P. Hickman*, 2012 Bankr. LEXIS 3301, at *17 ("[T]he basis for an

---

*Voluntary Purchasing Grps., Inc.*, 252 B.R. 373, 390–92 (E.D. Tex. 2000) (reversing the bankruptcy court's decision to confirm a nonprofit corporation's chapter 11 plan where bankruptcy court took an arbitrary discount of "30%" in the liquidation analysis without justification); *In re Wabash Valley Power Ass'n*, 77 B.R. 991, 993 (Bankr. S.D. Ind. 1987) (noting that the debtor and the creditor entered into stipulation that they would not address the liquidation value of the debtor at the valuation hearings); *In re Mandalay Shores Co-op. Hous. Ass'n, Inc.*, 53 B.R. 609, 615 (Bankr. M.D. Fla. 1985) (holding that the nonprofit debtor satisfied the requirement under section 1129(a)(7)(A) when the debtor sought to cramdown certain unsecured priority claims from former members because "there is serious doubt that in a voluntary chapter 7 case" the creditors would receive anything).

objection to a disclosure statement and its liquidation analysis would be that it contained inadequate information, not that the liquidation analysis was inaccurate.").

66.     Here, the Liquidation Analysis filed by the Debtors, attached as <u>Exhibit B</u> to the Disclosure Statement, provides sufficient information to satisfy disclosure.  Specifically, the Liquidation Analysis demonstrates that all impaired creditors are estimated to receive a recovery in a hypothetical chapter 7 liquidation that is less than or equal to the recovery under the Plan, and includes liquidation estimates for each Class under the Plan, including "Low," "Midpoint" and "High" estimates.  Second Amended Disclosure Statement, Ex. B. 12-13.   This analysis is consistent with, if not more informative than, the liquidation analyses provided in support of disclosure statements in other mass tort bankruptcies.  *See In re Imerys Talc Am., Inc.*, Case No. 19-10289  (Bankr.  D.  Del.  2019)  [D.I.  2616-4]  (approving  disclosure  statement  and  the liquidation analysis that provides low, midpoint, and high estimates of recoveries); *In re Specialty Prods. Holding Corp.*, Case No. 10-11780 (PJW) (Bankr. D. Del. Oct. 23, 2014) [D.I. 5118-4] (liquidation analysis did not estimate chapter 11 plan recoveries and instead listed the analysis as "N/A"); *In re United Gilsonite Labs.*, Case No. 5:11-bk-02032 (RNO) (Bankr. M.D. Pa. Sept. 30, 2014) [D.I. 2012] (liquidation analysis included a chapter 7 recovery estimate for asbestos claims, but listed the asbestos claimants' recovery under the plan as unknown); *In re Flintkote Co.*, Case No. 04-11300 (JKF) (Bankr. D. Del. July 3, 2008) [D.I. 3433] (listing a potential percentage of the amount of recoveries for asbestos personal injury claims, but failing to provide an exact figure).

> **2.     The Disclosure Statement Does Not Need to Include Assets, Contributions and Released Claims in Respect of Each Local Council.**

67.     Various parties object that the Liquidation Analysis needs to include the assets of the Local Councils and the value of the released claims against the Local Councils.  *See, e.g.*

Bonina & Bonina Obj. ¶ 7; Tort Claimants' Committee Obj. ¶ 93, 94; Future Claimants' Representative Obj. ¶ 26.   While the Debtors believe such disclosure is not necessary—particularly for the approval of the Disclosure Statement—the Liquidation Analysis now incorporates the assets and liabilities of the Local Councils.  Disclosure Statement, Ex. B.

68.     Additionally, various parties argue that that the Disclosure Statement or the Liquidation Analysis must include the contributions made by each Local Council.  *See, e.g.*, Bonina & Bonina Obj. ¶ 8; Tort Claimants' Committee Obj. ¶ 97.  The Disclosure Statement clearly provides that the "Local Councils will make a substantial contribution, which the Debtors are committed to ensuring is not less than $425,000,000, exclusive of insurance rights, to the Settlement Trust."  Second Amended Disclosure Statement, at 14.  In addition, the Plan provides that the Debtors will disclose the nature and extent of each Local Council's commitment to this contribution well in advance of the Voting Deadline so that voting creditors clearly understand, prior to casting their ballots, that the Debtors are able to deliver on this commitment.  *See* Plan Exhibit F (providing that the Debtors shall file a status report by June 15—approximately six weeks prior to the voting deadline—that shall include the status of efforts to obtain commitments from the Local Councils, the form of contributions by the Local Councils and the timing thereof).

### 3.     The Liquidation Analysis Adequately Includes the Debtors' Assets.

69.     Several Objecting Parties argue that the liquidation analysis is incomplete for various reasons.  All of these objections lack merit.

70.     The U.S. Trustee asserts that the Liquidation Analysis fails to show the available distribution in a liquidation scenario compared to the proposed plan, and fails to include and identify various assets, including the insurance rights, artwork portfolio, and detailed information of "Land, Building and Equipment." UST's Obj., ¶21.  This is wrong.  The current Liquidation

Analysis includes a detailed list of the Debtors' available assets in a chapter 7 liquidation scenario, including the Debtors' investments, accounts receivable, investment income receivables, pledges receivable, related party receivables, inventory, prepaid and deferred charges, land, building, and equipment.  Second Amended Disclosure Statement, Ex. B. at 6-8. Additionally, the Debtors provide the approximate fair market value of the Debtors' real property, including "national headquarters ($11.6 million), former Scouting U building ($1.9 million), distribution center ($7.3 million), High Adventure Bases ($190.3 million), Summit ($42.8 million), and Oil and Gas Interests ($7.6 million)." *Id.*

71.    Separately, the Future Claimants' Representative and the Tort Claimants' Committee argue that the Debtors should include the restricted property in the Liquidation Analysis.  Future Claimants' Representative Obj. ¶ 25; Tort Claimants' Committee Obj. ¶ 47. However, this approach would generate an inaccurate estimate of a creditors' recovery in a liquidation scenario by including assets that cannot legally be used to satisfy claims .  *See* 11 U.S.C. 541(d) ("Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."); *see also In re Save Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. 202, 247 (Bankr. W.D. Tex. 2008) (finding restricted funds are not property of the estate); *In re Parkview Hosp.*, 211 B.R. 616, 636 (finding unrestricted donations commingled with restricted donations resulted in a restricted express trust, and was not property of the estate).

72.    Additionally, even if a donation is not explicitly restricted, courts have repeatedly held that unrestricted charitable donations are unavailable to creditors. *See In re L.A. Cty. Pioneer Soc'y*, 257 P.2d 1, 5-7 (Cal. 1953) (finding unrestricted donations to Los Angeles

County Pioneer Society were intended to serve the charitable purpose expressed in the articles of incorporation); *Blocker v. State*, 718 S.W.2d 409, 415 (concluding that property transferred unconditionally to the Houston Conservatory of Music, a non-profit corporation whose purpose is charitable or educational, "is nevertheless subject to implicit charitable or educational limitations *defined by the donee's organizational purpose*.") (emphasis added)

73.     Finally, the issue of whether certain properties are unrestricted property of the Debtors' estates under Bankruptcy Code section 541(a)(1) is the subject of a pending adversary proceeding.  *See Official Tort Claimants' Committee vs. Boy Scouts of America and Delaware BSA, LLC*, No. 20-10343 (Bankr. D. Del. 2020).

