**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC,[1] | Case No. 20-10343 (LSS) |
| Debtors. | (Jointly Administered) |

**PROPOSED AMENDMENTS TO DISCLOSURE STATEMENT FOR THE SECOND
AMENDED CHAPTER 11 PLAN OF REORGANIZATION
FOR BOY SCOUTS OF AMERICA AND DELAWARE BSA, LLC**

WHITE & CASE LLP
Jessica C. Lauria (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Email: jessica.lauria@whitecase.com

– and –

WHITE & CASE LLP
Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
Blair M. Warner (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email: mandolina@whitecase.com
        mlinder@whitecase.com
        laura.baccash@whitecase.com
        blair.warner@whitecase.com

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Eric Moats (No. 6441)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Email: dabbott@morrisnichols.com
        aremming@morrisnichols.com
        emoats@morrisnichols.com
        ptopper@morrisnichols.com

*Attorneys for the Debtors and Debtors in Possession*

Dated: May 16, 2021
        Wilmington, Delaware

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Boy Scouts of America (6300); and Delaware BSA, LLC (4311).  The Debtors' mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT APPROVES THIS DISCLOSURE STATEMENT. ACCORDINGLY, THIS IS NOT A SOLICITATION OF A VOTE TO ACCEPT OR REJECT THE PLAN. THIS DISCLOSURE STATEMENT MAY BE REVISED TO REFLECT DEVELOPMENTS THAT OCCUR AFTER THE DATE HEREOF BUT PRIOR TO THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT.**

[*Remainder of Page Intentionally Left Blank*]

# TABLE OF CONTENTS

Page

ARTICLE I. IMPORTANT DATES ...................................................................................1

ARTICLE II. INTRODUCTION.......................................................................................5

A.    Background ..........................................................................................................5
B.    Voting and Confirmation ...................................................................................10
C.    Overview of the Plan .........................................................................................12

ARTICLE III. ORGANIZATION OVERVIEW AND CORPORATE HISTORY ................26

A.    Organization Overview......................................................................................26
B.    Corporate Structure ...........................................................................................34
C.    Revenue Sources and Assets..............................................................................36
D.    Prepetition Capital Structure..............................................................................38
E.    Local Councils and Chartered Organizations .....................................................41
F.    Insurance Coverage for Abuse Claims ...............................................................42

ARTICLE IV. EVENTS LEADING TO THE CHAPTER 11 CASES....................................49

A.    The BSA's Prepetition Global Resolution Efforts and Prepetition Claims Against
      the BSA...............................................................................................................49
B.    The Impact of Statutes-of-Limitation Changes on Claims against the BSA and
      Non-Debtor Stakeholders...................................................................................51

ARTICLE V. THE CHAPTER 11 CASES .........................................................................52

A.    Commencement of the Cases and First Day Relief .............................................52
B.    Procedural Motions............................................................................................53
C.    Critical Vendors and Shared Services.................................................................53
D.    Retention of Chapter 11 Professionals...............................................................53
E.    Appointment of Fee Examiner............................................................................54
F.    Appointment of Statutory Committees, Ad Hoc Committee, and Future
      Claimants' Representative ..................................................................................55
G.    Filing of Schedules of Assets and Liabilities and Statements of Financial Affairs......57
H.    Exclusivity .........................................................................................................57
I.    Removal .............................................................................................................58
J.    Preliminary Injunction .......................................................................................59
K.    Mediation ...........................................................................................................61
L.    Evaluation of Estate Assets................................................................................63
M.    Bar Dates and Body of Claims...........................................................................64
N.    Valuation of Abuse Claims.................................................................................70
O.    Assumption and Rejection of Unexpired Leases and Executory Contracts .................75
P.    Stay Relief Matters ............................................................................................75
Q.    Other Litigation..................................................................................................76
R.    Material Settlements and Resolutions.................................................................82
S.    Other Relevant Filings & Hearings.....................................................................89

ARTICLE VI. OVERVIEW OF THE PLAN ........................................................................91

A.    General ..........................................................................................................91
B.    Distributions ..................................................................................................91
C.    Treatment of Unclassified Claims .................................................................91
D.    Classification of Claims and Interests Summary ..........................................94
E.    Treatment of Claims and Interests ................................................................97
F.    Elimination of Vacant Classes ....................................................................105
G.    Cramdown.....................................................................................................105
H.    Means for Implementation of the Plan.........................................................105
I.    Vesting of Assets in the Reorganized BSA .................................................118
J.    Retention of Certain Causes of Action ........................................................119
K.    Workers' Compensation Programs ...............................................................119
L.    Treatment of Executory Contracts and Unexpired Leases ..........................119
M.    Provisions Governing Distributions.............................................................124
N.    Procedures for Resolving Contingent, Unliquidated, and Disputed Claims..............128
O.    Discharges, Channeling Injunction, Releases, Exculpations and Injunctions;
      Survival of Indemnification and Exculpation Obligations ..........................131
P.    Reservation of Rights....................................................................................141
Q.    Disallowed Claims ........................................................................................141
R.    Indemnities....................................................................................................141
S.    The Official Committees and the Future Claimants' Representative ...........142
T.    Retention of Jurisdiction ..............................................................................143
U.    Miscellaneous Provisions..............................................................................146

ARTICLE VII. THE SETTLEMENT TRUST AND TRUST DISTRIBUTION
      PROCEDURES..............................................................................................151

A.    The Settlement Trust......................................................................................151
B.    Trust Distribution Procedures under the Global Resolution Plan................160
C.    Trust Distribution Procedures under the BSA Toggle Plan..........................177

ARTICLE VIII. SOLICITATION PROCEDURES AND REQUIREMENTS ....................196

A.    Voting Summary and Deadline.....................................................................196
B.    Solicitation Procedures .................................................................................198
C.    Classes Entitled to Vote on the Plan ............................................................202
D.    Certain Factors to Be Considered Prior to Voting .......................................205

ARTICLE IX. CONFIRMATION PROCEDURES.............................................................206

A.    Hearing on Plan Confirmation .....................................................................206
B.    Requirements for Confirmation of the Plan..................................................206
C.    Acceptance by an Impaired Class .................................................................206
D.    Best Interests of Creditors / Liquidation Analysis.......................................207
E.    Feasibility......................................................................................................212
F.    Conditions Precedent to Confirmation of the Plan .......................................212
G.    Conditions Precedent to the Effective Date .................................................214
H.    Waiver of Conditions Precedent to the Effective Date ................................215
I.    Substantial Consummation of the Plan .........................................................215

J.      *Vacatur* of Confirmation Order; Non-Occurrence of Effective Date .........................216

ARTICLE X. RISK FACTORS.............................................................................................216

A.      Risks Relating to the Debtors' Operations, Financial Condition and Certain
        Bankruptcy Law Considerations..................................................................................216
B.      Additional Factors......................................................................................................226

ARTICLE XI. CERTAIN UNITED STATES FEDERAL INCOME TAX
        CONSEQUENCES OF THE PLAN..........................................................................227

A.      The Settlement Trust..................................................................................................228
B.      Holders of Claims ......................................................................................................229
C.      Holders that are Non-United States Persons................................................................231

ARTICLE XII. CONCLUSION AND RECOMMENDATION ............................................231

## **Table of Exhibits**

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Liquidation Analysis

EXHIBIT C    Financial Projections Analysis

EXHIBIT D    Abuse Claims List Composite

## ARTICLE I. IMPORTANT DATES[23]

| Event[4] | Date |
|---|---|
| Disclosure Statement Objection Deadline | May 6, 2021 at 4:00 p.m. (Eastern Time) |
| Disclosure Statement Hearing | May 19, 2021 |
| Voting Record Date | May 19, 2021 |
| Deadline to Mail Solicitation Packages and Related Notices | June 2, 2021 |
| Rule 3018(a) Motion Deadline | June 17, 2021 |
| Deadline to File Plan Supplement | July 16, 2021 |
| Voting Resolution Event Deadline | July 30, 2021 or as otherwise ordered by the Court |
| Voting Deadline | July 30, 2021 at 4:00 p.m. (Eastern Time) |
| Plan Objection Deadline | July 30, 2021 at 4:00 p.m. (Eastern Time) |
| Deadline to File Voting Report | August 16, 2021 |
| Confirmation Brief/Reply Deadline | August 16, 2021 |
| Confirmation Hearing | August 30, 2021 at 10:00 a.m. (Eastern Time) |

---

[2]  Certain of these proposed dates are subject to the Bankruptcy Court's availability.

[3]  The Debtors intend to file a motion seeking to establish a timeline and protocol for discovery related to estimation of Direct Abuse Claims in connection with Confirmation of the Plan. The dates requested in such motion shall thereafter be incorporated herein.

[4]  Capitalized terms used in this summary of "Important Dates" and not otherwise defined herein or in the Plan shall have the meaning ascribed to them in the Solicitation Procedures Motion (as defined below).

## **DISCLAIMER**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING VOTES TO ACCEPT, AND OBTAINING CONFIRMATION OF, THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE.

ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS ATTACHED EXHIBITS, INCLUDING THE PLAN, IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS AND SCHEDULES ATTACHED TO THE PLAN, AND DOCUMENTS INCLUDED IN THE PLAN SUPPLEMENT, WHICH CONTROL OVER THE DISCLOSURE STATEMENT IN THE EVENT OF ANY INCONSISTENCY OR INCOMPLETENESS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THIS DATE. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, BY ORDER OF THE BANKRUPTCY COURT OR IN ACCORDANCE WITH APPLICABLE LAW.

ANY STATEMENTS IN THIS DISCLOSURE STATEMENT CONCERNING THE PROVISIONS OF ANY DOCUMENT ARE NOT NECESSARILY COMPLETE, AND IN EACH INSTANCE REFERENCE IS MADE TO SUCH DOCUMENT FOR THE FULL TEXT THEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE BANKRUPTCY RULES AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.

PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT AND ANY DOCUMENTS APPROVED AS A PART OF THE SOLICITATION PACKAGE ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. NO SOLICITATION OF VOTES MAY BE MADE UNTIL THE BANKRUPTCY COURT HAS APPROVED THIS DISCLOSURE STATEMENT AND THE DEBTORS HAVE DISTRIBUTED THIS DISCLOSURE STATEMENT IN ACCORDANCE WITH THE SOLICITATION PROCEDURES. NO PERSON HAS BEEN AUTHORIZED TO

DISTRIBUTE ANY INFORMATION CONCERNING THE PLAN OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS.

THE DEBTORS' MANAGEMENT, WITH THE ASSISTANCE OF THE DEBTORS' FINANCIAL ADVISORS, PREPARED THE FINANCIAL PROJECTIONS APPENDED TO THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE PRESENTED THESE PROJECTIONS WITH NUMERICAL SPECIFICITY, THEY HAVE NECESSARILY BASED THE PROJECTIONS ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, ALTHOUGH CONSIDERED REASONABLE BY SENIOR LEADERSHIP OF THE DEBTORS AT THE TIME OF PREPARATION, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT OPERATIONAL, ECONOMIC, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE DEBTORS' OR REORGANIZED BSA'S CONTROL. THE DEBTORS CAUTION THAT THEY CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE DEBTORS' OR REORGANIZED BSA'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY DIFFER FROM ANY ASSUMED FACTS AND CIRCUMSTANCES. ALTERNATIVELY, ANY EVENTS AND CIRCUMSTANCES THAT COME TO PASS MAY WELL HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS. THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT," AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES, AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED IN ARTICLE X, "RISK FACTORS." IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. THE DEBTORS AND THE REORGANIZED BSA DO NOT UNDERTAKE ANY OBLIGATION TO PUBLICLY UPDATE OR REVISE ANY FORWARD- LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES. THE

HISTORICAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN OBTAINED FROM SUCH REPORTS AND OTHER SOURCES OF INFORMATION AS ARE AVAILABLE TO THE DEBTORS.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN FURTHERANCE OF A SETTLEMENT OF SUCH CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS.    THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING, NOR SHALL THIS DISCLOSURE STATEMENT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS OR REORGANIZED BSA.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

## ARTICLE II.  INTRODUCTION

A.    <u>Background</u>

This Disclosure Statement is being furnished by the Debtors in connection with the *Proposed Amendments to Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* (as such may be amended, altered, modified or supplemented from time to time, the "<u>Plan</u>"), dated May 16, 2021, pursuant to section 1125 of the Bankruptcy Code, and in connection with the solicitation of votes to accept or reject the Plan.

The Plan provides for two paths to reorganize the Debtors. The first plan of reorganization is a "Global Resolution Plan," which provides the framework for global resolution of Abuse Claims against the Debtors, Local Councils, Contributing Chartered Organizations, and Settling Insurance Companies, in exchange for contributions by such parties to the Settlement Trust for the benefit of Abuse victims, including the contribution of substantial insurance assets.  The Global Resolution Plan has been designed to maximize and expedite recoveries to Abuse victims.  The Debtors strongly encourage all holders of Direct Abuse Claims to vote in favor of the Global Resolution Plan.

If the holders of Abuse Claims do not provide a sufficient number of votes to accept the Plan (or the Bankruptcy Court otherwise finds that the Global Resolution Plan is not confirmable), the Debtors will be required to seek confirmation of the back-up to the Global Resolution Plan, a "BSA Toggle Plan."  The Debtors believe the BSA Toggle Plan provides for the resolution of Abuse Claims and other Claims against <u>only</u> the Debtors, thereby reducing the potential recoveries under the Plan for the holders of Direct Abuse Claims from as much as 100% of their Claims under the Global Resolution Plan to as little as 1% of their Claims. Holders of Direct Abuse Claims must provide a sufficient number of votes in favor of the Plan in order to ensure they will receive the treatment afforded by the Global Resolution Plan and not the treatment provided in the default BSA Toggle Plan.

If the conditions set forth in the Plan are not met and (a) the Plan has not been accepted by a sufficient number of voters holding Direct Abuse Claims (as determined by the Debtors in their sole discretion), or (b) the Bankruptcy Court declines to approve the provisions of the Plan relating to the Abuse Claims Settlement, then the Plan will constitute a BSA Toggle Plan.

A copy of the Plan is attached as **<u>Exhibit A</u>**.  The rules of interpretation set forth in <u>Article I.B</u> of the Plan govern the interpretation of this Disclosure Statement. **Please note that if any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern in all respects.**

The BSA's charitable mission is to prepare young people for life by instilling in them the values of the Scout Oath and Law and encouraging them to be trustworthy, kind, friendly and helpful.  The BSA also trains young men and women in responsible citizenship, character development, and self-reliance through participation in a wide range of outdoor activities, educational programs, and, at older ages, career-oriented programs in partnership with community organizations.

Since its inception more than 110 years ago, more than 130 million young men and women have participated in the BSA's youth programs.  More than 35 million adult volunteers have helped carry out the BSA's mission.[5]  The BSA's alumni are legion among our nation's business, political, and cultural leaders.  Their legacy is the creation and support of Scouting units in virtually every corner of America and at U.S. military bases worldwide.  Today, the BSA remains one of the largest youth organizations in the United States and one of the largest Scouting organizations in the world, with approximately 1.1 million registered youth participants and approximately 400,000 adult volunteers.

The BSA welcomes all young men and women, regardless of gender, race, ethnic background, sexual orientation, disability, or gender identification, who are willing to accept Scouting's values and meet the other requirements of membership.  A Scout subscribes to the following oath: "On my honor I will do my best to do my duty to God and my country and to obey the Scout Law; to help other people at all times; to keep myself physically strong, mentally awake, and morally straight."[6]  Scouts are expected to conduct themselves in accordance with the Scout Law: to be "trustworthy, loyal, helpful, friendly, courteous, kind, obedient, cheerful, thrifty, brave, clean, and reverent."[7]

The BSA cares deeply about all victims of child abuse.  The BSA understands that no apology can repair damage caused by abuse or take away pain that victims have endured.  The BSA is steadfast in its commitment to continually improve all of its policies to prevent abuse.

This Disclosure Statement is being transmitted in order to provide adequate information to enable holders of Claims in Class 3A (2010 Credit Facility Claims), Class 3B (2019 RCF Claims), Class 4A (2010 Bond Claims), Class 4B (2012 Bond Claims), Class 5 (Convenience Claims), Class 6 (General Unsecured Claims), Class 7 (Non-Abuse Litigation Claims), Class 8 (Direct Abuse Claims), and Class 9 (Indirect Abuse Claims), which Claims in such Classes are Impaired and entitled to vote on the Plan, to make an informed judgment in exercising their right to vote to accept or reject the Plan.

As set forth above, on the Effective Date, liability for all Abuse Claims, including Direct and Indirect Abuse Claims, shall be channeled to and assumed by the Settlement Trust.  As set forth in greater detail in <u>Article VII</u> of this Disclosure Statement, the purposes of the Settlement Trust shall be to: (i) assume exclusive responsibility for all Abuse Claims; (ii) preserve, hold, manage, and maximize the assets of the Settlement Trust; and (iii) direct the processing, liquidating, and payment of all compensable Abuse Claims in accordance with the Settlement Trust Documents.  The Debtors will demonstrate at the Confirmation Hearing that the Settlement Trust will resolve Abuse Claims in accordance with the Settlement Trust Documents in such a way that holders of Abuse Claims are treated fairly and equitably in light of the finite assets available to satisfy such Claims, and otherwise comply in all respects with the requirements of the Bankruptcy Code.

---

[5]   *See* BSA, *About the BSA*, https://www.scouting.org/about/.

[6]   *Id.*

[7]   *Id.*

By order dated [●], 2021, the Bankruptcy Court approved this Disclosure Statement in accordance with section 1125 of the Bankruptcy Code and found that it contained "adequate information" sufficient to enable a hypothetical Claim holder to make an informed judgment about the Plan, and authorized its use in connection with the solicitation of votes with respect to the Plan.  Approval of this Disclosure Statement does not, however, constitute a determination by the Bankruptcy Court as to the accuracy or completeness of the information contained herein nor an endorsement by the Bankruptcy Court as to the fairness or merits of the Plan.  No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.

As described above, the Plan provides for a Global Resolution Plan with a default BSA Toggle Plan if the Class of Direct Abuse Claimants does not provide a sufficient number of votes in favor of the Plan or the Bankruptcy Court otherwise concludes that the Global Resolution Plan is not confirmable.  As explained in <u>Article VI.G</u> of this Disclosure Statement, even if the Plan has not been accepted by the Class 8 holders of Direct Abuse Claims, the Debtors will seek confirmation of the BSA Toggle Plan in accordance with section 1129(b) of the Bankruptcy Code.

**<u>The Global Resolution Plan</u>**

To continue the BSA's long tradition of Scouting, and maximize distributions to holders of Direct Abuse Claims, the Debtors seek approval of a plan of reorganization under chapter 11 of the Bankruptcy Code that the Debtors believe provides a framework for a global resolution, which, if confirmed and consummated, will allow the Debtors, as Reorganized BSA, to emerge from bankruptcy, having fulfilled their dual restructuring goals of (a) providing an equitable, streamlined, and certain process by which survivors of Abuse (the "<u>Abuse Survivors</u>") may obtain compensation for Abuse and (b) ensuring that Reorganized BSA has the ability to continue its vital charitable mission.

The BSA's charitable mission of Scouting is supported by certain Entities that are not Debtors in these Chapter 11 Cases, including the Local Councils and the Chartered Organizations.  As described in this Disclosure Statement, the Local Councils serve geographic areas of varying size across the United States and facilitate the delivery of the Scouting program at the local level.  Chartered Organizations are typically local organizations—such as faith-based institutions, clubs, civic associations, educational institutions, businesses, and groups of citizens—that sponsor local Scouting units.  To continue the mission of Scouting through these non-Debtors, the proposed Global Resolution Plan provides for the settlement of Abuse Claims against the BSA, Local Councils, Contributing Chartered Organizations and Settling Insurance Companies by "channeling" all such Claims to the Settlement Trust, which shall have the exclusive responsibility for processing, liquidating and paying Abuse Claims.  To obtain the benefits of the Channeling Injunction, Local Councils, Contributing Chartered Organizations, and Settling Insurance Companies will make substantial financial and/or insurance contributions to the Settlement Trust.

The Debtors believe these contributions to the Settlement Trust, along with the BSA's contributions, will be used to fund significant recoveries for holders of compensable Direct Abuse Claims in accordance with the terms of the Trust Distribution Procedures.  The Trust

Distribution Procedures will establish the methodology for resolution of Abuse Claims, establish the process by which Abuse Claims will be reviewed by the Settlement Trust, and will specify liquidated values for compensable Claims based on the nature of the underlying Abuse.

As detailed further herein, the Debtors believe the distributions to holders of Direct Abuse Claims are substantially greater under the Global Resolution Plan.  In order to ensure holders of Direct Abuse Claims receive this greater recovery, holders of Direct Abuse Claims as a Class must provide a sufficient number of votes in favor of the Plan.

### The BSA Toggle Plan

By contrast, the BSA Toggle Plan does not provide for the resolution of Abuse Claims against Local Councils and Contributing Chartered Organizations.  Specifically, unlike the Global Resolution Plan, the BSA Toggle Plan does not "channel" Abuse Claims against the Local Councils and the Contributing Chartered Organizations (along with Abuse Claims against the BSA) to a Settlement Trust.  Instead, the BSA Toggle Plan provides a process by which Abuse Survivors may obtain compensation for Abuse from the BSA only.  Confirmation of the BSA Toggle Plan, as opposed to the Global Resolution Plan, forces Abuse Survivors to seek compensation on account of their Claims against Local Councils and Chartered Organizations by filing independent lawsuits in the tort system against such entities.  The Debtors believe this will necessarily entail lengthy, complicated litigation.  Unlike the current Chapter 11 Cases, where Abuse Survivors will receive equitable, consistent treatment through one, consolidated process, if the Plan defaults to the BSA Toggle Plan, Abuse Survivors will be competing for judgments and settlements against Local Councils and Chartered Organizations in multiple venues, resulting in a "rush to the courthouse."  Moreover, the Debtors believe the delays and uncertainties inherent in such a scenario, as well as the more limited contributions that will be made to the Settlement Trust in these Chapter 11 Cases, will likely produce inferior outcomes and recoveries for Abuse Survivors than would be achieved under the Global Resolution Plan.

Indeed, without the ability of the Local Councils and Contributing Chartered Organizations to contribute assets to the Settlement Trust, the Debtors believe the Settlement Trust will necessarily have substantially fewer assets to distribute to Abuse Survivors. Additionally, under the BSA Toggle Plan, the BSA is only assigning its own rights and interests to the Insurance Policies to the Settlement Trust, thereby making liquidation of the Insurance Policies more difficult.  Additionally, Insurance Companies will not agree to settle piecemeal litigation under the BSA Toggle Plan as opposed to entering into a final global resolution with respect to their policies under the Global Resolution Plan.

Moreover, Local Councils will likely face multiple litigations on account of Abuse Claims that are no longer stayed.  Many Local Councils will not have the financial wherewithal or capacity to address numerous litigation claims individually and may choose to file chapter 11 or chapter 7 bankruptcy petitions.  This could result in numerous bankruptcy cases across the country, which will significantly impair the ability of any holder of Direct Abuse Claims to receive a recovery from these Local Councils.

As a result, holders of Direct Abuse Claims are strongly encouraged by the Debtors to vote in favor of the Plan in order to ensure that the Plan does not default to the BSA Toggle Plan.

**As set forth above, on the Effective Date, liability for all Abuse Claims, including Indirect Abuse Claims, shall be channeled to and assumed by the Settlement Trust.  As set forth in greater detail in Article VII of this Disclosure Statement, the purposes of the Settlement Trust shall be to: (i) assume exclusive responsibility for all Abuse Claims; (ii) preserve, hold, manage, and maximize the assets of the Settlement Trust; and (iii) direct the processing, liquidating, and payment of all compensable Abuse Claims in accordance with the Settlement Trust Documents.  The Debtors will demonstrate at the Confirmation Hearing that the Settlement Trust will resolve Abuse Claims in accordance with the Settlement Trust Documents in such a way that holders of Abuse Claims are treated fairly, equitably, and reasonably in light of the finite assets available to satisfy such Claims, and otherwise comply in all respects with the requirements of the Bankruptcy Code.**

The difference between the release in Article X.J.4 of the Plan and the Channeling Injunction in Article X.J.3 of the Plan is that the release in Article X.J.4 of the Plan is consensual while the Channeling Injunction is non-consensual.  Specifically, the parties that vote against the Plan or abstain from voting to accept or reject the Plan may opt out of the releases in Article X.J.4 of the Plan.  Additionally, holders of Unimpaired Claims are deemed to grant the releases in Article X.J.4 of the Plan unless they object to the releases. In contrast, the Channeling Injunction, which benefits not only the BSA, but also the Local Councils, Contributing Chartered Organizations, and Settling Insurance Companies in the case of the Global Resolution Plan, will apply regardless of consent only if the Court finds, after evaluating certain factors, that such non-debtor third parties made a substantial contribution of assets to the Reorganized BSA and/or Settlement Trust.  That determination will be made at confirmation.

The Channeling Injunction is necessary to channel Abuse Claims to the Settlement Trust, creating a swift and efficient means to liquidate valid Abuse Claims pursuant to the Trust Distribution Procedures, while at the same time ensuring that the Reorganized BSA can continue to carry out its charitable mission.  The breadth of the Channeling Injunction will vary depending on whether the Plan is confirmed as a Global Resolution Plan or a BSA Toggle Plan and who is being released.  If the Plan is confirmed as a Global Resolution Plan, the Channeling Injunction and related non-consensual third-party releases as crafted are necessary to effect a meaningful and final resolution of Abuse Claims that will benefit holders of such claims.

The Channeling Injunction only applies to Abuse Claims, while the release in Article X.J.4 of the Plan applies to all Claims.  The Channeling Injunction does not mean that an Abuse Claim is being enjoined or extinguished.  Rather, the Abuse Claims are being channeled to the Settlement Trust, and will be reviewed and paid pursuant to the Trust Distribution Procedures.

By order dated [●], 2021, the Bankruptcy Court approved this Disclosure Statement in accordance with section 1125 of the Bankruptcy Code and found that it contained "adequate information" sufficient to enable a hypothetical investor of the relevant Class to make an informed judgment about the Plan, and authorized its use in connection with the solicitation of votes with respect to the Plan.  **Approval of this Disclosure Statement does not, however, constitute a determination by the Bankruptcy Court as to the accuracy or completeness of the information contained herein nor an endorsement by the Bankruptcy Court as to the fairness or merits of the Plan.**  No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.

B.    <u>Voting and Confirmation</u>

**<u>Article VIII</u> of this Disclosure Statement specifies the deadlines, procedures, and instructions for voting to accept or reject the Plan, as well as the applicable standards for tabulating ballots and master ballots, used in voting on the Plan (each, generally referred to herein as a "<u>Ballot</u>").  The following is an overview of certain information related to voting that is contained in <u>Article VIII</u> of this Disclosure Statement and elsewhere in this Disclosure Statement.**

Each holder of a Claim in Classes 3A, 3B, 4A, 4B, 5, 6, 7, 8, and 9 is entitled to vote to accept or reject the Plan.  Each Class of Claims entitled to vote shall have accepted the Plan pursuant to the requirements of section 1126(c) of the Bankruptcy Code if at least two-thirds (2/3) in amount and more than one-half (1/2) in number of those voting in each such Class voted to accept the Plan.  Assuming the requisite acceptances are obtained, the Debtors intend to seek Confirmation of the Plan at the Confirmation Hearing scheduled for August 30, 2021, at 10:00 a.m. (prevailing Eastern Time) before the Bankruptcy Court.  The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the Entities who have filed an objection to the Plan, if any, without further notice to parties in interest.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.  Any objection or response to Confirmation of the Plan must: (i) be in writing; (ii) state the name and address of the objecting party and the nature and amount of the Claim of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Plan and include any evidentiary support therefor; and (iv) be filed with the Bankruptcy Court, 824 North Market Street, Third Floor, Wilmington, Delaware 19801 together with proof of service **on or before <u>July 30, 2021 at 4:00 p.m. (Eastern Time)</u>** (the "<u>Plan Objection Deadline</u>"), and served on the Debtors and certain other parties in interest in accordance with the Solicitation Procedures Order (defined below) so that they are received on or before the Plan Objection Deadline.

The Debtors have engaged Omni Agent Solutions (the "<u>Solicitation Agent</u>" or "<u>Notice and Claims Agent</u>") to assist in the voting process.

The Solicitation Agent will provide additional copies of all materials and will process and tabulate the Ballots, as defined in the *Debtors' Motion for Order (I) Approving the Disclosure Statement and the Form and Manner of Notice, (II) Approving Plan Solicitation and Voting Procedures, (III) Approving Forms of Ballots, (IV) Approving Form, Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting Related Relief* [D.I. 2295] (the "<u>Solicitation Procedures Motion</u>"), filed on March 2, 2021, for Classes 3A, 3B, 4A, 4B, 5, 6, 7, 8, and 9, as applicable.  You may obtain these documents from the Solicitation Agent free of

charge by: (a) calling the Debtors' toll-free restructuring hotline at (866) 907-2721, (b) visiting the Debtors' restructuring website at https://omniagentsolutions.com/bsa, (c) writing to Boy Scouts of America, c/o Omni Agent Solutions, 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367, or (d) emailing BSAballots@omniagnt.com.  You may also access from these materials for a fee via PACER at http://www.deb.uscourts.gov/.

**As further described in the Solicitation Procedures (as defined in the Solicitation Procedures Motion), to be counted, your Ballot indicating acceptance or rejection of the Plan must be received by the Solicitation Agent no later than 4:00 p.m. (prevailing Eastern Time) on July 30, 2021 (the "Voting Deadline"),** unless the Debtors, in their sole discretion, extend the period during which votes will be accepted on the Plan, in which case the term "Voting Deadline" shall mean the last date on, and time by which, such period is extended.  Any executed Ballot that does not indicate either an acceptance or rejection of the Plan or indicates both an acceptance and rejection of the Plan will not be counted as an acceptance or rejection and will not count toward the tabulations required pursuant to either section 1129 of the Bankruptcy Code.

Prior to deciding whether and how to vote on the Plan, each holder of a Claim entitled to vote should consider carefully all of the information in this Disclosure Statement, including Article X entitled "Risk Factors."  **Each holder of a Claim entitled to vote on the Plan should review this Disclosure Statement and the Plan and all Exhibits hereto and thereto before casting a Ballot.  This Disclosure Statement contains a summary of certain provisions of the Plan and certain other documents and financial information.  The Debtors believe that these summaries are fair and accurate as of the date hereof and provide adequate information with respect to the documents summarized; however, such summaries are qualified to the extent that they do not set forth the entire text of those documents and as otherwise provided herein.**

**The Plan contains the proposed Abuse Claims Settlement, which, if the Plan is confirmed as a Global Resolution Plan, would provide for substantial contributions to the Settlement Trust by the Debtors, Local Councils, Contributing Chartered Organizations, and Settling Insurance Companies, if any, in exchange for the treatment of the foregoing Entities as Protected Parties under the Channeling Injunction.  The Abuse Claims Settlement is intended to provide for the fair and equitable resolution of Abuse Claims.**

**Alternatively, if it is confirmed as a BSA Toggle Plan, the Plan would provide for limited contributions to the Settlement Trust only by the Debtors from their few remaining unencumbered assets in exchange for the treatment of the Debtors and Reorganized BSA as Protected Parties under the Channeling Injunction.**

**The Plan also incorporates the JPM / Creditors' Committee Settlement, which, subject to its terms and the effectiveness of the Plan, resolves all issues and objections that could be asserted by the Creditors' Committee with respect to confirmation of the Plan and prospective lien challenges, claims or causes of action that might be brought by the Creditors' Committee by or on behalf of the Debtors' Estates.  As described more fully below and set forth in the Plan, the JPM / Creditors' Committee Settlement contemplates distributions to holders of Allowed Convenience Claims, Allowed General Unsecured**

**Claims, and Allowed Non-Abuse Litigation Claims.  The JPM / Creditors' Committee Settlement also contemplates the Allowance of JPM's Claims by amending and restating the Prepetition Debt and Security Documents in the manner described in the Plan.**

> **THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.  THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE HIGHEST AND BEST RECOVERY FOR ALL CREDITORS AND IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES.**

C.    Overview of the Plan[8]

The Debtors commenced these Chapter 11 Cases in order to address the significant potential liabilities arising from Claims related to historical acts of Abuse in the BSA's programs.  As discussed above, the stated purpose of the Chapter 11 Cases is to confirm a plan of reorganization that (a) timely and equitably compensates survivors of Abuse in Scouting and (b) ensures that the BSA emerges from bankruptcy with the ability to continue its vital charitable mission.  Through the Plan, the Debtors propose a Global Resolution Plan.  This Global Resolution Plan defaults to a BSA Toggle Plan if the Class of Direct Abuse Claims does not provide a sufficient number of votes in favor of the Plan or the Bankruptcy Court otherwise determines that the Global Resolution Plan is not confirmable.  While the Debtors believe that either of these scenarios would accomplish the Debtors' goals to some extent, the Debtors submit that the Global Resolution Plan better realizes these goals and offers a far more favorable treatment to holders of Abuse Claims.  The Global Resolution Plan contemplates a global settlement between the BSA, Reorganized BSA, the Local Councils, Contributing Chartered Organizations, and Settling Insurance Companies, and involves additional contributions from those parties to the Settlement Trust.  By contrast, as its name implies, the BSA Toggle Plan contemplates a resolution with (and contributions to the Settlement Trust from) only the BSA and the Reorganized BSA, forcing claimants to chase after Local Councils and Chartered Organizations in costly and time consuming litigation in the tort system.  Additionally, the Global Resolution Plan ensures that Scouting will continue in its current form serving approximately 1 million youth members.  The BSA Toggle Plan, however, could lead to massive litigation of Abuse Claims against the Local Councils, which would siphon off resources from performing the mission and may force additional chapter 11 or chapter 7 proceedings for those Local Councils.  The Coalition disagrees and does not believe that the Global Resolution Plan will timely or equitably compensate survivors of Abuse in Scouting.

While both alternatives channel Abuse Claims to the Settlement Trust, there are significant differences.  The Global Resolution Plan provides a mechanism to channel the Abuse Claims asserted against the Debtors, Local Councils and Contributing Chartered Organizations to the Settlement Trust established under section 105(a) of the Bankruptcy Code in accordance with Article X.F of the Plan.  In exchange for the Channeling Injunction, these parties will make significant contributions to the Settlement Trust including the BSA Settlement Trust

---

[8]    **This overview is qualified in its entirety by reference to the Plan**. The treatment of Claims and Interests under the Plan is not intended to, and will not, waive, compromise, or limit any rights, Claims, or Causes of Action if the Plan is not confirmed.  You should read the Plan in its entirety before voting to accept or reject the Plan.

Contribution, the Local Council Settlement Trust Contribution, and the Contributing Chartered Organization Contribution. These contributions include rights to substantial insurance assets.

While the BSA Toggle Plan similarly provides a mechanism to channel the Abuse Claims to the Settlement Trust, it only channels Abuse Claims asserted against the BSA. As a result, the contributions to be made by the Local Councils and Contributing Chartered Organizations, including the ability to access substantial insurance assets, will not be made, and the holders of Abuse Claims will receive only a *de minimis* recovery from the Debtors' few assets and potential and uncertain value of BSA's rights to insurance policies.

In either scenario, the assets contributed to the Settlement Trust will be administered by the Settlement Trustee and used to resolve Abuse Claims in accordance with the Settlement Trust Documents, including the Settlement Trust Agreement and the Trust Distribution Procedures. The Trust Distribution Procedures will specify the methodology for processing, liquidating, and paying Abuse Claims.

**Thus, the Plan provides two alternative scenarios for the Debtors. If the conditions set forth in the Plan are met, including that holders of Class 8 Abuse Claims vote in favor of the Plan in a sufficient number, the Plan shall constitute a Global Resolution Plan and shall provide for the global resolution of Abuse Claims against the Debtors, Local Councils, Contributing Chartered Organizations, and Settling Insurance Companies. If the conditions set forth in the Plan are not met, including that holders of Class 8 Direct Abuse Claims do not provide a sufficient number of votes in favor of the Plan, the Plan shall constitute a BSA Toggle Plan and shall provide for the resolution of Abuse Claims and other Claims only against the Debtors. Holders of Class 8 Abuse Claims must provide a sufficient number of votes in favor of the Plan to receive what the Debtors believe are the substantial recoveries provided for under the Global Resolution Plan.**

As further discussed in this Disclosure Statement, the BSA has been engaged in good-faith, arm's-length negotiations with its key stakeholders to submit the global settlement proposal embodied in the Global Resolution Plan. These negotiations were conducted in the context of a formal mediation with the assistance of three highly qualified Mediators appointed by the Bankruptcy Court. Although the Debtors have not reached agreements with the Mediation Parties (other than JPM and the Creditors' Committee), the Debtors will continue to work with the Mediation Parties and the Mediators in an effort to reach a resolution of these Chapter 11 Cases.

Generally, the features of settlements contemplated under both the Global Resolution Plan and the BSA Toggle Plan are as follows:

- A proposed settlement by and among the BSA, JPM (the BSA's senior Secured lender), and the Creditors' Committee, under which JPM has agreed that, in full and final satisfaction of its Allowed Claims and in exchange for the Creditors' Committee's agreement not to pursue certain alleged estate causes of action, it shall enter into the Restated Debt and Security Documents as of the Effective Date. The Restated Debt and Security Documents will contain terms that are substantially similar to the Prepetition Debt and Security Documents except that, among certain other modifications, the

maturity dates under the Restated Debt and Security Documents shall be the date that is ten (10) years after the Effective Date and principal under the Restated Debt and Security Documents shall be payable in installments beginning on the date that is two (2) years after the Effective Date;

- The proposed settlement referenced above provides for the BSA's assumption of its prepetition Pension Plan and satisfaction of Allowed Convenience Claims, Allowed General Unsecured Claims and Allowed Non-Abuse Litigation Claims, which are held by creditors who are core to the Debtors' charitable mission or whose Allowed Claims were incurred in furtherance of the Debtors' charitable mission;

- A term loan from the National Boy Scouts of America Foundation (as defined in the Plan, the "Foundation"), in the principal amount of $42.8 million, which will be used by Reorganized BSA for working capital and general corporate purposes. This Foundation Loan will permit the Debtors to contribute to the Settlement Trust a substantial amount of consideration in Cash on the Effective Date; and

- The BSA will contribute to the Settlement Trust, among other things, (a) Net Unrestricted Cash and Investments; (b) the BSA's right, title and interest in and to (i) Scouting University, (ii) the Artwork, (iii) the Oil and Gas Interests, (iv) the Warehouse and Distribution Center (the value of which is subject to the Leaseback Requirement); (c) certain of the Debtors' rights under applicable insurance; (d) the Settlement Trust Causes of Action; and (e) the assignment of any and all Perpetrator Indemnification Claims held by the BSA.

| **BSA Settlement Trust Contribution** | **Source** | **Estimated Amount** |
|---|---|---|
| Net Unrestricted Cash and Investments[9][10] | Cash | $39.9 million |
| Warehouse and Distribution Center[11][12] | Real Property | $11.6 million |
| Scouting University | Real Property | $1.8 million |
| Artwork | Asset | $59.0 million |
| Oil and Gas Interests | Asset | $7.6 million |
| **Total Estimated BSA Settlement Trust Contribution[13]** | | **$119.9 million** |

[9] Reflects Unrestricted Cash and Investments on the Effective Date, after giving effect to the Foundation Loan of $42.8 million, above $75 million less the JPM Exit Fee, Allowed Administrative Expense Claims, Professional Fee Reserve, Creditor Representative Fee Cap, and Allowed priority, Secured, and Convenience Claims. The Debtors believe that pursuing potential avoidance actions under the Bankruptcy Code, including potential preference or fraudulent transfer actions, would not yield a net return.

[10] Represents estimated trust contribution assuming an August 31, 2021 Effective Date per the financial projections in the Disclosure Statement. The actual Cash trust contribution is uncertain and subject various risks, including timing of emergence, amount of professional fees incurred, and performance of the organization through the Effective Date.

[11] Estimated amounts for the Warehouse and Distribution Center, Scouting University, Artwork, and Oil and Gas Interests are based on a broker opinion of value from the Appraisers.

[12] Subject to Leaseback Requirement from the Settlement Trust.

[13] A delayed emergence will result in a reduction in Cash available to creditors due to increased professional fees and its impact on operations.

In addition to the features described above, the Global Resolution Plan also provides the following substantial benefits to the holders of Direct Abuse Claims:

- Local Councils will make a substantial contribution, which the Debtors are committed to ensuring is not less than $425,000,000, exclusive of insurance rights, to the Settlement Trust to resolve the Abuse Claims that may be asserted against them in exchange for being included as a Protected Party under the Global Resolution Plan and receiving the benefits of the Channeling Injunction;

- The assignment and transfer to the Settlement Trust of insurance rights of all of the BSA, Local Councils and Contributing Chartered Organizations under insurance policies of the Debtors, Local Councils and Contributing Chartered Organizations thereby providing the potential for substantial insurance recoveries to holders of Direct Abuse Claims;

- A mechanism by which Chartered Organizations can make substantial contributions to the Settlement Trust to resolve Abuse Claims that may be asserted against them in connection with Abuse that arose in connection with their sponsorship of one or more Scouting units in exchange for being included as a Protected Party under the Global Resolution Plan and receiving the benefits of the Channeling Injunction, thereby becoming "Contributing Chartered Organizations" under the Plan;

- A mechanism by which Insurance Companies may enter into Insurance Settlement Agreements and provide sum-certain contributions to the Settlement Trust in exchange for being included as a Protected Party under the Global Resolution Plan and receiving the benefits of the Channeling Injunction, thereby becoming "Settling Insurance Companies" under the Plan; and

- Hartford will make a contribution of up to $650 million to the Settlement Trust for the payment of Abuse Claims in exchange for the sale of the Hartford Policies to Hartford free and clear of the interests of all third parties, including any additional insureds under the Hartford Policies, which interests will be channeled to the Settlement Trust; being included as a Protected Party under the Global Resolution Plan; and receiving the benefits of the Channeling Injunction.

The Debtors anticipate that every Local Council will join and fully participate in the Debtors' Plan. The Debtors are fully committed to ensuring that the Local Councils contribute not less than a total of $425,000,000 to the Settlement. The Ad Hoc Committee of Local Councils has conducted its own diligence to assess the amount each Local Council can contribute to the Settlement Trust. The Debtors believe that it is feasible for the Local Councils to contribute at least a total of $425,000,000 to the Settlement Trust.

With respect to Chartered Organizations and Settling Insurance Companies, as of this filing, there is one Settling Insurance Company participating in the Plan and no Contributing Chartered Organizations. The Debtors are committed to working with both groups to increase participation and contributions to the Settlement Trust. When any Chartered Organization agrees

to a settlement, the Debtors will send a notice to all parties in interest stating the name of the Contributing Chartered Organization and the amount of their contribution. The Debtors will also notify all parties in interest of any additional Settling Insurance Companies.

The Debtors have compiled a list of all potential Protected Parties under the Plan, including the identities of all Local Councils, Chartered Organizations, and Insurance Companies. If the Plan is confirmed as a Global Resolution Plan, to the extent any such parties participate, they will be included in the definition of Protected Parties and will benefit from the Channeling Injunction. This list of potential Protected Parties will be made available at https://omniagentsolutions.com/bsa-SAballots and https://omniagentsolutions.com/bsa-ballots. **This list only includes *potential* Protected Parties for disclosure purposes—it does not mean that any such party will in fact become a Protected Party under the Plan.**

**As such, the Debtors are affirmatively seeking to reach further mediated settlements of disputed issues related to the structure of the Plan, the nature, timing and amount of contributions from the Debtors, Local Councils, Contributing Chartered Organizations and Settling Insurance Companies, and other matters, which may result in the amendment or modification of the Plan to propose additional settlements pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019. The Debtors believe that resolution of these controversies in advance of the Confirmation Hearing will facilitate the favorable resolution of these Chapter 11 Cases and maximize distributions to holders of Allowed Claims and Abuse Claims that will be satisfied by the Settlement Trust in accordance with the Trust Distribution Procedures.**

The following section of the Disclosure Statement provides a general overview of various important sections of the Plan with respect to both the Global Resolution Plan and BSA Toggle Plan and the proposed treatment of all holders of Claims against, and Interests in, the Debtors. For a more detailed description of the terms and provisions of the Plan, please refer to <u>Article VI</u> of this Disclosure Statement titled "Overview of the Plan." All information and statements contained in this Disclosure Statement, including this overview of the Plan, are qualified in their entirety by the Plan, the information, the financial statements, and all other documents accompanying the Plan.

### 1.    *The Settlement Trust*

On the Effective Date of the Plan, the Settlement Trust will be established for the benefit of holders of Abuse Claims. From and after the Effective Date, all Abuse Claims shall be channeled to the Settlement Trust, which will be funded by the Settlement Trust Assets. As further described in <u>Article VII</u> of this Disclosure Statement, the Settlement Trust will administer the Settlement Trust Assets and process, liquidate, and pay Abuse Claims in accordance with the Trust Distribution Procedures.

The purpose of the Settlement Trust is to assume liability for all Abuse Claims, to administer the Settlement Trust Assets, and to direct the processing, liquidation, and payment of all compensable Abuse Claims. The Settlement Trust will resolve Abuse Claims through the Trust Distribution Procedures, which are summarized in <u>Article VII</u> of this Disclosure Statement and attached to the Plan as Exhibit A. The Trust Distribution Procedures are designed to permit

the Settlement Trustee to provide substantially similar treatment to holders of legally valid and factually supported, similar Abuse Claims.

As further described in Article VII.B.1 of this Disclosure Statement, under the Global Resolution Plan, upon a proper election on the Ballot, a holder of a properly completed, non-duplicative Direct Abuse Claim may elect to receive an "Expedited Distribution" in the amount of $1,500 and avoid submitting materials to, and having his or her Abuse Claim analyzed and resolved by, the Settlement Trust. The Settlement Trust will pay such amounts on, or as reasonably practicable after, the Effective Date.  Only holders of valid non-duplicative Abuse Claims will be eligible to elect to receive the Expedited Distribution.  The Expedited Distribution does not apply if the Plan is confirmed as a BSA Toggle Plan; *provided, however*, the Settlement Trustee may create a similar expedited distribution option in a *de minimis* amount, if, after consultation with the STAC, the Settlement Trustee determines that creation of such an expedited liquidation process is warranted in order to simplify processing Abuse Claims.

If a holder of a Direct Abuse Claim does not properly elect to receive the Expedited Distribution (or any similar mechanism established by the Settlement Trustee in the case of the BSA Toggle Plan) and chooses to pursue recovery from the Settlement Trust through the Trust Distribution Procedures, he or she will submit a "Trust Claim Submission" to the Settlement Trust, pursuant to which the "Abuse Claimant" will submit a claim for determination of validity, insured status, and potential valuation by the Settlement Trustee.  The Settlement Trustee will evaluate each Trust Claim Submission.  If the Settlement Trustee determines that the evidence in the Trust Submission Claim meets certain validity requirements listed in Section 4.4 of the Global Resolution Plan TDP and Section 5.4 of the BSA Toggle Plan TDP, the Settlement Trustee will utilize the "Claims Matrix" and "Points Scaling Factors" described below in Article VII.B.3 of this Disclosure Statement and in the Trust Distribution Procedures to assign a point value to the Abuse Claim that will help determine the distribution amount for such Claim.

The Claims Matrix has five tiers of Abuse categories, based on the severity of the Abuse, with associated "Base Points" values and "Maximum Points" values.  Once an Abuse Claim is assigned to a tier in the Claims Matrix, the Settlement Trustee determines such Claim's points value by applying the Points Scaling Factors to the Base Points value in the applicable tier.  The Settlement Trustee determines the appropriate Points Scaling Factors based on aggravating or mitigating factors associated with the specific Abuse Claim.  Aggravating factors, which cause an increase in points, include the nature and circumstances of the Abuse, the abuser profile, and lasting impact of the Abuse on the Abuse survivor.  Mitigating factors, which cause a decrease in points, include the absence or attenuation of a Protected Party's responsibility for the Abuse, other awards or settlements received by the Abuse survivor on account of the Abuse, and lack or weakness of the evidence submitted to the Settlement Trust.  At most, an Abuse Claim can be assigned the Maximum Points value for the tier that is it in.  An Abuse Claim's ultimate cash value may vary upward (in the case of a larger-than-expected Settlement Trust corpus) or downward (in the case of a smaller-than-expected Settlement Trust corpus) from the Base Points and Maximum Points values in the Claims Matrix based on the Trust Corpus Scaling Factor determined by the Settlement Trustee.

Once the Abuse Claimant accepts the Settlement Trustee's "Proposed Claim Valuation" or the reconsideration process contemplated in Section 4.6 of the Global Resolution Plan TDP

and Section 5.6 of the BSA Toggle Plan TDP and potential tort system process described in <u>Article IX</u> of the Global Resolution Plan TDP and <u>Article X</u> of the BSA Toggle Plan TDP have been exhausted, as applicable, and the Abuse Claimant executes a release, the Abuse Claim becomes a "Settled Claim" eligible for payment pursuant to the terms and conditions of the Trust Distribution Procedures. The Settlement Trust will make an "Initial Distribution" to a holder of a Settled Claim within 30 days of the Abuse Claim becoming a Settled Claim and the Settlement Trust establishing the "Initial Settlement Trust Corpus Scaling Factor". In order to set the Initial Settlement Trust Corpus Scaling Factor, the Settlement Trustee will consult the STAC and analysis the estimated available Settlement Trust Assets and estimated total points assigned to Settled Claims while taking into account the need to reserve Settlement Trust assets to pay for Abuse Claims that will be submitted to the Settlement Trust in the future and to fund litigation against Non-Settling Insurance Companies and pay Settlement Trust operations. The Settlement Trustee will conduct a valuation of available Settlement Trust Assets every six months after the Initial Settlement Trust Corpus Scaling Factor is determined and decide, in consultation with the SPAC, whether to establish a "Subsequent Settlement Trust Corpus Scaling Factor" and make a "Subsequent Distribution" to Settled Claims, by analyzing the same factors looked at in developing the Initial Settlement Trust Corpus Scaling Factor, and the evolving Settlement Trust corpus and Settled Claim points amounts.

If a holder of an Abuse Claim is not satisfied with the Settlement Trust's determination of validity or valuation of his or her Claim, the Trust Distribution Procedures provide for a reconsideration process, and in the last resort, a claimant may pursue the Settlement Trust in the tort system, pursuant to certain restrictions set forth in the Trust Distribution Procedures. The Trust Distribution Procedures will be the sole and exclusive method by which the holder of an Abuse Claim may seek allowance and resolution of his or her Abuse Claim.

### 2. *The Channeling Injunction*

The Channeling Injunction to be issued as a part of the Plan will permanently and forever stay, bar, and enjoin holders of Abuse Claims from taking any action for the purpose of directly or indirectly or derivatively collecting, recovering, or receiving payment of, on, or with respect to any Abuse Claim other than from the Settlement Trust pursuant to the Settlement Trust Agreement and the Trust Distribution Procedures, or as otherwise set forth in the Trust Distribution Procedures. Each holder of an Abuse Claim will have no right whatsoever at any time to assert its Abuse Claim against any Protected Party or any property or interest in property of any Protected Party.

If the Plan is confirmed as a Global Resolution Plan, the Protected Parties include: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Local Councils; (e) the Contributing Chartered Organizations; (f) the Settling Insurance Companies, including Hartford; and (g) with respect to each of the Persons in the foregoing clauses (a) through (f), such Persons' Representatives; <u>provided</u>, <u>however</u>, that no Perpetrator is or shall be a Protected Party. Notwithstanding the foregoing, the Contributing Chartered Organizations shall be Protected Parties only with respect to Abuse Claims that exist solely by virtue of the Contributing Chartered Organizations' affiliation with the Debtors.

If the Plan is confirmed as a BSA Toggle Plan, the Protected Parties include: (i) the Debtors; (ii) Reorganized BSA; (iii) the Related Non-Debtor Entities; and (iv) all of such Persons' Representatives; provided, however, that no Perpetrator is or shall be a Protected Party.

The effect of "channeling" Abuse Claims to the Settlement Trust is that Abuse Claims may only be pursued against, and resolved by, the Settlement Trust and in connection with the Trust Distribution Procedures, or as otherwise set forth in the Trust Distribution Procedures. Following the Effective Date, Abuse Claims may not be asserted against the Debtors, the Reorganized BSA or any other Protected Party (as applicable under each of the Plan scenarios). For the avoidance of doubt, Abuse Claims include Indirect Abuse Claims.

### 3. Treatment of General Unsecured Claims, Convenience Claims, and Non-Abuse Litigation Claims

As discussed in greater detail below, holders of Allowed General Unsecured Claims (to the extent such Claims are not Insured Non-Abuse Claims) shall receive, subject to the holder's ability to elect Convenience Class treatment on account of the Allowed General Unsecured Claim, its Pro Rata Share of the Core Value Cash Pool up to the full amount of such Allowed General Unsecured Claim. If a holder of a General Unsecured Claim makes the Convenience Class election, such holder shall receive, as provided in the Plan, Cash in an amount equal to 100% of such holder's Allowed Convenience Class Claim. The treatment of Allowed General Unsecured Claims under the Plan recognizes that the holders of such Claims delivered value that is core to the Debtors' charitable mission or whose Allowed Claims were incurred in furtherance of the Debtors' charitable mission and, accordingly, are entitled to a recovery from the value of the Debtors' core assets. Holders of Non-Abuse Litigation Claims shall retain the right to recover from available Insurance Coverage, available proceeds of any Insurance Settlement Agreements, and co-liable non-Debtors (if any) or their insurance coverage on account of such Claims. To the extent that the holder of an Allowed Non-Abuse Litigation Claim fails to recover in full from the foregoing sources on account of such Allowed Claim after exhausting its remedies in respect thereof, such holder may elect to have its Allowed Claim treated as an Allowed Convenience Claim subject to and in accordance with the Plan.

### 4. Treatment of the Claims Under the Debtors' Secured Facilities

The 2010 Credit Facility Claims, 2019 RCF Claims, 2010 Bond Claims, and 2012 Bond Claims will be Allowed and deemed fully Secured. On the Effective Date of the Plan, all such Claims will be restructured under the Restated Debt and Security Documents.

### 5. General Settlement of Claims and Interests

As described more fully in Articles V.R and X of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that holders of Claims or Interests might have with respect to any Claim or Interest under the Plan. Distributions made to holders of Claims in any Class are intended to be final.

### 6.    *Modification and Amendments*

**Mediation and settlement negotiations with various parties are on-going and will continue after the date of this Disclosure Statement.  Subject to the limitations contained in the Plan, the Debtors reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors one or more times including after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.**

**For the avoidance of doubt, such modification(s) may include a settlement pursuant to Bankruptcy Rule 9019 to resolve any unresolved controversies, including but not limited to those described in this Disclosure Statement.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with <u>Article XII</u> of the Plan.**

### 7.    *Effect of Confirmation on Modifications*

**If the Bankruptcy Court finds, after a hearing on notice to the parties in interest in the Chapter 11 Cases, that the proposed modification does not materially and adversely change the treatment of the Claim or Interest of any holder thereof who has not accepted in writing the proposed modification, the Bankruptcy Court may deem the Plan to be accepted by all holders of Claims or Interests who have previously accepted the Plan. Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.**

**For the avoidance of doubt, any and all rights of holders of Claims against the Debtors or Interests in the Debtors are expressly reserved under Bankruptcy Rule 3019 and any other applicable provisions under the Bankruptcy Rules, Local Rules of the Bankruptcy Court, or Bankruptcy Code.**

### 8.    *Summary and Description of Classes and Treatment*

Except for Administrative Expense Claims and Priority Tax Claims, which are not required to be classified, all Claims and Interests are divided into Classes under the Plan.  The following chart summarizes the projected distributions to holders of Allowed Claims against and Interests in each of the Debtors under the Plan and Abuse Claims that will be resolved by the Settlement Trust in accordance with the Trust Distribution Procedures.  This chart is only a summary of such classification and treatment and reference should be made to the entire

Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Interests.  The ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation of the Plan and meet the conditions to Confirmation and effectiveness of the Plan, as discussed in this Disclosure Statement.  And for holders of Direct Abuse Claims under Class 8, the ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation of the Plan as a Global Resolution Plan or BSA Toggle Plan. If the Plan is confirmed as a Global Resolution Plan, the Debtors believe that holders of Direct Abuse Claims will receive much more significant distributions that would otherwise receive under the BSA Toggle Plan.

Moreover, although every reasonable effort was made to be accurate, the projections of estimated recoveries are only an estimate.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  As a result of the foregoing and other uncertainties which are inherent in the estimates, the estimated recoveries in this Disclosure Statement may vary from the actual recoveries received.  The projected recoveries set forth below may change based upon changes in the amount of Allowed Claims and Abuse Claims resolved by the Settlement Trust in accordance with the Trust Distribution Procedures, as well as other factors related to the Debtors' operations and general economic conditions.  The Debtors reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

The summary of classification and treatment of Claims against and Interests in the Debtors is as follows:

| Class | Designation[14] | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Amount[15] and Approximate Percentage Recovery |
|-------|-----------------|--------------------------|------------------------------------|----------------------------------------------------------|
| 1 | Other Priority Claims | Each holder of an Allowed Other Priority Claim shall receive: (i) payment in Cash in an amount equal to such Allowed Other Priority Claim; or (ii) satisfaction of such Allowed Other Priority Claim in any other manner that renders the Allowed Other Priority Claim Unimpaired, including | Unimpaired  **Not Entitled to Vote** (Presumed to Accept) | Estimated Allowed Amount: Less than $0.1 million  Estimated Percentage Recovery: 100% |

---

[14]  The Debtors reserve the right to eliminate any Class of Claims in the event they determine that there are no Claims in such Class.

[15]  Figures with respect to the Allowed amounts of the Claims set forth in this chart are based upon the Debtors' best estimates of such Claims as of the date of this Disclosure Statement.  These estimates are based on various assumptions.  The actual amounts of Allowed Claims may differ significantly from these estimates should one or more underlying assumptions prove to be incorrect.  Such differences may adversely affect the percentage of recovery to holders of Allowed Claims under the Plan.  Moreover, the estimated recoveries set forth herein are necessarily based on certain assumptions, the realization of which are beyond the Debtors' control.

| Class | Designation[14] | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Amount[15] and Approximate Percentage Recovery |
|---|---|---|---|---|
| | | Reinstatement. | | |
| 2 | Other Secured Claims | Each holder of an Allowed Other Secured Claim shall receive: (i) payment in Cash in an amount equal to the Allowed amount of such Claim; (ii) satisfaction of such Other Secured Claim in any other manner that renders the Allowed Other Secured Claim Unimpaired, including Reinstatement; or (iii) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim. | Unimpaired<br><br>**Not Entitled to Vote** (Presumed to Accept) | Estimated Amount: $0<br><br>Estimated Percentage Recovery: 100% |
| 3A | 2010 Credit Facility Claims | Each holder of an Allowed 2010 Credit Facility Claim shall receive a Claim under the Restated Credit Facility Documents in an amount equal to the amount of such holder's Allowed 2010 Credit Facility Claim. | Impaired<br><br>**Entitled to Vote** | Estimated Amount: $80,762,060<br><br>Estimated Percentage Recovery: 100% |
| 3B | 2019 RCF Claims | Each holder of an Allowed 2019 RCF Claim shall receive a Claim under the Restated Credit Facility Documents in an amount equal to the amount of such holder's Allowed 2019 RCF Claim. | Impaired<br><br>**Entitled to Vote** | Estimated Amount: $61,542,720<br><br>Estimated Percentage Recovery: 100% |
| 4A | 2010 Bond Claims | Each holder of an Allowed 2010 Bond Claim shall receive a Claim under the Restated 2010 Bond Documents in an amount equal to the amount of such holder's Allowed 2010 Bond Claim. | Impaired<br><br>**Entitled to Vote** | Estimated Amount: $40,137,274<br><br>Estimated Percentage Recovery: 100% |
| 4B | 2012 Bond | Each holder of an Allowed | Impaired | Estimated Amount: |

| Class | Designation[14] | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Amount[15] and Approximate Percentage Recovery |
|---|---|---|---|---|
| | Claims | 2012 Bond Claim shall receive a Claim under the Restated 2012 Bond Documents in an amount equal to the amount of such holder's Allowed 2012 Bond Claim. | **Entitled to Vote** | $145,662,101<br><br>Estimated Percentage Recovery: 100% |
| 5 | Convenience Claims | Each holder of an Allowed Convenience Claim shall receive Cash in an amount equal to 100% of such holder's Allowed Convenience Class Claim. | Impaired<br><br>**Entitled to Vote** | Estimated Amount: $2.3 million – $2.9 million<br><br>Estimated Percentage Recovery: 100% |
| 6 | General Unsecured Claims | Each holder of an Allowed General Unsecured Claim (to the extent such Claim is not an Insured Non-Abuse Claim) shall receive, subject to the holder's ability to elect Convenience Class treatment on account of the Allowed General Unsecured Claim, its Pro Rata Share of the Core Value Cash Pool up to the full amount of such Allowed General Unsecured Claim in the manner described in <u>Article VII</u> of the Plan. | Impaired<br><br>**Entitled to Vote** | Estimated Amount: $26.5 million – $33.5 million<br><br>Estimated Percentage Recovery: 75 – 95% |
| 7 | Non-Abuse Litigation Claims | Each holder of an Allowed Non-Abuse Litigation Claim shall, subject to the holder's ability to elect Convenience Class treatment as provided in the following sentence, retain the right to recover up to the amount of such holder's Allowed Non-Abuse | Impaired<br><br>**Entitled to Vote** | Estimated Amount: Undetermined[16]<br><br>Estimated Percentage Recovery: 100% |

---

[16]    This class is comprised of approximately forty five wrongful death or personal injury claims as well as less than ten other litigation claims. None of these claims have been liquidated.

| Class | Designation[14] | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Amount[15] and Approximate Percentage Recovery |
|---|---|---|---|---|
| | | Litigation Claim from (i) available Insurance Coverage or the proceeds of any insurance policy of the Debtors, including any Specified Insurance Policy or D&O Liability Insurance Policy, (ii) applicable proceeds of any Insurance Settlement Agreements, and (iii) co-liable non-debtors (if any) or their insurance coverage.  Solely to the extent that the holder of an Allowed Non-Abuse Litigation Claim fails to recover in full from the foregoing sources on account of such Allowed Claim after exhausting its remedies in respect thereof, such holder may elect to have the unsatisfied portion of its Allowed Claim treated as an Allowed Convenience Claim and receive cash in an amount equal to the lesser of (a) the amount of the unsatisfied portion of the Allowed Non-Abuse Litigation Claim and (b) $50,000. | | |
| 8 | Direct Abuse Claims[17] | Pursuant to the Channeling Injunction set forth in Article X.F of the Plan, each holder of a Direct Abuse Claim shall have such holder's Direct Abuse Claim against the Protected Parties (or any of them) permanently channeled to | Impaired<br><br>**Entitled to Vote** | Estimated Amount: $2.4 billion – $7.1 billion<br><br>**Under the Global Resolution Plan**:<br>Estimated Percentage Recovery: 17 – 50% *plus* insurance rights, |

---

[17]    Under the Plan, "Direct Abuse Claim" means an Abuse Claim that is not an Indirect Abuse Claim.

| Class | Designation[14] | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Amount[15] and Approximate Percentage Recovery |
|---|---|---|---|---|
| | | the Settlement Trust, and such Direct Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents. | | **expected to yield up to 100% recovery**[18]<br><br>**Under the BSA Toggle Plan**: Estimated Percentage Recovery: 1 – 4% *plus* insurance rights, **expected to have limited recovery**[19]<br><br>**Under the Expedited Distribution**:[20] Estimated Amount: $1,500.00 |
| 9 | Indirect Abuse Claims[21] | Pursuant to the Channeling Injunction set forth in <u>Article X.F</u> of the Plan, each holder of an Indirect Abuse Claim shall have such holder's Indirect | Impaired<br><br>**Entitled to Vote** | **Under the Global Resolution Plan**: Estimated Amount: Unknown[22]<br><br>Estimated Percentage |

[18]    The following calculation was used to determine the percentage recovery range under the Global Resolution Plan: ($119.9 million (BSA Settlement Contribution) plus $425 million (Local Counsel Contribution) plus $650 million (Hartford settlement amount)) divided by $2.4 billion - $7.1 billion (Estimated Abuse Claims Range).

[19]    The following calculation was used to determine the percentage recovery range under the BSA Toggle Plan: $99.9 million (BSA Settlement Contribution) divided by $2.4 billion - $7.1 billion (Estimated Abuse Claims Range). The BSA Settlement Contribution is assumed to be lower under the BSA Toggle Plan versus the Global Resolution Plan as BSA is assumed to have incurred more litigation and professional fees prior to Plan Confirmation.

[20]    Pursuant to <u>Article III.B.10</u> of the Plan, under the Global Resolution Plan, each holder of a properly completed non-duplicative proof of claim asserting a Direct Abuse Claim who filed such Claim by the Bar Date or was permitted by a Final Order of the Bankruptcy Court to file a late claim may elect on his or her Ballot to receive an Expedited Distribution, in exchange for a full and final release in favor of the Debtors, the Related Non-Debtor Entities, the Local Councils, Contributing Chartered Organizations, and the Settling Insurance Companies, including Hartford. The Expedited Distribution does not apply if the Plan is confirmed as a BSA Toggle Plan. Under the Plan, "Expedited Distribution" means a one-time Cash payment from the Settlement Trust in the amount of $1,500.00, conditioned upon Confirmation of the Plan as a Global Settlement Plan.

[21]    Under the Plan, "Indirect Abuse Claim" means <u>a liquidated or unliquidated Abuse Claim</u> for contribution, indemnity, reimbursement, or subrogation, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, including any indemnification, reimbursement, hold-harmless or other payment obligation provided for under any prepetition settlement, insurance policy, program agreement or contract.

[22]    The Debtors are unable to estimate the recovery amount for Indirect Abuse Claims under both the Global Resolution Plan and BSA Toggle Plan since they are unliquidated and contingent and subject to objection under section 502(e) of the Bankruptcy Code. However, to the extent the Indirect Abuse Claims become liquidated in the future, Indirect Abuse Claimants have the ability, pursuant to the Plan, to bring a claim for reconsideration under section 502(j) of the Bankruptcy Code and may be able to recover, on account of such claim, against the Settlement Trust assets.

| Class | Designation[14] | Treatment under the Plan | Impairment and Entitlement to Vote | Estimated Amount[15] and Approximate Percentage Recovery |
|---|---|---|---|---|
| | | Abuse Claim against the Protected Parties (or any of them) permanently channeled to the Settlement Trust, and such Indirect Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents. | | Recovery: N/A<br><br>**Under the BSA Toggle Plan**:<br>Estimated Amount: Unknown<br><br>Estimated Percentage Recovery: N/A |
| 10 | Interests in Delaware BSA | Interests in Delaware BSA shall be deemed cancelled without further action by or order of the Bankruptcy Court and shall be of no further force or effect, whether surrendered for cancellation or otherwise. | Impaired<br><br>**Not Entitled to Vote**<br>(Deemed to Reject) | Estimated Amount: N/A<br><br>Estimated Percentage Recovery: 0% |

## ARTICLE III.  ORGANIZATION OVERVIEW AND CORPORATE HISTORY

A.    <u>Organization Overview</u>

### *1.    The Boy Scouts of America*

The BSA was incorporated in the District of Columbia on February 8, 1910, and subsequently chartered by Congress as a non-profit corporation under Title 36 of the United States Code on June 15, 1916.  36 U.S.C. §§ 30901-08.  The Congressional Report in Support of the Act to Incorporate the Boy Scouts of America provides that the Scouting program "is intended to supplement and enlarge established modern educational facilities in activities in the great and healthful out of doors where may be the better developed physical strength and endurance, self-reliance, and the powers of initiative and resourcefulness, all for the purpose of establishing through the boys of today the very highest type of American citizenship."  H.R. Rep. No. 64-130 at 245 (1916).  Consistent with this charitable intention, the BSA's congressional charter states that the purpose of the organization is to "promote, through organization, and cooperation with other agencies, the ability of boys to do things for themselves and others, to train them in Scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred virtues, using the methods which are now in common use by Boy Scouts."  BSA Charter, § 3; *see also*

BSA Bylaws, § 2 ("In achieving this purpose, emphasis shall be placed upon its educational program and the oaths, promises, and codes of the Scouting program for character development, citizenship training, leadership, and mental and physical fitness."). These mandates have been the guiding light for the BSA's work for over a century.

As a non-profit corporation, the BSA is required to adopt and carry out a charitable, religious, educational, or other philanthropic mission. It is the BSA's mission "to prepare young people to make ethical and moral choices over their lifetimes by instilling in them the values of the Scout Oath and Law."[23] Unlike a profit-seeking corporation, the BSA's senior leadership owes fiduciary duties to the Scouting mission, not the generation of profits. The successful delivery of this mission to youth in America is the BSA's fiduciary obligation. To that end, all Scouting policies, practices, and programming are specifically designed to train Scouts in responsible citizenship, character development, and self-reliance, in a manner consistent with the BSA's mission. Thus, to be eligible for Scouting, individuals must subscribe to, and conduct themselves in accordance with, the Scout Oath and the Scout Law:

- **Scout Oath.** "On my honor I will do my best to do my duty to God and my country and to obey the Scout Law; to help other people at all times; to keep myself physically strong, mentally awake, and morally straight."[24]

- **Scout Law.** "A Scout is trustworthy, loyal, helpful, friendly, courteous, kind, obedient, cheerful, thrifty, brave, clean, and reverent."[25]

At all levels of Scouting, these fundamental tenets of the BSA's mission are taught to Scouts so they can successfully develop into our nation's next generation of great leaders.

In support of its mission, the BSA has long facilitated the spread of Scouting in the United States through units chartered by local partners and has also designed and implemented an array of its own outdoor activities, educational and skill-building programs, and career training. Since its inception, more than 130 million Scouts have participated in the BSA's programming, and more than 35 million adult leaders have helped carry out the BSA's mission. The BSA has grown to be one of the largest youth organizations in the country, as well as one of the largest Scouting organizations in the world. In 2019, nearly three million Scouts and adult leaders were involved in Scouting and helped deliver more than 13 million Scouting service hours to communities across the country.

Throughout its 110-year history, the BSA has continually looked for ways to offer Scouting to more young men and women. In 1912, the BSA formed the Camp Fire Girls as a sister organization. In the 1930s, the BSA introduced Cub Scouts as a program for younger participants. Other past and current BSA programs include Air Scouts, Sea Scouts, Exploring, Venturing, and STEM Scouts. In 2018, the BSA welcomed girls into Cub Scouts, and in 2019, the BSA began chartering girl units to join Scouts BSA, the program previously known as Boy Scouts. Since 2017, over 200,000 girls have participated in Scouting, including approximately

---

[23]    BSA, *Mission & Vision*, https://www.scouting.org/legal/mission/.

[24]    BSA, *What are the Scout Oath and Law?*, https://www.scouting.org/discover/faq/question10/.

[25]    BSA, *About the BSA*, https://www.scouting.org/about/.

130,000 in Cub Scouts, 30,000 in Scouts BSA, and 65,000 in Venturing, Sea Scouts, and Exploring. The BSA has also organized affiliated organizations and affinity groups—such as Learning for Life, Order of the Arrow, and National Eagle Scout Association—to provide additional educational, civic, and developmental programs for Scouts, as well as engagement opportunities for Scouting alumni and supporters.

The BSA also provides other services critical to continued Scouting opportunities for America's young men and women, including core program content, such as events and other activities at high adventure facilities; the procurement and sale of uniforms and equipment; information technology and digital resources; training of professional Scouters to serve in Local Councils; communications and publications including magazines and online content for Scouts and adult leaders; training development and delivery; national events; registration systems; and other quality control services. In addition, every four years, the BSA hosts a National Jamboree, where tens of thousands of Scouts from around the country gather to celebrate Scouting, learn about teamwork and leadership, and develop lifelong friendships.

The Headquarters of the BSA is in Irving, Texas. The BSA has approximately 1,155 employees, all of whom are located in the United States and its territories. The BSA's employees are located at its Headquarters; at the BSA's national Warehouse and Distribution Center in Charlotte, North Carolina; at approximately 158 official BSA Scout Shops located throughout the country; and at the BSA's four high adventure facilities located in Florida and the U.S. Virgin Islands, New Mexico, West Virginia, and parts of Canada. The BSA's sources of funding include membership fees, high adventure facility fees, supply sales at Scout Shops, on its website, and directly to Local Councils, donor contributions, legacies, bequests, corporate sponsorships, and grants from foundations. In 2020, the BSA's total gross revenues were approximately $187 million. Of this total, approximately 28% was attributable to supply sales, approximately 47% to membership fees, approximately 8% to high adventure facility operations, approximately 2% to investments, approximately 4% to contributions, approximately 1% to event fees, and approximately 10% to other.

The BSA is governed by an executive board and an executive committee, which are responsible for managing the organization's affairs and electing officers. The executive board is comprised of 72 total members and is led by the National Chair. The board is made up of 64 regular members and the executive committee, which is a twelve-member delegation of the executive board that is also led by the National Chair. The executive committee includes, among others, the National "Key 3," who are responsible for guiding the BSA organization as a whole: the National Chair (Daniel G. Ownby), National Commissioner (W. Scott Sorrells), and Chief Executive Officer and President (Roger C. Mosby). The National Chair and National Commissioner are volunteer positions. The executive committee has formed a bankruptcy task force to direct the Debtors' restructuring strategy in connection with these Chapter 11 Cases.

## 2. *The Scouting Experience*

Delivery of the Scouting mission is the fiduciary obligation of the BSA. Local Councils and Chartered Organizations, and the Scouting units that they sponsor, operationalize this mission. Through these organizations, Scouts learn the values embodied in the Scout Oath and Scout Law. From the beginner-level Cub Scouts to the most advanced offerings at high

adventure facilities, all Scouting programming is intended to instill in the next generation of leaders the fundamental tenets of the BSA's mission.

### a.    Cub Scouts

The gateway to the Scouting program is Cub Scouts, where younger participants (kindergarten through fifth grade) first build character, learn citizenship, and develop personal skills and physical fitness. The den—a small group of six to eight children who are the same grade and gender—is the cornerstone of Cub Scouting. In the den, Cub Scouts make friends, develop new skills and interests, and learn respectfulness, sportsmanship, and citizenship. Several dens in the same community form a pack. At pack meetings, Cub Scouts engage in a wide range of fun and interactive activities, including games, arts and crafts, skits, and songs. Packs also hold special events and activities, such as advancement banquets, field trips, community service projects, and, most famously, the Pinewood Derby. Cub Scouts attend camp outings and participate in other local outdoor activities, such as hiking, biking, swimming, sledding, and a variety of team sports, all of which help instill in them a life-long respect for the environment, a core principle of the Scouting mission. Many of these outdoor adventures are held at Local Council-owned properties specifically developed and maintained for the purpose of delivering the Scouting program. Cub Scout programming is family-oriented, and adult volunteers, many of whom are parents of participating Cub Scouts, play an active role in den and pack leadership.

### b.    Scouts BSA

After Cub Scouts, youth participants progress to Scouts BSA. The Scouts BSA program focuses on service to others, community engagement, leadership development, respect for the environment, and personal and professional growth. In Scouts BSA, adult volunteers take a back seat, and Scouts themselves assume important leadership roles at their own meetings and activities. Scouts BSA units, known as "troops," are single-gender and composed of several smaller groups called "patrols." At patrol and troop meetings, Scouts engage in knowledge- and skill-based challenges, team building exercises, and community service projects, such as cleaning parks and other public spaces, enhancing nature preserves, building trails in wildlands, constructing playgrounds, creating libraries, collecting meals for food banks, visiting with the sick or elderly, or responding to national emergencies.

In Scouts BSA, every Scout is able to take on a leadership role in his or her patrol, which provides one of the unique experiences in Scouting that inspires young people from all backgrounds, experiences, and capabilities to see themselves as a leader and hone skills that will last a lifetime. In addition, Scouts are encouraged to participate in a wider suite of outdoor activities, including weekend camping trips, summer camps, and themed-camporees where they are exposed to more advanced Scouting programming and skill-building in diverse areas, such as first aid, rock climbing, forestry, conservation, and environmental awareness. At these events, Scouts from different troops work together and form life-long bonds. Local Council camps and other facilities are the hub for many of these outdoor adventures.

Central tenets of Scouts BSA programming are rank advancement and merit badges. Young men and women begin their journey in Scouts BSA at the rank of Scout. As they master

skills and learn important life lessons, they progress to the ranks of Tenderfoot, Second Class, First Class, Star, and then Life. Along the way, Scouts earn merit badges that recognize hard work and achievement in sports, arts, sciences, trades, personal finance, and future careers. At this time, there are more than 135 merit badges, and any Scout, or any qualified Venturer or Sea Scout may earn any of them at any time. In 2019, young men and women earned more than 1.7 million merit badges that represent skills that will help them succeed throughout their lives.

Scouts who successfully complete this rigorous program, serve as a leader in their troop for a designated period of time, and design and lead a significant service project, are awarded Scouts BSA's highest rank of Eagle. Less than 8% of Scouts achieve the Eagle Scout rank, and past Scouts achieving this honor permeate our nation's government, economy, and culture, including President Gerald Ford, astronaut Neil Armstrong, civil rights leader Percy Sutton, and entrepreneurs Sam Walton and Ross Perot, to name a few.

### c.    Advanced Scouting

In addition to Scouting's core Cub Scouts and Scouts BSA offerings, older Scouts participate in other advanced programs. In Venturing, co-ed groups form their own Scout-led "crews" that design and carry out specialized programming and activities. The opportunities available through Venturing are endless: A Scout interested in the outdoors can join a Venturing crew that backpacks in state or national parks and kayaks in local or remote rivers; a Scout interested in the sciences can join one that builds robots or volunteers at planetariums and museums; and a Scout interested in community service can join one that volunteers at soup kitchens or rebuilds homes in the wake of natural disasters. Venturing crews instill in their members the importance of adventure, leadership, personal growth, and service, all of which are fundamental to the Scouting mission.

Other advanced programs for older Scouts include Sea Scouts, where Scouts learn boating skills and water safety, and also study maritime heritage. Sea Scouts participate in boating and other water-based excursions, such as scuba diving off the Florida Keys and kayaking in the Everglades. Another program, Exploring, is the BSA's preeminent workforce development program. Through Exploring, Scouts join career-specific clubs sponsored by local businesses, government agencies, and community organizations. Scouts develop important personal and professional skills through immersive, on-the-job training. And STEM Scouts offers the Scouting experience with less emphasis on the outdoors. Participating young men and women learn about and nurture a lifelong interest in science, technology, engineering, and math through creative, hands-on activities, educational field trips, and interaction with STEM professionals.

### d.    High Adventure Facilities

The apex of the Scouting program is found at the four iconic high adventure facilities operated by the BSA. At these facilities, Scouts experience the truest embodiment of what Congress envisioned when it chartered the organization more than a century ago—unparalleled facilities hosting outdoor activities, educational programs, and leadership training. As Scouts progress through Scouting, these high adventure facilities provide them with opportunities to implement the knowledge and training that they gained through Cub Scouts and Scouts BSA at

locations and in programs that are not available anywhere else in the country. Not surprisingly, there is strong demand for these high adventure facilities—more than 50,000 Scouts and Scouters participate in the programs and events held there every year, and more than two million have done so since their openings. As their storied histories portend, these facilities and the programming they allow play a critical role in the BSA's delivery of the Scouting program to young Americans.

(i) <strong>Northern Tier</strong>

The BSA opened the Northern Tier high adventure facility ("<u>Northern Tier</u>")—located on the boundary waters between Minnesota and Canada—as its first high adventure facility in 1923. For nearly a century, the BSA has maintained several wilderness canoe bases at Northern Tier from which generations of Scouts have explored millions of acres of lakes, rivers, forests, and wetlands of northern Minnesota, northwestern Ontario, and southeastern Manitoba. Scouts at Northern Tier embark on canoe treks covering up to 150 miles and lasting as long as two weeks. Along the way, Scouts camp at remote, unstaffed campgrounds, where they must learn and implement Scouting's philosophy of self-sufficiency. In the winter, Northern Tier transforms into a cold-weather camping outpost, where Scouts can engage in winter activities such as cross-country skiing, dog sledding, snow shoeing, and ice fishing. Over the years, the BSA has hosted almost 250,000 Scouts and Scouters at Northern Tier.[26]

(ii) <strong>Philmont Scout Ranch</strong>

The BSA's largest high adventure facility, Philmont Scout Ranch ("<u>Philmont</u>"), was opened in 1938 on nearly 150,000 acres of rugged mountain wilderness in the Sangre de Cristo range of the Rocky Mountains in northeastern New Mexico. At Philmont, Scouts have access to a labyrinth of backpacking trails, as well as 35 staffed camps and 55 trail camps, spread across mountainous terrain ranging in elevation from 6,500 to 12,500 feet. In addition, the BSA's programming at Philmont features the best of the Old West—horseback riding, burro packing, gold panning, chuckwagon dinners, and interpretive history—along with physical challenges such as rock climbing, mountain biking, and sport shooting. These experiences teach Scouts about our nation's frontier history and instill in them a lifelong sense of adventure and confidence in challenging situations. In addition, Philmont hosts a series of leadership training programs for adult leaders. Well over a million Scouts and Scouters have experienced the unique and diverse offerings of Philmont.[27]

(iii) <strong>Florida Sea Base</strong>

Florida Sea Base ("<u>Sea Base</u>") was commissioned by the BSA as its third high adventure facility in 1980. At several facilities in south Florida and the U.S. Virgin Islands, Scouts swim, snorkel, scuba dive, and fish. Scouts also participate in boating and sailing adventures throughout the Caribbean, as well as primitive camping on several island-based settlements. Through Sea Base's programming, Scouts learn to trust one another and work as a team, and also learn the importance of conservation and the preservation of our environment. Since opening its

---

[26] *See generally* BSA, *About Northern Tier*, https://www.ntier.org/about/.

[27] *See generally* BSA, *About Philmont*, https://www.philmontscoutranch.org/about/.

doors, the BSA has provided aquatic adventures to nearly 300,000 Scouts and Scouters at Sea Base.[28]

### (iv)    Summit Bechtel Reserve

Most recently, in 2013, the BSA opened the Summit Bechtel Reserve ("Summit") in the wilds of West Virginia.  It is the preeminent summer camp, high adventure facility, and leadership training center for the millions of Scouts and adult leaders involved in Scouting now and for generations to come.  At the Summit, Scouts explore the New River Gorge region through white-water rafting, kayaking, canyoneering, and advanced orienteering.  Scouts also participate in more modern adventures, such as skateboarding, ATV riding, freestyle BMXing, and zip-lining.  This programming pushes Scouts past their comfort zones, where they can better develop and master the leadership, character, citizenship, and fitness that are core to the BSA's mission.  In addition to its regular programming, the BSA hosts a National Jamboree at the Summit every four years.  In 2019, the BSA hosted the largest World Jamboree ever, with over 45,000 attendees Scouts in attendance from 167 countries.  It was the first such event held in the United States in over 50 years.  All told, approximately 200,000 Scouts and Scouters have experienced the wonders of the Summit since it opened less than a decade ago.[29]

### 3.    Delivery of the Scouting Programs

Local Councils and Chartered Organizations work closely together to carry out the mission of Scouting.  Each of these entities plays a vital role in training Scouts in responsible citizenship, character development, and self-reliance.  Despite their common purpose, the BSA, Local Councils, and Chartered Organizations are legally independent entities.  Each Local Council is a non-profit corporation under the laws of its respective state and exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code.  Each Local Council also maintains its own senior management and independent volunteer board of directors.  The BSA does not hold any equity interest in any Local Council, Chartered Organization, or Scouting unit, and only the BSA and its wholly owned subsidiary, Delaware BSA, LLC, are Debtors in these Chapter 11 Cases.[30]

### a.    Local Councils

In furtherance of its mission, the BSA charters independently incorporated Local Councils to facilitate the delivery of the Scouting program.  Local Councils are not agents of the BSA, and they have no authority to bind the organization.

There are currently 252 Local Councils covering geographic areas of varying size, population, and demographics.  Although they are legally independent of the BSA, Local Councils are required to organize, operate, and promote Scouting in a manner that is consistent with the BSA's mission and with the BSA's Charter, bylaws, rules and regulations, policies, and

---

[28]    *See generally* BSA, *About Sea Base*, https://www.bsaseabase.org/about/.

[29]    *See generally* BSA, *The Summit Story*, https://www.summitbsa.org/about-us/summit-story/.

[30]    In addition to Local Councils and Chartered Organizations, the BSA is also affiliated with several non-stock Entities, each of which is related to, but legally independent of, the BSA.  Several of these affiliated, non-stock Entities are directly involved in delivering the Scouting program, while others, such as the Foundation, serve the BSA's mission in other ways.

guidelines.  Local Councils generally do not receive financial support from the BSA; instead, they rely upon their own fundraising through donations, product sales, special events, and corporate gifts.  The BSA does, however, provide certain corporate and administrative support to the Local Councils in exchange for shared services and other fees and reimbursements, as well as for the assistance of Local Councils in delivering the Scouting mission.  This support includes human resources, access to training facilities, marketing services, and general liability Insurance Coverage.

The BSA is responsible for developing and disseminating the structure and content of the Scouting program, owns and licenses intellectual property, and provides training and support services, including corporate services such as human resources, marketing and legal functions, and information technology.  The BSA, in addition to holding the power to grant charters to Local Councils, may also revoke a Local Council's charter for failing to meet national standards.  Local Councils, for their part, play a key role in delivering the Scouting program.  Local Councils also serve the vital function of collecting member fees and remitting such funds to the BSA.  Each of these Local Councils is crucial to the BSA's ability to carry out its mission.

The most important functions served by Local Councils are their recruiting of Chartered Organizations and their oversight of the operation of the Scouting units that those Chartered Organizations create.  Local Councils also provide other services essential to Scouting, including: funding of local Scouting programs and initiatives; recruiting of Scouts and volunteer leaders; providing Scout and volunteer training; offering opportunities for rank advancement; locally enforcing the BSA's policies, rules, and regulations; and registering members and leaders.  In addition, many Local Councils own and operate service centers, camps, and other facilities that provide the local resources necessary for a successful Scouting program.

Local Councils own and operate hundreds of unique camps and other properties that host outdoor activities, educational programs, and leadership training for youth involved in BSA's Scouting programs.  Certain Local Councils also own office buildings used for their program staff and approximately 150 Scout Shops, which the BSA leases from these Local Councils to sell retail merchandise and other products.  Certain Local Councils also own various other properties including vacant land and/or properties that are not in use.

A corps of qualified and trained professional and volunteer Scouters is essential for Local Councils to provide these services.  To that end, each of the Local Councils hires a professional Scout executive and other key staff from a pool of professionals—pre-commissioned by the BSA—who have demonstrated the moral, educational, and emotional qualities necessary for leadership.  Those commissioned professionals and other staff members support the Local Councils in connection with day-to-day operations, recruitment of new Chartered Organizations, management of fundraising, maintenance of program facilities, and numerous other services.  Thousands of volunteers also donate their time and resources to support the Local Councils, including through assistance with programming, such as unit leadership, unit activities, merit badge colleges, youth and adult leader training and advancement opportunities, and fundraising events.

b.    **Chartered Organizations**

There are currently more than 41,000 Chartered Organizations in the United States.  They are typically local organizations—such as faith-based institutions, clubs, civic associations, educational institutions, businesses, and groups of citizens—that sponsor the more than 50,000 local Scouting units throughout the country.  Some Chartered Organizations are actively involved with the units that they sponsor and encourage Scouting as a means to further in their own mission or serve their broader communities.  In addition, Chartered Organizations support the selection of adult leaders and other volunteers, and provide meeting space to the packs and troops that they sponsor along with storage space, use of equipment, and other monetary and in-kind support.

Unfortunately, relationships with some of these Chartered Organizations have deteriorated or been terminated.  For example, as of December 31, 2019, the Church of Jesus Christ of Latter-day Saints concluded its 105-year relationship as a Chartered Organization with all Scouting programs around the world, including the BSA—which is estimated to have resulted in approximately 525,000 fewer participants in the BSA's Scouting programs.

B.    Corporate Structure

1.    *Delaware BSA, LLC*

Debtor Delaware BSA, LLC ("Delaware BSA"), of which the BSA is the sole member, is a non-profit limited liability company that was incorporated under the laws of Delaware on July 11, 2019.  Delaware BSA is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code.  Delaware BSA has pledged substantially all of its assets to secure the obligations of the BSA and Arrow under the 2019 RCF Agreement, the Prepetition Security Agreement (2020), the 2010 Bond Agreement, and the 2012 Bond Agreement.  Delaware BSA's principal asset is a depository account located in Delaware.

2.    *BSA Asset Management, LLC and BSA Commingled Endowment Fund, LP*

The BSA receives services from certain specialized non-Debtor Affiliates, which are wholly-owned by, or subject to the control of, the BSA (each, a "Related Non-Debtor Entity"). While the Local Councils facilitate the Debtors' mission and are vital in reaching participants at a local level, the Related Non-Debtor Entities provide specialized services under shared services arrangements that are necessary to facilitate the BSA's national reach, including, among other things, investment and foundation management, management of national programs, lease transactions, and conference and training support functions.  BSA Asset Management, LLC ("BSAAM") is a Delaware limited liability company of which the BSA is the sole member.  The BSA receives investment management and advisory services from BSAAM, which oversees management of the funds making up the various benefits programs and trusts of the BSA, along with providing management and investment services for the BSA's unrestricted endowment and donations to the BSA.  BSAAM manages the BSA's and certain Local Councils' investments through the BSA Commingled Endowment Fund, LP (the "Endowment Fund"), which is a Delaware limited partnership and investment vehicle open only to the BSA, the Local Councils, and their affiliates for investing long-term funds.  BSAAM is the general partner of the

Endowment Fund. The BSA and certain Local Councils are limited partners of the Endowment Fund. Each limited partner receives units of partnership interest in proportion to, and in exchange for, its financial contributions to the Endowment Fund. In addition to its role as general partner of the Endowment Fund, BSAAM is the settlor of the BSA Endowment Master Trust.

### 3. BSA Endowment Master Trust

Related Non-Debtor Entity, BSA Endowment Master Trust (the "Master Trust"), is a non-profit 501(c)(3) Delaware trust established under the laws of Delaware exclusively for the purpose of investing funds contributed to the Endowment Fund by the BSA and participating Local Councils. The Master Trust is a multiple pooled account trust arrangement established to provide economies of scale and efficiency of administration to eligible Entities that elect to invest their funds in the Master Trust. Global Trust Co. is the trustee of the Master Trust as of the Petition Date. In addition, the Master Trust is also a limited partner of the Endowment Fund.

### 4. National Boy Scouts of America Foundation

Related Non-Debtor Entity National Boy Scouts of America Foundation (the "BSA Foundation") is a non-stock, non-profit corporation organized under the laws of the District of Columbia and exempt from federal income taxes under section 501(c)(3) of the Internal Revenue Code. The BSA Foundation was formed in 1997 and exists to help secure the future of Scouting, and partners with the Local Councils and donors by providing support for major-gift fundraising efforts across the BSA organization.[31] The balance of major gifts net of associated liabilities at the end of 2020 totaled approximately $66 million. The BSA Foundation also manages the distribution of donor-advised funds such as scholarships, funds for rebuilding camps and high adventure facilities including after the occurrence of natural disasters, and funding for major Scouting events such as the National Jamboree.

### 5. Learning for Life

Related Non-Debtor Entity Learning for Life is a non-stock, non-profit corporation organized under the laws of the District of Columbia that is exempt from federal income taxes under section 501(c)(3) of the Internal Revenue Code. The mission of Learning for Life is to empower students to build exceptional character and leadership skills by guiding them through an innovative, research-based curriculum that enhances the learning experience and teaches the skills necessary to succeed both academically and throughout their lives. Learning for Life also administers the Exploring club career education program for young men and women. The Exploring program teaches important life and career skills to young people from all backgrounds through immersive career experiences and mentorship provided by thousands of local, regional and national businesses and organizations, which offer career-specific posts or clubs that help youth pursue their special interests, grow, and develop.

---

[31] *See* BSA National Foundation, *About Us*, www.bsafoundation.org/about-us/.

### 6.    *Arrow WV, Inc.*

Arrow WV, Inc. ("Arrow") is a non-stock, non-profit corporation organized under the laws of West Virginia that is exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code.  Arrow was formed in 2009 to facilitate the acquisition and development of the Summit.  Arrow owns the real property and improvements that comprise the Summit and leases the Summit to BSA for nominal consideration.  Construction of the Summit was accomplished with the proceeds from the 2010 Bond and the 2012 Bond to the BSA from Fayette County, West Virginia.  The bonds were purchased by JPM.  The BSA provided funding for the construction of the facility, utilizing donations and pledges to the BSA and other BSA financial support, and the BSA provides the necessary services required to operate Summit.

### 7.    *Atikaki Youth Ventures Inc. and Atikokan Youth Ventures Inc.*

Related Non-Debtor Entities Atikaki Youth Ventures Inc. ("Atikaki") and Atikokan Youth Ventures Inc. ("Atikokan") are non-share capital corporations formed under the laws of Canada, with registered addresses in Winnipeg, Manitoba.  Atikaki and Atikokan provide certain services to the BSA related to the operation of Northern Tier.  Atikaki maintains the Bissett, Manitoba base for the Northern Tier high adventure facility, which offers canoe trips into the Atikaki Provincial Park and Woodland Caribou Provincial Park.  Atikokan maintains the Don Rogert Canoe Base for the Northern Tier high adventure facility in Atikokan, Ontario, Canada, which offers canoe trips into the Quetico and Crown Lands.

### 8.    *Dissolution of Inactive Entities*

As of the Petition Date, two of the Debtors' subsidiaries—NewWorld19, LLC ("New World") and Texas BSA, LLC ("Texas BSA")—had no operations or material assets and remained inactive after the filing.  Because the BSA no longer had a need to maintain NewWorld or Texas BSA as subsidiaries, on July 16, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order, Pursuant to Section 363(b) of the Bankruptcy Code, Authorizing Boy Scouts of America to Dissolve Inactive Non-Debtor Subsidiaries, NewWorld19, LLC and Texas BSA, LLC* [D.I. 1022].  On August 3, 2020, the Court entered an order authorizing the dissolution of NewWorld and Texas BSA [D.I. 1063].

## C.    Revenue Sources and Assets

### 1.    *Revenues*

As a non-profit organization, the focus of the BSA's operations is to carry out its charitable mission.  The BSA has historically funded the work to carry out the mission, in part, through the generation of revenue from sources such as member fees and donations.  Specifically, the BSA relies on revenue generated from membership registration fees, high adventure facility fees, supply sales at Scout shops, on its website, and directly to Local Councils, donor contributions, legacies and bequests, corporate sponsorships, and grants from foundations.

In 2019, the BSA's total gross revenues were approximately $394 million.  Of this total, approximately 30% was attributable to supply sales, approximately 16% to membership fees,

approximately 15% to high adventure facility operations, approximately 13% to investments, approximately 8% to contributions, approximately 8% to event fees, and approximately 10% to other. The BSA's estimated total 2020 gross revenues were approximately $187 million.

Although registration and renewal numbers are not yet finalized, the Debtors believe that Cub Scouts and Scouts BSA, in aggregate, have already met the combined retention levels as set forth in the financial projections of approximately 650,000 and will likely exceed those levels after unit rechartering is complete. Cub Scouts, including the Scoutreach program, and Scouts BSA represent approximately 93% of youth members, and therefore are an effective indicator of overall membership levels.

### 2.    *Identified Property*

The Debtors believe that certain property listed on the BSA's balance sheet (the "Identified Property") is legally protected under applicable laws governing charities and other non-profit organizations and, therefore, not available to satisfy certain creditors' Claims. The Debtors have provided a schedule of the property the Debtors intend to retain after the Effective Date that specifically delineates such property as Identified Property or property of the Estate (the "Retained Property List"). A copy of the Retained Property List is included appended to the Financial Projections attached as **Exhibit C** hereto and further described in Article IX.E of this Disclosure Statement. The Debtors assert that the Identified Property is not available to satisfy certain Claims against the Debtors for one or more of the following reasons: (i) it is subject to donors' restrictions on use and purpose; (ii) it is core to the BSA's charitable mission and Scouting program; (iii) it is held in an implied charitable trust; (iv) it is part of a charitable trust that can only be used in fulfillment and furtherance of the BSA's charitable mission; (v) selling or liquidating the Identified Property would violate the D.C. Nonprofit Corporation Act; (vi) selling or liquidating the Identified Property contradicts the Bankruptcy Code's treatment of charitable organizations; or (vii) it is otherwise not property of the estate under applicable law.

Specifically, it is the Debtors' position that certain of the Identified Property was donated with a restriction as to use or purpose rather than for general charitable purposes and is therefore, pursuant to section 541 of the Bankruptcy Code, not property of a debtor's estate. Moreover, to the extent that a donor made a restricted donation, the Debtors are contractually obligated to effectuate the donor's intent, and selling or liquidating the Identified Property to satisfy Abuse Claims would likely violate such intent. Even if certain Identified Property was found to be unrestricted, both unrestricted and restricted donations made to a charity are impressed with a charitable trust that cannot be diverted and used in contravention of the nonprofit's charitable mission. The same is true under the D.C. Nonprofit Corporation Act, which states that if any of the Identified Property was donated for the nonprofit's charitable mission, it cannot be diverted away from its original purpose by sales, leases, repayment of debt, or other transfers of the property.

Additionally, certain of the Identified Property is core and indispensable to carrying out the BSA's mission. The Identified Property not only enables the BSA to administer programming that trains today's youth in the values of the Scout Oath and Law, but some of the Identified Property, such as the BSA's high adventure facilities, animates the purpose for which Congress originally chartered the organization. Given that the Identified Property is core and

absolutely essential to the BSA's functioning as the premier Scouting organization, it is the Debtors' position that it cannot be available to satisfy Abuse Claims.

Most of the Identified Property also generates revenues necessary for the BSA to carry out its mission and is essential to the Debtors' ability to meet its business plan. And moreover, the sale or liquidation of the Identified Property runs contrary to the Bankruptcy Code's treatment of non-profits and contrary to case law holding that a charity may retain assets notwithstanding the lack of full payment of its creditors since the absolute priority rule does not apply in a restructuring of a charitable organization. Finally, JPM holds valid and properly perfected liens on certain of the Identified Property, and JPM has not agreed to release its liens on its prepetition collateral. *See* ¶¶ D(viii) and D(xvii) of the Cash Collateral Order.

The Tort Claimants' Committee has argued that the Identified Property may be used to satisfy Abuse Claims against the Debtors and, as described in more detail in Article V.Q.2 below, has filed an adversary complaint seeking a determination that the Identified Property is not subject to legal restrictions and should be used to satisfy Abuse Claims. The Debtors dispute the Tort Claimants' Committee's causes of action relating to the Identified Property. On April 23, 2021, JPM filed a motion to intervene in the adversary proceeding.

D.     Prepetition Capital Structure

1.     *The Prepetition Debt and Security Documents*

The following is an overview of the BSA's capital structure and approximate outstanding obligations (collectively, the "Prepetition Obligations") arising under the Prepetition Debt and Security Documents as of the Petition Date, which include the following:

| Description | Amount[32] | Interest Rate | Maturity |
|---|---|---|---|
| **2019 RCF Agreement** | | | |
| -   2019 Revolver | $0 | L + 125 | March 21, 2021 |
| -   2019 Letters of Credit | $61,542,720 | N/A | N/A |
| **2010 Credit Agreement** | | | |
| -   2010 Revolver | $25,212,317 | L + 125 | March 2, 2020 |
| -   2010 Term Loan | $11,250,000 | L + 100 | March 2, 2022 |
| -   2010 Letters of Credit | $44,299,743 | N/A | N/A |
| **2012 Bond Agreement** | $145,662,101 | 2.94% | March 9, 2022 |
| **2010 Bond Agreement** | $40,137,274 | 3.22% | November 5, 2020 |
| **Total Secured Debt** | **$328,104,155[33]** | | |

---

[32] Includes estimated amounts as of February 18, 2020. Since the Petition Date, $10,000,000 was drawn on the 2019 Letters of Credit (defined below), resulting in corresponding increases and decreases in the 2019 Revolver (defined below) and the 2019 Letters of Credit, respectively.

[33] These amounts include contingent, undrawn letters of credit under the 2019 RCF Agreement and the 2010 Credit Agreement totaling $105,842,463.

Under each of the above-referenced agreements, the BSA is the borrower and JPM is the sole secured lender or holder, as the case may be. Collectively, the Debtors' Prepetition Obligations totaled approximately $328,104,155 as of the Petition Date. The Prepetition Obligations are secured by the same collateral (collectively, the "Prepetition Collateral"), which consists of (i) a first-priority lien and security interest in the accounts (including certain property arising out of or otherwise relating to such accounts, but excluding certain amounts payable the source of which is certain donor-restricted funds), deposit accounts, securities accounts and investment property (each as defined in Article 9 of the Uniform Commercial Code), and proceeds and products of any or all of the foregoing, of the Debtors and Arrow, (ii) a security interest and mortgage in and to (a) the BSA's Headquarters in Texas and (b) certain of the BSA's high adventure facilities, including Sea Base in Florida, Philmont in New Mexico, and Northern Tier in Minnesota, and (iii) a collateral assignment of the Arrow Intercompany Note and Arrow Deed of Trust (which grants a security interest and mortgage in and to the Summit in West Virginia).

In accordance with the Cash Collateral Order, the Debtors have been authorized to pay prepetition and postpetition interest with respect to the Prepetition Obligations.

### a.    2010 Credit Agreement

On August 11, 2010, the BSA entered into the 2010 Credit Agreement with JPM, pursuant to which JPM made loans and other extensions of credit to the BSA. Arrow is a guarantor under the facility. The 2010 Credit Agreement has been amended seven times, most recently in conjunction with the entry into the 2019 RCF Agreement on March 21, 2019.

The 2010 Credit Agreement has two components, a $75,000,000 revolving credit component (the "2010 Revolver") and a $25,000,000 term loan component (the "2010 Term Loan"). The 2010 Credit Agreement also allowed the BSA to request the issuance of letters of credit by JPM (the "2010 Letters of Credit"). The 2010 Revolver matured on March 2, 2020, while the 2010 Term Loan is scheduled to mature on March 2, 2022.

As of the Petition Date, pursuant to the 2010 Credit Agreement, the Debtors were truly, justly, and lawfully indebted and liable to JPM for $25,212,317 in respect of the 2010 Revolver, $11,250,000 in respect of the 2010 Term Loan, and $44,299,743 in respect of undrawn 2010 Letters of Credit.

### b.    2010 Bond Agreement

On November 5, 2010, the BSA and Arrow entered into the 2010 Bond Agreement, pursuant to which the Bond Issuer issued the Series 2010A Bonds in an aggregate principal amount of $50,000,000 and the Series 2010B Bonds in an aggregate principal amount of $50,000,000 (collectively, the "Series 2010 Bonds"), the proceeds of which were loaned to the BSA. The loans from the Bond Issuer to the BSA were evidenced by that certain Promissory Note – 2010A and that certain Promissory Note – 2010B, each executed by the BSA and payable to the order of the Bond Issuer, each in the original principal amount of $50,000,000, and each

pledged by the Bond Issuer to JPM to secure the repayment of the Series 2010 Bonds.  On November 5, 2015, the BSA repaid the Series 2010A Bonds in full.

As of the Petition Date, pursuant to the 2010 Bond Agreement, the Debtors were truly, justly, and lawfully indebted and liable to JPM for $40,137,274 in respect of the remaining outstanding Series 2010 Bonds.

### c.    2012 Bond Agreement

On March 9, 2012, the BSA and Arrow entered into the 2012 Bond Agreement, pursuant to which the Bond Issuer issued the Series 2012 Bonds (the "Series 2012 Bonds") in an aggregate principal amount not to exceed $175,000,000, the proceeds of which were loaned to the BSA.  The loans from the Bond Issuer to the BSA were evidenced by that certain Promissory Note – 2012, executed by the BSA and payable to the order of the Bond Issuer in the principal amount of $175,000,000 and pledged by the Bond Issuer to JPM to secure the repayment of the Series 2012 Bonds.

As of the Petition Date, pursuant to the Series 2012 Bonds, the Debtors were truly, justly, and lawfully indebted and liable to JPM for $145,662,101 in respect of the remaining outstanding Series 2012 Bonds.

### d.    2019 RCF Agreement

On March 21, 2019, the BSA entered into the 2019 RCF Agreement, with Arrow as a guarantor, pursuant to which JPM agreed to make revolving loans and other extensions of credit to the BSA.  The 2019 RCF Agreement, which matures on March 21, 2021, is a secured facility with a revolving component (the "2019 Revolver") and a component under which the BSA can request the issuance of letters of credit by JPM, together in a maximum amount not to exceed $71,500,000 (the "2019 Letters of Credit").

As of the Petition Date, pursuant to the 2019 RCF Agreement, the Debtors were truly, justly, and lawfully indebted and liable to JPM for $0 in respect of the 2019 Revolver and $61,542,720 in respect of undrawn 2019 Letters of Credit.

### e.    Prepetition Security Agreement (2019)

The BSA's outstanding obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement and the 2019 RCF Agreement are secured *pari passu* by the "Collateral", as defined under the Prepetition Security Agreement (2019), pursuant to which the BSA and Arrow granted collateral to JPM, which collateral as of such date included a first-priority lien and security interest in their accounts (including certain property arising out of or otherwise relating to such accounts, but excluding certain amounts payable the source of which is certain donor-restricted funds), deposit accounts, securities accounts and investment property (each as defined in Article 9 of the Uniform Commercial Code), and proceeds and products of any or all of the foregoing.

f.     **Mortgages, Assignments, and Deeds of Trust**

In addition to the Prepetition Security Agreement (2019), the BSA's outstanding obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement and the 2019 RCF Agreement are secured *pari passu* by the Florida Sea Base Mortgage, the Florida Sea Base Assignment, the Headquarters Deed of Trust, the Headquarters Assignment, the Northern Tier Mortgage, the Northern Tier Assignment, the Philmont Mortgage, and the Philmont Assignment.

g.     **Collateral Assignment of Arrow Intercompany Note and Arrow Deed of Trust**

Also on March 21, 2019, the BSA executed the Arrow Collateral Assignment, pursuant to which the BSA assigned to JPM, as collateral securing the BSA's outstanding obligations under the 2010 Credit Agreement, the 2010 Bond Agreement, the 2012 Bond Agreement and the 2019 RCF Agreement, its right, title and interest in and to the Arrow Intercompany Note and Arrow Deed of Trust.

h.     **Prepetition Security Agreement (2020)**

On February 3, 2020, in connection with a capital contribution by the BSA to Delaware BSA, the BSA, Delaware BSA, and JPM entered into the Prepetition Security Agreement (2020), pursuant to which Delaware BSA pledged its accounts (including certain property arising out of or otherwise relating to such accounts, but excluding certain amounts payable the source of which is certain donor-restricted funds), deposit accounts, securities accounts and investment property (each as defined in Article 9 of the Uniform Commercial Code), and all proceeds and products of any or all of the foregoing, as security for the Prepetition Obligations.

2.     *Trade Payables, Retirement Benefits, and Other Liabilities*

The BSA incurs debt with numerous vendors in connection with its ordinary course organizational operations.  In addition, the BSA is obligated to pay employment related benefits to current and former employees, including, but not limited to, retirement benefits in connection with (a) the Restoration Plan, a non-qualified defined benefit retirement plan under section 457(f) of the Internal Revenue Code, which provides supplemental retirement benefits to certain current and former employees of the Debtors or Local Councils and (b) the Pension Plan, a single-employer, qualified, defined benefit Pension Plan that is subject to the Employee Retirement Income Security Act of 1974, as amended, and the Internal Revenue Code, of which BSA is the sponsor.

E.     Local Councils and Chartered Organizations

As discussed above, several organizations work together to deliver the Scouting program, including Local Councils that are independently incorporated and chartered by the BSA and Chartered Organizations which partner with the Local Councils to form the packs, troops, and other units at which the program is delivered.  Historically, Claims against the BSA, Local Councils, and Chartered Organizations, including approximately 275 civil actions asserting personal injury Claims against the BSA and certain Local Councils and Chartered Organizations

as of the Petition Date (collectively, the "Pending Abuse Actions"), generally were litigated and administered solely by the BSA. The unique relationship between the BSA and these Entities, as discussed above, had led the BSA to take a leading role in administering such litigation. In practice, the BSA coordinated with Local Councils and Chartered Organizations to efficiently respond to and manage such cases, while minimizing the risk of inconsistent treatment of actions and survivors of Abuse.

Although applicable Local Councils are named defendants in the Pending Abuse Actions as well, the consistent resolution of the Pending Abuse Actions required the BSA to pay careful attention to a wide variety of litigation matters, including, for example, responses to broad discovery requests, the overwhelming majority of which were directed at the BSA as opposed to Local Council or Chartered Organization defendants. Through this approach, the BSA had, among other things, facilitated the retention of joint defense counsel, responded to the vast majority of discovery requests, coordinated with insurance carriers, and authorized and funded the payment of any settlement amounts related to the Pending Abuse Actions or similar, previously resolved, Claims. Given the complexity of the issues involving the Pending Abuse Actions, and the BSA's central role in litigating them, prior to filing these Chapter 11 Cases, the organization had retained national coordinating counsel to oversee the handling of Claims against it and the Local Councils and Chartered Organizations.

F.      Insurance Coverage for Abuse Claims

The BSA has historically procured commercial, general-liability insurance ("CGL") policies from multiple insurers to protect itself from a myriad of risks, including Claims of Abuse or sexual misconduct. These Insurance Policies date back to the 1930s and over time came to include both primary and excess Insurance Coverage that provide substantial limits of liability in many years. While the amount of coverage remains substantial in many years, the insolvency of certain Insurance Companies and the resolution of Abuse and other Claims have either eroded, or exhausted the liability limits for certain Insurance Policies. In some instances, the availability of certain Insurance Policies remains contingent upon the resolution of active pending litigation between the BSA and some of the Insurance Companies. Nonetheless, with respect to most (if not all) policy years, at least some level of Insurance Coverage under the CGL policies is available for bodily injury Claims, including Claims arising out of Abuse.

At this time, the BSA is not able to calculate the total amount of Insurance Coverage that is available to fund Abuse Claims because of the structure of the BSA's insurance program. As discussed in more detail below, many of the BSA's Insurance Policies are per-occurrence policies, meaning that those Insurance Policies will pay up to their limits of liability for each Abuse Claim (assuming that the Abuse Claim is valued at such an amount). Thus, the BSA needs several data points in order to analyze the total Insurance Coverage available for Abuse Claims, including the value of each individual Abuse Claim, the Insurance Policies that will respond to each Abuse Claim, whether those Policies are not insolvent, exhausted or settled, and how the Abuse Claims will be distributed among the BSA's various Insurance Policies. As such, the Debtors cannot calculate the total amount of insurance coverage under these Insurance Policies.

Additionally, the Debtors' insurance coverage for years 2013 and later is shared among Abuse Claims and Non-Abuse Litigation Claims, but there is a negligible risk that the Debtors will exhaust all of their insurance coverage for such years on account of Non-Abuse Litigation Claims. The Debtors have identified approximately fifty (50) Non-Abuse Litigation Claims, all of which appear to have arisen in 2013 or later. The Debtors believe that at least ten (10) of these Claims will be disallowed through the Claims reconciliation process. The Debtors have approximately $200 million of available insurance coverage in each such year. Moreover, it is possible that a material number of these claims will not exceed the $1 million per-occurrence limit of the primary policies issued by Old Republic Insurance Company. These primary policies have no aggregate limit; accordingly, it is the Debtors' position that they cannot be exhausted. As such, the assertion that the Debtors will use all of their insurance coverage for Non-Abuse Litigation Claims is purely speculative and, in the Debtors' view, highly unlikely.

Moreover, while the BSA has substantial Insurance Coverage, especially post-1986, some of the excess policies are implicated only where hundreds of millions of dollars are exhausted based on the underlying policies, such that, many of the excess policies will likely not contribute to Abuse Claims. Moreover, many of these high limits of coverage are in the late 1990s and 2000s, years in which there are significantly less Abuse Claims. Lastly, the Insurance Policies are further limited given deductible obligations, exhaustion, insolvency and settled coverage. As such, the BSA is not able to provide a specific amount available under its Insurance Policies; however, the BSA has provided a detailed description of the Insurance Policies and the coverage afforded under each of those policies.

### 1.    Overview of the BSA's Insurance Program

The type of coverage provided for by the BSA's insurance program has varied over the last six decades. Between at least 1935 and 1982, the BSA acquired Insurance Policies where each Claim of bodily injury allowed the BSA to access the per-person or per-occurrence limit of liability under the applicable Insurance Policies.[34] These are more commonly referred to as "per-occurrence" policies. The per-occurrence policies generally only had aggregate limits that pertained to products-completed operations. The Insurance Policies between 1962 and 1982 had a per-occurrence limit of $500,000. Beginning in 1969, the BSA also began to procure excess Insurance Policies that provided $2 million in coverage on top of the $500,000 per-occurrence primary policies.

Although the BSA does not have copies of the Insurance Policies between 1935 and 1962, the BSA has strong secondary evidence that Insurance Policies were issued. The BSA believes that, if forced to do so, the BSA could prove the existence of these Insurance Policies and the insurers' obligations. However, the insurers, mainly Century (as defined below)—the issuer of these Insurance Policies, have disputed the existence of these Insurance Policies. Starting in 1962, there is no dispute regarding the existence of coverage with the BSA's insurers.

Insurance Company of North America, now known as Century Indemnity Company ("Century"),[35] issued the primary and umbrella policies to the BSA from approximately 1935 to

---

[34]    For purposes of simplicity, this analysis is limited to the BSA's primary Insurance Policies.

[35]    Century is acting in these Chapter 11 Cases as successor to CCI Insurance Company, Insurance Company of North America. Indemnity Insurance Company of North America, Ace Insurance Group Westchester Fire Insurance Company, Westchester

1971.  The Hartford Accident and Indemnity Company ("Hartford") issued primary and some umbrella policies to the BSA from 1971 to 1978.  Chartered Organizations are not additional insureds or co-insured under the Hartford policies issued to BSA prior to 1976.  The Hartford policies issued to BSA in 1976 and 1977 are ambiguous as to whether Chartered Organizations are additional insureds.  A complete list of Chartered Organizations is available at https://omniagentsolutions.com/bsa-SAballots and https://omniagentsolutions.com/bsa-ballots. Beginning in 1978, Century issued primary policies to the BSA until 1983.  The Insurance Policies between 1962 and 1982 had a per-occurrence limit of $500,000. Beginning in 1969, the BSA also began to procure excess Insurance Policies that provided $2 million in coverage on top of the $500,000 per-occurrence primary policies.  And beginning in 1972, the BSA began to procure additional excess insurance policies from various insurers, including Argonaut, AIG, Hartford, and others.  Because Century and Hartford provided the BSA with primary coverage with Insurance Policies containing no aggregate limits for several decades, Century and Hartford have substantial insurance coverage exposure relating to the Abuse Claims.  And, as discussed above, Century has substantially more exposure for Abuse Claims given the periods it issued Insurance Coverage to the BSA.

Beginning in 1983, the BSA shifted its insurance program to Insurance Policies that contained overall aggregate limits of liability.  Unlike the per-occurrence policies, each payment towards the settlement of a Claim erodes the Insurance Policy's aggregate limit until it is exhausted and no longer responds to Claims.  The BSA purchased these types of Insurance Policies from 1983 to the end of 1985. As a counterbalance to the imposition of aggregate limits, the BSA's towers of insurance in 1983 through 1985 included significant limits of liability and excess layers of coverage.  For example, in 1983, the BSA procured excess Insurance Policies with $50 million in aggregate limits.  The excess and umbrella policies were issued by various insurers.  However, even given the high aggregate limits, a majority of the Insurance Policies during this time period have been exhausted by pre-Petition settlements and defense costs.

The BSA again altered its insurance program beginning in 1986 through 2018, procuring a primary Insurance Policy and a first-layer excess Insurance Policy where the deductible matches the Insurance Policy's limit of liability.  More specifically, between 1986 and 2002, the BSA has primary Insurance Policies with $1 million in limits of liability per year and umbrella Insurance Policies with $1 million in limits of liability per year.  Between 2002 and 2008, the BSA has primary Insurance Policies with $1 million in limits of liability per year, but with increased umbrella obligations.  And between 2008 and 2018, the BSA maintained primary Insurance Policies with $1 million in limits of liability per year, and umbrella Insurance Policies with $9 million in limits of liability per year.  Because of the high deductibles in the 1990 to 2018 Insurance Policies, the BSA has not accessed many of the excess Insurance Policies in those years.  There are, however, a few excess Insurance Policies that have been eroded or exhausted by pre-Petition settlements and defense costs. Nevertheless, the BSA still has substantial excess Insurance Coverage during this time period despite the exhaustion of a few of the lower-excess Insurance Policies.

---

Fire Insurance Company, and Westchester Surplus Lines Insurance Company.  All of these Entities are generally referred to as "Century" herein.

The BSA's obligation to pay the deductibles for the Insurance Policies between 1986 and 2008 versus the Insurance Company's obligation to pay such deductibles is subject to the terms of such Insurance Policies. However, it is the BSA's position that when the BSA cannot or does not pay the deductible, the primary Insurance Policies issued between 1986 and 2008 require the Insurance Company to pay. A dispute exists as to whether the obligation on the primary insurer to pay the deductible on behalf of the BSA is subject to an aggregate limit of liability. The primary insurers have asserted that a $1 million aggregate applies to this obligation. Other insurers have asserted that the primary insurers' obligation to pay the deductible is not subject to any aggregate, and that the aggregate limit of liability only applies to those damages in excess of the deductible. In the event that the aggregate limit of liability does apply to the payment of the deductibles under the primary Insurance Policies, a related dispute exists as to whether the BSA can directly access the excess insurance policies issued between 1986 and 2008 or whether the BSA must continue to pay that deductible on an ongoing basis for each claim.[36]

In 2019, the BSA again changed its insurance program to avoid the deductibles noted above, which it has kept current and expects to continue in 2021. Throughout the years of Scouting operations, the BSA has eroded certain of the Insurance Policies referenced above. The BSA has also entered into settlement agreements pertaining to certain policies that may limit the extent of coverage available.

### 2.    The BSA's Insurance Coverage for the Local Councils

As noted, the BSA operates Scouting through the Local Councils and the Chartered Organizations. Prior to 1971, each Local Council was required to procure Insurance Policies that would provide coverage, for among other things, the types of Abuse Claims alleged herein.

Over the course of the Chapter 11 Cases, the Debtors and the Local Councils have gone through extensive insurance archeology efforts and discovery to obtain evidence of policies issued to the Local Councils prior to 1978. To date, the BSA and Local Councils have been able to locate either copies of the Insurance Policies or secondary evidence of their existence; however, some of the secondary evidence does not provide specific terms of the Insurance Policies, such as limits or the policy period. Discovery is ongoing in that regard.

From these insurance archeology efforts, the BSA and Local Councils have also learned that several Insurance Companies issued specific Insurance Policies to the Local Councils. For example, from 1965 to 1971, Century created an insurance program for the Local Councils. Likewise, from 1975 to 1976, the New Hampshire Insurance Company ("AIG") also created an insurance program through a broker, R.F. Lyons, that issued a significant number of AIG Insurance Policies to Local Councils. AIG also issued a substantial amount of Insurance Policies to Local Council as early as the 1940s.

Starting in 1971, the BSA began adding certain Local Councils as additional insureds under its CGL policies. Then, in 1978, the BSA formalized this practice through the

---

[36] Between 2008 and 2018, there is no dispute that the primary Insurance Policies between 2008 and 2018 are not subject to an aggregate limit of liability.

implementation of a General Liability Insurance Program ("GLIP"), whereby the BSA agreed to procure general liability insurance for all Local Councils by including them in the definition of "Named Insured" in all of the BSA CGL Insurance Policies. Similarly, starting in 1978, the BSA began to provide Insurance Coverage under its CGL policies to certain Chartered Organizations.

Schedule 3 to the Plan sets forth the various Insurance Policies that the BSA alleges afford the Local Councils Insurance Coverage on account of Abuse Claims. Columbia Casualty Company; The Continental Insurance Company as successor in interest to certain policies issued by Harbor Insurance Company; The Continental Insurance Company successor by merger to Niagara Fire Insurance Company; and The Continental Insurance Company (collectively "Continental Insurance Company") disagree with Schedule 3's allegation that certain policies issued by Continental Insurance Company or related entities afford the Local Councils any Insurance Coverage with respect to Abuse Claims, and Continental Insurance Company intends to vigorously defend this position.

### 3. Chartered Organizations' Rights Under the BSA Insurance Policies

Starting in or around 1976, the BSA included Chartered Organizations as insureds on its Insurance Policies. Specifically, the BSA added sponsors and Chartered Organizations as insureds. It is the BSA's position that Chartered Organizations are not an insured under any of the BSA's pre-1976 Insurance Policies; therefore, Chartered Organizations have no right to access the proceeds of these Insurance Policies to pay Abuse Claims.[37]

To the extent that the Chartered Organizations have rights to the BSA's post-1976 Insurance Policies, those rights are limited as such Insurance Policies have deductible obligations (as noted above), aggregate limits, exhausted limits, settlements, exclusions, etc.

For example, the BSA's 1978 Insurance Policy includes a deductible endorsement that requires a $250,000 deductible be met for each occurrence; therefore, Chartered Organizations access to the 1978 to 1980 Insurance Policies is limited by the required deductible obligation. The Chartered Organizations' access to the BSA's 1980 to 1982 Insurance Policies are likewise limited given many of these policies are either insolvent, exhausted or released through settlement. Further, the BSA's 1983 to 1985 Insurance Policies are also subject to aggregate limits, many of which have been substantially eroded based on pre-petition settlements and payments.

Additionally, in 1984, the Insurance Policies included an endorsement that provided that the Insurance Policies would be primary insurance for Chartered Organizations. However, prior to 1984, there was no such endorsement or language in the BSA policies. Therefore, for all pre-1984 claims, Chartered Organizations would not have primary access to the BSA's Insurance Policies. The Chartered Organizations would likewise be responsible for the high deductibles on all post-1986 Insurance Policies.

---

[37]   The BSA understands that some Chartered Organizations have asserted they are insured under the pre-1976 Insurance Policies. The BSA disputes this contention.

### 4. The First Encounter Agreement and Subsequent Endorsement in the BSA Policies

As noted above, Century provided the BSA with primary Insurance Coverage for several decades. In 1996, the BSA and Century engaged in an effort to minimize disputes regarding Insurance Coverage, specifically in regard to Abuse Claims. As a result of those discussions, on or about May 24, 1996, the BSA and certain Century Entities executed the "Settlement Agreement Regarding Sexual Molestation Claims." This settlement is often referred to as the "First Encounter Agreement" ("FEA"). For the avoidance of doubt, the FEA only applies to Abuse Claims based on the definitions set forth therein.

Pursuant to the FEA, the BSA and Century agreed that "the date of 'occurrence' pertaining to any Sexual Molestation Claim shall be the date when the first act of Sexual Molestation took place, even if additional acts of Sexual Molestation or additional Personal Injuries arising therefrom also occurred in subsequent policy periods; and all damages arising out of such additional acts of Sexual Molestation or additional Personal Injuries shall be deemed to have incurred during the policy year when the first act of Sexual Molestation took place." The BSA and Century were the only parties to the FEA; however, several of the BSA's other Insurance Companies ascribe to this agreement and provide coverage according to the first alleged year the Abuse occurred. Certain parties contend that the FEA is only applicable to Century; however, the Debtors disagree as the BSA and certain of the BSA's Insurance Companies have adjusted Abuse Claims consistent with the FEA since 1996.

In about 2008, the BSA's primary and excess Insurance Policies include the "Date of Exposure for Molestation Claims" endorsement. Similar to the FEA, the endorsement provides that any alleged sexual molestation occurrence involving the same claimant would be treated as a single occurrence with the date of the first alleged act of Abuse being designated the "date of loss."

### 5. Prepetition Insurance Coverage Actions

Prior to the Petition Date, the BSA's Insurance Companies generally defended and indemnified the BSA against Abuse Claims. In certain years in which the BSA's Insurance Policies were exhausted, insolvent or settled, the BSA would fund the settlement of Abuse Claims. While the Insurance Companies reserved the right to do so with respect to many Abuse Claims, in the last four years the BSA's Insurance Companies have only denied coverage in connection with a very limited number of underlying lawsuits.

The denials related to these lawsuits prompted the following Insurance Coverage Actions: (a) *Boy Scouts of America, et al. v. Insurance Company of North America et al.*, Case No. DC-18-11896, pending in the 192nd Judicial District Court of Dallas County, Texas; (b) *Boy Scouts of America, et al. v. Hartford Accident and Indemnity Co., et al.*, Case No. DC-18-07313, pending in the 95th Judicial District Court of Dallas County, Texas; (c) *National Surety Corp. v. Boy Scouts of America, et al.*, Case No. 2017-CH-14975, pending in the Circuit Court of Cook County, Illinois, Chancery Division. Hartford also initiated an adversary proceeding in these Chapter 11 Cases styled *Hartford Accident and Indemnity Co. and First State Ins. Co. v. Boy Scouts of America, et al.*, Adv. Pro. No. 20-50601 (LSS). The majority of the Insurance

Coverage Actions are currently stayed by operation of the automatic stay; however, the parties to the Hartford actions have agreed to stay the entirety of the adversary proceeding and the corollary state court action.

The Insurance Coverage Actions involved several of the BSA's Insurance Companies, including Century, Hartford, National Surety Corporation ("National Surety") and Allianz Insurance ("Allianz"). The Insurance Companies in the Insurance Coverage Actions asserted that the BSA and Local Councils were not entitled to coverage for specific sexual abuse claims based on various coverage defenses, including, but not limited to, the number of "occurrences" that were triggered by the Insurance Policies, the expected and intended language in the Insurance Policies precluded Insurance Coverage, and that the BSA had failed to cooperate with its Insurance Companies.

The Debtors believe that such defenses or limitations to the scope of Insurance Coverage are without merit. In the spirit of reaching consensus with the Insurance Companies, the BSA is currently participating in mediation with its Insurance Companies to resolve certain disputes regarding the Debtors' rights to Insurance Coverage under the Insurance Policies.[38]

Under the Plan, the Insurance Coverage Actions (along with Insurance Actions) will be contributed to the Settlement Trust. It is difficult to quantify the value of the Insurance Coverage Actions and Insurance Actions as the resolution of these Actions is dependent on the interpretation of certain terms, provisions, and exclusions in the Insurance Policies. However, if the BSA and the Settlement Trust are successful in defeating the coverage defenses that have been, or may be asserted in the Insurance Coverage Actions and Insurance Actions (which the BSA believes is probable), the proceeds of these Actions could represent a substantial contribution to the Settlement Trust.

### 6.    Post-Petition Insurance Coverage Defenses Asserted by Insurance Companies

The BSA tendered the Abuse Claims that were the subject of the Proofs of Claim to the BSA's Insurance Companies under the Insurance Policies. The BSA's Insurance Companies have reserved rights relating to the Abuse Claims under the Insurance Policies on various grounds, including but not limited to:

- The BSA may have failed to cooperate in the defense and investigation of the Abuse Claims;

- The BSA may not settle the Abuse Claims in violation of the Voluntary Payment provision under the Insurance Policies;

- Many of the Abuse Claims are not compensable under the Insurance Policies because of statute of limitations issues;

---

[38]    Pursuant to the Bankruptcy Court's *Order (I) Appointing Mediators, (II) Referring Certain Matters to Mediation, and (III) Granting Related Relief* [D.I. 812] entered on June 9, 2020, the mediations are currently before the Bankruptcy Court-appointed Mediators, the Honorable Kevin Carey (Ret.), Paul Finn, and Timothy Gallagher for the purpose of mediating the comprehensive resolution of issues and Claims in the Chapter 11 Cases through a chapter 11 plan.

- The BSA, Local Councils, and Chartered Organizations expected and intended the injuries subject to the Abuse Claims;

- The anti-assignment provisions in the Insurance Policies preclude the BSA, Local Councils and Chartered Organizations from assigning their Insurance Policies to the Trust; and

- Certain of the proposed terms of the Plan and TDPs violate the terms and conditions of the Insurance Policies.

The BSA strongly contests the merits of these coverage defenses. Further, there is no merit to any contention by the BSA's Insurance Companies that the BSA cannot assign the proceeds of the Insurance Policies to the Trust as this is well settled under Third Circuit law. As noted above, the BSA is actively working with the Insurance Companies to resolve these disputes.

### 7.    *Insurer Letters of Credit*

In connection with its insurance program, BSA posted certain letters of credit issued by JPM to secure obligations arising under certain of BSA's Insurance Policies (such letters of credit, the "Insurer LCs"). Neither any provision in the Plan nor the occurrence of the Effective Date shall alter, amend, or otherwise impair the rights and obligations of BSA, JPM, or any applicable Insurance Company holding one or more Insurer LCs. Without limiting the foregoing, nothing in the Plan or any confirmation order shall preclude any beneficiary of an Insurer LC from setting off, recouping, or drawing on any Insurer LC issued, or other security provided, for the benefit of the applicable Insurance Company in accordance with the applicable documents governing such Insurer LC or other security, or applying amounts therefrom to any Claim secured by an Insurer LC or other security.

## ARTICLE IV. EVENTS LEADING TO THE CHAPTER 11 CASES

The safety of children in its programs is the most important priority of the BSA. The BSA today enforces a robust set of multilayered policies and procedures to protect the young men and women involved in Scouting. These measures are informed by respected experts in the fields of child safety, law enforcement, and child psychology. The BSA is committed to the protection of its Scouts, and that commitment is integral to the BSA's identity and mission as it seeks to continue instilling values of leadership, service, and patriotism in millions of children who participate in Scouting programs across the country.

A.    The BSA's Prepetition Global Resolution Efforts and Prepetition Claims Against the BSA

As widely reported, as of the Petition Date, the BSA was a defendant in numerous lawsuits related to historical Abuse in its programs. Indeed, many Abuse victims had taken legal action against the BSA and Local Councils in the civil tort system. As explained further below, recent changes in state statutes of limitations led to a sharp increase in the number of Claims asserted against the BSA and placed tremendous financial pressure on the organization. In addition to Pending Abuse Actions that were pending in state and federal courts across the

United States, attorneys for Abuse victims had provided information regarding approximately 1,400 additional Claims not yet filed, for a total of approximately 1,700 known asserted Abuse Claims.

In light of the increasing number of Claims asserted against the BSA, the BSA made the decision that it could not continue to address Abuse litigation in the tort system on a case-by-case basis. The BSA spent more than $150 million on settlements and legal and related professional costs from 2017 through 2019 alone. In addition to the unsustainable financial cost of continuing to engage in piecemeal litigation across the country, continuing this process would have resulted in the risk of inconsistent judicial outcomes and inequitable treatment of victims. For these reasons, beginning in late 2018, the BSA, with assistance of legal and financial advisors, began to explore strategic options for achieving an equitable global resolution of Abuse Claims.

In connection with these strategic efforts, the BSA recognized that it would ultimately need to structure a settlement around a plan of reorganization that provides for channeling injunctions with respect to both current and potential future Abuse Claims.[39] Accordingly, the BSA determined, in consultation with its advisors, that it was necessary and appropriate to engage an independent third-party Representative for holders of Future Abuse Claims. After considering possible candidates for the role, the BSA selected James L. Patton, Jr. in early 2019 to serve as future claimants' representative (the "Future Claimants' Representative").[40] Future Abuse Claims include any Direct Abuse Claim against any Protected Party that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively, alleged Abuse that occurred prior to the Petition Date but which, as of the date immediately preceding the Petition Date, was held by a Person who, as of such date, (a) had not attained eighteen (18) years of age, or (b) was not aware of such Direct Abuse Claim as a result of "repressed memory," to the extent the concept of repressed memory is recognized by the highest appellate court of the state or territory where the claim arose. Notwithstanding the foregoing, if the Plan is Confirmed as a Global Resolution Plan, then, with respect to any Contributing Chartered Organization, the term "Future Abuse Claim" shall be limited to any such Claim that is attributable to, arises from, is based upon, relates to, or results from, Abuse that occurred prior to the Petition Date: (a) in connection with the Contributing Chartered Organization's sponsorship of one or more Scouting units; or (b) that has been asserted in a proof of claim in the Chapter 11 Cases asserting a Direct Abuse Claim, which Claim was filed by the Bar Date or was permitted by a Final Order of the Bankruptcy Court to file a late claim. For the avoidance of doubt, Direct Abuse Claims include Future Abuse Claims and their treatment under the Plan is the same.

In addition, the BSA engaged in discussions with several groups, including an ad hoc group of attorneys representing numerous holders of Abuse Claims advised by James Stang of Pachulski Stang Ziehl & Jones LLP, and certain of its insurers.

---

[39]  Unlike a future Claim in other mass tort contexts, there is no latency period for Abuse. In the Abuse context, a future Claim is properly understood as a Claim related to Abuse that has already occurred but which is held by an individual who (a) has not attained 18 years of age, or (b) was not aware of such Abuse Claim as a result of "repressed memory," such that he or she is not aware that he or she holds an Abuse Claim, to the extent the concept of repressed memory is recognized by the highest appellate court of the State or territory where the Claim arose.

[40]  As noted in Article V herein, the Bankruptcy Court appointed Mr. Patton as the Future Claimants' Representative on April, 24, 2020, *nunc pro tunc* to the Petition Date.

One of the strategic options that the BSA explored throughout 2019 included efforts to reach a settlement with a substantial number of Abuse victims that could be implemented through a prearranged chapter 11 proceeding. Those efforts involved several meetings with attorneys representing many Abuse victims, including a two-day mediation in early November 2019. The mediation was attended by a Future Claims Representative and some of the BSA's Insurance Companies. Unfortunately, the mediation was unsuccessful. It became apparent that attorneys for Abuse victims believed that certain Local Councils with significant Abuse liabilities had significant assets that could be used to compensate victims. Further, it became clear that attorneys for Abuse victims would only accept information about the nature and extent of the BSA's available assets if provided through a court-supervised process. Accordingly, the BSA recognized in late 2019 that there were no meaningful prospects for a prearranged global resolution. Under those conditions, the Debtors commenced these Chapter 11 Cases to achieve dual objectives: (a) timely and equitably compensate victims of Abuse in Scouting and (b) ensuring that the BSA emerges from bankruptcy with the ability to continue its vital charitable mission.

B.    The Impact of Statutes-of-Limitation Changes on Claims against the BSA and Non-Debtor Stakeholders

The number of Claims against the BSA has increased dramatically over the past twenty years due to changes to state statutes of limitations governing Causes of Action alleging child Abuse. Since 2002, 17 states have enacted legislation allowing individuals to bring Claims that would otherwise have been barred by the applicable limitations period. Most of these jurisdictions (including California, Delaware, Georgia, Hawaii, Minnesota, New Jersey, and North Carolina) have implemented revival windows that temporarily eliminate the civil statutes of limitations for survivors of Abuse whose Claims have already expired. These revival windows have allowed older survivors of child Abuse to bring lawsuits decades after the Abuse occurred, including against private organizations, such as the BSA and Local Councils. Other jurisdictions (including Vermont) have fully eliminated limitations periods going forward and revived expired Claims. Additionally, more states are considering opening statute of limitation windows, extending statutes of limitations, or even removing statutes of limitations for victims of child sexual Abuse.

The trend of retroactive revisions to limitations periods for Abuse Claims accelerated in 2019, when more than a dozen states (including Arizona, California, District of Columbia, Montana, New Jersey, New York, and North Carolina) revised their limitations periods to allow survivors of Abuse to bring Claims that would otherwise have been time-barred. Shortly before the Petition Date, a group of plaintiffs filed suit in the U.S. District Court in the District of Columbia alleging that the District's recent revival-window legislation permits plaintiffs to bring previously time-barred Claims, regardless of where the Abuse occurred or where the plaintiff resides.[41] In addition, prior to the Petition Date, plaintiffs began pursuing a theory that the recently opened New Jersey statute of limitations allowed the filing of any Claim that arose prior to 1979, regardless of where the Abuse occurred, since the BSA was headquartered in New Jersey prior to that date, before its Headquarters moved to Irving, Texas.

---

[41]    *See Does 1-8 v. Boy Scouts of America*, Case No. 20–00017 (D.D.C.).

These changes in statutes of limitations have dramatically altered the legal landscape for Abuse Claims.  Specifically, the number of suits alleging Claims from earlier years that would otherwise have been barred by the applicable limitations period has surged, which is reflected in the filing of tens of thousands of Abuse claims in these Chapter 11 Cases.  These suits have forced the BSA to look backward—past the decades of progress and leadership in youth protection—to the mid- to late-twentieth century, when the vast majority of the Abuse in Scouting occurred.  Claims alleging Abuse within the last thirty years make up a small fraction of total known Abuse claims.[42]  The vast majority of the Claims the BSA is now facing allege Abuse from the 1960s to the 1980s.  Fairly compensating survivors that were abused during this period placed tremendous financial pressure on the BSA and its local partners.

## ARTICLE V. THE CHAPTER 11 CASES

A.    Commencement of the Cases and First Day Relief

On the Petition Date, the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  As of the date hereof, the Debtors have continued, and will continue until the Effective Date, to operate their organization as Debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

Also on the Petition Date, the Debtors filed a number of motions seeking typical "first day" relief in chapter 11 cases authorizing the Debtors to maintain their operations in the ordinary course (collectively, the "First Day Motions").  This relief was designed to ensure a seamless transition into the chapter 11 process and allow the Debtors to maintain their operations in the ordinary course so as to function smoothly while their cases progressed.  The Bankruptcy Court granted substantially all of the relief requested in the First Day Motions and entered various orders authorizing the Debtors to, among other things:

- Continue paying employee wages and benefits [D.I. 295];

- Continue the use of the Debtors' cash management system, bank accounts, and business forms [D.I. 381];

- Continue the use of certain cash collateral and the granting of adequate protection with respect to the use of such cash collateral [D.I. 433];

- Continue customer, scout and donor programs, and honor related prepetition obligations [D.I. 279];

- Pay certain prepetition taxes and assessments [D.I. 366];

- Pay certain prepetition obligations for essential vendors, foreign vendors, shippers, warehousemen, and other Lien claimants [D.I. 275];

---

[42]    Of the approximately 95,200 pending or asserted Abuse Claims against the BSA, approximately 65,000 claims have ascertainable dates.  Of the approximately 65,000 dated Claims, approximately 80% involve Claims alleging Abuse that occurred before 1988.

- Pay certain prepetition obligations under shared services arrangements with the Local Councils and Related Non-Debtor Entities and authorize the Debtors to continue performing or paying under shared services arrangements with the Local Councils and Related Non-Debtor Entities [D.I. 369]; and

- Establish procedures for utility providers to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service [D.I. 273].

B.    Procedural Motions

The Debtors filed various motions on the Petition Date regarding procedural issues common to chapter 11 cases of similar size and complexity. The Bankruptcy Court granted substantially all of the relief requested in such motions and entered various orders authorizing the Debtors to, among other things:

- Establish procedures for interim compensation and reimbursement of expenses of chapter 11 professionals [D.I. 341]; and

- Retain and compensate certain professionals utilized by the Debtors in the ordinary course of their non-profit operations [D.I. 354].

C.    Critical Vendors and Shared Services

As described above, the Debtors filed various First Day Motions, two of which were motions to pay prepetition Claims of critical vendors [D.I. 7] (the "Critical Vendor Motion") and prepetition obligations under shared services arrangements [D.I. 15] (the "Shared Services Motion"). Pursuant to the Critical Vendor Motion, the Debtors obtained authorization to pay, in the ordinary course of the Debtors' non-profit operations, prepetition Claims of essential vendors, foreign vendors, 503(b)(9) vendors, and other Lien claimants. Pursuant to the Shared Services Motion, the Debtors requested authorization to pay prepetition obligations under shared organizational services agreements related to the Local Councils and Related Non-Debtor Entities and to continue performing under such arrangements. As explained in detail in the Shared Services Motion, the BSA provides benefits programs, liability insurance, and administrative services to Local Councils, such as accounting, human resources, information technology, member recruitment, fundraising, marketing, leadership training, and other related support (the "Shared Services Arrangements"). Without these Shared Services Arrangements, the Debtors would be incapable of providing Scouting programs nationwide and Local Councils would be unable to operate their organizations.

D.    Retention of Chapter 11 Professionals

On March 17, 2020, the Debtors filed applications to retain (i) Sidley Austin LLP ("Sidley Austin"), as the Debtors' bankruptcy counsel; (ii) Morris, Nichols, Arsht & Tunnell LLP, as the Debtors' bankruptcy co-counsel; (iii) Alvarez & Marsal North America, LLC, as financial advisor; (iv) Bates White, LLC, as Abuse Claims consultant ("Bates White"); (v) KCIC, LLC, as insurance and valuation consultant; (vi) Omni Agent Solutions, as administrative agent; (vii) Haynes and Boone, LLP, as special insurance counsel; and

(viii) Ogletree, Deakins, Nash, Smoak & Stewart, P.C., as special litigation counsel [D.I. 204, 205, 206, 207, 208, 209, 210, and 220]. In April 2020, the Bankruptcy Court entered orders authorizing the retention of all the Debtors' listed Estate Professionals, except for Sidley Austin [D.I. 339, 340, 353, 355, 364, 372, and 463]. On May 29, 2020, the Bankruptcy Court issued a bench ruling overruling the objection to the Debtors' application to retain Sidley Austin as bankruptcy counsel filed by Century [D.I. 755]. On June 2, 2020, the Bankruptcy Court entered an order granting Sidley Austin's retention [D.I. 758].[43]

Thereafter, the Debtors filed additional applications to retain (i) PricewaterhouseCoopers LLP, as independent auditor and tax compliance services provider to the Debtors; (ii) Appraisers of the Keys, Inc.; JFW Ranch Consulting, LLC; Hotel & Leisure Advisors; F.I. Salter, Inc.; Dawn M. Powell Appraisals Inc.; and BW Ferguson & Associates Ltd., as appraisers with respect to the Debtors' four high adventure facilities, discussed in greater detail herein; (iii) Quinn Emanuel Urquhart & Sullivan, LLP as special litigation counsel; and (iv) JLL Valuation & Advisory Services, LLC ("JLL") as appraiser with respect to certain Local Council real properties [D.I. 796, 868, 1125, and 1762]. The Bankruptcy Court entered orders approving the Debtors' retention applications on June 24, 2020, July 8, 2020, September 18, 2020, and December 14, 2020, respectively [D.I. 889, 984, 1343, and 1841].

On October 22, 2020, the Debtors filed an application requesting authorization to retain White & Case LLP ("White & Case") as bankruptcy counsel because core members of their restructuring team had transitioned their practices to White & Case from Sidley Austin [D.I. 1571]. The Debtors' restructuring team who transitioned have led the Debtors' restructuring efforts for the past two years and are familiar with the numerous stakeholders that are actively participating in these Chapter 11 Cases. The Bankruptcy Court entered an order authorizing the retention of White & Case on November 8, 2020 [D.I. 1698], over the objection of Century [D.I. 1637].[44]

E.    Appointment of Fee Examiner

Given the size and complexity of the Chapter 11 Cases, on September 18, 2020, the Court entered an order appointing Justin H. Rucki of Rucki Fee Review, LLC as Fee Examiner [D.I. 1342].

---

[43]   On June 11, 2020, Century filed a Notice of Appeal [D.I. 837] of the Bankruptcy Court's order authorizing the Debtors' retention of Sidley Austin. On May 7, 2021, the U.S. District Court for the District of Delaware issued a final order affirming the Bankruptcy Court's decision to authorize the retention of Sidley Austin [D.I. 3292] (Civil Action No. 20-cv-798, BAP No. 20-14).

[44]   On December 2, 2020, Century filed a Notice of Appeal [D.I. 1771] of the Bankruptcy Court's order authorizing the Debtors' retention of White & Case. The appeal was before the U.S. District Court for the District of Delaware (Civil Action No. 20-cv-1643, BAP No. 20-58) (the "W&C Retention Appeal"). On February 26, 2021, Century filed its *Stipulation of Dismissal of Bankruptcy Appeal* stipulating to the dismissal of the W&C Retention Appeal.

F.       Appointment of Statutory Committees, Ad Hoc Committee, and Future Claimants'
         Representative

   *1.       Ad Hoc Committee of Local Councils*

Prior to the Petition Date, the BSA assisted in the formation of an ad hoc committee of Local Councils comprised of eight Local Councils[45] of various sizes from regions across the country (the "Ad Hoc Committee"). The primary purpose of the Ad Hoc Committee is to allow Local Councils to participate in negotiations regarding a global resolution of Abuse Claims and other issues important to them, including the treatment of their shared insurance with the BSA. The Ad Hoc Committee has also been instrumental in coordinating the BSA's ongoing efforts to collect and organize Local Council asset information. The individual members of the Ad Hoc Committee are all volunteers. The volunteer chair is Richard G. Mason of the Wachtell, Lipton, Rosen & Katz law firm. Mr. Mason is the volunteer president of the Greater New York Council.

   *2.       Unsecured Creditors Committee*

On March 5, 2020, the United States Trustee appointed the Committee of Unsecured Trade Creditors (the "Creditors' Committee"), which consists of five members [D.I. 141]. The Creditors' Committee represents the interests of all non-Abuse-related unsecured creditors, including former employees, litigation claimants, and other non-Abuse unsecured creditors. The members of the Creditors' Committee are (1) Pension Benefit Guaranty Corporation, represented by Tom Taylor; (2) Girl Scouts of the United States of America, represented by Jennifer Rochon; (3) Roger A. Ohmstede; (4) Pearson Education, Inc., represented by John Garry; and (5) Lion Brothers Inc., represented by Susan Ganz.

   *3.       Tort Claimants' Committee*

On March 5, 2020, the United States Trustee also appointed the Tort Claimants' Committee (together with the Creditors' Committee, the "Committees"), which consists of nine individual members who hold Abuse Claims against the Debtors [D.I. 142].

To date, the Debtors have cooperated with the Committees, creditors, and other stakeholders on complex diligence and informal discovery issues, including participation in meet-and-confer calls, question-and-answer sessions, and the review and production of a significant volume of responsive documents and other information.

   *4.       Future Claimants' Representative*

On March 18, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order Appointing James L. Patton, Jr., as Legal Representative for Future Claimants, Nunc Pro Tunc to the Petition Date* [D.I. 223]. On April, 24, 2020, the Bankruptcy Court appointed Mr. Patton as the legal representative of Future Claimants [D.I. 486] (the "Future Claimants' Representative"), *nunc pro tunc* to the Petition Date.

---

[45]    The members are: (1) Andrew Jackson Council; (2) Atlanta Area Council; (3) Crossroads of America Council; (4) Denver Area Council; (5) Grand Canyon Council; (6) Greater New York Councils; (7) Mid-America Council; and (8) Minsi Trails Council.

On May 5, 2021, the Future Claimants' Representative filed his *Fourth Supplemental Declaration of James L. Patton, Jr.* [D.I. 3146]. The declaration provided that as the Future Claimants' Representative, Patton has continued to monitor any potential conflicts and remains independent, disinterested, and without interests materially adverse to the Future Claimants. Likewise, on May 5, 2021, Young Conaway Stargatt & Taylor, LLP filed its *Third Supplemental Declaration of Edwin J. Harron* [D.I. 3147]. This declaration provides that as the legal representative to the Future Claimants' Representative, Edwin J. Harron has continued to monitor any potential conflicts and remains independent, disinterested, and without interests materially adverse to the Future Claimants.

### 5.    Coalition of Abused Scouts for Justice

On July 24, 2020, the Coalition of Abused Scouts for Justice (the "Coalition"), an ad hoc group representing the interests of Abuse survivors, filed its *Notice of Appearance and Request for Service of Notices and Documents* [D.I. 1040]. The Coalition was formed in connection with several law firms ("State Court Counsel")[46] representing holders of Abuse Claims. The Coalition is made up of approximately 11,875 Abuse survivors having signed an "Affirmative Consent" which consents to becoming a member of the Coalition and authorizes their respective State Court Counsel to instruct the Coalition's professionals in connection with these Chapter 11 Cases. Additionally, the Coalition has asserted that the State Court Counsels represent approximately 65,000 Abuse survivors collectively and many of such additional Persons are expected to sign "Affirmative Consents."

On January 29, 2021, the filed its *Third Amended Verified Statement of Coalition of Abused Scouts of Justice Pursuant to Bankruptcy Rule 2019* [D.I. 1996 and 1997], and provides information regarding its members (with certain personal information redacted). The Coalition is represented by Monzack Mersky and Browder, P.A., and Brown Rudnick LLP.

### 6.    United Methodist Ad Hoc Committee

In late 2020, 49 United Methodist Annual Conferences supported the formation of an ad hoc group (the "United Methodist Ad Hoc Committee") to advance the interests generally of United Methodist local churches and other United Methodist organizations that serve or have served as Chartered Organizations to the BSA. The United Methodist Ad Hoc Committee, comprising of twelve members, has retained Bradley and Potter Anderson & Corroon LLP to represent them in these Chapter 11 Cases. The United Methodist Ad Hoc Committee also participates in the mediation regarding issues in connection with a global resolution of Abuse Claims. On January 6, 2021, the United Methodist Ad Hoc Committee filed a verified statement pursuant to Bankruptcy Rule 2019, detailing certain information relating to the its members. [D.I. 1901].

---

[46]    These firms are: (i) Slater Slater Schulman LLP, (ii) ASK LLP, (iii) Andrews & Thornton, (iv) Levin Papantonio Thomas Mitchell Rafferty & Procter P.A., (v) Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C., (vi) Junell & Associates PLLC, (vii) Reich & Binstock LLP, (viii) Marc J. Bern & Partners LLP, (ix) Krause & Kinsman Law Firm, (x) Bailey Cowan Heckaman PLLC, (xi) Babin Law, LLC, (xii) Jason J. Joy & Associates, PLLC, (xiii) Motley Rice LLC, (xiv) Weller Green Toups & Terrell LLP, (xv) Colter Legal PLLC, (xvi) Christina Pendleton & Associates PLLC, (xvii) Forman Law Offices, P.A., (xviii) Danziger & De Llano LLP, (xix) Swenson & Shelley PLLC, (xx) Brooke F. Cohen Law, (xxi) Damon J. Baldone PLC, (xxii) Cutter Law PC, (xxiii) The Robert Pahlke Law Group, (xxiv) Napoli Shkolnik PLLC, (xxv) the Hirsch Law Firm, and (xxvi) Porter & Malouf, P.A [D.I. 1997].

G.    Filing of Schedules of Assets and Liabilities and Statements of Financial Affairs

On February 19, 2020, the Bankruptcy Court entered an order extending the deadline by which the Debtors must file their Schedules and Statements of Financial Affairs with the Bankruptcy Court [D.I. 67].  In accordance with that order and pursuant to Bankruptcy Rule 1007 and Local Rule 1007-19(b), the Debtors filed their Schedules and Statements on April 8, 2020 [D.I. 375, 376, 377, and 378].  The Schedules provide summaries of the assets held by each of the Debtors as of the Petition Date, as well as a listing of the Debtors' liabilities, including Secured, unsecured priority, and unsecured non-priority Claims pending against each of the Debtors during the period prior to the Petition Date.

H.    Exclusivity

1.    *First Extension of Exclusivity Period*

On June 16, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [D.I. 858] extending the Debtors' exclusive period to (a) file a chapter 11 plan (the "Exclusive Filing Period") by 120 days, to and including October 15, 2020 and (b) solicit votes thereon (the "Exclusive Solicitation Period" and, together with the Exclusive Filing Period, the "Exclusive Periods") by 120 days, to and including December 15, 2020, without prejudice to the Debtors' rights to seek further extensions of the Exclusive Period.

On June 30, 2020, the Tort Claimants' Committee filed *The Official Committee of Tort Claimants' Response to Debtors' Motion for Entry of an Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [D.I. 915].

On July 2, 2020, the Creditors' Committee filed a *Statement of the Creditor's Committee with Respect to the Debtors' Motion for Entry of an Order Extending the Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [D.I. 947].

On July 9, 2020, the Bankruptcy Court entered the *Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [D.I. 996], which extended the exclusive period for the Debtors to file a chapter 11 plan by approximately 120 days, to and including October 15, 2020.  The period during which the Debtors had the exclusive right to solicit acceptances thereof was extended by approximately 120 days, to and including December 15, 2020.

2.    *Second Extension of Exclusivity Period*

On October 14, 2020, Debtors filed the *Debtors' Second Motion for Entry of an Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [D.I. 1519] extending the Debtors' exclusive periods to (a) file a chapter 11 plan by 180 days, to and including April 13, 2021, and (b) solicit votes thereon by 180 days, to and including June 14, 2021, without prejudice to the Debtors' rights to seek further extensions of the Exclusive Periods.

On October 30, 2020, the Bankruptcy Court entered the *Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [D.I. 1606], which extended the exclusive period for the Debtors to file a chapter 11 plan by approximately 155 days, to and including March 19, 2021. The period during which the Debtors have the exclusive right to solicit acceptances thereof was extended by approximately 154 days, to and including May 18, 2021.

### 3.    Third Extension of Exclusivity Period

On March 18, 2021, the Debtors filed the *Debtors' Third Motion for Entry of an Order Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [D.I. 2411] requesting that the Bankruptcy Court enter an order extending the Debtors' exclusive filing period to (a) file a chapter 11 plan on or before August 18, 2021, and (b) solicit votes thereon by October 18, 2021. On April 1, 2021, the Tort Claimants' Committee filed an objection arguing that the exclusivity should be terminated to permit the Tort Claimants' Committee to propose its own plan that permits reorganization and relies on insurance to compensate survivors, among other things [D.I. 2506]. The Tort Claimants' Committee also argue that the Plan is patently unconfirmable, the Local Council and Chartered Organization contributions are inadequate, and there is insufficient support from survivors of Abuse.

On April 22, 2021, the Coalition and the Future Claimants' Representative filed an objection arguing that exclusivity should be terminated to permit the Coalition, Future Claimants' Representative, and the Tort Claimants' Committee to propose its own plan that would provide for Local Councils and Charted Organizations to make contributions and become protected parties [D.I. 2672]. The Coalition and Future Claimants' Representative also argue that the Plan does not equitably compensate survivors, the Hartford Settlement does not provide for adequate compensation, Century may lack the ability to pay an equitable amount to the Trust, and the Debtors are working with their Insurance Companies to minimize the survivors' recovery and the insurance companies' coverage obligations.

I.    Removal

Concurrently with the commencement of the Chapter 11 Cases, the Debtors began taking measures to consolidate and stay all pending Abuse litigation against the BSA, Local Councils, and Chartered Organizations. In particular, the BSA removed to federal district court (or bankruptcy court, depending upon the applicable local rules) all Abuse Claims pending in state courts throughout the country against the BSA and/or the Local Councils and Chartered Organizations.

Since there are a number of actions that name the BSA as a defendant and that allege Claims substantially similar to those asserted in the Pending Abuse Actions (collectively, the "Further Abuse Actions") and dozens of additional non-Abuse actions that remain pending against the BSA in various state courts, on May 15, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order Under 28 U.S.C. § 1452 and Fed. R. Bankr. P. 9006(b) and 9027, Extending the Period Within which the Debtors May Remove Civil Actions and Granting Related Relief* [D.I. 653] requesting that the deadline to remove such actions be extended to the later of: (a) September 15, 2020; and (b) the date that is forty-five (45) days after the occurrence of the

Termination Date (as defined below).  The Court granted the motion on June 3, 2020 [D.I. 769].  On September 14, 2020, the Debtors filed the *Debtors' Second Motion for Entry of an Order, Under 28 U.S.C. § 1452 and Fed. R. Bankr. P. 9006(b) and 9027, Extending the Period Within Which the Debtors May Remove Civil Actions and Granting Related Relief* [D.I. 1316] requesting that the Bankruptcy Court extend the period within which the Debtors may file notices of removal of Claims or Causes of Action under Bankruptcy Rule 9027 by an additional 120 days to January 13, 2021.  On October 1, 2020, the Bankruptcy Court granted the motion. [D.I. 1393].  On December 29, 2020, the Debtors filed the *Debtors' Third Motion for Entry of an Order, Under 28 U.S.C. § 1452 and Fed. R. Bankr. P. 9006(b) and 9027, Extending the Period Within Which the Debtors May Remove Civil Actions and Granting Related Relief* [D.I. 1876] requesting that the Bankruptcy Court further extend the period within which the Debtors may file notices of removal of Claims or Causes of Action by an additional 120 days to May 13, 2021.  On January 14, 2021, the Bankruptcy Court entered an order granting the relief requested in the motion without objection.  [D.I. 1941].  On April 28, 2021, the Debtors filed their fourth motion seeking to extend the removal deadline [D.I. 2720].  The Bankruptcy Court entered the order further extending the period within which the Debtors may file notices of removal of Claims or Causes of Action by an additional 120 days to September 10, 2021.

J.      Preliminary Injunction

        On the Petition Date, the Debtors initiated an adversary proceeding by filing the *Verified Complaint for Injunctive Relief,* Adv. Pro. No. 20-50527 (LSS) [A.D.I. 1 (sealed); A.D.I. 5 (redacted)] (the "Complaint").  In connection with the Complaint, the Debtors filed *The BSA's Motion for a Preliminary Injunction Pursuant to Sections 105(a) and 362 of the Bankruptcy Code* [A.D.I. 6] (the "Preliminary Injunction Motion").

        In the Preliminary Injunction Motion and related pleadings, the Debtors sought to extend the automatic stay to enjoin the prosecution of the Pending Abuse Actions.  The Pending Abuse Actions comprise Claims filed in state and federal courts against the BSA, Non-Debtor Related Entity Learning for Life, Local Councils that are separate non-profit Entities independently incorporated under the applicable laws of their respective states, and non-Debtor Chartered Organizations, consisting of community and religious organizations, businesses and groups of individuals that organize Scouting units.  Each of the Pending Abuse Actions alleges Abuse arising out of the victim's involvement or connection with the BSA.

        As the result of an agreement reached between and among the Debtors and the Committees, on March 30, 2020, the Bankruptcy Court entered the *Consent Order Pursuant To 11 U.S.C. §§ 105(a) and 362 Granting the BSA's Motion for a Preliminary Injunction* [A.D.I. 54] (the "Consent Order").

        The Consent Order, among other things, stayed certain Pending Abuse Actions and Further Abuse Actions with respect to the Debtors and other BSA Related Parties (as defined in the Consent Order) up to and including May 19, 2020 (the "Termination Date").  The time period from the Petition Date to and including the Termination Date, as extended from time to time, is referred to as the "Standstill Period."  As part of the agreement with the Committees, the Debtors agreed to provide financial and other information that the Committees had identified as being relevant.  To that end, the Debtors provided the Committees' advisors with access to a secure

data room containing organizational documents, financial statements, shared services agreements, documents reflecting asset and liability information, Insurance Policies, and other relevant documents.

In accordance with the Consent Order, the Debtors have filed amended version of Schedule 1 to the Consent Order that include additional Further Abuse Actions subject to the Consent Order (each, an "Amended Schedule"). The Debtors have filed Amended Schedules on each of April 30, 2020, July 2, 2020, August 7, 2020, September 11, 2020, October 13, 2020, November 23, 2020, and December 23, 2020, February 8, 2021.

Likewise, the Debtors filed amended versions of Schedule 2 to the Consent Order identifying the then-current BSA Related Parties on August 7, 2020, September 25, 2020, and December 31, 2020, February 8, 2021.

On May 18, 2020, the Bankruptcy Court entered the *Stipulation and Agreed Order By and Among the Boy Scouts of America, the Official Committee of Survivors of Abuse, and the Official Committee of Unsecured Creditors Extending the Termination Date of the Standstill Period Under the Consent Order Granting the BSA's Motion for a Preliminary Injunction Pursuant to U.S.C. §§ 105(a) and 362* [A.D.I. 72], which extended the Termination Date and Standstill Period up to and including June 8, 2020.

On June 9, 2020, the Bankruptcy Court entered the *Second Stipulation and Agreed Order By and Among the Boy Scouts of America, the Official Committee of Survivors of Abuse, and the Official Committee of Unsecured Creditors Modifying the Consent Order Granting the BSA's Motion for a Preliminary Injunction Pursuant to 11 U.S.C. §§ 105(A) and 362 and Further Extending the Termination Date of the Standstill Period* [A.D.I. 77], which, among other things, further extended the Termination Date through and including November 16, 2020.

On November 18, 2020, the Termination Date and Standstill Period were once again extended with entry of the *Order Approving Third Stipulation by and Among the Boy Scouts of America, the Official Committee of Survivors of Abuse, and the Official Committee of Unsecured Creditors Modifying the Consent Order Granting the BSA's Motion for a Preliminary Injunction Pursuant to 11 U.S.C. §§ 105(a) and 362 and Further Extending the Termination Date of the Standstill Period* [A.D.I. 116] (the "Order Approving Third Stipulation"). As a result, the Termination Date was extended through and including March 19, 2021.

On November 4, 2020, three plaintiffs ("Movants") in certain state court actions regarding Abuse Claims filed their *Motion for Order Modifying Preliminary Injunction to Allow Movants to Proceed with State Court Actions as to Non-Debtor Defendants* [A.D.I. 109] (the "Motion to Modify"). Pursuant to the Motion to Modify, the Movants requested that the Bankruptcy Court modify the Consent Order to allow the Movants' actions to proceed against certain non-Debtor defendants. Despite not objecting initially to the entry of the Consent Order, which stayed the Movants' respective state court actions, the Movants argued that their Claims as against select non-Debtor defendants could be litigated separately without affecting the BSA.

On January 11, 2021, the Movants filed a *Notice of Withdrawal of Motion for Order Modifying Preliminary Injunction to Allow Movants to Proceed with State Court Actions as to Non-Debtor Defendants* [A.D.I. 138], withdrawing the Motion to Modify without prejudice.

On February 22, 2021, the Debtors filed their *Motion to Extend Preliminary Injunction Pursuant to 11 U.S.C. §§ 105(a) and 362* [A.D.I. 144] (the "Injunction Extension Motion") and, the following day, filed their *Opening Brief* in support of the Injunction Extension Motion [A.D.I. 145]. In their Injunction Extension Motion and Opening Brief, the Debtors request that the Court extend the Termination Date of the preliminary injunction from March 19, 2021 to July 19, 2021.

On March 17, 2021, the Court entered its *Order Approving Fourth Stipulation by and among the Boy Scouts of America, the Official Committee of Survivors of Abuse, and The Official Committee Of Unsecured Creditors Modifying The Consent Order Granting The BSA's Motion For A Preliminary Injunction Pursuant To 11 U.S.C. §§ 105(A) And 362 And Further Extending The Termination Date Of The Standstill Period* [A.D.I. 162] (the "Order Approving Fourth Stipulation"). As a result, the Termination Date has now been extended through and including July 19, 2021.

Additionally, the Order Approving Fourth Stipulation incorporates a disclosure and reporting protocol by which the Local Councils will send to the BSA rosters located through a reasonable good faith search of all rosters in the Local Councils' possession, custody, or control that identify survivors on a Local Council's claims list. Under the roster protocol, the BSA will also conduct a reasonable good faith search of electronic registration information in its possession, custody, or control with respect to Abuse Survivors who filed Sexual Abuse Survivor Proofs of Claim alleging Abuse that occurred after 1999.

K.    Mediation

On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Appointing a Judicial Mediator, (II) Referring Certain Matters to Mandatory Mediation, and (III) Granting Related Relief* [D.I. 17] (the "Mediation Motion") requesting that the Bankruptcy Court enter an order appointing a sitting bankruptcy judge (if the relevant parties were unable to agree on a mediator before hearing the Mediation Motion) to mediate any and all issues related to the comprehensive resolution of Claims relating to historical acts of Abuse in the BSA's Scouting programs through a chapter 11 plan of reorganization, and referring such matters to mandatory mediation. In response to a number of limited objections to the Mediation Motion filed by various parties [D.I. 161, 164, 166, 316, 388, 617, 646, 647, 648, 650, 652, 658, 664, 710, 711, 712, 713, 756, 757, 759, 761, 762, 771, 772 and 773], the Debtors filed the *Debtors' Reply in Support of Their Motion for Entry of an Order (I) Appointing Mediators, (II) Referring Certain Matters to Mediation, and (III) Granting Related Relief* [D.I. 782].

On June 9, 2020, the Court entered an order appointing Judge Kevin Carey (Ret.), Mr. Paul Finn, and Mr. Timothy V.P. Gallagher as Mediators, and referring certain matters to mediation [D.I. 812] (the "Mediation Order"). The Debtors subsequently successfully defended the Mediation Order against a motion for reconsideration filed by Century, which the Court denied on July 14, 2020—thereby enabling the Mediators to move forward with the substantial

task of mediating these large and complex cases. The original mediation parties consisted of (a) the Debtors; (b) the Ad Hoc Committee; (c) the Future Claimants' Representative; (d) the Tort Claimants' Committee, including its members, Professionals, and the individual members' professionals; (e) the Creditors' Committee, including each parties' members, professionals, and the individual members' professionals; and (f) the following insurers: The Chubb Group of Insurance Companies, The Hartford Companies, Allianz Global Risks US Insurance Company, National Surety Corporation, Liberty Mutual Insurance Company, and American International Group, Inc. Entities.

On August 26, 2020, the Coalition moved to participate in the mediation [D.I. 1161], arguing that the Coalition was a necessary and beneficial party to the Mediation Order and should be permitted to participate in, and will add value to, efforts to reach a global resolution. On September 2, 2020, various parties filed objections to the Coalition's motion, including Hartford and certain other insurers [D.I. 1222], Allianz Global Risks U.S. Insurance Company and National Surety Corporation [D.I. 1224], the Tort Claimants' Committee [D.I. 1229], and Century [D.I. 1230]. Century argued that "the Coalition's participation in the mediation and access to highly confidential information obtained through participation, raises . . . serious concerns," and that the Coalition should be required to file a Rule 2019 disclosure to identify conflicts that may be created by the Coalition's representation by Blank Rome LLP. The Tort Claimants' Committee argued, among other things, that the Coalition's motion should not be granted because "it is nothing more than a marketing term that was concocted by six law firms who were unhappy they could not control the Tort Claimants' Committee to implement their agenda in the case." [D.I. 1231 at 1]. On October 23, 2020, the Bankruptcy Court overruled these objections and entered an order allowing the Coalition to participate in the mediation and designating the Coalition as a mediation party [D.I. 1573].

The Debtors have subsequently engaged in extensive discussions and negotiations with the mediation parties regarding complex legal and factual issues that must be addressed in connection with a global resolution of Abuse Claims. Numerous additional parties have joined the mediation subsequent to the Coalition's designation as a mediation party. Such parties include JPM; the Corporation of the President of the Church of Jesus Christ of Latter-day Saints; the United Methodist Ad Hoc Committee; Agricultural Insurance Company; Aspen Insurance Holdings, Limited; AXA XL Insurance; CNA Insurance Companies; General Star Indemnity Company; Markel Insurance Company; Arrowood Indemnity Company; Old Republic Insurance Company; Travelers Indemnity Company; Colony Insurance Company; Argonaut Insurance Company; and Clarendon America Insurance Company. As of the filing of this Disclosure Statement, intensive formal mediation is continuing in an effort to resolve outstanding controversies, including issues relating to the terms of the Plan.

On March 1, 2021, the Debtors filed the *First Mediator's Report* [D.I. 2292], explaining that mediation has resulted in the Debtors, JPM, and the Official Committee of Unsecured Creditors agreeing to a settlement term sheet. The JPM / Creditors' Committee Term Sheet is attached to the *First Mediators' Report* as Exhibit A. The *First Mediator's Report* states that the Mediators are confident that the mediation will foster additional constructive discussion between and among the Debtors and other Mediation Parties. *Id.* at 2.

The Tort Claimants' Committee filed the *Tort Claimants' Committee's Response to First Mediators' Report* on March 2, 2021 [D.I. 2297], through which the Tort Claimants' Committee reserved all rights under the Final Cash Collateral Order [D.I. 433] and noted that it did not consent to or agree with the JPM / Creditors' Committee Term Sheet attached to the *First Mediator's Report* or any memorialization of such in the Debtors' plan.

On March 2, 2021, the Future Claimants' Representative filed a joinder in support of the *Tort Claimants' Committee's Response to First Mediators' Report* [D.I. 2305].

On March 4, 2021, the Coalition filed the *Joinder and Statement of Support of the Coalition of Abused Scouts for Justice Regarding Objections to First Mediators' Report* [D.I. 2319], which also stated its support of (1) the Tort Claimants' Committee's response to the First Mediators' Report [D.I. 2297] and (2) the Future Claimants' Representative's joinder to the Tort Claimants' Committee's response to the First Mediators' Report [D.I. 2305].

On March 23, 2021, the Tort Claimants' Committee filed the *Motion of the Official Tort Claimants' Committee for Order Requiring that Mediation Be Conducted Exclusively by Zoom* [D.I. 2427] (the "Zoom Mediation Motion") on shortened notice [D.I. 2428].  Through the motion, the Tort Claimants' Committee requested that the mediation session, which had been scheduled for March 30–April 1, 2021 in Miami, Florida, be conducted exclusively via Zoom, and that the Bankruptcy Court schedule a telephonic hearing on the motion as soon as possible.  That same day, the Debtors filed their response to the Tort Claimants' Committee's motions [D.I. 2434], requesting that the Bankruptcy Court deny the Tort Claimants' Committee's requested relief without the need for a hearing.  The same day, the Bankruptcy Court entered an order [D.I. 2441] denying the relief requested in the Zoom Mediation Motion without a hearing.

On April 16, 2021, the Debtors filed the *Second Mediators' Report* [D.I. 2624] explaining that the continued mediation resulted in the Debtors reaching a settlement agreement with Hartford.  The Settlement Agreement and Release, which is subject to Court approval, is attached to the *Second Mediators' Report* as Exhibit A.  The *Second Mediators' Report* states that the Mediators remain confident that the Mediation will continue to foster constructive discussion between and among the Debtors and other Mediation Parties.

L.    Evaluation of Estate Assets

On June 18, 2020, the Debtors filed the *Debtors' Omnibus Application for Entry of an Order Authorizing the Retention and Employment of Appraisers for the Debtors and Debtors in Possession, Nunc Pro Tunc to June 18, 2020* [D.I. 868], seeking to retain five different appraisers—Appraisers of the Keys, Inc.; Hotel & Leisure Advisors; F.I. Salter, Inc.; Dawn M. Powell Appraisals Inc.; and BW Ferguson & Associates Ltd. (collectively, the "Appraisers")—to provide appraisal services for the high adventure facilities located in Florida, Minnesota, and parts of Canada, New Mexico, and West Virginia.  Due to the differences in geographic location, property type, acreage, and land use of each high adventure facility, the Debtors retained Appraisers for each of the following: Sea Base; Philmont and Summit; the portion of Northern Tier located in Minnesota; the portion of Northern Tier located in Ontario, Canada; and the remainder of Northern Tier located in Manitoba, Canada (collectively, the "Subject Properties").  The Court entered an order authorizing the retention and employment of the Appraisers on July 8, 2020 [D.I. 984].

Pursuant to their engagement letters, the Appraisers provided the following during their appraisal process: (a) a highest and best use analysis, consideration, and determination of which is a standard and requisite component of property valuation; (b) physical viewing, inspection, and measurement of structures on the Subject Properties, observation of the condition of improvements, characterization of land use, and consideration of other conditions of the properties that may impact market values; (c) consideration of the number, type, sizes, uses, and conditions of structures on the Subject Properties; (d) research and consideration of rights restrictions and zoning restrictions on the Subject Properties; and (e) consideration of other requirements and restrictions specific to certain of the Subject Properties, including growth ordinance requirements, marinas draft depth and access channels, property composition, comparable sales data, water rights, property damage, and mineral rights.

As noted above, on November 30, 2020, in connection with the Debtors' ongoing efforts to evaluate Estate and non-Estate assets to fund the Settlement Trust and the Plan, the Debtors filed an application to retain JLL [D.I. 1762], which the Bankruptcy Court approved on December 14, 2020 [D.I. 1841]. The Debtors have retained JLL to provide broker opinions of market value, in consultation with certain of their stakeholders, of certain Local Council properties, which are ongoing as of the date hereof. Because many Local Councils lack significant unrestricted liquid assets, any contribution from Local Councils in the aggregate may need to include real property and improvements as a component, and any Local Councils that desire to participate in any potential negotiated resolution may wish to value potential real property that they seek to contribute. The Debtors are continuing to work with JLL to appraise approximately 300 of the approximately 1,000 Local Council real properties.

Concurrently with the filing of the Debtors' application to retain JLL, the Tort Claimants' Committee filed an application to retain CBRE, Inc. to provide desktop appraisals of additional of the Local Council real properties described above [D.I. 1785]. The Bankruptcy Court approved the application on December 15, 2020 [D.I. 1846]. The Debtors and the Tort Claimants' Committee have agreed to coordinate with respect to the appraisal of the Local Council properties to avoid unnecessary duplication of services.

M.    <u>Bar Dates and Body of Claims</u>

On the Petition Date, the Debtors filed the *Debtors' Motion, Pursuant to 11 U.S.C. § 502(b)(9), Bankruptcy Rules 2002 and 3003(c)(3), and Local Rules 2002-1(e), 3001-1, and 3003-1, for Authority to (I) Establish Deadlines for Filing Proofs of Claim, (II) Establish the Form and Manner of Notice Thereof, (III) Approve Procedures for Providing Notice of Bar Date and Other Important Information to Abuse Victims, and (IV) Approve Confidentiality Procedures for Abuse Victims* [D.I. 18]. On May 4, 2020, the Debtors filed the declaration of Shannon R. Wheatman, Ph.D, in support of the Bar Date Order [D.I. 556] and the *Supplement to Debtors' Bar Date Motion* [D.I. 557], which described the Supplemental Notice Plan, to provide extensive supplemental noticing to known and unknown survivors of Abuse.

After extensive negotiations regarding the Bar Date Order and the noticing program with parties in interest, on May 26, 2020, the Court entered an order approving the Bar Date Motion over the remaining objections of certain parties in interest [D.I. 695] (the "<u>Bar Date Order</u>"). The Supplemental Notice Plan approved by the Bankruptcy Court was a carefully tailored and

highly negotiated multi-million dollar Bar Date noticing program, comprised of an advertising campaign that utilized television, radio, magazines, newspapers, and online media. As described in detail in the declarations of Dr. Wheatman, the Debtors' primary target audience for the Supplemental Notice Plan was men 50 years of age or older. As described in the declaration from Dr. Wheatman regarding the implementation of the Supplemental Notice Plan [D.I. 1758], the Debtors delivered notice of the Bar Dates to the Debtors' primary target audience of men 50 years of age or older with a reach (the estimated percentage of a target audience reached through a combination of media vehicles) of 95.8%, and a frequency (the estimated average number of opportunities an audience member has to see a notice).[47]

### 1.    Establishment of Bar Dates

Through the Bar Date Order, the Debtors established (a) November 16, 2020 as the last date by which claimants could assert any prepetition Claims against the Debtors (the "General Bar Date"), except for Abuse Claims, (b) November 16, 2020 as the last date by which any holder of an Abuse Claim could assert any Claim arising from Abuse occurring prior to the Petition Date, and (c) August 17, 2020 as the deadline for Governmental Units to assert any prepetition Claims against the Debtors.

### 2.    Non-Abuse Liabilities of the Debtors

The Non-Abuse Claims and Non-Abuse Litigation Claims filed against the Debtors include, but are not limited to, various employee and benefits related Claims; indemnification Claims from, without limitation, Chartered Organizations, directors and officers, and Local Councils; non-Abuse personal injury and litigation Claims; and contract claims. In addition, numerous Non-Abuse Claims and Non-Abuse Litigation Claims were included in the Debtors' Schedules. The scheduled Claims fall into categories including, but not limited to, employment, personal injury, environmental Claims, service and utility claims, trade payments, unclaimed property, surety bonds, deferred compensation, Restoration Plan, and workers' compensation.

Approximately 14,000 contingent and unliquidated indemnification and contribution Claims have been filed against the Debtors. The majority were filed by Chartered Organizations. Among others, the Church Of Jesus Christ Of Latter-Day Saints has asserted a claim for indemnification and contribution from the BSA. The Debtors believe that those Claims are subject to objection pursuant to section 502(e) of the Bankruptcy Code.

Further, the Debtors believe that they were generally current on their known prepetition trade payables as of the Petition Date.

Particular parties may attempt to file additional Claims notwithstanding the passage of the Bar Dates and seek allowance of such Claims by the Court. Additionally, claimants may amend certain existing Claims to seek increased amounts.

---

[47]   As discussed further below, Century filed a Notice of Appeal [D.I. 803] of the Bar Date Order on June 9, 2020. The appeal was dismissed on March 29, 2021.

### 3. Supplemental Bar Date Order

On August 25, 2020, the Debtors filed the *Debtors' Motion Pursuant to Section 105(a) of the Bankruptcy Code and ¶ 27 of the Bar Date Order for Entry of an Order (I) Supplementing the Bar Date Order and (II) Granting Related Relief* [D.I. 1145] (the "Supplemental Bar Date Motion"), requesting that the Court supplement the Bar Date Order to prevent potential Abuse survivors from being misled or confused regarding the Bar Date and Claims process.  In the Supplemental Bar Date Motion and in supplemental briefing [D.I. 1260], the Debtors alleged that certain law firms had engaged in their own false and misleading advertising to solicit Claims from Abuse survivors, and that certain advertising contained false and misleading statements and was inconsistent with the content approved by the Bankruptcy Court in the Bar Date Order.

The Coalition objected to the Supplemental Bar Date Motion [D.I. 1190, 1264], arguing that the Debtors' proposed supplement sought an overly-broad, content-based prior restraint of speech.  After negotiations between the Debtors and the Coalition following a hearing on the Supplemental Bar Date Motion, on September 16, 2020, the Bankruptcy Court entered an order: (i) ruling that certain specific statements in plaintiffs' law firm advertising regarding the Debtors' Chapter 11 Cases was false and misleading; (ii) directing that the false and misleading statements be removed; (iii) directing that certain clarifying information be added to such law firms' advertising to prevent confusion and prejudice of sexual abuse survivors; and (iv) approving procedures for the Debtors to seek expedited relief with respect to additional false and misleading law firm advertising [D.I. 1331].

### 4. Claims Reconciliation and Objections

At the time of the Bar Date, approximately 15,000 Claims (other than Direct Abuse Claims) were timely filed on the general Claims Register.

The Debtors continue to review and analyze the proofs of Claim filed to date, and reconcile these Proofs of Claim with the Debtors' scheduled Claims.  On February 3, 2021, the Debtors filed their *First Omnibus (Non-Substantive) Objection to Certain (I) Exact Duplicate Claims, (II) Amended and Superseded Claims, and (III) Incorrect Debtor Claims (Non-Abuse Claims)* [D.I. 2019], which was sustained on March 5, 2021 [D.I. 2323]; *Second Omnibus (Substantive) Objection to Certain (I) Cross-Debtor Duplicate Claims, (II) Substantive Duplicate Claims, (III) No Liability Claims, (IV) Misclassified Claims, and (V) Reduce and Allow Claims (Non-Abuse Claims)* [D.I. 2020]; and *First Notice of Satisfaction of Claims and/or Scheduled Amounts (Non-Abuse Claims)* [D.I. 2021].  The Debtors will continue to file objections and may seek stipulations with respect to certain of these Claims.

On March 5, 2021, the Bankruptcy Court entered the *Order Sustaining Debtors' First Omnibus (Non-Substantive) Objection to Certain (I) Exact Duplicate Claims and (II) Amended and Superseded Claims and (III) Incorrect Debtor Claims (Non-Abuse Claims)* [D.I. 2323], disallowing and expunging certain exact duplicate claims, and amended and superseded Proofs of Claim.  This order also reassigned certain Claims incorrectly filed against one Debtor to the correct Debtor against whom the claims should have been asserted.

On April 26, 2021, the Bankruptcy Court entered the *Order Sustaining the Debtors' Second Omnibus (Substantive) Objection to Certain (I) No Liability Claims, (II) Misclassified Claims, and (III) Reduce and Allow Claims (Non-Abuse Claims)* [D.I. 2686], disallowing and expunging certain no liability claims. The order also reclassified certain misclassified claims, which remain subject to the Debtors' further objections on any substantive or non-substantive grounds and further order of the court, and it reduced certain allowed claims.

### 5.    *Estimation of Claims*

On March 16, 2021, the Future Claimants' Representative, the Tort Claimants' Committee, and the Coalition filed a motion requesting binding estimation proceedings [D.I. 2391] (the "Estimation Motion"). Through the Estimation Motion, the Future Claimants' Representative, Tort Claimants' Committee, and the Coalition request an estimation of aggregate liability for Abuse Claims, using a valuation scale for different types of Abuse, on a year-by-year basis, and identifying applicable Local Councils and Chartered Organizations. These moving parties argue that this estimation would resolve the disputes with respect to the amount that should be contributed to the Settlement Trust in order to fairly compensate Abuse Survivors. *Id.* at 6.

On March 17, 2021, the Future Claimants' Representative, the Tort Claimants' Committee, and the Coalition filed a motion requesting that the District Court for the District of Delaware withdraw the reference to the Bankruptcy Court [D.I. 2399] to hear the Estimation Motion (Civil Action No. 21-cv-00392) ("Withdrawal of Reference Proceedings"), which motion was subsequently docketed with the District Court. The Future Claimants' Representative, Tort Claimants' Committee, and the Coalition requested that the reference be withdrawn so that the District Court could conduct estimation proceedings, instead of the Bankruptcy Court.

On April 15, 2021, certain parties filed objections to the Estimation Motion, which include:

- *Objection of the Church of Jesus Christ of Latter-Day Saints* [D.I. 2610], claiming that estimation of non-debtor claims is not permitted under the Bankruptcy Code and asserting that estimation would lead to a lengthy and unworkable discovery process as it relates to the non-debtors.

- *Opposition of Certain Insurers* [D.I. 2611], arguing that there is no basis under the Bankruptcy Code to conduct an estimation proceeding to determine a debtor's aggregate liability for all mass-tort claims; the Estimation Motion was filed with the intent to prejudice insurers in state-court coverage litigation; and the proposed estimation procedures are improper. The following insurance companies were parties to this objection: First State Insurance Company; Hartford Accident and Indemnity Company; Twin City Fire Insurance Company; Liberty Mutual Insurance Company; Travelers Casualty and Surety Company; St. Paul Surplus Lines Insurance Company; Gulf Insurance Company; General Star Indemnity Company; American Zurich Insurance Company; American Guarantee and Liability Insurance Company; Steadfast Insurance Company; AIG Companies; Arrowood Indemnity Company; Allianz Global Risks US Insurance Company;

National Surety Corporation; Interstate Fire & Casualty Company; Agricultural Insurance Company; Agricultural Excess and Surplus Insurance Company; Great American E&S Insurance Company; Clarendon America Insurance Company; The Continental Insurance Company; and Columbia Casualty Company.

- *Debtors' Objection* [D.I. 2612], objecting to the moving parties' proposed procedures. Specifically, the Debtors' contend that the procedures provided in the Estimation Motion are unduly burdensome and neither necessary nor appropriate. The Debtors' have proposed a non-binding estimation under the Plan, see Plan art. V.T, and that certain additional discovery and related procedures be set though the *Debtors' Motion For Entry of Order (I) Scheduling Certain Dates and Deadlines In Connection With Confirmation of the Debtors' Plan of Reorganization, (II) Establishing Certain Protocols, and (III) Granting Related Relief* [D.I. 2618] (the "Confirmation Scheduling Motion"). The Confirmation Scheduling Motion was filed the same day as the Debtor's Objection.

- *Old Republic Insurance Company's Objection* [D.I. 2613], joining the legal arguments raised in the *Opposition of Certain Insurers* [D.I. 2611].

- *Century's Opposition* [D.I. 2614], objecting to the Estimation Motion because estimation of the aggregate liability of the debtor and non-debtors is devoid of any precedent; there is no basis for estimation of the abuse claims under the Bankruptcy Code; the Estimation Motion is an improper attempt to prejudice insurers in state-court coverage litigation; and the procedures proposed in the Estimation Motion are improper.

On April 15, 2021, certain insurers[48] also filed an *Opposition to Motion of the Coalition, TCC and FCR for Withdrawal of the Reference of Proceedings Involving the Estimation of Personal Injury Claims* [Withdrawal of Reference Proceedings, D.I. 14]. The insurers argue that if estimation were to take place it should remain with the Bankruptcy Court because it is a core proceeding, the estimation does not involve the trial of any personal injury claims such that the Bankruptcy Court cannot estimate, and the Bankruptcy Court is the best forum suited to decide the Estimation Motion.

On April 15, 2021, the Debtors also filed an answering brief in opposition to the motion to withdraw [Withdrawal of Reference Proceedings, D.I. 15]. The Debtors argue that the estimation contemplated in the Estimation Motion is a core proceeding that should remain with the Bankruptcy Court. In addition, the Debtors maintain that the Bankruptcy Court is the proper

---

[48] The insurers that filed the opposition are (1) First State Insurance Company, Hartford Accident and Indemnity Company and Twin City Fire Insurance Company, (2) Liberty Mutual Insurance Company, (3) Travelers Casualty and Surety Company, Inc. (f/k/a Aetna Casualty & Surety Company), St. Paul Surplus Lines Insurance Company and Gulf Insurance Company, (4) General Star Indemnity Company, (5) American Zurich Insurance Company, American Guarantee and Liability Insurance Company, and Steadfast Insurance Company, (6) AIG Companies, (7) Arrowood Indemnity Company, formerly known as Royal Indemnity Company, (8) Allianz Global Risks US Insurance Company, (9) National Surety Corporation and Interstate Fire & Casualty Company, (10) Agricultural Insurance Company, Agricultural Excess and Surplus Insurance Company, and Great American E&S Insurance Company, (11) Clarendon America Insurance Company, and (12) The Continental Insurance Company and Columbia Casualty Company.

forum for estimation because it will promote uniformity, discourage forum shopping, avoid undue delay, conserve the parties' resources, and expedite the bankruptcy process. The Debtors argue that withdrawal of the reference is not mandatory and that all of the factors weigh in favor of keeping proceedings centralized before the Bankruptcy Court.

On April 16, 2021, Century Indemnity Company filed an *Opposition to Motion of the Coalition, TCC and FCR to Withdraw the Reference of Proceedings Involving the Estimation of Personal Injury Claims* [Withdrawal of Reference Proceedings, D.I. 17], arguing that Estimation Motion would cause undue delay, there is no basis for estimation especially regarding claims against non-debtors, and the Estimation Motion was not for the liquidation or estimation of particular injury claims for the purpose of distribution.

On April 19, 2021, certain insurers filed a motion to adjourn the Debtors' Scheduling Motion [D.I. 2637] (the "Motion to Adjourn"). The insurers argued that the Debtors' Scheduling Motion should be heard at the Disclosure Statement Hearing scheduled for May 19, 2021 rather than April 29, 2021. Contemporaneously, these insurers filed a motion to shorten the notice period for the Motion to Adjourn [D.I. 2638] seeking a hearing date of April 22, 2021.

On April 21, 2021, the Debtors filed an amended notice concerning the Debtors' Scheduling Motion [D.I. 2655], which provides that the objection date for the motion would be May 12, 2021, and the hearing for on the Confirmation Scheduling Motion will take place on May 19, 2021.

On April 22, 2021, the Coalition, the Future Claimants' Representative, and the Tort Claimants' Committee filed a *Notice of Service of Discovery* [D.I. 2684]. In these discovery requests, the moving parties sought discovery from the Debtors, which they asserted was in connection with estimation proceedings. On April 27, 2021, James E. O'Neil, counsel to the Tort Claimants' Committee, certified that he caused a copy of the aforementioned discovery request to be served on various parties [D.I. 2718].

On April 22, 2021, the Future Claimants' Representative, the Official Committee of Tort Claimants, and the Coalition filed a reply brief in support of their motion to withdraw [Withdrawal of Reference Proceedings, D.I. 29]. The movants maintain that the District Court should conduct proceedings because they are non-core, other relevant factors weigh in favor of withdrawal, and withdrawal of reference is required by the Bankruptcy Code under the circumstances.

On April 23, 2021, the United Methodist Ad Hoc Committee filed a joinder to the *Objection of the Church of Jesus Christ of Latter-Day Saints* concerning the Estimation Motion [D.I. 2681].

On April 27, 2021, the Future Claimants' Representative, the Tort Claimants' Committee, and the Coalition filed a *Request for Oral Argument* [Withdrawal of Reference Proceedings, D.I. 30]. To date, no District Court hearing has been scheduled.

On May 12, 2021, various parties filed objections and responses to the Debtors' Confirmation Scheduling Motion.[49]  In the Objections to the Confirmation Scheduling Motion, certain parties such as the Tort Claimants' Committee, Coalition, and Future Claimants' Representative, disagree with the Debtors' attempt through the Confirmation Scheduling Motion to incorporate estimation proceedings in to the confirmation process [D.I. 3816]. On the other hand, certain insurers, such as Liberty Mutual Insurance Company, among others, argue that if any assessment of the Direct Abuse Claims is warranted, it should be for the limited purpose of confirmation and state the Bankruptcy Court should clarify any ruling will not have *res judicata* effect on any insurer, including for purposes of distribution or any later litigation in a non-bankruptcy forum [DI. 3794].

On May 14, 2021, the Tort Claimants' Committee, the Coalition, and the Future Claimants' Representative filed an omnibus reply to Estimation Motion objections filed by the (i) Debtors, (ii) Century Indemnity Company, (iii) certain insurers, (iv) the Church of Jesus Christ of Latter-day Saints, joined by (v) the United Methodist Ad Hoc Committee, and (vi) Old Republic Insurance Company [D.I. 4089].  The Tort Claimants' Committee argued the Bankruptcy Court should grant the Estimation Motion with leave for the parties to advise the District Court of the disposition of the Estimation Motion in connection with the District Court's determination of the pending Withdrawal of Reference Proceedings.

N.    Valuation of Abuse Claims

During its claim reconciliation process, Bates White established that there are approximately 82,500 unique, timely Proofs of Claims seeking personal injury damages on account of Abuse.  Bates White estimates the value of the Abuse Claims is between $2.4 billion and $7.1 billion.[50]  To establish this value range, Bates White analyzed BSA's historically resolved Abuse Claims, with a focus on four factors that have affected the Claims' settlement value: (i) the possible monetary damages the Abuse Survivor could obtain in the tort system, (ii) the connection to Scouting during the alleged acts, (iii) certain legal considerations regarding the viability of the Claim, and (iv) the credibility of the Claim.  Bates White anticipates being able to refine its valuation range as it continues to gather further facts and information regarding the Abuse Claims.

The actual valuation of the Abuse Claims could fall outside the estimated valuation range of $2.4 to $7.1 billion if the actual facts regarding the Claims materially differ from the information submitted in connection with the Proofs of Claim or the historical data used to derive potential values related to Abuse Claims proves unreliable.  For example, if more than half of the Abuse Claims that have been identified as presumptively time-barred are, in fact, not time barred, or if a significantly greater number of the Survivors asserting Abuse Claims identifies their abusers as serial abusers within Scouting, the valuation could exceed $7.1 billion.  In contrast, if more than half of the Abuse Claims that currently identify an abuser by name are deemed insufficient or otherwise subject to disallowance, or if the BSA's responsibility for the

---

[49]  D.I. 3708, 3739, 3747, 3771, 3794, 3799, 3806, 3816, 3855, 3859, 3928 (collectively, the "Objections to the Confirmation Scheduling Motion").

[50]  The number of unique, timely Proofs of Claim that Bates White evaluated is less than the total number of timely Proofs of Claim submitted in the Chapter 11 Cases because some Survivors filed multiple Proofs of Claim.

abuse is found to be less significant than was assumed in the valuation model, the valuation of Abuse Claims could be less than $2.4 billion.

The estimated valuation range of $2.4 billion to $7.1 billion is based upon current information included in the Proofs of Claim submitted to date, BSA's historically resolved Abuse Claims, and publicly available information related to potentially comparable settlements. The estimated valuation range is broad due to a number of factors.  The Debtors will seek to obtain discovery in these Chapter 11 Cases to aid Bates White's ability to refine and narrow the range of estimated values related to Abuse Claims.  In particular, the Debtors plan to establish a process whereby interviews or depositions will be conducted related to an appropriate sample of the Survivors, which should allow for a more accurate determination of potential liability and damages.  Moreover, the Debtors have revised this Disclosure Statement to make clear that certain creditor constituencies, such as the Coalition, believe that the aggregate value of all abuse claims is higher than the Debtors' current estimate of $2.4 billion to $7.1 billion.

To arrive at the valuation range, Bates White considered multiple scenarios arising from four categories of attributes that would affect the value of the Abuse Claims: (i) those that affect the amount of damages, (ii) those that affect the degree of accountability of the BSA based on any alleged connection with Scouting, (iii) those that affect legal considerations regarding the viability of the claim, and (iv) those that affect the allowance and credibility of the Abuse Claim. While there is some variation in how Bates White tested various scenarios, all of the scenarios are based on a frequency and severity valuation model where the number of current Abuse Claims (frequency) alleging a particular Abuse (severity) is measured against the attributes described above, which, when combined with historical data regarding resolution of abuse claims, allows Bates White to project the value of the Claims.

To evaluate the possible value of damages related to an Abuse Claim, Bates White assigned a score based on the most severe Abuse alleged across all of the relevant submissions for each Survivor using the categories specified on the Proof of Claim form.  For example, in certain scenarios, Claims were divided pursuant to the following categories, in descending order of severity: (i) those alleging sex acts involving penetration, oral sex, or masturbation; (ii) those alleging physical acts of groping and touching with clothing on or off; and (iii) those with unknown or missing allegations.  According to historical settlement amounts and other publicly available data, tort claimants generally obtain higher damage recoveries based on the severity of Abuse alleged.  Additional damages were considered, and corresponding scores were assigned, in at least some scenarios based upon a Survivor's age at the time of the first alleged act of Abuse and, where applicable, the number of instances of Abuse alleged in the Proof of Claim.

To evaluate the BSA's possible degree of liability, Bates White considered the alleged connection to Scouting, and corresponding scores were assigned based on whether (i) the Survivor had an affiliation with Scouting; (ii) the Survivor indicated having had another relationship with the abuser outside of Scouting (*e.g.*, through church or school contact); (iii) the alleged abuser was an adult or minor; and (iv) the abuser is alleged to have abused others involved in Scouting.

To evaluate the degree of legal liability, Bates White focused on whether the claim would be presumptively time-barred based on applicable law in the jurisdiction or jurisdictions in which each Survivor alleges abuse.

To evaluate the level of credible support for the Abuse Claims, Bates White examined factors such as (i) the amount of information the Survivor provided relating to the nature of the Abuse, (ii) whether the Survivor indicated that anyone else knew of the Abuse; (iii) whether the Survivor named at least one abuser; and (iv) whether the Survivor indicated that the Abuse was reported to Scouting, law enforcement, or any other party.  While trying to be as comprehensive as possible, the foregoing list of attributes is not perfect and certain Survivors may not be able to identify their abusers.  Moreover, a lack of prior reporting does not necessarily correspond to a lack of Abuse.  Accordingly, Bates White also considered simplified scenarios where such attributes were modeled through a rejection rate (*i.e.*, an assumption that a portion of the Claims would be disallowed, withdrawn, or found not to meet the criteria set out to receive compensation under the Trust Distribution Procedures related to the Settlement Trust or in the tort system).

All of Bates White valuation scenarios are based on the data currently provided in the Proofs of Claim.  To eliminate duplicative or defective Proofs of Claims, Bates White first considered Abuse Claims that were submitted prior to the Bar Date (or properly amended thereafter) and claimant personal identification.  Specifically, for individuals who made at least one timely submission, Bates White incorporated information from post-bar date amendments and supplemental submissions into one Claim.   Duplicate submissions from individuals identified on the basis of certain key personal identifying information on the Proof of Claim, including name, last four digits of Social Security Number, and birthday, were also consolidated into one, comprehensive Claim.

While there are approximately 82,500 unique, timely Abuse Claims, the majority of these are presumptively barred and many more fail to provide key information that would be necessary to establish payment within the tort system or potentially under the Trust Distribution Procedures and Settlement Trust Agreement.  Within this set, Bates White focused its valuation on the approximately 14,000 claims that are not presumptively barred and identify, by name, either in full or in part, an alleged abuser. These claims are the most similar to those that were resolved by the BSA, often in conjunction with its Insurance Companies, prior to these Chapter 11 Cases. There are multiple reasons, however, why the eventual number of compensable Abuse Claims could differ from this current core Claim count.

To determine which Claims might be presumptively time barred, Bates White analyzed the location where the Claimant alleges the Abuse occurred and the relevant law in the applicable state or territory.  Bates White also considered the age of majority for which a Claim is allowed in each state as compared to the Claimant's age as of the Bar Date and whether the last date of Abuse alleged is within the time window in which a Claim is allowed in each state. For purposes of determining the applicable criteria under each state or territory, Bates White relied upon information provided by Debtors' defense counsel.  For example, under the Bates White evaluation, a Claim alleging Abuse that took place in New Jersey, which is currently subject to a reviver statute under which claims are not time barred, would be considered not presumptively barred.  In contrast, a Claim alleging Abuse that took place in Pennsylvania would

not be presumptively barred for a Survivor who is 55 years old or younger, but would be presumptively barred for a Survivor who is older than 55 years.

The number of Abuse Claims that might not be considered presumptively barred could grow for multiple reasons. The recorded abuse location or locations currently available in the analytical data and used for purposes of the presumptively barred evaluation are not complete and may be supplemented—which could lead to further Abuse Claims being removed from the presumptively barred category. In addition, virtually all states recognize that abuse claims can be filed after the statutory limitations period has run under select circumstances, which vary from state to state. Over the last several years, multiple states have implemented revival windows under which previously barred Claims were allowed to be pursued.

The valuation range could change based on which Abuse Claims are allowed and compensated in accordance with the trust distribution procedures. Bates White expects that some portion of submitted Abuse Claims will (i) be disallowed for containing insufficient or deficient information, (ii) not meet the criteria set out to receive compensation pursuant to the trust distribution procedures, or (iii) be withdrawn. Further, the BSA's insurers have questioned the validity of certain of the Abuse Claims based on the manner in which large groups of the Abuse Claims were recruited. While Bates White attempted to account for these issues via the implementation of various assumed claim rejection rates, the actual rejection rate is not certain.

The Bates White analysis of the value of the claims asserted against the BSA draws on the BSA's historical data related to resolutions of Abuse liability. With the shift in Survivor behavior in the past two years—for example, the scale of the post-petition claims relative to those BSA received pre-petition—there is significant uncertainty regarding how historical settlements align with the currently filed Abuse Claims. In a context such as this, where Survivor behavior has shifted, the Claims that were historically resolved may not be representative of the Abuse Claims comprising the current population.

Across mass torts, there is significant selection bias regarding which cases are filed relatively early in the lifespan of the tort, when costs to plaintiffs are generally higher, and which cases are pursued as the tort is more developed, when costs to plaintiffs are lower. The significant increase in claims filed against the BSA represents a structural break in this process. Relative to the current pool of Abuse Claims, the BSA's historical data related to Abuse liability resolutions was stronger on observable, and likely also unobservable, characteristics. With this being the case, there is substantial uncertainty regarding how Claim values for the current pool of Abuse Claims, even those with similar characteristics, such as the particular type of abuse allegation, may differ from historical data. For example, an ongoing analysis has shown that the majority of the BSA's roughly 260 historical sexual abuse case resolutions over the last four years relate to Claims that named abusers who appear multiple times in that data set. Further, the data shows—as one would expect given that it relates to the BSA's potential accountability— that on average, Claims alleging Abuse against individuals who abused multiple people in connection with Scouting were paid more than similarly situated claims for which the alleged abuser is only identified by one individual. Within the Proof of Claim data, however, a supermajority of the Claims name abusers who appear unique. While we have some ability to control for this valuation factor, there are other factors that may also impact the value of the

Abuse Claims—particularly with regards to issues of credibility and accountability—which may differ across the pools.

The chart below provides a breakdown of the Abuse Claims.  Of the approximately 82,500 unique and timely Abuse Claims, approximately 23,000 are not presumptively barred by statute of limitations and approximately 59,500 are presumptively barred by statute of limitations.  Of those not presumptively barred, approximately 14,000 named an abuser, either in full or in part.

| Abuser Name Category | Count |
|---|---|
| Name Provided | 8,906 |
| Partial Name Provided | 5,134 |
| Physical Description Only | 2,977 |
| Unknown | 6,269 |

Additionally, attached hereto as **Exhibit D** are charts listing the Abuse Claims (i) by allegation type, (ii) counts by Local Council, (iii) counts by Local Council and allegation type, and (iv) counts by Chartered Organizations.  Some parties have asserted that Bates White's estimated valuation range should include valuations of Abuse Claims with respect to each individual Local Council and Chartered Organization. However, performing such an exercise would not likely to establish reliable estimates due to the data currently available.  The aggregate range of $2.4 billion to $7.1 billion is based upon current information included in the Abuse Claim Proofs of Claim submitted to date, BSA's historically resolved Abuse Claims, and publicly available information related to potentially comparable settlements. Critically, those historical BSA resolutions involved payments for releases covering all BSA-related parties. So while that data provides an empirical foundation for an aggregate projection of a value of the current Abuse Claims against all BSA-related parties, it does not, on its own, provide an empirical basis upon which to partition that aggregate value among different related parties, such as Local Councils. While it is possible to separately identify, at least in some instances, which Local Council(s) and Chartered Organization(s) may be involved with a given claim, the ability to provide a reasonable aggregate valuation range for all 82,500 Abuse Claims combined does not translate into a reasonable valuation for each distinct claim or with respect to each individual Local Council or Chartered Organization. Given the number of entities involved, oftentimes with a combination of Local Councils and Chartered Organizations, many of the potential valuation groupings involve only a single claim or a handful of claims. Moreover, even in the case of Local Council and Chartered Organization combinations involving sufficient numbers of claims, additional information would be needed to separately identify which portion of the aggregate estimate should be attributed to the BSA and which to the other related organizations.

O.    Assumption and Rejection of Unexpired Leases and Executory Contracts

Since the commencement of these Chapter 11 Cases, the Debtors have strategically reviewed their contractual obligations and sought to weed out contractual agreements that do not provide a significant value to the Debtors' Estates going forward.  Consistent with this goal, on March 31, 2020, the Debtors filed a motion seeking entry of an order authorizing the Debtors to reject that certain Personal Services Agreement by and between Pearson Education, Inc. ("Pearson") and the BSA whereby Pearson agreed to provide various services to the BSA, including providing publishing and communications channels, marking communications, program materials, and saleable literature [D.I. 318].  That same day, the Debtors filed an omnibus motion seeking authority to reject three additional Executory Contracts, including a sublease for office space in New York, New York and a letter agreement for hotel accommodations in connection with a regional conference the BSA had planned but was ultimately canceled [D.I. 319].  The Bankruptcy Court entered orders approving both motions on April 15 and 17, 2020, respectively [D.I. 440, 449].

On June 16, 2020, the Debtors filed a motion seeking an order extending the 120-day period for the Debtors to assume or reject Unexpired Leases of nonresidential real property by ninety (90) days, to September 15, 2020 [D.I. 857].  On July 6, 2020, the Bankruptcy Court entered an order granting the motion [D.I. 954].

In June of 2020, the Debtors motions seeking entry of orders (a) rejecting the lease of nonresidential real property with Dheera Limited Company, LLC effective as of June 30, 2020 [D.I. 865], and (b) rejecting an Executory Contract with Oracle America, Inc. effective as of June 30, 2020 [D.I. 906].  The Bankruptcy Court entered orders approving both of these motions [D.I. 981, 982].

On August 26, 2020, the Debtors filed their first omnibus motion seeking entry of an order approving assumption of various Unexpired Leases of nonresidential real property and fixing the cure amount with respect thereto [D.I. 1168].  Several days later, the Debtors entered into stipulations with lease counterparties extending the deadline to assume or reject until June 30, 2021 and filed those stipulations with the Court [D.I. 1298].  On September 11, 2020, the Bankruptcy Court entered two orders approving the Debtors' omnibus motion to assume Unexpired Leases and extending the deadline to assume or reject to June 30, 2021 [D.I. 1310, 1311].

P.    Stay Relief Matters

    *1.    Old Republic*

On May 21, 2020, Old Republic Insurance Company filed *Old Republic Insurance Company's Motion Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 4001 for an Order Modifying the Automatic Stay to Permit Payments of Claims Against Non-Debtor Insureds and Related Defense Costs Under Insurance Policies* [D.I. 678] requesting entry of an order modifying the automatic stay, to the extent it applies, to allow Old Republic and ESIS to pay losses and expenses which are incurred in conjunction with the investigation,

75

defense, adjustment or settlement of certain non-stayed Claims or suits on behalf Non-Debtor Insureds under certain Old Republic Insurance Policies.

On July 7, 2020, the Bankruptcy Court entered the *Order Granting Old Republic Insurance Company's Motion Pursuant to Section 362 of the Bankruptcy Code and Bankruptcy Rule 4001 for an Order Modifying the Automatic Stay to Permit Payments of Claims Against Non-Debtor Insured Parties and Related Defense Costs Under Insurance Policies* [D.I. 985], which modified the automatic stay, to the extent it applies, to allow Old Republic Insurance Company and its Affiliates (collectively "Old Republic") and ESIS, Inc. ("ESIS") to administer, handle, provide for the payment of defense costs and to pay any judgments or settlements in connection with Claims or Causes of Action, not subject to the automatic stay against non-Debtor Entities that are covered by an Old Republic Primary Policy and by an Old Republic Excess Policy.  With respect to settlements or judgments against non-Debtor Entities covered by an Old Republic Excess Policy, the automatic stay was modified to allow Old Republic and ESIS to pay any judgments or settlements on behalf of the insured non-Debtor Entities in connection with any Claims and Causes of Action against non-Debtor Entities pursuant to a notice protocol set forth therein.

### 2.      *Evanston*

On May 22, 2020, Evanston Insurance Company filed the *Evanston Insurance Company's Motion for Entry of an Order Pursuant to Section 362 of the Bankruptcy Code and Bankruptcy Rule 4001, Modifying the Automatic Stay to Permit Payments of Claims Against Non-Debtor Insured Parties and Related Defense Costs Under Insurance Policies* [D.I. 686] requesting entry of an order modifying the automatic stay, to the extent it applies, to allow Evanston to pay losses and expenses which are incurred in conjunction with the investigation, defense, adjustment, or settlement of certain non-stayed Claims or suits on behalf Non-Debtor Insureds under certain Evanston Insurance Policies.

On July 8, 2020, the Bankruptcy Court entered the *Order Granting Evanston Insurance Company's Motion Pursuant to Section 362 of the Bankruptcy Code and Bankruptcy Rule 4001 for an Order Modifying the Automatic Stay to Permit Payments of Claims Against Non-Debtor Insured Parties and Related Defense Costs under Insurance Policies* [D.I. 987], which modified the automatic stay to allow Evanston to pay any judgments or settlements in connection with any Non-Stayed Claims against Non-Debtor Insureds pursuant to a notice protocol set forth therein.

Q.      Other Litigation

### 1.      *Trademark Action*

On November 6, 2018, Girl Scouts of the United States of America ("GSUSA") filed a complaint in the United States District Court for the Southern District of New York, Case No. 18-cv-10287, against the BSA, alleging trademark infringement, dilution and tortious interference in connection with the BSA welcoming female members in into its youth programs (the "Trademark Action").  On February 18, 2020, the Debtors filed these Chapter 11 Cases, thereby staying the Trademark Action.  On March 10, 2020, GSUSA filed a motion for relief from stay to resume prosecution of the Trademark Action [D.I. 155], and on April 24, 2020, the Bankruptcy Court entered an order granting limited relief from the stay [D.I. 485].  Pursuant to

the order, the stay relief period ended on July 22, 2020 with respect to the Trademark Action. The BSA and GSUSA were unable to reach a resolution, and on July 23, 2020, the automatic stay was lifted to permit the Trademark Action to proceed. On September 18, 2020 the Bankruptcy Court entered an order authorizing the retention and employment of Quinn Emanuel Urquhart & Sullivan, LLP as special litigation counsel to the Debtors pursuant to section 327(e) of the Bankruptcy Code, *nunc pro tunc* to August 1, 2020, to represent the Debtors in the Trademark Action [D.I. 1343].

The Trademark Action remains ongoing, and the Debtors believe that they have sufficient insurance to cover any and all remaining defense costs and liability that may arise in connection therewith. Specifically, the Debtors have three policies that remain available: (1) a primary Directors and Officers Liability insurance policy issued by RSUI; (2) an umbrella Directors and Officer Liability policy issued by Markel; and (3) a cyber-insurance policy issued by Beazley. The RSUI policy has aggregate limits of liability of $10 million, of which approximately $5 million in limits are remaining. The Markel policy has aggregate limits of liability of $10 million, which is fully available. And the Beazley policy has aggregate limits of liability of $15 million, of which approximately $10 million in limits are remaining. RSUI and Beazley are presently providing the BSA coverage for its defense counsel.

## 2.    Adversary Proceedings and Appeals

On May 15, 2020, Hartford Accident and Indemnity Company and First State Insurance Company ("Hartford and State") filed an adversary complaint against the Debtors, certain Local Councils, and other insurers seeking declaratory judgment and contribution relating to Claims for Insurance Coverage for all underlying Abuse Claims against BSA and certain of its Local Councils (Adv. Pro. No. 20-50601). On August 14, 2020, the Debtors and the named Local Councils filed a motion to dismiss Hartford and State's adversary proceeding [D.I. 22]. The Debtors subsequently successfully negotiated a stay of the entirety of the Hartford and State adversary proceeding.

On June 9, 2020, Century filed an appeal (Civil Action No. 20-cv-00774) (the "Century Bar Date Appeal") of the Bar Date Order, alleging that the Proof of Claim form for Abuse claimants approved in the Bar Date Order was not properly before the Bankruptcy Court and was not designed to elicit sufficient information to establish the prima facie validity of Claims. On June 22, 2020, the Debtors filed a motion to dismiss the Century Bar Date Appeal [Century Bar Date Appeal, D.I. 4], and additionally prepared and filed extensive briefing in support of the motion to dismiss. On March 29, 2021, the District Court entered an order dismissing Century's appeal and closing the case [D.I. 2466]. The District Court concurrently issued a *Memorandum Opinion* [D.I. 2466-1], finding that the Bar Date Order is interlocutory and does not otherwise warrant immediate review under 28 U.S.C. § 1292(b).

On January 8, 2021, the Tort Claimants' Committee filed an adversary complaint (Adv. Pro. No. 21-50032) ("TCC Case"), seeking a determination that approximately $667 million of the Debtor's total approximately $1 billion in assets are not restricted and, as such, that they should be available to satisfy creditors' Claims [D.I. 1913]. The Tort Claimants' Committee alleged that the Debtors failed to show that there are any specific donation-related restrictions or others on the assets that would make the assets unavailable to satisfy creditor Claims. Further,

the Tort Claimants' Committee's complaint asserted that the Debtors failed to trace the restricted assets that were commingled with unrestricted assets and to demonstrate that those assets were not used, spent, or transferred.

On April 14, 2021, the Bankruptcy Court issued an *Order Approving Stipulation for Further Extension of Time* [TCC Case, D.I. 13], extending the day in which the Debtors must answer, or otherwise respond to the complaint.[51]   On April 23, 2021, JPMorgan Chase Bank, National Association, filed a *Motion to Intervene* [TCC Case, D.I. 15], arguing that its rights may be affected by the adversary proceeding because some, if not all, of the disputed property is its prepetition collateral.  On April 26, 2021, the Debtors filed its *Answer to the Tort Claimants' Committee's Complaint for Declaratory Judgment* [TCC Case, D.I. 16], explaining that the complaint fails to state a cause of action on which relief can be granted.  The answer also explains that the identified property is not property of the estate, and is not available for distribution to general unsecured creditors.  On April 27, 2021, JPMorgan Chase Bank, National Association, filed a *Corporate Ownership Statement Pursuant to Federal Rule of Bankruptcy Procedure 7007.1* [TCC Case, D.I. 17].

### 3. *2004 Exam Motions*

On September 29, 2020, the Tort Claimants' Committee filed the *Motion of the Official Tort Claimants' Committee Pursuant to Bankruptcy Rule 2004 and Local Rule 2004-1 for an Order Authorizing the Issuance of Subpoenas for Discovery from Debtors and Certain Local Councils* [D.I. 1379] (the "TCC 2004 Motion"), requesting entry of an order authorizing the Tort Claimants' Committee to issue subpoenas to and directing discovery from the Debtors, Ad Hoc Committee Members, and the locals listed on **Exhibit B** thereto.  The Debtors, the Ad Hoc Committee, and various Local Councils objected to the TCC 2004 Motion, and the Tort Claimants' Committee ultimately withdrew the TCC 2004 Motion on November 25, 2020 [D.I. 1735].

On January 22, 2021, Hartford Accident and Indemnity Company, First State Insurance Company and Twin City Fire Insurance Company (collectively, "Hartford et al."), and Century filed *Hartford and Century's Motion for an Order (I) Authorizing Certain Rule 2004 Discovery and (II) Granting Leave from Local Rule 3007-1(f) to Permit the Filing of Substantive Omnibus Objections* [D.I. 1972] (the "Hartford and Century's Rule 2004 Motion"), which requested entry of an order (i) authorizing Hartford et al. and Century to serve subpoenas, written discovery, including interrogatories and document requests, and deposition notices pursuant to Rule 2004 on a sampling of Persons who have filed Abuse Claims in these Chapter 11 Cases and (ii) providing relief from the requirements of Local Rule 3007-1(f) to permit (but not require) parties in interest in these Chapter 11 Cases to file omnibus Claim objections raising common legal issues to multiple Claims and that may, most efficiently, be subject to resolution if heard together.

On January 22, 2021, Hartford et al and Century also filed *Hartford and Century's Motion for Entry of an Order Authorizing Filing Under Seal of Certain Documents Relating to*

---

[51]   The U.S. Bankruptcy Court for the District of Delaware retained jurisdiction over this adversary proceeding (Adv. Pro. No. 21-50032).

*Hartford and Century's Motion for an Order (I) Authorizing Certain Rule 2004 Discovery and (II) Granting Leave from Local Rule 3007-1(f) to Permit the Filing of Substantive Omnibus Objections* [D.I. 1973] ("Motion to Seal"), which requested entry of an order (i) authorizing Hartford et al. and Century to file under seal certain portions of Hartford and Century's Rule 2004 Motion and certain supporting documents (the "Supporting Documents"); (ii) directing that information contained in the redacted portions of Hartford and Century's Rule 2004 Motion and the Supporting Documents (collectively, the "Confidential Information") shall remain under seal and confidential pursuant the Bar Date Order [D.I. 695] (entered by the Court on May 26, 2020) and shall not be made available to anyone, except to the Court, the Office of the United States Trustee for the District of Delaware, and the Permitted Parties (as defined in the Bar Date Order); and (iii) granting related relief.

On January 25, 2021, Agricultural Insurance Company filed a joiner in support of Hartford and Century's Rule 2004 Motion [D.I. 1979]. On February 2, 2021, Hartford et al and Century filed a revised proposed redacted version of their Rule 2004 Motion, which resolved the U.S. Trustee's informal comments to Hartford and Century's Motion to Seal [D.I. 2007]. On February 2, 2021, Travelers Casualty and Surety Company, Inc., St. Paul Surplus Lines Insurance Company, and Gulf Insurance Company filed a joinder in support of Hartford and Century's Rule 2004 Motion [D.I. 2008] with several other parties subsequently filing joinders.[52]

On February 5, 2021, the Coalition filed an objection to Hartford and Century's Rule 2004 Motion, asserting: (I) there is no evidence that the law firms violated Rule 9011 or committed fraud, (II) claim discovery is premature, (III) the insurers lack standing to seek Rule 2004 discovery, (IV) the insurers failed to establish good cause for the proposed discovery, (V) signing a Proof of Claim does not constitute a privilege waiver or make an attorney a fact witness, and (VI) the insurers' request for discovery is designed to prevent a reorganization [D.I. 2043].[53] That same day, Claimant 40573 similarly filed an objection to Hartford and Century's Rule 2004 Motion, stating that Claimant 40573 has a legitimate, timely submitted Claim and that the proposed discovery instruments are redundant of the Claim form [D.I. 2066]. Claimants known by Claim numbers 18867, 43995, and 50263, also filed an objection to Hartford and Century's Rule 2004 Motion stating, among other things, that while Rule 2004 discovery may be justified in instances where claimants provided inadequate information, these three claimants already provided, under penalty of perjury, the same information sought in the insurers' proposed discovery [D.I. 2085].

---

[52] The following parties also filed joinders in support of Hartford and Century's Rule 2004 Motion: (a) Allianz Global Risks U.S. Insurance Company, National Surety Corporation, and Interstate Fire & Casualty Company [D.I. 2026]; (b) Columbia Casualty Company, The Continental Insurance Company as successor in interest to certain policies issued by Harbor Insurance Company, The Continental Insurance Company successor by merger to Niagara Fire Insurance Company, and The Continental Insurance Company [D.I. 2065]; (c) National Union Fire Insurance Company of Pittsburgh, Pa., Lexington Insurance Company, Landmark Insurance Company, The Insurance Company of the State of Pennsylvania, and their affiliated entities (collectively "AIG") [D.I. 2070]; (d) General Star Indemnity Company [D.I. 2136]; and (e) Liberty Mutual Insurance Company, together with its affiliates and subsidiaries [D.I. 2168].

[53] On February 5, 2021, there were numerous joinders to the Coalition's objection filed by various law firms and claimants [D.I. 2054, D.I. 2060, D.I. 2062, D.I. 2069, D.I. 2074, D.I. 2077, D.I. 2078, D.I. 2079, D.I. 2080, D.I. 2081, D.I. 2082, D.I. 2084, D.I. 2087, D.I. 2089, D.I. 2090, D.I. 2091, D.I. 2093, D.I. 2094, D.I. 2098, D.I. 2101, D.I. 2102, D.I. 2108, and D.I. 2117].

On February 5, 2021, claimants 3675, 18787, 28206, 32230, 38281, 48081, 48446, 60443, and 63751, by and through their undersigned counsel (the "PCVA Claimants"), filed an objection to Hartford and Century's Rule 2004 Motion on the ground that (1) the insurers failed to meet and confer before filing their motion, (2) they fail to establish good cause for their requested Rule 2004 examinations, and (3) during a meet and confer that took place *after* they filed their motion, the insurers agreed to narrow the scope of their requested Rule 2004 examinations [D.I. 2088]. Subsequently, claimant 5502 [D.I. 2099] and claimant 54540 [D.I. 2107] filed joinders to the PCVA Claimants' objection. On February 16, 2021, the PCVA Claimants withdrew their objection to Hartford and Century's Rule 2004 Motion after the movants agreed to withdraw their motion as to the PCVA Claimants [D.I. 2212].

On February 5, 2021, claimants represented by the law firm of Crew Janci LLP objected to Hartford and Century's Rule 2004 Motion on the grounds that (1) the movants failed to meet and confer before filing the motion; (2) the requested discovery is overly broad by design; (3) the requested discovery is unduly burdensome and seeks information that is largely duplicative of that already provided; and (4) the requested discovery is inappropriate because of underlying pending litigation [D.I. 2092]. On February 16, 2021, the claimants represented by Crew Janci LLP withdrew their objection [D.I. 2205].

Also on February 5, 2021, Andrews & Thornton, Attorneys at Law ("A&T") and ASK LLP ("ASK") filed a motion seeking entry of an order (i) authorizing A&T and ASK to file under seal certain portions of their objection to Hartford and Century's Rule 2004 Motion; (ii) directing that information contained in the redacted portions of the objection remain under seal and confidential pursuant to the terms of the Bar Date Order; and (iii) granting related relief [D.I. 2083].

On February 11, 2021, Century filed a sealed declaration of Erich J. Speckin, who was retained by Century to examine the handwriting and signatures on the Proofs of Claim submitted by claimants in these Chapter 11 Cases [D.I. 2175]. Mr. Speckin indicated, among other things, that for some claimants, the claimant signature in the Proof of Claims does not match the claimant's signature found in public records. *Id.* at 5. On February 11, 2021, Hartford et al and Century also filed *Insurers' Reply Brief in Support of Motion for an Order Authorizing Rule 2004 Discovery of Certain Proofs of Claim* [D.I. 2180]. Among other things, the reply stated that insurers have standing to seek discovery under Rule 2004, and discovery is necessary for Confirmation. That same day, the Coalition filed a supplement to its objection to Hartford and Century's Rule 2004 Motion, asserting that the insurers refuse to disclose the Claims information they already possess and the insurers do not have a statistical model that would permit them to draw inferences on the entire pool of Abuse Claims [D.I. 2184].

On February 15, 2021, the Coalition filed a motion to authorize the Coalition to file a Sur Reply for the limited purpose of addressing the new legal argument and factual representations and omissions raised in the *Insurers' Reply Brief in Support of Motion for an Order Authorizing Rule 2004 Discovery of Certain Proofs of Claim* [D.I. 2196]. The D. Miller & Associates PLLC [D.I. 2197], Eisenberg, Rothweiler, Winkler, Eisenberg & Jeck, P.C. [D.I. 2201], and Timothy D. Kosnoff, Esquire [D.I. 2207], filed joinders to the Coalition's motion to file a Sur Reply to the insurers' reply brief.

On February 16, 2021, Timothy D. Kosnoff, Esquire filed a motion to strike *Insurers' Reply Brief in Support of Motion for an Order Authorizing Rule 2004 Discovery of Certain Proofs of Claim*, stating the reply brief contains arguments and factual material that should have been included in their original motion [D.I. 2204]. On the same day, Century et al and Hartford filed an opposition to Timothy Kosnoff's (i) motion to strike insurer's reply brief and (ii) Sur-Reply in support of objection to insurers' motion to authorize Rule 2004 discovery of certain Proofs of Claim [D.I. 2230]. Century et al and Hartford's opposition asserts that Mr. Kosnoff's brief does not offer facts to challenge Mr. Erich J. Speckin's conclusions regarding Proofs of Claim and Mr. Speckin is a competent and skilled forensics practitioner, who is a qualified witness [D.I. 2230].

On February 16, 2021, Century et al filed a declaration of Larry F. Stewart, an expert retained by Century et al, in support of the motion for discovery under Rule 2004, which stated that Mr. Stewart has observed numerous irregularities in thousands of Proofs of Claim regarding their creation and has found thousands of examples of incorrect forms that require additional scrutiny, before deeming them authentic [D.I. 2232].

On February 19, 2021, the Bankruptcy Court entered an order authorizing Century et al and Hartford's motion to file under seal certain documents relating to the motion for an order (I) authorizing certain Rule 2004 discovery and (II) granting leave from local Rule 3007-1(f) to permit the filing of substantive omnibus objections [D.I. 2247].

On March 4, 2021, Century et al and Hartford filed a statement regarding the Amended Plan and pending Rule 2004 motions [D.I. 2316], stating that the discovery the insurers seek will shed light on the increase in pending Abuse Claims and, by allowing all parties to uncover the facts, pave the way toward building consensus. On March 8, 2021, Allianz Global Risks U.S. Insurance Company, National Surety Corporation, and Interstate Fire & Casualty Company filed a joinder to *Century and Hartford's Statement Regarding the Recently-Filed Plan of Reorganization and Pending Rule 2004 Motions* [D.I. 2331].

On March, 17, 2021, the Bankruptcy Court took under advisement the insurers' sealed motion for an order authorizing Rule 2004 discovery of certain Proofs of Claims, and Century et al and Hartford's sealed motion for an order (I) authorizing certain Rule 2004 discovery and (II) granting leave from local Rule 3007-1(f) to permit the filing of substantive omnibus objections. *See* Mar. 17, 2021 Hr'g Tr. 51:9–52:13.

### 4.  *Personal Injury Settlement Motions*

The Debtors filed motions for entry of orders approving various settlements in connection with personal injury and wrongful death actions (the "Personal Injury Settlements")[54] and lifting the automatic stay, to the extent necessary, to permit payments of the settlement amount by applicable insurance. The Court entered orders approving the settlement agreements, and modifying the automatic stay of 11 U.S.C. § 362(a) for the parties to consummate the settlement agreements.

---

[54]  These include, but are not limited to, approving Qian Settlement Agreement [D.I. 1123], Wilson Settlement Agreement [D.I. 1596], Worley Settlement Agreement [D.I. 1598], Gordon Settlement Agreement [D.I. 1880], Henderson Settlement Agreement [D.I. 1881], and Neyrey Settlement Agreement [D.I. 1986].

The aim of the Personal Injury Settlements is to avoid the uncertainty and expense of litigating the lawsuits and uncertainty with respect to the amount and timing if a judgment were to be awarded.  In addition, the BSA is released under the settlement agreements, eliminating any liability under a plan of reorganization.  Accordingly, the settlement agreements are in the best interests of the Debtors' Estates and their creditors.

The Court has only authorized such Claims to be negotiated pre-litigation or liquidated in the tort system, without authorizing the payment of any settlements or judgments reached.  As a result, the only economic impact on the Estate will be the incurrence of defense costs, which will be paid by the applicable Insurance Company.  These defense costs are unavoidable and will ultimately be incurred by either the Estate or the Insurance Company, either now or later.  It is just a matter of timing.

Moreover, the Court cannot adjudicate personal injury claims under 28 U.S.C. § 157(b)(2)(B). Nor is it anticipated that these Claims will be allowed or treated pursuant to any Trust Distribution Procedures (unlike the Abuse Claims).

R.    Material Settlements and Resolutions

### 1.    JPM / Creditors' Committee Settlement

As of the filing of this Disclosure Statement, the Plan (as further described in Article VI of this Disclosure Statement and Article V.R of such Plan), effectuates a settlement among (i) the Debtors, (ii) the Creditors' Committee, and (iii) JPM (the "JPM / Creditors' Committee Settlement").  The JPM / Creditors' Committee Settlement represents a good-faith agreement negotiated at arm's length that provides significant value to the holders of Convenience Claims, General Unsecured Claims, and Non-Abuse Litigation Claims and provides the Debtors with more favorable terms under the amended and restated debt facilities provided by JPM on and after the Effective Date under the Restated Debt and Security Documents.

Specifically, the JPM / Creditors' Committee Settlement provides, among other things, the following terms with respect to general unsecured creditors (other than Abuse Claims):

- General Unsecured Claims (other than Abuse Claims), which are held by creditors who are core to the Debtors' mission or creditors whose Claims, if Allowed, were incurred in furtherance of the Debtors' mission, shall be classified into three Classes: (i) General Unsecured Claims; (ii) Convenience Claims; and (iii) Non-Abuse Litigation Claims; Cash under the Plan to satisfy Allowed General Unsecured Claims and Convenience Claims will be made from Cash relating to the BSA's core assets.

- Holders of Allowed General Unsecured Claims (including holders of Claims under the Restoration Plan, the Deferred Compensation Plan, holders of trade Claims, and holders of Rejection Damages Claims) will receive, on account of such Claims, their Pro Rata Share of the Core Value Cash Pool, which shall be funded by reorganized BSA in four semi-annual installments of $6,250,000, beginning 180 days after the Effective Date and concluding two years after the Effective Date.  Any Cash remaining in the Core Value Cash Pool after all Allowed General Unsecured Claims have been satisfied in full, shall

be first used to fund any shortfall in payments from the BSA's available insurance and co-liable non-Debtors on account of any Non-Abuse Litigation Claims, and then be transferred to and vest in Reorganized BSA.

- Holders of General Unsecured Claims or Non-Abuse Litigation Claims (after first seeking to recover from insurance, and have exhausted all remedies with respect to such applicable insurance policy) that have an Allowed Claim of $50,000 or less and shall become Convenience Class Claims, which are paid by Reorganized BSA in full, using Cash on hand, on the Effective Date of the Amended Plan or, if such Claim becomes allowed after the Effective Date, as soon as reasonably practicable after Allowance. Any holder of a General Unsecured Claim or Non-Abuse Litigation Claim that is Allowed in an amount greater than $50,000 may elect to have its claim treated as a Convenience Claim and receive payment of $50,000 in Cash in full and final satisfaction of such Claim.

- Holders Non-Abuse Litigation Claims will, upon the liquidation of such Non-Abuse Litigation Claim following the Effective Date, be satisfied solely from the BSA's available insurance and from any non-Debtor party or parties that may be determined to be co-liable with the Debtors on account of such Non-Abuse Litigation Claim. No holder of an allowed Non-Abuse Litigation Claim shall be entitled to recover from the Core Value Cash Pool on account of such Claim, unless and until all allowed General Unsecured Claims have been paid in full. Solely, in the event any Non-Abuse Litigation Claim is not covered by applicable BSA insurance Policies or there is a shortfall in BSA's applicable insurance for such Non-Abuse Litigation Claim, following the exhaustion of remedies with respect to applicable insurance and any co-liable non-Debtor, the holder of an Allowed Non-Abuse Litigation Claim may elect to have such Claim treated as a Convenience Claim and receive Cash in an amount equal to the lesser of (a) the amount of its Allowed Non-Abuse Litigation Claim and (b) $50,000.

- A Creditor Representative, to be selected by the UCC with the consent of the Debtors shall be appointed to assist with the reconciliation of General Unsecured Claims.

- The Pension Plan shall continue to be maintained, sponsored, and assumed.

The JPM / Creditors' Committee Settlement also provides, among other things, the following terms with respect to JPM:

- JPM will enter into amended and Restated Debt and Security Documents on the Effective Date in principal amounts equal to the amounts of unpaid principal and accrued interest and fees as of the Effective Date and containing substantially the same terms as the Prepetition Debt and Security Documents, except that:

    o The maturity date on the principal under the amended and restated 2010 Bond Documents and the 2012 Bond Documents was extended to ten (10) years after the Effective Date and the Debtors were given a two (2) year payment holiday such that monthly principal installments for the first two (2) years are deferred until maturity;

o The maturity date on the principal under the amended and restated 2010 Credit Facility Documents and the 2019 RCF Documents (which revolver shall be frozen and termed out under the amended and Restated Debt and Security Documents) was extended to ten (10) years after the Effective Date and the Debtors were given a two (2) year payment holiday such that monthly principal installments for the first two (2) years are deferred until maturity;

o Pursuant to the amended and Restated Debt and Security Documents, the principal amounts payable will be reduced, on a pro rata basis amongst the facilities, by an amount equal to the Unrestricted Cash and Investments, if any, that have been remitted to JPM under the Excess Cash Sweep (as described below); and

o Beginning on December 31 two (2) years after the Effective Date and continuing each successive calendar year the calendar year that is immediately prior to the calendar year of the Maturity Date, Reorganized BSA shall remit to JPM twenty-five percent (25%) of its Unrestricted Cash and Investments in excess of $75,000,000, if any, as of such date with the payment due within 45 days (the "Excess Cash Sweep"), and JPM shall apply any such amounts on a Pro Rata basis to the unpaid principal balances under the amended and Restated Debt and Security Documents.  However, no payments shall be made on account of the Excess Cash Sweep until the last Distribution is made on account of General Unsecured Claims two years after the Effective Date.

- JPM was also granted Allowed Claims in the following amounts, plus any accrued but unpaid interest and reasonable fees and expenses as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order:

  o on account of the 2010 Credit Facility Claims, an aggregate amount not to exceed $80,762,060 (including $44,299,743 of undrawn amounts under letters of credit issued under the 2010 Credit Facility Documents);

  o on account of the 2019 RCF Claims, an aggregate amount not to exceed $61,542,720 (including $51,542,720 of undrawn amounts under letters of credit issued under the 2019 RCF Documents);

  o on account of the 2010 Bond Claims, an aggregate amount of $40,137,274; and

  o on account of the 2012 Bond Clams, an aggregate amount of $145,662,101.

In exchange for the agreements in the JPM / Creditors' Committee Settlement, the following term are also provided:

- Certain releases, including with respect to JPM as well as Debtor releases of all preference and other avoidance action Claims against holders of General Unsecured Claims and Convenience Claims.

- The Committee's agreement to not seek standing, or otherwise pursue any prepetition avoidance-related Claim that could be asserted against JPM or others, or to challenge the allowance of certain of the Claims of JPM.

Under the Global Resolution Plan, the Debtors are committed to ensuring that the aggregate value of the Local Council Settlement Contribution is not less than $425,000,000. The Debtors intend to request the voluntary commitments of Local Councils to make their respective contributions, which contributions shall be set forth in commitment agreements executed by each Local Council. By no later than June 15, 2021, the Debtors shall file a report with the Bankruptcy Court concerning the status of the Debtors' efforts to obtain contribution commitments from the Local Councils. Such status report shall contain information concerning the form of contributions by the Local Councils (*i.e.*, cash, real property, securities or other currency) and the timing of such contributions. In addition, the status report will set forth any required amendments the Debtors may propose to the Plan to facilitate the Local Council Settlement Contribution. As part of this process, the Debtors intend to work with the Ad Hoc Committee of Local Councils and their professionals as well as individual Local Councils.

The Global Resolution Plan also contemplates that the Contributing Chartered Organizations will contribute the Contributing Chartered Organization Settlement Contribution and waive and release any Claims that have been asserted in these Chapter 11 Cases by or on behalf of any Contributing Chartered Organization, including Indirect Abuse Claims. Additionally, the Contributing Chartered Organizations will assign any Perpetrator Indemnification Claims held by the Contributing Chartered Organizations.

Under the Global Resolution Plan, in exchange for the Local Council Settlement Contribution and the Contributing Chartered Organization Settlement Contribution, which the Debtors believe will provide significant value to the Settlement Trust to fund Abuse Claims, the Local Councils and Contributing Chartered Organization will be granted third-party releases and Abuse Claims against the Local Councils and Contributing Chartered Organizations will be channeled to the Settlement Trust, as described in Article X.F of the Plan.

The Debtors intend to continue to engage in good-faith arm's-length negotiations with other key parties in interest in these Chapter 11 Cases to achieve settlements and agreements to maximize the value of the Debtors' Estates and for the benefit of holders of Claims.

### 2. *Hartford Insurance Settlement Agreement*

On April 15, 2021, the Debtors entered into a settlement with their Insurance Companies Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company, Navigators Specialty Insurance Company and certain related parties (collectively, "Hartford"). The settlement agreement (the "Hartford Insurance Settlement Agreement") is attached as Exhibit I to the Plan. The summary of the Hartford Insurance Settlement Agreement set forth here is qualified entirely by the text of the agreement, which shall control in the event of any inconsistencies.

If the Plan is confirmed as a Global Resolution Plan, it will incorporate the terms of the settlement with Hartford, which provides, subject to its terms and conditions, for Hartford to

make a contribution of up to $650 million to the Settlement Trust for the payment of Abuse Claims (the "Hartford Settlement Contribution"). In return, the settlement provides, in pertinent part, for the sale of the Hartford Policies to Hartford free and clear of the interests of all third parties, including any additional insureds under the Hartford Policies, which interests will be channeled to the Settlement Trust; the release of claims against Hartford by the Debtors and Local Councils; and the channeling of all present and future claims against Hartford relating to its provision of insurance coverage for Abuse Claims to the Settlement Trust. If the Plan is not confirmed as a Global Resolution Plan, or if the Local Councils do not all execute releases in favor of Hartford, the Hartford settlement will not take effect and the Settlement Trust will not receive the Hartford Settlement Contribution.

The Debtors believe that the Hartford Insurance Settlement Agreement is fair, reasonable, and in the best interests of the Estates and holders of Abuse Claims. Hartford issued primary and certain umbrella policies to the BSA for the period from September 21, 1971 to January 1, 1978. Prior to the Petition Date, the BSA and Hartford were engaged in litigation over the scope of coverage provided under the Hartford Policies. In that litigation, Hartford raised a number of defenses that, if successful, would substantially reduce or even eliminate coverage for the Abuse Claims, including that the BSA has breached conditions to coverage; that the Abuse Claims arise out of a single occurrence under applicable law, which Hartford believes is New Jersey law under its primary policies; and that the BSA and the Local Councils expected or intended the injuries for which they seek coverage.

Hartford has also contended, outside of litigation, that the BSA's access to certain of its policies is significantly limited, including that the BSA released and extinguished its primary policies for January 1, 1976 to January 1, 1978 through a prepetition settlement; that it has no coverage obligations for Abuse Claims that are barred by the applicable statute of limitations; and that at least one of the Hartford primary policies has an applicable aggregate limit for Abuse Claims.

While the Debtors dispute many, if not all, of those contentions, there can be no doubt that continuing to litigate against Hartford would not only drain the Debtors' limited resources but also create a substantial risk that Hartford would ultimately pay significantly less toward Abuse Claims than it will under the Hartford settlement—and some risk that Hartford would pay nothing.

The resolution of the coverage dispute reflected in the Hartford settlement is the product of extensive, arm's-length negotiations conducted over a lengthy period between the Debtors and Hartford, with the active assistance of the Mediators. It represents a good-faith settlement and compromise of complex disputes and will avoid the costs, risks, uncertainty, and delay associated with protracted litigation, while providing a very substantial payment on account of Abuse Claims.

The key provisions of the Hartford settlement are summarized below:

a.    **The Hartford Settlement Contribution**

The Hartford settlement provides for a contribution of $650 million to the Settlement Trust, contingent on (a) the Bankruptcy Court's entry of an order (i) confirming the Plan as a Global Resolution Plan and approving the Hartford Insurance Settlement Agreement, including the Debtors' sale of the Hartford Policies to Hartford, free and clear of all interests of any third party, and the Debtors' release of Hartford from the Hartford Released Claims (as defined in the Agreement), or (ii) if Hartford requests, an order entered prior to confirmation of the Plan, approving such Agreement, sale, and releases pursuant to section 363 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules; (b) Hartford's receipt of a fully executed release, substantially similar to the release to be provided by the BSA to Hartford, on behalf of each Local Council; (c) the provision in the Confirmation Order for a release and channeling injunction for the benefit of the Local Councils with respect to Abuse Claims; (d) the Debtors' provision of notice to Hartford that the Plan Effective Date has occurred; and (e) the Confirmation Order (or the Approval Order, if applicable) having become a Final Order (unless Hartford in its sole discretion waives such condition). If these preconditions are met, and subject to all of the terms and conditions of the Hartford Insurance Settlement Agreement, Hartford will pay the Debtors or, at the Debtors' written direction, the Settlement Trust, the Settlement Amount of $650 million, in cash, which (subject to the provisions discussed in the next paragraph of this Disclosure Statement and to the rights of any third parties under the Hartford Policies, which rights shall attach to the settlement proceeds) shall be used solely to pay or defend Abuse Claims.

The Settlement Amount is subject to reduction (or, if already paid by Hartford, to its right to a refund) if the Debtors, their Estates or the Settlement Trust enter into an agreement resolving the Debtors' or Local Councils' claims against Century and its affiliates for coverage of Abuse Claims and that agreement provides for payment by Century of less than $1.3 billion (two times the Settlement Amount). In that event, the Settlement Amount shall be reduced by (or Hartford shall be entitled to a refund, payable by the Settlement Trust, equal to) fifty percent of the difference between $1.3 billion and the amount paid by Century. After analyzing the Abuse Claims and the insurance coverage potentially available to pay them, the Debtors have concluded that Century's relative share of coverage obligations for Abuse Claims is more than two times Hartford's share. Accordingly, the Debtors believe that the payment-reduction provision of the Hartford Insurance Settlement Agreement is fair and reasonable, and was necessary to obtain the Hartford settlement.

Certain parties contend that the Hartford Settlement Agreement impairs other of the BSA's Insurance Companies' contribution rights; however, the BSA disagrees. The vast majority of the years Hartford provided the BSA Insurance Coverage, the BSA's Insurance Companies will not have contribution claims against Hartford as Hartford provided both the primary and excess Insurance Policies that would be implicated by the Abuse Claims.

b.    **Sale of the Hartford Policies to Hartford Free and Clear of all Interests**

If the Plan is confirmed as a Global Resolution Plan, confirmation will constitute approval of the Debtors' sale to Hartford of the Hartford Policies, free and clear of all interests of

third parties (which will be channeled to proceeds to be paid by Hartford and administered by the Settlement Trust), pursuant to sections 363, 1123 and 1141 of the Bankruptcy Code.

c.       **Mutual Release of Claims by Hartford, the Debtors and the Local Councils**

If the Plan is confirmed as a Global Resolution Plan, upon the later of the effective date of the Hartford Insurance Settlement Agreement and Hartford's payment of the Settlement Amount, (a) the Debtors, their Estates, and the Settlement Trust will release Hartford from the Hartford Released Claims (as such term is defined in, and as provided in Section IV.A. of, the Hartford Insurance Settlement Agreement), and (b) Hartford will release the Debtors, their Estates, and the Settlement Trust from the BSA Released Claims (as such term is defined in, and as provided in, Section IV.B of the Hartford Insurance Settlement Agreement) and will withdraw all requests or demands for payment by the Debtors or their Estates of any BSA Released Claims, including any proofs of claim that Hartford asserted in the Debtors' Chapter 11 Cases. In addition, Hartford will receive a fully executed Local Council Release (as such term is defined in the Hartford Insurance Settlement Agreement) on behalf of each Local Council, in form and substance acceptable to Hartford, under which (a) each Local Council will release Hartford from all claims by any Local Council under the Local Council Policies and the Hartford Policies, and (b) Hartford will release the Local Councils from all claims by Hartford in connection with the Hartford Policies and the Local Council Policies.

d.       **Channeling Injunction and Releases in Favor of Hartford as a Settling Insurance Company and Protected Party under the Plan**

If the Plan is confirmed as a Global Resolution Plan, Hartford will be a Settling Insurance Company and a Protected Party under the Plan and will be provided all benefits and protections afforded to Settling Insurance Companies and Protected Parties, including (a) the Channeling Injunction set forth in Article X.F of the Plan, which will permanently enjoin any person or entity from asserting any Abuse Claim against Hartford and will channel all such present and future Abuse Claims against Hartford to the Settlement Trust, and (b) the Releases and related Injunctions set forth in Articles X.J and Article X.L of the Plan, which will (i) provide releases of certain claims against Hartford by the Debtors and their Estates and by holders of Abuse Claims, and (ii) permanently enjoin all holders of claims released under Article X.J from asserting such released claims against Hartford.  The Channeling Injunction and the Releases and related Injunctions set forth in Articles X.F, X.J, and X.L of the Plan are further described in Article VI.O of this Disclosure Statement.

e.       **Reservation of Rights**

If the Plan is not confirmed as a Global Resolution Plan or if any other condition precedent to Hartford's obligations under the Hartford Insurance Settlement Agreement is not met or waived, Hartford shall have the right to object to the Plan and to take any other actions in the Debtors' Chapter 11 Cases that it may deem necessary to protect its rights and interests. Furthermore, in the event of any judicial disapproval of the Hartford Insurance Settlement Agreement, including any *vacatur* or reversal of the Confirmation Order (or Approval Order, if applicable) on appeal, Hartford and the Debtors shall have the right to declare the Agreement

null and void, in which case, among other things, Hartford shall have no obligation to pay the Settlement Amount (and, if already paid, such payment shall be returned to Hartford), and Hartford and the Debtors shall have all rights, defenses, and obligations with respect to insurance coverage that they would have had absent the Hartford Insurance Settlement Agreement.

S.    Other Relevant Filings & Hearings

- Century and Hartford have filed *Century and Hartford's Statement Regarding the Recently-Filed Plan of Reorganization and Pending Rule 2004 Motions* [D.I. 2316], stating that the Amended Plan has not garnered sufficient support.

- Allianz Insurers' joinder to Century and Hartford's statement regarding the Amended Plan and pending Rule 2004 Motions [D.I. 2331].

- On March 12, 2021, the Tort Claimants' Committee and Future Claimants Representative filed a joint motion (the "TCC / FCR Joint Standing Motion"), which requested standing for the Tort Claimants' Committee and Future Claimants' Representative to prosecute the following claims on behalf of the Debtors' bankruptcy estate: (1) declaratory judgment that the Intercompany Note be characterized as an equity or capital contribution made by BSA to Arrow or, in the alternative, an order avoiding certain transfers made under the Intercompany Note by BSA to Arrow; (2) declaratory judgment that certain property of the Debtors is not subject to the liens or security interests granted to the prepetition lender, JPM; (3) avoidance of certain unperfected liens and security interests asserted by JPM against certain property of the Debtors; and (4) an order reversing certain components of the Debtors' Final Cash Collateral Order [D.I. 2364 ].

- On March 16, 2021, the Tort Claimants' Committee filed the *Official Tort Claimants' Committee's Case Status Report* [D.I. 2388], outlining issues that it informally objected to with respect to the Debtors' proposed Amended Plan.  Through the status report, the Tort Claimants' Committee also asserted that various issues should be further addressed including, among other things, claims of the estate; restricted assets; Local Councils; and Chartered Organizations.

- On April 9, 2021, the Tort Claimants' Committee filed its second case status report, detailing, among other things, pending contested matters and unresolved issues [D.I. 2566].  The Tort Claimants' Committee stated that judicial resolution of issues might be necessary to reach a consensual plan and reiterated its assertion that the Tort Claimants' Committee should be permitted the opportunity to propose its own plan of reorganization in addition to the Debtors' Plan.  *Id.* at 7.

- On April 9, 2021, Century filed a motion to adjourn the Disclosure Statement hearing scheduled for April 29, 2021, to a later date after the Debtors file the Settlement Trust Agreement and Trust Distribution Procedures [D.I. 2568] (the "Century Motion to Adjourn").[55]

---

[55] Clarendon American Insurance Company ("Clarendon") and Travelers Casualty and Surety Company joined Century's motion to adjourn.  *Id.* at 1 n.2.  Clarendon formally filed a joinder to Century's motion on April 12, 2021 [D.I. 2572].

- On April 12, 2021, the Court held a status conference regarding, among other things, the status of Mediation, the Plan and Disclosure Statement, and the Century Motion to Adjourn. At that time the Court continued the hearing to approve the Disclosure Statement to May 19, 2021.

- On April 23, 2021, the Coalition, the Future Claimants' Representative, and the Tort Claimants' Committee filed two notices of discovery on Century and Hartford [D.I. 2682, 2683] (the "Century Discovery Request" and "Hartford Discovery Request," respectively).

- On April 28, 2021, the Debtors filed a *Motion for Entry of an Order (I) Approving Lehr Settlement Agreement and (II) Modifying the Automatic Stay, to the Extent Necessary, to Permit Payment of Settlement Amount by Applicable Insurance* [D.I. 2719] ("Lehr Settlement Agreement"), to which certain parties have objected. The Tort Claimants' Committee argues that it should not be approved at this time because it represents favorable treatment of Non-Abuse Claimants over Abuse Survivors [D.I. 3781]. The FCR joins this objection.

- On April 29, 2021, JPM filed an objection to the TCC / FCR Joint Standing Motion [D.I. 2732]. JPM argues that the motion should be denied on the grounds that: (1) the claims are not colorable; (2) the Debtors' refusal to litigate the alleged claims is justified; and (3) if the Bankruptcy Court finds that the claims need to be settled, the Bankruptcy Court should permit the Debtors' to settle these claims as an action in the best interests of the Debtors' estates.

- On April 29, 2021, the Debtors filed an objection to the TCC / FCR Joint Standing Motion [D.I. 2733]. The Debtors' objection asserts that the movants failed to state a colorable claim, and the Debtors did not unjustifiably refuse to pursue claims.

- On April 29, 2021, the Creditors' Committee filed a limited joinder to the Debtors' objection to the TCC / FCR Joint Standing Motion [D.I. 2737]. Specifically, the limited joinder agreed with the Debtors' objection in so much as the Bankruptcy Court should deny the relief in the motion; however, the Creditors' Committee asserted that the Court should deny without prejudice or adjourn the motion because the motion was premature.

- On May 5, 2021, Century filed a *Motion to Amend the Court's Order (I) Approving Procedures for (A) Interim Compensation and Reimbursement of Retained Professionals and (B) Expense Reimbursement for Official Committee Members and (II) Granting Related Relief* [D.I. 3161], to which the Debtors and the Tort Claimants' Committee have filed responses proposing certain modifications to the relief requested by Century

- On May 6, 2021, Stamatios Stamoulis, counsel for Century, filed a declaration verifying the accuracy of the monthly fee applications of professionals, and attesting to his review of the final reports filed on the docket by the Fee Examiner appointed by the Court in this case [D.I. 3286].

- On May 12, 2021, the Tort Claimants' Committee filed an objection to the Lehr Settlement Agreement [D.I. 3781], arguing that it should not be approved at this time because it represents favorable treatment of Non-Abuse Claimants over Abuse Survivors.

## ARTICLE VI. OVERVIEW OF THE PLAN

A.    General

This Article of the Disclosure Statement summarizes certain relevant provisions of the Plan. The confirmation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for treating claims against, and equity interests in, a debtor. Confirmation of a plan of reorganization by a bankruptcy court makes it binding on the debtor, any person or Entity acquiring property under the plan, and any creditor of, or equity interest holder in, the debtor, whether or not such creditor or equity interest holder has accepted the plan or received or retains any property under the plan. Subject to certain limited exceptions and other than as provided in a plan itself or in a confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan of reorganization.

Pursuant to Article V, of the Plan, on or after the Confirmation Date, the Debtors shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions consistent with the Plan as may be necessary or appropriate to enable them to implement the provisions of the Plan before, on, or after the Effective Date, including the creation of the Settlement Trust and the preparations for the transfer of the Settlement Trust Assets to the Settlement Trust.

**YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

B.    Distributions

One of the key concepts under the Bankruptcy Code is that only Claims and interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an Allowed Claim means that the Debtors agree, or if there is a dispute, the Bankruptcy Court determines, that the Claim (other than an Abuse Claim), and the amount thereof, is in fact a valid obligation of the Debtors. Similarly, with respect to Abuse Claims, such Claims will be channeled to, as well as allowed and resolved by, the Settlement Trust in accordance with the Trust Distribution Procedures. A detailed discussion of the treatment and anticipated means of satisfaction for each Class of Allowed Claims and the Class of Abuse Claims that are channeled to the Settlement Trust and allowed pursuant to terms of the Trust Distribution Procedures is set forth in Article VII of this Disclosure Statement.

C.    Treatment of Unclassified Claims

The treatment of unclassified Claims are as follows:

| Class | Designation | Treatment under the Plan | Impairment and Entitlement to Vote |
|-------|-------------|--------------------------|-------------------------------------|
| N/A | Administrative Expense Claims | Each holder of an Allowed Administrative Expense Claim shall receive payment of Cash in an amount equal to the unpaid portion of such Allowed Administrative Expense Claim. | Unimpaired<br><br>**Not Entitled to Vote** (Presumed to Accept) |
| N/A | Professional Fee Claims | Each holder of an Allowed Professional Fee Claim shall receive payment in Cash from funds held in the Professional Fee Reserve. | Unimpaired<br><br>**Not Entitled to Vote** (Presumed to Accept) |
| N/A | Priority Tax Claims | Each holder of an Allowed Priority Tax Claim shall receive Cash in an amount equal to such Allowed Priority Tax Claim. | Unimpaired<br><br>**Not Entitled to Vote** (Presumed to Accept) |

### 1.    *Administrative Expense Claims Generally*

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment with respect to such Allowed Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims, which are governed by Article II.A.2 of the Plan) shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Claim, payment of Cash in an amount equal to the unpaid portion of such Allowed Administrative Expense Claim, or such amounts and on other such terms as may be agreed to by the holders of such Claims, on or as soon as reasonably practicable after the later of: (a) the Effective Date; (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; (c) such other date(s) as such holder and the Debtors or Reorganized BSA shall have agreed; or (d) such other date ordered by the Bankruptcy Court; provided, however, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' non-profit operations during the Chapter 11 Cases may be paid by the Debtors or Reorganized BSA in the ordinary course of operations and in accordance with the terms and conditions of the particular agreements governing such obligations, course of dealing, course of operations, or customary practice.  Notwithstanding anything to the contrary in the Plan or in the Cash Collateral Order, no Claim on account of any diminution in the value of the Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) (as each such capitalized term is defined in the Cash Collateral Order) from and after the Petition Date shall be Allowed unless such Claim is Allowed by a Final Order of the Bankruptcy Court.

**HOLDERS OF ADMINISTRATIVE EXPENSE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE EXPENSE CLAIMS BY THE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE EXPENSE CLAIMS AGAINST THE DEBTORS OR THEIR PROPERTY, AND SUCH ADMINISTRATIVE EXPENSE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE.**

### 2. *Professional Fee Claims*

(a) <u>Final Fee Applications</u>.  All Professionals or other Persons requesting the final Allowance and payment of compensation and/or reimbursement of expenses pursuant to sections 328, 330, 331 and/or 503(b) for services rendered during the period from the Petition Date to and including the Effective Date shall file and serve final applications for Allowance and payment of Professional Fee Claims on counsel to the Debtors and the United States Trustee no later than the first Business Day that is forty-five (45) days after the Effective Date.  Objections to any Professional Fee Claim must be filed and served on Reorganized BSA and the applicable Professional within twenty-one (21) calendar days after the filing of the final fee application that relates to the Professional Fee Claim (unless otherwise agreed by the Debtors or Reorganized BSA, as applicable, and the Professional requesting Allowance and payment of a Professional Fee Claim).  The Fee Examiner shall continue to act in its appointed capacity unless and until all Professional Fee Claims have been approved by order of the Bankruptcy Court, and Reorganized BSA shall be responsible to pay the fees and expenses incurred by the Fee Examiner in rendering services after the Effective Date.

(b) <u>Professional Fee Reserve</u>.  On the Effective Date, the Debtors shall establish and fund the Professional Fee Reserve with Cash in an amount equal to the Professional Fee Reserve Amount.  Funds held in the Professional Fee Reserve shall not be considered property of the Debtors' Estates, Reorganized BSA, the Settlement Trust, or the Core Value Cash Pool.  Professional Fees owing on account of Allowed Professional Fee Claims shall be paid in Cash from funds held in the Professional Fee Reserve as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order of the Bankruptcy Court or authorized to be paid under the Compensation Procedures Order; <u>provided</u>, <u>however</u>, that Reorganized BSA's obligations with respect to Allowed Professional Fee Claims shall not be limited by or deemed limited to the balance of funds held in the Professional Fee Reserve.  To the extent the funds held in the Professional Fee Reserve are insufficient to satisfy the Allowed Professional Fee Claims in full, each holder of an Allowed Professional Fee Claim shall have an Allowed Administrative Expense Claim for any deficiency, which shall be satisfied in accordance with <u>Article II.A.2</u> of the Plan.  No Liens, Claims, interests, charges, or other Encumbrances or liabilities of any kind shall encumber the Professional Fee Reserve in any way.  When all Allowed Professional Fee Claims have been paid in full, amounts remaining in the Professional Fee Reserve, if any, shall revert to Reorganized BSA.

(c) <u>Professional Fee Reserve Amount</u>.  To receive payment for Accrued Professional Fees incurred up to and including the Effective Date, Professionals shall estimate their Accrued Professional Fees as of the Effective Date and deliver such estimate to the Debtors at least five (5) Business Days prior to the anticipated Effective Date.  If a Professional does not provide such estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated will constitute the Professional Fee Reserve Amount, provided that such estimate will not be considered an admission or limitation with respect to the fees and expenses of such Professional.

(d) <u>Post-Effective Date Fees and Expenses</u>.    From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 or 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and Professionals may be employed and paid in the ordinary course of operations without any further notice to or action, order, or approval of the Bankruptcy Court.  The reasonable and documented fees and expenses incurred by the Professionals to the Creditors' Committee after the Effective Date until the complete dissolution of the Creditors' Committee for all purposes in accordance with <u>Article X.R</u> of the Plan will be paid by Reorganized BSA in the ordinary course of business (and not later than thirty (30) days after submission of invoices).

### 3. *Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, at the sole option of the Debtors or Reorganized BSA, as applicable: (1) Cash in an amount equal to such Allowed Priority Tax Claim on or as soon as reasonably practicable after the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; <u>provided</u>, <u>however</u>, that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium; or (2) regular installment payments in Cash of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim over a period ending not later than five years after the Petition Date.

### D. Classification of Claims and Interests Summary

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor.  The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

The Plan establishes a comprehensive classification of Claims and Interests.  The table below summarizes the classification, treatment, voting rights, and Claims and Interests, by Class, under the Plan.

| Class | Designation[56] | Treatment under the Plan | Impairment and Entitlement to Vote |
|---|---|---|---|
| 1 | Other Priority Claims | Each holder of an Allowed Other Priority Claim shall receive: (i) payment in Cash in an amount equal to such Allowed Other Priority | Unimpaired **Not Entitled to Vote** |

---

[56] The Debtors reserve the right to eliminate any Class of Claims in the event they determine that there are no Claims in such Class.

| Class | Designation[56] | Treatment under the Plan | Impairment and Entitlement to Vote |
|---|---|---|---|
| | | Claim; or (ii) satisfaction of such Allowed Other Priority Claim in any other manner that renders the Allowed Other Priority Claim Unimpaired, including Reinstatement. | (Presumed to Accept) |
| 2 | Other Secured Claims | Each holder of an Allowed Other Secured Claim shall receive: (i) payment in Cash in an amount equal to the Allowed amount of such Claim; (ii) satisfaction of such Other Secured Claim in any other manner that renders the Allowed Other Secured Claim Unimpaired, including Reinstatement; or (iii) return of the applicable collateral in satisfaction of the Allowed amount of such Other Secured Claim. | Unimpaired<br><br>**Not Entitled to Vote** (Presumed to Accept) |
| 3A | 2010 Credit Facility Claims | Each holder of an Allowed 2010 Credit Facility Claim shall receive a Claim under the Restated Credit Facility Documents in an amount equal to the amount of such holder's Allowed 2010 Credit Facility Claim. | Impaired<br><br>**Entitled to Vote** |
| 3B | 2019 RCF Claims | Each holder of an Allowed 2019 RCF Claim shall receive a Claim under the Restated Credit Facility Documents in an amount equal to the amount of such holder's Allowed 2019 RCF Claim. | Impaired<br><br>**Entitled to Vote** |
| 4A | 2010 Bond Claims | Each holder of an Allowed 2010 Bond Claim shall receive a Claim under the Restated 2010 Bond Documents in an amount equal to the amount of such holder's Allowed 2010 Bond Claim. | Impaired<br><br>**Entitled to Vote** |
| 4B | 2012 Bond Claims | Each holder of an Allowed 2012 Bond Claim shall receive a Claim under the Restated 2012 Bond Documents in an amount equal to the amount of such holder's Allowed 2012 Bond Claim. | Impaired<br><br>**Entitled to Vote** |
| 5 | Convenience Claims | Each holder of an Allowed Convenience Claim shall receive Cash in an amount equal to 100% of such holder's Allowed Convenience Class Claim. | Impaired<br><br>**Entitled to Vote** |
| 6 | General Unsecured Claims | Each holder of an Allowed General Unsecured Claim (to the extent such Claim is not an Insured Non-Abuse Claim) shall receive, subject to the holder's ability to elect Convenience Class treatment on account of the Allowed General Unsecured Claim, its Pro | Impaired<br><br>**Entitled to Vote** |

| Class | Designation[56] | Treatment under the Plan | Impairment and Entitlement to Vote |
|---|---|---|---|
|  |  | Rata Share of the Core Value Cash Pool up to the full amount of such Allowed General Unsecured Claim in the manner described in <u>Article VII</u> of the Plan. |  |
| 7 | Non-Abuse Litigation Claims | Each holder of an Allowed Non-Abuse Litigation Claim shall, subject to the holder's ability to elect Convenience Class treatment as provided in the following sentence, retain the right to recover up to the amount of such holder's Allowed Non-Abuse Litigation Claim from (i) available Insurance Coverage or the proceeds of any insurance policy of the Debtors, including any Specified Insurance Policy or D&O Liability Insurance Policy, (ii) applicable proceeds of any Insurance Settlement Agreements, and (iii) co-liable non-debtors (if any) or their insurance coverage. Solely to the extent that the holder of an Allowed Non-Abuse Litigation Claim fails to recover in full from the foregoing sources on account of such Allowed Claim after exhausting its remedies in respect thereof, such holder may elect to have the unsatisfied portion of its Allowed Claim treated as an Allowed Convenience Claim and receive cash in an amount equal to the lesser of (a) the amount of the unsatisfied portion of the Allowed Non-Abuse Litigation Claim and (b) $50,000. | Impaired<br><br>**Entitled to Vote** |
| 8 | Direct Abuse Claims[57] | Pursuant to the Channeling Injunction set forth in <u>Article X.F</u> of the Plan, each holder of a Direct Abuse Claim shall have such holder's Direct Abuse Claim against the Protected Parties (or any of them) permanently channeled to the Settlement Trust, and such Direct Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents. | Impaired<br><br>**Entitled to Vote** |
| 9 | Indirect Abuse Claims[58] | Pursuant to the Channeling Injunction set forth in <u>Article X.F</u> of the Plan, each holder of an Indirect Abuse Claim shall have such holder's | Impaired<br><br>**Entitled to Vote** |

---

[57]    Under the Plan, "Direct Abuse Claim" means an Abuse Claim that is not an Indirect Abuse Claim.

| Class | Designation[56] | Treatment under the Plan | Impairment and Entitlement to Vote |
|---|---|---|---|
| | | Indirect Abuse Claim against the Protected Parties (or any of them) permanently channeled to the Settlement Trust, and such Indirect Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents. | |
| 10 | Interests in Delaware BSA | Interests in Delaware BSA shall be deemed cancelled without further action by or order of the Bankruptcy Court and shall be of no further force or effect, whether surrendered for cancellation or otherwise. | Impaired **Not Entitled to Vote** (Deemed to Reject) |

E.    Treatment of Claims and Interests

Holders of Claims and Interests shall receive the treatment as set forth below:

*1.    Class 1—Other Priority Claims*

(i)    Classification: Class 1 consists of all Other Priority Claims.

(ii)    Treatment: Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment of such Claim, in full and final satisfaction of such Allowed Other Priority Claim, at the sole option of Reorganized BSA: (i) each such holder shall receive payment in Cash in an amount equal to such Allowed Other Priority Claim, payable on or as soon as reasonably practicable after the last to occur of (x) the Effective Date, (y) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, and (z) the date on which the holder of such Allowed Other Priority Claim and the Debtors or Reorganized BSA, as applicable, shall otherwise agree in writing; or (ii) satisfaction of such Allowed Other Priority Claim in any other manner that renders the Allowed Other Priority Claim Unimpaired, including Reinstatement.

(iii)    Voting: Class 1 is Unimpaired, and each holder of an Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.   Therefore, holders of Other Priority

---

[58]    Under the Plan, "Indirect Abuse Claim" means a liquidated or unliquidated Abuse Claim for contribution, indemnity, reimbursement, or subrogation, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, including any indemnification, reimbursement, hold-harmless or other payment obligation provided for under any prepetition settlement, insurance policy, program agreement or contract.

Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Priority Claims.

**2.      *Class 2—Other Secured Claims***

(i)      Classification: Class 2 consists of all Other Secured Claims.  To the extent that Other Secured Claims are Secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2 for purposes of voting to accept or reject the Plan and receiving Plan Distributions under the Plan.

(ii)      Treatment: Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment of such Claim, in full and final satisfaction of such Allowed Other Secured Claim, each holder of an Allowed Other Secured Claim will receive, at the sole option of Reorganized BSA: (i) Cash in an amount equal to the Allowed amount of such Claim, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code, payable on or as soon as reasonably practicable after the last to occur of (x) the Effective Date, (y) the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, and (z) the date on which the holder of such Allowed Other Secured Claim and the Debtors or Reorganized BSA, as applicable, shall otherwise agree in writing; (ii) satisfaction of such Other Secured Claim in any other manner that renders the Allowed Other Secured Claim Unimpaired, including Reinstatement; or (iii) return of the applicable collateral on the Effective Date or as soon as reasonably practicable thereafter in satisfaction of the Allowed amount of such Other Secured Claim.

(iii)      Voting: Class 2 is Unimpaired, and each holder of an Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Secured Claims.

**3.      *Class 3A—2010 Credit Facility Claims***

(i)      Classification: Class 3A consists of all 2010 Credit Facility Claims.

(ii)      Allowance: On the Effective Date, all 2010 Credit Facility Claims shall be deemed fully Secured and Allowed pursuant to section 506(a) of the Bankruptcy Code, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount not less than $80,762,060 (including $44,299,743 of undrawn amounts under letters of credit issued under the 2010 Credit Facility Documents provided such letters of credit are drawn on or before the Effective Date) plus any accrued but unpaid

interest and reasonable fees and expenses as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order.  Because all 2010 Credit Facility Claims are deemed fully Secured, there are no unsecured 2010 Credit Facility Claims, and the holders of such Claims do not have or hold any Class 6 Claims against the Debtors on account of any 2010 Credit Facility Claims.

(iii)    Treatment: Except to the extent that a holder of an Allowed 2010 Credit Facility Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed 2010 Credit Facility Claim, each holder of an Allowed 2010 Credit Facility Claim shall receive a Claim under the Restated Credit Facility Documents in an amount equal to the amount of such holder's Allowed 2010 Credit Facility Claim.

(iv)    Voting: Class 3A is Impaired, and each holder of an Allowed 2010 Credit Facility Claim is entitled to vote to accept or reject the Plan.

**4.    *Class 3B—2019 RCF Claims***

(i)    Classification: Class 3B consists of all 2019 RCF Claims.

(ii)    Allowance: On the Effective Date, all 2019 RCF Claims shall be deemed fully Secured and Allowed pursuant to section 506(a) of the Bankruptcy Code, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount not less than $61,542,720 (including $51,542,720 of undrawn amounts under letters of credit issued under the 2019 RCF Documents provided such letters of credit are drawn on or before the Effective Date) plus any accrued but unpaid interest and reasonable fees and expenses as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order.  Because all 2019 RCF Claims are deemed fully Secured, there are no unsecured 2019 RCF Claims, and the holders of such Claims do not have or hold any Class 6 Claims against the Debtors on account of any 2019 RCF Claims.

(iii)    Treatment: Except to the extent that a holder of an Allowed 2019 RCF Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed 2019 RCF Claim, each holder of an Allowed 2019 RCF Claim shall receive a Claim under the Restated Credit Facility Documents in an amount equal to the amount of such holder's Allowed 2019 RCF Claim.

(iv)    Voting: Class 3B is Impaired, and each holder of a 2019 RCF Claim is entitled to vote to accept or reject the Plan.

**5.    *Class 4A—2010 Bond Claims***

(i)    Classification: Class 4A consists of all 2010 Bond Claims.

(ii)   Allowance: On the Effective Date, all 2010 Bond Claims shall be deemed fully Secured and Allowed pursuant to section 506(a) of the Bankruptcy Code, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount of not less than $40,137,274 plus any accrued but unpaid interest and reasonable fees and expenses as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order. Because all 2010 Bond Claims are deemed fully Secured, there are no unsecured 2010 Bond Claims, and the holders of such Claims do not have or hold any Class 6 Claims against the Debtors on account of any 2010 Bond Claims.

(iii)  Treatment: Except to the extent that a holder of an Allowed 2010 Bond Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed 2010 Bond Claim, each holder of an Allowed 2010 Bond Claim shall receive a Claim under the Restated 2010 Bond Documents in an amount equal to the amount of such holder's Allowed 2010 Bond Claim.

(iv)   Voting: Class 4A is Impaired, and each holder of a 2010 Bond Claim is entitled to vote to accept or reject the Plan.

**6.    Class 4B—2012 Bond Claims**

(i)    Classification: Class 4B consists of all 2012 Bond Claims.

(ii)   Allowance: On the Effective Date, all 2012 Bond Claims shall be deemed fully Secured and Allowed pursuant to section 506(a) of the Bankruptcy Code, and not subject to any counterclaim, defense, offset, or reduction of any kind, in an aggregate amount of not less than $145,662,101 plus any accrued but unpaid interest and reasonable fees and expenses as of the Effective Date to the extent not paid pursuant to the Cash Collateral Order. Because all 2012 Bond Claims are deemed fully Secured, there are no unsecured 2012 Bond Claims, and the holders of such Claims do not have or hold any Class 6 Claims against the Debtors on account of any 2012 Bond Claims.

(iii)  Treatment: Except to the extent that a holder of an Allowed 2012 Bond Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for an Allowed 2012 Bond Claim, each holder of an Allowed 2012 Bond Claim shall receive a Claim under the Restated 2012 Bond Documents in an amount equal to the amount of such holder's Allowed 2012 Bond Claim.

(iv)   Voting: Class 4B is Impaired, and each holder of a 2012 Bond Claim is entitled to vote to accept or reject the Plan.

**7.**    ***Class 5—Convenience Claims***

(i)    <u>Classification</u>: Class 5 consists of all Convenience Claims.

(ii)    <u>Treatment</u>: In full and final satisfaction, settlement, release, and discharge of, and in exchange for, an Allowed Convenience Claim, each holder of an Allowed Convenience Claim shall receive, on the Effective Date or within thirty (30) days following the date that such Convenience Claim becomes Allowed (if such Claim becomes Allowed after the Effective Date), each holder of an Allowed Convenience Claim shall receive Cash in an amount equal to 100% of such holder's Allowed Convenience Class Claim.

(iii)    <u>Voting</u>: Class 5 is Impaired, and each holder of a Convenience Claim is entitled to vote to accept or reject the Plan.

**8.**    ***Class 6—General Unsecured Claims***

(i)    <u>Classification</u>: Class 6 consists of all General Unsecured Claims.

(ii)    <u>Treatment</u>: Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in exchange for full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim (to the extent such Claim is not an Insured Non-Abuse Claim), each holder of an Allowed General Unsecured Claim shall receive, subject to the holder's ability to elect Convenience Class treatment on account of the Allowed General Unsecured Claim, its Pro Rata Share of the Core Value Cash Pool up to the full amount of such Allowed General Unsecured Claim in the manner described in <u>Article VII</u> of the Plan.

(iii)    <u>Voting</u>: Class 6 is Impaired, and each holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

**9.**    ***Class 7—Non-Abuse Litigation Claims***

(iv)    <u>Classification</u>: Class 7 consists of all Non-Abuse Litigation Claims.

(v)    <u>Treatment</u>: Except to the extent that a holder of an Allowed Non-Abuse Litigation Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Non-Abuse Litigation Claim, each holder thereof shall, subject to the holder's ability to elect Convenience Class treatment as provided in the following sentence, retain the right to recover up to the amount of such holder's Allowed Non-Abuse Litigation Claim from (i) available Insurance Coverage or the proceeds of any insurance policy of the Debtors, including any Specified Insurance Policy or D&O Liability Insurance Policy, (ii) applicable proceeds of any Insurance Settlement Agreements, and (iii) co-liable non-debtors (if any) or their

insurance coverage.  Solely to the extent that the holder of an Allowed Non-Abuse Litigation Claim fails to recover in full from the foregoing sources on account of such Allowed Claim after exhausting its remedies in respect thereof, such holder may elect to have the unsatisfied portion of its Allowed Claim treated as an Allowed Convenience Claim and receive cash in an amount equal to the lesser of (a) the amount of the unsatisfied portion of the Allowed Non-Abuse Litigation Claim and (b) $50,000.

(vi) <u>Voting</u>: Class 7 is Impaired, and each holder of a Non-Abuse Litigation Claim is entitled to vote to accept or reject the Plan.

### 10.  *Class 8—Direct Abuse Claims*

(i) <u>Classification</u>: Class 8 consists of all Direct Abuse Claims.

(ii) <u>Treatment</u>:

a. <u>Global Resolution Plan</u>.  If Class 8 votes to accept the Plan, the Debtors shall request that the Plan be Confirmed as a Global Resolution Plan.  If the Plan is Confirmed as a Global Resolution Plan, the Settlement Trust shall receive, for the benefit of holders of Abuse Claims, the BSA Settlement Trust Contribution, the Local Council Settlement Contribution, the Contributing Chartered Organization Settlement Contribution, the Hartford Settlement Contribution (subject to the terms and conditions set forth in the Hartford Insurance Settlement Agreement), and the proceeds of any other applicable Insurance Settlement Agreements.  In addition, if the Plan is Confirmed as a Global Resolution Plan, each holder of a properly completed non-duplicative proof of claim asserting a Direct Abuse Claim who filed such Claim by the Bar Date or was permitted by a Final Order of the Bankruptcy Court to file a late claim may elect on his or her Ballot to receive an Expedited Distribution, in exchange for a full and final release in favor of the Debtors, the Related Non-Debtor Entities, the Local Councils, Contributing Chartered Organizations, and the Settling Insurance Companies, including Hartford.  The Settlement Trust shall make the Expedited Distributions on or as soon as reasonably practicable after the later to occur of (a) the Effective Date or (b) the date upon which the Settlement Trust has sufficient Cash to fund the full amount of the Expedited Distributions while retaining sufficient Cash reserves to fund applicable Settlement Trust Expenses, as determined by the Settlement Trustee.

b. <u>BSA Toggle Plan</u>:  If Class 8 does not vote to accept the Plan or the Bankruptcy Court otherwise concludes that the Global Resolution Plan is not Confirmable, the Debtors shall request that the Plan be Confirmed as a BSA Toggle Plan.  If the Plan is Confirmed as a BSA Toggle Plan, the Settlement Trust shall only receive, for the benefit of

the holders of Abuse Claims, the BSA Settlement Trust Contribution, and shall not receive the Local Council Settlement Contribution, or the Contributing Chartered Organization Settlement Contribution. In addition, all elections to receive the Expedited Distribution shall be null and void. For the avoidance of doubt, if the Plan is Confirmed as a BSA Toggle Plan, the Settlement Trust shall receive no part of the Hartford Settlement Contribution.

c.  As of the Effective Date, the Protected Parties' liability for all Direct Abuse Claims shall be assumed in full by the Settlement Trust without further act, deed, or court order and shall be satisfied solely from the Settlement Trust as set forth in the Settlement Trust Documents. Pursuant to the Channeling Injunction set forth in Article X.F of the Plan, each holder of a Direct Abuse Claim shall have such holder's Direct Abuse Claim against the Protected Parties (and each of them) permanently channeled to the Settlement Trust, and such Direct Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents. Holders of Direct Abuse Claims shall be enjoined from prosecuting any outstanding, or filing any future, litigation, Claims, or Causes of Action arising out of or related to such Direct Abuse Claims against any of the Protected Parties and may not proceed in any manner against any the Protected Parties in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue such Direct Abuse Claims solely against the Settlement Trust as provided in the Settlement Trust Documents.

d.  For the avoidance of doubt, (a) if the Plan is Confirmed as a Global Resolution Plan, the Protected Parties shall include: (i) the Debtors; (ii) Reorganized BSA; (iii) the Related Non-Debtor Entities; (iv) the Local Councils; (v) the Contributing Chartered Organizations; (vi) the Settling Insurance Companies, including Hartford; and (vii) all of such Persons' Representatives; and (b) if the Plan is Confirmed as a BSA Toggle Plan, the Protected Parties shall include: (i) the Debtors; (ii) Reorganized BSA; (iii) the Related Non-Debtor Entities; and (iv) all of such Persons' Representatives.

(iii)  Voting: Class 8 is Impaired, and each holder of a Direct Abuse Claim is entitled to vote to accept or reject the Plan.

11.  *Class 9—Indirect Abuse Claims*

(i)  Classification: Class 9 consists of all Indirect Abuse Claims.

(ii)  Treatment:

a. As of the Effective Date, the Protected Parties' liability for all Indirect Abuse Claims shall be assumed in full by the Settlement Trust without further act, deed, or court order and shall be satisfied solely from the Settlement Trust as set forth in the Settlement Trust Documents solely to the extent that an Indirect Abuse Claim has not been deemed withdrawn with prejudice, irrevocably waived, released and expunged in connection with the Local Council Settlement Contribution, the Contributing Chartered Organization Trust Contribution, or the Hartford Insurance Settlement Agreement (if the Plan is Confirmed as a Global Resolution Plan).  Pursuant to the Channeling Injunction set forth in <u>Article X.F</u> of the Plan, each holder of an Indirect Abuse Claim shall have such holder's Indirect Abuse Claim against the Protected Parties (and each of them) permanently channeled to the Settlement Trust, and such Indirect Abuse Claim shall thereafter be asserted exclusively against the Settlement Trust and processed, liquidated, and paid in accordance with the terms, provisions, and procedures of the Settlement Trust Documents.  Holders of Indirect Abuse Claims shall be enjoined from prosecuting any outstanding, or filing any future, litigation, Claims, or Causes of Action arising out of or related to such Abuse Claims against any of the Protected Parties and may not proceed in any manner against any the Protected Parties in any forum whatsoever, including any state, federal, or non-U.S. court or any administrative or arbitral forum, and are required to pursue such Indirect Abuse Claims solely against the Settlement Trust as provided in the Settlement Trust Documents.

b. For the avoidance of doubt, (a) if the Plan is Confirmed as a Global Resolution Plan, the Protected Parties shall include: (i) the Debtors; (ii) Reorganized BSA; (iii) the Related Non-Debtor Entities; (iv) the Local Councils; (v) the Contributing Chartered Organizations; (vi) the Settling Insurance Companies, including Hartford; and (vii) all of such Persons' Representatives; and (b) if the Plan is Confirmed as a BSA Toggle Plan, the Protected Parties shall include: (i) the Debtors; (ii) Reorganized BSA; (iii) the Related Non-Debtor Entities; and (iv) all of such Persons' Representatives.

(iii)    <u>Voting</u>: Class 9 is Impaired, and each holder of an Indirect Abuse Claim is entitled to vote to accept or reject the Plan.

**HOLDERS OF ABUSE CLAIMS (OTHER THAN FUTURE ABUSE CLAIMS) WERE REQUIRED TO SUBMIT A PROOF OF CLAIM ON OR BEFORE THE ABUSE CLAIMS BAR DATE IN ACCORDANCE WITH THE BAR DATE ORDER.  HOLDERS OF ABUSE CLAIMS MAY ALSO BE REQUIRED TO SUBMIT ADDITIONAL DOCUMENTATION REGARDING SUCH CLAIMS IN ACCORDANCE WITH THE TRUST DOCUMENTS.**

12. ***Class 10—Interests in Delaware BSA***

    (i)    <u>Classification</u>: Class 10 consists of all Interests in Delaware BSA.

    (ii)    <u>Treatment</u>: On the Effective Date, Interests in Delaware BSA shall be deemed cancelled without further action by or order of the Bankruptcy Court and shall be of no further force or effect, whether surrendered for cancellation or otherwise.

    (iii)    <u>Voting</u>: Class 10 is Impaired, and each holder of an Interest in Delaware BSA shall be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Interests in Delaware BSA are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Interests in Delaware BSA.

F.    <u>Elimination of Vacant Classes</u>

    Any Class of Claims against or Interests in the Debtors that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

G.    <u>Cramdown</u>

    If any Class is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtors may (a) seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (b) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims are, or any class of Claims is, impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

H.    <u>Means for Implementation of the Plan</u>

    1.    ***Operations of the Debtors between Confirmation and the Effective Date***

    The Debtors shall continue to operate as debtors and debtors in possession during the period from the Confirmation Date to the Effective Date.

    2.    ***BSA Governance Documents***

    From and after the Effective Date, Reorganized BSA shall be governed pursuant to the BSA Charter and the Amended BSA Bylaws.  The Amended BSA Bylaws shall contain such provisions as are necessary to satisfy the provisions of the Plan, subject to further amendment thereof after the Effective Date, as permitted by applicable law.  Under the BSA Charter, the BSA has no power to issue certificates of stock, its object and purpose being solely of a

charitable character and not for pecuniary profit; accordingly, the requirement of section 1123(a)(6) does not apply to the BSA.

### 3.  Continued Legal Existence of BSA

The BSA shall continue to exist on and after the Effective Date, with all of the powers it is entitled to exercise under applicable law and pursuant to the BSA Charter and the Amended BSA Bylaws, subject to further amendment of the Amended BSA Bylaws after the Effective Date, as permitted by applicable law.

### 4.  Reorganized BSA's Directors and Senior Management

Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent that there are anticipated changes in Reorganized BSA's directors and officers, the Debtors will identify any such changes in the Plan Supplement.  On and after the Effective Date, the Amended BSA Bylaws, as such may be amended thereafter from time to time, shall govern the designation and election of directors of Reorganized BSA.

### 5.  Dissolution of Delaware BSA

On the Effective Date, Delaware BSA's members, directors, officers and employees shall be deemed to have resigned, and Delaware BSA shall be deemed to have dissolved for all purposes and be of no further legal existence under any applicable state or federal law, without the need for any further action or the filing of any plan of dissolution, notice, or application with the Secretary of State of the State of Delaware or any other state or government authority, and without the need to pay any franchise or similar taxes to effectuate such dissolution.  Any Allowed Claims against Delaware BSA will be treated as set forth in <u>Article III.B</u> of the Plan.

### 6.  Due Authorization

As of the Effective Date, all actions contemplated by the Plan that require corporate action of the Debtors, or either of them, including actions requiring a vote of the National Executive Board or the National Executive Committee of the BSA or the sole member of Delaware BSA, and execution of all documentation incident to the Plan, shall be deemed to have been authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by the Bankruptcy Court, members, officers, or directors of the Debtors, Reorganized BSA, or any other Person.

### 7.  Cancellation of Interests

As of the Effective Date, in accordance with <u>Article III.B.12</u> of the Plan, Interests in Delaware BSA shall be deemed cancelled without further action by or order of the Bankruptcy Court and shall be of no further force or effect.

### 8.  Restatement of Indebtedness

Except as otherwise provided in the Plan, or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, and subject to the

treatment afforded to holders of Allowed Claims in Class 3A, 3B, 4A, or 4B under <u>Article III</u> of the Plan, on the Effective Date, all Prepetition Debt and Security Documents, including all agreements, instruments, and other documents evidencing or issued pursuant to the 2010 Credit Facility Documents, the 2019 RCF Documents, the 2010 Bond Documents, the 2012 Bond Documents, or any indebtedness or other obligations thereunder, and any rights of any holder in respect thereof, shall be deemed amended and restated in the form of the Restated Debt and Security Documents on the terms set forth herein.

Any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the satisfactions, Injunctions, Releases, Discharges and other transactions provided for in the Plan shall be deemed null and void and shall be of no force or effect. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court, including the Confirmation Order.

### 9. *Cancellation of Liens*

Except as otherwise provided in the Plan, on the Effective Date, any Lien securing any Allowed Secured Claim (other than a Lien securing any Allowed Secured Claim that is Reinstated pursuant to the Plan, including, for avoidance of doubt, the liens securing the Restated Debt and Security Documents) shall be deemed released and the holder of such Allowed Secured Claim shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral) held by such holder and to take such actions as may be requested by the Debtors (or Reorganized BSA, as the case may be) to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be requested by the Debtors (or Reorganized BSA, as the case may be).

### 10. *Effectuating Documents and Further Transactions*

The Chief Executive Officer and President, the Chief Financial Officer, and the General Counsel of the BSA is authorized to execute, deliver, file or record such contracts, instruments, releases, indentures, and other agreements or documents and take or direct such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 11. *Sources of Consideration for Plan Distributions*

    1.    <u>Global Resolution Plan</u>. If the Plan is Confirmed as a Global Resolution Plan, distributions under the Plan shall be funded from the following sources:

        a.    the Debtors shall fund Distributions on account of and satisfy Allowed General Unsecured Claims exclusively from the Core Value Cash Pool;

b.      the Settlement Trust shall fund distributions on account of and satisfy compensable Abuse Claims in accordance with the Global Resolution Plan TDP from (a) the BSA Settlement Trust Contribution, (b) the Local Council Settlement Contribution, (c) the Contributing Chartered Organization Settlement Contribution, (d) the Hartford Settlement Contribution, and (e) any and all other funds, proceeds or other consideration otherwise contributed to the Settlement Trust pursuant to the Plan or the Confirmation Order or other Final Order of the Bankruptcy Court;

c.      the Debtors shall satisfy 2010 Credit Facility Claims, 2019 RCF Claims, 2010 Bond Claims, and 2012 Bond Claims in accordance with the terms of the Restated 2010 Bond Documents, the Restated 2012 Bond Documents and the Restated Credit Facility Documents, as applicable; and

d.      the Debtors shall fund Distributions on account of and satisfy all other Allowed Claims with Unrestricted Cash and Investments on hand on or after the Effective Date in accordance with the terms of the Plan and the Confirmation Order.

2.      <u>BSA Toggle Plan</u>.  If the Plan is Confirmed as a BSA Toggle Plan, distributions under the Plan shall be funded from the following sources:

a.      the Debtors shall fund Distributions on account of and satisfy Allowed General Unsecured Claims exclusively from the Core Value Cash Pool;

b.      the Settlement Trust shall fund distributions on account of and satisfy compensable Abuse Claims in accordance with the BSA Toggle Plan TDP from the BSA Settlement Trust Contribution;

c.      the Debtors shall satisfy 2010 Credit Facility Claims, 2019 RCF Claims, 2010 Bond Claims, and 2012 Bond Claims in accordance with the terms of the Restated 2010 Bond Documents, the Restated 2012 Bond Documents and the Restated Credit Facility Documents, as applicable; and

d.      the Debtors shall fund Distributions on account of and satisfy all other Allowed Claims with Unrestricted Cash and Investments on hand on or after the Effective Date in accordance with the terms of the Plan and the Confirmation Order.

12.      *Resolution of Abuse Claims*

All Abuse Claims shall be channeled to and resolved by the Settlement Trust in accordance with the Trust Distribution Procedures, subject to the right of any Non-Settling Insurance Company to raise any valid Insurance Coverage Defense in response to a demand by

the Settlement Trust that such Insurance Company handle, defend, or pay any such Claim, including any right of such Insurance Company to assert any defense that could, but for the Settlement Trust's assumption of the liabilities, obligations, and responsibilities of the Protected Parties for Abuse Claims, have been raised by the Debtors or other applicable Protected Party with respect to such Claim.

**If the Plan is confirmed as a Global Resolution Plan, the Plan shall provide for the global resolution of Abuse Claims against the Debtors, Local Councils, Contributing Chartered Organizations, and Settling Insurance Companies.  If the Plan is confirmed as a BSA Toggle Plan, the Plan shall provide for the resolution of Abuse Claims and other Claims only against the Debtors.**

### 13.    *Funding by the Settlement Trust*

The Settlement Trust shall have no obligation to fund costs or expenses other than those set forth in the Plan or the Settlement Trust Documents, as applicable.

### 14.    *Core Value Cash Pool*

Reorganized BSA shall deposit Cash into the Core Value Cash Pool by making four semi-annual installment payments equal to $6,250,000.  Reorganized BSA shall make the first deposit six (6) months after the Effective Date; the second installment on the first anniversary after the Effective Date; the third installment eighteen (18) months after the Effective Date; and the fourth installment on the second anniversary of the Effective Date.

### 15.    *Creditor Representative*

The Creditor Representative shall be appointed as of the Effective Date and shall be responsible for assisting Reorganized BSA and its professionals in their efforts to efficiently reconcile Convenience Claims, General Unsecured Claims, and Non-Abuse Litigation Claims. The identity of the Creditor Representative shall be determined by the Creditors' Committee, with the consent of the Debtors (such consent not to be unreasonably withheld).  The Debtors or Reorganized BSA, as applicable, will use commercially reasonable efforts to assist the Creditor Representative in reconciling Convenience Claims, General Unsecured Claims, and Non-Abuse Litigation Claims on or before the applicable Claims Objection Deadline.  The reasonable fees and actual and necessary costs and expenses of the Creditor Representative shall be paid by Reorganized BSA up to the Creditor Representative Fee Cap, and Reorganized BSA shall have no obligation to compensate or reimburse the costs or expenses of the Creditor Representative beyond the amount of the Creditor Representative Fee Cap.

### 16.    *Residual Cash in Core Value Cash Pool*

To the extent any Cash remains in the Core Value Cash Pool after all Allowed General Unsecured Claims have been satisfied in full, such remaining Cash shall: (i) first, on account of any Allowed Non-Abuse Litigation Claims that shall not have elected to be treated as an Allowed Convenience Claim under <u>Article III.B.9</u> of the Plan to satisfy any deficiency in payments of such Allowed Claims from available Insurance Coverage, from applicable proceeds of any Insurance Settlement Agreements, and from co-liable non-debtors (if any) or their

insurance coverage; (ii) second, to pay interest to holders of Allowed General Unsecured Claims in accordance with Article VII.L of the Plan; and (iii) third irrevocably re-vest in Reorganized BSA.

### 17.    *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan and the Plan Documents, as of the Effective Date, the provisions of the Plan, including the Abuse Claims Settlement (if the Plan is Confirmed as a Global Resolution Plan), the Hartford Insurance Settlement Agreement (if the Plan is Confirmed as a Global Resolution Plan), the JPM / Creditors' Committee Settlement, and the Settlement of Restricted and Core Asset Disputes set forth in Article V.R of the Plan, shall constitute good-faith compromises and settlements of Claims, Interests, and controversies among the parties thereto relating to the contractual, legal, equitable and subordination rights that holders of Claims or Interests may have with respect to any Claim or Interest under the Plan or any Distribution to be made on account of an Allowed Claim.  The Plan shall be deemed a motion, proposed by the Debtors and joined by the parties to the Abuse Claims Settlement (if the Plan is Confirmed as a Global Resolution Plan), the Hartford Insurance Settlement Agreement (if the Plan is Confirmed as a Global Resolution Plan), the JPM / Creditors' Committee Settlement, and the Settlement of Restricted and Core Asset Disputes, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies among the parties thereto, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable and reasonable.

1.    Abuse Claims Settlement.  The provisions of this Article—Article V.R.1 under the Plan—shall only apply if the Plan is Confirmed as a Global Resolution Plan. The treatment provided for Abuse Claims under the Plan incorporates and reflects a proposed compromise and settlement of all Abuse Claims against the Protected Parties, and the Scouting Released Claims against the Local Councils and Contributing Chartered Organizations (the "Abuse Claims Settlement"), and the Plan constitutes a request for the Bankruptcy Court to authorize and approve the Abuse Claims Settlement.  The following constitutes the provisions and conditions of the Abuse Claims Settlement:

a.    Local Council Settlement Contribution.  The Local Councils shall, if the Plan is Confirmed as a Global Resolution Plan, make, cause to be made, or be deemed to have made, as applicable, the Local Council Settlement Contribution, as set forth in Exhibit F of the Plan and as defined in the Plan, meaning:

(i)    the contribution to the Settlement Trust by the Local Councils, as set forth in Exhibit F to the Plan;

(ii)    to the maximum extent under applicable law, any and all of the Local Councils' rights, titles privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, interest, claims, demands or entitlements, as of the Effective Date, to any proceeds,

payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to: (i) the BSA Insurance Policies (subject to Article IV.D.3 and Article IV.D.4 of the Plan, with respect to Insure Non-Abuse Claims), the Insurance Coverage, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof (but not the policies themselves); (ii) the Insurance Actions; and (iii) the Insurance Action Recoveries;

(iii)    to the maximum extent permitted under applicable law, any and all of the Local Councils' rights, titles, privileges, interests, claims, demands or entitlements, as of the Effective Date, to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, arising under or attributable to: (i) the Local Council Insurance Policies (subject to Article IV.D.3 and Article IV.D.4 of the Plan with respect to Insured Non-Abuse Claims), the Insurance Coverage, the Insurance Settlement Agreements, and claims thereunder and proceeds thereof; (ii) the Insurance Actions; and (iii) the Insurance Action Recoveries;

(iv)    the waiver, release, and expungement from the Claims Register of any and all Claims that have been asserted in the Chapter 11 Cases by or on behalf of any Local Council, including any Indirect Abuse Claims, without any further notice to or action, order or approval of the Bankruptcy Court, and the agreement of each Local Council not to file or assert any Claim or Claims against the Debtors or Reorganized BSA arising from any act or omission of the Debtors on or prior to the Confirmation Date; and

(v)    the assignment of any and all Perpetrator Indemnification Claims held by the Local Councils.

b.    <u>Contributing Chartered Organization Settlement Contribution</u>.  The Contributing Chartered Organizations will, if the Plan is confirmed as a Global Resolution Plan, make, cause to be made, or be deemed to have made, as applicable, the Contributing Chartered Organization Settlement Contribution.

c.    <u>Claims Deemed Withdrawn with Prejudice By Settling Insurance Companies</u>.  On the Effective Date, any and all Claims that have been asserted in the Chapter 11 Cases by or on behalf of any Settling Insurance Company shall be deemed withdrawn with prejudice and irrevocably waived, released and expunged from the Claims Register without any further notice to or action, order, or approval of the Bankruptcy Court.  Further, no Settling Insurance Company shall

file or assert any Claim or Claims against the Debtors or Reorganized BSA arising from any act or omission of the Debtors prior to the Confirmation Date.

d.  <u>Injunctions and Releases</u>.  Notwithstanding anything to the contrary set forth in the Plan or any other document filed with the Bankruptcy Court, the Injunctions and Releases contained in <u>Article X</u> of the Plan shall not be effective: (i) as to the Local Councils, until the Local Council Settlement Contribution shall have been made; and (ii) as to the Contributing Chartered Organizations, until the Contributing Chartered Organization Settlement Contribution shall have been made; and (iii) as to any Settling Insurance Company, until such Settling Insurance Company shall have made its contribution to the Settlement Trust pursuant to an Insurance Settlement Agreement.

2.  <u>The JPM / Creditors' Committee Settlement</u>.  The provisions of this Article—<u>Article V.R.2</u> under the Plan—apply irrespective of whether the Plan is Confirmed as a Global Resolution Plan or a BSA Toggle Plan.  The treatment provided for under the Plan for Allowed 2010 Credit Facility Claims, Allowed 2019 RCF Claims, Allowed 2010 Bond Claims, Allowed 2012 Bond Claims, Allowed Convenience Claims, Allowed General Unsecured Claims, and Allowed Non-Abuse Litigation Claims, together with the terms and conditions of the JPM / Creditors' Committee Term Sheet, reflects a proposed compromise and settlement by and among the Debtors, the Creditors' Committee and JPM (the "<u>JPM / Creditors' Committee Settlement</u>").[59]  The following constitutes the provisions and conditions of the JPM / Creditors' Committee Settlement:

a.  <u>Allowance and Treatment of 2010 Credit Facility Claims, 2019 RCF Claims, 2010 Bond Claims and 2012 Bond Claims</u>.  The 2010 Credit Facility Claims, the 2019 RCF Claims, the 2010 Bond Claims and the 2012 Bond Claims shall be Allowed in the amounts set forth in <u>Article III.B</u> of the Plan and receive the treatment afforded to such Claims thereunder.  The Debtors acknowledge and agree that the Claims held by JPM (the 2010 Credit Facility Claims, the 2019 RCF Claims, the 2010 Bond Claims and the 2012 Bond Claims), are core to the Debtors' charitable mission and were incurred in furtherance of the Debtors' charitable mission.

b.  <u>Treatment of Convenience Claims, General Unsecured Claims, and Non- Abuse Litigation Claims</u>.  Convenience Claims, General Unsecured Claims, and Non-Abuse Litigation Claims shall receive the treatment afforded to such Claims under <u>Article III.B</u> of the Plan.  The Debtors acknowledge and agree that General Unsecured Claims, Convenience Claims, and Non-Abuse Litigation Claims are held by creditors who are core to the Debtors' charitable mission or creditors whose Claims in such Classes, if Allowed, were incurred in furtherance of the Debtors' charitable mission; accordingly, payments by Reorganized BSA under the Plan on account of such Allowed Claims, if applicable, will be made from Cash relating to Reorganized BSA's core assets.

---

[59]  In the event of a conflict between the terms and conditions of the Plan, on the one hand, and the terms and conditions of the JPM / Creditors' Committee Term Sheet, on the other hand, the terms of the Plan shall control.

c.      *Challenge Period*.  As of the Effective Date, (i) the Challenge Period (as defined in the Cash Collateral Order) shall be deemed to have expired with respect to the Creditors' Committee; (ii) the Stipulations (as defined in the Cash Collateral Order) and other admissions, agreements and releases set forth in the Cash Collateral Order shall be final and binding on the Creditors' Committee. The ability of any other party to bring a Challenge Proceeding (as defined in the Cash Collateral Order) shall be governed by the terms and conditions of the Cash Collateral Order.

3.      *Settlement of Restricted and Core Asset Disputes*.  The provisions of this Article—Article V.R.3 of the Plan—apply irrespective of whether the Plan is Confirmed as a Global Resolution Plan or a BSA Toggle Plan.  The Debtors have agreed under the Plan to: (a) fund the Core Value Cash Pool, in the amount of $25,000,000; and (b) make the BSA Settlement Trust Contribution, including all of the Net Unrestricted Cash and Investments.  The proceeds of the Foundation Loan, in the amount of $42,800,000 (which Reorganized BSA will use exclusively for working capital and general corporate purposes), will permit the Debtors to contribute to the Settlement Trust a substantial amount of core value consideration in Cash on the Effective Date.  The foregoing components of the consideration proposed to be provided by the Debtors to holders of certain Claims under the Plan constitute a compromise and settlement of any and all disputes between and among the Tort Claimants' Committee, the Future Claimants' Representative, the Creditors' Committee, and the Debtors concerning the Debtors' restricted and/or core assets, including the claims asserted in the complaint filed by the Tort Claimants' Committee in the adversary proceeding entitled *Official Tort Claimants' Committee of Boy Scouts of America and Delaware BSA, LLC v. Boy Scouts of America and Delaware BSA, LLC*, Adv. Pro. No. 21-50032 (LSS) (the "Settlement of Restricted and Core Asset Disputes").

4.      *Hartford Insurance Settlement*.  The provisions of this Article—Article V.R.4 of the Plan—shall apply only if the Plan is Confirmed as a Global Resolution Plan. The Plan incorporates the Hartford Insurance Settlement Agreement, which is attached to the Plan as Exhibit I, and the Plan shall constitute a motion by the Debtors for the Bankruptcy Court to approve, pursuant to sections 363, 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019, (a) the Hartford Insurance Settlement Agreement, (b) the sale by the Debtors and the purchase by Hartford of the Hartford Policies, free and clear of all Interests of any Person (as such terms are defined in the Hartford Insurance Settlement Agreement; for the avoidance of doubt, the term "Interests" as used in this Article shall have the meaning given to the term "'Interests" in the Hartford Insurance Settlement Agreement, rather than as such term is defined in Article I of the Plan), and (c) the settlement, compromise and release of the Hartford Released Claims (as defined in the Hartford Insurance Settlement Agreement) as provided in Section IV.A of the Hartford Insurance Settlement Agreement.  The Confirmation Order shall constitute the Bankruptcy Court's approval of such motion pursuant to sections 363, 1123 and 1141 of the Bankruptcy Code and Bankruptcy Rule 9019 and shall include findings of fact and conclusions of law pertaining to such approval, in form and substance acceptable to Hartford.

### 18.    *Good-Faith Compromise and Settlement*

The Plan (including its incorporation of the Abuse Claims Settlement and the Hartford Insurance Settlement Agreement, if the Plan is Confirmed as a Global Resolution Plan, the JPM / Creditors' Committee Settlement, and the Settlement of Restricted and Core Asset Disputes), the Plan Documents, and the Confirmation Order constitute a good-faith compromise and settlement of Claims, Interests and controversies based upon the unique circumstances of these Chapter 11 Cases, and none of the foregoing documents, the Disclosure Statement, or any other papers filed in furtherance of Confirmation, nor any drafts of such documents, may be offered into evidence or deemed as an admission in any context whatsoever beyond the purposes of the Plan, in any other litigation or proceeding, except as necessary, and as admissible in such context, to enforce their terms before the Bankruptcy Court or any other court of competent jurisdiction. The Plan, the Abuse Claims Settlement, the Hartford Insurance Settlement (if the Plan is Confirmed as a Global Resolution Plan), the JPM / Creditors' Committee Settlement, the Settlement of Restricted and Core Asset Disputes, the Plan Documents, and the Confirmation Order will be binding as to the matters and issues described therein, but will not be binding with respect to similar matters or issues that might arise in any other litigation or proceeding in which none of the Debtors, Reorganized BSA, the Protected Parties, or the Settlement Trust is a party.

### 19.    *Estimation of Direct Abuse Claims*

If and only if the Plan is confirmed as a Global Resolution Plan, the Bankruptcy Court shall, at the Confirmation Hearing, conduct an estimation of the Debtors' aggregate liability on account of Direct Abuse Claims in accordance with the procedures set forth in the Bankruptcy Court's order granting the Confirmation Scheduling Motion. This estimation will, among other things, provide a basis for the Bankruptcy Court and the parties to assess the estimated aggregate value of the Direct Abuse Claims as that value is relevant to determining whether the settlements proposed in the Plan, including Insurance Settlement Agreements and the Abuse Claims Settlement, should be approved under section 1123(b)(3)(A) of the Bankruptcy Code as compromises that are fair, reasonable, and in the best interests of the estate with respect to disputed claims, disputed liabilities, and disputed issues. As set forth in the order granting the Confirmation Scheduling Motion, the Debtors shall offer evidence at the Confirmation Hearing in support of the estimation, and other parties shall be permitted to submit evidence in support of, or to dispute, the evidence offered by the Debtors. The Confirmation Order will contain the Bankruptcy Court's findings of fact and conclusions of law with regard to the Debtors' estimated aggregate liability on account of Direct Abuse Claims, which findings of fact and conclusions of law shall, by their terms, be subject to Article X.M of the Plan and, for the avoidance of doubt, shall only be for purposes of Confirmation of the Plan and shall not constitute a trial or hearing on the merits or an adjudication or judgment, or accelerate the obligations, if any, of any Insurance Company under its Insurance Policies. If the Plan is Confirmed as a BSA Toggle Plan, there shall be no such estimation, and the provisions of Article V.T of the Plan shall not apply.

### 20.    *Restated Debt and Security Documents*

On the Effective Date, the Prepetition Debt and Security Documents shall be amended and restated in the form of the Restated Debt and Security Documents, and Reorganized BSA,

JPM and Arrow shall, and shall be authorized, to execute, deliver and enter into the Restated Debt and Security Documents as of such date, in principal amounts equal to the Allowed amounts set forth in <u>Article III.B.3</u>, <u>Article III.B.4</u>, <u>Article III.B.5</u>, and <u>Article III.B.6</u> of the Plan without the need for any further corporate action or any further notice to or order of the Bankruptcy Court.  The Debtors or Reorganized BSA, as applicable, JPM, and Arrow shall take all actions necessary to continue the Debtors' obligations under the Prepetition Debt and Security Documents, as amended and restated by the Restated Debt and Security Documents and to give effect to the Restated Debt and Security Documents, including surrendering any debt instruments or securities that are no longer applicable under the Restated Debt and Security Documents to the Debtors or Reorganized BSA.

Except as otherwise modified by the Restated Debt and Security Documents, all Liens, mortgages and security interests securing the obligations arising under the Restated Debt and Security Documents that were collateral securing the Debtors' obligations under the Prepetition Debt and Security Documents as of the Petition Date are unaltered by the Plan, and all such Liens, mortgages and security interests are reaffirmed and perfected with respect to the Restated Debt and Security Documents to the same extent, in the same manner and on the same terms and priorities as they were under the Prepetition Debt and Security Documents, except as the foregoing may be modified pursuant to the Restated Debt and Security Documents.  All Liens and security interests granted and continuing pursuant to the Restated Debt and Security Documents shall be (a) valid, binding, perfected, and enforceable Liens and security interests in the personal and real property described in and subject to such documents, with the priorities established in respect thereof under applicable non-bankruptcy law; (b) granted in good faith and deemed not to constitute a fraudulent conveyance or fraudulent transfer; and (c) not otherwise subject to avoidance, recharacterization, or subordination (whether equitable, contractual or otherwise) under any applicable law.  The Debtors, Reorganized BSA, Arrow, and JPM are authorized to make, and to the extent required by the Restated Debt and Security Documents, the Debtors, Reorganized BSA, Arrow will make, all filings and recordings, and obtain all governmental approvals and consents necessary (but otherwise consistent with the consents and approvals obtained in connection with the Prepetition Debt and Security Documents) to establish, attach and perfect such Liens and security interests under any applicable law (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.  For purposes of all mortgages and deposit account control agreements that secured the obligations arising under the Prepetition Debt and Security Documents, the Restated Debt and Security Documents are deemed an amendment and restatement of the Prepetition Debt and Security Documents, and such mortgages and control agreements shall survive the Effective Date, shall not be cancelled, and shall continue to secure Reorganized BSA's obligations under the Restated Debt and Security Documents, except as expressly set forth therein.

1. The definitive terms of the Restated Debt and Security Documents shall be (x) acceptable to JPM and the BSA, (y) reasonably acceptable to the Creditors' Committee, and (z) substantially the same as the Prepetition Debt and Security Documents, except that, as to be specified in the Restated Debt and Security Documents:

a. the maturity dates under the Restated 2010 Bond Documents, the Restated 2012 Bond Documents, and the Restated Credit Facility Documents will be the Restated Maturity Date;

b. principal under the Restated 2010 Bond Documents and the Restated 2012 Bond Documents shall be payable in monthly installments, in the same monthly amounts as the prepetition periodic amortization amounts, beginning on the date that is two (2) years after the Effective Date and ending on the Restated Maturity Date; provided, that the scheduled principal amounts payable under the Restated 2010 Bond Documents and the Restated 2012 Bond Documents shall be reduced, on a pro rata basis, by an amount equal to the Excess Cash and Investments, if any, that are remitted to JPM under the Excess Cash Sweep;

c. interest under the Restated 2010 Bond Documents and the Restated 2012 Bond Documents shall be payable in monthly installments, at the currently applicable existing rates in the 2010 Bond Documents and the 2012 Bond Documents, beginning on the date that is one month after the Effective Date and ending on the Restated Maturity Date;

d. principal under the Restated Credit Facility Documents shall be payable in quarterly installments, set at 1/40th of the outstanding balance on the Effective Date, beginning on the date that is two (2) years after the Effective Date and ending on the Restated Maturity Date; provided, that the principal amounts payable under the Restated Credit Facility Documents shall be reduced, on a pro rata basis, by an amount equal to the Excess Cash and Investments, if any, that are remitted to JPM under the Excess Cash Sweep;

e. interest under the Restated Credit Facility Documents shall be payable in quarterly installments at the applicable existing rates in the Prepetition Debt and Security Documents, beginning on the date that is three (3) months after the Effective Date and ending on the Restated Maturity Date;

f. all of the obligations of Reorganized BSA under the Restated Debt and Security Documents shall be secured by first-priority liens on and security interests in all of the assets of Reorganized BSA;

g. all of the obligations of Reorganized BSA under the Restated Debt and Security Documents shall be guaranteed by Arrow; and

h. beginning on December 31 of the calendar year that is two (2) years after the Effective Date and continuing on December 31 of each successive calendar year until December 31 of the calendar year that is immediately prior to the calendar year of the Restated Maturity Date, Reorganized BSA shall remit to JPM, as soon as reasonably practicable but in no case later than thirty (30) days of such date, twenty-five percent (25%) of the Excess Cash and Investments in excess of $75,000,000, if any, as of such date

116

(the "Excess Cash Sweep"), and JPM shall apply any such amounts on a pro rata basis to the unpaid principal balances under the Restated Debt and Security Documents.  For the avoidance of doubt, no payments shall be made on account of the Excess Cash Sweep until the last Distribution is made on account of Allowed General Unsecured Claims.

### 21.    *Foundation Loan*

On the Effective Date, the Foundation Loan Agreement and any applicable collateral and other loan documents governing the Foundation Loan shall be executed and delivered, and Reorganized BSA shall be authorized to execute, deliver and enter into, the Foundation Loan Agreement and related documentation governing the Foundation Loan without the need for any further corporate action or any further notice to or order of the Bankruptcy Court.

As of the Effective Date, upon the granting of Liens in accordance with the Foundation Loan Agreement and any applicable collateral and other loan documents governing the Foundation Loan, all of the Liens and security interests granted thereunder (a) shall be deemed to have been granted, (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the applicable collateral as of the Effective Date in accordance with the respective terms of the Foundation Loan Agreement and related documentation, subject to the Liens and security interests set forth in the Restated Debt and Security Documents, as permitted under the Foundation Loan Agreement and related documentation.  All Liens and security interests granted pursuant to the Foundation Loan Agreement and related documentation shall be (i) valid, binding, perfected, and enforceable Liens and security interests in the personal and property described in and subject to such documents, with the priorities established in respect thereof under applicable non-bankruptcy law; (ii) granted in good faith and deemed not to constitute a fraudulent conveyance or fraudulent transfer; and (c) not otherwise subject to avoidance, recharacterization, or subordination (whether equitable, contractual or otherwise) under any applicable law.  The Debtors, Reorganized BSA, Arrow WV, Inc., and the Foundation are authorized to make, and to the extent contemplated by the Foundation Loan Agreement and related documentation, the Debtors, Reorganized BSA, Arrow WV, Inc. will make, all filings and recordings, and obtain all governmental approvals and consents necessary to establish, attach and perfect such Liens and security interests under any applicable law (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interest to third parties.

### 22.    *Pension Plan*

No provision contained in the Plan, Confirmation Order, the Bankruptcy Code (including section 1141 of the Bankruptcy Code), or any other document filed or order entered in the Chapter 11 Cases shall be construed to exculpate, discharge, release or relieve the Debtors, the Local Councils, or any other party, in any capacity, from any liability or responsibility to any Person with respect to the Pension Plan under any law, governmental policy, or regulatory provision.  The Pension Plan shall not be enjoined or precluded from enforcing any such liability

or responsibility as a result of any of the provisions of the Plan (including those provisions providing for exculpation, satisfaction, release and discharge of Claims against the Debtors), the Confirmation Order, the Bankruptcy Code (including section 1141 of the Bankruptcy Code), or any other document filed or order entered in the Chapter 11 Cases. The Settlement Trust shall not have any liability to any Person on account of the Pension Plan, including liability as a member of a "Controlled Group" as defined in 29 U.S.C. § 1301(a)(14)(A) or on any other basis whatsoever.

As of the Effective Date, Reorganized BSA shall assume and continue the Pension Plan to the extent of its obligations under the Pension Plan and applicable law, including, as applicable, (1) satisfaction of the minimum funding requirements under 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083, (2) payment of all required Pension Benefit Guaranty Corporation premiums in accordance with 29 U.S.C. §§ 1306 and 1307, and (3) administration of the Pension Plan in all material respects in accordance with the applicable provisions of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1301 *et seq.*, and the Internal Revenue Code. Notwithstanding the foregoing, Reorganized BSA reserves all of its rights under the Pension Plan. All Proofs of Claim filed by the Pension Benefit Guaranty Corporation with respect to the Pension Plan shall be deemed withdrawn on the Effective Date.

### 23.    *Single Satisfaction of Allowed General Unsecured Claims*

In no event shall any holder of an Allowed General Unsecured Claim recover more than the full amount of its Allowed General Unsecured Claim from the Core Value Cash Pool, and to the extent that the holder of an Allowed General Unsecured Claim has received, or in the future receives, payment on account of such Allowed General Unsecured Claim from a party that is not a Debtor or Reorganized BSA, such holder shall repay, return, or deliver to the Core Value Cash Pool any Distribution held by or transferred to such holder to the extent the holder's total recovery on account of its Allowed General Unsecured Claim from the third party and from the Core Value Cash Pool exceeds the amount of such holder's Allowed General Unsecured Claim.

### 24.    *Exemption from Certain Transfer Taxes and Recording Fees*

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code and applicable law, any transfers of property pursuant to the Plan, including any transfers to the Settlement Trust by the Debtors, the Local Councils, the Contributing Chartered Organizations, and the Settling Insurance Companies, and payments by Reorganized BSA to or from the Core Value Cash Pool, shall not be taxed under any law imposing a stamp tax or similar tax.

### I.    Vesting of Assets in the Reorganized BSA

In accordance with Article X.A of the Plan, and except as explicitly provided in the Plan (including with respect to the Core Value Cash Pool), on the Effective Date, pursuant to sections 1141(b) and 1141(c) of the Bankruptcy Code, all property comprising the Estates, other than the BSA Trust Contributions, shall vest in each respective Reorganized Debtor free and clear of all Liens, Claims, interests, charges, other Encumbrances and liabilities of any kind unless expressly provided by the Plan or the Confirmation Order. On and after the Effective Date, each Reorganized BSA may continue is operations and may use, acquire, or dispose of property, and

compromise or settle any Claims, Interests, or Causes of Action without supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

J.       Retention of Certain Causes of Action

In accordance with section 1123(b)(3) of the Bankruptcy Code and Article XI.B of the Plan, subject to the transfer of the Settlement Trust Causes of Action to the Settlement Trust under Article IV.D of the Plan and the Debtors' and their Estates' Release of certain Estate Causes of Action under Article X.J of the Plan, all Causes of Action that a Debtor may hold against any Person shall vest in Reorganized BSA on the Effective Date.  Thereafter, subject to Article IV.D and Article X.J of the Plan, Reorganized BSA shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, whether arising before or after the Petition Date, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any specific Cause of Action as any indication that the Debtors or Reorganized BSA, as applicable, will not pursue any and all available Causes of Action.  The Debtors or Reorganized BSA, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to any Cause of Action upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date.

K.       Workers' Compensation Programs

As of the Effective Date, the Debtors and the Reorganized BSA shall continue to honor their obligations under: (a) all applicable workers' compensation laws in all applicable states; and (b) the Workers' Compensation Program.  All Proofs of Claims on account of the Workers' Compensation Program shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized BSA's defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the Workers' Compensation Programs; provided further, however, that nothing in the Plan shall be deemed to impose any obligations on the Debtors or their Insurance Companies in addition to what is provided for under the terms of the Workers' Compensation Programs and applicable state law.

L.       Treatment of Executory Contracts and Unexpired Leases

*1.       Assumption and Rejection of Executory Contracts and Unexpired Leases*

As set forth in Article VI of the Plan, on the Effective Date, except as otherwise provided in the Plan, all Executory Contracts and Unexpired Leases shall be deemed assumed by Reorganized BSA without the need for any further notice to or action, order, or approval of the

Bankruptcy Court under sections 365 or 1123 of the Bankruptcy Code, except for Executory Contracts or Unexpired Leases:

a.    that are identified on the Rejected Contracts and Unexpired Leases Schedule;

b.    that previously expired or terminated pursuant to their terms;

c.    that the Debtors have previously assumed or rejected pursuant to a Final Order of the Bankruptcy Court;

d.    that are the subject of a motion to reject that remains pending as of the Effective Date;

e.    as to which the effective date of rejection will occur (or is requested by the Debtors to occur) after the Effective Date; or

f.    as to which the Debtors or Reorganized BSA, as applicable, determine, in the exercise of their reasonable business judgment, that the Cure Amount, as determined by a Final Order or as otherwise finally resolved, would render assumption of such Executory Contract or Unexpired Lease unfavorable to Debtors or Reorganized BSA;

provided that the Debtors reserve the right to seek enforcement of an assumed or assumed and assigned Executory Contract or Unexpired Lease following the Confirmation Date, including seeking an order of the Bankruptcy Court rejecting such Executory Contract or Unexpired Lease for cause.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumption or rejection, as applicable, of Executory Contracts or Unexpired Leases pursuant to the Plan, pursuant to sections 365 and 1123 of the Bankruptcy Code. Except as otherwise set forth in the Plan, the assumption or rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall be effective as of the Effective Date; provided that the rejection of an Unexpired Lease shall be effective as of the later of: (a) the Effective Date; and (b) the date on which the leased premises are unconditionally surrendered to the non-Debtor counterparty to the rejected Unexpired Lease. Reorganized BSA is authorized to abandon any De Minimis Assets at or on the premises subject to an Unexpired Lease that is rejected pursuant to the Plan, and the non-Debtor counterparty to such Unexpired Lease may dispose of any such De Minimis Assets remaining at or on the leased premises on the applicable lease rejection date.

Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or a Final Order of the Bankruptcy Court shall re-vest in and be fully enforceable by Reorganized BSA in accordance with its terms, except as such terms may have been modified by the provisions of the Plan, the Confirmation Order, or any Final Order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by Reorganized BSA.

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount in Cash on the Effective Date or in the ordinary course of the Debtors' or Reorganized BSA's non-profit operations, subject to the limitation described in the Plan.

Except as otherwise provided in the Plan, the Debtors shall, on or before the date of filing of the Plan Supplement, cause Cure and Assumption Notices to be served on affected counterparties to Executory Contracts and Unexpired Leases to be assumed pursuant to the Plan. Any objection by a non-Debtor counterparty to an Executory Contract or Unexpired Lease to the assumption, assumption and assignment, the related Cure Amount, or adequate assurance, must be filed, served, and actually received by the Debtors on or prior to the deadline for filing objections to the Plan (or such later date as may be provided in the applicable Cure and Assumption Notice); provided that, each counterparty to an Executory Contract or Unexpired Lease (a) that the Debtors later determine to assume or (b) as to which the Debtors modify the applicable Cure Amount, must object to the assumption or Cure Amount, as applicable, by the earlier of (i) fourteen (14) days after the Debtors serve such counterparty with corresponding Cure and Assumption Notice; and (ii) the Confirmation Hearing. **Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease shall be forever barred, estopped, and enjoined from contesting the Debtors' assumption of the applicable Executory Contract or Unexpired Lease and from requesting payment of a Cure Amount that differs from the amounts paid or proposed to be paid by the Debtors or Reorganized BSA, in each case without the need for any objection by the Debtors or Reorganized BSA or any further notice to or action, order, or approval of the Bankruptcy Court. Reorganized BSA may settle any dispute regarding a Cure Amount without any further notice to or action, order, or approval of the Bankruptcy Court.**

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed, or assumed and assigned, pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or would be deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any change of control or similar provision), then such provision shall be deemed preempted and modified such that neither the Debtors' assumption or assumption and assignment of the Executory Contract or Unexpired Lease nor any of the transactions contemplated by the Plan shall entitle the non-debtor counterparty to terminate or modify such Executory Contract or Unexpired Lease or to exercise any other purported default-related rights thereunder.

**The Debtors' assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and payment of any applicable Cure Amount in accordance with the procedures set forth in <u>Article VI.C</u> of the Plan, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed, or assumed and assigned, Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases,**

**including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged as of the later of: (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption; (b) the effective date of such assumption; or (c) the Effective Date, in each case without the need for any objection by the Debtors or Reorganized BSA or any further notice to or action, order, or approval of the Bankruptcy Court.**

In the event of a timely filed objection regarding: (1) a Cure Amount; (2) the ability of Reorganized BSA or any assignee to provide adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code under the Executory Contract or Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption or the requirements of section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtors or Reorganized BSA, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors or Reorganized BSA, applicable, shall pay the applicable Cure Amount as soon as reasonably practicable after entry of a Final Order resolving such dispute and approving such assumption, or as may otherwise be agreed upon by the Debtors or Reorganized BSA, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. To the extent that a dispute regarding the applicable Cure Amount is resolved or determined unfavorably to the Debtors, the Debtors may, in their discretion, reject the applicable Executory Contract or Unexpired Lease after such determination, which rejection shall supersede, nullify, and render of no force or effect any earlier assumption or assumption and assignment. Under no circumstances shall the status of payment of a Cure Amount required by section 365(b)(1) of the Bankruptcy Code following the entry of a Final Order resolving the dispute and approving the assumption prevent or delay implementation of the Plan or the occurrence of the Effective Date.

### 2. *Rejection Damages Claims*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim for Rejection Damages Claims, if any, shall be filed within thirty (30) days after the latest to occur of: (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; (2) the effective date of the rejection of such Executory Contract or Unexpired Lease; or (3) the Effective Date (as applicable, the "Rejection Damages Bar Date"). Claims arising from the rejection of an Executory Contract or an Unexpired Lease shall be classified as General Unsecured Claims and subject to the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules. **Any holder of a Rejection Damages Claim that is required to file a Proof of Claim in accordance with Article VI.B of the Plan but fails to do so on or before the Rejection Damages Bar Date shall not be treated as a creditor with respect to such Claim for the purposes of voting or Distributions, and such Rejection Damages Claim shall be automatically Disallowed, forever barred from assertion, and unenforceable against the Debtors, their Estates, Reorganized BSA, or its or their respective property, whether by setoff, recoupment, or otherwise, without the need for any objection by the Debtors or Reorganized BSA or further notice to, or action, order, or approval of the Bankruptcy Court, and such Rejection Damages Claim shall be deemed fully satisfied, released, and discharged.**

### 3. *Contracts and Leases Entered into After the Petition Date*

Contracts and leases entered into after the Petition Date by the BSA, including any Executory Contracts and Unexpired Leases assumed by BSA, will be performed by the BSA or Reorganized BSA in the ordinary course of its charitable non-profit operations.  Accordingly, such contracts and leases (including any assumed Executory Contract and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

### 4. *Directors and Officers Insurance Policies*

All of the Debtors' unexpired D&O Liability Insurance Policies shall be treated as and deemed to be Executory Contracts under the Plan.  Notwithstanding anything in the Plan to the contrary, on the Effective Date, Reorganized BSA shall be deemed to have assumed all unexpired D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or prior to the Petition Date pursuant to sections 365 and 1123 of the Bankruptcy Code and Article VI of the Plan.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized BSA's assumption of each of the unexpired D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, entry of the Confirmation Order shall not discharge, impair, or otherwise modify any indemnity obligations assumed as a result of the foregoing assumption of the D&O Liability Insurance Policies and related documents, and each such indemnity obligations will be deemed and treated as an Executory Contract that has been assumed by the Reorganized BSA under the Plan as to which no Proof of Claim need be filed.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of Reorganized BSA's foregoing assumption of the unexpired D&O Liability Insurance Policies.

### 5. *Insurance Policies*

Notwithstanding anything to the contrary herein, all BSA Insurance Policies issued or entered into prior to the Petition Date shall not be considered Executory Contracts and shall neither be assumed nor rejected by the Debtors; provided, however, that to the extent any BSA Insurance Policy is determined to be an Executory Contract, then, subject to Article IV.P of the Plan, and notwithstanding anything contained in the Plan to the contrary, the Plan will constitute a motion to assume such BSA Insurance Policy and pay all future obligations, if any, in respect thereof and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order will constitute approval of such assumption pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtors, their respective Estates and all parties in interest.

Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of any Debtor existing as of the Confirmation Date with respect to any BSA Insurance Policy; and prior payments for premiums or other charges made prior to the Petition Date under or with respect to any BSA Insurance Policy shall be indefeasible.  Moreover, as of the Effective Date, all payments of premiums or other charges made by the Debtors on or after the Petition Date under or with respect to any BSA Insurance Policy shall be deemed to have been authorized, approved, and ratified in all respects without any requirement of further action by the

Bankruptcy Court. Notwithstanding anything to the contrary contained herein, Confirmation shall not discharge, impair or otherwise modify any obligations assumed by the foregoing assumption, and each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

Other than the permissibility of the Insurance Assignment, which is to be determined by or in connection with Confirmation, the rights and obligations of the parties under such Insurance Policies, including the question of whether any breach has occurred, shall be determined under applicable law.

M.    Provisions Governing Distributions

### 1.    *Applicability*

None of the terms or provision of Article VII of the Plan shall apply to Abuse Claims, which shall be exclusively processed, liquidated and paid by the Settlement Trust in accordance with the Settlement Trust Documents.

### 2.    *Distributions Generally*

The Disbursing Agent shall make all Distributions to appropriate holders of Allowed Claims in accordance with the terms of the Plan.

### 3.    *Distributions on Account of Certain Claims Allowed as of the Effective Date*

Except as otherwise provided in the Plan, on or as soon as practicable after the Effective Date, the Disbursing Agent shall make Distributions in Cash in amounts equal to all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, and Allowed Convenience Claims.

### 4.    *Distributions on Account of Allowed General Unsecured Claims*

On each Distribution Date, the Disbursing Agent shall Distribute to each holder of an Allowed General Unsecured Claim an amount equal to such holder's Pro Rata Share of (1) the total balance of the Core Value Cash Pool as of such date, less (2) the balance of the Disputed Claims Reserve.

### 5.    *Distributions on Account of Disputed Claims Allowed After the Effective Date*

Distributions on account of any Disputed Claim shall be made to the extent such Claim is Allowed in accordance with the provisions of Article VIII of the Plan. Except as otherwise provided in the Plan, the Confirmation Order, another order of the Bankruptcy Court, or as agreed to by the relevant parties, Distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made as soon as practicable after the Disputed Claim becomes an Allowed Claim.

6.      *Rights and Powers of Disbursing Agent*

The Disbursing Agent shall make all Distributions to the appropriate holders of Allowed Claims in accordance with the terms of the Plan, including <u>Article VII</u> of the Plan.  Except as otherwise ordered by the Bankruptcy Court, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.  The Disbursing Agent may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns for all taxable periods through the date on which final Distributions are made.

7.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

(a)      <u>Claims Record Date</u>.  As of the close of business on the Claims Record Date, the various transfer registers for each of the Classes of Claims as maintained by the Debtors or their agents shall be deemed closed for purposes of determining whether a holder of such a Claim is a record holder entitled to a Distribution under the Plan, and there shall be no further changes in the record holders or the permitted designees with respect to such Claims.  The Debtors or Reorganized BSA, as applicable, shall have no obligation to recognize any transfer or designation of such Claims occurring after the close of business on the Claims Record Date.  With respect to payment of any Cure Amounts or assumption disputes, neither the Debtors nor Reorganized BSA shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the close of business on the Claims Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

(b)      <u>Delivery of Distributions</u>.  If a Person holds more than one Claim in any one Class, in the Disbursing Agent's sole discretion, all such Claims will be aggregated into one Claim and one Distribution will be made with respect to the aggregated Claim.

(c)      <u>Special Rules for Distributions to Holders of Disputed Claims</u>.  Except as otherwise provided in the Plan or agreed to by the relevant parties: (a) no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (b) any Person that holds both an Allowed Claim and a Disputed Claim shall not receive any Distribution on account of the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Disputed Claims have been Allowed or expunged.  Any Distributions arising from property Distributed to holders of Allowed Claims in a Class and paid to such holders under the Plan shall also be paid, in the applicable amounts, to any holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such Distributions were earlier paid to holders of Allowed Claims in such Class.

125

8. *Undeliverable and Non-Negotiated Distributions*

(a)  Undeliverable Distributions. If any Distribution to a holder of an Allowed Claim is returned to Reorganized BSA as undeliverable, no further Distributions shall be made to such holder unless and until Reorganized BSA is notified in writing of such holder's then-current address or other necessary information for delivery, at which time such previously undeliverable Distribution shall be made to such holder within ninety (90) days of receipt of such holder's then-current address or other necessary information; provided, however, that any such undeliverable Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 180 days after the date of the initial attempted Distribution. After such date, all unclaimed property or interests in property shall revert to Reorganized BSA automatically and without the need for any notice to or further order of the Bankruptcy Court (notwithstanding any applicable non-bankruptcy escheatment, abandoned, or unclaimed property laws to the contrary), and the right, title, and interest of any holder to such property or interest in property shall be discharged and forever barred; provided that Distributions made from the Core Value Cash Pool and returned as undeliverable shall revert to the Core Value Cash Pool.

(b)  Non-Negotiated Distributions. If any Plan to a holder of an Allowed Claim is not negotiated for a period of 180 days after the Distribution, then such Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and re-vest in Reorganized BSA or re-vest in the Core Value Cash Pool if such Distribution was made from the Core Value Cash Pool. After such date, all non-negotiated property or interests in property shall revert to Reorganized BSA automatically and without the need for any notice to or further order of the Bankruptcy Court (notwithstanding any applicable non-bankruptcy escheatment, abandoned, or unclaimed property laws to the contrary), and the right, title, and interest of any holder to such property or interest in property shall be discharged and forever barred.

9.  *Manner of Payment under the Plan*

Except as otherwise specifically provided in the Plan, at the option of Reorganized BSA, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of Reorganized BSA.

10.  *Satisfaction of Claims*

Except as otherwise specifically provided in the Plan, any Distributions to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

11.  *Minimum Cash Distributions*

Reorganized BSA shall not be required to make any Distribution of Cash less than twenty dollars ($20) to any holder of an Allowed Claim; provided, however, that if any Distribution is

not made pursuant to <u>Article VIII.K</u> of the Plan, such Distribution shall be added to any subsequent Distribution to be made on behalf of the holder's Allowed Claim.

### 12.   *Postpetition Interest*

Except as provided in the Cash Collateral Order or in the following sentence, interest shall not accrue on Impaired Claims; no holder of an Impaired Claim shall be entitled to interest accruing on or after the Petition Date on any such Impaired Claim, and interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim. Notwithstanding the foregoing, each holder of an Allowed General Unsecured Claim shall accrue interest on the Allowed amount of such Claim at the federal judgment rate applicable on the Effective Date; <u>provided</u>, that such interest shall be payable to each such holder only from the Core Value Cash Pool and only to the extent that the Core Value Cash Pool shall have been sufficient: (i) first, to satisfy the full amount of all Allowed General Unsecured Claims; and (ii) second, on account of any Allowed Non-Abuse Litigation Claims that shall not have elected to be treated as an Allowed Convenience Claim under <u>Article III.B.9</u> of the Plan, to satisfy any deficiency in payments of such Allowed Claims from available Insurance Coverage, from applicable proceeds of any Insurance Settlement Agreements, and from co-liable non-debtors (if any) or their insurance coverage.  Neither the Debtors nor Reorganized BSA shall have any independent obligation to pay interest for or on account of any Allowed General Unsecured Claims other than from the Core Value Cash Pool in accordance with the terms of <u>Article VII.L</u> of the Plan.

### 13.   *Setoffs*

The Debtors and Reorganized BSA may, pursuant to the applicable provisions of the Bankruptcy Code, or applicable non-bankruptcy law, set off against any applicable Allowed Claim (before any Distribution is made on account of such Claim) any and all claims, rights, Causes of Action, debts or liabilities of any nature that the Debtors or Reorganized BSA may hold against the holder of such Allowed Claim; <u>provided</u>, <u>however</u>, that the failure to effect such a setoff shall not constitute a waiver or release of any such claims, rights, Causes of Action, debts or liabilities.

### 14.   *Claims Paid or Payable by Third Parties*

(a)     <u>Claims Paid by Third Parties</u>.  A Claim shall be reduced in full, and such Claim shall be Disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized BSA.  To the extent a holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not a Debtor or Reorganized BSA on account of such Claim, such holder shall repay, return, or deliver any Distribution held by or transferred to such holder to Reorganized BSA to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan.

(b)  <u>Non-Abuse Claims Payable from Insurance</u>.  No Distributions under the Plan shall be made on account of any Allowed Non-Abuse Claim that is payable pursuant to an insurance policy until the holder of such Allowed Non-Abuse Claim has exhausted all remedies with respect to such insurance policy, including pursuing such insurance through litigation and obtaining entry of a final, non-appealable order.  To the extent that one or more of the Insurance Companies satisfies in full or in part an Allowed Non-Abuse Claim, then immediately upon such satisfaction, the portion of the Claim so satisfied may be expunged from the Claims Register by the Notice and Claims Agent without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 15.    *Compliance with Tax Requirements and Allocations*

In connection with the Plan and all Distributions hereunder, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any federal, state or local taxing authority, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions including tax certification forms, or establishing any other mechanisms it believes are reasonable and appropriate.

For tax purposes, Distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claim.

### N.    <u>Procedures for Resolving Contingent, Unliquidated, and Disputed Claims</u>

### 1.    *Applicability*

All Disputed Claims against the Debtors, other than Administrative Expense Claims, shall be subject to the provisions of <u>Article VIII</u> of the Plan.  All Administrative Expense Claims shall be determined and, if Allowed, paid in accordance with <u>Article II</u> of the Plan.  None of the terms or provision of <u>Article VIII</u> of the Plan shall apply to Abuse Claims, which shall be exclusively processed, liquidated and paid by the Settlement Trust in accordance with the Settlement Trust Documents.

### 2.    *Allowance of Claims*

After the Effective Date, Reorganized BSA shall have and retain any and all rights and defenses that the Debtors, or either of them, had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim becomes Allowed by Final Order of the Bankruptcy Court or by agreement between the Debtors or Reorganized BSA, on the one hand, and the holder of such Claim, on the other.

### 3.      *Claims Administration Responsibilities*

(a)      Except as otherwise expressly provided in the Plan, from and after the Effective Date, Reorganized BSA shall have the authority (1) to file, withdraw, or litigate to judgment objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

(b)      Reorganized BSA shall consult with the Creditor Representative in connection with the reconciliation, settlement and administration of Convenience Claims, General Unsecured Claims and Non-Abuse Litigation Claims and shall use commercially reasonable efforts to resolve such Claims before the applicable Claims Objection Deadline.

### 4.      *Estimation of Claims*

The Debtors (before the Effective Date) or Reorganized BSA (on and after the Effective Date) may at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any Person.  If the estimated amount of a Claim constitutes a maximum limitation on such Claim, the Debtors (before the Effective Date) or Reorganized BSA (on and after the Effective Date) may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim.  All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Claims may be estimated and subsequently compromised, objected to, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 5.      *No Distributions Pending Allowance*

No Distributions or other consideration shall be paid with respect to any Claim that is a Disputed Claim unless and until all objections to such Disputed Claim are resolved and such Disputed Claim becomes an Allowed Claim by Final Order of the Bankruptcy Court or agreement between the Debtors or Reorganized BSA, on the one hand, and the holder of such Claim, on the other.

### 6.      *Distributions After Allowance*

To the extent that a Disputed Claim (or a portion thereof) becomes an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.

### 7.    *Disputed Claims Reserve*

The provisions of <u>Article VIII.G</u> of the Plan apply only to the extent that any General Unsecured Claims remain Disputed as of any Distribution Date.

(a)    If any General Unsecured Claims remain Disputed as of any Distribution Date, the undistributed portion of the Core Value Cash Pool shall be held in a segregated account.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination from the IRS, the Disbursing Agent shall treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and, to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including the Debtors, Reorganized BSA, the Disbursing Agent, and holders of General Unsecured Claims) shall be required to report for tax purposes in a manner consistent with the foregoing.  The Disputed Claims Reserve shall be responsible for payment, out of the assets of the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve or its assets.

(b)    The Debtors or Reorganized BSA, as applicable, with the consent of the Creditor Representative, shall determine the amount of the Disputed Claims Reserve, if applicable, as of the initial Distribution Date, based on the least of: (a) the asserted amount of the Disputed General Unsecured Claims in the applicable Proofs of Claim; (b) the amount, if any, estimated by the Bankruptcy Court pursuant to (i) section 502(c) of the Bankruptcy Code or (ii) <u>Article VIII.D</u> of the Plan if, after the Effective Date, a motion is filed by Reorganized BSA to estimate such Claim; (c) the amount otherwise agreed to by the Debtors (or Reorganized BSA, if after the Effective Date) and the holders of such Disputed General Unsecured Claims; or (d) any amount otherwise approved by the Bankruptcy Court.  Upon each Distribution Date, Reorganized BSA shall deposit into the Disputed Claims Reserve an amount of Cash equal to the amount sufficient to make the Distributions to which holders of Disputed General Unsecured Claims would be entitled under the Plan as of the applicable Distribution Date if the Disputed General Unsecured Claims were Allowed Claims as of such date.

(c)    If a Disputed General Unsecured Claim becomes an Allowed Claim after the first Distribution Date, the Disbursing Agent shall, on the next Distribution Date after the Disputed General Unsecured Claim becomes an Allowed Claim (or, if the Disputed General Unsecured Claim becomes an Allowed Claim after the final Distribution Date, as soon as practicable after Allowance), Distribute to the holder of such Claim, exclusively from the Disputed Claims Reserve, the amount of Cash that such holder would have received in that Distribution and all prior Distributions (if any) if such holder's General Unsecured Claim had been Allowed as of the Effective Date, net of any allocable taxes imposed thereon or otherwise payable by the Disputed Claims Reserve.

(d)    If a Disputed Claim is Disallowed, in whole or in part, then on the Distribution Date next following the date of Disallowance, Cash shall be released from the Disputed Claims Reserve and placed in the Core Value Cash Pool, which Cash shall then be unreserved and unrestricted, and which shall be available for Distribution to holders of Allowed General Unsecured Claims.

(e)     If any assets remain in the Disputed Claims Reserve after all Disputed General Unsecured Claims have been resolved, such assets shall be placed in the Core Value Cash Pool and distributed Pro Rata to all holders of Allowed General Unsecured Claims on the next Distribution Date (or, if all Disputed General Unsecured Claims are resolved after the final Distribution Date, as soon as practicable thereafter).

**8.      Adjustment to Claims Register without Objection**

Any duplicate Proof of Claim that has been paid or satisfied, or any Proof of Claim that is clearly marked as amended or superseded by a subsequently filed Proof of Claim that remains on the Claims Register, may be adjusted or expunged on the Claims Register by the Notice and Claims Agent at the direction of Reorganized BSA upon stipulation between the parties in interest without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**9.      Time to File Objections to Claims**

Any objections to Claims must be filed on or before the applicable Claims Objection Deadline, as such deadline may be extended from time to time.  The expiration of the Claims Objection Deadline shall not limit or affect the Debtors' or Reorganized BSA's rights to dispute Claims asserted in the ordinary course of the Debtors or Reorganized BSA's non-profit operations other than through a Proof of Claim.

**10.      Treatment of Untimely Claims**

Except as provided herein or otherwise agreed, any and all creditors that have filed Proofs of Claim after the applicable Bar Date shall not be treated as a creditor with respect to such Claim for the purposes of voting and distribution.

O.     Discharges, Channeling Injunction, Releases, Exculpations and Injunctions; Survival of Indemnification and Exculpation Obligations

**1.      Discharge**

a.      Discharge of the Debtors

Except as expressly provided in the Plan or the Confirmation Order, the treatment of Claims under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge, termination and release of, all Claims and Interests of any nature whatsoever against or in the Debtors or any of their assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date, and, as of the Effective Date, each of the Debtors shall be deemed discharged and released, and each holder of a Claim or Interest and any successor, assign, and affiliate of such holder shall be deemed to have forever waived, discharged and released each of the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights and liabilities, and all debts of the kind specified in section 502 of the Bankruptcy Code, based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date, in each case whether or not (a) a Proof of Claim based upon such debt is filed

or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, (c) a Claim based upon such debt is or has been Disallowed by order of the Bankruptcy Court, or (d) the holder of a Claim based upon such debt is deemed to have accepted the Plan.

      b.    Discharge Injunction

From and after the Effective Date, except as expressly provided in the Plan or the Confirmation Order, all holders of Claims or Interests of any nature whatsoever against or in the Debtors or any of their assets or properties based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date that are discharged pursuant to the terms of the Plan shall be precluded and permanently enjoined from taking any of the following actions on account of, or on the basis of, such discharged Claims and Interests: (a) commencing or continuing any action or other proceeding of any kind against the Debtors, Reorganized BSA, the Settlement Trust, or its or their respective property; (b) enforcing, attaching, collecting, or recovering by any manner or means of judgment, award, decree or other against the Debtors, Reorganized BSA, the Settlement Trust, or its or their respective property; (c) creating, perfecting or enforcing any Lien or Encumbrance of any kind against the Debtors, Reorganized BSA, the Settlement Trust, or its or their respective property; or (d) commencing or continuing any judicial or administrative proceeding, in any forum and in any place in the world, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.  The foregoing injunction shall extend to the successors and assigns of the Debtors (including Reorganized BSA) and its and their respective properties and interests in property.  In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall be a judicial determination of discharge or termination of all Claims, Interests and other debts and liabilities against or in the Debtors pursuant to sections 105, 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment obtained against the Debtors at any time to the extent such judgment relates to a discharged Claim or Interest.

      *2.*    ***Channeling Injunction***

      a.    **Terms**

**      (i)    To preserve and promote the settlements contemplated by and provided for in the Plan, including the Abuse Claims Settlement, and to supplement, where necessary, the injunctive effect of the Discharge as provided in sections 1141 and 524 of the Bankruptcy Code and as described in <u>Article X</u> of the Plan, pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court and the District Court under section 105(a) of the Bankruptcy Code, the sole recourse of any holder of an Abuse Claim against a Protected Party on account of such Abuse Claim shall be to and against the Settlement Trust pursuant to the Settlement Trust Documents, and such holder shall have no right whatsoever at any time to assert such Abuse Claim against any Protected Party or any property or interest in property of any Protected Party.  On and after the Effective Date, all Persons that have held or asserted, currently hold or assert, or that may in the future hold or assert, any Abuse Claim against the Protected Parties, or any of them, shall be**

**permanently and forever stayed, restrained and enjoined from taking any action for the purpose of directly, indirectly, or derivatively collecting, recovering, or receiving payment, satisfaction, or recovery from any Protected Party with respect to any such Abuse Claim other than from the Settlement Trust pursuant to the Settlement Trust Documents, including:**

**(ii)    commencing, conducting, or continuing, in any manner, whether directly, indirectly, or derivatively, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum in any jurisdiction around the world against or affecting any Protected Party or any property or interest in property of any Protected Party;**

**(iii)    enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering, by any manner or means, either directly or indirectly, any judgment, award, decree, or order against or affecting any Protected Party or any property or interest in property of any Protected Party;**

**(iv)    creating, perfecting, or otherwise enforcing in any manner, whether directly or indirectly, any Encumbrance of any kind against any Protected Party or any property or interest in property of any Protected Party;**

**(v)    asserting, implementing or effectuating any setoff, right of reimbursement, subrogation, indemnity, contribution, reimbursement, or recoupment of any kind, in any manner, directly or indirectly, against any obligation due to any Protected Party or any property or interest in property of any Protected Party; or**

**(vi)    taking any act in any manner, and in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents or the Settlement Trust Documents or with regard to any matter that is within the scope of the matters designated by the Plan to be subject to resolution by the Settlement Trust, except in conformity and compliance with the Settlement Trust Documents with respect to any such Abuse Claim.**

     b.    **Reservations**

**Notwithstanding anything to the contrary in <u>Article X.F</u> of the Plan, the Channeling Injunction shall not enjoin:**

**(i)    the rights of holders of Abuse Claims to assert such Abuse Claims solely against the Settlement Trust in accordance with the Trust Distribution Procedures;**

**(ii)    the rights of holders of Abuse Claims to assert such Abuse Claims against anyone other than a Protected Party;**

   **(iii)**  **the right of any Person to assert any Claim, debt, obligation or liability for payment of Settlement Trust Expenses solely against the Settlement Trust in accordance with the Settlement Trust Documents; or**

   **(iv)**  **the Settlement Trust from enforcing its rights under the Plan and the Settlement Trust Documents; or**

   **(v)**  **the rights of the Settlement Trust and Reorganized BSA (to the extent permitted or required under the Plan) to prosecute any action against any Non-Settling Insurance Company based on or arising from Insurance Policies that are not the subject of an Insurance Settlement Agreement, subject to any Insurance Coverage Defenses.**

*3.*  *Provisions Relating to Channeling Injunction*

  a.  **Modifications**

There can be no modification, dissolution, or termination of the Channeling Injunction, which shall be a permanent injunction.

  b.  **Non-Limitation.**

Nothing in the Plan or the Settlement Trust Documents shall or shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction or the Settlement Trust's assumption of all liability with respect to Abuse Claims.

  c.  **Bankruptcy Rule 3016 Compliance**

The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute or be deemed to constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

  d.  **Enforcement**

Any Protected Party may enforce the Channeling Injunction as a defense to any Claim brought against such Protected Party that is enjoined under the Plan as to such Protected Party and may seek to enforce such injunction in a court of competent jurisdiction.

  e.  **Contribution Claims**

If a Non-Settling Insurance Company asserts that it has rights, whether legal, equitable, contractual, or otherwise, of contribution, indemnity, reimbursement, subrogation or other similar claims directly or indirectly arising out of or in any way relating to such Non-Settling Insurance Company's payment of loss on behalf of one or more of the Debtors in connection with any Abuse Claim against a Settling Insurance Company (collectively, "Contribution Claims"), (a) such Contribution Claims may be asserted as a defense or counterclaim against the Settlement Trust in any Insurance Action involving such Non-Settling Insurance Company, and the Settlement Trust may assert the legal or equitable rights (if any) of the Settling Insurance

Company, and (b) to the extent such Contribution Claims are determined to be valid, the liability (if any) of such Non-Settling Insurance Company to the Settlement Trust shall be reduced by the amount of such Contribution Claims.

### f.    No Duplicative Recovery

In no event shall any holder of an Abuse Claim be entitled to receive any duplicative payment, reimbursement, or restitution from any Protected Party under any theory of liability for the same loss, damage, or other Claim that is reimbursed by the Settlement Trust or is otherwise based on the same events, facts, matters, or circumstances that gave rise to the applicable Abuse Claim.

### g.    District Court Approval

The Debtors shall seek entry of the Affirmation Order, which shall approve (a) the Channeling Injunction and the Settlement Trust's assumption of all liability with respect to Abuse Claims and (b) the releases by holders of Abuse Claims for the benefit of the Protected Parties, each as set forth in Article X of the Plan.

### *4.    Insurance Entity Injunction*

### a.    Purpose

**If the Plan is Confirmed as a Global Resolution Plan, then, to facilitate the Insurance Assignment, protect the Settlement Trust, and preserve the Settlement Trust Assets, pursuant to the equitable jurisdiction and power of the Bankruptcy Court and the District Court under section 105(a) of the Bankruptcy Code, the Bankruptcy Court shall issue the injunction set forth in <u>Article X.H</u> of the Plan (the "<u>Insurance Entity Injunction</u>"); <u>provided</u>, <u>however</u>, that the Insurance Entity Injunction is not issued for the benefit of any Insurance Company, and no Insurance Company is a third-party beneficiary of the Insurance Entity Injunction, except as otherwise specifically provided in any Insurance Settlement Agreement.**

### b.    Terms Regarding Claims against Insurance Companies

**Subject to the terms of <u>Article X.E</u> and <u>Article X.F</u> of the Plan, all Persons that have held or asserted, that hold or assert, or that may in the future hold or assert any claim or cause of action (including any Abuse Claim or any claim for or respecting any Settlement Trust Expense) against any Insurance Company based upon, attributable to, arising out of, or in any way connected with any Abuse Claim, whenever and wherever arising or asserted, whether in the United States of America or anywhere else in the world, whether sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, shall be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such claim or cause of action, including:**

**(i)    commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a**

judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such claim, demand, or cause of action against any Insurance Company, or against the property of any Insurance Company, with respect to any such claim, demand, or cause of action;

(ii)    enforcing, levying, attaching, collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Insurance Company, or against the property of any Insurance Company, with respect to any such claim or cause of action;

(iii)    creating, perfecting, or enforcing in any manner, directly or indirectly, any Lien or Encumbrance against any Insurance Company, or the property of any Insurance Company, with respect to any such claim or cause of action; and

(iv)    except as otherwise specifically provided in the Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation of any Insurance Company, or against the property of any Insurance Company, with respect to any such claim or cause of action;

provided, however, that (i) the injunction set forth in Article X.H of the Plan shall not impair in any way any (a) actions brought by the Settlement Trust against any Non-Settling Insurance Company or (b) the rights of any co-insured of the Debtors (x) under any Insurance Policy that is not the subject of an Insurance Settlement Agreement or against any Non-Settling Insurance Company, in each case with respect to Insured Non-Abuse Claims and (y) as specified under any Final Order of the Bankruptcy Court approving an Insurance Settlement Agreement; and (ii) the Settlement Trust shall have the sole and exclusive authority at any time to terminate, or reduce or limit the scope of, the injunction set forth in Article X.H of the Plan with respect to any Non-Settling Insurance Company, in accordance with the Settlement Trust Documents, upon express written notice to such Non-Settling Insurance Company, except that the Settlement Trust shall not have any authority to terminate, reduce or limit the scope of the injunction herein with respect to any Settling Insurance Company so long as, but only to the extent that, such Settling Insurance Company complies fully with its obligations under any applicable Insurance Settlement Agreement.

c.    Reservations

Notwithstanding anything to the contrary in Article X.H of the Plan, the Insurance Entity Injunction shall not enjoin:

(i)    the rights of any Person to the treatment accorded them under the Plan, as applicable, including the rights of holders of Abuse Claims to assert such Claims, as applicable, in accordance with the Trust Distribution Procedures;

(ii)    the rights of any Person to assert any claim, debt, obligation, cause of action or liability for payment of Settlement Trust Expenses against the Settlement Trust;

(iii)    the rights of the Settlement Trust to prosecute any action based on or arising from Insurance Policies;

(iv)    the rights of the Settlement Trust to assert any claim, debt, obligation, cause of action or liability for payment against an Insurance Company based on or arising from the Insurance Policies; or

(v)    the rights of any Insurance Company to assert any claim, debt, obligation, cause of action or liability for payment against any Non-Settling Insurance Company.

5.    *Injunction Against Interference with Plan*

Upon entry of the Confirmation Order, all holders of Claims and Interests shall be precluded and enjoined from taking any actions to interfere with the implementation and consummation of the Plan.

6.    *Releases*

a.    **Releases by the Debtors and the Estates of the Released Parties**

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Released Parties to facilitate and implement the reorganization of the Debtors, as an integral component of the Plan, the Debtors, Reorganized BSA, and the Estates shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each and all of the Released Parties of and from any and all Estate Causes of Action that do not constitute Settlement Trust Causes of Action, any and all other Claims, Interests, obligations, rights, demands, suits, judgments, damages, debts, remedies, losses and liabilities of any nature whatsoever (including any derivative claims or Causes of Action asserted or that may be asserted on behalf of the Debtors, Reorganized BSA, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to the Debtors, the Estates, their respective assets and properties, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated by the Plan, the business or contractual arrangements between one or both of the Debtors and any Released Party, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Cases, any of the Plan Documents, or any related agreements, instruments, and other documents created or

entered into before or during the Chapter 11 Cases or the negotiation, formulation, preparation or implementation thereof, the pursuit of Confirmation, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the distribution of property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in <u>Article X.J.1</u> of the Plan shall not, and shall not be construed to: (a) release any Released Party from Causes of Action arising out of, or related to, any act or omission of a Released Party that is a criminal act or that constitutes fraud, gross negligence or willful misconduct; or (b) release any post-Effective Date obligations of any Person under the Plan Documents or any document, instrument, or agreement executed to implement the Plan.

b.      **Releases by the Debtors and the Estates of Certain Avoidance Actions**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of Creditors' Committee and its members in their respective capacities as such in facilitating and implementing the reorganization of the Debtors, as an integral component of the Plan, the Debtors, Reorganized BSA, and the Estates shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each and all holders of General Unsecured Claims, Non-Abuse Litigation Claims, and Convenience Claims of and from any and all Avoidance Actions.

c.      **Releases by the Debtors and the Estates of the Local Councils and the Contributing Chartered Organizations**

If the Plan is Confirmed as a Global Resolution Plan, then, in furtherance of the Abuse Claims Settlement, on the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, on their own behalf and as representatives of their respective Estates, and Reorganized BSA, are deemed to irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge each and all of the Local Councils and Contributing Chartered Organizations of and from any and all claims, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, executions and demands whatsoever, of whatever kind or nature (including, without limitation, those arising under the Bankruptcy Code), whether known or unknown, suspected or unsuspected, in law or in equity, which the Debtors, their Estates, or Reorganized BSA have, had, may have, or may claim to have against any of the Local Councils and Contributing Chartered Organizations with respect to any Abuse Claims (collectively, the "<u>Scouting Released Claims</u>").

d.      **Releases by Holders of Abuse Claims**

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of

which is hereby confirmed, including the service of the Protected Parties to facilitate and implement the reorganization of the Debtors and the settlements embodied in the Plan, including the Abuse Claims Settlement, as an integral component of the Plan, and except as otherwise expressly provided in the Plan or the Confirmation Order, to the maximum extent permitted under applicable law, as such law may be extended subsequent to the Effective Date, all holders of Abuse Claims shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release each and all of the Protected Parties and their respective property and successors and assigns of and from all Abuse Claims and any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, veil piercing or alter-ego theories of liability, successor liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to such Abuse Claims.

      e.      **Releases by Holders of Claims**

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Confirmation Order, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Released Parties to facilitate and implement the reorganization of the Debtors and the settlements embodied in the Plan, as an integral component of the Plan, and except as otherwise expressly provided in the Plan or the Confirmation Order, to the maximum extent permitted under applicable law, as such law may be extended subsequent to the Effective Date, all Releasing Claim holders shall, and shall be deemed to, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever release and discharge each and all of the Released Parties of and from any and all Claims, Interests, obligations, rights, demands, suits, judgments, damages, debts, remedies, losses and liabilities of any nature whatsoever (including any derivative claims or Causes of Action asserted or that may be asserted on behalf of the Debtors, Reorganized BSA, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act, omission, transaction, event, or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to the Debtors, the Estates, their respective assets and properties, the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated by the Plan, the business or contractual arrangements between one or both of the Debtors and any Released Party, the restructuring of any Claim or Interest that is treated by the Plan before or during the Chapter 11 Cases, any of the Plan Documents, or any related agreements, instruments, and other documents created or entered into before or during the Chapter 11 Cases or the negotiation, formulation, preparation or implementation thereof, the pursuit of Confirmation, the administration and implementation of the Plan, the solicitation of votes with respect to the Plan, the distribution of property under the Plan, or any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; **provided**, **however**, that the releases set forth in **Article X.J.4**

of the Plan shall not, and shall not be construed to: (a) release any Released Party from Causes of Action arising out of, or related to, any act or omission of a Released Party that is a criminal act or that constitutes fraud, gross negligence or willful misconduct; (b) release any post-Effective Date obligations of any Person under the Plan Documents or any document, instrument, or agreement executed to implement the Plan; or (c) modify, reduce, impair, or otherwise affect the ability of any holder of an Allowed Non-Abuse Litigation Claim to recover on account of such Allowed Claim in accordance with **Article III.B.9** of the Plan.  Notwithstanding the foregoing or anything to the contrary herein, with respect to holders of Allowed General Unsecured Claims or Allowed Non-Abuse Litigation Claims, nothing in the Plan or the release set forth in **Article X.J.4** of the Plan shall, or shall be construed to, release any claims or Causes of Action against any Local Council, Chartered Organization, or Insurance Company.

### 7.    *Exculpation*

From and after the Effective Date, none of the Exculpated Parties shall have or incur any liability to, or be subject to any right of action by, any Person for any act, omission, transaction, event, or other circumstance occurring on or before the Effective Date in connection with, relating to or arising out of the Chapter 11 Cases, the negotiation of the Plan Documents, the Releases and Injunctions, the pursuit of Confirmation of the Plan, the administration, consummation and implementation of the Plan or the property to be Distributed under the Plan, or the management or operation of the Debtors (except for any liability that results primarily from such Exculpated Party's gross negligence, bad faith or willful misconduct).  In all respects, each and all such Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under, or in connection with, the matters referenced in the preceding sentence.

### 8.    *Injunctions Related to Releases and Exculpation*

a.    **Injunction Related to Releases**

As of the Effective Date, all holders of Claims that are the subject of **Article X.J** of the Plan are, and shall be, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Released Party or its property or successors or assigns on account of or based on the subject matter of such Claims, whether directly or indirectly, derivatively or otherwise: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including any judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien or Encumbrance; and/or (d) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under **Article X.E** or released under **Article X.J** of the Plan; **provided**, **however**, that the injunctions set forth in **Article X.L.1** of the Plan shall not, and shall not be construed to, enjoin any holder of a Claim that is the subject of **Article**

**X.J of the Plan from taking any action arising out of, or related to, any act or omission of a Released Party that is a criminal act or that constitutes fraud, gross negligence or willful misconduct.**

        b.      **Injunction Related to Exculpation**

**As of the Effective Date, all holders of Claims that are the subject of <u>Article X.K</u> of the Plan are, and shall be, expressly, conclusively, absolutely, unconditionally, irrevocably, and forever stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Exculpated Party on account of or based on the subject matter of such Claims, whether directly or indirectly, derivatively or otherwise: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including any judicial, arbitral, administrative or other proceeding) in any forum; (b) enforcing, attaching (including any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (c) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien or Encumbrance; and/or (d) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under <u>Article X.E</u> or released under <u>Article X.J</u> of the Plan.**

P.     <u>Reservation of Rights</u>

       Notwithstanding any other provision of the Plan to the contrary, no provision of <u>Article X</u> of the Plan shall be deemed or construed to satisfy, discharge, release or enjoin claims by the Settlement Trust, the Reorganized BSA, or any other Person, as the case may be, against (1) the Settlement Trust for payment of Abuse Claims in accordance with the Trust Distribution Procedures, (2) the Settlement Trust for the payment of Settlement Trust Expenses, or (3) any Insurance Company that has not performed under an Insurance Policy or an Insurance Settlement Agreement.

Q.     <u>Disallowed Claims</u>

       On and after the Effective Date, the Debtors and Reorganized BSA shall be fully and finally discharged of any and all liability or obligation on any and all Disallowed Claims, and any order Disallowing a Claim that is not a Final Order as of the Effective Date solely because of a Person's right to move for reconsideration of such order pursuant to section 502 of the Bankruptcy Code or Bankruptcy Rule 3008 shall nevertheless become and be deemed to be a Final Order on the Effective Date.

R.     <u>Indemnities</u>

       *1.*     *Prepetition Indemnification and Reimbursement Obligations*

       The respective obligations of the Debtors to indemnify and reimburse Persons who are or were directors, officers or employees of the Debtors on the Petition Date or at any time thereafter up to and including the Effective Date, against and for any obligations pursuant to the bylaws, applicable state or non-bankruptcy law, or specific agreement or any combination of the

foregoing, shall, except with respect to any Perpetrator: (a) survive Confirmation of the Plan and remain unaffected thereby; (b) be assumed by Reorganized BSA as of the Effective Date; and (c) not be discharged under section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with any event occurring before, on or after the Petition Date.  In furtherance of, and to implement the foregoing, as of the Effective Date, Reorganized BSA shall obtain and maintain in full force insurance for the benefit of each and all of the above-indemnified directors, officers and employees, at levels no less favorable than those existing as of the date of entry of the Confirmation Order, and for a period of no less than three (3) years following the Effective Date.

### 2.    *Plan Indemnity*

In addition to the matters set forth above and not by way of limitation thereof, Reorganized BSA shall indemnify and hold harmless all Persons who are or were officers or directors of the Debtors on the Petition Date or at any time thereafter up to and including the Effective Date on account of and with respect to any claim, cause of action, liability, judgment, settlement, cost or expense (including attorneys' fees) on account of claims or Causes of Action threatened or asserted by any third party against such officers or directors that seek contribution, indemnity, equitable indemnity, or any similar claim, based upon or as the result of the assertion of primary claims against such third party by any representative of the Debtors' Estates.

### 3.    *Limitation on Indemnification*

Notwithstanding anything to the contrary set forth in the Plan or elsewhere, neither the Debtors, Reorganized BSA, the Local Councils, nor the Contributing Chartered Organizations, as applicable, shall be obligated to indemnify or hold harmless any Person for any claim, cause of action, liability, judgment, settlement, cost or expense that results primarily from (i) such Person's bad faith, gross negligence or willful misconduct or (ii) an Abuse Claim.

### S.    The Official Committees and the Future Claimants' Representative

Except as otherwise described in the Settlement Trust Documents with respect to the Future Claimants' Representative, the Official Committees and the Future Claimants' Representative shall continue in existence until the Effective Date, and after the Effective Date for the limited purposes of: prosecuting requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date.  The Debtors shall pay the reasonable fees and actual and necessary expenses incurred by the Official Committees and the Future Claimants' Representative up to the Effective Date, and after the Effective Date solely for the purposes set forth in the preceding sentence, in accordance with the Compensation Procedures Order, the Fee Examiner Order, and the terms of the Plan, including Article II of the Plan.  As of the Effective Date, the members of the Creditors' Committee shall be released and discharged from all further authority, duties, responsibilities, liabilities, and obligations involving the Chapter 11 Cases.  Upon the closing of the Chapter 11 Cases, the Official Committees shall be dissolved.  Neither the Debtors nor Reorganized BSA have any obligation to pay fees or expenses of any Professional retained by the Official Committees or the Future Claimants' Representative that are earned or incurred before the Effective Date to the extent such fees or expenses (or any portion thereof) qualify as Settlement Trust Expenses, in

which case such fees and expenses (or the applicable portion thereof) shall be paid by the Settlement Trust in accordance with the Settlement Trust Documents.

T.    Retention of Jurisdiction

Until the Chapter 11 Cases are closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction that is permissible, including the jurisdiction necessary to ensure that the purposes and intent of the Plan are carried out.  Except as otherwise provided in the Plan or the Settlement Trust Agreement, the Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against and Interests in the Debtors, and to adjudicate and enforce the Insurance Actions, the Settlement Trust Causes of Action, and all other Causes of Action which may exist on behalf of the Debtors.  Nothing contained herein shall prevent Reorganized BSA or the Settlement Trust, as applicable, from taking such action as may be necessary in the enforcement of any Estate Cause of Action, Insurance Action, Settlement Trust Cause of Action, or other Cause of Action which the Debtors have or may have and which may not have been enforced or prosecuted by the Debtors, which actions or other Causes of Action shall survive Confirmation of the Plan and shall not be affected thereby except as specifically provided herein.  Nothing contained herein concerning the retention of jurisdiction by the Bankruptcy Court shall be deemed to be a finding or conclusion that (1) the Bankruptcy Court in fact has jurisdiction with respect to any Insurance Action, (2) any such jurisdiction is exclusive with respect to any Insurance Action, or (3) abstention or dismissal of any Insurance Action pending in the Bankruptcy Court or the District Court as an adversary proceeding is or is not advisable or warranted, so that another court can hear and determine such Insurance Action(s).  Any court other than the Bankruptcy Court that has jurisdiction over an Insurance Action shall have the right to exercise such jurisdiction.

### 1.    General Retention

Following Confirmation of the Plan, the administration of the Chapter 11 Cases will continue until the Chapter 11 Cases are closed by a Final Order of the Bankruptcy Court.  The Bankruptcy Court shall also retain jurisdiction for the purpose of classification of any Claims and the re-examination of Claims which have been Allowed for purposes of voting, and the determination of such objections as may be filed with the Bankruptcy Court with respect to any Claims.  The failure by the Debtors or Reorganized BSA to object to, or examine, any Claim for the purposes of voting, shall not be deemed a waiver of the rights of the Debtors, Reorganized BSA, or the Settlement Trust, as the case may be, to object to or reexamine such Claim in whole or part.

### 2.    Specific Purposes

In addition to the foregoing, the Bankruptcy Court shall retain jurisdiction, as enumerated in Article XI.C of the Plan, over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan, including jurisdiction to:

>           (a)      modify the Plan after Confirmation pursuant to the provisions of the
>                    Bankruptcy Code and the Bankruptcy Rules;

(b)     correct any defect, cure any omission, reconcile any inconsistency or make any other necessary changes or modifications in or to the Plan, the Trust Documents or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance in the Plan in the event the Effective Date does not occur as provided herein so that the intended effect of the Plan may be substantially realized thereby;

(c)     assure performance by the Settlement Trust and the Disbursing Agent of their respective obligations to make distributions under the Plan;

(d)     enforce and interpret the terms and conditions of the Plan, the Plan Documents, the Settlement Trust Documents, and any Insurance Settlement Agreements;

(e)     enter such orders or judgments, including injunctions (a) as are necessary to enforce the title, rights and powers of Reorganized BSA, and the Settlement Trust, and (b) as are necessary to enable holders of Claims to pursue their rights against any Person that may be liable therefor pursuant to applicable law or otherwise;

(f)     hear and determine any and all motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors that may be pending on the Effective Date (which jurisdiction shall be non-exclusive as to any such non-core matters);

(g)     hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits and similar or related matters, including without limitation contested matters arising on account of transactions contemplated by the Plan, or relating to the period of administration of the Chapter 11 Cases;

(h)     hear and determine all applications for compensation of Professionals and reimbursement of expenses under sections 328, 330, 331, or 503(b) of the Bankruptcy Code;

(i)     hear and determine any Causes of Action arising during the period from the Petition Date to the Effective Date, or in any way related to the Plan or the transactions contemplated hereby, against the Debtors, Reorganized BSA, the Settlement Trust, and their respective Representatives;

(j)     determine any and all motions for the rejection, assumption or assignment of Executory Contracts or Unexpired Leases and the Allowance of any Claims resulting therefrom;

(k)     hear and determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l)     hear and determine the Allowance and/or Disallowance of any Claims, including Administrative Expense Claims, against or Interests in the Debtors or their Estates, including any objections to any such Claims or Interests, and the compromise and settlement of any Claim, including Administrative Expense Claims, against or Interest in the Debtors or their Estates;

(m)     hear and resolve disputes concerning any reserves under the Plan or the administration thereof;

(n)     hear and determine all questions and disputes regarding title to the assets of the Debtors or their Estates, or the Settlement Trust;

(o)     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or if distributions pursuant to the Plan or under the Settlement Trust Documents are enjoined or stayed;

(p)     hear and determine all questions and disputes regarding, and to enforce, the Abuse Claims Settlement;

(q)     hear and determine the Insurance Actions, any Settlement Trust Cause of Action and any similar claims, Causes of Action or rights of the Settlement Trust to construe and take any action to enforce any Insurance Policy, and to issue such orders as may be necessary for the execution, consummation and implementation of any Insurance Policy, and to determine all questions and issues arising thereunder; provided, that such retention of jurisdiction shall not constitute a waiver of any right of a Non-Settling Insurance Company to seek to remove or withdraw the reference of any Insurance Action filed after the Effective Date;

(r)     hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Chapter 11 Cases;

(s)     resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, the Bar Date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(t)     enter in aid of implementation of the Plan such orders as are necessary, including, but not limited to, the implementation and enforcement of the Injunctions, Releases, and Discharges described herein;

(u)     if the Plan is Confirmed as a Global Resolution Plan, hear and determine any questions and disputes pertaining to, and to enforce, the Abuse Claims

Settlement, including the Contributing Chartered Organization Settlement Contribution, the Local Council Settlement Contribution, and the Hartford Settlement Contribution;

(v)     hear and determine any questions and disputes pertaining to, and to enforce, the JPM / Creditors' Committee Settlement;

(w)     enter a Final Order or decree concluding or closing the Chapter 11 Cases; and

(x)     enter and implement such orders as may be necessary or appropriate if any aspect of the Plan, the Settlement Trust, or the Confirmation Order is, for any reason or in any respect, determined by a court to be inconsistent with, to violate, or insufficient to satisfy any of the terms, conditions, or other duties associated with any Insurance Policies; provided, however, that (a) such orders shall not impair the Insurance Coverage Defenses or the rights, claims, or defenses, if any, of any Insurance Company that are set forth or provided for in the Plan, the Plan Documents, the Confirmation Order, or any other Final Orders entered in the Debtors' Chapter 11 Cases, (b) this provision does not, in and of itself, grant this Court jurisdiction to hear and decide disputes arising out of or relating to the Insurance Policies, and (c) all interested parties, including any Insurance Company, reserve the right to oppose or object to any such motion or order seeking such relief.

As of the Effective Date, notwithstanding anything in Article XI of the Plan to the contrary, the Restated Debt and Security Documents and any documents related thereto shall be governed by the jurisdictional provisions thereof and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

### 3.     *Courts of Competent Jurisdiction*

To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the foregoing matters, the reference to the "Bankruptcy Court" in Article XI of the Plan shall be deemed to be replaced by the "District Court." If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

U.     Miscellaneous Provisions

### 1.     *Closing of Chapter 11 Cases*

After each Chapter 11 Case has been fully administered, Reorganized BSA shall file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close such Chapter 11 Case.

**2.      Amendment or Modification of the Plan**

(a)      Plan Modifications.  The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and after entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend, modify or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code unless section 1127 of the Bankruptcy Code requires additional disclosure.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of the Plan, and any holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.  All amendments to the Plan (a) must be reasonably acceptable to JPM and the Creditors' Committee to the extent they pertain to the treatment of the 2010 Credit Facility Claims, the 2019 RCF Claims, the 2010 Bond Claims, or the 2012 Bond Claims (in the case of JPM) or Convenience Claims, General Unsecured Claims, or Non-Abuse Litigation Claims (in the case of the Creditors' Committee) and (b) shall not be inconsistent with the terms of the Hartford Insurance Settlement Agreement (except as provide in Section III.I of such agreement).

(b)      Other Amendments.  Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

**3.      Revocation or Withdrawal of the Plan**

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date.  If the Plan has been revoked or withdrawn prior to the Effective Date, or if Confirmation of the Plan or the occurrence of the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan, including the Settlement Trust Documents, shall be deemed null and void; and (3) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim against, or any Interest in, the Debtors or any other Person; (ii) prejudice in any manner the rights of the Debtors or any other Person; or (iii) constitute an admission of any sort by the Debtors or any other Person.

**4.      Request for Expedited Determination of Taxes**

The Debtors and Reorganized BSA, as applicable, shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns

filed, or to be filed, for any and all taxable periods ending after the Petition Date to and including the Effective Date.

**5.        *Non-Severability of Plan Provisions***

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.   Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation.   The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms, (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors or Reorganized BSA (as the case may be), and (3) nonseverable and mutually dependent.

**6.        *Notices***

All notices, requests, and demands to or upon the Debtors or Reorganized BSA to be effective shall be in writing (including by email transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered, addressed as follows:

> Boy Scouts of America
> 1325 W. Walnut Hill Lane
> Irving, Texas 75015
> Attn:  Steven McGowan, General Counsel
> Email: Steve.McGowan@scouting.org
>
> with copies to:
>
> White & Case LLP
> 1221 Avenue of the Americas
> New York, New York 10020
> Attn:  Jessica C. Lauria
> Email:  jessica.lauria@whitecase.com
>
> – and –
>
> White & Case LLP
> 111 South Wacker Drive, Suite 5100
> Chicago, Illinois 60606
> Attn:  Michael C. Andolina
> Matthew E. Linder

Email: mandolina@whitecase.com
          mlinder@whitecase.com

– and –

Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Attn:  Derek C. Abbott
Email:  dabbott@morrisnichols.com

**7.        *Notices to Other Persons***

After the occurrence of the Effective Date, Reorganized BSA has authority to send a notice to any Person providing that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Person must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; provided, however, that the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary. After the occurrence of the Effective Date, Reorganized BSA is authorized to limit the list of Persons receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee and those Persons that have filed such renewed requests.

**8.        *Governing Law***

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement or any other Plan Document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof; provided, however, that governance matters relating to Reorganized BSA shall be governed by the laws of the District of Columbia.

**9.        *Immediate Binding Effect***

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of any Person named or referred to in the Plan and the successors and assigns of such Person.

**10.        *Timing of Distributions or Actions***

In the event that any payment, Distribution, act or deadline under the Plan is required to be made or performed or occurs on a day that is not a Business Day, then such payment, Distribution, act or deadline shall be deemed to occur on the next succeeding Business Day, but if so made, performed or completed by such next succeeding Business Day, shall be deemed to have been completed or to have occurred as of the required date.

### 11.    Deemed Acts

Whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred by virtue of the Plan or the Confirmation Order without any further act by any Person.

### 12.    Entire Agreement

The Plan Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions, negotiations, understandings and documents.  No Person shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for in the Plan or the other Plan Documents or as may hereafter be agreed to by the affected parties in writing.

### 13.    Plan Supplement

Any and all exhibits, lists, or schedules referred to herein but not filed with the Plan shall be contained in the Plan Supplement to be filed with the Clerk of the Bankruptcy Court prior to the Confirmation Hearing on the Plan, and such Plan Supplement is incorporated into and is part of the Plan as if set forth in full herein.  The Plan Supplement will be available for inspection in the office of the Clerk of the Bankruptcy Court during normal court hours, at the website maintained by the Notice and Claims Agent (https://omniagentsolutions.com/BSA), and at the Bankruptcy Court's website (ecf.deb.uscourts.gov).

### 14.    Withholding of Taxes

The Disbursing Agent, the Settlement Trust or any other applicable withholding agent, as applicable, shall withhold from any assets or property distributed under the Plan any assets or property which must be withheld for foreign, federal, state and local taxes payable with respect thereto or payable by the Person entitled to such assets to the extent required by applicable law.

### 15.    Payment of Quarterly Fees

All Quarterly Fees due and payable prior to the Effective Date shall be paid on or before the Effective Date. The Reorganized Debtors shall pay all such fees that arise after the Effective Date, but before the closing of the Chapter 11 Cases, and shall comply with all applicable statutory reporting requirements.

### 16.    Duty to Cooperate

Nothing in the Plan, the other Plan Documents or the Confirmation Order shall relieve (by way of injunction or otherwise) any Person that is or claims to be entitled to indemnity under an Insurance Policy from any duty to cooperate that may be required by any such Insurance Policy or under applicable law with respect to the defense and/or settlement of any Claim for which coverage is sought under such Insurance Policy.  To the extent that any Person incurs costs in satisfying such duty to cooperate with respect to Abuse Claims, the Settlement Trust shall reimburse Person for all such reasonable out-of-pocket expenses.

### 17.     *Effective Date Actions Simultaneous*

Unless the Plan or the Confirmation Order provides otherwise, actions required to be taken on the Effective Date shall take place and be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

### 18.     *Consent to Jurisdiction*

Upon default under the Plan, Reorganized BSA, the Settlement Trust, the Settlement Trustee, the Official Committees, the Future Claimants' Representative, and the Protected Parties, or any successor thereto, respectively, consent to the jurisdiction of the Bankruptcy Court, and agree that it shall be the preferred forum for all proceedings relating to any such default.

## ARTICLE VII. THE SETTLEMENT TRUST AND TRUST DISTRIBUTION PROCEDURES

A.     The Settlement Trust

### 1.     *Establishment and Purpose of the Settlement Trust*

The Settlement Trust shall be established on the Effective Date irrespective of whether the Plan is Confirmed as a Global Resolution Plan or a BSA Toggle Plan.  The Settlement Trust shall be administered and implemented by the Settlement Trustee as provided in the Trust Documents.  The purposes of the Settlement Trust shall be to assume liability for all Abuse Claims, to hold, preserve, maximize and administer the Settlement Trust Assets, and to direct the processing, liquidation and payment of all compensable Abuse Claims in accordance with the Settlement Trust Documents.  The Settlement Trust Assets include,

a.     if the Plan is Confirmed as a Global Resolution Plan: (i) the BSA Settlement Trust Contribution; (ii) the Local Council Settlement Contribution; (iii) the Chartered Organization Settlement Contribution; and (iv) any and all other funds, proceeds or other consideration otherwise contributed to the Settlement Trust pursuant to the Plan or the Confirmation Order or other Final Order of the Bankruptcy Court.

b.     if the Plan is Confirmed as a BSA Toggle Plan: (i) the BSA Settlement Trust Contribution; and (ii) any and all other funds, proceeds or other consideration otherwise contributed to the Settlement Trust pursuant to the Plan or the Confirmation Order or other Final Order of the Bankruptcy Court.  For the avoidance of doubt, except as may be provided in any Insurance Settlement Agreement, if the Plan is Confirmed as a BSA Toggle Plan, the insurance rights of any Person that is not a Protected Party are expressly reserved for such Person, and the Plan Documents shall not, and shall not be deemed to, transfer, grant, or assign such rights to the Settlement Trust.

The Settlement Trust shall resolve Abuse Claims in accordance with the Settlement Trust Documents in such a way that the holders of Abuse Claims are treated equitably and reasonably in light of the finite assets available to satisfy such Claims.  From and after the Effective Date,

the Abuse Claims shall be channeled to the Settlement Trust pursuant to the Channeling Injunction set forth in Article X.F of the Plan and may be asserted only and exclusively against the Settlement Trust.

In the event of a conflict between the terms or provisions of the Plan and the Settlement Trust Documents, the terms of the Plan shall control.

### 2. Transfer of Claims to the Settlement Trust

On the Effective Date, or as otherwise provided in the Plan, and without further action of any Person, the Settlement Trust shall assume the liabilities, obligations, and responsibilities of the Protected Parties for all Abuse Claims, financial or otherwise. These assumptions by the Settlement Trust shall not affect (a) the application of the Discharge Injunction or the Channeling Injunction or (b) any Non-Settling Insurance Company's obligation under any Insurance Policy that is not the subject of an Insurance Settlement Agreement.

Except as otherwise expressly provided in the Plan, the Settlement Trust Agreement, or the Trust Distribution Procedures, the Settlement Trust shall have control over the Settlement Trust Causes of Action and the Insurance Actions, and the Settlement Trust shall thereby become the Estate Representative pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with the exclusive right (except as otherwise provided in Article IV.D.5 of the Plan) to enforce each of the Settlement Trust Causes of Action and the Insurance Actions, and the proceeds of the recoveries on any of the Settlement Trust Causes of Action or the Insurance Actions shall be deposited in and become the property of the Settlement Trust, and the Settlement Trust shall have the right to enforce the Plan and any of the other Plan Documents (including the Cooperation Agreement) according to their respective terms, including the right to receive the Settlement Trust Assets as provided in the Plan; provided, however, that (a) the Settlement Trust shall have no other rights against the Protected Parties except to enforce the Plan and any of the other Plan Documents; (b) the Settlement Trust Causes of Action and the Insurance Actions shall not include any Claims or Interests fully and finally released, compromised, or settled pursuant to the Plan or any Plan Documents, including if the Plan is Confirmed as a Global Resolution Plan, any Claims against Hartford released, compromised and settled under the Hartford Insurance Settlement Agreement; and (c) for the avoidance of doubt, the Settlement Trust Causes of Action and the Insurance Actions do not include any rights of the Protected Parties arising under the Channeling Injunction or any of the Injunctions, Releases, or Discharges granted under the Plan and the Confirmation Order.

### 3. Transfer of Settlement Trust Assets to the Settlement Trust

On the Effective Date, subject to Article IV.D.2 of the Plan, all right, title, and interest in and to the Settlement Trust Assets and any proceeds thereof shall be automatically, and without further act or deed, transferred to, vested in, and assumed by the Settlement Trust free and clear of all Encumbrances or Claims or other interests of any Person, subject to the Channeling Injunction and other provisions of the Plan.

To the extent any of the Settlement Trust Assets are not transferred to the Settlement Trust by operation of law on the Effective Date pursuant to the Plan, then when such assets

accrue or become transferable subsequent to the Effective Date, they shall automatically and immediately transfer to the Settlement Trust free and clear of all Encumbrances and Claims or other interests of any Person, subject to the Channeling Injunction and other provisions of the Plan.  To the extent that any action of a Protected Party is required to effectuate such transfer, such Protected Party shall promptly transfer, assign, and contribute, such remaining Settlement Trust Assets to the Settlement Trust.  In the event a Protected Party breaches any obligation contained in this section, the Settlement Trust will have no adequate remedy at law and shall be entitled to preliminary and permanent declaratory and injunctive relief.  Article IV.D.2 of the Plan applies, without limitation, to (a) that portion of the Local Council Settlement Contribution required to be contributed to the Settlement Trust after the Effective Date, if the Plan is Confirmed as a Global Resolution Plan, and (b) the transfer to the Settlement Trust of the Warehouse and Distribution Center, subject to the Leaseback Requirement.

### 4.  *The Settlement Trust Distribution Procedures*

On the Effective Date, the Settlement Trust shall implement the applicable Trust Distribution Procedures (the "TDP") in accordance with the terms of the Settlement Trust Agreement.  From and after the Effective Date, the Settlement Trustee shall have the authority to administer, amend, supplement, or modify the TDP solely in accordance with the terms thereof and the Settlement Trust Agreement.

### 5.  *The Settlement Trust Agreement*

The Settlement Trust is formed through the Settlement Trust Agreement, executed by and between BSA and the Settlement Trustee.  The Settlement Trust Agreement describes and dictates the purpose, scope, function, and funding of the Settlement Trust.  Namely, the Settlement Trust Agreement provides that the Settlement Trust is (i) to assume the liability for all Abuse Claims, (ii) to hold, preserve, maximize and administer the Settlement Trust Assets, (iii) to direct the processing, liquidation, and payment of all compensable Abuse Claims, and (iv) resolve Abuse Claims in accordance with the Settlement Trust Documents in such a way that the holders of Abuse Claims are treated equitably and reasonably.  Settlement Trust Agreement § 1.2. The Settlement Trust Agreement provides that the Settlement Trust will be funded through irrevocable transfers of the Settlement Trust Assets, in addition to, without limitation, proceeds received from the Settling Insurance Companies.  Settlement Trust Agreement § 3.1.  The Settlement Trust Agreement also provides for the potential formation of a litigation sub-trust (the Litigation Trust) if necessary under applicable law to pursue litigation in order to further fund the Settlement Trust for the benefit of Abuse Claim holders. Settlement Trust Agreement § 2.1.

To operate the Settlement Trust, the Settlement Trust Agreement appoints a Settlement Trustee and enumerates the Settlement Trustee's powers, duties, and limitations.  These include, among others: the power to distribute assets of the Settlement Trust to holders of Abuse Claims pursuant to the terms and conditions and the procedures for distributions established in the TDP; to assist the Litigation Trustee prosecute Settlement Trust Causes of Action, the Insurance Actions, and the Insurance Coverage Actions on behalf of holders of Abuse Claims; to enforce the Settlement Trust's rights in the Settlement Trust Assets, including through judicial proceedings or bankruptcy/insolvency proceedings; and to make, sign, execute, acknowledge, and deliver any documents that may be necessary or appropriate to effectuate the purposes of the

Settlement Trust or to maintain and administer the Settlement Trust. Settlement Trust Agreement § 4.1. The Settlement Trustee is required under the Settlement Trust Agreement to consult with a Settlement Trust Advisory Committee on matters related to development of a questionnaire for Abuse Claims submissions, Abuse Claims valuations, valuations of Settlement Trust Assets at intervals set forth in the TDP, appropriate percentages of Abuse Claim values for distributions under the TDP, initiation and settlement of litigation against insurers, amendments or modifications to the Settlement Trust Agreement or the TDP, and termination of the Settlement Trust or Litigation Trust. Settlement Trust Agreement § 1.6(b)-(c).

In line with the Settlement Trust's objective, the Settlement Trust Agreement mandates that the Settlement Trust qualify as a "qualified settlement fund" within the meaning of § 468B of the Tax Code and § 468B's associated regulations. Settlement Trust Agreement § 10. To accomplish this, the Settlement Trust Agreement obligates the Settlement Trustee to take all reasonable steps to ensure that the Settlement Trust qualifies as, and remains, a "qualified settlement fund." Settlement Trust Agreement § 10.1. This includes authorizing the Settlement Trustee to take all actions it deems reasonably necessary to ensure that the Settlement Trust is treated as such. Settlement Trust Agreement § 10.5.

Lastly, the Settlement Trust Agreement sets forth the Settlement Trust's termination and associated procedures. Specifically, the Settlement Trust terminates upon the completion of the Settlement Trustee's administration and distribution of the Settlement Trust Assets and with the Bankruptcy Court's entry of a final order approving the termination of the Settlement Trust, but in no event later than the tenth (10th) anniversary of the Effective Date. Settlement Trust Agreement § 5.1. Upon termination of the Settlement Trust, the Settlement Trustee will pay all fees and expenses of the Settlement Trust and distribute all remaining assets to a charity chosen by the BSA. Settlement Trust Agreement § 5.3.

### 6.        *Discharge of Liabilities to Holders of Abuse Claims*

Except as provided in the Plan, the transfer to, vesting in and assumption by the Settlement Trust of the Settlement Trust Assets as contemplated by the Plan shall, as of the Effective Date, discharge all obligations and liabilities of and bar any recovery or action against the Protected Parties for or in respect of all Abuse Claims, including all Indirect Abuse Claims (and the Confirmation Order shall provide for such discharge). The Settlement Trust shall, as of the Effective Date, assume sole and exclusive responsibility and liability for all Abuse Claims and such Claims shall be paid by the Settlement Trust from the Settlement Trust Assets or as otherwise directed in the Settlement Trust Documents.

### 7.        *Imposition of Channeling Injunction*

From and after the Effective Date, all Abuse Claims shall be subject to the Channeling Injunction pursuant to section 105(a) of the Bankruptcy Code and the provisions of the Plan and the Confirmation Order. From and after the Effective Date, the Protected Parties shall not have any obligation with respect to any liability of any nature or description arising out of, relating to, or in connection with any Abuse Claims.

### 8. Insurance Assignment

As of the Effective Date, the Insurance Assignment shall be completed, which includes an assignment and transfer of (a) the Insurance Actions, (b) the Insurance Action Recoveries, (c) the Insurance Settlement Agreements, (d) the Insurance Coverage, and (e) all other rights or obligations under or with respect to the Insurance Policies (but not the policies themselves). The Insurance Assignment does not include any rights or obligations under or with respect to any Insurance Policies that are the subject of an Insurance Settlement Agreement.

Moreover, the Insurance Assignment shall not, and shall not be deemed to, transfer, grant, or assign to the Settlement Trust any insurance rights of any Person that pertain to any Insured Non-Abuse Claims. The insurance rights of any Person that pertain to Insured Non-Abuse Claims are expressly reserved for the such Persons, and the Plan Documents shall not, and shall not be deemed to, transfer, grant, or assign such rights to the Settlement Trust.

Notwithstanding the Insurance Assignment, with respect to any Specified Insurance Policy, and except as may otherwise be provided in an Insurance Settlement Agreement, the right of the Debtors and Reorganized BSA (and any other named or additional insureds under such Specified Insurance Policy) are expressly reserved to (a) tender any Insured Non-Abuse Claims to the Specified Insurance Policies and (b) access the limits of liability of the Specified Insurance Policies to settle or otherwise resolve Insured Non-Abuse Claims. Further, the Settlement Trust cannot settle, compromise, or otherwise resolve any rights, duties, or obligations under the Specified Insurance Policies without the express written consent and approval of the Debtors or Reorganized BSA (and any other named or additional insureds under such Specified Insurance Policy), as applicable, and the Creditors' Committee, prior to its dissolution. Nonetheless, the Settlement Trust shall have the same rights, if any, as the Protected Parties with respect to any Specified Insurance Policy insofar as the Settlement Trust may (i) tender Abuse Claims to the Specified Insurance Policies and (ii) access the limits of liability of the Specified Insurance Policies to pay Abuse Claims pursuant to the Trust Distribution Procedures.

### 9. Settlement Trust Causes of Action

The transfer of the Settlement Trust Causes of Action to the Settlement Trust, insofar as they relate to the ability to defend against or reduce the amount of Abuse Claims, shall be considered the transfer of a non-exclusive right enabling the Settlement Trust to defend itself against asserted Abuse Claims, which transfer shall not impair, affect, alter, or modify the right of any Person, including the Protected Parties, an insurer or alleged insurer, or co-obligor or alleged co-obligor, sued on account of an Abuse Claim or on account of any asserted right relating to any BSA Insurance Policy or Local Council Insurance Policy alleged to provide insurance coverage for an Abuse Claim, to assert each and every defense or basis for claim reduction such Person could have asserted had the Settlement Trust Causes of Action not been assigned to the Settlement Trust (including any defense or basis for claim reduction that any Insurance Company or other insurer or alleged insurer could have asserted under section 502 of the Bankruptcy Code, applicable non-bankruptcy law, or any BSA Insurance Policy, Local Council Insurance Policy or other agreement with respect to (a) any alleged liability of BSA or any Local Council, Contributing Chartered Organization or any other insured Person for any Abuse Claim or (b) any alleged liability of any Insurance Company or other insurer or alleged

insurer to provide indemnity or defense relating to any Abuse Claim or any alleged extracontractual liability of any Insurance Company or other insurer or alleged insurer relating to any Abuse Claim).

### 10.   Indemnification by Settlement Trust

From and after the Effective Date, the Settlement Trust shall indemnify each of the Protected Parties, to the fullest extent lawful, from and against any and all Claims, liabilities, losses, actions, suits, proceedings, third-party subpoenas, damages, costs and expenses (including full reimbursement of all fees and expenses of counsel), as incurred, related to, arising out of, or in connection with any Abuse Claim.

### 11.   Excess Assets in Settlement Trust

To the extent any Settlement Trust Assets remain at such time as the Settlement Trust is dissolved under the terms of the Settlement Trust Documents, any remaining Settlement Trust Assets shall be distributed to Reorganized BSA.

### 12.   Investment Guidelines

All monies held in the Settlement Trust shall be invested, subject to the investment limitations and provisions enumerated in the Settlement Trust Agreement.

### 13.   Settlement Trust Expenses

The Settlement Trust shall pay all Settlement Trust Expenses from the Settlement Trust Assets.  The Settlement Trust shall bear sole responsibility with respect to the payment of the Settlement Trust Expenses.  Additionally, the Settlement Trust shall promptly pay all reasonable and documented Settlement Trust Expenses incurred by any Protected Party for any and all liabilities, costs or expenses as a result of taking action on behalf of or at the direction of the Settlement Trust.

### 14.   Settlement Trustee

There shall be one Settlement Trustee.  The initial Settlement Trustee shall be the Person identified in the Plan Supplement.  Any successor Settlement Trustee shall be appointed in accordance with the terms of the Settlement Trust Agreement.  For purposes of any Settlement Trustee performing his or her duties and fulfilling his or her obligations under the Settlement Trust and the Plan, the Settlement Trust and the Settlement Trustee shall be deemed to be, and the Confirmation Order shall provide that he or she is, a "party in interest" within the meaning of section 1109(b) of the Bankruptcy Code.  The Settlement Trustee shall be the "administrator" of the Settlement Trust as such term is used in Treas. Reg. Section 1.468B-2(k)(3).

### 15. The Settlement Trust Advisory Committee

The Settlement Trust Advisory Committee shall be established pursuant to the Settlement Trust Agreement.   The initial Settlement Trust Advisory Committee shall have three (3) members and shall have the functions, duties, and rights provided in the Settlement Trust

Agreement.    Each member of the Settlement Trust Advisory Committee shall serve in accordance with the terms and conditions of the Settlement Trust Agreement.

### 16.    Compensation of Settlement Trustee and Retention of Professionals

The Settlement Trustee shall be entitled to compensation as provided for in the Settlement Trust Agreement.  The Settlement Trustee may retain and reasonably compensate, without Bankruptcy Court approval, counsel and other professionals as reasonably necessary to assist in their duties as Settlement Trustee, subject to the terms of the Settlement Trust Agreement.  All fees and expenses incurred in connection with the foregoing shall be payable from the Settlement Trust as provided for in the Settlement Trust Agreement.

### 17.    Consent Rights of the Debtors and the Reorganized BSA

The Settlement Trust Documents may not be amended or modified without the consent of the Debtors or the Reorganized BSA, as applicable, which shall not be unreasonably withheld. The Debtors shall also have consent rights with respect to any successor Settlement Trustee and Trust Advisory Committee members, which consent shall not be unreasonably withheld. Notwithstanding any of the foregoing, the Indemnification Obligations of the Settlement Trust described in Article IV.I of the Plan may not be amended or modified without the consent of the Protected Party that is otherwise entitled to indemnification pursuant to those provisions.

### 18.    Cooperation Agreement

The Debtors and the Settlement Trust shall enter into the Cooperation Agreement on the Effective Date substantially in the form contained in the Plan Supplement.  If the Plan is Confirmed as a Global Resolution Plan, (a) the Local Councils and Contributing Chartered Organizations shall also be parties to the Cooperation Agreement and (b) the Cooperation Agreement shall provide for certain documents, books and records of the Debtors (including all portions of the Volunteer Screening Database relating to allegations of Abuse set forth in Proofs of Claim), the Local Councils, and Contributing Chartered Organizations to be shared with the Settlement Trust.  The parties to the Cooperation Agreement shall be bound by the terms thereof.

As is customary, the Cooperation Agreement, under which parties thereto shall provide the Settlement Trust with documents, witnesses, or other information, will be submitted in connection with the Plan Supplement.

### 19.    First Encounter Agreement

The Debtors' rights and obligations, if any, in the FEA will be assigned to the Settlement Trust. However, the Settlement Trust retains the ability to dispute its applicability.

### 20.    Privileged Information

The transfer or assignment of any Privileged Information to the Settlement Trustee shall not result in the destruction or waiver of any applicable privileges pertaining thereto.  Further, with respect to any privileges: (a) they are transferred to or contributed for the sole purpose of enabling the Settlement Trustee to perform their duties to administer the Settlement Trust and for

no other reason; (b) they are vested solely in the Settlement Trustee and not in the Settlement Trust, the Settlement Trust Advisory Committee, or any other Person, committee or subcomponent of the Settlement Trust, or any other Person (including counsel and other professionals) who has been engaged by, represents or has represented any holder of an Abuse Claim; (c) they shall be preserved and not waived; and (d) no privileged information shall be publicly disclosed by the Settlement Trustee or the Settlement Trust or communicated to any Person not entitled to receive such information or in a manner that would diminish the protected status of any such information.  Notwithstanding the foregoing, (i) nothing herein shall preclude the Settlement Trustee from providing information received pursuant to this section to any Insurance Company as necessary to preserve, secure, or obtain the benefit of any rights under any Insurance Policy and (ii) the transfer or assignment of any Privileged Information shall not include any Common-Interest Communications with Insurance Companies.

### 21.  *No Liability*

The Protected Parties shall neither have nor incur any liability to, or be subject to any right of action by, any Person for any act, omission, transaction, event, or other circumstance in connection with or related to the Settlement Trust, the Settlement Trustee, or the Settlement Trust Documents, including the administration of Abuse Claims and the distribution of Settlement Trust Assets by the Settlement Trust, or any related agreement.

### 22.  *U.S. Federal Income Tax Treatment of the Settlement Trust*

The Settlement Trust shall be a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1.  The Settlement Trust shall file (or cause to be filed) statements, returns, or disclosures relating to the Settlement Trust that are required by any Governmental Unit.  The Settlement Trustee shall be responsible for the payment of any taxes imposed on the Settlement Trust or the Settlement Trust Assets, including estimated and annual U.S. federal income taxes in accordance with the terms of the Settlement Trust Agreement.  The Settlement Trustee may request an expedited determination of taxes on the Settlement Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Settlement Trust for all taxable periods through the dissolution of the Settlement Trust.

### 23.  *Institution and Maintenance of Legal and Other Proceedings*

As of the Effective Date, the Settlement Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Settlement Trust, including the Insurance Actions, Abuse Claims, and the Settlement Trust Causes of Action.  Without limiting the foregoing, on and after the Effective Date, the Settlement Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all such actions, in the name of the Debtors or Reorganized BSA, if deemed necessary or appropriate by the Settlement Trust.  The Settlement Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred on or after the Effective Date arising from, relating to, or associated with any legal action or other proceeding which is the subject of Article IV.P of the Plan and shall pay Indirect Abuse Claims, in accordance with the Trust Distribution Procedures, that may arise from deductibles, self-insured

retentions, retrospective premium adjustments, or other charges. Furthermore, without limiting the foregoing, the Settlement Trust shall be empowered to maintain, administer, preserve, or pursue the Insurance Coverage and the Insurance Action Recoveries.

### 24.    Notation on Claims Register Regarding Abuse Claims

On the Effective Date, all Abuse Claims filed against the Debtors in the Chapter 11 Cases shall be marked on the Claims Register as "Channeled to the Settlement Trust" and resolved exclusively in accordance with the Trust Distribution Procedures.

### 25.    Insurance Provisions

As provided in Article X.M of the Plan, the following shall apply to all Entities, including all Insurance Companies:

Except as provided in the Hartford Insurance Settlement Agreement and any other Insurance Settlement Agreement, nothing contained in the Plan, the Plan Documents, or the Confirmation Order, including any provision that purports to be preemptory or supervening, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (a) the rights or obligations of any Insurance Company or (b) any rights or obligations of the Debtors arising out of or under any Insurance Policy. For all issues relating to insurance coverage allegedly provided by Hartford, the provisions, terms, conditions, and limitations of the Hartford Insurance Settlement Agreement (if effective in accordance with its terms and conditions and approved by an order of the Bankruptcy Court) shall control, and for all issues relating to insurance coverage allegedly provided by any other Settling Insurance Company, the provisions, terms, conditions, and limitations of the applicable Insurance Settlement Agreement shall control. For all other issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Insurance Policies shall control. For the avoidance of doubt, nothing contained in the Plan, the Plan Documents, the Confirmation Order, the Affirmation Order, or any findings of fact, conclusions of law or other determinations made in connection therewith (including any estimation or valuation of Abuse Claims or the Debtors' liability for Abuse Claims, either individually or in the aggregate, pursuant to Article V.T of the Plan or pursuant to any other order or agreement entered in the Chapter 11 Cases) shall: (x) operate to require any Insurance Company to indemnify or pay the liability or defense costs of any Protected Party that it would not have been required to pay in the absence of the Plan, the Plan Documents, the Confirmation Order, the Affirmation Order, or of such findings, conclusions and determinations made in connection therewith (including any such estimation or valuation of Abuse Claims or the Debtors' liability for Abuse Claims); (y) establish (i) the liability of the Debtors with respect to any individual Abuse Claim or the Debtors' aggregate liability for Abuse Claims or (ii) the liquidated amount of any such Abuse Claim or Abuse Claims; or (z) impair or affect the right of any Insurance Company or other insurer or alleged insurer (i) to assert all of its rights and defenses under any BSA Insurance Policy or Local Council Insurance Policy and applicable law with respect to coverage of any Abuse Claim or (ii) to assume the defense of any insured Person against any Abuse Claim in the tort system and to assert all of the insured Person's defenses to liability in connection with any such Abuse Claim.

The Plan, the Plan Documents, and the Confirmation Order shall be binding on the Debtors, Reorganized BSA, and the Settlement Trust.  Except as provided in any Insurance Settlement Agreement, the obligations, if any, of the Settlement Trust to pay holders of Abuse Claims shall be determined pursuant to the Plan and the Plan Documents.  Except as provided in Article X.M.4 of the Plan, none of (a) the Bankruptcy Court's or District Court's approval of the Plan or the Plan Documents, (b) the Confirmation Order, the Affirmation Order or any findings or conclusions entered with respect to Confirmation, or (c) any estimation or valuation of Abuse Claims, either individually or in the aggregate (including any agreement as to the valuation of Abuse Claims) in the Chapter 11 Cases shall, with respect to any Insurance Company, constitute or be deemed to constitute a trial or hearing on the merits or an adjudication or judgment, or accelerate the obligations, if any, of any Insurance Company under its Insurance Policies.

No provision of the Plan, other than those provisions contained in the applicable Injunctions contained in Article X of the Plan, shall be interpreted to affect or limit the protections afforded to any Settling Insurance Company by the Channeling Injunction or the Insurance Entity Injunction (if the Plan is Confirmed as a Global Resolution Plan).

Nothing in Article X.M of the Plan is intended or shall be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against any Insurance Company with respect to any issue that is actually litigated by such Insurance Company as part of its objections, if any, to Confirmation or as part of any contested matter or adversary proceeding filed by such Insurance Company in conjunction with or related to Confirmation.  Plan objections that are withdrawn prior to the conclusion of the Confirmation Hearing shall be deemed not to have been actually litigated.

B.    Trust Distribution Procedures under the Global Resolution Plan

If the Global Resolution Plan is confirmed, the Settlement Trust will resolve Abuse Claims through the Trust Distribution Procedures under the Global Resolution Plan (the "Global Resolution Plan TDP"), which are summarized herein and are attached to the Plan as Exhibit A-1.  **Please note that if there are any inconsistencies between this summary and the Global Resolution Plan TDP, the Global Resolution Plan TDP shall govern in all respects.**

The Global Resolution Plan TDP are designed to permit the Settlement Trustee to provide substantially similar treatment to holders of similar, legally valid, and supported Abuse Claims.  The procedures set forth in the Global Resolution Plan TDP will be the sole and exclusive method by which the holder of an Abuse Claim may seek allowance and resolution of his or her Abuse Claim.  With respect to payment of claimants pursuant to the Global Resolution Plan TDP, the Settlement Trustee will be provided broad discretion to determine the allocation of funds in the Settlement Trust to pay (1) each claimant, (2) administrative fees, and (3) legal fees. This includes discretion regarding how to allocate proceeds received from both Settling Insurance Companies and Non-Settling Insurance Companies.  The process for submission of Abuse Claims to the Settlement Trust, review of such Claims by the Settlement Trustee, and the treatment of the valid Claims under the Global Resolution Plan TDP are summarized below.

1.    ***General Trust Procedures***

    a.    **Expedited Distributions**

As set forth in the Plan and Confirmation Order, a Direct Abuse Claimant who properly completes a non-duplicative proof of claim may elect to resolve his or her Abuse Claim for an Expedited Distribution of $1,500.  The Settlement Trust shall make Expedited Distributions to Abuse Claimants who have properly elected to receive the Expedited Distribution, and who have executed an appropriate release, on or as soon as practicable after the Effective Date.  Abuse Claimants that elect to receive the Expedited Distribution will not have to submit any additional information to the Settlement Trust in order to receive payment of the Expedited Distribution from the Settlement Trust.

An Abuse Claimant who elects to receive the Expedited Distribution shall have no other remedies with respect to his or her Abuse Claim against the Settlement Trust, Protected Parties, or any Non-Settling Insurance Company.  An Abuse Claimant who does not properly elect to receive the Expedited Distribution may not later elect to receive the Expedited Distribution.  Abuse Claimants that elect to receive an Expedited Distribution will not be eligible to receive any further distribution on account of their Abuse Claim pursuant to the Global Resolution Plan TDP.

    b.    **Trust Claim Submission**

Each Abuse Claimant that does not make the Expedited Distribution Election and instead elects to pursue recovery from the Settlement Trust pursuant to the Global Resolution Plan TDP must submit his or her claim for determination of validity, insured status, and potential valuation by the Settlement Trustee pursuant to the requirements set forth herein (each, a "<u>Trust Claim Submission</u>").  In order to properly make a Trust Claim Submission, each submitting Abuse Claimant must (a) complete under oath a questionnaire to be developed by the Settlement Trustee in consultation with Reorganized BSA; (b) produce all records and documents requested by the Settlement Trustee, including all documents pertaining to all settlements, awards, or contributions already received, or that are expected to be received, from BSA or other sources; (c) consent to and cooperate in any examinations requested by the Settlement Trustee (including by healthcare professionals selected by the Settlement Trustee) (a "<u>Trustee Interview</u>"); and (d) consent to and cooperate in a written and/or oral examination under oath if requested to do so by the Settlement Trustee.  To complete the evaluation of each Abuse Claim submitted through a Trust Claim Submission (each a "<u>Submitted Abuse Claim</u>"), the Settlement Trustee also may, but is not required to, obtain additional evidence from the Abuse Claimant or from other parties pursuant to the Cooperation Agreement Obligations (as defined in the Global Resolution Plan TDP).

    c.    **Cooperation**

The Settlement Trust shall perform all obligations under the Insurance Policies issued by the Non-Settling Insurance Companies in order to maintain coverage and obtain the benefit of coverage under such policies.  Such obligations shall include any requirement to share documents, witnesses, or other information with the Non-Settling Insurance Companies, to the extent required under the relevant insurance policies (the "<u>Trust Cooperation Obligations</u>").  In

addition, the parties to the Cooperation Agreement shall provide the Settlement Trust with documents, witnesses, or other information as provided therein (the "Cooperation Agreement Obligations" and together with the Trust Cooperation Obligations, the "Cooperation Obligations").  Other than their Cooperation Agreement Obligations owed to the Settlement Trust, the Settlement Trust's counterparties thereto shall have no obligation to act in any capacity in the claims resolution process under the Global Resolution Plan TDP.

### d.    **Deceased Abuse Survivor**

The Settlement Trustee shall review the claim of a deceased Abuse Claimant without regard to the Abuse Claimant's death, except that the Settlement Trustee may require evidence that the person submitting the claim on behalf of the decedent is authorized to do so.

### 2.    *Trust Evaluation Procedures*

### a.    **General**

The claims review and validation procedures set forth in Article IV of the Global Resolution Plan TDP will apply to all Submitted Abuse Claims.

### b.    **Claims Evaluation**

The Settlement Trustee shall evaluate each Submitted Trust Claim individually, and shall follow the procedures and guidelines outlined below in order to provide substantially the same treatment to holders of similar Abuse Claims.  After a review of the documentation provided by the Abuse Claimant in his or her Trust Claim Submission, materials received pursuant to the Cooperation Agreement Obligations, and any follow-up materials or examinations (including, without limitation, any Trustee Interview), the Settlement Trustee will either find the Abuse Claim to be legally valid or invalid.  In order to make this determination, among other things, the Settlement Trustee must evaluate each Submitted Abuse Claim to determine whether the evidence viably supports a finding that:

> (i)    the Abuse Claimant timely filed a proper Proof of Claim in the Chapter 11 Cases prior to the Bar Date and the Claim is not barred by any statute of limitations, repose, or by other applicable law, or—if the Proof of Claim is defective or untimely, or the Claim is barred by a statute of limitations, repose, or other applicable law—the strength of the evidence supporting the Submitted Abuse Claim warrants making a distribution from the Settlement Trust to the holder of such Claim;
>
> (ii)    the Submitted Abuse Claim had not been previously resolved by litigation and/or settlement with a Protected Party or through the tort system; and
>
> (iii)    the Abuse Claimant at issue in the Submitted Abuse Claim was abused by an employee or volunteer of a Protected Party or by a Scout participant; *provided, however*, that if the Protected Party

referenced in this subsection is a Contributing Chartered Organization, the Abuse asserted in the Submitted Abuse Claim occurred in connection with the Contributing Chartered Organization's sponsorship of one or more Scouting units.

c.    **Invalid Abuse Claims**

Except as otherwise provided in the Global Resolution Plan TDP, the Settlement Trustee finds that the evidence submitted by the Abuse Claimant in a Trust Claim Submission does not support a viable claim against a Protected Party in the tort system, the Settlement Trustee shall make a determination that the Submitted Abuse Claim is invalid and provide written notice of its determination to the relevant Abuse Claimant (an "Invalid Claim Notice").

Such determination may be based on a conclusion that the information provided in the Trust Claim Submission is fraudulent or insufficient to demonstrate a viable claim against a Protected Party, that the Abuse Claim is time-barred or procedurally deficient, or any other grounds that the Settlement Trustee in her discretion may find appropriate. The Settlement Trustee shall have discretion to determine whether a defect in the Abuse Claimant's Proof of Claim or Trust Claim Submission should invalidate a Submitted Abuse Claim. For example, if the Settlement Trustee finds that a Submitted Abuse Claim (including the related Proof of Claim, if any) is strong enough to warrant distribution on the Claim from the Settlement Trust, the Settlement Trustee may find that the Submitted Abuse Claim is valid despite the defect or untimeliness of the Claim and assign points to such Claim pursuant to Article V of the Global Resolution Plan TDP. If the Settlement Trustee finds that a Submitted Abuse Claim is invalid, the Settlement Trustee will not conduct a valuation analysis described in Article V of the Global Resolution Plan TDP.

Abuse Claimants shall have the ability to seek reconsideration of the Settlement Trustee's determination set forth in the Invalid Claim Notice as described in Section 4.6 of the Global Resolution Plan TDP.

d.    **Valid Abuse Claims**

If the Settlement Trustee finds that a Submitted Abuse Claim is valid, the Settlement Trustee shall utilize the Claims Matrix and Points Scaling Factors described in Article V of the Global Resolution Plan TDP to assign a proposed Claims Matrix tier and Points Scaling Factors to such Abuse Claim (the "Proposed Claim Valuation"), and provide written notice of validity, Proposed Claim Valuation, and the Initial Settlement Trust Corpus Scaling Factor (as defined below) and any Subsequent Trust Corpus Scaling Factor(s) (to the extent they have been determined) to the Abuse Claimant (a "Valid Claim Notice" and together with the Invalid Claim Notice, a "Claim Notice") as set forth in Section 4.5 of the Global Resolution Plan TDP.

e.    **Treatment of Valid Abuse Claims**

The Settlement Trustee shall provide a Valid Claim Notice for any Submitted Abuse Claim that the Settlement Trustee determines to be valid under Sections 4.2 and 4.4 of the Global Resolution Plan TDP to the relevant Abuse Claimant. The Abuse Claimant shall have the ability to seek reconsideration of the Proposed Claim Valuation set forth in the Valid Claim Notice as

described in <u>Section 4.6</u> of the Global Resolution Plan TDP.  If the Abuse Claimant accepts the Settlement Trustee's Proposed Claim Valuation or the reconsideration process set forth in <u>Section 4.6</u> has been exhausted (and no further action has been taken by the Abuse Claimant in the tort system pursuant to <u>Article IX</u> of the Global Resolution Plan TDP), the subject Submitted Abuse Claim shall become a settled claim at the Proposed Claim Valuation amount (a  "<u>Settled Claim</u>") and receive treatment in accordance with <u>Article VI</u> of the Global Resolution Plan TDP, subject to the Abuse Claimant executing the form of release set forth in <u>Section 5.6</u> of the Global Resolution Plan TDP.

f.    <b>Reconsideration of Settlement Trustee's Determination</b>

An Abuse Claimant may make a request for reconsideration of (i) the validity of his or her Submitted Abuse Claim, or (ii) regarding the Proposed Claim Valuation (a "<u>Reconsideration Request</u>"), within 30 days of receiving a Claim Notice from the Settlement Trust.  Each Reconsideration Request must be accompanied by a check or money order for $500 as an administrative fee for reconsideration.  The Abuse Claimant may submit further evidence in support of the Submitted Abuse Claim with the Reconsideration Request.  The Settlement Trustee will have sole discretion whether to grant the Reconsideration Request.  The decision to grant the Reconsideration Request does not guarantee that the Settlement Trustee will reach a different result after reconsideration.

If the Reconsideration Request is denied, the administrative fee will not be returned and the Settlement Trustee will notify the Abuse Claimant within 30 days of receiving the request that it will not reconsider the Abuse Claimant's Submitted Abuse Claim.  The Abuse Claimant shall retain the ability to pursue the Settlement Trust in the tort system as described in <u>Article IX</u> in the Global Resolution Plan TDP.

If the Reconsideration Request is granted, the Settlement Trustee will provide the Abuse Claimant written notice within 30 days of receiving the Reconsideration Request that it is reconsidering the Abuse Claimant's Submitted Abuse Claim.  The Settlement Trustee will then reconsider the Submitted Abuse Claim (in consultation with a Non-Settling Insurance Company if the Abuse Claim is an Insured Abuse Claim)—including all new information provided by the Abuse Claimant in the Reconsideration Request and any additional Trustee Interview—and will have the discretion to find that the Submitted Abuse Claim in question is valid and/or should receive a new Proposed Claim Valuation.

If the Settlement Trustee determines upon reconsideration that a Submitted Abuse Claim is valid and/or should receive a new Proposed Claim Valuation, the Settlement Trustee will deliver a Valid Claim Notice and return the administrative fee to the relevant Abuse Claimant.  If the Settlement Trustee determines upon reconsideration that the totality of the evidence submitted by the Abuse Claimant does not support changing the earlier finding that the Submitted Abuse Claim is invalid or Proposed Claim Valuation, the Settlement Trustee's earlier determinations as to validity and/or Proposed Claim Valuation shall stand and the Settlement Trustee will provide a Claim Notice to the Abuse Claimant of either result within 90 days of delivering notice of accepted reconsideration to the Abuse Claimant.  The Abuse Claimant shall retain the ability to pursue the Settlement Trust for reconsideration of its claim determination in the tort system as described in <u>Article IX</u> of the Global Resolution Plan TDP.

### 3.    *Claims Matrix and Points Scaling Factors*

a.    **Points System**

The Settlement Trustee shall utilize the claims matrix (the "<u>Claims Matrix</u>") and points scaling factors ("<u>Points Scaling Factors</u>") set forth in <u>Sections 5.3 and 5.4</u> of the Global Resolution Plan TDP as the basis to determine a Proposed Claim Valuation for each valid Submitted Abuse Claim.

b.    **Conversion of Points to Cash Payments**

Points assigned to a valid Submitted Abuse Claim will be converted to a recovery dollar amount to be determined by an aggregate scaling factor consisting of the Initial Settlement Trust Corpus Scaling Factor and any Subsequent Settlement Trust Scaling Factor(s) (each as defined below) (the "<u>Settlement Trust Corpus Scaling Factor</u>"), which is the ratio of the expected size of the Settlement Trust corpus (allowing for a reserve for Settlement Trust operating expenses and Abuse Claims litigated in the tort system) to the expected total points assigned to all Submitted Abuse Claims evaluated by the Settlement Trustee (including Future Abuse Claims).  By way of example, if the Settlement Trust corpus is expected to be valued at net $1.5 billion and the Settlement Trustee expects the total points assigned to all Submitted Abuse Claims evaluated by the Settlement Trustee (including Future Abuse Claims) to be 4.5 billion, the Settlement Trust Corpus Scaling Factor will be one third, meaning that the cash payment value of a point is $1 to 3 points, and consequently, a Settled Claim assigned 300,000 points would receive $100,000.  In contrast, as a further example, if the Settlement Trust corpus is expected to be $4.5 billion, the Settlement Trust Corpus Scaling Factor will be one, meaning the cash payment value of a point would instead be $1 to 1 point, and in that circumstance, a Settled Claim assigned 300,000 points would instead receive $300,000.  As set forth in <u>Sections 6.2, 6.3, and 6.4</u> in the Global Resolution Plan TDP, the Settlement Trustee (with the approval of the STAC) will set an initial scaling factor and then, if the Settlement Trust corpus is larger, will increase the Settlement Trust Corpus Scaling Factor by subsequent scaling factor increases proportionate to the increased size of the Settlement Trust corpus.

c.    **Claims Matrix**

The Claims Matrix establishes five tiers of types of abuse, and provides ranges of points assignable to a Submitted Abuse Claim in each tier.  The first two columns of the Claims Matrix delineate the five possible tiers to which a Submitted Abuse Claim can be assigned based on the nature of the abuse.  The base points column for each tier represents the default point value for a Submitted Abuse Claim assigned to a given tier prior to application of the Point Scaling Factors described in <u>Section 5.4</u> of the Global Resolution Plan TDP (the "<u>Base Points</u>").  The maximum points column for each tier represents maximum point values a Submitted Abuse Claim assigned to a given tier can receive based on application of the Point Scaling Factors described in <u>Section 5.4</u> of the Global Resolution Plan TDP (the "<u>Maximum Points</u>").  The ultimate recovery to a holder of a Settled Claim may vary upward (in the case of a larger-than-expected Settlement Trust corpus) or downward (in the case of a smaller-than-expected Settlement Trust corpus) from the Base Points and Maximum Points values in the Claims Matrix based on the Trust Corpus Scaling Factor determined by the Settlement Trustee.  If a Submitted Abuse Claim would fall

into more than one tier, the Submitted Abuse Claim will be placed in the highest applicable tier. An Abuse Claimant cannot have multiple Submitted Abuse Claims assigned to different tiers.[60]

| Tier | Type of Abuse | Base Points | Maximum Points |
|------|---------------|-------------|----------------|
| 1 | Anal or Vaginal Penetration by Adult Perpetrator | 600,000 | 2,700,000 |
| 2 | Oral or Digital Penetration by Adult Perpetrator<br><br>Anal or Vaginal Penetration by a Youth Perpetrator | 450,000 | 2,025,000 |
| 3 | Masturbation by Adult Perpetrator<br><br>Oral or Digital Penetration by a Youth Perpetrator | 300,000 | 1,350,000 |
| 4 | Touching of the Sexual or Other Intimate Parts (unclothed) by Adult Perpetrator | 150,000 | 675,000 |
| 5 | Touching of the Sexual or Other Intimate Parts (clothed)<br><br>Touching of the Sexual or Other Intimate Parts (clothed or unclothed) by a Youth Perpetrator<br><br>Sexual Abuse – No Touching;<br><br>Other Abuse – Not Sexual | 75,000 | 337,500 |

d.    **Points Scaling Factors**

After the Settlement Trustee has assigned a valid Submitted Abuse Claim to one of the five tiers in the Claims Matrix, the Settlement Trustee will utilize the Points Scaling Factors described below to set the points attributable to each Submitted Abuse Claim. These scaling factors can increase or decrease the number of points assigned to a Submitted Abuse Claim depending on the severity of the facts underlying the Claim. By default, the value of each scaling factor is one, meaning that in the absence of the application of the scaling factor, the Base Points assigned to a Claim are not affected by that factor. In contrast, if the Settlement Trustee determines that a particular scaling factor as applied to a given Submitted Abuse Claim is 1.5, the number of points assigned the Submitted Abuse Claim are increased by 50%, the

---

[60]    The proposed Maximum Points values in the Claims Matrix demonstrates the anticipated maximum dollar values for Submitted Abuse Claims in tiers 1–5 when the Trust Corpus Scaling Factor is one. However, the value of the total Settlement Trust corpus may result in a higher or lower Trust Corpus Scaling Factor depending on the amounts of recoveries from Non-Settling Insurance Companies, and total points awarded. The Settlement Trust Corpus Scaling Factor accommodates the potential variances in the Settlement Trust corpus size by scaling the point values assigned to Submitted Abuse Claims based on the size of the Settlement Trust corpus.

result of multiplying the Base Points of the Submitted Abuse Claim by 1.5.  The combined effect of all scaling factors is determined by multiplying the scaling factors together then multiplying the result by the Base Points of the Submitted Abuse Claim.

**Aggravating Factors**: The Settlement Trustee may assign upward Point Scaling Factors to each Submitted Abuse Claim based on the following categories:

(i) **Nature of Abuse and Circumstances**.  To account for particularly severe abuse or aggravating circumstances, the Settlement Trustee may assign an upward Point Scaling Factor of up to 1.5 to each Submitted Abuse Claim.  The hypothetical base case scenario for this scaling factor would involve a single incident of abuse during a BSA sponsored event with a single perpetrator held in high regard by the victim and in a position of trust within BSA as an employee or volunteer.  The hypothetical base case is incorporated into the Base Points in the Claims Matrix' tiers and would not receive an increase on account of this factor.  By way of example, aggravating factors that can give rise to a higher scaling factor include, but are not limited to, the following factors:

1. Unusual duration and/or multiple circumstance of the abuse;

2. Repeated targeting and grooming behaviors including but not limited to special privileges, special activities, and attention, social relationship with parents, personal relationship with Claimant, opportunity to experience sports or activities, isolation from others, use of alcohol or illicit drugs by abuser or Claimant, or use of or exposure to pornography;

3. Coercion or threat or use of force or violence, stalking;

4. Multiple perpetrators involved in sexual misconduct.

(ii) **Abuser Profile**.  To account for the alleged abuser's profile, the Settlement Trustee may assign of up an upward Point Scaling Factor of up to 2.0 to a Submitted Abuse Claim.  This factor is to be evaluated relative to a hypothetical base case scenario of an unknown abuser who is only accused of abuse by one Abuse Claimant.  The hypothetical base case is incorporated into the Base Points in the Claims Matrix' tiers and would not receive an increase on account of this factor.  An upward Point Scaling Factor may be applied for this category as follows (the Settlement Trustee may only apply the scaling factor of the single highest applicable category listed below):

1. 1.25 if the abuser was accused by at least one (1) other Abuse Claimant;

2. 1.5 if the abuser was accused by five (5) or more other Abuse Claimants;

3.      2.0 if the abuser was accused by ten (10) or more other Abuse Claimants.

In addition, an upward Point Scaling Factor may also be applied for this category if the Protected Party(ies) knew, or had reason to know, that the alleged perpetrator was likely to commit acts of Abuse against individuals involved in Scouting.

(iii)    **Impact of the Abuse**.  To account for the impact of the alleged abuse on the Abuse Claimant's mental health, physical health, inter-personal relationships, vocational capacity or success, academic capacity or success, and whether the alleged abuse at issue resulted in legal difficulties for the Abuse Claimant, the Settlement Trustee may assign an upward Point Scaling Factor of up to 1.5.  This factor is to be evaluated relative to a hypothetical base case scenario of a victim of abuse who suffered the typical level of abuse-related distress within the tier to which the Submitted Abuse Claim was assigned.   The hypothetical base case is incorporated into the base points in the Claims Matrix' tiers and would not receive an increase on account of this factor.  The Settlement Trustee will consider, along with any and all other relevant factors, whether the abuse at issue manifested or otherwise led the Abuse Claimant to experience or engage in behaviors resulting from:

1.      Mental Health Issues:  This includes but is not limited to anxiety, depression, post-traumatic stress disorder, substance abuse, addiction, embarrassment, fear, flashbacks, nightmares, sleep issues, sleep disturbances, exaggerated startle response, boundary issues, self-destructive behaviors, guilt, grief, homophobia, hostility, humiliation, anger, isolation, hollowness, regret, shame, isolation, sexual addiction, sexual problems, sexual identity confusion, low self-esteem or self-image, bitterness, suicidal ideation and suicide attempts.

2.      Physical Health Issues:  This includes but is not limited to physical manifestations of emotional distress, gastrointestinal issues, headaches, high blood pressure, physical manifestations of anxiety, erectile dysfunction, heart palpitations, sexually-transmitted diseases, physical damage caused by acts of abuse, reproductive damage, self-cutting and other self-injurious behavior.

3.      Interpersonal Relationships:  This includes but is not limited to problems with authority figures, hypervigilance, sexual problems, marital difficulties, problems with intimacy, lack of trust, isolation, betrayal, impaired relations, secrecy, social discreditation and isolation; damage to family relationships, and fear of children or parenting;

4.  <u>Vocational Capacity</u>:  This includes but is not limited to under- and un-employment, difficulty with authority figures, difficulty changing and maintaining employment, feeling of unworthiness or guilt related to financial success.

5.  <u>Academic Capacity</u>:  This includes but is not limited to school behavior problems.

6.  <u>Legal Difficulties</u>:  This includes but is not limited to criminal difficulties, bankruptcy, fraud.

**Potential Mitigating Factors**.  The Settlement Trustee may assign a Point Scaling Factor in the range of 0 to 1.0 to each Submitted Abuse Claim to decrease the points awarded to such Claim.  This factor is to be evaluated relative to a hypothetical base case scenario of an abuse claim with solidly credible evidence of abuse that occurred during a BSA sponsored event involving a perpetrator held in high regard and in a position of trust within BSA as an employee or volunteer.  The hypothetical base case is incorporated into the base points in the Claims Matrix' tiers and would not receive a decrease on account of this factor.  Such factors may include but are not limited to the following:

(i)  **Absence of Protected Party Relationship or Presence of Another Responsible Party**.  In certain circumstances, a Protected Party's responsibility for a perpetrator may be factually or legally attenuated, mitigated, or non-existent.  For example, the perpetrator may have maintained a relationship with the Abuse Claimant through a separate affiliation, such as a school, religious organization, or as a family member of the Abuse Claimant; or the abuse occurred in settings unrelated to Scouting or where a Protected Party did not have the ability or responsibility to exercise control.  By way of non-exhaustive example, familial abuse—even if the perpetrator was also a Protected Party employee and the abuse occurred on a Scouting activity—should result in a significant reduction or wholesale elimination, of points.

(ii)  **Other Settlements, Awards, Contributions, or Limitations**.  The Settlement Trustee should consider the amounts of any settlements or awards already received by the Abuse Claimant from other sources as well as expected contributions from other sources that are related to the abuse.  By way of example, the Settlement Trustee should assign an appropriate Point Scaling Factor to Submitted Abuse Claims capped by charitable immunity under the laws of the jurisdiction where the abuse occurred.

(iii)  **Defectiveness**.  If the Abuse Claimant filed a defective Proof of Claim or filed its Proof of Claim after the Bar Date, or if the evidence provided by the Abuse Claimant indicates that the Submitted Abuse Claim is time barred based on prevailing law in the jurisdictions in which the abuse occurred, the Settlement Trustee may reduce the points assigned to such Claim by assigning a Point Scaling Factor of less than one.  The Settlement Trustee should weigh the strength of the evidence supporting

the Submitted Abuse Claim to determine whether such Claim should receive mitigation on account of its defectiveness or untimeliness. The Settlement Trustee may assign a mitigating factor of zero (0) in cases where the Settlement Trustee determines that the Submitted Abuse Claim is fully barred, but may, however, assign a factor of up to one (1) if the Settlement Trustee determines that the evidence supporting the Submitted Abuse Claim warrants distribution from the Settlement Trust despite its defectiveness or untimeliness.

(iv)    **Incomplete or Suspicious Evidence of Abuse**.  If the evidence provided by the Abuse Claimant does not establish by a preponderance of the evidence that the abuse occurred, the identity of the abuser, the location of the abuse, or when the abuse occurred the Settlement Trustee shall reduce the points of the Submitted Abuse Claim by assigning a Point Scaling Factor of less than one.  If the Settlement Trustee believes the evidence provided is deliberately false or misleading, the Settlement Trustee will assign a Point Scaling Factor of zero (0).

(v)    **Absence of Notice**.  If the evidence provided by the Abuse Claimant does not establish by a preponderance of the evidence that the Protected Party(ies) knew, or had reason to know, that the alleged perpetrator was likely to commit acts of Abuse against individuals involved in Scouting, the Settlement Trustee shall reduce the points assigned to such Claim by assigning a Point Scaling Factor of less than one.  The Settlement Trustee should weigh the strength of the evidence demonstrating knowledge of the risk of potential abuse by the perpetrator to determine the appropriate factor of mitigation.

e.    **Claims Calculus**

After the Settlement Trustee has assigned a Submitted Abuse Claim to a claim tier and determined the appropriate Point Scaling Factors to apply to the Claim, the total points to be assigned to the Submitted Abuse Claim are to be determined as the product of the Base Points of the Claim and the Point Scaling Factors applied to the Claim.  In no event can a Submitted Abuse Claim's point value exceed the Maximum Points value for the Claim's assigned tier.

By way of example, if a Submitted Abuse Claim is determined by the Settlement Trustee to be a tier 1 claim with a Base Point value of 600,000, with a Point Scaling Factor of 1.5 for the nature and circumstances of the abuse, and a mitigating point scaling factor of 0.75, and no other Point Scaling Factors, the number of points assigned to the Claim (the Proposed Claim Valuation) would be 675,000 points calculated as 600,000 x 1.5 x 0.75 = 675,000.  As a further example, if, in addition to the above Point Scaling Factors, the same Submitted Abuse Claim had an additional aggravating Point Scaling Factor of 2.0 on account of the alleged abuser's profile, the points assigned to the Abuse Claim (the Proposed Claim Valuation) would be twice as much, namely 1,350,000 (600,000 x 1.5 x .75 x 2.0).  If, on the other hand, for example the Settlement Trustee believes the evidence provided for the Submitted Abuse Claim was deliberately false or

misleading, the Settlement Trustee will assign a mitigating Point Scaling Factor of zero, in which case the Claim would be assigned a point value (the Proposed Claim Valuation) of zero.

To determine the dollar value for each Submitted Abuse Claim, the Settlement Trustee will multiply the point value of the Claim by the Trust Corpus Scaling Factor. In the above example of a Submitted Abuse Claim assigned a point value of 1,350,000, if the Trust Corpus Scaling Factor is 1/3, the Submitted Abuse Claim would be valued at $450,000 (1,350,000 x 1/3). If instead the Trust Corpus Scaling Factor is one, the Submitted Abuse Claim would be valued at $1,350,000. If the Settlement Trust corpus exceeds its expected value and the Trust Corpus Scaling Factor is 1.5, except as otherwise provided herein with respect to Submitted Abuse Claims litigated to final judgement in the tort system, the Submitted Abuse Claim would be valued at $2,025,000 (1,350,000 x 1.5). In the other example above of a Submitted Abuse Claim assigned a point value of zero, the Claim's dollar value would be $0.

### 4. *Payment of Settled Claims*

#### a. **Settled Claim Payment**

After a Submitted Abuse Claim becomes a Settled Claim, as described in Article IV of the Global Resolution Plan TDP, the Settlement Trust shall pay an initial distribution ("Initial Distribution") to the holder of such Settled Claim within 30 days of the Claim becoming a Settled Claim and the Settlement Trust establishing the Initial Settlement Trust Corpus Scaling Factor (as defined below).

#### b. **Initial Distribution Payment Scaling Factor**

After analyzing the Submitted Abuse Claims and determining the number of Submitted Abuse Claims and the likely, aggregate Proposed Claim Valuations for all Settled Claims and value of the Settlement Trust Assets at that time, the Settlement Trustee and the STAC shall determine, pursuant to the terms and conditions set forth in the Trust Agreement, the appropriate initial Settlement Trust corpus scaling factor (the "Initial Settlement Trust Corpus Scaling Factor"). For this purpose, the Settlement Trustee will calculate the Initial Settlement Trust Corpus Scaling Factor as the ratio of the then available Settlement Trust Assets (accounting for future Settlement Trust operating expenses and Submitted Abuse Claims litigated in the tort system pursuant to Article IX of the Global Resolution Plan TDP) to the total points assigned to all Submitted Abuse Claims (accounting for Future Abuse Claims). By way of example, if the available Settlement Trust Assets are $1.5 billion and the Settlement Trustee calculates the total points assigned to all Submitted Abuse Claims to be 4.5 billion, the Initial Settlement Trust Corpus Scaling Factor would be one third, meaning that the cash payment value of a point for initial payment purposes is $1.00 for every 3 points.

#### c. **Payment of Initial Distribution**

The Settlement Trust will make an Initial Distribution to each holder of a Settled Claim based on the Initial Settlement Trust Corpus Scaling Factor while at the same time maintaining sufficient assets in the Settlement Trust for payment of operating expenses, additional Settled Claims, and lawsuits against the Settlement Trust. With respect to Settled Claims that are Insured Abuse Claims (as defined below), the Settlement Trustee shall make such Initial

Distribution (and any further distributions) regardless of the status of any litigation seeking coverage from any Insurance Companies.

d.    <strong>Subsequent Payments</strong>

As the Settlement Trust obtains additional assets through indemnity payments and recoveries from coverage litigation or settlements with Non-Settling Insurance Companies (or otherwise), or determines that amounts reserved for operating expenses can be reduced, the Settlement Trust's corpus will increase and more funds will become available for distribution to Abuse Claimants on account of Settled Claims. Consequently, every six months after the payment of the Initial Distribution, the Settlement Trustee shall conduct an evaluation of the total value of the Settlement Trust Assets then available for distribution, and the aggregate points value of Settled Claims. In consultation with the STAC, the Settlement Trustee will then determine when subsequent distributions (each a "<u>Subsequent Distribution</u>") should be made to Abuse Claimants on account of Settled Claims and at what additional factor, by updating the Settlement Trust Corpus Scaling Factor (each additional factor, a "<u>Subsequent Settlement Trust Corpus Scaling Factor</u>"). Holders of Settled Claims that have not yet received an Initial Distribution prior to the Settlement Trustee's determination to make a Subsequent Distribution shall receive as an Initial Distribution the points value of their Claim multiplied by the Initial Settlement Trust Corpus Scaling Factor plus any Subsequent Settlement Trust Corpus Scaling Factor(s). By way of example, if a Settled Claim is assigned 900,000 points, and the Settlement Trust has established an Initial Settlement Trust Corpus Scaling Factor of one third and a Subsequent Settlement Trust Corpus Scaling Factor of one sixth before the Claim becomes a Settled Claim, the Abuse Claimant holding such Claim will receive an initial payment of $450,000, or the sum of the product of 900,000 x 1/3 ($300,000) plus the product of 900,000 x 1/6 ($150,000).

Payments will be made to holders of Insured Abuse Claims and uninsured Abuse Claims using the same Settlement Trust Corpus Scaling Factor and in the same manner as described in <u>Article VI</u> of the Global Resolution Plan TDP.

e.    <strong>Release</strong>

In order for a Submitted Abuse Claim to become a Settled Claim and for the relevant Abuse Claimant to receive any payment from the Settlement Trust, the Abuse Claimant must submit an executed form of release to be developed by the Settlement Trustee in consultation with Reorganized BSA. Payments made by the Settlement Trust to the holder of a Settled Claim pursuant to the process and procedures described herein shall be in full and complete satisfaction of the Abuse Claimant's Abuse Claim.

<strong><em>5.    Tender of Insured Abuse Claims and Coverage Litigation with Insurers</em></strong>

a.    <strong>Rights of Settlement Trust Against Non-Settling Insurance Companies</strong>

Pursuant to the Plan, the Settlement Trust will take assignment of BSA's rights under the BSA Insurance Policies. For any Abuse Claim that the Settlement Trustee determines is a valid Abuse Claim pursuant to <u>Article IV</u> of the Global Resolution Plan TDP, the Settlement Trustee

172

will determine, based on the relevant Trust Claim Submission and any other information submitted in connection with that submission and materials obtained through the Cooperation Agreement, whether any Non-Settling Insurance Company issued coverage that is available to respond to such Claim (an "Insured Abuse Claim").  The Settlement Trustee may determine that multiple Non-Settled Insurance Companies have responsibility for an Insured Abuse Claim.

b.    **Treatment of Insured Abuse Claims**

The Settlement Trustee shall tender each Insured Abuse Claim (including the Proposed Claim Valuation)—along with all information related to the subject Insured Abuse Claim gathered pursuant to the Global Resolution Plan TDP—to the applicable Non-Settling Insurance Company(ies) for review and coverage determination prior to sending the relevant Abuse Claimant his or her Valid Claim Notice.  The applicable Non-Settling Insurance Company will have 60 days to review each Insured Abuse Claim tendered to it by the Settlement Trust and provide written notice to the Settlement Trust of whether it will cover, in whole or in part, the Proposed Claim Valuation of a particular Insured Settled Claim or decline to provide coverage of such Insured Settled Claim (a "Coverage Determination Notice").  If the Non-Settling Insurance Company denies coverage, the Coverage Determination Notice must provide an explanation of the reason for the denial.

c.    **Reimbursement of Insured Abuse Claims**

For Insured Abuse Claims that a Non-Settling Insurance Company agrees to cover pursuant to a Coverage Determination Notice, the Non-Settling Insurance Company shall reimburse the Settlement Trust for its share of the amount of the Proposed Claim Valuation for such claim, applying an assumed Settlement Trust Corpus Scaling Factor of one (1), within 30 days of such claim becoming a Settled Claim.  The decision by a Non-Settling Insurance Company to cover its share of an Insured Abuse Claim shall be deemed to be a compromise of a disputed claim and shall not have any collateral estoppel or *res judicata* effect for any future claim, nor shall it be deemed to be an admission with respect to coverage.

d.    **Coverage Disputes**

For Insured Abuse Claims where a Non-Settling Insurance Company declines to cover pursuant to a Coverage Determination Notice, the Settlement Trust will have the right to pursue the Non-Settling Insurance Company in coverage litigation for the Non-Settling Insurance Company's share of the Proposed Claim Valuation or judgment or settlement amount, as applicable.  The Settlement Trust will have the right to bring such coverage actions in one or more consolidated actions.  For purposes of this section, the dollar value of an Insured Abuse Claim shall be calculated based on an assumed Trust Corpus Scaling Factor of one (1).  The Settlement Trust shall also have the option to negotiate a settlement of coverage issues with each Non-Settling Insurance Company to obtain the benefit of insurance coverage under any Non-Settling Insurance Policy.  All amounts recovered by the Settlement Trust through coverage litigation or settlements shall flow into the corpus of the Settlement Trust for distribution or payment of Settlement Trust operating expenses, including payment of Abuse Claims, in accordance with the Trust Agreement and the Global Resolution Plan TDP.

e. **No Direct Action Right**

Abuse Claimants shall have no rights against the Non-Settling Insurance Companies.

f. **Rights of Non-Settling Insurance Companies**

Nothing in the Global Resolution Plan TDP (a) shall affect, impair, or prejudice the rights and defenses of the Non- Settling Insurance Companies in any manner; (b) shall in any way operate to, or have the effect of, impairing or having any *res judicata*, collateral estoppel, or other preclusive effect on any party's legal, equitable, or contractual rights or obligations under any Non-Settling Insurance Policy in any respect; or (c) shall otherwise determine the applicability or non-applicability of any provision of any Non-Settling Insurance Policy and any such rights and obligations shall be determined under Non-Settling Insurance Policies and applicable law.  Additionally, any action by the Settlement Trust against any Non-Settling Insurance Company may be brought in a court of competent jurisdiction other than the Bankruptcy Court; *provided, however*, that nothing herein waives any right of the Settlement Trust to elect arbitration to the extent the relevant Non-Settling Insurance Policy provides for such.

g. **Results of Negotiation or Litigation**

If the Settlement Trustee obtains a settlement or final judgment against a Non-Settling Insurance Company, the proceeds from such judgment or settlement will flow into the Settlement Trust corpus.  To the extent a deductible is owed to the Non-Settling Insurance Company in order for the Settlement Trust to obtain the insurance proceeds from a final judgment or settlement, any such deductible shall be submitted to the Settlement Trust as an Indirect Abuse Claim.

6. *Indirect Claims*

a. **Indirect Abuse Claims**

An Indirect Abuse Claim asserted against the Settlement Trust shall be reviewed by the Settlement Trustee and treated as valid and paid by the Settlement Trust pursuant to the distribution methodology set forth in the Global Resolution Plan TDP if (a) such Indirect Abuse Claim satisfied the requirements of the Bar Date, and is not otherwise disallowed by section 502(e) of the Bankruptcy Code (subject to the right of the holder of the Indirect Abuse Claim to seek reconsideration under section 502(j) of the Bankruptcy Code) or subordinated under section 509(c) of the Bankruptcy Code, and (b) the holder of the Indirect Abuse Claim establishes to the satisfaction of the Settlement Trustee that (i) the holder has paid the liability and obligation of the Settlement Trust to the individual claimant to whom the Settlement Trust would otherwise have had a liability or obligation under the Global Resolution Plan TDP (and which has not been paid by the Settlement Trust), (ii) the Settlement Trust and Protected Parties are forever and fully released from all liability related thereto, and (iii) the Indirect Abuse Claim is not otherwise barred by a statute of limitations or repose or by other applicable law.

b.      **Offset**

The liquidated value of any Indirect Abuse Claim paid by the Settlement Trust shall be treated as an offset to or reduction of the full liquidated value of any Direct Abuse Claim that might be subsequently asserted against the Settlement Trust.

*7.      Tort System Alternative*

a.      **Exhaustion of Trust Distribution and Reconsideration Procedures**

If an Abuse Claimant has appealed a Claim Notice through the reconsideration process described in <u>Section 4.6</u> of the Global Resolution Plan TDP and the Abuse Claimant disagrees with the Settlement Trustee's final determination regarding the validity or valuation of the subject Submitted Abuse Claim, the Abuse Claimant may file a lawsuit against the Settlement Trust for reconsideration of his or her Submitted Abuse Claim in any court of competent jurisdiction.  An Abuse Claimant that elects to file a lawsuit under this provision forfeits any Proposed Claim Valuation offered by the Settlement Trust, and recovery, if any, is limited to settlement or judgment from such lawsuit as provided in the Global Resolution Plan TDP.

b.      **Tender to Non-Settling Insurance Company**

If an Abuse Claimant elects to file suit against the Settlement Trust as provided herein, the Settlement Trustee shall determine, based on the Trust Claim Submission and any other information obtained in connection with that submission and materials received in connection with the Cooperation Obligations, whether any Non-Settling Insurance Company issued coverage that is available to respond to the lawsuit (an "<u>Insured Lawsuit</u>").  The Settlement Trustee may determine that there are multiple Non-Settled Insurance Companies that have responsibility for an Insured Lawsuit.  The Settlement Trustee shall tender any Insured Lawsuit to each Non-Settling Insurance Company from whom the Settlement Trustee determines insurance coverage may be available.

c.      **Acceptance of Tender**

A Non-Settling Insurance Company shall have 60 days to determine whether to accept an Insured Lawsuit that is tendered to it.

d.      **Limit on Settlement Trust Liability**

An Abuse Claimant who pursues the Settlement Trust in the tort system shall not be able to receive from the Settlement Trust more than the dollar value of a Settled Claim that is assigned the Maximum Points in the applicable tier set forth in the Claims Matrix assuming a Settlement Trust Corpus Scaling Factor of one (1).  By way of example, for an Abuse Claimant asserting tier one abuse, the maximum damages amount that Abuse Claimant is allowed to sue the Settlement Trust for in the relevant tort system is $2,700,000, or 2,700,000 points (the Maximum Points in tier one) multiplied by an assumed Settlement Trust Corpus Scaling Factor of one (1).

e.    **Parties to Lawsuit**

Any lawsuit commenced under Section 9.1 of the Global Resolution Plan TDP must be filed by the Abuse Claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit.  The potential parties that may be defendants in the lawsuit shall be limited to the Settlement Trust; an Abuse Claimant may not sue any of the Protected Parties or Non-Settling Insurance Companies.

f.    **Defenses**

All defenses (including, with respect to the Settlement Trust, all defenses that could have been asserted by the Debtors, except as otherwise provided in the Plan) shall be available to both sides at trial; however, for any uninsured Abuse Claim or Insured Abuse Claim where no Insurance Company has agreed to provide a defense, the Settlement Trust may waive any defense and/or concede any issue of fact or law.  In cases where a Non-Settling Insurance Company has agreed to provide a defense, such Insurance Company retains all liability defenses.

g.    **Costs**

Each party's costs of litigation shall be borne by that party.  An Abuse Claimant may not seek costs or expenses in the lawsuit filed against the Settlement Trust.

h.    **Settlement or Final Judgment**

The defending Non-Settling Insurance Company or, if no Insurance Company is defending, the Settlement Trust, is authorized to settle any lawsuit by an Abuse Claimant for an amount it determines appropriate in light of the circumstances of the case, subject to the limitations that the Settlement Trust or defending Non-Settling Insurance Company may not settle any claim for an amount that exceeds the amount that exceeds its potential liability for that Abuse Claim pursuant to Section 9.4 of the Global Resolution Plan TDP.

i.    **Payment of Judgments by the Settlement Trust**

If and when an Abuse Claimant obtains a final judgment or settlement against the Settlement Trust or defending Non-Settling Insurance Company in the tort system, such judgment or settlement amount shall be treated for purposes of distribution under the Global Resolution Plan TDP as the Abuse Claimant's Proposed Valuation Amount.  Within 30 days of executing the release as set forth in Section 6.5 of the Global Resolution Plan TDP, the Abuse Claim in question shall become a Settled Claim and the Abuse Claimant shall receive an Initial Distribution (based on the Initial Settlement Trust Corpus Scaling Factor and any Subsequent Settlement Trust Corpus Scaling Factor in effect at such time) from the Settlement Trust. Thereafter, the Abuse Claimant shall receive any Subsequent Distributions based on any Subsequent Settlement Trust Corpus Scaling Factor(s) as determined by the Settlement Trust. Under no circumstances shall the Settlement Trust pay interest under any statute on any judgments obtained by an Abuse Claimant in the tort system.  Non-Settling Insurance Companies that choose to defend a lawsuit against the Settlement Trust under Article IX of the Global Resolution Plan TDP shall pay the full amount of any judgment or settlement achieved by the Abuse Claimant to the Settlement Trust for distribution through the Global Resolution Plan TDP.

### 8.   *Miscellaneous Provisions*

#### a.    **Non-Binding Effect of Settlement Trust and/or Litigation Outcome**

Notwithstanding any other provision of the Global Resolution Plan TDP, a decision by the Settlement Trust to pay or not to pay any Submitted Abuse Claim shall not be used in, be admissible as evidence in, binding in, or have any *res judicata*, collateral estoppel, or other preclusive effect in any lawsuit or other proceeding against any other entity other than the Settlement Trust.  Notwithstanding any other provision of the Global Resolution Plan TDP, the outcome of litigation against the Debtors by the holder of an Indirect Abuse Claim shall not be used in, be admissible as evidence in, binding in or have any other preclusive effect in connection with the Settlement Trust's resolution or valuation of an Indirect Abuse Claim.

#### b.    **Amendments**

Except as otherwise provided in the Trust Distribution Procedures, the Settlement Trustee may not amend, modify, delete, or add to any provisions of the Global Resolution Plan TDP, without the written consent of the STAC.  Nothing in the Trust Distribution Procedures is intended to preclude the STAC from proposing to the Settlement Trustee, in writing, amendments to the Global Resolution Plan TDP.

#### c.    **Severability**

Should any provision contained in the Global Resolution Plan TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Global Resolution Plan TDP.  Should any provision contained in the Global Resolution Plan TDP be determined to be inconsistent with or contrary to Debtors' obligations to any Insurance Company providing Insurance Coverage to the Debtors in respect of claims for personal injury for which the Debtors have legal responsibility, the Settlement Trustee, with the consent of the STAC, may amend the Global Resolution Plan TDP and/or the Trust Agreement to make the provisions of either or both documents consistent with the duties and obligations of the Debtors to said Insurance Company.

#### d.    **Governing Law**

Administration of the Global Resolution Plan TDP shall be governed by, and construed in accordance with, the laws of the State of Delaware.  The law governing litigation in the tort system shall be the law of the jurisdiction in which the Abuse Claimant files the lawsuit as described in Article IX of the Global Resolution Plan TDP.

### C.    Trust Distribution Procedures under the BSA Toggle Plan

If the BSA Toggle Plan is confirmed, the Settlement Trust will resolve Abuse Claims through the Trust Distribution Procedures under the BSA Toggle Plan (the "BSA Toggle Plan TDP"), which are summarized herein and are attached to the Plan as Exhibit A-2.  **Please note that if there are any inconsistencies between this summary and the BSA Toggle Plan TDP, the BSA Toggle Plan TDP shall govern in all respects.**

The BSA Toggle Plan TDP are designed to permit the Settlement Trustee to provide substantially similar treatment to holders of similar, legally valid, and supported Abuse Claims. The procedures set forth in the BSA Toggle Plan TDP will be the sole and exclusive method by which the holder of an Abuse Claim may seek allowance and resolution of his or her Abuse Claim, and will provide a mechanism for tendering and liquidating certain Abuse Claims through the tort system as and to the extent provided in the BSA Toggle Plan TDP.  As a general principle, the BSA Toggle Plan TDP are intended to set out procedures that provide substantially the same treatment to holders of similar Abuse Claims, subject to differing assets, including insurance assets, that may be available to compensate certain Abuse Claims.  The process for submission of Abuse Claims to the Settlement Trust and treatment of the Claims under the BSA Toggle Plan TDP are summarized below.

    *1.*     ***General Trust Procedures***

      a.      **Expedited Distribution**

For the avoidance of doubt, under the BSA Toggle Plan the Settlement Trust will not make the Expedited Distributions as contemplated in the Plan and solicitation materials, and Abuse Claimants that elected to receive an Expedited Distribution will be eligible to receive treatment pursuant to the BSA Toggle Plan TDP; *provided, however*, the Settlement Trustee may create a similar expedited distribution option in a *de minimis* amount, if, after consultation with the STAC, the Settlement Trustee determines that creation of such an expedited liquidation process is warranted in order to simplify processing Abuse Claims under the BSA Toggle Plan TDP.

      b.      **Trust Claim Submission**

Each Abuse Claimant that elects to pursue recovery from the Settlement Trust pursuant to the BSA Toggle Plan TDP must submit his or her claim for determination of insured status and, where applicable, validity and potential valuation by the Settlement Trustee pursuant to the requirements set forth herein (each, a "Trust Claim Submission").  In order to properly make a Trust Claim Submission, each submitting Abuse Claimant must (a) complete under oath a questionnaire to be developed by the Settlement Trustee in consultation with Reorganized BSA; (b) produce all records and documents requested by the Settlement Trustee, including all documents pertaining to all settlements, awards, or contributions already received, or that are expected to be received, from BSA or other sources; (c) consent to and cooperate in any examinations requested by the Settlement Trustee (including by healthcare professionals selected by the Settlement Trustee) (a "Trustee Interview"); and (d) consent to and cooperate in a written and/or oral examination under oath if requested to do so by the Settlement Trustee.  To complete the evaluation of each Abuse Claim submitted through a Trust Claim Submission (each a "Submitted Abuse Claim"), the Settlement Trustee also may, but is not required to, obtain additional evidence from the Abuse Claimant or from other parties pursuant to the Cooperation Agreement Obligations (as defined in the BSA Toggle Plan TDP).

      c.      **Cooperation**

The Settlement Trust shall perform all obligations under the BSA Insurance Policies issued by the Insurance Companies in order to maintain coverage and obtain the benefit of

coverage under such policies.    Such obligations shall include any requirement to share documents, witnesses, or other information with the Insurance Companies, to the extent required under the relevant insurance policies (the "Trust Cooperation Obligations").    In addition, the parties to the Cooperation Agreement shall provide the Settlement Trust with documents, witnesses, or other information as provided therein (the "Cooperation Agreement Obligations" and together with the Trust Cooperation Obligations, the "Cooperation Obligations").    Other than their Cooperation Agreement Obligations owed to the Settlement Trust, the Settlement Trust's counterparties thereto shall have no obligation to act in any capacity in the claims resolution process under the BSA Toggle Plan TDP.

### d.    Deceased Abuse Claim Holders

.   The Settlement Trustee shall review the Abuse Claim of a deceased Abuse Claimant without regard to the Abuse Claimant's death, except that the Settlement Trustee may require evidence that the person submitting the Abuse Claim on behalf of the decedent is authorized to do so.

### e.    Insured Status of Abuse Claims

The Settlement Trustee shall determine whether each Submitted Abuse Claim is potentially covered by a collectible Insurance Policy (each, an "Insured Abuse Claim"), or is uninsured or covered only by an Insurance Policy that is exhausted, unavailable or uncollectible (each, an "Uninsured Abuse Claim").    In order to make such determination, the Settlement Trustee will determine when the alleged acts of Abuse occurred and which BSA Insurance Policy(ies) may provide coverage for the period in question.    No Abuse Claim shall be determined to be an Uninsured Abuse Claim merely because of the presence of deductibles that may reduce an Insurance Company's obligations.

(i)    **Insured Abuse Claims**.  For any Abuse Claim that is determined to be an Insured Abuse Claim, the Settlement Trustee shall follow the procedures in Article IV of the BSA Toggle Plan TDP, and shall not follow the procedures set forth in Article V–Article VIII of the BSA Toggle Plan TDP (except as otherwise provided in Section 4.2 of the Trust Distribution Procedures).

(ii)    **Uninsured Abuse Claims**.    For any Abuse Claim that is determined to be an Uninsured Abuse Claim, the Settlement Trustee shall follow the procedures set forth in Article V–Article VIII of the BSA Toggle Plan TDP to liquidate the Abuse Claim.

## 2.    *Insured Abuse Claim Procedures*

### a.    Tender of Insured Abuse Claims Required

The Settlement Trustee shall tender each Insured Abuse Claim to all Insurance Companies that the Settlement Trustee believes, or has reason to believe, may provide coverage for such Abuse Claim.  An Insurance Company shall have no obligation to provide coverage for any Abuse Claim that is not tendered to it.

b.    **Rejection of Tender**

If no Insurance Company accepts tender of an Abuse Claim from the Settlement Trustee for defense within 60 days from the date of tender (a "Non-Tender Insured Abuse Claim"), then the Settlement Trustee shall move forward under the BSA Toggle Plan TDP as though the Non-Tender Insured Abuse Claim were an Uninsured Abuse Claim, and may proceed to liquidate such Non-Tender Insured Abuse Claim in accordance with Articles V–VII of the BSA Toggle Plan TDP and seek coverage from any applicable Insurance Company to which the Settlement Trustee has tendered that Abuse Claim pursuant to Article VIII of the BSA Toggle Plan TDP.

c.    **Acceptance of Tender**

If any Insurance Company accepts the tender of such Abuse Claim within 60 days of receipt of the tender and agrees to provide a defense, then the Settlement Trustee shall not evaluate that Abuse Claim under Articles V–VI of the BSA Toggle Plan TDP, and Articles V–VI of the BSA Toggle Plan TDP shall not apply.  Liquidation of such Abuse Claim shall occur exclusively through the tort system.  The Settlement Trustee shall notify the holder of such Abuse Claim that the Abuse Claim is an Insured Abuse Claim, identify the Insurance Company(ies) that have agreed to defend the Abuse Claim, and inform the Abuse Claimant that he or she is required to bring a lawsuit in a court of competent jurisdiction against the Settlement Trust to prosecute such Abuse Claim.  Absent the timely filing of such a suit, neither the Settlement Trust nor any Insurance Company shall have any further liability for the Abuse Claim.  The Abuse Claimant may also satisfy this requirement by substituting the Settlement Trust as a defendant in an existing pre-petition action or by adding the Settlement Trust as a defendant to an existing lawsuit against co-defendants that are allegedly liable for the same acts of Abuse.  Service of such lawsuit shall be made upon the Settlement Trust and any defending Insurance Company.  The Insurance Company(ies) that accept(s) tender of the Insured Abuse Claim shall defend the Settlement Trust and satisfy any judgment or settlement obtained by the Abuse Claimant in the lawsuit pursuant to Section 10.9 of the BSA Toggle Plan TDP.

d.    **Confidentiality**

The Settlement Trust shall not voluntarily disseminate to any Abuse Claimant or their counsel any documents or information that could compromise the defense of any Abuse Claim, and the Settlement Trust shall ensure that any applicable privileges and confidentiality protections are preserved in this regard.

e.    **Insurance Companies' Rights Preserved**

Nothing in the BSA Toggle Plan TDP (a) shall affect, impair, or prejudice the rights and defenses of the Insurance Companies in any manner; (b) shall in any way operate to, or have the effect of, impairing or having any *res judicata*, collateral estoppel, or other preclusive effect on any party's legal, equitable, or contractual rights or obligations under any BSA Insurance Policy in any respect; or (c) shall otherwise determine the applicability or non-applicability of any provision of any Insurance Policy and any such rights and obligations shall be determined under BSA Insurance Policies and applicable law.  Additionally, any action by the Settlement Trust

against any Insurance Company may be brought in a court of competent jurisdiction other than the Bankruptcy Court; *provided, however*, that nothing herein waives any right of the Settlement Trust to elect arbitration to the extent the relevant BSA Insurance Policy provides for such.

### 3.    *Trust Evaluation Procedures for Uninsured Abuse Claims*

#### a.    **General**

The claims review and validation procedures set forth in <u>Article V</u> of the BSA Toggle Plan TDP apply only to Uninsured Abuse Claims  and Non-Tender Insured Abuse Claims.  The procedures set forth in <u>Article V</u> of the BSA Toggle Plan TDP do not apply to Insured Abuse Claims accepted for defense by one or more Insurance Companies.

#### b.    **Claims Evaluation**

The Settlement Trustee shall evaluate each eligible Trust Claim Submission individually, and shall follow the procedures and guidelines outlined below in order to provide substantially the same treatment to holders of similar Abuse Claims.  After a review of the documentation provided by the Abuse Claimant in his or her Trust Claim Submission, materials received pursuant to the Cooperation Agreement Obligations, and any follow-up materials or examinations (including, without limitation, any Trustee Interview), the Settlement Trustee will either find the Abuse Claim to be legally valid or invalid.  In order to make this determination, among other things, the Settlement Trustee must evaluate each Submitted Abuse Claim to determine whether the evidence viably supports a finding that:

> (i)    the Abuse Claimant timely filed a proper Proof of Claim in the Chapter 11 Cases prior to the Bar Date and the Claim is not barred by any statute of limitations, repose, or by other applicable law, or—if the Proof of Claim is defective or untimely, or the Claim is barred by a statute of limitations, repose, or other applicable law— the strength of the evidence supporting the Submitted Abuse Claim warrants making a distribution from the Settlement Trust to the holder of such Claim;

> (ii)    the Submitted Abuse Claim had not been previously resolved by litigation and/or settlement with a Protected Party or through the tort system; and

> (iii)    the Abuse Claimant at issue in the Submitted Abuse Claim was abused by an employee or volunteer of a Protected Party or by a Scout participant.

#### c.    **Invalid Abuse Claims**

Except as otherwise provided herein, if the Settlement Trustee finds that the evidence submitted by the Abuse Claimant in a Trust Claim Submission does not support a viable claim against a Protected Party in the tort system, the Settlement Trustee shall make a determination

that the Submitted Abuse Claim is invalid and provide written notice of its determination to the relevant Abuse Claimant (an "Invalid Claim Notice").

Such determination may be based on a conclusion that the information provided in the Trust Claim Submission is fraudulent or insufficient to demonstrate a viable claim against a Protected Party, that the Abuse Claim is time-barred or procedurally deficient, or any other grounds that the Settlement Trustee in her discretion may find appropriate.  The Settlement Trustee shall have discretion to determine whether a defect in the Abuse Claimant's Proof of Claim or Trust Claim Submission should invalidate a Submitted Abuse Claim.  For example, if the Settlement Trustee finds that a Submitted Abuse Claim (including the related Proof of Claim, if any) is strong enough to warrant distribution on the claim from the Settlement Trust, the Settlement Trustee may find that the Submitted Abuse Claim is valid despite the defect or untimeliness of the Claim and assign points to such Claim pursuant to **Error! Reference source not found.** below.  If the Settlement Trustee finds that a Submitted Abuse Claim is invalid, the Settlement Trustee will not conduct a valuation analysis described in Article VI of the BSA Toggle Plan TDP.

Abuse Claimants shall have the ability to seek reconsideration of the Settlement Trustee's determination set forth in the Invalid Claim Notice as described in Section 5.6 of the BSA Toggle Plan TDP.

### d.    **Valid Abuse Claims**

If the Settlement Trustee finds that a Submitted Abuse Claim is valid, the Settlement Trustee shall utilize the Claims Matrix and Points Scaling Factors described in Article V of the BSA Toggle Plan TDP to assign a proposed Claims Matrix tier and Points Scaling Factors to such Abuse Claim (the "Proposed Claim Valuation"), and provide written notice of validity, Proposed Claim Valuation, and the Initial Settlement Trust Corpus Scaling Factor (as defined below) and any Subsequent Trust Corpus Scaling Factor(s) (to the extent they have been determined) to the Abuse Claimant (a "Valid Claim Notice" and together with the Invalid Claim Notice, a "Claim Notice") as set forth in Section 5.5 of the BSA Toggle Plan TDP.

### e.    **Treatment of Valid Abuse Claims**

The Settlement Trustee shall provide a Valid Claim Notice for any Submitted Abuse Claim that the Settlement Trustee determines to be valid under Sections 5.2 and 5.4 of the BSA Toggle Plan TDP to the relevant Abuse Claimant.  The Abuse Claimant shall have the ability to seek reconsideration of the Proposed Claim Valuation set forth in the Valid Claim Notice as described in Section 5.6 of the BSA Toggle Plan TDP.  If the Abuse Claimant accepts the Settlement Trustee's Proposed Claim Valuation or the reconsideration process set forth in Section 5.6 has been exhausted (and no further action has been taken by the Abuse Claimant in the tort system pursuant to Article X of the BSA Toggle Plan TDP), the subject Submitted Abuse Claim shall become a settled claim at the Proposed Claim Valuation amount (a  "Settled Claim") and receive treatment in accordance with Article VII of the BSA Toggle Plan TDP, subject to the Abuse Claimant executing the form of release set forth in Section 7.5 of the BSA Toggle Plan TDP, to be developed by the Settlement Trustee in consultation with Reorganized BSA.

### f.      Reconsideration of Settlement Trustee's Determination

An Abuse Claimant may make a request for reconsideration of (i) the validity of his or her Submitted Abuse Claim, or (ii) the Proposed Claim Valuation (a "Reconsideration Request"), within 30 days of receiving a Claim Notice from the Settlement Trust.  Each Reconsideration Request must be accompanied by a check or money order for $500 as an administrative fee for reconsideration.  The Abuse Claimant may submit further evidence in support of the Submitted Abuse Claim with the Reconsideration Request.  The Settlement Trustee will have sole discretion whether to grant the Reconsideration Request.  The decision to grant the Reconsideration Request does not guarantee that the Settlement Trustee will reach a different result after reconsideration.

If the Reconsideration Request is denied, the administrative fee will not be returned and the Settlement Trustee will notify the Abuse Claimant within 30 days of receiving the request that it will not reconsider the Abuse Claimant's Submitted Abuse Claim.  The Abuse Claimant shall retain the ability to pursue the Settlement Trust in the tort system as described in Article X in the BSA Toggle Plan TDP.

If the Reconsideration Request is granted, the Settlement Trustee will provide the Abuse Claimant written notice within 30 days of receiving the Reconsideration Request that it is reconsidering the Abuse Claimant's Submitted Abuse Claim.  The Settlement Trustee will then reconsider the Submitted Abuse Claim (in consultation with the applicable Insurance Company(ies) if the Submitted Abuse Claim is an Insured Abuse Claim)—including all new information provided by the Abuse Claimant in the Reconsideration Request and any additional Trustee Interview—and will have the discretion to find that the Submitted Abuse Claim in question is valid and/or should be receive a new Proposed Claim Valuation.

If the Settlement Trustee determines upon reconsideration that a Submitted Abuse Claim is valid and/or should receive a new Proposed Claim Valuation, the Settlement Trustee will deliver a Valid Claim Notice and return the administrative fee to the relevant Abuse Claimant.  If the Settlement Trustee determines upon reconsideration that the totality of the evidence submitted by the Abuse Claimant does not support changing the earlier finding that the Submitted Abuse Claim is invalid or the Proposed Claim Valuation, the Settlement Trustee's earlier determinations as to validity and/or regarding the Proposed Claim Valuation shall stand and the Settlement Trustee will provide a Claim Notice to the Abuse Claimant of either result within 90 days of delivering notice of accepted reconsideration to the Abuse Claimant.  The Abuse Claimant shall retain the ability to pursue the Settlement Trust for reconsideration of its claim determination in the tort system as described in Article X of the BSA Toggle Plan TDP.

### 4.      *Claims Matrix and Points Scaling Factors*

### a.      Points System

The Settlement Trustee shall utilize the claims matrix (the "Claims Matrix") and points scaling factors ("Points Scaling Factors") set forth in Sections 6.3 and 6.4 of the BSA Toggle Plan TDP as the basis to determine a Proposed Claim Valuation for each valid Submitted Abuse Claim that is an Uninsured Abuse Claim or Non-Tender Insured Abuse Claim.  This Claims

Matrix shall not apply to any Insured Abuse Claim for which an Insurance Company has tendered and agreed to provide a defense.

### b.    Conversion of Points to Cash Payments

Points assigned to a valid Submitted Abuse Claim will be converted to a recovery dollar amount to be determined by an aggregate scaling factor consisting of the Initial Settlement Trust Corpus Scaling Factor and any Subsequent Settlement Trust Scaling Factor(s) (each as defined below) (the "Settlement Trust Corpus Scaling Factor"), which is the ratio of the expected size of the Settlement Trust corpus (allowing for a reserve for Settlement Trust operating expenses and Abuse Claims litigated in the tort system) to the expected total points assigned to all Submitted Abuse Claims evaluated by the Settlement Trustee (including Future Abuse Claims).  By way of example, if the Settlement Trust corpus is expected to be valued at net $1.5 billion and the Settlement Trustee expects the total points assigned to all Submitted Abuse Claims evaluated by the Settlement Trustee (including Future Abuse Claims) to be 4.5 billion, the Settlement Trust Corpus Scaling Factor will be one third, meaning that the cash payment value of a point is $1 to 3 points, and consequently, a Settled Claim assigned 300,000 points would receive $100,000.  In contrast, as a further example, if the Settlement Trust corpus is expected to be $4.5 billion, the Settlement Trust Corpus Scaling Factor will be one, meaning the cash payment value of a point would instead be $1 to 1 point, and in that circumstance, a Settled Claim assigned 300,000 points would instead receive $300,000.  As set forth in Sections 7.2, 7.3, and 7.4 in the BSA Toggle Plan TDP, the Settlement Trustee (with the approval of the STAC) will set an initial scaling factor and then, if the Settlement Trust corpus is larger, will increase the Settlement Trust Corpus Scaling Factor by subsequent scaling factor increases proportionate to the increased size of the Settlement Trust corpus.

### c.    Claims Matrix

The Claims Matrix establishes five tiers of types of abuse, and provides ranges of points assignable to a Submitted Abuse Claim in each tier.  The first two columns of the Claims Matrix delineate the five possible tiers to which a Submitted Abuse Claim can be assigned based on the nature of the abuse.  The base points column for each tier represents the default point value for a Submitted Abuse Claim assigned to a given tier prior to application of the Point Scaling Factors described in Section 6.4 of the BSA Toggle Plan TDP (the "Base Points").  The maximum points column for each tier represents maximum point values a Submitted Abuse Claim assigned to a given tier can receive based on application of the Point Scaling Factors described in Section 6.4 of the BSA Toggle Plan TDP (the "Maximum Points").  The ultimate recovery to a holder of a Settled Claim may vary upward (in the case of a larger-than-expected Settlement Trust corpus) or downward (in the case of a smaller-than-expected Settlement Trust corpus) from the Base Points and Maximum Points values in the Claims Matrix based on the Trust Corpus Scaling Factor determined by the Settlement Trustee.  If a Submitted Abuse Claim would fall into more than one tier, the Submitted Abuse Claim will be placed in the highest applicable tier.  An Abuse Claimant cannot have multiple Submitted Abuse Claims assigned to different tiers.[61]

---

[61]    The proposed Maximum Points values in the Claims Matrix demonstrates the anticipated maximum dollar values for Submitted Abuse Claims in tiers 1–5 when the Trust Corpus Scaling Factor is one.  However, the value of the total Settlement Trust corpus may result in a higher or lower Trust Corpus Scaling Factor depending on the amounts of recoveries

| Tier | Type of Abuse | Base Points | Maximum Points |
|------|---------------|-------------|----------------|
| 1 | Anal or Vaginal Penetration by Adult Perpetrator | 600,000 | 2,700,000 |
| 2 | Oral or Digital Penetration by Adult Perpetrator<br><br>Anal or Vaginal Penetration by a Youth Perpetrator | 450,000 | 2,025,000 |
| 3 | Masturbation by Adult Perpetrator<br><br>Oral or Digital Penetration by a Youth Perpetrator | 300,000 | 1,350,000 |
| 4 | Touching of the Sexual or Other Intimate Parts (unclothed) by Adult Perpetrator | 150,000 | 675,000 |
| 5 | Touching of the Sexual or Other Intimate Parts (clothed)<br><br>Touching of the Sexual or Other Intimate Parts (clothed or unclothed) by a Youth Perpetrator<br><br>Sexual Abuse – No Touching;<br><br>Other Abuse – Not Sexual | 75,000 | 337,500 |

d.    **Points Scaling Factors**

After the Settlement Trustee has assigned a valid Submitted Abuse Claim to one of the five tiers in the Claims Matrix, the Settlement Trustee will utilize the Points Scaling Factors described below to set the points attributable to each Submitted Abuse Claim.  These scaling factors can increase or decrease the number of points assigned to a Submitted Abuse Claim depending on the severity of the facts underlying the Claim.  By default, the value of each scaling factor is one, meaning that in the absence of the application of the scaling factor, the Base Points assigned to a Claim are not affected by that factor.  In contrast, if the Settlement Trustee determines that a particular scaling factor as applied to a given Submitted Abuse Claim is 1.5, the number of points assigned the Submitted Abuse Claim are increased by 50%, the result of multiplying the Base Points of the Submitted Abuse Claim by 1.5.  The combined effect of all scaling factors is determined by multiplying the scaling factors together then multiplying the result by the Base Points of the Submitted Abuse Claim.

---

from Insurance Companies, and total points awarded.  The Settlement Trust Corpus Scaling Factor accommodates the potential variances in the Settlement Trust corpus size by scaling the point values assigned to Submitted Abuse Claims based on the size of the Settlement Trust corpus.

**Aggravating Factors**: The Settlement Trustee may assign upward Point Scaling Factors to each Submitted Abuse Claim based on the following categories:

(i) **Nature of Abuse and Circumstances**. To account for particularly severe abuse or aggravating circumstances, the Settlement Trustee may assign an upward Point Scaling Factor of up to 1.5 to each Submitted Abuse Claim. The hypothetical base case scenario for this scaling factor would involve a single incident of abuse during a BSA sponsored event with a single perpetrator held in high regard by the victim and in a position of trust within BSA as an employee or volunteer. The hypothetical base case is incorporated into the Base Points in the Claims Matrix' tiers and would not receive an increase on account of this factor. By way of example, aggravating factors that can give rise to a higher scaling factor include, but are not limited to, the following factors:

   1. Unusual duration and/or multiple circumstance of the abuse;

   2. Repeated targeting and grooming behaviors including but not limited to special privileges, special activities, and attention, social relationship with parents, personal relationship with Claimant, opportunity to experience sports or activities, isolation from others, use of alcohol or illicit drugs by abuser or Claimant, or use of or exposure to pornography;

   3. Coercion or threat or use of force or violence, stalking;

   4. Multiple perpetrators involved in sexual misconduct.

(ii) **Abuser Profile**. To account for the alleged abuser's profile, the Settlement Trustee may assign an upward Point Scaling Factor of up to 2.0 to a Submitted Abuse Claim. This factor is to be evaluated relative to a hypothetical base case scenario of an unknown abuser who is only accused of abuse by one Abuse Claimant. The hypothetical base case is incorporated into the Base Points in the Claims Matrix' tiers and would not receive an increase on account of this factor. An upward Point Scaling Factor may be applied for this category as follows (the Settlement Trustee may only apply the scaling factor of the single highest applicable category listed below):

   1. 1.25 if the abuser was accused by at least one (1) other Abuse Claimant;

   2. 1.5 if the abuser was accused by five (5) or more other Abuse Claimants;

   3. 2.0 if the abuser was accused by ten (10) or more other Abuse Claimants.

In addition, an upward Point Scaling Factor may also be applied for this category if the Protected Party(ies) knew, or had reason to know, that the alleged perpetrator was likely to commit acts of Abuse against individuals involved in Scouting.

(iii) **Impact of the Abuse**.  To account for the impact of the alleged abuse on the Abuse Claimant's mental health, physical health, inter-personal relationships, vocational capacity or success, academic capacity or success, and whether the alleged abuse at issue resulted in legal difficulties for the Abuse Claimant, the Settlement Trustee may assign an upward Point Scaling Factor of up to 1.5.  This factor is to be evaluated relative to a hypothetical base case scenario of a victim of abuse who suffered the typical level of abuse-related distress within the tier to which the Submitted Abuse Claim was assigned.    The hypothetical base case is incorporated into the base points in the Claims Matrix' tiers and would not receive an increase on account of this factor.  The Settlement Trustee will consider, along with any and all other relevant factors, whether the abuse at issue manifested or otherwise led the Abuse Claimant to experience or engage in behaviors resulting from:

1. Mental Health Issues:  This includes but is not limited to anxiety, depression, post-traumatic stress disorder, substance abuse, addiction, embarrassment, fear, flashbacks, nightmares, sleep issues, sleep disturbances, exaggerated startle response, boundary issues, self-destructive behaviors, guilt, grief, homophobia, hostility, humiliation, anger, isolation, hollowness, regret, shame, isolation, sexual addiction, sexual problems, sexual identity confusion, low self-esteem or self-image, bitterness, suicidal ideation and suicide attempts.

2. Physical Health Issues:  This includes but is not limited to physical manifestations of emotional distress, gastrointestinal issues, headaches, high blood pressure, physical manifestations of anxiety, erectile dysfunction, heart palpitations, sexually-transmitted diseases, physical damage caused by acts of abuse, reproductive damage, self-cutting and other self-injurious behavior.

3. Interpersonal Relationships:  This includes but is not limited to problems with authority figures, hypervigilance, sexual problems, marital difficulties, problems with intimacy, lack of trust, isolation, betrayal, impaired relations, secrecy, social discreditation and isolation; damage to family relationships, and fear of children or parenting;

4. Vocational Capacity:  This includes but is not limited to under- and un-employment, difficulty with authority figures, difficulty changing and maintaining employment, feeling of unworthiness or guilt related to financial success.

5.    <u>Academic Capacity</u>:  This includes but is not limited to school behavior problems.

6.    <u>Legal Difficulties</u>:  This includes but is not limited to criminal difficulties, bankruptcy, fraud.

**Potential Mitigating Factors**.  The Settlement Trustee may assign a Point Scaling Factor in the range of 0 to 1.0 to each Submitted Abuse Claim to decrease the points awarded to such Claim.  This factor is to be evaluated relative to a hypothetical base case scenario of an abuse claim with solidly credible evidence of abuse that occurred during a BSA sponsored event involving a perpetrator held in high regard and in a position of trust within BSA as an employee or volunteer.  The hypothetical base case is incorporated into the base points in the Claims Matrix' tiers and would not receive a decrease on account of this factor.  Such factors may include but are not limited to the following:

(i)    **Absence of Protected Party Relationship or Presence of Another Responsible Party**.  In certain circumstances, a Protected Party's responsibility for a perpetrator may be factually or legally attenuated, mitigated, or non-existent.  For example, the perpetrator may have maintained a relationship with the Abuse Claimant through a separate affiliation, such as a school, religious organization, or as a family member of the Abuse Claimant; or the abuse occurred in settings unrelated to Scouting or where a Protected Party did not have the ability or responsibility to exercise control.  By way of non-exhaustive example, familial abuse—even if the perpetrator was also a Protected Party employee and the abuse occurred on a Scouting activity—should result in a significant reduction or wholesale elimination, of points.

(ii)    **Other Settlements, Awards, Contributions, or Limitations**.  The Settlement Trustee should consider the amounts of any settlements or awards already received by the Abuse Claimant from other sources as well as expected contributions from other sources that are related to the abuse.  By way of example, the Settlement Trustee should assign an appropriate Point Scaling Factor to Submitted Abuse Claims capped by charitable immunity under the laws of the jurisdiction where the abuse occurred.

(iii)    **Defectiveness**.  If the Abuse Claimant filed a defective Proof of Claim or filed its Proof of Claim after the Bar Date, or if the evidence provided by the Abuse Claimant indicates that the Submitted Abuse Claim is time barred based on prevailing law in the jurisdictions in which the abuse occurred, the Settlement Trustee may reduce the points assigned to such Claim by assigning a Point Scaling Factor of less than one.  The Settlement Trustee should weigh the strength of the evidence supporting the Submitted Abuse Claim to determine whether such Claim should receive mitigation on account of its defectiveness or untimeliness.  The Settlement Trustee may assign a mitigating factor of zero (0) in cases where the Settlement Trustee determines that the Submitted Abuse Claim is fully barred, but may, however, assign a factor of up to one (1) if the

Settlement Trustee determines that the evidence supporting the Submitted Abuse Claim warrants distribution from the Settlement Trust despite its defectiveness or untimeliness.

(iv)    **Incomplete or Suspicious Evidence of Abuse**.  If the evidence provided by the Abuse Claimant does not establish by a preponderance of the evidence that the abuse occurred, the identity of the abuser, the location of the abuse, or when the abuse occurred the Settlement Trustee shall reduce the points of the Submitted Abuse Claim by assigning a Point Scaling Factor of less than one.  If the Settlement Trustee believes the evidence provided is deliberately false or misleading, the Settlement Trustee will assign a Point Scaling Factor of zero (0).

(v)    **Absence of Notice**.  If the evidence provided by the Abuse Claimant does not establish by a preponderance of the evidence that the Protected Party(ies) knew, or had reason to know, that the alleged perpetrator was likely to commit acts of Abuse against individuals involved in Scouting, the Settlement Trustee shall reduce the points assigned to such Claim by assigning a Point Scaling Factor of less than one.  The Settlement Trustee should weigh the strength of the evidence demonstrating knowledge of the risk of potential abuse by the perpetrator to determine the appropriate factor of mitigation.

e.    **Claims Calculus**

After the Settlement Trustee has assigned a Submitted Abuse Claim to a claim tier and determined the appropriate Point Scaling Factors to apply to the Claim, the total points to be assigned to the Submitted Abuse Claim are to be determined as the product of the Base Points of the Claim and the Point Scaling Factors applied to the Claim.  In no event can a Submitted Abuse Claim's point value exceed the Maximum Points value for the Claim's assigned tier.

By way of example, if a Submitted Abuse Claim is determined by the Settlement Trustee to be a tier 1 claim with a Base Point value of 600,000, with a Point Scaling Factor of 1.5 for the nature and circumstances of the abuse, and a mitigating point scaling factor of 0.75, and no other Point Scaling Factors, the number of points assigned to the Claim would be 675,000 points calculated as 600,000 X 1.5 X 0.75 = 675,000.  As a further example, if, in addition to the above Point Scaling Factors, the same Submitted Abuse Claim had an additional aggravating Point Scaling Factor of 2.0 on account of the alleged abuser's profile, the points assigned to the Abuse Claim would be twice as much, namely 1,350,000 (600,000 x 1.5 x .75 x 2.0).  If, on the other hand, for example the Settlement Trustee believes the evidence provided for the Submitted Abuse Claim was deliberately false or misleading, the Settlement Trustee will assign a mitigating Point Scaling Factor of zero, in which case the Claim would be assigned a point value of zero.

To determine the dollar value for each Submitted Abuse Claim, the Settlement Trustee will multiply the point value of the Claim by the Trust Corpus Scaling Factor.  In the above example of a Submitted Abuse Claim assigned a point value of 1,350,000, if the Trust Corpus Scaling Factor is 1/3, the Submitted Abuse Claim would be valued at $450,000 (1,350,000 x

1/3).  If instead the Trust Corpus Scaling Factor is one, the Submitted Abuse Claim would be valued at $1,350,000.  If the Settlement Trust corpus exceeds its expected value and the Trust Corpus Scaling Factor is 1.5, except as otherwise provided herein with respect to Submitted Abuse Claims litigated to final judgement in the tort system, the Submitted Abuse Claim would be valued at $2,025,000 (1,350,000 x 1.5).  In the other example above of a Submitted Abuse Claim assigned a point value of zero, the Claim's dollar value would be $0.

### 5. *Payment of Settled Claims*

#### a. **Settled Claim Payment**

The Settlement Trustee shall evaluate each of the Submitted Abuse Claims in a timely fashion.  After a Submitted Abuse Claim becomes a Settled Claim, as described in Article VI of the BSA Toggle Plan TDP, the Settlement Trust shall pay an initial distribution ("Initial Distribution") to the holder of such Settled Claim within 30 days of the Claim becoming a Settled Claim and the Settlement Trust establishing the Initial Settlement Trust Corpus Scaling Factor (as defined below).

#### b. **Initial Distribution Payment Scaling Factor**

After analyzing the Submitted Abuse Claims and determining the number of Submitted Abuse Claims and the likely, aggregate Proposed Claim Valuations for the Settled Claims and value of the Settlement Trust Assets at that time, the Settlement Trustee and the STAC shall determine, pursuant to the terms and conditions set forth in the Trust Agreement, the appropriate initial Settlement Trust corpus scaling factor (the "Initial Settlement Trust Corpus Scaling Factor").  For this purpose, the Settlement Trustee will calculate the Initial Settlement Trust Corpus Scaling Factor as the ratio of the then available Settlement Trust Assets (accounting for future Settlement Trust operating expenses) to the total points assigned to all Submitted Abuse Claims (accounting for Future Abuse Claims).  By way of example, if the available Settlement Trust Assets are $1.5 billion and the Settlement Trustee calculates the total points assigned to all Submitted Abuse Claims evaluated by the Settlement Trustee to be 4.5 billion, the Initial Settlement Trust Corpus Scaling Factor would be one third, meaning that the cash payment value of a point for initial payment purposes is $1.00 for every 3 points.

#### c. **Payment of Initial Distribution**

The Settlement Trust will make an Initial Distribution to each holder of a Settled Claim based on the Initial Settlement Trust Corpus Scaling Factor while at the same time maintaining sufficient assets in the Settlement Trust for payment of operating expenses, additional Settled Claims, and lawsuits against the Settlement Trust.  With respect to Settled Claims that are Insured Abuse Claims, the Settlement Trustee shall make such Initial Distribution (and any further distributions) regardless of the status of any litigation seeking coverage from any Insurance Companies.

#### d. **Subsequent Payments**

As the Settlement Trust obtains additional assets through litigation or settlements with Insurance Companies (or otherwise), or determines that amounts reserved for operating expenses

can be reduced, the Settlement Trust's corpus will increase and more funds will become available for distribution to Abuse Claimants on account of Settled Claims. Consequently, every six months after the payment of the Initial Distribution, the Settlement Trustee shall conduct an evaluation of the total value of the Settlement Trust Assets then available for distribution, and the aggregate points value of Settled Claims. In consultation with the STAC, the Settlement Trustee will then determine when subsequent distributions (each a "Subsequent Distribution") should be made to Abuse Claimants on account of Settled Claims and at what additional factor, by updating the Settlement Trust Corpus Scaling Factor (each additional factor, a "Subsequent Settlement Trust Corpus Scaling Factor"). Holders of Abuse Claims that have not yet received an Initial Distribution prior to the Settlement Trustee's determination to make a Subsequent Distribution shall receive as an Initial Distribution the value of their Claim multiplied by the Initial Settlement Trust Corpus Scaling Factor plus any Subsequent Settlement Trust Corpus Scaling Factor(s). By way of example, if a Settled Claim is assigned 900,000 points, and the Settlement Trust has established an Initial Settlement Trust Corpus Scaling Factor of one third and a Subsequent Settlement Trust Corpus Scaling Factor of one sixth before the Claim becomes a Settled Claim, the Abuse Claimant holding such Claim will receive an initial payment of $450,000, or the sum of the product of 900,000 x 1/3 ($300,000) plus the product of 900,000 x 1/6 ($150,000).

e.    **Release**

In order for a Submitted Abuse Claim to become a Settled Claim and for the relevant Abuse Claimant to receive any payment from the Settlement Trust, the Abuse Claimant must submit an executed form of release to be developed by the Settlement Trustee in consultation with Reorganized BSA. Payments made by the Settlement Trust to the holder of a Settled Claim pursuant to the process and procedures described herein shall be in full and complete satisfaction of the Abuse Claimant's Abuse Claim.

6.    ***Tender of Insured Abuse Claims and Coverage Litigation with Insurers***

a.    **Rights of Settlement Trust Against Non-Settling Insurance Companies**

Pursuant to the Plan, the Settlement Trust will take assignment of the BSA's rights under the BSA Insurance Policies. For any Non-Tender Insured Abuse Claim that the Settlement Trustee determines is a valid Abuse Claim pursuant to Article V of the BSA Toggle Plan TDP, the Settlement Trustee shall tender each such Abuse Claim (including the Proposed Claim Valuation)—along with all information related to the subject Abuse Claim gathered pursuant to the BSA Toggle Plan TDP—to the applicable Insurance Company(ies) for review and coverage determination prior to sending the relevant Abuse Claimant his or her Valid Claim Notice. The applicable Insurance Company will have 60 days to review each Non-Tender Insured Abuse Claim tendered to it by the Settlement Trust under this section and provide written notice to the Settlement Trust of whether it will cover, in whole or in part, the Proposed Claim Valuation of a particular Non-Tender Insured Abuse Claim or decline to provide coverage of such Abuse Claim (a "Coverage Determination Notice"). If an Insurance Company denies coverage, the Coverage Determination Notice must provide an explanation of the reason for the denial.

b.    **Reimbursement of Insured Abuse Claims**

For each Non-Tender Insured Abuse Claims that an Insurance Company agrees to cover pursuant to a Coverage Determination Notice, the Insurance Company shall reimburse the Settlement Trust for its share of the amount of the Proposed Claim Valuation for such claim, applying an assumed Settlement Trust Corpus Scaling Factor of one (1), within 30 days of such Abuse Claim becoming a Settled Claim.  The decision by an Insurance Company to cover its share of a Non-Tender Insured Abuse Claim Proposed Valuation Amount shall be deemed to be a compromise of a disputed claim and shall not have any collateral estoppel or *res judicata* effect for any future claim, nor shall it be deemed to be an admission with respect to coverage.

c.    **Coverage Disputes**

For Insured Abuse Claims where an Insurance Company declines to cover, the Settlement Trust will have the right to pursue the Insurance Company in coverage litigation for the Insurance Company's share of the Proposed Claim Valuation or judgment or settlement amount, as applicable.  The Settlement Trust will have the right to bring such coverage actions in one or more individual or consolidated actions.  For purposes of this section, the dollar value of disputed Insured Abuse Claims shall be calculated based on an assumed Trust Corpus Scaling Factor of one (1).  The Settlement Trust shall also have the option to negotiate a settlement of coverage issues with each Insurance Company to obtain the benefit of insurance coverage under any BSA Insurance Policy.  All amounts recovered by the Settlement Trustee through coverage litigation or settlements shall flow into the corpus of the Settlement Trust for distribution or payment of Settlement Trust operating expenses, including payment of Abuse Claims, in accordance with the Trust Agreement and the BSA Toggle Plan TDP.

d.    **Rights of Insurance Companies**

Nothing in the BSA Toggle Plan TDP (a) shall affect, impair, or prejudice the rights and defenses of the Insurance Companies in any manner; (b) shall in any way operate to, or have the effect of, impairing or having any *res judicata*, collateral estoppel, or other preclusive effect on any party's legal, equitable, or contractual rights or obligations under any BSA Insurance Policy in any respect; or (c) shall otherwise determine the applicability or non-applicability of any provision of any BSA Insurance Policy and any such rights and obligations shall be determined under BSA Insurance Policies and applicable law.  Additionally, any action by the Settlement Trust against any Insurance Company may be brought in a court of competent jurisdiction other than the Bankruptcy Court; *provided, however*, that nothing herein waives any right of the Settlement Trust to elect arbitration to the extent the relevant BSA Insurance Policy provides for such.

e.    **Results of Negotiation or Litigation**

If the Settlement Trustee obtains a settlement or final judgment against an Insurance Company, the proceeds from such judgment, will flow into the Settlement Trust corpus.  To the extent a deductible is owed to the Insurance Company in order for the Settlement Trust to obtain the insurance proceeds from a final judgment or settlement, any such deductible shall be submitted to the Settlement Trust as an Indirect Abuse Claim.

### 7.    Indirect Claims

An Indirect Abuse Claim asserted against the Settlement Trust shall be reviewed by the Settlement Trustee and treated as valid and paid by the Settlement Trust pursuant to the distribution methodology set forth in the BSA Toggle Plan TDP if (a) such Indirect Abuse Claim satisfied the requirements of the Bar Date, and is not otherwise disallowed by section 502(e) of the Bankruptcy Code (subject to the right of the holder of the Indirect Abuse Claim to seek reconsideration under section 502(j) of the Bankruptcy Code) or subordinated under section 509(c) of the Bankruptcy Code, and (b) the holder of the Indirect Abuse Claim establishes to the satisfaction of the Settlement Trustee that (i) the holder has paid the liability and obligation of the Settlement Trust to the individual claimant to whom the Settlement Trust would otherwise have had a liability or obligation under the BSA Toggle Plan TDP (and which has not been paid by the Settlement Trust), (ii) the Settlement Trust and Protected Parties are forever and fully released from all liability related thereto, and (iii) the Indirect Abuse Claim is not otherwise barred by a statute of limitations or repose or by other applicable law.

### f.    Offset

The liquidated value of any Indirect Abuse Claim paid by the Settlement Trust shall be treated as an offset to or reduction of the full liquidated value of any Direct Abuse Claim that might be subsequently asserted against the Settlement Trust.

### 8.    Tort System Alternative

### a.    Exhaustion of Trust Distribution and Reconsideration Procedures

If an Abuse Claimant has appealed a Claim Notice through the reconsideration process described in Section 5.6 of the BSA Toggle Plan TDP and the Abuse Claimant disagrees with the Settlement Trustee's final determination regarding the validity or valuation of the subject Submitted Abuse Claim, the Abuse Claimant may file a lawsuit against the Settlement Trust for reconsideration of his or her Submitted Abuse Claim in any court of competent jurisdiction.  An Abuse Claimant that elects to file a lawsuit under this provision forfeits any Proposed Claim Valuation offered by the Settlement Trust, and recovery, if any, is limited to settlement or judgment from such lawsuit as provided in the BSA Toggle Plan TDP.

### b.    Tender to Insurance Company

If an Abuse Claimant elects to file suit against the Settlement Trust as provided herein, the Settlement Trustee shall determine, based on the Trust Claim Submission and any other information obtained in connection with that submission, whether any Insurance Company issued coverage that is available to respond to the lawsuit (an "Insured Lawsuit").  The Settlement Trustee may determine that there are multiple Insurance Companies that have responsibility for an Insured Lawsuit.  The Settlement Trustee shall tender any Insured Lawsuit to each Insurance Company from whom the Settlement Trustee determines insurance coverage may be available.

c.    **Acceptance of Tender**

An Insurance Company shall have 60 days to determine whether to accept an Insured Lawsuit that is tendered to it.

d.    **Limit on Settlement Trust Liability**

An Abuse Claimant who pursues the Settlement Trust in the tort system shall not be able to receive from the Settlement Trust more than the dollar value of a Settled Claim that is assigned the Maximum Points in the applicable tier set forth in the Claims Matrix assuming a Trust Corpus Scaling Factor of one.  By way of example, for an Abuse Claimant asserting tier 1 abuse, the maximum damages amount that the Abuse Claimant is allowed to sue the Settlement Trust for in the relevant tort system is $2,700,000, or 2,700,000  (the Maximum Points in tier 1) points multiplied by an assumed Trust Corpus Scaling Factor of one.

e.    **Parties to Lawsuit**

Any lawsuit commenced under <u>Section 10.1</u> of the BSA Toggle Plan TDP must be filed by the Abuse Claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit.  The potential parties that may be defendants in the lawsuit shall be limited to the Settlement Trust; an Abuse Claimant may not sue any of the Protected Parties or Non-Settling Insurance Companies.

f.    **Defenses**

All defenses (including, with respect to the Settlement Trust, all defenses that could have been asserted by the Debtors, except as otherwise provided in the Plan) shall be available to both sides at trial; however, for any Uninsured Abuse Claim or any Insured Abuse Claim where no Insurance Company has agreed to provide a defense, the Settlement Trust may waive any defense and/or concede any issue of fact or law.  In cases where an Insurance Company has agreed to provide a defense, such Insurance Company retains all liability defenses.

g.    **Costs**

Each party's costs of litigation shall be borne by that party.  An Abuse Claimant may not seek costs or expenses in the lawsuit filed against the Settlement Trust.

h.    **Settlement or Final Judgment**

The defending Insurance Company or, if no Insurance Company is defending, the Settlement Trust, is authorized to settle any lawsuit by an Abuse Claimant for an amount it determines appropriate in light of the circumstances of the case, subject to the limitations that the Settlement Trust or Insurance Company may not settle any claim for an amount that exceeds the amount that exceeds its potential liability for that Abuse Claim pursuant to <u>Section 10.4</u> of the BSA Toggle Plan TDP.

i.     **Payment of Judgments by the Settlement Trust**

If and when an Abuse Claimant obtains a final judgment or settlement against the Settlement Trust in the tort system, such judgment amount shall be treated for purposes of distribution under the BSA Toggle Plan TDP as the Abuse Claimant's Settled Claim points amount.  Within 30 days of executing the release as set forth in Section 7.5 of the BSA Toggle Plan TDP, the Abuse Claimant shall receive an Initial Distribution (based on the Initial Settlement Trust Corpus Scaling Factor and any Subsequent Settlement Trust Corpus Scaling Factor in effect at such time) from the Settlement Trust.  Thereafter, the Abuse Claimant shall receive any Subsequent Distributions based on any Subsequent Settlement Trust Corpus Scaling Factor(s) as determined by the Settlement Trust.  Under no circumstances shall the Settlement Trust pay interest under any statute on any judgments obtained by an Abuse Claimant in the tort system.  Insurance Companies that choose to defend a lawsuit against the Settlement Trust shall pay the full amount of any judgment or settlement achieved by the Abuse Claimant to the Settlement Trust for distribution through the BSA Toggle Plan TDP.

*9.     Miscellaneous Provisions*

a.     **Non-Binding Effect of Settlement Trust and/or Litigation Outcome**

Notwithstanding any other provision of the BSA Toggle Plan TDP, a decision by the Settlement Trust to pay or not to pay any Submitted Abuse Claim shall not be used in, be admissible as evidence in, binding in, or have any *res judicata*, collateral estoppel, or other preclusive effect in any lawsuit or other proceeding against any other entity other than the Settlement Trust.  Notwithstanding any other provision of the BSA Toggle Plan TDP, the outcome of litigation against the Debtors by the holder of an Indirect Abuse Claim shall not be used in, be admissible as evidence in, binding in or have any other preclusive effect in connection with the Settlement Trust's resolution or valuation of an Indirect Abuse Claim.

b.     **Amendments**

Except as otherwise provided in the Trust Distribution Procedures, the Settlement Trustee may not amend, modify, delete, or add to any provisions of the BSA Toggle Plan TDP, without the written consent of the STAC.  Nothing in the Trust Distribution Procedures is intended to preclude the STAC from proposing to the Settlement Trustee, in writing, amendments to the BSA Toggle Plan TDP.  Notwithstanding the foregoing, the Settlement Trustee shall not have the ability to enter into any amendment that abridges, limits or narrows the rights of Insurance Companies under Article IV of the BSA Toggle Plan TDP.

c.     **Severability**

Should any provision contained in the BSA Toggle Plan TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the BSA Toggle Plan TDP.  Should any provision contained in the BSA Toggle Plan TDP be determined to be inconsistent with or contrary to Debtors' obligations to any Insurance Company providing Insurance Coverage to the Debtors in respect of claims for personal injury for which the Debtors have legal responsibility, the Settlement Trustee, with the consent of the STAC, may amend the BSA Toggle Plan TDP and/or

the Trust Agreement to make the provisions of either or both documents consistent with the duties and obligations of the Debtors to said Insurance Company.

### d. **Governing Law**

Administration of the BSA Toggle Plan TDP shall be governed by, and construed in accordance with, the laws of the State of Delaware. The law governing litigation in the tort system shall be the law of the jurisdiction in which the Abuse Claimant files the lawsuit as described in Article X of the BSA Toggle Plan TDP.

## ARTICLE VIII. SOLICITATION PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each holder of a Claim entitled to vote should carefully review the Plan. All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and provisions of the Plan.

A.    Voting Summary and Deadline[62]

The Bankruptcy Court entered an order in these Chapter 11 Cases [D.I. [●]] (the "Solicitation Procedures Order") that, among other things, approved certain procedures governing the solicitation of votes to accept or reject the Plan from holders of Claims against the Debtors, including setting the deadline for voting, specifying which holders of Claims are eligible to receive Ballots to vote on the Plan, and establishing other voting and tabulation procedures attached to the Solicitation Procedures Order as Exhibit 1 (the "Solicitation Procedures").

**THE SOLICITATION PROCEDURES ORDER IS HEREBY INCORPORATED BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN. YOU SHOULD READ THE SOLICITATION PROCEDURES ORDER, THE SOLICITATION PROCEDURES, THE CONFIRMATION HEARING NOTICE, AND THE INSTRUCTIONS ATTACHED TO YOUR BALLOT IN CONNECTION WITH THIS SECTION, AS THEY SET FORTH IN DETAIL PROCEDURES GOVERNING VOTING DEADLINES AND OBJECTION DEADLINES.**

The Plan, though proposed jointly and consolidated for purposes of making distributions to holders of Claims under the Plan, constitutes a separate Plan proposed by each Debtor. Therefore, the classifications set forth in the Plan apply separately with respect to each Plan proposed by, and the Claims against and Interests in, each Debtor. Your vote will count as votes for or against, as applicable, each Plan proposed by each Debtor.

| Voting Classes: | The Debtors are soliciting votes to accept or reject the Plan from the holders of Claims in Classes 3A, 3B, 4A, 4B, 5, 6, 7, 8, and 9. |
|---|---|
| **Voting Record Date:** | The Voting Record Date is May 19, 2021. Only holders in the Voting Classes as of this date will be entitled to vote to accept or reject the Plan. |

---

[62]   Capitalized terms used in this Article VIII and not otherwise defined herein or in the Plan shall have the meanings ascribed to such terms in the Solicitation Procedures Motion, Solicitation Procedures Order, or Solicitation Procedures, as applicable.

| | The Debtors reserve the right to set a later Voting Record Date if the Debtors decide to extend the Voting Deadline. |
|---|---|
| **Voting Deadline; Extension:** | The Voting Deadline is July 30, 2021 at 4:00 p.m. (Eastern Time), unless the Debtors in their sole discretion extend the date by which Ballots will be accepted.  If the Voting Deadline is extended, the term "Voting Deadline" will mean the time and date that is designated.  Any extension of the Voting Deadline will be followed as promptly as practicable by notice of the extension. |
| **Solicitation Procedures:** | If you are a holder of a Claim in the Voting Classes, you should deliver a properly completed Ballot to the Solicitation Agent.  Ballots must be received by the Solicitation Agent on or before the Voting Deadline.  To be counted as a vote to accept or reject the Plan, each Ballot must be properly executed, completed, and delivered by (1) the electronic Ballot submission platform on the Solicitation Agent's website (the "E-Ballot Platform"), (2) mail, (3) overnight delivery, or (4) personal delivery, so that it is ***actually received***, in each case, by the Solicitation Agent no later than the Voting Deadline.  Specifically, each Ballot must be returned through the E-Ballot Platform by July 30, 2021 at 4:00 p.m. (Eastern Time), by mail using the envelope included in the Solicitation Package, as applicable, or by overnight or personal delivery to the following address: Boy Scouts of America Ballot Processing, c/o Omni Agent Solutions, 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367. |
| **Revocation or Withdrawal of Ballots:** | After the Voting Deadline, no Ballot may be withdrawn or modified without the prior written consent of the Debtors; provided, that prior to the Voting Deadline, a voter may withdraw a valid Ballot by delivering a written notice of withdrawal to the Solicitation Agent.  The withdrawal must be signed by the party who signed the Ballot, and the Debtors reserve the right to contest any withdrawals. |
| **Solicitation Agent:** | The Debtors have retained Omni Agent Solutions as the Solicitation Agent in connection with the solicitation of votes on the Plan.  Deliveries of Ballots should be directed to Omni Agent Solutions as set forth herein or pursuant to the instructions contained in the Ballots. |

The following instructions for voting to accept or reject the Plan, together with the instructions contained in the Ballot and the Solicitation Procedures, constitute the voting instructions.  Only holders of Claims in Classes 3A, 3B, 4A, 4B, 5, 6, 7, 8, and 9 (the "Voting Classes") as of the Voting Record Date are entitled to vote on the Plan.  To vote, you, or in the case of certain holders of Direct Abuse Claims, your attorney, must fill out and sign the Ballot enclosed in the Solicitation Package (as defined below).

B.    <u>Solicitation Procedures</u>

      *1.*      ***Vote Required for Acceptance by a Class of Claims***

      Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims in such class that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims in such class that have voted.

      *2.*      ***Solicitation Package***

      The package of materials (the "<u>Solicitation Package</u>") sent to the Voting Classes contains:

      (a)      a cover letter describing the contents of the Solicitation Package and instructions to obtain access, free of charge, to the Plan, the Disclosure Statement, and the Solicitation Procedures Order via https://omniagentsolutions.com/bsa-SAballots or https://omniagentsolutions.com/bsa-ballots, and urging holders of Claims in the Voting Classes to vote to accept the Plan;

      (b)      the *Notice of Hearing to Consider Confirmation of Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC*, substantially in the form annexed to the Solicitation Procedures Order as Exhibit 3 (the "<u>Confirmation Hearing Notice</u>");

      (c)      the Disclosure Statement with all exhibits, including the Plan and all exhibits (to the extent such exhibits are filed with the Bankruptcy Court before the Solicitation Date) via https://omniagentsolutions.com/bsa-SAballots or https://omniagentsolutions.com/bsa-ballots;

      (d)      the Solicitation Procedures Order, including the Solicitation Procedures and all exhibits, via https://omniagentsolutions.com/bsa-SAballots or https://omniagentsolutions.com/bsa-ballots;

      (e)      an appropriate form of Ballot with return instructions and a return envelope, as applicable;

      (f)      if a party becomes a co-proponent of the Plan on or before the Solicitation Date, solely for holders of Direct Abuse Claims, a letter from such applicable proponents recommending that holders of Direct Abuse Claims vote to accept the Plan, in the Debtors' discretion; and

      (g)      any other materials ordered by the Bankruptcy Court to be included as part of the Solicitation Package.

The Debtors have distributed the Solicitation Packages to holders of Claims in the Voting Classes as of the Solicitation Date.  In addition, the Plan, this Disclosure Statement, the Solicitation Procedures Order, and, once they are filed, all exhibits to the three documents (including the Plan Supplement) will be made available online at no charge at the website maintained by the Solicitation Agent, Omni Agent Solutions, at https://omniagentsolutions.com/bsa-SAballots or https://omniagentsolutions.com/bsa-ballots, and all other contents of the Solicitation Package, including Ballots, shall be provided in paper format, except as specifically provided in <u>Section IV</u> of the Solicitation Procedures with respect to certain holders of Direct Abuse Claims.  In addition, the Debtors will provide parties in interest (at no charge) with a flash drive or paper format of the Plan and/or Disclosure Statement, as well as any exhibits thereto, upon request to the Solicitation Agent by (1) calling the Debtors' toll-free restructuring hotline at (866) 907-2721; (2) visiting the Debtors' restructuring website at https://omniagentsolutions.com/bsa; (3) writing to Boy Scouts of America Ballot Processing, c/o Omni Agent Solutions, 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367; or (4) emailing BSAballots@omniagnt.com.

If you are a holder of a Claim or represent a holder of a Direct Abuse Claim who is entitled to vote on the Plan and you or your attorney did not receive a Ballot, received a damaged Ballot, or lost your Ballot, please contact the Solicitation Agent by (1) emailing BSAballots@omniagnt.com, (2) calling the Debtors' toll-free restructuring hotline at (866) 907-2721, or (3) writing to Boy Scouts of America, c/o Omni Agent Solutions, 5955 De Soto Avenue, Suite 100, Woodland Hills, CA 91367.  Moreover, any holder of a Direct Abuse Claim that receives the Solicitation Package materials via email in accordance with the communication preferences indicated in such holder's Proof of Claim but prefers to receive such materials by mail may contact the Solicitation Agent to receive a mailed copy instead at no cost to such holder.

The Solicitation Procedures set forth a process by which known attorneys representing holders of Direct Abuse Claims (collectively, the "<u>Firms</u>"), received copies of the Abuse Claim Solicitation Notice, an Abuse Survivor Plan Solicitation Directive, and Client List.  The Abuse Claim Solicitation Notice notified the Firms of the two options proposed for soliciting votes on the Plan in respect of Direct Abuse Claims, and the Debtors requested that each Firm voluntarily return a completed Abuse Survivor Plan Solicitation Directive and confirmed Client List in order to streamline and expedite the delivery of information to holders of Direct Abuse Claims and ensure that holders of Direct Abuse Claims can make informed and meaningful decisions regarding whether to accept or reject the Plan.

Pursuant to the Abuse Survivor Plan Solicitation Directive, each Firm voluntarily selected its preferred method for the Solicitation Agent to solicit votes on the Plan from its clients who hold Direct Abuse Claims (collectively, the "<u>Abuse Survivor Clients</u>") according to one of the following proposed methods:

a.   **Master Ballot Solicitation Method.**  A Firm may direct the Solicitation Agent to serve the Firm with one Solicitation Package and one Master Ballot on which to record the votes of all of its Abuse Survivor Clients to accept or reject the Plan (the "<u>Master Ballot Solicitation Method</u>") if the Firm certifies that (a) the Firm shall collect and record the votes of its Abuse Survivor Clients through customary and accepted practices (*i.e.*, written communication, and that it has authority to

cast each of its Abuse Survivor Clients' votes to accept or reject the Plan (subject in each case to the requirements that the Firm comply with the voting procedures and that each Abuse Survivor Client shall have indicated to the Firm his or her informed decision on such vote), or (b) the Firm has the authority under applicable law to vote to accept or reject the Plan on behalf of its Abuse Survivor Clients (a valid power of attorney or other written documentation may be requested by the Debtors, in their discretion).  If it is the Firm's customary and accepted practice to collect and record authorizations or instructions from its Abuse Survivor Clients by email, telephone, or other standard communication methods, the Firm shall be authorized to follow such customary practices to collect and record the votes of its Abuse Survivor Clients.  Each Firm that selects the Master Ballot Solicitation Method shall provide the Disclosure Statement, in hard copy, flash drive, or electronic format, to its Abuse Survivor Clients.  Any Firm that elects the Master Ballot Solicitation Method must return the Master Ballot to the Solicitation Agent so that it is received by the Voting Deadline.

b.  **Direct Solicitation Method.**  A Firm may direct the Solicitation Agent to solicit votes on the Plan directly from each of the Firm's Abuse Survivor Clients by distributing a Solicitation Package (including a Ballot) directly to each of the Firm's Abuse Survivor Clients via email addressed to the email address specified on the Firm's Client List or, where no email address is specified for an Abuse Survivor Client, via U.S. mail at the street address specified on the Firm's Client List (the "Direct Solicitation Method").[63]  Under the Direct Solicitation Method, each Abuse Survivor Client must return his or her completed Ballot to the Solicitation Agent so that it is received by the Voting Deadline.  **For the avoidance of doubt, the Debtors intend to solicit votes to accept or reject the Plan from each holder of a Direct Abuse Claim who cannot be matched to a Firm or who is not included in any Client List to be solicited via the Direct Solicitation Method.**

If a Firm did not voluntarily return an Abuse Survivor Plan Solicitation Directive to the Solicitation Agent, or otherwise did not select a solicitation method, the Debtors reserve the right, subject to Bankruptcy Court authorization, to direct the Solicitation Agent to solicit votes to accept or reject the Plan from the Firm's Abuse Survivor Clients according to the Direct Solicitation Method, using the communication preferences indicated in such Abuse Survivors' Proofs of Claim.  A Firm may submit a Ballot on behalf of an Abuse Survivor Client, but only to the extent such Firm has the requisite authority to do so under applicable law and completes a certification of such authority in the manner set forth herein and on the Ballot that corresponds to such Abuse Claim (a valid power of attorney may be requested by the Debtors, in their discretion).  Each Firm voting on behalf of more than one Abuse Survivor Client must complete a Master Ballot, which shall set forth all of the votes cast by such Firm on behalf of all such clients.

---

[63]  For the avoidance of doubt, the Debtors shall only cause a Solicitation Package (including a Ballot) to be emailed to holders of Direct Abuse Claims who specifically indicated on their filed Sexual Abuse Survivor Proofs of Claim that the Debtors are authorized to communicate with these holders regarding their claims via email.  Each holder of a Direct Abuse Claim who did not specifically authorize email communications on his or her Sexual Abuse Survivor Proof of Claim shall only be served a Solicitation Package by U.S. mail.

### 3. Solicitation Procedures, Ballots, and Voting Deadline

If you are entitled to vote to accept or reject the Plan, one or more Ballot(s) has been enclosed in your Solicitation Package for the purpose of voting on the Plan. Please vote and return your Ballot(s) in accordance with the instructions accompanying your Ballot(s).

You should carefully review (1) the Plan, (2) this Disclosure Statement, (3) the Solicitation Procedures Order, (4) the Confirmation Hearing Notice, and (5) the detailed instructions accompanying your Ballot prior to voting on the Plan.

After carefully reviewing these materials, including the detailed instructions accompanying your Ballot(s), please indicate your acceptance or rejection of the Plan by completing the Ballot(s). All votes to accept or reject the Plan with respect to any Class of Claims entitled to vote on the Plan must be cast by properly submitting the duly completed and executed form of Ballot designated for such Class. Holders of Claims or their Firms (as applicable) voting on the Plan should complete and sign the Ballot(s) in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept (vote in favor of) the Plan" or "Reject (vote against) the Plan." In addition, if any holder of a Claim who does not vote to accept the Plan elects not to grant the releases contained in Article X.J.4 of the Plan, then it should check the appropriate box on its Ballot and follow the instructions contained in the Ballot. Eligible holders of General Unsecured Claims and Direct Abuse Claims that wish to make the optional elections for Convenience Class treatment or an Expedited Distribution, as such elections are more fully described herein and in the Plan, must carefully follow the instructions set forth in their Ballots. In order for your vote to be counted, you must complete and return your Ballot(s) in accordance with the instructions accompanying your Ballot(s) on or before the Voting Deadline. Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you.

**In order for the holder of a Claim in the Voting Class to have such holder's Ballot counted as a vote to accept or reject the Plan, such holder's Ballot must be properly completed, executed, and delivered by (1) the electronic Ballot submission platform on the Solicitation Agent's website (the "E-Ballot Platform"), (2) mail, (3) overnight delivery, or (4) personal delivery, so that such holder's Ballot is actually received by the Solicitation Agent on or before the Voting Deadline, i.e. July 30, 2021 at 4:00 p.m. prevailing Eastern Time.**

**Specifically, each Ballot must be returned through the E-Ballot Platform at (a) https://omniagentsolutions.com/bsa-SAballots for Direct Abuse Claim Ballots and Master Ballots or (b) https://omniagentsolutions.com/bsa-ballots for all other Ballots, by mail using the envelope included in the Solicitation Package, as applicable, or by overnight or personal delivery to the following address:**

**Boy Scouts of America Ballot Processing**
**c/o Omni Agent Solutions**
**5955 De Soto Avenue, Suite 100**
**Woodland Hills, CA 91367**

**IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.**

**ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM IN THE VOTING CLASSES BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.**

**EACH HOLDER OF A CLAIM IN THE VOTING CLASSES MUST VOTE ALL OF ITS CLAIMS WITHIN SUCH CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM IN THE VOTING CLASSES WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTOR THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN SUBMITTED OR, IF ANY OTHER BALLOTS HAVE BEEN SUBMITTED WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN. IF A HOLDER OF A CLAIM SUBMITS MORE THAN ONE INCONSISTENT BALLOTS RECEIVED BY THE SOLICITATION AGENT ON THE SAME DAY, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.**

**IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.**

C.      <u>Classes Entitled to Vote on the Plan</u>

Under the Bankruptcy Code, holders of Claims and Interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan. Holders of Claims in Classes 1 and 2 are Unimpaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Holders of Interests in Class 10 shall not receive or retain property on account of such interests and are, therefore, deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, no holders of Claims or Interests in such Classes shall be entitled to vote to accept or reject the Plan.

Each of Classes Class 3A (2010 Credit Facility Claims), Class 3B (2019 RCF Claims), Class 4A (2010 Bond Claims), Class 4B (2012 Bond Claims), Class 5 (Convenience Claims), Class 6 (General Unsecured Claims), Class 7 (Non-Abuse Litigation Claims), Class 8 (Direct Abuse Claims), and Class 9 (Indirect Abuse Claims) are Impaired and the holders of Claims in Classes 3A, 3B, 4A, 4B, 5, 6, 7, 8 and 9 are entitled to vote to accept or reject the Plan.

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package, including a Ballot setting forth detailed voting instructions. If your Claim is included in the Voting Classes, you should read your Ballot and

carefully follow the instructions included in the Ballot.  Please use only the Ballot or Master Ballot that accompanies this Disclosure Statement or the Ballot that the Debtors otherwise provided to you.

### 1.    *Holders of Claims Entitled to Vote*

Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is deemed to be "impaired" under a plan unless (1) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or equity interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such claim or equity interest, the plan (a) cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy or defaults of a kind that do not require cure), (b) reinstates the maturity of such claim or equity interest as it existed before the default, (c) compensates the holder of such claim or equity interest for any damages from such holder's reasonable reliance on such legal right to an accelerated payment, (d) if such claim or such interest arises from a failure to perform nonmonetary obligations, other than a default arising from a failure to operate a nonresidential real property lease, compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure and (e) does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

The following table sets forth a simplified summary of which Classes are entitled to vote on the Plan and which are not and the voting status for each of the separate Classes of Claims and Interests provided for in the Plan.

| Class | Claim or Interest | Entitled to Vote |
|---|---|---|
| 1 | Other Priority Claims | No—Presumed to Accept |
| 2 | Other Secured Claims | No—Presumed to Accept |
| 3A | 2010 Credit Facility Claims | Yes |
| 3B | 2019 RCF Claims | Yes |
| 4A | 2010 Bond Claims | Yes |
| 4B | 2012 Bond Claims | Yes |
| 5 | Convenience Claims | Yes |
| 6 | General Unsecured Claims | Yes |
| 7 | Non-Abuse Litigation Claims | Yes |
| 8 | Direct Abuse Claims | Yes |
| 9 | Indirect Abuse Claims | Yes |
| 10 | Interests in Delaware BSA | No—Deemed to Reject |

In accordance with sections 1126 and 1129 of the Bankruptcy Code, the Voting Classes are Impaired under the Plan and, to the extent Claims in the Voting Classes are deemed Allowed or subject to the distributions under the Trust Distribution Procedures, the holders of such Claims will receive distributions under the Plan.  As a result, the holders of Claims in each of these Classes are entitled to vote to accept or reject the Plan.

Holders of Claims in Classes 1 and 2 are Unimpaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, no holders of Claims or Interests in such Classes shall be entitled to vote to accept or reject the Plan.

Accordingly, the Debtors are only soliciting votes on the Plan from holders of Claims, in Classes 3A, 3B, 4A, 4B, 5, 6, 7, 8, and 9.  If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package or a Ballot. If your Claim is included in the Voting Classes, you should read your Ballot and carefully follow the instructions included in the Ballot.  Please use only the Ballot that accompanies this Disclosure Statement or the Ballot that the Debtors otherwise provided to you.

**Holders of an Impaired Claim under the Plan are deemed to provide the releases contained in Article X.J.4 of the Plan if they vote to accept the Plan, do not vote to accept or reject the Plan, or reject the Plan but do not opt out of the release provision of the Plan.  Holders of an Impaired Claim may check box on their Ballot to opt out of the releases in Article X.J.4 of the Plan *only if* they vote to reject the Plan or abstain from voting on the Plan.  Please be advised that the Plan also contains injunction and exculpation provisions, certain of which are set forth in the Ballot.  If the Plan is confirmed by the Bankruptcy Court, these sections will be binding on holders of an Impaired Claim whether or not they elect to opt out of the releases in Article X.J.4 of the Plan by their Ballot.  For a full description of these provisions, see Article VI.O of this Disclosure Statement and Article X of the Plan, which sets forth the terms of each of these provisions.**

If you have filed a Proof of Claim that is subject to an objection, other than a "reclassify" or "reduce and allow" objection, that is filed with the Bankruptcy Court on or before the Solicitation Date (a "Disputed Claim"), you are not entitled to vote on the Plan.  If you seek to challenge the disallowance or estimation of your Disputed Claim for voting purposes, you must file with the Bankruptcy Court a motion for an order, pursuant to Bankruptcy Rule 3018(a), temporarily allowing such Claim for purposes of voting to accept or reject the Plan (a "Rule 3018(a) Motion").  **As set forth in the Confirmation Hearing Notice and the Solicitation Procedures, any Rule 3018(a) Motion shall be filed with the Bankruptcy Court and served on the Debtors on or before June 17, 2021.  If a holder of a Disputed Claim files a timely Rule 3018(a) Motion, such holder's Ballot shall not be counted unless a Resolution Event occurs with respect to such Disputed Claim on or prior to July 30, 2021.**  For the avoidance of doubt, any Claim that is subject to an objection *after* the Solicitation Date shall be deemed temporarily allowed solely for voting purposes in accordance with the Solicitation Procedures, without further action by the Debtors or the holder of the Claim, and without further order of the Bankruptcy Court, unless the Debtors and claimant agree to other treatment for voting purposes or the Bankruptcy Court orders otherwise.

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  The Solicitation Procedures also set forth assumptions and procedures for determining the amount of Claims that each creditor is entitled to vote in these Chapter 11 Cases and how votes will be counted under various scenarios.

**Your vote on the Plan is important.**  The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired and entitled to vote under a plan votes to accept such plan, unless the plan is being confirmed under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.  Section 1129(b) permits confirmation of a plan of reorganization, notwithstanding the nonacceptance of the plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims or interests votes to accept a proposed plan.  Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class.

D.    <u>Certain Factors to Be Considered Prior to Voting</u>

There are a variety of factors that all holders of Interests entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors, which may impact recoveries under the Plan, include the following:

1.    unless otherwise specifically indicated, the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

2.    although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

3.    the Debtors may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

4.    any delays of either Confirmation or the occurrence of the Effective Date could result in, among other things, increased Administrative Expense Claims and Professional Fee Claims.

**Additionally, the Plan may be modified to include one or more settlements pursuant to Bankruptcy Rule 9019 to resolve any unresolved controversies, including but not limited to those described in this Disclosure Statement.**  While these factors, including the incorporation of any settlements, could affect distributions available to holders of Allowed Claims or Abuse Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a re-solicitation of the votes of holders of Claims in the Voting Classes.

For a further discussion of risk factors, please refer to <u>Article X</u> of this Disclosure Statement, entitled "Risk Factors."

## ARTICLE IX.  CONFIRMATION PROCEDURES

A.      Hearing on Plan Confirmation

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, shall hold a hearing to confirm a plan of reorganization.  The Confirmation Hearing pursuant to section 1128 of the Bankruptcy Code will be held on August 30, 2021, before the Honorable Laurie Selber Silverstein, United States Bankruptcy Judge for the District of Delaware, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market Street, 6th Floor, Wilmington, Delaware.  The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the Entities who have filed an objection to the Plan, if any, without further notice to parties in interest.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.  Any objection to Confirmation of the Plan must: (i) be made in writing; (ii) state the name and address of the objecting party and the nature and amount of the Claim or Interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Plan and include any evidentiary support therefor; and (iv) be filed with the Bankruptcy Court, 824 North Market Street, Third Floor, Wilmington, Delaware 19801 together with proof of service **on or before the Plan Objection Deadline (<u>July 30, 2021 at 4:00 p.m. (Eastern Time)</u>)**, and served so as to be <u>actually</u> <u>received</u> by the notice parties set forth in the Confirmation Hearing Notice before the Plan Objection Deadline, which service may be through the CM/ECF system, with courtesy copies by email.

B.      Requirements for Confirmation of the Plan

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan is (A) accepted by all impaired Classes of Claims and Interests entitled to vote or, if rejected or deemed rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (B) in the "best interests" of the holders of Claims and Interests impaired under the Plan; and (C) feasible.

C.      Acceptance by an Impaired Class

The Bankruptcy Code requires, as a condition to confirmation, that each class of claims or interests that is impaired under a plan of reorganization, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  As stated above, the Voting Classes are Impaired Classes and are comprised of the holders of Claims in Class 3A, Class 3B, Class 4A, Class 4B, Class 5, Class 6, Class 7, Class 8, and Class 9.  Section 1126(c) of the Bankruptcy

Code defines acceptance of a plan by a class of impaired claims as an affirmative vote of more than one-half in number of total allowed claims in such class that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims in such class that have voted. Thus, the Voting Classes described herein will have voted to accept the Plan only if one-half of the holders of Allowed Claims and Abuse Claims, as applicable, with at least two-thirds of the total dollar amount of the Allowed Claims and Abuse Claims, as applicable, vote on the Plan to accept.

**AS EXPLAINED IN <u>ARTICLE VI.G</u> OF THIS DISCLOSURE STATEMENT, THE BANKRUPTCY CODE CONTAINS PROVISIONS FOR CONFIRMATION OF A PLAN EVEN IF IT IS NOT ACCEPTED BY ALL CLASSES.  THESE SO-CALLED "CRAMDOWN" PROVISIONS ARE SET FORTH IN SECTION 1129(b) OF THE BANKRUPTCY CODE, WHICH PROVIDES THAT A PLAN OF REORGANIZATION CAN BE CONFIRMED EVEN IF IT HAS NOT BEEN ACCEPTED BY ALL IMPAIRED CLASSES OF CLAIMS AND INTERESTS AS LONG AS AT LEAST ONE IMPAIRED CLASS OF NON-INSIDER CLAIMS HAS VOTED TO ACCEPT THE PLAN.**

D.     <u>Best Interests of Creditors / Liquidation Analysis</u>

Section 1112(c) of the Bankruptcy Code provides that non-profit Entities such as the Debtors, cannot have their chapter 11 cases converted into chapter 7 cases involuntarily.[64]  A liquidation under chapter 7 of the Bankruptcy Code is—unlike in the context of for-profit debtors—a path that can be chosen only by the non-profit debtor.  Because the Chapter 11 Cases could not be involuntarily converted to a chapter 7 liquidation, the Debtors submit they are not required to satisfy the requirements of section 1129(a)(7) in connection with Confirmation of the Plan.

Although the Debtors do not believe they are required to satisfy the "best interests of creditors" test embodied in section 1129(a)(7), the Debtors do believe a liquidation analysis will be helpful to holders of Claims as they evaluate their proposed treatment under the Plan.  Accordingly, the Debtors are providing the Liquidation Analysis attached as **Exhibit B** hereto.

Exhibit B to the Disclosure Statement contains three sets of analyses. The first section contains the Liquidation Analysis applicable to the Debtors and Related Non-Debtor Entities. The second section provides a similar analysis in relation to the Local Councils. Although the Debtors do not believe they are required to satisfy the best-interests test as it relates to the Local Councils, the Debtors have consented to including this analysis to address objections to the Disclosure Statement asserted by the TCC and others.

The Debtors' submission of the Liquidation Analysis shall not be construed as or deemed to constitute a waiver or admission of any kind.  The Debtors reserve all rights to oppose the applicability of the best interests test in the Chapter 11 Cases.

---

[64]    11 U.S.C. § 1112(c) ("The court may not convert a case under [chapter 11] to a case under chapter 7 of this title if the debtor is a farmer or a corporation that is not a moneyed, business, or commercial corporation, unless the debtor requests such conversion.").

The Liquidation Analysis considers whether holders of Impaired Claims will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Nine Classes of Impaired Claims, Class 3A (2010 Credit Facility Claims), Class 3B (2019 RCF Claims), Class 4A (2010 Bond Claims), Class 4B (2012 Bond Claims), Class 5 (Convenience Claims), Class 6 (General Unsecured Claims), Class 7 (Non-Abuse Litigation Claims), Class 8 (Direct Abuse Claims), and Class 9 (Indirect Abuse Claims), are Impaired under the Plan.

To calculate the probable distribution to holders of each Impaired Class of Claims and interests if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtors' assets if the Debtors were in cases under chapter 7 of the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a sale of the Debtors' assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors and interest holders would be reduced by the Claims of any Secured creditors to the extent of the value of their collateral, by the costs and expenses of liquidation, and by other administrative expenses and costs of both the chapter 7 cases and the Chapter 11 Cases. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtors in the Chapter 11 Cases (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the chapter 7 cases, litigation costs, and any Claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases.

Once the Bankruptcy Court ascertains the recoveries in liquidation of Secured creditors and priority claimants, if any, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

Nine Classes of Impaired Claims, Class 3A (2010 Credit Facility Claims), Class 3B (2019 RCF Claims), Class 4A (2010 Bond Claims), Class 4B (2012 Bond Claims), Class 5 (Convenience Claims), Class 6 (General Unsecured Claims), Class 7 (Non-Abuse Litigation Claims), Class 8 (Direct Abuse Claims), and Class 9 (Indirect Abuse Claims), are Impaired under the Plan. If the Debtors were liquidated under chapter 7 of the Bankruptcy Code, holders of Convenience Claims (Class 5), General Unsecured Claims (Class 6), and Abuse Claims (Classes 8 and 9) would receive lesser distributions than under the Plan, as explained in detail in the Liquidation Analysis. In addition, holders of Claims in all other Classes will receive at least as much under the Plan as they would in a liquidation and, moreover, the Plan provides much more certain, efficient, and timely recoveries to holders of these Claims.

The following chart reflects the estimated recoveries under a hypothetical chapter 7 liquidation as compared to the recoveries under the Global Resolution Plan and the BSA Toggle Plan:

| Class | Designation[65] | Estimated Amount[66] and Approximate Percentage Recovery | Estimated Recovery in Chapter 7 |
|---|---|---|---|
| 1 | Other Priority Claims | Estimated Allowed Amount: Less than $0.1 million<br><br>Estimated Percentage Recovery: 100% | Estimated Allowed Amount: $0.1 million<br><br>Estimated Percentage Recovery: 100% |
| 2 | Other Secured Claims | Estimated Amount: $0<br><br>Estimated Percentage Recovery: 100% | **BSA Only**:<br>Estimated Amount: $0<br><br>Estimated Percentage Recovery: N/A<br><br>**BSA and Local Councils**:<br>Estimated Amount: $1.1 billion[67]<br><br>Estimated Percentage Recovery: 100% |
| 3A | 2010 Credit Facility Claims | Estimated Amount: $80,762,060<br><br>Estimated Percentage Recovery: 100% | Estimated Amount: $80,762,060<br><br>Estimated Percentage Recovery: 100% |
| 3B | 2019 RCF Claims | Estimated Amount: $61,542,720<br><br>Estimated Percentage Recovery: 100% | Estimated Amount: $61,542,720<br><br>Estimated Percentage Recovery: 100% |
| 4A | 2010 Bond Claims | Estimated Amount: $40,137,274<br><br>Estimated Percentage Recovery: 100% | Estimated Amount: $40,137,274<br><br>Estimated Percentage Recovery: 100% |

---

[65]  The Debtors reserve the right to eliminate any Class of Claims in the event they determine that there are no Claims in such Class.

[66]  Figures with respect to the Allowed amounts of the Claims set forth in this chart are based upon the Debtors' best estimates of such Claims as of the date of this Disclosure Statement.  These estimates are based on various assumptions.  The actual amounts of Allowed Claims may differ significantly from these estimates should one or more underlying assumptions prove to be incorrect.  Such differences may adversely affect the percentage of recovery to holders of Allowed Claims under the Plan.  Moreover, the estimated recoveries set forth herein are necessarily based on certain assumptions, the realization of which are beyond the Debtors' control.

[67]  Represents the PBGC claim related to pension termination, a portion of which is assumed to be asserted as a secured claim against each and every member of the controlled group not currently in bankruptcy and result in a full recovery against both the secured and unsecured portion.

| Class | Designation[65] | Estimated Amount[66] and Approximate Percentage Recovery | Estimated Recovery in Chapter 7 |
|---|---|---|---|
| 4B | 2012 Bond Claims | Estimated Amount: $145,662,101<br><br>Estimated Percentage Recovery: 100% | Estimated Amount: $145,662,101<br><br>Estimated Percentage Recovery: 100% |
| 5 | Convenience Claims | Estimated Amount: $2.3 million – $2.9 million<br><br>Estimated Percentage Recovery: 100% | Claims are included in General Unsecured Claims in Class 6 |
| 6 | General Unsecured Claims | Estimated Amount: $26.5 million – $33.5 million<br><br>Estimated Percentage Recovery: 75 – 95% | Estimated Amount: $1.1 billion<br><br>Estimated Percentage Recovery: 0.2% |
| 7 | Non-Abuse Litigation Claims | Estimated Amount: Undetermined[68]<br><br>Estimated Percentage Recovery: 100% | Estimated Amount: Undetermined<br><br>Estimated Percentage Recovery: 100% |
| 8 | Direct Abuse Claims[69] | Estimated Amount: $2.4 billion – $7.1 billion<br><br>**Under the Global Resolution Plan**:<br>Estimated Percentage Recovery: 17 – 50% *plus* insurance rights, **expected to yield up to 100% recovery**[70]<br><br>**Under the BSA Toggle Plan**:<br>Estimated Percentage Recovery: 1 – 4% *plus* insurance rights, **expected to have limited recovery**[71] | **BSA Only**:<br>Estimated Amount: $2.4 billion – $7.1 billion<br><br>Estimated Percentage Recovery: 0.1% – 0.5%[73]<br><br>**BSA and Local Councils**:<br>Estimated Amount: $2.4 billion – $7.1 billion<br><br>Estimated Percentage Recovery: 5% – 6%[74] |

---

[68]   This class is comprised of approximately forty five wrongful death or personal injury claims as well as less than ten other litigation claims. None of these claims have been liquidated.

[69]   Under the Plan, "Direct Abuse Claim" means an Abuse Claim that is not an Indirect Abuse Claim.

[70]   The following calculation was used to determine the percentage recovery range under the Global Resolution Plan: ($119.9 million (BSA Settlement Contribution) plus $425 million (Local Counsel Contribution) plus $650 million (Hartford settlement amount)) divided by $2.4 billion - $7.1 billion (Estimated Abuse Claims Range).

[71]   The following calculation was used to determine the percentage recovery range under the BSA Toggle Plan: $99.9 million (BSA Settlement Contribution) divided by $2.4 billion - $7.1 billion (Estimated Abuse Claims Range). The BSA Settlement Contribution is assumed to be lower under the BSA Toggle Plan versus the Global Resolution Plan as BSA is assumed to have incurred more litigation and professional fees prior to Plan Confirmation.

| Class | Designation[65] | Estimated Amount[66] and Approximate Percentage Recovery | Estimated Recovery in Chapter 7 |
|---|---|---|---|
| | | **Under the Expedited Distribution**:[72]<br>Estimated Amount: $1,500.00 | |
| 9 | Indirect Abuse Claims[75] | **Under the Global Resolution Plan**:<br>Estimated Amount: Unknown[76]<br><br>Estimated Percentage Recovery: N/A<br><br>**Under the BSA Toggle Plan**:<br>Estimated Amount: Unknown<br><br>Estimated Percentage Recovery: N/A | Estimated Amount: Unknown<br><br>Estimated Percentage Recovery: N/A |
| 10 | Interests in Delaware BSA | Estimated Amount: N/A<br><br>Estimated Percentage Recovery: 0% | [TBD] |

---

[73]   Recoveries in a hypothetical chapter 7 liquidation do not include recoveries on BSA's insurance policies as such recoveries are uncertain and are expected to be lower in a liquidation due to the difficulty of obtaining insurance recoveries in such a scenario because, in large part, many of the BSA's Insurance Policies are subject to the rights of co-insured, non-debtors, including Local Councils, under those policies and because obtaining recoveries would likely require significant litigation.

[74]   Recoveries in a hypothetical chapter 7 liquidation do not include recoveries on BSA's insurance policies as such recoveries are uncertain and are expected to be lower in a liquidation due to the difficulty of obtaining insurance recoveries in such a scenario because, in large part, many of the BSA's Insurance Policies are subject to the rights of co-insured, non-debtors, including Local Councils, under those policies and because obtaining recoveries would likely require significant litigation.

[72]   Pursuant to Article III.B.10 of the Plan, under the Global Resolution Plan, each holder of a properly completed non-duplicative proof of claim asserting a Direct Abuse Claim who filed such Claim by the Bar Date or was permitted by a Final Order of the Bankruptcy Court to file a late claim may elect on his or her Ballot to receive an Expedited Distribution, in exchange for a full and final release in favor of the Debtors, the Related Non-Debtor Entities, the Local Councils, Contributing Chartered Organizations, and the Settling Insurance Companies, including Hartford.  The Expedited Distribution does not apply if the Plan is confirmed as a BSA Toggle Plan.  Under the Plan, "Expedited Distribution" means a one-time Cash payment from the Settlement Trust in the amount of $1,500.00, conditioned upon Confirmation of the Plan as a Global Settlement Plan.

[75]   Under the Plan, "Indirect Abuse Claim" means a liquidated or unliquidated Abuse Claim for contribution, indemnity, reimbursement, or subrogation, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, including any indemnification, reimbursement, hold-harmless or other payment obligation provided for under any prepetition settlement, insurance policy, program agreement or contract.

[76]   The Debtors are unable to estimate the recovery amount for Indirect Abuse Claims under the Global Resolution Plan, BSA Toggle Plan, and hypothetical chapter 7 liquidation since they are unliquidated and contingent and subject to objection under section 502(e) of the Bankruptcy Code.  However, to the extent the Indirect Abuse Claims become liquidated in the future, Indirect Abuse Claimants have the ability, pursuant to the Plan, to bring a claim for reconsideration under section 502(j) of the Bankruptcy Code and may be able to recover, on account of such claim, against the Settlement Trust assets.

E.    Feasibility

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan of reorganization is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet obligations under the Plan.  The Debtors, with the assistance of their advisors, have prepared projections for the calendar years 2021 through 2025, including management's assumptions related thereto, attached hereto as **Exhibit C** (the "Financial Projections").  The Financial Projections assume that the Plan will be implemented in accordance with its stated terms.  The Debtors are unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the Financial Projections due to a material change in the Debtors' prospects so long as the Effective Date occurs before September 1, 2021.  As reflected in the Financial Projections, the Debtors anticipate that they will timely meet all of their collective obligations and will be financially viable after Confirmation of the Plan.  Accordingly, the Debtors believe that Confirmation is not likely to be followed by liquidation or the need for further reorganization.

F.    Conditions Precedent to Confirmation of the Plan

Confirmation of the Plan shall not occur unless the following conditions precedent have been satisfied, or are otherwise waived, in accordance with Article IX.C of the Plan:

1.    The Bankruptcy Court shall have entered the Disclosure Statement Order, in form and substance reasonably acceptable to the Debtors, JPM, and the Creditors' Committee;

2.    The Debtors, JPM, and the Creditors' Committee shall have approved of or accepted the Confirmation Order in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet, as incorporated by reference in Article I.D of the Plan;

3.    The Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order and any other order in conjunction therewith, in form and in form and substance acceptable to the Debtors.  These findings and determinations are designed, among other things, to ensure that the Injunctions, Releases and Discharges set forth in Article X of the Plan shall be effective, binding and enforceable and shall, among other things, provide that:

a.    the Plan complies with all applicable provisions of the Bankruptcy Code, including that the Plan was proposed in good faith and that the Confirmation Order was not be procured by fraud;

b.    the Channeling Injunction and the Insurance Entity Injunction (if the Plan is Confirmed as a Global Resolution Plan) are to be implemented in connection with the Settlement Trust and shall be in full force and effect on the Effective Date;

c.    upon the Effective Date, the Settlement Trust shall assume the liabilities of the Protected Parties with respect to Abuse Claims and have exclusive authority as of the Effective Date to satisfy or defend such Abuse Claims;

d.    the Settlement Trust will be funded with the Settlement Trust Assets;

e.    the Settlement Trust will use the Settlement Trust Assets to resolve Abuse Claims;

f.    the terms of the Discharge Injunction, the Channeling Injunction, the Release Injunctions, and the Insurance Entity Injunction (if the Plan is Confirmed as a Global Resolution Plan), including any provisions barring actions against third parties, are set out in conspicuous language in the Plan and in the Disclosure Statement;

g.    the Future Claimants' Representative was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Channeling Injunction and the Insurance Entity Injunction (if the Plan is Confirmed as a Global Resolution Plan) for the purpose of, among other things, protecting the rights of persons who might subsequently assert Abuse Claims of the kind that are addressed in the Channeling Injunction (if the Plan is Confirmed as a Global Resolution Plan) and the Insurance Entity Injunction, which will be transferred to and assumed by the Settlement Trust;

h.    the Plan complies with section 105(a) of the Bankruptcy Code to the extent applicable;

i.    the Injunctions are essential to the Plan and the Debtors' reorganization efforts;

j.    the Bankruptcy Code authorizes the Insurance Assignment notwithstanding any terms of the Insurance Policies, the Insurance Settlement Agreements, or provisions of applicable non-bankruptcy law that any Insurance Company may otherwise argue prohibit the Insurance Assignment;

k.    the Insurance Settlement Agreements are approved, and any Insurance Company that has contributed funds, proceeds or other consideration to or for the benefit of the Settlement Trust pursuant to an Insurance Settlement Agreement is designated as a Settling Insurance Company;

l.    if the Plan is sought to be Confirmed as a Global Resolution Plan, the Abuse Claims Settlement represents a sound exercise of the Debtors' business judgment, is in the best interest of the Debtors' Estates, complies with section 1123 of the Bankruptcy Code, and is approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019;

m.    the JPM / Creditors' Committee Settlement represents a sound exercise of the Debtors' business judgment, is in the best interest of the Debtors' Estates, complies with section 1123 of the Bankruptcy Code, and is

213

approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019;

n.     the Settlement of Restricted and Core Asset Disputes represents a sound exercise of the Debtors' business judgment, is in the best interest of the Debtors' Estates, complies with section 1123 of the Bankruptcy Code, and is approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019; and

o.     if the Plan is sought to be Confirmed as a Global Resolution Plan, the Hartford Insurance Settlement Agreement, including the sale of the Hartford Policies free and clear of all Interests of any Person (as such terms are defined in the Hartford Insurance Settlement Agreement) is approved in accordance with the findings of fact and conclusions of law made by the Bankruptcy Court pursuant to Article V.R.4 of the Plan.

G.     Conditions Precedent to the Effective Date

The Effective Date of the Plan shall not occur unless the following conditions precedent have been satisfied or waived in accordance with Article IX.C of the Plan:

1.     if the Plan is Confirmed as a Global Resolution Plan, the Confirmation Order shall have been submitted to the District Court for affirmation, the District Court shall have entered the Affirmation Order in form and substance acceptable to the Debtors, and the Confirmation Order and the Affirmation Order shall have become Final Orders.  The Effective Date may occur when the Confirmation Order or the Affirmation Order are not Final Orders at the sole option of the Debtors unless the effectiveness of the Confirmation Order or the Affirmation Order, as applicable, shall have been stayed or vacated, in which case the Effective Date may be the first Business Day immediately following the expiration or other termination of any stay of effectiveness of the Confirmation Order or the Affirmation Order;

2.     the Settlement Trust Assets shall, simultaneously with the occurrence of the Effective Date or as otherwise provided herein, be transferred to, vested in, and assumed by the Settlement Trust in accordance with Article IV and Article V of the Plan;

3.     the Settlement Trust Documents and other applicable Plan Documents necessary or appropriate to implement the Plan shall have been executed, delivered and if applicable, filed with the appropriate governmental authorities;

4.     the Restated Debt and Security Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness thereof shall have been satisfied or duly waived in writing in accordance with the terms of the Restated Debt and Security Documents and the closing shall have occurred thereunder;

5.      the Foundation Loan Agreement and any applicable collateral and other loan documents governing the Foundation Loan shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness thereof shall have been satisfied or duly waived in writing in accordance with the terms of the Foundation Loan Agreement and related documentation, and the closing shall have occurred thereunder;

6.      the Debtors shall have adequately funded the Professional Fee Reserve so as to permit the Debtors to make Distributions on account of Allowed Professional Fee Claims in accordance with Article II of the Plan;

7.      the Debtors shall have obtained all authorizations, consents, certifications, approvals, rulings, opinions or other documents that are necessary to implement and effectuate the Plan;

8.      all payments required to be made pursuant to the terms of the Cash Collateral Order shall have been paid;

9.      all actions, documents, and agreements necessary to implement and effectuate the Plan shall have been effected or executed; and

10.     the Debtors shall have filed a notice of occurrence of the Effective Date.

H.      Waiver of Conditions Precedent to the Effective Date

To the fullest extent permitted by law, each of the conditions precedent in Article IX of the Plan may be waived or modified, in whole or in part, in the sole discretion of the Debtors and, to the extent the conditions precedent impact the treatment of General Unsecured Claims, Non-Abuse Litigation Claims, or Convenience Claims, with the consent of the Creditors' Committee (not to be unreasonably withheld);  provided, that the conditions precedent set forth in Article IX.B.4 and Article IX.B.8 of the Plan may be waived only with the prior written consent of JPM and, if the Plan is Confirmed as a Global Resolution Plan, the condition precedent set forth in Article IX.A.3.o of the Plan may be waived only with the prior written consent of Hartford.   Any waiver or modification of a condition precedent under Article IX of the Plan may be effectuated at any time, without notice, without leave or order of the Bankruptcy Court or the District Court, and without any other formal action other than proceedings to confirm or consummate the Plan.  The failure to satisfy or waive any condition precedent to the Effective Date may be asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied or waived.

I.      Substantial Consummation of the Plan

On the Effective Date, the Plan shall be deemed to substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

J.      *Vacatur* of Confirmation Order; Non-Occurrence of Effective Date

If the Confirmation Order is vacated or the Effective Date does not occur within 180 days after entry of the Confirmation Order (subject to extension by the Debtors in their sole discretion), the Plan shall be null and void in all respects and nothing contained in the Plan or this Disclosure Statement shall (1) constitute a waiver or release of any Causes of Action by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any holders of a Claim or Interest or any other Person; (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders, or any other Person in any respect; or (4) be used by the Debtors or any other Person as evidence (or in any other way) in any litigation, including with respect to the strengths and weaknesses of positions, arguments or claims of any of the parties to such litigation.

## ARTICLE X. RISK FACTORS

**HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR INCORPORATED BY REFERENCE, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.    THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE MATERIALLY DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENT.**

A.      Risks Relating to the Debtors' Operations, Financial Condition and Certain Bankruptcy Law Considerations

   *1.     The Plan is Premised Upon a Global Resolution of Abuse Liability and if Such Resolution Cannot be Obtained, There is a Risk that the Plan Will Not Be Confirmed*

If confirmed and consummated, the Debtors believe the Plan will accomplish two core objectives: (a) provide an equitable, streamlined, and certain process by which Abuse Survivors may obtain compensation for their Abuse Claims and (b) ensure that the BSA has the ability to continue its vital charitable mission.  If the Plan cannot be Confirmed, or if the Bankruptcy Court otherwise finds that conditions necessary for Confirmation cannot be met, the Debtors may be required to liquidate and/or voluntarily convert these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  In this event, the Debtors believe that neither of the Debtors' core objectives would be accomplished.  Abuse Survivors would not have a certain, streamlined way to recover

on account of their Claims, and there would be a material risk that the BSA's mission could not continue to be carried out.

The Debtors believe that the best mechanism for the Debtors to achieve these two core objectives is Confirmation of a plan of reorganization as a Global Resolution Plan that provides for substantial contributions by Local Councils, by Contributing Chartered Organizations, and by Settling Insurance Companies (if any) to the Settlement Trust in exchange for the protection of the Channeling Injunction and Releases under the Plan. If there is insufficient support for the Plan to be Confirmed as a Global Resolution Plan, the Debtors will pursue Confirmation of the Plan as a BSA Toggle Plan. Even if there is sufficient support for Confirmation of the Plan as a Global Resolution Plan, or alternatively, as a BSA Toggle Plan, the commitments contemplated by the Plan will not be realized if the Plan is not Confirmed. Without an agreement by a substantial majority of creditors to support the Plan, the Debtors will be unable to meet the requirements necessary to Confirm the Plan as currently contemplated with respect to the Channeling Injunction and Releases. The Channeling Injunction and Releases are a necessary component of the Plan, without which the Local Council Contribution and the Contributing Chartered Organization Contribution will not be made to the Settlement Trust.

### 2.     *If Enough Holders of Abuse Claims Do Not Vote to Accept the Plan, the Plan May Be Confirmed as a BSA Toggle Plan Instead of a Global Resolution Plan*

The Debtors believe that the best path forward is the Global Resolution Plan. The Debtors believe it provides an equitable, streamlined, and certain process by which (a) Abuse Survivors may obtain compensation for their Abuse Claims from the BSA, Local Councils, Contributing Chartered Organizations and Settling Insurance Companies and (b) ensures that the BSA has the ability to continue its vital charitable mission. The contributions from the Local Councils, Contributing Chartered Organizations and Settling Insurance Companies to the Settlement Trust, along with BSA's contributions, will be used to fund what the Debtors believe are significant recoveries for holders of compensable Direct Abuse Claims in accordance with the terms of the Trust Distribution Procedures. The Trust Distribution Procedures will establish the methodology for resolution of Abuse Claims, establish the process by which Abuse Claims will be reviewed by the Settlement Trust, and will specify liquidated values for compensable Claims based on the nature of the underlying Abuse. The Debtors believe the recoveries to holders of Direct Abuse Claims are substantially greater under the Global Resolution Plan. In order to ensure holders of Direct Abuse Claims receive this greater recovery, holders of Direct Abuse Claims as a Class must vote in favor of the Plan in a sufficient number to confirm the Plan.

If there is insufficient support for the Plan to be Confirmed as a Global Resolution Plan, the Debtors will pursue Confirmation of the Plan as a BSA Toggle Plan. In that case, the BSA Toggle Plan provides a process by which Abuse Survivors may obtain compensation for Abuse from the BSA only. Confirmation of the BSA Toggle Plan, as opposed to the Global Resolution Plan, forces Abuse Survivors to seek compensation on account of their Claims against Local Councils and Chartered Organizations by filing independent law suits in the tort system against such entities. The Debtors believe this will necessarily entail lengthy, complicated litigation. Abuse Survivors will be competing for judgments and settlements against Local Councils and Chartered Organization in multiple venues, resulting in a "rush to the courthouse." Moreover,

the Debtors believe the delays and uncertainties inherent in such a scenario, as well as the more limited contributions that will be made to the Settlement Trust in these Chapter 11 Cases, will likely produce inferior outcomes and recoveries for Abuse Survivors than would be achieved under the Global Resolution Plan.

As a result, holders of Direct Abuse Claims are strongly encouraged by the Debtors to vote in favor of the Plan in order to ensure that the Plan does not default to the BSA Toggle Plan.

### 3. *The Pension Benefit Guaranty Corporation Could Assert Contingent Claims*

On October 29, 2020, the Pension Benefit Guaranty Corporation ("PBGC") filed a contingent Proof of Claim in the amount of $1,102,200,000 against the BSA (the "Unfunded Benefit Liability Claim") based on the unfunded benefit liabilities of the Pension Plan. Contemporaneously, the PBGC also filed a contingent Proof of Claim with respect to PBGC premiums, including an amount of $51,862,500 against the BSA that may become due upon termination of the Pension Plan (the "Termination Premiums Claims"). Finally, the PBGC contemporaneously asserted a claim in an unspecified amount with respect to any failure to make minimum funding contributions (the "Minimum Funding Contribution Claims"). The Unfunded Benefit Liability Claims and the Termination Premiums Claims are contingent on the termination of the Pension Plan, and for purposes of such claims, it is assumed that the Pension Plan terminated on October 1, 2020. It is asserted that all of these liabilities are joint and several among the BSA and each Local Council that is a member of the BSA's "controlled group" on account of statutory liability under 29 USC §§ 1082, 1307, 1362. The PBGC, as a result, believes that it can assert the full amount of any of its Claims against each and every member of the controlled group upon termination.  In addition, if the Unfunded Benefit Liability Claim is not paid to the PBGC on demand, it is asserted that a statutory lien arises in favor of the PBGC on the assets of the plan sponsor and the members of the plan sponsor's controlled group.  The amount of this lien would be the lesser of the Unfunded Benefit Liability Claim and 30% of the collective net worth of the controlled group.  The Plan does not contemplate termination of the Pension Plan. However, if the Plan is not confirmed and consummated and the Debtors' Pension Plan is terminated, the PBGC's contingent Unfunded Benefit Liability Claims and the Termination Premiums Claims against the BSA and Local Councils within its "controlled group" may become due and would significantly dilute any recoveries available to satisfy creditors from both the BSA and the Local Councils within the controlled group.

### 4. *Debtors May be Impacted by the Continuing COVID-19 Pandemic*

The COVID-19 pandemic has presented issues and caused disruptions to the entire organization and Scouting as a whole.  Beginning in late February 2020, the BSA began to face unprecedented operational challenges associated with the spread of COVID-19 in the United States.  As the pandemic spread through North America, the BSA was forced to temporarily close its Headquarters, distribution center, and virtually all of its scout shops, consistent with governmental health guidelines and directives.  The BSA was also ultimately forced to cancel summer programming at Philmont, its largest high adventure base, and limit programming at its other three high adventure bases.  Local Councils also significantly curtailed activity throughout 2020 which impacted the BSA's retail sales and fall recruiting season.  Throughout 2020, as the global pandemic gradually worsened, the BSA undertook a number of critical cost-saving

initiatives, including initially furloughing and later permanently reducing staff, eliminating all non-essential spending, negotiating concessions with suppliers and local vendors, and canceling a number of revenue generating events due to social gathering concerns.

The impact of COVID-19 has been devastating to the BSA. Membership recruitment in 2020 ground to a halt with school closures and other social distancing measures resulting in an 81% decline versus 2019, which will impact 2021 membership revenue. Supply revenue declined 57% driven the several months of retail locations being closed and poor recruiting driving lower uniform sales. High adventure facility revenue declined 74% driven the temporary closure of Philmont and shortened seasons and/or reduced capacity at the other facilities. The BSA further expects to have lower retention of existing members when annual memberships renew in early 2021 due to significant curtailment of programing throughout 2020.

The continued spread of COVID-19 could have a significant impact on the Debtors' activities in the future and, in turn, the functions of Scouting at every level. This includes the ability to have pack and troop meetings in-person, restricted or limited use of BSA or Local Council properties such as summer camps and high adventure facilities. It remains unclear the extent and duration that restrictions will remain in place in response to the pandemic, which could bar or limit engaging in fundamental Scouting activities such as camping, service projects, meetings, and other group activities that help build the bonds of fellowship essential to the BSA's mission. Moreover, the health, social, and economic impact the pandemic will have in the future is unknown. As such, there can be no assurance that the uncertainties caused by the spread of COVID-19 will not negatively impact the Debtors in the future and, therefore, affect the underlying financial projections contained in this Disclosure Statement.

### 5.    *Pending and Future Litigation*

As discussed in this Disclosure Statement, the Debtors are involved various litigation, including but not limited to, the Trademark Action with the GSUSA—which so long as it remains unresolved represents a reputational issue, a potential challenge to welcoming female members into Scouting, and potential Claim for monetary damages. Additionally, there is a risk of future litigation. Such litigation could be brought in connection with the BSA's operations, including its high adventure facilities, or otherwise. Pending litigation or future litigation could result in a material judgment against the Debtors or the Reorganized BSA. Such litigation, and any judgment in connection therewith, could have a material negative effect on the Debtors or the Reorganized BSA.

### 6.    *Risk of Non-Confirmation of the Plan*

Although the Debtors believe that the Plan satisfies all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for Confirmation or that such modifications would not necessitate re-solicitation of votes. Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if all Voting Classes vote in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejects or is deemed to reject the Plan, the Bankruptcy Court may exercise discretion as a court of equity and choose not to confirm the Plan. If the Plan is not

confirmed, it is unclear what distributions holders of Claims or Interests would ultimately receive with respect to their Claims or Interests in a subsequent plan of reorganization, a liquidation, or other proceedings.

### 7. *Other Parties in Interest Might Be Permitted to Propose Alternative Plans of Reorganization*

Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization. However, such exclusivity period can be reduced or terminated upon order of the Bankruptcy Court, or it may expire under the applicable provisions of the Bankruptcy Code. If such an order were to be entered or such expiration were to occur, other parties in interest would then have the opportunity to propose alternative plans of reorganization.

If other parties in interest were to propose an alternative plan of reorganization following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to the Debtors, their Estates, and their stakeholders. In addition, if there were competing plans of reorganization, the Chapter 11 Cases would likely become longer, more complicated, and more expensive, thereby reducing recoveries to holders of Claims.

### 8. *Non-Consensual Confirmation*

If any Impaired Class of Claims does not accept or is deemed not to accept a plan of reorganization, a Bankruptcy Court may nevertheless confirm such plan at the proponent's request if at least one Impaired Class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. If any Class votes to reject or is deemed to reject the Plan, then these requirements must be satisfied with respect to such rejecting Class. The Debtors believe that the Plan satisfies these requirements.

### 9. *Parties in Interest May Object to the Debtors' Classification of Claims and Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if the claim or interest is substantially similar to the other claims or interests in that class. Parties in interest may object to the classification of certain claims and interests both on the grounds that certain claims and interests have been improperly placed in the same Class and/or that certain claims and interests have been improperly placed in different Classes. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements of the Bankruptcy Code because the Classes established under the Plan each encompass Claims or Interests that are substantially similar to similarly classified Claims or Interests. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Parties in interest may object to the classification of certain Claims and Interests both on grounds that certain Claims and Interests have been improperly placed in

the same Class and/or that certain Claims and Interests have been improperly placed in different Classes.

### 10.      The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim where such Claim is subject to an objection.  Any holder of a Claim that is subject to an objection may, therefore, not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 11.      The Conditions Precedent to Plan Confirmation and the Effective Date of the Plan May Not Occur

As more fully set forth in <u>Article IX</u> of the Plan, Plan Confirmation and the Effective Date are subject to a number of conditions precedent.  If such conditions precedent are not satisfied or waived, Plan Confirmation, the Effective Date, or both will not occur.

### 12.      The Recovery to Holders of Allowed Claims, Abuse Claims, and Interests Cannot Be Stated with Absolute Certainty

Due to the inherent uncertainties associated with projecting financial results and litigation outcomes, the projections contained in this Disclosure Statement should not be considered assurances or guarantees of the amount of funds or the amount of Claims that may be allowed in the various Classes.  While the Debtors believe that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.  Also, because the Liquidation Analysis, distribution projections, and other information contained herein and attached hereto are estimates only, the timing and amount of actual distributions to holders of Allowed Claims and Abuse Claims satisfied by the Settlement Trust in accordance with the Trust Distribution Procedures, if applicable, may be affected by many factors that cannot be predicted.

### 13.      Appointment of Different Settlement Trustee and/or Different Members of the Settlement Trust Advisory Committee for the Settlement Trust

Prior to the Confirmation Hearing, the Plan Supplement shall identify the initial Settlement Trustee of the Settlement Trust and the initial members of the Settlement Trust Advisory Committee.  Parties-in-interest, however, may object to the proposed Settlement Trustee, or one or more of the proposed members of the Settlement Advisory Committee.  In that case, an alternate Settlement Trustee and/or alternative proposed members of the Settlement Trust Advisory Committee would have to be nominated, potentially resulting in significant delays in the occurrence of the Confirmation Date and Effective Date. The selection of a different Settlement Trustee or different Settlement Trust Advisory Committee Members also could materially affect administration of the Settlement Trust.

### 14.    *Distributions under the Trust Distribution Procedures*

Abuse Claims will be resolved pursuant to the Settlement Trust Documents, and their treatment will be based upon, among other things, estimates of the number, types, and amount of Abuse Claims, the value of the assets of the Settlement Trust, the liquidity of the Settlement Trust, the Settlement Trust's expected future income and expenses, and other matters.  There can be no certainty as to the precise amounts that will be distributed by the Settlement Trust in any particular time period or when Settlement Claims will be resolved by the Settlement Trust.

### 15.    *Participation by Local Councils and Contributing Chartered Organizations*

If the Plan is confirmed as a Global Resolution Plan, it contemplates participation by the Local Councils and Contributing Chartered Organizations, including through the Local Council Settlement Contribution and Contributing Organization Settlement Contribution to the Settlement Trust.  However, there can be no assurance that the Local Councils or Contributing Chartered Organizations will agree to make the required contributions or that the level of contributions will be acceptable to other parties in these Chapter 11 Cases or satisfy the requirements for obtaining approval of the Channeling Injunction by the Bankruptcy Court.  Any failure to contribute by the Local Councils and/or the Contributing Chartered Organizations and/or objections to the level of the Local Council Settlement Contribution and the Contributing Organization Settlement Contribution could materially affect the Plan, resulting in significant delays to the occurrence of the Confirmation Date and Effective Date, the Debtors deciding to pursue Confirmation of the Plan as a BSA Toggle Plan (which would necessarily include less assets being contributed to the Settlement Trust), amendment to the Plan, and/or significant alterations to the current structure contemplated by the Plan.

### 16.    *U.S. Federal Income Tax Risks*

For a discussion of certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to holders of certain Claims and Interests, see Article XI of this Disclosure Statement.

### 17.    *Risk of Non-Occurrence of the Effective Date*

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.  Any delay to the Confirmation Date may materially negatively impact the Debtors' business and may result in a liquidation.

### 18.    *Amendment of Plan Prior to Confirmation by the Debtors*

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan or waive any conditions thereto if and to the extent

necessary or desirable for confirmation.  The potential impact of any such amendment or waiver on holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.

### 19.    *Financial Projections*

The Debtors have prepared financial projections on a consolidated basis with respect to the Reorganized BSA and Related Non-Debtor Entities based on certain assumptions, as set forth in **Exhibit C** hereto.  The projections have not been compiled, audited, or examined by independent accountants, and neither the Debtors nor their advisors make any representations or warranties regarding the accuracy of the projections or the ability to achieve forecasted results.

Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or Reorganized BSA, including the timing, Confirmation, and consummation of the Plan, continued engagement with Scouting and the Reorganized BSA, and the ability of the Local Councils to continue to support the Debtors' membership.    Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results.  Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant economic, and operational risks, and the assumptions underlying the projections may be inaccurate in material respects.  Moreover, if the Plan is confirmed as a BSA Toggle Plan, because the Local Councils and Contributing Chartered Organizations will not be subject to the releases under the Plan, there is incremental economic risk related to the continued reach of Scouting which could lead to lower membership levels and require additional expense reductions versus what are reflected in the projections.  In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court including any natural disasters, terrorist attacks, or health epidemics may affect the actual financial results achieved.  Such results may vary significantly from the forecasts and such variations may be material.  The Debtors' projections reflect expectations of continued donor support.  However, the Debtors cannot state with certainty that such donation programs will achieve their targeted results and such projects would face further downside risk under a BSA Toggle Plan.

### 20.    *Potential Settlements*

As set forth in <u>Article II.C</u> of this Disclosure Statement, the Debtors have been in negotiations with the Mediation Parties in hopes of resolving certain controversies related to the structure of the Plan, level of contributions by the Debtors, Local Councils and Contributing Chartered Organizations and insurance-related issues, which may result in settlements pursuant to Bankruptcy Rule 9019 and may be included in the Plan.  If a Settlement Agreement is reached, the Plan may be modified prior to the Confirmation Hearing to incorporate any number of resolutions of the unresolved controversies.  The potential impact of any such settlements or resolutions on holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.

### 21. *Insurance Contributions*

If the Debtors are unable to reach agreement on the terms of Insurance Settlement Agreements with the Insurance Companies, there is a risk that the Settlement Trust may not realize contributions from Insurance Companies, or that the Settlement Trust's efforts to realize recoveries on account of the Insurance Coverage will be the subject of litigation that is expensive and time-consuming.  This risk would be further heighted under a BSA Toggle plan where insurers will be faced with competing demands between the Settlement Trust and other named insured including the Local Councils.

### 22. *Insurance Coverage Risks*

As set forth in <u>Article V.F.6</u> of this Disclosure Statement, the Debtors' Insurance Companies have reserved rights to contest various Abuse Claims tendered to them based on various coverage defenses. While the Debtors believe these defenses have no merit and are working to resolve these disputes, to the extent any of these defenses prevail, rights to payment with respect to such Insurance Policies related to Abuse Claims could be reduced or barred entirely. Additionally, as set forth in <u>Article V.F.1</u> of this Disclosure Statement, the obligation to pay certain deductible and self-insured retentions under the certain Insurance Policies is disputed. However, it is the BSA's position that when the BSA cannot or does not pay the deductible, the primary Insurance Policies issued between 1986 and 2008 require the insurer to pay. A dispute exists as to whether the obligation on the primary insurer to pay the deductible on behalf of the BSA is subject to an aggregate limit of liability. The primary insurers have asserted that a $1 million aggregate applies to this obligation. Other insurers have asserted that the primary insurers' obligation to pay the deductible is not subject to any aggregate, and that the aggregate limit of liability only applies to those damages in excess of the deductible. In the event that the aggregate limit of liability does apply to the payment of the deductibles under the primary Insurance Policies, a related dispute exists as to whether the BSA can directly access the excess insurance policies issued between 1986 and 2008 or whether the BSA must continue to pay that deductible on an ongoing basis for each claim. Any of the forgoing disputes could potentially reduce or eliminate the right to payment under certain Insurance Policies. Moreover, defenses, disputes, and other relevant circumstances could arise that could potentially reduce or eliminate the right to payment under certain Insurance Policies.

### 23. *Insurance Assignment Risks*

Pursuant to the Plan, (i) if the Plan is confirmed as the Global Resolution Plan, the insurance rights of the BSA, Local Councils and Contributing Chartered Organizations under Insurance Policies of the BSA, Local Councils and Contributing Chartered Organizations or (ii) if the Plan as is confirmed as the BSA Toggle Plan, the insurance rights of the BSA under Insurance Policies of the BSA, will be assigned and transferred to the Settlement Trust to be used to satisfy Abuse Claims in accordance with the Trust Distribution Procedures.  Certain parties in interest, including certain of the Debtors' Insurance Companies, contest the ability of the BSA to assign those rights under these Insurance Policies to the Settlement Trust.  To the extent that such assignment is not allowed, the assets contributed to the Settlement Trust to satisfy Abuse Claims will be reduced.

24.     *Insurance Neutrality*

As set forth in <u>Article III.F.7</u> of the this Disclosure Statement, the Plan does not diminish the rights of Insurance Companies or increase their burdens under the Insurance Policies and is, therefore, "insurance neutral" as to the Debtors' Insurance Companies. Accordingly, the Debtors believe that the Plan and Plan Documents do not affect insurers' rights or obligations, including any indemnity obligations. Certain of the Debtors' Insurance Companies have taken the position that <u>Article X.M</u> of the Plan is inadequate and does not provide appropriate neutrality protections. They also contend that if confirmation of the Plan is appealed, the Debtors may be required to include more robust language in order for the Plan be insurance neutral.

25.     *Failure to Obtain Approval of Releases, Injunctions, and Exculpation*

As set forth in <u>Article VI.O</u> of this Disclosure Statement, the Plan provides for certain Releases, Injunctions, and exculpations, including a release of Liens and third-party releases that may otherwise be asserted against the Debtors, the Reorganized BSA, the other Released Parties and their respective Related Parties, as applicable. The Releases, Injunctions, and exculpations (including, for the avoidance of doubt, the Channeling Injunction and the definitions of Released Parties and Exculpated Parties) provided in the Plan are subject to objection by parties in interest and may not be approved. If the Releases are not approved, certain parties may not be considered Released Parties or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

26.     *The Channeling Injunction*

The Channeling Injunction, which, among other things, bars the assertion of any Abuse Claims against the Protected Parties, is a necessary element of the Plan. Although the Plan, the Settlement Trust Agreement, and the Trust Distribution Procedures all have been drafted with the intention of complying with the Bankruptcy Code, there is no guarantee that the validity and enforceability of the Channeling Injunction or the application of the Channeling Injunction to Abuse Claims will not be challenged, either before or after Confirmation of the Plan.

While the Debtors believe that the Plan satisfies the requirements of the Bankruptcy Code, certain objections might be lodged on grounds that the requirements of the Bankruptcy Code cannot be met given the unique facts of the Chapter 11 Cases. At this juncture, the Debtors believe that the Plan provides a sufficient basis for the issuance of the Channeling Injunction under section 105(a) of the Bankruptcy Code.

27.     *Voting Requirements*

If sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims and Abuse Claims satisfied by the Settlement Trust in accordance with the Trust Distribution Procedures as those proposed in the Plan.

### 28. Conversion into Chapter 7 Cases

If no plan of reorganization can be confirmed, the Debtors may choose to convert these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  Under section 1112(c) of the Bankruptcy Code, the Chapter 11 Cases may not be converted to cases under chapter 7 without the Debtors' consent.

### 29. Dismissal of the Chapter 11 Cases

If the Plan is not confirmed, the Debtors or other parties in interests may seek dismissal of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code. Without limitation, dismissal of the Chapter 11 Cases would terminate the automatic stay and might allow certain creditors to file litigation against the Debtors or take other action to pursue their Claims against the Debtors.  Accordingly, the Debtors believe that dismissal of the Chapter 11 Cases would significantly reduce the value of the Debtors' remaining assets.

B.    Additional Factors

### 1. Debtors Could Withdraw the Plan

Subject to, and without prejudice to, the rights of any party in interest, the Plan may be revoked or withdrawn before the Confirmation Date by the Debtors.

### 2. Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  Additionally, the Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3. No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### 4. No Legal or Tax Advice Is Provided by this Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each holder of a Claim or Interest should consult its own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.  This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

### 5.     *This Disclosure Statement May Contain Forward Looking Statements*

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The liquidation analysis, distribution projections or other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to holders of Allowed Claims and Abuse Claims satisfied by the Settlement Trust in accordance with the Trust Distribution Procedures may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

### 6.     *No Admission Made*

Nothing contained herein or in the Plan shall constitute an admission of, or shall be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

## ARTICLE XI. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan and is for general information purposes only.  This summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim or Interest.  This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "Code"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions.  Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the U.S. federal income tax consequences of the Plan. Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences of the Plan.

Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No ruling has been requested or obtained from the IRS with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto.  The discussion below is not binding upon the IRS or any court.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.  No representations or assurances are being made to the holders of Claims or Interests with respect to the U.S. federal income tax consequences described herein.  Except as

specifically set forth below, this discussion addresses only holders of Claims or Interests that are "United States persons" (within the meaning of Section 7701(a)(30) of the Code).

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

A.    The Settlement Trust

On the Confirmation Date, the Settlement Trust shall be established in accordance with the Trust Documents. The Settlement Trust is intended to qualify as a "qualified settlement fund" ("QSF") pursuant to Treasury Regulation section 1.468B-1. The Protected Parties are the "transferors" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Settlement Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3). The Trust Documents, including the Settlement Trust Agreement, are incorporated herein by reference.

The primary tax consequences of the Settlement Trust being characterized as a QSF are the following:

1.    The Settlement Trust must use a calendar taxable year and the accrual method of accounting.

2.    If the Protected Parties fund the Settlement Trust with appreciated property, the Protected Parties are deemed to sell the property to the Settlement Trust. Accordingly, any gain or loss from the deemed sale must be reported by the Protected Parties.

3.    The Settlement Trust takes a fair market value basis in property contributed to it by the Protected Parties.

4.    The Settlement Trust's gross income less certain modifications is taxable at the highest federal tax rate applicable to trusts and estates. The Protected Parties' funding of the Settlement Trust with Cash and other property is not reported by the Settlement Trust as taxable income. However, earnings recognized from, for example, the short-term investment of the Settlement Trust's funds will be subject to tax.

5.    The Settlement Trust may deduct from its gross income a limited number of administrative expenses; the Settlement Trust is not entitled to deduct distributions paid to its beneficiaries.

6.    The Settlement Trust will have a separate taxpayer identification number and will be required to file annual tax returns (which are due on March 15, or later if an extension is granted under applicable law). The Settlement Trust will also be required to comply with a

number of other administrative tax rules including filing information returns (generally IRS Form 1099) when approved payments are made to claimants.

B.    Holders of Claims

The federal income tax consequences to a holder of a Claim receiving, or entitled to receive, a distribution in partial or total satisfaction of a Claim may depend on a number of factors, including the nature of the Claim, the claimants' method of accounting, and their own particular tax situation.  Because each claimant's tax situation differs, claimants should consult their own tax advisors to determine how the Plan affects them for federal, state and local tax purposes, based on their particular tax situations.

Among other things, the federal income tax consequences of a distribution to a claimant may depend initially on the nature of the original transaction pursuant to which the Claim arose.  For example, a distribution in repayment of the principal amount of a loan is generally not included in the claimant's gross income.  A distribution to a holder of an Abuse Claim may not be taxable as it may be considered compensation for personal injuries.  The federal income tax consequences of a distribution to a claimant may also depend on whether the item to which the distribution relates has previously been included in the claimant's gross income or has previously been subject to a loss or bad debt deduction.   For example, if a distribution is made in satisfaction of a receivable acquired in the ordinary course of the claimant's trade or business, and the claimant had previously included the amount of such receivable distribution in his or her gross income under his or her method of accounting, and had not previously claimed a loss or bad debt deduction for that amount, the receipt of the distribution should not result in additional income to the claimant but may, as discussed below, result in a loss.

Conversely, if the claimant had previously claimed a loss or bad debt deduction with respect to the item previously included in income, the claimant generally would be required to include the amount of the distribution in income when received.

A claimant receiving a distribution in satisfaction of his or her Claim generally may recognize taxable income or loss measured by the difference between (i) the amount of Cash and the fair market value (if any) of the property received and (ii) its adjusted tax basis in the Claim.  For this purpose, the adjusted tax basis may include amounts previously included in income (less any bad debt or loss deduction) with respect to that item.  This income or loss may be ordinary income or loss if the distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the claimant's trade or business for the performance of services or for the sale of goods or merchandise.  In addition, if a claimant had claimed an ordinary bad debt deduction for the worthlessness of his or her Claim in whole or in part in a prior taxable year, any income realized by the claimant as a result of receiving a distribution may be taxed as ordinary income to the extent of the ordinary deduction previously claimed.  Generally, the income or loss will be capital gain or loss if the Claim is a capital asset in the claimant's hands.

Subject to the qualifications and limitations set forth above:

1.    A holder of a Class 3A, 3B, 4A, or 4B Claim may recognize gain or loss pursuant to the Plan depending on whether the receipt of the Claim under the

Restated Credit Facility Documents or under the Restated Bond Documents, as applicable, in satisfaction of its existing Claim is treated as a taxable exchange for U.S. federal income tax purposes. The tax treatment of the receipt of such Claim pursuant to the Plan is unclear – although it seems likely under applicable law that the receipt of the Claims would be treated as a taxable exchange. Holders of Class 3A, 3B, 4A, or 4B Claims are strongly urged to consult their own tax advisors regarding the specific tax consequences of the transactions described in the Plan.

2.    A holder of a Class 5 Claim generally will recognize gain or loss measured by the difference between (i) the amount of the cash and the fair market value (if any) of the property received and (ii) its adjusted tax basis in the Convenience Claim.

3.    A holder of a Class 6 Claim generally will recognize gain or loss measured by the difference between (i) the U.S. dollar value of such holder's Pro Rata Share of the Core Value Cash Pool received and the fair market value (if any) of the property received and (ii) its adjusted tax basis in the General Unsecured Claim.

4.    A holder of a Class 7 Claim generally will recognize gain or loss measured by the difference between (i) the amount of cash received from (a) available Insurance Coverage, (b) applicable proceeds of any Insurance Settlement Agreements, and (c) co-liable non-debtors (if any) or their insurance coverage, and (ii) its adjusted tax basis in the Non-Abuse Litigation Claim, unless such holder elects to have its Claim treated as an Allowed Convenience Claim. A holder of a Class 7 Claim that elects to have its Claim treated as an Allowed Convenience Claim generally will recognize gain or loss measured by the difference between (i) the amount of the cash and the fair market value (if any) of the property received and (ii) its adjusted tax basis in the Non-Abuse Litigation Claim.

5.    The United States federal income tax treatment of a Class 8 Claim will depend on several factors, including the nature of the Abuse that forms the basis for the relevant Claim. As a result, certain holders of Class 8 Claims generally will recognize gain or loss measured by the difference between (i) the amount of the cash and the fair market value (if any) of the property received and (ii) their adjusted tax basis in the Direct Abuse Claim, while other holders will not be required to include the amount of such cash or the value of such property in their gross income for U.S. federal income tax purposes. Holders of Class 8 Claims are urged to consult their tax advisors concerning the tax consequences of the Plan.

6.    A holder of a Class 9 Claim generally will recognize gain or loss measured by the difference between (i) the amount of the cash and the fair market value (if any) of the property received and (ii) its adjusted tax basis in the Indirect Abuse Claim.

C.      Holders that are Non-United States Persons

Holders of Claims that are not "United States persons" (within the meaning of Section 7701(a)(30) of the Code) generally will not be subject to U.S. federal income tax with respect to property (including Cash) received in exchange for such Claims, unless (i) such holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes, or (ii) if such holder is an individual, such holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

## ARTICLE XII.  CONCLUSION AND RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger and more timely distribution to the Debtors' creditors than would otherwise result from any other scenario.  Any alternative to Confirmation of the Plan, moreover, could result in extensive delays, increased administrative expenses, reduced financial performance, and a potential liquidation.  Accordingly, the Debtors believe that the Plan provides the best available recovery to their stakeholders and should be confirmed.

Dated: May 16, 2021

Boy Scouts of America

Delaware BSA, LLC

/s/
Roger C. Mosby
Chief Executive Officer and President

# EXHIBIT A

## PLAN OF REORGANIZATION

*See Proposed Amendments to Second Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC* **filed at D.I. 4107.**

# **EXHIBIT B**

## **LIQUIDATION ANALYSIS**

**Boy Scouts of America**

**Exhibit B**

**Liquidation Analysis[1]**

This hypothetical liquidation analysis (this "Liquidation Analysis") is based on certain estimates and assumptions that the Debtors have developed, with the assistance of their advisors, and which the Debtors consider to be reasonable under the circumstances of the Chapter 11 Cases. These estimates and assumptions are inherently subject to significant economic, operational, legal, and other uncertainties and contingencies that are outside of the Debtors' control. Accordingly, the Debtors cannot provide any assurance that the values reflected in this Liquidation Analysis would be realized if the Debtors were, in fact, to undergo the liquidation discussed herein, and actual results in the event of a liquidation could vary materially from this Liquidation Analysis.

## 1)  Introduction

The Debtors, with the assistance of their legal and financial advisors, have prepared this Liquidation Analysis in connection with the Plan and the Disclosure Statement. As described in Article IX.D of the Disclosure Statement, section 1112(c) of the Bankruptcy Code provides that the chapter 11 cases of non-profit corporations such as the Debtors may not be involuntarily converted to cases under chapter 7 of the Bankruptcy Code. *See* 11 U.S.C. § 1112(c) ("The court may not convert a case under [chapter 11] to a case under chapter 7 of this title if the debtor is a farmer or a corporation that is not a moneyed, business, or commercial corporation, unless the debtor requests such conversion."). Because the Chapter 11 Cases could not be involuntarily converted a chapter 7 liquidation, the Debtors submit that they are not required to satisfy the requirements of section 1129(a)(7) in connection with confirmation of the Plan. Although the Debtors do not believe they are required to satisfy the "best interests of creditors" test embodied in section 1129(a)(7), the Debtors do believe that this Liquidation Analysis will be helpful to holders of Claims as they evaluate their proposed treatment under the Plan. This Liquidation Analysis shall not be construed as or deemed to constitute a waiver or admission of any kind. The Debtors reserve all rights to oppose the applicability of the best interests test in the Chapter 11 Cases, including any arguments that the Local Councils must be included in the Liquidation Analysis.

The Liquidation Analysis permits holders of Impaired Claims to evaluate whether they will receive or retain value under the Plan on account of their Claims of a value, as of the Effective Date, that is not less than the amount that such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To calculate the probable distribution to holders of Claims in each Impaired Class if the Debtors were liquidated under chapter 7, the Liquidation Analysis:

i)    estimates the cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee (the "Trustee") would generate if the Chapter 11 Cases were converted to cases under

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them the Plan or Disclosure Statement, as applicable.

chapter 7 on the Effective Date and the assets of the Debtors' Estates and the Related Non-Debtor Entities were liquidated;

ii)     determines the distribution each holder of an Impaired Claim would receive from the Liquidation Proceeds under the statutory priority scheme that applies in a case under chapter 7; and

iii)    compares each holder's distribution from the Liquidation Proceeds to the distribution such creditor would receive under the Plan if it were confirmed and consummated.

This Exhibit B to the Disclosure Statement contains three sets of analyses.  The first section contains the Liquidation Analysis applicable to the Debtors and Related Non-Debtor Entities.  The second section provides a similar analysis in relation to the Local Councils.  Although the Debtors do not believe they are required to satisfy the best-interests test as it relates to the Local Councils, the Debtors have consented to including this analysis to address objections to the Disclosure Statement asserted by the TCC and various individuals holding Class 8 Direct Abuse Claims.  The analysis pertaining to the Local Councils is only applicable, if at all, if the Plan is confirmed as a Global Resolution Plan.  If the Plan is confirmed as a BSA Toggle Plan (which does not contain releases for Local Councils), any analysis pertaining to the Local Councils is not relevant.  Third and finally, this Exhibit B contains an analysis depicting a combination of the Liquidation Analysis pertaining to the Debtors and Related Non-Debtor Entities and the analysis pertaining to the hypothetical liquidation of the Local Councils.  As noted above, this Liquidation Analysis shall not be construed as or deemed to constitute a waiver or admission of any kind.  The Debtors reserve all rights to oppose the applicability of the best interests test in the Chapter 11 Cases.

## 2)     Liquidation Analysis of Debtors and Related Non-Debtor Entities

### i)        Process and Assumption Overview

This Liquidation Analysis was prepared on a consolidated basis and assumes that the Debtors and all of the Related Non-Debtor Entities with material assets (specifically, National Boy Scouts of America Foundation, Arrow WV, Inc., BSA Asset Management, LLC, and Learning for Life) would be liquidated on a jointly administered but nonconsolidated basis.  This Liquidation Analysis has been prepared assuming that the Chapter 11 Cases are converted to chapter 7 on or about August 31, 2021 (the "Conversion Date") and that Related Non-Debtor Entities file for chapter 7 liquidation at that time.  Certain of the Related Non-Debtor Entities are not subsidiaries of the BSA but rather are independently incorporated non-stock, non-profit entities.  Accordingly, the Liquidation Analysis does not consider any defenses that could be raised by the Related Non-Debtor Entities as to whether their assets would be available to the BSA's creditors, which defenses, if successful, would reduce the recoveries set forth herein.  The Debtors have assumed that the liquidation would occur over an approximately six-month time period.  This assumption is consistent with assumptions utilized for hypothetical liquidations analyses in other chapter 11 cases.    In the Debtors' view, six months is the minimum time period that would be required to complete the sale of substantially all of the Debtors' unrestricted assets,[2] monetize and collect

---

[2] For purposes of this Exhibit B, a "restricted" asset is an asset that is subject to enforceable use restrictions under

receivables and other unrestricted assets of the Debtors and Related Non-Debtor Entities, and administer and wind-down the estates.  Except as otherwise noted herein, the Liquidation Analysis is based upon the Debtors' and Related Non-Debtor Entities' unaudited pro forma consolidated balance sheets as of February 28, 2021, and those values are assumed to be representative of the Debtors' and Related Non-Debtor Entities' assets and liabilities as of the Conversion Date unless otherwise noted.  Any projected balance sheet amounts presented in this Liquidation Analysis are intended to be a proxy for actual balances on the Conversion Date (the "Liquidation Balances").  In addition, this Liquidation Analysis incorporates certain adjustments to account for the effects of the chapter 7 liquidation process, including costs of winding down the Debtors' and Related Non-Debtor Entities' estates, employee-related costs, and professional and Trustee fees.

It is assumed that, on the Conversion Date, the Bankruptcy Court would appoint the Trustee, who would sell the unrestricted assets of the Debtors' and Related Non-Debtor Entities' bankruptcy estates and distribute the Liquidation Proceeds, net of liquidation-related costs, to creditors in accordance with the statutory priority scheme provided for under section 726 of the Bankruptcy Code.  To maximize recoveries in an expedited process, this Liquidation Analysis assumes that the Trustee's initial step would be to develop a liquidation plan to generate Liquidation Proceeds from the sale of the Debtors' and Related Non-Debtor Entities' unrestricted assets for distribution to creditors.  This Liquidation Analysis assumes the appointed Trustee will retain legal and financial advisors and real estate and other brokers to assist in the liquidation.

This Liquidation Analysis assumes that a Trustee would immediately begin the wind-down process following a conversion to chapter 7, with minimal employee and operating costs continuing during the liquidation process.  The Debtors' and Related Non-Debtor Entities' unrestricted assets would be marketed on an accelerated timeline, and asset sales would generally occur within the six-month wind-down period.  Asset values in the liquidation process are assumed to be driven by, among other factors:

- the accelerated time frame in which the assets are marketed and sold;

- the loss of key personnel;

- negative public sentiment and damage to the BSA's brand; and

- the general forced nature of the sale.

The cessation of operations in a liquidation would likely trigger certain Claims that otherwise would not exist under a Plan absent a liquidation.  Examples of these kinds of Claims include, without limitation, potential employee Claims (such as severance or WARN Act Claims) and executory contract and unexpired lease rejection damages Claims.  The amounts of these Claims could be material and certain of these Claims could be entitled to administrative or priority

---

applicable law or an asset that the Debtors, the Related Non-Debtor Entities or the Local Councils hold in a fiduciary capacity for the sole benefit of donors, their intended beneficiaries, or members of the public who have entrusted the Debtors, Related Non-Debtor Entities or Local Councils to carry out their respective charitable missions.  The Bankruptcy Code recognizes and enforces these state-law restrictions in bankruptcy cases of charitable non-profit corporations under sections 363(d)(1) and 541(d) of the Bankruptcy Code.

payment status under the relevant provisions of the Bankruptcy Code. Administrative and priority Claims would be paid in full from the Liquidation Proceeds before the balance of such proceeds would be made available to holders of allowed general unsecured Claims. Estimates of certain of these potential additional Claims have been included in the Liquidation Analysis.

Except as described below with respect to the Debtors' restricted investments, no recovery or related litigation costs have been attributed to any potential avoidance actions under the Bankruptcy Code, including potential preference or fraudulent transfer actions. The Debtors believe that the vast majority of the payments made to creditors in the 90 days preceding the chapter 11 proceedings (including one year for insiders) were in the ordinary course of business and when weighed against, among other issues, the cost of such litigation, the uncertainty of the outcome thereof and anticipated disputes regarding these matters, the outcome of such litigation is unlikely to affect materially the outcome of the Liquidation Analysis. Additionally, this analysis does not include estimates for tax consequences, either federal or state, that may be triggered upon the liquidation and sale of assets; these tax consequences could be material. Finally, the Liquidation Analysis assumes that there will not be any proceeds from the Debtors' directors and officers liability insurance available to satisfy creditors generally because the Debtors are unaware of any legally viable causes of action that could be asserted on behalf of the general creditor body that would recover from the Debtors' directors and officers liability insurance.

A substantial amount of the Debtors' and certain of the Related Non-Debtors Entities' assets are subject to valid and enforceable donor-imposed restrictions on use or disposition of such assets.[3] Under applicable law, restricted assets do not constitute property of the estate and would not be available to creditors in a chapter 7 liquidation.[4] The Liquidation Analysis excludes the value of those assets in calculating the gross Liquidation Proceeds unless specifically noted. Moreover, certain of the Debtors' and Local Councils' properties may be less marketable due to disputes over their classification as being restricted or unrestricted, limitations on their use including requirements to be used in the same manner, or restrictions on commercial development.[5]

---

[3] The Debtors are continuing to assess their restricted assets in connection with the adversary complaint filed by the Tort Claimants' Committee on January 8, 2021 (Adv. Pro. No. 21-50032).

[4] In a chapter 7 liquidation of a charitable non-profit corporation, courts often apply the *cy pres* doctrine to carry out a donor's intent rather than distribute a restricted donation to creditors. For example, in *Salisbury v. Ameritrust Tex. N.A. (In re Bishop College)*, 151 B.R. 394 (Bankr. N.D. Tex. 1993), the trustee of a testamentary trust declined to continue to pay trust income to a defunct private college that had commenced chapter 7 proceeds on the basis that the original purpose of the gift—providing scholarships—had become impossible to fulfill. *Id.* at 396. The bankruptcy court denied the chapter 7 trustee's turnover action, holding that, "[u]nder Texas law, where the particular charitable purpose for which the trust was created becomes impossible of achievement or illegal or impracticable, the trust does not fail if the settlor has shown a general intention that his property shall be used for charitable purposes." *Id.* at 400. In this situation, the court reasoned, "the court will exercise its *cy pres* power to authorize that the property be applied to some other some other particular charitable purpose falling within the general intention of the settlor," and that "the court will choose the public charity which is as near as possible to the one designated by the settlor." *Id.*

[5] *In re Save Our Springs (S.O.S.) All., Inc.*, 388 B.R. 202, 239 (Bankr. W.D. Tex. 2008) (finding, in a non-profit chapter 11 case, that "the evidence offered by the debtor regarding its assets and their values . . . [was] credible and substantial" and that such evidence was sufficient to meet the best interests test, "considering the unique nature of the Debtor as a non-profit organization dependent on contributions that are voluntary and may be restricted, and of the

In addition, certain other factors could materially diminish the Liquidation Proceeds due to the nature of the Debtors' status as non-profit entities. The Debtors will be required to comply with the applicable non-bankruptcy law that governs non-profit entities in connection with the disposition of their assets. These obligations vary among jurisdictions, but can require, *inter alia*, consent from a state's attorney general or other governmental authorities. State attorneys general may intervene or, depending upon state law, be compelled to intervene, in a chapter 7 liquidation to ensure that the intent of donors is carried out and that the restricted donations are not distributed to creditors.[6] The costs that attend these potential disputes and related delays and uncertainty regarding the same are not factored into this Liquidation Analysis and could reasonably be expected to negatively impact the Liquidation Proceeds.

Under a chapter 7 liquidation, moreover, it is likely that the BSA's defined benefit pension plan would be terminated and the Pension Benefit Guarantee Corporation (the "PBGC") would pursue its Claim of approximately $1.1 billion against all members of the controlled group, which are jointly and severally liable for such amounts and include the Related Non-Debtor Entities and Local Councils. The Debtors expect that under section 4068(a) of ERISA, the PBGC would successfully assert a lien arising as of the termination date against each member of the controlled group in an amount not to exceed 30% of the "collective net worth" of all members of the controlled group combined. However, for any member of the controlled group that has filed for bankruptcy prior to the termination, the automatic stay will generally prevent perfection of any lien under ERISA. The PBGC's Claim could therefore be asserted jointly and severally against each member of the controlled group in the full amount of the approximately $1.1 billion Claim, provided that the PBGC's Claim, to the extent not secured by a lien under ERISA, would likely be treated as a General Unsecured Claim. The Liquidation Analysis assumes that the lien on Related Non-Debtor Entity and Local Council assets would represent 30% of Liquidation Proceeds remaining for all of the Debtors, Related Non-Debtor Entities, and Local Councils combined after wind down costs and secured debt, if any.

Approximately 82,500 non-duplicative Claims alleging Abuse were timely filed against the BSA in the Chapter 11 Cases. The BSA and certain Local Councils have procured commercial general liability policies from multiple insurers since the 1930s to protect themselves from losses including Abuse Claims. This Liquidation Analysis does not account for any recovery from insurance proceeds (irrespective of whether an insured Claim relates to Abuse) on the basis that recoveries from such proceeds are assumed to be materially the same or greater under a plan of reorganization that provides for a global resolution of Abuse Claims than under a chapter 7 liquidation[7].

### ii)    Distribution of Net Proceeds to Claimants

Any available net proceeds would be allocated to holders of Claims in accordance with the

---

Debtor's other assets . . .").

[6] *See In re Bishop College*, 151 B.R. at 397 (observing that the Texas attorney general intervened in the chapter 7 trustee's turnover action, which under Texas law "is required in all disputes involving charitable trusts").

[7] The Debtors believe the value of its insurance policies will be maximized under the Global Resolution Plan, in part because the Local Councils are additional or named insureds under many of the policies and, absent confirmation of the Plan as the Global Resolution Plan, the BSA will only be able to assign its own rights and interests in the Insurance Policies to the Settlement Trust, thereby making liquidation of the Insurance Policies unlikely.

priority scheme of section 726 of the Bankruptcy Code:

- <u>Liquidation Adjustments / Super Priority Claims</u> – includes estimated fees paid to the U.S. Trustee and Clerk of the Bankruptcy Court, wind-down costs and certain Professional Fees and broker fees;

- <u>Secured Claims</u> – includes 2010 Bond Claims, 2012 Bond Claims, 2010 Credit Facility Claims, 2019 RCF Claims,  and the secured portion of the PBGC's Claim consistent with section 4068(a) of ERISA and PBGC guidance under 29 CFR § 4062.4;

- <u>Chapter 11 Administrative and Priority Claims</u> – includes estimated Claims held by creditors that are able to assert liens on particular assets, including certain trade vendors in addition to Claims for post-petition accounts payable, post-petition accrued expenses including professional fees, taxes, employee obligations, Claims arising under section 503(b)(9) of the Bankruptcy Code, and Unsecured Claims entitled to priority under section 507 of the Bankruptcy Code; and

- <u>General Unsecured Claims</u> – includes prepetition trade Claims, prepetition rejection damages Claims, and other types of prepetition liabilities; Abuse and non-Abuse litigation Claims; and unsecured and unrecovered PBGC Claims.

Under the absolute priority rule, no junior creditor would receive any distributions until all senior creditors are paid in full.  The assumed distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule.

### iii)    Conclusion

This Liquidation Analysis was prepared before the completion of the reconciliation and allowance process for Claims against the Debtors and without any deadline for filing Claims against the Related Non-Debtor Entities' chapter 7 estates in a hypothetical liquidation, and so the Debtors have not had an opportunity to fully evaluate Claims against the Debtors or to adjudicate such Claims before the Bankruptcy Court.  Accordingly, the amount of the final Allowed Claims against the Debtors' estates may differ from the Claim amounts used in this Liquidation Analysis. Additionally, asset values discussed herein may be different than amounts referred to in the Plan, which presumes the reorganization of the Debtors' assets and liabilities under chapter 11 of the Bankruptcy Code.  The estimated liquidation recoveries and proceeds waterfall are presented herein as a consolidated summary of each individual liquidating estate with their estimated recoveries.

The Debtors determined, as summarized in the following analysis, upon the Effective Date, the Plan will provide all creditors with a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code, and thus the Plan satisfies the requirement of 1129(a)(7) of the Bankruptcy Code, if the Bankruptcy Court determines that such requirement is applicable to non-profits debtors in chapter 11.

The following Liquidation Analysis should be reviewed with the accompanying notes.

iv)    **General Liquidation Summary and Detail – Debtors and Related Non-Debtor Entities**

*Liquidation Proceeds*

A.    Cash and Cash Equivalents – Represents Cash and Cash equivalents of the Debtor and Related Non-Debtor Entities as of the Conversion Date based on the BSA's most recent financial projections, segregated between restricted and unrestricted balances. Restricted cash balances reflect donor imposed restrictions on use and disposition and accordingly such amounts are excluded from the Liquidation Proceeds (see Note B below). The Debtors estimate a 100% recovery on the unrestricted cash balances.

- Cash Securing Letters of Credit – Reflect cash held by JPM to secure letters of credit issued for the benefit of Old Republic Insurance ("ORIC"). ORIC is assumed to draw on the letters of credit in full and JPM is assumed to be able to recover against this cash collateral in full. The cash is included in the Liquidation Proceeds and in the recovery to JPM.

B.    Investments – Represents investments of the Debtor and Related Non-Debtor Entities as of the Conversion Date based on the BSA's most recent financial projections, segregated between restricted and unrestricted, and excluding non-controlling interest in the BSA Commingled Endowment Fund, LP (*i.e.*, the limited partnership interests owned by the Local Councils). Restricted investment balances reflect donor imposed restrictions on use and disposition and accordingly such amounts are excluded from the Liquidation Proceeds.[8] There is the potential for litigation related to asset restrictions in a liquidation, which could result in certain unrestricted investments being determined to be restricted or certain restricted investments being determined to be unrestricted. The TCC has commenced an adversary proceeding relating to the restriction of certain of the Debtors' assets. Although the Debtors believe the action is meritless, for illustrative purposes, the Liquidation Analysis assumes $25 million of currently restricted investments could be available to creditors in a liquidation. The Debtors estimate a 100% recovery on unrestricted investments plus the $25 million of restricted investments.

C.    Accounts Receivable – Accounts receivable are comprised of invoiced and accrued third party receivables, including receivables from the Local Councils, and other non-trade receivables and deposits. Accounts Receivable is presented based on the BSA's most recent financial statements and is assumed to be materially consistent as of the Liquidation Date. Estimated recovery percentages for accounts receivable are between approximately 50% and 60%.

D.    Investment Income Receivables – Comprised of accrued investment earnings primarily from the BSA's restricted investment holdings. These amounts are based on the BSA's recent financial statements and balances are assumed to be materially consistent with

---

[8]    These amounts are subject to the adversary proceedings currently pending before the Bankruptcy Court further discussed in Article V.J.2 of the Disclosure Statement.

balances as of the liquidation date. Investment income receivables are excluded from the Liquidation Proceeds.

E.  <u>Pledges Receivable</u> – Pledges receivables reflect unconditional donor pledges at estimated net present collectable value. As the pledges are both donor restricted and highly unlikely to be enforceable in a liquidation they are valued at zero. Additional pledges not reflected on the financial statements are conditional and thus could not be collected in a liquidation.

F.  <u>Related Party Receivables</u> – Interfund receivables are comprised of amounts due to/from Related Non-Debtor Entities. These amounts are consolidated and eliminated within this Liquidation Analysis. The most significant Related Party Receivable is a note receivable due from Arrow, which is secured by a deed of trust in the Summit high adventure facility, Arrow's only asset, and which note is pledged to JPM under the BSA's credit agreements. In lieu of showing a recovery on this line in the schedule, the recovery from the liquidation of the Summit is reflected as part of Land Building & Equipment below. Gross recoveries on this note total $35 million. Proceeds from the intercompany note via the sale of Arrow's assets are assumed to satisfy JPM's Secured Claims.

G.  <u>Inventory</u> – Inventory is primarily comprised of branded and non-branded Boy Scout apparel, High Adventure Base general inventory stock, and other miscellaneous inventory items. Inventory is presented based on the BSA's most recent financial statements. Inventory is assumed to be materially consistent as of liquidation date as in the BSA's current financial statements. Estimated recoveries are based on liquidation assumptions that include only sellable apparel and stock at substantially discounted values. Inventory reserves are not contemplated within this analysis.

H.  <u>Prepaid and Deferred Charges</u> – Primarily comprised of prepaid Insurance Policies, professional fees, and deferred expenses. Prepaids are presented based on the BSA's most recent financial statements. Prepaid insurance recoveries are estimated based on a detailed breakdown of 2021-2022 plan year Insurance Policies, prorated for recoveries as of the liquidation period. Prepaid professional fees are assumed to be recovered 100% and applied against administrative professional fee Claims in a liquidation scenario. Deferred charges are recovered at 0% of current financial statement balances.

I.  <u>Land, Building, and Equipment (net)</u> – Primarily comprised of the BSA's national headquarters, High Adventure Bases, distribution center, various furniture and fixtures, and software and computers. Land, building, and equipment balances are presented based on the Debtor and Related Non-Debtor Entities most recent financial statements. Pro forma balances represent the following:

- National HQ, Scouting U, National Distribution Center, the High Adventure Bases (Philmont, Sea Base, and Northern Tier), and Summit are presented based on valuations conducted by third party experts during the course of this bankruptcy and reflect estimates of the fair market value of the respective properties. The BSA also owns a portfolio of Oil and Gas Interests. These rights, and the value of the rights,

are not included within the financial statements, however, are included in the pro forma fair market value balance of land, building, and equipment based on a recent third party valuation report.

- The remaining balance of land, building, and equipment which primarily includes furniture, fixtures, capital and project improvements, and software and computers is estimated to be materially consistent to the BSA's most recent financial statements.

- Pro forma balances are presented before depreciation and amortization.

After a review of the assets, the Debtors and their advisors concluded that the forced sale of the Debtors' assets in the compressed timeframe that typically occur during a chapter 7 liquidation would likely result in a valuation discount relative to "fair value." The liquidation value of land, buildings, and equipment is stratified based on estimated recoveries ranging from 80% to 85% recovery on brokers opinion of value of the national headquarters ($11.6 million), former Scouting U building ($1.9 million), and distribution center ($7.3 million), fair market value appraisals of each of the High Adventure Bases (Philmont South Ranch $153 million, Sea Base $29 million, and Northern Tier $8.4 million including the Summit ($42.8 million), and an appraisal of the Oil and Gas Interests ($7.6 million). Recoveries on remaining assets are expected to be minimal based on the nature of the assets and the circumstances of a chapter 7 liquidation. Total land, building, and equipment recoveries range from 55% to 65% of pro forma values.

Certain of the BSA's properties are collateral for JPM's Secured debt. These properties include the national headquarters, Philmont Scout Ranch, and the High Adventure Bases at Sea Base and Northern Tier. Liquidation proceeds from these properties are assumed to satisfy JPM's Secured debt first, with any remaining proceeds made available to creditors based on priority. As noted above, the value of the Summit which flows to BSA through a note receivable is also reflected in the value of land, building and equipment and is subject to JPM's security interest.

The sale of certain of the High Adventure Bases and other properties could be disputed by third parties, potentially driving down their value or barring them from sale entirely if determined to be restricted property and non-alienable under applicable law; however, that issue is not addressed herein given the JPM lien. Similarly the High Adventure Bases are core to the mission of scouting and as such may not be subject to liquidation or the proceeds may not be available to all creditors.

J.    Other Assets – Other assets are primarily comprised of miscellaneous equipment located at the Summit property, pooled and gift annuity investments, and off-balance sheet art. Balances are presented based on BSA's most recent financial statements with the exception of the Artwork balances which is reflected at an estimated fair market value of $59 million based primarily on a 2012 appraisal. Recoveries are assumed between 50% and 80% for Artwork given indications that the value of the Artwork would be significantly depressed in a sale over a compressed timeframe as well as the impact of the BSA bankruptcy and Abuse Claims on the value of the Artwork, while the remaining

balance of other assets is assumed to recover 100% for pooled and gift annuity investments and between 5% and 25% for Summit assets.  Note that it is possible that the beneficiaries of the annuities and pooled investments would try to assert some type of priority to those assets which would reduce the liquidation value.  In addition some of these assets are core to the mission of scouting as such may not be available to all creditors.

There is no value attributed to the Debtors' intellectual property given that it derives from a congressional charter that is non-transferable and thus it is unclear if any value could be derived.

---

### *Liquidation Distributions*

K.  <u>Operational Wind Down Costs</u> represent an estimate of the costs incurred during a liquidation of the assets of the Debtor and Related Non-Debtor Entities and reflect BSA and its advisor's most recent budget for operational expenses during 2021 under a wind down scenario.  Wind down costs primarily include payroll, and related expenses, costs to maintain the BSA's supply and distribution center, high adventure base operating costs, general liability and other Insurance Policies, and other non-high adventure base operating expenses.  Operating expenses are assumed to reduce significantly during a liquidation between 25% and 75% of projected monthly costs.  Further, wind down expenses are reduced on a month to month basis during the liquidation period to account for expected closures of facilities and further reductions in labor force as the liquidation process progresses.

L.  <u>Chapter 7 Trustee Fees</u> would be limited to the fee guidelines in Section 326(a) of the Bankruptcy code.  The Debtors assumed that trustee fees are approximately 3% of entity gross Liquidation Proceeds.

M.  <u>Chapter 7 Professional Fees</u> include the estimated cost for financial advisors, attorneys and other professionals retained by the Trustee.  In the Liquidation Analysis, chapter 7 professional fees are estimated to be approximately 1.5% of gross Liquidation Proceeds excluding current cash on-hand.  These fees are applied on an individual basis across each liquidating entity based on the estimated Liquidation Proceeds available to each Estate excluding current Cash on-hand.  The amount of professional fees is estimated based on our best estimate based on the size and nature of the case; however, this amount can fluctuate based on length and complexity of the wind-down process and could be substantially greater than the amounts assumed herein which would further reduce recoveries to creditors.

N.  <u>Claims Processing Costs</u> include an estimate of the costs of administering Claims to various claimants, primarily Abuse litigation claimants.  Estimates reflect a minimum of $1 million.

O.  <u>Secured Lender Professional Fees</u> are estimated between $700,000 and $1 million during the liquidation period.

P.  <u>Broker Fees</u> include the estimated cost to market and dispose of substantially all of the BSA's land, building, equipment and Artwork.  In the Liquidation Analysis, chapter 7 broker fees are estimated to be approximately 2.0% of gross Liquidation Proceeds from these asset classes.

## *Claims*

Q.  <u>Secured Claims</u>

- The Liquidation Analysis assumes that all letters of credit are drawn and as a result the outstanding funded debt totals $328 million.  Debt is assumed to be Secured by the gross Liquidation Proceeds of certain of the BSA's real property assets, unrestricted Cash, unrestricted investments, and certain accounts receivable balances including the note receivable from Arrow WV which is Secured by the Summit high adventure facility.  In addition the debt benefits from replacement liens pursuant to the Cash Collateral Order to the extent of any diminution in value of the collateral.  Secured debt is estimated to be recovered at 100% of total Claims.

- The Liquidation Analysis assumes that a portion of the PBGC Claim, asserted against Related Non-Debtor Entities, is Secured by a lien in the amount of 30% of Liquidation Proceeds remaining for all members of the control group combined after wind down costs and Secured debt, if any.  The Secured PBGC Claim is estimated between $428 million and $496 million.

R.  <u>Administrative and Priority Claims</u>

- The Liquidation Analysis assumes that priority Claims consist of priority employee benefits pursuant to Section 507(a)(4) of the Bankruptcy code which are estimated to be $20 million as of the Conversion Date, comprised primarily of accrued employee benefit costs, severance, seasonal and part time payroll costs, and 503(b)(9) Claims.  Full time salaried employees assumed to be paid current immediately prior to the Conversion Date.

- Post-Petition Professional Fees as of the Conversion Date are estimated to be $31 million.  Post-Petition Trade Claims are estimated to be $18 million as of the Conversion Date based on BSA's most recent financial projections.

- Administrative and priority Claims are estimated to recover at 100% in the Liquidation Analysis.

S.  <u>General Unsecured Claims</u>

- The below chart reflects the aggregation of individual Liquidation Analyses of the Debtors and, independently, the Related Non-Debtor Entities.  Certain general unsecured claims presented in the Liquidation Analysis recover a greater percentage than the pro rata share of proceeds available for these unsecured claims due to the recoveries within individual Debtor and Related Non-Debtor Entity Liquidations.

- The Liquidation Analysis estimates that there will be between $12 million and $42 million of proceeds available to satisfy General Unsecured Claims. As some of these proceeds may be from assets that are core to the mission of Scouting, it is possible that some or all of this value may only be available for certain core creditor Claims including that of the PBGC.

- General Unsecured Claims are assumed to include estimated Abuse Claims, unrecovered unsecured PBGC Claim, employee-related Claims (primarily Restoration Plan Claims), contract rejection Claims, and pre-petition trade payables and accrued liabilities.

- Non-Abuse litigation Claims are assumed to recovery from applicable insurance and are not contemplated in the Liquidation Analysis.

- An estimate of the remaining unrecovered asserted PBGC Claim of $1.1 billion is included in the General Unsecured Claims pool.

- As described in Article [__] of the Disclosure Statement, Abuse Claims are estimated to be between $2.4 and $7.1 billion and the Liquidation Analysis presents Abuse Claim recoveries under both a high ($7.1 billion) and low ($2.4 billion) assumption. As noted in the Disclosure Statement in Article V.N, this aggregate estimation of liability takes into account a number of different factors including assumptions concerning the estimated number of time-barred Abuse Claims. The range used in the Disclosure Statement and this Liquidation Analysis is merely an estimate of the Debtors' aggregate liability, which could be significantly greater or lower depending upon, among other things, changes to the assumptions concerning the number of time-barred claims or the accuracy and sufficiency of information provided by the Abuse Claimants on their Proof of Claim submissions. As applied to individual Abuse Claims, the Liquidation Analysis provides an estimate of the percent-on-the-dollar recovery that individual claimants would receive in a hypothetical liquidation. However, the value of any particular individual claim that this percentage applies to is highly dependent on the facts and circumstances of the individual claim. For example, although the same percentage recovery applies to all claims whether or not time-barred, the average value of time-barred claims is significantly less (and in many cases may not have any value) in comparison to the average value of claims that are not time-barred.

- Contract rejection Claims are estimated to be $8 million and do not include any estimates for additional executory contract rejection Claims arising as a result of the liquidation.

- General Unsecured Claims recover between 0.1% and 0.5% in the Debtor and Related Non-Debtor Entity Liquidation Analysis based on high Abuse Claims ($7.1 billion) and between 0.3% and 1.2% based on low Abuse Claims ($2.4 billion).

### *Summary Liquidation Analysis – Debtors and Related Non-Debtor Entities*

| | Note | Asset Values — Book Value at 2/28/2120 | Asset Values — Adjustments to BV | Asset Values — Pro Forma BV / FMV | Estimated Recovery (%) — Low | Estimated Recovery (%) — Mid | Estimated Recovery (%) — High | Estimated Recovery ($ 000s) — Low | Estimated Recovery ($ 000s) — Mid | Estimated Recovery ($ 000s) — High |
|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | |
| Cash and Cash Equivalents | A | $ 111,518 | $ 2,145 | $ 113,663 | 100% | 100% | 100% | $ 113,663 | $ 113,663 | $ 113,663 |
| Cash and Cash Equivalents: Restricted | A | 32,627 | (8,928) | 23,699 | 0% | 0% | 0% | - | - | - |
| Investments | B | 127,462 | (70,632) | 56,830 | 100% | 100% | 100% | 56,830 | 56,830 | 56,830 |
| Investments: Restricted | B | 174,782 | (7,693) | 167,089 | 15% | 15% | 15% | 25,000 | 25,000 | 25,000 |
| Accounts Receivable | C | 16,762 | 218 | 16,980 | 33% | 34% | 35% | 5,573 | 5,736 | 5,899 |
| Investment Income Receivable | D | 653 | - | 653 | 0% | 0% | 0% | - | - | - |
| Pledges Receivable | E | 17,207 | - | 17,207 | 0% | 0% | 0% | - | - | - |
| Related Party Receivables | F | - | - | - | 0% | 0% | 0% | - | - | - |
| Inventory | G | 56,407 | 16,944 | 73,350 | 8% | 9% | 10% | 5,731 | 6,448 | 7,164 |
| Prepaid and Deferred Charges | H | 63,036 | - | 63,036 | 5% | 5% | 5% | 3,101 | 3,101 | 3,101 |
| Land, Building, and Equipment (Net) | I | 476,143 | (111,588) | 364,555 | 58% | 61% | 63% | 211,828 | 220,942 | 230,056 |
| Other | J | 17,353 | 59,337 | 76,690 | 48% | 60% | 72% | 36,909 | 46,222 | 55,536 |
| **Total Gross Liquidation Proceeds** | | $ 1,093,950 | $ (120,197) | $ 973,752 | 47% | 49% | 51% | $ 458,634 | $ 477,942 | $ 497,249 |
| **( - ) Less Cost of Liquidation** | | | | | | | | | | |
| ( - ) Liquidation Wind-Down Expenses | K | | | | | | | $ (13,465) | $ (15,841) | $ (18,217) |
| ( - ) Chapter 7 Trustee Fees | L | | | | | | | (14,807) | (15,416) | (16,026) |
| ( - ) Trustee's Professional Fees | M | | | | | | | (4,622) | (5,437) | (6,253) |
| ( - ) Claims Processing Costs | N | | | | | | | (1,000) | (1,000) | (1,000) |
| ( - ) Secured Lender Professional Fees | O | | | | | | | (715) | (842) | (968) |
| ( - ) Broker Fees | P | | | | | | | (4,826) | (5,186) | (5,545) |
| **Total Liquidation Costs** | | | | | | | | $ (39,435) | $ (43,722) | $ (48,009) |
| **Total Net Liquidation Proceeds** | | | | | | | | $ 419,199 | $ 434,220 | $ 449,240 |

| | | Estimated Claims Pool (High) | Estimated Recovery (%) — Low | Estimated Recovery (%) — Mid | Estimated Recovery (%) — High | Estimated Recovery ($ 000s) — Low | Estimated Recovery ($ 000s) — Mid | Estimated Recovery ($ 000s) — High |
|---|---|---|---|---|---|---|---|---|
| **Secured Claims** | | | | | | | | |
| JPMorgan Funded Debt | | $ 232,262 | 100% | 100% | 100% | $ 232,262 | $ 232,262 | $ 232,262 |
| JPMorgan Letters of Credit | | 95,842 | 100% | 100% | 100% | 95,842 | 95,842 | 95,842 |
| PBGC Termination Claim | | 509,173 | 2% | 2% | 2% | 9,469 | 9,475 | 9,481 |
| **Total Secured Claims** | Q | $ 896,251 | 35% | 35% | 38% | $ 337,573 | $ 337,579 | $ 337,586 |
| **Proceeds Available After Secured Claims** | | | | | | $ 81,626 | $ 96,640 | $ 111,655 |
| **Administrative / Priority Tax Claims** | | | | | | | | |
| Employee Related Claims | | $ 20,326 | 100% | 100% | 100% | $ 20,326 | $ 20,326 | $ 20,326 |
| Professional Fee Claims | | 30,952 | 100% | 100% | 100% | 30,952 | 30,952 | 30,952 |
| Post-Petition Trade Claims | | 18,035 | 100% | 100% | 100% | 18,035 | 18,035 | 18,035 |
| **Total Administrative / Priority Tax Claims** | R | $ 69,313 | 100% | 100% | 100% | $ 69,313 | $ 69,313 | $ 69,313 |
| **Proceeds Available for General Unsecured Creditors** | | | | | | $ 12,313 | $ 27,328 | $ 42,342 |
| **General Unsecured Claims (High)** | | | | | | | | |
| Trade Payables and Accrued Expenses | | $ 119,760 | 0.0% | 0.0% | 0.0% | $ 8 | $ 18 | $ 28 |
| Employee Related Claims | | 30,926 | 0.1% | 0.2% | 0.4% | 34 | 75 | 117 |
| Real Property & Equipment Lease Rejection Damages | | 101,455 | 0.0% | 0.0% | 0.0% | 12 | 27 | 41 |
| Abuse Claims | | 7,100,000 | 0.1% | 0.3% | 0.5% | 10,615 | 23,558 | 36,501 |
| PBGC Termination Claim | | 1,090,519 | 0.2% | 0.3% | 0.5% | 1,645 | 3,650 | 5,655 |
| **Total General Unsecured Claims (High)** | S | $ 8,501,633 | 0.1% | 0.3% | 0.5% | $ 12,313 | $ 27,328 | $ 42,342 |
| **Proceeds Available After General Unsecured Claims** | | | | | | $ - | $ - | $ - |
| **General Unsecured Claims (Low)** | | | | | | | | |
| Trade Payables and Accrued Expenses | | $ 5,350 | 0.3% | 0.8% | 1.2% | $ 19 | $ 41 | $ 64 |
| Employee Related Claims | | 22,689 | 0.3% | 0.8% | 1.2% | 79 | 175 | 272 |
| Real Property & Equipment Lease Rejection Damages | | 8,000 | 0.3% | 0.8% | 1.2% | 28 | 62 | 96 |
| Abuse Claims | | 2,400,000 | 0.3% | 0.8% | 1.2% | 8,357 | 18,548 | 28,739 |
| PBGC Termination Claim | | 1,090,519 | 0.4% | 0.8% | 1.2% | 3,830 | 8,501 | 13,172 |
| **Total General Unsecured Claims (Low)** | S | $ 3,526,557 | 0.3% | 0.8% | 1.2% | $ 12,313 | $ 27,328 | $ 42,342 |
| **Proceeds Available After General Unsecured Claims** | | | | | | $ - | $ - | $ - |

Note: Recovery percentages are based on a) asset proceeds recovered divided by pro forma asset balances and b) claims recoveries based on the low, mid, and high ranges of estimated claims

**3)    General Liquidation Summary and Detail – Local Councils**

As noted above, although the Debtors do not believe they are required to satisfy the best interests test as it relates to the non-debtor Local Councils, various parties have objected to the Disclosure Statement, including the TCC, and the Debtors have agreed to provide a hypothetical analysis depicting the liquidation of the Local Councils utilizing the same assumptions as the Liquidation Analysis for the Debtors and Related Non-Debtor Entities.  Accordingly, the following analysis depicts an aggregated summary of hypothetical Local Council liquidations on an aggregate basis, which are assumed to occur independently during an orderly liquidation process over six months after the Conversion Date. Local Council liquidation analysis is based on the unaudited pro forma financial statements of Local Councils as of February 28, 2021 (refer to Exhibit 1: Individual Local Council Balance Sheets below). While the Debtors have significant financial information related to the Local Councils, including balance sheets and property valuations (refer to Exhibit 2: Local Council Property Value Information below), there is a significantly higher degree of variability and potential for market saturation associated with the liquidation of approximately 251 independent entities and thus greater risk that the actual recoveries would be less than the projected recoveries set forth herein.

Although this analysis assumes that all entities in the organization are liquidated substantially concurrently as part of a hypothetical liquidation of the Boy Scouts organization, the analysis assumes each local council is liquidated separately from BSA, that each local council is rendered insolvent due to the magnitude of the joint and several pension termination liability, and any excess value after satisfying the pension termination liability and other local council obligations (including pension contribution claims) flows to BSA for further distribution to creditors, including Abuse Claims.

*Liquidation Proceeds*

A.    <u>Cash and Cash Equivalents</u> – Represents Cash and Cash equivalents of the Local Councils as of February 28, 2021, excluding "custodial cash" that is either (a) cash held on account of registration fees payable to BSA, as that amount is included in BSA's forecasted cash at the Conversion Date or (b) cash held on behalf of units that are legally distinct from the Local Councils.  The Debtors estimate a 100% recovery on the cash balances.

B.    <u>Investments</u> – Represents investments of the Local Councils as of February 28, 2021, segregated between restricted and unrestricted.  Restricted investment balances reflect donor imposed restrictions on use and disposition and accordingly such amounts are generally excluded from the Liquidation Proceeds; however, the Debtors prepared the Local Council liquidation analysis assuming that Local Councils would be able to recover approximately the same share of restricted investments (20%) as the Debtors in their Liquidation Analysis as described above.  The Debtors estimate a 100% recovery on unrestricted investments and 20% recovery on restricted investments.

C.    <u>Land, Building, and Equipment (net)</u> – Primarily comprised of Local Councils' camp properties, land, office and store structures and other miscellaneous real property.  Book value of land, building, and equipment balances are presented based on Local Council

balance sheets as of February 28, 2021 and are not disaggregated based on restricted and unrestricted book value.  Pro forma balances represent the following:

- Unrestricted Land, Building, and Equipment – Represents a) real property asserted by Local Councils as unrestricted, plus b) certain real property asserted as restricted by Local Councils that the BSA has determined, based on its legal analysis of the asserted restrictions, is capable of being sold with the proceeds available for distribution to general unsecured creditors of the Local Councils. Pro forma balances of unrestricted land, building, and equipment are presented at fair market value based on recent broker opinion of values conducted by third party real estate advisors (or the average thereof if multiple valuations were conducted on the same property).[9]

- Restricted Land Building, and Equipment – Represents real property asserted by Local Councils as restricted such that the restriction would preclude a sale of the property or require reversion of the proceeds based on donor restriction documentation, as validated by BSA's legal analysis. Pro forma balances of restricted land, building, and equipment are presented at fair market value based on recent broker opinion of values conducted by third party real estate advisors (or the average thereof if multiple valuations were conducted on the same property).

After a review of the assets, the Debtors, with the assistance of their advisors, concluded that the sale of the Local Council assets in the compressed timeframes that typically occur during a chapter 7 liquidation would likely result in a valuation discount relative to "fair value." Further BSA believes a larger discount for the Local Councils than the BSA properties described above is appropriate for a number of reasons.  First, the Local Council properties were valued through broker opinions of value, which are inherently more limited and provide less certainty than full appraisals used for the principal Debtor properties.  Second, the broker opinions of value also generally did not take into account limitations on use driven, for example, by conservation easements, which would further reduce the value of the properties. Third, the Debtors expect that the proceeds derived from the sale of Local Council properties would be suppressed due to the market being saturated with a large number of similar camp properties, which are often located in relatively close proximity to one another.  The liquidation value of land, buildings, and equipment is estimated based on recoveries of 60% of unrestricted real property. Restricted real property is excluded from liquidation proceeds.

D.    <u>Other Assets</u> – Other assets are primarily comprised of miscellaneous inventory, prepaid expenses, contributions and pledges receivable, beneficial interests in trusts, and notes receivable held by the Local Councils.  Balances are presented based on Local Council balance sheets as of February 28, 2021. Recoveries of other assets are estimated to be 5% of book value balances as these assets either have little sellable or recoverable value via a chapter 7 liquidation or in some cases are restricted based on donor stipulations.

---

[9] Any property for which a valuation was not obtained is assumed to have limited value in the Liquidation Analysis and is factored into the 60% recovery.  Approximately 896 of 1,180 properties were valued and approximately 75 of the unvalued properties are restricted.  Self-reported indications of value from the Local Councils of the remaining unrestricted properties, which are a mix of mainly book and tax assessed amounts, total less than $40 million.

*Liquidation Distributions*

E.  <u>Operational Wind Down Costs</u> represent an estimate of the costs incurred during a liquidation of the assets of the individual Local Councils.  Wind down costs are assumed to include payroll and related expenses, costs to maintain Local Council real property until liquidated, and other operating expenses during the wind down period.  Operating expenses are assumed to reduce significantly during a liquidation and are estimated at 3.5% of gross liquidation proceeds.

F.  <u>Chapter 7 Trustee Fees</u> would be limited to the fee guidelines in Section 326(a) of the Bankruptcy code.  The Debtors assumed that trustee fees are approximately 3% of gross Liquidation Proceeds.

G.  <u>Chapter 7 Professional Fees</u> include the estimated cost for financial advisors, attorneys and other professionals retained by the Trustee.  In the Liquidation Analysis, chapter 7 professional fees are estimated to be approximately 3.5% of gross Liquidation Proceeds excluding current cash on-hand.  These fees are applied on an individual basis across each liquidating Local Council based on the estimated Liquidation Proceeds available to each Estate excluding current cash on-hand.  However, this amount can fluctuate based on length and complexity of the wind-down process and could be substantially greater than the amounts assumed herein.

H.  <u>Claims Processing Costs</u> include an estimate of the costs of administering Claims to various claimants, primarily Abuse litigation claimants.  Estimates reflect approximately 2.5% of Abuse Trust recoveries, consistent with a US Chamber of Commerce publication on trust distributions dated March 2018.

I.  <u>Broker Fees</u> include the estimated cost to market and dispose of substantially all of the Local Councils' land, building, equipment.  In the Liquidation Analysis, chapter 7 broker fees are estimated to be approximately 4% of gross Liquidation Proceeds from these asset classes.

*Claims*

J.  <u>Secured Claims</u>

- The Liquidation Analysis assumes that approximately 50% of the debt on Local Council balance sheets as of February 28, 2021 is secured debt based on a review of a selection of approximately 80% of the total Local Council debt.  Secured debt related Local Council Claims are estimated to recover in full.

- The Liquidation Analysis assumes that a portion of the PBGC Claim, asserted against each individual Local Council, is Secured by a lien in the amount of 30% of Liquidation Proceeds remaining for all members of the control group after wind down costs and Secured debt, if any.  The Secured PBGC Claim is estimated to be between $428 million and $496 million, asserted against each individual Local

16

Council. The Liquidation Analysis assumes that the PBGC recovers 100% of its $1.1 billion Claim between the Local Councils and proceeds from the Debtor and Related Non-Debtor Entity Liquidation Analysis.

K.    Administrative and Priority Claims

- The Liquidation Analysis assumes that priority Claims consist of priority employee benefits pursuant to Section 507(a)(4) of the Bankruptcy code which are estimated to be $17.7 million as of the Conversion Date, comprised primarily of accrued employee payroll and benefit costs and severance.

- Administrative and priority Claims are estimated to recover 64% in the aggregate.

L.    General Unsecured Claims

- The below chart reflects the aggregation of individual Liquidation Analyses of the Local Councils.  Certain Secured and Administrative Expense Claims of individual Local Councils are deficient in the mid-range recovery scenario, and no proceeds remain available for General Unsecured Claims for those Local Councils. Certain other Local Councils have estimated liquidation proceeds that exceed the estimated value of all Claims after application of contribution claims that such Local Councils could assert against other Local Councils on account of payment on the joint and several pension liability.   All such value is distributed to BSA and redistributed to creditors.

- The Liquidation Analysis estimates that there will be approximately $445 million of proceeds available to satisfy General Unsecured Claims.  As some of these proceeds may be from assets that are core to the mission of Scouting, it is possible that some or all of this value may only be available for certain core creditor Claims .

- General Unsecured Claims are assumed to include estimated Abuse Claims, contract rejection Claims, unsecured debt, and pre-petition trade payables and accrued liabilities.  Solely for purposes of this analysis, the estimated aggregate Abuse Claim liability is allocated to each council based on number of Abuse Claims as a proportion of all non-duplicative Abuse Claims that identify a local council. We believe this allocation method results in a higher aggregate recovery for Abuse Claims.

- Non-Abuse Litigation Claims are assumed to recovery from applicable insurance and are not contemplated in the Liquidation Analysis.

- Contract rejection Claims are estimated to be 5% of unrestricted net assets per Local Council balances sheets as of February 28, 2021.

### *Summary Liquidation Analysis – Local Council Organizations*

| | Note | Asset Values | | | Estimated Recovery (%) | Estimated Recovery ($ 000s) |
| --- | --- | --- | --- | --- | --- | --- |
| | | Book Value at 2/28/2021 | Adjustments to BV / FMV | Pro Forma BV / FMV | Mid | Mid |
| **Assets** | | | | | | |
| Cash and Cash Equivalents | A | $ 309,526 | $ (22,294) | $ 287,232 | 100% | $ 287,232 |
| Investments | B | 1,646,979 | (1,077,287) | 569,693 | 100% | 569,693 |
| Investments: Restricted | B | - | 1,063,151 | 1,063,151 | 20% | 211,504 |
| Land, Building, and Equipment (Net) | C | 1,291,886 | (79,819) | 1,212,066 | 60% | 727,240 |
| Land, Building, and Equipment (Net): Restricted | C | - | 580,363 | 580,363 | 0% | - |
| Other | D | 280,271 | - | 280,271 | 5% | 14,059 |
| **Total Gross Liquidation Proceeds** | | $ 3,528,662 | $ 464,114 | $ 3,992,776 | 45% | $ 1,809,727 |
| **( - ) Less Cost of Liquidation** | | | | | | |
| ( - ) Liquidation Wind-Down Expenses | E | | | | | $ (63,340) |
| ( - ) Chapter 7 Trustee Fees | F | | | | | (54,298) |
| ( - ) Trustee's Professional Fees | G | | | | | (53,287) |
| ( - ) Claims Processing Costs | H | | | | | (9,884) |
| ( - ) Broker Fees | I | | | | | (29,090) |
| **Total Liquidation Costs** | | | | | | $ (209,899) |
| **Total Net Liquidation Proceeds** | | | | | | $ 1,599,828 |

| | Note | Estimated Claims Pool | Recovery (%) Mid | Recovery ($ 000s) Mid |
| --- | --- | --- | --- | --- |
| **Secured Claims** | | | | |
| Secured Local Council Debt | | $ 58,974 | 100% | $ 58,871 |
| Priority Claims (PBGC) | | 1,084,863 | 100% | 1,084,863 |
| **Total Secured Claims** | J | $ 1,143,837 | 100% | $ 1,143,735 |
| **Proceeds Available After Secured Claims** | | | | $ 456,093 |
| **Administrative / Priority Tax Claims** | | | | |
| Employee Related Claims | | $ 17,655 | 64% | $ 11,344 |
| **Total Administrative / Priority Tax Claims** | K | $ 17,655 | 64% | $ 11,344 |
| **Proceeds Available After Administrative / Priority Tax Claims** | | | | $ 444,749 |
| **General Unsecured Claims (High)** | | | | |
| Trade Payables and Accrued Expenses | | $ 114,410 | 8% | $ 8,932 |
| Employee Related Claims | | 8,237 | 8% | 678 |
| Real Property & Equipment Lease Rejection Damages | | 93,455 | 13% | 12,302 |
| Secured Local Council Debt | | 58,974 | 7% | 4,160 |
| Abuse Claims | | 7,100,000 | 6% | 405,225 |
| PBGC Termination Claim | | - | 0% | - |
| **Total General Unsecured Claims** | L | $ 7,375,076 | 6% | $ 431,298 |
| **Residual Scouting Interest** | | | | $ 13,451 |
| **General Unsecured Claims (Low)** | | | | |
| Trade Payables and Accrued Expenses | | $ 114,410 | 19% | $ 21,401 |
| Employee Related Claims | | 8,237 | 19% | 1,551 |
| Real Property & Equipment Lease Rejection Damages | | 93,455 | 29% | 26,936 |
| Secured Local Council Debt | | 58,974 | 17% | 9,857 |
| Abuse Claims | | 2,400,000 | 15% | 355,991 |
| PBGC Termination Claim | | - | 0% | - |
| **Total General Unsecured Claims** | L | $ 2,675,076 | 16% | $ 415,735 |
| **Residual Scouting Interest** | | | | $ 29,014 |

Note: Recovery percentages are based on a) asset proceeds recovered divided by pro forma asset balances and b) claims recoveries based on estimated claims. "Residual Scouting Interest" assumed to be reallocated to BSA for further distribution to creditors; however, the Debtors understand that various parties, including Local Councils, would assert that such value should be utilized for scouting purposes in local jurisdiction.

### 4)  *Combined Debtors, Related Non-Debtor Entities and Local Councils*

As noted above, in addition to the separate analysis of the Debtor and Related Non-Debtors on the one hand and the Local Councils on the other, we have created an analysis depicting a combination of the Liquidation Analysis pertaining to the Debtors and Related Non-Debtor Entities and the analysis pertaining to the hypothetical liquidation of the Local Councils.  The analysis is simply the addition of each of the prior sections of this document, plus showing any excess proceeds at individual local councils distributed to BSA resulting in incremental recovery to Claims against BSA including Abuse claims, without any other changes in assumptions.

### *Summary Liquidation Analysis – Debtors, Related Non-Debtor Entities, and Local Councils*

| | Note | Asset Values — Book Value at 2/28/2120 | Asset Values — Adjustments to BV | Asset Values — Pro Forma BV / FMV | Estimated Recovery (%) Low | Estimated Recovery (%) Mid | Estimated Recovery (%) High | Estimated Recovery ($000s) Low | Estimated Recovery ($000s) Mid | Estimated Recovery ($000s) High |
|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | |
| Cash and Cash Equivalents | A | $ 421,043 | $ (20,149) | $ 400,894 | 100% | 100% | 100% | $ 400,894 | $ 400,894 | $ 400,894 |
| Cash and Cash Equivalents:  Restricted | A | 32,627 | (8,928) | 23,699 | 0% | 0% | 0% | - | - | - |
| Investments | B | 1,774,442 | (1,147,919) | 626,523 | 100% | 100% | 100% | 626,523 | 626,523 | 626,523 |
| Investments:  Restricted | B | 174,782 | 1,055,459 | 1,230,241 | 19% | 19% | 19% | 236,504 | 236,504 | 236,504 |
| Accounts Receivable | C | 16,762 | 218 | 16,980 | 33% | 34% | 35% | 5,573 | 5,736 | 5,899 |
| Investment Income Receivable | D | 653 | - | 653 | 0% | 0% | 0% | - | - | - |
| Pledges Receivable | E | 17,207 | - | 17,207 | 0% | 0% | 0% | - | - | - |
| Related Party Receivables | F | - | - | - | 0% | 0% | 0% | - | - | - |
| Inventory | G | 56,407 | 16,944 | 73,350 | 8% | 9% | 10% | 5,731 | 6,448 | 7,164 |
| Prepaid and Deferred Charges | H | 63,036 | - | 63,036 | 5% | 5% | 5% | 3,101 | 3,101 | 3,101 |
| Land, Building, and Equipment (Net) | I | 1,768,029 | (191,407) | 1,576,622 | 60% | 60% | 61% | 939,068 | 948,182 | 957,296 |
| Other | J | 297,625 | 59,337 | 356,961 | 14% | 17% | 19% | 50,967 | 60,281 | 69,595 |
| **Total Gross Liquidation Proceeds** | | $ 4,622,612 | $ 343,917 | $ 4,966,529 | 46% | 46% | 46% | $ 2,268,361 | $ 2,287,669 | $ 2,306,976 |
| **( - ) Less Cost of Liquidation** | | | | | | | | | | |
| ( - ) Liquidation Wind-Down Expenses | K | | | | | | | $ (76,805) | $ (79,181) | $ (81,557) |
| ( - ) Chapter 7 Trustee Fees | L | | | | | | | (69,105) | (69,714) | (70,324) |
| ( - ) Trustee's Professional Fees | M | | | | | | | (57,909) | (58,725) | (59,540) |
| ( - ) Claims Processing Costs | N | | | | | | | (10,884) | (10,884) | (10,884) |
| ( - ) Secured Lender Professional Fees | O | | | | | | | (715) | (842) | (968) |
| ( - ) Broker Fees | P | | | | | | | (33,916) | (34,275) | (34,635) |
| **Total Liquidation Costs** | | | | | | | | $ (249,334) | $ (253,621) | $ (257,908) |
| **Total Net Liquidation Proceeds** | | | | | | | | $ 2,019,027 | $ 2,034,048 | $ 2,049,068 |

| | Note | Estimated Claims Pool (High) | Estimated Recovery (%) Low | Estimated Recovery (%) Mid | Estimated Recovery (%) High | Estimated Recovery ($000s) Low | Estimated Recovery ($000s) Mid | Estimated Recovery ($000s) High |
|---|---|---|---|---|---|---|---|---|
| **Secured Claims** | | | | | | | | |
| JPMorgan Funded Debt | | $ 232,262 | 100% | 100% | 100% | $ 232,262 | $ 232,262 | $ 232,262 |
| JPMorgan Letters of Credit | | 95,842 | 100% | 100% | 100% | 95,842 | 95,842 | 95,842 |
| Secured Local Council Debt | | 58,974 | 100% | 100% | 100% | 58,871 | 58,871 | 58,871 |
| PBGC Termination Claim | | 509,173 | 215% | 215% | 215% | 1,094,339 | 1,094,339 | 1,094,345 |
| **Total Secured Claims** | Q | $ 896,251 | 155% | 155% | 165% | $ 1,481,308 | $ 1,481,314 | $ 1,481,320 |
| **Proceeds Available After Secured Claims** | | | | | | $ 537,719 | $ 552,733 | $ 567,748 |
| **Administrative / Priority Tax Claims** | | | | | | | | |
| Employee Related Claims | | $ 37,981 | 83% | 83% | 83% | $ 31,669 | $ 31,669 | $ 31,669 |
| Professional Fee Claims | | 30,952 | 100% | 100% | 100% | 30,952 | 30,952 | 30,952 |
| Post-Petition Trade Claims | | 18,035 | 100% | 100% | 100% | 18,035 | 18,035 | 18,035 |
| **Total Administrative / Priority Tax Claims** | R | $ 86,968 | 93% | 93% | 93% | $ 80,657 | $ 80,657 | $ 80,657 |
| **Proceeds Available for General Unsecured Creditors** | | | | | | $ 457,062 | $ 472,077 | $ 487,091 |
| **General Unsecured Claims (High)** | | | | | | | | |
| Trade Payables and Accrued Expenses | | $ 119,760 | 7.5% | 7.5% | 7.5% | $ 8,950 | $ 8,960 | $ 8,970 |
| Employee Related Claims | | 30,926 | 2.4% | 2.6% | 2.7% | 755 | 796 | 837 |
| Real Property & Equipment Lease Rejection Damages | | 101,455 | 12.2% | 12.2% | 12.2% | 12,329 | 12,344 | 12,358 |
| Unsecured Local Council Debt | | 58,974 | 7.1% | 7.1% | 7.1% | 4,160 | 4,160 | 4,160 |
| Abuse Claims | | 7,100,000 | 6.0% | 6.2% | 6.4% | 429,224 | 442,167 | 455,110 |
| PBGC Termination Claim | | 5,655 | 29.1% | 64.5% | 100.0% | 1,645 | 3,650 | 5,655 |
| **Total General Unsecured Claims (High)** | S | $ 7,416,770 | 6.2% | 6.4% | 6.6% | $ 457,062 | $ 472,077 | $ 487,091 |
| **Proceeds Available After General Unsecured Claims** | | | | | | $ - | $ - | $ - |
| **General Unsecured Claims (Low)** | | | | | | | | |
| Trade Payables and Accrued Expenses | | $ 119,760 | 17.9% | 18.0% | 18.0% | $ 21,493 | $ 21,516 | $ 21,539 |
| Employee Related Claims | | 30,926 | 6.3% | 6.6% | 6.9% | 1,944 | 2,041 | 2,137 |
| Real Property & Equipment Lease Rejection Damages | | 101,455 | 26.7% | 26.7% | 26.8% | 27,075 | 27,109 | 27,143 |
| Unsecured Local Council Debt | | 58,974 | 16.7% | 16.7% | 16.7% | 9,857 | 9,857 | 9,857 |
| Abuse Claims | | 2,400,000 | 16.6% | 17.0% | 17.4% | 395,048 | 407,837 | 418,027 |
| PBGC Termination Claim | | 8,388 | 19.6% | 44.3% | 100.0% | 1,645 | 3,717 | 8,388 |
| **Total General Unsecured Claims (Low)** | S | $ 2,719,502 | 16.8% | 17.4% | 17.9% | $ 457,063 | $ 472,077 | $ 487,091 |
| **Proceeds Available After General Unsecured Claims** | | | | | | $ - | $ - | $ - |

Note: Recovery percentages are based on a) asset proceeds recovered divided by pro forma asset balances and b) claims recoveries based on estimated claims

### *Consolidating Mid-Point Recoveries of Debtors, Related Non-Debtor Entities, and Local Councils*

**Estimated Mid-Point Recovery ($ 000s)**

| | BSA Debtors | Foundation | Arrow | BSAAM | Learning for Life | Interco | Consolidated Debtors & Related Non-Debtors | Local Councils | Residual Scouting Interest | Total BSA + LCs |
|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | |
| Cash and Cash Equivalents | 113,662 | - | - | 0 | - | (0) | 113,663 | 287,232 | - | 400,894 |
| Cash and Cash Equivalents: Restricted | - | - | - | - | - | - | - | - | - | - |
| Investments | 47,078 | 9,497 | - | - | 256 | - | 56,830 | 569,693 | - | 626,523 |
| Investments: Restricted | 25,000 | - | - | - | - | - | 25,000 | 211,504 | - | 236,504 |
| Accounts Receivable | 5,631 | 105 | - | - | - | - | 5,736 | - | - | 5,736 |
| Investment Income Receivable | - | - | - | - | - | - | - | - | - | - |
| Pledges Receivable | - | - | - | - | - | - | - | - | - | - |
| Related Party Receivables | 33,520 | - | - | - | - | (33,520) | - | - | - | - |
| Inventory | 6,448 | - | - | - | - | - | 6,448 | - | - | 6,448 |
| Prepaid and Deferred Charges | 3,101 | - | - | - | - | - | 3,101 | - | - | 3,101 |
| Land, Building, and Equipment (Net) | 185,542 | 90 | 35,310 | - | - | - | 220,942 | 727,240 | - | 948,182 |
| Other | 46,222 | - | - | - | - | - | 46,222 | 14,059 | - | 60,281 |
| **Total Gross Liquidation Proceeds** | 466,204 | 9,692 | 35,310 | 0 | 256 | (33,520) | 477,942 | 1,809,727 | - | 2,287,669 |
| **( - ) Less Cost of Liquidation** | | | | | | | | | | |
| ( - ) Liquidation Wind-Down Expenses | (15,841) | (315) | (1,084) | (0) | (6) | - | (15,841) | (63,340) | - | (79,181) |
| ( - ) Chapter 7 Trustee Fees | (14,015) | (145) | - | - | (4) | - | (15,416) | (54,298) | - | (69,714) |
| ( - ) Trustee's Professional Fees | (5,288) | - | (706) | - | - | - | (5,437) | (53,287) | - | (58,725) |
| ( - ) Claims Processing Costs | (1,000) | - | - | - | - | - | (1,000) | (9,884) | - | (10,884) |
| ( - ) Secured Lender Professional Fees | (842) | - | - | - | - | - | (842) | - | - | (842) |
| ( - ) Broker Fees | (4,478) | (2) | - | - | - | - | (5,186) | (29,090) | - | (34,275) |
| **Total Liquidation Costs** | (41,459) | (463) | (1,790) | (0) | (10) | - | (43,722) | (209,899) | - | (253,621) |
| **Total Net Liquidation Proceeds** | 424,745 | 9,229 | 33,520 | 0 | 246 | (33,520) | 434,220 | 1,599,828 | - | 2,034,048 |

**Estimated Recovery ($ 000s)**

| | BSA Debtors | Foundation | Arrow | BSAAM | Learning for Life | Intercompany | Subtotal BSA National | Local Councils | | Subtotal BSA + LCs |
|---|---|---|---|---|---|---|---|---|---|---|
| **Secured Claims** | | | | | | | | | | |
| JPMorgan Funded Debt | 232,262 | - | - | - | - | - | 232,262 | - | - | 232,262 |
| JPMorgan Letters of Credit | 95,842 | - | - | - | - | - | 95,842 | - | - | 95,842 |
| Secured Local Council Debt | - | - | - | - | - | - | - | 58,871 | - | 58,871 |
| BSA Secured Intercompany Note | - | - | 33,520 | - | - | (33,520) | - | - | - | - |
| PBGC Termination Claim | - | 9,229 | - | - | 246 | - | 9,475 | 1,084,863 | - | 1,094,339 |
| **Total Secured Claims** | 328,104 | 9,229 | 33,520 | 0 | 246 | (33,520) | 337,579 | 1,143,735 | - | 1,481,314 |
| **Proceeds Available After Secured Claims** | 96,640 | - | - | - | 0 | - | 96,640 | 456,093 | - | 552,733 |
| **Administrative / Priority Tax Claims** | | | | | | | | | | |
| Employee Related Claims | 20,326 | - | - | - | - | - | 20,326 | 11,344 | - | 31,669 |
| Professional Fee Claims | 30,952 | - | - | - | - | - | 30,952 | - | - | 30,952 |
| Post-Petition Trade Claims | 18,035 | - | - | - | - | - | 18,035 | - | - | 18,035 |
| **Total Administrative / Priority Tax Claims** | 69,313 | - | - | - | - | - | 69,313 | 11,344 | - | 80,657 |
| **Proceeds Available for General Unsecured Creditors** | 27,328 | - | - | - | - | - | 27,328 | 444,749 | - | 472,077 |
| **General Unsecured Claims** | | | | | | | | | | |
| Trade Payables and Accrued Expenses | 18 | - | - | - | - | - | 18 | 8,932 | 10 | 8,960 |
| Employee Related Claims | 75 | - | - | - | - | - | 75 | 678 | 43 | 796 |
| Real Property & Equipment Lease Rejection Damages | 27 | - | - | - | - | - | 27 | 12,302 | 15 | 12,344 |
| Unsecured Local Council Debt | - | - | - | - | - | - | - | 4,160 | - | 4,160 |
| Abuse Claims | 23,558 | - | - | - | - | - | 23,558 | 405,225 | 13,383 | 442,167 |
| PBGC Termination Claim | 3,650 | - | - | - | - | 0 | 3,650 | - | - | 3,650 |
| **Total General Unsecured Claims** | 27,328 | - | - | - | - | 0 | 27,328 | 431,298 | 13,451 | 472,077 |
| **Proceeds Available After General Unsecured Claims** | 0 | - | - | - | - | 0 | 0 | 13,451 | (13,451) | - |

Note: Recovery percentages are based on a) asset proceeds recovered divided by pro forma asset balances and b) claims recoveries based on estimated claims

**<u>EXHIBIT 1</u>**

DRAFT - Subject to Change

**Boy Scouts of America**
**Local Council Aggregate Balance Sheet Summary** [1], [2], [3]

**As of February 28, 2021**

| | Operating Fund | Capital Fund | Endowment Fund | Total |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash & Equivalents | $ 164,184,107 | $ 98,136,442 | $ 47,205,116 | $ 309,525,665 |
| Land, Buildings, and Equipment | - | 1,291,885,722 | - | 1,291,885,722 |
| Long-Term Investments | 8,403,126 | 40,447,219 | 1,598,129,035 | 1,646,979,381 |
| Other Assets | 74,115,867 | 50,620,454 | 155,535,141 | 280,271,461 |
| **Total Assets** | **246,703,100** | **1,481,089,837** | **1,800,869,292** | **3,528,662,229** |
| | | | | |
| **Liabilities** | | | | |
| Debt | 78,009,865 | 39,229,254 | 707,952 | 117,947,070 |
| Other Liabilities | 92,689,062 | 16,584,373 | 5,136,816 | 114,410,251 |
| **Total Liabilities** | **170,698,928** | **55,813,627** | **5,844,767** | **232,357,321** |
| | | | | |
| Unrestricted Net Assets | 38,910,035 | 1,191,652,790 | 638,534,344 | 1,869,097,169 |
| Restricted Net Assets | 37,181,139 | 233,625,198 | 1,156,494,165 | 1,427,300,502 |
| **Total Net Assets** | **$ 76,091,174** | **$ 1,425,277,988** | **$ 1,795,028,509** | **$ 3,296,397,671** |

Footnote:

(1) Figures presented are unaudited and preliminary and are as reported by each individual local council in the financial accounting system maintained by BSA. Some local council balance sheets may be incomplete. All figures are subject to material change

(2) Restricted and unrestricted classifications are reflected according to GAAP and generally does not include restrictions related to real property. Classification may not reflect all legal restrictions.

(3) The local councils are independent legal entities not controlled by BSA. The information reflected herein is aggregated for presentation purposes only.

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1], [2], [3]
**As of February 28, 2021**

| Council # | 1 | 3 | 4 | 5 | 6 | 10 | 11 | 13 | 16 | 18 | 23 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Greater Alabama | Alabama-Florida | Mobile Area | Tukabatchee Area | Black Warrior | Grand Canyon | Catalina | De Soto Area | Westark Area | Quapaw Area | Golden Gate Area Council |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 4,420,229 | $ 77,704 | $ 68,499 | $ 702,265 | $ 816,010 | $ 2,166,111 | $ 521,021 | $ 51,096 | $ 1,000,123 | $ 747,092 | $ 1,013,701 |
| Land, Buildings, and Equipment | 4,773,209 | 306,180 | 457,226 | 2,372,696 | 681,838 | 5,752,921 | 1,426,868 | 622,104 | 3,384,867 | 3,055,534 | 10,360,288 |
| Long-Term Investments | 8,560,125 | 249,811 | 31,206 | 2,224,425 | 3,318,947 | 6,223,695 | 2,077,190 | 371,276 | 1,604,652 | 11,659,187 | 12,094,041 |
| Other Assets | 2,159,016 | 81,723 | 37,242 | 152,343 | 321,508 | 115,989 | 58,185 | 105,845 | 273,838 | 303,974 | 9,065,552 |
| **Total Assets** | **19,912,578** | **715,419** | **594,174** | **5,451,729** | **5,138,304** | **14,258,716** | **4,083,265** | **1,150,321** | **6,263,480** | **15,765,787** | **32,533,582** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 469,985 | 254,951 | 124,457 | 110,700 | - | 448,968 | 204,900 | 39,000 | 153,975 | 355,574 | 2,093,295 |
| Other Liabilities | 164,017 | 87,339 | 73,031 | 231,185 | 49,807 | 589,200 | 157,723 | 54,831 | 884,808 | 174,269 | 1,531,284 |
| **Total Liabilities** | **634,002** | **342,290** | **197,488** | **341,885** | **49,807** | **1,038,168** | **362,623** | **93,831** | **1,038,783** | **529,843** | **3,624,578** |
| Unrestricted Net Assets | 5,858,141 | 162,947 | 76,647 | 3,625,053 | 2,273,695 | 9,582,089 | 2,930,433 | 734,154 | 1,737,613 | 12,824,556 | 10,325,190 |
| Restricted Net Assets | 13,420,435 | 210,182 | 320,039 | 1,484,791 | 2,814,802 | 3,638,459 | 790,208 | 322,337 | 3,487,085 | 2,411,388 | 18,583,815 |
| **Total Net Assets** | **$ 19,278,576** | **$ 373,129** | **$ 396,686** | **$ 5,109,844** | **$ 5,088,496** | **$ 13,220,548** | **$ 3,720,641** | **$ 1,056,490** | **$ 5,224,697** | **$ 15,235,944** | **$ 28,909,004** |

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1], [2], [3]

As of February 28, 2021

| Council # | 27 | 30 | 31 | 32 | 33 | 35 | 39 | 41 | 42 | 45 | 47 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Sequoia | Southern Sierra | Pacific Skyline | Long Beach Area | Greater Los Angeles Area | Marin | Orange County | Redwood Empire | Piedmont | California Inland Empire | Golden Empire |
| Assets | | | | | | | | | | | |
| Cash & Equivalents | $ 363,998 | $ 166,493 | $ 1,049,042 | $ 1,521,513 | $ 1,206,870 | $ 194,699 | $ 1,744,481 | $ 16,543 | $ 158,281 | $ 1,174,736 | $ 1,615,343 |
| Land, Buildings, and Equipment | 8,611,598 | 438,736 | 3,464,343 | 2,562,923 | 27,931,097 | 1,767,871 | 38,048,572 | 5,112 | 103,788 | 1,439,339 | 4,980,341 |
| Long-Term Investments | 628,386 | 362,115 | 5,143,646 | 9,078,698 | 20,836,692 | 3,360,496 | 9,876,894 | 541,048 | 8,455,480 | 1,716,399 | 2,400,206 |
| Other Assets | 2,534,179 | 112,141 | 1,350,848 | 154,886 | 5,257,609 | 128,263 | 647,797 | 1,494,191 | 33,871 | 97,602 | 493,682 |
| **Total Assets** | **12,138,161** | **1,079,485** | **11,007,880** | **13,318,021** | **55,232,268** | **5,451,329** | **50,317,744** | **2,056,893** | **8,751,419** | **4,428,076** | **9,489,572** |
| Liabilities | | | | | | | | | | | |
| Debt | 299,518 | 154,807 | 632,038 | 209,976 | 452,695 | 136,088 | 4,625,565 | 44,167 | - | 148,055 | 414,000 |
| Other Liabilities | 316,905 | 223,702 | 135,626 | 157,216 | 1,094,625 | 81,665 | 1,338,299 | 81,886 | (9,008) | 497,235 | 464,080 |
| **Total Liabilities** | **616,423** | **378,509** | **767,664** | **367,192** | **1,547,320** | **217,753** | **5,963,864** | **126,053** | **(9,008)** | **645,290** | **878,080** |
| Unrestricted Net Assets | 9,912,453 | (249,930) | 7,927,061 | 5,122,574 | 31,726,269 | 3,474,055 | 38,005,058 | 1,412,193 | 5,544,891 | 2,893,220 | 6,551,803 |
| Restricted Net Assets | 1,609,286 | 950,906 | 2,313,155 | 7,828,255 | 21,958,679 | 1,759,521 | 6,348,822 | 518,648 | 3,215,536 | 889,566 | 2,059,689 |
| **Total Net Assets** | **$ 11,521,738** | **$ 700,976** | **$ 10,240,216** | **$ 12,950,829** | **$ 53,684,948** | **$ 5,233,576** | **$ 44,353,880** | **$ 1,930,841** | **$ 8,760,428** | **$ 3,782,786** | **$ 8,611,492** |

For Discussion Purposes Only

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1], [2], [3]

As of February 28, 2021

| Council # | 49 | 51 | 53 | 55 | 57 | 58 | 59 | 60 | 61 | 62 | 63 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | San Diego-Imperial | Western Los Angeles County | Los Padres | Silicon Valley Monterey Bay | Ventura County | Verdugo Hills | Greater Yosemite | Pikes Peak | Denver Area | Longs Peak | Rocky Mountain |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 2,371,701 | $ 2,914,717 | $ 784,742 | $ 2,872,971 | $ 185,481 | $ 3,660,215 | $ 707,574 | $ 501,234 | $ 5,774,502 | $ 565,123 | $ (268,841) |
| Land, Buildings, and Equipment | 2,760,209 | 8,146,416 | 12,449,400 | 20,424,463 | 1,594,642 | 527,161 | 936,663 | 4,199,752 | 19,006,862 | 2,512,537 | 1,102,615 |
| Long-Term Investments | 800,269 | 5,861,050 | 4,675,327 | 23,125,556 | 655,726 | 3,098,253 | 2,522,680 | 5,532,283 | 32,022,359 | 7,728,187 | 320,068 |
| Other Assets | 4,181,339 | 664,285 | 344,889 | 327,022 | 213,282 | 240,182 | 24,008 | 89,192 | 1,830,530 | 678,728 | 177,779 |
| **Total Assets** | **10,113,517** | **17,586,468** | **18,254,358** | **46,750,012** | **2,649,131** | **7,525,811** | **4,190,925** | **10,322,461** | **58,634,253** | **11,484,574** | **1,331,621** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 492,757 | 663,400 | 422,822 | 469,448 | 366,302 | 150,286 | 56,228 | 628,000 | 847,910 | 302,433 | 234,274 |
| Other Liabilities | 1,267,988 | 1,220,676 | 148,402 | 564,288 | 175,401 | 678,601 | 103,897 | 100,924 | 1,215,596 | 175,377 | 30,593 |
| **Total Liabilities** | **1,760,745** | **1,884,076** | **571,224** | **1,033,736** | **541,703** | **828,887** | **160,125** | **728,924** | **2,063,506** | **477,810** | **264,867** |
| Unrestricted Net Assets | (566,856) | 9,690,805 | 14,453,991 | 33,397,061 | 1,437,344 | 6,230,000 | 3,753,019 | 5,605,495 | 21,140,913 | 4,722,329 | 659,135 |
| Restricted Net Assets | 8,919,628 | 6,011,587 | 3,229,143 | 12,319,215 | 670,084 | 466,924 | 277,781 | 3,988,043 | 35,429,834 | 6,284,435 | 407,619 |
| **Total Net Assets** | **$ 8,352,772** | **$ 15,702,392** | **$ 17,683,135** | **$ 45,716,276** | **$ 2,107,428** | **$ 6,696,924** | **$ 4,030,800** | **$ 9,593,538** | **$ 56,570,747** | **$ 11,006,764** | **$ 1,066,753** |

DRAFT - Subject to Change

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [(1), (2), (3)]

As of February 28, 2021

| Council # | 66 | 67 | 69 | 70 | 72 | 81 | 82 | 83 | 84 | 85 | 87 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Connecticut Rivers | Greenwich | Housatonic | Old North State | Connecticut Yankee | Del-Mar-Va | National Capital Area | Central Florida | South Florida | Gulf Stream | North Florida |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 1,072,720 | $ 609,159 | $ 84,880 | $ 1,642,775 | $ 1,033,695 | $ 860,907 | $ 3,777,073 | $ 1,836,823 | $ 1,028,488 | $ 1,114,401 | $ 1,216,530 |
| Land, Buildings, and Equipment | 3,750,125 | 5,186,704 | 787,570 | 5,005,038 | 4,743,693 | 10,538,102 | 27,153,840 | 8,122,735 | 12,827,584 | 3,601,059 | 5,324,767 |
| Long-Term Investments | 9,352,286 | 4,652,101 | 669,333 | 10,032,419 | 6,147,302 | 5,318,522 | 14,597,402 | 1,269,850 | 7,754,991 | 1,947,828 | 14,301,717 |
| Other Assets | 240,241 | 100,022 | 138,310 | 474,197 | 1,220,412 | 3,716,552 | 1,327,749 | 837,149 | 1,051,104 | 148,864 | 359,039 |
| **Total Assets** | **14,415,372** | **10,547,986** | **1,680,092** | **17,154,429** | **13,145,103** | **20,434,084** | **46,856,064** | **12,066,557** | **22,662,167** | **6,812,152** | **21,202,053** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 505,647 | 201,907 | 68,733 | 249,200 | 2,000,035 | 518,917 | - | - | 521,205 | 373,668 | 264,546 |
| Other Liabilities | 396,463 | 268,572 | 104,876 | 228,116 | 456,193 | 372,842 | 1,230,381 | 1,492,854 | 218,528 | 769,470 | 470,684 |
| **Total Liabilities** | **902,110** | **470,478** | **173,610** | **477,316** | **2,456,228** | **891,759** | **1,230,381** | **1,492,854** | **739,733** | **1,143,138** | **735,230** |
| Unrestricted Net Assets | 6,164,604 | 8,182,865 | 1,224,069 | 10,589,939 | 4,716,717 | 12,402,191 | 33,820,605 | 8,604,279 | 14,275,784 | 3,129,806 | 7,459,145 |
| Restricted Net Assets | 7,348,658 | 1,894,643 | 282,413 | 6,087,174 | 5,972,158 | 7,140,133 | 11,805,079 | 1,969,424 | 7,646,649 | 2,539,208 | 13,007,678 |
| **Total Net Assets** | **$ 13,513,262** | **$ 10,077,508** | **$ 1,506,483** | **$ 16,677,113** | **$ 10,688,875** | **$ 19,542,325** | **$ 45,625,683** | **$ 10,573,703** | **$ 21,922,433** | **$ 5,669,014** | **$ 20,466,823** |

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1], [2], [3]

As of February 28, 2021

| Council # | 88 | 89 | 91 | 92 | 93 | 95 | 96 | 98 | 99 | 100 | 101 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Southwest Florida | Greater Tampa Bay Area | Chattahoochee | Atlanta Area | Georgia-Carolina | Flint River | Central Georgia | South Georgia | Coastal Georgia | Northwest Georgia | Northeast Georgia |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 1,646,901 | $ 3,696,307 | $ 489,084 | $ 8,022,593 | $ 512,709 | $ 476,466 | $ 64,424 | $ 504,402 | $ 2,049,111 | $ 554,932 | $ 3,135,952 |
| Land, Buildings, and Equipment | 3,109,957 | 5,855,613 | 6,300,214 | 24,014,830 | 2,347,710 | 5,653,014 | 1,357,412 | 1,496,551 | 8,029,446 | 877,179 | 3,650,021 |
| Long-Term Investments | 10,608,194 | 11,901,098 | 2,140,098 | 61,313,295 | 590,527 | 1,906,489 | 811,765 | 822,126 | 8,161,339 | 2,517,640 | 6,922,350 |
| Other Assets | 193,361 | 1,578,453 | 260,828 | 2,195,961 | 124,685 | 627,295 | 98,893 | 126,361 | 225,181 | (87,901) | 797,130 |
| **Total Assets** | **15,558,413** | **23,031,471** | **9,190,223** | **95,546,679** | **3,575,632** | **8,663,265** | **2,332,493** | **2,949,440** | **18,465,076** | **3,861,850** | **14,505,454** |
| **Liabilities** | | | | | | | | | | | |
| Debt | - | 365,663 | 710,030 | 7,125,358 | 323,544 | 176,300 | 149,900 | - | 756,173 | 90,729 | 339,904 |
| Other Liabilities | 410,440 | 310,274 | 110,692 | 2,510,148 | 63,249 | 70,768 | 85,205 | 27,160 | 81,879 | 53,678 | 1,030,839 |
| **Total Liabilities** | **410,440** | **675,937** | **820,722** | **9,635,505** | **386,793** | **247,068** | **235,105** | **27,160** | **838,052** | **144,407** | **1,370,743** |
| Unrestricted Net Assets | 7,997,609 | 18,192,495 | 6,082,594 | 58,149,032 | 1,786,314 | 6,970,107 | 1,392,435 | 1,952,636 | 17,382,082 | 1,600,467 | 6,396,650 |
| Restricted Net Assets | 7,150,364 | 4,163,039 | 2,286,908 | 27,762,142 | 1,402,525 | 1,446,090 | 704,953 | 969,644 | 244,942 | 2,116,975 | 6,738,061 |
| **Total Net Assets** | **$ 15,147,973** | **$ 22,355,534** | **$ 8,369,501** | **$ 85,911,174** | **$ 3,188,839** | **$ 8,416,197** | **$ 2,097,388** | **$ 2,922,281** | **$ 17,627,025** | **$ 3,717,442** | **$ 13,134,711** |

For Discussion Purposes Only

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [(1), (2), (3)]

As of February 28, 2021

| Council # | 104 | 106 | 107 | 117 | 127 | 129 | 133 | 138 | 141 | 144 | 145 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Northeast | | | Mississippi | Abraham | |
| Council Name | Aloha | Ore-Ida | Grand Teton | Prairielands | Three Fires | Illinois | Illowa | W.D. Boyce | Valley | Lincoln | Hoosier Trails |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 1,318,714 | $ 339,883 | $ 240,542 | $ 248,593 | $ 1,252,923 | $ 1,973,973 | $ 447,695 | $ 1,112,827 | $ 1,364,170 | $ 1,146,215 | $ 290,658 |
| Land, Buildings, and Equipment | 7,963,108 | 2,502,604 | 3,841,902 | 1,202,993 | 4,853,884 | 6,101,517 | 2,065,469 | 2,092,790 | 1,536,295 | 2,311,524 | 1,171,515 |
| Long-Term Investments | 2,061,777 | 6,165,464 | 3,369,606 | 1,373,902 | 4,063,435 | 5,718,214 | 1,859,785 | 1,960,433 | 2,377,304 | 9,887,281 | 2,794,151 |
| Other Assets | 3,604,904 | 34,090 | 187,567 | 86,719 | 638,035 | 1,238,208 | 239,919 | 212,194 | 2,366,475 | 137,186 | 560,955 |
| **Total Assets** | **14,948,504** | **9,042,041** | **7,639,617** | **2,912,207** | **10,808,277** | **15,031,911** | **4,612,868** | **5,378,244** | **7,644,245** | **13,482,207** | **4,817,279** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 505,815 | - | 132,500 | 94,388 | 3,073,410 | 236,704 | 261,600 | 371,313 | 135,047 | - | 136,543 |
| Other Liabilities | 462,200 | 130,940 | 117,923 | 57,789 | 767,132 | 330,115 | 149,383 | 246,979 | 86,053 | 62,929 | 343,069 |
| **Total Liabilities** | **968,015** | **130,940** | **250,423** | **152,177** | **3,840,542** | **566,819** | **410,983** | **618,291** | **221,099** | **62,929** | **479,612** |
| Unrestricted Net Assets | 5,975,712 | 7,578,672 | 6,775,425 | 2,252,777 | 2,454,029 | 8,230,332 | 3,364,933 | 3,004,490 | 3,795,781 | 2,458,695 | 1,988,860 |
| Restricted Net Assets | 8,004,777 | 1,332,429 | 613,769 | 507,253 | 4,513,707 | 6,234,760 | 836,952 | 1,755,462 | 3,627,364 | 10,960,582 | 2,348,807 |
| **Total Net Assets** | **$ 13,980,489** | **$ 8,911,101** | **$ 7,389,194** | **$ 2,760,030** | **$ 6,967,736** | **$ 14,465,093** | **$ 4,201,885** | **$ 4,759,953** | **$ 7,423,145** | **$ 13,419,277** | **$ 4,337,667** |

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1], [2], [3]

As of February 28, 2021

| Council # | 156 | 157 | 160 | 162 | 165 | 172 | 173 | 177 | 178 | 192 | 194 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Buffalo Trace | Anthony Wayne Area | Crossroads of America | Sagamore | LaSalle | Hawkeye Area | Winnebago | Mid-Iowa | Northeast Iowa | Coronado Area | Santa Fe Trail |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 286,282 | $ 1,332,065 | $ 7,210,534 | $ 233,472 | $ 2,094,254 | $ 566,415 | $ 915,209 | $ 355,767 | $ 726,239 | $ 547,171 | $ 45,375 |
| Land, Buildings, and Equipment | 2,476,302 | 2,149,931 | 17,269,868 | 2,014,140 | 1,836,061 | 1,156,723 | 483,701 | 11,007,290 | 1,305,793 | 2,718,311 | 1,501,238 |
| Long-Term Investments | 1,690,202 | 3,907,296 | 25,287,079 | 3,633,365 | 2,555,790 | 907,055 | 1,772,366 | 8,028,206 | 2,048,404 | 2,790,611 | 664,522 |
| Other Assets | 109,630 | 267,521 | 5,739,982 | 3,272,618 | 217,188 | 63,397 | 210,823 | 1,071,824 | 100,831 | 94,744 | 1,189 |
| **Total Assets** | 4,562,416 | 7,656,813 | 55,507,464 | 9,153,595 | 6,703,293 | 2,693,590 | 3,382,099 | 20,463,088 | 4,181,266 | 6,150,837 | 2,212,324 |
| **Liabilities** | | | | | | | | | | | |
| Debt | 103,442 | 137,347 | 740,406 | 123,112 | 137,100 | 140,485 | - | 378,527 | - | 280,199 | 342,655 |
| Other Liabilities | 145,162 | 183,652 | 1,023,455 | 91,331 | 211,562 | 316,256 | 79,724 | 328,018 | 158,302 | 88,496 | 166,164 |
| **Total Liabilities** | 248,604 | 320,999 | 1,763,861 | 214,443 | 348,662 | 456,741 | 79,724 | 706,545 | 158,302 | 368,694 | 508,820 |
| Unrestricted Net Assets | 2,586,680 | 3,604,204 | 24,178,049 | 4,861,534 | 5,790,020 | 1,100,691 | 2,670,485 | 16,033,550 | 2,452,014 | 2,710,907 | 762,886 |
| Restricted Net Assets | 1,727,132 | 3,731,610 | 29,565,553 | 4,077,618 | 564,612 | 1,136,158 | 631,889 | 3,722,993 | 1,570,950 | 3,071,236 | 940,618 |
| **Total Net Assets** | $ 4,313,812 | $ 7,335,814 | $ 53,743,602 | $ 8,939,152 | $ 6,354,632 | $ 2,236,849 | $ 3,302,375 | $ 19,756,543 | $ 4,022,964 | $ 5,782,143 | $ 1,703,505 |

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [(1), (2), (3)]

As of February 28, 2021

| Council # | 197 | 198 | 204 | 205 | 209 | 211 | 212 | 213 | 214 | 215 | 216 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Louisiana | Southeast | | |
| Council Name | Jayhawk Area | Quivira | Blue Grass | Lincoln Heritage | Calcasieu Area | Istrouma Area | Evangeline Area | Purchase | Louisiana | Norwela | Katahdin Area |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 54,055 | $ 695,946 | $ 9,662 | $ 970,193 | $ 168,519 | $ 517,588 | $ 79,539 | $ 304,501 | $ 998,544 | $ 1,895,587 | $ 200,037 |
| Land, Buildings, and Equipment | 1,799,637 | 4,476,661 | 1,937,158 | 10,807,450 | 750,970 | 2,765,407 | 779,568 | 1,835,519 | 1,656,710 | 2,284,911 | 352,030 |
| Long-Term Investments | 1,082,538 | 1,768,187 | 196,366 | 16,917,542 | 1,791,903 | 1,274,299 | 383,852 | 3,009,183 | 4,690,961 | 9,395,687 | 704,882 |
| Other Assets | 6,691,333 | 356,678 | 122,826 | 1,146,391 | 48,879 | 190,108 | 1,301,089 | 102,627 | (785,642) | 174,662 | 5,713,385 |
| **Total Assets** | **9,627,563** | **7,297,473** | **2,266,012** | **29,841,576** | **2,760,271** | **4,747,402** | **2,544,048** | **5,251,829** | **6,560,573** | **13,750,847** | **6,970,334** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 254,000 | 793,997 | 306,375 | 475,826 | 22,075 | - | 299,427 | 93,000 | 202,737 | 285,697 | 109,582 |
| Other Liabilities | 116,606 | 620,458 | 306,750 | 344,691 | 54,101 | 277,475 | 106,643 | 69,257 | 110,244 | 153,569 | 123,584 |
| **Total Liabilities** | **370,606** | **1,414,455** | **613,125** | **820,516** | **76,176** | **277,475** | **406,070** | **162,257** | **312,981** | **439,266** | **233,166** |
| Unrestricted Net Assets | 1,777,238 | 4,157,657 | 1,520,150 | 12,521,252 | 2,310,197 | 2,688,810 | 243,363 | 4,170,751 | 5,729,971 | 12,640,310 | 386,862 |
| Restricted Net Assets | 7,479,719 | 1,725,360 | 132,737 | 16,499,808 | 373,898 | 1,781,117 | 1,980,767 | 918,821 | 517,621 | 671,271 | 6,350,306 |
| **Total Net Assets** | **$ 9,256,957** | **$ 5,883,018** | **$ 1,652,887** | **$ 29,021,060** | **$ 2,684,095** | **$ 4,469,927** | **$ 2,224,130** | **$ 5,089,572** | **$ 6,247,592** | **$ 13,311,581** | **$ 6,737,168** |

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1], [2], [3]

As of February 28, 2021

| Council # | 218 | 220 | 221 | 224 | 227 | 230 | 234 | 250 | 251 | 283 | 286 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Cape Cod and | Spirit of | Heart of New | Western | | | | |
| Council Name | Pine Tree | Baltimore Area | Mason-Dixon | Islands | Adventure | England | Massachusetts | Northern Star | Mayflower | Twin Valley | Voyageurs Area |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 562,463 | $ 947,489 | $ 576,014 | $ 362,422 | $ 639,462 | $ 1,018,531 | $ 215,388 | $ 8,257,833 | $ 409,480 | $ 428,757 | $ 1,084,791 |
| Land, Buildings, and Equipment | 4,999,319 | 5,519,418 | 4,716,985 | 2,066,437 | 3,826,607 | 1,570,750 | 933,097 | 35,607,213 | 6,597,503 | 1,343,368 | 65,489 |
| Long-Term Investments | 2,018,761 | 9,836,148 | 717,782 | 3,652,027 | 9,757,494 | 2,801,859 | 1,595,767 | 47,909,279 | 17,960,921 | 2,543,159 | 785,889 |
| Other Assets | 243,219 | 1,628,074 | 295,229 | 297,733 | 693,617 | 141,281 | 286,876 | 7,933,619 | 894,318 | 291,222 | 132,879 |
| **Total Assets** | **7,823,761** | **17,931,129** | **6,306,010** | **6,378,619** | **14,917,180** | **5,532,421** | **3,031,128** | **99,707,945** | **25,862,223** | **4,606,506** | **2,069,048** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 1,424,886 | 405,092 | 1,347,574 | 60,000 | 1,833,653 | 300,043 | 551,372 | 10,545,035 | - | 49,820 | 98,620 |
| Other Liabilities | 163,224 | 978,100 | 142,349 | 623,139 | 606,957 | 353,859 | 150,680 | 1,489,502 | 320,647 | 173,020 | 152,611 |
| **Total Liabilities** | **1,588,110** | **1,383,192** | **1,489,923** | **683,139** | **2,440,610** | **653,902** | **702,052** | **12,034,536** | **320,647** | **222,841** | **251,231** |
| Unrestricted Net Assets | 3,651,504 | 12,242,788 | 3,737,266 | 4,903,912 | 8,058,233 | 1,876,850 | 1,514,624 | 45,643,422 | 22,562,733 | 3,706,565 | 1,210,218 |
| Restricted Net Assets | 2,584,146 | 4,305,149 | 1,078,822 | 791,568 | 4,418,337 | 3,001,568 | 814,453 | 42,029,986 | 2,978,842 | 677,100 | 607,600 |
| **Total Net Assets** | **$ 6,235,651** | **$ 16,547,937** | **$ 4,816,087** | **$ 5,695,480** | **$ 12,476,570** | **$ 4,878,419** | **$ 2,329,076** | **$ 87,673,408** | **$ 25,541,575** | **$ 4,383,665** | **$ 1,817,817** |

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1], [2], [3]
As of February 28, 2021

| Council # | 296 | 299 | 302 | 303 | 304 | 306 | 307 | 311 | 312 | 315 | 322 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Central Minnesota | Gamehaven | Choctaw Area | Andrew Jackson | Pine Burr Area | Ozark Trails | Heart of America | Pony Express | Greater St. Louis Area | Montana | Overland Trails |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 784,881 | $ 681,787 | $ 231,242 | $ 224,234 | $ 259,941 | $ 152,709 | $ 5,962,869 | $ 744,672 | $ 6,479,036 | $ 28,228 | $ 502,968 |
| Land, Buildings, and Equipment | 3,892,149 | 1,385,663 | 1,619,712 | 3,804,780 | 2,542,278 | 4,020,259 | 16,178,880 | 3,656,201 | 22,665,733 | 28,360,122 | 1,051,452 |
| Long-Term Investments | 1,373,337 | 398,904 | 2,221,484 | 4,026,367 | 671,467 | 6,208,975 | 27,853,951 | 3,184,473 | 58,568,744 | 12,277,125 | 1,421,864 |
| Other Assets | 77,360 | 555,568 | 159,159 | 809,513 | 176,483 | 196,154 | 2,333,076 | 358,815 | 9,064,631 | 537,770 | 139,973 |
| **Total Assets** | **6,127,727** | **3,021,922** | **4,231,597** | **8,864,895** | **3,650,169** | **10,578,097** | **52,328,775** | **7,944,161** | **96,778,145** | **41,203,245** | **3,116,257** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 119,098 | 258,188 | 95,701 | 525,006 | 230,937 | 152,184 | 970,791 | 114,145 | 1,363,600 | 363,482 | 446,367 |
| Other Liabilities | 114,594 | 79,991 | 96,098 | 1,516,027 | 72,302 | 232,120 | 3,282,618 | 216,649 | 2,541,834 | 607,913 | 75,703 |
| **Total Liabilities** | **233,692** | **338,179** | **191,799** | **2,041,033** | **303,239** | **384,304** | **4,253,409** | **330,794** | **3,905,434** | **971,395** | **522,070** |
| Unrestricted Net Assets | 2,483,885 | 1,393,364 | 3,394,222 | 1,519,057 | 2,911,447 | 5,368,753 | 18,738,579 | 4,430,970 | 31,740,144 | 33,748,789 | 1,325,334 |
| Restricted Net Assets | 3,410,150 | 1,290,379 | 645,576 | 5,304,805 | 435,483 | 4,825,041 | 29,336,787 | 3,182,396 | 61,132,567 | 6,483,061 | 1,268,853 |
| **Total Net Assets** | **$ 5,894,035** | **$ 2,683,743** | **$ 4,039,798** | **$ 6,823,862** | **$ 3,346,929** | **$ 10,193,793** | **$ 48,075,366** | **$ 7,613,366** | **$ 92,872,710** | **$ 40,231,850** | **$ 2,594,187** |

DRAFT - Subject to Change

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1), (2), (3)]
As of February 28, 2021

| Council # | 324 | 326 | 328 | 329 | 330 | 333 | 341 | 347 | 358 | 364 | 368 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Cornhusker | Mid-America | Las Vegas Area | Nevada Area | Daniel Webster | Northern New Jersey | Jersey Shore | Monmouth | Patriots' Path | Twin Rivers | Baden-Powell |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 192,230 | $ 1,683,284 | $ 1,783,981 | $ 1,604,923 | $ 768,132 | $ 717,530 | $ 187,458 | $ 3,506,925 | $ 1,794,561 | $ 951,362 | $ 524,789 |
| Land, Buildings, and Equipment | 3,631,366 | 8,058,199 | 5,322,454 | 2,070,030 | 4,819,321 | 3,390,077 | 1,193,174 | 3,856,997 | 6,532,252 | 1,167,745 | 1,555,244 |
| Long-Term Investments | 1,023,162 | 21,734,964 | 6,688,727 | 8,496,786 | 12,097,762 | 6,630,536 | 882,984 | 5,102,999 | 6,121,537 | 5,364,320 | 3,306,743 |
| Other Assets | 1,407,892 | 714,130 | 307,328 | 219,199 | 1,791,125 | 376,071 | 650,123 | 193,229 | 1,232,418 | 48,086 | 239,104 |
| **Total Assets** | 6,254,651 | 32,190,576 | 14,102,491 | 12,390,937 | 19,476,340 | 11,114,215 | 2,913,739 | 12,660,150 | 15,680,767 | 7,531,513 | 5,625,879 |
| **Liabilities** | | | | | | | | | | | |
| Debt | 298,475 | 607,900 | 253,763 | 127,800 | 448,553 | 513,818 | 244,657 | - | 2,021,717 | 136,862 | 134,700 |
| Other Liabilities | 90,995 | 588,809 | 1,986,405 | 119,737 | 1,392,322 | 450,210 | 234,921 | 1,045,622 | 1,416,778 | 225,247 | 161,102 |
| **Total Liabilities** | 389,470 | 1,196,709 | 2,240,168 | 247,537 | 1,840,875 | 964,027 | 479,577 | 1,045,622 | 3,438,495 | 362,109 | 295,802 |
| Unrestricted Net Assets | 3,827,718 | 8,289,589 | 4,968,407 | 9,478,814 | 10,286,304 | 6,863,268 | 1,120,096 | 10,212,112 | 7,830,214 | 4,229,406 | 4,015,196 |
| Restricted Net Assets | 2,037,463 | 22,704,277 | 6,893,916 | 2,664,586 | 7,349,160 | 3,286,921 | 1,314,065 | 1,402,416 | 4,412,059 | 2,939,948 | 1,314,882 |
| **Total Net Assets** | $ 5,865,181 | $ 30,993,867 | $ 11,862,323 | $ 12,143,400 | $ 17,635,465 | $ 10,150,188 | $ 2,434,162 | $ 11,614,527 | $ 12,242,272 | $ 7,169,354 | $ 5,330,078 |

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1], [2], [3]

**As of February 28, 2021**

| Council # | 373 | 375 | 376 | 380 | 382 | 386 | 388 | 397 | 400 | 404 | 405 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Greater Niagara | Allegheny | Theodore | Greater Hudson | Seneca | | | |
| Council Name | Longhouse | Five Rivers | Iroquois Trail | Frontier | Highlands | Roosevelt | Valley | Waterways | Leatherstocking | Suffolk County | Rip Van Winkle |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 280,020 | $ 558,295 | $ 299,480 | $ 1,229,752 | $ 107,959 | $ 709,735 | $ 836,509 | $ 1,620,867 | $ 436,795 | $ 1,116,272 | $ 95,290 |
| Land, Buildings, and Equipment | 415,410 | 1,395,865 | 631,999 | 2,391,802 | 510,736 | 3,954,447 | 4,720,215 | 4,410,981 | 3,161,833 | 1,067,734 | 121,335 |
| Long-Term Investments | 2,224,122 | 2,207,693 | 1,007,846 | 2,611,445 | 2,399,359 | 8,710,101 | 9,121,804 | 21,420,436 | 13,191,054 | 3,622,866 | 1,040,462 |
| Other Assets | 806,032 | 92,480 | 53,989 | 287,515 | 56,086 | 431,073 | 444,970 | 617,266 | 411,850 | 402,031 | 56,551 |
| **Total Assets** | **3,725,584** | **4,254,333** | **1,993,314** | **6,520,513** | **3,074,139** | **13,805,356** | **15,123,498** | **28,069,550** | **17,201,532** | **6,208,903** | **1,313,638** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 438,312 | 285,573 | 224,973 | 352,107 | 46,228 | 237,048 | 96,522 | 451,329 | 65,295 | 453,375 | 55,000 |
| Other Liabilities | 184,915 | 89,960 | 257,080 | 261,678 | 18,809 | 344,456 | 532,409 | 371,915 | 627,166 | 313,003 | 143,993 |
| **Total Liabilities** | **623,227** | **375,533** | **482,053** | **613,785** | **65,036** | **581,503** | **628,931** | **823,244** | **692,461** | **766,378** | **198,993** |
| Unrestricted Net Assets | 1,581,633 | 2,972,059 | 283,246 | 3,346,922 | 2,113,548 | 9,905,508 | 10,073,749 | 11,797,728 | 11,828,471 | 1,329,216 | 121,824 |
| Restricted Net Assets | 1,520,724 | 906,741 | 1,228,014 | 2,559,806 | 895,555 | 3,318,344 | 4,420,819 | 15,448,578 | 4,680,600 | 4,113,309 | 992,821 |
| **Total Net Assets** | **$ 3,102,357** | **$ 3,878,800** | **$ 1,511,261** | **$ 5,906,728** | **$ 3,009,103** | **$ 13,223,853** | **$ 14,494,568** | **$ 27,246,306** | **$ 16,509,071** | **$ 5,442,525** | **$ 1,114,645** |

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1), (2), (3)

As of February 28, 2021

| Council # | 412 | 413 | 414 | 415 | 416 | 420 | 421 | 424 | 425 | 426 | 427 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Great Southwest | Conquistador | Daniel Boone | Mecklenburg County | Central North Carolina | Piedmont | Occoneechee | Tuscarora | Cape Fear | East Carolina | Old Hickory |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 625,892 | $ 4,717,232 | $ 1,409,077 | $ 1,317,642 | $ 1,821,922 | $ 1,813,939 | $ 909,031 | $ 447,991 | $ 1,199,248 | $ 720,724 | $ 717,983 |
| Land, Buildings, and Equipment | 2,967,510 | 2,295,565 | 4,883,770 | 8,010,323 | 2,562,270 | 5,687,967 | 6,389,314 | 1,259,585 | 3,603,106 | 3,523,022 | 3,506,031 |
| Long-Term Investments | 715,451 | 22,184,750 | - | 8,843,571 | 4,365,393 | 6,828,683 | 3,943,180 | 3,306,709 | 2,061,800 | 4,793,130 | 1,814,759 |
| Other Assets | 285,814 | 8,846,036 | 2,606,752 | 1,218,614 | 259,250 | 327,751 | 1,914,536 | 109,310 | 26,125 | 464,760 | 269,873 |
| **Total Assets** | **4,594,667** | **38,043,584** | **8,899,599** | **19,390,150** | **9,008,835** | **14,658,340** | **13,156,062** | **5,123,596** | **6,890,279** | **9,501,636** | **6,308,646** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 466,703 | - | - | 1,069,040 | 357,770 | 264,101 | 1,303,136 | 258,900 | - | - | 315,233 |
| Other Liabilities | 427,986 | 97,160 | 408,334 | 466,708 | 90,584 | 219,604 | 560,902 | 105,692 | 256,215 | 376,449 | 343,634 |
| **Total Liabilities** | **894,689** | **97,160** | **408,334** | **1,535,748** | **448,354** | **483,705** | **1,864,038** | **364,592** | **256,215** | **376,449** | **658,867** |
| Unrestricted Net Assets | 1,275,497 | 2,700,824 | 7,829,640 | 11,248,480 | 5,199,820 | 9,801,687 | 6,056,221 | 1,365,311 | 5,557,337 | 5,040,234 | 5,253,957 |
| Restricted Net Assets | 2,424,480 | 35,245,600 | 661,624 | 6,605,923 | 3,360,662 | 4,372,949 | 5,235,803 | 3,393,693 | 1,076,727 | 4,084,954 | 395,821 |
| **Total Net Assets** | **$ 3,699,977** | **$ 37,946,424** | **$ 8,491,265** | **$ 17,854,403** | **$ 8,560,481** | **$ 14,174,636** | **$ 11,292,024** | **$ 4,759,005** | **$ 6,634,063** | **$ 9,125,187** | **$ 5,649,778** |

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1), (2), (3)

As of February 28, 2021

| Council # | 429 | 433 | 436 | 438 | 439 | 440 | 441 | 444 | 449 | 456 | 460 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Northern Lights | Great Trail | Buckeye | Dan Beard | Tecumseh | Lake Erie | Simon Kenton | Miami Valley | Black Swamp Area | Pathway to Adventure | Erie Shores |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 771,071 | $ 1,124,027 | $ 1,553,281 | $ 1,597,005 | $ 223,906 | $ 590,852 | $ 1,040,499 | $ 1,132,918 | $ 1,637,474 | $ 3,144,373 | $ 980,978 |
| Land, Buildings, and Equipment | 9,386,593 | 7,414,131 | 4,930,248 | 9,677,263 | 1,469,337 | 5,238,945 | 5,992,765 | 3,473,289 | 2,957,373 | 4,753,960 | 6,118,616 |
| Long-Term Investments | 5,390,335 | 6,584,428 | 6,288,750 | 8,180,394 | 1,935,848 | 15,733,339 | 5,504,076 | 2,385,682 | 8,842,891 | 17,728,863 | 18,358,600 |
| Other Assets | 917,348 | 1,784,543 | 973,509 | 3,200,930 | 217,210 | 1,052,085 | 598,035 | 206,429 | 805,068 | 2,080,668 | 1,450,368 |
| **Total Assets** | 16,465,347 | 16,907,129 | 13,745,788 | 22,655,593 | 3,846,301 | 22,615,222 | 13,135,375 | 7,198,317 | 14,242,807 | 27,707,864 | 26,908,562 |
| **Liabilities** | | | | | | | | | | | |
| Debt | 236,759 | 330,000 | 271,360 | 630,100 | 81,985 | 953,095 | 395,467 | 268,200 | 219,807 | 590,082 | 364,185 |
| Other Liabilities | 217,589 | 471,478 | 543,270 | 645,477 | 72,496 | 604,487 | 454,867 | 138,414 | 322,642 | 805,787 | 664,007 |
| **Total Liabilities** | 454,348 | 801,478 | 814,630 | 1,275,577 | 154,481 | 1,557,582 | 850,334 | 406,614 | 542,449 | 1,395,869 | 1,028,192 |
| Unrestricted Net Assets | 13,766,368 | 9,525,356 | 6,322,015 | 13,233,734 | 2,799,022 | 11,269,256 | 8,647,700 | 5,399,371 | 7,775,738 | 15,824,269 | 22,222,575 |
| Restricted Net Assets | 2,244,631 | 6,580,296 | 6,609,144 | 8,146,281 | 892,798 | 9,788,384 | 3,637,340 | 1,392,331 | 5,924,620 | 10,487,726 | 3,657,796 |
| **Total Net Assets** | $ 16,011,000 | $ 16,105,652 | $ 12,931,159 | $ 21,380,016 | $ 3,691,820 | $ 21,057,639 | $ 12,285,041 | $ 6,791,703 | $ 13,700,358 | $ 26,311,995 | $ 25,880,370 |

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1], [2], [3]
As of February 28, 2021

| Council # | 467 | 468 | 469 | 474 | 480 | 488 | 491 | 492 | 497 | 500 | 501 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Muskingum Valley | Arbuckle Area | Cherokee Area | Cimarron | Last Frontier | Indian Nations | Crater Lake | Cascade Pacific | Juniata Valley | Moraine Trails | Northeastern Pennsylvania |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 994,915 | $ 225,859 | $ 279,747 | $ 141,286 | $ 1,662,260 | $ 1,351,481 | $ 276,839 | $ 3,560,525 | $ 215,306 | $ 719,498 | $ 174,534 |
| Land, Buildings, and Equipment | 1,718,688 | 1,396,180 | 1,274,793 | 775,070 | 12,020,085 | 26,026,563 | 398,392 | 17,691,798 | 2,208,844 | 2,327,757 | 1,385,917 |
| Long-Term Investments | 1,042,986 | 3,621,375 | 4,131,368 | 1,407,164 | 8,898,943 | 12,182,992 | 653,717 | 31,832,255 | 1,333,391 | 6,244,895 | 2,241,631 |
| Other Assets | 123,077 | 1,294,117 | 122,735 | 86,823 | 2,946,628 | 1,747,635 | 1,275,858 | 2,943,413 | 57,807 | 41,410 | 172,836 |
| **Total Assets** | 3,879,666 | 6,537,531 | 5,808,642 | 2,410,343 | 25,527,916 | 41,308,670 | 2,604,805 | 56,027,991 | 3,815,348 | 9,333,560 | 3,974,918 |
| **Liabilities** | | | | | | | | | | | |
| Debt | 96,085 | 70,200 | 0 | 148,500 | 402,800 | 418,742 | 135,618 | 617,197 | 149,900 | 24,306 | - |
| Other Liabilities | 115,649 | 13,807 | 23,253 | 111,326 | 739,372 | 224,941 | 77,760 | 2,088,899 | 215,934 | 28,295 | 185,583 |
| **Total Liabilities** | 211,733 | 84,007 | 23,253 | 259,826 | 1,142,172 | 643,683 | 213,377 | 2,706,096 | 365,834 | 52,601 | 185,583 |
| Unrestricted Net Assets | 2,934,099 | 4,618,434 | 5,014,481 | 1,932,008 | 6,594,443 | 28,426,208 | 681,197 | 34,421,289 | 1,893,688 | 6,858,072 | 2,988,316 |
| Restricted Net Assets | 733,834 | 1,835,090 | 770,908 | 218,508 | 17,791,302 | 12,238,779 | 1,710,231 | 18,900,606 | 1,555,826 | 2,422,886 | 808,059 |
| **Total Net Assets** | $ 3,667,933 | $ 6,453,524 | $ 5,785,389 | $ 2,150,517 | $ 24,385,744 | $ 40,664,987 | $ 2,391,428 | $ 53,321,895 | $ 3,449,513 | $ 9,280,958 | $ 3,796,375 |

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1], [2], [3]

As of February 28, 2021

| Council # | 502 | 504 | 509 | 512 | 524 | 525 | 527 | 528 | 532 | 533 | 538 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Minsi Trails | Columbia-Montour | Bucktail | Westmoreland-Fayette | Pennsylvania Dutch | Cradle of Liberty | Laurel Highlands | Hawk Mountain | French Creek | Susquehanna | Chief Cornplanter |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 905,176 | $ 259,583 | $ 77,551 | $ 190,973 | $ 888,276 | $ 3,393,012 | $ 3,424,538 | $ 994,296 | $ 131,538 | $ 363,013 | $ 105,349 |
| Land, Buildings, and Equipment | 5,602,276 | 714,128 | 912,932 | 855,345 | 3,694,468 | 7,177,031 | 11,781,383 | 2,691,323 | 833,259 | 1,840,202 | 182,408 |
| Long-Term Investments | 9,522,804 | 859,340 | 912,545 | 4,950,860 | 2,903,975 | 15,960,222 | 23,901,725 | 6,132,428 | 2,215,183 | 1,179,203 | 957,394 |
| Other Assets | 716,777 | 61,597 | 50,702 | 201,577 | 1,615,535 | 1,086,575 | 1,575,900 | 360,156 | 2,184,608 | 205,224 | 154,223 |
| **Total Assets** | 16,747,032 | 1,894,648 | 1,953,730 | 6,198,755 | 9,102,255 | 27,616,840 | 40,683,547 | 10,178,203 | 5,364,589 | 3,587,642 | 1,399,374 |
| **Liabilities** | | | | | | | | | | | |
| Debt | 149,999 | 272,751 | 200,521 | 135,412 | 1,453,304 | - | - | 387,500 | 110,448 | 86,500 | - |
| Other Liabilities | 1,517,184 | 84,847 | 66,426 | 249,592 | 83,049 | 655,809 | 3,260,525 | 390,551 | 137,280 | 145,846 | 33,515 |
| **Total Liabilities** | 1,667,183 | 357,598 | 266,947 | 385,004 | 1,536,353 | 655,809 | 3,260,525 | 778,051 | 247,728 | 232,346 | 33,515 |
| Unrestricted Net Assets | 6,716,274 | 675,522 | 520,567 | 1,621,221 | 5,329,855 | 14,249,730 | 23,961,119 | 6,589,184 | 2,525,616 | 2,649,064 | 417,106 |
| Restricted Net Assets | 8,363,576 | 861,529 | 1,166,216 | 4,192,530 | 2,236,047 | 12,711,300 | 13,461,902 | 2,810,968 | 2,591,245 | 706,232 | 948,753 |
| **Total Net Assets** | $ 15,079,849 | $ 1,537,051 | $ 1,686,783 | $ 5,813,752 | $ 7,565,902 | $ 26,961,031 | $ 37,423,022 | $ 9,400,152 | $ 5,116,861 | $ 3,355,296 | $ 1,365,859 |

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1], [2], [3]

As of February 28, 2021

| Council # | 539 | 544 | 546 | 549 | 550 | 551 | 552 | 553 | 556 | 557 | 558 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Chester County | New Birth of Freedom | Narragansett | Palmetto | Coastal Carolina | Blue Ridge | Pee Dee Area | Indian Waters | Cherokee Area | Great Smoky Mountain | Chickasaw |
| Assets | | | | | | | | | | | |
| Cash & Equivalents | $ 2,072,859 | $ 60,972 | $ 3,173,244 | $ 186,943 | $ 77,228 | $ 622,469 | $ 352,496 | $ 537,921 | $ 426,886 | $ 983,109 | $ 2,356,093 |
| Land, Buildings, and Equipment | 8,177,607 | 4,741,387 | 12,702,487 | 1,276,841 | 453,698 | 3,049,033 | 1,700,544 | 889,480 | 1,030,388 | 4,847,886 | 5,653,270 |
| Long-Term Investments | 4,121,451 | 8,295,169 | 18,346,906 | 378,568 | 423,921 | 2,381,888 | 2,779,479 | 3,070,000 | 1,035,067 | 2,039,245 | 7,961,577 |
| Other Assets | 797,907 | 663,924 | 962,721 | 1,320,455 | 130,979 | 1,290,510 | 1,240,867 | 259,697 | 354,912 | 3,437,032 | 410,901 |
| **Total Assets** | **15,169,823** | **13,761,452** | **35,185,358** | **3,162,807** | **1,085,825** | **7,343,899** | **6,073,386** | **4,757,099** | **2,847,253** | **11,307,271** | **16,381,842** |
| Liabilities | | | | | | | | | | | |
| Debt | 335,444 | 248,938 | 513,600 | 260,643 | 198,495 | 259,075 | 218,216 | 798,536 | 350,054 | - | 312,465 |
| Other Liabilities | 433,507 | 620,570 | 750,071 | 127,056 | 167,572 | 155,349 | 47,311 | 320,700 | 163,613 | 247,105 | 45,737 |
| **Total Liabilities** | **768,951** | **869,507** | **1,263,671** | **387,698** | **366,067** | **414,424** | **265,527** | **1,119,236** | **513,667** | **247,105** | **358,202** |
| Unrestricted Net Assets | 6,856,711 | 7,383,106 | 18,836,603 | 442,822 | 317,720 | 4,681,093 | 2,207,773 | 1,296,106 | 1,947,397 | 5,869,902 | 4,733,366 |
| Restricted Net Assets | 7,544,161 | 5,508,839 | 15,085,084 | 2,332,286 | 402,039 | 2,248,382 | 3,600,087 | 2,341,756 | 386,189 | 5,190,264 | 11,290,273 |
| **Total Net Assets** | **$ 14,400,872** | **$ 12,891,945** | **$ 33,921,688** | **$ 2,775,109** | **$ 719,759** | **$ 6,929,475** | **$ 5,807,860** | **$ 3,637,862** | **$ 2,333,587** | **$ 11,060,166** | **$ 16,023,639** |

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1], [2], [3]

As of February 28, 2021

| Council # | 559 | 560 | 561 | 562 | 564 | 567 | 571 | 573 | 574 | 576 | 577 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | West Tennessee Area | Middle Tennessee | Texas Trails | Golden Spread | Capitol Area | Buffalo Trail | Circle Ten | Yucca | Bay Area | Sam Houston Area | South Texas |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ (20,484) | $ 5,452,578 | $ 101,464 | $ 949,559 | $ 2,153,076 | $ 156,864 | $ 3,674,800 | $ 2,157,005 | $ 341,876 | $ 14,808,272 | $ 243,597 |
| Land, Buildings, and Equipment | 614,253 | 15,232,842 | 1,192,983 | 5,227,855 | 22,294,248 | 2,144,026 | 28,358,740 | 68,610 | 2,122,433 | 74,632,476 | 4,914,389 |
| Long-Term Investments | 521,929 | 20,454,936 | 2,336,378 | 8,025,325 | 25,424,549 | 2,718,573 | 44,251,837 | 27,350 | 3,884,879 | 82,600,926 | 1,145,434 |
| Other Assets | 108,437 | 3,028,705 | 163,502 | 936,818 | 1,326,505 | 175,749 | 16,196,952 | 148,411 | 106,011 | 7,795,945 | 160,634 |
| **Total Assets** | 1,224,135 | 44,169,062 | 3,794,328 | 15,139,557 | 51,198,378 | 5,195,212 | 92,482,329 | 2,401,376 | 6,455,199 | 179,837,619 | 6,464,055 |
| **Liabilities** | | | | | | | | | | | |
| Debt | 378,591 | 626,890 | 320,906 | 195,208 | 662,726 | 324,034 | 1,248,050 | 85,381 | 88,356 | - | 347,410 |
| Other Liabilities | 222,711 | 473,123 | 58,496 | 117,546 | 726,240 | 234,720 | 735,198 | 57,446 | 155,606 | 3,449,002 | 122,779 |
| **Total Liabilities** | 601,302 | 1,100,013 | 379,402 | 312,754 | 1,388,967 | 558,754 | 1,983,248 | 142,827 | 243,963 | 3,449,002 | 470,189 |
| Unrestricted Net Assets | 135,786 | 20,265,491 | 1,567,414 | 8,879,958 | 45,026,850 | 2,331,639 | 1,828,738 | 1,572,425 | 2,643,449 | 88,569,253 | 4,777,870 |
| Restricted Net Assets | 487,047 | 22,803,557 | 1,847,512 | 5,946,845 | 4,782,561 | 2,304,819 | 88,670,343 | 686,123 | 3,567,787 | 87,819,364 | 1,215,995 |
| **Total Net Assets** | $ 622,833 | $ 43,069,049 | $ 3,414,926 | $ 14,826,803 | $ 49,809,411 | $ 4,636,458 | $ 90,499,081 | $ 2,258,548 | $ 6,211,236 | $ 176,388,617 | $ 5,993,865 |

For Discussion Purposes Only

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1), (2), (3]

**As of February 28, 2021**

| Council # | 578 | 583 | 584 | 585 | 587 | 590 | 592 | 595 | 596 | 598 | 599 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Three Rivers | Alamo Area | Caddo Area | East Texas Area | Northwest Texas | Crossroads of the West | Green Mountain | Colonial Virginia | Tidewater | Shenandoah Area | Blue Ridge Mountains |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 779,934 | $ 11,864,069 | $ 637,927 | $ 793,667 | $ 1,744,281 | $ 3,239,353 | $ 415,267 | $ 803,883 | $ 493,787 | $ 162,845 | 116,942 |
| Land, Buildings, and Equipment | 868,287 | 12,814,929 | 504,838 | 2,644,075 | 1,228,601 | 28,328,333 | 391,186 | - | 1,433,086 | 1,088,647 | 5,619,448 |
| Long-Term Investments | 1,935,067 | - | 1,285,582 | 4,335,882 | 383 | 10,655,065 | 2,137,505 | 659,530 | 1,291,625 | 653,105 | 2,310,992 |
| Other Assets | 720,063 | 5,015,408 | 136,954 | 267,214 | 736,903 | 3,344,424 | 152,742 | 70,888 | 467,717 | 168,826 | (23,789) |
| **Total Assets** | **4,303,350** | **29,694,406** | **2,565,301** | **8,040,839** | **3,710,167** | **45,567,175** | **3,096,700** | **1,534,300** | **3,686,215** | **2,073,423** | **8,023,593** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 166,717 | 554,600 | - | 161,879 | 18,125 | - | 257,824 | 256,718 | 214,813 | 251,200 | 3,980,810 |
| Other Liabilities | 136,348 | 1,081,361 | 91,357 | 161,036 | 91,063 | 2,702,273 | 135,608 | 52,973 | 455,059 | 137,251 | 306,796 |
| **Total Liabilities** | **303,065** | **1,635,961** | **91,357** | **322,915** | **109,188** | **2,702,273** | **393,432** | **309,691** | **669,872** | **388,451** | **4,287,606** |
| Unrestricted Net Assets | 1,071,295 | 15,476,476 | 2,309,301 | 3,605,254 | 1,551,351 | 36,894,524 | 1,652,225 | 581,632 | 861,184 | 902,224 | 2,199,821 |
| Restricted Net Assets | 2,928,990 | 12,581,969 | 164,643 | 4,112,670 | 2,049,628 | 5,970,377 | 1,051,043 | 642,977 | 2,155,159 | 782,748 | 1,536,166 |
| **Total Net Assets** | **$ 4,000,286** | **$ 28,058,446** | **$ 2,473,944** | **$ 7,717,924** | **$ 3,600,979** | **$ 42,864,901** | **$ 2,703,268** | **$ 1,224,609** | **$ 3,016,343** | **$ 1,684,972** | **$ 3,735,987** |

For Discussion Purposes Only

DRAFT - Subject to Change

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [(1), (2), (3)]

As of February 28, 2021

| Council # | 602 | 604 | 606 | 609 | 610 | 611 | 612 | 614 | 615 | 617 | 619 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Heart of Virginia | Blue Mountain | Mount Baker | Chief Seattle | Great Alaska | Inland Northwest | Pacific Harbors | Grand Columbia | Mountaineer Area | Buckskin | Ohio River Valley |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 1,825,330 | $ 64,290 | $ 945,995 | $ 4,797,437 | $ 440,214 | $ 510,730 | $ 706,885 | $ 271,322 | $ 451,570 | $ 1,231,022 | $ 397,215 |
| Land, Buildings, and Equipment | 8,282,095 | 450,632 | 4,577,996 | 14,932,380 | 7,566,023 | 195,476 | 1,698,729 | 2,899,402 | 2,124,264 | 5,509,776 | 1,034,238 |
| Long-Term Investments | 4,312,441 | 2,332,590 | 5,496,435 | 23,300,784 | 1,299,648 | - | 5,603,841 | 536,763 | 727,846 | 5,112,232 | 3,194,533 |
| Other Assets | 894,263 | 72,657 | 604,919 | 423,855 | 7,089,134 | 103,859 | 641,508 | 127,706 | 1,033,937 | 1,526,580 | 374,803 |
| **Total Assets** | 15,314,128 | 2,920,168 | 11,625,345 | 43,454,457 | 16,395,019 | 810,065 | 8,650,963 | 3,835,193 | 4,337,617 | 13,379,609 | 5,000,790 |
| **Liabilities** | | | | | | | | | | | |
| Debt | 670,665 | 77,600 | 416,500 | - | 261,025 | 212,079 | 183,870 | 64,213 | 225,300 | 131,905 | 157,389 |
| Other Liabilities | 481,758 | 42,933 | 139,006 | 846,633 | 179,697 | 220,798 | 146,369 | 44,959 | 86,616 | 235,466 | 475,698 |
| **Total Liabilities** | 1,152,422 | 120,533 | 555,506 | 846,633 | 440,723 | 432,877 | 330,239 | 109,172 | 311,916 | 367,371 | 633,087 |
| Unrestricted Net Assets | 6,509,720 | 510,479 | 7,795,644 | 33,363,479 | 6,710,102 | 118,020 | 5,353,855 | 2,956,830 | 3,466,293 | 9,024,883 | 2,925,194 |
| Restricted Net Assets | 7,651,986 | 2,289,157 | 3,274,195 | 9,244,344 | 9,244,195 | 259,168 | 2,966,869 | 769,190 | 559,408 | 3,987,356 | 1,442,509 |
| **Total Net Assets** | $ 14,161,706 | $ 2,799,636 | $ 11,069,839 | $ 42,607,823 | $ 15,954,297 | $ 377,188 | $ 8,320,724 | $ 3,726,020 | $ 4,025,701 | $ 13,012,239 | $ 4,367,703 |

DRAFT - Subject to Change

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [(1), (2), (3)]

As of February 28, 2021

| Council # | 620 | 624 | 627 | 635 | 636 | 637 | 638 | 640 | 651 | 653 | 660 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Glacier's Edge | Gateway Area | Samoset | Bay-Lakes | Three Harbors | Chippewa Valley | Greater Wyoming | Greater New York | Potawatomi Area | Great Rivers | Blackhawk Area |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 353,220 | $ 206,726 | $ 1,614,176 | $ 667,003 | $ 1,236,467 | $ 416,837 | $ 438,019 | $ 1,494,300 | $ 1,207,714 | $ 306,660 | $ 310,974 |
| Land, Buildings, and Equipment | 3,903,691 | 1,786,398 | 2,807,331 | 8,083,634 | 4,292,134 | 4,083,805 | 776,046 | 5,630,537 | 1,835,782 | 3,352,871 | 1,832,040 |
| Long-Term Investments | 1,767,849 | 809,357 | 6,296,782 | 24,486,659 | 14,850,327 | 876,082 | 2,411,309 | 13,729,490 | 2,490,382 | 765,289 | 3,989,290 |
| Other Assets | 365,391 | 87,526 | 407,639 | 515,196 | 2,289,467 | 12,184,278 | 215,537 | 2,598,496 | 432,512 | 588,843 | 5,881,177 |
| **Total Assets** | **6,390,151** | **2,890,007** | **11,125,928** | **33,752,492** | **22,668,395** | **17,561,002** | **3,840,910** | **23,452,823** | **5,966,391** | **5,013,663** | **12,013,480** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 1,052,426 | 551,591 | 234,175 | 1,965,457 | 221,470 | 155,600 | 63,500 | 1,983,276 | 190,200 | 25,000 | 457,366 |
| Other Liabilities | 183,990 | 102,076 | 148,014 | 688,011 | 213,132 | 140,551 | 134,805 | 565,079 | 209,563 | 278,715 | 178,242 |
| **Total Liabilities** | **1,236,416** | **653,668** | **382,189** | **2,653,468** | **434,602** | **296,151** | **198,305** | **2,548,355** | **399,763** | **303,715** | **635,608** |
| Unrestricted Net Assets | 3,107,723 | 1,295,142 | 4,149,307 | 12,448,113 | 17,038,431 | 4,663,116 | 2,035,401 | 10,041,590 | 2,395,254 | 2,031,475 | 5,023,665 |
| Restricted Net Assets | 2,046,012 | 941,197 | 6,594,433 | 18,650,911 | 5,195,362 | 12,601,735 | 1,607,204 | 10,862,878 | 3,171,374 | 2,678,473 | 6,354,208 |
| **Total Net Assets** | **$ 5,153,735** | **$ 2,236,339** | **$ 10,743,740** | **$ 31,099,024** | **$ 22,233,793** | **$ 17,264,851** | **$ 3,642,605** | **$ 20,904,468** | **$ 5,566,628** | **$ 4,709,948** | **$ 11,377,873** |

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [1], [2], [3]

As of February 28, 2021

| Council # | 661 | 662 | 664 | 690 | 691 | 694 | 695 | 696 | 697 | 702 | 713 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Puerto Rico | Longhorn | Suwannee River Area | Garden State | Pushmataha Area | South Plains | Black Hills Area | Midnight Sun | Oregon Trail | Rainbow | Sequoyah |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 439,115 | $ 2,713,841 | $ 214,021 | $ 865,260 | $ 287,641 | $ 524,323 | $ 217,906 | $ 266,375 | $ 1,347,126 | $ 119,116 | $ 323,392 |
| Land, Buildings, and Equipment | 7,061,994 | 3,126,846 | 986,763 | 3,913,886 | 414,242 | 805,283 | 668,300 | 2,289,523 | 2,521,835 | 1,832,618 | 4,636,500 |
| Long-Term Investments | 243,640 | 2,025,600 | 590,907 | 8,248,664 | - | 3,737,464 | 491,979 | 5,947,002 | 6,442,855 | 2,423,436 | 2,828,703 |
| Other Assets | 135,702 | 1,498,859 | 142,020 | 396,305 | (6,740) | 236,175 | 132,863 | 718,620 | 304,925 | 156,376 | 2,340,942 |
| **Total Assets** | **7,880,451** | **9,365,146** | **1,933,711** | **13,424,115** | **695,144** | **5,303,245** | **1,511,049** | **9,221,520** | **10,616,741** | **4,531,546** | **10,129,538** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 277,340 | 726,046 | 157,655 | 236,398 | 44,614 | 153,248 | 175,333 | 111,542 | 139,200 | 240,198 | 176,700 |
| Other Liabilities | 267,911 | 474,806 | 548,811 | 262,010 | 35,127 | 55,813 | 169,872 | 72,528 | 184,594 | 141,169 | 2,025,243 |
| **Total Liabilities** | **545,251** | **1,200,852** | **706,466** | **498,408** | **79,741** | **209,061** | **345,205** | **184,070** | **323,794** | **381,367** | **2,201,943** |
| Unrestricted Net Assets | 6,883,357 | 6,059,764 | (238,956) | 9,300,738 | 415,595 | 583,361 | 664,784 | 2,126,874 | 8,408,697 | 3,812,852 | 4,270,519 |
| Restricted Net Assets | 451,842 | 2,104,530 | 1,466,201 | 3,624,969 | 199,807 | 4,510,823 | 501,060 | 6,910,577 | 1,884,250 | 337,328 | 3,657,076 |
| **Total Net Assets** | **$ 7,335,199** | **$ 8,164,294** | **$ 1,227,245** | **$ 12,925,707** | **$ 615,402** | **$ 5,094,184** | **$ 1,165,843** | **$ 9,037,450** | **$ 10,292,948** | **$ 4,150,180** | **$ 7,927,595** |

**Boy Scouts of America**
**Individual Local Council Balance Sheets** [(1), (2), (3)]

As of February 28, 2021

| Council # | 733 | 741 | 748 | 763 | 773 | 775 | 777 | 780 | 802 | 803 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Council Name | Sioux | Texas Southwest | Yocona Area | Stonewall Jackson Area | Gulf Coast | Rio Grande | Washington Crossing | Michigan Crossroads | Transatlantic | Far East | GRAND TOTAL |
| **Assets** | | | | | | | | | | | |
| Cash & Equivalents | $ 1,320,790 | $ 124,087 | $ 217,749 | $ 228,421 | $ 402,098 | $ 364,477 | $ 628,447 | $ 8,235,359 | $ 567,842 | $ 670,682 | $ 309,525,665 |
| Land, Buildings, and Equipment | 2,104,654 | 723,088 | 992,495 | 1,072,888 | - | 6,029,080 | 2,012,185 | 21,428,581 | - | - | 1,291,885,722 |
| Long-Term Investments | 835,041 | 655,538 | 814,461 | 1,394,178 | - | 1,798,169 | 3,423,224 | 31,637,398 | 662,887 | 2,200,977 | 1,646,979,381 |
| Other Assets | 932,377 | 96,120 | 91,413 | 2,490,208 | 7,693 | 1,550,593 | 389,536 | 5,786,383 | 399,052 | 188,738 | 280,271,461 |
| **Total Assets** | **5,192,862** | **1,598,832** | **2,116,118** | **5,185,695** | **409,791** | **9,742,319** | **6,453,392** | **67,087,721** | **1,629,782** | **3,060,397** | **3,528,662,229** |
| **Liabilities** | | | | | | | | | | | |
| Debt | 201,463 | 88,060 | 70,583 | 612,700 | 395,300 | 618,600 | 263,300 | 7,415,844 | - | - | 117,947,070 |
| Other Liabilities | 713,191 | 37,265 | 93,756 | 353,484 | 99,011 | 105,973 | 358,690 | 11,358,441 | 208,902 | 73,474 | 114,410,251 |
| **Total Liabilities** | **914,653** | **125,325** | **164,339** | **966,184** | **494,311** | **724,573** | **621,990** | **18,774,285** | **208,902** | **73,474** | **232,357,321** |
| Unrestricted Net Assets | 1,496,185 | 916,498 | 863,638 | 217,980 | (292,475) | 1,906,030 | 3,906,611 | 25,109,723 | 966,036 | 2,886,174 | 1,869,097,169 |
| Restricted Net Assets | 2,782,024 | 557,010 | 1,088,141 | 4,001,531 | 207,677 | 7,111,716 | 1,924,791 | 23,203,713 | 454,843 | 100,750 | 1,427,300,502 |
| **Total Net Assets** | **$ 4,278,209** | **$ 1,473,507** | **$ 1,951,779** | **$ 4,219,511** | **$ (84,798)** | **$ 9,017,746** | **$ 5,831,402** | **$ 48,313,436** | **$ 1,420,880** | **$ 2,986,924** | **$ 3,296,397,671** |

Footnote:
(1) Figures presented are unaudited and preliminary and are as reported by each individual local council in the financial accounting system maintained by BSA. Some local council balance sheets may be incomplete. All figures are subject to material change
(2) Restricted and unrestricted classifications are reflected according to GAAP and generally does not include restrictions related to real property. Classification may not reflect all legal restrictions.
(3) The local councils are independent legal entities not controlled by BSA. The information reflected herein is aggregated for presentation purposes only.

**<u>EXHIBIT 2</u>**

## **Valuations Disclaimer**

The summaries of the valuations provided herein are for informational purposes only and are not to be used or considered as an offer or a solicitation to buy, nor should they be relied upon in making any decisions concerning the condition or value of the property for any other purpose including, but not limited to, the sale of property, property tax assessment, condemnation proceeding, or probate estate valuation.

The information used to value each of the Local Council properties is based upon data gathered from sources the appraisers assume to be reliable and accurate. However, this information is not guaranteed for accuracy, even though every attempt has been made to verify the authenticity of this information as much as possible. Notwithstanding the foregoing, no site visits were performed for purposes of providing these limited assessments of value. Neither Debtors nor the appraisers are responsible for the accuracy or completeness of such information, nor do they accept any liability (whether in contract, tort or otherwise howsoever and whether or not they have been negligent) for any loss or damage (including, without limitation, loss of profit), which may arise directly or indirectly from use of or reliance on such information.

Because market conditions, including economic, social and political factors change rapidly and, on occasion, without notice or warning, the estimated market value expressed herein, as of the effective date of the valuations, cannot necessarily be relied upon as of any other date. No representation is made as to the effect of subsequent events. Assessed values may change significantly and unexpectedly over short periods. Neither Debtors nor the appraisers are liable for any conclusions that may be different if there are subsequent changes in value. Neither Debtors nor the appraisers are liable for loss relating to reliance upon the valuation of the Local Council properties.

**Boy Scouts of America**
Local Council Property Value Information [1]
Disclosure Statement

May 14, 2021
($ in actuals)

| | Property Information | | | | Property Value Information [2] | | | | Restriction Review [3] |
|---|---|---|---|---|---|---|---|---|---|
| Line | Local Council Name | Local Council Number | Property Name: Camp, Service Center, or Common Name | Property Type | Fair Market Value: Source 1 | Fair Market Value: Value 1 | Fair Market Value: Source 2 | Fair Market Value: Value 2 | Restriction Status: BSA Review |
| 1 | Greater Alabama | 001 | French Farms Pavilion Lot | Other | CBRE | $ 512,500 | | $ - | U |
| 2 | Greater Alabama | 001 | Comer Scout Reservation | Camp | CBRE | 2,987,500 | | - | U |
| 3 | Greater Alabama | 001 | Camp Jackson | Camp | CBRE | 1,900,000 | | - | R |
| 4 | Greater Alabama | 001 | Clayton Service Center | Office/Store | CBRE | 3,000,000 | | - | U |
| 5 | Greater Alabama | 001 | Lot in Fort Payne | Other | JLL | 94,500 | | - | U |
| 6 | Greater Alabama | 001 | Lot in Mentone | Other | JLL | 27,300 | | - | U |
| 7 | Greater Alabama | 001 | Land near Monte Sano State Park | Other | JLL | 330,000 | | - | U |
| 8 | Greater Alabama | 001 | Lot in Central Heights | Other | JLL | 19,500 | | - | U |
| 9 | Greater Alabama | 001 | Two Lot's near Camp Winnataska | Other | JLL | 240,000 | | - | U |
| 10 | Greater Alabama | 001 | Lot in River Park Subdivision | Other | JLL | 3,600 | | - | U |
| 11 | Greater Alabama | 001 | Lot in Talladega County | Other | JLL | 69,500 | | - | U |
| 12 | Greater Alabama | 001 | Lot in Talladega County | Other | JLL | 31,000 | | - | U |
| 13 | Greater Alabama | 001 | Cedar Bluff-Gaylesville Property | Other | JLL | 31,000 | | - | U |
| 14 | Alabama-Florida | 003 | Camp Alaflo | Camp | JLL | 1,160,000 | | - | L |
| 15 | Mobile Area | 004 | Camp Maubila | Camp | CBRE | 925,000 | | - | R |
| 16 | Tukabatchee Area | 005 | Highway 80 Property | Other | JLL | 525,000 | CBRE | 222,500 | U |
| 17 | Tukabatchee Area | 005 | Camp Tukabatchee | Camp | CBRE | 2,000,000 | | - | L |
| 18 | Tukabatchee Area | 005 | S. Montgomery Co. Property | Other | JLL | 48,000 | | - | U |
| 19 | Black Warrior | 006 | Camp O'Rear | Camp | JLL | 530,000 | | - | L |
| 20 | Black Warrior | 006 | The Leroy McAbee Sr Service Center | Office/Store | JLL | 473,000 | | - | U |
| 21 | Black Warrior | 006 | Camp Horne | Camp | CBRE | 1,662,500 | | - | R |
| 22 | Grand Canyon | 010 | R-C Scout Camp | Camp | CBRE | 2,250,000 | | - | U |
| 23 | Grand Canyon | 010 | Camp Geronimo | Camp | CBRE | 4,641,300 | | - | U |
| 24 | Grand Canyon | 010 | Camp Raymond | Camp | CBRE | 3,810,443 | | - | R |
| 25 | Grand Canyon | 010 | Heard Scout Pueblo | Camp | CBRE | 7,350,000 | CBRE | 8,140,000 | U |
| 26 | Grand Canyon | 010 | Little Grand Canyon Ranch | Camp | Council | 1,510,000 | | - | U |
| 27 | Catalina | 011 | Double VV | Camp | CBRE | 14,059,125 | | - | R |
| 28 | Catalina | 011 | Property Held for Resale | Other | CBRE | 66,419 | | - | U |
| 29 | Catalina | 011 | Council Office | Office/Store | CBRE | 360,000 | | - | U |
| 30 | De Soto Area | 013 | Camp De Soto | Camp | CBRE | 1,106,892 | | - | U |
| 31 | De Soto Area | 013 | Council Service Center | Office/Store | CBRE | 200,000 | | - | U |
| 32 | Westark Area | 016 | Rogers Scout Reservation | Camp | CBRE | 5,418,336 | | - | R |
| 33 | Westark Area | 016 | Camp On High Adventure Base | Camp | JLL | 660,000 | | - | L |
| 34 | Quapaw Area Council | 018 | Camp Rockefeller | Camp | CBRE | 8,439,664 | | - | U |
| 35 | Golden Gate Area Council | 023 | YLTC | Office/Store | CBRE | 5,400,000 | | - | L |
| 36 | Mt Diablo Silverado | 023 | Camp Herms | Camp | CBRE | 1,500,000 | | - | L |
| 37 | Golden Gate Area Council | 023 | Rancho Los Mochos | Camp | CBRE | 3,275,000 | | - | R |
| 38 | Golden Gate Area Council | 023 | Camp Royaneh | Camp | CBRE | 1,900,000 | | - | U |
| 39 | Golden Gate Area Council | 023 | Wente Scout Reservation | Camp | CBRE | 4,700,000 | | - | U |
| 40 | Mt Diablo Silverado | 023 | Council Service Center | Office/Store | JLL | 2,690,000 | | - | U |
| 41 | Sequoia | 027 | Lot, undeveloped | Other | JLL | 70,500 | | - | U |
| 42 | Sequoia | 027 | Shaver Lake Ranger House | Other | CBRE | 320,000 | | - | L |
| 43 | Sequoia | 027 | Visalia Office | Office/Store | CBRE | 725,000 | | - | L |
| 44 | Sequoia | 027 | Fresno Office | Office/Store | JLL | 660,000 | | - | L |
| 45 | Sequoia | 027 | 147 acres at Shaver Lake, inundated by Shaver Lake (under water) | Other | JLL | 32,500 | | - | L |
| 46 | Southern Sierra | 030 | Scout Service Center | Office/Store | JLL | 450,000 | | - | U |
| 47 | Pacific Skyline | 031 | Boulder Creek Scout Reservation | Camp | CBRE | 4,525,000 | | - | U |
| 48 | Pacific Skyline | 031 | Cutter Scout Reservation | Camp | CBRE | 855,000 | | - | U |
| 49 | Pacific Skyline | 031 | Foster City Service Center | Office/Store | CBRE | 5,100,000 | | - | U |
| 50 | Long Beach Area | 032 | Service Center | Office/Store | JLL | 2,220,000 | | - | U |
| 51 | Long Beach Area | 032 | Camp Tahquitz | Camp | CBRE | 14,269,275 | | - | U |
| 52 | Greater Los Angeles | 033 | Trask Scout Reservation | Camp | CBRE | 3,536,985 | | - | U |
| 53 | Greater Los Angeles | 033 | Firestone Scout Reservation | Camp | CBRE | 512,433 | | - | TBD |
| 54 | Greater Los Angeles | 033 | Cushman Watt Scout Center | Office/Store | CBRE | 9,667,350 | | - | TBD |
| 55 | Greater Los Angeles | 033 | Hubert Eaton Scout Reservation | Camp | CBRE | 31,590,825 | | - | R |
| 56 | Greater Los Angeles | 033 | Remnant Parcels | Other | CBRE | 129,062 | | - | U |
| 57 | Marin | 035 | Camp Tamarancho | Camp | CBRE | 1,907,500 | | - | TBD |
| 58 | Marin | 035 | Camp Marin Sierra | Camp | CBRE | 775,000 | | - | TBD |
| 59 | Orange County | 039 | Schoepe Scout Reservation at Lost Valley | Camp | JLL | 2,940,000 | CBRE | 13,008,500 | U |
| 60 | Orange County | 039 | William Lyons Homs Center for Scouting | Office/Store | JLL | 9,184,000 | | - | U |
| 61 | Orange County | 039 | Irvine Ranch Outdoor Education Center | Camp | JLL | 9,461,700 | | - | U |
| 62 | California Inland Empire | 045 | Land | Other | JLL | 19,120 | | - | U |
| 63 | California Inland Empire | 045 | Jack Dembo Scout Center | Office/Store | CBRE | 1,652,490 | | - | U |
| 64 | California Inland Empire | 045 | Camp Emerson | Camp | JLL | 2,693,075 | | - | R |
| 65 | Golden Empire | 047 | Norcal Adventure Area | Camp | CBRE | 587,500 | | - | U |
| 66 | Golden Empire | 047 | Camp Lassen | Camp | CBRE | 207,500 | | - | U |
| 67 | San Diego-Imperial | 049 | Camp Mataguay | Camp | CBRE | 10,054,699 | | - | L |
| 68 | Western Los Angeles County | 051 | Sand Canyon land | Other | CBRE | 275,257 | | - | U |
| 69 | Western Los Angeles County | 051 | Camp Josepho | Camp | CBRE | 2,485,350 | | - | R |
| 70 | Los Padres | 053 | Rancho Alegre | Camp | CBRE | 3,805,200 | | - | R |
| 71 | Silicon Valley Monterey Bay | 055 | Council Service Center | Office/Store | JLL | 3,700,000 | | - | U |
| 72 | Silicon Valley Monterey Bay | 055 | Camp Chesebrough | Camp | JLL | 10,720,000 | Council | 6,350,000 | U |
| 73 | Silicon Valley Monterey Bay | 055 | Camp Hi-Sierra | Camp | CBRE | 2,827,500 | | - | U |
| 74 | Silicon Valley Monterey Bay | 055 | Camp Pico Blanco | Camp | CBRE | 3,100,000 | | - | U |
| 75 | Ventura County | 057 | Oso Service Center | Office/Store | JLL | 2,020,000 | | - | U |
| 76 | Ventura County | 057 | Camp Three Falls | Camp | CBRE | 877,976 | | - | U |
| 77 | Ventura County | 057 | Camp Willett | Camp | CBRE | 5,366,500 | | - | U |
| 78 | Verdugo Hills | 058 | Council Service Center | Office/Store | JLL | 5,750,000 | | - | U |
| 79 | Greater Yosemite | 059 | Camp McConnell | Camp | CBRE | 240,000 | | - | R |
| 80 | Greater Yosemite | 059 | Camp Messinger | Camp | CBRE | 225,000 | | - | R |
| 81 | Greater Yosemite | 059 | Camp Isian | Camp | CBRE | 85,500 | | - | R |
| 82 | Pikes Peak | 060 | Camp Alexander | Camp | CBRE | 1,513,200 | | - | L |
| 83 | Pikes Peak | 060 | Council Office | Office/Store | CBRE | 1,766,400 | | - | L |
| 84 | Pikes Peak | 060 | Donated Land | Other | CBRE | 941,847 | | - | TBD |
| 85 | Denver Area | 061 | Hamilton Scout Headquarters | Office/Store | CBRE | 3,746,220 | | - | U |
| 86 | Denver Area | 061 | Tahosa High Adventure Base | Camp | CBRE | 2,579,182 | | - | L |
| 87 | Denver Area | 061 | Peaceful Valley Scout Ranch | Camp | CBRE | 6,341,966 | | - | U |
| 88 | Longs Peak | 062 | Paliya | Camp | JLL | 1,830,000 | | - | U |
| 89 | Longs Peak Council | 062 | Ben Delatour Scout Ranch | Camp | JLL | 7,000,000 | CBRE | 6,770,884 | L |
| 90 | Longs Peak | 062 | Camp Laramie Peak | Camp | JLL | 1,810,000 | | - | U |
| 91 | Rocky Mountain | 063 | Rocky Mountain High Adventure Base | Other | JLL | 488,000 | | - | L |
| 92 | Rocky Mountain | 063 | Boy Scout Resident Camp San Isabel Scout Ranch | Camp | CBRE | 1,455,074 | | - | L |
| 93 | Connecticut Rivers | 066 | Camp Workcoeman | Camp | CBRE | 3,263,440 | | - | U |
| 94 | Connecticut Rivers | 066 | Camp Mattatuck | Camp | CBRE | 2,656,100 | | - | U |
| 95 | Connecticut Rivers | 066 | June Norcross Webster Scout Reservation | Camp | CBRE | 4,822,700 | | - | R |
| 96 | Connecticut Rivers | 066 | Barbour Scout Reservation | Camp | CBRE | 526,500 | | - | R |
| 97 | Greenwich | 067 | Seton Scout Reservation | Camp | CBRE | 17,750,000 | | - | TBD |
| 98 | Housatonic | 069 | Bakelos Property | Camp | CBRE | 204,188 | | - | L |
| 99 | Housatonic | 069 | Edmund O. Strang Scout Reservation | Camp | CBRE | 2,418,000 | | - | U |
| 100 | Old North State | 070 | Woodfield Scout Preservation | Camp | JLL | 4,600,000 | CBRE | 4,251,263 | U |
| 101 | Old North State | 070 | Royce Reynolds Family Scout Service Center | Office/Store | CBRE | 2,343,750 | | - | U |
| 102 | Old North State | 070 | Hagan Sea Base | Other | CBRE | 645,000 | | - | R |
| 103 | Old North State | 070 | Cherokee Scout Reservation | Camp | CBRE | 8,758,805 | | - | L |
| 104 | Connecticut Yankee | 072 | Camp Pomperaug | Camp | JLL | 1,450,000 | | - | L |
| 105 | Connecticut Yankee | 072 | Hoyt Scout Reservation | Camp | JLL | 420,000 | | - | U |
| 106 | Connecticut Yankee | 072 | Deimck Property | Other | JLL | TBU | | - | U |
| 107 | Connecticut Yankee | 072 | Catamount Cabin | Other | JLL | TBU | | - | U |
| 108 | Connecticut Yankee | 072 | Guilford | Other | JLL | 18,000 | | - | U |
| 109 | Connecticut Yankee | 072 | Monroe | Other | JLL | 195,000 | | - | U |
| 110 | Connecticut Yankee | 072 | North Branford | Other | JLL | 389,000 | | - | U |
| 111 | Connecticut Yankee | 072 | Southbury | Other | JLL | 21,800 | | - | U |
| 112 | Connecticut Yankee | 072 | Wallingford | Other | JLL | 280,000 | | - | U |
| 113 | Connecticut Yankee | 072 | Deer Lake Scout Reservation | Camp | CBRE | 3,964,500 | | - | L |
| 114 | Connecticut Yankee | 072 | Wah Wah Taysee Scout Reservation | Camp | CBRE | 140,448 | | - | L |
| 115 | Connecticut Yankee | 072 | Council Service Center | Office/Store | Council | 2,757,600 | Council | 3,300,000 | U |
| 116 | Connecticut Yankee | 072 | Camp Sequassen | Camp | CBRE | 2,705,600 | | - | U |
| 117 | Del-Mar-Va | 081 | Akridge Scout Reservation | Camp | CBRE | 2,611,350 | | - | L |
| 118 | Del-Mar-Va | 081 | Henson Scout Reservation | Camp | CBRE | 4,605,000 | | - | L |
| 119 | National Capital Area | 082 | Marriott Scout Service Center | Office/Store | JLL | 4,620,000 | | - | U |
| 120 | National Capital Area | 082 | Howard H Wall Boy Scout Camp | Camp | CBRE | 3,340,000 | | - | U |
| 121 | National Capital Area | 082 | Goshen Scout Reservation | Camp | CBRE | 14,745,758 | | - | U |
| 122 | National Capital Area | 082 | Camp William B. Snyder | Camp | CBRE | 3,310,000 | | - | U |
| 123 | Central Florida | 083 | Scout Service Center | Office/Store | JLL | 2,640,000 | | - | U |
| 124 | Central Florida | 083 | Camp La-No-Che | Camp | CBRE | 9,900,000 | | - | L |
| 125 | South Florida | 084 | Tatham Scout Service Center | Office/Store | CBRE | 2,650,000 | | - | U |
| 126 | South Florida | 084 | Camp Elmore (Seminole) | Camp | CBRE | 14,300,000 | | - | R |
| 127 | South Florida | 084 | Camp Jackson Sawyer | Camp | CBRE | 5,350,000 | | - | R |
| 128 | Gulf Stream | 085 | Oklawaha - Unrestricted | Camp | JLL | 1,070,000 | | - | U |
| 129 | Gulf Stream | 085 | Oklawaha - Restricted | Camp | JLL | 7,480,000 | | - | R |
| 130 | Gulf Stream | 085 | Tanah Keeta | Camp | CBRE | 24,000,000 | | - | R |
| 131 | North Florida | 087 | St. Johns Riverbase at Echockotee | Camp | JLL | 2,630,000 | CBRE | 2,875,000 | U |
| 132 | North Florida | 087 | Council Service Center | Office/Store | JLL | 990,000 | | - | U |

**Boy Scouts of America**
Local Council Property Value Information [1]
Disclosure Statement

May 14, 2021
($ in actuals)

| | Property Information | | | | Property Value Information [4] | | | | Restriction Review [5] |
|---|---|---|---|---|---|---|---|---|---|
| Line | Local Council Name | Local Council Number | Property Name: Camp, Service Center, or Common Name | Property Type | Fair Market Value: Source 1 | Fair Market Value: Value 1 | Fair Market Value: Source 2 | Fair Market Value: Value 2 | Restriction Status: BSA Review |
| 133 | North Florida | 087 | Baden Powell Scout Reservation | Camp | CBRE | 3,550,000 | | - | U |
| 134 | North Florida | 087 | Brown Donated Property | Other | CBRE | 137,500 | | - | U |
| 135 | Southwest Florida | 088 | SWFL Council Volunteer Service Center | Office/Store | | | | | U |
| 136 | Southwest Florida | 088 | Camp Flying Eagle | Camp | JLL | 4,475,000 | | - | L |
| 137 | Greater Tampa Bay Area | 089 | Camp Soule | Camp | JLL | 4,130,000 | CBRE | 3,250,000 | U |
| 138 | Greater Tampa Bay Area | 089 | Camp Flaming Arrow - Unrestricted | Camp | JLL | 1,680,000 | | - | U |
| 139 | Greater Tampa Bay Area | 089 | Camp Flaming Arrow - Restricted | Camp | | 404,000 | | - | L |
| 140 | Greater Tampa Bay Area | 089 | Council Office | Office/Store | JLL | 3,650,000 | Council | 3,530,000 | U |
| 141 | Greater Tampa Bay Area | 089 | Camp Bronin | Camp | CBRE | 4,625,000 | | - | TBD |
| 142 | Greater Tampa Bay Area | 089 | Camp Alafia | Camp | CBRE | 3,225,000 | | - | U |
| 143 | Greater Tampa Bay Area | 089 | Camp Sand Hill | Camp | CBRE | 12,250,000 | | - | R |
| 144 | Chattahoochee | 091 | Chattahoochee Council, Inc. BSA George & Jo Jeter Scout Ser... | Office/Store | CBRE | 1,344,000 | | - | L |
| 145 | Chattahoochee | 091 | Camp Pine Mountain | Camp | CBRE | 227,757 | | - | R |
| 146 | Atlanta Area | 092 | Volunteer Service Center | Office/Store | CBRE | 7,629,878 | | - | R |
| 147 | Atlanta Area | 092 | Bert Adams Scout Camp | Camp | CBRE | 4,511,698 | | - | R |
| 148 | Atlanta Area | 092 | Woodruff Scout Camp | Camp | CBRE | 8,191,680 | | - | R |
| 149 | Georgia-Carolina | 093 | Scout Service Center | Office/Store | JLL | 610,000 | | - | U |
| 150 | Georgia-Carolina | 093 | Robert E Knox Scout Reservation | Camp | CBRE | 2,165,940 | | - | R |
| 151 | Flint River | 095 | Gerald Lawhorn Scouting Base | Camp | CBRE | 6,426,150 | | - | R |
| 152 | Flint River | 095 | Titman T Blakely Scout Service Center | Office/Store | CBRE | 669,840 | | - | L |
| 153 | Central Georgia | 096 | Council Service Center | Office/Store | JLL | 600,000 | | - | L |
| 154 | Central Georgia | 096 | Camp Benjamin Hawkins | Camp | CBRE | 1,822,500 | | - | U |
| 155 | South Georgia | 098 | Camp Patten | Camp | CBRE | 346,500 | | - | U |
| 156 | South Georgia | 098 | Camp Osborn | Camp | CBRE | 3,088,640 | | - | U |
| 157 | Coastal Georgia | 099 | Camp Tolochee | Camp | CBRE | 4,200,000 | | - | R |
| 158 | Coastal Georgia | 099 | Black Creek Scout Reservation | Camp | CBRE | 874,576 | | - | U |
| 159 | Northwest Georgia | 100 | Camp Sidney Dew | Camp | CBRE | 1,145,529 | | - | R |
| 160 | Northwest Georgia | 100 | Dalton Service Center | Office/Store | JLL | 103,000 | | - | U |
| 161 | Northwest Georgia | 100 | Birdsong Property | Other | JLL | 138,000 | | - | U |
| 162 | Northeast Georgia | 101 | Camp Rainey Mountain | Camp | CBRE | 2,628,540 | | - | TBD |
| 163 | Northeast Georgia | 101 | House for Ranger at Scoutland and Easement to Army Corp of ... | Other | CBRE | 221,760 | | - | L |
| 164 | Northeast Georgia | 101 | Drew Road | Other | CBRE | 190,775 | | - | L |
| 165 | Aloha | 104 | Camp Pupukea | Camp | CBRE | 875,000 | | - | L |
| 166 | Aloha | 104 | Camp Honokaia | Camp | CBRE | 440,000 | | - | L |
| 167 | Aloha | 104 | Camp Maluhia | Camp | CBRE | 825,000 | | - | L |
| 168 | Aloha | 104 | Camp Alan Faye | Camp | CBRE | 397,500 | | - | L |
| 169 | Aloha | 104 | Aloha Council Service Center | Office/Store | JLL | 4,440,000 | CBRE | 3,925,000 | U |
| 169 | Aloha | 104 | Aloha Council Service Center | Office/Store | | | | - | U |
| 170 | Mountain West (file name One | 106 | Camp Mertaugh | Camp | JLL | 389,000 | | - | U |
| 171 | Mountain West (file name Ore | 106 | Salmon River High Adventure Base Camp | Camp | CBRE | 485,000 | | - | U |
| 172 | Mountain West (file name Ore | 106 | Camp Bradley | Camp | JLL | 128,000 | | - | U |
| 173 | Mountain West (file name Ore | 106 | Mountain West Council Office | Office/Store | JLL | 1,200,000 | | - | U |
| 174 | Mountain West (file name Ore | 106 | MWC Satellite Office | Office/Store | JLL | 239,000 | | - | U |
| 175 | Grand Teton Council | 107 | Pocatello Service Center | Office/Store | CBRE | 451,500 | | - | U |
| 176 | Grand Teton Council | 107 | Dougherty Salmon River HAB | Camp | Council | 450,000 | | - | U |
| 177 | Grand Teton Council | 107 | Krupp Scout Hollow | Camp | CBRE | 383,000 | | - | L |
| 178 | Grand Teton Council | 107 | Idaho Falls Service Center | Office/Store | JLL | 4,250,000 | | - | U |
| 179 | Prairielands | 117 | Camp Drake | Camp | CBRE | 1,216,608 | | - | U |
| 180 | Prairielands | 117 | Lee Service Center | Office/Store | JLL | 350,000 | | - | U |
| 181 | Prairielands | 117 | Danville Office | Office/Store | JLL | 57,800 | | - | U |
| 182 | Three Fires | 127 | Camp Big Timber | Camp | CBRE | 769,800 | | - | U |
| 183 | Three Fires | 127 | Camp Freeland Leslie | Camp | Council | 2,000,000 | | - | U |
| 184 | Northeast Illinois | 129 | Ma-Ka-Ja-Wan Scout Reservation | Camp | CBRE | 2,932,820 | | - | U |
| 185 | Northeast Illinois | 129 | Camp Sol R Crown | Camp | CBRE | 1,037,190 | | - | L |
| 186 | Northeast Illinois | 129 | Camp Oakarro | Camp | CBRE | 441,830 | | - | L |
| 187 | Northeast Illinois | 129 | Kasperson Center for Scouting at Morrison Park | Office/Store | JLL | 1,000,000 | | - | U |
| 188 | Illowa | 133 | Service Center | Office/Store | JLL | 1,150,000 | | - | U |
| 189 | Illowa | 133 | Camp Loud Thunder | Camp | CBRE | 2,470,000 | | - | U |
| 190 | W. D. Boyce | 138 | Ingersoll Scout Reservation | Camp | CBRE | 3,466,769 | | - | U |
| 191 | W. D. Boyce | 138 | Peoria Scout Service Center | Office/Store | CBRE | 225,000 | | - | U |
| 192 | Mississippi Valley | 141 | Saukenauk Scout Reservation | Camp | CBRE | 2,729,250 | | - | L |
| 193 | Mississippi Valley | 141 | Camp Eastman | Camp | CBRE | 911,808 | | - | R |
| 194 | Mississippi Valley | 141 | Burlington Service Center | Office/Store | JLL | 68,600 | | - | U |
| 195 | Mississippi Valley | 141 | Quincy Service Center | Office/Store | JLL | 273,000 | | - | U |
| 196 | Abraham Lincoln Council | 144 | Camp Bunn | Camp | CBRE | 2,167,076 | | - | U |
| 197 | Hoosier Trails | 145 | Maumee Scout Reservation | Camp | CBRE | 1,934,400 | | - | U |
| 198 | Hoosier Trails | 145 | Council Service Center | Office/Store | JLL | 645,000 | | - | U |
| 199 | Buffalo Trace | 156 | Eykamp Scout Center | Office/Store | CBRE | 2,991,360 | | - | U |
| 200 | Buffalo Trace | 156 | Santa Claus property | Other | JLL | 71,500 | | - | U |
| 201 | Buffalo Trace | 156 | Old Ben Scout Reservation | Camp | CBRE | 680,000 | | - | U |
| 202 | Anthony Wayne Area | 157 | Anthony Wayne Area Council Service Center | Office/Store | JLL | 2,140,000 | | - | U |
| 203 | Anthony Wayne Area | 157 | Anthony Wayne Area Scout Reservation | Camp | CBRE | 2,717,853 | | - | U |
| 204 | Crossroads of America | 160 | Camp Kikthawenund | Camp | CBRE | 917,080 | | - | U |
| 205 | Crossroads of America | 160 | Camp Belzer | Camp | CBRE | 4,518,800 | | - | U |
| 206 | Crossroads of America | 160 | Golden-Burke Scout Service Center | Office/Store | CBRE | 4,568,030 | | - | U |
| 207 | Crossroads of America | 160 | Indianapolis Technology | Office/Store | | | | | U |
| 208 | Crossroads of America | 160 | Muncie Scout Service Center | Office/Store | JLL | 66,500 | | - | U |
| 209 | Crossroads of America | 160 | Terre Haute Muncie Service Center | Office/Store | JLL | 358,000 | | - | U |
| 209 | Crossroads of America | 160 | Romburg Scout Reservation | Camp | CBRE | 3,750,000 | | - | U |
| 210 | Crossroads of America | 160 | Camp Kretenstein | Camp | JLL | 1,480,000 | | - | U |
| 211 | Sagamore | 162 | Camp Buffalo - Restricted | Camp | JLL | 19,700 | | - | L |
| 212 | Sagamore | 162 | Camp Buffalo - Unrestricted | Camp | JLL | 2,050,000 | | - | U |
| 213 | LaSalle | 165 | Wood Lake Scout Resvation | Camp | JLL | 1,340,460 | | - | U |
| 214 | LaSalle | 165 | Ranger House | Other | CBRE | 120,960 | | - | U |
| 215 | LaSalle | 165 | Topenmebee | Camp | JLL | 1,480,000 | | - | U |
| 216 | LaSalle | 165 | Rice Woods | Camp | JLL | 665,000 | | - | U |
| 217 | Hawkeye | 172 | Hawkeye Area Council Service Center | Office/Store | JLL | 980,000 | | - | U |
| 218 | Hawkeye | 172 | Howard H Cherry Reservation Camp | Camp | CBRE | 1,377,051 | | - | L |
| 219 | Winnebago | 173 | Winnebago Scout Service Center | Office/Store | JLL | 379,000 | | - | U |
| 220 | Winnebago | 173 | Ingawanis Adventure Base | Camp | JLL | 3,210,000 | | - | U |
| 221 | Mid-Iowa | 177 | Foster Acres | Camp | JLL | 230,000 | | - | U |
| 222 | Mid-Iowa | 177 | Grinell Scout Land | Camp | JLL | 319,000 | | - | U |
| 223 | Mid-Iowa | 177 | Maytag Scout Center | Office/Store | CBRE | 3,190,000 | CBRE | 5,797,190 | U |
| 224 | Mid-Iowa | 177 | Mitigwa Scout Reservation | Camp | CBRE | 1,188,772 | | - | U |
| 225 | Northeast Iowa | 178 | Camp C.S. Klaus - Restricted | Camp | JLL | 42,000 | | - | L |
| 226 | Northeast Iowa | 178 | Camp C.S. Klaus - Unrestricted | Camp | JLL | 760,000 | | - | U |
| 227 | Coronado | 192 | Dane G Hansen Scout Reservation | Camp | CBRE | 387,750 | | - | U |
| 228 | Coronado | 192 | Brown Memorial Camp | Camp | JLL | 1,630,000 | | - | U |
| 229 | Coronado | 192 | William H. Graves Scout Service Center | Office/Store | JLL | 200,000 | | - | U |
| 230 | Santa Fe Trail | 194 | Spanish Peaks Scout Ranch | Camp | CBRE | 863,955 | | - | U |
| 230 | Santa Fe Trail | 194 | Spanish Peaks Scout Ranch - Equipment | Camp | | | | - | U |
| 231 | Jayhawk Area | 197 | Falley Scout Reservation | Camp | JLL | 476,000 | | - | U |
| 232 | Quivira | 198 | Camp Kanza | Camp | JLL | 975,000 | | - | U |
| 233 | Quivira | 198 | Quivira Scout Ranch | Camp | CBRE | 5,905,200 | | - | U |
| 234 | Quivira | 198 | Council Office | Office/Store | JLL | 1,130,000 | | - | U |
| 235 | Blue Grass | 204 | McKee Scout Reservation | Camp | JLL | 900,000 | | - | U |
| 236 | Lincoln Heritage | 205 | Sam Swope Scout Center | Office/Store | CBRE | 2,350,000 | | - | U |
| 237 | Lincoln Heritage | 205 | Pfeffer Scout Reservation | Camp | CBRE | 2,762,505 | | - | U |
| 238 | Lincoln Heritage | 205 | Tunnel Mill Scout Reservation | Camp | CBRE | 808,318 | | - | U |
| 239 | Lincoln Heritage | 205 | Harry S. Frazier Jr. Scout Reservation | Camp | CBRE | 2,305,868 | | - | U |
| 240 | Calcasieu Area | 209 | Camp Edgewood | Camp | CBRE | 561,755 | | - | U |
| 241 | Istrouma Area Council | 211 | Avondale Scout Reservation | Camp | CBRE | 8,195,545 | | - | U |
| 242 | Istrouma Area Council | 211 | Pennington Scout Service Center | Office/Store | CBRE | 680,000 | | - | U |
| 243 | Evangeline Area | 212 | Lost Bayou | Camp | CBRE | 855,000 | CBRE | 1,256,168 | U |
| 244 | Evangeline Area | 212 | Camp Steen (2) | Camp | JLL | 30,000 | | - | U |
| 245 | Evangeline Area | 212 | Service Center | Office/Store | JLL | 540,000 | | - | U |
| 246 | Louisiana Purchase Council | 213 | Camp T'L James | Camp | CBRE | 400,000 | | - | U |
| 247 | Southeast Louisiana | 214 | Salmen Scout Reservation | Camp | CBRE | 4,337,706 | | - | U |
| 248 | Norwela | 215 | Office | Office/Store | CBRE | 620,000 | | - | U |
| 249 | Katahdin Area | 216 | Milo Property | Other | JLL | 146,000 | | - | U |
| 250 | Katahdin Area | 216 | Lincoln Property | Other | JLL | 41,300 | | - | U |
| 251 | Katahdin Area | 216 | Lincoln Property | Other | JLL | 71,500 | | - | R |
| 252 | Katahdin Area | 216 | Egg Pond | Other | JLL | 69,500 | | - | U |
| 253 | Pine Tree | 218 | Camp Hinds | Camp | CBRE | 3,617,170 | | - | U |
| 253 | Pine Tree | 218 | Messer Training Center | Office/Store | CBRE | | | - | U |
| 253 | Pine Tree | 218 | Sherry River | Camp | | | | - | U |
| 254 | Baltimore Area | 220 | Shapiro Scout Service Center | Office/Store | CBRE | 1,414,050 | | - | R |
| 255 | Baltimore Area | 220 | Broad Creek Memorial Scout Reservation | Camp | CBRE | 7,290,000 | | - | U |
| 256 | Mason-Dixon | 221 | Camp Sinequipe | Camp | CBRE | 1,050,546 | | - | U |
| 257 | Cape Cod and Islands | 224 | Camp Greenough | Camp | CBRE | 8,195,276 | | - | U |
| 258 | Cape Cod and Islands | 224 | Lot | Other | CBRE | 112,488 | | - | U |
| 259 | Cape Cod and Islands | 224 | Lot | Other | CBRE | 47,580 | | - | U |
| 260 | Spirit of Adventure | 227 | Plymouth Land | Other | JLL | 178,000 | | - | U |

**Boy Scouts of America**
Local Council Property Value Information [1]
Disclosure Statement

May 14, 2021
($ in actuals)

| | Property Information | | | | Property Value Information [4] | | | | Restriction Review [5] |
|---|---|---|---|---|---|---|---|---|---|
| Line | Local Council Name | Local Council Number | Property Name: Camp, Service Center, or Common Name | Property Type | Fair Market Value: Source 1 | Fair Market Value: Value 1 | Fair Market Value: Source 2 | Fair Market Value: Value 2 | Restriction Status: BSA Review |
| 261 | Spirit of Adventure | 227 | T.L. Storer Scout Reservation | Camp | CBRE | 2,014,614 | | | L |
| 262 | Spirit of Adventure | 227 | Lone Tree Scout Reservation | Camp | CBRE | 1,479,086 | Council | 1,270,000 | L |
| 263 | Spirit of Adventure | 227 | Wah-tut-ca Scout Reservation | Camp | CBRE | 1,517,970 | | | L |
| 264 | Spirit of Adventure | 227 | Lone Tree Land | Other | CBRE | 204,720 | Council | 190,000 | L |
| 265 | Spirit of Adventure | 227 | New England Base Camp (Camp Sayer) | Camp | JLL | 1,140,000 | | | L |
| 266 | Heart of New England Council | 230 | Treasure Valley Scout Reservation | Camp | JLL | 3,781,425 | | | TBD |
| 267 | Heart of New England | 230 | Camp Split Rock | Camp | JLL | 375,000 | | - | R |
| 268 | Heart of New England Council | 230 | Camp Wanocksett | Camp | JLL | 375,000 | | - | L |
| 269 | Heart of New England Council | 230 | Council Office | Office/Store | JLL | 635,000 | | - | U |
| 270 | Western Massachusetts | 234 | Horace A. Moses Scout Reservation | Camp | CBRE | 3,654,235 | | - | U |
| 271 | Northern Star | 250 | Many Point Scout Camp | Camp | CBRE | 3,432,042 | | - | U |
| 271 | Northern Star | 250 | MP Midweg Property | Other | CBRE | - | | - | U |
| 272 | Northern Star | 250 | Stearns Scout Camp | Camp | CBRE | 3,054,205 | | - | U |
| 273 | Northern Star | 250 | Base Camp | Camp | CBRE | 8,710,000 | | - | U |
| 274 | Northern Star | 250 | Robert C Wood Property | Other | JLL | 126,000 | | - | U |
| 275 | Northern Star | 250 | Gronholm Property | Other | CBRE | 560,000 | | - | U |
| 276 | Northern Star | 250 | Phillipso Scout Reservation | Camp | JLL | 2,890,000 | | - | U |
| 277 | Northern Star | 250 | Rum River Scout Camp | Camp | JLL | 1,060,000 | | - | U |
| 278 | Mayflower | 251 | Service Center | Office/Store | JLL | 1,100,000 | | - | U |
| 279 | Mayflower | 251 | Camp Nobscot - Restricted | Camp | JLL | 545,000 | | - | L |
| 280 | Mayflower | 251 | Camp Resolute | Camp | CBRE | 1,640,655 | | - | U |
| 281 | Mayflower | 251 | Camp Squanto | Camp | CBRE | 2,780,619 | | - | L |
| 282 | Mayflower | 251 | Camp Nobscot - Unrestricted | Camp | JLL | 128,000 | | - | U |
| 283 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | 1,623,000 | CBRE | 1,678,352 | L |
| 283 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | | - | L |
| 283 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | | - | L |
| 283 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | | - | L |
| 283 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | | - | L |
| 283 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | | - | L |
| 283 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | | - | L |
| 283 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | | - | L |
| 283 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | | - | L |
| 283 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | | - | L |
| 283 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | | - | L |
| 283 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | | - | L |
| 283 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | | - | L |
| 284 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | | - | U |
| 284 | Twin Valley | 283 | Cuyuna Scout Camp | Camp | JLL | - | | - | U |
| 285 | Twin Valley | 283 | Norseland Scout Camp | Camp | JLL | 805,000 | | - | U |
| 286 | Twin Valley | 283 | Council Service Center | Office/Store | JLL | 990,000 | | - | U |
| 286 | Voyageurs Area | 286 | Council Service Center | Office/Store | JLL | 211,000 | | - | U |
| 288 | Central Minnesota | 296 | Parker Scout Camp | Camp | CBRE | 941,250 | | - | U |
| 289 | Central Minnesota | 296 | CMC Service Center | Office/Store | CBRE | 610,000 | | - | U |
| 290 | Gamehaven | 299 | Gamehaven Scout Reservation | Camp | CBRE | 1,049,680 | | - | L |
| 291 | Choctaw Area Council | 302 | Choctaw Area Council Office | Office/Store | JLL | 338,000 | | - | U |
| 292 | Choctaw Area Council | 302 | Camp Binachi | Camp | CBRE | 1,182,500 | | - | U |
| 293 | Andrew Jackson | 303 | Eight Undeveloped Small Residential Lots | Other | CBRE | 189,000 | | - | U |
| 294 | Andrew Jackson | 303 | Port Amsterdam Farm Property (not on Council asset list) | Other | CBRE | 2,765,210 | Council | 2,700,000 | U |
| 295 | Andrew Jackson | 303 | Hood Scout Reservation | Camp | CBRE | 3,717,375 | | - | L |
| 296 | Andrew Jackson | 303 | Council Service Center | Office/Store | JLL | 368,000 | | - | L |
| 297 | Pine Burr Area Council | 304 | Camp Tiak | Camp | CBRE | 2,657,525 | | - | U |
| 298 | Ozark Trails | 306 | Timmons Wildlife Area | Camp | JLL | 126,000 | Council | 100,000 | U |
| 299 | Ozark Trails | 306 | Frank Childress Scout Reservation | Camp | CBRE | 789,750 | Council | 1,480,000 | U |
| 300 | Ozark Trails | 306 | Camp Arrowhead | Camp | CBRE | 1,123,740 | Council | 2,150,000 | U |
| 301 | Ozark Trails | 306 | Springfield Scout Service Center | Office/Store | CBRE | 2,160,500 | Council | 2,000,000 | L |
| 302 | Heart of America Council | 307 | Theodore Naish Scout Reservation | Camp | JLL | 10,269,875 | | - | U |
| 303 | Heart of America Council | 307 | H. Roe Bartle Scout Reservation | Camp | CBRE | 6,395,290 | | - | L |
| 304 | Heart of America Council | 307 | Scout Office | Office/Store | CBRE | 2,090,000 | Council | 1,803,500 | U |
| 305 | Pony Express | 311 | Camp Geiger | Camp | CBRE | 1,305,000 | | - | U |
| 306 | Greater St. Louis Area | 312 | Camp Vandeventer | Camp | JLL | 101,000 | | - | L |
| 307 | Greater St. Louis Area | 312 | Camp Warren Levis | Camp | CBRE | 1,218,048 | | - | L |
| 308 | Greater St. Louis Area | 312 | Beaumont Scout Reservation | Camp | CBRE | 5,943,900 | | - | L |
| 309 | Greater St. Louis Area | 312 | S-bar F Scout Ranch | Camp | CBRE | 11,554,920 | | - | L |
| 310 | Greater St. Louis Area | 312 | Rhodes France Scout Camp | Camp | JLL | 1,210,000 | | - | L |
| 311 | Greater St. Louis Area | 312 | Camp Lewallen | Camp | JLL | 411,000 | | - | U |
| 312 | Montana | 315 | Libby Property | Other | JLL | 21,400 | | - | U |
| 313 | Montana | 315 | Bozeman Office | Office/Store | JLL | 350,000 | | - | U |
| 314 | Montana | 315 | Melita - Landing 1 | Camp | CBRE | 380,080 | | - | U |
| 314 | Montana | 315 | Melita - Landing 2 | Camp | CBRE | - | | - | U |
| 314 | Montana | 315 | Melita - Landing 3 | Camp | CBRE | - | | - | U |
| 315 | Montana | 315 | K-M Muridel | Camp | CBRE | 7,861,190 | | - | R |
| 315 | Montana | 315 | K-M 2 | Camp | CBRE | - | | - | R |
| 315 | Montana | 315 | K-M 3 | Camp | CBRE | - | | - | R |
| 315 | Montana | 315 | K-M Possible Mine | Camp | CBRE | - | | - | R |
| 315 | Montana | 315 | K-M 4 | Camp | CBRE | - | | - | R |
| 315 | Montana | 315 | K-M Kendall Original Townsite | Camp | CBRE | - | | - | R |
| 315 | Montana | 315 | K-M Kendall Original Townsite 2 | Camp | CBRE | - | | - | R |
| 315 | Montana | 315 | K-M Kendall Original Townsite 3 | Camp | CBRE | - | | - | R |
| 315 | Montana | 315 | K-M Kendall Original Townsite 4 | Camp | CBRE | - | | - | R |
| 315 | Montana | 315 | K-M Daisy Fraction Mine | Camp | CBRE | - | | - | R |
| 315 | Montana | 315 | K-M Butterfly Mine | Camp | CBRE | - | | - | R |
| 315 | Montana | 315 | K-M Wedge Mine | Camp | CBRE | - | | - | R |
| 315 | Montana | 315 | K-M Emmit Mine | Camp | CBRE | - | | - | R |
| 315 | Montana | 315 | K-M Saddle Mine | Camp | CBRE | - | | - | R |
| 315 | Montana | 315 | K-M Evening Star Mine | Camp | CBRE | - | | - | R |
| 315 | Montana | 315 | K-M Chandler Easement 1 | Camp | CBRE | - | | - | R |
| 315 | Montana | 315 | K-M Chandler Easement 2 | Camp | CBRE | - | | - | R |
| 316 | Montana | 315 | Grizzly Base Camp | Camp | CBRE | 986,850 | | - | U |
| 317 | Montana | 315 | Great Falls HQ Property | Office/Store | CBRE | 850,816 | | - | R |
| 318 | Montana | 315 | Melita - Lot 001 | Camp | CBRE | 680,685 | | - | R |
| 318 | Montana | 315 | Melita - Lot 002 | Camp | CBRE | - | | - | R |
| 318 | Montana | 315 | Melita - Lot 003 | Camp | CBRE | - | | - | R |
| 318 | Montana | 315 | Melita - Lot 004 | Camp | CBRE | - | | - | R |
| 318 | Montana | 315 | Melita - Lot 005 | Camp | CBRE | - | | - | R |
| 318 | Montana | 315 | Melita - Lot 006 | Camp | CBRE | - | | - | R |
| 318 | Montana | 315 | Melita - Lot 007 | Camp | CBRE | - | | - | R |
| 318 | Montana | 315 | Melita - Lot 008 | Camp | CBRE | - | | - | R |
| 318 | Montana | 315 | Melita - Lot 009 | Camp | CBRE | - | | - | R |
| 318 | Montana | 315 | Melita - Lot 010 | Camp | CBRE | - | | - | R |
| 318 | Montana | 315 | Melita - Lot 011 | Camp | CBRE | - | | - | R |
| 318 | Montana | 315 | Melita - Lot 012 | Camp | CBRE | - | | - | R |
| 318 | Montana | 315 | Melita - Lot 013 | Camp | CBRE | - | | - | R |
| 318 | Montana | 315 | Melita - Lot 014 | Camp | CBRE | - | | - | R |
| 318 | Montana | 315 | Melita - Lot 015 | Camp | CBRE | - | | - | R |
| 318 | Montana | 315 | Melita - Lot 016 | Camp | CBRE | - | | - | R |
| 318 | Montana | 315 | Melita - Lot 017 | Camp | CBRE | - | | - | R |
| 319 | Montana | 315 | Clark Fork Property | Other | CBRE | 21,450 | | - | U |
| 320 | Montana | 315 | Billings Scout Acres | Other | CBRE | 619,300 | | - | TBD |
| 321 | Montana | 315 | Missouri River Property | Other | CBRE | 31,750 | | - | TBD |
| 322 | Montana | 315 | Camp Arcola | Camp | CBRE | 960,000 | | - | L |
| 323 | Overland Trails | 322 | Camp Augustine | Camp | JLL | 187,000 | CBRE | 544,192 | L |
| 324 | Overland Trails | 322 | Scout Office | Office/Store | CBRE | 336,000 | | - | U |
| 325 | Overland Trails | 322 | Scout 40 | Camp | JLL | 60,000 | Council | 115,000 | U |
| 326 | Cornhusker | 324 | Camp Cornhusker | Camp | JLL | 865,000 | | - | U |
| 327 | Cornhusker | 324 | Outdoor Education Center | Office/Store | JLL | 1,150,000 | | - | U |
| 328 | Mid-America | 326 | Covered Wagon Scout Reservation | Camp | CBRE | 2,891,196 | | - | R |
| 329 | Mid-America | 326 | Little Sioux Scout Ranch | Camp | CBRE | 4,837,525 | | - | R |
| 330 | Las Vegas Area | 328 | Kimball Scout Reservation | Camp | JLL | 4,660,000 | CBRE | 13,642,080 | U |
| 331 | Las Vegas Area | 328 | Sacramento Valley Ranch | Other | JLL | 90,000 | | - | U |
| 332 | Nevada Area Council | 329 | Council Office and Trading Post | Office/Store | JLL | 1,220,000 | | - | U |
| 333 | Nevada Area Council | 329 | Dog Valley Land | Other | JLL | 393,000 | | - | U |
| 334 | Nevada Area Council | 329 | RAE Land | Other | JLL | 200,000 | | - | U |
| 335 | Nevada Area Council | 329 | Fuller Lake Land | Other | JLL | 555,000 | | - | U |
| 336 | Daniel Webster | 330 | The Unity Program Center | Camp | CBRE | 625,000 | | - | U |
| 337 | Daniel Webster | 330 | DWC Office Bld | Office/Store | CBRE | 1,305,000 | | - | U |
| 338 | Daniel Webster | 330 | Griswold Scout Reservation | Camp | CBRE | 2,089,011 | | - | R |
| 338 | Daniel Webster | 330 | Griswold Scout Reservation | Camp | CBRE | - | | - | R |
| 338 | Daniel Webster | 330 | Griswold Scout Reservation | Camp | CBRE | - | | - | R |
| 339 | Daniel Webster | 330 | Camp Carpenter | Camp | CBRE | 3,369,520 | | - | R |
| 340 | Daniel Webster | 330 | Camp Whip-O-Will | Camp | CBRE | 310,500 | | - | R |
| 341 | Daniel Webster | 330 | Pierre Hope Scout Camp | Camp | CBRE | 204,750 | | - | R |
| 342 | Northern New Jersey | 333 | NNJC Service Center | Office/Store | CBRE | 2,730,000 | | - | U |
| 343 | Northern New Jersey | 333 | Camp Conklin | Camp | CBRE | 350,000 | | - | R |
| 344 | Northern New Jersey | 333 | Camp Turrell | Camp | CBRE | 2,615,000 | | - | L |

**Boy Scouts of America**
Local Council Property Value Information [1]
Disclosure Statement

May 14, 2021
($ in actuals)

| | Property Information | | | | Property Value Information [4] | | | | Restriction Review [5] |
|---|---|---|---|---|---|---|---|---|---|
| Line | Local Council Name | Local Council Number | Property Name: Camp, Service Center, or Common Name | Property Type | Fair Market Value: Source 1 | Fair Market Value: Value 1 | Fair Market Value: Source 2 | Fair Market Value: Value 2 | Restriction Status: BSA Review |
| 345 | Northern New Jersey | 333 | Camp Nobebozo | Camp | CBRE | 1,665,000 | - | - | U |
| 346 | Northern New Jersey | 333 | Floodwood Mtn Scout Reservation | Camp | CBRE | 820,000 | - | - | L |
| 347 | Jersey Shore | 341 | Clayton Service Center | Office/Store | JLL | 1,150,000 | - | - | U |
| 348 | Jersey Shore | 341 | Joseph A. Citta Scout Reservation | Camp | CBRE | 1,989,038 | - | - | L |
| 349 | Monmouth | 347 | Sea Bright Beach | Other | JLL | 1,180,000 | - | - | L |
| 350 | Monmouth | 347 | Forestburg Scout Reservation | Camp | CBRE | 3,200,000 | - | - | U |
| 351 | Monmouth | 347 | Quail Hill Scout Camp | Camp | CBRE | 995,000 | - | - | L |
| 352 | Monmouth | 347 | Council Service Center | Office/Store | CBRE | 2,600,000 | - | - | U |
| 353 | Patriots' Path Council | 358 | Cedar Knolls Service Center | Office/Store | CBRE | 2,030,000 | - | - | U |
| 354 | Patriots' Path Council | 358 | Sabattis Adventure Camp | Camp | CBRE | 1,585,000 | - | - | L |
| 355 | Patriots' Path Council | 358 | Winnebago Scout Reservation | Camp | CBRE | 935,000 | - | - | R |
| 356 | Patriots' Path Council | 358 | Mount Allamuchy Scout Reservation | Camp | CBRE | 3,475,000 | - | - | L |
| 357 | Twin Rivers | 364 | Council Office | Office/Store | JLL | 471,000 | - | - | U |
| 358 | Twin Rivers | 364 | Rotary Scout Reservation | Camp | CBRE | 4,800,000 | - | - | U |
| 359 | Twin Rivers | 364 | Camp Wakpominee | Camp | Keen | 6,425,000 | - | - | U |
| 360 | Twin Rivers | 364 | Camp Bedford | Camp | Keen | 337,500 | - | - | R |
| 361 | Baden-Powell | 368 | Baden-Powell Council Service Center | Office/Store | JLL | 188,000 | - | - | U |
| 362 | Baden-Powell | 368 | Camp Barton | Camp | Keen | 650,000 | - | - | L |
| 363 | Baden-Powell | 368 | Tuscarora Scout Reservation | Camp | Keen | 3,300,000 | - | - | L |
| 364 | Longhouse | 373 | Land, Town of Brutus | Other | | 9,750 | - | - | U |
| 365 | Longhouse | 373 | Camp Woodland | Camp | CBRE | 3,005,000 | - | - | L |
| 366 | Longhouse | 373 | Sabattis Scout Reservation | Camp | CBRE | 1,910,000 | - | - | L |
| 367 | Hudson Valley | 388 | Council Center | Office/Store | JLL | 620,000 | - | - | L |
| 368 | Hudson Valley | 388 | Camp Nooteeming | Camp | CBRE | 3,805,000 | - | - | U |
| 369 | Hudson Valley | 388 | Camp Bullowa | Camp | CBRE | 3,440,000 | - | - | L |
| 370 | Five Rivers | 375 | Camp Gordon | Camp | CBRE | 1,090,000 | - | - | U |
| 371 | Five Rivers | 375 | Camp Brule | Camp | CBRE | 701,350 | - | - | L |
| 372 | Five Rivers | 375 | Dorman Property | Camp | Council | 199,900 | - | - | U |
| 373 | Iroquois Trail | 376 | Camp Ottmer | Camp | CBRE | 1,115,000 | - | - | U |
| 374 | Iroquois Trail | 376 | Camp Sam Wood | Camp | CBRE | 1,095,000 | - | - | U |
| 375 | Greater Niagara Frontier | 380 | Schoellkopf Scout Reservation | Camp | JLL | 555,000 | - | - | U |
| 376 | Greater Niagara Frontier | 380 | Camp Stone Haven | Camp | JLL | 494,000 | - | - | L |
| 377 | Greater Niagara Frontier | 380 | Camp Scouthaven | Camp | CBRE | 427,974 | - | - | U |
| 378 | Allegheny Highlands | 382 | Camp Merz | Camp | Council | 1,810,000 | - | - | L |
| 379 | Allegheny Highlands | 382 | Elk Lick Scout Reserve | Camp | CBRE | 641,650 | - | - | L |
| 380 | Theodore Roosevelt | 386 | Council Program Center | Office/Store | JLL | 1,480,000 | - | - | U |
| 381 | Theodore Roosevelt | 386 | John M. Schiff Scout Reservation | Camp | Keen | 4,000,000 | - | - | U |
| 382 | Theodore Roosevelt | 386 | Onteora Scout Reservation | Camp | Keen | 1,225,000 | - | - | L |
| 383 | Westchester-Putnam | 388 | Curtis S. Read Scout Reservation | Camp | CBRE | 5,255,000 | - | - | U |
| 384 | Westchester-Putnam | 388 | Service Center | Office/Store | CBRE | 1,000,000 | - | - | U |
| 385 | Westchester-Putnam | 388 | Agatha Durland Scout Reservation | Camp | CBRE | 11,770,000 | - | - | L |
| 386 | Seneca Waterways | 397 | Scout Service Center | Office/Store | JLL | 1,960,000 | - | - | U |
| 387 | Seneca Waterways | 397 | J Warren Cutler Scout Reservation | Camp | CBRE | 2,560,000 | - | - | U |
| 388 | Seneca Waterways | 397 | Babcock Hovey Scout Camp | Camp | CBRE | 1,540,000 | - | - | U |
| 389 | Seneca Waterways | 397 | Massawepie Scout Reservation | Camp | CBRE | 3,210,000 | - | - | L |
| 390 | Leatherstocking | 400 | Oneonta Office | Office/Store | JLL | 293,000 | - | - | U |
| 391 | Leatherstocking | 400 | Camp Kingsley | Camp | CBRE | 1,070,000 | - | - | U |
| 392 | Leatherstocking | 400 | Cedarlands Scout Reservation | Camp | CBRE | 3,400,000 | - | - | L |
| 393 | Leatherstocking | 400 | Henderson Scout Reservation | Camp | CBRE | 1,870,000 | - | - | U |
| 394 | Suffolk County | 404 | Baiting Hollow Scout Camp | Camp | Keen | 2,925,000 | - | - | L |
| 395 | Suffolk County | 404 | Service Center | Office/Store | CBRE | 1,982,200 | Council | 1,660,000 | U |
| 396 | Rip Van Winkle | 405 | Camp Tri-Mount | Camp | CBRE | 1,365,000 | - | - | L |
| 397 | Great Southwest | 412 | Campbell Scout Ranch | Camp | CBRE | 335,764 | - | - | R |
| 398 | Conquistador Council | 413 | Dowling Aquatic Base | Camp | CBRE | 451,075 | - | - | R |
| 399 | Conquistador Council | 413 | Camp Jim Murray | Camp | CBRE | 222,664 | - | - | R |
| 400 | Conquistador Council | 413 | S.P. Yates Scout Service Center | Office/Store | CBRE | 391,377 | - | - | U |
| 401 | Conquistador Council | 413 | Wehinahpay Mountain Camp | Camp | CBRE | 709,916 | - | - | L |
| 402 | Conquistador Council | 413 | Tularosa Lot | Other | JLL | 2,334 | - | - | U |
| 403 | Daniel Boone | 414 | Camp Tatham | Camp | JLL | 545,000 | - | - | U |
| 404 | Daniel Boone | 414 | Service Center | Camp | JLL | 950,000 | - | - | U |
| 405 | Daniel Boone | 414 | Camp Daniel Boone | Camp | CBRE | 5,277,825 | - | - | U |
| 406 | Mecklenburg County | 415 | Belk Scout Camp | Camp | CBRE | 4,960,942 | - | - | U |
| 407 | Mecklenburg County | 415 | Mecklenburg Scout Reservation | Camp | CBRE | 4,117,463 | - | - | U |
| 408 | Central North Carolina | 416 | Central Office | Office/Store | JLL | 414,000 | - | - | U |
| 409 | Central North Carolina | 416 | Camp John J. Barnhardt | Camp | CBRE | 2,964,195 | - | - | L |
| 410 | Piedmont | 420 | C.C. Kimbrell Scout Service Center | Office/Store | CBRE | 1,232,560 | - | - | L |
| 411 | Piedmont | 420 | Piedmont Scout Reservation | Camp | CBRE | 5,175,638 | - | - | L |
| 412 | Occoneechee | 421 | Occoneechee Scout Reservation | Camp | JLL | 8,300,000 | CBRE | 9,786,603 | U |
| 413 | Occoneechee | 421 | Council Office | Office/Store | CBRE | 1,681,198 | - | - | U |
| 414 | Tuscarora Council | 424 | Camp Tuscarora | Camp | CBRE | 1,615,898 | - | - | U |
| 415 | Cape Fear | 425 | Cape Fear Scout Reservation | Camp | CBRE | 885,000 | CBRE | 6,033,555 | U |
| 416 | Cape Fear | 425 | Local Scout Reservation | Camp | | - | - | - | U |
| 417 | East Carolina | 426 | Farmville | Other | JLL | 895,000 | - | - | U |
| 418 | East Carolina | 426 | Camp Bonner North | Camp | CBRE | 2,927,340 | - | - | U |
| 419 | East Carolina | 426 | Camp Charles | Camp | CBRE | 287,520 | - | - | R |
| 420 | East Carolina | 426 | East Carolina Scout Reservation | Camp | CBRE | 3,983,670 | - | - | U |
| 421 | East Carolina | 426 | Camp Sam Hatcher | Camp | CBRE | 1,192,880 | - | - | L |
| 422 | Old Hickory | 427 | Land west of Wilderness Cabin | Other | JLL | 530,000 | - | - | R |
| 423 | Old Hickory | 427 | Camp Raven Knob | Camp | CBRE | 5,966,950 | - | - | U |
| 424 | Northern Lights | 429 | Camp Wilderness | Camp | CBRE | 3,985,110 | - | - | R |
| 425 | Northern Lights | 429 | Jon L Wiancek Center for Scouting | Office/Store | JLL | 751,000 | - | - | U |
| 426 | Great Trail | 433 | Scout Service Center | Office/Store | JLL | 3,078,548 | - | - | U |
| 427 | Buckeye | 436 | Seven Ranges Scout Reservation | Camp | CBRE | 2,897,018 | - | - | U |
| 428 | Buckeye | 436 | Hoover Scout Service Center | Office/Store | JLL | 620,000 | - | - | U |
| 429 | Buckeye | 436 | Camp McKinley | Camp | JLL | 469,000 | - | - | U |
| 430 | Dan Beard | 438 | Dan Beard Scout Reservation (also known as Camp Friedlander) | Camp | CBRE | 5,896,530 | - | - | R |
| 431 | Dan Beard | 438 | Camp Michaels | Camp | CBRE | 3,247,250 | - | - | R |
| 432 | Tecumseh | 439 | Camp Hugh Taylor Birch | Camp | CBRE | 665,000 | - | - | L |
| 433 | Tecumseh | 439 | Patton Service Center | Office/Store | JLL | 160,000 | - | - | U |
| 434 | Lake Erie | 440 | Council Service Center | Office/Store | JLL | 1,060,000 | - | - | U |
| 435 | Lake Erie | 440 | Beaumont Scout Reservation - Unrestricted | Camp | CBRE | 2,430,000 | CBRE | 3,410,550 | U |
| 436 | Lake Erie | 440 | Firelands Scout Reservation | Camp | JLL | 1,100,000 | - | - | L |
| 437 | Lake Erie | 440 | Beaumont Scout Reservation - Restricted | Camp | JLL | 307,000 | - | - | L |
| 438 | Simon Kenton | 441 | Leadership Development Center | Camp | JLL | 3,240,000 | - | - | U |
| 439 | Simon Kenton | 441 | Camp Oyo | Camp | JLL | 288,000 | - | - | U |
| 439 | Simon Kenton | 441 | CIP - Camp Oyo | Camp | JLL | - | - | - | U |
| 440 | Simon Kenton | 441 | Camp Madison Lake | Camp | JLL | 243,000 | - | - | U |
| 441 | Simon Kenton | 441 | Camp Lazarus - Unrestricted | Camp | CBRE | 1,590,000 | - | - | U |
| 442 | Simon Kenton - Restricted | 441 | Camp Lazarus - Restricted | Camp | CBRE | 259,000 | - | - | L |
| 443 | Simon Kenton | 441 | Chief Logan Scout Reservation | Camp | CBRE | 834,976 | - | - | L |
| 444 | Simon Kenton | 441 | Camp Falling Rock | Camp | CBRE | 1,791,216 | - | - | U |
| 445 | Miami Valley | 444 | Cricket Holler Camp | Camp | JLL | 1,200,000 | - | - | U |
| 446 | Miami Valley | 444 | Woodland Trails Boy Scout Camp | Camp | CBRE | 2,490,000 | - | - | U |
| 447 | Black Swamp | 449 | Camp Lakota | Camp | CBRE | 890,000 | - | - | U |
| 448 | Black Swamp | 449 | Camp Berry | Camp | CBRE | 1,377,225 | - | - | R |
| 449 | Pathway to Adventure | 456 | Steve Fossett Center for Scouting | Office/Store | CBRE | 3,430,000 | CBRE | 5,481,280 | U |
| 450 | Pathway to Adventure | 456 | Des Plaines Valley Center for Scouting | Office/Store | JLL | 610,000 | - | - | U |
| 451 | Pathway to Adventure | 456 | Camp Lakota | Camp | CBRE | 1,120,420 | - | - | U |
| 452 | Pathway to Adventure | 456 | Robert J Welsh Center for Scouting | Office/Store | CBRE | 631,805 | - | - | U |
| 453 | Pathway to Adventure | 456 | Owasippe Scout Ranch | Camp | CBRE | 7,333,632 | - | - | L |
| 454 | Pathway to Adventure | 456 | Camp Napowan | Camp | CBRE | 1,215,961 | - | - | U |
| 455 | Erie Shores | 460 | Camp Miakonda | Camp | CBRE | 3,820,000 | - | - | U |
| 456 | Erie Shores | 460 | Pioneer Scout Reservation | Camp | CBRE | 3,045,845 | - | - | U |
| 457 | Muskingum Valley | 467 | Muskingum Valley Scout Reservation | Camp | CBRE | 1,915,950 | - | - | L |
| 458 | Arbuckle Area Council | 468 | Arbuckle Office | Office/Store | JLL | 215,000 | - | - | U |
| 459 | Arbuckle Area Council | 468 | Camp Simpson | Camp | JLL | 2,450,000 | - | - | U |
| 460 | Cherokee | 469 | Camp McClintock | Camp | CBRE | 412,500 | - | - | U |
| 461 | Last Frontier | 480 | Dripping Springs | Camp | CBRE | 102,000 | - | - | U |
| 462 | Last Frontier | 480 | Diamond H | Camp | CBRE | 7,900,000 | - | - | U |
| 463 | Last Frontier | 480 | John Nichols | Camp | CBRE | 4,848,000 | - | - | TBD |
| 464 | Last Frontier | 480 | Kerr Scout Ranch | Camp | CBRE | 3,400,000 | - | - | U |
| 465 | Last Frontier | 480 | Camp George Thomas | Camp | CBRE | 480,000 | - | - | R |
| 466 | Indian Nations | 488 | Cherokee Nation Scout Ranch | Camp | JLL | 424,000 | - | - | U |
| 467 | Indian Nations | 488 | Graves Scout Reservation | Camp | JLL | 471,000 | - | - | U |
| 468 | Indian Nations | 488 | Camp Washerfine | Camp | JLL | 1,480,000 | - | - | U |
| 469 | Indian Nations | 488 | Donald W. Reynolds Scout Resource Center | Office/Store | JLL | 1,480,000 | - | - | U |
| 470 | Indian Nations | 488 | Mabee Scout Reservation | Camp | CBRE | 1,175,000 | - | - | U |
| 471 | Crater Lake | 491 | Camp McCaleb | Camp | CBRE | 540,498 | - | - | U |
| 472 | Crater Lake | 491 | Central Point Office | Office/Store | JLL | 170,000 | - | - | U |
| 473 | Crater Lake | 491 | Eureka Office | Office/Store | JLL | 285,000 | - | - | U |
| 474 | Cascade Pacific | 492 | Lewis | Camp | CBRE | 558,650 | - | - | R |
| 475 | Cascade Pacific | 492 | Butte Creek | Camp | CBRE | 3,354,010 | - | - | U |
| 476 | Cascade Pacific | 492 | Cooper | Camp | CBRE | 1,195,644 | - | - | R |

**Boy Scouts of America**
Local Council Property Value Information [1]
Disclosure Statement

May 14, 2021

($ in actuals)

| | Property Information | | | | Property Value Information [3] | | | | Restriction Review [4] |
| Line | Local Council Name | Local Council Number | Property Name: Camp, Service Center, or Common Name | Property Type | Fair Market Value: Source 1 | Fair Market Value: Value 1 | Fair Market Value: Source 2 | Fair Market Value: Value 2 | Restriction Status: BSA Review |
|---|---|---|---|---|---|---|---|---|---|
| 477 | Cascade Pacific | 492 | Meriwether | Camp | CBRE | 6,477,425 | - | - | U |
| 478 | Cascade Pacific | 492 | Baldwin | Camp | CBRE | 896,000 | - | - | L |
| 479 | Cascade Pacific | 492 | Ireland | Camp | CBRE | 525,000 | - | - | R |
| 480 | Cascade Pacific | 492 | Portland Office | Office/Store | CBRE | 4,900,000 | - | - | U |
| 481 | Juniata Valley | 497 | Seven Mountains Scout Camp | Camp | CBRE | 723,750 | - | - | R |
| 482 | Moraine Trails | 500 | Camp Agawam | Camp | CBRE | 987,804 | - | - | R |
| 483 | Moraine Trails | 500 | Camp Bucoco | Camp | CBRE | 1,145,503 | - | - | U |
| 484 | Northeastern Pennsylvania | 501 | NEPA Scout Service and Training Center | Office/Store | JLL | 362,000 | - | - | U |
| 485 | Northeastern Pennsylvania | 501 | vacant land across road from SSTC | Other | JLL | 262,000 | - | - | U |
| 486 | Northeastern Pennsylvania | 501 | Camp Acahela | Camp | CBRE | 699,884 | - | - | L |
| 487 | Northeastern Pennsylvania | 501 | Goose Pond Scout Reservation | Camp | CBRE | 1,652,343 | - | - | L |
| 488 | Minsi Trails | 502 | Camp Minsi, Deed Book 170, Page 524 | Camp | JLL | 2,100,000 | CBRE | 4,200,900 | U |
| 488 | Minsi Trails | 502 | Camp Minsi  19/4/1/2 | Camp | JLL | - | - | - | U |
| 488 | Minsi Trails | 502 | Camp Minsi  19/4/1/1-1C | Camp | JLL | - | - | - | U |
| 488 | Minsi Trails | 502 | Camp Minsi 19/4/1/2-2C | Camp | JLL | - | - | - | U |
| 488 | Minsi Trails | 502 | Camp Minsi 03/14/1/3 | Camp | JLL | - | - | - | U |
| 489 | Minsi Trails | 502 | Trexler Scout Reservation 13/9/1/5 | Camp | JLL | 1,970,000 | CBRE | 2,582,247 | U |
| 489 | Minsi Trails | 502 | Trexler Scout Reservation, Deed Book 119, Page 184 | Camp | JLL | - | - | - | U |
| 489 | Minsi Trails | 502 | Trexler Scout Reservation, Deed Book 121, Page 346 | Camp | JLL | - | - | - | U |
| 489 | Minsi Trails | 502 | Trexler Scout Reservation, Deed Book 217, Page 600 | Camp | JLL | - | - | - | U |
| 489 | Minsi Trails | 502 | Trexler Scout Reservation, Deed Book 226, Page 120 | Camp | JLL | - | - | - | U |
| 489 | Minsi Trails | 502 | Trexler Scout Reservation, Deed Book 315, Page 1107 | Camp | JLL | - | - | - | U |
| 489 | Minsi Trails | 502 | Trexler Scout Reservation PA 534, 13/10/1/6-2 | Camp | JLL | - | - | - | U |
| 489 | Minsi Trails | 502 | Trexler Scout Reservation, Deed Book 113, Page 627 | Camp | JLL | - | - | - | U |
| 490 | Columbia-Montour | 504 | Ranger House and Pole Barn | Camp | JLL | 625,000 | - | - | U |
| 490 | Columbia-Montour | 504 | Camp Lavigne | Camp | JLL | - | - | - | U |
| 491 | Columbia-Montour | 504 | Council Office | Office/Store | JLL | 252,000 | - | - | U |
| 492 | Bucktail | 509 | Camp Mountain Run | Camp | CBRE | 704,900 | - | - | R |
| 493 | Westmoreland-Fayette | 512 | Scout Service Center | Office/Store | JLL | 390,000 | - | - | U |
| 494 | Westmoreland-Fayette | 512 | Camp Tenacharison | Camp | CBRE | 574,275 | - | - | L |
| 495 | Pennsylvania Dutch | 524 | Bashore Scout Reservation | Camp | JLL | 350,000 | CBRE | 1,233,288 | U |
| 495 | Pennsylvania Dutch | 524 | Bashore Scout Reservation | Camp | JLL | - | - | - | R |
| 495 | Pennsylvania Dutch | 524 | Bashore Scout Reservation | Camp | JLL | - | - | - | R |
| 495 | Pennsylvania Dutch | 524 | Bashore Scout Reservation | Camp | JLL | 3,592,900 | - | - | R |
| 496 | Pennsylvania Dutch | 524 | J. Edward Mack | Camp | JLL | - | - | - | U |
| 497 | Cradle of Liberty | 525 | Seltzer Property | Other | JLL | 750,000 | - | - | U |
| 498 | Cradle of Liberty | 525 | Firestone Scout Service Center | Office/Store | JLL | 1,560,000 | - | - | L |
| 499 | Cradle of Liberty | 525 | Camp Hart | Camp | CBRE | 1,890,769 | - | - | L |
| 500 | Cradle of Liberty | 525 | Camp Garrison | Camp | CBRE | 624,952 | - | - | L |
| 501 | Cradle of Liberty | 525 | Camp Delmont | Camp | CBRE | 3,978,500 | - | - | L |
| 502 | Cradle of Liberty | 525 | East Camp | Camp | CBRE | 139,800 | - | - | L |
| 503 | Cradle of Liberty | 525 | Resica Falls Scout Reservation | Camp | CBRE | 3,965,794 | - | - | L |
| 503 | Cradle of Liberty | 525 | Resica Falls Scout Reservation | Camp | CBRE | - | - | - | L |
| 504 | Laurel Highlands | 527 | Camp Potomac | Camp | JLL | 920,000 | - | - | U |
| 505 | Laurel Highlands | 527 | Camp Anawanna | Camp | JLL | 1,180,000 | - | - | U |
| 506 | Laurel Highlands | 527 | Camp Guyasuta | Camp | JLL | 9,200,000 | CBRE | 1,882,274 | L |
| 507 | Laurel Highlands | 527 | Camp Baker | Camp | CBRE | 311,600 | Council | 640,000 | R |
| 508 | Laurel Highlands | 527 | Heritage Reservation | Camp | CBRE | 6,938,508 | - | - | U |
| 509 | Laurel Highlands | 527 | Flag Plaza | Office/Store | CBRE | 2,097,810 | - | - | U |
| 510 | Hawk Mountain | 528 | Hawk Mountain Scout Reservation | Camp | CBRE | 2,162,160 | - | - | U |
| 511 | Hawk Mountain | 528 | Hawk Mountain Council, BSA | Office/Store | CBRE | 524,905 | - | - | U |
| 512 | French Creek | 532 | Custaloga Town Scout Reservation | Camp | CBRE | 906,604 | - | - | U |
| 512 | French Creek | 532 | Custaloga Town Scout Reservation | Camp | JLL | - | - | - | U |
| 512 | French Creek | 532 | Custaloga Town Scout Reservation | Camp | JLL | - | - | - | U |
| 512 | French Creek | 532 | Custaloga Town Scout Reservation | Camp | JLL | - | - | - | U |
| 512 | French Creek | 532 | Custaloga Town Scout Reservation | Camp | JLL | - | - | - | U |
| 512 | French Creek | 532 | Custaloga Town Scout Reservation | Camp | JLL | - | - | - | U |
| 512 | French Creek | 532 | Custaloga Town Scout Reservation | Camp | JLL | - | - | - | U |
| 512 | French Creek | 532 | Custaloga Town Scout Reservation | Camp | JLL | - | - | - | U |
| 513 | French Creek | 532 | Moss Woods - part of Custaloga Town Scout Reservation | Camp | JLL | 160,000 | - | - | U |
| 514 | Susquehanna | 533 | Camp Karoondinha | Camp | JLL | 735,000 | CBRE | 1,360,800 | U |
| 515 | Chief Cornplanter | 538 | Camp Olmstead | Camp | CBRE | 784,000 | - | - | U |
| 516 | Chester County | 539 | Program, Activities, and Resource Campus (PARC) | Camp | JLL | 4,940,000 | - | - | U |
| 517 | Chester County | 539 | Horseshoe Scout Reservation (Camp John H. Ware, 3rd ) | Camp | CBRE | 540,120 | - | - | U |
| 518 | Chester County | 539 | Horseshoe Scout Reservation (Camp Horseshoe) | Camp | CBRE | 4,075,000 | - | - | U |
| 519 | New Birth of Freedom | 544 | Mechanicsburg Service Center (KAC Service Center) | Office/Store | JLL | 487,000 | - | - | U |
| 520 | New Birth of Freedom | 544 | Camp Tuckahoe | Camp | CBRE | 1,573,090 | - | - | U |
| 521 | New Birth of Freedom | 544 | Hidden Valley Scout Reservation | Camp | CBRE | 1,857,862 | - | - | U |
| 522 | New Birth of Freedom | 544 | York Service Center (YAC Service Center) | Office/Store | CBRE | 610,184 | Council | 830,000 | U |
| 523 | Narragansett | 546 | Camp Cachalot | Camp | JLL | 910,000 | - | - | L |
| 523 | Narragansett | 546 | Camp Cachalot | Camp | JLL | - | - | - | L |
| 523 | Narragansett | 546 | Camp Cachalot | Camp | JLL | - | - | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | 3,996,701 | - | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | L |
| 524 | Narragansett | 546 | Camp Norse | Camp | CBRE | - | - | - | L |
| 525 | Palmetto | 549 | Camp Bob Hardin | Camp | CBRE | 877,100 | - | - | U |
| 526 | Palmetto | 549 | Glendale Outdoor Leadership School | Other | CBRE | 340,416 | Council | 305,000 | U |
| 527 | Blue Ridge | 551 | Blue Ridge Council | Office/Store | CBRE | 2,530,000 | - | - | U |
| 528 | Blue Ridge | 551 | Camp Reservation Property | Camp | CBRE | 3,400,763 | - | - | U |
| 529 | Blue Ridge | 551 | Land Donation | Other | JLL | 15,000 | - | - | U |
| 530 | Blue Ridge | 551 | Land Donation | Other | JLL | 5,000 | - | - | U |
| 531 | Pee Dee | 552 | 14 Lots of Wetlands | Other | JLL | 625,000 | - | - | U |
| 532 | Indian Waters | 553 | Camp Barstow | Camp | JLL | 720,000 | CBRE | 1,577,688 | U |
| 532 | Indian Waters | 553 | Camp Barstow | Camp | JLL | - | - | - | U |
| 532 | Indian Waters | 553 | Camp Barstow | Camp | JLL | - | - | - | U |
| 532 | Indian Waters | 553 | Camp Barstow | Camp | JLL | - | - | - | U |
| 532 | Indian Waters | 553 | Camp Barstow | Camp | JLL | - | - | - | U |
| 532 | Indian Waters | 553 | Camp Barstow | Camp | JLL | - | - | - | U |
| 532 | Indian Waters | 553 | Camp Barstow | Camp | JLL | - | - | - | U |
| 532 | Indian Waters | 553 | Camp Barstow | Camp | JLL | - | - | - | U |
| 533 | Indian Waters | 553 | Scout Camp and Office | Office/Store | Council | 820,000 | - | - | U |
| 534 | Cherokee | 556 | 175 Donated Property | Other | JLL | 1,180,000 | - | - | U |
| 535 | Cherokee | 556 | Skymont Camp | Camp | CBRE | 1,428,000 | - | - | U |
| 536 | Great Smoky Mountain | 557 | Camp Pellissipi | Camp | CBRE | 565,000 | - | - | L |
| 537 | Great Smoky Mountain | 557 | Camp Buck Toms | Camp | CBRE | 2,437,500 | - | - | L |
| 538 | Great Smoky Mountain | 557 | Buzzard's Roost | Camp | CBRE | 105,000 | - | - | L |
| 539 | Chickasaw | 558 | Kia Kima Scout Reservation | Camp | CBRE | 1,610,000 | - | - | TBD |
| 540 | West Tennessee Area Council | 559 | Service Center | Office/Store | JLL | 201,000 | - | - | U |
| 541 | West Tennessee Area Council | 559 | Camp Mack Morris | Camp | JLL | 1,110,000 | CBRE | 1,211,100 | U |
| 542 | Middle Tennessee Council, Inc | 560 | Boxwell Scout Reservation | Camp | CBRE | 5,351,500 | - | - | R |
| 543 | Middle Tennessee Council, Inc | 560 | Jet Potter Scout Service Center | Office/Store | CBRE | 5,469,285 | - | - | L |
| 544 | Middle Tennessee Council, Inc | 560 | Latimer High Adventure Scout Reservation | Camp | CBRE | 3,540,250 | - | - | R |
| 545 | Texas Trails Council | 561 | Camp Billy Gibbons | Camp | CBRE | 500,000 | - | - | R |
| 546 | Texas Trails Council | 561 | Camp Tonkawa | Camp | CBRE | 683,213 | - | - | R |
| 547 | Golden Spread | 562 | Scout Service Center | Office/Store | CBRE | 770,000 | CBRE | 1,731,600 | R |
| 548 | Golden Spread | 562 | Camp Don Harrington | Camp | CBRE | 1,628,585 | - | - | R |
| 549 | Golden Spread | 562 | Camp M.K.Brown | Camp | CBRE | 744,000 | - | - | R |
| 550 | Capitol Area Council | 564 | Frank Fickett Scout Training and Service Center | Office/Store | CBRE | 8,755,000 | - | - | L |
| 551 | Capitol Area Council | 564 | Lost Pines Scout Reservation | Camp | CBRE | 6,772,625 | - | - | R |
| 552 | Capitol Area Council | 564 | Griffith League Ranch | Camp | CBRE | 24,237,500 | - | - | L |
| 553 | Capitol Area Council | 564 | Camp McHenry | Camp | CBRE | 1,379,290 | - | - | TBD |
| 554 | Capitol Area Council | 564 | Green Dickson | Camp | CBRE | 1,691,750 | - | - | R |
| 555 | Capitol Area Council | 564 | Smilin V | Camp | CBRE | 1,956,500 | - | - | L |
| 556 | Capitol Area Council | 564 | Roy D Rivers | Camp | CBRE | 2,770,320 | - | - | R |
| 557 | Buffalo Trail | 567 | Midland Scout Service Center | Office/Store | JLL | 595,000 | - | - | U |
| 558 | Buffalo Trail | 567 | Buffalo Trail Scout Ranch | Camp | CBRE | 4,182,300 | - | - | R |
| 559 | Buffalo Trail | 567 | Pecos Property | Other | CBRE | 425,000 | - | - | L |
| 560 | Circle Ten Council | 571 | Clements Scout Ranch | Camp | CBRE | 10,290,000 | - | - | R |
| 561 | Circle Ten Council | 571 | Camp Wisdom | Camp | CBRE | 4,498,690 | - | - | R |
| 562 | Circle Ten Council | 571 | Murchison Scouting Center | Office/Store | CBRE | 9,082,500 | - | - | R |
| 562 | Circle Ten Council | 571 | STEM van | Other | - | - | - | - | R |

**Boy Scouts of America**
Local Council Property Value Information [1]
Disclosure Statement

May 14, 2021
($ in actuals)

| | Property Information | | | | Property Value Information [4] | | | | Restriction Review [4] |
|---|---|---|---|---|---|---|---|---|---|
| Line | Local Council Name | Local Council Number | Property Name: Camp, Service Center, or Common Name | Property Type | Fair Market Value: Source 1 | Fair Market Value: Value 1 | Fair Market Value: Source 2 | Fair Market Value: Value 2 | Restriction Status: BSA Review |
| 563 | Circle Ten Council | 571 | Bobby Lyle/Billy Gamble Scouting Center | Camp | CBRE | 2,483,460 | | | R |
| 564 | Circle Ten Council | 571 | Camp Constantin | Camp | CBRE | 8,865,350 | | | TBD |
| 565 | Bay Area | 574 | Camp Karankawa | Camp | CBRE | 2,715,850 | | | TBD |
| 566 | Sam Houston Area | 576 | Camp Strake | Camp | CBRE | 16,846,542 | | | R |
| 567 | Sam Houston Area | 576 | Cockrell Scout Center | Office/Store | CBRE | 13,650,000 | | | L |
| 568 | Sam Houston Area | 576 | Bovay Scout Ranch | Camp | CBRE | 5,951,004 | | | R |
| 569 | Sam Houston Area | 576 | Camp Brosig | Camp | CBRE | 974,505 | | | R |
| 570 | Three Rivers | 578 | Dishman Service Center | Office/Store | JLL | 484,000 | | | U |
| 571 | Three Rivers | 578 | Scott Scout Ranch | Camp | CBRE | 1,574,694 | | | U |
| 572 | Alamo Area | 583 | Lake Property | Camp | CBRE | 1,950,000 | | | U |
| 572 | Alamo Area | 583 | Scoutreach Leadership Development Center | Office/Store | JLL | - | | - | U |
| 573 | Alamo Area | 583 | Bear Creek Scout Reservation | Camp | CBRE | 10,951,270 | | | U |
| 574 | Alamo Area | 583 | McGimsey Scout Park | Camp | CBRE | 24,652,250 | | | R |
| 575 | Alamo Area | 583 | Mays Family Scout Ranch | Camp | CBRE | 809,297 | | | R |
| 576 | Caddo Area | 584 | Camp Preston Hunt | Camp | CBRE | 663,948 | | | U |
| 577 | East Texas Area Council | 585 | Land-Camp | Camp | JLL | 1,300,000 | CBRE | 2,029,423 | U |
| 577 | East Texas Area Council | 585 | 2005 Chevrolet Silverado | Camp | JLL | - | | | U |
| 577 | East Texas Area Council | 585 | 2016 Dump Trailer | Camp | JLL | - | | | U |
| 577 | East Texas Area Council | 585 | 2007 Legend Craft flat boat w/ trailer | Camp | JLL | - | | | U |
| 577 | East Texas Area Council | 585 | 2006 Glastron ski boat w/ trailer | Camp | JLL | - | | | U |
| 577 | East Texas Area Council | 585 | Aquatic Equipment | Camp | JLL | - | | | U |
| 577 | East Texas Area Council | 585 | Land Improvements-Camp | Camp | JLL | - | | | U |
| 577 | East Texas Area Council | 585 | Camp Buildings | Camp | JLL | - | | | U |
| 577 | East Texas Area Council | 585 | Comp Furniture/Fixtures | Camp | JLL | - | | | U |
| 578 | Northwest Texas | 587 | Service Center | Office/Store | CBRE | 772,950 | | | U |
| 579 | Northwest Texas | 587 | Camp Perkins | Camp | CBRE | 1,049,724 | | | R |
| 579 | Northwest Texas | 587 | Camp Perkins - Keeler | Camp | CBRE | - | | | U |
| 580 | Crossroads of the West Counc | 590 | Fife | Camp | JLL | 985,000 | | | U |
| 581 | Crossroads of the West Counc | 590 | Kiesel/Browning | Camp | JLL | 2,230,000 | | | U |
| 582 | Crossroads of the West Counc | 590 | Maple Dell | Camp | JLL | 2,280,000 | | | U |
| 583 | Crossroads of the West Counc | 590 | Thunder Ridge | Camp | JLL | 4,430,000 | | | U |
| 584 | Crossroads of the West Counc | 590 | Ogden Canyon | Camp | JLL | 286,000 | | | U |
| 585 | Crossroads of the West Counc | 590 | Logan Service Center | Office/Store | JLL | 585,000 | | | U |
| 586 | Crossroads of the West Counc | 590 | Meyerhoffer | Other | JLL | 260,000 | | | U |
| 587 | Crossroads of the West Counc | 590 | Tifie | Camp | JLL | 2,880,000 | CBRE | 5,410,990 | U |
| 588 | Crossroads of the West Counc | 590 | Ogden Service Center | Office/Store | JLL | 1,130,000 | | | U |
| 589 | Crossroads of the West Counc | 590 | Hobble Creek | Other | JLL | 670,000 | | | U |
| 590 | Crossroads of the West Counc | 590 | Bear Lake Aquatics | Camp | CBRE | 2,097,936 | | | R |
| 591 | Crossroads of the West Counc | 590 | Hinckley Scout Ranch & East Fork of the Bear Scout Reservati | Camp | CBRE | 8,687,540 | | | U |
| 592 | Crossroads of the West Counc | 590 | Teton High Adventure Base | Camp | CBRE | 675,150 | | | U |
| 592 | Crossroads Of The West | 590 | Camp Tracy | Other | CBRE | 1,299,780 | | | U |
| 594 | Crossroads of the West Counc | 590 | Lake Park | Other | CBRE | 2,010,750 | | | U |
| 595 | Crossroads of the West Counc | 590 | Hunt | Camp | CBRE | 233,800 | | | U |
| 596 | Crossroads of the West Counc | 590 | Schofield | Camp | Council | 1,000,000 | | | U |
| 597 | Green Mountain | 592 | Barre Town Property | Camp | Other | 10,925 | | | U |
| 598 | Green Mountain | 592 | Camp Sunrise | Camp | JLL | 1,102,350 | | | U |
| 599 | Green Mountain | 592 | Mt Norris Scout Reservation | Camp | JLL | 1,988,788 | | | L |
| 600 | Green Mountain | 592 | Georgia Property | Camp | CBRE | 22,421 | | | U |
| 601 | Green Mountain | 592 | Middlesex Property | Other | CBRE | 900 | | | U |
| 602 | Green Mountain | 592 | Townshend Property | Other | CBRE | 11,250 | | | U |
| 603 | Green Mountain | 592 | Council Service Center | Office/Store | JLL | 499,000 | CBRE | 410,000 | U |
| 604 | Green Mountain | 592 | Bradford Property | Other | JLL | 306,000 | CBRE | 21,150 | U |
| 605 | Tidewater | 596 | Pipsico Scout Reservation | Camp | CBRE | 5,725,000 | | | L |
| 606 | Shenandoah | 598 | Armstrong Scout Service Center | Office/Store | JLL | 735,000 | | | U |
| 607 | Shenandoah Area | 598 | Camp Rock Enon | Camp | CBRE | 2,850,250 | | | U |
| 608 | Blue Ridge Mountains | 599 | New Mexico prop | Other | Council | 18,516 | | | U |
| 608 | Blue Ridge Mountains | 599 | Reservation | Camp | CBRE | 16,415,000 | | | L |
| 610 | Blue Ridge Mountains | 599 | Claytor Lake | Camp | CBRE | 4,256,063 | | | U |
| 611 | Heart of Virginia | 602 | Finley Albright Scout Reservation | Camp | CBRE | 5,194,600 | Council | 2,730,000 | U |
| 612 | Heart of Virginia | 602 | Cub & Webelos Adventure Camp | Camp | CBRE | 468,708 | | | L |
| 613 | Heart of Virginia | 602 | Camp T. Brady Saunders | Camp | CBRE | 3,877,431 | | | L |
| 614 | Heart of Virginia | 602 | Highwoods Site | Other | Council | 390,000 | | | U |
| 615 | Blue Mountain | 604 | Franklin County Property | Camp | JLL | 575,000 | | | TBD |
| 616 | Blue Mountain | 604 | Service Center | Camp | CBRE | 450,000 | | | U |
| 617 | Blue Mountain | 604 | Randall and Marie Martin Scout Ranch | Camp | CBRE | 2,384,382 | | | R |
| 618 | Mount Baker | 606 | Everett Service Center | Office/Store | JLL | 2,150,000 | | | U |
| 619 | Mount Baker | 606 | Fire Mountain | Camp | CBRE | 1,752,930 | | | L |
| 620 | Chief Seattle | 609 | Service Center | Office/Store | JLL | 8,230,000 | CBRE | 8,359,560 | U |
| 621 | Chief Seattle | 609 | Snoqualmie Pass | Other | JLL | 1,360,000 | | | U |
| 622 | Chief Seattle | 609 | Camp Parsons | Camp | JLL | 1,966,302 | | | U |
| 623 | Chief Seattle | 609 | Cascade Scout Reservation | Camp | JLL | 2,689,100 | | | L |
| 624 | Great Alaska | 610 | Eagle River Scout Camp | Camp | JLL | 324,000 | CBRE | 804,195 | U |
| 626 | Great Alaska | 610 | Camp Carlquist #2 | Camp | Council | 1,050,000 | | | U |
| 626 | Great Alaska | 610 | Camp Gorsuch | Camp | CBRE | 862,500 | | | U |
| 627 | Great Alaska | 610 | Denali High Adventure Scout Base | Camp | CBRE | 701,600 | | | U |
| 628 | Inland Northwest Council | 611 | Service Center | Office/Store | JLL | 890,000 | | | L |
| 629 | Inland Northwest Council | 611 | Camp Easton | Camp | CBRE | 3,244,025 | | | R |
| 630 | Inland Northwest Council | 611 | Camp Grizzly | Camp | CBRE | 1,540,000 | | | R |
| 631 | Inland Northwest Council | 611 | Cowles Scout Reservation | Camp | CBRE | 2,699,646 | | | L |
| 632 | Pacific Harbors | 612 | Camp Thunderbird | Camp | JLL | 2,380,000 | CBRE | 1,385,230 | U |
| 633 | Pacific Harbors | 612 | Camp Delezenne | Camp | JLL | 124,383 | | | U |
| 634 | Pacific Harbors | 612 | Camp Hahobas | Camp | JLL | 575,000 | CBRE | 333,108 | L |
| 635 | Grand Columbia | 614 | Camp Fife | Camp | JLL | 1,617,788 | | | U |
| 636 | Grand Columbia | 614 | Summit Lake | Camp | CBRE | 125,000 | | | U |
| 636 | Grand Columbia | 614 | Camp Bonaparte | Camp | CBRE | 97,500 | | | U |
| 637 | Grand Columbia | 614 | Scout-Avista | Camp | CBRE | 335,855 | | | U |
| 638 | Mountaineer Area | 615 | Service Center | Office/Store | JLL | 111,000 | | | L |
| 639 | Buckskin | 617 | Camp Kootaga | Camp | CBRE | 511,250 | | | R |
| 640 | Ohio River Valley | 619 | Sandscrest Scout Reservation | Camp | JLL | 60,000 | | | U |
| 641 | Ohio River Valley | 619 | Fort Steuben Scout Reservation | Camp | CBRE | 1,673,848 | | | U |
| 642 | Glacier's Edge | 620 | Camp Indian Trails | Camp | JLL | 795,000 | | | U |
| 643 | Gateway Area | 624 | Camp Decorah | Camp | CBRE | 1,340,403 | | | U |
| 644 | Samoset | 627 | Camp Phillip | Camp | JLL | 344,000 | | | U |
| 645 | Samoset | 627 | Camp DuBay | Camp | JLL | 2,630 | | | U |
| 646 | Samoset | 627 | Crystal Lake Scout Reservation | Camp | JLL | 2,640,000 | | | U |
| 647 | Bay-Lakes | 635 | Scout Center/Office | Office/Store | JLL | 515,000 | CBRE | 630,753 | U |
| 648 | Bay-Lakes | 635 | Bear Paw Scout Camp | Camp | JLL | 1,020,000 | CBRE | 1,280,000 | U |
| 649 | Bay-Lakes | 635 | Gardner Dam Scout Camp | Camp | JLL | 762,411 | | | R |
| 650 | Bay-Lakes | 635 | Camp Rokilio | Camp | CBRE | 1,128,900 | | | U |
| 651 | Bay-Lakes | 635 | Strebel Property | Other | CBRE | 129,600 | | | U |
| 652 | Three Harbors | 636 | Milwaukee Scout Service Center | Office/Store | JLL | 1,400,000 | CBRE | 2,541,000 | R |
| 653 | Three Harbors | 636 | Oh-Da-Ko-Ta | Camp | CBRE | 1,178,520 | | | R |
| 654 | Three Harbors | 636 | Indian Mound Scout Reservation | Camp | CBRE | 2,019,430 | | | R |
| 655 | Chippewa Valley | 637 | Camp Brunswick | Camp | JLL | 390,000 | | | U |
| 656 | Chippewa Valley | 637 | Council Office Building | Office/Store | JLL | 545,000 | | | U |
| 657 | Chippewa Valley | 637 | L. E. Phillips Scout Reservation | Camp | CBRE | 3,490,536 | | | U |
| 658 | Greater New York | 640 | Ten Mile River Scout Camps | Camp | Council | 14,050,000 | Keen | 26,250,000 | U |
| 659 | Greater New York | 640 | Alpine Scout Camp | Camp | Keen | 175,000,000 | | | U |
| 660 | Greater New York | 640 | William H. Pouch Scout Camp | Camp | Council | 3,750,000 | Keen | 27,125,000 | U |
| 661 | Potawatomi Area | 651 | Camp Long Lake | Camp | JLL | 880,000 | CBRE | 1,146,600 | U |
| 662 | Potawatomi Area | 651 | Council Service Center | Office/Store | JLL | 1,200,000 | | | U |
| 663 | Great Rivers | 653 | Great Rivers Council Service Center | Office/Store | JLL | 420,000 | | | U |
| 664 | Blackhawk Area | 660 | Camp Lowden | Camp | CBRE | 1,010,000 | | | U |
| 665 | Blackhawk Area | 660 | Canyon Camp | Camp | CBRE | 1,668,940 | | | U |
| 666 | Blackhawk Area | 660 | Crystal Lake Service Center | Office/Store | CBRE | 510,000 | | | U |
| 667 | Blackhawk Area | 660 | Tunnicweg Center | Office/Store | CBRE | 755,000 | | | U |
| 668 | Blackhawk Area | 660 | Program Center | Other | JLL | 317,000 | | | U |
| 669 | Puerto Rico | 661 | Camp Guajataka | Camp | CBRE | 913,685 | | | TBD |
| 669 | Puerto Rico | 661 | Camp Guajataka - Buildings | Camp | CBRE | - | | | TBD |
| 669 | Puerto Rico | 661 | Camp Guajataka - Basketball Court | Other | CBRE | - | | | TBD |
| 669 | Puerto Rico | 661 | Camp Guajataka - Buildings | Other | CBRE | - | | | TBD |
| 670 | Heart of Texas d.b.a. Longhorn | 662 | Camp Tahuaya | Camp | JLL | 650,000 | | | U |
| 670 | Heart of Texas d.b.a. Longhorn | 662 | Camp Tahuaya | Camp | JLL | - | | | U |
| 670 | Heart of Texas d.b.a. Longhorn | 662 | Camp Tahuaya | Camp | JLL | - | | | U |
| 671 | Heart of Texas d.b.a. Longhorn | 662 | Camp Klondike | Camp | JLL | 69,795 | | | R |
| 672 | Suwannee River Area | 664 | Wallwood Boy Scout Reservation | Camp | CBRE | 1,725,000 | | | U |
| 673 | Garden State | 690 | Rental House - Elmer | Other | JLL | 16,800 | | | U |
| 674 | Garden State | 690 | Pill Hill Scout Reservation | Camp | JLL | 1,600,000 | CBRE | 820,849 | U |
| 675 | Garden State | 690 | Camp Grice | Camp | JLL | 205,931 | | | U |
| 676 | Garden State | 690 | Rowan Training Center | Office/Store | CBRE | 769,005 | | | R |
| 677 | Garden State | 690 | Halpas Scout Reservation | Camp | CBRE | 561,764 | | | U |
| 678 | Garden State | 690 | Quinipet Center | Camp | CBRE | 731,400 | | | U |
| 679 | Garden State | 690 | land | Other | CBRE | 13,878 | | | U |
| 680 | Garden State | 690 | Riggins Service Center | Office/Store | CBRE | 438,190 | | | L |

**Boy Scouts of America**
Local Council Property Value Information [1]
Disclosure Statement

May 14, 2021
($ in actuals)

| | Property Information | | | | Property Value Information [2] | | | | Restriction Review [3] |
|---|---|---|---|---|---|---|---|---|---|
| Line | Local Council Name | Local Council Number | Property Name: Camp, Service Center, or Common Name | Property Type | Fair Market Value: Source 1 | Fair Market Value: Value 1 | Fair Market Value: Source 2 | Fair Market Value: Value 2 | Restriction Status: BSA Review |
| 681 | Garden State | 690 | Pine Tree Education and Environmental Center | Camp | CBRE | 560,282 | | - | L |
| 682 | Garden State | 690 | Rental House - Vineland | Other | CBRE | 112,500 | | - | U |
| 683 | Garden State | 690 | Rowan Resource Center | Office/Store | CBRE | 592,250 | | - | R |
| 684 | Pushmataha Area | 691 | Camp Seminole | Camp | JLL | 383,000 | | - | U |
| 685 | South Plains | 694 | Lost Scout Service Center | Office/Store | JLL | 338,000 | | - | U |
| 686 | South Plains | 694 | CW Post Scout Camp | Camp | CBRE | 1,022,558 | | - | U |
| 687 | South Plains | 694 | Camp Haynes | Camp | CBRE | 160,000 | | - | R |
| 688 | Black Hills Area | 695 | Medicine Mountain Scout Ranch - Family Camp | Camp | JLL | 330,000 | | - | U |
| 689 | Black Hills Area | 695 | Medicine Mountain Scout Ranch | Camp | JLL | 480,000 | | - | U |
| 690 | Midnight Sun | 696 | Earl & Pat Cook Service Center | Office/Store | JLL | 340,000 | | - | U |
| 691 | Oregon Trail | 697 | Camp Mooney | Camp | CBRE | 735,138 | | - | U |
| 692 | Oregon Trail | 697 | Herb Hill Family & Guaranty Scout Center | Camp | CBRE | 1,800,000 | | - | U |
| 693 | Oregon Trail | 697 | Camp Murnane | Camp | CBRE | 412,895 | | - | R |
| 694 | Oregon Trail | 697 | Camp Baker | Camp | CBRE | 1,450,175 | | - | U |
| 695 | Oregon Trail | 697 | Camp Salholm | Camp | CBRE | 184,664 | | - | U |
| 696 | Oregon Trail | 697 | Camp Kinton | Camp | CBRE | 346,426 | | - | U |
| 697 | Rainbow | 702 | Camp Theakiki | Camp | JLL | 193,000 | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Camp | CBRE | 3,197,403 | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 698 | Rainbow Council | 702 | Rainbow Council Scout Reservation | Other | CBRE | - | | - | U |
| 699 | Sequoyah | 713 | Service Center | Office/Store | CBRE | 685,000 | CBRE | 876,760 | U |
| 700 | Sequoyah | 713 | Camp Davy Crockett | Camp | CBRE | 3,672,000 | | - | U |
| 701 | Sioux | 733 | Camp Ivetaka | Camp | JLL | 214,000 | | - | U |
| 702 | Sioux | 733 | Center for Scouting Service Center | Office/Store | JLL | 1,620,000 | | - | U |
| 703 | Sioux | 733 | Lewis and Clark Scout Camp | Camp | CBRE | 777,392 | | - | U |
| 704 | Sioux | 733 | Newton Hills Scout Camp | Camp | Council | 980,000 | | - | U |
| 705 | Sioux | 733 | Camp Shetek | Camp | CBRE | 1,270,000 | | - | U |
| 706 | Texas Southwest | 741 | Camp Fawcett | Camp | CBRE | 355,571 | | - | R |
| 707 | Texas Southwest | 741 | Sid Mayer and Sol Mayer Ranch | Camp | CBRE | 12,883,579 | | - | R |
| 708 | Yocona Area | 748 | Camp Yocona | Camp | JLL | 730,000 | | - | U |
| 709 | Virginia Headwaters (formerly | 763 | Camp Shenandoah (Preserve) | Camp | JLL | 3,300,000 | CBRE | 1,732,800 | U |
| 709 | Virginia Headwaters (formerly | 763 | Camp Shenandoah (Reservation) | Camp | JLL | - | | - | U |
| 710 | Gulf Coast | 773 | Spanish Trail Scout Reservation | Camp | JLL | 193,000 | | - | U |
| 711 | Gulf Coast | 773 | Scout Service Center | Office/Store | Council | 580,000 | | - | U |
| 712 | Rio Grande | 775 | Laguna Station | Other | JLL | TBD | | - | U |
| 713 | Rio Grande | 775 | Office Property | Other | CBRE | 98,194 | | - | R |
| 713 | Rio Grande | 775 | Scout Office | Camp | JLL | 193,000 | | - | R |
| 714 | Rio Grande | 775 | Camp Charles F. Perry | Camp | CBRE | 477,225 | | - | R |
| 715 | Washington Crossing | 777 | Ockanickon Scout Reservation | Camp | CBRE | 1,207,656 | | - | L |
| 716 | Washington Crossing | 777 | Council Service Center | Office/Store | Council | 900,000 | | - | U |
| 717 | Michigan Crossroads | 780 | DeVos Center for Scouting | Office/Store | JLL | 4,290,000 | | - | U |
| 718 | Michigan Crossroads | 780 | Dauch Service Center | Office/Store | JLL | 1,960,000 | CBRE | 4,900,000 | U |
| 719 | Michigan Crossroads | 780 | Traverse City Service Center | Office/Store | JLL | 635,000 | | - | U |
| 720 | Michigan Crossroads | 780 | Ann Arbor Service Center | Office/Store | JLL | 1,230,000 | | - | U |
| 721 | Michigan Crossroads | 780 | Auburn Service Center | Office/Store | JLL | 320,000 | CBRE | 1,299,500 | U |
| 722 | Michigan Crossroads | 780 | Cole Canoe Base | Camp | CBRE | 1,929,200 | | - | U |
| 723 | Michigan Crossroads | 780 | D-Bar-A Scout Ranch | Camp | CBRE | 5,695,000 | | - | U |
| 724 | Michigan Crossroads | 780 | Paul Bunyan Scout Res | Camp | CBRE | 1,376,000 | Council | 1,300,000 | U |
| 725 | Michigan Crossroads | 780 | Gerber Scout Reservation | Camp | CBRE | 1,824,933 | | - | R |
| 726 | Michigan Crossroads | 780 | Lost Lake Scout Res | Camp | CBRE | 1,100,000 | | - | U |
| 727 | Michigan Crossroads | 780 | Camp Munhacke | Camp | CBRE | 608,160 | Council | 1,275,000 | L |
| 728 | Michigan Crossroads | 780 | Camp Teetonkah | Camp | CBRE | 952,560 | | - | U |
| 729 | Michigan Crossroads | 780 | Rota-Kiwan Scout Reservation | Camp | Council | 2,000,000 | | - | U |

**Footnotes**

[1] The exhibit includes those properties owned by the Local Councils which were valued by JLL, CBRE, Keen Summit, or in limited cases other appraisers retained directly by the individual local councils.
By order and approval of the United States Bankruptcy Court for the District of Delaware, JLL was retained by Boy Scouts of America and CBRE / Keen Summit retained by The Official Committee of Tort Claimants, respectively, to provide opinions of value for certain real property as owned by certain Local Councils.
To minimize costs, the valuations were completed on a desktop basis and no site inspections were conducted.
These opinions of value are concise and were developed using the best information available at the time of completion. The valuations do not reflect legal restrictions on the sale of the property. In some cases the valuations may reflect certain limitations on the use of the property. The Debtors' and local councils' work and review of local council properties remains ongoing and subject material change. The Debtors and local councils reserve all rights to update or amend as necessary.

[2] Certain properties are pending sale or may have been sold after the valuation was completed. Nothing herein is an admission that the property is still owned by the Council.
CBRE reported high and low values for properties if valued, the average of which is included herein

[3] Certain properties owned by the local councils are subject to legal or other restrictions which may impact the value of the property and/or the ability to sell the property or use the proceeds of the property to satisfy claims against the local council. Restrictions based on BSA Review reflects the Debtors' good faith effort to review documents provided by the applicable local council and assess the validity and nature of the asserted restriction. The Debtor's review may not be complete and may also not reflect other parties' views of the enforceability of such restrictions. The restriction designations is based on the Debtors' review of the properties and may not reflect the view of the local councils and the local councils reserve their rights to assert additional properties are subject to restriction.
U: Unrestricted - No restriction on the property was asserted or confirmed
L: Limitations - Documents support existence of use limitations or sale limitations such as conservation easements which may impact the value of the property
R: Restricted - Assertion of or documents supporting legal restrictions including donor restrictions to the sale of property and/or requiring the reversion of property or proceeds to an unrelated party.
TBD: Assertion of restriction remains subject to review and/or additional documentation

# **EXHIBIT C**

**FINANCIAL PROJECTIONS ANALYSIS**

**Boy Scouts of America**

**Exhibit C**

**Financial Projections[1]**

## Overview / Basis of Projections

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code (*see* <u>Article IX</u> of the Disclosure Statement), as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors under the Plan. In connection with the development of the Plan and to determine whether the Plan satisfies the feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

The Debtors prepared consolidated condensed financial projections herein (the "<u>Financial Projections</u>") based on, among other things, the projected results of operations, financial position, free cash flow and balance sheet of the Debtors and the Related Non-Debtor Entities. With the assistance of the Debtors' advisors, the Debtors' management team developed and refined the business plan and prepared consolidated financial projections for the fiscal years ending December 31, 2021 through December 31, 2025.

Although the Financial Projections represent the Debtors' commercially reasonable estimates and good faith judgment (for which the Debtors' management team believes it has a reasonable basis) of the results of future operations, financial position, and cash flows of the Debtors, the Financial Projections are only estimates and actual results may vary considerably from the Financial Projections. Consequently, the Financial Projections should not be regarded as a representation by the Debtors, the Debtors' advisors or any other person that the projected results of operations, financial position, or free cash flow of the Debtors will be achieved. The Financial Projections are based on forecasts that may be significantly impacted by, among other factors, the prolonged impact of COVID-19, changes in demand for the Debtors' programming, member and youth preferences, and changes in terms with material suppliers and vendors. Consequently, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to material operational, economic, and other uncertainties.

The Financial Projections have been prepared by management, with the assistance of their advisors, using accounting policies that are generally consistent with those applied in the Debtors' historical financial statements. The Financial Projections were not, however, prepared with a view toward compliance with guidelines established by the American Institute of Certified Public Accountants, or the Financial Accounting Standards Board. The Financial Projections have not been examined or compiled by independent accountants.

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

The Financial Projections should be read in conjunction with the significant assumptions, qualifications and notes set forth below, as well as the assumptions, qualifications and explanations set forth in the Disclosure Statement. *See* Article X of the Disclosure Statement – Risk Factors.

THE FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, MAINTAINING GOOD EMPLOYEE, MEMBER, AND DONOR RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENT BODIES, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, ACTS OF TERRORISM OR WAR, ORGANIZATIONAL-SPECIFIC RISK FACTORS (AS DETAILED IN ARTICLE X OF THE DISCLOSURE STATEMENT ENTITLED "RISK FACTORS"), AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT OPERATIONAL, ECONOMIC, REGULATORY AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL AND WILL BE BEYOND REORGANIZED BSA'S CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR THE REORGANIZED BSA'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INACCURATE. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE FINANCIAL PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED BSA, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE FINANCIAL PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE FINANCIAL

2

PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.  IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

**THE DEBTORS BELIEVE THAT THE CONFIRMATION AND CONSUMMATION OF THE PLAN ARE NOT LIKELY TO BE FOLLOWED BY THE LIQUIDATION OR FURTHER REORGANIZATION OF REORGANIZED BSA OR ITS SUCCESSORS.  ACCORDINGLY, THE DEBTORS BELIEVE THAT THE PLAN SATISFIES THE FEASIBILITY REQUIREMENT OF SECTION 1129(A)(11) OF THE BANKRUPTCY CODE.**

## Accounting Policies

The Financial Projections have been prepared using accounting policies that are consistent with those applied in the Debtors' historical financial statements.

Upon emergence from chapter 11, Reorganized BSA will implement "fresh start" reporting pursuant to Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code," as codified in Accounting Standards Codification ("ASC") Topic 852, "Reorganization."  The main principles of fresh start reporting require that the value of the emerging entity be allocated to all of the entity's assets in conformity with the procedures specified by Statement of Financial Accounting Standards ("SFAS") No. 141R, "Business Combinations," as codified in ASC Topic 805, "Business Combinations," and any portion of the value that cannot be attributed to specific tangible or identifiable intangible assets of the emerging entity is required to be reported as goodwill.

## Assumptions and Methodologies to the Financial Projections

### General Assumptions

The Financial Projections were developed on a consolidated basis for the Debtors and the Related Non-Debtor Entities and take into account the assumptions noted below, as well as the current environment in which the Debtors operate, including many economic and financial forces that are beyond the control of the Debtors.  The Debtors are a not-for-profit entity providing outdoor-focused youth programming in the United States, its territories and certain locations outside of the United States, both directly at four high adventure facilities owned or operated by the BSA and indirectly through approximately 251 Local Councils which collectively charter more than 50,000 Cub Scout, Scouts BSA and affiliated programs units.  Economic growth or slowdowns on a national or regional basis, including continuing impacts from COVID-19, may

3

impact the Debtors' and Reorganized BSA's revenues and expenses.  In addition, general trends and changes within the market for youth programming and the ability of the BSA and the Local Councils to raise donations to support their programming may impact performance.

- **Plan and Effective Date:** The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by August 31, 2021 and that Reorganized BSA will continue to conduct operations substantially similar to their businesses currently.

- **Forecast Period:** The Debtors prepared the Financial Projections based on, among other things, the anticipated future financial condition and results of operations of Reorganized BSA and the terms of the Plan.  The Debtors prepared consolidated Financial Projections of the Boy Scouts of America for the years ending December 31, 2021 through December 31, 2025.

- **Foundation Loan:** The Financial Projections assume the Debtors receive proceeds from a second-lien term loan made on the Effective Date by the Foundation in the amount of $42.8 million (the "Foundation Loan").  The Foundation Loan will provide for equal quarterly amortization over the 10-year period following the Effective Date with an annual interest rate of 6.5%.

- **Trust Contribution:** The Financial Projections assume the Debtors contribute to the Settlement Trust on the Effective Date all of the Unrestricted Cash and Investments as of the Effective Date, after Reorganized BSA has received the proceeds of the Foundation Loan, less (i) $75,000,000, which shall be funded first from the proceeds of the Foundation Loan, (ii) an amount of Cash equal to the JPM Exit Fee, (iii) an amount of Cash sufficient to fund all unpaid Allowed Administrative Expense Claims, (iv) without duplication, an amount of Cash sufficient to fund the Professional Fee Reserve, (v) an amount of Cash equal to the Creditor Representative Fee Cap, and (vi) the amount of Cash estimated to be required to satisfy Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Secured Claims, and Allowed Convenience Claims.  Additionally, the Financial Projections assume the Debtors contribute to the Settlement Trust on the Effective Date all of the BSA's right, title and interest in and to (a) Scouting University, (b) the Artwork, (c) the Oil and Gas Interests, and (d) the Warehouse and Distribution Center, subject to the Leaseback Requirement, or the proceeds of a third-party sale-leaseback of the Warehouse and Distribution Center for fair market value.

- **Core Value Cash Pool:** The Financial Projections assume that holders of Allowed General Unsecured Claims will be paid a total of $25 million in four equal semi-annual installments over the 24-month period following the Effective Date; a liability has therefore been established on Reorganized BSA's balance sheet for such obligation.  The Financial Projections also assume amortization under the Restated Debt Documents will not be payable until 24 months after the Effective Date.

- **Global Resolution:  The Financial Projections are based on the confirmation of the Global Resolution Plan.  Assumptions that would change under the BSA Toggle Plan are noted in a separate section at the end of the Financial Projections.**

## Projected Income Statement

Operating Surplus / (Deficit) After Restriction Release is not a measure of financial performance under GAAP, and is not intended to represent cash flow from operations under GAAP.  However, Operating Surplus is utilized as a measure of operations and the Debtors' ability to meet indebtedness service requirements.  The Projected Consolidated Statements of Operations do not reflect potential impacts from fresh start accounting.  Certain restructuring expenses related to financing may be capitalized and amortized over time; however, are reflected herein as expensed when incurred.

### Revenue Assumptions

a.  <u>Membership Levels</u> – Membership levels are assumed to decrease in 2021 by 13%, primarily due to the impact of COVID-19 on programing, but are forecasted to stabilize between 2023 to 2024 and achieve modest growth in 2024 and 2025 driven by the following factors:
   - Adjustments to programming and operations to account for reduced membership, including the departure of Scouts affiliated with the Church of Jesus Christ of Latter-day Saints.
   - Channeling all Abuse Claims to the Settlement Trust, which will remove a significant impediment to the Debtors' continued operational success.
   - Broadening program access for girls and young women, thus potentially doubling total potential participants in Cubs Scouts and Scouts BSA age groups.
   - Reimaging public relations campaign to bolster positive visibility and move the organization past bankruptcy, which can generate new interest in Scouting and generate increased donations.
   - Improving the organization's online registration system.
   - Improving the rechartering system for Local Councils and Chartered Organizations.
   - Expanding delivery methods that make it easier for individuals who might not have access to a local Scouting unit to participate through lone Cub Scouting and increasing these Scouts' virtual experience.
   - Gradual restoration of Local Council resources / refocus on membership growth.

b.  <u>Registration Fees</u> – Consist of membership fees and joining fees for youth members and adult volunteers.  Assumes marginal annual fee increases for traditional youth members from 2021-2025, roughly corresponding to an inflationary rate.

c.  <u>Supply Operations</u> – Consist of retail and wholesale sales of apparel, badges, equipment, and other merchandise sold at Scout Shops, online, and to Local Councils and third parties.  Assumes COVID-19 impacts are largely diminished by the summer of 2021 and the

traditionally high sales season in the fall is not anticipated to be significantly impacted. Assumes annual price increases from 2021-2025 to offset inflation and sales volume fluctuates with membership.

d. High Adventure Facilities ("HAF") – Consist of registration fees to attend the facilities, trading post sales, and other revenues. Assumes the BSA retains all four HAFs and all HAFs return to normal operations for the summer of 2021. Assumes modest annual price increases for 2021-2025. Attendance is assumed to be slightly reduced in 2023 due to the assumption that the National Jamboree (as described below) is held, but is anticipated to stabilize in 2024 and beyond.

e. National Jamboree – Consist of fees from Scouts and volunteers for a large-scale Scout event typically held every four years. Assumes events to be held in 2023 and 2026, with revenue largely recorded in such years.

f. Other Revenues – Consist of service fees paid from Local Councils, other event fees, unrestricted contributions, unit charter fees, and other miscellaneous revenues. Other revenues are largely consistent with preliminary 2020 results. Oil and gas royalties cease as the Effective Date as the underlying rights are contributed to the Settlement Trust on the Effective Date.

**Expense Assumptions**

a. Payroll & Benefits – Expenses forecasted to decline in 2021 driven by annualizing the impact of headcount reductions implemented in 2020, slightly offset by an increase in the retirement policy for defined benefit pension and 403(b) funding from 7.75% to 12% of eligible wages. Assumes 2.5% annual wage increases and 3.5% annual benefits inflation from 2021-2025.

Note that the BSA provides certain benefits to Local Council employees at cost and also collects contributions to the defined benefit pension plan on the same percentage of wages. These amounts are not reflected in the projections as they are as passed through. The contributions to the defined benefit pension plan from the retirement policy by both the BSA and the Local Councils are expected to be sufficient to avoid any other contributions to the plan during the forecast period. Pursuant to the Plan, the Restoration Plan, a non-qualified retirement plan, is terminated and therefore there is no ongoing expense associated.

b. Supply Operating Expenses – Assumes 2.5% annual wage increases for full-time employees from 2021-2025. Assumes cost of goods sold, part-time wages and other operating costs are largely variable based on sales volume. Assumes the National Distribution Center is contributed to the Settlement Trust on the Effective Date, and space is leased-back to the BSA.

    c.   <u>High Adventure Facilities Expenses</u> – Assumes 2.5% annual wage increases for full-time employees from 2021-2025.  Assumes seasonal employees and some operating costs are variable based on revenue and scout attendance.

    d.   <u>GLIP Expenses</u> – Predominately consist of insurance premiums and 2021 estimates reflect the current assessment of the insurance renewal process, which are slightly reduced from 2020 amounts.  Insurance premiums are assumed to increase 4% annually from 2022-2025.  Assumes no changes in the current insurance programs.  Expenses also include some legal and administrative fees, which are assumed to remain stable throughout the projection period.

    e.   <u>Other Expenses</u> – Consist of external services, operating, information technology, travel, marketing, facilities, non-GLIP insurance, National Jamboree-related, and other expenses.  2021 is assumed to be relatively stable to 2020 with additional cost cuts offsetting areas of higher post-COVID activity.  National Jamboree expenses are expected to drive 2023 expense increases.

**<u>Free Cash Flow Assumptions</u>**

    a.   <u>Debt Service</u> – Assumes the Prepetition Obligations, owed to JPM, are amended and restated on the Effective Date on terms that are substantially the same as the terms of the Prepetition Debt Documents, except that (i) the obligations under the Restated Debt Documents will be secured by a blanket lien on all of the BSA's assets; (ii) the maturity dates under the Restated Debt Documents are extended ten years after the Effective Date; (iii) there is a 24-month amortization holiday under the Restated Debt Documents, with deferred amortization amounts to be paid at maturity; (iv) the revolving credit facility provided under the 2019 RCF Documents will be frozen and converted to a term loan; and the Restated Debt Documents will provide for the Excess Cash Sweep (as discussed below).  As the financial statements are presented on a consolidated basis, the Foundation Loan is an intercompany payable from the BSA to the Foundation and thus eliminated on the balance sheet, such amortization and interest is shown as debt service for illustrative purposes.

    b.   <u>Capital Expenditures</u> – Reflect estimate for capital projects for the High Adventure Facilities, IT systems, and Supply operations.  Assumes roughly stable spending over the forecast period.

    c.   <u>Other Working Capital Changes</u> – Changes in working capital reflect usage of inventory in relation to Supply sales, changes to unearned income related to estimated HAF attendance, increases in insurance premium prepaid amounts, and timing of payments for the National Jamboree.

    d.   <u>Excess Cash Sweep</u> – The Financial Projections assume that 25% of the Excess Cash and Investments in excess of $75 million, if any, will be applied pro rata by facility to outstanding JPM debt principal balances under the Restated Debt Documents on December 31, 2023, December 31, 2024, and December 31, 2025.  Such principal payments are

additional to the regularly scheduled amortization payments and will reduce the balloon principal amounts due at maturity.  For simplicity, these amounts are shown paid on December 31 of the applicable year; however, they will actually be due 45 days later.

## Projected Consolidated Unrestricted Income Statement (Global Resolution Plan)

| ($ in millions) | Actual | Preliminary | Financial Projections | | | | | Total |
|---|---|---|---|---|---|---|---|---|
| Year | 2019 [1] | 2020 [1] | 2021 | 2022 | 2023 | 2024 | 2025 | 2021 - 2025 |
| Year-end Youth Membership Estimates (000s) | 2,118 | 1,195 | 1,050 | 994 | 978 | 984 | 1,011 | |
| **Revenues** | | | | | | | | |
| Registration Fees | $ 65 | $ 88 | $ 74 | $ 74 | $ 75 | $ 79 | $ 83 | $ 385 |
| Supply Operations (Gross) | 119 | 51 | 83 | 80 | 80 | 82 | 87 | 412 |
| High Adventure Facilities (Gross) | 58 | 15 | 63 | 60 | 61 | 71 | 73 | 328 |
| National Jamboree Fees | - | - | - | 4 | 16 | - | 4 | 24 |
| Other Revenues [2] | 181 | 33 | 33 | 39 | 39 | 40 | 41 | 192 |
| **Total Revenues** | 423 | 187 | 253 | 257 | 271 | 272 | 288 | 1,342 |
| **Operating Expenses** | | | | | | | | |
| Payroll and Benefits (Excluding Supply & HAF) [3] | 68 | 56 | 43 | 44 | 45 | 46 | 47 | 225 |
| Supply Operating Expenses [3] | 99 | 57 | 69 | 68 | 68 | 70 | 72 | 347 |
| High Adventure Facilities Operating Expenses [3] | 47 | 30 | 50 | 48 | 48 | 51 | 51 | 247 |
| GLIP Expenses (Gross) | 112 | 49 | 41 | 42 | 43 | 45 | 46 | 217 |
| Other Expenses [2] | 185 | 36 | 33 | 33 | 49 | 31 | 35 | 182 |
| **Total Expenses** | 511 | 228 | 235 | 235 | 254 | 243 | 252 | 1,218 |
| **Operating Surplus / (Deficit)** | $ (89) | $ (41) | $ 18 | $ 22 | $ 18 | $ 29 | $ 36 | $ 123 |
| (before Debt Service, Capex, Depreciation and Restructuring) | | | | | | | | |
| Net Assets Released from Restrictions | 12 | 8 | 8 | 4 | 4 | 4 | 4 | 23 |
| **Operating Surplus / (Deficit) After Restriction Release** | $ (77) | $ (33) | $ 26 | $ 26 | $ 21 | $ 33 | $ 40 | $ 146 |
| **Cash Flow Items** | | | | | | | | |
| Debt Service - Interest [4] | (7) | (7) | (8) | (10) | (10) | (9) | (9) | (47) |
| Debt Service - Principal [4] | (11) | (2) | (1) | (4) | (10) | (18) | (19) | (52) |
| Excess Cash Sweep [5] | - | - | - | - | (1) | (1) | (3) | (5) |
| Capital Expenditures (Non-Summit) | (16) | (5) | (4) | (4) | (4) | (4) | (4) | (21) |
| Other Working Capital Changes | 52 | 67 | 14 | (2) | 0 | 1 | 3 | 16 |
| **Cash Flow Items** | 18 | 53 | 1 | (21) | (25) | (32) | (32) | (109) |
| **Estimated Unrestricted Free Cash Flow** | $ (59) | $ 20 | $ 27 | $ 5 | $ (3) | $ 1 | $ 8 | $ 37 |
| (before Depreciation, Restructuring, Creditor Settlements / Contributions) | | | | | | | | |
| Core Value Cash Pool Payments [6] | | | - | (13) | (13) | - | - | (25) |
| **Estimated Unrestricted Cash Flow** | | | $ 27 | $ (8) | $ (16) | $ 1 | $ 8 | $ 12 |
| (before Depreciation, Restructuring, Effective Date Creditor Contributions) | | | | | | | | |

Footnotes:
(1)  2019 results are unaudited and 2020 results are preliminary and unaudited
(2)  2019 Other Revenue and Other Expenses are increased due to the World Scout Jamboree, which was a one-time large event
(3)  Payroll and benefits represent G&A/corporate expenses. Payroll related to High Adventure Facilities ("HAF") and Supply is captured in HAF and Supply operating expenses
(4)  Includes quarterly principal and interest for the Foundation Loan
(5)  Reflects 25% of estimated unrestricted cash and investments above $75 million as of December 31, if any, to be applied to JPM's principal balances beginning in 2023
(6)  Reflects semi-annual payments to holders of Allowed General Unsecured Claims beginning six months after the Effective Date

**Projected Pro Forma Consolidated Balance Sheet – August 31, 2021 (Global Resolution Plan)**

| ($ in millions) | Pre-Emergence 8/31/2021 | | Reorganization Adjustments | | | Post-Emergence 8/31/2021 | |
|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | |
| Cash and Cash Equivalents | | | | | | | |
| Cash and cash equivalents - Unrestricted | $ | 51 | $ | (33) | (a.) | $ | 18 |
| GAAP Restricted Cash - LC Cash Collateral | | 63 | | (63) | (b.) | | - |
| Donor Restricted Cash | | 24 | | - | | | 24 |
| Total cash and cash equivalents | | 137 | | (95) | | | 42 |
| Investments, at fair value | | | | | | | |
| Investments - Unrestricted | | 57 | | - | | | 57 |
| Investments - Donor Restricted | | 167 | | (43) | (c.) | | 124 |
| Total Investments, at fair value | | 224 | | (43) | | | 181 |
| Accounts receivable | | 16 | | - | | | 16 |
| Pledges receivable | | 17 | | - | | | 17 |
| Other receivables | | 1 | | - | | | 1 |
| Gift annuities | | 6 | | - | | | 6 |
| Prepaid expenses | | 27 | | - | | | 27 |
| Inventories | | 56 | | - | | | 56 |
| Land, buildings, and equipment, net | | 470 | | (3) | (d.) | | 468 |
| Other | | 12 | | - | | | 12 |
| **Total Assets, excluding Non-Controlling Interests** | **$** | **966** | **$** | **(141)** | | **$** | **825** |
| **Liabilities** | | | | | | | |
| Accounts payable and accrued liabilities | $ | 60 | $ | (36) | (e.) | $ | 25 |
| Core Value Claims Payable | | - | | 25 | (f.) | | 25 |
| Gift annuities | | 6 | | - | | | 6 |
| Unearned fees and subscriptions | | 31 | | - | | | 31 |
| Secured funded debt | | 232 | | 29 | (g.) | | 261 |
| Insurance reserves | | 239 | | (232) | (h.) | | 7 |
| **Total liabilities** | **$** | **568** | **$** | **(215)** | **(i.)** | **$** | **353** |
| **Net Assets** | | | | | | | |
| Unrestricted Net Assets - controlling interest | $ | 198 | $ | 116 | | $ | 314 |
| Restricted Net Assets - controlling interest | | 200 | | (43) | | | 157 |
| **Total Net Assets, excluding Non-Controlling Interests** | **$** | **398** | **$** | **74** | **(j.)** | **$** | **471** |
| **Total Net Assets and Liabilities, excluding Non-Controlling Interests** | **$** | **966** | **$** | **(141)** | | **$** | **825** |
| Estimated Unrestricted Liquidity | $ | 108 | $ | (33) | | $ | 75 |

**Notes to Projected Pro Forma Balance Sheet**

The pro forma balance sheet adjustments contained herein account for (i) the reorganization and related adjustments pursuant to the Plan and (ii) the estimated impact from the implementation of fresh start accounting pursuant to ASC Topic 852, "Reorganization."

The Debtors have not yet completed their fresh start reporting analysis. The Financial Projections have limited fresh start accounting adjustments and the values ultimately used by the Debtors in implementing fresh start reporting may differ from this estimate. Likewise, the Debtors' allocation of values to individual assets and liabilities is based upon preliminary estimates that are subject to change upon the formal implementation of fresh start reporting and could result

in material differences to the allocated values included in these Financial Projections. For purposes of estimating the impact of fresh start accounting, the Debtors' have assumed that the book value of all of their assets are adjusted to fair market value. Also contained herein is Exhibit 1: Retained Property List.

a. <u>Exit Costs / Cash Contributions</u> – The net change in unrestricted cash of $(33) million is comprised of the following components:

- <u>Professional Fee Reserve</u> – Restructuring professional fees outstanding as of the Effective Date, which are estimated to be approximately $31 million are reserved and not part of Reorganized BSA's assets.
- <u>Proceeds of the Foundation Loan</u> – The Foundation is assumed to issue a $42.8 million loan to Reorganized BSA on the Effective Date, which is to be transferred from the Foundation's restricted investments.
- <u>Administrative Expense Claims Reserve</u> – Administrative claims, estimated as approximately $450,000, are assumed to be paid on the Effective Date.
- <u>Creditor Representative Fee Cap</u> – Reorganized BSA will reserve on the Effective Date $100,000, which is the maximum amount of reasonable fees and actual and necessary costs and expenses payable by Reorganized BSA to the Creditor Representative.
- <u>Allowed Priority Tax Claims</u> – Priority tax claims, estimated as less than $100,000 are assumed to be paid on the Effective Date.
- <u>Allowed Other Priority Claims</u> – Other priority claims, estimated as less than $100,000 are assumed to be paid on the Effective Date.
- <u>Allowed Convenience Claims</u> – Convenience claims, estimated as approximately $2.6 million, are assumed to be paid on the Effective Date.
- <u>JPM Exit Fee</u> – The facility exit fee is assumed to be approximately $1.3 million and to be paid on the Effective Date.
- <u>Trust Contributions</u> – The Financial Projections assume that the Net Unrestricted Cash and Investments which are estimated at approximately $40 million, will be contributed to the Settlement Trust.

b. <u>Cash Collateral</u> – Assumes substantially all letters of credit are drawn on the Effective Date and are converted to funded debt. Approximately $63 million cash collateral is assumed to be used to partially reimburse JPM for such draws.

c. <u>Restricted Investments</u> – Reflects, from a consolidated BSA perspective, the transfer of cash from the Foundation's restricted investments as loaned to Reorganized BSA.

d. <u>Land, Buildings and Equipment</u> – The Scouting University building and the Warehouse and Distribution Center are assumed to be contributed to the Settlement Trust as of the Effective Date. No changes assumed in remaining values or depreciation expense pending fresh start accounting.

e. <u>Accounts Payable</u> – Assumes outstanding restructuring professional fees (estimated to be approximately $31 million) are reserved on the Effective Date. All prepetition trade

liabilities, which are estimated to be approximately $5 million, will be settled in accordance with the terms of the Plan. Note that the other General Unsecured Claims comprised of Restoration Plan Claims and Deferred Compensation claims were not recorded on the Debtor's pre-emergence balance sheet and thus no reduction for the resolution of those claims is reflected.

f.  <u>Core Value Claims Payable</u> – Reflects the establishment of a new $25 million liability for the Core Value Cash Pool to be paid to Allowed General Unsecured Claims over 2 years.

g.  <u>Post-Emergence Capital Structure</u> – The Plan contemplates a restructured capital structure for the Debtors consisting of (a) $40 million of 2010 Notes, (b) $146 million of 2012 Notes, (c) a $64 Revolving Credit Facility, (d) an $11 million Term Loan, and (e) $5 million of undrawn letters of credit, which are off balance sheet. Assumes approximately $91 million of letters of credit are drawn on the Effective Date and converted to secured funded debt, which are partially reimbursed by the $63 million of cash collateral outstanding. Note that while the Foundation Loan is to be issued on the Effective Date, it is treated as an intercompany loan and not funded debt.

h.  <u>Insurance Reserves</u> – Prepetition liability amounts are assumed to be eliminated on the Effective Date as Abuse Claims will be channeled to the Settlement Trust and Non-Abuse Litigation Claims will recover from available Insurance Coverage. Post-emergence amounts relates to non-general liability insurance.

i.  The defined benefit Pension Plan assets and liabilities are not reflected on the balance sheet.

j.  Represents the net accounting gain from completion of the reorganization.

## Projected Consolidated Balance Sheet (Global Resolution Plan) [1]

| ($ in millions) | Actual [1][2] | Preliminary [1][2] | Financial Projections [1][3] | | | | |
|---|---|---|---|---|---|---|---|
| Year Ending | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
| **Assets** | | | | | | | |
| _Cash and Cash Equivalents_ | | | | | | | |
| Cash and cash equivalents - Unrestricted | $ 94 | $ 55 | $ 43 | $ 36 | $ 20 | $ 20 | $ 28 |
| GAAP Restricted Cash - LC Cash Collateral | 63 | 63 | - | - | - | - | - |
| Donor Restricted Cash | 42 | 33 | 22 | 22 | 22 | 22 | 22 |
| Total cash and cash equivalents | 199 | 151 | 66 | 58 | 42 | 43 | 51 |
| _Investments, at fair value_ | | | | | | | |
| Investments - Unrestricted | 130 | 132 | 57 | 57 | 57 | 57 | 57 |
| Investments - Donor Restricted | 148 | 167 | 128 | 141 | 154 | 167 | 182 |
| Total Investments, at fair value | 277 | 299 | 185 | 198 | 211 | 224 | 238 |
| Accounts receivable | 22 | 10 | 12 | 12 | 12 | 12 | 12 |
| Pledges receivable | 36 | 17 | 17 | 17 | 17 | 17 | 17 |
| Other receivables | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Gift annuities | 7 | 6 | 6 | 6 | 6 | 6 | 6 |
| Prepaid expenses | 28 | 15 | 15 | 16 | 16 | 16 | 16 |
| Inventories | 67 | 59 | 47 | 47 | 47 | 47 | 47 |
| Land, buildings, and equipment, net | 497 | 480 | 463 | 448 | 434 | 420 | 406 |
| Other | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| **Total Assets, excluding Non-Controlling Interests** | **$ 1,147** | **$ 1,050** | **$ 823** | **$ 814** | **$ 797** | **$ 797** | **$ 805** |
| **Liabilities** | | | | | | | |
| Accounts payable and accrued liabilities | $ 106 | $ 63 | $ 29 | $ 30 | $ 27 | $ 27 | $ 30 |
| Core Value Claims Payable [4] | - | - | 25 | 13 | - | - | - |
| Gift annuities | 7 | 6 | 6 | 6 | 6 | 6 | 6 |
| Unearned fees and subscriptions | 43 | 53 | 51 | 48 | 51 | 52 | 52 |
| Secured funded debt | 225 | 232 | 261 | 261 | 254 | 240 | 222 |
| Insurance reserves | 235 | 239 | 7 | 7 | 7 | 7 | 7 |
| **Total liabilities** | **$ 615** | **$ 593** | **$ 377** | **$ 363** | **$ 344** | **$ 330** | **$ 316** |
| **Net Assets** | | | | | | | |
| Unrestricted Net Assets - controlling interest | $ 309 | $ 257 | $ 284 | $ 277 | $ 266 | $ 266 | $ 275 |
| Restricted Net Assets - controlling interest | 223 | 200 | 161 | 174 | 187 | 200 | 214 |
| **Total Net Assets, excluding Non-Controlling Interests** | **$ 533** | **$ 457** | **$ 446** | **$ 451** | **$ 452** | **$ 467** | **$ 489** |
| **Total Net Assets and Liabilities, excluding Non-Controlling Interests** | **$ 1,147** | **$ 1,050** | **$ 823** | **$ 814** | **$ 797** | **$ 797** | **$ 805** |
| Estimated Unrestricted Liquidity [5] | $ 224 | $ 188 | $ 100 | $ 92 | $ 77 | $ 77 | $ 85 |

Footnotes:
(1) Presented excluding non-controlling interests
(2) 2019 is unaudited. 2020 reflects preliminary, unaudited results. Amounts are subject to change
(3) Financial Projections reflect limited fresh start accounting assumptions and do not include any significant revaluation of assets
(4) Reflects the establishment of a new $25 million liability for the Core Value Cash Pool on the Effective Date, which is to be paid to Allowed General Unsecured Claims
in semi-annual installments over a 24-month period
(5) Consists of unrestricted cash & equivalents and unrestricted investments

13

## Projected Consolidated Statement of Cash Flows (Global Resolution Plan)

| ($ in millions) | Preliminary [1] | | Financial Projections | | | |
| Year Ending | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|
| **Operating Surplus / (Deficit) After Restriction Release** | $ (33) | $ 26 | $ 26 | $ 21 | $ 33 | $ 40 |
| Interest Expense | (7) | (8) | (10) | (10) | (9) | (9) |
| Cash Restructuring / Reorganization Expenses [2] | (56) | (154) | - | - | - | - |
| Core Value Cash Pool Payments | - | - | (13) | (13) | - | - |
| _Changes in Assets & Liabilities_ | | | | | | |
| Unearned Income and Prepaid Expenses | 23 | (2) | (3) | 3 | 1 | 0 |
| Accounts receivable | 12 | (1) | (0) | - | - | - |
| Pledges receivable | 19 | - | - | - | - | - |
| Other receivables | 0 | - | - | - | - | - |
| Gift annuities | 1 | - | - | - | - | - |
| Inventories | 9 | 12 | - | - | - | - |
| Other | 1 | - | - | - | - | - |
| Accounts payable and accrued liabilities (excluding restructuring) | (16) | (2) | 1 | (3) | - | 3 |
| Gift annuities | (1) | - | - | - | - | - |
| Other / Adjustments [3] | 13 | 5 | - | - | - | - |
| **Cash Flow from Operating Activities** | **(35)** | **(125)** | **1** | **(1)** | **24** | **34** |
| Capital Expenditures | (11) | (8) | (8) | (8) | (8) | (8) |
| Investment Transfers / Disbursements [4] | - | 118 | - | - | - | - |
| Donor Restricted Cash Usage (Summit Capital Expenditures) | 9 | 4 | 4 | 4 | 4 | 4 |
| **Cashflow from Investing Activities** | **(2)** | **114** | **(4)** | **(4)** | **(4)** | **(4)** |
| Amortization | (2) | (1) | (4) | (10) | (18) | (19) |
| Excess Cash Sweep | - | - | - | (1) | (1) | (3) |
| **Cashflow from Financing Activities** | **(2)** | **(1)** | **(4)** | **(11)** | **(19)** | **(22)** |
| **Total Change in Unrestricted Cash** (excluding unrestricted investments) | $ (39) | $ (12) | $ (8) | $ (16) | $ 1 | $ 8 |
| Beginning Unrestricted Cash Balance (excluding investments) | 94 | 55 | 43 | 36 | 20 | 20 |
| Ending Unrestricted Cash Balance (excluding investments) | 55 | 43 | 36 | 20 | 20 | 28 |

Footnotes:
(1) 2020 reflects preliminary, unaudited results. Amounts are subject to change
(2) Includes estimated cash restructuring fees paid and contributions to trust on the Effective Date
(3) Includes non-cash working capital adjustments, such as reserves for inventory and pledge receivables in 2020
(4) Reflects transfers from unrestricted investment account to cash for restructuring and operating expenses, as well as proceeds from the Foundation Loan via Foundation's restricted investments

14

**Assumption Changes Under the BSA Toggle Plan**

If the holders of Abuse Claims do not provide a sufficient number of votes to accept the Plan (or the Bankruptcy Court otherwise finds that the Global Resolution Plan is not confirmable), the Debtors will be required to seek confirmation of the back-up to the Global Resolution Plan, a "BSA Toggle Plan." The BSA Toggle Plan provides for the resolution of Abuse Claims and other Claims against only the Debtors, leaving local claimants free to pursue claims against the Local Councils in the tort system.  The BSA Toggle Plan has certain negative implications on BSA's business plan, primarily related to membership growth, and an adjusted business plan would reflect the following considerations:

- Local Councils – Assumes that litigation in the tort system will lead to local council bankruptcies concentrated in "open" states (i.e. those states with statute of limitation windows) and that as a result BSA will need to services its membership in those states through alternative means including but not limited to establishing new local councils or assigning territory to other existing councils.  Other local councils will also have some degree of distraction and diversion of resources from ongoing litigation.

- **Membership** - Membership retention estimates are assumed to be consistent with the business plan, but membership additions in 2021 and beyond are reduced. Assumes a general 5% reduction to member additions is driven by ongoing plaintiff advertising, diversion of resources. More significant reductions are assumed for local councils in very plaintiff favorable to neutral states driven by progressive waves of bankruptcies impacting ability of BSA to recruit new members until alternative means of servicing membership in those regions is established.

- **Supply** -  Supply revenue is impacted by lower membership with offsetting lower costs and investment in inventory, but is otherwise unaffected.

- **High Adventure Facilities** - Since the membership reductions are mainly assumed to impact Cubs membership levels and not Scouts BSA, during the forecast period, no adjustments have been made to the HAF forecasts.

- **National Service Fees** - Fees are assumed to be redeployed to remaining and replacement local councils and thus remain unchanged.

- Operating Expenses – Management believes that under the BSA Toggle Plan there would be opportunities to further reduce operating expenses which provides additional downside protection to the following protections.

- **Estimated Unrestricted Cash and Investments** – Due to the anticipated membership reductions, and associated lower registration fees, supply sales, and lower unit charter

15

fees, estimated unrestricted cash and investments is projected to be $42 million in 2025, a $43 million reduction from the $85 million projected in the Global Resolution Plan but sufficient liquidity for the operation of the organization.

## Projected Consolidated Unrestricted Income Statement (BSA Toggle Plan)

| ($ in millions) | Actual | Preliminary | Financial Projections | | | | | Total |
|---|---|---|---|---|---|---|---|---|
| Year | 2019 [1] | 2020 [1] | 2021 | 2022 | 2023 | 2024 | 2025 | 2021 - 2025 |
| Year-end Youth Membership Estimates (000s) | 2,118 | 1,195 | 1,032 | 911 | 859 | 866 | 916 | |
| **Revenues** | | | | | | | | |
| Registration Fees | $ 65 | $ 88 | $ 73 | $ 69 | $ 67 | $ 70 | $ 75 | $ 355 |
| Supply Operations (Gross) | 119 | 51 | 81 | 73 | 71 | 73 | 79 | 377 |
| High Adventure Facilities (Gross) | 58 | 15 | 63 | 60 | 61 | 71 | 73 | 328 |
| National Jamboree Fees | - | - | - | 4 | 16 | - | 4 | 24 |
| Other Revenues [2] | 181 | 33 | 33 | 38 | 39 | 39 | 40 | 190 |
| **Total Revenues** | 423 | 187 | 251 | 246 | 253 | 253 | 271 | 1,273 |
| **Operating Expenses** | | | | | | | | |
| Payroll and Benefits (Excluding Supply & HAF) [3] | 68 | 56 | 43 | 44 | 45 | 46 | 47 | 225 |
| Supply Operating Expenses [3] | 99 | 57 | 69 | 64 | 63 | 64 | 68 | 327 |
| High Adventure Facilities Operating Expenses [3] | 47 | 30 | 50 | 48 | 48 | 51 | 51 | 247 |
| GLIP Expenses (Gross) | 112 | 49 | 41 | 42 | 43 | 45 | 46 | 217 |
| Other Expenses [2] | 185 | 36 | 33 | 33 | 49 | 31 | 35 | 182 |
| **Total Expenses** | 511 | 228 | 235 | 231 | 248 | 237 | 247 | 1,198 |
| **Operating Surplus / (Deficit)** | $ (89) | $ (41) | $ 16 | $ 15 | $ 5 | $ 16 | $ 24 | $ 75 |
| (before Debt Service, Capex, Depreciation and Restructuring) | | | | | | | | |
| Net Assets Released from Restrictions | 12 | 8 | 8 | 4 | 4 | 4 | 4 | 23 |
| **Operating Surplus / (Deficit) After Restriction Release** | $ (77) | $ (33) | $ 24 | $ 18 | $ 9 | $ 19 | $ 27 | $ 98 |
| **Cash Flow Items** | | | | | | | | |
| Debt Service - Interest [4] | (7) | (7) | (8) | (10) | (10) | (9) | (9) | (47) |
| Debt Service - Principal [4] | (11) | (2) | (1) | (4) | (10) | (18) | (19) | (52) |
| Excess Cash Sweep [5] | - | - | - | - | - | - | - | - |
| Capital Expenditures (Non-Summit) | (16) | (5) | (4) | (4) | (4) | (4) | (4) | (21) |
| Other Working Capital Changes | 52 | 67 | 15 | (2) | 0 | 1 | 3 | 16 |
| **Cash Flow Items** | 18 | 53 | 2 | (21) | (24) | (32) | (29) | (104) |
| **Estimated Unrestricted Free Cash Flow** | $ (59) | $ 20 | $ 26 | $ (3) | $ (15) | $ (12) | $ (1) | $ (6) |
| (before Depreciation, Restructuring, Creditor Settlements / Contributions) | | | | | | | | |
| Core Value Cash Pool Payments [6] | | | - | (13) | (13) | - | - | (25) |
| **Estimated Unrestricted Cash Flow** | | | $ 26 | $ (16) | $ (28) | $ (12) | $ (1) | $ (31) |
| (before Depreciation, Restructuring, Effective Date Creditor Contributions) | | | | | | | | |
| **Variance to Global Resolution Plan** | | | | | | | | |
| Youth Membership (000s) | | | (18) | (84) | (119) | (117) | (95) | (95) |
| Operating Surplus / (Deficit) After Restriction Release | | | $ (2) | $ (8) | $ (13) | $ (14) | $ (12) | $ (48) |
| Estimated Unrestricted Free Cash Flow | | | $ (1) | $ (8) | $ (12) | $ (13) | $ (9) | $ (43) |

Footnotes:
(1) 2019 results are unaudited and 2020 results are preliminary and unaudited
(2) 2019 Other Revenue and Other Expenses are increased due to the World Scout Jamboree, which was a one-time large event
(3) Payroll and benefits represent G&A/corporate expenses. Payroll related to High Adventure Facilities ("HAF") and Supply is captured in HAF and Supply operating expenses
(4) Includes quarterly principal and interest for the Foundation Loan
(5) Reflects 25% of estimated unrestricted cash and investments above $75 million as of December 31, if any, to be applied to JPM's principal balances beginning in 2023
(6) Reflects semi-annual payments to holders of Allowed General Unsecured Claims beginning six months after the Effective Date

17

## Projected Consolidated Balance Sheet (BSA Toggle Plan) [1]

| ($ in millions) | Actual [1)(2] | Preliminary [1)(2] | Financial Projections [1)(3] | | | | |
|---|---|---|---|---|---|---|---|
| Year Ending | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
| **Assets** | | | | | | | |
| _Cash and Cash Equivalents_ | | | | | | | |
| Cash and cash equivalents - Unrestricted | $ 94 | $ 55 | $ 42 | $ 26 | $ 10 | $ 10 | $ 10 |
| GAAP Restricted Cash - LC Cash Collateral | 63 | 63 | - | - | - | - | - |
| Donor Restricted Cash | 42 | 33 | 22 | 22 | 22 | 22 | 22 |
| Total cash and cash equivalents | 199 | 151 | 65 | 49 | 32 | 32 | 32 |
| _Investments, at fair value_ | | | | | | | |
| Investments - Unrestricted | 130 | 132 | 57 | 57 | 45 | 33 | 32 |
| Investments - Donor Restricted | 148 | 167 | 128 | 141 | 154 | 167 | 182 |
| Total Investments, at fair value | 277 | 299 | 185 | 198 | 199 | 200 | 214 |
| Accounts receivable | 22 | 10 | 12 | 12 | 12 | 12 | 12 |
| Pledges receivable | 36 | 17 | 17 | 17 | 17 | 17 | 17 |
| Other receivables | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Gift annuities | 7 | 6 | 6 | 6 | 6 | 6 | 6 |
| Prepaid expenses | 28 | 15 | 15 | 16 | 16 | 16 | 16 |
| Inventories | 67 | 59 | 46 | 46 | 46 | 46 | 46 |
| Land, buildings, and equipment, net | 497 | 480 | 463 | 448 | 434 | 420 | 406 |
| Other | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| **Total Assets, excluding Non-Controlling Interests** | $ 1,147 | $ 1,050 | $ 821 | $ 804 | $ 774 | $ 762 | $ 761 |
| **Liabilities** | | | | | | | |
| Accounts payable and accrued liabilities | $ 106 | $ 63 | $ 29 | $ 30 | $ 27 | $ 27 | $ 30 |
| Core Value Claims Payable [4] | - | - | 25 | 13 | - | - | - |
| Gift annuities | 7 | 6 | 6 | 6 | 6 | 6 | 6 |
| Unearned fees and subscriptions | 43 | 53 | 51 | 48 | 51 | 52 | 52 |
| Secured funded debt | 225 | 232 | 261 | 261 | 254 | 240 | 222 |
| Insurance reserves | 235 | 239 | 7 | 7 | 7 | 7 | 7 |
| **Total liabilities** | $ 615 | $ 593 | $ 377 | $ 363 | $ 344 | $ 330 | $ 316 |
| **Net Assets** | | | | | | | |
| Unrestricted Net Assets - controlling interest | $ 309 | $ 257 | $ 282 | $ 267 | $ 243 | $ 231 | $ 231 |
| Restricted Net Assets - controlling interest | 223 | 200 | 161 | 174 | 187 | 200 | 214 |
| **Total Net Assets, excluding Non-Controlling Interests** | $ 533 | $ 457 | $ 443 | $ 441 | $ 430 | $ 431 | $ 445 |
| **Total Net Assets and Liabilities, excluding Non-Controlling Interests** | $ 1,147 | $ 1,050 | $ 821 | $ 804 | $ 774 | $ 762 | $ 761 |
| Estimated Unrestricted Liquidity [5] | $ 224 | $ 188 | $ 99 | $ 83 | $ 55 | $ 43 | $ 42 |

| **Variance to Global Resolution Plan** | | | | | | | |
|---|---|---|---|---|---|---|---|
| Estimated Unrestricted Liquidity | | | $ (1) | $ (9) | $ (21) | $ (34) | $ (43) |
| Estimated Unrestricted Net Assets | | | (2) | (10) | (22) | (35) | (44) |

Footnotes:
(1) Presented excluding non-controlling interests
(2) 2019 is unaudited.  2020 reflects preliminary, unaudited results.  Amounts are subject to change
(3) Financial Projections reflect limited fresh start accounting assumptions and do not include any significant revaluation of assets
(4) Reflects the establishment of a new $25 million liability for the Core Value Cash Pool on the Effective Date, which is to be paid to Allowed General Unsecured Claims
    in semi-annual installments over a 24-month period
(5) Consists of unrestricted cash & equivalents and unrestricted investments

## Projected Consolidated Statement of Cash Flows (BSA Toggle Plan)

| ($ in millions) | Preliminary [1] | Financial Projections | | | | |
|---|---|---|---|---|---|---|
| Year Ending | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
| **Operating Surplus / (Deficit) After Restriction Release** | $ (33) | $ 24 | $ 18 | $ 9 | $ 19 | $ 27 |
| Interest Expense | (7) | (8) | (10) | (10) | (9) | (9) |
| Cash Restructuring / Reorganization Expenses [2] | (56) | (154) | - | - | - | - |
| Core Value Cash Pool Payments | - | - | (13) | (13) | - | - |
| Changes in Assets & Liabilities | | | | | | |
| Unearned Income and Prepaid Expenses | 23 | (2) | (3) | 3 | 1 | 0 |
| Accounts receivable | 12 | (2) | (0) | - | - | - |
| Pledges receivable | 19 | - | - | - | - | - |
| Other receivables | 0 | - | - | - | - | - |
| Gift annuities | 1 | - | - | - | - | - |
| Inventories | 9 | 13 | - | - | - | - |
| Other | 1 | - | - | - | - | - |
| Accounts payable and accrued liabilities (excluding restructuring) | (16) | (2) | 1 | (3) | - | 3 |
| Gift annuities | (1) | - | - | - | - | - |
| Other / Adjustments [3] | 13 | 5 | - | - | - | - |
| **Cash Flow from Operating Activities** | **(35)** | **(126)** | **(7)** | **(14)** | **10** | **22** |
| Capital Expenditures | (11) | (8) | (8) | (8) | (8) | (8) |
| Investment Transfers / Disbursements [4] | - | 118 | - | 11 | 12 | 1 |
| Donor Restricted Cash Usage (Summit Capital Expenditures) | 9 | 4 | 4 | 4 | 4 | 4 |
| **Cashflow from Investing Activities** | **(2)** | **114** | **(4)** | **7** | **8** | **(3)** |
| Amortization | (2) | (1) | (4) | (10) | (18) | (19) |
| Excess Cash Sweep | - | - | - | - | - | - |
| **Cashflow from Financing Activities** | **(2)** | **(1)** | **(4)** | **(10)** | **(18)** | **(19)** |
| **Total Change in Unrestricted Cash** (excluding unrestricted investments) | **$ (39)** | **$ (13)** | **$ (16)** | **$ (17)** | **$ (0)** | **$ (0)** |
| Beginning Unrestricted Cash Balance (excluding investments) | 94 | 55 | 42 | 26 | 10 | 10 |
| Ending Unrestricted Cash Balance (excluding investments) | 55 | 42 | 26 | 10 | 10 | 10 |

Footnotes:
(1) 2020 reflects preliminary, unaudited results. Amounts are subject to change
(2) Includes estimated cash restructuring fees paid and contributions to trust on the Effective Date
(3) Includes non-cash working capital adjustments, such as reserves for inventory and pledge receivables in 2020
(4) Reflects transfers from unrestricted investment account to cash for restructuring and operating expenses, as well as proceeds from the Foundation Loan via Foundation's restricted investments

19

**<u>EXHIBIT 1</u>**

**Boy Scouts of America**                                                          DRAFT - Subject to Change
**Breakdown of Assets as of the Effective Date**

($ in millions)

| | Estimated BSA Only Assets Immediate Post Effective Date [1] | | |
|---|---|---|---|
| | **Total Balance** | **Restricted and/or Core Property** | **Unrestricted Property** |
| **ASSETS** | | | |
| **Cash & Equivalents** | | | |
| Cash & Equivalents | $ 42 | $ 24 | $ 18 |
| LC Collateral (JPM) [2] | - | - | - |
| **Total Cash** | 42 | 24 | 18 |
| **Investments** | | | |
| General Investments [3] | 146 | 99 | 47 |
| **Total Investments** | 146 | 99 | 47 |
| **Land & Buildings** | | | |
| National Headquarters [4] | 11 | - | 11 |
| Scouting University [5] | - | - | - |
| Warehouse and Distribution Center [5] | - | - | - |
| **Subtotal Land & Buildings** | 11 | - | 11 |
| High Adventure Facilities: [6] | | | |
| Philmont Scout Ranch [4] | 153 | 153 | - |
| Florida Sea Base [4] | 29 | 29 | - |
| Northern Tier [4] | 8 | 8 | - |
| **Subtotal Adventure Bases** | 190 | 190 | - |
| **Total Land & Buildings** | 201 | 190 | 11 |
| **Furniture & Equipment** | 29 | - | 29 |
| **Accounts Receivable** | 17 | - | 17 |
| **Pledges Receivable (NPV, net of allowances)** | | | |
| Donor Restricted Pledges Receivable, net | 15 | 15 | - |
| Unrestricted Receivable, net | - | - | - |
| **Total Pledge Receivable** | 15 | 15 | - |
| **Inventory** | 56 | - | 56 |
| **Prepaids & Deferred Charges** | 27 | - | 27 |
| **Other Assets** | | | |
| Misc. Summit Assets | 5 | 5 | - |
| Gift Annuity & Pooled Income Investments | 7 | 7 | - |
| **Total Other Assets** | 11 | 11 | - |
| **Other Receivables** | | | |
| Note Receivable from Arrow WV [6] | 43 | 43 | - |
| Other Interfund Rec/(Pay) | (11) | - | (11) |
| **Total Interfund Receivable** | 32 | 43 | (11) |
| **TOTAL ASSETS [7]** | $ 576 | $ 383 | $ 193 |

(1) Represents property that was Identified Property and 541 Property respectively during the chapter 11 process that is retained by Reorganized BSA.

(2) Assumes substantially all letters of credit are drawn by the Effective Date and ~$63 million cash collateral is utilized to reimburse JPM for such draws

(3) Includes approximately $6.5 million of Order of the Arrow funds, which are treated as Unrestricted property in the Plan and included in unrestricted operating cash retained by BSA on the Effective Date. Additionally, approximately $10 million of non-Debtor unrestricted investments are included in unrestricted operating cash retained on the Effective Date

(4) Reflects amounts based on appraisals for high adventure bases as of August 2020 and broker opinion of value for National HQ. Value is assumed consistent throughout the period as no appraisal is expected on the Effective Date

(5) Assumed to be contributed to the Trust, along with the Artwork and Oil & Gas Leases (not shown), on the Effective Date

(6) The Summit high adventure facility is in a separate legal entity, Arrow WV. BSA has a note receivable due from Arrow, which was $359 million as of 3/31/21. Amount based on appraisals / projected sale proceeds per third party appraisal for Summit

(7) Total assets do not tie to the estimated pro forma consolidated balance sheet because (a) this schedule represents BSA-only assets, (b) pro forma balance sheet reflects limited fresh start accounting, and (c) property values and Arrow intercompany balance reflect appraisal values vs. book values

# EXHIBIT D

**ABUSE CLAIMS LIST COMPOSITE**

**EXHIBIT 1**

## Unique and Timely Abuse Claim Count by Allegation

| Most Severe Allegation | Unique & Timely Abuse Claim Count | Percent of Total |
|---|---|---|
| 1. Penetration | 23,973 | 29% |
| 2. Oral Sex | 18,861 | 23% |
| 3. Masturbation | 12,854 | 16% |
| 4. Groping | 17,220 | 21% |
| 5. Touching-Unclothed | 1,887 | 2% |
| 6. Touching-Clothed | 1,294 | 2% |
| 7. Unknown/Unconfirmed | 4,057 | 5% |
| 8. Missing | 2,312 | 3% |
| **Total** | **82,458** | **100%** |

**EXHIBIT 2**

## Unique and Timely Abuse Claim Count by Local Council
Rows 1-265 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council

| Local Council | All Unique & Timely Abuse Claims* | All Not-Barred, Unique & Timely Abuse Claims* |
|---|---|---|
| UNKNOWN | 22,895 | 6,368 |
| MISSING | 11,772 | 2,739 |
| MICHIGAN CROSSROADS | 1,550 | 58 |
| GREATER NEW YORK | 1,454 | 1,420 |
| PATHWAY TO ADVENTURE | 1,386 | 148 |
| GREATER LOS ANGELES | 1,215 | 1,187 |
| GREATER ST. LOUIS AREA | 836 | 51 |
| SAM HOUSTON AREA | 786 | 51 |
| GOLDEN GATE AREA | 721 | 699 |
| SPIRIT OF ADVENTURE | 662 | 15 |
| CROSSROADS OF THE WEST | 637 | 20 |
| HEART OF AMERICA | 603 | 18 |
| NATIONAL CAPITAL AREA | 564 | 131 |
| CRADLE OF LIBERTY | 541 | 77 |
| CIRCLE TEN | 539 | 22 |
| CASCADE PACIFIC | 522 | 92 |
| SOUTH FLORIDA COUNCIL | 500 | 11 |
| GRAND CANYON | 497 | 475 |
| NORTHERN NEW JERSEY | 493 | 463 |
| GREATER TAMPA BAY AREA | 459 | 16 |
| CALIFORNIA INLAND EMPIRE | 456 | 443 |
| LAKE ERIE | 456 | 22 |
| BALTIMORE AREA | 446 | 21 |
| ATLANTA AREA | 429 | 19 |
| GOLDEN EMPIRE | 420 | 409 |
| LONGHORN | 407 | 12 |
| SAN DIEGO - IMPERIAL COUNCIL | 405 | 389 |
| GREATER ALABAMA | 401 | 12 |
| ORANGE COUNTY | 396 | 385 |
| CROSSROADS OF AMERICA | 395 | 10 |
| LINCOLN HERITAGE | 389 | 5 |
| NARRAGANSETT | 363 | 10 |
| NORTHERN STAR | 363 | 329 |
| SIMON KENTON | 361 | 28 |
| QUAPAW AREA | 353 | 17 |
| DAN BEARD | 350 | 17 |
| LAUREL HIGHLANDS | 346 | 18 |
| SOUTHEAST LOUISIANA | 342 | 7 |
| CHICKASAW | 335 | 12 |
| DENVER AREA | 333 | 7 |
| LAST FRONTIER | 299 | 3 |
| CENTRAL FLORIDA | 298 | 13 |
| CHIEF SEATTLE | 298 | 10 |
| SILICON VALLEY MONTEREY BAY | 296 | 287 |
| CONNECTICUT RIVERS | 286 | 39 |
| ALAMO AREA | 281 | 7 |
| NORTH FLORIDA | 278 | 14 |
| BUCKSKIN | 261 | 28 |
| THREE HARBORS | 256 | 4 |
| WESTERN LOS ANGELES COUNTY | 255 | 248 |
| MID-AMERICA | 254 | 13 |
| QUIVIRA | 252 | 1 |
| MIDDLE TENNESSEE | 249 | 1 |
| GREAT SOUTHWEST | 245 | 16 |
| GREAT TRAIL | 239 | 14 |
| GARDEN STATE | 235 | 221 |
| SEQUOIA | 228 | 220 |
| GREATER NIAGARA FRONTIER | 227 | 216 |
| PACIFIC HARBORS | 226 | 3 |
| SENECA WATERWAYS | 223 | 214 |
| CONNECTICUT YANKEE | 219 | 33 |
| MAYFLOWER | 218 | 6 |
| CATALINA | 216 | 213 |
| TIDEWATER | 216 | 21 |
| TWIN RIVERS | 213 | 198 |
| PATRIOTS' PATH | 208 | 199 |
| OCCONEECHEE | 203 | 188 |
| WESTCHESTER-PUTNAM | 201 | 196 |
| GREATER YOSEMITE | 193 | 188 |
| BLUE GRASS | 191 | 5 |
| INDIAN NATIONS | 189 | 2 |

## Unique and Timely Abuse Claim Count by Local Council
Rows 1-265 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council

| Local Council | All Unique & Timely Abuse Claims* | All Not-Barred, Unique & Timely Abuse Claims* |
|---|---|---|
| ANDREW JACKSON | 188 | 10 |
| SUFFOLK COUNTY | 187 | 176 |
| LAS VEGAS AREA | 186 | 56 |
| GULF COAST | 185 | 5 |
| WESTERN MASSACHUSETTS | 185 | 4 |
| ALOHA | 181 | 173 |
| PINE TREE | 181 | 45 |
| DANIEL WEBSTER | 179 | 15 |
| HEART OF NEW ENGLAND | 175 | 9 |
| THEODORE ROOSEVELT | 170 | 166 |
| GREAT SMOKY MOUNTAIN | 166 | 5 |
| OZARK TRAILS | 166 | 9 |
| YUCCA | 166 | 5 |
| ERIE SHORES | 165 | 9 |
| LONGHOUSE | 165 | 159 |
| NEW BIRTH OF FREEDOM | 163 | 7 |
| GULF STREAM | 161 | 2 |
| PINE BURR AREA | 160 | 6 |
| BUCKEYE | 158 | 8 |
| INLAND NORTHWEST | 158 | 3 |
| EAST CAROLINA | 156 | 153 |
| BAY-LAKES | 155 | 5 |
| BLUE RIDGE | 152 | 19 |
| BLACKHAWK AREA | 151 | 15 |
| HEART OF VIRGINIA | 151 | 7 |
| COASTAL CAROLINA | 150 | 11 |
| LONG BEACH AREA | 150 | 141 |
| OLD NORTH STATE | 150 | 146 |
| MID-IOWA | 149 | 3 |
| TRANSATLANTIC | 146 | 1 |
| OREGON TRAIL | 145 | 29 |
| SOUTHERN SIERRA | 144 | 141 |
| THREE FIRES | 144 | 18 |
| MOUNT BAKER | 143 | 5 |
| MIAMI VALLEY | 142 | 7 |
| PIEDMONT 420 | 140 | 136 |
| ISTROUMA AREA | 139 | 0 |
| W.D. BOYCE | 136 | 15 |
| MOUNTAIN WEST | 134 | 6 |
| THREE RIVERS | 132 | 1 |
| INDIAN WATERS | 131 | 14 |
| DEL-MAR-VA | 130 | 25 |
| MONTANA | 129 | 125 |
| CRATER LAKE COUNCIL | 126 | 62 |
| COASTAL GEORGIA | 125 | 7 |
| SOUTH TEXAS | 125 | 6 |
| CAPITOL AREA | 122 | 11 |
| HUDSON VALLEY | 121 | 115 |
| ILLOWA | 119 | 9 |
| LASALLE | 118 | 3 |
| LONGS PEAK COUNCIL | 118 | 4 |
| CHATTAHOOCHEE | 114 | 0 |
| GOLDEN SPREAD | 114 | 7 |
| NORTHEAST GEORGIA | 114 | 9 |
| TUKABATCHEE AREA | 114 | 1 |
| MONMOUTH | 111 | 109 |
| EAST TEXAS AREA | 110 | 5 |
| MOBILE AREA | 110 | 4 |
| SOUTHWEST FLORIDA | 109 | 4 |
| LOUISIANA PURCHASE | 108 | 1 |
| BUFFALO TRACE | 107 | 2 |
| NORTHEAST ILLINOIS | 107 | 9 |
| NEVADA AREA | 106 | 43 |
| SAGAMORE | 105 | 5 |
| WESTARK AREA | 105 | 3 |
| OLD HICKORY | 103 | 97 |
| BLUE RIDGE MOUNTAINS | 102 | 6 |
| MINSI TRAILS | 102 | 14 |
| PACIFIC SKYLINE | 102 | 100 |
| GLACIER'S EDGE | 98 | 0 |
| GREEN MOUNTAIN | 98 | 95 |

## Unique and Timely Abuse Claim Count by Local Council
**Rows 1-265 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council**

| Local Council | All Unique & Timely Abuse Claims* | All Not-Barred, Unique & Timely Abuse Claims* |
|---|---|---|
| NORTHERN LIGHTS | 98 | 35 |
| ANTHONY WAYNE AREA | 95 | 2 |
| COLONIAL VIRGINIA | 95 | 5 |
| JERSEY SHORE | 94 | 90 |
| RAINBOW | 94 | 20 |
| GREAT ALASKA | 93 | 91 |
| NORWELA | 93 | 1 |
| BADEN POWELL | 92 | 86 |
| CHEROKEE AREA 556 | 92 | 2 |
| PIKES PEAK | 92 | 1 |
| FRENCH CREEK | 91 | 7 |
| SOUTH PLAINS | 90 | 2 |
| VENTURA COUNTY | 90 | 86 |
| MECKLENBURG COUNTY | 88 | 86 |
| BAY AREA | 87 | 4 |
| LEATHERSTOCKING | 87 | 85 |
| CAPE FEAR | 86 | 85 |
| GRAND COLUMBIA | 85 | 1 |
| LOS PADRES | 85 | 81 |
| BUFFALO TRAIL | 84 | 4 |
| CENTRAL NORTH CAROLINA | 82 | 81 |
| RIO GRANDE | 82 | 9 |
| CENTRAL GEORGIA | 81 | 3 |
| GRAND TETON | 81 | 5 |
| PEE DEE AREA | 81 | 9 |
| SOUTH GEORGIA | 81 | 4 |
| CALCASIEU | 79 | 3 |
| PALMETTO | 79 | 22 |
| PRAIRIELANDS | 78 | 8 |
| PUERTO RICO | 78 | 2 |
| EVANGELINE AREA | 77 | 3 |
| ROCKY MOUNTAIN | 76 | 1 |
| HAWK MOUNTAIN | 74 | 5 |
| NORTHEASTERN PENNSYLVANIA | 74 | 9 |
| WASHINGTON CROSSING | 74 | 19 |
| VERDUGO HILLS | 73 | 72 |
| BLACK SWAMP AREA | 72 | 8 |
| GEORGIA-CAROLINA | 72 | 2 |
| REDWOOD EMPIRE | 72 | 68 |
| NORTHWEST TEXAS | 71 | 0 |
| PENNSYLVANIA DUTCH | 71 | 6 |
| TECUMSEH | 70 | 3 |
| GREAT RIVERS | 69 | 5 |
| SEQUOYAH | 69 | 0 |
| FIVE RIVERS | 68 | 57 |
| BLACK WARRIOR | 67 | 0 |
| HOOSIER TRAILS | 66 | 3 |
| CORONADO AREA | 65 | 3 |
| TEXAS TRAILS | 65 | 1 |
| FLINT RIVER | 64 | 5 |
| WESTMORELAND-FAYETTE | 63 | 5 |
| YOCONA AREA | 61 | 3 |
| GAMEHAVEN | 60 | 59 |
| ALLEGHENY HIGHLANDS | 59 | 48 |
| BLUE MOUNTAIN | 59 | 3 |
| HAWKEYE AREA | 58 | 3 |
| WINNEBAGO | 58 | 1 |
| ALABAMA-FLORIDA | 57 | 0 |
| CIMARRON | 57 | 3 |
| CONQUISTADOR | 57 | 4 |
| DANIEL BOONE | 57 | 56 |
| WEST TENNESSEE AREA | 57 | 0 |
| CADDO AREA | 55 | 3 |
| PONY EXPRESS | 55 | 3 |
| OHIO RIVER VALLEY | 54 | 4 |
| CORNHUSKER | 53 | 6 |
| FAR EAST | 53 | 1 |
| KATAHDIN AREA | 53 | 19 |
| MORAINE TRAILS | 51 | 4 |
| ABRAHAM LINCOLN | 50 | 6 |
| OVERLAND TRAILS | 50 | 1 |

## Unique and Timely Abuse Claim Count by Local Council

**Rows 1-265 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council**

| Local Council | All Unique & Timely Abuse Claims* | All Not-Barred, Unique & Timely Abuse Claims* |
|---|---|---|
| TEXAS SOUTHWEST | 50 | 1 |
| CHIPPEWA VALLEY | 49 | 0 |
| SUWANNEE RIVER AREA | 49 | 1 |
| PUSHMATAHA AREA | 48 | 2 |
| CHESTER COUNTY | 47 | 3 |
| SUSQUEHANNA | 45 | 4 |
| TWIN VALLEY | 45 | 44 |
| SIOUX | 44 | 5 |
| MUSKINGUM VALLEY | 41 | 2 |
| VOYAGEURS AREA | 41 | 32 |
| CHOCTAW AREA | 40 | 0 |
| NORTHWEST GEORGIA | 40 | 1 |
| IROQUOIS TRAIL | 38 | 35 |
| JAYHAWK AREA | 38 | 1 |
| MOUNTAINEER AREA | 38 | 2 |
| MISSISSIPPI VALLEY | 37 | 3 |
| CENTRAL NEW JERSEY | 36 | 34 |
| VIRGINIA HEADWATERS | 36 | 2 |
| CAPE COD & ISLANDS | 35 | 2 |
| TUSCARORA | 35 | 30 |
| MASON-DIXON | 34 | 1 |
| MARIN | 33 | 32 |
| POTAWATOMI AREA | 32 | 1 |
| BLACK HILLS AREA | 30 | 0 |
| DE SOTO AREA | 30 | 1 |
| SAMOSET COUNCIL | 30 | 1 |
| ARBUCKLE AREA | 29 | 1 |
| GATEWAY AREA | 28 | 3 |
| GREATER WYOMING | 28 | 0 |
| CENTRAL MINNESOTA | 27 | 25 |
| NORTHEAST IOWA COUNCIL | 27 | 3 |
| CHEROKEE AREA 469 | 25 | 1 |
| SHENANDOAH AREA | 25 | 1 |
| MIDNIGHT SUN | 23 | 22 |
| BUCKTAIL | 22 | 1 |
| JUNIATA VALLEY | 22 | 3 |
| RIP VAN WINKLE | 17 | 17 |
| SANTA FE TRAIL | 16 | 0 |
| DIRECT SERVICE | 13 | 2 |
| COLUMBIA-MONTOUR | 9 | 0 |
| HOUSATONIC | 9 | 2 |
| CHIEF CORNPLANTER | 7 | 0 |
| PIEDMONT 042 | 7 | 7 |
| GREENWICH | 4 | 1 |
| CENTRAL ESCARPMENT | 1 | 0 |
| GREATER TORONTO | 1 | 1 |
| CENTRAL NEW JERSEY; WASHINGTON CROSSING | 45 | 42 |
| CALIFORNIA INLAND EMPIRE; GREATER LOS ANGELES | 42 | 37 |
| NORTHERN NEW JERSEY; PATRIOTS' PATH | 42 | 37 |
| ALOHA; DIRECT SERVICE | 28 | 25 |
| CENTRAL NEW JERSEY; PATRIOTS' PATH | 26 | 25 |
| COLONIAL VIRGINIA; TIDEWATER | 25 | 1 |
| CHIEF SEATTLE; PACIFIC HARBORS | 22 | 1 |
| CIRCLE TEN; LONGHORN | 22 | 2 |
| GREATER LOS ANGELES; WESTERN LOS ANGELES COUNTY | 21 | 21 |
| GREATER NIAGARA FRONTIER; IROQUOIS TRAIL | 21 | 21 |
| CROSSROADS OF AMERICA; HOOSIER TRAILS | 19 | 0 |
| BALTIMORE AREA; NATIONAL CAPITAL AREA | 18 | 3 |
| BUCKEYE; LAKE ERIE | 17 | 2 |
| GREATER NEW YORK; HUDSON VALLEY | 17 | 16 |
| ATLANTA AREA; NORTHEAST GEORGIA | 16 | 1 |
| GOLDEN EMPIRE; GOLDEN GATE AREA | 16 | 15 |
| GREATER ALABAMA; MOBILE AREA | 16 | 0 |
| NORTHEAST ILLINOIS; PATHWAY TO ADVENTURE | 15 | 1 |
| CONNECTICUT RIVERS; CONNECTICUT YANKEE | 14 | 3 |
| CROSSROADS OF AMERICA; DEL-MAR-VA | 14 | 1 |
| MAYFLOWER; SPIRIT OF ADVENTURE | 14 | 0 |
| SUFFOLK COUNTY; THEODORE ROOSEVELT | 14 | 14 |
| GREAT TRAIL; NORTHERN NEW JERSEY | 13 | 0 |
| GREATER NEW YORK; NORTHERN NEW JERSEY | 13 | 13 |
| GREATER ALABAMA; TUKABATCHEE AREA | 12 | 0 |

## Unique and Timely Abuse Claim Count by Local Council

**Rows 1-265 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council**

| Local Council | All Unique & Timely Abuse Claims* | All Not-Barred, Unique & Timely Abuse Claims* |
|---|---|---|
| MAYFLOWER; NARRAGANSETT | 12 | 1 |
| CHIEF SEATTLE; MOUNT BAKER | 11 | 0 |
| CONNECTICUT YANKEE; GREENWICH | 11 | 2 |
| DANIEL WEBSTER; SPIRIT OF ADVENTURE | 11 | 0 |
| GREATER LOS ANGELES; LONG BEACH AREA | 11 | 11 |
| GREATER NEW YORK; THEODORE ROOSEVELT | 11 | 11 |
| LAS VEGAS AREA; NEVADA AREA | 11 | 3 |
| LASALLE; PATHWAY TO ADVENTURE | 11 | 1 |
| PACIFIC SKYLINE; SILICON VALLEY MONTEREY BAY | 11 | 11 |
| IROQUOIS TRAIL; LEATHERSTOCKING | 10 | 10 |
| JUNIATA VALLEY; LAUREL HIGHLANDS | 10 | 0 |
| OLD HICKORY; OLD NORTH STATE | 10 | 10 |
| CENTRAL FLORIDA; NORTH FLORIDA | 9 | 0 |
| CENTRAL MINNESOTA; NORTHERN STAR | 9 | 9 |
| CROSSROADS OF AMERICA; SAGAMORE | 9 | 0 |
| GREATER LOS ANGELES; ORANGE COUNTY | 9 | 9 |
| NORTH FLORIDA; SUWANNEE RIVER AREA | 9 | 0 |
| BLACK WARRIOR; GREATER ALABAMA | 8 | 0 |
| GOLDEN EMPIRE; GREATER YOSEMITE | 8 | 8 |
| GREAT RIVERS; HEART OF AMERICA | 8 | 0 |
| LAUREL HIGHLANDS; WESTMORELAND-FAYETTE | 8 | 0 |
| MICHIGAN CROSSROADS; PATHWAY TO ADVENTURE | 8 | 1 |
| NORTHERN STAR; VOYAGEURS AREA | 8 | 8 |
| ALAMO AREA; SAM HOUSTON AREA | 7 | 1 |
| CASCADE PACIFIC; OREGON TRAIL | 7 | 0 |
| FIVE RIVERS; SENECA WATERWAYS | 7 | 6 |
| GOLDEN GATE AREA; PACIFIC SKYLINE | 7 | 7 |
| GREAT TRAIL; LAKE ERIE | 7 | 2 |
| LONGHORN; SAM HOUSTON AREA | 7 | 0 |
| MECKLENBURG COUNTY; PIEDMONT 420 | 7 | 6 |
| ALLEGHENY HIGHLANDS; SENECA WATERWAYS | 6 | 6 |
| BALTIMORE AREA; DEL-MAR-VA | 6 | 0 |
| BAY-LAKES; PATHWAY TO ADVENTURE | 6 | 0 |
| CENTRAL NORTH CAROLINA; MECKLENBURG COUNTY | 6 | 6 |
| CIRCLE TEN; WESTERN LOS ANGELES COUNTY | 6 | 6 |
| CRATER LAKE COUNCIL; LOS PADRES | 6 | 6 |
| DAN BEARD; MIAMI VALLEY | 6 | 0 |
| GEORGIA-CAROLINA; INDIAN WATERS | 6 | 0 |
| GOLDEN EMPIRE; NEVADA AREA | 6 | 6 |
| HEART OF AMERICA; QUIVIRA | 6 | 0 |
| HEART OF VIRGINIA; TIDEWATER | 6 | 2 |
| KATAHDIN AREA; PINE TREE | 6 | 2 |
| MISSISSIPPI VALLEY; SPIRIT OF ADVENTURE | 6 | 1 |
| BAY-LAKES; MICHIGAN CROSSROADS | 5 | 1 |
| BUCKEYE; GREAT TRAIL | 5 | 0 |
| CRADLE OF LIBERTY; WASHINGTON CROSSING | 5 | 2 |
| DAN BEARD; SIMON KENTON | 5 | 1 |
| DANIEL WEBSTER; HEART OF NEW ENGLAND | 5 | 0 |
| GARDEN STATE; JERSEY SHORE | 5 | 5 |
| GREATER NEW YORK; SUFFOLK COUNTY | 5 | 5 |
| GULF COAST; SOUTH TEXAS | 5 | 0 |
| HEART OF AMERICA; MID-AMERICA | 5 | 0 |
| LAUREL HIGHLANDS; MORAINE TRAILS | 5 | 0 |
| LEATHERSTOCKING; LONGHOUSE | 5 | 5 |
| MIAMI VALLEY; TECUMSEH | 5 | 0 |
| MINSI TRAILS; NORTHERN NEW JERSEY | 5 | 5 |
| NEW BIRTH OF FREEDOM; PENNSYLVANIA DUTCH | 5 | 0 |
| PATHWAY TO ADVENTURE; THREE FIRES | 5 | 1 |
| SOUTHERN SIERRA; WESTERN LOS ANGELES COUNTY | 5 | 5 |
| ALAMO AREA; CAPITOL AREA | 4 | 0 |
| ALAMO AREA; TEXAS SOUTHWEST | 4 | 0 |
| ANDREW JACKSON; PINE BURR AREA | 4 | 0 |
| ANDREW JACKSON; PUSHMATAHA AREA | 4 | 3 |
| ATLANTA AREA; CHATTAHOOCHEE | 4 | 0 |
| BLUE GRASS; LINCOLN HERITAGE | 4 | 0 |
| BUCKSKIN; MOUNTAINEER AREA | 4 | 0 |
| CALIFORNIA INLAND EMPIRE; WESTERN LOS ANGELES COUNTY | 4 | 4 |
| CAPE FEAR; DEL-MAR-VA | 4 | 3 |
| CENTRAL MINNESOTA; VOYAGEURS AREA | 4 | 4 |
| CHESTER COUNTY; WESTCHESTER-PUTNAM | 4 | 4 |
| CORONADO AREA; JAYHAWK AREA | 4 | 0 |

## Unique and Timely Abuse Claim Count by Local Council

Rows 1-265 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council

| Local Council | All Unique & Timely Abuse Claims* | All Not-Barred, Unique & Timely Abuse Claims* |
|---|---|---|
| CRADLE OF LIBERTY; MINSI TRAILS | 4 | 0 |
| CROSSROADS OF AMERICA; CROSSROADS OF THE WEST | 4 | 0 |
| DAN BEARD; HOOSIER TRAILS | 4 | 0 |
| ERIE SHORES; LAKE ERIE | 4 | 0 |
| GREAT ALASKA; MIDNIGHT SUN | 4 | 4 |
| GREAT RIVERS; OZARK TRAILS | 4 | 0 |
| GREATER ST. LOUIS AREA; HEART OF AMERICA | 4 | 0 |
| GREATER ST. LOUIS AREA; MISSISSIPPI VALLEY | 4 | 1 |
| GREATER ST. LOUIS AREA; PRAIRIELANDS | 4 | 2 |
| GREATER TAMPA BAY AREA; SOUTH FLORIDA COUNCIL | 4 | 0 |
| GREATER YOSEMITE; SILICON VALLEY MONTEREY BAY | 4 | 4 |
| ISTROUMA AREA; LOUISIANA PURCHASE | 4 | 0 |
| LONG BEACH AREA; ORANGE COUNTY | 4 | 4 |
| LONGHORN; TEXAS TRAILS | 4 | 0 |
| NATIONAL CAPITAL AREA; TIDEWATER | 4 | 0 |
| NEVADA AREA; PACIFIC SKYLINE | 4 | 4 |
| NORTHEAST ILLINOIS; SAMOSET COUNCIL | 4 | 0 |
| PATHWAY TO ADVENTURE; THREE HARBORS | 4 | 0 |
| VERDUGO HILLS; WESTERN LOS ANGELES COUNTY | 4 | 3 |
| ABRAHAM LINCOLN; W.D. BOYCE | 3 | 0 |
| ALLEGHENY HIGHLANDS; FRENCH CREEK | 3 | 0 |
| ATLANTA AREA; COASTAL GEORGIA | 3 | 0 |
| ATLANTA AREA; FLINT RIVER | 3 | 0 |
| ATLANTA AREA; SOUTH GEORGIA | 3 | 0 |
| BADEN POWELL; CRADLE OF LIBERTY | 3 | 0 |
| BLUE GRASS; SEQUOYAH | 3 | 0 |
| BLUE RIDGE MOUNTAINS; TIDEWATER | 3 | 0 |
| BLUE RIDGE; PALMETTO | 3 | 0 |
| BUCKEYE; SIMON KENTON | 3 | 0 |
| BUFFALO TRACE; LINCOLN HERITAGE | 3 | 0 |
| CADDO AREA; QUAPAW AREA | 3 | 0 |
| CAPITOL AREA; NATIONAL CAPITAL AREA | 3 | 1 |
| CASCADE PACIFIC; CRATER LAKE COUNCIL | 3 | 0 |
| CASCADE PACIFIC; MOUNT BAKER | 3 | 0 |
| CASCADE PACIFIC; PINE TREE | 3 | 0 |
| CATALINA; GRAND CANYON | 3 | 2 |
| CENTRAL NEW JERSEY; MINSI TRAILS | 3 | 3 |
| CENTRAL NORTH CAROLINA; OLD NORTH STATE | 3 | 3 |
| CHATTAHOOCHEE; GREATER ALABAMA | 3 | 0 |
| CHEROKEE AREA 469; QUAPAW AREA | 3 | 0 |
| CROSSROADS OF AMERICA; SIMON KENTON | 3 | 0 |
| CROSSROADS OF THE WEST; GRAND TETON | 3 | 0 |
| CROSSROADS OF THE WEST; MOUNTAIN WEST | 3 | 0 |
| DANIEL BOONE; MECKLENBURG COUNTY | 3 | 3 |
| DANIEL WEBSTER; GREATER ST. LOUIS AREA | 3 | 0 |
| GARDEN STATE; NORTHERN NEW JERSEY | 3 | 2 |
| GARDEN STATE; THEODORE ROOSEVELT | 3 | 3 |
| GRAND TETON; MOUNTAIN WEST | 3 | 0 |
| GREAT RIVERS; GREATER ST. LOUIS AREA | 3 | 0 |
| GREAT SMOKY MOUNTAIN; MIDDLE TENNESSEE | 3 | 0 |
| GREATER LOS ANGELES; GREATER YOSEMITE | 3 | 3 |
| GREATER LOS ANGELES; VERDUGO HILLS | 3 | 3 |
| GULF STREAM; SOUTH FLORIDA COUNCIL | 3 | 0 |
| HEART OF AMERICA; OZARK TRAILS | 3 | 0 |
| HEART OF NEW ENGLAND; MAYFLOWER | 3 | 0 |
| INLAND NORTHWEST; PACIFIC HARBORS | 3 | 0 |
| ISTROUMA AREA; SOUTHEAST LOUISIANA | 3 | 0 |
| LONGHOUSE; PATRIOTS' PATH | 3 | 3 |
| LOS PADRES; WESTERN LOS ANGELES COUNTY | 3 | 3 |
| MAYFLOWER; WESTCHESTER-PUTNAM | 3 | 3 |
| MECKLENBURG COUNTY; PALMETTO | 3 | 1 |
| MID-AMERICA; MID-IOWA | 3 | 0 |
| MID-AMERICA; NORTHERN STAR | 3 | 2 |
| MINSI TRAILS; NORTHEASTERN PENNSYLVANIA | 3 | 0 |
| NATIONAL CAPITAL AREA; VIRGINIA HEADWATERS | 3 | 0 |
| NEW BIRTH OF FREEDOM; SUSQUEHANNA | 3 | 0 |
| NORTHEAST GEORGIA; NORTHWEST GEORGIA | 3 | 0 |
| NORTHEAST ILLINOIS; THREE FIRES | 3 | 0 |
| NORTHERN STAR; TWIN VALLEY | 3 | 2 |
| POTAWATOMI AREA; THREE HARBORS | 3 | 0 |
| QUAPAW AREA; WESTARK AREA | 3 | 0 |

## Unique and Timely Abuse Claim Count by Local Council

Rows 1-265 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council

| Local Council | All Unique & Timely Abuse Claims* | All Not-Barred, Unique & Timely Abuse Claims* |
|---|---|---|
| TIDEWATER; VIRGINIA HEADWATERS | 3 | 0 |
| ALABAMA-FLORIDA; GREATER ALABAMA | 2 | 0 |
| ALABAMA-FLORIDA; TUKABATCHEE AREA | 2 | 0 |
| ALLEGHENY HIGHLANDS; BALTIMORE AREA | 2 | 0 |
| ALLEGHENY HIGHLANDS; BUCKSKIN | 2 | 0 |
| ALLEGHENY HIGHLANDS; GREAT TRAIL | 2 | 1 |
| ALLEGHENY HIGHLANDS; LAUREL HIGHLANDS | 2 | 0 |
| ALOHA; FAR EAST | 2 | 2 |
| ANDREW JACKSON; CHICKASAW | 2 | 0 |
| ATLANTA AREA; JERSEY SHORE | 2 | 0 |
| ATLANTA AREA; NORTHWEST GEORGIA | 2 | 1 |
| BADEN POWELL; JUNIATA VALLEY | 2 | 1 |
| BADEN POWELL; SUSQUEHANNA | 2 | 1 |
| BADEN POWELL; TUSCARORA | 2 | 2 |
| BAY-LAKES; NORTHEAST ILLINOIS | 2 | 0 |
| BAY-LAKES; SAMOSET COUNCIL | 2 | 0 |
| BLACK HILLS AREA; SIOUX | 2 | 0 |
| BLACK SWAMP AREA; BUCKEYE | 2 | 1 |
| BLACK SWAMP AREA; ERIE SHORES | 2 | 0 |
| BLACK SWAMP AREA; SIMON KENTON | 2 | 0 |
| BLACKHAWK AREA; PATHWAY TO ADVENTURE | 2 | 0 |
| BLUE GRASS; LAUREL HIGHLANDS | 2 | 0 |
| BLUE GRASS; SIMON KENTON | 2 | 0 |
| BLUE MOUNTAIN; CASCADE PACIFIC | 2 | 1 |
| BLUE MOUNTAIN; INLAND NORTHWEST | 2 | 0 |
| BUCKSKIN; SIMON KENTON | 2 | 0 |
| BUFFALO TRAIL; TEXAS TRAILS | 2 | 0 |
| CALCASIEU; LOUISIANA PURCHASE | 2 | 0 |
| CALIFORNIA INLAND EMPIRE; GOLDEN EMPIRE | 2 | 2 |
| CALIFORNIA INLAND EMPIRE; SAN DIEGO - IMPERIAL COUNCIL | 2 | 2 |
| CASCADE PACIFIC; PACIFIC HARBORS | 2 | 0 |
| CENTRAL GEORGIA; COASTAL GEORGIA | 2 | 0 |
| CENTRAL GEORGIA; SOUTH GEORGIA | 2 | 0 |
| CENTRAL NORTH CAROLINA; OCCONEECHEE | 2 | 2 |
| CHATTAHOOCHEE; FLINT RIVER | 2 | 1 |
| CHEROKEE AREA 469; INDIAN NATIONS | 2 | 0 |
| CHEROKEE AREA 556; NORTHWEST GEORGIA | 2 | 0 |
| CHESTER COUNTY; CRADLE OF LIBERTY | 2 | 0 |
| CHIEF SEATTLE; INLAND NORTHWEST | 2 | 0 |
| CHIPPEWA VALLEY; NORTHERN STAR | 2 | 0 |
| CIRCLE TEN; SAM HOUSTON AREA | 2 | 0 |
| COASTAL CAROLINA; PEE DEE AREA | 2 | 0 |
| CONNECTICUT RIVERS; HEART OF NEW ENGLAND | 2 | 0 |
| CONNECTICUT RIVERS; NARRAGANSETT | 2 | 0 |
| CONNECTICUT RIVERS; WESTERN MASSACHUSETTS | 2 | 0 |
| CONNECTICUT YANKEE; HOUSATONIC | 2 | 0 |
| CONQUISTADOR; GREAT SOUTHWEST | 2 | 0 |
| CRADLE OF LIBERTY; LAUREL HIGHLANDS | 2 | 0 |
| CRATER LAKE COUNCIL; OREGON TRAIL | 2 | 1 |
| CROSSROADS OF AMERICA; DAN BEARD | 2 | 0 |
| CROSSROADS OF AMERICA; GREATER ST. LOUIS AREA | 2 | 0 |
| CROSSROADS OF AMERICA; MIAMI VALLEY | 2 | 0 |
| CROSSROADS OF AMERICA; MICHIGAN CROSSROADS | 2 | 0 |
| CROSSROADS OF AMERICA; MINSI TRAILS | 2 | 1 |
| DANIEL BOONE; EAST CAROLINA | 2 | 2 |
| DANIEL WEBSTER; GREEN MOUNTAIN | 2 | 1 |
| DANIEL WEBSTER; MAYFLOWER | 2 | 0 |
| DANIEL WEBSTER; NARRAGANSETT | 2 | 0 |
| DENVER AREA; GREAT SOUTHWEST | 2 | 0 |
| DENVER AREA; LONGS PEAK COUNCIL | 2 | 0 |
| DENVER AREA; PIKES PEAK | 2 | 0 |
| EAST CAROLINA; INDIAN WATERS | 2 | 1 |
| EAST CAROLINA; MECKLENBURG COUNTY | 2 | 2 |
| EAST CAROLINA; OCCONEECHEE | 2 | 2 |
| EAST CAROLINA; OLD NORTH STATE | 2 | 1 |
| EAST CAROLINA; PIEDMONT 420 | 2 | 2 |
| EVANGELINE AREA; LOUISIANA PURCHASE | 2 | 0 |
| FIVE RIVERS; GREATER NEW YORK | 2 | 1 |
| FIVE RIVERS; OHIO RIVER VALLEY | 2 | 0 |
| FRENCH CREEK; LAUREL HIGHLANDS | 2 | 0 |
| GARDEN STATE; PATRIOTS' PATH | 2 | 2 |

## Unique and Timely Abuse Claim Count by Local Council

**Rows 1-265 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council**

| Local Council | All Unique & Timely Abuse Claims* | All Not-Barred, Unique & Timely Abuse Claims* |
|---|---|---|
| GOLDEN EMPIRE; GREATER LOS ANGELES | 2 | 2 |
| GOLDEN EMPIRE; NORTHERN STAR | 2 | 1 |
| GOLDEN EMPIRE; PACIFIC SKYLINE | 2 | 2 |
| GOLDEN EMPIRE; SEQUOIA | 2 | 2 |
| GOLDEN EMPIRE; SILICON VALLEY MONTEREY BAY | 2 | 2 |
| GOLDEN GATE AREA; GREATER YOSEMITE | 2 | 1 |
| GOLDEN GATE AREA; ORANGE COUNTY | 2 | 2 |
| GOLDEN GATE AREA; PATRIOTS' PATH | 2 | 2 |
| GOLDEN GATE AREA; PIEDMONT 042 | 2 | 2 |
| GOLDEN GATE AREA; REDWOOD EMPIRE | 2 | 2 |
| GRAND COLUMBIA; INLAND NORTHWEST | 2 | 0 |
| GREAT RIVERS; PONY EXPRESS | 2 | 0 |
| GREATER LOS ANGELES; PATHWAY TO ADVENTURE | 2 | 1 |
| GREATER LOS ANGELES; SAM HOUSTON AREA | 2 | 1 |
| GREATER NEW YORK; GREATER NIAGARA FRONTIER | 2 | 2 |
| GREATER NEW YORK; IROQUOIS TRAIL | 2 | 2 |
| GREATER NEW YORK; WESTCHESTER-PUTNAM | 2 | 2 |
| GREATER ST. LOUIS AREA; NORTHEAST ILLINOIS | 2 | 0 |
| GREATER YOSEMITE; SEQUOIA | 2 | 2 |
| GREEN MOUNTAIN; WESTERN MASSACHUSETTS | 2 | 2 |
| GULF COAST; LONGHORN | 2 | 0 |
| HAWK MOUNTAIN; MINSI TRAILS | 2 | 0 |
| HAWKEYE AREA; WINNEBAGO | 2 | 0 |
| HEART OF AMERICA; JAYHAWK AREA | 2 | 0 |
| HEART OF NEW ENGLAND; WESTERN MASSACHUSETTS | 2 | 0 |
| HUDSON VALLEY; WESTCHESTER-PUTNAM | 2 | 2 |
| ILLOWA; MISSISSIPPI VALLEY | 2 | 0 |
| INDIAN NATIONS; LAST FRONTIER | 2 | 0 |
| INDIAN WATERS; PALMETTO | 2 | 0 |
| INLAND NORTHWEST; MONTANA | 2 | 0 |
| LAKE ERIE; SIMON KENTON | 2 | 1 |
| LAKE ERIE; WESTERN MASSACHUSETTS | 2 | 0 |
| LASALLE; SAGAMORE | 2 | 0 |
| LAUREL HIGHLANDS; NATIONAL CAPITAL AREA | 2 | 1 |
| LAUREL HIGHLANDS; OHIO RIVER VALLEY | 2 | 1 |
| LAUREL HIGHLANDS; SUSQUEHANNA | 2 | 0 |
| LEATHERSTOCKING; TWIN RIVERS | 2 | 2 |
| LONG BEACH AREA; SILICON VALLEY MONTEREY BAY | 2 | 2 |
| LONGHOUSE; SENECA WATERWAYS | 2 | 2 |
| LONGS PEAK COUNCIL; PIKES PEAK | 2 | 0 |
| LOS PADRES; SEQUOIA | 2 | 2 |
| MARIN; PACIFIC SKYLINE | 2 | 2 |
| MARIN; WESTERN LOS ANGELES COUNTY | 2 | 2 |
| MAYFLOWER; TRANSATLANTIC | 2 | 0 |
| MECKLENBURG COUNTY; NATIONAL CAPITAL AREA | 2 | 2 |
| MECKLENBURG COUNTY; OLD NORTH STATE | 2 | 2 |
| MIAMI VALLEY; SIMON KENTON | 2 | 0 |
| MICHIGAN CROSSROADS; NORTHEAST ILLINOIS | 2 | 0 |
| MICHIGAN CROSSROADS; NORTHERN LIGHTS | 2 | 1 |
| MID-AMERICA; NATIONAL CAPITAL AREA | 2 | 0 |
| MID-AMERICA; OVERLAND TRAILS | 2 | 0 |
| MID-IOWA; TWIN RIVERS | 2 | 0 |
| MIDDLE TENNESSEE; WEST TENNESSEE AREA | 2 | 0 |
| MINSI TRAILS; PATRIOTS' PATH | 2 | 2 |
| MONMOUTH; PATRIOTS' PATH | 2 | 2 |
| NARRAGANSETT; SUFFOLK COUNTY | 2 | 1 |
| NORTH FLORIDA; SOUTH FLORIDA COUNCIL | 2 | 0 |
| NORTHEAST ILLINOIS; POTAWATOMI AREA | 2 | 0 |
| NORTHEAST IOWA COUNCIL; WINNEBAGO | 2 | 0 |
| NORTHERN LIGHTS; NORTHERN STAR | 2 | 0 |
| NORTHERN NEW JERSEY; SPIRIT OF ADVENTURE | 2 | 2 |
| NORTHERN NEW JERSEY; WASHINGTON CROSSING | 2 | 2 |
| OCCONEECHEE; OLD HICKORY | 2 | 2 |
| OLD HICKORY; PIEDMONT 420 | 2 | 2 |
| OZARK TRAILS; QUIVIRA | 2 | 0 |
| PATHWAY TO ADVENTURE; RAINBOW | 2 | 1 |
| SAM HOUSTON AREA; THREE RIVERS | 2 | 0 |
| SEQUOIA; SEQUOYAH | 2 | 0 |
| SHENANDOAH AREA; TIDEWATER | 2 | 0 |
| SILICON VALLEY MONTEREY BAY; TWIN RIVERS | 2 | 2 |
| ABRAHAM LINCOLN; DAN BEARD | 1 | 0 |

## Unique and Timely Abuse Claim Count by Local Council

Rows 1-265 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council

| Local Council | All Unique & Timely Abuse Claims* | All Not-Barred, Unique & Timely Abuse Claims* |
|---|---|---|
| ABRAHAM LINCOLN; GREATER ST. LOUIS AREA | 1 | 0 |
| ABRAHAM LINCOLN; PATHWAY TO ADVENTURE | 1 | 0 |
| ABRAHAM LINCOLN; THREE FIRES | 1 | 0 |
| ALABAMA-FLORIDA; GULF COAST | 1 | 0 |
| ALABAMA-FLORIDA; TRANSATLANTIC | 1 | 0 |
| ALAMO AREA; BAY AREA; CIRCLE TEN | 1 | 0 |
| ALAMO AREA; CAPITOL AREA; PINE BURR AREA | 1 | 0 |
| ALAMO AREA; CAPITOL AREA; SAM HOUSTON AREA | 1 | 0 |
| ALAMO AREA; GREATER NEW YORK | 1 | 1 |
| ALAMO AREA; LONGHORN | 1 | 0 |
| ALAMO AREA; SOUTH TEXAS | 1 | 0 |
| ALAMO AREA; SPIRIT OF ADVENTURE | 1 | 0 |
| ALAMO AREA; WESTARK AREA | 1 | 0 |
| ALLEGHENY HIGHLANDS; ATLANTA AREA; BUFFALO TRAIL; GREAT TRAIL; GULF STREAM; INDIAN WATERS; LAS VEGAS ARE | 1 | 1 |
| ALLEGHENY HIGHLANDS; BADEN POWELL | 1 | 1 |
| ALLEGHENY HIGHLANDS; BLACK SWAMP AREA | 1 | 0 |
| ALLEGHENY HIGHLANDS; BUCKTAIL | 1 | 0 |
| ALLEGHENY HIGHLANDS; CHICKASAW | 1 | 0 |
| ALLEGHENY HIGHLANDS; GREATER NIAGARA FRONTIER | 1 | 1 |
| ALLEGHENY HIGHLANDS; GREATER NIAGARA FRONTIER; IROQUOIS TRAIL | 1 | 1 |
| ALLEGHENY HIGHLANDS; LEATHERSTOCKING | 1 | 1 |
| ALLEGHENY HIGHLANDS; LOS PADRES; VENTURA COUNTY | 1 | 1 |
| ALOHA; CROSSROADS OF THE WEST | 1 | 0 |
| ALOHA; GOLDEN GATE AREA | 1 | 1 |
| ALOHA; GREAT SOUTHWEST | 1 | 1 |
| ALOHA; MICHIGAN CROSSROADS; NORTHEAST ILLINOIS; THREE HARBORS | 1 | 0 |
| ALOHA; PACIFIC SKYLINE | 1 | 1 |
| ALOHA; TEXAS SOUTHWEST; TRANSATLANTIC | 1 | 1 |
| ALOHA; WESTERN LOS ANGELES COUNTY | 1 | 1 |
| ANDREW JACKSON; ISTROUMA AREA | 1 | 0 |
| ANDREW JACKSON; MICHIGAN CROSSROADS | 1 | 0 |
| ANDREW JACKSON; SAM HOUSTON AREA | 1 | 0 |
| ANTHONY WAYNE AREA; CROSSROADS OF AMERICA | 1 | 0 |
| ANTHONY WAYNE AREA; ERIE SHORES | 1 | 0 |
| ANTHONY WAYNE AREA; LASALLE | 1 | 0 |
| ANTHONY WAYNE AREA; MICHIGAN CROSSROADS | 1 | 0 |
| ANTHONY WAYNE AREA; SAGAMORE | 1 | 0 |
| ARBUCKLE AREA; LAST FRONTIER | 1 | 0 |
| ATLANTA AREA; BLUE GRASS | 1 | 0 |
| ATLANTA AREA; CENTRAL GEORGIA | 1 | 0 |
| ATLANTA AREA; CENTRAL GEORGIA; JERSEY SHORE; TRANSATLANTIC | 1 | 0 |
| ATLANTA AREA; DANIEL BOONE | 1 | 1 |
| ATLANTA AREA; GEORGIA-CAROLINA | 1 | 0 |
| ATLANTA AREA; GREAT SOUTHWEST | 1 | 0 |
| ATLANTA AREA; GREATER ALABAMA | 1 | 0 |
| ATLANTA AREA; GREATER ST. LOUIS AREA | 1 | 0 |
| ATLANTA AREA; NEVADA AREA | 1 | 0 |
| ATLANTA AREA; NORTH FLORIDA | 1 | 0 |
| ATLANTA AREA; OLD NORTH STATE | 1 | 0 |
| ATLANTA AREA; PATHWAY TO ADVENTURE | 1 | 0 |
| ATLANTA AREA; SAN DIEGO - IMPERIAL COUNCIL | 1 | 1 |
| ATLANTA AREA; SUWANNEE RIVER AREA | 1 | 0 |
| ATLANTA AREA; TUKABATCHEE AREA | 1 | 0 |
| BADEN POWELL; CRADLE OF LIBERTY; CROSSROADS OF AMERICA | 1 | 0 |
| BADEN POWELL; DEL-MAR-VA | 1 | 0 |
| BADEN POWELL; GARDEN STATE | 1 | 1 |
| BADEN POWELL; LAST FRONTIER | 1 | 0 |
| BADEN POWELL; LAUREL HIGHLANDS | 1 | 0 |
| BADEN POWELL; LONGHOUSE; THREE FIRES | 1 | 1 |
| BADEN POWELL; NATIONAL CAPITAL AREA | 1 | 0 |
| BADEN POWELL; PATRIOTS' PATH | 1 | 1 |
| BADEN POWELL; SOUTH FLORIDA COUNCIL | 1 | 0 |
| BADEN POWELL; SPIRIT OF ADVENTURE | 1 | 0 |
| BADEN POWELL; TWIN RIVERS | 1 | 1 |
| BALTIMORE AREA; CHESTER COUNTY | 1 | 0 |
| BALTIMORE AREA; GRAND CANYON | 1 | 1 |
| BALTIMORE AREA; GREATER ST. LOUIS AREA | 1 | 0 |
| BALTIMORE AREA; LAUREL HIGHLANDS | 1 | 0 |
| BALTIMORE AREA; LINCOLN HERITAGE | 1 | 0 |
| BALTIMORE AREA; MASON-DIXON | 1 | 0 |
| BALTIMORE AREA; NATIONAL CAPITAL AREA; PATRIOTS' PATH | 1 | 1 |

## Unique and Timely Abuse Claim Count by Local Council

Rows 1-265 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council

| Local Council | All Unique & Timely Abuse Claims* | All Not-Barred, Unique & Timely Abuse Claims* |
|---|---|---|
| BAY AREA; HEART OF AMERICA | 1 | 0 |
| BAY-LAKES; CASCADE PACIFIC | 1 | 0 |
| BAY-LAKES; GLACIER'S EDGE | 1 | 0 |
| BAY-LAKES; LAUREL HIGHLANDS | 1 | 0 |
| BAY-LAKES; NORTHERN STAR | 1 | 1 |
| BAY-LAKES; OREGON TRAIL | 1 | 0 |
| BAY-LAKES; PACIFIC HARBORS | 1 | 0 |
| BAY-LAKES; POTAWATOMI AREA | 1 | 0 |
| BAY-LAKES; RAINBOW | 1 | 0 |
| BAY-LAKES; REDWOOD EMPIRE | 1 | 1 |
| BAY-LAKES; THREE FIRES | 1 | 0 |
| BAY-LAKES; THREE HARBORS | 1 | 0 |
| BAY-LAKES; TWIN RIVERS | 1 | 1 |
| BLACK HILLS AREA; GREATER ALABAMA | 1 | 0 |
| BLACK HILLS AREA; MONTANA | 1 | 0 |
| BLACK SWAMP AREA; JAYHAWK AREA | 1 | 0 |
| BLACK SWAMP AREA; WESTERN LOS ANGELES COUNTY | 1 | 0 |
| BLACK WARRIOR; TUKABATCHEE AREA | 1 | 0 |
| BLACKHAWK AREA; BUCKEYE | 1 | 0 |
| BLACKHAWK AREA; CONNECTICUT RIVERS; CONNECTICUT YANKEE | 1 | 0 |
| BLACKHAWK AREA; CROSSROADS OF AMERICA | 1 | 0 |
| BLACKHAWK AREA; NORTHEAST ILLINOIS | 1 | 0 |
| BLACKHAWK AREA; RAINBOW | 1 | 0 |
| BLACKHAWK AREA; THREE RIVERS | 1 | 0 |
| BLUE GRASS; DAN BEARD | 1 | 0 |
| BLUE MOUNTAIN; PATRIOTS' PATH | 1 | 1 |
| BLUE MOUNTAIN; SOUTHEAST LOUISIANA | 1 | 0 |
| BLUE RIDGE MOUNTAINS; CASCADE PACIFIC | 1 | 0 |
| BLUE RIDGE MOUNTAINS; CROSSROADS OF AMERICA | 1 | 0 |
| BLUE RIDGE MOUNTAINS; HEART OF VIRGINIA | 1 | 0 |
| BLUE RIDGE MOUNTAINS; NEW BIRTH OF FREEDOM | 1 | 0 |
| BLUE RIDGE MOUNTAINS; OLD NORTH STATE | 1 | 1 |
| BLUE RIDGE MOUNTAINS; SHENANDOAH AREA | 1 | 0 |
| BLUE RIDGE; CHICKASAW | 1 | 0 |
| BLUE RIDGE; OCCONEECHEE | 1 | 0 |
| BUCKEYE; GREAT TRAIL; LAKE ERIE | 1 | 0 |
| BUCKEYE; GREEN MOUNTAIN | 1 | 1 |
| BUCKEYE; HEART OF AMERICA | 1 | 0 |
| BUCKEYE; LAKE ERIE; MAYFLOWER; NARRAGANSETT | 1 | 0 |
| BUCKEYE; MUSKINGUM VALLEY | 1 | 0 |
| BUCKEYE; TECUMSEH | 1 | 0 |
| BUCKEYE; TUSCARORA | 1 | 0 |
| BUCKSKIN; DENVER AREA; PIKES PEAK | 1 | 0 |
| BUCKSKIN; MECKLENBURG COUNTY | 1 | 0 |
| BUCKSKIN; SENECA WATERWAYS | 1 | 1 |
| BUCKTAIL; EAST TEXAS AREA; NORWELA | 1 | 0 |
| BUCKTAIL; GEORGIA-CAROLINA | 1 | 0 |
| BUCKTAIL; LAUREL HIGHLANDS | 1 | 0 |
| BUFFALO TRACE; BUFFALO TRAIL | 1 | 0 |
| BUFFALO TRACE; CROSSROADS OF AMERICA | 1 | 0 |
| BUFFALO TRACE; MICHIGAN CROSSROADS | 1 | 0 |
| BUFFALO TRACE; SAGAMORE | 1 | 0 |
| BUFFALO TRAIL; CADDO AREA | 1 | 0 |
| BUFFALO TRAIL; DIRECT SERVICE | 1 | 0 |
| BUFFALO TRAIL; SOUTH PLAINS | 1 | 0 |
| CADDO AREA; CHICKASAW; DE SOTO AREA; QUAPAW AREA; WESTARK AREA | 1 | 0 |
| CADDO AREA; CIRCLE TEN | 1 | 0 |
| CADDO AREA; CIRCLE TEN; EAST TEXAS AREA; RIO GRANDE | 1 | 0 |
| CADDO AREA; DE SOTO AREA | 1 | 0 |
| CADDO AREA; NORWELA | 1 | 1 |
| CALCASIEU; EVANGELINE AREA | 1 | 0 |
| CALCASIEU; SOUTHEAST LOUISIANA | 1 | 0 |
| CALIFORNIA INLAND EMPIRE; CENTRAL FLORIDA | 1 | 0 |
| CALIFORNIA INLAND EMPIRE; CROSSROADS OF THE WEST | 1 | 1 |
| CALIFORNIA INLAND EMPIRE; LAS VEGAS AREA | 1 | 1 |
| CALIFORNIA INLAND EMPIRE; LONG BEACH AREA | 1 | 1 |
| CALIFORNIA INLAND EMPIRE; NATIONAL CAPITAL AREA | 1 | 1 |
| CALIFORNIA INLAND EMPIRE; ORANGE COUNTY | 1 | 1 |
| CALIFORNIA INLAND EMPIRE; RIO GRANDE | 1 | 0 |
| CALIFORNIA INLAND EMPIRE; VENTURA COUNTY | 1 | 1 |
| CALIFORNIA INLAND EMPIRE; YUCCA | 1 | 1 |

## Unique and Timely Abuse Claim Count by Local Council

Rows 1-265 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council

| Local Council | All Unique & Timely Abuse Claims* | All Not-Barred, Unique & Timely Abuse Claims* |
|---|---|---|
| CAPE COD & ISLANDS; FAR EAST | 1 | 0 |
| CAPE COD & ISLANDS; FAR EAST; LAS VEGAS AREA | 1 | 0 |
| CAPE COD & ISLANDS; GREATER NEW YORK | 1 | 1 |
| CAPE COD & ISLANDS; MAYFLOWER; NARRAGANSETT | 1 | 0 |
| CAPE COD & ISLANDS; NARRAGANSETT | 1 | 0 |
| CAPE COD & ISLANDS; NATIONAL CAPITAL AREA | 1 | 0 |
| CAPE COD & ISLANDS; SAGAMORE | 1 | 0 |
| CAPE COD & ISLANDS; SPIRIT OF ADVENTURE | 1 | 0 |
| CAPE COD & ISLANDS; TWIN RIVERS | 1 | 0 |
| CAPE FEAR; CENTRAL NORTH CAROLINA; EAST CAROLINA | 1 | 1 |
| CAPE FEAR; DANIEL BOONE | 1 | 1 |
| CAPE FEAR; EAST CAROLINA | 1 | 1 |
| CAPE FEAR; MECKLENBURG COUNTY | 1 | 1 |
| CAPE FEAR; OLD HICKORY | 1 | 1 |
| CAPE FEAR; PIEDMONT 420 | 1 | 1 |
| CAPITOL AREA; DENVER AREA | 1 | 0 |
| CAPITOL AREA; GREATER LOS ANGELES; SAM HOUSTON AREA | 1 | 0 |
| CAPITOL AREA; LONGHORN | 1 | 0 |
| CAPITOL AREA; TEXAS TRAILS | 1 | 0 |
| CASCADE PACIFIC; CROSSROADS OF THE WEST | 1 | 0 |
| CASCADE PACIFIC; GOLDEN EMPIRE | 1 | 1 |
| CASCADE PACIFIC; GRAND COLUMBIA | 1 | 0 |
| CASCADE PACIFIC; INDIAN NATIONS | 1 | 0 |
| CASCADE PACIFIC; MONTANA | 1 | 1 |
| CASCADE PACIFIC; PENNSYLVANIA DUTCH | 1 | 0 |
| CASCADE PACIFIC; TUSCARORA | 1 | 1 |
| CATALINA; LAS VEGAS AREA | 1 | 1 |
| CATALINA; LONGS PEAK COUNCIL | 1 | 1 |
| CATALINA; ORANGE COUNTY | 1 | 1 |
| CATALINA; SAN DIEGO - IMPERIAL COUNCIL | 1 | 1 |
| CENTRAL FLORIDA; GREATER NEW YORK | 1 | 1 |
| CENTRAL FLORIDA; GREATER TAMPA BAY AREA | 1 | 0 |
| CENTRAL FLORIDA; GULF COAST | 1 | 1 |
| CENTRAL FLORIDA; NORTHERN STAR | 1 | 1 |
| CENTRAL FLORIDA; ORANGE COUNTY | 1 | 0 |
| CENTRAL FLORIDA; SIMON KENTON | 1 | 0 |
| CENTRAL FLORIDA; SOUTH FLORIDA COUNCIL | 1 | 0 |
| CENTRAL FLORIDA; SOUTHWEST FLORIDA | 1 | 0 |
| CENTRAL GEORGIA; GEORGIA-CAROLINA | 1 | 0 |
| CENTRAL GEORGIA; NORTHWEST GEORGIA | 1 | 0 |
| CENTRAL MINNESOTA; GAMEHAVEN; NORTHERN STAR | 1 | 1 |
| CENTRAL MINNESOTA; GREATER NEW YORK; NORTHERN STAR | 1 | 0 |
| CENTRAL MINNESOTA; GREATER TAMPA BAY AREA | 1 | 1 |
| CENTRAL MINNESOTA; SIOUX | 1 | 1 |
| CENTRAL NEW JERSEY; GARDEN STATE; WASHINGTON CROSSING | 1 | 1 |
| CENTRAL NEW JERSEY; MONMOUTH | 1 | 1 |
| CENTRAL NEW JERSEY; NORTHERN NEW JERSEY; PATRIOTS' PATH | 1 | 1 |
| CENTRAL NEW JERSEY; NORTHERN NEW JERSEY; WASHINGTON CROSSING | 1 | 1 |
| CENTRAL NORTH CAROLINA; PATRIOTS' PATH | 1 | 1 |
| CHATTAHOOCHEE; GEORGIA-CAROLINA | 1 | 0 |
| CHATTAHOOCHEE; NORTHEAST GEORGIA | 1 | 0 |
| CHATTAHOOCHEE; SIMON KENTON | 1 | 0 |
| CHATTAHOOCHEE; SUWANNEE RIVER AREA | 1 | 0 |
| CHEROKEE AREA 469; CIMARRON | 1 | 0 |
| CHEROKEE AREA 556; GREAT RIVERS | 1 | 0 |
| CHEROKEE AREA 556; MIDDLE TENNESSEE; NORTH FLORIDA | 1 | 0 |
| CHEROKEE AREA 556; NATIONAL CAPITAL AREA | 1 | 1 |
| CHEROKEE AREA 556; NORTH FLORIDA | 1 | 0 |
| CHEROKEE AREA 556; SAM HOUSTON AREA | 1 | 0 |
| CHESTER COUNTY; CRADLE OF LIBERTY; WESTCHESTER-PUTNAM | 1 | 1 |
| CHESTER COUNTY; GREATER ST. LOUIS AREA | 1 | 0 |
| CHESTER COUNTY; HEART OF VIRGINIA | 1 | 0 |
| CHESTER COUNTY; NORTHEASTERN PENNSYLVANIA | 1 | 0 |
| CHICKASAW; CHOCTAW AREA | 1 | 0 |
| CHICKASAW; GREATER ALABAMA | 1 | 0 |
| CHICKASAW; HEART OF AMERICA | 1 | 0 |
| CHICKASAW; MIDDLE TENNESSEE; QUAPAW AREA | 1 | 0 |
| CHICKASAW; NATIONAL CAPITAL AREA | 1 | 0 |
| CHICKASAW; NEW BIRTH OF FREEDOM | 1 | 0 |
| CHICKASAW; PINE BURR AREA; PUSHMATAHA AREA | 1 | 0 |
| CHICKASAW; WEST TENNESSEE AREA | 1 | 0 |

## Unique and Timely Abuse Claim Count by Local Council

Rows 1-265 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council

| Local Council | All Unique & Timely Abuse Claims* | All Not-Barred, Unique & Timely Abuse Claims* |
|---|---|---|
| CHICKASAW; YOCONA AREA | 1 | 0 |
| CHIEF CORNPLANTER; GREAT TRAIL | 1 | 0 |
| CHIEF SEATTLE; CROSSROADS OF THE WEST | 1 | 0 |
| CHIEF SEATTLE; INDIAN NATIONS | 1 | 0 |
| CHIEF SEATTLE; SAM HOUSTON AREA | 1 | 0 |
| CHIEF SEATTLE; SILICON VALLEY MONTEREY BAY | 1 | 1 |
| CHIPPEWA VALLEY; GLACIER'S EDGE | 1 | 0 |
| CHIPPEWA VALLEY; VOYAGEURS AREA | 1 | 0 |
| CHOCTAW AREA; PINE BURR AREA | 1 | 0 |
| CIMARRON; INDIAN NATIONS | 1 | 0 |
| CIMARRON; QUIVIRA | 1 | 0 |
| CIMARRON; SOUTH PLAINS | 1 | 0 |
| CIRCLE TEN; CROSSROADS OF THE WEST | 1 | 0 |
| CIRCLE TEN; EAST TEXAS AREA | 1 | 0 |
| CIRCLE TEN; GREATER LOS ANGELES | 1 | 1 |
| CIRCLE TEN; GREATER LOS ANGELES; WESTERN LOS ANGELES COUNTY | 1 | 1 |
| CIRCLE TEN; HEART OF VIRGINIA | 1 | 0 |
| CIRCLE TEN; NARRAGANSETT | 1 | 0 |
| CIRCLE TEN; ORANGE COUNTY | 1 | 0 |
| CIRCLE TEN; TUKABATCHEE AREA | 1 | 0 |
| CIRCLE TEN; VENTURA COUNTY; WESTERN LOS ANGELES COUNTY | 1 | 1 |
| COASTAL CAROLINA; COASTAL GEORGIA | 1 | 0 |
| COASTAL CAROLINA; EAST TEXAS AREA | 1 | 0 |
| COASTAL CAROLINA; GOLDEN SPREAD | 1 | 0 |
| COASTAL CAROLINA; PALMETTO | 1 | 0 |
| COASTAL GEORGIA; GREATER TAMPA BAY AREA | 1 | 0 |
| COASTAL GEORGIA; MIDDLE TENNESSEE | 1 | 0 |
| COASTAL GEORGIA; SOUTH GEORGIA | 1 | 0 |
| COASTAL GEORGIA; TUSCARORA | 1 | 1 |
| COLONIAL VIRGINIA; HEART OF VIRGINIA | 1 | 0 |
| COLONIAL VIRGINIA; HEART OF VIRGINIA; TIDEWATER | 1 | 0 |
| COLONIAL VIRGINIA; NATIONAL CAPITAL AREA | 1 | 0 |
| COLONIAL VIRGINIA; PINE BURR AREA | 1 | 0 |
| COLUMBIA-MONTOUR; SUSQUEHANNA | 1 | 0 |
| CONNECTICUT RIVERS; DAN BEARD; HEART OF NEW ENGLAND; OREGON TRAIL | 1 | 1 |
| CONNECTICUT RIVERS; DANIEL WEBSTER | 1 | 0 |
| CONNECTICUT RIVERS; GREENWICH | 1 | 0 |
| CONNECTICUT RIVERS; HOUSATONIC | 1 | 0 |
| CONNECTICUT RIVERS; HUDSON VALLEY | 1 | 1 |
| CONNECTICUT RIVERS; MAYFLOWER; WESTCHESTER-PUTNAM | 1 | 1 |
| CONNECTICUT RIVERS; MONMOUTH | 1 | 0 |
| CONNECTICUT RIVERS; SENECA WATERWAYS | 1 | 0 |
| CONNECTICUT RIVERS; TRANSATLANTIC | 1 | 0 |
| CONNECTICUT RIVERS; WASHINGTON CROSSING | 1 | 0 |
| CONNECTICUT RIVERS; WESTCHESTER-PUTNAM | 1 | 1 |
| CONNECTICUT YANKEE; MICHIGAN CROSSROADS | 1 | 0 |
| CONNECTICUT YANKEE; SUWANNEE RIVER AREA | 1 | 0 |
| CONQUISTADOR; CROSSROADS OF THE WEST | 1 | 0 |
| CONQUISTADOR; FAR EAST; YUCCA | 1 | 0 |
| CORNHUSKER; GREATER YOSEMITE | 1 | 1 |
| CORNHUSKER; PRAIRIELANDS | 1 | 0 |
| CORNHUSKER; QUIVIRA | 1 | 0 |
| CORONADO AREA; GREAT SOUTHWEST | 1 | 0 |
| CORONADO AREA; GREATER NEW YORK | 1 | 0 |
| CORONADO AREA; MICHIGAN CROSSROADS | 1 | 0 |
| CRADLE OF LIBERTY; CROSSROADS OF AMERICA | 1 | 0 |
| CRADLE OF LIBERTY; FRENCH CREEK | 1 | 0 |
| CRADLE OF LIBERTY; GREAT SOUTHWEST | 1 | 0 |
| CRADLE OF LIBERTY; JERSEY SHORE | 1 | 0 |
| CRADLE OF LIBERTY; JUNIATA VALLEY | 1 | 0 |
| CRADLE OF LIBERTY; MINSI TRAILS; NORTHERN NEW JERSEY | 1 | 1 |
| CRADLE OF LIBERTY; NEW BIRTH OF FREEDOM | 1 | 0 |
| CRADLE OF LIBERTY; NORTHERN NEW JERSEY | 1 | 1 |
| CRADLE OF LIBERTY; PATRIOTS' PATH | 1 | 1 |
| CRADLE OF LIBERTY; QUIVIRA | 1 | 1 |
| CRADLE OF LIBERTY; SUSQUEHANNA | 1 | 0 |
| CRATER LAKE COUNCIL; GOLDEN EMPIRE | 1 | 1 |
| CRATER LAKE COUNCIL; LOS PADRES; VENTURA COUNTY | 1 | 1 |
| CRATER LAKE; WESTERN LOS ANGELES COUNTY | 1 | 1 |
| CROSSROADS OF AMERICA; DEL-MAR-VA; NATIONAL CAPITAL AREA | 1 | 0 |
| CROSSROADS OF AMERICA; GARDEN STATE | 1 | 1 |

## Unique and Timely Abuse Claim Count by Local Council

**Rows 1-265 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council**

| Local Council | All Unique & Timely Abuse Claims* | All Not-Barred, Unique & Timely Abuse Claims* |
|---|---|---|
| CROSSROADS OF AMERICA; KATAHDIN AREA; NORTHERN NEW JERSEY | 1 | 0 |
| CROSSROADS OF AMERICA; NATIONAL CAPITAL AREA | 1 | 0 |
| CROSSROADS OF AMERICA; PATHWAY TO ADVENTURE | 1 | 0 |
| CROSSROADS OF AMERICA; TUKABATCHEE AREA | 1 | 0 |
| CROSSROADS OF THE WEST; DENVER AREA | 1 | 0 |
| CROSSROADS OF THE WEST; GREATER WYOMING | 1 | 0 |
| CROSSROADS OF THE WEST; GREATER WYOMING; NORTHEAST ILLINOIS | 1 | 0 |
| CROSSROADS OF THE WEST; INLAND NORTHWEST | 1 | 0 |
| CROSSROADS OF THE WEST; LAS VEGAS AREA | 1 | 0 |
| CROSSROADS OF THE WEST; LINCOLN HERITAGE | 1 | 0 |
| CROSSROADS OF THE WEST; SAN DIEGO - IMPERIAL COUNCIL | 1 | 1 |
| DAN BEARD; GREAT RIVERS; SOUTH FLORIDA COUNCIL | 1 | 0 |
| DAN BEARD; GREAT SMOKY MOUNTAIN | 1 | 0 |
| DAN BEARD; GREAT TRAIL | 1 | 1 |
| DAN BEARD; LASALLE | 1 | 0 |
| DAN BEARD; LAST FRONTIER | 1 | 0 |
| DAN BEARD; LINCOLN HERITAGE | 1 | 0 |
| DAN BEARD; NORTH FLORIDA | 1 | 0 |
| DAN BEARD; QUAPAW AREA | 1 | 1 |
| DAN BEARD; TECUMSEH | 1 | 0 |
| DANIEL BOONE; MOBILE AREA | 1 | 0 |
| DANIEL BOONE; OLD HICKORY | 1 | 0 |
| DANIEL BOONE; PEE DEE AREA | 1 | 1 |
| DANIEL BOONE; TIDEWATER | 1 | 0 |
| DANIEL WEBSTER; MICHIGAN CROSSROADS | 1 | 0 |
| DANIEL WEBSTER; NORTHERN NEW JERSEY | 1 | 1 |
| DANIEL WEBSTER; TIDEWATER | 1 | 0 |
| DANIEL WEBSTER; WESTERN MASSACHUSETTS | 1 | 0 |
| DE SOTO AREA; WESTARK AREA | 1 | 0 |
| DEL-MAR-VA; GREATER LOS ANGELES | 1 | 1 |
| DEL-MAR-VA; NATIONAL CAPITAL AREA | 1 | 0 |
| DEL-MAR-VA; WESTERN MASSACHUSETTS | 1 | 0 |
| DENVER AREA; GREATER ST. LOUIS AREA | 1 | 0 |
| DENVER AREA; GREATER YOSEMITE | 1 | 1 |
| DENVER AREA; HEART OF AMERICA | 1 | 0 |
| DENVER AREA; INLAND NORTHWEST | 1 | 0 |
| DENVER AREA; MOUNT BAKER | 1 | 0 |
| DENVER AREA; SIMON KENTON | 1 | 0 |
| DENVER AREA; THREE FIRES | 1 | 0 |
| DIRECT SERVICE; GREATER ST. LOUIS AREA | 1 | 0 |
| DIRECT SERVICE; NATIONAL CAPITAL AREA | 1 | 0 |
| EAST CAROLINA; GRAND CANYON | 1 | 0 |
| EAST CAROLINA; PINE TREE | 1 | 1 |
| EAST CAROLINA; TIDEWATER | 1 | 1 |
| EAST CAROLINA; TUSCARORA | 1 | 1 |
| EAST CAROLINA; TWIN RIVERS | 1 | 1 |
| EAST TEXAS AREA; LAS VEGAS AREA; NEVADA AREA | 1 | 0 |
| EAST TEXAS AREA; LONGHORN | 1 | 0 |
| EAST TEXAS AREA; SAM HOUSTON AREA | 1 | 0 |
| EAST TEXAS AREA; THREE RIVERS | 1 | 0 |
| ERIE SHORES; GREAT TRAIL | 1 | 0 |
| ERIE SHORES; MICHIGAN CROSSROADS | 1 | 0 |
| ERIE SHORES; QUAPAW AREA | 1 | 0 |
| EVANGELINE AREA; GREATER ST. LOUIS AREA; SOUTHEAST LOUISIANA | 1 | 0 |
| EVANGELINE AREA; ISTROUMA AREA | 1 | 0 |
| EVANGELINE AREA; MICHIGAN CROSSROADS | 1 | 0 |
| EVANGELINE AREA; SAGAMORE | 1 | 0 |
| EVANGELINE AREA; SOUTHEAST LOUISIANA | 1 | 0 |
| FAR EAST; TRANSATLANTIC | 1 | 0 |
| FIVE RIVERS; LAUREL HIGHLANDS | 1 | 0 |
| FRENCH CREEK; GREATER NIAGARA FRONTIER | 1 | 0 |
| FRENCH CREEK; LAKE ERIE | 1 | 1 |
| GAMEHAVEN; GOLDEN EMPIRE; MARIN; PACIFIC SKYLINE | 1 | 1 |
| GAMEHAVEN; LONGHOUSE | 1 | 1 |
| GAMEHAVEN; NORTHERN STAR | 1 | 1 |
| GAMEHAVEN; TWIN VALLEY | 1 | 1 |
| GARDEN STATE; GREEN MOUNTAIN | 1 | 1 |
| GARDEN STATE; JERSEY SHORE; WASHINGTON CROSSING | 1 | 1 |
| GARDEN STATE; MORAINE TRAILS | 1 | 0 |
| GARDEN STATE; WASHINGTON CROSSING | 1 | 1 |
| GATEWAY AREA; GLACIER'S EDGE | 1 | 1 |

## Unique and Timely Abuse Claim Count by Local Council

**Rows 1-265 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council**

| Local Council | All Unique & Timely Abuse Claims* | All Not-Barred, Unique & Timely Abuse Claims* |
|---|---|---|
| GATEWAY AREA; GREATER NEW YORK | 1 | 1 |
| GATEWAY AREA; GREATER ST. LOUIS AREA | 1 | 0 |
| GEORGIA-CAROLINA; MECKLENBURG COUNTY | 1 | 1 |
| GEORGIA-CAROLINA; NORTHEAST GEORGIA | 1 | 0 |
| GEORGIA-CAROLINA; PEE DEE AREA | 1 | 0 |
| GEORGIA-CAROLINA; PINE BURR AREA | 1 | 0 |
| GEORGIA-CAROLINA; PINE TREE | 1 | 0 |
| GEORGIA-CAROLINA; TIDEWATER; VIRGINIA HEADWATERS | 1 | 1 |
| GLACIER'S EDGE; NORTHEAST ILLINOIS | 1 | 0 |
| GLACIER'S EDGE; SAMOSET COUNCIL | 1 | 0 |
| GLACIER'S EDGE; SIOUX | 1 | 0 |
| GLACIER'S EDGE; THREE HARBORS | 1 | 0 |
| GLACIER'S EDGE; W.D. BOYCE | 1 | 0 |
| GOLDEN EMPIRE; LAKE ERIE; SOUTHWEST FLORIDA | 1 | 0 |
| GOLDEN EMPIRE; LAS VEGAS AREA | 1 | 0 |
| GOLDEN EMPIRE; MARIN | 1 | 1 |
| GOLDEN EMPIRE; MORAINE TRAILS | 1 | 0 |
| GOLDEN EMPIRE; NARRAGANSETT | 1 | 0 |
| GOLDEN EMPIRE; OREGON TRAIL | 1 | 1 |
| GOLDEN EMPIRE; REDWOOD EMPIRE | 1 | 1 |
| GOLDEN EMPIRE; SAN DIEGO - IMPERIAL COUNCIL | 1 | 1 |
| GOLDEN EMPIRE; SOUTHERN SIERRA | 1 | 1 |
| GOLDEN EMPIRE; SOUTHWEST FLORIDA | 1 | 1 |
| GOLDEN EMPIRE; WESTERN LOS ANGELES COUNTY | 1 | 1 |
| GOLDEN GATE AREA; GREAT SOUTHWEST | 1 | 0 |
| GOLDEN GATE AREA; MARIN; SILICON VALLEY MONTEREY BAY | 1 | 1 |
| GOLDEN GATE AREA; MIAMI VALLEY | 1 | 0 |
| GOLDEN GATE AREA; MONTANA | 1 | 1 |
| GOLDEN GATE AREA; SAN DIEGO - IMPERIAL COUNCIL | 1 | 1 |
| GOLDEN GATE AREA; SENECA WATERWAYS | 1 | 1 |
| GOLDEN SPREAD; GREAT SOUTHWEST | 1 | 0 |
| GOLDEN SPREAD; GULF COAST; SOUTH TEXAS | 1 | 0 |
| GOLDEN SPREAD; LAST FRONTIER | 1 | 0 |
| GOLDEN SPREAD; SAM HOUSTON AREA | 1 | 0 |
| GOLDEN SPREAD; SOUTH FLORIDA COUNCIL | 1 | 0 |
| GRAND CANYON; GREATER LOS ANGELES | 1 | 1 |
| GRAND CANYON; LAS VEGAS AREA | 1 | 1 |
| GRAND CANYON; LONGHORN | 1 | 0 |
| GRAND CANYON; LOUISIANA PURCHASE | 1 | 1 |
| GRAND CANYON; MICHIGAN CROSSROADS | 1 | 1 |
| GRAND CANYON; SAN DIEGO - IMPERIAL COUNCIL | 1 | 1 |
| GRAND CANYON; TIDEWATER | 1 | 1 |
| GRAND COLUMBIA; MOUNT BAKER | 1 | 0 |
| GRAND COLUMBIA; PACIFIC HARBORS | 1 | 0 |
| GRAND COLUMBIA; PIKES PEAK | 1 | 0 |
| GRAND TETON; MONTANA | 1 | 0 |
| GREAT ALASKA; MIDNIGHT SUN; ORANGE COUNTY | 1 | 1 |
| GREAT RIVERS; INDIAN WATERS | 1 | 0 |
| GREAT RIVERS; MICHIGAN CROSSROADS | 1 | 0 |
| GREAT RIVERS; PACIFIC HARBORS | 1 | 0 |
| GREAT SMOKY MOUNTAIN; INDIAN WATERS | 1 | 0 |
| GREAT SMOKY MOUNTAIN; LAKE ERIE | 1 | 0 |
| GREAT SMOKY MOUNTAIN; PALMETTO | 1 | 0 |
| GREAT SMOKY MOUNTAIN; SAMOSET COUNCIL | 1 | 0 |
| GREAT SMOKY MOUNTAIN; SEQUOYAH | 1 | 0 |
| GREAT SOUTHWEST; NORTHERN STAR | 1 | 0 |
| GREAT SOUTHWEST; OLD HICKORY; SEQUOYAH | 1 | 1 |
| GREAT SOUTHWEST; SEQUOYAH | 1 | 0 |
| GREAT SOUTHWEST; SILICON VALLEY MONTEREY BAY | 1 | 0 |
| GREAT TRAIL; GREAT TRAILS; THREE FIRES | 1 | 0 |
| GREAT TRAIL; MIAMI VALLEY | 1 | 0 |
| GREAT TRAIL; SIMON KENTON | 1 | 1 |
| GREAT TRAIL; WESTERN MASSACHUSETTS | 1 | 0 |
| GREAT TRAILS; LAKE ERIE; THREE FIRES; WESTERN MASSACHUSETTS | 1 | 0 |
| GREATER ALABAMA; MOBILE AREA; PUSHMATAHA AREA | 1 | 0 |
| GREATER ALABAMA; SEQUOIA | 1 | 0 |
| GREATER ALABAMA; SEQUOYAH | 1 | 0 |
| GREATER ALABAMA; WASHINGTON CROSSING | 1 | 0 |
| GREATER LOS ANGELES; GREATER TAMPA BAY AREA | 1 | 0 |
| GREATER LOS ANGELES; LAKE ERIE | 1 | 1 |
| GREATER LOS ANGELES; LONG BEACH AREA; ORANGE COUNTY | 1 | 1 |

## Unique and Timely Abuse Claim Count by Local Council

Rows 1-265 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council

| Local Council | All Unique & Timely Abuse Claims* | All Not-Barred, Unique & Timely Abuse Claims* |
|---|---|---|
| GREATER LOS ANGELES; LONG BEACH AREA; ORANGE COUNTY; SAN DIEGO - IMPERIAL COUNCIL; VERDUGO HILLS | 1 | 1 |
| GREATER LOS ANGELES; LOS PADRES | 1 | 1 |
| GREATER LOS ANGELES; MOBILE AREA | 1 | 1 |
| GREATER LOS ANGELES; MONTANA | 1 | 1 |
| GREATER LOS ANGELES; PATRIOTS' PATH | 1 | 1 |
| GREATER LOS ANGELES; SAN DIEGO - IMPERIAL COUNCIL | 1 | 1 |
| GREATER LOS ANGELES; SIOUX | 1 | 1 |
| GREATER LOS ANGELES; SOUTHERN SIERRA | 1 | 1 |
| GREATER LOS ANGELES; SPIRIT OF ADVENTURE | 1 | 1 |
| GREATER NEW YORK; LAKE ERIE | 1 | 0 |
| GREATER NEW YORK; LEATHERSTOCKING | 1 | 1 |
| GREATER NEW YORK; MAYFLOWER; TWIN RIVERS; WESTCHESTER-PUTNAM | 1 | 1 |
| GREATER NEW YORK; MONTANA | 1 | 1 |
| GREATER NEW YORK; NEW BIRTH OF FREEDOM | 1 | 1 |
| GREATER NEW YORK; NORTHERN STAR | 1 | 1 |
| GREATER NEW YORK; RIP VAN WINKLE | 1 | 1 |
| GREATER NEW YORK; SENECA WATERWAYS | 1 | 1 |
| GREATER NEW YORK; SOUTH FLORIDA COUNCIL | 1 | 1 |
| GREATER NEW YORK; WESTARK AREA | 1 | 0 |
| GREATER NIAGARA FRONTIER; LONGHOUSE | 1 | 1 |
| GREATER NIAGARA FRONTIER; NORTHERN LIGHTS | 1 | 1 |
| GREATER NIAGARA FRONTIER; SENECA WATERWAYS | 1 | 1 |
| GREATER NIAGARA FRONTIER; THREE FIRES | 1 | 1 |
| GREATER NIAGARA FRONTIER; THREE RIVERS | 1 | 1 |
| GREATER ST. LOUIS AREA; ILLOWA | 1 | 0 |
| GREATER ST. LOUIS AREA; LINCOLN HERITAGE | 1 | 0 |
| GREATER ST. LOUIS AREA; MICHIGAN CROSSROADS | 1 | 0 |
| GREATER ST. LOUIS AREA; NATIONAL CAPITAL AREA | 1 | 1 |
| GREATER ST. LOUIS AREA; OREGON TRAIL; PALMETTO | 1 | 0 |
| GREATER ST. LOUIS AREA; OZARK TRAILS | 1 | 0 |
| GREATER ST. LOUIS AREA; SAM HOUSTON AREA | 1 | 0 |
| GREATER ST. LOUIS AREA; SOUTH FLORIDA COUNCIL | 1 | 0 |
| GREATER ST. LOUIS AREA; THREE FIRES | 1 | 1 |
| GREATER ST. LOUIS AREA; VOYAGEURS AREA | 1 | 1 |
| GREATER ST. LOUIS AREA; W.D. BOYCE | 1 | 0 |
| GREATER TAMPA BAY AREA; GREEN MOUNTAIN | 1 | 1 |
| GREATER TAMPA BAY AREA; GULF COAST | 1 | 0 |
| GREATER TAMPA BAY AREA; GULF STREAM | 1 | 0 |
| GREATER TAMPA BAY AREA; LEATHERSTOCKING | 1 | 1 |
| GREATER TAMPA BAY AREA; NORTH FLORIDA | 1 | 0 |
| GREATER TAMPA BAY AREA; SOUTHWEST FLORIDA | 1 | 0 |
| GREATER TAMPA BAY AREA; SUWANNEE RIVER AREA | 1 | 0 |
| GREATER WYOMING; LONGS PEAK COUNCIL | 1 | 0 |
| GREATER YOSEMITE; PACIFIC SKYLINE | 1 | 1 |
| GREATER YOSEMITE; WESTERN MASSACHUSETTS | 1 | 0 |
| GREEN MOUNTAIN; HEART OF NEW ENGLAND | 1 | 0 |
| GREEN MOUNTAIN; NARRAGANSETT | 1 | 0 |
| GREEN MOUNTAIN; NORTHERN NEW JERSEY | 1 | 1 |
| GULF COAST; LAST FRONTIER | 1 | 0 |
| GULF COAST; NORTH FLORIDA | 1 | 0 |
| GULF COAST; SOUTH TEXAS; YUCCA | 1 | 0 |
| GULF STREAM; MECKLENBURG COUNTY | 1 | 1 |
| GULF STREAM; MOUNTAINEER AREA | 1 | 0 |
| GULF STREAM; SAN DIEGO - IMPERIAL COUNCIL | 1 | 1 |
| HAWK MOUNTAIN; NEW BIRTH OF FREEDOM | 1 | 0 |
| HAWK MOUNTAIN; NORTHEASTERN PENNSYLVANIA | 1 | 0 |
| HAWK MOUNTAIN; PENNSYLVANIA DUTCH | 1 | 0 |
| HAWK MOUNTAIN; SHENANDOAH AREA | 1 | 0 |
| HAWKEYE AREA; MID-AMERICA | 1 | 0 |
| HEART OF AMERICA; LAUREL HIGHLANDS | 1 | 0 |
| HEART OF AMERICA; ORANGE COUNTY | 1 | 0 |
| HEART OF AMERICA; OREGON TRAIL | 1 | 0 |
| HEART OF AMERICA; PATHWAY TO ADVENTURE | 1 | 1 |
| HEART OF AMERICA; PATRIOTS' PATH; WINNEBAGO | 1 | 0 |
| HEART OF AMERICA; PONY EXPRESS | 1 | 0 |
| HEART OF AMERICA; SOUTH TEXAS | 1 | 0 |
| HEART OF AMERICA; TWIN RIVERS | 1 | 0 |
| HEART OF AMERICA; TWIN VALLEY | 1 | 0 |
| HEART OF NEW ENGLAND; MAYFLOWER; SPIRIT OF ADVENTURE | 1 | 0 |
| HEART OF NEW ENGLAND; NARRAGANSETT | 1 | 0 |
| HEART OF NEW ENGLAND; TWIN RIVERS | 1 | 0 |

## Unique and Timely Abuse Claim Count by Local Council

**Rows 1-265 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council**

| Local Council | All Unique & Timely Abuse Claims* | All Not-Barred, Unique & Timely Abuse Claims* |
|---|---|---|
| HEART OF VIRGINIA; NATIONAL CAPITAL AREA | 1 | 1 |
| HEART OF VIRGINIA; PIKES PEAK | 1 | 0 |
| HOOSIER TRAILS; LASALLE | 1 | 0 |
| HOOSIER TRAILS; MUSKINGUM VALLEY | 1 | 0 |
| HOOSIER TRAILS; QUAPAW AREA | 1 | 0 |
| HUDSON VALLEY; LEATHERSTOCKING | 1 | 1 |
| HUDSON VALLEY; MAYFLOWER | 1 | 0 |
| HUDSON VALLEY; NORTHERN NEW JERSEY | 1 | 1 |
| HUDSON VALLEY; SUSQUEHANNA | 1 | 1 |
| HUDSON VALLEY; THEODORE ROOSEVELT | 1 | 1 |
| HUDSON VALLEY; TWIN RIVERS | 1 | 1 |
| ILLOWA; MID-AMERICA | 1 | 0 |
| ILLOWA; NORTHEAST ILLINOIS | 1 | 0 |
| ILLOWA; NORTHEAST IOWA COUNCIL | 1 | 0 |
| ILLOWA; PRAIRIELANDS | 1 | 0 |
| ILLOWA; WINNEBAGO | 1 | 0 |
| INDIAN WATERS; PEE DEE AREA | 1 | 0 |
| INDIAN WATERS; TIDEWATER | 1 | 0 |
| INLAND NORTHWEST; MOUNT BAKER | 1 | 0 |
| INLAND NORTHWEST; MOUNTAIN WEST | 1 | 0 |
| INLAND NORTHWEST; NORTHERN STAR | 1 | 1 |
| INLAND NORTHWEST; OREGON TRAIL | 1 | 0 |
| INLAND NORTHWEST; POTAWATOMI AREA | 1 | 0 |
| IROQUOIS TRAIL; MICHIGAN CROSSROADS | 1 | 0 |
| IROQUOIS TRAIL; PATHWAY TO ADVENTURE | 1 | 0 |
| ISTROUMA AREA; NORWELA | 1 | 0 |
| JAYHAWK AREA; MID-IOWA | 1 | 0 |
| JAYHAWK AREA; NORTHERN LIGHTS | 1 | 1 |
| JAYHAWK AREA; OVERLAND TRAILS | 1 | 0 |
| JAYHAWK AREA; QUIVIRA | 1 | 0 |
| JERSEY SHORE; MINSI TRAILS | 1 | 1 |
| JERSEY SHORE; PATRIOTS' PATH | 1 | 1 |
| JERSEY SHORE; SOUTH FLORIDA COUNCIL | 1 | 1 |
| JERSEY SHORE; WASHINGTON CROSSING | 1 | 1 |
| LAKE ERIE; LAUREL HIGHLANDS | 1 | 0 |
| LAKE ERIE; MIAMI VALLEY | 1 | 0 |
| LAKE ERIE; NORTHEAST ILLINOIS | 1 | 0 |
| LAS VEGAS AREA; MOUNTAIN WEST; NEVADA AREA | 1 | 0 |
| LAS VEGAS AREA; PIKES PEAK | 1 | 0 |
| LASALLE; MIAMI VALLEY | 1 | 0 |
| LASALLE; MICHIGAN CROSSROADS | 1 | 0 |
| LASALLE; NARRAGANSETT | 1 | 0 |
| LASALLE; OREGON TRAIL | 1 | 0 |
| LASALLE; THREE HARBORS | 1 | 0 |
| LAST FRONTIER; LONG BEACH AREA | 1 | 1 |
| LAST FRONTIER; SAGAMORE | 1 | 0 |
| LAST FRONTIER; TEXAS TRAILS | 1 | 0 |
| LAUREL HIGHLANDS; LINCOLN HERITAGE | 1 | 0 |
| LAUREL HIGHLANDS; MOUNTAINEER AREA | 1 | 0 |
| LAUREL HIGHLANDS; WESTERN MASSACHUSETTS | 1 | 0 |
| LEATHERSTOCKING; LINCOLN HERITAGE | 1 | 0 |
| LEATHERSTOCKING; NARRAGANSETT | 1 | 0 |
| LEATHERSTOCKING; RIP VAN WINKLE | 1 | 1 |
| LEATHERSTOCKING; SENECA WATERWAYS | 1 | 1 |
| LEATHERSTOCKING; THEODORE ROOSEVELT | 1 | 1 |
| LEATHERSTOCKING; WESTCHESTER-PUTNAM | 1 | 1 |
| LINCOLN HERITAGE; SAGAMORE | 1 | 1 |
| LINCOLN HERITAGE; SAN DIEGO - IMPERIAL COUNCIL | 1 | 1 |
| LONG BEACH AREA; OVERLAND TRAILS | 1 | 0 |
| LONG BEACH AREA; PACIFIC SKYLINE | 1 | 1 |
| LONG BEACH AREA; TRANSATLANTIC | 1 | 0 |
| LONG BEACH AREA; WESTERN LOS ANGELES COUNTY | 1 | 1 |
| LONGHORN; NATIONAL CAPITAL AREA | 1 | 0 |
| LONGHORN; NORTHWEST TEXAS | 1 | 0 |
| LONGHORN; PACIFIC HARBORS | 1 | 0 |
| LONGHORN; PACIFIC SKYLINE | 1 | 1 |
| LONGHORN; TRANSATLANTIC | 1 | 0 |
| LONGHORN; WINNEBAGO | 1 | 0 |
| LONGHOUSE; THEODORE ROOSEVELT | 1 | 1 |
| LONGHOUSE; TWIN RIVERS | 1 | 1 |
| LOS PADRES; SILICON VALLEY MONTEREY BAY | 1 | 1 |

## Unique and Timely Abuse Claim Count by Local Council

**Rows 1-265 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council**

| Local Council | All Unique & Timely Abuse Claims* | All Not-Barred, Unique & Timely Abuse Claims* |
|---|---|---|
| LOS PADRES; SOUTHERN SIERRA | 1 | 1 |
| MASON-DIXON; PEE DEE AREA | 1 | 0 |
| MAYFLOWER; NARRAGANSETT; SPIRIT OF ADVENTURE | 1 | 0 |
| MAYFLOWER; QUAPAW AREA | 1 | 0 |
| MECKLENBURG COUNTY; OCCONEECHEE | 1 | 1 |
| MECKLENBURG COUNTY; OLD HICKORY | 1 | 0 |
| MECKLENBURG COUNTY; TUSCARORA | 1 | 1 |
| MIAMI VALLEY; MICHIGAN CROSSROADS; TECUMSEH | 1 | 0 |
| MIAMI VALLEY; SOUTH FLORIDA COUNCIL | 1 | 0 |
| MICHIGAN CROSSROADS; MID-AMERICA | 1 | 0 |
| MICHIGAN CROSSROADS; NARRAGANSETT | 1 | 0 |
| MICHIGAN CROSSROADS; NORTH FLORIDA | 1 | 0 |
| MICHIGAN CROSSROADS; ORANGE COUNTY | 1 | 0 |
| MICHIGAN CROSSROADS; PINE BURR AREA | 1 | 0 |
| MICHIGAN CROSSROADS; QUAPAW AREA | 1 | 0 |
| MICHIGAN CROSSROADS; RIO GRANDE | 1 | 0 |
| MICHIGAN CROSSROADS; SENECA WATERWAYS | 1 | 0 |
| MICHIGAN CROSSROADS; THREE FIRES; THREE HARBORS; THREE RIVERS | 1 | 0 |
| MICHIGAN CROSSROADS; VERDUGO HILLS | 1 | 1 |
| MID-AMERICA; OREGON TRAIL | 1 | 0 |
| MID-AMERICA; SIOUX | 1 | 0 |
| MID-IOWA; MISSISSIPPI VALLEY | 1 | 0 |
| MID-IOWA; W.D. BOYCE | 1 | 0 |
| MID-IOWA; WINNEBAGO | 1 | 0 |
| MIDNIGHT SUN; OREGON TRAIL | 1 | 0 |
| MINSI TRAILS; MONMOUTH | 1 | 1 |
| MINSI TRAILS; MORAINE TRAILS | 1 | 0 |
| MINSI TRAILS; NEW BIRTH OF FREEDOM | 1 | 0 |
| MINSI TRAILS; NORTHEAST GEORGIA | 1 | 1 |
| MINSI TRAILS; RIP VAN WINKLE | 1 | 1 |
| MINSI TRAILS; WASHINGTON CROSSING | 1 | 0 |
| MISSISSIPPI VALLEY; NORTHERN STAR | 1 | 0 |
| MISSISSIPPI VALLEY; PATHWAY TO ADVENTURE | 1 | 0 |
| MISSISSIPPI VALLEY; PINE BURR AREA | 1 | 0 |
| MOBILE AREA; PINE BURR AREA | 1 | 0 |
| MONMOUTH; NORTHERN NEW JERSEY | 1 | 1 |
| MONTANA; NORTH FLORIDA | 1 | 1 |
| MOUNTAIN WEST; NEVADA AREA | 1 | 0 |
| MOUNTAINEER AREA; SIMON KENTON | 1 | 0 |
| MUSKINGUM VALLEY; SIMON KENTON | 1 | 0 |
| MUSKINGUM VALLEY; SPIRIT OF ADVENTURE | 1 | 0 |
| NARRAGANSETT; NATIONAL CAPITAL AREA | 1 | 0 |
| NARRAGANSETT; SPIRIT OF ADVENTURE | 1 | 0 |
| NARRAGANSETT; THEODORE ROOSEVELT | 1 | 0 |
| NARRAGANSETT; WESTERN MASSACHUSETTS | 1 | 0 |
| NATIONAL CAPITAL AREA; ORANGE COUNTY | 1 | 1 |
| NATIONAL CAPITAL AREA; PACIFIC HARBORS | 1 | 0 |
| NATIONAL CAPITAL AREA; SOUTH FLORIDA COUNCIL | 1 | 0 |
| NATIONAL CAPITAL AREA; SOUTH PLAINS | 1 | 0 |
| NATIONAL CAPITAL AREA; TEXAS TRAILS | 1 | 0 |
| NATIONAL CAPITAL AREA; WESTERN LOS ANGELES COUNTY | 1 | 0 |
| NEVADA AREA; OVERLAND TRAILS | 1 | 0 |
| NEVADA AREA; OZARK TRAILS | 1 | 0 |
| NEVADA AREA; SILICON VALLEY MONTEREY BAY | 1 | 1 |
| NEVADA AREA; SPIRIT OF ADVENTURE | 1 | 1 |
| NEVADA AREA; WESTERN LOS ANGELES COUNTY | 1 | 1 |
| NEW BIRTH OF FREEDOM; NORTHEASTERN PENNSYLVANIA | 1 | 0 |
| NEW BIRTH OF FREEDOM; TECUMSEH | 1 | 0 |
| NEW BIRTH OF FREEDOM; TRANSATLANTIC | 1 | 0 |
| NORTHEAST ILLINOIS; RAINBOW | 1 | 0 |
| NORTHEAST ILLINOIS; W.D. BOYCE | 1 | 0 |
| NORTHEASTERN PENNSYLVANIA; NORTHERN NEW JERSEY | 1 | 1 |
| NORTHEASTERN PENNSYLVANIA; SUSQUEHANNA | 1 | 0 |
| NORTHERN NEW JERSEY; PATHWAY TO ADVENTURE | 1 | 0 |
| NORTHERN NEW JERSEY; PINE BURR AREA | 1 | 0 |
| NORTHERN NEW JERSEY; QUIVIRA | 1 | 1 |
| NORTHERN NEW JERSEY; SAM HOUSTON AREA | 1 | 0 |
| NORTHERN NEW JERSEY; SOUTHWEST FLORIDA | 1 | 1 |
| NORTHERN NEW JERSEY; TWIN RIVERS | 1 | 1 |
| NORTHERN STAR; PIKES PEAK | 1 | 0 |
| NORTHERN STAR; PRAIRIELANDS | 1 | 1 |

## Unique and Timely Abuse Claim Count by Local Council

**Rows 1-265 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council**

| Local Council | All Unique & Timely Abuse Claims* | All Not-Barred, Unique & Timely Abuse Claims* |
|---|---|---|
| NORTHWEST TEXAS; QUIVIRA | 1 | 0 |
| NORTHWEST TEXAS; SAM HOUSTON AREA | 1 | 0 |
| OCCONEECHEE; OLD NORTH STATE | 1 | 1 |
| OCCONEECHEE; TRANSATLANTIC | 1 | 1 |
| OHIO RIVER VALLEY; PATHWAY TO ADVENTURE | 1 | 0 |
| OLD HICKORY; SEQUOYAH | 1 | 1 |
| OLD HICKORY; TIDEWATER | 1 | 1 |
| OLD NORTH STATE; WESTERN MASSACHUSETTS | 1 | 1 |
| OREGON TRAIL; PIKES PEAK | 1 | 0 |
| OREGON TRAIL; QUIVIRA | 1 | 0 |
| OREGON TRAIL; SHENANDOAH AREA | 1 | 0 |
| OZARK TRAILS; THREE FIRES | 1 | 0 |
| PACIFIC HARBORS; SAN DIEGO - IMPERIAL COUNCIL | 1 | 1 |
| PACIFIC HARBORS; TRANSATLANTIC | 1 | 0 |
| PACIFIC HARBORS; WESTERN MASSACHUSETTS | 1 | 0 |
| PALMETTO; PIEDMONT 420 | 1 | 1 |
| PATHWAY TO ADVENTURE; PRAIRIELANDS | 1 | 1 |
| PATHWAY TO ADVENTURE; SAGAMORE | 1 | 0 |
| PATHWAY TO ADVENTURE; SAMOSET COUNCIL | 1 | 0 |
| PATHWAY TO ADVENTURE; THREE FIRES; THREE HARBORS | 1 | 0 |
| PATRIOTS' PATH; SENECA WATERWAYS | 1 | 1 |
| PATRIOTS' PATH; WINNEBAGO | 1 | 1 |
| PENNSYLVANIA DUTCH; SAM HOUSTON AREA | 1 | 0 |
| PIEDMONT 420; SENECA WATERWAYS | 1 | 1 |
| PONY EXPRESS; QUIVIRA | 1 | 0 |
| PRAIRIELANDS; THREE FIRES | 1 | 0 |
| QUAPAW AREA; SEQUOYAH | 1 | 0 |
| QUIVIRA; SANTA FE TRAIL | 1 | 0 |
| QUIVIRA; TEXAS TRAILS | 1 | 0 |
| RIO GRANDE; SOUTH TEXAS | 1 | 0 |
| RIO GRANDE; TEXAS SOUTHWEST | 1 | 0 |
| SAGAMORE; SPIRIT OF ADVENTURE | 1 | 0 |
| SAGAMORE; THREE FIRES | 1 | 0 |
| SAM HOUSTON AREA; SOUTH TEXAS | 1 | 0 |
| SAM HOUSTON AREA; TIDEWATER | 1 | 0 |
| SAN DIEGO - IMPERIAL COUNCIL; SEQUOIA | 1 | 1 |
| SENECA WATERWAYS; THEODORE ROOSEVELT | 1 | 1 |
| SENECA WATERWAYS; TWIN RIVERS | 1 | 1 |
| SENECA WATERWAYS; WESTCHESTER-PUTNAM | 1 | 1 |
| SEQUOIA; WESTERN LOS ANGELES COUNTY | 1 | 1 |
| SILICON VALLEY MONTEREY BAY; SOUTHERN SIERRA | 1 | 1 |
| SILICON VALLEY MONTEREY BAY; WESTERN LOS ANGELES COUNTY | 1 | 1 |
| SIMON KENTON; TECUMSEH | 1 | 0 |
| SOUTH FLORIDA COUNCIL; SOUTHWEST FLORIDA | 1 | 0 |
| SOUTH GEORGIA; SUWANNEE RIVER AREA | 1 | 0 |
| SOUTH PLAINS; TEXAS SOUTHWEST | 1 | 0 |
| SOUTH TEXAS; TEXAS SOUTHWEST | 1 | 0 |
| SOUTHERN SIERRA; VENTURA COUNTY | 1 | 1 |
| SOUTHERN SIERRA; VERDUGO HILLS | 1 | 1 |
| SPIRIT OF ADVENTURE; TRANSATLANTIC | 1 | 0 |
| SUFFOLK COUNTY; TWIN RIVERS | 1 | 1 |
| TEXAS TRAILS; THREE RIVERS | 1 | 0 |
| THEODORE ROOSEVELT; WASHINGTON CROSSING | 1 | 0 |
| VENTURA COUNTY; WESTERN LOS ANGELES COUNTY | 1 | 1 |
| WEST TENNESSEE AREA; YOCONA AREA | 1 | 0 |
| **Total** | **82,458** | **24,308** |

\* The abuse claim count listed in this column is based on the claimants' responses to Part 4.I. on the Sexual Abuse Proof of Claim Form and does not account for references to the Local Council that may be located elsewhere in the proof of claim.  The abuse claim count listed above also does not reflect any other analysis conducted by the Debtors to approximate the total number of abuse claims that implicate the Local Council.

**<u>EXHIBIT 3</u>**

## Unique and Timely Abuse Claim Count by Local Council & Allegation

Rows 1-264 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council

| Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching-Clothed | Unknown/Unconfirmed | Missing | Total* |
|---|---|---|---|---|---|---|---|---|---|
| UNKNOWN | 6,796 | 5,444 | 3,406 | 4,875 | 608 | 463 | 1,197 | 106 | 22,895 |
| MISSING | 2,078 | 1,966 | 1,104 | 2,202 | 351 | 174 | 1,788 | 2,109 | 11,772 |
| MICHIGAN CROSSROADS | 477 | 375 | 249 | 358 | 36 | 23 | 29 | 3 | 1,550 |
| GREATER NEW YORK | 457 | 326 | 253 | 334 | 34 | 20 | 30 | 0 | 1,454 |
| PATHWAY TO ADVENTURE | 384 | 356 | 232 | 344 | 27 | 15 | 25 | 3 | 1,386 |
| GREATER LOS ANGELES | 426 | 281 | 193 | 259 | 19 | 17 | 19 | 1 | 1,215 |
| GREATER ST. LOUIS AREA | 247 | 215 | 149 | 172 | 18 | 18 | 15 | 2 | 836 |
| SAM HOUSTON AREA | 218 | 177 | 141 | 194 | 19 | 15 | 20 | 2 | 786 |
| GOLDEN GATE AREA | 211 | 169 | 113 | 177 | 21 | 9 | 19 | 2 | 721 |
| SPIRIT OF ADVENTURE | 174 | 180 | 120 | 144 | 16 | 8 | 20 | 0 | 662 |
| CROSSROADS OF THE WEST | 229 | 124 | 128 | 125 | 7 | 12 | 10 | 2 | 637 |
| HEART OF AMERICA | 222 | 134 | 95 | 124 | 7 | 11 | 10 | 0 | 603 |
| NATIONAL CAPITAL AREA | 158 | 140 | 93 | 150 | 7 | 5 | 9 | 2 | 564 |
| CRADLE OF LIBERTY | 144 | 158 | 87 | 115 | 11 | 12 | 13 | 1 | 541 |
| CIRCLE TEN | 187 | 149 | 72 | 98 | 6 | 8 | 19 | 0 | 539 |
| CASCADE PACIFIC | 163 | 116 | 97 | 119 | 7 | 5 | 13 | 2 | 522 |
| SOUTH FLORIDA COUNCIL | 139 | 137 | 94 | 109 | 4 | 8 | 8 | 1 | 500 |
| GRAND CANYON | 166 | 120 | 80 | 104 | 6 | 8 | 11 | 2 | 497 |
| NORTHERN NEW JERSEY | 133 | 117 | 100 | 111 | 12 | 10 | 10 | 0 | 493 |
| GREATER TAMPA BAY AREA | 144 | 111 | 94 | 85 | 14 | 5 | 6 | 0 | 459 |
| CALIFORNIA INLAND EMPIRE | 173 | 90 | 67 | 106 | 6 | 6 | 8 | 0 | 456 |
| LAKE ERIE | 134 | 113 | 92 | 90 | 7 | 4 | 14 | 2 | 456 |
| BALTIMORE AREA | 148 | 115 | 54 | 99 | 7 | 7 | 15 | 1 | 446 |
| ATLANTA AREA | 148 | 95 | 77 | 86 | 11 | 4 | 8 | 0 | 429 |
| GOLDEN EMPIRE | 130 | 97 | 76 | 85 | 14 | 7 | 9 | 2 | 420 |
| LONGHORN | 140 | 88 | 77 | 78 | 6 | 8 | 10 | 0 | 407 |
| SAN DIEGO - IMPERIAL COUNCIL | 129 | 95 | 83 | 73 | 9 | 6 | 6 | 4 | 405 |
| GREATER ALABAMA | 121 | 98 | 67 | 92 | 10 | 3 | 8 | 2 | 401 |
| ORANGE COUNTY | 131 | 82 | 81 | 75 | 9 | 6 | 12 | 0 | 396 |
| CROSSROADS OF AMERICA | 123 | 99 | 58 | 90 | 7 | 10 | 8 | 0 | 395 |
| LINCOLN HERITAGE | 123 | 94 | 66 | 90 | 5 | 3 | 8 | 0 | 389 |
| NARRAGANSETT | 104 | 90 | 69 | 81 | 9 | 4 | 6 | 0 | 363 |
| NORTHERN STAR | 106 | 77 | 70 | 78 | 10 | 6 | 14 | 2 | 363 |
| SIMON KENTON | 127 | 82 | 64 | 74 | 5 | 3 | 5 | 1 | 361 |
| QUAPAW AREA | 115 | 85 | 54 | 72 | 7 | 10 | 9 | 1 | 353 |
| DAN BEARD | 112 | 82 | 68 | 63 | 12 | 6 | 4 | 3 | 350 |
| LAUREL HIGHLANDS | 94 | 98 | 61 | 74 | 8 | 3 | 7 | 1 | 346 |
| SOUTHEAST LOUISIANA | 100 | 102 | 46 | 71 | 12 | 4 | 7 | 0 | 342 |
| CHICKASAW | 109 | 69 | 58 | 81 | 6 | 6 | 5 | 1 | 335 |
| DENVER AREA | 109 | 69 | 73 | 61 | 8 | 4 | 6 | 3 | 333 |
| LAST FRONTIER | 100 | 66 | 54 | 63 | 3 | 3 | 10 | 0 | 299 |
| CENTRAL FLORIDA | 73 | 71 | 53 | 73 | 8 | 10 | 10 | 0 | 298 |
| CHIEF SEATTLE | 92 | 75 | 60 | 55 | 5 | 2 | 8 | 1 | 298 |
| SILICON VALLEY MONTEREY BAY | 104 | 60 | 63 | 55 | 5 | 2 | 6 | 1 | 296 |
| CONNECTICUT RIVERS | 78 | 70 | 57 | 63 | 4 | 3 | 11 | 0 | 286 |
| ALAMO AREA | 93 | 63 | 54 | 59 | 2 | 4 | 6 | 0 | 281 |
| NORTH FLORIDA | 101 | 59 | 39 | 65 | 7 | 3 | 4 | 0 | 278 |
| BUCKSKIN | 94 | 58 | 33 | 59 | 6 | 6 | 3 | 2 | 261 |
| THREE HARBORS | 77 | 61 | 43 | 67 | 2 | 3 | 3 | 0 | 256 |
| WESTERN LOS ANGELES COUNTY | 94 | 47 | 48 | 56 | 1 | 1 | 7 | 1 | 255 |
| MID-AMERICA | 80 | 51 | 47 | 54 | 5 | 2 | 14 | 1 | 254 |
| QUIVIRA | 75 | 58 | 50 | 48 | 6 | 4 | 11 | 0 | 252 |
| MIDDLE TENNESSEE | 71 | 73 | 41 | 60 | 2 | 1 | 1 | 0 | 249 |
| GREAT SOUTHWEST | 95 | 38 | 47 | 47 | 2 | 7 | 8 | 1 | 245 |
| GREAT TRAIL | 76 | 58 | 35 | 56 | 5 | 4 | 4 | 1 | 239 |
| GARDEN STATE | 77 | 61 | 45 | 45 | 2 | 2 | 3 | 0 | 235 |
| SEQUOIA | 86 | 48 | 28 | 53 | 6 | 2 | 5 | 0 | 228 |
| GREATER NIAGARA FRONTIER | 64 | 58 | 41 | 51 | 7 | 2 | 4 | 0 | 227 |
| PACIFIC HARBORS | 77 | 40 | 50 | 52 | 2 | 1 | 4 | 0 | 226 |
| SENECA WATERWAYS | 68 | 56 | 39 | 49 | 2 | 3 | 6 | 0 | 223 |
| CONNECTICUT YANKEE | 64 | 55 | 28 | 54 | 3 | 6 | 9 | 0 | 219 |
| MAYFLOWER | 56 | 56 | 43 | 43 | 3 | 2 | 14 | 1 | 218 |
| CATALINA | 72 | 55 | 30 | 42 | 4 | 3 | 10 | 0 | 216 |
| TIDEWATER | 71 | 52 | 42 | 41 | 3 | 2 | 3 | 2 | 216 |
| TWIN RIVERS | 63 | 60 | 37 | 37 | 4 | 2 | 7 | 3 | 213 |
| PATRIOTS' PATH | 63 | 55 | 33 | 51 | 1 | 1 | 4 | 0 | 208 |
| OCCONEECHEE | 62 | 51 | 37 | 43 | 7 | 2 | 1 | 0 | 203 |
| WESTCHESTER-PUTNAM | 53 | 43 | 42 | 48 | 7 | 5 | 3 | 0 | 201 |
| GREATER YOSEMITE | 74 | 42 | 28 | 40 | 4 | 4 | 1 | 0 | 193 |
| BLUE GRASS | 67 | 61 | 23 | 31 | 2 | 4 | 3 | 0 | 191 |
| INDIAN NATIONS | 67 | 62 | 26 | 27 | 1 | 1 | 5 | 0 | 189 |
| ANDREW JACKSON | 63 | 42 | 23 | 50 | 5 | 0 | 4 | 1 | 188 |
| SUFFOLK COUNTY | 49 | 46 | 30 | 50 | 6 | 3 | 3 | 0 | 187 |
| LAS VEGAS AREA | 59 | 43 | 27 | 42 | 4 | 5 | 6 | 0 | 186 |
| GULF COAST | 69 | 42 | 30 | 39 | 0 | 0 | 5 | 0 | 185 |
| WESTERN MASSACHUSETTS | 50 | 48 | 28 | 49 | 3 | 3 | 4 | 0 | 185 |
| ALOHA | 65 | 48 | 31 | 30 | 4 | 1 | 2 | 0 | 181 |
| PINE TREE | 53 | 56 | 30 | 31 | 2 | 2 | 6 | 1 | 181 |
| DANIEL WEBSTER | 70 | 44 | 33 | 23 | 1 | 2 | 6 | 0 | 179 |
| HEART OF NEW ENGLAND | 47 | 57 | 31 | 34 | 2 | 0 | 4 | 0 | 175 |
| THEODORE ROOSEVELT | 43 | 34 | 37 | 45 | 5 | 1 | 5 | 0 | 170 |
| GREAT SMOKY MOUNTAIN | 58 | 39 | 31 | 34 | 1 | 0 | 3 | 0 | 166 |
| OZARK TRAILS | 61 | 39 | 20 | 34 | 4 | 2 | 6 | 0 | 166 |
| YUCCA | 60 | 35 | 29 | 33 | 2 | 1 | 6 | 0 | 166 |
| ERIE SHORES | 35 | 51 | 32 | 39 | 2 | 4 | 2 | 0 | 165 |
| LONGHOUSE | 48 | 34 | 36 | 39 | 2 | 3 | 3 | 0 | 165 |
| NEW BIRTH OF FREEDOM | 34 | 55 | 36 | 29 | 3 | 2 | 3 | 1 | 163 |
| GULF STREAM | 43 | 59 | 20 | 30 | 2 | 1 | 6 | 0 | 161 |
| PINE BURR AREA | 56 | 37 | 20 | 39 | 5 | 0 | 2 | 1 | 160 |
| BUCKEYE | 47 | 39 | 30 | 25 | 7 | 1 | 9 | 0 | 158 |
| INLAND NORTHWEST | 56 | 29 | 29 | 35 | 2 | 2 | 4 | 1 | 158 |
| EAST CAROLINA | 55 | 46 | 25 | 22 | 3 | 3 | 2 | 0 | 156 |
| BAY-LAKES | 39 | 37 | 32 | 39 | 2 | 1 | 4 | 1 | 155 |
| BLUE RIDGE | 48 | 40 | 25 | 29 | 5 | 2 | 2 | 1 | 152 |
| BLACKHAWK AREA | 40 | 44 | 18 | 41 | 5 | 1 | 2 | 0 | 151 |

## Unique and Timely Abuse Claim Count by Local Council & Allegation

Rows 1-264 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council

| Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching-Clothed | Unknown/Unconfirmed | Missing | Total* |
|---|---|---|---|---|---|---|---|---|---|
| HEART OF VIRGINIA | 49 | 39 | 30 | 27 | 2 | 3 | 1 | 0 | 151 |
| COASTAL CAROLINA | 52 | 25 | 30 | 28 | 3 | 4 | 8 | 0 | 150 |
| LONG BEACH AREA | 44 | 37 | 29 | 35 | 1 | 3 | 1 | 0 | 150 |
| OLD NORTH STATE | 52 | 27 | 26 | 32 | 4 | 2 | 6 | 1 | 150 |
| MID-IOWA | 42 | 41 | 25 | 28 | 3 | 4 | 6 | 0 | 149 |
| TRANSATLANTIC | 44 | 30 | 38 | 26 | 3 | 2 | 3 | 0 | 146 |
| OREGON TRAIL | 56 | 35 | 22 | 28 | 0 | 1 | 3 | 0 | 145 |
| SOUTHERN SIERRA | 49 | 30 | 23 | 35 | 3 | 2 | 2 | 0 | 144 |
| THREE FIRES | 43 | 36 | 24 | 29 | 5 | 4 | 3 | 0 | 144 |
| MOUNT BAKER | 47 | 29 | 30 | 32 | 2 | 1 | 1 | 1 | 143 |
| MIAMI VALLEY | 44 | 33 | 21 | 40 | 2 | 1 | 0 | 1 | 142 |
| PIEDMONT 420 | 53 | 34 | 19 | 31 | 3 | 0 | 0 | 0 | 140 |
| ISTROUMA AREA | 36 | 40 | 31 | 24 | 5 | 2 | 1 | 0 | 139 |
| W.D. BOYCE | 53 | 25 | 23 | 27 | 2 | 3 | 3 | 0 | 136 |
| MOUNTAIN WEST | 51 | 32 | 17 | 29 | 2 | 1 | 2 | 0 | 134 |
| THREE RIVERS | 58 | 25 | 19 | 23 | 1 | 1 | 5 | 0 | 132 |
| INDIAN WATERS | 45 | 31 | 20 | 28 | 2 | 1 | 3 | 1 | 131 |
| DEL-MAR-VA | 35 | 43 | 15 | 27 | 1 | 3 | 6 | 0 | 130 |
| MONTANA | 44 | 28 | 26 | 24 | 2 | 1 | 4 | 0 | 129 |
| CRATER LAKE COUNCIL | 44 | 26 | 22 | 23 | 1 | 1 | 9 | 0 | 126 |
| COASTAL GEORGIA | 51 | 25 | 21 | 22 | 2 | 2 | 2 | 0 | 125 |
| SOUTH TEXAS | 54 | 30 | 20 | 15 | 1 | 3 | 2 | 0 | 125 |
| CAPITOL AREA | 40 | 20 | 25 | 30 | 4 | 2 | 0 | 1 | 122 |
| HUDSON VALLEY | 31 | 29 | 25 | 28 | 1 | 2 | 3 | 2 | 121 |
| ILLOWA | 42 | 33 | 20 | 18 | 2 | 1 | 3 | 0 | 119 |
| LASALLE | 33 | 31 | 17 | 30 | 3 | 2 | 2 | 0 | 118 |
| LONGS PEAK COUNCIL | 50 | 18 | 26 | 18 | 2 | 3 | 1 | 0 | 118 |
| CHATTAHOOCHEE | 28 | 33 | 18 | 28 | 3 | 1 | 2 | 1 | 114 |
| GOLDEN SPREAD | 36 | 29 | 19 | 24 | 2 | 1 | 3 | 0 | 114 |
| NORTHEAST GEORGIA | 45 | 24 | 17 | 19 | 4 | 2 | 3 | 0 | 114 |
| TUKABATCHEE AREA | 27 | 22 | 20 | 37 | 4 | 2 | 2 | 0 | 114 |
| MONMOUTH | 28 | 27 | 24 | 26 | 3 | 2 | 0 | 1 | 111 |
| EAST TEXAS AREA | 40 | 25 | 15 | 22 | 3 | 1 | 3 | 1 | 110 |
| MOBILE AREA | 45 | 27 | 15 | 22 | 0 | 0 | 1 | 0 | 110 |
| SOUTHWEST FLORIDA | 35 | 32 | 21 | 18 | 2 | 0 | 1 | 0 | 109 |
| LOUISIANA PURCHASE | 42 | 22 | 21 | 22 | 0 | 0 | 1 | 0 | 108 |
| BUFFALO TRACE | 33 | 25 | 26 | 18 | 1 | 1 | 3 | 0 | 107 |
| NORTHEAST ILLINOIS | 33 | 20 | 19 | 25 | 0 | 4 | 5 | 1 | 107 |
| NEVADA AREA | 37 | 26 | 16 | 22 | 1 | 2 | 2 | 0 | 106 |
| SAGAMORE | 37 | 32 | 11 | 21 | 2 | 0 | 2 | 0 | 105 |
| WESTARK AREA | 32 | 28 | 20 | 18 | 4 | 2 | 1 | 0 | 105 |
| OLD HICKORY | 30 | 29 | 18 | 20 | 3 | 1 | 2 | 0 | 103 |
| BLUE RIDGE MOUNTAINS | 39 | 22 | 10 | 24 | 3 | 2 | 2 | 0 | 102 |
| MINSI TRAILS | 28 | 28 | 17 | 22 | 4 | 2 | 1 | 0 | 102 |
| PACIFIC SKYLINE | 26 | 23 | 20 | 24 | 3 | 3 | 3 | 0 | 102 |
| GLACIER'S EDGE | 18 | 20 | 27 | 24 | 3 | 3 | 3 | 0 | 98 |
| GREEN MOUNTAIN | 20 | 22 | 28 | 25 | 0 | 0 | 3 | 0 | 98 |
| NORTHERN LIGHTS | 26 | 24 | 20 | 21 | 5 | 1 | 1 | 0 | 98 |
| ANTHONY WAYNE AREA | 36 | 20 | 15 | 15 | 3 | 1 | 4 | 1 | 95 |
| COLONIAL VIRGINIA | 21 | 26 | 18 | 24 | 0 | 4 | 2 | 0 | 95 |
| JERSEY SHORE | 34 | 20 | 12 | 23 | 3 | 1 | 1 | 0 | 94 |
| RAINBOW | 29 | 22 | 18 | 22 | 1 | 0 | 2 | 0 | 94 |
| GREAT ALASKA | 36 | 26 | 11 | 15 | 1 | 1 | 3 | 0 | 93 |
| NORWELA | 30 | 24 | 8 | 26 | 3 | 1 | 1 | 0 | 93 |
| BADEN POWELL | 24 | 25 | 19 | 21 | 1 | 0 | 2 | 0 | 92 |
| CHEROKEE AREA 556 | 26 | 21 | 20 | 17 | 3 | 4 | 1 | 0 | 92 |
| PIKES PEAK | 29 | 22 | 16 | 18 | 3 | 1 | 2 | 1 | 92 |
| FRENCH CREEK | 15 | 29 | 19 | 20 | 3 | 0 | 5 | 0 | 91 |
| SOUTH PLAINS | 31 | 16 | 17 | 23 | 0 | 1 | 2 | 0 | 90 |
| VENTURA COUNTY | 31 | 17 | 16 | 21 | 3 | 0 | 1 | 1 | 90 |
| MECKLENBURG COUNTY | 26 | 20 | 17 | 18 | 1 | 3 | 3 | 0 | 88 |
| BAY AREA | 24 | 23 | 13 | 24 | 1 | 1 | 1 | 0 | 87 |
| LEATHERSTOCKING | 29 | 26 | 13 | 14 | 1 | 2 | 2 | 0 | 87 |
| CAPE FEAR | 29 | 20 | 11 | 19 | 1 | 2 | 4 | 0 | 86 |
| GRAND COLUMBIA | 34 | 16 | 17 | 15 | 2 | 0 | 1 | 0 | 85 |
| LOS PADRES | 30 | 19 | 15 | 15 | 2 | 2 | 2 | 0 | 85 |
| BUFFALO TRAIL | 27 | 19 | 21 | 16 | 0 | 0 | 1 | 0 | 84 |
| CENTRAL NORTH CAROLINA | 24 | 17 | 15 | 18 | 2 | 2 | 4 | 0 | 82 |
| RIO GRANDE | 26 | 13 | 16 | 17 | 3 | 4 | 3 | 0 | 82 |
| CENTRAL GEORGIA | 22 | 21 | 19 | 12 | 2 | 2 | 3 | 0 | 81 |
| GRAND TETON | 27 | 11 | 14 | 20 | 5 | 3 | 1 | 0 | 81 |
| PEE DEE AREA | 18 | 21 | 12 | 22 | 4 | 2 | 1 | 1 | 81 |
| SOUTH GEORGIA | 20 | 17 | 14 | 27 | 1 | 0 | 2 | 0 | 81 |
| CALCASIEU | 29 | 19 | 9 | 14 | 2 | 1 | 5 | 0 | 79 |
| PALMETTO | 23 | 21 | 6 | 25 | 4 | 0 | 0 | 0 | 79 |
| PRAIRIELANDS | 25 | 16 | 14 | 19 | 0 | 2 | 2 | 0 | 78 |
| PUERTO RICO | 33 | 16 | 15 | 11 | 2 | 0 | 1 | 0 | 78 |
| EVANGELINE AREA | 31 | 18 | 8 | 16 | 2 | 0 | 2 | 0 | 77 |
| ROCKY MOUNTAIN | 18 | 25 | 13 | 15 | 0 | 1 | 3 | 1 | 76 |
| HAWK MOUNTAIN | 20 | 29 | 12 | 12 | 0 | 1 | 0 | 0 | 74 |
| NORTHEASTERN PENNSYLVANIA | 20 | 25 | 13 | 14 | 1 | 0 | 1 | 0 | 74 |
| WASHINGTON CROSSING | 23 | 12 | 22 | 15 | 0 | 1 | 1 | 0 | 74 |
| VERDUGO HILLS | 21 | 21 | 14 | 14 | 0 | 2 | 1 | 0 | 73 |
| BLACK SWAMP AREA | 15 | 26 | 9 | 16 | 2 | 0 | 4 | 0 | 72 |
| GEORGIA-CAROLINA | 23 | 9 | 11 | 24 | 2 | 1 | 2 | 0 | 72 |
| REDWOOD EMPIRE | 26 | 16 | 14 | 11 | 2 | 2 | 1 | 0 | 72 |
| NORTHWEST TEXAS | 17 | 14 | 18 | 17 | 0 | 1 | 3 | 1 | 71 |
| PENNSYLVANIA DUTCH | 20 | 14 | 18 | 14 | 4 | 1 | 1 | 0 | 71 |
| TECUMSEH | 25 | 18 | 10 | 14 | 1 | 1 | 1 | 0 | 70 |
| GREAT RIVERS | 22 | 18 | 17 | 6 | 3 | 0 | 3 | 0 | 69 |
| SEQUOYAH | 25 | 20 | 9 | 11 | 1 | 0 | 2 | 1 | 69 |
| FIVE RIVERS | 23 | 16 | 8 | 17 | 0 | 1 | 1 | 2 | 68 |
| BLACK WARRIOR | 14 | 14 | 17 | 19 | 0 | 2 | 0 | 1 | 67 |
| HOOSIER TRAILS | 21 | 16 | 13 | 15 | 0 | 1 | 0 | 0 | 66 |
| CORONADO AREA | 20 | 18 | 8 | 15 | 1 | 0 | 1 | 2 | 65 |

## Unique and Timely Abuse Claim Count by Local Council & Allegation

Rows 1-264 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council

| Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching-Clothed | Unknown/Unconfirmed | Missing | Total* |
|---|---|---|---|---|---|---|---|---|---|
| TEXAS TRAILS | 23 | 14 | 11 | 13 | 1 | 0 | 3 | 0 | 65 |
| FLINT RIVER | 13 | 12 | 16 | 21 | 1 | 0 | 1 | 0 | 64 |
| WESTMORELAND-FAYETTE | 16 | 14 | 19 | 9 | 2 | 0 | 3 | 0 | 63 |
| YOCONA AREA | 23 | 12 | 8 | 13 | 1 | 2 | 1 | 1 | 61 |
| GAMEHAVEN | 15 | 13 | 13 | 15 | 1 | 2 | 1 | 0 | 60 |
| ALLEGHENY HIGHLANDS | 20 | 10 | 14 | 13 | 1 | 0 | 0 | 1 | 59 |
| BLUE MOUNTAIN | 19 | 10 | 12 | 12 | 2 | 0 | 3 | 1 | 59 |
| HAWKEYE AREA | 15 | 15 | 13 | 11 | 1 | 2 | 1 | 0 | 58 |
| WINNEBAGO | 15 | 10 | 15 | 15 | 1 | 1 | 1 | 0 | 58 |
| ALABAMA-FLORIDA | 21 | 9 | 11 | 14 | 0 | 1 | 1 | 0 | 57 |
| CIMARRON | 15 | 15 | 10 | 11 | 2 | 2 | 1 | 1 | 57 |
| CONQUISTADOR | 19 | 18 | 7 | 11 | 1 | 0 | 1 | 0 | 57 |
| DANIEL BOONE | 16 | 14 | 12 | 12 | 1 | 1 | 1 | 0 | 57 |
| WEST TENNESSEE AREA | 17 | 16 | 5 | 15 | 1 | 2 | 1 | 0 | 57 |
| CADDO AREA | 12 | 15 | 12 | 12 | 1 | 1 | 2 | 0 | 55 |
| PONY EXPRESS | 13 | 9 | 6 | 23 | 1 | 1 | 2 | 0 | 55 |
| OHIO RIVER VALLEY | 18 | 8 | 11 | 16 | 1 | 0 | 0 | 0 | 54 |
| CORNHUSKER | 20 | 8 | 6 | 10 | 3 | 1 | 5 | 0 | 53 |
| FAR EAST | 21 | 14 | 9 | 4 | 2 | 0 | 2 | 1 | 53 |
| KATAHDIN AREA | 15 | 12 | 13 | 10 | 1 | 0 | 2 | 0 | 53 |
| MORAINE TRAILS | 24 | 10 | 8 | 6 | 1 | 1 | 1 | 0 | 51 |
| ABRAHAM LINCOLN | 18 | 16 | 4 | 10 | 1 | 1 | 0 | 0 | 50 |
| OVERLAND TRAILS | 18 | 11 | 10 | 7 | 4 | 0 | 0 | 0 | 50 |
| TEXAS SOUTHWEST | 14 | 12 | 12 | 10 | 1 | 1 | 0 | 0 | 50 |
| CHIPPEWA VALLEY | 12 | 7 | 12 | 13 | 2 | 1 | 2 | 0 | 49 |
| SUWANNEE RIVER AREA | 12 | 8 | 12 | 13 | 1 | 2 | 1 | 0 | 49 |
| PUSHMATAHA AREA | 18 | 6 | 8 | 9 | 4 | 2 | 1 | 0 | 48 |
| CHESTER COUNTY | 21 | 12 | 8 | 6 | 0 | 0 | 0 | 0 | 47 |
| SUSQUEHANNA | 13 | 9 | 11 | 10 | 1 | 0 | 1 | 0 | 45 |
| TWIN VALLEY | 12 | 9 | 14 | 7 | 1 | 1 | 1 | 0 | 45 |
| SIOUX | 11 | 11 | 8 | 8 | 4 | 1 | 1 | 0 | 44 |
| MUSKINGUM VALLEY | 15 | 11 | 5 | 8 | 1 | 0 | 1 | 0 | 41 |
| VOYAGEURS AREA | 15 | 6 | 11 | 8 | 0 | 1 | 0 | 0 | 41 |
| CHOCTAW AREA | 15 | 11 | 9 | 4 | 1 | 0 | 0 | 0 | 40 |
| NORTHWEST GEORGIA | 16 | 5 | 10 | 7 | 0 | 0 | 2 | 0 | 40 |
| IROQUOIS TRAIL | 13 | 10 | 7 | 7 | 0 | 0 | 1 | 0 | 38 |
| JAYHAWK AREA | 11 | 9 | 6 | 11 | 0 | 0 | 1 | 0 | 38 |
| MOUNTAINEER AREA | 17 | 8 | 4 | 8 | 0 | 1 | 0 | 0 | 38 |
| MISSISSIPPI VALLEY | 11 | 11 | 8 | 6 | 0 | 0 | 1 | 0 | 37 |
| CENTRAL NEW JERSEY | 10 | 4 | 8 | 9 | 1 | 0 | 4 | 0 | 36 |
| VIRGINIA HEADWATERS | 10 | 9 | 7 | 8 | 0 | 2 | 0 | 0 | 36 |
| CAPE COD & ISLANDS | 12 | 11 | 6 | 5 | 1 | 0 | 0 | 0 | 35 |
| TUSCARORA | 8 | 12 | 7 | 6 | 1 | 0 | 1 | 0 | 35 |
| MASON-DIXON | 12 | 8 | 5 | 6 | 1 | 2 | 0 | 0 | 34 |
| MARIN | 7 | 14 | 9 | 3 | 0 | 0 | 0 | 0 | 33 |
| POTAWATOMI AREA | 6 | 11 | 5 | 6 | 0 | 1 | 3 | 0 | 32 |
| BLACK HILLS AREA | 8 | 7 | 11 | 3 | 0 | 0 | 1 | 0 | 30 |
| DE SOTO AREA | 13 | 7 | 4 | 6 | 0 | 0 | 0 | 0 | 30 |
| SAMOSET COUNCIL | 7 | 10 | 7 | 5 | 0 | 1 | 0 | 0 | 30 |
| ARBUCKLE AREA | 11 | 7 | 1 | 10 | 0 | 0 | 0 | 0 | 29 |
| GATEWAY AREA | 6 | 7 | 7 | 5 | 1 | 0 | 2 | 0 | 28 |
| GREATER WYOMING | 10 | 7 | 6 | 3 | 0 | 1 | 1 | 0 | 28 |
| CENTRAL MINNESOTA | 5 | 3 | 8 | 7 | 1 | 2 | 1 | 0 | 27 |
| NORTHEAST IOWA COUNCIL | 6 | 9 | 5 | 6 | 1 | 0 | 0 | 0 | 27 |
| CHEROKEE AREA 469 | 10 | 5 | 5 | 3 | 0 | 0 | 2 | 0 | 25 |
| SHENANDOAH AREA | 7 | 8 | 1 | 7 | 0 | 1 | 1 | 0 | 25 |
| MIDNIGHT SUN | 7 | 8 | 4 | 2 | 1 | 1 | 0 | 0 | 23 |
| BUCKTAIL | 7 | 6 | 2 | 7 | 0 | 0 | 0 | 0 | 22 |
| JUNIATA VALLEY | 5 | 6 | 7 | 2 | 1 | 1 | 0 | 0 | 22 |
| RIP VAN WINKLE | 2 | 7 | 2 | 3 | 2 | 0 | 1 | 0 | 17 |
| SANTA FE TRAIL | 6 | 3 | 1 | 4 | 0 | 1 | 1 | 0 | 16 |
| DIRECT SERVICE | 2 | 5 | 2 | 2 | 2 | 0 | 0 | 0 | 13 |
| COLUMBIA-MONTOUR | 5 | 1 | 0 | 1 | 0 | 0 | 2 | 0 | 9 |
| HOUSATONIC | 1 | 4 | 0 | 2 | 1 | 0 | 1 | 0 | 9 |
| CHIEF CORNPLANTER | 2 | 2 | 1 | 1 | 0 | 1 | 0 | 0 | 7 |
| PIEDMONT 042 | 2 | 2 | 1 | 2 | 0 | 0 | 0 | 0 | 7 |
| GREENWICH | 1 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 4 |
| CENTRAL ESCARPMENT | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| GREATER TORONTO | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CENTRAL NEW JERSEY; WASHINGTON CROSSING | 16 | 8 | 8 | 12 | 0 | 0 | 1 | 0 | 45 |
| CALIFORNIA INLAND EMPIRE; GREATER LOS ANGELES | 21 | 8 | 6 | 5 | 0 | 1 | 1 | 0 | 42 |
| NORTHERN NEW JERSEY; PATRIOTS' PATH | 6 | 29 | 5 | 1 | 0 | 0 | 0 | 0 | 42 |
| ALOHA; DIRECT SERVICE | 10 | 7 | 7 | 3 | 1 | 0 | 0 | 0 | 28 |
| CENTRAL NEW JERSEY; PATRIOTS' PATH | 6 | 4 | 5 | 8 | 1 | 1 | 0 | 1 | 26 |
| COLONIAL VIRGINIA; TIDEWATER | 8 | 8 | 2 | 5 | 0 | 0 | 2 | 0 | 25 |
| CHIEF SEATTLE; PACIFIC HARBORS | 11 | 8 | 2 | 1 | 0 | 0 | 0 | 0 | 22 |
| CIRCLE TEN; LONGHORN | 12 | 5 | 3 | 1 | 1 | 0 | 0 | 0 | 22 |
| GREATER LOS ANGELES; WESTERN LOS ANGELES COUNTY | 7 | 1 | 10 | 3 | 0 | 0 | 0 | 0 | 21 |
| GREATER NIAGARA FRONTIER; IROQUOIS TRAIL | 11 | 4 | 6 | 0 | 0 | 0 | 0 | 0 | 21 |
| CROSSROADS OF AMERICA; HOOSIER TRAILS | 8 | 5 | 2 | 4 | 0 | 0 | 0 | 0 | 19 |
| BALTIMORE AREA; NATIONAL CAPITAL AREA | 5 | 3 | 6 | 4 | 0 | 0 | 0 | 0 | 18 |
| BUCKEYE; LAKE ERIE | 7 | 3 | 2 | 1 | 0 | 1 | 3 | 0 | 17 |
| GREATER NEW YORK; HUDSON VALLEY | 3 | 4 | 4 | 5 | 0 | 0 | 1 | 0 | 17 |
| ATLANTA AREA; NORTHEAST GEORGIA | 4 | 5 | 3 | 2 | 1 | 0 | 1 | 0 | 16 |
| GOLDEN EMPIRE; GOLDEN GATE AREA | 6 | 3 | 4 | 3 | 0 | 0 | 0 | 0 | 16 |
| GREATER ALABAMA; MOBILE AREA | 3 | 6 | 2 | 2 | 0 | 0 | 3 | 0 | 16 |
| NORTHEAST ILLINOIS; PATHWAY TO ADVENTURE | 3 | 5 | 4 | 2 | 0 | 1 | 0 | 0 | 15 |
| CONNECTICUT RIVERS; CONNECTICUT YANKEE | 6 | 4 | 3 | 1 | 0 | 0 | 0 | 0 | 14 |
| CROSSROADS OF AMERICA; DEL-MAR-VA | 5 | 7 | 1 | 1 | 0 | 0 | 0 | 0 | 14 |
| MAYFLOWER; SPIRIT OF ADVENTURE | 5 | 5 | 1 | 3 | 0 | 0 | 0 | 0 | 14 |
| SUFFOLK COUNTY; THEODORE ROOSEVELT | 4 | 4 | 2 | 2 | 0 | 0 | 1 | 0 | 14 |
| GREAT TRAIL; NORTHERN NEW JERSEY | 4 | 2 | 3 | 2 | 0 | 0 | 1 | 1 | 13 |
| GREATER NEW YORK; NORTHERN NEW JERSEY | 6 | 2 | 3 | 2 | 0 | 0 | 0 | 0 | 13 |
| GREATER ALABAMA; TUKABATCHEE AREA | 6 | 4 | 1 | 1 | 0 | 0 | 0 | 0 | 12 |
| MAYFLOWER; NARRAGANSETT | 5 | 4 | 1 | 1 | 1 | 0 | 0 | 0 | 12 |

## Unique and Timely Abuse Claim Count by Local Council & Allegation

Rows 1-264 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council

| Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching-Clothed | Unknown/Unconfirmed | Missing | Total* |
|---|---|---|---|---|---|---|---|---|---|
| CHIEF SEATTLE; MOUNT BAKER | 5 | 1 | 3 | 1 | 0 | 1 | 0 | 0 | 11 |
| CONNECTICUT YANKEE; GREENWICH | 3 | 3 | 2 | 2 | 1 | 0 | 0 | 0 | 11 |
| DANIEL WEBSTER; SPIRIT OF ADVENTURE | 3 | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 11 |
| GREATER LOS ANGELES; LONG BEACH AREA | 2 | 4 | 3 | 1 | 0 | 0 | 1 | 0 | 11 |
| GREATER NEW YORK; THEODORE ROOSEVELT | 5 | 3 | 0 | 2 | 0 | 1 | 0 | 0 | 11 |
| LAS VEGAS AREA; NEVADA AREA | 3 | 2 | 3 | 1 | 1 | 0 | 1 | 0 | 11 |
| LASALLE; PATHWAY TO ADVENTURE | 3 | 1 | 2 | 3 | 2 | 0 | 0 | 0 | 11 |
| PACIFIC SKYLINE; SILICON VALLEY MONTEREY BAY | 1 | 2 | 4 | 4 | 0 | 0 | 0 | 0 | 11 |
| IROQUOIS TRAIL; LEATHERSTOCKING | 4 | 1 | 2 | 3 | 0 | 0 | 0 | 0 | 10 |
| JUNIATA VALLEY; LAUREL HIGHLANDS | 7 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 10 |
| OLD HICKORY; OLD NORTH STATE | 5 | 2 | 1 | 2 | 0 | 0 | 0 | 0 | 10 |
| CENTRAL FLORIDA; NORTH FLORIDA | 1 | 2 | 2 | 3 | 0 | 0 | 1 | 0 | 9 |
| CENTRAL MINNESOTA; NORTHERN STAR | 3 | 2 | 3 | 1 | 0 | 0 | 0 | 0 | 9 |
| CROSSROADS OF AMERICA; SAGAMORE | 3 | 1 | 4 | 1 | 0 | 0 | 0 | 0 | 9 |
| GREATER LOS ANGELES; ORANGE COUNTY | 4 | 2 | 2 | 1 | 0 | 0 | 0 | 0 | 9 |
| NORTH FLORIDA; SUWANNEE RIVER AREA | 4 | 0 | 2 | 3 | 0 | 0 | 0 | 0 | 9 |
| BLACK WARRIOR; GREATER ALABAMA | 0 | 7 | 0 | 1 | 0 | 0 | 0 | 0 | 8 |
| GOLDEN EMPIRE; GREATER YOSEMITE | 1 | 0 | 4 | 2 | 1 | 0 | 0 | 0 | 8 |
| GREAT RIVERS; HEART OF AMERICA | 2 | 2 | 1 | 2 | 0 | 1 | 0 | 0 | 8 |
| LAUREL HIGHLANDS; WESTMORELAND-FAYETTE | 2 | 4 | 0 | 2 | 0 | 0 | 0 | 0 | 8 |
| MICHIGAN CROSSROADS; PATHWAY TO ADVENTURE | 2 | 4 | 2 | 0 | 0 | 0 | 0 | 0 | 8 |
| NORTHERN STAR; VOYAGEURS AREA | 2 | 1 | 2 | 3 | 0 | 0 | 0 | 0 | 8 |
| ALAMO AREA; SAM HOUSTON AREA | 4 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 7 |
| CASCADE PACIFIC; OREGON TRAIL | 2 | 1 | 2 | 1 | 0 | 1 | 0 | 0 | 7 |
| FIVE RIVERS; SENECA WATERWAYS | 0 | 3 | 2 | 1 | 1 | 0 | 0 | 0 | 7 |
| GOLDEN GATE AREA; PACIFIC SKYLINE | 2 | 4 | 0 | 0 | 1 | 0 | 0 | 0 | 7 |
| GREAT TRAIL; LAKE ERIE | 1 | 2 | 1 | 2 | 0 | 1 | 0 | 0 | 7 |
| LONGHORN; SAM HOUSTON AREA | 0 | 3 | 3 | 0 | 0 | 0 | 1 | 0 | 7 |
| MECKLENBURG COUNTY; PIEDMONT 420 | 3 | 1 | 0 | 3 | 0 | 0 | 0 | 0 | 7 |
| ALLEGHENY HIGHLANDS; SENECA WATERWAYS | 2 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 6 |
| BALTIMORE AREA; DEL-MAR-VA | 2 | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 6 |
| BAY-LAKES; PATHWAY TO ADVENTURE | 3 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 6 |
| CENTRAL NORTH CAROLINA; MECKLENBURG COUNTY | 3 | 2 | 0 | 0 | 0 | 0 | 1 | 0 | 6 |
| CIRCLE TEN; WESTERN LOS ANGELES COUNTY | 3 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 6 |
| CRATER LAKE COUNCIL; LOS PADRES | 2 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 6 |
| DAN BEARD; MIAMI VALLEY | 3 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 6 |
| GEORGIA-CAROLINA; INDIAN WATERS | 0 | 1 | 3 | 2 | 0 | 0 | 0 | 0 | 6 |
| GOLDEN EMPIRE; NEVADA AREA | 3 | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 6 |
| HEART OF AMERICA; QUIVIRA | 1 | 2 | 2 | 1 | 0 | 0 | 0 | 0 | 6 |
| HEART OF VIRGINIA; TIDEWATER | 3 | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 6 |
| KATAHDIN AREA; PINE TREE | 0 | 5 | 1 | 0 | 0 | 0 | 0 | 0 | 6 |
| MISSISSIPPI VALLEY; SPIRIT OF ADVENTURE | 2 | 1 | 1 | 2 | 0 | 0 | 0 | 0 | 6 |
| BAY-LAKES; MICHIGAN CROSSROADS | 2 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 5 |
| BUCKEYE; GREAT TRAIL | 0 | 3 | 0 | 2 | 0 | 0 | 0 | 0 | 5 |
| CRADLE OF LIBERTY; WASHINGTON CROSSING | 2 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 5 |
| DAN BEARD; SIMON KENTON | 2 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 5 |
| DANIEL WEBSTER; HEART OF NEW ENGLAND | 1 | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 5 |
| GARDEN STATE; JERSEY SHORE | 0 | 2 | 1 | 2 | 0 | 0 | 0 | 0 | 5 |
| GREATER NEW YORK; SUFFOLK COUNTY | 4 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 5 |
| GULF COAST; SOUTH TEXAS | 2 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 5 |
| HEART OF AMERICA; MID-AMERICA | 2 | 1 | 0 | 0 | 0 | 2 | 0 | 0 | 5 |
| LAUREL HIGHLANDS; MORAINE TRAILS | 2 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 5 |
| LEATHERSTOCKING; LONGHOUSE | 2 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 5 |
| MIAMI VALLEY; TECUMSEH | 2 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 5 |
| MINSI TRAILS; NORTHERN NEW JERSEY | 1 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 5 |
| NEW BIRTH OF FREEDOM; PENNSYLVANIA DUTCH | 1 | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 5 |
| PATHWAY TO ADVENTURE; THREE FIRES | 2 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 5 |
| SOUTHERN SIERRA; WESTERN LOS ANGELES COUNTY | 3 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 5 |
| ALAMO AREA; CAPITOL AREA | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 4 |
| ALAMO AREA; TEXAS SOUTHWEST | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 4 |
| ANDREW JACKSON; PINE BURR AREA | 1 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 4 |
| ANDREW JACKSON; PUSHMATAHA AREA | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 4 |
| ATLANTA AREA; CHATTAHOOCHEE | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 4 |
| BLUE GRASS; LINCOLN HERITAGE | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 4 |
| BUCKSKIN; MOUNTAINEER AREA | 1 | 2 | 0 | 0 | 0 | 1 | 0 | 0 | 4 |
| CALIFORNIA INLAND EMPIRE; WESTERN LOS ANGELES COUNTY | 0 | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 4 |
| CAPE FEAR; DEL-MAR-VA | 3 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 4 |
| CENTRAL MINNESOTA; VOYAGEURS AREA | 1 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 4 |
| CHESTER COUNTY; WESTCHESTER-PUTNAM | 0 | 1 | 2 | 1 | 0 | 0 | 0 | 0 | 4 |
| CORONADO AREA; JAYHAWK AREA | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 4 |
| CRADLE OF LIBERTY; MINSI TRAILS | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 4 |
| CROSSROADS OF AMERICA; CROSSROADS OF THE WEST | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 4 |
| DAN BEARD; HOOSIER TRAILS | 1 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 4 |
| ERIE SHORES; LAKE ERIE | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 4 |
| GREAT ALASKA; MIDNIGHT SUN | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 4 |
| GREAT RIVERS; OZARK TRAILS | 1 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 4 |
| GREATER ST. LOUIS AREA; HEART OF AMERICA | 2 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 4 |
| GREATER ST. LOUIS AREA; MISSISSIPPI VALLEY | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 4 |
| GREATER ST. LOUIS AREA; PRAIRIELANDS | 1 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 4 |
| GREATER TAMPA BAY AREA; SOUTH FLORIDA COUNCIL | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 4 |
| GREATER YOSEMITE; SILICON VALLEY MONTEREY BAY | 1 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 4 |
| ISTROUMA AREA; LOUISIANA PURCHASE | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| LONG BEACH AREA; ORANGE COUNTY | 3 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| LONGHORN; TEXAS TRAILS | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 4 |
| NATIONAL CAPITAL AREA; TIDEWATER | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 4 |
| NEVADA AREA; PACIFIC SKYLINE | 2 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 4 |
| NORTHEAST ILLINOIS; SAMOSET COUNCIL | 1 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 4 |
| PATHWAY TO ADVENTURE; THREE HARBORS | 1 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 4 |
| VERDUGO HILLS; WESTERN LOS ANGELES COUNTY | 1 | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 4 |
| ABRAHAM LINCOLN; W.D. BOYCE | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| ALLEGHENY HIGHLANDS; FRENCH CREEK | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| ATLANTA AREA; COASTAL GEORGIA | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| ATLANTA AREA; FLINT RIVER | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 3 |
| ATLANTA AREA; SOUTH GEORGIA | 0 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| BADEN POWELL; CRADLE OF LIBERTY | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |

## Unique and Timely Abuse Claim Count by Local Council & Allegation

Rows 1-264 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council

| Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching-Clothed | Unknown/ Unconfirmed | Missing | Total* |
|---|---|---|---|---|---|---|---|---|---|
| BLUE GRASS; SEQUOYAH | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| BLUE RIDGE MOUNTAINS; TIDEWATER | 0 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 3 |
| BLUE RIDGE; PALMETTO | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 3 |
| BUCKEYE; SIMON KENTON | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| BUFFALO TRACE; LINCOLN HERITAGE | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| CADDO AREA; QUAPAW AREA | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 3 |
| CAPITOL AREA; NATIONAL CAPITAL AREA | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 3 |
| CASCADE PACIFIC; CRATER LAKE COUNCIL | 0 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 3 |
| CASCADE PACIFIC; MOUNT BAKER | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| CASCADE PACIFIC; PINE TREE | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 3 |
| CATALINA; GRAND CANYON | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 3 |
| CENTRAL NEW JERSEY; MINSI TRAILS | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 3 |
| CENTRAL NORTH CAROLINA; OLD NORTH STATE | 1 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| CHATTAHOOCHEE; GREATER ALABAMA | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 3 |
| CHEROKEE AREA 469; QUAPAW AREA | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| CROSSROADS OF AMERICA; SIMON KENTON | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 3 |
| CROSSROADS OF THE WEST; GRAND TETON | 0 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 3 |
| CROSSROADS OF THE WEST; MOUNTAIN WEST | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 3 |
| DANIEL BOONE; MECKLENBURG COUNTY | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 3 |
| DANIEL WEBSTER; GREATER ST. LOUIS AREA | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| GARDEN STATE; NORTHERN NEW JERSEY | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 3 |
| GARDEN STATE; THEODORE ROOSEVELT | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 3 |
| GRAND TETON; MOUNTAIN WEST | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| GREAT RIVERS; GREATER ST. LOUIS AREA | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| GREAT SMOKY MOUNTAIN; MIDDLE TENNESSEE | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| GREATER LOS ANGELES; GREATER YOSEMITE | 1 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 3 |
| GREATER LOS ANGELES; VERDUGO HILLS | 0 | 0 | 1 | 1 | 0 | 0 | 1 | 0 | 3 |
| GULF STREAM; SOUTH FLORIDA COUNCIL | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 3 |
| HEART OF AMERICA; OZARK TRAILS | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| HEART OF NEW ENGLAND; MAYFLOWER | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| INLAND NORTHWEST; PACIFIC HARBORS | 0 | 0 | 1 | 1 | 0 | 0 | 1 | 0 | 3 |
| ISTROUMA AREA; SOUTHEAST LOUISIANA | 1 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 3 |
| LONGHOUSE; PATRIOTS' PATH | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| LOS PADRES; WESTERN LOS ANGELES COUNTY | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 3 |
| MAYFLOWER; WESTCHESTER-PUTNAM | 0 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 3 |
| MECKLENBURG COUNTY; PALMETTO | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| MID-AMERICA; MID-IOWA | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 3 |
| MID-AMERICA; NORTHERN STAR | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 3 |
| MINSI TRAILS; NORTHEASTERN PENNSYLVANIA | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 3 |
| NATIONAL CAPITAL AREA; VIRGINIA HEADWATERS | 0 | 1 | 0 | 1 | 0 | 0 | 1 | 0 | 3 |
| NEW BIRTH OF FREEDOM; SUSQUEHANNA | 0 | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 3 |
| NORTHEAST GEORGIA; NORTHWEST GEORGIA | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 3 |
| NORTHEAST ILLINOIS; THREE FIRES | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 3 |
| NORTHERN STAR; TWIN VALLEY | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 3 |
| POTAWATOMI AREA; THREE HARBORS | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 3 |
| QUAPAW AREA; WESTARK AREA | 1 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 3 |
| TIDEWATER; VIRGINIA HEADWATERS | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 3 |
| ALABAMA-FLORIDA; GREATER ALABAMA | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| ALABAMA-FLORIDA; TUKABATCHEE AREA | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| ALLEGHENY HIGHLANDS; BALTIMORE AREA | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| ALLEGHENY HIGHLANDS; BUCKSKIN | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| ALLEGHENY HIGHLANDS; GREAT TRAIL | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| ALLEGHENY HIGHLANDS; LAUREL HIGHLANDS | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| ALOHA; FAR EAST | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| ANDREW JACKSON; CHICKASAW | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| ATLANTA AREA; JERSEY SHORE | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| ATLANTA AREA; NORTHWEST GEORGIA | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| BADEN POWELL; JUNIATA VALLEY | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| BADEN POWELL; SUSQUEHANNA | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| BADEN POWELL; TUSCARORA | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| BAY-LAKES; NORTHEAST ILLINOIS | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| BAY-LAKES; SAMOSET COUNCIL | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| BLACK HILLS AREA; SIOUX | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| BLACK SWAMP AREA; BUCKEYE | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| BLACK SWAMP AREA; ERIE SHORES | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| BLACK SWAMP AREA; SIMON KENTON | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| BLACKHAWK AREA; PATHWAY TO ADVENTURE | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| BLUE GRASS; LAUREL HIGHLANDS | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| BLUE GRASS; SIMON KENTON | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| BLUE MOUNTAIN; CASCADE PACIFIC | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| BLUE MOUNTAIN; INLAND NORTHWEST | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| BUCKSKIN; SIMON KENTON | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| BUFFALO TRAIL; TEXAS TRAILS | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| CALCASIEU; LOUISIANA PURCHASE | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| CALIFORNIA INLAND EMPIRE; GOLDEN EMPIRE | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| CALIFORNIA INLAND EMPIRE; SAN DIEGO - IMPERIAL COUNCIL | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| CASCADE PACIFIC; PACIFIC HARBORS | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| CENTRAL GEORGIA; COASTAL GEORGIA | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| CENTRAL GEORGIA; SOUTH GEORGIA | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| CENTRAL NORTH CAROLINA; OCCONEECHEE | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| CHATTAHOOCHEE; FLINT RIVER | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| CHEROKEE AREA 469; INDIAN NATIONS | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| CHEROKEE AREA 556; NORTHWEST GEORGIA | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| CHESTER COUNTY; CRADLE OF LIBERTY | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| CHIEF SEATTLE; INLAND NORTHWEST | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| CHIPPEWA VALLEY; NORTHERN STAR | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| CIRCLE TEN; SAM HOUSTON AREA | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| COASTAL CAROLINA; PEE DEE AREA | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| CONNECTICUT RIVERS; HEART OF NEW ENGLAND | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| CONNECTICUT RIVERS; NARRAGANSETT | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| CONNECTICUT RIVERS; WESTERN MASSACHUSETTS | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| CONNECTICUT YANKEE; HOUSATONIC | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| CONQUISTADOR; GREAT SOUTHWEST | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| CRADLE OF LIBERTY; LAUREL HIGHLANDS | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 2 |
| CRATER LAKE COUNCIL; OREGON TRAIL | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |

**Unique and Timely Abuse Claim Count by Local Council & Allegation**
Rows 1-264 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council

| Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching-Clothed | Unknown/Unconfirmed | Missing | Total* |
|---|---|---|---|---|---|---|---|---|---|
| CROSSROADS OF AMERICA; DAN BEARD | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| CROSSROADS OF AMERICA; GREATER ST. LOUIS AREA | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 |
| CROSSROADS OF AMERICA; MIAMI VALLEY | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 2 |
| CROSSROADS OF AMERICA; MICHIGAN CROSSROADS | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| CROSSROADS OF AMERICA; MINSI TRAILS | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| DANIEL BOONE; EAST CAROLINA | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 2 |
| DANIEL WEBSTER; GREEN MOUNTAIN | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| DANIEL WEBSTER; MAYFLOWER | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| DANIEL WEBSTER; NARRAGANSETT | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| DENVER AREA; GREAT SOUTHWEST | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| DENVER AREA; LONGS PEAK COUNCIL | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| DENVER AREA; PIKES PEAK | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| EAST CAROLINA; INDIAN WATERS | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 2 |
| EAST CAROLINA; MECKLENBURG COUNTY | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| EAST CAROLINA; OCCONEECHEE | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| EAST CAROLINA; OLD NORTH STATE | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| EAST CAROLINA; PIEDMONT 420 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| EVANGELINE AREA; LOUISIANA PURCHASE | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| FIVE RIVERS; GREATER NEW YORK | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| FIVE RIVERS; OHIO RIVER VALLEY | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| FRENCH CREEK; LAUREL HIGHLANDS | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| GARDEN STATE; PATRIOTS' PATH | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| GOLDEN EMPIRE; GREATER LOS ANGELES | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| GOLDEN EMPIRE; NORTHERN STAR | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| GOLDEN EMPIRE; PACIFIC SKYLINE | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| GOLDEN EMPIRE; SEQUOIA | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| GOLDEN EMPIRE; SILICON VALLEY MONTEREY BAY | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| GOLDEN GATE AREA; GREATER YOSEMITE | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 |
| GOLDEN GATE AREA; ORANGE COUNTY | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| GOLDEN GATE AREA; PATRIOTS' PATH | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| GOLDEN GATE AREA; PIEDMONT 042 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| GOLDEN GATE AREA; REDWOOD EMPIRE | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| GRAND COLUMBIA; INLAND NORTHWEST | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| GREAT RIVERS; PONY EXPRESS | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| GREATER LOS ANGELES; PATHWAY TO ADVENTURE | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| GREATER LOS ANGELES; SAM HOUSTON AREA | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 |
| GREATER NEW YORK; GREATER NIAGARA FRONTIER | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| GREATER NEW YORK; IROQUOIS TRAIL | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| GREATER NEW YORK; WESTCHESTER-PUTNAM | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| GREATER ST. LOUIS AREA; NORTHEAST ILLINOIS | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| GREATER YOSEMITE; SEQUOIA | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| GREEN MOUNTAIN; WESTERN MASSACHUSETTS | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| GULF COAST; LONGHORN | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| HAWK MOUNTAIN; MINSI TRAILS | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| HAWKEYE AREA; WINNEBAGO | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| HEART OF AMERICA; JAYHAWK AREA | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| HEART OF NEW ENGLAND; WESTERN MASSACHUSETTS | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| HUDSON VALLEY; WESTCHESTER-PUTNAM | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| ILLOWA; MISSISSIPPI VALLEY | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| INDIAN NATIONS; LAST FRONTIER | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| INDIAN WATERS; PALMETTO | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| INLAND NORTHWEST; MONTANA | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| LAKE ERIE; SIMON KENTON | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| LAKE ERIE; WESTERN MASSACHUSETTS | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| LASALLE; SAGAMORE | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| LAUREL HIGHLANDS; NATIONAL CAPITAL AREA | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 2 |
| LAUREL HIGHLANDS; OHIO RIVER VALLEY | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| LAUREL HIGHLANDS; SUSQUEHANNA | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| LEATHERSTOCKING; TWIN RIVERS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 2 |
| LONG BEACH AREA; SILICON VALLEY MONTEREY BAY | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| LONGHOUSE; SENECA WATERWAYS | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| LONGS PEAK COUNCIL; PIKES PEAK | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| LOS PADRES; SEQUOIA | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| MARIN; PACIFIC SKYLINE | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| MARIN; WESTERN LOS ANGELES COUNTY | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| MAYFLOWER; TRANSATLANTIC | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| MECKLENBURG COUNTY; NATIONAL CAPITAL AREA | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| MECKLENBURG COUNTY; OLD NORTH STATE | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 2 |
| MIAMI VALLEY; SIMON KENTON | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| MICHIGAN CROSSROADS; NORTHEAST ILLINOIS | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| MICHIGAN CROSSROADS; NORTHERN LIGHTS | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| MID-AMERICA; NATIONAL CAPITAL AREA | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| MID-AMERICA; OVERLAND TRAILS | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| MID-IOWA; TWIN RIVERS | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| MIDDLE TENNESSEE; WEST TENNESSEE AREA | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| MINSI TRAILS; PATRIOTS' PATH | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| MONMOUTH; PATRIOTS' PATH | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| NARRAGANSETT; SUFFOLK COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 |
| NORTH FLORIDA; SOUTH FLORIDA COUNCIL | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| NORTHEAST ILLINOIS; POTAWATOMI AREA | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| NORTHEAST IOWA COUNCIL; WINNEBAGO | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| NORTHERN LIGHTS; NORTHERN STAR | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 |
| NORTHERN NEW JERSEY; SPIRIT OF ADVENTURE | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 2 |
| NORTHERN NEW JERSEY; WASHINGTON CROSSING | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| OCCONEECHEE; OLD HICKORY | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| OLD HICKORY; PIEDMONT 420 | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 2 |
| OZARK TRAILS; QUIVIRA | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| PATHWAY TO ADVENTURE; RAINBOW | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 2 |
| SAM HOUSTON AREA; THREE RIVERS | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| SEQUOIA; SEQUOYAH | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 |
| SHENANDOAH AREA; TIDEWATER | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 2 |
| SILICON VALLEY MONTEREY BAY; TWIN RIVERS | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 2 |
| ABRAHAM LINCOLN; DAN BEARD | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ABRAHAM LINCOLN; GREATER ST. LOUIS AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ABRAHAM LINCOLN; PATHWAY TO ADVENTURE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

## Unique and Timely Abuse Claim Count by Local Council & Allegation
Rows 1-264 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council

| Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching-Clothed | Unknown/Unconfirmed | Missing | Total* |
|---|---|---|---|---|---|---|---|---|---|
| ABRAHAM LINCOLN; THREE FIRES | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ALABAMA-FLORIDA; GULF COAST | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ALABAMA-FLORIDA; TRANSATLANTIC | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| ALAMO AREA; BAY AREA; CIRCLE TEN | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ALAMO AREA; CAPITOL AREA; PINE BURR AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ALAMO AREA; CAPITOL AREA; SAM HOUSTON AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| ALAMO AREA; GREATER NEW YORK | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ALAMO AREA; LONGHORN | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| ALAMO AREA; SOUTH TEXAS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| ALAMO AREA; SPIRIT OF ADVENTURE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ALAMO AREA; WESTARK AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| ALLEGHENY HIGHLANDS; ATLANTA AREA; BUFFALO TRAIL; GRE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ALLEGHENY HIGHLANDS; BADEN POWELL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ALLEGHENY HIGHLANDS; BLACK SWAMP AREA | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| ALLEGHENY HIGHLANDS; BUCKTAIL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ALLEGHENY HIGHLANDS; CHICKASAW | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ALLEGHENY HIGHLANDS; GREATER NIAGARA FRONTIER | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ALLEGHENY HIGHLANDS; GREATER NIAGARA FRONTIER; IROQU | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| ALLEGHENY HIGHLANDS; LEATHERSTOCKING | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ALLEGHENY HIGHLANDS; LOS PADRES; VENTURA COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ALOHA; CROSSROADS OF THE WEST | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ALOHA; GOLDEN GATE AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| ALOHA; GREAT SOUTHWEST | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ALOHA; MICHIGAN CROSSROADS; NORTHEAST ILLINOIS; THREE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ALOHA; PACIFIC SKYLINE | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| ALOHA; TEXAS SOUTHWEST; TRANSATLANTIC | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ALOHA; WESTERN LOS ANGELES COUNTY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| ANDREW JACKSON; ISTROUMA AREA | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| ANDREW JACKSON; MICHIGAN CROSSROADS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ANDREW JACKSON; SAM HOUSTON AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| ANTHONY WAYNE AREA; CROSSROADS OF AMERICA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ANTHONY WAYNE AREA; ERIE SHORES | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| ANTHONY WAYNE AREA; LASALLE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ANTHONY WAYNE AREA; MICHIGAN CROSSROADS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ANTHONY WAYNE AREA; SAGAMORE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ARBUCKLE AREA; LAST FRONTIER | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ATLANTA AREA; BLUE GRASS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| ATLANTA AREA; CENTRAL GEORGIA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| ATLANTA AREA; CENTRAL GEORGIA; JERSEY SHORE; TRANSAT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ATLANTA AREA; DANIEL BOONE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ATLANTA AREA; GEORGIA-CAROLINA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ATLANTA AREA; GREAT SOUTHWEST | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ATLANTA AREA; GREATER ALABAMA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| ATLANTA AREA; GREATER ST. LOUIS AREA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| ATLANTA AREA; NEVADA AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ATLANTA AREA; NORTH FLORIDA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ATLANTA AREA; OLD NORTH STATE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| ATLANTA AREA; PATHWAY TO ADVENTURE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ATLANTA AREA; SAN DIEGO - IMPERIAL COUNCIL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ATLANTA AREA; SUWANNEE RIVER AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ATLANTA AREA; TUKABATCHEE AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BADEN POWELL; CRADLE OF LIBERTY; CROSSROADS OF AMER | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BADEN POWELL; DEL-MAR-VA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| BADEN POWELL; GARDEN STATE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BADEN POWELL; LAST FRONTIER | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BADEN POWELL; LAUREL HIGHLANDS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BADEN POWELL; LONGHOUSE; THREE FIRES | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| BADEN POWELL; NATIONAL CAPITAL AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BADEN POWELL; PATRIOTS' PATH | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BADEN POWELL; SOUTH FLORIDA COUNCIL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BADEN POWELL; SPIRIT OF ADVENTURE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BADEN POWELL; TWIN RIVERS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BALTIMORE AREA; CHESTER COUNTY | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BALTIMORE AREA; GRAND CANYON | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BALTIMORE AREA; GREATER ST. LOUIS AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| BALTIMORE AREA; LAUREL HIGHLANDS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| BALTIMORE AREA; LINCOLN HERITAGE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| BALTIMORE AREA; MASON-DIXON | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| BALTIMORE AREA; NATIONAL CAPITAL AREA; PATRIOTS' PATH | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| BAY AREA; HEART OF AMERICA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| BAY-LAKES; CASCADE PACIFIC | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BAY-LAKES; GLACIER'S EDGE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BAY-LAKES; LAUREL HIGHLANDS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BAY-LAKES; NORTHERN STAR | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| BAY-LAKES; OREGON TRAIL | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| BAY-LAKES; PACIFIC HARBORS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| BAY-LAKES; POTAWATOMI AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BAY-LAKES; RAINBOW | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| BAY-LAKES; REDWOOD EMPIRE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| BAY-LAKES; THREE FIRES | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BAY-LAKES; THREE HARBORS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BAY-LAKES; TWIN RIVERS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BLACK HILLS AREA; GREATER ALABAMA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BLACK HILLS AREA; MONTANA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BLACK SWAMP AREA; JAYHAWK AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| BLACK SWAMP AREA; WESTERN LOS ANGELES COUNTY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| BLACK WARRIOR; TUKABATCHEE AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| BLACKHAWK AREA; BUCKEYE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BLACKHAWK AREA; CONNECTICUT RIVERS; CONNECTICUT YAN | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BLACKHAWK AREA; CROSSROADS OF AMERICA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BLACKHAWK AREA; NORTHEAST ILLINOIS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| BLACKHAWK AREA; RAINBOW | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BLACKHAWK AREA; THREE RIVERS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BLUE GRASS; DAN BEARD | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| BLUE MOUNTAIN; PATRIOTS' PATH | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

## Unique and Timely Abuse Claim Count by Local Council & Allegation

Rows 1-264 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council

| Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching-Clothed | Unknown/Unconfirmed | Missing | Total* |
|---|---|---|---|---|---|---|---|---|---|
| BLUE MOUNTAIN; SOUTHEAST LOUISIANA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BLUE RIDGE MOUNTAINS; CASCADE PACIFIC | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| BLUE RIDGE MOUNTAINS; CROSSROADS OF AMERICA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BLUE RIDGE MOUNTAINS; HEART OF VIRGINIA | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| BLUE RIDGE MOUNTAINS; NEW BIRTH OF FREEDOM | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| BLUE RIDGE MOUNTAINS; OLD NORTH STATE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BLUE RIDGE MOUNTAINS; SHENANDOAH AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BLUE RIDGE; CHICKASAW | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BLUE RIDGE; OCCONEECHEE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BUCKEYE; GREAT TRAIL; LAKE ERIE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BUCKEYE; GREEN MOUNTAIN | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| BUCKEYE; HEART OF AMERICA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BUCKEYE; LAKE ERIE; MAYFLOWER; NARRAGANSETT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BUCKEYE; MUSKINGUM VALLEY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| BUCKEYE; TECUMSEH | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BUCKEYE; TUSCARORA | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| BUCKSKIN; DENVER AREA; PIKES PEAK | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BUCKSKIN; MECKLENBURG COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BUCKSKIN; SENECA WATERWAYS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BUCKTAIL; EAST TEXAS AREA; NORWELA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BUCKTAIL; GEORGIA-CAROLINA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BUCKTAIL; LAUREL HIGHLANDS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| BUFFALO TRACE; BUFFALO TRAIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BUFFALO TRACE; CROSSROADS OF AMERICA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BUFFALO TRACE; MICHIGAN CROSSROADS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BUFFALO TRACE; SAGAMORE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BUFFALO TRAIL; CADDO AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| BUFFALO TRAIL; DIRECT SERVICE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| BUFFALO TRAIL; SOUTH PLAINS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CADDO AREA; CHICKASAW; DE SOTO AREA; QUAPAW AREA; W | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CADDO AREA; CIRCLE TEN | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CADDO AREA; CIRCLE TEN; EAST TEXAS AREA; RIO GRANDE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CADDO AREA; DE SOTO AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CADDO AREA; NORWELA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CALCASIEU; EVANGELINE AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| CALCASIEU; SOUTHEAST LOUISIANA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CALIFORNIA INLAND EMPIRE; CENTRAL FLORIDA | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| CALIFORNIA INLAND EMPIRE; CROSSROADS OF THE WEST | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CALIFORNIA INLAND EMPIRE; LAS VEGAS AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| CALIFORNIA INLAND EMPIRE; LONG BEACH AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CALIFORNIA INLAND EMPIRE; NATIONAL CAPITAL AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CALIFORNIA INLAND EMPIRE; ORANGE COUNTY | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| CALIFORNIA INLAND EMPIRE; RIO GRANDE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CALIFORNIA INLAND EMPIRE; VENTURA COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CALIFORNIA INLAND EMPIRE; YUCCA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CAPE COD & ISLANDS; FAR EAST | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| CAPE COD & ISLANDS; FAR EAST; LAS VEGAS AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| CAPE COD & ISLANDS; GREATER NEW YORK | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CAPE COD & ISLANDS; MAYFLOWER; NARRAGANSETT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CAPE COD & ISLANDS; NARRAGANSETT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CAPE COD & ISLANDS; NATIONAL CAPITAL AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CAPE COD & ISLANDS; SAGAMORE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| CAPE COD & ISLANDS; SPIRIT OF ADVENTURE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CAPE COD & ISLANDS; TWIN RIVERS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CAPE FEAR; CENTRAL NORTH CAROLINA; EAST CAROLINA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CAPE FEAR; DANIEL BOONE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| CAPE FEAR; EAST CAROLINA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CAPE FEAR; MECKLENBURG COUNTY | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CAPE FEAR; OLD HICKORY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CAPE FEAR; PIEDMONT 420 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CAPITOL AREA; DENVER AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CAPITOL AREA; GREATER LOS ANGELES; SAM HOUSTON AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CAPITOL AREA; LONGHORN | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CAPITOL AREA; TEXAS TRAILS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| CASCADE PACIFIC; CROSSROADS OF THE WEST | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CASCADE PACIFIC; GOLDEN EMPIRE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CASCADE PACIFIC; GRAND COLUMBIA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| CASCADE PACIFIC; INDIAN NATIONS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CASCADE PACIFIC; MONTANA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| CASCADE PACIFIC; PENNSYLVANIA DUTCH | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CASCADE PACIFIC; TUSCARORA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CATALINA; LAS VEGAS AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| CATALINA; LONGS PEAK COUNCIL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CATALINA; ORANGE COUNTY | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| CATALINA; SAN DIEGO - IMPERIAL COUNCIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CENTRAL FLORIDA; GREATER NEW YORK | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CENTRAL FLORIDA; GREATER TAMPA BAY AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CENTRAL FLORIDA; GULF COAST | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CENTRAL FLORIDA; NORTHERN STAR | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CENTRAL FLORIDA; ORANGE COUNTY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CENTRAL FLORIDA; SIMON KENTON | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| CENTRAL FLORIDA; SOUTH FLORIDA COUNCIL | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CENTRAL FLORIDA; SOUTHWEST FLORIDA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CENTRAL GEORGIA; GEORGIA-CAROLINA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| CENTRAL GEORGIA; NORTHWEST GEORGIA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CENTRAL MINNESOTA; GAMEHAVEN; NORTHERN STAR | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| CENTRAL MINNESOTA; GREATER NEW YORK; NORTHERN STAR | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CENTRAL MINNESOTA; GREATER TAMPA BAY AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| CENTRAL MINNESOTA; SIOUX | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CENTRAL NEW JERSEY; GARDEN STATE; WASHINGTON CROSS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CENTRAL NEW JERSEY; MONMOUTH | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| CENTRAL NEW JERSEY; NORTHERN NEW JERSEY; PATRIOTS' P | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| CENTRAL NEW JERSEY; NORTHERN NEW JERSEY; WASHINGTO | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CENTRAL NORTH CAROLINA; PATRIOTS' PATH | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CHATTAHOOCHEE; GEORGIA-CAROLINA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

**Unique and Timely Abuse Claim Count by Local Council & Allegation**
Rows 1-264 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council

| Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching-Clothed | Unknown/Unconfirmed | Missing | Total* |
|---|---|---|---|---|---|---|---|---|---|
| CHATTAHOOCHEE; NORTHEAST GEORGIA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CHATTAHOOCHEE; SIMON KENTON | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CHATTAHOOCHEE; SUWANNEE RIVER AREA | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| CHEROKEE AREA 469; CIMARRON | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CHEROKEE AREA 556; GREAT RIVERS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| CHEROKEE AREA 556; MIDDLE TENNESSEE; NORTH FLORIDA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CHEROKEE AREA 556; NATIONAL CAPITAL AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CHEROKEE AREA 556; NORTH FLORIDA | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| CHEROKEE AREA 556; SAM HOUSTON AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CHESTER COUNTY; CRADLE OF LIBERTY; WESTCHESTER-PUTN | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CHESTER COUNTY; GREATER ST. LOUIS AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CHESTER COUNTY; HEART OF VIRGINIA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CHESTER COUNTY; NORTHEASTERN PENNSYLVANIA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| CHICKASAW; CHOCTAW AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CHICKASAW; GREATER ALABAMA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CHICKASAW; HEART OF AMERICA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CHICKASAW; MIDDLE TENNESSEE; QUAPAW AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CHICKASAW; NATIONAL CAPITAL AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CHICKASAW; NEW BIRTH OF FREEDOM | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CHICKASAW; PINE BURR AREA; PUSHMATAHA AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CHICKASAW; WEST TENNESSEE AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CHICKASAW; YOCONA AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CHIEF CORNPLANTER; GREAT TRAIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CHIEF SEATTLE; CROSSROADS OF THE WEST | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CHIEF SEATTLE; INDIAN NATIONS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CHIEF SEATTLE; SAM HOUSTON AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CHIEF SEATTLE; SILICON VALLEY MONTEREY BAY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CHIPPEWA VALLEY; GLACIER'S EDGE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| CHIPPEWA VALLEY; VOYAGEURS AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CHOCTAW AREA; PINE BURR AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CIMARRON; INDIAN NATIONS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CIMARRON; QUIVIRA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| CIMARRON; SOUTH PLAINS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CIRCLE TEN; CROSSROADS OF THE WEST | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CIRCLE TEN; EAST TEXAS AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CIRCLE TEN; GREATER LOS ANGELES | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CIRCLE TEN; GREATER LOS ANGELES; WESTERN LOS ANGELE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CIRCLE TEN; HEART OF VIRGINIA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CIRCLE TEN; NARRAGANSETT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CIRCLE TEN; ORANGE COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CIRCLE TEN; TUKABATCHEE AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CIRCLE TEN; VENTURA COUNTY; WESTERN LOS ANGELES COU | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| COASTAL CAROLINA; COASTAL GEORGIA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| COASTAL CAROLINA; EAST TEXAS AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| COASTAL CAROLINA; GOLDEN SPREAD | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| COASTAL CAROLINA; PALMETTO | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| COASTAL GEORGIA; GREATER TAMPA BAY AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| COASTAL GEORGIA; MIDDLE TENNESSEE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| COASTAL GEORGIA; SOUTH GEORGIA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| COASTAL GEORGIA; TUSCARORA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| COLONIAL VIRGINIA; HEART OF VIRGINIA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| COLONIAL VIRGINIA; HEART OF VIRGINIA; TIDEWATER | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| COLONIAL VIRGINIA; NATIONAL CAPITAL AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| COLONIAL VIRGINIA; PINE BURR AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| COLUMBIA-MONTOUR; SUSQUEHANNA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CONNECTICUT RIVERS; DAN BEARD; HEART OF NEW ENGLAND | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CONNECTICUT RIVERS; DANIEL WEBSTER | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CONNECTICUT RIVERS; GREENWICH | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CONNECTICUT RIVERS; HOUSATONIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CONNECTICUT RIVERS; HUDSON VALLEY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CONNECTICUT RIVERS; MAYFLOWER; WESTCHESTER-PUTNAM | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CONNECTICUT RIVERS; MONMOUTH | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CONNECTICUT RIVERS; SENECA WATERWAYS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CONNECTICUT RIVERS; TRANSATLANTIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CONNECTICUT RIVERS; WASHINGTON CROSSING | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CONNECTICUT RIVERS; WESTCHESTER-PUTNAM | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CONNECTICUT YANKEE; MICHIGAN CROSSROADS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CONNECTICUT YANKEE; SUWANNEE RIVER AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CONQUISTADOR; CROSSROADS OF THE WEST | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CONQUISTADOR; FAR EAST; YUCCA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CORNHUSKER; GREATER YOSEMITE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CORNHUSKER; PRAIRIELANDS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CORNHUSKER; QUIVIRA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CORONADO AREA; GREAT SOUTHWEST | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CORONADO AREA; GREATER NEW YORK | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CORONADO AREA; MICHIGAN CROSSROADS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CRADLE OF LIBERTY; CROSSROADS OF AMERICA | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| CRADLE OF LIBERTY; FRENCH CREEK | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CRADLE OF LIBERTY; GREAT SOUTHWEST | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| CRADLE OF LIBERTY; JERSEY SHORE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CRADLE OF LIBERTY; JUNIATA VALLEY | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| CRADLE OF LIBERTY; MINSI TRAILS; NORTHERN NEW JERSEY | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CRADLE OF LIBERTY; NEW BIRTH OF FREEDOM | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CRADLE OF LIBERTY; NORTHERN NEW JERSEY | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| CRADLE OF LIBERTY; PATRIOTS' PATH | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CRADLE OF LIBERTY; QUIVIRA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CRADLE OF LIBERTY; SUSQUEHANNA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CRATER LAKE COUNCIL; GOLDEN EMPIRE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CRATER LAKE COUNCIL; LOS PADRES; VENTURA COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CRATER LAKE; WESTERN LOS ANGELES COUNTY | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CROSSROADS OF AMERICA; DEL-MAR-VA; NATIONAL CAPITAL A | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CROSSROADS OF AMERICA; GARDEN STATE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CROSSROADS OF AMERICA; KATAHDIN AREA; NORTHERN NEW | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CROSSROADS OF AMERICA; NATIONAL CAPITAL AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CROSSROADS OF AMERICA; PATHWAY TO ADVENTURE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |

## Unique and Timely Abuse Claim Count by Local Council & Allegation

Rows 1-264 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council

| Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching-Clothed | Unknown/ Unconfirmed | Missing | Total* |
|---|---|---|---|---|---|---|---|---|---|
| CROSSROADS OF AMERICA; TUKABATCHEE AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CROSSROADS OF THE WEST; DENVER AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CROSSROADS OF THE WEST; GREATER WYOMING | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CROSSROADS OF THE WEST; GREATER WYOMING; NORTHEAS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CROSSROADS OF THE WEST; INLAND NORTHWEST | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| CROSSROADS OF THE WEST; LAS VEGAS AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CROSSROADS OF THE WEST; LINCOLN HERITAGE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CROSSROADS OF THE WEST; SAN DIEGO - IMPERIAL COUNCIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| DAN BEARD; GREAT RIVERS; SOUTH FLORIDA COUNCIL | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| DAN BEARD; GREAT SMOKY MOUNTAIN | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| DAN BEARD; GREAT TRAIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| DAN BEARD; LASALLE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| DAN BEARD; LAST FRONTIER | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| DAN BEARD; LINCOLN HERITAGE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| DAN BEARD; NORTH FLORIDA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| DAN BEARD; QUAPAW AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| DAN BEARD; TECUMSEH | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| DANIEL BOONE; MOBILE AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| DANIEL BOONE; OLD HICKORY | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| DANIEL BOONE; PEE DEE AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| DANIEL BOONE; TIDEWATER | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| DANIEL WEBSTER; MICHIGAN CROSSROADS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| DANIEL WEBSTER; NORTHERN NEW JERSEY | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| DANIEL WEBSTER; TIDEWATER | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| DANIEL WEBSTER; WESTERN MASSACHUSETTS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| DE SOTO AREA; WESTARK AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| DEL-MAR-VA; GREATER LOS ANGELES | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| DEL-MAR-VA; NATIONAL CAPITAL AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| DEL-MAR-VA; WESTERN MASSACHUSETTS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| DENVER AREA; GREATER ST. LOUIS AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| DENVER AREA; GREATER YOSEMITE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| DENVER AREA; HEART OF AMERICA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| DENVER AREA; INLAND NORTHWEST | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| DENVER AREA; MOUNT BAKER | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| DENVER AREA; SIMON KENTON | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| DENVER AREA; THREE FIRES | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| DIRECT SERVICE; GREATER ST. LOUIS AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| DIRECT SERVICE; NATIONAL CAPITAL AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| EAST CAROLINA; GRAND CANYON | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| EAST CAROLINA; PINE TREE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| EAST CAROLINA; TIDEWATER | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| EAST CAROLINA; TUSCARORA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| EAST CAROLINA; TWIN RIVERS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| EAST TEXAS AREA; LAS VEGAS AREA; NEVADA AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| EAST TEXAS AREA; LONGHORN | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| EAST TEXAS AREA; SAM HOUSTON AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| EAST TEXAS AREA; THREE RIVERS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ERIE SHORES; GREAT TRAIL | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| ERIE SHORES; MICHIGAN CROSSROADS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ERIE SHORES; QUAPAW AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| EVANGELINE AREA; GREATER ST. LOUIS AREA; SOUTHEAST LO | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| EVANGELINE AREA; ISTROUMA AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| EVANGELINE AREA; MICHIGAN CROSSROADS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| EVANGELINE AREA; SAGAMORE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| EVANGELINE AREA; SOUTHEAST LOUISIANA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| FAR EAST; TRANSATLANTIC | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| FIVE RIVERS; LAUREL HIGHLANDS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| FRENCH CREEK; GREATER NIAGARA FRONTIER | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| FRENCH CREEK; LAKE ERIE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GAMEHAVEN; GOLDEN EMPIRE; MARIN; PACIFIC SKYLINE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GAMEHAVEN; LONGHOUSE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| GAMEHAVEN; NORTHERN STAR | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GAMEHAVEN; TWIN VALLEY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GARDEN STATE; GREEN MOUNTAIN | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GARDEN STATE; JERSEY SHORE; WASHINGTON CROSSING | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| GARDEN STATE; MORAINE TRAILS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GARDEN STATE; WASHINGTON CROSSING | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| GATEWAY AREA; GLACIER'S EDGE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GATEWAY AREA; GREATER NEW YORK | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GATEWAY AREA; GREATER ST. LOUIS AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GEORGIA-CAROLINA; MECKLENBURG COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GEORGIA-CAROLINA; NORTHEAST GEORGIA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| GEORGIA-CAROLINA; PEE DEE AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GEORGIA-CAROLINA; PINE BURR AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| GEORGIA-CAROLINA; PINE TREE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| GEORGIA-CAROLINA; TIDEWATER; VIRGINIA HEADWATERS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GLACIER'S EDGE; NORTHEAST ILLINOIS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| GLACIER'S EDGE; SAMOSET COUNCIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GLACIER'S EDGE; SIOUX | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| GLACIER'S EDGE; THREE HARBORS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GLACIER'S EDGE; W.D. BOYCE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GOLDEN EMPIRE; LAKE ERIE; SOUTHWEST FLORIDA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GOLDEN EMPIRE; LAS VEGAS AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GOLDEN EMPIRE; MARIN | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GOLDEN EMPIRE; MORAINE TRAILS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GOLDEN EMPIRE; NARRAGANSETT | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| GOLDEN EMPIRE; OREGON TRAIL | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GOLDEN EMPIRE; REDWOOD EMPIRE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| GOLDEN EMPIRE; SAN DIEGO - IMPERIAL COUNCIL | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| GOLDEN EMPIRE; SOUTHERN SIERRA | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| GOLDEN EMPIRE; SOUTHWEST FLORIDA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GOLDEN EMPIRE; WESTERN LOS ANGELES COUNTY | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| GOLDEN GATE AREA; GREAT SOUTHWEST | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| GOLDEN GATE AREA; MARIN; SILICON VALLEY MONTEREY BAY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GOLDEN GATE AREA; MIAMI VALLEY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

## Unique and Timely Abuse Claim Count by Local Council & Allegation

Rows 1-264 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council

| Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching-Clothed | Unknown/Unconfirmed | Missing | Total* |
|---|---|---|---|---|---|---|---|---|---|
| GOLDEN GATE AREA; MONTANA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| GOLDEN GATE AREA; SAN DIEGO - IMPERIAL COUNCIL | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GOLDEN GATE AREA; SENECA WATERWAYS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GOLDEN SPREAD; GREAT SOUTHWEST | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GOLDEN SPREAD; GULF COAST; SOUTH TEXAS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GOLDEN SPREAD; LAST FRONTIER | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GOLDEN SPREAD; SAM HOUSTON AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GOLDEN SPREAD; SOUTH FLORIDA COUNCIL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GRAND CANYON; GREATER LOS ANGELES | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GRAND CANYON; LAS VEGAS AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GRAND CANYON; LONGHORN | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GRAND CANYON; LOUISIANA PURCHASE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GRAND CANYON; MICHIGAN CROSSROADS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GRAND CANYON; SAN DIEGO - IMPERIAL COUNCIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GRAND CANYON; TIDEWATER | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GRAND COLUMBIA; MOUNT BAKER | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| GRAND COLUMBIA; PACIFIC HARBORS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GRAND COLUMBIA; PIKES PEAK | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GRAND TETON; MONTANA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREAT ALASKA; MIDNIGHT SUN; ORANGE COUNTY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREAT RIVERS; INDIAN WATERS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREAT RIVERS; MICHIGAN CROSSROADS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| GREAT RIVERS; PACIFIC HARBORS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREAT SMOKY MOUNTAIN; INDIAN WATERS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREAT SMOKY MOUNTAIN; LAKE ERIE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| GREAT SMOKY MOUNTAIN; PALMETTO | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREAT SMOKY MOUNTAIN; SAMOSET COUNCIL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREAT SMOKY MOUNTAIN; SEQUOYAH | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| GREAT SOUTHWEST; NORTHERN STAR | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREAT SOUTHWEST; OLD HICKORY; SEQUOYAH | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREAT SOUTHWEST; SEQUOYAH | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREAT SOUTHWEST; SILICON VALLEY MONTEREY BAY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREAT TRAIL; GREAT TRAILS; THREE FIRES | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREAT TRAIL; MIAMI VALLEY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREAT TRAIL; SIMON KENTON | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREAT TRAIL; WESTERN MASSACHUSETTS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREAT TRAILS; LAKE ERIE; THREE FIRES; WESTERN MASSACH | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER ALABAMA; MOBILE AREA; PUSHMATAHA AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER ALABAMA; SEQUOIA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER ALABAMA; SEQUOYAH | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER ALABAMA; WASHINGTON CROSSING | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER LOS ANGELES; GREATER TAMPA BAY AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER LOS ANGELES; LAKE ERIE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER LOS ANGELES; LONG BEACH AREA; ORANGE COUNT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER LOS ANGELES; LONG BEACH AREA; ORANGE COUNT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER LOS ANGELES; LOS PADRES | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER LOS ANGELES; MOBILE AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER LOS ANGELES; MONTANA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER LOS ANGELES; PATRIOTS' PATH | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| GREATER LOS ANGELES; SAN DIEGO - IMPERIAL COUNCIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER LOS ANGELES; SIOUX | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER LOS ANGELES; SOUTHERN SIERRA | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| GREATER LOS ANGELES; SPIRIT OF ADVENTURE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| GREATER NEW YORK; LAKE ERIE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER NEW YORK; LEATHERSTOCKING | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER NEW YORK; MAYFLOWER; TWIN RIVERS; WESTCHES | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER NEW YORK; MONTANA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER NEW YORK; NEW BIRTH OF FREEDOM | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| GREATER NEW YORK; NORTHERN STAR | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER NEW YORK; RIP VAN WINKLE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER NEW YORK; SENECA WATERWAYS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER NEW YORK; SOUTH FLORIDA COUNCIL | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| GREATER NEW YORK; WESTARK AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER NIAGARA FRONTIER; LONGHOUSE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER NIAGARA FRONTIER; NORTHERN LIGHTS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER NIAGARA FRONTIER; SENECA WATERWAYS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| GREATER NIAGARA FRONTIER; THREE FIRES | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER NIAGARA FRONTIER; THREE RIVERS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER ST. LOUIS AREA; ILLOWA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER ST. LOUIS AREA; LINCOLN HERITAGE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER ST. LOUIS AREA; MICHIGAN CROSSROADS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER ST. LOUIS AREA; NATIONAL CAPITAL AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER ST. LOUIS AREA; OREGON TRAIL; PALMETTO | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| GREATER ST. LOUIS AREA; OZARK TRAILS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER ST. LOUIS AREA; SAM HOUSTON AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER ST. LOUIS AREA; SOUTH FLORIDA COUNCIL | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| GREATER ST. LOUIS AREA; THREE FIRES | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER ST. LOUIS AREA; VOYAGEURS AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER ST. LOUIS AREA; W.D. BOYCE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| GREATER TAMPA BAY AREA; GREEN MOUNTAIN | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER TAMPA BAY AREA; GULF COAST | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| GREATER TAMPA BAY AREA; GULF STREAM | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER TAMPA BAY AREA; LEATHERSTOCKING | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER TAMPA BAY AREA; NORTH FLORIDA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER TAMPA BAY AREA; SOUTHWEST FLORIDA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER TAMPA BAY AREA; SUWANNEE RIVER AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER WYOMING; LONGS PEAK COUNCIL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER YOSEMITE; PACIFIC SKYLINE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREATER YOSEMITE; WESTERN MASSACHUSETTS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| GREEN MOUNTAIN; HEART OF NEW ENGLAND | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREEN MOUNTAIN; NARRAGANSETT | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GREEN MOUNTAIN; NORTHERN NEW JERSEY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GULF COAST; LAST FRONTIER | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| GULF COAST; NORTH FLORIDA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| GULF COAST; SOUTH TEXAS; YUCCA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

## Unique and Timely Abuse Claim Count by Local Council & Allegation

Rows 1-264 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council

| Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching-Clothed | Unknown/Unconfirmed | Missing | Total* |
|---|---|---|---|---|---|---|---|---|---|
| GULF STREAM; MECKLENBURG COUNTY | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GULF STREAM; MOUNTAINEER AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| GULF STREAM; SAN DIEGO - IMPERIAL COUNCIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| HAWK MOUNTAIN; NEW BIRTH OF FREEDOM | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| HAWK MOUNTAIN; NORTHEASTERN PENNSYLVANIA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| HAWK MOUNTAIN; PENNSYLVANIA DUTCH | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| HAWK MOUNTAIN; SHENANDOAH AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| HAWKEYE AREA; MID-AMERICA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| HEART OF AMERICA; LAUREL HIGHLANDS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| HEART OF AMERICA; ORANGE COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| HEART OF AMERICA; OREGON TRAIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| HEART OF AMERICA; PATHWAY TO ADVENTURE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| HEART OF AMERICA; PATRIOTS' PATH; WINNEBAGO | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| HEART OF AMERICA; PONY EXPRESS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| HEART OF AMERICA; SOUTH TEXAS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| HEART OF AMERICA; TWIN RIVERS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| HEART OF AMERICA; TWIN VALLEY | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| HEART OF NEW ENGLAND; MAYFLOWER; SPIRIT OF ADVENTUR | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| HEART OF NEW ENGLAND; NARRAGANSETT | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| HEART OF NEW ENGLAND; TWIN RIVERS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| HEART OF VIRGINIA; NATIONAL CAPITAL AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| HEART OF VIRGINIA; PIKES PEAK | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| HOOSIER TRAILS; LASALLE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| HOOSIER TRAILS; MUSKINGUM VALLEY | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| HOOSIER TRAILS; QUAPAW AREA | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| HUDSON VALLEY; LEATHERSTOCKING | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| HUDSON VALLEY; MAYFLOWER | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| HUDSON VALLEY; NORTHERN NEW JERSEY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| HUDSON VALLEY; SUSQUEHANNA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| HUDSON VALLEY; THEODORE ROOSEVELT | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| HUDSON VALLEY; TWIN RIVERS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ILLOWA; MID-AMERICA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ILLOWA; NORTHEAST ILLINOIS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ILLOWA; NORTHEAST IOWA COUNCIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ILLOWA; PRAIRIELANDS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| ILLOWA; WINNEBAGO | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| INDIAN WATERS; PEE DEE AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| INDIAN WATERS; TIDEWATER | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| INLAND NORTHWEST; MOUNT BAKER | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| INLAND NORTHWEST; MOUNTAIN WEST | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| INLAND NORTHWEST; NORTHERN STAR | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| INLAND NORTHWEST; OREGON TRAIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| INLAND NORTHWEST; POTAWATOMI AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| IROQUOIS TRAIL; MICHIGAN CROSSROADS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| IROQUOIS TRAIL; PATHWAY TO ADVENTURE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ISTROUMA AREA; NORWELA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| JAYHAWK AREA; MID-IOWA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| JAYHAWK AREA; NORTHERN LIGHTS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| JAYHAWK AREA; OVERLAND TRAILS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| JAYHAWK AREA; QUIVIRA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| JERSEY SHORE; MINSI TRAILS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| JERSEY SHORE; PATRIOTS' PATH | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| JERSEY SHORE; SOUTH FLORIDA COUNCIL | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| JERSEY SHORE; WASHINGTON CROSSING | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| LAKE ERIE; LAUREL HIGHLANDS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| LAKE ERIE; MIAMI VALLEY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| LAKE ERIE; NORTHEAST ILLINOIS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| LAS VEGAS AREA; MOUNTAIN WEST; NEVADA AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| LAS VEGAS AREA; PIKES PEAK | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| LASALLE; MIAMI VALLEY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| LASALLE; MICHIGAN CROSSROADS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| LASALLE; NARRAGANSETT | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| LASALLE; OREGON TRAIL | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| LASALLE; THREE HARBORS | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| LAST FRONTIER; LONG BEACH AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| LAST FRONTIER; SAGAMORE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| LAST FRONTIER; TEXAS TRAILS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| LAUREL HIGHLANDS; LINCOLN HERITAGE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| LAUREL HIGHLANDS; MOUNTAINEER AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| LAUREL HIGHLANDS; WESTERN MASSACHUSETTS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| LEATHERSTOCKING; LINCOLN HERITAGE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| LEATHERSTOCKING; NARRAGANSETT | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| LEATHERSTOCKING; RIP VAN WINKLE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| LEATHERSTOCKING; SENECA WATERWAYS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| LEATHERSTOCKING; THEODORE ROOSEVELT | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| LEATHERSTOCKING; WESTCHESTER-PUTNAM | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| LINCOLN HERITAGE; SAGAMORE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| LINCOLN HERITAGE; SAN DIEGO - IMPERIAL COUNCIL | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| LONG BEACH AREA; OVERLAND TRAILS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| LONG BEACH AREA; PACIFIC SKYLINE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| LONG BEACH AREA; TRANSATLANTIC | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| LONG BEACH AREA; WESTERN LOS ANGELES COUNTY | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| LONGHORN; NATIONAL CAPITAL AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| LONGHORN; NORTHWEST TEXAS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| LONGHORN; PACIFIC HARBORS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| LONGHORN; PACIFIC SKYLINE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| LONGHORN; TRANSATLANTIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| LONGHORN; WINNEBAGO | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| LONGHOUSE; THEODORE ROOSEVELT | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| LONGHOUSE; TWIN RIVERS | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| LOS PADRES; SILICON VALLEY MONTEREY BAY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| LOS PADRES; SOUTHERN SIERRA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MASON-DIXON; PEE DEE AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MAYFLOWER; NARRAGANSETT; SPIRIT OF ADVENTURE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MAYFLOWER; QUAPAW AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

## Unique and Timely Abuse Claim Count by Local Council & Allegation

Rows 1-264 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council

| Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching-Clothed | Unknown/Unconfirmed | Missing | Total* |
|---|---|---|---|---|---|---|---|---|---|
| MECKLENBURG COUNTY; OCCONEECHEE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| MECKLENBURG COUNTY; OLD HICKORY | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| MECKLENBURG COUNTY; TUSCARORA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| MIAMI VALLEY; MICHIGAN CROSSROADS; TECUMSEH | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MIAMI VALLEY; SOUTH FLORIDA COUNCIL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MICHIGAN CROSSROADS; MID-AMERICA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MICHIGAN CROSSROADS; NARRAGANSETT | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| MICHIGAN CROSSROADS; NORTH FLORIDA | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| MICHIGAN CROSSROADS; ORANGE COUNTY | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| MICHIGAN CROSSROADS; PINE BURR AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MICHIGAN CROSSROADS; QUAPAW AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| MICHIGAN CROSSROADS; RIO GRANDE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MICHIGAN CROSSROADS; SENECA WATERWAYS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MICHIGAN CROSSROADS; THREE FIRES; THREE HARBORS; THR | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MICHIGAN CROSSROADS; VERDUGO HILLS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MID-AMERICA; OREGON TRAIL | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| MID-AMERICA; SIOUX | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MID-IOWA; MISSISSIPPI VALLEY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MID-IOWA; W.D. BOYCE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MID-IOWA; WINNEBAGO | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MIDNIGHT SUN; OREGON TRAIL | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| MINSI TRAILS; MONMOUTH | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MINSI TRAILS; MORAINE TRAILS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MINSI TRAILS; NEW BIRTH OF FREEDOM | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MINSI TRAILS; NORTHEAST GEORGIA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MINSI TRAILS; RIP VAN WINKLE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| MINSI TRAILS; WASHINGTON CROSSING | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MISSISSIPPI VALLEY; NORTHERN STAR | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| MISSISSIPPI VALLEY; PATHWAY TO ADVENTURE | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| MISSISSIPPI VALLEY; PINE BURR AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| MOBILE AREA; PINE BURR AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| MONMOUTH; NORTHERN NEW JERSEY | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MONTANA; NORTH FLORIDA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MOUNTAIN WEST; NEVADA AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MOUNTAINEER AREA; SIMON KENTON | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| MUSKINGUM VALLEY; SIMON KENTON | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| MUSKINGUM VALLEY; SPIRIT OF ADVENTURE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| NARRAGANSETT; NATIONAL CAPITAL AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| NARRAGANSETT; SPIRIT OF ADVENTURE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| NARRAGANSETT; THEODORE ROOSEVELT | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| NARRAGANSETT; WESTERN MASSACHUSETTS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| NATIONAL CAPITAL AREA; ORANGE COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| NATIONAL CAPITAL AREA; PACIFIC HARBORS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| NATIONAL CAPITAL AREA; SOUTH FLORIDA COUNCIL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| NATIONAL CAPITAL AREA; SOUTH PLAINS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| NATIONAL CAPITAL AREA; TEXAS TRAILS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| NATIONAL CAPITAL AREA; WESTERN LOS ANGELES COUNTY | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| NEVADA AREA; OVERLAND TRAILS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| NEVADA AREA; OZARK TRAILS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| NEVADA AREA; SILICON VALLEY MONTEREY BAY | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| NEVADA AREA; SPIRIT OF ADVENTURE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| NEVADA AREA; WESTERN LOS ANGELES COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| NEW BIRTH OF FREEDOM; NORTHEASTERN PENNSYLVANIA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| NEW BIRTH OF FREEDOM; TECUMSEH | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| NEW BIRTH OF FREEDOM; TRANSATLANTIC | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| NORTHEAST ILLINOIS; RAINBOW | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| NORTHEAST ILLINOIS; W.D. BOYCE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| NORTHEASTERN PENNSYLVANIA; NORTHERN NEW JERSEY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| NORTHEASTERN PENNSYLVANIA; SUSQUEHANNA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| NORTHERN NEW JERSEY; PATHWAY TO ADVENTURE | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| NORTHERN NEW JERSEY; PINE BURR AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| NORTHERN NEW JERSEY; QUIVIRA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| NORTHERN NEW JERSEY; SAM HOUSTON AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| NORTHERN NEW JERSEY; SOUTHWEST FLORIDA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| NORTHERN NEW JERSEY; TWIN RIVERS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| NORTHERN STAR; PIKES PEAK | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| NORTHERN STAR; PRAIRIELANDS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| NORTHWEST TEXAS; QUIVIRA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| NORTHWEST TEXAS; SAM HOUSTON AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| OCCONEECHEE; OLD NORTH STATE | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| OCCONEECHEE; TRANSATLANTIC | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| OHIO RIVER VALLEY; PATHWAY TO ADVENTURE | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| OLD HICKORY; SEQUOYAH | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| OLD HICKORY; TIDEWATER | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| OLD NORTH STATE; WESTERN MASSACHUSETTS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| OREGON TRAIL; PIKES PEAK | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| OREGON TRAIL; QUIVIRA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| OREGON TRAIL; SHENANDOAH AREA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| OZARK TRAILS; THREE FIRES | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| PACIFIC HARBORS; SAN DIEGO - IMPERIAL COUNCIL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| PACIFIC HARBORS; TRANSATLANTIC | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| PACIFIC HARBORS; WESTERN MASSACHUSETTS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| PALMETTO; PIEDMONT 420 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| PATHWAY TO ADVENTURE; PRAIRIELANDS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| PATHWAY TO ADVENTURE; SAGAMORE | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| PATHWAY TO ADVENTURE; SAMOSET COUNCIL | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| PATHWAY TO ADVENTURE; THREE FIRES; THREE HARBORS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| PATRIOTS' PATH; SENECA WATERWAYS | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| PATRIOTS' PATH; WINNEBAGO | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| PENNSYLVANIA DUTCH; SAM HOUSTON AREA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| PIEDMONT 420; SENECA WATERWAYS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| PONY EXPRESS; QUIVIRA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| PRAIRIELANDS; THREE FIRES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| QUAPAW AREA; SEQUOYAH | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| QUIVIRA; SANTA FE TRAIL | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |

## Unique and Timely Abuse Claim Count by Local Council & Allegation

**Rows 1-264 (in white) list Abuse Claims against individual Local Councils. Rows 265-1,267 (in blue) list Abuse Claims against more than one Local Council**

| Local Council | Penetration | Oral Sex | Masturbation | Groping | Touching-Unclothed | Touching-Clothed | Unknown/Unconfirmed | Missing | Total* |
|---|---|---|---|---|---|---|---|---|---|
| QUIVIRA; TEXAS TRAILS | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| RIO GRANDE; SOUTH TEXAS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| RIO GRANDE; TEXAS SOUTHWEST | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| SAGAMORE; SPIRIT OF ADVENTURE | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| SAGAMORE; THREE FIRES | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| SAM HOUSTON AREA; SOUTH TEXAS | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| SAM HOUSTON AREA; TIDEWATER | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| SAN DIEGO - IMPERIAL COUNCIL; SEQUOIA | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| SENECA WATERWAYS; THEODORE ROOSEVELT | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| SENECA WATERWAYS; TWIN RIVERS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| SENECA WATERWAYS; WESTCHESTER-PUTNAM | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| SEQUOIA; WESTERN LOS ANGELES COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| SILICON VALLEY MONTEREY BAY; SOUTHERN SIERRA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| SILICON VALLEY MONTEREY BAY; WESTERN LOS ANGELES CO | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| SIMON KENTON; TECUMSEH | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| SOUTH FLORIDA COUNCIL; SOUTHWEST FLORIDA | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| SOUTH GEORGIA; SUWANNEE RIVER AREA | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| SOUTH PLAINS; TEXAS SOUTHWEST | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| SOUTH TEXAS; TEXAS SOUTHWEST | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| SOUTHERN SIERRA; VENTURA COUNTY | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| SOUTHERN SIERRA; VERDUGO HILLS | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| SPIRIT OF ADVENTURE; TRANSATLANTIC | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| SUFFOLK COUNTY; TWIN RIVERS | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| TEXAS TRAILS; THREE RIVERS | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| THEODORE ROOSEVELT; WASHINGTON CROSSING | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| VENTURA COUNTY; WESTERN LOS ANGELES COUNTY | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| WEST TENNESSEE AREA; YOCONA AREA | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| **Total** | **23,973** | **18,861** | **12,854** | **17,220** | **1,887** | **1,294** | **4,057** | **2,312** | **82,458** |

* The abuse claim count listed in this column is based on the claimants' responses to Part 4.I. on the Sexual Abuse Proof of Claim Form and does not account for references to the Local Council that may be located elsewhere in the proof of claim.  The abuse claim count listed above also does not reflect any other analysis conducted by the Debtors to approximate the total number of abuse claims that implicate the Local Council.

**<u>EXHIBIT 4</u>**

## Unique and Timely Abuse Claim Count* by Top-20 Most Common Chartered Organizations

| Chartered Organization Group | Unique & Timely Abuse Claim Count** |
|---|---|
| METHODIST CHURCH | 3,760 |
| BAPTIST CHURCH | 3,157 |
| CATHOLIC CHURCH | 3,131 |
| CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS | 2,430 |
| PRESBYTERIAN CHURCH | 1,611 |
| LUTHERAN CHURCH | 1,416 |
| ARMED FORCES*** | 607 |
| EPISCOPAL CHURCH | 557 |
| AMERICAN LEGION | 477 |
| YMCA | 435 |
| VFW | 369 |
| SALVATION ARMY | 242 |
| ELKS LODGE | 222 |
| LIONS CLUB | 199 |
| BOYS AND GIRLS CLUBS | 195 |
| KNIGHTS OF COLUMBUS | 157 |
| BOYS CLUB | 129 |
| KIWANIS CLUB | 108 |
| ROTARY CLUB | 88 |
| MOOSE LODGE | 75 |
| OTHER | 20,985 |
| UNKNOWN | 36,496 |
| MISSING | 5,740 |
| **Total** | **82,586** |

* The total Abuse Claim count in this table is slightly higher than the total count of unique and timely Abuse Claims to account for claimants that named multiple organizations.

** The abuse claim count listed in this column is based on the claimants' responses to Part 4.H. on the Sexual Abuse Proof of Claim Form and does not account for references to the Chartered Organization that may be located elsewhere in the proof of claim. The abuse claim count listed above also does not reflect any other analysis conducted by the Debtors to approximate the total number of abuse claims that implicate the Chartered Organization.

*** Abuse Claims flagged as "Armed Forces" named one of the following groups: Army, Navy, Marines, Air Force, Coast Guard, National Guard, or the generic US Military or US Armed Forces.