### 4.     The Plan Is Insurance Neutral.

74.     Multiple insurers[17] object to the Plan and Disclosure Statement on the grounds that the Plan is not insurance neutral, meaning that it does not preserve insurers' rights under their policies with respect to the administration of claims under the Plan.  *See In re Combustion Eng'g*, 391 F. 3d 190, 217 (3d Cir. 2004) ("So long as claims are paid in a manner consistent with the rights and conditions set forth in the subject policies, the objecting insurers . . . are not aggrieved for purposes of bankruptcy appellate standing."); *In re Pittsburgh Corning Corp.*, 417 B.R. 289, 317 (Bankr. W.D. Pa. 2006) (holding that objecting insurers did not have standing to object to confirmation because the debtor's plan contained an insurance neutrality provision similar to that of *Combustion Engineering* that "broadly preserves insurers' pre-petition rights under the subject insurance policies").  Contrary to the Insurer Objections, the Plan's insurance neutrality provisions accomplish exactly that.

---

[17] *See, e.g.*, D.I. 3271, p. 2 (the "Great American Insurer Objection"), D.I. 3285, p. 2 (the "Argonaut Objection"), D.I. 3523, pp. 10–14 (the "AIG Objection"), D.I. 3549, p. 4 (the "Allianz Objection"), and D.I. 3578, pp. 4–5 (the "Liberty Mutual Objection," collectively, the "Insurer Objections").

75. The Plan's insurance neutrality provisions are substantially similar to other insurance neutrality provisions repeatedly endorsed by courts in the Third Circuit as preserving the rights of insurers, and thus depriving non-settling insurers of standing to object to the Plan. Section X.M.1 of the Plan provides:

> Except as provided in any Insurance Settlement Agreement, nothing contained in the Plan, the Plan Documents, or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (a) the rights or obligations of any Insurance Company or (b) any rights or obligations of the Debtors arising out of or under any Insurance Policy. For all issues relating to insurance coverage allegedly provided by any Settling Insurance Company, the provisions, terms, conditions, and limitations of the applicable Insurance Settlement Agreement shall control. For all other issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Insurance Policies shall control. For the avoidance of doubt, nothing contained in the Plan, the Plan Documents, or the Confirmation Order shall operate to require any Insurance Company to indemnify or pay the liability of any Protected Party that it would not have been required to pay in the absence of the Plan.

Section X.M.2 further provides:

> Except as provided in Article X.M.4, none of (a) the Bankruptcy Court's or District Court's approval of the Plan or the Plan Documents, (b) the Confirmation Order, the Affirmation Order or any findings or conclusions entered with respect to Confirmation, or (c) any estimation or valuation of Abuse Claims, either individually or in the aggregate (including any agreement as to the valuation of Abuse Claims) in the Chapter 11 Cases shall, with respect to any Insurance Company, constitute or be deemed to constitute a trial or hearing on the merits or an adjudication or judgment, or accelerate the obligations, if any, of any Insurance Company under its Insurance Policies.

Section X.M.4 in turn provides:

> Nothing in this Article X.M is intended or shall be construed to preclude otherwise applicable principles of res judicata or collateral estoppel from being applied against any Insurance

Company with respect to any issue that is actually litigated by such Insurance Company as part of its objections, if any, to Confirmation or as part of any contested matter or adversary proceeding filed by such Insurance Company in conjunction with or related to Confirmation. Plan objections that are withdrawn prior to the conclusion of the Confirmation Hearing shall be deemed not to have been actually litigated.

76.     The language in subsections X.M.1 and 2 conforms to the requirements stated by the Third Circuit in *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 209, 217 (3d Cir. 2004) (holding a plan must include language precluding anything in the confirmation order, the plan, and the plan documents from "operat[ing] to, or hav[ing] the effect of, impairing the insurers' legal, equitable or contractual rights").  As the Third Circuit has explained, a plan's neutrality provision "broadly preserves insurers' pre-petition rights under the subject insurance policies" and make clear "that any prepetition contractual rights remain[] unaltered and that insurer claims [are] therefore unimpaired." *Id.* at 217–18.

77.     That is what the insurance neutrality provisions of the Plan achieve.  As shown above, Section X.M of the Plan prevents anything in the Plan and the Plan Documents from affecting the insurers' rights or obligations, including their indemnity obligations (Plan § X.M.1), and disclaims any adjudicative effect arising from any estimation or valuation of Abuse Claims pursuant to the Plan with respect to any of the insurers under their insurance policies (Plan § X.M.2).

78.     Disregarding these robust protections, the Insurer Objections object that subsection X.M.4 of the Plan leaves the insurers' rights subject to claim preclusion if an insurer litigates an issue "in conjunction with or related to Confirmation" and loses.  *See* Plan § X.M.4; AIG Objection at 11–14; Allianz Objection ¶ 4; Liberty Mutual Objection at 4.  This provision is necessary and standard, and does not alter the Plan's neutrality.  There is nothing prejudicial or

unfair about precluding insurers' from continuing to litigate claims after those claims have been rejected by the Court and excluded from the confirmed Plan.  Indeed, there must be a way to fully and finally resolve insurers' objections to the Plan so as to bind the insurers to the Plan's confirmation.  More important, nothing in this provision affects the Plan's neutrality.  Where an insurer litigates or objects to an issue during the plan confirmation process, the binding effect of the court's decision on the issue in no way impinges on any of the insurer's rights under its policies, which, as noted above, are protected from alteration pursuant to sections X.M.1 and X.M.2.[18]

79.     Finally, Liberty Mutual Insurance Company complains that although the Settling Insurance Companies will be entitled to a release from a claimant who elects to take the Expedited Distribution, the Plan is silent as to the effect of such election on Non-Settling Insurance Companies.  *See* Liberty Mutual Objection pp. 4–5.  Liberty Mutual's objection implies that it believes it is entitled to a release of its obligations under its policies without having participated in the settlement that led to the development of the Plan.  That position has

---

[18] AIG relies on *In re Global Industrial Technologies*, 645 F.3d 201 (3d Cir. 2011) to support the argument that the Plan's insurance neutrality provisions are not sufficient.  *See* AIG Objection pp. 11–12.  While an extraordinary number of Abuse Claims have been filed in the Debtors' chapter 11 cases—as a result of the extensive advertising efforts by plaintiff firms and the Debtors' noticing program which was required to satisfy due process concerns—the formulation of the Plan and the trust distributions procedures, and the ultimate creation of the Settlement Trust, have in no way caused the "integrity of the bankruptcy proceeding [to be] called into question by nonfrivolous allegations of collusion between [the debtors] and asbestos claimants' counsel." *Id.* at 214.  Courts have repeatedly held that the mere fact that claims have increased since the bankruptcy filing is an insufficient basis for insurers to receive the extreme relief provided in *Global Industrial Technologies*.  *See, e.g.*, *Mt. McKinley Ins. Co. v. Pittsburgh Corning Corp.*, 518 B.R. 307, 320–28 (W.D. Pa. 2014) (rejecting insurer's argument that plan was not insurance neutral because the debtors' "quantum of liability [] would increase from minimal to hundreds of millions of dollars" on account of the additional claims filed against the Debtor since the petition date, and finding that the increased number of claims was "reasonable under the circumstances" and the record did not contain "the extreme evidence of fraud and collusion found in *Global Industrial Technologies*"); *see also In re Federal-Mogul Global,* 684 F.3d 355, 379 (3d Cir. 2012) (holding that plan did not violate anti-assignment provisions in relevant insurance policies where there was no evidence of collusion similar to *Global Industrial Technologies* and the insurers had "no economic incentive to prevent [the] assignment, particularly whereas here, the events creating exposure to asbestos liability ha[d] already occurred" and "there [would] be no additional risk to the insurance companies by virtue of the assignments.")).

no basis in the law or logic.  The Non-Settling Insurance Companies will not be entitled to any

releases executed by claimants who receive an Expedited Distribution.  Rather, all of the BSA's

and Settlement Trust's rights against the Non-Settling Insurers on account of the claim, and the

Non-Settling Insurers' rights under its policies with respect to the claim, will be preserved.

Furthermore, to the extent Liberty Mutual or any other Non-Settling Insurance Company

believes that the Expedited Distribution election process may result in the Settlement Trust

making an erroneous distribution in error, their rights under their insurance policies are fully

preserved under the insurance neutrality provisions of the Plan.

### 5. The Channeling Injunction and Related Non-Consensual Third-Party Releases Do Not Render the Plan Patently Unconfirmable.

80.     The Tort Claimants' Committee objects that the Plan is patently unconfirmable to

the extent it provides non-consensual releases to the Local Councils and Contributing Chartered

Organizations in connection with the Channeling Injunction.  *See* TCC Objection pp. 53–56.

Similarly, the Coalition objects that the BSA Toggle Plan is patently unconfirmable because,

among other alleged reasons, the Channeling Injunction under the BSA Toggle Plan fails to

satisfy applicable Third Circuit standards for approving non-consensual third-party releases.  *See*

Coalition Objection at 22–23.  These Objections fail.

81.     In the Third Circuit, non-consensual third-party releases are permissible if they

satisfy the *Continental* hallmarks of "fairness and necessity to the reorganization," which must

be supported by specific factual findings.  *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252,

272 (Bankr. D. Del. 2017) (citing *Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d

203, 214 (3d Cir. 2000)).   In determining whether a non-consensual release meets this standard,

courts apply five factors, known as the *Master Mortgage* factors, to the specific facts of the case:

> (1) an identity of interest between the debtor and the third party,
> such that a suit against the non-debtor is, in essence, a suit against

the debtor or will deplete assets of the estate; (2) substantial contribution by the non-debtor of assets to the reorganization; (3) the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success; (4) an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes 'overwhelmingly' votes to accept the plan; and (5) provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.

*Id.* (quoting *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999)). "These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness." *In re Washington Mut. Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011).

82.    It would be premature, at this stage, to determine whether the Channeling Injunction and releases satisfy the *Continental* hallmarks and the *Master Mortgage* factors. Facts material to such a determination are being developed, and will continue to be developed after the approval of the Disclosure Statement. Such facts include the outcome of the creditors' votes, the identity of each Protected Party, the total value of contributions to be made to the Settlement Trust and, consequently, the total value of distributions to be made to affected creditors. Indeed, the Plan expressly contemplates that additional parties may qualify to become Protected Parties by making certain substantial contributions to the Settlement Trust.

83.    Ignoring this reality, the Tort Claimants' Committee and Coalition present objections that are based on presupposed facts tailored to fit their arguments. Because these material facts are still in development, the Tort Claimants' Committee and Coalition have failed to show that the Channeling Injunction and non-consensual third-party releases render the Plan patently unconfirmable. *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 154–55 (3d Cir. 2012) (finding that a plan is "patently unconfirmable" only "where (1) confirmation defects [cannot] be overcome by creditor voting results and (2) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure

statement hearing."). The Debtors will demonstrate at confirmation that the nonconsenual releases and Channeling Injunction are integral to the Debtors' restructuring under the Global Resolution Plan and the Protected Parties will have made substantial contributions in exchange for the releases.

84.    While the Debtors are confident that should they seek to confirm the Global Resolution Plan as opposed to the BSA Toggle Plan, the Channeling Injunction and non-consensual third-party releases will ultimately be found to satisfy *Continental*, such a determination should be made after the Confirmation Hearing. Accordingly, the Debtors ask that the Court overrule the objections of Tort Claimants' Committee and the Coalition.

### 6.    Century's 502(a) Objection Has Been Repeatedly Rejected by Bankruptcy Courts as Meritless.

85.    Century objects that the Plan violates the statutory rights of parties in interest pursuant to section 502(a) of the Bankruptcy Code by assigning the rights to prosecute claims exclusively to the settlement trust. [D.I. 3856 at 42-43]. Bankruptcy courts consistently reject this argument. For example, in *Western Asbestos*, the bankruptcy court overruled this objection (also by an insurer) and held that the plan and trust distribution procedures did not violate section 502(a) by assigning the rights to object to claims to the asbestos personal injury trust:

> In a chapter 11 case, 11 U.S.C. § 502(a) only governs the right of a party in interest to object to a claim until the plan is confirmed. Once a plan is confirmed, the terms of the plan govern who may object to the claim. 11 U.S.C. § 1141(a). Generally, a plan assigns that right and duty either to the reorganized debtor or to the official creditors' committee. In these cases, that duty is assigned to the Trust. There is nothing inconsistent with the Bankruptcy Code in this provision.

*In re W. Asbestos Co.*, 313 B.R. 832, 845 (Bankr. N.D. Cal. 2003).

86.    In *In re Congoleum Corp.*, the bankruptcy court faced a similar objection from the insurers that, by channeling the asbestos-related personal injury claims to a trust, the plan

eliminated their right to object to claims pursuant to section 502(a). The *Congoleum* court overruled the objection, holding that this argument undermines the purpose of channeling injunctions and aims to circumvent the trust mechanisms. *In re Congoleum Corp.*, No. 03-51524, 2008 Bankr. LEXIS 2375, at *29-30 (Bankr. D.N.J. Sept. 2, 2008). The court further observed that this objection, which sought to have "each individual claim estimated by the bankruptcy court under the guise of an objection to claims presents a further difficulty because the underlying claims at issue here are tort claims. Bankruptcy courts are not authorized to try personal injury tort claims." *Id.* (citing 28 U.S.C. § 157(b)(5)).[19] The same is true here.

87.    Indeed, many other mass tort cases have confirmed plans that assign the rights to object to claims exclusively to the personal injury trust. *See e.g.*, *In re Remington Outdoor Co.*, Case No. 20-81688 (Bankr. N.D. Ala. 2020) [D.I. 1370] (confirming chapter 11 plan providing that the plan administrator has the exclusive right to prosecute any estate causes of action); *Catholic Diocese of Wilmington, Inc.*, Case No. 09-13560 (Bankr. D. Del. 2019) [D.I. 1493] (confirming chapter 11 plan providing that the plan trust shall be vested with and may "exclusively enforce and prosecute" any claims or causes of action that the debtor or the plan trust may have); *In re Oldco, LLC*, Case No. 17-30140 (Bankr. W.D.N.C. 2017) [D.I. 26] (same); *In re Christian Bros.' Institute*, Case No. 11-22820 (Bankr. S.D.N.Y. 2011) [D.I. 620] (same); *In re The Christy Refractories*, Case No. 08-48541 (Bankr. E.D. Miss. 2009) [D.I. 269] (same).

---

[19] *See also In re ACandS, Inc.*, 311 B.R. 36, 42 (Bankr. D. Del. 2004) (rejecting an insurer's argument that the plan violated section 502(a) by limiting its rights to object to claims under the personal injury trust); *In re Abengoa Bioenergy Biomass of Kan.*, LLC, Case No. 16-10446, 2018 Bankr. LEXIS 1361, at *7-8 (Bankr. D. Kan. May 7, 2018) (holding that it was appropriate to vest the rights to object to claims exclusively in a trustee and bar other parties in interest to object).

7.     **The Third-Party Consensual Releases Are Consistent with Applicable Law.**

88.     The U.S. Trustee objects to the releases in Section X.J.4 of the Plan, arguing that the releases are not consensual because they bind parties who are presumed to accept the Plan and parties who are entitled to vote on the Plan but abstain from voting.  On the substance (which need not be addressed at this time), the U.S. Trustee ignores the weight of authority holding that consensual third-party releases, like the releases in Section X.J.4, are appropriate where holders of claims or interests are presumed to accept the plan or are provided with the informed opportunity to opt out of such releases, but fail to do so.  The Debtors submit that the Court should follow the routine practice in this District of granting such releases in connection with confirmation and overrule the U.S. Trustee's objection at this stage.

89.     The Plan includes a general third-party release provision that provides for consensual third-party releases of all voting parties and holders of unimpaired claims. *See* Plan, Section X.J.4.  The Plan and Solicitation Materials further provide ample opportunity for such parties to evaluate and opt out of the releases by checking the opt-out box and timely and properly returning their ballot.  Nonetheless, the U.S. Trustee objects to these fair and standard releases.

90.     As a threshold matter, and as noted above, although asserted as objections to the Disclosure Statement and Solicitation Procedures, the U.S. Trustee's third-party release objections are quintessential confirmation issues that the Court should not consider at the Hearing.  *See In re GUE Liquidation Cos., Inc.*, No. 19-11240 (LSS) (Bankr. D. Del. Oct. 23, 2019) Hr'g Tr. at 60:20–62:23 (stating that issues related to releases would be determined at confirmation, not disclosure statement hearing); *In re TK Holdings, Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Jan. 3, 2018) Hr'g Tr. at 199:9-13 (declining to rule on appropriateness of

44

releases at the hearing, as such issues are "classically [for] a confirmation hearing"); *In re Molycorp, Inc.*, Case No. 15-11357 (CSS) (Bankr. D. Del. Jan. 8, 2016) Hr'g Tr. at 67:12–15 (noting that potential issues with releases should be dealt with at confirmation).

91.     As the Debtors will argue at confirmation if the U.S. Trustee continues to press its objection, the third-party releases in Section X.J.4 of the Plan are consensual in nature and appropriate in scope.  Courts in this district have found releases to be consensual where there is sufficient notice of a plan's release provisions and parties have an opportunity to object to the plan or opt out of the release.  Here, the Ballots and Confirmation Hearing Notice, among other documents, conspicuously state the third-party releases in Section X.J.4 of the Plan and describe the opt-out mechanism to any party that is entitled, and may decide, to opt out of those releases. All voting creditors will receive comprehensive and detailed notice of the third-party releases in Section X.J.4, their impact on creditors and creditors' rights, the opportunity to opt out, and the right to object to confirmation of the Plan.  Similarly, creditors holding claims in unimpaired classes under the Plan, who are presumed to accept the Plan, will receive a notice that includes the release in conspicuous writing and states that the release will be granted unless the claimholder objects.

92.     Courts in this jurisdiction routinely approve third-party releases where, as here, creditors in a voting class have an opportunity to opt out of the releases.  *See Indianapolis Downs, LLC*, 486 B.R. 286, 305–06 (Bankr. D. Del. 2013) (approving ballots that had an opt-out mechanism for third-party releases); *see also In re Chaparral Energy Inc.*, Case No. 20-11947 (MFW) (Bankr. D. Del. Oct. 1, 2020) [D.I. 237] (confirming plan that provided an opportunity for parties presume to accept to affirmatively elect to "opt out"); *In re Z Gallerie, LLC*, Case No. 19-10488 (LSS) (Bankr. D. Del. June 14, 2019) Hr'g Tr. 48:9–11 ("With respect to third-party

releases I'm prepared to find that they are consensual because of the opt-out box in the ballots."). Thus, the releases under Section X.J.4 of the Plan are consensual as to all creditors and interest holders who do not object or affirmatively opt out.

93.     The Debtors intend to further establish the appropriateness of the consensual releases at the Confirmation Hearing, but, at this stage, the Court should overrule the UST Objection to the third-party releases as it relates to approval of the Disclosure Statement and Solicitation Procedures.

**B.     The Solicitation Procedure Objections and Other Procedural Objections Are Meritless or Have Been Addressed**

94.     The Debtors have engaged in efforts to resolve Objections to the proposed solicitation and voting procedures, but certain issues remain outstanding.  Accordingly, the Objection Responses Chart attached hereto as **Exhibit B** summarizes (a) each of the Objections related to solicitation and voting procedures and related procedural issues and (b) the Debtors' proposed responses thereto.  The Debtors supplement certain of these responses in greater detail below, and submit that any remaining Objections should be overruled.

**1.     Century's Objection That All Claims Information Must Be Provided in the Disclosure Statement Contradicts Bankruptcy Law and Practice.**

95.     Century objects that the Disclosure Statement prejudices claimants by failing to provide the criteria for the disallowance of abuse claims and the number of viable abuse claims. *See* Century Objection at 6–8.  Thus, Century argues, the Disclosure Statement Hearing must be delayed until after the Court has ruled on Century's pending Rule 2004 and 2019 motions and its motion for relief from Local Rule 3007-1(f), and Century has been able to conduct discovery regarding the abuse claims and litigate its objections.  *See id.*

96.     None of the cases cited by Century stand for the proposition that a disclosure statement cannot be approved until the debtor has investigated the merits of each unliquidated

tort claim asserted against it. *See In re Rosenblum*, No. 18-17155-MKN, 2019 Bankr. LEXIS 2278, at *16–17 (Bankr. D. Nev. July 15, 2019) (rejecting disclosure statement for failing to "disclose and account for" a proof of claim with liquidated secured and priority amounts); *In re Acemla De P.R. Inc.*, No. 17-2021 ESL, 2019 Bankr. LEXIS 182, at *60 (Bankr. D.P.R. Jan. 22, 2019) (rejecting disclosure statement for failing to mention a "contract that provides [debtor] the right to administer songs"); *In re Kiklis*, 352 B.R. 355, 360 (Bankr. D. Mass. 2006) (rejecting disclosure statement for failing to disclose treatment of mortgage creditors' undersecured claim). Indeed, contrary to Century's claims, "[t]here is no requirement in case law or statute that a disclosure statement estimate the value of specific unliquidated tort claims." *Menard-Sanford v. Mabey (In re A.H. Robins Co.)*, 880 F.2d 694, 697 (4th Cir. 1989). Likewise, there is no legal basis to permit Century to hold up the Debtors' cases while it investigates 84,000 claims and then litigates its claims objections. In fact, in many cases the claims resolution process even extends past plan confirmation. *See e.g.*, *Remington Outdoor Company*, Case No. 20-81688 (Bankr. N.D. Ala. 2020) [D.I. 1370] (confirming chapter 11 plan providing for post-confirmation claims resolution process); *In re 24 Hour Fitness Worldwide, Inc.*, Case No. 20-11558 (Bankr. D. Del. 2020) [D.I. 1487] (same); *In re Insys*, 19-11292 (Bankr. D. Del. 2020) [D.I. 1115] (same).

97.     The determination of the validity and amount of the abuse claims will occur in due course under the claims resolution process. Century's objection to this standard and customary process, dressed up as an objection to the Debtors' disclosure, fails.

**2.     The Debtors' Procedures with Respect to the Solicitation Directive Appropriately Incorporate the Instructions of Abuse Survivors on their Proofs of Claim.**

98.     Among other Objections, the Tort Claimants' Committee asserts that the Debtors' proposed procedures disenfranchise survivors by not taking into account the wishes of survivors

with respect to whether a survivor would like to vote on the Plan via master ballot or directly. D.I. 3526 at 59. The Debtors have worked with both the Tort Claimants' Committee and the Coalition on the solicitation directive process, and believe that the procedures appropriately incorporate the elections that survivors made on their filed proofs of claim. Under the Master Ballot procedure proposed by the Debtors, counsel who abuse survivors have expressly listed on their proofs of claim may submit a Master Ballot recording the vote of each of their abuse survivor clients, along with a certification that such counsel is authorized to do so. This procedure, by which the Debtors have requested each counsel's preference with respect to master balloting or direct solicitation, rather than contacting more than 82,500 abuse survivors individually, is particularly appropriate given the way in which a large majority of applicable Direct Abuse Claims were asserted against the Debtors. The Debtors estimate that approximately 95% of Direct Abuse Claims listed that a survivor was represented by counsel. It follows that the Debtors would solicit the preferences of such counsel—and only in cases where a survivor indicated on their proof of claim that communications regarding their claim may occur with listed counsel—with respect to solicitation on the Plan.

### 3. It Is Not Relevant or Feasible for the Debtors to Identify a Local Council on Each Ballot.

99. The Tort Claimants' Committee also asserts that survivors need to understand the Local Council that he or she is being asked to release by voting to accept the Plan, and that such information should (a) be included on the Ballots, and (b) for the over 30,000 claims in which a Local Council is not identified, the Debtors should research this information prior to solicitation. (D.I. 3526 at 60.) This information, as presented by the Tort Claimants' Committee, is not relevant to the solicitation process, nor is it feasible to obtain. Under the Global Resolution Plan, abuse survivors will be asked to release all Local Councils as Protected Parties. Under the BSA

Toggle Plan, no Local Councils will be released as Protected Parties. The individual Local Council associated with a given claimant is thus irrelevant.

100. This is also not something the Debtors can accommodate from a logistical standpoint under the structure of the Solicitation Procedures and Ballots, and the Debtors submit that this is not the appropriate avenue for this information request. A substantial number of abuse survivors' votes may be solicited via Master Ballot, in which the law firm is responsible for putting together the exhibit containing information about each abuse survivor client and their vote on the Plan. The Master Ballot will be sent to attorneys, not to survivors themselves. This request would also jeopardize the Debtors' solicitation process due to the amount of time it would take to individually research and review approximately 30,000 claims. Additionally, the Debtors propose to add a link and instructions to the Direct Abuse Claim Ballot, the Master Ballot, and the Indirect Abuse Claim Ballot that will direct claimants to a list of potential Protected Parties under the Plan.

        **4.**      **The Debtors Are Willing to Work with the Tort Claimants' Committee and the Coalition on Inserts to the Cover Letter for the Solicitation Package.**

101. The Tort Claimants' Committee requests the inclusion of a cover letter to abuse survivors in the Solicitation Package. (D.I. 3526 at 61.) The requested language has not yet been shared with the Debtors. The Coalition also requests the inclusion of a letter in the Solicitation Package recommending that survivors vote to reject the Plan. (D.I. 3569 at 21.) The Debtors are willing to work with both constituencies on inserts to the cover letter that are reasonably acceptable to the Debtors and to the Tort Claimants' Committee and Coalition.

5. **The Procedures Related to Claim Objections Filed After the Solicitation Date Do Not Disenfranchise Claimants.**

102.    The U.S. Trustee argues that the Disclosure Statement should confirm that the Debtors will not be objecting to claims after the Solicitation Date and prior to the Voting Deadline, so that claimants are not disenfranchised by an interposed objection. (*See* D.I. 3581 at 16.)  The U.S. Trustee adds that claimants might be unaware of the Bankruptcy Rule 3018 procedures and deadlines that require additional affirmative steps for their votes to be counted. *Id.*  This objection is misplaced.

103.    The proposed Solicitation Procedures provide that if a Claim in a Voting Class is subject to an objection that is filed with the Court *after* the Solicitation Date, the Claim shall be deemed temporarily allowed solely for voting purposes, without further action by the Debtors or the holder of such Claim and without further order of the Bankruptcy Court, unless the Debtors and claimant agree to other treatment for voting purposes or the Bankruptcy Court orders otherwise.  *See* Solicitation Procedures § III.C.  As such, a claimant subject to an objection after the Solicitation Date will not be disenfranchised, as its Claim will be temporarily allowed for voting on the Plan without any affirmative steps being required.  Courts have readily approved this procedure without requiring a blanket prohibition on claim objections during the voting period.[20]  There is no need to implement a blanket prohibition on the filing of claim objections during a lengthy 60-day solicitation period, as the Debtors have sufficiently considered the rights of any affected claimants.

---

[20]    *See*, *e.g.*, *In re Century 21 Dep't Stores, LLC*, Case No. 20-12097 (SCC) (Bankr. S.D.N.Y. Mar. 21, 2021) [D.I. 769]; *In re Hertz Corp.*, Case No. 20-11218 (MFW) (Bankr. D. Del. Apr. 22, 2021) [D.I. 4111] (approving solicitation procedure in which the debtors were permitted to file claim objections after the solicitation date, and any such claims would be temporarily allowed for voting purposes only without further action from the affected claimants); *In re Southland Royalty Co.*, Case No, 20-10158 (KBO) (Bankr. D. Del. Mar. 23, 2021) [D.I. 1462]; *In re Extraction Oil & Gas, Inc.*, Case No. 20-11548 (CSS) (Bankr. D. Del. Nov. 6, 2020) [D.I. 1022]; *In re Melinta Therapeutics, Inc.*, Case No. 19-12748 (LSS) (Bankr. D. Del. Feb. 25, 2020) [D.I. 342].

**6.    The Use of Modern Forms of Distribution of the Solicitation Packages Is an Appropriate and Efficient Use of Estate Resources Given the Number of Claimants in the Voting Classes and Costs of Mailing**

104.    The U.S. Trustee objects to the Debtors' distribution procedures for the Solicitation Packages, indicating that the Debtors ask to send "only a notice" containing instructions to access the solicitation materials online.  (D.I. 3581 at 17.)  The Debtors are proposing to mail the cover letter, the Confirmation Hearing Notice, and the applicable Ballot to the Voting Classes, and are proposing to provide prominent website hyperlinks to the Plan, the Disclosure Statement, and the Solicitation Procedures Order and exhibits.  Additionally, the Debtors are proposing to cause Solicitation Packages (including Ballots) to be emailed to any holders of Direct Abuse Claims whose votes are not being solicited via Master Ballot and who expressly indicated on their proof of claim that the Debtors are authorized to communicate with these holders regarding their claims via email.  *See* Bar Date Order, Ex. 7.  Further, as is made apparent in the solicitation materials, any party that prefers paper or another format of these documents may contact the Solicitation Agent to obtain these materials at no cost.

105.    These procedures respect the express indications in the case of abuse survivors, and reflect the realities of administering voting in a bankruptcy case with over 100,000 timely filed Abuse and Non-Abuse Claims.  And such procedures are not without precedent.  The Debtors anticipate that the Plan, the Disclosure Statement, and the Solicitation Procedures Order and exhibits alone will total well over 900 pages.[21]  If each document in the Solicitation Package was printed in full, the Debtors estimate a mailing cost for each Solicitation Package of approximately $45.00, even after shrinking multiple pages onto each printed page—an exorbitant

---

[21]    The Tort Claimants' Committee even notes in its Objection that the Disclosure Statement alone weighs in at "approximately two pounds," and proposes the addition of hyperlinks to certain additional disclosure documents.  (D.I. 3526 at 9, 20, 45, 46.)

cost to the Debtors' estate.  Similarly, the Debtors estimate that mailing a USB drive would add $5.00 in increased mailing costs to the mailing of each Solicitation Package.

106.    In addition to the increased cost of printing and mailing the Plan, the Disclosure Statement, and the Solicitation Procedures Order and exhibits in the Solicitation Package, the Debtors note the absence of any objection to these mailing procedures from the Tort Claimants' Committee, the Coalition, and any individual abuse survivors or law firms.  Providing hyperlinks to a subset of documents provides the same level or superior access to these documents and reflects the modern reality of how many parties review documents and materials.  Any parties who need physical copies of documents—such as, as the U.S. Trustee notes, elderly claimants, will have clear instructions to obtain physical copies of these materials at no cost to them. Multiple bankruptcy courts in and outside of this District have approved the provision of electronic copies of the plan and disclosure statement via website links in the solicitation package.  *In re Drone LC, Inc.* (f/k/a *Lily Robotics, Inc.*), Case No. 17-10426 (KJC) (Bankr. D. Del. Aug. 1, 2017) [D.I. 435] (authorizing the provision of electronic copies of the plan and disclosure statement on a website instead of including copies of such documents in the solicitation package); *In re Draw Another Circle, LLC*, Case No. 16-11452 (KJC) (Bankr. D. Del. Dec. 19, 2016) [D.I. 1067] (same); *In re Dune Energy, Inc.*, Case No. 15-10336 (Bankr. W.D. Tex. Aug. 18, 2015) [D.I. 453] (same); *In re Borders Grp., Inc.*, Case No. 11-10614 (Bankr. S.D.N.Y. Nov. 14, 2011) (MG) [D.I. 2122] (same).

107.    Other specialized procedures have been approved by bankruptcy courts with respect to noticing in mass tort cases with a significant number of creditors, and the Debtors submit that these procedures are appropriate here.  For example, in *TK Holdings*, the bankruptcy court approved the use of a single postcard-sized notice to millions of potential airbag inflator

personal injury claimants that combined notice of the bar date, provided hyperlinks to access the plan and disclosure statement, provided notice of the potential free and clear sale of substantially all assets of the Debtors, and provided an email address opt-in. *See In re TK Holdings Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Oct. 4, 2017) [D.I. 959, Ex. A-2].   If personal injury claimants did not opt in and register their email address, they were not entitled to receive any further notices of any kind in the chapter 11 cases. *Id.*  Similarly, other recent mass tort and non-mass tort bankruptcy cases have approved the dissemination of solicitation package materials to creditors via email. *See*, *e.g.*, *In re PG&E Corp.*, Case No.  19-30088 (DM) (Bankr. N.D. Cal. Mar. 17, 2020) [D.I. 6340] (permitting the dissemination of solicitation packages to fire victims in email format); *In re TK Holdings Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Jan. 5, 2018) [D.I. 1639] (approving solicitation materials to be distributed via email to holders of personal injury and wrongful death claims); *In re Drone LC, Inc.* (f/k/a *Lily Robotics, Inc.*), Case No. 17-10426 (KJC) (Bankr. D. Del. Aug. 1, 2017) [D.I. 435] (authorizing the transmission of solicitation packages by email to over 60,000 customers entitled to vote).

> **7.     The Debtors Are Not Required to Weed Out Abuse Claims Prior to Soliciting Votes on the Plan.**

108.    Much of Century's "objection" to the solicitation and voting procedures is an attempt to repeat and rehash its Bankruptcy Rule 2004 and 2019 motions that it has already briefed and argued. (D.I. 3857 at 3–11.)  Century argues in its Objection to the solicitation procedures that Debtors' procedures are flawed because they do not seek to vet Abuse Claims prior to commencing solicitation, asserting that the Debtors are in violation of section 502(a) of the Bankruptcy Code and Bankruptcy Rule 3018.  (D.I. 3857 at 11–12.)  As this Court has already ruled and the District Court has affirmed (despite Century's continued appeals), a claim

has the effect that the Bankruptcy Code gives it.[22]  The effects are governed by section 502(a) of the Bankruptcy Code and Bankruptcy Rule 3001(f), which prescribe that a proof of claim constitutes prima facie evidence of the validity and amount of a claim.[23]  Ignoring these statutory starting points for analysis of claims, Century asserts that the Debtors are impermissibly dispensing with judicial scrutiny of Abuse Claims prior to solicitation on the Plan.  This represents a flawed analysis of the mechanics of plan solicitation and claim objection procedures.

109.    Claim objections or related procedures are not required to be commenced before confirmation of a Plan, nor is "judicial scrutiny" of a claim a precursor to solicitation.  For example, in *Kane v. Johns-Manville Corp.*, the Second Circuit held that "objections to claims need not be resolved before voting on a plan may occur."  *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 646 (2nd Cir. 1988); *see also In re DeSardi*, 340 B.R. 790, 794 (Bankr. S.D. Tex. 2006) (noting that procedures for claim objection are distinct from plan confirmation procedures, and finding that claim objections may be resolved after a plan is confirmed).  Century asserts that Bankruptcy Rule 3018 grants the Court judicial scrutiny that the Debtors somehow abrogate, but fails to note the full context of the portion of Bankruptcy Rule 3018(a) upon which it relies: "*Notwithstanding objection to a claim* . . . , the court . . . may temporarily allow the claim . . . in an amount which the court deems proper for the purpose of accepting or rejecting a plan."  Fed. R. Bankr. P. 3018(a) (emphasis added).  As is discussed in greater detail in Section II.B.6 of this Reply, the Debtors do not violate section 502(a) by assigning the right to prosecute Abuse

---

[22]  *See* Memorandum Opinion at 4 ("[T]he return of [the] proof of claim form has the effect that the [Bankruptcy] Code gives it." (quoting D.I. 675, May 18, 2020 Hr'g Tr. at 70:2–6)).

[23]  *See In re Milbourne*, 557 B.R. 376, 388 (Bankr. E.D. Pa. 2016) ("A proof of claim is deemed allowed, unless a party in interest . . .  If properly filed, a proof of claim is prima facie evidence of the validity and amount of the claim, even if an objection is filed.") (citing 11 U.S.C. § 502(a)); *In re AgFeed USA, LLC*, No. 13-11761, 2015 Bankr. LEXIS 1403, at *9 (Bankr. D. Del. Mar. 11, 2015) ("The filing of a proof of claim constitutes prima facie evidence of the validity of the claim.").

Claims exclusively to the Settlement Trust, and this has been approved over objection in other mass tort cases. *See* § II.B.6. Similarly, temporarily allowing a large body of contingent, unliquidated Abuse Claims for voting purposes pursuant to Bankruptcy Rule 3018(a) is a standard procedure in similar bankruptcy cases and ensures that a large body of claimants may still participate in the voting process.

110.    Century also asserts that the Court should prohibit solicitation until it rules on Century's Bankruptcy Rule 2004 motions, effectively holding hostage the Debtors' plan solicitation in their own bankruptcy proceedings. As noted above, Century rehashes its arguments and evidence in support of its Rule 2004 motions. For the same reasons noted above, Century inappropriately ties claim objection procedures to the confirmation process for a plan— these are independent processes that may be handled independently in a bankruptcy case, particularly one with a material number of contingent, unliquidated claims that the Debtors seek to exclusively channel to a trust to administer.

><b>8.    The Debtors' Master Ballot Procedures Are Sufficient, and the Court Does Not Need to Require Counsel to Comply with Bankruptcy Rule 2019 Prior to Recording Abuse Survivor Clients' Votes on a Master Ballot.</b>

111.    Century also objects to the Master Ballot procedure that the Debtors have proposed, arguing that the Debtors' procedures do not require a showing that counsel is authorized to cast votes on claimants' behalf and should require counsel to comply with Bankruptcy Rule 2019. (D.I. 3857 at 14-16.) The Debtors' use of a master ballot process in this chapter 11 case is an efficient procedure that accounts for the manner in which a large majority of applicable Direct Abuse Claims have been asserted against the Debtors (i.e., by counsel on behalf of individual claimants) as well as the significant number of Direct Abuse Claims that have been asserted (approximately 82,500 unique, timely filed Direct Abuse Claims). Similar

master ballot procedures have been approved by bankruptcy courts in connection with the solicitation of votes of tort claimants in other chapter 11 cases, and are appropriate here.[24]  *See*, *e.g.*, *In re Lloyd E. Mitchell, Inc.*, 373 B.R. 416, 426 (Bankr. D. Md. 2007) ("The use of master ballots in mass tort cases is a long-standing procedural mechanism that has been employed almost as a matter of course.").

112.    Despite Century's assertion that "[t]he Debtor's proposed procedures require no showing that counsel is authorized to cast votes on the claimants' behalf," the master ballots and related procedures in other cases, as in this case, have sufficient certification procedures in place. Law firms submitting votes on a Master Ballot are simply documenting the votes of their Abuse Survivor Clients in compliance with Bankruptcy Rule 3018(c), which provides that "[a]n acceptance or rejection shall . . . be signed by the creditor . . . or an authorized agent."  The Master Ballot requires each law firm to certify that it has collected and recorded the votes of each of its abuse survivor clients through customary and accepted practices or that it has authority to under applicable law to vote to accept or reject the Plan on behalf of each of its clients.  (D.I. 2726, Ex. 2-5.)  The Debtors may request a valid power of attorney or other written documentation evidencing such authority.[25]  *Id.  See In re Quigley Co.*, 437 B.R. 102, 122 (Banrk .S.D.N.Y. 2010) (holding that master ballots were a valid method of submission as long

---

[24]   *See, e.g., In re Imerys Talc Am., Inc.*, Case No. 19-10289 (LSS) (Bankr. D. Del. Jan. 27, 2021) [D.I. 2863] (approving use of master ballots for attorneys of record for voting the claims of asbestos personal injury claimants); *In re PG&E Corp.*, Case No. 19-30088 (DM) (Bankr. N.D. Cal. Mar. 17, 2020) [D.I. 6340] (approving procedures to allow authorized counsel to cast master ballots on behalf of fire victims); *In re Insys Therapeutics, Inc.*, Case No. 19-11292 (KG) [D.I. 952] (Bankr. D. Del. Dec. 4, 2019) (authorizing master and class ballots for tort claimants); *In re Maremont Corp.*, Case No. 19-10118 (KJC) (Bankr. D. Del. Jan. 23, 2019) [D.I. 30] (approving use of master ballots for attorneys of record for voting the claims of asbestos personal injury claimants).

[25]   Bankruptcy Rule 9010(c) expressly excludes voting on a plan from the requirement that a power of attorney be submitted showing the authority of an agent.  Fed. R. Bankr. P. 9010(c) ("The authority of any agent, attorney in fact, or proxy to represent a creditor for any purpose other than the . . . acceptance or rejection of a plan shall be evidenced by a power of attorney conforming substantially to the appropriate Official Form.").

as each attorney certified to its authority to vote on behalf of multiple claimants).  Century's argument that there are no procedures to demonstrate that counsel is authorized to cast votes simply rehashes its earlier arguments that seek to deprive Direct Abuse Claims of *prima facie* validity under section 502(a) and Bankrutpcy Rule 3001.  Century objects to the Debtors' proposed procedures because they do not require that counsel comply with Bankruptcy Rule 2019 prior to signing a Master Ballot.  (D.I. 3857 at 14.)  For the reasons just discussed, the Debtors' procedures comply with Bankruptcy Rule 3018(c), which governs the form for acceptance or rejection of the Plan.

113.    Century also asserts that the procedures and Master Ballot fail to comply with Bankruptcy Rule 3018(a), which "confers on the Court . . . the authority to determine which claims are valid for voting purposes."  (D.I. 3857 at 15.)  But that is precisely why the Debtors ask the Court, in the Motion, to temporarily allow Direct and Indirect Abuse Claims in the amount of $1.00 in the aggregate per claimant solely for voting purposes.  The Debtors seek the Court's authority to do this, in addition to the Court's approval of the Master Ballots—all of which are procedures that promote efficient and equitable procedures for abuse survivors and holders of Indirect Abuse Claims.

### 9. The Master Ballot and Related Procedures Do Not Improperly Disenfranchise Holders of Abuse Claims and Do Not Give Undue Influence to the Coalition Law Firms.

114.    Century asserts that three features of the Solicitation Procedures give undue control over the voting process to claimant law firms that have already filed tens of thousands of improper claims.  The first feature is that the procedures permit law firms to use Master Ballots, which will invite abuse and taint the solicitation process.  As the Debtors have relayed in detail above, the Master Ballot procedures are an appropriate and efficient procedure to employ in a case with 82,500 unique, timely filed Direct Abuse Claims.  Century may unhappy with this

process and assert that these claims are "improper," but as discussed above these claims have been appropriately filed on the proof of claim form approved by the Bankruptcy Court and as such are prima facie evidence of the validity of the claims.

115.    Moreover, approximately 95% of abuse survivors submitted a proof of claim listing a law firm, and most of these survivors listed on the forms that communications with their counsel were permissible.  The Debtors are entitled to rely on this information and to correspond with counsel that abuse survivors have expressly disclosed to the Debtors—particularly given the realities of administering solicitation and voting procedures in a chapter 11 case with claims of this magnitude.  As discussed above, master ballots have been used in many similar mass tort reorganization cases.

### 10.    The Certification on the Master Ballot Does Not Invite Manipulation of Voting.

116.    Century's second argument with respect to undue influence by the Coalition is that the Master Ballot's certification feature is unlawful and will enable manipulation of voting. Further to this, Century claims that the certification vitiates Bankruptcy Rule 2019, and adds that the Bankruptcy Court should require law firms acting on behalf of multiple claimants to file evidence of their authority to vote for their clients on this specific Plan.  Century adds that the Court should then make a determination of the attorney's authority, and then allow parties in interest to object.  (D.I. 3857 at 19-21.)  An endless string of review of an attorney's authority to act exceeds the bounds of what is appropriate or necessary here.  The Debtors have discussed above the appropriateness of the certification on the Master Ballot and its compliance with Bankruptcy Rule 3018(c).  As such, the Debtors are entitled to rely on the certifications of counsel representing holders of Direct Abuse Claims that they are authorized to vote on their behalf and record and submit their votes.  As discussed above, Bankruptcy Rule 9010(c)

expressly excepts an attorney voting on a plan from being required to submit a power of attorney, and in the Solicitation Procedures the Debtors specifically reserve the right to request evidence from any law firm submitting a Master Ballot of such firm's authority to act. This is sufficient for voting purposes.[26]

> **11.    The Solicitation Procedures Do Not Give Undue Influence to Coalition Law Firms, and Coalition Firms Are Not Precluded from the Use of Master Ballots.**

117.    Finally, Century argues that the Solicitation Procedures give undue influence to the law firms that make up the Coalition, and the Coalition firms have various conflicts of interest and lack authority to use Master Ballots. (D.I. 3857 at 25–26.) This Objection appears to be based on a misunderstanding of the Master Ballot procedure, which is a matter of efficient case administration in a case with claims of this magnitude. The Master Ballot is simply a tool to aggregate the votes of a law firm's abuse survivor clients. As the Debtors state prominently in bold text in the Motion, while the Master Ballot and other special solicitation procedures proposed for holders of Abuse Claims "are intended to expedite and streamline the transmission of information to holders of Direct Abuse Claims, increase voter participation, and better ensure such claimants are empowered to make informed and meaningful decisions as to whether to accept or reject the Plan, each voting decision rests exclusively with the Abuse Survivor Client." Solicitation Procedures Motion ¶ 40. As discussed above, the Debtors are entitled to rely on the submission of the proofs of claim, which were signed and submitted under penalty of perjury, as demonstrating their prima facie validity pursuant to section 502(a) and Bankruptcy Rule 3001. Sufficient safeguards are in place with respect to the Debtors' Solicitation Procedures.

---

[26]    As a practical matter, given the sheer number of Direct Abuse Claims, there are significant administrative complexities to requiring law firms to submit a power of attorney for each claimant for which a firm intends to vote via Master Ballot for review by the Court, in addition to confidentiality considerations.

####     12.    The Temporary Allowance of Abuse Claims at $1.00 Solely for Voting Purposes Is Proper.

118.    Finally, Century argues that the Solicitation Procedures improperly value all Abuse Claims at $1.00 for voting purposes, despite evidence that claims may be deficient or illegitimate.  (D.I. 3857 at 25–26.)  As with the use of a master ballot, the temporary allowance of a large body of contingent, unliquidated personal injury claims for voting purposes is a standard practice and ensures equitable voting for a large number of claimants in these chapter 11 cases.  Pursuant to Bankruptcy Rule 3018(a), the "court after notice and hearing may temporarily allow [any] claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan."

119.    The proposed temporary allowance of these claims considers the contingent and unliquidated nature of both Direct and Indirect Abuse Claims and invites equitable participation in the solicitation process.  Courts in numerous other mass tort and personal injury cases have allowed claims temporarily for limited purposes, including allowing such claims at $1.00 for voting purposes, in order to facilitate voting on plans of reorganization and ensure the adequate representation of tort victims.  As noted by the court in *A.H. Robins*, the placement of a nominal value on each claim for voting purposes was appropriate, as "[a]ny attempt to evaluate each individual claim for purposes of voting on the Debtor's Plan of Reorganization would, as a practical matter, be an act of futility, and would be so time consuming as to impose on many, many deserving claimants further intolerable delay all not only to their detriment, but to the detriment of the financial well being of the estate as well."  *In re A.H. Robins Co., Inc.*, 88 B.R. 742, 747 (E.D. Va. 1988), *aff'd*, 880 F.2d 694 (4th Cir. 1989); *see also In re Johns-Manville Corp.*, 68 B.R. 618, 631 (Bankr. S.D.N.Y. 1986) (fixing asbestos claims at $1.00 for voting purposes and holding that "[i]t has been the stated goal of this court and of the parties in interest

. . . to ensure the protection and participation of the interests of the asbestos health victims"). Century seems to propose the individual valuation of Abuse Claims as a viable alternative, refusing to recognize the practical realities of the intolerable delay and ruinous burden this would place on abuse survivors and the Debtors' estate.

120.    As set forth in the Motion, the procedures proposed by the Debtors are substantially similar to procedures employed by bankruptcy courts in other large mass tort chapter 11 cases.[27] The circumstances of this case warrant approval of these procedures in order to avoid disenfranchising substantially all of the holders of Direct Abuse Claims in particular. Further, the Tort Claimants' Committee and the Coalition raise no objection to this procedure. At most, any argument with respect to section 1126(c) is not properly before this Court at this stage of the case and should only be evaluated in connection with confirmation.

## CONCLUSION

WHEREFORE, the Debtors request that the Court (i) overrule the Objections and approve the Disclosure Statement, as modified prior to the Hearing and subject to such further modifications presented by the Debtors to, or ordered by, the Court at the Hearing, (ii) enter the Proposed Solicitation Procedures Order, (iii) grant such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Left Blank]*

---

[27]    *See also, e.g.*, *In re PG&E Corp.*, Case No. 19-30088 (DM) (Bankr. N.D. Cal. Mar. 17, 2020) [D.I. 6340] (approving procedures temporarily allowing fire victim claims at $1.00 for voting purposes); *In re Roman Catholic Bishop of Great Falls*, Case No. 17-60271 (Bankr. D. Mont. June 18, 2018) [D.I. 382] (approving solicitation procedures temporarily allowing abuse claims at $1.00 for voting purposes); *In re TK Holdings Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Jan. 5, 2018) [D.I. 1639] (approving procedures temporarily allowing tort claims relating to Debtors' defective airbag inflators, whether based on personal injury, wrongful death, or economic loss, at $1.00 for voting purposes); *In re Catholic Diocese of Wilmington, Inc.*, Case No. 09-13560 (CSS) [D.I. 1317] (Bankr. D. Del. May 20, 2011) (approving procedures temporarily allowing abuse personal injury claims at $1.00 for voting purposes).

Dated: May 16, 2021  **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Wilmington, Delaware

*/s/ Eric W. Moats*

Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Eric W. Moats (No. 6441)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email:  dabbott@mnat.com
        aremming@mnat.com
        emoats@mnat.com
        ptopper@mnat.com

– and –

**WHITE & CASE LLP**

Jessica C. Lauria (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 819-8200
Email:  jessica.lauria@whitecase.com

– and –

**WHITE & CASE LLP**

Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone:  (312) 881-5400
Email: mandolina@whitecase.com
        mlinder@whitecase.com
        laura.baccash@whitecase.com
        blair.warner@whitecase.com

ATTORNEYS FOR THE DEBTORS AND
DEBTORS IN POSSESSION